**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **DONNA CURLING, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CA No. 1:17cv02989-AT** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BRIAN KEMP, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**STATE DEFENDANTS' BRIEF IN SUPPORT OF
THEIR MOTION TO DISMISS**

Come Now the State Election Board ("SEB"), Secretary of State and Chair of the SEB Brian P. Kemp, members of the SEB David J. Worley, Rebecca N. Sullivan, Ralph F. Simpson, and Seth Harp[1] (hereafter "State Defendants") through counsel, and pursuant to Fed. R. Civ. Proc. 81(c)(2)(C), hereby file their response to the Complaint.[2]  The State Defendants move for dismissal of all claims pursuant to Fed. R. Civ. Proc. 12(b)(1) and 12(b)(6).

**Introduction and Procedural History**

This action was initially filed on July 3, 2017 in Fulton County Superior Court on behalf of six individuals and an out-of-state organization against twenty-

---

[1] Seth Harp, while appointed to the SEB has not yet been sworn in to office.

[2] Defendants Merle King and CES have not been served with process in this action.

nine state and county defendants, asserting eight causes of action.  Doc. 1-2.  On

August 8, 2017, the State Defendants removed the action to this court.  Doc. 1.

Plaintiffs are challenging the use of Direct Recording Electronic ("DRE")

machines for voting during the June 20, 2017 run-off for the Sixth Congressional

District.[3]  Plaintiffs seek to void the results of the June 20, 2017 run-off because of

their *uncertainty* as to whether "any party interfered with" the election.[4]  Doc. 1-2

¶ 9.  Plaintiffs assert federal claims of Due Process and Equal Protection, pursuant

to the Fourteenth Amendment (Counts II and III); a state constitutional claim

(Count I); two state law election contest claims (Counts IV and V); a state law

claim for "failure to recanvass" (Count VI); a state law claim for "lack of

certification of DRE voting system" (Count VII); and a mandamus claim seeking

to require a re-examination of the state's DRE voting system (Count VIII).

The State Defendants now move to dismiss all claims.  Specifically, these

Defendants move to dismiss claims for lack of standing (Counts I-III; VI-VII);

being barred by the Eleventh Amendment (Counts II and III); sovereign immunity

---

[3] Plaintiffs Donna Curling, Donna Price, and Coalition for Good Governance filed
a similar action just prior to the run-off election and sought an injunction
preventing Defendants from using DRE machines for the election.  The motion for
injunction was denied and all claims dismissed by the Court. *Curling, et al., v.
Kemp, et al.*, CA No. 2017cv290630 (Fulton County Superior Court, June 9, 2017).
[4] Of course, the House of Representatives has jurisdiction of election contests for
its members.  *See* 2 U.S.C. § 381 *et seq.*

(Counts IV, V, VI); official immunity (Counts I, IV, V, VI, VII); the statute of

limitations (Counts IV and V); and for failure to state a claim (all Counts).

## ARGUMENT

### I. Plaintiffs' Complaint Should be Dismissed in Part for Lack of Subject Matter Jurisdiction.

A complaint is subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(1) where the

district court lacks subject matter jurisdiction.[5]

#### A. Plaintiffs Lack Standing to Challenge the Use of DRE Machines During the June 20, 2017 Election.

Plaintiffs bear the burden of establishing standing. *Susan B. Anthony List v.*

*Driehaus*, 134 S. Ct. 2334, 2342 (2014).

> It is by now well settled that 'the irreducible constitutional minimum of
> standing contains three elements. First, the plaintiff must have suffered an
> 'injury in fact'--an invasion of a legally protected interest that is (a)
> concrete and particularized, and (b) actual or imminent, not conjectural or
> hypothetical. Second, there must be a causal connection between the
> injury and the conduct complained of . . . . Third, it must be likely, as
> opposed to merely speculative, that the injury will be redressed by a
> favorable decision.

*United States v. Hayes*, 515 U.S. 737, 742-743 (1995) (quoting *Lujan* v. *Defenders*

*of Wildlife,* 504 U.S. 555, 560-561 (1992)). The Supreme Court has "repeatedly

refused to recognize a generalized grievance against allegedly illegal governmental

---

[5] The challenge to jurisdiction is based on Plaintiffs' lack of standing, Eleventh Amendment immunity, sovereign immunity, and official immunity.

conduct as sufficient for standing to invoke the federal judicial power." *Hays*, 515

U.S. at 743.  Even in the context of an equal protection challenge, "if a

governmental actor is discriminating on the basis of race, the resulting injury

'accords a basis for standing only to those persons who are personally denied equal

treatment by the challenged discriminatory conduct.'" *Hays*, 515 U.S. at 743-744

(quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984)) (internal quotation omitted).

"An 'injury-in-fact' requires an invasion of a legally protected interest." *Klayman*

*v. President of the United States*, 2017 U.S. App. LEXIS 8173 (11th Cir. 2017)

(quoting *Hollywood Mobile Estates, Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259,

1265 (11th Cir. 2011)).

Here, Plaintiffs' complaint seeks to address a purely speculative injury.

Plaintiffs assert federal and state causes of action premised on the alleged

"uncertainty" of the Sixth Congressional District run-off election because "[i]t is

presently *unknown* if any party interfered with Georgia's elections in 2016 or

2017."  Doc. 1-2 ¶ 9 (emphasis added).  Plaintiffs seek relief, in the form of an

Order voiding the election, for an injury they concede is unknown.  *See* Doc. 1-2

Prayer for Relief.

"It is not enough that 'the [plaintiffs'] complaint sets forth facts from which

we could imagine an injury sufficient to satisfy Article III's standing

4

requirements.'" *Dimaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir. 2008) (quoting *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006)). Courts "should not speculate concerning the existence of standing . . . . If the plaintiff fails to meet its burden, th[e] court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." *Dimaio*, 520 F.3d at 1301 (quoting *Elend*, 471 F.3d at 1206). Plaintiffs have failed to allege a concrete injury caused by the State Defendants to a legally cognizable right, and therefore lack standing to bring this action.

Plaintiffs Davis and Price lack standing for the additional reason that they do not reside in the sixth congressional district and therefore could not have been injured by the use of DRE machines in that election. Doc. 1-2 ¶¶ 58, 62; Exhibit A, Declaration of Chris Harvey[6] ¶¶ 5, 9. *See Hays*, 515 U.S. at 745 (only voters residing in the challenged district have standing).

Finally, all Plaintiffs lack standing to bring claims premised on an injury from the alleged favorable treatment of absentee ballots to ballots cast on a DRE machine, because none of the Plaintiffs actually cast their ballot on a DRE

---

[6] Where there is "a factual attack on jurisdiction, such as in this case, the district court may consider matters outside the pleadings, and the presumption of truthfulness normally afforded a plaintiff under Rule 12(b)(1) does not apply." *Briggs v. Briggs*, 245 Fed. Appx. 934, 936 (11th Cir. 2007) (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). *Accord McElmurray v. Consol. Gov't of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007).

machine.  *See* Exhibit A, Declaration of Chris Harvey ¶¶ 4, 6-8; *See Hayes*, *supra*.

Plaintiffs Schoenberg, L. Digges, and W. Digges, all voted by absentee ballot.

Plaintiff Curling did not vote in the run-off election.  Plaintiff CGG has not alleged

that it has members that voted on the DRE machines in the run-off election.

### B.    Plaintiffs' Federal Claims Are Barred by the Eleventh Amendment.

Plaintiffs' federal claims are asserted against the individually named State

Defendants in their official capacities.  Doc. 1-2 (Counts II and III).  These claims

are barred by the Eleventh Amendment.[7]

The Eleventh Amendment bars suit against a State or one of its agencies,

departments or officials, absent a waiver by the State or a valid congressional

override, when the State is the real party in interest. *Kentucky v. Graham*, 473 U.S.

159, 169 (1985).[8]  Because claims against public officials in their official

capacities are merely another way of pleading an action against the entity of which

---

[7] The State Defendants acknowledge that by removing this action to federal court
they have waived immunity as to a federal *forum*.  However, Defendants retain all
defenses they would have had in state court, including immunity from liability.
*Stroud v. McIntosh*, 722 F.3d 1294, 1303 (11th Cir. 2013) (citing *Lombardo v.
Penn. Dep't of Pub. Welfare*, 540 F.3d at 190-198 (3rd Cir. 2008)).

