IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **DONNA CURLING, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CA No. 1:17cv02989-AT** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BRIAN KEMP, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**STATE DEFENDANTS' BRIEF IN SUPPORT OF**
**THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## Introduction

Plaintiffs are challenging the method by which voters in Georgia cast their ballot during in person voting, through the Direct Recording Electronic (DRE) machine, as well as the equipment used to read paper absentee ballots, the Opti Scan reader.  Plaintiffs spin together a collection of unrelated news stories about nationwide election hacking scares, a general distrust of DRE and Opti Scan technology, past vulnerability of a server at the Center for Election Systems (CES), and a misstatement of certification requirements, and then conclude that "it must be presumed" that DRE ballots are not safe and that the Opti Scan readers cannot be trusted.  To be clear, Plaintiffs do not claim to have *any* evidence that *any* DRE machine or Opti Scan reader *has in fact* been tampered with or has failed to record

1

a *single vote* correctly. Rather, Plaintiffs contend only that the technology is vulnerable to hacking, and therefore they do not know *whether* Georgia's voting system is compromised.  Plaintiffs contend that by providing for a statewide voting system that relies on DRE machines and Opti Scan readers, technology Plaintiffs consider inferior to paper ballots, Defendants have somehow violated their federal and state constitutional rights.[1] Plaintiffs not only seek to enjoin the use of the State's current technology, which has been used since approximately 2002 without *any* evidence that even a *single* vote has been recorded incorrectly, but Plaintiffs seek to impose a *particular* ballot system, paper ballots, on all Georgia voters. Should this Court hold that Plaintiffs have standing to bring a general grievance such as this and dictate a particular balloting method, nothing can stop another small group of individual voters from suing Defendants – tomorrow, next week, or next month - to *reinstate* the DRE machines because *those* voters prefer DREs to any paper method of casting a ballot because paper ballots have a long history of being unreliable and subject to manipulation.

Plaintiffs assert a range of claims against both State Defendants and County Defendants.  Plaintiffs assert federal constitutional violations of the First Amendment, Due Process and Equal Protection.  Doc. 15 at 71-85.  They also

---

[1] A system requiring only paper ballots would violate the Help America Vote Act (HAVA), 52 U.S.C. § 21081(a)(3).  *See Infra*, pp. 29-30.

assert a violation of the Georgia Constitution.  Doc. 15 at 63-70. Finally, Plaintiffs assert a number of violations of Georgia election statutes, including election challenge statutes.  Doc. 15 at 86-100.  Plaintiffs seek both to void the June 20, 2017 run-off, and to dictate the balloting method for future elections in Georgia, and an award of nominal damages.  Doc. 15 at 113-114.

The State Defendants now move to dismiss all claims.  Specifically, these Defendants move to dismiss as moot Plaintiffs' election challenge claims (Counts VI and VII), recanvassing claim (Count IV), and that part of each additional claim that seeks to void the June 20, 2017 run-off.  The Defendants also move to dismiss claims for lack of standing; as barred by the Eleventh Amendment; as barred by sovereign immunity; as barred by official immunity; as barred by the statute of limitations; as barred by legislative immunity[2]; and for failure to state a claim.

## ARGUMENT

### I.   This Court Lacks Subject Matter Jurisdiction.

A complaint is subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(1) where the district court lacks subject matter jurisdiction.[3]  As explained in the State Defendants'

---

[2] This defense is asserted only to the extent that Plaintiffs are suing the State Election Board for promulgation of rules and regulations.
[3] The challenge to jurisdiction is based on mootness, Plaintiffs' lack of standing, Eleventh Amendment immunity, sovereign immunity, and official immunity. Defendants concede that Plaintiffs Curling, Schoenberg, L. Digges, and W. Digges

Response to Motion for Expedited Discovery, Doc. 28 at 2-7, all of Plaintiffs' claims

relating to the June 20, 2017 election are moot. *Roudebush v. Hartke*, 405 U.S. 15, 19

(1972). Defendants hereby adopt and incorporate by reference their mootness argument

on pages 2-7 of Doc. 28. This argument relates to the merits of counts IV, VI, and VII, as

well as to any request to void the election as part of the relief sought in counts I-III.

### A.   Plaintiffs Lack Standing to Bring This Action.

Plaintiffs bear the burden of establishing standing. *Susan B. Anthony List v.*

*Driehaus*, 134 S. Ct. 2334, 2342 (2014). "No principle is more fundamental to the

judiciary's proper role in our system of government than the constitutional

limitation of federal-court jurisdiction to actual cases or controversies." *Raines v.*

*Byrd*, 521 U.S. 811, 818 (1997).

> It is by now well settled that 'the irreducible constitutional minimum of
> standing contains three elements. First, the plaintiff must have suffered an
> 'injury in fact'--an invasion of a legally protected interest that is (a)
> concrete and particularized, and (b) actual or imminent, not conjectural or
> hypothetical. Second, there must be a causal connection between the injury
> and the conduct complained of . . . . Third, it must be likely, as opposed to
> merely speculative, that the injury will be redressed by a favorable
> decision.

*United States v. Hays*, 515 U.S. 737, 742-743 (1995) (quoting *Lujan* v. *Defenders*

*of Wildlife,* 504 U.S. 555, 560-561 (1992)). A "plaintiff must demonstrate standing

---

have standing to bring the election contest claims. (Counts VI and VII). However,
those claims are moot. *See* Doc. 28 at 2-7.

for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 519 (1975)).

### 1. Plaintiffs Have Not Sufficiently Alleged An "Injury In Fact."

The Supreme Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *Hays*, 515 U.S. at 743.

As an initial matter, "[f]or an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560. Here, Plaintiffs are not affected in a personal way. All voters in Georgia may choose to vote in person using a DRE machine, or alternatively by absentee paper ballot. Moreover, since Plaintiffs are challenging both the sixth congressional district election and future elections, additional requirements for the particularized injury factor are that the Plaintiffs actually reside in the jurisdictions for the challenged elections and voted using the challenged method in the June 20, 2017 run-off. The following chart summarizes Plaintiffs' residency and ballot choice in the run-off.

| Plaintiff | Resides in CD 6 | Resides in a Municipality | Member of CGG[4] Doc. 15 ¶ 2 | Voted by DRE 6/20/17 | Voted by Absentee 6/20/17 | Did not vote on 6/20/17 |
|---|---|---|---|---|---|---|
| Curling Doc. 15 ¶ 1 | Yes | Roswell | Yes | | | Exh. A ¶ 4 |
| Price Doc. 15 ¶ 4 | No | None | Yes | n/a | n/a | Not eligible |
| Schoenberg Doc. 15 ¶ 5 | Yes | Dunwoody | No | No per Exh A ¶ 6 But see Doc. 15 ¶ 5 | Yes per Exh A ¶ 6 But see Doc. 15 ¶ 5 | |
| Davis Doc. 15 ¶ 8 | No | None | Yes | n/a | n/a | Not eligible |
| L. Digges Doc. 15 ¶ 6 | Yes | None | No | No | Yes | |
| W. Digges Doc. 15 ¶ 7 | Yes | None | No | No | Yes | |

As reflected in the chart,[5] only two of the Plaintiffs live in municipalities, so Plaintiffs do not have standing to seek injunctive relief with respect to *all* municipal elections in 2017. Similarly, only four the Plaintiffs reside in the sixth congressional district, the remaining Plaintiffs lack standing to challenge the use of

---

[4] CGG purports to have "members" in "various municipalities" in Georgia. Doc. 15 ¶ 2. Plaintiffs do not identify any specific cities where they allegedly have members. Defendants address CGG's lack of associational standing at pp. 11-12.

[5] Where there is "a factual attack on jurisdiction, such as in this case, the district court may consider matters outside the pleadings, and the presumption of truthfulness normally afforded a plaintiff under Rule 12(b)(1) does not apply." *Briggs v. Briggs*, 245 Fed. Appx. 934, 936 (11th Cir. 2007) (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). *Accord McElmurray v. Consol. Gov't of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007).

DRE and optical scan readers used in that election.  *See Hays*, 515 U.S. at 745 (only voters residing in the challenged district have standing).  Additionally, all Plaintiffs lack standing to bring claims premised on an injury during the June 20, 2017 run-off from the alleged favorable treatment of absentee ballots to ballots cast on a DRE machine.  None of the Plaintiffs actually cast their ballot on a DRE machine during the June 20, 2017 run-off.  *See* Exhibit A, Declaration of Chris Harvey ¶¶ 4, 6-8; *See Hays*, *supra*.

"Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be concrete." *Spokeo*, 136 S. Ct. at 1548. "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id.* (quoting Black's Law Dictionary 479 (9th ed. 2009)).  The Supreme Court has explained:

> When we have used the adjective "concrete," we have meant to convey the usual meaning of the term — "real," and not "abstract." Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967). Concreteness, therefore, is quite different from particularization.

*Spokeo*, 136 S. Ct. at 1548.

Here, as in *Spokeo*, Plaintiffs have failed to articulate any concrete injury from the use of the DRE machines and Opti Scan readers, either in the prior election or in any future elections.  Plaintiffs' claims are premised entirely on the

*possibility* that Georgia's election system *might be* subjected to malicious

interference.  While Defendants do not question the importance of maintaining a

secure election system, and Defendants strongly contend that Georgia's system is

secure, a generalized fear that malicious activity might occur is not sufficiently

concrete to confer standing.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410

(2013) (rejecting "reasonable likelihood" of injury as sufficient to meet the injury

in fact standard).  Here, Plaintiffs' allegations do not even rise to the level rejected

as insufficient in *Clapper*.  Instead, Plaintiffs assert that "Georgia's DRE System

(and, by logical *extension and inference*, the Opti Scan System) must be *presumed*

to have been compromised, it is *more than probable* that it was compromised."

Doc. 15 ¶ 154 (emphasis added).  These, and similar allegations are insufficient to

confer standing.  "[S]tanding requires 'personal injury suffered by a party as a

consequence of the alleged constitutional error, other than the psychological

consequence presumably produced by observation of conduct with which one

disagrees.' . . .  '[S]tanding is not measured by the intensity of the litigant's interest

or the fervor of his advocacy.'"  *Burdick v. Kennedy*, 2017 U.S. App. LEXIS

13738 *3 (11th Cir. 2017) (quoting *Valley Forge Christian Coll. v. Americans

United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982)).

Nor are Plaintiffs' allegations that Georgia election statutes have been violated, by themselves, sufficient to confer Article III standing.  Even the violation of a federal statutory right is insufficient to necessarily confer Article III standing.  A Plaintiff must still show harm, not just a "bare procedural violation" of a statute.  *Perry v. CNN, Inc.*, 854 F.3d 1336, 1340 (11th Cir. 2017) (quoting *Spokeo*, 136 S. Ct. at 1550).  Here, Plaintiffs' Amended Complaint seeks to address a purely speculative injury; that the DRE and Opti Scan readers *might* not work as designed due to hackers. *See Stein v. Cortes*, 223 F. Supp. 3d 423, 432 (E.D. PA 2016) (holding that allegations that DRE machines are "vulnerable, hackable, and antiquated" are insufficient to confer standing).

Courts "should not speculate concerning the existence of standing . . . . If the plaintiff fails to meet its burden, th[e] court lacks the power to create jurisdiction by embellishing a deficient allegation of injury."  *Dimaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir. 2008) (quoting *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006)).  Here, Plaintiffs have failed to allege a concrete injury and therefore lack standing to bring this action.

### 2. There is No Causal Connection Between Plaintiffs' Alleged Injury And Any of the State Defendants' Conduct.

Even if Plaintiffs' alleged injury, that the DRE machines and/or Opti Scan readers will not accurately count votes cast, was more than speculative, the injury

is still not traceable to any of the State Defendants but rather to criminal interference with the voting system by third hypothetical parties. *Clapper*, 568 U.S. at 411 (holding that speculation about whether Plaintiffs would be subjected to surveillance under the challenged federal statute, "or some other authority – shows that [Plaintiffs] cannot satisfy the requirement that any injury in fact must be fairly traceable to" the challenged statute). Here, any injury would be traced to illegal hacking, not the actual use of DRE or Opti Scan readers. There is no dispute that when working properly, DRE machines record a vote in the same manner as it is cast, and it is only hypothetical third party interference via hacking, that creates any potential injury to Plaintiffs. *See also Allen v. Wright*, 468 U.S. 737, 752-753 (1984) (holding that parents of school children did not have standing to challenge federal tax exemptions to racially discriminatory private schools because the alleged injury was not "fairly traceable to the assertedly unlawful conduct of the IRS.").

### 3. It is Unlikely That Any Favorable Decision Will Redress Plaintiffs' Alleged Injury.

Plaintiffs' alleged injury, that their votes will not be counted as cast, cannot be redressed by a favorable ruling from this Court. Here, Plaintiffs' speculation that a different balloting system would eliminate potential third party interference with voting ignores the reality embraced by the courts that no election system is

flawless. *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("The unfortunate reality is that the possibility of electoral fraud can never be *completely* eliminated, no matter which type of ballot is used.") (emphasis in original); *Favorito v. Handel*, 285 Ga. 795, 797 (2009) (same). Plaintiffs' alleged injury therefore cannot be redressed by a favorable decision from this Court.

### 4. Plaintiff CGG Lacks Associational Standing.

Finally, Plaintiff CGG does not have standing to bring this action. Plaintiff CGG is a non-profit corporation organized in Colorado. Doc. 15 ¶ 2. CGG asserts that it is bringing this action on behalf of its members. *Id.* While Plaintiff CGG purports to be a "membership organization," its executive director testified in June, 2017 that there was no formal procedure to membership. Instead, she considers anyone that contacts the organization "to be on [their] mailing list and get information" a "member." Exhibit B at 139-140, attached hereto. Plaintiffs have cited no authority for applying associational standing principles to an organization's right to assert the rights of individuals on their mailing list.[6] Nor

---

[6] Associational standing permits an organization to bring suit on behalf of its members where:

> (a) its members would otherwise have standing to sue in their own right;
> (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

have Plaintiffs provided factual allegations to support the assertion that they are a membership organization. According to their website, under the "About CGG" and "Who we are" tabs, the officers of the organization are all from Colorado, therefore not eligible Georgia voters.[7] Additionally, linking to the "Join Email List" tab on the website provides no indication that by providing a name and address an individual is actually *joining* the organization.[8] Plaintiffs CGG should at a minimum be required to provide some basis for its assertion that persons on their email list are "members" of their organization.

**B.    Plaintiffs' Federal Claims, Against the State Defendants in Their Official Capacities, Are Barred by the Eleventh Amendment.**

Plaintiffs' federal claims are asserted against the individually named State Defendants in both their individual and official capacities. Doc. 15 (Counts II and III). Plaintiffs seek both injunctive relief and damages. *Id.* These claims are barred by the Eleventh Amendment.[9] *Kentucky v. Graham*, 473 U.S. 159, 169

---

*United Food & Commer. Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 553 (1996) (internal quotation and citation omitted).

[7] https://coalitionforgoodgovernance.org/bios/ last visited on August 29, 2017.

[8] https://coalitionforgoodgovernance.org/join-us/ last visited on August 29, 2017.

[9] The State Defendants acknowledge that by removing this action to federal court they have waived immunity as to a federal *forum*. However, Defendants retain all defenses they would have had in state court, including immunity from liability. *Stroud v. McIntosh*, 722 F.3d 1294, 1303 (11th Cir. 2013) (citing *Lombardo v. Penn. Dep't of Pub. Welfare*, 540 F.3d 190, 190-198 (3rd Cir. 2008)).

(1985).[10]  An exception to this immunity, pursuant to *Ex parte Young*, 209 U.S.

123 (1908), is limited to suits against state officers for *prospective* injunctive relief.

*Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 no. 24 (1997).

Two limitations on this exception to Eleventh Amendment immunity are

applicable in this case.  First, "[a] federal court cannot award *retrospective* relief,

designed to remedy past violations of federal law."  *Id.* (emphasis added).  Second,

"[i]n making an officer of the State a party defendant in a suit to enjoin the

enforcement of an act alleged to be unconstitutional it is plain that such officer

must have some connection with the enforcement of the act, or else it is merely

making him a party as a representative of the State, and thereby attempting to make

the State a party."  *Ex parte Young*, 209 U.S. at 157.

With respect to the first limitation, that the relief requested be prospective,

Plaintiffs' claims for injunctive and declaratory relief and damages, premised on

the June 20, 2017 election that has already passed, are barred because they are

retrospective in nature.  "Retrospective relief is backward-looking, and seeks to

remedy harm 'resulting from a *past* breach of a legal duty on the part of the

defendant state officials.'"  *Seminole Tribe of Fla. v. Fla. Dep't of Revenue*, 750

---

[10] The Supreme Court has held that "§ 1983 does not override a State's Eleventh
Amendment immunity." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63
(1989); *Quern v. Jordan*, 440 U.S. 332, 342 (1979); *Kentucky*, 473 U.S. at 169.

