**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **DONNA CURLING, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CA No. 1:17cv02989-AT** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BRIAN KEMP, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**STATE DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

**<u>Introduction</u>**

Plaintiffs have filed a third iteration of their claims challenging the method by which all voters in Georgia cast their ballot during in person voting, i.e., through the Direct Recording Electronic (DRE) machine.  Plaintiffs continue to bring claims against the Secretary of State, the State Election Board and each of its members, and against Merle King, the Executive Director of the Center for Election Systems (CES) at Kennesaw State University (the State Defendants). Plaintiffs also bring claims against county officials for three of Georgia's one hundred fifty nine counties.[1]

---

[1] Plaintiffs' initial lawsuit included election challenge claims directed at the Sixth Congressional District election which included Cobb, DeKalb and Fulton counties. Plaintiffs have since abandoned those claims but continue to include the three counties that make up Congressional District Six as Defendants in this litigation.

Like Plaintiffs' first two versions of the complaint, Plaintiffs continue to allege only generalized fears that Georgia's election machinery is *vulnerable* to tampering and continue to assert that tampering in prior elections should be *presumed*.  Doc. 70 ¶¶ 62, 73, 74, 123, 124, 157, 162, 164, 170.  Plaintiffs allege facts relating to an alleged past security lapse relating to a server at CES and then *conclude* that the DRE system must therefore be *presumed* unreliable, without *any* allegations that connect the dots between past security at CES involving a server and anything relating to DRE machines.  What's more, in this third iteration of their claims, Plaintiffs purport to assert five federal claims, Counts 1 through 5, but these claims are simply repetitive and conclusory, and none sufficiently alleges a federal cause of action.

Plaintiffs continue to sue twenty-eight state and county officials and entities for both federal and state injunctive relief and damages.[2]  Plaintiffs' complaint fails to match any individual Defendant's actions to the specific claims against that Defendant.[3]

---

[2] Plaintiffs have dropped one Defendant, Mark Wingate to defeat a motion for remand.  *See* Docs. 58 and 75.

[3] Liability under Section 1983 cannot be imposed on theories of vicarious liability or *respondeat superior*.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Personal involvement is the *sine qua non* of liability under 42 U.S.C. §1983.  *Id.*

Plaintiffs' Second Amended Complaint is a typical shotgun pleading. Each count of the complaint incorporates by reference all prior paragraphs in the complaint. *See* Doc. 70 at ¶¶ 58, 66, 81, 89, 95, 103, 113, 126, 138, 145 and 155. The Eleventh Circuit has consistently condemned such an approach. *See Corbitt v. Home Depot U.S.A., Inc.*, 589 F.3d 1136, 1166 (11th Cir. 2009) (explaining that the problem with permitting a complaint to simply incorporate all previous paragraphs by references is that "it is impossible to determine the factual basis for each claim."); *Anderson v. District Board of Trustees of Central Florida Community College*, 77 F.3d 364, 366-67 (11th Cir. 1996); *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002) (explaining that "[t]he typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts . . . contain irrelevant factual allegations and legal conclusions.").

Making matters even worse, Plaintiffs repeat verbatim many of their boilerplate and conclusory allegations throughout the five asserted federal claims. *Compare* ¶¶ 59 and 83, ¶¶ 60 and 84, ¶¶ 61 (a-d) and 85 (a-d), ¶¶ 62 and 74, ¶¶ 67 and 96, ¶¶ 82 and 90, ¶¶ 86, 92 and 100. The Eleventh Circuit has made clear that neither this Court nor the Defendants should be required to "sift through the facts

presented and decide for itself which were material to the particular cause of action asserted" against each Defendant.  *See Beckwith v. Bellsouth Telcoms., Inc.*, 146 Fed. Appx. 368, 372 (11th Cir. 2005) (explaining that one problem with the complaint was that it was "virtually impossible to ascertain what factual allegations correspond with each claim and which claim is directed at which defendant."). While Plaintiffs represented to this Court, and Defendants, that their Second Amended Complaint would *streamline* their allegations and causes of action, the complaint in fact does neither.  *See* Doc. 60 at pp. 6, ln. 7-9; pp. 9, ln. 4-9.The State Defendants now move to dismiss all claims.

## ARGUMENT

## I.   This Court Lacks Subject Matter Jurisdiction.

### A.   Plaintiffs Lack Standing to Bring This Action.

Plaintiffs bear the burden of establishing standing.  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014).  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

> It is by now well settled that 'the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

hypothetical. Second, there must be a causal connection between the injury
and the conduct complained of . . . . Third, it must be likely, as opposed to
merely speculative, that the injury will be redressed by a favorable
decision.

*United States v. Hays*, 515 U.S. 737, 742-743 (1995) (quoting *Lujan* v. *Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992)).  A "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).  "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 519 (1975)).

## 1. Plaintiffs Have Not Sufficiently Alleged An "Injury In Fact."

The Supreme Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power."  *Hays*, 515 U.S. at 743.

As an initial matter, "[f]or an injury to be particularized, it must affect the plaintiff in a personal and individual way."  *Lujan*, 504 U.S. at 560.  Here, Plaintiffs are not affected in a personal way.  All voters in Georgia may choose to vote in person using a DRE machine, or alternatively by absentee paper ballot. Moreover, Plaintiffs must reside in the jurisdiction for which they seek to enjoin the future use of DRE machines.  *See Hays*, 515 U.S. at 745 (only voters residing

in the challenged district have standing).  Plaintiffs fail to set forth facts demonstrating that they each have a particularized injury.

"Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be concrete." *Spokeo*, 136 S. Ct. at 1548. "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id.* (quoting Black's Law Dictionary 479 (9th ed. 2009)).  The Supreme Court has explained:

> When we have used the adjective "concrete," we have meant to convey the usual meaning of the term — "real," and not "abstract." Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967). Concreteness, therefore, is quite different from particularization.

*Spokeo*, 136 S. Ct. at 1548.

Here, as in *Spokeo*, Plaintiffs have failed to articulate any concrete injury from the use of the DRE machines, either in any prior election or in any future election.  Plaintiffs' claims are premised entirely on the *possibility* that Georgia's election system *might be* subjected to malicious interference.  A generalized fear that malicious activity might occur is not sufficiently concrete to confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (rejecting "reasonable likelihood" of injury as sufficient to meet the injury in fact standard).  Here, Plaintiffs' allegations do not even rise to the level rejected as insufficient in

*Clapper*.  Instead, Plaintiffs assert that Georgia's DRE System "must be *presumed to be compromised* and incapable of producing verifiable results," Doc. 70 ¶¶ 62, 74, 124 (emphasis added); and that the DRE system "should have been *presumed to be compromised*," Doc. 70 ¶ 123 (emphasis added); and that the "DRE System must be *presumed* to have caused substantial discrepancies or errors in returns." Doc. 70 ¶ 157 (emphasis added).  These, and similar allegations are insufficient to confer standing.  "[S]tanding requires 'personal injury suffered by a party as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees.' . . . '[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy.'" *Burdick v. Kennedy*, 2017 U.S. App. LEXIS 13738 *3 (11th Cir. 2017) (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982)).

Nor are Plaintiffs' allegations that Georgia election statutes have been violated, by themselves, sufficient to confer Article III standing.  Even the violation of a federal statutory right is insufficient to necessarily confer Article III standing.  A Plaintiff must still show harm, not just a "bare procedural violation" of a statute.  *Perry v. CNN, Inc.*, 854 F.3d 1336, 1340 (11th Cir. 2017) (quoting *Spokeo*, 136 S. Ct. at 1550).  Here, Plaintiffs' Second Amended Complaint seeks to

7

address purely speculative injuries; that the DREs *might* not work as designed due to hackers or that election officials might surreptitiously track the order in which voters appear and then discover how a voter voted.[4]  *See Stein v. Cortes*, 223 F. Supp. 3d 423, 432 (E.D. PA 2016) (holding that allegations that DRE machines are "vulnerable, hackable, and antiquated" are insufficient to confer standing).

