# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

|  |  |
|---|---|
| DONNA CURLING, ET AL.<br><br>            **Plaintiff,**<br><br>**v.**<br><br>BRIAN KEMP, ET AL.<br><br>            **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Civil Action File No. 1:17-cv-2989-AT**

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiffs Donna Curling, Coalition for Good Governance, Donna Price, Jeffrey Schoenberg, Laura Digges, William Digges III, Ricardo Davis, and Edward Terry respectfully request that the Court deny Defendants various motions to dismiss: (1) DeKalb Defendants' Motion to Dismiss (Dkt. No. 79) ("Motion – DeKalb"), (2) Fulton County Defendants' Brief in Support of Their Motion to Dismiss (Dkt. No. 82-1) ("Motion – Fulton"), (3) State Defendants' Brief in Support of their Motion to Dismiss Plaintiffs' Second Amended Complaint (Dkt. No. 83-1) ("Motion – SoS"), and (4) Cobb Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint and Brief in Support (Dkt. No. 84) ("Motion – Cobb") all brought pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

*"[T]he right of suffrage is a fundamental matter in a free and democratic society.  Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."*

> *- Reynolds v. Sims,* 377 U.S. 533, 561 (1964)

The right to vote is the most fundamental and sacrosanct of all of the rights conferred on U.S. citizens by the Constitution as well as by the Georgia Constitution and state law.  As the Supreme Court observed in a seminal voting rights case, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined."  *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  *See also Wexler v. Anderson*, 452 F.3d 1226, 1232(III) (11th Cir.2006) ("The right to vote is fundamental, forming the bedrock of our democracy.").  The Georgia Constitution as well reflects the drafters' intent to "preserve[] from assault" the "sanctity of elections under our system of self-government, wherein the will of the people— freely voiced and fairly polled—is the supreme law" by incorporating a provision that confers on Georgia citizens the right to vote in secret.  Ga. Const. Art. § 1 ("Elections by the people shall be by secret ballot and shall be conducted in

accordance with procedures provided by law.").  This guarantee was added to the Georgia Constitution "specifically for the purpose of maintaining the sanctity of the polling place by preventing any possible influence on the voter" and thus protecting the fundamental right to vote.  *National Broadcasting Co., Inc. v. Cleland*, 697 F.Supp. 1204, 1207 (N.D. Ga. 1988).

Yet, to study the history of democratic elections in this country is to study the infringement and suppression of the right to vote by local and state governments and, sometimes, by our federal government.  From the complete disenfranchisement of black and women voters, to land ownership requirements, to literacy and civics test, to physical intimidation, to poll taxes, to discriminatory apportionment, to ballot stuffing and ballot destruction, to discriminatory re-districting, the rights of citizens to vote has been under assault in nearly countless ways since the founding of the Republic.

The use of electronic voting machines is just the latest way in which the conduct of elections by states has resulted in the disenfranchisement of voters.  The vulnerability of such systems to manipulation and hacking was already well-recognized in the cybersecurity community and in other circles prior to the November 2016 election.  But events in the run-up to that election that had the FBI, the Department of Homeland Security ("DHS") and others in a near-panic

over the efforts of foreign agents to penetrate those systems across the U.S. served to heighten and broaden concerns nationally that entrusting our right to vote to such equipment that cannot be adequately secured under the best of circumstances threatens the franchise rights of every voter using that equipment.

And the circumstances in which the voters of Georgia have found themselves since at least early last year—and probably for much longer—have been far from the best of circumstances.  Indeed, the events giving rise to this lawsuit have been extraordinarily alarming, and, unprecedented.  Other cases, some cited by Defendants, have examined whether direct-recording electronic ("DRE") voting systems managed and operated properly deprive voters of their state law and constitutional right to vote.

To Plaintiffs' knowledge, however, no court has ever had before it a voting rights case on facts anything like what has happened in Georgia.  Here, Plaintiffs allege that through acts of gross misfeasance or malfeasance, a state has outsourced to a unit of a local university the complete management of the DRE System; that contractor has used one central server to program every DRE used in the state's elections; the contractor failed to establish even the most basic firewalls and other protections needed to protect voters' personal data and to protect the hardware, software and firmware used to program all of the state's DRE's from unauthorized

intrusion and manipulation; when advised of the enormous security risk—and breach—resulting from its failures, the Secretary of State responded not by taking immediate steps to fix the problem, but by threatening the cybersecurity expert who discovered the problem and brought it to the State's attention with unspecified retribution from the "downtown politicians" if he persisted in raising with anyone what he discovered; the State then ignored the multiple and dire warnings from at least twenty of the nation's top cybersecurity experts about the enormous security risk with its DRE System; the state then ignored similar warnings from the FBI and DHS; the State responded to DHS's and offers of assistance by publicly decrying an attempted "federal takeover" of that state's electoral process; and the FBI ultimately.

Against this backdrop, Defendants argue that Plaintiffs' claims are predicated upon mere speculation and conjecture, and that they fail to allege actual harm.  As demonstrated below, Plaintiffs' Second Amended Complaint (Dkt. No. 70) ("SAC") amply alleges actual harm in myriad ways, including in the form of an infringement of their rights to vote using a system that is reasonably reliable, and no less reliable than other voting methods made available by the state; actual, repeated breaches of the server used to house voters' voting records and all of the software and firmware used to program every DRE deployed in the state; to vote

by a method that, when there is reason to do so—as there clearly was here—those entrusted to manage the state's elections can verify that votes were accurately recorded and tallied; and to vote in secret.  Yes, without access to the DREs and related equipment as to which only Defendants currently have access, Plaintiffs do not yet know the extent of any further breaches into the DRE System, or the manipulation, if any, of voting records, nor does the public.  Should Defendants prevail—and they should not—no one will ever know whether, for example, voting software and records were manipulated in ways that resulted in the nullification or altering of thousands or even millions of votes, or even whether a losing candidate was wrongly "elected."

Plaintiffs' claims are forward-looking.  Plaintiffs' goal is to prevent such harm from occurring in the future.  To prove their claims, however, Plaintiffs must be able to probe the extent and nature of the mismanagement of the state's DRE system, and the extent to which that mismanagement may have or did deny Plaintiffs' their state and U.S. Constitutional rights of suffrage.

In brief, we now know that Georgia's electronic voting system was the electoral equivalent of a nuclear power plant operated through an internet-connected server with no meaningful digital safeguards and no containment vessel, and that has been entrusted to managers whose response to being repeatedly

warned of the vulnerability of the system and of the fact that nefarious actors *were trying to break into the state's system* would be to ignore them and claim, falsely, that the system was perfectly safe.  No one, of course, would tolerate such a threat in any state, including Georgia.  Surely, no one should tolerate its equivalent in the context of our elections.

There is time to fix this and an easy way of doing so.  The convenience of Defendants or Defendants' other goals in defending a woefully flawed voting system and their own acts of gross misfeasance or malfeasance cannot take priority over the statutory and fundamental Constitutional rights of Georgia voters.  For these reasons and those demonstrated below, Plaintiffs respectfully urge the Court to deny the Defendants' motions.

## ARGUMENT[1]

## I.     PLEADING STANDARD AND STANDARD OF REVIEW

Although review of the sufficiency of Plaintiffs' pleading is *de novo,* the Court's task "is necessarily a limited one."  *Swierkiewicz v. Sorema,* 534 U.S. 506, 506 (2002).  Under the liberal pleading standard of Federal Rule of Civil Procedure

---

[1] While Defendants attempt to incorporate each other's statute of limitations arguments, none of the newly filed motions to dismiss make such arguments.  Any statute of limitations arguments in the original motions to dismiss were based on election contest claims, which are no longer asserted.  Accordingly, Defendants have not made and Plaintiffs do not address any statute of limitations arguments.

8(a), Plaintiffs need only allege "a short plain statement of the claim showing that the pleader is entitled to relief." *Conley v. Gibson,* 355 U.S. 41, 47 (1957).  In the context of a 12(b)(6) motion, the court must construe the complaint in the light most favorable to Plaintiffs and accept as true all of the factual allegations and permissible inferences from those allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## II.    PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS

No court has dismissed in entirety a lawsuit challenging DRE voting machines for lack of standing.  Even the sole case involving a challenge to DREs that Defendants cite to support their standing argument, *Stein v. Cortes*, was not dismissed.  223 F. Supp. 3d 423, 432-34 (E.D. Penn. 2016).  Rather, the court in *Stein* acknowledged that plaintiffs lacked standing only in the context of denying plaintiffs' motion for preliminary injunction and not defendants' motion to dismiss. *See id.*[2]

Defendants argue that Plaintiffs have not sufficiently alleged an injury in fact to support standing to sue.  "Motion – SoS" at 5.  Specifically, Defendants

---

[2] The *Stein* case is currently awaiting a ruling on motions to dismiss.  In denying the plaintiffs' motion for preliminary injunction, the court noted that plaintiffs failed to adequately allege that votes were not counted properly.  The plaintiffs have since amended their complaint to explicitly assert that the DRE machines did not accurately record votes.

argue that Plaintiffs have failed to show that each has suffered a particularized injury; and that the fact that Georgia's DRE system must be presumed to be compromised and incapable of producing verifiable results is only a generalized fear. *Id.* at 6-8.

Defendants have misconstrued both the law and facts in arguing that the Plaintiffs lack standing. At the motion to dismiss stage, Plaintiffs must only demonstrate that it is plausible that they have standing. *Made in the USA Found. v. United States*, 242 F.3d 1300, 1307 (11th Cir. 2001) (court must accept as true all material allegations in a complaint when ruling on a motion to dismiss for lack of standing). Instead of adhering to this standard, Defendants conflate the "standing inquiry with a merits determination" in focusing their arguments on whether Plaintiffs have shown actual hacking or manipulation of the Electronic Voting System used in Georgia. *Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987).

While Plaintiffs agree that a general grievance is an insufficient assertion, this Court has recognized that "a claim is not a generalized grievance solely because the injury is shared in substantially equal measure by a large group of citizens." *Pub. Citizen, Inc. v. Miller*, 813 F. Supp. 821, 825 (N.D. Ga.), *aff'd*, 992 F.2d 1548 (11th Cir. 1993). Indeed, allegations that state governmental conduct

deprives a plaintiff of his or her individual constitutional right to vote is sufficient to establish standing.  *Id.*

As demonstrated below, Plaintiffs can show each of the three prongs to establish standing:  (1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct and that is (3) likely to be redressed by the requested relief."  *Allen v. Wright*, 468 U.S. 737, 751 (1984) (internal quotation marks omitted).

### A.  Plaintiffs Will Suffer Injury-In-Fact Because the Electronic Voting System Does Not Accurately Record Votes, Violates Their Right to Vote in Secrecy, and Subjects Them to Unequal Treatment

The Plaintiffs readily satisfy the first prong of standing, and allege at least four individualized and imminent harms stemming from Defendants' use of DREs, namely: (1) inaccurate recording of votes, (2) loss of the right to vote in secrecy,[3] (3) unequal treatment compared with mail-in absentee voters, and (4) loss of protection in personally identifiable information.  "There can be no question that a plaintiff who alleges that his right to vote has been burdened by state action has standing to bring suit to redress that injury."  *Judicial Watch, Inc. v. King*, 993 F.

---

[3] The harm first occurs at the moment that the voter is contemplating voting their ballot, knowing that it can be traced, and having to decide whether they can freely vote their conscience in each race.

Supp. 2d 919, 924 (S.D. Ind. 2012).  In recognizing voters' rights to protect the

most precious of rights as United States citizens, courts across the country have

recognized the very injuries alleged here as sufficient to confer standing.

For instance, courts have accepted allegations that voters have no way of

knowing whether DREs will accurately count their votes as sufficient to establish

standing.  *See, e.g.*, *Banfield v. Cortes*, 922 A.2d 36, 44 (Pa. Commw. Ct. 2007)

(allegations that voters have no way of knowing whether DREs will recognize their

votes sufficient to establish standing); *Stewart v. Blackwell*, 444 F.3d 843, 854 (6th

Cir. 2006), *vacated,* (July 21, 2006), *superseded,* 473 F.3d 692 (6th Cir. 2007)

(allegation of probability of miscounted votes in upcoming elections sufficient to

establish standing).[4]

Similarly, claims that defendants failed to safeguard secrecy of the ballot

guaranteed by State Constitution and unequal treatment based on the method of

voting constitute concrete and cognizable injuries.  *Citizen Ctr. v. Gessler*, 770

F.3d 900, 914 (10th Cir. 2014) (recognizing claims based on violation of liberty

interest in secrecy of ballot and differential treatment of voters residing in counties

using different methods of voting); *Am. Civil Liberties Union of N.M. v.*

---

[4] *Banfield* was dismissed only after plaintiffs failed to provide evidence supporting
their claims after discovery.  The *Stewart* decision was vacated as moot after the
defendants adopted a new voting system.

*Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008) (holding that in-person voters had standing to challenge additional identification requirement not placed on absentee voters).[5]

All of these concrete and particularized injuries are explicitly alleged in the SAC in support of each count.  Each of the individual Plaintiffs are Georgia voters residing in counties that use DREs, who allege that they voted in one or more Recent Previous Elections, with all but one doing so using the DRE System in at least one election, and all intend to vote in future elections.  SAC ¶¶ 12-13, 16-21. While other Georgia voters may share the same concerns as Plaintiffs, the SAC makes clear that the Defendants' actions deprived Plaintiffs of their individual rights secured by the U.S. Constitution, the Georgia Constitution, and the laws of both the United States and Georgia.  *Id.* at ¶¶ 133, 142 (supporting Counts 8-9). Indeed, Plaintiffs petitioned for a recanvass of votes and had their individual requests denied.  *Id.* at 158 (supporting Count 11).  Thus, these claims are not generalized grievances as Defendants argue.

_____

[5] The court in *Gessler* dismissed the due process claim because the court interpreted Colorado's Constitution as prohibiting unique numbering on ballots only in the event of an election contest and dismissed the equal protection claim because plaintiffs did not allege different treatment within the same county.  The court in *Santillanes* ultimately found that absentee voters had to undergo a separate identification process, and thus dismissed the equal protection claims.  Thus, these cases are distinguishable from the law and facts here.

