```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
2                              ATLANTA DIVISION

3

4    DONNA CURLING, ET AL.,              :
                                         :
5             PLAINTIFFS,                :
     vs.                                 :   DOCKET NUMBER
6                                        :   1:17-CV-2989-AT
     BRIAN P. KEMP, ET AL.,              :
7                                        :
              DEFENDANTS.                :
8

9

10        TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11           BEFORE THE HONORABLE AMY TOTENBERG

12              UNITED STATES DISTRICT JUDGE

13                      MAY 9, 2018

14                       4:04 P.M.

15

16

17

18

19

20

21   MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                  TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
      SCHOENBERG:
 4

 5         DAVID D. CROSS
           CATHERINE CHAPPLE
 6         MORRISON & FOERSTER, LLP

 7         HALSEY G. KNAPP, JR.
           KREVOLIN & HORST, LLC
 8

 9    FOR THE PLAINTIFF COALITION FOR GOOD GOVERNANCE:

10

11         ROBERT ALEXANDER McGUIRE, III
           ROBERT McGUIRE LAW FIRM
12
           BRUCE P. BROWN
13         BRUCE P. BROWN LAW

14    FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
      WILLIAM DIGGES, III, AND RICARDO DAVIS:
15

16         CARY ICHTER
           ICHTER DAVIS, LLC
17

18    FOR THE STATE OF GEORGIA DEFENDANTS:

19

20         JOHN FRANK SALTER, JR.
           ROY E. BARNES
21         THE BARNES LAW GROUP, LLC

22

23

24

25
                                          (...CONT'D...)
```

```
 1   (...CONT'D....)

 2

 3   FOR THE FULTON COUNTY DEFENDANTS:

 4
         KAYE WOODARD BURWELL
 5       CHERYL RINGER
         DAVID R. LOWMAN
 6       OFFICE OF THE FULTON COUNTY ATTORNEY

 7

 8   FOR THE DEKALB COUNTY DEFENDANTS:

 9
         LAURA JOHNSON
10       DEKALB COUNTY DEPARTMENT OF LAW

11

12   FOR THE COBB COUNTY DEFENDANTS:

13
         DANIEL WALTER WHITE
14       HAYNIE LITCHFIELD & WHITE

15

16   FOR THE DEFENDANT MERLE KING, IN HIS INDIVIDUAL CAPACITY AND
     HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE CENTER FOR
17   ELECTION SYSTEMS AT KENNESAW STATE UNIVERSITY:

18
         GRANT EDWARD SCHNELL
19       HOLLAND & KNIGHT, LLP

20

21

22

23

24

25
```

4

```
1              P R O C E E D I N G S
2    (Atlanta, Fulton County, Georgia; May 9, 2018.)
3              COURTROOM DEPUTY CLERK:  Good afternoon, Counsel.
4    This is Amy McConochie, Judge Totenberg's courtroom deputy
5    clerk.  The Court is joining the conference call in Civil
6    Action 17-CV-2989.  That is the case of Curling vs. Kemp, just
7    to keep it a little shorter.
8              Counsel, I'm going to remind you that we have a lot
9    of people, I assume, on this call.  So it is very important
10   that you state your name when you first start speaking so that
11   both Judge Totenberg and the court reporter, Ms. Welch, will
12   know who is speaking at any given time.
13             And I'm going to ask you-all to please introduce
14   yourselves starting with plaintiffs' counsel.  Then you will
15   all be on the line with Judge Totenberg.
16             MR. McGUIRE:  Hi, this is Robert McGuire for the
17   Coalition plaintiffs.  And with me is also Bruce Brown and Cary
18   Ichter.  And we have our client, Marilyn Marks, on the phone.
19             MR. CROSS:  This is David Cross with Morrison &
20   Foerster for the Curling plaintiffs.  My colleague, Catherine
21   Chapple, I believe, is on the phone.  And I'm hoping our
22   co-counsel, Mr. Knapp, may be on as well.
23             MR. KNAPP:  We are.
24             MS. CHAPPLE:  Good afternoon, Your Honor.
25             THE COURT:  Good afternoon.
```

1          MR. BARNES:  Your Honor, this is Roy Barnes and John

2    Salter for Kemp and the State Elections Board.

3          MS. JOHNSON:  Laura Johnson for Dekalb County.

4          MR. WHITE:  Daniel White here for Cobb County.

5          MS. BURWELL:  Kaye Burwell, David Lowman, and Cheryl

6    Ringer for Fulton County.

7          MR. SCHNELL:  Grant Schnell with Holland & Knight for

8    Merle King.

9          THE COURT:  All right.  This is Judge Totenberg.

10   Good afternoon.

11         MR. CROSS:  Good afternoon, Judge.

12         THE COURT:  Did you make any progress about the

13   machines and releasing any of the machines or not?

14         MR. McGUIRE:  Your Honor, this is Robert McGuire for

15   the Coalition plaintiffs.  We -- after the -- after the hearing

16   last week, we met for about 20 minutes in the courtroom and

17   then we have been exchanging a lot of correspondence since

18   then.  We had a call on May 4.

19         The position we're in is that we have asked the

20   counties to provide us with information that we need in order

21   to determine what machines we can, quote-unquote, release.  And

22   we are still in the situation where we need information from

23   the counties in order to tell them what machines are of

24   interest for us.

25         And so we haven't been able to propose a plan of

```
 1    selection for the machines that we want to do discovery on for

 2    them to preserve.  Unfortunately, we're still -- we're at a bit

 3    of an impasse because the defendants have kind of taken the

 4    position that discovery is not open so they don't have to give

 5    us any information that we need in order to tell them what

 6    machines we don't need to look at.

 7         That is from our side.  And I know the other

 8    plaintiffs have been doing some separate planning as well.  We

 9    have also taken care of the other thing in your minute order.

10    We filed our notice of material allegations.  And the state

11    defendants filed their advisory notice of immunity defenses.

12         Our hope was that we could address each of those

13    issues, as well as the third amended complaint, which we were

14    hopeful the Court would be willing to accept and let us move

15    forward on.

16         MS. CHAPPLE:  Your Honor, this is Catherine Chapple

17    for the Curling plaintiffs.  As counsel for the Coalition

18    plaintiffs noted, we had been also working diligently to come

19    up with a sample of machines that will allow us to let the --

20    let the defendants know which machines we don't need so they

21    can be released from the sequestered pool of machines.

22         And we had a very -- what we saw as a very productive

23    call on Thursday in which the defendants noted that because

24    they already really have the machines that they will be using

25    for the May primaries the question of which machines should be
```

1 released is maybe not as urgent as it seemed at first because

2 the next time that they will need machines is not until August.

3          And so we're continuing to work with them and provide

4 the information -- you know, provide the information that we

5 need from them.  And we're working towards that.

6          MS. RINGER:  Your Honor, this is Cheryl Ringer from

7 Fulton County.  I would take exception to some of what you

8 heard.

9          As you requested when we were in court, I did forward

10 the same information that I had provided to prior plaintiffs'

11 counsel, which identified by precinct and serial number the

12 machines that were used in the April and in the June 2017

13 elections.  I provided that information.

14          Plaintiffs' counsel has requested that we provide it

15 via (unintelligible) of some sort.  But I believe it is

16 something that they need to do and not defendants.  So I

17 provided exactly what we provided to previous counsel.

18          There is a disagreement as to what additional

19 information would be needed.  From our perspective, we provided

20 what we provided prior plaintiffs' counsel and they said they

21 could use that to make a sample.  We now understand that

22 between the two plaintiffs they are not in agreement as to what

23 sort of sampling they would need.  That presents an issue for

24 us.

25          As well, there is an ongoing dispute about any sort

1    of requirement that we would have had to sequester machines

2    from November and December 2017.  We have spoken to our clients

3    and have been able at the last minute to pull two machines.

4    But at this juncture we need them to release an additional two

5    machines that have been sequestered.  We don't have extra

6    machines.

7            And, in fact, what we identified to plaintiffs were

8    that at this point in preparing for May 22nd we're already so

9    far down the line that testing has begun and things have been

10   set in motion that if we continue to argue about what machines

11   we get it won't be in time for May.  So we did agree to let's

12   start working on the machines after any sort of runoff for

13   May 22nd.

14           But our understanding as to where we are is a little

15   bit different from what you just heard.

16           MR. ICHTER:  Your Honor, this is Cary Ichter.  May I

17   address that --

18           THE COURT:  Yes.

19           MR. ICHTER:  -- for the Coalition plaintiffs?

20   Ms. Ringer may very well have supplied us with spreadsheets

21   that indicate what the inventory of machines were for the April

22   and June 2017 elections.

