## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRIAN KEMP, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CURLING PLAINTIFFS' S MEMORANDUM IN SUPPORT OF THEIR</u>
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................1

II.  STATEMENT OF FACTS .......................................................................2

III. ARGUMENT ........................................................................................12

   A.   Plaintiffs Are Likely to Succeed on the Merits ........................................13

      1.   *The Curling Plaintiffs Have Standing to Pursue Their Claims* ................. 13

      2.   *The Curling Plaintiffs Are Likely to Succeed on their Constitutional*
           *Claims* ....................................................................... 15

   B.   Irreparable Harm Will Occur Absent Court Intervention ..................21

   C.   Balancing the Equities and Considering the Public Interest Heavily
        Favor Relief. ............................................................................23

IV.  CONCLUSION ....................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)) ............................................................... 15, 16, 21

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ...................................................................... 15, 16

*Bush v. Gore*,
  531 U.S. 98 (2000) ...............................................................................16

*Common Cause/Ga. v. Billups*,
  406 F. Supp. 2d 1326 (N.D. Ga. 2005) ..............................................22

*Common Cause/Ga. v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) ........................................... 13, 14, 20

*Const. Party of Pa. v. Cortes*,
  877 F.3d 480 (3d Cir. 2017) ...............................................................18

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008) ...................................................................... 20, 21

*Dunn v. Blumstein*,
  405 U.S. 330 (1972) .............................................................................19

*Estate of James v. Weigle*,
  No. 1:14-CV-4027-CAP,
  2015 WL 12683822 (N.D. Ga. Aug. 13, 2015)...................................18

*Fla. State Conference of N.A.A.C.P. v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ................................................... 14, 15

*Frontiero v. Richardson*,
  411 U.S. 677 (1973) .............................................................................19

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ..............................................................22

*League of Women Voters of Fla., Inc. v. Detzner*,
  No. 4:18-CV-251-MW/CAS,
  2018 WL 3545079 (N.D. Fla. July 24, 2018)............................................... passim

*League of Women Voters of Ohio v. Brunner*,
  548 F.3d 463 (6th Cir. 2008) .................................................................17

*N.A.A.C.P. State Conference of Pa. v. Cortes*,
  591 F. Supp. 2d 757 (E.D. Pa. 2008) ....................................................16

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) .................................................................15

*One Wis. Inst., Inc. v. Thomsen*,
  198 F. Supp. 3d 896 (W.D. Wis. 2016) .................................................14

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ..................................................................................25

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) .............................................................12

*Stewart v. Blackwell*,
  444 F.3d 843 (6th Cir. 2006) .................................................. 16, 18, 19

*Tashjian v. Republican Party of Conn.*,
  479 U.S. 208 (1986) ..............................................................................21

*United States v. Georgia*,
  892 F. Supp. 2d 1367 (N.D. Ga. July 5, 2012)....................................... 22, 24, 25

## Other Authorities

O.C.G.A. § 21-2-385 (2017).....................................................................23

O.C.G.A. § 21-2-386 (2017).....................................................................23

O.C.G.A. § 21-2-418 (2017).....................................................................24

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ...................................................................................12

## I.    INTRODUCTION

"Voting is the beating heart of democracy." *League of Women Voters of Fla., Inc. v. Detzner*, No. 4:18-CV-251-MW/CAS, 2018 WL 3545079, *6 (N.D. Fla. July 24, 2018).  This unassailable truth is just one of the many facts that are not in dispute in this case.  It is also undisputed that the sanctity of our election system is under unprecedented attack from assailants both known and unknown. The extent to which the country's elections have been and remain a target of interference is a near-daily headline, and Georgia's election system in particular already has been targeted—and is virtually certain to be targeted again.

Georgia's election system indisputably is one of the most vulnerable in the country, primarily as the result of being one of the few states with an all-electronic, unverifiable voting system.  Law enforcement officials, Congress, and industry experts agree that systems like Georgia's are the least protected against the current threat.  Indeed, Georgia's Secretary of State has repeatedly acknowledged that DREs ***should be replaced*** with a system that allows for verification.

The only dispute before this Court is whether the State Defendants' persistent refusal to replace the DRE system places an unconstitutional burden on Plaintiffs Donna Curling, Donna Price, and Jeffrey Schoenberg's (the "Curling Plaintiffs") right to vote under the Fourteenth Amendment.  Defendants insist on

subjecting the Curling Plaintiffs—and all other Georgia voters—to a system they acknowledge needs to be replaced and that the election security community has unanimously decried as inherently unsecure, at a time when every U.S. intelligence agency has concluded that threat of election interference is "real" and "continuing."  Even if the efforts required to replace this system were substantial (*and they are not*), they nonetheless would be required as a matter of law given the enormous interest of the Curling Plaintiffs and the public in a secure election. There is perhaps no more fundamental right in a democracy than for the people to choose their leaders.  The deprivation of this right is unquestionably irreparable, especially given that it likely cannot even be detected under the current system.

