Civil Action File No: 1:17-CV-02989-AT

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

---

DONNA CURLING, et al.,
*Plaintiffs,*

v.

BRIAN KEMP, et al.,
*Defendants.*

---

## RESPONSE OF DEFENDANTS SECRETARY OF STATE KEMP AND STATE ELECTION BOARD MEMBERS TO MOTIONS FOR PRELIMINARY INJUNCTION

---

**JOHN F. SALTER**
Georgia Bar No. 623325
**ROY E. BARNES**
Georgia Bar No. 039000

**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, GA 30060
(770) 227-6375
(770) 227-6373 (fax)
john@barneslawgroup.com
roy@barneslawgroup.com

*Attorneys for Defendants Brian P. Kemp, David J. Worley, Rebecca N. Sullivan, Ralph F. "Rusty" Simpson, Seth Harp, & The State Election Board*

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………..…..i

TABLE OF AUTHORITIES……………………………………………iii

INTRODUCTION…………………………………………………1

FACTS…………………………………………………………2

I.   GEORGIA IS ALREADY ENGAGED IN PREPARATIONS FOR THE NOV. 2018 ELECTION………………………………………….....................2

II.  PLAINTIFFS' "EVIDENCE" OF DRE UNRELIABILITY………………………3

III. THE SECRETARY OF STATE'S ROLE…………………………….....................5

IV.  SEB'S RULEMAKING PROCESS…………………………………………..…5

V.   PLAINTIFFS' "PLANS" FOR IMPLEMENTATION BY FEDERAL DECREE…………………………………………………………6

VI.  STATEWIDE IMPLEMENTATION OF THE REQUESTED INJUNCTIONS IN A LIMITED TIMEFRAME WOULD COMPROMISE GEORGIA'S 2018 ELECTION……………………………….....................................10

ARGUMENT…………………………………………………13

I.   STANDARD OF REVIEW………………………………………….....................13

II.  PLAINTIFFS' INEXCUSABLE DELAY HAS PREJUDICED THE STATE…………14

III. THE INJUNCTIONS ARE NOT CAPABLE OF ENFORCEMENT…………………17

   A. Plaintiffs' Injunctions Are Too Vague to be Enforceable………17

   B. Plaintiffs' Incomplete Injunctions Omit Necessary Parties……18

IV.    THE PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUIRED ELEMENTS
       TO OBTAIN A PRELIMINARY INJUNCTION.........................................19

   A. Plaintiffs Cannot Show Substantial Likelihood of Success......21

      1. *Plaintiffs Fail to Show Substantial Likelihood of Successfully
         Establishing Jurisdiction*...............................................21

      2. *Plaintiffs Fail to Show Substantial Likelihood of Success on the
         Merits of their Claims*..................................................22

   B. Plaintiffs Cannot Show Substantial Likelihood of Irreparable
      Harm...........................................................................23

   C. The Balance of Equities Does Not Weigh in Favor of
      Plaintiffs......................................................................26

   D. Preliminary Injunction Not in the Public Interest..................28

   CONCLUSION.....................................................................29

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Andrade v. NAACP of Austin*,
  345 S.E.2d 1 (Tex. Sup. 2011)...................................................................- 20 -

*Barthelmes v. Morris*,
  342 F.Supp. 153 (D.Md. 1972)..................................................................- 16 -

*Benisek v. Lamone*,
  138 S.Ct. 1942 (June 18, 2018)................................................................- 16 -

*Burton v. City of Belle Glade*,
  178 F.3d 1175 (1999)................................................................................- 18 -

*Bush v. Gore*,
  531 U.S. 98 (2000) ..................................................................... - 24 -, - 27 -

*Canal Auth. of State of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974).....................................................................- 13 -

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398, 133 S.Ct. 1138 (2013).........................................................- 25 -

*Costello v. United States*,
  365 U.S. 265 (1961) ..................................................................................- 14 -

*Crawford v. Marion Cty. Elec. Bd.,*
   553 U.S. 181 (2008) ............................................................- 28 -

*De La Fuenta v. Merrill,*
   214 F.Supp.3d 1241 (M.D. Ala. 2016) .......................................- 15 -

*Farnum v. Burns,*
   548 F.Supp. 769 (D.R.I. 1982) ...............................................- 16 -

*Favorito v. Handel,*
   285 Ga. 795 (2009) ............................................................ passim

*Fishman v. Schaffer,*
   429 U.S. 1325 (1976) .........................................................- 16 -

*Food & Water Watch, Inc. v. Vilsack,*
   808 F.3d 905 (D.C. Cir. 2015) ........................................ - 21 -, - 22 -

*Greater Birmingham Ministries v. State,*
   161 F.Supp.3d 1104 (N.D. Ala. 2016).......................................- 25 -

*Hughey v. JMS Development Corp.,*
   78 F.3d 1523 (11th Cir. 1996).............................................- 17 -

*League of Women Voters of North Carolina v. North Carolina,*
   769 F.3d 224 (4th Cir. 2014)..............................................- 26 -

*Martinez v. Mathews,*
   544 F.2d 1233 (5th Cir. 1976).............................................- 14 -

*Maryland v. King,*
  567 U.S. 1301, 133 S.Ct. 1 (2012) ............................................................- 26 -

*McDonald's Corp. v. Robertson,*
  147 F.3d 1301 (11th Cir. 1998) ......................................................- 13 -, - 19 -

*Miller v. Bd. of Com'rs of Miller County,*
  45 F.Supp.2d 1369 (M.D.Ga. 1998) .........................................................- 14 -

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
  434 U.S. 1345 (1977) ...............................................................................- 26 -

*Obama v. Klayman,*
  800 F.3d 559 (D.C. Cir. 2015) ........................................................- 21 -, - 22 -

*Pennhurst State School & Hosp. v. Halderman,*
  465 U.S. 89 (1984) ...................................................................................- 19 -

