*CURLING, et al. v. KEMP, et al.*
Civil Action File No: 1:17-CV-02989

**EXHIBIT 2**
DECLARATION OF CHRIS HARVEY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

DONNA CURLING, et al.,

Plaintiffs,

v.

BRIAN KEMP, et al.,

Defendants.

CIVIL ACTION FILE

NO. 1:17-CV-02989-AT

## DECLARATION OF CHRIS HARVEY

Pursuant to 28 U.S.C. § 1746, CHRIS HARVEY, Elections Director in the office of the Secretary of State for the State of Georgia, declares as follows:

1. I make this Declaration in support of a response by Secretary Kemp, the State Election Board, and the members of the State Election Board to motions for preliminary injunction filed in the above-styled matter *of Donna Curling, et al., v. Brian Kemp, et al*, (Civil Action No. 1:17-cv-2989-AT).

2. I have been the State of Georgia's Elections Director since July 2015. From August 2007 to July 2015, I was the Chief Investigator and Deputy Inspector General for the Secretary of State's office, investigating, amongst other things, potential violation of state election law. For over a decade, I have

acquired first-hand knowledge of Georgia's election processes at both the state and county level.

3. This declaration focuses on the practical considerations of procuring, testing and training for, and implementing a new system of voting statewide less than 90 days before Election Day in a major statewide election and without any prior preparation for such a change. Making such a switch at this point would require investments in equipment and supplies that are not currently available, creation of new processes to ensure security, training on those processes at the county, state, and precinct level, and appropriation of funds that are not currently available. Beginning a conversion to a new statewide system less than 90 days from Election Day presents a substantial risk of voter confusion, disruption, increased errors at polls, increased wait times, suppressed voter turnout, and potential disenfranchisement.

4. I am in full support of moving to new voting system by the 2020 Presidential Primary. I believe our current machines are accurate, secure, and safe for use, but given their age, it is time to update them. I have personally appeared before the Secure, Accessible, and Fair Elections (SAFE) Commission appointed by Secretary Kemp, which has the stated goal of making a recommendation for a new voting system and corresponding legislative changes to the General Assembly prior to 2019 legislative session. I continue

to be involved in the SAFE Commission process and believe that it is the responsible way to study and obtain stakeholder input before moving to a new system.

## ELECTION PREPARATION BASED ON EXISTING SYSEM IS ALREADY WELL UNDERWAY

5. There are approximately 6.7 Million registered voters in Georgia.

6. Based on past trends, approximately 50% of all voters can be expected to choose to vote absentee-in-person; approximately 45% choose to vote on Election Day; and between 5% and 10% choose to vote absentee-by-mail ballots.

7. While Election Day in Georgia is November 6, 2018, the preparations pursuant to our actual elections calendar must begin in advance in order to ensure an orderly and secure election process. Absentee-by-mail and Uniformed and Overseas Civilian Absentee Voting Act (UOCAVA) ballots begin to be sent out by counties on September 18. All UOCAVA ballots must go out not later than September 22. Absentee-in-person voting (often referred to as early voting) begins on October 15 ends November 2. The voter registration deadline for the November general election is October 9, 2018.

## PROCURING A SUFFICIENT NUMBER OF COMPATIBLE PAPER BALLOTS WOULD BE DIFFICULT AND EXPENSIVE

8. In Georgia, any person can chose to vote an absentee-by-mail paper ballot for any reason or no reason. Both the state and counties make budgetary and logistical plans based on past trends. Going from an election where less than 10% of the ballots cast would likely be paper to 100% would be a huge change with potentially drastic consequences. Georgia counties typically line up their ballot printing schedules and volume with their vendor well in advance of Election Day. The available vendors provide ballot printing services for many different states. Dramatic changes to expected volumes at this stage in the election cycle would disrupt Georgia elections but could potentially even disrupt other elections. Procuring enough paper ballots for all Georgia voters in a timely fashion, whether it be paper ballots for Election Day, absentee-in-person, or absentee-by-mail voting or in order to mail every registered voter an absentee ballot would be a significant hurdle in itself.

9. The cost of procuring so many paper ballots would be substantial and is not currently budgeted. Customarily, counties bear the costs of ordering paper ballots. By contrast, the digital ballots that are used on the Direct Recording Electronic (DRE) machines are prepared by the Secretary of State's office and provided to counties at no cost. Some counties are able to print their own

ballots through an expensive machine called a ballot-on-demand printer, but those printers are not designed to print paper ballots in the volumes needed for an entire election.

10. The counties that do have a ballot-on-demand printer would still have to make drastic changes to their processes. Those printers are designed to print absentee-by-mail ballots, which generally represent less than 10% of the total votes cast. They are prepared from a central location as absentee ballot requests are processed. They are not designed to print all ballots that might be necessary in a jurisdiction. Counties would be tasked with coming up with how many different voters they may have across all different ballot combinations and then print the proper amount of those ballots, deliver them to the precincts, and securely store them in the polling place. Any mistake would cause large amounts of voter confusion on Election Day. Early voting, where voters can vote at any location in their county, would be even more complex. Counties would have to prepare sufficient paper ballots for all potential ballot combinations at all different early voting locations.

