IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, et al;                )
                                     )
              Plaintiffs,            )
                                     )
                                     )
v.                                   )   CIVIL ACTION
                                     )   FILE NO: 1:17cv02989-AT
BRIAN P. KEMP, et al.;               )
                                     )
                                     )
              Defendants.            )
                                     )
                                     )

## FULTON COUNTY DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

The Fulton County Board of Registration and Elections ("FCBRE") and members of the FCBRE, Mary Carole Cooney, Vernetta Nuriddin, David J. Burge, Stan Matarazzo, Mark Wingate and Aaron Johnson, (hereafter "Fulton County Defendants") hereby file this Response to Plaintiffs' Motions for Preliminary Injunction. Fulton County Defendants show that Plaintiffs are not entitled to the equitable relief requested in either Motion for Preliminary Injunction filed on August 3, 2018 or August 8, 2018, for the following reasons:

## INTRODUCTION

The Fulton County Defendants, in conjunction with Fulton County elections staff, are already engaged in preparation for the November 2018 elections. At this late date, converting to a paper ballot election system cannot be accomplished without compromising the public interest and diminishing the fundamental right to vote. This is true statewide as well. Plaintiffs' dismissive assertion that immediate conversion of elections to paper ballots can be accomplished for the November 2018 elections "without any new equipment, software, significant poll worker training, or additional funding." [Doc. 229 at 9] is simply not true. Such an undertaking, especially when viewed in the context of changing a statewide voting system is not possible without great upheaval and virtual impossibility at this time.

## STATEMENT OF FACTS

This matter has been pending since July 3, 2017. On August 3, 2018, the Coalition Plaintiffs filed a Motion for Preliminary Injunction, asking the Court to prohibit Defendants "from conducting the November 2018 general election and the related December 2018 runoff election through direct recording electronic (DRE) voting units for in-person voting." [Coalition Pls.' Motion, Doc. 258 at 1]. Plaintiffs also asked the Court to order Defendants instead to "conduct such elections using paper ballots" and to "promulgate rules requiring and specifying appropriate procedures for conducting precertification audits of the results of both

2

such elections and, to order the Defendant Secretary of State, before October 1, 2018, to conduct an audit of and correct any identified errors in the DRE system's electronic pollbook data that will be used in both such elections." (Id. at 1-2). [1]

In its Order of August 7, 2018, the Court directed, "Defendants in their response brief to particularly focus on the public interest factor – i.e., the practical realities surrounding implementation of the requested relief in the next one to three months." [Doc. 259 at 2].  For the reasons set out below, the Fulton County Defendants request that Plaintiffs' Motions for Preliminary Injunction be denied in their entirety.

## Standard for Granting Preliminary Injunctions

In order to obtain injunctive relief pursuant to Federal Rule of Civil Procedure 65, the moving party must show: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000).  Injunctive relief "is an extraordinary and drastic remedy, not to

---

[1] On August 8, 2018, the Curling Plaintiffs also filed a Motion for Preliminary Injunction [Doc. 260], asking the Court to prohibit Defendants "from conducting the November 2018 general election and the related December 2018 runoff election through direct recording electronic (DRE) voting units for in-person voting."  As agreed by the parties [Doc. 261 at 1], this Response is to both groups of Plaintiffs' motions.

be granted unless the movant clearly established the 'burden of persuasion'" as to **each of the four prerequisites**. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998) (internal citations and quotations omitted); see also Texas v. Seatrain Int'l, S.A., 518 F.2d 175, 179 (5th Cir. 1975) (injunctive relief "is the exception rather than the rule," and movant must clearly carry the burden of persuasion).  In order to be entitled to injunctive relief, plaintiffs must meet the burden of persuasion on all four of the delineated factors. Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 435 (5th Cir. 1981).

## ARGUMENT AND CITATION OF AUTHORITY

**I.      Plaintiffs Are Barred From Receipt of Equitable Relief by the Availability of Adequate Remedies at Law.**

The universal test of the jurisdiction of a court of equity to issue injunctions is the absence of a legal remedy by which the complainant might obtain the full relief to which the facts and circumstances entitle him or her. Strozzo v. Sea Island Bank, 240 Ga. App. 183, 521 S.E. 2d 392 (1999).

Here, the adequate remedy available and any Georgian that believes that paper ballots with optical scanners is a more secure way to vote,  is to vote via absentee ballot.  Absentee ballots are paper ballots and are read with optical scanners.  Utilization of the existing process, as provided by law,  provides Plaintiffs and the general citizenry with the preferred method of voting via paper ballot, yet does not result in upheaval of the state's current process, increased

4

unfunded costs, a need for additional poll worker training, frustration of advance voting or increased voter confusion.

Plaintiffs have asserted that the "substantial effort" allegedly undertaken by one elector amounts to election roulette, [Doc. 260, at 14] yet they overlook the substantial effort that will have to be taken by the Fulton County Defendants and every election official in the State to produce the requested relief, when access to paper ballots that can be audited is already available via absentee ballot.

**II.    Because Plaintiffs Do Not Seek to Maintain the Status Quo, Plaintiffs Have Failed to Meet the Legal Standard for a Preliminary Injunction.**

The purpose of a preliminary injunction is to maintain the status quo pending final adjudication. DREs have been used in the state of Georgia since 2002, thus the use of DREs constitutes the status quo.  Both the Supreme Court of Georgia and Georgia Court of Appeals have stated repeatedly that "[i]t is axiomatic that the sole purpose of a temporary or interlocutory injunction is to maintain the status quo pending a final adjudication on the merits of the case." Hampton Island Founders v. Liberty Capital, 283 Ga. 289, 293 (2008) (citing Bailey v. Buck, 266 Ga. 405, 405-06 (1996)) Hicks v. Doors by Mike, Inc., 260 Ga. App. 407, 408 (2003).

The status quo here is using the DRE machines for in-person voting and paper ballots for absentee voting. Because Plaintiffs cannot meet the prerequisite legal standard for the granting of a preliminary injunction (because they want

to change the status quo, not maintain it), its motion for an order for a preliminary injunction must be denied.

### III.   Plaintiffs are Barred From Injunctive Relief By the Doctrine of Laches.

Plaintiffs unreasonably delayed bringing their motions and they did so to the detriment of the Defendants.  Laches arises from a "lack of diligence by the party against whom the defense is asserted, and . . . prejudice to the party asserting the defense." Costello v. United States, 365 U.S. 265, 282 (1961).  Thus, Plaintiffs' motions are barred by laches.  A movant may be barred by laches from preliminary injunctive relief in a voting rights case where a defendant establishes that the moving party "unreasonably delayed in asserting their rights and that such delay prejudiced" the defendant. Miller v. Bd. of Com'rs of Miller County, 45 F.Supp.2d 1369, 1373 (M.D.Ga.1998); see also United States v. Barfield, 396 F.3d 1144, 1150 (11th Cir. 2005).

DRE machines have been used in Georgia since 2002.  After this matter was removed to this Court in August 9, 2017, this Court offered Plaintiffs an expedited schedule that would have allowed the Court ample time to rule on a motion to dismiss and the jurisdictional arguments made therein before entertaining Plaintiffs' case for injunctive relief. [Doc. 40]. It is now undeniable that Plaintiffs missed that window of opportunity.

6

The Fulton County Defendants have been readying for the November 2018 election based upon the current early voting timeline.  (Declaration of Richard Barron at ¶¶ 16, 19, Exhibit 1).   Not only the Fulton County Defendants, but thousands of county officials across Georgia - who are not even parties to this suit—would be prejudiced by the issuance of the requested injunction because election officials have already made critical decisions, expended significant resources planning for the general election based on the existing early voting schedule, and the established elections apparatus and procedures.   The drastic changes—both foreseeable and probably some unforeseeable—implicated by Plaintiffs' unreasonable demands would result in unexpected resource allocation and expenditures for which neither the State, nor county governments have planned or budgeted.

Under similar circumstances, the U.S. Supreme Court in <u>Benisek v. Lamone</u>, 138 S.Ct. 1942 (June 18, 2018), supported the District Court's discretionary decision to deny a preliminary injunction and to stay the proceedings." 138 S.Ct. at 1944-45, where, as here, time is inadequate to balance a preliminary injunction with ensuring orderly administration of elections, "a due regard for the public interest in orderly elections."   It is now August, and this Court should conclude that a preliminary injunction would be "against the public interest," as an injunction would work "a *needlessly 'chaotic and disruptive effect upon the*

7

*electoral process.*'" *Id.* at 1945 (emphasis supplied).   Plaintiffs' eleventh-hour
motion comes too late.

## IV.   Plaintiffs Have Failed to Establish that They Are Entitled to a Preliminary Injunction.

Injunctive relief such as that requested by Plaintiffs has been held to be "an
extraordinary and drastic remedy [that is] not to be granted until the movant clearly
carries the burden of persuasion as to the four prerequisites."   Northeastern Fla.
Chapter v. Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir.1990).   Plaintiffs'
Motions for Preliminary Injunction, even when considered in tandem with all other
pleadings of record in this matter, completely fail to present this Court with any
evidence whatsoever as to any of the four prerequisites for the issuance of the
requested injunction. Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d
430, 435 (5th Cir. 1981).

