1           IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,              :
                                        :
5           PLAINTIFFS,                 :
    vs.                                 :   DOCKET NUMBER
6                                       :   1:17-CV-2989-AT
    BRIAN P. KEMP, ET AL.,              :
7                                       :
            DEFENDANTS.                 :
8

9

10      **TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS**

11        **BEFORE THE HONORABLE AMY TOTENBERG**

12          **UNITED STATES DISTRICT JUDGE**

13               **SEPTEMBER 12, 2018**

14                  **10:16 A.M.**

15

16

17

18

19

20

21   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22              *TRANSCRIPT PRODUCED BY:*

23

    *OFFICIAL COURT REPORTER:*        *SHANNON R. WELCH, RMR, CRR*
24                                    *2394 UNITED STATES COURTHOUSE*
                                      *75 TED TURNER DRIVE, SOUTHWEST*
25                                    *ATLANTA, GEORGIA  30303*
                                      *(404) 215-1383*

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
      SCHOENBERG:

 4

 5         DAVID D. CROSS
           CATHERINE L. CHAPPLE
 6         JANE P. BENTROTT
           ROBERT W. MANOSO
 7         MORRISON & FOERSTER, LLP

 8         HALSEY G. KNAPP, JR.
           KREVOLIN & HORST, LLC
 9

10    FOR THE PLAINTIFF COALITION FOR GOOD GOVERNANCE:

11

           ROBERT ALEXANDER McGUIRE, III
12         ROBERT McGUIRE LAW FIRM

13         BRUCE P. BROWN
           BRUCE P. BROWN LAW
14

15    FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
      WILLIAM DIGGES, III, AND RICARDO DAVIS:

16

17         CARY ICHTER
           ICHTER DAVIS, LLC
18

19    FOR THE STATE OF GEORGIA DEFENDANTS:

20

           JOHN FRANK SALTER, JR.
21         ROY E. BARNES
           THE BARNES LAW GROUP, LLC
22

23

24

25                                          (...CONT'D...)
```

```
1    (...CONT'D....)

2

3    FOR THE FULTON COUNTY DEFENDANTS:

4
         KAYE WOODARD BURWELL
5        CHERYL RINGER
         DAVID R. LOWMAN
6        OFFICE OF THE FULTON COUNTY ATTORNEY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X   T O   P R O C E E D I N G S

 2      ELEVENTH AMENDMENT ISSUES REGARDING IMMUNITY AND STANDING

 3                                                      PAGE

 4   ARGUMENT

 5         by Mr. McGuire                               16
           by Ms. Bentrott                              20
 6         by Mr. Salter                                22
           by Mr. McGuire                               31
 7
     RULING
 8
           by The Court                                 32
 9

10            HEARING ON MOTION FOR PRELIMINARY INJUNCTION

11

     OPENING STATEMENT
12
           by Mr. Cross                                 35
13         by Mr. Manuso                                40
           by Mr. Brown                                 44
14         by Mr. Salter                                48
           by Ms. Burwell                               62
15         by Mr. Cross                                 66
           by Mr. Brown                                 70
16
              WITNESS                                   PAGE
17
     J. ALEX HALDERMAN, Ph.D.
18
           Direct Examination
19           by Ms. Chapple                             73
           Cross-Examination
20           by Mr. Barnes                              96
           Cross-Examination
21           by Ms. Burwell                             118

22   RICHARD DeMILLO, Ph.D.

23         Direct Examination
             by Mr. McGuire                             130
24         Direct Examination
             by Mr. Cross                               143
25
                                      (...cont'd...)
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
1    (...cont'd...)

2        WITNESS                              PAGE

3        Cross-Examination
           by Mr. Salter                      148
4        Redirect Examination
           by Mr. Cross                       160
5
     CHRIS HARVEY
6
         Cross-Examination
7          by Mr. Cross                       163
         Cross-Examination
8          by Mr. McGuire                     176
         Direct Examination
9          by Mr. Salter                      185
         Recross-Examination
10         by Mr. Cross                       195
         Recross-Examination
11         by Mr. McGuire                     200

12   MICHAEL BARNES

13       Direct Examination
           by Mr. Salter                      205
14       Cross-Examination
           by Mr. Brown                       217
15       Cross-Examination
           by Mr. Cross                       225
16       Redirect Examination
           by Mr. Salter                      234
17
     CECILIA HOUSTON-TORRENCE
18
         Direct Examination
19         by Ms. Burwell                     236
         Cross-Examination
20         by Mr. Brown                       241

21   RICHARD BARRON

22       Direct Examination
           by Ms. Burwell                     243
23       Cross-Examination
           by Mr. Cross                       265
24       Cross-Examination
           by Mr. McGuire                     271
25
                                    (...cont'd...)
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
1   (...cont'd...)

2        WITNESS                                    PAGE

3        Redirect Examination
           by Ms. Burwell                          272
4

5   CATHY COX

6        Direct Examination
           by Mr. Salter                           275
7        Cross-Examination
           by Mr. Cross                            296
8        Cross-Examination
           by Mr. McGuire                          305
9                                   * * *

10

11  CERTIFICATE                                    323
```

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **(Atlanta, Fulton County, Georgia; September 12, 2018.)** |
| 3 | THE COURT:  Morning.  Please have a seat.  Morning |
| 4 | all.  There are some people in the hallway.  I'm assuming that |
| 5 | they are being advised to go into the overflow room. |
| 6 | COURTROOM DEPUTY CLERK:  They are, Your Honor. |
| 7 | THE COURT:  We are here in the matter of *Donna* |
| 8 | *Curling, et al., plaintiffs, vs. Brian Kemp, et al.,* Civil |
| 9 | Action Number 1:17-CV-2989. |
| 10 | We have a lot of counsel.  I think it would -- I have |
| 11 | a little diagram of who everyone is.  But why don't whoever is |
| 12 | serving as lead counsel for the moment on each side stand up |
| 13 | and introduce everyone with you. |
| 14 | MR. McGUIRE:  I'm Robert McGuire for the Coalition |
| 15 | plaintiffs.  I'm here with Bruce Brown -- |
| 16 | THE COURT:  You're not near a microphone.  So please |
| 17 | speak up. |
| 18 | MR. McGUIRE:  Your Honor, I'm Robert McGuire with |
| 19 | Coalition plaintiffs.  I'm here with Bruce Brown, co-counsel; |
| 20 | Cary Ichter, co-counsel; and Coalition's corporate |
| 21 | representative, Marilyn Marks. |
| 22 | MR. CROSS:  Your Honor, David Cross with Morrison & |
| 23 | Foerster on behalf of the Curling plaintiffs.  With me is my |
| 24 | colleague Jane Bentrott, Catherine Chapple, and Robert Manuso |
| 25 | and Halsey Knapp. |

```
 1              THE COURT:  Thank you.

 2              MR. SALTER:  Good morning, Judge.  John Salter with

 3   Barnes Law Group for the state defendants, which is the State

 4   Election Board members in their official capacity and Secretary

 5   of State Brian Kemp in his official capacity.

 6              With me at the table, Your Honor, is Mr. Barnes with

 7   my firm and also one of the parties to the case, Rebecca

 8   Sullivan.  And Ryan Germany is deputy counsel -- counsel at the

 9   Secretary of State's office.  Also with me is Leigh Barnes, who

10   is my paralegal at the table.

11              We also have David Worley who is another State

12   Election Board member, Your Honor.

13              David, do you want to raise your hand?

14              I will let Fulton County and everyone else talk.

15              MS. BURWELL:  Good morning, Your Honor.  Kaye Burwell

16   on behalf of Fulton County, along with Cheryl Ringer and David

17   Lowman.

18              THE COURT:  Very good.  Thank you.

19              Now, we are sort of already a little cramped for time

20   and besides that space because we are -- I gather Fulton County

21   had some trouble getting through the security.

22              MS. BURWELL:  Yes, Your Honor.  We apologize.

23              THE COURT:  Let's try to keep to the rest of the

24   timelines.

25              All right.  First of all, I want to say I appreciate
```

1    the great amount of public interest in this and attendance.

2    The days of the courtrooms being packed and people looking down

3    from the balconies seem to be well gone and over except in our

4    movie imagination.

5           And so whatever happens here, I think that we should

6    all appreciate the profound public concern about voting issues

7    and wanting to be -- basically to participate in our democracy

8    and make it a vibrant democracy and make the judicial system

9    meaningful and exercising in meaningful review and being

10   witness to that.

11          So in keeping with those remarks, I want to simply

12   say I would genuinely appreciate if all counsel here as

13   stringent and colorful as your argument may be would be as

14   courteous as possible and not demean the other side.  I don't

15   think it really helps the circumstance.  There are sharp things

16   to be said on both sides.  And I understand that.  This --

17   these are issues of great importance to everybody.  But I just

18   wanted to start with that remark.

19          I regret that there are individuals who are having to

20   hear and participate in this from the public who are in the

21   overflow courtroom.  I would have used the overflow courtroom,

22   in fact, basically out of respect for everybody.  But the

23   parties had a good deal of technology that they wanted to use

24   in presentation.  And it was going to be a great deal more

25   awkward and difficult, and that courtroom is not equipped for

1   some of the technology at issue.  That courtroom also was built

2   at a different time.  So it reflects some of that as well as

3   the lack of endless funds to modernize.

4           We are making available, of course, the audio in the

5   overflow courtroom as well as there will be -- there are

6   screens in there that will show any exhibits.  But

7   unfortunately or fortunately you won't get to see some of the

8   witnesses.  There is no video presentation.

9           Obviously some people may decide to leave at points

10  because it may simply not be as interesting as they thought,

11  which is often so in court.  And some of the people in the

12  front rows may decide they wish they could leave at points.

13  But in any event, that definitely happens.

14          I don't know whether anyone read any of the coverage

15  of people who attended the criminal trial in Virginia that went

16  on for a long time.  And I had a feeling sometimes some people

17  were going to take amphetamines or something because they said

18  they were just holding themselves to stay awake.  So this is a

19  daylong hearing.  It is not weeks and weeks.  But it has that

20  capacity as well for -- that people may be bored and move on.

21          I want to just say that I have already provided to

22  counsel a schedule for the day's proceedings.  And just so that

23  everyone understands again, we're starting with arguments on

24  Eleventh Amendment immunity, standing, and related issues.

25          I think that in the interest of time because I have

1    read those briefs and they are very much legally oriented and I

2    do understand the arguments, I would ask counsel because --

3    particularly because we had to start late because of Fulton

4    County to try to truncate that to no more than 10 minutes each,

5    rather than 15 minutes.

6          And then we are going to have opening arguments on

7    the motion for preliminary injunction that is before me.  And

8    then we are going to have direct and cross-examination of two

9    of the plaintiff Coalition's witnesses, I think Mr. DeMillo --

10   is that --

11         MR. McGUIRE:  DeMillo.

12         THE COURT:  -- and Mr. Barnes.  And then I anticipate

13   unless we have done something very wrong that we're going to

14   have a lunch break.  And after that, we are going to have other

15   experts from the Curling plaintiffs and some of the state

16   defendants' witnesses, which include I understand individuals

17   from the state or county involved in the administration, as

18   well as former Secretary of State Cathy Cox and a

19   representative of Fulton County defendants.  I can't remember

20   exactly everyone's titles.

21         Is that more or less right?

22         MR. CROSS:  Your Honor, one thing, if I may.  David

23   Cross for the Curling plaintiffs.  We are not going to call

24   Mr. Barron at this point.  And we have spoken with the

25   Coalition plaintiffs.  I understand that they are not going to

1    call Mr. Barnes.

2            One other change, if we may.  We will start with

3    Professor Halderman and then transition to Professor DeMillo.

4    And one thing --

5            THE COURT:  I'm sorry.  You are going to start

6    with --

7            MR. CROSS:  Professor Halderman -- Alex Halderman and

8    then Rich DeMillo.

9            THE COURT:  So you are going to swap the order --

10           MR. CROSS:  Yes, Your Honor.

11           THE COURT:  -- of the expert witnesses?

12           MR. CROSS:  And then Chris Harvey will be the next

13   witness and the last.

14           Could I ask one question?

15           THE COURT:  Yes.

16           MR. CROSS:  As long as we don't elongate the schedule

17   overall, is it okay if we have flexibility to use time we have

18   picked up from losing witnesses -- letting witnesses go into

19   perhaps more time on closing arguments, which we think may be

20   valuable to the Court as long as we are not extending the day?

21           THE COURT:  As long as you are not extending the day

22   and understanding we had to start late.

23           MR. CROSS:  Understood.

24           THE COURT:  But yes.

25           MR. CROSS:  Thank you, Your Honor.

1        MS. BURWELL:  Your Honor, Fulton County intends to

2   call Mr. Barron since the plaintiffs are not going to call him.

3        MR. SALTER:  Your Honor, on behalf of the state,

4   since we had this planned based on our conference, I don't have

5   any problems with them switching the order of their experts.

6   We did bring Mr. Barnes -- Michael Barnes.  We're not going to

7   let Roy testify, of course.  But we did want to bring him

8   briefly on some -- on a particular issue, I think, that will be

9   of interest to the Court.  It is a foundational issue.  But it

10  won't elongate the time I don't think.  And if they want to

11  cross him about that, they can.  But we did expect him to

12  testify, and we built that into the schedule.

13        THE COURT:  As long as it doesn't elongate your time.

14        I want to remind everybody that because the people in

15  the overflow courtroom are only hearing audio -- they can't see

16  you and see the way you are articulating -- it is probably more

17  important than ever that you be closer to a microphone and

18  speak in measured -- enough measured tones that people can

19  understand you.  And it is always important for me too.

20        MR. BARNES:  Your Honor, I would like to invoke the

21  rule of sequestration before any of the arguments or testimony.

22        THE COURT:  As to expert witnesses?

23        MR. BARNES:  Yes, ma'am.  If they don't have their

24  facts down by now --

25        THE COURT:  Well, I don't -- I'm going to not allow

1   it because I think that it is going to end up being a waste of

2   time.  Because you're going to ask people about -- each of you

3   are going to ask about other individuals.  This is not just

4   kind of did I see -- what did I see.  I don't think it really

5   aids the efficient management of hearing the expert testimony.

6              MR. BARNES:  I just want to put it on the record,

7   Your Honor.

8              THE COURT:  All right.  Of course, if the parties

9   agree, that is something else.  But do you-all want to excuse

10  the experts then?  If you-all think that, in fact, we're going

11  to be more likely to get to the bottom of things that way, that

12  is fine.  But that is my instinct in terms of just efficient

13  management of the hearing.

14             MR. SALTER:  Your Honor, just a point of

15  clarification, so the rule is invoked as to fact witnesses but

16  not the experts?

17             THE COURT:  That would be my view.  But I jumped in.

18  And if the parties actually agree, I don't want to -- about --

19  I will consider that.  I'm not telling you what I'm going to

20  do, but I certainly will consider if the parties think that the

21  experts should be sequestered.

22             MR. McGUIRE:  Your Honor, this is Robert McGuire.  We

23  don't believe the experts should be sequestered.  We think it

24  will be faster if they are able to listen to what other experts

25  are saying so they can opine on that and comment on that.

```
 1              THE COURT:  All right.  So back -- yes?
 2              MR. CROSS:  Your Honor, we agree.  For clarification,
 3    I think the only fact witnesses in the room today are employed
 4    or affiliated with the defendant.  So does that mean the fact
 5    witnesses are leaving?
 6              MR. BARNES:  They are our parties.  She is a party
 7    today.
 8              MR. CROSS:  Okay.  So no one is actually leaving the
 9    courtroom?  Is that -- I'm trying to figure out who is leaving
10    the courtroom.  Because they invoked Rule 615, but now they
11    want their witnesses in the courtroom.
12              MR. BARNES:  If you are going to let one of them in,
13    let them all in.
14              MR. SALTER:  We'll just withdraw --
15              MR. BARNES:  We'll withdraw the motion.  Just let
16    everybody in.
17              THE COURT:  All right.  Apparently I have.
18              MR. BARNES:  That is fine.
19              THE COURT:  All right.  Anything else on a
20    preliminary basis that we need to discuss?
21              MR. SALTER:  Not for the state, Your Honor.  We're
22    ready.
23              MR. McGUIRE:  Not for us, Your Honor.
24              MR. CROSS:  Ready, Your Honor.
25              THE COURT:  All right.
```

```
 1              Again, just simply for clarity because of individuals

 2     sitting in the overflow room who can't see anything, the

 3     plaintiffs here are two different groups, two different

 4     organizations and sets of individuals.  And they have separate

 5     counsel.

 6              And what we have here is representatives of the

 7     Secretary of State and the State of Georgia and then also

 8     representatives of Fulton County on the defendants' side.  So

 9     we are hearing from all of those counsel for all those entities

10     or individuals.

11              All right.  As Eleventh Amendment immunity and

12     standing are threshold issues for the Court to consider before

13     exercising jurisdiction in this matter, we'll address those

14     issues first.

15              And I gather, Mr. McGuire, you are going first.

16                             ARGUMENT

17              MR. McGUIRE:  Yes, Your Honor.  And I will truncate

18     my argument to half of the ten minutes and allow the MoFo --

19     the Curling plaintiffs' counsel to address the immunity portion

20     of it.  I was planning to address standing and preclusion.

21              And so I can direct my argument to whatever it is of

22     most interest to the Court.  I think the thing that was

23     covered -- the motion to dismiss briefings covered the injury

24     piece pretty solidly.  So what was not covered in as much

25     detail was the preclusion issue.
```

1          So what I would like to address unless the Court has

2    other questions is the preclusion issue.  And when we were here

3    in May -- 1st of May, Your Honor indicated that you were

4    concerned potentially with res judicata and collateral estoppel

5    arising from what we are calling Curling One, which was a state

6    court lawsuit filed in May of 2017.  And then that was

7    dismissed in July of 2017.  And there were some of the same

8    plaintiffs that are here in this case, and it also involved

9    DREs.

10          The state law of preclusion governs res judicata and

11   collateral estoppel in federal court.  And the Eleventh Circuit

12   has issued a good decision that actually deals directly with

13   Georgia state preclusion law.  And that is *Community State Bank*

14   *vs. Strong*, 651 F.3d 1241.  That is a 2011, Eleventh Circuit

15   decision.

16          And they talk in that case about res judicata and

17   about collateral estoppel.  Since it may not be clear to

18   everybody, res judicata bars you from litigating any claim

19   which you brought or could have brought that was previously

20   decided on the merits in a final determination.

21          And collateral estoppel or issue preclusion is not as

22   broad.  It prevents you only from relitigating issues that were

23   decided on the merits in an earlier case that were necessary to

24   the determination.

25          So Curling One filed in May 2017 was a case that only

1    brought state law claims, and it brought them in state court.

2    There was a motion for preliminary injunction, which was denied

3    on June 9 in an order.  And in that order, the state court said

4    that sovereign immunity barred those state law claims.

5           We attempted to argue -- I represented the Coalition

6    in that case.  We attempted to argue at the hearing that there

7    were federal claims that we could bring, Section 1983 claims,

8    and the judge made a very solid ruling that that was not an

9    issue in the case in dismissing the state law claims on

10   sovereign immunity grounds.  Then she denied the motion for

11   preliminary injunction.

12          She issued that order, and no judgment was actually

13   issued.  So that case remained alive until -- this case was

14   filed on July 3rd while that case was still alive.  This case

15   brought federal claims under Section 1983.

16          And then on July 7th after this case was brought,

17   that case was voluntarily dismissed by the plaintiffs.  So

18   there was never an entry of a final judgment in that case,

19   which is a prerequisite for both res judicata and collateral

20   estoppel to apply.

21          Just as a matter of Georgia law, they don't apply for

22   that reason.  And there are other reasons as well.  But that is

23   the main one.

24          THE COURT:  All right.

25          MR. McGUIRE:  As far as standing goes, just to turn

```
 1    back to injury, there are a number of injuries that are alleged
 2    by the plaintiffs in the third amended complaint brought by our
 3    clients and the second amended complaint brought by the Curling
 4    plaintiffs.  And all of those injuries are sufficient to invoke
 5    standing, to invoke the jurisdiction of this Court, because
 6    those injuries are all caused directly or indirectly by the
 7    state's enforcement of the State Election Board rule requiring
 8    the use of DREs for in-person polling place voting.  And those
 9    injuries are redressable if the Court grants us the relief
10    we're requesting.  Therefore, all three of the elements of
11    standing, injury, causation, and redressability exist.  And so
12    therefore we think the standing prong is covered.
13            Unless the Court has any questions on standing or
14    preclusion, I can sit down and turn over the rest of my time to
15    co-counsel to talk about the immunity.
16            THE COURT:  All right.  If you want to -- if either
17    of you want to save a minute if you have one, then I'm not --
18    then to respond to the state, you may do so also.
19            MR. McGUIRE:  By my watch, I have got 25 seconds of
20    my half.  So I'll save that.
21            MS. BENTROTT:  Good morning, Your Honor.  Jane
22    Bentrott on behalf of Curling plaintiffs.
23            THE COURT:  All right.
24            MS. BENTROTT:  If it is all right, my colleague,
25    Robert Manuso, will pass out some of our slides.
```

```
 1              THE COURT:  And would you speak up also.

 2              MS. BENTROTT:  If you could, put up our slides on the

 3    screen.

 4              THE COURT:  Thank you.

 5              MS. BENTROTT:  As Mr. McGuire said, I'm going to

 6    address the Eleventh Amendment immunity issues.

 7              THE COURT:  Still a little louder.

 8                            ARGUMENT

 9              MS. BENTROTT:  Yes, ma'am.  I think all parties agree

10    here the question is whether the ex parte Young exception to

11    Eleventh Amendment sovereign immunity applies.  And the

12    exception is pretty clear.  The immunity is limited to -- the

13    exception is limited to suits against state officers for

14    prospective injunctive relief, which is exactly what plaintiffs

15    seek here.

16              And the case law is very clear this is a very broad

17    exception.  Where plaintiffs don't seek damages, where they

18    seek prospective injunctive and declaratory relief, the

19    Eleventh Amendment is not a bar in these cases.

20              Defendants attempt to wedge the plaintiffs into a

21    very narrow carve-out to the ex parte Young exception.  Courts

22    don't apply the ex parte Young exception when the suit is

23    ultimately designed to redress only a past harm and not a harm

24    that may have begun in the past but is continuing and ongoing.

25              It cannot credibly be disputed that plaintiffs here
```

1  allege an ongoing and continuous violation of federal law as

2  required to meet the ex parte Young exception.  Defendants

3  themselves have told the Court repeatedly and will tell the

4  Court again today that they intend to use the challenged DREs

5  in the upcoming election absent an injunction.  That is the

6  definition of a continuing and ongoing harm and for which we

7  seek prospective injunctive and declaratory relief.

8          Just to clarify a few of the arguments that

9  defendants make, they suggest that the immunity does not apply

10  if the claim is based on conduct that began in the past.  But

11  they cite *Papasan vs. Allaine*, which itself says that immunity

12  does not bar claims based on past, present, and future

13  deprivations.

14          Defendants also suggest that declaratory relief

15  affirmatively shows that plaintiffs are seeking to redress only

16  a past harm.  Again, the cases they cite show that declaratory

17  relief is contemplated by the ex parte Young exception as seen

18  in *Summit Medical Associates vs. Pryor*, an Eleventh Circuit

19  case.

20          As my colleague covered this, I will just briefly

21  move on.  And unless the Court has any questions on immunity,

22  I'll just briefly address the Curling plaintiffs' standing.

23          We agree with the Coalition plaintiffs that

24  plaintiffs here have standing, and we would just like to

25  highlight that requiring a registered voter to make the choice

1   between casting an absentee or provisional ballot or producing

2   photo identification in person has been determined by the

3   Eleventh Circuit to be an injury sufficient to qualify -- to

4   confer standing.

5         Defendants themselves say that the remedy here is

6   that plaintiffs possess an unlimited legal right to cast their

7   vote by paper absentee ballot if they do not trust the

8   unsecured DREs.  That shows that this meets the exact

9   requirement of *Common Cause vs. Billups*.

10        I would just like to highlight our plaintiff Donna

11  Curling's experience when she tried to do exactly what

12  defendants here suggest.  When she was concerned about the use

13  of DREs and her vote being counted, she attempted to vote via

14  paper absentee ballot only to learn in this litigation that her

15  vote did not count and she was disenfranchised.  That alone

16  shows very clearly why Curling plaintiffs have standing in this

17  case.

18        If you don't have any questions, I'll reserve my

19  minute for any follow-up if needed.

20        THE COURT:  Thank you.

21        MS. BENTROTT:  Thank you, Your Honor.

22        MR. SALTER:  Amy, would you switch the video from

23  plaintiff, please, ma'am.

24                        ARGUMENT

25        MR. SALTER:  May it please the Court, Your Honor.

1    John Salter for the state defendants.  I'll try to keep

2    checking my time as best I can.

3           Let me start with why we are here today generally.  I

4    know I have only got ten minutes and maybe one minute of amen

5    reserved for my folks in Fulton County.  Most of this is my

6    issue alone.  But I think they may join in one portion of the

7    argument.

8           We are here because Georgia state law delegates a

9    duty to the Secretary of State to -- they shall perform all the

10   duties imposed by this chapter in the election law title, and

11   that includes the obligation to develop, program, build, and

12   review ballots for use by counties and municipalities on direct

13   recording electronic voting systems used in the state.

14          In 2008 {sic} the Secretary of State at the

15   plaintiffs' request -- their first iteration of their complaint

16   you'll remember sought a mandamus action to compel a

17   reexamination of the DRE machines.  That has been done.  It has

18   been reexamined.  There has been an additional certification.

19   That was in the spring of 2018 this year.

20          But the law allows -- the Secretary of State

21   delegates discretion to that office to in his or her opinion

22   attest that the kind of system so examined can be safely and

23   accurately used by electors.  That discretionary decision

24   delegated to that office has been performed this year.

25          The DRE allegations in this case are unlike -- no one

1    disputes here that voting is fundamental.  No one disputes that

2    it is important.  This case is particular in terms of the

3    standing issue that is presented.

4           You have -- DRE allegations are different from vote

5    dilution cases, one man/one vote, *Wesberry vs. Sanders*, voter

6    ID cases.  We don't have a waiting issue.  We don't have a

7    dilution issue that is particular to any of these persons that

8    are before the Court today.

9           And what the claim is is that the DRE machines should

10   be presumed to be compromised.  That is in the complaints.  And

11   they want to override the discretionary decision delegated by

12   state law to a state official and basically have the Court

13   override his decision in this case and prohibit the use of DRE

14   machines.

15          The subject matter jurisdiction with this is that you

16   can't.  The Supreme Court in 2013 said -- there was a very

17   reasonable common sense opinion from the Second Circuit that

18   said in a surveillance case where there was a data issue and

19   said -- the Second Circuit said we're going to use a reasonable

20   likelihood standard in order to weigh Article III standing

21   under the Constitution.  The Supreme Court in 2013 in a case

22   called *Clapper* said, no, you are going to have to show more

23   than that.

24          And that inability to make a reasonable presumption

25   is what keeps the plaintiffs from showing the existence clearly

1    of subject matter jurisdiction in this case.  It is also --

2    they are barred by the Eleventh Amendment because this is an

3    official capacity suit to control the state's discretion.  They

4    are not saved by the three elements they would have to show

5    under ex parte Young.

6           Further, the State Election Board -- to the extent

7    that they are asking now to say, hey, tell the State Election

8    Board -- they are going to have to rulemake to try to make this

9    work for November 6.  That gets us directly into a hornet's

10   nest of issues regarding legislative immunity where you are

11   basically telling them, you legislate, and if you don't

12   legislate the way I want to, state officials, basically the

13   next question is a contempt violation to make people legislate

14   the way this federal court wants them to or wants the court to.

15          So you can't presume standing under Article III.

16   Plaintiffs have no injury.  These are arguments that are all

17   briefed.  And I'm not going to go through every single one of

18   them, Your Honor.

19          There is no causal connection between any alleged

20   injury and any of the state's conduct.  They are unlikely to

21   have a favorable decision that will actually redress their

22   fears.

23          The plaintiffs may not manufacture standing by

24   sitting on the train tracks and waiting for the train to hit

25   them.  And, finally, we argued in the briefs -- I won't revisit

1    this -- that the plaintiff Coalition entity lacks associational

2    standing under that body of law.

3            Let me just hit the high points with you.  The most

4    important -- the most prominent argument, I think, that is

5    clear under the precedent, especially after 2013, is that

6    plaintiffs have no injury, in fact.  And there is no -- related

7    to that is there is no continuous, ongoing violation under the

8    ex parte Young analysis.  Because -- and it is related to why

9    there is no harm.  For a violation to exist, it makes sense

10   that you would have a harm that would be shown.  Because the

11   state -- the theory that we're before the Court on today, Your

12   Honor, is that because the state and because the particular

13   state officer disagrees with the plaintiffs' software fears --

14   that he disagrees that those are reasonable fears, just as the

15   Secretary of State before him, Karen Handel, did, just as you

16   will hear today the Secretary of State before Karen, Cathy Cox,

17   disagrees.

18           Because the state doesn't agree that the plaintiffs'

19   fears are reasonable and well-founded, their argument is, well,

20   if we disagree, we can go to court and constitutionalize that

21   disagreement, that discretionary decision.  And they then walk

22   directly into the argument that the certification by the state

23   officer that they are safe and secure to use is

24   unconstitutional.  That is the theory we're talking about.

25           And the problem with that, as I said, is that the

1   Supreme Court has clarified in 2013 that their argument that

2   when they walk into a poll on November the 6th, 2018 -- the

3   argument that they are just fearful that their vote will not

4   count for some reason or will not be proven to count in a

5   recount or an audit thereafter if the election were contested,

6   that that is an injury.   *Clapper* says that is not.

7          Secondly, we have a case that came out after 2013

8   after the Supreme Court wrote that opinion in *Clapper* that

9   actually deals with the DRE machines.   A federal judge in

10  Pennsylvania, *Stein vs. Cortes* -- this is cited in our brief.

11  The quote from that case -- it actually didn't simply say, hey,

12  we have standing.   We'll go forward.   It denied the preliminary

13  injunction.   But it also said this, plaintiffs' allegation that

14  voting machines may be hackable and the seemingly rhetorical

15  question they pose respecting the accuracy of the vote count

16  simply do not constitute injury-in-fact.   That is a 2016 case.

17  We would ask the Court to agree.

18          I'm also going to talk about the fact that they can't

19  assume the risk here.   They have a free and unrestricted right.

20  You didn't have this several years ago.   But they have a free

21  and unrestricted right to vote absentee.   And if they want a

22  paper ballot, they can -- it appears that Ms. Curling made a

23  mistake in how she sent her paper ballot in.   Of course, that

24  is regrettable.   But that is something that the voters are

25  expected to do for themselves.

1          You can't manufacture standing nearly by inflicting

2     harm on yourself based on a fear of a hypothetical future harm.

3     You can't parlay a future hypothetical harm into a real harm by

4     simply saying, well, I'm not going to take the unrestricted

5     right to file a paper ballot.  That doesn't work under *Clapper*.

6     And the Supreme Court of Georgia in a DRE machine case in

7     *Favorito vs. Handel* said exactly the same thing in a unanimous

8     opinion of the Supreme Court of Georgia.

9          Here is why their claims are barred by the Eleventh

10    Amendment and not saved by ex parte Young.  If you look at

11    *Lathrop vs. Deal* -- it came down last year in 2017 -- sovereign

12    immunity would bar these claims for injunctive relief because

13    of a law they allege -- that plaintiffs allege to be

14    unconstitutional.

15         And if you look at the *Seminole Tribe* case that went

16    from this circuit court in the Eleventh Circuit to the Supreme

17    Court of the United States, the Eleventh Amendment also serves

18    to avoid the indignity of subjecting a state to the coercive

19    process of judicial tribunals at the instance of private

20    parties.

21         Here is why they are not saved by the exception, the

22    three elements they have to meet, under ex parte Young.  The

23    Young exception is not available --

24         THE COURT:  How are you doing on your time?

25         MR. SALTER:  8:05.

```
1              THE COURT:  All right.  I just wanted --
2              MR. SALTER:  I'm going to cite the same case that
3    Ms. Chapple -- I'm sorry.  Excuse me -- that Ms. Bentrott just
4    cited -- Jane cited.  And that is Idaho vs. The Tribe of Idaho.
5    That exception is unavailable when the relief it sought would
6    upset the balance of federal and state interest that it
7    embodies.
8              If you have -- if you want -- can I switch real
9    quick, Amy, to the ELMO?
10             Look -- on the preclusion issue, look at the order.
11   If it is not in the record, we can put it in there.  But the
12   Curling vs. Kemp case -- I want to correct something that my
13   brother of the bar said on behalf of the Coalition
14   plaintiffs -- that Mr. McGuire said.  That case was not
15   dismissed at their instance.
16             It was dismissed in June -- the emergency motion was
17   denied, and the complaint is dismissed.  It was dismissed
18   because the Court cannot adopt plaintiffs' conclusion that
19   Georgia's DRE voting equipment and its related voting system
20   are unsafe, inaccurate, and impracticable within the meaning of
21   the statute.  Plaintiffs have failed to demonstrate any
22   concrete harm.
23             It went on to hold -- and so that harm -- now,
24   listen, this was at a different election granted.  They were
25   trying on the eve of election in spring of 2017.  But they were
```

arguing the same exact theory.  And the Court said, you don't

have -- you haven't shown a harm.  Then it said you have got --

we have sovereign immunity here that is at issue there.

　　　　　If we can switch back real quick, Ms. Amy, and I'll

wind up.

　　　　　So that is why they are not saved.  The last thing

I'll point out is they are starting this Court, Your Honor,

down a road.  Both of their injunctions depend on just saying,

well, just rulemake to make this elephant have wings and fly.

We'll take away the machines.  Leave us with no system that is

workable for November the 6th.  But the SEB, they can rulemake

to make this all work with the implicit thing that they are

going to come back and say, well, if they don't rulemake the

right way, you can hold them in contempt.

　　　　　That is why you have legislative immunity according

to the Eleventh Circuit.  We have cited a case on that.

　　　　　With that, I'll hush, Judge, unless you have any

questions.

　　　　　THE COURT:  Not at this moment.  Thank you.

　　　　　MR. SALTER:  Thank you, Judge.

　　　　　MS. BURWELL:  Your Honor, Fulton County joins in the

state's standing argument.

　　　　　THE COURT:  Thank you.

　　　　　MR. McGUIRE:  Your Honor, Robert McGuire just very

briefly to rebut some of these points.  So first of all --

```
1          MR. SALTER:  I'll object.  I don't want -- I don't
2     know if they want to do that as part of the preliminary
3     injunction.  But we need to stay on track.  It is our motion to
4     dismiss.  So I just make that note.  If they want to take us on
5     to the preliminary injunction presentation, I have no
6     objection.
7          THE COURT:  I allowed him -- he had 25 seconds and
8     one minute.  We're going to spend more time discussing it.
9     So --
10                         ARGUMENT
11         MR. McGUIRE:  So in a case for prospective relief --
12    injunctive prospective relief, the test is whether there is
13    substantial risk.  That is the test to determine whether there
14    is a substantial risk of future injury.  And the distinction
15    between the Clapper case where it was not certain that the
16    voters -- that the people complaining would be surveilled is
17    different from this case where it is certain that the
18    plaintiffs are going to vote and be exposed to some substantial
19    risk.  So that is the difference.  Clapper does not apply to
20    this case.  It does not control this case.
21         Mr. Salter pointed out that the order in Curling One
22    said that the complaint was dismissed.  That is correct.  But
23    there was no judgment.  And a judgment is required for a final
24    judgment on the merits.  There has -- a final judgment -- you
25    can't appeal an order.  You can't appeal it unless there is a
```

1    judgment.  There was no judgment.

2          And so the plaintiffs dismissed it.  And to the

3    extent he wants to put the order in the record, we can also put

4    the notice of dismissal in the record that terminated the case.

5    That was a voluntarily dismissal.

6          And, finally, his point under the *Lathrop* case that

7    sovereign immunity bars claims against the state, that is

8    beside the point because the essence of the doctrine of ex

9    parte Young is that an official of the state who is acting

10   unconstitutionally, who is sued in his official capacity or her

11   official capacity, isn't the state.  They are being sued --

12   they are acting outside of their authority because they are

13   doing something unconstitutional.  And therefore the Eleventh

14   Amendment immunity that the state benefits from doesn't apply

15   to that official for a prospective injunctive relief suit.

16          And that is my time.

17          THE COURT:  Thank you.

18          MS. BENTROTT:  Nothing further, Your Honor.

19          THE COURT:  All right.  Thank you.  First of all, for

20   purposes of moving forward here efficiently, I'm going to say I

21   am -- will not address the res judicata or collateral estoppel

22   arguments because I think that those can be properly handled in

23   the order.  And I expect to issue an order on Friday or on

24   Monday.  And I think that the real threshold issue is do I have

25   jurisdiction to hear this at all --

1              And I have considered the arguments made by the state

2     defendants and Fulton County who argue that there is not a

3     basis for standing and there is not a basis for jurisdiction

4     and that the Eleventh Amendment bars plaintiffs' federal

5     claims, particularly against the state defendants.

6              As to standing, I find that the plaintiffs have

7     sufficiently alleged the elements of standing.  Specifically

8     they have alleged facts that plausibly show that they have --

9     that they will suffer injury-in-fact and have and that there is

10    at least reasonable allegations of a causal link between the

11    defendants' challenged conduct and the plaintiffs' injury here

12    and that the requested injunctive relief, if ultimately

13    granted, would redress the plaintiff' injury.

14             That is not to say that all of those things will end

15    up panning out.  But for purposes of making the determination

16    that I have jurisdiction, I think it is sufficient.

17             As to the Eleventh Amendment immunity issue, the

18    Court finds that this is a classic ex parte Young case.

19    Plaintiffs are only seeking prospective injunctive relief

20    against state officials and county officials.  Thus the ex

21    parte exception applies so that the plaintiffs' federal claims

22    are not barred by the Eleventh Amendment.

23             I understand the argument being made about *Clapper*.

24    I think the allegations here are far more detailed, far more

25    factually based, and also the motions for preliminary

1    injunction shore that up.  I understand well that there are a

2    host of cases that have dealt with DREs in the past.  And that

3    is the voting machine here.  Though not all of them dealt with

4    software issues and some of the complex issues that have now

5    been presented to the Court.

6           The reality is times change, and it is not because we

7    have a different view of what -- sometimes we have a different

8    view of what the law is.  Sometimes the facts have changed, and

9    we are in a rapidly changing time as to the issues and

10   assessment of what it means to essentially have a system that

11   is vulnerable to being hacked and, in fact, likely to --

12   potentially likely to have been hacked.

13          The type of evidence that is presently before the

14   Court or at least the allegations are far more substantive and

15   material and different even than what was in front of the court

16   in 2017.  Not to mention that it was a different -- we're not

17   talking about retroactive relief guided towards the Sixth

18   District, which was involved in the case in superior court in

19   2017.

20          So I do think that the concerns in *Clapper* are real.

21   But I think that the allegations of the complaint and the

22   evidence that has been submitted in connection with the

23   allegations of the complaint are at least sufficient for me to

24   assert jurisdiction for purposes of holding this hearing and

25   considering the preliminary injunction.

1          And I will elaborate on that more fully again in an

2     order to be issued.  But given the volume of paper that has

3     been submitted, I have just simply tried to -- we'll move

4     forward and hear the preliminary injunction based on that

5     determination.

6          All right.  It is the motion of the plaintiff.  So

7     I'll hear opening arguments on the motion for preliminary

8     injunction.  And please remember at this point that I -- even

9     though I would expect those who are members of the public

10    haven't heard your arguments in full, I have read your briefs

11    in full.  So this is -- while I know many who attended -- who

12    have requested to come thought this might be a public meeting

13    as opposed to a court hearing, it is not a public meeting.

14         So, you know, the most important thing is I get -- I

15    get helped in hearing this as to the arguments.  The evidence

16    is something else.  We'll address that later.  Thank you.

17                         OPENING STATEMENT

18         MR. CROSS:  Your Honor, David Cross on behalf of the

19    Curling plaintiffs.  Good morning.  I'm going to start and then

20    I'm going to hand it off to my colleague, Mr. Manoso, within

21    the time that we have.  And the Coalition plaintiffs and our

22    group have split this up within the time allotted.

23         Your Honor, the legal issues in this case that Your

24    Honor is going to have to decide on the preliminary injunction

25    essentially boil down, we submit, to two fundamental questions.

1    This case turns on two questions.  The first is, do the

2    circumstances involving the current DRE-based system constitute

3    a deprivation of a constitutional right?

4         We submit in light of the showing from our side in

5    terms of expert testimony and extensive other findings

6    regarding these machines and vulnerabilities -- and we'll talk

7    through that today -- and the absolute dearth of evidence from

8    the defendants to defend this system the only answer the Court

9    can reach to that question is yes, which means the only

10   question before the Court today is the second, which is what is

11   the appropriate remedy.  Not is there a remedy, whether there

12   will be a remedy, but what is it.

13        The remedy that we have proposed is paper ballots at

14   the polls throughout early voting and on the election day with

15   at least some measure -- additional measure for folks who are

16   disabled who can't do that and then some sort of appropriate

17   audit.  We will talk through all that today.  And to be clear,

18   the paper ballots should be the ballot of record --

19        The reality is that Georgia has been frozen in time

20   for the last 16 years and as a result has been left behind by

21   virtually every other state in the country with respect to how

22   elections are run today.

23        The Supreme Court has repeatedly emphasized that the

24   right to vote is sacrosanct.  And I want to be clear about

25   something here, Your Honor.  It is not just the right to cast a

ballot but also the right to have them counted.  And the only
thing that Georgia -- that the Secretary of State and the
defendants can point to today that is possibly guaranteed to
Georgia voters is the right to cast a ballot.  Once that ballot
has gone into the ether, no one knows whether it is accurately
recorded because it simply cannot be verified and the system is
inherently vulnerable as we will show today.

Confidence, the Supreme Court has also emphasized,
Your Honor, is essential to the functioning of our
participatory democracy, Your Honor.  So even eroding
confidence constitutes harm.  And given what we know from the
U.S. intelligence community today about the ongoing efforts to
hack these sorts of systems, voters cannot have confidence in
this system in the State of Georgia.

It is difficult to understand how the Secretary of
State and Fulton County can come before the Court, along with
the State Election Board, and claim that we are paranoid, that
our concerns are hypothetical because it flies in the face of
everything that we hear almost on a daily basis about Russia's
and others' efforts to interfere in the election.

The director of national intelligence characterizes
it as ongoing and pervasive efforts to undermine our democracy.

**(A videotape was played for the Judge.)**

MR. CROSS:  The director of DHS, what is the target
of our enemies?  It is our elections, fair elections.  It is

1    very specific what they are targeting, Your Honor.  The head of

2    the FBI says that this is a threat we need to take extremely

3    seriously to tackle and respond with fierce determination and

4    focus.

5           The Secretary of State who is entrusted with this

6    vote -- with this system here has literally done nothing.  And

7    we will talk through the specifics of that today, Your Honor.

8           And let's just be clear about some specific facts.

9    Because when they say our concerns are hypothetical, again it

10   flies in the face of the facts.  We learned over the summer

11   from Bob Mueller's investigation that sophisticated Russian

12   hackers were visiting websites for the purpose of trying to

13   infiltrate elections here, specifically in the State of

14   Georgia.  At least one state -- it wasn't Georgia -- but at

15   least in one state they actually accessed the registration

16   database.

17          The timing of this is important.  This is October 28

18   of 2016.  Here is why that timing matters.  Because Logan Lamb,

19   respected cybersecurity researcher, found in August of 2016,

20   one month before Russian hackers were trying to get into the

21   election system here, that that election system was vulnerable

22   to hackers.

23          What you will find also is that six months later

24   after he had warned the state that same system was still open

25   to hackers.  So in the same exact time that we know Russian

1    hackers were trying to infiltrate the system here, it was

2    exposed to those hackers, Your Honor.

3            And tellingly, even though the defendants had an

4    opportunity to come forward with evidence in response to our

5    preliminary injunction motion and to assure the Court and the

6    State of Georgia voters that they have done the forensic

7    analysis to determine whether this system was compromised, it

8    is crickets.  There is not a single cybersecurity expert on

9    their side of the room.

10           And you know what is interesting about that, Your

11   Honor, is there is one cybersecurity expert that the state

12   apparently respects because Secretary Kemp put a professor at

13   Georgia Tech, Wenke Lee, on the SAFE Commission.  He is the

14   only cybersecurity expert on that commission.

15           And you're going to learn today, Your Honor, that he

16   recently gave a presentation that is entirely consistent with

17   all of our warnings and recommends the very same proposed

18   relief that we recommend.  So it comes as little surprise that

19   they couldn't find any cybersecurity expert to refute the

20   showing that we have made.

21           Ultimately what this means, Your Honor, is that the

22   right to vote in the State of Georgia is illusory.  As one of

23   my clients once said, it is akin to whispering your vote to

24   someone behind a curtain and just hoping they write it down and

25   count it as you intended.  That is all that voters can take

1    away at the end of the day.

2          What the state says publicly is that the system

3    remains accurate and secure.  They seek to assure voters of

4    that.  And I don't think it can be overstated how disturbing

5    those representations are when given the opportunity in the

6    course of this case they have not come forward with a single

7    bit of evidence to support that representation.

8          Their entire defense in response to our preliminary

9    injunction motion is this.  They simply attack our relief.

10   They say paper ballots in August are just going to be too hard,

11   take too much time and too much money.  But they are utterly

12   silent on the vulnerabilities that rise to the level of

13   constitutional deprivation, and they should not continue to

14   defend a system publicly that they cannot defend in court.

15         That then leaves us, Your Honor, where I began.  The

16   only question remaining before this Court is whether relief is

17   required -- I'm sorry -- not whether relief is required but

18   what relief is required.

19         With that, I'll hand it off to Mr. Manuso.

20                        OPENING STATEMENT

21         MR. MANUSO:  Never give the boss the clicker.

22         Thank you, Your Honor.  This is Rob Manuso also for

23   the Curling plaintiffs.  I would like to walk the Court through

24   briefly the issues of the public interest and whether the

25   change set forth in our proposed relief is feasible.

```
1              Our proposed relief is feasible in the time allotted.

2     And, in fact, it is necessary to promote the public interest.

3     One of the things that is ignored in the defendants' papers is

4     that paper ballots are already in the fabric of the current

5     Georgia voting system.  Our proposed relief simply makes them a

6     much sturdier foundation than the current DREs.

7              The Georgia legislature recognized that there might

8     be times when the DREs fail.  In these instances, paper is

9     established as the backup.  We cited to several provisions in

10    our briefs that show when any voting equipment, including the

11    DREs, is impossible or impracticable the solution is the use of

12    paper ballots.

13             The statute specifically referenced DRE units

14    malfunctioning or another emergency situation that calls for

15    their use.  Clearly, Your Honor, given the uncontested evidence

16    regarding the vulnerabilities, given the inability of the state

17    to solve them, the use of DREs is currently impracticable at

18    least at a minimum.  And so the statutes already provide a

19    framework for the relief that we seek.

20             Those ballots are taken.  They are counted.  They are

21    secured.  And the votes are counted on a paper ballot.  These

22    are just two examples of the way in which paper is already in

23    use providing the framework for our proposed relief.  This also

24    includes mail-in absentee ballots, which are currently done

25    using the optical scanners that are part of our proposed
```

1    relief.

2           And in addition, the optical scanning statutory

3    provisions that were on the books before the use of the DREs

4    are still on the books.  They were never repealed, and they

5    give all the details necessary to use optical scanners down to

6    how you tabulate the vote and stick the optical scanned ballot

7    for scanning.  So we believe the procedures are in place, Your

8    Honor.

9           We also believe that Georgia has the resources.  One

10   of the things that is missing from their brief is any analysis

11   of the cost savings or the cost exchange by not having to use a

12   DRE system.

13          As the defendants noted in their papers, there are

14   over 28,000 DREs:  28,000 computers that need to be set up,

15   loaded, tested, maintained, and like all computers eventually

16   fixed when problems inevitably arise.  The defendants have

17   given us no benchmark from which we could truly evaluate

18   whether the proposal -- our requested relief is actually going

19   to be more expensive.

20          In addition, there is no mention of the fact that the

21   federal government has specifically allotted resources for the

22   use of securing elections.  As you will hear later today, Your

23   Honor, in just July of this year, Georgia finally requested

24   over $10 million specifically for the purpose of securing

25   elections.  You will also hear testimony that the resources are

1    there for the state in order to do this in a timely fashion.

2         On that note, we also believe that the state has

3    time.  As you will hear today, several of the biggest counties

4    that would have the most to do have not even begun training of

5    their election workers.  Again, those election workers already

6    have the procedures in place to use paper ballots because of

7    the statutory provisions I just referred to.

8         At the end of the day, Your Honor, it might be that

9    there are some added costs to this process.  And it might be

10   that there are some time constraints we are bumping up against.

11   But we submit, Your Honor, that you have to look at both sides

12   of the scale.

13        Any burden on the part of the state and any potential

14   burden that they may incur in making this change are far

15   outweighed by the harm to the plaintiffs and other Georgia

16   voters if we simply resign ourselves to the status quo for

17   another election.

18        Mr. Cross already talked to you about the dilution of

19   the individual right to vote.  It doesn't matter whether their

20   specific vote was counted or altered.  If their candidate -- if

21   their chosen candidate is no longer a successful candidate

22   because of interference, their right was infringed in just the

23   same way.  And, of course, Mr. Cross also talked about the loss

24   of voter confidence.

25        On the other side of the equation, Your Honor, you

have the burdens that were set forth by the defendants.  The

cost, which we cited numerous cases that found the mere cost of

implementing a change, that doesn't mean that the change should

be implemented.  The same thing goes for time.  I offer to this

Court from the Fourth Circuit that a tight time frame before an

election does not diminish the right to vote because that

vote -- that right is fundamental.

Ultimately there may be a voter or a poll worker who

makes a mistake.  As the defendants' papers readily admitted,

there is going to be human error as long as there are

elections.  Our position -- our proposed relief is simply that

it is better to have inadvertent error than intentional

interference, Your Honor.

I'm happy to answer any questions.

THE COURT:  I think we'll just move on for now.

Thank you.

                    OPENING STATEMENT

MR. BROWN:  Your Honor, Bruce Brown for the Coalition

plaintiffs.  Given the excellent presentation by Mr. Manuso and

Mr. Cross, I will keep my remarks very brief and save the rest

of my time for rebuttal.  I did want to drill down on one issue

involving state law first.

Because when the Georgia legislature has spoken, it

sets forth certain understandings about how the law is to be

followed.  And it also informs the administration of the law.

1   As a federal court, you, of course, are not bound by state law.

2   And if the plaintiffs assert a constitutional right that is

3   being infringed by the enforcement of state law, of course,

4   state law must give way.

5          But we think it is significant nevertheless that

6   state law here provides the remedy if the DRE machines are

7   found to be impossible or impracticable.  Now, what does

8   impracticable mean?  Impracticable means that they do not do

9   what they are supposed to do.  And if DRE machines are proven

10  to be unreliable and untrustworthy, as we believe they have

11  proven to be, then they are manifestly impracticable.  And

12  therefore the relief that we are seeking fits hand in glove

13  into the entire administration of the election machinery that

14  the Georgia legislature has provided.

15         Now, as I said, as a federal court, that is not a

16  dominating consideration.  But in terms of the public interest

17  and also in the balancing of the equities, the fact that the

18  relief we are seeking is exactly what the Georgia statute

19  contemplates is significant.

20         Given the overwhelming amount of evidence that these

21  systems are unreliable, the state -- and as Mr. Cross

22  mentioned, the crickets you hear from the other side in

23  response to that -- you will hear after we get through some of

24  the noise the basic response is, okay, okay, it is broken, but

25  we'll fix it later.  That is what the state is saying.

1          And, Your Honor, when anyone says it is broken but
2   we'll fix it later, what they are doing is they are measuring
3   the chance of something really bad happening and they are
4   measuring the resulting harm.  If I get a recall for my car
5   because the tires might explode, I can make one or two
6   decisions.  I can put my kids in the back, drive for a month,
7   and hope nothing happens.  The cargo, what you are carrying,
8   and the risk tells us what we're supposed to do.  And here
9   everyone who knows the risk and what is at stake says change it
10  now.  Don't change it for next year's election.  But change it
11  now.

12          Most recently -- and we have put this in the record
13  over the weekend because it just came in several days ago -- as
14  Your Honor is aware, the National Academy of Sciences was
15  established by President Lincoln in 1861 as the authority that
16  the United States Government goes to when they have a technical
17  or a scientific question.

18          Two years ago, the National Academy of Sciences was
19  assigned the important task of looking at election security.
20  They came out with their report just last week.  And in their
21  report -- and importantly, it is what is called a consensus
22  report, which means their entire staff of experts agrees.

23          In their consensus report -- and this is attached to
24  the supplemental declaration of Rich DeMillo, which was filed
25  on Friday or Saturday.  In the consensus report, the National

1    Academy of Sciences in this 100-page report says that states

2    should use paper ballots.  They should take every available --

3    every effort to replace the electronic machines with paper

4    ballots.  And then they say before the 2018 election.

5            The National Academy of Sciences has a calendar.  It

6    knows that the 2018 election is however many weeks away.  Still

7    given that deadline, they have told us to take every effort to

8    get rid of those DRE machines and replace them with paper

9    ballots.

10           Your Honor, there will be a lot said about the

11   particular type of relief that we're requesting in this case.

12   In our motion, as is proper under Rule 65, we have done the

13   best we can in charting out in the proposed order exactly the

14   kind of relief that we think would be effective and sensible.

15           We have also tried to balance the various interests

16   that go into fashioning equitable relief.  On the one hand, if

17   the order is too vague, it doesn't give the defendants fair

18   notice of what is in contempt.  On the other hand, particularly

19   when there is a state agency involved, if it is too specific,

20   it might encroach upon their discretion and their judgment and

21   exactly how they want to effectuate the relief.

22           Your Honor, in case after case, the federal courts

23   and the Supreme Court have said once there is a constitutional

24   violation found, a United States District Court has vast

25   discretion in fashioning flexible, practical, effective relief.

1    It is practical.

2           In a case just several years ago, the Supreme Court

3    said flexibility is the heart of injunctive relief in federal

4    court.  And so today we would respectfully request that at the

5    conclusion of the evidence we will have closing arguments.  And

6    we would be welcome to questions and exchanges with the state

7    in ways that the Court could fashion effective relief

8    immediately that would balance all the interests involved.

9           Thank you, Your Honor.  I'll reserve the rest of my

10   time for rebuttal.

11           MR. SALTER:  Ms. Amy, could you switch over.

12                        OPENING STATEMENT

13           MR. SALTER:  May it please the Court.  Judge, let me

14   start with this is the target they started you with back in the

15   spring.  Their statement -- the plaintiffs stated to the Court

16   that immediate conversion to paper ballots can be accomplished

17   easily, their word, for November's elections, quote, without

18   any new equipment, software, significant poll worker training,

19   or additional funding.

20           We expect the evidence to show today that that is

21   completely untrue and incorrect.  There are approximately -- I

22   think the evidence will show.  This is not to the penny.  But

23   this is my approximate figure.  There are -- we think there are

24   2365 polling places on a given election date.  We expect that

25   would decrease if your order were entered, certainly as to

1    early voting.

2           I think the evidence will show -- and I'll let

3    Fulton's witness describe this.  I think the evidence would

4    show that early voting would be catastrophically impacted by an

5    order like this.

6           There are approximately 12,000 to 20,000 poll workers

7    for each election day.  That poll worker training is scheduled

8    to begin in most counties, I think if not this week, next.  How

9    do you train poll workers if you don't know what the rules

10   would be?  We have approximately ten percent of voters under a

11   normal election historically who vote by a paper ballot --

12   absentee ballot, paper.  We would go to 90 percent on that in

13   less than two months' time.

14          We have approximately 6.8 million registered voters,

15   active and inactive.  Approximately -- let's call it less

16   than -- let's call it about 46 percent of that will turn out,

17   but you are talking about 3 million votes.

18          THE COURT:  I have seen these numbers before.  Remind

19   me if you have an exhibit with this.

20          MR. SALTER:  I don't.

21          THE COURT:  All right.  If you would, provide it.

22   Thank you.

23          MR. SALTER:  These are largely county executed

24   events, Judge.  There is one county present before Your Honor,

25   as you know.  There are 158 others.  Voters are registered in

1    their county of residence.  They vote and have their votes

2    counted in their county.  These are all updated from the county

3    to the state.  And the county elections officials determine

4    ultimately the validity of the ballots and the votes cast.

5             There are several different ways to vote in Georgia.

6    The most ones -- you know, absentee by mail with paper ballot

7    before election day, advance in-person election day on a DRE.

8    And then there are special circumstances I won't get into.

9             We cannot predict in good faith, Judge, how an order

10   like they are -- the plaintiffs are contemplating would affect

11   these between now and November the 6th and certainly for early

12   voting that begins before that.

13            Let's talk a little bit about the system just to

14   orient you.  It is not just they are DRE machines.  We use

15   ExpressPoll scanners to populate and figure out who is going to

16   get what kind of a ballot.  We have a voter access card that is

17   that yellow card that you see.  You have -- this is what the

18   units -- I think there is one in the courtroom.

19            This is what the DRE machine component of the system

20   looks like.  DRE machines are not just -- it is not -- that is

21   not the system.  The system is everything.  It is also physical

22   security.  It is how these things are secure.  It is how they

23   are placed under lock and key, yes, at warehouses with

24   surveillance cameras; how we train poll workers to watch people

25   and how they -- so they don't insert something into the

1    machine.  It is all of those things.

2          Here is an optical scanner that you will hear about.

3    You will hear today why Georgia was designed back in 2001 to be

4    not heavily dependent on optical scanners.  You will hear why

5    Georgia does not have high capacity optical scanning machines.

6    You will hear the explanation for that.

7          You will hear why this is not a feasible solution to

8    run an election off of a primarily or 100 percent paper ballot

9    environment through the 800-something machines we have for what

10   we would anticipate to be approximately 3 million paper

11   ballots.

12         You will hear the testimony and you have seen -- the

13   testimony is unrebutted on the declarations.  We only have 800

14   machines.  That is inadequate.  It is grossly inadequate to

15   think we could run a paper election off of 800 optical scanning

16   machines.  And that is unrebutted.

17         Their plans are to use optical scanners and, failing

18   that, hand tabulation of this total expected volume.

19         THE COURT:  Just in fairness, what they say is you

20   can either buy or rent additional scanners.  So I'm not going

21   to quibble about it.  But it is not that they have said -- not

22   rebutted it.  They just simply said there is a method of --

23         MR. SALTER:  If you look at one -- and pardon me.

24   Because we have got two different injunctions.  One of their

25   proposals has been amended twice.  I will point out that there

1   are several layers of this problem.

2          One is there aren't enough optical scanners.  Two is

3   we can't procure them in time.  Where does that leave you?

4   That leaves you with hand tabulation.  That is a very, very

5   real -- because we don't have any other regime to go to.

6          One thing that I don't think my friends from up north

7   realize.  In 2001 or in 2000, we did not have a uniform system.

8   There is no legacy uniform system to fall back upon.  The first

9   time we had uniformity in the State of Georgia regarding a

10  voting -- a true voting system was 2002 when this joker lost

11  his election.  That was the first time.

12         Before that, you had four --

13         THE COURT:  Are you sure you are not changing sides?

14         MR. BARNES:  Yeah.  I believe I lost that one all by

15  myself, Judge.

16         MR. SALTER:  We had four different systems in 2000,

17  Judge.  You will hear evidence of that.  You will hear evidence

18  that that is why it makes it so impossible to say, well, we'll

19  just put this on the State Election Board and they will

20  rulemake it away and make it all right.

21         Their idea -- they said this in their briefs.  They

22  said, listen, Maryland did this in one year.  You know -- you

23  have seen now in the briefing that is incorrect.  The State of

24  Maryland has 24 counties.  We have 159.  It is a smaller state.

25  They said Maryland is the centerpiece for how you can do this.

1    They don't need all this time.  We can do this for November.

2         It actually took Maryland -- the state, they started

3    in 2008.  They didn't finish until 2016.  It took them tens of

4    millions of dollars.  And the implementation was actually

5    postponed in 2010 because they couldn't find the money.  They

6    had to go back to their general assembly and say, we need more

7    money to budget this migration away from the DRE machines to a

8    paper ballot environment.  That is the reality of what we're

9    contemplating here.

10        THE COURT:  Although that was in the middle of the

11   financial crisis, and there wasn't extra money.

12        MR. SALTER:  Your Honor, this took eight years.

13        THE COURT:  I know.  Right.  I understand.  Just

14   about the --

15        MR. SALTER:  Let's talk a little bit about laches.

16   That is one of the arguments we made in terms of the

17   preliminary injunction issue for the relief sought.

18        With modifications and improvements, DRE machines

19   have been used in Georgia since 2002.  The Curling plaintiffs

20   and the Coalition tried an injunction in front of the Honorable

21   Kim Adams -- Kimberly Adams in 2017.  You have heard about

22   that.

23        This Court set -- then set an emergency schedule.

24   They came to federal court.  Your Honor said, well, I'm going

25   to move heaven and earth to get you an emergency hearing before

1    the election of last year.  You gave them a hearing -- a

2    deadline to file a preliminary injunction for September 1 of

3    last year.  And they let it go.

4          And the Court told the plaintiffs in here in this

5    courtroom back in May, quote, I will reiterate again that it

6    would be in my mind virtually impossible to have a trial before

7    the November election in time to do anything with that.  And

8    they still sat on their hands until last month.

9          Preliminary injunctions will be against the -- a

10   preliminary injunction here would be against the public

11   interest where it would have a needlessly chaotic and

12   disruptive effect upon the electoral process.  This is a quote

13   from the Supreme Court of the United States from last June.

14         And this is that gerrymandering case -- partisan

15   gerrymandering case.  It is about how we dilute votes through

16   partisan line drawing.  You will see -- and while it is

17   important, there is no greater champion of voting rights than

18   Emmett Bondurant.  We actually worked on a voter ID case -- my

19   firm did -- with Emmett's firm.

20         And then when this -- when one of these cases went

21   back down -- it is a Common Cause one in North Carolina two

22   weeks ago -- and the Court said, change it now.  We're tired of

23   it.  We have had it.  We have decided they are

24   unconstitutional.  Change it for the November election.  Even

25   Common Cause, which actually the Georgia version gave a

1    declaration in this case -- even Common Cause got their

2    lawyers, Emmett Bondurant and Jason Carter, who I respect, and

3    said, stop.  This is wrong.  We have a disagreement with it.

4    It is unconstitutional, but it is too close to the election to

5    do this.  And that is the responsible course here.

6          Elements of an extraordinary and drastic remedy like

7    an injunction in this case, they have to show four things:

8    Substantial likelihood of success, irreparable harm without an

9    injunction, and that the threatened injury outweighs the

10   damage -- basically a balancing of the equities -- and that

11   they advance the public interest.

12         Their injunction is not capable of enforcement, with

13   all due respect to the Court.  A preliminary injunction to,

14   quote, come up with a plan is not specific enough and is not

15   capable of enforcement as an operative command according to the

16   Eleventh Circuit.

17         The omission of parties.  We don't have the other 158

18   county election boards before the Court.  And we can't -- we

19   can partner with the counties.  We provide the ballots.  We

20   provide -- we're supposed to provide a uniform election system

21   to the counties for their use.  But we can't control them any

22   more than the Court we think can control absent parties who

23   aren't in this courtroom.

24         There is no substantial likelihood of success.  And I

25   know the Court -- I hear what the Court is ruling.  And I

1    respect the Court.  We disagree, and I think we'll have to go

2    up on this.

3            But look at the past.  *Favorito vs. Handel*, DRE case,

4    State of Georgia, 2009, affirmed the constitutionality of this

5    DRE system.  Unanimous opinion of the Supreme Court of Georgia,

6    seven justices.

7            Eleventh Circuit here in Atlanta, DREs without paper

8    verification are constitutional.  That is a 2006 case.

9            *Andrade*, a case from the Texas courts, dismissing

10   claims for injunctive relief that were complaining, like these

11   plaintiffs are, of the Secretary of State of Texas's

12   certification saying he shouldn't certify them.

13           *Schade vs. Maryland Board of Elections*, 2007, the

14   year before they decided to migrate.  That held the DRE system

15   was constitutional.

16           *Weber vs. Shelley*, Ninth Circuit, quote, we cannot

17   say that use of paperless touchscreen voting systems restricts

18   the right to vote.

19           *Stein vs. Cortes*, Eastern District of Pennsylvania,

20   two years ago.  They don't even have standing to argue this.

21   But then preliminary injunction denied.

22           And, of course, the order from Judge Adams in the

23   state court below.  They can't cite a single case anywhere in

24   the country that sides with them.

25           The bottom line is the plaintiffs just disagree with

1    the unanimous opinion of the court of the state where we are

2    sitting.  That court in that unanimous opinion in *Favorito*

3    said, quote, the fact that voters cannot actually see the

4    electronic record within the machine does not mean that the

5    vote is not accurately recorded or not recorded at all.

6              THE COURT:  Now, listen, I'm very respectful of all

7    of the authority.  But I think that to then point me to

8    *Favorito*, a decision in 2008, which certainly is a very

9    important decision to consider -- but it doesn't help me deal

10   with the record that is being presented to me now.  And for the

11   state to say there is no difference in the world that we're

12   facing right now in data breaches and in handling -- in

13   handling the sort of threats that actually that we are hearing

14   about and which are being presented in competent evidence is

15   basically making me work in an Alice in Wonderland world.

16             I respect the judgments.  I absolutely think that all

17   of the precedent you cite are obviously extremely on my mind

18   and absolutely will be considered in terms of whether to grant

19   injunctive relief.  But it would be more helpful for me if the

20   state would grapple with what actually is also some of the

21   changes in the circumstances and not just point me to cases

22   that are older and that were not grappling with those

23   circumstances.  Because they are not saying here it is just

24   simply because you have a -- you've got an electronic system.

25   It is certainly a part of it that it can't be audited.  But we

1    are in different circumstances.

2         MR. SALTER:  Your Honor, what has not changed because

3    of a threat environment with Russia is that they can be

4    audited.  That is the point I'm trying to make.

5         THE COURT:  Well, I --

6         MR. SALTER:  I'm not trying to argue that current

7    events have changed.  Current events by definition have

8    changed.  What I'm trying to point out is the representation of

9    my friends on the other side that these things cannot be

10   audited is untrue.  And the Supreme Court of Georgia, seven

11   justices, unanimously agree that is incorrect.  It

12   fundamentally misunderstands the processes that we use in

13   Georgia as part of its election system.  That is the point.

14   You can audit these things.

15        Plaintiffs' contentions regarding the accuracy of

16   recounts are merely hypothetical.  That is what the court in

17   Georgia has said.  There is no irreparable harm here in part

18   because the Georgia voters -- if they have this fear that their

19   vote will be somehow not counted correctly, not shown on a

20   recount, then they have the option unrestricted to do -- to

21   cast a paper ballot in the form of an absentee ballot prior to

22   actual election day.

23        And what the Supreme Court of Georgia said is

24   absentee voters have not been treated differently from polling

25   place voters except in the matter permissible under the

```
 1    election statutes and as a result of the plaintiffs' own
 2    choice.
 3          They have adequate legal remedies.  If Your Honor --
 4    let's take as an example something bad happens.  There are
 5    election contests.  There are recounts, both statutory and that
 6    can be filed in court.  And what has happened here -- what the
 7    plaintiffs initially sought is a reexamination of the system by
 8    the Secretary of State and his team.  That has happened here.
 9          I respectfully disagree with my friends who get up
10    here and say and characterize this as the Secretary of State's
11    office is doing nothing, the State Election Board is doing
12    nothing.  That is incorrect.  We gave them exactly what their
13    first complaint wanted.
14          Under the statute, a statutory reexamination of the
15    system began in 2017.  We conducted a team review.  And the
16    Court knows what that found.  We'll have that certification in
17    evidence in the case.
18          That is what happened.  They just continue to
19    disagree with that decision.
20          An immediate conversion to paper ballots -- to a
21    paper ballot election for November without time to prepare will
22    damage and disable Georgia's election security.  They don't
23    have -- we argued about what is uncontroverted and all that
24    stuff.
25          But Merritt Beaver is chief information officer in
```

1    the Secretary of State's office.  And what he has testified is

2    that moving to paper ballots in such an abbreviated time frame

3    could potentially damage Georgia's election security.  We have

4    many years of experience protecting the current system.  But we

5    do not have personnel that have dealt with the security

6    surrounding a paper ballot environment.

7            While it is certainly possible to build a system to

8    adequately protect the paper ballot environment, properly doing

9    so requires the right personnel, processes, and time for

10   testing and validation.  Without each of those in place prior

11   to moving to a new system, security would be unmanageable.

12           You're going to hear -- you have in the record

13   declarations of the chief information officer, the election

14   director in the Secretary of State's office, the election

15   director of Cobb County, Gwinnett County, Muscogee County,

16   Richmond County, and Fulton County.

17           They don't have on their side a single current or

18   former elections official on their side saying, yeah, this is

19   doable, it is a good idea.  Not a single one.

20           Paper ballots are, in fact, history tells us less

21   safe and secure.  The chain of custody on what they are

22   suggesting would be a nightmare.  It is one thing to say we

23   manage ten percent of absentee ballots that come in in the

24   state.  It is another thing to say 100 percent in this time

25   frame.

1          Traditional paper ballots as became evident during

2    the 2000 presidential election are prone to overvotes,

3    undervotes, and -- you will hear testimony of this today --

4    hanging chads, and other mechanical and human errors that may

5    thwart voter intent.  These are not the Holy Grail of voting

6    integrity.  That is just incorrect.

7          The plaintiffs' motions must be denied, Judge.  We

8    would ask you to do it and do it today and not in an order that

9    waits.  Mandating paper ballots now has the potential to cause

10   voter confusion, particularly when implemented at such a late

11   date in the election process.  That is our position.

12         Plaintiffs' plans for an immediate conversion are not

13   real plans at all.  They are punting the rulemaking to the SEB

14   as window dressing really just to scapegoat the state for what

15   is liable to be a mess.  And then they will blame -- they will

16   step back and say, we let the SEB rulemake it to make it all

17   right and it is their fault.

18         They cannot guarantee a secure election with a paper

19   ballot environment.  Nobody -- there is no 100 percent system.

20   And you have read all the cases that have said all this.  But

21   going to a system like this with this little time, with no time

22   to do real valid voter education, no time to actually rulemake,

23   no time to budget for, no time to procure a sufficient number

24   of optical scanning machines that would actually work, that

25   will virtually guarantee an unsafe and insecure election.

```
1                    Thank you, Judge.

2              THE COURT:  Thank you.  Would you mind sending to

3   Ms. McConochie an electronic copy of your PowerPoint.

4              MR. SALTER:  Yes, ma'am.  I'll try to do so.  I don't

5   know if I can do it though -- are you directing me to do it

6   right now or later today?

7              THE COURT:  Later today is fine.

8              MR. SALTER:  Thank you, Judge.

9              Any questions?

10             THE COURT:  Maybe if you could do it at lunchtime if

11  you have it on the computer.

12             MR. SALTER:  I will try.  Anything further?

13             THE COURT:  No, not right now.

14                         OPENING STATEMENT

15             MS. BURWELL:  Very briefly, Your Honor.  Kaye Burwell

16  on behalf of Fulton County.

17             As this Court is aware, the case law is clear that

18  the grant of injunctive relief is an extraordinary remedy that

19  requires that it only be issued in limited circumstances and

20  only where the movant has satisfied this Court through a clear

21  showing that they have carried their burden.  And in the

22  instant case, the stack of documents and declarations and

23  information provided by these plaintiffs does not carry their

24  burden.

25             That is because there is no real evidence of
```

1    irreparable harm.  There is an argument that there is a risk

2    that exists.  But there is no evidence that that risk has

3    actually been realized.  And the Court understands that

4    establishing a risk of irreparable harm is not enough.

5    Plaintiffs have the burden of proving that immediate injury.

6    And here they can't do that.

7              As Mr. Salter said, the evidence is undisputed that

8    every plaintiff with the right to vote in Georgia has the

9    ability to vote via absentee ballot.  They can vote a paper

10   ballot.  They have the right to choose that and can.

11             THE COURT:  If you ended up having 10,000 more people

12   voting in Fulton County, Fulton County would be prepared right

13   now?

14             MS. BURWELL:  Your Honor, Fulton County -- if 10,000

15   people because generally --

16             THE COURT:  More than the norm.  Not 10,000 as a

17   whole.  But 10,000 more than the norm.

18             MS. BURWELL:  Well, I think 10,000 more they could --

19   Fulton County has 752,000 registered voters.  And so for this

20   Court to say that in less than two months there needs to be

21   processes put in place to allow for paper balloting for all

22   752,000 is unreasonable and untenable.

23             You will hear from Mr. Barron.  And when the Court

24   thinks about statewide the number of voters that would need

25   paper ballots if the Court were to grant the relief sought by

64

1    these plaintiffs, it is exponentially more than 752,000.

2          And the Court needs to keep in mind that the Eleventh

3    Circuit has made clear that a plaintiff that is seeking

4    injunctive relief has to do more than just assert a

5    constitutional violation or a risk.  The threat can't be remote

6    or speculative.  It has to be real and immediate.

7          And what we have here is a lack of evidence that it

8    is real and immediate.  All we have is the potential risk.

9    There is no evidence in anything that the plaintiffs have

10   provided this Court that shows any hacking took place, that any

11   machine has been tampered with.  There is only the allegation

12   that it is possible.

13         Mr. Salter talked to the Court about the fact that

14   plaintiffs have unreasonably delayed in bringing this

15   preliminary injunction.  And it is important for the Court to

16   know that an unreasonable delay in and of itself negates the

17   presumption of irreparable harm.

18         Courts have recognized that claims against election

19   procedures have to be expressed expeditiously.  And a delay in

20   preliminary injunction suggests that the status quo does not

21   irreparably damage the moving party.

22         Plaintiffs have waited over a year to file this

23   motion from -- they filed this case in July of 2017 and didn't

24   file for preliminary injunction until 2018.  And because of the

25   previous lawsuit in 2017, these plaintiffs recognize all of the

1    administrative hurdles that go into a fair election process.

2    And they understand that what they are seeking would benefit

3    them.  But it would not benefit Fulton County.  It would not

4    benefit the voting public.  It would not benefit the citizens.

5    It would not benefit the taxpayers.

6            And so the rights and burdens on the non-movants

7    greatly exceeds the speculative claim of harm that these

8    plaintiffs have put forth.  You will hear testimony about the

9    administrative upheaval that would happen within the election

10   process this close to an extremely important election for

11   Georgia voters.

12           This Court is going to hear about the disruption in

13   early voting that would occur if this Court were to grant the

14   relief sought by these plaintiffs.  This Court is going to hear

15   about the fact that there is not enough time and processes in

16   place for paper balloting.  There is not enough time to get

17   ballots.  There is not enough time to train people.  There is

18   not enough time to come up with processes with respect to how

19   these ballots -- if there are this many millions of paper

20   ballots, how those would be transported and reviewed and

21   counted.

22           The Court is going to hear that Fulton County does

23   not have enough optical scanners to take care of all of these

24   potential paper ballots should the Court decide to grant the

25   injunction.  And when the Court weighs the burdens on the

```
1   public versus the burdens on the few plaintiffs who say they
2   want to vote paper ballots, clearly they have not met that
3   burden because they do have the right to vote on a paper
4   ballot, just as other citizens have the right to use the DRE
5   machine if that is what they choose to use.
6             That is my time.
7             THE COURT:  Thank you.
8                       OPENING STATEMENT
9             MR. CROSS:  Your Honor, brief rebuttal before we call
10  our first witness.  I do have to say that I think the most
11  important thing I need to rebut is Mr. Salter's
12  characterization of lawyers from up north.  I grew up in the
13  holy city of Charleston, South Carolina, and went to school
14  with Mr. Salter's wife.  So I know he is not talking about me.
15  Let's just be clear.
16            THE COURT:  It used to be people in D.C. anyway were
17  supposed to be part of the south.  But that was maybe --
18            MR. CROSS:  Well, I have to give him D.C.  We live in
19  Virginia though.
20            Your Honor, on the delay point, I'm just going to say
21  this case has seen unusual circumstances.  Our clients lost
22  their --
23            THE COURT:  You can come up.  I was trying to get a
24  member of my staff.  But she is -- she just got confused.  Go
25  ahead.
```

1          MR. CROSS:  Our clients lost their chosen counsel.

2    Once they retained counsel, which took time particularly for a

3    case where they need pro bono counsel, we have moved as

4    expeditious as we could and have even gotten creative -- Your

5    Honor may remember the stipulation.  But the Eleventh Circuit

6    coincidentally came down with incredible timing after we worked

7    it out with the defendants.  But I just don't think laches

8    applies here at all.

9          The poll worker training, Mr. Salter admits it hasn't

10   even begun.  But the point that gets lost when they talk about

11   this is they have to train the poll workers on paper ballots.

12   You heard from Mr. Salter and especially from Fulton County

13   that every single voter in the State of Georgia has an

14   unlimited right to vote by absentee.

15         And Your Honor hit the nail on the head when you

16   posed the possibility of what about an additional 10,000

17   voters.  Well, what if every voter in the state decides to vote

18   absentee because they don't trust the DREs?  They have said

19   that that is an absolute unlimited right that every voter has.

20   So they have got to be prepared to be able to do that.  And

21   they have got to anticipate that voters are going to come in

22   with a lot more requests for paper, even if this fails.

23         But as we have pointed out, the absentee system is

24   actually not a viable alternative.  Donna Curling is Exhibit 1.

25   She went through it, had no idea her vote didn't count until we

1    got into this litigation.  And it is a cumbersome process.  It

2    will be far easier and far less expensive for voters and the

3    state to provide those at the polls, Your Honor.

4            The redistricting decision, just briefly on that.

5    Mr. Salter mentioned this.  The North Carolina case where

6    Common Cause, the plaintiff, stepped back from the relief.  We

7    are nowhere in the world of redistricting.  We're talking about

8    an increased volume of providing paper in addition to what they

9    already provide, not redrawing the lines.  So it is just

10   completely inapposite, Your Honor.

11           Particularly unsettling to us also is the Secretary

12   of State is actually blocking the effort of some counties to

13   try to do this on their own.  They sent out letters to the

14   superintendents saying you cannot do this on your own.  Even

15   though the statute -- and we'll see this today.  The statute

16   actually provides a discretion for the superintendents of the

17   counties to determine whether the machines are impracticable to

18   use.

19           And why the Secretary of State would stop that is

20   difficult to understand.  And when they say we don't have any

21   county officials on our side, one, we haven't gotten discovery

22   and, two, those letters have a chilling effect on anyone in the

23   counties who might actually want to support us.

24           The election DRE cases they cite, Your Honor, only

25   briefly on that.  As Your Honor pointed out, these are largely

1    older decisions.  Importantly when you look at the decisions

2    like the *Stein* case in Pennsylvania, including Curling One

3    which they talked about, these are cases that were

4    retrospective.  They were saying that we need relief for an

5    election that has already happened.

6            It makes perfect sense that in that situation the

7    Court would expect some showing of hacking having happened in

8    the past if you are going to undo a questioned election.  The

9    whole premise of our case is let's not end up in that role.

10   That is a constitutional crisis that no one wants.  So let's

11   take reasonable measures now and head that off.

12           On the auditing, Mr. Salter says it today.  And one

13   of their declarants -- it may have been Chris Harvey -- says

14   that these machines can be audited.  Notice what is missing.

15   Facts.  Even Mr. Salter today did not offer you any explanation

16   of how to audit these machines.

17           Let me tell you why.  Because it is not an audit.

18   What they are doing is they are just going to compare the

19   electronic recording of voting in one part of the machine to

20   the electronic recording of voting in another part of the

21   machine.

22           There is no independent record.  That would be like

23   coming in and saying, we want to know if a bookkeeper is fixing

24   the books.  Well, he kept two sets of books that he made at the

25   same time with the same method.  So we'll just see if they

70

```
1   match up.  If they are, then these books must be okay.
2           It is absurd on its face, Your Honor.  It is not an
3   audit.  These systems cannot be verified in any fashion.
4           The last point, Your Honor, is on the issue of harm.
5   Fulton County hit this pretty hard but had what struck me as a
6   pretty remarkable claim.  She said the risk of irreparable harm
7   is not enough.
8           Your Honor, that is literally the standard for a
9   preliminary injunction, and we readily meet it as we will show
10  today.  Thank you.
11          THE COURT:  Would you later on at the break provide
12  me the citation with the case you are referring to on -- as to
13  the Eleventh Circuit's laches -- most recent laches decision?
14  I think that is what you were referring to.
15          MR. CROSS:  Not on laches.  It was the one that you
16  said you couldn't accept our stipulation where we were trying
17  to amend the complaint.  That is what -- because we had --
18  everybody got on board with it and then the Eleventh Circuit --
19          THE COURT:  About the parties?
20          MR. CROSS:  Yes.  Yes.
21          THE COURT:  All right.  And the claims.
22                      OPENING STATEMENT
23          MR. BROWN:  Your Honor, in the brief time that we
24  have, I'm going to hand to you, if I may approach, a timeline
25  of election security warnings.  And that is just a guide to all
```

1   of the mountains of evidence showing that the state has been

2   given notice for 24 months to 10 years, depending on how you

3   look at it, that these systems need to be changed.

4          And one of the things that I would think the evidence

5   will focus upon is that the difficulty that the state explains

6   we believe is entirely exaggerated.  But it is all from the

7   standpoint of the state staff.  It is hard for staff to do this

8   because they have got to buy scanners.  They have got to pick

9   up the phone and order scanners.  They have got to order paper

10  ballots.

11         The state is not talking about harm to the voters.

12  The voters will go to the same places.  They will go -- instead

13  of mashing a computer screen, they will get a paper ballot.

14  They will fill it out just like you fill out an SAT test,

15  except you know the answers in advance.  It is that easy.  That

16  is the only change in the voting experience.  And the cases and

17  this case is about the perspective of the voters and the rights

18  of the voters, not inconvenience to the state.

19         Moreover, Your Honor, we have -- ironically we have

20  much more confidence in the state staff than they have

21  themselves.  They can do it.  They need to have a can-do

22  attitude to get this done.

23         MR. SALTER:  I want that written down.

24         MR. BROWN:  Thank you, Your Honor.

25         THE COURT:  All right.  In the interest of time,

```
 1    we're going to just keep on moving.  I'm going to let -- there
 2    appear to be a few seats up here.  So if -- Ms. McConochie, if
 3    you would just let the security know that we have about maybe
 4    four seats for somebody.
 5            If someone is just going to the restroom and they are
 6    planning to come back, please indicate that to the person you
 7    are sitting next to.
 8            All right.  Thank you.  There is a seat over there.
 9            MS. CHAPPLE:  Good morning, Your Honor.
10            THE COURT:  Let me just let everyone get seated.
11            How many seats are there back there now?  I don't
12    want to sound like a flight attendant stuffing people in.  But
13    I'm just trying to be accommodating.
14            MR. SALTER:  This is Mr. Halderman, Catherine?
15            MS. CHAPPLE:  It is.
16            Good morning, Your Honor.
17            THE COURT:  Good morning.
18            MS. CHAPPLE:  May we have permission to bring this
19    voting machine up?
20            THE COURT:  Yes.
21            MR. SALTER:  No objection, Judge.
22            MS. CHAPPLE:  Thank you.
23            THE WITNESS:  It might be better to plug it in.
24               (There was a brief pause in the proceedings.)
25            MS. CHAPPLE:  Your Honor, I would like to call
```

1    Professor Halderman to the stand.

2            THE COURT:  Before he begins and since there is -- in

3    case there are any people left in the overflow courtroom, I

4    will say when we break for lunch some people may indicate they

5    are not coming back to their seats and there -- if they all

6    stay, there may be some seats because I notice some people come

7    and some people apparently stay.  So all right.

8            COURTROOM DEPUTY CLERK:  Good morning, sir.  Please

9    raise your right hand.

10                        **(Witness sworn)**

11           COURTROOM DEPUTY CLERK:  Thank you.  I'm going to ask

12   you to pull up close to the microphone.  You can adjust the

13   microphone as needed.  It is very important that we all be able

14   to hear you.

15           I'm going to ask you to state your first and last

16   name again for the record, and please spell your first and last

17   name for the record.

18           THE WITNESS:  My name is Alex Halderman.  That is

19   A-L-E-X H-A-L-D-E-R-M-A-N.

20           COURTROOM DEPUTY CLERK:  Thank you.

21       Whereupon,

22                   J. ALEX HALDERMAN, PH.D.,

23       after having been first duly sworn, testified as follows:

24                       DIRECT EXAMINATION

25   BY MS. CHAPPLE:

1   **Q.**   Thank you.  Professor Halderman, the Court has your

2   declaration and CV.  But could you please briefly summarize

3   your experience for the Court.

4   **A.**   Yes.  I'm a professor of computer science and engineering

5   at the University of Michigan and director of the Michigan

6   Center for Computer Security and Society.  I have written more

7   than 70 technical papers and peer-reviewed studies about

8   computer science and computer security topics, including

9   numerous studies of electronic voting systems used in the U.S.

10  and other countries.

11  **Q.**   Have you had any involvement with policymaking related to

12  election cybersecurity?

13  **A.**   I have.  One example is last summer I testified before the

14  U.S. Senate Select Committee on Intelligence as part of their

15  investigation into Russian interference in the 2016 election on

16  the subject of cybersecurity threats to U.S. election

17  infrastructure.

18  **Q.**   Since you began in the field in 2007, have views of

19  election threats changed at all?

20  **A.**   Yes, they certainly have.  When I began actually in 2006,

21  I started working on this while I was studying for my Ph.D. at

22  Princeton.  And back then when we were thinking about threats

23  to election systems, the main concern was, well, dishonest

24  insiders or dishonest candidates, attackers who would be

25  criminals of the usual nature.

1          But everything changed in 2016 -- in 2016 when during the

2     presidential election the threats of interference by foreign

3     power, by nation state attackers, presented a substantially

4     different and new threat and a much more serious form of

5     attacker than we had considered previously.

6     **Q.**   Turning to the question today, what kind of electronic

7     voting machines are used in Georgia elections?

8     **A.**   Georgia uses AccuVote TS and TSx paperless electronic

9     voting machines as its primary polling place equipment.  It

10    also uses AccuVote-OS optical scanners to count the absentee

11    ballots.

12    **Q.**   Based on your research with the DRE machines, are they

13    vulnerable to hacking or interference?

14          MR. BARNES:  Well, Your Honor, I object.  That is a

15    general question not addressed to this state and the

16    circumstances in this case that is pending before you.

17          Does the sun come up in the east?  Yes, it does.  But

18    it may not necessarily have the same basis in Georgia as it

19    does in Michigan.  So unless he can --

20          THE COURT:  I thought the sun in Michigan and in

21    Georgia were the same myself.

22          MR. BARNES:  It comes up -- it comes up different in

23    Michigan.

24          THE COURT:  I have heard that argument intimated in

25    your papers.  And I thought, oh, my gosh, really we have

nuclear physicists that are different in Georgia who are
dealing with our nuclear power plants here than in any other
place.

I'm going to let her proceed.

**Q.   (BY MS. CHAPPLE)**   Okay.  Thank you.

**A.**   So --

**Q.**   The question was:  In your opinion, are the DRE machines
vulnerable to hacking or interference?

**A.**   Yes, I would say in my opinion they are.  And that is in
part because these AccuVote TS and TSx machines are the most
widely studied paperless electronic voting machines of any kind
in the world.

And I'm prepared -- I have done work developing
vulnerabilities and demonstration attacks on them myself.  I
have reviewed work of my peers that has demonstrated further
vulnerabilities.  I have even participated in security reviews
sponsored by a Secretary -- Secretary of State in another
state.

**Q.**   What machine do you have here with you today?

**A.**   This is an AccuVote TSx, one of those two machines used in
Georgia.

MS. CHAPPLE:  Your Honor, may the witness have
permission to step down and perform the demonstration for the
Court?

THE COURT:  Yes.  You know, you can move it back a

1    little bit so you have some room.

2              MR. BARNES:  Yeah.  Move it back so I can see it.

3              THE COURT:  So just move it back there.  And that way

4    counsel can see it.

5              And, Counsel, if you get close to there, then you are

6    going to be able to see.  It is just -- I'm flexible.

7              I think you're going to need to move it a little bit

8    this way so I can see it.  Okay.  I've got it.

9              Are you all right?

10             MR. BARNES:  I'm fine.

11   **A.**  Can everyone see?  These are unfortunately not

12   current-type screen technology.  So it is hard to see them at

13   an angle.

14        So what I'm going to demonstrate today is some of the

15   vulnerabilities that are present in these AccuVote touchscreen

16   voting machines.  And I brought with me a voting machine that

17   currently has no malicious software running on it.  It is set

18   up as a voting machine would be prior to an election.  There is

19   no election loaded on to it at all.

20        And what I'm going to show is how it is possible for an

21   attacker to spread malicious and vote-altering code to these

22   machines without having physical access to the machines used in

23   Georgia.

24        So I'll begin by taking a step that poll workers would

25   take prior to any election, which is --

1          THE COURT:  Give that down to him.

2     **A.**    -- which is to load the ballot programming on to the

3     machine.  Before every election, every electronic voting

4     machine needs to be programmed with the design of the ballot,

5     the races, the candidates, the rules of counting.

6          And in the machines used in Georgia, that programming is

7     created on a central system and then copied on to memory cards,

8     like this one I have here, and then loaded by election workers

9     into each of the machines.

10         I have prepared a demonstration in which I have created

11    malicious programming and infected this memory card with that,

12    along with a mock election.  And even though that is not

13    visible to the poll workers -- there is nothing you can

14    externally see -- that programming is going to affect the

15    behavior of the machine.

16         So I'm going to use this key to unlock the door on the

17    side of the machine.  And then I can insert the memory card.

18             MR. BARNES:  Wait just a minute.  This is by a poll

19    worker or a voter?

20             THE WITNESS:  This is a poll worker.

21             MR. BARNES:  I see.  Okay.  Go ahead.

22    **A.**    When the poll worker inserts the memory card prior to the

23    election, the machine loads the election.  And now it provides

24    election workers an opportunity to perform various kinds of

25    tests.

1          We hear a lot about logic inaccuracy testing, for example.
2     I'm going to perform just a very abbreviated form of logic
3     inaccuracy testing.  I'm going to cast one test vote.  So I
4     pressed the test vote button.  No voter cards.  Okay.  It is
5     telling me the paper is low.
6          Okay.  So test vote.  And here is the special mock
7     election I prepared.  It is an election for president of the
8     United States.  And the candidates are George Washington or
9     Benedict Arnold.  And I'm going to cast a test vote for George
10    Washington.  I'm going to press the button to cast the test
11    ballot.  Okay.  The machine has thanked me for voting.  Now,
12    that is all the time I would like to take now for logic
13    inaccuracy testing.  Although we could certainly do more.
14         I'm going to have the machine print the results of the
15    logic inaccuracy test.  And this printer is used by election
16    officials to print summary tapes.  These are not a paper trail
17    in the sense that we use in the election research and practice
18    area.  This is just a total of the number of votes recorded for
19    each candidate.
20    Q.   (BY MS. CHAPPLE)  Did the voter receive a tape like that?
21         THE COURT:  Can you speak up?  The court reporter has
22    to be able to get you.
23    Q.   (BY MS. CHAPPLE)  Excuse me.  I asked whether a voter
24    would receive a tape like that.
25    A.   No.  The voter doesn't get to see this.  This is just

1    printed by poll workers at the beginning or the end of the

2    election to summarize the totals.

3        And as you can see, Your Honor, the logic inaccuracy test

4    shows the machine is counting properly.  We have the one vote

5    registered for George Washington and zero for Benedict Arnold.

6        Now I'm going to set the machine to run the actual

7    demonstration election.  This is as poll workers would do, say,

8    on the morning of election day.  I'm going to do this by

9    pressing the set for election button.  This will clear all of

10   the votes that were entered during the tests.  And it will

11   print what is called a zero tape.  The zero tape -- the zero

12   tape is a record that shows that there were no ballots present

13   in the machine at the beginning of the election.

14       And indeed, Your Honor, there were zero ballots in the

15   machine according to the printout.  Let me just fix the paper

16   tape.  Okay.  Now we can cast some votes.  And this machine

17   just like all other TSx's requires a voter card in order to

18   authorize a vote.  I have brought the voter cards here with me.

19       So I'm going to insert a voter card authorizing one vote.

20   And we can proceed to cast the vote.  I'll cast one vote for

21   George Washington.  Now I'll insert another voter card, and we

22   can cast the second vote also for George Washington.  And now

23   we'll do one more vote.

24       Would anyone like to decide who our third vote will be?

25            THE COURT:  George Washington, of course.

1  **A.**   George Washington.  All right.  One more for George

2  Washington.  All right.  We have three votes for George

3  Washington in our test.

4       Now I am going to insert a different card.  This is an

5  administrative card that poll workers can use to access

6  administrator functions.  And I'm going to put it in in order

7  to end voting and say the election is complete.  This requires

8  the poll worker to enter a PIN, which I will do.  Now we can

9  access the function to end voting.

10      Okay.  This says close the election.  Now the machine will

11 print out a record of the totals for each candidate.  This is

12 how the machine has counted up the votes, what it has

13 registered.  And we expect -- I certainly hope we'll get a

14 result that says three votes for George Washington.

15      Excuse me.  So the results that the machine has shown,

16 Your Honor -- the results the machine has produced are one vote

17 for George Washington and two votes for Benedict Arnold.

18      What has happened here is that the malware that I inserted

19 with the memory card without having pre-installed any malicious

20 software on the machine -- the malware that spread to the

21 machine through the memory card invisibly altered the records

22 of the vote to produce a fraudulent outcome.

23           MS. CHAPPLE:  Your Honor, I would like to offer into

24 evidence the three tapes.

25           THE COURT:  You've got to speak up.  All right?

```
1              MS. CHAPPLE:  Sorry.  I would like to offer --
2              THE COURT:  Get near the microphone.  All right.
3     Thank you.
4              MS. CHAPPLE:  Your Honor, I would like to offer into
5     evidence the three tapes as Plaintiffs' Exhibits 1 through 3.
6              THE COURT:  Are there objections?
7              MR. BARNES:  Yes, until I can cross him about it.
8              THE COURT:  All right.  Well, they are conditionally
9     admitted subject to being crossed.  All right.
10             MS. CHAPPLE:  Thank you, Your Honor.
11             THE COURT:  Are we through with the machine for now?
12             THE WITNESS:  Yes, we are.
13             THE COURT:  So let's just put it a little closer to
14    me so it is not just blocking the way in case anyone needs to
15    approach you at some other point.
16             All right.  Thank you.
17             Is that going to be any problem?
18             (There was a brief pause in the proceedings.)
19    Q.  (BY MS. CHAPPLE)  Thank you for that demonstration,
20    Professor Halderman.
21        During the demonstration, you inserted the memory card
22    with malware into the --
23             THE COURT:  If you would bring the microphone closer,
24    you won't have that same problem.  All right.  Just get it
25    closer to you.
```

1          MS. CHAPPLE:  The cord is tight.

2          THE COURT:  The cord is tight.  All right.  Very

3     good.

4     **Q.   (BY MS. CHAPPLE)**  During the demonstration, you actually

5     physically inserted the memory card with malware into the

6     machine.  Would an attacker need physical access to the machine

7     to infect the system?

8     **A.**   No.  So it would be sufficient to merely be able to change

9     the data that is loaded on to that memory card as part of

10    normal election processes.  One way to do that would be to

11    infect the central administration systems on which the election

12    programming is produced, which would allow a way to spread

13    malicious software to many voting machines over a wide area all

14    at once.

15    **Q.**   And for election results to be altered as you just

16    demonstrated, would the machines or system need to be connected

17    to the internet at all?

18    **A.**   No.  So this machine is not connected to the internet, for

19    instance.  We're still able to -- we're still able to alter the

20    results.

21    **Q.**   Can you alter or could an attacker alter results without

22    physical access and without an internet connection to the

23    machines or the system?

24    **A.**   Yes.

25    **Q.**   What -- and what is the basis for your opinion that voting

1  machines like the one that you just demonstrated on could be

2  hacked here in Georgia?

3  **A.**    Well, I have done my own original peer-reviewed scientific

4  research about the machines.  I have reviewed the work of

5  others.  I have reviewed the -- I have reviewed Georgia's

6  explanations of the way the system operates and of its security

7  procedures that are in use.  That is part of the basis for that

8  opinion.

9  **Q.**    Other than the types of vulnerabilities you demonstrated

10 just now, are there additional serious vulnerabilities in

11 Georgia's system?

12 **A.**    Yes.  So I demonstrated just one way that an attack could

13 manifest and spread to the machines.  There are many ways to

14 spread malicious software to the machines.  There are ways to

15 spread malicious software potentially back to the election

16 management systems where that programming is created.  And

17 there are other kinds of vulnerabilities, including ways that

18 voters could cast more votes than they are entitled to, that

19 officials could find out how -- the officials could find out

20 potentially how voters voted.  There are many different kinds

21 of vulnerabilities.

22 **Q.**    I would like to put a slide up on the projector.

23         MS. CHAPPLE:  Your Honor, may I approach the witness?

24         THE COURT:  Yes.

25 **Q.**    **(BY MS. CHAPPLE)**  Do you recognize this slide?

1   **A.**   Yes, I do recognize this.

2   **Q.**   And what is it?

3   **A.**   This is -- I believe this is part of the index from a

4   security review of the AccuVote voting system that I performed

5   in 2007.

6            THE COURT:  What is on the screen right now?

7            MS. CHAPPLE:  Yes.

8            MR. BARNES:  Was that in Georgia, Your Honor?

9            THE WITNESS:  This was in California, which used the

10  same machine.

11           MR. BARNES:  Well, to your knowledge, it used the

12  same machine?  You don't know what changes have been made?

13           THE COURT:  Well, do you?

14           THE WITNESS:  It uses the same model of machine.

15           MR. BARNES:  Well, Your Honor, I object to what they

16  do in California.  I mean, you know, we are here about Georgia,

17  whether there is irreparable harm to this system after the

18  changes have been made to conform with the state's.

19           THE COURT:  You will have an opportunity to

20  cross-examine the witness fully and bring out any differences

21  as to why I should not consider this.  But I think we are

22  proceeding.

23           THE WITNESS:  May I correct one thing about that?

24  California's machines had a paper trail add-on.  So they did

25  produce a record of each paper ballot.

1          THE COURT:  Were they the same -- other than that,

2     were they the same technology or not?

3          THE WITNESS:  They were the same technology.

4          THE COURT:  Were they also produced by Diebold?

5          THE WITNESS:  Yes, they were also the AccuVote TSx

6     produced by Diebold.

7     **Q.    (BY MS. CHAPPLE)**  And is that the same machine you

8     demonstrated the hack on today?

9     **A.**    Yes.

10          THE COURT:  I need you to step back.  Thank you.

11          THE WITNESS:  I can see on the screen here.

12          THE COURT:  It is also next to you over there.

13          THE WITNESS:  Thank you.  Thank you, Your Honor.

14          MS. CHAPPLE:  I would like to enter this slide as

15     Exhibit 4.

16          MR. BARNES:  I object.  It has no relevancy to this

17     proceeding.

18          THE COURT:  This is --

19          MR. BARNES:  -- California.

20          THE COURT:  All right.  Well, I don't think the fact

21     that it is from California is the basis of an objection.

22     Whether it is something different and that the machine is

23     different, all of those things are to be considered and

24     potentially excluded but -- or given very little weight.

25          But what I'm trying to understand is what this

1  document is that you're asking to introduce.

2        MS. CHAPPLE:  So this document is a source code

3  review of the Diebold voting system in 2007.  The software and

4  the machines that Georgia uses are not any newer than 2007.

5  And as you can see, for example, the very first line, 5.2.1,

6  that AV TSx, that stands for the AccuVote TSx machine.

7        THE COURT:  I'm just saying:  Is this a summary that

8  was prepared by you, Professor Halderman, or is this something

9  that was from Diebold?  I'm confused about what this is.

10        THE WITNESS:  I did prepare the highlighted portions

11  of this index, yes.

12        THE COURT:  All right.  So this -- tell me -- this is

13  a summary of what that you prepared?

14        THE WITNESS:  This is a summary of the findings of

15  the security review in 2007 that was conducted at the behest of

16  the California Secretary of State.  And this list comes from

17  that study with portions highlighted by me.

18        MR. BARNES:  Well, Your Honor, that is hearsay.  I

19  mean, he is truly -- he didn't -- you didn't have anything to

20  do with this, did you?

21        MS. CHAPPLE:  Yes.  He is an author.

22        THE WITNESS:  Yes, I'm an author of this study.

23        MS. CHAPPLE:  He is the third author listed,

24  Halderman.

25        MR. BARNES:  So you took it from other folks?

 1               THE WITNESS:  No.

 2               MS. CHAPPLE:  No.

 3               MR. CROSS:  Your Honor, could we have some procedure?

 4               MR. BARNES:  All right.  I object, Your Honor.

 5               THE COURT:  All right.  You object.  I'm going to

 6      give you a robust opportunity to cross-examine.

 7               MS. CHAPPLE:  May I enter these?

 8               THE COURT:  We don't have a jury here, even though we

 9      have a lot of people here.  So it is not like there is any

10      contamination of the jury.

11               Go ahead.

12               MS. CHAPPLE:  I may enter it as Exhibit 4?

13               THE COURT:  I'm going to allow it for now

14      conditionally.  But I would certainly allow cross-examination,

15      and I'm doing that instead of doing some voir dire of this

16      because we'll never finish this proceeding.  Otherwise I would

17      allow voir dire of it.

18               But this is -- you were a co-author of this study?

19               THE WITNESS:  Yes.  It is an excerpt.

20               THE COURT:  If I understand correctly, this is a

21      summary of your findings and your peers' findings, who are --

22      and who are they?

23               THE WITNESS:  This is a study that was authored by me

24      and other experts selected by the California Secretary of

25      State's office.  And this is an excerpt from the study --

1          THE COURT:  All right.

2          THE WITNESS:  -- just to be clear.

3          THE COURT:  All right.

4  **Q.   (BY MS. CHAPPLE)**   These are vulnerabilities that you found

5  as part of your study of the AccuVote TSx machines?

6  **A.**   Yes.

7  **Q.**   Is this list exhaustive?

8  **A.**   No.  This doesn't cover all of the known vulnerabilities.

9  No.

10  **Q.**   Georgia performs testing prior to and on election day.

11  Would the issues, for example, the malware inserted in the

12  machine that we saw, be detected during that testing?

13  **A.**   Based on the kinds of testing that I understand Georgia

14  conducts, no.

15          MR. BARNES:  Well, Your Honor, what he -- I'm sorry.

16  I hate to do this.  But I need to do it to build my record.

17          What he understands Georgia to do is not sufficient

18  --

19          MS. CHAPPLE:  He has not made an objection.

20          THE COURT:  Do you have an objection?  I understand

21  you have obviously a line of effective cross-examination.  But

22  is there an objection?

23          MR. BARNES:  The objection is that what he

24  understands is not a sufficient foundation to give an answer.

25  I can understand a lot of things.  But it is not --

90

1    THE COURT:  It would probably more succinct to simply

2    say there is insufficient foundation for his opinion.  Would

3    you please then go ahead and elaborate -- have the witness

4    elaborate what is the foundation for what he is stating.

5    **Q.   (BY MS. CHAPPLE)**  For example, parallel testing -- can you

6    explain to the Court what parallel testing is?

7    **A.**   Yes.  So I understand Georgia conducts some amount of

8    parallel testing.  Parallel testing --

9    THE COURT:  You understand this -- I mean, is this --

10   you actually know this or not?

11   THE WITNESS:  I'm sorry.  Based on the documents that

12   I have read about Georgia's procedures, Georgia conducts

13   parallel testing.

14   MS. CHAPPLE:  Your Honor --

15   MR. BARNES:  If he says I took the declaration of

16   somebody from the state and that I based it upon that, I have

17   no objection.  It is just --

18   THE COURT:  That is fine.  Is it based on a

19   declaration, or is it based on -- of a state official or state

20   document?

21   THE WITNESS:  Yes, based on state documents that I've

22   reviewed --

23   THE COURT:  All right.

24   THE WITNESS:  -- which -- I'm sorry.  I don't

25   remember exactly which of the state documents.

```
 1              THE COURT:  Were they documents produced in this
 2    proceeding or in other proceedings?
 3              THE WITNESS:  Documents provided that I --
 4              MS. CHAPPLE:  In this proceeding.
 5              THE WITNESS:  In this proceeding?  Yes, I believe
 6    documents that have been produced in this proceeding.
 7              THE COURT:  Well, for ease, we're going to proceed,
 8    and we're going to have a lunch break.  And I would like you to
 9    shore this up what he is basing this on.  But we're proceeding
10    now.
11              THE WITNESS:  Yes.  Excuse me.
12              MS. CHAPPLE:  Thank you, Your Honor.
13    Q.   (BY MS. CHAPPLE)  Would parallel testing detect issues
14    such as malware in the DRE system?
15    A.   Parallel testing is not sufficient to detect the malware.
16    It is not sufficient to detect malware on the voting machines.
17    Q.   Why not?
18    A.   Well, so parallel testing -- what parallel testing is is
19    it means that you take some of the voting machines and set them
20    aside during the election and have people cast votes on them
21    that you know what the votes are, as we did in this
22    demonstration, and then look at whether the results are what
23    you expected.
24         Well, there are a few problems with that.  One is that
25    just like the malware I showed was able to detect logic
```

1    inaccuracy testing.  And during logic inaccuracy testing, it is

2    possible to create an algorithm that detects the machine is

3    under parallel testing and not cheat during parallel testing.

4         When poll workers are following a script to enter votes

5    into the machine that they know, they are not going to behave

6    identically to real voters.  Real voters do things like

7    sometimes take time to read the instructions that are unlikely

8    to be happening when people are casting vote after vote

9    following a script.

10        Even if parallel testing could perfectly simulate voters

11   and be indistinguishable, the best it would establish is that

12   the machines that were tested counted accurately.  It couldn't

13   establish that every single one of the other machines was

14   counting accurately.

15   **Q.**  Would testing a machine in election mode be sufficient to

16   know that there was no malware on the machine?

17   **A.**  No.  And for the same reasons.  That parallel testing

18   would usually be conducted in election mode.

19             THE COURT:  To your knowledge, is it normal to test

20   every machine or is it -- or is this a random amount of

21   testing?  I realize it is based on your knowledge.

22             But let me just say:  Generally speaking, since you

23   are an expert on elections as a whole, what is the norm?

24             THE WITNESS:  Generally speaking, every machine would

25   be subject to logic inaccuracy testing as a pre-election

1 procedure.  But for parallel testing, because it is

2 time-consuming and expensive and necessarily takes a machine

3 out of service if you are testing in parallel on election day,

4 only a few machines are tested in that form.

5          THE COURT:  Per precinct or as a whole?

6          THE WITNESS:  I've seen it done per county.  I am not

7 sure if that -- for sure if that is what Georgia does or not.

8 A small number of machines.

9          THE COURT:  So are you saying -- maybe you-all used

10 this.  I can't remember.  I think you did in -- in your

11 brief -- that this is equivalent to the VW emission issue that

12 they were able to mask -- mask what was actually happening?

13          THE WITNESS:  Yes.  That is another example in which

14 malicious software is engineered to defeat testing by detecting

15 it is under testing and suppressing the cheating during tests.

16 And it is exactly the same kind of problem with parallel

17 testing, logic inaccuracy testing, other functional testing on

18 voting machines.

19          Because you necessarily can't be testing with the

20 real voters and the real ballots, you are simulating what is

21 going on.  It is in a controlled environment, and that

22 controlled environment is not going to be the same as the real

23 votes that are counted.  It is going to be distinguishable

24 potentially by a computer algorithm.

25 Q.   **(BY MS. CHAPPLE)**  Thank you, Professor Halderman.  Now I

94

1    would like to move to discuss the optical scanners used here in

2    Georgia.  What type of optical scanning machines does Georgia

3    use?

4    **A.**    Georgia uses AccuVote-OS optical scanners.

5    **Q.**    Are you familiar with the AccuVote-OS scanner?

6    **A.**    Yes.  I do have one in my lab back in Michigan.

7    **Q.**    How long does it take to run a ballot through an optical

8    scanner -- an AccuVote optical scanner?

9    **A.**    I believe that the cycle time on the AccuVote-OS is about

10   three seconds.

11   **Q.**    Given that time, how long would it take to tabulate the

12   election results in a Georgia election assuming 6.8 million

13   voters, a 50 percent voter turnout as the defendants have said

14   in their -- in their declaration using 891 optical scanners?  I

15   can give you a piece of paper.

16   **A.**    Oh, my gosh.  Now you are really giving me the examination

17   dream.  So I have done some of this math at the

18   back-of-the-envelope calculation.  And 6.8 million voters,

19   50 percent turnout.  So 3.4 million, divided by about 900

20   scanners is roughly, let's say, within ten percent about 3600

21   ballots per scanner.  3600 ballots per scanner, if it takes

22   three seconds per ballot at the fastest the scanners can

23   possibly go, that is what?  120 -- 180 -- it is about three

24   hours.  Right.  I believe that works out to about three hours

25   of work using all 900 scanners Georgia has across the state in

1    parallel.

2    **Q.**    To tabulate all of the ballots in Georgia --

3    **A.**    To tabulate --

4    **Q.**    -- would take about three hours using 900 optical

5    scanners?

6    **A.**    If they were utilized as quickly as they can possibly go.

7    Let's suppose in real life it takes -- maybe it takes five

8    times that.  But that is still 15 hours.

9    **Q.**    And if the ballots were multiple pages, you would

10   multiply, you know, by that amount of time.  So if it is a

11   two-page ballot, it would maybe be double that?

12   **A.**    At most, yes.

13   **Q.**    30 hours or --

14   **A.**    No more than double.

15   **Q.**    Right.  In your opinion, what is the most secure election

16   system configuration?

17   **A.**    My opinion is that the most secure election configuration

18   is one that has a paper trail that the voter can see.  A paper

19   ballot or a machine that produces a voter verifiable paper

20   record.

21        And this is the most secure because you have both an

22   electronic record and a paper record.  You are not relying on

23   either one of those to be the sole authority, and you can

24   cross-check them to make sure that both records are unchanged.

25   **Q.**    And, finally, in your opinion as a computer scientist and

1    expert on cybersecurity, is there anything that Georgia could

2    do to know for sure that the November 18 election would not be

3    hacked?

4    **A.**    No.  And I would say something even stronger than that.  I

5    don't think that there is anything that Georgia can do to

6    reasonably secure the -- the machines that are -- the

7    touchscreen -- paperless touchscreen machines that are in use

8    today.

9              MS. CHAPPLE:  Thank you, Your Honor.  No further

10   questions.

11             MR. BARNES:  May I proceed?

12             THE COURT:  Yes.

13                          CROSS-EXAMINATION

14   BY MR. BARNES:

15   **Q.**    Now, let me see this.  You say these machines are no good

16   because a crook could get into the machine and create a

17   crime -- commit a crime; is that correct?

18   **A.**    I worry less about crooks than about nation state

19   intelligence agencies.  But yes, a crook potentially could as

20   well.

21   **Q.**    And do you know where the ballot is built in Georgia?

22   **A.**    The ballot -- my understanding is it is built today by the

23   Secretary of State's office.

24   **Q.**    And do you know what security is around building that

25   ballot?

1   **A.**   I know that Georgia takes steps to attempt to secure those

2   systems.

3   **Q.**   So is that answer yes or no?  Do you know what security --

4   do you know what security measures are around the building of

5   the ballot?

6   **A.**   I know some of the security measures, yes.

7   **Q.**   And where did you find that?

8   **A.**   I believe one of the declarations from your side described

9   some of those measures.

10  **Q.**   And do you realize these matters are very sensitive you

11  would agree and a state secret as to all of the way ballots are

12  built?

13  **A.**   I'm sorry.  I don't understand.

14  **Q.**   Sometimes I confuse myself.

15      You have never been to the secure location in Georgia and

16  seen what has happened to build the ballot and to keep a crook

17  from putting in some malicious malware?

18  **A.**   Not in Georgia.  Although I have in other locations where

19  that is done for other states.

20  **Q.**   Well, how many times has this malicious malware by a crook

21  in Georgia ever been found?

22  **A.**   I don't know.

23  **Q.**   Do you know of any that has ever been found?

24  **A.**   Of any --

25  **Q.**   Of any in Georgia.  You said you don't know.  I asked you

1    how many times.  You said I don't know.

2        And the next question is:  Do you know even one time that

3    malicious malware has been put in by a crook and came over the

4    security provisions put out by the Secretary of State?

5    **A.**   I don't know.  But it would be inherently hard to detect.

6    That is the problem with this kind of attack.

7    **Q.**   So the question is -- it is not the question do you know

8    or not know.

9        Do you know as you sit here, yes or no, where a malicious

10   crook has ever put it into the state system where they build

11   the ballots?

12   **A.**   I do know that Logan Lamb was able to access the Kennesaw

13   State systems.

14   **Q.**   Yes, sir.  Do you know what has happened with Kennesaw

15   State?  Do you know what --

16           MR. CROSS:  Your Honor, he needs to be able to finish

17   his answer.

18           MR. BARNES:  I'm sorry.

19   **Q.   (BY MR. BARNES)**   Are you through?

20   **A.**   I do know that Logan Lamb was able to access the Kennesaw

21   State system.  And it would -- based on the way in which he was

22   able to access it, those systems would have been accessible to

23   other attackers as well.

24   **Q.**   Do you know whether he ever got into the election system

25   or whether it was into a separate website?

**A.**   That website was used to communicate the kinds of ballot programming that are at issue here.

**Q.**   And -- but the question back to it is:  Is that the only one that you know where a malicious malware has been put in to a system in the secured location of the Secretary of State?

**A.**   Well, I understand that there were further vulnerabilities later shown at Kennesaw State as well.

**Q.**   So all of yours is about Kennesaw State?  Everything you know about this malicious malware is at Kennesaw State?

**A.**   Even if it was only Kennesaw State, unfortunately if the machines were infected during the time that Kennesaw State was exposed, they would likely remain infected today.

**Q.**   Yes.  You don't know what has been done since that time at Kennesaw State?  You don't know what they have done -- the Secretary of State has done to move from Kennesaw State to inspect all of the machines?  You don't know any of that; correct?

MR. CROSS:  Your Honor, we'll stipulate that the state has not provided any information on any such measures.

MR. BARNES:  Well, Your Honor, is that an objection, as you told me?

We'll have testimony regarding it.  I'm trying to -- I believe I have got him on cross.

THE COURT:  Yeah.  You can go ahead and cross.  But I must say, you know, that there hasn't been discovery.  And the

1  affidavit from the state was a little bit oblique, to say the

2  least, about what measures were implemented.

3          MR. BARNES:  We'll have a witness here.

4          THE COURT:  Okay.  That is marvelous.

5  **Q.   (BY MR. BARNES)**  Let me ask you this.  You say the optical

6  scanners are the way to go?

7  **A.**   I do believe that the optical scanners can be made more

8  secure, yes.

9  **Q.**   I'm sorry.  Is that a yes or a no?

10 **A.**   Yes.

11 **Q.**   Okay.  And do you know of the study that was conducted by

12 Secretary of State Cathy Cox where lower educated, lower income

13 were undercounted under the optical scanners?

14 **A.**   I'm not aware of the study, no.

15 **Q.**   Well, do you know if that undercounting of minority and

16 disadvantaged people is the reason that we went away from

17 optical scanners?

18 **A.**   Optical scanners do provide a different interface, but

19 they are the most widely used voting technology in the country.

20 **Q.**   Well, that is not what I'm asking you.  Do you know that

21 because of the Georgia experience and the Georgia -- not the

22 Michigan where the sun comes up in the west -- but in Georgia

23 where we did a study and found out that minority and

24 disadvantaged voters would mark with an X rather than coloring

25 in the bubble and other things like that that they were being

1   undercounted?

2   **A.**   I am not familiar with the study that you are referring

3   to.

4   **Q.**   And have you ever seen any other study where optical

5   scanners because of the lack of expertise of the voters on how

6   to color -- you do color in the little bubble, don't you?

7   **A.**   Yes.

8   **Q.**   Okay.  And if you don't color in the little bubble

9   altogether, you put an X or a check, you have seen studies that

10   show that those votes were undercounted; correct?

11   **A.**   I have seen studies that say that.  But there are studies

12   that show how to design the ballot for an optical scan system

13   in a way that reduces voter error.

14   **Q.**   Yes.  But this election is in two months.  Well, less than

15   that really now.  Do you think it could be developed in two

16   months?

17   **A.**   I do, yes.

18   **Q.**   Oh, okay.  And how much do you think that will cost?

19   **A.**   Well, we could do back-of-the-envelope calculations if you

20   would like.  But I don't have figures prepared.

21   **Q.**   All right, sir.  Now, the gold standard --

22         THE COURT:  Let me ask you:  Has it been done in

23   other states or not?  You say that it is the most -- it is

24   frequently used.  So what --

25         THE WITNESS:  Excuse me, Your Honor.  Has what been

done in other states?

        MR. BARNES:  Optical scanners --

        THE COURT:  Optical scanners --

        MR. BARNES:  -- change with 60 days.

        THE COURT:  That is not my question.  My question followed up on:  Is this just an idea of yours that a program could be developed, or it has been developed and is used -- is in use by other states?

        THE WITNESS:  Optical scanners are used very widely across the country.

        THE COURT:  But to address the problem that Barnes stated.

        THE WITNESS:  There are -- many states have addressed concerns by -- about voter error through ballot design changes.

        THE COURT:  That is what I was asking.

        THE WITNESS:  Yes.

**Q.**  **(BY MR. BARNES)**  So you would have to redesign the ballot?

**A.**  I don't know how your current ballot is designed I must say.

**Q.**  Because you don't know anything about Georgia?  You have never been hired by Georgia, have you?  Have you ever been hired by the State of Georgia?

**A.**  No, I have never been hired by the State of Georgia.

**Q.**  How many times have you been here?

        THE COURT:  All right.  Proceed.

1   **Q.**   **(BY MR. BARNES)**   Well, let me ask you one last question:

2   Do you know where the Big Chicken is?

3       Now, let me ask you this:  The gold standard in your mind

4   is a paper ballot; correct?

5   **A.**   Yes.

6   **Q.**   All right.  And did you ever vote on a paper ballot?

7   **A.**   I have, yes.

8   **Q.**   Old paper ballot where you mark an X?

9   **A.**   Where you fill in the bubble, yes.

10  **Q.**   No, I'm not talking about a bubble.  We are over the

11  optical scanners.  I'm talking about an old paper ballot.

12  **A.**   I'm sorry.  I am referring to optical scan paper ballots,

13  the type used in Georgia.

14  **Q.**   I'm talking about old paper ballots.  Just, you know, you

15  mark; isn't that right?  Have you ever voted on one of those?

16  **A.**   I don't believe so.

17  **Q.**   Yeah.  Well, I have.

18      Now, you have to -- when you -- when you are counting the

19  paper ballot, every person that is on the list you have to

20  count -- for example, governor, you go through and you

21  count two stacks on Stacey Abrams and Brian Kemp for governor.

22  And then you go through all the governors.  Then you go back

23  and count the same ballot again to lieutenant governor, then

24  secretary of state.

25      Isn't that the way you do it?

1    **A.**    Yes.  I have participated in a hand count of paper

2    ballots.

3    **Q.**    And the studies show that the hand counting of the paper

4    ballots are the greatest fraud that has occurred?

5    **A.**    Again, this is why optical scan paper ballots are

6    desirable because you end up with an electronic record and a

7    paper record and can check them to make sure they agree.

8    **Q.**    Listen, I'm just trying to get you in the stall where you

9    are telling me you are.  So you agree with me that the paper

10   ballots -- the old paper ballots are not a valid way to do

11   this?

12   **A.**    I don't know if I want to say they are invalid.  They are

13   still stronger as a defense against cyber attacks because,

14   well, it is on a piece of paper.  It cannot be changed through

15   computer fraud.

16   **Q.**    Yeah.  But it can be changed by the fellow that is keeping

17   the tally, can't it?

18   **A.**    Well, if there are dishonest election officials in

19   Georgia, it could be.

20   **Q.**    Yes.  Just like you have -- just like you have to have a

21   court right here --

22           THE COURT:  All right, everyone.  I understand your

23   humor, but this is really not a public meeting.  So no

24   clapping.

25           MR. BARNES:  I'm sorry.

1   **Q.    (BY MR. BARNES)**  Just like you would have to have a crook

2   to do what you have said?

3   **A.**   You wouldn't need to have an insider to do what I said,

4   someone who was part of the process of counting.

5   **Q.**   Not if they -- not if -- listen, that is the reason you

6   restrict the access when they are building the ballot; isn't

7   that true?

8   **A.**   It is a good idea to restrict access while they are

9   building the ballot.

10  **Q.**   So -- listen, so you would have to have a crook in the

11  room -- the secure room to build -- to make what you just did

12  here work?

13          THE COURT:  Hello?

14  **A.**   No, that is not true.

15      And fortunately these machines are quite sturdy.  So you

16  are welcome to bang on it.

17          THE COURT:  Why is it not true?

18          THE WITNESS:  But it is not true that you would need

19  to have a person in the room.  What you would need to do is be

20  able to spread malicious software to that machine.

21  **Q.    (BY MR. BARNES)**  Yes, sir.  But you would have to -- if it

22  is -- I want you to --

23          THE COURT:  All right.  Step back.  Thank you.

24          MR. BARNES:  Can you not hear me?

25          THE COURT:  I always can hear you, and you are here a

1    lot.  So --

2    **Q.    (BY MR. BARNES)**  So you don't know -- so you say, well,

3    you can spread malicious software and you wouldn't have to be

4    in the room?

5    **A.**    That is right.

6    **Q.**    And you would have to do that how?

7    **A.**    Well, so let me give you the example.  We're talking about

8    the threat of nation state intelligence sectors.  Very

9    sophisticated adversaries.  And they routinely have techniques

10   available to them to spread malicious software to machines that

11   aren't directly connected to the internet.

12       The most famous example of that is the Stuxnet malware.

13   That is what was used to sabotage Iran's nuclear enrichment

14   program.

15   **Q.**    That we did?

16   **A.**    According to the New York times, yes.

17   **Q.**    Okay.

18   **A.**    But what -- the way that worked, those nuclear -- those

19   uranium centrifuges were not connected to the internet.

20   Instead, the malware spread on USB sticks that were

21   occasionally connected to the computer systems used to program

22   the uranium centrifuges.

23   **Q.**    So you are telling me that even though this is not

24   connected to the internet, no malicious malware in the

25   beginning, that some outside source could infect it with

1  malicious malware -- some other crook?

2  **A.**   Yes.  Yes, that is the finding.

3  **Q.**   And so you would have to have a crook voter to put the

4  information in, wouldn't you?

5  **A.**   No.  No one has to touch the machine.  That is right.  The

6  malware can spread in on the memory cards from the election

7  management system.  It could potentially spread to the election

8  management system in a number of ways.

9  **Q.**   Okay.  But the election management system, if it is

10 secured, is not going to spread to the local systems, is it?

11 **A.**   If the election management system is compromised, then all

12 of the local systems can be infected.

13 **Q.**   Do you have a problem understanding my questions?  I just

14 want to make sure.

15 **A.**   I may.  I'm sorry.

16 **Q.**   If the election system -- the management system is

17 secured, then you cannot get to a local system to infect the

18 voting?  Yes or no?

19 **A.**   No.  So there are other ways to spread malware to these

20 machines unfortunately.

21 **Q.**   Yes, sir.  So you have got to have a crook inside the

22 sealed room, the air-gapped system --

23          THE COURT:  That is not what he said.  So let's

24 just --

25 **Q.**   **(BY MR. BARNES)**  Well, that is the first one you said.

1    You said you would have to have one to insert it where they

2    built the ballot?

3    **A.**   No.  I said you don't need a crook inside the sealed room

4    because there are moments like the Stuxnet attack in which

5    malware can spread to that system, even though the state

6    does -- and I'm sure this is -- even though the state does

7    assert that those machines are isolated.

8    **Q.**   And -- but you don't know that because you haven't looked

9    at Georgia's system?

10   **A.**   I have read your side's declarations.

11   **Q.**   From your personal knowledge, do you know?

12   **A.**   From my personal knowledge?

13   **Q.**   Yes.

14   **A.**   Do I know -- excuse me.  I don't understand the question.

15   **Q.**   From your personal knowledge, do you know any breach in

16   the security that has occurred?

17   **A.**   That has occurred?

18   **Q.**   Yes.

19   **A.**   For instance, the Kennesaw State breaches.

20   **Q.**   You have already told us about that, and we're going to

21   get into that.

22        Anything else?

23   **A.**   From my personal knowledge, the Kennesaw State breaches

24   are the ones I'm familiar with.

25   **Q.**   So when did you visit Kennesaw State to examine this?

1    **A.**   I haven't visited Kennesaw State, but I have reviewed the

2    FOIA emails that were produced that described their security

3    procedures and mitigations.

4    **Q.**   So everything you know is what somebody else has said?

5    **A.**   Well, what the people who were administering the network

6    at Kennesaw State said in their emails that were FOIAed yes.

7    **Q.**   But not based on your personal investigation or not?

8    **A.**   No.

9    **Q.**   Okay.

10            THE COURT:  So how much time more?

11            MR. BARNES:  Just about five minutes.  I'm about

12   done.

13            THE COURT:  All right.

14   **Q.**   **(BY MR. BARNES)**  Do you have any knowledge regarding what

15   cybersecurity protocols are used by Georgia?

16   **A.**   Yes, I do have some knowledge.

17   **Q.**   Is that knowledge based on your personal knowledge or what

18   you read from somebody else?

19   **A.**   It is based on what I have read.

20   **Q.**   And do you have any specific knowledge of Georgia's

21   password change requirements?

22   **A.**   No.  Although those would be irrelevant to the issues at

23   hand.

24   **Q.**   Do you have any specific knowledge of Georgia's policy

25   regarding brute force and inactivity during disabling?

**A.**   During disabling?

**Q.**   Yes.

**A.**   What do you mean during disabling?

**Q.**   Listen, do you not -- do you not understand what brute force is and disabling?  I'm just asking you.  If you are -- if you don't know what it is, I'll pass on.

**A.**   I'll just say it is ambiguous in this context.

**Q.**   So you have no specific knowledge of Georgia's policy regarding brute force and --

THE COURT:  All right.  You have to explain what you mean.  Come on.  Brute force is either I'm knocking somebody over or are you talking about knocking the machine over?  I mean, I have to understand too.

MR. BARNES:  I know, but I'm trying to get to the extent -- I'm going to educate you with a witness.

THE COURT:  That is great.  But it doesn't help -- it doesn't help me when you are examining the witness.  So that is what -- the ultimate point here, frankly, is to educate me.

THE WITNESS:  If I can conjecture what the policy you are referring to is, just for sake of clarifying the question, it sounds like you are talking about password guessing and password disabling policy.

And I don't have knowledge of Georgia's specific policy for that.  Although the policies about RAM passwords are irrelevant to the kinds of attacks that I've demonstrated.

1   **Q.   (BY MR. BARNES)**  I'm sorry.  Are you through?

2   **A.**   Yes.

3   **Q.**   Do you have any specific knowledge of any defenses Georgia

4   uses against SQL?

5   **A.**   You mean against SQL injection?

6   **Q.**   Yes.

7   **A.**   So --

8          MR. BARNES:  Your Honor, would you instruct the

9   witness.  That is a yes or no.  If it is yes, he can explain.

10  If it is no, he can explain.

11  **A.**   I need to take a second to think about whether I know

12  about any of Georgia's policies.  I believe no, I do not know.

13  Although I would say once again that is irrelevant to the

14  particular attack that is at issue.

15  **Q.   (BY MR. BARNES)**  Do you have any specific knowledge of the

16  penetration testing that Georgia undertakes?

17  **A.**   I have knowledge about the kinds of penetration tests that

18  were undertaken at Kennesaw State.

19  **Q.**   And that is all?

20  **A.**   Yes.

21  **Q.**   Okay.  And you don't know what has been done since

22  Kennesaw State?

23  **A.**   I do not.

24  **Q.**   All right.  Regarding how data relevant to election in

25  Georgia is secured, do you have any specific knowledge as to

112

```
1   how that has changed since Kennesaw State, that is, in 2016 to
2   the present?
3   A.   Between Kennesaw State and the present, I do have some
4   knowledge of that.
5   Q.   And so you have knowledge of the changes that have been
6   made by the State of Georgia?
7   A.   Yes.
8   Q.   All right.  And where did you obtain that knowledge?
9   A.   From the declarations of the other side, from published
10  reports.
11  Q.   Declarations from the other side.  Which side?
12  A.   From your side.  The defense's declarations.  Excuse me.
13  Q.   Do you have any personal experience designing an election
14  system specific to a primarily paper ballot environment?
15  A.   I do, yes.
16  Q.   What is that?
17  A.   I have designed -- in my research, among other things, I
18  have designed ways to more efficiently audit paper ballots.
19  Q.   Yes, sir.  Have you ever published a peer-reviewed study
20  on the accuracy of optical scanners?
21  A.   I myself haven't.  I'm familiar with other peer-reviewed
22  literature on that topic.
23  Q.   The question is:  Have you published a peer-reviewed
24  article on the accuracy of optical scanners?
25  A.   No, I haven't.
```

1    Q.   Should voting -- you agree with me that voting mechanisms

2    should be racially neutral so far as that is possible?  You

3    agree with that?

4    A.   I agree with you.

5    Q.   And also it should be neutral as to education level?

6    A.   Insofar as is possible.

7    Q.   Are optical scanners immune from overvotes?

8    A.   From -- precinct count optical scanners can be made immune

9    from overvotes.

10   Q.   No, sir.  Well, let me ask you this:  As optical scanners

11   are -- do you know what system of optical scanners Georgia used

12   before this?

13   A.   Before the present?

14   Q.   We had hanging chads in between.

15   A.   Oh, those weren't -- those were mechanical --

16   electromechanical, rather than optical, I believe.  I may be

17   wrong about that.

18   Q.   We had optical scanners before that.  Do you know anything

19   about the system that was used when we had optical scanners?

20   A.   What year are you asking about perhaps?

21   Q.   How old are you?  Probably before you started.  But it was

22   in the 1980s.

23   A.   In the 1980s.

24        THE COURT:  Let's move on then.

25   Q.   **(BY MR. BARNES)**  Do you know anything --

```
 1              MR. BROWN:  Your Honor, I object on relevancy

 2   grounds.  Georgia uses the same optical scanners today.  This

 3   line of questioning is challenging the optical scanners that

 4   Georgia uses now to count 340,000 votes of Georgians.  At issue

 5   is not the accuracy of the scanners.  They are using them right

 6   now.  So all we are hearing here, it is not going to have

 7   anything to do with your decision.

 8              MR. BARNES:  I will rephrase the question.

 9   Q.   (BY MR. BARNES)  Have you examined the optical scanners

10   Georgia uses now to count absentee ballots?

11   A.   I have done some tests on the AccuVote-OS, yes.

12   Q.   Well, that is not -- the ones that are used in Georgia

13   now -- have you tested a Georgia machine?

14   A.   I have tested the model of voting machine used in Georgia,

15   yes.

16   Q.   All right.  And where did you test that?

17   A.   Well, I have one in my laboratory at Michigan.

18   Q.   And who in Georgia gave you that?

19   A.   I don't think it was given to me by someone in Georgia.

20   Q.   Well, listen --

21              THE COURT:  Is it the same model as they are using?

22              THE WITNESS:  It is the same model of machine.

23   Q.   (BY MR. BARNES)  You are sure of that?

24   A.   Yes.

25   Q.   And the question that I have for you is:  Is that machine
```

1   capable of overvotes without some modification?

2   **A.**   The machine can reject ballots that have been inserted in

3   them that have been overvoted.

4   **Q.**   All I asked you is:  Is the machine without alteration

5   capable of overvotes?

6   **A.**   You mean of a voter casting a ballot that has been

7   overvoted?  It may be the case that a voter can force the

8   machine to accept a ballot that has been overvoted.  But I

9   don't actually -- I'm not sure if that is true.

10  **Q.**   Well, you're the expert.  I'm just a country lawyer.

11  **A.**   Yes.

12  **Q.**   And the question I have for you:  Is it susceptible and

13  immune from undervotes without modification?

14  **A.**   Every voting system is susceptible potentially to

15  undervotes.

16  **Q.**   And overvotes?

17  **A.**   The voter can always just choose not to cast the ballot at

18  all.

19  **Q.**   No.  I'm talking about where you get a ballot.  You check

20  instead of filling in the bubble, and you put it in the

21  machine.

22  **A.**   Oh, I see what you mean.

23  **Q.**   Well -- and, you know, could that happen without

24  modification?

25  **A.**   The machines are supposed to reject ballots that have too

1    many marks.  But they can still fail to count a valid mark.

2    **Q.**   They can fail to count a mark unless it is colored in?

3           MR. BROWN:  Your Honor, I object on the same grounds.

4    They are using these scanners.  The defendants are trying to

5    eat into our time massively.

6           THE COURT:  All right.  Well, you have one minute to

7    close up.

8    **Q.   (BY MR. BARNES)**  The question is:  If you don't fill in

9    the bubble sufficiently, is it -- is that vote possible to not

10   be counted?

11   **A.**   Yes, it is possible.

12   **Q.**   All right, sir.  Do you have any specific knowledge as to

13   the security protocol used by the Secretary of State regarding

14   the EMS server?

15   **A.**   I have some knowledge regarding it.

16   **Q.**   And that all came from the declarations that you read of

17   the employees of the Secretary of State?

18   **A.**   And other published reports.

19   **Q.**   If certified results do not rely on the election

20   management system, would the election outcome change?

21   **A.**   If certified results -- you mean in the alternative?  If

22   they relied on the paper tapes that the machines printed out?

23   **Q.**   In Georgia.  I'm giving you everything from Georgia.  If

24   certified results by the Board of Elections do not rely on an

25   election management system, would the election outcome change?

**A.**   I'm not sure I understand what alternative you are proposing.

THE COURT:  All right.  You can have someone testify about this.  I think we've had enough at this juncture.

MR. BARNES:  All right.

THE COURT:  You know, you already went over your -- the amount of time.  So if you have one minute you want to clarify, that is it.  But we have got also Fulton County.  And you-all also basically violated all of your time forecasts, frankly, on this.

So we have got to get real when we are through with this.  Basically we've got to -- I understand that Fulton County didn't get to examine.  But is there something that is pressing on your mind that is -- other than what Governor Barnes very fulsomely went over?

MR. BARNES:  Your Honor, the only thing I would like to put on the record is the witness was being nonresponsive.  And that is the reason I ate up the time.  And I ask the Court not to restrict because of that.

THE COURT:  I know that that is your view.  I can't say it is mine.  But that is fine.

MS. BURWELL:  Can I just clarify a few things with the witness, Your Honor?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MS. BURWELL:

**Q.**   Mr. Halderman, this machine that you have here that you have demonstrated for the Court, that is not a machine that was previously in use in Georgia; is that correct?

**A.**   I don't believe that this particular example was -- just to be clear, the model is used currently in Georgia.  This particular one I don't believe was used in Georgia.

**Q.**   And there is different software on the same model; correct?

**A.**   That is correct.

**Q.**   And, in fact, in your declaration in Paragraphs 25 and 26, you talk about the fact that the software in the Georgia machines is different from the software in the machines that you did your demonstrations on; correct?

**A.**   That is correct.  Georgia uses a version of the software that is version -- ballot station version 4.5.  The demonstration I gave here is on ballot station 4.6, a more recent line of the code.  I have previously done work showing vulnerabilities in version 4.3 and 4.4.

**Q.**   But not 4.5, which is what is used in Georgia; correct?

**A.**   Only 4.3, 4.4, and 4.6.  You are correct.

**Q.**   So you have not done any sort of demonstration on a Georgia machine as they are configured in Georgia; correct?

**A.**   I haven't.  Although I would be happy to work with the state to do so.

**Q.**   Okay.  So let me ask you --

THE COURT:  Let me ask you:  You're an expert on these machines.  You do this type of studying all the time.  Obviously you have done it for the State of California and for other places.

So what are the material differences, if any, in the actual software to your knowledge in all of these iterations?  Obviously the earlier versions -- there are developments that are supposed to make things more secure.  Though one would think 4.6 was more secure than 4.5.

MR. BARNES:  Your Honor, I would object because he couldn't know if he has never done a study on 4.5.

THE WITNESS:  I can say for the --

THE COURT:  Are you familiar with the software -- the Diebold software and its developments as a whole?  Let's put aside Georgia.  Are they marketed around the country to the states?

THE WITNESS:  Yes, they are.  I am familiar, Your Honor, with the features that have been added to the software over the years.  And the more recent versions of the software have generally added additional security features.  The current version is 4.7.  It is the most recent that was certified by the -- by the EAC.

THE COURT:  EAC is?

THE WITNESS:  I'm sorry.  The federal Election

```
1   Assistance Commission.
2           THE COURT:  So does the 4.6 incorporate to your
3   knowledge the software advancements as to security that were in
4   4.5?
5           THE WITNESS:  Yes, it does to my knowledge.  Yes.
6   Q.   (BY MS. BURWELL)  Can you give the Court what your
7   knowledge is?
8   A.   Well, so I have seen the source code to 4.6 under
9   nondisclosure agreements as part of the State of California.
10  And I reverse-engineered the previous version, 4.3, in
11  extensive testing.  And I can see what has changed before --
12  between 4.3, 4.4, and 4.6.  So there are reasonable
13  extrapolations that as a software engineer you can make about
14  what features are added and removed between versions.
15  Q.   But you don't have any firsthand knowledge -- correct? --
16  of what those changes would be in 4.5?
17  A.   In software engineering, features are usually added and
18  removed and persist over time.  I saw what was in the room this
19  morning, and I saw what was in the room at lunchtime, and
20  people may have come in and out in the interim.  But it is
21  unlikely that the overall architecture changed.
22  Q.   That is your opinion that it is unlikely to change, but
23  you don't know that for sure; correct?
24  A.   I can only speak to how software development typically
25  works.  As a computer scientist, I have seen the engineering of
```

1    many other programs.  But I do know about the vulnerabilities

2    that were common between the previous version and the version

3    after the Georgia version.

4    **Q.**   So we're clear that you haven't seen 4.5?

5           MR. BROWN:  Objection, Your Honor.  Asked and

6    answered.

7           THE COURT:  All right.  Go ahead and proceed.  I

8    think his testimony is clear.

9    **Q.   (BY MS. BURWELL)**   The demonstration that you have done

10   here and the demonstrations that you have done back at your

11   place of employment, none of those have been carried out in an

12   actual race in Georgia; correct?

13   **A.**   Well, I'm not a criminal.

14   **Q.**   Correct.

15   **A.**   Yes.

16   **Q.**   So they are demonstrations --

17          THE COURT:  I think there is enough of the Georgia

18   questions, frankly.  I think the Governor has covered this.  So

19   I think he obviously indicated he has not done his work -- been

20   involved with the machines in Georgia -- personally in Georgia.

21   **Q.   (BY MS. BURWELL)**   So let me ask you about:  Do you have

22   any expertise in setting up paper ballot environments?

23   **A.**   Setting up paper ballot environments?

24   **Q.**   Yes.

25   **A.**   Well, I have done work on post-election audits of paper

1  ballot systems, yes.

2  **Q.**   I'm not asking about post-election auditing.  I'm asking

3  about the front end, setting up the processes and procedures.

4          MR. CROSS:  Your Honor, we object.  Governor Barnes

5  asked this exact question.  We have covered this.  Asked and

6  answered.

7          MS. BURWELL:  I didn't hear an answer to that.  I was

8  marking off everything.

9          THE COURT:  Well, I'm sorry.  He did ask about it.

10  So I'm going to ask you to move on, and I'm going to ask you if

11  there is something else.

12          MS. BURWELL:  Okay.

13          THE COURT:  I just think though the plaintiff took 34

14  minutes and you-all have taken 34 minutes plus.  So I'm sorry

15  that a lot of your time was stolen -- but or not.  But you

16  y'all shared it.  I assumed -- I'm sorry -- that y'all had some

17  agreement.  So I'm allowing you some room, but not a lot

18  because, A, the cafeteria closes at 1:30 and, B, we need to be

19  through with this witness and move on.

20  **Q.**   **(BY MS. BURWELL)**  Let me ask you about optical scanners.

21  I don't think you answered this question.

22      It is possible, isn't it, for optical scanners to be

23  compromised.

24  **A.**   Yes, that is true.

25  **Q.**   It can be compromised both with respect to the software, I

1    guess you would call it --

2           MR. CROSS:  Your Honor, I'm sorry to object.  But not

3    only was this covered but, as Mr. Brown pointed out, they use

4    optical scanners.  If they are going to indict their own

5    system, then let's all move to paper ballots.

6           THE COURT:  No more argument about it.  But I think

7    that was precisely the sort of question that was asked.  But

8    you did answer yes, that they can be compromised.  And I'm

9    going to let you wrap up.  And then we're going to close at

10   this point.

11          THE WITNESS:  So yes, they can be compromised.

12   However, the advantage in an optical scan system is you have an

13   uncompromisable in a cyber attack physical record that can then

14   be spot-checked to make sure that the electronic record is

15   correct.  That auditable record is what is completely lacking

16   in the paperless system.

17          THE COURT:  Thank you very much.  Plaintiffs' counsel

18   may do one minute and no more.

19          MS. CHAPPLE:  No further questions, Your Honor.

20          MR. BROWN:  No questions.

21          THE COURT:  All right.  I don't know how many people

22   may be out in the other room, and they may have all passed.  We

23   look like we have a few seats left for when we get back.

24          I'm not going to take a full hour because we don't

25   have a full hour at this point.  You-all need to just really

1    talk about what is -- what is important to you.

2         Originally we had -- it said direct and

3    cross-examination of Alex Halderman was 30 minutes.  I assume

4    because you had deleted some witnesses that you added time to

5    that.  But I didn't force you to basically tell me how that was

6    going to work out.  But I do need to know now.  Because,

7    otherwise, we're not going to finish today.  And I am going to

8    finish today.

9         I mean, I wanted to give an opportunity for these

10   issues to be aired and for me to actually personally hear.  And

11   I thought as a matter of public concern that the public had a

12   right to also hear the matters that are being briefed in this

13   court.  And I thought that was important no matter what

14   happens.  But we have to be able to move forward too.

15        MR. CROSS:  Your Honor, just one quick thing before

16   we go.  We actually didn't intend for his examination to go

17   longer.  It would help if we could get a commitment that we're

18   going to have the normal rules of decorum because a lot of time

19   was lost on his direct with many, many interjections.  And if

20   we could just stick to the rules, I think this will actually

21   stick to the schedule.

22        MR. BARNES:  Well, I believe I have the right to make

23   an objection and to --

24        MR. CROSS:  But not question the witness and jump

25   into voir dire at every other opportunity.  He is either doing

1   it right then or on cross.

2          MR. BARNES:  He was never offered as an expert.

3          MR. CROSS:  That is not required in federal court.

4          MR. BARNES:  I'll let --

5          MR. CROSS:  The foundation was laid for his

6   expertise.

7          MR. BARNES:  I understand.

8          THE COURT:  Are you offering him as an expert?

9          MR. CROSS:  Absolutely, Your Honor.  And the

10  foundation we believe has been laid, and I don't think there

11  was any dispute about that.

12         THE COURT:  All right.

13         MR. BARNES:  I object because there has not been a

14  proper foundation of the knowledge and information regarding

15  the facts and circumstances of the State of Georgia --

16         THE COURT:  All right.

17         MR. BARNES:  -- and what is in dispute here.

18         THE COURT:  Well, I'm going to accept him as an

19  expert as a computer science engineer who specializes in the

20  area of election technology.  His background clearly manifests

21  that.

22         You know, whether there are weaknesses as to his

23  knowledge of Georgia is another matter.  And you have had an

24  opportunity to explore it.  Like it or not, we live in a

25  nation, just not in one state.  And technology is not only

1    national.  It is international.

2           So I understand the questions.  I understand their

3    relevance -- some of their relevance.  I'm not discounting

4    that.  Because we are dealing with specific events in Georgia.

5    But they don't just occur in isolation.

6           Just as when there is a data breach in the financial

7    systems or in the medical systems, they are not just confined

8    to Georgia or to one state typically.  They are nationwide, as

9    everyone well knows.

10          All right.  It is ten after 1:00.  I would like

11   you-all to talk about your schedule and be prepared to address

12   it with me afterwards.  We'll resume at -- just because it is a

13   matter of reality, we won't be ready until ten of 2:00.

14          MR. SALTER:  What was that, Your Honor?

15          THE COURT:  Ten of 2:00.

16          MS. BURWELL:  Your Honor, Fulton County joins in all

17   of the objections made by the state.  I was trying not to --

18          THE COURT:  That is fine.  I appreciate that.  It is

19   so noted.  And I'm going to assume that unless you jump up and

20   say that is not our objection at some point.  But I'm going to

21   just sort of have that as a standing position.

22          All right.  If I say we're going to start then, if

23   you are coming back, come back a few minutes before then.

24          MR. McGUIRE:  Is that 1:50, Your Honor?

25          THE COURT:  1:50.

1          COURTROOM SECURITY OFFICER:  All rise.  Court stands

2     in recess until 1:50.

3               **(A lunch break was taken at 1:10 P.M.)**

4          THE COURT:  Please have a seat.  Counsel, have you

5     conferred and tried to impose some order on the schedule?  I

6     can tell you my order -- order I can conceive of is basically

7     cutting off on closing argument.  And basically you had very

8     full opening arguments that were in part closing arguments, as

9     far as I can see.  And I have read your briefs.

10         So I might have some questions for you.  But I don't

11    know that -- given what you-all have as an agenda, I don't know

12    how we get to closing arguments.

13         MR. SALTER:  We hadn't encountered that.  But I think

14    at this point -- I think we should plow through, Your Honor.  I

15    would suggest we plow through and get through as much as we

16    possibly can.

17         THE COURT:  You think we should just plow through?

18         MR. SALTER:  And do the best we possibly can.

19         THE COURT:  What I need to understand is -- because I

20    had given you-all a schedule based on what you gave me.  But

21    because you eliminated some of the witnesses, I really didn't

22    know how much time you were forecasting.  So that is one of the

23    reasons it was hard to control the time on the last one because

24    I didn't know once you had gotten rid of a witness.

25         So I need you to tell me when you start a witness how

```
 1    long you have actually projected for the direct and the same
 2    amount will be for the cross.  But the cross is as divided
 3    between -- just as when you put the person on, I'm expecting if
 4    it is 20 minutes for the plaintiffs then it is going to be
 5    divided as ever you see fit.  It is the same thing over here so
 6    we don't end up with -- if Fulton County counsel really has a
 7    lot of questions, then the state defendant needs to allow for
 8    the time.  You can't just take up all of the time.
 9              I didn't like having to do that to Ms. Burwell.  That
10    is not fair.  She is smart and has information and examination
11    to contribute.  I can see that the plaintiffs have already
12    collaborated, but I wasn't so sure over on this side of the
13    room that you-all had.
14              I just want to say additionally I understand that
15    this is a Georgia case.  And I have said that before.  But I
16    don't think it is helpful at this juncture to grandstand about
17    this.
18              I think you can zero in on what somebody -- what they
19    have done with these particular machines.  But obviously the
20    experts here are experts as defendants well know who have
21    been -- who are independent experts whose resumes have been
22    made available.  And they are basically -- some of them have
23    worked for different states.  But none of them indicate that
24    they have worked for Georgia.  So this is obvious.  I can take
25    note of that.
```

1          We don't have a jury.  They don't need to be -- it

2     doesn't need to be brought home a thousand times.  But there is

3     obviously a science of field to this.  And these individuals

4     have identified what their credentials are.  You can certainly

5     note that they haven't -- I can note and already have noted if

6     they have worked for Georgia or not.

7          And to my knowledge, most of them have not.  I think

8     the Georgia Tech -- we have a Georgia Tech professor coming in?

9          MR. McGUIRE:  He is next, Your Honor.

10          THE COURT:  Maybe he has some knowledge I don't know

11     about.  But let's focus.

12          What is the period of time for this witness?

13          MR. McGUIRE:  So it is 30 minutes on the schedule.  I

14     will take 14 minutes, and I will give Mr. Cross a minute.  That

15     is all we have decided -- that is how we decided we can break

16     it up.

17          THE COURT:  When defense counsel gets up to examine

18     this witness, tell me how you are breaking it up.  If somebody

19     wants to concede something, that is fine.  But --

20          MR. SALTER:  We represented five and five, five

21     minutes for me and five minutes for Fulton County, in the

22     report.  That was before, of course, the Court decided to grant

23     the plaintiffs' request to enlarge time.

24          THE COURT:  Well, anyway, you will hear it.  You can

25     consult and let me know.

```
 1              MR. SALTER:  Yes, Your Honor.

 2              THE COURT:  Call your next witness.

 3              MR. McGUIRE:  Your Honor, we would call Richard A.

 4    DeMillo.

 5              COURTROOM DEPUTY CLERK:  Good afternoon, sir.  Please

 6    raise your right hand.

 7                        (Witness sworn)

 8              COURTROOM DEPUTY CLERK:  Thank you.  Please be

 9    seated.  Please pull up close to the microphone.  You can

10    adjust the microphone if you need.  It is very important that

11    we all be able to hear you.

12              I'm going to ask you to state your first and last

13    name again for the record, and then please spell those names

14    for the record.

15              THE WITNESS:  Richard DeMillo.  R-I-C-H-A-R-D.  My

16    last name is spelled D-E, capital, M-I-L-L-O.

17         Whereupon,

18                        RICHARD DEMILLO, PH.D.,

19         after having been first duly sworn, testified as follows:

20                          DIRECT EXAMINATION

21    BY MR. MCGUIRE:

22    Q.   Mr. DeMillo, I'm Robert McGuire, counsel for Coalition for

23    Good Governance.  You submitted two affidavits in this case;

24    yes?

25    A.   Yes.
```

1    Q.   They were Documents 277 and 285.  You said that your

2    primary focus and your experience there was information,

3    communication, cybersecurity, and computer system testing?

4    A.   That is my background, yes.

5    Q.   I'm going to ask you some questions in that area of

6    expertise.  Mr. DeMillo, do you have an opinion as to

7    whether --

8              THE COURT:  And you are a professor at Georgia Tech?

9              THE WITNESS:  I'm a professor at Georgia Tech.

10   Q.   **(BY MR. McGUIRE)**  You have also worked for other places as

11   well; yes?

12   A.   I have, yes.

13        Would you like to know some of them?

14   Q.   Have you worked at Hewlett-Packard?

15   A.   I have worked at Hewlett-Packard.  I was the chief

16   technology officer at Hewlett-Packard.

17   Q.   Have you worked for the Department of Defense?

18   A.   I have worked for the Department of Defense.  I ran a

19   project called the software test and evaluation project for the

20   Department of Defense.

21   Q.   And in those positions, were you dealing with

22   cybersecurity and computer system testing?

23   A.   Frequently, yes.

24   Q.   Mr. DeMillo, I'm going to ask you if you have an

25   opinion -- have you formed an opinion on the question of

1    whether Georgia's DRE system can be trusted to accurately

2    deliver election results?

3    **A.**    Yes, I have.

4    **Q.**    What is your opinion?

5    **A.**    My opinion is it is not a trustworthy system.

6    **Q.**    Okay.  Why do you have that opinion?

7    **A.**    Well, cybersecurity depends on three pillars of trust:

8    Protection, detection, and containment.  And I think in all

9    three of those areas, there are unanswered questions that

10   experts who have looked at these systems, experts who know

11   about cybersecurity have about Georgia's system, the

12   vulnerabilities we heard about this morning.  There needs to be

13   a rather full explanation of what protections are in place in

14   order to address those vulnerabilities.  We heard the

15   nonexistence of paper ballots.  That makes it difficult,

16   impossible to detect the vulnerability breaches when they

17   occur.

18       And we have yet to hear anything about containment.  So in

19   the event of a catastrophic breach, how do you go forward?  How

20   do you conduct the election?

21   **Q.**    So I want to take that conceptual framework, and I want to

22   put what happened in this case -- the allegations in this case

23   in the context of that framework.

24       So talk about protection.  To your knowledge, based on

25   your understanding of the allegations in this case, has that

1    pillar been satisfied?

2    **A.**    So you hear about vulnerabilities in computer systems.

3    And these voting machines, like this one, are just computers.

4    And the way that you protect against intrusions is to

5    understand those vulnerabilities and build in safeguards.

6         But you have to go through the vulnerabilities one-by-one,

7    and you have to explain how about that vulnerability is going

8    to be addressed.

9         I can give you just a couple of examples of that if you

10   would like.

11   **Q.**   Real briefly.

12   **A.**    So you want physical security.  You want to know that the

13   equipment has been secured, that someone can't come in and

14   tamper with it.  But in the case of Georgia, we have no such

15   assurance.  We really don't know very much about the physical

16   security of the systems.

17        You have to be able to have logical security.  These

18   systems, particularly the DREs, are built on top of 25-year-old

19   computer technology that really didn't have security

20   subsystems.  There is nothing like an AV system, an antivirus

21   system, that sits on this computer.

22        And so all of the things that you would do in the normal

23   course of events with modern computers to say, well, here is

24   how I address this vulnerability is lacking.

25   **Q.**   So rather than go through the other pillars, I'm just

1   going to jump into something specific.  So this machine -- you

2   see this machine in front of you?

3   **A.**   Yes.

4   **Q.**   Now, you saw Professor Halderman hack this machine?

5   **A.**   Yes.

6   **Q.**   So we know this machine is compromised; yes?

7   **A.**   Yes.

8   **Q.**   If the State of Georgia came to you and said, Mr. DeMillo,

9   we want to find out if this machine is compromised, could you

10  figure that out?

11  **A.**   You could conceivably figure it out, yes.

12  **Q.**   What would you have to do for this machine to figure that

13  out?

14  **A.**   So what I would probably do is open the machine up, attach

15  some probes to terminals in the back of the machine, and read

16  the memory of the machine just like you would read a disc on a

17  PC.  I would compare that image to the latest software that we

18  had from Diebold to see if it was a match or not.

19  **Q.**   If you did that, how long do you think it would take to do

20  this machine?

21  **A.**   I'm guessing, but I would guess about a half hour per

22  machine.

23  **Q.**   Now, if Georgia has 27,000 of these machines, how long

24  would it take to do that?

25  **A.**   It would take -- it would take 14,000 hours to do that.

1  **Q.**   And then if you did that, the system would be good; yes?

2  **A.**   No.  Because the infection was spread by a contaminated

3  memory card.  So as soon as you insert that memory card back

4  into the machine, the machine is contaminated again.

5  **Q.**   So you have to check memory cards also?

6  **A.**   You have to check all the memory cards.

7  **Q.**   Same process?

8  **A.**   Basically, the memory card readers are commodity devices.

9  You insert the memory card and check to see what is there.

10  **Q.**   We have heard about other components of the system like

11  the GEMS server, the optical scan units, e-poll books.

12      Would those have to be checked also?

13  **A.**   Yes.  But very different processes for those.

14  **Q.**   Shorter?  Quicker?

15  **A.**   Well, in the case of GEMS servers, it is really a

16  difficult problem because we're talking about software that

17  hides in the deep recesses of the operating system.  Sometimes

18  in the software that loads as the machine is starting -- it is

19  there to not be detected.  So it is in many cases impossible to

20  find it.

21  **Q.**   Let's say you can check every single component that

22  Georgia uses in its election system.  You did that, and you had

23  enough time, and you took care of that.

24      Would the system then be trustworthy to accurately deliver

25  election results?

1    **A.**    No.

2    **Q.**    And why not?

3    **A.**    Because the second pillar isn't in place.  You have to be

4    able to detect.  And without a written record of voter intent

5    to conduct an audit against, you have no way of determining

6    whether or not the votes have been changed.

7    **Q.**    So when you say written record, what do you mean?

8    **A.**    A paper ballot.  Hand-marked paper ballot.

9    **Q.**    So do machines like this ever have any kind of written

10   record?

11   **A.**    No.

12   **Q.**    Does Georgia's DRE system have the capability to produce

13   an independent and paper audit trail of every ballot cast?

14   **A.**    No.

15   **Q.**    How do you know that?

16   **A.**    Because I know the architecture of the machines.  When I

17   was at Hewlett-Packard, I used to manufacture machines very

18   similar to this.  If the machine is compromised, all the memory

19   in the machine is compromised.  It doesn't matter how often you

20   print it it is going to come out to be whatever the malware

21   wants it to be.

22   **Q.**    Are you familiar with Georgia's machines in particular?

23   **A.**    Am I familiar with Georgia -- so I don't think that there

24   is a Georgia machine.  I think these machines are manufactured

25   by companies like Hewlett-Packard, like Diebold for mass

1  market.  They are commodity electronics.

2      They have components that come from all over the world.

3  Sometimes those get packaged into machines that are delivered

4  to Georgia, sometimes to California.  And so, you know, the

5  idea of a Georgia machine from the point of cybersecurity

6  doesn't really make a lot of sense.

7  **Q.**  So you heard the cross-examination of Professor Halderman;

8  yes?

9  **A.**  Yes.

10 **Q.**  Do you put any significance in the fact that he's looked

11 at versions 4.3, 4.4, and 4.6 but not 4.5?

12 **A.**  No, not really.  If you -- even if you assumed that the

13 ballot station software were perfect, they were clean, they

14 weren't contaminated, you have to understand that the hardware

15 and software that runs on these machines is commodity

16 electronics.

17     It is a Windows CE operating system that is notoriously

18 insecure.  It doesn't have a security subsystem, for example.

19 And that is what you would compromise.

20     If I were going to approach this machine, I probably

21 wouldn't start with the ballot station software.  I would start

22 with known compromises for Windows CE.

23 **Q.**  Are you familiar with the National Academy of Sciences

24 report?

25 **A.**  I am.

1    **Q.**   Did that address a system that has been compromised by

2    being available to the internet for six months, or did it

3    address -- what did it address?

4    **A.**   Well, it addressed the vulnerabilities of the system.

5            MR. SALTER:  Your Honor, one objection for the record

6    if I may.  It assumes facts not in evidence.  But go ahead.

7            THE COURT:  All right.  So noted.

8    **Q.    (BY MR. McGUIRE)**   Let me ask you the question again.  Your

9    second affidavit attached the National Academy of Sciences

10   report?

11   **A.**   Yes.

12   **Q.**   Yes?

13   **A.**   Yes.

14   **Q.**   So did that report look at DREs in their pristine state or

15   DREs in a compromised state?

16   **A.**   So the National Academy report looked at the inherent

17   vulnerabilities of DREs, in particular paperless DREs, and said

18   that they are so dangerous that they shouldn't be used in any

19   further elections.

20   **Q.**   So if you start with DREs that have been evaluated that

21   way and you make them accessible to anyone in the world over

22   the internet for six months, does that make them in your

23   opinion more or less safe?

24   **A.**   Well, it certainly doesn't help.  It makes them more

25   vulnerable, I think.

1   Q.   Now, the defendants have represented in their opening

2   statements that they do testing.

3   A.   Uh-huh (affirmative).

4   Q.   Have you observed any of that?

5   A.   I have observed logic inaccuracy testing.

6   Q.   Does that set your mind at ease as far as the security of

7   these systems?

8   A.   No.  It really doesn't tell you anything at all about the

9   accuracy of the system as they are used in elections.  And in

10  particular, it doesn't tell you anything about the accuracy of

11  the systems when they are under attack.

12  Q.   Mr. Salter's opening also represented that DREs can be

13  audited.  Are you aware of that?

14  A.   No.

15  Q.   How would you audit a DRE?

16  A.   Well, the very idea of an audit requires two independent

17  sources of information or two independent transactions to

18  compare against each other.  And the idea of auditing a single

19  machine is sort of circular reasoning.

20       If the machine is compromised, you have to assume that

21  everything in the machine is compromised.  Therefore anything

22  the machine tells you about its internal state is unreliable.

23  Q.   What about the safeguard of being able to run a recount?

24  A.   Same thing.  Same thing.  You are just adding the numbers

25  up again and expecting to get the same result.

1    Q.    We have heard some testimony or some questioning about the

2    accuracy of paper ballots in recording voter intent versus

3    optical scanners -- read by optical scanners --

4    A.    Yes.

5    Q.    -- versus DREs?

6    A.    Right.

7    Q.    The implication, as I understood it, was that DREs are

8    more accurate.  Do you have a view on that?

9    A.    Well, so let me say at the beginning of my answer that

10   recording human choices is an inherently error prong process.

11   So any way of doing that is going to be subject to error.

12        I'm not aware of any studies that say that DREs are any

13   inherently -- any more inherently reliable at recording human

14   choices than paper ballots.

15   Q.    How can DRE be inaccurate in recording your choice?

16   A.    Well, a lot of things happen.  So one thing that happens

17   is that when a machine is compromised what gets compromised are

18   the relationship between the touches that a voter makes on the

19   screen and the names of candidates that are supposed to be

20   voted for when the screen is touched.  And that would destroy

21   the accuracy of the vote.

22        Even if the machine wasn't compromised by malicious

23   software, these are old machines.  And they require constant

24   calibration.  Now, in fact, the machines -- the contemporaries

25   of these machines, the little small handheld devices that we

1    used to sell, when you started the machines up would first ask

2    you to calibrate the screen.  And that was because they can't

3    really tell when you touch the screen have you touched exactly

4    the mark that you intend to touch.

5    **Q.**   So relying on what you know of cybersecurity and computer

6    system testing, what would your solution be to make the

7    security of this system better?

8    **A.**   Well, as I said, I think these are designed to be unsafe.

9    It is not clear that you can design in security to the system

10   that we have in front of us here.  I think introducing a

11   voter-verified paper trail would help a lot.  I think replacing

12   these machines with hand-marked paper ballots would

13   dramatically improve the system.

14   **Q.**   Now, the defendants have accused the plaintiffs of being

15   Luddites.  Do you know what a Luddite is?

16   **A.**   I do know what a Luddite is.

17   **Q.**   What is a Luddite?

18   **A.**   A Luddite is a person who doesn't like technology and is

19   prone to go out and smash them whenever he finds them.

20   **Q.**   Do you consider yourself a Luddite?

21   **A.**   This is a strange career for a Luddite.

22   **Q.**   And would paper -- going to paper ballots be a Luddite

23   solution to this problem?

24   **A.**   No.  I think every -- every cybersecurity expert, every

25   computer scientist that I know of who has weighed in on this

1   matter thinks that paper is the safest way to conduct

2   elections.

3        The weaknesses in paper are well-known.  But you don't

4   have the unknown weaknesses of cybersecurity to worry about.

5   **Q.**   And are you aware of how many Americans vote using paper

6   ballots?

7   **A.**   I'm not.

8             MR. McGUIRE:  All right.  I'm going to stop there and

9   turn it over to Mr. Cross.  Thank you.

10            THE COURT:  I just want to ask you to clarify what

11   you said about the cards.  I just couldn't catch what -- I

12   missed something in terms of how to detect whether a card has

13   been infected.

14            THE WITNESS:  So you would read the card.  There are

15   card readers.  The old-fashioned computers used to have these

16   slots that you would fit these big fat cards into.  You would

17   read it just like you would read a disc.

18            Then there are programs that pull the information off

19   those cards.  And you can use it to compare it to other files.

20   And if those files match, then you would know that the card

21   wasn't in its original -- or was in its original state.

22            THE COURT:  All right.  Do you know whether that is

23   being done or not?

24            THE WITNESS:  I don't know.

25            THE COURT:  All right.

```
 1              MR. CROSS:  Very briefly, permission to approach the
 2     witness with an exhibit.
 3              THE COURT:  All right.
 4                        DIRECT EXAMINATION
 5     BY MR. CROSS:
 6     Q.   Mr. DeMillo, I hand you what has been marked as
 7     Plaintiffs' Exhibit 5.
 8          Let me ask you a couple of foundational questions if I
 9     may.  Are you familiar with something called the SAFE
10     Commission in Georgia?
11     A.   I am, yes.
12     Q.   And what do you understand that to be?
13     A.   I understand it to be the commission that the Secretary of
14     State formed to make recommendations for acquiring the next
15     generation of voting systems.
16     Q.   Is there a member of that SAFE Commission selected by
17     Secretary Kemp who is an information technology and
18     cybersecurity expert?
19     A.   Yes.
20     Q.   What is his name?
21     A.   His name is Professor Wenke Lee.
22     Q.   Do you know him personally?
23     A.   I do.  He is a colleague.
24     Q.   At Georgia Tech?
25     A.   Yes.
```

**Q.**   And did you attend a meeting of the SAFE Commission just last week?

**A.**   I did.

**Q.**   And did Mr. -- did Professor Lee put up a presentation at the meeting?

**A.**   He did, yes.

**Q.**   And was that meeting in sort of a private lunch session of the committee as opposed to the public forum?

**A.**   It was a smaller room.  But the public was invited in to view the session.

**Q.**   And did you observe Professor Lee's presentation?

**A.**   I did.

**Q.**   And did that -- what did that presentation concern just very generally and briefly?

**A.**   It was --

        MR. SALTER:  We're getting into hearsay.  I just want to make an objection.  I would move to strike.

        THE COURT:  He is talking about the subject matter of the presentation.  You may proceed.  Objection overruled.

        But if there is going to be hearsay --

        MR. CROSS:  Let me do this.  I'm going to move in Exhibit 5 once he takes a look at it and authenticates it.

        But the argument on hearsay, I will say, Your Honor, is the SAFE Commission is organized by Secretary Kemp.  He runs it.  He picked the people.  So this would fall under a party

1   opponent admission we would submit, Your Honor, because this

2   is, in fact -- it is funny they laugh.  It is almost offensive.

3   But this is the only thing they pointed to in all their

4   briefing that the Secretary of State has done to secure the

5   election.  This is it.  They say it is his initiative.  And

6   this is the man he handpicked to be his cybersecurity expert.

7               MR. BARNES:  Bring him in here.

8               THE COURT:  All right.

9               MR. CROSS:  Please do.  Sorry, Your Honor.

10              THE COURT:  All right.  Enough.  Find out what the

11  subject matter is.  And if there is a presentation, then he can

12  present -- provide a copy of the presentation.

13              MR. CROSS:  Thank you, Your Honor.

14  **A.**   It was a tutorial to the commission members on the basics

15  of cybersecurity.

16  **Q.   (BY MR. CROSS)**  Take a look at Exhibit 5 you have in front

17  of you, and let me know if that looks to be a fair and accurate

18  copy of the presentation that Professor Lee made at the SAFE

19  Commission meeting just last week.

20  **A.**   Yes, it looks like the same presentation.

21              MR. CROSS:  Your Honor, we move Exhibit 5 into

22  evidence.

23              MR. SALTER:  Objection, Your Honor.

24              THE COURT:  What?

25              MR. SALTER:  Objection.

```
 1              THE COURT:  You have an objection?

 2              MR. SALTER:  I have a hearsay objection.

 3              THE COURT:  All right.  Well --

 4              MR. CROSS:  Your Honor, the additional argument I'll

 5    make just briefly, one, it is not hearsay for the reason I

 6    said.  The additional argument I will make is we don't frankly

 7    have to put it in for the truth because it directly contradicts

 8    their position.  And so even just to get it in front of the

 9    Court to show that the statements were made by their own

10    cybersecurity expert --

11              THE COURT:  Well, let me see a copy of it.

12              MR. SALTER:  I didn't mean to interrupt.

13              THE COURT:  You made your objection.  We're going

14    to -- I can always in the end determine it is hearsay.  But

15    we're going to proceed for now.

16              MR. CROSS:  Thank you, Your Honor.  I'll also just

17    note for the record, if I may, the rules of evidence don't

18    strictly apply in a preliminary injunction hearing.  And Your

19    Honor is entitled to hear hearsay as well.

20              That was all I had, Your Honor.  Thank you.

21              THE COURT:  Could I see the exhibit?

22              MR. CROSS:  Yes, please.  I handed him the marked

23    copy, Your Honor.

24              THE COURT:  That is all right.

25              So just when we say AV industry in 1998 or in 2000,
```

```
 1    AV refers to?

 2              THE WITNESS:  Antivirus.

 3              THE COURT:  Antivirus.  All right.

 4              Are you through?

 5              MR. CROSS:  I just didn't know if you had any

 6    questions.

 7              THE COURT:  No.

 8              MR. CROSS:  Thank you, Your Honor.

 9              MR. SALTER:  Can I ask for a ruling from the Court?

10    I'm not sure where my bounds are as to this exhibit that was

11    just tendered by Brother Cross.

12              Is the Court going to admit it or simply just allow

13    some testimony in as kind of a treatise?

14              THE COURT:  Well, this is the presentation that was

15    given?

16              THE WITNESS:  Yes.

17              THE COURT:  I mean, I don't have to accept it for the

18    truth of the matter.  But I'm going to allow it for what was --

19    it was presented, and certainly it seems to me one of the

20    points that the state has is that you are moving forward.  So I

21    think, you know, it is relevant in that regard.  I don't have

22    to accept it all for the truth of the matter asserted in here

23    though.  But for the high points, that is something else.

24              MR. SALTER:  May I examine from it then, Your Honor,

25    subject to our objection that it is --
```

1    THE COURT:  You haven't been given a copy?

2    MR. SALTER:  I have a copy, Your Honor.  Counsel

3  provided me with a copy.

4                    CROSS-EXAMINATION

5  BY MR. SALTER:

6  **Q.**   Mr. DeMillo -- is it DeMillo or DeMillo?

7  **A.**   DeMillo.

8  **Q.**   I'm John Salter.  Good to meet you, sir.  I'll try to move

9  along as quickly as I can.

10     You have performed a study of the overall security system

11  at the state before?  You participated in one through Georgia

12  Tech?

13  **A.**   I supervised one.

14  **Q.**   You supervised.  Was this back in 2007 for Karen Handel,

15  Secretary of State at the time?

16  **A.**   Yes.

17  **Q.**   Okay.  I will try to --

18     MR. SALTER:  May I approach the witness, Your Honor?

19     THE COURT:  What?

20     MR. SALTER:  May I approach the witness?

21     THE COURT:  Yes.

22     MR. SALTER:  I apologize.  I don't have enough copies

23  for the Mongol horde of lawyers here on the other side of me.

24  Your Honor, if y'all want one.

25     I don't know if we'll tender this or not.  But I

1    wanted to have it present if the witness wanted to read it.

2    **Q.**   **(BY MR. SALTER)**   Can you identify the title page of that

3    document, Professor?

4    **A.**   Security Study of the Processes and Procedures Surrounding

5    Electronic Voting in Georgia.

6    **Q.**   And I'm going to stick and move.   If I confuse you, let me

7    know.   But I'm going to try to move along because I promised

8    five minutes, and that was the representation.

9        So when was this study done?

10   **A.**   It was delivered -- well, you see on the front page it was

11   delivered May 2008.   So it was done in the seven months leading

12   up to that.

13   **Q.**   And was this -- was the final report actually made to the

14   Secretary of State at the time?

15   **A.**   Yes.

16   **Q.**   And did this assume -- did this study basically assume the

17   similar kind of software vulnerabilities that you have

18   testified today --

19   **A.**   Well, this was --

20   **Q.**   -- as a potential problem?

21   **A.**   This was 2007.   So 2007 we knew much, much less about the

22   vulnerabilities than we do today.

23   **Q.**   Well, it did assume that -- you didn't perform a software

24   audit of e-voting machines because you accepted the findings of

25   previous software security studies; correct?

**A.**    I'm not an author of the report.

MR. CROSS:  Your Honor, by Mr. Salter's own objection, this would appear to be hearsay.  Nor does this witness appear on this document.  Could we --

MR. SALTER:  It is actually a Government report.

MR. CROSS:  I'm sorry.  Could we just maybe have some context of what it is and what we are doing.

MR. SALTER:  I'm not tendering it yet.  I am using it as a learning treatise.  He actually participated in the study. It was actually funded.  It is a Georgia Tech -- if you want to call it a public document, Government report, it could come in under Rule 4, the exception to the hearsay rule.

I'm just using it to examine this witness as a proffered expert on cybersecurity, including the systems in action in Georgia.

THE COURT:  All right.  Well, you can ask him questions about it, and I'm not sure where you are going though.

To the extent you know -- because I know you participated in the review.  I'm not sure you participated in the writing of the study.

THE WITNESS:  So these authors worked for me.  So -- and I am familiar with the methodology they used.  I'm not an author of this report.

THE COURT:  All right.

1    **Q.    (BY MR. SALTER)**  But you directed some of the study?

2    **A.**   I supervised the study.

3    **Q.**   Supervised some of the study.  Are you familiar with some

4    of the findings that were made and furnished to the Secretary

5    of State?

6    **A.**   Some of them, yes.  It has been a while since I have

7    looked at it.

8             COURT REPORTER:  Y'all were talking at the same time.

9    I cannot get you.

10   **Q.    (BY MR. SALTER)**  She's going to get on to us.  Okay.  Are

11   you with me?

12        Were you familiar with the findings that were presented to

13   the Secretary of State back in 2007 or '8?

14   **A.**   Yes.

15   **Q.**   And was some of the findings -- I want to ask you if this

16   sounds familiar.  Was some of the findings a concern that a

17   single trusted person could install malicious software on a DRE

18   machine?  Was that a finding?

19   **A.**   I don't recall.

20   **Q.**   Okay.  So if you turn to Page 4 of the executive

21   summary -- I'll try not to take you through the whole entire

22   report because we don't have time.

23            MR. SALTER:  And if I could, Amy, if you would light

24   up the ELMO here.

25   **Q.    (BY MR. SALTER)**  Do you see where it says election

1    officials would likely be able to detect certain technical

2    attacks by voters discovered in previous studies provided that

3    they are trained to recognize suspicious voter behavior?

4         Did I read that right?

5    **A.**   Yes.

6    **Q.**   All right.  And in terms of what that is referencing, it

7    is talking about the fact that we know even in 2007 and 2008

8    when this was actually published -- we knew that you could

9    install if you had free access to it -- if you assume that,

10   that you could install a memory card with a malicious virus on

11   a DRE machine?  We knew that back then, didn't we?

12   **A.**   We did, yes.

13            MR. CROSS:  Your Honor, again, is this coming in for

14   the truth?  What are we doing here?  This is clearly hearsay.

15            MR. SALTER:  Your Honor, their only theory on why all

16   the other case law doesn't matter is because they told the

17   Court, well, there is a new threat.  This isn't a new threat.

18   It is new that it is Russian and coordinated.

19            THE COURT:  No.  That is not true.  The cases you

20   bring in this court often are based on new technology and new

21   efforts.  They are not necessarily based on Russia in terms of

22   data breach and hacking.

23            So, you know, you can do this.  I think you can

24   examine it.  But I don't know that it obliterates everything

25   else.  And I really think that we would spend a lot better time

```
 1    if we could also deal with what has happened since that time.

 2          But you are welcome to do it.  You can spend all your

 3    time on 2008 if you want, ten years ago.

 4    A.    Can I respond to your question?

 5    Q.    (BY MR. SALTER)  Yeah.  Was it known in 2008 that you

 6    could install -- if you had access to a memory card to install

 7    malicious virus malware on a DRE machine?

 8    A.    The question is:  Who do you mean by you?  So in 2007, we

 9    didn't know about the kind of threat called the advanced

10    persistent threat.  This is a kind of threat that is mounted by

11    organized crime, by nation states using advanced techniques.

12          The cartoon that the Judge noted in Wenke Lee's

13    presentation makes a humorous point about that.  But it

14    nevertheless is the point that what has happened since 2008 is

15    that these people have much more capabilities than they had

16    in -- you know, in this time frame.

17          And so the things that we could do back then can now be

18    done over a long period of time using very complicated tools,

19    using advanced capabilities.

20          THE COURT:  Things that we can do back then, what do

21    you mean?

22          THE WITNESS:  So what it would take to install

23    malware on a single voting machine in 2007 has now been

24    automated to the point where an advanced persistent threat can

25    make a process of it.  They can just like manufacture malware
```

1    to send out to these machines without even -- without even

2    contacting someone that is internal to the system.

3    **Q.    (BY MR. SALTER)**  My question -- if I can direct you back

4    to my question, I don't want to be here all day.  In terms of

5    the demonstration that was made this morning with Mr. Halderman

6    -- Professor Halderman -- do you recall that? -- where he

7    inserted a memory card.  He had a programmed virus on it, and

8    you insert that in -- that was something that has been known

9    for more than a decade as a potential vulnerability with DRE

10   machines; is that fair?

11   **A.**   Yes.

12   **Q.**   Okay.  And one of the things in terms of going in with a

13   memory card and you unlock the key -- remember how he had to

14   unlock the key?  You had to have a key; right?

15   **A.**   (Witness nods head affirmatively.)

16   **Q.**   Can you answer?

17   **A.**   Yes.  But that misstates what the demonstration was.

18   **Q.**   No.  He had a key; correct?

19   **A.**   But he was playing the role of a poll worker.  He wasn't

20   playing the role of an attacker.

21   **Q.**   I'm not arguing with you.  But he had a key?

22   **A.**   Yes.

23   **Q.**   He had the memory card?

24   **A.**   Yes.

25   **Q.**   And so in terms of a poll worker doing that, using the

1    key, putting the memory card in there, is that the kind of

2    thing that in terms of y'all's studying back in 2008 that you

3    referenced that kind of thing if observed by another poll

4    worker would be a suspicious activity and likely to be

5    discovered; fair?

6    **A.**    No.

7    **Q.**    Okay.

8    **A.**    No.

9    **Q.**    Let's talk about this.  This is Page 4 where it says, even

10   if you were a poll worker, a single trusted person choosing to

11   act against the state may find an opportunity to alter the

12   software on a machine.  That is basically what we heard about

13   this morning; fair?

14   **A.**    Right.

15   **Q.**    Okay.  By limiting an individual's access to the voting

16   equipment, reliance on each individual's trust can be reduced;

17   correct?  Did I read that correctly?

18   **A.**    Yes.

19   **Q.**    Do you know whether or not this recommendation was acted

20   on and that there was a reg implemented to increase and train

21   poll workers regarding watching not only voters inserting

22   something but also other poll workers potentially tampering

23   with the machine?

24   **A.**    Do I know that?

25   **Q.**    Yes.

1  **A.**   No, I do not know that.

2  **Q.**   Fair enough.  In terms of -- I want to flip to this.

3  Well, let me ask one other thing.

4       Are you aware -- let me say this.  Is it reasonable to

5  expect any software program to be error-free?

6  **A.**   No.

7  **Q.**   Absolutely not?  Knowing that, isn't it reasonable for

8  people to design a system that has enhanced consistently

9  implemented physical security measures regarding the software

10  components and the chain of custody involved that is implicated

11  by that; fair?

12  **A.**   Physical security of software components?

13  **Q.**   Locking up the actual software devices that make the

14  memory cards; fair?  You would lock that machine up?

15  **A.**   Those are connected to the internet.

16  **Q.**   Are you -- hold on.  Is it your testimony that your

17  opinions are based on the idea that the computers that form --

18  that populate the ballots that make the memory cards -- is it

19  your testimony that that is connected to the internet?

20  **A.**   The GEMS servers are from time to time connected to the

21  internet, yes.

22  **Q.**   That is the basis of your opinions here today?

23  **A.**   I'm reading the training manuals that Diebold distributes

24  with its machines.

25  **Q.**   So that -- so yes, the basis of your opinions today is

1    that the critical GEMS servers that populate the ballots for

2    the state and create the memory cards -- that that is sometimes

3    connected to the internet?  That is your opinion?

4    **A.**    Yes.

5    **Q.**    One of the things you have testified that you are talking

6    about here in this presentation or whatever it was last week --

7    do you have a complete and reasonable understanding of the data

8    encryption that is used by the Secretary of State in the

9    Secretary of State's IT department?

10   **A.**    No.

11   **Q.**    Do you have a -- same question as to the blocking

12   parameters that are used in the Secretary of State's IT

13   department in relation to election security.

14   **A.**    I don't know what blocking parameters means.

15   **Q.**    In terms of how -- do you have personal direct knowledge

16   regarding how updated the security patches are on the critical

17   infrastructure technology equipment used by the Secretary of

18   State's IT department?

19   **A.**    No.

20   **Q.**    Do you have personal, direct knowledge regarding the

21   penetration testing and the methodology that is used?

22        THE COURT:  All right.  Listen, if you want to enter

23   into a stipulation as to all of those questions, since I know

24   none of it has been provided to me and it was very -- and might

25   have all been relevant, could have been under seal -- but there

1    is no indication that any -- because of the affidavits given

2    here that these individuals have been provided that access.

3              MR. SALTER:  They haven't.  Absolutely not.  That is

4    my next question.

5              THE COURT:  So then why don't you stipulate?  We

6    don't have a jury here.  Let's save time.  Stipulate and just

7    move on.

8              MR. SALTER:  Do y'all stipulate that the plaintiffs

9    have no knowledge regarding penetration technology

10   (unintelligible) --

11             COURT REPORTER:  I'm sorry, Mr. Salter.  I just need

12   you to slow down, please.

13             MR. SALTER:  Yes, ma'am.  I'm sorry.

14             COURT REPORTER:  I got about four words.

15             MR. BROWN:  We will stipulate that there is no

16   evidence in the record describing what he is talking about and

17   that we're unaware of whether Professor DeMillo in his capacity

18   at Georgia Tech or otherwise has knowledge of that.

19             And Mr. Salter is way over his time and eating into

20   Fulton County's time and eating into our time later today.

21             MR. SALTER:  Fair enough.

22   **Q.   (BY MR. SALTER)**  But do you have any personal knowledge to

23   that in terms of basing your opinions regarding how we use

24   penetration testing?

25   **A.**   I'm not aware that you use penetration testing.

1      MR. SALTER:  I will roll through this and wind up and

2  then let --

3      THE COURT:  Well, I'm going to -- unless Fulton

4  County wants to -- I'm going to let Fulton County's counsel

5  appear at this point unless --

6      MS. BURWELL:  I will concede my time.

7  **Q.  (BY MR. SALTER)**  Mr. DeMillo, can you testify from your

8  personal knowledge regarding a single instance in which a flash

9  drive or some other medium-type device was inserted -- has been

10  inserted into the server used at the Secretary of State's IT

11  department that led to a vote being changed on the DRE machine?

12  **A.**  I'm not -- ask the question again.  I'm not sure what you

13  are asking.

14  **Q.**  Are you aware of a single instance in which a corrupted

15  flash drive or other medium was inserted into the server at the

16  Secretary of State's office, the one that is kept behind -- I

17  will represent to you is kept behind a locked door -- that

18  somehow resulted in a malicious virus that changed a vote in

19  Georgia?

20  **A.**  I don't know how I would be aware of that.

21  **Q.**  Do you have -- can you testify to an instance in which

22  that has happened anywhere in the country under election -- in

23  a real election anywhere in the country?

24  **A.**  Ask me again what you are saying.

25  **Q.**  I was removing it out of the Georgia Secretary of State's

1    server that populates the ballots that creates the memory

2    cards.

3         Are you aware of a single instance anywhere in the country

4    where a virus was propagated down through the server that

5    creates the ballot format, through the memory card, on to a DRE

6    machine?

7    **A.**   I don't think so, no.

8              MR. SALTER:  I'm over my time, Judge, and I know it,

9    and I'll hush, but I think that establishes where we are.

10             THE COURT:  All right.  And I trust then that you are

11   going to present some actual affirmative evidence from the

12   Secretary of State's office.

13             MR. SALTER:  Could I ask one more question?

14             THE COURT:  No.  No, you cannot.

15             Is this witness excused?

16             MR. McGUIRE:  Yes, Your Honor.

17             MR. CROSS:  Your Honor, just one question if I may.

18             THE COURT:  Yes.

19                     REDIRECT EXAMINATION

20   BY MR. CROSS:

21   **Q.**   Professor DeMillo, do you have Professor Lee's

22   presentation in front of you?

23   **A.**   Yes, I do.

24   **Q.**   So Mr. Salter turned you to the last page, operation and

25   maintenance and some best practices there.  Do you see that?

**A.**   The last page?

**Q.**   Yes.

**A.**   Yes.

**Q.**   That is the one he put up?

**A.**   Yes.

**Q.**   Just very briefly, do you see the one on the page a few pages before, same heading, with the subheading specification and design and it says paper ballots done right?

**A.**   Uh-huh (affirmative).

**Q.**   Do I read this correctly that even with the best practices that Mr. Salter put up the only specification and design for an election system that Professor Lee offered in this presentation that has the characteristics of verifiably cast as intended, verifiably collected as cast, and verifiably counted as collected, and cannot by completely controlled -- or be completely controlled or manipulated by any cyber component -- the only specification design are paper ballots done right with auditing?

**A.**   Yes.

          MR. CROSS:  Thank you.

          THE COURT:  Do you want your -- what were you planning to do, Mr. Salter?

          MR. SALTER:  Could we tender that, Judge.  We'll offer that as D-1.

          MR. McGUIRE:  We have nothing else for the professor.

1          THE COURT:  Do you have any objection to the exhibit

2     being offered by Mr. Salter?

3          MR. SALTER:  Let me identify it.  I think it is the

4     2008 report by Georgia Tech in which Mr. -- is it Professor

5     DeMillo?

6          THE WITNESS:  Professor, Dr. DeMillo.

7          MR. SALTER:  -- that Dr. DeMillo had some role in

8     supervising the report.

9          Any objection?

10         MR. CROSS:  Your Honor, our position would be that

11    they should be received the same way.  So we have no objection

12    if he withdraws his objection to ours.  If he is going to stand

13    on his objection, then we're forced to make a hearsay

14    objection.  I say just let it all come in and let Your Honor

15    figure out the facts.

16         THE COURT:  They are both basically presented to the

17    Government as part of the Government process.  They are both

18    admitted.

19         MR. CROSS:  Thank you, Your Honor.

20         THE COURT:  Thank you.

21         Who is your next witness?

22         MR. CROSS:  Your Honor, the plaintiffs call to the

23    stand Chris Harvey.

24         THE COURT:  How long do you anticipate?

25         MR. CROSS:  I'm going to try to stick to 15 minutes,

1   and I can cut out some stuff on the witness.  But that is the

2   aim.

3           THE COURT:  Are you -- is that the totality of

4   plaintiffs' examination, or are you doing some examination, Mr.

5   McGuire?

6           MR. McGUIRE:  I need a few minutes.  Your Honor, we

7   would like -- I would like to have five minutes if I could.

8                         **(Witness sworn)**

9           COURTROOM DEPUTY CLERK:  Thank you.  Please be

10  seated.  Please pull up close to the microphone so we can hear

11  you.

12          I'm going to ask you to state your first and last

13  name again for the record, and please spell your first and last

14  names for the record.

15          THE WITNESS:  Yes, ma'am.  My name is Chris Harvey.

16  That is spelled C-H-R-I-S H-A-R-V-E-Y.

17          COURTROOM DEPUTY CLERK:  Thank you, sir.

18          MR. CROSS:  Your Honor, for convenience, could I pass

19  up a binder to the witness and to you?

20          THE COURT:  Yes.

21      Whereupon,

22                        CHRIS HARVEY,

23      after having been first duly sworn, testified as follows:

24                      CROSS-EXAMINATION

25  BY MR. CROSS:

1   **Q.**   You don't need to look at it quite yet.  We'll get to it,

2   Mr. Harvey.

3        So, Mr. Harvey, you've been the State of Georgia's

4   elections director since July of 2015; is that right?

5   **A.**   That is correct.

6   **Q.**   Before that, from August 2007 to July 2015, you were the

7   chief investigator and deputy; right?

8   **A.**   Correct.

9   **Q.**   That was for Georgia?

10  **A.**   For the Secretary of State's office, yes.

11  **Q.**   Sorry.  Deputy inspector general for the Secretary of

12  State's office?

13  **A.**   That is correct.

14  **Q.**   So you have worked for the current Secretary of State for

15  the last eight years; is that right?

16  **A.**   That is correct.

17  **Q.**   So you work for Brian Kemp?

18  **A.**   Yes, sir.

19  **Q.**   Take a look at -- well, let me ask you first:  You're

20  familiar with the SAFE Commission we have talked about today;

21  right?

22  **A.**   Yes, sir, I am.

23  **Q.**   And the members of that commission were selected by

24  Secretary Kemp; right?

25  **A.**   Yes, sir.

1   Q.   And the only individual on that commission who was

2   identified as an information technology and cybersecurity

3   expert is Professor Wenke Lee from the University of Georgia

4   Tech; right?  Or Georgia Tech Institute?

5   A.   Yes, sir.

6   Q.   He was selected by Secretary Kemp for that role; right?

7   A.   That is my understanding.

8   Q.   The SAFE Commission has had only two meetings since it was

9   announced in the spring of this year; right?

10  A.   Yes, sir.

11  Q.   The first was in June of this year?

12  A.   Yes, sir.

13  Q.   The second was just last week?

14  A.   I believe two weeks ago.  It may have been last week.

15  Q.   Fair enough.  I think it was September 4.  Does that sound

16  right?

17  A.   It could have been.  I have been on the road.

18  Q.   Within the last two weeks?

19  A.   Yes, sir.

20  Q.   And you attended both meetings; right?

21  A.   I did.

22  Q.   And at the most recent meeting, you attended a panel

23  moderated by Professor Wenke regarding cybersecurity and

24  elections?

25  A.   I did.

1    **Q.**   And you also attended a presentation that he put on

2    regarding cybersecurity considerations for voting systems;

3    right?

4    **A.**   Yes, sir.

5    **Q.**   So you saw the presentation, some of which went up on the

6    screen today, from Professor Lee that is now in evidence;

7    right?

8    **A.**   I did.

9    **Q.**   Turn to Tab 3 in the binder if you would, sir.  So you

10   sent a letter to county commissioners and officials across 159

11   counties of Georgia on August 1st of 2018; right?

12   **A.**   Yes, sir.

13   **Q.**   So approximately six weeks ago; right?

14   **A.**   Yes, sir.

15   **Q.**   And this is -- the copy you have in front of you, does

16   that look to be a fair and accurate copy of the letter that you

17   sent out?

18   **A.**   Without reading every word, I believe so.

19   **Q.**   That is your signature on the last page, is it not?

20   **A.**   It is, yes, sir.

21            MR. CROSS:  Your Honor, we move Exhibit 6 into

22   evidence.

23            MR. SALTER:  No objection.

24            THE COURT:  It is admitted.

25            MR. McGUIRE:  No objection.

1          THE COURT:  Admitted.

2          MR. CROSS:  Thank you, Your Honor.  We'll give marked

3   copies at the end if that is okay to keep things moving.

4          THE COURT:  That is fine.

5   **Q.   (BY MR. CROSS)**  And you sent this letter in your official

6   capacity as the State of Georgia's elections director; right?

7   **A.**   Yes, sir.

8   **Q.**   And you acknowledge in this letter that for over a decade

9   it has been your job to be intimately familiar with both

10  Georgia election law, systems processes and procedures; right?

11  **A.**   That is correct.

12  **Q.**   And you state in this letter that throughout your tenure

13  at the Secretary of State's office election security has been a

14  top priority for you personally and for the entire Secretary of

15  State's office and county election officials; right?

16  **A.**   That is correct.

17  **Q.**   That would be since your tenure began in 2007; right?

18  **A.**   Yes, sir.

19  **Q.**   You are aware that in August -- on August 24, 2016,

20  cybersecurity researcher Logan Lamb was able to access and

21  download information from the GEMS server, which is used to

22  manage the elections in the State of Georgia; right?

23  **A.**   That is not my understanding, no, sir.

24  **Q.**   Are you not aware that Logan Lamb was able to access the

25  GEMS server?

1    **A.**   My understanding is that Logan Lamb was not able to access

2    the GEMS server.  My understanding is that he was able to

3    access a web server at Kennesaw State University that was used

4    exclusively for the staff at Kennesaw State to communicate with

5    the counties.  But at no time was that ever connected to a GEMS

6    server or to any of the systems that built ballots in Georgia.

7    **Q.**   But that web server included GEMS databases?

8    **A.**   I don't believe it did.  But I could be wrong.

9    **Q.**   Did you investigate that?

10   **A.**   I did not.

11   **Q.**   But you believe that when Mr. Lamb stated in his

12   declaration under oath that he was able to download GEMS

13   databases that he was mistaken?

14          MR. SALTER:  Objection to the question.  I think the

15   witness has answered I don't know.  I think he is asking him to

16   comment on the credibility of a witness who is not here.

17          THE COURT:  I don't think he is asking -- have you

18   read that before, or were you aware of that before?

19          THE WITNESS:  No, ma'am.

20          THE COURT:  So you had never looked at Mr. Lamb's

21   statement or any of the information he provided in your

22   capacity as director of elections?

23          THE WITNESS:  Not -- his declaration for this case,

24   no, ma'am.

25          THE COURT:  Yes.  That is part of the question.  But

1    the question also is:  When this came out -- and it was a

2    fairly public thing -- you didn't make yourself familiar with

3    the scope of the information that Mr. Lamb had identified was

4    accessible?

5              THE WITNESS:  I made myself aware of the generalities

6    of the situation.  The FBI actually investigated and did not

7    share that information with our office.

8              And in talking with the -- with the staff at KSU, I

9    was told that the web server only contained communication

10   information to the -- went from KSU to the counties.

11             So my understanding is that it did not contain GEMS

12   databases.  That is my understanding as I sit here today.

13   **Q.    (BY MR. CROSS)**  Are you aware that it -- well, I tell you

14   what, just for the sake of speed, let me ask this:  When

15   Mr. Lamb accessed the database that you said is used to

16   communicate with the counties, that happened during your

17   tenure; right?

18   **A.**    In June of 2016, again --

19   **Q.**    In August of 2016.

20   **A.**    In August of 2016, yes, sir, I was the election director

21   at that time.

22   **Q.**    When he accessed that same system and the same data six

23   months later, that was also during your tenure, was it not,

24   sir?

25   **A.**    It was.

1    **Q.**   You state in the letter that there are some who believe

2    that because the current DRE machines are fully electronic

3    there is no way to verify that voter selections match the vote

4    counts output.  You say this belief is not true; right?

5    **A.**   Yes, sir.

6    **Q.**   But as you heard from Professor Lee during his

7    presentation, he certainly disagrees with you in saying that

8    that is not true; right?

9    **A.**   Well, I don't know that he was speaking -- I don't recall

10   him speaking specifically about our system.

11   **Q.**   You think that when Professor Lee got up to give a

12   presentation to the SAFE Commission, which the Secretary of

13   State's office has touted as its singular effort to secure this

14   election, and he was talking about securing an election -- you

15   didn't think he was talking about the system in this state?

16   **A.**   No.  The SAFE Commission -- the commission of the SAFE

17   Commission is to look at future voting systems.  He was

18   speaking -- my understanding of the presentation he gave -- are

19   you talking about the lunch presentation?

20   **Q.**   Yes.

21   **A.**   He was speaking generally about cybersecurity.  He was not

22   speaking specifically about our current voting system is my

23   understanding of that presentation.

24   **Q.**   I'm trying to move on for the sake of time here,

25   Mr. Harvey.  The State of Georgia has requested from the

1   federal government just over $10 million as part of the federal

2   funding, the HAVA funding, that is available to secure

3   elections in the country; is that right?

4   **A.**   That is correct.

5   **Q.**   Did you determine the amount that was requested?

6   **A.**   No, sir.  The amount was allocated to the state by the EAC

7   and by Congress.

8   **Q.**   The state has received that funding; right?

9   **A.**   We have completed all the paperwork.  Whether the money

10  has actually hit the account or not, I don't know.  As of a

11  week or two ago, I think we were still waiting for it to land

12  in the account.

13  **Q.**   And you didn't request that funding from the state until

14  July 10 of this year; correct?

15  **A.**   That sounds about right.

16  **Q.**   In fact, originally Secretary Kemp turned it down and said

17  he was not going to take it?  That was the original position;

18  right?

19  **A.**   I'm not aware of any declination of funds.  No, sir, I'm

20  not aware of that.

21  **Q.**   Take a look at Tab 4 if you would, which is the

22  declaration you submitted in this case.  And if you would

23  start -- we're almost done.  Turn to paragraph -- I'm sorry --

24  Paragraph 20 on Page 11.

25      At the bottom, the very last line, you have got a sentence

1  that reads -- going to the top of the next page -- the optical

2  scanners that are currently part of Georgia's system are

3  manufacturer recommended to tabulate up to 2000 ballots each

4  election; right?

5  **A.**   Yes, sir.

6  **Q.**   Sir, is it your testimony under oath that the optical

7  scanners available in this state have a maximum capacity of

8  tabulating a sum total of only 2000 ballots for an entire

9  election?

10  **A.**   That information came from Michael Barnes in our office as

11  far as the general --

12  **Q.**   Sorry to interrupt.  I just want to make sure.  Is that

13  your testimony?  Do I understand correctly that that is what

14  you are stating here?

15  **A.**   That is my understanding of what the manufacturer

16  recommendations are.

17  **Q.**   But you heard that from Mr. Barnes?

18  **A.**   That is correct.

19  **Q.**   You have no firsthand personal knowledge on whether that

20  is accurate; correct?

21  **A.**   Yeah.  I heard it from Mr. Barnes.  I believe it to be

22  correct.

23  **Q.**   Based on what you heard from Mr. Barnes?

24  **A.**   Yes, sir.

25  **Q.**   So you haven't read --

1          THE COURT:  From Attorney Barnes or somebody else?

2          THE WITNESS:  No, sir.  Michael Barnes is the Center

3    for Elections Systems director in the Secretary of State's

4    office.  He deals with the machines.

5          THE COURT:  All right.

6          MR. BARNES:  No kin.

7          MR. CROSS:  Your Honor, we move to strike that

8    portion of the declaration as obvious hearsay.  He has no

9    foundation or personal knowledge.  And it is actually quite an

10   important fact in this case.

11         MR. SALTER:  Your Honor, no objection.  We'll have

12   Mr. Barnes present.

13         THE COURT:  All right.

14   **Q.   (BY MR. CROSS)**  You also state in the very next sentence,

15   currently Georgia has 891 optical scan machines; is that

16   accurate?

17   **A.**   Again, based on Mr. Barnes' report, it is.

18   **Q.**   Turn to Paragraph 11, if you would, sir.

19         THE COURT:  Are you moving to strike that too or not?

20         MR. CROSS:  No.  We're okay with that.

21         THE COURT:  All right.

22         MR. KNAPP:  We finally got a number out of them.

23         MR. CROSS:  That one we think is true.

24   **Q.   (BY MR. CROSS)**  Paragraph 11 you provide -- let me just

25   direct your attention here.

```
 1              THE COURT:  You are looking at an affidavit of his?
 2   What is the document number?
 3              MR. CROSS:  It is -- his affidavit -- it is --
 4              MR. SALTER:  265.
 5              MR. CROSS:  -- 265-2 in the docket.  265-2.
 6   Q.   (BY MR. CROSS)  Do you see at the top of Page 6, where
 7   Paragraph 11 goes on -- you provide an estimated cost where it
 8   states, I estimate the cost of preparing and mailing out a
 9   paper ballot, including the cost of ballot printing, preparing
10   and printing the inner and outer envelopes and both outgoing
11   and return postage to be approximately $2 per absentee ballot
12   package; right?
13   A.   Yes, sir.
14   Q.   And that is an estimate you made -- well, strike that.
15   How much of that was outgoing and return postage?  I assume it
16   is about half?
17   A.   The postage outgoing would probably be about between 50
18   and 60 cents.
19   Q.   Each way?
20   A.   Yes.
21   Q.   So somewhere from half to a little more than half?
22   A.   Probably.
23   Q.   And how much of that was preparing and printing the inner
24   and outer envelopes?
25              MR. SALTER:  Your Honor, may I object as to
```

```
 1    relevancy.  And, Cross, you tell me if I'm wrong.  But I
 2    thought y'all had withdrawn this whole absentee ballot --
 3             MR. CROSS:  We have, which is why this is very
 4    relevant which will become clear.
 5             MR. SALTER:  Subject to that, we'll reserve an
 6    objection as to relevance.
 7             THE COURT:  All right.
 8    Q.   (BY MR. CROSS)  How much of the two dollars or the roughly
 9    80 cents to a dollar left over was preparing and printing the
10    inner and outer envelopes?
11    A.   It is a much smaller amount.  We print those in our
12    office.  I would say maybe ten percent.
13    Q.   Of the total.  So another 20 cents?
14    A.   Approximately.
15    Q.   So we're somewhere around 1.20 to 1.40?
16    A.   I believe so.
17    Q.   And so how much of that was ballot printing?
18    A.   The remainder would be ballot printing.
19    Q.   So around 40 --
20    A.   You think --
21    Q.   Around 60 to 80 cents?
22    A.   Correct.  That is my understanding.
23    Q.   Okay.  All right.
24             THE COURT:  Is that what you are trying to make me
25    aware of?  That it is 60 to 80 cents for ballot printing?
```

1          MR. CROSS:  Yes.  The only estimate we have of the

2     cost to do paper ballots in this court is 60 to 80 cents per

3     ballot.  And we'll walk through the math, if we actually get

4     some closing on it.  But you will see it comes down to a very

5     small number when you figure about 3 million voters.

6     **Q.    (BY MR. CROSS)**  Georgia has run a pilot program in Conyers

7     using paper ballot voting machines; right?

8     **A.**    Ballot marking devices, yes.

9     **Q.**    And there has been no problem reported during that pilot?

10    **A.**    Not that I'm aware of, no, sir.

11    **Q.**    And, in fact, you recognized as of October of last year

12    that this kind of technology seems to be what a lot of states

13    are going towards; is that right?

14    **A.**    It is.

15    **Q.**    In fact, you recognize as of last year that this is

16    becoming the new normal to have some sort of paper as part of

17    the voting machine; right?

18    **A.**    Yes, sir.

19    **Q.**    And, again, just so we're clear, you made that recognition

20    in October of 2017; right?

21    **A.**    Yes, sir.

22          MR. CROSS:  No further questions.

23                        CROSS-EXAMINATION

24    BY MR. MCGUIRE:

25    **Q.**    Ready, Mr. Harvey?

```
 1    A.    I'm ready.

 2    Q.    My name is Robert McGuire.  I represent the Coalition

 3    plaintiffs, the other set of plaintiffs.

 4          Mr. Harvey, you're the election director for the entire

 5    State of Georgia?

 6    A.    That is correct.

 7    Q.    And in the Secretary of State's office, everyone there is

 8    a public servant?

 9    A.    Yes.

10    Q.    And you serve the public?

11    A.    That is correct.

12    Q.    What you do is what is in the public's interest; yes?

13    A.    Yes.

14    Q.    As you see it?

15    A.    Yes, sir.  In accordance with the laws and office policies

16    and regulatory guidelines, rules, and all that stuff.

17    Q.    And when your office takes an action, your office by

18    definition views that action as being in the public interest?

19    A.    I believe so.

20    Q.    So I would like to direct your attention back to Exhibit 7

21    or 6, which Mr. Cross put in front of you as Tab 3 in the

22    binder.  It is your letter.

23          Now, you wrote this letter on August 1st; yes?

24    A.    Yes.

25    Q.    That is six weeks ago today?
```

**A.**    I believe so.

**Q.**    Okay.  You wrote it to counties to stop them from exploring this switch -- making the switch on their own to paper ballots?

**A.**    Yes.  I had gotten some questions about whether or not they had the authority to do that.

**Q.**    And at the bottom of Page 2, there is a paragraph that says -- I'll just read it -- there is a provision of Georgia law that allows the state to move to paper ballots in the event that the machines are inoperable or unsafe.

Did I read that right?

**A.**    Yes, sir.

**Q.**    And then it says, if we ever reach a point where our office feels that these machines cannot be trusted to accurately deliver election results, we will invoke this statutory provision.  Did I read that right?

**A.**    Yes, sir.

**Q.**    So your office sees it as being in the public interest to move to paper ballots if the DRE machines are untrustworthy; yes?

**A.**    If the DRE machines are not untrustworthy?  I may have misheard you.  Could you repeat that, please.

**Q.**    So your letter says, if we ever reach a point where our office -- that is Secretary of State Kemp's office; yes?

**A.**    Yes, sir.

1   Q.   If we ever reach a point where our office feels that these

2   machines -- that is the DREs; right?

3   A.   That is correct.

4   Q.   -- these machines cannot be trusted to accurately deliver

5   election results, we will invoke this statutory provision to

6   move to paper ballots?  That is what you said there; right?

7   A.   Yes, sir.

8   Q.   And you wouldn't say that if you didn't think it was in

9   the public interest to do that if the machines are

10  untrustworthy; right?

11  A.   If that is what we felt, yes, sir.

12  Q.   Now, Secretary Kemp has a history of being concerned about

13  hacking, does he not?

14  A.   A history of being concerned about hacking?  I think

15  election security has always been a concern of Secretary

16  Kemp's.

17  Q.   But specifically hacking?  He has been concerned about

18  hacking in Georgia's election system; yes?

19  A.   I think people -- I would have to know exactly what

20  context.  I think people use the term hacking in a very general

21  way that has anything to do with manipulating or interfering as

22  opposed to the specific hacking in terms of computers and

23  networks and things like that.

24  Q.   Does David Dove work in Secretary Kemp's office?

25  A.   No.

**Q.**   Did he ever at any point?

**A.**   He did.

**Q.**   When was that?

**A.**   He worked -- he worked in the office up until, I want to
say, maybe six -- six months ago or maybe a year ago.  Maybe it
has been a year.

**Q.**   And how long did he work there before he left?

**A.**   Several years.  I don't know exactly.

**Q.**   Several years.  He was the chief of staff and legal
counsel to the Secretary of State; correct?

**A.**   He was chief of staff.  I think he was deputy general
counsel.

**Q.**   So like you, when he says something in writing, he speaks
for the secretary?

**A.**   I assume.  I wouldn't want to speak for him.

          MR. McGUIRE:  Okay.  Your Honor, if I may approach
the witness, I have an exhibit I marked as Exhibit 7.

          THE COURT:  Yes, you can approach the witness.

          MR. SALTER:  What is this exhibit, Rob?

          MR. McGUIRE:  That is being marked as 7.

          MR. SALTER:  It is being marked as 7?

          MR. McGUIRE:  7.

**Q.   (BY MR. McGUIRE)**  Mr. Harvey, do you recognize exhibit --
well, what has been marked for identification as Exhibit 7?

**A.**   I don't.

1   **Q.**   Do you see the Georgia Secretary of State seal on it at

2   the top left corner of every page?

3   **A.**   I do.

4   **Q.**   Do you see on Page 2 it has contact information, David

5   Dove, chief of staff and legal counsel for Georgia Secretary of

6   State's office?

7   **A.**   I do.

8   **Q.**   Okay.  The title of this presentation is critical

9   infrastructure and DHS hacking attempts; yes?

10  **A.**   It is.

11  **Q.**   And it looks like there is a table of contents over on the

12  left that begins with introduction and talks about critical

13  infrastructure, SOS network security, and then DHS hacking

14  attempts.  Do you see that?

15  **A.**   I do.

16  **Q.**   This is a presentation that Secretary Kemp's office gave

17  to someone.  It says legislative update.  Is it reasonable to

18  think that was to the legislature?

19  **A.**   I think that is reasonable.  But I'm not aware of it.

20  **Q.**   Does it surprise you that Secretary Kemp would appear to

21  be concerned about hacking of Georgia's election system by our

22  own Government?

23  **A.**   Does it concern me?

24  **Q.**   Does it surprise you?

25  **A.**   I think Secretary Kemp was concerned about any type of

1    interference in the election system.

2    **Q.**   He takes hacking very seriously?

3    **A.**   I believe so.

4         MR. McGUIRE:  Okay.  Your Honor, I would move to

5    admit Exhibit 7 as a statement of opposing party.

6         MR. SALTER:  Objection, Your Honor.  I don't think

7    this witness has adequately identified this document.  I don't

8    think there is a witness who can today.

9         MR. McGUIRE:  Your Honor, I believe it is

10   self-authenticating.  It has the seal of the State of Georgia

11   on every page, and it has information within it that is

12   self-evident as to the authorship.

13        THE COURT:  Had you seen it before?

14        MR. SALTER:  No, ma'am.

15        THE COURT:  Why don't you take a look at it and

16   attempt to verify.  If this is basically -- if it was put out

17   by the Secretary of State's office on this topic, it seems

18   relevant.  And unless I know that, you know, you-all claim that

19   this is not, in fact, from the Secretary of State's office, I'm

20   inclined under the context here to allow it.  I'm not -- it

21   could have been the proper witness.  One would think he would

22   have known about it because of the topic.  But if he doesn't,

23   he doesn't.

24        MR. SALTER:  Your Honor, that is my point.  This

25   witness does not.  And if they have someone who can come in and

1    authenticate it, that is fine.  But this witness --

2            THE COURT:  Well, I'm just asking you under the

3    circumstances of a preliminary injunction hearing -- you know,

4    we could be here for days and get it properly authenticated.

5    If you could ask your -- obviously this witness can make a

6    phone call and determine if it is what it purports to be.

7            Okay?

8            MR. McGUIRE:  I have less than a minute left, so I

9    will be very brief.

10   **Q.   (BY MR. McGUIRE)**  So you spoke in your initial examination

11   by Mr. Cross about the KSU server being used to communicate

12   with the counties.  Do you remember that?

13   **A.**   The KSU web server, yes.

14   **Q.**   So I think I wrote this down.  You say the KSU server was

15   used to communicate to the counties?

16   **A.**   That is correct.

17   **Q.**   What do you mean by communicate to the counties?

18   **A.**   Send information to the counties.

19   **Q.**   Okay.  So counties were receiving election information

20   presumably that was sent from that server?

21   **A.**   Yes.  Some election information.

22   **Q.**   That server is the server that was wide open to the world

23   for at least six months from August 2016 to March of 2017?

24   **A.**   My understanding is that was a communication server that

25   was improperly configured and exposed, yes.

1   **Q.**   And is it not the source of the pollbook data that the

2   counties download to use in their own election operations?

3   **A.**   It is not currently.

4   **Q.**   At the time though it was?

5   **A.**   I'm -- I don't -- I don't believe that is correct.  But

6   I'm not 100 percent sure, Your Honor.

7   **Q.**   Is it not true that the counties -- that the Secretary of

8   State's office would send out Tweets to the counties saying

9   your e-pollbook information is ready to download?

10  **A.**   There were -- there was some information that would come

11  that way.  For example, the bulk update, which is -- at the end

12  of advanced voting, you take the data for everybody who has

13  advanced voted and you send the counties the registration

14  numbers of those individuals so that they can go in and mark

15  them as having already voted so that if they try to show up on

16  election day they will be shown as voted.  That was the kind of

17  information that was sent across that server.

18       I don't believe that more sensitive information like the

19  ExpressPoll logs or the ExpressPoll data would have been sent

20  across that.  But I'm not the best person to give you an exact

21  answer on that.

22  **Q.**   So you are not in a position to contradict Logan Lamb's

23  affidavit, for example, in which he suggests that that kind of

24  data was on the KSU server?

25  **A.**   There was some data that was on the server.  I don't

1    know -- I don't know.

2    **Q.**   And, finally, last question, you would agree with me that

3    the e-pollbook is part of the certified DRE system that Georgia

4    uses to conduct its election?

5    **A.**   It is part of the voting system.

6         MR. McGUIRE:  No further questions.  Thank you.

7         MR. SALTER:  May I, Your Honor?

8         THE COURT:  Yes.  Proceed.

9         MR. SALTER:  May it please the Court.

10                        DIRECT EXAMINATION

11   BY MR. SALTER:

12   **Q.**   Mr. Harvey, once the plaintiffs filed their lawsuit, did

13   the Secretary of State reexamine the DRE system?

14   **A.**   We did.

15   **Q.**   And what was the recommendation that was made to the

16   Secretary of State by the team that conducted that

17   reexamination in 2017?

18   **A.**   That the DREs in the voting system in the three counties

19   we examined performed flawlessly, recorded and reported every

20   vote as cast.

21              **(There was a brief pause in the proceedings.)**

22         MR. SALTER:  Your Honor, I would like to tender a

23   copy of the official certification.  And if I could approach

24   the witness with that.

25         THE COURT:  Yes.

1          MR. SALTER:  Approach, Your Honor?

2          THE COURT:  Yes.

3  **Q.  (BY MR. SALTER)**  Can you identify that record for me?

4  **A.**   Yes.  This is the report of the recertification of the

5  election system that we did at the end of 2017.

6          MR. SALTER:  Your Honor, I'm going to tender that as,

7  I think, Defendants' 2.

8          THE COURT:  Any objection?

9          MR. McGUIRE:  No objection.

10          MR. CROSS:  No objection.

11          THE COURT:  Admitted.

12  **Q.  (BY MR. SALTER)**  And did the Secretary accept the

13  recommendations that were made by the team that conducted that

14  examination?

15  **A.**   Yes, they did.

16  **Q.**   Talk to me about paper ballots because we're short on

17  time.  Is it possible to manipulate paper ballots?

18  **A.**   It is.

19  **Q.**   Can you describe some of the ways that you can remember as

20  you sit here today that paper ballots could be manipulated?

21  **A.**   Paper ballots could be -- they could be lost.  They could

22  be excluded.  They could have improperly marked ballots

23  inserted in them.  They could be forgotten.  They could be left

24  in trunks of cars.  They could be spoiled intentionally by poll

25  workers or people that were counting or other folks.  They

1    could be stolen or gotten unauthorized access, passed around.

2    Any number of ways.

3    **Q.**    Currently what is the percentage -- I know you may not

4    have it down to the number.  But can you -- are you aware of

5    the historical percentage that we would estimate for the number

6    of voters who would vote via a printed paper ballot election --

7    what you would expect that to be in the upcoming election?

8    **A.**    Between five to ten percent depending on turnout.

9    **Q.**    And assuming the Court were to mandate a primarily paper

10   ballot election with only narrow exceptions for people who have

11   disabilities or visually-impaired folks who need to use a DRE

12   machine for that, how will we execute a primarily paper ballot

13   election for the November 6, 2018, election and include early

14   voting if you would?

15   **A.**    How would we do that?

16   **Q.**    Yes.

17   **A.**    It would be -- it would be extremely difficult.  It would

18   require getting ballots printed, ordered, proofed, distributed.

19   One of the difficulties with paper ballots is that, you know,

20   when we went to a uniform voting system in the early part of --

21   well, 2002, we went from a system -- we went from a system

22   where there were basically three primary ways where people

23   voted, either optical scan paper ballot -- I'm sorry -- optical

24   scan, the punch card, or the lever machine.  And there was no

25   statewide system.

1           So while there are laws regarding optical scan ballots,

2     there are no uniform rules or laws regarding optical scan

3     ballots in Georgia, like we do have for DREs, like we do have

4     for absentee ballots, to the extent that it would govern

5     exactly how the ballots were handled and sealed and

6     transported, not nearly to the same degree that they are DREs.

7           So you would have to -- you would have to, first of all,

8     get the ballots.  You have to pay for the ballots.  You would

9     have to train the poll workers on using them.  You have to

10    devise a system to account for all of the ballots, to transport

11    the ballots.

12          It would be, I believe, impossible to conduct precinct

13    tabulation because we simply don't have enough optical scan

14    devices to tabulate at the precinct level.  So you would have

15    to take the ballots to a central location.  They would have to

16    be accounted for.  They would have to be scanned in.

17          The process would take considerably -- considerably

18    longer.  Results would be longer in coming.  We would have to

19    account for storage space with paper ballots.

20          There are lots of different things that come into play:

21    Equipment, privacy screens, tables, chairs, precinct setups,

22    polling places.  All of those things are something that have

23    not been thought about in elections in Georgia since before

24    2002.

25    **Q.**   Is early voting required by state law in terms of your

1   understanding?

2   **A.**   It is.

3   **Q.**   And when does early voting begin for this upcoming

4   November 6 election?

5   **A.**   On October 15.

6   **Q.**   Assuming a paper ballot requirement, how would paper

7   ballots -- let me back up.

8        How many different ballot combinations -- different ballot

9   combinations are there estimated for the next November 6

10  election?

11  **A.**   Oh, hundreds, if not thousands, throughout the state.

12  **Q.**   Could it be as many as 3000?  Does that sound --

13  **A.**   It wouldn't surprise me.

14  **Q.**   And so in terms of how would you conduct early voting --

15  if you are required to have early voting, how would you run a

16  secured chain of custody when you have to have each ballot

17  design available for the given district and for the given

18  voter?

19  **A.**   One of the advantages of advanced voting now with the DREs

20  from a convenience point of view is that you have got a

21  centralized ballot provider, which is the DRE.

22       Especially in large counties that have multiple ballot

23  size, you would have to have individual stacks of provisional

24  ballots that were identified by ballot style, by precinct.  And

25  you would have to -- as voters come in, you would have to have

1   the poll worker identify what ballot style it was, retrieve the

2   ballot, get it to them.  The voter would vote it.

3       The voting process would be the voter simply marking a

4   paper ballot with a pen or pencil.  But the logistical support

5   to go into that in a place like, you know, Fulton County that

6   would have hundreds of ballot styles for advanced voting, you

7   would need significantly more staff, significantly more space,

8   and, like I said, some of the auxiliary equipment.

9   **Q.**   There has been a mention of the Help America Vote Act

10  money, this $10 million.  Do you have an opinion as to whether

11  or not that money could be used to offset any costs regarding

12  an immediate conversion to paper ballots for November the 6th?

13  **A.**   We --

14          MR. CROSS:  Objection, Your Honor.  Foundation.

15          THE COURT:  I'm sorry?

16          MR. CROSS:  Foundation.

17          MR. SALTER:  I'm asking whether he has an opinion.

18  And we can get into it.  I will get there.

19          MR. CROSS:  He needs to answer that yes before he

20  offers his opinion.

21          MR. SALTER:  Yes.  That is fine.

22  **A.**   Could you reask the question, please.

23  **Q.**   **(BY MR. SALTER)**  Do you have an opinion as to whether --

24  an understanding of whether or not the state could use this

25  $10 million of money from the HAVA, Help America Vote Act,

1  grant money on a paper ballot election if we were forced to

2  immediately convert?

3  **A.**   I do have an opinion.

4  **Q.**   All right.  How did you come by that opinion?

5  **A.**   I asked -- we asked the EAC, the Election Assistance

6  Commission.

7  **Q.**   Okay.  And what were you told?

8  **A.**   We were told --

9       MR. CROSS:  Objection.  Hearsay.

10       MR. SALTER:  It goes to explain conduct, Your Honor.

11       THE COURT:  All right.  Go ahead.

12       Who were you told something by?

13       THE WITNESS:  I'm sorry?

14       THE COURT:  You said we were told.  Who were you told

15  by?

16       THE WITNESS:  We were told by Mark -- I believe his

17  name is Mark Abbott at the Election Assistance Commission.  He

18  is the one that is responsible for the disbursement of the

19  grants via email yesterday.  And we're told that that would

20  be -- in an audit that would likely not be a covered expense.

21  **Q.**   **(BY MR. SALTER)**  How would you -- can you describe for the

22  Court your feelings on the importance of public voter education

23  regarding any significant change to the voting system?

24  **A.**   Well, one of the -- in 2002 when the new system was rolled

25  out, there was a significant effort and expense of time spent

1    in educating voters about the new voting system.

2        I think it is important that if a change were to be made

3    that voters would be given as much advance notice as possible,

4    as much information as possible, as much opportunity to receive

5    whatever kind of training would be necessary so that the voters

6    would maintain a high level of confidence in the voting system.

7    **Q.**   Assume an immediate conversion somehow for the November

8    the 6th election.  How would that -- how would you expect --

9    based off your experience as election director for the last

10   several years at the Secretary of State, how would that affect

11   early voting?

12   **A.**   I believe it would reduce the number -- one of the first

13   things is it would reduce the number of early voting sites.

14   For the reasons I mentioned, the logistics of it would make

15   staffing a significant problem.  So I believe it would reduce

16   the number of advance voting sites.

17       I believe it would significantly increase the time that it

18   would take a voter to vote.

19   **Q.**   Why is that?

20   **A.**   Well, I think there is something -- I think there is kind

21   of a fundamental difference in interacting with paper and

22   reading something in a way that you are not familiar with.

23   When you have been voting on a screen for 15 years, I think

24   there is just a general interaction that operates differently.

25       You know, there may be issues with legibility, with

1    vision -- people being able to see the ballot.  So I believe it

2    would slow down voting.  I believe it would take a longer time.

3    I think it would lead to longer voting lines and possibly

4    discourage voters from participating in advanced voting.

5    **Q.**   What is your opinion about whether Georgia can rely on the

6    current optical scanning machines to tabulate votes?

7    **A.**   I think it would be an extraordinarily big lift to use the

8    current optical scans to conduct a statewide election.

9    **Q.**   Why is that?

10   **A.**   They are not designed to operate ballots at that level.

11   They make -- the companies make high volume scanners that can

12   scan hundreds or thousands of ballots at a time.  These are

13   generally designed to be done at the precinct level.  And there

14   is -- you know, they are not new technology.

15       I have had counties tell me that they have had just

16   difficulties with the physical operation.  They have rollers,

17   and they have -- they need to be cleaned.  And, again, it is

18   just a difficulty.

19       From a time perspective, it would increase the time to get

20   results dramatically.

21   **Q.**   Why not procure more optical scanning machines by

22   November 6?

23   **A.**   Well, it would be -- that would be a solution.  You would

24   have to find some.  They are not -- these aren't manufactured

25   much any more.  I believe our vendor has a very, very small

1    number.

2         So we would have to find them.  We have to go through a

3    procurement process.  We would have to get funds.  I say we,

4    the counties or us, however it was decided or directed.  We

5    would have to have funds to purchase these.  We would have to

6    get them into the state, get them acceptance tested, make sure

7    that they were ready to go, and get them to the counties.

8    **Q.**   Assume an immediate conversion for the purposes of this

9    upcoming November 6th election.  What is your opinion as to

10   whether that would increase or decrease the risk of human error

11   in terms of overall election security?

12   **A.**   I believe it would increase the possibility that voters

13   would --

14              MR. CROSS:  Objection, Your Honor.  Is this witness

15   being offered as an expert?  If so, what is it in?  Because we

16   are hearing a lot of opinions.  Or is this just a lay witness?

17              MR. SALTER:  I think he has basically got -- based on

18   his experience, he investigates human error and when it

19   happens.  And it does happen.

20              THE COURT:  Well, I don't know that he is an expert.

21   He can -- he can testify based on his experience in the

22   department and dealing with recollections as a lay witness.

23   But he is not an expert.

24              MR. CROSS:  Thank you, Your Honor.

25   **Q.**   **(BY MR. SALTER)**  When was the last election before DREs?

1   **A.**   The last election before DREs -- well, they went to DREs

2   in 2002.  So statewide it would have been, I guess, the 2000

3   election.

4   **Q.**   And if the uniform DRE -- if the system that we have that

5   is uniform were taken away, would there be a uniform system to

6   fall back on?  That rulemaking could be made for one uniform

7   system?

8   **A.**   There is not another uniform system for Georgia right now.

9   It is -- the uniform system is based on DREs.

10  **Q.**   If there was an immediate conversion to paper ballots, how

11  would --

12          THE COURT:  You can keep on going, but I don't know

13  whether your co-counsel planned to ask any questions.  You are

14  at about 16.

15          MR. SALTER:  Thank you, Judge.

16          MS. BURWELL:  I'll concede my time, Your Honor.

17          MR. SALTER:  That is all I have, Judge.  Thank you.

18          THE COURT:  All right.

19                          RECROSS-EXAMINATION

20  BY MR. CROSS:

21  **Q.**   Mr. Harvey, we have heard a number of times from the

22  defendants in this case that voters have a, quote, unlimited

23  right to vote by paper absentee ballot.  Do you agree with

24  that?

25  **A.**   Yes.

1   Q.   And the defendants have offered that as an alternative for

2   voters who don't trust the DREs and want to make sure their

3   vote is counted?  To vote by absentee?  Do you understand that?

4   A.   I do.

5   Q.   But do I understand you are saying that if every voter who

6   votes in the upcoming election were to vote in that manner the

7   state would not and could not comply?  You just couldn't handle

8   the volume of paper?

9   A.   Not exactly.  It would still be a challenge because we're

10  dealing with the same number of optical scans.

11       One of the big differences would be the actual voting.

12  When you vote by absentee, all the ballots come by mail into

13  the election office.  It comes in to a central place with

14  full-time staff and systems that are designed to process those

15  ballots as efficiently as possible, more efficiently than

16  generally happens at a polling place.  So that would be a

17  significant difference.

18       If this were to happen or if there were to be some type of

19  allocation that may allow for an earlier tabulation or

20  something, that may affect it also.

21       But the optical scan problem still exists.  You have these

22  machines that would have a very hard time.  But if the process

23  were to be spread out over time and that was acceptable, then

24  it would be -- it would be different than voting at the polling

25  places on paper.

Q.   So if all of the voters who cast votes waited until the final days to get their absentee ballots in, say roughly maybe 3 million votes, even though they have an unlimited right under the law to do that, do I understand correctly you are saying the state just simply could not and would not count those votes?  It would not comply with the law?

A.   No, sir, I'm not saying that at all.  I'm saying they would continue -- they would process those absentee ballots just like they do now.  There would be a lot more of them.  And it would take longer.

But the difference would be that you wouldn't be dealing with the polling place logistical difficulties that you would if they were voting on paper at a polling place and you had to account for all that stuff.

You know, the good thing about absentee voting is everything is right there and it goes out and it comes back right here -- you know, right back to the same place.  And there is a very solid structure set up for absentee voting by mail.  It has been in place and has been effective for several years.

Q.   Just so I understand, if those votes did come in in the final days, even all on election day, if every voter in the state decided to exercise that unlimited right on election day, 3 million paper came in, the state certainly would and could comply with the law to get those scanned in time to certify the

1  election; right?

2  **A.**   Yeah.  We would absolutely do everything and the counties

3  would too to make sure that those got processed.

4  **Q.**   Two final points.  We have heard a lot about the

5  difficulty of storage with the paper ballots; right?  That was

6  one of the things you mentioned?

7  **A.**   Yes, sir.

8  **Q.**   There are 27,000 DREs that you have to store across the

9  state; right?

10  **A.**   Correct.

11  **Q.**   Do I understand right that 500 paper ballots, assuming

12  each one is a single page, would be roughly about the size of a

13  ream of paper, 500 pages in a ream; does that sound right?

14  **A.**   Well, the ballots are -- they are a little bit longer

15  than -- 8 by 14, maybe legal size.  In some cases, maybe

16  18-inch ballots.  So they would be larger than a piece of

17  paper.

18  **Q.**   Same thickness, maybe a little bit longer?

19  **A.**   Probably a little heavier grade.  But I mean, not wildly

20  different.  I mean, we're not --

21  **Q.**   Sure.  Have you actually done the math to figure out how

22  much storage it would take if you had to store roughly

23  3.3 million paper ballots?

24  **A.**   Well, we would have to store twice that number because we

25  would have to have ballots for all of the voters.  So it would

1    be double that.

2        I have actually done -- I can't say I have done the math,

3    but I have done sort of the visualization.  If you think about

4    a box of paper as being 5000 pieces of paper, which I think is

5    the standard -- you know, we all know about the size of a box

6    of paper.  That is 5000 ballots.  And you go to, you know, a

7    county like Fulton County with 600,000 voters or Cobb County

8    with four -- Gwinnett County with 500,000 voters, that is a lot

9    of boxes, in addition to the DREs that they already have.

10            THE COURT:  But just thinking about the -- how much

11   for the ballots?  And then let's move on.  How many rooms for

12   ballots?  How many --

13            MR. CROSS:  I think I can help, Your Honor.

14   **Q.   (BY MR. CROSS)**  If we stick with the idea that it is,

15   let's say, double the thickness of a ream of paper, a little

16   bit longer, and you are working with 3.3 million ballots, would

17   it surprise you to learn that that would only come to about

18   1500 cubic feet?  About the size of two U-Haul trucks?

19            MR. SALTER:  Your Honor, I'll just object.

20   **Q.   (BY MR. CROSS)**  Would that surprise you?

21            MR. SALTER:  It is argumentative.  And in terms of

22   relevance, there is no probative value of this.  I don't want

23   to coach.  But there is -- this is -- the ballots are printed

24   by the county.  The cost would be incurred by the counties, not

25   the state.  They would have to do the storage.

1          THE COURT:  I understand.  He is just asking, since

2     the witness said he had looked at it, does that sound right to

3     you.

4          THE WITNESS:  It sounds approximately right.  The

5     other issue is not just storing the bulk ballots but storing

6     them in polling places overnight and things like that.

7          THE COURT:  I understand.

8     Q.   (BY MR. CROSS)  Last question, Mr. Harvey.  Are you aware

9     of studies finding that paper ballots are actually faster than

10    electronic voting machines?  Have you read those studies?

11    A.   I'm not aware of any.  I'm not aware of that.

12         MR. CROSS:  No further questions.

13         MR. McGUIRE:  Just very short.

14         THE COURT:  Be very short.  Because really -- is

15    there something you have to add because that is significant

16    really?

17         MR. McGUIRE:  I think it is.

18         THE COURT:  All right.  Ask your two questions.

19                         RECROSS-EXAMINATION

20    BY MR. MCGUIRE:

21    Q.   Mr. Harvey, you said Georgia doesn't have any scanners to

22    make this switch without burdening voters?  That is your

23    testimony?

24    A.   In polling places, yes.

25    Q.   Georgia has about 800 scanners roughly?

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1    **A.**    Approximately, yes.

2    **Q.**    Are you just guessing that it doesn't have enough, or did

3    you do some analysis?

4    **A.**    No.  I've spent a lot of time talking with county election

5    officials that actually do it.  I have seen -- I have been to

6    tabulation on election night and have seen the process of

7    scanning ballots and seen how long it takes.  And it would

8    be -- again, to say you couldn't do it is, you know -- is

9    different than saying it would take an exceptionally long time.

10   It may exceed the time for certification.

11   **Q.**    So it is fair to say that you don't have a number that you

12   think Georgia needs in order to make this possible?  You

13   haven't done an analysis that has that number?

14   **A.**    A number of what?

15   **Q.**    Number of scanners that would be required.

16   **A.**    That is correct.  I have not done that analysis.

17   **Q.**    You can't give the Court that information?

18   **A.**    No, sir.

19            MR. McGUIRE:  Nothing further.

20            MR. SALTER:  We'll call Michael Barnes next.  Thank

21   you, Mr. Harvey.

22            THE COURT:  I do have a question for the witness

23   myself.  If a lot more people were going to vote though, the

24   counties -- you would come up with the money?  If there was an

25   indication that there was an interest in a greater volume of

1    absentee ballots, the state would be responsible for getting

2    them printed; correct?

3              THE WITNESS:  Under the law, the counties are

4    responsible.

5              THE COURT:  But right now they are paying for it or

6    the state is paying for it?

7              THE WITNESS:  The counties pay for the paper ballots.

8              THE COURT:  They would have to do so?

9              THE WITNESS:  Right.

10             THE COURT:  Regardless of whether they had it in

11   their budget or not, they would have to be responsible?

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  I know you didn't -- that you were not

14   aware of what plaintiffs offered, this Exhibit 7.  But it does

15   deal with critical infrastructure and supposed hacking by the

16   Department of Homeland Security into the -- into the website of

17   the Secretary of State and you weren't consulted about this at

18   all?

19             THE WITNESS:  Not about this report.  I'm aware of

20   some of the circumstances around the DHS aspect of it.  And we

21   have certainly been involved in cybersecurity and those kinds

22   of issues.  As I believe you will see from other witnesses

23   about how that's sort of segmented some within the Secretary of

24   State's office.

25             THE COURT:  And is there somebody in the Secretary of

1   State's office who assumed responsibility other than it is

2   going over to the FBI for dealing with any of the issues that

3   arose as a result of the exposure of information that Mr. Lamb

4   provided?

5           THE WITNESS:  Secretary Kemp, ma'am.

6           THE COURT:  He did?

7           THE WITNESS:  He did.

8           THE COURT:  He did the evaluation?

9           THE WITNESS:  I thought you asked who assumed

10  responsibility.

11          THE COURT:  I'm sorry.  Then my question was -- he

12  assumed responsibility.  But is there some -- was there anyone

13  in the department or anyone who was hired to basically look at

14  the breadth of the issues or maybe there weren't that were

15  raised by Mr. Lamb's -- that experience and the fact that the

16  fact data field was open for six months at least allegedly

17  according to Mr. Lamb and then his colleagues that all sorts of

18  personal information was identified -- identifiable and

19  manipulatable in that time period?

20          THE WITNESS:  That would be Merritt Beaver, who is

21  our CIO in the Secretary of State's office.

22          THE COURT:  And Mr. Beaver, did he consult with you

23  about that at all?

24          THE WITNESS:  We consult regularly back and forth on

25  that stuff, yes, ma'am.

1     THE COURT:  So -- all right.  And this indicates --

2  this document -- and it may or may not be true -- but that at

3  least to the legislature that the secretary took the position

4  in a very active way that the election system is not a critical

5  infrastructure.  Is that still the position of the department?

6     THE WITNESS:  I don't believe so, ma'am.  At the time

7  when elections were declared critical infrastructure, nobody

8  knew what that meant, including the Department of Homeland

9  Security.

10     And since that time, there has been a lot of

11  development, a lot of consultation, and a lot of -- a lot more

12  specificity added so that people understand what critical

13  infrastructure is.

14     THE COURT:  Thank you.  Can this witness step down?

15     MR. SALTER:  Yes, Your Honor.

16     We'll call Michael Barnes, Your Honor.

17     COURTROOM DEPUTY CLERK:  Good afternoon, sir.

18     THE WITNESS:  Good afternoon.

19         **(Witness sworn)**

20     COURTROOM DEPUTY CLERK:  Thank you.  Please be

21  seated.  Please pull up close to the microphone.  You can

22  adjust it if you need to.

23     I'm going to ask you to just state your first and

24  last name again for the record, and please spell those names

25  for the record.

```
 1              THE WITNESS:  Michael Barnes.

 2    M-I-C-H-A-E-L B-A-R-N-E-S.

 3         Whereupon,

 4                        MICHAEL BARNES,

 5         after having been first duly sworn, testified as follows:

 6                        DIRECT EXAMINATION

 7    BY MR. SALTER:

 8    Q.    Just to verify, are you any kin to this gentleman right

 9    here at counsel table?

10    A.    I am not, sir.

11    Q.    Not related to Roy?

12    A.    I am not.

13    Q.    But you are from Mableton?

14    A.    I reside in Mableton, yes, sir.

15    Q.    When were you first employed by the Secretary of State's

16    office?

17    A.    I was first employed with the Secretary of State's office

18    in August of 1998.

19    Q.    Who hired you?

20    A.    Lewis Massey.

21    Q.    Kind of trace for the Court -- just kind of give the Court

22    a thumbnail sketch of your employment since.

23    A.    I started off with Secretary Massey as a special

24    assistant.  When Secretary Cox was elected in 1998, I stayed on

25    with the office as a special assistant.  I was promoted over to
```

1    the elections division in 2000 -- late 2001 as the assistant

2    director of elections.

3         I resided at the Secretary of State's office as assistant

4    director of elections from that time until June of 2005.  And

5    then I returned to the Secretary of State's office in January

6    of this year.

7    **Q.**   Where did you go in 2005?

8    **A.**   In 2005, I transitioned to be the assistant director for

9    the Center for Elections Systems at Kennesaw State University.

10   **Q.**   What was the idea behind creating this Center for

11   Elections Systems up at Kennesaw State?

12   **A.**   The center was brought to Secretary Cox in 2002 as a

13   training facility.  Then Professor Brit Williams, who was on

14   staff with the computer science department at Kennesaw State,

15   came forward to Secretary Cox and suggested that there needed

16   to be something available to poll workers, to county officials

17   across the state that was continually there to educate and help

18   assist counties as we transitioned to a uniform system.  Sort

19   of a continuing education process.

20   **Q.**   What were your job responsibilities in 2006 or -- excuse

21   me -- 2016?

22   **A.**   2016?  I was the director for the Center for Elections

23   Systems at Kennesaw State.

24   **Q.**   What did that entail?

25   **A.**   I was in charge of the overall day-to-day operations of

managing the employees there within the center, overseeing the

ballot building production operations within the center, the

production of the ExpressPoll data sets, the two primary

functions that the Secretary of State's office had entrusted to

the Center for Elections.

**Q.**   How do you build a ballot?

**A.**   It is a process that takes a substantial amount of time

given an election.  An election like what we have coming up

forward, the general election, we start building the databases

at approximately 90 days prior to the given election.

**Q.**   Where do you build the -- on what computer device do you

build the ballots?

**A.**   We have an air-gapped system within the Secretary of

State's office that holds our ballot-building information, our

ballot-building software.  And that is the system that is used

to produce that data output.

**Q.**   Is that ever connected to the internet?

**A.**   It is not.

**Q.**   Ever?

**A.**   Ever.

**Q.**   Has it ever in the time that you have been employed either

with the center -- with CES or any of your tenures before or

after in the Secretary of State's office -- to your knowledge,

has it ever been connected to the internet?

**A.**   Our ballot-building servers have never been connected to

the internet.

**Q.**   Are those ballot-building servers protected from anybody walking in and simply inserting a USB drive or a media into the device?

**A.**   The SOS server where the ballot-building information is housed today -- I don't even have access to that server.  It is within a locked environment that only the IT systems operators for the Secretary of State's office have access.

THE COURT:  I'm sorry.  What is your current position?

THE WITNESS:  I am the director for Center for Elections Systems at the Secretary of State's office.

THE COURT:  So you basically moved -- when the center got moved out of Kennesaw, you moved with them?

THE WITNESS:  Yes, ma'am.  I was the only one that was retained.

**Q.   (BY MR. SALTER)**  Mr. Barnes, are you aware of this issue regarding a website server at KSU in 2016?

**A.**   I am.

**Q.**   Can you describe what happened in your understanding?

**A.**   To the best of my recollection of those events that took place in August of 2016, we received a phone call -- we being the executive director at the time Merle King.  I did not receive the phone call -- received a phone call from Mr. Logan Lamb.

1    And he first introduced himself by saying that he was

2    directed to our center by Fulton County elections office, that

3    he had visited the election supervisor in Fulton County to

4    offer his services to Fulton County on tightening their

5    elections operations.

6    And the director for elections in Fulton County then

7    directed Mr. Lamb to the Center for Elections Systems at

8    Kennesaw State saying that if you wanted to learn more about

9    the voting system in Georgia that you would reach out to them.

10    He then let it known to us that he -- in his capacity he

11    did a scan of our web server and said that he found some

12    deficiencies with it and he would be interested in talking to

13    us about how he might help us address those deficiencies.

14    **Q.**   Can you describe whether what, if anything, regarding the

15    web server -- can you describe how many servers would have been

16    located at CES in Kennesaw in 2016?

17    **A.**   In 2016, we would have had three individual computers that

18    we would have referenced as servers.  We would have had our web

19    server, which was our outward phasing server, the one that was

20    penetrated by Mr. Lamb.

21    We had our ballot-building server, which is in our

22    air-gapped system where it was separated out from the internet

23    and no connection ever to that.  Yet it was networked to other

24    devices within the office and only within the office that

25    allowed our ballot-building teams to do their work and then

1    save that information back to that internal server.

2        And then the third server was the one that was used to

3    build the ExpressPoll data sets.  Those are the -- those are

4    the electors' list that reside on the ExpressPolls that are

5    used on election day.

6    **Q.**   Were the problems -- which servers did the problems that

7    Mr. Logan Lamb call to your attention affect?

8    **A.**   The web server.

9    **Q.**   Any of the other two?

10   **A.**   No, sir.

11            THE COURT:  I'm sorry.  The third server uses --

12   creates the ExpressPoll data sets; right?

13            THE WITNESS:  Correct.

14            THE COURT:  And is that linked to something?

15            THE WITNESS:  It is not.  It is also in the

16   air-gapped system.  It is not linked to anything external.

17            THE COURT:  But this is -- so I'm just trying to

18   understand the impact of it.  When we go and go to our precinct

19   and try to vote and they say, you are not listed here.  I don't

20   know who you are, and you insist that you are there, this is

21   the information they have?  They are working off of that?

22            THE WITNESS:  Correct.  The data set that is --

23            THE COURT:  That is worst case scenario.  I know

24   exactly who you are.  Yes, go ahead.  I have seen you a hundred

25   times.

```
 1            THE WITNESS:  The data set that is on ExpressPoll --

 2   that is a data file that has been generated and built and

 3   replicated.  We replicate that data file about 6000 times.  It

 4   is placed on compact flash memory cards that are then

 5   hand-delivered to the elections offices in each individual

 6   county.

 7            Then those data sets are placed into the

 8   ExpressPolls.  Basically it is an electronic electors' list.

 9   It contains not only the information for the polling location

10   that the device is assigned to, but it also has the polling

11   information for all other polling locations in use on that

12   election.

13   Q.   (BY MR. SALTER)  All right.  What, if anything, about this

14   web server issue in 2016 makes the election that would occur on

15   November the 6th less safe?

16            MR. CROSS:  Objection, Your Honor.  Speculation.

17   Foundation.

18            MR. SALTER:  He has got a foundation.  He makes --

19            THE COURT:  I think --

20            MR. SALTER:  He makes the memory cards.

21            THE COURT:  You need to make your question a lot more

22   specific than that.  I'm sorry.

23            MR. SALTER:  He understands the whole system.  He has

24   actually -- actually has the actual factual knowledge, and this

25   is the issue.  We have had a lot of talk and a lot of talk to
```

1    the media by their lawyers.

2            THE COURT:  You can ask a general question, but I'm

3    going to ask you -- we're just going to be potentially

4    wandering in the universe.  But go ahead.

5    **Q.   (BY MR. SALTER)**  What, if anything, about this web server

6    that ran the website for CES and the issues that were called to

7    your attention by Mr. Lamb in 2016 would make November 6th,

8    2018's election less safe?

9    **A.**   I cannot think of something off the top of my head that

10   would endanger the election in this coming November based upon

11   what was on that server.

12   **Q.**   Whether because of what happened in 2016 or simply because

13   of other reasons and/or steps we wanted to take to change the

14   security procedures at the Secretary of State, can you describe

15   kind of what has changed in terms of election security between

16   then and now?

17   **A.**   Since we transitioned to the Secretary of State's office,

18   first off, we have completely -- the Secretary of State's

19   office built a brand-new air-gapped system.  The air-gapped

20   system had been looked at by Kennesaw State after all of these

21   things took place.  And they agreed that the air-gapped system

22   was still tightly controlled, that there was no penetration

23   point in to that system.

24       But that system was not brought in and plugged in to the

25   Secretary of State's office.  The Secretary of State's office

1  built a whole new ballot-building air-gapped system for us to

2  use from preparing the databases for the given elections in

3  2018 and moving forward.

4      The distribution of the completed databases, first off,

5  before a completed database can be issued to a jurisdiction

6  that jurisdiction has to proof the database.  They have to

7  proof the ballot images.

8      Those images are now shared to the county -- they are all

9  PDF files.  But those PDF files are shared to counties through

10 an SOS-controlled FTP site.

11 **Q.**   Can you explain to the Court what that is?

12 **A.**   It is a secure file transfer process where the counties

13 have direct access to a single folder.  And then within that

14 folder, we would place the PDF files that are ballot proofs

15 that are reports from the generated database that allow them to

16 then proof the content of the database.

17     It also provides them a sign-off sheet that has to be

18 returned once they have proofed the database and found it to be

19 accurate for their needs for that given election.  Then that

20 sign-off sheet is returned to the Secretary of State's office.

21     We do not release the completed database until we have

22 that sign-off sheet validating that what we have built is what

23 the county needs.

24     Once we have that sign-off sheet, we then prepare a

25 database for delivery to the county itself.  And that data file

1    is password protected.  But we also place that data file on to

2    a CD, and then we encrypt the CD.  The CD --

3    **Q.**    Why do you do that?

4    **A.**    Just an extra layer of security to try to protect the

5    content of the data that is on that CD.

6    **Q.**    So can anybody -- in terms of how -- the memory cards that

7    go into the DRE machine for a particular election, how do those

8    get from -- can you give a quick understanding of how those get

9    from this secure air-gapped server under lock and key at the

10   Secretary of State's office to a machine?  Can you run the

11   traps on that process?

12   **A.**    It starts by the completion of the database, the CD that I

13   was just mentioning.  The CD has to be delivered to the county.

14   The county then takes that CD, and they load that CD directly

15   into their controlled GEMS computer, which is another computer

16   that is not networked to any external points.

17        From that server, the county then loads the database that

18   is on the CD.  Now, in order to access the CD, the county has

19   to call the Secretary of State's office and request the

20   passcode to access the database.  And we have -- for every

21   county, we have a folder with contact points.  And it is

22   expected that we will hear from those contact points at the

23   county.

24        The other item that we have placed on to the CD is a

25   verification code where the county provides that verification

1    code back to us before we release the password that accesses

2    the database.  If they cannot give us that verification code,

3    we don't give them the passcode.  We would -- we just send them

4    another CD.  We would not try to make it happen for them.

5        Once that -- once they have the proper passwords to access

6    the CD and load it on to their GEMS server, once it is loaded

7    to their GEMS server, then they are in control of creating the

8    individual memory cards that are used and inserted into the

9    voting machines.

10   **Q.**   If you are going to have a counting malicious virus on a

11   graphical interface like a DRE machine, what is the importance

12   of having the ballot design file in order to make that

13   malicious virus perform the way you attempted to?  Does that

14   make sense?

15   **A.**   I think it does.  I'll do my best to try to answer.

16       I believe you would want to know where the candidates are

17   positioned within the structure of the database.  It is not --

18   and I'm not a computer scientist.  And I don't claim to be.

19   And I have never written malicious code.  I'm not a -- I don't

20   write code.

21       But from a layman's perspective, if I were writing

22   something like that, it doesn't matter that the ballot says

23   Brian Kemp or Stacey Abrams.  It is the position of that name

24   within the structure of the database.  What is the ID that

25   correlates to it?

1          MR. CROSS:  Your Honor, again, we object.  This

2    witness is not an expert.  This is way beyond any foundation we

3    have heard from him.

4          MR. SALTER:  I think he is actually testifying

5    correctly.  I think you would actually need the actual ballot

6    design in order to know where to put --

7          THE COURT:  Well, I think he has so disclaimed

8    knowledge of computer engineering and not done malicious code

9    that -- with knowledge of that, I mean, I have allowed a lot

10   including the opining as to it couldn't have any impact on the

11   election.  And, you know, since he is -- I don't know what his

12   background is.  But he definitely has disclaimed being a

13   computer scientist or an expert on malicious code.  So I'm a

14   little bit hesitant --

15         MR. SALTER:  I'll withdraw that question.

16   **Q.   (BY MR. SALTER)**  In terms of -- have you spent the last --

17   how many years have you spent doing -- looking at holistically

18   election security as a system for the State of Georgia?

19   **A.**   I have been working with this voting system since it was

20   selected in 2002.

21   **Q.**   Are you aware of any instance in which a malicious code

22   was successfully installed on a DRE machine under election

23   circumstances?

24   **A.**   I am not.

25   **Q.**   During election circumstances?

1    **A.**    I am not.

2              MR. SALTER:  Thank you, sir.

3              THE COURT:  Are there any questions?

4                        CROSS-EXAMINATION

5    BY MR. BROWN:

6    **Q.**   Mr. Barnes, my name is Bruce Brown.  Just a few questions.

7    **A.**   Yes, sir.

8    **Q.**   You mentioned the ballot-building process.  The ballots

9    have already been built for the 2018 election; correct?

10   **A.**   We are currently in the ballot-building phase for the 2018

11   election.  As of this morning, we had -- of 159 county

12   databases complete, I think we were still waiting on sign-offs

13   from 15 of those.

14   **Q.**   And after the ballot-build is completed, you will move to

15   actually ordering printed ballots; correct?

16   **A.**   Counties actually have already -- those counties that have

17   signed off on their databases -- those counties have already

18   been delivered their databases.  They have already been in

19   talks with their printers to acquire their needed printed

20   ballots.

21   **Q.**   So if they needed more printed ballots, they already have

22   the template to do so and would simply need to order more

23   printed ballots from their printer; correct?

24   **A.**   I don't know yet because I don't know what the Court may

25   ask us to do, if I would have to readjust the databases that

1    have already been built.  So I don't know the true answer to

2    that question yet.

3    **Q.**    Why would you need to readjust the database for the

4    ballot?

5    **A.**    Because the current databases are not set up to tabulate

6    election day ballots through optical scan means.

7    **Q.**    So the provisional ballots aren't done that way?

8    **A.**    No.  The provisional ballots, within the database

9    structure, there are four counting groups.  There is the

10   polling day counting group, which is done through DRE.  There

11   is the advanced in-person counting group that is done through

12   DRE.  There is the absentee by mail, which is done through

13   optical scan.  Then there is the provisional that is done

14   through optical scan.  So two of those four have been

15   configured from optical scan use when you would be scanning

16   ballots centrally.  The other two have not been configured.

17   **Q.**    But in terms of absentee ballots or provisional ballots,

18   those could come from any precinct in any ballot style;

19   correct?

20   **A.**    I'm not sure what the question is.

21   **Q.**    Well, all I'm saying is that the state has anticipated

22   having to process using an optical scanner every single ballot

23   style; correct?

24   **A.**    The optical scan system is set up so that it can handle

25   any optical scan ballot from any precinct.  Yes, sir.

1   Q.   So what would be necessary with the switch to all paper

2   ballots is simply ordering more paper ballots; correct?

3            MR. SALTER:  Objection.  Go ahead.  I think it

4   misstates the testimony.  Go ahead.  I withdraw the objection.

5            THE COURT:  Thank you.

6   A.   The databases that -- the legislature states that we have

7   to count votes at the precinct level.  We have to be able to

8   know -- the state law says we have to count results of ballots

9   at the precinct level.

10       So we have to be able to calculate those at the precinct.

11   So additional work would have to be done on these completed

12   databases to make them available to tabulate votes not only at

13   the absentee level.  A ballot could be scanned and said yes,

14   this is a vote from this precinct from the absentee category.

15       But the way the databases are currently configured, I

16   could not scan a ballot that was collected on election day and

17   know that it was an election day ballot.

18   Q.   (BY MR. BROWN)  So if you were ordered by the Court to

19   switch to paper ballots, are you telling me that your team

20   could not construct the database sufficient to handle election

21   day ballots like you handle other ballots?

22   A.   No, sir, I'm not saying that at all.

23   Q.   That is good.  Now, let me go to your --

24   A.   What I would like to add to that is I would have to spend

25   some time adjusting the databases to make them able to do that.

1          Do I know how much time would be needed to do that?  I do

2     not.  Because we have never had to adjust a database in that

3     capacity before.

4     **Q.**   And in responding to our motion for summary judgment, you

5     haven't developed any estimates of the cost of that, have you?

6     **A.**   I have not.

7          MR. SALTER:  Objection.  Instead of summary judgment,

8     you mean preliminary injunction?

9          MR. BROWN:  What did I say?

10          MR. SALTER:  Summary judgment.

11          MR. BROWN:  We could convert it.

12          MR. SALTER:  I will say no.

13          MR. BROWN:  I misspoke.  In response to our motion

14     for preliminary injunction.

15     **Q.   (BY MR. BROWN)**  Has the Secretary's office done anything

16     to decontaminate the DRE machines since the KSU server was

17     accessed by Mr. Lamb?

18     **A.**   Can you explain your question?

19     **Q.**   No.

20          MR. SALTER:  It assumes facts not in evidence would

21     be the objection, Judge.

22          THE COURT:  Well, have you done anything to determine

23     whether there was a contamination or what was the issue

24     involving -- that Mr. -- what was the scope of the issue that

25     Mr. Lamb brought to your attention so you are able to know

1  whether it had the larger -- might have had a larger impact?

2          THE WITNESS:  What I can speak to is that the

3  computer that Mr. Lamb accessed did not contain any of the

4  ballot station software, the ballot station firmware, the GEMS

5  operating system, the GEMS executable files, those items that

6  are actually needed to create a GEMS database that are able to

7  populate a touchscreen with its ballot station operational

8  executable program.

9  **Q.   (BY MR. BROWN)**  And have you reviewed -- I know you are a

10 layperson like me.  But have you reviewed the scientific

11 submissions that have been made by Experts Bernhard or looked

12 at Mr. DeMillo's testimony as to their contrary view about the

13 way that an intrusion by Mr. Lamb or someone who did what he

14 did could contaminate the system?  Have you looked at that?

15         MR. SALTER:  Your Honor, I'll just object to that as

16 argumentative.

17         THE COURT:  Overruled.

18 **Q.   (BY MR. BROWN)**  Have you looked at that?

19 **A.**   I have reviewed them.  Have I analyzed them and read

20 through them for all content?  I have not.

21 **Q.**   Has the -- besides the gentleman whose slide we saw

22 earlier who was on the STAR commission -- no.

23         THE COURT:  SAFE.

24 **Q.   (BY MR. BROWN)**  The SAFE Commission.  Besides that

25 gentleman, has the Secretary employed a cyber security expert

1   to review those allegations to determine whether or not you

2   need to do something more?

3   **A.**   I know that the CIO for the Secretary of State's office

4   has been highly engaged in analyzing how our systems are set up

5   now within the Secretary of State's office.  Any additional

6   analyzation of that, I cannot speak to.

7   **Q.**   And what is his name?

8   **A.**   Merritt Beaver.

9   **Q.**   And is he here today?

10   **A.**   I believe he is.

11   **Q.**   And is he going to testify?

12   **A.**   I don't know the answer to that.

13          THE COURT:  Is he testifying -- Mr. Beaver -- today?

14          MR. SALTER:  You have got a declaration from

15   Mr. Beaver.  I showed it in my preliminary or opening

16   statement.

17          THE COURT:  My problem is I know that the -- it

18   doesn't answer the question that has been asked to many

19   different witnesses.  They just said they do things differently

20   now.

21          MR. SALTER:  That is what we want to show.

22          THE COURT:  That is all it says.

23          MR. SALTER:  Yes.

24          THE COURT:  But I don't really know in the end

25   then -- you are not able to say what the department did to

```
 1    fully get to the bottom of whether there -- how all sorts of
 2    personal information purportedly was available about voters
 3    that would be the sort of information collected on a -- for
 4    voting purposes -- why that would have been accessible to Mr
 5    Lamb.
 6              THE WITNESS:  I cannot speak to that.
 7              THE COURT:  And why his colleague said it continued
 8    to be available six months later.
 9              THE WITNESS:  I can't speak to that.
10              THE COURT:  And the department doesn't have any
11    information and you -- as the division of head of elections,
12    you don't have any information on that?
13              THE WITNESS:  Not on that, no, ma'am.
14              MR. SALTER:  What was that last question, Judge?  I
15    didn't hear that.
16              THE COURT:  It is a secret.  I will ask the court
17    reporter to repeat it because it is not.
18              Go ahead.  Can you do that?
19              **(The record was read back by the court
20              reporter.)**
21              THE COURT:  That was about the -- did you want her to
22    go back further?
23              MR. SALTER:  No -- yeah.
24              THE COURT:  About the -- how -- the question really
25    related to how was it that all of this sort of information that
```

1    was basic voter information and voter ID information that would

2    have been collected for the voter registration -- that he would

3    have -- it would have been available on this website and why it

4    would be still available on an open -- on an open access basis

5    six months later, not just to Mr. Lamb but to other researchers

6    who called and were concerned and reported it.  That was it.

7            MR. SALTER:  I'll hush in the interest of time.

8    **Q.    (BY MR. BROWN)**  Mr. Barnes, whether at KSU or at the

9    Secretary of State's office, did the Secretary of State

10   undertake any forensic examination of the computer systems that

11   were at KSU?  Any of them?

12   **A.**   I know that those servers were inspected by the FBI.  But

13   the Secretary of State, no, sir.

14   **Q.**   And so if they were -- if an intruder from Ahira or Moscow

15   had gone into the systems, the Secretary was not curious enough

16   to find out, was he?

17           MR. SALTER:  Objection, Your Honor.

18           THE COURT:  I'm going to overrule it -- I mean,

19   sustain the objection.  Let's just move on.

20           You've got more?

21           MR. CROSS:  I'm sorry?

22           THE COURT:  You have got more?

23           MR. CROSS:  I haven't questioned him yet.  But I'm

24   going to be brief.

25           THE COURT:  You better be.

CROSS-EXAMINATION

BY MR. CROSS:

**Q.**   Mr. Barnes, the KSU server that we talked about that Mr. Lamb accessed, that was wiped after this litigation was filed; right?

**A.**   Following university protocol, yes, sir, it was.

**Q.**   Following the university protocol but didn't Secretary Kemp's office characterize that as reckless, inexcusable, and inept?  Those were his words; right?

**A.**   I believe I have heard those before, yes, sir.

**Q.**   So I want to talk about the air-gapped or the GEMS server that you say is air-gapped.  Did I understand correctly you said that is networked to other devices; correct?

**A.**   The air-gapped system is on its own private network.

**Q.**   Is that a yes, sir, it is networked to other devices?

**A.**   It is networked to other devices in a private system.

**Q.**   And do those devices include PCs?

**A.**   Yes, sir.

**Q.**   Do they include laptops?

**A.**   No.

**Q.**   Do those PCs -- have the PCs -- well, strike that.

     The GEMS server that you say is air-gapped, it has a wireless access point; correct?

**A.**   It does not.

**Q.**   Do you believe that the GEMS server does not have a

1    wireless access point?

2    **A.**   The GEMS server within the Secretary of State's office

3    that I do my work on does not have a wireless connect point.

4    **Q.**   And you are saying that that network that it is connected

5    to -- the network has no wireless access point?

6    **A.**   Yes, sir.

7    **Q.**   And is that the basis for your testimony today in saying

8    that it is a secured air-gapped system?

9    **A.**   Yes, sir.

10   **Q.**   Do state workers --

11            THE COURT:  It is all connected by wire?  That is

12   what your testimony is?

13            THE WITNESS:  Yes, ma'am.

14   **Q.   (BY MR. CROSS)**  The GEMS network that was posted by KSU,

15   that would have a wireless access point; correct?

16   **A.**   It did not have a wireless access point.

17   **Q.**   So you are saying even at KSU there was no wireless access

18   point to the network to which the GEMS server was connected; is

19   that right?

20   **A.**   The GEMS servers at KSU was never on any network except

21   its private network.

22   **Q.**   Do state workers type in every race and candidates' name

23   into the GEMS server?

24   **A.**   Yes, sir.

25   **Q.**   So that is how the data gets loaded?

1   **A.**   Yes, sir.  It is all manual entry.

2   **Q.**   What version of Windows is used?  XP?

3   **A.**   Within our office, yes, sir.

4   **Q.**   On the GEMS server?

5   **A.**   The -- yes, sir.

6   **Q.**   And what is the most recent version of that?

7   **A.**   The most recent version of XP?

8   **Q.**   On the GEMS server.

9   **A.**   I would have to ask my CIO.

10   **Q.**   So you don't know?

11   **A.**   I do not know.

12   **Q.**   How recently was it patched?

13   **A.**   Again I would have to ask the CIO.

14   **Q.**   Do you know whether it was in the last year?

15   **A.**   I would have -- it was constructed in this year.  So --

16   **Q.**   But you don't know?

17   **A.**   I do not know what levels of security they have -- they

18   have surrounding that entire system with.

19   **Q.**   This removable media like flash discs, memory discs,

20   memory cards -- are those ever connected to the network to

21   which the GEMS server is connected?

22   **A.**   The only thing that is used to transfer data from the

23   private network over to distribution points is a single USB --

24   lockable USB drive.

25   **Q.**   Okay.  So this GEMS server network does have removable

```
1   media that is connected to it from time to time; correct?

2   A.   The removal media, yes, is used to take PDF files that are

3   generated as proofs to transfer over for county for proofing

4   purposes.

5   Q.   And what are all the devices that that USB device is

6   connected to?

7   A.   It is connected to a single computer in my office.

8   Q.   What is that computer connected to?

9   A.   That is our public facing process, but that is how it is

10  connected up to the secured FTP site.

11  Q.   What do you mean when you say public facing?

12  A.   It is my computer where I check emails and work and do my

13  daily business.

14  Q.   Okay.  So if you are checking emails, that computer is

15  connected to the internet; right?

16  A.   That is correct.

17  Q.   So you have got a computer connected to the internet that

18  then has a USB device connected to it.  You then take that USB

19  device, and you connect it to the network where the GEMS server

20  is connected; correct?  Yes?

21  A.   The USB drive that I move from --

22  Q.   Can you answer my question yes, sir?

23  A.   The USB drive that I move from the private network, I put

24  into a locked position, insert it into my public device, and

25  transfer data up to the secured FTP.
```

```
1          When that USB drive is removed from my computer and moved
2    over to the private network, it is reformatted before it is
3    used again.
4    Q.   Was the answer to my question yes?
5    A.   Do I move a USB drive from one unit to the next?  The
6    answer is yes.
7    Q.   From one unit connected to the internet to the GEMS server
8    network; yes?
9    A.   Yes.
10   Q.   Thank you.  The memory cards that are used in the 27,000
11   or so DREs around the state, are those at some point connected
12   to the GEMS network?
13   A.   When you say GEMS network, what do you mean?
14   Q.   Are they ever connected to the network to which the GEMS
15   server is connected?
16   A.   Ask the question again, please, sir.
17   Q.   The GEMS server includes the ballot definitions that
18   ultimately end up on the memory cards, which end up in the DRE
19   machines; right?
20   A.   Uh-huh (affirmative).
21   Q.   Yes?
22   A.   Yes.
23   Q.   Okay.  So how does the -- how do the ballot definitions
24   get from the GEMS server to the memory cards?
25   A.   The ballot definitions are first delivered to the county
```

1   on an encrypted CD.  The encrypted CD is then loaded directly

2   to the GEMS computer.  The GEMS computer then reads the data

3   file that is on the CD, loads it into the GEMS computer.

4       Then the GEMS computer is connected to a single

5   touchscreen unit through a local area network, hard wired,

6   wired together.  And then a memory card is inserted into the

7   touchscreen unit.  And the images from the database are

8   transferred through the touchscreen to the memory card.

9   **Q.**   So the memory cards are connected to the GEMS computer by

10  way of this other unit -- this other device?

11  **A.**   By way of the touchscreen, yes.

12  **Q.**   Now, it sounds like we have learned that in addition to

13  the USB device that goes from your computer to the GEMS network

14  there is additional removable media?  There is a CD that you

15  just mentioned that also gets plugged into the GEMS computer;

16  correct?

17  **A.**   Correct.

18  **Q.**   Are you aware of studies finding that a single memory card

19  infected with malware -- that malware can make its way into a

20  GEMS system through the sort of connection that you just

21  described?

22  **A.**   I have heard those studies, yes, sir.

23  **Q.**   Last point, you testified that you can't think of any risk

24  or any reason why Logan Lamb's access to this web server would

25  make the upcoming election or any election less safe; is that

1  right?

2  **A.**    Yes, sir.

3  **Q.**    Are you aware that he was able to obtain voter

4  registration databases filled with personally identifiable

5  information of over 6 million voters, driver's licenses, birth

6  dates, home addresses, the last four digits of Social Security

7  numbers, and more?  Did you know that?

8          MR. SALTER:  Objection, Your Honor.  Relevance as to

9  how that makes DRE less safe.

10          MR. CROSS:  Are we really arguing about what that is

11  all about now?

12          THE COURT:  Counsel is entitled to make his

13  objections, and I would ask the audience to be reserved.

14          MR. CROSS:  I'm sorry, Your Honor.

15          THE COURT:  I'm going to overrule the objection.

16  **Q.    (BY MR. CROSS)**  Were you aware of that, sir?  Yes or no?

17  Were you aware of that?

18  **A.**    Was I aware that we made mistakes at Kennesaw State?  Yes,

19  sir.

20  **Q.**    That is not my question.  I just identified several

21  categories of personal identifying information.  Were you aware

22  that Mr. Lamb was able to access that through this web server?

23  **A.**    I was aware that Mr. Lamb was able to see those files.

24  But to pull them down, I am unaware.

25  **Q.**    And do I understand that it is your view that a

1    sophisticated hacker like Russia could not affect the security

2    of the upcoming election at all with all of the information we

3    just identified?  No way they could do it?

4            MR. SALTER:  Objection.

5    **Q.   (BY MR. CROSS)**  Is that right?

6            MR. SALTER:  Objection as to how it relates to

7    putting a malicious virus on a DRE.  That is the issue.

8            MR. CROSS:  That is not the question that he was

9    asked by Mr. Salter.  We covered this.  And he insisted on a

10   very general, broad question.  You let him do it.  I am

11   impeaching him.

12           THE COURT:  All right.  Well, you can ask him the

13   question, and then we need to stop.

14           MR. CROSS:  Understood.

15           THE COURT:  Do you want him to repeat it?

16   **Q.   (BY MR. CROSS)**  So do I understand correctly --

17           THE COURT:  I'll just have the court reporter read

18   it.  Can you do that?

19           Go ahead.  Ask the question.

20   **Q.   (BY MR. CROSS)**  Do I understand correctly that you can't

21   think of any way -- I tell you what.  I'm going to make it

22   quick.  We'll make it easy.

23       Just so I understand, are you aware that Mr. Lamb was able

24   to access election management system GEMS databases?  Did you

25   know that before today?

```
 1              MR. SALTER:  Objection.  Assumes facts not in

 2    evidence.

 3              MR. CROSS:  It is in Mr. Lamb's declaration, which is

 4    part of the record.

 5    Q.   (BY MR. CROSS)  Did you know that before today?

 6    A.    The only election database that I was aware of that was on

 7    the server at the time that Mr. Lamb accessed the server was a

 8    training database that was used to educate local county

 9    election officials on how to use a voting system and also to

10    educate high school students on how to use it as well.

11    Q.   Did you know that he was able to extract passwords for

12    supervisors that controlled the administration of the DRE

13    voting machines?  Did you know that?

14    A.    The passwords that I am familiar with him accessing on the

15    website were for the ExpressPolls, not for the DRE machines.

16    Q.   So your understanding is that the only thing he got is the

17    ExpressPolls, not the administrator passwords that controlled

18    the administration of the DRE voting machines?  Is that your

19    understanding?

20    A.    It is my understanding that the only passwords that were

21    on that device were ExpressPoll passwords.

22    Q.   So given how little you understand about what Mr. Lamb was

23    able to access, that may explain why you can't see how that

24    could pose a risk to a future election.

25              THE COURT:  That is argumentative.  That is
```

1    argumentative.

2              MR. SALTER:  Can I ask one question I think the Court

3    would like to know the answer to?

4              THE COURT:  Go ahead, especially since I cut you off

5    on the one other question you wanted to ask.

6                        REDIRECT EXAMINATION

7    BY MR. SALTER:

8    **Q.**   You were asked one question -- Mr. Cross asked a

9    question -- I think it is pertinent for the Court -- about that

10   private network that was at KSU.  And you have some computers

11   that are directly networked to that closed network.

12        Do you know what I'm talking about?

13   **A.**   Uh-huh (affirmative).

14   **Q.**   Do those computers that are connected in -- do those PCs

15   have any sort of internet capability?

16   **A.**   They do not.

17             MR. SALTER:  Thank you.

18             No more for this witness, Judge.  Thank you.

19             THE COURT:  May this witness be excused?

20             MR. SALTER:  Come on down, Mike.

21             MR. BARNES:  Can we go to the bathroom for about five

22   minutes?

23             THE COURT:  All right.  I'll take a five-minute

24   break.

25             MR. SALTER:  Your Honor, just so you know for

1    housekeeping, I think Fulton County will call Mr. Barron, the

2    election director for Fulton County, and then we'll call

3    Secretary of State Cathy Cox.  We can get both of those.

4    Rebecca --

5              THE COURT:  All right.  There are a lot of people

6    here.  So even though I would like to say five minutes, please

7    try to get back in five minutes.  But I understand that there

8    are limits.  There are bathrooms on the 22nd floor, the 21st

9    floor in the same location.

10             COURTROOM SECURITY OFFICER:  All rise.  This court is

11   in recess for five minutes.

12             **(A brief break was taken at 4:09 P.M.)**

13             THE COURT:  Please have a seat.  Go ahead.

14             MS. BURWELL:  Thank you, Your Honor.  Fulton County

15   would call Cecilia Houston-Torrence.

16             COURTROOM DEPUTY CLERK:  Good afternoon, ma'am.

17   Please raise your right hand.

18             **(Witness sworn)**

19             COURTROOM DEPUTY CLERK:  Thank you.  Please be

20   seated.  Please pull up close to the microphone.  And you can

21   adjust that microphone as you need.  It is very important we

22   are all able to hear you today.

23             I'm going to ask you to state your name again for the

24   record, and please spell your first and last name for the

25   record.

1            THE WITNESS:  Cecilia Houston-Torrence.

2    C-E-C-I-L-I-A.  Houston, H-O-U-S-T-O-N, Torrence,

3    T-O-R-R-E-N-C-E.

4            THE COURT:  Just before we begin with your

5    examination, I wanted to ask counsel what is the projection of

6    the length of the testimony.

7            MS. BURWELL:  Ten minutes tops.

8            THE COURT:  All right.  Mr. Barron is still coming?

9            MS. BURWELL:  Yes.

10            THE COURT:  I got a little confused because of the

11    change.  I just wondered if there had been a change.

12            Very good.  Proceed.

13        Whereupon,

14                    CECILIA HOUSTON-TORRENCE,

15        after having been first duly sworn, testified as follows:

16                    DIRECT EXAMINATION

17    BY MS. BURWELL:

18    **Q.**   Ms. Torrence, are you a registered voter?

19    **A.**   Yes.

20    **Q.**   In what county are you registered?

21    **A.**   Fulton County.

22    **Q.**   Can you tell the Court about your background and

23    experience regarding voting in Fulton County?

24    **A.**   I have been voting in Fulton County since 1986.  I am past

25    president of the League of Women Voters, Atlanta, Fulton

1    County, a poll watcher -- and yeah.

2    **Q.**   When DREs were being recommended for use in Georgia, were

3    you selected to assist with testing the machines?

4    **A.**   Yes.  I was part of the team that tested out the initial

5    machines back in, I think, 2001, 2000.

6    **Q.**   Can you please tell the Court about that?

7    **A.**   Yes.  We were asked to go in, I guess, just more like a

8    focus group to test the machines for ease and see how easy it

9    was for us to use the machines and if we had any questions at

10   that time.

11   **Q.**   How many machines did you --

12   **A.**   There were about ten, I think, in the facility that we

13   were at.

14   **Q.**   So what was your impression of DRE machines at that point?

15   **A.**   I was -- it was much easier than I had anticipated.  And

16   all of our questions that we asked were answered.  So it was

17   fairly easy for us to use.

18   **Q.**   Did you have any concerns about the accuracy of DRE

19   machines at that point in time?

20   **A.**   Yeah.  Our initial -- I think all of us had concerns about

21   the accuracy of the machines.  And yeah, we did initially.

22   **Q.**   Did you ask questions about that?

23   **A.**   Yeah, we did.  We were concerned about, you know, the fact

24   that we did not have a paper receipt, but those were -- those

25   were all addressed.

1   **Q.**   So all of your concerns about it were addressed?

2   **A.**   Uh-huh (affirmative).

3   **Q.**   Now, has your impression of DRE machines changed at all?

4   **A.**   No.  I haven't had any change over the last 15 years.  And

5   I poll-watched for probably 10 or 12 years.

6   **Q.**   And when you are poll-watching, the machines that are in

7   use are the DRE machines?

8   **A.**   Yes.  The machines are, yes.

9   **Q.**   Do you have any concerns at all about DRE machines being

10   susceptible to tampering?

11   **A.**   No.

12   **Q.**   Are you planning on voting this November?

13   **A.**   Definitely.

14   **Q.**   Are you planning on voting using the DRE machine?

15   **A.**   Yes.

16   **Q.**   Do you trust that a DRE machine is going to accurately

17   record your vote?

18   **A.**   Yes.

19   **Q.**   Do you have any concerns about paper ballots?

20   **A.**   My concern about paper ballots was how many hands would

21   touch the ballots and the possibilities of them being

22   compromised by human error.

23   **Q.**   As a former president of the League of Women Voters, what

24   was your reaction when you first learned about this lawsuit?

25           MR. KNAPP:  Your Honor, I don't think she is speaking

1    on behalf of the League of Women Voters.  She is speaking on --

2            THE WITNESS:  That is correct.  I'm not speaking on

3    behalf of the League.

4            MS. BURWELL:  I wasn't suggesting that she was

5    speaking on behalf.  But given her experience in that role,

6    that was why the question started with that.

7            MR. KNAPP:  The same.  I don't think that is, first

8    of all, relevant to a point in time when she was involved back

9    in 2001.  I'm not sure what relevance that has to do with her

10   comfort in voting in 2018 as the prior line of questioning was

11   proceeding.

12           THE COURT:  I think we're kind of going far astray in

13   terms of the issues right now before us.  I mean, obviously

14   even by who -- the reaction of people here, there are lots of

15   people who have different views.  It is one of public concern.

16           MS. BURWELL:  Correct, Your Honor.  And because there

17   are declarations with respect to issues, Fulton County has the

18   obligation to bring before the Court all --

19           THE COURT:  All right.  You can simply have her do

20   it.  But I would have preferred if that is what you wanted to

21   do is just an affidavit.  But go ahead and ask one question and

22   then proceed.

23   **Q.   (BY MS. BURWELL)**  So are you concerned at all about issues

24   with respect to the November election and any impact?

25   **A.**   My only concern was that this is a historic election.  And

1    changing at this late a date might cause people to have some

2    reserve about voting.

3    **Q.**   Have you had any discussions with others about the

4    upcoming election or any concerns about it?

5            MR. KNAPP:  Objection.  Hearsay.

6            THE COURT:  Could you move beyond that.  I don't

7    think we can have her reporting on other people -- identify

8    other people's discussions with her about this.

9    **Q.    (BY MS. BURWELL)**  Given your experience as a poll worker

10   and your prior experience, do you have any information about

11   segments of the population who use early voting?

12   **A.**   Most of the people that I have experienced use early

13   voting are people that use public transportation, people that

14   can't -- can't get off to vote during regular hours, and they

15   take advantage of that opportunity.

16   **Q.**   So for you personally, would a change to a paper ballot at

17   this point in time this close to the election increase your

18   confidence in the election?

19   **A.**   No.

20   **Q.**   Okay.  Why not?

21   **A.**   I just think a change -- the timing.  I think the timing

22   on it for me initially when I heard about it was suspect.  Like

23   why now?  I just think that at this point changing it might

24   cause more chaos and be a little more hectic than the current

25   system that we have in place.

1    **Q.**   Do you have any concerns about a change to paper ballot

2    disenfranchising voters?

3    **A.**   That is a concern.  That is a major concern.

4    **Q.**   And what is your opinion on that?

5    **A.**   I just feel that we do everything we can to encourage

6    people to vote.  And any change might -- might cause people to

7    be more skeptical about the process.

8          MS. BURWELL:  Thank you.  I have nothing further,

9    Your Honor.

10         MR. SALTER:  Nothing for the state, Your Honor.

11                        CROSS-EXAMINATION

12   BY MR. BROWN:

13   **Q.**   My name is Bruce Brown, and I represent the Coalition

14   plaintiffs.  Just a few questions.

15         Would you agree that the county should not reduce the

16   number of voting centers for early voting for the reasons you

17   said; correct?

18   **A.**   Correct.

19   **Q.**   So that if an order is entered with respect to paper

20   ballots, you would agree that it would be appropriate to

21   include in that an order that the counties keep the number of

22   voting centers open for early voting as it has been in the

23   past; correct?

24   **A.**   Yes, sir.

25   **Q.**   You mentioned that you have a long association with the

1    League of Women Voters; correct?

2    **A.**    Yes.

3    **Q.**    And I'm going to hand to you --

4        MR. BROWN:  If I may approach the witness, Your

5    Honor.

6    **Q.**    **(BY MR. BROWN)**  -- hand to you what will be marked as

7    number -- Plaintiffs' 8.  And from time to time, the League of

8    Women Voters comes out with publications called Impact on

9    Issues and things like that; correct?

10   **A.**    That is correct.

11   **Q.**    And does this appear to be a selection of the League of

12   Women Voters Impact on Issues 2016 to 2018?

13   **A.**    It appears to be.

14   **Q.**    Let me turn your attention to the second page of this

15   exhibit, which is the 15th page of this publication.

16       And is it true that the League of Women Voters at their

17   convention in 2006 clarified their position that voting systems

18   should employ a voter-verifiable paper ballot or other paper

19   record?

20       MS. BURWELL:  Objection.  Foundation.

21       THE COURT:  I just think we have limited time.  I'm

22   not sure this is really -- unless this is something that you

23   feel is essential to your proceeding, I think we probably

24   should give it up.

25       MR. BROWN:  I'll take your lead on that.  Thank you.

```
 1              MR. KNAPP:  No questions, Your Honor.

 2              THE COURT:  All right.  You may step down.  Thank you

 3    very much for coming.

 4              MS. BURWELL:  Fulton County calls Richard Barron.

 5              COURTROOM DEPUTY CLERK:  Good afternoon, sir.

 6                   (Witness sworn)

 7              COURTROOM DEPUTY CLERK:  Thank you.  Please be

 8    seated.  Please pull up close to the microphone so we can all

 9    hear you.

10              I'm going to ask you to state your name again for the

11    record, and please spell your first and last name for the

12    record.

13              THE WITNESS:  Richard Barron.  R-I-C-H-A-R-D.

14    Barron, B-A-R-R-O-N.

15              COURTROOM DEPUTY CLERK:  Thank you, sir.

16         Whereupon,

17                        RICHARD BARRON,

18         after having been first duly sworn, testified as follows:

19                        DIRECT EXAMINATION

20    BY MS. BURWELL:

21    Q.   What do you do for a living, Mr. Barron?

22    A.   I am the Director of Registration and Elections for Fulton

23    County.

24    Q.   So that means that you oversee all of the election

25    activities for the county?
```

1  **A.**    I oversee all the elections that happen in Fulton County,

2  yes.

3  **Q.**    And in your position as elections director, are you aware

4  of any evidence that any Fulton County DRE machine has ever

5  been physically accessed by an unauthorized person?

6  **A.**    No.

7  **Q.**    And as the Fulton County election director, are you aware

8  of any evidence that any Fulton County DRE machine has been

9  remotely accessed by any unauthorized person?

10  **A.**    No.

11  **Q.**    And, again, as the election director, are you aware of any

12  evidence that the Fulton County GEMS server has been improperly

13  accessed?

14  **A.**    No, I'm not.

15  **Q.**    Are you aware of any evidence that any memory card used in

16  the Fulton County DRE machines has been improperly accessed?

17  **A.**    No.

18  **Q.**    Are you aware of any evidence that any memory card used in

19  Fulton County DRE machines has been infected with malware?

20  **A.**    No.

21  **Q.**    Are the Fulton County DRE machines connected to the

22  internet?

23  **A.**    No, they are not.

24  **Q.**    Are there written protocols for the handling of DRE

25  machines?

1   **A.**   Yes.

2   **Q.**   And can you tell the Court about that?

3   **A.**   Well, we have a chain of custody.  Whenever we prepare the

4   DREs before the election, they go through L&A.  We seal them.

5   They go out for delivery.  They are assigned to a polling

6   place.  They are delivered to that polling place.

7        Once they are delivered, there is a cable that runs

8   through them through the handles.  They are left in most

9   polling places in a locked room.  Some places those aren't

10  available.

11       But -- and then when the poll workers get there on

12  election day, they will -- or the day before when they set up

13  the machines, they get those ready.  The morning of election

14  day, they verify the seals with the DRE recap sheet based on

15  the serial numbers on the DRE units.  And also they verify

16  those against the wire seals.

17       They open those up, check to make sure there are no votes

18  on the machine.  And then voting happens throughout the day.

19  At the end of the day, they will record the number of votes

20  that are on there.  They reseal those -- first, they have to

21  accumulate the results.  The media cards are put into a sealed

22  bag, which would then go to one of our check-in centers.  And

23  then all of those machines come back to the warehouse.

24  **Q.**   Before any voting occurs, can you tell the Court where the

25  Fulton County DRE machines are kept?

1   **A.**   We have them in a warehouse.

2   **Q.**   And can you tell the Court about the security in the

3   warehouse?

4   **A.**   We have a warehouse that is protected by an alarm system.

5   It is also -- there is a locked door.  Then you go in -- there

6   is a second locked door with a keypad to get into it.

7       Once you get in there, all of the voting units are in

8   stacks like you would see at a Costco.  And in that area also

9   is our GEMS server and all of the other election equipment and

10  supplies.

11  **Q.**   Are the DRE machines sealed unless they are being tested

12  or used?

13  **A.**   Well, if they are -- we seal them once they are ready to

14  go out.  Once they have been tested, then we seal them.

15  **Q.**   So when you seal them, tell the Court what that means.

16  **A.**   We put -- there is a -- on the handle -- once the lid is

17  closed, we -- there are seals like a security seal with a seal

18  number on them, like a serial number.  And those are secured --

19  fastened through -- through the -- there is a hole in the

20  handles.  The only way that you can get into the machine is if

21  you cut that.

22  **Q.**   So is this seal made out of metal?

23  **A.**   Yes.

24  **Q.**   How is the serial number imprinted on this particular

25  seal?

**A.**    Well, it is a hard molded plastic.  And so the number is imprinted into the plastic.  You would have to file it off to get rid of it.

**Q.**    So that is on the external?  That is on the outside of the machine -- the seal?

**A.**    Yes.

**Q.**    And tell the Court about the chain of custody forms with respect to a particular machine.

**A.**    Well, each machine is assigned to a polling place.  So those -- those machines and the serial numbers and the seals are all on a DRE recap sheet.  And those are assigned their -- we have delivery teams that take those out to the assigned polling places.  Once they get there, they have to verify that what they are delivering is what is on that DRE recap sheet.

**Q.**    And can you tell the Court who delivers to the polling places for Fulton County?

**A.**    We have -- mostly it is firemen and some police officers that are off duty.

**Q.**    And are they familiar with the security requirements?

**A.**    Yes.

**Q.**    Including the chain of custody form?

**A.**    Correct.

**Q.**    Now, once a machine has been delivered to a polling place, can you tell the Court what the process is with respect to security once a machine arrives and is about to be used?

**A.**   Well, they are -- they are chained together like -- it is like a bike -- almost like a bike cable.  You would have to take a bolt cutter to get through it.  All the machines are secured together.

They are all sealed as I said before.  The poll workers have to take the chain off of it.  And then they set up the machines.  They would -- they also -- they have to verify the seals, as I said before, cut those seals if they all are fine.

If there was a machine that has been tampered with, if a seal has been cut, then that machine would be taken out of service.

**Q.**   Are you aware of any instance where a seal has been cut?

**A.**   No.

**Q.**   Okay.  So you said they would check the serial number?

**A.**   Correct.

**Q.**   Tell the Court what they are checking the serial number against.

**A.**   Well, before they go out on the DRE recap sheet, we record the seal number -- the security seal number on the DRE recap sheet.  So when the poll workers then get that, when they have the DRE recap sheet, they have their own copy that they pick up.

When they get to the polling place, they have to verify that those match, that the serial number on the DRE and the serial number on the security seal match.

1   **Q.**   Can you tell the Court how physical security is different

2   during early voting?

3   **A.**   Well, during early voting, we -- the machines are there.

4   We have early voting for 19 days.  So they are opened on the

5   first day of early voting.  And then they are resealed and

6   closed at the end of each day of voting.

7        They record the number of votes before they close it at

8   the end of the night.  The next morning they have to verify

9   that the same number of votes are on there.  And they also have

10  to verify the seal that was put on the night before.  It is on

11  there before they open it in the morning.

12  **Q.**   Is there additional physical security during early voting?

13  **A.**   Most of our early voting sites are in the libraries.  So

14  we have -- they are in locked -- they are in locked rooms.

15  **Q.**   And what about on the machine itself?  Is there any

16  additional security for the actual machine during early voting?

17  **A.**   We have -- well, this machine right here also has -- this

18  unit doesn't have it on there.  But Georgia has a specific

19  piece of equipment -- or it is a piece of metal that slides

20  over the lock on the side that would prevent tampering.

21  **Q.**   And that is placed on every --

22  **A.**   Every early voting unit.

23  **Q.**   And that is every night --

24  **A.**   Yes.

25  **Q.**   -- it is placed on there?

**A.**   Yes.  It is put on -- it is affixed to the unit before it ever leaves the warehouse.

**Q.**   Okay.  All right.  So it just stays on?

**A.**   Yes.

THE COURT:  How long are we going to be on the security -- the physical security of the machine?  Because, you know, I want you -- I obviously would like to complete this hearing today, and I thought there were other issues that he -- I'm not sure that these issues are necessarily in contest.  And I don't remember Mr. Barron's affidavit at the moment.  So --

MS. BURWELL:  Yes.  I'll move on, Your Honor.

THE COURT:  Thank you.

**Q.   (BY MS. BURWELL)**  Let's tell the Court about the memory card that is inside.  Can you tell the Court what security features are on the memory card?

**A.**   Well, the memory cards go in the side.  For example, during early voting, the door that was spoken about during the demonstration this morning isn't accessible.  Once the memory card is in there, we slide that metal piece down there.  And the only way to get that off until it gets back to the warehouse is to break the machine.

**Q.**   Are you aware of any instance where there has been a broken machine?

**A.**   No.

**Q.**   Now, is there a seal on the memory card?

**A.**   We have some identifiable information that we put on each of our memory cards before they're put into the machine.

**Q.**   Okay.  And can you tell the Court how that memory card and that identifying information works with the actual machine?

**A.**   Well, once it goes in there, it is -- it is paired with that machine.  It has already gone through L&A.  So it is ready to go into election mode.

If for some reason, as they said this morning, you take it out -- if somebody was to take it out, first they would have to get through the metal -- the outside portion of the metal that protects the door.  And if you pulled it out and you stuck another memory card in there if it is not -- if it is in election mode, the first thing that is going to happen is it is going to kick the printer on, especially if it is from a different database.

Each database is -- an election database is specific to that election.  So if someone wanted to -- if someone had access to a GEMS server, if it wasn't ours, they wouldn't be able to put a memory card in there and have it -- it wouldn't work because the machine wouldn't recognize it.

**Q.**   Is that because the memory card is tied to a particular machine in a particular precinct?

**A.**   It is tied to a particular election.  The only way it can be compromised is if somebody has access to our -- to our database.

```
 1                MR. CROSS:  Your Honor, I apologize.
 2      A.   Our server.
 3                THE COURT:  I'm sorry.
 4                MR. CROSS:  I have to object.  This is well beyond
 5      any foundation laid for -- he is giving it sounds like expert
 6      opinion on computer science at this point.
 7                THE COURT:  All right.  Are you a computer engineer?
 8                THE WITNESS:  No, I am not.
 9                THE COURT:  I think that we are going beyond his
10      expertise.  He can certainly say he doesn't think it happens.
11      But I don't know that he can be basically identifying the only
12      way something can happen as -- in terms of the computer science
13      here.
14                MS. BURWELL:  Well, Your Honor, this isn't computer
15      science.  This is the process by which the machines are
16      prepared, and this is the elections director.  And so he is
17      responsible for the machines and knowing how they work and
18      knowing how they are configured.
19                THE COURT:  Are you familiar, in fact, with all of
20      the computer science of how the machines are working and how --
21      is that true?
22                THE WITNESS:  I am not a computer scientist.  But I
23      know enough to rebut what was -- what is in the demonstration
24      this morning.  I watched the video of the professor.
25                And what Georgia has that he didn't say is that there
```

1   is -- we have a big piece of metal that protects it from being

2   manipulated during the day.

3            THE COURT:  All right.  You're talking though -- I

4   think that the point of the presentation was not that -- at

5   least as I took it, was not that somebody secretively

6   necessarily would just come in during the day but the fact that

7   it is, in fact -- it is subject to manipulation -- the data.

8            Maybe other people took something else from it, and I

9   understand that.  And maybe that is why we're spending so much

10  time on the physical apparatus.  But I absolutely accepted the

11  testimony that you got -- that you have some way of blocking

12  the -- physically of blocking somebody from putting a new card

13  in there as your routine process.  And I accept that.  But I

14  think going beyond that is -- I'm uncomfortable with.

15           MS. BURWELL:  Okay.

16  **Q.    (BY MS. BURWELL)**  Can you tell the Court about any

17  security measures you have put in place for the GEMS server?

18  **A.**    Well, it is an air-gapped server.  We have -- basically it

19  is never -- it is not connected to the internet.

20           MR. CROSS:  Objection, Your Honor.  Air-gapped is a

21  computer term.  This is also duplicative of what we have heard.

22  He can't possibly testify to whether the system is air-gapped.

23           MR. SALTER:  On behalf of the state -- may I on

24  behalf of the state -- go ahead, Kaye.

25           MS. BURWELL:  Your Honor, as the elections director,

1    Mr. Barron is testifying to the processes that take place --

2         THE COURT:  All right.  You have a GEMS computer in

3    your -- you have a GEMS --

4         THE WITNESS:  Server.

5         THE COURT:  Your GEMS server is not connected to the

6    internet you are saying?

7         THE WITNESS:  Correct.

8         THE COURT:  And all of the other counties have a GEMS

9    server?

10        THE WITNESS:  Correct.

11        THE COURT:  And you communicate with the GEMS server

12   from the --

13        THE WITNESS:  A warehouse.

14        THE COURT:  Well, no.  When you get a -- when you

15   get -- this disc -- because you have been here all day -- and

16   any other -- that has been testified about from the director of

17   elections for the state, you get that mailed or you get that

18   sent?

19        THE WITNESS:  We pick it up because of our proximity.

20   Yes.

21        THE COURT:  And others may have it mailed to them?

22        THE WITNESS:  No.  It is either -- it is usually

23   delivered from what I understand out by officers to the other

24   counties.

25        THE COURT:  There are 159 counties.

```
1              THE WITNESS:  Yes.

2              THE COURT:  And you are one of -- obviously the

3   largest one, and you get it.  And I guess the others have one

4   server, or do you have more than one server?

5              THE WITNESS:  We have one.

6              THE COURT:  You have one.  And then that server

7   has -- you are saying has absolutely no interface at all --

8              THE WITNESS:  Correct.

9              THE COURT:  -- with the web or anything else like

10  that?

11             THE WITNESS:  (Witness nods head affirmatively.)

12             THE COURT:  You are just running it based on the

13  information that is on the disc is your testimony?

14             THE WITNESS:  Correct.

15             THE COURT:  And there is -- and that server never

16  interfaces at any other time -- it is completely -- it is not

17  wireless you are saying?

18             THE WITNESS:  Correct.

19             THE COURT:  So it is only used for this particular

20  purpose you are saying?

21             THE WITNESS:  Yes.

22  Q.   (BY MS. BURWELL)  There is a security system where the

23  GEMS server is?  A security system?

24  A.   Yes.  We have two cameras that are pointed at it.  And

25  then we also -- I mean, we have the alarm system and the
```

1    keypad.

2    **Q.**   Let me ask you now about the financial impact of the

3    proposed use of paper ballots.  Can you speak to that?

4    **A.**   If we were ordered to go to paper ballots with our active

5    voter count -- it is about 752,000 registered voters.  We would

6    probably -- because you have to have enough ballots on hand for

7    100 percent turnout.

8         In Georgia, there is no limit in the code as to if a voter

9    makes a mistake how many times they can go back and correct

10   their ballot.  Therefore we would probably need to order a

11   million ballots.  And you are talking about 40 cents a ballot.

12   So that would be $400,000 for Fulton County.

13   **Q.**   What other expenses would there be other than just the

14   cost of the ballot itself?

15   **A.**   Well, just to get -- I think the biggest cost is going to

16   be the -- it depends on how we count those ballots.  For

17   example, it took us -- our absentee ballots, we began on

18   election day morning in the presidential election at 7:00 A.M.

19   And we had 30,000.  We only have 45 optical scan units in

20   Fulton County.

21        Just in the most recent election, we had -- during L&A

22   testing, 19 of them went down, which they have been out -- sent

23   out for repair.  It took us until 5:00 Wednesday to count

24   30,000.

25        So I heard testimony earlier that it takes three seconds

1    to run these through.  If you have a perfect ballot and those

2    things are running in a perfect condition, you might be able to

3    get some of them.  Sometimes it takes a ballot to go through

4    four or five or six times before the scanner reads it.

5    **Q.**    Have you estimated how many scanners you think you would

6    need if you had to potentially scan up to 700,000 ballots?

7    **A.**    We would need -- well, if we're going to precinct scan and

8    do our absentee, we would need 250 scanners.  We have -- we

9    have -- we'll probably have 45 ahead of this election.

10         I talked to ES&S, our vendor.  They only have 55 left for

11   the entire state.

12   **Q.**    And so you told us that you had 41, and 19 are out for

13   repair.  So if you were to get the ones that ES&S has, you

14   would end up with about how many?

15   **A.**    If all of them are working on election day, we would -- we

16   would have 100.  But none of the other counties would be able

17   to increase their inventory.

18   **Q.**    So you would have 100 even though you think you would need

19   250?

20   **A.**    Correct.  Because if we have to run those through at the

21   warehouse, I would estimate it would take a week at least to

22   count those ballots.  That is probably running teams 24 hours a

23   day.

24         I don't know how many of those -- you are going to have

25   ballots that aren't going to run through.  They are going to

1    have to be remade.  You would have to have teams that are going

2    to have to determine the intent on some of those.  You are

3    going to have ballots that are going to be marked incorrectly.

4        You are going to have all sorts of things come up.  We

5    definitely would not meet the time to canvass if we --

6              THE COURT:  When you say time to canvass, what do you

7    mean?

8              THE WITNESS:  We are given until -- we have to -- by

9    the Monday after the election, we have to canvass the election,

10   which is to declare the results official.

11             I don't -- unless everything went absolutely perfect,

12   I couldn't guarantee that we would finish by Monday.

13             THE COURT:  So what happens if you can't?

14             THE WITNESS:  I guess that is up to Mr. Harvey.

15             THE COURT:  I mean, Fulton County has had problems

16   with its elections before.  Has it always been able to declare

17   the results by that canvassing deadline?

18             THE WITNESS:  I think before I came here there were a

19   couple of times before when they had a difficulty, yes.

20             THE COURT:  But they proceeded to ultimately have the

21   actual results declared; right?

22             THE WITNESS:  Correct.  But they -- yeah.  They have

23   never done it with --

24             THE COURT:  Under you?

25             THE WITNESS:  No.  You are going to have a lot of

1  really unhappy candidates and elected officials if they have to

2  wait that long.

3          I mean -- speaking for myself, I'm under significant

4  pressure to get those results out by no later than 11:00 just

5  by elected officials in my county.

6          THE COURT:  11:00 on --

7          THE WITNESS:  On election night.

8          THE COURT:  And on any election night?  Because I'm

9  just trying to think about people waiting the night of the

10 sixth district runoff.  There was -- the Fulton County machines

11 went down that night; right?

12         THE WITNESS:  Not the runoff.  In the first --

13         THE COURT:  In the first one?

14         THE WITNESS:  Yes.

15         Well, what happened in that election was we had three

16 different databases that we had to use.  We had one for south

17 Fulton, the Roswell election runoff that was in April.  We had

18 to produce -- we had to have a -- we had to have a CD 6

19 database, and we had to have one for Johns Creek.  So we had

20 those three -- we had to run three different databases.

21         And Fulton County is different than all the other

22 counties in that we have check-in centers because the county

23 has so many precincts.  They are spread out all over the -- it

24 is 75 miles from one end to the other.

25         Therefore we had to use three databases because of

1    all of these different timelines that came down upon us when

2    the elections could get -- when they could get programmed.  So

3    once we had those on election night, every time we had to

4    switch between databases.  If we wanted to bring in CD 6,

5    because we modem our results in --

6                THE COURT:  CD 6 means?

7                THE WITNESS:  Congressional district six.  If we

8    wanted congressional district six results to come in, we had to

9    have all five check-in centers modem those results in.  We had

10   everything color-coded depending on whether it was a CD 6 media

11   card or whether it was a City of Roswell, south Fulton card, or

12   whether it was a Johns Creek card.  Those were all color-coded

13   and separated.

14              What happened on election night was when we had shut

15   the -- we had a City of Roswell card.  It got put into one of

16   the machines, and it entered in to the congressional district 6

17   database.

18              So when we went to run the results, it wouldn't kick

19   it out.  I mean, it wouldn't tabulate because it said there was

20   an error.  The problem with our system now is that the error

21   messages are gobbledygook.  They don't tell you what the real

22   error is.

23              But what it did show that night was that if you stick

24   a media card in there that is foreign to the database, because

25   the Roswell database was separate from the CD 6 one, the

results came in and that database wouldn't accept it.  So even

though it took us -- when we went -- when we asked the state,

you know, what does this -- this error mean, they weren't sure.

The guy in my warehouse that is in charge of all the machines

figured it out.  We got --

THE COURT:  Was that before or after 11:00 at night?

THE WITNESS:  Oh, that was probably going from 11:00

to 12:30.  Yeah.  So, anyway, what it did -- I mean, it was a

big pain.  But what it did prove was that the system works and

that it doesn't read results from -- one database can't go into

another.

THE COURT:  Thank you.

**Q.   (BY MS. BURWELL)**  Do you know how you would transport --

if you had to have this million ballots how you would transport

them before and after the election?

**A.**   How we're going to transport them?  I haven't -- the last

time I did -- I did some paper ballot elections when I was a

director in Texas.  And you -- the poll workers pick the

ballots up.  They are sealed in boxes.  And the ballots go out

with the poll workers.  And they take them home until election

day.  They will pick them up on a Sunday.  And then they take

them home until election day.  That is how we did it there.

**Q.**   In Texas?

**A.**   Yes.  The same thing would have to happen here.

**Q.**   Well, there would have to be processes put in place?

1    **A.**   Right.  There would have to be a number of things put into

2    place.  It would be a really tough thing to do given this time

3    frame.

4    **Q.**   And they are --

5             MR. CROSS:  Your Honor, I'm sorry to interject.  We

6    have been going on for half an hour with this witness.  We seem

7    to be treading ground that we have covered with other

8    witnesses.

9             THE COURT:  Is there an affidavit from Mr. Barron?

10            MS. BURWELL:  I tried not to cover the things that

11   were in his --

12            THE COURT:  How much more do you have?

13            MS. BURWELL:  I'm almost finished.

14            THE COURT:  All right.

15   **Q.**   **(BY MS. BURWELL)**  When is early voting scheduled to begin?

16   **A.**   October 15th.

17   **Q.**   Is it likely or unlikely that you could get everything in

18   place if you were -- if it was determined that paper ballots

19   need to be used?

20   **A.**   The problem with using paper and early voting is that you

21   have to have every ballot style available.  And poll workers,

22   even though a lot of them are good, they are notorious about

23   giving out the wrong ballot during early voting because they

24   have to pick from what in Fulton County would probably be

25   400 -- 450 ballot styles.

1          And it is very easy to give out the incorrect ballot.

2    That was always the Number 1 complaint that we had in Texas.

3    And it just -- it was -- it was amazing no matter what you did

4    how many times you would get that complaint.

5    **Q.**   Okay.  So if given that, how would you handle early voting

6    in terms of numbers of locations and places?  What do you think

7    you would need to do?

8    **A.**   I don't think I -- I would probably cut the number of

9    early voting sites down to a minimum.  Either just have it at

10   the government center or maybe have it at our annexes as well.

11   But no more than three places.  I just don't -- there are too

12   many headaches.

13   **Q.**   What about training for an election using paper ballots?

14   **A.**   We have already begun our online training.  Our poll

15   workers go through online training, as well as in-person

16   training.  The online training has already started.  As far as

17   the -- we're going to begin soon the in-person training.

18          We would have to rewrite all of our procedures.  And the

19   manuals -- we try to get those printed before training.  I just

20   don't see that it is -- at this point at this late date, I

21   don't see how it is reasonable to expect any of the counties to

22   do that.

23   **Q.**   Would you need ballot boxes at each precinct if you went

24   to paper ballots?

25   **A.**   Yes.

1   Q.   Do you know how many ballot boxes you would need?

2   A.   Well, we are going to need at least -- it depends on -- we

3   have 183 polling places, 377 precincts.  So you are talking --

4   we would need at least 250 to 300 ballot boxes.  Some of them

5   are going to -- it just depends on the turnout.  I mean, we are

6   going to have to have extra ballot boxes out there because some

7   of them are going to overflow.  And they would have to be

8   sealed during the day, and we would have to open up a new one.

9       Now, if we had precinct counters in some of them, we

10  could -- I don't even know if the optical scan units can mount

11  on to -- they can mount on to like a big huge box where the

12  ballots drop in to that.  I don't know if those are available.

13  Q.   For purchase for use?

14  A.   Correct.

15  Q.   What impact would having a few -- how many early voting

16  locations are you expecting to have currently using DRE

17  machines?

18  A.   We have 20.  And then we're going to have up to two

19  outreach locations per day going.

20  Q.   So if you cut that down to three locations, what impact

21  will that have on election day?

22  A.   We're going to have -- the lines are going to be -- we're

23  going to have longer lines.  It usually takes longer to vote a

24  paper ballot from what I have witnessed over 19 years because

25  it just -- people are coloring those ovals in.  It takes longer

1    than it does to press -- press the screen and scroll through a

2    screen.

3    **Q.**   Are you required to keep track of all paper ballots?

4    **A.**   Yes.  You have to do -- we would have to design some

5    new -- I mean, it would basically be an accounting -- like an

6    accounting sheet.  You know, it is not going to be that hard to

7    design it.  But you have to make sure that you account for all

8    of the unvoted ballots, the voted ballots, any ballots that are

9    spoiled during the day if the voter makes a mistake,

10   provisional ballots.

11              MS. BURWELL:  I have nothing further, Your Honor.

12              MR. SALTER:  Nothing from the state, Your Honor.

13              THE COURT:  All right.  Can you-all possibly

14   consolidate your questions -- the sides -- or have you already

15   divided territory?

16              MR. CROSS:  We have divided these up.

17                    **(There was a brief pause in the proceedings.)**

18                         CROSS-EXAMINATION

19   BY MR. CROSS:

20   **Q.**   Mr. Barron, you talked about dealing with the election

21   results from the April 2017 sixth district special election;

22   right?

23   **A.**   Yes.

24   **Q.**   You said you had to modem the results in; is that right?

25   **A.**   Yes.

1  **Q.**   And by modem, you mean a computer modem?  Just sending the

2  results in over the internet; right?

3  **A.**   No.  It is an old analog -- they are analog phone lines.

4  **Q.**   So what does the modem connect to?

5  **A.**   They go from our -- from -- all of the machines that we

6  have, we have card readers up at our check-in centers.  Those

7  go into a phone line that we have at the check-in centers.

8  They are assigned phone numbers -- modem phone numbers into our

9  server.

10 **Q.**   They are assigned phone numbers into the GEMS server?

11 **A.**   The GEMS server.

12 **Q.**   Mr. Barron, do you honestly not understand that hackers

13 can get into the GEMS server through the phone modem?

14 **A.**   That is extraordinarily difficult to do.

15 **Q.**   You are not a computer scientist, are you?

16 **A.**   No.  But I have asked people with the expertise about it.

17 And it would take an extraordinary effort to even do that.

18 **Q.**   You've never heard of hackers -- okay.  It is fine.

19      But your GEMS server is connected to phone lines?  We're

20 clear about that.

21 **A.**   These are analog phone lines.

22 **Q.**   All right.  So it is not air-gapped?  Let's just be clear.

23 Correct?

24 **A.**   Yes, it is.

25 **Q.**   You think a GEMS server that is connected to phone lines

1  is air-gapped?  That is your understanding of air-gapped; is

2  that right, sir?

3  **A.**   Yes.

4  **Q.**   Thank you.  You mentioned something about you got error

5  messages from the election night reporting system that were

6  gobbledygook; is that right?

7  **A.**   Uh-huh (affirmative).

8  **Q.**   Yes?

9  **A.**   Yes.

10 **Q.**   Thank you.  You talked about the challenge of poll workers

11 handing out the right paper ballot.  But poll workers have to

12 figure out which electronic ballot voters use on a DRE;

13 correct?

14 **A.**   Yeah.  They do that on the ExpressPoll.

15 **Q.**   Right.  So -- but because there is no hard copy of the

16 ballot that is voted by any particular voter on a DRE, we

17 actually have no idea how often a voter gets the wrong ballot

18 on a DRE; right?

19 **A.**   Usually -- I mean, we do get -- we do get complaints here

20 and there about that, yes.

21 **Q.**   On the DRE?

22 **A.**   Yes.  It is just that over 19 years when you get -- use a

23 paper system the number of complaints go way up.

24 **Q.**   Mr. Barron, you actually have concerns about the existing

25 electronic system because of the age of the software; correct?

1    **A.**   I would like a new system.

2    **Q.**   Well, let's be clear.  In your view, you don't find it

3    defensible to keep defending year 2000 software on these

4    systems; correct?

5    **A.**   Well, I mean --

6    **Q.**   That is your view; right, sir?

7    **A.**   It is old.  Correct.

8    **Q.**   I'm going to ask the question again.  Is it in your view

9    that it is not defensible to keep defending year 2000 software

10   on these election systems; right?  You have said that; right?

11   **A.**   I have said something similar, yes.

12   **Q.**   We can pull up the article.

13   **A.**   Yeah, you can get it.  I know what you are talking about.

14   I don't remember exactly what my quote was.

15   **Q.**   But I've accurately characterized what you said?

16   **A.**   Probably.

17   **Q.**   I'm trying to save time here, sir.

18          MR. CROSS:  Pull the email up.

19   **Q.**   **(BY MR. CROSS)**  Last thing -- oh, sorry.  Two more things.

20   We'll move quick.

21       Mr. Barron, can you see what is on the screen?  There

22   should be a monitor behind you if that is easier.  This is an

23   email that you sent on May 15 of 2017; correct?

24   **A.**   Uh-huh (affirmative).

25   **Q.**   Yes?  I'm sorry.  You have got to say yes or no.

1   **A.**   What was the question?

2   **Q.**   This is an email you sent on May 17th of -- May 15 of

3   2017?

4   **A.**   Yes.

5   **Q.**   Okay.  Do you see you wrote in that second paragraph there

6   was -- let me give the context.  There was an error that

7   occurred with some memory cards around an election at this

8   time; right?

9   **A.**   Uh-huh (affirmative).

10  **Q.**   Yes?

11  **A.**   There was --

12  **Q.**   There was an error that occurred with some memory cards in

13  Fulton County around this time; correct?

14          THE COURT:  Could you sit down.  You can sit wherever

15  you want, but sit down.  Thank you.

16  **Q.   (BY MR. CROSS)**  A disagreement arose between you and

17  Secretary Kemp as to who was responsible and how it got

18  handled; is that fair?

19  **A.**   Well, I don't know that I had any -- any contact with

20  Secretary Kemp about it.  But what I was saying was that

21  basically we -- we didn't have the choice of how many databases

22  we were going to run.  And --

23  **Q.**   Mr. Barron, I'm just asking:  You had a different view

24  than the one you understood to be expressed by Secretary Kemp

25  concerning how this happened?

1    **A.**    I don't remember what his view was.  But --

2    **Q.**    Okay.  Here is what you wrote.  Secretary Kemp is out of

3    line for thinking this violated any rule or law.  He has never

4    run an election and has no clue how to run one.  This very old

5    system, year 2000, coupled with the state forcing multiple

6    databases on us should be investigated.  The new voting systems

7    out there would have prevented this human error.

8        That is what you wrote on May 15 of 2017 from your

9    official Fulton County work account; correct?

10   **A.**    Right.  Correct.

11   **Q.**    Last question or last point, sir:  At least as of June of

12   2017, the Secretary of State's office was using an FTP site to

13   share election-related files with the counties, including

14   Fulton; right?

15   **A.**    I believe so, yes.

16   **Q.**    And that is still true today; right?

17   **A.**    Yes.  An FTP site?

18   **Q.**    Yes.

19   **A.**    Yes, we get PDFs from it.

20   **Q.**    Yes?

21   **A.**    Yes.  PDFs.

22   **Q.**    On FTP?

23   **A.**    Yes.

24            MR. CROSS:  Thank you.

25                        CROSS-EXAMINATION

1   BY MR. MCGUIRE:

2   **Q.**   My name is Robert McGuire, Mr. Barron.  Good afternoon.

3        So, Mr. Barron, you described a very elaborate process it

4   sounds like that goes into setting up DREs, servicing them,

5   breaking them down, securing them.  It sounds like it takes a

6   lot of labor; is that right?

7   **A.**   Yes.

8   **Q.**   And it sounds like obviously those are people who are

9   working for you?  You have to pay them?

10  **A.**   Correct.

11  **Q.**   And if you didn't have to use DREs, all of that labor and

12  those costs would be freed up for you to use on other things;

13  yes?

14  **A.**   Yeah.  It depends on what system we have.  Yes.

15  **Q.**   And, secondly, you talked a lot about the physical

16  security that you used, the processes you used to keep the DREs

17  secure.

18       You would admit that no physical security system is

19  perfect; yes?

20  **A.**   Correct.

21  **Q.**   But your folks would do just as good a job of securing

22  paper ballots as they would have of securing DREs; yes?

23  **A.**   Yes.

24            MR. MCGUIRE:  No further questions.

25                      REDIRECT EXAMINATION

1    BY MS. BURWELL:

2    Q.   Mr. Barron, do you have money in your budget to cover the

3    cost of paper ballots, ballot boxes?

4         MR. CROSS:  Your Honor, this is beyond the scope.  We

5    really need to move on.  None of us asked any questions about

6    this.  She doesn't get to do another direct.

7         MS. BURWELL:  He brought up the issue of money.  That

8    is why I'm asking him about that.

9         THE COURT:  I think that -- I think that -- I'm going

10   to -- I think the parties will probably agree that everyone's

11   budgets are set.  But I have already asked what happens as it

12   is if you got a -- if you ended up with independently 15,000

13   more people voting by absentee ballot, somebody would have to

14   get those ballots out regardless if it was in the budget.  You

15   can't prevent people from voting.

16        MS. BURWELL:  Right.  But there is a difference

17   between 15,000 additional votes and 700 --

18        THE COURT:  I think the parties -- the plaintiffs

19   ought to be able to stipulate, frankly, that the budgets were

20   set before.

21        MR. BROWN:  That is correct, Your Honor.

22        THE COURT:  And they did not make an allocation for

23   this; is that right?

24        MR. BROWN:  We have no contrary evidence, Your Honor.

25        THE COURT:  All right.  Fine.

1          MR. BARNES:  And the State of Georgia has not.  We

2    are required at appropriation from the General Assembly.

3          MR. BROWN:  If a hurricane hit and prevented the DREs

4    from being used, Georgia law would provide the paper ballots

5    and the State of Georgia would pay every dime for those.

6          MR. BARNES:  That -- you --

7          THE COURT:  All right.

8          MR. BARNES:  Could or would.

9          THE COURT:  I'm going to -- wait a second.  This

10   witness is not going to resolve that.  You inserted that.  And

11   I understand why you did.  But the fact is they agreed as to

12   Fulton County.  And so that is what the question was.

13         So does that take care of the rest of your follow-up?

14         MS. BURWELL:  Just one other.

15   **Q.   (BY MS. BURWELL)**  You had talked about the modem results.

16   Those results were temporary; correct?

17   **A.**   Yes.

18   **Q.**   Ultimately you still have to rely on the actual memory

19   cards?

20   **A.**   Correct.

21         MS. BURWELL:  Thank you.  Nothing further.

22         THE COURT:  May this witness step down?

23         MR. SALTER:  No objection, Judge.

24         Your Honor, with your permission, we will try to get

25   in former Secretary of State Cathy Cox.

```
1              THE COURT:  I want to say, just so it doesn't get
2     lost, I'm admitting all of the documents.  Some of them
3     you-all -- about Exhibit 7, it still looks like it is an
4     official document.  If you think it is not -- so I'm going to
5     say all exhibits because I can always give no weight to an
6     exhibit or later on determine it is of no value.
7              As to Plaintiffs' Exhibit 7, you have been in the
8     hearing all day.  Please email Ms. McConochie or put -- I tell
9     you what.  File a notice in the morning by 11:00 whether you
10    are admitting that it is, in fact, what it purports -- what it
11    seems to be, which is a publication of the Secretary of State's
12    office, Brian Kemp, as a legislative update critical
13    infrastructure and DHS hacking attempts.  I can't tell the
14    exact date.  But it appears to be -- have been given to the --
15    as a legislative update in 2007.  And I would think you would
16    be able to determine that.  If it is not real, then tell me
17    that.
18             MR. BARNES:  I think the objection is this was a
19    presentation made to the committee, a legislative body.
20             THE COURT:  I understand by the Secretary of State's
21    office.
22             MR. BARNES:  No.  No.  No.  The Secretary of State's
23    office didn't make it.  Oh, they did.  I'm sorry.  They did.
24             THE COURT:  It says Georgia Secretary of State.
25             MR. SALTER:  I think you are thinking of the other
```

1    presentation.

2         THE COURT:  It has the Secretary of State's office

3    seal.  I would understand otherwise.  So I would just -- you

4    know, it may be worth nothing.  But I'm just trying to move

5    through there.  All right.

6         MR. SALTER:  Understood, Judge.  We'll move along.

7    Thank you.

8                    **(Witness sworn)**

9         COURTROOM DEPUTY CLERK:  Thank you.  Please be

10   seated.  Please pull up close to the microphone, and you can

11   adjust it if you need to.

12        I'm going to ask you to state your first and last

13   name again for the record, and then spell those names for the

14   record.

15        THE WITNESS:  My name is Cathy Cox.  C-A-T-H-Y C-O-X.

16     Whereupon,

17                       CATHY COX,

18     after having been first duly sworn, testified as follows:

19                   DIRECT EXAMINATION

20   BY MR. SALTER:

21   **Q.**   I think most people know you, Ms. Cox.  But can you

22   explain -- can you describe -- kind of give the Court a

23   thumbnail sketch of your education and career.

24        That is broad I know.  I'm just trying to move fast.

25   **A.**   I grew up in Bainbridge, Georgia.  I attended and

1    graduated from Abraham Baldwin Agricultural College, University

2    of Georgia, and Mercer Law School.

3         I was elected to the Georgia House of Representatives in

4    1992, elected Secretary of State in 1998, reelected in 2002.  I

5    serve currently as the dean of Mercer University School of Law.

6    **Q.**   And were you a Secretary of State elected to the State of

7    Georgia?

8    **A.**   Yes.  Twice.

9    **Q.**   And what responsibility did you have in the capacity --

10   well, give me your terms of service as Secretary of State for

11   the State of Georgia.

12   **A.**   First elected in 1998 and reelected in 2002.  So 1998 to

13   2006.

14             MR. SALTER:  And this is -- we're not going to use

15   this exhibit up on the wall.  We're not going to put this into

16   evidence, Judge.

17   **Q.   (BY MR. SALTER)**  But can you -- I don't know if you can

18   read that, Ms. Cox.  But if you want to step down, feel free

19   to.  But one of the things I wanted just for you to explain to

20   the Court was kind of how you -- did you have a role in

21   designing the current election system that we are using with

22   DREs back in 2000, 2001?

23   **A.**   Yes, I did.

24   **Q.**   What was that role?

25   **A.**   Well, it started after the 2000 presidential election when

1    the country was really focused on Florida.  And the recounts

2    started in that presidential election, and it was clear that

3    Florida had a real mess on their hands.

4         And so we undertook a study to determine whether we had

5    had similar problems.  And as we jumped into that, we found

6    that we had a lot of problems.  So we instituted a more formal

7    study of exactly what happened in Georgia in the 2000 election

8    and made that report then to the Governor and the legislature

9    determining that Georgia had actually lost more votes

10   proportionally than Florida had in the 2000 election, which was

11   really stunning to us.

12        But the number that we lost would not have changed the

13   outcome of the vote in Georgia.  So the media really was not

14   paying much attention to the error rate in Georgia as they were

15   in Florida where the results were much closer.  But to us it

16   was really horrifying to know that we had lost almost 94,000

17   votes in that 2000 election.

18        So as Secretary of State --

19            THE COURT:  When you say by lost, you had no record

20   of them?

21            THE WITNESS:  We could tell that people voted, but

22   there was no vote registered in the presidential election,

23   which is highly unusual because that is why you have a higher

24   turnout in every presidential election because almost everybody

25   has an opinion on the presidential race.  They may not vote for

1   any other race.  But they are going to cast a vote and have an

2   opinion on the presidential race.

3          So to know that close to 100,000 people went to the

4   polls, cast a vote, but no vote registered was a major problem.

5   We had four different types of election equipment at the time.

6   So we began in earnest a real study of what had happened and

7   what we might be able to do about it.

8   **Q.   (BY MR. SALTER)**  When we talk about lost votes, can you

9   tell the Court -- can you define an undervote for the Court's

10  benefit?

11  **A.**   Well, in a generic sense, an undervote means that someone

12  cast a ballot but their choice did not register.  It could not

13  register at the time in 2000 because we had four different

14  types of ballots being used in Georgia.  It could mean that on

15  a paper ballot -- we actually had two counties that were using

16  the old bed sheet size paper ballots in 2000 -- that they maybe

17  double-marked a race or it appeared that they marked two

18  candidates.  So, technically, that might be called an overvote.

19  But in the generic sense of our report, it would mean that vote

20  didn't -- was voided.  So there was no vote cast in that

21  particular race.

22          On an optical scan ballot at the time, there were two

23  different types of optical scan systems.  There was one where

24  you filled in a bubble.  There was another type that had an

25  arrow out beside a name.  And the voter literally had to draw a

line to connect the ends of an arrow, which was a very unusual

system.

     And if they mismarked it -- sometimes they would put an X

in the bubble instead of filling it in, and the scanner might

not read it.  We saw ballots where people would circle the

candidate's name and not fill in the bubble.  For whatever

reason, a host of different types of reasons, a choice would

not register.

     So depending on the type of equipment, the bottom line is

their choice would not register.

**Q.**   Several of the different systems that Georgia was using at

the time could be made to show undervotes that were essentially

lost votes; is that fair?

**A.**   That is right.  Of course, we had the hanging chads on

punch card machines in a lot of larger counties.

**Q.**   I was going to -- describe for the Court the different

systems that the -- the report --

          THE COURT:  Is that really worthwhile at this point?

So we don't have -- I mean, no one is here challenging the fact

at this point that there was a decision made to change the

voting system in 2001.  We are just sort of back up at this

point in time.

          MR. SALTER:  The point, Your Honor --

          THE COURT:  And I think you did provide a good

summary of the history of --

1          MR. SALTER:  I just want to make sure that -- you

2     know, sometimes the Eleventh Circuit doesn't take my word for

3     it.  You know, the opinion of counsel is not evidence.  So I

4     want to make sure that it is in the record.

5          THE COURT:  All right.  Go ahead.

6     **Q.   (BY MR. SALTER)**  Can you describe the four different

7     systems that -- in the last election before DREs, the 2000

8     election, there were four different systems in place.  Can you

9     describe those for the record?

10    **A.**   There were two counties that were still using the literal

11    paper ballots that were large -- we called them bed sheet size

12    ballots.  There were a number of counties that were still

13    using -- I think numerically more counties were using the

14    refrigerator-sized lever machines than any other type of

15    equipment.

16         Some of the larger counties were using the punch card

17    ballot.  Then a number of counties had moved to the optical

18    scan -- one of the two types of optical scans.

19         So four different types.

20    **Q.**   What kind of -- the idea being -- did Georgia have

21    experience -- before DRE machines were instituted and we had

22    this system designed around them in 2002, do we have a uniform

23    body of rulemaking that we can refer to immediately for use in

24    the November 6th, 2018, election?

25    **A.**   Before 2000 -- before we passed the laws in 2001, it was

1    every county unto themselves.  So it was -- that is why it was

2    a real hodgepodge.  Every county could choose their own

3    equipment.

4        And procedures were -- there were some procedures spelled

5    out in the code, but it was really up to the counties to sort

6    of administer elections.

7    **Q.**   I want to read to you just Page 10 of that.  Let me ask.

8    You issued two reports.  What were the names of the public

9    reports?

10   **A.**   The first report was based on the study we did after the

11   2000 election, which was called a Wake-up Call or something.

12   I'm not sure I remember the full title.  But the second report

13   after we put in to place a 21st Century Voting Commission was a

14   report of that commission.

15   **Q.**   Who was on that commission?

16              MR. CROSS:  Your Honor, I just want to put an

17   objection on the record, and hopefully we can move on.  But

18   we're talking about circumstances 20 years ago.

19              MR. SALTER:  That is right.

20              MR. CROSS:  That is --

21              MR. SALTER:  The point is in terms of the relevancy

22   issue, David?

23              MR. CROSS:  It is not relevant.

24              MR. SALTER:  Thank you.  May I respond to the

25   relevancy objection, Your Honor?

```
 1              THE COURT:  Yes.

 2              MR. SALTER:  We don't have anything to go back to.

 3    That is the whole point.  We don't have a uniform system to go

 4    back to if you take this away.  We never rulemade for the

 5    counties.  If you take this system away, we don't have anything

 6    to go back to.

 7              Their whole idea is the representation --

 8              MR. BROWN:  Your Honor --

 9              MR. SALTER:  May I finish?

10              The representation in the plaintiffs' motions is we

11    already have the framework.  The point is you take this away

12    and we don't.  That is the whole point.

13              MR. BROWN:  Your Honor, it is not our representation.

14    I was reading from Mr. Harvey's letter to all the counties that

15    said we do have it and if there is an emergency or if it is

16    unsafe everybody will use paper ballots.  It wasn't -- it is

17    not our position.  It is our quoting their directions to the

18    counties.

19              MR. SALTER:  Presumably --

20              MR. CROSS:  The only point -- if I can also respond

21    too.  I agree with everything that Mr. Brown said, and I will

22    just say this.  The position that the state boils down to today

23    is that if there were a power outage on election day, hurricane

24    or what have you, that they could not run an election.  That

25    is, with all due respect, a ridiculous position to take.
```

```
 1              As Mr. Brown points out and I believe this witness
 2     will testify, the intended alternative was paper ballots.  So
 3     to say that there is no framework is just an absolute mistake
 4     of the law.  This is not relevant to talk about how paper
 5     ballots were dealt with 20 years ago.
 6              MR. SALTER:  May I proceed, Your Honor?
 7              THE COURT:  You can.  But I think you need to curtail
 8     this some because I think -- I don't think that there is a
 9     great deal of -- going to be a great deal of dispute about
10     this.  And I think all of this could have been provided in a
11     response.  And if you want to provide it by affidavit, I would
12     be willing to do that.
13              MR. SALTER:  This is expounding on something that is
14     in a declaration generally.  It is in Chris Harvey's
15     declaration.  I wanted to point out just the history in terms
16     of whether or not we could go back to something.
17              THE COURT:  Move through so we can --
18              MR. SALTER:  I think I've made that point.  We'll
19     move on to a different subject.
20     Q.   (BY MR. SALTER)  Madam Secretary, Ms. Cox, one of the
21     things was in the 21st Century -- I want to read this to you
22     and ask you about it.  The Secretary of State's office
23     undertakes a more detailed analysis of undervote data, which I
24     think is the lost votes you were just speaking to, focusing on
25     differences that occur from precinct to precinct within the
```

1    same county using the same equipment.  The study finds that

2    while undervoting is almost always more common in predominantly

3    African-American precincts, the gap between black and white

4    undervoting rates is actually highest not in punch card

5    counties but in counties using optical scanning equipment.

6         Can you talk about what y'all drew from that in terms of

7    the recommendations that were made to the General Assembly in

8    2001?

9    **A.**   This was very surprising data to us to find -- Number 1,

10   to find because optical scanning equipment in 2001 and '2 was

11   the newest type of equipment being used.  So there was a

12   presumption that it is newer, it must be better.

13        But when we found from the study in 2000 that some of the

14   highest error rates in individual counties actually came from

15   optical scan votes, then we dug deeper to say what is really

16   going on here.  And then we would look precinct by precinct

17   within some counties.

18        For example, statewide the 94,000 votes that we couldn't

19   account for, that represented three and a half percent of our

20   total vote.  But we found error rates in individual counties

21   using optical scan that were many -- 21 counties that were over

22   5, many that were over 9 and 10.  Some as high as 15 percent of

23   their votes that wouldn't register on optical scan equipment.

24        And then when we broke it down precinct by precinct, we

25   found significant -- significantly higher rates between

1    majority minority precincts and majority white precincts on

2    optical scan equipment.

3         So there was a clear difference either in age or

4    educational levels.  We didn't have the psychological

5    statistical means to dig much further into what the exact cause

6    was beyond that glaring difference.  But that undervote gap was

7    largest among optical scan equipment over any of the other

8    types of --

9              THE COURT:  Optical scan of ballots?

10             THE WITNESS:  Of ballots.  Of any of the other types

11   of equipment then in use in 2000.  So some great racial or age

12   or educational experience difference in that type of equipment

13   over any of the others that were being used.

14             THE COURT:  Did you control for any other factors?

15             THE WITNESS:  We just looked at the data and the

16   outcomes.

17   **Q.   (BY MR. SALTER)**  Ms. Cox, plaintiffs argue that the system

18   we have now with the DREs is not auditable.  How would you

19   respond to that?

20   **A.**   Well, it depends on how you define an audit.  If you had a

21   pure audit, I would assume you would violate the secret ballot

22   that is required by Georgia's Constitution.  Because you would

23   need to track a ballot back to every individual and make sure

24   their vote was tracked and counted, which would be

25   unconstitutional.

1       But there are so many checks and balances in the system

2   from the paper certificate that a voter fills out in the

3   polling place that has to balance out at the end of the day

4   with the number of votes cast to the numbered list of voters

5   when voters check in and you know the number of people that

6   check in at any given precinct.  All of those things have to

7   add up at the end of the day with the tapes that run off of

8   individual machines and that are posted in every polling place.

9   So there is an audit process --

10          THE COURT:  That is just the total volume of the

11  votes?

12          THE WITNESS:  Right.

13          THE COURT:  That doesn't really go to though the

14  actual -- the sorts of issues, in fact, you in some ways might

15  have gotten with the 94,000, that maybe some votes were

16  erroneously captured or improperly moved to one category

17  versus --

18          THE WITNESS:  No, it could not tell a vote that

19  moved.  But --

20          THE COURT:  You couldn't then.

21          THE WITNESS:  But the numbers all have to add up at

22  the end of the night in terms of how many votes are cast within

23  an individual precinct.  And that kind of balancing act is done

24  at every election.

25  **Q.   (BY MR. SALTER)**  There is a -- in the law, there is

1    this -- there is -- the certification by the Secretary of State

2    was crafted into this -- the kind of statutory design in terms

3    of DRE machines; correct?  And there is a certification that

4    they are safe and secure; right?

5    **A.**    Yes.  That is correct.

6    **Q.**    There is also this language that was argued today about

7    impractical in terms of voting machines.  Do these two concepts

8    relate in terms of how the DRE machine election system works?

9    The impractical standard and the safe and secure certification?

10   **A.**    The safe and secure certification I think is Code Section

11   418 maybe -- 21-2-418, something like that, where anybody can

12   ask the Secretary of State before an election to say they have

13   some doubts about the election.  And the Secretary of State is

14   then -- if ten or more electors request, the Secretary of State

15   has to go back and recertify that the equipment is safe and

16   does accurately record votes, which I believe was done earlier

17   this year based on that kind of request.

18        There is a code section -- I think it is 21-2-334 which

19   has the language about if the use of a voting machine is

20   impractical -- this is what is in my view being misunderstood

21   because voting machine as used in the Georgia election code is

22   a term of art that is defined in 21-2-2 as a refrigerator-sized

23   lever machine.  So voting machine is a lever machine.

24   **Q.**    That is not just a term of art that is undefined?  It is

25   defined in the code?

1    **A.**    It is defined in 21-2-2.  What you see before you is not

2    called a voting machine in the election code.  That is called a

3    direct recording electronic device.  So that code section that

4    uses the language that if a voting machine becomes

5    impracticable to use then you can go to paper ballots doesn't

6    even talk to this.  That code section was adopted in 1964 when

7    lever machines were put in place.  It was tweaked in 1998 in a

8    small way --

9    **Q.**    Which is before all this happened?

10   **A.**    Before any of this happened.  It hasn't even been touched.

11   So that code section doesn't even apply to DRE machines.  Now,

12   there is a code section in 4 --

13           THE COURT:  You know, I think that Ms. Cox is a

14   spectacular lawyer.  But I mean, I'm not sure that this is

15   proper testimony for her as -- I mean, she is testifying about

16   her experience as Secretary of State.  And I respect her

17   judgment and her thoughtfulness and always have.

18           But I'm not sure it is proper for her to be basically

19   trying to educate me about -- though I appreciate it -- her

20   view of the law.

21           MR. SALTER:  We are calling it to your attention.

22   The Court is obviously going to be the ultimate decider of the

23   law.  I think Rule 703 allows us to explain this in terms of

24   the architecture of the system and the way it is designed.  But

25   ultimately, of course, the Court is always the ultimate decider

1      of law.  We don't dispute that, Judge.

2               I'll move on.

3               THE WITNESS:  One thing if I could clarify my answer.

4      The one difference is there is one other code section that does

5      apply to DREs that says if a machine -- if a DRE malfunctions

6      then you could use a provisional ballot for that particular

7      machine.

8               It doesn't contemplate a statewide replacement of a

9      voting system.  It is just if something happened to that

10     machine or in that polling place, like electricity went out in

11     a thunderstorm, they could use provisional ballots for that

12     next hour.

13     **Q.    (BY MR. SALTER)**  Let's turn to the idea of an immediate

14     conversion to a paper ballot election -- a primarily almost

15     exclusive paper ballot election for November the 6th.

16          The plaintiffs' argument is that paper ballots have more

17     integrity, that they're safer.  Can you -- based off of -- you

18     are the last Secretary of State who was around when there was a

19     primarily paper ballot election or at least a lot bigger than

20     the ten percent we are currently using.

21          What were some of the chain of custody and security

22     challenges that you witnessed as Secretary of State back then

23     with paper ballots?

24     **A.**   Well, the fraud opportunity with paper ballots is truly

25     limited only by one's imagination.  And even in the years that

1    I was Secretary of State, we had issues with ballot boxes that

2    would disappear from locked vaults in a probate judge's office

3    overnight after election night before a recount could happen.

4        When you had ballots counted, papers would go missing.

5    You had suspicion about people who would have a piece of lead

6    literally in between their fingers and count -- you know, move

7    a piece of paper so they could add a mark to it and make it

8    look like it was a double vote and therefore not count.  There

9    are just any number of security issues that can go wrong in

10   handling ballots.

11       But then there is just plain 'ol problems.  We had a

12   county one time using optical scan that the humidity was high

13   and the paper absorbed so much humidity that the scanners kept

14   jamming.  They called us.  We had to suggest that they go home

15   and get hair dryers and lay out the ballots and literally dry

16   out the ballots so that they could scan any of the ballots.

17       We had one county just east of Atlanta where an entire

18   election nothing would scan because they had -- the county had

19   given out the wrong pen or pencil.  And it would not register

20   in the scanner.  So they had to get these teams to replicate

21   every single ballot to run it again in the machine because the

22   marker would not show up.

23   **Q.**   Did they literally color the ballots in for the voters?

24   **A.**   You have to do that under the watchful eye of the team who

25   makes sure that it is transferred correctly to another ballot.

1    But then you get into interpreting what the voter intended, and

2    all of those issues arise.

3         So there are common daily problems with handling paper and

4    unlimited opportunities for fraud.

5    **Q.**   In terms of the way the DRE system was designed, how did

6    you take into account the risk that is presented by the fact

7    that software can be changed if someone has access to it?  How

8    did y'all address that in the design of this system?

9    **A.**   Well, I think we all would agree that any piece of

10   machinery that we bring in to an election place is not secure

11   in and of itself.  You have to build a system of security

12   around it.

13        And that is where the State Election Board rules come into

14   place.  And over the years from 2002 and until I left office at

15   the end of 2006, almost probably every time we had a State

16   Election Board meeting some issue would come out of a county

17   that looked like it might be problematic.  And we would either

18   add a rule or tweak a rule about how these machines are used

19   and secured.

20        And that is why the physical security is so important to

21   the overall security.  Because nobody thinks any piece of

22   equipment by itself is safe and secure.  It is how you use it,

23   how you store it, and this whole process of logic and accuracy

24   testing.  That is the whole protocol.

25        The analogy, Your Honor, that I would use is if you let me

1    take a slot machine home from Las Vegas I could find a way to

2    tweak it until it started giving me quarters.  But the reality

3    is you use it under heavy duty security just like we do so that

4    those kinds of forms of mischief can't really happen.  That is

5    why the physical security is absolutely essential to the

6    overall security of the system.

7        It is not that there is anything magical about that system

8    or that we thought that system would be it forever.  It is the

9    whole process in which they are used and tested and secured.

10   **Q.**   That is why you have things like air-gapped servers?  That

11   is why you put those under lock and key?  And was that all

12   envisioned from the beginning in 2002?

13   **A.**   Absolutely.

14   **Q.**   Is the idea of a malicious hacker -- whether they are

15   Russian or anything else like that, how -- how was that

16   considered by the 21st Century Voting Commission back in 2001

17   when they made the report?

18   **A.**   Well, that was the heart of why we set up an independent

19   group like the group at Kennesaw State where they had some

20   staff initially that had the computer expertise because we

21   wanted to make sure that you don't just order equipment online

22   and have it delivered out to a county.

23       That acceptance testing that was mentioned here today is a

24   critical thing to make sure what comes off a shelf -- even if

25   we move to optical scanning, you just don't bring it from

```
 1    Walmart and put it in a polling place.  You have to make sure
 2    that the software is absolutely working the way every other
 3    piece of software in the state is working.  So you go through
 4    all of those levels.
 5              THE COURT:  But then why would we then -- why would
 6    the state be using Windows software, for instance, that is out
 7    of date that there are no patches for?  This is such a concern.
 8    I'm just -- and I know that you are not currently in this
 9    position.
10              But I guess the question is:  You are talking about
11    the very good work that you-all did -- thoughtful work that you
12    did and clearly there were real reasons for.
13              But would it be fair to say that you would anticipate
14    that there would be constant need for change in the environment
15    that we work in --
16              THE WITNESS:  Absolutely.
17              THE COURT:  -- and live in?
18              THE WITNESS:  Absolutely.  In the 21st Century Voting
19    Commission report, we recommended from the start that if we
20    move to DRE that it have some kind of a paper trail.  But when
21    we got actual bids for the equipment in 2001, it wasn't
22    available.
23              But none of us contemplated that this would be the
24    end of the process but that it would -- that Kennesaw to some
25    extent could help us stay on top of things.  But I don't know
```

1    that we realized this equipment probably could not be updated

2    as much as we would have anticipated.

3            We probably didn't anticipate obviously a recession

4    would come about and there wouldn't be money to provide new

5    equipment over time.  But --

6    **Q.   (BY MR. SALTER)**  From beginning to end, how long did the

7    process take for you to feel like you made -- were making a

8    responsible decision that was communicated to the public,

9    communicated to the counties to make this kind of a drastic

10   change in the voting system in 2001 and '2?

11   **A.**   We did it faster than anyone in the nation ever had done

12   it or ever thought it could be done.  But it was all hands on

13   deck from the time that this report came out.  And we went to

14   the Governor and the legislature in 2001 and passed this scheme

15   of the new law in 2001.

16           And so from 2001 to November of 2002, there is nothing

17   else my office focused on but changing out the election system

18   and doing massive amounts of voter education all over the

19   state.

20           The state gave us well over a million dollars, as I

21   recall, to do voter education and training.  Wherever two or

22   more were gathered, I was there with a voting machine to train

23   people on these pieces of equipment.  We hired massive staff to

24   do voter education and poll worker training and county election

25   training to get voters very comfortable with a new system of

1    voting.

2        We did a pilot project in 13 different cities so that we

3    could get further feedback on how it could work and what you

4    would have to do to acclimate voters to a new system.  So it is

5    a system that -- anytime you make a change in voting, the last

6    thing you want to do is throw something in front of voters that

7    they are not comfortable with because it could either stifle

8    people from turning out to start with because they don't want

9    to show up and look like they don't know what is going on in a

10   polling place or get there and make a mistake that cancels

11   their vote.

12   **Q.**   Would it be easy to make these -- strike that.  Forget

13   easy.  Would it be responsible in your position as a former

14   Secretary of State who has made the change -- a significant

15   change in the voting system statewide -- would it be

16   responsible in your personal opinion to make an immediate

17   conversion to a primarily paper ballot election for November

18   the 6th, 2018?

19              THE COURT:  Is there an objection?

20              MR. CROSS:  Yes, Your Honor.

21              THE COURT:  What is the objection?

22              MR. CROSS:  Relevance.  Speculation.  Foundation.

23              THE COURT:  Well, I think that Ms. Cox has

24   significant experience, and she is opining based on her

25   experience and the question of equitable -- what is proper

1  equitable relief and -- I don't doubt that the public interest

2  is great in terms of having integrity in voting.  But the

3  question is really is an injunction at this point warranted.

4  And I think the testimony is relevant.

5          MR. SALTER:  Thank you, ma'am.

6  **Q.   (BY MR. SALTER)**  Do you remember the question, Ms. Cox?

7  **A.**   I don't know any conceivable way you could change

8  Georgia's election system to any other system in the span of a

9  matter of weeks because that is what we're talking about is

10 weeks.  Early voting starts in a matter of weeks.

11       And to train poll workers and county officials, to educate

12 voters on something new -- and especially an optical scan

13 system where we know how high the error rates were the last

14 time we used it -- I think would be chaotic beyond belief and a

15 setup for massive amounts of voter error, which is really not

16 where anybody in the election world would want to go.

17          MR. SALTER:  Thank you, ma'am.  Your witness.

18          MR. CROSS:  Your Honor, permission to approach with

19 just a couple of documents we have been referencing.

20                          CROSS-EXAMINATION

21 BY MR. CROSS:

22 **Q.**   Good afternoon, Ms. Cox.

23       Secretary Cox, just to be clear, you haven't worked -- you

24 haven't been involved in the election system in this state

25 other than as a voter since 2007; right?

1    **A.**   I have had a lot of contact with the staff and the

2    election office over the years.  But I have not directly

3    supervised it, no.

4    **Q.**   So you haven't managed it?  You haven't conducted any

5    analysis of the current systems, anything like that; right?

6    **A.**   That is correct.

7    **Q.**   And you don't have any background in computer science,

8    information technology, cybersecurity?

9    **A.**   I do not directly.  But I spent a couple years of my life

10   studying this particular system.

11   **Q.**   And that stopped as of 2007 as the Secretary of State?

12   **A.**   That is correct.

13   **Q.**   You agree that the current system does need to be

14   replaced?  Your issue is timing; is that fair?

15   **A.**   I don't know exactly what is in the marketplace now.  But

16   even when we purchased it, we contemplated that at some point

17   there would be better technology.  And we had hoped even then

18   there would be some mechanism with a paper trail that was not

19   available at that time.

20   **Q.**   Right.  So even back in 2001, 2002 when you adopted this

21   system, you had recommended -- you preferred a paper trail

22   because you understood the value of that; right?

23   **A.**   We preferred an electronic system that also had a paper

24   backup.  Not to stick with paper because of the inherent

25   problems with paper.

1  **Q.**   Even though what you just described, an electronic voting

2  system that has a paper trail, has been available for many,

3  many years, we all understood Georgia has never switched --

4  **A.**   I have heard that.  But I don't know that to be true in my

5  discussions with some of the representatives of voting

6  companies.

7  **Q.**   You are not aware that other states like California had

8  electronic voting machines that have paper records?

9  **A.**   I'm not personally aware of that.

10  **Q.**   You talked a little bit about the statute.  When you

11  adopted this system in 2002, your office actually had the great

12  foresight to recognize that at some point these machines might

13  not be usable for any variety of reasons; right?  Due to power

14  outage?  They become impracticable, as the language in the

15  statute?  And the good foresight that you had was in those

16  circumstances use paper ballots; right?

17  **A.**   Well, that was a little of the discussion we just had.

18  The code section that uses the word impracticable does not

19  apply to DRE machines.  There is another code section that says

20  if a DRE machine -- I think it is under the provisional voting

21  section -- that if a DRE machine malfunctions that you can use

22  provisional ballots for that -- for the duration of that

23  malfunction.  But it doesn't contemplate throwing out an entire

24  system.

25  **Q.**   Section 21-2-281 --

1  **A.**    What was the last?

2  **Q.**    281.  We can pull it up if it helps Your Honor -- I'm

3  sorry -- if it helps you, Ms. Cox.  It states --

4            MR. CROSS:  Would you like a copy.  We have --

5            MR. BARNES:  We have got it.  We have got the book.

6            MR. SALTER:  Paper copy.

7            MR. ICHTER:  More reliable.

8            MR. SALTER:  So you say, my friend.

9  **Q.**    **(BY MR. CROSS)**  Do you have that in front of you?  281?

10  **A.**    Yes.

11  **Q.**    So 281 states, in any primary or election in which the use

12  of voting equipment -- not machine -- voting equipment is

13  impossible or impracticable for the reasons set out in Code

14  Section 21-2-334 the primary or election may be conducted by

15  paper ballot in the manner provided by 334; right?

16  **A.**    Right.

17  **Q.**    Okay.  That doesn't say voting machine, does it, ma'am?

18  **A.**    No.  That is correct.

19  **Q.**    And in the section you were talking about, Section 418 --

20  you are welcome to turn to it if that helps.  It is

21  Subsection (h) of 418, it talks about voting machines and DRE

22  units and indicates paper ballots can be used if some other

23  emergency situation exists which prevents the use of that

24  equipment to cast votes; right?

25  **A.**    That is correct, 418(h).

1   Q.    Yes, ma'am.  Thank you.

2       Just to be clear, you are not suggesting in any way that

3   if DREs were to become unusable on election day for any variety

4   of reasons, inoperable, hurricane, whatever happens, power

5   outage -- you are not suggesting that the counties would have

6   no authority under the law to use paper ballots at those polls;

7   right?

8   A.    I think that is the fail-safe mechanism that is there

9   if -- and I think we have frequently had power outages and

10  things like that for short periods of time on election day.

11  None of the polls would -- you know, under current law would

12  not have a supply of ample provisional ballots on hand to

13  accommodate that.  But it has never been contemplated that it

14  would last for the duration of the day.

15  Q.    Right.  But the fail-safe available under the law is paper

16  ballots?  We're agreed on that; right?

17  A.    Yes, sir.

18  Q.    When you were Secretary of State -- and Mr. Salter talked

19  to you quite a bit about your role then -- if you had gotten an

20  order from a court requiring you at this point in time to

21  proceed with paper ballots instead of the DREs, you're not

22  suggesting you wouldn't have complied with that order; right?

23  A.    Certainly I would do everything within human power to

24  comply with an order.  But it would be very problematic.

25  Q.    Difficult, but you would certainly expect that you and the

1    good workers -- the poll workers would have been -- would have

2    complied with the court order requiring that; right?

3    **A.**    To the extent you can.  I mean, I think -- I don't know

4    that paper supplies would be available.  Ballots are not

5    printed on just ordinary paper.  They require a special kind of

6    paper.  I mentioned the issue with paper that absorbed

7    humidity.  There are a lot of other factors that go into

8    whether we could just snap our fingers and comply.

9    **Q.**    And one of the things that you pointed out is that when

10   you moved to the DREs you actually did that faster than anyone

11   thought was possible and it was a massive undertaking?  I think

12   you said you hired a massive number of people?  A rather

13   Herculean effort went in to get that done in time for the

14   election in 2002; right?  Yes?

15   **A.**    That is correct, yes.

16   **Q.**    In fact, the decision was made and the implementation of

17   that didn't actually start until May of 2002; right?  Do you

18   recall that?

19   **A.**    No.  I believe it was earlier than that.

20   **Q.**    You think it was earlier?

21   **A.**    Yes.  But I -- the time frame may not be correct.

22   **Q.**    It has been a while.  It has been a while.

23   **A.**    I don't remember when we got the federal funding.  That

24   would have been the real key of when we set things in motion as

25   to know that we could proceed.

Q.   You believe that a cyber intrusion into Georgia's election
system is unlikely so long as voting machines itself are not
connected to the internet; is that right?

A.   That is my general impression, yes.

Q.   You believe that the only way the Georgia election system
could be hacked is if a hacker would have to go machine by
machine in a polling place while poll workers are sitting there
watching them?  That is your understanding; is that right?

A.   Not completely.  I mean, I think there are other
mechanisms.  But I think one of the good security features of
our system is that it is not connected to the internet.  And
the individual machines are not connected to each other.

     So I think there are some types of DREs out there that are
connected to the internet that are connected to each other.
And some kind of intrusion could be done a lot easier than it
could happen in Georgia.

Q.   But your comfort level -- I just want to be clear.  The
comfort you have with the existing system, that is because you
believe, as you just describe, because the individual machines
aren't connected to the internet they can't be hacked; right?

A.   I would never say they can't be hacked.  But, for example,
the demonstration this morning, I think, ignores the physical
security protocols that we have in place that would require
somebody -- somebody to violate some of those provisions that
we have in place to get access into the -- to an individual

1    machine or to the GEMS server to set that kind of mischief into

2    motion.

3    **Q.**    One of the things that you point out challenges the paper

4    ballots -- you have given instances, for example, where paper

5    ballots disappeared from locked vaults; right?

6    **A.**    That is right.

7    **Q.**    Another one is where ballot boxes disappeared from secure

8    facilities; right?

9    **A.**    That is right.

10   **Q.**    So even with paper ballots, individuals have been able to

11   circumvent the locked facilities that you have talked about by

12   one of the measures that you say protect the DREs; right?

13   **A.**    Well, that was before the Secretary of State set out

14   requirements for how equipment had to be stored.  That was back

15   prior to 2002 when counties got to do their own sort of thing

16   and they tried to lock them up.  But somebody found ways that

17   had an agenda to steal votes.

18   **Q.**    Okay.  So then the concerns you just talked about about

19   stealing paper ballots -- we don't have to actually worry about

20   those any more because you just described there are new

21   measures in place now that would prevent that; right?

22   **A.**    There are certainly enhanced measures in place.

23   **Q.**    And to the extent that someone would circumvent those

24   measures as to paper ballots, there's no reason to think they

25   couldn't circumvent the same measures with respect to DREs?

1   Both are locked up?

2   **A.**   Well, we're talking apples and oranges here.  I was

3   telling you what did actually happen.  And Georgia has a

4   100-plus year history of voter fraud with paper ballots that we

5   can spend the rest of the day talking about.

6        But that was not a comparison to the security measures

7   that we now require by law and by rule and regulation for

8   voting equipment today.

9   **Q.**   You mentioned before that one of the reasons that led to

10  the change in the system in 2000 was you went back and looked

11  and found around 90,000 votes that year that were undervoted,

12  meaning 90,000 votes that were no vote for president?  Does

13  that sound about right?

14  **A.**   Not quite the number.  But yes, that is the process.

15  **Q.**   Between 90- and 100,000?

16  **A.**   Yes.

17  **Q.**   But you didn't redo that election; right?

18  **A.**   No.  That was -- the election was already over.  Florida's

19  recount was in process, and we wanted to know how bad was it on

20  our watch.

21  **Q.**   So to be clear --

22  **A.**   There was no process for redoing an election.

23  **Q.**   Right.  There is no process for redoing an election.  That

24  is correct, isn't it, ma'am?

25  **A.**   That is right.

**Q.**   And the 90 -- let's just call it 95,000.  I think it may be 96,000 votes you found at the time -- that didn't give you enough concern to think we have got to throw out the election results?

**A.**   You can't -- you can't throw out election results.  It caused us to say -- caused me to say as Secretary of State -- and that is why I was so focused on getting this done before 2002 -- I do not want to go through another election cycle knowing how inaccurate our current systems of voting are.

So that is why I was absolutely determined that we were going to find a better way to do this before the next major election in Georgia.

MR. CROSS:  No further questions.  Thank you very much.

                    CROSS-EXAMINATION

BY MR. MCGUIRE:

**Q.**   Good afternoon, Secretary.

**A.**   Good afternoon.

**Q.**   You mentioned -- my name is Robert McGuire.  I represent the other set of plaintiffs, the Coalition plaintiffs.

You mentioned the report of the 21st Century Voting Commission, and I would like to hand you a document.

MR. McGUIRE:  If I may approach the bench -- approach the witness.

THE COURT:  Yes.  What is the exhibit number?

```
 1              MR. McGUIRE:  Are we on 10, David?

 2              MR. CROSS:  I'm sorry?

 3              MR. McGUIRE:  Are we on 10?

 4              MR. CROSS:  Yes.

 5              THE COURT:  What was 9?  I thought we were on 9 now.

 6   Was there an Exhibit 9 offered?  Because we were at 1 through 8

 7   for plaintiff.

 8              MR. CROSS:  We were going to mark Mr. Barron's email

 9   as Number 9, the one that was on the screen.

10              MR. SALTER:  We object to that just based on --

11              THE COURT:  General principle?

12              MR. SALTER:  Yes.  Just on --

13              THE COURT:  At 6:05?

14              MR. SALTER:  Just kidding.  Under Rule 403 and -- 403

15   based on balancing in terms of its probative value.

16              MR. BROWN:  Because it is bad for your side.

17              MR. SALTER:  The prejudice of it in terms of -- it

18   outweighs the probative value.

19              THE COURT:  I don't have a jury.  It is not

20   inflammatory.  I'll admit it.

21              MR. SALTER:  You are the jury.

22              THE COURT:  So Exhibit 9 is admitted, as well as

23   Plaintiffs' 1 through 6 and 8 and 9.  7 I'm holding out until I

24   make sure that it is what it purports to be.  That is what you

25   are going to file the notice on.
```

```
 1                    MR. SALTER:  I think I am.  Yeah.  Ryan is going to
 2    keep -- Mr. Germany will keep me straight.
 3                    THE COURT:  Defendants' exhibits -- I have two
 4    exhibits at this point, 1 and -- how many exhibits do I have on
 5    your part?  Just 1 and 2?
 6                    MR. SALTER:  This will be --
 7                    THE COURT:  Just to clear up the record again.
 8                    MR. SALTER:  This is a joint exhibit for us, I think.
 9                    THE COURT:  All right.
10                    MR. McGUIRE:  It sounds like it is a stipulated
11    exhibit.
12                    THE COURT:  Stipulated Exhibit 1.  Joint Exhibit 1.
13                    COURTROOM DEPUTY CLERK:  I'm sorry, Judge.
14                    MR. SALTER:  Something we can agree on.
15                    COURTROOM DEPUTY CLERK:  Joint Exhibit 1, or is it
16    Plaintiffs' Exhibit 10?
17                    MR. McGUIRE:  This is will be the 21st Century Voting
18    Commission report.
19                    THE COURT:  It is Joint Exhibit 1.  He marked it --
20    let's just have it Exhibit -- Plaintiffs' Exhibit 10, and you
21    agree to its admission.  All right.
22                    COURTROOM DEPUTY CLERK:  I just need to know how it
23    is labeled.
24    Q.   (BY MR. McGUIRE)  Secretary Cox, this Exhibit 10, which is
25    in front of you, Plaintiffs' 10, that is your 21st Century
```

1    Voting Commission report; yes?

2    **A.**    Yes, it appears to be.

3    **Q.**    And if I can ask you to flip to Page 38 -- it is numbered

4    at the bottom.  And if you count down to the fifth bullet

5    point, there is a recommendation here that says, the chosen

6    system should have the capability to produce an independent and

7    paper audit trail of every ballot cast; correct?

8    **A.**    That is correct.

9    **Q.**    You said that -- now, this was a consensus recommendation,

10   I take it?

11   **A.**    Yes, of the commission.

12   **Q.**    So everybody in the commission favored this?

13   **A.**    I can't say that it was a unanimous vote.  But it was

14   certainly an ultimate recommendation of the commission.

15   **Q.**    And if you recall, did you agree with this recommendation?

16   **A.**    I did.

17   **Q.**    And I believe you testified earlier that that kind of

18   voting system wasn't available for DREs back then?

19   **A.**    We had heard that it was, and I think we had had some

20   discussion with the vendors at the time that it might be.  But

21   when we ultimately put out an RFP, we didn't have any -- I

22   don't recall that we had any systems that had a real backup

23   system.

24   **Q.**    Okay.

25   **A.**    We liked -- the overall recommendation was that DRE cured

1    so many ills.  It gave the voters the ability to review their

2    ballot, which was the biggest problem you had with undervotes

3    and overvotes because the voter never got a chance to know they

4    made a mistake.  You got to review the ballot on the electronic

5    equipment.

6            THE COURT:  I hate to cut off the witness, but I

7    think you have talked about this quite a bit.  And I think

8    we're just talking now about this recommendation.  All right?

9            THE WITNESS:  But the paper trail was not that we

10   thought paper should be the real ballot.  We liked the DRE

11   equipment for all the things that it cured.  But having the

12   backup system would have been a nice addition.

13   **Q.   (BY MR. McGUIRE)**  And you would agree that without an

14   independent paper audit trail you can only audit a DRE by

15   asking the DRE itself what it has got recorded; right?

16   **A.**   No.  It goes to -- as I said earlier, it depends on how

17   you define an audit.  There is an audited system of checks and

18   balances at the end of every election night.  A perfect audit

19   would violate the private ballot.  So some variation of that.

20   **Q.**   Sure.  And if I understood your testimony, the reason you

21   wanted to move to DREs in the first place was because you had a

22   concern that Georgia's then current system was missing -- it

23   wasn't accurately recording the vote for some voters on the

24   paper with optical scan that was used then?

25   **A.**   All four of the types of systems.

1  **Q.**   Right.  But this report says the optical scan was the best

2  one in use in Georgia at that time; right?

3  **A.**   I wouldn't say the best one in use.  But it had some of

4  the highest error rates that were equivalent to the punch card,

5  which everybody in the country at the time was talking about as

6  being so horrible.

7  **Q.**   So if I can ask you just to turn to Page 22.  I recognize

8  that you had reservations about the optical scan where it did

9  have error rates.  But does it not say at the top of Page 22

10  optical scan should be noted shows the best overall accuracy

11  performance of any of the systems currently in use in Georgia?

12  Does it say that?

13  **A.**   That is true, compared to punch cards, lever machines, and

14  bed sheet paper ballots.  None of them looked very good in the

15  light of day.

16  **Q.**   Now, it is true, isn't it, also that under your

17  administration of the Secretary of State's office you certified

18  a brand-new optical scanning system that replaced the one that

19  is talked about in this report?

20  **A.**   Well, there were at least two different types of optical

21  scan used by the dozens of counties.  And they could have been

22  made by different vendors.  So I couldn't tell you how many

23  variations.  But we certified one centralized type.

24  **Q.**   And that is the more -- the most recent certification of

25  an optical scanner in Georgia?

1  **A.**   I couldn't tell you if it is exactly the same now as we

2  put in place in 2002.

3  **Q.**   But you wouldn't have certified it then if it wasn't

4  better than the one that was mentioned in this report; right?

5  **A.**   I think it was essentially -- the worst type of optical

6  scan that we saw in 2002 was the type that had the arrow out

7  beside a name.  And voters were not clear on what they were

8  even supposed to do.

9       So I know we talked about making sure we went to a bubble

10 system, which was one of the systems in place.  So I don't know

11 that there was anything new about what we put into place other

12 than we certainly didn't want the connect-the-arrow type.

13 **Q.**   Okay.  So you got rid of that one and got a new one in?

14 And that is the one we use today you believe?

15 **A.**   I believe so.

16             THE COURT:  The one you got in 2002 --

17             THE WITNESS:  I believe so, yes.

18             THE COURT:  -- is what we still have?

19             THE WITNESS:  I think so.

20             THE COURT:  All right.

21 **Q.   (BY MR. McGUIRE)**   Now, so you as the Secretary of State

22 were dissatisfied with the quality of the state's voting

23 systems, and you initiated an effort to change it?

24 **A.**   Well, every county had systems.  The state really was not

25 in the voting system business until the 2001 legislation came

1    about as a result of this study.  So yes, I was dissatisfied

2    with all of these types of equipment, the hodgepodge of

3    equipment that counties were using at the time.

4    **Q.**   So is it fair to say you saw a problem with Georgia's

5    voting system?  And in your judgment as an officer of the

6    state, you felt it was in the public interest to move to a

7    different system that would do a better job for Georgia voters?

8    **A.**   Yes.  That is a fair statement.

9    **Q.**   Can you understand why folks who have doubts about these

10   DREs believe that is what needs to happen now?

11   **A.**   I can understand if people don't fully understand the

12   security protocols about how these systems are used and tested

13   and stored that it would raise doubts.  That is why when people

14   ask me about it and I go into all of this minutia about how

15   they are used they generally come away from a conversation

16   feeling a lot better than something they heard on the news or

17   read on social media because they didn't know all of that.

18        And it is -- again, it is because people say, how can you

19   have faith in this piece of equipment?  I don't have faith in

20   that piece of equipment.  I have faith in this whole system we

21   devised about how to use, store, test, and secure that system.

22   **Q.**   And when you talk about the folks who don't understand the

23   system or maybe don't have the full picture of it, you surely

24   don't mean the National Academy of Sciences, for example, which

25   just issued a report saying these kind of systems shouldn't be

1    used just last week?  You don't mean them, do you?

2    **A.**    I haven't read their report.  But, again, I could take

3    that home myself and probably figure out how to do something

4    bad with it.  It is not any -- there is nothing magical about

5    that machine.  It is how it is all used and stored.  And I

6    don't know whether any of the scientific reports take those

7    things into consideration.

8    **Q.**    So it sounds like you are saying the circumstances matter.

9              THE COURT:  I think that it is --

10             MR. McGUIRE:  Thank you, Your Honor.  That is all.

11             THE COURT:  All right.  Can this witness step down?

12             MR. SALTER:  Yes, ma'am.  Thank you.

13             THE COURT:  Thank you.  All right.  There are no

14   other witnesses, are there?

15             MR. SALTER:  There is one other witness that I have

16   like three questions for.  I swear on the Bible.  Identify

17   yourself, talk about how much time -- basically it is about

18   their ability to rulemake under the APA and how that works with

19   time.  That is it.  It takes --

20             THE COURT:  We can't have him give me an affidavit

21   tomorrow morning?

22             MR. SALTER:  Would y'all object to something like

23   that?  Do y'all want to cross on the APA in terms of time and

24   emergency rulemaking?  We have a public comment period, 30

25   days.  We have to serve the General Assembly, the two houses.

1    We have to serve the Attorney General's office.  And there is a

2    public comment period on rulemaking --

3             MR. BROWN:  Your Honor, this appears to be not fact

4    testimony.  And so it would be mainly do your rules say this,

5    do they say that.

6             MR. SALTER:  That is fair.

7             MR. BROWN:  So I don't think this is proper --

8             THE COURT:  Can't you-all stipulate to what they say?

9    I mean, is it not -- is it not just legal?

10            MR. SALTER:  It really is legal.  I mean, that is --

11   Bruce's point is fair.  And I think --

12            THE COURT:  If you want to provide me a summary of

13   that tomorrow.

14            MR. SALTER:  I could do that, if there is no

15   objection to a short five-page brief.

16            THE COURT:  You can provide a summary.

17            MR. BROWN:  If we can respond with an even shorter

18   rebuttal.

19            THE COURT:  Do you think you can do that -- are you

20   going to do that by 2:00 or something like that?

21            MR. SALTER:  I think we can do that.  I think we

22   could do that, Judge.

23            THE COURT:  Then they can respond.

24            MR. SALTER:  It is a simple issue.

25            THE COURT:  Why don't you provide it by 1:00.  And

1    they can provide something by 5:00.  Does that -- does that

2    work with you-all?

3               MR. BROWN:  That is fine, Your Honor.

4               THE COURT:  1:00 and 5:00 tomorrow.

5               MR. SALTER:  That is fine.  1:00 for us.

6               THE COURT:  Great.  I didn't allow for oral argument.

7    I did allow for the submission.  And I wanted something else

8    in.

9               I know that -- I know everyone would like to have a

10   decision as quickly as possible.  And obviously I would have

11   hoped in an ideal world to have had the hearing be shorter and

12   to be able to be ready to announce something.  But I am aiming

13   to do it this week.

14              I know that there have been references about walking

15   down the street to the Eleventh Circuit.  And, of course, that

16   is the right of either party.  I would say -- and I don't want

17   to discourage anyone's exercise of their rights obviously here.

18              I would point counsel to the Supreme Court's decision

19   in *Purcell vs. Gonzalez,* 549 U.S. 1, which basically it said

20   because there were no findings of fact by the court -- by

21   either the District Court or then ultimately the Court of

22   Appeals there is nothing -- basically it remands because they

23   can't really properly review it.

24              So I'm not planning to give an exhaustive decision in

25   this time frame.  But I have allowed you-all to present the

1    evidence, and I think it would just suggest to both parties

2    that it would be preferable to wait until I have a decision.

3    And I do have some criminal cases that I have to hear in the

4    next day and a half.  And I'm going to do my very best to give

5    you a decision on Friday.  But if not, then it would be Monday.

6         And I just think that, you know, we have done all of

7    this, and I would hate to just simply not at least have a

8    written decision that sets forth the general reasons for

9    whatever I'm doing, whether it is for jurisdiction or for --

10   the jurisdictional determination, a standing determination, or

11   the ruling on the preliminary injunction.

12        Of course, as I said, it is up to you.  But that is

13   my view.  And, you know, what ends up happening in *Purcell* is

14   even though the District Court and the Court of Appeals took a

15   different position in *Purcell* basically then says -- sends it

16   back and can't -- too late then, of course, for the election

17   and then says essentially but the Court of Appeals' decision

18   was vacated and the case was remanded for further proceedings.

19        So it is sort of like let's not -- my hope would be

20   that no one would jump the gun.  I'm going to get you a

21   decision as absolutely fast as possible hopefully Friday but

22   not later than Monday so that there is plenty of, I think,

23   time.

24        You know, the general observation I have here is the

25   one I made from the start.  Times change.  We are facing -- I

1    don't mean to be focusing on Russia or anything else.  But we

2    are in a very quickly evolving situation in terms of cyber

3    technology and cyber crime.

4           I have sat through some very sophisticated testimony

5    myself in other cyber crime cases from the FBI.  And, you know,

6    obviously we have a lot of expert testimony here.  And there

7    has been a -- we have a lot of concern nationally that has been

8    expressed by recognized bodies, not just the National Sciences

9    Academy but -- and not just the FBI and not just the NSA as to

10   the continued use of an unverifiable -- DREs without verifiable

11   tape results.

12          But -- so these are big issues.  And they are big

13   issues because they also impact not just the integrity of the

14   vote but they can dilute one party's vote versus the other.  It

15   affects the credibility of the system.  And I, you know, have

16   basically proceeded to allow the evidentiary hearing here and

17   go at great length because I recognize that and because it is

18   an issue of public import that also ends up in the court

19   because you don't want anyone's -- no one wants their vote to

20   be insecure but moreover diluted or altered.

21          But at the same time, one -- I have to recognize --

22   and I am just saying this as a preview, which everyone here

23   knows from the testimony here -- that there are -- this is a

24   catch-22 because there is significant -- we know other ways in

25   which people's votes can be compromised:  Long lines, people

1    losing -- not understanding how to use ballots.  And it is not

2    just a parade of horribles either.  I mean, it is a parade of

3    horribles that Ms. Cox described from another era.

4           We might not be in that era.  But these are real

5    challenges, and there are lots of -- the Sixth Circuit right

6    now has basically allowed a case to proceed because of -- in

7    part because there was the whole -- problems in administration

8    of the precincts in the balloting process.

9           So, you know, I'm concerned that we're here at this

10   eleventh hour.  I'm concerned that I understand what the

11   plaintiffs' position is is that the evidence didn't at this

12   point ripen this much, it didn't become as much of a crisis

13   from their perspective given the evidence that was available in

14   the most recent number of months.

15          I won't fully comment on that because I attempted to

16   deal with this earlier.  And I'm concerned in part for the

17   state as well that, you know, why are we just dealing with this

18   now.  I know that ideally in all -- in the best circumstances

19   is that the legislature would have dealt with this.  And it

20   would never end in a court's lap to address these voting

21   issues.

22          But I don't think what happened at Kennesaw

23   completely -- and other sorts of data has been presented can be

24   just said that it is nothing, that this is not a question of

25   Luddites, and it is not a question of -- but at the same time

1    you don't want people standing outside the polls giving up,

2    being confused, being discouraged.  And those are very real

3    things.

4              And the catch-22 is that, you know, there is a lot of

5    criticism of the fact that the state and counties have not

6    moved -- been able to move on this, that we're using antiquated

7    software that would be -- that is susceptible -- not just

8    susceptible but there is a great -- strong evidence about some

9    of its susceptibility.

10             It is not just, oh, it is a theoretical paranoid

11   notion at this point.  And we don't think that in other

12   contexts in financial frauds, as I said, in data breach cases.

13   We don't think it is theoretical because it hits our bank

14   accounts, and we can see it.  But we can't in the same way see

15   about whether our vote was -- what happened to it, did it

16   actually go for the same person.

17             So it is ideally -- and it is not just ideally.

18   These are real, real issues.  But the fact still is that lots

19   of people who work at the precincts are virtual volunteers.  It

20   is a big job to put on an election.  And the last thing -- I

21   don't think we want to compromise the voting process that way.

22   What we do want is this to be dealt with.

23             And that is really why I -- you know, I didn't like

24   it to be called just paranoia because if you call it just

25   paranoia you don't deal with it.  And I would anticipate that

1  we have to deal with it, whether here or in the -- or in the

2  legislature or in the -- by the Secretary of State.

3         But it is late.  I have to tell you a few things.

4  Lots of you had your phones taken downstairs.  And the court is

5  basically closed.  Everyone will have to meet with the court

6  security officer outside the courtroom who has given their

7  phone over.  He will escort you to pick up your telephones.

8         So do not walk out when I saw one person go out

9  without the phone -- without your phone.  And you are going to

10  need to do that.  So don't just simply go off willy-nilly or

11  else you will be picking up your phones and coming back here

12  tomorrow.

13         And in terms of getting out of the building --

14         COURTROOM DEPUTY CLERK:  Your Honor, the court

15  security officers will direct them once they pick up their

16  telephones.

17         THE COURT:  All right.  Because normally the front

18  door is closed at this point.  So I'm not going to even pretend

19  to give you any directions.

20         COURTROOM DEPUTY CLERK:  Your Honor, if anyone does

21  not need to pick up a telephone and came in on the LP level,

22  they can leave without having to do anything further.  If you

23  did not leave a telephone downstairs but you came in on the

24  Spring Street level and you need to leave on the Spring Street

25  level, you will need to be escorted by security in order to do

1   that.

2           MR. BARNES:  Your Honor, do you intend to issue the

3   order on the immunity and Eleventh Amendment at the same time?

4           THE COURT:  Yes.  I'm planning to do the whole thing

5   together.  That is why I just sort of asked you to hold off so

6   that at least if you want to appeal you have got --

7           MR. BARNES:  I understand.

8           THE COURT:  -- a piece of paper.

9           MR. BARNES:  I understand.  I was just trying to

10  get --

11          MR. SALTER:  We were doing that.  We figured that --

12  we have been waiting, Judge.

13          THE COURT:  So I really -- in the end, I want to say

14  I appreciate everyone's presence again as I started in the

15  morning.  I appreciate the interest.  I appreciate how much all

16  sides put in to trying to educate me and clarify from your

17  perspectives what the evidence points to.

18          I think it has been very helpful.  And I know how

19  much energy goes into an emergency hearing.  Certainly it has

20  been for me.

21          MS. BURWELL:  Your Honor, could I provide the Court

22  with like a one-page closing?  Just one page?

23          THE COURT:  You are welcome to do that.  You are

24  welcome to do that.  But I have, you know, notebooks and

25  notebooks and files and files.  So you -- I have been reading

1    everything.  You are welcome to do whatever.

2            But since I believe I have a -- I have some criminal

3    cases tomorrow.

4            COURTROOM DEPUTY CLERK:  You do, Your Honor.  You

5    have a criminal case and a civil case tomorrow.

6            THE COURT:  I probably can't get to read it until

7    4:00 or 5:00.  You are welcome to file something.

8            Thank you-all very much.  Have a good evening.

9            COURTROOM SECURITY OFFICER:  All rise.  This

10   Honorable Court has been adjourned.

11                    **(The proceedings were thereby concluded at 6:26**

12                    **P.M.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


     I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of
the United States District Court, for the Northern District of
Georgia, Atlanta Division, do hereby certify that the foregoing
322 pages constitute a true transcript of proceedings had
before the said Court, held in the City of Atlanta, Georgia, in
the matter therein stated.

     In testimony whereof, I hereunto set my hand on this, the
15th day of September, 2018.




                              _____
                              SHANNON R. WELCH, RMR, CRR
                              OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT