# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRIAN KEMP, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

# COALTION PLAINTIFFS' BRIEF IN SUPPORT OF
# MOTION FOR ADDITIONAL INJUNCTIVE RELIEF

**October 2, 2018**

Plaintiffs Coalition for Good Governance, William Digges III, Laura Digges, Megan Missett, and Ricardo Davis (the "Coalition Plaintiffs") file this Brief in Support of their Motion for Additional Injunctive Relief.

## I.   INTRODUCTION AND SUMMARY

The Coalition Plaintiffs file this Motion to seek injunctive relief that is consistent with the factual findings and legal conclusions of this Court's Order dated September 17, 2018 (Doc. 309) ("the Order").  The Coalition Plaintiffs do not seek reconsideration of the Court's denial of the request to replace the DRE voting machines with paper ballots for the November 6, 2018 general election, and understand the "Catch 22" presented by the timing of Plaintiffs' initial motions.. Instead, the Coalition Plaintiffs seek relief that can be granted on the existing evidentiary record and that will measurably improve the security and integrity of the upcoming elections without disrupting or interfering with "the orderly operation of the electoral and voting process."  (*Id.,* at 2).[1]

While this relief will not obviate the risk of errors and manipulation in the upcoming November election, and falls short of the relief sought in Plaintiffs'

---

[1] Page number citations to docketed documents throughout this Brief reference the blue page numbers produced by PACER.

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

preliminary injunction motions, it will reduce that risk in important respects without raising the implementation and timing issues that caused the Court to deny Plaintiffs' motions.

There will be other elections, and every election, and every vote, is important.  But the stakes today are very high, and there will never be another opportunity to improve the reliability or security of this crucial 2018 mid-term election.   The Coalition Plaintiffs therefore urge this Court to order these reasonable measures to improve the integrity of the election results and voter confidence in the democratic process.

The requested relief in this Motion falls into three categories.  First, as explained in Part III(A), the Coalition Plaintiffs seek relief that was requested in the Coalition Plaintiffs' Motion for Preliminary Injunction (Doc. 258) but not expressly addressed in the Order.  One such request is for this Court to order the Defendants to correct errors in the electronic pollbooks in advance of the November and December 2018 elections in order to halt the voter disenfranchisement and confusion now occurring.  Another such request is for this Court to order the State Defendants to require counties to audit the results of the scanned paper ballots after future elections, including the November election, and

Page 2

before the certification of those elections.  This relief will prevent corruption of the process for counting the numerous absentee and other paper ballots that are expected in the upcoming election.

Second, Part III(B) addresses relief that was not originally sought in the Coalition Plaintiffs' Motion, but nonetheless is warranted by the factual findings and legal conclusions of this Court's Order.  Specifically, the Coalition Plaintiffs ask this Court to enjoin Defendants in all upcoming elections (including the November 2018 elections) from prohibiting counties from adopting paper ballots at the polling place *if* the authorized officials in those counties determine that it is feasible to do so.  The Court held that state law does not prevent counties from using paper ballots, but noted that the State Elections Board has adoted a rule requiring use of DREs.  Given the Court's conclusions about the vulnerability of DREs, if a county concludes that it can readily implement a shift to paper ballots before Election Day, there is no justification for Defendants to block them from doing so.

Additionally in Part III (B) the Coalition Plaintiffs seek an order requiring the Secretary of State to require all counties to determine that all DRE machine

Page 3

tape totals printed on election night are accurately summarized in the election results reports from the GEMS server.

Third, as explained in Part III(C), the Coalition Plaintiffs seek a preliminary injunction requiring the Defendants to use paper ballots in every election *after* the November 6, 2018 election, including (a) the special elections and potential run-off elections scheduled for December 4, 2018 and (b) all the elections scheduled for 2019. The Coalition Plaintiffs are well aware of this Court's concerns about the potential difficulties counties might face if otherwise appropriate injunctive relief were granted near Election Day. It is for this very reason that the Coalition Plaintiffs seek a preliminary injunction *now* that prohibits the use of DRE machines in any election after the November 6, 2018 election. Elections in Georgia are always just around the corner: after the December 2018 special elections and run-off, there are scheduled elections in 2019 in January, March, April, June, July, September, October, November and December.[2] The granting of preliminary injunctive relief now is warranted under the balancing of the equities and would have the salutary effect of taking the pressure off of the discovery and

---

[2] http://sos.ga.gov/index.php/elections/elections_and_voter_registration_calendars. Attached as Exhibit A is a table showing each currently scheduled election through the end of 2019.

trial schedules and eliminating the need to litigate motions for injunctive relief on the eve of the elections implicated.

Moreover, in its Order, the Court stressed the urgent need for a secure voting system: "[T]he Court advises the Defendants that further delay is not tolerable in their confronting and tackling the challenges before the State's election balloting system." (Order, Doc 309, at 45.)  The December and 2019 elections will likely have much lower voter turnout and will involve far fewer ballot styles than will the November 2018 general election.  Given the additional time available, and the relative size and scope of the post-November elections, the balancing of the equities already conducted by this Court with respect to the originally requested relief weighs heavily in favor of granting the requested relief for elections after November 2018.  Requiring those elections to be conducted using paper ballots, not the compromised and insecure DRE machines, is in the public interest. [3]

---

[3] Nothing in this Motion should interfere with Plaintiffs' proposed schedule, issued in response to this Court's admonition to the parties to commence discovery immediately and to work diligently toward trial on the merits.  The schedule proposes expedited discovery starting on September 28, 2018 and trial readiness in February 2019. (Doc. 319-1).  Defendants have filed a Motion to Stay the case pending appeal (Doc. 320.) which should be denied because the appeal is frivolous.  (*See* Curling Plaintiffs' Briefs in Opposition, Doc. 323; Coalition Plaintiffs' Brief in Opposition, Doc. 324).

Page 5

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

The Coalition Plaintiffs do not seek oral argument or a hearing on this Motion unless the Court deems it helpful to the Court's consideration. The Coalition Plaintiffs respectfully request that this Court issue an accelerated briefing schedule to allow this Motion to be resolved in an expeditious manner.

## II.   RELEVANT FINDINGS AND HOLDINGS IN THE ORDER

Among the many important findings and legal conclusions in the Order, four are particularly germane to this Motion.

First, although the relief requested in the Plaintiffs' initial motions focused on DRE voting machines themselves, the extreme vulnerabilities shown by the evidence, and discussed by the Court in its Order, extend to the entire DRE system: the Diebold electronic pollbooks, the DRE voting machines themselves, the Diebold AccuVote Optical Scanners, and the GEMS servers.[4]

---

[4] (*E.g.,* Order, Doc. 309 at 6 ("Viruses and malware have also been developed by cyber specialists that can spread the 'vote stealing malware automatically and silently from machine to machine during normal pre- and post-election activities,' as the cards are used to interface with the County and State GEMS servers."); *id.* at 34 ("Plaintiffs shine a spotlight on the serious security flaws and vulnerabilities in the State's DRE system – including unverifiable election results, outdated software susceptible to malware and viruses, and a central server that was already hacked multiple times."); Doc. 258-1 at 42 (Bernhard Decl. ("The Diebold DRE system, including the ExpressPollbook, is known to be vulnerable to malicious manipulation that would produce" the kinds of registration errors and anomalies reported in Georgia).)

Second, the State Defendants have done *nothing* to address either the intrinsic defects of the DRE system or the exacerbated vulnerabilities caused by the State's neglect.  "[T]he State offered little more than a one-sentence response to these data system incursions and vulnerabilities at CES."  (Order, Doc. 309 at 9).  "In fact, Defendants presented scant evidence to rebut Plaintiffs' expert evidence regarding Georgia's persistent failure to update or replace systems, despite security flaws identified by the software industry."  (Order, Doc. 309 at 34-35).  The Secretary has performed no forensic examination of any of the computer systems that were exposed at KSU.  (Tr. at 224).  Defendants presented no witnesses to address the impact of the voting system's compromise-by-exposure at CES or to explain what remedial efforts, if any, the Defendants undertook to ensure the integrity of the system or its data following that compromise.  (Order, Doc. 309 at 34-35).

