1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,            :
                                      :
5         PLAINTIFFS,                 :
    vs.                               :   DOCKET NUMBER
6                                     :   1:17-CV-2989-AT
    BRAD RAFFENSPERGER, ET AL.,       :
7                                     :
          DEFENDANTS.                 :
8

9

10        **TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS**

11          **BEFORE THE HONORABLE AMY TOTENBERG**

12            **UNITED STATES DISTRICT JUDGE**

13                  **APRIL 9, 2019**

14                    **2:37 P.M.**

15

16

17

18

19

20

21   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22              *TRANSCRIPT PRODUCED BY:*

23

    *OFFICIAL COURT REPORTER:*        *SHANNON R. WELCH, RMR, CRR*
24                                    *2394 UNITED STATES COURTHOUSE*
                                      *75 TED TURNER DRIVE, SOUTHWEST*
25                                    *ATLANTA, GEORGIA  30303*
                                      *(404) 215-1383*

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
      SCHOENBERG:
 4

 5         DAVID D. CROSS
           CATHERINE L. CHAPPLE
 6         MORRISON & FOERSTER, LLP

 7         ADAM SPARKS
           KREVOLIN & HORST, LLC
 8

 9    FOR THE PLAINTIFF COALITION FOR GOOD GOVERNANCE:

10

11         BRUCE P. BROWN
           BRUCE P. BROWN LAW
12

13    FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
      WILLIAM DIGGES, III, AND RICARDO DAVIS:

14

15         CARY ICHTER
           ICHTER DAVIS, LLC
16

17    FOR THE STATE OF GEORGIA DEFENDANTS:

18         VINCENT ROBERT RUSSO, JR.
           JOSHUA B. BELINFANTE
19         CAREY A. MILLER
           ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
20
           BRYAN P. TYSON
21         TAYLOR ENGLISH DUMA

22

23    FOR THE FULTON COUNTY DEFENDANTS:

24
           KAYE WOODARD BURWELL
25         DAVID R. LOWMAN
           OFFICE OF THE FULTON COUNTY ATTORNEY
```

```
 1                    P R O C E E D I N G S

 2    (Atlanta, Fulton County, Georgia; April 9, 2019.)

 3              THE COURT:  Good afternoon.  Please have a seat.

 4    We're here for a status conference in Donna Curling, et al. vs.

 5    Brad Raffensperger, Civil Action File Number 1:17-CV-2989.

 6              Good afternoon, Counsel.  We have some changes in

 7    faces and some not.  But just for purposes of this hearing at

 8    least, why don't we have everyone introduce themselves anew or

 9    for the first time.

10              MS. CHAPPLE:  Good afternoon, Your Honor.  Catherine

11    Chapple from Morrison & Foerster for the Curling plaintiffs.

12    With me today is David Cross also with Morrison & Foerster and

13    Adams Sparks with Krevolin & Horst.

14              THE COURT:  Very good.

15              MR. BROWN:  Your Honor, Bruce Brown for the Coalition

16    plaintiffs.  And with me today is Marilyn Marks, the director

17    of the Coalition, and Cary Ichter.

18              THE COURT:  Very good.

19              MR. RUSSO:  Good afternoon, Your Honor.  Vincent

20    Russo with Robbins Ross Alloy Belinfante Littlefield for the

21    state defendants.

22              MR. TYSON:  Your Honor, Bryan Tyson of Taylor English

23    Duma for the same defendants as well.

24              MR. BELINFANTE:  Good afternoon, Your Honor.  Josh

25    Belinfante of the Robbins Firm for the state defendants.
```

```
 1              THE COURT:  Very good.

 2              MR. MILLER:  Carey Miller with the Robbins Firm also

 3    for the state defendants.

 4              THE COURT:  Very good.

 5              MS. BURWELL:  Good afternoon, Your Honor.  Kaye

 6    Burwell, Fulton County.

 7              MR. LOWMAN:  Good afternoon, Your Honor.  David

 8    Lowman, Fulton County.

 9              MR. GERMANY:  Good afternoon, Your Honor.  Ryan

10    Germany.  I'm from the Secretary of State's office.

11              THE COURT:  Thank you.

12              All right.  What I have here is really just

13    essentially the Coalition plaintiffs' status report and nothing

14    from anyone else.  And I had read the Coalition plaintiffs'

15    status report.  And I tried to familiarize myself to the extent

16    I can on my own without the assistance of counsel with the

17    status of the legislation and any issues that are raised by the

18    RFP.

19              I wondered if the state defendants could apprise me

20    of the timelines involved at this juncture.  Just give me a

21    little sort of overview of that.  Thank you.

22              MR. RUSSO:  Yes, Your Honor.  So in terms of the time

23    frames, Your Honor, as you are aware, you issued an order at

24    the end of last year telling the state to get moving,

25    so-to-speak --
```

```
1              THE COURT:  Right.
2              MR. RUSSO:  -- and that, you know, as time continued
3    forward, if the state wasn't moving -- wasn't moving along that
4    their arguments regarding lack of resources and difficulties
5    changing to an all paper ballot system would weaken.  The state
6    took that to heart.  And as you are aware, House Bill 316,
7    which is now Act 24, has been signed into law.  That bill
8    changes a number of areas of the Georgia Election Code but with
9    respect to this case specifically the DRE issue and allows the
10   state to implement new voting machines and a new voting
11   system -- a back end system also that will address -- it
12   addresses the concerns of the Court with the outdated machines.
13             It allows for a paper ballot to be printed from the
14   machine and then to be scanned and counted, similar to an
15   optical scan paper ballot.  It is just that the voter puts --
16   inputs their votes on a touch screen device.  And there are a
17   number of reasons why the state -- well, the legislature -- and
18   it is indicated in the bill why the legislature did that.  And
19   some were for ADA compliance issues.  There are some aspects of
20   it that prevent overvotes and will notify the voter also if
21   they forget to vote in a race.
22             But the point being is that has been signed.  The
23   Governor put $150 million in his budget to buy new machines.
24   That is obviously a large piece of being able to acquire new
25   voting equipment.  And then as Your Honor mentioned, the
```

1    state -- Secretary of State has issued an RFP, which is the

2    procurement process.

3              We have certified copies of the legislation.

4              THE COURT:  Good.  Because I printed one that was

5    not, clearly.  I just have the marked-out version that looked

6    like it had been adopted.

7              MR. RUSSO:  Well, there is -- there are a lot of

8    aspects to the bill that are not relevant here today.  And we

9    can go through those --

10             THE COURT:  Thank you.

11             MR. RUSSO:  -- for you.  We have copies for you-all.

12             THE COURT:  You've given me two identical copies; is

13   that right?

14             MR. RUSSO:  They should be identical.

15             THE COURT:  I just was going to have one for

16   Ms. Cole.

17             Why don't you give that one to Ms. Cole so that she

18   has it.  Then we'll give it back to Harry.  Okay.

19             The RFP was issued when?

20             MR. RUSSO:  The RFP was issued in January, I believe.

21   I'm trying to find where I think I have that written down.  It

22   was a little out of order than what I prepared for.

23             THE COURT:  Sorry.

24             Yes?

25             MS. CHAPPLE:  Your Honor, March 15.

```
 1                    THE COURT:  All right.  March 15.

 2                    MR. RUSSO:  Thank you.  Here we go.  So that's right.

 3      So March 15.  And proposal responses are due April 23rd.  Under

 4      the RFP, the timeline for the initial valuation is -- of the

 5      proposals is two to three weeks after the close, which closes

 6      April 23rd.  So sometime around May 7 through 14, the state

 7      will go through --

 8                    THE COURT:  Just one second.

 9                    To members of the audience, I assume we want you-all

10      to be able to sit.  Some of you may -- there are a few seats

11      here.  And if there are members of the press, you can sit in

12      the jury box.

13                    UNIDENTIFIED SPEAKER:  May I move this?

14                    THE COURT:  I think that -- Mr. Martin, do you want

15      to just oversee the moving?

16                    (There was a brief pause in the proceedings.)

17                    THE COURT:  All right.  Go ahead.

18                    MR. RUSSO:  So the final valuation and the RFP time

19      frame is in June -- late June, 18 through the 25th, sometime

20      around there, eight to nine weeks after the close.  And then

21      the state will finalize the contract terms through early July.

