## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **DONNA CURLING, *et al.*,** | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **1:17-CV-2989-AT** |
| **BRAD RAFFENSPERGER, *et al.*,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>ORDER</u>

This case challenges the constitutionality of the State of Georgia's use of Direct Recording Electronic voting machines ("DREs") and associated software systems in today's era of heightened cybersecurity threats.

Approximately two weeks the November 2018 general election, the Court held a full day evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction, and in so doing, considered Defendants' jurisdictional related defenses. Following the hearing, the Court entered an Order denying Defendants' Motions to Dismiss Plaintiffs' claims based on Eleventh Amendment immunity and for lack of standing. The Court also denied Plaintiffs' Motion for Preliminary Injunction seeking to require the State of Georgia to use paper ballots for the 2018 general election. Although the Court found (with a measure of caution) that Plaintiffs demonstrated a likelihood of success on the merits for at least some of their claims,

the Court ultimately determined that the Plaintiffs' eleventh-hour request for an immediate rollout of paper ballots statewide would adversely impact the public interest in an orderly and fair election, with the fullest voter participation possible under the circumstances precluded.

On an expedited appeal, the Eleventh Circuit denied and dismissed the State Defendants' appeal of the Court's jurisdictional rulings.  Currently before the Court are the remaining arguments in Defendants' motions to dismiss [Docs. 82, 83, 234] which the Court reserved for ruling pending review of the threshold jurisdictional issues of standing and Eleventh Amendment immunity in the context of expeditiously addressing Plaintiffs' preliminary injunction motions. (*See* Order at Doc. 309.)  As the Court stated in its September 17, 2018 Order, Defendants' Motions to Dismiss also raised other non-jurisdictional arguments that Plaintiffs have failed to state viable claims for relief and that their claims are barred by res judicata and collateral estoppel.

## I.  Background

Although the issues now before the Court are narrower than those addressed in the September 17, 2018 Order, in the interest of judicial efficiency the Court incorporates its lengthy factual background discussion of Plaintiffs' allegations and

the evidence provided in support of their injunction request in connection with the November 2018 general election.[1]

In their complaints, their motions for preliminary injunction, and their presentations during the September 12th hearing, Plaintiffs[2] paint an unsettling picture of the vulnerabilities of Georgia's voting system along with the recent, increased, and real threats of malicious intrusion and manipulation of the system and voter data by nation states and cyber savvy individuals.

Plaintiffs start by describing Georgia's voting system. The system relies on the use of Direct Recording Electronic voting machines ("DREs") for electors to cast their votes in public elections. This computer voting equipment is used in tandem with the State's Global Election Management Systems ("GEMS") server and County GEMS servers that communicate voting data.[3]  DRE touchscreen computer voting machines are located at polling stations in every precinct during elections and are otherwise stored in various county facilities throughout the state. Electors use DRE machines if they are voting early and in-person with absentee

---

[1] The Court's factual background section is based on the allegations in the Curling Plaintiffs' Second Amended Complaint (Doc. 70), the Coalition Plaintiffs' Third Amended Complaint (Doc. 226), the Curling Plaintiffs' Motion for Preliminary Injunction (Doc. 260), the Coalition Plaintiffs' Motion for Preliminary Injunction (Doc. 258), information presented during the September 12, 2018 hearing, and supplemental affidavits as well as Defendants' responses to Plaintiffs' filings.

[2] There are two sets of Plaintiffs in this case represented by separate counsel. Donna Curling, Donna Price, and Jeffrey Schoenberg are referred to as the "Curling Plaintiffs." The Coalition for Good Governance ("CGG"), Laura Digges, William Digges III, Ricardo Davis, and Megan Missett are referred to as the "Coalition Plaintiffs."

[3] A related software program is used to create the ExpressPoll pollbooks providing confidential voter identification information by precinct. Poll workers access this data by computer to verify voter registration and to create the DRE Voter Access Card that activates the specific electronic ballot on the DRE machine that should be linked to the voter's address.

ballots or if they are voting in-person on election day. "The voting machines are computers with reprogrammable software." (Halderman Affidavit, Doc. 260-2 ¶ 16.) The DRE machines record votes electronically on a removable memory card, and each card is later fed into the county GEMS server to tabulate the vote totals by candidate and the results of other ballot questions. When the polls have closed, poll workers prompt the DRE machines to internally tally the electronic total number of votes and print a paper tape of the vote totals per machine.

Most significantly, the DREs do not create a paper trail or any other means by which to independently verify or audit the recording of *each* elector's vote. i.e., the actual ballot selections made by the elector for either the elector's review or for audit purposes. Plaintiffs allege that Georgia's voting machines are susceptible to the introduction of undetectable malware designed to alter votes. At the September 2018 hearing, Dr. Alex Halderman, a Professor of Computer Science and Engineering and Director of the Center for Computer Security and Society at the University of Michigan in Ann Arbor, discussed and demonstrated how a malware virus can be introduced into the DRE machine by insertion of an infected memory card (or by other sources) and alter the votes cast without detection.[4] Dr. Halderman gave a live demonstration in Court with a Diebold DRE using the same type of equipment and software as that used in Georgia. The demonstration showed that although the same total number of votes were cast, the contaminated

---

[4] Dr. Halderman's affidavit provides additional detail and context related to his testimony. (Doc. 260-2.)

memory card's malware changed the actual votes cast between candidates.  There was no means of detection of this as the "malware modified all of the vote records, audit logs, and protective counters stored by the machine, so that even careful forensic examination of the files would find nothing amiss."  (Halderman Affidavit, Doc. 260-2 ¶ 19.)  The DRE machine's paper tape simply confirmed the same total number of votes, including the results of the manipulated or altered votes.  Viruses and malware have also been developed by cyber specialists that can spread the "vote stealing malware automatically and silently from machine to machine during normal pre- and post-election activities," as the cards are used to interface with the County and State GEMS servers.  (*Id.* ¶ 20.)

As detailed in Plaintiffs' complaints, other cybersecurity elections experts have shared in Professor Halderman's observations of the data manipulation and detection concealment capacity of such malware or viruses, as well as the ability to access the voting system via a variety of entry points.  Plaintiffs filed affidavits in the record for several of these experts.[5]  Professor Wenke Lee (Professor of Computer Science at Georgia Tech and a member of a new election study Commission convened by the Secretary of State) also prepared a PowerPoint presentation summary on the topic for the Commission that identified this malware detection and manipulation capacity.  (Pl. Ex 5, Preliminary Injunction

---

[5] *See* DeMillo Affidavit, Doc. 277, Ex. C; Buell Affidavit, Doc. 260-3; Stark Affidavit, Doc. 296-1; Bernhard Affidavit, Doc. 258-1 at 33-42.  Professor DeMillo, who also testified at the September 2018 hearing, is the Chair of Computer Science at Georgia Tech and has served as Dean of the College of Computing at Georgia Tech and as Director of the Georgia Tech Center for Information Security.

Hearing.)  According to Plaintiffs' allegations and supporting evidence, national- and state-commissioned research-based studies by cybersecurity computer scientists and elections experts consistently indicate that an independent record of an elector's physical ballot is essential as a reliable audit confirmation tool.

The DREs record individual ballot data in the order in which they are cast, and they assign a unique serial number and timestamp to each ballot.  This design for recording ballots, according to Plaintiffs, makes it possible to match the ballots to the electors who cast them.  Additionally, the Georgia DREs use versions of Windows and BallotStation (developed in 2005) software, both of which are out of date – to the point that the makers of the software no longer support these versions or provide security patches for them.  (Halderman Affidavit, Doc. 260-2 ¶¶ 24-28.) The DRE machines and related election software are all the product of Premier Election Solutions, formerly known as Diebold Election Systems.  A large volume of the voting machines were purchased when the DRE initiative was first implemented in the 2002 to 2004 period in Georgia.

Statewide, Georgia uses its central GEMS server at the Secretary of State's offices to build the ballots for each election for each county.[6]  The central GEMS server communicates the election programming and other files onto the memory cards before an election.  From 2002 to December 2017, the Secretary of State contracted with Kennesaw State University to maintain the central server for the

---

[6] The ballot software also programs the location of candidates and other ballot options on the touchscreens of the DRE machines.  Ballot adaptations, thus, are created for 159 counties and their over 2,600 precincts.

State at a unit in the University called the Center for Election Services ("CES"). Plaintiffs allege that the central server was accessible via the internet for a time – at least between August 2016 and March 2017.

In August 2016, Logan Lamb, a professional cybersecurity expert in Georgia, went to CES's public website and discovered that he was able to access key election system files, including multiple gigabytes of data and thousands of files with private elector information. The information included electors' driver's license numbers, birth dates, full home addresses, the last four digits of their Social Security numbers, and more. Mr. Lamb was also able to access, for at least 15 counties, the election management databases from the GEMS central tabulator used to create ballot definitions, program memory cards, and tally and store and report all votes. He also was able to access passwords for polling place supervisors to operate the DREs and make administrative corrections to the DREs, as well as executable programs that could be used to implant vote altering malware into the system. Immediately, Mr. Lamb alerted Merle King, the Executive Director overseeing CES, of the system's vulnerabilities. The State did not take any remedial action after Mr. King was alerted.

In February 2017, a cybersecurity colleague of Mr. Lamb's, Chris Grayson, was able to repeat what Mr. Lamb had done earlier and access key election information. Mr. Lamb also found, around this time, that he could still access and download the information as he had before. On March 1, 2017, Mr. Grayson notified a colleague at Kennesaw State University about the system's

vulnerabilities, and this led to notification of Mr. King again. Days later, the FBI was alerted and took possession of the CES server.

The Secretary of State subsequently shut down the CES and moved the central server internally within the Secretary's office. But on July 7, 2017, four days after this lawsuit was originally filed in Fulton Superior Court, all data on the hard drives of the University's "elections.kennesaw.edu" server was destroyed. And on August 9, 2017, less than a day after this action was removed to this Court, all data on the hard drives of a secondary server – which contained similar information to the "elections.kennesaw.edu" server – was also destroyed.

The Premier/Diebold voting machine models at issue have been the subject of comprehensive critical review both by university computer engineer security experts independently as well as under the auspices of the States of Maryland, California, and Ohio. These studies identified serious security vulnerabilities in the software and resulted in the three states' adoption of different voting systems. (Halderman Affidavit, Doc. 260-2 ¶¶ 17-23; *see also* Atkeson Affidavit, Doc. 276-1 ¶¶ 8-9 (also discussing the states of New Mexico and Virginia transitioning away from DREs after identifying several issues with the machines).)[7]

---

[7] By contrast, the Secretary of State certified in April 2018 the accuracy and safety of the Georgia DRE system. This certification was based on a pre-announced examination of voting facilities and the conducting of a tiny mock election in several Georgia counties on November 27-29, 2017 by a combination of staff from the Secretary of State's Office and the Center for Election Services at Kennesaw State University. (Def. Ex. 2 from Preliminary Injunction Hearing.) No cybersecurity experts or computer engineering scientists are listed as participants in this review. There is no indication in the description of the examination that any effort was made to go beyond a simple running of the equipment and observation of election procedures to reach this determination. In other words, there is no indication that any effort was made to evaluate the

Plaintiffs point to several national authorities which, in the last year, have raised the alarm about U.S. election security – and particularly about the use of DREs in elections.  For instance, in March 2018, the Secretary the U.S. Department of Homeland Security (DHS) declared DRE voting systems to be a "national security concern," (Coalition Mot., Doc. 258-1 at 10 n. 3) – approximately 14 months after the Department declared election systems to be "critical infrastructure" pursuant to 42 U.S.C. § 5195c.[8]  (U.S. Department of Homeland Security, "DHS Cybersecurity Services Catalog for Election Infrastructure," at 3.)[9] In May 2018, the Senate Select Committee on Intelligence concluded that DREs are "at highest risk of security flaws" and that states "should rapidly replace outdated and vulnerable voting systems" with systems that have a verified paper trail.  (*Id.* at 11 n. 5.)  And on September 6, 2018, after it was commissioned to consider the future of voting in the United States, the National Academies of Sciences, Engineering, and Medicine[10] and associated National Research Council ("NAS") issued a consensus report about the need to secure and improve state and

---

trove of software and data security and accuracy issues identified in studies performed on behalf of other states or by cybersecurity and computer engineers in the field.

