# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CURLING PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF FACTS .................................................................4

III.  ARGUMENT........................................................................................11

    A.    Plaintiffs Are Likely to Succeed on the Merits....................................12

        1.    Curling Plaintiffs Have Standing.................................................12

        2.    Curling Plaintiffs Are Likely to Succeed on Their Constitutional Claims....................................................................14

    B.    Plaintiffs Will Unquestionably Suffer Irreparable Injury Absent Court Intervention ....................................................................19

    C.    Balancing the Equities and Considering the Public Interest Heavily Favor Injunctive Relief.............................................................21

IV.   REQUESTED RELIEF ........................................................................22

V.    CONCLUSION.....................................................................................24

## TABLE OF AUTHORITIES

**Page**

## Cases

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ...................................................................15

*Burdick v. Takushi,*
504 U.S. 428 (1992) .............................................................14, 15

*Bush v. Gore,*
531 U.S. 98 (2000) .....................................................................20

*Common Cause/Ga. Billups,*
406 F. Supp. 2d 1326 (N.D. Ga. 2005) .....................................20

*Common Cause/Ga. v. Billups,*
554 F.3d 1340 (11th Cir. 2009)...........................................12, 13

*Const. Party of Pa. v. Cortes,*
877 F.3d 480 (3d Cir. 2017) ......................................................16

*Crawford v. Marion Cnty. Election Bd.,*
553 U.S. 181 (2008) ...................................................................18

*Curling v. Kemp,*
344 F. Supp. 3d 1303 (N.D. Ga. 2018) .....................................21

*Fla. State Conference of N.A.A.C.P. v. Browning,*
522 F.3d 1153 (11th Cir. 2008).................................................12

*Frontiero v. Richardson,*
411 U.S. 677 (1973) ...................................................................18

*Larios v. Cox,*
305 F. Supp. 2d 1335 (N.D. Ga. 2004) .....................................20

*League of Women Voters of Fla. v. Detzner,*
314 F. Supp. 3d 1205 (N.D. Fla. 2018).........................11, 15, 18

*League of Women Voters of N.C. v North Carolina,*
769 F.3d 224 (4th Cir. 2014).....................................................20

### TABLE OF AUTHORITIES

**Page**

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ....................................................................15

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) .....................................................................................21

*Reynolds v. Sims*,
  377 U.S. 533 (1964) ....................................................................................1

*Serv. Emps. Int'l Union, Local 1 v. Husted*,
  906 F. Supp. 2d 745 (S.D. Ohio 2012)......................................................15

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) ................................................................11

*Stewart v. Blackwell*,
  444 F.3d 843 (6th Cir. 2006) ..............................................................16, 18

### Other Authorities

U.S. Const. amend. XIV, § 1 .........................................................11, 15, 19

## I.    INTRODUCTION

"Once a State's [election-related] scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).  The time has come to ensure that no further elections are conducted in Georgia using the unconstitutional Direct Recording Electronic ("DRE") machines and GEMS systems.  In September, following briefing on Plaintiffs' motions for preliminary injunction and a full-day hearing in which Plaintiffs demonstrated the extreme vulnerability of the DREs used in Georgia, this Court decided all four injunctive factors in the Plaintiffs' favor, essentially finding Georgia's use of the DREs and GEMS system unconstitutional.  At that time, however, the November 2018 elections were right around the corner.  As a result, this Court declined to issue a preliminary injunction stopping the use of DREs and the GEMS system because of uncertainty surrounding the ability of Defendants to implement paper ballots in a statewide election in less than two months.

The time pressure and complexity involving the November 2018 elections are now gone, but the DREs and the GEMS system are not.  In April, the legislature and Governor Brian Kemp confirmed that Georgia voters will be forced to use that same

unconstitutional system until at least the end of March 2020—*after* March 3, the likely date for Georgia's 2020 Presidential Primary.  And if the state's ambitious plan to implement 30,000+ ballot marking devices ("BMDs") across 159 counties in less than six months is delayed in any way—as it seems certain it will be—the DREs are the only back up plan for the 2020 election.

Therefore, absent a preliminary injunction barring their use, DREs *will* be used in Georgia throughout 2019 and *most likely in the 2020 elections as well*. Every election is important, no matter how small, and DREs are simply too unsecure, unreliable, and potentially already compromised to use unless absolutely necessary, as the Court concluded for November 2018.  Now, however, it unquestionably is no longer necessary—or constitutional—to use DREs.  In fact, the approximately 115 smaller elections taking place in 2019 are ideal for implementing the hand-marked paper ballot system Curling Plaintiffs request.

