```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

4    DONNA CURLING, ET AL.,            :
                                       :
5           PLAINTIFFS,                :
     vs.                               :   DOCKET NUMBER
6                                      :   1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,       :
7                                      :
            DEFENDANTS.                :
8

9

10        TRANSCRIPT OF SCHEDULING CONFERENCE PROCEEDINGS

11            BEFORE THE HONORABLE AMY TOTENBERG

12               UNITED STATES DISTRICT JUDGE

13                      MAY 31, 2019

14                      11:21 A.M.

15

16

17

18

19

20

21   MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                  TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:
 4

 5        DAVID D. CROSS
          ROBERT W. MANOSO
 6        MORRISON & FOERSTER, LLP

 7        HALSEY G. KNAPP, JR.
          ADAM SPARKS
 8        KREVOLIN & HORST, LLC

 9

10
     FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
11   WILLIAM DIGGES, III, AND RICARDO DAVIS:

12
          CARY ICHTER
13        ICHTER DAVIS, LLC

14        JOHN POWERS
          LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
15

16   FOR THE STATE OF GEORGIA DEFENDANTS:

17
          VINCENT ROBERT RUSSO, JR.
18        CAREY A. MILLER
          KIMBERLY ANDERSON
19        ALEXANDER DENTON
          ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
20
          BRYAN P. TYSON
21        BRYAN JACOUTOT
          TAYLOR ENGLISH DUMA
22

23   FOR THE FULTON COUNTY DEFENDANTS:

24
          KAYE WOODARD BURWELL
25        DAVID R. LOWMAN
          OFFICE OF THE FULTON COUNTY ATTORNEY
```

```
 1                    P R O C E E D I N G S

 2    (Atlanta, Fulton County, Georgia; May 31, 2019.)

 3              THE COURT:  I can't guarantee what is going to happen

 4    here on the HVAC system.  Everyone is very -- the people down

 5    there are very far away.  But that is all right.  Hello.

 6    Hello.

 7              So, Ms. Burwell, we're going to just start back here

 8    with the Fulton County group and maybe just go around this way.

 9    Okay.  If we can introduce -- if everyone can introduce

10    themselves.

11              And we're here for a conference in Curling, et al.

12    vs. Raffensperger, Case Number 17-CV-2989.

13              MS. BURWELL:  Yes, Your Honor.  Kaye Burwell for

14    Fulton County, as well as David Lowman.

15              THE COURT:  Very good.

16              MR. ICHTER:  Cary Ichter.  I represent the Coalition

17    plaintiffs, Laura Digges, William Digges, Ricardo Davis, and

18    Megan Missett.

19              Your Honor, may I mention that I mentioned to

20    Mr. Martin earlier on that I have an appearance at 1:00 in

21    Fulton Superior Court and was told that it would be okay if I

22    snuck out at about 12:30.  So with the Court's permission --

23              THE COURT:  Oh, I had no idea that that was so.  Are

24    you planning to come back?

25              MR. ICHTER:  If it is still going on, absolutely.
```

1    Yes.

2          THE COURT:  Because I'm not sure we will be through.

3          MR. ICHTER:  All right.

4          THE COURT:  I'm sorry.  I don't know why we had a

5    communication break.  But I have no idea when we're going to be

6    through.  So I'm going to just treat that as a lunch break.

7          MR. ICHTER:  Perfect.

8          MR. RUSSO:  We actually -- Judge, we actually worked

9    out a lot next door.  So we may not be here as long.

10          THE COURT:  Good.  That's marvelous.  Well, that was

11   the hope that if we weren't in a courtroom that people would

12   actually sit and talk a little bit.

13          MR. MANOSO:  That room is even hotter.  So there was

14   reason to get along.  I'm sure you didn't do that on purpose.

15          THE COURT:  I probably did.

16          MR. KNAPP:  We commend you on the accommodations.

17          THE COURT:  Is Mr. Powers joining you, Mr. Ichter?

18          MR. ICHTER:  Yes.

19          THE COURT:  All right.  Has he filed a notice of

20   appearance in the case?

21          MR. POWERS:  Yes.

22          THE COURT:  I didn't notice that.  Very good.

23          Let's keep on moving this way.

24          MR. SPARKS:  Yes, Your Honor.  Adams Sparks with

25   Krevolin & Horst for the Curling plaintiffs.

```
 1              MR. KNAPP:  Halsey Knapp also with Krevolin & Horst
 2   on behalf of the Curling plaintiffs.
 3              MR. CROSS:  David Cross of Morrison & Foerster for
 4   the Curling plaintiffs.
 5              MR. MANOSO:  And Rob Manoso of behalf of the Curling
 6   plaintiffs.
 7              THE COURT:  Obviously you know who I am, and you know
 8   the court reporter.  And you may or may not know Ms. Cole, who
 9   is actually my permanent law clerk.
10              And I don't know -- this is Dr. Suman Malinpati, who
11   is actually working as an intern in the case.  Had another life
12   as a doctor and somehow has decided to go into the law.  And I
13   won't comment on the wisdom of that, other than referencing
14   that there is a question about wisdom.  But maybe he will gain
15   it.  All right.
16              MR. RUSSO:  Vincent Russo with the Robbins Firm for
17   the state defendants.
18              MR. TYSON:  Bryan Tyson from Taylor English for the
19   state defendants as well.
20              MR. MILLER:  Carey Miller of the Robbins Firm for the
21   state defendants.
22              MS. ANDERSON:  Kimberly Anderson from the Robbins
23   Firm also for the state defendants.
24              MR. JACOUTOT:  Bryan Jacoutot from Taylor English for
25   the state defendants.
```

1              MR. DENTON:  Alexander Denton with the Robbins Firm

2    for the state defendants.

3              THE COURT:  Very good.

4              Are you expecting you are going to speak?  Because I

5    hate to have y'all out there.

6              MR. JACOUTOT:  I don't expect to have to speak.

7              THE COURT:  Okay.  Though you could from that point.

8    I know that our court reporter here, Shannon Welch, is able to

9    do anything.  But she might bark at you.  But those who are

10   further away, remember that you are a distance.  We don't have

11   a microphone.

12             Why don't we start by your telling me what sorts of

13   things you've agreed about in the hot room so I don't go into

14   things I don't need to go into.

15             MR. RUSSO:  Sure.

16             THE COURT:  Because I was just trying to catch up

17   with what had been filed this morning.  Because I had a hearing

18   first thing in the morning and didn't catch it.  Then I was

19   sort of trying to catch up.  All right.

20             MR. RUSSO:  I mean, I can kind of start, and

21   everybody can jump in.  Feel free.  But we discussed the

22   discovery schedule and really the case schedule and timing for

23   having a 26(f) conference and submitting a discovery plan.  And

24   we can walk through the dates with you now or we can --

25             THE COURT:  Sure.

```
 1              MS. ANDERSON:  Do you want me to take it?
 2              MR. RUSSO:  I will pass it to her.
 3              THE COURT:  Do you need them to state their names?
 4    Because it is a lot of people.
 5              COURT REPORTER:  No, ma'am.  I've got it.
 6              MS. ANDERSON:  So as far as what I have down for our
 7    schedule:  So our answers are due June 4th.  The 26(f)
 8    conference will start the week of June 10th followed by a
 9    seven-day -- within seven days, we need to submit a discovery
10    plan to the Court.
11              Fact -- well, do we want to -- sorry.  Do we want to
12    address -- I'll do these general ones.  Fact discovery will end
13    on November 15.
14              THE COURT:  November 15?
15              MS. ANDERSON:  Yes, ma'am.  Initial expert reports
16    are due November 22nd.
17              **(There was a brief pause in the proceedings.)**
18              THE COURT:  Is that a Wednesday, November 22nd?  I
19    neglected to bring my phone.
20              MS. ANDERSON:  I believe it is a Friday.
21              THE COURT:  Okay.  So that is -- I'm just trying to
22    think about Thanksgiving.
23              MS. ANDERSON:  Yes, Your Honor.  And generally
24    speaking surrounding experts, just so we have it on the record,
25    when I say initial expert report, whoever has the burden to
```

```
 1    prove the particular issue, they will submit the expert report

 2    at that time.  So if they have -- so if plaintiffs have

 3    particular topics for their complaint and then on the state

 4    defendants to support any of their defenses we submit those on

 5    November 22nd.  The rebuttal expert reports are due December 4.

 6    Any reply expert reports would be December 11.  And then

 7    generally speaking the case should be ready for trial

 8    January -- the month of January 2020.

 9                THE COURT:  Okay.

10                MR. RUSSO:  Then do you want to do the discovery

11    response deadlines?

12                MS. ANDERSON:  Yes.  So our discovery response

13    deadlines, we will have four actual responses and objections to

14    interrogatories or document productions.  We have a 15-day

15    deadline.

16                MR. RUSSO:  Just written discovery.

17                MS. ANDERSON:  Yes.  Well, I'm saying like the actual

18    written responses are due within 15 days.  And then the actual

19    production of documents would be due within the 30-day

20    deadline.

21                THE COURT:  15 days from the time you receive the

22    interrogatory?

23                MS. ANDERSON:  We must respond or object.

24                THE COURT:  Does that include any requests for

25    admission or not?
```

1        MS. ANDERSON:  Yes.

2        THE COURT:  Then 30 days for the production of

3  documents?

4        MR. RUSSO:  Yes, Your Honor.

5        MR. CROSS:  Objections and written responses to

6  document requests would also be due in 15 days.

7        MS. ANDERSON:  Correct.  Yes.

8        MR. MANOSO:  Objection and response.

9        MR. RUSSO:  You are right.  Just not the production.

10  You are right.  We are shooting for 30 days.  There may be some

11  rolling productions that we all recognize could occur on either

12  side.

13        THE COURT:  Well, that is great.  Agree on anything

14  else?

15        MS. ANDERSON:  So I believe the -- sorry --

16        MR. MANOSO:  Keep going.  You're doing good.

17        MS. ANDERSON:  I believe we agreed to have -- if the

18  Court will permit, since I know it varies from the Federal

19  Rules, to have 20 depositions per side.  No more than 20

20  depositions per side.

21        MR. KNAPP:  Fact depositions.

22        MS. ANDERSON:  Fact depositions.

23        THE COURT:  Does that include the plaintiffs'

24  third-party depositions?

25        MR. MANOSO:  Yes, Your Honor.

```
 1              MR. CROSS:  It is third parties too for both sides.

 2              MS. ANDERSON:  Yes, Your Honor.

 3              THE COURT:  And the 20 is between both the Curling

 4    and Coalition plaintiffs?

 5              MR. CROSS:  Per side.

 6              THE COURT:  You're dividing it per side.  As a whole.

 7    Fine.

 8              MS. ANDERSON:  Yes, Your Honor.

 9              MR. KNAPP:  Also 30(b)(6) depositions are considered

10    to be one deposition no matter how many designated witnesses

11    might be identified with response to the topics raised in the

12    30(b)(6) notice.

13              THE COURT:  All right.  That was helpful.  Thank you.

14              MS. ANDERSON:  As far as the other things that I have

15    remaining, which I don't know if you guys might want to handle

16    it, is the amending of the complaints.  The Curling plaintiffs

17    it is my understanding are not amending their complaint.

18              MR. CROSS:  There is no present intention to do that.

19              THE COURT:  You mean there might be a future

20    intention but there is not a present intention?

21              MR. KNAPP:  Things change.

22              MR. CROSS:  What we had suggested was the issue of

23    the BMDs we still agree as we took the last hearing that that

24    is just parked.  They are still kind of figuring out what they

25    are doing.
```

1          It may come to a point where the BMDs are

2     implemented, and we would either possibly amend the complaint,

3     possibly file a new action, or possibly argue that what they

4     have done is within the scope of this case.  Just right now,

5     our case is focused on the claims that are before us.

6          THE COURT:  All right.

7          MR. CROSS:  We're not focusing on BMDs as part of

8     that present claim.

9          MR. TYSON:  We're not going to be conducting

10    discovery on BMDs at this point either.

