**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **DONNA CURLING, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION** |
| **vs.** | ) | |
| | ) | **FILE NO. 1:17-cv-2989-AT** |
| **BRAD RAFFENSPERGER,** | ) | |
| **ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COALITION PLAINTIFFS' NOTICE OF FILING EVIDENCE

## PART TWO

Coalition Plaintiffs give Notice of the Filing of Evidence in support of their Motion for Preliminary Injunction. The Coalition Plaintiffs will be filing said Motion, with supporting Brief, Proposed Order and additional evidence, on or before June 21, 2019.  Because of e-filing size limitations, this evidence is filed in two parts.  Part One contains Pages 1 through 287 of Exhibit A, the Consolidated Voters' Declarations; Part Two contains pages 288 and following of Exhibit A, and Exhibits B through I.

Exhibit A:          Consolidated Voters' Declarations

Exhibit B:          Declaration of Jeanne Dufort

Exhibit C:          Declaration of Rhonda Martin

Exhibit D:   Supplemental Declaration of Amber McReynolds

Exhibit E:   Declaration of Candice Hoke

Exhibit F:   Declaration of Virginia Martin

Exhibit G:   Declaration of Garland Favorito

Exhibit H:   Declaration of Megan Missett

Exhibit I:    Declaration of Pride Forney


Respectfully submitted this 19th day of June, 2019.

| /s/ Bruce P. Brown | /s/ Robert A. McGuire, III |
|---|---|
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Admitted Pro Hac Vice |
| BRUCE P. BROWN LAW LLC | (ECF No. 125) |
| 1123 Zonolite Rd. NE | ROBERT MCGUIRE LAW FIRM |
| Suite 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 881-0700 | (253) 267-8530 |

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter

Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges, Ricardo Davis and Megan Missett*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day caused the foregoing to be served upon all other parties in this action by via electronic delivery using the PACER-ECF system.

This 19th day of June, 2019.

*/s/ Bruce P. Brown*
Bruce P. Brown

EXHIBIT

A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **DONNA CURLING, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION** |
| **vs.** | ) | |
| | ) | **FILE NO. 1:17-cv-2989-AT** |
| **BRAD RAFFENSPERGER,** | ) | |
| **ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>INDEX TO CONSOLIDATED VOTERS' DECLARATIONS</u>

Tab A (Bates No. 1)      Problems with Lt. Governor's Race

Tab B (Bates No. 011):   Problems with candidate affiliation or district

Tab C (Bates No. 026):   "Self-casting" ballots

Tab D (Bates No. 034):   Vote Flipping

Tab E (Bates No. 075):   DRE machines crashing

Tab F  (Bates No. 079):   DRE machines not operational

Tab G (Bates No. 091):   Voters not given provisional ballots

Tab H (Bates No. 108):   Epollbook Problems

Tab I (Bates No. 324):   Long lines

Tab J (Bates No. 388):   Absentee ballots not received or returned

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Carolyn E. Stephens. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I served as a Poll Watcher for the Democratic Party of Georgia  on November 6, 2018.

3. The following are issues I observed when I was at the Cedar Shoals High School Polling Location:

    a. Voter One moved to Athens in 2017. He went to the Division of Motor Vehicles tag office on Lexington, Road and changed his voter registration on around March of 2017, so he could vote in Athens. On November 5, 2018 the night before the general election, he checked the Athens-Clarke Board of Elections website. It confirmed that he was registered to vote at Cedar Shoals High School polling station. On November 6, 2018 at the polling station, he was told that he could not vote at Cedar Shoals. When the poll manager called the Board of Elections, she told him that he would have to go to Lawrenceville (a one-hour drive), where he used to live, in order to vote.  Because he had been given time off from work to vote, he had to return immediately to work without voting. He took a registration form and

said he would have to come back to complete a provisional ballot. I do not know if he returned to vote.

b. Voter Two registered to vote before the registration deadline and more than a month before Election Day. He received no notice of any problem with his registration. When he arrived to vote, he found that he was not listed on any voter rolls. He was unable to vote because the poll manager could not get advice from a Board of Elections person because no one answered her phone call. The poll manager asked Voter Two to return at 2:00 p.m., by which time she thought she would have been able to reach her supervisor who could tell her how to advise him. He said he would return.

c. Voter Three mailed in her voter registration with her current and correct address in Athens in September of 2018. She said she mailed it directly from a U.S. Post Office to make sure it was correctly posted. She knew registration closed in October. When she was at the Cedar Shoals High School voting station on November 6, she was told that she was registered to vote only in Milledgeville (her former home two hours from Athens). She was not offered a provisional ballot. At first, she indicated that she would drive to Milledgeville, but before she left, she said that she was unlikely to be able to drive the 4 hours it

said he would have to come back to complete a provisional ballot. I do not know if he returned to vote.

b. Voter Two registered to vote before the registration deadline and more than a month before Election Day. He received no notice of any problem with his registration. When he arrived to vote, he found that he was not listed on any voter rolls. He was unable to vote because the poll manager could not get advice from a Board of Elections person because no one answered her phone call. The poll manager asked Voter Two to return at 2:00 p.m., by which time she thought she would have been able to reach her supervisor who could tell her how to advise him. He said he would return.

c. Voter Three mailed in her voter registration with her current and correct address in Athens in September of 2018. She said she mailed it directly from a U.S. Post Office to make sure it was correctly posted. She knew registration closed in October. When she was at the Cedar Shoals High School voting station on November 6, she was told that she was registered to vote only in Milledgeville (her former home two hours from Athens). She was not offered a provisional ballot. At first, she indicated that she would drive to Milledgeville, but before she left, she said that she was unlikely to be able to drive the 4 hours it

would require to vote. She did not vote. Her brother, who lives at her same address, is listed as Voter Four below. He was initially prevented from voting on Election Day.

d.  Voter Four (the brother of Voter Three) had changed his voter registration to reflect his Athens address. When he attempted to vote at Cedar Shoals High School on Election Day, he was initially unable to do so. The poll manager called the Board of Elections who also talked with Voter Four. They told him that someone had entered his name into the system incorrectly (I think originally someone told him it didn't match his social security number). He was able to correct this mistake on the phone and he voted at Cedar Shoals after the phone conversation.

e.  Voter Five said she was purged from the voter roll because she missed at least one electoral cycle. The voter had to leave to get to a doctor's appointment on time.  The poll manager asked her to return at 2:00 p.m. when she could complete a provisional ballot. I do not think she returned.

f.  Voter Six arrived at the Cedar Shoals High School  polling location at 7:13 p.m. He told the poll manager that a person (name was stated) from the Board of Elections told him to get to Cedar Shoals High

School  by 7:30 and complete a provisional ballot. When I spoke with
him, I learned that Voter Six had  registered to vote two to three days
before the registration deadline ended. A man offered to register him
at the Athens Neighborhood Health Center near where Voter Six
works as a security guard. On election day, he was surprised to find
that he was not registered. He said he was frustrated and angry and
raised his voice when speaking with someone at the Board of
Elections. He insisted on being allowed to vote. The person told him
to complete a provisional ballot at  Cedar Shoals High School. He said
he called the emergency voter number, among others, in order to vote.
He completed a provisional ballot.

g.  Voter Seven moved to Athens, GA and voted at a Clarke County
voting station in 2016. At 6:45 p.m. she was told at the Cedar Shoals
High School  polling location that she was supposed to be in
Crawford, Georgia to vote. She said she had not lived in Crawford  for
the past two years.  The poll manager asked her to talk with someone
from the Board of Elections. Voter Seven told the Board of elections
representative that she had voted in Athens in 2016 and did not
understand the reason she could not vote there on election day.  The
person  acknowledged to Voter Seven that they had the record in their

system of her voting in Athens in 2016.  They told her that when she

went to the DMV on December 28,  2017, Oglethorpe County had

"pulled you back in".  Voter Seven told the poll workers that she had

registered at the DMV on November 28, 2017 not December 28.

Voter Seven told me she was concerned not only with the fact that

they had an incorrect address in her registration but that they had the

incorrect date on which she registered. She was not told that she could

complete a provisional ballot. It was 6:45 and polls were closing at

7:00. I suggested she complete a provisional ballot even if it did not

count after someone had a chance to review her dispute about

registration. Voter Seven completed a provisional ballot at 6:55 p.m.

on election day.

h.  I observed multiple people leave without voting throughout the day

because of varied problems. Six of the seven voters that thought they

were correctly registered to vote were African-Americans. The person

who was not African-American voted after 7:00 p.m.  Most of the

voters with issues were not offered provisional ballots. I did not

understand why people who claimed they had correctly registered as

citizens of Athens-Clarke County were not advised to record their

votes on provisional ballots in case the registration errors were later assessed as County rather than voter mistakes.

    i.  Voters with whom I spoke to told me that they were being directed to drive 30 minutes, one hour, or two hours to another county to vote. As far as I could determine, provisional ballots were not being offered as alternatives to driving long distances when they believed they had registered correctly to vote where they live.

    j.  On the morning of the election, I reported that people were registering to vote when they were getting their driver's licenses from the Athens-Clarke County DMV. I realized during the day that they were describing the DMV county tag office on Lexington Road as the place where they registered to vote, not the driver's license office as I had originally reported. Multiple voters told me that their voter registrations were filed from the DMV office. A long-time poll worker told me that registering people to vote from the DMV office had resulted in voters with previous, rather than current addresses for voter registration. According to this poll-worker, this had been an on-going problem that they had been unable to stop.

**4.** I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

293

**5.** I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**6.** I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _13_ day of November, 2018.

Signature

Sworn to and subscribed before me
This the _13th_ day of November, 2018.

Notary Public

Carla Braswell
Notary Public, State of Georgia
Clarke County
My Commission Expires 02/11/2022

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

My name is Ayesha Terry. I am over eighteen years of age and competent to testify

to the matters contained herein.

1. I am a resident of Henry County in Georgia and my residence address is

   _____ ████████████ Stockbridge Ga. ████████ .

2. I have reviewed the list below and I believe that my situation most closely

   fits into the category that I have checked:

   **a.** _____ I requested an absentee ballot but I never received it.

   **b.** _____ I received an absentee ballot and returned it but my ballot was

   rejected.

   **c.** _____ I received an absentee ballot and returned it but my ballot was

   not accepted.

   **d.** ___**x**__ I was not permitted to vote using a voting machine (a DRE)

   (circumstances below) and was not offered a provisional ballot even

   though I reside in the county in which the precinct was located where

   I tried to vote.

   **e.** _____ I was not permitted to vote using a voting machine (a DRE)

   (circumstances below) because I was told I was not a resident of the

295

county in which I was attempting to vote despite the fact that I had changed my address in a timely manner.

**f.** _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below). I asked for a provisional ballot but was told that it was too early in the day for provisional ballots or that there were not enough provisional ballots or that no provisional ballots remained.

**g.** _____ I moved counties but did not change my registration address. When I attempted to vote in my new county, the poll workers told me to return to my old county in order to vote.

**h.** _____ There were long lines at my polling location and I saw people leaving without voting.

**i.** _____ There were long lines at my polling location and I had to leave without being able to cast my vote.

**j.** _____ There were problems with the voting machines at the precinct at which I voted or attempted to vote.

**k.** _____ Other – please explain - _____

_____

**3.** My individual circumstances are the following:

I was unable to vote in the mid-term election. I attempted to vote a First Baptist Church in Henry County. This is where I voted for the 2016 Presidential election. When I went to the polls on election day, I was told that my name was not showing up in the system and that I hadn't voted in 8 years. They told me that I had to re-register. They pulled up an old address in Macon and I did not vote during the time I lived in Macon. They did not offer me a provisional ballot and I was unable to vote. There was a long line of people who were not able to vote. I know, for a fact, that the reason I was given for not being able to vote was untrue.

4. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the ___12_ day of November, 2018.

_____
Signature

Sworn to and subscribed before me
This the  16th day of November, 2018.

297



Notary Public

W-00276932

# Certificate of Appointment
# of Notary Public

**Georgia, RICHMOND County**

I, **ELAINE C. JOHNSON**, Clerk of Superior Court in and for said County, hereby certify that

**WAYNE FRAZIER**, whose address is ██████ ████████████ **HEPHZIBAH, GA**
████

Age: **62**, Sex: **MALE**, was duly appointed and sworn in as a Notary Public under the provision of

O.C.G.A. Title 45, Ch. 17, Art. 1 as Amended, that their term of office begins on the **15th day of**

**March, 2016,** and expires on the **14th day of March, 2020**.



WITNESS my hand and seal of said Court this
17th day of March, 2016

_____
(Deputy Clerk's Signature)

Deputy Clerk of Superior Court
RICHMOND County, Georgia

_____
(Notary's Signature)

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Diondra Thurman-Jetter. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Clayton County in Georgia and my residence address is ████████████████ Riverdale, Georgia, ████

3. I traveled to my precinct, but they told me I was not registered. I had registered online, and the address online matched my driver's license.

4. I was told I had to fill out a provisional ballot and I did.

5. I was not given any information or documentation on how to check whether my provisional ballot counted in the current election.

6. The woman that discussed the provisional ballot with me did not seem to understand how it would work.

7. I had voted at the same precinct with no issues since 2012.

8. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

9. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

10. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 15th day of November, 2018.

_____
Signature

Sworn to and subscribed before me
This the 15th day of November, 2018.

_____
Notary Public

4826-8345-6379, v. 1

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Dana Van Zajac. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Cherokee County in Georgia and my residence address is ███████████████, Woodstock, GA, ██████

3. I served as a poll watcher on November 6, 2018 at the polling location at Liberty Elementary School in Cherokee County. This was, I believe, one of the largest Cherokee County polling locations with in excess of 2000 voters casting their ballots throughout the day.

4. One of most troubling things that I observed was spouses coming to vote together after having changed their addresses through the Department of Motor Vehicles. They had changed their residence addresses and checked the box to update their voter registration as well. When they tried to vote, at least three couples learned that one spouse's address had been correctly updated while the other spouse's address showed as the former address in the registration system. All of them had drivers' licenses that reflected their new address.

5. In each instance, the spouse with the unchanged address was directed to return to the original location to cast their ballot. I do not believe that they cast provisional ballots at the Liberty precinct.

6. There was a BOE employee (Jonathan) on site because of problems with the voting machines. One of the machines was taken off line because he could not recalibrate it. Until at least noon, almost all of the machines were operating on battery power because one of the machines kept "popping a fuse." They had to keep resetting the machine and it kept the remaining machines from charging.

7. I spoke to "Jonathan" about the provisional ballot issues. He told me that they preferred, strongly, that voters return to their original voting site even though they were entitled to vote provisionally.

8. In fact, I observed one voter who came in requesting a provisional ballot because she did not have time to get to her assigned location. The poll workers had her get on the phone with the Board of Elections and she was questioned, extensively, about why and whether she could get back to the assigned precinct. Ultimately, after an extended period of time, she was given a provisional ballot and allowed to vote.

9. I did observe one woman, who came very close to the closing time, who I believe was properly registered in Cherokee County but not assigned to the

Liberty precinct. She was going to be allowed to vote a provisional ballot and stood in line to do so. Unfortunately, there were a number of people in line and, after waiting in line for at least 20 or 25 minutes, she had to leave without voting because she had family waiting. Her husband was able to vote at the Liberty location but her address had not appropriately updated.

10. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

11. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

12. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the ___11TH___ day of November, 2018.

_____
Dana Van Zajac

Sworn to and subscribed before me
This the _11TH_ day of November, 2018.

_____
Notary Public

304

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Eunice Walden. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Dekalb County in Georgia and my residence address is ██████████████████ Lithonia, GA ███████

3. I have voted at the polling location associated with my residence address, Miller Grove High School, for the past three years, after I moved to my residence from Macon, GA.

4. For the 2018 Georgia General Election, I disallowed from voting at the polling place for my residence address, where I have been voting for the past three years.

   a. On Election Day, November 6, 2018, I showed up to vote at Miller Grove High School around 4pm and someone took my ID and told me I was not on the list to vote.

   b. I was surprised because I moved to my current address 3 years ago from Macon, GA and when I moved I switched my voter registration to DeKalb County. I also switched the registration of my daughter and my son.

    c. When I went to vote they had my family member's name on the list and not mine. They said I could not vote because they sent notice to Macon, GA to verify who I am and they never received anything back so they said I was not active.

    d. I asked why they sent it to Macon when I have an address in Lithonia and they did not answer. I then asked if I could use a provisional ballot and she replied that if I used a provisional ballot it would only be thrown out so I left without being able to vote at all.

    e. I have voted in Dekalb County since living here the past 3 years. I was prevented from voting this year, and they didn't even let me cast a provisional ballot. I am upset that I was unable to vote.

5. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the _15_ day of November, 2018.

Eunice Walden

Sworn to and subscribed before me
This the _15_ day of November, 2018.


_____
Notary Public

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Talisha Warren. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Gwinnett County in Georgia and my residence address is

   ███████ Snellville GA ████

3. My individual circumstances are the following:

   a. In 2016 I registered to vote and my polling location was "Anderson ~~Living.~~ *Livsey PW* At a later point, I received a letter notification that my new polling location was "Annistown Baptist." I then received a second letter stating that my polling location was switched back to "~~Anderson~~ *Ann Anderson* ~~Living.~~ *Livsey PW*"

   b. A few days before Election Day I received a 3rd and final letter that my polling location would be at "Lenora Church." On Election Day in 2016, I ended up voting at Lenora Church. Between the presidential and this election, I did not receive a notice that the polling location changed.

   c. On Election Day this year, I went to "Lenora Church" and I stood in line for 2 hours to vote. When I got to the front the elections officials scanned my ID and I was told I needed to vote at "Anderson ~~Living~~ *Livsey PW* Elementary School." I explained that I voted at this location in 2016

and that I have a special needs daughter and I cannot go to the other polling location, especially not after waiting 2 hours.

    **d.** After requesting a provisional ballot, they allowed me to vote provisionally.

**4.** I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

**5.** I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**6.** In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _1 8_ day of November, 2018.

_Talisha Warren_

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Carlos White.  I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Gwinnett County in Georgia and my residence address is

   ███████████████  Rex, Georgia  ██████

3. I have reviewed the list below and I believe that my situation most closely fits into the category that I have checked:

   a. _____ I requested an absentee ballot but I never received it.

   b. _____ I received an absentee ballot and returned it but my ballot was rejected.

   c. _____ I received an absentee ballot and returned it but my ballot was not accepted.

   d. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) and was not offered a provisional ballot even though I reside in the county in which the precinct was located where I tried to vote.

   e. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) because I was told I was not a resident of the county in which I was attempting to vote despite the fact that I had changed my address in a timely manner.

**f.** _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below). I asked for a provisional ballot but was told that it was too early in the day for provisional ballots or that there were not enough provisional ballots or that no provisional ballots remained.

**g.** _____ I moved counties but did not change my registration address. When I attempted to vote in my new county, the poll workers told me to return to my old county in order to vote.

**h.** _____ There were long lines at my polling location and I saw people leaving without voting.

**i.** _____ There were long lines at my polling location and I had to leave without being able to cast my vote.

**j.** _____ There were problems with the voting machines at the precinct at which I voted or attempted to vote.

**k.** __X___ Other – See below.

4. My individual circumstances are the following:  I am a resident in Clayton County and have resided there for the last 3 years. Even though I have been able to vote in Clayton County in previous elections with no trouble whatsoever, this year I was told there was a problem with my registration. When I went to the polling place on election day, my county of residence

had been switched somehow to my old address in Gwinnett County. The poll worker allowed me to vote with a provisional ballot, but as of today's date, I still have not been able to confirm my registration with Clayton County and feel that my vote was most likely not counted.

5. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _18th_ day of November, 2018.

Carlos White

312

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Michael White. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Cobb County and my address is ███████████ Powder Springs, GA, ███████

3. My polling location was at the George Ford Center, 4181 Atlanta St., Powder Springs, GA.

4. My individual circumstances are the following:

   a. I voted in Cobb County in 2016. When I searched for my information on the Secretary of State's (SOS) My Voter Page (MVP) I could not find my registration in Cobb County.

   b. I called the SOS and was transferred to the Cobb Board of Elections and they told me I was registered in Fulton County. I told them I had never lived in Fulton County. The woman on the phone found that it was a mistake on Fulton County's part because of my address-- it's in Powder Springs but the lines have it pulled for Fulton County.

   c. The woman on the phone told me to vote with a provisional ballot and that she would have everything in her office so that it would not show that I was voting at two locations.

313

    **d.** I went on Tuesday to the George Ford Center and voted with a provisional ballot. I was told that I should call the Voter Protection Hotline number and the Cobb Board of Elections (BOE) to confirm my vote counted.

    **e.** Cobb BOE employees said that officials had not gotten to count the paper ballots on Friday and that they wouldnt be done unitl Monday. I asked how they would do that if Monday was a holiday and they hung up on me.

**5.** I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

**6.** I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**7.** I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the _14th_ day of November, 2018.

_____
Signature

Sworn to and subscribed before me
This the _14th_ day of November, 2018.

_____
Notary Public

Jeff Totty
My Commission Expires
Notary Public
February 10, 2020
Gwinnett County, Georgia

314

Notary Public

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Camille Christina Williams. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Cobb County in Georgia and my residence address is █████ ████████████████████████, ATLANTA, GA, ██████

3. I was not allowed to cast a regular ballot at my registered polling place.

4. I am registered to vote in Georgia at my aforementioned residence address. My polling place, as listed on the Georgia Secretary of State's "My Voter Page," is 'Precinct VG01 VININGS LIBRARY-VG01, 4290 PACES FERRY RD, ATLANTA, GA, 30339 – 0000.'

5. I verified my polling place on the Secretary of State's "My Voter Page" before arriving at the Vinings Library on 7:15 AM on Election Day, November 6, 2018.

6. After waiting in line for a total of 150 minutes, at 9:45 AM I spoke to a poll worker who told me that according to their information, I was not registered to vote at my current address, and was instead registered to vote at my previous address in Kennesaw, GA.

7. I was told by the poll worker that I would not be allowed to cast a regular ballot at the Vinings Library precinct, and would only be allowed to cast a provisional ballot unless I traveled to my previous polling location.

8. I ended up casting a provisional ballot at the Vinings Library.

9. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

10. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

11. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _____ day of November, 2018.


Camille Christina Williams

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Mariah Wolfe. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia and my residence address is ██ ████████ Atlanta, GA ████ I am a student at Spelman College.

3. For the 2018 Georgia General Election, I registered to vote well ahead of time, showed up at multiple Fulton County polling locations, and was still forced to cast a provisional ballot. I do not believe that my ballot was counted.

   a. I am a first-year student at Spelman College, who moved to Spelman from out of state to attend.

   b. Voting is very important to me; I was registered to vote before moving to Georgia, and I wanted to make sure I was registered in Georgia to vote in a historic election.

   c. During the first few weeks of school of the Fall Semester, Spelman College held a voter registration drive for its students. During this drive, I registered to vote using a program called Turbo Vote.

**d.** When I registered to vote, I distinctly remember seeing a confirmation screen, which indicated that I submitted my registration information and that I was good to go.

**e.** Between registering to vote and Election Day, I received general mail from Turbo Vote, which further made me believe that I had done what I had needed to register to vote as a Spelman College student and cast my ballot come Election Day.

**f.** On Election Day, I not only had classes to attend at school, but I also was scheduled to work at my place of employment.

**g.** Still, because voting is important to me, I carved out the time to show up around 4 PM to the polling place associated with students of the AUC Consortium, Archer Hall at Morehouse College.

**h.** The situation at the polling location was chaotic. Multiple long lines were readily visible, with varying instructions given by poll workers on who should be in which line.

**i.** Eventually, I was told to look up some information on my phone regarding my voter registration. The information did not come up, and I was told that I may not be able to vote at Morehouse.

**j.** I had no idea what to do at that point. Another person at the polling location told me to call a Voter Protection Hotline to find out what

was going on. I called the Hotline and the person I spoke to told me I needed to go to a different precinct, at Booker T. Washington High School, in order to vote.

**k.** At this point, I was very frustrated, but still committed to vote. A volunteer at Morehouse was willing to drive me to Booker T. Washington High School, so I decided to go in order to cast my ballot.

**l.** After we arrived at Booker T. Washington High School, the first thing I noticed was that the lines were very long. I got in line, and once I got to the front, the poll worker told me that I was not registered to vote and that I needed to cast a provisional ballot.

**m.** The time at this point was a little too close to 6 PM, which was the time I needed to report to my workplace.

**n.** I decided to stay anyway, until 6:30 PM, and cast a provisional ballot, despite the fact that I was already late for work and had spent multiple hours attempting to vote on a busy day for me.

**o.** I received an orange slip of paper after filling out my provisional ballot with instructions on how to follow up on the ballot. But after already expending so much time in the middle of a busy schedule that included classes and work, I did not have time to follow up on my provisional ballot.

     **p.** I am deeply frustrated that my vote does not seem to have been

        counted for the 2018 Georgia General Election. I registered to vote, I

        spent multiple hours trying to vote, and still was not allowed to cast a

        regular ballot.

     **q.** Many students at my school told me that they also were not able to

        vote on Election Day. I hope someone fixes this broken system that is

        taking the right to vote away from so many people.

**4.** I give this Declaration freely, without coercion, and without any expectation
of compensation or other reward.

**5.** I understand that in giving this Declaration, that I am not represented by a
lawyer. Nor has any lawyer asked me to be their client or to serve in anyway
as anything other than a witness in this litigation.

**6.** I declare under penalty of perjury that the foregoing is true and correct.
Further affiant sayeth not, this the ___14___ day of ___February___, 2019.

                                Signature

321

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Devin Young.  I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of DeKalb County in Georgia and my residence address is ▇▇▇▇▇▇▇▇▇▇ Chamblee, Georgia ▇▇▇▇

3. My individual circumstances are the following: Prior to election day, I confirmed my voter registration status twice on the Secretary of State's website (once myself and once with my girlfriend), and I also received a voter registration card in the mail. When I arrived to my local polling place on election day with my voter registration card in hand, I was told that my name does not appear in the voter registration computer system.  I was told I could vote using a provisional ballot, which I did.  However, I never received a piece of paper explaining my rights, including how to correct a deficiency and how to check whether my ballot was counted. I did follow-up to correct any deficiency with my registration status and am hopeful that my vote was counted.

4. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 15 day of November, 2018.

Devin Young

Sworn to and subscribed before me
This the 15 day of November, 2018.

CHRYSTIAN S WOODS
Notary Public, Georgia
Cobb County
My Commission Expires
January 23, 2022

Notary Public

323

TAB

I

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1.  My name is Ann Brown. I am over eighteen years of age and competent to testify to the matters contained herein.

2.  I am a resident of Fulton County in Georgia, and my current home ███████████████████████████ Atlanta, Georgia ██████

3.  My voting experience was not good. On Election Day, November 6, 2018, I went to vote at Pitman Park Recreation Center. It was not organized, people were complaining about how long they were spending in line; people were shouting; it was very confusing; and the poll workers were not helpful.

4.  I waited there for an hour. But my bones are bad; I can't stand long, and I have a pinched nerve on the left side of my neck and can't sit long either. Plus, it was getting dark and raining, and Pitman Park Recreation Center is in the Pittsburgh neighborhood of Atlanta, and that area is not good. I had to leave.

5.  I did the best I could, but being there was too much on me. I am very disappointed that I did not get to vote, but they have got to do a better job. They have to be more organized so people don't have to stay in line that long.

6.     I give this Declaration and/or Affidavit freely, without coercion, and

       without any expectation of compensation or other reward.

7.     I understand that in giving this Declaration and/or Affidavit, that I am not

       represented by a lawyer. Nor has any lawyer asked me to be their client

       or to serve in anyway as anything other than a witness in this litigation.

8.     I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _13_ day of November, 2018.

_____
Signature

Sworn to and subscribed before me
This the _13_ day of November, 2018.

_____
Notary Public

JUSTIN PITTS
Notary Public, Georgia
DeKalb County
My Commission Expires
February 11, 2022

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Arnaud Huguet.  I am over eighteen years of age and competent
   to testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia and my residence address is

   ███████████████ , Atlanta, Georgia.

3. I have reviewed the list below and I believe that my situation most closely

   fits into the category that I have checked:

   a. _____ I requested an absentee ballot but I never received it.

   b. _____ I received an absentee ballot and returned it but my ballot was
      rejected.

   c. _____ I received an absentee ballot and returned it but my ballot was
      not accepted.

   d. _____ I was not permitted to vote using a voting machine (a DRE)
      (circumstances below) and was not offered a provisional ballot even
      though I reside in the county in which the precinct was located where
      I tried to vote.

   e. _____ I was not permitted to vote using a voting machine (a DRE)
      (circumstances below) because I was told I was not a resident of the

county in which I was attempting to vote despite the fact that I had

changed my address in a timely manner.

f. _____ I was not permitted to vote using a voting machine (a DRE)

(circumstances below). I asked for a provisional ballot but was told

that it was too early in the day for provisional ballots or that there

were not enough provisional ballots or that no provisional ballots

remained.

g. _____ I moved counties but did not change my registration address.

When I attempted to vote in my new county, the poll workers told me

to return to my old county in order to vote.

h. __X__ There were long lines at my polling location and I saw people

leaving without voting.

i. __X__ There were long lines at my polling location and I had to

leave without being able to cast my vote.

j. __X__ There were problems with the voting machines at the precinct

at which I voted or attempted to vote.

k. __X__ Other – See below.

4. My individual circumstances are the following:  My typical polling place

was Gideons Elementary, which was being renovated.  I was directed to vote

at Pitman Park Recreation Center, which only had three operational voting

machines, even though Pitman Park had been designated as the polling place for both Gideons (which has 1200 registered voters) and Pitman Park (which has 900 registered voters).  I went at noon to vote and waited 30 minutes. Given the long lines, and given that I was told that it was going to be another hour, I had to leave and return to work.  I returned to Pitman Park Recreational Center after work at 4:00 p.m.  I waited 30 minutes, but was told the wait was going to be 2-3 hours because of the limited number of machines and the size of the voter turnout.  I left and returned at 6:30 p.m. to vote.  At that point, I could not even find a parking space to park my car.  At that time, I was told it was a 3-4 hour waiting period.  Given the limited number of machines, the long wait times and the inability to find parking, I was not able to vote.

5. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer.  Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the 11th day of November, 2018.

Arnaud Huguet

Sworn to and subscribed before me
This the 11th day of November, 2018.

Notary Public

X-220



**STATE OF GEORGIA**

𝔅𝔯𝔦𝔞𝔫 𝔓. 𝔎𝔢𝔪𝔭

Secretary of State

Documents have been filed with this office certifying that

**ARNAUD D. HUGUET**

is
**FULTON COUNTY SURVEYOR**
**FULTON COUNTY**

Term
**JAN. 1 2017 - DEC. 31 2020**

Secretary of State

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Pamela Terekhova. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Chatham County in Georgia and my residence address is ███████████, Pooler, GA ████.

3. My polling location is the Rockwell Methodist Church.

4. For the 2018 Georgia General Election, I went to the polls three times, stood in long lines twice, and still was not able to cast my ballot and exercise my right to vote.

   a. I have lived in Pooler for ten years. The Rockwell Methodist Church has always been my voting place. During the 2016, Presidential Election there was a two-hour wait. There is always a line but, this year, it was unbelievable.

   b. I dropped my son off at school and arrived at the Church 7am. The street was extremely dark and dangerous at that hour. I drove past a long line of people waiting in the street to find a place to park. Most of the parking lot and the field were being used for the line.

   c. After I parked, I joined the line in the street. There was no sidewalk; we were standing in the gutter. There was only enough room for one car to go by at a time; the other car would have to wait while

oncoming traffic passed. There were cars trying to get by us and I thought I was going to get hit. I waited in line for about thirty minutes and the line wasn't moving at all. So I left.