[8] The Supreme Court has held that "§ 1983 does not override a State's Eleventh
Amendment immunity."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63
(1989); *Quern v. Jordan*, 440 U.S. 332, 342 (1979); *Kentucky*, 473 U.S. at 169
n.17.

the officer is an agent, "official capacity" claims against a state officer are included in the Eleventh Amendment's bar. *Kentucky*, 473 U.S. at 165.

While an exception to Eleventh Amendment immunity exists under *Ex parte Young*, 209 U.S. 123 (1908), it is limited to suits against state officers for *prospective* injunctive relief. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n. 24 (1997). "In *Young*, the Court held that a federal court has jurisdiction over a suit against a state officer to enjoin official actions that violate federal law, even if the State itself is immune from suit under the Eleventh Amendment." *Idaho v. Coeur d' Alene Tribe*, 521 U.S. 261, 288 (1997) (O'Connor, J., concurring).

Two limitations on this exception to Eleventh Amendment immunity are applicable in this case. First, "[a] federal court cannot award *retrospective* relief, designed to remedy past violations of federal law." *Id.* (emphasis added). Second, "[i]n making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party." *Ex parte Young*, 209 U.S. at 157.

Here, Plaintiffs challenge the use of DRE machines for an election that has already passed, and they seek to "void" the June 20, 2017 run-off election results. Doc. 1-2 ¶¶ 128, 138, 152, 161, 176 and prayer for relief.  Plaintiffs' claims are clearly for retrospective relief and are therefore barred by the Eleventh Amendment.

Second, Plaintiffs' complaint lacks any factual allegations connecting the individual members of the SEB to the use of DRE machines in the Sixth Congressional District run-off election or any election.  *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1342 (11th Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000) (declining to apply *Ex parte Young* exception where Defendants had "no authority to enforce" the challenged statutory provision).

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

*Summit Med. Assocs., P.C.*, 180 F.3d at 1341 (quoting *Ex parte Young*, 209 U.S. at 157).  Here, the only mention of each of the SEB members is in paragraph 64 of the complaint, which states:

> Defendants DAVID J. WORLEY, REBECCA N. SULLIVAN, RALPH F.  "RUSTY" SIMPSON, and SETH HARP ("Members of the State Election Board") are members of the State Election Board in Georgia. In their individual capacities and their official capacities as members, they

8

> are responsible for (1) promulgating rules and regulations to ensure the legality and purity of all elections, (2) investigating frauds and irregularities in elections, and (3) reporting election law violations to the Attorney General or appropriate district attorney. *See* O.C.G.A. § 21-2-31.

Doc. 1-2 ¶ 64.  Plaintiffs do not connect any of the above responsibilities of the SEB with their causes of action.  Plaintiffs make no allegations that the members of the SEB played *any* role in determining what voting system was used in the June 20, 2017 run-off election or may be used in any future election.  To the contrary, Plaintiffs affirmatively allege that it is the Secretary of State that has the statutory responsibility to "approve the use of Georgia's voting systems and conduct any reexaminations of Georgia's voting systems, upon request or at his own discretion."  Doc. 1-2 ¶ 63.  Because Plaintiffs fail to allege facts demonstrating a causal connection between the actions of the individual SEB members and the Plaintiffs' alleged injuries, the Eleventh Amendment bars their federal claims. Moreover, because Plaintiffs' claims are premised on an alleged past violation of federal law and the relief they seek is retrospective in nature, their federal claims against the Secretary of State are also barred by the Eleventh Amendment.

### C.     Plaintiffs' State Law Election Contest Claims And Failure to Re-Canvass Claim Are Barred by Sovereign Immunity.

In Counts IV and V of the Complaint, the Plaintiffs seek to assert election contest claims under Article 13 of the Georgia Election Code against State

Defendants Secretary of State Kemp in his individual and official capacity, the

SEB, and each SEB member in their individual and official capacities.  In Count

VI, Plaintiff CGG asserts a claim against Secretary Kemp in his official and

individual capacity and the SEB for an alleged violation of Ga. Comp. R. & Regs.

r. 183-1-12-.02(7)(a).  As discussed fully below, these claims must be dismissed

for lack of jurisdiction because there is no waiver of sovereign immunity to

authorize a lawsuit under Article 13 of the Election Code or under Ga. Comp. R. &

Regs. r. 183-1-12 against a State agency or State officials acting in their official

capacity.[9]

---

[9] The Georgia Supreme Court has repeatedly stated that sovereign immunity
applies to public officials sued in their official capacities because these "are in
reality suits against the state." *Georgia Department of Natural Resources v. Center
for a Sustainable Coast*, 294 Ga. 593, 599, n. 4 (2014), citing *Cameron v. Lang*,
274 Ga. 122, 126 (2001).  While the Georgia Supreme Court has held that
sovereign immunity does not generally bar suits for prospective injunctive relief in
which state officials are sued in their *individual* capacities for allegedly unlawful
official acts [*see Lathrop v. Deal*, 2017 Ga. LEXIS 529 at *47 (2017); *Center for a
Sustainable Coast*, 294 Ga. at 603], Plaintiffs' claims against the Secretary of State
and the Board members in their individual capacities are nonetheless subject to
dismissal for failure to state a claim for the same reason that sovereign immunity is
lacking:  None of the named parties fall within the four categories of persons
against whom an election contest may be lodged under O.C.G.A § 21-2-520.  *See*
II.D.2 below.  Nor does Ga. Comp. R. & Regs. r. 183-1-12-.02(7)(a) provide a
cause of action against any state official.

**1.  Plaintiffs Cannot Demonstrate the Existence of a Clear, Unequivocal Waiver of Sovereign Immunity.**

The "sweep of sovereign immunity" under the Georgia Constitution is "broad."  *Olvera v. University System of Georgia's Board of Regents*, 298 Ga. 425, 426 (2016).  The 1991 amendment to the Georgia Constitution gave the legislature the "exclusive power to waive sovereign immunity":

> Except as specifically provided in this Paragraph, sovereign immunity extends to the state and all of its departments and agencies.  The sovereign immunity of the state and its departments and agencies can *only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.*

Ga. Const.  Art. I, Sec. II, Par. IX (e) (emphasis added).  "Where the sovereign has sovereign immunity from a cause of action, and has not waived that immunity, the immunity rises to a constitutional right and cannot be abrogated by any court." *Ga. Dep't of County Health v. Neal*, 334 Ga. App. 851, 854 (2015); s*ee Center for Sustainable Coast*, 294 Ga. at 599 ("The history of sovereign immunity in our State shows that the 1991 amendment intended to expressly reserve the power to waive sovereign immunity exclusively to the legislature.")

The Georgia courts have also made clear that it is the *plaintiff's burden* to demonstrate the existence of an explicit waiver of sovereign immunity to authorize the suit.  *See, e.g.*, *Neal*, 334 Ga. App. at 855 ("It is axiomatic that the party

11

seeking to benefit from the waiver of sovereign immunity bears the burden of proving such waiver"). Thus, in order to survive this Motion, Plaintiffs must show the existence of a statute that specifically waives sovereign immunity by authorizing suits against the State in election contests under Article 13 of the Election Code. As discussed below, Plaintiffs clearly cannot make such a showing here: Not only does the Election Code *not* contain a waiver of sovereign immunity, it contains the opposite of a waiver – an explicit legislative directive in O.C.G.A. § 21-2-520 that the State is *not* subject to suit in an election contest.

> **2.    The State Defendants Are Subject to Suit in an Election Contest.**

In O.C.G.A. § 21-2-520, the General Assembly clearly delineated only four categories of persons subject to suit in an election contest under Article 13 of the Election Code, and none of the State Defendants fit within any of those four categories.

Plaintiffs' Complaint contends that O.C.G.A. § 21-2-520(2)(C) provides the necessary waiver of sovereign immunity to authorize their claims, alleging that the Secretary of State, the SEB, and the SEB members are "election superintendents" and thus subject to suit. Doc. 1-2 ¶¶ 156-157. This legal assertion is, however, plainly incorrect and directly contrary to the clear definition of "superintendent" in the Election Code, which *expressly excludes* both the

Secretary of State and the SEB.  In O.C.G.A. § 21-2-2(35), the General Assembly

defined "superintendent" for purposes of the Election Code.  With the exception of

municipal elections, a "superintendent" is defined as follows:

> (35) "Superintendent" means:
>
>> (A) Either *the judge of the probate court* of a county or *the county board of elections*, *the county board of elections and registration*, the *joint city-county board of elections*, or the *joint city-county board of elections and registrations*, if a county has such.