F.3d 1238, 1249 (11th Cir. 2014) (quoting *Edelman v. Jordan*, 415 U.S. 651, 668

(1974)) (emphasis in original).  "Simply because the remedy will occur in the

future, does not transform it into 'prospective' relief. The term, 'prospective relief,'

refers to the ongoing or future threat of harm, not relief."  *Fedorov v. Bd. of

Regents*, 194 F. Supp. 2d 1378, 1387 (S.D. Ga. 2002).  Plaintiffs' claims for any

relief related to prior elections or prior alleged security breaches or other past

injuries are retrospective and barred by the Eleventh Amendment.

The second limitation in the *Ex Parte Young* exception is that the State

Officer "have some connection with the enforcement" of the State action sought to

be enjoined.  209 U.S. at 157; *see also Summit Med. Assocs., P.C. v. Pryor*, 180

F.3d 1326, 1342 (11th Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000) (declining to

apply *Ex parte Young* exception where Defendants had "no authority to enforce"

the challenged statutory provision).  Here, Plaintiffs have sued the Secretary of

State, the members of the State Election Board, and Merle King, Executive

Director of the Center for Election Systems at Kennesaw State University.

With respect to the individual members of the SEB, Plaintiffs allege that

these members are responsible for:

> (1) promulgating rules and regulations to ensure the legality and
> purity of all elections, (2) investigating frauds and irregularities in
> elections, and (3) reporting election law violations to the Attorney
> General or appropriate district attorney.

Doc. 15 ¶ 10.  The only additional allegation about the SEB board members in all of Plaintiffs' 240 paragraphs, is that they "used, and instructed the use of, Georgia's DRE System and Optical Scanning System to conduct the Special Election and Run-off in Georgia's 6th District."[11]  Doc. 15 ¶ 51.  None of the alleged "responsibilities" of the SEB are sufficiently connected to the state action Plaintiff seeks to enjoin to allow suit under *Ex Parte Young*.  Moreover, to the extent Plaintiffs suit is premised on the SEB's promulgation of rules and regulations, or any lack thereof, any claim would be barred by legislative immunity, regardless of the relief sought.  *Scott v. Taylor*, 405 F.3d 1251, 1254 (11th Cir. 2005) (explaining that the immunity "applies with equal force to suits seeking damages and those seeking declaratory or injunctive relief.").  The Supreme Court has extended legislative immunity to state officials "acting in their legislative capacity."  *Consumers Union v. Supreme Court of Virginia*, 446 U.S. 719, 734 (1980) (extending immunity to state supreme court justices in challenge to attorney disciplinary rules).  Plaintiffs have failed to satisfy the second limitation of the *Ex Parte Young* exception with respect to the SEB members.  Therefore the

---

[11] This allegation relates only to alleged *past* conduct related to the June 20, 2017 run-off, and therefore fails the first *Ex Parte Young* limitation.

individual members of the SEB, in their official capacities, are entitled to Eleventh Amendment immunity as to all claims.

Plaintiffs also sue Merle King, the Executive Director of the Center for Election Systems. Plaintiffs' allegations regarding King relate to an alleged past breach of security at CES. Doc. 15 ¶¶ 26-44, 76, 85. First, these allegations relate to past harm and therefore do not even pass the first *Ex Parte Young* limitation. Second, they do not demonstrate any connection between King and what Plaintiffs allege to be a continuing violation of federal law, i.e., the continued use of DRE machines and Opti Scan readers. Therefore, Merle King is entitled to Eleventh Amendment immunity for all claims against him in his official capacity.

Finally, Plaintiffs seek injunctive relief and damages against Secretary Kemp in his official capacity. All claims for money damages, and any injunctive relief related to past elections are retrospective and therefore barred.

**C.     Plaintiffs' State Law Claims Based on Alleged Violations of the Georgia Constitution and Statutory Law Are Barred by Sovereign Immunity.**

The Georgia Supreme Court has made clear that the "sweep of sovereign immunity under the Georgia Constitution is broad." *Olvera v. University System of Georgia*, 298 Ga. 425, 426 (2016). In *Georgia Dep't of Natural Resources v. Center for a Sustainable Coast*, the Georgia Supreme reversed earlier precedent

16

that had authorized common law injunctive relief against the State to announce a "bright line rule that only the Constitution itself or a specific waiver by the General Assembly can abrogate sovereign immunity." *Center for a Sustainable Coast*, 294 Ga. 593, 602 (2014), *overruling IBM v. Evans*, 265 Ga. 215 (1995). Absent an explicit statutory waiver authorizing a claim for injunctive relief against the state or its officials, the Court in *Sustainable Coast* held that sovereign immunity barred claims for injunctive relief, and the Court extended the protections of the sovereign immunity bar to claims for declaratory relief in *Olvera*. More recently, in *Lathrop v. Deal*, 2017 Ga. LEXIS 529 at *29 (2017), the Georgia Supreme Court ruled that sovereign immunity likewise barred claims against the State for injunctive and declaratory relief based on enforcement of a law alleged by the plaintiffs to be unconstitutional.

The holdings in these three cases leave no doubt that Plaintiffs cannot sue the State or the State Defendants for declaratory or injunctive relief based on the alleged violations of the Georgia Constitution (Count 1) and the provisions of the Georgia Election Code (Counts 4-7) because there is no explicit waiver of

sovereign immunity in the Georgia Constitution or the Georgia Code to authorize any of these claims.[12]

In an obvious attempt to circumvent this sovereign immunity bar, Plaintiffs have sued the State Defendants individually and not in their official capacities.[13] This attempt fails.  It is true that the Georgia Supreme Court stated in dicta in *Lathrop* that a claim brought against a state officer in an individual capacity may not be barred if the suit seeks declaratory or injunctive relief solely to prevent "the enforcement of allegedly unconstitutional laws."  *Lathrop*, 2017 Ga. LEXIS at *11. However, Plaintiffs here do not seek to prevent enforcement of an allegedly unconstitutional state law; they seek to enjoin election officials from using certain voting machines.  Whatever door *Lathrop* left open for individual-capacity claims is not available to Plaintiffs here.

Moreover, the *Lathrop* Court reiterated that parties cannot circumvent sovereign immunity by making an action "nominally" against a state officer or

---

[12] Sovereign immunity does not bar claims for mandamus; however, the mandamus claims (Counts 8 and 9) are subject to dismissal for failure to state a claim as set forth below.

[13] A suit against a state officer in his or her official capacity is considered to be a suit against the State, and, therefore, sovereign immunity applies to lawsuits naming state officials in their official capacity.  *See e.g.*, *Cameron v. Lang*, 274 Ga. 122, 126 (2001).  The Plaintiffs did properly sue the State Defendants in their official capacities with respect to the recanvassing and election contest counts (Counts 4, 6, and 7).

employee in an individual capacity when the real party in interest is the State. *Lathrop*, 2017 Ga. LEXIS 529 at *11, quoting *Cannon v. Montgomery*, 184 Ga. 588, 591 (1937). The fact that a pleading "is *in name* a suit against the defendant solely in his individual capacity is <u>immaterial</u>, if upon consideration of the petition as a whole, including the relief which it seeks, it appears that the action is in reality a suit against the State brought without its consent." *Musgrove v. Georgia R.& B.*, 204 Ga. 139, 155 (1948) (italics in original; underscore added). That is exactly what Plaintiffs have done here. The *only* way the Secretary and Board members could even perform some of the relief requested by Plaintiffs – for example, the re-examination and recertification – is by acting *in their official capacity* as state officers. *See Hennessy v. Webb*, 245 Ga. 329 (1980), cited in *Lathrop* [2017 Ga. LEXIS at *22] (where school principal was sued in his individual capacity, the Supreme Court stated that "it is clear from these allegations *the suits were brought against this defendant solely because of the position he held and the duties imposed upon him as a result of this position. Indeed the act complained of could only have been done in the official capacity of [the] defendant*.") (emphasis added). An "individual" lacks the legal authority and administrative expertise to examine and/or re-certify voting equipment. Thus, if Plaintiff were successful in

obtaining their requested relief, this lawsuit would compel state officials to take specified actions that could *only* be undertaken by virtue of their official positions.