Courts "should not speculate concerning the existence of standing. . . . If the plaintiff fails to meet its burden, th[e] court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." *Dimaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir. 2008) (quoting *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006)).  Here, Plaintiffs have failed to allege a concrete injury and therefore lack standing to bring this action.[5]

## 2. There is No Causal Connection Between Plaintiffs' Alleged Injury And Any of the State Defendants' Conduct.

Even if Plaintiffs' alleged injuries were more than speculative, the injuries are still not traceable to any of the State Defendants but rather to criminal

---

[4] Defendants deny Plaintiffs' allegations that ballots are sequentially numbered and recorded as such when real ballots are cast.

[5] Plaintiffs assert that Plaintiff Terry has "third party standing representing voters to bring his claim."  Doc. 70 ¶ 21.  Plaintiffs have not alleged facts sufficient to assert claims of third parties.  *See Singleton v. Wulff*, 428 U.S. 106, 113 (1976) ("Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation.").

8

interference with the voting system by hypothetical third parties. *Clapper*, 568 U.S. at 411 (holding that speculation about whether Plaintiffs would be subjected to surveillance under the challenged federal statute, "or some other authority— shows that [Plaintiffs] cannot satisfy the requirement that any injury in fact must be fairly traceable to" the challenged statute).  Here, any injury would be traced to illegal hacking or surreptitious conduct by election officials, not the actual use of DREs.  There is no dispute that when working properly, DRE machines record a vote in the same manner as it is cast, and it is only hypothetical third-party interference that creates any potential injury to Plaintiffs. *See also Allen v. Wright*, 468 U.S. 737, 752-753 (1984) (holding that parents of school children did not have standing to challenge federal tax exemptions to racially discriminatory private schools because the alleged injury was not "fairly traceable to the assertedly unlawful conduct of the IRS.").

### 3.  It is Unlikely That Any Favorable Decision Will Redress Plaintiffs' Alleged Injury.

Plaintiffs' alleged injuries cannot be redressed by a favorable ruling from this Court.  Plaintiffs' speculation that a different balloting system would eliminate potential third party interference with voting ignores the reality recognized by the courts that no election system is flawless. *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("The unfortunate reality is that the possibility of electoral fraud

can never be *completely* eliminated, no matter which type of ballot is used.")

(emphasis in original); *Favorito v. Handel*, 285 Ga. 795, 797 (2009) (same).

### 4. Plaintiff CGG Lacks Associational Standing.

Finally, Plaintiff CGG does not have standing to bring this action.  Plaintiff

CGG is a non-profit corporation organized in Colorado.  Doc. 70 ¶ 15.  CGG

asserts that it is bringing this action on behalf of its members.  *Id.*  While Plaintiff

CGG purports to be a "membership organization," its executive director testified in

June, 2017 that there was no formal procedure to membership.  Instead, she

considers anyone that contacts the organization "to be on [their] mailing list and

get information" a "member."  Doc. 49-3 at 2 ln. 21 through p. 3 ln. 6.  However,

Colorado law is clear that *consent* of the proposed member is needed before they

may become a member.  C.R.S. § 7-126-102(2).  According to the CGG's website,

under the "Join Email List" tab on the website, no indication is provided that by

providing a name and address an individual is actually *joining* the organization,

much less any ability to grant or deny consent to be a member.[6]  CGG cannot

assert the rights of individuals simply because they are on CGG's mailing list.

### B. Plaintiffs' Federal Claims, Against the State Defendants in Their Official Capacities, Are Barred by the Eleventh Amendment.

---

[6] https://coalitionforgoodgovernance.org/join-us/ last visited on August 29, 2017.

Plaintiffs' federal claims are asserted against the individually named State Defendants in both their individual and official capacities.  Doc. 70 (Counts I through V).  Plaintiffs seek both injunctive relief and damages and do not identify in what capacity Defendants are sued for each type of relief.  *Id.*  The claims against the State Defendants in their official capacities are barred by the Eleventh Amendment.  *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).[7]  An exception to this immunity, pursuant to *Ex parte Young*, 209 U.S. 123 (1908), is limited to suits against state officers for *prospective* injunctive relief.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 no. 24 (1997).

Two limitations on this exception to Eleventh Amendment immunity are applicable in this case.  First, "[a] federal court cannot award *retrospective* relief, designed to remedy past violations of federal law."  *Id.* (emphasis added).  Second, "[i]n making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party."  *Ex parte Young*, 209 U.S. at 157.

---

[7] The Supreme Court has held that "§ 1983 does not override a State's Eleventh Amendment immunity."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63 (1989); *Quern v. Jordan*, 440 U.S. 332, 342 (1979); *Kentucky*, 473 U.S. at 169.

11

With respect to the first limitation, that the relief requested be prospective, Plaintiffs' claims for injunctive and declaratory relief and damages, premised on any past election, are barred because they are retrospective in nature. "Retrospective relief is backward-looking, and seeks to remedy harm 'resulting from a *past* breach of a legal duty on the part of the defendant state officials.'" *Seminole Tribe of Fla. v. Fla. Dep't of Revenue*, 750 F.3d 1238, 1249 (11th Cir. 2014) (quoting *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)) (emphasis in original). "Simply because the remedy will occur in the future, does not transform it into 'prospective' relief. The term, 'prospective relief,' refers to the ongoing or future threat of harm, not relief." *Fedorov v. Bd. of Regents*, 194 F. Supp. 2d 1378, 1387 (S.D. Ga. 2002). Plaintiffs' claims for any relief related to prior elections or any alleged past security lapses or other past injuries are retrospective and barred by the Eleventh Amendment.

The second limitation in the *Ex Parte Young* exception is that the State Officer "have some connection with the enforcement" of the State action sought to be enjoined. 209 U.S. at 157; *see also Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1342 (11th Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000) (declining to apply *Ex parte Young* exception where Defendants had "no authority to enforce" the challenged statutory provision). Here, Plaintiffs have sued the Secretary of

State, the members of the State Election Board, and Merle King, Executive Director of CES.

With respect to the individual members of the SEB, Plaintiffs allege only that these members are responsible for:

> (1) promulgating rules and regulations to ensure the legality and purity of all elections, (2) investigating frauds and irregularities in elections, and (3) reporting election law violations to the Attorney General or appropriate district attorney.

Doc. 70 ¶ 23.  None of the asserted "responsibilities" of the SEB are sufficiently connected to the state action Plaintiff seeks to enjoin to allow suit under *Ex Parte Young*.  Moreover, to the extent Plaintiffs' suit is premised on the SEB's promulgation of rules and regulations, the claim is barred by legislative immunity, regardless of the relief sought.[8]  *Scott v. Taylor*, 405 F.3d 1251, 1254 (11th Cir. 2005) (explaining that the immunity "applies with equal force to suits seeking damages and those seeking declaratory or injunctive relief.").  The Supreme Court has extended legislative immunity to state officials "acting in their legislative capacity."  *Consumers Union v. Supreme Court of Virginia*, 446 U.S. 719, 734 (1980) (extending immunity to state supreme court justices in challenge to attorney

---

[8] Plaintiffs assert that "Defendant State Election Board . . . promulgated Rule 183-1-12.01 requiring the use of DRE's in the state's elections, other than municipal elections."  Doc. 70 ¶ 24.  Plaintiffs ignore that state law, not the SEB, requires use of a DRE system of voting.  *See* O.C.G.A. § 21-2-379.3.  The SEB regulation merely recognizes what is otherwise required by state statute.

disciplinary rules).  Plaintiffs have failed to satisfy the second limitation of the *Ex Parte Young* exception with respect to the SEB members.  Therefore the individual members of the SEB, in their official capacities, are entitled to Eleventh Amendment immunity as to all federal claims.

Plaintiffs also sue Merle King, the Executive Director at CES.  Plaintiffs' allegations regarding King relate to an alleged past lapse in security at CES.  Doc. 70 ¶¶ 41, 45, 48, 49, 51.  First, these allegations all relate to past harm and therefore do not even pass the first *Ex Parte Young* limitation.  Second, Plaintiffs do not allege facts demonstrating a connection between King and what Plaintiffs allege to be a continuing violation of federal law, i.e., the continued use of DRE machines.  Therefore, Merle King is entitled to Eleventh Amendment immunity for all claims against him in his official capacity.