Instead, like in *Banfield* and *Stewart*, Plaintiffs allege that the DRE System harms their right to vote by not accurately recording and counting their votes. *Id.* at ¶¶ 12-13, 16-21, 60, 62, 65, 80, 87, 124, 129, 160 (supporting Counts 1-3, 7-8, 11). As in *Gessler*, the Plaintiffs also allege that the Defendants' use of the voting system, here the DRE System, violates their right to vote in absolute secrecy. *Id.* at ¶¶ 12-13, 16-21, 91, 111 (supporting Counts 4-9). Similar to *Santillanes*, the Plaintiffs clearly have standing to assert equal protection claims because they allege that as in-person voters using the DRE System, they will be treated differently than absentee voters *in the same county* who have the ability to cast a verifiable ballot and maintain the secrecy of their vote. *Id.* at ¶¶ 75, 77, 98 (supporting Counts II, V). Finally, Plaintiffs allege an additional injury that the Defendants violated their right to privacy of their personally identifiable information. *Id.* at ¶¶ 136, 154 (supporting Counts VIII, X). Defendants do not— and cannot—even attempt to dispute standing for Counts VIII and X.

The Defendants attempt to avoid the clear showing of standing in this matter by solely focusing on a presumed lack of direct evidence that the Electronic Voting System has in fact been subjected to malicious interference. Their reliance on this singular allegation is misplaced. First, whether actual or possible interference with the Electronic Voting System has occurred is a merits determination and has no

bearing on standing.  Indeed, the primary cases that Defendants rely on for support

that the mere speculation that electronic voting machines are subject to

cybersecurity threats are decisions at the summary judgment stage.  *See, e.g.*,

*Weber v. Shelley*, 347 F.3d 1101, 1105 (9th Cir. 2003) (affirming summary

judgment for defendants after plaintiffs failed to demonstrate after discovery that

the electronic voting machines did not improperly count votes); *Favorito v.

Handel*, 285 Ga. 795, 800 (2009) (granting summary judgment to defendants after

the "undisputed evidence" showed that the "touch-screen machines accurately

record each vote when they are '*properly operated*.'") (emphasis added).

Second, Plaintiffs here do not allege mere possibility, but actual breach of

Georgia's Electronic Voting System:

1.     Cybersecurity experts were "able to access key components of Georgia's electronic election infrastructure, without so much as entering a password";

2.     Cybersecurity experts found "a startling amount of private information, including: driver license numbers, birthdates, and the last four digits of social security numbers for over [6.5] million Georgia voters";

3.     Cybersecurity experts identified "executable programs that could be used to implant malware and vote stealing programs in the system";

4.     Cybersecurity experts were able to obtain passwords needed to make administrative corrections and to open and close the DRE machines;

5.     "Four electronic pollbooks and memory cards containing" state-wide voter personally identifiable information were stolen.

SAC ¶¶ 42, 43, 50.  Defendants ignored Plaintiffs' concerns and cybersecurity experts', including the FBI's, warning about the compromised security of Georgia's Electronic Voting System.  Because the Defendants intend to continue to use compromised equipment without any effort to verify their security, Plaintiffs will suffer continued harm to their fundamental right to vote and privacy in future elections.

**B.     Plaintiffs' Injuries Are Causally Connected to the Defendants' Conduct Because Defendants' Have Failed to Implement Adequate Security Measures and Have Ignored Plaintiffs' Concerns about Election Integrity**

Plaintiffs can also fairly trace their injuries to the Defendants' conduct, even if only indirectly.  *Freeman v. JPMorgan Chase Bank N.A.*, 675 Fed. App'x 926 n. 4 (11th Cir. 2017) ("The fairly traceable requirement is satisfied even if a plaintiff's injury is indirectly caused by a defendant's action.").  Thus, courts in this jurisdiction have consistently found sufficient standing in cases involving failure to properly implement security measures to prevent fraud by third parties. *Id.* (plaintiff had standing where defendant bank allowed a third party misappropriated funds albeit with imputed knowledge); *In re: The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-2583-TWT, 2016 WL 2897520,

at *3 (N.D. Ga. May 18, 2016) (standing established in credit card hacking case where defendant allegedly failed to implement adequate data security measures).

Here, the Plaintiffs allege that Defendants had sufficient knowledge of the security breaches and failed to implement adequate security measures.  SAC ¶¶ 45-57.  Thus, Defendants' conduct is responsible for any interference with the Electronic Voting System.  Defendants have also ignored concerns about the security and reliability of the Electronic Voting System, further undermining Plaintiffs' confidence in election integrity and depriving Plaintiffs of their fundamental right to ensure that their votes are counted.

### C.     A Court-Ordered Injunction against the Use of Compromised DRE's Adequately Redresses Plaintiffs' Injuries

In further misconstruing the standard for standing, Defendants attempt to argue that this Court cannot redress the Plaintiffs' injuries because "no election system is flawless."  However, flawless relief is not the standard for redressability. *Ala.-Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244, 1256 (11th Cir. 2003) ("[w]hile redressability must not be speculative, it need only be 'likely,' not certain.").  Here, Plaintiffs are not seeking a resolution that could completely eliminate third party interference in elections.  Instead, Plaintiffs simply seek a declaration and injunction from this Court to enjoin the Defendants from continued

use of the DRE System known to be susceptible to hacking and malfunction, and unable to audit votes in the event of interference or malfunction.

### D.   CGG and Mayor Terry Have Standing

The United States Supreme Court has made clear that only one party must have standing for a case to proceed.  *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006).  Thus, it is not necessary for the Court to analyze CGG's and Mayor Terry's standing in this case.

In any event, an "association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *King*, 993 F. Supp. 2d at 924 n.6.  The Defendants' only argument against CGG's standing is that purported members did not consent to membership.  However, in accepting the Plaintiffs' allegations in the complaint as true, the Court can only come to the single conclusion that Plaintiffs Donna Curling and Donna Price, who explicitly allege that they are members of CGG, have consented to membership.  SAC ¶¶ 13, 16.  Because these two individual Plaintiffs have standing, CGG has standing.

There can be no dispute that Mayor Terry has standing to assert claims as an individual voter in Georgia.  SAC ¶ 21.  Moreover, Defendants cannot deny that third party standing is allowed in certain circumstances, including a candidate's right to assert the constitutional rights of his or her voters.  *See, e.g.*, *Mancuso v. Taft*, 476 F.2d 187, 190 (1st Cir. 1973) ("A candidate for public office . . . is so closely related to and dependent upon those who wish to vote for him and his litigation will so vitally affect their rights that courts will relax the rule of practice (which is designed to assure vibrant representation of the vital interests of non-parties) and will permit a candidate to raise the constitutional rights of voters.").  Accordingly, Mayor Terry has standing to pursue these claims both as an individual voter and on behalf of his voters.

## III.   DEFENDANTS HAVE NO SOVEREIGN IMMUNITY DEFENSE TO PLAINTIFFS' CLAIMS, EITHER UNDER THE 11TH AMENDMENT OR UNDER STATE LAW

Plaintiffs' federal law claims and state law claims are all validly before this Court, because 1) Defendants, by removing this case to federal court, voluntarily waived their 11th Amendment right to have claims against them heard in state court; 2) Plaintiffs' claims fit within well-established exceptions to sovereign immunity and related doctrines under state law; and 3) any sovereign immunity

that Defendants may have under state law is abrogated as to Plaintiffs' § 1983 claims.

### A.    The 11th Amendment Does Not Bar Any Claims In This Case

Defendants assert that the federal claims against them (or at least those in their official capacities) are barred by the 11th Amendment.  There is no basis in the law for this assertion.  A state's sovereign immunity is a creature of state law, which federal law does not expand, but can curtail.  The 11th Amendment does not provide substantive immunity for states—it only provides states a right to decline to have cases against them heard in a federal forum.  This right is waived where, as here, a state defendant has removed the case to federal court.  Once in federal court, at least in the Eleventh Circuit,[6] any state law sovereign immunity is subject to abrogation by federal law.  Section 1983 constitutes a valid abrogation by Congress, under basic preemption principles and the authority of the 14th Amendment, of any state law sovereign immunity a state defendant might otherwise enjoy with respect to those claims.

---

[6] In other circuits, a state defendant's removal to federal court constitutes a waiver of its state law sovereign immunity as well.  *Stroud v. McIntosh*, 722 F.3d 1294, 1300 (11th Cir. 2013) (construing the scope of *Lapides v. Bd. of Regents*, 535 U.S. 613 (2002)) (Declining to follow the 7th, 9th and 10th Circuits, which "read *Lapides's* broad reasoning to establish the general rule that a state's removal to federal court constitutes a waiver of immunity, regardless of what a state waived in its own courts.").

### 1.   Defendants Waived Their 11th Amendment Jurisdictional Immunity by Removing this Case to Federal Court

The State Defendants assert that the 11th Amendment bars claims against them in their official capacity, based on the Supreme Court's decision in *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).  Motion – SoS at 11.  The Cobb and DeKalb Defendants similarly contend that the 11th Amendment bars the claims against them, relying on the 11th Circuit's decision in *Lassiter v. Alabama A&M University*, 3 F.3d 1482, 1485 (11th Cir. 1993).  Motion – Cobb at 7; Motion – DeKalb at 6.[7]  However, the Defendants' briefs provide no justification for this position, or even any discussion of it whatsoever, because none exists.  The law is clear that a state defendant waives its 11th Amendment right to have claims against it heard in state court when it voluntarily removes a case to federal court, as Defendants have done here.[8]

---

[7] The Fulton Defendants only mention the words "11th Amendment immunity" one time, with no argument, citation or statement of position at all.  Motion – Fulton at 5.

[8] The 11th Amendment does not apply at all to counties or municipalities, or their officials, unless acting as "arms of the state."  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280–81 (1977).  *See* Section V.D., in which we establish that the County Defendants are not acting as "arms of the state" for the purpose of this case.  Nor does the 11th Amendment apply to actions against state officers in their individual capacities.  *Gamble v. Florida Dep't of Health & Rehab. Servs.,* 779 F.2d 1509, 1518 (11th Cir. 1986) (In dismissing a § 1983

The Cobb and DeKalb Defendants even acknowledge that the 11th Amendment does not apply if the state has consented to have a case against it heard in federal court.  Motion – Cobb at 7; Motion – DeKalb at 6.  But they disregard the crucial fact that, not only did they consent to have this case heard in federal court, they affirmatively sought to have the case removed from state court.

That a state defendant waives the 11th Amendment when it removes to federal court is not a subtle or novel point of law.  In fact, the Supreme Court was quite clear about it, with Justice Breyer writing in the opening of his opinion in *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 616 (2002): "The question before us is whether the State's act of removing a lawsuit from state court to federal court waives [its 11th Amendment] immunity. We hold that it does." The Court went on to point out that this principle was established more than a century ago.  *Id.* (citing *Clark v. Barnard*, 108 U.S. 436, 447 (1883).

While the DeKalb Defendants acknowledge that *Lapides* is the controlling law on this point, they misconstrue its holding.  Motion – DeKalb at 7.  The 11th Amendment does not provide immunity against liability to a state for its conduct; it only provides immunity against involuntarily becoming subject to a federal forum.

---

action, the court stated that "the Eleventh Amendment provides no bar to recovery of damages against state officers acting in their individual capacities.").

The *Lapides* Court necessarily limited its ruling to the context of state law claims, because the federal law claims were dismissed at an earlier stage in the proceedings for unrelated reasons.  But whether a case is brought under federal or state law is irrelevant to the issue of immunity with respect to forum.

While misstating the holding of *Lapides* and the basic purpose and effect of the 11th Amendment, the Defendants also ignore the controlling 11th Circuit precedent on point.  The 11th Circuit has explicitly ruled that a state waives its 11th Amendment immunity against being sued in federal court for federal law claims when it removes the case to federal court.  *Stroud v. McIntosh*, 722 F.3d 1294, 1296 (11th Cir. 2013) ("We conclude that removal waived the agency's immunity from suit in a federal forum but did not waive the agency's immunity from liability on this federal claim.") (emphasis in original).  That holding essentially states the obvious: because the 11th Amendment is only a jurisdictional provision, it does not bear on liability for any claim in any forum.  The *Stroud* court was equally clear on this point.  *Id.* at 1299.  Defendants' reliance on *Stallworth v. Alabama Dep't of Mental Health*, 801 F. Supp. 2d 1231, 1234 (M.D. Ala. 2011), is misplaced, as it predates *Stroud* and is no longer good law.

> **2.    In the Alternative, the *Ex parte Young* Exception to the 11th Amendment Applies Here and Vests the Court with Broad Discretion to Grant Any Appropriate Form of Relief, Including Attorney's Fees and Other Costs**

State Defendants acknowledge the exception to the 11th Amendment for prospective relief established by *Ex parte Young*, 209 U.S. 123 (1908), but they argue that it does not apply here.  Motion – SoS at 11-14.  Defendants do not, however, dispute that courts construe the *Ex parte Young* exception broadly enough to allow for any form of relief that the court, in its discretion, deems appropriate in order to remedy effectively the ongoing violations of federal law that *Ex parte Young* targets.

> **a)    The *Ex parte Young* Exception Does Apply Here**

State Defendants seem to argue that *Ex parte Young* does not apply in this case at all, on the grounds that Plaintiffs have alleged violations of law in connection with past elections.  Motion – SOS at 11-12.  They also argue that *Ex parte Young* does not apply specifically to Defendant King, because the allegations involving Defendant King only relate to "past harm."  *Id.* at 14.  But the fact that Plaintiffs' claims are based in part on past conduct in no way negates the fact that the relief it seeks is prospective.  Indeed, every claim for prospective, equitable relief must be based in part on the events leading up to the filing of the lawsuit.  Thus, whether there is an "ongoing and continuous violation" of federal law that

can be addressed through *Ex parte Young* is a "straightforward inquiry." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999) (Prospective relief is "designed to prevent injury that will occur in the future."). Here, Plaintiffs have alleged facts relating to past wrongs in order to establish that a violation of their legal rights has occurred and is ongoing, but Plaintiffs do not seek retrospective relief. All Defendants, including Mr. King, have a role to play in remedying these violations going forward.