23           For some reason, it appears as though the defendants

24   have come to the joint conclusion that the only machines and

25   only memory cards to which the litigation hold and the Court's

1    order of evidence preservation apply are those from the

2    Congressional Sixth District election and that all other

3    machines are available for wiping and for overwriting and for

4    deploying for upcoming elections.

5         We were distressed to learn last week that perhaps

6    hundreds of machines that were the subject of litigation holds

7    and the Court's evidence preservation order that were used in

8    the November 8, 2016, election; the November 7, 2017, election;

9    the December 5, 2017, election were overwritten or wiped.  That

10   is that the data from those machines was deleted and

11   essentially destroyed and those machines were then deployed to

12   the field for use in the pending election.

13        We don't know where the notion comes from that that

14   is okay.  There is nothing in any of the litigation hold

15   letters, there is nothing in the evidence preservation order

16   from the Court indicating that you can wipe clean data from

17   machines that are the subject of this lawsuit.

18        We identified the relevant elections in the

19   complaint -- in the second amended complaint and in the third

20   amended complaint.  And those were among the elections that

21   were identified, and those machines have been wiped.  That is

22   spoliation of evidence.

23        I want to make sure the Court understands this

24   though.  The defendants are likely to argue and I think are

25   going to argue that scores of machines are going to be made

1    available to us for testing.  And that is going to be a select

2    group that are handpicked by the defendant.  Generally

3    speaking, I have a problem with my opposition picking my

4    samples in connection with any kind of analysis of evidence

5    that needs to be performed in a case.

6              What we are looking for is machines that have been

7    involved in unusual or anomalous results, machines in precincts

8    that show meaningful discrepancies between ballot counts and

9    number of voters, machines that have generated voter complaints

10   because of malfunctions, machines that show repetitive error

11   messages and individual audit logs, machines that generate

12   unanticipated maintenance issues, machines that show that no

13   votes were cast on them whatsoever -- that would be

14   particularly interesting given the protest we hear about the

15   desperate need for machines to be deployed to the field -- and

16   machines that were involved in the Fulton County April 18,

17   2017, upload errors.

18             We are looking for those kinds of machines because

19   those would be indicative of the possibility of some sort of

20   tampering.  We believe that the best way to resolve any issues

21   concerning preservation are that the -- for the counties to be

22   ordered by the Court -- and this has nothing to do with the

23   discovery.  This has to do with preservation of evidence so

24   that when we can get to the discovery phase -- when we get to

25   the discovery phase we can conduct meaningful discovery about

1    what has actually happened.

2         We're asking that the Court order that no further

3    machines be deployed to the field to precincts until such time

4    as there is a mirror image of the drives on the DREs.  These

5    are just computers.  If we were dealing with any other kind of

6    issue, if we were dealing with some sort of question of

7    financial issues and the county was saying, oh, well, we have

8    to use our accounting software every day, it is modified every

9    day, you can't prevent us from using it, everybody would say

10   the same thing:  Make a mirror image of it so that everybody

11   can access it and we all know what we're dealing with.

12        So what we should -- all these machines we learned

13   last week have to be prepped.  They have to be rolled out to

14   the field.  They have to -- they are wiping them, and that is a

15   part apparently of the prep process.

16        So what they should do is as they prep them to deploy

17   them to the field make a mirror image of the hard drives on the

18   machines and of the memory cards so that the Curling plaintiffs

19   can do whatever they want to do with that data and the

20   Coalition plaintiffs can do whatever they want to do with that

21   data and there is no increased burden on anybody to make that

22   data available to two sets of plaintiffs because we're just

23   picking from the same data that has been preserved.

24        But in any other kind of case, that is exactly what

25   would happen and that is all we're asking that happens here.

1    And they can roll out the machines as they are mirror imaged.

2    And then we don't care what happens to them from there.  We

3    don't care about the machines.  We care about the data.

4         THE COURT:  Well, since they have been wiped -- since

5    they have been -- the ones that are currently there have not

6    been wiped.  So you are worried -- you are still worried about

7    those and you are just saying to mirror the -- do a mirror

8    image of the machine and the cards for those and they can have

9    the machines; is that right?

10        MR. ICHTER:  That is correct, Your Honor.

11        MR. WHITE:  Your Honor, this is Daniel White on

12   behalf of Cobb County.  I think this is a good point for me

13   just to go back and point out that what has happened in this

14   case is that there was a litigation hold first sent in July of

15   2017 that asked all of the counties to hold their machines and

16   cards from the April and June elections of 2017.

17        And it was then not until later in the fall that the

18   plaintiffs attempted to then go back and say let's go back and

19   hold all of your machines from 2016, which if you ask the

20   counties will tell you is 90 percent of their machines and

21   cards that were rolled out in the presidential election -- hold

22   those while we decide how to collect the data.  And then again

23   earlier this year there was another letter sent that said,

24   please hold all your machines from November of 2017.

25        So in essence, we have been asked to hold -- well, in

```
 1   their case, apparently it is as easy as just making a mirror
 2   image.  It is not that easy.  They don't have any testimony to
 3   present to you that it is that easy.  We can get our election
 4   people here and tell you that it is not that easy and it is
 5   expensive.
 6        What we said from the beginning is if you want to
 7   enjoin us from using our machines, if you want our clients to
 8   not use these machines, you need to make a motion for
 9   preliminary injunction.  You need to pay the bond for the cost
10   of us doing this because that is what you are doing is you are
11   litigating through litigation hold.  You are trying to get an
12   injunction through a litigation hold and it is not --
13        THE COURT:  I'm sorry.  When did you say that?
14        **(Unintelligible cross-talk.)**
15        THE COURT:  I'm sorry.  When did you say that?  I
16   have never heard you say that before.  When did you say --
17        MR. WHITE:  That has been in discussions -- this is
18   in discussions with plaintiffs.
19        THE COURT:  But when?  Most recently?  You mean in
20   the last week?
21        MR. WHITE:  Last fall.
22        What is that, Your Honor?
23        THE COURT:  Before I issued the order of December 15?
24        MS. RINGER:  These discussions were had when the
25   preservation order was received and discussed.  And it is
```

1    that -- I'm sorry.  This is Cheryl Ringer from Fulton County.

2         Those emails -- and one of which Ms. McConochie was

3    on -- where defendants specifically objected to any language in

4    the preservation order that would have kept us from using our

5    machines.  This is not the first time this has come up.

6         MR. WHITE:  Your Honor, your order stated that the

7    Court recognizes the case involves Government and public

8    officials with the responsibility to execute and prepare for

9    future elections.  And that is the countervailing interest here

10   that we told them about from the beginning.

11        MR. ICHTER:  Your Honor, this is Cary Ichter.

12        **(Unintelligible cross-talk.)**

13        THE COURT:  All right.  Let me -- you-all have made

14   obviously not a lot of progress.  So let me just say this.  I

15   mean, the election is in the end of -- the end of May.  And I'm

16   just -- I don't know how many -- what is kind of stunning to me

17   is I don't know how many more machines you need.

18        And there is a pragmatic solution here for now.  I

19   can't see you next week and I can't -- and probably the

20   following week I'm going to be having a trial.  So you are

21   welcome to come to see me at some terrible time of the day for

22   all of you.

23        But I don't -- I don't really understand why -- what

24   the problem is in actually fashioning a pragmatic interim

25   solution.  And is it true or is it not true that you-all

1    need -- in fact, don't need these machines for the next

2    election?  I mean, that was the first thing that was -- one of

3    the things that was represented to me.

4            Do you actually -- do any of the counties actually

5    need more machines -- and if so, how many -- for the May

6    election?

7            MS. JOHNSON:  Your Honor, this is Laura Johnson for

8    Dekalb County.  Our elections people need 450 more machines to

9    use.  They have sequestered all of the machines from April and

10   June 2017.  At the moment they are sequestering 300 from the

11   November and December '17 elections.  But they cannot continue

12   to sequester all of those.  They need at least 450 of those

13   released.

14           THE COURT:  So --

15           MR. WHITE:  Your Honor, part of the problem -- this

16   is Daniel White from Cobb County -- is the defendants were all

17   holding machines from June and April of 2017.  And at this

18   point, if you combine all the machines that the litigation hold

19   purportedly applies to, it is over 90 something percent of our

20   machines going back to November of 2016.

21           So yes.  If we're going to talk about all the

22   machines that have been used since November 2016, we need those

23   machines released.

24           MS. CHAPPLE:  Your Honor, this is Catherine Chapple

25   for the Curling plaintiffs.  We have been asking the defendants

1    for information so that we can look to a pragmatic solution.

2    And what we have said for Cobb County and to Cobb County

3    because they have machines that they have located that were

4    last used in November of 2017 -- and we were discussing with

5    them the possibility of switching some of those machines for

6    the machines that they have sequestered from April and June of

7    2017.