The Curling Plaintiffs respectfully request that this Court enter a preliminary injunction that requires Defendants to do what they have long admitted needs to be done but have shown they will not do before the next election, *if ever*—namely, prohibit the use of DREs and require the use of paper ballots, as detailed in the Proposed Order filed with this Memorandum.[1]

## II.   STATEMENT OF FACTS

*There is Overwhelming Consensus that Georgia's System Is Unsecure*

---

[1] The Curling Plaintiffs will address the factors outlined in the Court's Order dated August 7, 2018 (Dkt. No. 259) in our reply brief, as the Court ordered Coalition Plaintiffs to do in response to Defendants' Opposition.

2

Computer scientists and cybersecurity experts universally urge against the use of DREs.  (Dkt. No. 15-2 ¶ 7.)  Every peer-reviewed study of these systems has found them to be incapable of ensuring safe elections.[2]  (Buell Decl. ¶ 10.)  And every laboratory attempt to hack DREs has been successful.  (Buell Decl. ¶ 7.)  Georgia's testing procedures are incapable of preventing an attack.  (Halderman Decl. ¶¶ 35-48.)  Despite this, Georgia is one of only five states that continue to rely exclusively on DREs for voting.[3]

*Georgia's DRE Machines Are Highly Susceptible to an Attack*

Georgia's non-absentee voting system relies entirely on the use of touchscreen DREs, which are supposed to record individuals' votes onto a memory card stored in each DRE machine.  The DREs used by Georgia include a

---

[2] Ohio Sec'y of State, *EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing*, 103 (Dec. 7, 2007) ("EVEREST Study"), http://www.patrickmcdaniel.org/pubs/everest.pdf ("Our analysis suggests that the Premier system lacks the technical protections necessary to guarantee a trustworthy election under operational conditions."); Joseph A. Calandrino et al., *Source Code Review of the Diebold Voting System*, at i, University of California, Berkeley (2007), ("Source Code Review"), http://votingsystems.cdn.sos.ca.gov/oversight/ttbr/diebold-source-public-jul29.pdf ("[T]he technological controls in the Diebold software do not provide sufficient security to guarantee a trustworthy election.").

[3] *See* U.S. Comm. On H. Admin. – Democrats, *Election Security Update: Top 18 Most Vulnerable States*, at 4 (July 2018) ("Election Security Update"), https://democrats-cha.house.gov/sites/democrats.cha.house.gov/files/Election_Security_Update.pdf?wpisrc=nl_cybersecurity202&wpmm=1.

combination of AccuVote TS DREs and AccuVote TSx DREs.  (Halderman Decl.

¶ 6.) They leave no paper trail of a voter's selections – a voter only sees their

"vote" on the screen, and must trust that it is recorded and transmitted

electronically without interference or manipulation. (Buell Decl. ¶ 13.)[4]

Another critical vulnerability in Georgia's DREs is their use of out-of-date

software.  Like many personal computers, Georgia's DREs use Windows as their

operating software.  (Halderman Decl. ¶ 27.) The DREs also use software called

BallotStation to program and conduct its elections. (*Id.*at ¶ 25.)  BallotStation

interacts with the voter, accepts and records votes, counts the votes, and performs

all other election-related processing. (*Id.*)  The versions of Windows and

BallotStation used by Georgia (4.1 and 4.5.2!, respectively) are many years out of

date—the makers of the software no longer support or provide security patches for

the versions in use by Georgia.  (Halderman Decl. ¶¶ 24-28.)  These additional

security risks further compromise the integrity of Georgia's voting system.  (*Id.*)[5]

---

[4] Memory cards transmit data between the DREs and the central GEMS server and contain "all of the information about an election, including the ballot definition and the tallied election results." EVEREST Study at 130.  Before an election, the central GEMS server communicates the election programming and other files onto the memory cards.  The memory cards are then inserted behind a locked door in each DRE machine.  (Halderman Decl. ¶¶ 20, 30.)

[5] Recent reports indicate that  ES&S (the primary vendor of DRE machines and software in Georgia) has admitted that it provided remote connection software on systems it sold during the years Georgia purchased its DREs. Discovery will show

*Georgia's Central Server Is Also Highly Susceptible to an Attack*

Georgia uses a single central server—a GEMS server—to create the ballot definitions that encode every election.  The central GEMS server is another easy target for malicious interference in Georgia's elections.  Any intrusion could permit an attacker to spread malicious code to every single DRE in Georgia. (Halderman Decl. ¶¶ 29-34, Buell Decl. ¶ 11.)