*Reynolds v. Sims,*
  377 U.S. 533 (1964) ........................................................- 16 -, - 24 -, - 29 -

*Schade v. Maryland Board of Elections,*
  930 A.2d 304 (Md. App. 2007) ...............................................- 23 -, - 27 -, - 28 -

*Schmidt v. Lessard,*
  414 U.S. 473 (1974) ................................................................................- 17 -

*Siegel v. LePore,*
  234 F.3d 1163 (11th Cir. 2000) ...............................................................- 23 -

*Stein v. Cortes,*
   223 F.Supp.3d 423 (E.D. Pa. 2016) ........................................... - 4 -, - 7 -, - 25 -

*Storer v. Brown,*
   415 U.S. 724 (1974) ................................................................. 26 -

*Thaxton v. Vaughan,*
   321 F.2d 474 (4th Cir. 1963) ................................................... - 19 -

*United States v. Alabama,*
   443 Fed.Appx. 411 (11th Cir. 2011) ........................................ - 21 -

*United States v. Barfield,*
   396 F.3d 1144 (11th Cir. 2005) ............................................... - 14 -

*United States v. Jefferson Cnty.,*
   720 F.2d 1511 (11th Cir. 1983) ............................................... - 13 -

*Univ. of Texas v. Camenisch,*
   451 U.S. 390 (1981) ............................................................... - 13 -

*Walker v. City of Calhoun,*
   682 Fed.Appx. 721 (11th Cir. 2017) ........................................ - 18 -

*Weber v. Shelley,*
   347 F.3d 1101 (9th Cir. 2003) ................................... - 1 -, - 23 -, - 27 -

*Wesberry v. Sanders,*
   376 U.S. 1 (1964) ................................................................... - 24 -

*Wexler v. Anderson,*
  452 F.3d 1226 (11th Cir. 2006)............................................................- 1 -

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .....................................................- 20 -, - 21 -

**STATUTES**

Ga. Const. of 1983, Art. 3, § 9, ¶ 3.............................................- 12 -

Ga. Const. of 1983, Art. 5, § 2, ¶ 7.............................................- 12 -

O.C.G.A. § 21-2-50(15) ..............................................................- 5 -

O.C.G.A. § 21-2-380(b) ..............................................................- 24 -

O.C.G.A. § 21-2-383....................................................................- 18 -

O.C.G.A. § 21-2-383(b) ..............................................................- 18 -

O.C.G.A. § 46-6-5........................................................................- 18 -

O.C.G.A. § 50-5A-8 .....................................................................- 12 -

**RULES**

Federal Rule of Civil Procedure 65(d)(1) ..................................- 17 -

Rule 65 ........................................................................................- 17 -

**COME NOW** the State Election Board members and Secretary of State (the "State Defendants") and respond to Plaintiffs' Motions for Preliminary Injunction (Docs. 258 and 260) as ordered by the Court (Doc. 259).

## INTRODUCTION

The right to vote forms the bedrock of our democracy. "Nevertheless, states are entitled to burden that right to ensure that elections are *fair, honest and efficient*." *Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006) (DREs without paper verification constitutional). States need "broad leeway in enacting reasonable, even-handed legislation to ensure that elections are carried out in a fair and orderly manner." *Weber v. Shelley*, 347 F.3d 1101, 1105 (9th Cir. 2003). Plaintiffs' untimely Motions are at cross purposes with these important governmental roles.

Working together with county officials across the State of Georgia, the Secretary of State's Office is already preparing for an orderly election in November 2018. The Secretary of State also is actively leading a bipartisan commission to study modernizing Georgia's elections system and to propose recommendations to the General Assembly in 2019. To the Secretary of State, therefore, the issue is not whether Georgia should soon update a voting

system first implemented in 2002, but whether the elections system we need for November 2018 will be plunged into chaos.

Plaintiffs ask this Court to believe that what they want—immediate conversion to paper ballots—can be accomplished "easily" for November's elections "without any new equipment, software, significant poll worker training, or additional funding." Doc. 229 at 9. Plaintiffs' statements are false and irresponsible. Such recklessness, if given the power of a federal decree, would compromise the public interest.

## FACTS

I. GEORGIA IS ALREADY ENGAGED IN PREPARATIONS FOR THE NOV. 2018 ELECTION.

The Court is correct that this situation raises important questions of public interest. *See* Doc. 259 (Order directing parties to focus on "the practical realities" of statewide implementation in an expedited, limited time frame). The Secretary of State's Office and public officials all over Georgia are already engaged in preparation for the November 2018 elections. *See, e.g.,* Boren Dec. (Ex. 5) at ¶ 5. At this late date, converting to an exclusively paper-ballot election cannot be done without compromising the public interest.

II.   PLAINTIFFS' "EVIDENCE" OF DRE UNRELIABILITY.

As argued *infra*, proof of irreparable harm is required for a preliminary injunction.   Seeking to reduce their burden, Plaintiffs employ an impoverished definition of vote manipulation that is inconsistent with their burden to show a concrete and irreparable harm. *See, e.g.*, Doc. 226 at ¶ 91 (alleging machines "not trustworthy"); *see also*, *id*. at ¶ 90 ("the results produced by an AccuVote DRE are not reliable because the machine's software . . . is subject to undetectable manipulation").