11. The cost of printing paper ballots and sending out absentee ballot packages is born by the counties. Cobb County estimates that its ballot printing costs would go from $27,048 in the November 2016 General Election to $208, 933 if all paper ballots were required, a 672% increase in printing

costs. I believe other counties would see similar increases. In speaking with multiple counties, I estimate that the cost of preparing and mailing out a paper ballot, including the cost of ballot printing, preparing and printing the inner and outer envelopes, and both outgoing and return postage, to be approximately $2.00 per absentee ballot package. The cost of sending an absentee ballot package to every registered voter would be over $13.4 million, and it is doubtful that sufficient supplies of all necessary materials could be procured in time to do that for this election. None of these expenses have been planned for, either by counties or by the Secretary of State.

## IMPORTANT ELECTION DEADLINES ARE FAST APPROACHING

12.   Even if a significant number of paper ballots could be procured, making an orderly switch to paper ballots in time for the upcoming election would still be a difficult logistical challenge. To be ready for counties to begin sending absentee-by-mail ballots by September 18, the Secretary of State's office is currently building the files that are used to create these ballots. Building these ballots is a cooperative effort between state and county officials.  To ensure accuracy, multiple drafts are reviewed and re-reviewed. The Secretary of State's office builds ballots for every different ballot combination in every different county. There are 6,091 different ballot combinations in Georgia. This

is a labor-intensive and detailed process that is critical to ensuring voters are presented with a correct ballot. Pursuant to our elections calendar, this effort is already in progress, since it began as soon as the July 24 runoff election was certified and will continue until early September.

13. While they are assisting the state in reviewing their ballots, county election officials are themselves in an especially busy time of year. They are in a heavy voter registration period that continues up until the voter registration deadline. It is imperative that counties stay caught up on processing voter registrations this time of year because delays on processed voter registration applications will lead to delays to sending out absentee ballots will lead to delays in early voting. Counties are also busy finalizing the county-specific portions of the elections process. Many counties have a referendum that must be called by the county elections superintendent by August 8, 2018. Counties are also in the process of verifying petition signatures for independent and third-party candidates, which is a time-consuming process. Even petitions that do not on their face have a sufficient number of signatures are still validated so that the signers can receive credit for signing. Moving to a new statewide system at this point would pull county election off their current tasks because it would be necessary to learn how any new system would work, help propose necessary regulations and security protocols, and prepare training for their

poll workers. Halting their current tasks would lead to delays in the later tasks, including voting.

## THERE IS NOT SUFFICIENT TIME TO PREPARE AND CONDUCT ADEQUATE TRAINING AND PUBLIC SERVICE ANNOUNCEMENTS

14. Attempting to change to a new statewide system of voting at this point would place significant and disruptive burdens on state and county election officials at a crucial time for preparing for the upcoming election. Poll workers for the upcoming election have already been trained in the existing processes. Not only would state and county election officials, as well as the State Election Board, have to come up with new procedures, they would have to quickly become experts on those procedures, develop training for counties, schedule and carry out that training. Then, in turn, county officials would have to develop training for poll workers and schedule and implement that training.

15. To minimize public confusion, public service announcements letting the public know about the new voting system and what they can expect when they vote should also be created, as well as an extensive marketing campaign to educate voters on the new processes. Of course, these could not even be created, much less distributed, before those new processes are created. Thus, there is not sufficient time to allow for new election-official and pollworker training or

to properly educate the public on these changes. Attempting to change those processes in the middle of an election cycle creates heightened risks of voter confusion, errors at the polls, and potentially diminished voter turnout and/or disenfranchisement.

## EARLY VOTING WOULD BE SIGNIFICANTLY DISRUPTED

16. Absentee-in-person voting is very popular in Georgia. Based on past trends, I expect at least 50% of voter and likely more than that to choose to vote early. Early voting in Georgia is different than Election Day voting and carrying out early voting successfully with a paper ballot system would be incredibly difficult. Currently, voters in Georgia can vote in any early voting location in their county. They do not have to vote in a specific, assigned polling place like they do in Election Day. This means that early voting locations have to have access to every possible ballot combination in the county. Even counties that have ballot-on-demand printing could not serve this role without purchasing additional quantities of printers. Alternatively, counties would have to have stacks of every ballot combination in the county available at every early voting location. This would require a drastically redesigned polling place layout from current configurations, as well as revised physical security measures, procedures and training. There is not sufficient time to update

existing State Election Board rules on polling place layout, ballot assignment, and ballot security.

17. There is insufficient time for the State Election Board to enact rulemaking that would facilitate such wide-ranging and dramatic changes so close to Election Day. General timing for rule promulgation under the Georgia Administrative Procedure Act is that the State Election Board must first vote to post a rule for 30 days. After that 30 days is up, the Board must meet again, review any public comment, and vote to adopt or reject the rule. If the rule is amended based on the public comment or otherwise, it must be re-posted for 30 days and then voted on after that. If the rule is adopted, it must be submitted to the Administrative Procedures Division and becomes effective 20 days after that submission. There are provisions for emergency rulemaking in the event of imminent peril, in circumstances such as "quarantines, contrabands, and seizures," but whether this situation would fall into that category is doubtful at best.