Plaintiffs have provided this Court with no evidence as to the likelihood that
their underlying claims will succeed on the merits or that this Court's refusal to
issue the requested orders would cause them any harm whatsoever, much less
irreparable harm.  The affidavits of the named Plaintiffs in this matter, submitted as
exhibits to the Motions for Preliminary Injunction, fail to speak to actual harm that
will befall them if the injunction is not granted: Jeffrey Schoenberg speaks to his
"doubts about election integrity" ¶ 8 and his "worry" ¶ 10.   Donna Curling's
affidavit speaks to her "persistent and serious concerns" ¶ 5, but also states that she

8

intends to vote by absentee using a paper ballot in the upcoming November 2018 election. Donna Price's affidavit speaks about her concern over the security of Georgia's system, ¶ 11, but also notes that she has a choice to vote via the DRE or to vote absentee, ¶ 13. These are not irreparable harms, and they underscore the fact that Plaintiffs have an adequate remedy. Plaintiffs have strung together news articles about foreign powers intrusions on social media, white papers written by hackers, anecdotes about dealing with government employees, and the general fear about Russian intrusion into U.S. elections to come to the conclusion that Georgia's election system is unreliable. But, Plaintiffs have failed to support their allegation with any evidence that the alleged future potential injury to Plaintiffs outweighs the harm to Defendants, if the requested order is issued. Plaintiffs have also downplayed the impact of the requested orders and the public interest.

## 1. Plaintiffs Have Not and Can Not Show a Likelihood of Success on the Merits.

Plaintiffs have conveniently downplayed the Georgia jurisprudence on this very subject. Georgia courts have upheld the use of DRE machines; therefore, Plaintiffs are not likely to succeed on the merits. See Favorito v. Handel, 285 Ga. 795 (2009). In Favorito, the Court rejected a constitutional challenge to the use of DRE machines for Georgia elections. In so doing, the Court held that voters are not entitled to have their votes cast and tabulated in a particular manner. Id. at 797. Plaintiffs assert that various persons agree that Georgia's system is susceptible, but

9

this "consensus" is not evidence that anyone's constitutional rights have been violated, and does invalidate <u>Favorito</u> as good law.2

Further, Plaintiffs ignore the tests that have been conducted by the Secretary of state on the DRE machines [Doc. 49-6] with regard to the reliability of the DREs. Plaintiffs have put forth no evidence of illegal access to Fulton County's voting machines. In fact, there is no evidence of actual problems with Fulton County's voting machines that have denied any elector the right to have his or her vote counted. Yet, Plaintiffs proclaim that it is now without a doubt that Fulton County's and the entire State of Georgia's voting machines are unreliable and must be replaced by paper ballots immediately.

> a. *Plaintiffs Fail to Show Substantial Likelihood of Success Overcoming Jurisdictional Issues Asserted in the Motions to Dismiss.*

The "merits" Plaintiffs must show a likelihood of success "encompass not only substantive theories but also establishment of jurisdiction." <u>Obama v. Klayman</u>, 800 F.3d 559, 565 (D.C. Cir. 2015). A party's inability to establish a substantial likelihood of standing on a motion for preliminary injunction requires

---

[2] In Curling v. Kemp, CAFN 2017CV290630 (Fulton Superior Court), the previously filed action in the Fulton County Superior Court in 2017, Plaintiffs Emergency Motion for Temporary Restraining Order and Interlocutory Injunction was denied by Judge Adams. The Court held that Plaintiffs failed to satisfy the elements for injunction. See Exhibit 6, Order Denying Plaintiff's Motion for Temporary Restraining Order and Interlocutory Injunction and for Writ of Mandamus, page 4.

denial of the motion. See, e.g., Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) ("when considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)."). While this Court asked Defendants to focus on the "public interest" prong, jurisdictional issues like standing, immunity, etc., are prerequisites to judicial action. They may not be assumed for expediency's sake.

      b.     *Plaintiffs' Fail to Show Substantial Likelihood of Success on the Merits of their Claims.*

Plaintiffs cite a litany of alleged "errors" or mishaps, but fail to connect them to malicious hacking that would result in a loss of their votes. The existence of evidence that DREs might be "hacked" in an academic setting is negligible. Plaintiffs cannot show a substantial likelihood that their votes are in danger by someone attempting to hack a DRE in the face of election officials and other members of the public.

In addition to the Fulton Superior Court denying interlocutory relief when some of these same plaintiffs attacked Georgia's use of DREs in Curling v. Kemp, CAFN 2017CV2906301, the following cases have also denied relief to plaintiffs seeking to enjoin the use of DREs: Weber v. Shelley, 347 F.3d 1101, 1103 (9th Cir. 2003) (holding that all-electronic DREs lacking a voter-verified paper record do not deprive voters of legal rights); Tex. Democratic Party v. Williams, 285 F.

11

App'x. 194, 195 (5th Cir. 2008) (per curiam), cert. denied, 129 S. Ct. 912 (2009) (unpublished opinion affirming summary judgment in favor of Secretary of State on claims that DRE deprived voters of equal protection and due process and violated the Election Code). Andrade v. NAACP of Austin, 345 S.W.3d 1, 14 (Tex. 2011) (unsuccessful action for declaratory and injunctive relief against Secretary of State, alleging that Secretary acted outside of her authority when she certified paperless DRE machines for use by county in recording election votes because Secretary had the power to balance relative assets and deficiencies of the challenged all-electronic DRE voting systems, and that under a rational basis review, the court lacked the power to displace that judgment); Schade v. Md. State Bd. of Elections, 930 A.2d 304, 328 (Md. 2007) (voters and candidates were not entitled to preliminary injunction against State Board of Elections against use of DREs that lacked a voter verified paper audit trail).

**2.     Plaintiffs Cannot Show that They Will Suffer Irreparable Harm.**

"[T]he absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000). DRE machines have been used in Georgia for decades. When challenged, they passed constitutional muster with the Supreme Court of Georgia and the Eleventh Circuit. Favorito v. Handel, 285 Ga. 795 (2009) (DRE voting machines do not violate voters state or federal constitutional rights);

Wexler v. Anderson, 452 F.3d 1226 (11th Cir. 2006) (holding that all-electronic DREs lacking a voter-verified paper record do not deprive voters of their legal rights.)  The Plaintiffs should not now be heard to complain that they will suffer irreparable harm if this Court does not grant them a preliminary injunction halting the operation of a duly-enacted State statute passed in the early 2000s.

Plaintiffs have failed to demonstrate irreparable harm.  Indeed, allowing the election to proceed with the use of DRE machines does not prevent Plaintiffs from securing the relief that they ultimately seek (i.e., use of paper ballots that are verified via optical scanners). This relief is available to each and every person who seeks to take advantage of the absentee voting process.  If Plaintiffs want to vote through the use of paper ballots, they can request an absentee paper ballot without the need of disrupting ongoing Election preparation.   O.C.G.A. §21-2-381; Favorito, 285 Ga. at 798.  Absentee voting will begin on September 22, 2018 for the November 2018 election. (Barron Decl., ¶ 15).

Because Plaintiffs have failed to show that they stand to be harmed if an injunction is not granted, the granting of an injunction is not warranted. Thomas v. Mayor, etc. of Savannah, 209 Ga. 866, 76 S.E.2d 796 (1953).  Injunction is an extraordinary remedy, and the most important one which courts of equity issue; being so, it should never be granted except where there is grave danger of impending injury to person or property rights, and a mere threat or bare fear of

13

such injury is not sufficient.  Id. at 867.  See also City of Willacoochee v. The

Satilla Rural Electric Membership Corporation, 283 Ga. 137 (2008).  (Where there

has been no interference with the person or property rights of the petitioner, but

that the petition is based upon a threat or mere apprehension of injury to person or

property rights, it is proper to refuse an interlocutory injunction.) "A showing of

irreparable harm is the 'sine qua non' of injunctive relief." Siegel v. LePore, 234

F.3d 1163, 1176 (11th Cir.2000).

All Georgia voters "have the option of casting an absentee ballot or using the

touch screen electronic voting machines on Election Day." Favorito, 285 Ga. at

798.  Plaintiffs cannot possibly show irreparable harm when they may easily cast

the paper ballot they perceive as more secure.  O.C.G.A. § 21-2-380(b); see also

Doc. 260-4 at 5 (Curling intends to vote absentee using a paper ballot); Doc. 258-1

at 76 (Bowers plans to vote by mail-in paper ballot in Nov. 2018); Doc. 258-1 at

123 (Kadel plans to vote by mail-in paper ballot); Doc. 258-1 (same as to Luse)[3].