Third, the Court concluded that Plaintiffs will likely prove that the State Defendants are continuing to violate the Plaintiffs' constitutional rights – in the November election and in every subsequent election – until Georgia's flawed election system is remedied.  "[T]he State's continued reliance on the use of DRE machines in public elections likely results in 'a debasement or dilution of the

Page 7

weight of [Plaintiffs'] vote[s]," even if such conduct does not completely deny Plaintiffs the right to vote. *Bush v. Gore,* 531 U.S. 98, 105 (2000)." (Order, Doc. 309 at 33). "Absent an injunction, there is a threat that Plaintiffs' votes in the upcoming elections will not be accurately counted." (Order, Doc. 309 at 40).

Finally, the equities identified by the Court in favor of denying relief as specific to the timeline leading up to the November election and focus on the potential disruption caused by mandating replacement of DREs with paper ballots. "For upcoming elections after November 2018, Defendants are forewarned that these same arguments would hold much less sway in the future – as any timing issue then would appear to be exclusively of Defendants' own making at that point." (Order at 44).

## III.   REQUESTS FOR RELIEF

## A.   Relief Not Expressly Addressed

### 1.   *Electronic Pollbook Accuracy*

#### a)   *Relief Initially Sought and Court's Disposition*

In their Motion for Preliminary Injunction, the Coalition Plaintiffs sought an order requiring "the Defendant Secretary of State, before October 1, 2018, to conduct an audit of and correct any identified errors in the DRE system's

Page 8

electronic pollbook data that will be used" in the November and December elections.  (Doc. 258, at 2.)  The Order does not specifically address this request, which is fully consistent with the Court's findings and analysis.  Correcting errors in the electronic pollbook data will improve the accuracy and integrity of the pollbooks in the polling place and will greatly reduce voter disenfranchisement and voter confusion.

    *b) Vulnerability and Corruption of Electronic Pollbooks*

   As this Court found, the electronic pollbooks are a part of the vulnerable Diebold system that the State has done nothing to remediate.  The electronic pollbook computers, maintained in each voting place, reference voter data and create the DRE Voter Access Card that activates the specific electronic ballot on the DRE machine that should contain the accurate ballot contests based on the voter's address.  (Order, Doc. 309, at 4 n.4). A working copy of the Secretary's voter registration information, which populates the electronic pollbooks, was previously maintained by the Center for Election Services at Kennesaw State University, (*id.* at 24), where it was left accessible to the public for at least six months during the period from August 2016 to March 1, 2017. (*Id.* at 34).

Page 9

With their initial brief, the Coalition Plaintiffs presented alarming evidence from a number of voters in recent 2018 elections documenting unexplained discrepancies between their voter registration information in Diebold's electronic pollbooks maintained at the voting places and their information in the Secretary's official voter registration records, or errors in the official voter registration records themselves.  (Doc. 258-1 at 19–20).  The evidence from individual voters who produced photographic and documentary evidence, which likely represented only a fraction of what is occurring statewide, included the following:

- Voter eligibility information in the Diebold electronic pollbooks differs from the Secretary of State's official voter registration records.  (Clark Decl., Doc 258-1, at 108-109, ¶¶ 10–15; Bowers Decl., Doc 258-1, at 72-75, ¶¶ 35–46; Marks Decl., Doc 258-1, at 262, ¶ 2);

- Inaccurate political party designation in electronic pollbook has caused voter disenfranchisement (Luse Decl., Doc 258-1, at 258-259, ¶¶ 6–8);

- Unauthorized changes in the voter registration records, including changing polling places and assigning voters to incorrect districts (Mitchell Decl., Doc 258-1, at 287-288, ¶¶ 8-11);

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

- Inaccurate DRE electronic ballots causing the DRE screen to display wrong districts and candidates during early voting – subjecting unwary voters to disenfranchisement.  (Kadel Decl., Doc 258-1, at 120-123, ¶¶ 8-28);

In addition, on September 21, 2018, the Superior Court of Banks County has ordered a special election in December for the House District 28 election in five counties because of voter registration and electronic pollbook errors. The court found: "At least 74 votes were assigned to the wrong district, and voted in the wrong election in the May 22, 2018 House District Republican Primary Election." *Gasaway v. Ellison,* No. 18-CG-249 (Superior Court of Banks County), at 4.[5]  If the relief requested is not granted, the possibility of numerous similar election challenges will increase exponentially.

The record in this case shows that errors of the type above are indicative of what experts would expect to see if Georgia's voting system were in fact either compromised by malware or else suffering from programming errors or other sources of computer system malfunction.  (Bernhard Decl., Doc 258-1, at 10, ¶ 49).

---

[5] The Order in *Gasaway v. Ellison,* No. 2018-cv-249, Superior Court of Banks County, is attached hereto as Exhibit I.

### c)    *Defendants have no equities*

Defendants have not addressed the electronic pollbook discrepancies.  At the hearing, no witness for the Defendants described any effort to correct the numerous types of errors in the electronic pollbooks.  Crucially, Defendants presented no evidence or argument suggesting that an audit and subsequent corrections of pollbook data would not be feasible or even burdensome.

### d)    *Relief sought*

The relief that the Coalition Plaintiffs are seeking includes two parts.  First, the Secretary should be ordered to audit the electronic pollbook data and its source record, the voter registration database, to the fullest extent possible in the runup to the November election to identify and correct discrepancies between electronic pollbook voter data and the most accurate official voter registration data maintained by the Secretary.  This Motion does not attempt to specify the exact protocols that the State Defendants should follow to obtain the most accurate voter data available and use it in the polling places, but it does ask this Court to require the State Defendants to confer with the Coalition Plaintiffs and file a report with the Court within five days detailing the audit and data correction procedures and timeline that the State Defendants will follow.

Page 12

Second, this Motion asks the Court to require that, after voter-database discrepancies are corrected and the voter registration database is updated to reflect early voting and create electronic pollbooks, updated paper backup copies of the pollbooks be required to be delivered to and maintained at all polling places on Election Day.  Using paper backups of electronic pollbooks is a standard recommended procedure[6] to avoid polling place voter disenfranchisement that can emanate from electronic failures or mechanical or power failure. (McReynolds Decl., Doc. 277, at 98–100, ¶¶ 13–20; Martin Decl., Doc 277, at 81, ¶¶ 16–17; Bernhard Decl., Doc 277, at 42–43, ¶ 12.) The paper backups should be used as the official record on Election Day for adjudication of any electronic-pollbook discrepancies related to voter eligibility and polling-place assignment.

  e)  *Conclusion*

The Court has already found that Plaintiffs have shown a substantial risk that the entire DRE system, including the electronic pollbooks, is sufficiently compromised, vulnerable, and insecure so as to violate Plaintiffs' constitutional rights.  Granting the Coalition Plaintiffs' requested relief with respect to electronic

---

[6] For instance see Brennan Center for Justice's "Election Security Advance Planning Checklist." https://www.brennancenter.org/sites/default/files/publications/2018_08_13_ChecklistV4.pdf

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

pollbook data corrections will redress the imminent injury to voters' rights
presented by this specific form of election interference, involves none of the
logistical challenges associated with adopting paper ballots, and will directly
*reduce* voter disenfranchisement and voter confusion.