22      And the notice of award will be issued sometime in mid-July.

23                    Now, this is -- so around July 12 through 19.  The

24      RFP is set out where it is -- the timing that everything occurs

25      is based on the weeks after the close.  So the dates I'm giving
```

1    you are just our own calculation of that.

2            THE COURT:  All right.

3            MR. RUSSO:  It is expected that by early August the

4    implementation will begin.  As you are aware, the state is

5    going to have certain elections this year that they will run

6    the new machines and the new voting system in.  There's HB316.

7    I'll just call it HB316 even though it is an act now.  HB316

8    provides for the state to have a pilot program for at least ten

9    counties -- but it could have more -- to test -- for testing

10   purposes of the machines.

11           So actual elections will be run this year on

12   ballot-marking devices.  And the full implementation is set to

13   be done by the end of the first quarter of 2020.  So that is

14   the deadline, and the -- the legislation requires vendors to be

15   able to meet those deadlines.  So it is not just in the RFP.

16   It is something that, you know, is expected.

17           THE COURT:  Are any of the ten jurisdictions where

18   they are going to be voting ones with large populations?

19           MR. RUSSO:  I don't think the jurisdictions have been

20   selected yet.

21           THE COURT:  But I just don't know whether -- what

22   counties or cities are planning to have votes in the next year

23   in 2019.

24           MR. RUSSO:  That's right.  So 2019 is an off year for

25   elections.  There are no state or federal or regularly set

1    elections this year.  There are some municipalities --

2    municipalities in Georgia have to have elections in

3    odd-numbered years under the law.  If you're an Atlanta voter

4    like me, then you won't vote until 2021.  So some are not this

5    year, but some are.  Then counties can have special elections

6    for SPLOSTs, and those -- the state has set a time frame

7    throughout the year that counties can hold those to avoid --

8            THE COURT:  I'm just trying to determine is there

9    actually going to be anything that would be the equivalent of a

10   large jurisdiction with a large turnout that would happen in

11   the next -- in 2019 before we run into using this in the

12   primary season when you can anticipate a large turnout.

13           MR. RUSSO:  So, Your Honor, for planning purposes

14   with the RFP, there are counties in here, such as Fulton and

15   Gwinnett, that will be part of Phase 1, which will be the first

16   rollout.  It looks like Fulton will have 200 ballot-marking

17   devices for that phase.  And --

18           THE COURT:  So there's an anticipated election in

19   Fulton in 2019?

20           MR. RUSSO:  I suspect that Fulton will have

21   elections, but I'll have to defer to Fulton County for sure.

22           MS. BURWELL:  I didn't -- there are some potential

23   SPLOSTs in 2019, Your Honor.  Then we would also have some --

24           THE COURT:  Some potential SPLOSTs -- SPLOSTs

25   elections you mean in terms of authorizing expenditures?

1          MS. BURWELL:  Yes.

2          THE COURT:  All right.  And what type of vote would

3    you anticipate based on your prior -- is there one actually

4    anticipated, or are you just saying there is a potentiality for

5    that?

6          MS. BURWELL:  I think it is just a potential.  I

7    don't know of it being actually scheduled.

8          MR. RUSSO:  But, Your Honor, I can tell you we have

9    looked at past years to see how many counties had SPLOSTs in

10   this cycle.  And the estimate that the state gave us is about

11   115 counties could have elections this year.

12         THE COURT:  All right.  So then you are going to roll

13   into -- and those would typically be in November or not?

14         MR. RUSSO:  November.

15         THE COURT:  In November.  Then you are rolling into

16   the primary season, which is in February?

17         MR. RUSSO:  Well, next year will be a little bit

18   different than last year because we'll have a presidential

19   preference primary in Georgia, which that is never held -- it

20   is always on a different date from the regular primary, which

21   we'll have.

22         So it is not set yet.  But it is usually held

23   sometime in March.  It could be April.  It really just -- it

24   really just depends and starts to get into some of the rules

25   around how parties -- the national parties will work, I think.

1          THE COURT:  All right.

2          MR. RUSSO:  But there will be that statewide

3    election, and then there will be a regular primary, which the

4    State of Georgia will have a U.S. senator on the ballot next

5    year.  So there will be at least one statewide race in Georgia

6    at the primary.  Then, of course, we move into the November

7    elections.

8          So that is the general schedule with 2020 to be --

9    all the 2020 elections to be using ballot-marking devices or

10   whatever the state ends up getting.  That is one of the issues

11   we obviously have here is what -- you know, what machines is

12   the state going to buy.  We don't know.  That process is

13   ongoing.  But the plaintiffs have filed a status report today

14   as you are aware that, you know, we --

15         THE COURT:  I know you didn't agree with it.  And I

16   sort of put you on the spot by making you go first.  But I just

17   wanted --

18         MR. RUSSO:  I'm happy to continue if you would like

19   me to.

20         THE COURT:  But I wanted to get a bigger picture of

21   things.  And, you know, I'm happy to allow you to respond to

22   what they have to say.  But I had read it, so I was trying to

23   cut to the quick in that way.

24         But what I don't really understand from the

25   plaintiffs that might be helpful in terms of your responding to

1    it is -- it is a fulsome status report the plaintiffs provide.

2    But I'm not sure how you are seeking that -- seeking to proceed

3    here, and I'm not sure I completely understand also -- and this

4    is, I guess, a question I would like to pose to counsel while

5    you are up.  And then I'll let you come back again though.

6              I mean, it seems to me the essence of what -- of the

7    concern that the plaintiffs have articulated -- I mean, they

8    have a lot of different concerns saying that a different system

9    would be far better.  And I understand what their argument is

10   there.  But that we still have an inherently hackable,

11   difficult, not auditable system is their argument, as I

12   understand it.

13             If the vote is being counted off of the bar code

14   and -- which may not be, in fact, the same or auditable by the

15   voter as a facsimile of what the vote is that -- so as I

16   understand it, the vote is not being counted off of the actual

17   machine that you place your vote on.  That is not -- it is not

18   like a DRE in that sense, which does the actual calculation.

19             The calculation is done from the bar code --

20             MR. RUSSO:  Well, it is --

21             THE COURT:  -- or is it --

22             MR. RUSSO:  At the end of the day, the calculation is

23   similar to the calculation with an optical scan ballot.  You

24   stick it in the machine.  The machine reads information off of

25   it.  It just reads it differently.  With an optical scan

1  machine, there are various infrared components to how the

2  machine reads the paper and where it reads the smudge marks for

3  folks who filled in a -- bubbled in a vote for somebody or for

4  yes or no on a ballot question.

5          With the BMD, the difference is the individual walks

6  up to the machine, the machine pulls up their ballot for the

7  race that they are eligible to vote for --

8          THE COURT:  Right.

9          MR. RUSSO:  -- similar to a DRE.  They go through.

10 They pick who they want to vote for.  The machine doesn't let

11 them vote for two people unlike bubbling in two people.  The

12 machine also lets you know if you didn't vote for someone

13 unlike with the paper ballot.

14         And then when you are done, you hit, you know, submit

15 and it prints out a piece of paper.  Different vendors have

16 different kinds of paper that they print out.  But at the end,

17 it is a piece of paper that is a paper ballot.  And that paper

18 could have a QR code on it or it could have a bar code.

19         THE COURT:  What is a QR code?

20         MR. RUSSO:  It is -- well, I'm not --

21         THE COURT:  I know.  I have seen that word too.  I

22 didn't go --

23         MR. RUSSO:  I'm barely able to use Facebook.

24         THE COURT:  What is a QR code?

25         MS. CHAPPLE:  It is that little picture, sort of

1   square sort of thing with a different -- you may have seen it.

2   Brands have it on signs, and you can scan it.  But it is a

3   little bit like a -- you know --

4          MR. RUSSO:  Yeah.  I mean, all of these, at the end

5   of the day, it gets put in.  So you have the paper ballot.  You

6   can go through and make sure that it had your choices that you

7   voted for, and it gets put in to a machine.

8          And this is kind of a big -- I'm giving you a fairly

9   high level view of how it all works.  But it goes in the

10  machine, and the machine counts it.  Then you have the paper

11  ballot that can be used for a recount or for an audit.

12         Now, an optical scan ballot is -- looks like a

13  provisional ballot.  Right.  I don't know if you have ever seen

14  one.  But it looks like a paper ballot.  You bubble in.  And

15  you can vote for two people.  You can vote for nobody.  Or you

16  could accurately bubble in all of the votes.

17         Then you take it.  You review if it is correct and

18  put it into the scanner.  The scanner then has -- it basically

19  reads -- reads the ballot.  Right.  It uses -- it uses various

20  things such as timing marks surrounding the edges of the

21  printed ballot.

22         At the end of the day, there is some technology

23  obviously being used to read all of this -- all of these

24  ballots that are being put into the ultimate machine that reads

25  it.  So that is -- that is the difference.

1          When you audit, if you audited an optical scan

2     machine, you might -- or you did a recount, you might take all

3     the ballots, look and see what the vote count was that was

4     recorded, and rerun them.  You could look at them individually

5     and say, yep, he voted for, you know, George Washington or not.

6     And that is the same as what happens with the ballot-marking

7     devices.  It looks -- they might look a little different.  But

8     at the end of the day, somebody has a piece of paper.  If they

9     want to do a recount or you wanted to audit every single vote,

10    you go through every single piece of paper and see did the

11    machine -- the machine had ten votes for George Washington.  Do

12    we have ten pieces of paper that have George Washington printed

13    out on them as the vote the individual was casting?

14         So, again, it is somewhat high level.  But it is

15    auditable.  To say it is not I don't think is being accurate,

16    quite honestly.

17         And, you know, Your Honor, there are other issues

18    with the status report that were raised such as the

19    unreasonable burden for voters to check accuracy of a long and

20    complex ballot.  And, you know, in fact, I think that the

21    plaintiffs probably summed up the whole case here right on

22    Page 7 where it says it is an unreasonable burden on voters to

23    require them to undertake the difficult process to check the

24    machine accuracy for a long and complex ballot.

25         But, Your Honor, they are going to have to check the

1    ballot of the same length for all the same reasons no matter

2    what.  It is quite unbelievable that -- the stage that we're at

3    in this case.  The plaintiffs' position is that the ballot that

4    comes out of a ballot-marking device is now so long that a

5    voter is just not going to check it all but if somebody is

6    bubbling in a vote that the voter is going to then check all --

7    check all of those votes before they put it into the optical

8    scan machine and further underlining some of the -- some of the

9    issues here.

10          There is the note -- Footnote 7 in the status report

11   that plaintiffs have argued throughout this status report,

12   which we don't -- you know, this status report and Mr. Brown's

13   letters we do not think are substitutes for an amended

14   complaint, by any means.  But putting that aside, you know,

15   Footnote 7 says that the plaintiffs, you know, have argued that

16   ballot-marking devices are unconstitutional but for the most

17   vulnerable members of society, those with disabilities,

18   ballot-marking devices are okay.

19          I can't figure out, you know, how we get to the point

20   of someone who is a disabled individual can use a machine that

21   the plaintiffs claim puts an unconstitutional burden on the

22   right of other voters to vote but it is okay for an individual

23   with a disability.

24          So those are a few of the high level issues we see

25   here.