[8] Critical infrastructure is defined as "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters."  Section 5195c(b) of the Critical Infrastructures Protection Act makes clear that information systems and their interdependence constitute a central concern of Congress.

[9] *See* https://www.eac.gov/assets/1/6/DHS_Cybersecurity_Services_Catalog_for_Election_Infrastructure.pdf.

[10] Congress established the National Academies of Sciences, Engineering, and Medicine in 1863 as an independent body, which has the obligation to provide scientific and technical advice to any department of the Government upon request and without compensation.  *See* http://www.nasonline.org/about-nas/leadership/governing-documents/act-of-incorporation.html.

local election systems.[11]  The report, titled "Securing the Vote: Protecting American Democracy," made a number of recommendations, including that "[e]very effort should be made to use human-readable paper ballots in the 2018 federal election." (Doc. 285-1 at 35.)  The report further recommended that voting machines that do not produce paper audit trails for each elector's vote "should be removed from service as soon as possible" and that each state "should require a comprehensive system of post-election audits of processes and outcomes."  (*Id.* at 35-36.)

Similarly, the Board of Advisors of the U.S. Elections Assistance Commission (EAC) passed a resolution in 2018 recommending that the EAC "not certify any system that does not use voter-verifiable paper as the official record of voter intent."[12]

Dr. Wenke Lee, Professor of Computer Science at Georgia Tech University and Co-Executive Director of the Institute for Information Security – the sole computer scientist appointed to the Secretary of State's new Secure Accessible Fair Elections ("SAFE") Commission – has echoed these same paper ballot and audit verification recommendations in his August 30, 2018 presentation on cybertechnology to the Commission.  He has also stressed the essential need for installation on an ongoing basis of new hardware and software components

---

[11] As noted by Professor Richard A. DeMillo in his supplemental affidavit, "a consensus report of the NAS . . . represents the highest authority that the U.S. Government can rely upon when it seeks to be advised on matters of science, technology and engineering."  (Doc. 285-1 ¶ 9.)

[12] *See* discussion of EAC action and audit outcome issues in the affidavit of Philip B. Stark, Professor of Statistics and Associate Dean of Mathematical and Physical Sciences and faculty member in Graduate Program in Computational Data Science and Engineering at University of California, Berkeley.  (Doc. 296 ¶¶ 20-25.)

designed to provide security protection to ensure voting system security.  (Pl. Ex. 5, Preliminary Injunction Hearing.)

In the midst of the events involving the breach of the CES at Kennesaw State University, Plaintiffs filed the current case against Defendants[13] in August 2017. Plaintiffs essentially claim that the direct recording electronic (DRE) voting system in Georgia is unsecure, is unverifiable, and compromises the privacy and accuracy of their votes, and therefore they claim that Defendants' continued use of the DRE system in future elections will result in an undue burden on their fundamental right to vote in violation of their constitutional rights to due process and equal protection.  The following is a brief overview of the particular claims brought by each set of Plaintiffs.

The Coalition Plaintiffs bring two federal claims in their Third Amended Complaint:

(1) a 42 U.S.C. § 1983 claim for violation of the Fourteenth Amendment's guarantee of due process, based on the substantial burden placed on their fundamental right to vote; and

(2) a 42 U.S.C. § 1983 claim for violation of the Fourteenth Amendment's guarantee of equal protection, based on the more severe burdens placed on the

---

[13] Defendants are largely classified in two groups: (1) the "State Defendants," which include Brian Kemp in his official capacity, the State Election Board, and members of the State Election Board (David J. Worley, Rebecca N. Sullivan, Ralph F. Simpson, and Seth Harp) in their official capacities; and (2) the "Fulton County Defendants," which include Richard Barron in his official capacity, the Fulton County Board of Registration and Elections, and members of the Fulton County Board of Registration and Elections (Mary Carole Cooney, Vernetta Nuriddin, David J. Burge, and Aaron Johnson) in their official capacities.

Plaintiffs' right to vote, right to freedom of speech and association, and the Georgia constitutional right to a secret ballot[14] as a result of Plaintiffs choosing to vote by DRE relative to other similarly situated electors choosing to vote another way.

For each of these claims, the Coalition Plaintiffs seek declaratory and injunctive relief against the Secretary of State of Georgia in his official capacity and as Chairperson of the State Election Board; the members of the State Election Board in their official capacities; and the members of the Fulton County Board of Registration and Elections in their official capacities.   The Coalition Plaintiffs' Third Amended Complaint seeks the following:

- A court order declaring it unconstitutional to conduct public elections using any DRE model,

- An injunction enjoining Defendants from enforcing O.C.G.A. § 21-2-383(b)[15] and Georgia State Election Board Rule 183–1–12–.01[16] and from requiring voters to cast votes using DREs,

---

[14] The Coalition Plaintiffs clarify, in their Response to the State Defendants' Motion to Dismiss, that they are not bringing a state-law claim for violation of the Georgia Constitution.  They are instead bringing a federal § 1983 claim based on unequal enforcement of state law.

[15] "Notwithstanding any other provision of this Code section, in jurisdictions in which direct recording electronic (DRE) voting systems are used at the polling places on election day, such direct recording electronic (DRE) voting systems shall be used for casting absentee ballots in person at a registrar's or absentee ballot clerk's office or in accordance with Code Section 21-2-382, providing for additional sites."  O.C.G.A. § 21-2-383(b).

[16] "Beginning with the November 2002 General Election, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia shall be conducted at the polls through the use of direct recording electronic (DRE) voting units supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State. In addition, absentee balloting shall be conducted through the use of optical scan ballots which shall be tabulated on optical scan vote tabulation systems furnished by the Secretary of State or purchased by the counties with the authorization of the Secretary of State; provided, however, that the use of direct recording electronic (DRE) voting units is authorized by

- An injunction prohibiting Defendants from conducting public elections with optical scanned paper ballots without also requiring post-election audits of paper ballots to verify the results, and

- An injunction prohibiting Defendants from conducting public elections without also requiring subordinate election officials to allow meaningful public observation of all stages of election processing.

The Curling Plaintiffs bring essentially the same two constitutional claims as those brought by the Coalition Plaintiffs. As a slight variation, the Curling Plaintiffs bring their constitutional claims against the Defendants listed above as well as one additional defendant: Richard Barron in his official capacity as the Director of the Fulton County Board of Registration and Elections. The Curling Plaintiffs also seek somewhat varied relief for these claims in their Second Amended Complaint:

- A court order declaring that Defendants violated the Fourteenth Amendment, and

- An injunction prohibiting Defendants from using DREs or other voting equipment that fails to satisfy state requirements.[17]

---

the Secretary of State for persons desiring to vote by absentee ballot in person." Ga. Comp. R. & Regs. r. 183–1–12–.01.

[17] Additionally, the Curling Plaintiffs bring a state-law claim under O.C.G.A. § 9-6-20 for a writ of mandamus ordering Defendants to discontinue the use of DRE machines and to either use (a) an optical scanning voting system or (b) hand-counted paper ballots. The Curling Plaintiffs seek a writ of mandamus against the following Defendants: the members of the State Election Board in their official capacities; the State Election Board; Richard Barron in his official capacity as the Director of the Fulton County Board of Registration and Elections; the members of the Fulton County Board of Registration and Elections in their official capacities; and the Fulton County Board of Registration and Elections.

13

## II.    Whether Plaintiffs' Claims are Barred by Res Judicata or Collateral Estoppel

A federal court exercising federal question jurisdiction "asked to give res judicata effect to a state court judgment [] must apply the 'res judicata principles of the law of the state whose decision is set up as a bar to further litigation.'" *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1509 (11th Cir. 1985) (quoting *Hernandez v. City of Lafayette*, 699 F.2d 734, 736 (5th Cir. 1983)).   In Georgia, Defendants bear the burden of proof on their affirmative defenses of res judicata and collateral estoppel.   *Glen Oak, Inc. v. Henderson*, 369 S.E.2d 736, 738 (Ga. 1988).

The doctrine of res judicata is aimed at fostering the finality of litigation, but it must also be balanced against the right of litigants to be heard in court. *Brown & Williamson Tobacco Corp. v. Gault*, 627 S.E.2d 549, 551 (Ga. 2006); *Anderson Oil Co. v. Benton Oil Co.,* 271 S.E.2d 207, 209 (Ga. 1980) (stating that the res judicata analysis "involves a fact determination in balancing the policy toward ending litigation and due process").   In balancing these interests, and determining whether the doctrine should apply, Georgia courts consider (a) the identity of the parties or their privies; (b) the identity of the cause of action; (c) the binding effect of the prior judgment, i.e. whether there was an adjudication on the merits; and (d) public policy concerns weighing against a strict application of res

judicata. *Smith v. AirTouch Cellular of Georgia, Inc.*, 534 S.E.2d 832, 836 (Ga. Ct. App. 2000) (citing *Fierer v. Ashe,* 249 S.E.2d 270, 272 (Ga. Ct. App. 1978)).

The doctrine of res judicata is not a rigid rule of law.[18]  *Brown & Williamson Tobacco Corp.*, 627 S.E.2d at 554 (Thompson, J., dissenting) (citing *Brookins v. Brookins,* 357 S.E.2d 77, 78 (Ga. 1987) ("a mechanical application of the res judicata rule in this situation would frustrate the purposes of the URESA")).  It has "'been occasionally rejected or qualified in cases in which an inflexible application would have violated an overriding public policy or resulted in manifest injustice to a party.'" *Fierer,* 249 S.E.2d at 273 (quoting 1B Moore's Federal Practice 783, Para. 0.405[11]).

### A. *Favorito v. Handel*

The State Defendants and the Fulton County Defendants argue (in a footnote) that Plaintiff Ricardo Davis' claims in this action are barred by res judicata because he was also a plaintiff in an earlier challenge to Georgia's DRE election system in *Favorito v. Handel*.  Following Georgia's original rollout of DRE voting machines, several Georgia residents filed a lawsuit in 2006 for declaratory, injunctive, and mandamus relief challenging Georgia's authorization and use of the DRE machines.  *See Favorito v. Handel*, 684 S.E.2d 257 (Ga. 2009).  The

---

[18] This is on par with the federal common law on res judicata.  *See Maldonado v. U.S. Atty. Gen.*, 664 F.3d 1369, 1375 (11th Cir. 2011) (stating that the application of res judicata "is not strictly mechanical [and] courts have some leeway in deciding whether or not res judicata bars a subsequent suit"); *Moch v. E. Baton Rouge Parish Sch. Bd.*, 548 F.2d 594, 598 (5th Cir. 1977) ("We are unwilling to hold ... that [the doctrine of res judicata] constitute[s] an absolute from which we must never stray, even when a mechanical application would result in manifest injustice. Rather, we believe that the occasional adoption of an exception to the finality rule when public policy so demands does not undermine its general effectiveness.").

*Favorito* plaintiffs argued that their fundamental right to vote was being injured "because the recording, counting, and retention of their votes, unlike paper ballots, are not being properly protected either by an independent audit trail or by county and state tabulators which can prevent fraudulent manipulation." *Id.* at 260.