The 2018 midterm elections confirmed the unreliability of DREs and the need for much more secure—and far simpler—hand-marked paper ballots now that it is plainly feasible to make the switch.  Georgia officials, like Fulton County's Director of Registration and Elections, Richard Barron, have shown that they will not act on their own to anticipate and resolve issues like machine shortages and other failures seen in the 2018 elections that caused many Georgia voters to wait in lines for hours

to vote or to miss the opportunity to vote at all—problems that are easily avoided with simple, inexpensive paper ballots.  When given a chance to take responsibility after the election and describe how Georgia would work to fix the problems going forward, Barron chose instead to blame this Court for election officials' own failures. Shortly after the November 2018 elections, when asked why his team never sought to have additional machines released from sequestration in the lead-up to those elections, Mr. Barron falsely claimed that Fulton County had "sought to get those removed from sequestration" and that this Court had denied such a request:  "[Judge Totenberg] refuses. So, we have no access to them. I mean, pretty much, I would lay that on her doorstep."[1]

Unless this Court acts to stop Defendants from using the current unconstitutional system, Curling Plaintiffs and countless other Georgians will have to vote on insecure DREs in 2019, and likely 2020, at great security risk and with no confidence that their votes will count as intended.  Plaintiffs Donna Curling, Donna Price, and Jeffrey Schoenberg (the "Curling Plaintiffs") therefore renew their request for a preliminary injunction barring further use of DREs in Georgia and ask that, for

---

[1] *See* Emilia Brock, *Closer Look: Georgia Midterm Election Day 2018*, WABE, at 3:31 (Nov. 6, 2018), https://www.wabe.org/episode/closer-look-georgia-midterm-election-day-2018/.

elections occurring after June 30, 2019, this Court require Defendants to (1) replace the DREs with paper ballots and ballot scanners and (2) institute reasonable and effective post-election, pre-certification audits of the ballots to verify election results. The only hurdle this Court found to this relief before the November 2018 elections—a concern over feasibility in the face of the midterm elections—is gone. No lawful reason exists to subject Georgians to the constitutional violations of the current system.

## II.   STATEMENT OF FACTS

Plaintiffs previously met their burden of demonstrating the vulnerability and insecurity of the DRE machines, and Defendants barely defended the indefensible machines.[2] In September 2018, this Court made the following findings:

- "Plaintiffs have shown that their Fourteenth Amendment rights to Due Process and Equal Protection have been burdened. Put differently, the State's continued reliance on the use of DRE machines in public elections likely results in 'a debasement or dilution of the weight of [Plaintiffs'] vote[s],' even if such conduct does not completely deny Plaintiffs the right to vote." (Dkt. No. 309 at 33.)

---

[2] In the interest of efficiency and the Court's time, Curling Plaintiffs incorporate their prior preliminary injunction briefs and exhibits as well as the hearing transcript and exhibits by reference rather than repeat facts or arguments regarding the vulnerability of the DREs and failure of Georgia's Office of the Secretary of State to protect the election system. Nothing has changed with respect to the vulnerability, insecurity, or unreliability of the DREs or GEMS system. All that has changed is that now there is ample time to implement paper ballot voting across Georgia for upcoming elections in 2019 and beyond.

4

- "Contrary to Defendants' assertions, Plaintiffs' claims do not boil down to paranoia or hypothetical fear. National security experts and cybersecurity experts at the highest levels of our nation's government and institutions have weighed in on the specific issue of DRE systems in upcoming elections and found them to be highly vulnerable to interference, particularly in the absence of any paper ballot audit trail." (*Id.* at 36-37.)

- "Plaintiffs have so far shown that the DRE system, as implemented, poses a concrete risk of alteration of ballot counts that would impact their own votes. Their evidence relates directly to the manner in which Defendants' alleged mode of implementation of the DRE voting system deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted)." (*Id.* at 38.)

Nothing has changed with respect to the unsecure nature of DREs or Defendants' implementation of the DRE voting system since this Court issued its Order in September condemning their use. They are as vulnerable as ever—if not more vulnerable for having been used for yet another statewide election this past November.[3] And, absent an injunction, they will continue to be used in Georgia for at least another year, if not longer. Act 24, signed by Governor Kemp on April 2, 2019, does not end the use of DREs. *See* Act, 24, H.B. 316, 155th Gen. Assemb. (Ga. 2019) (enacted), http://www.legis.ga.gov/Legislation/en-US/display/20192020/HB/316. Under the new law, DREs continue to be the sole

---

[3] Indeed, the 2018 elections produced more evidence that DREs are compromised. *See* Halderman Declaration at ¶¶ 9-11 (stating that significant "undervotes," widespread irregularities and malfunctions, and foreign intrusion suggest possible malfeasance).