11         MR. RUSSO:  And we disagree that they have alleged

12    anything about BMDs.  But they are just -- they are parking

13    discovery for now.  It is an issue for another day.

14         THE COURT:  All right.  What about the Coalition?

15         MR. ICHTER:  Our position is that the complaint

16    currently embraces BMDs as well.  But we also agree that it is

17    an issue that should be parked until such time as there's some

18    greater clarity as to exactly what is happening with BMDs.

19         THE COURT:  All right.  I just want to say to

20    everybody, on one hand, I don't think the plaintiffs'

21    complaints have been quite as narrow as the state has construed

22    them at least in your response to the discovery issues that you

23    filed, I guess, on the 30th, some unknown time.

24         But I want to be clear on the other side with the

25    plaintiffs that I do think that either you have to amend the

1   complaint if you're going to get into the BMDs -- I mean, it

2   might be peripheral while you are doing discovery, and there

3   may be something that you've got -- you can ask about it for

4   sure but -- or file a new complaint.  I mean, it is up to you

5   then whether you consider it or the Clerk's Office whether they

6   consider it a related case or not.

7          And I can see arguments for that.  But -- but I

8   don't -- as I said earlier, I think if there really is a new

9   system it doesn't necessarily vitiate everything here.  But on

10  the other hand, because I don't know how much it will be ready

11  for implementation besides everything else so we could have a

12  very mixed situation -- I don't know what it will be.

13         And I think having read Judge Jones' order in the

14  Fair Fight case last night, I kind of agree with his just

15  realistic observation you don't really know a rollout until you

16  see it.  And any of us who have gone through any type of

17  computer system rollout know that.

18         But anyway -- but I've heard the plaintiffs' argument

19  about why you think it embraces all future systems.  But I just

20  don't want to lure you in that regard because -- thinking that

21  I find that really acceptable as a basis for ultimately relief

22  on the whole new system.  You would need to do something.

23         MR. ICHTER:  We appreciate that guidance.

24         MR. CROSS:  Your Honor, I think we actually made good

25  progress on the scope of discovery at at least a high level.

1          THE COURT:  That would be helpful because I --

2          MR. CROSS:  I think at a high level it seems like,

3     you know, putting aside maybe some discrete issues it seemed

4     like that the only real divide at a high level since we parked

5     the issue of BMDs concerns vulnerabilities that we have alleged

6     with the voter registration system.

7          THE COURT:  Right.

8          MR. CROSS:  So it seems like -- y'all correct me if

9     I'm wrong -- we are agreed that the DREs, the GEMS, the memory

10    cards, everything that sort of funnels into and supports the

11    DREs system, which again is the GEMS, the servers, and all of

12    that behind it -- that is within the scope of discovery at a

13    general level.  And then it is the issue of the voter

14    registration database and vulnerabilities that we have

15    identified with respect to -- with respect to Logan Lamb's work

16    and other issues.  So I think that is probably the macro issue

17    of the day.

18         THE COURT:  Yes.

19         MR. CROSS:  I don't know if that's fair.

20         MR. TYSON:  Before we get to that, we may want to

21    address the protective order.

22         MR. CROSS:  Sure.

23         MR. TYSON:  I think we looked at the Common Cause

24    protective order that we proposed.  I think we're in broad

25    agreement that we can fashion something based on that

1    protective order to protect a lot of this information.

2              THE COURT:  Great.  Excellent.

3              MR. TYSON:  Before we go --

4              MR. MANOSO:  Our plan would be to come to the next

5    conference with a protective order agreed to.  Our plan is to

6    submit to them any comments or revisions that we would have so

7    that we can get that taken care of sooner rather than later.

8              MR. RUSSO:  The issues in that case were a little bit

9    different.  So we'll have to define the scope within the

10   protective order.  But I think that is going to be doable.

11             THE COURT:  All right.

12             Ms. Burwell, can you hear when we're speaking down

13   here?

14             MS. BURWELL:  Yes, Your Honor.

15             THE COURT:  If at some point you can't, you are

16   entitled to say hey.

17             MR. TYSON:  On the voter registration database, Your

18   Honor, given the claims in Common Cause, which I know you are

19   familiar with in terms of voter registration database, eNet

20   functions separately from the other components of the election

21   system.  And as -- I know we have Common Cause stayed right

22   now.  I think the agreement with the plaintiffs we're trying to

23   work through is that House Bill 316 and House Bill 392 mooted

24   the claims in Common Cause relating to the voter registration

25   database.

1          We don't see the connection between the voter

2     registration database and the system that operates the DREs,

3     the programs that operate them.  So that's our difference of

4     opinion in terms of that on that issue.

5          THE COURT:  Okay.  Well, it was a very compressed

6     fall for me let me just say.  So I may have missed something in

7     trying to recall everything that was in the Common Cause case.

8     But tell me what specifically in both of those acts you think

9     mooted out their claims so I can understand how that might

10    relate here or not.

11          MR. TYSON:  Certainly.  So in the Common Cause case,

12    the allegation was that someone could manipulate the voter

13    registration system causing someone when I show up to my

14    precinct I'm not in the voter registration database.  So the

15    remedy for that is what you have ordered and then what House

16    Bill 316 put into place, which is the voter registrar when the

17    person votes a provisional ballot then has to check the paper

18    records, check the other records of where they may have

19    registered to vote to determine whether the ballot should be

20    counted or not.

21          House Bill 392 additionally put in place a security

22    protocol where the Secretary of State is about to issue a rule

23    related to ensuring that all the voter registration database

24    components meets the National Institute of Standards and other

25    kind of third-party security organizations and review the

1    security of the database on an ongoing basis.

2            The reality in terms of how the voter registration

3    database interacts with the DREs is there really isn't an

4    interaction.  The voter registration database information is

5    put into the ExpressPoll machine, which are not connected to

6    and on a live basis.  And any manipulation of the --

7            THE COURT:  They get into the ExpressPoll machines,

8    and you are saying that is not connected to --

9            MR. TYSON:  The DREs.

10           THE COURT:  -- the DREs?

11           MR. TYSON:  Because the programming on the -- from

12   the ExpressPoll is carried to the DRE is which ballot is the

13   voter eligible.  Mr. Russo shows up.  We say which ballot is he

14   entitled to.  The information on the card is, DRE, call up this

15   particular ballot.  And so there is not a connection between a

16   manipulation of the voter registration database and the

17   operations of the DREs and the vulnerabilities the plaintiffs

18   have alleged.

19           The other challenge is a manipulation of the voter

20   registration database, which we, of course, don't believe is

21   possible or has happened, also would affect voters regardless

22   of whether they voted on absentee ballots, DREs, or whatever

23   other method of election they use.  So we don't see those as

24   being related to the DRE claims that are brought here by the

25   plaintiffs' complaints.

```
 1            MR. ICHTER:  Your Honor, can I say something about
 2   that?
 3            THE COURT:  Yes.
 4            MR. ICHTER:  If all of that is true from what I'm
 5   hearing -- and I could be wrong -- it sounds like the voter has
 6   to be able to identify the fact that they have been handed a
 7   wrong ballot or that the ballot that they are dealing with is
 8   incorrect before they would be given a provisional.  Right?
 9            MR. TYSON:  The challenge in Common Cause was
10   specifically that the person did not appear on the voter
11   registration database.  And so if you showed up to vote, they
12   would say you are not a registered voter at this precinct, in
13   which case then your only remedy is a provisional ballot.
14            MR. ICHTER:  But that is not the only problem that we
15   have with the information that flows from the database on to
16   the memory cards and then going into DREs.  They can include
17   such things as somebody tinkering with what the race of the
18   person is who is listed on the rolls and/or where they are --
19   from my example more specifically, where they are located
20   geographically which would affect what ballot they will get,
21   who appears on that ballot.
22            And if they pull up that ballot and they are not
23   savvy enough to know that they have been given the wrong
24   ballot, it doesn't sound like being given the provisional
25   ballot -- or they wouldn't necessarily know they were given the
```

1    wrong ballot.

2            MR. POWERS:  They would still vote a --

3            MR. ICHTER:  They would have to identify the fact

4    that this is the wrong ballot, go to the poll worker, and say

5    you have given me the wrong ballot.  They might not know that.

6            MR. SPARKS:  Your Honor, if I might.  Excuse me.

7    Cary, I'm sorry.

8            I might add two additional potential vulnerabilities

9    that come with at least the Curling plaintiffs' claim here.  If

10   you will recall at the preliminary injunction hearing in

11   September, our expert, Mr. Halderman, demonstrated the

12   possibility of malware being entered into a DRE unit from the

13   memory card, the same memory card that is also programmed by

14   the ExpressPolls.

15           So you do have a link between the two systems at

16   least when it comes to the memory card and the possibility

17   of -- excuse me --

18                   **(Unintelligible speaking.)**

19                   **(There was a brief pause in the proceedings.)**

20           MR. SPARKS:  So the memory card is one link between

21   those two systems.  So they may be keep discretely.  But they

22   are linked by the use of the common memory card.  And certainly

23   we have shown that malware, as you have identified in your

24   order, Your Honor --

25                   **(Unintelligible speaking.)**

1          COURT REPORTER:  I didn't even understand that.  Slow

2     down.

3          MR. SPARKS:  The memory card can contain an advanced

4     persistent threat which can then conceal its own existence.

5     And so you do have a link between the two discrete systems, if

6     they are discrete.

7          The second point I would make is that our concerns

8     about the vulnerability of the database as housed by the state

9     defendants would apply with equal force, whether you are

10    discussing GEMS or whether you are discussing eNet.  And

11    certainly that would seem to come within the auspices of the

12    second amended complaint.

13         MR. TYSON:  I think for us I don't think there is any

14    disagreement that the ExpressPoll units and the GEMS server are

15    part of the operations of the DREs.  Those are all connected.

16    The difference is there is no connection between the

17    ExpressPoll as a live connection to the voter registration

18    database.

19         The data is populated on to ExpressPoll units from

20    the voter registration database.  But the vulnerabilities the

21    plaintiffs are alleging commence with the ExpressPoll, which is

22    part of the operation of the DRE, totally separate from what is

23    happening with the voter registration database.

24         THE COURT:  So you agree the ExpressPoll and the

25    memory cards are part of the system and to the extent the

1   memory cards are bearing some imprint from the voter

2   registration database -- I mean, is it -- are they, in fact --

3   I can't remember.  Do they come through the eNet system?  I

4   know that they have the voter as identified with them.

5           MR. RUSSO:  The memory card that Mr. Halderman used

6   in his demonstration is not the -- that was the flash drive

7   that goes into the machine.  There was a yellow card also.

8           THE COURT:  It is the yellow card.  He also had the

9   yellow card.

10          MR. RUSSO:  But I don't believe he had malware on

11  that yellow card in his demonstration.  Correct?

12          THE COURT:  I thought he did.

13          MR. RUSSO:  The memory card -- well, my

14  understanding --

15          THE COURT:  Then he also talked about basically

16  programming them in the beginning of the day as well and then

17  when they break down also reinserting the cards.

18          MR. RUSSO:  The yellow cards aren't a memory card.

19  They are just taking, you know, someone's information from the

20  ExpressPoll.

21          THE COURT:  Right.  But that is what he spoke about

22  also.

23              **(Unintelligible crosstalk.)**

24          MR. RUSSO:  I mean, the memory card doesn't touch the

25  voter registration system.  So I'm -- that is what I'm

trying --

MR. MILLER:  You are talking about the yellow --

MR. RUSSO:  The yellow card -- the memory card is the card that -- is the little flash drive that he put in.

MR. TYSON:  I think the important thing to remember is the ExpressPoll, the yellow card that is coming out of that, the information on that card from the ExpressPoll is which ballots do you get, not this is Bryan Tyson and this is the ballot he is receiving.

And the information in the ExpressPoll -- it goes through a process from the voter registration system to basically a flat Excel database and then into the ExpressPoll machines.  So it is not like you are transmitting software between those two systems.

You are moving an Excel sheet of data into an ExpressPoll.  The ExpressPoll then generates you are entitled to this ballot.  And that is what you receive.  So there is not again this connection between the voter registration system and the ExpressPoll.