**d.** I came back at about 1:30pm and this time I found a place to park on the field. It was hot. The line wrapped around inside of the parking lot and the field; it did not spill out onto the street. When I got there, I saw my neighbor was there with two small children about halfway to the church, and she said that she had been in line for two hours. I thought, "Oh my god, you have a baby! This is ridiculous." There were old people there, people with babies, people sitting down on the pavement. It was hot.

**e.** The Chatham County Sheriff was there, so I asked him what he could do to help. I told him it the situation was ridiculous and asked whether the old people and babies go inside. The Sheriff said, "this is my first time working at the elections; I don't know." I was appalled. He is the Sheriff of Chatham County! Finally, the elderly couple in front of me—he was 76 and his ankles were swelling—were allowed to cut the line and go inside. I counted 200 people in line at this time.

**f.** I waited for two hours in the parking lot and only moved half the distance I needed to. I saw some people coming out who said they had

been there since 10:30am and it was now 2:30 in the afternoon. After hearing this, I gave up hope.

g. The word was that they only had 7 or 8 polling machines and because we had so many questions on the ballot, and it took 10 minutes/person to vote. My son was coming home from school, so I had to leave.

h. Around 6:30pm, my son and I went back. I drove for the third time to the Church and again saw people in the street and wrapped around the parking lot.

i. I couldn't find a parking spot and it was getting dark. It was dangerous for my son and I to stand in line on the street in the dark while cars go by. So we kept driving.

j. I went to the polls three times and stood in line twice, and was not able to vote.

k. I was glad that we didn't wait because, the next day, a woman at my church told me she was there from 6:30pm - 11:00pm. She had stood in line earlier in the day while she waited to vote and then her husband got off work and she waited with him. She estimated that there were 300-400 people in line that night.

l. There is another polling place on my block but it's in Savannah rather than Pooler. I saw people parking all over the place there, too. There

383 1/17/19

were 50-60 cars in the street and 100+ cars in the parking lot. This Church let everyone in and let people sit in the pews of the church instead of making them stand in the street.

**m.** I talked to a volunteer poll worker and she told me that the precinct of Pooler has grown—it's almost doubled in the last five years or so—but the number of machines hasn't increased. There was plenty of room in the church.

**n.** They easily could have added another eight machines or so, or found another polling location entirely. They knew that they would have an issue because there were extraordinary lines in 2016; it should not have been a big surprise.

**o.** I've voted for forty years in seven other states. Longest I had to wait was one hour. Only in Georgia are people expected to stand vote to five hours outdoors.

**p.** What's going on? It was totally against my rights that I could not vote when I tried three times to do so.

5. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

07/17/2019

6. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the _17th_ day of January, 2019.

_Pamela R Jerekhov_
Signature

_Pooler  GA_

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Erika Underwood-Jackson. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia and my residence address is ███ ████████████ Atlanta, GA, ████

3. For the 2018 Georgia General Election, I was very disturbed by what I experienced and observed at my polling location, Pittman Park.

    a. I arrived at my polling location at Pitman Park a little bit before 8 AM. When I arrived my polling place was in disarray. A line has spiraled on the way to three voting machines.

    b. Most of the people I spoke to who were in line had been there since the polling place opened at 7 AM.

    c. The line moved very slowly. There was no seating for the elderly and disabled so they had to stand which caused most of them to go home.

    d. I observed around 25 elderly and disabled voters leave the line. The fact that these voters were not given any other way to vote is a travesty.

    e. The line moved so slowly it felt as if there were technical issues with all of the voting machines and none of them were in operation.

**f.** Other voters and I asked to speak to a manager several times but a manager never came over to address us.  One the poll workers told us that they should've had eight machines and that they had been calling since before they opened up to get those other machines.

**g.** While waiting in line, I called Secretary of State's office at least 12 times. Each time I was hung up on or placed on hold for an excessive amount of time.

**h.** Finally, I got on the phone with someone who told me nothing could be done and that more machines would not be coming. I also called Fulton County Board of Elections office and was hung up on several times.

**i.** In the end, I stood in line for five hours to vote.

**j.** I have never experienced such disorganization implemented to deprive people of their legal right to vote ever in my life, until that day.

**k.** Pitman Park is not my usual voting location. I typically vote at Gideon but it was closed this election cycle.

**l.** However, I found out from speaking to other voters that at least two polling locations were closed and these voters were condensed into the Pittman Park polling location, perhaps tripling the number of registered voters for this polling location.

**m.** At my previous voting location, the longest I have ever waited to vote was 45 minutes.

**n.** I even have video that was shot showing how disorganized it was at the polling location.

**o.** I am shocked at what I observed this election cycle. I have never seen the referee also playing in the game.

**p.** I don't understand how a person running for an office is not made to step down from overseeing the election.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 24 day of January, 2019.


Signature

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1.  My name is Shanna Antoine. I am over eighteen years of age and competent to testify to the matters contained herein.

2.  I am a resident of Gwinnett County in Georgia and my residence address is ███████████████ Duluth, GA ███████

3.  My polling location is PLEASANT HILL PRESBYTERIAN, 3700 PLEASANT HILL RD, DULUTH, GA 30096.

4.  For the 2018 Georgia General Election, I and my fellow Georgia voters at my polling location were subjected to an abnormally long wait before voting.

    a.  On Election Day, November 6, 2018, I showed up to vote at Pleasant Hill Presbyterian.

    b.  I waited there for 2 hours. Once it was time for me to go vote, they said we had to wait 15-20 minutes because there was something wrong with the system. There were only 8 machines there. Everyone was very upset to wait. We had to just stand there and wait.

    c.  They did not offer a chance to vote by paper. They then let us vote regularly. They looked to see if I was registered. They then gave me a yellow card to use in the machine to vote.

339

5. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the ____ day of November, 2018.

Shanna Antoine

Sworn to and subscribed before me
This the ____ day of November, 2018.

_____
Notary Public

340

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is April Baier. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia and my residence address is ████████████████ Fairburn GA ██████

3. For the 2018 Georgia General Election, I experienced and observed various issues voting including very long lines.

   a. My polling location has changed every year.

   b. This year it was at the Fairburn Baptist Church. I got to on Election Day around 5/6pm because I thought the lines would be shorter. I had to wait twenty or thirty minutes just to find a parking space. I kept driving around and around and finally someone left. There was nobody helping with parking.

   c. There were only 10 voting booths for a few hundred people in line. The line was moving very slowly and sometimes not at all. One woman saw my kids getting irritated and antsy and she offered to let me cut, and then another woman ahead of her let me cut again.

   d. My children are two years old and eleven years old, and my son has special needs.

341

e. By the time I left, it was very dark. I had been waiting in line for at least an hour or so. If I hadn't been able to cut the line, I would have been in line for more than two hours.

f. People are senior citizens, people have health problems, people have neurological problems — they can't stand in line for hours. My sister wasn't even able to vote because she is pregnant and the line in her location was even longer. She couldn't stand in line for that long.

g. I don't know why this system is so messed up in Georgia. I'm originally from Oregon. My family said that they have never waited in line. They get their ballot a few weeks before the Election, everything is printed and easy to use.

h. Why can't our system be just be like others states, like Oregon? Other states don't have to wait in long lines.

i. The way Georgia runs election is deeply disturbing. You don't know what they're doing behind the scenes.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**6.** I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _____ day of December, 2018.

Signature

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

**1.** My name is Chad Carter. I am over eighteen years of age and competent to testify to the matters contained herein.

**2.** I am a resident of Fulton County and my address is ██████████████ ████ Atlanta, GA, ██████

**3.** My individual circumstances are the following:

    **a.** I have been voting at the same polling location since I was 18. I am now 34. At the polling location the line was out the door similar to an amusement park. There were approximately 40 people outside and more inside. I waited for an hour and a half. There were two machines available for voter verification and four voting machines open in total.

    **b.** Most of the individuals in line were students, and they didn't know what was going on. I have never waited this long to vote in line. In the past I have been in line for 8 minutes max.

**4.** I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

**5.** I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**6.** In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the <u>11/19/18</u> day of November, 2018.

Chad Carter

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1.  My name is Patricia Davis. I am over eighteen years of age and competent to testify to the matters contained herein.

2.  I am a resident of Fulton County in Georgia and my residence address is ▮▮ ▮▮▮▮▮▮▮▮▮▮ Atlanta, GA.

3.  I have reviewed the list below and I believe that my situation most closely fits into the category that I have checked:

    a.  _____ I requested an absentee ballot but I never received it.

    b.  _____ I received an absentee ballot and returned it but my ballot was rejected.

    c.  _____ I received an absentee ballot and returned it but my ballot was not accepted.

    d.  _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) and was not offered a provisional ballot even though I reside in the county in which the precinct was located where I tried to vote.

    e.  _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) because I was told I was not a resident of the county in which I was attempting to vote despite the fact that I had changed my address in a timely manner.

**f.** _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below). I asked for a provisional ballot but was told that it was too early in the day for provisional ballots or that there were not enough provisional ballots or that no provisional ballots remained.

**g.** _____ I moved counties but did not change my registration address. When I attempted to vote in my new county, the poll workers told me to return to my old county in order to vote.

**h.** _____ There were long lines at my polling location and I saw people leaving without voting.

**i.** _____ There were long lines at my polling location and I had to leave without being able to cast my vote.

**j.** __x___ There were problems with the voting machines at the precinct at which I voted or attempted to vote.

**k.** _____ Other – please explain - _____

_____

4. My individual circumstances are the following: **I got in line at 8:30 and left at noon. My regular polling place was closed due to renovations. We only had 3 voting machines and were told by election worker there were only 39 cards. By 11:30, 5 more Voting machines were brought in by**

**Jesse Jackson. What normally took me 10 minutes took 3.5 hours. I saw my neighbor and others leave who didn't want to wait in line.**

5. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the _14th_ day of December, 2018.

_____
Signature

348

## DECLARATION UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746 AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Tunnizia Gilliam I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Cobb County in Georgia and my residence address is ███ ██████████ Austell, GA

3. I have reviewed the list below and I believe that my situation most closely fits into the category that I have checked:

   a. _____ I requested an absentee ballot but I never received it.

   b. _____ I received an absentee ballot and returned it but my ballot was rejected.

   c. _____ I received an absentee ballot and returned it but my ballot was not accepted.

   d. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) and was not offered a provisional ballot even though I reside in the county in which the precinct was located where I tried to vote.

   e. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) because I was told I was not a resident of the

county in which I was attempting to vote despite the fact that I had
changed my address in a timely manner.

**f.** _____ I was not permitted to vote using a voting machine (a DRE)
(circumstances below). I asked for a provisional ballot but was told
that it was too early in the day for provisional ballots or that there
were not enough provisional ballots or that no provisional ballots
remained.

**g.** _____ I moved counties but did not change my registration address.
When I attempted to vote in my new county, the poll workers told me
to return to my old county in order to vote.

**h.** ___x__ There were long lines at my polling location and I saw people
leaving without voting.

**i.** _____ There were long lines at my polling location and I had to leave
without being able to cast my vote.

**j.** _____ There were problems with the voting machines at the precinct
at which I voted or attempted to vote.

**k.** _____ Other – please explain - _____

_____

4. My individual circumstances are the following: **I left home at 6:30 AM and
went to my polling location and waited for one hour, and then I had to**

leave because of work. I returned at my lunch break at 2:20 PM and remained in line before voting until 5:30. I was allotted only one hour for lunch. As a result, I lost two hours of pay. At the polling place there were one handicap and six regular voting machines. I recall clearly that during the 2016 election there appeared to be twice as many machines.

5. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the 15 day of November, 2018.


Signature: Tunnizia Gilliam


Sworn to and subscribed before me
This the 15 day of November, 2018.


Notary Public

JUSTIN PITTS
Notary Public, Georgia
DeKalb County
My Commission Expires
February 11, 2022

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746
AND/OR
SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW**

1. My name is Velma Lambert.  I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Gwinnett County, Georgia.

3. I voted at Evangel Community Church in Snellville, Georgia. There were three voting machines in use and four voting machines that were not working and turned off. I waited in line for 2 hours 45 minutes with a boot on my foot because of a broken toe. When I left, the line was longer than when I arrived. There was no place for elderly people to sit while waiting. I observed approximately 50 people leave without voting because the line was too long.

4. The machine I used to vote was glitchy and had problems going back. The poll worker stated she could not assist because she was not allowed to look at the machine while I was voting.

5. After I voted, I passed an extremely long line at Annistown Elementary School in Snellville, Georgia. I stopped to see what was going on because I thought they might be giving something away. I spoke with someone on line who said she had been waiting on line for hours to vote. While I was there, a poll worker came out and said none of the machines were working. She

apologized and said they were trying to figure out what to do. I observed a lot of people leave without voting.

6. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

7. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

8. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the ___13th___ day of November, 2018.

_Velma Lambert_
Velma Lambert

Sworn to and subscribed before me
This the ___13th___ day of November, 2018.

_____
Notary Public

353

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Jeffrey Marion.

2. I am over eighteen years of age and competent to testify to the matters contained herein.

3. I reside at ███████████████, Snellville, GA ████ and I vote in Gwinnett County.

4. I voted on election day.  I arrived at 6:30 am at the Annistown Elementary School. The polling place was supposed to open at 7 am, but the machines were down until about 11am. So no votes were cast before 11am.

5. At first we were told that the license verifcation machine was broken. We waited about an hour and half. Then someone brought new power cords for the machine, but it still would not work.

6. The next thing we knew, at about 10:45 or 10:50, they brought new voting cards to put in the voting machines.  Voting began shortly after that.

7. The line to vote was wrapped around the school by the time I got to vote.

8. I did not vote until about 11:15 am.

9. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

10. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**11.** In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the ___24___ day of December, 2018.

Signature

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Derrick Oatis. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Gwinnett County in Georgia and my residence address is
   ███████████ , Suwanee, GA ██████ _____.

3. I have reviewed the list below and I believe that my situation most closely fits into the category that I have checked:

   a. _____ I requested an absentee ballot but I never received it.

   b. _____ I received an absentee ballot and returned it but my ballot was rejected.

   c. _____ I received an absentee ballot and returned it but my ballot was not accepted.

   d. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) and was not offered a provisional ballot even though I reside in the county in which the precinct was located where I tried to vote.

   e. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) because I was told I was not a resident of the county in which I was attempting to vote despite the fact that I had changed my address in a timely manner.

f. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below). I asked for a provisional ballot but was told that it was too early in the day for provisional ballots or that there were not enough provisional ballots or that no provisional ballots remained.

g. _____ I moved counties but did not change my registration address. When I attempted to vote in my new county, the poll workers told me to return to my old county in order to vote.

h. __x___ There were long lines at my polling location and I saw people leaving without voting.

i. _____ There were long lines at my polling location and I had to leave without being able to cast my vote.

j. ___x__ There were problems with the voting machines at the precinct at which I voted or attempted to vote.

k. _____ Other – please explain - _____

_____

4. My individual circumstances are the following:

In 2016, I voted at Shadowbrook Church. I went online and discovered that my polling place had changed. I do not recall receiving any notice that my polling place had changed. I got to my polling place at 361 Main Street

(Suwanee Public Library). I got there at 5 minutes to 7am. There were maybe 30-50 people already in line. About 10 minutes later, one of the poll workers came out and apologized for the delay but said that there was an issue that they were trying to correct relative to the machines. She gave no further information but that she would let us know when we could vote.

Thirty minutes later (about 7:45am) she came out and apologized and stated that none of the machines were working. The line had grown. She offered the choice of provisional ballots or for people to stay in line until the issue was resolved. She told some of the people that their provisional ballots would not be counted until the following Tuesday, not all of the people who took provisional ballots heard this announcement. I did not witness anyone who got a provisional ballot being given any type of receipt and I was not previously aware that one was required. I witnessed less than five people who accepted one.

The poll worker offered to create a list for those who decided to stay. She said that none of the machines were reading the voter cards. They sent another poll worker to Lawrenceville to get new cards in hopes that it would rectify the situation. A few people asked how long it would take. She didn't know but guessed 1.5-2.0 hours depending upon traffic. Within a matter of five minutes, of the 70+ people who were in line, about 90% of the people just left. This was so disheartening to me because I knew that many of them would not come back.

Fortunately, I had the flexibility to remain until I could cast my vote on a machine.

I also witnessed a few people who came to this polling place after being sent from another polling place where they were told that they were at the wrong place. I believe they were offered provisional ballots but I'm not certain if they took them. Both were African-American. The male was adamant that he was at the correct polling place. I'm not sure what happened for him. Eventually, I asked if there was protocol for testing the machines. The poll workers said that they test the machines but don't test the cards that go into the machines. What sense does that make? The gentleman who went to get the cards came back at 9:40am. They DID test those cards and they worked fine. I was able to vote and be in and out in less than ten minutes. The delay of 2.5 hours left several people without the chance to vote - how many, I don't know. Voting should not be this difficult under any circumstances. Eligible voters should be able to vote under the simplest terms possible.

5. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that
   the foregoing is true and correct.

   Further affiant sayeth not, this the __20__ day of December, 2018.

   _____
   Signature

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Kevin O'Malley. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Chatham County in Georgia and my residence address is ███ ██ ██, Savannah Georgia ████.

3. My individual circumstances are the following:

   a. On election day, I went to vote at 9:00 am at my polling location, the Jewish Education Alliance. There were seven machines that were all working, but there was still a pretty really long line. I had the day off so I told my wife to stay and vote. It took my wife an hour and 15 minutes to vote.

   b. I went back to the same polling location at 1:00 pm and I noticed that five of the seven machines were down so only two machines were working. I saw an estimated 20 people leaving in front of me. I also counted about 128 people in front of me. I left the line because after doing the math, I realized I could not wait over 8 hours to vote.

   c. After I left, I called the voter protection hotline and spoke to a representative who said she was going to call Chatham county and try to get more machines at the location.

    d.  At 4:30 pm I went back to the same polling location. They now had

       four machines working. I voted a regular ballot and it took me about

       an hour and half to vote.

**4.**  I give this Declaration freely, without coercion, and without any expectation

   of compensation or other reward.

**5.**  I understand that in giving this Declaration, that I am not represented by a

   lawyer. Nor has any lawyer asked me to be their client or to serve in anyway

   as anything other than a witness in this litigation.

**6.**  In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that

   the foregoing is true and correct.

Further affiant sayeth not, this the _18_ day of November, 2018.

_____
Signature

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746**

1. My name is Sherri Ozcomert. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Dekalb County in Georgia and my residential address is ▮▮▮▮▮▮▮▮▮; Atlanta, Georgia ▮▮▮▮

3. I have reviewed the list below and I believe that my situation most closely fits into the category that I have checked:

   a. _____ I requested an absentee ballot but I never received it.

   b. _____ I received an absentee ballot and returned it but my ballot was rejected.

   c. _____ I received an absentee ballot and returned it but my ballot was not accepted.

   d. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) and was not offered a provisional ballot even though I reside in the county in which the precinct was located where I tried to vote.

   e. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) because I was told I was not a resident of the county in which I was attempting to vote despite the fact that I had NOT changed my address.

   f. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below). I asked for a provisional ballot but was told that it was too early in the day for provisional ballots or that there were not enough provisional ballots or that no provisional ballots remained.

   g. _____ I moved counties but did not change my registration address. When I attempted to vote in my new county, the poll workers told me to return to my old county in order to vote.

   h. __X__ There were long lines at my polling location and I saw people leaving without voting.

   i. _____ There were long lines at my polling location and I had to leave without being able to cast my vote.

   j. _____ There were problems with the voting machines at the precinct at which I voted or attempted to vote.

   k. __X__ Other – please explain – PLEASE SEE SECTION 4 BELOW.

4. My individual circumstances are the following:
   On Tuesday, November 6, 2018 I voted in the 2018 General Elections for the State of Georgia at my assigned precinct, Mary Lin Elementary School, where I observed several differences from my previous experiences voting at the same precinct, differences which caused substantial voter confusion, voter frustration and led to voters leaving without casting a ballot.
   One difference I observed was the fact that there were fewer machines and fewer workers at my precinct on election day, but there were many more voters
   Second, voters from another precinct were directed to vote at my precinct. However, voters were still required to line up in one of two lines to vote.

363

Each was given directing voters as to which line was the correct line for the voter to line up in, according to their precinct.

Therefore, many voters waited in line to vote, only to discover upon reaching the poll worker station that the voter had lined up in the incorrect line, based on the voter's precinct, and had to line up in the back of the other line.

I observed many voters' frustration, and observed voters leaving without casting a ballot. This situation troubled me, because I worried that many citizens, through no fault of their own, had been denied their right to vote.

5. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the ____ day of November, 2018.

Signature

364

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Mary Price. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of DeKalb County in Georgia and my residence address is

   ▓▓▓▓▓▓▓▓▓, Decatur, Georgia ▓▓▓▓

3. My individual circumstances are the following:

   I voted early on the second day of early voting. I had voted at the same location for the primary and there was no wait. During early voting for the general election, there were only four voting booths. When I voted early for the primary, there were around eight working voting booths, so I was surprised to find only the four voting booths for early voting on this election. I heard a poll worker say that more voting booths were going to be added. It took me an hour and a half to vote.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6.  In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that

the foregoing is true and correct.

Further affiant sayeth not, this the ___ day of November, 2018.

_____
Signature

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Vasile Stanescu. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am registered to vote at ▇▇▇▇▇▇▇▇, Warner Robins, GA ▇▇▇▇

3. My individual circumstances are the following:

   a. I voted early in person at the Houston Health Pavilion Conference Center in Warner Robins on Friday, November 2, 2018. I waited in line for nearly two hours in order to cast my ballot. While I waited in line, the poll workers made announcements to people in line saying that voters would have an opportunity to cast their ballot, but they just had to wait and it would be a long wait.

   b. In 2016, I voted early in person at this location, and it took me 10 minutes from start to finish.

   c. I observed people waiting in line behind me who left the line because the wait was so long.

   d. Additionally, I observed people who arrived later to the early voting location, asked voters in line how long we had been waiting, and left the early voting location when they learned of the wait time.

   e. I waited precisely an hour and 48 minutes. I did cast an early vote.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

367

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the __21__ day of November, 2018.

Signature

**DECLARATION UNDER PENALTY OF PERJURY**
**PURSUANT TO 28 U.S.C. § 1746**
**AND/OR**
<u>**SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW**</u>

1. My name is Carrie Vanzant. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of DeKalb County in Georgia and my residence address is ███████████████████, Decatur, Georgia ██████

3. I have reviewed the list below and I believe that my situation most closely fits into the category that I have checked:

   a. _____ I requested an absentee ballot but I never received it.

   b. _____ I received an absentee ballot and returned it but my ballot was rejected.

   c. _____ I received an absentee ballot and returned it but my ballot was not accepted.

   d. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) and was not offered a provisional ballot even though I reside in the county in which the precinct was located where I tried to vote.

   e. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) because I was told I was not a resident of the county in which I was attempting to vote despite the fact that I had changed my address in a timely manner.

   f. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below). I asked for a provisional ballot but was told that it was too early in the day for provisional ballots or that there were not enough provisional ballots or that no provisional ballots remained.

   g. _____ I moved counties but did not change my registration address. When I attempted to vote in my new county, the poll workers told me to return to my old county in order to vote.

   h. __X__ There were long lines at my polling location and I saw people leaving without voting.

   i. _____ There were long lines at my polling location and I had to leave without being able to cast my vote.

   j. _____ There were problems with the voting machines at the precinct at which I voted or attempted to vote.

   k. _____ Other – please explain - _____
   _____

4. My individual circumstances are the following:

   I arrived at my polling place, Peachcrest Elementary, at approximately 8:15 am. After about an hour of waiting in line, I was near the table where you check in to get your voting card and noticed that some of the voting machines were not being used. After that, I noticed that there were no voters at any of the voting machines. I asked a poll worker about it and she said that the line was moving and to be patient. She said there were only two machines to get voting cards. I noticed that they were having trouble with the machines. One of the poll workers unplugged one of the check-in machines. Then poll workers unplugged both check-in machines. A poll worker said that both machines needed to be in sync for the count, and that

369

they were trying to get the machines in sync. It took 20-25 minutes to get the machines in sync and then they started checking people in again. I noticed people leaving when the machines were down. I saw several people ask whether they could take their registration form that they had already filled out with them and return later. The poll worker told them that they could not take the form with them.  I voted and left the polling place at around 9:50 am. There were very long lines wrapping around a couple of hallways in the school when I left.

5. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the *14th* day of November, 2018.

_Carrie Vanzant_
Signature

Sworn to and subscribed before me
This the *14th* day of November, 2018.

_Paul A. B___
Notary Public

PAULA M BARRY
NOTARY
PUBLIC
Exp. Aug. 14, 202_
CLAYTON COUNTY, GA

370

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Glenn Wooten II. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia, and my residence address is ███████████████████ Atlanta, GA ████

3. I am a registered <u>voted</u> in Georgia.

4. I tried to vote on October 31, 2018, at the Adams Park Library location but, when I arrived, other voters and I <u>were turned</u> away. We <u>were told</u> that there was a water main break in the library and the location <u>was closed</u> until Election Day. We <u>were given</u> information about other locations where early voting was taking place. I thought the story was strange because there were no trucks or workers near the library; no indication of a water main break or repairs going on that I could see.

5. On Friday, November 2, 2018, I voted at the Pryer Street location. I waited in line for more than three hours. During that time, I saw at least ten people leave the line because they could not wait any longer.

6. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

7. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

8. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 27 day of November 2018.

Signature

**DECLARATION UNDER PENALTY OF PERJURY**
**PURSUANT TO 28 U.S.C. § 1746**
**AND/OR**
**SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW**

1. My name is Jeffery Young. I am over eighteen years of age and competent

   to testify to the matters contained herein.

2. I am a resident of Gwinnett County in Georgia and my residence address is

    Snellville, Georgia,

3. My individual circumstances are the following:

   a. On election day my polling place, Annistown Elementary, had
      six voting machines. I arrived at 8:45 am to vote and there were
      about 125 people or more in line.

   b. While in line I heard that the machines were down, and that no
      one had voted yet. At that time, they were bringing in two more
      machines but those ended up not working either.

   c. Later we were told that the issue wasn't with the machines, but
      was instead with the cards. A representative from the board of
      elections was there and said they sent someone to get new
      cards.

   d. The representative at the polling location made an
      announcement that people could fill out provisional paper
      ballots. About 60 people chose to fill out provisional ballots.

   e. I was able to vote at 12:49 pm.

4. I give this Declaration and/or Affidavit freely, without coercion, and without

   any expectation of compensation or other reward.

5. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the 13th day of November, 2018.

_____
Signature

Sworn to and subscribed before me
This the _____ day of November, 2018.

_____
Notary Public

374

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746
AND/OR
SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW**

1.    My name is Suzanne Urquhart. I am over eighteen years of age and competent to testify to the matters contained herein.

2.    I am a resident of DeKalb County in Georgia, and my residence address is ▮▮▮▮▮▮▮▮▮▮▮ Atlanta, Georgia▮▮▮

3.    The matters described herein are based on my first-hand, personal knowledge.

4.    On Election Day, November 6, 2018, I served as a Poll Watcher at Mary Lin Elementary School ("Mary Lin") in DeKalb County. I arrived at Mary Lin when the polls opened at 7:00 a.m., and I left between 1:30 p.m. and 2:00 p.m.

5.    Throughout the day, the poll workers were working hard and trying their best, but Mary Lin experienced a number of issues with voters.

6.    Starting at the time the polls opened, there were issues with voters not being in the system. When a voter would sign in, the Mary Lin Poll Manager would call someone, and whomever the Poll Manager called would say whether or not a person could vote. In the first couple of hours, there were at least fifteen people who were not in the system; they

were allowed to cast provisional ballots, however, after the Poll Manager made the phone call.

7.  Another significant issue at Mary Lin was that it was the voting location for two precincts—both Mary Lin and Epworth Church ("Epworth")— because Epworth Church was under construction. Mary Lin was upstairs in the theater, and Epworth was downstairs in the cafeteria.

8.  There were two different entrances for Mary Lin and Epworth; there were handwritten signs with arrows identifying the two different precincts. The problem, however, is that voters didn't know if they were Mary Lin or Epworth because their voter registration cards and the My Voter Page would both indicate Mary Lin for both precincts, with the only differentiating factor being that Mary Lin would indicate "Mary Lin LE" and Epworth would indicate "Mary Lin EE." None of the voters, however, knew what "LE" or "EE" meant.

9.  As a result, and starting at 7:00 a.m., voters would wait for an hour and a half in the Mary Lin line only to get to the front of the line and be told that they had to go downstairs to Epworth—where they had to wait in line again.

10.  I asked one woman how long she had been waiting in line, and she said, laughing, "*This* line?" Another woman, however, was not in such good

spirits, and she was ready to cry when she was told she had to go downstairs to vote after she had waited in the long Mary Lin line. I went downstairs with her and asked the Epworth poll workers if she could cut in line, and she was able to do so, but she was very upset.

11. The poll workers started to tell people that if they normally vote at Epworth then they needed to go downstairs. But there were a lot of new voters, and they didn't know where they normally voted. In addition, many people were adamant that they should be in the Mary Lin line because their registration cards said "Mary Lin"—because again, people did not know what the "LE" and "EE" initials meant.

12. I also witnessed people being sent back and forth between the two lines multiple times—they would wait downstairs at Epworth, then be sent upstairs to Mary Lin, wait in line at Mary Lin, and then be told they needed to go back downstairs to Epworth.

13. I know at least two people left after they waited in the wrong line. One gentleman had waited an hour and a half in the Mary Lin line and was then told he was not in the system. He said his My Voter Page showed he was active and that his precinct was Mary Lin. He became very upset, indicating that the situation was ridiculous; that he had to get to work and that was why he had come early; and that he was not willing to stand in a

whole other line and find out he was not in their system either. He said if someone would tell him where to vote, he might try. But he ultimately left Mary Lin without voting, and I don't know if he tried to vote again.

14.     In addition to people not being in the system and voters being sent back and forth between the Mary Lin and Epworth lines, I also witnessed other voter issues at Mary Lin.

15.     One woman was told she needed two forms of identification to vote, without explanation. This same issue had happened at the primary election; she was permitted to cast a provisional vote then. The only reason she was allowed to vote at Mary Lin on Election Day is because the Mary Lin Assistant Poll Manager recognized the woman from the primary election, and he stated that he would act as her second form of identification. She was very angry, however, questioning why she was the only one who needed two forms of identification and explaining that both her mother and either her grandmother or her aunt (I'm not sure which one) couldn't speak English and to imagine what they would have done if this identification problem had happened to them.

16.     Another woman who was registered to vote came in to Mary Lin but was told she had to cast a provisional ballot. I stayed in contact with her via text message after she left Mary Lin. She called the voter protection line

and was told she had to go to the DeKalb County elections office with her identification and proof of residency. When she went to the office on Friday (November 11, 2018), she was told that the voter hotline had given her the wrong information; that she did not have to come back; and that there was nothing further she could do. She told me that other people in line at the elections office were told the same thing. She wasn't sure if her provisional ballot was counted.

17.   Another gentleman had to cast a provisional ballot even though he and his family received voter cards that reflected Mary Lin as their precinct. He and his family had lived in DeKalb County since 1993, and nobody else in his family had to cast a provisional ballot. After waiting in line at Mary Lin, however, the gentleman was told he was not in the system, and he had to vote provisionally. I'm not sure his vote was counted, however, because he was told his precinct was in Morningside, which I believe is Fulton County.

18.   Another gentleman had voted at Mary Lin for years. His residence is in DeKalb County, but the address on his license said Tift County. After he waited in line, he was turned away and told he had to go vote in Tift County. He left to drive to Tift County, which was almost four hours away. I don't know whether he was able to vote.

19.   I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

20.   I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

21.   I declare under penalty of perjury that the foregoing is true and correct.


Further affiant sayeth not, this the  _13_ day of November, 2018.

_____
Signature

Sworn to and subscribed before me
This the _13_ day of November, 2018.