O.C.G.A. § 21-2-2(35)(A) (emphasis added).  The definition above defines

"superintendent" as one of five possible *city* or *county* officials/entities: 1) the

judge of the probate court of a county; 2) the county board of elections; 3) the

county board of elections and registrations; 4) the joint city-county board of

elections; and 5) the joint city-county board of elections and registration.  None of

these five entities are state agencies or officials of any kind, and the Secretary of

State and the SEB and its members are thus *not* "superintendents" for purposes of

the Election Code, in which case they are *not* subject to suit in an election contest

under O.C.G.A. § 21-2-520(2)(C).  Similarly, Ga. Comp. R. & Regs. r. 183-1-12-

.02(7)(a) provides that the *election superintendent* shall in certain circumstances

order a recanvass.  Since neither Secretary Kemp nor the SEB are election

superintendents, sovereign immunity bars any claim for a violation of the

regulation.  Of course, even if the regulations of the SEB had expanded the definition of election superintendent to include the Secretary of State, which they do not, only the Georgia legislature may waive sovereign immunity.[10]

It is a cardinal principle of statutory construction that courts must "presume that the General Assembly meant what it said and said what it meant." *Deal v. Coleman*, 294 Ga. 170, 172 (2013).  "If the statutory text is clear and unambiguous [courts] attribute to the statute its plain meaning, and our search for statutory meaning is at an end." *Id.* at 173.  Here, the definition of "superintendent" in the Election Code is clear and unambiguous, and it plainly does not include any state agencies or officials, including the Secretary of State, the SEB, and the Board members.

While no further legal analysis is necessary when, as in this case, the statutory language is plain on its face, other well established rules of statutory construction further demonstrate that neither the Secretary of State nor the SEB and its members are election "superintendents" under O.C.G.A. § 21-2-520(2)(C). For example, courts often note that words in statutes must not be "interpreted in isolation," but instead must be construed to give 'sensible and intelligent effect' to

---

[10] The Secretary of State is authorized, pursuant to O.C.G.A. § 21-2-495(d) to order a recount or recanvass of votes in an election for federal office, but only a *candidate* may request such a recount.

"other statutes of which it is part," especially when statutes are "in parti materia,

i.e., statutes relating to the same subject matter."  A related corollary to this rule is

that courts should "avoid a construction that makes some language mere

surplusage." *Cherokee Funding LLC v. Ruth*, 2017 Ga. App. LEXIS 313 at *3

(2017).

Application of these rules to the provisions of the Election Code

demonstrates that the General Assembly defined "superintendent(s)," the

"Secretary of State," and the "State Election Board" to be distinct and separate

offices and entities from each other and that neither the Secretary of State, the

SEB, nor the Board members can be considered election "superintendents." Article

2 of the Election Code, entitled "Supervisory Boards and Officers," for example,

contains *separate* Parts for the SEB, the Secretary of State, and the

Superintendents.  Statutory provisions governing the SEB are contained in Part 1

of Article 2 and can be found at O.C.G.A. §21-2-30 through § 21-2-34.

Provisions governing the Secretary of State are found in Part 2 at O.C.G.A. § 21-2-

50 through 21-2-52.  Lastly, provisions governing superintendents are found in

Part 3 at O.C.G.A. § 21-2-70 through 21-2-77.   In each of these separate Parts,

there are distinct statutes setting forth the distinct powers and duties of each of

these different offices and/or entities.  *See* O.C.G.A. § 21-2-31 (listing "[d]uties" of

SEB); O.C.G.A. § 21-2-50 (listing "[p]owers and duties" of Secretary of State); and O.C.G.A. § 21-2-70 (listing "[p]owers and duties" of the superintendents).

The Election Code is replete with statutes that refer to a "superintendent" in the exact same statute as the Secretary of State and/or the SEB, all of which would be rendered unintelligible if "superintendent" was defined as interchangeable with the Secretary of State and/or the SEB.   To cite a few examples, O.C.G.A. § 21-2-101(a) provides that "election superintendents" shall become certified by completing a certification program approved by the Secretary of State . . ." This provision makes clear that the election superintendent is different than the Secretary of State and also makes no sense if the Secretary of State were deemed to be a superintendent because in that event the Secretary of State would be a candidate for certification and at the same time in charge of the certification program. *See also* O.C.G.A. § 21-2-100(a) ("The election superintendent . . . shall attend a minimum of 12 hours' training biennially as may be selected by the Secretary of State")

The statutory provisions governing recount/recanvass procedures also demonstrate that the Secretary of State is *not* a superintendent:

> Procedure for recount or recanvass of votes; losing candidate's right
> to a recount

* * * *

16

> (c)(1) . . . . If the office sought is a federal or state office voted upon by the electors of more than one county, the request shall be made to *the Secretary of State who shall direct that the recount be performed in all counties in which electors voted for such office and notify the superintendents of the several counties involved of the request.  In all other cases, the request shall be made to the superintendent.  The superintendent or superintendents shall order a recount of such votes to be made immediately*.  If, upon such recount, it is determined that the original count was incorrect, *the returns and all papers prepared by the superintendent, the superintendents, or the Secretary of State* shall be corrected accordingly and the results re-certified.

O.C.G.A. § 21-2-495(c)(1) (emphasis added).[11]  The underscored language makes clear that the Secretary of State is *not* the election superintendent: In multi-county elections, notice of a recount request must be made *to the Secretary of State* who then *notifies* the superintendents of the relevant counties.  Interpreting the Secretary of State to be a "superintendent" renders the statute unintelligible and ignores the use of the disjunctive "or" in the statute ("the superintendents or the Secretary of State").[12]

---

[11] Similarly, O.C.G.A. § 21-2-495(d) also refers to the Secretary of State directing the election superintendents to conduct any recount or recanvass if a candidate for federal or state office so petitions.

[12]  To cite one more example, a statute involving the DRE machines also makes clear that the Secretary of State is not a "superintendent." O.C.G.A. § 21-2-379.8(a) provides that the "*Secretary of State shall advise the superintendents* on recommended methods of demonstrating [DRE] units so as to properly educate electors in the use thereof . . ." If the Secretary of State were a superintendent, he would be in effect advising himself, which obviously makes no sense. There are numerous other provisions throughout the Election Code where

17

The Election Code statutes also make clear that the SEB is not itself a superintendent. The Board is the state agency statutorily charged with "the promulgation of rules and regulations to obtain uniformity in the practices and proceedings of superintendents . . . " O.C.G.A. § 21-2-31(1). O.C.G.A. § 21-2-101(d), for example, provides that a "superintendent . . . may be fined by the State Election Board" for failure to attain required certification. O.C.G.A. § 21-2-101(e) gives the Board the authority to "require additional or remedial training or limit, suspend, or revoke the certification of a superintendent if such superintendent is found to have violated any provision of this chapter or any rule, regulation, or order issued by the State Election Board." In cases where a

---

the Secretary of State and the "superintendent(s)" are referred to as separate entities within the same statute. *See e.g.*, O.C.G.A. § 21-4-5(j) ("recall petition forms shall be printed by the office of the Secretary of State and distributed to election superintendents"); O.C.G.A. § 21-2-499 ("Upon receiving the certified returns of any election from the various superintendents, the Secretary of State shall immediately proceed to tabulate, compute, and canvass the votes cast . . .); O.C.G.A. § 21-2-99 ("the superintendent shall notify the Secretary of State on forms provided by the Secretary of State" that poll workers received required training); O.C.G.A. § 21-2-497(b) ("Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such election); O.C.G.A. § 21-2-400(a) ("Prior to each primary and election, the superintendent shall obtain from the Secretary of State a sufficient number of cards of instructions for guidance of electors"); O.C.G.A. § 21-2-132(d) (qualifying fees paid to Secretary of State *or* superintendent depending upon type of election); O.C.G.A. § 21-2-293(a) (superintendent must give at least 24 hours notice to the Secretary of State and affected candidates of mistakes or omissions on ballots).

superintendent wishes to establish a polling place outside the boundaries of a precinct, O.C.G.A. § 21-2-265(e) requires that "the superintendent shall submit a report to the State Election Board to demonstrate that there is no suitable facility within the precinct . . ."