That this is in substance a suit against the State is confirmed by the fact that the expansive relief sought by the Plaintiffs – an order "enjoining all future use of the Georgia's DRE System and the future use of the Optical Scanning System as currently configured" [Doc. 15, Prayer for Relief at 113] directly impacts State resources, State policy, and the Secretary's discretion to administer the Election Code. The Secretary's administration of a DRE voting system is legally authorized and required by the Georgia Election Code. O.C.G.A. § 21-2-50(15).  Further, the legislature expressly provided the Secretary with discretionary authority to choose voting equipment for counties.  O.C.G.A. § 21-2-300(a). Plaintiffs are using this lawsuit as a vehicle to control the Secretary's discretionary authority under that statute.  This too demonstrates that the State is the real party in interest, not the individual persons Plaintiffs have sued.

In sum, this case is in substance a suit against the State, not any individuals. Accordingly, Plaintiffs must demonstrate the existence of an explicit waiver of sovereign immunity in order to bring the claims.  There is no waiver of sovereign immunity to authorize the injunctive-relief claims, and therefore, under the holding in *Sustainable Coast*, those claims are barred.  *Sustainable Coast*, 294 Ga. at 602.

There is also no waiver of sovereign immunity to authorize the declaratory-relief claims, and, therefore, under the holding in *Olvera*, those claims are barred. *Olvera*, 294 Ga. at 427.  Thus, with the exception of the mandamus claims, all the state-law claims must be dismissed on grounds of sovereign immunity.

> **D.     Alternatively, Plaintiffs' State Law Claims Are Barred by Official Immunity.**

Under Article I, Section II, Paragraph IX(d) of the Georgia Constitution, official immunity bars declaratory and injunction actions against officials in their individual capacities when the claim concerns past injury.  *See Lathrop*, 2017 Ga. LEXIS 529, at *48–49.  The State Constitution provides that "officers and employees of the state or its departments or agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions."  GA. CONST. Art. I, Sec. II, Para. IX(d).  In *Lathrop*, the Georgia Supreme Court recently clarified the specific requirements for State officers to be protected by official immunity and concluded that the phrase "performance or nonperformance of their official functions" means "a performance of official functions that has 'caused' injuries and damages, that is, a past performance."  *Lathrop*, 2017 Ga. LEXIS 529 at *62–63 (describing how the past-tense nature of the first sentence of official immunity provision should be incorporated into the second sentence).

Here, each of Plaintiffs' individual capacity state law claims against the State Defendants is premised on a prior act or failure to act that Plaintiffs allege violated State law.  In Count I, Plaintiffs allege that Defendants violated the Georgia Constitution because they did not allegedly conduct the June 20th runoff election in accordance with various state statutes.  *See* Doc. 15 ¶¶ 133, 134, 136. To the extent Count I is based on Defendants' "past performance or nonperformance," i.e., the administration of the June 20th runoff election, that caused the harm Plaintiffs allege, the court is barred by official immunity.

Likewise, official immunity bars Plaintiffs' individual capacity claims in Count IV because  Plaintiffs seek  retrospective relief to undo the prior election.

Finally, in Count V Plaintiffs allege that Defendants used uncertified DRE and optical scanning machines in the June 20th runoff election in violation of O.C.G.A. § 21-2-368, § 21-2-379.2 and Ga. Comp. R. & Regs. r. 183-1-12-.02 and 590-8-1-.01.  *See* Doc. 15 ¶¶ 193-95.  Similarly, to the extent that Count V seeks relief from injuries caused by an official's past performance or nonperformance, it must be dismissed. *See Lathrop*, 2017 Ga. LEXIS 529 at *62–63.

Even if the Court determines that sovereign immunity does not bar Counts I, IV, and V, the State Defendants are entitled to official immunity barring these claims.  *See* GA. CONST. Art. I, Sec. II, Para. IX(d);  *see also Lathrop*, 2017 Ga.

22

LEXIS 529 at *48 (recognizing that official immunity bars suits against state officers in their individual capacities for official acts involving an element of discretion based on wrongs already done and injuries already sustained).

## II.   Plaintiffs' Complaint Fails to State a Claim.

As discussed above, Plaintiffs' Complaint should be dismissed in part as moot, for lack of standing, and as barred by the Eleventh Amendment, sovereign immunity, and official immunity.  However, even if Plaintiffs' claims were not barred, they are all nonetheless subject to dismissal for failure to state a claim.[14]

### A.   Plaintiffs Fail to Sufficiently Allege a Federal Constitutional Claim.

Plaintiffs assert claims pursuant to the First Amendment, the Fourteenth Amendment's Due Process Clause and Equal Protection Clause.[15]

---

[14] With respect to Plaintiffs' election contest claims, even if they were not moot and barred by sovereign immunity, they are barred by the statute of limitations. *See* Doc. 8-1 at 30-39.

[15] Plaintiff, Ricardo Davis, was also a Plaintiff in an earlier challenge to the DRE ballot system.  *Favorito v. Handel*, 285 Ga. 795 (2009).  Federal courts, pursuant to the Full Faith and Credit Clause, 28 U.S.C. § 1738, give state court judgments the same preclusive effect as would other courts in that state.  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005); *See also Community State Bank v. Strong*, 651 F.3d 1241, 1263 (11th Cir. 2011) (federal courts apply state law when enforcing a state judgment).  Ricardo Davis' claims in this action are barred by res judicata.  *Brown v. Williamson Tobacco Corp. v. Gault*, 280 Ga. 420, 421 (2006).

23

To the extent Plaintiffs' equal protection claim is premised on allegations that use of a DRE machine to cast a ballot is less favorable than voting by absentee ballot which is then read by an Opti Scan reader, Doc. 15 ¶¶ 166-169, 175, Plaintiffs lack standing to bring this claim because *none* of the Plaintiffs actually voted on a DRE machine.  However, even if they could establish standing, Plaintiffs have not made out an Equal Protection claim for the reasons stated in Defendants' initial motion to dismiss, Doc. 8-1 at 27-30.  Defendants hereby adopt and incorporate by reference their earlier equal protection arguments here.

With respect to Plaintiffs' Due Process claim, the Fourteenth Amendment's Due Process Clause provides two types of protection: (1) substantive due process; and (2) procedural due process.  *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (*en banc*).  Count II of Plaintiffs' Complaint asserts a federal due process claim but fails to articulate if Plaintiffs are asserting a substantive due process claim or procedural due process claim.[16]  The allegations in Count II appear to

---

[16] While Counts II and III purport to be a federal constitutional claims brought pursuant to 42 U.S.C. § 1983, the allegations within these counts include references to Georgia's Due Process and Equal Protection clauses.  Doc. 15 ¶¶ 160 and 178.  These state provisions are no broader than their federal counterparts.  "The due process guarantees [of the United States and Georgia Constitutions] are substantively identical."  *Cherokee County v. Greater Atlanta Homebuilders Ass'n*, 255 Ga. App. 764, 767 n. 1 (2002); *Ambles v. State*, 259 Ga. 406, 407 (1989) (describing equal protection clauses of the United States and Georgia Constitutions as "coextensive.").

premise the alleged due process violation on Defendants' alleged "failure to comply with the Georgia Constitution and Georgia Code." Doc. 15 ¶ 151; *see also* ¶¶ 152-159 (describing alleged violations of state law as underpinning the federal due process claim). These allegations suggest a procedural due process claim. Defendants therefore adopt and incorporate by reference the argument in their initial motion to dismiss on this point. *See* Doc. 8-1 at 25-27. In an abundance of caution, and because Plaintiffs' claim is not at all clear to Defendants' counsel, this brief will also address the lack of a substantive due process claim.

As an initial matter, it is not clear exactly what specific rights and injuries Plaintiffs assert. Plaintiffs sometimes appear to assert an *individual* right to cast a ballot with a paper trail. Doc. 15 ¶¶ 1, 4-7. Later in the complaint, Plaintiffs appear to bring claims asserting a broader right to have the election conducted pursuant to a specific balloting system. Doc. 15 ¶¶ 49, 55-56, 64, 72. Plaintiffs also refer to their federal right to have elections pursuant to a voting system that complies with Plaintiffs' reading of state law. Doc. 15 at ¶¶ 86-92. Of course, even if Plaintiffs were correct as to their interpretation of state law, a [m]ere violation of a state statute does not infringe the federal Constitution." *Snowden v. Hughes*, 321 U.S. 1, 11 (1944). Nor will every election irregularity rise to the level of a constitutional claim. *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975)

(rejecting election challenge based on voting device malfunction and explaining that "[i]t is not every election irregularity . . . which will give rise to a constitutional claim and an action under section 1983.").