Finally, Plaintiffs seek injunctive relief and damages against Secretary Kemp in his official capacity.  All claims for money damages, and injunctive relief related to past elections are retrospective and therefore barred.

### C.    Counts 6, 7, and 10 Are Barred by State Sovereign Immunity.

The "sweep of sovereign immunity under the Georgia Constitution is broad."  *Olvera v. University System of Georgia*, 298 Ga. 425, 426 (2016).  In *Georgia Dep't of Natural Resources v. Center for a Sustainable Coast*, the Georgia

14

Supreme Court reversed its earlier divided precedent to announce a "bright line rule that only the Constitution itself or a specific waiver by the General Assembly can abrogate sovereign immunity." 294 Ga. 593, 602 (2014).

Application of that bright-line rule led the Court to reject a prior holding that had authorized common law injunctive relief against the State and rule that injunctive relief is barred by sovereign immunity, unless the plaintiff can demonstrate the existence of an explicit waiver authorizing the claim. In *Olvera*, the Georgia Supreme Court applied the same reasoning to claims seeking declaratory relief. Most recently, in *Lathrop v. Deal*, 2017 Ga. LEXIS 529 at *29 (2017), the Georgia Supreme Court ruled that sovereign immunity barred claims against the State for injunctive and declaratory relief based on enforcement of a law alleged by the plaintiffs to be unconstitutional. 2017 Ga. LEXIS at *34-37.

The holdings in these three cases leave no doubt that Plaintiffs cannot sue the State or the State Defendants in their official capacity for declaratory or injunctive relief based on the alleged violations of the Georgia Constitution (Count 6), the Georgia Election Code (Count 7), or the Georgia Personal Identity Protection Act ("PIPA") (Count 10) because there is no explicit waiver of sovereign immunity in either the state constitution or those Georgia Code provisions to authorize any of these claims.

15

In an obvious attempt to circumvent this sovereign immunity bar, Plaintiffs have sued State Defendants Secretary of State Brian Kemp, individually named members of the State Election Board, and CES Executive Director Merle King, in their individual capacities for alleged violations of the state constitution and state election law.[9] *See* Counts 6 and 7.  As discussed fully below, *Lathrop* and the older Georgia case law discussed and endorsed by the Supreme Court in *Lathrop*, demonstrate that a party cannot evade immunities through artful pleading.  Where, as in this case, the real party at interest is the State, sovereign immunity applies to bar the claim, irrespective of the fact that the state official was sued in his or her "individual" capacity.

## 1. Sovereign Immunity Cannot Be Circumvented Through Artful Pleading.

In *Lathrop*, the Georgia Supreme Court quoted approvingly from its holding in *Cannon v. Montgomery*, 184 Ga. 588 (1937), where the Court had made clear that sovereign immunity cannot be circumvented by making an action "nominally" against a state officer or employee in an individual capacity when the real party at interest is the State and the relief sought will "control the action of the State":

---

[9] A suit against a state officer in his or her official capacity is considered to be a suit against the State, and, therefore, sovereign immunity applies to lawsuits naming state officials in their official capacity.  *See e.g., Cameron v. Lang*, 274 Ga. 122, 126 (2001).

> A suit cannot be maintained against the State without its statutory consent. This general rule cannot be evaded by making an action nominally one against the servants or agents of a State when the real claim is against the State itself and it is the party vitally interested. . . . [A] judgment for plaintiff, although nominally against the named defendant as an individual or entity distinct from the state, will operate to control the action of the State or subject it to liability, the suit is in effect one against the State.

*Lathrop*, 2017 Ga. LEXIS 529 at *11, quoting *Cannon*, 184 Ga. at 591.

Similarly, *in Musgrove v. Georgia R. & B*., 204 Ga. 139 (1948), also cited in *Lathrop* (2017 Ga. LEXIS at *9), the Georgia Supreme Court explained that the fact that a pleading "is *in name* a suit against the defendant solely in his individual capacity is underlined, if upon consideration of the petition as a whole, including the relief which it seeks, it appears that the action is in reality a suit against the State brought without its consent." *Musgrove*, 204 Ga. at 155 (italics in original; underscore added). Thus, in holding that the plaintiffs' lawsuit seeking declaratory and injunctive relief was a suit against the State, notwithstanding the fact that the plaintiff had sued the State Revenue Commissioner in his individual capacity, the Supreme Court held that it was necessary to consider the "substance" of the allegations in the lawsuit and the "effect" on the State in terms of the relief requested. *See also National Distributing Co. v. Oxford*, 103 Ga. App. 72, 73 (1961) ("[A] suit cannot be maintained against a State official in his individual capacity as a means to sue the State.")

In determining whether a suit should be deemed to be one against the State, as was the case in *Musgrove*, or one against the individual state officer,[10] Georgia courts have stated that "the test for determining whether or not a suit is in reality one against the State" focuses on the relief sought: The action is considered a suit against the state where the requested relief "will operate to control the action of the State or subject it to liability." *Moore v. Robinson*, 206 Ga. 27, 37 (1949).

In *Holcombe v. Georgia Milk Producers Confederation*, 188 Ga. 358 (1939), discussed in *Lathrop* (2017 Ga LEXIS at *16-17), the Georgia Supreme Court elaborated on some of the relevant factors in determining whether a lawsuit suit controls the action of the State:

> In the present case . . . No judgment is asked which will take the property of the State, or fasten a lien on it, or interfere with the disposition of funds in its treasury, or compel the State indirectly, by controlling its officers, to affirmatively perform any contract, or to pay any debt, *or direct the exercise of any discretion committed to its officers*.

*Holcombe*, 188 Ga. at 363, quoted in *Lathrop*, 2017 Ga. LEXIS at *16-17 (emphasis added).  Thus, because the relief sought in that case did not control the actions of the state, by, for example, interfering with funds or state property or by

---

[10] In *Lathrop*, the Supreme Court ruled that individual capacity suits could be brought in one category of case not applicable here: where "state officers were sued in their individual capacities with respect to the enforcement of allegedly unconstitutional laws."  *Lathrop*, 2017 Ga. LEXIS at *11.

directing the discretion of a state officer, the Court held that the state was not the real party at interest, and, the suit could proceed against the individually named officers with sovereign immunity serving as no bar.

Application of this law to the facts of this case demonstrates that the State is the real party at interest here, and not the individually named Secretary of State or CES Director.  This is *not* a case involving an ultra vires act or threatened enforcement of an allegedly unconstitutional law.  While the State Defendants and the Plaintiffs may disagree about the meaning of statutes in the Election Code and thus the legal requirements governing examination and/or certification, Plaintiffs have not, and cannot allege, that the Secretary or the Director has taken actions acting wholly without legal authority.  .

Unlike the situation where a state officer has engaged in actions without legal authority, here Georgia law affirmatively *requires* the Secretary to administer a DRE system: O.C.G.A. § 21-2-50 states that the Secretary "shall perform all the duties imposed by this chapter," including the duty "[t]o develop, program, build, and review ballots for use by counties and municipalities *on direct recording electronic (DRE) voting systems in use in the state*."  O.C.G.A. § 21-2-50(15) (emphasis added).  While the relief clause in Plaintiffs' Second Amended Complaint changes the wording from the Amended Complaint to purportedly

narrow its scope by no longer seeking to enjoin the use of *all* DREs (Doc. 15 at ¶

113], but only those allegedly in violation of  specified provisions of Georgia law

(Doc. 70 at ¶ 165), this change is purely semantic in view of the Second Amended

Complaint's new allegation that the "particular Diebold DRE system used

throughout Georgia" has an alleged "inherent" "design flaw" that, in Plaintiffs'

view, allegedly prevents the machines from ever being legally compliant.  Doc. 70

at ¶ 106.  Thus, Plaintiffs are still seeking an injunction barring continued use of

the DRE machines currently in use in Georgia, which are Diebold DRE machines.