State Defendants also argue that *Ex parte Young* does not apply because they do not have "some connection with the enforcement" of the state action at issue—a standard that is flexible on its face. Motion – SOS at 11-12 (quoting *Ex parte Young*, 209 U.S. at 157). But State Defendants rely for this point on *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1342 (11th Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000) (declining to apply *Ex parte Young* because defendants had "no authority to enforce" the challenged provision). Plaintiffs have adequately alleged facts demonstrating that each of the Defendants has an important role to play in the conduct of elections in Georgia, and in the use and misuse of the paperless electronic voting systems. SAC at ¶¶ 22-34. There can be no dispute that these allegations satisfy the standard that *Ex parte Young* does not apply only if the defendants have "no authority" to address the issues being litigated.

With respect to the SEB Defendants specifically, after listing their authorities in connection with elections, State Defendants claim that none of those duties "are sufficiently connected to the state action Plaintiff seeks to enjoin to allow suit under *Ex parte Young*." However, even under the authorities State Defendants rely on, only "some connection" is required—something more than "no authority to enforce" the challenged action. Plaintiffs have more than satisfied this low bar. *See* SAC ¶ 24.[9] To the extent State Defendants assert that *Ex parte Young* does not apply to Defendant Kemp, that, along with their argument related to the SEB members, would conflict directly with *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (finding that Mr. Kemp and the SEB members have the

---

[9] State Defendants also claim that "to the extent Plaintiffs' suit is premised on the SEB's promulgation of rules and regulations, the claim is barred by legislative immunity, regardless of the relief sought." Motion – SOS at 13. It is apparent from their own language that State Defendants acknowledge that Plaintiffs' claims are not premised on the SEB's promulgation of rules, but rather are much broader. Moreover, State Defendants cite *Scott v. Taylor*, 405 F.3d 1251, 1254 (11th Cir. 2005), to support this argument. However, *Scott* is inapposite in this case, as it dealt with a challenge to an act of the state legislature, and the holding only applied to the extent the defendants were acting "in their official legislative capacities." *Id.* Furthermore, principles of legislative immunity do not apply in this case, based on the function of the SEB under Georgia law.

requisite responsibility related to elections to be subject to suit under the *Ex parte*

*Young* exception.).[10]

### b)     The *Ex parte Young* Exception Is Broad

*Ex parte Young* simply reflects a longstanding limitation in the scope,

purpose and effect of the 11th Amendment, which only provides a limited right for

nonconsenting states to avoid a federal forum in cases involving retrospective

compensatory money damages against the state.  *See Hess v. Port Auth. Trans-*

*Hudson Corp.,* 513 U.S. 30, 39, 48 (1994).  Reflecting this view of the 11th

Amendment's purpose and limitations, the *Ex parte Young* exception does not

allow purely monetary judgments.  In the instant case, Plaintiffs do not seek a

purely monetary injunction or any form of compensatory or retrospective remedy –

they seek prospective relief to address ongoing violations of federal law through

---

[10] State Defendants argue that state data breach laws are applicable only to state or local agencies or subdivisions, and not individuals, as "data collectors," under O.C.G.A. § 10-1-911 ("'Data collector' means any state or local agency or subdivision thereof including any department, bureau, authority, public university or college, academy, commission, or other government entity . . . ."). Motion – SOS at 22. While there is little other legal authority to interpret these provisions, it is clear that the state's data breach laws must, by logic, consider individuals – if they are acting within their scope of authority as employees of a state or local agency – to enforce and be held liable under these laws. This logic can be seen in the same reasoning that permits state officers to be sued under the same circumstances.  As discussed below, sovereign immunity and official immunity under state law generally do not bar claims for prospective relief against individual officers acting *on behalf of* a state arm.  Defendants are acting on behalf of "any state or local agency or subdivision" acting as a "data collector."

whichever means this court deems most effective, including injunctive and declaratory relief (and related orders), along with nominal damages, attorney's fees and costs.

The case law is clear that the *Ex parte Young* exception can include a broad array of relief, even if it has an "ancillary impact on the state treasury." *DeKalb Cty. Sch. Dist. v. Schrenko,* 109 F.3d 680, 690–91 (11th Cir. 1997); *see also Edelman v. Jordan*, 415 U.S. 651, 667–68 (1974) (recalling that the injunction issued in *Ex parte Young* itself had a substantial impact on the state treasury, and pointing out that "[l]ater cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex parte Young*." The Court then provides examples and explains that "State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*.").

*Ex parte Young* specifically allows for awards of attorney's fees, among other forms of relief, for example, in order to allow the court to exercise its "authority over a recalcitrant litigant." *Hutto v. Finney*, 437 U.S. 678, 690-691

27

(1978) (In affirming an order requiring the state to pay attorney's fees, the Court stated "[m]any of the court's most effective enforcement weapons involve financial penalties. . . . The less intrusive power to impose a fine is properly treated as ancillary to the federal court's power to impose injunctive relief. . .").

Furthermore, the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, expressly provides for payment of attorney's fees in civil rights actions as part of the "costs," subject to the court's discretion, even without a finding of bad faith or other specific reason to impose additional costs on a litigant, and expressly abrogates the states' 11th Amendment immunity in this respect. *Gamble v. Florida Dep't of Health & Rehab. Servs.*, 779 F.2d 1509, 1516–17 (11th Cir. 1986). Indeed, the state can be required to pay attorney's fees even if not named as a defendant. *Hutto*, 437 U.S. at 699-700 ("Although the 11th Amendment prevented respondents from suing the State by name, their injunctive suit against prison officials was, for all practical purposes, brought against the State . . . and it was the State's lawyers who decided to bring this appeal . . .").

The *Ex parte Young* exception is designed to be construed broadly enough to allow a federal court to give real effect to the protections guaranteed by the 14th Amendment against the states. *Edelman v. Jordan*, 415 U.S. 651, 664, 668 (1974) ("*Ex parte Young* . . . has permitted the Civil War Amendments to the Constitution

to serve as a sword, rather than merely as a shield, for those whom they were designed to protect.").  Plaintiffs here only ask the court to use its power under *Ex parte Young* to vindicate their rights, using whatever means the court finds appropriate.

### B.    State Law Sovereign Immunity Does Not Bar Any Claims in this Case

Under Georgia law, sovereign immunity and official immunity doctrines include broad exceptions that encompass Plaintiffs' claims.  In the alternative, to the extent any state law sovereign immunity may apply here, § 1983 expressly abrogates it with respect to those claims.

### 1.    Sovereign Immunity under State Law Includes an Exception Analogous to *Ex parte Young* that Supports Plaintiffs' Claims

Georgia law is clear—and the Fulton Defendants, at least, acknowledge— that sovereign immunity permits claims for prospective declaratory and injunctive relief against individual officials.  Motion – Fulton at n. 5.  This exception to sovereign immunity is analogous to *Ex parte Young* doctrine under federal law, and should be interpreted equally broadly, as discussed above.  "[T]he doctrine of sovereign immunity usually poses no bar to suits in which state officers are sued in their individual capacities for official acts that are alleged to be unconstitutional." *Lathrop v. Deal*, 801 S.E.2d 867, 885 (Ga. 2017); *see also Georgia Dept. of*

*Natural Resources v. Center for a Sustainable Coast*, 755 S.E.2d 184 (2014);

*Olvera v. University System of Ga. Board of Regents*, 782 S.E.2d 436 (2016).  The

same basic principles apply to counties and county officials.  *See Strength v.*

*Lovett*, 713 S.E.2d 723 (Ga. 2011).

### 2.   State Law Official Immunity Doctrine Does Not Bar Plaintiffs' Claims because Defendants Acted with "Actual Malice"

Georgia law is also clear that official immunity does not bar claims for

prospective declaratory and injunctive relief against state officers.  As the Supreme

Court of Georgia has stated, "official immunity generally is no bar to claims

against state officers in their individual capacities for injunctive and declaratory

relief from the enforcement of laws that are alleged to be unconstitutional, so long

as the injunctive and declaratory relief is only prospective in nature."  *Lathrop*, 801

S.E.2d at 886.

State Defendants and Cobb Defendants argue that Plaintiffs' claims are

barred by official immunity because the claims are premised on prior acts that

involved discretion.  Motion – SOS at n. 13; Motion – Cobb at 6.  Along similar

lines, Fulton Defendants argue that Plaintiffs' claims are barred because official

immunity remains a barrier unless there is a showing of actual malice.  Motion –

Fulton at 10.  However, Defendants have not engaged in merely negligent

behavior, or even reckless behavior, by exercising discretion erroneously or without sufficient view to the wrongful consequences. *See Merrow v. Hawkins*, 467 S.E.2d 336, 337 (1996) (holding that official immunity does not apply where "actual malice," defined as the deliberate intention to do wrong, exists). Rather, Defendants, knowing that these voting systems have fundamental compromises violating specific state election laws, knowing that they are choosing to employ these systems, and aware of the clear and natural consequences that would result, nonetheless persisted, and persist, with this conduct. Indeed, Defendants not only persisted in this behavior, they knowingly ignored all warnings about the vulnerability of the DRE System resulting from their own gross mismanagement and refused offers of assistance from DHS.

Thus, as Plaintiffs have alleged, the claims for prospective injunctive and declaratory relief are premised on a consistent, unchanging, and predictable pattern and practice on the part of Defendants of intentionally abusing their discretion. Specifically, Defendants have adopted a pattern and practice of using, at least for almost the last 10 years, DRE machines for electronic ballots and electronic vote tallies of paper absentee ballots – where it is clear that the only practice complying with all applicable laws has been to use paper ballots and manual counts thereof. *See* SAC *passim*.

This does not mean that Defendants necessarily had "ill will" towards Plaintiffs or to voters in general.  However, "ill will" itself, as the Supreme Court of Georgia has distinguished, is not the same as actual malice, or the deliberate intention to do wrong.  *See Adams v. Hazelwood*, 520 S.E.2d 896, 898 (1999) (ill will "may" be an element of actual malice).

State Defendants do argue that, at least with respect to authority to examine or recertify election equipment, the Director for the Center for Election Systems and individual SEB members do not possess such power at all. Motion – SOS at n. 12.  This argument overlooks, however, that these entities possess considerable knowledge and authority to continue to employ the system—even in the face of others' clear failure to examine or recertify despite known vulnerabilities.  It is for these actions that these particular Defendants are asked to be held liable prospectively.

Finally, State Defendants' argument that claims against the SEB members are barred by legislative immunity for promulgation of rules fails, because, with respect to the actions giving rise to Plaintiffs' claims, these members cannot be considered at all to be acting in a legislative function.  Motion – SOS at 13.  Under general principles of legislative immunity, immunity "necessarily focuses on particular acts or functions, not on particular actors or functionaries."  *Bryant v.*

*Jones*, 575 F.3d 1281, 1305 (2009).  While this means that non-legislative bodies might enjoy legislative immunity, *see Saleem v. Snow*, 460 S.E.2d 104 (Ga. 1995) (holding that legislative immunity extends to the rule-promulgating functions of the state Board of Pardons and Paroles), this also means that such bodies— particularly when not promulgating rules, but implementing them—may not enjoy legislative immunity.

Here, while state statute confers the authority on the General Assembly, a legislative body, both to create and elect members onto a state board for elections, structurally speaking, it is clear that the board is not, as a whole, a legislative body exercising only legislative functions.  The statute is clear, for example, that "[n]o person while a member of the General Assembly shall serve as a member of the board."  O.C.G.A. § 21-2-30.  The statute is also clear that the board makes only "recommendations" to the General Assembly, "as it may deem advisable relative to the conduct and administration of primaries and elections."  *Id.* at § 21-2-31(2).

Furthermore, notwithstanding the clearly non-legislative structure of the board, the statute also lays out other clearly non-legislative responsibilities of the board, such as investigating electoral fraud.  *See, e.g.*, *id.* at § 21-2-31(5).   It is these responsibilities that give rise to these claims.  SAC ¶¶ 139-142.

### 3. In the Alternative, Section 1983 Abrogates Any Sovereign Immunity under State Law that May Otherwise Bar Plaintiffs' Section 1983 Claims

State Defendants assert that "[t]he Supreme Court has held that '§ 1983 does not override a State's 11th Amendment immunity.' *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63 (1989); *Quern v. Jordan*, 440 U.S. 332, 342 (1979); *Kentucky*, 473 U.S. at 169." Motion – SoS at 11 n. 7. While it is true that a federal statute cannot override a provision of the federal Constitution, that is irrelevant here. Furthermore, the quote is taken out of context and does not support the proposition for which it is cited.[11] The question is not whether § 1983 could somehow override 11th Amendment immunity. The Defendants have no 11th Amendment immunity for the purpose of this case, having voluntarily waived it by removing to federal court. The question is whether § 1983 overrides any sovereign

---

[11] *Will* did not involve any application of the 11th Amendment – it was a U.S. Supreme Court review of a Michigan Supreme Court decision. 491 U.S. at 63-64. The *Will* Court made clear that all it was doing was considering the scope of the 11th Amendment as a way of "deciphering congressional intent as to the scope of § 1983." *Id.* at 66-67. The Court pointed out that it was only answering a question of the scope of § 1983 as a statutory matter, "since the 11th Amendment does not apply in state courts." *Will* cites *Quern* for the quoted language that the defendants use, but both of those cases only involve an analysis of the scope of § 1983 as a matter of statutory interpretation. 440 U.S. at 341-342. That statutory analysis was informed by the history, scope and purpose of the 11th Amendment, but the Court was not deciding on the scope of an 11th Amendment defense. *Kentucky v. Graham* is not applicable here for the reasons stated above.

immunity that the defendants may enjoy under Georgia law.  The Supreme Court has held that it does, though Defendants fail to address this point.