8         We have more information that we need from them to

9    determine which of the machines from the April and June

10   elections could be switched for the machines in the November

11   election.  We haven't received any information from them about

12   the November election machines.

13        As soon as we have that information, we -- the

14   Curling plaintiffs are prepared to have a solution that will

15   allow those machines to be released.  But we just need this

16   information from them before we can come to those -- to a

17   conclusion about the numbers that will work.

18        THE COURT:  Well, let's just deal with that issue.

19   What is the impediment to providing that information?

20        MS. JOHNSON:  Your Honor, this is Dekalb County.  We

21   had provided some information.  But we share concerns with Cobb

22   County about providing serial numbers for DRE machines without

23   some kind of a protective order because under the state

24   regulations --

25        THE COURT:  All right.  You can get a protective

1    order.  That is not the issue.  It can't be the issue.

2    Everyone understands you can have a protective order.  So that

3    should have been a given.  They are not --

4            MS. JOHNSON:  Beyond that, we have attempted to

5    provide some information and we're preparing to provide more.

6    But just the tenor of the email conversation made it clear that

7    providing more information was not going to resolve the release

8    of the machines in time for us to use them.  Because, in fact,

9    the May 2018 election is already going on through early voting

10   and our election people are having to prepare machines right

11   now for use in the ultimate election.

12           And so we really don't have time to wait for these

13   machines to be released.  We really do need them released now.

14                   **(Unintelligible cross-talk.)**

15           MR. ICHTER:  Your Honor, this is Cary Ichter.  This

16   is a problem of the counties' creation.  The Court's

17   December 15 order doesn't have any exceptions for the idea

18   that, you know, if we wait until the last minute to have a

19   discussion about what the needs from an evidentiary standpoint

20   are of the parties in this case that we can somehow manipulate

21   the Court into releasing machines that have relevant evidence

22   on them so that we can do our jobs.

23           There is a way to do this.  And it is done all the

24   time in connection with electronically-stored information in

25   these kinds of cases.  That is just what we're dealing with,

1    electronically-stored information.  We're in this all the time.

2    Mr. White can talk all he wants about how it is tougher than it

3    sounds.  But this occurs every day in litigated cases.  And if

4    it is tough, then the county should have started sometime back

5    around December when the Court issued its order.

6              MS. CHAPPLE:  Your Honor, this is Catherine again

7    with the Curling plaintiffs.  Part of the issue and the holdup

8    is that the information we have received from the counties

9    hasn't been reliable.  For one of the counties, we received

10   handwritten records.  Everything was in handwriting, illegible

11   serial numbers.  So there were serial numbers that were listed

12   more than one time.

13             When we added it all up -- we had statistical experts

14   on the call with the parties last week.  And they were asking

15   questions and trying to get information from the county.  When

16   we added it all up, it didn't match the numbers that the

17   counties have said -- of machines the counties have said that

18   have been sequestered.

19             So due to the things that we're running into -- and

20   we're working as hard as possible and, you know, doing what we

21   can with the information that we have in trying to get

22   additional information because we understand the need here and

23   the need for the machines -- although I will say that on the

24   call last week, Cobb County stated that it had the machines it

25   needed for May.  So this is sort of the first time that we're

1    hearing that they need machines for an election in two weeks.

2                    **(Unintelligible cross-talk.)**

3          MR. WHITE:  Your Honor, this is Daniel White.  Cobb

4    County told them in the phone conference last Thursday that we

5    had enough machines, but that was with the understanding that

6    we -- Cobb County was holding the machines from April and June

7    of last year.

8          It was the next day that emails started flying from

9    plaintiffs' counsel saying we're shocked that these other

10   machines have been prepared for elections.  So we have -- and I

11   don't want the Court to get the impression that Cobb hasn't

12   done anything.  Cobb County has gone and created a record that

13   we aren't required to keep in the course of business to

14   identify every machine that has been used since 2016 and which

15   elections.  We have sent that spreadsheet to them.  We

16   protected the serial numbers, which we feel like we're supposed

17   to do under state law.  But we have identified every machine.

18         The only thing we haven't given them is which

19   precincts the machines were at.  And we think that that

20   violates the State Admin Regulation Code.  So we've come a long

21   way towards identifying every single machine we have available

22   and in what election they have been used and have asked them to

23   come forward with a reasonable sample size.  And they are

24   saying, no, we want to move into discovery and find out more

25   information about these machines than what is on them.  And

1    that is not okay with us.  We objected to that.

2         But we did move towards them and identify all of

3    these things on behalf of Cobb in terms of what machines we

4    have, what elections they were used in.  We just haven't given

5    them the serial numbers and precinct location.

6         MS. CHAPPLE:  This is Catherine with the Curling

7    plaintiffs.  We do appreciate the -- I feel like there has been

8    a serious cooperation in a lot of ways.  But it is -- without

9    the information about the precincts and the serial numbers for

10   the machines, it is impossible for us to put together the

11   sample that we need.

12        And so we absolutely need that information.  And if

13   there is some sort of request that we need to put in, we'll do

14   that.  But we haven't -- we haven't heard from defendants what

15   we need to do to get that information, if there is a separate

16   step that they need us to take.

17        THE COURT:  What is --

18        MR. ICHTER:  Your Honor, this is Cary Ichter.  We

19   agree with that.  We need the serial numbers.  We need the

20   precincts.  But we also in order -- as I said, we're not

21   looking at sample size.  This is not a question of sampling.

22        We'll do a lot of wasting of time if we're basing

23   everything on taking a look at hundreds upon hundreds of DREs

24   looking for a needle in a haystack.  What we need to do is

25   narrow down our universe of suspected machines by taking a look

1    at anomalies that our experts will identify that narrow the

2    field and immediately upon getting that kind of information

3    will enable us to release sequestered machines that are being

4    held on to by the other side.

5            But we don't have to sequester anything if we can

6    start making mirror images now.  And I would hasten to add that

7    we have never, ever said that we want to move into discovery

8    now.  We have avoided using any kind of language like that

9    because that is not what we're looking for.

10           We have been looking for a way to accommodate the

11   competing legal obligations that the defendants have by coming

12   up with a solution that resolves this for everybody.  It

13   resolves it for the Curling plaintiffs, Coalition plaintiffs,

14   and the defendants by simply doing what everybody else does

15   with electronically-stored information:  Making an image of it

16   so that you can use your computers for additional work.

17           MS. CHAPPLE:  This is Catherine with the Curling

18   plaintiffs.  We feel that we will need to sample some of the

19   machines -- the physical machine.

20           THE COURT:  All right.  Well, first of all, let me

21   just --

22                   **(Unintelligible cross-talk.)**

23           THE COURT:  All right.  Let me ask you this:  How

24   long -- has the State prepared a mirror image of any of the

25   machines and cards?

1        MR. SALTER:  I don't believe so.  This is John

2   Salter, Judge.  And I don't believe that was -- I don't believe

3   that was something that we were doing.

4        THE COURT:  Has anyone --

5        MR. SALTER:  Part of the problem --

6        THE COURT:  Let me just ask you this.  Let me follow

7   up on that.  How -- have you tried to determine how long it

8   will take to do that?  I mean, for instance, just for one

9   machine so we could just understand what we're facing here.

10            **(Unintelligible cross-talk.)**

11       MR. SALTER:  Your Honor, I honestly don't know the

12  answer to that.

13       MS. RINGER:  We have no idea how long it would take.

14  We welcome the idea but at the defendants' -- I mean, at the

15  plaintiffs' cost.

16       THE COURT:  I understand that.  But I'm just saying

17  you can -- it could be done next week, I believe.  But, you

18  know, I'm not --

19       MS. RINGER:  I don't know.  This is the first time

20  that Mr. Ichter has said that.

21       MR. ICHTER:  Your Honor, this is Cary Ichter.  I have

22  been talking about this since I entered the case.

23       THE COURT:  All right.  I'm going to --

24       MR. WHITE:  Your Honor, this is Daniel White.  Part

25  of the problem is we were moving towards a sampling solution

1    last fall with prior counsel.  And then this spring it has

2    emerged that one group of plaintiffs seems to want to stick

3    with the sampling and the other group seems to -- they just

4    want all images of everything.  So we don't know who we're

5    negotiating with.

6              THE COURT:  I understand.  And they want something

7    different.  And it makes it very challenging.  But at the same

8    time, this has been a drumbeat that you-all want to get the

9    information.  You want to get the machines back into play.  And

10   at the same time you don't want to provide the information on

11   precinct number and machine number.