The most obvious and dangerous vulnerability is that the central GEMS server used to program every electronic voting machine in Georgia was readily accessible (via its Internet connection) for months (and possibly years) before and after the November 2016 election.  On August 24, 2016, cybersecurity researcher Logan Lamb was able to download GEMS databases (.mdb files), Election Day supervisor passwords, and Windows executables and dynamic-link libraries (DLLs).  (Lamb Aff., Dkt. No. 15-1, ¶ 4.)  The public availability of this extraordinarily sensitive information to anyone with internet access created numerous security risks, including the ability to easily compromise an entire

---

whether remote access is included in the software installed on Georgia's DREs, creating another open door for hackers.  (Halderman Decl. ¶ 32.)

election.[6]  This single vulnerability—one of many—permitted any malicious actor

to dictate ***any future Georgia election***.

In addition, Lamb found that the server was running a version of Drupal that

would allow any hacker to gain full control of Georgia's GEMS server, aptly

referred to as "drupalgeddon."  (Lamb Aff., Dkt. No. 15-1 ¶¶ 5, 9; Buell Decl. ¶

13.)  Drupal itself issued a warning regarding drupalgeddon, advising that "a

vulnerability in this API allows an attacker to send specially crafted requests

resulting in  arbitrary SQL injection," a form of hacking that can result in the

exposure of sensitive data such as voter registration lists (Buell Decl. ¶¶ 13-14.)

Mr. Lamb immediately warned the State Defendants' agents. (Lamb Aff.,

Dkt. No. 15-1 ¶¶ 5-6.)  Six months later, Mr. Lamb checked to see if these security

loopholes had been closed—they had not.  (*Id.* ¶¶ 7-8.)  Even an unsophisticated

hacker easily could have accessed the server to implant malicious code to erase or

change votes, for example.  (Halderman Decl. ¶ 14; Buell Decl. ¶ 10.)  Even if the

State Defendants' agents took corrective action, they ***could not*** safeguard against

malicious code that may have already been inserted into the system during the

---

[6] "[T]o exploit this vulnerability, an attacker requires a few minutes access to the
GEMS server file system.  In particular, the .mdb files used to store election
information and results…. Example modifications include changing a ballot
definition after a database has been "set-for-election'…, manipulating the audit log
to hide tampering, and creating new database users with administrative access."
EVEREST Study at 124-25.

period of vulnerability.  Such code can be programmed to be activated only at a later date, such as November 6, 2018.  (Halderman Decl. ¶ 38.)

*An Attack Is Likely to Be Undetectable and Its Impact Unknown*

Unfortunately, the lack of proof that an election has been manipulated does not mean that no manipulation has occurred.  (Halderman Decl. ¶¶ 14, 34.)  The current system does not allow Georgia's officials or cybersecurity experts to rule out vote-stealing and assure voters that their votes were accurately recorded and counted.  (Buell Decl. ¶ 9.)  The so-called "logic and accuracy testing" employed by Georgia's election officials can be fooled—sophisticated hackers will design their malicious code to detect when a system is being "tested" and program it only to "cheat" during a real election.  (Halderman Decl. ¶ 37.)  Any sophisticated attempt to interfere in Georgia's elections surely will include malicious software code that is written to evade detection:  by performing properly when tested, by lying dormant until Election Day, by erasing itself after Election Day, and numerous other ways to avoid discovery.  (Halderman Decl. ¶¶ 37, 45-48; Buell Decl. ¶ 12.)  Georgia's standard testing will be incapable of ruling out such tampering.  (Halderman Decl. ¶ 44.)

Further, audits of the results would be unavailing.  Because Georgia's system has no voter-verified paper trail of a voter's selections, there is no way to

7

check the electronic records against anything except those same electronic records. (Halderman Decl. ¶¶ 41, 46; Buell Decl. ¶ 13.)  If Georgia's officials or voters suspect that an attack has occurred, Georgia's DRE system provides **_no way_** to conduct an audit or recount that would do anything but re-print the suspicious election results.

*Interference in Elections Has Already Occurred, and Is Expected to Escalate*

In January 2017, the Office of the Director of National Intelligence released a report documenting Russian interference in the 2016 election.[7]  The report found that Russia's activities during the 2016 election represented a "significant escalation in directness, level of activity, and scope of effort compared to previous operations" "to undermine the US-led liberal democratic order".[8]  These findings were confirmed throughout 2017.[9]

As recently as August 2, 2018, the White House and some of the highest-ranking law enforcement officials confirmed that foreign efforts to influence our

---

[7] U.S. Office of the Dir. of Nat'l Intelligence, *Background to "Assessing Russian Activities and Intentions in Recent US Elections": The Analytic Process and Cyber Incident Attribution* (Jan. 6, 2017),
https://www.dni.gov/files/documents/ICA_2017_01.pdf.