"Undetectable manipulation" is Plaintiffs' phrase *de jure* for the convenient reason that it dodges any test for corroboration.   Evidence of "undetectable manipulation" is oxymoronic.   Contrary to legal precedent, Plaintiffs disclaim any burden to show evidence "that an impairment of their right to have their votes counted accurately has already occurred or that it is certain to occur." *See, e.g.*, Doc. 258-1 at 7.[1]

The speculative harm imagined by Plaintiffs cannot be remedied without inflicting reciprocal harm of other types.   Plaintiffs' so-called experts

---

[1] "[T]he fact that voters cannot actually see the electronic record within the machine does not mean that the vote was not accurately recorded or not recorded at all. The machines have an internal storage unit that can be audited in order to confirm the ballots cast." *Favorito v. Handel*, 285 Ga. 795, 800 (2009) (affirming constitutionality of Georgia's DRE statutes) (internal quotation omitted).

are Ph.D. candidates, a hacker, and lower-level functionaries from other states.    Not one is a current or former election official from Georgia.[2] Plaintiffs' declarants lack familiarity with the actual internal workings of Georgia's elections security infrastructure.    Further, none of Plaintiffs' so-called experts consider the reciprocal harms or vulnerabilities that would be created by mandating an exclusively-paper-ballot election at this late date.

Students of Georgia history know our checkered experience with paper-ballots.    In the 1940s, forged paper ballots in the Talmadge-stronghold of Telfair County precipitated the infamous constitutional crisis of a stand-off between Herman Talmadge, Ellis Arnall and M.E. Thompson.[3]    All three claimed to be the rightfully-elected governor.    Absent from any of Plaintiffs'

---

[2] Courts should discount the relevance of putative computer-science experts when their testimonies are disconnected to the actual security procedures and particular requirements of the state at issue. *See, e.g., Stein v. Cortes*, 223 F.Supp.3d 423, 441 (E.D. Pa. 2016) (Plaintiffs' expert Dr. J. Alex Halderman "knew *virtually nothing* about Pennsylvania's security procedures, the practices of the Commonwealth's election officials, or the Pennsylvania Election Code") (emphasis supplied).

[3] "It appeared impossible that 34 citizens anywhere could have appeared at the polls and been voted in alphabetical order, starting with the first letter and stopping abruptly at K." Gary Pomerantz, "When Georgia had three governors: the story that won Georgia Goodwin a journalism prize," ATLANTA JOURNAL-CONSTITUTION(Jan. 21, 2015). https://www.myajc.com/news/special-reports/when-georgia-had-three-governors-the-story-that-won-george-goodwin-journalism-prize/PNNohvV4spaPsd5lFSzbkK/. (originally published Dec. 29, 1996).

declarations is any appreciation of the vulnerabilities correlative to an exclusive paper-ballot process, especially one rushed into implementation at the eleventh hour.

## III.   THE SECRETARY OF STATE'S ROLE.

Under Georgia law, the Secretary "shall perform all the duties imposed by this chapter," including the duty "[t]o develop, program, build and review *ballots for use by counties and municipalities on direct recording electronic (DRE) voting systems* in use in the state." O.C.G.A. § 21-2-50(15) (emphasis supplied).   The Secretary of State does not "enforce" the DRE system; he administers it. Plaintiffs, therefore, misunderstand the roles the State Defendants must play as part of an election system that depends upon cooperation with Georgia's local and county officials.

## IV.   SEB's RULEMAKING PROCESS.

Both Plaintiff-Factions seek to conscript the SEB into "rulemaking" on their behalf. *See, e.g.*, Doc. 258 at 2 (Coalition Faction asking Court to order SEB to adopt "appropriate procedures" without further specification); *see also* Doc. 260 at 2 (Curling Faction wanting to order SEB members to come up with "plan for administering those ballots" and "to promulgate rules requiring and specifying appropriate procedures for conducting pre-certification audits" of paper ballots).   Plaintiffs appear to hope this can

disguise the deficiencies in their "plans."  Constrained legally by the publish-and-comment restrictions of the Administrative Procedures Act, the SEB cannot ensure a workable conversion to paper-ballot-only election in Nov. 2018 simply because it is commanded to "make a plan." *See* Harvey Dec. (Ex. 2) at ¶ 17.

## V.   PLAINTIFFS' "PLANS" FOR IMPLEMENTATION BY FEDERAL DECREE.

It would be wrong to saddle Georgia taxpayers with the exorbitant cost—monetary and non-monetary—of Plaintiffs' paranoia.  "Replacing the means of voting statewide this close to the actual casting of ballots would require significant logistical challenges, procurement of new equipment and hardware, new administrative regulations, new polling place design, cost money that has not been budgeted for this year's elections, and contribute significantly to voter confusion and disaffection." Harvey Dec. (Ex. 2) at ¶ 24.

"[T]here is not sufficient time to allow for new election-official and pollworker training or to properly educate the public" for an entirely new system." *Id*. at ¶ 15.  "Going from an election where less than 10% of the ballots cast would likely be paper to 100% would be a huge change with potentially drastic consequences." *Id*. at ¶ 8.  Printing costs (customarily borne by the counties), would soar by orders of magnitude. Eveler Dec. (Ex. 3) at ¶ 10; Ledford Dec. (Ex. 4) at ¶ 9 (estimating Gwinnett County's ballot

printing costs between $550,000-$825,000). Paper ballots would require county elections officials to institute changes regarding (1) storage, transportation, and delivery of the ballots; (2) equipment designed to ensure compliance with voter privacy requirements; (3) ballot accounting and tabulation and (4) training. *See generally* Eveler Dec. (Ex. 3) at ¶¶ 11-22; *see also* Ledford Dec. (Ex. 4).[4]

Tacitly conceding the impracticality of counting millions of votes literally by hand in a statewide election, both Plaintiff-Factions presume to mandate a massive deployment of optical scanner machines between now and November 2018. *See e.g.*, Doc. 260-1 at 29 (Curling Faction demanding injunction requiring State to "procur[e] additional ballot scanners for deployment in heavily populated areas so that paper ballots are quickly counted.").[5] Notwithstanding Plaintiffs' uninformed assumptions, however,

---

[4] Plaintiffs' injunctions appear to implicate, but not operate against, 158 non-party defendants (i.e. every other county board of election besides Fulton). In addition to the issues noted above, the Curling Faction imagines the Court ordering the "centralizing [of] ballot counting across counties to eliminate the need for optical scanners in every precinct," (Doc. 260-1 at 29), notwithstanding neither the State Defendants, nor the SEB have the authority to enforce counties' compliance with such an order.