## VOTER CHECK-IN PROCESSES WOULD BE SIGNIFICANTLY DISRUPTED

18. On actual Election Day, a switch to a new voting system would present other difficulties. Poll Workers use ExpressPoll during voter check-in.

ExpressPolls are currently programmed to create voter access cards and mark that a voter has voted when that voter access card is created. If we moved to paper ballots, each ExpressPoll in the state would have to be re-programmed. This would require hands-on assistance from the state's technical experts. There are currently 8,660 ExpressPolls across all 159 Georgia counties that would need to be re-programmed. Poll workers would also need training on the new process for checking voters in, which could not be completed prior to voting beginning. Re-programming Express Polls this late in the process would likely lead to many more errors in polling places, disaffected voters, and longer wait times.

## TABULATION WOULD BE SIGNIFICANTLY DISRUPTED

19.   Of course, paper ballots would need to be tabulated for reporting. Counting so many paper ballots accurately for a major, State-wide election using existing optical scan machines is not a realistic solution.

20.   The optical scan machines used in Georgia are not designed to count all ballots cast in an election. There are optical scanners on the market that are designed to be central tabulators that count all votes in an election, but Georgia does not have any of those optical scanners because Georgia's system is designed differently. The optical scanners that are currently part of Georgia's

system are manufacturer-recommended to tabulate up to two thousand ballots each election. Currently, Georgia has 891 optical scan machines, which is not nearly enough to ensure accurate and timely counting of a 100%-paper-ballot election. Generally, counties do not use their entire inventory of optical scanners in order to hold some in reserve. For example, Cobb County used 8 of their 18 optical scanners to count paper absentee and provisional ballots in the 2016 election. If Cobb used all 18 of their optical scanners to tabulate all votes cast in 2016, they would be tabulating a total of 18,637 ballots per scanner. This is well over the manufacturer recommended use of these scanners, and I would expect to encounter equipment issues if this was attempted.

21. Procuring new optical scan machines is not feasible at this point. A procurement of that size would likely be subject to state and county procurement rules. Even if an adequate number of machines could be procured in time, all machinery that is part of Georgia's election system is acceptance-tested by the State before it is delivered to a county, to ensure that it meets specifications. Even if the State could quickly and legally procure a sufficient number of optical scanners, there would not be sufficient time before Election Night to acceptance-test all of those machines.

22. The optical scanners consist of both the hardware the machine uses to operate and memory card that records the tabulated votes. Each memory card

must have precincts pre-loaded onto it, so that ballots can properly be attributed to the correct precinct. No more than 20 precincts can be loaded onto each memory card. Further, each memory card is only recommended to hold between six thousand and eight thousand votes. Since the machines would have to be tabulating many more ballots than that, there would have to be multiple memory cards used per machine. I would expect to see equipment and custody issues arise. Switching to counting all ballots via optical scanners would mean operating the current optical scanners at levels well above their manufacturer recommended uses.

## MOVING TO ALL PAPER BALLOT SYSTEM SO QUICKLY WOULD NOT MITIGATE HUMAN ERROR

23. I am also familiar with the situation described in the Declaration of Rob Kadel. As I described in a previously submitted declaration about this issue, the most likely cause of the delay in Mr. Kadel correctly voting his ballot was that the poll worker inadvertently selected the ballot precinct directly above the correct ballot precinct. Such an inadvertent manual-selection would have nothing to do with the functionality, accuracy or reliability of either the memory card or DRE machine themselves, but is attributable to touching the screen slightly above the intended target and a poll worker not confirming his

or her selection. Plaintiffs cite additional instances of data entry errors in support of their motion, including issues in Habersham and Hall Couty. As long as humans are involved in elections, there will be an element of human error. Moving to an all paper-ballot system would not do anything to mitigate this type of error. In fact, it would probably increase instances of human error because poll workers would be using a system that they are less familiar with and trying to employ new processes without time for sufficient training.

24.   Georgia is a unique and diverse state when it comes to voting. We have a statewide, uniform system, and while that is helpful some ways, it does mean that implementing major changes successfully requires planning and coordination with other local and county officials to ensure our process performs successfully for all Georgia counties. With over 27,000 voting machines across 159 counties and 6.7 million registered voters, changes have to be implemented responsibly and carefully with attention to how they affect big counties, small counties, rural counties, and urban counties. Replacing the means of voting statewide this close to the actual casting of ballots would require significant logistical challenges, procurement of new equipment and hardware, new administrative regulations, new polling place design, cost money that has not been budgeted for this year's elections, and contribute significantly to voter confusion and disaffection.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

Executed this 13 day of August, 2018.

*CHRIS HARVEY*
*Elections Director, in the office of the Secretary of State for the State of Georgia*