As the Favorito Court recognized, "absentee voters 'have not been treated

differently from the polling place voters, except in a manner permissible under the

election statutes' and as a result of their own choice."  285 Ga. at 798.

Not every alleged constitutional violation regarding voting rights shows

irreparable injury. See, e.g., Greater Birmingham Ministries v. State, 161

_____

[3] There is no legal authority holding that having to choose between voting by
absentee paper ballot or on election-day burdens Plaintiffs' right to vote.

14

F.Supp.3d 1104, 1117 (N.D. Ala. 2016). "Plaintiffs' allegations that voting machines may be 'hackable,' and the seemingly rhetorical question they pose respecting the accuracy of the vote count, simply do not constitute injury-in-fact." Stein v. Cortes, 223 F.Supp.3d 423, 432 (E.D. Pa. 2016), citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 133 S.Ct. 1138, 1148, 185 L.Ed.2d 264 (2013). Plaintiffs' litany of supposed errors and discrepancies neither connect causally to an actual hack of the DRE machines, nor prove these Plaintiffs will suffer imminent loss of their voting rights.   Absent evidence that Georgia's DRE machines—much less the individual votes of these Plaintiffs—have been manipulated in any Georgia election, Plaintiffs fail to show substantial likelihood of irreparable injury, especially when they have ample time to exercise their right to vote by paper absentee ballots, as many apparently will.

### 3. Plaintiffs Have Failed to Show that the Threatened Injury Outweighs the Harm to the Defendants and the Public.

Plaintiffs have also failed to establish that the balance of equities tips in their favor.  The Supreme Court has long recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." Storer v. Brown, 415 U.S. 724, 730 (1974). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Maryland v. King, 567 U.S. 1301 (2012) (Roberts,

15

C.J., in chambers) (quoting New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,

434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

In contrast to the lack of injury to Plaintiffs outlined above, requiring the

Defendants to not use DRE machines in the upcoming election would cause

significant administrative upheaval, disruption of the election process, extreme

financial cost, voter disenfranchisement and voter confusion.  (Barron Decl., ¶ 18).

These outcomes, in turn, would undermine voter confidence in the electoral

process, the integrity of that process, and trust in the governmental entities and

officials who administer the electoral system.  Plaintiffs assert that they are seeking

to protect the integrity of the voting system, but the requested relief, haphazardly

being applied to the upcoming election, would have the opposite effect.

Plaintiffs' claim that immediate conversion of elections to paper ballots can

be accomplished for November's elections "without any new equipment, software,

significant poll worker training, or additional funding." [Doc. 229 at 9] is patently

false.  Fulton County has 28 operable and non-sequestered optical scanning (OS)

units available for the November 2018 general election.  The OS units are used to

read absentee ballots.  To conduct the November 2018 general election via paper

ballots, the County would need approximately 250 OS machines for Election Day

and absentee ballots. Accordingly, Fulton County does not currently have enough

OS units to use for counting all of the ballots expected to be cast in November of

2018. The cost of procuring and deploying adequate numbers of OS units for the November 2018 election would carry excessive and unbudgeted cost. It is even questionable whether enough compatible OS units are available as they are no longer manufactured. (Barron Decl., ¶ 6).

Fulton County has budgeted $2,536,942.00 for conducting the November 2018 general election. (Barron Decl., ¶ 17). There are no additional funds to purchase the more than 200 additional OS machines that would be needed. (Presumably the other 158 Georgia counties would be similarly affected). Further, use of the OS units in the proposed remedy asserted by Plaintiffs is curious, given Plaintiffs assertions that the OS machines are supposedly just as unreliable and susceptible to hacking as the DREs are.

There would also have to be additional poll worker training. Fulton County's procedures for absentee ballots, when there are random marks or illegible handwriting is to have three staff members assist with providing a legible ballot – one worker reads the ballot as best they can, one worker marks another ballot, the third worker verifies that the person marking the ballot has done so consistent with what has been read. It is anticipated that a similar process would need to be employed if paper ballots are encountered that have stray marks or are illegible or not fully completed. Additional personnel would need to be trained and procedures

would need to be put in place for dealing with markings on paper ballots that make the voter's intention ambiguous. (Barron Decl., ¶ 23).

As it stands now, for the November 2018 general election, it is anticipated that 2,210 poll workers will be trained in Fulton County. (Barron Decl., ¶ 26). Online poll worker training will begin on September 10, 2018, and in-person training will begin on September 26, 2018. (Barron Decl., ¶ 30).

Additionally, the Fulton County Defendants are already preparing for election via DREs. Elections have been called; candidate names and referendums have been submitted to the counties and are being prepared for submission to the Secretary of State. (Barron Decl., ¶¶ 7-10). By the end of this month, electronic ballots proofs will be submitted and reviewed and the GEMS database will be submitted for approval. (Barron Decl., ¶¶ 11-13). Fulton County anticipates commencing Logic and Accuracy testing on September 18, 2018 for the November 2018 general election. (Barron Decl., ¶ 4).

On a motion for preliminary injunction, the plaintiffs bear the burden of showing that the perceived injury outweighs the damages that the preliminary injunction might cause to the defendants. Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 169 (11th Cir. 1988). Here, the harm to Defendant is significant. An injunction would interfere with the County's election processes which are already being planned and would require Defendants to expend additional taxpayer dollars.

Plaintiffs make casual assertions that the switch to paper ballots could be quickly and easily achieved.  Again, Plaintiffs ignore the fact that the OS machines that they assert should be used to provide an audit trail for the paper ballots, have also been alleged by Plaintiffs to be faulty (Coalition Plaintiffs' Third Amended Complaint, ¶¶ 79-91) and are programmed by the very same system that is alleged to be susceptible to hacking. (Barron Decl., ¶ 5).   Accordingly, it is curious how the use of this alleged faulty OS equipment would be acceptable for scanning paper ballots, but is unacceptable as currently used alongside the DREs.

Plaintiffs' demands are unlike injunctions that would merely require the State to refrain from implementing a newly-enacted law or requiring the continuation of a familiar procedure as the status quo pending a decision on the merits of a new one.  Cf. League of Women Voters of North Carolina v. North Carolina, 769 F.3d 224, 247-48 (4th Cir. 2014) (finding balance of equities leaned towards plaintiffs because challenged changes to North Carolina's voting laws involved systems that "have existed, do exist, and simply need to be resurrected" or "merely require[d] the revival of previous practices or, however accomplished, the counting of a relatively small number of ballots").  Instead, Plaintiffs seek an injunction requiring the State to expend considerable resources to create a new regulatory framework for every vote Statewide, pass it into law within mere days,

and have Fulton County and all of the other 158 counties implement it instantly thereafter.

No balloting system is perfect. Traditional paper ballots, as became evident during the 2000 presidential election, are prone to over-votes, under-votes, "hanging chads," and other mechanical and human errors that may thwart voter intent. See generally, Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Meanwhile, touchscreen voting systems remedy a number of these problems, albeit at the hypothetical price of vulnerability to programming "worms." The AVC Edge System does not leave Riverside voters without any protection from fraud, or any means of verifying votes, or any way to audit or recount. The unfortunate reality is that the possibility of electoral fraud can never be *completely* eliminated, no matter which type of ballot is used. Hennings v. Grafton, 523 F.2d 861, 864 (7th Cir.1975). Plaintiffs' speculation that a different balloting system would eliminate potential third-party interference with voting ignores reality. Again, no election system is flawless. Weber v. Shelley, 347 F.3d 1101, 1106 (9th Cir. 2003) ("The unfortunate reality is that the possibility of electoral fraud can never be *completely* eliminated, no matter which type of ballot is used.") (emphasis in original); Favorito v. Handel, 285 Ga. at 797 (voters do not have a right to a particular ballot system). Plaintiffs are naïve to think paper ballots do not have tradeoffs and problems, just of different types, gravities and levels of

20

risk.

"There [is] no guarantee that the [Plaintiffs'] proposed remedy, i.e. the implementation of specific security measures and a paper ballot option, would [result], in fact, in a 'secure' election." See, e.g. Schade v. Maryland Board of Elections, 930 A.2d 304, 327 (Md. App. 2007) (denying preliminary injunction against use of DRE machines or use without paper trail, saying "[n]o system is infallible"). "[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." Favorito, 285 Ga. at 797-798. The balance of the equities favors shielding the voters from the chaos and disruption of an injunction so that the State's interest and role in promoting fair and orderly elections is respected.

### 4. Plaintiffs Have Failed to Show that Enjoining the use of the DRE Machines Would Serve the Public Interest.

Plaintiffs' reference to the State of Maryland switching from a DRE-based voting system to a paper ballot system does not bolster their clams. [Doc. 258 at 23]. The situations are not analogous.   A deeper look into the circumstances surrounding the State of Maryland's switch to paper ballots demonstrates the hardship and near impossibility the Defendants in this case would face if required to switch to a paper ballot voting system before the November 2018 elections.