2.    *Audit of Scanned Paper-Ballot Tabulations*

a)    *Factual background*

The publicity surrounding the vulnerability of Georgia's paperless DRE
machines has led to dramatically increased public interest in voting on paper by
mail ballot.  Both leading gubernatorial candidates are aggressively encouraging
voters to vote by mail absentee ballots, sending out mailers containing absentee-
ballot applications and emails urging supporters to "vote absentee" with links to
absentee mail ballot applications.  Such voting is widely being encouraged by
various users on social media.[7]  Multiple Coalition Plaintiffs and members now
intend to vote by absentee mail ballot and, along with candidates, are encouraging
others to do so in order to cast a ballot that permits later confirmation of voter

---

[7] *See* Declaration of M. Marks, attached hereto as Exhibit F.

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

intent.  (See attached Exhibits B – E (Decls.  Smythe DuVal, Laura Digges, William Digges III and Ricardo Davis)).[8]

Even if there were no increase in the number of absentee mail ballots cast this November, the State will be required in the upcoming election to scan and count hundreds of thousands of paper mail and provisional ballots.  Doing so accurately and correcting discrepancies could easily make a difference in the outcomes of statewide or local elections, and increase lagging voter confidence.

Paper ballots are scanned and tabulated by Diebold AccuVote Optical Scan units located in the county election offices.  On election night, the memory cards from the scanners are uploaded to the Diebold GEMS server and combined with the data from the DREs to create unofficial consolidated results.  (TAC, Doc. 226, at ¶¶ 76–78).  It is well-recognized that the Diebold scanners and the Diebold GEMS server are generally vulnerable to malware and programming errors.  (Doc. 258-1, at 36–37).  Georgia's optical scanners and GEMS servers are particularly at risk given the security breach of the KSU server and the State Defendants have

---

[8] This decision is unsurprising, for voting by mail-in absentee ballot is the remedy that was suggested by the *Defendants themselves* at the last preliminary injunction hearing as a way that voters could attempt to avoid the injury of having to use a DRE when voting in person. (Tr. 27:19-21; Tr. 58:17-22).

produced no evidence that any such risks have been mitigated. (*See, e.g.* Tr. 221 – 224).

### b)    *Relief Initially Sought and Court's Disposition*

The Coalition Plaintiffs' original Motion sought a paper-ballot election and requested that the Court "order the Defendant State Election Board Members to promulgate rules requiring and specifying appropriate procedures for conducting pre-certification audits." (Doc. 258, at 2).[9]  Because pre-certification audits were proposed in connection with Plaintiffs' request to replace the DRE machines with paper ballots altogether, the Court understandably did not address the request in the Order.  However, the request for this relief remains warranted on the basis of the existing record and the Coalition Plaintiffs respectfully ask that it be granted.

### c)    *Relief Sought in this Motion*

The Coalition Plaintiffs respectfully request that this Court order the Defendants to conduct pre-certification audits of the processing of paper ballots, under the protocols developed by Coalition Plaintiffs' expert, Dr. Philip Stark, and as set forth in the Proposed Order, which will avoid the administrative law

---

[9] This request for injunctive relief followed a formal demand sent to the State Defendants in April 2018 asking them to disinfect the AccuVote Optical Scan and GEMS servers.  (Doc. 258-1, at 97.)

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

technicalities raised by the State Elections Board.[10] (*See* Stark Decl. ¶ 10-13 (attached as Exhibit G)).

### d)   *Equities Favor Granting Relief*

An order requiring the State Defendants to develop and implement appropriate plans for pre-certification audits is not a "wholesale change" in the voting process nor will it "run the voting process and voter participation amuck." (Order at 2).   Post-election audits have no impact on the electors' voting experience or poll worker duties in the polling place, but they will strengthen voter confidence in the integrity of the election results and will help prevent interference with the election results in the form of hacking the processing of paper ballots. This requested element of injunctive relief, therefore, should be granted.

---

[10] In their original Motion, the Coalition Plaintiffs asked that the Court "order the Defendant State Election Board Members to promulgate rules requiring and specifying appropriate procedures for conducting pre-certification audits of the results" of both the November and December elections.  (Doc. 258, at 2).   Vice-Chair of the  State Elections Board, Rebecca Sullivan, submitted a declaration stating that the SEB does not have the capacity to make such rules under its normal rule-making process in time for the November elections. Yet as the Curling Plaintiffs explained in their Post-Hearing Brief, Ms. Sullivan "is tellingly silent on the SEB's authority and capacity to make rules under emergency circumstances, such as imminent hacking of the statewide election system that would deprive voters of their constitutional right to vote."  (Doc. 301 at 5 (citing O.C.G.A. § 50-13- 4(b) (permitting an agency to adopt emergency rules without prior notice or hearing) and O.C.G.A. § 50-5-71 (granting emergency purchasing authority to any state officer or board)).)

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

**B.     Relief Flowing From Court's Order**

*1.  County Freedom to Use Paper Ballots*

The Court's denial of the Plaintiffs' motions was based in substantial part on the burdens associated with a state-wide implementation of paper ballot and ballot scanning voting systems for the 2018 election cycle. (Order at 41.)  In support of this finding, the Court cited declarations from officials from five large Georgia counties.  (*Id.*)

There may be counties, however, in which the local board of elections determines that the switch to paper ballots is feasible, if not for the November elections, for the December runoff and special elections or the elections scheduled for 2019.   For example, in Coweta County, the Election Director is reported to have stated that if paper ballots were adopted, "we would have just had to order more ballots and we would have just used the machines we have."[11]  In fact, approximately 125 of Georgia's 159 counties conduct all early voting at a single location—the county election office[12]—where all styles of paper ballot inventory are already maintained and from which all mail-in absentee ballots are distributed

---

[11] http://times-herald.com/news/2018/09/coweta-elections-chief-voting-machines-are-secure

12 For a list of May 22, 2018 early voting locations, see  https://mbernhard.com/ev.pdf.

Page 18

to voters.  With respect to these counties, at least, all of the equitable

considerations weigh in favor of granting equitable relief and allowing the use of

paper ballots in those counties.

The Secretary, however, has taken the position that Georgia statutory law

requires the use of DRE machines state-wide.  (Doc. 258 at 103 (August 1, 2018

Memorandum from C. Harvey to Count Election Officials, at page 2).  The State

Board of Elections has issued a rule requiring the use of DREs in all elections.  Ga.

Comp. R. & Regs. R. 183-1-12-.01. (Doc. 309 at 23).   As the Court held, however,

the Secretary's position and SEB regulations are not consistent with Georgia

statutory law, which does not require DRE use state-wide.[13]

In this Motion, the Coalition Plaintiffs seek an order stating that for all

upcoming elections, including the November elections, if an individual county

wishes to make the decision to switch to paper ballots, the State Defendants may

---

[13] The Court held that this was not a correct reading of Georgia statutory law:

> Defendants assert that the State Defendants (the Secretary and the State Election Board)
> do not mandate the use of DREs.  Defendants maintain that the State Defendants are
> merely implementing the governing state law, which they are bound to do. . . .But
> O.C.G.A. § 21-2-383(b) does not require the use of DREs as Defendants claim it does.
> The statute requires absentee electors who vote in-person in the advance voting period to
> vote by DRE, but only "in jurisdictions  in which direct recording electronic (DRE)
> voting systems are used at the polling places on election day."

(Doc. 309 at 23).

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

not directly or indirectly *prevent* the county from doing so, whether by invoking the SEB rule or otherwise.  Granting the narrow relief is fully consistent with the findings and holdings of this Court in its Order.