```
 1              THE COURT:  I just want to go back to my question
 2    though, which is -- which I posed to you.  My understanding is
 3    that it is the bar code at least on three of the five
 4    certified -- potentially EAC certified systems that might apply
 5    that is the basis of the counting of the vote and that -- I
 6    mean, that is sort of -- that is what I was trying to get
 7    clarified.
 8              I realize that two of the systems do not use that.
 9    They do it more like when we do bubble in tests as kids, and
10    they are just OCRing in it.  If I put down George Washington --
11              MR. RUSSO:  There are the little dots that the
12    machine is reading.
13              THE COURT:  Is reading, right.  But whatever you put
14    down and you are seeing -- when you verify what the results are
15    on the ballot on two of the systems, if it is George
16    Washington, George Washington is going in; whereas, what they
17    are saying -- at least according to the report of the OSET
18    Institute -- and I'm just trying to understand whether this is
19    your --
20              MR. RUSSO:  I think it is somewhat of a distinction
21    without a difference, quite honestly, Your Honor.  I mean, at
22    the end of the day, you have a computer reading code on a piece
23    of paper.  It may be reading little dots that are doing -- that
24    has been OCRed in.  It may be a QR code or a bar code.  Or -- I
25    mean, the lines go up on the side of the Scantron and how an
```

1   optical scan -- it is not the exact same technology.  But there

2   is a process.  Right.  And it is still requiring a computer to

3   read something.  And if there are issues with the computer, all

4   of these -- every single -- every single one of these, even

5   what they are proposing, has a computer between the piece of

6   paper and the vote being tabulated.  There isn't a system where

7   everybody is just counting paper ballots.  It would take -- it

8   would be over by the time you got done going through all of the

9   paper ballots.

10          So that is just not -- it is not accurate to say that

11  one system doesn't -- doesn't involve a computer on tabulating

12  votes and the other one does or that a bar code is at the end

13  of the day any different than an OCRed scan of a ballot.  It is

14  all just the underlying technology.

15          MR. CROSS:  Your Honor, could I ask:  Does counsel

16  have the ability to read the bar code that's attached as

17  Exhibit 4 to the Coalition's status report?  If he can, just

18  read that to us as to what that says.

19          MR. RUSSO:  It is the exact same thing.  He couldn't

20  read what the optical scanner puts into the computer either.  I

21  mean, we can all read what the person's whose name is being --

22  who is being voted for.  One might have a bubble next to the

23  name.  The other one might list out the person's name.  But

24  just as I can't read what is on the OCR, you can't read what is

25  going into the machine or the optical scanner.

| | |
|---|---|
| 1 | MS. CHAPPLE:  Well, that is not true if what is -- |
| 2 | THE COURT:  All right.  Well, I'm going to give you |
| 3 | an opportunity to address this. |
| 4 | All right.  Well, let me hear from them, and then |
| 5 | we'll proceed.  I'm just trying to understand what -- where the |
| 6 | plaintiffs are going.  I understand that you want some |
| 7 | expedited discovery.  But -- and I'm assuming because you-all |
| 8 | represented that you didn't come to any agreement that the |
| 9 | state defendants don't agree with that. |
| 10 | So I think before I have you sit down, let me just |
| 11 | sort of ask you globally where are you at in terms of you |
| 12 | received this, you had a conference, I gather, with plaintiffs' |
| 13 | counsel about their -- what they wanted to do in the status |
| 14 | report, and you disagreed with it.  But I don't have any |
| 15 | information about what -- what your overall position is in |
| 16 | terms of where we go from now -- here, if anywhere. |
| 17 | MR. RUSSO:  Well, Your Honor, at this point it |
| 18 | doesn't appear that the plaintiffs are intending to amend their |
| 19 | complaint.  I think they are on the third one now.  It might |
| 20 | actually be the fourth one.  But who is counting?  I did have |
| 21 | to go through the record to get prepared. |
| 22 | And, you know, Your Honor, we don't think that -- we |
| 23 | have never filed an answer.  None of the defendants have filed |
| 24 | an answer.  So to the extent they want to start discovery, we |
| 25 | need to go through the process. |

```
 1                    And we think that 316 does moot their case.  Their
 2     case is about DRE machines.  The relief they have requested is
 3     about DRE machines.  It is not about ballot-marking devices
 4     anywhere.  And we need to know what we're responding to and
 5     what the allegations are and what they are claiming is
 6     unconstitutional if we're going to go through this litigation
 7     process.  And, you know, we think even if Your Honor says that
 8     the case -- maybe it is not moot yet because there are 2019
 9     elections.  We think there is a real question about whether
10     effective relief could even be granted as to the DRE machines.
11                    And for the same reasons that you had concerns in
12     2018, I think that we would say that those concerns, you know,
13     are alive in 2019, especially with a 2020 presidential election
14     around the corner in which new machines will be used.  And, you
15     know, every presidential election is the highest turnout.
16                    So we don't think it is practical to implement what
17     they want in 2019.  By the time we got around to it anyway, we
18     would be past the November elections and moving into final
19     implementation of the ballot-marking devices.
20                    But then also with regard to the ballot-marking
21     devices, you know, I think there is a ripeness issue that needs
22     to be considered.  I think that -- but even at very basic --
23                    THE COURT:  That it is not ripe yet?
24                    MR. RUSSO:  I don't think so.  I think at a very
25     basic level though if they -- I mean, if they want to make a
```

1    facial challenge, I guess, to the statute, maybe they could do

2    something like that.

3            But I think at a very basic level we have got to have

4    a complaint that we know what they are alleging.  As much as I

5    enjoy Mr. Brown's letters, those just -- it is tough for me to

6    go back to my client and tell them how we're going to respond

7    to this lawsuit when we get a different letter every week.

8            THE COURT:  Okay.  Thank you.

9            MR. RUSSO:  Thank you.

10           MS. CHAPPLE:  Good afternoon, Your Honor.

11           THE COURT:  Good afternoon.

12           MS. CHAPPLE:  If it is all right with the Court, I

13   would like to show a brief slide show just to focus on our

14   arguments.

15           THE COURT:  We just need to get the screen down.

16           I'm happy to look at the slide show.  But why don't

17   you start before you go -- you are going to say it is not moot.

18   Is this going to tell me also why you don't need to have an

19   amended complaint?

20           MS. CHAPPLE:  Yes.

21           THE COURT:  All right.

22           MS. CHAPPLE:  Yes.

23           THE COURT:  Go ahead.

24           MS. CHAPPLE:  So our case is really about violations

25   of the constitutional right --

```
 1              THE COURT:  Could we just dim the lights a slight
 2    degree, Mr. Martin.
 3              COURTROOM DEPUTY CLERK:  Ma'am?
 4              THE COURT:  Just dim the ceiling light just a little
 5    bit.  Not all the way.  But a little bit.  All right.
 6    Whatever.
 7              Go ahead.
 8              MS. CHAPPLE:  We're having technical difficulties
 9    over here.
10              THE COURT:  Do you want Mr. Martin to give you a
11    hand?
12              MS. CHAPPLE:  Yes.  So at the heart of it all --
13              THE COURT:  All right.  Just one second so we don't
14    do everything in --
15              MS. CHAPPLE:  I think it is the computer.
16              THE COURT:  I'll give you a minute.  All right.
17              MS. CHAPPLE:  So really -- our case is really about
18    the violations of the constitutional right required when the
19    state subjects voters to an electronic system that is
20    unreliable, unsecure, and unauditable.
21              THE COURT:  We're having technology just to mirror
22    the issues?
23              MS. CHAPPLE:  Yes.  We did this on purpose.
24              THE COURT:  All right.  It is going to distract me
25    thinking about trying to do two things at once here.  So just
```