Defendants' argument focuses exclusively on the "identity of parties" prong of res judicata. They offer no substantive arguments on the remaining elements. For this reason alone, Defendants have failed to satisfy their burden of proof on their affirmative defense of res judicata as to Plaintiff Ricardo Davis. *See Glen Oak, Inc. v. Henderson*, 369 S.E.2d at 739, n. 4 (stating that the defense of res judicata "must be sustained by 'clear proof'").

It is true that both *Favorito* and this case challenge the reliability and accuracy of Georgia's electronic voting machines. However, the *Favorito* lawsuit was brought during the infancy of the use of DREs in Georgia when the susceptibility of the machines to fraudulent manipulation may have been foreseeable but was far from a reality. More than a decade following the initiation of the lawsuit in *Favorito*, the Secretary of the U.S. Department of Homeland Security (DHS) declared DRE voting systems to be a "national security concern." (Coalition Mot., Doc. 258-1 at 10 n. 3.) Since its adoption in 2001, the technology has not been updated to address known vulnerabilities in the face of persistent election security threats that the national government warns remain looming for future elections. Respectfully, many of the court's findings regarding the reliability of Georgia's DRE voting system in *Favorito* have been proven outdated or

16

inaccurate with the passage of time.  Thus, the Court cannot hold that Plaintiffs' claims, as currently factually presented and plead here, are identical to, were fully and fairly litigated in, and were actually decided on the merits by the Court in *Favorito.  See Haley v. Regions Bank*, 586 S.E.2d 633, 638-39 (Ga. 2003) ("Since the questions now before us arose after the holding in *Busbee*, depend on a substantially different set of facts, and are not settled by that holding, the causes of action are not identical," and are thus "not precluded by application of the doctrine of res judicata."); *see also Stringer v. Bugg*, 563 S.E.2d 447, 449 (Ga. Ct. App. 2002) ("Stringer correctly points out she could not have asserted these claims originally in the magistrate court because at the time an answer was due, these causes of action, which arise from Bugg's subsequent actions, had not accrued.").

## B. Curling I: Curling, et al., v. Kemp, et al., Civil Action No. 2017CV290630, Superior Court of Fulton County Georgia

The Fulton County Defendants also argue Plaintiffs' claims "rest[ing] on the premise that the DRE voting system is unable to be safely and accurately used to conduct elections" are barred by res judicata and collateral estoppel as a result of the state court's order in *Curling I*.[19]  (Fulton Defs.' Mot., Doc. 82-1 at 18.)  This is because, the Fulton County Defendants contend, the court "in *Curling I* specifically held that Plaintiffs' state law causes of action were subject to qualified immunity

---

[19] The State Defendants do not assert that *Curling I* bars the Plaintiffs' claims in this action. Accordingly, the Court finds that Plaintiffs' claims against the State Defendants are not barred by res judicata or collateral estoppel.  *Mayer v. Wylie*, 494 S.E.2d 60, 61 (Ga. Ct. App. 1997) *(citing Northgate Village Apts. v. Smith*, 428 S.E.2d 381 (1993) (holding that res judicata, an affirmative defense, is waived if not asserted in timely-filed responsive pleading)).

and must be dismissed; and Plaintiffs' request for writ of mandamus must necessarily fail." (*Id.*)

The *Curling I* plaintiffs filed a lawsuit in the Superior Court of Fulton County in May, 2017 following alleged irregularities in Georgia's DRE voting system during the preceding April, 2017 Special Election for the Sixth Congressional District. The plaintiffs sought relief related solely to the June 2017 Runoff for the Special Election for the Sixth Congressional District "under the Constitution and the laws of the State of Georgia." (*Curling I* Complaint, ¶ 2.) Specifically, they sought: (1) a declaration from the Court under O.C.G.A. § 9-4-2 that the use of DREs to conduct the Runoff is "impracticable" and "not practicable" within the meaning of O.C.G.A. §§ 21-2-281 and 21-2-334 (allowing for use of paper ballots when use of voting machines or equipment is not practicable); (2) a temporary and permanent injunction under Georgia law enjoining the use of DREs in the Runoff; and (3) a writ of mandamus requiring the Secretary of State to conduct a reexamination of Georgia's DRE voting system under O.C.G.A. § 21-2-379.2(a). These claims were brought against Brian P. Kemp in his official capacity at that time as Secretary of State, Richard Barron in his official capacity as Director of the Fulton County Board of Elections and Registration, Maxine Daniels in her official capacity as Director of Voter Registrations and Elections for DeKalb County, and

Janine Eveler in her official capacity as Director of the Cobb County Board of Elections and Registration.

The day after filing their lawsuit and on the eve of early voting for the Runoff, the *Curling I* plaintiffs moved for an emergency temporary restraining order to enjoin the defendants from using the DRE voting equipment and DRE-based voting system during the June 20, 2017 Sixth Congressional District Runoff in Cobb, DeKalb and Fulton counties. The Superior Court entered an Order denying the emergency motion on June 9, 2017.

Although no motion to dismiss had been filed by the defendants, the Superior Court *on its own initiative* also dismissed the claims of the *Curling I* plaintiffs. The Superior Court ruled:

> [B]ecause the individually-named Defendants have been sued in their official capacities, the doctrine of sovereign immunity applies. *Cameron v. Lang*, 274 Ga. 122 (2001). Sovereign immunity also extends to the County Defendants. *Butler v. Dawson Co.*, 238 Ga. App. 808, 809 (1999). As such, any state law claims against the Defendants are covered under the sovereign immunity doctrine unless there is some waiver of immunity. Plaintiffs have failed to identify any such waiver. . .

> [T]here are no federal claims before this Court, and any state law causes of action would be subject to qualified immunity and must be DISMISSED. Moreover, because sovereign immunity applies, Plaintiffs are barred from injunctive relief at common law on any state law claims. *Ga. Dept. of Nat'l Resources, et al. v. Center for Sustainable Coast*, 294 Ga. 593 (2014). Even if Plaintiffs' claims were not barred by sovereign immunity, Plaintiffs request for an interlocutory injunction must fail because Plaintiffs cannot satisfy the elements for such a remedy. . .

> Accordingly, for the reasons discussed above, the Court finds that Defendants are entitled to sovereign immunity from any claim for

injunctive and declaratory relief.  The Court further finds that the harm to the public would greatly outweigh the issuance of an injunction upon a consideration of the applicable factors . . . For similar reasons, the Court still further finds that Plaintiff's Request for a Writ of Mandamus must necessarily fail.  Accordingly, Plaintiff's Emergency Motion is hereby DENIED and the Complaint is hereby DISMISSED.

(June 9, 2017 Order in *Curling I*, at 3-4, 8.)

The Fulton County Defendants assert that the Superior Court's ruling operates as res judicata and collateral estoppel to bar Plaintiffs' claims here.  First, they argue that there is "identity of parties" between *Curling I* and this case (dubbed as *Curling II*) because several plaintiffs and defendants are parties to both actions and "the new *Curling II* parties' interests (concerns about the safety and accuracy of the DRE voting systems) were adequately represented by the parties in *Curling I*."  (Mot. at 19.)  Second, they contend that the "pre- and post-election challenges here concern the same essential claim: the DRE voting system is unsafe and inaccurate for use in conducting elections," despite the addition of some new factual allegations, new relief, and new defendants.  (*Id.* at 19-20)  And third, they assert that the Plaintiffs here had a full and fair opportunity to present evidence (including expert witness testimony) and arguments in the Superior Court.

### 1.  Identity of Parties

Defendants contend that the plaintiffs in the *Curling I* litigation were "privies" for the Plaintiffs in this matter because "many of the Plaintiffs in the instant matter were also plaintiffs in *Curling I*, and thus they had control over the litigation," their interests were "fully congruent," and the *Curling I* plaintiffs "fully

'represented' the interests of these Plaintiffs." (*Id.* at 21-22.)  The Fulton County Defendants cite no relevant authority to support this conclusory argument.

The doctrines of res judicata and collateral estoppel apply only to the parties to the prior suit and those in privity with them. O.C.G.A. § 9–12–40; *Brown & Williamson Tobacco Corp.*, 627 S.E.2d at 551 (discussing res judicata); *Waldroup v. Green County Hosp.*, 463 S.E.2d 5, 7-8 (Ga. 1995) ("Like res judicata, collateral estoppel requires the identity of the parties or their privies in both actions.").  "The term 'party' to an action includes all who are directly interested in the subject matter, and who have a right to make defense, control the pleadings, examine and cross-examine witnesses, and appeal from the judgment." *State Bar of Ga. v. Beazley*, 350 S.E.2d 422, 424 (Ga. 1986) (internal citations omitted).  A "privy" is generally defined as "one who is represented at trial and who is in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right." *Brown & Williamson Tobacco Corp.*, 627 S.E.2d at 551 (quoting *Butler v. Turner*, 555 S.E.2d 427 (Ga. 2001)).

Plaintiffs Donna Curling, Donna Price, and the Coalition for Good Governance (formally known as Rocky Mountain Foundation) were plaintiffs in *Curling I*.  It is undisputed that Plaintiffs Jeffrey Schoenberg, Laura Digges, William Digges III, Ricardo Davis, and Megan Missett were **not** parties in *Curling I*.  Contrary to the Fulton County Defendants' assertion that their interests were adequately represented in *Curling I*, Plaintiffs contend these five individual

additional plaintiffs "represent distinct interests and fundamental rights that have been violated," from those raised by the *Curling I* plaintiffs.[20]

*Curling I* was not a class action. Defendants offer no explanation how these individuals are "so connected in the law," to qualify as privies. Rather, Defendants ask this Court to assume that a single eligible Georgia voter represents the interests of every eligible Georgia voter when she pursues a claim to protect her fundamental right to vote. This argument fails to acknowledge that the right to vote, as guaranteed by the United States Constitution, is individual to each citizen. *See Pub. Citizen, Inc. v. Miller*, 813 F. Supp. 821, 826-27 (N.D. Ga. 1993), *aff'd per curium without modification* 992 F.2d 1548 (11th Cir. 1993) ("Plaintiffs here assert that they were deprived of an *individualized* right that the Constitution guarantees to them as individuals—the right to vote for and elect their own United States Senators. This is more than a generalized grievance about Georgia's conduct of government; this is an assertion that they are being denied the full scope of their *individualized* right to vote for their United States Senator.") (emphasis added); *see also See Shaw v. Hunt*, 517 U.S. 899, 917 (1996) (rejecting the implication that

---

[20] In *Curling I*, Donna Curling and Donna Price asserted direct individual harm to their voting rights under the Georgia constitution. The Coalition for Good Governance (known as Rocky Mountain Foundation in *Curling I*) asserted associational standing *in Curling I* on behalf of its individual Georgia members, including Curling, Price, and other Georgia electors residing in the Sixth Congressional District counties of Cobb, DeKalb, and Fulton. Although Defendants do not expressly advance this argument, the Coalition's members who resided in the sections of the counties comprising the Sixth Congressional District would have been in privity with the Coalition. However, only Ricardo Davis is alleged to have been a member of the Coalition in May 2017 when *Curling I* was filed, but Davis is a resident of Cherokee County, and thus, was not an eligible voter in the Sixth Congressional District Runoff. As such his interests in this litigation would not have been represented by the Coalition's associational standing in *Curling I*.

a vote dilution "claim and hence the coordinate right to an undiluted vote (to cast a ballot equal among voters), belongs to the minority as a group and not to its individual members.  It does not."); *Reynolds v. Sims*, 377 U.S. 533, 561 (1964) ("[A] predominant consideration in determining whether a State's legislative apportionment scheme constitutes an invidious discrimination violative of rights asserted under the Equal Protection Clause is that the rights allegedly impaired are *individual* and *personal* in nature.") (emphasis added).