5

method of in-person voting in Georgia until the state switches from DREs to electronic ballot markers and ballot scanners,[4] which, even if every single thing goes right in the procurement and implementation of the BMDs, will happen no sooner than April 2020.[5]

Meanwhile, elections will take place in Georgia in June, in September, and in November 2019, including any special-purpose local-option sales tax ("SPLOST") municipal elections that are likely but not yet scheduled in counties like Fulton.  (*See* Dkt. No. 367 at 4 (explaining that special elections for SPLOSTs can be held November 12, 2019, special elections to fill vacancy in a county office can be held June 18, 2019 or November 12, 2019), 5-6 (special election likely in September for

---

[4] As Plaintiffs previewed during the April 9, 2019 status conference, cybersecurity experts agree that ballot marking devices ("BMDs") are also vulnerable and not capable of producing an auditable record.  Once a ballot marking system is chosen through the procurement process and publicly announced, Plaintiffs anticipate asserting any appropriate constitutional challenges to the adopted system at that time.  Until then, Plaintiffs concentrate on DREs, as the current system, and reserve their arguments against BMDs.

[5] Act 24 says only that the shift to ballot-marking devices should happen "as soon as possible."  Act, 24, H.B. 316, 155th Gen. Assemb. § 18(a)(2) (Ga. 2019) (enacted).  The schedule laid out in the Request for Proposals for Statewide Voting System (RFP) posted March 15, 2019, states that distribution of the machines throughout Georgia will occur no earlier than the end of March 2020, and possibly much later.  *See* RFP, Statewide Voting System, eRFP No. 47800-SOS0000037, Att. C at I (2019) ("Phase 2 – Part 2 will be the full distribution of all equipment to the counties including training. . . . Completion of Phase 2 – Part 2 will be completed prior to the end of the first quarter of 2020 (March 31, 2020).").

vacancy on Atlanta Board of Education); *see also* Dkt. No. 363 at 9:13-10:11 (stating that Fulton County believes there may be SPLOST elections in Fulton County in 2019 though none have been scheduled).)  Looking into 2020, the date for Georgia's presidential primary is not yet set, but will most likely be March 3, 2020, ***almost a month before*** the final date for all 30,000+ BMDs to be distributed in Georgia.[6] This means that Curling Plaintiffs who plan to vote in 2019 and 2020—and hundreds of thousands, even millions, of other Georgians—will vote on DREs before the state can implement BMDs, including during a Presidential election.  (Curling Decl. ¶ 2; Price Decl. ¶ 3; Schoenberg Decl. ¶ 10)

And it is far from certain that the BMDs will be implemented across Georgia on the schedule set by the Secretary of State.  The plan for deployment across Georgia of 30,000+ BMDs—which no other state uses as its sole method of voting and therefore have never been implemented on this scale before—in 159 counties in less than six months is recklessly ambitious.  Even the state's request for proposal ("RFP") acknowledges that the Secretary of State's Office will not be able to

---

[6] *See, e.g.*, Greg Bluestein, *Georgia election officials still don't know when 2020 primary will be held*, Atlanta Journal-Constitution (Feb. 19, 2019), https://www.ajc.com/blog/politics/georgia-elections-officials-still-don-know-when-2020-primary-will-held/PaWDHi2TwYryn07bUh8IZO/ ("It's presumed that Georgia will hold the 2020 primary on March 3, joining California, Texas, Massachusetts and a bloc of southern states that has already picked that date.").

assemble, distribute, and test all 30,080 machines in six months without significant (and potentially unsafe) outside help. Despite the security risk created by granting unknown non-government employees[7] full access to the machines, the RFP requires vendors to "propose staffing in terms of full time equivalents (FTEs) [*i.e.*, full time employees] and their available resources for ***assembly, testing, and distribution efforts*** given the ***compressed delivery schedules*** required for this proposal." RFP, Statewide Voting System, eRFP No. 47800-SOS0000037, Att. C at B(1).

Yet the Secretary of State's office has not indicated it has any back-up plan other than the DREs if its ambitious schedule should slip. If the State's plan to use BMDs is delayed in any way, Georgia risks a situation like last fall in which there is not enough time to change to a new system before early voting and the 2020 general election are well underway. In that nightmare scenario, which is not unlikely given the compressed timeframe and massive scale of the roll out of machines that have yet to been chosen or purchased, DREs would again be used in the 2020 election.