MR. KNAPP:  You are saying that you use a hard copy of an Excel spreadsheet or the digital copy of an Excel spreadsheet?

MR. TYSON:  No.  There is an export from the voter registration system to a flat database file that is then loaded into --

1          MR. KNAPP:  It is a digital file.

2          MR. TYSON:  It is a digital file.

3          MR. KNAPP:  That digital file is then loaded into the

4     system.

5          MR. TYSON:  Correct.

6          MR. CROSS:  And the ExpressPoll is what you are using

7     to generate each voter specific card that then activates the

8     machine and tells which ballots to pull up.

9          MR. TYSON:  Right.  But it only populates a card with

10    which ballot you are entitled to.

11         MR. CROSS:  Right.  My understanding of what

12    Mr. Halderman or Dr. Halderman explained was that those

13    particular cards also are means of infecting the machines --

14         THE COURT:  They are means of --

15         MR. CROSS:  They are means of infecting the specific

16    DRE machine.  And so --

17         THE COURT:  That was -- I just want to say that was

18    my understanding as well.

19         MR. CROSS:  So if you have access to the voter

20    registration database, not only can you manipulate registration

21    but it is another access point to the machines for the malware.

22    And if you can infect one machine, then you have the potential

23    to populate multiple machines because of the interconnected

24    nature of the machines.  Right.  You pull a memory card off.

25    You pull results off that machine.  That is digital

1    information.

2           THE COURT:  Let's just wait for a second.

3                  **(There was a brief pause in the proceedings.)**

4           MR. CROSS:  In any event --

5           THE COURT:  Wait a second.  I didn't realize he was

6    still there.

7                  **(There was a brief pause in the proceedings.)**

8           MR. CROSS:  So, anyway, the net of it your

9    understanding was what Dr. Halderman was explaining.  That was

10   my understanding of it.

11          THE COURT:  So I think the memory cards in that way

12   and what they are connected to on both sides are relevant.  The

13   question I think still is are the plaintiffs saying that this

14   affects the integrity of the voter database.  Because --

15   because what happened at Kennesaw and its open valve

16   information still was voter identification information.  And,

17   you know, I see the very clear allegations about that.  I

18   saw -- I obviously discussed them in the preliminary injunction

19   order.

20          But there is at some point there something that

21   you're not trying -- it seemed like you were not trying to get

22   into in the same weeds that the Common Cause people were.  They

23   focused on basically approximately 45 percent of the

24   provisional ballots were for people or -- people who were

25   disqualified and that some of them weren't allowed to give

```
 1   provisional ballots.  But the use of a code where they just
 2   didn't appear on the polls at all.  And they had people who had
 3   affirmative evidence of having actually registered and actually
 4   voted.  So -- and in the Fair Fight case, they are making
 5   comparable allegations.
 6            You had a different variation on this, which was more
 7   about just simply the data becoming unreliable and also
 8   infected because of the way it was handled as a whole --
 9            MR. CROSS:  I think that is generally fair.
10            THE COURT:  -- rather than being in this exact same
11   prism that the others have.  Is that a fair characterization of
12   your claim?
13            MR. MANOSO:  Your Honor -- you were talking.  Your
14   Honor, generally I would say that is right.  And, you know, to
15   be clear, in our papers the first time around in our first
16   preliminary injunction, we did talk about the way in which the
17   actors -- and obviously it came out in the news in the Mueller
18   Report -- the use and the hacking of voter registration systems
19   as an access point to break into the system.  But you are right
20   that it is separate from the exact prism of those other cases.
21            THE COURT:  So I mean, to the extent it deals with
22   hacking into the system and being -- and the system being not
23   secure and it being a source of malware, you are saying it is
24   in.  But you are not looking to go through all the codes and
25   challenge each -- the accuracy?  You're not challenging the
```

1    accuracy in the sense of the focus of the Common Cause folks or

2    the Fair Fight; is that right?

3              MR. MANOSO:  Yes, Your Honor.

4              THE COURT:  Now, is that something different -- now

5    that I've summarized that, is that something different than

6    what the state sees?  I know these are not exactly clean

7    borders.  But --

8              MR. TYSON:  I think so, Your Honor.  I think the

9    issue is, you know, when we're talking about discovery of the

10   voter registration system --

11             THE COURT:  I know.

12             MR. TYSON:  -- is there a need for us to get into the

13   security protocol surrounding that system or do we just look at

14   what is in the ExpressPoll and then if you discover some

15   malware then we ask what is its origin.  I don't see a reason

16   for us as an initial matter to get into all the security that

17   surrounds the voter registration system, especially because

18   like we talked about in Common Cause there is so much security

19   built around that and caused even by House Bill 316 and 392 now

20   amping up on a number of levels what the state has done for

21   eNet security even since last year.

22             So I don't see that there is a reason for us to dig

23   into those kinds of issues in discovery because we're not

24   getting into kind of the integrity of that system.

25             MR. CROSS:  I think that remark may touch on a more

1    fundamental dispute that we actually didn't think to raise next

2    door, which is -- so what you just said was if we found malware

3    in the ExpressPoll maybe that would lead to some further

4    discovery.  But that touches on a position in their filing from

5    last night that I read which said we have to show that the

6    system is compromised.

7            And we fundamentally disagree with that.  We do not

8    think that is our burden.  We actually thought Your Honor's

9    prior order had made clear that that was not our burden.  That

10   it is enough to show that there is a vulnerability.  Because

11   what it does -- if we have to show that it is actually

12   compromised, there are two issues with that as we have

13   addressed before.

14           One, it is very difficult to even detect malware, as

15   Dr. Halderman and others have explained.  But the bigger issue

16   as a legal issue, as a constitutional issue is it should be

17   enough that the system is vulnerable and unreliable.  Because,

18   otherwise, what happens is you only ever have retrospective

19   relief in a world in which you are now in a true democratic,

20   constitutional crisis.  Because we suddenly go backwards and

21   realize the election results of some election were wrong.

22           What we're trying to do is prevent that, to say it is

23   enough for us to show that there are certain vulnerabilities

24   that are so severe that whether there has been a compromise

25   already voters cannot be subjected to that system because we

1    need to protect it on the front end.

2            And I thought Your Honor at least embraced that at a

3    high level.  But we seem to be moving backwards, unless I

4    misunderstood the ruling, in saying no, no, our burden is to

5    show actual compromise.  I don't think there is any court that

6    has ever held that.  I don't know that --

7            THE COURT:  Well, I think you were trying to show

8    actual compromise --

9            MR. CROSS:  Oh, I think we can.  But I don't --

10           THE COURT:  I think that was part of the whole thing

11   about the Kennesaw situation.

12           MR. CROSS:  Right.

13           THE COURT:  And then -- but --

14           MR. CROSS:  I just don't want there to be confusion

15   that for us to prevail, whether on a preliminary injunction or

16   a permanent injunction, that our burden is -- that the only way

17   we eliminate DREs, for example, just to focus on the machines

18   for a minute, is if we show that those machines are compromised

19   with existing malware.  I do not think that is the law.  And I

20   think it fundamentally prejudices voters to say that that is

21   the law because it only means -- the only relief voters ever

22   get is if you can actually show your vote was manipulated there

23   was compromise.

24           We're trying to avoid that happening.  That is the

25   constitutional protection is to make sure voters never end up

1  in that place, assuming they haven't already.

2        THE COURT:  Well, I think you-all know I'm very fact

3  based.  So I hate to just be commenting as a theoretical

4  proposition on that.  I -- I think what -- all I can say

5  about -- with respect to the order I did issue I found that

6  there was -- there was so many problems and such a disregard of

7  the problems that it became a very vulnerable situation where

8  people have no confidence their vote was being properly

9  counted.

10        But it is not just a negligence standard.  That is

11  the thing.  It is clearly -- you know, because it is a

12  constitutional violation.  And so I thought there was in some

13  ways a shocking amount of evidence of what had happened.  And

14  perhaps as we now also reflect with the increasing amount of

15  knowledge that all of us have that our understanding of these

16  issues changes over time about what makes the system

17  vulnerable.

18        So I don't know that I can exactly respond to you.

19  Because, you know, you don't know -- in terms of what your

20  responsibilities are in proof.

21        I would say I was trying a case myself a good number

22  of decades ago in front of Judge O'Kelley.  And it was a case

23  against the state in an employment discrimination case.  He

24  kept on saying, why do you have to put on so much evidence?

25  Why do you have to put on so much evidence?  I said, because if

```
 1    I didn't put so much evidence on, I wouldn't -- I would not

 2    prevail.  And I had prevailed.  So it was -- he was very funny.

 3    He was the usual judge pushing you onward.  But, generally

 4    speaking, my view is the more evidence the better evidence, not

 5    just crappy evidence.  That doesn't mean just cumulative for no

 6    value.

 7            So if you are trying to actually show something, you

 8    have got to show real evidence of it.  And that is -- and we

 9    have kind of a set of rolling circumstances here.  But just as

10    to the point you-all were trying to say about the voter

11    registration system, I think the discussion might be informed

12    some in your trying to reach what some parameters are by

13    talking to your experts about what they really need without

14    basically swamping you.

15            So that's my best suggestion about it.  I don't have

16    a precise line.  I can understand absolutely why you have to

17    have some information.  But to the extent that you don't want

18    to be pressing on basically trying to be proving the accuracy

19    of the voter registration, then you have got to sort of modify

20    it so that it is actually based on what you need relative to

21    your particular claims.

22            And I don't know -- not being an expert in this and

23    now having been educated a lot by your experts, I don't know

24    where that exact line is.  And I don't know how -- I don't know

25    what the state's -- how the state systems are exactly
```

1    configured, other than everything I have already shown that I

2    know and don't know in other prior orders.

3              MR. MANOSO:  I think, Your Honor, we agree.  It seems

4    like the meet-and-confer that we had this morning was

5    productive.  And there has been some informal exchange of

6    information, which has also been productive.  And it seems to

7    make sense for us to be able to consult with our experts.  And

8    if we need some additional more informal information to make an

9    informed decision with our experts, then that would seem to

10   move the ball forward on this issue.  While at the same time,

11   we continue with our discovery on the pieces of the system or

12   the tripod issue referred to earlier that we agreed to within

13   the scope of the case.

14             THE COURT:  And the memory cards clearly -- I do

15   remember the memory cards.  So they clearly are.  Also another

16   way you could proceed is if you have an expert who is working

17   with you on this and you want to have an informal conference

18   with the state and somebody from the Secretary of State's

19   office or your elections folks where you are just basically

20   conversing so that you can try to make it simple and not -- and

21   actually get into the nuts and bolts, that would be useful.

22   Because a lot of these times these people can talk to each

23   other and help you sort it out.

24             MR. RUSSO:  That is fine.

25             MR. CROSS:  You guys should retain Professor Wenke

1   Lee.  I don't know if you --

2          THE COURT:  So does that -- I hope that -- I don't

3   think it clarified anything.  But it --

4          MR. MANOSO:  It makes homework, but it keeps the ball

5   moving.

6          MR. RUSSO:  Yes.

7          MS. ANDERSON:  Just so --

8          MR. RUSSO:  We are on the same page with what we

9   agree is part of the complaint and where we think there is

10  going to be an issue at a certain point.  You know, we'll work

11  it out.

12         MS. ANDERSON:  It seems more of a wait-and-see kind

13  of approach for the voting registration --

14         THE COURT:  Well, except to the extent that you are

15  really -- if you are infecting the system, I mean -- and that

16  was the thing about the memory cards at the very least.  There

17  may -- I think you ought to -- basically I think the plaintiffs

18  ought to identify for you what they consider the points of --

19         MS. ANDERSON:  Of infection?

20         THE COURT:  -- of infection and also how -- how and

21  why they think it is relevant.

22         MR. CROSS:  We can get more concrete, and I think

23  that will help.

24         THE COURT:  Because I read your discovery

25  descriptions.  And I also had some of the state's reaction.