_____
Notary Public

JUSTIN PITTS
Notary Public, Georgia
DeKalb County
My Commission Expires
February 11, 2022

380

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1.  My name is Ami Rodrigues. I am over eighteen years of age and competent to testify to the matters contained herein.

2.  I reside at ⬛⬛⬛⬛⬛⬛ Atlanta, Georgia ⬛⬛ and I currently work as an attorney in Atlanta.

3.  The matters described herein are based on my first-hand, personal knowledge.

4.  On Election Day, November 6, 2018, I served as a Poll Watcher at First Baptist Church on Gresham Road in DeKalb County. I arrived at First Baptist at about 8:30 a.m. and did not leave until about 1:00 p.m.

5.  During my time at First Baptist, I tried to talk to people who had cast provisional ballots. There was only one station at First Baptist where voters could cast provisional ballots. The Assistant Poll Manager was in charge of the provisional ballot station.

6.  If anyone was having an issue with provisional ballots, the wait time for those people casting provisional ballots increased significantly. Likewise, if anyone else voting required the attention of the Assistant Poll Manager, then those people waiting to vote provisionally experienced longer wait times.

7.  One specific incident I witnessed involved an elderly blind woman who wanted to cancel her absentee ballot. Her issue required the assistance of both the Poll Manager and the Assistant Poll Manager, and they were unavailable for other

voters for at least an hour while they were assisting her. Nobody was able to cast a provisional ballot during that entire hour. As a result of the increased wait time, I witnessed two other elderly individuals waiting to cast provisional ballots leave. One woman could not wait any longer because she had to pick up her grandchildren. The other was an elderly gentleman who had already been at First Baptist earlier in the day waiting to cast a provisional vote, and he had come back to try again. He left again during the hour that the poll managers were assisting the elderly blind woman. I'm not sure if he came back.

8.   I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

9.   I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

10.  I declare under penalty of perjury that the foregoing is true and correct.


Further affiant sayeth not, this the 12th day of November, 2018.


_____
Signature

Sworn to and subscribed before me
This the 12 day of November, 2018.

_____
Notary Public



382

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746
AND/OR
SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW**

1. My name is Kristi Feenie. I am over eighteen years of age and competent to

   testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia and my residence address is ███

   ████████████████ Atlanta, GA███

3. My individual circumstances are the following:

   a. I went to my voting location, which is parkside elementary and I

      waited in line for somewhere between an hour and a half and two

      hours. While waiting I witnessed many people complaining to

      themselves and each other that they wouldn't be able to vote because

      they needed to get back to work, or take their kids to daycare, or had

      other obligations. I saw many of those people leave the line. I also

      saw many people entered the facility, saw the line, and then turned

      around and left.

   b. I had no issue preventing me from voting. I did hear the poll workers

      say they had issues, that some of the voter cards were not working

      with the machines. They said for some of the machines "the card was

      just popping out." So they said they had to ask those voters to file

provisional ballots. I didn't see any of those cards not working with the machines.

**c.** I returned about 5:30 that evening, because I'd heard they were still having issues. I brought bottled water to those in line, in case that might be the determining factor to ensure they could vote. I have voted at this location I think three times before, including presidential elections, and I've never seen lines like this.

**4.** I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

**5.** I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**6.** I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the ⟨15th⟩ day of November, 2018.

Kristi Feeni

Signature

Sworn to and subscribed before me
This the ⟨15⟩ day of November, 2018.

Doneya Peoples

Notary Public

Doneya Peoples
Notary Public
Fulton County, Georgia
My Comm. Expires 02/20/2022

384

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Sharman R. Southall. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Cobb County in Georgia and my residence address is ▮▮▮ ▮▮▮▮▮▮▮▮▮ Roswell, GA ▮▮▮

3. On November 6, 2018, I was a poll watcher at Argyle Elementary School, which was built in 1970 near the new Braves Stadium. Another polling place is located directly across Spring Road at the fire station. When I arrived at Argyle Elementary School 6:20am, a handful of voters were already in line to cast their ballots.

4. The voting area was located in the media center this year, though it seems to have been located in the cafeteria in past years. The cafeteria is a more open and accessible location than the media center. The media center was somewhat crowded with the students' computer terminals and book shelves.

5. Shortly after the polls opened, heavy rain and wind moved into the area. Voters were brought into the interior of the school and access to the building for voting was changed to a door located closer to the main entrance of the school. The signage was not immediately moved, however, which lead to some confusion.

6. The waiting time throughout the day ranged from about 1.5 hours to 2.5 hours due to high voter turn-out, few voting machines, and the long ballot and amendments. The long line was consistent throughout the day. Many seniors in line knew they could come to the front of the line but some did not. No handicap accessible machines were provided, but the poll workers provided chairs to those who needed one while they voted.

7. I noticed several voters who got very close to the front of the line but had to abandon the line to pick up their children from daycare or return to work – they had run out of time to wait any longer and left without voting. In all, I observed about 20-25 voters who abandon the line. Most said they would return later but I only recognized two such voters who returned later. Other voters may have left the line without voting but I could not see them from where I stood at the front of the line.

8. The parking was not plentiful at this location. I went outside several times during the day and saw that parking was always at capacity and cars had parked on the grassy areas and on the sidewalks. I always observed cars leaving the lot but do not know if they parked elsewhere or abandoned voting.

9. Our last voter in line when the polls closed completed his voting at 9:40 pm.

10. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

**11.** I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**12.** I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the _13th_ day of November, 2018.

_Signature_

Sworn to and subscribed before me
This the _13th_ day of November, 2018.

Notary Public



TAB

J

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Caroline Allen Bailey. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Dekalb County in Georgia and my residence address is ████████ ████ Decatur, GA█████. The address on my voter registration is ████████ Decatur, GA ████.

3. My individual circumstances are the following:

   a. I am registered to vote at ███████████████ Decatur, GA████, in DeKalb County.

   b. I currently attend Washington and Lee University in Lexington, Virginia.

   c. I applied for an absentee ballot on October 22, 2018 by emailing my absentee ballot application to the Dekalb County Voter Registration and Elections Office. I had not received my absentee ballot by November 1, 2018, so I called the Voter Protection Hotline regarding my application. The Voter Protection Hotline recommended that I resend my absentee ballot application via an email that included the documentation of the first email I sent with the attached application. I sent the second email to the Dekalb County Voter Registration and Elections Office on November 1, 2018.

   d. On November 2, 2018, I received an email from Dekalb County Voter Registration and Elections Office stating that my new absentee ballot application had been printed off, delivered to the absentee department for processing, and

388

would be mailed out that day. The email also stated that Administrative Assistant
did not see another request for an absentee ballot from me in the system.

   e.   I did not receive the absentee ballot until Election Day, November 6, 2018, and
        when I called the Dekalb County Board of elections I was told that my absentee
        ballot must arrive by 7:00PM on Election Day.

   f.   I did not mail in my absentee ballot.

4. I give this Declaration and/or Affidavit freely, without coercion, and without any
   expectation of compensation or other reward.

5. I understand that in giving this Declaration and/or Affidavit, that I am not represented by
   a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as
   anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct.

   Further affiant sayeth not, this the _15_ day of November 2018.


                                                    _____
                                                    Signature


Sworn to and subscribed before me
This the _15th_ day of November 2018.

_____
Notary Public

```
BRIANNE MARIE KLEINERT
       NOTARY PUBLIC
   REGISTRATION # 7742803
COMMONWEALTH OF VIRGINIA
  MY COMMISSION EXPIRES
     JANUARY 31, 2021
```

389

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Norman Broderick. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Cobb County in Georgia and my residence address is ███ ███████ Powder Springs, GA ██████

3. I am retired military. I was in the military for 24 years and I have voted absentee before, while being stationed overseas.

4. For the 2018 Georgia General Election, I could not exercise my right to vote due to unacceptable errors from elections officials.

5. I tried to vote absentee. I filled out all of my forms correctly, and I sent them in on time. But my ballot arrived at the wrong address, and elections officials would not resolve the situation.

    a. I work at the Shaw Air Force Base in Sumter, SC, so I knew I needed to vote absentee this election cycle. I submitted an application for an absentee ballot well in advance of the election.

    b. I went to the Cobb County Elections website. I designated my residential address as one in Georgia and my mailing address as one in South Carolina to ensure that the ballot was sent to me.

    c. I typed the form myself to ensure there were no mistakes. I emailed it in per the website instructions.

390

**d.** Later, my wife checked the mail at our home in Georgia and informed me that my ballot had arrived at my address in Georgia, instead of my address in South Carolina.

**e.** I clearly indicated that the ballot needed to be sent to South Carolina.

**f.** At that point, I knew that I did not have time to return to Georgia to vote before Election Day, and I hoped to find a resolution for the issue with the Cobb County Board of Elections.

**g.** I emailed the Cobb County officials to let them know I was disappointed with the process and that I wanted to file a grievance. I then visited the Cobb County Board of Elections website to file a grievance detailing my issue.

**h.** On the Saturday after the election, November 10, I received a call back.

**i.** An elections official informed me that they indeed made a mistake with my ballot and that, unfortunately, I would not be able to vote this cycle.

**j.** She acknowledged that the elections officials had failed on their end. They committed an error by mailing my ballot to the incorrect location.

**k.** She stated that after they receive the absentee ballot application, the ballot issuance process involves three separate people who verify that the information is correct.

**l.** Through three stages of the process, all three people, tasked with verifying the correct information, failed to ensure that my absentee ballot would be sent to the proper address.

**m.** The elections official informed me that a resolution would not be possible and that my ballot would not be counted.

**n.** I have copies of my application to vote absentee and the chain of email correspondence with the Cobb County Board of Elections.

**o.** As someone who served for decades in our military, the fact that my absentee ballot was mishandled by elections officials is unacceptable.

**p.** I did everything I needed to do to vote on my end, only to watch as my right to vote was taken away from me this election cycle.

**6.** I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

**7.** I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**8.** I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 6 day of December, 2018.

Norman Broderick

**DECLARATION UNDER PENALTY OF PERJURY**
**PURSUANT TO 28 U.S.C. § 1746**
**AND/OR**
**SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW**

1. My name is Dinesh Chandra. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Gwinnett County in Georgia and my residence address is ▮▮▮▮▮▮▮▮▮▮▮▮, Lawrenceville, GA ▮▮▮▮ .

3. I am 72 years old and voted by absentee ballot so that I would not have to stand on a long line to vote. I returned my absentee ballot on November 5, 2018 in person to the Gwinnett County Board of Registration and Elections office located at 455 Grayson Highway, Lawrenceville, Georgia. After arriving at the Board of Elections office, I handed my ballot to the person at the desk. The person at the desk asked me to sign a sticker they put on the envelope and I did so. The person then took my ballot to another room to compare my signature with the signature they have on file for me. After approximately five minutes, the employee returned and told me that the signatures matched. The employee told me that there was nothing else I needed to do to make my ballot count. No other instructions were given to me. On November 8, 2018, I learned that my absentee ballot was rejected because it was missing the year of my birth. On the same day, I went to the same Board of Elections office and explained that my ballot was not counted

because it was missing the year of my birth. I was told that nothing could be done to correct the error and my ballot would not be counted. I believe that since my signature matched and the rest of my information was on the ballot, my ballot should be counted.

4. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _____ day of November, 2018.

_____
Signature

Sworn to and subscribed before me
This the _____ day of November, 2018.

_____
Notary Public



395

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746**

1. My name is Maya Cross. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am registered to vote in DeKalb County in Georgia and my registered address is ███████████, Avondale Estates, GA ███

3. For the 2018 Georgia General Election, I attempted to vote absentee, but I was subjected to a very frustrating and flawed process. Despite doing everything I could to cast my ballot, I was deprived of my right to vote.

   a. I am an absentee voter because I am a temporary overseas resident. I am in my third year as a volunteer with the United States Peace Corps in Colombia.

   b. Attempting to vote absentee in the 2018 General Election was a very difficult process for me.

   c. To begin, I mailed my absentee ballot request on October 2nd from Colombia to Georgia through the U.S. embassy. The mail arrives to Washington D.C. through the diplomatic pouch and is then transferred to USPS for delivery to Georgia.

   d. In my absentee ballot request I asked that my absentee ballot be emailed to me. I waited a couple of weeks and did not receive any

396

email from DeKalb County. On October 23rd, I took it upon myself to call DeKalb County internationally through Skype.

e.  DeKalb County officials told me that they didn't know anything about my request, but nonetheless decided to email me my absentee ballot the same day.

f.  The possibility exists that my absentee ballot request got lost in the mail, but I doubt it. If I had not been willing to expend my time and resources to call DeKalb County, after weeks of not receiving my ballot, I would have not even had the chance to vote.

g.  I filled out my absentee ballot and mailed it from Colombia through the Embassy on November 1. My ballot followed the same process as my ballot request, first going to Washington through the diplomatic pouch and then to Georgia through USPS.

h.  On November 10, I started email correspondence with DeKalb County as the Secretary of State's My Voter Page did not indicate that my ballot had been received. On November 15, I was told by Dekalb County that from the Colombian embassy an absentee ballot should only take a week to arrive.

i.  On December 4, I again checked the My Voter Page and my ballot was listed as rejected. The page seems to claim that my ballot was

received on November 19, and since that was after the deadline, my
vote was never counted.

j.  Having to deal with this process internationally has been very
stressful. I am lucky that as a Peace Corps Volunteer, I have a
schedule flexible enough to allow me to spend hours investigating and
calling to make sure that my voice is heard.

k.  What about those who have a less flexible work schedule? What about
those who have children and don't have hours to spend online trying to
figure if their voice was actually heard? What if I hadn't had the time
or the energy to call DeKalb County internationally after I didn't
receive the absentee ballot?

l.  I am deeply angry that my vote was not counted. I did everything I
could on my end to exercise my right to vote, and I believe my right to
vote was taken away from me.

m. The difficulty I had voting absentee as an eligible Georgia voter, and
the fact that my vote was not counted, is completely unacceptable.

4.  I give this Declaration freely, without coercion, and without any expectation
of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the 28 day of December, 2018.

Maya Cross

**DECLARATION UNDER PENALTY OF PERJURY**
**PURSUANT TO 28 U.S.C. § 1746**
**AND/OR**
**SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW**

1. My name is Lamarra George. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia and my residence address is ███ ███████████████████ Atlanta, Georgia ██████

3. I have reviewed the list below and I believe that my situation most closely fits into the category that I have checked:

   a. _____ I requested an absentee ballot but I never received it.

   b. _____ I received an absentee ballot and returned it but my ballot was rejected.

   c. __✓__ I received an absentee ballot, returned it, received a confirmation of receipt, yet my vote was not counted.

   d. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) and was not offered a provisional ballot even though I reside in the county in which the precinct was located where I tried to vote.

   e. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) because I was told I was not a resident of the

county in which I was attempting to vote despite the fact that I had changed my address in a timely manner.

f. _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below). I asked for a provisional ballot but was told that it was too early in the day for provisional ballots or that there were not enough provisional ballots or that no provisional ballots remained.

g. _____ I moved counties but did not change my registration address. When I attempted to vote in my new county, the poll workers told me to return to my old county in order to vote.

h. _____ There were long lines at my polling location and I saw people leaving without voting.

i. _____ There were long lines at my polling location and I had to leave without being able to cast my vote.

j. _____ There were problems with the voting machines at the precinct at which I voted or attempted to vote.

k. _____ Other – please explain - _____

_____

4. My individual circumstances are the following: **My son, Julien Christopher George, is currently living and attending Marist College in**

**Florence, Italy.  Julien requested and received an absentee ballot via e-mail.  He also received an electronic ballot via**

**e-mail.  Julien cast his ballot for November 6th, 2018, election, and received a confirmation from Ralph Jones at Fulton County stating that his vote had been received and counted on October 31, 2018.  Having checked the MVP website online for confirmation of his vote, the website states that Julien, in fact, had not returned his ballot.  This is not true.  Attached is a copy of the e-mail he received confirming receipt of his vote.**

5. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _12th_ day of November, 2018.

_____
Signature

Sworn to and subscribed before me
This the _12_ day of November, 2018.

_____
Notary Public

Glen Paul Freedman
NOTARY PUBLIC
Fulton County, GEORGIA
My Commission Expires 11/5/19

402

Redacted Work Product

---

**From:** Lamarra George ████████████████
**Sent:** Monday, November 26, 2018 10:55 AM
**To:** Elizabeth Conrad
**Subject:** Fwd: Ballot Request Received

Ms. Conrad, please see the email confirm receipt of Julien's ballot. Please let me know if there is anything else you need.

Thank you.

Lamarra George, CCR-2582.

(Julien George's mother)

████████████

----- Forwarded Message -----
**From:** Julien George ████████████████
**To:** Lamarra George ████████████████
**Sent:** Friday, November 9, 2018, 9:59:06 AM EST
**Subject:** Fwd: Ballot Request Received

---------- Forwarded message ---------
From: <electronicballot_noreply@sos.ga.gov>
Date: Wed, Oct 31, 2018 at 3:55 PM
Subject: Ballot Received
To: ████████████████

Dear JULIEN CHRISTOPHER GEORGE,

We have successfully received your ballot for one or more upcoming elections via facsimile.

To find information regarding election dates and other general updates, please visit the Georgia Secretary of State's website for military and overseas voters at:
http://sos.ga.gov/index.php/elections/military_and_overseas_voting2.

If you need any additional information or assistance, please contact your county elections office at:

1

RALPH JONES

UOCAVA CONTACT, FULTON COUNTY

130 PEACHTREE STREET 2186

SW

ATLANTA, GA 30303 - 3460

4046127060 (phone)

4046123697 (fax)

ELECTIONS.ABSENTEE@FULTONCOUNTYGA.GOV

Thank you for being a Georgia voter.

This e-mail is an automated notification and is unable to receive replies. Please communicate directly with your county election office. They will be happy to assist you with any question or concern you may have.

404

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Emily Johnson. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Chatham County in Georgia and my residence address is ███████████████████████████ Cambridge, MA ███

3. For the 2018 Georgia General Election, I sent my absentee ballot request in well ahead of time, but I did not receive my ballot in time to send it in. I did what I needed to do to vote in this election, and yet my vote was taken away from me.

   a. I am a student at Harvard University. I am a senior studying the history of science.

   b. I mailed in the request for my absentee ballot on October 22nd from Cambridge, MA. I waited awhile and my ballot didn't come. I kept checking my mail and it still hadn't come.

   c. I thought I had done something wrong like misspelled my name or put in the wrong address. I had heard about problems with voting and had been as meticulous as possible to avoid them while filling out my ballot. But, I didn't think there it was possible that, something other than my own mistakes, could have gone wrong.

**d.** By Monday, November 5th, I still didn't have my ballot. On Election Day and in the days following, I saw voting issues intensifying in the news. I saw my friend Peggy Xu post on social media and speak on the record in the Washington Post about issues with her absentee ballot.

**e.** Peggy's story inspired me to investigate my ballot and I checked the Secretary of State's website. On the Secretary of State's My Voter Page, I saw that Chatham County had received my ballot request form on October 25th and mailed my ballot that same day to my address in Cambridge. And yet I never received it.

**f.** I checked my mail frequently after Election Day—out of morbid curiosity, I suppose— and finally received my absentee ballot the week of Thanksgiving. The packet containing my ballot had a sticker on the front, near the addresses, that said, "Received after election day."

**g.** Inside was a blank ballot for the General Election with Stacey Abrams and Brian Kemp on the ballot. This was incredibly confusing; the Secretary of State's website said my request had been received before Election Day. It felt like they were rubbing salt in my wounds by

sending me a ballot I couldn't use. I was angry and threw it out. It felt like a farce.

**h.** My father is Bob Johnson. He ran for Congress in District 1 in 2014 as a Tea Party Candidate. The first time I voted was in my father's election.

**i.** The second time I tried to vote, in 2016, I had a concussion was not able to vote. Despite all my best efforts, I was not able to vote again this year.

**j.** Voting is very important to me. When I went to vote for my father in 2014, the campaign manager for Buddy Carter's campaign was driving around the precinct in his truck. I remember my father saying that this was illegal voter suppression. Now, I feel like things have come full circle, at a different level. It's so upsetting.

**4.** I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

**5.** I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**6.** I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the $\underline{14^{th}}$ day of January, 2019.

Signature

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Roderick Jolivette. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Muscogee County in Georgia and my residence address is ▮▮▮▮▮▮▮▮▮▮ Midland, GA, ▮▮▮▮

3. My individual circumstances are the following:

   a. My dad died in March and my mom is now living with me. I live in Muscogee County and my mom previously lived in Albany (Dougherty County). My mom is still registered to vote in Dougherty County.

   b. I was going to take her to Albany to vote on Election Day but a few days before Election Day she was scheduled to have surgery on her foot and have her toe removed. In the week before Election Day, I went to Muscogee County Elections Office to request an absentee ballot. After some confusion, I was instructed to reach out to Dougherty County Elections Office. It was a bit unclear what the process was to request an absentee ballot in her circumstance between counties.

   c. On Friday, November 2nd, before the deadline, I submitted the application for the absentee ballot with Dougherty County Elections

Office. That same day the Dougherty County Elections office faxed in the application and told me they would send out the ballot that same day. I was told the ballot would arrive to my home in the next 1-2 days, either Saturday or Monday, and that it should not be a problem.

d.  After not receiving the ballot over the weekend, I called the Dougherty Elections Office to check on the status on Monday and Tuesday. I was going to let my mom fill it out and I was going to drive it to Albany on Monday or Tuesday before the polls close. As long as we received the ballot an hour or so before polls closed, we would have been able to turn it in before the deadline.

e.  The ballot arrived on Wednesday, November 7th. My mother was upset, she really wanted to vote. My mom is 71 years old. She has been voting all her life. I remember the court made a ruling on the absentee ballots, so I thought there might be a chance I could still receive it and have it counted, especially considering the circumstances.

f.  I continued to reach out to the Secretary of State's Office and the Dougherty County Elections Office, however, they told me it was too late for her vote to be counted. A woman I spoke with told me I should have been provided a pre-paid overnight mailing envelope for

the ballot, but I was repeatedly reassured that the absentee ballot
would arrive in time for me to drop it off in Albany. It was all very
frustrating and in the end my mother was not able to vote.

4. I give this Declaration freely, without coercion, and without any expectation
of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a
lawyer. Nor has any lawyer asked me to be their client or to serve in anyway
as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct.
Further affiant sayeth not, this the 12 day of December, 2018.


Roderick Jolivette

411

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is _____Jack Albert Lansky___. I am over eighteen years of age

   and competent to testify to the matters contained herein.

2. I am a resident of ___Fulton_____ County in Georgia and my residence

   address is _                          Atlanta GA              .

3. I have reviewed the list below and I believe that my situation most closely

   fits into the category that I have checked:

   a. _____ I requested an absentee ballot but I never received it.

   b. _____ I received an absentee ballot and returned it but my ballot was
   rejected.

   c. _____ I received an absentee ballot and returned it but my ballot was
   not accepted.

   d. _____ I was not permitted to vote using a voting machine (a DRE)
   (circumstances below) and was not offered a provisional ballot even
   though I reside in the county in which the precinct was located where
   I tried to vote.

   e. _____ I was not permitted to vote using a voting machine (a DRE)
   (circumstances below) because I was told I was not a resident of the

412

county in which I was attempting to vote despite the fact that I had changed my address in a timely manner.

**f.** \_\_\_\_\_ I was not permitted to vote using a voting machine (a DRE) (circumstances below). I asked for a provisional ballot but was told that it was too early in the day for provisional ballots or that there were not enough provisional ballots or that no provisional ballots remained.

**g.** \_\_\_\_\_ I moved counties but did not change my registration address. When I attempted to vote in my new county, the poll workers told me to return to my old county in order to vote.

**h.** \_\_\_\_\_ There were long lines at my polling location and I saw people leaving without voting.

**i.** \_\_\_\_\_ There were long lines at my polling location and I had to leave without being able to cast my vote.

**j.** \_\_\_\_\_ There were problems with the voting machines at the precinct at which I voted or attempted to vote.

\_\_\_**X**\_\_ Other – please explain - I am a Fulton County resident that was traveling abroad in Europe until Nov 7th, after election day. I filled out and emailed an absentee ballot application on time, but I didn't check the box for overseas resident. I didn't know exactly how I should fill the form out, and when I tried calling their office during normal

operating hours (multiple times), no one ever picked up. Eventually I emailed the form filled out as best I could, clearly describing my situation and hoping for clarification on correcting the form if necessary before it was too late. They never responded to my emails or phone calls, and there was no way to leave a message. The phone just rings and rings and eventually cuts off. Finally on election day when I still hadn't received any email, I tried calling a different department and they gave me a different phone number for a Shamira Marshall. She told me to email her the form again, which I did. Finally I was told that they mailed me a paper absentee ballot because I had filled the form out incorrectly, but that form had to be turned in by the end of the day. I explained to her that I was still abroad, had tried many times to call and email before it was too late, as I didn't know how exactly how to fill out the form based on my situation and didn't want to commit perjury. I immediately emailed the form back corrected, and also reached out directly to Shamira's supervisor, Ralph Jones, via email and phone, and even left him a direct voicemail. His number was also not available publicly and I had to get it from the North Annex. As usual, I never got a response and was never followed up with. I am upset for two reasons: 1. Most importantly, none of this would have happened if they had just done their jobs and been available to answer my questions, pick up the phone, reply to my emails, etc, and if the form was clearer. 2. I sent them back the corrected form with the proper check boxes before the deadline for electronic transmission (Friday Nov 9th) and they still never sent me the ballot, followed up with me, etc. I would also like to note that even on the original form I put my email address and checked the box requesting electronic transmission AND explained my situation clearly in the email that

the form was attached to. I feel my vote was suppressed, whether intentionally or not, due to employee incompetence at the Fulton Absentee Office.

k. _____

_____

4. My individual circumstances are the following:

5. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _____ day of November, 2018.

Signature

Sworn to and subscribed before me
This the 20th day of November, 2018.

Notary Public

415

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746**

1.  My name is Sarah Laurand. I am over eighteen years of age and competent to testify to the matters contained herein.

2.  I am a resident of DeKalb County in Georgia and my residence address is ████████████████, Stone Mountain, GA, ██████

3.  For the 2018 Georgia General Election, I attempted to vote absentee but my ballot was mishandled. I was disenfranchised from my right to vote for state and local offices.

   a.  I am an experienced voter who has exercised my right to vote absentee by mail many times before.

   b.  For the 2018 Georgia General Election, I requested an absentee ballot but I elected to receive my absentee ballot electronically, for the first time. Previously I have received my absentee ballot by post.

   c.  I emailed the DeKalb County to make sure that my absentee application had been accepted. DeKalb County told me that the signature had not come through so they asked me to sign and re-submit the application.

   d.  I re-submitted and signed the application. DeKalb County said they would issue a link with an electronic ballot.

**e.** By October 10, since it had been a while since my previous correspondence, I was concerned because I had not received my ballot.

**f.** I emailed the county again and they said they would reissue the ballot. When I received the ballot, I saw that my ballot had only federal races on it -- no statewide or local offices.

**g.** I have always been able to vote for local offices, statewide offices, and statewide amendments on my ballot. I spoke with my mom because I thought this was strange.

**h.** My mother said she had other issues on her ballot herself, so that prompted me to follow up. I surmised that my ballot was delivered with important parts missing due to its electronic delivery.

**i.** I emailed the county on October 22 and two different officials confirmed that I had received the correct ballot.

**j.** As far as I am aware of, I filled out the application in the same way as I had in previous years, and I have always received the full ballot.

**k.** After the election, I reviewed my application and confirmed that I had checked the box for "temporary overseas resident," which means I should have gotten the full ballot with statewide and local candidates.

**l.** I was not able to vote for statewide or local offices this year, because DeKalb County refused to deliver me a full ballot.

**m.** I was deprived of my right to vote for statewide and local offices this election cycle.

**4.** I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

**5.** I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

**6.** I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _28_ day of December, 2018.

_____
Signature

418

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Isaac Mirza. I am over eighteen years of age and competent to

   testify to the matters contained herein.

2. I am a resident of DeKalb County in Georgia and my residence address is

   ███████████████████████ Atlanta, GA, ████. I currently live

   abroad in India as a Fulbright Scholar.

3. For the 2018 Georgia General Election, I had to jump over numerous hurdles

   and spend a considerable amount of time and resources to vote absentee.

   a. Though I am temporarily living overseas, I knew I needed to vote in

      such an important election, so I prepared to vote absentee for the

      election cycle.

   b. Initially, I went to the Secretary of State's web page, downloaded the

      absentee ballot request form, and thoroughly read the instructions for

      how send my form in and request my absentee ballot.

   c. I clicked on the link that was supposed to tell me where I would need

      to send my absentee ballot request, but no specific name was listed: it

      just said "County Registrar's office."

   d. I don't remember an email being associated with the County Registrar

      in DeKalb County at that time. I Googled the county registrar and got

the name "Maxine Daniels." I emailed the application to Maxine
Daniels on October 10 (IST) at mwdaniels@dekalbcountyga.gov.

e. Within a minute, I got an auto-response from this email that said she
would be retiring September 27, 2017. The email said to contract
Mary Frances Weeks at mfweeks@dekalbcountyga.gov or Ericka
Hamilton at ehamilton@dekalbcounty.gov or 404-298-4020.

f. I sent my application in again to those email addresses about six hours
later on October 10th. But I never heard back from Mary Frances or
Ericka. A week later, on October 22, I began to wonder about the
status of my absentee ballot request.

g. I Googled again and this time found a fourth email address,
voterreg@dekalbcountyga.gov. I sent my application to that email
address and they responded within five hours. Mary Frances Weeks
responded and said she could not open my attachment.

h. I sent a new copy of the application back to her. Four hours later, she
told me that my request had been printed and delivered for processing.
I heard nothing between October 22 and October 29.

i. On October 29, I called the Democratic Party's Voter Protection
hotline and they could not find any record of my application online.
They called the County Registrar and we did a three-way phone call.

**j.** After half an hour on the phone, the woman from the County said that she emailed me the application confirmation. I received an email from electronicballot_noreply@sos.ga.gov that said that my application had been approved and I would be receiving a ballot sometime soon.

**k.** Ten hours later, I got another email that said my ballot was ready on the Secretary of State's My Voter Page.

**l.** On October 30, I printed out the ballot and read the instructions many times. I have ADHD and know that's easy for me to overlook small details, so I read the instructions over, and over, and over again.

**m.** Before I put any documents in any envelope, I checked five or six times to make sure I did it correctly. I packed my ballot, included my affidavit, and went through all of the steps I was supposed to take.

**n.** Because it had taken so long for my ballot to be ready for me, I went to a DHL express and spent $50 to have my ballot sent in time to be counted.

**o.** I stayed in the DHL office and watched the man put the label on my envelope to make sure he didn't cover the portion that said "Official Absentee Ballot."

**p.** They gave me a tracking number and told me that my ballot would arrive by Monday, November 5th. On Monday, November 5th, I

checked both the DHL page and the SOS My Voter Page to see if my ballot had made it to DeKalb County.

**q.** On the DHL website, I saw that a T. Martinez had signed for the delivery on November 2, 2018 at 5:05pm. I took a screenshot.

**r.** On the My Voter Page, I saw that my request had been received on October 29 and my ballot was issued on October 29. The ballot return date and ballot status were both blank.

**s.** At that point, I assumed that they would update the status after they counted the votes. I was not concerned.

**t.** On the morning of November 7 (India Standard Time, which was the night of November 6), my wife told me that people had problems with their absentee ballots and in person voting. I checked again on the My Voter page and discovered that my vote had not been counted. I took a screenshot.

**u.** I called the Voter Protection Hotline again and they thought maybe DeKalb County had not had a chance to count everything yet and update the system. They said to wait two days. I waited two days, and on November 9, I posted on FaceBook that I had just spent 20 minutes on the phone with DeKalb County.