The plain language of the Election Code thus makes clear that neither the Secretary of State nor the SEB or its members are "superintendents" under O.C.G.A. § 21-2-520(2)(C).  Because the state agency and state officials do not fall within any of the four categories of parties that may be sued in an election contest under O.C.G.A. § 21-2-520(2)(A)-(D), the General Assembly has clearly not waived sovereign immunity to authorize election contest claims to be brought against State agencies or State officials acting in their official capacity.   The election contest and recanvassing claims against the Secretary of State, the SEB, and the members of the SEB in their official capacity are, therefore, barred by sovereign immunity.[13]

---

[13]  In attempting to argue that the Secretary of State is a superintendent under O.C.G.A. § 21-2-520, Plaintiffs' Complaint cites to the case of *Dawkins-Haigler v. Anderson*, 799 S.E.2d 180 (2017) [Doc. 1-2 at ¶ 156].  While that case was an election contest in which the Secretary of State appeared as a defendant, the issue of sovereign immunity and lack of jurisdiction was never raised by the parties or addressed by the courts.  The Georgia Supreme Court has cautioned that decisions "do not stand for points that were neither raised by the parties nor actually decided in the resulting opinion, and that 'questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be

### D.     Plaintiffs' State Law Claims Against the State Defendants in Their Individual Capacities Are Barred by Official Immunity.

Under Article I, Section II, Paragraph IX(d) of the Georgia Constitution, official immunity bars declaratory and injunction actions against officials in their individual capacities when the claim concerns past injury.  *See Lathrop*, 2017 Ga. LEXIS 529, at *48–49.  The State Constitution provides that "officers and employees of the state or its departments or agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions."  GA. CONST. Art. I, Sec. II, Para. IX(d).  In *Lathrop*, the Georgia Supreme Court recently clarified the specific requirements for State officers to be protected by official immunity and concluded that the phrase "performance or nonperformance of their official functions" means "a performance of official functions that has 'caused' injuries and damages, that is, a past performance."  *Lathrop*, 2017 Ga. LEXIS 529 at *62–63 (describing how the past-tense nature of the first sentence of official immunity provision should be incorporated into the second sentence).  Finally, the Georgia Supreme Court

---

considered as having been so decided as to constitute precedents." *Palmer v. State*, 282 Ga. 466, 468 (2007).  Furthermore, even if the court in *Dawkins* had ruled that the Secretary of State was subject to suit in an election contest, which it clearly did *not* do, a court has no power to abrogate the State's sovereign immunity, which can only be waived by an explicit Act of the General Assembly.  Ga. Const. of 1983, Art. 1, Sec. II, Par. IX(e).

concluded that Georgia's doctrine of official immunity only does not bar declaratory and injunctive relief against public officers in their individual capacities based on the imminent threat of official acts that would violate the constitution. *Id.* at 65–66.

Here, each of Plaintiffs' individual capacity state law claims against the State Defendants is premised on a prior act that Plaintiffs allege violated State law. In Count I, Plaintiffs allege that Defendants violated the Georgia Constitution because they did not allegedly conduct the June 20th runoff election in accordance with various state statutes. *See* Doc. 1-2 ¶ 120. This Count is entirely based on Defendants' "past performance," i.e., the administration of the June 20th runoff election, that caused the harm Plaintiffs allege, and the primary relief they seek, voiding the election results, would undo a prior act. Thus, Count I is barred by official immunity.

Likewise, official immunity bars Plaintiffs' individual capacity claims in Counts IV through VII because through each of these claims Plaintiffs seek relief based on alleged harms caused by the State Defendants' prior performance or nonperformance of certain acts. Fundamentally, Plaintiffs allege that Defendants used unsecure, uncertified DRE machines in the June 20th runoff election in violation of O.C.G.A. §§ 21-2-379.1(8) and 21-2-379.2 and Ga. Comp. R. & Regs.

r. 183-1-12-.02 and 590-8-1-.01.  *See* Doc. 1-2 ¶¶ 159, 167, 175, and 182.  These

allegations are the basis for all of the harms that Plaintiffs allege in Counts IV

through VII and are the rationale for all of the relief that Plaintiffs seek in these

counts.  As with Count I, these claims must be dismissed because official

immunity bars individual capacity claims that seek relief from injuries caused by

an official's past performance.  *See Lathrop*, 2017 Ga. LEXIS 529 at *62–63.

Accordingly, the State Defendants are entitled to official immunity barring

Plaintiffs' individual capacity claims in Counts I, IV, V, VI, and VII.  See GA.

CONST. Art. I, Sec. II, Para. IX(d).  Thus, as a threshold matter, this court lacks

subject matter jurisdiction to entertain the individual capacity state law claims.  *See*

*Lathrop*, 2017 Ga. LEXIS 529 at *48 (recognizing that official immunity bars suits

against state officers in their individual capacities for official acts involving an

element of discretion based on wrongs already done and injuries already

sustained).

### E.   Plaintiffs' Request for a Writ of Mandamus Must be Dismissed For Lack of Subject-Matter Jurisdiction.

Plaintiffs' claim for a writ of mandamus in Count VIII against Secretary

Kemp in his individual capacity must be dismissed because, under Georgia law,

mandamus is, by its very nature, an action brought against officials only in their

official capacities.  In Georgia, a cause of action for the extraordinary writ of

mandamus is available by statute under O.C.G.A. § 9-6-20.  Fundamentally,

mandamus is a remedy for "government[al] inaction—the failure of a *public*

*official* to perform a clear legal duty."  *Southern LNG, Inc. v. MacGinnitie*, 294 Ga.

657, 661 (2014) (emphasis added).  The Supreme Court of Georgia has made clear

that mandamus relief can *only* be sought against officials for their failure to

perform official duties.  *See Southern LNG*, 294 Ga. at 661; *see also City of*

*Hoschton v. Horizon Cmtys.*, 287 Ga. 567, 568 (2010) (holding that a suit for

mandamus requires naming the official required by law to perform the official act

sought in their official capacity); *See SJN Props.LLC v. Fulton County Bd. of*

*Assessors*, 296 Ga. 793, 799 (2015) ("Our mandamus statute expressly authorizes

claimants to seek relief against a *public official* 'whenever . . . a defect of legal

justice would ensue from [the official's] failure to perform or from improper

performance' of '*official duties*.'" (emphasis added) (quoting O.C.G.A. § 9-6-20)).

In sum, it is axiomatic that mandamus actions can only be brought against

public officials sued in their official capacities to perform official duties.  *See SJN*,

296 Ga. at 799 n.6.  ("[M]andamus actions . . . by their very nature may be sought

only against public officials."); O.C.G.A. § 9-6-20 (mandamus used to compel

performance of official duties).

Furthermore, in Georgia, improperly naming the capacity of a defendant is not a "mere misnomer." *See Bd. of Comm'rs v. Johnson*, 311 Ga. App. 867, 873 n.5 (2011). Georgia courts have repeatedly recognized that there is a substantive difference between a suit brought against a government official in his or her official capacity and one brought in an individual capacity. *See, e.g., id.* at 871-72 (citing *City of Atlanta v. Harbor Grove Apts.*, 308 Ga. App. 57, 58 (2011); *Ward v. Dodson*, 256 Ga. App. 660, 662 (2002); *Colvin v. McDougall*, 62 F3d 1316 (11th Cir. 1995)). Thus, under Georgia law, mandamus relief is available against public officers only in their official capacity. A public official sued in his or her individual capacity lacks the legal authority to act on behalf of the state; a state officer can only act on behalf of the state in his or her "official" capacity. Accordingly, Plaintiffs' request for a writ of mandamus against Secretary Kemp in his individual capacity should be dismissed pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction.

## II.   Plaintiffs' Complaint Fails to State a Claim.

As discussed above, Plaintiffs' Complaint should be dismissed for lack of standing, and as barred by the Eleventh Amendment, sovereign immunity, and official immunity. However, even if Plaintiffs' claims were not barred, they are nonetheless subject to dismissal for failure to state a claim.