The Supreme Court has long recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). "Regulations imposing severe burdens on Appellants' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434).

Importantly, here, Plaintiffs have not identified any actual burden on their right to vote from use of DRE or Opti Scan readers, absent interference by a third party engaged in criminal conduct. First, pursuant to state law, Plaintiffs may choose to vote by absentee paper ballot or on election day by DRE. O.C.G.A. § 21-2-380(b). Plaintiffs cite no authority for their statement that having to choose between voting by absentee paper ballot or on election day burdens their right to vote. As the *Favorito* Court recognized, "absentee voters 'have not been treated

26

differently from the polling place voters, except in a manner permissible under the election statutes' and as a result of their own choice." 285 Ga. at 798. More importantly, Plaintiffs make no allegations that their votes *have been* diluted or not counted as cast. Rather, they allege that DRE's are vulnerable and therefore *maybe*, if a third party intervenes, Plaintiffs' votes will not be counted as cast. Those allegations, that a third party may by criminal conduct change Plaintiffs' votes, are insufficient to state a First or Fourteenth Amendment claim.[17]

The Georgia Supreme Court has held that the use of DRE voting machines does not violate voters' state or federal constitutional rights, including substantive due process rights.[18] *Favorito*, 285 Ga. at 797-798 (explaining that voters do not have a right to a particular ballot system and that "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems."). Similarly, the Eleventh Circuit has rejected a Due Process and Equal Protection challenge to manual recount procedures premised on the lack of a paper trail for counties that used the touchscreen machines. *Wexler v. Anderson*, 452 F.3d 1226, 1233 (11th Cir. 2006), *cert. denied*, 549 U.S. 1111 (2007).

---

[17] Analysis under the First and Fourteenth Amendment is the same. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

[18] While this Court is not bound to the state court's interpretation of federal law, it is bound to that court's interpretation on matters of state law. *Johnson v. United States*, 559 U.S. 133, 138 (2010).

> [I]f voters in touchscreen counties are burdened at all, that burden is
> the mere possibility that should they cast residual ballots, those ballots
> will receive a different, and allegedly inferior, type of review in the
> event of a manual recount.  Such a burden, borne of a reasonable,
> nondiscriminatory regulation, is not so substantial that strict scrutiny
> is appropriate.

452 F.3d at 1232-1233.

Other courts have also held that the use of a DRE ballot system does not,

without more, state a due process claim.  *Stein*, 223 F. Supp. 3d at 438 (explaining

that "decisions that sustain due process challenges to elections involve documented

instances of improperly cast ballots, wholesale refusal to count properly cast

ballots, direct infringements of the right to cast ballots, or a total failure to conduct

the election.").  Those types of allegations are not present here.

The Ninth Circuit Court of Appeals has held that use of DRE technology is

not a severe restriction on voting and is therefore only subject to rational review.

*Weber*, 347 F.3d at 1106 ("Under *Burdick*, the use of touchscreen voting systems is

not subject to strict scrutiny simply because this particular balloting system may

make the possibility of some kinds of fraud more difficult to detect.").  The *Weber*

Court recognized that "it is the job of democratically-elected representatives to

weigh the pros and cons of various balloting systems. So long as their choice is

reasonable and neutral, it is free from judicial second-guessing."  *Weber*, 347 F.3d

at 1107; *Favorito*, 285 Ga. at 797 (same, quoting *Weber*).  Relying in part on

28

*Weber*, the Pennsylvania Supreme Court has also recently held that "DREs that register votes electronically without a voter-verified ballot do not severely restrict the right to vote." *Banfield v. Cortés*, 631 Pa. 229, 265 (Pa. 2015).  Similarly, in recognizing the benefits of DRE machines, the Texas Supreme Court has held that:

> DREs are not perfect.  No voting system is.  We cannot say that DREs impose severe restrictions on voters, particularly in light of the significant benefits such machines offer. . . . DREs can reduce uncounted votes and virtually eliminate the racial gap that tends to exist with other types of equipment, have the potential to expand access for people with disabilities and for voters with limited English proficiency, and tend to considerably reduce the number of uncounted votes.

*Andrade v. NAACP of Austin*, 345 S.W. 3d 1, (Tex. 2011) (internal quotations and citations omitted).

Importantly, Defendants are required, pursuant to the Help America Vote Act (HAVA), to provide a voting system that will:

> (A)  be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters;
>
> (B)  satisfy the requirement of subparagraph (A) through the use of *at least one direct recording electronic voting system* or other voting system equipped for individuals with disabilities at each polling place;

52 U.S.C. § 21081(a)(3) (emphasis added).  Paper ballots do not provide vision impaired voters the ability to cast a vote in a private and independent manner.

> DRE systems contain an audio component which enables visually
> impaired voters to listen to candidates' names on headphones and to
> vote using distinctively shaped keys. DRE systems also contain mouth
> or head sticks, sip-and-puff devices, or other accessible switch
> technology that enables manually impaired voters to select candidates
> of their choice. Only with the use of these devices may such disabled
> voters, for the first time, vote independently and in private.

*Am. Ass'n of People with Disabilities v. Shelley*, 324 F. Supp. 2d 1120, 1125 (C.D. Cal. 2004).

Where, as here, Plaintiffs have not alleged any burden on their right to vote by use of DRE and Opti Scan readers, absent criminal conduct, Plaintiffs have failed to sufficiently allege a federal constitutional claim.  But even if this Court were to find that Plaintiffs' right to vote was burdened, that burden is not severe, and the State's interests in complying with federal law and providing persons with disabilities access to voting technology that provides them with the means to vote in private and independently is more than sufficient to justify any minimal burden.

### B.    The State Defendants, In Their Individual Capacities, Are Entitled to Qualified Immunity.

Defendants, in their individual capacities, are entitled to qualified immunity from Plaintiffs' federal constitutional claims.  Qualified immunity protects governmental defendants sued in their individual capacities so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Vinyard v. Wilson*, 311 F.3d 1340,

1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The immunity is decided as a matter of law and is effectively lost if a case is erroneously permitted to go to trial. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To avail of the immunity, a defendant must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Vinyard*, 311 F.3d at 1346. Once this showing is made, the burden shifts to the plaintiff to show that the law was clearly established. *Id.* A plaintiff can meet this burden only by pointing to constitutional provisions, federal statutes, and binding judicial decisions of the United States Supreme Court, the Eleventh Circuit, and the Georgia Supreme Court clearly establishing the law. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1200 n.6 (11th Cir. 2007); *Marsh v. Butler County*, 268 F.3d 1014, 1033 n.10 (11th Cir. 2001) (*en banc*).

When determining whether defendant was engaged in discretionary acts, the question that must be answered is whether they were pursuing legitimate job-related goals through means that were within their power to utilize. *Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). The inquiry does not focus on whether it was within a defendant's authority to commit the allegedly illegal act. *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). Rather, the question is "whether the act complained of, if done for a proper purpose, would be

31

within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.* (quoting *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997)).  Courts look to the "general nature of the defendant's action, putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266.  Here, Defendants are sued for their alleged involvement in the administration of Georgia's elections, which Plaintiffs assert resulted in a violation of Plaintiffs' constitutional rights.  Therefore, Defendants were clearly acting within their discretionary authority and the burden shifts to Plaintiffs to show a violation of a clearly established constitutional right.

For the reasons stated above in Section II.A., *supra*, Plaintiffs have not been deprived of any federal constitutional right.  Moreover, even if this Court were to find the allegations in the complaint sufficient to allege a constitutional violation, the State Defendants, in their individual capacities, are nonetheless entitled to qualified immunity because there is no clearly established law that their actions would violate the constitution.  *See Favorito*, *supra; Wexler*, *supra.*

Whether the law is clearly established turns on whether the Defendants had fair notice that their conduct was unlawful.  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  General principles of law are not specific enough to provide fair

warning. *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). For the law to be clearly established to the point that qualified immunity does not apply, it must have been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the government official's place, that "what he is doing violates federal law." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Here, the law is not clearly established that any of the actions alleged in the complaint would violate Plaintiffs' federal constitutional rights.