The Plaintiffs here are clearly attempting to "direct the exercise of . . .

discretion" committed to the Secretary by the General Assembly under the Election

Code, which demonstrates that the lawsuit is in substance against the State.

*Holcombe*, 188 Ga. at 363.  The expansive relief sought by the Plaintiffs – an order

enjoining all continued use of Georgia's current DRE System would clearly affect

State property, State resources, State policy, and the Secretary's discretion to

administer the Election Code.  In O.C.G.A. § 21-2-300(a), the General Assembly

expressed a legislative determination that voting should be uniform among

counties and stated that subject to the appropriation of necessary funds from the

General Assembly, the equipment used for voting "shall . . . be the same in each

county in this state and shall be provided to each county by the state, *as determined*

*by the Secretary of State*."  O.C.G.A. § 21-2-300(a) (emphasis added).  Thus, the legislature expressly provided the Secretary with discretionary authority to choose voting equipment for counties, and Plaintiffs are using this lawsuit to dictate the type of equipment that must be purchased.

Courts have emphasized that a lawsuit is deemed to control the state for purposes of determining the real party at interest when the subject matter involves expenditure and disbursement of State funds.  In *Peters v. Boggs*, 217 Ga. 471 (1961), for example, another older Georgia Supreme Court case cited to with approval in *Lathop*, 2017 Ga. LEXIS 529, at *12, the Court considered a suit against state education officials in their individual capacities seeking to enjoin allegedly unconstitutional appropriations of public funds for the support of desegregated schools.  In ruling that the lawsuit was in reality against the State and thus barred by sovereign immunity, the Court held that "[t]he cases relied on by the plaintiffs . . . where the State officer or agent was sued as an individual, were actions seeking to recover property or damages on account of unauthorized or illegal acts of the defendant and did not involve State property or seek to control State action."  *Peters*, 217 Ga. at 474.  The Court held that the state officers "are acting for this purpose as agents of the State.  Though they are sued as individuals, their acts, sought to be enjoined, are acts of the State."  *Peters*, 217 Ga. at 474-475

21

The reasoning of *Peters* applies with equal force to this lawsuit.  Here, the State itself would be required to purchase new voting equipment and train poll workers on new procedures.

### 2.  An Individually Named Official Cannot Be Sued Under PIPA.

The express language of PIPA makes clear that an individually named state officer or employee, such as Secretary Kemp or CES Director King, is not a proper party defendant.  O.C.G.A. § 10-1-911(2) specifically defines a "data collector" to refer to a state or local agency or subdivision, and *not* individual state or local employees.  Plaintiffs obviously recognize that neither State Defendants Kemp nor King are thus "data collectors" under O.C.G.A. § 10-1-911(2) because the Second Amended Complaint alleges that "the Secretary of State[11] and KSU were 'data collectors' as defined in O.C.G.A. § 10-1-911(2)" (Second Amended Complaint at ¶ 147); however, Count 10 does not name either the Office of the Secretary of State or KSU as defendants, but instead asserts a claim against Defendants Kemp and King (without specifying whether they are being sued in an individual or official capacity).  *See* Doc. 70 at pp. 47.

---

[11] The reference to "the Secretary of State" in this paragraph is somewhat unclear since it could refer to Secretary Kemp or the Office of the Secretary of State. However, given that Count 10's designation of parties sued refers to "Kemp" and "King," and paragraph 147 refers to "the Secretary of State and KSU," it appears that this paragraph is attempting to refer to the state agencies or subdivisions where Kemp and King work, respectively.

Again, under PIPA, if relief were ordered pursuant to O.C.G.A. § 10-1-912, the State would be required to provide notice of the release of personally identifiable information in an "expedient" fashion in consideration of unspecified "measures to determine the scope of the breach and [to] restore the reasonable integrity, security, and confidentiality of the data system." O.C.G.A. § 10-1-912. The form and type of notice required under PIPA depends upon the cost (whether it exceeds $50,000 or not), and the statute requires that if over 10,000 persons in the State are affected, notice must be provided to credit reporting agencies. O.C.G.A. §§ 10-1-911, 10-1-912. Thus, if the State were determined to have violated PIPA, any relief ordered under the statute would impact State resources and involve the exercise of state discretion.

Finally, this month, in *McConnell v. Georgia Department of Labor*, 2017 Ga. LEXIS 783 (Ga. 2017), the Georgia Supreme Court held that the Georgia Court of Appeals had erred when it dismissed a class action alleging tort claims against the Georgia Department of Labor based on the accidental release of personal information on grounds that the Court of Appeals should not have decided the motion to dismiss for failure to state a claim without first deciding the threshold issue as to whether a waiver of sovereign immunity had authorized the suit. *McConnell*, 2017 Ga. LEXIS at *2. While the Trial Court had dismissed the

claim both on grounds of sovereign immunity and failure to state a claim, the Court of Appeals did not address the sovereign immunity issue, affirming the trial court's dismissal for failure to state a claim on grounds that there was no legal duty imposed on the State (including a duty arising under PIPA) to safeguard the plaintiffs' private information.  [Id.].  The Supreme Court did not address the plaintiffs' appeal on the lack of a legal duty, but instead, citing *Lathrop*, 301 Ga. 408 (2017), stated that "[t]he Georgia Constitution provides broad sovereign immunity" and held that the applicability of sovereign immunity must be addressed as a threshold issue.  Thus, the Court remanded the case to the Court of Appeals to rule on the legal correctness of the trial court's ruling that the claims were barred by sovereign immunity.  *Id.* at *3.

### 3.  The Relief in Counts 6, 7, and 10 Would Require Official Acts.

That this case is in substance a suit against the State and not the individually named state officers is further evidenced by the fact that the *only* way the State Defendants could even perform certain types relief requested by Plaintiffs—the re-examination and recertification of voting equipment, the provision of notice regarding release of personally identifiable information, etc.,—is by acting *in their official capacity* as state officers.  *See Hennessy v. Webb*, 245 Ga. 329 (1980), cited in *Lathrop* [2017 Ga. LEXIS at *22] (where school principal was sued in his

24

individual capacity, the Supreme Court stated that "it is clear from these allegations *the suits were brought against this defendant solely because of the position he held and the duties imposed upon him as a result of this position. Indeed the act complained of could only have been done in the official capacity of [the] defendant*.") (emphasis added).  An "individual" lacks the legal authority and administrative expertise to examine and re-certify voting equipment or to provide notice to State citizens of the release of personally identifiable information.  Thus, if Plaintiffs were successful in obtaining their requested relief, this lawsuit would compel state officials to take various actions that could *only* be undertaken by virtue of their official positions.[12]

### 4. Sovereign Immunity Would In Effect Never Exist if Litigants Could Choose to Circumvent It Through Pleading.

Allowing plaintiffs to pursue claims against State officers in an individual capacity when the lawsuit affects and controls the State would in effect result in the *de facto* abolishment of sovereign immunity because litigants would invariably plead their claims as individual capacity suits in order to circumvent the bar on sovereign immunity.  Numerous courts around the country have made clear that in

---

[12] The Second Amended Complaint does, however, seek to compel certain State Defendants to perform certain actions that they are not authorized to undertake. For instance, the CES Director and the individually named State Board members have no authority to examine or re-certify election equipment; only Secretary Kemp has statutory authority to undertake those activities.

order to prevent a circumvention of sovereign immunity, the plaintiffs' designation

of capacity is not controlling, and courts must look to the substance of the claims

and the nature of the relief.  *See Parmer v. Madigan*, 2017 Ill App. LEXIS 251

(App. Ct. Ill. 2017) ("As one might expect, sovereign immunity is not

circumvented by simple party designation.  The State's immunity cannot be evaded

by naming an official or agent of the State as the nominal party defendant"); *Young*

*v. Duenas*, 164 Wn. App. 343, 349 (App. Wash. 2011) (cannot circumvent tribal

sovereignty through 'a mere pleading device' that names tribal official).