Section 1983, to the extent the cause of action applies to a particular defendant,[12] abrogates any sovereign immunity that would otherwise apply under state law.  *Howlett v. Rose*, 496 U.S. 356, 376–77 (1990) (*citing Owen v. City of Independence*, 445 U.S. 622, 647–648) ("By including municipalities within the class of 'persons' subject to liability for violations of the Federal Constitution and laws, Congress—the supreme sovereign on matters of federal law—abolished whatever vestige of the State's sovereign immunity the municipality possessed."; *see also Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 405 F.3d 1298, 1314–15 (11th Cir. 2005); *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670-672 (1999).

## IV. QUALIFIED IMMUNITY DOES NOT APPLY BECAUSE PLAINTIFFS' VOTING RIGHTS ARE "CLEARLY ESTABLISHED," AND DEFENDANTS VIOLATED THOSE RIGHTS

Defendants argue they have qualified immunity from Plaintiffs' federal law claims, because Defendants' conduct "does not violate clearly established statutory

---

[12] The question of the scope of § 1983 is addressed in Section V.D.

or constitutional rights of which a reasonable person would have known."[13]

Motion – Fulton at 8 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also* Motion – DeKalb at 8; Motion – SoS at 37; Motion – Cobb at 6–7.[14]  But any reasonable actors in Defendants' positions would have known that their conduct violated equal protection and due process rights as recognized by the Supreme Court.  Further, Defendants mistakenly rely on a Georgia Supreme Court case that does not answer whether their actions violated "clearly established" law.

### A.   The Rights Asserted by Plaintiffs Are "Clearly Established"

The touchstone for qualified immunity is whether the rights a defendant violated were "clearly established" at the time of the violation.  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  A plaintiff's rights are "clearly established" in one of three ways:  (1) A plaintiff "may show that a materially similar case has already been decided"; (2) a plaintiff may "point to a broader, clearly established principle [that] should control the novel facts [of the] situation"; or (3) "the conduct

---

[13] Qualified immunity does not apply to claims for injunctive or declaratory relief, or to any claim against an official in his or her official capacity.  *See County of Sacramento v. Lewis,* 523 U.S. 833, 841 n.5 (1998); *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 n.9 (11th Cir. 1995).

[14] The State Defendants purport to incorporate by reference their qualified immunity argument from an earlier motion.  Motion – SoS at 37.  However, the cited page range includes no qualified immunity argument, and Plaintiffs can find no such argument elsewhere in that motion.  Doc. 8-1 at 30–33.  Accordingly, Plaintiffs address only the arguments in the remaining Defendants' motions.

involved in the case may so obviously violate [ ] th[e] constitution that prior case law is unnecessary." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204–05 (11th Cir. 2012) (citation omitted).

A previous case need not be "materially similar" to the scenario confronting the defendant to make out a "clearly established" right; "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citation omitted). "A right may be clearly established irrespective of whether courts have specifically deemed the cause of action as being available under a particular legal theory. Accordingly . . . the salient question is whether the state of the law at the time provided officials fair warning that their . . . conduct was unlawful." *Bryant v. Jones*, 575 F.3d 1281, 1309 (11th Cir. 2009).

In this matter, Plaintiffs assert their rights to have their votes counted and to have their votes valued equally to those of similarly situated electors. As demonstrated below, these rights have been clearly established in myriad Supreme Court and other cases. *See* Section V. As also demonstrated below, Defendants violated these rights. *Id.*

Thus, any reasonable state official in the "situation [Defendants] confronted"—that is, after experts laid bare the substantial risks of DRE system

intrusion and manipulation, (SAC ¶¶ 42–46)—would have had "fair warning" that refusing to take steps to ensure election integrity would violate Georgia electors' equal protection and due process rights.  *Saucier*, 533 U.S. at 202; *Bryant*, 575 F.3d at 1309.

### B.    *Favorito v. Handel* is inapposite

Defendants rely on *Favorito v. Handel*, 684 S.E.2d 257 (Ga. 2009), to argue that the Georgia Supreme Court has held that the DRE system does not violate the federal constitutional rights asserted here, and that Defendants thus could not have been on notice that their conduct violated those rights.  As demonstrated below, this reliance is misplaced.  *See* Section V(B)(3)  The *Favorito* court held that offering verifiable paper ballots as well as less secure, non-verifiable touchscreen voting did not violate equal protection rights because "the possibility of electoral fraud can never be completely eliminated, no matter which type of ballot is used." *Id.* at 261 (citation omitted).  So long as state officials made a "reasonable and neutral" choice between balloting systems, the court held, its choice did not violate equal protection.  *Id.* (citation omitted).

But even if state officials made a "reasonable and neutral" choice when they originally implemented the DRE system in the early 2000s, this was not the case after Defendants left Georgia's DRE system open to election hackers through the

use of unsecured electronic infrastructure and refused to remedy the system's

vulnerabilities after being informed of them.  SAC ¶¶ 42–46.  The court's

pronouncement that "the possibility of electoral fraud can never be completely

eliminated" simply does not contemplate the scenario at issue here:  Far from

seeking to eliminate fraud, Defendants created and then refused to address the

substantial risk of election fraud that Plaintiffs now seek to correct.

Nor can Defendants rely on the court's other holdings that votes are

accurately counted when the DRE machines are "properly operated."  684 S.E.2d

at 262.  The crux of Plaintiffs' claims is that Defendants allowed the DRE

machines to be *improperly* operated.

## V.  PLAINTIFFS HAVE ADEQUATELY PLED SECTION 1983 CLAIMS PREDICATED UPON DEFENDANTS' VIOLATIONS OF PLAINTIFFS DUE PROCESS AND EQUAL PROTECTION RIGHTS

Title 42 U.S.C. § 1983 provides that:

> Every person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State* …, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the *deprivation of any rights, privileges, or immunities secured by the Constitution and laws*, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress….

42 U.S.C. § 1983 (emphasis added).  Section 1983 "is not itself a source of

substantive rights, but a method for vindicating federal rights elsewhere conferred

by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). To state a claim for relief under § 1983, a person must allege that (1) she was deprived of a federal right; and (2) such deprivation was effected by one acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

Defendants do not contest that Plaintiffs satisfied the first element. They do contest that Plaintiffs satisfied the second element of this test by arguing that none of the five Section 1983 claims alleged in the SAC states a cause of action. As demonstrated below, however, each of the Plaintiffs 14th Amendment claims are adequately pled, and Defendants fail to demonstrate otherwise.

### A. The Constitutionally Protected Fundamental Right to Vote and to Have Votes Accurately Counted

The electoral franchise is a fundamental right of all U.S. residents who are constitutionally entitled to vote because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Thus, the Supreme Court has long emphasized that when reviewing constitutional challenges to states' restraints on the right of suffrage, "as a general matter, 'before [the] right (to vote) can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (citation omitted). This is true even when the restraint does not

disenfranchise a protected class of voters because the right to vote is fundamental

to *all* voters, individually and as a group.  Thus, any restriction on the right to vote

will be struck down as an unconstitutional infringement unless it is "tied to a

particularized legitimate purpose, and is in no sense invidious or arbitrary."

*Rosario v. Rockefeller*, 410 U.S. 752, 762 (1973).  As the Supreme Court has held,

"[a] court considering a state election law challenge must weigh the character and

magnitude of the asserted injury to the First and Fourteenth Amendment rights that

the plaintiff seeks to vindicate against the precise interests put forward by the State

as justification for the burden imposed by its rule, taking into consideration the

extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze*, 460

U.S. 780, 788-89 (1983)).

    This fundamental, constitutionally protected right includes not just the right

to cast a ballot, but to have that ballot *accurately counted*.  "[A]ll qualified voters

have a constitutionally protected right to vote . . . and to have their votes counted. .

. ."  *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (internal citations omitted).  Thus,

the right to vote also includes the right to be protected from the alteration of

ballots, or to have a vote diluted by counting ballots not properly cast ("ballot-

stuffing") because "the right of suffrage can be denied by a debasement or dilution

of the weight of a citizen's vote just as effectively as by wholly prohibiting the free

exercise of the franchise."  *Id.* at 555.

As demonstrated below, such deprivations of the right of suffrage implicate

both the Equal Protection and the Due Process Clauses of the 14th Amendment.

The Due Process Clause of the 14th Amendment is implicated whenever a state

acts in a way so as to deprive voters of their rights to vote and to have their votes

accurately counted and not diluted.  *See, e.g.*, *League of Women Voters of Ohio v.*

*Brunner*, 548 F.3d 463, 478 (6th Cir. 2008).  Similarly, the Equal Protection

Clause of the 14th Amendment protects all voters from having their votes count

less than the votes of other voters in determining the outcome of elections.  *Bush v.*

*Gore*, 531 U.S. 98, 105 (2000) ("Having once granted the right to vote on equal

terms, the State may not, by later arbitrary and disparate treatment, value one

person's vote over that of another").

### B.     The SAC States a Section 1983 Claim Under the Equal Protection Clause

The SAC alleges two separate Section 1983 claims predicated upon

Defendants' violations of the Plaintiffs' rights under the Equal Protection Clause.

As demonstrated below, each of these claims easily satisfies Plaintiffs' notice

pleading obligation and Defendants' motions should be denied as to these claims.

### 1. Count II: Unequal Treatment of DRE and Paper Ballot Voters – Vote Dilution

First, under Count II, Plaintiffs allege that Defendants violated the Equal Protection rights of voters using the DRE system due to the fact that unlike paper ballots issued to mail-in absentee voters and counted on optical scanners, DRE equipment cannot reliably prevent or detect errors, reliably determine the election results, and leave no paper record against which voting results can be verified and recounts conducted if necessary.  (SAC ¶¶ 2, 4, 7, 38-39).  Furthermore, the SAC alleges that the extraordinary mismanagement of the DRE System by the Secretary of State and KSU/CES resulted in: (a) the system being left wide open to intrusion and manipulation (SAC ¶¶ 4, 5, 40, 42-44); (b) a massive breach of the personal voting data of 6.5 million Georgia voters (SAC ¶¶ 4, 43); and (c) unauthorized access to the system on multiple occasions (SAC ¶¶ 42, 43, 47).  The SAC further alleges that Secretary of State Kemp and CES ignored repeated warnings about the system's vulnerability and the risk of manipulation and dilution of voters' votes by no fewer than twenty of the nation's top cybersecurity experts, DHS, the FBI, and Logan Lamb, who had accessed Georgia's system and learned that he—and any other person who could similarly access the system—could manipulate all voter records and voting system programming databases.  (SAC ¶¶ 42-46).  Indeed, rather than accept DHS's offers of assistance to help protect Georgia's DRE

System from the very real threat of intrusion and manipulation, Defendant Kemp chose to publicly decry a putative federal government conspiracy to hijack Georgia's elections.  (SAC ¶¶ 5, 44, ).  Ultimately, it is alleged, the FBI was so concerned about the risk and about Defendants Kemp's and KSU's refusal to take any reasonable steps to protect Georgia voters that it seized control of the CES server (SAC ¶¶ 6, 47).

These allegations easily meet the threshold pleading requirement for an Equal Protection Claim.  The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall… deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.  This constitutional guarantee "creates no substantive rights.  Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly."  *Vacco v. Quill*, 521 U.S. 793, 799 (1997). "A violation of equal protection occurs when the government treats someone differently than another who is similarly situated."  *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, 927 F.2d 1111, 1118 (10th Cir. 1991).

The Clause applies to protect voters from discriminatory treatment in the conduct of elections.  *Harper v. Harrison*, 383 U.S. 663 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are

inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). As the Supreme Court held in *Reynolds v. Sims*, the Fourteenth Amendment grants to all residents the "conception of political equality," including the fundamental requirement of "one man, one vote." 377 U.S. at 557-58. That bedrock principle is echoed in the Court's decision in *Bush v. Gore*, in which the Court held that the essence of this right "lies in the equal weight accorded to each vote and the equal dignity owed to each voter." 531 U.S. at 104. Thus, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05.

The courts have applied the Equal Protection Clause in holding that a wide variety of state laws and actions that resulted in certain groups of voters being denied the same suffrage rights as other voters could or did violate those voters' constitutional rights under circumstances analogous to those here. For example, in *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008), the Sixth Circuit affirmed the district court's denial of the defendants' motions to dismiss the plaintiffs' Equal Protection and Due Process claims predicated upon the allegations that the votes of Ohio voters were treated very differently depending upon where they voted, and what voting method they used. This alleged disparate treatment resulted in part from "the promulgation and

maintenance of nonuniform rules, standards, procedures, and training of election personnel throughout Ohio." *Id.* at 478.

Similarly, in *Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002), the court denied a motion to dismiss the 14th Amendment claims brought by a group of voters challenging the defendants' use of multiple voting methods, including punch cards and optical scanning. The plaintiffs claimed that the punch card method of voting was prone to a significantly higher rate of error than optical scanning, due to human error, machine defects, and other factors.

In denying the defendants' motions to dismiss, the court held that the plaintiffs had adequately alleged a claim under Section 1983 based upon the alleged denial of plaintiffs' 14th Amendment Equal Protection rights. In doing so, the court held that:

> [W]hether the counter is a human being looking for hanging chads in a recount, or a machine trying to read ballots in a first count, the lack of a uniform standard of voting results in voters being treated arbitrarily in the likelihood of their votes being counted. *The State, through the selection and allowance of voting systems with greatly varying accuracy rates, 'value[s] one person's vote over that of another,'* even if it does not know the faces of those people whose votes get valued less. This system does not afford the 'equal dignity owed to each voter.'

*McGuffage*, 209 F. Supp. 2d at 899 (citations omitted) (emphasis added).

The District Court for the Central District of California reached a similar result on comparable facts in *Common Cause Southern Christian Leadership Conference v. Jones*, 213 F. Supp. 2d 1106 (C.D. Cal. 2001).  There, the court denied a motion for judgment on the pleadings in a case brought by a group of plaintiffs challenging the state's use of punch cards, which were less likely to be counted than other voting systems used in the state.  In denying the defendants' motions, the court held that "Plaintiff has alleged facts indicating that the Secretary of State's permission to counties to adopt either punch-card voting procedures or more reliable voting procedures is unreasonable and discriminatory."  *Id.* at 1109.