12             And I mean -- you know, so it is -- at one level, I

13   don't think that there is -- that you have done what you need

14   in order to get ahold of the machines.  And I'm concerned -- of

15   course, I want you to have the machines.  And at least -- I

16   mean, this all seems so absolutely resolvable.

17             I tell you what is that one of you -- Mr. Ichter,

18   have you talked with any of your experts about basically what

19   they determine will be the type of cost and time involved in

20   mirror imaging of a typical DRE machine?

21             MR. ICHTER:  Your Honor, what we have -- this is Cary

22   Ichter.  What we have done is we have asked the other side to

23   provide us with user manuals so that we know what the kinds of

24   configurations are that these machines are in, exactly what

25   kind of machines they are using.  We have asked to meet with

1   the Secretary of State's office.  We have asked to get the

2   backup procedures for these machines so that we understand how

3   they are backed up and what kind of data is retained.

4         And we have been stiff-armed 100 percent on all of

5   that.  The Secretary of State's people refused to even meet

6   with us.  Nobody from the counties has given us the first piece

7   of operational technical detail about the machines.  So it is

8   impossible for us to come up with that information.  If they

9   will supply us with that information, we could come up with an

10  estimate.

11              **(Unintelligible cross-talk.)**

12         THE COURT:  All right.  I'm going to go offline right

13  now.  I'm sorry.  I'm going to go offline for a few minutes to

14  consider where you are all at so we can have a productive

15  discussion about this because I don't think we're making any

16  progress.

17         So just know that I can hear you.  Though you can't

18  hear me.  So you don't need to say anything to each other if

19  you don't want to.  You are welcome to talk, but I'm going to

20  hear everything you say.  All right.

21         MR. ICHTER:  Thank you, Judge.

22              **(A brief break was taken.)**

23         COURTROOM DEPUTY CLERK:  Counsel -- Counsel, the

24  Court is rejoining the conference call.

25         THE COURT:  Hi.  All right.  So, Ms. Chapple, why is

```
1   it that -- let me just try to determine why is it that you
2   would need to have -- you want to have some machines and how
3   many of them would you need if, in fact, the mirror image of
4   the machine and the cards are being made.
5              MS. CHAPPLE:  Yes, Your Honor.  This is Catherine
6   Chapple.  We, in speaking with our computer scientist and the
7   experts that would be doing the forensic analysis, believe that
8   they would need a handful of machines -- it would be a much
9   smaller sample of the physical machines -- to look for
10  vulnerabilities in the physical aspects of the machine.
11             THE COURT:  So how many machines are we talking
12  about -- then about?
13             MS. CHAPPLE:  So I don't have a number from them.
14  But I think it would be very small compared with what we're
15  talking about in the software sort of type of vulnerabilities.
16             THE COURT:  All right.  Well --
17             MR. SALTER:  Your Honor, this is John Salter.  May I
18  add something here?
19             THE COURT:  Yes.
20             MR. SALTER:  My recollection -- and I was responding
21  to my brothers and sisters a moment ago.  But my recollection
22  when me and Grant Schnell and Robert Highsmith and Roy kind of
23  came into the case in the fall, there was a great deal of angst
24  and anxiety about the preservation duty and how broad and how
25  absolute that would be.  And there was a great deal of
```

1   back-and-forth, some of you which you ended up being privy to

2   and an actual participant in and some which, of course, you

3   were not.

4       And my concerns here as representing the state and

5   the State Elections Board is that the county defendants and the

6   state have in good faith operated under an understanding that

7   that -- a certain understanding of that December 22nd order

8   wherein we voiced in the lead-up to it in one of these status

9   conferences that we really did need to know that we would have

10  enough machines available for the spring elections of 2018.

11  And the allegations are really concerned about these discrete

12  elections that had already occurred.

13      And further understanding the state of the complaint

14  at the time -- and I think this still holds true -- in other

15  words, the effect is one that is inherent in every machine if

16  the complaint is to be believed, it seemed to us logical that

17  we would -- that that would not lead to anybody's prejudice.

18  Certainly that was not our intent.

19      What I am concerned about is that we had a conference

20  call for an hour -- almost an hour and a half last week.  Less

21  than, you know, 12 hours after it occurred, the object being

22  rotating some of these machines back into service, the position

23  that came across was we're so -- we're so surprised that you

24  are spoiling evidence, deleting evidence, we're getting our

25  sanctions motions ready.  In the meantime, we insist that you

```
 1   embargo pretty much every machine because you are actively
 2   destroying data by continuing to do elections.
 3           That is in my view and the position of my clients,
 4   Your Honor, is that what we're now doing is we're getting
 5   around the fact that we don't know what the complaint is.  The
 6   motions to dismiss are not ruled on.  Discovery would be
 7   barred.  But what we're doing is we're getting an injunction
 8   de facto against us because of what I view are a flipping of
 9   position and an opportunistic expansion of their interpretation
10   of our obligations.  And that is my concern.
11               THE COURT:  All right.
12               MR. SALTER:  And I'll --
13               (Unintelligible cross-talk.)
14               THE COURT:  I'm really not -- I'm going to tell you
15   what I'm thinking.  All right.  You can all argue obviously
16   endlessly.  But let me just say that I don't think we would be
17   in this position, first of all, Mr. Salter, if we didn't have a
18   wipeout that was done at Kennesaw of the state election base.
19   So we got -- and that happened at the time of this lawsuit.
20           So I'm just -- I think that we have a context here
21   that I can't completely ignore.  Because there would have been
22   a very simple way of proceeding with this but for that.  But
23   what I --
24               MR. SALTER:  Your Honor, may I --
25               THE COURT:  No.  I'm really not asking you to
```

1    interrupt me at this point.  So I'm just -- what I don't

2    understand right at this moment is if, in fact, the plaintiffs

3    are prepared -- and I don't know that they are prepared to do

4    this -- to assume the cost of doing basically the mirror

5    imaging of the machines and cards and do it on an emergency

6    basis with obviously paying for you-all to do it.  Because I'm

7    sure you don't want all of their technicians.  But if you do,

8    you can agree upon a contractor to do it all.  That is not a

9    problem.

10          It would seem like with doing that, plus identifying

11   a handful of machines as Ms. Chapple said so that her folks can

12   test it, that that would basically at least for now resolve the

13   pragmatic issue.

14          So explain to me why that would not be a viable

15   solution at the moment, or maybe you will agree that it is a

16   viable solution.  I don't know what the cost is.  You know, I

17   don't know anything about that.  But I view it as ultimately

18   the plaintiffs' cost.  Of course, if the plaintiffs were to

19   prevail in the litigation, you could seek reimbursement.  But I

20   don't know that you are going to.  I don't know what you are

21   going to get past.

22          I'm not seeing this as discovery.  I am seeing it as

23   preservation -- necessary preservation of evidence though.

24          MS. CHAPPLE:  Your Honor, this is Catherine Chapple

25   with the Curling plaintiffs.  As long as we were also able to

```
1   get the information that we need regarding the serial numbers
2   of the machines, the precincts, and that other (unintelligible)
3   that would allow us to know what machines they have and to
4   identify with reasonable certainty what has been sequestered
5   and how we would go about imaging them, I think we need to --
6   so clearly the Curling plaintiffs have not been -- are not as
7   far down the road with the idea of imaging as the Coalition
8   plaintiffs are.  And we would like the opportunity to discuss
9   with our experts that we are, of course --
10                   (Unintelligible cross-talk.)
11           THE COURT:  All right.  I hear you.  I'm just -- and
12   I think that you-all -- I understand why you need the precinct
13   number and the serial number because the serial number might be
14   relevant to a whole series of machines that are defective or
15   not defective.  But -- and it might not be.  But I can
16   understand that.  I can understand why you want it by precinct
17   as well.
18           And I have said already I think that that is
19   appropriate.  But there needs to be a confidentiality order.
20   But -- and if you consider -- I guess your folks would have to
21   make a decision.
22           I'm telling you I am not going to be available at all
23   come 3:00 on Friday.  And we have to have -- I have sentencing
24   hearings all of tomorrow.  So, you know, if we have to resolve
25   this tomorrow night in court, we'll do that and have you come
```

1    down.

2            But I think that is -- you know, if the Coalition

3    folks at this point think that is what is critical for them,

4    then you might end up ponying up all the money yourself.  But

5    then it is -- it is a different -- just simply in order to get

6    this resolved now.

7            But I think you need to look at -- I don't know how

8    long it will take.  I don't know whether -- what the State's

9    perspective is.  But that is what I need to know right now.

10                **(Unintelligible cross-talk.)**

11           MR. ICHTER:  Your Honor, this is Cary Ichter.  Can

12   I -- can I speak since we're talking about my client paying for

13   this?