[8] *Id.* at ii.

[9] Nicole Gaudiano & David Jackson, *Despite Trump's comments, CIA stands by assessment that Russia meddled in election*, USA Today (Nov. 11, 2017), https://www.usatoday.com/story/news/politics/2017/11/11/despite-trumps-comments-cia-stands-assessment-russia-meddled-election/855212001/.

elections are ongoing and will continue.  As FBI Director Christopher Wray stated, "Russia attempted to interfere with the last election and continues to engage in malign influence operations to this day. This is a threat we need to take extremely seriously and to tackle and respond to with fierce determination and focus."[10]  The Russian-led effort is constant, "24-7 365-days-a-year."[11] According to Secretary of Homeland Security Kirstjen Nielsen, "[o]ur democracy itself is in the cross hairs," confirming that the federal government has "seen a willingness and a capability on the part of the Russians" to interfere in U.S. elections, including by hacking into voter rolls and voting machines.[12]

Moreover, Georgia is a known and easy target.  In a report published by the Committee on House Administration, House members highlighted five "Tier 1" states, representing the states with "the most serious election security vulnerabilities": Delaware, Louisiana, South Carolina, New Jersey, and Georgia.[13] The report highlights that Georgia's vulnerabilities are directly related to its reliance on electronic voting machines that do not create a voter-verified paper

---

[10] Michael D. Shear & Michael Wines, *Russian Threat 'Is Real,' Trump Officials Say, Vowing to Protect U.S. Elections*, N.Y. Times (Aug. 2, 2018), https://www.nytimes.com/2018/08/02/us/politics/russia-election-security-midterm.html.
[11] *Id.*
[12] *Id.*
[13] *Election Security Update* at 1, 3-5.

trail.[14]   Georgia's voting system "[makes] it impossible to verify if the counts produced by the electronic voting machines are accurate."[15]

Georgia has already been targeted.  The Special Counsel's investigation into Russian interference in the 2016 election found that Russia specifically targeted Georgia.[16]   An October 28, 2016 indictment alleges that Russian hackers probed certain counties in Georgia "to identify vulnerabilities."[17]  This is exactly how an attacker would be expected to proceed before implanting malicious software in Georgia's vulnerable system.  (Halderman Decl. ¶ 34.)

*Defendants' Conduct Amplifies the Risks Associated with the Current System*

Defendants have taken no meaningful action in the face of known threats. When asked as recently as July 30, 2018, how he could assure voters about the security of Georgia's election system, Secretary Kemp stated he believes Georgia's unchanged voting procedures are "robust" and "as good as anybody in the country,

---

[14] *Id.* at 4.

[15] *Id.*

[16] See *United States v. Netyksho et al.*, No. 1:18-cr-00215-ABJ, Indictment ¶ 72, Dkt. No. 1 (D.D.C. July 13, 2018).

[17] *Id.*  In the same indictment, the Government accuses these agents of hacking at least one state's voter registration database, leading to the theft of thousands of voter information.

and there is no question about that."[18]   However, Secretary Kemp has readily acknowledged that the system needed to be replaced with those that provide an auditable paper trail.[19]  His counsel has admitted the same.  (Dkt. No. 186 at 28:22, "everybody admits we are going to replace these.")

On April 13, 2018, Secretary Kemp announced an initiative intended to "secure" Georgia's voting system:  the Secure, Accessible & Fair Elections (SAFE) Commission.[20]  Since the announcement, however, it has met only once.[21] There is no evidence that SAFE has implemented or even adopted any changes, much less that it will do so in time for the midterm election, as Kemp acknowledged its next meeting had not even been scheduled as of July 30, 2018.[22]

Defendants' inaction is even more troubling in the face of numerous and specific warnings they have received about serious security lapses in Georgia's

---

[18] Martha Dalton, Kemp: 'Robust' Systems Will Keep Georgia Elections Secure, WABE (July 30, 2018), https://www.wabe.org/kemp-robust-systems-will-keep-georgia-elections-secure/.

[19] "After the success of our pilot project last November using new voting equipment with a voter-verified paper trail, it is time for the state to move forward with phasing out our current voting equipment . . ." Press Release, *Kemp Creates Commission to Review New Voting System*, Ga. Sec'y of State (Apr. 13, 2018), http://sos.ga.gov/index.php/general/kemp_creates_commission_to_review_new_voting_system.

[20] *Id*.

[21] Ga. Sec'y of State, Tr. of SAFE Comm'n meeting (June 13, 2018), http://sos.ga.gov/admin/uploads/SAFE%20Commission%20Transcript%20June_13_2018.pdf.