[5] Previously, the Coalition Faction told this Court optical scanners are no more secure than the DREs "because all computers can be infiltrated with malware." Doc. 209-1; *see also id.* (Plaintiffs representing to the Court that their "litigation hold in this case includes optical scanning machines because . . . [of] the ability inherent in the system to spread malware."). The

Georgia's 891 optical scanners are "not nearly enough to ensure accurate and timely counting of a 100%-paper-ballot election." Harvey Dec. (Ex. 2) at ¶ 20; *see also* Ledford Dec. (Ex. 4) at ¶ 12 (Gwinnett Elections Director: "The current inventory of optical scan units would not handle the number of ballot pages to be scanned.").[6] "Even if the State could quickly and legally procure a sufficient number of optical scanners, there would not be sufficient time before Election Night to acceptance-test all of those machines." Harvey Dec. (Ex. 2) at ¶ 21.

Costs to procure and deploy adequate numbers of optical scanners in such a limited timeframe are onerous and, given the limited time, perhaps not feasible at any price.[7]  Plaintiffs' reliance upon optical scanners as a "solution" is unrealistic. Harvey Dec. (Ex. 2) at ¶ 21.

---

appeasement of the Coalition Faction, therefore, could only be purchased at the cost of tasking thousands of poll workers with a statewide hand-count or, alternatively, a miraculous procurement of ballot-counting machines that do not use any sort of software.

[6] Although there are optical scanners available on the market that could handle the massive volume of a 100%-paper-ballot election, because "Georgia's system is designed differently," it does not have them. Harvey Dec. (Ex. 2) at ¶ 20; *see also* Eveler Dec. (Ex. 3) at ¶ 6. "Using optical scanners that were designed for low volume in a high volume environment would likely break those scanners." Beaver Dec. (Ex. 1) at ¶ 9.

[7] "With 159 counties looking to acquire optical scan units within a short time frame, the surge in demand could create a tighter market which could raise prices. . . ." Ledford Dec. (Ex. 4) at ¶ 15.

These court-mandated expenditures of public monies would be exacerbated by the wasteful proposal of the Curling Faction to require a mass-mailing of absentee paper ballots "to all registered voters with pre-paid postage in order to encourage voters to send in their ballots by mail prior to Election Day." Doc. 260-1 at 29. The profligate printing/mailing costs would be onerous to county governments that, customarily, have borne those costs. Ledford Dec. (Ex. 4) at ¶ 11 ("estimated cost of mailing out an absentee ballot package to all Gwinnett's registered voters, including postage, would exceed $1,000,000.00"). Estimating $2.00 per absentee ballot package (i.e. the cost of absentee-ballot printing, preparing and printing the inner and outer envelopes, and outgoing and pre-paid return postage), it would cost approximately $13.4 million to send this to all 6.7 million of Georgia's registered voters. Harvey Dec. (Ex. 2) at ¶ 11. And there is no guarantee printing vendors could fulfill such a large printing request. *See, e.g.,* Eveler Dec. (Ex. 3) at ¶ 8 (unable even to obtain the necessary paper from the paper mill until the second week in October at the earliest, Cobb County's vendor could not even begin printing paper ballots before the scheduled start of early voting).

Voter check-in processes may be disrupted. Harvey Dec. (Ex. 2) at ¶ 18 (8,660 ExpressPolls used for voter check-in would require re-programming, a

technical challenge that, given the limited time, would likely lead to many more errors in polling places, disaffected voters, and longer wait times). Early voting would be impacted. Harvey Dec. (Ex. 2) at ¶ 10; *id.* at ¶16.  The aforementioned burdens cannot be justified when Plaintiffs could avoid any harm to themselves simply by exercising their choice to cast an absentee paper ballot.

VI.  STATEWIDE IMPLEMENTATION OF THE REQUESTED INJUNCTIONS IN A LIMITED TIMEFRAME WOULD COMPROMISE GEORGIA'S 2018 ELECTION.

There is no "Paper-Ballot Fairy" who, with magic wand at ready, can save Plaintiffs' half-baked "plans" from devolving into fiasco.[8]  The Coalition Faction makes the State of Maryland the centerpiece of their argument for an injunction.   Citing a Maryland precinct-judge (roughly equivalent to a supervisory poll-worker in Georgia), they lead this Court to believe Maryland converted in one year (2016) from DRE machines to paper-ballots and that "it took little or no pollworker training to make the switch." Doc. 258-1 at 25. The full truth of Maryland's experience (widely reported in the media), is materially different from the Coalition Faction's depiction.[9]

_____

[8] The Curling Faction offers no evidence whatsoever of the feasibility or the practical consequences of a statewide conversion to paper-ballots. *See* Doc. 260-1 at 28 (arguing, without support, "Georgia already has the framework").
[9] Maryland's conversion from DREs back to paper-ballots spanned from 2007 to 2016. *See* Christian Davenport, "Paper Ballot Has Md.'s, Va.'s Vote," THE

The implementation of paper ballots would be "a sudden and unanticipated change," demanding "significant funds that have not been budgeted for expenditure in 2018." Ledford Dec. (Ex. 4) at ¶ 8. While it is impossible to calculate with precision the budgetary impact of Plaintiffs'