The State of Maryland did not switch to a paper ballot system of voting in one to three months' time.   Maryland had been planning to switch to paper ballots

for nearly a decade.  (See Ben Weathers, *After Decade Absence, Paper Ballots Return to Maryland*, Capital Gazette (April 25, 2016), http://www.capitalgazette.com/news /elections/ph-ac-cn-paper-ballot-returns-0426-20160425-story.html)  (Exhibit 2).  It should also be noted that Georgia and Maryland are not similarly situated - Georgia has approximately twice the number of registered voters and six times as many counties as Maryland.[4]

The Maryland legislature voted to go back to paper voting in 2007.  (See Glynis Kazanjian, *Maryland Prepares for Move Back to Paper Ballots*, Cumberland Times-News (November 20, 2013), http://www.times-news.com/news/local_news/maryland-prepares-for-move-back-to-paper-ballots/article_4350732d-0981-5f72-afc2-b30fd668ec83.html)  (Exhibit 3). Maryland's switch back to paper ballots was delayed in 2010 because of the enormous cost of the switch.  Id. Even when it was finally funded by the legislature in 2013-2014 *at a cost of over $28 million*, election officials still had concerns about the switch, *two years before it was required to switch*.  (See Nate Stewart, *Maryland Switching to Paper Ballots in 2016,* Local DVM.com (January 20,

---

[4]  According the Office of the Secretary of State of Georgia, there are 6,176,672 registered voters in the State of Georgia.  (www.sos.ga.gov).  There are 159 counties in Georgia.  According to the Maryland State Board of Elections, there are 3,597,135 registered voters in Maryland.  (www.elections.maryland.gov).  There are 24 counties in the State of Maryland.

2015), https://www.localdvm.com/news/maryland-switching-to-paper-ballots-in-2016/164953656) (Exhibit 4).

Any assertion by Plaintiffs in the news media that Maryland accomplished the switch "two months before the election" is incorrect. Paper ballots were already required for Election Day in April 2016, but machines were still going to be used for early voting to cut down on the number of ballots needed to be printed. (See Pamela Wood, *Maryland Ditches Touch Screen Machines for Early Voting*, The Baltimore Sun (February 4, 2016), http://www.baltimoresun.com/news/maryland/politics/bs-md-paper-ballots-20160204-story.html) (Exhibit 5). In February 2016, the Maryland State Board of Elections voted to also require early voting via paper ballots in 2016 after candidates threatened to sue. Id. In essence, Maryland elections officials already had the new system in place and had budgeted $28 million to accomplish the switch and train workers on the new system. The Maryland State Elections Board simply ordered that paper ballots should also be used in early voting, which only required more ballots to be printed. Id.

In sum, Maryland had 10 years of preparation time and millions of dollars to make the switch; for a state with half the voters of Georgia. Now Plaintiffs would have the Court and the public believe that Defendants and the remaining 158 counties in the State of Georgia could accomplish the same feat with less than

23

three months and no money budgeted for such a task.

Fulton County is the most populous county in the entire state and has a significant population of African American voters. Because there is a candidate vying to become the nation's first African American woman governor, it is expected that Fulton County will see a record turnout. In order to assist the citizenry and to reduce the possibility of Election Day issues, Fulton County has steadily increased its early voting program over the last few years. During early voting, electors can vote at any of early voting sites. Thus, electors can vote on their lunch break, or while running Saturday errands. Electors can plan to vote on a day when they have a doctor's appointment, or on a day when they can get a friend or family member to take them to the polls. Fulton County anticipates having up to 24 early voting locations for the 2018 election. (Barron Decl., ¶ 20-22). Nineteen locations have already been confirmed. Locations include senior centers and college campuses. Early voting is particularly important to minorities, senior citizens and the poor. These members of the electorate may not have flexibility in their jobs to take off on Election Day, or may not have reliable transportation. Others can't risk waiting in line on Election Day because they can't pay childcare late fees or can't be late to work. (Barron Decl., ¶¶ 20-22). For these electors, being able to cast their vote at numerous locations, on their day off, which could be a Saturday, provides them an opportunity to be a part of the electorate, rather than

being shut out of it.  In the 2016 general election, 2260,135 votes were cast during early voting.  If an injunction issues against the use of DRE machines in the November 2018 election, Fulton County's early voting program will have to be drastically reduced.  Fulton County has 267 precincts, thus, all early voting sites have to have all possible ballot styles for all precincts.  In November 2018, Fulton County will be conducting elections for 14 referendums, 3 county races, 13 General Assembly races, 5 Constitutional Amendments and 1 gubernatorial race. (Barron Decl., ¶ 31).  Each precinct lies in different districts for the various races and thus each ballot style will include a distinct combination of the elections in which each elector can cast a vote.  The electronic provision of the correct ballot style to each elector that presents for early voting via DRE is easy and literally requires the push of a button.  By contrast, the provision of the correct paper ballot style to each elector that could present for early voting via paper ballots would be a difficult task fraught with the possibility of human error.  (Barron Decl., ¶¶ 20-21). The provision of the incorrect ballot style would mean that an elector could cast a ballot in a race for which he/she is ineligible and would not be able to cast a ballot in those races where he/she is eligible. The ineligible votes would get stricken, but the elector would have not had the ability to vote in the correct races.  In order to reduce the possibility of errors of this type, Fulton County would reduce the number of early voting locations to ensure that its full time staff could maintain

control of the paper ballots so as to reduce the possibility of counterfeit ballots and to oversee the provision and collection of paper ballots. The reduction of early voting locations will negatively impact elector options and disenfranchise a sizable population of minority voters.

Plaintiffs raise only phantom fears that DREs will be hacked and votes miscounted. A theoretical possibility that a voting machine somewhere in the State might be susceptible to tampering is outweighed by the State's legitimate interest in protecting its elections from the mad scramble that would certainly ensue if the Plaintiffs' motions were granted.

Mandating paper ballots by preliminary injunction "ha[s] the potential to cause voter confusion, particularly when implemented at such a late date in the election process." Schade, 930 A.2d at 327. It would also force the Defendants to absorb substantial costs in terms of implementation, education and training. The Defendants urge the Court "to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." Reynolds v. Sims, 377 U.S. 533, 585 (1964).

Given the irreparable harm suffered by a state when a court enjoins implementation of a duly enacted statute, the public resources required to enact new legislation, and the lack of guidance from Plaintiffs as to what they mean by

promulgated "appropriate procedures" [Doc. 258 at 2], or a "plan for administering those ballots" [Doc. 260 at 2], a preliminary injunction would not be in the public interest. The public interest can only be served by denying the preliminary injunction, ruling on the motions to dismiss and preserving the use of the DRE machines as the operative status quo pending further disposition of the case.

## CONCLUSION

As stated in <u>Southwest Voter Registration Education Project v. Shelley</u>, 344 F3d 914, 918 (9th Cir. 2003) (en banc) a "federal court cannot lightly interfere with or enjoin a state election." Accordingly, Fulton County Defendants respectfully request that the Court deny Plaintiffs' Motions for Preliminary Injunction in their entirety.

Respectfully submitted this 14th day of August, 2018.

**OFFICE OF THE COUNTY ATTORNEY**

**/s/David R. Lowman**
**Kaye Burwell**
**Georgia Bar Number:  775060**
**kaye.burwell@fultoncountyga.gov**
**Cheryl Ringer**
**Georgia Bar Number: 557420**
**cheryl.ringer@fultoncountyga.gov**
**David Lowman**
**Georgia Bar Number: 460298**
**david.lowman@fultoncountyga.gov**

ATTORNEYS FOR
DEFENDANTS RICHARD
BARRON MARY CAROLE
COONEY, VERNETTA
NURIDDIN, DAVID J. BURGE,
STAN MATARAZZO, AARON
JOHNSON, AND THE FULTON
COUNTY BOARD OF
REGISTRATION & ELECTIONS

**Office of the County Attorney**
141 Pryor Street, S.W.
Suite 4038
Atlanta, Georgia 30303

## CERTIFICATE OF SERVICE

I hereby certify that on this date I have electronically filed the foregoing

**FULTON COUNTY DEFENDANTS' RESPONSE TO PLAINTIFFS'**

**REQUESTS FOR PRELIMINARY INJUNCTION** with the Clerk of Court

using the CM/ECF system, with the Clerk of Court using the CM/ECF system,

which will send email notification of such filing to all attorneys of record.

This 14th day of August, 2018.

> **/s/ David R. Lowman**
> Georgia Bar Number: 460298
> david.lowman@fultoncountyga.gov

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, et al;                  )
                                       )
            Plaintiffs,                )
                                       )
                                       )
v.                                     )   CIVIL ACTION
                                       )   FILE NO: 1:17cv02989-AT
BRIAN P. KEMP, et al.;                 )
                                       )
                                       )
            Defendants.                )
                                       )

## DECLARATION OF RICHARD BARRON

Pursuant to 28 U.S.C. 1746, Richard Barron declares as follows:

1.