2. *Manual Vote Tally Comparison*

In their initial Motion, the Coalition Plaintiffs sought to prohibit use of DRE units entirely and accordingly did not seek alternative relief requiring the State Defendants to mitigate some of the dangers of DRE use.  In this Motion, the Coalition Plaintiffs seek an order requiring the Secretary to order county election superintendents prior to election certification to manually compare the electronic results tallies reported by the GEMS server against the vote totals printed on the DRE  machine tapes printed on election night.  As explained by Professor Stark in his Supplemental Declaration, there should be "manual checks of the accuracy with which DRE results are reflected in the reported, aggregated contest results." (Stark Supplemental Decl., attached as Exhibit G, ¶ 8).

It is imperative to note that the votes recorded on the DRE machines cannot be audited to determine the accuracy of the election, so this will not solve the problem of vulnerability to hacking entirely. The review and comparison requested here tests the accuracy of the reported vote accumulation starting after the DRE

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

tapes have been printed, not whether the votes were recorded accurately, which cannot be determined because there is no voter verified paper trail.

However, ordering this procedure will prevent some types of interference with the election tabulation.  On election night, each DRE machine's results are printed at the polling location. Two copies of the DRE poll tapes are required to be delivered to the county election office on election night along with the respective memory cards that are uploaded to the GEMS server (Election Rule 183-1-12.02(5)(a)(5-6)).  The GEMS server aggregates all the DRE memory card data to accumulate vote totals and reports the results.  Irregularities can be introduced in the transfer or tabulation of the DRE memory card contents, but can easily be detected by a comparison of polling place DRE results tapes against the GEMS server's precinct reports and aggregated county totals.  The record demonstrates that such errors have indeed occurred in recent elections in Fulton County, Gwinnett County and Hall County. (258-1 Bowers Decl. p 63-64 ¶ 5-8, p 70-71  ¶ 30-33; Marks Decl. p 262 ¶ 3.)  Such a comparison can also help detect memory cards that were mistakenly not uploaded.

Therefore, the Coalition Plaintiffs seek an order requiring the Secretary to order county election superintendents that before certification of the election, every

electronic results tally included in the aggregated county vote tally be manually

verified against the totals printed on the DRE tape printed in the polling place.  In

addition, the Secretary's directive to the counties should provide that all

discrepancies must be resolved to the satisfaction of the superintendent, generally

the bi-partisan county Board of Elections, and reported to the Secretary of State's

office prior to the certification of the election. Candidates on the ballot or their

respective parties should also be notified of such discrepancies at the time that the

Secretary of State is notified.

## C.    PAPER BALLOTS FOR ELECTIONS AFTER THE NOVEMBER ELECTION

The basis for denying the requested preliminary injunction rested entirely on

the limited time available to switch from DRE machines to paper balloting.

(Order, Doc. 309 at 41).  The Court also found, however, that this excuse would

not extend beyond the November elections.  The Coalition Plaintiffs therefore have

moved to preliminarily enjoin Defendants from using DREs in any election after

the November general elections.

The excuses of timing and administrative inconvenience are no defense to an

order requiring the State Defendants to switch to paper ballots for elections on and

after January 8, 2019. The 2019 elections are much smaller and months from being

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

underway.  The State Defendants and counties plainly have sufficient time to

implement any and all procedures necessary to conduct these elections as paper-

ballot elections.  Granting preliminary injunctive relief now for elections in 2019

will also ease the pressure on the discovery schedule and preserve the status quo

pending a trial on the merits.[14]  There simply is no reason to allow the State

Defendants to continue to violate the Plaintiffs' constitutional rights.

As to the December 4, 2018 special elections and potential runoff elections:

the Plaintiffs' initial motions addressed both the 2018 November and December

runoff elections jointly, and the Court's Order denying relief did the same.  But the

equities and public interests involved in two remaining 2018 elections are much

different, for the following reasons.

First, the turnout for the December elections will most likely be far less than

for the November election.  Attached as Exhibit H is a table comparing voter

turnout for various elections, which shows that turnout for run-off and special

elections tends to be far less than for general or special elections.  To be sure, if

there is a run-off  in the Gubernatorial race the turnout could be higher than usual,

---

[14] The Coalition Plaintiffs nonetheless continue to respectfully request that this Court adopt the expedited Joint Discovery Schedule proposed by the Plaintiffs and to set this case down for trial on the merits, if possible, in February 2019.

but in that scenario the need for an auditable paper trial would be even more compelling.

Second, an order entered prior to the November elections enjoining the State Defendants from using DREs in the December run-offs and special elections will not interrupt the preparation for the run-offs because that preparation cannot even begin until the general election is certified, expected to be November 13, 2018. After election day, the State Defendants will have to build the ballots for the run-offs and order the printed ballots in time for mail ballots, and provisional voting for the run-offs, regardless of whether this injunctive relief is granted.  The only difference will be that, instead of using vulnerable DREs, the State Defendants will need to order more paper ballots.  Indeed, using paper ballots for the December run-offs and special elections may be significantly more convenient for the State Defendants than using DREs: under state law, the State Defendants may not reuse the DREs used in the November 6 for thirty days. [15]  For early and election day

---

[15] Election Rule 183–1–12–.02(6)(d) states: "The election results, ballot styles, ballot images, and other information for each election stored in the internal memory storage of each DRE unit shall be maintained for a minimum of one month following each election after which time the results may be erased provided that there are no election contests pending concerning such election."  Using the DREs in a subsequent election will compromise and alter the data in the internal memory  that is required to be preserved for at least thirty days.

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

voting for the run-offs and special elections, therefore, different DREs must be programmed, tested, transported and deployed if DREs are to be used.[16]

Finally, any compromise of the November election, whether through malware, programming errors or more pedestrian system failures, will likely not become apparent until it is too late to plan for verifiable paper ballot elections for the December or early 2019 elections.  Ordering this injunctive relief now, for both the December and 2019 elections, would therefore clearly serve the public interest.

---

[16] Early voting for the December 4,  2018 House District 28 Special Election is required to begin November 12, 2018.  *See Gasoway*, Order at page 6 (attached as Exhibit I).

COALITION PLAINTIFFS' BRIEF
IN SUPPORT OF ADDITIONAL
INJUNCTIVE RELIEF
OCTOBER 2, 2018

For the foregoing reasons, the Coalition Plaintiffs' Motion for Addition

Injunctive Relief should granted.

Respectfully submitted this 2nd day of October, 2018.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Robert A. McGuire, III* |
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Admitted Pro Hac Vice |
| BRUCE P. BROWN LAW LLC | (ECF No. 125) |
| Attorney for Coalition for | Attorney for Coalition |
| Good Governance | for Good Governance |
| 1123 Zonolite Rd. NE | Robert McGuire Law Firm |
| Suite 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 881-0700 | (253) 267-8530 |
| | |
| */s/ William Brent Ney* | |
| William Brent Ney | */s/ Cary Ichter* |
| Georgia Bar No. 542519 | CARY ICHTER |
| Attorney for Coalition | Georgia Bar No. 382515 |
| for Good Governance, William | Attorney for William Digges III, Laura |
| Digges III, Laura Digges, Ricardo | Digges, Ricardo Davis and Megan Missett |
| Davis, and Megan Missett | Ichter Davis LLC |
| Ney Hoffecker Peacock & Hayle | 3340 Peachtree Road NE |
| 1360 Peachtree Street NE | Suite 1530 |
| Atlanta, Georgia 30309 | Atlanta, Georgia 30326 |
| (404) 842-7232 | (404) 869-7600 |

Page 26

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRIAN KEMP, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in

accordance with the font type and margin requirements of LR 5.1, using font

type of Times New Roman and a point size of 14.

> */s/ Bruce P. Brown*
> Bruce P. Brown
> Georgia Bar No. 064460
> BRUCE P. BROWN LAW LLC
> Attorney for Coalition for
> Good Governance
> 1123 Zonolite Rd. NE
> Suite 6
> Atlanta, Georgia 30306
> (404) 881-0700

Page 27

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRIAN KEMP, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF SERVICE

This is to certify that I have this day caused the foregoing coalition

PLAINTIFFS' BRIEF IN SUPPORT OF ADDITIONAL INJUNCTIVE RELIEF

to be served upon all other parties in this action by via electronic delivery using the

PACER-ECF system.