```
 1    wait until you get your -- you are straightened out.
 2              (There was a brief pause in the proceedings.)
 3              THE COURT:  All right.
 4              MS. CHAPPLE:  So the heart of our case is that an
 5    electronic system that is unreliable, unsecure, and unauditable
 6    violates the constitutional rights of Georgia voters.  And the
 7    system that is in place under HB316, Act 24, does not resolve
 8    that because, first of all, the act does not prohibit DREs.
 9    For at least a year, DREs will be in use in Georgia elections
10    until the state can implement the ballot-marking devices.  And
11    the schedule that we heard the defendants talk about has
12    Phase 2, Part 2 completing at the end of March next year after
13    the presidential preference primaries are completed and after
14    the elections that will be taking place later this year.
15              THE COURT:  What's Phase 2 versus Phase 1?
16              I'm sorry.  Somebody in the back should just take
17    responsibility for the people standing outside the door.  Okay?
18    Thank you.
19              MS. CHAPPLE:  Phase 1 is, I think, another way to
20    put -- it is the pilot program.  It is the ten counties.
21    Phase 2 is the larger implementation.
22              Phase 2 is broken up into two parts.  The first part
23    has a small number of machines going to each county.  I believe
24    it is five -- five BMDs and then a certain number of optical
25    scanners, a certain number of polls -- of EPolls.  Then Part 2
```

1    of Phase 2 is the rollout of all of the machines across the

2    state.  And the RFP, I believe, requests 30,050 ballot-marking

3    device machines.

4           THE COURT:  Just for the general election?  Not for

5    the primaries?

6           MS. CHAPPLE:  That is for -- yes.  That is Quarter 1

7    of 2020.  I would also point out that that would be an

8    unprecedented use of ballot-marking devices.  They are used

9    statewide in other states but only for accessibility for voters

10   with -- who need the accessible machines.  They have not been

11   used in any other state as the only means of voting.  It would

12   be something that no other state has done.

13          So to the extent that the schedule is set, it is not

14   based on anything that anyone else has done.  And there's a

15   very high probability that that timeline will be pushed out

16   further.

17          But even if it is not, the timeline allows the DREs

18   to be in place for the next year.  And so we feel that our

19   claims are not mooted as to the DREs or to the BMDs for the

20   following reasons.  Specifically that like the DREs, the

21   ballot-marking devices have security vulnerabilities.

22          Dr. Wenke Lee -- we all talked about him during the

23   September hearing.  He is the computer scientist who was part

24   of the Georgia SAFE Commission.  He voted against the Georgia

25   SAFE Commission's final report because he said he could not

1   sign on to the use of BMDs.  He said that BMDs contain at least

2   one vulnerability.  That means the device may not accurately

3   report a vote or provide a correct receipt back to the voter.

4   And while the BMDs do have a paper record, because they may

5   have -- sorry -- they provide a paper record, but the paper

6   record may not be accurate.

7          And there are issues with whether voters will verify

8   them, first of all.  Many of the machines actually ask a voter

9   if he or she wants to verify.  And voters will say no and move

10  on.  And so the opportunity to correct and to look at the

11  printout is gone.  We talked a little bit about the bar code --

12         THE COURT:  Let's put aside human motivation and lack

13  of diligence.  Is it your understanding that if the individual

14  voter says, no, I don't that -- how is it -- what happens at

15  that juncture?

16         MS. CHAPPLE:  So at that juncture, a printout would

17  be scanned.  And depending on the type of machine as you talked

18  about with the defendant's counsel, three of the five types of

19  machines being proposed in Georgia have a bar code or a QR

20  code.  And so even if the diligent voter tries to look and

21  looks at the names below the bar code, that is not actually

22  what will be scanned.  That is not how the vote is recorded.

23         The vote is recorded off of the bar code.  And there

24  is -- there is a non-zero chance that the bar code could have

25  been altered.  And so even if the voter who was looking at the

1   list of names has no ability to read a bar code.  And so

2   unlike -- unlike a voter-marked paper ballot where you are

3   verifying your vote as you cast it, you really cannot know what

4   is in that bar code to verify it.  And that is the vote that is

5   recorded.

6          THE COURT:  But my question was -- you said that

7   there was an option.  And maybe this is speculation on the part

8   of plaintiffs that a voter would simply say, I've got to go to

9   work.  It is 7:00 in the morning, and I have got to get going.

10         MS. CHAPPLE:  Or I trust the machine.

11         THE COURT:  Or I trust the machine.  What happens

12   then in these five major systems?

13         MS. CHAPPLE:  I believe the -- it is a little

14   speculation on my part.  But I believe that what happens is

15   then the poll worker goes and scans it.  I believe something

16   still comes out.

17         THE COURT:  Somebody else does it?

18         MS. CHAPPLE:  Yes, somebody else does it.  The voter

19   doesn't just have to look at it any more.  And I would say we

20   talk about voters who maybe aren't diligent.  But there are

21   voters who are.  And there are reasons why they maybe wouldn't

22   want to bring up an issue that they see on the ballot to have

23   to say to a poll worker --

24         THE COURT:  All right.  I understand all of this

25   human stuff.  I'm trying to understand basic system issues at

1    this hearing -- that is all -- so that I can understand why you

2    are saying I don't need to have an amended complaint --

3              MS. CHAPPLE:  Right.

4              THE COURT:  -- and where you are going and what is

5    necessary.  There may be -- I understand that there are all

6    sorts of other reasons that somebody who is a diligent voter

7    and comes to vote but may not be able to do this or want to.

8    But that is not really what is before me at the moment.

9              MS. CHAPPLE:  Could I say one -- make one other point

10   that might be helpful?  When we were speaking to our experts in

11   advance of the hearing, he gave me some context for what it

12   would look like if there was an issue.  Typically if someone is

13   trying to influence the outcome of an election, they will

14   change one to two percent, a small number of the votes.  They

15   won't change all the votes.

16             If you have -- you have voters who are looking for

17   issues, it may only be a few voters who see them at a precinct.

18   And even if they announce an issue to a poll worker, there is

19   nothing in this -- in this act that there is no -- there is no

20   system in Georgia to account for the errors or to look for

21   patterns in errors.  And so there may not be a connection

22   regardless of all of that.  So that is -- that is a further

23   reason that there is an issue here.

24             THE COURT:  All right.

25             MS. CHAPPLE:  So -- and along the same lines, the

1    act, House Bill 316, Act 24, does not address the other

2    security flaws in Georgia's system.  The GEMS server that we

3    talked about in September is still in place.  There is not --

4    there are no required changes to how ballots are loaded, the

5    protection of transmittal of the vote totals.  Presumably the

6    Secretary of State's office could continue to transmit vote

7    totals via modem.  There is no air gapping that is required.

8    It does not require any particular testing standards or

9    publication of results of testing.  There's nothing required in

10   the bill of a reexamination or reapproval of devices after

11   changes to machines unless a change impairs a machine.  But

12   impair is not defined.  And --

13          THE COURT:  Is there anything that is done regarding

14   the question of the integrity of the voting database and how it

15   interfaces with this system?

16          MS. CHAPPLE:  No, Your Honor.

17          THE COURT:  Well, are you seeking to challenge the

18   entire bill?  What are you seeking here?

19          MS. CHAPPLE:  We're seeking discovery into the system

20   that is in place in Georgia.  We have been before you a few

21   times --

22          THE COURT:  Well, the old system or the current -- or

23   the one that is being proposed as they begin to try to fly this

24   plane?

25          MS. CHAPPLE:  The system is still in place for