The law of claim preclusion is subject to due process limitations.  *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) (discussing federal common law); *Richards v. Jefferson County*, 517 U.S. 793, 797 (1996).  The general rule is that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Taylor*, 553 U.S. 884, 891 (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). "A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit." *Taylor*, 553 U.S. at 892-93.  The application of res judicata to nonparties "thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Id.* (quoting *Richards*, 517 U.S., at 798).  "'[I]n certain limited circumstances,' a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit."  *Id.* at 894 (quoting *Richards*, 517 U.S., at 798). "Representative suits with preclusive effect on nonparties include

properly conducted class actions,[21] and suits brought by trustees, guardians, and other fiduciaries." *Id.* (internal citations omitted).

In *Richards*, the United States Supreme Court reviewed a decision by the Alabama Supreme Court holding that a challenge to a tax was barred by a judgment upholding the same tax in a suit filed by different taxpayers. 517 U.S. at 795–797. The plaintiffs in the first suit "did not sue on behalf of a class," their complaint "did not purport to assert any claim against or on behalf of any nonparties," and the judgment "did not purport to bind" nonparties. *Id.* at 801. As there was no indication that the court in the first suit "took care to protect the interests" of absent parties, or that the parties to that litigation "understood their suit to be on behalf of absent [parties]," the Supreme Court in *Richards* held that the application of claim preclusion was inconsistent with "the due process of law guaranteed by the Fourteenth Amendment." *Id.* at 797, 802.

Subsequently, in *Taylor* the Supreme Court addressed the so-called "virtual" or "adequate representation" exception to the general rule against precluding nonparties and held:

> A party's representation of a nonparty is "adequate" for preclusion purposes **only if**, at a minimum: (1) The interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty. In addition,

---

[21] "In a class action, for example, a person not named as a party may be bound by a judgment on the merits of the action, if she was adequately represented by a party who actively participated in the litigation." *Taylor*, 553 U.S. at 884 (citing *Hansberry*, 311 U.S. at 41).

> adequate representation sometimes requires (3) notice of the original
> suit to the persons alleged to have been represented.

*Taylor*, 553 U.S. at 900 (internal citations omitted) (emphasis added).  To adopt the Fulton County Defendants' bare, unsupported assertion that the *Curling I* plaintiffs were in privity because they adequately represented the interests of Plaintiffs Jeffrey Schoenberg, Laura Digges, William Digges III, Ricardo Davis, and Megan Missett would "recognize, in effect, a common-law kind of class action" and "would authorize preclusion based on identity of interests and some kind of relationship between parties and nonparties, shorn of the procedural protections" grounded in due process prescribed by the Supreme Court in *Hansberry and Richards. See Taylor*, 553 U.S. at 900-01 (holding that "adequate representation" exception to res judicata, in order to comport with due process, required either special procedures in first suit to protect nonparties' interests, or understanding by concerned parties in first suit that it was brought in representative capacity). Accordingly, the Court finds that these Plaintiffs were not privies of the *Curling I* plaintiffs.

## 2. Identity of Claims or Issues and Binding Effect of Superior Court Order

The Fulton County Defendants argue in a cursory manner that res judicata and collateral estoppel[22] apply because the election challenges in *Curling I* and this

---

[22] Claim preclusion and issue preclusion are often confused (and sometimes even more confusingly are collectively referred to as "res judicata"). *Sorrells Const. Co., Inc. v. Chandler Armentrout & Roebuck, P.C.*, 447 S.E.2d 101, 102 (Ga. Ct. App. 1994); *Taylor v. Sturgell*, 553 U.S. at 892.  However, these preclusion doctrines are not interchangeable legal terms. Under the doctrine of claim preclusion (or res judicata), a final judgment forecloses "successive litigation of

case "concern the same essential claim: the DRE voting system is unsafe and inaccurate for use in conducting elections." (Doc. 82-1 at 19.) Again, Defendants bear the burden of proof on their preclusion defenses and "[t]he identity between the cause of action or issues raised in the present suit and those adjudicated in the prior action cannot be uncertain, indefinite, or based upon inferences." *Glen Oak, Inc. v. Henderson*, 369 S.E.2d at 738-39.

Georgia courts define "cause of action" as "the *entire* set of facts which give rise to an enforceable claim. Where some of the operative facts necessary to the causes of action are different in the two cases, the later suit is not upon the same cause as the former, although the subject matter may be the same, and even though the causes arose out of the same transaction." *Haley v. Regions Bank*, 586 S.E.2d 633, 638 (Ga. 2003) (emphasis in original); *Morrison v. Morrison*, 663 S.E.2d 714, 719 (Ga. 2008). "The fact that the subject matter of different lawsuits may be linked factually does not mean that they are the same 'cause' [of action]" for purposes of

---

the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Taylor v. Sturgell*, 553 U.S. at 892 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)); *see also Jordan v. Board of Public Safety*, 559 S.E.2d 94, 96 (Ga. Ct. App. 2002); *Sorrells Const. Co., Inc.*, 447 S.E.2d at 102 ("[U]nder the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action."). Issue preclusion (or collateral estoppel), in contrast, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a different claim. *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. at 748–749); *Jordan*, 559 S.E.2d at 96-97 ("[U]nlike res judicata, collateral estoppel does not require identity of the claim—so long as the issue was determined in the previous action and there is identity of the parties, that issue may not be re-litigated, even as part of a different claim . . . When collateral estoppel applies, as here, an issue previously litigated and adjudicated on the merits cannot be relitigated even as part of a different cause of action."); *Sorrells Const. Co., Inc.*, 447 S.E.2d at 102 ("Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.")

determining whether a suit is barred by res judicata." *Morrison*, 663 S.E.2d at 719 (quoting *Gunby v. Simon*, 594 S.E.2d 342 (Ga. 2004); *accord Stringer v. Bugg*, 563 S.E.2d 447, 450 (Ga. Ct. App. 2002) ("[This court has found no identity of causes of action when a prior suit was based upon an account and the action in issue was brought on a written guaranty, even though both arose from the same debt. We found no identity of causes of action between a prior suit for damages brought by a husband for personal injury to a child, and a later wrongful death suit brought by the wife based upon the same wrongful act.") (citations omitted).  For res judicata "to act as a bar, the cause of action in each suit must be identical." *Haley*, 586 S.E.2d at 638 (internal quotation marks omitted) ("Although both the prior action brought by Herbert and the instant suit against his executors involve the construction and effect of Testator's will, the former resolved the nature and transferability of the defeasible and reversionary interests under the will, while the latter concerns the validity of a subsequent transfer and whether one of Testator's children later died leaving a surviving lineal descendant under the terms of the will. Since the questions now before us arose after the holding in *Busbee*, depend on a substantially different set of facts, and are not settled by that holding, the causes of action are not identical."); *Gunby v. Simon*, 594 S.E.2d 342, 344 (Ga. 2004) (because the subject matter of the different actions were separate surgeries

they were not identical causes of action so that res judicata did not bar claims based on separate, later surgeries).

On the other hand, for collateral estoppel to apply, "[t]he issue sought to be precluded must *actually have been litigated and decided in the first action* before collateral estoppel would bar it from being considered in the second action, or the issue *necessarily had to be decided in order for the previous judgment to have been rendered*." *Morrison*, 663 S.E.2d at 718 ("The previous litigation in the probate court resolved the issues of whether the 2003 notes and instructions were relevant to the claim of undue influence and whether they constituted a revocation of the 1998 will. However, the probate court did not decide the issue of whether Appellee breached his fiduciary duties as testator's attorney in fact, or intentionally interfered with an expected gift, by failing to comply with his written directions in 2003. Nor were the separate issues of fraud litigated in probate court. We specifically note that the probate court's determination of whether Appellee actually represented Lee Morrison at the mediation did not constitute a decision as to whether Appellee misled Appellants in that regard. Therefore, Appellants' claims are not barred by collateral estoppel.") (citation omitted) (emphasis in original).

Claims maturing after prior actions between parties are not barred by either res judicata or collateral estoppel. *See Glen Oak*, 369 S.E.2d at 739 (holding that judgment in prior case "cannot be res judicata as to liabilities arising after that judgment" and that the issue of payments due in the *future* "was not in fact

28

previously adjudicated" where the demand for installment payments in prior action was for two *past-due* rental installments); *Haley v. Regions Bank*, *supra* 586 S.E.2d at 638–39 (holding that the issues that had not matured at time of first action clearly could not have been adjudicated in that action).

*Curling I* (as filed in Fulton Superior Court) involved claims solely under Georgia law to enjoin the use of DREs in the June 2017 Runoff for the Sixth Congressional District Special Election and to compel, via mandamus, a statutory reexamination of the DRE voting system by the Secretary of State under O.C.G.A. § 21-2-379.2(b) to determine whether Georgia's DRE-Based Voting System can be safely and accurately used by electors at primaries and elections.  Plaintiffs' claims here, in their current posture,[23] involve federal claims under 42 U.S.C. § 1983 for violations of their due process and equal protection rights guaranteed by the United States Constitution and the Curling Plaintiffs' claim for mandamus seeking to compel the members of the State and Fulton County Board of Elections to require the use of an optical scan system and paper ballots for all future elections.[24]

Although both cases involve the same general subject matter – a challenge to Georgia's use of the DRE electronic voting system – the claims and relief sought in *Curling I* were narrower and limited solely to the June 2017 Sixth District Runoff for electors residing only in designated portions of three Georgia counties.

---

[23] Plaintiffs have dismissed all of their state law claims save Count IX of the Curling Plaintiff's Second Amended Complaint for mandamus.
[24] Although both lawsuits included claims for "mandamus," the causes of action are not the same. *Curling I* sought a reexamination of the DRE voting equipment while the Plaintiffs in this case seek a mandate that the elections be conducted using Georgia's paper ballot scheme.

Plaintiffs' claims here seek broader relief to require the State to use the optical

scanned paper ballots in all future local, state, and federal elections.[25]  Therefore,

the Court finds that the "causes of action" are not identical, considering the entirety

of the facts giving rise to Plaintiffs' claims here, and the additional information

(post-*Curling I*) offered to substantiate the nature of the security vulnerabilities of

the DRE voting system and machines described above, including:

(a)  the Congressional Task Force on Election Security's January 2018 Final Report;

(b)  the Secretary of the U.S. Department of Homeland Security's March 2018 declaration that DRE voting systems are a "national security concern;"

(c)  The May 2018 conclusion of the United States Senate Select Committee on Intelligence that DREs are "at highest risk of security flaws" and that states "should rapidly replace outdated and vulnerable voting systems" with systems that have a verified paper trail;

(d)  the September 6, 2018 consensus report of the National Academies of Sciences, Engineering, and Medicine and associated National Research Council ("NAS"), titled "Securing the Vote: Protecting American Democracy," addressing the need to improve voting machine security, and recommending that voting machines that do not produce paper audit trails for each elector's vote "should be removed from service as soon as possible" and that "[e]very effort should be made to use human-readable paper ballots in the 2018 federal election;"  and

(e)  the 2018 resolution by the the Board of Advisors of the U.S. Elections Assistance Commission (EAC) recommending that the EAC "not certify any system that does not use voter-verifiable paper as the official record of voter intent."

The sea change between the issues raised in *Curling I* in 2017 and by September

2018 are highlighted most recently by the March 2019 Report on the Investigation

---

[25] Or at least through the end of 2019 when the State intends to switch to a new system of ballot marking devices (BMDs) in the first quarter of 2020, depending on the success of their pilot program and full-scale rollout of the new machines.

Into Russian Interference in the 2016 Presidential Election by Special Counsel

Robert S. Mueller.   That Report, of which the Court takes judicial notice,

documents successful efforts of Russian agents' cyber intrusions targeting the

individuals and entities involved in the administration of U.S. elections.   *See*

Mueller Report: Section C (2.) Intrusions Targeting the Administration of U.S.