In addition to security concerns, serious issues throughout Georgia occurred with the use of DREs during the 2018 midterms, including malfunctioning machines, missing power cords, and precincts with far too few DREs, which caused such

---

[7] The RFP does not require any particular vetting of vendor employees or background checks.

8

serious problems as wait times of many hours for tens of thousands of voters.[8]  These further burdens on the right to vote should not be left to occur in 2019 and 2020, but almost certainly will when Georgia again uses DREs to vote.  And if the past is any indication, rather than take responsibility, the State will look to shift blame for its failures to others, including this Court.  During the 2018 midterms, as news of poor administration—including erroneous registration information—reached the national media, Richard Barron falsely claimed that this Court was to blame for the State's failure to properly administer its elections in several heavily populated precincts.[9]

---

[8] *See* Jeff Martin, *Broken voting machines, long lines under scrutiny in Georgia*, Chicago Tribune (Nov. 7, 2018), https://www.chicagotribune.com/news/nationworld/politics/ct-georgia-voting-problems-20181107-story.html (wait times of 3+ hours); New York Times, *'We've Been in Line for 5 Hours,' Georgia Voter Says* (Nov. 6, 2018), https://www.nytimes.com/video/us/100000006201582/midterm-election-voting-georgia-long-lines.html (5-hour wait times, voters leaving lines); Michael King & Nick Sturdivant, *Gwinnett Co. voters wait for hours after workers forget power cords for the voting machines*, WXIA TV - 11 Alive (*updated* Nov. 7, 2018), https://www.11alive.com/article/news/politics/elections/gwinnett-co-voters-wait-for-hours-after-workers-forget-power-cords-for-the-voting-machines/85-611764666 (poll workers forgot power cords leading to long lines and delays in opening voting).

[9] *See* Emilia Brock, *Closer Look: Georgia Midterm Election Day 2018*, WABE, at 2:41 (Nov. 6, 2018), https://www.wabe.org/episode/closer-look-georgia-midterm-election-day-2018/ ("We do have very few spares left in the county to send out. We have less than 40 for, you know, in case of emergency, which is less than, it's about one for every four-and-a-half precincts because of a federal court order. Judge Totenberg sequestered 700 of our machines last summer and she hasn't released

The further use of DREs is even more unreasonable because it is not necessary.  Georgia can immediately convert to an auditable, accountable voting system using hand marked paper ballots, which current Georgia law expressly allows, as this Court recently found.  (Finley Decl. at ¶¶ 13, 16.)  The local and district elections planned for 2019 are the ideal conditions for an immediate conversion to hand marked paper ballots tabulated by optical scanners without confusion for voters or officials.  (*Id.* at ¶ 14.)  Such a shift would allow state officials to train poll workers, perfect ballot chain of custody and security measures, and to experiment with various types of effective post-election auditing.  There is every reason to stop the use of DREs in Georgia and no reason not to implement paper ballots now, yet Defendants refuse to do so.  As a result, it is critical that this Court

them. So between early voting and today we sent out close to 2,000 machines and we've got less than forty remaining that are available. But we have 700 sitting in our warehouse wrapped in plastic, really for no reason."); *see also* Ayman Mohyeldin (@AymanM), Twitter (Nov. 6, 2018, 9:08 AM), https://twitter.com/AymanM/status/1059855139979358208 (NBC report confirming a "lack of power cords"); Emily Dreyfuss, *Georgia Voting Machine Issues Heighten Scrutiny on Brian Kemp*, Wired (Nov. 6, 2018), https://www.wired.com/story/georgia-voting-machine-issues-heighten-scrutiny-brian-kemp/ (reporting that wait times averaged three hours); Associated Press, *The Latest: Some Georgia Statewide Races Too Close to Call*, U.S. News & World Report (Nov. 7, 2018), https://www.usnews.com/news/best-states/georgia/articles/2018-11-06/the-latest-georgia-voters-decide-open-statewide-seats (reporting that voters waited "more than 3 hours").

issue a preliminary injunction stopping the use of DREs and requiring that Georgia implement paper ballots immediately.

## III.  ARGUMENT

Georgia's decision to keep DREs as it transitions to BMDs[10] leaves in place a system that violates Curling Plaintiffs' rights—and the rights of Georgia voters generally—to a system of voting that ensures their vote is counted equally and accurately and that election results will reflect each voter's intent.