1    But it may -- but it may get clarified by being concrete.

2         MR. MANOSO:  And to your point, Your Honor, obviously

3    these were categories which we tried to be somewhat general,

4    but they aren't our actual discovery requests.  So obviously

5    there was some reference to things being undefined or being

6    vague.  Well, this was a general notice to the Court.  Our

7    discovery responses -- or excuse me -- requests will obviously

8    have more detail to your point.

9         MR. POWERS:  To kind of broaden it out, I think the

10   general concern is if -- to take the example of folks who get

11   wrong ballots, you know, they cast regular ballots but, you

12   know, it has them in the other district, you know, is the

13   problem with the GEMS server -- I'm sorry -- the database, the

14   memory cards, something in the machines themselves, or was it a

15   registration problem upfront in the beginning?  That is where

16   the registration piece has to fit in at some point.

17        But I think we can -- we can narrow and be specific

18   about our request so as to frame them in a way that we're not

19   asking for, you know, all of the state's registration

20   information.

21        THE COURT:  There was some evidence of the voter

22   closeout sheets from Fulton County from the precincts where the

23   numbers didn't add up that was attached to -- I can't

24   remember -- one plaintiffs' submission from the other.  But it

25   might have been the Coalition's.

1          MR. MANOSO:  It was, Your Honor.

2          THE COURT:  But -- and that had some bearing.  I

3    mean, you spent time looking at those submissions.  And I

4    don't -- you know, I don't know whether that was the data

5    system or whatever.  But that was -- that was part of the

6    problems that it looked like that Fulton County was having.

7    But they indicated different numbers on these closeout sheets.

8          MR. RUSSO:  I don't know the issue.  That could --

9    there are scenarios where that could happen when you have a

10   federal election and voters who do not reside in the U.S. any

11   more would still get to vote and they get lumped into a

12   precinct for counting purposes.

13         THE COURT:  They seemed to have signed in.  But I

14   can't --

15         MR. RUSSO:  I don't know --

16         THE COURT:  I think if you want to look for it I

17   think I referenced it in the order at some point -- the exhibit

18   number, at least one of the exhibit numbers.  But there were a

19   number of them.  And I don't know how it bears on any of this.

20   But that seemed to be -- I didn't know if it was the voter

21   registration system.  I didn't know whether it was the ballot

22   counting, what happened exactly.  But you could see that they

23   noted it on the closeout --

24         MR. RUSSO:  Okay.

25         THE COURT:  -- of the precincts.  So were there other

1    topics that you were not able to agree on?

2          MR. MILLER:  If I may, Your Honor, related to the

3    other topics -- and I want to just address those because

4    Mr. Ichter is going to need to run down the street.  Because,

5    frankly, we got so far along on most of our topics, we may not

6    be here when he gets back.  I'm not sure.  But nonetheless --

7          THE COURT:  We have another 27 minutes at this time.

8          MR. MILLER:  Okay.  Perfect.

9          THE COURT:  Then I'll find out whether Mr. Powers is

10   going to sub for him.

11         MR. POWERS:  Tag me in.

12         MR. MILLER:  Your Honor, there is an outstanding

13   issue of the third-party subpoenas, those Rule 45 subpoenas

14   that have been issued.  As Your Honor is probably aware, there

15   was a subpoena issued to Morgan County prior to your ruling on

16   the motion to dismiss.  That was then withdrawn, refiled the

17   next day.

18         And then your order on the motion to dismiss came.

19   At that point it was then again reissued, along with another

20   subpoena to Rockdale County.  The issue that we are kind of

21   flagging -- and, you know, I think we couldn't quite come to

22   the total agreement.  But I think we understand each other's

23   point of view.  The question as far as the timing of compliance

24   and whether that is getting the cart ahead of the horse on the

25   scope issue that we're here to talk about generally because

1  there are some things as I recall related -- as I mentioned,

2  there were multiple versions of these -- but as I recall

3  related to documents concerning BMDs, other things that are

4  just outside the scope of discovery.  And so what we would like

5  to propose is that that compliance date be pushed out until the

6  joint discovery plan is submitted.  At that point we're not

7  putting multiple things in front of you.

8          Right now the compliance date is set for June 4, the

9  same day that our answers are due.  And, again, this is to

10  Morgan County and Rockdale County.  At that point, you know, we

11  would also ask that -- and I think whether the dates are

12  correct -- but I think in concept -- and please correct me.  I

13  don't want to put words in your mouth.  But I think a concept

14  of putting a hold on other third-party subpoenas to counties

15  until that discovery plan point is something that would just

16  provide ease, not get the cart ahead of the horse on scope, not

17  require us to continue to pester you, frankly, while we're

18  still trying to define the scope of discovery.

19          That is not related to things that are served on us.

20  If it is us, we can handle it.  But we're getting calls from,

21  you know, the two counties at issue saying, well, I don't know

22  what to do with this.  This is y'all's stuff really.  What are

23  we supposed to do?

24          And then, of course, from the state's perspective,

25  there are protective order issues as it relates to the GEMS

1    database, even things that are relevant to the scope, that we

2    agree, I think, are relevant to the scope that also are out

3    there with the subpoenas.

4           And, finally, to the extent that some of the

5    information is probably more readily obtainable through the

6    state defendants, I think there is an opportunity to work that

7    route and fall within a potential protective order easier as

8    well.

9           My understanding of the issue -- and, again, I don't

10   want to put words into plaintiffs' mouth.  But this is more of

11   a Curling plaintiffs' issue than -- I'm sorry -- Coalition

12   plaintiffs' issue than a Curling plaintiffs' issue.

13          THE COURT:  So what is the date that you are

14   proposing that it be --

15          MR. RUSSO:  Seven days after --

16          MR. MILLER:  Seven days after the 26(f) conference.

17          THE COURT:  June 17.

18          MS. ANDERSON:  We just had the week of -- we had the

19   week of June 10th to accommodate schedules.

20          MR. MILLER:  The goal with that, Your Honor, would be

21   that at least at that point we would have a joint plan

22   discussing where we see specifically the scope is and we have

23   sat down and hammered it out.  I think after today we've come

24   to a lot of agreement in terms of scope.

25          You know, there are only a few discrete issues that

1    we think are outside of the scope.  But, nonetheless, that is

2    kind of where we are.

3              THE COURT:  Mr. Ichter?

4              MR. ICHTER:  It seems like the state's in a big hurry

5    with respect to a lot of things, except when they

6    (unintelligible) --

7              COURT REPORTER:  Speak up.

8              MR. ICHTER:  And these are subpoenas that have been

9    out there for weeks already.  The ability to pull together the

10   information necessary to respond to them seems to be -- they

11   should be capable of doing it.  They already had notice of it.

12   The responses -- not responses but motions to quash have

13   already been filed with respect to one of the two subpoenas.

14             MR. MILLER:  The first version -- the first out of

15   three versions of the Morgan County subpoena, yes.

16             MR. ICHTER:  Right.  In terms of scope --

17             THE COURT:  But is that moot though in terms of --

18             LAW CLERK COLE:  It has been withdrawn.

19             THE COURT:  It was withdrawn.

20             MR. MILLER:  We withdrew it after plaintiffs withdrew

21   their subpoena.  Plaintiffs then subsequently then reissued the

22   subpoena less than 24 hours after we withdrew the motion, as I

23   recall the timing of that.  At that point, our arguments as

24   to -- again, you know, our arguments as to the subpoena issue

25   relate to scope Rule 26 issues that are applicable and that a

1    party to the case can raise as to a third-party issue and as to

2    protective order issues to the extent there are state interests

3    with respect to the GEMS server and things of that nature.  I

4    just think it gets the cart ahead of the horse before we have

5    the protective order and before we kind of try and get close to

6    the same page on scope.

7              MR. RUSSO:  The new subpoenas have been expanded

8    also.

9              MR. POWERS:  No.

10             MR. RUSSO:  Even the Morgan County --

11             MR. POWERS:  Morgan County was narrowed.

12             MR. MILLER:  Well, I think the Rockdale County --

13   Rockdale County adds an additional --

14             COURT REPORTER:  Please don't talk at the same time.

15             MR. RUSSO:  Well, all I know is the Morgan County

16   subpoena originally had 17 requests.  Now it has got about 20.

17   Right?

18             THE COURT:  Well, I think you should try to sit down

19   and talk about them.  I can't -- I don't know that you need to

20   wait until the 20 -- I don't know what -- this is not a firm

21   deadline obviously.  You are talking about the week of the 10th

22   and sometime seven days after you got it.  But I know that the

23   plaintiffs want to get going on it.

24             MR. CROSS:  Just to clarify, Your Honor, these are

25   served only by the Coalition.  We're not --

1          THE COURT:  They are not yours.

2          MR. ICHTER:  If I could --

3          THE COURT:  Is there some reason why it can't wait

4   until you have figured everything else out I guess is my

5   question.

6          MR. ICHTER:  Well, it sounds to me like the vast

7   majority of scope issues have been resolved, and it seems to me

8   that we have eliminated all the procedural obstacles with

9   respect to the subpoenas and with respect to service and that

10  sort of thing.

11         So I think that the scope issues will be mainly the

12  things that are left over.  And it would be useful once we walk

13  away from this meeting to know what -- based upon those

14  subpoenas, what scope issues still exist so that we can

15  refine -- and get a decision on that so that we can refine

16  subpoenas that are going to additional third parties in the

17  future.

18         And this is just going to push that back by a couple

19  of weeks when all is said and done.  They have already done one

20  motion to quash.  The brief is written.  Just eliminate the

21  things that have been mooted.  And with respect to the

22  counties, they have had these for weeks.

23         MR. MILLER:  Respectfully, Your Honor, the question

24  is really more of a practical concern of the Court and also of

25  the parties as we continue to respond to the discovery that has

1    been served on state defendants.  File our answers.  Respond to

2    the motion for preliminary injunction.  And the question is

3    truly whether that is more appropriately handled in the 26(f)

4    conference and the joint discovery plan that we're kind of

5    working to hammer out or if Your Honor prefers that there be

6    multiple docket entries as to motions to quash and having

7    dueling 26(f) conference meet-and-confers pursuant to your

8    standing order and those kind of things.

9          Just from a practical perspective, it seems to me to

10   line those up would be helpful to both the parties and the

11   Court.  And, Your Honor, respectfully we have been, you know, I

12   think as available as we can be on voluntarily providing some

13   additional information that may be ahead of, you know, time

14   here with respect to the municipalities, with respect to all

15   kinds of other things to the plaintiffs.  And we're not trying

16   to play hard ball here.  But, practically speaking, we think

17   that makes sense.

18         MR. ICHTER:  It doesn't seem to me that the 26(f)

19   conference is going to occur -- well --

20         MR. MILLER:  I believe we said the week of the 10th.

21   And truthfully that is just right after our answers are filed,

22   right after the --

23         THE COURT:  I think you need to try to work it out on

24   when you are having your -- the conference on June 10.  Because

25   I just -- I realize it holds you up in dealing with the

1    counties.  But it doesn't make sense otherwise.  Because

2    whatever the issue is that they are fussing about, that they

3    are moving to quash on potentially again, will be the same

4    issue that we're dealing with as a whole.

5           So I just can't -- and it may have some repercussions

6    also for the Curling plaintiffs' other discovery that they'll

7    end up doing.  So I just think -- I think you need to resolve

8    it then.  And it may be that you can come back to me about

9    whatever the issues before the seven -- the discovery plan

10   because you may have already basically at that point identified

11   here is where we come up with a collision.

12          MR. ICHTER:  We're not trying to play hard ball

13   either.  And what I was trying to say a moment ago is that if

14   we -- if they tee up their motion to quash, that their position

15   will be laid out.  For the purposes of the 26(f) conference,

16   we'll have something to talk about.

17          THE COURT:  But you're asking them -- you have

18   already seen one motion to quash.  You are asking them to write

19   something when I'm trying to get people to actually talk.

20   Obviously you can't during the last weekend decide it was a bad

21   idea to have everyone be in camps rather than seeing each

22   other.  So I don't think that makes sense.