**v.** They said that the woman who signed for my ballot "works on the opposite side of the building and they needed to track her down to

422

find out what happened to your package." It sounds like someone signed for my package, put it down somewhere, and then went home for the weekend. The ineptitude was infuriating.

w. After that woman hung up, two hours later, she called later and said that she had tracked down my ballot. I went online to the My Voter Page and saw that my vote had been counted. She had backdated my ballot so that it said it had been received on the day of the election.

x. I'm sure that the only reason my vote counted was because, throughout the whole process, I referenced that I am a Fulbright Scholar. I used this title and position to credential why I was voting absentee and demand attention; given the stories I have heard and read, I don't believe I would have been heard without it.

y. This shouldn't be happening to anyone and despite the fact that things eventually worked out for me and my ballot was counted, I can't sit back and say everything turned out okay—it's not okay. Even given my relative privilege, it took three days of me hounding people to track down my ballot application and, before that, get my application submitted. It was nonsense. This was an important election to make change in Georgia. I wanted to vote to help people who do not have the privileges I have.

4.  I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5.  I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6.  I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the 20 day of February, 2019.

Signature

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Betty Morris. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Dekalb County in Georgia and my residence address is ███████████ Decatur, GA ██████

3. For the 2018 Georgia General Election, I helped my sister submit an absentee ballot to the Dekalb County Board of Elections, which she never received. Sadly, my sister was unable to vote.

   a. We received the absentee application request for my sister in the mail. In mid-October, well before Election Day or the deadline for submitting absentee ballots, I submitted the request for an absentee ballot on behalf of my sister, Jossiephine McClain, who has a disability.

   b. We never received the absentee ballot, which meant my sister was not able to vote.

   c. My sister voted in 2016; she stood in line but the lines were so long and with her disability, it made absentee voting the right thing to do.

   d. Unfortunately, my sister was deprived of her right to vote after never receiving her absentee ballot.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the ___ day of November, 2018.

Betty Morris

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Nailah Ogle. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of DeKalb in Georgia and my residence address is ███ ███████ Stone Mountain, Georgia ██████

3. My individual circumstances are the following:

   I attend law school at Georgetown University. I requested an absentee ballot the first week of October 2017. Approximately two weeks later, my mother told me that she called the DeKalb Board of Electors to inquire about my ballot and was told that it had been sent to the wrong address. I followed up with the DeKalb Board of Electors and the status I was given was pending. No one followed up with me. I did not get to vote.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 21 day of November, 2018.

Signature

Scanned with CamScanner

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Robyn Roberts. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of DeKalb County in Georgia and my residence address is ██████████, Decatur, GA ████.

3. For the 2018 Georgia General Election, my daughter experienced an imperfect absentee ballot process that caused anxiety, and for the following runoff election, the absentee ballot process seems to have failed my daughter completely.

   a. My daughter, Alexandra (Alex) Greiner, and I live in DeKalb County and are registered to vote there. Alex attends Wellesley College in Massachusetts.

   b. For the General Election, Alex requested her absentee ballot around the middle of October and received it around 10 days later. She mailed the absentee ballot before the end of October.

   c. Alex periodically checked the Secretary of State's My Voter Page (MVP) to see if her ballot had been received. She checked on Election Day, November 6, 2018, and the absentee ballot section of her MVP page did not show that her ballot was received.

**d.** Alex and I were both very concerned because voting in this election was very important to her. So Alex checked MVP again on the Thursday after the Election and her absentee ballot status said that it was received on 11/05/2018 and that it was accepted.

**e.** To see that her ballot counted was a relief but also caused us anxiety because the status of her ballot did not show up until after the election. We thought the ballot may not have arrived on time.

**f.** Alex came home for Thanksgiving. She wanted to vote in the Run-off Election but was leaving right before Early Voting would start. In order to get an Absentee Ballot mailed to her at Wellesley as quickly as possible and to make sure the ballot request form arrived, we decided that I would deliver the form in person.

**g.** She filled out the Absentee Ballot Request form and I went in person to deliver it to the DeKalb Board of Elections office on Memorial Drive on November 26.

**h.** When I arrived, I handed Alex's Absentee Ballot Request form to the woman working at the Elections office. She took the form, stamped the ballot request form using a type of stamping machine, and said it should be sent out that day.

i.  To this day, December 9, 2018, Alex has not received her absentee ballot at Wellesley College. Her MVP says it was issued 11/27/18 but she never received it and did not have time to request another one.

j.  For the general election, my daughter Alex was left wondering whether her absentee ballot had actually counted until two days after the election. Then, Alex requested her ballot well-ahead of time in order to vote in the Run-off election, but never received her ballot.

k.  The absentee ballot process was imperfect at best for the General Election. For the runoff election, the absentee ballot process seems to have prevented Alex from exercising her right to vote altogether.

4.  I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5.  I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6.  I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the 14ᵗʰ day of December, 2018.

_Robyn Roberts_
Signature

431

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Mary Alexandra Romero. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Fulton County and my address is ███████████ College Park, GA ████

3. My individual circumstances are the following:

   a. I voted with an Absentee Ballot because I'm currently working in New York. I requested an absentee ballot Labor Day weekend. About mid- October, I realized that friends of mine who were also voting absentee had received their ballots but I still hadn't received mine which left me confused. A friend of mine posted a number for a voter protection hotline that I called sometime mid - October.

   b. From my conversation with the hotline, I found out that my absentee request had been rejected because I signed the ballot with a PDF e-signature instead of printing it out and manually signing it. I was never notified that my ballot was rejected. I only learned it was rejected after I called the Voter Protection Hotline.

   c. It was early enough before Election Day that I was able to request another ballot. After doing so, I received another Absentee Ballot. When I received my second absentee ballot - I looked over everything

and realized that it did not explicitly state that an e-signature was not permissible. I was able to send in my second absentee ballot about a week and a half before Election Day.

d. After the Election, a friend of mine posted that everyone should check the status of their vote. I proceeded to do so and online my status was listed as rejected. Again, I called the Voter Protection Hotline who connected me with the Board of Elections in Fulton County who relayed to me over the phone that my vote was counted in the system. I'm still unsure about whether my vote counted.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration , that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 19th day of November, 2018.

Mary Alexandra Romero

**DECLARATION UNDER PENALTY OF PERJURY**
**PURSUANT TO 28 U.S.C. § 1746**
**AND/OR**
**SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW**

1. My name is Elizabeth Tallmadge. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia and my residence address is

   ▇▇▇▇▇▇▇▇▇▇ Atlanta, GA ▇▇▇ ▇▇▇▇▇.

3. I have reviewed the list below and I believe that my situation most closely fits into the category that I have checked:

   **a.** _____ I requested an absentee ballot but I never received it.

   **b.** _____ I received an absentee ballot and returned it but my ballot was rejected.

   **c.** _____ I received an absentee ballot and returned it but my ballot was not accepted.

   **d.** _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) and was not offered a provisional ballot even though I reside in the county in which the precinct was located where I tried to vote.

   **e.** _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below) because I was told I was not a resident of the

434

county in which I was attempting to vote despite the fact that I had changed my address in a timely manner.

**f.** _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below). I asked for a provisional ballot but was told that it was too early in the day for provisional ballots or that there were not enough provisional ballots or that no provisional ballots remained.

**g.** _____ I moved counties but did not change my registration address. When I attempted to vote in my new county, the poll workers told me to return to my old county in order to vote.

**h.** _____ There were long lines at my polling location and I saw people leaving without voting.

**i.** _____ There were long lines at my polling location and I had to leave without being able to cast my vote.

**j.** _____ There were problems with the voting machines at the precinct at which I voted or attempted to vote.

**k.** __x___ Other – please explain – I applied for an absentee ballot and it was denied.

**4.** My individual circumstances are the following:

My husband (Allin Tallmadge  DOB ▇▇▇▇▇ ) and I applied for our absentee ballot at end of August and never received them. We called the Voter Protection

Hotline and discovered that the ballot request was denied because of a signature issue. We were never notified and were unable to obtain new ballot because we were out of country for an extended period of time. Ultimately, we were unable to vote

5. I give this Declaration and/or Affidavit freely, without coercion, and without

   any expectation of compensation or other reward.

6. I understand that in giving this Declaration and/or Affidavit, that I am not

   represented by a lawyer. Nor has any lawyer asked me to be their client or to

   serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct.

   Further affiant sayeth not, this the _15_ day of November, 2018.

Signature

Sworn to and subscribed before me
This the _____ day of November, 2018.

_____
Notary Public

436

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746**

1. My name is Marjorie Thuon. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Fayette County in Georgia and my residence address is ██████████, Peachtree City, GA ██████

3. For the 2018 Georgia General Election, I received an incomplete absentee ballot, which disallowed me from voting this cycle.

   a. I attend school in Massachusetts, and therefore needed to vote absentee this cycle. In fact, as October set in, my mother sent me regular reminders to request my absentee ballot and make my voice heard.

   b. I visited the Secretary of State's website, printed out a form labeled 'Application for Official Absentee Ballot,' filled in the required boxes, and sent the ballot request to the email address listed for Fayette County's Election Office.

   c. Within a few hours, I received confirmation that my application had been received for processing and thought that was that.

   d. Then I waited for my ballot to arrive. When my absentee ballot did arrive by mail, due to academic obligations including midterm exams,

lab work, and research papers, I had to wait until one week before Election Day to sit down with the ballot.

**e.** When I opened the neatly sealed white envelope, instead of a long strip of folder paper, dotted with names of state and county candidates, I found only a single question, marked for my hometown of Peachtree City, regarding the Sunday ban on the sale of alcohol.

**f.** I rechecked the envelope for the missing pages. Finding nothing, I compared my emailed application to my college-aged brother's, and they were exactly the same. Troubled, but not suspicious, I decided that the ballot must have been split into two parts.

**g.** I mailed what I thought was the 'first' ballot on November 4, and waited patiently for a 'second' ballot. A second ballot did not arrive.

**h.** I try to vote in every election—to not be a part of one so critical felt almost shameful.

**i.** I did what I needed to do, as a Georgia citizen, requesting an absentee ballot well-ahead of time.

**j.** I received nothing close to a complete ballot. My right to vote was taken away from me.

**4.** I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the _2 6_ day of November, 2018.

Marjorie Thuon

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746**

1. My name is Yujue Wang. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am registered to vote in Fulton County in Georgia and my registered address is ███████████████, Johns Creek, GA ██████

3. For the 2018 Georgia General Election, my absentee ballot was addressed incorrectly, which disallowed me from voting this cycle.

   a. I moved to the Bay Area from Georgia near the end of September, unsure whether I would stay in the Bay Area permanently, so I maintained my Georgia voter registration.

   b. I requested my absentee ballot on October 9, 2018 to ensure that I would be able to vote in the 2018 Georgia General Election.

   c. I requested my absentee ballot by mail and via email. In the past I have requested an absentee ballot and had issues receiving one so I wanted to make sure I also had an emailed copy for documentation purposes.

   d. Attached is a copy of my application to vote by mail that I submitted through email.

   e. I specified on my ballot that I needed to have the ballot addressed a specific way in order to reach me at my office at WeWork. I included

the address and all the instructions, including that it needed to be addressed to the company with "C/O Rachel Wang" below.

f. The absentee ballot was addressed incorrectly and simply used my legal name. When the ballot arrived, it was immediately returned to sender.

g. When I called the Fulton County Elections Office no one picked up and I did not have time to continue to follow up.

h. I wanted to vote. I did what I needed to do in order to vote, requesting my absentee ballot a month before Election Day. But Fulton County mismanaged my absentee ballot application, which kept me from voting.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the _25_ day of December, 2018.

Yujue Wang

441

### DECLARATION UNDER PENALTY OF PERJURY
### PURSUANT TO 28 U.S.C. § 1746

1. My name is Stephanie Washington. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Gwinnett County in Georgia and my residence address is ▮▮▮▮▮▮▮▮▮▮ Snellville, GA ▮▮▮▮

3. For the 2018 Georgia General Election, my son Jale'n had great difficulties voting absentee.

    a. My son Jale'n Hodges is a student who is living out of the state. He sent in his absentee ballot request in September. He came home on Fall Break the second weekend in October and he filled out his ballot.

    b. I was very careful and checked to make sure he filled it out correctly, and then we mailed it off. On October 20th, we received a letter that said his ballot had been rejected due to issues with the oath.

    c. I called Gwinnett County the following Monday, 10/22, and the person told me that I could request a new ballot on his behalf online. However, I was concerned that they would not send the ballot to Jale'n directly on campus so I called back.

    d. The second person told me that I could sign my name on the application but check the box that said I was requesting on behalf of

442

someone out of the state and fax it in. I not only faxed the application but also mailed it because I wanted to have a paper trail of the request.

**e.** I checked in with my son frequently to make sure that he received the ballot.

**f.** I called Gwinnett County at least five times between October 22nd and October 30th to make sure that they were giving me the correct information and that they would mail the ballot.

**g.** I checked his address twice and checked on the status of the ballot twice.

**h.** The County repeatedly told me my son's ballot would be mailed "in the next day or two", but it was not mailed until 10/30 -- a week after they received the application.

**i.** I called Gwinnett County on Friday, 11/2, because my son had not received his ballot and was told that, as long as the ballot was postmarked by 11/6, it would be counted. The officials did not know why it took so long for his ballot to be mailed.

**j.** Jale'n finally received his ballot on Monday, 11/5, the day before the election. I called Gwinnett County that day and, this time, I was told that the ballot must be received in the office by 7pm on Election Day to be certified.

**k.** I told the woman what another official had told me on Friday, that the ballot just needed to be postmarked by 11/6, and the woman said, "I'm sorry m'am you were given incorrect information".

**l.** This is not helpful when you are trying to do the right thing. I talked with Jale'n as he filled out the ballot again and mailed it back the same day.

**m.** I was perturbed. This has happened before. Jale'n was not able to vote in the 2016 Presidential Election. His absentee ballot was rejected twice because his signature did not match.

**n.** I believe they target kids who are out of state because they are not here and cannot vote in person.

**o.** Next year, my son will physically come home to Georgia to vote in person. What really bothers me the most is that, after they rejected Jale'n the first time, I wanted to speak with the head of Gwinnett Voter Registration about this and have never heard back.

**p.** It should not be this hard to vote. My son was disenfranchised.

**4.** I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the _21_ day of December, 2018.

Signature

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Rachel Shauna Christine Edler. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of DeKalb County and my address is ███████████

   Stone Mountain, GA, ████

3. My individual circumstances are the following:

   a. I live in Washington D.C. while I attend Howard University. My dad requested an absentee ballot for me and sent it to me with postage. I received the ballot in early October, around the 5th. I sent it in a few weeks later, probably around the 15th. I signed the ballot every place there was an "X".

   b. I wanted to see if my ballot was received, so I looked on the Secretary of State's MVP (My Voter Page) website. I checked there every day. My ballot was rejected for "Insufficient Oath Information." I don't even know what that means.

   c. When I saw that it had been rejected I did not know what to do and after reaching out to people I was sent the number for a hotline to call if there are problems with your ballot. The hotline gave me the number for the Board of Elections. I called the Board of Elections early last week (Monday or Tuesday, 11/5 or 11/6) and they asked for

my name and number and said they would call me back. They did not
call me back.

    **d.**  I called again on the 12th or so and the Board of Elections said they
could not make a decision until the judge rules on what she wants to
do with absentee ballots. I asked the woman I spoke with to give me
an estimated time of when she would call me back but she could not.

    **e.**  They have not called me back. I have called many times and they
transfer me but when the call is transferred it drops. I worked in
customer service and know that you need to wait for the other person
to pick up before the call is transferred, or else it drops. The Board of
Elections takes my information down and does not do any follow-up
with my case.

**4.** I give this Declaration, without coercion, and without any expectation of
compensation or other reward.

**5.** I understand that in giving this Declaration, that I am not represented by a
lawyer. Nor has any lawyer asked me to be their client or to serve in anyway
as anything other than a witness in this litigation.

**6.** In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that
the foregoing is true and correct.

Further affiant sayeth not, this the ___ day of November, 2018.

447

Rachel Shauna Christine Edler

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Tammy Fortune-Coles. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Rockdale County in Georgia and my residence address is ▮▮▮▮▮▮▮▮▮▮▮▮▮ Conyers, GA ▮▮▮▮▮

3. For the 2018 Georgia General Election, I felt very anxious because the Secretary of State's website took a very long time to reflect the fact that my absentee ballot request had been received.

   a. I requested an absentee ballot very early on in the process, and I sent it in at the end of September.

   b. After I sent my ballot it, I checked the Secretary of State's My Voter Page repeatedly for updates on my ballot status.

   c. Weeks went by, I still did not see an update.

   d. Only on October 26 did the Secretary of State's My Voter page display that my ballot was received on October 5.

   e. I cannot believe that it took three entire weeks for my absentee ballot status to display as having been received.

   f. The severe delay in my absentee ballot status caused me anxiety, and I cannot think of any good excuse for it.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 31 st day of December, 2018.

Signature



## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is ANNISHA JE'NAE FRIALL. I am over eighteen years of age

   and competent to testify to the matters contained herein.

2. I am a resident of DEKALB County in Georgia and my residence address is

   ███████████████████████ STONE MOUNTAIN, GA███████

3. I received an absentee ballot and returned it but my ballot was rejected.

4. My individual circumstance is the following:

I received my absentee ballot in late September and mailed it in on November 1, 2018. When I found out about the MVP website from my friend, I checked it to see if my ballot was accepted and it was not due to "insufficient oath information". I called the numbers I was able to find online. I called the Stone Mountain office and they forwarded me to someone that handles the absentee ballots. I was told by this person that "Once it's in, it's in. There is nothing you can do about it." I found this out on Thursday after the election. I never received a call or email advising me that the ballot was rejected. By then, it was too late to go to the polling place and vote.

5. I give this Declaration freely, without coercion, and without any expectation

   of compensation or other reward.

6. I understand that in giving this Declaration, that I am not represented by a

   lawyer. Nor has any lawyer asked me to be their client or to serve in anyway

   as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 26 day of November, 2018.

Signature

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Ora L. Gadson. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Dougherty County in Georgia and my residence address is ███████████, Albany, GA ███.

3. I am 90 years old and have been sick since January. I tried to vote by absentee ballot because I did not feel well enough to vote in person.

4. I requested an absentee ballot on September 12, 2018. I did not receive my ballot until approximately one month later. I completed it and mailed it in.

5. I understand that my absentee ballot was received October 29, 2018 and was rejected because of "insufficient oath information." I do not recall being made aware that it was rejected and would not count.

6. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

7. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

8. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _13_ day of November, 2018.

_Ora Lee Madison_
Signature

Sworn to and subscribed before me
This the _13_ day of November, 2018.

_Myracle S. Hall_
Notary Public

454

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746
AND/OR
SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW**

1. My name is Olivia Haas. I am over eighteen years of age and competent to
   testify to the matters contained herein.

2. I am a resident of DeKalb County in Georgia and my residence address is

   ▮▮▮▮▮▮▮▮▮▮▮▮ Atlanta, GA ▮▮▮. I am temporarily living in

   Brooklyn, New York.

3. I have reviewed the list below and I believe that my situation most closely
   fits into the category that I have checked:

   a. _____ I requested an absentee ballot but I never received it.

   b. _x_ I received an absentee ballot and returned it but my ballot was
      rejected.

   c. _____ I received an absentee ballot and returned it but my ballot was
      not accepted.

   d. _____ I was not permitted to vote using a voting machine (a DRE)
      (circumstances below) and was not offered a provisional ballot even
      though I reside in the county in which the precinct was located where
      I tried to vote.

   e. _____ I was not permitted to vote using a voting machine (a DRE)
      (circumstances below) because I was told I was not a resident of the

county in which I was attempting to vote despite the fact that I had changed my address in a timely manner.

**f.** _____ I was not permitted to vote using a voting machine (a DRE) (circumstances below). I asked for a provisional ballot but was told that it was too early in the day for provisional ballots or that there were not enough provisional ballots or that no provisional ballots remained.

**g.** _____ I moved counties but did not change my registration address. When I attempted to vote in my new county, the poll workers told me to return to my old county in order to vote.

**h.** _____ There were long lines at my polling location and I saw people leaving without voting.

**i.** _____ There were long lines at my polling location and I had to leave without being able to cast my vote.

**j.** _____ There were problems with the voting machines at the precinct at which I voted or attempted to vote.

**k.** _____ Other – please explain - _____

_____

**4.** My individual circumstances are the following:

I recently graduated from Converse College with a degree in Politics and Spanish. Voting is very important to me, and I believe in the importance of voting in local elections and making my voice heard. I have voted twice in the past via absentee ballot, and I have never had any problem with doing so, at least to my knowledge. For the 2018 election, however, I had several problems, and my ballot ending up being rejected.

I first requested an absentee ballot on September 26, 2018, but I never received it. I called to follow up on that request towards the middle to end of October. The records reflect that I requested the second ballot on October 18, 2018. I did receive that ballot, and I returned it. Records show that the ballot was received on November 3, 2018. I never received any other documentation or correspondence about my ballot.

The day after the election, November 7, 2018, I decide to check on the status of my vote. That is when I learned for the first time that my ballot had been rejected. I called the DeKalb County Chief Registrar's Office to find out why my vote had been rejected, and they told me that there was some sort of issue with my oath. They told me that they would submit a service request to the absentee ballot office, who would then called me. They did not provide me with a tracking number for my complaint, and they were

unable to provide any sort of estimate on when I would hear back about my ballot.

On November 8, 2018, I filed a complaint with the Secretary of State's office via a form online. I have not heard anything in response to this complaint either.

5. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

6. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

7. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the 13th day of November, 2018.

Signature

Sworn to and subscribed before me
This the 13th day of November, 2018.

Notary Public

MARIA ESTHER ARIA RAVEN NOLASCO
Notary Public, State of New York
No. 01NO6069167
Qualified in Kings County
Commission Expires January 22, 2022

458

**DECLARATION UNDER PENALTY OF PERJURY**
**PURSUANT TO 28 U.S.C. § 1746**
**AND/OR**
**SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW**

1. My name is Jordan L. Hargrave. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Gwinnett County in Georgia and my residence address is ▮▮▮▮▮▮▮▮▮▮ Lilburn, GA ▮▮▮▮

3. I am currently out-of-state and requested an absentee ballot to vote in the November 6, 2018 election. I requested an absentee ballot at the end of October and received it on November 2, 2018. On November 3, 2018 my dad visited me and took my completed absentee ballot, which he mailed from Lilburn, Georgia on November 4, 2018 via United States Postal Service to Lawrenceville, Georgia. On November 9, 2018, I learned that my ballot was rejected because it was missing my date of birth. I believed that my ballot was complete and my vote should count.

4. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct.

459

Further affiant sayeth not, this the 12 day of November, 2018.

Jordan Hargrave
Signature

Sworn to and subscribed before me
This the 12 day of November, 2018.

Philip Werr
Notary Public

460

State of Georgia
County of _Gwinnett_

Signed or attested before me on ___11-12-2018,___

(Date)

by _____Jordan     Hargrove_____, who proved to me on the

(Printed Name[s] of Individual[s] Signing Document)

basis of satisfactory evidence to be the person(s) who appeared before me.

___ Personally Known or

_✗_ Produced Identification

Type of ID ___Ga Drivers License___

Notary
Seal

(Signature of Notary)
(Name of Notary Typed, Stamped or Printed)
Notary Public, State of Georgia
My commission expires: ___02-12-2021___

_Philip Warner_

461

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Sharonda Longino. I am over eighteen years of age and

   competent to testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia, but am currently living in

   California to work. My California address is ██████████████████████

   ██████Valencia, CA 91381.

3. My individual circumstances are the following:

   a. I'm a traveling nurse who is currently working in California, but I'm
      registered to vote in Georgia. I requested an absentee ballot
      using vote.org on 10/27/18.
   b. I received by absentee ballot on Nov 2. I already knew the candidates
      I was voting for so I immediately filled it out and went to USPS to
      send the absentee by Priority Mail. When I went to USPS, I received a
      confirmation that my envelope would arrive on Nov 5th and a
      tracking number. I purposely chose to have the envelope arrive early
      to ensure it would be received by closing on Nov 6.
   c. On Nov 5, I checked my tracking number and the status stated that my
      ballot envelope had been received and signed for, but I did not see this
      status reflected in My Voter Page on the Secretary of State's Website.
   d. I called Fulton County Board of Elections and a representative could
      not confirm whether or not my ballot had been received. The
      representative told me that the Board of Elections was working on
      processing ballots from Friday, Nov 2nd. and that the remaining after
      Nov 2nd would be processed on Tuesday by 5 pm.
   e. On Election Day, I called back again but I could not reach the Board
      of Elections office to find out the status of my ballot. I also tried
      checking the status of my ballot online, but the status was still not
      updated which concerned me since it was already Election Day and I
      wanted to make sure that my vote counted. I wasn't able to reach the
      office on election day and even checked My Voter page a few days
      after and the status was not updated so I was still unsure of my vote.

    f. The status as of today, 11/17/18, is "Accepted" and it says Received on 11/6/18 even though my tracking number says it was received and signed for on 11/5/18.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

    Further affiant sayeth not, this the 29 day of January, 2019.

Signature

sherondalongino@gmail.com

sharondalongino@gmail.com

463

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Isaac Mason. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of DeKalb County in Georgia and my residence address is ███████████ Stone Mountain.

3. I voted by absentee ballot in the last two presidential elections and I am therefore familiar with how the process works. I was anxious to be able to vote in the midterm election but I am currently working out of town in Texas. I therefore requested an absentee ballot in ample time.

4. I received and executed my absentee ballot and returned it to DeKalb County, believing that I had done everything required in order to have my vote count.

5. On November 5, 2018 – the day before the election and while I was out of town in Texas – I received a communication from DeKalb County saying my ballot had been rejected because the oath of the elector was incomplete. I immediately sent a fax to the Manager of Absentee Ballots in DeKalb requesting a copy of the oath and an explanation of what was wrong with my submission. I could not get any information on how to cure the deficiency.

6. I am seriously frustrated at the apparent fact that my ballot has not been counted. As I said above, I have previously voted by absentee ballot without any problem. I have a college education and fully understand the requirements and instructions for completing an absentee ballot. If I made a mistake, I accept the consequences but, based on my prior experience, I seriously doubt that I am at fault.

7. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

8. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

9. I declare under penalty of perjury that the foregoing is true and correct. Further affiant sayeth not, this the *13ᵗʰ* day of November, 2018.

_Isaac Mason_
Isaac Mason

Sworn to and subscribed before me
This the _13_ day of November, 2018.

_____
Notary Public

**ERICA D. HAMILTON**
VOTER REGISTRATION & ELECTIONS DIRECTOR
(404) 298-4020
FAX (404) 298-4038

**BOARD MEMBERS**
MICHAEL COVENY
ANTHONY LEWIS
LEONA PERRY
SAMUEL E. TILLMAN
BAOKY N. VU

# DeKalb County
## GEORGIA

4380 Memorial Drive, Ste 300
Decatur GA 30032

*(11-67B)
• Called 7:17 Am Central Time to Leave message
No Answer & not able to Leave message*

*Voter Registration
404 - 298-4020
8 Am - 4 pm*

*Fax # 404 - 298-4038
www.DeKalbvote.com*

Issac Mason

███ ███ ███.

Ennis, TX ███

Dear Voter: *EXACTLY WHAT ARE YOU SAYING?*

|   |   |
|---|---|
|   | The Oath on the back of the envelope appears to be signed by someone else. |
| X | The Oath of Elector was incomplete. |
|   | The signature on the back does not appear to be valid. |
|   | There was no mark of Elector although person assisting signed the ballot. |
|   | **Your ballot must be in this office by 7 pm Election Day to be counted.** |

YOU CAN REQUEST ANOTHER BALLOT, EARLY VOTE OR CHOSE TO VOTE AT YOUR
PRECINCT ON ELECTION DAY.

*PROVIDE COPY PLEASE*

Thank you for your cooperation.

Sincerely,
ABSENTEE DEPARTMENT

466

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Tracy Matthews. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of DeKalb County in Georgia and my residence address is ███████████ Stone Mountain, Georgia ██████

3. My individual circumstances are the following:

I voted by absentee ballot in the election. I completed my ballot and signed the outside envelope with my name, Tracy Matthews. After the election, I saw a post on Facebook that included a number to call to see if your absentee ballot was rejected. I called and learned that my ballot had been rejected. I went to the DeKalb County voter registration office to straighten it out. The woman I spoke with said that my ballot had been rejected for insufficient oath. She had my absentee ballot and envelope in her hand. She said that once a ballot hits the registration office there is nothing that can be done to fix it. I then called the voter protection hotline. The man I spoke with told me to go back to the voter registration office. I called the voter registration office and was told the same thing again: that my ballot was rejected for insufficient oath and that once a ballot hits the registration office nothing can be changed. I did not get to vote.

4. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _21_ day of November, 2018.

_____
Signature

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746
## AND/OR
## SWORN STATEMENT IN ACCORDANCE WITH GEORGIA LAW

1. My name is Bulinda Moore. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Dougherty County in Georgia and my residence address is ████████████████████ Albany, Georgia████

3. My individual circumstances are the following: I requested, received, and returned an absentee ballot to Dougherty County. When I called to determine whether my ballot had been received and counted, I was told that it was received on November 2, 2018 but *not* counted because I did not sign the oath on the back of the ballot. No one at Dougherty County contacted me to advise of the claimed deficiency, even though my mailing address, telephone number, and electronic mail address were all indicated on the absentee ballot. I had several conversations with the Dougherty County Polling Office, in an effort to cure the claimed deficiency with my ballot but was told repeatedly that the deficiency could not be cured. I know I reviewed my ballot thoroughly before returning it; I work as a proofreader. I am saddened by this process, as I am 62 years of age and have voted since I was 18 years of age. I would like my ballot to be counted.

469

4. I give this Declaration and/or Affidavit freely, without coercion, and without any expectation of compensation or other reward.

5. I understand that in giving this Declaration and/or Affidavit, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

6. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the _____ day of November, 2018.

_Bulinda Moore_

Bulinda Moore

Sworn to and subscribed before me
This the **15** day of November, 2018.

_Shawntay Coleman_

Notary Public

470

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Sallie M. Warren. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia, and my residence address is ███████████████████████████ Atlanta, GA 30331.

3. I am a registered voter in Georgia.

4. I am 91 years old. On or about October 21, 2018, I requested an absentee ballot to vote in the November 6, 2018 election.

5. I received the absentee ballot on or about October 24, 2018, completed the ballot and mailed it back on Friday, October 26, 2018.

6. On November 8, 2018, I received a form letter in the mail informing me that I did not sign the oath on the back of the absentee ballot envelope and, therefore, my vote was not counted. I mailed my ballot in two weeks before the election but, two days after the election, there was nothing I could do to correct this error.

7. When I checked the Secretary of State's "My Voter Page" website, no date was entered telling me when my ballot had been received and processed for me to know how much time the elections office had had to process the error and send me this notice. In fact, as of November 21, 2018, the website still

shows my absentee ballot has having not been received, gives no status, and no reason for it being rejected.

8. Strangely, the My Voter Page also shows that, on October 21, 2018, I requested an absentee ballot for the December 4, 2018 election. I did not request a ballot on October 21, 2018 for the then-unknown run-off election on December 4, 2018.

9. My Voter Page also shows that I requested an absentee ballot on October 21, 2018, for a federal run-off election on January 8, 2019. On October 21, 2018, I did not request an absentee ballot for this election either.

10. I do not understand how the Secretary of State can predict that I will want an absentee ballot for two future elections but not count the ballot I actually requested, completed, and submitted for the November 6, 2018 election.

11. My Voter Page should be corrected to accurately reflect my requests and the status of my absentee ballot for the November 6, 2018 election. I may request absentee ballots for the other elections, but have not done so yet.

12. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

13. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in any way as anything other than a witness in this litigation.