24

### A.    Plaintiffs Fail to Sufficiently Allege a Due Process Claim.

The Fourteenth Amendment's due process clause provides two types of protection: (1) substantive due process; and (2) procedural due process. *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (*en banc*).  Count II of Plaintiffs' Complaint asserts a federal due process claim that is premised on Defendants' alleged "failure to comply with the Georgia Constitution and Georgia Code."  Doc. 1-2 ¶ 131;  *see also* ¶¶ 133-137 (describing alleged violations of state law as underpinning the federal due process claim).  Plaintiffs' claim is therefore a procedural due process claim.  Areas in which rights are created by the state are not subject to substantive due process protection. *McKinney*, 20 F.3d at 1556.  "As a result, these state law based rights constitutionally may be rescinded so long as the elements of procedural--not substantive--due process are observed."  *Id.* Of course, Plaintiffs must still identify and establish the liberty or property interests they assert have been granted pursuant to state law.[14]

Procedural due process is a guarantee of fair procedures whereby the state may not deprive a person of life, liberty, or property without providing

---

[14] The Georgia Supreme Court has held that the use of DRE voting machines does not violate voters' state or federal constitutional rights, including substantive due process rights.  *Favorito v. Handel*, 285 Ga. 795, 797-798 (2009) (explaining that voters do not have a right to a particular ballot system and that "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems.").

"appropriate procedural safeguards." *Daniels v. Williams*, 474 U.S. 327, 337-338 (1986). "The fundamental requirement of [procedural] due process is the opportunity to be heard." *Parratt v. Taylor*, 451 U.S. 527, 540 (1981). "A §1983 action alleging a procedural due process clause violation requires proof of three elements: a deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally inadequate process." *Doe v. Fla. Bar*, 630 F.3d 1336, 1342 (11th Cir. 2011) (quoting *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)). Plaintiffs here have not even sufficiently alleged the first step, identifying a constitutionally-protected liberty or property interest. As noted, the Georgia Supreme Court has already held that voters do *not* have a right under state law to a particular balloting system. *Favorito*, 285 Ga. at 797-798.

Additionally, even if Plaintiffs could articulate a constitutionally protected liberty interest, Plaintiffs cannot satisfy the third step, i.e., constitutionally inadequate process. The Eleventh Circuit has repeatedly explained that procedural due process violations are not complete unless and until the state refuses to provide due process. *McKinney*, 20 F.3d at 1562; *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir. 2007). Only when the state refuses to provide a process sufficient to remedy the deprivation does a constitutional violation become actionable under § 1983. *Id. See also Wells v. Columbus Tech. College*, 510 Fed. Appx. 893, 897

(11th Cir. 2013) (explaining that "[p]rocedural due process violations do not even exist unless no adequate state remedies are available.") (quoting *Cotton v. Jackson*, 216 F.3d 1328, 1331 n.2 (11th Cir. 2000)).

Here, Plaintiffs have not alleged that state remedies are not available.  The availability of a state remedy means that the procedural due process claim asserted does not exist.  *See Horton v. Bd. of County Comm'rs*, 202 F.3d 1297, 1300 (11th Cir. 2000) ("If state court could [provide an adequate remedy], then there is no federal due process violation regardless of whether the plaintiff has taken advantage of the state remedy or attempted to do so.").  Moreover, the Eleventh Circuit has held that a state remedy is *not* inadequate merely because a claim may be barred by state immunity laws.  Rittenhouse v. DeKalb County, 764 F.2d 1451, 1459 (11th Cir. 1985); *Taylor v. Ledbetter*, 791 F.2d 881, 884 (11th Cir. 1986). Accordingly, Plaintiffs fail to state a procedural due process claim.

### B.     Plaintiffs Fail to Sufficiently Allege an Equal Protection Claim.

As addressed above, Plaintiffs' equal protection claim is premised on allegations that use of a DRE machine to cast a ballot is less favorable than voting by absentee ballot.  Doc. 1-2 ¶¶ 142-148.  Because *none* of the Plaintiffs actually voted on a DRE machine, they have no standing to bring this claim.  However,

even if they could establish standing, Plaintiffs have not made out an Equal Protection claim.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons *similarly situated* should be treated alike. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (emphasis added). An Equal Protection claim requires a showing that a plaintiff has been the victim of intentional discrimination. *Batson v. Kentucky*, 476 U.S. 79, 94, n.18 (1986). The requisite discriminatory purpose must be "more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (internal citations omitted). A plaintiff may prove intent with direct or circumstantial evidence. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999).

The first step in any Equal Protection claim is to establish that a recognizable, distinct class is singled out for different treatment under the laws as written or as applied. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977). Here, Plaintiffs fail this first step. Plaintiffs' complaint is not that similarly situated

28

voters are treated differently, it's that voters (like Plaintiffs) that choose to vote by absentee paper ballot get a paper ballot and voters that choose to vote on a DRE machine do not.  Doc. 1-2 ¶¶ 142, 146.  In other words, the two classes of voters which Plaintiffs seek to create are not similarly situated.  As soon as a voter picks their ballot method, they become dissimilar.  All voters get a choice to vote by absentee paper ballot or by DRE machine.  *See Favorito*, 285 Ga. at 798.  "To maintain this focus on discrimination, and to avoid constitutionalizing every state regulatory dispute, [courts] are obliged to apply the 'similarly situated' requirement with rigor."  *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007).  "Different treatment of dissimilarly situated persons does not violate the equal protection clause."  *Id.* (quoting *E & T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987)).  As the Georgia Supreme Court recognized in an earlier challenge to Georgia's use of DRE machines, all Georgia voters "have the option of casting an absentee ballot or using the touch screen electronic voting machines on election day."  *Favorito,* 285 Ga. at 798.[15]  To the extent that different recount procedures are necessarily applied to these different ballots does not

---

[15] Plaintiff Ricardo Davis was a Plaintiff in *Favorito v. Handel*, CA No. 2006cv119719 (Fulton County Superior Court).  Davis is therefore barred by *res judicata* from relitigating the same claims here.  Federal courts, pursuant to the Full Faith and Credit Clause, 28 U.S.C. § 1738, give state court judgments the same preclusive effect as would other courts in that state.  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005).

violate the Equal Protection Clause.  *Id.* at 799.  Where, as here, there are no

allegations that Plaintiffs are members of a suspect or quasi-suspect class, "[t]he

general rule is that [the state action] is presumed to be valid and will be sustained if

the classification drawn by the [state action] is rationally related to a legitimate

state interest."  *City of Cleburne*, 473 U.S. at 440.

### C.    The Election Contest Claims Are Barred by the Statute of Limitations.

The Georgia General Assembly established a short statute of limitations for

bringing election contests: O.C.G.A. § 21-2-524(a) provides that petitions

challenging election results must be filed within 5 days of the consolidation of

returns.  O.C.G.A. § 21-2-524(a).  While Plaintiffs timely filed their Complaint on

the last day before this 5-day statute of limitations expired (July 3, 2017),[16] as of

the date of this Motion, Plaintiffs have perfected service of process by complying

with the mandatory special service of process requirements contained in O.C.G.A.

§ 21-2-524(f) as to *one* State Defendant only – State Defendant Secretary of State

and Chair of the SEB, Brian Kemp, who was very belatedly served with the special

process form and notice on August 3, 2017, a full month after the expiration of the

---

[16] As noted in Footnote 26 of Plaintiffs' Complaint, the fifth day fell on Saturday, July 1, 2017, which meant that the deadline for filing the Petition was Monday, July 3, 2017. *See* Doc. 1-2 at ¶ 80, p. 36, n. 26.

statute of limitations.[17]   The remaining State Defendants have never been served

with the special process required by O.C.G.A. § 21-2-524(f) for election contests.

It is settled law in Georgia that the "mere filing of a petition is not the

commencement of a suit unless timely service is perfected as required by law and

the named defendant is duly brought into court." *Staggs v. Wang*, 185 Ga. App.

310, 311 (1987).   Under Georgia law, when "service is made after the expiration

of the applicable statute of limitations, the timely filing of a Complaint tolls the

statute of limitations *only* if 'the plaintiff shows that he acted in a reasonable and

*diligent* manner in attempting to insure that a proper service was made *as quickly*

*as possible*.'"   *Id.* (emphasis added) (internal citations omitted).   Where such a

showing can be made, the subsequently perfected service is held to "relate back" to

the date when the Complaint was filed, rendering the claim to be within the statute

of limitations.   *See Choice v. Florida Men's Medical Clinic*, 2017 Ga. App. LEXIS

323 at *7 (2017).