### C.   Plaintiffs Have Failed to State a Claim Pursuant to the Georgia Constitution and Election Statutes.

First, the provision of the Georgia Constitution that Plaintiffs cite does not provide a private right of action that would give rise to their claim that they can dictate what election equipment is used an election or otherwise abrogate the State's sovereign immunity to force it to use the election equipment of Plaintiffs' choosing. *See* Section I.C, *supra*. Second, there is no state law equivalent to 42 U.S.C. § 1983 which would provide a cause of action for a violation of the State constitution. *Howard v. Miller*, 222 Ga. App. 868, 872 (1996); *accord Davis v. Standifer*, 275 Ga. App. 769, 772 n. 2 (2005); *Draper v. Reynolds*, 278 Ga. App. 401, 403 n. 2 (2006). Therefore, simply citing to a provision of the Constitution does not provide Plaintiffs with a private right of action.

33

Finally, even if Plaintiffs had a private right of action to sue directly under the Georgia Constitution, their claim is foreclosed by the Georgia Supreme Court's decision in *Favorito v. Handel*. See *Favorito*, 285 Ga. at 797 (rejecting arguments that voters are entitled to have their votes cast and tabulated in a particular manner and that the alleged lack of an "independent audit trail" violated a voter's fundamental right to vote). Similar to this case, *Favorito* was a constitutional challenge to the use of the exact same DRE units for Georgia elections that are at issue here. As shown in Section II.A., *supra*, even if Plaintiffs' speculations about the dangers of DRE units had any evidentiary foundation, Plaintiffs' constitutional rights are not violated where the State's choices are "reasonable and neutral." *Favorito*, 285 Ga. at 797.

If Plaintiffs could somehow overcome these shortcomings, Count I would still be subject to dismissal because none of Plaintiffs' factual allegations demonstrate that the June 20th runoff election was not "conducted in accordance with procedures provided by law" as required by Article II, Section 1, Paragraph 1 of the State Constitution. Plaintiffs misconstrue a number of State statutes to reach their conclusion. First, they cite O.C.G.A. § 21-2-379.1(8) and § 21-2-365(8), which state that DRE and optical scanning machines must "when properly operated, record correctly and accurately every vote cast." However, Plaintiffs can

34

only point to hypothetical allegations of compromise to the voting machines themselves based on allegations that a separate computer system at KSU was compromised.  Plaintiffs allege that the voting system was a "compromised system" but they do not, and cannot, show that the DREs and the other connected voting hardware actually were compromised or that these machines did not "register or record correctly and accurately every vote case."

Second, Plaintiffs create a series of statutory requirements for the election out of statutes that are actually either (1) discretionary in nature (O.C.G.A. § 21-2-279(b)) or irrelevant to the allegations at issue here (O.C.G.A. §§ 21-2-379.6(a); 21-2-379.6(c);  21-2-379.7(b), (c), and (d)(3)); 21-2-379.9(b)).

Third, Plaintiffs contort the statutory language in O.C.G.A. § 21-2-379.2 and § 21-2-368, governing reexamination of DREs and optical scanning machines, respectively, to suggest that because ten Georgia electors requested a reexamination of the current DRE system,  the system could not be used until such a reexamination occurred.  Plaintiffs also mistakenly read a "certification" requirement into these statutes, when the two provisions clearly speak to nothing more than the reexamination (i.e., post-certification) process.  *See* Doc. 15 ¶¶ 58 and 61.

The only approval requirements in § 21-2-368 and §21-2-379.2 are that once a reexamination occurs, the Secretary of State must approve or disapprove of either system; under the statutes, the systems may be used until such time as the Secretary conducts a reexamination and concludes that in his opinion the systems can no longer be safely used.  *See* O.C.G.A. §§ 21-2-368(b)-(c), (f) and 21-2-379.2(b)-(c), (f).  Plaintiffs would like to read subparagraphs (b) and (c) in isolation, to suggest that (1) once a reexamination is requested, the current DRE and optical scanning systems cannot be used; and (2) Secretary Kemp has a separate responsibility to certify the DRE and optical scanning systems absent a reexamination taking place first.  *See* Doc. 15 ¶ 58, 62, 94, and 95.  The terms in statutory provisions "should be understood in relation to each other, since '[w]ords, like people, are judged by the company they keep.'"  *Warren v. State*, 294 Ga. 589, 590-591 (2014) (quoting *Hill v. Owens*, 292 Ga. 380, 383 (2013)).  Here, read in context, it is clear that Georgia's previously certified voting system retains its certification until the Secretary of State, not Plaintiffs, determines otherwise.  Certification should not be confused with reexamination.  Plaintiffs cannot rely on their request for reexamination of the DREs, or the reexamination statutes, to claim that the systems are not certified and that use of the current DRE and optical scanning systems in the June 20th runoff election violated the Georgia

Constitution.  Nothing in §§ 21-2-368 or 21-2-379.2 requires Secretary Kemp to "approve" of the DRE and optical scanning systems absent a reexamination occurring first.

Furthermore, there is no timeframe in the statute for how quickly the reexamination must be completed and no standards in Georgia law "controlling the examination and certification of voting systems" as Plaintiffs allege.  *See* Doc. 15 ¶ 138.  As Plaintiffs admit, Secretary Kemp has waived the fee for the reexamination, and he has been in regular contact with the requesting electors about the ongoing reexamination process since the request was first made.  *See* Doc. 15 ¶¶ 97, 137, and 138.  The Secretary of State has the sole authority to determine whether in his opinion the DRE and optical scanning systems are safe and accurate, and he has no legal duty to "sideline" the voting systems as Plaintiffs allege unless the Secretary makes a determination that the machines are not safe and accurate.  *See* Doc. 15 ¶ 140.  In addition, all of Plaintiffs' allegations that any ballot used in the June 20 runoff election was illegal are purely speculative and cannot create a cause of action, despite Plaintiffs citation to a Georgia Supreme Court case that is wholly irrelevant here because it merely concerned a ballot that was illegal because a proper candidate's name was omitted.  *See* Doc. 15 ¶ 142 (citing *Mead v. Sheffield*, 278 Ga. 268, 269, 601 S.E.2d 99, 100 (2004).

37

Finally, as with other counts in the complaint, Plaintiffs fail to make any factual allegations connecting the individual members of the SEB or Merle King to the use of DRE and optical scanning machines in the Sixth Congressional District run-off election or any election.  Based on the foregoing, Count I fails to state a claim for relief.

In Count V of the Complaint, Plaintiffs rely on two state statutes and a state regulation to argue that Secretary Kemp has not certified the DRE and optical scanning systems, but Plaintiffs have not cited to a single statutory provision that authorizes a private right of action for them to bring this suit and obtain the relief they seek.

In Georgia, "[c]ivil liability may only be authorized . . . when the General Assembly has expressly provided for a private right of action in the textual provisions of the statute."  *Somerville v. White*, 337 Ga. App. 414, 416 (2016) (emphasis in original); *Anthony v. Am. Gen. Fin. Servs.*, 287 Ga. 448, 454-459 (2010) (holding that the notary statute does not contain an express private cause of action and rejecting any implied private right of action).  "The judicial task is, of course, to interpret the statute the General Assembly has passed 'to determine whether it displays an intent to create not just a private right of action but also a private remedy.'"  *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).

The election statutes and regulation Plaintiffs rely on, O.C.G.A. § 21-2-379.2 and § 21-2-368 and Ga. Comp. R. & Regs. r. 590-8-1-.01, do not provide a private right of action.  The Georgia General Assembly has created private rights of action elsewhere in the election code.  *See* O.C.G.A. § 21-2-521; (providing a cause of action to candidates and electors for the purpose of challenging an election); § 21-2-522 through § 21-2-529 (setting out in detail the framework for all causes brought pursuant to O.C.G.A. § 21-2-521); § 21-2-171(c) (providing cause of action for candidate seeking nomination by petition to challenge the denial of the nomination petition); § 21-2-186 (providing cause of action for political body to challenge denial of nomination by petition).  These examples of private rights of action stand in stark contrast to the election statutes cited by Plaintiffs.  Importantly, the Georgia Supreme Court has recognized that the 2010 enactment of O.C.G.A. § 9-2-8(a), which provides that no private right of action shall arise from any Act enacted after the effective date of this Code section unless such right is expressly provided therein, "counsels against deviating from [the Court's] established precedent to find new implied causes of action," even where a pre-existing statute is at issue.  *Anthony*, 287 Ga. at 459.