This case asserts claims that are in substance and reality claims against the

State and/or the state officials in an official, and not individual, capacity.  As such,

there is no subject matter jurisdiction to hear such claims unless they are

authorized by an explicit waiver of sovereign.  There is no waiver of sovereign

immunity to authorize the state constitutional claim (Count 6); there is no waiver

of sovereign immunity to authorize the claim based on alleged violations of the

State Election Code (Count 7); and there is no waiver of sovereign immunity to

authorize the claim based on PIPA (Count 10).[13]

_____

[13] Even if the Court determines that sovereign immunity does not bar Counts 6, 7,
and 10 and that these claims are properly brought as individual capacity claims, the
State Defendants are entitled to official immunity barring because these claims are
premised on prior acts.  *See* GA. CONST. Art. I, Sec. II, Para. IX(d);  *see also*
*Lathrop*, 2017 Ga. LEXIS 529 at *48 (recognizing that official immunity bars suits

## II.     Plaintiffs' Complaint Fails to State a Claim.

As discussed above, Plaintiffs' Complaint should be dismissed for lack of subject matter jurisdiction.  However, even if Plaintiffs' claims were not barred, they are all nonetheless subject to dismissal for failure to state a claim.

When reviewing a motion to dismiss, the Court must take the factual allegations of the complaint as true, and must construe those allegations in the light most favorable to the plaintiff. *Riven v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Amer. Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (courts are to "eliminate any allegations in the complaint that are merely legal conclusions").  Additionally, "unwarranted deductions of fact in a complaint are not admitted as true for purposes of testing the sufficiency of plaintiff's allegations." *Sinaltrainal v. The Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (internal quotations omitted).

### A.     Plaintiffs Fail to Allege a Federal Constitutional Claim.

against state officers in their individual capacities for official acts involving an element of discretion based on wrongs already done and injuries already sustained).

27

Plaintiffs assert five largely redundant claims pursuant to the Fourteenth Amendment's Due Process Clause and Equal Protection Clause.[14]

### 1. The Due Process Claims.

The Fourteenth Amendment's Due Process Clause provides two types of protection: (1) substantive due process; and (2) procedural due process. *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (*en banc*). Plaintiffs' three Due Process claims do not clearly set forth whether the claims asserted are procedural due process claims or substantive due process claims. For instance, the caption for Count I, purports to be a claim for violation of the "fundamental right to vote," suggesting a substantive due process claim. However, Plaintiffs include allegations within this count that Defendants failed to follow state law. Doc. 70 ¶¶ 61(b), 61(d), 63. Additionally, Plaintiffs also include in this count that "Defendants' violation of the Due Process Clause is patently and fundamentally unfair." Doc. 70 ¶ 65. These allegations all relate to procedural due process claims, not substantive due process. Similarly, the caption for Count III, purports to be a claim for "denial of procedural due process." Doc. 70 at 30. However, the allegations included in this count then refer to the "fundamental right to vote,"

---

[14] Plaintiff, Ricardo Davis, was also a Plaintiff in an earlier challenge to the DRE ballot system. *Favorito v. Handel*, 285 Ga. 795 (2009). Ricardo Davis' claims in this action are barred by res judicata. *Brown v. Williamson Tobacco Corp. v. Gault*, 280 Ga. 420, 421 (2006).

suggesting a substantive due process claim.  Doc. 70 ¶¶ 83-85, 87.  Plaintiffs' third due process claim suffers from the same problem.  Doc. 70, 33-34.  As these three claims are not clearly set forth, and are largely redundant, Defendants will address all three due process claims in one response.

Procedural due process is a guarantee of fair procedures whereby the state may not deprive a person of life, liberty or property without providing "appropriate procedural safeguards." *Daniels v. Williams*, 474 U.S. 327 (1986).  "The fundamental requirement of [procedural] due process is the opportunity to be heard." *Parratt v. Taylor*, 451 U.S. 527, 540 (1981).  "A §1983 action alleging a procedural due process clause violation requires proof of three elements: a deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally inadequate process." *Doe v. Fla. Bar*, 630 F.3d 1336, 1342 (11th Cir. 2011) (quoting *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)).  Plaintiffs here have not even sufficiently alleged the first step, identifying a constitutionally-protected liberty or property interest.  The Georgia Supreme Court has already held that voters do *not* have a right under state law to a particular balloting system and held that the DRE system does not violate the Georgia Constitution's requirement that voting be by secret ballot. *Favorito*, 285 Ga. at 797-799.  Even if Plaintiffs could articulate a constitutionally protected liberty

29

interest, Plaintiffs cannot satisfy the third step, i.e., constitutionally inadequate process.  Procedural due process violations are not complete unless and until the state refuses to provide due process.  *McKinney*, 20 F.3d at 1562.  Here, Plaintiffs have not alleged that state remedies are not available.  The availability of a state remedy means that the procedural due process claim asserted does not exist.  *See Horton v. Bd. of County Comm'rs*, 202 F.3d 1297, 1300 (11th Cir. 2000) ("If state court could [provide an adequate remedy], then there is no federal due process violation regardless of whether the plaintiff has taken advantage of the state remedy or attempted to do so.").  Moreover, the Eleventh Circuit has held that a state remedy is *not* inadequate merely because a claim may be barred by state immunity laws.  *Rittenhouse v. DeKalb County*, 764 F.2d 1451, 1459 (11th Cir. 1985); *Taylor v. Ledbetter*, 791 F.2d 881, 884 (11th Cir. 1986).  Accordingly, Plaintiffs fail to state a procedural due process claim.

Plaintiffs also fail to sufficiently allege a violation of substantive due process.  Areas in which rights are created only by the state are not subject to substantive due process protection.  *McKinney*, 20 F.3d at 1556.  Therefore, Plaintiffs' allegations of state law violations do not establish a substantive due process violation.  Nor do Plaintiffs' conclusory allegations that DRE machines must be "presumed" to not be reliable.  Doc. 70 at ¶¶ 62, 73, 74, 123, 124, 157,

162, 164, 170.  Plaintiffs cannot pursue substantive due process claims premised on conclusory allegations that the DRE system is unreliable when the complaint lacks *any* factual allegation that even a single vote has been incorrectly recorded. The "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Nor do allegations that election officials *could* by review of votes, and by surreptitiously recording the order in which voters appear, discover how a particular voter voted establish a substantive due process violation.  While Defendants strongly dispute Plaintiffs' allegations regarding sequentially issued serial numbers connected to ballots, even if that allegation was true, speculative allegations about the possibility of manipulation by election officials cannot by itself state a claim.  Absentee ballots may be subject to illegal manipulation in numerous ways.  A voter may be coerced to vote an absentee ballot for a particular candidate by persons close to that voter.  While the activity of coercing a voter to vote for a particular candidate is illegal, that does not make absentee ballots unconstitutional.

Plaintiffs also premise their due process claims on Defendants' alleged violation of state requirements for voting systems.  Doc. 70 at ¶¶ 61, 85.  Of course, even if Plaintiffs were correct as to their interpretation of state law, a

[m]ere violation of a state statute does not infringe the federal Constitution."

*Snowden v. Hughes*, 321 U.S. 1, 11 (1944).  *See also Hennings v. Grafton*, 523

F.2d 861, 864 (7th Cir. 1975) (explaining that "[i]t is not every election irregularity

. . . which will give rise to a constitutional claim and an action under section

1983.").

The Supreme Court has long recognized that "as a practical matter, there

must be a substantial regulation of elections if they are to be fair and honest and if

some sort of order, rather than chaos, is to accompany the democratic process."

*Storer v. Brown*, 415 U.S. 724, 730 (1974).  "Regulations imposing severe burdens

on Appellants' rights must be narrowly tailored and advance a compelling state

interest.  Lesser burdens, however, trigger less exacting review, and a State's

'important regulatory interests' will usually be enough to justify 'reasonable,

nondiscriminatory restrictions.'"  *Timmons v. Twin Cities Area New Party*, 520

U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434).