The SAC clearly alleges comparable, if not more dramatically distinct, disparate treatment.  Notably, the State's argument that Plaintiffs suffered no unequal treatment because "Plaintiffs may choose to vote by absentee paper ballot or on election day by DRE," Motion – SoS at 32, far from curing the violation, actually gives rise to it:  voters using the DRE System were unwittingly subjecting themselves to a greater risk that their votes would not be counted than those voting by paper ballot.  And, even if the State's "assumption of the risk" theory could, under *any* circumstances, find purchase in the constitutional jurisprudence of this country—and it cannot—voters obviously had no way to know just how badly the

State and CES had mismanaged its DRE system, and just how exposed they were to the risk that their vote would not be counted, or would otherwise be diluted.

Thus, when voters using the DRE system voted, they certainly had no way of knowing that, unlike voters using paper ballots, they were forced to vote using equipment that not only was left wide open to intrusion and manipulation, but *was in fact breached* on multiple occasions.  While those who (so easily) breached the system had benign—indeed, noble intentions—only discovery will reveal who else breached the system and with what effect.

Only if Defendants had left millions of paper ballots available in public for months before every election cycle with an invitation to anyone, anywhere, around the globe, to pre-mark them as they wished for later use by actual voters who would be unable to change the selections previously made, would voters using paper ballots have been treated in a comparable manner.  Similarly, voters using paper ballots could have their votes audited and recounted in an election contest in the event that was necessary.  Voters using the DRE systems had and have no such option.  Under these circumstances, the SAC clearly states a viable, if not compelling, cause of action under Section 1983 and the Equal Protection Clause.

### 2.     Count V: Unequal Treatment of DRE and Paper Ballot Voters – Voting Secrecy

For Count V, Plaintiffs allege that they were denied equal protection under the laws by virtue of the fact that unlike voters using paper ballots, their votes were readily identifiable.  SAC ¶¶ 39, 95-102.  The right to vote in secret is not only guaranteed by the Georgia Constitution, but is fundamental to the right to vote. "[S]ecrecy and privacy as to political preferences and convictions are fundamental in a free society [and] one of the great political reforms was the advent of the secret ballot as a universal practice."  *Buckley v. Valeo*, 424 U.S. 1, 237 (1976) (Burger, J., concurring in part and dissenting in part).  *See also Rogers v. Lodge*, 458 U.S. 613, 647 n.30 (Stevens, J., dissenting) ("[T]he very purpose of the secret ballot is to protect the individual's right to cast a vote without explaining to anyone for whom, or for what reason, the vote is cast"); *Ury v. Santee*, 303 F. Supp. 119, 126 (N.D. Ill. 1969) ("United States citizens do have the right guaranteed by the Constitution to a reasonable opportunity to vote . . . in a reasonable time and in a private and enclosed space.").  By denying this right to vote in secrecy to DRE voters but honoring the right of voters using paper ballots, Defendants have denied the Plaintiffs Equal Protection under the law, and Plaintiffs are entitled to proceed on this claim as well.

### 3.     Defendants Have Not Demonstrated that Counts II and V Fail to State a Claim

None of the Defendants other arguments satisfy their burden of demonstrating that Plaintiffs have failed to adequately plead Equal Protection Claims.  For example, the State cites *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007) for the proposition that "[t]here is no equal protection violation for treating dissimilar persons unequally."  The State fleshed out its "dissimilarity" argument in its initial motion to dismiss (which it purports to incorporate by reference).[15]  There, the State argued that DRE voters *chose* to vote that way and are therefore not protected by the Equal Protection clause even if they received *unequal* treatment with respect to the validity of their votes.

First, *Griffin* is wholly inapposite.  That case involved an equal protection claim brought by a chicken rendering plant against various state and local public officials on the grounds that the plaintiff's rights were allegedly violated by "disparately treat[ing] and disparately regulat[ing] Griffin Industries in a way that its competitors . . . are not treated or regulated."  At issue here is not, of course, the regulation of a chicken rendering plant but the fundamental right to vote protected

---

[15] The State's attempt to incorporate the arguments it made previously in a motion that has now been denied as moot may raise questions for the Court, but Plaintiffs' will assume that the State's method is valid for purpose of this response.

by the 14th Amendment, and any impairment of that right is subject to close

judicial scrutiny:  the rights of owners of chicken rendering plants to "equal

protection" under the laws regulating such plants to not enjoy this degree of

protection.  No more need be said to distinguish *Griffin*, and tempting though it

may be, Plaintiffs refrain from further comment on the State's suggestion that the

right to vote deserves no more protection than the right to make chicken fat.

 The State also relies on the decision of the Georgia Supreme Court in

*Favorito v. Handel*, 285 Ga. 795 (Ga. 2009) in arguing that the SAC fails to state

an Equal Protection claim.  There, the plaintiffs challenged the state's use of the

DRE system under the Equal Protection and Due Process Clauses on the basis that

the system does not create an auditable paper trail, and because the system is

subject to undetectable fraudulent manipulation.  In so holding, the Court adopted

the defendants' reasoning that because voters have the option of voting by other

means, their rights under either the Equal Protection Clause or the Due Process

Clause were not violated.

 With all due respect to the Georgia Supreme Court, the Court's decision

cannot be squared with many decades of Constitutional jurisprudence.  The

Constitution does not require citizens to bend to the arbitrary regulations and

actions of the state in order to enjoy the Constitutional protections afforded by the

14th Amendment.  Under the Court's reasoning, no one would have a constitutional right under the 14th Amendment to marry someone of a different race—or of the same gender—because everyone could choose to marry someone else.  But the Constitution does not require those it protects to make choices to evade state disparate and arbitrary treatment that impinges on the rights it confers. Furthermore, the Court's reasoning relies on either the assumption that either voters were aware of the higher risk of their votes being diluted if they choose to vote by DRE, or that it does not matter for constitutional purposes whether they know or not.  Either way, the Court's decision cannot be squared with well-established constitutional law and should not be followed by this Court.

In any event, the facts here are readily distinguishable from those alleged in *Favorito*.  Plaintiffs' claims are not remotely predicated just upon the fact that their DRE votes left no paper trail, or even upon the inherent vulnerabilities of DRE voting equipment.  Rather, Plaintiffs' claims are predicated largely upon the gross mismanagement of the state's voting system and the abject refusal of the state and KSU to take reasonable steps to cure the problem.

For all the above reasons, the SAC adequately alleges claims that the Defendants violated the 14th Amendment Equal Protection rights of the Plaintiffs.

**C.     The SAC States a Section 1983 Claim Under the Due Process Clause**

The SAC alleges three separate Due Process claims.  Like Plaintiffs' Equal Protection claim under Count II, Counts I and III allege a violation of the Plaintiffs' fundamental right to vote and to use a reliable system of voting and to have their votes counted due to (a) Defendants' use and mismanagement of the DRE System in a manner that failed to provide reasonable and adequate protection against the very real and substantial threat of electronic and other intrusion, manipulation and tampering, and by failing to ensure that all of the equipment, firmware and software would record votes accurately; and (b) Defendants' failure to provide reasonable and adequate methods for counting votes, and to have those votes recounted if necessary.  (SAC ¶¶ 58-65; 81-88).  Count V, like Plaintiffs' Equal Protection claim Count IV, alleges a violation of the fundamental right to vote in secrecy.  (SAC ¶¶ 95-102.)  For the reasons set out below, each of these claims states a cause of action.

The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.  In its substantive application, the Due Process Clause "forbids the government to infringe ... fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly

tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S

702, 721 (1997) (emphasis in original) (quotation marks omitted).  In its

procedural application, the Due Process Clause safeguards individuals who: (1)

possess a protected interest to which due-process protections are applicable; and

(2) are not afforded an appropriate level of process. *See Couture v. Bd. of Educ.*,

535 F.3d 1243, 1256 (10th Cir. 2008).  "The Due Process Clause is implicated, and

§ 1983 relief is appropriate, in the exceptional case where a state's voting system is

*fundamentally unfair*."  *League of Women Voters of Ohio v. Brunner*, 548 F.3d

463, 478 (6th Cir. 2008)(emphasis added).

Thus, for similar reasons that the courts have upheld the plaintiffs' claims

under the Equal Protection clause in the cases discussed above, many of those

same cases also held that a cause of action had been properly alleged (or proven)

under the Due Process clause. *See, e.g.*, *Brunner*, 548 F.3d at 478 (plaintiffs had

adequately alleged a Due Process claim where the state's error-prone system of

voting was "pervasive, several, chronic and persistent"); *McGuffage*, 209 F. Supp.

2d at 899-902 (Due Process claim adequately alleged where voters who voted by

punch card allegedly had a greater chance of having their votes not counted than

voters using other methods); *Jones*, 213 F. Supp. 2d 1106 (denial of fundamental

right to vote of punch-card voters).

Here, Plaintiffs are alleged to have been denied their rights to vote using a voting system that is reasonably reliable, and to have those votes counted as a result of the Defendants' use, and gross mismanagement, of the DRE voting system.  Just as the courts held in *Brunner*, *McGuffage*, and *Jones*, the Plaintiffs here allege that they faced a greater risk of having their votes not counted—vote dilution—than voters using other methods of voting permitted by the state.

For these reasons, Plaintiffs' have amply stated a cause of action under Counts I and III, and none of Defendants' arguments are to the contrary.  For example, the State again relies upon the Georgia Supreme Court's decision in *Favorito*, 285 Ga. 795 (Ga. 2009) in making the absolutist argument that "voters do *not* have a right under state law to a particular balloting system" and making the point that the court held in *Favorito* that the State's use of the DRE System did not violate the State Constitution.  Motion – SoS at 30.  The State takes *Favorito* too far:  voters may have no abstract right to use any particular balloting system of their choosing, but that does not mean that the State has complete license to manage its elections in any way it chooses, and to force or induce voters to use a system that violates their Constitutional rights.  And, while the states are not obligated to administer their elections in a way that constitutes an abstract, constitutional ideal, that does not mean that the manner in which they decide to do

so is not subject to constitutional scrutiny.  Rather, when faced with constitutional challenges to the manner in which states administer their elections, the courts assess whether the restraint in fact advances a legitimate interest and does not unduly impair the plaintiffs' constitutional rights.  *See, e.g.*, *Burdick*, 504 U.S. at 789 (""[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'") (internal citations omitted).  In any event, and as demonstrated above, *Favorito* is easily distinguished on the facts and is inconsistent with federal jurisprudence.

Second, the State argues that the Plaintiffs' procedural Due Process rights were not violated because the claim is not ripe until the State has refused to provide due process.  In support of this argument, the State cites *Horton v. Board of County Commissioners*, 202 F.3d 1297, 1300 (11th Cir. 2000) for the proposition that "[i]f a state court could [provide an adequate remedy], then there is no federal due process violation. . . ."  The State's argument is misplaced. *Horton* dismissed the claim on jurisdictional, not substantive grounds, in a case

involving state real property rights, not the federally protected fundamental right of suffrage.  This case cannot be read to stand for the proposition that plaintiffs alleging violations of the Due Process clause arising from the deprivation of a fundamental right must first exhaust any available state court procedures. Plaintiffs are aware of no cases so holding.  In any event, particularly since the Defendants successfully *removed* Plaintiffs' case from state to this court, Defendants' should not now be heard to argue that, as the 11th Circuit held in *Horton*, the case should be *remanded* back to the state court.

Defendants' substantive due process arguments are no less misplaced.  For example, the State relies on *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) for the proposition that "[a]reas in which rights are created only by the state are not subject to substantive due process protection."  The State's argument is specious. *McKinney* involved a "state-created property interest" in the plaintiff's employment; not a fundamental right protected by the 14th Amendment.  While states have the right under the Constitution to regulate the manner in which elections in their state are conducted[16] (subject of course to limitations on that right expressly provided in the Constitution and that arise under the 14th Amendment), the right to vote in federal elections is conferred by Articles I and II.  And, even

---

[16] *Kramer v. Union Free School District*, 395 U.S. 621, 625 (1969).

where the state has conferred upon its citizens the right to vote in certain elections, once granted, voters enjoy the full protections of the 14th Amendment.

The State also argues that Plaintiffs have not adequately alleged a substantive Due Process claim because they have not alleged actual harm and because their allegations that DRE voters' votes can be traced is "speculative." Motion – SoS at 31.  The latter argument fails for the simple reason that the court on a 12(b)(6) motion must take all allegations as true.  Defendants' time to argue that Plaintiffs cannot prove their claims is not in a 12(b)(6) motion.  Second, the State argues that Plaintiffs merely allege that their votes *might* be discounted or not counted at all, and that this Court should therefore dispose of Plaintiffs' claims as reflecting no more than conjecture and speculation.  Defendants' arguments are misplaced.  Not only are the facts alleged here distinguishable from the facts alleged in the cases on which Defendants' rely, Plaintiffs are aware of *no* prior case in which the State defendant(s) had so flagrantly breached its statutory and other obligations to ensure the integrity of its electronic voting system.  To be sure, no state has received urgent warnings from scores of cybersecurity experts, the FBI, DHS (and, in the case of CES, the KSU IT department) that its system was completely exposed to intrusion and manipulation to anyone with even rudimentary computing skills—at a time when the threats to the integrity of states'

electronic voting systems was widely reported (and taken very seriously at the highest levels of the federal government)—and then rebuffed all such warnings. And, in no other case had the state's conduct posed such a dire threat to the integrity of its electoral system and the fundamental rights of citizens that the FBI was forced step in and *seize control over its facilities*.  Under these circumstances, the State can hardly be heard to dismiss the Plaintiffs' allegations as rank speculation.

Nor for that matter is the State correct in arguing that the Plaintiffs fail to allege actual harm.  Plaintiffs allege that their fundamental right under the U.S. and Georgia Constitutions to vote using a method that is reliable and to vote in absolute secrecy *was* violated.  These claims do not, as the State argues, rely on mere conjecture and speculation.