14           THE COURT:  Yes.

15           MR. ICHTER:  I hasten to note that it is an nonprofit

16   organization.  And I understand the direction that the Court is

17   heading in.  Could we be allowed an opportunity to brief the

18   question of the shifting of the cost of the counties'

19   preservation to the plaintiffs?  That is the first question.

20           But almost as -- and perhaps more importantly, when

21   we get to the preliminary injunction phase, I think that it is

22   important for the Court to remember what the defendants are

23   essentially saying.  The sort of submerged text here is that,

24   well, they say it is inherently defective, and they ought to be

25   able to prove that with a very small sample size; so therefore

1   they should only need a very small number of machines.

2           Implicit in that argument is that the mere showing of

3   inherent vulnerability should be sufficient to carry our burden

4   at the preliminary injunction stage because that is essentially

5   what they are saying.  That is all -- this is all the evidence

6   that they need.  They only need to show that it is inherently

7   vulnerable.  Well, if that is fine, fine.  We'll accept that.

8           THE COURT:  I'm sure they are not saying that.

9           MR. ICHTER:  But I'm hoping -- I don't think that

10  they are saying that.  But they are essentially saying that the

11  only evidence that we are entitled to pursue is inherent

12  vulnerability.  And I think that we only need to look at what

13  happens out there in data breaches to understand that everybody

14  is inherently vulnerable, and the question is who is a victim

15  of vulnerabilities being acted upon.

16          MR. BARNES:  Your Honor, this is Roy Barnes.  I have

17  been very quiet.  May I say a few words on behalf of the state?

18          THE COURT:  You can say a few words if it is going to

19  be helpful to getting this resolved.

20          MR. BARNES:  Well, I hope so.

21          THE COURT:  All right.

22          MR. BARNES:  Your Honor, the first thing is there is

23  a difference between the plaintiffs as you just heard.  The

24  Curling plaintiffs say that --

25          THE COURT:  All right.  I understand the differences

1    in the postures.  But I think that ultimately my own judgment

2    is going to end up needing the mirror image.  But that is

3    something different.

4            MR. BARNES:  And the second thing that I would

5    like -- and we have -- Mr. Salter and I have proffered with our

6    clients.  And here is our position so that it can be very

7    clear.

8            This case is still closed.  We think that there is

9    immunity in the case as we have set forth.  We want the process

10   of a regular case, that is, a person comes forward and says,

11   I've suffered this specific harm, and this is what I want to be

12   proved, and we believe that the immunity gives -- allows us --

13   that issue needs to be decided first because either side could

14   appeal that as a collateral order.

15           And so before we get into all of this, it is our

16   position respectfully that we decide the immunity issue.  The

17   case is not even open.  And this case go back to a regular case

18   rather than policy decisions.  We think that this has happened

19   or this may have occurred and we are talking about two weeks

20   before the election.  The election is two weeks from Tuesday.

21   And we think that that orderly process ought to follow.

22           Now, the other thing too about turning over serial

23   numbers and manuals and all of this, which would be contrary to

24   state law to do so is, as Mr. Salter says, what they are trying

25   to do by litigation holds is what they cannot do by a proper

1   pleading before the Court either for injunction or otherwise

2   from which we would be able to assert immunity.

3          THE COURT:  Governor, I think you've made -- I think

4   you've all made your point, and Mr. Salter made the point, and

5   I understand that.

6          But what would you have?  That you would also say

7   we're going to eliminate all evidence in this case because we

8   need these machines and we have done nothing to -- basically

9   ourselves mirror image them in order to be able to have free

10  access to them ourselves in the last number of months?

11         I mean, the positions of the plaintiffs obviously has

12  significant issues.  But I also think so does the problem of

13  the defendants, especially in the context of what happened at

14  Kennesaw.  So, you know, I think that really -- you know, I'm

15  not saying what they can do with anything.

16         I'm just trying to say, if the plaintiffs are willing

17  to pay for the mirror imaging and either the state can do it

18  itself or the counties can do it itself and they can -- or you

19  can hire -- obviously everyone has their own jobs.  Though it

20  may end up having to be an independent entity.  But it is

21  simply preserving evidence.  And you need the machines, and I

22  don't know that they are going to even end up having access to

23  this ever.

24         But if they want to pay for it, it is simply a matter

25  of preservation.  I understood what was being said about the

```
1    nonprofit.  But so is, so-to-speak, the state and the community
2    are the essence of a nonprofit entity.  So I'm not sympathetic
3    to that.  So I just --
4              MR. ICHTER:  They are a little more flush with cash.
5              THE COURT:  They are more flush with cash.  But,
6    nevertheless, the reason -- the reason I said that ultimately I
7    think it will come down somewhat to this, even though I
8    understand that the plaintiffs -- the Curling plaintiffs want
9    the precinct number and the server number so that they have --
10   it could ultimately do a sample.  The reality though is that
11   we're going to continue to have this problem about the data if
12   the case moves forward.  And so -- and, you know, you're going
13   to want your machines, and they have to be serviced.  So there
14   has to be a resolution of this.
15             And I just don't understand why that resolution, if
16   the plaintiffs want to pay for it, is not ultimately the
17   resolution along with at least some precinct and server number
18   information, even if it means right now you simply make
19   generally the information and you are holding the information
20   until the point that I would rule on any of the dismissals
21   because they don't need to be doing it until later -- they
22   don't have any need for the information until they can get past
23   the motion to dismiss point.  But I want -- in the event they
24   do, I want there to actually be meaningful data available.
25             MR. ICHTER:  Thank you.
```

**(Unintelligible cross-talk.)**

1            **(Unintelligible cross-talk.)**

2            MR. BARNES:  If I could just reply to that.

3    Number 1, we'll be glad to show you about Kennesaw and the -- I

4    mean, that is the red herring in the whole deal.  But we won't

5    get into that today.

6            THE COURT:  All right.

7            MR. BARNES:  I think it is, of course, the state --

8    it is the counties that have custody and control of the

9    machines.

10            THE COURT:  Right.

11            MR. BARNES:  And that is -- so it is really an issue

12    addressed to them.  But, secondly, we think it is critically

13    important that before, even if there is some information that

14    is mirrored or whatever, that we have a complete vetting of

15    people that are going to get that information because we

16    have -- we have a duty under state law to make sure that is

17    true and that they pass -- that they be folks that we have the

18    right to vet because you're talking about very sensitive

19    information.

20            THE COURT:  Well, surely the state has its own

21    contractor for handling this in very sensitive situations.

22            MR. SALTER:  Your Honor, this is John Salter.  I

23    don't know that they can even do this in -- I do not know that

24    this is feasible without compromising the machines.  And I

25    don't want to mislead the Court and then have to raise that

```
1    issue down the line and be thought to be making a reversal or

2    shifting of our position.

3              We do not yet know whether or not even the

4    sampling -- you know, the idea that we're going to get in there

5    and find which machines are more prone to vulnerability is

6    different from a random sampling where we just hold out a

7    certain number of randomly picked machines.

8              What Mr. Ichter has arrived at is a much more

9    intrusive sifting process more akin to we would say basically

10   viciating the immunities of the state and moving into

11   discovery.  And I think it puts us in a different place.  And I

12   think we're going to have to think about how to do that.

13             But I know that will involve pretty extensive

14   consultation before we can take a firm position on that.  Thank

15   you.

16             MR. CROSS:  Your Honor, this is David Cross.  Could I

17   just perhaps make a proposal that might move things forward?

18             THE COURT:  All right.

19             MR. CROSS:  On the issue of confidentiality or any

20   other regulatory hurdles, if we could just get a proposed

21   protective order from the defendants in the next day or so that

22   lays out whatever protections they believe they need to share

23   the data, I think that would move things forward very quickly.

24             And we're happy for my clients -- for the Curling

25   plaintiffs, we're happy to try to work that out with them so we
```

1    can take that issue off the table.

2          The other thing that would be useful -- and

3    Mr. Salter and I started talking about this when you stepped

4    off the call -- is if we could get a follow-up meeting with the

5    defendants, particularly the counties since they have these

6    machines, and have the sort of robust exchange of information

7    that Ms. Chapple has described.

8          When I say robust, it is actually not that much.  We

9    just need to nail down things like the categories that she has

10   articulated.  And then our statistical experts are ready to go

11   forward with some sort of proposal on our side.  And that will

12   involve imaging machines no doubt.  But I was prepared to

13   figure out if we could do it on a statistically significant

14   sample size and help the state move forward with the election.

15   And --

16         THE COURT:  And you can do this in the next two

17   days -- two or three?  I mean, they have to service these

18   machines as well is my understanding.

19         MR. CROSS:  Well, our hope for my clients is that we

20   can figure out a statistically significant sample that enables

21   us to identify specific machines.  And then those machines will

22   get preserved either as they are or taking an image of them.