[22] Dalton, *supra* note 18.

election infrastructure.  For instance, although Mr. Lamb warned Defendants about the vulnerability of the KSU Server in 2016, Defendants evidently did nothing to secure it, as the KSU Server was still wide open to the public six months later. (Lamb Aff., Dkt. No. 258-1 ¶ 16.)  This is just one example of a pattern: Defendants use software with known security vulnerabilities that has not been patched for years (Halderman Decl. ¶¶ 25-28); Defendants use machines that have been demonstrably hacked in minutes; (*Id.*); and Defendants rely on a system law enforcement officials warn against and other states have abandoned.[23]  Defendants have essentially ignored over a decade of credible and serious warnings about the vulnerability of its DRE voting system.

## III.   ARGUMENT

The Curling Plaintiffs readily meet the requirements necessary for this Court to issue a preliminary injunction.  *See League of Women Voters*, 2018 WL 3545079, at *6 (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)). Plaintiffs are likely to succeed in proving a violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  U.S. Const. amend. XIV, § 1. Forcing the Curling Plaintiffs to use DREs to vote in-person imposes a severe

---

[23] California decommissioned DRE machines in 2007.  Cal. Sec'y of State, News Release (revised Aug. 15, 2007), http://votingsystems.cdn.sos.ca.gov/oversight/ttbr/ttbr-qa-final-081507.pdf.

burden given the unsecure, unverifiable nature of the DREs, coupled with the imminent threat of attacks to that system. Defendants must show a compelling state interest in the use of DREs to justify this severe burden. They cannot. Indeed, the use of DREs actually ***undermines*** important state interests, such as the interest in preventing fraud and promoting voter confidence.

The other factors similarly favor the Curling Plaintiffs. Plaintiffs will unquestionably suffer irreparable injury absent relief—such injury is presumed in cases involving the right to vote. Because the injury to the Curling Plaintiffs far outweighs any injury to the State Defendants in implementing an alternative system, and because an injunction is unquestionably in the public's interest, injunctive relief should be granted.

### A. Plaintiffs Are Likely to Succeed on the Merits

#### 1. *The Curling Plaintiffs Have Standing to Pursue Their Claims*

Each of the Curling Plaintiffs meets the requirements for standing: (1) each has suffered—and face an imminent prospect of future suffering—invasions of their right to vote resulting in "concrete and particularized" injuries; (2) the Curling Plaintiffs' injuries were caused by Defendant's actions; and (3) their injuries or threat of injuries are likely to be redressed by the relief they seek. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009) (quoting *Fla.*

*State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1159 (11th Cir. 2008)).

Each Plaintiff has suffered or has an imminent prospect of suffering a concrete injury because each Plaintiff is required to either vote in person using DREs or to go through the burdensome process of voting absentee. (Curling Decl. ¶ 12; Price Decl. ¶ 13; Schoenberg Decl. ¶ 10.) *See Common Cause*, 554 F.3d at 1351-52 ("Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing."). The experience of Ms. Curling illustrates that voting absentee via paper ballot is not the simple substitute described by Defendants. Ms. Curling undertook substantial effort to make sure her absentee ballot was turned in on time, only to learn *in this litigation* that there was no record of her vote. (Curling Decl. ¶ 11.) Forcing voters to engage in such election roulette is sufficient injury to confer standing. *See One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 909 (W.D. Wis. 2016) (having to present photo ID to vote in-person sufficient injury for standing).

Defendants' refusal to fix the DRE system is also the cause of the Curling Plaintiffs' injury. Defendants readily can enhance election security but have done virtually nothing; if anything, their latent response to known vulnerabilities in

Georgia's system has made matters worse by effectively painting a target on that system for November.  Finally, the Curling Plaintiffs' injury can be readily redressed by the Court.  Plaintiffs merely ask the Court for an order that unsecure aspects of the current system not be used and that any system have the minimal, verifiable safeguards universally recommended by experts and law enforcement officials.  Each of the Curling Plaintiffs has standing to seek such relief.

        2. *The Curling Plaintiffs Are Likely to Succeed on their Constitutional Claims*

  "It is beyond cavil that voting is of the most fundamental significance under our constitutional structure."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotation marks omitted).  In evaluating a state's election law imposing restrictions on the right to vote,[24] courts utilize a "sliding-scale balancing analysis." *League of Women Voters*, 2018 WL 3545079, at *6.  The Court "must weigh 'the character and magnitude of the asserted injury to'" the right to vote against "the precise interests put forward by the State as justifications for the burden imposed

---

[24] Because courts have applied the *Burdick-Anderson* test to claims involving the right to vote under both the Equal Protection and Due Process Clauses, the Curling Plaintiffs address both claims together for purposes of seeking injunctive relief. *See League of Women Voters*, 2018 WL 3545079 at *6 (applying *Burdick-Anderson* to general claims asserted under First and Fourteenth Amendments); *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (Equal Protection Clause applies when state places restrictions on the right to vote); *Serv. Emps. Int'l Union, Local 1 v. Husted*, 906 F. Supp. 2d 745, 750 (S.D. Ohio 2012) (same).

by its rule," and the extent to which those interests make the burden necessary. *Burdick,* 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983)) (internal quotation marks omitted).  Where, as here, the burden on the right to vote is severe, the state must show a compelling state interest that justifies the burden imposed and the restriction must be narrowly tailored to that interest. *League of Women Voters*, 2018 WL 3545079, at *6.