---

WASHINGTON     POST     (Oct.     30,     2008),     available     at
http://www.washingtonpost.com/wp-
dyn/content/article/2008/10/29/AR2008102904105.html?sid=ST200810290412
9 (visited Aug. 11, 2018) ("[L]ast year, the [Maryland General Assembly] voted unanimously to discard the touch-screen machines and go to paper ballots by 2010. *It won't be cheap*.") (emphasis supplied). In 2010, cost concerns forced the legislature to postpone implementation, with funding not budgeted until 2014. *See* Ben Weathers, "After decade absence, paper ballots return to Maryland," CAPITAL GAZETTE (April 25, 2016), available at http://www.capitalgazette.com/news/elections/ph-ac-cn-paper-ballot-returns-0426-20160425-story.html (visited Aug. 11, 2018).   Even then, Maryland elections officials expressed concerns regarding the transition. *See* Glynis Kazanijian, "Maryland prepares for move back to paper ballots," CUMBERLAND TIMES-NEWS (Nov. 20, 2013), available at http://www.times-news.com/news/local_news/maryland-prepares-for-move-back-to-paper-ballots/article_4350732d-0981-5f72-afc2-b30fd668ec83.html, (visited Aug. 11, 2018) ("Several election officials that attended last week's demonstration were wary about taking on a new statewide voting system.  Concerns ranged from potential long lines at the polls to problems with producing multiple versions of paper ballots or not having enough time to test the new system before it goes live."). Costs were substantial. *Id.* ("State election officials would not provide an estimate of the cost to transition the state to the new paper voting system. . . .[but] referred to a 2010 study conducted for the state . . . which estimated that initial implementation would *cost approximately $37 million*.") (emphasis supplied).  With over twice the registered voters and six times as many counties as Maryland, a statewide switch in Georgia would be more challenging and costly than Maryland's multi-million-dollar, nine-year slog.

amateurish mandates, budget appropriations comparable to Maryland's experience would require a special session of the General Assembly.[10]

"While it is certainly possible to build a system to adequately protect a paper ballot environment, properly doing so requires the right personnel, processes, and time for testing and validation." Beaver Dec. (Ex. 1) at ¶ 8. "Moving to paper ballots in such an abbreviated time frame would potentially damage Georgia's election security." *Id.*; *see also* Ledford Dec. (Ex. 4) at ¶ 5 ("a change to paper ballots will require considerably more than a period less than ninety days before November 6, 2018"). Plaintiffs' irresponsible demands "present[] a substantial risk of voter confusion, disruption, increased errors at polls, increased wait times, suppressed voter turnout, and potential disenfranchisement." Harvey Dec. (Ex. 2) at ¶ 3.

---

[10] Because Georgia's Constitution restricts appropriations only to those obligations imposed by a bill of the General Assembly, a new voting system would require a "separate bill" for "other appropriations." Ga. Const. of 1983, Art. 3, § 9, ¶ 3.  The Governor can only sign a warrant for expenditures of funds if there is a legislative appropriation. O.C.G.A. § 50-5A-8.  The practical effect of the preliminary injunction, therefore, is to mandate financial expenditures that would require a special session that could not be triggered by the Secretary of State alone. Ga. Const. of 1983, Art. 5, § 2, ¶ 7.

# ARGUMENT

## I.   STANDARD OF REVIEW.

Parties seeking a preliminary injunction must demonstrate substantial likelihood of the following: (1) success on the merits, (2) that they will suffer irreparable harm unless the injunction is granted, (3) that the threatened injury outweighs any damage the injunction might cause the opposing party, and (4) that the injunction would not be adverse to the public interest. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983), quoting *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).

Typically, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  A true status quo in this case, however, would allow the State to continue using DRE machines that (a) it has used for two decades and (b) that have weathered prior constitutional challenges making similar arguments.  In substance, Plaintiffs are seeking a mandatory injunction to force the Secretary of State

- 13 -

and the State Board of Elections to take various actions prior to the November 2018 elections.[11] Courts disfavor mandatory injunctions, issuing them only when "the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

## II. PLAINTIFFS' INEXCUSABLE DELAY HAS PREJUDICED THE STATE.

Laches arises from a "lack of diligence by the party against whom the defense is asserted, and . . . prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961). A movant for preliminary injunctive relief may be barred by laches in a voting rights case where a defendant establishes that the moving party "unreasonably delayed in asserting their rights and that such delay prejudiced" the defendant. *Miller v. Bd. of Com'rs of Miller County*, 45 F.Supp.2d 1369, 1373 (M.D.Ga. 1998); *see also United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). Plaintiffs delayed bringing their motions and they did so to the detriment of the State.

With modifications and improvements, DRE machines have been used in Georgia since 2002. Right now, the staff of county elections boards across the State are readying for the Nov. 2018 election. Not only the Secretary of State, but thousands of county officials across Georgia—who are not even

---

[11] Instead of preserving a status quo, the Motions award Plaintiffs the relief sought in their Complaints as to the November 2018 election.

parties to this suit—would be prejudiced by the issuance of the requested injunction because they have already made decisions and expended resources planning for the general election based on the existing early voting schedule and the established elections apparatus and procedures.  The drastic changes—foreseeable  and  unforeseeable—implicated  by  Plaintiffs' unreasonable demands would result in unexpected resource allocation and expenditures for which neither the State, nor county governments have planned or budgeted.

At the outset of this case, the Court set an initial deadline of September 1, *2017* to seek a preliminary injunction. Doc. 40.  Now, almost a year later, Plaintiffs place the responsibility for speedy action at the feet of this Court and the State.  Plaintiffs' delay prejudices the State in its mission to apply state  election  laws  that  impose  only  reasonable,  nondiscriminatory restrictions upon voters and that are narrowly drawn to effect the State's regulatory interest in maintaining fair, honest and efficient elections.

By waiting until the last minute to file these motions, Plaintiffs put this Court in an unenviable position where a "slapdash decision" could result in "[a]n error in judgment brought about by the hurried decision-making process [that] would deny the public its interest in enforcement of its election laws." *De La Fuenta v. Merrill*, 214 F.Supp.3d 1241, 1252 (M.D. Ala. 2016)

(denying preliminary injunction). As the Court expressed during the hearing on May 10: "I will reiterate again that it would be in my mind *virtually impossible to have a trial before the November election in time to do anything with that.*" May 10, 2018 Trans. 17-18 (emphasis supplied). The prescience of that remark is reflected in a decision of the U.S. Supreme Court in *Benisek v. Lamone*, 138 S.Ct. 1942 (June 18, 2018). When time is inadequate to balance a preliminary injunction with ensuring orderly administration of elections, an eleventh-hour motion comes too late. *Id*. at 1945 (preliminary injunction "against the public interest" where it would have "a *needlessly 'chaotic and disruptive effect upon the electoral process*.'") (emphasis supplied).