I make this Declaration in support of a response by Fulton County Board of Elections to certain motions filed in the above-styled matter of Donna Curling, et al., v. Brian Kemp, et al., (Civil Action No. 1:17-cv-2989-AT). Specifically, the purpose of this Declaration is to respond to the allegations in Plaintiffs' Motions for Preliminary Injunction by providing the practical realities surrounding implementation of a paper ballot voting system for the November 2018 general election and the related December 2018 runoff election.

2.

I am the Director of the Fulton County Department of Registration and Elections and have been employed in that role since June 19, 2013.

3.

Pursuant to O.C.G.A. §21-2-379 *et seq.*, the November 2018 general election and if necessary, the related December 2018 runoff election are to be conducted through the use of Direct Recording Electronic ("DRE") voting equipment.

4.

Beginning on September 18, 2018, Fulton County's Department of Registration and Elections will perform logic and accuracy testing on more than 1300 DRE voting machines to validate the functionality of the equipment and the accuracy of vote accumulation. This is a prerequisite that must occur on all voting equipment (including Optical Scan [OS] units) used in an official election. Any new or additional voting and tabulation equipment introduced will require logic and accuracy testing as well.

5.

If as Plaintiffs claim, the DRE system can be hacked, it should be understood that the GEMS server programs both the DRE and the OS units. If one could theoretically hack the DRE system, the same hack would affect the OS units

2

as well.  In fact, Plaintiffs' have requested that the Fulton County Department of Registration and Elections sequester a portion of its OS machines because of their alleged vulnerability.

<div align="center">6.</div>

Fulton County has 28 operable and non-sequestered OS units available for the November 2018 general election. The OS units are used to read absentee ballots. To conduct the November 2018 general election via paper ballots, the County would need approximately 250 OS machines for Election Day and absentee ballots. Accordingly, Fulton County does not currently have enough optical scanners to use for counting all of the ballots expected to be cast in November 2018. The cost of procuring and deploying adequate numbers of optical scanners for the November 2018 election would carry exorbitant and unbudgeted cost.  In addition, it is questionable whether compatible equipment is available since it is no longer manufactured.

<div align="center">7.</div>

Pursuant to O.C.G.A. §21-2-9 *et seq.*, August 8, 2018 is the final date to call the Fulton County General and Special elections held in conjunction with the November 2018 general election.

<div align="center">3</div>

8.

Pursuant to O.C.G.A. §21-2-9 *et seq.*, August 10, 2018 is the final date to submit municipal public notice, resolutions and call the special elections held in conjunction with the November 2018 general election.

9.

Pursuant to O.C.G.A. §21-2-9 *et seq.*, August 14, 2018 is the final date to submit candidate names, offices and referendum titles to the county superintendents for the special elections held in conjunction with the November 2018 general election.

10.

Pursuant to O.C.G.A. §21-2-9 *et seq.*, August 16, 2018 is the final date to submit candidate and referendum information to the Secretary of State for special elections held in conjunction with the November 2018 general election.

11.

Pursuant to O.C.G.A. §21-2-9 *et seq.*, August 23, 2018 is the final date to receive ballot proofs from the Secretary of State for the November 2018 general election.

12.

Pursuant to O.C.G.A. §21-2-9 *et seq.*, August 24, 2018 is the final date to conduct concurrent review of ballot proofs from the Secretary of State for the November 2018 general election.

13.

Pursuant to O.C.G.A. §21-2-9 *et seq.*, August 28, 2018 is the final date to submit the approved GEMS database to the Secretary of State for the November 2018 general election.

14.

Depending on when the Secretary of State finalizes the County's GEMS database, ballot images and  transmits them to the County for proofing and approval; the County anticipates commencing Logic and Accuracy testing on September 18, 2018 for the November 2018 general election.

15.

On September 22, 2018 absentee voting will commence for the November 2018 general election, with the mailing of absentee ballots.  Absentee ballots are paper ballots.

16.

The Fulton County Department of Registration and Elections will begin conducting early voting poll worker training for the November 2018 general

5

election during the period of October 15, 2018 through November 2, 2018. Each poll worker is expected to attend 2-3 classes each. Approximately 175 advance voting poll workers will be trained. More than 2000 Election Day poll workers will be trained. If the Court enjoins the use of DRE machines, Fulton County would have to rewrite early voting and Election Day procedures manuals and retrain early voting and Election Day poll workers as paper ballots have not been used in a Georgia election since 1964.

17.

The Fulton County Department of Registration and Elections has budgeted $2,536,942.00 for the November 2018 general election. These costs were based on using DRE machines. If the Court restrains the use of DRE machines, paper ballots would have to be ordered, additional staff would have to be hired and additional optical scanning machines would have to be purchased. Approximately 125 ballot boxes would have to be purchased for Election Day. There is no additional money in the Fulton County Department of Registration and Elections budget to cover the additional costs that a paper ballot election would require.

18.

Requiring the Defendants to implement a paper ballot voting system would cause administrative upheaval, financial crisis and voter confusion. Confusion would result from being required to have all ballot types at every early voting site.

6

19.

O.C.G.A. § 21-2-385(d)(1)(C) requires a period of advance voting be provided. Early voting for the November 2018 election in Fulton County will run from October 15, 2018 until November 2, 2018. In order for early voting to occur, Fulton County election officials would have to rewrite election procedures, retrain poll workers, order paper ballots and ballot boxes for the early voting locations, and distribute the paper ballots and ballot boxes to each early voting location.

20.

During early voting, a voter can go to any site to vote, this is the advantage of participating in early voting. A voter may go to the location nearest one's employment, or on the weekend to cast their vote. This means that during early voting, each and every ballot style has to be present at every location. The provision of all of the ballot styles for multiple early voting sites would produce an administrative nightmare, that would be susceptible to human error and intentional misconduct. In order to facilitate advance voting via paper ballot, there would have to be folders of all of the 377 precincts with paper ballots in them at every location. Poll workers would have to locate and retrieve the correct paper ballot from the correct folder for each voter and then return it to the correct ballot box. The potential for error is great and the expense in the provision of sufficient paper ballots would be tremendous. Even though poll worker training, checklists

7

and procedures would be put in place to minimize confusion and to reduce the potential for human error and voter frustration; the number of early voting sites would have to be drastically reduced.

21.

In order to ensure that counterfeit ballots are not utilized, that the ballot boxes are properly secured, and that the casting of early voting ballots of 377 precincts is properly facilitated, I would need my for my full-time staff to be available to oversee advance voting.  Therefore, if Fulton County is required to go to a paper ballot voting system, early voting would be reduced to one location, the Fulton County Government Center.

22.

Fulton County's advance voting program has come to be a staple in Fulton County's elections.  Fulton County has a large number of voters and we generally provide close to 20 early voting sites for our electors.  Some of our early voting sites are located near or in college campuses and senior centers. Currently, Fulton County has confirmed nineteen early voting sites for the November 2018 elections and we are actively working to secure five more sites.  I believe that any reduction in advance voting sites is likely to impact voter turnout and lead to voter alienation.  However, it is in the best interests of the County's citizens to guard against the

8

administrative turmoil, confusion and voter disenfranchisement that would result if 19-25 locations each attempted to provide paper ballots for 377 precincts.

23.

Our current procedures for absentee ballots, when there are random marks or illegible handwriting, is to have 3 staff members assist with providing a legible ballot. One person reads the ballot to the best of their ability, one person marks another ballot, the third person verifies that the person marking the ballot has done so consistent with what has been read. It is anticipated that a similar process would need to be employed if paper ballots are encountered that have stray marks or are illegible or not fully completed. Additional personnel would need to be trained and procedures would need to be put in place for dealing with markings on paper ballots that make the voter's intention ambiguous.

24.

As of August 1, 2018, there are 749,517 registered voters in Fulton County.

25.

In the November 2016 general election, 260,135 voters utilized early voting in Fulton County.

26.

For the November 2018 general election, it is anticipated that 2,210 poll workers will be trained in Fulton County.

27.

Any reduction in early voting locations will likely result in long lines at the remaining early voting sites and on Election Day.  Long lines could also result in chilling voter turnout both during early voting and on election day.

28.

Long lines usually result in voting locations not closing on time, because persons in line at the time of poll closure are all allowed to vote, thus it takes a longer time to close the polls and to begin tabulation.  Delays in vote tabulation will result in delays in results being reported.

29.

Fulton County currently has 103 temporary staff for election support and anticipates hiring 210 staff for early voting.

30.

For the November 2018 general election, online poll worker training will begin on September 10, 2018, and in-person training will begin on September 26, 2018.

31.

In the 2016 general election, 260,135 votes were cast during early voting.  If an injunction issues against the use of DRE machines in the November 2018 election, Fulton County's early voting program will have to be drastically reduced.