This 2ND day of October, 2018.

> */s/ Bruce P. Brown*
> Bruce P. Brown
> Georgia Bar No. 064460
> BRUCE P. BROWN LAW LLC
> Attorney for Coalition for
> Good Governance
> 1123 Zonolite Rd. NE
> Suite 6
> Atlanta, Georgia 30306
> (404) 881-0700

Page 28

EXHIBIT

A

## Georgia Elections Through December 31, 2019

The schedule of upcoming elections through December 31, 2019 based on the Secretary of State's website is as follows:

| 2018-19 Scheduled State Office Elections | Election Date |
|---|---|
| 2018 General Election | November 6, 2018 |
| Special Elections[1] and Runoff Elections | December 4, 2018 |
| Federal Runoff Elections | January 8, 2019 |
| Special Election Date | March 19, 2019 |
| Special Election Runoff Date | April 16, 2019 |
| Special Election Date | June 18, 2019 |
| Special Election Runoff Date | July 16, 2019 |
| Special Election Date | September 17, 2019 |
| Special Election Runoff Date | October 15, 2019 |
| General Election/Special Election Runoff Date | November 5, 2019 |
| General Election/Special Election Runoff Date | December 3, 2019 |

Source: http://sos.ga.gov/index.php/elections/elections_and_voter_registration_calendars.

---

[1] At least one special election has been scheduled for December 4, 2018, by court order in Banks County Superior Court, *Gasaway v. Ellison* (18-cv-249), attached hereto as Exhibit I.

EXHIBIT

B

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **DONNA CURLING, et al.** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION FILE NO.: 1:17-cv-** |
| **vs.** ) | **2989-AT** |
| ) | |
| **BRIAN P. KEMP, et al.** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF J. SMYTHE DUVAL

**J. SMYTHE DUVAL** hereby declares as follows:

1.  I am the Libertarian Party of Georgia's candidate for Secretary of State in the November 6, 2018 election. The Secretary of State's race is a statewide race, and my name is on the ballot in all 159 counties.

2.  I am currently completing work on my Master's Degree in Information Technology at Kennesaw State University, with emphasis in Healthcare IT. I am scheduled to receive the degree in December 2018.

3.  My professional experience includes approximately 12 years of IT Project Management experience, and approximately 3 years of Senior IT Management experience, including experience as a HIPAA Security & Privacy officer for a large medical practice.

4.  Because of my experience and technical knowledge of information technology and cyber-security risk assessment, I am aware of the security deficiencies of Georgia's DRE voting system, and have read the press reports of Georgia voting system's security flaws and have reviewed several declarations of experts in this case, to include serious operational deficiencies in the SOS's implementation of an IT security and compliance program.

5.  Following the press reports that foreign entities were analyzing Georgia government websites, including the Cobb Board of Elections website, I reviewed the Plaintiffs' recommended solution of using Diebold optical scanners with the GEMS servers to conduct the November election and as a candidate, publicly endorsed that solution. I am aware of the unaddressed security flaws in the optical scanner and GEMS server.

6.  I attended the September 12, 2018 hearing in this case and heard the testimony of Michael Barnes and Chris Harvey. I was stunned to learn that no remediation efforts have been taken nor any forensic review undertaken by the Secretary of State's office since the KSU server was exposed to anyone with an internet connection.

7.  My research as an IT professional and candidate for Secretary of State is that the tabulation data can be directly modified after the election by an

"insider", such as an election staff employee, an IT staff member, a custodian, a vendor representative, or anyone with unobserved access to election equipment following balloting. Additionally, my observation is that optical scanners and GEMs servers can easily be compromised with malware, introduced either by an "insider" or an external "bad actor." Either scenario has the effect of making a paper trail of questionable value if the paper trail is not audited or reviewed against the optical-scan tabulation results. The risk of compromise is exacerbated by what I learned from testimony at the hearing about the apparent lack of a formal IT security program, the lack of an effective compliance and risk management program, as evidenced by the following: the lack of curiosity, the failure to formally investigate and identify weaknesses/ deficiencies in the IT system, the failure to review and identify weaknesses/ deficiencies in the governing policies, processes, and procedures of the organization (aka a "root cause analysis") and therefore the lack of any holistic, methodical, or meaningful remediation or prevention effort (aka risk management).

8. I have carefully followed and actively participated in voters' statewide efforts to advocate for paper ballots in the polling place in the November election. I have spoken at numerous public meetings advocating for the

essential and urgent need for paper ballots in Georgia elections to secure our elections so that they may be audited and recounted.

9.  As a candidate, I have a strong interest in having a reliable, legally conducted election that can be recounted, audited, or reviewed in an election challenge—and only paper ballots can provide that.

10. I have made public requests of the appropriate county bodies in Georgia counties and specifically Cobb County to exercise their legal option to adopt paper ballots for the November election, despite the Secretary of State's claim that the counties do not have the authority to do so.

11. In my discussions with local county officials, I have learned that they have been told by the Secretary of State's office that they do not have the authority to adopt paper ballots.

12. I still continue to encourage local officials, particularly in smaller counties, to switch to paper ballots, given that the vast majority of counties do not have multiple early voting centers and therefore seemingly no logical barrier to the swift adoption of paper ballots in the polling places.

13. I continue to encourage local county officials' immediate adoption of paper ballots, despite the Secretary of State's claims that the local officials have no authority to do so, and although the Court determined that paper ballots would not be required in the polling places in November's election.

14. After the Court's decision, I reluctantly began advocating that voters opt for voting by mail ballot, because paper ballots can be recounted and audited and used as evidence in any potential post-election challenge.  During upcoming Secretary of State candidate forums, I will advocate for mail ballots for this election, encouraging all ballots to be cast that in a way that a paper trail is created.

15. My strong preference is to vote on Election Day in my local precinct along with other voters, particularly since I am a candidate, and I want to be seen by voters exercising the right to vote. I also want the full benefit of acquiring the latest news and information on all matters on the ballot, right up until Election Day. I want all voters to have these same two benefits of voting on Election Day.

16. However, I have to forego those two important benefits to cast a ballot with an auditable paper trail, and encourage others to do so, given that Election Day voting is limited to unauditable and unreliable DRE voting.

17. My overriding goal is to cast a secure ballot that I am confident reflects my intent that can be recounted and tested. Therefore, I am making the reluctant choice to vote several days prior to Election Day by mail ballot, foregoing the benefits of voting on Election Day, and suggesting that voters do the same.

18. I will mail or deliver my mail ballot well before Election Day in order to ensure that it is delivered and accepted in time for me to cure possible delivery failure or signature differences or technical errors in the oath information details, and encourage all voters to do the same.

19. Although this is a disadvantage in casting my ballot before Election Day, I unhappily accept the mail ballot disadvantages and risks for the benefit of casting a paper ballot that can be audited.

I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this date, September 30, 2018

J. Smythe Duval

6

E
X
H
I
B
I
T

C

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| DONNA CURLING, et al. | ) |
| Plaintiff, | ) |
| vs. | ) **CIVIL ACTION FILE NO.: 1:17-cv-2989-AT** |
| BRIAN P. KEMP, et al. | ) |
| Defendant. | ) |

## DECLARATION OF LAURA DIGGES

**LAURA DIGGES** hereby declares as follows:

1. I am a Georgia voter, registered to vote at my residence 3478 Chastain Glen Lane NE, Marietta, Georgia 30066.

2. I intend to vote in the upcoming November 6, 2018 election and all future elections for which I am eligible to vote. My general practice is to vote in all elections for which I am eligible.