```
 1    another year.
 2               THE COURT:  All right.  That's what you are seeking
 3    right now --
 4               MS. CHAPPLE:  Right now.
 5               THE COURT:  -- is discovery on the old system and the
 6    interface of the voter databases also with the way the old
 7    system works?
 8               MS. CHAPPLE:  Right.  Yes, Your Honor.  And we're
 9    seeking the same relief that we've been seeking, which is
10    voter-marked paper ballots.
11               THE COURT:  All right.  I understand that that is
12    what you want but -- the same relief.  But it is kind of -- let
13    me just say, because of the focus of your -- of the Coalition
14    and their status report on the new system, which I wasn't clear
15    about that at all, so I'm not sure -- I know that the motion to
16    sever the plaintiffs has thankfully been dropped.
17               But are they seeking -- Mr. Brown, are you-all
18    seeking to challenge the GEMS system?  I mean, the new
19    system -- not the GEMS system.  But the new HB316 or -- is that
20    the focus of your efforts, or is that --
21               MR. BROWN:  Your Honor, Bruce Brown.  Your Honor,
22    we're -- the Coalition plaintiffs and the Curling plaintiffs
23    seek identical relief.  And that is to the -- at the end would
24    be to permanently enjoin BMDs and DREs and that in advance of
25    that to preliminarily enjoin the use of voting systems that are
```

1    inconsistent with hand-marked paper ballots.

2         I think the question that you asked is do we need to

3    amend the complaint.  We don't think we need to at least to our

4    third amended complaint.  In Paragraph 169 -- and this is

5    Document 226 -- we allege that inherent in an individual's

6    fundamental right to vote is the right to participate in a

7    trustworthy and verifiable election process that safely,

8    accurately, and reliably records and counts all votes cast and

9    that produces a reliable election result capable of being

10   verified as true.

11        And, Your Honor, in the third amended complaint, that

12   complaint was also drafted and filed at the time that the state

13   in the 2018 legislative session was considering an earlier

14   version of House Bill 316, which also contemplated removing the

15   DREs with another inadequate system.

16        And so we would -- we would -- our position is that

17   it is included in the complaint.  And as Mr. Russo alluded,

18   they have been very aware through our letters as to our

19   position of the unconstitutionality of the BMDs.

20        Now, there is a lot in the new bill, Your Honor, that

21   we are not seeking to enjoin.  In fact, we have another case in

22   front of Judge May in which some of the relief -- I say we.  It

23   is different -- I have another case.  It is different

24   plaintiffs.  But there have been some changes made, for

25   example, to the absentee ballot system that we're not

1    challenging.

2           What we are challenging and what we have been

3    challenging -- and it is the same for the DREs and the BMDs.

4    And there is a lot of different ways to explain it, Your Honor,

5    and different experts have different ways of articulating it.

6    We have tried to distill it down to the essence of the flaw in

7    these new systems.  And that is, whenever you put a computer in

8    between the voter and the permanent record of that voter's

9    choice, you have an unconstitutional election system, at

10   least -- at least until they develop something that we have

11   never seen before.

12          And the reason for that is because there is no

13   independent source of the voter's intent.  And so no matter how

14   you do it, you will -- it will still be flawed.  Because you

15   are asking the voter to cast a ballot into this dark machine

16   and you don't know where it is going.

17          Now, it is correct that in our proposed solution,

18   which is used nationwide and which is recommended by all of the

19   experts --

20          THE COURT:  We can get the lights up right now,

21   Mr. Martin.  Can you just pull the lights up?

22          Thank you.  Go ahead.

23          MR. BROWN:  Mr. Russo is right.  Our system -- the

24   proposal that we have sought from the beginning, like the DREs

25   and the BMDs, uses a computer.  The difference is the

1    hand-marked paper ballot leaves an independent

2    noncomputer-generated record of the voter's intent.

3           The difference between what we're proposing and all

4    of these other systems -- it is not -- it is not -- it may

5    matter a little bit on the edges.  But fundamentally it is not

6    exactly what computer creates what sort of artifact we have

7    from our computer.  It is that the artifact is from a computer.

8    It could be a bar code.  It could be those little silly squares

9    that you see on products.  It could be a printout.  But the

10   fact is it is created by a computer and therefore it is

11   fundamentally flawed.

12          With a hand-marked paper ballot, the voter does not

13   have to verify anything.  He just -- he or she just makes the

14   choice once, fills it in, and puts it into the machine.  It is

15   easily auditable because you have the permanent, independent

16   noncomputer-generated record of their vote.

17          And so our view is that any voting system that puts a

18   computer in between the voter and the permanent record of the

19   voter's choice is fundamentally flawed because -- and not be

20   audited at the end of the day.  And if you put a computer where

21   there is a DRE or BMD, it is identical to us.  If you put a

22   computer in between the voter and the record, you cannot audit

23   it at the end of the day.

24          You can with paper ballots.  You cannot with these

25   computer systems because with the computer-generated artifact

1    all you are doing is comparing computer to computer.  It is not

2    an audit.  You are comparing two computer-generated applicants.

3          So that is fundamentally what our case has always

4    been.  It may be that BMD -- it may be another sort of system

5    that does that.  They are all flawed, and they are all flawed

6    in the same way.  And so --

7          THE COURT:  Well, if you have a precinct -- again

8    just so I understand this -- because we really are not here on

9    the merits at this juncture.  But I just want to make sure I

10   understand your position totally.

11         If you have a printout of a vote that does not have

12   a -- it is not going to be considered by the square or by a bar

13   code -- and I understand what Mr. Russo's argument is -- it is

14   still going to go into the computer.  And I guess you accept

15   that.  You believe that he is right at that point maybe.

16         But at the end of the day, you will have -- at

17   precinct 105, you'll have potentially 1000 votes that you have

18   1000 printouts for.  And if they -- won't you have a record

19   that way of what the actual vote is?

20         I realize there is all these human motivation things

21   and that some people will not have looked at their printout.

22   But other than the human motivation issue, won't you have, in

23   fact, a record of what people voted for in the old example that

24   it is -- it is George Washington versus Benedict Arnold?

25   You've got, let's say, 600 votes for George Washington and 400

1    for Benedict Arnold.  Aren't you going to see that on those

2    paper printouts or not?

3            MR. BROWN:  Your Honor, if you have, let's say,

4    1000 -- a stack of 1000 outputs from the computer-generated

5    output, for that to be auditable, all of the voters would have

6    had to check them accurately and completely.  Because what the

7    audit does at the end of the day is take 100,000 of those and

8    if you are using, for example, a risk-limiting audit, which is

9    what Dr. Stark recommends, you make a lot of assumptions about

10   how many of those that you can choose.  None of that works

11   unless that stack is deemed to be completely accurate.

12           With the hand-marked paper ballots, you have the

13   voter's choice.  There is no verification needed.  With these,

14   you are just guessing is it 50 percent of those were checked,

15   is it 60.

16           THE COURT:  You mean checked by the voter?

17           MR. BROWN:  That the voters verified them accurately.

18           THE COURT:  Right.

19           MR. BROWN:  And the experts that have looked at this,

20   the statistician and the cybersecurity people, looked exactly

21   at this issue that you raised, the exact same question.  And

22   that is, if you have the printouts, isn't that the same as

23   having a stack of hand paper ballots?  All of them say, no,

24   fundamentally it is not.  Because what the stack has to be that

25   you are comparing is the real thing.  Once you -- once you

1    introduce another variable in it -- and you don't know how many

2    people checked it or if they did so accurately -- then you

3    can't rely on it.

4              THE COURT:  It is easier for me to understand the bar

5    code complaint, that you are not verifying the bar code or the

6    square, that the voter -- and that the legislation was intended

7    to allow the voter to actually look at their own vote and to

8    make sure that by looking at it and auditing it that that is

9    themselves -- that they have the opportunity to cast a vote

10   that they are confident about and they cannot verify the bar

11   code or the square.  But you are telling me that it is -- that

12   really the definition of what your concerns are in part -- are

13   in large part, in fact, have to do also with the fact that the

14   voters simply don't -- there is a missing step there.  They

15   don't know that -- the system can take advantage of the fact

16   that 60 percent of the people will never look at their

17   printout.

18             MR. BROWN:  That is correct, Your Honor.

19             THE COURT:  And those votes can be altered, and some

20   percentage of them will be altered or is subject to error?

21             MR. BROWN:  Yes, Your Honor.  The experts --

22             THE COURT:  Is that what you are saying?

23             MR. BROWN:  Yes.  The experts -- and there are two

24   dozen of them who have opined on this exact system.  They are

25   not -- they would agree that having only a bar code would be

1  particularly horrible.  I think everybody would agree with

2  that.

3          But they were focusing their criticism on an output

4  that had also a human readable component to it.  And so yes,

5  our objection really is more fundamental than just to the bar

6  code, which is a horrible idea.  It is also to any artifact

7  that is not -- that is computer-generated for the auditability

8  reason.

9          Your Honor, there is also -- and I think -- I think

10 this could become actually a potent problem with the BMDs that

11 is a little bit different.  And that is, there is no feedback

12 mechanism for incorrect votes.  And these are some of the

13 things that we might get into in discovery.

14         But another flaw with ballot-marking devices is let's

15 say the voter gets the printout and says, wait a minute, I

16 voted for this one and it is blank or that is not all the votes

17 that I cast or I voted for Smith instead of Jones.  What

18 happens?

19         THE COURT:  Well, that is the same problem now.  They

20 have to go to your machine and cancel the vote.

21         MR. BROWN:  It is a problem.  And what is the

22 feedback -- what happens to that machine?  Does it keep on

23 getting used?  Does the state use that information to say, wait

24 a minute, we have a problem.

25         The reason why it is an intractable problem, Your

1    Honor -- it is why these machines are just a bad idea from the

2    start -- is that there is no way of believing either the voter

3    that -- did he make it up?  There is no record of what the

4    voter actually did.  So if the voter says I voted for Smith,

5    the poll manager is going to say, honestly, I don't know

6    whether you did or not.  The machine says you voted for Jones.

7    And there is no way to reconcile that, and there is nothing --

8    there is no feedback mechanism for that.

9            So our position -- and it is supported by science and

10   the logic of it -- is that these systems are fundamentally

11   flawed in the same way the DREs are, Your Honor.

12           In terms of the schedule of the case, we would seek

13   preliminary injunctive relief with respect to the DREs that are

14   going to be used in the meantime and then permanent relief at

15   the end of the day on both sets of the machines.

16           THE COURT:  What is your understanding of when the

17   first elections are in the 2019 year?

18           MR. BROWN:  Your Honor, we have tried to get a better

19   feel from the defendants on that, and I think they are doing

20   the best they can to anticipate it.  They are held often, but

21   you don't know very long in advance sometimes --

22           MR. RUSSO:  It is just SPLOSTs.

23           MR. BROWN:  -- if they are actually needed.  So they

24   are SPLOSTs.  But there will be some in 2019 that we hope to

25   enjoin.  Thank you.