Elections at 50-51.[26]

---

[26] The Report found:

> Victims included U.S. state and local entities, such as state boards of elections (SBOEs), secretaries of state, and county governments, as well as individuals who worked for those entities. The GRU also targeted private technology firms responsible for manufacturing and administering election-related software and hardware, such as voter registration software and electronic polling stations.  The GRU continued to target these victims through the elections in November 2016 [Redacted] . . .

> By at least the summer of 2016, GRU officers sought access to state and local computer networks by exploiting known software vulnerabilities on websites of state and local governmental entities. GRU officers, for example, targeted state and local databases of registered voters using a technique known as "SQL injection," by which malicious code was sent to the state or local website in order to run commands (such as exfiltrating the database contents). In one instance in approximately June 2016, the GRU compromised the computer network of the Illinois State Board of Elections by exploiting a vulnerability in the SBOE's website. The GRU then gained access to a database containing information on millions of registered Illinois voters, and extracted data related to thousands of U.S. voters before the malicious activity was identified.

> GRU officers [Redacted] . . . scanned state and local websites for vulnerabilities.  For example, over a two-day period in July 2016, GRU officers [searched] for vulnerabilities on websites of more than two dozen states [Redacted] . . . Similar [searches] for vulnerabilities continued through the election.

> Unit 74455 also sent spearphishing emails to public officials involved in election administration and personnel at companies involved in voting technology. In August 2016, GRU officers targeted employees of [Redacted] a voting technology company that developed software used by numerous U.S. counties to manage voter rolls, and installed malware on the company network. Similarly, in November 2016 , the GRU sent spearphishing emails to over 120 email accounts used by Florida county officials responsible for administering the 2016 U .S. election. The spearphishing emails contained an attached Word document coded with malicious software (commonly referred to as a Trojan) that permitted the GRU to access the infected computer. The FBI was separately responsible for this investigation. We understand the FBI believes that this operation enabled the GRU to gain access to the network of at least one Florida county government. . . .

> *Id.*

As for their collateral estoppel argument, the only "issue" arguably identified by the Fulton County Defendants' motion as preclusive is the safety and accuracy of the DRE voting system for use in conducting elections. (*See* Mot. at 19.) But this issue was not actually decided in *Curling I*. *See Morrison*, 663 S.E.2d at 718 (holding that for collateral estoppel to apply, "[t]he issue sought to be precluded must *actually have been litigated and decided in the first action* before collateral estoppel would bar it from being considered in the second action, or the issue *necessarily had to be decided in order for the previous judgment to have been rendered*"). Rather, the superior court determined that the *Curling I* defendants were entitled to immunity from the plaintiffs' state law claims.

Neither was there an an adjudication on the merits of the claims in *Curling I*. The superior court found that sovereign immunity applied to the *Curling I* plaintiffs' state law claims for injunctive and declaratory relief.[27] A dismissal based

---

[27] The Fulton County Defendants point to the superior court's statement that "any state law causes of action would be subject to qualified immunity and must be DISMISSED" as the basis for the court's binding effect of the superior court's order. The court's reference to "qualified immunity" appears to be an error. Qualified immunity, also referred to as official immunity, would bar a suit against state officers in their *individual capacities* for official acts involving an element of discretion, including their enforcement of laws alleged to be unconstitutional, as to retrospective relief or monetary damages and other relief for wrongs already done and injuries already sustained. *Lathrop v. Deal*, 801 S.E.2d 867, 885–86 (Ga. 2017). Official immunity is no bar to claims against state officers in their official or individual capacities for injunctive and declaratory relief from the enforcement of laws that are alleged to be unconstitutional, so long as the injunctive and declaratory relief is only prospective in nature. *Id.* Indeed, the superior court noted that "[a]ll of the defendants were sued in their respective official capacities," and stated that sovereign immunity principles applied because the claims were against the defendants in their official capacity. (June 9, 2017 Order in Curling I, at 2, 3.) Despite the single errant reference to "qualified" immunity without citation to legal authority, it is clear that the superior court's decision was based on sovereign immunity, referencing sovereign immunity six times over the course of three pages, and citing applicable case law on sovereign immunity in support of its conclusion. (*See* June 9, 2017 Order in *Curling I*, at 3-4, 8.)

on sovereign immunity does not go to the merits of the case, but raises the court's subject matter jurisdiction over the case. *Dep't of Transp. v. Kovalcik*, 761 S.E.2d 584, 588 (Ga. Ct. App.2014) ("[L]ong-standing statutory and case law requir[es] courts to dismiss an action "whenever it appears, by suggestion of the parties or otherwise, that the court lacks jurisdiction of the subject matter."); *Dep't of Transp. v. Dupree*, 570 S.E.2d 1, 5 (Ga. Ct. App. 2002). Accordingly, a dismissal based on sovereign immunity is not an adjudication on the merits for purposes of res judicata. *See* O.C.G.A. § 9-11-41(b)(2) (providing that "[t]he effect of dismissals shall be as follows . . Any other dismissal under this subsection and any dismissal not provided for in this Code section, *other than a dismissal for lack of jurisdiction* or for improper venue or for lack of an indispensable party, does operate as an adjudication upon the merits . . ."); *Douglas v. Douglas*, 233 S.E.2d 195, 196 (Ga. 1977) (same). As state law sovereign immunity principles do not apply to Plaintiffs' federal claims, the superior court's ruling on sovereign immunity does not preclude those claims asserted in this case.[28]      And finally, state sovereign immunity does not preclude the Curling Plaintiffs' claim for mandamus relief. *SJN Properties, LLC v. Fulton Cty. Bd. of Assessors*, 770 S.E.2d 832, 837 (Ga. 2015) ("Were we to hold otherwise, mandamus actions, which by their very nature may be sought only against public officials, would be categorically precluded by sovereign immunity.") (citing *Southern LNG, Inc. v. MacGinnitie*, 719 S.E.2d 473

---

[28] The Eleventh Circuit affirmed this Court's decision that Plaintiffs' federal claims are not barred by Eleventh Amendment immunity.

(Ga. 2011)).  Georgia's mandamus statute expressly authorizes plaintiffs to seek relief against a public official "whenever ... a defect of legal justice would ensue from [the official's] failure to perform or from improper performance" of "official duties." O.C.G.A. § 9–6–20.

For these reasons, the Court **DENIES** Defendants' Motions to Dismiss on the basis that Plaintiffs' claims are barred by res judicata or collateral estoppel.

### III. Whether Plaintiffs' Complaint States Viable Claims for Due Process and Equal Protection Violations

Plaintiffs allege that the State's DRE voting system violates their fundamental right to vote by, among other things, failing to provide a reasonable and adequate method for voting by which Georgia electors' votes would be accurately counted.  (*See* Curling Compl. ¶ 61(c); Coalition Compl. ¶ 169.)   They assert that the State's failure to remedy known security breaches compromising the state's electronic voting machines and election servers violates their Fourteenth Amendment substantive due process and equal protection rights.

"Voting is the beating heart of democracy."   *Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019).   It is a "fundamental political right, because it is preservative of all rights.'"   *Id.* (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."  *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  Voting is, indisputably, a right "'of the

34

most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).   "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."   *Reynolds v. Sims*, 377 U.S. at 560.

The right to vote includes the right of qualified voters within a state to cast their ballots and have them counted, a right which can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot box stuffing.   *United States v. Classic*, 313 U.S. 299, 315 (1941); *Reynolds*, 377 U.S. at 554-555.   Voters also enjoy a Fourteenth Amendment right "to participate equally in the electoral process."   *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1319 (quoting *Swanson v. Worley*, 490 F.3d 894, 902 (11th Cir. 2007)).   "But, of course, voting alone is not enough to keep democracy's heart beating. Legitimately cast votes must then be counted."   *Id.* at 1315.   State and local laws that unconstitutionally burden that right are impermissible. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

When deciding whether a state election law violates the Fourteenth Amendment, the Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden and consider the extent to which the State's concerns make the burden necessary.   *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997);

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) ("The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections.").

A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. *Burdick*, 504 U.S. at 434; *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1318. "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1318-19; *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009). The more a challenged law burdens the right to vote, the stricter the scrutiny is to be applied. *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1319; *Stein v. Ala. Sec. of State*, 774 F.3d 689, 694 (11th Cir. 2014) ("[T]he level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights — "[l]esser burdens trigger less exacting review.").

It is well established that when a state accords arbitrary and disparate treatment to voters, those voters are deprived of their constitutional rights to due process and equal protection. *Bush v. Gore*, 531 U.S. 98, 107 (2000) (citing *Gray v. Sanders*, 372 U.S. 368, 379–80 (1963); *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969)). To establish an undue burden on the right to vote, "Plaintiffs need not demonstrate discriminatory intent" behind the state's voting scheme because the

issue concerns "the constitutionality of a generalized burden on the fundamental right to vote," for which the court employs a balancing test instead of a traditional equal protection inquiry. *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1319 (citing *Obama for America v. Husted*, 697 F.3d 423, 429-30 (6th Cir. 2012) (rejecting calls to apply "a straightforward equal protection analysis" and explaining that "when a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson-Burdick* standard applies")); *see also Clements v. Fashing*, 457 U.S. 957, 965 (1982) (rejecting the assertion that traditional equal protection principles should automatically apply in the voting rights context "without first examining the nature of the interests that are affected and the extent of the burden").

Because the right to vote is fundamental[29] and the exercise of that right "in a free and unimpaired manner is preservative of other basic civil rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds*, 377 U.S. at 562. "[T]he due process clause of the [F]ourteenth [A]mendment affords protection against the disenfranchisement of a state electorate in violation of state election law." *Duncan v. Poythress*, 657 F.2d 691, 708 (5th Cir. 1981).[30] "When an election process 'reaches the point of patent

---

[29] "The Supreme Court has long recognized that burdens on voters implicate fundamental First and Fourteenth Amendment rights." *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1319 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 787 n.7 (1983)).

[30] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

and fundamental unfairness,' there is a due process violation." *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183–84 (11th Cir. 2008) (quoting *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir.1995) (citing *Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir.1986))).   While the constitution affords the states broad power to regulate the conduct of federal and state elections, "the federal courts have not hesitated to interfere when state actions have jeopardized the integrity of the electoral process."  *Duncan*, 657 F.2d at 702.

When a state adopts an electoral system, the Equal Protection Clause of the Fourteenth Amendment guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process. *Reynolds v. Sims*, 377 U.S. 533, 566 (1964); *see also Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966). In any state-adopted electoral scheme, "[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. at 104–05; *see also Davis v. Bandemer*, 478 U.S. 109, 124 (1986) (noting that "everyone [has] the right to vote and to have his vote counted").

While "there is no single, bright line to distinguish cases in which federal intervention is appropriate from those in which it is inappropriate," a viable election challenge:

must go well beyond the ordinary dispute over the counting and marking of ballots .... Federal courts have properly intervened *when the attack was, broadly, upon the fairness of the official terms and procedures under which the election was conducted.* The federal courts were not asked to count and validate ballots and enter into the details of the administration of the election. Rather they were *confronted with an officially-sponsored election procedure which, in its basic aspect, was flawed.* Due process, representing a profound attitude of fairness between man and man, and more particularly between individual and government,  is implicated in such a situation. In cases falling within such confines, we think that a federal judge need not be timid, but may and should do what common sense and justice require.

*Duncan*, 657 F.2d at 703 (internal citations omitted) (emphasis added).