As this Court found in September, Curling Plaintiffs readily meet the requirements necessary for this Court to issue a preliminary injunction. *See League of Women Voters of Fla. v. Detzner*, 314 F. Supp. 3d 1205, 1215 (N.D. Fla. 2018) (*quoting Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).  Curling Plaintiffs are likely to succeed in proving a violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  U.S. Const. amend. XIV, § 1.  Forcing Curling Plaintiffs to use DREs to vote in-person imposes a severe burden given the unsecure, unverifiable nature of the DRE system, coupled with the imminent threat of attacks to that system.  Defendants must show a compelling state interest in the use of DREs to justify this severe burden.  They cannot.  Indeed, the use of DREs

---

[10] As Plaintiffs previewed during the April 9, 2019 status conference, BMDs are also viewed by experts as vulnerable and not capable of producing an auditable record, but that is a separate issue that does not detract from the need to replace DREs now.

actually undermines important state interests, such as the interests in preventing fraud and promoting voter confidence.

As before, the other factors similarly favor Curling Plaintiffs. Curling Plaintiffs will unquestionably suffer irreparable injury absent relief—such injury is presumed in cases involving the right to vote. Because the injury to Curling Plaintiffs far outweighs any injury to the State Defendants in implementing an alternative system, and because an injunction is unquestionably in the public's interest, injunctive relief should be granted for elections after June 30, 2019.

### A.    Plaintiffs Are Likely to Succeed on the Merits

#### 1.    *Curling Plaintiffs Have Standing*

Each of the Curling Plaintiffs meets the requirements for standing: (1) each has suffered—and faces an imminent prospect of future suffering—invasions of their right to vote resulting in "concrete and particularized" injuries; (2) the Curling Plaintiffs' injuries were caused by Defendant's actions; and (3) their injuries or threat of injuries are likely to be redressed by the relief they seek. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009) (quoting *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1159 (11th Cir. 2008)).

Curling Plaintiffs meet all three standing requirements, just as this Court found in September. (Dkt. No. 309 at 16-25.) Each Curling Plaintiff has suffered

or has an imminent prospect of suffering a concrete injury because each Curling Plaintiff is required either to vote in person using DREs or to go through the burdensome process of voting absentee.  (Price Decl. at ¶¶ 3, 11-13; Schoenberg Decl. at ¶¶ 2, 10; Curling Decl. at ¶¶ 2, 5-12.); *see also Common Cause/Ga.*, 554 F.3d at 1351-52 ("Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing.").  Curling Plaintiffs have already suffered harm, "specifically to their fundamental right to participate in an election process that accurately and reliably records their votes and protects the privacy of their votes and personal information." (Dkt. No. 309 at 18.)

This harm remains imminent and actual as long as DREs are the method of voting in Georgia and because Curling Plaintiffs plan to vote in the 2019 and 2020 elections.  (Price Decl. at ¶ 3; Schoenberg Decl. at ¶ 2; Curling Decl. at ¶ 2.).  Defendants' refusal to end the use of DREs is also the cause of Curling Plaintiffs' injury.  Defendants can readily decertify DREs and move to paper ballots, the most secure and cost effective method of voting.  (*See* Finley Decl. at ¶¶ 12, 13, 16.)  Finally, the Curling Plaintiffs' injury can be redressed by the Court.  Curling Plaintiffs merely ask the Court for an order that unsecure aspects of the current system not be used and that any system have the minimal, verifiable safeguards—

hand-marked paper ballots and a system for auditing—universally recommended by experts and law enforcement officials.  Each of the Curling Plaintiffs has standing to seek such relief.[11]

## 2. *Curling Plaintiffs Are Likely to Succeed on Their Constitutional Claims*

While finding that discovery and a full hearing on the merits would be necessary, this Court has already acknowledged that the evidence already presented by Plaintiffs indicate they are "substantially likely" to succeed on one or more of their constitutional claims.  (Dkt. No. 309 at 38.)  Since that time, Defendants have done nothing to refute Plaintiffs' substantial evidence that use of the DREs violates Plaintiffs' constitutional rights, and nothing has changed to make DREs more secure or Plaintiffs' rights less significant.

"It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotation marks and citation omitted).  In evaluating a state's election law imposing restrictions on the right to vote,[12] courts utilize a "sliding-scale balancing analysis."

---

[11] State Defendants are also the proper parties for this lawsuit.  *See generally* Dkt No. 379.