23          You may end up having to do that and do an informal

24   discovery statement to me because you can't agree on something.

25   I'm sure that may be so.  But I think you ought to try to talk

1    first and have identified what the issues are and also have

2    resolved the protective order because the protective order has

3    to be done anyway.

4              MR. ICHTER:  I understand that.

5              THE COURT:  Then if you see yourself -- you identify

6    what you can't agree on and it is not -- it doesn't need to be

7    part of the discovery plan because these are things you can't

8    just agree on, then you can go ahead and proceed on the

9    informal discovery process and dispute resolution process

10   without a full motion to quash.  And we'll give you a number of

11   pages needed under the circumstances for you to do that without

12   making it incredibly exhausting for you or for us in terms of

13   the amount of time.

14             And I will say there was some reference in one of the

15   other -- the discussion most -- when we last spoke on the

16   preceding Friday about, well, maybe I could expedite discovery

17   by appointing a magistrate judge to preside over it.  But that

18   won't work because, you know, you use the magistrate judge.

19   The magistrate judge has to issue an R&R, which takes time, and

20   they always feel like they want to understandably put things as

21   fully as possible so I understand how they are thinking.  Then

22   you get to object to the R&R, which you have 14 days to do so

23   unless you agree on something else.  And then I have to read

24   it.

25             So you basically already built in a month at that

1    juncture.  It is not that I want to deal with all of the

2    discovery issues.  But I think if you're actually trying to

3    move things on a reasonable time frame, I'm just -- we're going

4    to have to have phone conversations, or you are just going to

5    have to come in and see each other a lot with me.  Because,

6    otherwise, we'll just never be able to move this.

7             I mean, because you've worked together today, I'm

8    going to assume that there are other things that you'll be able

9    to work out too if you actually see each other and try to talk

10   to each other.

11            MR. MILLER:  I believe as far as the subpoenas are

12   covered, I think we can handle it in one fell swoop with the

13   26(f) and then not have to be as concerned moving forward.

14            THE COURT:  All right.  So is there anything else

15   regarding discovery?  Because I wanted to talk about the

16   Curling plaintiffs' motion for preliminary injunction too.  And

17   I'm just watching myself on Mr. Ichter's schedule.

18            MR. ICHTER:  Sorry about that.

19            MR. TYSON:  I think the only other issue, Your Honor

20   -- we talked generally and I know we didn't reach an agreement

21   on this point.  But we discussed did we want to have a deadline

22   for complaint amendments or not since we parked the ballot

23   marking device issue.  I think that is something out there.  I

24   don't know if we have a good answer on that.  But it is kind of

25   setting a hard point of when do we know what this case is.

```
1              THE COURT:  Well, you -- the state is selecting its

2    vendor sometime in July.  I wasn't clear when that was from --

3    I went back and looked at the RFP.  Is there any clearer idea

4    of what that date is at this point?

5              MR. MILLER:  Your Honor, they have got kind of a cone

6    of silence around the procurement.  So it is still as far as we

7    know the same range that was provided in those documents.

8              THE COURT:  And then you select them, and then

9    there's some other two-week or three-week period for doing some

10   other things.  I can't remember what that was.  But probably

11   shaking out a contract actually.

12             MR. MILLER:  That is right.  It is a NOIA and then a

13   contractual negotiation period.

14             THE COURT:  So is everything confidential in that

15   period as well, or do you announce who won the bid?

16             MR. RUSSO:  That is right.  The NOIA announces who

17   got the bid.

18             MR. MILLER:  Who won the bid.  I cannot recall if the

19   details are released at the NOIA point or at the point of the

20   actual award.

21             MR. RUSSO:  It is the award.

22             MR. MILLER:  They announce the name at that point.

23   That's true.

24             THE COURT:  I see.  Well, I don't see how they can

25   write an intelligent new complaint or an amendment without
```

1    knowing more about the system.  That is the only thing.  So I

2    think you will be in a better position to firm that up.  But

3    they can, of course, file a new complaint at any time and not

4    in the same posture.

5          And I don't know -- I'm not quite sure how you -- and

6    this is for plaintiffs to think about -- how you are going to

7    proceed on that without knowing more about the system.  So that

8    is your problem and obviously easier if you do it as -- I know

9    you want to do it as an amended complaint probably rather than

10   anything else and would really prefer just not to have to do

11   anything.  But that is something else.

12         But anything else as to discovery?

13         MR. CROSS:  The only other thing --

14         THE COURT:  When you get a clearer date though, you

15   might share that with them so they have that in mind.

16         MR. RUSSO:  We told them that we would keep them up

17   to date on it.

18         MS. ANDERSON:  We discussed that.  We will.

19         MR. CROSS:  I think the only thing we had on the

20   schedule, Your Honor, was there was a disagreement about

21   dispositive motions.  As long as we're agreed on the rest of

22   the schedule and we're agreed that trial is in January,

23   candidly, I'm indifferent as to whether they want to file a

24   dispositive motion.

25         I can't imagine there is any efficiency in Your Honor

1    deciding that in advance of a trial that you're going to be the

2    ultimate fact finder in.  But if they want to file, that is

3    fine.  I just don't want anything to hold up --

4              THE COURT:  Well, the problem is if they file it what

5    is the -- I can't prevent them from doing it.  But we could

6    have -- but we could have a conference beforehand.

7              You wanted to have the dispositive motions due when?

8    You are having the end of discovery in -- the end of discovery

9    is December 11.

10             MR. MILLER:  So it would be -- it would be slightly

11   altered from what we proposed in our schedule in the filing to

12   the Court.  You know, the intention, I guess, would be to do it

13   towards the end of discovery, Your Honor.  But I don't think we

14   discussed specifically a date for that.  But certainly we'll be

15   amenable to it.

16             THE COURT:  Well, if you're actually relying on any

17   expert testimony and the reply experts are due to be completed

18   by December 11, we would have a hard time having a trial in

19   January.  That is the pragmatic problem.

20             MR. CROSS:  From my perspective, we all have agreed

21   to trial in January.  So that obviates dispositive motions in

22   my mind.  But if they want to file something, again, I don't

23   care what they file as long as we don't have to brief it at the

24   same time we're preparing for trial.

25             You know, what many judges -- even in jury trials, I

1    have had judges just take summary judgment -- like in EDVA

2    where they are wanting things to move quickly, they just turn

3    it into a Rule 50 motion at trial.  There is no obligation for

4    Your Honor to brief that or to decide it before trial,

5    particularly when you are the fact finder.

6              So I really don't understand why they want to do

7    this.  It is a lot of work for them as well.  We should just go

8    to trial.  And whatever presentation they would make under

9    Rule 56, they will make to you on the merits.  It is the same

10   thing on the same evidence.

11             MR. RUSSO:  Well, I mean, I think what I'm hearing is

12   we don't have any disagreement on submitting dispositive

13   motions.  However you treat it, we will just follow your lead.

14             THE COURT:  I mean, I could have a trial still and

15   hear you and construe it as a motion for directed verdict --

16             MR. RUSSO:  That's right.

17             THE COURT:  -- which makes probably more sense at

18   that point.  Otherwise, we will never get to it.

19             MR. RUSSO:  We're not going to tell you what to do.

20   We are in agreement that dispositive motions can be filed.

21             THE COURT:  All right.  So what is the story with the

22   motion for preliminary injunction in June where the plaintiffs

23   don't agree on the timing of that?  How am I going to hear from

24   the Curling plaintiffs, which I just barely have scratched the

25   surface on reading it, versus the Coalition plaintiffs not

1    being ready until the end of July?  I'm not sure how I would

2    deal with that.

3            Also I wanted to talk about the scope of relief here

4    you are actually seeking.  Let's just deal with the easy or the

5    not easy issue of the difference in timing.

6            MR. MANOSO:  Sure, Your Honor.  Our concern and our

7    reason in filing when we did was to specifically avoid the

8    situation that we found ourselves in last year.  And we heard

9    you loud and clear in your order that time was the factor, if

10   not a factor.  And that was the purpose in our moving when we

11   did in order to have briefing be finished during the summer so

12   that we can have a hearing during the summer.

13           I believe the bulk of elections that will occur are

14   in November, maybe a few -- one or a few in September.

15           THE COURT:  Fulton County is in September.

16           MR. MANOSO:  Fulton County in September and the

17   remaining in November.  So, again, our intent was to keep

18   moving forward and to prevent ourselves from being in the exact

19   same situation we were in a year ago when we filed in August.

20           And, respectfully, the Coalition plaintiffs puts us

21   somewhere in the middle, and we just didn't want to take that

22   risk or impose a burden on ourselves or Your Honor over the

23   summer.

24           MR. CROSS:  One thing if I could just add, Your

25   Honor.  As Your Honor might recall, we wanted to file the

1    preliminary injunction motions last year much earlier, and we

2    got bogged down in a lot of procedural stuff with the amended

3    complaint that we did not want to happen.

4           One of the messages that came from Your Honor -- and

5    I can't remember which order it was -- Your Honor pointed out

6    that we as Curling plaintiffs could have filed earlier.  And in

7    retrospect, it is probably one of the biggest regrets of my

8    career is that we tried to stay aligned and wait on their

9    timetable.

10          And we lost relief that even I think the prior

11   defense counsel acknowledged we probably would have gotten if

12   we had filed in the spring when we wanted to.  That is not a

13   mistake that we're prepared to make again.  So while we would

14   much prefer to be aligned -- Mr. Ichter can speak to their

15   timing.  I thought we were aligned until a couple of days ago.

16          But we cannot find ourselves in a situation again

17   where we waited for reasons we didn't think were appropriate

18   and suddenly we're out of time.  So that is why we are where we

19   are.

20          MR. ICHTER:  Judge, based upon the Court's schedule

21   as we learned about it, we calculated that the earliest date

22   that we could have the hearing was going to be the July date

23   identified in our papers.  And we worked back from that to come

24   up with a date for filing the motion for preliminary

25   injunction.

1          Rather than filing it at the same time that the

2     Curling plaintiffs filed, we thought it made more sense to wait

3     until the 21st, have a little more breathing room to get the

4     thing filed.  And we have people off on vacation now who are

5     involved in the process of drafting the documents that are

6     going to have to be filed with the Court and not being in a

7     situation where we file a motion yesterday or next week that is

8     going to sit around and have nothing happen with it until three

9     more weeks when we could have that additional time to perfect

10    our filing, if you will.  So that is the reason why we proposed

11    to file a little bit later.

12          THE COURT:  Well, I guess what I'm -- tell me the

13    relief in either case -- I mean, I don't -- that you are

14    seeking.

15          MR. MANOSO:  Yes, Your Honor.  I don't know -- I have

16    an extra copy if Your Honor would like.  Or you have got one

17    there.

18          Your Honor, our past hearings and the past order

19    focused on the tripod and this notion of a system that is

20    replete with vulnerabilities, and our position is that that

21    system should be replaced by a system that cures those

22    vulnerabilities.

23          So that is why we asked for stopping the use of the

24    DREs once and for all, using in-person hand marked paper

25    ballots, and as well as provide the minimum necessary for the

1   HAVA/ADA requirements, as well as providing a ballot scanner at

2   each polling place for casting, tabulation, and storing the

3   paper ballots.  So, again, our relief seeks to end the use of

4   the DREs and replace that system with a system that is far more

5   recognized as secure and is something that, as we talked about

6   in our previous papers, is a system that is already sprinkled

7   throughout the current system, Your Honor.  People know paper.

8          MR. CROSS:  I think if you turn to Page 23, Your

9   Honor --

10         MR. MANOSO:  Sorry.

11         THE COURT:  All right.  So it is three minutes before

12  Mr. Ichter says he has to leave.  Are you -- do you need -- if

13  you need to be here, then we're going to break.  And I'll read

14  the whole thing rather than just my select parts.  But I don't

15  know whether Mr. Powers -- I know he hasn't been a constant

16  presence here.  So I hate to --

17         MR. ICHTER:  Mr. Powers can handle it.  But, Your

18  Honor, we have prepared a summary.  Now it says draft, not

19  final at the top because this issue from our perspective just

20  arose last night with the filing of the motion for preliminary

21  injunction.  But this is a summary of the relief that we have

22  been asking for from the get-go in connection --

23         THE COURT:  Well, when are you going to be through do

24  you think with the hearing down in Fulton County?