**14.** In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 22nd day of November 2018.

_Sallie M. Warren_
Signature

State of Georgia
County of Fulton

Subscribed this 22nd day of
November, 2018

Christie Marshall
Notary Public

My Commission Expires March 13, 2020

473

EXHIBIT

B

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

DONNA CURLING, et al.

Plaintiff,

vs.

BRIAN P. KEMP, et al.

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION FILE NO.: 1:17-cv-2989-AT

## DECLARATION OF JEANNE DUFORT

**JEANNE DUFORT** hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

2. I am a registered voter in Morgan County and voted on a DRE machine in the special SPLOST election on March 19, 2019 and in the November 8, 2016 election.

3. I try to vote by mail ballots when I can because of the untrustworthy nature of the DRE machines. However, there are times that I need to vote in person, which means voting on a DRE.

4. I recently learned that the secrecy of the DRE electronic ballots is violated, according to documents filed by the Secretary of State in this

1

case, as he stated that Morgan County should not disclose individual ballot records because it would "destroy the secrecy of the ballot." [Doc. 369 p. 23].

5. Upon learning of this disturbing statement by the Secretary of State from Coaliton for Good Governance, of which I am a member, I decided to explore this further in my home county, Morgan County.

6. On May 9, 2019,  I emailed a public records request with the Morgan County Elections Office seeking copies of the ballot image record (also called "cast vote record") of my votes in the 2019 SPLOST election and the November 2016 election.  For reference to what a ballot image record is, I have attached as Exhibit A copies of example of ballot image records obtained from Fulton County.

7. On May 13, 2019, I received a letter from Christian G. Henry, an attorney representing Morgan County, a true and correct copy of which is attached hereto as Exhibit B.  In the letter, Mr. Henry states that the records sought are not in existence and, even if they were, "those documents would be exempt from disclosure pursuant to Ga. Const. Art. II, Sec. I, Par. I, which provides that all elections 'shall be by secret ballot.'"

8. I believe that at least the March 2019 SPLOST ballot image record exists because state law requires that election officials retain a the record of each ballot cast for a minimum of 24 months. (O.C.G.A. § 21-2-73)  In addition, my understanding is that the ballot image records are automatically generated and stored on the County's GEMS server, the internal memory of the machines, and on the DRE memory cards.

9. If these ballot image records cannot be disclosed because they "would be exempt from disclosure pursuant to Ga. Const. Art. II, Sec.I, Par. I, which provides that all elections 'shall be by secret ballot,'" as Mr. Henry states in his email letter, it appears that Morgan County maintains that the DRE electronic ballots are not anonymous and can be traced back to the voter. If the ballot image records reflect anonymous ballots,  they could be disclosed to anyone without concern of secret ballot or privacy violations.

10. I was concerned about the Secretary's and Morgan County attorney's assertions related to ballot secrecy, so I attended the Morgan County Board of Elections and Registration on May 30, 2019 to try to learn more. During the last portion of the meeting, the issue of Morgan County's response to the subpoena was discussed.

11. I recorded this portion of the meeting on my mobile phone, and obtained a transcript from Bea Brown, Coalition for Good Governance intern. The transcript is attached at Exhibit C. It is a accurate record of my video recording and the discussions that took place at the meeting.

12. Jennifer Doran, Election Supervisor, spoke on the topic of whether the County would comply with the subpoena issued by Coalition for Good Governance, or whether they would object to some or all of the requests. She stated, "We will object to that for the exact same reasons. And then the Cast Vote Records which are also requested, under the Georgia Constitution the ballots are secret ballots so I can't pull Mike's ballot or my ballot. They're asking for the first five ballots. Cast Vote Records are protected and we can't turn over someone's specific ballots." [Exhibit C]

13. I asked additional questions to be seek elaborations on Ms. Doran's comments. My understanding leaving the meeting is that Morgan County can connect the voter with his or her ballot votes, as they the County Attorney had previously indicated in denying the Open Record Act Request access to ballot image reports.

14. The fact that Morgan County election officials maintain such private electronic information is disturbing to me, and I believe that it would be disturbing to most voters. I am angry and concerned that my electronic ballots cast in the past and in the future can be accessed by election officials and even hackers who can obtain, sell, and abuse such personal information.  Even if current Morgan County officials would not abuse voters' trust by accessing ballot image records to determine how voters voted, electronic information is vulnerable to unauthorized access and abuse as is demonstrated repeatedly by malicious intrusions of databases of commercial and governmental records.

15. In my opinion, other Morgan County voters and I should not need to evaluate whether the County can actually identify our electronic ballot choices, and whether such private information is recorded and kept reliably secure from all potential abuses by insiders or hackers. Their statements suggesting that they possess such records itself has a discouraging impact on voters who value their privacy.

16. The statements made by the Morgan County attorney, Ms. Doran and the Secretary of State have a chilling effect on my ability to vote freely without any concern that my ballot choices will be known in my small community. I never want to be called on by anyone to explain my vote.

17. I value the absolute privacy of my ballot and should have the freedom to vote with the understanding that the machines do not record electronic data that can connect the ballot to me personally.

18. Morgan County and especially the city of Madison, where my office is located, is a small close-knit community. I am in the residential real estate business, and have clients of widely varying political views. I personally know almost all the local civic leaders and candidates for office, and do business with some of them. While my general political views are no secret, I need to be able to keep my final political choices absolutely secret for races and ballot questions.

19. I am hesitant to vote on DRE machines in the future given that I cannot be assured of the secrecy of my vote, and that I cannot freely vote my preferred choices without concern for unauthorized recording and disclosure of my votes, whether that knowledge is gained by election officials or by hackers.

Executed on this date, June 17, 2019.

Jeanne Dufort

E

X

H

I

B

I

T


A

Precinct 980: 08H (Machine Id: 1)
Ballot Id: 3   Ballot SN: 916113   Voter SN: --

40 - ATLANTA MAYOR
Vote For 1
   [X]  MARY NORWOOD

50 - ATLANTA CITY COUNCIL PRESIDENT
Vote For 1
   [X]  ALEX WAN

210 - ATLANTA BOE D7 AT LARGE
Vote For 1
   [X]  KANDIS W. JACKSON

980 - STATE SENATE 39 SPECIAL
Vote For 1
   UNDERVOTE

990 - FULTON CO COMM CHAIRPERSON AT LARGE SPEC
Vote For 1
   [X]  ROBB PITTS (D)

```
Precinct 980: 08H (Machine Id: 1)
Ballot Id: 3   Ballot SN: 161301   Voter SN: --


40 - ATLANTA MAYOR
Vote For 1
   [X]  MARY NORWOOD

50 - ATLANTA CITY COUNCIL PRESIDENT
Vote For 1
   [X]  ALEX WAN

210 - ATLANTA BOE D7 AT LARGE
Vote For 1
   [X]  KANDIS W. JACKSON

980 - STATE SENATE 39 SPECIAL
Vote For 1
   [X]  LINDA PRITCHETT (D)

990 - FULTON CO COMM CHAIRPERSON AT LARGE SPEC
Vote For 1
   [X]  ROBB PITTS (D)
```

```
Precinct 980: 08H (Machine Id: 1)
Ballot Id: 3   Ballot SN: 238306   Voter SN: --
```

40 - ATLANTA MAYOR
Vote For 1
   [X]  MARY NORWOOD

50 - ATLANTA CITY COUNCIL PRESIDENT
Vote For 1
   [X]  ALEX WAN

210 - ATLANTA BOE D7 AT LARGE
Vote For 1
   [X]  KANDIS W. JACKSON

980 - STATE SENATE 39 SPECIAL
Vote For 1
   [X]  LINDA PRITCHETT (D)

990 - FULTON CO COMM CHAIRPERSON AT LARGE SPEC
Vote For 1
   [X]  KEISHA S. WAITES (D)

EXHIBIT

B



H|B|S   HALL BOOTH SMITH, P.C.

**Christian Henry** | 440 College Avenue North, Suite 120
(706) 316-0231 | Athens, GA 30601-2773
chenry@hallboothsmith.com | www.hallboothsmith.com

May 13, 2019

**Via e-mail (jeanne@horseandhome.com) only**

Jeanne Dufort
1360 Apalachee Road
Madison, GA  30650

Re:   Open Records Request – May 9, 2019
      Morgan County Board of Elections and Registration

Dear Ms. Dufort:

Please allow this letter to respond to your open records request e-mailed to Jennifer Doran, Elections Supervisor with the Morgan County Board of Elections and Registration on Thursday, May 9, 2019.  In your request, you seek your "ballot image report (also called cast vote record) for [your] personal votes in the following elections:  2019 T-Splost. . . [and] 2016 November Presidential."  As Ms. Doran explained to you, the records you seek are not in existence, and the Board is not required under the Open Records Act to create documents.  O.C.G.A. § 50-18-71(j).  Moreover, even if the documents you request were in existence, or could be created using data in existence, those documents would be exempt from disclosure pursuant to Ga. Const. Art.  II, Sec. I, Par. I, which provides that all elections "shall be by secret ballot."

Very Truly Yours,

Christian G. Henry

CGH/cjb

cc:   Jennifer Doran
      Leslie Brandt



EXHIBIT

C

**Morgan county Board of Elections meeting 5/30/19**

JEANNE DUFORT: So we're back in open session now.

JENNIFER DORAN: One of the things that Jeanne Dufort actually brought up in the meeting was hiring our own investigators. I contacted the state regarding that. Their position is, it is not ours to hire someone to investigate or do an analysis.

JEANNE DUFORT: The state is who?

JENNIFER DORAN: The Secretary of State.

JEANNE DUFORT: By way of Chris Harvey or actual Secretary State Raffensperger?

JENNIFER DORAN: Their attorneys. I'm sure you know most of the subpoena. There are a lot of documents that are open to public disclosure which this office is prepared to turn over some of the GEMs database we will be be objecting to because that is protected under law, under court order. Georgia Court of Appeals.

HELEN BUTLER: Smith versus Dekalb.

JENNIFER DORAN: Smith versus Dekalb. And that's what we are citing. And with the same objection to the DRE memory cards. We will object to that for the exact same reasons. And then the Cast Vote Records which are also requested, under the Georgia Constitution the ballots are secret ballots so I can't pull Mike's ballot or my ballot. They're asking for the first five ballots. Cast Vote Records are protected and we can't turn over someone's specific ballots.

JEANNE DUFORT: So if I understand correctly that pulling those five and turning it over would reveal or have the potential to reveal somebody associated with that.

JENNIFER DORAN: Correct. And as much as we want to make sure everybody is able to vote. We also want to maintain the secrecy.

JEANNE DUFORT: Absolutely.

JENNIFER DORAN: Nobody's going to vote if they know their vote is not protected.

JEANNE DUFORT: So you could look at that and tell that if you were to look?

JENNIFER DORAN: I have been told that they are not in time-order. I have never pulled those because that is not a report that we pull. I've been told by the Secretary of State that it's sort of randomized. I know there is a serial number attached to each one but that serial number is not attached to a specific voter.

JEANNE DUFORT: So that confuses me. If revealing it could reveal personal voter information—that's one thing right. But if personal vote, if a voter isn't connected to it then that's a different thing. So, I'm just trying to understand which it is.

HELEN BUTLER: We are just, from a board perspective, we are bound by the judicial decision of Smith versus Dekalb with regards to the server and any of the things that's associated with the server.

JEANNE DUFORT: So the cast vote record would be associated with the server.

HELEN BUTLER: Correct

JENNIFER DORAN: I know that one of the things that has been suggested, and even in the Supreme Court case that's pending right now, is that they do hire experts with an NDA, but that is not under our purview to do. That would have to be through court order or through the state. But I think the board feels also that that is not something that we are able to do.

MICHAEL: Does anybody from the board have any questions? All right. If there's no further discussion, we'll get a motion to adjourn the meeting. The meeting is adjourned, thank you very much for coming. If you have any further questions

JEANNE DUFORT: Aren't you supposed to state for the public record what your affidavit for why the executive session.

JENNIFER DORAN: Yes

JEANNE DUFORT: So could you read that for us please?

JENNIFER DORAN: Consult and meet with—and we spoke to him over the phone, so he was present—pertaining to pending or potential litigation settlement claims, administrative proceedings, or other judicial actions.

JEANNE DUFORT: And what was the basis for the potential, the fear of litigation, what was the basis for that?

JENNIFER DORAN: Because depending on how the board responds to the subpoena there could be potential litigation regarding this.

UNKNOWN: I am kind of new to this I don't understand all the procedures. You said there were two reasons that you were doing this and that you were not going to respond the subpoena or not going to provide what was asked. One was that it was in litigation right now. Is that right?

JENNIFER DORAN: Right. I know that one of the comments made during the hearing for the Supreme Court was hiring a computer expert, signing a nondisclosure agreement. But that is not something that we can locally decide on. If a court order is issued saying that we need to do that, obviously we would comply with that.

MICHAEL: If you guys have any further questions for Jennifer feel free to email her or call her.

UNKNOWN: The court case you're quoting is Smith versus Dekalkb was it?

JENNIFER DORAN: Smith versus Dekalb with the Georgia Court of Appeals.

**Transcription review by Bea Brown, with identification of individuals by Jeanne Dufort**
**Transcribed from Facebook video**
**https://www.facebook.com/MOCOGADEMS/videos/86828522353736 6/**

EXHIBIT

C

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, et al.<br><br>Plaintiff,<br><br>vs.<br><br>BRIAN P. KEMP, et al.<br><br>Defendant. | )<br>)<br>)<br>)<br>)  CIVIL ACTION FILE NO.: 1:17-cv-<br>)  2989-AT<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF  RHONDA J. MARTIN

**RHONDA J. MARTIN** declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.  I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

2. I am Executive Secretary of the Qatar Computing Research Institute Scientific Advisory Commitee and a member of the Coalition for  Good Governance.

3. I reviewed the minutes and summaries of board meetings occurring after September 17, 2018  available on the websites of the Georgia State Board of Elections and the Fulton County Board of Elections and Registration. The two websites in which I located the minutes were

http://www.fultoncountyga.gov/rae-board-of-registration-and-elections/rae-approved-meeting-minutes and  http://sos.ga.gov/index.php/elections/state_election_board .

4.  I read the minutes and summaries of the board meetings to locate meeting discussions of  any of the following topics:

    a.  election security of the DRE voting system;

    b.  this Court's September 17, 2018 order;

    c.  the feasibility of converting to a hand marked paper ballot system;

    d.  methods of post-election auditing or plans to discuss post-election auditing;

    e.  security and reliability issues concerning the DRE voting system.

5.  The  review of the documents revealed no discussions of these topics by the State Election Board. All discussions by the Fulton County Board of Registration and Elections regarding voting systems were focused on tracking HB 316 and planning for the change over to the whatever system the State ultimately decides to provide to the counties. More specifically, there was no discussion of security, reliability, or post-election audits. Further, there was no recorded discussion of a possible transition to an interim secure

hand marked paper ballot system prior to the adoption of a new

HB316-mandated system.


Executed on this date, May 20, 2019.

*Rhonda J. Martin*

Rhonda J. Martin

EXHIBIT

D

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, et al.<br><br>Plaintiff,<br><br>vs.<br><br>BRAD RAFFENSPERGER, et al.<br><br>Defendant. | CIVIL ACTION FILE NO.:<br>1:17-cv-2989-AT |

**SUPPLEMENTAL DECLARATION OF AMBER F. McREYNOLDS**

**AMBER F. McREYNOLDS** declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. This declaration supplements my previous declaration of August 20, 2018 [Doc. 277 p. 93-124].

2. The opinions expressed at the time of the previous declaration continue to represent my opinions on the urgent necessity and feasibility of conducting Georgia elections on an auditable and verifiable paper ballot voting system, and other improvements, such as electronic pollbook corrections that must be made to conduct fair elections in Georgia.

3. It is my understanding that Georgia has conducted regional, district or local special elections on DREs in every month since the November 2018 mid-

terms, and plans to use DREs to conduct hundreds more municipal and special elections during 2019. [Doc. 362 p.9]

4.  It is my understanding that the State currently plans to undertake a statewide conversion of the DRE voting system prior March 31, 2020 to an electronic touchscreen Ballot Marking Device system.   It is my understanding that the system conversion will include the installation of a new election management system in each county, installation of 7,750 new electronic pollbooks and related software in every polling place, along with 30,000+ touchscreen ballot marking devices, 3,500 polling place scanners, central count scanners in each county for mail ballot processing, and an election night reporting system. [Doc. 357-5 p.7]

5.  To the best of my knowledge, such a voting system conversion would be the largest and most complex voting system conversion ever attempted in the nation in such a short time frame.  Based on my experience in managing voting system implementations, a conversion in 159 counties involving over 40,000 new computers with numerous components that must be integrated is a massive challenge for the Secretary of State, the vendors, and the county personnel. A system conversion is a difficult undertaking even when done in stages with a well-staffed IT department like Denver has.

6. Colorado's 64 counties each choose their own system from a short list of certified voting systems and choose the appropriate timing for any system upgrades or conversions. Colorado counties' voting systems primarily support hand marked paper ballots because of the state's mail ballot model. Colorado's most recent state-initiated conversion took place during the 2015 and 2016 election cycles in a somewhat coordinated manner, although not centrally managed or simultaneously undertaken. The extensive system requirements and public and election officials' technical systems review and input phase began in 2013.  The transparent and deliberative public process of choosing new certified voting systems through to system selection, multiple layers of testing, certification, and implementation was over a two year process with a few smaller counties converting in year 3. Colorado had the advantage of local election officials already using paper ballots and scanners, utilizing a central count environment, and having local responsibility for programming their counties' ballots with a user-friendly system, having abandoned paperless DREs many years ago. Additionally, Colorado election officials have been conducting post-election audits for over 12 years, so audit processes did not require significant new training as Georgia officials will encounter.

7. A statewide system implementation in Georgia managed centrally by the Secretary of State's office will be an ambitious undertaking with escalated risks that require considerable contingency planning, and the recognition that many elements of the complex plan can fail. That is why most jurisdictions adopting new voting systems avoid the demanding stress of a presidential election year for a cut-over from existing systems. A best practice in the election administration world is to implement new systems in odd-year election cycles to ensure a smooth transition and adjust timing for specific tasks throughout the process. Attempting a statewide transition (rather than county initiated transition) is an especially unusual and daunting project.

8. I am aware that numerous questions about the planned procurement have already been raised that may themselves cause delays if controversies are created about system compliance with the provisions of HB316 and security of the proposed voting systems.

9. The continued use of the current unauditable DRE system should not inadvertently become the "back up plan" for failure or delays that may occur while attempting to purchase and implement a new voting system . The dangers of the continued use of the DRE system escalate with the age and continued exposure to additional undetectable cybersecurity attacks.

10. Georgia can immediately convert to an auditable accountable voting system using primarily hand marked paper ballots consistent with the recommendations in my August 20, 2018 declaration.

11. It is my understanding that the numerous currently planned and anticipated 2019 elections are expected to be local or district election with relatively low volume, and simple ballots with a limited number of candidates and ballot questions.  Such factors make for ideal conditions for an immediate conversion to primarily hand marked paper ballots tabulated by optical scanners and tabulation servers of the same type (Diebold/GEMS) used by each county now, without confusion for the voters or officials.

12. An immediate conversion to primarily hand marked paper ballots permits the state officials to train pollworkers, perfect paper ballot chain of custody and security measures and to experiment with various types of effective post-election auditing.  Making such conversions in a presidential election year will add unnecessary complexity and increase the already elevated risk of failure.

13. Hand marked paper ballots counted by precinct scanners (either in the polling location or in a central count environment)  are used across the nation in approximately 112,000 precincts covering 133 million registered

voters.[1] This hand marked paper ballot and optical scanning method of balloting is the most widely accepting voting method in the nation. This means that if Georgia officials believe that they can benefit from external implementation assistance, there are scores of experienced officials and former officials available to provide the assistance required and best practices documentation.

## Issues Raised in Previous Declaration

14. With respect to my previous statements concerning absentee ballot processing, most of those comments are no longer applicable.  It is my understanding that 2019- HB316 and litigation have addressed a number of the issues that were raised in my previous declaration ¶¶ 37-42 relating to the need for improved processing of mail ballots to avoid voter disenfranchisements, after the November 2018 election suffered from such of these problems. Therefore, such changes should be already incorporated in current processes and will not require another simultaneous change in procedures as hand marked paper ballots are adopted at the polling places.

---

[1] Estimates derived from data available from Verified Voting Verifier inventory of voting equipment. https://www.verifiedvoting.org/verifier/

15. I have reviewed a number of voter and pollwatcher affidavits articulating their complaints related to the November 2018 election and were provided to me by Coalition for Good Governance. The affidavits I reviewed can be accessed at https://coaltionforgoodgovernance.sharefile.com/d-s6d6045c865e4fadb . The types of irregularities and errors reported in the affidavits are broad-ranging and consistent with those anticipated in my August 20, 2018 declaration.

16. Given the ongoing reports of voter disenfranchisement and November 6 Election Day confusion caused by the errors in the voter registration database and electronic pollbooks, my concerns continue to be as stated in the August declaration, as do my recommendations in the previous declaration regarding the necessity of DRE system electronic pollbook remediation, voter registration database auditing, and the need for paper backups of the pollbooks to be used in the polling places.

17. An immediate switch to auditable paper ballots would avoid the continued irregularities of concern to voters caused by machine malfunctions such as misconfigured ballot screen displays and vote flipping, widely reported by voters in November 2018.

18. Georgia's problems with long wait times for machine use at the polling places were widely reported in the national news, and are needless

discouragement for voters. Numerous November wait time complaints are also documented in the affidavits referenced in ¶15 above.

19. Voting capacity can be quickly and inexpensively expanded by use of primarily hand marked paper ballots as explained in ¶ 60 of the prior declaration.

20. Expanding voting capacity alone will not resolve discouraging polling place wait times if the voter registration flaws and pollbook software causing electronic pollbook problems are not solved with a thorough audit of the voter registration database followed by having the DRE system electronic pollbooks updated accordingly. The issue and solution are described in the previous declaration at ¶¶ 13-20.

21. Georgia's problems with polling place wait times in 2018 appear to have been easily avoidable.  In addition to Georgia rejecting a potentially more efficient voting method by primarily using paper ballots for the high turnout midterms, it is my understanding that thousands of voting machines used in early voting were idled by officials and withhold from Election Day voting in November. Good security practices do not require that officials idle such machines, because the early voting DRE memory cards could have been removed, secured, and the machines reloaded and retested and placed in service for Election Day.  In fact, in 2008, 2010, and 2012, Denver re-

purposed early voting DRE's for election day use over the weekend prior to Election Day. Decisions such as those to hold back thousands of machines from polling places on Election Day have a materially depressing impact on voter turnout, and priorities driving such decisions must change in order to solve Georgia's voter disenfranchisement problems.

**Secure Paper Ballots Can Prevent Tabulation Irregularities**

22.  Media reports I have reviewed since election day have caused me to conclude that voter confidence in the Georgia's November 2018 announced outcomes suffers to a significant degree because of the widespread voting problems and the inability to audit the results.

23. Further, I have reviewed the large unprecedented undervote rate, alleged at 127,000 votes in the Lieutenant Governor's race, and understand that the election contest litigation is ongoing to seek a new election. To my knowledge, this is the largest vote count irregularity and controversy involving electronic voting machines ever detected in this country, and cannot be resolved without litigation forensic discovery because there is no auditable record of votes.

24. Such a controversy would not go unsettled in a hand marked paper ballot election. A simple audit or recount of the scanner tabulations would quickly reveal whether the votes were missed, miscounted or whether there was a

ballot design problem. A change to a primarily hand marked paper ballots with an accessible marking option is required to avoid repetition of significant problematic outcomes that cannot be audited and erode voter confidence.

25. I have reviewed the experts' reports[2] and press reports[3] about increased undervote rates in African American neighborhood precincts in DRE machine undervote tallies in the 2018 Lieutenant Governor's election. My understanding is that the public still does not know why this occurred, although misprogramming is possible. If Georgia had used paper ballots in the 2018 election, this problem might not have occurred and, if it did, there would have been a reliable audit trail to examine and correct errors in the tabulations.

26. The most practical, feasible and low-risk solution to securing Georgia's elections in the near term is the expanded use of the paper ballot optical scanning components in the Diebold Accu-vote system that Georgia currently owns. This solution is the recommended solution covered in my declaration of August 20, 2018. This solution can be configured for counting

---

[2] https://coaltionforgoodgovernance.sharefile.com/d-se7213426c9646bfb
[3] https://www.theroot.com/exclusive-thousands-of-black-votes-in-georgia-disappea-1832472558 and
https://www.politico.com/story/2019/02/12/georgia-voting-states-elections-1162134

to occur in a central count environment or in each polling location,

depending on logistical considerations for each county.

27. This Accu-vote optical scanning solution continues to use the GEMS

election management system, the ExpressPoll electronic pollbooks, and the

Accu-vote OS scanners in a central count environment or in use at polling

locations depending on what may be appropriate for each county. DRE units

can continue to be configured for assistive technology for voters, if that is

determined to be the best and most appropriate solution for accessibility

needs.  This low risk, low cost modest transition plan to a more modern

voting system provides for a change to secure elections for several more

years of useful life of the Diebold scanners while avoiding the need to rush a

major system overhaul at an inappropriate time.

28. The Diebold system is not recommended as a long-term solution given the

well-documented performance and security issues with the GEMS election

management system, but is recommended as a short term transition system

to produce auditable elections immediately. However, in a paper ballot

election counted using Diebold optical scanners, tabulation errors that result

in erroneous outcomes will be detected and corrected by rigorous post-

election audits. Thorough post-election auditing is essential and must be

taken seriously in all elections, but this is especially true when using an

outdated and vulnerable Diebold system. Georgia's specific risks of relying on the GEMS election management system is further escalated by the well-publicized compromise of the Secretary's election server while located at KSU. It is my understanding that statewide remediation efforts for voting system components have not been undertaken after that period in which the State's election server was unsecured. Post-election audits must be diligently planned with expert consultants to assure that material errors are detected and corrected, especially while this particular election management system and voting system components are in use.

29. According to Verified Voting's Verifier data[4], Diebold Accu-vote optical scanners are in service in approximately 11,300 precincts serving 13.5 million voters[5] for counting hand marked paper ballots.  GEMS tabulation servers consolidate the vote tallies and report results. This is the same model of equipment used by Georgia now.

30. Only modest changes in pollworker operations are required as pollworkers will merely issue paper ballots to the voters in lieu of plastic voter access cards for DRE operation. Workers will have far less computerized equipment to set up, secure, monitor, and maintain in operable condition.

---

[4] https://www.verifiedvoting.org/verifier/
[5] https://coaltionforgoodgovernance.sharefile.com/d-s32cae5d2b884a42b seu

Training time for this change should be modest. Central office election workers are already trained on Accu-vote optical scanners as they used now for mail and provisional ballots.

31. The local elections anticipated for 2019, with anticipated lower turnout, make a logical lowest risk transition period to a secure voting system.

32. Defendants' claims in the September 2018 Preliminary Injunction hearing regarding the difficulties of a switch to primarily hand marked paper ballots failed to take the problems of continued use of the DRE system into account.

33. For example, Fulton County Election Director Richard Barron testified that 400-450 ballot styles would be required for management in the November 2018 early voting locations. [Transcript. P 262, line 25], claiming that management of so many ballot styles would overwhelm and confuse the workers. However, in testimony in the Fulton County election contest case (Coalition for Good Governance v. Raffensperger 2018-CV-313418), Mr. Barron testified that the county only had 115 ballot styles during the November 2018 election. [Trial Transcript, January18, 2019,  p 39 line 14]. Either scenario could have been managed as recommended in my August 2018 declaration, but 115 different ballot styles for early voting centers would have been manageable.  In fact, in 2008, Denver had more than 425

ballot styles at each early voting center across the city during the

Presidential Election and more than 850 during the 2008 primary.

34. Based on the testimony during the September 12, 2018 preliminary

injunction hearing, Defendants predicted chaos, long lines, and resulting

voter disenfranchisement if paper ballots were required, yet the continued

use of the DRE system seemed to result in a significant level of reported

polling place problems and long lines, because of insufficient machines,

malfunctioning machines, and problems with the electronic pollbooks. I

believe that the use of hand marked paper ballots in the polling place along

with paper backups of the pollbooks to resolve electronic pollbook problems

would have permitted far smoother operations and permitted more eligible

voters to vote in the November 2018 election. Furthermore, the election

outcomes could have been confirmed and anomalies and discrepancies

resolved without the need for election contest litigation and loss of voter

confidence.

35. The widely publicized problems with Georgia's November 2018 election

administration and voter disenfranchisement have drawn review by the U.S.

House of Representatives House Oversight Committee[6].  Many of the

---

[6] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-03-06.EEC%20Raskin%20to%20Raffensperger-GA%20SOS.pdf

election administration problems Congress is now investigating could have been avoided if the State had voluntarily taken the long-standing recommendations of election integrity experts and Coalition for Good Governance in preparation of the mid-terms.  There is no need to repeat these mistakes.

36. Additionally, Georgia is currently a no-excuse absentee ballot state.  Georgia could also streamline this process to make it more convenient for voters and more efficient for administrators by making a small change to allow voters to sign up for 'permanent no excuse absentee' ballots.  This is simply tweaking the current statute so that administrators do not have to process the same forms each election cycle and year and allow voters to simply request the ballot permanently.  Many states have moved to this model because it is more efficient and allows administrators to more efficiently plan for expected voter turnout.  Additionally, to reduce the number of provisional ballots in Georgia, it would also be good for Georgia to allow voters to drop-off their absentee ballots at any polling location given that it is already staffed with election judges.  This simple change would reduce provisional ballots and thus the transactional time that causes lines.

37. The same principles noted above hold true for every election expected in the remaining months of 2019 and planned for 2020 as well. A swift and low

cost transition can be made to secure Georgia's elections by merely using the current Diebold system relying on the Accu-vote optical scanners with rigorous post-election audits rather than the Accu-vote DRE components.

38. Implementing this temporary transition plan immediately can position the state well for 2020, permitting training and transition "bugs" to be worked out in low volume simple elections of 2019. Without such a plan, the 2020 elections will be at significant risk. Given the high implementation risks of HB316 and the controversies surrounding the expected equipment purchase, and the extremely compressed installation schedule, Georgia could easily find itself facing the unacceptable use of DREs in the 2020 election with little time to plan for a switch to a secure paper ballot system.

39. In a conversion to a paper ballot system tabulated by scanners (either in the polling location or in a central location) and election management software, it is imperative that statistically valid post-election audits be conducted prior to certification of the elections.  No computerized voting system is safe from misprogramming, malfunction or hacking. The impact of any such material irregularity can be detected and corrected by a robust post-election manual audit of hand marked paper ballots counted by scanners. Counting paper ballots on optical scanners without such an audit does not mitigate the risk of machine-caused errors in the election results.

40. Post-election audits vary greatly in time, cost, effectiveness and complexity. The state and county election boards may want to start auditing with simpler audits which are sometimes more time-consuming as they work toward more sophisticated and efficient Risk Limiting Audits. Work to plan effective post-election audits of paper ballot election results should begin immediately.

41. It is my opinion that immediate transition to primarily hand marked paper balloting is both immediately feasible and essential to secure Georgia's elections.

Dated: June __6/17__, 2019

      Denver, Colorado        _____

                                   Amber McReynolds

EXHIBIT

E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, ET AL.,
*Plaintiffs,*

v.

BRAD RAFFENSPERGER, ET AL.,
*Defendants.*

Civil Action No. 1:17-CV-2989-AT

## DECLARATION OF CANDICE HOKE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1.     I, Candice Hoke, submit this Declaration under penalty of perjury pursuant to 28 U.S.C. §1746. This Declaration supplements my previous Declaration of September 13, 2018 [Doc. 304-1], which I understand was submitted by *Amicus Curiae* Common Cause and the Election Defense Coalition, in support of Motions for a Preliminary Injunction.