In determining whether the plaintiff has acted in "a reasonable and diligent

manner," the trial court must "look at all the facts involved and ascertain whether

the plaintiff was *in any way* guilty of laches."   *Staggs*, 185 Ga. App. at 311

---

[17] Plaintiffs initially arranged for personal service on the Secretary of State with a
regular summons on July 26, 2017, more than twenty days after the complaint was
filed.

(emphasis added); *see Choice*, 2017 Ga. App. LEXIS 323 at *7 ("plaintiff bears

burden of proving lack of fault when service is not timely perfected as required by

law.")   If the plaintiff is at fault for the delay and/or cannot prove that he or she

acted diligently to accomplish service "as quickly as possible," then in that event,

the untimely service will *not* relate back to the date of filing, and the claim will be

held to be barred under the statute of limitations.  *Id.*

As discussed below, application of this settled Georgia law demonstrates

that Plaintiffs' election contest claims must be dismissed.

### 1. State Law Determines the Adequacy of the Pre-Removal Service and the Applicable Statute of Limitations.

It is well settled that federal courts apply state law to determine the adequacy

of service of process occurring prior to removal.  *See Usatorres v. Marina*

*Mercante Nicaraguenses, S.A.*, 768 F.2d 1285, 1285 n.1 (11th Cir. 1985) ("A

federal court may consider the sufficiency of process after removal and does so by

looking to the state law governing process"); *Ritts v. Dealers Alliance Credit*

*Corp.*, 989 F. Supp. 1475, 1477 (N.D. Ga. 1997) ("Although this action is now in

federal court, in analyzing Defendant's motion to dismiss for insufficiency of

service of process, the court must examine whether Plaintiff complied with

Georgia law governing process."); *Oiler v. Biomet Orthopedics*, 2003 U.S. Dist.

LEXIS 17002  at *4-5 (E.D. La. 2003) (citing authorities from 5th, 7th, 8th, and

9th Circuits for proposition that "state law pursuant to which service was made governs this Court's determination of the sufficiency of service made prior to removal.")

It is equally well established that federal courts apply state statutes of limitations to the adjudication of state law claims heard in federal court. *Sonyika v. Emory Crawford Long Hospital*, 2009 U.S. Dist. LEXIS 134763 at *6 n.10 (N.D. Ga. 2009) ("Although defendants removed this case based on federal question jurisdiction, state law governs the applicable statute of limitations for state law claims over which this Court exercises supplemental jurisdiction.")

The Eleventh Circuit has repeatedly held that with regard to state law claims, "the law governing when the suit was commenced for purposes of the statute of limitations is also governed by state law." *Aucoin v. Connell*, 209 Fed. Appx 891, 892-893 (2006). Georgia federal courts have ruled that service of process "is an 'integral part of the state statute of limitations'" because "Georgia law does not deem an action to be commenced until service of process has been made." *Johnson v. American Meter*, 412 F. Supp. 2d 1260, 1263 (N.D. Ga. 2004) (citing *Cambridge Mut. Fire Ins. v. Claxton*, 720 F.2d 1230, 1233 (11th Cir. 1983)). Thus, "Georgia law concerning the timeliness of service of process, not federal

law, shall be applied in determining whether a plaintiff has complied with the relevant statute of limitations." *Id.*

### 2.  Plaintiffs Have Failed To Comply With the Service Requirements In O.C.G.A. § 21-2-524(f).

In order to bring an election contest claim against a party subject to suit under O.C.G.A. § 21-2-520(2)(A)-(D), the General Assembly mandated that such defendants receive "special process" as set forth in O.C.G.A. § 21-2-524(f).  The 5-day statute of limitations contained in O.C.G.A. § 21-2-524(a) and the expedited process and answer procedure set forth in subsection (f) reflect "the legislature's strong desire to avoid election uncertainty and the confusion and prejudice which can come in its wake." *Swain v. Thompson*, 281 Ga. 30, 31 (2006).  While service of process has generally been held to be "an integral part of the statute of limitations" under Georgia law [*see Cambridge*, 720 F.2d at 1233], that conclusion is especially clear in the election context where the statute of limitations and the service of process requirements are set forth in the exact *same* statutory provision.

Even if the State Defendants were proper parties to the election contest claims and were not barred by sovereign immunity, it is undisputed that the *only* State Defendant to have been served with the special service of process mandated by O.C.G.A. § 21-2-524(f) is Secretary of State Kemp, who was served in his official capacity as Secretary of State and as chairperson of the SEB on August 3,

34

2017, which was a full month after the filing of the Complaint and the expiration of the statute of limitations under O.C.G.A. § 21-2-524(a).

State Defendants Simpson, Harp, Sullivan and Worley were personally served in accordance with O.C.G.A. § 9-11-4(e) on July 13, July 15, July 26, and August 11 of 2017, respectively, but none of them have been served with the special process and form required by O.C.G.A. § 21-2-524(f).  Thus, service is defective under O.C.G.A. § 21-2-524(f) as to all State Defendants, with the sole exception of Secretary of State and Chair of the SEB Kemp. Because service did not occur prior to the expiration of the statute of limitations, the claims are barred by the statute of limitations unless Plaintiffs can demonstrate due diligence in attempting service and lack of fault for the service deficiencies, which, as discussed below, they cannot do.

### 3.  Plaintiffs Cannot Demonstrate Due Diligence and Lack of Fault.

Georgia courts have stated that "[a]s the burden rests on plaintiffs to ensure diligent service, they must provide specific dates or details to show diligence and cannot rely on conclusory statements." *Parker v. Silviano*, 284 Ga. App. 278, 279 (2007).  Although "the pertinent process statutes place sole responsibility on the clerk to issue the necessary copies of the complaint and summons to the sheriff or marshal to accomplish service, the responsibility for exercising due diligence in

effecting service remain[s] [the Plaintiffs']." *Choice*, 2017 Ga. App. LEXIS 323 at

* 7 (internal citations omitted).  In applying Georgia law on what constitutes "due

diligence" for purposes of the relation back rule, federal courts have noted that

"Georgia courts have 'consistently used the phrase 'as quickly as possible.'"

*Sonyika*, 2009 U.S. Dist. LEXIS 134763 at *9.

The law also recognizes that when service occurs after the expiration of the

statute of limitations, the plaintiff bears a "special duty" to exercise reasonable

diligence because in that situation "the cause of action [is] dead":

> The *special* duty the plaintiff bears to exercise reasonable diligence in
> serving a complaint for which the statute of limitations has expired is too
> well established to dissertate.  <u>The thing that can never be lost in sight is
> that the plaintiff's cause of action was dead.  It could not be revived
> unless the plaintiff used due diligence to perfect service,</u> which diligence
> must be examined in light of the particular fact that the cause of action
> has expired.

*Wade v. Whalen*, 232 Ga. App. 765, 766 (1998) (italics in original, underscore

added).  "Diligence" in this context has been defined by reference to the dictionary

definition of "'persevering application devoted and painstaking application to

accomplish an undertaking.'" *Id.* (citing Webster's Third International Dictionary).

Plaintiffs here clearly do not meet this stringent standard.  Their Complaint

was filed over a month ago on the last day of the limitations period, and they have

undertaken virtually no effort to perfect service by complying with the

requirements in O.C.G.A. § 21-2-524(f).  Courts have held that service was not

diligent, and the claims thus time-barred where the delay in perfecting service was

less than the delay in this case.  *See e.g.*, *Cantin v. Justice*, 224 Ga. App. 195, 195-

197 (1997) (service occurring 19 days after the filing of the Complaint and the

expiration of the statute of limitations was not sufficiently diligent to toll the

statute of limitations); *Botts v. Proflow*, 2010 U.S. Dist. LEXIS 148110 at *7 (38-

day delay held to not constitute "diligence" because it was not "as quickly as

possible); *Parker*, 284 Ga. App. at 278 (service held not diligent when served 18

days after the complaint was filed and 10 days after the expiration of the statute of

limitations).