Finally, citing to Ga. Comp. R. & Regs. r. 590-8-1-.01(b)(4), Plaintiffs incorrectly argue that Georgia's voting system certification has been rendered

39

invalid because of certain alleged modifications to the system since it was last

certified.  In addition to the fact that this regulation does not provide a private right

of action, Plaintiffs misconstrue the regulation.  Subsection (b)(4) provides in full:

> Any modification to the hardware, firmware, or software of a voting
> system **which has completed Qualification, Certification, or**
> **Acceptance testing in accordance with these Rules** shall invalidate
> the State certification unless it can be shown that the modification
> does not affect the overall flow of program control or the manner in
> which the ballots are recorded and the vote data are processed, and the
> modification falls into one of the following classifications listed
> below.  The Secretary of State shall be the sole judge of whether or
> not a modification requires additional testing.

Ga. Comp. R. & Regs. r. 590-8-1-.01(b)(4) (emphasis added).  Plaintiffs admit that

the components that they allege have been added and modified since 2008 have not

completed new certification testing.  *See* Doc. 15 ¶¶ 191, 192.  Thus, under

Plaintiffs own allegations, this regulation is inapplicable.  Finally, Plaintiffs create

out of whole cloth the requirement that Secretary Kemp "must certify any new

system configuration, tested as an integrated whole, before it can be used in any

election." Doc. 15 ¶ 194.  Plaintiffs cite to no statute or regulation in support of

this alleged requirement, and none exists.  In fact, Ga. Comp. R. & Regs. r. 590-8-

1-.01(b)(4) implies the opposite of such a requirement by making the Secretary of

State "the sole judge of whether or not a modification requires additional testing."

Accordingly, Plaintiffs reliance on this State regulation should be disregarded.

**D.     Plaintiffs Are Not Entitled to a Writ of Mandamus.**

Both mandamus counts fail as a matter of law.  As to Count 8, the Secretary has no mandatory legal duty under O.C.G.A. §§ 21-2-379.2(a) and 21-2-368(a) to re-examine DREs or optical scanning equipment "*sua sponte*." Doc. 15 at ¶¶ 221-222. The claim against the State Board of Elections should be dismissed because mandamus claim may only be brought against public officials, and not public entities.  With respect to the Board members, the claim fails because the law imposes no duty upon them "to remove from use [DREs and optical scanning equipment] that are not practicable." Doc. 15 at ¶ 236.  Finally, both mandamus counts also fails as a matter of law because they seeks relief that is not available under a mandamus.

**1.   Plaintiffs Have Mischaracterized the Legal Standard Applicable to Mandamus Actions Under Georgia Law.**

Plaintiffs' Amended Complaint mischaracterizes Georgia law governing the extraordinary writ of mandamus when it describes an allegation that a public officer committed "a gross abuse of discretion" as providing an *alternative* basis to obtain mandamus in the absence of a clear legal right to the relief.  Doc. 15 at ¶¶ 218, 235 (mandamus is warranted when "requesting party has a clear legal right to the relief sought or that [sic] the public official has committed a gross abuse of discretion") (emphasis in original).

41

In *Bibb County v. Monroe County*, 294 Ga. 730 (2014), the Georgia
Supreme Court surveyed Georgia precedent governing mandamus law and
explained that "the writ of mandamus is properly issued *only* if 1) no other
adequate legal remedy is available to effectuate the relief sought; and 2) the
applicant has a clear legal right to such relief." *Bibb*, 294 Ga. at 734 (emphasis
added).  Demonstrating the existence of "a clear legal right to such relief" is thus
one of the two *mandatory* requirements in order to state a legally cognizable claim
for mandamus.

Georgia courts have repeatedly stated that this necessary "clear legal right to
the relief sought may be found *only where the claimant seeks to compel the
performance of a public duty that an official or agency is required by law to
perform*." *Bibb County*, 294 Ga. at 735 (emphasis added); *see also Bland Farms v.
Georgia Department of Agriculture*, 281 Ga. 192, 193 (2006) (Mandamus
complainant must show that the law "not only authorize[s] the act to be done, but
must require its performance.").  In cases "[w]*here performance is required by
law*, a clear legal right to relief will exist either where the official or agency fails
entirely to act or where, *in taking such required action*, the official or agency
commits a gross abuse of discretion." *Bibb County*, 294 Ga. at 735 (emphasis
added); see also *Riley v. Southern LNG*, 300 Ga. 689, 691 (2017) (same).  The

42

underscored language thus makes clear that the "gross abuse of discretion" standard for obtaining mandamus relief is legally relevant *only* when the official is performing a *legally required* duty.  If the act is not one that the public official is legally required to undertake, mandamus cannot lie, even if it were alleged that the official had grossly abused his or her discretion.

The Georgia Supreme Court has explained that "[t]he determination of whether official action is required depends on the law governing the subject matter at issue" and that "where the applicable law vests the official or agency with discretion with regard to whether action is required in a particular circumstance, mandamus will not lie, because there is no clear legal right to the performance of such an act."  *Bibb*, 294 Ga. at 735 (citing other Georgia authorities)

### 2.  The Secretary Is Not Legally Required to Re-Examine the DREs aor The Optical Scanning Equipment As Requested in Count VIII.

The plain statutory language in O.C.G.A. §§ 21-2-379.2(a) and 21-2-368(a) makes clear that the Secretary is legally required to conduct a re-examination in only *one* circumstance: when he is requested by ten or more electors who have paid reasonable costs.  The Amended Complaint's contention that the Secretary has a duty "*sua sponte*" to re-examine the DREs and the optical scanning equipment [Doc. 15 at ¶¶ 220-221] is belied by the plain language of the two parallel provisions, which state that "the Secretary of State *may*, at any time, *in his*

*or her discretion*, re-examine" [the DREs and the optical scanning equipment].

O.C.G.A. § 21-2-379.2(a); § 21-2-368(a) (emphasis added).  As noted above, the

Georgia Supreme Court has instructed that an action cannot be deemed to be

"required" for purposes of seeking a mandamus "where the applicable law vests

the official or agency with discretion with regard to whether action is required."

*Bibb*, 294 Ga. at 735.  Here, the applicable law not only uses the discretionary

word "may," but specifically states that the Secretary can use "discretion" in

determining whether or not to re-examine the DREs and the optical scanning

equipment. Thus, a mandamus claim cannot be predicated on the Secretary's

failure to act on his own to conduct a re-examination because a reexamination is

not legally required.  The allegations in the Amended Complaint that the Secretary

"grossly abused his discretion" by not initiating the reexamination [Doc. 15 at ¶¶

223-228], even if deemed true (which they are not), are legally irrelevant because

gross abuse of discretion for purposes of mandamus relief applies only to required

legal actions that are properly the subject of a mandamus in the first place.

A mandamus *could* theoretically lie to compel the Secretary to re-examine

the equipment if ten or more electors had requested him to do so and if those

electors had paid the reasonable costs.  *See* O.C.G.A. §§ 21-2-379.2(a) and 21-2-

368(a) ("*Before* any such examination or reexamination, the person, persons, or

organization requesting such reexamination shall pay to the Secretary of State the reasonable expenses of such examination." (emphasis added). Subsection (b) provides that if that request has been made and if the reasonable costs have been paid, "[t]he Secretary of State *shall* thereupon examine or reexamine [the equipment] and *shall* make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether in his or her opinion, [the DRE or optical scanning equipment] so examined can be safely and accurately used by electors . . ." O.C.G.A. §§ 21-2-379.2(b) and 21-2-368(b).  The General Assembly's use of the mandatory word "shall" in those provisions makes clear that this act *is* a legally required action and thus could properly be addressed through a mandamus action.  While 10 or more electors did request that the Secretary undertake the examination [Doc. 15 at ¶ 97], the Amended Complaint does not allege that the requesting electors have paid reasonable costs for the examination, and without payment being made, there is no legal duty for the Secretary to conduct the re-examination.