Importantly, here, Plaintiffs have not identified any actual burden on their

right to vote from use of DRE, absent interference by a third party engaged in

criminal conduct.  First, pursuant to state law, Plaintiffs may choose to vote by

absentee paper ballot or on election day by DRE.  O.C.G.A. § 21-2-380(b).

Plaintiffs cite no authority for their statement that having to choose between voting

by absentee paper ballot or on election day burdens their right to vote.  As the *Favorito* Court recognized, "absentee voters 'have not been treated differently from the polling place voters, except in a manner permissible under the election statutes' and as a result of their own choice."  285 Ga. at 798.  More importantly, Plaintiffs make no allegations that their votes *have been* diluted or not counted as cast.  They simply assert that this Court should *presume* that DREs are unreliable.  These allegations are insufficient to state a Fourteenth Amendment claim.

The Georgia Supreme Court has held that the use of DRE voting machines does not violate voters' state or federal constitutional rights, including substantive due process rights.  *Favorito*, 285 Ga. at 797-798 (explaining that voters do not have a right to a particular ballot system and that "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems.").  Similarly, the Eleventh Circuit has rejected a Due Process and Equal Protection challenge to manual recount procedures premised on the lack of a paper trail for counties that used the touchscreen machines.  *Wexler v. Anderson*, 452 F.3d 1226, 1233 (11th Cir. 2006), *cert. denied*, 549 U.S. 1111 (2007).

> [I]f voters in touchscreen counties are burdened at all, that burden is the mere possibility that should they cast residual ballots, those ballots will receive a different, and allegedly inferior, type of review in the event of a manual recount.  Such a burden, borne of a reasonable, nondiscriminatory regulation, is not so substantial that strict scrutiny is appropriate.

452 F.3d at 1232-1233.  Other courts have also held that the use of a DRE ballot system does not, without more, state a due process claim.  *Stein*, 223 F. Supp. 3d at 438 (explaining that "decisions that sustain due process challenges to elections involve documented instances of improperly cast ballots, wholesale refusal to count properly cast ballots, direct infringements of the right to cast ballots, or a total failure to conduct the election.").  No such allegations are present here.

The Ninth Circuit Court of Appeals has held that use of DRE technology is not a severe restriction on voting and is therefore only subject to rational review.  *Weber*, 347 F.3d at 1106 ("Under *Burdick*, the use of touchscreen voting systems is not subject to strict scrutiny simply because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect.").  The *Weber* Court recognized that "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing."  *Weber*, 347 F.3d at 1107; *Favorito*, 285 Ga. at 797 (same, quoting *Weber*).  Relying in part on *Weber*, the Pennsylvania Supreme Court has also recently held that "DREs that register votes electronically without a voter-verified ballot do not severely restrict the right to vote."  *Banfield v. Cortés*, 631 Pa. 229, 265 (Pa. 2015).  Similarly, in recognizing the benefits of DRE machines, the Texas Supreme Court has held that:

DREs are not perfect.  No voting system is.  We cannot say that DREs impose severe restrictions on voters, particularly in light of the significant benefits such machines offer. . . . DREs can reduce uncounted votes and virtually eliminate the racial gap that tends to exist with other types of equipment, have the potential to expand access for people with disabilities and for voters with limited English proficiency, and tend to considerably reduce the number of uncounted votes.

*Andrade v. NAACP of Austin*, 345 S.W. 3d 1, (Tex. 2011) (internal quotations and citations omitted).

Importantly, Defendants are required, pursuant to the Help America Vote Act (HAVA), to provide a voting system that will:

(A)  be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters;

(B)  satisfy the requirement of subparagraph (A) through the use of *at least one direct recording electronic voting system* or other voting system equipped for individuals with disabilities at each polling place;

52 U.S.C. § 21081(a)(3) (emphasis added).  Paper ballots do not provide vision impaired voters the ability to cast a vote in a private and independent manner.

DRE systems contain an audio component which enables visually impaired voters to listen to candidates' names on headphones and to vote using distinctively shaped keys. DRE systems also contain mouth or head sticks, sip-and-puff devices, or other accessible switch technology that enables manually impaired voters to select candidates of their choice. Only with the use of these devices may such disabled voters, for the first time, vote independently and in private.

*Am. Ass'n of People with Disabilities v. Shelley*, 324 F. Supp. 2d 1120, 1125 (C.D. Cal. 2004).

Where, as here, Plaintiffs have not alleged any burden on their right to vote by use of DRE, absent criminal conduct, Plaintiffs have failed to sufficiently allege a federal constitutional claim.  But even if this Court were to find that Plaintiffs' right to vote was burdened, that burden is not severe, and the State's interests in complying with federal law and providing persons with disabilities access to voting technology that provides them with the means to vote in private and independently is more than sufficient to justify any minimal burden.

## 2.  The Equal Protection Claims.

Like the due process claims, Plaintiffs' two equal protection claims are redundant.  Plaintiffs complain that electors casting DRE ballots are treated differently than electors casting absentee ballots.   There is no equal protection violation for treating dissimilar persons unequally.  *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007) ("To maintain this focus on discrimination, and to avoid constitutionalizing every state regulatory dispute, [courts] are obliged to apply the 'similarly situated' requirement with rigor.").  Additionally, for the reasons stated in Defendants' initial motion to dismiss, Doc. 8-1 at 27-30, which

Defendants hereby adopt and incorporate by reference, Plaintiffs have failed to sufficiently allege an equal protection claim.

### B.     The State Defendants Are Entitled to Qualified Immunity.

Defendants, in their individual capacities, are entitled to qualified immunity from Plaintiffs' federal constitutional claims.  Defendants now adopt and incorporate that portion of their prior brief in full.  *See* Doc. 8-1 at 30-33.  For the reasons stated above in Section II.A, *supra*, Plaintiffs have not been deprived of any federal constitutional right.  Even if this Court were to find the allegations in the complaint sufficient to allege a constitutional claim, State Defendants, in their individual capacities, are entitled to qualified immunity because there is no clearly established law that their actions would violate the constitution.  *See Favorito*, *supra; Wexler*, *supra.*

### C.     Plaintiffs Have Failed to State a Claim Under State Law.

In Count 6, the provision of the Georgia Constitution and the State statute that Plaintiffs cite requiring that elections be conducted by secret ballot cannot support a claim for relief.  These provisions do not provide a private right of action that would give rise to Plaintiffs' attempt to dictate what election equipment is used for elections or otherwise abrogate the State's sovereign immunity and force it to use the election equipment of Plaintiffs' choosing.  Further, there is no state

37

law equivalent to 42 U.S.C. § 1983 which would provide a cause of action for a violation of the State Constitution. *Howard v. Miller*, 222 Ga. App. 868, 872 (1996); *accord Davis v. Standifer*, 275 Ga. App. 769, 772 n. 2 (2005); *Draper v. Reynolds*, 278 Ga. App. 401, 403 n. 2 (2006). Therefore, simply citing to a provision of the Constitution and a statute does not provide Plaintiffs with a private right of action.

Even if Plaintiffs had a private right of action to sue directly under the Georgia Constitution, their claim is foreclosed by the Georgia Supreme Court's decision in *Favorito v. Handel*. *See Favorito*, 285 Ga. at 797 (rejecting arguments that voters are entitled to have their votes cast and tabulated in a particular manner and that the alleged lack of an "independent audit trail" violated a voter's fundamental right to vote). *Favorito* was a constitutional challenge to the use of the exact same DRE units for Georgia elections that are at issue here. Even if Plaintiffs' speculations about the dangers of DRE units had any evidentiary foundation, Plaintiffs' constitutional rights are not violated where the State's choices as to what voting machines it will use are "reasonable and neutral." *Favorito*, 285 Ga. at 797. Furthermore, *Favorito* already recognized that voters' ballots are kept secret under the DRE system that was in place at the time of the decision, the same exact system that is still in place today. *See id.* at 799.