Finally, the State relies on *Wexler v. Anderson*, 452 F.3d 1226, 1233 (11th Cir. 2006) to argue that the lack of a manual recount feature does not in itself violate the Equal Protection and Due Process Clauses.  On the record before the 11th Circuit and the specific claims alleged, that is what the 11th Circuit held in that case.  But the claims and allegations here are different.  As already discussed, the Plaintiffs' constitutional claims here are not predicated solely upon the fact that DRE System voting does not result in a paper record.  That is just one of the bases

upon which Plaintiffs claim that their rights to have their votes counted were violated.  Indeed, the court in *Wexler* held that the plaintiffs' had failed to adequately allege a 14th Amendment violation because the plaintiffs "did not plead that voters in touchscreen counties are less likely to cast effective votes due to the alleged lack of a meaningful manual recount procedure in those counties."  *Id.* at 1222.

That is precisely what Plaintiffs here allege.  Plaintiffs allege that due to the vulnerabilities and gross mismanagement of the state's DRE System, the Plaintiffs *are* less likely to cast effective votes as voters using paper ballots.  *See, e.g.*, SAC ¶¶ 7 ("[T]he rights of Georgia voters . . . to have their votes counted accurately, have been flagrantly and repeatedly breached by Defendants' conduct."); 61(a) (Defendants' "[f]ailed to provide reasonable and adequate protection against the real and substantial threat of electronic and other intrusion and manipulation. . . ."); 61(b) (Defendants "[f]ailed to include the minimal and legally required steps to ensure that . . . each DRE unit would cast and that no votes that were not properly cast would not be counted. . . ."); 61(d) (Defendants "[f]ailed to provide reasonable, adequate and legally mandated methods and steps to ensure that the votes of Georgia electors were accurately counted. . . .").

For these reasons, Defendants' reliance on *Wexler* is misplaced, as is their reliance on decisions from other jurisdictions holding that the use of DRE technology does not, in itself, violate voters' 14th Amendment rights. *See* Motion – SoS at 34. At issue in those cases was not the gross mismanagement of the State's DRE System but the limitations of technology when managed and operated properly.

Accordingly, Defendants' arguments that Plaintiffs have failed to adequately allege that their Due Process rights under the 14th Amendment are misplaced. The facts here are not just distinguishable from each of the cases on which Defendants are relying: they are as distinguishable as they are alarming. And the posture being taken by the Defendants—particularly the State Defendants—in pretending that there was and is no problem and that the rights of Georgia voters are being protected is the same posture they took with the FBI and DHS. Defendants were wrong then. And they are just as wrong now.

### D. DeKalb Defendants' and Cobb Defendants' Argument That They Act As Arms of the State and Are Therefore Excluded from Liability Under Section 1983 Is Incorrect

The DeKalb and Cobb County Defendants argue that they "act as arms of the state when conducting elections" and therefore are protected by 11th Amendment Immunity and cannot count as "persons" under Section 1983. Motion

– DeKalb at 7; *see also* Motion – Cobb at 7.  Defendants are incorrect. In the context of this case, the DeKalb, Cobb, and Fulton Boards of Elections, and their members, do not act as "arms of the state" and did not act as "arms of the state" when they violated Plaintiffs' constitutional rights.  Consequently, they can be classified as "persons" under Section 1983.

The Eleventh Circuit has established a four-factor test "to determine whether an entity is an 'arm of the State' in carrying out a particular function, as opposed to a "person" under Section 1983:  (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003).  Analysis under *Manders* is function-specific: the question is not "whether the officer acts for the state or the county 'in some categorical, "all or nothing" manner' but, rather, whether they act for the county or state "in a particular area, or on a particular issue." *Stanley v. Israel*, 843 F.3d 920, 924 (11th Cir. 2016); *see also Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) ("Whether a defendant is an arm of the State must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise").  Application of these factors

here makes clear that Defendants are not functioning as "arms of the state," and are therefore "persons" for purposes of Plaintiffs' Section 1983 claims.

Plaintiffs allege that the Defendants DeKalb, Cobb, and Fulton Boards of Elections and their members have conducted elections in violation of Plaintiffs' rights under the Due Process and Equal Protection clauses of the United States Constitution.  Local boards of election and their members function as autonomous entities. Though they have some particular obligations based on Georgia state law, these requirements are among the many and varied responsibilities of the Boards. The Boards are individually responsible for the operation and reliability of their own local elections, without state support or state interference.  Financial obligation is arguably the most telling indicator that the counties are not "arms of the state." The counties bear the burden of paying for the elections and would be liable for any monetary judgment should one be levied against the Board.

Whether a Georgia county Board of Elections acts as an arm of the state was addressed in *Casey v. Clayton Cty., GA*, No. CIVA 104CV-00871, 2007 WL 788943 (N.D. Ga. Mar 14, 2007).  That case involved a single hiring decision by the Clayton Board of Elections. The defendants moved for summary judgment, relying on their claimed Eleventh Amendment immunity.  This Court denied that motion, holding that, on the facts of the case, "the Court is inclined to believe …

Eleventh Amendment immunity is not warranted." Neither this Court nor any other Eleventh Circuit district court has directly considered whether a county Board of Elections acts as an arm of the state in managing elections.  Nevertheless, application of the four *Manders* factors demonstrates that the County Defendants are not "arms of the state" for purposes of Plaintiffs' claims.

### 1.    How State Law Defines the Entity

The Georgia General Assembly creates county Boards of Elections by "local Act" and may "empower the board[s] with the powers and duties of the election superintendent relating to the conduct of primaries and elections . . . and with the powers and duties of the board of registrars relating to the registration of voters and absentee-balloting procedures." Ga. Code. § 21-2-40; Casey at *8.  Other than this provision, the Georgia Code is largely silent as to how Boards of Elections fit into the structure of Georgia state and county government.  Functionally, the state creates Boards of Election, but then leaves virtually all aspects of the management and funding to the counties.  If the Georgia General Assembly did not establish the Boards of Election, there would be no basic mandate under which counties assume the role of running elections.  And the state does almost nothing to ensure the proper implementation and function of the election structure.  The Code does not dictate, designate, or even provide guidelines for the appointment of Board

members.[17] And the state does not take any real responsibility for protecting the rights of voters.

### 2.     What Degree of Control the State Maintains Over the Entity

The Boards of Elections themselves conduct and manage the elections. Ga. Code. §21-2-70. *See Abusaid v. Hillsborough County Bd. Of County Com'rs*, 405 F.3d 1298, 1306 (11th Cir.) (noting that the "great independence" Florida sheriffs enjoyed in their "day-to-day operations" weighed "against arm of the state status" in the context of second *Manders* Factor). While the Georgia Secretary of State can examine the use of DRE Systems, Ga. Code §21-2-379.2, the county superintendent is responsible for preparing and managing the systems throughout the election process. Ga. Code §§ 379.6-7.  Additionally, the decision whether to switch to paper ballots is in the hands of the superintendent.  Ga. Code § 21-2-334 ("If [voting machines are impracticable for some reason], the superintendent may arrange to have the voting for such candidates or offices or for such questions conducted by paper ballots").  Whether recanvassing a precinct is required is also under the superintendent's discretion. Ga. Comp. R & Regs. 1831-12-.02.  In sum,

---

[17] The Georgia General Assembly does define the powers and duties of the Boards of Elections when they act as election superintendents. Ga. Code. § 21-2-70.

the county Boards of Elections are substantially independent of state control, and were at the time they performed the functions that exposed them to liability for violating Plaintiffs' constitutional rights.

### 3. Where the Entity Derives Its Funds

In Georgia, county Boards of Elections derive their funds from the counties whose elections they supervise, another clear indication they do not act as arms of the state when they manage elections. Ga. Code. § 21-2-71; *Casey* at *9 (N.D. Ga. Mar. 14, 2007).  The DeKalb, Cobb, and Fulton County Boards of Election are all funded by their respective counties, indicating that they are not arms of the state.

### 4. Who Is Responsible for Judgments against the Entity

Because Boards of Elections are funded by the counties that they serve, the counties are responsible for paying any judgments against the Boards.  *Casey* at *9 ("as Clayton County must pay for the Board's operations, to the extent a judgment would be paid out of the Board's general operating budget, it would appear that it would be indirectly paid by Clayton County"). This responsibility further indicates that the Boards are county entities and not arms of the state.

## VI. PLAINTIFFS HAVE ADEQUATELY PLED CLAIMS UNDER THE GEORGIA CONSTITUTION AND GEORGIA STATUTES

The SAC alleges three claims under Georgia state law, including:

**Count VI: Violation of State Ballot Secrecy Laws (SAC ¶¶ 103 - 112).** This claim alleges that Defendants violated the Plaintiffs' rights to vote in absolute secrecy as guaranteed by Article II, Section 1, Paragraph 1 of the Georgia Constitution and Section 21-2-379.1(6) of the Georgia Code. Defendants violated this obligation by deploying a Diebold DRE System that records votes in sequence, allowing for votes to become traceable to individual voters.

**Count VII: Violation of State Electronic Voting System Laws (SAC ¶¶ 113 - 125).** This claim alleges that Defendants violated the Plaintiffs' rights to an election conducted in accordance with the laws and procedures of the State of Georgia as guaranteed by Article II, Section 1, Paragraph 1 of the Georgia Constitution. Specifically, Defendants violated the Election Code statutes and governing regulations by employing a materially non-compliant Diebold DRE System that was unsecured, breached, and compromised.

**Count X: Violation of State Law Requiring Notification of Unauthorized Disclosure of Personal Identifying Information (SAC ¶¶ 145 - 154).** This claim alleges the Defendants violated state law that requires expedient notification to individuals when their personal information held in computerized data is breached. In multiple separate incidents, Plaintiffs' personal information was subject to such breaches and Defendants have yet to issue notice as required under the statute.

For various reasons, Defendants argue that Plaintiffs fail to state proper claims under Georgia law. Defendants' errant arguments misapply the law, and as demonstrated below, each of these counts adequately alleges a claim.

### A. Defendants Argue that No Private Right of Action Exists for State Law Claims by Relying Upon Decisions on Penal Statutes and Laws that Clearly Do Not Apply

In arguing that none of the three state law claims provides a private right of action under which Plaintiffs are entitled to sue, Defendants cite the Georgia

Supreme Court's decision in *Somerville v. White*, 337 Ga. App. 414, 416 (Ga. Ct. App. 2016) for the proposition that, "[i]n Georgia, '[c]ivil liability may only be authorized… when the General Assembly has expressly provided for a private right of action in the textual provisions of the statute.'" (Motion – SoS at 40; Motion – DeKalb at 16; *see also* Motion – Cobb at 11).  The fully accurate and unedited quotation of the case actually reads "civil liability may only be authorized **under a penal statute** when the General Assembly has *expressly provided* for a private right of action in the textual provisions of that statute."  *Somerville*, 337 Ga. App. at 416 (first emphasis added, second emphasis in original).  Defendants rely upon the same selective editing of the court's decision in *Anthony v. American General Financial Services*, 287 Ga. 448 (Ga. 2010) as standing for the same proposition that they purport *Somerville* supports.  In *Anthony*, the Eleventh Circuit certified to the Georgia Supreme Court the question of whether a notary statute—a penal statute—created a civil private right of action.  *Id.* at 454.

Second, Defendants use a clearly inapplicable state statute to argue that no private right of action exists.  Defendants cite O.C.G.A. § 9-2-8(a), which states that "[n]o private right of action shall arise from any Act enacted after July 1, 2010, unless such right is expressly provided therein."  Even the most cursory search would reveal, however, that all of the statutes Plaintiffs cite in Counts VI,

VII, and X were enacted before this date, and therefore, the limitation does not apply.[18]

There is no prohibition against Plaintiffs' constitutional and state law claims. In fact, Defendants repeatedly cite *Favorito v. Handel*, 285 Ga. 795 (Ga. 2009), a case in which the plaintiffs asserted a private right of action derived from a violation of Article II, Section 1, Paragraph 1 of the Georgia Constitution.  While the plaintiffs were ultimately unsuccessful, Georgia courts never dismissed the claim for lack of private right of action and the claim proceeded through discovery. *Id.*  Counts VI and VII similarly assert claims under Article II, Section 1, Paragraph 1 of the Georgia Constitution and thus assert proper private rights of action.

Further, Defendants can point to nothing limiting a private right of action in asserting Count X, the failure to notify individuals when their personal information held in computerized data is breached.  In O.C.G.A. § 10-1-912(b), there is a clear duty to notify upon such a breach.  For example, in *McConnell v. Department of Labor*, 337 Ga. App. 457, 460-61 (Ga. Ct. App. 2016) ("In line with [the General

_____

[18] The current iteration of the Georgia Constitution, upon which Counts VI and VII are predicated, was ratified in 1982.  The General Assembly established the DRE laws upon which Counts VI and VII are predicated in 2002.  *Favorito v. Handel*, 285 Ga. 795 (Ga. 2009).  The amendment to include the language upon which Count X is in O.C.G.A. § 10-1-912 came into effect on May 24, 2007.

Assembly's finding that individuals' privacy and financial security are increasingly at risk], the GPIPA requires that affected persons be given certain notice of a data breach…"), *overruled on other grounds*, No. S16G1786,  2017 WL 4017958 (Ga. Sept. 13, 2017).  In Georgia, such a breach of a private duty established in other statutes to provide a beneficial act gives a right of action.  O.C.G.A. § 51-1-6.; 51-1-8.

### B.    Defendants Misconstrue *Favorito v. Handel*

Defendants further claim that Plaintiffs' claims under the Georgia Constitution are foreclosed by *Favorito v. Handel*, 285 Ga. 795 (Ga. 2009), reasoning that the Georgia Supreme Court already concluded that voters' ballots are kept secret under the DRE System.  In *Favorito*, however, plaintiffs did not dispute whether voters' ballots were kept secret by the DRE System, and thus, it is *dicta*.  *Id.* at 799.  Further, as discussed above, *Favorito* is easily distinguishable and was simply a flawed decision, and this court is under no obligation to—and should not—follow it.