23   If they don't need them for the election, then I think they

24   could just sit and be preserved in place.

25         Beyond that, I would leave that to the Coalition

1    plaintiffs to figure what else they may want preserved.  We're

2    trying to figure out if we can get to a statistically

3    significant sample size.  And if we can get the information we

4    need from them, then our statistical experts tell us we could

5    put that proposal together quite quickly.  And I think we could

6    work it out.  But we need to get this information from the

7    defendants.  We need them to do that.  And we haven't been able

8    to do that so far.

9          The last thing I just wanted to say is:  I am

10   sympathetic to Mr. Salter's point and others have made that

11   notions of spoliation and sanctions start to inflame things.  I

12   will make a commitment that for my clients we have intention to

13   be talking about spoliation or sanctions.  We obviously are

14   reserving all our rights.

15         But my only intention at this point is to try to

16   figure out can we preserve as little as we need for our claims

17   without prejudicing our client's claims.  And we're prepared to

18   move forward with our experts as quickly as possible on that.

19   And we'll park any notion of whether something was lost

20   historically or whether it is lost going forward later.

21         But I would like to have a very pragmatic approach to

22   this and let's just get the legal arguments out of the way and

23   focus on exchange of information.  We will move as fast as we

24   can.  We have experts ready to go.

25         THE COURT:  Well --

1              **(Unintelligible cross-talk.)**

2              MR. ICHTER:  If I can agree with that, we agree that

3    if we can sit down with the other side -- if there is an order

4    that we immediately sit down that some of the information that

5    we have been looking for is disclosed to us so that we

6    understand some of the information necessary to be able to make

7    some decisions about what is the universe that we need, then

8    we'll be light years ahead of where we are right now.  And

9    there will be room for compromise.

10             But they are asking us to shoot in the dark right

11   now.  And we have been asking for meetings and data for a week

12   since the -- since the all-hands conference call last week.  So

13   I agree entirely with Mr. Cross.

14             **(Unintelligible cross-talk.)**

15             THE COURT:  So y'all have not had a meeting in

16   person?  There has not been a meeting in person?

17             MR. SALTER:  Your Honor, this is John Salter.  We had

18   an hour-and-15-minute call on May the 4th.  I think that was

19   last Thursday afternoon.  And the very next morning, almost

20   before I got into work, having thought we had an

21   all-hands-on-deck constructive call, we get this email from

22   Mr. Ichter that, you know, our spoliation motion is being

23   prepared.  It is imminent.

24             And really what we have here is a situation where the

25   DRE machines are the hostage to a preservation issue that has

```
1   been expanded much beyond its intent.  And they want to shoot
2   the hostage.  I mean, the thing is they don't like the
3   machines.  That is the issue.  In my view this is really --
4   this really is just an injunction by another name where they
5   hold out, threaten spoliation, hold us up on evidence
6   preservation, and they don't care if the machines can't get
7   used because that is what their lawsuit wants.
8                   THE COURT:  All right.  Who is ready to come down to
9   the courthouse tomorrow?
10                       (Unintelligible cross-talk.)
11                  THE COURT:  Who is ready to come down to the
12  courthouse tomorrow morning?  I mean, I'll set a room up for
13  you.
14                  MR. SALTER:  This is Salter -- this is John Salter.
15  I've got -- me and Roy have a hearing at 9:00 that is expected
16  to last half a day tomorrow morning.
17                  THE COURT:  Okay.  But we need county representatives
18  more than you, don't we?  I mean, it is --
19                  MS. JOHNSON:  Your Honor, Dekalb County's lead
20  counsel is out of the country until Monday.  We could send
21  someone.  But we're not going to have all the details at that
22  time.
23                  MR. ICHTER:  Your Honor, this is Cary Ichter.  I can
24  be there any time you want me.
25                       (Unintelligible cross-talk.)
```

1              UNIDENTIFIED SPEAKER:  -- can be there when we need

2      to be.

3              MR. WHITE:  Cobb County can be there.  I want to say

4      that just the reality is -- and we are willing to meet, and we

5      have offered and spoke with actually Mr. Cross and his

6      associates earlier about doing the protective order.  So we're

7      not against that idea.  Today is the first we have heard of

8      anybody offering to pay for mirror imaging or anything of that

9      nature.  That is another bridge we can cross.

10             But I do want to point out one complication for us is

11     we are literally down to one employee.  The information that we

12     were able to turn over this weekend was made by the director

13     over the weekend.

14             Everybody else right now is all hands on deck rolling

15     these machines out, getting the precincts ready, running

16     advanced voting, and -- you know, so the idea that this is just

17     something that can be just done easily in the middle of

18     preparing for an election two weeks out is not -- that doesn't

19     mean we're not willing to talk.  And I will ask Ms. Eveler to

20     make herself or whoever from her staff can be available to do

21     this.  But they are in the busiest part of their jobs other

22     than a presidential election or a general election.  So it is a

23     very difficult time.

24             THE COURT:  And I understand that.  And I don't mean

25     to be in any way dictatorial about this.  But I am just trying

1   to get you to a point of having at least an interim pragmatic

2   resolution.  And you need -- you know, I want -- it doesn't --

3   when I hear that you need -- that Dekalb needs 450 machines and

4   Cobb says it needs all of the machines, I mean, that is really

5   obviously -- and I don't know if the 450 are all machines or

6   not or there are 750 or not.  I don't know those numbers.

7           And I just can't believe that there is not some

8   interim pragmatic resolution.  It may not be the long term

9   resolution.  But the interest -- ultimately the reason I

10  started the conference was to address the county concerns.  Not

11  to try to take care of the plaintiffs.  But simply to try to

12  address the concerns that the counties had.

13          And it was part of just the entire resolution here.

14  So that is really -- that is where we're at.  It is not a

15  hostage situation.  It is a matter of what is an interim

16  solution so you can have -- whatever you think is necessary

17  given the projected turnout, which I don't know that the

18  projected turnout is great either.  But maybe it is.

19                  **(Unintelligible cross-talk.)**

20          THE COURT:  I didn't hear you.

21          MR. WHITE:  Your Honor, this is Daniel White.  I

22  don't want the Court to misunderstand.  I don't need all the

23  machines released.

24          What I was trying to point out was that Cobb County

25  agrees to move forward without, you know, releasing -- without

1    having to release any of the machines.  But that was when the

2    understanding was we were only talking about April and June.

3         What happened is the next morning we got told or

4    sanctions letters threatening saying we need to mirror image

5    all of your machines since 2016, in essence.  So that is where

6    the misunderstanding was.  We have already withheld all 40

7    machines that we have that haven't been touched since 2016 and

8    we're willing to keep those aside.

9         MS. JOHNSON:  Your Honor, Dekalb has more than 1,000

10   machines currently sequestered, and that is why we need some of

11   them back.  Because we simply need enough to be able to conduct

12   this election.  And our election supervisor is asking for the

13   Court's help with that.

14        I mean, we are not unwilling to participate in

15   efforts to preserve documents.  But I'm just going to question

16   whether it is going to be practical to do a mirror imaging of

17   hundreds of machines during an election when, like Cobb County,

18   all of our elections folks are working hard to try to get this

19   election going without a lot of their machines.

20        THE COURT:  Right.  I get it.  I understand.

21        MR. McGUIRE:  Your Honor, this is Robert McGuire.  I

22   just want to be very clear.  We're not looking to inconvenience

23   the counties.  We wanted to get a meeting to get information so

24   that we can minimize the inconvenience by targeting the

25   machines we are interested in.

1          And if we could just sit down with -- the Secretary

2     of State is very important because the Secretary of State has

3     answers that we think the counties won't have.  If we could sit

4     down with them, we can target the machines.  And then we don't

5     need to do hundreds of copies with lots of costs, which have to

6     be shifted or not shifted.

7          Our goal is to minimize the inconvenience and

8     maximize the preservation of what we need.  We're not trying

9     to -- we're not trying to get them to mirror image everything.

10    That is the worst solution from our perspective and from

11    theirs.  So our sole --

12          THE COURT:  So let me ask you this.  When the

13    machines are put into use, are they wiped at that time or is

14    the current data preserved on it?

15          MS. JOHNSON:  Your Honor, my understanding --

16                    **(Unintelligible cross-talk.)**

17          MS. JOHNSON:  Your Honor, my understanding is that

18    the machines do archive some information but that the

19    plaintiffs objected to using the archived information.

20    However, I have entered this case late because our counsel is

21    out of the country.

22          MR. CROSS:  My understanding from the discussion we

23    had with the defendants last Thursday was that the machines go

24    back into use.  While there may be some data that is archived,

25    the machines are wiped.  And so that's where the concern comes

1    from and again why we are trying to get down to some reasonable

2    number for physical sampling otherwise.