"It cannot be denied that the malfunctioning of DRE voting machines, either because of human error or mechanical failure, causes a significant injury whenever voters are effectively denied the right to cast their ballots."  *N.A.A.C.P. State Conference of Pa. v. Cortes*, 591 F. Supp. 2d 757, 764 (E.D. Pa. 2008). The same reasoning should clearly apply when voters are denied their right as the result of intentional interference.  That said, the actual denial of the ability to vote is not necessary, as "[i]t must be remembered that the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."  *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (citation omitted); *see e.g. Stewart v. Blackwell*, 444 F.3d 843, 876 (6th Cir. 2006) (plaintiffs stated constitutional claims over use of voting technology that increased risk of vote being discounted) *vacated as moot, superseded,* 473 F.3d 692; *League of Women Voters of Ohio v. Brunner*, 548 F.3d

463, 478 (6th Cir. 2008) (allegations of poor voting conditions, including, long lines, inadequate poll worker training, and failing touchscreen machines, supported claim for dilution of votes in violation of Equal Protection and Due Process Clauses).

Defendants' use of DREs severely burdens the Curling Plaintiffs' exercise of their right to vote.  The current DRE system contains serious security flaws at every level, including: (1) machines that are susceptible to viruses and other malicious code and produce unverifiable results; (2) memory cards that can be easily compromised and used as a vehicle for malicious code; and (3) a central server that, while serving as the state's central nervous system for elections, was recently exposed for an unknown period of time.  It is also highly likely that an attack would be undetectable.  (Halderman Decl. ¶ 44.)  Because Georgia's system leaves no voter-verified paper trail of a voter's selections, there is no way to check the electronic records against anything else to determine whether there has been a breach.  (*Id.* ¶¶ 41, 46.)  Thus, the current system provides little protection against an attack, and little ability to investigate whether an attack has occurred.

Although the existence of these pervasive security flaws, alone, place an unconstitutional burden on the Curling Plaintiffs' rights, this Court must not "review such claims in a vacuum but do so with a focus on the real world

justifications and implications of [Defendants'] decision[s]." *Stewart*, 444 F.3d at 876; *see Const. Party of Pa. v. Cortes*, 877 F.3d 480, 485–86 (3d Cir. 2017) (discussing the "fact-intensive" inquiry into whether challenged regulation burdens constitutional right). Here, the context shows just how severe the burden is, as U.S. elections, and Georgia's specifically, are in the cross hairs for both state-sponsored and freelance hackers set on disrupting the voting process. Unfortunately, Georgia is an easy target. Thus, far beyond some hypothetical threat of harm to the Curling Plaintiffs and others, the threat that their votes will be diluted or discounted is more acute than ever.

Defendants' conduct only adds to the burden on the Curling Plaintiffs' rights. While all but a few states have eliminated DREs, Defendants merely have established a committee that has met once. (*See supra* § 2.) When the Secretary of State's office was warned about the vulnerability of the server responsible for carrying out elections, nothing was done for months. (*See supra* § 2.)[25] And, while publicly renouncing the current DREs, the Secretary of State and other

---

[25] Even after the Secretary of State's office acted, the evidence that would show whether there had in fact been an actual breach, and any information accessed, was deleted ***after this litigation was filed***. (Dkt. No. 107.) The consequences of Defendants' agents' spoliation of highly critical evidence will be the subject of a forthcoming motion for an adverse inference. *Estate of James v. Weigle*, No. 1:14-CV-4027-CAP 2015 WL 12683822, at *8 (N.D. Ga. Aug. 13, 2015) (defendants entitled to presumption that inspection of missing evidence would have been non-favorable to plaintiffs).

Defendants have done virtually nothing to cure its deficiencies. This unfortunate combination of inherent risk, actual threat, and persistent inaction show that the use of DREs constitutes a severe burden on the Curling Plaintiffs' right to vote.

As result, Defendants must show significant, "precise" interests that "explain why it is necessary to burden the plaintiff's rights,'" and show that the burden is narrowly tailored to further that interest. *League of Women Voters*, 2018 WL 3545079, at *10 (citation omitted). They cannot do so. The state's interests in election ease or efficiency hardly justifies the risk that the Curling Plaintiffs' and others' votes will be compromised by using DREs. "Administrative convenience is simply not a compelling justification in light of the fundamental nature of the right." *Stewart*, 444 F.3d at 869 (citing *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) (plurality)).