Here, the election is too close for the State, realistically, to be able to implement extensive changes before the election. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also Fishman v. Schaffer*, 429 U.S. 1325, 1330 (1976) (denying injunction where applicants "delayed unnecessarily" and "injunction at this time would have a chaotic and disruptive effect upon the electoral process"). Plaintiffs' motions should be denied purely for the reason that Georgia's "election machinery is already in gear." *Farnum v. Burns*, 548 F.Supp. 769, 774 (D.R.I. 1982) (equitable principles may require a court not to interfere with the conduct of rapidly upcoming elections where "election machinery is already in gear"); *see also Barthelmes v. Morris*, 342 F.Supp.

153, 160 (D.Md. 1972) (although "the election process is one fraught with uncertainty . . . . [i]t does not follow . . . that a court should add a further element of wholly unanticipated uncertainty into the process at the eleventh hour").

III.   THE INJUNCTIONS ARE NOT CAPABLE OF ENFORCEMENT.

### A. Plaintiffs' Injunctions Are Too Vague to be Enforceable.

Specificity is important in fashioning a preliminary injunction. *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). All preliminary injunctions must comply with Federal Rule of Civil Procedure 65(d)(1) which requires that an injunctive order state the reasons for its coercive provisions, state the provisions "specifically," and describe the acts restrained or required "in reasonable detail."

Plaintiffs' proposed preliminary injunctions depend upon mandating the SEB to "rulemake" around the disruptions Plaintiffs' demands make inevitable.  This proves how poorly conceived Plaintiffs' plans are.  Plaintiffs' dependence upon vague mandates violate Rule 65.

A preliminary injunction to "come up with a plan" is "incapable of enforcement as an operative command." *Hughey v. JMS Development Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996).  The "rulemaking" injunctions proposed by both Plaintiff-Factions lack any specific or determinable standards of

reasonableness. *Burton v. City of Belle Glade*, 178 F.3d 1175 (1999). The Court cannot paper-over the deficiencies in the Plaintiffs' preliminary injunctions by ordering Defendants to "come up with a plan" to mitigate the disruption Plaintiffs otherwise would cause. *Walker v. City of Calhoun*, 682 Fed.Appx. 721, 724 (11th Cir. 2017).

## B. Plaintiffs' Incomplete Injunctions Omit Necessary Parties.

An injunction that purported to enjoin Defendants "from enforcing O.C.G.A. § 21-2-383(b) . . . and from requiring voters to vote using DREs" (Doc. 226, at ¶ 175), would not provide any meaningful redress to the Plaintiffs. The State Defendants are *not* "enforcing" Section 21-2-383(b) "against" the Plaintiffs.[12] Although Plaintiffs complain of a SEB rule (183-1-12-.01), that rule merely carries into effect the statutory command requiring DREs generally in the absence of enumerated exceptions that do not apply here. The State Defendants—along with all county and local elections officials—are obliged to carry into effect the laws passed by the General Assembly unless and until they are declared unconstitutional. O.C.G.A. § 46-6-5 ("Powers of all public officers are defined by law. . . ."). "As the [Secretary and SEB] ha[ve] no authority to act alone, a decree entered solely against

---

[12] The complaint(s) does not challenge (at least not forthrightly), the constitutional validity of O.C.G.A. § 21-2-383 that was confirmed by the Supreme Court of Georgia in *Favorito v. Handel*, 285 Ga. 795 (2009).

[them] could not possibly be granted effectively in the absence of . . . other appropriate defendants, and a court, particularly in an equity action, ought not grant relief against a public officer unless its order will be effective." *Thaxton v. Vaughan*, 321 F.2d 474, 478 (4th Cir. 1963).  Without joining other officials, injunctive relief against the State Defendants alone would be ineffective and incomplete. *See, e.g., Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104, 124 (1984).  Even were such an order of injunction entered against the State Defendants, other public officials who are not parties to this case would still be charged with following Georgia's statutory elections law and presumably would continue to do so even if the State Defendants took no further action.

IV.   THE PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUIRED ELEMENTS TO OBTAIN A PRELIMINARY INJUNCTION.

Plaintiffs' motions and supporting exhibits reveal that they are unable to satisfy the elements for a preliminary injunction. *McDonald's Corp. v. Robertson*, 147 F.3d at 1306 (listing elements).  Pretending as if the political branches' responsibility for secure and orderly elections exists in a vacuum and without regard to state law, Plaintiffs press this Court for extraordinary intervention outside the mainstream of federal jurisprudence.

By adopting the convenient mantra of "undetectable manipulation," Plaintiffs excuse themselves from offering any proof (since none exists) that Georgia's upcoming elections will fail to record voter intent. Plaintiffs' "concerns about system integrity and vulnerability . . . . are policy disputes more appropriately resolved in the give-and-take of politics." *Andrade v. NAACP of Austin*, 345 S.E.2d 1 (Tex. Sup. 2011) (dismissing claims for injunctive relief complaining of Secretary of State's certification of DRE machines). Plaintiffs overlook the fact—proven by their own declarations— that voters concerned about using DRE machines possess an unlimited legal right to cast their vote by paper absentee ballot at any time before Nov. 6, 2018. *See, e.g.,* Doc. 260-4 (Curling intends to vote absentee using a paper ballot). Luddite prejudices against software technology are insufficient justification to override a statutory regime promulgated by duly-elected legislators, sustained against prior constitutional challenges, and overseen by state officials acting pursuant to their respective duties within that legislative framework.