Fulton County has 267 precincts, thus, all early voting sites have to have all possible ballot styles for all precincts.  In November 2018, Fulton County will be conducting elections for 14 referendums, 3 county races, 13 general assembly races, 5 constitutional amendments and 1 gubernatorial race.

<div align="center">32.</div>

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

This 14th day of August, 2018.

Richard Barron, Director
Fulton County Department of Registration and Elections

# EXHIBIT 2

# After decade absence, paper ballots return to Maryland



A voter places their paper ballot inside a scanning machine, a new process for 2016, at the early voting location at the Annapolis Senior Center earlier this month. (by Joshua McKerrow / Staff)



By **Ben Weathers**
bweathers@capgaznews.com



SHARE THIS

f  ⅴ          After decade absence, paper ballots return to Maryland

APRIL 25, 2016 5:00 PM

**F**or the first time in more than a decade, Anne Arundel voters will cast their votes on a paper ballot during Tuesday's Democratic and Republican Presidential Primary Elections.

As of Monday afternoon, some 2,600 election judges were gearing up for Tuesday's primaries. There will be 178 polling locations throughout the county, said Joe Torre, the election director for the Anne Arundel County Board of Elections.

In addition to election judges out in the field, around another 90 people will be at the State Board of Elections headquarters on Baymeadow Drive in Glen Burnie working as "field support," Torre said.

Torre predicted that 45 percent-to-50 percent of the county's some 287,000 registered Republicans and Democrats would cast ballots on Tuesday.

"It's on the news every night – we think people are excited," Torre said.

Maryland has "closed" primary elections, meaning that only registered Republicans and Democrats may cast their votes – registered Independents are excluded.

The state used paper ballots until 2004, when it switched over to Diebold touch screen voting machines, Torre said.

The switch back to paper ballots is almost a decade in the making.

In 2007, the General Assembly passed legislation advocating for a verifiable paper trail in elections, necessitating the purchase of machines that collect paper ballots, in addition to tallying votes. However, funding for the new system was not included in the state budget until 2014, according to the State Board of Elections website.

Upon checking into their respective polling places, check-in judges will issue voters their "voter authority cards." Then they will go to the ballot judges, who will issue a ballot and privacy sleeve, Torre said.

They will then take their ballot to a privacy booth where they will fill in their choices. After that, they will take their vote in its privacy sleeve to a scanning unit.

Voters will then feed the ballot into the unit, which will then read the ballot and deposit it into a secure ballot box, Torre said.

If a voter "made a mis-mark" or "over-voted," the machine will return the ballot. Election judges will then void the ballot and issue voters a new one, Torre said

"But most (voters) fill out the ballots correctly – it's not a difficult system," Torre said.

Polls officially close at 8 p.m. Though, Torre stressed that those waiting in line when the polls close will have a chance to vote.

After all the ballots have been deposited into the machines, the memory cards and ballots will be taken back to the Board of Elections headquarters. From there, the memory cards containing the vote calculations will be uploaded to the state's server, Torre said.

"Usually things start rolling in around 9 p.m. and we hope to be out of here around midnight," Torre said.

At least one candidate plans on spending election night in the county. Kathy Szeliga, a Republican from Baltimore County, running to represent Maryland's 3rd District in the U.S. Senate will hold an election night party at the BWI Marriott, at 1743 W. Nursery Road in Linthicum. The event is open to the public and begins at 8:30 p.m., Szeliga's communications director, Leslie Shedd said.

Szeliga is scheduled to appear earlier in the afternoon at Solley Elementary School, at 7608 Solley Road in Glen Burnie.

Chris Van Hollen, a Democratic also running to represent Maryland's 3rd District in the U.S. Senate, spent Sunday afternoon in downtown Annapolis meeting with local business owners and voters.

www.twitter.com/BenW_MDGazette

Cast your vote: Polls open at 7 a.m., close at 8 p.m.

Copyright © 2018, Capital Gazette, a Baltimore Sun Media Group publication | Privacy Policy

Missing comments? We've turned off comments across Capital Gazette while we review our commenting platform and consider ways to improve the system. If you purchased points through the Solid Opinion platform and would like a refund, please let us know at circsupport@tronc.com.

# EXHIBIT 3



- Newspaper Ads
- Buy Native Queen

69°

Serving Western Maryland and the
Potomac Highlands of West Virginia

Cumberland

Today

Isolated thun
morning, ther
during the aft
thunderstorm
Winds light a
Chance of ra
flooding is po

Tonight

Partly cloudy
give way to c
stray shower
possible. Low
and variable.

Updated: Augus

Full Forecast

- Twitter

Search...    Search    Search

Toggle navigation Menu

Search    Search    Search

- Contact Us
  - Purchase Photos
  - Submit a Letter to the Editor
  - Submit a News Tip
  - Place an Obituary
- Subscribe
  - Start a Subscription
  - Manage My Subscription
  - E-Paper
  - App Downloads
  - Newsletter

- E-Paper
- App
- Celebrations
- Obituaries
- Public Notices

# Maryland prepares for move back to paper ballots

- Glynis Kazanjian
  MarylandReporter.com
- Nov 20, 2013

ANNAPOLIS — Local election officials are already expressing uncertainty about what could go wrong when the state switches from an electronic voting system to using paper ballots in the next two years.

By the 2016 presidential elections the state will replace touch-screen machines and make a fundamental shift to the way voters cast ballots.

"This is a big transition for us," said Montgomery County Board of Elections Deputy Director Alysoun McLaughlin. "Everything from set up, to warehouses, to the voting experience is based around touch screen (voting) machines."

McLaughlin attended a demonstration last week in Baltimore where Dominion Voting Systems showcased a paper ballot scanning unit to local elections officials that the state will consider purchasing for use in 2016.

State officials are considering using an average of one or two optical scan machines per precinct. Dominion estimates it will take a voter five seconds to feed their ballot into the machine, but election officials foresee various reasons for it taking longer.

Marylanders primarily vote on touch-screen machines. In 2007, legislation was passed requiring the state election system to produce a voter verifiable paper record for each vote cast in an election. Lack of funding delayed the switch until now.

Election officials resisted the move because they were convinced of the integrity of the computerized voting, despite its lack of a paper trail. Paper ballots lead to more inaccurate and miscast votes which touch-screen voting does not permit, they said.

Several election officials that attended last week's demonstration were wary about taking on a new statewide voting system. Concerns ranged from potential long lines at the polls to problems with producing multiple versions of paper ballots or not having enough time to test the new system before it goes live.

State election officials would not provide an estimate of the cost to transition the state to the new paper voting system. Instead, the state board referred to a 2010 study conducted for the state by RTI International, which estimated that initial implementation would cost approximately $37 million.

React to this story:

Love
0
Funny
0
Wow
0
Sad
0
Angry
0

Tags

- Ctn Local
- Paper Ballots
- Maryland
- Election

Cumberland Times-News
Events

Fri, Aug 17          Mon, Aug 13

‹                                    ›

Dueling Piano Show          Lindy Hop Swing Class

Bobby McKey's Dueling Piano      Industrial Ballroom

MON   TUE   WED   THU   FRI   SAT

COUPON DEALS

NEWSPAPER ADS

ACT1ST FEDERAL CREDIT UNION
Allegany Hearing & Balance Center
American Rent All (2)
Audibel Hearing Aid Centers

**THIS WEEK'S CIRCULARS**

**OBITUARIES**

- COLEMAN, Shirley Jun 24, 1935 - Aug 12, 2018
- SUESS, Richard Nov 4, 1938 - Aug 10, 2018
- "JERRY" FISH, Randall Jan 14, 1945 - Aug 11, 2018
- BLANK, John Oct 27, 1959 - Aug 10, 2018
- SAUER, Thomas Feb 15, 1938 - Aug 8, 2018

# MOST POPULAR

- Articles
- 
- 
- 

**Articles**

- Drug arrests reported at Keyser
- UPDATE: 'Possible barricade situation' reported on Virginia Avenue - subject in custody
- NO TRESPASSING - violators will be prosecuted
- City moving forward with Arch Street housing plan
- Developer: Over half of units leased at Footer building
- More charges for jailed Cresaptown man
- City man sentenced to 30-year prison term for robberies
- Study finds more than 500 neglected properties
- Cumberland man arrested in South End barricade incident
- Spontaneous combustion cause of Frostburg fire

**Images**

# EXHIBIT 4

LOCAL DVM .com

News

# Maryland Switching to Paper Ballots in 2016

By:

NATE STEWART (https://www.localdvm.com/meet-the-team/nate-stewart/135916243)

(mailto:nate.stewart@wearegreenbay.com)

Updated: Jan 20, 2015 06:45 PM EST










Hagerstown, Maryland -

**HAGERSTOWN, Md. -** Maryland voters will say goodbye to electronic-based voting systems in 2016, and they'll welcome back the paper-based voting system.

In 2007, the Maryland General Assembly decided unanimously to bring back the paper ballots, after voters complained about not having a verifiable paper trail.