3. I plan to vote by absentee mail ballot in the November 6, 2018 because paper ballots will not be available in the polling place on Election Day.

4. My strong preference is to vote on Election Day at my neighborhood precinct with my neighbors and participate in the shared local civic experience with the benefit of the latest news and information on candidates and contests on the ballot.

5. However, my priority is to cast a secure ballot that I am confident reflects my intent, but this is impossible to do by voting on the DREs provided on Election Day. Therefore, I am making the unwelcome choice to vote several days prior to Election Day by mail ballot, foregoing the benefits of voting on Election Day.

6. I understand that I must mail or deliver my mail ballot well before Election Day in order to ensure that it is delivered and accepted in time for me to cure possible delivery failure or any alleged deficiencies in signature match or oath information details. Although this is a disadvantage in casting my ballot before Election Day, I will reluctantly accept this voting disadvantage for the benefit of casting a paper ballot that can be recounted and audited.

I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this date, September 27, 2018

Laura Digges

E
X
H
I
B
I
T

D

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DONNA CURLING, et al.

Plaintiff,

vs.

BRIAN P. KEMP, et al.

Defendant.

)
)
)
)
)
)
)
)
)
)
)

**CIVIL ACTION FILE NO.: 1:17-cv-2989-AT**

## DECLARATION OF WILLIAM DIGGES III

**WILLIAM DIGGES III** hereby declares as follows:

1. I am a Georgia voter, registered to vote at my residence 3478 Chastain Glen Lane NE, Georgia 30066.

2. I will be voting in the November 6, 2018 election and plan to vote in all future elections for which I am eligible to vote. I vote in every election of which I am aware that I can participate.

3. I plan to vote by absentee mail ballot in the November 6, 2018 because paper ballots will not be issued at the polling places in Cobb County on Election Day.

4. My definite preference is to vote on Election Day at my local precinct with my community and participate in the community experience, also with the benefit of the latest information on matters on the ballot.

5. I wish to cast a secure ballot that I reflects my intent, but this is impossible to do by voting on the DREs provided by Cobb County in the polling places. Therefore, I am making the unfortunate choice to vote several days prior to Election Day by mail ballot, and unhappily giving up the benefits of voting in the polling place.

6. I understand that I must mail or deliver my mail ballot several days before Election Day in order to confirm that it is delivered and approved in time for me to cure possible delivery failure or any technical deficiencies in signature match or oath information details.

7. Although this is a serious disadvantage in casting my ballot before Election Day, I will reluctantly accept this voting disadvantage for the benefit of casting a paper ballot that can be recounted and audited.

I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this date, September 27, 2018

William Digges III

E
X
H
I
B
I
T

E

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| DONNA CURLING, et al.<br><br>Plaintiff,<br><br>vs.<br><br>BRIAN P. KEMP, et al.<br><br>Defendant. | CIVIL ACTION FILE NO.: 1:17-cv-2989-AT |

## DECLARATION OF RICARDO DAVIS

**RICARDO DAVIS** hereby declares as follows:

1. I am a registered Georgia voter residing at 206 Hunters Mill Lane, Woodstock, Georgia 30188.

2. I will be voting in the November 6, 2018 election, and plan to vote in all future elections for which I am eligible to vote. I generally vote in every election of which I am aware that I can participate.

3. I plan to vote by absentee mail ballot in the November 6, 2018 because paper ballots will not be issued at the polling places in Cherokee County on Election Day.

4. This is consistent with my usual practice of voting by paper mail-in ballot, which I elected to do some years ago when the DRE system deficiencies were exposed. As an Information Technology professional I understand that

Georgia's DRE machines cannot be audited; therefore I consistently choose mail-in ballots as my typical method of voting.

5. I am the State Chairman of the Constitution Party of Georgia, a conservative political party. I will encourage our members and supporters to vote by mail in the November 6, 2018 election despite some of the disadvantages. Voting by mail at least preserves an auditable record of the voters' intent, which Georgia's DRE machines cannot do.

6. In my estimation, encouraging voters to vote on auditable paper ballots helps improve voter confidence and turnout. Over the years Georgia voters have heard reports about Georgia's unauditable elections systems and the failure of the Georgia state legislature and the Secretaries of State to rectify the problems as many other states have done. Now that the DRE's computer security issues are a reoccurring topic in national news Georgia voters are rightly concerned that if their electronic votes are manipulated then it would be very difficult to impossible to detect, which may discourage them from voting.

7. Given my technical familiarity with the elevated security risk of Georgia's DRE voting system, I am aware that paper ballots alone do not assure that ballots are counted accurately. Optical scan machines and the GEMS servers

cannot be assumed to be accurate any more than DRE machines, as they are just as subject to hacking and erroneous programming.

8. However, if a paper trail of mail-in ballots is created and the Court permits or an election is contested after certification, then a post-election review can take place using the voter-verified paper ballots as evidence.

I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this date, September 25, 2018

Ricardo Davis

EXHIBIT

F

# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| DONNA CURLING, et al. ) | |
| Plaintiff, ) | |
| vs. ) | **CIVIL ACTION FILE NO.: 1:17-cv-2989-AT** |
| BRIAN P. KEMP, et al. ) | |
| Defendant. ) | |

## DECLARATION OF MARILYN MARKS

**MARILYN MARKS** hereby declares as follows:

1. I am the Executive Director of Coalition for Good Governance.

2. In the last few weeks I have seen a considerable number of ads from candidates and their supporters in both major political parties advocating for voting by mail ballot.

3. An example of Republican gubernatorial candidate Brian Kemp's ad for mail ballots is linked here. https://action.kempforgovernor.com/absentee-ballot/#1

4. An example of Democratic gubernatorial candidate Stacey Abrams's ad for mail ballots is linked here.

   https://www.facebook.com/stacey.abrams.77/videos/263868541001096/

5.  Smythe DuVal, Libertarian candidate for Secretary of State recommends mail ballots under the circumstances. (Duval Decl. ¶ 14) and has Tweeted his recommendation linked here

    https://twitter.com/JSmytheDuVal/status/1045393188108861440

6.  The desire for paper ballots in the Georgia's November election is being promoted by celebrities such as Alyssa Milano, advocating for mail ballots. Her Tweet is linked here.

    https://twitter.com/Alyssa_Milano/status/1046444231664062464

7.  As Executive Director of Coalition for Good Governance, I have been contacted in the last two weeks by dozens of Georgia voters asking for advice on the safety of voting by mail ballot because they had seen candidate ads suggesting it.

I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this date, October 2, 2018

_____
Marilyn Marks

EXHIBIT

G

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, et al. )<br><br>Plaintiff, )<br><br>vs. )<br><br>BRIAN P. KEMP, et al. )<br><br>Defendant. ) | **CIVIL ACTION FILE NO.:**<br>**1:17-cv-2989-AT** |

## SUPPLEMENTAL DECLARATION OF PHILIP B. STARK

**PHILIP B. STARK**  hereby declares as follows:

1.  This statement supplements my statement of September 9, 2018 regarding the need for post-election audits generally, and in Georgia specifically. I stand by everything in the previous declaration, but in light of the court's decision to allow the State of Georgia to conduct the November 2018 elections using its current equipment, I wish to add a few recommendations.

2.  I understand that in the upcoming 6 November 2018 election, some voters will cast their votes using polling-place DRE machines. I understand that other voters will cast paper ballots that will be tabulated using Diebold Accu-Vote optical scanners.

3.  There is no way to ensure that DREs correctly record and tabulate votes, because there is no voter-reviewed, durable, tamper-evident record of the votes cast on DREs, and it is possible to alter DRE software undetectably. Unless so few voters cast their votes using DREs that those votes cannot change the outcome of the contests under audit, there is no

way to audit election outcomes in Georgia that guarantees a high probability of detecting and correcting incorrect election outcomes (i.e., a *risk-limiting audit*).