```
1              THE COURT:  Well, stay one more minute, and then I'll
2    allow Ms. Chapple to finish if she has something.
3              Why is this ripe, I mean, as to the new voting
4    equipment as opposed to the DRE machines that are currently in
5    use?  And if the others are not ready to fly, I guess we'll
6    continue with the DRE machines indefinitely.  But why is it
7    ripe as to the new machines?  Because right now we don't know
8    what system they are going to use, what sort of -- and a host
9    of other questions.
10             I realize you say -- part of it is you say any
11   computer interface at this point is not trustworthy.  But what
12   if I were to find or what if -- or what if the evidence
13   pointed, in fact, that at least on ballots, let's say, two of
14   the systems or three of the systems are more trustworthy
15   because they are not going to have a bar code, which you
16   describe as the ultimate --
17             MR. BROWN:  Most offensive.
18             THE COURT:  Most offensive to you -- to your clients
19   and most threatening.  We don't know what is going to be
20   picked.  We don't know much about the rollout.  We don't know
21   much about the interface between these systems at this point
22   and the voter database, which was certainly an issue also.
23             So why is it ripe?
24             MR. BROWN:  We believe that our -- the claims in the
25   third amended complaint of the Coalition plaintiffs embrace the
```

1    various options that the state might choose to deploy under

2    HB316.  That is the first issue.

3            In terms of when relief, permanent or preliminary,

4    with respect to HB316 would be ripe and would be equitable,

5    that may have to wait until the state actually picks a

6    particular vendor because Your Honor would want to not make it

7    in the abstract I think but would want to be looking at a

8    particular deployment.  So I would divide that into two

9    different questions.

10            THE COURT:  All right.

11            MR. BROWN:  But the relief for the old DREs is ripe

12    and urgent we would say.  Thank you.

13            THE COURT:  Is there something else you wanted to go

14    over without going through all of this?  I mean, if there is

15    some particular screen you want me to focus on, then fine.  But

16    since I have read your materials, I think --

17            MS. CHAPPLE:  Yes.  No.  It is fine.  I just wanted

18    to make clear that we agree with the Coalition plaintiffs as to

19    the claims against both systems and to the relief that we're

20    seeking.  We think there is no need or reason for an amended

21    complaint because there is no new system in place.  There is

22    still the same system that we had addressed in September of

23    last year.  So that is it.  Thank you.

24            THE COURT:  Thank you.

25            MR. TYSON:  Your Honor, just a few points for the

1    defendants on some of those issues.  I think we have confirmed

2    that we don't have a ripeness -- we're not ripe yet on the

3    ballot-marking devices for sure.  One of -- the whole point of

4    ripeness, quote, is to prevent the courts from premature

5    adjudication, from entangling themselves in abstract

6    disagreements.  And I'm afraid we're in an abstract

7    disagreement at this point until there has been a selection of

8    a vendor.

9         The RFP outlines a lot of security issues that must

10   be included.  It requires vendors to explain how they will

11   interact through air gaps with other systems, like the voter

12   registration database.  It requires the use of modern

13   encryption technology for any purchases that are made.  So

14   anything that is going to happen here, there is going to be a

15   different analysis of what the system ultimately is selected

16   and what is done.

17        I also heard from Mr. Brown, I think, two different

18   theories of what their complaint actually is going forward.  It

19   either is all computers are bad between the voter and the

20   ballot or it is bar codes are the problem on these

21   ballot-marking devices.  And I think that just goes to --

22        THE COURT:  I don't know that they are different.  It

23   is sort of like a higher level of horridness.

24        MR. TYSON:  That can work.  I think the real

25   challenge is in terms of a constitutional violation, you know,

1    does the constitution require only hand-marked paper ballots,

2    especially when we have issues related to disabled voters or

3    voters who have a limited reading proficiency who may need some

4    electronic device that can provide assistance to them.  There's

5    obviously a number of interests that go into selecting the

6    right kind of system as the SAFE Commission looked at and tried

7    to analyze beyond just the security question.  There's voters'

8    experience; the administrability; the fact that you have to

9    prepare and implement the paper ballot options as you discussed

10   in your order previously.

11           So I think in terms of the security piece, we don't

12   have a ripeness issue.  We have a ripeness issue as to the

13   ballot-marking devices.  We have a mootness issue in terms of

14   the DREs with House Bill 316.  As Mr. Russo explained, the

15   state is moving as quickly as possible to eliminate these

16   machines.  In House Bill 316, it specifically says as soon as

17   possible we have got to move away from these DRE units.

18           And as I know Your Honor is aware, that is not an

19   instantaneous process with the Government.  We're moving as

20   quickly as we can on that process.  And if there is a

21   limitation on the use of DREs right now, we're then going to be

22   pushing voters into a third system before we go back to an

23   electronic-based system in the first quarter of next year.  So

24   I think that is another challenge in terms of the overall

25   direction we're going.

1          And --

2          THE COURT:  You mean a third system being a hand

3    ballot?

4          MR. TYSON:  A hand ballot system.  Right.  We have to

5    obviously train voters who have been voting on these machines

6    for over a decade now.  They are familiar with electronic

7    voting.  We would have poll workers.  We have equipment we

8    would have to prepare and get and maintain for basically one

9    election and it takes resources away from the move to

10   ballot-marking devices and to a more modern voting system,

11   which is our end goal when this is all said and done.

12         THE COURT:  Well, that is a good argument.  But what

13   is the problem with having discovery about it, among other

14   things -- with all due respect to the technology companies, all

15   of us have been in the midst of major changes and conversions

16   and systems where things go bust and you have to wait for six

17   months to get things fixed.  And we're talking about a major

18   election.

19         So I could conceive of easily that we could be moving

20   at all due speed and it is just not ready to fly or that -- and

21   that the DREs become the system of default and we're in the

22   same situation all over again.  So why wouldn't, in fact, it be

23   a realistic step to, in fact, allow the discovery that is at

24   least at this point as to the DREs that is being sought and

25   that -- and I don't know what it is because I heard a lot more