Defendants argue that Plaintiffs have failed to state viable due process claims because: (1) the Georgia Supreme Court held in *Favorito v. Handel* that voters do not have a right under state law to a particular balloting system and that the DRE system does not violate the Georgia Constitution's requirement that voting be by secret ballot; (2) by requesting a reexamination of the DRE system in prior versions of their Complaints, Plaintiffs concede the existence and availability of adequate state remedies;[31] (3) Plaintiffs' conclusory and hypothetical allegations

---

[31] Plaintiffs have abandoned their procedural due process claims and the claim seeking a reexamination of the DREs.  The State Defendants contend that the Secretary of State voluntarily conducted such an examination and concluded that Georgia's DRE system is safe and accurate. As the Court noted in its September 2018 Order, the Secretary of State certified in April 2018 the accuracy and safety of the Georgia DRE system.  This certification was based on a pre-announced examination of voting facilities and the conducting of a tiny mock election in several Georgia counties on November 27-29, 2017 by a combination of staff from the Secretary of State's Office and the Center for Election Services at Kennesaw State University.  (Def. Ex. 2 from Preliminary Injunction Hearing.)  No cybersecurity experts or computer engineering scientists are listed as participants in this review.  There is no indication in the description of the examination that any effort was made to go beyond a simple running of the equipment and observation of election procedures to reach this determination.  In other words, there is no indication that any effort was made to evaluate the trove of software and data security and accuracy issues identified in studies performed on behalf of other states or by cybersecurity and computer engineers in the field.

that the DRE machines are unreliable are insufficient to state a violation of substantive due process.[32]

Defendants argue that Plaintiffs cannot maintain an equal protection challenge based on the DREs because Plaintiffs do not allege they have been the victims of intentional discrimination, are not alleged to be members of a suspect or quasi-suspect class, and cannot show they are "similarly situated" as required to sustain an equal protection claim.[33]  (Mot. at 46.)  Once again, Defendants rely on *Favorito's* holding that because all Georgia voters "have the option of casting an absentee ballot or using the touch screen electronic voting machines on Election Day," the different recount procedures necessarily applied to these different ballots

---

[32] The State Defendants also seek dismissal of Plaintiffs' claim that Defendants' alleged violation of state requirements for public observance violates Federal due process because a mere violation of a state statute does not infringe the federal Constitution.  (State Defs.' Mot., Doc. 234-1, citing Curling Compl., Doc. 226 ¶¶ 134-35).   It appears that the Curling Plaintiffs' detailed allegations relate to the actions of the Fulton County Board of Elections only in failing to perform their duties in public, though Plaintiffs allege the Fulton County Defendants undertook these action "with the authorization of" the Secretary of State and State Board of Elections. Plaintiffs' Response brief does not acknowledge or respond to the State Defendants' arguments that a due process claim on the public observance requirements of Georgia law is subject to dismissal.  Accordingly, the court finds that the Curling Plaintiffs have abandoned this portion of their complaint.

[33] Defendants' characterization of the law is incorrect.  Voters enjoy a fundamental right under the fourteenth Amendment "to participate equally in the electoral process." *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1319.  When assessing equal protection challenges, a statute is tested under a standard of strict judicial scrutiny if it either operates to the disadvantage of a suspect class *or* interferes with the exercise of a fundamental right. *See San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973).  In an equal protection challenge based on an undue burden on the right to vote, "Plaintiffs need not demonstrate discriminatory intent" behind the state's voting scheme because the issue concerns "the constitutionality of a generalized burden on the fundamental right to vote," for which the court employs a balancing test instead of a traditional equal-protection inquiry. *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1319.

does not violate the Equal Protection Clause.[34]  (*Id.* at 47 (quoting *Favorito*, 285 Ga. at 798-99.))

   First, *Favorito* is not conclusive of the plausibility of Plaintiffs' claims here. As the Court mentioned at the hearing and intimated above in the Court's res judicata analysis, the viability of Plaintiffs' claims cannot be determined in a vacuum based on the decade-old circumstances in existence at the time of the *Favorito* court's decision on the original DRE challenge.  Plaintiffs' claims here are based on substantiated allegations of the serious security flaws and vulnerabilities in the State's DRE system – including unverifiable election results, outdated software susceptible to malware and viruses, and a central server that was already hacked multiple times.  Rapidly evolving cybertechnology changes and challenges have altered the reality now facing electoral voting systems and Georgia's system in particular.    Plaintiffs' Complaints emphasize current cybersecurity developments regarding election security and the heightened, legitimized concerns of election interference.    And it is this reality that Plaintiffs have since substantiated with expert affidavits and testimony as well as an array of voter affidavits and documentation.  Thus, the *Favorito* court's decision – cast amidst a vastly different landscape and founded on a sizably restricted record – is not controlling of the issues before the Court today.[35]  *See Harper v. Virginia State Bd.*

---

[34] But, as explained below, Plaintiffs' equal protection claim is not based solely on the recount procedures.
[35] Nor are Plaintiffs' Fourteenth Amendment claims here foreclosed by *Wexler v. Anderson*, 452 F.3d 1226 (11th Cir. 2006) as Defendants contend.  The Court explained in its September 2018 Order that *Wexler* and this case are distinguishable.  The Eleventh Circuit noted that the *Wexler*

*of Elections*, 383 U.S. 663, 669–70 (1966) ("[T]he Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights. Notions of what constitutes equal treatment for purposes of the Equal Protection Clause do change.").

Second, Defendant's assertion that Plaintiffs have not identified any actual burden on their right to vote caused by the State's DRE electronic voting system is an incorrect characterization of the Plaintiffs' claims. Contrary to Defendants' characterizations, Plaintiffs' allegations are not premised on a theoretical notion or hypothetical possibility that Georgia's voting system might be hacked or improperly accessed and used. (*See* State Defendants' Motion to Dismiss Coalition Plaintiffs' Third Amended Complaint, Doc. 234-1 at 1 (characterizing Plaintiffs'

---

plaintiffs "did not plead that voters in touchscreen counties are less likely to cast effective votes due to the alleged lack of a meaningful manual recount procedure in those counties," and therefore their "burden is the mere possibility that should they cast residual ballots, those ballots will receive a different, and allegedly inferior, type of review in the event of a manual recount." *Id.* at 1226. Wexler distinguishes this situation from the one in *Stewart v. Blackwell*, 444 F.3d at 868-72, where strict scrutiny was applied based on the plaintiffs' allegations of "vote dilution due to disparate use of certain voting technologies." 444 F.3d at 871. Thus, in contrast with *Stewart*, the Eleventh Circuit in *Wexler* did not apply strict scrutiny and instead reviewed "Florida's manual recount procedures to determine if they are justified by the State's 'important regulatory interests.'" *Wexler*, 452 F.3d at 1233 (citing *Burdick*, 504 U.S. at 434)). As the Court noted before, Plaintiffs here appear to present facts that fall somewhere between *Wexler* and *Stewart*. Unlike *Wexler*, Plaintiffs are alleging that they are less likely to be able to cast accurate or effective ballots when voting by DRE. The Court finds that Plaintiffs presented sufficient allegations, as substantiated by evidence thus far, that their votes cast by DRE may be altered, diluted, or effectively not counted on the same terms as someone using another voting method – or that there is a serious risk of this under the circumstances.

complaints as being based on "unfounded fear").   As this Court recognized in its prior Order, national security experts and cybersecurity experts at the highest levels of our nation's government and institutions have weighed in on the specific issue of DRE systems in upcoming elections and found them to be highly vulnerable to interference, particularly in the absence of any paper ballot audit trail.  Georgia's DRE system also originally was intended to include the capacity for an independent paper audit trail of every ballot cast, and this feature was never effectuated.  Defendants' motion arguments completely ignore the reality faced by election officials across the country underscored by Plaintiffs' allegations that electronic voting systems are under unceasing attack.

Moreover, Plaintiffs have alleged and offered evidence to show that the DRE voting system was *actually* accessed multiple times already – albeit by cybersecurity experts who reported the system's vulnerabilities to state authorities, as opposed to someone with nefarious purposes.  (Curling Complaint, Doc. 70 ¶¶ 42-43, 45-49; Coalition Complaint, Doc. 226 ¶¶ 95-106.)  Plaintiffs allege that harm has in fact occurred, specifically to their fundamental right to participate in an election process that accurately and reliably records their votes and protects the privacy of their votes and personal information.  (Curling Complaint, Doc. 70 ¶ 14 ("Curling also chose to exercise her right to cast her vote using a verifiable paper ballot in the Runoff, so as to ensure that her vote would be permanently recorded on an independent record.  To do so, Curling persisted through considerable inconvenience – only to be incorrectly told by Defendants Kemp and the Fulton

County Board of Registration and Elections that she had not, in fact, cast a ballot, creating irreparable harm that her ballot was not counted."); ¶ 16 (Donna Price "cast her vote on a DRE in the 2016 General Election," and "[w]ithout the intervention of this Court, Price will be compelled to choose between relinquishing her right to vote and acquiescing to cast her vote under a system that violates her right to vote in absolute secrecy and have her vote accurately counted"); ¶ 38 ("DREs produce neither a paper trail nor any other means by which the records of votes cast can be audited."); ¶¶ 42-43 ("Lamb was able to access key components of Georgia's electronic election infrastructure . . . .  In accessing these election system files, Lamb found a startling amount of private information," including driver's license numbers, birth dates, and the last four digits of Social Security numbers); Coalition Complaint, Doc. 226 ¶ 152 (member of CGG, Brian Blosser, "was prohibited from voting on April 18, 2017 . . . when his name did not appear on the eligible voter rolls" for the Sixth Congressional District and "was instead erroneously listed" as a resident of another district, an error that Fulton County Board members blamed on a "software glitch"); ¶ 154 (members of CGG, Mr. and Ms. Digges, previously in 2017 "chose to vote by mail-in paper absentee ballot because they were aware that an electronic ballot cast using an AccuVote DRE was insecure," and they "were required to undergo the inconvenience of requesting paper ballot[s] and the cost of postage to mail their ballots" "well before Election Day"); ¶ 72 ("Georgia's AccuVote DREs do not record a paper or other independent verifiable record of the voter's selections."); ¶ 92 ("[D]esign flaws render the

44

electronic ballots cast on AccuVote DREs capable of being matched to voter records maintained by pollworkers and pollwatchers," and thereby expose citizens' candidate selections to poll workers); ¶ 97 ("Lamb freely accessed files hosted on the 'elections.kennesaw.edu' server, including the voter histories and personal information of all Georgia voters . . . . Lamb noted that the files had been publicly exposed for so long that Google had cached (i.e., saved digital backup copies of) and published the pages containing many of them."); ¶ 138 ("Fulton Board Members have adopted voting procedures under which individual electronic ballots bearing a unique identifier are transmitted from Fulton County's AccuVote DREs located in satellite voting centers to Fulton County's central GEMS tabulation server in clear text (i.e., unencrypted) over an ordinary, unsecured telephone line on Election Night. This practice violates fundamental security principles because it subjects the transmitted votes to manipulation (such as man-in-the-middle interception and substitution of votes) and exposes the votes with their unique identifier to third-party interception, violating voters' rights of secrecy in voting.").)

Furthermore, Plaintiffs plausibly allege a threat in upcoming elections of a future hacking event that would jeopardize their votes and the voting system at large. Despite being aware of election system and data cybersecurity threats and vulnerabilities identified by national authorities and the DRE system's vulnerability to hacking as early as August 2016 — when Logan Lamb, the computer scientist, first alerted the State's Executive Director of the CES of his ability to

access the system – Defendants allegedly have not taken steps to secure the DRE system from such attacks.  (Curling Complaint, Doc. 70 ¶ 46 ("[N]ot only did Georgia fail to take remedial action when alerted to the problem Lamb raised, it failed to act even in the face of the detailed information on the cybersecurity threats facing the nation's election systems, and the recommended specific steps to reduce the risk, which were disseminated by the FBI, the DHS and the EAC[36]."); Coalition Complaint, Doc. 226 ¶ 112 ("[N]o efforts have been made to remediate the compromised software programs and machines or to identify and remove any malware that was likely introduced during the lengthy security breaches referred to herein on the 'elections.kennesaw.edu' server that hosted the election-specific software applications and data that are re-installed on every piece of voting and tabulation equipment used to conduct Georgia's elections in advance of each election conducted using Georgia's Voting System.").)