[12] Because courts have applied the *Burdick-Anderson* test to claims involving the right to vote under both the Equal Protection and Due Process Clauses, Plaintiffs address both claims together for purposes of seeking injunctive relief.  *See League of Women Voters*, 314 F. Supp. 3d at 1215 (applying *Burdick-Anderson* to general

14

*League of Women Voters*, 314 F. Supp. 3d at 1215.  The Court "must weigh the character and magnitude of the asserted injury to" the right to vote against "the precise interests put forward by the State as justification for the burden imposed by its rule," and the extent to which those interests make the burden necessary. *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983)) (internal quotation marks omitted).  Where, as here, the burden on the right to vote is severe, Defendants must show a compelling state interest that justifies the burden imposed and the restriction must be narrowly tailored to that interest.  *League of Women Voters*, 314 F. Supp. 3d at 1215.

Defendants' continued use of DREs severely burdens Curling Plaintiffs' exercise of their right to vote.  As it did in September, the current DRE system contains serious security flaws at every level, including: (1) machines that are susceptible to viruses and other malicious code and produce unverifiable results; (2) memory cards that can be easily compromised and used as a vehicle for malicious code; and (3) a central server that, while serving as Georgia's central nervous system for elections, was exposed for an unknown period of time.  (Dkt. Nos. 258-1 at 9-

claims asserted under First and Fourteenth Amendments); *Obama for Am. v. Husted*, 697 F.3d 423, 428-29 (6th Cir. 2012) (Equal Protection Clause applies when state places restrictions on the right to vote); *Serv. Emps. Int'l Union, Local 1 v. Husted*, 906 F. Supp. 2d 745, 750 (S.D. Ohio 2012) (same).

13, Lamb Decl. at ¶¶ 7-26; 260-1 at 4-8; 260-2, Halderman Decl. at ¶¶ 13-34; Finley Decl. at ¶¶ 9-12.)  It is also highly likely that an attack would be undetectable.  (Dkt. No. 260-2 at ¶¶ 14, 34.)  Because Georgia's system leaves no voter-verified paper record of a voter's selections, there is no way to check the electronic records against anything else to determine whether there has been a breach.  (*Id.* ¶ 14.)  Thus, the current system provides little protection against an attack, and almost no ability to detect an attack.

Although the existence of these pervasive security flaws, alone, place an unconstitutional burden on Curling Plaintiffs' rights, this Court must not "review such claims in a vacuum but do so with a focus on the real world justifications and implications of [Defendants'] decision[s]." *Stewart v. Blackwell*, 444 F.3d 843, 876 (6th Cir. 2006); *see Const. Party of Pa. v. Cortes*, 877 F.3d 480, 485-86 (3d Cir. 2017) (discussing the "fact-intensive" inquiry into whether challenged regulation burdens constitutional right).  Here, the context shows just how severe the burden is, as U.S. elections, and Georgia's specifically, are in the cross-hairs for both state-sponsored and freelance hackers set on disrupting the voting process.[13]  The threat

---

[13] Following the publication of the Mueller Report, security threats casting doubt upon the accuracy of the administration of U.S. elections became more pronounced and more credible within states, like Georgia, using systems vulnerable to attack. *See* Robert S. Mueller, Report on the Investigation into Russian Interference in the

that Curling Plaintiffs' votes will be diluted or discounted is made greater by the continued use of DREs because bad actors know the DREs make Georgia an easy target. And while the individual elections in 2019 are not statewide, they are nonetheless fundamental to democracy and no less worthy of protection. Absent action by this Court, these elections will be run with DREs—as will some or all of the *statewide* elections in 2020, given the significant risk that Defendants will not be able to purchase, test, distribute, and put 30,000+ BMDs into use before the election season begins in March 2020. In that not-unlikely scenario, Georgia will again be a natural and easy target for anyone who would like to manipulate an election.

Defendants' conduct only adds to the burden on Curling Plaintiffs' rights. While publicly renouncing the current DRE system and championing a move to BMDs, Defendants have done nothing to cure the current system's deficiencies despite the fact that hundreds of elections will be run using DREs this year. (Dkt. No. 367 at 3, Ex. B.) This unfortunate combination of inherent risk, actual threat, and persistent inaction shows that the use of DREs constitutes a severe and unconstitutional burden on the Curling Plaintiffs' right to vote.

---

2016 Presidential Election 113 (2019) ("Officers from Unit 74455 separately hacked computers belonging to state boards of elections, secretaries of state, and US companies that supplied software and other technology related to the administration of US elections.").