25         MR. ICHTER:  I think it will be a 45- to 60-minute

1    hearing.

2            THE COURT:  All right.  That is too long.  It starts

3    at 1:00?

4            MR. ICHTER:  Yes, Your Honor.

5            **(There was a brief pause in the proceedings.)**

6            THE COURT:  Mr. Powers is just going to have to cover

7    for you.  I will say before you leave without -- I will be

8    happy to look at this, and I think we would be efficient to

9    take a 15-minute break so I can finish looking at this as well.

10   And if you want anyone to look -- we could copy what you are

11   saying if you want.

12           MR. ICHTER:  I have multiple copies, Your Honor.

13           THE COURT:  But before you leave, I want to just say

14   this.  The plaintiffs seem to assume that we're in the exact

15   same posture as we were last summer in September.  And I don't

16   know that that is exactly so.

17           That is my -- and I want to just flag that for you.

18   There are -- I'm sure that the state's counsel can make their

19   own arguments about this but there are -- and have done so.

20   And you have probably thought of them.

21           First of all, I don't know -- for all of the

22   deficiencies in the DRE system, I don't know what they have

23   done in the last -- since I last saw them in the last

24   elections.  I don't know -- and there may be extreme limits as

25   to what they can do under -- given the age of the software.

1    And that, I assume, is likely so.

2            But -- but I just want to point out it is not like --

3    because whatever I said in the September 17 order I said.  But

4    it was still based on the information and evidence in front of

5    me then.  Not on whatever you are going to do.

6            Secondly, to the extent we're dealing in this coming

7    election with lots of small counties, there are some other

8    circumstances.  Also, I don't know really what is going to --

9    what their capacity is.  I don't know whether you are going to

10   address this at all.

11           You know, on one hand, Fulton County has one set of

12   capacity issues as a major county and whatever its issues are.

13   A small county is -- I'm not even talking about money.  It may

14   be personnel, have other sorts of issues.  I don't know to the

15   extent somebody needs a scanner in order to have the -- that we

16   need a lot more scanners.  And you have to think about problems

17   with the scanning.  Those are issues that would have to be

18   addressed.

19           So there seemed at points to be this sort of

20   proposition that this is a slam dunk.  And I'm just saying it

21   is not a slam dunk.  I have to look at the record each time and

22   where we are.  And it is -- the grant of an injunction is an

23   equitable set of considerations.  You still have public

24   interest issues, which I think the state has been arguing, hey,

25   we're going to be moving into a whole other election system.

1    How much are you going to burden people, confuse them, et

2    cetera?  And you also have the reality that you don't have that

3    many voters.

4         Now, I understand what you are all arguing

5    potentially is that the election system may not be ready for

6    the primaries.  And that may be so.  And that is something

7    we'll talk about.  And that is a lot more voters.  But there is

8    a lot of change here.  There is a lot of things that may not be

9    changed at all.

10        But I just -- before Mr. Ichter left, I wanted to --

11   so that he would hear it from me as well, I want to express my

12   concerns.  Because your clients, with all of the enthusiasm of

13   dedicated voters and citizen activists, may not necessarily see

14   any of those distinctions sometimes.  It is something that

15   everyone has to be aware of.

16        MR. CROSS:  Your Honor, we fully appreciate that.  To

17   be candid, we have advised our clients that an injunction is

18   never a slam dunk and circumstances have changed.  We think as

19   we have laid out in our papers and we'll lay out if we can

20   fully brief this and get to a hearing that those circumstances

21   move in our favor.  Because, for example, you were talking

22   smaller elections with a much smaller turnout where, for

23   example, you don't need a scanner because you have a few

24   hundred people vote by paper.  You can count those by hand.

25        THE COURT:  All right.  Well, we'll talk about that

1    in a moment.  I am going to let Mr. Ichter go.  I'm going to

2    read what you have.  We'll get -- then you'll distribute

3    whatever -- you want to distribute that, and we'll -- I'll

4    just -- so realistically how many pages do I have here?  I can

5    be able to be back with you in 15 or 20 minutes.

6              MR. RUSSO:  What about those ten exhibits?

7              THE COURT:  The ten exhibits.

8              MR. TYSON:  Exactly.

9              THE COURT:  Well, they are not like your 120 pages of

10   fascinating procurement information.

11             All right.  Okay.

12             MR. ICHTER:  Thank you, Your Honor.

13             THE COURT:  All right.  It is still pretty warm in

14   here.  So I don't know whether it is any better in the hallway.

15             All right.  Just come back in about 15 minutes and

16   we'll round you up.

17                       **(A brief break was taken at 12:35 P.M.  Mr.**

18                       **Ichter and Mr. Lowman exited the scheduling**

19                       **conference.)**

20             THE COURT:  So do the Curling plaintiffs seek an

21   injunction at this point that would extend and resolve issues

22   all the way through the primaries, or is this really just

23   focused on the 2019 elections?

24             MR. MANOSO:  I think our intent is to cover up

25   through the primaries and whenever the replacement system is

1    rolled out and as we were discussing earlier to then evaluate

2    to the extent that resolves the concerns that we believe have

3    already been shown and will continue to prove during discovery

4    that exists in the current system.

5         THE COURT:  Because it is a little confusing when I

6    read the brief.  And this is what I was sort of -- on one hand,

7    you say that this is an ideal circumstance for the introduction

8    of hand ballots -- paper ballots because it is a smaller

9    election.  And that is one of the factors you point to is that

10   it is a smaller election.  But obviously the primaries are not

11   that smaller election.

12        So is this -- I know ideally you would like to get

13   everything done at once.  But in terms of the preliminary

14   injunction, isn't that sort of a tension in terms of the relief

15   that you potentially will be looking at or what is the focus of

16   any hearing and what we need for that in order to be

17   considering that?

18        MR. MANOSO:  I think I understand your question.  And

19   you can reel me back in if I'm going off course.  So our

20   position is that the 2019 elections provide the framework for a

21   system to be rolled out -- for the new system that we requested

22   as we state in our relief to be rolled out, to be applied in

23   those elections where the state has a role as discussed in the

24   Coalition plaintiffs' brief.  And so that that system is in

25   place or at least largely in place by the time of the March

 1   primaries.

 2         So as opposed to the BMDs, the current solution that

 3   is being -- going to be implemented, which at best will be

 4   coming in right before the primaries, our proposal allows for a

 5   system to be put in place this year for these elections so that

 6   by the time there is a more general or more widespread election

 7   in March that system has already been put in place.

 8         One of the concerns as we set forth in our brief is

 9   that the timeline that is set forth for the replacement system

10   is aggressive to quite aggressive.  And our solution allows for

11   an implementation in these smaller elections that will be ready

12   in time for the primaries that occur in March.

13         THE COURT:  All right.  I heard that before.  I'm

14   just -- the scope of the evidence at the hearing that you are

15   seeking on the preliminary injunction relates to that I would

16   be basically seeing what is the burden, what is the -- what are

17   the issues involved would be the entire state or would be the

18   entities that are having elections in 2019?

19         MR. MANOSO:  So I think the -- our approach was to

20   roll out the system --

21         THE COURT:  I know what you're rolling out.  I'm

22   asking --

23         MR. CROSS:  It is both, Your Honor.  It is both.  It

24   is both.

25         THE COURT:  It is both.

1          MR. CROSS:  You're going to have interim elections

2    that are coming up that are smaller.  So there will be

3    feasibility issues raised as to those.  We think that is

4    readily resolved.  But by the time we get to the primaries, if

5    the DRE system is still in place, then yeah, it will encompass

6    that as well.

7          And so they have told us today that they fully expect

8    the BMDs to be in place before the primaries.  And so I assume

9    they are going to tell the Court there is no feasibility issue

10   with respect to our relief as to the primaries because the

11   primaries are never going to happen on DREs, which is what they

12   told us today.  If that -- they can correct me if I got that

13   wrong.

14          If that continues to be their position, then the

15   feasibility scope for Your Honor will only be on these much

16   smaller elections.  But, of course, our concern is that they

17   are never -- that that may actually not play out as they

18   anticipate.  So we want that relief in place before we get to

19   the primaries before it is too late to do something about that.

20          Does that answer Your Honor's question?

21          THE COURT:  Better.

22          MR. CROSS:  Still incomplete?

23          THE COURT:  No.  I mean, I think that one of the

24   things that bothers me is really what is happening at this --

25   at this hearing.  I mean, what you -- when I read your motion,

1    I mean, a substantial part of it is information and argument I

2    have obviously considered in the past.  And then there's -- in

3    terms of addition, there's the affidavits and obviously the

4    findings in the Mueller Report.  And they are briefly

5    referenced, the attempted intrusion that was in Georgia and the

6    peculiarity of the vote count in the lieutenant governor's

7    race.  That's the most I get that is extra.

8          So I'm just trying to determine what is involved in

9    the preliminary injunction hearing, whether it be one just that

10   your clients are asking to be held in the end of June or it is

11   one in July.  And then I would rather, of course, hear directly

12   from the defendants if they actually think given the rollout of

13   the BMD system that's identified in the RFP -- do you actually

14   think that you're going to actually be functional before

15   March 3rd?

16         MR. RUSSO:  Yes, ma'am, we do.  I mean, there is a

17   pilot project, of course, this year that will roll out and then

18   roll into the full implementation next year.  I think the RFP

19   indicates that by the end of the first quarter will be the

20   deadline.  The primary -- presidential preference primary has

21   not been set for next year yet.  The Secretary of State sets

22   that and has a statutory requirement to do that by December 1.

23         For practical purposes, I suspect it is done earlier

24   because of the two political parties that are involved in that

25   process.  But, you know, right now I suspect it would be -- I

1    suspect it will be in late March at the earliest.  But, again,

2    the Secretary of State hasn't decided.  It won't be before

3    March 1st.  We do know that.  And we have no reason to think

4    that the BMDs will not be in place.

5              THE COURT:  Is there going to be a Super Tuesday

6    again where all of the other --

7              MR. RUSSO:  We don't -- we really don't know.  You

8    start getting into issues around really the RNC and the DNC and

9    how they apportion delegates to those candidates.  And so,

10   again, we'll have an idea and maybe -- we're happy to try to

11   get some additional clarity sooner rather than later from the

12   Secretary of State about when he is going to set that date.

13             But we have no reason to think that the -- the end of

14   the first quarter deadline in the RFP for full implementation

15   wouldn't -- we will be satisfying that.

16             THE COURT:  All right.  So just let's assume that is

17   so.  It is still a question mark to me because of the

18   challenges of the aggressive schedule.

19             What do the plaintiffs as a whole envision being put

20   up at a preliminary injunction hearing versus a trial on the

21   merits?  And I know you don't have the evidence that you

22   have -- necessarily that you're trying to obtain in connection

23   with the trial on the merits.  But what are we doing with the

24   trial on the merits on the issue that we have before us of the

25   DRE -- why are we doing that in January or February I guess is

1   my question.  Especially -- and what are we doing with a

2   preliminary injunction hearing?  Are you just basically asking

3   me in the end just to hear a short update of Dr. Halderman's

4   affidavit and one or two other things and say now, Judge, do

5   this and that is -- we think we're entitled now because there

6   is enough time?  That was the whole reason why I raised my

7   concerns before we broke.

8           MR. MANOSO:  Sure, Your Honor.  I think one thing

9   that kind of first comes to mind is the notion of whether there

10  was, in fact, a compromise.  And the forensic analysis that we

11  expect our experts to do after discovery -- that is obviously

12  something that we wouldn't have at the preliminary stage

13  because we have only been talking about vulnerabilities, and we

14  haven't really had the opportunity to look and see whether

15  there was a compromise.

16          What is the extent of the vulnerabilities beyond what

17  Dr. Halderman is able to access from the public facing, the

18  public information about these systems?  So that is one of the

19  first categories that comes to mind.