2.     My previous Declaration continues to represent my professional views on the feasibility and security benefits of conducting Georgia elections on an auditable and verifiable paper ballot voting system, especially a system already known to Georgia election officials and to the many citizens who have voted using absentee, mailed-in paper ballots. Given the threat environment for U.S. elections,

1

deployment of an auditable voter-marked paper ballot system is an utter imperative.

3.      I hereby depose and say as follows:

### Background & Qualifications

4.      My name is Candice Hoke.   I held the rank of Professor of Law at Cleveland State University, Cleveland, Ohio, where I co-founded the Center for Cybersecurity & Privacy Protection. I currently hold the title Founding Co-Director of the Center as well as Professor of Law, *Emerita*, at Cleveland State University.

5.      In early 2005, I founded the Center for Election Integrity at Cleveland State University, which was dedicated to improving the managerial, technological, and security capabilities of election administration in Ohio and throughout the Nation, as an essential means to ensure fair elections.

6.      I hold a J.D. from Yale Law School and a Master's of Science in Information Security Policy and Management from Carnegie Mellon University. I clerked for the Honorable Hugh Bownes of the U.S. Court of Appeals for the First Circuit. I also worked as a Cybersecurity Engineer for the Computer Emergency Readiness Team (CERT) division of the Software Engineering Institute, in the Cyber Risk and Resilience unit.  My resume is attached to this Declaration as Exhibit 1.

2

7.      I was the only law professor (and one of the two lawyers) to participate as a security researcher in the pathbreaking California Secretary of State's scientific study of voting system security (Top to Bottom Review, 2007)[1] ("TTBR") conducted by the University of California. My TTBR team was comprised of Diebold voting system experts; we focused on analyzing and evaluating the security aspects of Diebold voting systems similar to those used in Georgia. The Ohio Secretary of State's office also sought my guidance in structuring its own scientific study of voting system security (EVEREST, 2007[2]).

8.      I have authored numerous published works on the security and regulation of voting systems and other election technologies, including some monographs solicited and published by the American Bar Association.  I have been especially recruited to explain election security issues in a technically accurate but accessible manner for lawyers, executive managers, and election officials, as evidenced by *Judicial Protection of Popular Sovereignty: Redressing Voting Technology*, 62 Case Western Reserve Law Review 997 (2012). In other work, I have sought to illuminate for security experts the unusual, if not unique, security context of public governmental elections, and the complexities of election administration that can impede security readiness/resilience.

---

[1] https://www.sos.ca.gov/elections/voting-systems/oversight/top-bottom-review/

[2] https://security.cs.georgetown.edu/~msherr/papers/everest-ohio.pdf

3

9.     I served as the first voting technology expert appointed to the

American Bar Association's Advisory Commission to the Election Law

Committee, serving three terms (2007-10). I initiated and co-authored a primer on

election technology forensics for election officials and their attorneys, which the

ABA published electronically and distributed to the entire membership of the

Section on State and Local Government Law (October 2008).

10.     I taught Election Law for over a decade, with coursework that

included lectures and advanced readings on election technologies and their

scientifically documented security vulnerabilities. I also taught Information

Security in courses for law students and (via continuing education offerings) for

practicing attorneys from 2015 until late 2017, when I resigned my law faculty

position to refocus my work on information security and election cyber risk

management.

11.     While serving as Director of the Center for Election Integrity,

Cuyahoga County experienced an internationally notorious election disaster when

it sought to implement its new Diebold electronic voting system primarily

comprised of DRE touchscreen units (Direct Recording Electronic) at the polling

locations, AccuVote scanners for absentee paper ballots, and the GEMS server

(Federal Primary election, May 2006). Every technical and managerial system

failed. Public authorities appointed me to the (3-member) Cuyahoga Election

4

Review Panel to investigate and evaluate the causes and potential remedies for this debacle. Thereafter, the Center was appointed to serve as Public Monitor of Cuyahoga Election Reform, work that continued through 2008.

12.     As Project Director of the Public Monitor, in an effort to restore public trust in the electoral process and voting equipment, I successfully initiated Ohio's first post-election audit of cast votes in Cuyahoga County, where we audited the absentee ballots tabulated by the Diebold AccuVote optical scanners as well as the paper tapes of the Diebold TSx DRE touchscreens-- machines that are very similar to those that Georgia has been using, but with a voter-verifiable paper record of the voter's choices that Georgia lacks. I hired and fielded the first technically qualified, operational security team to observe and report on managerial activities related to the voter registration databases and voting technologies. I authored numerous operational security reports plus other reports on election administrative activities. The foci included procurement processes for new e-voting systems, managerial/systems transition to implementing these voting systems, implementation of post-election auditing, and administrative compliance with governing election law.

13.     I have been invited to speak on electronic voting, election administration, and election cybersecurity issues at conferences and on panels dating from 2004 to the present, by varied organizations that include the

Chautauqua Institute, American Bar Association, Carnegie Mellon University's School of Computer Science, Ohio Secretary of State, Pew Charitable Trust, chapters of the League of Women Voters and NAACP, Penn State University, University of California at Irvine, the U.S. Election Assistance Commission, Oberlin College, Election Verification Network, DEFCON, Overseas Vote Foundation, and the Council on Government Ethics Laws.

14.     By request, I testified before the elections oversight committee of the U.S. House of Representatives on the importance of conducting independent post-election audits.

15.     At the Federal level, from 2009-17, I have advised high Pentagon officials as well as officials in the Executive Office of the President (EOP), the Departments of Homeland Security and Justice, the Election Assistance Commission, and others on election security vulnerabilities pervading our nation.  I may have been the first to recommend that the U.S. election administrative system be designated as part of critical infrastructure.

16.     My engagement for producing this Declaration is *pro bono publico*, without any financial remuneration to me.

17.     I make this Declaration of my own personal and professional knowledge, and I am competent to testify to the matters set forth herein.

6

## **Relevant Experience**

18.   Cuyahoga County (home to Cleveland, Ohio) is one of the nation's most populous electoral jurisdictions-- approximately the 11th largest--with more registered voters than some States' entire voting population.  The County conducts elections for 59 entities (such as school boards and library taxing districts) in addition to holding major Federal, State and local contests.  As a panel member for the Cuyahoga Election Review Panel, I selected, trained, and supervised the work of an 18-person staff in investigating the causes and potential best remedies for the failed 2006 Federal primary election.  This effort included assessment of the County's procurement and contracting activities for its Diebold direct recording electronic (DRE) plus AccuVote scanner voting system, as well as its planning and implementation of the overall transition from punchcards to the new e-voting system.  The Final Report for which I was primary author included over 300 action recommendations for improving the election management process, including management of the electronic voting systems.[3] (It also led to litigation against the vendor-manufacturer and a major settlement in favor of the governmental plaintiffs.)  By talking with election officials and election technology vendors from

---

[3] Candice Hoke, Ronald B. Adrine, and Tom J. Hayes, "Final Report of the Cuyahoga County Election Review Panel" (2006), available at https://moritzlaw.osu.edu/electionlaw/litigation/documents/CuyahogaElectionReviewPanelReport.pdf

other jurisdictions, and reviewing documentary evidence they provided, I gained a vast knowledge of markedly different activities undertaken by other jurisdictions which had experienced decisive success in their e-voting transitions.

19.     As Director of the Public Monitor of Cuyahoga Election Reform, I assisted the County in determining first, whether to move away from DRE voting machines to hand-marked paper ballots read by optical scanners, and then, to transition smoothly to the new hand-marked paper ballot system that deployed precinct optical scanners for processing in-person voting and central-count scanners for absentee ballot tabulation at the elections office.

20.     In Ohio, I also served within the election administrative system in several capacities, including as a supervising poll worker, a "roving" election technology trouble-shooter, a voter registration problem-solver, and a consultant to the Ohio Secretary of State's office on election management and improvement. Other credentials pertaining to election management and technologies can be found in my attached resume (Exhibit 1).

21.     After the Cuyahoga County Board of Elections and the County Commission formally appointed the Center for Election Integrity to serve as Public Monitor of Cuyahoga Election Reform, I directed the Public Monitor's effort to improve administrative competence and restore public trust in Cuyahoga elections. Some efforts were designed to identify, and bring transparency to, continuing

election problems (such as inconsistency between the number of voters signing in

to cast ballots and the number of ballots counted) as well as to highlight effective

actions Cuyahoga election officials were taking to correct existing errors and

prevent future ones. At times similar to a special master role, we worked closely

with election managers to suggest methods for improving or assuring their overall

administrative and technological-security success.

22.     On December 21, 2007, while I was serving as Public Monitor of

Cuyahoga County Election Reform, Ohio's Secretary of State Jennifer Brunner

broke a 2-2 tie of the Cuyahoga County Board of Elections and directed Cuyahoga

County to change rapidly from the vulnerable and unreliable DRE touchscreen

voting machines to the use of an optical scanning voting system with hand-marked

paper ballots. The Secretary of State required the new system to be launched in the

March 4, 2008 presidential primary election.

23.     Although I had advocated change to auditable hand-marked paper

ballot voting systems, I initially opposed the Secretary of State's late December

mandate for Cuyahoga County to rapidly transition from touchscreen DRE voting

machines to optical scanning machines using paper ballots for the Federal primary.

Such a decision could have been issued months earlier rather than 60 days before a

major election, and I feared that there was insufficient time (given the holidays,

almost exactly two months) to make that transition successfully.  In hindsight, I

9

was wrong – thankfully, the highly motivated executive officials and capable staff were able to transition the voting public to hand-marked paper ballots for the March 4, 2008 primary.

24. The County was able to lease state-certified voting system optical scanning equipment from a vendor and produce all the necessary paper ballots before the March 2008 election. Voters in Cuyahoga County, Ohio's most populous county, successfully voted in that primary using hand-marked paper ballots and precinct-based optical scanners, generating an auditable election record.

### Feasibility of Georgia Using Hand-Marked Paper Ballots in 2019

25. Transitioning from DRE voting machines to hand-marked paper ballots tabulated by optical scanners in Georgia should be less complex than the mostly successful transition that I monitored in Cuyahoga County. It is my professional opinion that conducting 2019 elections on auditable hand-marked paper ballots is feasible, economical, and efficient for Georgia. Its administrative success, however, will be best assured by officials having maximum lead time for proper planning, including contingency planning, with the ability to gain practical experience managing the changes via the off-year, mostly local elections.

26. Georgia already has a fully integrated, State-certified paper ballot system (the Diebold AccuVote system), that can immediately produce auditable elections. The unauditable, grossly insecure DRE touchscreen units should be

10

sidelined for the elections through 2020, and likely permanently mothballed or sold.

27.    I understand that, unfortunately, the State has chosen again to deploy the flawed Diebold DRE touchscreen units as the primary vote recording device for the 2019 elections, despite the well-documented security problems that include lack of any meaningful post-election audit capacity (a major security concern). The State has another low-cost, low-disruption option available: expand the use of hand-marked paper ballots from absentee and provisional voters to virtually all voters, and then use the Diebold AccuVote scanners to tabulate. These steps must be paired with robust, statistically valid post-election auditing as a check for the myriad security vulnerabilities that cannot otherwise be mitigated.

28.    In the intermediate term, to successfully accomplish such a switch to hand-marked paper ballots, the State need not overhaul the entire election management system and all its components, nor change vendors, nor adopt and train staff on new hardware or software. The State needs merely expand the use of the Diebold AccuVote optical scanners and discontinue the use of the Diebold DRE touchscreens as the standard voting device. But robust post-election audits conducted according to well-documented best practices[4] must be added to the

---

[4] *E.g., Principles and Best Practices for Post-Election Tabulation Audits*, (Rev. Ed. 2018) https://electionaudits.org/principles/

11

transition activities, or the security and integrity of the election cannot be achieved

with this antiquated equipment. In fact, rigorous audits are normally required for

all computer-driven information systems where information integrity is paramount.

Voting systems should not be excluded from this basic quality assurance

technique.

29.     Fortunately, these auditing practices are feasible and efficient, and can

render otherwise insecure and obsolete technologies like the Diebold GEMS

software and its AccuVote scanners relatively secure and assure accuracy of the

vote tabulation, given the reliable paper audit trail created by the hand marked

paper ballots.

30.     AccuVote scanners are older technology and, from word-of-mouth

reports, available for de minimis prices from other jurisdictions that have retired

them.  For example, Adams County, Colorado, donated 154 AccuVote scanners to

Georgia in 2016.[5] All Georgia counties already use the Diebold optical scanners

for mail-in absentee ballots, with the Diebold GEMS servers functioning as the

central software ("election management system").  Georgia election officials and

their staff are familiar with the Diebold software and equipment, having operated it

for well over a decade. No further technology or software change need be involved

---

[5] https://www.ledger-enquirer.com/news/politics-government/election/article96275322.html

12

if the 2019 elections are to be conducted on hand-marked paper ballots tabulated by AccuVote scanners. It is a relatively minor change to use *more* Accu-Vote optical scanners and *far fewer* (or no) DRE touchscreens.

31.    While the Diebold voting system is far from state-of-the-art, given that it runs grossly outdated software pervaded with well-documented flaws, the good news is that if tabulation errors or deliberate hacks were to occur, election officials who conduct pre-certification post-election audits should be able to detect the discrepancies and promptly correct the tabulation. But the audit protocols must be sufficiently robust using a random sampling of ballots. Several sound auditing models have been published and can be used to restore the integrity of Georgia's elections and its citizens' voting rights without the State having to quickly modify or update the entire voting system.

32.    This proposed interim solution to Georgia's profound, long-term election security mismanagement would leverage the Diebold knowledge base within the Secretary of State's office and local election administration but would supplement it with robust post-election audits as a major security mitigation and public transparency device. It would not offer a complete cure to Georgia's ongoing election cybersecurity issues pertaining to, e.g., the voter registration systems and e-pollbooks. All mission-critical technical components will require

13

their own cyber risk assessments and effective security mitigations, now and for all elections into the foreseeable future.

33.    While permanent elections staff generally can be presumed to have working knowledge of Diebold AccuVote scanners that can be leveraged in this interim solution, the pollworkers and other temporary staff would need to be retrained for handling hand-marked paper ballots at the polling locations.  (In Cuyahoga County, we found poll workers expressed great relief that they no longer bore responsibility for the cumbersome multi-step set up and booting of numerous DRE touchscreens when we changed to paper ballots.) Other modifications would be needed but are relatively modest and manageable compared with changing to an entirely new voting system.  For instance, more AccuVote scanners would likely need to be identified for borrowing or short-term leasing arrangements; cardboard privacy tents, and stands or tables for marking ballots would need to be procured; ballot printing would need to be contracted at higher volumes to produce the requisite numbers of ballots for absentee as well as most other voters; appropriate pens would be needed for marking ballots; and warehousing facilities would need to be identified for storing paper ballots (for the federally-required 22 months for any Federal elections). The current procedures for assuring a secure chain of custody for all ballots also must be reassessed, with public and expert input, to enable a statistically valid post-election audit in each electoral jurisdiction.

14

34. All of the required and recommended logistical steps for transitioning from all-electronic DRE elections to hand-marked paper ballots tabulated by optical scanners have been well-documented, as have the steps for producing a secure chain of ballot custody for auditing. Georgian officials can draw on ample experience from predecessor jurisdictions and from election management consultants .

35. Undoubtedly, like other States, Georgia will need to replace the Diebold system relatively soon with an improved and much more secure voting system-- which, I would submit, should be to a hand-marked paper ballot voting system. Some such systems are being developed now and others have been on the market for at least ten years. But given the systemic security and judgment problems palpable in Georgia election administration (from the Secretary of State's level through to some local county offices), and the myriad difficulties of transitioning during high volume, managerially complex Federal election years, I would counsel against Georgia's announced timetable. While some States and jurisdictions could manage this timetable, it does not seem prudent for Georgia's state officials (and its local election administration) to add to their already substantial burdens, especially where overall election security and integrity will not be significantly improved by the selected new voting system.

15

36.    Unlike Cuyahoga County's experience prior to its State-mandated rapid transition to paper ballots, Georgia has not had the benefit of an independent expert investigatory body's documentation of the myriad managerial dysfunctions and security breaches that had occurred in its elections over a number of years. That July 2006 investigatory report also provided concrete steps-- a roadmap-- for rectifying the managerial problems, and Cuyahoga County elections staff then had time (18 months) to correct these before being saddled with the rapid transition to a new voting system.  Neither of these components has been present for Georgia. Nor has Georgia's voting public received the type of systemic assessments and transparency about voting location/precinct problems undermining voter access that contradict administrative denials and inertia.  By contrast, in Cuyahoga County, these problems were carefully documented and publicly exposed, and in conjunction with the appointed Public Monitor of Cuyahoga Election Reform, forced significant managerial changes throughout the elections agency, including in staffing and supporting voting locations.

37.    All of these steps, and the 1.5 years of time following publication of the investigatory Report, enabled the Cuyahoga County elections office to conduct increasingly successful elections that in turn helped to rebuild public trust in the elections system and its managers.  In my professional opinion (and though from out of state), Georgia's voters likely remain distrustful of their election

16

administrative system, owing to the systematic mismanagement of its elections and

its failure to practice the most basic cybersecurity hygiene. If administrators take

small but meaningful steps during 2019 that enable election officials to produce a

record of administrative success and provably accurate tabulations, that will greatly

benefit the State, its voters, and voting rights immediately and as they move into

2020's heightened demands.

38.     Having studied and been a part of successful voting system

transitions, I would recommend that the best interim step for greatly improving

Georgia election security and public trust in its elections is the use of hand-marked

paper ballots in 2019 and 2020, for all voters who can complete such ballots

without assistance. (I explain the rationale for 2020 in paragraph 39 below.) These

ballots can be created within GEMS, and tabulated on AccuVote scanners in

conjunction with the existing GEMS election management system. No substantial

change in equipment or vendors would be required. Voters can be educated in a

public education campaign as to how to mark such ballots, how to use the scanners

in the precincts, and how the post-election audits will assure that their votes are

accurately counted and reported. Many nongovernmental organizations would be

delighted to draw on their honed experience in designing and rolling out, in

support of the election process, such a voter education campaign. I would pledge

17

my assistance, and would identify helpful steps that we used in Cuyahoga County to help assure the transition.

39.     Coalition Plaintiffs have also asked me to comment on the Secretary of State's currently planned date -- the 2020 Presidential Primary-- for statewide launch of a completely new voting system.   Generally, the rule in election administration is to roll out mission-critical new technology in off-year, non-federal election years, as the volume of voters and candidates/issues is normally smaller and thereby reduces the complexities that must be managed.

40.     As further detailed below, the reconfiguration of the current Diebold system to be an auditable paper ballot system can be accomplished swiftly and relatively smoothly in 2019, and its good faith implementation in 2019 would not impose significant risks to voters' rights or to the election administrative system.

41.     First, the upcoming 2019 elections in Georgia are local and municipal rather than major statewide and national elections.  Such "off-year elections" are the ideal time for a mission-critical technology transition.  These elections are likely to require fewer ballot styles, and contain fewer questions or races, than would be required in a primary or general election. The simplicity of the ballots will facilitate a successful transition.

42.     Second, the local and municipal elections taking place this year will allow Georgia to implement the hand-marked paper ballot system in smaller-scale

18

elections. As a result, poll workers and administrators, as well as voters, can gain additional familiarity with marking and scanning paper ballots, with (likely to be) lower voter turn-out.   Although fewer voters may participate, they can be expected to report on their voting experience and help to facilitate the overall voter and public knowledge about broadly using hand-marked paper ballots.

43.     Third, many sources of practical administrative knowledge are available to assist Georgia in charting an effective transition to hand-marked paper ballots. Given that such ballots are used extensively across the United States—partially or statewide in at least  45 States and the District of Columbia[6]—there is a large network of experienced practitioners nationwide, and many sources for advice and professional recommendations on how to achieve a smooth, efficient transition.

44.   Fourth, by ordering this interim modification of Georgia's election operations, election officials will have an opportunity to conduct paper-ballot elections, critically evaluate their process in a post-mortem, and revise their procedures before the high volume and complexity of administering the 2020 Federal elections.   This approach thereby increases the likelihood of administrative and security success -- which can help augment public and staff

---

[6] https://www.verifiedvoting.org/verifier/

morale and confidence -- before a wholesale election technology change is implemented.

45. Fifth, compared with the monetary cost of maintaining, storing, transporting, securing, and testing DRE electronic voting machines, and training plus re-training poll workers on the cumbersome procedures for initiating and then properly closing down the DRE units and aggregating their votes, the cost of implementing a hand-marked paper ballots system plus robust auditing is comparatively low. To achieve the expanded use of AccuVote scanners as recommended here, the cost of additional scanners should be quite modest, given the number of used AccuVote scanners available for donation or purchase. In advising officials and citizens from jurisdictions that were/are considering changing their voting system, I draw on the "lessons learned" in Ohio to underscore that upfront purchase and maintenance costs of an election system must be supplemented by attention to the "hidden" ancillary costs that are rarely divulged by vendors. The vendors' sales teams tend to promote their newest and most expensive electronic voting machines, and continue to vastly overstate the security and accessibility attributes of their newest systems. But over time it has become clear that DRE systems (and now their successors, most BMDs- ballot marking devices) are among the most expensive and difficult systems to operate and maintain over their expected lifespan.

46. Finally, as we saw in Cuyahoga County, it is probable that Georgia's citizens will be willing to volunteer their time to assist in improving the integrity and transparency of Georgia's elections. In my experience in Ohio, many citizens were eager to help restore the legitimacy of their electoral system, and thereby, also help improve their State's reputation, especially after years of negative information and justified critiques. For example, in Cuyahoga County, there was a surge in volunteers for poll-worker positions after the independent review panel was appointed and undertook its activities transparently -- including by holding six public hearings around the county to collect information and concerns about the experiences in the 2006 failed primary election. In the remedial phase after our investigative report was published and the county election officials sought wider assistance, many nonprofits helped to develop voter education campaigns and troubleshooting teams for rapid identification and resolution of polling place problems. They also augmented their efforts to support the rapid transition to paper ballots. Nonprofit leaders volunteered time and earmarked organizational efforts to facilitate voter knowledge, comfort, and confidence in using the new hand-marked paper ballots system. Little explanation was needed, as the public was accustomed to marking paper for choices from SAT exams to lottery cards. But we did need voters to understand how to mark the ballot to assure that their marks would "count" as valid votes (e.g., *color-in the oval, don't circle it*!;  use black ink

21

and the pen provided, not another color, so that the ink won't sink through and cause undesired marks on other races on the flip side).

47. In conclusion, it is my opinion that Georgia's voters and their vital interests in accurate, secure elections would be best served by (1) an immediate transition to hand-marked paper ballots that can be tabulated using the AccuVote optical scanners, combined with (2) use of robust post-election auditing protocols that comply with documented best practices.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 18, 2019
Orlando, FL

Candice Hoke
_____
Candice Hoke

22

# CANDICE HOKE

10713 Boca Pointe Dr.
Orlando, FL  32836
shp899 *at* icloud *dot* com

## EDUCATION

Master of Science in Information Security Policy & Management, Carnegie Mellon University, 2014.

Juris Doctor, Yale Law School, Yale University, 1983.  *Yale Law Journal.*

Bachelor of Arts, *cum laude,* Hollins University, 1977.

## EMPLOYMENT

Consultant, Operational Security and Cyber Risk Assessments, 2018 - present (private practice).

Professor of Law, Cleveland-Marshall College of Law, Cleveland State University, Cleveland, OH. 1994 – 2017 (tenured in 1995);  Professor of Law *emerita* 2017 - present.

- Founding Co-Director, Center for Cybersecurity & Privacy Protection, 2015 – present.
- Director, Center for Election Integrity, 2005-08; Project Director, Public Monitor of Cuyahoga Election Reform.

Cyber Security Engineer, Cyber Risk & Resilience Team, CERT Division of the Software Engineering Institute, Carnegie Mellon University (predominantly part-time), May 2014 - Feb 2015.

Founder & Executive Director, Center for Election Excellence, Cleveland Hts, OH (part-time), 2008-11.

Visiting Research Engineer & Research Team Leader, Department of Electrical Engineering and Computer Sciences, University of California-Berkeley, May-Aug. 2007 (for voting systems security studies).

The Judge Ben C. Green Visiting Professor of Law, Case Western Reserve University Law School, Cleveland, OH, 1993-94.

Assistant Professor of Law, University of Pittsburgh School of Law, Pittsburgh, PA, 1987- 93.

Adjunct Assistant Professor, Northeastern University, Master of Public Administration, Boston, MA, summer term 1986.

Associate Attorney, Hill and Barlow, Boston, MA, 1985–87.

Law clerk to The Honorable Hugh H. Bownes, of the U.S. Court of Appeals for the First Circuit, Boston, MA, 1983 – 85.

Summer Associate Attorney, Equal Rights Advocates, Inc., San Francisco, CA, summers 1980, 1982.

Summer Associate Attorney, Thelen Marrin Johnson and Bridges, San Francisco, CA, summer 1981.

## PUBLICATIONS

### BOOK CHAPTERS & MONOGRAPHS

Voting Technologies and the Quest for Trustworthy Elections, Chapter 17 in America Votes, Benjamin Griffith, ed., American Bar Association Press, 2nd ed. 2012.

Voting and Registration Technology Issues: Lessons from 2008 (with David Jefferson), Chapter 3 of America Votes! Supplement, Benjamin Griffith, ed. American Bar Association Press 2009.

Resolving the Unexpected In Elections:  Election Officials' Options [election forensics], with computer scientists Matt Bishop, David Jefferson, Mark Graff, and Sean Peisert, October 2008), first published by the American Bar Association and distributed to the Section on State and Local Government, October 2008; currently available at http://nob.cs.ucdavis.edu/bishop/notes/2008-forensic/index.html.

The Guarantee Clause, Encyclopedia of American Federalism, 2 vols. Greenwood Press; E. Katz, et al., eds. 2006.

## LAW REVIEW & JOURNAL ARTICLES: PEER-REVIEWED

Are they worth reading? An in-depth analysis of online advertising companies' privacy policies, (with Lorrie Faith Cranor, Pedro Leon, et al.), I/S: A Journal of Law and Policy for the Information Society, vol. 11, issue 2, Aug 2015.

Judicial Protection of Popular Sovereignty: Redressing Voting Technology, *Symposium: Baker v. Carr After 50 Years: Appraising the Reapportionment Revolution*, 62 Case Western Reserve Law Review 997, 2012.

State Discretion Under New Federal Welfare Legislation: Illusion, Reality, and a Federalism-Based Constitutional Challenge, 9 Stanford L. & Policy Rev. 115, 1997, solicited for the *Symposium: Welfare Reform and Beyond.*

Review of Federalism and Rights by Ellis Katz & G. Alan Tarr and To Make a Nation: The Rediscovery of American Federalism by Samuel H. Beer, 47 Journal of Legal Education 149, 1997.

Arendt, Tushnet, and Lopez: The Philosophical Challenge Behind Ackerman's Theory of Constitutional Moments, 47 Case W. Res. L. Rev. 903, 1997; solicited to respond to Mark Tushnet in *Symposium: The New Federalism After United States v. Lopez.*

Constitutional Impediments to National Health Reform: Tenth Amendment and Spending Power Hurdles, 21 Hastings Const. L. Q. 489, 1994; lead article in *Symposium: Health Care and the Constitution.*

## OTHER LAW REVIEW ARTICLES

Transcending Conventional Supremacy: A Reconstruction of the Supremacy Clause, 24 Connecticut Law Rev. 829, 1994.

Preemption Pathologies and Civic Republican Values, 71 Boston Univ. Law Review 685, 1991, lead article).

## PEER-REVIEWED CONFERENCE & WORKSHOP PAPERS

Are They Worth Reading? An In-Depth Analysis of Online Advertising Companies' Privacy Policies (with Lorrie Faith Cranor, Pedro Leon, et al.) presented by co-author at 2014 TPRC: 42nd Research Conference on Communication, Information and Internet Policy, George Mason Univ., Arlington, VA. Sept. 12-14, 2014.

Self-Regulation of the Online Behavioral Advertising Industry: Empirical Analysis and Regulatory Competence (with Lorrie Faith Cranor, Pedro Leon, et al.), Privacy Law Scholars Conference, George Washington University, June 6-7, 2014.

Internet Voting: Formulating Structural Governance Principles for Elections Cybersecurity, proceedings of ISGIG 2009: Second International Symposium on Global Information Governance, September 15-17, 2009, Prague, Czech Republic; published in ACM Library.
http://dl.acm.org/citation.cfm?id=1920329

E-Voting and Forensics: Prying Open the Black Box (with Matt Bishop, Sean Peisert, Mark Graff and David Jefferson), EVT/WOTE (Electronic Voting Technology/Workshop on Trustworthy Elections), USENIX Security Conference, Montreal, CA, August 2009.
http://www.usenix.org/events/evtwote09/tech/

GEMS Tabulation Database Design Issues In Relation to Voting Systems Certification Standards (with Thomas P. Ryan), EVT: Electronic Voting Technology Workshop, USENIX Security Conference, Boston, MA, August 6, 2007. http://www.usenix.org/events/evt07/tech/

## OTHER SCHOLARLY CONFERENCE & WORKSHOP PAPERS

Essential Research Needed to Support UOCAVA-MOVE Act Implementation at the State and Local Levels (co-authored with Matt Bishop), one version published in the NIST-FVAP-EAC Workshop on UOCAVA Remote Voting Systems, held in Washington, D.C., August 2010.
http://www.nist.gov/itl/csd/ct/uocava_workshop_aug2010.cfm;
updated in SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1697848

Election Cyber Security and the Federal Quest for Online Voting (presentation in the Schloss-Dagstuhl, Germany, Symposium: Verifiable Elections and the Public), July 10-15, 2011 http://www.dagstuhl.de/program/calendar/partlist/?semnr=11281&SUOG

Licensing and Other Credentialing for Software Engineering, Software Assurance Working Group Sessions, U.S. Department of Homeland Security, National Cyber Security Division, MITRE-1, McLean, VA, June 29, 2011.

A Common Law Remedy for Genetic Discrimination, in Symposium: Is There a Pink Slip in Your Genes? Genetic Discrimination Law Conference, Cleveland-Marshall College of Law, Cleveland, OH, December 6, 2001.

State Discretion Under New Federal Welfare Legislation: Illusion, Reality, and a Federalism-Based Constitutional Challenge, ABA Annual Meeting, Section on State and Local Government Law, Chicago, IL, August 6, 1997.

Arendt, Ackerman, and Lopez: Testing the Theory of Constitutional Moments (responding to a paper by Mark Tushnet), Symposium on the New Federalism After United States v. Lopez, Case Western Reserve University Law School, Nov. 10-11, 1996.

Federalism Issues in National Health Reform, 15th Annual Health Law Teachers Conference, sponsored by the American Society of Law, Medicine, and Ethics, et al., Indianapolis, IN, June 2-4, 1994.

Constitutional Impediments to National Health Reform: Tenth Amendment Hurdles, at the Conference on National Health Care Reform: The Legal Issues, sponsored by the Law-Medicine Center of Case Western Reserve University, Feb. 25-26, 1994.

## TECHNICAL REPORTS

Documentation Assessment of the Diebold Voting Systems, commissioned by the California Secretary of State and part of larger study conducted by the University of California (with David Kettyle), July 20, 2007. http://www.sos.ca.gov/elections/elections_vsr.htm

Collaborative Public Audit, Final Report of Cuyahoga County's November 2006 General Election (with co-author workgroup), April 2007,

http://engagedscholarship.csuohio.edu/cgi/viewcontent.cgi?article=1001&amp;context=lawfac_reports

College Poll Worker Guidebook for the U.S. Election Assistance Commission, a Center for Election Integrity project with Abigail Horn, Principal Investigator, Dec. 2006, final edition at http://www.eac.gov/assets/1/Page/A Guidebook for Recruiting College Poll Workers.pdf

Final Report of the Cuyahoga Election Review Panel, primary author, with Ronald Adrine & Thomas J. Hayes, July 20, 2006.
http://engagedscholarship.csuohio.edu/cgi/viewcontent.cgi?article=1003&context=lawfac_reports

Operational Security and Management Assessment Reports for the Public Monitor of Cuyahoga County Election Reform, 2006-08.