In *Swain v. Thompson*, 281 Ga. 30 (2006), the Georgia Supreme Court

affirmed the dismissal of a petition challenging an election when the *pro se*

plaintiff had the defendant personally served with a normal summons form, but did

not use the special process form required by O.C.G.A. § 21-2-524(f).  *Swain*, 281

Ga. at 30.  The plaintiff's petition had correctly identified the case as an election

contest and had cited the appropriate statutes; however, the clerk nevertheless

issued the wrong summons.  *Id.* at 31.  Prior to the hearing on the motion to

dismiss, the plaintiff had successfully arranged for the petition to be personally

served on the defendants, and he had made unsuccessful attempts to have the clerk

issue the special summons form. *Id.*  While the Georgia Supreme Court expressed "sympathy" for the plaintiff and acknowledged that the defective service was partly the result of the clerk's errors in issuing the wrong summons, the Court nevertheless ruled that the legislative desire for "swift resolution of election contests" reflected a governmental policy that required the balancing of "the clerk's duty to issue proper process" "against the traditional placement on plaintiffs of the duty to ensure time proper and timely service."  *Swain*, 281 Ga. at 31. Applying that balancing test, the Court held that the plaintiff's failure to timely perfect service required dismissal of the petition. *Id.* at 32.

While *Swain* did involve application of the even more stringent "greatest possible diligence" standard because the plaintiff had been placed on notice of the deficiency through service of the motion challenging service, the outcome would have been the same under the reasonable diligence standard given that almost two months had elapsed since the filing of the complaint without service being perfected. *Id.* at 30.  The *Swain* decision is also relevant here in its ruling that the legislative purpose in providing for swift resolution of election contests would be undermined if Plaintiffs were allowed to protract resolution through untimely service.

Moreover, even if Plaintiffs were able to proffer evidence showing some error by the clerk's office in connection with the defective service in this case (which is unknown), Plaintiffs are themselves at fault by failing to ensure that the service was done correctly.  Unlike the *pro se* plaintiff in *Swain*, Plaintiffs here are represented by counsel and were thus in a far better position to have understood and conveyed the requirements in O.C.G.A. § 21-2-524(f) to the clerk's office. Whereas the pro se plaintiff in *Swain* did identify his claim as an elections contest to the clerk's office, here Plaintiffs' attorneys prepared a summons for the clerk that did *not* properly identify their claim as an election contest.  *See e.g.*, Doc. 1-4.

Clearly, then, Counts IV and V must be dismissed as untimely under O.C.G.A. § 21-2-524(a).  Because Plaintiffs failed to exercise diligence in perfecting service as quickly as possible after the filing of the Complaint, the service does not relate back to filing, and the claims are, therefore, barred by the statute of limitations.

> ### D.   Plaintiffs Fail to Sufficiently Allege Any State Law Claims Against the State Defendants.
>
> #### 1.  Plaintiffs Fail to Sufficiently Allege a violation of the Georgia Constitution.

Plaintiffs' Count I alleging a violation of the Georgia Constitution should be dismissed because none of Plaintiffs' factual allegations demonstrate that the June

20th runoff election was not "conducted in accordance with procedures provided by law" as required by Article II, Section 1, Paragraph 1 of the State Constitution.[18]  Plaintiffs rely on two State statutes to claim that the June 20th election was not conducted in accordance with the law.  First, they cite O.C.G.A. § 21-2-379.1(8), which states that DRE machines must "when properly operated, record correctly and accurately every vote cast."  However, Plaintiffs can only point to hypothetical allegations of compromise to computer systems at KSU in support of their claim that use of the DREs violated § 21-2-379.1(8).  *See* Doc. 1-2 ¶¶ 7, 115, and 121.  Plaintiffs allege that the DRE voting system was a "likely compromised system" but they do not, and cannot, show that the DREs and the other connected voting hardware actually was compromised or that these machines did not "register or record correctly and accurately every vote cast."

Second, Plaintiffs contort the statutory language in O.C.G.A. § 21 2 379.2 to suggest that because ten Georgia electors requested a reexamination of the current DRE system, the DRE system could not be used until such a reexamination occurred.  *See* Doc. 1-2 ¶¶ 82, 106, and124.

---

[18] Notably the Supreme Court of Georgia has already held that Georgia's use of its DRE system does not violate this constitutional provision.  *See Favorito*, 285 Ga. at 799-800.

To reach their erroneous conclusion, Plaintiffs misconstrue § 21-2-379.2(c) to create a requirement that the statutory language does not support.  Plaintiffs assert that "[n]o kind of [DRE] voting system" not so examined or reexamined "shall be used at any primary or election."  Doc. 1-2 ¶ 124.  In this quote, Plaintiffs omit the operative word "approved" in the statute and replace it with the phrase "not so examined or reexamined," which dramatically changes the meaning of the provision.  The actual text of subsection (c) states: "No kind of direct recording electronic voting system *not so approved* shall be used at any primary or election . . . ."  O.C.G.A. § 21-2-379.2(c) (emphasis added).  When read in the context of the Section as a whole, this sentence plainly means that no DRE that the Secretary of State has not approved for use, after he or she has performed a reexamination pursuant to the statute, may be used.  *See id.* at § 21-2-379.2(a)–(c).

The only approval requirement in § 21-2-379.2 is that once a reexamination occurs, the Secretary of State must approve or disapprove of the system; under the statute, the system may be used until such time as a reexamination shows that it can no longer be safely used.  *See* O.C.G.A. §§ 21-2-379.2(c) and 21-2-379.2(f).  Plaintiffs would like to read subparagraphs (b) and (c) in isolation, to suggest that (1) once a reexamination is requested, the current DRE system cannot be used; and (2) Secretary Kemp has a separate responsibility to approve the DRE system under

§ 21-2-379.2 absent a reexamination taking place first.  *See* Doc. 1-2 ¶ 106.  The terms in statutory provisions "should be understood in relation to each other, since '[w]ords, like people, are judged by the company they keep.'"  *Warren v. State*, 294 Ga. 589, 590-591 (2014) (quoting *Hill v. Owens*, 292 Ga. 380, 383 (2013)).  Here, read in context, it is clear that Georgia's previously certified voting system retains its certification until the Secretary of State, not Plaintiffs, determines otherwise.  Plaintiffs cannot rely on their request for reexamination of DREs, or the reexamination statute, to claim that the use of the current DRE system in the June 20th runoff election violated the Georgia Constitution.  Further, nothing in § 21-2-379.2 requires Secretary Kemp to "approve" of the DRE system absent a reexamination occurring first.

Finally, as with other counts in the complaint, Plaintiffs fail to make any factual allegations connecting the individual members of the SEB to the use of DRE machines in the Sixth Congressional District run-off election or any election.  Thus, the Complaint does not state a claim for a violation of the Georgia Constitution as to these defendants.

Based on the foregoing, Count I of the Complaint should be dismissed in its entirety for failure to state a claim.

**2.  The Election Contest Claims Against All the State Defendants in their Individual and Official Capacities, and the Failure to Recanvass Claim Against the Secretary and the SEB, Should Be Dismissed for Failure to State a Claim.**

In addition to being subject to dismissal on sovereign immunity grounds, these claims are also subject to dismissal for failure to state of claim because the State Defendants are not "superintendents" under O.C.G.A. § 21-2-520(2)(C) or pursuant to Ga. Comp. R. & Regs. r. 183-1-12-.02(7(a).  As fully discussed above in connection with the sovereign immunity issue, the statutory definition of "superintendent" in O.C.G.A. § 21-2-2(35) makes clear that none of the named State Defendants are "superintendents," as that term is specifically defined in the Election Code.  The election contest claims should, therefore, be dismissed for failure to state a claim as to each of the named State Defendants because Article 13 of the Election Code does not create a right of action to sue state agencies or state officials (in an individual or official capacity) unless they fall within the four categories of persons set forth in O.C.G.A. § 21-2-520(2)(C).  Similarly, the State Defendants are not election superintendents for purposes of Ga. Comp. R. & Regs. R 183-1-12-.02(7)(a).

### 3.  There is no private right of action for an alleged lack of certification of the DRE machines.

In Count VII of the Complaint, Plaintiffs rely on a state statute and a state regulation to argue that Secretary Kemp has not certified the DRE system, Plaintiffs have not cited to a single statutory provision that authorizes a private right of action for them to bring this suit and obtain the relief they seek.

In Georgia, "[c]ivil liability may only be authorized . . . when the General Assembly has expressly provided for a private right of action in the textual provisions of the statute."  *Somerville v. White*, 337 Ga. App. 414, 416 (2016) (emphasis in original); *Anthony v. Am. Gen. Fin. Servs.*, 287 Ga. 448, 454-459 (2010) (holding that the notary statute does not contain an express private cause of action and rejecting any implied private right of action).  "The judicial task is, of course, to interpret the statute the General Assembly has passed 'to determine whether it displays an intent to create not just a private right of action but also a private remedy.'"  *Id.* (quoting *Alexander v. Sandoval*,  532 U.S. 275, 286 (2001)).