While the Secretary was not required to conduct the reexamination, the Secretary has nevertheless exercised his discretion to reexamine the voting equipment at no charge to the requesting electors, an examination that is currently underway as acknowledged in the Amended Complaint.  Doc. 15 at ¶ 231.  Thus,

even if a mandamus could lie to compel the reexamination (which it cannot), the claim would be subject to dismissal on mootness grounds given that the Secretary is in fact conducting the requested investigation.  *See Brown v. Principi*, 2004 U.S. App. Vet Claims LEXIS 275 at *2 (Under "jurisdictional restraints provided for in Article III of the U.S. Constitution," mandamus petition must be dismissed as moot when "the relief requested in a petition has been obtained.").  While the Amended Complaint suggests that the current reexamination is somehow deficient because it is not "timely" [Doc. 15 at ¶ 231], O.C.G.A. §§ 21-2-379.2(b) and 21-2-368(b) do not require that the examinations be conducted within a specified number of days, and, therefore, a mandamus cannot be predicated on alleged failure to be "timely" because there is no legal requirement concerning the time frame.[19]

---

[19]  It is the Plaintiffs, and not Secretary Kemp, who have been unreasonable in their estimates of the time needed to conduct the reexamination. While Plaintiffs do not attach the electors' request to the Amended Complaint (attaching only the Secretary's response [Doc. 2 at 230-231]), the electors' request that the Secretary complete a review of 12 broad technical areas within a "*few hours*" is unreasonable.  *See* May 10, 2017 letter from electors to Kemp, attached as hereto Exhibit C (emphasis added).  The Plaintiffs' technical advisor subsequently opined that "it should require *no more than one day to review the system documentation and one day to prepare, review, and release your findings*."  *See* May 17, 2017 letter from Buell to Kemp, attached hereto as Exhibit D (emphasis added).  A complex analysis of 27,000 voting machines across 159 counties clearly requires more than a few hours or a couple of days, and the Secretary's initial estimate of 6 months was thus not unreasonable.  Doc. 2 at 230-231.  The Secretary has subsequently agreed to "conduct a reexamination that is thorough, methodologically sound, and able to be accomplished in a reasonable period of

**3. The State Board Is Not a Proper Party to a Mandamus Claim, and Neither The Board nor its Members Have Any Legal Duty to Remove DREs or Optical Scanning Equipment.**

The mandamus claim in Count IX should be dismissed against the State under the well established rule that mandamus actions may be brought only against public officials in their official capacity, and may *not* be brought against the office or the employing state agency. *SJN Properties v. Fulton County Board of Assessors*, 296 Ga. 793, 799, n.6 (2015) ("mandamus actions . . . may be sought only against public officials"); *City of Homerville v. Touchton*, 282 Ga. 237, 237 (2007) (petition for mandamus "did not properly 'allege a cause of action since it was brought against the City and not the proper officials required by law to perform the specified act.'"); *Bulloch County v. Ritzert*, 213 Ga. 818, 818 (1958) ("the writ of mandamus is personal and issues to the individual to compel performance, and it does not reach the office but is directed against the officer to compel him to perform the required legal duty").

The claim against the Board members should be dismissed because the Board members have no legal duty under O.C.G.A. § 21-2-344 "to remove from

time" at no cost to the requesting electors, thus rendering the mandamus claim moot. *See* July 18, 2017 letter from Germany to Marks, attached hereto as Exhibit E. This Court may consider documents extrinsic to the pleadings in determining a jurisdictional issue, such as mootness. *Briggs v. Briggs*, 919 F.2d 1525, 1529 (11th Cir. 2007).

use machines that are not practicable."[Doc. 15 at ¶ 236].  That provision provides election superintendents with the discretionary authority ("may arrange") to use paper ballots when "the use of voting machines is not possible or practicable." O.C.G.A. § 21-2-334.  First, "superintendent" is defined in the Election Code to refer to various county or municipal employees or entities and expressly excludes any state agencies or officials.  O.C.G.A. § 21-2-2(35)

Thus, the State Board and its members are not "superintendents," and, therefore, have no duty to take action of any kind pursuant to O.C.G.A. 21-2-334.[20] In addition, the superintendents' discretionary authority to discontinue use of "voting machines" in favor of paper ballots does not refer to either DREs or optical scanning equipment.  "Voting machine" is specifically defined in the Election Code as "a *mechanical device* on which an elector may cast a vote and which tabulates those votes by its own devices and is also known as a '*lever machine*.'" O.C.G.A. § 21-2-2(40) (emphasis added).  This type of mechanical device with a lever is *not* a DRE, nor is it an optical scanner.  DREs are separately defined in the Election Code as "computer-driven units" with "a video screen."  *See* O.C.G.A. §

---

[20] The State Defendants refer the Court to pages 12-19 of their Motion to Dismiss the original Complaint, which discussed the meaning of "superintendent" in the Election Code.  Footnote 12 on pages 17-18 of the State Defendants' Brief cites numerous provisions of the Election Code, which clearly show that neither the Secretary nor the State Board are superintendents as that term is defined in the Code.

21-2-2(4.1).  Clearly, then, this statute imposes no legal obligations on the State

Defendants, or even superintendents for that matter, to remove DREs from use

because it refers only to older mechanical voting machines.  In fact, it would

actually be unlawful for the Board members to remove the DREs, as requested in

Count IX, because this action is not one of the ten legally enumerated duties of the

Board set forth in O.C.G.A. § 21-2-31 (Duties of the State Election Board).

### 4. Mandamus Does Not Authorize the Relief in Counts VIII and IX.

Finally, even if Plaintiffs had pled a viable claim for mandamus by alleging

a legally required duty by the State Defendants, the law is clear that a mandamus

cannot be used to obtain the relief requested.  Plaintiffs are not simply seeking to

compel state officials to take an alleged required action; they are attempting to

dictate the form and content of such action by asking this Court to order the State

Defendants to replace DREs with an optical scan-based system or paper ballots.

[Doc. 15 at at ¶¶ 232, 240.  Georgia law is clear that "mandamus will not lie to

dictate the manner in which the action is taken or the outcome of such action."

*Bibb County*, 294 Ga. at 736.  As the Georgia Supreme Court has stated, "'[w]here

the act required to be done involves the exercise of some degree of official

discretion and judgment upon the part of the officer charged with its performance,

*the writ may properly command him to act*, or as is otherwise expressed, may set

49

him in motion; *it will not further control or interfere with his action, nor will it direct him to act in any specific manner*.'"  *Georgia Dep't of Transportation v. Peach Hill Properties*, 278 Ga. 198, 200 (2004) (internal citations omitted) (emphasis added).  Thus, even if the Secretary here had a mandatory legal duty to undertake the re-examination, the only relief Plaintiffs would be able to obtain is an order requiring the Secretary to undertake the re-examination, which, as noted above, he is already doing.[21]

### CONCLUSION

For the foregoing reasons, the State Defendants pray that all claims against them be dismissed.

Respectfully submitted,

CHRISTOPHER M. CARR
Attorney General                           112505

ANNETTE M. COWART               191199
Deputy Attorney General

RUSSELL D. WILLARD              760280
Senior Assistant Attorney General

/s/Cristina M. Correia
CRISTINA M. CORREIA            188620
Assistant Attorney General

---

[21] No relief of any kind would ever be available with respect to Count IX because the Board has no legal authority to remove DRE equipment based on its determination that it is "impracticable."

50

/s/Elizabeth A. Monyak
ELIZABETH A. MONYAK    005745
Assistant Attorney General

/s/Josiah B. Heidt
JOSIAH B. HEIDT    104183
Assistant Attorney General

Georgia Department of Law
40 Capitol Square SW
Atlanta, GA  30334
404-656-7063

Attorneys for State Defendants

Please address all
Communication to:
CRISTINA CORREIA
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
404-651-9325

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Defendants' Brief in Support of Motion to Dismiss was prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).

/s/ Cristina Correia
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on this date I have electronically filed the foregoing

**STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS**

with the Clerk of Court using the CM/ECF system, which will automatically send

email notification of such filing to the following attorneys of record:

Bryan Ward
Marvin Lim
Holcomb + Ward LLP
3399 Peachtree Rd NE, Suite 400
Atlanta, GA 30326
Bryan.Ward@holcombward.com
Marvin@holcombward.com

Overtis Hicks Brantley
Bennett D. Bryan
DeKalb County Law Department
1300 Commerce Drive 5th Floor
Decatur, GA 30030

Patrise M. Perkins-Hooker
Kaye Burwell
Cheryl Ringer
Fulton County Attorney's Office
141 Pryor Street SW Suite 4038
Atlanta, GA 30303
Facsimile: (404) 730-6324

Daniel W. White
Haynie, Litchfield, Crane & White, PC
222 Washington Avenue
Marietta, Georgia 30060

Russell D. Waldon
WALDON ADELMAN CASTILLA
HIESTAND & PROUT
900 Circle 75 Parkway
Suite 1040
Atlanta, GA  30339

Anne Lewis
Strickland Brockington Lewis LLP
1170 Peachtree Street, NE
Suite 2200
Atlanta, GA  30309-7200

This 29th day of August, 2017.


/s/ Cristina Correia
Assistant Attorney General