38

If Plaintiffs could somehow overcome these shortcomings, Count 6 would still be subject to dismissal because none of Plaintiffs' factual allegations demonstrate that any Georgia election was not conducted by secret ballot and "in accordance with procedures provided by law" as required by Article II, Section 1, Paragraph 1 of the State Constitution and O.C.G.A. § 21-2-379.1(6). All of Plaintiffs' allegations concerning whether ballots cast on Georgia's DRE units remain secret are purely hypothetical and cannot form the basis for a constitutional or statutory challenge to the State's use of the machines.

In Count 7, Plaintiffs misconstrue a number of State statutes in an attempt to create a claim. First, they cite O.C.G.A. § 21-2-379.1(8), which requires that DRE machines must "when properly operated, record correctly and accurately every vote cast." However, Plaintiffs can only point to hypothetical allegations of compromise to the voting machines themselves based on allegations that a separate computer system located at Kennesaw State University was compromised. Plaintiffs allege that the voting system "must be presumed to be [a] compromised" system (Doc. 70 at ¶ 124), but they do not, and cannot, show that the DREs and the other connected voting hardware actually were compromised or that these machines did not "register or record correctly and accurately every vote case."

Second, Plaintiffs describe a series of statutory provisions governing the administration of elections and a regulation on election equipment certification, none of which provide for a private right of action. *See* Doc. 70 at ¶¶ 116-122 (citing O.C.G.A. §§ 21-2-379.6(a); 21-2-379.6(c); 21-2-379.7(b), (c), and (d)(3); 21-2-379.9(b); Ga. Comp. R. & Regs. 590-8-1-.01(a)(3)).  Even if these laws did provide Plaintiffs with a cause of action, Plaintiffs have provided nothing more than conclusory allegations that Defendants did not follow the specific requirements in these provisions.

In Georgia, "[c]ivil liability may only be authorized . . . when the General Assembly has expressly provided for a private right of action in the textual provisions of the statute." *Somerville v. White*, 337 Ga. App. 414, 416 (2016) (emphasis in original); *Anthony v. Am. Gen. Fin. Servs.*, 287 Ga. 448, 454-459 (2010) (holding that the notary statute does not contain an express private cause of action and rejecting any implied private right of action).  "The judicial task is, of course, to interpret the statute the General Assembly has passed 'to determine whether it displays an intent to create not just a private right of action but also a private remedy.'" *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).

The Georgia General Assembly has created private rights of action elsewhere in the election code.  *See* O.C.G.A. § 21-2-521; (providing a cause of

40

action to candidates and electors for the purpose of challenging an election); § 21-2-522 through § 21-2-529 (setting out in detail the framework for all causes brought pursuant to O.C.G.A. § 21-2-521); § 21-2-171(c) (providing cause of action for candidate seeking nomination by petition to challenge the denial of the nomination petition); § 21-2-186 (providing cause of action for political body to challenge denial of nomination by petition).  These examples of private rights of action stand in stark contrast to the election statutes and regulation cited by Plaintiffs.  Importantly, the Georgia Supreme Court has recognized that the 2010 enactment of O.C.G.A. § 9-2-8(a), which provides that no private right of action shall arise from any Act enacted after the effective date of this Code section unless such right is expressly provided therein, "counsels against deviating from [the Court's] established precedent to find new implied causes of action," even where a pre-existing statute is at issue.  *Anthony*, 287 Ga. at 459.

Finally, as with other counts in the complaint, Plaintiffs fail to make any factual allegations connecting the individual members of the SEB or Merle King to the use of DRE machines in any election.

As with the election law claims, the PIPA claim in Count 10 must also be dismissed because there exists no private right of action to authorize a claim based on an alleged PIPA violation.  PIPA does not expressly provide for a private right

41

of action and, therefore, one cannot be inferred.  *Somerville v. White*, 337 Ga. App.

414, 416 (2016).  The claim must also be dismissed because, as discussed above,

an individual officer or employee is not a "data collector" under O.C.G.A.

§10-1-911(2), which refers only to "state or local agencies" and their subdivisions.

### D.    Plaintiffs Are Not Entitled to Writs of Mandamus.

#### 1.  The Mandamus Standard

In *Bibb County v. Monroe County*, 294 Ga. 730 (2014), the Georgia

Supreme Court surveyed Georgia precedent governing mandamus law and

explained that "the writ of mandamus is properly issued *only* if 1) no other

adequate legal remedy is available to effectuate the relief sought; and 2) the

applicant has a clear legal right to such relief."  *Bibb*, 294 Ga. at 734 (emphasis

added).  Demonstrating the existence of "a clear legal right to such relief" is thus

one of the two *mandatory* requirements in order to state a legally cognizable claim

for mandamus.

Georgia courts have repeatedly stated that this necessary "clear legal right to

the relief sought may be found *only where the claimant seeks to compel the*

*performance of a public duty that an official or agency is required by law to*

*perform*."  *Bibb County*, 294 Ga. at 735 (emphasis added); *see also Bland Farms v.*

*Georgia Department of Agriculture*, 281 Ga. 192, 193 (2006) (Mandamus

complainant must show that the law "not only authorize[s] the act to be done, but must require its performance."). In cases "[w]here performance is required by law, a clear legal right to relief will exist either where the official or agency fails entirely to act or where, in taking such required action, the official or agency commits a gross abuse of discretion." Bibb County, 294 Ga. at 735 (emphasis added); see also Riley v. Southern LNG, 300 Ga. 689, 691 (2017) (same). Thus, the "gross abuse of discretion" standard for obtaining mandamus relief is legally relevant only when the official is performing a legally required duty. If the act is not one that the public official is legally required to undertake, mandamus cannot lie, even if it were alleged that the official had grossly abused his or her discretion.

The Georgia Supreme Court has explained that "[t]he determination of whether official action is required depends on the law governing the subject matter at issue" and that "where the applicable law vests the official or agency with discretion with regard to whether action is required in a particular circumstance, mandamus will not lie, because there is no clear legal right to the performance of such an act." Bibb, 294 Ga. at 735 (citing other Georgia authorities).

Application of this law demonstrates that Counts 8 and 9, and 11are subject to dismissal as a matter of law because each claims seeks to compel acts that are discretionary, and not required as a matter of law.

## 2.  The Secretary Has No Duty To Re-examine the DREs.

Plaintiffs contention in Count 8 that the Secretary has a "public duty to conduct [a] reexamination required by O.C.G.A. § 21-2-379.2(b)" (Doc. 70 at ¶¶ 220-221) is belied by the plain language of that statute, which state that "the Secretary of State *may*, at any time, *in his or her discretion*, re-examine" the DREs.  O.C.G.A. § 21-2-379.2(a) (emphasis added).  As noted above, the Georgia Supreme Court has instructed that an action cannot be deemed to be "required" for purposes of seeking a mandamus "where the applicable law vests the official or agency with discretion with regard to whether action is required."  *Bibb*, 294 Ga. at 735.  Here, the applicable law not only uses the discretionary word "may," but specifically states that the Secretary can use "discretion" in determining whether or not to re-examine the DREs. Thus, a mandamus claim cannot be predicated on the Secretary's failure to act on his own to conduct a re-examination because a reexamination is not legally required.  The allegations in the Second Amended Complaint that the Secretary "grossly abused his discretion" by not initiating the reexamination (Doc. 70 at ¶43), even if deemed true (which they are not), are legally irrelevant because gross abuse of discretion for purposes of mandamus relief applies only to required legal actions that are properly the subject of a mandamus in the first place.

44

O.C.G.A. §§ 21-2-379.2(a) makes clear that the Secretary is legally required to conduct a re-examination in only *one* circumstance: when he is requested by ten or more electors *who have paid reasonable costs*.  Thus, a mandamus *could* theoretically lie to compel the Secretary to re-examine the equipment if ten or more electors had requested him to do so and if those electors had paid the reasonable costs.  *See* O.C.G.A. § 21-2-379.2(a) ("*Before* any such examination or reexamination, the person, persons, or organization requesting such reexamination shall pay to the Secretary of State the reasonable expenses of such examination.)" (emphasis added).  The General Assembly's use of the mandatory word "shall" in O.C.G.A. § 21-2-379(b) makes clear that this act *is* a legally required action and thus could properly be addressed through a mandamus action.  While 10 or more electors did request that the Secretary undertake the examination as alleged (Doc. 70 at ¶ 97), the Second Amended Complaint does not allege that the requesting electors have paid reasonable costs for the examination, and without payment being made, there is no legal duty for the Secretary to conduct the re-examination.