### C.    Defendants Misapply The Standard of Review

Defendants also argue that Plaintiff's factual allegations under Count VI and Count VII are "hypothetical," and for Count VII specifically, that Plaintiffs "do not, and cannot, show that the DRES and other connected voting hardware actually

were compromised."  (Dkt. No. 83-1 at 39).  These arguments fail, as on a 12(b)(6)

motion, a court must take all allegations as true.  *Hishon v. King & Spalding,* 467

U.S. 69, 73 (1984).

## VII.  PLAINTIFFS ARE ENTITLED TO WRITS OF MANDAMUS

### A.  Count VIII - Secretary of State Kemp Has a Duty to Re-Examine the DREs

Secretary Kemp argues that he was not legally required to re-examine the

DREs and, therefore, the examination cannot be the subject of a mandamus action.

*See* SoS Motion at 44.  Kemp, however, concedes that "10 or more electors did

request that the Secretary undertake the examination as alleged," meeting the first

requirement for elector-triggered re-examinations of DREs.  *See* SoS Motion at 45;

O.C.GA. §21-2-379.2(a)[19].  Kemp argues that the electors did not meet the second

requirement of the statute—to pay costs of the re-examination—but, in fact,

Secretary Kemp chose to "waive the fee that the statute requires." (Doc. 49-6).  By

---

[19] O.C.GA. §21-2-379.2(a) states: "Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any direct recording electronic voting system may request the Secretary of State to examine the system. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any such system previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination. The Secretary of State may, at any time, in his or her discretion, reexamine any such system."

choosing to waive the required fee for the elector-requested re-examination, Kemp did not convert the elector-requested re-examination into a Secretary-initiated discretionary re-examination, but rather, confirmed that the re-examination was an elector-initiated legally-required action that is subject to a writ of mandamus.  *See* O.C.GA. §21-2-379.2(a); *Bibb Cty. v. Monroe Cty.*, 294 Ga. 730, 735, 755 S.E. 2d 760, 766 (Ga. 2014) (where performance is required by law, a clear legal right to relief will exist either where the official or agency fails entirely to act or where, in taking such required action, the official or agency commits a gross abuse of discretion), *citing  Ga. Dep't of Transp. v. Peach Hill Props., Inc.*, 278 Ga. 198(2), 599 S.E.2d 167 (Ga. 2004); *Persons v. Mashburn*, 211 Ga. 477, 86 S.E.2d 319 (Ga. 1955).

Furthermore, the claim is not moot, because, while Secretary Kemp's office states that he is "conducting the requested investigation" (SoS Motion at 46), he has not completed the requested investigation or taken corrective action on a timely basis.  Plaintiffs respectfully request that the Court issue a writ of mandamus pursuant to Count VIII to ensure that Secretary Kemp completes the investigation and takes any action as required by O.C.GA. §21-2-379.2.

## B.  Count IX – Defendants Have a Duty to Use Paper Ballots

The SAC alleges myriad reasons as to why the DREs fail to meet the requirements set forth in O.C.G.A. §21-2-379.1 for their use and thus render their use impossible or impracticable in Georgia elections.  *See*, *e.g.*, SAC ¶¶ 3-11, 38-52, 105, 115-125.  Defendants claim that the authority of election superintendents to discontinue the use of "voting machines" when their use is impossible or impracticable under O.C.G.A. § 21-2-334 does not apply to DREs.  *See* SoS Motion at 46-48.  However, O.C.G.A § 21-2-281 addresses voting equipment generally—which includes DREs—and provides that "[i]n any primary or election in which the use of voting equipment is impossible or impracticable, for the reasons set out in Code Section 21-2-334, the primary or election may be conducted by paper ballot in the manner provided in Code Section 21-2-334."[20]

_____

[20] O.C.G.A §21-2-334 states: "If a method of nomination or election for any candidate or office, or of voting on any question is prescribed by law, in which the use of voting machines is not possible or practicable, or in case, at any primary or election, the number of candidates seeking nomination or nominated for any office renders the use of voting machines for such office at such primary or election impracticable, or if, for any other reason, at any primary or election the use of voting machines wholly or in part is not practicable, the superintendent may arrange to have the voting for such candidates or offices or for such questions conducted by paper ballots. In such cases, paper ballots shall be printed for such candidates, offices, or questions, and the primary or election shall be conducted by the poll officers, and the ballots shall be counted and return thereof made in the

Defendants also argue that the use of the words "may arrange" (*see* O.C.G.A

§ 21-2-334) arms election superintendents with discretionary authority.  SoS

Motion at 47.  However, the dictionary definitions of "may" include "shall, must -

used in law where the sense, purpose, or policy requires this interpretation."  *See*

https://www.merriam-webster.com/dictionary/may (last accessed 10/13/17).  The

use of the word "may" in the present context requires that it be interpreted to grant

authority, but not discretion, because the goal of safeguarding fair elections cannot

be achieved if interpreted otherwise.  *See D.R. ex rel. Igles v. Grant*, 770 F.Supp.

2d 1337, 1347 (M.D. Ga. 2011) (finding that the use of "may" in a Georgia statute

does not give a guardian discretion to seek certain powers from another source

because such an interpretation would the statute to conflict with other statutes.);

*Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of North America, Inc.*32 F.3d

528, 534  (11th Cir. 1994) (even if Florida Automobile Dealer's Act was

ambiguous in stating that successful litigant "may" recover treble damages with

respect to whether trebling of damages was mandated, statute's remedial purpose of

adjusting economic power of manufacturers and promoting fair dealing was more

likely to be achieved if treble damages were mandatory.).  Due to the failures of

---

manner required by law for such nominations, offices, or questions, insofar as
paper ballots are used."

DREs to meet the requirements of O.C.G.A. §21-2-379.1, the DREs cannot be used in Georgia elections and Plaintiffs respectfully request that the Court issue writs of mandamus ordering the use paper ballots under O.C.G.A §21-2-281.

### C.     Count XI – Defendants Have a Duty to Recanvass

Defendants argue that recanvassing is a discretionary act and does not meet the requirements for the Court to issue a writ of mandamus.  *See* Motion – DeKalb at 18-19.  However, Ga. Comp. R. & Regs. 183-1-12.02(7)(a) requires that an election superintendent, upon petition of three electors, "*shall* order a recanvass" when "it shall appear that a discrepancy or error, although not apparent on the face of the returns, has been made."[21]  Plaintiffs have alleged, upon information and belief, that at least three electors petitioned the Cobb County and DeKalb County

---

[21] Ga. Comp. R. & Regs. 183-1-12.02(7)(a) states in full: "The election superintendent shall, either of his or her own motion, or upon petition of any candidate or political party or three electors of the county or municipality, as may be the case, order a recanvass of all the memory cards (PCMCIA cards) for a particular precinct or precincts for one or more offices in which it shall appear that a discrepancy or error, although not apparent on the face of the returns, has been made. Such recanvass may be held at any time prior to the certification of the consolidated returns by the election superintendent and shall be conducted under the direction of the election superintendent. Before making such recanvass, the election superintendent shall give notice in writing to each candidate and to the county chairperson of each party or body affected by the recanvass. Each such candidate may be present in person or by representative and each such political party or body may send two representatives to be present at such recanvass. If upon such recanvass, it shall appear that the original vote count was incorrect, such returns and all papers being prepared by the election superintendent shall be corrected accordingly."

Boards of Election and "informed them of their obligation."  SAC at ¶159.  The

DeKalb Defendants concede that they received such a request stating the DRE

machines "must be presumed to have caused substantial discrepancies or errors in

returns", but still refused to recanvass.  Motion – DeKalb at 19. The "presumed"

errors in the DREs were based on risks and problems relating to the DREs that

were well known to the defendants at the time of the receipt of the recanvass

petitions.  *See, e.g.*, SAC ¶¶ 3-11, 38-52, 105, 115-125.  The Cobb County and

DeKalb County Board of Election members failed to act as required and

improperly certified the election in despite of the recanvass requests.  Plaintiffs

respectfully request that the Court issue writs of mandamus to conduct the

recanvass.

## VIII.  DEFENDANTS' LACHES DEFENSE IS INAPPLICABLE BECAUSE PLAINTIFFS PURSUED THEIR CLAIMS WITHIN MONTHS OF THE EVENTS GIVING RISE TO THEIR CLAIMS OCCURRING

"A claim is not easily disposed of at the motion to dismiss stage based on a

laches defense."  *See, e.g.*, *L.B. v. W. Contra Costa Unified Sch. Dist.*, No. 16-CV-

04382-DMR, 2017 WL 1208394, at *6 (N.D. Cal. Apr. 3, 2017).  In any event,

Defendants cannot prove any of the three elements of their laches defense, namely:

(1) plaintiff's delay in asserting a right, (2) without excuse, and (3) material

prejudice to defendant.  *See, e.g.*, *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545

(11th Cir. 1986) (finding delay of less than two years insufficient to support laches defense).

First, Defendants assert that Plaintiffs' delayed at worst eight months in pursuing their claims.  But, a delay of a few months "is too slender a reed on which to base a laches defense."  *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1286 (11th Cir. 2015).  Instead, a delay of several years is generally required.  *Id.*; *E.E.O.C. v. Rollins Acceptance Corp.*, No. 1:87-cv-929-WCO, 1988 WL 147895, at *2 (N.D. Ga. 1988) (accepting a laches defense based on a four-year delay).  Further, while the applicable statute of limitations is not determinative of an unreasonable delay, it provides guidance.  This Court has recognized that either Georgia's 20-year statute of limitations for statutory claims or two-year statute of limitations for personal injury claims would apply to due process and equal protection claims.  *Cook v. Ashmore*, 579 F. Supp. 78, 82-83 (N.D. Ga. 1984).[22]  All of Plaintiffs' claims arise under statute or by operation of

---

[22] Ga. Code Ann. § 9-3-22 (West 2017) (20-year statute of limitations for enforcement of rights accruing under statutes, acts, or by operation of law); Ga. Code Ann. § 9-3-33 (West 2017) (two-year statute of limitations applicable to personal injury claims).

law.[23]  Accordingly, Plaintiffs pursuit of their claims within a year of their

occurrence falls well within any applicable statute of limitations.

Second, Defendants' laches argument suggests that Plaintiffs are required to

immediately pursue their claims without any investigation.  Yet, the Eleventh

Circuit recognizes that holding that a "plaintiff's reasonable need to fully

investigate its claims does not excuse delay . . . would create a powerful and

perverse incentive for plaintiffs to file premature and even frivolous suits to avoid

the invocation of laches."  *Black Warrior Riverkeeper, Inc.*, 781 F.3d at 12.

Defendants base their purported eight-month delay on Plaintiffs new allegations

raising concerns with the November 8, 2016 General Election as additional

background.  Doc. No. 84 at 8-9.[24]  Similarly, Defendants argue that Plaintiffs'

---

[23] Defendants have attempted to incorporate their laches argument from their
original motion to dismiss, which includes additional arguments that the Plaintiffs'
election contest claim should be denied because of laches.  Dkt. No. 50, Cobb
County Defs.' Mot. to Dismiss and Brief in Support ("Original Motion-Cobb)at
19-20.  As the SAC no longer asserts an election contest claim, Defendants'
arguments on this basis are moot.  *See* Dkt. No. 14 (recognizing that amended
pleadings supersede prior pleadings).

[24] Moreover, the Defendants argue that Plaintiffs addition of claims, such as
constitutional claims or Defendants' violation of their right to be notified of a
compromise to their private information in the amended complaints constitute
laches.  *See* Doc. No. 84 at 9; Doc. No. 50 at 18-19.  However, the Court granted
Plaintiffs leave to file the amended complaints asserting additional claims.  *See*
Doc. Nos. 14 & 57.  Defendants' argument that the addition of claims within
months of filing the original complaint pursuant to Court hardly constitutes

mere five-month delay in asserting their claim under Georgia Code Section 10-1-912 constitutes laches because it became ripe on April 15, 2017 when the electronic pollbooks were allegedly stolen.   *Id.* Yet, the SAC is silent on when Plaintiffs became aware that Georgia's DRE System was compromised or when the electronic pollbooks were stolen, making these issues factual disputes that require discovery.  Even if the Plaintiffs became aware of the discrepancies in the DRE system as early as November 2016, they are still permitted a reasonable time of only a few months to investigate their claims before filing the lawsuit.  *See Black Warrior Riverkeeper, Inc.*, 781 F.3d at 1285 ("Once [plaintiffs'] need to properly prepare for litigation is accounted for, the length of [plaintiffs'] delay drops to a few months at worst.").

Finally, Defendants have not made any attempt to demonstrate how a purported eight-month delay has caused them any prejudice in their current motion to dismiss.[25]  They summarily state that Plaintiffs' purported delay "will prejudice

---

unexcused delay.  Defendants are instead attempting to improperly assert a motion for reconsideration of the Court's previous orders granting Plaintiffs leave to amend their complaints, which should have been made within 10 days of the rulings.  Fed. R. Civ. P. 59(a).  Accordingly, any such argument is untimely.

[25] At best, Defendants asserted in their original motion to dismiss that they would be prejudiced because of their need to prepare for early elections in November 2017.  However, the SAC is no longer focused on the November 2017 elections, negating any claim to prejudice that Defendants may have asserted.

the Cobb Defendants."  Doc. 84 at 8.  Defendants must affirmatively demonstrate

that "they were made significantly worse off because [Plaintiffs] did not bring suit

as soon as it had the opportunity to do so."  *Black Warrior Riverkeeper, Inc.*, 781

F.3d at 1231.  Any prejudice to the Defendants must be caused by the purported

delay itself and not on changes that Defendants must make if the Plaintiffs' prevail.

*Id.*  Accordingly, any attempts to establish prejudice based on the efforts and

expense necessary to change Georgia's voting system would be based on a ruling

on the merits and not on any purported delay.  Simply put, Defendants have not

and cannot establish their laches defense.