3           I would just come back to the proposal I made, if I

4    could, Your Honor, and figure out what time frame do the

5    defendants, the state and counties, need to be able to meet

6    with us -- if not tomorrow, then maybe Friday, if I've got my

7    days right -- to have the sort of exchange of information we

8    need for at least our clients to have a statistical sampling

9    methodology and try to move this forward.  Because that is the

10   only hurdle is just the limited number of categories of

11   information we need.  And then we can wrap this up for

12   preservation purposes.

13                    **(Unintelligible cross-talk.)**

14          MR. BARNES:  Your Honor, the position of the state is

15   that we are not going -- unless the Court orders and decides on

16   the immunity issue, we're not going to turn over secret

17   information to the plaintiffs.  And that is the reason I made

18   my little speech awhile ago.

19          The second thing is just an observation.  If the

20   machines are inherently defective like they say, what

21   difference does it make which election you pull?  Because they

22   should show all of it at every time.  And this is what happens

23   when you have folks that -- that really don't -- respectfully

24   don't have a clear view of proof of any abuse.

25          And so I mean, if they are inherently defective, it

1   is going to show up in every election that occurs.  So what

2   does it matter whether there's others that are preserved?  But

3   the state's position I have been instructed -- and I do not

4   disagree with them -- is that we -- that we are not going to

5   turn over confidential and state secret information unless

6   ordered to do so by the Court and with a right to appeal on the

7   immunity issue.

8                    **(Unintelligible cross-talk.)**

9            MR. CROSS:  Your Honor, if I could just respond real

10   briefly.  Mr. Barnes' comments epitomize the problem we have

11   run into --

12            COURT REPORTER:  I don't know who is speaking.

13            THE COURT:  I'm sorry.  Who is speaking?

14            MR. CROSS:  I'm sorry, Your Honor.  This is David

15   Cross -- David Cross again for the Curling plaintiffs.

16            THE COURT:  Yes.  Go ahead.

17            MR. CROSS:  Mr. Barnes' comments epitomize the hurdle

18   we have hit, which is they are taking the position that things

19   like serial numbers, which our statistical experts tell us they

20   need, is secret information.  And so absent an order from the

21   Court that requires them to disclose -- again, just narrow the

22   categories of information, like serial numbers, precincts, we

23   can't move forward.  And we're only looking for it for

24   preservation purposes, not broader discovery.

25            The second point I'll make on what Mr. Barnes, Your

1    Honor, had to say is we are trying to move this forward as

2    quickly as possible.  And part of the challenge we have is that

3    the defendants kind of want to have their cake and eat it too

4    because if they realize -- I think Mr. Ichter has explained it

5    before.  If the defendants will waive any defenses -- any

6    arguments right now that any sample size we take or any number

7    of machines our experts rely on, that those are necessarily

8    representative and reliable as to the broader universe, then

9    maybe this gets a lot easier.

10          But I have not heard that waiver from them, and we

11    cannot now just haphazardly choose some number of machines and

12    then have them come in later and say, well, those machines

13    actually are not representative of the broader universe.  You

14    did not do a statistical sample.  It is coming and going both

15    ways.

16          THE COURT:  You know, the thing is this.  I'm not

17    sure -- I really believe that -- Mr. Cross, I understand that

18    you have been trying to say that if we can have this

19    information then we could preserve a smaller number of them and

20    it is in their interest.  And we can have a confidentiality

21    order.  You could be -- it could go directly to the experts.

22    It could be -- there are any number of ways that could be

23    worked simply so that it is -- though a smaller number of

24    machines are preserved.  That is one solution.  And it seems

25    like a reasonable one.

```
 1              But I hear Governor Barnes saying, no, we're going to
 2     object to anything even though the counties may or may not
 3     agree to do this in terms of the machine numbers.  I don't
 4     really understand that position of the state.  And that is why
 5     I was trying -- even though I thought it was more burdensome in
 6     its own way to have to image everything, that is -- you know,
 7     it clearly was intended as a way of, again, providing a
 8     pragmatic solution.  And no one needs to have -- there are
 9     obvious methods for being able to deal with ensuring state
10     security with that.  But --
11              MR. BARNES:  Hello.  Hello.
12              THE COURT:  We are here.
13              MR. BARNES:  I'm here.  I just -- y'all broke up on
14     me.
15              THE COURT:  Well --
16              MR. BARNES:  I heard the -- I heard you when you said
17     -- where I heard was you don't understand the state's position.
18              THE COURT:  What I said that it is a pragmatic,
19     narrow solution and that the state says it will interfere with
20     and -- that it will demand that no one provide this
21     information.  That is what I heard.
22              But I think it is a narrow solution, and there are
23     strategies for ensuring confidentiality.  I mean, I don't have
24     any time for this either.  But, you know, I'm going to reserve
25     a room here.  I will make myself available.
```

```
1              When is the last sentencing?  At 3:30 in the
2     afternoon?
3              COURTROOM DEPUTY CLERK:  Yes, Your Honor.
4              THE COURT:  So I can't really have a hearing myself
5     until 5:00 probably.  But I'll make myself available at 5:00 to
6     do so.  But I do think -- I mean, I think it would be helpful
7     if the -- if representatives of the county with an ability to
8     call somebody -- a representative would come and meet with
9     plaintiffs' counsel.  And if the state wants to be there, then
10    you could do it early in the afternoon given the fact that
11    Mr. Salter and Governor Barnes have a hearing.
12             But I think this is very difficult to do on a
13    conference call with me in live action, and there is a
14    resolution, and it is not like these folks need to have any of
15    the data other than to pick a sample.  And that just -- I mean,
16    they don't know what the serial numbers mean.  It doesn't mean
17    that they have to have any data as to the machines.  It just
18    seems to be frankly somewhat obstructive as a means for trying
19    just to resolve a preservation issue.
20             And I hear what you are saying.  And I'm just into
21    the narrowest form of preservation or else just mirror imaging
22    everything, and you keep it, and you take responsibility for
23    that, and they pay it, and the state has its own contractor
24    where it controls the secrecy itself.
25             Those are all possibilities.
```

```
 1                    (Unintelligible cross-talk.)

 2            THE COURT:  I can't resolve this.  So all I can

 3   resolve is:  Are you going to come here tomorrow?  That is all

 4   I am going to say at this point.  Are you -- we'll reserve a

 5   room, and we'll reserve 5:00 in the afternoon.

 6            And who is coming?

 7            MR. ICHTER:  Cary Ichter will be there, Your Honor.

 8            MR. CROSS:  Curling plaintiffs will be there, Your

 9   Honor.  And I apologize.  I have to drop off.  So I am going to

10   leave this to Mr. Knapp and Ms. Chapple.

11            THE COURT:  All right.  That's fine.

12            Can the county representatives be there?

13            MR. BROWN:  Coalition plaintiffs will be there.  Cary

14   and/or me, Bruce Brown.

15            THE COURT:  What about the county representatives?

16            MR. WHITE:  Your Honor, it will be difficult for Cobb

17   County to be there.  But I will do what I can.  I have a wife

18   who will be out of town.  I'm not sure -- I will do what I can

19   to make arrangements to care for the children and be there.

20                    (Unintelligible cross-talk.)

21            MR. KNAPP:  Your Honor, Halsey Knapp on behalf of the

22   Curling plaintiffs will be there.

23            THE COURT:  But what I'm --

24                    (Unintelligible cross-talk.)

25            MS. JOHNSON:  Dekalb County can have someone present.
```

1    But, of course, counties are not islands.  And we would need

2    the approval of the state to do certain things in order to

3    avoid a conflict.

4           THE COURT:  So which of the state's counsel can be

5    available earlier in the afternoon so that you can actually

6    have a conversation about this so we don't just have a repeat

7    at 5:00 of what just happened today?

8           MR. BARNES:  Your Honor, I have got a hearing.  And

9    then I've got a speech to give.  And then I'm going to

10   Thomasville, Georgia, for another hearing that is early Friday

11   morning.

12          Now, John, I don't know where you are.

13          MR. SALTER:  As soon as we are done with Dekalb --

14   assuming that -- and I think that is reasonable -- we could be

15   there probably about 3:30.

16          MR. BARNES:  Yeah.  But I have got a speech at 5:00.

17   But we can drive separately.

18          MR. SALTER:  Okay.

19          MR. BARNES:  And then like I say, I've got a hearing

20   that started last Friday and is going to be completed.  It is a

21   trial.  It is a nonjury trial that is going to be completed

22   down in Thomasville on Friday.

23          THE COURT:  Well, you've got Mr. Salter.  And he is

24   very able, to say the least.  So why don't you-all try to --

25   you're going to have to obviously share emails about what

1    information you want.