In addition, there are readily available alternatives that promote the state's interest and impose a far lesser burden on the Curling Plaintiffs' right to vote. *See Dunn v. Blumstein*, 405 U.S. 330, 343 (1972) ("And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'"). Georgia is one of only a few states that rely

19

solely on an all-electronic system, and Defendants have not shown—and cannot show—why some other, safer means of voting could not be implemented soon.

Moreover, Defendants' insistence on using DREs undermines other important state interests, such as safeguarding voter confidence, preserving election integrity, and curbing election fraud/manipulation. "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008); *see also Common Cause*, 554 F.3d at 1355 (Georgia has legitimate interest in preventing voter fraud). Georgia's DREs are unsecure.  Plaintiffs' collective testimony demonstrates that the use of Georgia's unsecure system has greatly diminished their and others' confidence that their votes will be counted, particularly in light of the active threat of interference. (Curling Decl. ¶ 12, Price Decl. ¶ 13, Schoenberg Decl. ¶ 10). Thus, Defendants' continued use of DREs is contrary to their own interest in protecting the integrity of elections, an interest which the state has used to justify other voting restrictions. *See Common Cause*, 554 F.3d at 1355 (use of photo identification furthered interest in preventing voter fraud).  This contradiction shows that Defendants cannot justify the significant burden imposed by using DREs.

Even if the Court were to apply a more deferential standard (and it should not), Defendants cannot show any "sufficiently weighty" or otherwise "important regulatory interests" that justify the continued use of DREs. *Crawford*, 553 U.S. at 191; *Anderson*, 460 U.S. at 788; *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217 (1986) (state's "power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote"). Indeed, far from showing a weighty reason for their continued use, the Secretary of State himself has readily acknowledged the need to ***replace*** DREs with a system that enables a paper audit. (*See supra* § 2.) His counsel has acknowledged the same. (Dkt. No. 186 at 28:22.)

All-electronic systems like Georgia's have been condemned by government agencies, elected officials, and industry experts, in part because they undermine the government's interest in promoting free and fair elections. Safer alternatives exist that do not compromise the state's interest in efficiency or accuracy. And, Defendants themselves recognize the need for change. But they refuse to act. The Fourteenth Amendment does not permit so great an intrusion on the right to vote with so little justification. Thus, the Curling Plaintiffs are likely to succeed on the merits of their constitutional claims.

## B. Irreparable Harm Will Occur Absent Court Intervention

Absent injunctive relief, it is likely that the Curling Plaintiffs' fundamental right to have their votes accurately and equally counted in the upcoming midterm election will be impaired.  Impairment of voters' right to vote constitutes substantial and irreparable harm.  *See Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005) ("Denying an individual the right to vote works a serious, irreparable injury upon that individual."); *United States v. Georgia*, 892 F. Supp. 2d 1367, 1375-76 (N.D. Ga. July 5, 2012) (same).  "Courts routinely deem restrictions on fundamental voting rights irreparable injury" because "once the election occurs, there can be no do-over and no redress." *League of Women Voters of  N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

It is beyond dispute that the Curling Plaintiffs' right to vote is under attack and that Georgia's DREs are highly vulnerable to numerous types of attacks from both sophisticated and even unsophisticated actors.  (Halderman Decl. ¶¶ 35-48.) Thus, absent an injunction, the Curling Plaintiffs' votes in the upcoming election will be debased merely by the well-founded doubt infecting Georgia's inadequate voting system and the impossibility of auditing results to remove that doubt. The Curling Plaintiffs have shown that the current system has caused and will continue to cause them irreparable injury.  (Curling Decl. ¶¶ 11-12, Price Decl. ¶¶ 12-13, Schoenberg Decl. ¶¶ 7-8.)  Given the importance of their right to vote, the

22

likelihood of their votes being diluted or lost, and the inadequacy of any *ex post*

redress, this factor cuts strongly in favor of granting the requested injunction.

### C. Balancing the Equities and Considering the Public Interest Heavily Favor Relief

Although Defendants will attempt to justify continued use of the DREs

because of the "inconvenience and/or disruption" caused by change (Dkt. No. 228

at 3), the burden on Defendants in implementing an injunction is far outweighed by

the injury to the Curling Plaintiffs (and Georgia voters at large). Moreover, the

Curling Plaintiffs' requested relief minimizes the administrative burden by

leveraging existing processes in order to maintain the public interest in an efficient

election while promoting the public interest in a secure election. Thus, both factors

weigh heavily in the Curling Plaintiffs' favor.

Georgia already has the framework in place for processing and counting

absentee paper ballots sent in by mail. *See* O.C.G.A. §§ 21-2-385, -386 (2017).

Georgia also has the framework in place for *in-person* paper ballots given the

current law governing provisional ballots. Georgia law provides for the use of

paper provisional ballots (in the same form as absentee ballots) in instances where:

(1) DRE units at a polling place malfunction or some other emergency exists; (2) a

person does not appear on the registered list but expresses a good faith belief of

their eligibility and completes the requisite forms/affirmations; and (3) poll closing

times are extended by court order in a federal election. *See* O.C.G.A. § 21-2-418(a)-(h) (2017). Given that the law requires paper ballots to be available, ***including when DREs are unreliable*** (as they inherently are), Defendants, by law, must have the procedures in place for the processing and counting of such votes.

Thus, the primary challenge is determining how the state will handle the increased volume of paper ballots. There are many ways to minimize the burden of providing paper ballots at polling stations and ensure a smooth transition, several of which are included in the Curling Plaintiffs' Proposed Order: (1) mailing absentee ballots to all registered voters with pre-paid postage in order to encourage voters to send in their ballots by mail prior to Election Day; (2) centralizing ballot counting across counties to eliminate the need for optical scanners in every precinct; and (3) procuring additional ballot scanners for deployment in heavily populated areas so that paper ballots are quickly counted.

Ultimately, the costs of the steps to secure Georgia's election are far outweighed by the Curling Plaintiffs' injury absent relief. *See United States v. Georgia*, 892 F. Supp. 2d at 1375-77 (N.D. Ga. July 5, 2012) (Georgia's potential financial and human capital burdens, and diminished time to prepare for an election, "are substantially outweighed by the threatened injury to [] voters."). Moreover, if the Court denies relief merely because of the costs and administrative

24

issues associated with change, then the State Defendants would benefit from their failure to act over the last year this litigation has been pending.  The proposed injunction relieves the Curling Plaintiffs of the burden of voting on an unsecure machine; the costs of doing so are not severe and any such costs are the result of the State Defendants' refusal to implement necessary change when election interference is virtually inevitable.

For this reason, a preliminary injunction is in the public's best interest.  In cases in which voters' rights are threatened, "there is no question that the requested preliminary injunction is not adverse to the public interest." *Id.* at 1378.  This is particularly true in light of the relief requested here, as "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).  The Curling Plaintiffs' proposed injunction would unquestionably serve the public interest by promoting a secure election while doing so in the least disruptive manner possible.

## IV.   CONCLUSION

The Curling Plaintiffs (and Georgia voters generally) should not be forced to accept the electronic equivalent of a broken lockbox to exercise their right to vote. The proposed injunction is necessary to secure this fundamental right and should be issued as soon as possible.

Dated: August 7, 2018                    Respectfully submitted,

                                          /s/ Halsey G. Knapp, Jr.
                                         Halsey G. Knapp, Jr.
                                         GA Bar No. 425320
                                         Adam M. Sparks
                                         GA Bar No. 341578
                                         KREVOLIN & HORST, LLC
                                         1201 West Peachtree Street, NW
                                         Suite 3250
                                         Atlanta, GA 30309
                                         HKnapp@khlawfirm.com
                                         Sparks@khlawfirm.com

                                         David D. Cross (admitted *pro hac vice*)
                                         Jane P. Bentrott (admitted *pro hac vice*)
                                         John P. Carlin (admitted *pro hac vice*)
                                         Catherine L. Chapple (admitted *pro hac vice*)
                                         Robert W. Manoso (admitted *pro hac vice*)
                                         MORRISON & FOERSTER LLP
                                         2000 Pennsylvania Avenue, NW
                                         Suite 6000
                                         Washington, DC 20006
                                         Telephone: (202) 887-1500
                                         DCross@mofo.com
                                         JBentrott@mofo.com
                                         JCarlin@mofo.com
                                         CChapple@mofo.com
                                         RManoso@mofo.com

                                         *Counsel for Plaintiffs Donna Curling,*
                                         *Donna Price & Jeffrey Schoenberg*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DONNA CURLING, ET AL.,
Plaintiffs,**

**v.**

**BRIAN KEMP, ET AL.,
Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has

been prepared in accordance with the font type and margin requirements of LR 5.1,

using font type of Times New Roman and a point size of 14.

    /s/ Halsey G. Knapp, Jr.
Halsey G. Knapp, Jr.

27

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRIAN KEMP, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2018, a copy of the foregoing CURLING

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR

PRELIMINARY INJUNCTION was electronically filed with the Clerk of Court

using the CM/ECF system, which will automatically send notification of such

filing to all attorneys of record.

  /s/ Halsey G. Knapp, Jr.
Halsey G. Knapp, Jr.

28