Plaintiffs are not entitled to a preliminary injunction because they have not established that they are "likely to succeed on the merits" of their claims. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Further, Plaintiffs have failed to establish the other required elements of a request for

preliminary injunctive relief: that they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id*.[13]  As the Supreme Court has cautioned, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Id*. at 24.  Plaintiffs must satisfy all four factors to be entitled to relief. *Id*. at 20.

### A. Plaintiffs Cannot Show Substantial Likelihood of Success.

#### 1. *Plaintiffs Fail to Show Substantial Likelihood of Successfully Establishing Jurisdiction.*

The "merits" for which Plaintiffs must show a likelihood of success "encompass not only substantive theories but also establishment of jurisdiction." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015).   A party's inability to establish a substantial likelihood of standing on a motion for preliminary injunction requires denial of the motion. *See, e.g., Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("when considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties).").  While this Court

---

[13] Special care is required when putative injunctions would operate against legislative enactments "because they interfere with the democratic process and lack safeguards against abuse or error." *United States v. Alabama*, 443 Fed.Appx. 411, 420 (11th Cir. 2011).

understandably is focused on the "public interest," jurisdiction is prerequisite to judicial action and may not be assumed for expediency's sake.

2. *Plaintiffs Fail to Show Substantial Likelihood of Success on the Merits of their Claims.*

Plaintiffs cite a litany of alleged "errors" or mishaps without connecting any of them to malicious hacking of DREs that threaten imminently a loss of *their* votes. The probity of evidence that DREs might be "hacked" in an academic setting is negligible. Plaintiffs cannot show a substantial likelihood their votes are in danger by someone attempting to hack a DRE in real life and in full view of election officials and the public.

Nor can Plaintiffs use spurious accusations of "spoliation" to parlay an adverse inference into a "substantial likelihood of success." First, Plaintiffs' conjecture as to what remains—or what was lost—of KSU's server are irrelevant since "[t]he way that KSU stored and transmitted data is not the way that those tasks are undertaken now." Beaver Dec. (Ex. 1) at ¶ 6. Additionally, certain parts of Georgia's elections infrastructure must remain secret. "It is entirely possible that, even if plaintiffs are granted discovery, the government may refuse to provide information (if any exists) that would further plaintiffs' case." *Obama v. Klayman*, *supra* at 564; *see also id.*

("Plaintiffs must realize that secrecy is yet another form of regulation [of election security].").

The fact that Plaintiffs may not have access to secret information or data does not entitle them to an adverse presumption, especially where legitimate security concerns, and/or state secrets doctrine, would preclude them from accessing it in the first place.   Plaintiffs' mudslinging and accusations are a gimmick to distract from the lopsided precedent that prevents them from showing a substantial likelihood of success on the merits. *See, e.g., Weber*, 347 F.3d at 1106 ("We cannot say that use of paperless, touchscreen voting systems severely restricts the right to vote."); *Wexler, supra*; *Favorito, supra* (DREs do not violate Georgia voters' constitutional rights); *Schade v. Maryland Board of Elections*, 930 A.2d 304, 327 (Md. App. 2007); *Andrade, supra.*

## B. Plaintiffs Cannot Show Substantial Likelihood of Irreparable Harm.

"[T]he absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).   DRE machines have been used in Georgia for years.   When challenged in court, they passed constitutional muster with the Supreme Court of Georgia and the Eleventh Circuit.

*Favorito v. Handel*, *supra*; *Wexler v. Anderson*, *supra*.  The Plaintiffs should not now be heard to complain that they will suffer irreparable harm if this Court does not grant them a preliminary injunction halting the operation of constitutional statutes enacted in the early 2000s.

It is wrong for Plaintiffs to compare this case to seminal voting-rights cases.  In contrast to cases involving ballot access restrictions or vote dilution that directly burden the right to vote, Plaintiffs' "contentions regarding the accuracy of recounts are merely hypothetical." *Favorito*, *supra*, at 800.  Using DREs does not "value one person's vote over another," *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (*per curium*); or result in "[w]eighting the votes of citizens differently," *Reynolds v. Sims*, 377 U.S. 533, 563 (1964); or make one man's vote in a congressional election worth more than another's as in *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).

All Georgia voters "have the option of casting an absentee ballot or using the touch screen electronic voting machines on Election Day." *Favorito*, 285 Ga. at 798.  Plaintiffs cannot possibly show irreparable harm when they may easily cast the paper ballot they perceive as more secure. O.C.G.A. § 21-2-380(b); *see also* Doc. 260-4 at 5 (Curling intends to vote absentee using a paper ballot); Doc. 258-1 at 76 (Bowers plans to vote by mail-in paper ballot in Nov. 2018); Doc. 258-1 at 123 (Kadel plans to vote by mail-in paper ballot);

Doc. 258-1 (same as to Luse).[14]    As the Supreme Court of Georgia unanimously ruled, "absentee voters 'have not been treated differently from the polling place voters, except in a manner permissible under the election statutes' and *as a result of their own choice*." *Favorito*, 285 Ga. at 798 (emphasis supplied).

Not every alleged constitutional violation regarding voting rights shows irreparable injury. *See, e.g., Greater Birmingham Ministries v. State*, 161 F.Supp.3d 1104, 1117 (N.D. Ala. 2016).   "Plaintiffs' allegations that voting machines may be 'hackable,' and the seemingly rhetorical question they pose respecting the accuracy of the vote count, simply do not constitute injury-in-fact." *Stein v. Cortes*, 223 F.Supp.3d 423, 432 (E.D. Pa. 2016), citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 1148 (2013).   Plaintiffs' litany of attenuated discrepancies neither connect causally to an actual hack of the DRE machines, nor prove these Plaintiffs will suffer imminent loss of their voting rights.   Absent evidence that the individual votes of *these* Plaintiffs will be manipulated in the upcoming election, Plaintiffs fail to show substantial likelihood of irreparable injury, especially when they have ample

---

[14] There is no legal authority holding that having to choose between voting by absentee paper ballot or DRE burdens Plaintiffs' right to vote.

time to exercise their right to vote by paper absentee ballots (as all apparently intend).

**C. The Balance of Equities Does Not Weigh in Favor of Plaintiffs.**

Plaintiffs have also failed to establish that the balance of equities tips in their favor.  The Supreme Court has long recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."  *Storer v. Brown*, 415 U.S. 724, 730 (1974). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 133 S.Ct. 1, 3 (2012) (Roberts, C.J., in chambers), quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

Plaintiffs' demands are unlike injunctions that would merely require the State to refrain from implementing a newly-enacted law or requiring the continuation of a familiar procedure pending judicial review of a new one. *C.f. League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247-48 (4th Cir. 2014) (balance of equities leaned towards plaintiffs since injunction merely required "the counting of a relatively small number of ballots"). Instead, Plaintiffs seek an injunction requiring the State divert

substantial resources to create a new framework for every vote Statewide and implement it instantly.

"There [is] no guarantee that the [Plaintiffs'] proposed remedy, i.e. the implementation of specific security measures and a paper ballot option, would [result], in fact, in a 'secure' election." *Schade*, 930 A.2d at 327.[15] Plaintiffs are naïve to think paper ballots do not have tradeoffs and problems, just of different types, gravities and levels of risk. "Traditional paper ballots, as became evident during the 2000 presidential election, are prone to overvotes, undervotes, 'hanging chads,' and other mechanical and human errors that may thwart voter intent." *Weber*, 347 F.3d at 1106, citing *Bush v. Gore*, 531 U.S. 98 (2000).

No election system is flawless. *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("The unfortunate reality is that the possibility of electoral fraud can never be *completely* eliminated, no matter which type of ballot is used.") (emphasis retained).   "[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." *Favorito*, 285 Ga. at 797-798.  The effect of Plaintiffs' irresponsible Motions

---

[15] "Moving to paper ballots for the voting mechanism would not add one iota of protection to the state's voter registration database, air-gapped ballot building network, or other online tools such as election night reporting." Beaver Dec. (Ex. 1) at ¶ 7.

would be to "frustrate the intent of the elected representatives of the people." *Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 203 (2008) (evenhanded restrictions that protect integrity and reliability of electoral process itself satisfy equal protection); *Favorito*, 285 Ga. at 797 (voters do not have a right to a particular ballot system). The balance of the equities favors shielding the voters from the chaos and disruption of an injunction by respecting the State's role in promoting fair and orderly elections.

## D. Preliminary Injunction Not in the Public Interest.

Plaintiffs raise only spectral fears that DREs will be hacked and votes miscounted. A theoretical possibility that a voting machine somewhere might be susceptible to tampering is outweighed by the State's legitimate interest in protecting its elections from the mad scramble that would certainly ensue if the Plaintiffs' motions were granted.

Mandating paper ballots now "ha[s] the potential to cause voter confusion, particularly when implemented at such a late date in the election process." *Schade*, 930 A.2d at 327. It would also force the State to suffer substantial costs in terms of implementation. The State Defendants urge the Court "to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing

- 28 -

demands on a State in adjusting to the requirements of the court's decree." *Reynolds v. Sims*, *supra* at 585.

The public interest can only be served by denying the preliminary injunction, ruling on the Motions to Dismiss and preserving the use of the DRE machines as the operative status quo pending further disposition of the case.

## CONCLUSION

Plaintiffs' "cure" is worse than the disease. Their proposed "plans" for a last-minute conversion to an exclusively paper-ballot election are not real plans at all. Certainly, they cannot guarantee a secure election. Drastic changes to a statewide voting system this close to Election Day, and after preparations are already underway, would do harm without doing good.

For the foregoing reasons, the State Defendants request the Court DENY Plaintiffs' Motions for Preliminary Injunction.

This 14th day of August, 2018.

BARNES LAW GROUP, LLC

*/s/John F. Salter*
JOHN F. SALTER
Georgia Bar No. 623325
ROY E. BARNES
Georgia Bar No. 039000

BARNES LAW GROUP, LLC
31 Atlanta Street
Marietta, GA 30060
(770) 227-6375
(770) 227-6373 (fax)
john@barneslawgroup.com
roy@barneslawgroup.com

*Attorneys for Defendants Brian P. Kemp, David J. Worley, Rebecca N. Sullivan, Ralph F. "Rusty" Simpson, Seth Harp, & The State Election Board*

## CERTIFICATE OF COMPLIANCE

I hereby certify that I have read the Court's Standing Order in Cases Proceedings Before the Honorable Amy Totenberg and that I will comply with its provisions during the pendency of this litigation.

*/s/ John F. Salter*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Century Schoolbook and a point size of 13.

*/s/ John F. Salter*

## CERTIFICATE OF SERVICE

I hereby certify that on this date I have electronically filed the foregoing **RESPONSE OF DEFENDANTS SECRETARY OF STATE KEMP AND STATE ELECTION BOARD MEMBERS TO MOTIONS FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system, which will send email notification of such filing to all attorneys of record.

This 14th day of August, 2018.

**BARNES LAW GROUP, LLC**

*/s/ John F. Salter*
**JOHN F. SALTER**
Georgia Bar No. 623325
**ROY E. BARNES**
Georgia Bar No. 039000

**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, GA 30060
(770) 227-6375
(770) 227-6373 (fax)
john@barneslawgroup.com
roy@barneslawgroup.com

*Attorneys for Defendants Brian P. Kemp, David J. Worley, Rebecca N. Sullivan, Ralph F. "Rusty" Simpson, Seth Harp, & The State Election Board*