"There was no way to go back and have a recount that actually showed the votes of the voters," said Sharon Mackereth, deputy director with the Washington County Board of Elections.

The state spent $65 million in 2002 for the electronic voting system, and for the past couple of years, there was not enough money in the budget to switch over to paper-based voting.

"The numbers we are getting from the state is that this new voting system will cost $28.1 million," Mackereth said. "That will be split, half and half, between the state and all of the counties in Maryland."

Washington County will also have to find a larger warehouse to store the new equipment.

"The old equipment from the touch screens - the state will take those away and store them in a warehouse in Annapolis until after 2016, when we can say we no longer need them," Mackereth added.

Officials said they had no issues with the touch-based voting system in Washington County throughout the years that they used them. They also expect a high voter turnout next year.

"2016 is presidential elections, and historically, we get a larger turnout for presidential elections," Mackereth said.

The touch screens will not be completely taken away - voters with disabilities will still have access to them when they cast their ballots.

Washington County will receive 65 new precinct scanners and tabulators, one for each precinct in the county.

*Copyright 2018 Nexstar Broadcasting, Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.*

# EXHIBIT 5

# Maryland ditches touch screen machines for early voting



This is a mock-up of the type of ballots voters will use during early voting and election day voting in the April 2016 primary election. Voters will mark their choices and then feed the ballot into a scanner machine that will keep the paper. (Pamela Wood / The Baltimore Sun)



By **Pamela Wood**
The Baltimore Sun

**SHARE THIS**

f    🐦    Maryland may explore ditching touch screen voting machines in favor of paper ballots.



FEBRUARY 4, 2016, 8:20 PM

**E** arly voters in April's primary will cast their ballots on paper that will be scanned by a machine — just as election day voters will — after Maryland elections officials on Thursday nixed the use of touch screen machines for early voting.

Case 1:17-cv-02989-APM    Document 267    Filed 08/24/18    Page 54 of 67

The change was made after elections officials said they realized that many primary contests will feature long lists of candidates that can't fit on one screen, and some candidates threatened legal action for being stuck on a second or third screen.

"The fairest, most viable and reasonable solution is paper ballots," said Patrick J. Hogan, a former state senator who is vice chairman of the Maryland State Board of Elections. Board members voted 5-0 in favor of the switch to paper ballots for early voting.

Each early voting location will have at least one touch screen machine available for voters with disabilities who cannot vote with the paper ballot. Judges will need to be trained to alert them to the issues with races that have multiple screens of candidates, officials said.

The state's touch screen machines — which are different from ones used in recent elections — can fit seven candidates on a screen. At least half-a-dozen races in the primary feature more candidates than that, including the 12 Republican nominees for president and 13 Democrats vying for mayor of Baltimore.

State elections administrator Linda H. Lamone said the decision to switch to paper was made after realizing the touch-screen navigational tools were not user-friendly for voters making decisions in races with multiple screens' worth of candidates.

"We didn't realize how unintuitive the navigation tools were," Lamone said.

The issue first came up in Rockville's city elections last year. And Anne Arundel County Circuit Court Judge Cathleen M. Vitale, who will be up for election this year, raised concerns at a Jan. 21 elections board meeting, according to the meeting minutes. Vitale did not respond to a request for comment.

In recent weeks, some candidates have suggested they may pursue legal action if the touch-screen machines were used.

"We got some not so subtle threats about litigation from candidates who would be on the second page," Lamone said.

As recently as last week, however, Lamone said publicly that elections officials and machine manufacturer Election Systems & Software had devised a fix and were ready to go forward with them for early voting.

During a briefing for lawmakers last Friday, elections officials set up a touch screen machine with mock election-city decisions such as "favorite Olympic sports" and "favorite Maryland symbols." For

START NOW »

Subscribe for only 99¢

elections with more than seven choices, a "more" button blinked at the bottom and the voter was prevented from voting for the race until viewing all of the candidates.

"We have corrected that going forward," Lamone told lawmakers at the time.

But before Thursday's vote to switch to paper, Lamone explained that voters could get tangled in the "more" and "previous" buttons, accidentally going back to a prior contest instead of a prior page of candidates.

Switching to paper ballots for early voting — which runs from April 14 through April 21 at 66 locations across the state — will require adjustments by state and local elections workers.

More ballots will have to be printed and distributed to early voting centers. The total cost of printing extra paper ballots has not yet been determined, though they are about 21 cents each.

Some jurisdictions will face a logistical challenge in dealing with stocking dozens of types of paper ballots at the early voting centers.

In Baltimore, for example, there are dozens of combinations of City Council districts and Congressional districts, which means there could be as many as 84 types of ballots, depending on where a voter lives and what their party is, said Armstead B.C. Jones, the city's elections director. Because a Baltimore voter can vote at any of the city's six early voting centers, each center must have all 84 ballots available. Election judges will have to make sure they give each voter the proper ballot.

Prince George's County also will have dozens of ballot styles, but most counties will have fewer than a dozen.

Jones said he'll have to find the money and the staff to pull off the switch to paper ballots. "We suck it up and we get it done. Whatever comes up, that's what we do. We have to get to the end product, which is the end of the election," he said.

Local elections offices pay for the election judges, while the cost of printing ballots is split between the state and the local elections offices.

But state elections officials said Thursday they don't think it will be too hard for local elections staff to make the switch to paper for early voting. After all, they're already being trained to handle paper ballots for election day on April 26, Hogan said. The switch "shouldn't be a bigger deal than it really is," he said.

Support Quality Journalism
Subscribe for only 99¢          START NOW ›

The voting machines were preferred for early voting because they can store all the various ballot styles, which is more convenient than printing out and keeping organized so many paper ballots. For election day voting, each polling location will need to have just two ballot styles on hand — one for Democrats and one for Republicans.

Del. Kathy Szeliga, who is running in the Republican primary for the U.S. Senate, is keenly aware of the challenges of having a name at the end of the ballot, no matter what type of voting system is used.

"It's certainly a challenge that every election, anybody with a last name at the end of the alphabet faces," she said.

Szeliga was slated to be listed 12th among the 14 candidates in her race on the voting machines.

David Warnock, who would have appeared 11th out of 13 Democratic candidates for Baltimore's mayor, was not terribly concerned about the issue.

The job of candidates is to prove they are qualified and that remains the same "whether you are on the bottom of a paper ballot or on the second screen" of a machine, said Anastasia Apa, Warnock's campaign manager.

During the 2014 elections, 19.1 percent of primary voters cast ballots during early voting and 17.6 percent of voters during the general election cast ballots during early voting.

The primary election day is April 26. Early voting is scheduled to run from April 14 through April 21.

*pwood@baltsun.com*

*twitter.com/pwoodreporter*

Copyright © 2018, The Baltimore Sun, a Baltimore Sun Media Group publication | Place an Ad

**This 'attr(data-c-typename)' is related to:** Elections, Democratic Party, David Warnock, Patrick J Hogan

Missing comments? We've turned off comments across Baltimore Sun while we review our commenting platform and consider ways to improve the system. If you purchased points through the Solid Opinion platform and would like a refund, please let us know at circsupport@tronc.com.

Support Quality Journalism    START NOW ›
Subscribe for only 99¢

**Support Quality Journalism**
Subscribe for only 99¢

START NOW ›

# EXHIBIT 6

Fulton County Superior Court
***EFILED***NE
Date: 6/9/2017 6:39:47 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

DONNA CURLING, et al.              )
                                   )
        Plaintiffs,                )
                                   )        **CIVIL ACTION FILE**
v.                                 )        **NO. 2017CV290630**
                                   )
BRIAN P. KEMP, in his official     )
capacity as Secretary of State of  )
Georgia, et al.                    )
                                   )
        Defendants.                )

## ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND INTERLOCUTORY INJUNCTION AND FOR WRIT OF MANDAMUS

Plaintiffs' Emergency Motion for Temporary Restraining Order and Interlocutory Injunction ("Emergency Motion") filed on May 26, 2017 — on the eve of advance voting in the State of Georgia's Sixth Congressional District Run-Off Election — came before the Court for hearing and oral argument on June 7, 2017 following statutory notice to the State of Georgia. Attorneys Robert McGuire (*pro hac vice*) and Edward Krugman appeared on behalf of Plaintiffs; Attorneys Christina Correia and Josiah Heidt appeared on behalf of Defendant Brian Kemp, Georgia Secretary of State; Attorney Kaye Burrell appeared on behalf of Defendant Richard Barron, Director of the Fulton County Board of Elections; Attorney Bennett Bryan appeared on behalf of Defendant Maxine Daniels, Director of Voter Registrations and Elections for Dekalb County; and Attorney Daniel

White appeared on behalf of Defendant Janine Eveler, Director of the Cobb County Board of Elections and Registration. All of the defendants were sued in their respective official capacities.

In their Emergency Motion, Plaintiffs, a Colorado-based non-profit organization with members in Georgia's Sixth Congressional District, seek an Order from this Court to restrain and enjoin Defendants from using the Direct Recording Electronic ("DRE") voting equipment and its related DRE-based voting system to conduct the June 20, 2017 run-off election for the 2017 Sixth Congressional District Special Election in Cobb, Dekalb and Fulton counties. More particularly, Plaintiffs assert that Georgia's DRE voting system is uncertifiable, unsafe and inaccurate such that Defendants should be required to comply with O.C.G.A. §§ 21-2-334 and 21-2-281 and use paper ballots for hand counting in the manner proscribed under the laws of the State of Georgia. Having considered the issues presented in the parties' motions and supporting briefs, evidence, argument of counsel and applicable authority, Plaintiffs' Emergency Motion for Temporary Restraining Order and Interlocutory Injunction is hereby **DENIED** for the reasons explained below.

Plaintiffs assert their claim for injunctive relief applies only to the Defendant Counties. However, inasmuch as the Secretary of State is statutorily conferred with the authority to determine the voting equipment that will be used throughout

the State of Georgia, the claim for injunctive relief is necessarily asserted against Defendant Secretary of State as the relief Plaintiffs seek rests exclusively within his control. Even still, because the individually-named Defendants have been sued in their official capacities, the doctrine of sovereign immunity applies. <u>Cameron v. Lang</u>, 274 Ga. 122 ( 2001). Sovereign immunity also extends to the County Defendants. <u>Butler v. Dawson Co.</u>, 238 Ga. App. 808, 809 (1999). As such, any state law claims against the Defendants are covered under the sovereign immunity doctrine unless there is some waiver of immunity. Plaintiffs have failed to identify any such waiver.

Plaintiffs asserted for the first time during the Emergency Hearing that their claims were based, in part, on the United States Constitution at 42 USC § 1983 authorizing their claims to be brought against state officers and employees in their official capacities where plaintiffs allege a violation of federal rights based on action taken under the color of law as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in

> such officer's judicial capacity, injunctive relief shall not
> be granted unless a declaratory decree was violated or
> declaratory relief was unavailable. For the purposes of
> this section, any Act of Congress applicable exclusively
> to the District of Columbia shall be considered to be a
> statute of the District of Columbia.

42 USC § 1983.   Although such claims could be properly brought before this

Court, in this instance Plaintiffs have failed to make such a pleading.   As such

there are no federal claims before this Court, and any state law causes of action

would be subject to qualified immunity and must be **DISMISSED**. Moroever,

because sovereign immunity applies, Plaintiffs are barred from injunctive relief at

common law on any state law claims. <u>Ga. Dept. of Nat'l. Resources, et. al v.</u>

<u>Center for Sustainable Coast</u>, 294 Ga. 593 (2014).

Even if Plaintiffs' claims were not barred by sovereign immunity, Plaintiffs

request for an interlocutory injunction must fail because Plaintiffs cannot satisfy

the elements for such a remedy.   It is well settled that the issuance of an injunction

is an extraordinary remedy that should be reserved for **"clear and urgent cases."**

OC.G.A. § 9-5-8 (emphasis added).   Courts have been cautioned to exercise this

power "prudently and cautiously."   <u>Id.</u>   In considering whether to exercise the

power to grant this extraordinary remedy, the Court must consider the following

factors:

> (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of [their] claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.

Holton v. Physician Oncology Servs. LP, 292 Ga. 864, 866, (2013).

As to the first factor, while the Court is keenly aware and appreciates the heightened concern surrounding voting security in the State of Georgia and nationally taken together with troubling allegations of election interference, this Court is constrained by the law and the evidence presented in this case. Additionally, Plaintiffs' concern that the DRE voting system lacks a verification feature is legitimate. However, in the absence of evidence (*e.g.,* voter testimony, malfunction, unexplained deviations, skewed results, historical data, national research, etc.), this Court cannot adopt Plaintiffs' conclusion that Georgia's DRE voting equipment and its related voting system are unsafe, inaccurate and impracticable within the meaning of the statute. Plaintiffs have failed to demonstrate any concrete harm. Accordingly, the first factor militates against Plaintiffs.

Moving to the second and fourth factors, the Court finds that these factors also militate against Plaintiffs. Advance voting in the Special Election Sixth

Congressional Run-Off commenced on May 26, 2017. Evidence presented during the hearing showed that requiring Defendants to halt the Special Election in order to substitute DRE machines with paper ballot in the middle this election would be costly and could potentially create voter confusion and possible voter disenfranchisement in an ongoing election. These outcomes would necessarily undermine voter trust and confidence in the electoral process and the integrity of Georgia's elections and disserve the public interest. Further evidence showed that visually-impaired and other disabled voters would not have equal access to the ballot. The testimony further showed that election officials, including many volunteer poll officers and workers, are only trained to conduct elections using the method certified by the Secretary of State and, as such, would need to be re-trained on both the administration and tabulation of paper ballots which could have the unintended consequence of creating both security and accuracy concerns. As such, the Court finds that both the second and fourth factors favor Defendants.

As to the third factor, *assuming arguendo* that the claims survive sovereign immunity, the Georgia Supreme Court found in Favorito v. Handel, that so long as the voting method used – DRE machines in that case – was reasonable and neutral, that method would be free from second-guessing. 285 Ga. 795, 798 (2009). Based on precedent and the dearth of non-speculative evidence presented by Plaintiffs at

the hearing on the Emergency Motion, the Court finds that there is little likelihood of success on the merits.

Finally, Defendants jointly assert a valid laches argument. Laches applies to a request for equitable relief when: (1) there was a delay in asserting the claim; (2) the delay was not excusable; and (3) the delay caused the non-moving party undue prejudice. United States v. Barfield, 396 F.3d 1144, 1150 (11th Cir. 2005). Here, evidence shows the Plaintiffs was aware of the factors giving rise to the Verified Complaint and Emergency Motion on April 18, 2017, if not sooner. Plaintiffs knew that Advance Voting for the June 20, 2017 Special Run-off Election commenced on May 30, 2017. Plaintiffs were aware of alleged system errors that occurred during the April 18, 2017 Special Election tabulation in Fulton County. Plaintiffs were aware of a March 15, 2017 inquiry being forwarded to the Georgia Secretary of State regarding concerns with DRE machines. Despite all of this knowledge, however, Plaintiffs filed suit one (1) business day before advance voting commenced. This delay taken together with an intervening holiday and the statutory notice to which the State of Georgia is entitled prevented this matter from being considered by the Court prior to the start of Advance Voting. Plaintiffs' delay in asserting the claim has prejudiced Defendants.

It cannot be argued in a democracy that the right to vote is fundamental. Concomitant with that right is the assurance that the ballot cast reflects the choices of the elector.  As the Favorito Court pointed out:

> The unfortunate reality is that the possibility of electoral fraud can never be completely eliminated; no matter which type of ballot is used. [Citation omitted.] [Even assuming that] none of the advantages of touch-screen systems over traditional methods would be sacrificed if voter-verified paper ballots were added to touchscreen systems . . . , it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. [Citation omitted.]  So long as their choice is reasonable and neutral, it is free from judicial second-guessing.

Favorito, 684 S.E.2d 257, 261.

Accordingly, for the reasons discussed above, the Court finds that Defendants are entitled to sovereign immunity from any claim for injunctive and declaratory relief.  The Court further finds that the harm to the public would greatly outweigh the issuance of an injunction upon a consideration of the applicable factors and in conjunction with Defendants' laches arguments.  For similar reasons, the Court still further finds that Plaintiffs' Request for a Writ of Mandamus must necessarily fail.  Accordingly, Plaintiffs' Emergency Motion is hereby **DENIED** and the Complaint is hereby **DISMISSED**.

This 9th day of June 2017.

HONORABLE KIMBERLY M. ESMOND ADAMS
SUPERIOR COURT OF FULTON COUNTY
ATLANTA JUDICIAL CIRCUIT

## Distribution List

EDWARD B. KRUGMAN
ROBERT L. ASHE, III
1201 WEST PEACHTREE STREET NW
SUITE 3900
ATLANTA, GA 30309
KRUGMAN@BMELAW.COM

CHRISTOPHER CARR
CHRISTINA CORREIA
GEORGIA ATTORNEY GENERAL
40 CAPITOL SQUARE, SW
ATLANTA, GA 30334
CCARR@LAW.GA.GOV

OVERTIS HICKS BRANTLEY
BENNETT. BRYAN
DEKALB COUNTY LAW DEPARTMENT
1300 COMMERCE DRIVE
FIFTH FLOOR
DECATUR, GA 30030
OVBRANTLEY@DEKALBCOUNTYGA.GOV

PATRISE M. PERKINS-HOOKER KAYE BURWELL
FULTON COUNTY ATTORNEY'S OFFICE
141 PRIOR STREET, SW
SUITE 4038
ATLANTA, GA 30303
PATRISE.HOOKER@FULTONCOUNTYGA.GOV