4. Nonetheless, I recommend that a sample of DREs be audited forensically, both before the election (but after the DREs have been configured for the election) and after the election. I recognize that there might not be time for a complete forensic examination of machines before contest results are certified, owing to the short canvass period in Georgia. However, such an examination should be conducted as soon as possible after the election, to inform the conduct of future elections.

5. The forensic examination should be performed by appropriate independent security experts and/or suitably skilled law enforcement personnel. While such examination cannot be guaranteed to detect all tampering, bugs, or hacking, it could detect some kinds of problems and it could discourage malicious tampering.

6. The sample of machines inspected forensically after the election should include any machines for which the reported results are suspicious or anomalous, for instance, because they report more votes than the number of voters reflected in the pollbooks, or because they report a surprisingly large number of undervotes in one or more contests.

7. The samples should also include a number of randomly selected machines. The number of machines selected randomly for forensic auditing after the election should be large enough to ensure that if a material number of DREs used in the election had their software or firmware altered detectably, there is a large chance that the forensic audit will find at least one such machine. The number of machines that should be considered material depends in part on contest margins and the number of votes cast on each DRE. If the court orders the state to conduct such audits, I will gladly make myself available to

determine appropriate sample sizes, to draw the random sample, and to conduct other statistical calculations as needed.

8. I recommend that there be manual checks of the accuracy with which DRE results are reflected in the reported, aggregated contest results: every uploaded electronic tally from a DRE should be checked manually against the totals printed in the polling place when the polls close on election night. The DRE results should also be checked for obvious problems, such as reporting more votes than voters at a polling place.

9. I also recommend that the accuracy of the tabulation of the votes on paper ballots be checked by a post-election audit involving manually inspecting a random sample of ballots, as described below. Even though perfect tabulation of the votes cast on paper ballots cannot in general guarantee that contest outcomes are correct (because some votes are cast on DREs), auditing the accuracy of the tabulation of votes cast on paper ballots is valuable for many reasons, including as a deterrent.

10. I recommend auditing the tabulation of as many contests as practicable, giving priority to statewide and federal contests. The method of determining which contests to audit is not crucial, provided it is not possible for anyone to know which contests will not be audited before election results have been announced. Otherwise, a malicious actor could avoid any possibility of detection. An example of a reasonable rule would be to audit every statewide and federal contest, and a random sample of three within-county contests in each county.

11. I recommend recording voter intent for every contest represented on every ballot inspected by the audit, even contests that are not the deliberate target of the audit, and

making those data publicly available. Such data can provide additional information about the accuracy of the tabulation of other contests at negligible marginal cost.

12. For contests deliberately subject to audit, I suggest that the audit ensure with at least 95 percent confidence that the error (in votes) in the tabulation does not exceed the margin of the contest (in votes), times the percentage of ballots in the contest that were cast using paper ballots. In California law, this is called a "partial risk-limiting audit."

13. Statistical methods and example software that could be used to perform such audits are given in Ottoboni, K., P.B. Stark, M. Lindeman, and N. McBurnett, 2018 (in press). Stratified Union-Intersection Tests of Elections (SUITE), *Electronic Voting. E-Vote-ID 2018*. Lecture Notes in Computer Science, Springer. Preprint: https://arxiv.org/abs/1809.04235, last visited 29 September 2018. If the court orders such post-election audits, I will gladly make myself available to help design and conduct the audit, including providing software to support the audits, and training for election officials.

14. If Georgia election officials undertake post-election auditing of paper ballots, I urge that they consult with non-profit organizations experienced in post-election risk-limiting audits to tailor existing procedures to Georgia's circumstances quickly, inexpensively, and reliably. The procedures need to ensure that the paper records remain trustworthy, through measures such as ballot accounting, verified chain of custody, two-person access rules, and appropriate physical security and surveillance.

15. Post-election auditing has no impact on voters' experience casting their votes nor on pollworkers' duties at the polling places: the audit is conducted in the election officials' offices after polls close, not at polling places.

I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this date, September  30,  2018.

_____

Philip B. Stark

EXHIBIT

H

# Exhibit H – Vote Turnout Table[1]

| Election Date | Special and Runoff Ballots Cast | General and Primary Ballots Cast |
|---|---|---|
| **2018** | | |
| General Primary and Nonpartisan General Election Runoff - July 24, 2018 | 750,000* | |
| General Primary and Nonpartisan General Election - May 22, 2018 | | 1,175,000* |
| Special Election - February 13, 2018 | 3,331 | |
| Special Election - January 9, 2018 | 9,297 | |
| **2017** | | |
| Special Election - December 5, 2017 | 129,857 | |
| Special Election - November 7, 2017 | 249,327 | |
| Special Election Runoff - June 20, 2017 | 260,455 | |
| Special Election Runoff - May 16, 2017 | 32,701 | |
| Special Election - April 18, 2017 | 192,756 | |
| Special Election Runoff - January 10, 2017 | 6,782 | |
| **2016** | | |
| Special Election - December 13, 2016 | 4,971 | |
| General Election - November 8, 2016 | | 4,165,405 |

---

[1] The source of this information is the web page of the Georgia Secretary of State.  The asterisk (*) indicates that accumulated actual totals of turnout were not reported, but were estimated by Coalition Plaintiffs based on the supporting documents posted on Secretary of State webpage http://sos.ga.gov/index.php/Elections/current_and_past_elections_results

| | | |
|---|---|---|
| General Primary and Nonpartisan General Election Runoff - July 26, 2016 | Not Available | |
| General Primary and Nonpartisan General Election - May 24, 2016 | | 1,000,000* |
| Special Election Runoff - April 26, 2016 | 1,290 | |
| Special Election - March 29, 2016 | 2,632 | |
| Presidential Preference Primary - March 1, 2016 | | 2,062,000* |
| Special Election Runoff - February 16, 2016 | 1,137 | |
| Special Election - January 19, 2016 | 836 | |

**2015**

| | |
|---|---|
| Special Election - December 1, 2015 | 21,140 |
| Special Election - November 3, 2015 | 57,260 |
| Special Election Runoff - August 11, 2015 | 13,403 |
| Special Runoff Election - July 14, 2015 | 6,258 |
| Special Election - July 14, 2015 | 14,449 |
| Special Election - June 16, 2015 | 6,571 |
| Special Election Runoff - February 3, 2015 | 7,957 |
| Special Election - January 6, 2015 | 7.988 |

**2008 (Last statewide runoff)**

| | |
|---|---|
| Dec. 2, 2008 runoff | 2,145,000* |
| Nov 4, 2008 General election | 3,950,000* |

2

EXHIBIT

I

## IN THE SUPERIOR COURT OF BANKS COUNTY
## STATE OF GEORGIA

DAN GASAWAY,                                    )
                                               )
    Petitioner,                           )
                                               )
v.                                              )     Civil Action No.: 18-CV-249
                                               )
LAUREL ELLISON, Habersham County               )
Elections Supervisor, CHRIS                     )
ERWIN, Republican Nominee for Georgia           )
House District 28 – May 22, 2018,               )
STEPHENS COUNTY BOARD OF                        )
ELECTIONS, HABERSHAM COUNTY                      )
BOARD OF ELECTIONS AND                          )
REGISTRATION, BANKS COUNTY                       )
BOARD OF ELECTIONS AND                          )
REGISTRATIONS,                                  )
                                               )
    Respondents.                          )

*Filed with the County this 20th of September, 2018, at 2:57 p.m.*

*[signature]*
*S.J.S.C.G.*

---

## ORDER GRANTING PETITIONER DAN GASAWAY'S PETITION TO CONTEST ELECTION RESULTS and ORDERING A SECOND PRIMARY ELECTION

### Preliminary Findings

After notice to the parties, on September 18 and 19, 2018, the Court conducted

a hearing on Petitioner Dan Gasaway's ("Mr. Gasaway") Petition and all other

matters pending before the Court.  Counsel for Mr. Gasaway, Laurel Ellison, the

Habersham County Board of Elections and Registrations (the "Habersham County

Board"), the Stephens County Board of Elections and Registrations (the "Stephens

1

County Board"), and Chris Erwin ("Mr. Erwin") appeared at the hearing. Although counsel for the Banks County Board of Elections and Registrations (the "Banks County Board") did not formally appear in the case, he was present in the courtroom.

The Court first heard argument on all pre-hearing motions. After hearing and considering argument from Mr. Gasaway and Mr. Erwin on these motions and considering the evidence in the record, the Court **ORDERS** as follows regarding the pre-hearing motions:

1.    The Court **GRANTS** Mr. Gasaway's Motion for Leave to Amend to File His First Amended Petition and to Add Banks County Board of Elections and Registrations.[1]   The Court finds that Mr. Gasaway met the burden to amend his petition pursuant to O.C.G.A. § 21-2-524(g) because he pled additional grounds of contest and other relevant facts, and the Court finds that Mr. Gasaway met the burden of adding the Banks County Board under O.C.G.A. § 9-11-15 and applicable Georgia case law.   The Court provided Mr. Erwin a reasonable opportunity to respond to the First Amended Petition by allowing him to respond orally to the Petition at the hearing.[2]

---

[1] Although Mr. Gasaway also sought to add the Board of Elections and Registrations for Stephens County, Habersham County, Jackson County, and Franklin County, this request was mooted because the Stephens County and Habersham County Boards of Elections voluntarily appeared in the case and because Mr. Gasaway withdrew his Motion for Leave to Amend to the extent that it sought to add the Franklin County and Jackson County Boards of Elections and Registration.

[2] In determining a reasonable time for response, the Court considered that the Motion for Leave to Amend had been pending three months, the amendment added no new claims, and addition of the Banks County Board did not create new issues. Given that the Banks County Board was

2.     The Court **DENIES** Mr. Erwin's Motion to Dismiss.  Mr. Erwin's argues that Mr. Gasaway's Petition should be dismissed for failing to name the Stephens County Board and the Banks County Board. These argument are mooted by the Stephens County Board's voluntary appearance in the case and the Banks County Board's addition as a party as a result of the Court's granting of Mr. Gasaway's Motion for Leave to Amend.

As to the argument that the Plaintiff's petition was not timely filed, the Court adopts Judge John J. Goger's Order allowing Mr. Gasaway's Petition back to relate back to the time of original submission on June 6, 2018 at 11:36 p.m.[3] The Court further finds that Mr. Gasaway paid all statutory filing fees at the time of filing his Petition and submitted a case initiation form. The Court finds that Plaintiff submitted a completed filing to the Fulton County Superior Court at 11:36 p.m. on June 6, 2018.  Therefore, the Court **DENIES** Mr. Erwin's Motion to Dismiss.

3.     The Court **GRANTS** Ms. Ellison's Motion for Leave to withdraw her motion to dismiss and to withdraw any objections.

---

added as a necessary party for complete relief, the Court found no prejudice to Defendant Erwin in allowing an immediate, oral response.

[3] Judge Goger relied on the Superior Court of Fulton County's standing order on electronic filing.  Judge Goger's was an administrative determination of the adequacy of the filing under a local order. The Court does not find that intervention of an appointed judge from outside the Atlanta Circuit was necessary.

## Findings of Fact

After resolution of the pre-hearing motions, the Court heard evidence on the merits of Mr. Gasaway's Petition. Based upon the evidence presented, the Court makes the following findings of fact:

1.      The 2018 May 22, 2018 House District 28 General Republican Primary Election (the "Election") was decided by 67 votes;

2.      The Habersham County Board placed at least 33 voters in House District 28, when they resided in House District 10;

3.      These 33 voters voted in the Election;

4.      The Habersham County Board placed at least 37 voters in House District 10, when they resided in House District 28;

5.      These 37 voters voted in the Election;

6.      The Habersham County Board additionally placed Mary S. Murphy in House District 10, when she resided in House District 28;

7.      Mary S. Murphy voted in the Election;

8.      The Habersham County Board additionally placed Christopher N. Woods in House District 28, when he resided in House District 10;

9.      Christopher N. Woods voted in the Election;

10.     The parties stipulated that the Stephens County Board placed Sue and Frank Harriman in House District 28, when they resided in House District 32;

4

11.    These two voters voted in the Election;

12.    At least 74 voters were assigned to the wrong district, and voted in the wrong election in the May 22, 2018 House District 28 General Republican Primary Election.

## Conclusions of Law

O.C.G.A. § 21-2-522  establishes that a result of  a primary election may be contested if:

> (1)  [m]isconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result;
>
> …
>
> (3)  [w]hen illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result.

To prevail under O.C.G.A. § 21-2-522, a party challenging an election result must affirmatively show that a sufficient number of voters voted illegally or were irregularly recorded in the contest being challenged to make a difference in the result or to cast doubt on the outcome. *Taggart v. Phillips*, 242 Ga. 484, 487 (1978).  If that party carries this burden, the election should be voided and another one held. *See generally Bush v. Johnson*, 111 Ga. App. 702, 706 (143 S.E.2d 21) (1965).  A contestor does not have to show how the voters would have voted, only that they voted in the underlying election. *Howell v. Fears*, 275 Ga. 627, 628 (2002).

5

## Order of the Court

Having heard and considered the evidence in the record and the arguments by counsel, the Court hereby **GRANTS** Mr. Gasaway's First Amended Petition to Contest Election Results & Request for New Election and **ORDERS** as follows:

(a)    Plaintiff presented sufficient evidence to change or cast in doubt the results of the May 22, 2018 Georgia House District 28 Republican General Primary Election based upon illegal votes being cast and irregularities by primary election officials as is shown by 74 voters being placed in the wrong district when 67 votes decided the Election;

(b)    The Court **DECLARES** invalid the 2018 Georgia House District 28 Republican General Primary Election which took place on May 22, 2018;

(c)    The Court **ORDERS** that a second 2018 Georgia House District 28 Republican General Primary Election shall take place on December 4, 2018 with all absentee ballots, early voting ballots, and other ballots to be administered in accordance with Georgia's Election Code;

(d)    Pursuant to O.C.G.A. § 21-2-291, because there is no eligible Democratic candidate or eligible candidates of a party other than the Republican party in the 2018 Georgia House District 28 race, the winner of the second 2018 Georgia House District 28 Republican General Primary Election taking place on

December 4, 2018 **SHALL** be declared the winner of the 2018 Georgia House District 28 General Election to take office on January 14, 2019;

(e)     Because the Court has declared the 2018 House District 28 General Republican Primary Election, which occurred on May 22, 2018, to be invalid, Defendants Banks County Board, Habersham County Board and Stephens County Board **Shall Not** provide voters in the November 6 General Election ballots which list Chris Erwin as the Republican nominee in the General Election for House District 28;

(f)     The individuals eligible to vote in the second 2018 House District 28 General Republican Primary Election taking place on December 4, 2018 **SHALL** be all voters who were eligible to vote in the May 22, 2018 House District 28 General Primary that (1) did not request a Democratic ballot in that May 22, 2018 General Primary Election, and (2) have not subsequently become ineligible to vote in House District 28.

**SO ORDERED**, this 20th day of September, 2018, nu*nc pro tunc* to September 19, 2018.

David R. Sweat, Senior Judge
Superior Courts of Georgia