```
1    in the status report about the -- in general about the new
2    system.
3              But I -- I'm grateful that the Georgia General
4    Assembly turned its attention to this.  I certainly am.  But I
5    mean, I'm just talking about reality and an individual's right
6    to cast a vote that is accountable and meaningful ultimately.
7    So you are on a short time frame, and their attention to that
8    is realistic to the extent that they don't want to be caught in
9    the same position all over again also.
10             MR. TYSON:  I understand, Your Honor.  I think I kind
11   of have two answers.  One is a procedural process, and the
12   other relates to scope.
13             THE COURT:  All right.
14             MR. TYSON:  So maybe I can touch on both of those.
15   First, I think just from a procedural standpoint of where we
16   are in this case, there are a couple of issues remaining on the
17   motion to dismiss in your footnote about -- those may be
18   relatively easy to dispose of as far as res judicata and
19   collateral estoppel.  I think those need to be disposed of.  If
20   we're going to have a preliminary injunction motion briefing
21   process, we need to set a schedule for that.
22             We believe that given the mootness issues that have
23   arisen with House Bill 316 that there should at least be an
24   opportunity to brief and argue that as a jurisdictional matter
25   as a loss of subject matter jurisdiction here as to the DREs.
```

1    So that would be basically one additional motion to dismiss on

2    (b)(1) specifically for subject matter jurisdiction in light of

3    House Bill 316.  Then we can get to an answer and then begin

4    discovery.  That is the procedural answer.

5            But then I think we're left on the scope of discovery

6    question with what are we conducting discovery on.  And if it

7    is limited only to the existing system, that's a different

8    question than if it is including kind of any computer that is

9    currently used in the election system.

10           The plaintiffs have already served on us despite the

11   stay of discovery a request for the full GEMS server database,

12   which the Georgia Court of Appeals has recognized the

13   disclosure of that database would cause a serious security

14   problem for elections.

15           When Judge Grubbs had a similar request from similar

16   plaintiffs in a case in superior court a few months ago, she

17   granted discovery that was allowing reports from the GEMS

18   database as opposed to accessing the full database.  So I think

19   if we're going to get into discovery on the existing election

20   system, we are going to need to carefully cabin to make sure we

21   don't end up creating a security problem in the process of

22   trying to look at what the plaintiffs believe is a security

23   problem.

24           But we do not believe there should be anything

25   related to the ballot-marking devices or anything else, given

1    the fact that the plaintiffs' complaint is strictly about DREs.

2    And the only counts that are in existence right now are focused

3    only on DREs.

4         THE COURT:  So you don't agree with Mr. Brown's

5    characterization of what the third amended complaint

6    encompasses?

7         MR. TYSON:  Correct, Your Honor.  Because when you go

8    to the counts that are still out there, they are all tied to

9    the use of DREs in elections.  There was one count in the

10   second amended complaint from the Curling plaintiffs -- I

11   believe it was Count 3 -- that related to kind of a broader

12   question about election administration.  But that was

13   specifically dismissed by those plaintiffs.

14        So of the counts that are still remaining, all of

15   them focus specifically on DREs, which again goes to our

16   concern about mootness and belief that that should be at least

17   briefed and addressed by this Court before we move into kind of

18   a full scale discovery and normal litigation track.

19        The reality is we're facing a situation where we know

20   DREs are -- there is going to be a point hopefully sooner

21   rather than later where DREs are not in use in Georgia.  So if

22   we're not moot now, we're going to be moot in relatively short

23   order.

24        THE COURT:  Well, the only thing is that they -- it

25   was about DREs.  But it was also about the interface of these

1   machines with the voting database and its security as a whole.

2   So the DREs were you could say -- if you had a tripod, they

3   were certainly one leg.  But they were not the only leg --

4              MR. TYSON:  Correct.

5              THE COURT:  -- that is being challenged.

6              MR. TYSON:  Yes, Your Honor.

7              THE COURT:  And I think that is partly what they are

8   relying on also is that it is -- and I realize that you and

9   your co-counsel are defending a number of different cases that

10  relate to an overlap of these issues, which is -- I recognize

11  that problem also.  But it is -- the next system has to deal

12  with those -- you haven't changed the system for voter

13  information management, as I understand it.

14             MR. TYSON:  Yes, Your Honor.  And it is important to

15  note on that front that the RFP is seeking to get an entirely

16  new back end system to go with the election administration

17  side.  So it is not just the ballot-marking devices.  It

18  includes the election night reporting piece.  I have the RFP if

19  you want it.

20             THE COURT:  I probably do.

21             MR. TYSON:  Yes.  The background pieces.  All of the

22  functions that go with the operation of the unit as well.  The

23  state voter registration database, as I know you are familiar

24  with from other cases, there's specific language in House Bill

25  316 protecting provisional ballot voters and looking for those

1    pieces of if there are other paper registrations that were

2    missed and additional language in House Bill 392 that was added

3    that focuses on the security of the voter registration database

4    and bringing it -- a certification of its complying with modern

5    security standards somewhere in that language.  So there is a

6    definite focus on all of these various pieces of the election

7    system of bringing the security up to the highest level we can.

8            THE COURT:  Who is it, the Secretary of State's

9    office, or is it the new vendor that will be responsible for

10   management of the voter database?

11           MR. TYSON:  So the voter database -- I'm going to

12   speculate a little bit.  The voter database, eNet, is not

13   changing.  The vendors for the new election systems have to

14   explain how their system will interact with eNet.  So that will

15   still be maintained as the system that is going forward there.

16           The last point I'll make is just as to the

17   ballot-marking devices themselves just very briefly.  When that

18   ballot comes out -- I know Mr. Cross said can you read the bar

19   code and you can't.  But if you look below that, you see the

20   voter selections.

21           So in an audit, which the new legislation also

22   requires auditing of election returns and election machines,

23   you would be able to say I see 100 votes for George Washington

24   on the printouts.  Does the machine also show 100 votes for

25   George Washington on its count?  So the voter will have that

1    opportunity to see candidate, party, and race for each -- the

2    race that they voted in for each of those selections.

3              THE COURT:  Right.  I think the question in part is

4    will there be -- the audits that are anticipated under the

5    legislation, are they of the entire precinct or a portion of

6    the precinct or how -- can you explain a little bit more about

7    that?

8              MR. TYSON:  And I'm sorry.  Your Honor, I don't know

9    exactly what auditing process will be used.  I know that the

10   legislation requires the Secretary of State to begin those

11   audits in 2020.  And so there will be an auditing both of the

12   machines, the returns.  It is going to be consistent with the

13   practices of election officials nationwide looking for --

14   looking for problems so we can identify those and get those

15   taken care of.

16             THE COURT:  All right.  On my simple question before

17   that there were 1000 votes cast in a Fulton County district --

18   precinct that perhaps has had issues before, one particular

19   one -- and I don't know what that one might be -- does it mean

20   you do -- do you have any notion of whether that means you're

21   going to -- the state would look at all of the votes cast or

22   just a portion of them?

23             MR. TYSON:  So there are a number of different

24   auditing methods you can use I'm aware of in the election

25   process.  There's the risk-limiting audit process that has been

1   referred to.  There is a Bayesian audit.  There's various kind

2   of pieces you look at.

3            So there is a -- I don't know the process that would

4   be used.  But I would presume that you would look at a

5   particular precinct, look at all the paper ballots that were

6   generated by the ballot-marking devices, compare these to the

7   electronic returns, do the same thing with absentee ballots.

8            I was involved in an election in north Georgia that

9   is happening today.  During a post-election audit, the election

10  official determined she was missing one vote.  She had one more

11  check-in on her check-in list than she had ballots and located

12  that the ballot had been set aside at one point for some other

13  purpose.

14           So those are the kinds of things you would be looking

15  to identify:  Are we missing a ballot?  Are all of our numbers

16  between voter check-ins, votes cast -- are all those lining up?

17  We do rely at some point on the voter to be able to say this is

18  the ballot I'm casting, just like you would with the

19  hand-marked paper ballot.

20           THE COURT:  And the auditing will only start in 2020

21  even though you are going to be running, I guess, some sort of

22  trial versions of this in 2019?

23           MR. TYSON:  Yes, Your Honor.  I'm certain that during

24  the testing and certification phase there will be a lot of

25  auditing happening with that.  The statutorily-required audits

1    statewide would begin in 2020.

2              THE COURT:  So how fast would you be willing or able

3    to actually file a motion to dismiss on mootness grounds?

4              MR. TYSON:  I think we could file that very quickly,

5    Your Honor.  Two weeks at most.  Maybe a week if you need us to

6    turn it around that quickly.

7              THE COURT:  All right.  Now, let's say that is all

8    done and it is all in to me and we rule in six weeks and I find

9    it is not moot.  At that juncture I'm not going to have another

10   motion to dismiss?

11             I mean, I'm not trying to say what is going to happen

12   here.  But it just seems like we had a lot of opportunity.  And

13   I had to deal with a lot of motions to dismiss.  It seems like

14   as long as we have the 2000 -- the system going on right now it

15   is hard for me to see how it is moot.

16             It may not be of enormous significance at the moment

17   at least -- unless the new system isn't ready to go.  But I

18   don't see quite how it is moot.  So I mean, it just seems like

19   it is a lot of time and energy for naught, other than delay.

20             MR. TYSON:  Yes, Your Honor.  That is why I think we

21   think the cleanest way going forward procedurally would be to

22   have a new complaint -- amended complaint from the plaintiffs

23   about exactly what their claims are at this point.  Then we

24   could focus in on issues you haven't already ruled on.

25             I know there were a lot of ruling on motions to

1    dismiss related to standing and other issues.  I'm assuming

2    those are not going to be changing in an amended complaint.

3           But if we had an amended complaint that could tell us

4    what their claims are, we could really focus in on any other

5    motions that needed to be filed, if any, and then we would also

6    know what we're looking at in terms of the scope of discovery,

7    which is the other big challenge.  If we're proceeding on the

8    current complaint, I'm just afraid we're going to have a lot of

9    disagreement about what the boundaries of that discovery might

10   look like.

11          THE COURT:  So --

12          MR. BROWN:  Your Honor --

13          THE COURT:  If you had an amended complaint -- I'll

14   let you go in a second, Mr. Brown.

15          If you have an amended complaint, if I go in that

16   direction, then we don't have immediately a motion on mootness

17   grounds?

18          MR. TYSON:  I'm not going to say we wouldn't, Your

19   Honor.  I can't make you that promise.  But we can at least

20   assess what the plaintiffs' claims are kind of in the current

21   moment, especially if there are existing or other exigent

22   claims that they would be raising unrelated to DREs and other

23   parts of the election system.

24          THE COURT:  Okay.  Thank you.

25          MR. CROSS:  Your Honor, could I respond to just a

1    couple of points quickly?

2              THE COURT:  Yes.

3              MR. CROSS:  Your Honor, I confess I'm confused to

4    what their position is because they seem to be taking

5    irreconcilable positions.  They began by arguing that the BMD

6    and the new legislation moots our case, and that's where they

7    have ended up.  But much of Mr. Tyson's argument was that it is

8    not ripe.  I don't see how they can take both.  If it is -- if

9    it moots our case, then it is ripe and we'll deal with it in

10   discovery and we'll proceed as if it is in place.

11             But the reality is there is only one system that is

12   in place under law in this state.  And there's no time period

13   in which that is going to move.  Now, there is a proposed

14   framework.  But everyone has to acknowledge, as Your Honor has,

15   that that could slip in any way.  And the mootness motion they

16   want to file is going to be just as frivolous as the Eleventh

17   Circuit found their immunity arguments, which the Eleventh

18   Circuit found was, in fact, frivolous.  And it is another delay

19   effort.  Because all that is going to happen with -- the

20   mootness law, Your Honor, is unequivocal.  Our case is only

21   moot if they have adopted something, it is in place, and it

22   resolves every conceivable claim and aspect of the relief that

23   we ask for.

24             If they are going to say it is not ripe, then they

25   have just eviscerated their mootness argument.  What we would

1    say is let's focus on what is in front of us.  Let's focus on

2    what is in place.  That is the DREs.  But it goes beyond that.

3    It is the GEMS server.  It is the infrastructural and

4    systematic issues that are still in place, including the use of

5    modems.

6            So what we would propose is let's move forward on

7    this system.  Let's get discovery going.  They say discovery is

8    still stayed.  Your Honor's stay was only based on the immunity

9    arguments.  Once the Eleventh Circuit found those to be

10   frivolous, we thought the stay would be lifted.  We assumed

11   that that was automatic.  So discovery should proceed.  There

12   is no basis to stay it.

13           And the other point, Your Honor, is the notion of an

14   amended complaint.  They keep saying our case is about DREs.

15   Our case is not and has never been about DREs specifically.

16   Our case, as Mr. Brown described, is about using -- is having a

17   system that unconstitutionally is unreliable, unsecure, and

18   can't be audited.

19           Obviously we focused on DREs because those were the

20   machines in place.  If they are now saying BMDs are going to

21   get ruled out and it moots our case, well, then that's the

22   focus of the case.

23           The point that I want to make clear is they cannot

24   have it both ways.  It cannot be our case is moot because

25   there's something new but this something new isn't ripe and so

1    we don't get discovery and no one gets to talk about it.  I'm

2    perfectly happy at this point to accept their argument that it

3    is not ripe.  Let's stipulate to that and let's move forward on

4    the system in place.  We'll move for a preliminary injunction

5    within the next few weeks.  We'll get that on the same basis

6    Your Honor found before we should have gotten it.  The only

7    reason we didn't, as we read Your Honor's order, was because we

8    just didn't have time for such a major election.  That was

9    their sole objection was feasibility, couldn't do it by the

10   midterms.  Their sole argument for proposing that is now gone.

11   It is off the table.

12            There is ample time to get a preliminary injunction

13   in place that deals with these DRE elections that are small

14   elections but still important.  Because under the Constitution,

15   every election matters.  Let's get that in place.  Then they

16   can figure out what they are going to do with the BMDs.  But

17   we'll have the relief that the voters of Georgia are entitled

18   to under the current system.  And if they come up with

19   something better out of this new legislation, great.  Maybe

20   that will moot our case a year from now.  But that is a year

21   from now.

22            That is how we would proceed, Your Honor.

23            MR. RUSSO:  Your Honor, just a real quick point of

24   clarification.  Is Mr. Cross saying that the plaintiffs are

25   stipulating or agreeing that this case is not about

1   ballot-marking devices and changes --

2           THE COURT:  Get to the microphone for the court

3   reporter to get an accurate transcript.

4           MR. RUSSO:  I'm just trying to find out if Mr. Cross

5   is stipulating to this case not being about ballot-marking

6   devices.

7           THE COURT:  I would have to say I didn't hear him

8   saying that at all.  I think he was saying -- and he can

9   correct me if I'm wrong.  It is still about that.  But it is

10  not -- because these issues are not ripe in the sense that you

11  have not -- the state has not adopted which system concretely

12  is what I understood.

13          MR. RUSSO:  Okay.  Sure.

14          THE COURT:  That any -- so that is what I understood

15  him to say.

16          MR. RUSSO:  Okay.

17          THE COURT:  Did you mean to say something different?

18          MR. CROSS:  That is correct, Your Honor.

19          MR. RUSSO:  So we should take when they refer to DREs

20  in the complaint to mean BMDs also?

21          THE COURT:  I can't speak to that.

22          MR. CROSS:  Your Honor, I would say read the

23  complaint holistically, which is what the law requires.  And

24  what you find is arguments, claims, and legal theories that a

25  system that is not reliable, that is not secure, is not

1    auditable, that relies on electronic machines, whether we call

2    them DREs or BMDs, that is unconstitutional and the relief

3    we're seeking for is the same regardless of what those machines

4    are.

5           The ultimate position is there is only one system in

6    place across this state that is not BMDs.  So why they are

7    talking about BMDs I'm not entirely clear.  But, again, if they

8    are saying that is what is ruled out, judicial economy says

9    let's take discovery on both.  But at the very least, let's get

10   relief on the system that is in place.  And then they can get

11   their act together on whatever else they are going to roll out.

12          THE COURT:  Well, I understand why you are willing to

13   put off the BMD issue in the sense of saying we don't know what

14   the system exactly will be, other than what is identified in

15   the RFP and in the legislation.  And I understand the argument

16   as to the mootness and that it is not moot at this juncture.

17   And I tend to agree that the argument about mootness at this

18   point is not meritorious.

19          I will not forbid the state from making any argument

20   it wants to make.  But I don't think it is meritorious when we

21   still are going to be using that system right now.  And it

22   seems like we have gone through a lot to just be delaying on

23   that.

24          But I can't agree with the plaintiffs that you're not

25   going to actually have to amend ultimately your complaint here.

1    I understand why you say it is all connected and it is the

2    same -- it should be within the context of whatever the civil

3    action number here is, 17-CV-2989.

4            But we need to have the actual specific allegations

5    here.  I mean, that is -- we moved to a system -- at least the

6    current status of American law is that we have more -- we rely

7    on more specific allegations.  We don't have just generic

8    notice pleading.  And I just can't conceive of your not needing

9    to amend the complaint ultimately.

10           Now, the timing of that is another matter and

11   something you-all could more concretely discuss.  But --

12           MR. CROSS:  Your Honor, if I may propose, speaking

13   for our clients, I don't have an objection to amending the

14   complaint.  The only objection we have ever had -- and Your

15   Honor will recall we went through this last spring -- is -- and

16   I suspect why they really wanted an amended complaint because

17   they are on notice of what our positions are -- is it triggers

18   a whole new round of motions to dismiss, and they are going to

19   argue that there is a stay all over again.

20           If discovery moves forward from this day on, I'm

21   happy to put in however many amended complaints we need so that

22   this argument finally goes away.  That is our only concern.

23   And so we could get an amended complaint within two weeks, I'm

24   sure, that lays out whatever needs to be laid out on a system

25   that's actually not even adopted, which is a little weird.  But

1    we can do that.  But discovery needs to be moving forward.

2         That is the sole bottom line.  If they want to file a

3    new motion to dismiss, have at it.  But discovery moves

4    forward.  I mean, again, we won at the Eleventh Circuit.  There

5    is only one ground in this case to stay.  That is immunity.

6    And the Eleventh Circuit -- I was there.  It was a hostile

7    reception, Your Honor.  And this has always been about nothing

8    more than delay.  And that is what we're seeing again today.

9         So we will take -- we will proceed however Your Honor

10   thinks is best.  An amended complaint, fine; motion to dismiss,

11   fine, as long as discovery is moving forward and we get to file

12   a new preliminary injunction motion and we get the relief that

13   we, I think, showed we were entitled to last year now that we

14   are no longer under the time pressures of a major election.

15        MR. RUSSO:  Your Honor, I mean, with all due respect

16   to Mr. Cross because I know he didn't start out in the case

17   originally -- there have been quite a few parties and attorneys

18   on the other side of the room that have exited stage left as

19   this case has gone on -- we're on the third amended complaint.

20        And, quite honestly, if the complaint is that any

21   voting system the state has is unconstitutional, when does this

22   case ever end?  I mean, that is just -- that is a problem from

23   the start.

24        But putting that aside, Your Honor -- and I may be --

25   I may have this wrong.  So somebody will need to correct me I'm

1    sure.  You can.  But looking through the docket, it looked like

2    there were two issues that were never addressed that were still

3    on the table regarding res judicata and collateral estoppel.

4           I don't know where those sit now.  But to the extent

5    that discovery was stayed due to the appeal, you know, those

6    two issues on the motion to dismiss have yet to be responded

7    to.

8           THE COURT:  It hasn't come back that long.  Believe

9    it or not, as important as elections are, I do have some other

10   cases.

11          MR. RUSSO:  And, you know, I don't necessarily know

12   where we stand even on those issues, quite honestly.  But I do

13   know that, you know, this Court has rules.  And local rules do

14   provide for the time for an answer to be filed and when

15   discovery begins.

16          MR. BROWN:  Judge, a couple of --

17          THE COURT:  Would you come next to the microphone.

18   Thank you.

19          MR. BROWN:  Just a couple of points to -- Your Honor

20   said that upon remand you would insist upon expedited

21   proceedings.  And that is the way we're prepared to move.

22   There's a couple of ways that the scheduling could be

23   expedited.  One would be to -- this is a little bit like what

24   Mr. Cross said but not to have back -- different phases sort of

25   end to end with one not starting until the one before that is

1    finished.

2         So, for example, they complained about sort of

3    mootness-related issues on the DREs like, well, is it really

4    that important.  That is a response to our motion for

5    preliminary injunction that they can put -- if they have a

6    problem, they can put it in there.  They don't have to go

7    through a whole new motions process.

8         Also with respect to discovery, it is true that in

9    the typical case you answer and then you get into the

10   discovery.  Well, they haven't answered yet even though the

11   complaints were filed years ago.  But Your Honor has the

12   discretion to start discovery before the answer under the

13   rules.  You don't have to wait.  And so that doesn't need to

14   delay.  So we don't need to wait on an answer to come in.  We

15   should start.  There is no reason -- there is no real reason to

16   not start discovery right now.

17        Thank you, Your Honor.

18        THE COURT:  All right.  Well, I know that y'all have

19   been giving a great deal of thought to this since the Eleventh

20   Circuit ruled.  And I need to process the information and your

21   points that you have articulated today.  And we'll try to get

22   back to you at least within the week about how I think we

23   should proceed.

24        I know that there are members of the public here who

25   always want to know what does the Judge think, what is she

1    going to do now.

2             MR. BROWN:  So do we, Judge.

3             THE COURT:  And so does counsel and so do our public

4    officials who are responsible for running the elections.  So I

5    respect that.  And at the same time, I don't have an election

6    next week or four weeks from now.  If you-all can't tell me

7    that there's SPLOSTs in this next month, then I don't have -- I

8    don't have the monster breathing down my neck quite this way.

9             So it is probably more important for me to be

10   thoughtful about this and to consider what everyone has said

11   than to just speak at this point about something that I'm just

12   trying to process.  It is a complicated posture the case is in.

13            And I understand the viewpoint argued by Mr. Russo.

14   We can't just be doing this forever.  And the case goes back to

15   2017.  I do understand that viewpoint.  At the same time,

16   obviously this is a hot issue of concern to everybody and it

17   is -- and I have to deal with it still.  And the fact that the

18   case dates back to then doesn't answer the problem that there

19   are serious issues involved.

20            And I certainly hope that the process of -- the RFP

21   process still is a very serious one.  I don't know who the team

22   is.  It is not -- that is not mine to be involved with.  And I

23   don't know the breadth of issues.  I do think it would be

24   helpful for me to have a copy of the RFP as well.  Not that

25   that is going to answer all of my questions by any means.  But

1    at least I'll understand what that is and not just have little

2    morsels of information.

3              MR. RUSSO:  It is not the RFP.  It is the key places.

4              THE COURT:  Does the state believe that the five

5    identified vendors are likely, in fact, to bid on this, or are

6    there additional ones as well?

7              MR. RUSSO:  We'll have to defer to our client.

8              MR. TYSON:  Your Honor, we believe there were four

9    vendors that attended the bidders' conference.  So I don't know

10   if that covers all of the ones.  But there were several vendors

11   that are looking to bid it looks like.

12             THE COURT:  All right.  And you'll know who is -- is

13   it public at the point that the bids are submitted on

14   April 23rd who the bidders are or who attended the bidding

15   conference?

16             MR. RUSSO:  Your Honor, we can follow up with you and

17   let you know.  We do some procurement work.  But I do not know

18   off the top of my head.  My partner, Josh Belinfante, might be

19   able to shed some additional light on that.

20             MR. BELINFANTE:  Typically, Your Honor, under the

21   procurement that this rule is governed under, anything that

22   goes into the procurement will remain confidential and

23   privileged until it is over.  I know you know that from your

24   school board days.  But in terms of the identity, that may be

25   something that is a more limited nature.

```
 1            THE COURT:  That is all I was asking about.  Because

 2   since they identified three systems that used some type of bar

 3   code and two that didn't, I was just trying to figure out

 4   what -- I don't really care about the name.  I'm just trying to

 5   figure out what their technology is and whether you are going

 6   to have a full array of whatever is available and in those

 7   terms or whether you are going to have something else

 8   additional.

 9            MR. BELINFANTE:  Right.  To that point, it may be

10   something that we could get you an answer on.  I notice that

11   the filing that was made today -- we were planning to respond

12   post-hearing.  And if the Court would indulge us at the latest

13   Monday, if we could submit a response to that, we could include

14   an answer to that question to the extent that we would be able

15   to have one.

16            THE COURT:  Well, today is Tuesday.  I can give you

17   until Thursday.

18            MR. BELINFANTE:  Then that is when we will have it

19   in.  Thank you, Judge.

20            THE COURT:  All right.  Very good.  Thank you,

21   everybody.  We'll try to get you something by Friday or Monday,

22   depending on what is filed.

23            All right.  Thank you.

24            MR. CROSS:  Thank you, Your Honor.

25            COURTROOM SECURITY OFFICER:  All rise.  This court is
```

1    in recess.

2              **(The proceedings were thereby concluded at 4:09**

3              **P.M.)**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   64 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   11th day of April, 2019.

14

15

16

17                         _____
                           SHANNON R. WELCH, RMR, CRR
18                         OFFICIAL COURT REPORTER
                           UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```