The State Defendants further contend that Plaintiffs constitutional rights are not burdened because they may choose to vote by absentee paper ballot or on Election Day by DRE, pointing again to *Favorito's* finding that "absentee voters 'have not been treated differently from the polling place voters, except in a manner permissible under the election statutes' and as a result of their own choice."  684 S.E.2d at 261.  Plaintiffs allege that Defendants are requiring them to face the Hobbesian choice of undergoing additional burdens on their right to vote by

---

[36] DHS is the acronym for the U.S. Department of Homeland Security, and EAC is the acronym for the U.S. Election Assistance Commission.

absentee ballot to avoid having to use unsecure DRE machines, thereby subjecting them to unequal treatment. Such a "choice" requires the voter to undergo the inconveniences of (i) requesting an absentee paper ballot sufficiently in advance of the date of a scheduled election, (ii) the costs of postage necessary to mail in an absentee ballot, (iii) forcing the voter to place his voted ballots in the mail well before election day to ensure their timely delivery and to give himself the ability to ensure receipt, (iv) being deprived of the ability to await the latest campaign information before making his voting decisions, and (v) foregoing voting in person on election day with his fellow electors, thereby depriving him of exercising his right of political association.  (Coalition Compl. ¶ 155.)   These burdens are exacerbated when voters are faced with a constrained timeframe for absentee voting in the case of a runoff or special election, as was experienced by Plaintiff Ricardo Davis in November 2017 when he "was unable to submit his mail-in ballot application in time and was required to choose between not voting at all and voting by DRE." (*Id.* ¶ 156.)  As evidenced by the most recent election, absentee voting is not without its constitutional problems. *See Martin v. Kemp*, 341 F.Supp.3d 1326 (N.D. Ga. 2018) (concluding that additional burdens and procedures required by absentee voters were violative of due process guarantee of Fourteenth Amendment); *see also Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312 (finding that plaintiffs had established a likelihood of success on

constitutional challenge to Florida's signature-match requirement for vote-by-mail paper ballots). These are not trivial concerns.

Having granted its citizens the right to vote, Georgia must not only allow qualified voters to participate equally in elections, it must also ensure that qualified voters are given an equal opportunity to participate in elections. *Hadley v. Junior Coll. Dist.*, 397 U.S. 50, 56 (1970); *Reynolds v. Sims*, 377 U.S. at 566 (holding that "the opportunity for equal participation by all voters in the election" is required). When a state accords arbitrary and disparate treatment to voters, those voters are deprived of their constitutional rights to due process and equal protection. *Bush*, 531 U.S. at 107.  Despite this constitutional mandate, Plaintiffs allege that Georgia's voting scheme results in the arbitrary and disparate treatment of its citizens based on their chosen method of voting: in person via DRE or by absentee paper mail-in-ballot.  Unlike in *Favorito*, the crux of Plaintiffs' claims here are that even if the State's officials made a "reasonable and neutral" choice when they originally implemented the DRE system, "this was not the case when they left the DRE system open to election hackers by using unsecured electronic infrastructure and refusing to remedy the system's vulnerabilities after being informed of them." (Pls.' Resp. at 30.)

Plaintiffs allege that the DRE system, *as implemented*, poses a concrete risk of alteration of ballot counts that would impact their own votes. Their allegations relate directly to the manner in which Defendants' alleged mode of implementation of the DRE voting system deprives them or puts them at imminent risk of

deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted). *United States v. Classic*, 313 U.S. 299, 315 (1941); *Stewart*, 444 F.3d at 868. Plaintiffs have plausibly and sufficiently demonstrated a legitimate concern that when they vote by DRE, their vote is in jeopardy of being counted less accurately and thus given less weight than a paper ballot.[37] *See Crawford v. Marion County Election Bd.*, 484 F.3d 436, 438 (2007) (en banc) (Wood, J., dissenting) ("Recent national election history tells us ... that disenfranchising even a tiny percentage of voters can be enough to swing election outcomes" [referring to, among other races, the gubernatorial race in Washington State in 2004, which was decided by only 129 votes] and "[e]ven if only a single citizen is deprived completely of her right to vote ... this is still a 'severe' injury for that particular individual."). As the Supreme Court held in *Bush v. Gore*:

> The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. . . . It must be remembered that "the right of suffrage can be denied by a debasement or dilution of the

---

[37] Plaintiffs also allege that their right to cast a secret ballot is violated by Georgia's use of DREs. It is not clear that the right to a secret ballot, while guaranteed under Georgia state law, is a fundamental right guaranteed by the United States Constitution. *Compare John Doe No. 1 v. Reed*, 561 U.S. 186, 224–27, 130 S. Ct. 2811, 2834–36, 177 L. Ed. 2d 493 (2010) (Scalia, concurring) (explaining America's history of once "voting by a show of hands or by voice—viva voce voting" and stating "[w]e have acknowledged the existence of a First Amendment interest in voting, *see, e.g., Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 25(1992), but we have never said that it includes the right to vote anonymously. The history of voting in the United States completely undermines that claim") *with United States v. Executive Comm. of Democratic Party of Greene Cty., Ala.*, 254 F. Supp. 543, 546 (N.D. Ala. 1966) ("The secrecy of the ballot is one of the fundamental civil liberties upon which a democracy must rely most heavily in order for it to survive."). Having found that Plaintiffs' have stated due process and equal protection violations on other grounds, the Court need not address the merits of the constitutionality of Plaintiffs' secret ballot claim.

> weight of a citizen's vote just as effectively as by wholly prohibiting the
> free exercise of the franchise."

531 U.S. 98, 104-05 (2000) (internal citations omitted).  As the Court previously

stated "[a] wound or reasonably threatened wound to the integrity of a state's

election system carries grave consequences beyond the results in any specific

election, as it pierces citizens' confidence in the electoral system and the value of

voting." (September 17, 2018 Order, Doc. 309 at 45.)

Defendants acknowledge that "DREs are not perfect" but assert that because

"no voting system is" perfect, Plaintiffs' claims must fail.  Defendants argue – albeit

without substantiation or support –that the DRE touchscreen voting system "is so

nearly accurate as to approach zero defects" and that a paper ballot voting system

is "far less accurate." (Doc. 234-1 at 39.)  Plaintiffs are seeking relief to address a

particular voting system which, as currently implemented, is allegedly recognized

on a national level to be unsecure and susceptible to manipulation by advanced

persistent threats through nation state or non-state actors.  Plaintiffs are not

asking for a system impervious to all flaws or glitches or for the Court to direct how

the State counts ballots.  They are asking the Court to bar the use of DREs based

on the specific circumstances, history, and data security issues presented in this

case and where the State has alternative options of using optical scanners and hand

counting ballots.  And they seek to require the State to implement a fully auditable

ballot system designed to ensure the accuracy and reliability of the voting process

in this challenging era when data system vulnerabilities pose a serious risk of opening election data, processes, and results to cyber manipulation and attack.

According to Defendants, the State has a compelling interest in maintaining its use of DREs.  Defendants point to HAVA's requirement that the state provide persons with disabilities access to voting technology that provides them with the means to vote in private and independently "through the use of at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place."  52 U.S.C. 21081(a)(3).  But, as court after court has recognized, states also have an "undoubtedly important" interest "in preserving the integrity of the electoral process" that is "particularly strong with respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well: It 'drives honest citizens out of the democratic process and breeds distrust of our government.'" *John Doe No. 1 v. Reed*, 561 U.S. 186, 198 (2010) (quoting Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) (per curiam )); *see also Crawford v. Marion County Election Bd.*, 553 U.S. 181, 196 (2008) (opinion of STEVENS, J.).  This Court previously noted that Defendants sidestep the fact that Georgia is only one of five states that rely on a DRE voting process that generates no independent paper ballot or audit record.  As Defendants offer no real answers to Plaintiffs' claims as to the problems of security, accuracy, reliability, and currency of Georgia's system and software, the Court earlier found Plaintiffs were likely to prevail on the merits of their claims.  Ultimately, an electoral system must be accurate and trustworthy.  Thus, the Court already found

in its prior Order that the State's apparent asserted interest in maintaining the DRE system without significant change cannot by itself justify the burden and risks imposed given the circumstances presented.[38]   *Burdick*, 504 U.S. at 434; *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1325-26 (holding that "the state's interest in preventing fraud is not in conflict with the voters' interest in having their legitimately-cast ballots counted, the state has not shown that its interest in facilitating timely and orderly election processing will be impaired by providing the injured voters with a reasonable opportunity to have their votes counted; and public faith in elections benefits from providing injured voters the opportunity to have their legitimately cast ballots counted when the reason they were not counted was not the voters' fault").

In sum, the Plaintiffs have alleged that Defendants were aware of serious security breaches in the DRE voting system and failed to take adequate steps to address those breaches.  Notably, even after Mr. Lamb first alerted the State about his access of the voting system, he and another cybersecurity expert were able to access the system *again* about six months later.  (Curling Complaint, Doc. 70 ¶ 47.) Plaintiffs allege that Defendants have failed to take action to remedy the DRE system's vulnerabilities.  (*Id.* ¶¶ 46, 61, 62, 72.)  And they allege that this failure, in

---

[38] The Court recognizes that the Georgia legislature passed Act No. 24/House Bill 316, signed by the Governor on April 2, 2019, and approved funds for a new system of voting technology slated to go into effect in 2020.  As the state has yet to choose which specific vendor's proposal will be selected and implemented, how these issues will play out in the context of new voting technology remains an open question.  Nonetheless, a number of elections are anticipated to take place using the current DRE system in 2019.

turn, impacts the integrity of the voting system and their ability as citizens to rely upon it when casting votes in this system.  (*Id.*)  At the motion to dismiss stage, Plaintiffs' allegations that Defendants' continued use of unsecure DREs infringe the Plaintiffs' fundamental right to vote are sufficient to state a plausible due process violation.  *Duncan*, 657 F.2d at 702-3 ("the federal courts have not hesitated to interfere when state actions have jeopardized the integrity of the electoral process" and when "confronted with an officially-sponsored election procedure which, in its basic aspect, was flawed").

Here, Plaintiffs have adequately alleged that their Fourteenth Amendment rights to Due Process and Equal Protection have been burdened – i.e., that the State's continued reliance on the use of DRE machines in public elections likely results in "a debasement or dilution of the weight of [Plaintiffs'] vote[s]," even if such conduct does not completely deny Plaintiffs the right to vote.  *Bush v. Gore*, 531 U.S. 98, 105 (2000) (quoting *Reynolds*, 377 U.S. at 555).  Accordingly, the Court **DENIES** Defendants' Motions to Dismiss Plaintiffs' due process and equal protection claims.

## IV.   Whether the Members of the State Board of Elections are Proper Defendants

Finally, Defendants argue that the individual State Board of Elections Members are not proper parties because they "have not, and will not, be the party 'enforcing' O.C.G.A. § 21-2-383" and that "it would be unlawful for the Board

53

members to remove the DREs," because such action is outside of the Board's statutorily enumerated duties set forth in O.C.G.A. § 21-2-31.

In response, Plaintiffs argue that their Complaint alleges that the State Board members "collectively exercise the power vested in the State Board to enforce compliance with the Georgia Election Code and with the State Board's regulations," and that the State Board Members actually intend to enforce O.C.G.A. § 21–2–383(b) and SEB Rule 183–1–12–.01 "and thus to require that all voters who cast ballots in person at the polls on Election Day must vote by DRE." (Doc. 226, at 48, ¶¶ 127–28.) For these reasons, Plaintiffs contend the State Board Members are properly named as Defendants.

In *Grizzle v. Kemp*, the Eleventh Circuit recognized that the State Election Board is charged with enforcing Georgia's election code under state law. 634 F.3d 1314, 1316 (11th Cir. 2011) ("Under Georgia law, '[t]he State Election Board is vested with the power to issue orders ... directing compliance with [Chapter 2 of Georgia's election code] or prohibiting the actual or threatened commission of any conduct constituting a violation [of Chapter 2] ....' § 21–2–33.1(a)."). Accordingly, Defendants' Motion to Dismiss Plaintiffs' claims against the members of the State Board of Elections is **DENIED**.

## V.   Whether the Curling Plaintiffs Have Stated a Plausible Claim for Mandamus Under Georgia Law

In Count IX of their Second Amended Complaint, the Curling Plaintiffs bring a state-law claim under O.C.G.A. § 9-6-20 for a writ of mandamus ordering

Defendants to discontinue the use of DRE machines and to either use (a) an optical scanning voting system or (b) hand-counted paper ballots.  The Curling Plaintiffs seek a writ of mandamus against the following Defendants: the members of the State Election Board in their official capacities; the State Election Board; Richard Barron in his official capacity as the Director of the Fulton County Board of Registration and Elections; the members of the Fulton County Board of Registration and Elections in their official capacities; and the Fulton County Board of Registration and Elections.

In support of their claim for mandamus, the Curling Plaintiffs allege the following: (1) Defendants were aware of numerous security breaches and statutory non-compliance of the DRE system, but acted in an arbitrary and capricious manner by ignoring security threats and grossly abused their discretion by failing to remove from use DRE systems that are not practicable; (2) despite such knowledge and the burden on Georgia electors' fundamental right to vote, Defendants plan to continue using the DRE system in future elections; and (3) Defendants have an official public duty under Georgia law to remove from commission voting machines that are not "practicable" and replace them with a safe, accurate, and legally compliant system.  (Curling Compl. ¶¶ 138-144.)  The Curling Plaintiffs allege that O.C.G.A. §§ 21-2-281, 21-2-334 and 21-2-366 provide for voting by paper ballots and optical scanning voting systems when the use of DRE electronic voting machines is not practicable.

The State Election Board Defendants and the Fulton County Defendants seek dismissal of the Curling Plaintiffs' mandamus claim on the basis that Plaintiffs cannot demonstrate a clear right to relief or a gross abuse of discretion entitling them to mandamus.  The State Defendants assert that the mandamus claim should be dismissed because they have no legal duty "to remove from commission machines that are not 'practicable,'" and that the authority granted by the Georgia election code to revert to paper ballots is merely discretionary.[39]

The use of writs of mandamus by federal courts is extremely limited. *Moye v. Clerk, DeKalb Cty. Superior Court*, 474 F.2d 1275, 1275–76 (5th Cir. 1973). Under Georgia law, mandamus is an extraordinary remedy that can be granted only when the plaintiff has a clear legal right to the relief sought and no other adequate remedy at law. *Bibb Cty. v. Monroe Cty.*, 755 S.E.2d 760, 766 (Ga. 2014);

---

[39] The State Defendants' arguments that the statutory provisions on which Plaintiffs rely apply only (i) to election "superintendents," defined to refer to various county or municipal employees and thus excluding state agencies and officials, and (ii) to "voting machines" defined as "a mechanical device on which an elector may cast a vote and which tabulates those votes by its own devices and is also known as a 'lever machine,'" are meritless. The Curling Plaintiffs rely on O.C.G.A. § 21-2-281, providing for the "use of paper ballots where use of voting equipment impossible or impracticable," which states "[i]n any primary or election in which the use of *voting equipment* is impossible or impracticable, for the reasons set out in Code Section 21-2-334, the primary or election may be conducted by paper ballot in the manner provided in Code Section 21-2-334." (emphasis added). O.C.G.A. 21-2-582.1 defines "voting equipment" as including a "direct recording electronic voting system."  Contrary to Defendants' assertion, the individual board members are not subject to dismissal as O.C.G.A. § 21-2-281 is not limited to election "superintendents" and the board members are responsible for enforcing Georgia's election laws. "A state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit," and as explained above, the State Election Board is charged with enforcing Georgia's election code under state law. *Grizzle v. Kemp*, 634 F.3d at 1316 (holding that the Secretary of State, as statutorily designated member and chairperson of the State Election Board was proper party to action because the "[t]he State Election Board is vested with the power to issue orders ... directing compliance with [Chapter 2 of Georgia's election code] or prohibiting the actual or threatened commission of any conduct constituting a violation [of Chapter 2]" under O.C.G.A. § 21–2–33.1(a)).

O.C.G.A. § 9–6–20 ("All official duties should be faithfully performed, and whenever, from any cause, a defect of legal justice would ensue from a failure to perform or from improper performance, the writ of mandamus may issue to compel a due performance if there is no other specific legal remedy for the legal rights...."). "Mandamus is a remedy for improper government inaction—the failure of a public official to perform a clear legal duty." *Southern LNG, Inc. v. MacGinnitie*, 755 S.E.2d 683, 688 (Ga. 2014). "Mandamus will not issue to compel performance of a discretionary act unless the public official has grossly abused his or her discretion." *Pryor Organization v. Stewart*, 554 S.E.2d 132 (Ga. 2001) (citation omitted); *Gwinnett Cty. v. Ehler Enterprises, Inc.*, 512 S.E.2d 239, 240 (Ga. 1999) ("[T]he decision to grant a special use permit ultimately lies within the discretion of the board. Because the decision is discretionary, in seeking mandamus Ehler must show that the denial was a gross abuse of discretion.").

"The duty which a mandamus complainant seeks to have enforced must be a duty arising by law, either expressly or by necessary implication; and the law must not only authorize the act to be done, but must require its performance." *Gilmer County v. City of East Ellijay*, 533 S.E.2d 715, 717 (Ga. 2000) (citations omitted). Where performance is required by law, a clear legal right to relief will exist either where the official or agency fails entirely to act or where, in taking such required action, the official or agency commits a gross abuse of discretion. *Bibb Cty.*, 755 S.E.2d 760at 766. The determination of whether official action is

57

required depends on the law governing the subject matter in question. *Id.* at 766–67.

Georgia law mandates the use of a uniform system of voting equipment in all county, state, and federal elections.  O.C.G.A. § 21-2-300(a) (providing "the equipment used for casting and counting votes in county, state, and federal elections shall, by the July 2004, primary election and afterwards, be the same in each county in this state and shall be provided to each county by the state, as determined by the Secretary of State").  The State Board of Election, charged with the duty of "promulgat[ing] rules and regulations so as to obtain uniformity . . . in all primaries and elections," issued the following rule, requiring:

> Beginning with the November 2002 General Election, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia shall be conducted at the polls through the use of direct recording electronic (DRE) voting units supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State. In addition, absentee balloting shall be conducted through the use of optical scan ballots which shall be tabulated on optical scan vote tabulation systems furnished by the Secretary of State or purchased by the counties with the authorization of the Secretary of State; provided, however, that the use of direct recording electronic (DRE) voting units is authorized by the Secretary of State for persons desiring to vote by absentee ballot in person.

Ga. Comp. R. & Regs. 183-1-12-.01.  Thus, county, state, and federal elections in Georgia must be conducted by one of two statutorily provided methods: DREs or paper ballots tabulated on optical scan vote tabulation systems.

"The construction of statutes must square with common sense and sound reasoning." *Tuten v. City of Brunswick*, 418 S.E.2d 367, 370 (Ga. 1992).  And "[i]f

the plain language of the statute is susceptible of only one meaning, courts must follow that meaning unless to do so would produce contradiction or absurdity." *Sizemore v. Georgia*, 416 S.E.2d 500, 502 (Ga. 1992). Additionally, where a statute is susceptible of two constructions, courts should construe the statute "in harmony with the general policy of the law, rather than against it." *Singleton v. Close*, 61 S.E. 722, 724 (Ga. 1908).

As the Curling Plaintiffs assert, Georgia law provides that where the use of DREs is impossible or impracticable, the election "may be conducted by paper ballot." O.C.G.A. § 21-2-281; O.C.G.A. § 21-2-334. For this reason, when only two methods of voting are provided, and one method is determined to be impracticable, the use of the word "may" in the statute authorizing the election to be conducted in the only other authorized manner does not make the authority simply discretionary. *See* O.C.G.A. § 1-3-3 (10) ("As used in this Code or in any other law of this state, the term: . . . '[m]ay' ordinarily denotes permission and not command. However, where the word as used concerns the public interest or affects the rights of third persons, it shall be construed to mean 'must' or 'shall.'"). The Court therefore rejects Defendants' argument that Plaintiffs have not alleged a clear legal right to the use of paper ballots under the circumstances alleged in their claim for mandamus.

Even so, mandamus is improper here due to the availability of injunctive relief in connection with the Plaintiffs' constitutional claims pursuant to § 1983. *See Curling v. Sec'y of Georgia*, 18-13951, 2019 WL 480034, at *4 (11th Cir. Feb.

7, 2019) (rejecting the State Defendant's immunity defenses and recognizing the availability of injunctive relief based on the Plaintiffs' claims that the State's plan to continue to use the allegedly non-compliant DRE System and unsecure DRE machines in future elections will violate federal law).  A plaintiff may be entitled to a writ of mandamus "only 'if there is no other specific legal remedy' to vindicate the petitioner's rights." *Blalock v. Cartwright*, 799 S.E.2d 225, 227 (Ga. 2017) (quoting O.C.G.A. § 9-6-20).  "To preclude mandamus, an alternative legal remedy must be equally convenient, complete and beneficial to the petitioner." *Id.*  Where a private right of action exists to enforce the statutory obligations at issue through legal or equitable remedies, there is an "adequate alternative remedy to mandamus," such that "mandamus relief is not only unnecessary but improper." *Id.* at 228 (finding that mandamus action seeking to compel compliance with Georgia Open Records act was not proper where there existed a private right of action for enforcement without resort to mandamus) (citing *Tobin v. Cobb County Bd. of Educ.*, 278 Ga. 663, 663 (2), 604 S.E.2d 161 (2004) ("[t]he Act provides legal and equitable remedies to ensure compliance with its provisions") and *Bowers v. Shelton*, 265 Ga. 247, 249 (1), 453 S.E.2d 741 (1995) (private citizens sued to enjoin disclosure of requested records alleged to be exempt under the Act)).  While plaintiffs are generally entitled to plead alternative causes of action, here the Curling Plaintiffs' claim for mandamus is barred because they are entitled to seek the same injunctive remedy pursuant to their claims for relief under § 1984 and the Fourteenth Amendment.

60

Accordingly, the Court **GRANTS** Defendants' Motions to Dismiss the Curling Plaintiffs' mandamus claim in Count IX of the Second Amended Complaint.

## VI.    Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motions to Dismiss the Curling Plaintiffs' Second Amended Complaint and the Coalition Plaintiffs' Third Amended Complaint [Docs. 82, 83, 234].  The Motions to Dismiss are **GRANTED** as to Count IX of the Curling Plaintiffs' Second Amended Complaint and are **DENIED** in all other respects.

Discovery in this matter **SHALL** begin immediately upon entry of this Order.  The Court will schedule a follow-up status conference under separate notice.

**IT IS SO ORDERED** this 21st day of May, 2019.


**Amy Totenberg**
**United States District Judge**