As result, Defendants must show significant, "precise" interests that "explain why it is necessary to burden the plaintiff's rights," and show that the burden is narrowly tailored to further that interest.  *League of Women Voters*, 314 F. Supp. 3d at 1220 (internal quotation marks and citation omitted).  They cannot do so.  Although Defendants may find it easier to leave DREs in place while they plan a move to BMDs, their interests in election ease or efficiency hardly justifies the risk that Curling Plaintiffs' and others' votes will be compromised by using DREs.  "Administrative convenience is simply not a compelling justification in light of the fundamental nature of the right."  *Stewart*, 444 F.3d at 869 (citing *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) (plurality)).

Moreover, Defendants' insistence on using DREs undermines other important state interests, such as safeguarding voter confidence, preserving election integrity, and curbing election fraud/manipulation.  "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008).  Georgia's current election system is unsecure and a planned move to a different type of voting machine does not alleviate that fact for elections preceding that change.  Curling Plaintiffs' testimony demonstrates that the use of Georgia's unsecure system has greatly diminished their and others'

18

confidence that their votes will be counted, particularly in light of the active threat of interference.  (Curling Decl. ¶ 12; Price Decl. ¶ 13; Schoenberg Decl. ¶ 10). Thus, Defendants' continued use of DREs is contrary to their own interest in protecting the integrity of elections, an interest which Defendants have used to justify other voting restrictions.  This contradiction shows that Defendants cannot justify the significant burden imposed by using DREs.

The burden DREs impose on Curling Plaintiffs' and other voters rights must end now, not in a year or however long it will take Defendants to establish another system using similar (and similarly flawed) machines.  The Fourteenth Amendment simply does not permit so great an intrusion on the right to vote with so little justification where a less restrictive (and far less expensive) alternative is readily available.  Thus, the Curling Plaintiffs are likely to succeed on the merits of their constitutional claims.

**B.    Plaintiffs Will Unquestionably Suffer Irreparable Injury Absent Court Intervention**

Georgia's continued use of DREs irreparably harms Curling Plaintiffs: "the State's continued reliance on the use of DRE machines in public elections likely results in 'a debasement or dilution of the weight of [Plaintiffs'] vote[s],' even if such conduct does not completely deny Plaintiffs the right to vote."  (Dkt. 309 at 33 (quoting *Bush v. Gore*, 531 U.S. 98, 105 (2000)); *see also Common Cause/Ga. v.*

*Billups*, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005) (noting that the right to vote "is preservative of all other rights"); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004) ("To the extent that a citizen's right to vote is debased, he is that much less of a citizen.").) Impairment of the right to vote constitutes an irreparable harm because this type of injury cannot be undone or adequately redressed once an election occurs. *See League of Women Voters of N.C. v North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

This Court has recognized that Georgia's use of DREs creates a genuine threat that Curling Plaintiffs' votes will not be counted accurately or equally in upcoming elections. (*See* Dkt. 309 at 40-41 ("Absent an injunction, there is a threat that Plaintiffs' votes in the upcoming elections will not be accurately counted. Given the absence of an independent paper audit trail of the vote, the scope of this threat is difficult to quantify . . . .").) When assessing irreparable injury to Plaintiffs previously, this Court found: "Plaintiffs have demonstrated a real risk of suffering irreparable injury without court intervention." (*Id.* at 40.) The vulnerability of Georgia's voting system and the harm that will befall Curling Plaintiffs absent court intervention have not changed to warrant any other finding now.

20

### C.   Balancing the Equities and Considering the Public Interest Heavily Favor Injunctive Relief.

Any burden injunctive relief would have on Defendants is far outweighed by the ongoing injury to Curling Plaintiffs and Georgia voters at large if relief is not granted.  Plaintiffs have shown, and this Court has recognized, the "threat of real harms" to the constitutional interests at stake in this case.  *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018).  The injunction Curling Plaintiffs seek would free them from their current position of having to vote on unsecure machines, knowing that election interference or machine error may alter or eliminate their votes entirely.  (Curling Decl. ¶ 4, Price Decl. ¶¶ 12-13, Schoenberg Decl. ¶ 10)  A preliminary injunction is also in the public's best interest because it would enhance the integrity of the electoral processes that are "essential to the functioning of our participatory democracy."  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).  Injunctive relief must come now to promote fair future elections in the public's interest.

Conversely, the Defendants can no longer demonstrate that the implementation of paper ballot and ballot screening systems would impose insurmountable practical burdens on them. The time and scale concerns that existed in September are no longer an issue, and the cost and time it would take to move to paper ballots at this point do not outweigh Curling Plaintiffs' significant constitutional interests.  In fact, the smaller scale municipal and special elections to

be held this year in September, and November offer the perfect opportunity to introduce paper ballots.  And the easy, cost-effective paper ballot relief Curling Plaintiffs seek would not interfere with the Secretary of State's plan to implement BMDs after those are chosen later this year.  Under the schedule set in the RFP, the first two phases (Phase 1 and Phase 2-Part 1) are (1) a pilot program in just ten counties and (2) a limited release of eight components of the new system to each county, which will not take place until November 2019.

Therefore, because the injury to Curling Plaintiffs far outweighs any injury to the State Defendants in implementing an alternative system, and because an injunction is unquestionably in the public's interest, injunctive relief should be granted now.

## IV.    REQUESTED RELIEF

Curling Plaintiffs and all Georgia voters have a right to election processes that meet minimum constitutional requirements.  Given the vulnerabilities demonstrated by Logan Lamb, Professor Halderman, and countless other experts, the current system in Georgia—including the Diebold AccuVote DREs, the AccuVote-OS scanners, and the GEMS system—fails to meet these minimum requirements and must be replaced with a secure and reliable system.  Thus, the Curling Plaintiffs request that the State be ordered to:

- Cease use of the Diebold AccuVote DRE voting system, including but not limited to stopping use of the programming and machine configurations connected to the DRE voting system (*i.e.*, the GEMS server and AccuVote-OS optical scanners);[14]

- Conduct in-person voting by hand-marked paper ballot in all elections after June 2019;

- Supply a minimum of one electronic or mechanical ballot-marking device (BMD) per polling location that meets HAVA/ADA requirements and is transparent and verifiable for assistive voting by paper ballot;

- Provide a minimum of one ballot scanner at each polling place for casting, tabulation, and secure storage of voted paper ballots.

The small number and size of the upcoming elections in Georgia mean the Secretary of State's resources should be more than sufficient to readily implement this relief. Defendants should be able to quickly lease or purchase new scanners and devices for use by voters with disabilities in the elections that will be held in 2019 and after.

That said, the Curling Plaintiffs recognize the potential burden on the state of a resolution that involves replacing the GEMS system and acquiring scanners and

---

[14]If this Court should decide that voting should be conducted using the GEMS system and AccuVote-OS optical scanners, Curling Plaintiffs request that the Court order an immediate security evaluation of the counties' and Secretary of State's GEMS servers and other related systems and components to detect malware or other significant security vulnerabilities and require Defendants to promptly develop appropriate mitigation action and timetables in consultation with Curling Plaintiffs.

appropriate BMDs before September and November.  Curling Plaintiffs therefore defer to the Court to provide meaningful relief that results in transparent and verifiable elections in the State of Georgia and that strikes the right balance between burdens on the right to vote and burdens on the state in administering elections during the pendency of this proceeding, before permanent relief issues.

## V.    CONCLUSION

This is an urgent, nonpartisan issue that requires this Court's action now.  As President Trump said just this morning, "[W]e're trying to do paper ballots, as a back-up system, as much as possible.  Because going to good, old-fashioned paper, in this modern age, is the best way to do it."[15]

Curling Plaintiffs (and Georgia voters generally) should not be forced to accept a fundamentally unreliable system that violates their constitutional rights while Georgia works to adopt a new, different, potentially flawed, electronic system on an uncertain timeline.  The proposed injunction is necessary to secure Curling Plaintiffs' fundamental right to vote during the pendency of this proceeding and should be issued as soon as possible.

---

[15] *Remarks by President Trump Before Marine One Departure* (May 30, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-45/.

24

Dated: May 30, 2019            Respectfully submitted,

                                /s/ David D. Cross
David D. Cross (*pro hac vice*)
John P. Carlin (*pro hac vice*)
Catherine L. Chapple (*pro hac vice*)
Jane P. Bentrott (*pro hac vice*)
Robert W. Manoso (*pro hac vice*)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
Telephone: (202) 887-1500
DCross@mofo.com
JCarlin@mofo.com
CChapple@mofo.com
JBentrott@mofo.com
RManoso@mofo.com

Halsey G. Knapp, Jr.
GA Bar No. 425320
Adam M. Sparks
GA Bar No. 341578
KREVOLIN & HORST, LLC
1201 West Peachtree Street, NW
Suite 3250
Atlanta, GA 30309
HKnapp@khlawfirm.com
Sparks@khlawfirm.com

*Counsel for Plaintiffs Donna Curling,*
*Donna Price & Jeffrey Schoenberg*

25

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been

prepared in accordance with the font type and margin requirements of LR 5.1, using

font type of Times New Roman and a point size of 14.

*/s/ David D. Cross*
David D. Cross

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER , ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2019, a copy of the foregoing **CURLING PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ David D. Cross*
David D. Cross

27