20          THE COURT:  You're talking about that at trial or --

21  on the trial on the merits or preliminary injunction?

22          MR. MANOSO:  That would be at the trial.

23          THE COURT:  Let's just talk about the preliminary

24  injunction though.  Because that points out what is -- what is

25  it that is additional, supplemental, or anything else that you

1    are trying to do with this preliminary injunction hearing that

2    is -- that provides me any further information.  I mean, I can

3    almost anticipate more what the defendants are going to say

4    than what you are going to say at this juncture that would make

5    this anything other than your making the same arguments you

6    have made before.

7              MR. MANOSO:  Well, in some ways, that is kind of the

8    point, Your Honor, because the goal of this is to put the

9    defendants to their proof.  Because as Your Honor pointed out

10   earlier, we don't know if there have been changes that have

11   been made.  We don't know if any of the vulnerabilities that

12   were identified before have changed.

13             Our position, as we sat forth in our papers, is that

14   there is no indication that there has been a change.  Now, if

15   they come forward at the preliminary injunction hearing and

16   say, well, we've done this, this, and this and if they -- I'm

17   sure they will set that out in their papers -- we'll have an

18   opportunity to say, well, that doesn't fix this.  That doesn't

19   fix that.

20             So it is not so much what we can add to the table.

21   because I agree with Your Honor I think some of what the

22   findings that you have made before, at least as it stands now,

23   we have no indication that the facts have changed.  But the

24   burden should be on the defendants to come forward and say,

25   well, Your Honor, your concern was this.  We have addressed

```
 1    this with this.  Your Honor, your concern was this.
 2           THE COURT:  So we're just going to be flying by the
 3    seat of our pants, if I have a hearing the last week of June,
 4    which is when you would like to do this, or the last week --
 5    the second to the last week of July, we're going to be
 6    basically flying by the seat of our pants by finding out what
 7    the state has to say?
 8           MR. CROSS:  No, Your Honor.  What I would think is it
 9    will play out like it did before.  There is briefing.  They'll
10    come forward with their evidence, declarants, what have you.
11    And so Your Honor will have a full, robust record in the
12    papers.  And then if there are live witnesses, it will play out
13    as it did before.
14           I mean, I guess the one thing, Your Honor, to be
15    candid I'm trying to understand is when Your Honor says we
16    haven't come forward with something new, there are new facts
17    that I think further support our position.  For example,
18    problems that arose in the last election that show why DREs
19    themselves are unreliable and pose issues you don't have with
20    hand ballots.
21           THE COURT:  I just didn't see them really
22    discussed --
23           MR. CROSS:  Fair enough.
24           THE COURT:  -- in this brief.
25           MR. CROSS:  So I guess from my state of mind --
```

```
 1              THE COURT:  Tracingly so.  But I'm not saying that
 2     they weren't --
 3              MR. CROSS:  Understood.
 4              THE COURT:  They weren't referenced on some high
 5     level generality.
 6              MR. CROSS:  Right.  I mean, so our thinking going
 7     into this is there are vulnerabilities that we believe the
 8     evidence established last time.  Those vulnerabilities,
 9     irrespective of any developments, warrant a preliminary
10     injunction.  They warrant relief from voters having to use this
11     system at any point going forward.
12              We didn't get that relief because it was just too
13     late in the day for something as massive as the midterms.  So I
14     would respectfully submit, Your Honor, on the record we have
15     already submitted I think as a matter of law we are entitled to
16     that relief.
17              We do have additional evidence.  We have additional
18     facts that we will develop.  But I think it shifts to them to
19     be able to come in and say whether they have resolved those
20     vulnerabilities so they no longer warrant relief or they can
21     address the feasibility issue which seemed to be a pivotal
22     turning point in their direction last time.  It wasn't really
23     the vulnerabilities.  It was the feasibility.  And feasibility
24     has swapped to the other direction.  So --
25              THE COURT:  But why then -- let's say that is exactly
```

1    as you say.  Why would I reach the question of a statewide

2    injunction in a preliminary injunction hearing that is -- at

3    this point in time?

4            MR. CROSS:  Because there are upcoming elections.  I

5    guess candidly, Your Honor, that, I think, concern holds in any

6    preliminary injunction with a permanent injunction.  The point

7    is you found we're likely to succeed on the merits.  We think

8    that still holds.  There is an irreparable harm for voters to

9    go forward --

10           THE COURT:  Let me just be clear with you.

11           MR. CROSS:  Okay.  Sorry.

12           THE COURT:  You are asking -- there is one set of

13   problems with small counties and cities.  And we have got a few

14   larger ones as well.  But I don't know how many people turn out

15   for some of these elections.  Even like in Fulton County, it is

16   still one commission seat.  So it is not -- unless it is a -- I

17   think it is just a particular district.  It is not countywide

18   voting.  So it is still not a huge number of people who vote.

19   That is one thing to factor in when the Court is determining

20   the equities and the harms and just the whole posture of the

21   case.

22           It is potentially something else to say I am entering

23   an injunction that is statewide so that come whatever the month

24   the primary is that if, in fact, they are not ready to roll

25   that my injunction has that impact.  And I may not have

1    considered at that point what the impact of having -- of that

2    rollout would be.  That is a whole other body of evidence, even

3    though you think it is a cinch.  And it may be a necessity.  I

4    agree.  But it may not be.  But the point is that it is --

5    there is additional evidence.

6              MR. CROSS:  Well, I think Your Honor is going to get

7    up in that situation regardless because we have all agreed on a

8    trial in January.  So if Your Honor takes no steps on the

9    relief we're seeking until a trial in January, then the state

10   is in a worse position because -- right?  At least our thinking

11   was if we get it --

12             THE COURT:  Well, I guess -- all right.  So are you

13   prepared to present evidence -- statewide evidence about cost,

14   et cetera?  Because let me just say that some of your argument

15   has been, hey, this is really a lot simpler for you to do on

16   a -- and for the state to do when you have these small amount

17   of elections.  And it sort of is a -- gives us a little

18   laboratory of how this is going to be run.  But you're not --

19   and all right.  Let's say that is what -- that is so.

20             You've asked me and I'll have granted according to

21   your scenario an injunction though that goes further than that.

22   So I'll have to consider anything else as well -- everything

23   else relating to the state, even though it has been made out as

24   if this isn't so much, Judge.  All you're doing is having to

25   deal with the -- what the impact and challenges are in

1      implementing it in these small election frameworks.

2              MR. CROSS:  Right now we're taking them at face

3      value.  Again, I think it is a question mark, and we have

4      serious doubts about this.  But we take them at face value that

5      they will have a new system.  It will not be this system come

6      time for the primaries.

7              So that is why we've briefed it to say this really is

8      focused on small elections because those are the only elections

9      the state has represented will be on the current system.

10             I mean, I guess what I would say, Your Honor, is Your

11     Honor has discretion to figure out what the right result and

12     the equities are.  So at the very least, you could issue an

13     order that says for the 2019 elections, no DREs, here is the

14     scope of relief.  And we can determine whether there's broader

15     relief as we get closer to the primaries.  There is January.

16     We'll all be in trial.

17             That certainly is not what we want.  But Your Honor

18     has the latitude.  So you are not in a box where it is an all

19     or nothing --

20             THE COURT:  So what is then the 2000 -- the March --

21     what is the January trial on the merits though at that point,

22     if, in fact, they have selected another -- this other system,

23     which you may be challenging through one route or another?  But

24     what -- what is the focus if not on the DREs which are -- is it

25     irrelevant if they have at that point moved on to the ballot --

1    I'm sorry.

2            MR. RUSSO:  BMDs.  Ballot marking --

3            THE COURT:  Right.  Thank you -- ballot marking

4    machines?

5            MR. RUSSO:  Device.

6            THE COURT:  Device.

7            MR. CROSS:  We're getting there.  Just call them

8    BMDs.

9            MR. RUSSO:  We know what you're talking about.

10           THE COURT:  The BMDs.  Is it irrelevant?  I mean --

11           MR. CROSS:  I think it is irrelevant only at the

12   point at which it is implemented.  Here is what you can

13   envision happening.  They roll them out to some degree with

14   pilot programs over the next nine months or whatever it is.  We

15   could get to January, and they may come in and say, here is our

16   system.  We expect this to be fully in place for the primaries

17   by X date.

18           The problem is that may or may not happen.  Right?

19   So to the mootness point, what the case law makes clear is your

20   case is not moot until the state has literally -- it has done

21   it.  It has adopted it.  And what we don't want to have happen

22   is they come in in January and say we're far enough along that

23   that is moot.  But then suddenly it doesn't happen, and

24   everyone is voting on DREs in the primaries.

25           So, bottom line, our claims are relevant.  The system

1    is unsecure until the point they have actually implemented

2    something and the public is voting on something different.

3           Does that answer --

4           THE COURT:  Yes.  So relative to the difference

5    between the Curling and the Coalition plaintiffs, are you

6    actually going to be prepared for a trial the last week in

7    June?  Is that what you are --

8           MR. CROSS:  I imagine it will be like before.

9    Probably a one-day.  We can do it in a day like we did before

10   because it is just preliminary.

11          THE COURT:  So what is your -- did you get an

12   opportunity to talk with Mr. Ichter or Mr. Brown?  I know

13   Mr. Powers is here, but he has not been on the case as long --

14   about this difference between your respective positions and how

15   you think the Court should resolve that?  I can't split the

16   baby here because I'm just not going to be here to be able to

17   do it.

18          MR. CROSS:  So Bruce -- and there was a lot -- in

19   fairnesses to the Coalition plaintiffs, there was a lot that

20   went back and forth over the last probably six weeks -- Bruce

21   and I in particular getting aligned -- and there was a point in

22   which we were, like I say, pretty much aligned on the relief.

23   I think we're still aligned on the basic propositions of the

24   relief, hand marked ballots, no DREs.

25          It wasn't until, I think, yesterday or Wednesday

1    where they announced to us for the first time that they wanted

2    to push this to June 21st.

3              THE COURT:  To July?

4              MR. CROSS:  Well, their filing would be June

5    something, late June, and then the hearing later.  And as you

6    saw in the prior schedule, we had all agreed on the schedule we

7    originally submitted weeks ago that it would be filed this

8    week.  So a lot of compromise and effort went into that.  Cary

9    reached out since Bruce is traveling to say they wanted to push

10   it to late June.  And as I said before --

11             THE COURT:  To July?  They wanted to push it to July?

12             MR. CROSS:  The hearing to be in July.  I'm talking

13   about their filing of their actual motion.

14             THE COURT:  I see.

15             MR. CROSS:  I very much remember Your Honor's

16   admonition that we could have filed separately.  And I'm not

17   making that mistake again.

18             MR. POWERS:  I think our position is that, you know,

19   while we based on our understanding of the Court's schedule

20   think that a July hearing allows for the opportunity for Your

21   Honor to digest the briefing, hold the hearing, issue an order,

22   and have the local jurisdictions implement that order in time

23   for the upcoming elections --

24             THE COURT:  Who other than Fulton had a September

25   election?

1          MR. POWERS:  That is correct.

2          THE COURT:  I mean, were any of the other

3    jurisdictions having an election other than Fulton?

4          MR. RUSSO:  I believe they did.

5          MR. CROSS:  Your Honor, if it helps, while they look

6    at this, just to be clear, we don't have an objection to a July

7    hearing as long as we're not going to hear an argument from

8    anyone and it is not going to put Your Honor in a position to

9    say it is too late.

10          THE COURT:  Well, I'm just --

11          MR. CROSS:  That is my --

12          THE COURT:  I understand that.  That is why I'm

13    asking you about -- they are not trying to get that September

14    election, but you are.  So that is why --

15          MR. CROSS:  Right.

16          MR. RUSSO:  So the statute -- those would be SPLOST

17    elections.  So we wouldn't have necessarily notice of all of

18    those yet.  I think right now there is one.

19          MR. MILLER:  I'm aware of -- I think we've known

20    anecdotally of maybe a couple.  There is one for -- yes, that

21    is the Fulton commissioner.

22          MR. RUSSO:  One for sure.

23          MR. MILLER:  At this point, we wouldn't have been

24    noticed of a SPLOST election.  So, you know, a county -- if I

25    was actively involved in Hall County politics or wherever, I

1    would know that my SPLOST election is coming up.  But they

2    wouldn't have noticed the Secretary of State.

3            MR. POWERS:  Aren't there more than 100 county SPLOST

4    elections currently scheduled for November?

5            THE COURT:  No.  It was a very shorter list.  I mean,

6    the state did a good job of identifying what the last

7    comparable elections were in the last comparable off year.  And

8    there were a lot more elections than are currently in their

9    Exhibit A or 1.

10           MR. RUSSO:  And -- yeah.

11           THE COURT:  Maybe that will expand, and maybe it

12   won't.  I mean, there can be any -- to the extent that there

13   were a lot of SPLOST elections before, I mean --

14           MR. RUSSO:  There are SPLOST elections.

15           THE COURT:  That could fluctuate with what is

16   happening, frankly, with public education and funding.

17           MR. RUSSO:  Yeah.  I mean, we don't know how many

18   more there will be, of course.  We do know that there is an

19   intervening effect though with moving into discovery in the

20   case right now and then trying to do a preliminary injunction

21   hearing.

22           I mean, there are affidavits by a number of experts

23   who I think we would probably try to depose before that

24   hearing.  Either way, though, there's some impact on how we try

25   to move forward quickly with discovery while also trying to

1    prepare for essentially a mini trial on the preliminary

2    injunction now.  So I think there is that issue.

3         There is also -- the point that you've I think hit on

4    a number of times already with municipalities -- and if you

5    enjoin us, I don't know if you can reach the municipality or

6    whether you could.  They have their own authority under the law

7    to run their own elections the way they would like to.

8         Some municipalities -- we have reached out to GMA,

9    the Georgia Municipal Association, to have them pull their

10   municipalities.  We're aware of seven or eight municipalities

11   that actually own their own DRE machines and run their own

12   elections.  So, you know, those --

13        MR. MILLER:  To clarify, we're aware of 141 that run

14   their own elections.  Now, the information they provided us as

15   to how they run those elections has just been a voluntary

16   survey, frankly, within the last week after we got -- before we

17   knew the preliminary injunction was being filed after we got

18   the notice of the Coalition plaintiffs filing as to state

19   defendants' role in municipal elections.

20        Since then, we have kind of learned about a broad

21   group of folks that either own their own DREs, contract with

22   the counties to run their elections, lease a DRE from the

23   county but still conduct their own election, or operate any

24   number of other voting systems.

25        We have identified at least two municipalities at

1   this point -- this is only out of maybe a dozen that we've

2   gotten responses from -- that run lever machines.  So these

3   are -- it is a Shoup lever machine.

4           MR. TYSON:  We had to look that one up.

5           MR. MILLER:  It is not as -- not nearly as uniform as

6   the elections conducted.  So if they contract with the county,

7   they have to run it by DRE by law.  In fact, by law they have

8   to run it by DRE with the county.  But if they are doing their

9   own, it is truly kind of all over the place.

10          We have attempted to provide as much information to

11  the plaintiffs at each point that they have asked with respect

12  to kind of what we know.  But as we have expressed before, this

13  isn't something that the Secretary or the state defendants

14  actually run themselves.

15          THE COURT:  Well, except that you do -- you prepare

16  the ballot; right?

17          MR. RUSSO:  It depends on the election.

18          THE COURT:  If it is one where the county is using

19  the --

20          MR. MILLER:  Respectfully, it is not always correct

21  that the Secretary prepares the ballot if it is a local

22  election.  In that case, actually the statutory authority is on

23  the municipal superintendent to create and provide the ballot.

24  To the extent there is help or if it intervenes with a state

25  election at that point or otherwise a county conducted one,

1       then we would be involved.  Yes.

2              THE COURT:  If it is a county conducted one -- I

3       mean, I'm just trying to figure out maybe should we be just

4       focused on the county managed elections if that is really --

5       just to basically cut to the quick about this.  Because it

6       would seem like it would be simpler.

7              MR. MANOSO:  Your Honor, I think that is right.  And

8       we would never -- we don't intend to bring the Court within the

9       purview of small municipalities that have small elections.  We

10      understand that we might not reach those.  But, again, our

11      point is that it seems like at least for the majority of the

12      elections -- I don't have the exact number -- that it is the

13      state through the counties that would have the role that would

14      be enjoined.  And so in our view it is better to have some

15      relief to a large number of voters than have no relief at all.

16             And the fact that some small municipalities might not

17      be reached doesn't mean that no voter should get any added

18      protection in this elections cycle.

19             MR. POWERS:  If I may, from the Coalition plaintiffs'

20      perspective, I think there is obviously a dispute here about

21      the relative role of the state in conducting some of these

22      municipal elections.  And from our perspective, that is

23      something we intend to use the next couple of weeks -- well, if

24      we had a couple of more weeks before filing the PI motion to

25      develop some evidence and present that as part of our briefing.

1    Because obviously the burden on the -- the burden on the

2    counties and municipalities is going to be perhaps the main

3    issue here.  And we want to provide as many facts on that to

4    Your Honor as possible.

5            THE COURT:  Well, I think you would have to -- if we

6    have a preliminary injunction hearing in July, I think that the

7    plaintiffs would have to likely give up the thought of being

8    able to affect Fulton County in that time frame.

9            MR. CROSS:  That is our concern.  And Fulton County

10   is arguably the biggest, most significant county.

11           THE COURT:  I know.  But it is just one district I

12   thought.  Isn't -- it is one county -- just -- I mean -- not to

13   say that is not a significant seat.

14           How many commissioners are there?

15           MS. BURWELL:  There are seven.  This is district six.

16           THE COURT:  It is September?

17           MS. BURWELL:  17.

18           MR. CROSS:  Does that election have to happen in

19   September?  Or is there a reason it can't be moved until later?

20           MS. BURWELL:  Fulton County doesn't have any control

21   over that.  The Board of Registrations and Elections determines

22   when they have the capability of handling an election.

23           THE COURT:  Is this somebody who has vacated his or

24   her seat?

25           MS. BURWELL:  Commissioner Darnell passed away.

```
1              THE COURT:  Oh, that's right.

2              MR. RUSSO:  Now, of course, we have people who are

3    not being represented on the commission now.  So I think that

4    is the reason they would try to have this as early as possible.

5              MR. CROSS:  I see.

6              THE COURT:  Well, I'm going to think about it.  But I

7    think that -- I think you have likely enough time but not for

8    Fulton County.  I mean, I still have to have some weeks to look

9    at -- to write a coherent order.  I might not.  But --

10             MR. CROSS:  The last time Your Honor wrote a very

11   coherent order in a few days.

12             THE COURT:  Yeah.  But I never left my chair.

13             MR. MANOSO:  It is hot outside in July.

14             THE COURT:  I never left my chair.

15             MR. RUSSO:  Your Honor, we'll, of course, obviously

16   respond to this in detail.  But there are steps that the state

17   has taken.  You have raised this point before.  New security

18   measures.  And we'll lay that out in our response.  But the

19   circumstances are different now than they were.

20             THE COURT:  Okay.  All right.  Well, let me think

21   about it and get back to you on Monday afternoon about it.  But

22   you would -- if you go to November -- to July, I still would

23   want to see a briefing schedule that wasn't too jammed up.

24             MR. MILLER:  Is Your Honor referring to the Coalition

25   plaintiffs' schedule?
```

```
 1              THE COURT:  Yes.

 2              MR. POWERS:  Certainly we're willing to be flexible

 3    on that, Your Honor.

 4              MR. MILLER:  I think as far as the state's concern on

 5    that is obviously it is the plaintiffs' prerogative if they

 6    want to file a preliminary injunction.  But the practical

 7    aspect into the intervening effect of us trying to get to a

 8    trial on the merits within a reasonable time frame and then

 9    also as far as the dates -- I think one of the proposed dates

10    had us responding on July 5.

11              THE COURT:  I saw that.

12              MR. POWERS:  We'll obviously be flexible on that.

13              THE COURT:  File 6/21, 14 days falls on July 5th.

14    Someone will be unhappy, or their family will be.

15              MR. MILLER:  My wife.

16              THE COURT:  What is happening with the baby?

17              MR. RUSSO:  She is ready to rock and roll in a few

18    days.  The 5th is the date.

19              THE COURT:  Well, that is great.  Someone will be

20    very unhappy.

21              MR. RUSSO:  Well, June 5th.

22              THE COURT:  Do you have other children?

23              MR. RUSSO:  Yes, ma'am, I do.  One other.  She's very

24    excited.

25              THE COURT:  How old is she?
```

```
1              MR. RUSSO:  Almost four.

2              THE COURT:  Great.  That's wonderful.

3              All right.  Well, I will think about it.  Is there

4    anything else we should address?

5              MR. POWERS:  Not for us.

6              MR. CROSS:  No, Your Honor.

7              THE COURT:  The thing is if you're going to want to

8    take their depositions I will say of anyone -- if they are

9    going to testify, they are going to, of course, want to take --

10   find out about your security measures.  And you should get

11   that -- get that protective order in place as soon as possible,

12   so --

13             MR. CROSS:  We should be able to do the protective

14   order next week.  They proposed one, the Common Cause one.

15   That is fine.

16             THE COURT:  All right.  Is there -- are there any

17   other topics we should address?

18             MR. TYSON:  Not for us.

19             THE COURT:  Very good.  Well, thank you very much.  I

20   think this was productive.  And I will do it again.  I know

21   that your clients like to attend, and I don't want to foreclose

22   public observation of the proceedings.  But I really saw this

23   as a working meeting.  And sometimes it is what you have to do

24   in order to get people to actually move a case forward.

25             MR. CROSS:  Your Honor, I do think it is worth noting
```

1    in fairness to the defendants the meeting next door was quite

2    productive.  So I think getting folks together definitely helps

3    even when Your Honor is not here.

4            THE COURT:  Right.  Well, obviously you got more done

5    without me.  But that -- I just was looming up there.

6            MR. MANOSO:  We saved the fun stuff for you.

7            THE COURT:  But, you know, you are welcome, of

8    course, to use the court any time if it is helpful to you.

9            MR. RUSSO:  Thank you.

10           THE COURT:  Then I can come down if it is helpful to

11   you at some point that you just have something you think you

12   would want to be able to confer about.  You-all have law

13   offices.  But if you think you're going to need me at some

14   point, even if you don't end up needing it, it can be

15   productive.  And I'm happy to facilitate that.

16           MR. KNAPP:  The prospect of your appearance is very

17   positive in resolving disputes.

18           MR. CROSS:  Or for any purpose.

19           THE COURT:  You know, I have a colleague who is in

20   the Northern District of California, and I think she is much

21   more -- she's extraordinarily effective on having meetings.

22   And she really actually -- she requires people to, like the way

23   Judge Owens used to do, get her permission essentially before

24   they file summary judgment motions.  But when they come in and

25   tell her about the case, she will say, well, it might make

1    sense on this count and that count.  It doesn't -- I'm telling

2    you that you are losing on this one.  But she often makes food

3    available -- so that is a whole other concept -- and definitely

4    air-conditioning.

5         All right.  Thank you.  Have a good weekend.

6              **(The proceedings were thereby concluded at 1:51**

7              **P.M.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1                    C E R T I F I C A T E

2

3  UNITED STATES OF AMERICA

4  NORTHERN DISTRICT OF GEORGIA

5

6      I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

7  the United States District Court, for the Northern District of

8  Georgia, Atlanta Division, do hereby certify that the foregoing

9  81 pages constitute a true transcript of proceedings had before

10  the said Court, held in the City of Atlanta, Georgia, in the

11  matter therein stated.

12      In testimony whereof, I hereunto set my hand on this, the

13  4th day of June, 2019.

14

15

16

17      _____
        SHANNON R. WELCH, RMR, CRR
18      OFFICIAL COURT REPORTER
        UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25