# PUBLIC & EXTERNAL ACTIVITIES

## FEDERAL AGENCY TESTIMONY & COUNSEL

U.S. Dept. of Homeland Security, U.S. CERT and other staff, requesting insight and recommendations on analyzing and achieving election cybersecurity objectives, July 2016- Jan. 2017.

Risks and Legality of Internet Voting Initiatives, presentations and discussions with the Office of General Counsel, U.S. Department of Defense, June 2011- Jan. 2012.

Licensing the Software Engineering Workforce, DHS Working Groups on Software Assurance, MITRE: McLean, VA, June 29, 2011.

Department of Homeland Security, Director Cyber + Strategy, discussions of steps within DHS scope that would assist in protecting US election cybersecurity, Oct. 2010.

U.S. Justice Department, Antitrust Division: regarding the merger of the two largest voting system companies and subsequent divestiture of assets; led a national collaboration of nonprofit research and advocacy entities dedicated to fair elections in negotiations with the Department, Dec. 2009-May 2010.

Executive Office of the President, Office of Legal Counsel:  discussions of election cybersecurity and omission of election systems from designation as critical infrastructure assets warranting federal protection and planning; federal legislative needs for fair, secure, accurate, and accountable elections, May-June 2009, March 2010.

Tracking Voting Technology Field Performance: The Federal Role. Public Hearing of U.S. Election Assistance Commission; solicited written and oral testimony to include technical monitoring program established in Cuyahoga County, Ohio; Washington, D.C., Dec. 8, 2008.
http://www.eac.gov/assets/1/AssetManager/testimony%20candice%20hoke%20center%20for%20election%20integrity%20public%20meeting%20december%208%202008.pdf

Comparing Provisional Ballots in Ohio and Indiana, testimony before the U.S. Election Assistance Commission concerning the November 2004 General Election, Feb. 2005.

U.S. Justice Department, Office of Legal Counsel, per request, consulted on the constitutionality under Tenth Amendment and Spending Power of the President's proposed health reform bill, April – May, July 1994.

## FEDERAL LEGISLATIVE TESTIMONY & COUNSEL

Legislative drafting and critiques of bills concerning election technologies and election cybersecurity for Members of the U.S. House and Senate including Senators Schumer, Cornyn, and Feinstein; Representatives Maloney and Holt, and for committee staff of both parties, 2007-16.

Risks and Legality of Internet Voting Initiatives, presentations and discussions with the Chief of Staff of the Chair of U.S. Senate Armed Services Committee; Legal Staff of other Senate Armed Services Committee members (both parties); Legal Staff, U.S. House of Representatives, Committee on Administration; Legal Staff, U.S. Senate Rules Committee, June 2011- Jan. 2012.

Testimony before the U.S. House of Representatives, Elections Subcommittee of the House Administration Committee, on independent post-election auditing and impediments to election auditing and transparency.  Washington, D.C., March 20, 2007 (invited oral & written). http://engagedscholarship.csuohio.edu/cgi/viewcontent.cgi?article=1037&context=fac_presentations

U.S. Senate, Committee on the Judiciary, Subcommittee on the Constitution.  As requested, reviewed, edited and commented on draft health reform legislation; drafted additional legislative proposals; wrote legal memoranda in support of proposed legislation, and provided written testimony for the record, summer and fall 1995.

## STATE TESTIMONY & COUNSEL

Effective Management of Voting Systems Procurement and Launch Issues, invited witness, Allegheny County Public Hearing on Voting Systems Procurement, Pittsburgh, PA., June 7, 2019.

Regarding the Ohio Secretary of State's Voting System Security study (EVEREST), before the Ohio General Assembly, fall 2007.

A Deliberative Process for Reform of Ohio Election Statutes, written and oral testimony on S.B. 380, House Committee on State Government and Elections, Columbus, OH, Dec. 11, 2008.

Consultant and legislation drafting, proposals for post-election auditing and other election administrative issues in Ohio, New Jersey, Pennsylvania, and other States, Dec. 2007 – June 2011.

Consultant on Ohio constitutional ballot initiative to establish a State minimum wage with COLA provision for automatic increases annually, summer 2005.

## ELECTION TECHNOLOGY STANDARDS-SETTING WORKGROUPS

NIST Workgroups focused on developing the new Federal Voluntary Voting System Guidelines, specifically the VVSG-cybersecurity and VVSG-testing workgroups, 2016-present.

NIST Cybersecurity Framework Workshop preceding initial drafting of the Cybersecurity Framework, Pittsburgh, PA, May 29-31, 2013.

Federal Voting Assistance Program (FVAP) of U.S. Department of Defense, Security Workgroups, Chicago and Washington, D.C. 2010.

Voting Rights Institute of the Ohio Secretary of State, workgroups on Voting Technology, Auditing, and Election Official Education, 2007- 10.

## APPOINTED PUBLIC POSITIONS

Member, Ohio Attorney General's Cybersecurity Advisory Board, Subcommittee on Data Protection Legislation, Sept. 2016- Jan. 2018.     http://www.ohioattorneygeneral.gov/Media/News-Releases/September-2016/Attorney-General-DeWine-Launches-CyberOhio-Initiat

Member, Advisory Council, Voting Rights Institute, Ohio Secretary of State.  Workgroups on Voting Technology and Auditing; Election Official Education, 2007- 10.

Public Monitor of Cuyahoga Election Reform. Pioneered field assessments of operational, technical and physical security. Assessed and offered recommendations for improving managerial, technical, and other operational functionality plus achieving compliance with governing law. Initiated first post-election audit in Ohio. Provided crisis management recommendations and PR support.    Joint Appointment by the Board of Elections of Cuyahoga County, and County Commissioners of Cuyahoga County. August 2006 - Dec. 2008.

Member, Cuyahoga Election Review Panel. As the onsite member of 3-person panel, structured and supervised the investigative and reporting teams and provided executive management of investigative and reporting commission charged to determine the causes and cures for a high-profile Federal election failure. Conducted all recruitment, hiring, onboarding and training; drafted final report. Completed intensive investigation and public report within the 60-day assigned time frame Interfaced with broadcast and print media locally and internationally as part of crisis management. Joint Appointment by the Board of Elections of Cuyahoga County and County Commissioners of Cuyahoga County. May - August 2006.

## INVITED TALKS & PANEL PRESENTATIONS

Election Security Improvements Realized, Annual Conference of the Center for Cybersecurity & Privacy Protection, Cleveland State University, Cleveland, OH, May 31, 2019.

Federal Litigation to Redress Election Cybersecurity Deficiencies, Election Verification Conference, Washington, D.C., March 2019.

Election Security: A 2018 Midterms Retrospective, Penn State Symposium on Election Security, Penn State University, State College, PA, December 3, 2018.

Election Cybersecurity: Are We Ready for 2018? League of Women Voters, Oberlin, OH. June 2, 2018.

Conference: Can Adversaries Hack Our Elections? Can We Stop Them? University of California at Irvine, Irvine, CA, March 13, 2018.

Voting System Vulnerabilities and their Potential Consequences, State of the Net Conference, Washington, DC, January 29, 2018.

Outdated Legal Frameworks for Redressing Exploited Voting Technology Vulnerabilities, First DEFCON Voting Village, Las Vegas, NV, July 28, 2017.

The Federal Interest in Expanding Cyber Risk Insurance, 2d Annual Conference on Cybersecurity & Privacy Protection, Cleveland, OH, April 28, 2017.

Constitutional Rights to Election Tabulation Accuracy, in Recounts and Beyond, Election Verification Conference, George Washington University, Washington, D.C., March 15-17, 2017.

Avoiding Email Insecurity in Achieving Secure Confidential Communications With Clients, Cleveland, OH, Dec. 2, 2016.

Pervasive Cybersecurity to Reduce Risk, Chemical Industry General Counsel Symposium, Thompson Hine, Cleveland, OH, Oct. 25-26, 2016.

Developing a Resilience-Oriented Security Culture, CRAIN 360: Cyber Security Conference, Crain's Cleveland Business, Oct. 5, 2016.

Privacy Interests and Election Technologies, Cleveland IAPP KnowledgeNet, Cleveland, OH, April 26, 2016.

Election Cyber Security and the Federal Quest for Online Voting presented at Schloss-Dagstuhl, Germany, Symposium: Verifiable Elections and the Public), July 10-15, 2011.

Moderator and Panel Member, Election Technologies: What's On the Table & Off, and Why, Overseas Vote Foundation Annual Summit, Pew Charitable Trusts, Washington, D.C., February 10, 2011.

Keynote Address: Credentialing the Workforce: Licensing Software Developers to Achieve Enhanced Software Security, NSF-funded Summit on Education for Secure Software, Washington, D.C., October 18 - 19, 2010.

Election Recounts: Law and Practice, Panel presentation at Election Verification Network, Washington, D.C., March 2010.

Internet Voting:  Formulating Structural Governance Principles for Elections Cybersecurity, presentation to the international conference ISGIG 2009: Second International Symposium on Global Information Governance, Prague, Czech Republic, Sept. 15-17, 2009.

Litigating Voting Technology Deficiencies, American Bar Association, Section on State & Local Government, Chicago, IL, March 21, 2009.

Keynote Address: Ignorance of Computer Security Science and Usability Engineering: The Public Costs, NSF-funded Living in the KnowlEdge Society Workshop, Villanova University, Villanova PA, March 19 - 21, 2009.

Lawyers' Roles in Election Administration Fairness, Proficiency and Accountability, COGEL: Council on Government Ethics Laws, Annual Conference, Chicago, IL, Dec. 9, 2008.

Statewide Voter Registration Database and Other Election Security Issues, Ohio Election Summit sponsored by the Ohio Secretary of State, Columbus, OH, Dec. 2, 2008.

Voting Technology:  History and Litigation, American Bar Association, Section on State and Local Government Fall Meeting, Chicago, IL, Sept. 2008.

Litigation on Voting Technology Issues, Annual Meeting, American Bar Association, New York, New York, NY (program co-sponsored by 4 Sections and Councils), Aug. 8, 2008.

Technical Monitoring and other Post-TTBR Interim Strategies for Election Integrity, Electronic Voting Technology Workshop, USENIX Conference, San Jose, CA (panel with chief election administration officers of California, New York, and the federal Election Assistance Commission), July 27-30, 2008.

Trustworthy Elections?   The Way Forward, Chautauqua Institution, Chautauqua, NY, in the week dedicated to Restoring Legitimacy to Our Elections, July 3, 2008.

Understanding Voting Technology Security Issues, Pew Charitable Trusts and Electionline.org conference for selected media representatives, Chicago, IL, Dec. 6, 2007.

The California TTBR Study of E-Voting Security Issues, ABA Standing Committee on Election Law, Washington, DC, Oct. 2007.

Working With Election Officials for Increased Transparency, National Post-Election Audit Summit, Minneapolis, MN, Oct. 2007.

Polling Locations Competence and Voting Technology Issues, NAACP Public Hearing on Voter Suppression and November General Election, Cleveland, OH, Nov. 14, 2006.

Ohio:  A Crucible for Improving the Nation's Elections, Conference on Election 2006 and the Future of American Politics, Oberlin College, Oberlin, OH, November 10-12, 2006.

Federalism Issues in National Health Reform, 15th Annual Health Law Teachers Conference, sponsored by the American Society of Law, Medicine, and Ethics, et al., Indianapolis, IN, June 2-4, 1994.

Constitutional Impediments to National Health Reform: Tenth Amendment Hurdles, at the Conference on National Health Care Reform:  The Legal Issues, sponsored by the Law-Medicine Center of Case Western Reserve University, Feb. 25-26, 1994.

Anti-Discrimination Protection and Disability Accommodation for the HIV-Infected Individual, at HIV: The Human Perspective Conference, Pennsylvania/New York AIDS Regional Education and Training Center, et al., Pittsburgh, PA, Nov. 12, 1989.

## CONFERENCE & WORKSHOP LEADERSHIP

Panel Chair, Recounts, Election Accountability and Beyond, Election Verification Conference, George Washington University, Washington, DC, March 16, 2017.

Conference Committee, Annual Awards Chair, Election Verification Conference, George Washington University, Washington, DC, March 2016.

Panel Chair and presenter, Cross-Cutting Program: The Challenges of Internet Voting and New Election Technologies: Are Votes Counted as Cast?" at the 2012 Annual Meeting of the Association of American Law Schools, Washington, D.C., Jan. 5, 2012.

General Chair (of Program Committee and Organizing Committee), 2011 GTIP: Governance of Technology, Information and Policies Workshop (GTIP), co-located with ACSAC:  Annual Computer Security Applications Conference, Orlando, FL, Dec. 6, 2011.

Program Committee member, 2012 and 2011 EVT/WOTE (Electronic Voting Technology /Workshop on Trustworthy Elections), co-located with USENIX Security Conference, Bellevue, Washington, August 2012; San Francisco, CA, August 2011.

Program Committee member, 2010 GTIP Governance of Technology, Information and Policies Workshop (GTIP), co-located with ACSAC:  Annual Computer Security Applications Conference, Austin, TX, Dec. 7, 2010.

## SELECTED GUEST EDITORIALS (OP-EDS) & BLOG POSTS

Pennsylvania's Voting Systems, Pittsburgh Post-Gazette, Dec. 12, 2018.

Election Integrity: Missing Components to Remedy, The Hill, Nov. 8, 2016. http://thehill.com/blogs/congress-blog/technology/304835-election-integrity-missing-components-to-remedy

The Quest for Cyber Resilience- Not Mere Security, http://achievingcybersecurity.org/category/resilience

Constitutional Obstacles to National Health Reform, In Brief, Jan. 1, 1994.

## BAR ADMISSIONS & PROFESSIONAL CERTIFICATIONS

Admitted to practice

U.S. Court of Appeals for the First Circuit, 1985.
U.S. District Court for Massachusetts, 1985.
Massachusetts, 1984.

Certifications

CIPP/US, by the International Association of Privacy Professionals, 2014 - present.

## EDITORIAL BOARDS AND REFEREE FOR BOOKS

Co-Founder & Co-Editor, SSRN LSN Cybersecurity, Data Privacy, & e-Discovery Law & Policy e-Journal, 2015-present.

Editorial Board Member, JETS: Journal of Election Technologies, 2 volumes, 2013, 2014.

Evaluated election-related articles for Publius, intermittently 2005-08.

Evaluated articles for the Election Law Journal, intermittently 2006-10.

Evaluated proposed text in Employment Law for LexisNexis, 2001.

Evaluated proposed treatise published as Erwin Chemerinsky, Constitutional Law, Aspen, 1997, 2002.

Evaluated proposed text on Feminist Jurisprudence for Aspen, 1992.

Evaluated proposed casebook, Sullivan, Calloway, and Zimmer, Employment Law, 1992.

## PROFESSIONAL ASSOCIATIONS

American Bar Association, Sections on Science & Technology and Administrative & Regulatory Law

ACM - Association of Computer Machinery

International Association of Privacy Professionals

## NGO ADVISORY COMMITTEES AND BOARDS

Member, Board of Directors, Verified Voting Foundation 2007-10; Chair, Capacity Building and Development Committee, 2009-10; Advisory Board, 2010-present.

Northeast Ohio Cybersecurity Consortium (comprised of major corporations, universities, hospital systems, regional Federal Reserve Bank, and other entities). Chair, Committee on Workforce and Economic Development, 2015-16.

Member, Standing Committee on Election Law, Advisory Commission, American Bar Association, three terms, 2007- 10.

Member, Advisory Board, Florida Voters Coalition, 2007-12.

Member, Advisory Board, Richard Austin Election Center, Michigan 2007-10.

## MEDIA

Commentator on election cybersecurity, election law and administration, Internet of Things cybersecurity and privacy/data protection, for broadcast and print media including National Public Radio (*All Things Considered, Morning Edition*), CNN, NBC, FOX National, CBS-TV, *New York Times, Boston Globe, Los Angeles Times, Washington Post, Wall Street Journal, San Jose Mercury News, The Guardian, New York Daily News*, San Francisco Chronicle, *Columbus Dispatch, Cleveland Plain Dealer, La Presse* (France), AP National and Ohio, *Toledo Blade, Cincinnati Inquirer, Cleveland* magazine, *McClatchy, The Hill,* POTUS XM Radio, NPR affiliates for Los Angeles, San Francisco, Akron-Canton, Cleveland, Columbus-OSU, Memphis, Louisville, Baltimore; and local TV affiliates for NBC, FOX, and ABC; and *Marketplace.*

# CONTRACT & GRANT SUPPORT

## EXTERNAL

### FOUNDATION

National foundation consortium, to provide strategic leadership of national, state and local nonprofits working in Ohio 2008 election cycle to achieve successful, fair election administration (recruited by the foundations); included Carnegie Corporation, Open Society Institute, Rockefeller Brothers, Quixote, Tides, and Democracy Alliance. Grantee: Center for Election Excellence, 2008.

### FEDERAL

U.S. Election Assistance Commission (EAC) to the CSU Center for Election Integrity (Abigail Horn, P.I., Candice Hoke, Center Director) to evaluate and develop best practices for recruiting and training college poll workers, published as http://www.eac.gov/assets/1/Page/A Guidebook for Recruiting College Poll Workers.pdf.

## INTERNAL UNIVERSITY

Faculty Research & Development Grant for scientific investigation: The Significance of Human Factors in Cyber Risk Assessment Tools, 2016-17.

Numerous legal research grants.

## GRADUATE & PROFESSIONAL COURSES TAUGHT

Cybersecurity & Privacy Protection I
Data Protection and Privacy Law
Employment Law
Constitutional Federalism/Structural Constitution
Federal Jurisdiction

Regulatory Law
Election Law
Unincorporated Business Associations
Administrative Law
Civil Procedure

## SUPERVISOR OF GRADUATE RESEARCH PROJECTS (SELECTED)

- Regulation of Security and Privacy Vulnerabilities in Autonomous Vehicles
- Effective Regulation of Supply Chain Risks for U.S. Cybersecurity Policy Objectives
- Educational Methods for Reducing Police Violence Toward Racial Minorities
- Building Security In vs. Building in Backdoors: Assessing Regulatory Alternatives
- Regulatory Approaches for Reducing Seismic Activity Correlated with Fracking

# UNIVERSITY SERVICE

## SELECTED ACADEMIC SERVICE

Executive Committee, Yale Law School, four-year term, 2007-10.

## CURRICULAR AND EDUCATIONAL PROGRAM DEVELOPMENT

M.S. in Cybersecurity: led inter-college workgroup to develop interdisciplinary M.S. degree with 5 concentrations, Cleveland State University, 2015-16.

First-year law school curriculum, to introduce Legislative & Regulatory law into core coursework, 2009.

**UNIVERSITY COMMITTEES & TASK FORCE WORK**

Cleveland State University includes:

Faculty Senate Academic Computing Committee (formerly chair)

Member, CSU Administration's Information Technology Advisory Committee, which included business interruption and contingency planning

# PERSONAL

Orlando, FL resident; one son; spouse (University of Pittsburgh law professor *emeritus*).

EXHIBIT

F

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| DONNA CURLING, et al.<br><br>Plaintiff,<br><br>vs.<br><br>BRIAN P. KEMP, et al.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION FILE NO.: 1:17-cv-2989-AT |

## SUPPLEMENTAL DECLARATION OF VIRGINIA MARTIN

**VIRGINIA MARTIN** hereby declares as follows:

1.     My name is Virginia Martin. I am over the age of twenty-one (21) years of age and am fully competent to execute this Declaration. I have personal knowledge of the facts recited here, which are true and correct.

2.     This supplements my declaration of August 20, 2018 [Doc. 277 at 81) in this case. There is nothing in my August 20, 2018 declaration that I wish to change. The purpose of this declaration is to address how the use of hand-marked paper ballots and paper pollbooks (or at least paper backups of pollbooks) can mitigate some of the problems that Georgia experienced in the November 2018 elections, specifically long lines and potential voter disenfranchisement. In addition, my declaration addresses my experience in conducting Columbia County's municipal elections as it applies to Georgia's upcoming November 2019 municipal elections.

3.      I am the Democratic Election Commissioner in Columbia County, New York. I have been employed as election commissioner since 2008. The role of Commissioner in Columbia County is a full-time salaried role overseeing three full-time Democratic staff, one half-time Democratic staff, and 150 or more Democratic seasonal and election-day workers. There is a similarly staffed Republican counterpart.

4.      Columbia County has 44,628 registered voters, and includes one city, 18 towns and four villages.

5.      The Columbia County Board of Elections conducts all federal, state, county and municipal elections with the exception of three villages' elections. All such elections are conducted on hand-marked paper ballots, scanned and tabulated in the polling place by optical scanners and then tabulated in the central office on the central tabulator for the election management system.

6.      As required by HAVA, for all elections run by our board, each polling place is outfitted with at least one Dominion ImageCast accessible voting unit.

7.      After the close of every election, my department, assisted by perhaps as many as 20 bipartisan election workers, conducts a hand count of a number of races to verify the accuracy of the optical scanning tabulations. Our method provides unofficial scanner tabulations quickly on election night which are then verified or modified by hand counts in the following days before final certification.

8.     Our audit begins with the New York State mandated audit of 3% of the voting machines deployed in the county, which in our case is one machine, and per statute we fully hand count every race on all the ballots cast on that machine. Then, for all ballots cast in the county, we fully hand count all municipal races in which there are more candidates than there are offices to be filled. We count federal, statewide, countywide or regional races at the request of any candidate, party, or either commissioner until the requestor is satisfied that the scanner's outcome was accurate. Unless a race falls under the 3% audit referenced above, we do not hand count races in which there are no more candidates than there are offices to be filled.

9.     Over the course of the 10 years we have been verifying our results via hand count, we have hand counted hundreds of thousands of ballots. As discussed below, our verification procedures are particularly important in the municipal elections we conduct which determine the local governance of our local communities. Significant public policy is decided in municipal elections, many times by just a handful of votes and sometimes by just one. Municipal elections, given their stakes but frequently small size, generally demand the most precision in election security and accuracy.

**Georgia's reported 2018 election failures and discrepancies**

10.     I understand from reviewing news reports and from reviewing affidavits from voters and pollwatchers that I received from Coalition for Good Governance that voters experienced: long waits at polling places;[1] problems attempting to check in at their precinct because of problems with the electronic pollbook information; faulty operation of the DRE machines

---

[1] https://www.ledger-enquirer.com/latest-news/article221190550.html

in the polling places, including "vote flipping" or incorrectly displayed or missing races on the electronic ballot; and DRE voting sessions being cancelled while the voter was voting.

11.    Based on my knowledge and experience, the problems that Georgia voters encountered in the November 2018 elections related to problems with *both* the electronic pollbooks and the DRE machines themselves.

*Need for E-Pollbook Update and Paper Backup*

12.    In my previous declaration, I recommended that paper pollbooks or paper backups be extensively used to avoid electronic pollbook software errors and resulting voter disenfranchisement. [Doc. 277, p 81, 16-17] It appears that electronic pollbook errors indeed caused widespread problems in voting, including creating long lines at the polling places in the November 2018 election.

13.    In order to avoid voter confusion and voter disenfranchisement, it is essential that the electronic pollbook data be fully audited, updated and tested well before use on Election Day, and that the data agree with the most accurate information available in the official voter registration database.

14.    It is also equally important that complete and updated paper backups to the pollbook be available in each polling location, and used immediately for adjudication of voters' eligibility or correct precinct, rather than attempting to force resolution through a flawed electronic pollbook. Voters should not be kept waiting in long lines so that pollworkers can avoid using paper backup pollbooks.

*Hand-Marked Paper Ballots Reduce Long Lines*

15.     The use of hand-marked paper ballots and paper backup pollbooks can dramatically shorten polling place lines and time for voting to avoid discouraging long lines caused by the complexity of operating integrated aging and unreliable electronic voting equipment.

16.     In Columbia County during the November 2018 general election, we experienced polling place average wait times of 5-15 minutes, and our wait times in the 2016 presidential election were 5-25 minutes. My understanding, based on voter affidavits I reviewed and news reports, is that wait times in Georgia were much longer, as long as  4 to 5 hours in some precincts.

17.     When hand-marked paper ballots are used, it is simple and inexpensive to expand capacity at the polling place when high turnout occurs. More ink pens and cardboard privacy shields are required, and possibly a modest addition of pollworkers, but no additional voting system equipment is necessary. In addition, if paper copies of electronic pollbooks are available, problems with electronic pollbooks need not cause any voting delays.

18.     Based on the transition to hand-marked paper ballots counted by optical scanner in Columbia County, New York and other jurisdictions with which I am familiar, it is my opinion that in Georgia an immediate switch to hand-marked paper ballots using the optical scanning capabilities of its current voting system is feasible, economical and essential for fair elections.

19.     In my experience, voters have no trouble understanding how to hand-mark a paper ballot or insert it into an optical scanner or locked ballot box in the polling place. Training time for pollworkers should be quite manageable, and education time for the voters will be minimal. Instructing voters and pollworkers on DRE operation is far more complex than working with hand-marked paper ballots.

20.     Immediately adopting hand-marked paper ballots and continuing to use Georgia's current Diebold Accu-vote optical scanning system and the current GEMS election management software and hardware should require minimal training time as the system components have been in use by Georgia elections staff since 2002. Hand-marked paper ballots have been used by hundreds of thousands of Georgia voters to vote absentee by mail.

21.     No new system selection, certification, testing and implementation is required for the deployment of hand-marked paper ballots counted by Diebold optical scanners and the GEMS election management system. The results of such tabulations should of course be verified by hand-count audit techniques, either through sampling techniques or full hand counts where preferred.

22.     It is my understanding that Georgia statutes permit optical scanning of paper ballots to take place either (a) at the polling place or (b) in a central count operation where all precincts' ballots are brought to the county election office after the close of the polls for centralized counting. It is my opinion that, during this potential transition period, the options may

create flexibility and convenience that should make the transition to hand-marked paper ballots even smoother.

23.     Election administration professionals have differing preferences for polling place scanning versus central count. I am unaware of any universally accepted "best practice" on this issue. While I prefer precinct scanning, it may be more convenient for some counties in Georgia to minimize the change for their pollworkers by having all the scanning done centrally at the election office. So long as well-documented chain-of-custody and ballot-security processes are maintained at the polling place and through and including the delivery to the central count location, the central count method is an acceptable method of transition until a new voting system is purchased with polling place scanners.

24.     If each county's election superintendent is given the option to choose precinct scanning or central count, depending on the county's particular needs, including pollworker training considerations, equipment considerations, and local logistics, the transition to paper ballots will be made all the smoother given that such local considerations have been taken into account.

25.     For example, in small municipal elections in November 2019 or before, many with only one polling place, a traditional metal or wooden locked, secured ballot box could be used to collect voted ballots, without any need to deploy an optical scanner to the polling place. The ballots would be transported to the election office using traditional and ideally bipartisan security protocols and would be counted by the county election officials in central count under public observation.

26.    For larger jurisdictions, the challenge of needing numerous ballot styles in early-voting vote centers in a few high-population counties is manageable using hand-marked paper ballots. The problem is not unique to the high-population counties in Georgia and has been solved in other jurisdictions across the country without the reliance on touchscreen voting machines. Such solutions include, sometimes in combination:

    a.  Paper-ballot-inventory management plans based on past voting trends for each early-voting center.

    b.  Careful ballot-inventory daily monitoring supplemented by Ballot-on-Demand printers.

    c.  Ballot-inventory management aided by a few roving teams of technicians to assist with printing issues, inventory shortages, etc.

    d.  Clear protocols for unexpected ballot shortages.

    e.  Requiring that two pollworkers, ideally from opposing political parties, check the accuracy of the ballot style before issuing the blank ballot to the voter.

    f.  Requiring that high-traffic early-vote centers be managed by experienced staff.

**Municipal election processes and considerations**

27.    Columbia County has historically conducted between one and six elections in a given year. Those elections include village elections, single-race special elections, federal primary elections, state and local

primary elections, presidential primary elections, and November general elections. Each election can comprise from one to 23 different ballot styles and as few as one race or as many as about a dozen races per ballot. Some municipal elections have very small turnout, as small as 72 in a 2018 village election.

28.     On June 25, 2019, our Board of Elections will be conducting small primary elections in several different parties in four towns. Party enrollment in these towns, which confers eligibility to vote in these elections, is 13 and 113 voters in the Town of New Lebanon, 28 and 53 voters in the Town of Gallatin, 74 voters in the Town of Chatham, and 16, 157, and 462 voters in the Town of Kinderhook. These elections will be conducted on hand-counted paper ballots scanned into optical scanners at each town's poll site. Ballots will be subjected to a 100% hand-count audit. While the numbers of voters turning out in these municipal elections will necessarily be small, our board does not find the quantity of voters an excuse to begrudge any voter or any candidate the benefit of a professionally conducted fair and accurate election that meets the same standard of excellence conferred on any other election in our county.

29.     In Columbia County, the process of conducting elections, which is largely the same across New York State, is as follows:

  a. Candidates qualify for ballot positions by filing with our Board of Elections, or, for cross-county elections, with the New York State Board of Elections.

  b. For cross-county elections, the New York State Board of Elections certifies its ballot to our county.

9

c.  Municipalities inform us of their ballot questions.

d.  Our board builds the ballots.

e.  Once approved, ballots are printed for use as non-scannable absentee and affidavit/provisional ballots and for optical-scan ballots for issuance at the polls. Optical-scan ballots undergo logic and accuracy (preLAT) testing.

f.  On Election Day, the pollworkers issue paper ballots to the voters who, after marking them by hand, cast them by placing them in the optical scanner, which tabulates their votes. At the close of polls, polling place results are publicly announced and posted.

g.  Immediately after the close of polls on election night, the secured memory cards from the precinct scanners; all the ballots, voted and unvoted; the pollbooks; and other election materials are brought, securely via a bipartisan team, to the county Board of Elections where our bipartisan staff aggregates the tabulations from the memory cards. Results reports are issued, posted on the board's website, and securely uploaded to the State Board of Elections. All election materials are secured behind bipartisan locks and keys, one held by the Republican commissioner and one held by myself, so that no materials can be accessed without the presence and assent of the other party.

10

h.  Following the election, and prior to the certification of the results, pollworkers hand count/audit some number of ballots to verify the machine totals. We believe that this verification is particularly important in small municipal races where a few votes can change the outcome of an election.

30.  Based on my experience, I do not perceive a meaningful risk to Georgia's municipal elections in November 2019 if hand-marked paper ballots and optical scanners are employed. In fact I see a clear benefit to the municipalities in doing so as I explain below.

31.  Municipal elections across the country are frequently close elections with only a few votes constituting the margin of victory. For example: in Saratoga County, New York, which is two counties north of Columbia County, in the City of Saratoga Springs, there was a 2017 referendum to change the form of city government. Nearly 9,000 votes were cast and the election was decided by only 10 votes. Notably, the loser in this election asked the Saratoga County board for permission to see the ballots or for a recount but was denied on the grounds that election law prohibited such access. Following the board's rebuff, relief was sought from the courts, but the petitioner was again denied access. To my knowledge that access was never granted. Had that election been held in Columbia County, a public hand count of all 9,000 ballots would have been undertaken as a matter of course, without need for legal petition. Given the importance of getting the accurate outcome that reflects the will of the voters, I believe strongly that leaving the results to an unauditable, flawed DRE system from which the

results cannot be recounted is taking an unacceptable risk with the governance of municipalities.

32.    In Columbia County, between 2001 and 2017, in municipal elections there were 10 tie elections, 18 elections won/lost by one vote, 16 elections won/lost by two votes, and 10 elections won/lost by three votes. Many more elections were won, or lost, by fewer than 10 votes.

33.    In our county's elections, hand-marked paper ballots are counted by optical scanner, and 100% of the municipal races in which there are more candidates than there are offices to be filled, and 100% of all ballot questions, are recounted by hand to be certain that the results reflect the will of the voters, with significant emphasis on ballot security and chain of custody documentation.

34.    My understanding is that, in Georgia, paper ballots are currently printed for every municipal election whether the county or the municipality is conducting the election, because absentee mail ballots are permitted in all elections. With the transition to hand-marked paper ballots, ballot print orders can simply be increased. Pollworkers can easily issue printed paper ballots to voters in the polling place rather than DRE voter-access cards.

35.    Based on my experience in Columbia County's conversion to a hand-marked paper ballot system, and my conferrals with other election officials who have managed such conversions, I strongly believe that pollworkers in municipal elections will encounter minimal difficulty in a transition to paper ballots, particularly given the small number of ballot styles to handle.

36.     It is my understanding based on information from the Secretary of State's office that roughly one half of Georgia's 535 municipalities currently conduct their own elections.[2] It is my understanding that such elections are primarily conducted by hand-counted paper ballots. A county switch to hand-marked scanned paper ballots should have no impact upon those municipalities.

37.     In a worst-case scenario, if a county refused to conduct hand-marked paper ballot elections for its local municipalities, it is entirely feasible that the municipalities themselves could undertake the hand counting of such ballots. In smaller elections, hand-counting paper ballots is not prohibitively time- or labor-intensive, and provides a reasonable alternative for tabulating election results. Consider my county's hand-tally ballot-counting time for the 2016 presidential election, in which 27,725 ballots were cast at our poll sites on election day. Reconciliation of all election-day materials including ballots took eight workers 1.5 eight-hour days, or 96 hours. Approximately half of that time, or 48 hours total, can be attributed to preparing the ballots for the hand count. Our Livingston-1 voting machine, on which 479 ballots had been cast, was randomly drawn for the 100% New York State mandated audit. The hand-counting of all six races on those ballots, one of which was a vote-for-two race, took four workers four hours, or 16 hours total. Hand-counting the races for President and Congress on 75% of all ballots cast in the county on election day, or approximately 20,800 ballots, for approximately 41,600 votes cast, plus a

---

[2] SAFE Commission June 13, 2018 transcript p, 77-78
https://sos.ga.gov/admin/uploads/SAFE%20Commission%20Transcript%20June_13_2018.pdf

total of 23,630 votes cast in seven other races, took 16 workers five eight-hour days, or 640 hours total.

38.     In summary, if, as I believe, Georgia would be well served to switch to hand-marked paper ballots generally on a state-wide basis, there is nothing about Georgia's municipal elections that should prevent a smooth transition.

**Fail-safe system is essential for 2020**

39.     Georgia has an unusual and high-risk model of conducting elections on a statewide uniform system because it centralizes in the Secretary of State's office all programming of all machines and tabulations of all elections across the State. In contrast, New York requires bipartisan local county responsibility for machine configuration, programming and post-election review.

40.     Georgia's voting system policy requires that all systems in all 159 counties uniformly conduct state, county and federal elections, meaning that any new system conversion must be simultaneous. Based on my experience in New York, it appears that Georgia has adopted an unusual and very ambitious plan for voting system conversion.

41.     New York State's massive conversion from lever machines to hand-marked paper ballots actually began in 2002 with passage of the federal Help America Vote Act and culminated in 2010, the very tail end of which conversion I participated in as a county election official. The State Board of Elections conducted a lengthy and diligent public process in which scientists, voters, activists and other election administrators participated. The

multi-year testing and certification process was completed in 2009. Many counties implemented their new systems in 2009, and Columbia County implemented its Dominion ImageCast system in September 2010.

42.     Each New York county was responsible for choosing one of two certified machines and implementing its own system.

43.     It is my understanding that Georgia plans to convert 159 counties to a new technology where all components and the election management system must be replaced in a presidential election year, with a goal of implementation by the spring presidential primary. This strikes me as a remarkably ill-advised time to be making such an extensive and complex voting-system conversion. In my state, a myriad of sweeping election reforms were passed early this year to take effect over the course of this year, all on fairly short notice. The reason for implementation in 2019 rather than in 2020, which in fact amounts to a quite aggressive schedule, was that legislators and the governor agreed that these conversions must not be made in a presidential year. Hence, they accelerated the implementation schedule so as to avoid precisely the serious risks that Georgia seems poised to take.

44.     Based on Columbia County's system conversion and implementation experience and the research I conducted, I believe that Georgia's unusual and ambitious voting system conversion in a presidential election year is unwise and poses many risks of failure and delay.

45.     Based on our Columbia County voting system conversion experience with trained staff and considerable planning time, and a medium-sized county, problems and setbacks must be expected. It is difficult for me to imagine how Georgia, with its history of election administration failures

and challenges, can successfully cut over to new technology with over 40,000 new pieces of equipment[3] by the first quarter of 2020.

46.    Part of my job is to stay abreast of voting system technology and election security trends and emerging issues. The new technology of Ballot Marking Devices adopted by Georgia is complex and expensive technology that our county will not consider using because the results cannot be audited.

47.    As Georgia officials become more familiar with the new technology's limitations and with voting system experts' criticisms, and the complexities of installing new voting systems, Georgia's plan for rapid adoption may hit obstacles and delays. A contingency plan is crucial, particularly in a presidential election year.

48.    The only practical near-term voting system solution appears to me to be the system that Coalition Plaintiffs have recommended—the existing GEMS/Diebold/Accu-vote optical scanning system without using the DREs as standard voting equipment, with results subjected to rigorous post-election auditing.

49.    Adopting the paper ballot optical scanning option in the currently owned GEMS Diebold Accu-vote system (as is used for provisional and mail ballots) offers a simple, low cost, low risk solution.

50.    Under the proposed approach, ballots are still programmed, tested, printed, and tabulated on the same system as they are today for mail

---

[3] Based on Attachment O to Georgia's 2019 voting system RFP.

absentee ballots. No new skills, software or hardware operation need be learned in the central elections office.

51.    Pollworkers would merely issue paper ballots instead of voter-access cards for DREs. I am confident that pollworkers would find the issuance and control of paper ballots to be far easier than operating DRE machines in the polling place, with all their operational and maintenance issues. The physical security required for the paper ballots would be much like the security protocols the pollworkers employ today for the paper provisional ballots.

52.    I have been asked to consider whether, if DRE voting machines are going to be replaced with hand-marked paper ballots, it is necessary or advisable to replace the other Diebold components of Georgia's existing system, that is, to replace the GEMS servers, and Diebold Accu-vote optical scan system, and the ExpressPoll units ("the Diebold optical scan system"). Based on my knowledge and expertise, in the short term, the Diebold optical scan system should not be replaced now because of the challenge in implementing an entirely new voting system in the near future. An entirely new hand-marked paper ballot system certainly is best for Georgia in the long run, but it will take at least 24 to 36 months, in my opinion, for Georgia to investigate, fund, procure, purchase, certify, test and install a new system, and then State pollworkers and staff would need to be trained on such a system. Such a transition would not be possible or advisable before the 2020 Presidential election in November 2020. Using the Diebold system with hand-marked paper ballots and its optical scanners is a far better solution in the immediate and near term, particularly combined with the essential post-election audit procedures sought by the Coalition Plaintiffs.

53.     The intensive work needed to select a new hand-marked paper ballot voting system should indeed begin immediately, while the current Diebold voting system should be configured to issue and process paper ballots to be marked by hand, read by optical scanners, and tabulated via the GEMS tabulation system.

This declaration is submitted pursuant to 28 U.S.C. 1746.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this date, June 18, 2019.

Virginia Martin

18

EXHIBIT

G

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| DONNA CURLING, et al.<br><br>Plaintiff,<br><br>vs.<br><br>BRIAN P. KEMP, et al.<br><br>Defendant. | CIVIL ACTION FILE NO.: 1:17-cv-2989-AT |

## DECLARATION OF  GARLAND FAVORITO

**GARLAND FAVORITO** hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.  I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

2. I am a registered voter in Fulton County and the founder of VoterGA, a non-partisan group of Georgia voters with the mission of promoting election integrity and security.

*Ballot secrecy and unique identifiers*

3. Since about 2006 in my volunteer work for VoterGA, I frequently make public presentations concerning problems with Georgia's current electronic voting system and the need for a new secure, verifiable, auditable and recount capable voting system.

1

4. On or about June 19, 2017, I made such a public presentation in Gwinnett County at the Magnolia Bakery Cafe for the Conservative Republican Women's group.

5. A Gwinnett County Board of Registrations and Elections ("Gwinnett Board") member who I subsequently identified as Alice O'Lenick was in attendance for the presentation.

6. At the meeting, the issue of early voting and pollbook security to prevent fraudulent voting was raised and discussed during a question and answer period. Ms. O'Lenick spoke up and engaged me and other participants in the discussion of this topic.

7. Ms. O'Lenick insisted that the Gwinnett Board had a safeguard against duplicate early voting through the use of a "batch" procedure where officials can retrieve electronic DRE ballots cast by early voters and detect duplicate votes because those DRE ballots contain a unique identifier that can be connected back to the voter.

8. A then-Georgia State House candidate, who I believe to be Matt Reeves, explained his perspective to the group and to me that such a practice or ability to connect the voter with their vote would violate secret ballot protections in the law.

9. Ms. O'Lenick continued to insist that the unique identifier on DRE ballots and the ability to retrieve early voting ballots is a security feature of Georgia's voting system, and is utilized by Gwinnett County election officials.

10. I was alerted over ten years earlier that such a voter identifier as Ms. O'Lenick described might exist when I was contacted by a 2006 Georgia House candidate, Taffy Rice. She claimed that during one of her court cases, a representative of the Georgia elections division insisted that Mrs. Rice's cast electronic ballot could be identified.

11. As a result of these corroborating assertions, I followed up on this topic with Gwinnett County Elections Director Lynn Ledford. She stated that voter records are updated at the time a voter cast an early voting ballot and Gwinnett County uses an "online" procedure at the polling location to determine if the voter has previously cast another early voting ballot.

12. I mentioned to Ms. Ledford that I believed the "online" procedure did not exist when the DREs were originally used in 2002 and possibly in 2004 but she did not tell me when the "online" procedure was implemented or why the identifier would no longer exist.

*Electronic Pollbook Software Defect*

13. I first became aware of a reported defect in the software of the ExpressPoll books at a meeting of the Fulton County Board of Elections that I attended on April 22, 2017 where they met to certify the April 18, 2017 Special Election for the 6th Congressional District.

14. I recorded the portion of the meeting during which this problem that caused pollworkers to direct voters to the wrong precincts was discussed. I provided my recording to the Coalition for Good Governance, which prepared the transcript of that portion of the meeting. [Exhibit A]

15. I have reviewed the attached Exhibit A transcript and attest that it reflects an accurate record of the discussion I witnessed, and in which I asked the Fulton Board to confirm that the issue was a software defect.

16. The speakers in the meeting as reflected on the transcript were Fulton County Election Board members, county election staff members Richard Barron and Ralph Jones, and myself. I was the only member of the public who spoke during this particular segment of the meeting.

17. After the meeting I asked Director Barron if he was aware of any attempts to mitigate the electronic pollbook software defect by the State Elections Division or the  Center for Election Systems at Kennesaw State University and he indicated that he was unaware of any such action.

Executed on this date, June 18th, 2019.

_____

Garland Favorito

EXHIBIT

A

## Transcript of portion of Fulton County Board of Elections meeting April 22, 2017

## ExpressPoll discussion transcript

**Male Speaker 1** [00:19:52] Apparently… first thing at 7 there was no sign...before 9:30 or so. There was a sign by 9:30--I don't know exactly what time. But I know by 9:30 there was a sign. But then the issue was it was just a sign with an arrow. Not really "this is where you go." So you could have stopped in a couple of different places before you got to the gym.

**RICHARD BARRON** [00:20:19] OK.

**RICHARD BARRON** [00:20:20] They tried to keep people to tell... The campaigns apparently tried to keep people how to tell them "this is where you go. Go down here to vote."

**RICHARD BARRON** [00:20:31] Yeah. And I don't know if we were aware that the school was going to move us.

**Male Speaker 2** [00:20:36] Probably not, no. I imagine not. Sometimes the school will make that decision on... [unintelligible, cross-chatter]

**Male Speaker 3** [00:20:45] You know, my concern is we still should have had... we always have the standard "vote here" sign by the entrance. So even if they [unintelligible] there was an error. They should have seen... we need to post that by the door.

**Male Speaker 1** [00:20:57] I'm trying to explain it, but the way a parking lot is configured, you can turn into one little section. And that's what you are until you're ready to leave. To get over to where they were voting, you have to go around... So when you see that arrow pointing, you to go to the front door to go in. You can go to the media center-- there's a couple of different entrances, but once you saw that arrow that just said "go that way," there was nothing else to say, "vote here" until you get around. But you couldn't see it from there. [Unintelligible] But that was the only issue that I heard about of, obviously, [unintelligible] North Fulton. In South Fulton that was the only issue that I had. And a couple people went to the wrong precinct. They were so accustomed to going to Wolf Creek for early voting or whatever, so they ended up going there thinking they were supposed to vote there. But other than that... [Off mic chatter]

**RICHARD BARRON** [00:22:02] Yeah and what-- [unintelligible]. Can you explain...This is another thing that is...Really deficient--Ralph can maybe explain this-- with the ExpressPolls. If it's less than a county-wide election, listen to what happens. This is...makes this whole... This makes the state voting system even more of a joke, I think.

**RALPH JONES** [00:22:30] Well. When we have a full election for...all of the precincts participate in Fulton County, there is a portion of ExpressPoll says "precinct details." That actually tells a voter where they're supposed to go to vote on Election Day. It works fine when everybody's participating in Fulton County. Well, when we have an election that all the precincts are NOT participating in Fulton County---

**Female Speaker 1** [00:23:00] Which might be City of Atlanta, say.

**RALPH JONES** [00:23:02] If it's just the City of Atlanta, yeah. You get the same problem.

**Female Speaker 1** [00:23:09] Okay.

**RALPH JONES** [00:23:09] What happens is that it only reflects the last time you touched the vote. That will be pulled up as the precinct that it would show. So, therefore, if you came in and you voted at Johns Creek Environmental Center—your actual voting place is Roswell library—and you had come in to vote… well, they couldn't find her on the list. But when they go to "precinct details" it's going to come up Johns Creek Environmental Center. And then they'll call and say "well, she's on our list for Johns Creek Environmental Center." And then we'll say, "OK, well, go ahead. Issue a ballot."  Well she's not coming up. And when WE look it up in "election day" we say, "Oh, she's supposed to go to Roswell." They said--poll workers said, "no! it said Johns Creek Environmental Center!" "I understand. That's incorrect. She's supposed to go to Roswell library." So, it stores the last person that you process. Instead of showing the correct polling place that she's supposed to go to.

**RICHARD BARRON** [00:24:20] It...It stores. The last time you touched the voter, rather than... So--

**Male Speaker 1** [00:24:25] And when you "say touch the voter," you mean the last time... If I voted early...

**RALPH JONES** [00:24:31] Whoever the last person was processed.

**Male Speaker 1** [00:24:35] Oh, OK.

**RICHARD BARRON** [00:24:39] Oh, the last VOTER who processed. Oh, JESUS.

**Male Speaker 1** [00:24:40] I was wondering why you went from me to her. [Cross-chatter, chuckles] I get it now.

**RALPH JONES** [00:24:45] Right. So, if you went first, you're supposed to go in that precinct. So when she comes in, even though she's supposed to be at Roswell Library, it's going to show YOU, because you were supposed to be at that precinct, so...

**Male Speaker 1** [00:25:00] It'll show my information...

**RALPH JONES** [00:25:00] Yeah. It will show your information, even though it pulls up her record.

**Female Speaker 1** [00:25:05] So it's like she hacks your identity.

**RALPH JONES** [00:25:06] Correct.

**RICHARD BARRON** [00:25:08] And KSU knows about this. And [Dwight?] said they just blew us off.

**RALPH JONES** [00:25:13] Yeah, because we were saying "what in the world?" Because we couldn't understand what was happening. They said, "oh, this is what happened."

**RICHARD BARRON** [00:25:20] And the poll workers are used to going into "precinct detail." And [chuckles] So I talked to Chris Harvey yesterday. He'd never heard of this. He doesn't know anything about it. I said "this is a major issue."

**Male Speaker 2** [00:25:35] It could be happening all over the state.

**RICHARD BARRON** [00:25:37] Right. And I said we have--because… I did get a couple e-mails from the--I got a couple of e-mails from people saying they were--they were sending at least 25 to 30 people to the wrong polling places. And, you know, I was like...so we have the big staff meeting the other day. I've never heard of this before. And...you know...

**Male Speaker 2** [00:26:03] This is the first election [unintelligible].

**RICHARD BARRON** [00:26:07] Whenever it's not a county-wide.

**RALPH JONES** [00:26:09] Whenever it's not a county-wide election, then we have this problem.

**Male Speaker 2** [00:26:12] But we had an election that in previous...Situation. Didn't happen before

**Female Speaker 1** [00:26:16] It's probably like those there's little mail postcards that get sent out. There just aren't that... I mean, people are upset that there aren't that many [unintelligible]

**Male Speaker 1** [00:26:29] In other counties—in smaller counties—I can see it being a problem here more so, because when you go to smaller counties, no matter where you live in a whole city, you probably only have one precinct.

**Female Speaker 1** [00:26:40] Right.

**Male Speaker 1** [00:26:40] So even if...

**Male Speaker 1** [00:26:42] Right, it never changes. [unintelligible]

**Femail Speaker 2** [00:26:47] So, If she were to go back to her poll...

**RALPH JONES** [00:26:49] If she had gone back to Roswell, she would have been on the Roswell list. Correct.

**RICHARD BARRON** [00:26:53] Yeah, that happened to one of my doctors. She called me and said, "hey. I just went to this—and then now they're telling me I need to go all the way to Alpharetta to vote." I said, "do you live there?" She goes, "no." But that precinct...So that's why that precinct detail...

**Female Speaker 1** [00:27:12] So the voter ahead of her.

**RICHARD BARRON** [00:27:13] Yeah.

**Female Speaker 1** [00:27:14] And gave that voter's identity, so to speak.

**RICHARD BARRON** [00:27:19] Yeah. [Chuckles.] Yeah. That's... So this is, I mean... What do you say about that?

**Female Speaker 1** [00:27:25] Well we got... I was wondering after the presidential election if we had anything at all to do this year. So it sounds like we do. And to call it a PR onslaught or something, or mission, is to denigrate what needs to be done. We need to communicate what needs to be done.

**RICHARD BARRON** [00:27:47] There needs to be a concerted effort by a lot of people either to get rid of the uniform voting laws, so that counties can purchase their own systems if they want--Because I personally don't like the uniform voting law anyway. I think every county should be able to purchase whatever system they want, but they... We need to get the state to upgrade the voting system. Because the ExpressPolls, to me, are just the worst thing in the world.

**Female Speaker 1** [00:28:18] What you just described is the worst?

**Male Speaker 2** [00:28:19] What's the current version of the ExpressPolls? What's the 2017 equivalent? Does anybody know?

**RICHARD BARRON** [00:28:26] I mean, those things were designed back-- probably in 2000 or so.

**UNKNOWN Speaker** [00:28:30] 2005, I think, is when we got those. [Unintelligible]

**Male Speaker 2** [00:28:32] So what do they have now? The little laptops and...

**RICHARD BARRON** [00:28:37] That's only for early voting. We use the ExpressPolls on Election Day.

**Male Speaker 2** [00:28:41] No, I mean for... Anybody in the country that bought equipment this year.

**RICHARD BARRON** [00:28:47] Oh.

**Male Speaker 2** [00:28:47] What's their equivalent of ExpressPoll?

**RICHARD BARRON** [00:28:47] Yeah. People are using tablets or...yeah. Or.... Yeah. You can--.

**Male Speaker 2** [00:28:56] Plus they have 2017 software built in with the systems.

**RICHARD BARRON** [00:28:58] Right. Yeah. The Election Assistance Commission also has new voting system standards for the new vendors, and those vendors are starting to go through that now--all that testing.

**Female Speaker 1** [00:29:17] I have to ask one more question so I can explain this to people I'm having dinner with tonight. So, Aaron walks in and he votes. And it takes his information and it confirms that's the right [unintelligible].

**Male Speaker 2** [00:29:31] Is this Election Day?

**Female Speaker 1** [00:29:32] This is Election Day. And this is...this happens on Election Day only?

**UNKNOWN Speaker** [00:29:37] Correct. [Unintelligible]

**Female Speaker 1** [00:29:41] Small blessings. Then Felicia comes in, who lives next door to him... No, doesn't live next door to him.

**Male Speaker 1** [00:29:47] In the next precinct.

**Female Speaker 1** [00:29:48] Next precinct. And she comes... And that happens to every single person in those circumstances?

**RALPH JONES** [00:29:57] Well when Felicia comes in, even though she's in the next precinct, when they go out to find Felicia, her name's not going to appear on the roster because she's not...She's going to the wrong precinct. So what they're doing...they try to help this Felicia get to the correct precinct. And they go to the precinct details. And it says she's supposed to be here. Then we get a phone call saying, well, "why isn't Miss Felicia able to vote in our precinct?" We pull up Felicia  and say, "oh, no,  she's supposed to be at Roswell."

**GARLAND FAVORITO** [00:30:36] Is that a software defect? [Chuckles from board]. [Unintelligible chatter].

**Male Speaker 2** [00:30:39] Is that a what?

**Female Speaker 1 and GARLAND** [00:30:42] A software defect.

**Female Speaker 1:** [00:30:44] That is a system...

**RICHARD BARRON** [00:30:46] Uh, that is a Kennesaw State question. [chatter].

**Female Speaker 1** [00:30:50] And we can't, excuse me, we can't let you participate.

**FAVORITO** [00:30:52] Oh, sorry.

**Female Speaker 1**  [00:30:52] But. I'm sure there are people who...

**Male Speaker 2**  [00:30:56] Doesn't the ExpressPoll also have the state...

**RALPH JONES** [00:30:59] Statewide.

**Male Speaker 2** [00:31:01] So, if they looked up the state, wouldn't she be in the other precinct that she's supposed to be in? [Chatter]

**RICHARD BARRON** [00:31:10] Is it conceivable that somebody... You could send somebody to a... something in another county?

**RALPH JONES** [00:31:17] I don't know that. [unintelligible]

**Male Speaker 2**  [00:31:17] I'm just thinking, the database for the state would still have her correct precinct. So if the worker looked to that next step in the ExpressPoll... State database. [unintelligible]

**Female Speaker 2** [00:31:28] Well they can't use that at all now, right?

**Male Speaker 2** [00:31:33] They can't use that?

**UNKNOWN Speaker** [00:31:36] They can use it but what they are accustomed to doing... We always tell when... They're trained that way. If someone comes in and you don't find them, you go to "additional voter information" and that's where they would normally find the information of the correct polling. [unintelligible] In a less than county-wide, it's going to pull up the last instance of the record.

**RALPH JONES** [00:32:01] [Chatter] It doesn't have a state database like you think.

**Male Speaker 2** [00:32:04] Oh it doesn't have it?

**RALPH JONES** [00:32:05] No.

**Male Speaker 2** [00:32:06] It used to have it.

**RALPH JONES** [00:32:06] You can search by state records. But when you go to precinct details, it doesn't have... You can search by a state record. You can see where she lives and everything else. But the precinct details that's attached to her doesn't show up.

**Male Speaker 2** [00:32:26] Okay.

**RALPH JONES** [00:32:27] It's never... She would never see...The person in the precinct, if she goes in the wrong precinct, would never see that she was [unintelligible] of voting.

**Male Speaker 2** [00:32:35] Okay.

**Male Speaker 2** [00:32:35] So, like Stan said, wouldn't that be a great work around just to get on the internet? Instead of coming down and having that [unintelligible] to the poll manager downtown? What's the work around now that we know that it's happening? I think that's the bottom line.

**Female Speaker 1** [00:32:56] OK. We're great. We've got something to talk about.

**Male Speaker 2** [00:33:00] I have one other thing.

**Female Speaker 1** [00:33:02] Please do.

**Male Speaker 2**  [00:33:02] I mean, he said that based on that AJC article that we have a black eye.

**RICHARD BARRON** [00:33:10] Well.

**Male Speaker 2**  [00:33:10] So, what are we gonna do about making that at least purple? [Laughter].

**RICHARD BARRON** [00:33:13] I mean well...Well I... You know, I mean, it's is weird because I did see... The janitor came in last night. She comes into the office and she said...I said "yeah, I'm trying to get some emails done before I get out of here for the weekend." She goes... She goes, "you're famous." And I said, "well, I don't think that I'm famous in a good way this week." She goes "I was watching." She goes "the voting system is old, and everybody knows it, but they aren't going to change it." [Chatter] So I don't know that...it may be a purple eye.

**Female Speaker 2** [00:34:01] I think also...just consider, food for thought...to kinda keep a running tally of where it's working. And even when you address those issues publicly that you...first speak to the good part: that it is working in most places before you address the black eye. I would just encourage us to keep a tally of it working and to let the public know that every time we talk. [Unintelligible] human error, because that's gonna happen.

**Female Speaker 1** [00:34:33] OK. This discussion to be continued. To be… Basis for that discussion to be provided to Board members. And are there any other questions or comments from board members?

E
X
H
I
B
I
T

H

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| DONNA CURLING, et al. | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) CIVIL ACTION FILE NO.: 1:17-cv-<br>) 2989-AT |
| BRIAN P. KEMP, et al. | ) ) |
| Defendant. | ) ) ) ) |

## DECLARATION OF  MEGAN MISSETT

**MEGAN MISSETT** declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.  I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

2. I am a Plaintiff in this case and a registered voter in Fulton County. I voted in the November 6, 2018 election on a DRE touchscreen machine on October 31, 2018 at the early voting location at Ponce de Leon Library.

3. I am a politically active citizen, and spend several hundred hours each year volunteering in candidates' campaigns and political activities. I take my right and responsibility to vote seriously. Therefore,  I struggled for weeks with whether to vote on unreliable touchscreen machines or

submit a mail-in ballot to the Fulton County Elections Department with a known track record for improper handling of mail ballots.

4. As Election Day grew closer and I became more aware of reports of mail ballot application, mail ballot rejections and delivery failures, I decided to take the risk of voting on the touchscreen machines. I feel having to evaluate the least risky way of voting because of Georgia's poor election administration is a bad choice for voters to be required to make to exercise their right to vote.

5. After learning about the high undervote level in the Lieutentant Governor's race that occurred only on touchscreen machines at anomalous rates, I now regret my choice to vote on the DRE, because of the risk that my vote for Lieutenant Governor may not have counted.

6. I am also very troubled to see the state confirm my fears that electronic ballots are traceable to the individual voter. I have read the State's Motion to Quash Non-Party Subpoena statement that the disclosure of electronic records of cast ballots would "destroy the secrecy of the ballot." [Doc. 369 p. 22-23]

7. The disclosure of individual electronic ballot records should never cause a problem, as I expect my voted ballot choices to be completely anonymous to protect my voters' rights to a secret ballot.

8. I have had concerns for some time that the DRE machines may use electronic identifiers in the records that can connect the voter with their ballot. I have noticed a number displayed on the DRE screen once I cast my ballot, and that number appears to be a unique identifier. I am now further concerned that my ballot is not anonymous based on the statements made by the Secretary of State in his motion.

9. Although I am politically active and express most of my political views very openly, I also depend on the anonymity of my ballot to be able to make my final choices privately and freely without evaluating the risk of disclosure of my vote. There are times that I quietly choose not to vote for some candidates or ballot questions that my friends and co-workers ask me to. Politically active voters may find the need for such privacy especially true in primary elections, when they are friendly with multiple competing candidates.

10. In addition to concern about whether my vote is accurately counting on a DRE machine, if I vote on a DRE, I also have to evaluate with every vote whether I should vote my conscience if there is risk of disclosure of my vote. In my view, having to make such calculations standing at the voting machine is not consistent with a free and fair election.

Executed on this date, May <u>21</u>, 2019.

_____

Megan Missett

EXHIBIT

I

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DONNA CURLING, et al.       )

Plaintiff,       )

vs.       )

BRIAN P. KEMP, et al.       )

Defendant.       )

**CIVIL ACTION FILE NO.: 1:17-cv-2989-AT**

## DECLARATION OF PRIDE F. FORNEY

**PRIDE F. FORNEY** hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct as follows:

1.  I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

2.  I am a registered voter in Fulton County and voted in the November 6, 2018 election during the early voting period on October 28, 2018 at the Ponce de Leon Library location.  I voted on a touchscreen voting machine.

3.  Although I do not trust the DRE machine to record and report my vote accurately, I chose to take that risk, as I did not apply for an mail ballot out of concern that it would not be properly processed and counted.

4. I am aware of Fulton County's poor track record in processing absentee mail ballots[1] and did not feel comfortable that a mail ballot would be properly processed, or that I would be notified timely if my ballot envelope was rejected for a technical reason. Therefore, I hesitantly decided to vote on the touchscreen machines, which I know to be unreliable as well.

5. During the last several elections, I paid close attention to the touchscreen display when I voted. I noticed each time that after I pressed the cast ballot button that a number similar to a serial number or identifying number was displayed on the screen. The number that displayed appeared to be my precinct number, my ballot combination number, and another number that appears to be a sequence number or possibly some other unique identifier.

6. I expressed my concern  about this displayed number to Marilyn Marks, Executive Director of Coalition for Good Governance of which I am a member. I told her that I was concerned that unique traceable identifiers may be embedded in the electronic ballot, permitting ballots to be traceable and retrievable.

---

[1] https://www.ajc.com/news/state--regional-govt--politics/ajc-analysis-absentee-voting-pitfalls-tripped-thousands-voters/5Qu6ynxydaKrT4le1edtPL/  and https://www.cbs46.com/news/absentee-ballots-delivered-to-fulton-county-voters-days-after-run/article_a2317780-225e-592b-a65a-6e68604e8e13.html

7. I value the absolute privacy of my ballot, and vote with the assumption that the machines do not record electronic data that can connect the ballot to me personally, and that no one should be able to determine how I vote.

8. I manage a medical practice in which I see multiple local candidates and elected officials, as well as patients with strong political views. For professional reasons, I must keep my final actual ballot political choices absolutely secret.

9. I recently became aware through Coalition for Good Governance of, and read the the Secretary of State's recent acknowledgement in his attempt to quash a subpoena, that counties are not permitted to disclose individual ballot records because it would "destroy the secrecy of the ballot." [Doc. 369 p. 23]

10. If the electronic ballot records were absolutely secret, they could be disclosed to anyone without concern of secret ballot and privacy violations. The Secretary of State is informing us that the local government election officials can indeed determine how voters vote.

11. I am angry and concerned that my electronic ballots cast in the past and in the future can be accessed by election officials and even hackers who can access and abuse such personal information.

12. I am hesitant to vote on DRE machines in the future given that I cannot be assured of the secrecy of my vote, and that I cannot freely vote my preferred choices without concern for unauthorized recording and disclosure of my votes, whether that knowledge is gained by election officials or by hackers.

13. I am further concerned that my vote in the Lt. Governor's race may not have been counted accurately. The Lt. Governor's race was one which I was familiar with and made certain that I selected the choice on the screen for my preferred candidate. However, through Coalition for Good Governance, I have learned of the large volume of anomalous touchscreen votes in the Lt. Governor's race.

14. I am also familiar with the news reports and reports of my friends who experienced problems voting on malfunctioning touchscreen machines, including some at the Ponce de Leon early voting center. Therefore I am concerned that the widespread touchscreen malfunction that caused the apparent loss of Lt. Governor votes may have impacted my electronic vote while voting at the Ponce de Leon voting center as well.

Executed on this date, May 23, 2019.

PRIDE F. FORNEY