The election statute and regulation Plaintiffs rely on, O.C.G.A. § 21-2-379.2 and Ga. Comp. R. & Regs. r. 590-8-1-.01, do not provide a private right of action. The Georgia General Assembly has created private rights of action elsewhere in the election code.  *See* O.C.G.A. § 21-2-521; (providing a cause of action to candidates and electors for the purpose of challenging an election); § 21-2-522

44

through § 21-2-529 (setting out in detail the framework for all causes brought

pursuant to O.C.G.A. § 21-2-521); § 21-2-171(c) (providing cause of action for

candidate seeking nomination by petition to challenge the denial of the nomination

petition); § 21-2-186 (providing cause of action for political body to challenge

denial of nomination by petition).  These examples of private rights of action stand

in stark contrast to the election statutes cited by Plaintiffs.  Importantly, the

Georgia Supreme Court has recognized that the 2010 enactment of O.C.G.A.

§ 9-2-8(a), which provides that no private right of action shall arise from any Act

enacted after the effective date of this Code section unless such right is expressly

provided therein, "counsels against deviating from [the Court's] established

precedent to find new implied causes of action," even where a pre-existing statute

is at issue.  *Anthony*, 287 Ga. at 459.

　　　Finally, citing to Ga. Comp. R. & Regs. r. 590-8-1-.01(b)(4), Plaintiffs

incorrectly argue that Georgia's voting system certification has been rendered

invalid because of certain alleged modifications to the system since it was last

certified.  In addition to the fact that this regulation does not provide a private right

of action, Plaintiffs misconstrue the regulation.  Subsection (b)(4) provides in full:

> Any modification to the hardware, firmware, or software of a voting
> system **which has completed Qualification, Certification, or
> Acceptance testing in accordance with these Rules** shall invalidate the
> State certification unless it can be shown that the modification does not

> affect the overall flow of program control or the manner in which the ballots are recorded and the vote data are processed, and the modification falls into one of the following classifications listed below. The Secretary of State shall be the sole judge of whether or not a modification requires additional testing.

Ga. Comp. R. & Regs. r. 590-8-1-.01(b)(4) (emphasis added).  Plaintiffs admit that the components that they allege have been added and modified since 2007 have not completed new certification testing.  *See* Doc. 1-2 ¶¶ 180, 181.  Thus, under Plaintiffs own allegations, this regulation is inapplicable.  Finally, Plaintiffs create out of whole cloth the requirement that Secretary Kemp "must certify any new system configuration, tested as an integrated whole, before it can be used in any election."  Doc. 1-2 ¶ 182.  Plaintiffs cite to no statute or regulation in support of this alleged requirement, and none exists.  In fact, Ga. Comp. R. & Regs. r. 590-8-1-.01(b)(4) implies the opposite of such a requirement by making the Secretary of State "the sole judge of whether or not a modification requires additional testing." Accordingly, Plaintiffs reliance on this State regulation should be disregarded.

### 4. Plaintiffs' Request for a Writ of Mandamus Should be Dismissed for Failure to State a Claim.

Under Georgia law, a cause of action for the extraordinary writ of mandamus is available by statute under O.C.G.A. § 9-6-20.  To succeed on a claim for mandamus, the petitioner must show (1) that the public official has a clear legal duty to perform the official act requested; (2) that the requesting party has a clear

legal right to the relief sought or that the public official has committed a gross abuse of discretion; and (3) that there is no other adequate legal remedy.  *See Bland Farms, LLC v. Georgia Dept. of Agriculture*, 281 Ga. 192, 193 (2006); *see also SJN Props.*, 296 Ga. at 800 (petitioner must show that no other adequate legal remedy is available and that it has a "clear legal right" to the relief sought); *Trip Network, Inc. v. Dempsey*, 293 Ga. 520, 522 (2013) ("Mandamus will issue against a public officer under two circumstances: (1) where there is a clear legal right to the relief sought, and (2) where there has been a gross abuse of discretion."); *Goldman v. Johnson*, 297 Ga. 115, 116 (2015) (mandamus relief is not available if petitioner has an adequate legal remedy).

Here, Plaintiffs have not identified any legal duty that the Secretary of State has to reexamine the State's DRE machines before the requirements in O.C.G.A. § 21-2-379.2(a) are met.  They likewise have not shown that they have a ***clear*** legal right to such a reexamination at this time.  In the Complaint, Plaintiffs argue that they are entitled to a writ of mandamus forcing Secretary Kemp to conduct the reexamination because (1) ten electors have requested an examination; and, in the alternative, (2) Secretary Kemp abused his discretion by not conducting the reexamination on his own.

First, the ten electors are not entitled to a reexamination yet (much less a writ of mandamus forcing one) because they have not satisfied one of the requirements necessary to trigger the Secretary of State's responsibilities under that statute.[19]   Section 21-2-379.2(a) allows ten or more electors to request that the secretary of State reexamine direct recording electronic (DRE) voting systems, and a group of voters did make such a request.   Nevertheless, the group failed to pay for the cost of a reexamination, and the Secretary of State has no duty to perform the requested reexamination until such payment is made.   *See* O.C.G.A. § 21-2-379.2(a).   Accordingly, Plaintiffs fail to state a claim for a writ of mandamus because they cannot show that they have a *clear* legal right to the reexamination on terms that are different than what Secretary Kemp has estimated will be required for a robust and cost-effective reexamination.

Based on the foregoing, Plaintiffs' request for a writ of mandamus should be dismissed for failure to state a claim.

---

[19] In addition, from the Complaint it appears that only two Plaintiffs, Price and Davis, are actually alleged to be one of the ten electors who made the reexamination request; therefore; they are the only plaintiffs who even have a theoretical legal right pursuant the reexamination statute.   *See* Doc. 1-2 ¶¶ 58, 62.

## CONCLUSION

For the foregoing reasons, the State Defendants pray that all claims against them be dismissed.

Respectfully submitted,

CHRISTOPHER M. CARR
Attorney General                 112505

ANNETTE M. COWART        191199
Deputy Attorney General

RUSSELL D. WILLARD        760280
Senior Assistant Attorney General

/s/Cristina M. Correia
CRISTINA M. CORREIA        188620
Assistant Attorney General

/s/Elizabeth A. Monyak
ELIZABETH A. MONYAK        005745
Assistant Attorney General

/s/Josiah B. Heidt
JOSIAH B. HEIDT              104183
Assistant Attorney General

Georgia Department of Law
40 Capitol Square SW
Atlanta, GA  30334
404-656-7063

Attorneys for State Defendants

49

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Defendants' Brief in Support of Motion to Dismiss was prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).

Please address all
Communication to:
CRISTINA CORREIA
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
404-651-9325

## CERTIFICATE OF SERVICE

I hereby certify that on this date I have electronically filed the foregoing

**STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS**

with the Clerk of Court using the CM/ECF system, which will automatically send

email notification of such filing to the following attorneys of record:

Bryan Ward
Marvin Lim
Holcomb + Ward LLP
3399 Peachtree Rd NE, Suite 400
Atlanta, GA 30326
Bryan.Ward@holcombward.com
Marvin@holcombward.com

I further certify that I have served, by electronic mail, the following non-

cm/ecf participants:

Overtis Hicks Brantley
Bennett D. Bryan
DeKalb County Law Department
1300 Commerce Drive 5th Floor
Decatur, GA 30030

Patrise M. Perkins-Hooker
Kaye Burwell
Cheryl Ringer
Fulton County Attorney's Office
141 Pryor Street SW Suite 4038
Atlanta, GA 30303
Facsimile:  (404) 730-6324

Daniel W. White
Haynie, Litchfield, Crane & White, PC
222 Washington Avenue
Marietta, Georgia 30060

Rep. Karen Handel                           Jon Ossoff
U.S. Congressional District 6               Candidate for Congress
c/o Anne Lewis, Esq.                        c/o Russell Waldon, Esq.
awl@sbllaw.net                              rwaldon@wachp.com

This 15th day of August, 2017.


/s/ Cristina Correia
Assistant Attorney General