While the Secretary was not required to conduct the reexamination, the Secretary has nevertheless exercised his discretion to "conduct a reexamination that is thorough, methodologically sound, and able to be accomplished in a reasonable period of time" at no cost to the requesting electors, thus rendering the

45

mandamus claim moot.  *See* Doc. 49-6 (July 18, 2017 Letter from Germany to Marks).[15]  Thus, even if a mandamus could lie to compel the reexamination (which it cannot), the claim would be subject to dismissal on mootness grounds given that the Secretary is in fact conducting the requested investigation.

### 3.   The State Board Is Not a Proper Party to a Mandamus Claim, and the Board Members Have No Legal Duty.

The mandamus claim in Count 9 should be dismissed against the State Board under the well-established rule that mandamus actions may be brought only against public officials in their official capacity, and may *not* be brought against the office or the employing state agency.  *SJN Properties v. Fulton County Board of Assessors*, 296 Ga. 793, 799, n.6 (2015) ("mandamus actions . . . may be sought only against public officials"); *City of Homerville v. Touchton*, 282 Ga. 237, 237 (2007); *Bulloch County v. Ritzert*, 213 Ga. 818, 818 (1958).

The claim against the individual Board members should be dismissed because the members have no legal duty under O.C.G.A. § 21-2-344 "to remove from commission machines that are not 'practicable.'"[16]  Doc. 70 at ¶ 143.  That

---

[15] This Court may consider documents extrinsic to the pleadings in determining a jurisdictional issue, such as mootness.  *Briggs v. Briggs*, 919 F.2d 1525, 1529 (11th Cir. 2007).

[16]  Count 9 cites three statutes, O.C.G.A. §§ 21-2-366, 21-2-281, and 21-2-334 as the basis for the alleged legal duty.  Doc. 70 at ¶ 144.  O.C.G.A. § 21-2-366 is directed only at counties and municipalities.  O.C.G.A. § 21-2-282 generally

provision provides election superintendents with the discretionary authority ("may arrange") to use paper ballots when "the use of voting machines is not possible or practicable."  O.C.G.A. § 21-2-334.  First, "superintendent" is defined in the Election Code to refer to various county or municipal employees or entities and expressly excludes any state agencies or officials.  O.C.G.A. § 21-2-2(35).Thus, the State Board and its members are not "superintendents," and, therefore, have no duty to take action of any kind pursuant to O.C.G.A. 21-2-334.[17]

In addition, the superintendents' discretionary authority to discontinue use of "voting machines" in favor of paper ballots does not refer to DREs.  "Voting machine" is specifically defined in the Election Code as "a *mechanical device* on which an elector may cast a vote and which tabulates those votes by its own devices and is also known as a '*lever machine*.'"  O.C.G.A. § 21-2-2(40) (emphasis added).  This type of mechanical device with a lever is *not* a DRE. DREs are separately defined in the Election Code as "computer-driven units" with

---

authorizes use of paper ballots when "use of voting equipment is impossible or impracticable, for the reasons set out in Code section 21-2-334."  Thus, Plaintiffs' claim against the State Defendants turns solely on the meaning and applicability of O.C.G.A. § 21-2-334.

[17] The State Defendants refer the Court to their Motion to Dismiss Plaintiffs' original Complaint, which contains a lengthy discussion of the meaning of "superintendent" in the Election Code.  [Doc. 8, pp. 12-19].  *See also* Doc. 8, n.12 citing numerous provisions of the Election Code, which make clear that neither the Secretary nor the State Board are superintendents as that term is defined.

"a video screen." *See* O.C.G.A. § 21-2-2(4.1).  Clearly, then, this statute imposes no legal obligations on the State Defendants, or even superintendents for that matter, to remove DREs from use because it refers only to older mechanical voting machines.  In fact, it would actually be unlawful for the Board members to remove the DREs, as requested in Count IX, because this action is not one of the ten legally enumerated duties of the Board set forth in O.C.G.A. § 21-2-31 (Duties of the State Election Board).

### 4.  The Secretary Has No Duty to Recanvass.

Count 11 alleges that Secretary Kemp had a public duty to order a recanvassing of certain precincts in Cobb and DeKalb following the June 2017 Run-off, after being informed that Cobb and DeKalb County Election Boards had denied Plaintiffs' petition for a recanvass and seeks issuance of a writ of mandamus ordering the Secretary to recanvass the precincts to "explore presumed discrepancies."  Doc. 70 at ¶¶ 54-57, 170.  The law is clear that not only does the Secretary have no legal duty to recanvass the precincts, he has no authority to do so.  In support of this alleged public duty, Plaintiffs cite to Ga. Comp. R. & Regs. 183-1-12-.02(7)(a) [Doc. 70 at ¶ 156]; however, this regulation applies only to "election superintendents," which, as noted above, is statutorily-defined to refer to county and municipal officials and does not include state officers or employees.

O.C.G.A. § 21-2-2(35).  Moreover, this regulation, which requires superintendents to order a recanvass of the memory cards for a particular precinct(s) when petitioned by electors who are able to make a showing of a possible "discrepancy or error," applies only "*prior to the certification of the consolidated returns by the election superintendent*." Ga. Comp. R. & Regs. 183-1-12-.02(7)(a) (emphasis added).  Thus, the time for any recanvassing has long past even for the superintendents, and the Secretary never had a duty to act on the Plaintiffs' recanvassing petition at any time.

### 5.  Mandamus Cannot Be Used to Dictate Governmental Action.

Plaintiffs' claims also fail because they are not simply seeking to compel state officials to take an alleged required action, but are instead attempting to dictate the form and content of such action by requiring the State Defendants to replace DREs with an optical scan-based system or paper ballots.  Doc. 70 at ¶¶ 135, 144.  Georgia law is clear that "mandamus will not lie to dictate the manner in which the action is taken or the outcome of such action."  *Bibb County*, 294 Ga. at 736.  "Where the act required to be done involves the exercise of some degree of official discretion and judgment upon the part of the officer charged with its performance, *the writ may properly command him to act*, or as is otherwise expressed, may set him in motion; *it will not further control or interfere with his*

49

*action, nor will it direct him to act in any specific manner*.'"  *Georgia Dep't of Transportation v. Peach Hill Properties*, 278 Ga. 198, 200 (2004) (internal citations omitted) (emphasis added).  Even if the Secretary here had a mandatory legal duty to undertake the re-examination as alleged in Count 8, the only relief Plaintiffs would be able to obtain is an order requiring the Secretary to undertake the re-examination, which, as noted above, he is already doing.  The mandamus could not be used to require implementation of a specific voting system.

## CONCLUSION

For the foregoing reasons, the State Defendants pray that all claims against them be dismissed.

Respectfully submitted,

CHRISTOPHER M. CARR
Attorney General                           112505

ANNETTE M. COWART          191199
Deputy Attorney General

RUSSELL D. WILLARD          760280
Senior Assistant Attorney General

/s/Cristina M. Correia
CRISTINA M. CORREIA        188620
Assistant Attorney General

/s/Elizabeth A. Monyak
ELIZABETH A. MONYAK     005745
Assistant Attorney General

/s/Josiah B. Heidt
JOSIAH B. HEIDT                    104183
Assistant Attorney General

Georgia Department of Law
40 Capitol Square SW
Atlanta, GA  30334
404-656-7063

Attorneys for State Defendants

Please address all
Communication to:
CRISTINA CORREIA
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
404-651-9325

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Defendants' Brief in Support of Motion to Dismiss was prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).


/s/ Cristina Correia
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on this date I have electronically filed the foregoing

**STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS**

with the Clerk of Court using the CM/ECF system, which will automatically send

email notification of such filing to all attorneys of record.

This 29th day of September, 2017.

/s/ Cristina Correia
Assistant Attorney General