## IX.   DEKALB AND COBB DEFENDANTS HAVE FAILED TO PROVE AFFIRMATIVE DEFENSES OF RES JUDICATA AND COLLATERAL ESTOPPEL[26]

Defendants bear the burden to properly raise and prove affirmative defenses

of res judicata and collateral estoppel.  *Glen Oak, Inc. v. Henderson*, 369 S.E.2d

736, 738 (Ga. 1988).  However, to support these defenses Defendants have

fundamentally mischaracterized the Plaintiffs' claims in order to shoehorn this case

---

[26] The Cobb Defendants' Motion to Dismiss incorporates by reference the section of DeKalb Defendants' Second Motion to Dismiss that asserts defenses based on res judicata and collateral estoppel. Motion – Cobb at ¶ 5  This response should be considered to respond to both Cobb and DeKalb Defendants' Motions to Dismiss but for simplicity refers only to the Defendants.  Fulton County did not assert any defenses on the basis of res judicata or collateral estoppel.

into a match for the wholly distinct case represented by *Curling v. Kemp*, Case No.

2017-CV-290630 (Super. Ct. of Fulton Cty) ("Curling I"), and declared in

conclusory fashion that Curling I already litigated the issues.  However,

Defendants have failed to meet essential prongs of the tests for both defenses.

### A.  There is No Identity of Parties or Subject Matter Between Curling I and the Current Case and There Has Been No Fair and Full Opportunity to Litigate the Claims Presented

Under Georgia law, a party arguing claim preclusion must satisfy three

elements of the relevant test: (1) the first action must have involved an adjudication

by a court of competent jurisdiction; (2) the two actions must have an identity of

parties and subject matter; and (3) the party against whom the doctrine of res

judicata is raised must have had a full and fair opportunity to litigate the issues in

the first action.  O.C.G.A. § 9-12-40; *see Copeland v. Wells Fargo Bank, NA*, 317

Ga. App. 669, 671, 732 S.E.2d 536 (2012), cert. denied, (Feb. 4, 2013).  In this

case, there is no identity of parties or subject matter and there was no full and fair

opportunity to litigate the issues on the merits.

### 1.  Lack of Identity of Parties

Res judicata requires identity of parties or their privies, the latter of which is

generally defined as "one who is represented at trial and who is in law so

connected with a party to the judgment as to have such an identity of interest that

the party to the judgment represented the same legal right." *See Brown & Williamson Tobacco Corp. v. Gault*, 280 Ga. 420, 421, (Ga. 2006).  While there are some parties in Curling I who are also participating in the current case,[27] there are five additional plaintiffs in the current case who each represent distinct interests and fundamental rights that have been violated.  Moreover, defendants in the Curling I case were limited to Secretary of State Kemp, and Directors Barron, Daniels, and Eveler of the Fulton, DeKalb, and Cobb County Boards of Registration and Elections, respectively.  The current case also includes the Georgia State Election Board and Members thereof, as well as the Fulton, DeKalb, and Cobb County Boards of Registration and Elections and Members thereof and Merle King, the Executive Director of Center for Election Systems at Kennesaw State University.  Each of these additional defendants has failed in their legal obligations to ensure the integrity of the Georgia electronic voting system.  The significant differences between both plaintiffs and defendants in Curling I as compared to the current case preclude the conclusion of identity of parties.

---

[27] Plaintiffs Curling and Price and the Coalition for Good Governance (formerly the Rocky Mountain Foundation).

## 2.     Lack of Identity of Subject Matter

To conclude there is identity of subject matter between two actions requires consideration of the entire set of facts which give rise to an enforceable claim. *Crowe v. Elder*, 290 Ga. 686, 688, 723 S.E.2d 428, 430 (2012).  The Plaintiffs in Curling I filed an Emergency Motion to restrain and enjoin the use of DRE voting equipment and the DRE-based voting system to conduct the June 20, 2017 run-off election for the 2017 Sixth Congressional District Special Election in Cobb, DeKalb, and Fulton Counties, on the basis that the system was "uncertifiable, unsafe and inaccurate."  Curling I, Order Den. Pls.' Mot. for TRO and Interlocutory Inj. and Writ of Mandamus, 2017-CV-290630, 2 ("Order"). Plaintiffs in Curling I sought, therefore, remedies limited solely to the conduct of the Runoff election, based on the unsuitability of the voting system and the potential that the election would not properly reflect the judgment of the Cobb, DeKalb, and Fulton County electors.  Plaintiffs' claims in the current case extend well beyond the Runoff election, and encompass the November 8, 2016 General Election, the April 18, 2017 Special Election, the Runoff Election, and Relevant Pending Elections (SAC ¶¶ 10-11).  Thus, on their face, the subject matters between the two cases are significantly different in scope.

The scope of the matters is also significantly different between the two actions. Defendants characterize the issue in Curling I as concerns about safety and accuracy of the voting system, and then seek to apply this narrow characterization to Plaintiffs' current claims. This simply mischaracterizes the allegations and claims made in this case, the gravamen of which is that the Defendants conducted the relevant elections in a way that violated Plaintiffs rights under Georgia law and the 14th Amendment through their reckless management of the DRE System, and subsequent refusal to do anything to correct the problems they had created once they were brought to Defendants' attention. In short, the claims in the current case are distinct and distinguished from the prior action and should not be barred. *See Morrison v. Morrison*, 284 Ga. 112, 115, 663 S.E.2d 714 (2008) (for purposes of res judicata, "[t]he fact that the subject matter of different lawsuits may be linked factually does not mean that they are the same 'cause' …'For that doctrine to act as a bar, "the cause of action in each suit must be identical.'" (citations omitted)).

### 3.    Lack of Full and Fair Opportunity to Litigate

The third prong of a res judicata defense requires the prior action to have provided a full and fair opportunity for an adjudication on the merits. O.C.G.A. § 9-12-40; *see* Copeland, 317 Ga. App. at 671. First, because there is no identity of

claims as between Curling I and the current case, there was no opportunity for the court in Curling I to adjudicate the constitutional law claims on the merits.  The third prong of res judicata is therefore not met on this basis.

In addition, the nature of the Curling I litigation precluded the opportunity for a full opportunity to address the merits of the case.  Plaintiffs in Curling I sought, on an emergent basis, a Temporary Restraining Order and Interlocutory Injunction (Verified Compl. for Declaratory and Injunctive Relief and Writ of Mandamus, 2017-CV-290630) ("Ver. Compl.").  In its Order, the Court noted that the issuance of an injunction is an extraordinary remedy, reserved for "clear and urgent cases[.]" (*citing* O.C.G.A. § 9-5-8) (Order p. 4). Thus, although the Court took specific note of Plaintiffs' legitimate concern regarding the lack of a verification feature in the DRE voting system, due to the heightened standard for issuance of the TRO and Injunction the Court determined that it had insufficient evidence to grant the requested remedy. (Order at 5).  Again, the claims in the current case do not allege mere possibility of harm, but actual breach of Georgia's Electronic Voting System for which discovery is needed to establish the effects of the harm.

Moreover, the Court considered practical factors for denying Plaintiffs' requests, including the realities that advanced voting had already commenced, that

halting the election to change systems would be costly and potentially result in

voter confusion and disenfranchisement, that visually-impaired and other disabled

voters may not have equal access to the ballot, and that election officials would

need to be re-trained on both the administration and tabulation of paper ballots.

(Order at 5-6).  The heighted standard for and the practical implications of the

requested remedies, combined with the court's desire to exercise its power

"prudently and cautiously," resulted in denial of the requests and no opportunity

for plaintiffs to have a full adjudication on the merits.  (Order at 4).

Finally, the Defendants cite *Lilly v. Heard*, 295 Ga. 399 (Ga. 2014) as

precedent for dismissal of the current case.  However, the opportunity given in

Curling I to introduce expert witness testimony and reports to the court is not

sufficient to satisfy the third prong of res judicata when the court's evaluation of

that evidence is subject to a heightened review standard.  There is no indication in

*Lilly* that the administrative hearing held by Baker County Board of Elections was

subject to the same review standard as applicable in Curling I.  Lilly is not

relevant, therefore, to the current case.

### B.     Collateral Estoppel

Although Georgia law has not settled on a canonical list of elements to

establish collateral estoppel, the Eleventh Circuit has distilled Georgia case law as

requiring the following: (1) an identity of issues, (2) between identical parties, (3) the claim was actually litigated and (4) necessarily decided, (5) on the merits, (6) in a final judgment, (7) by a court of competent jurisdiction. *Aqeel v. Cach LLC*, No. 1:15-cv-2158, 2016 WL 5334751 (N.D. Ga. Sept. 22, 2016) (*citing Cmty. State Bank v. Strong*, 651 F.3d 1241, 1264 (11th Cir. 2011)). As discussed above, there is considerable overlap between the elements of res judicata and collateral estoppel. *See Cmty. State Bank*, at 1264-1265 ("[A]s a general principle, issue preclusion requires the same elements as claim preclusion, except that instead of requiring an identical cause of action, it requires only an identical issue between the two cases, where the issue was actually litigated and decided in the previous adjudication.") For elements (2)-(7), therefore, we incorporate the discussion above as support that the issue was not litigated or decided on the merits by identical parties and instead focus on element (1), the absence of an identical issue.

In asserting the defense of collateral estoppel, the Defendants once again mischaracterize the issues in the current case in order to conclude that the present case is the same as in Curling I. (Motion – DeKalb at 14). The issue in Curling I can fairly be described as the potential impact of the DRE-based voting system on the safety and accuracy of the Runoff election. (Ver. Compl. ¶1). While Plaintiffs in the current case are similarly concerned about the overarching safety and

accuracy of the DRE-voting system, the issue presented here is no less than the protection of the fundamental right to vote and whether past and continued use of the DRE-based voting system violates that constitutional right, as protected by the 14th Amendment, and Georgia state law.  This constitutional issue goes far beyond the narrow scope of the issue presented to the court in Curling I as to the suitability of the DRE-voting system for conducting the Runoff election, and deserves a complete and robust opportunity for discovery and adjudication on the merits well in excess of the review available to the Curling I court.

## X.   STATE DEFENDANTS HAVE FAILED TO PROPERLY RAISE AND DEMONSTRATE THE AFFIRMATIVE DEFENSE OF RES JUDICATA AS AGAINST PLAINTIFF RICARDO DAVIS

Defendants bear the burden to properly raise and prove the affirmative defense of res judicata.  *In re R.W.*, 592 S.E.2d 907, 907 (Ga. App. 2004).  In this case, the State Defendants have failed to properly raise and prove that Plaintiff Ricardo Davis' claims are barred by res judicata.  The defense is raised solely in footnote 14 with reference to Plaintiff Davis' participation in *Favorito v. Handel*, 285 Ga. 795 (2009), and attempts to support the defense with only a single citation, to *Brown v. Williamson Tobacco Corp. v. Gault*, 280 Ga. 420, 421 (2006).  State Defendants' base claim of res judicata is insufficient, without additional discussion or evidence, to prove the claim or to permit Plaintiffs to appropriately respond.

Moreover, while Plaintiff Davis was a party in *Favorito*, that case was decided in 2009, well before the events alleged here that constitute the gravamen of Plaintiffs' claims.  Because the set of facts which give rise to the current claims are significantly different to *Favorito*, there is no identity of subject matter.  *See Crowe* at 688 (2012).  Further, the defendants in *Favorito* were limited to the Secretary of State, the Governor of Georgia, and the Georgia State Election Board ("SEB").  Further, the defendants in Favorito were limited to the Secretary of State (which was Representative Karen Handel at the time), the Governor of Georgia (which was Secretary of Agriculture Sonny Perdue at the time), and the Georgia State Election Board ("SEB") (which has changed members since 2009).  While the current case also includes the current Secretary of State and the SEB, there are many more defendants in the current case and the claims of the current case are based, in part, on the specific actions of Secretary of State Kemp.  As such, there is no identity of parties.  As State Defendants fail to properly raise and prove res judicata, Plaintiff Davis should not be barred from the current case.

## CONCLUSION

Just as Secretary Kemp's and KSU's responses to the multiple dire warnings regarding the extreme vulnerability of the DRE system under their management, and to the repeated offers of assistance from the FBI, DHS and others, was to

throw a blockade around their operations and their equipment and cover-up their acts of gross misfeasance or malfeasance, Defendants now wish to ensure that the truth is never revealed about the extent of their misdeeds and reckless conduct, as well as the extent of the resulting harm to Georgia voters and, indeed, to the state as a whole.

Defendants should not be permitted to succeed.  Defendants are obligated to comply with the requirements of the Georgia election code, the Georgia Constitution, and the 14th Amendment of the U.S. Constitution in conducting elections in the state of Georgia.  Plaintiffs allege ample facts supporting their claims that Defendants systematically and, in some cases, intentionally, failed to do so, and Plaintiffs are now entitled to proceed to discovery on their claims.  The time for Defendants to disclose the full extent of the breaches of the DRE System, and their own breaches of their obligations, was many months ago when the extraordinary vulnerability of the system was first discovered.  This case is the best, and, perhaps, the last, opportunity for the public to learn just what actually transpired with Defendants' management of the DRE System, and the full extent and nature of the violations of the rights of Georgia voters.  It is time to move forward.

Dated: October 13, 2017        Respectfully submitted,

   /s/ Bryan M. Ward
_____
BRYAN M. WARD
Georgia Bar No. 736656
MARVIN LIM
Georgia Bar No. 147236
HOLCOMB + WARD, LLP
3399 Peachtree Road NE, Suite 400
Atlanta, GA 30326
Telephone:  (404) 601-2803
Facsimile:  (404) 393-1554

/s/ Edward B. Schwartz
EDWARD B. SCHWARTZ (*pro hac vice*)
JOE R. CALDWELL, JR. (*pro hac vice*)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 200036
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902

## CERTIFICATE OF COMPLIANCE

Pursuant to the Local Rule 7.1(D), Plaintiffs certify that this brief has been prepared in 14-point Times New Roman in compliance with Local Rule 5.1(C).

/s/ Edward B. Schwartz

EDWARD B. SCHWARTZ

/s/ Bryan M. Ward

BRYAN M. WARD

## PROOF OF SERVICE

I hereby certify that a true copy of the above document was served upon the

attorneys of record through the Court's electronic filing service on October 13,

2017.


/s/ Edward B. Schwartz
_____
EDWARD B. SCHWARTZ


/s/ Bryan M. Ward
_____
BRYAN M. WARD