2         Why don't you -- we will save a room for you-all to

3    meet at 3:30 in the afternoon here.  And Ms. McConochie will be

4    in touch with you about that.  And I would like a

5    representative of each county and a representative of the

6    state.  And I would like you to basically have been able to

7    talk enough in advance to your clients and determine and --

8    basically, you know, I can't imagine it is so difficult to

9    figure out the precinct number and the server number and to be

10   considering a -- I think plaintiffs' counsel needs to circulate

11   a possible confidentiality order as to that so that you have

12   something in advance.  That you are basically walking into the

13   meeting with that.

14        And if somebody is interested in doing the mirror

15   imaging and assuming the cost, then you need to basically

16   address -- be able to address that.

17        And Mr. Salter or Governor Barnes, I think you should

18   actually make an inquiry as to find out what resources would be

19   available in the state to assist in that if there was proper

20   payment of costs because obviously --

21             **(Unintelligible cross-talk.)**

22        MR. BARNES:  The State closes at 5:00.  We'll do it

23   in the morning.

24        THE COURT:  Thank you.

25        MR. BARNES:  The only other thing that I will say is

```
1   there is a state law and regulations that prohibit us from
2   giving numbers out.  And I know what my folks are going to tell
3   me.  They are going to say, well, I can't override the state
4   law.  I can't agree to override the state law.
5              THE COURT:  All right.
6              MR. BARNES:  And that is the reason --
7                    (Unintelligible cross-talk.)
8              THE COURT:  Why don't you send me the state law about
9   the number -- that says that you can't provide a serial number.
10             MR. BARNES:  Okay.
11             MR. SALTER:  Your Honor, this is -- this is John
12  Salter.  We will try to do this.  Because we're going to be in
13  court in the morning and as Roy said this is -- it is after
14  5:00.  He and I are going to be in court from 9:00.  We'll do
15  what we can.
16             THE COURT:  I understand.
17             MR. SALTER:  I will point out that I don't know --
18  I'm not saying it won't.  But as to a protective order, because
19  the Department of Homeland Security declares these election
20  systems -- they are treated specially, I'm not sure a
21  protective order will be sufficient.
22             THE COURT:  All right.
23             MR. SALTER:  But I'm not saying that.  But I have --
24  we have discussed that internally, and we don't know that that
25  would do it.
```

1           THE COURT:  All right.

2           MR. SALTER:  All right.

3               **(Unintelligible cross-talk.)**

4           MR. BARNES:  Go ahead.

5           MR. ICHTER:  Your Honor, this is Cary Ichter.  Could

6     we ask that the Secretary of State's office have some of its

7     technical people available to answer questions so that we will

8     be able to know what we are dealing with in terms of being able

9     to make mirror images.  Because different kinds of systems

10    require different kinds of approaches.  And having available

11    information will be useful in that regard.

12          MR. BARNES:  Well --

13              **(Unintelligible cross-talk.)**

14          MR. ICHTER:  I think the word that John was looking

15    for that Homeland Security uses in describing these systems as

16    vulnerable.

17          MR. SALTER:  I think it is --

18              **(Unintelligible cross-talk.)**

19          MR. BARNES:  Every system is vulnerable every day.

20          MR. ICHTER:  I think I made that point.

21          MR. SALTER:  This particular thing is treated

22    differently under the Department of Homeland Security's

23    protocols.  That is why there is a specific national

24    security -- a security exemption for these materials.  And

25    there is actually a Court of Appeals case that says that, *Smith*

*vs. Dekalb County.*

I do not know that we will produce this under any circumstance, Your Honor, to be quite frank with you. I just want to put that out there. I don't know --

THE COURT: All right.

MR. SALTER: And what I will not do -- although I will bring people that I can liaison with if I can get them there tomorrow. But what I will not do is subject them to interrogation by the plaintiffs' counsel. Because that might undermine the security of the system. And I'm not going to be forced to choose in a catch 22 between giving discovery in order to continue letting the state do its job with elections and the other.

And I am -- I continue to ask the Court to consider the fact that this -- that by them holding out until they get manuals and mirror images of data --

THE COURT: I --

MR. SALTER: -- to consider the fact that that puts us -- the position that that puts us in in terms of making this system more vulnerable than it is.

THE COURT: All right. Mr. Salter, I think we're looking at multiple different solutions. And I just -- I don't -- I really don't appreciate basically being told the world is going to basically fall apart or explode if this happens. It is not helping us.

1          If you have a regulation, tell me.  We're asking for

2    some resources.  I'm going to tell Mr. Ichter not to make any

3    threats whatsoever because it doesn't help.  That obviously has

4    impeded some of the problem -- some of the solution-making

5    here.

6          And -- but your firm also has some very smart people

7    working for it.  And so if you are driving or you can't reach

8    somebody, I am sure if you are needing to get one piece of

9    information, two pieces of information that somebody else in

10   the firm can do it to assist.

11         So I just -- I would appreciate seeing the regulation

12   or the state law that expressly states that no -- that this is

13   basically immune from disclosure ever and -- because there are

14   lots of things under state law that are not supposed to be

15   disclosed but are disclosed under a protective order.  But it

16   doesn't mean that that is what should happen here.

17         But I just -- these counties want these machines.

18   And they seem to need them for orderly operation of -- at least

19   some of them.  And it doesn't sound like Cobb necessarily does.

20   But Dekalb does.  And I would like to address that concern.

21   And I just don't think at this point that you-all have done --

22   had the level of communication necessary in order to resolve

23   this.  And I think it is resolvable.

24         So we'll reserve the room at 3:30.  Ms. McConochie

25   will be in touch.  And if I have to have a hearing at 5:00 --

1   it may be 5:30 for all I know.  But I hope I don't have to have

2   the hearing, frankly.  Because I have to -- I have to proceed

3   with what is already on my agenda.  And you-all have a

4   time-sensitive problem.  And that is why I'm saying come down

5   on Thursday.  If it wasn't time-sensitive, I would say sure,

6   let's wait another two weeks.  But it is time-sensitive.

7           Thank you very much.

8               **(Unintelligible cross-talk.)**

9           MR. SCHNELL:  One quick point.  This is Grant Schnell

10  on behalf of Merle King.  And if I could just have ten seconds

11  here.

12          THE COURT:  Yes.

13          MR. SCHNELL:  We haven't had any real substantive

14  position on any of these discussions and even during this call.

15  I'll gladly come down tomorrow at 3:30 for the meeting and

16  hearing.  But if it is agreeable -- and I'll work it out with

17  the plaintiffs' side after this.  But if we could be excused

18  from that just so that we would not have -- I mean, I don't

19  know that I would have anything to add.

20          THE COURT:  Well, if plaintiffs' counsel agree, that

21  is fine.

22          MR. McGUIRE:  We do, Your Honor.  From the Coalition

23  plaintiffs, we have no reason to think that Mr. Schnell should

24  be there.

25          COURT REPORTER:  Who was that speaking?

```
 1              MR. McGUIRE:  I'm sorry.  That was Robert McGuire for
 2    the Coalition plaintiffs.
 3                    (Unintelligible cross-talk.)
 4              MR. SALTER:  Your Honor, this is -- go ahead,
 5    Catherine.  I'm sorry.  Go ahead.
 6              MS. CHAPPLE:  No.  That is okay.  This is Catherine
 7    Chapple with the Curling plaintiffs.  We also agree.
 8              THE COURT:  All right.  Well --
 9              MR. SCHNELL:  Thank you, Judge.
10              MR. SALTER:  Your Honor, this is John Salter.  Do we
11    have any insight into -- you know, we filed a notice and tried
12    to lay out our -- where we stand on our position on immunity.
13    Does the Court have any indication of your intent to --
14                    (Technical interference.)
15              MR. SALTER:  -- what to do with putting the case back
16    open -- although I'm not sure it makes a difference right
17    now -- and/or the motions to dismiss?
18              THE COURT:  You know what?  I will issue an order or
19    talk to you about it tomorrow.  Okay.
20              MR. McGUIRE:  Thank you, Your Honor.
21              MR. SALTER:  Thank you, Judge.  We would appreciate
22    that.
23              THE COURT:  Thank you.  Bye-bye.
24                    (The proceedings were thereby concluded at 5:28
25                    P.M.)
```

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


     I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

the United States District Court, for the Northern District of

Georgia, Atlanta Division, do hereby certify that the foregoing

58 pages constitute a true transcript of proceedings had before

the said Court, held in the City of Atlanta, Georgia, in the

matter therein stated.

     In testimony whereof, I hereunto set my hand on this, the

15th day of May, 2018.




                         _____
                         SHANNON R. WELCH, RMR, CRR
                         OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT