1     IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF GEORGIA
2        ATLANTA DIVISION

3

4 DONNA CURLING, ET AL.,    :
             :
5     PLAINTIFFS,    :
 vs.          : DOCKET NUMBER
6            : 1:17-CV-2989-AT
 BRAD RAFFENSPERGER, ET AL., :
7            :
     DEFENDANTS.    :
8

9

10   **TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

11    **BEFORE THE HONORABLE AMY TOTENBERG**

12     **UNITED STATES DISTRICT JUDGE**

13       **JUNE 28, 2019**

14        **2:06 P.M.**

15

16

17

18

19

20

21  *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22      *TRANSCRIPT PRODUCED BY:*

23

 *OFFICIAL COURT REPORTER:*   *SHANNON R. WELCH, RMR, CRR*
24           *2394 UNITED STATES COURTHOUSE*
            *75 TED TURNER DRIVE, SOUTHWEST*
25           *ATLANTA, GEORGIA  30303*
            *(404) 215-1383*

```
 1                A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
      SCHOENBERG:
 4

 5         DAVID D. CROSS
           CATHERINE CHAPPLE
 6         MORRISON & FOERSTER, LLP

 7         HALSEY G. KNAPP, JR.
           ADAM SPARKS
 8         KREVOLIN & HORST, LLC

 9

10

      FOR THE PLAINTIFF COALITION FOR GOOD GOVERNANCE:
11

12         BRUCE BROWN
           BRUCE P. BROWN LAW
13

14    FOR THE STATE OF GEORGIA DEFENDANTS:

15

           VINCENT ROBERT RUSSO, JR.
16         CAREY A. MILLER
           JOSHUA BELINFANTE
17         ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

18         BRYAN P. TYSON
           BRYAN JACOUTOT
19         TAYLOR ENGLISH DUMA

20

21    FOR THE FULTON COUNTY DEFENDANTS:

22

           KAYE WOODARD BURWELL
23         CHERYL RINGER
           OFFICE OF THE FULTON COUNTY ATTORNEY
24

25
```

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; June 28, 2019.)**

COURTROOM DEPUTY CLERK:  Good afternoon, everyone.
We're here for the teleconference in the case of Curling, et
al. vs. Raffensperger, et al., Civil Action Number 17-CV-2989.

Beginning with the Curling plaintiffs, would counsel
please introduce yourselves for the record.

**(Unintelligible.)**

MR. SPARKS:  This is Adams Sparks with Krevolin &
Horst also for the Curling plaintiffs.

COURTROOM DEPUTY CLERK:  Okay.  We are not able to
hear.  Are we on cell phones?

MS. CHAPPLE:  We are not -- we are on -- is that a
little better?  I'm leaning over the phone.

COURTROOM DEPUTY CLERK:  That's actually a whole lot
better.  If you would please make your appearance again.

MS. CHAPPLE:  This is Catherine Chapple with Morrison
Foerster.  David Cross is also on the line from Morrison
Foerster.  I have with me in the room Dr. Alex Halderman.  And
on the line is also Adams Sparks with Krevolin & Horst.  We're
all on the line for --

MR. KNAPP:  Halsey Knapp is here as well.

THE COURT:  So Halsey was clear.  When Catherine was
speaking -- this is Judge Totenberg -- it was a -- excuse me
for using your first name.  But it is the easiest at the moment

1    on a Friday afternoon.  It was -- there was a whole side

2    buzzing.

3              MS. CHAPPLE:  Was there?  Okay.  I'm sorry, Your

4    Honor.  I will try to call back in using another -- another

5    phone.

6              THE COURT:  Okay.  Thank you.

7              MS. CHAPPLE:  Okay.  Just one second.

8              **(There was a brief pause in the proceedings.)**

9              COURTROOM DEPUTY CLERK:  I'm sorry.  Who is speaking?

10             Hello?

11             MS. BURWELL:  Hello.  This is Cheryl Ringer and Kaye

12   Burwell from Fulton County.  All of a sudden, our phone kind of

13   went silent.

14             COURTROOM DEPUTY CLERK:  No, ma'am.  We were just

15   waiting on Ms. Chapple to come back on.

16             MS. BURWELL:  Thank you.

17             COURTROOM DEPUTY CLERK:  Who do we have on the line

18   for the Coalition?

19             MR. BROWN:  Hello.  This is Bruce Brown.  And also on

20   the line is Matt Bernhard, our expert, and my client, Marilyn

21   Marks.

22             COURTROOM DEPUTY CLERK:  Okay.  Thank you, Mr. Brown.

23             State of Georgia?

24             MR. RUSSO:  This is Vincent Russo.  I have here with

25   me Josh Belinfante.  We also have on the line Bryan Tyson,

1   Bryan Jacoutot, and Carey Miller.  And we also have in here

2   with us from the Secretary of State's office Merritt Beaver,

3   the CIO of the Secretary of State's office, and Kevin Rayburn.

4           COURTROOM DEPUTY CLERK:  Okay.  Thank you, Mr. Russo.

5           And we have Ms. Ringer and Ms. Burwell on for Fulton

6   County.

7           MS. BURWELL:  Yes.

8           MS. CHAPPLE:  Hello, this is Catherine Chapple and

9   Dr. Halderman.  We just called in from my office.

10          COURTROOM DEPUTY CLERK:  Sounds much better.  Thank

11  you, ma'am.

12          MS. CHAPPLE:  Perfect.  Thank you very much.

13          MR. CROSS:  This is David Cross.  I'm on for the

14  Curling plaintiffs as well.

15          THE COURT:  All right.  This is Judge Totenberg.

16  Good afternoon.  I'm going to deal with the issue -- the

17  substantive issues before you get to the protective order.

18  Though I understand that there is a strong connection between

19  the two.  And arguably some of the issues might be resolved if

20  you had resolved the protective order issue.

21          But let me at least get a sense of the issues at play

22  with the -- on the merits of the request for production.  I

23  don't -- let me just ask the first question.  Why is it that

24  the plaintiffs need the entire state GEMS database?

25          MR. BROWN:  Your Honor, this is Bruce Brown for the

1    Coalition plaintiffs.  The GEMS database is an application

2    system that the Secretary of State sends to each of the

3    counties after building the ballots at the Secretary of State's

4    office.  And it is the GEMS database that contains fields and

5    tables.  And it is the mechanism by which the GEMS system

6    accesses the information from a voter when a voter votes.

7         So the GEMS database -- it is by no means the entire

8    state system.  It is just one piece of it.  It is the low

9    hanging fruit in a way in that it gives a good overview of the

10   application, and it is very easy to produce -- physically easy

11   to produce.  It is simply a CD for each county.

12        And our experts understand that it is the best first

13   thing to review when trying to look for defective programming.

14   And the GEMS database is a -- there is no source code.  There

15   is no proprietary IP involved.  It is a public record in other

16   states, though not in Georgia.  Examples of GEMS databases are

17   on the internet.  And a GEMS database for the State of Georgia

18   was one of the files that Logan Lamb had access to when he had

19   access to the web server at KSU in 2016.

20        And so it seems to be a good place to start on the

21   discovery.  We sent this discovery out in March actually even

22   before the discovery period began.  And one of the reasons why

23   we sent it out was to get a start on lining up the forensic

24   work that would be necessary.  There's many steps that follow.

25   But this was a good first step.

1          MS. CHAPPLE:  Your Honor --

2          THE COURT:  Just one second.

3          Mr. Brown, let me ask you an additional just

4  follow-up question, which was:  Why would you need it for the

5  entire state as opposed to the CDs of the database for a

6  selective -- a representative number of cities and counties

7  associated also with those that are having elections?

8          MR. BROWN:  I will give -- I will give you one

9  advantage.  We have seen aberrant vote totals in many

10 counties --

11         THE COURT:  You had seen -- I'm sorry.  You had seen

12 what?

13         MR. BROWN:  Aberrant vote totals that appear in some

14 counties that do not appear in others.  And so one of the ways

15 of trying to detect a defect in the programming, innocent or

16 not, would be to compare the database that was sent to County

17 A, for example, with the database that was sent to County B.

18         And it is also -- on just the burdensome issue, Your

19 Honor, we're just talking about CDs.  It is not -- it is not a

20 very taxing production effort to produce the databases for the

21 different counties.  It is just (unintelligible) or any sort of

22 forensic type of work involved in the production.

23         THE COURT:  Keep close to the mic on your phone

24 because you're coming in and out.  I understand you.  But the

25 court reporter cannot get it with enough consistency to be able

1    to --

2          MR. BROWN:  Thank you, Judge.  I apologize.  We're in

3    Athens.  We just took a deposition in this case, and so I'm

4    speaking on a cell phone.  I apologize.

5          THE COURT:  Okay.  Well, Ms. Chapple, was that you

6    trying to speak?

7          MS. CHAPPLE:  Yes, Your Honor.  Thank you.  This is

8    Catherine Chapple.  I wanted to add two things to what

9    Mr. Brown was saying.

10          First is that the GEMS system is the ideal -- is an

11    ideal infection point.  And so it is also a place that we would

12    like to look for malware on the machine -- within the system.

13          And then, second, that the Curling plaintiffs would

14    like more than just the CDs that Mr. Brown is referencing.  We

15    would like -- I'm actually looking at Dr. Halderman because I

16    think he is in a better position to explain exactly what we are

17    looking for if -- but -- and then he typed out a hard disc

18    image of the server is what the Curling plaintiffs would like.

19          THE COURT:  And is that what you have actually

20    requested as well?  I know you would like it, but has that been

21    the subject of an actual request?

22          MS. CHAPPLE:  I believe so, Your Honor.  But I would

23    need to look for the number of the request.

24          THE COURT:  All right.  So just to save time --

25          MR. CROSS:  Your Honor, this is David Cross.

1          THE COURT:  Yes.

2          MR. CROSS:  I can help.  It is Request Number 15.  It

3   is the one that we referenced in the notice that we sent in to

4   join the call.  It seeks all the underlying data on the GEMS

5   server and in other respects.  So the GEMS server is the only

6   focus today.  And we received an amended response from the

7   state defendant this morning.  The request indicating that they

8   are not going to produce the GEMS database itself or any of the

9   underlying data or image is how I read their response.

10          THE COURT:  All right.  So does Dr. Halderman wish to

11   explain the need for this from your perspective or his

12   perspective?

13          DR. HALDERMAN:  Yes, Your Honor.  So the GEMS

14   database or the GEMS server -- excuse me -- is essentially the

15   nexus of the whole election system.  This is a place from which

16   ballot programming is being produced and distributed down

17   through the counties to the voting machines throughout the

18   state.

19          So that positioning makes it an ideal point for an

20   attacker to begin an infection that they would try to spread to

21   voting machines in the field.  We would like to be able to

22   perform forensics on the GEMS server to see if there is

23   evidence that such an infection did occur.

24          THE COURT:  All right.  So the state indicates it has

25   made other alternative suggestions in place of these requests.

1    I don't know what those are.  But I'm trying to, first of all,

2    just determine:  Did you actually sit down and discuss any of

3    those?  Did you have any of your experts talk with the chief

4    technology officer for the Secretary of State's office, Merritt

5    Beaver, or what did you do?

6              MR. BROWN:  Your Honor, this is Bruce Brown.  We did

7    discuss the options.  And the options -- there were a couple of

8    things discussed with the state.  The first was we made

9    repeated requests to the state to identify the fields and the

10   tables in the database that they contended contain sensitive

11   information but they did not want to disclose.

12             And the state refused to identify the fields taking

13   the position it said that it was the entire architecture of the

14   database that was proprietary.  The next thing that we

15   discussed was their offer to produce certain printed reports

16   that would be generated by the GEMS database pursuant to the

17   GEMS database report function.  Just like most applications, in

18   addition to all the computing functionality they have, they

19   also have a piece that will let you select data and report it

20   anyway you want to.

21             Our experts are on record as saying that that

22   production of reports generated by the GEMS database may be

23   interesting and it may also be subject to discovery but it is

24   many orders of magnitude removed from any kind of effort to

25   determine if there's defective underlying programming.  You

1   would have to take a PDF of a report.

2          So those were the two areas that we discussed.  And,

3   frankly, I think it is fair to both sides -- to both sides that

4   we are at a pretty fundamental disagreement over the discovery

5   of the GEMS database.  We have advanced it to a point where it

6   is appropriate to seek Your Honor's guidance.

7          THE COURT:  Well, does anyone on the plaintiffs' side

8   want to explain why their offer of the report would -- while

9   not the full monty would be still not -- and I understand it is

10  not.  But why wouldn't it be sufficient from your perspective?

11  Is that Dr. Halderman who is going to be --

12          DR. HALDERMAN:  Yes, Your Honor.  I can explain.

13  What a report from GEMS covers is -- it is essentially a

14  summary of some of the kinds of data in the system.  But it

15  does not tell us about the -- about the underlying programming

16  essentially that is going to be affecting the way -- the way

17  votes are counted.  Nor does it tell us about potential

18  corruption to the database itself that could be used as a means

19  of infecting or altering the behavior of the system.

20          I would also like to add that our request for the

21  hard disc image for this server I had said was to allow us to

22  identify whether infection had occurred.  I should have added

23  that it will also allow us to evaluate vulnerabilities in the

24  system that could provide a way to infect the system and

25  manipulate elections using the GEMS server as an infection

1    point.

2          THE COURT:  I understand some of this.  But the

3    plaintiffs provided me with a copy of the 2007 decision from

4    Arizona -- from an administrative judge in Arizona.  And, of

5    course, that was pursuant to an Open Records Act request.  But

6    in that case, which was -- I'm sorry.  It was in front of the

7    superior court judge.  But it was *Democratic Party of Pima*

8    *County vs. Pima County Board of Supervisors.*  And I guess there

9    was an administrative judge involved also who was writing the

10   initial decision.

11          The judge found that the database should be made

12   available but not the programming because of the concerns about

13   security and security of the election-related functions.  And

14   so it seems like the Coalition is willing to forgo having --

15   obtaining that, the programming information, and just wants the

16   database and the Curling plaintiffs want both.

17          Is that a correct summary?

18          MR. BROWN:  Your Honor, that's a correct summary as

19   of this moment.  This is Bruce Brown for the Coalition.  I'm

20   sorry.  But this was our first very limited narrow request, and

21   we would eventually also seek the disc image of the servers --

22   there is more than one -- and pursue what Dr. Halderman

23   suggested.

24          So we teed up the dispute resolution process over

25   this very narrow limited request that we made first.  And

1    Curling came in with a broader -- broader request.  So we have

2    technically joined their request as well.  But in terms of the

3    dispute resolution process, we are here before you on the GEMS

4    database.  And so that is what our request today concerns.

5          MS. CHAPPLE:  Your Honor, this is Catherine Chapple

6    for the Curling plaintiffs.  Yes.  Yes, that is what we're

7    asking for.  And we feel that a protective order should be

8    sufficient to protect and allay the concerns of the defendants.

9          We also asked them when we met a couple of weeks ago

10   at the Rule 26(f) conference to identify what issues would be

11   inherent in our request, what they were willing to give us and

12   what they could not give us.  And we still have that offer

13   open.  But we have not heard from them as to specifics that

14   would allow us to tailor our request any further.

15         THE COURT:  Well, the way I understood it from the

16   state's statement of its position was they felt that you were

17   not interested, you weren't going to consider any alternatives,

18   which might be so.  I don't know.  But you saw that as well?

19         MS. CHAPPLE:  Yes, Your Honor.  Our position was that

20   we don't have the access to the information about the system to

21   know what is involved and what they could give us that they

22   might be comfortable with that would be sufficient for us to be

23   able to respond without more information from them.

24         So it is not -- it is not that we aren't interested.

25   It is that we don't have enough information to know whether we

1    would have an interest.

2         THE COURT:  Well, what have you-all done to have

3    Dr. Halderman talk with Mr. Beaver or somebody else designated

4    by the state so that you could explore that very question?

5         MS. CHAPPLE:  Your Honor, that is a good suggestion,

6    and we would be open to a conversation like that.

7         MR. CROSS:  Your Honor, this is Davis Cross.  I guess

8    the one thing that I would offer is we don't have a lot of

9    time.

10        THE COURT:  No.  I know that.

11        MR. CROSS:  We want to be efficient.  My concern is

12   what we have heard from them so far and what they have offered

13   up in terms of these reports, which we have talked through with

14   Dr. Halderman, obviously are inadequate.  If there is a way to

15   work this out to where we get the data and we get it quickly,

16   certainly we're willing to explore that.

17        But we have not heard anything from them that would

18   suggest that they are looking to give us anything other than

19   what sounds like are just one-off reports or snapshots of data

20   as Dr. Halderman explained won't do the job.

21        As Bruce pointed out, there are two things in the

22   database itself.  There is the forensic image.  If we can get

23   the database, that is a start.  But I will add the reason why

24   we put them together is because, as Dr. Halderman has explained

25   to me, there is not a substantive difference.  But if they give

1   us the database, there is nothing else sitting on there that a

2   forensic image has any greater sensitivity to.

3          So our view is let's just do it in the most efficient

4   way, which is take a forensic image of the server -- multiple

5   servers as it may be.  We get the substantive data.  But we

6   also get the additional forensic -- the whole comprehensive

7   image that allows the expert to do the forensic analysis, which

8   is really at the core of this case, rather than doing it

9   piecemeal.

10          Because at the end of the day, again, the forensic

11   image is going to contain the same substantive data as the

12   database itself.  But we'll take it in whatever steps we can

13   get it.

14          I just haven't heard anything in the number of

15   conversations we've had with Mr. Russo's team that they are

16   willing to give us anything remotely close to what our experts

17   need.  So I'm just not convinced that further conversations are

18   going to get us there.  But we'll explore that obviously if the

19   Court wants.

20          THE COURT:  Who is going to speak on behalf of the

21   state?

22          MR. TYSON:  I will, Your Honor.  This is Bryan Tyson.

23   We have had some conversations.  I think it is important to

24   note that we have not had a situation where Dr. Halderman has

25   been able to speak to Mr. Beaver -- something we suggested --

1    about how to accomplish this.

2         I think the plaintiff has correctly identified that

3    this is the nexus to the election system.  It is the most

4    critical infrastructure we have in terms of our election

5    system, which is why we are so careful with releasing it and

6    don't want to release it to someone who could -- or I think the

7    reality is when you take the database itself -- I'll start with

8    that and then go to the rest of the server.

9         If someone had the database, they could see the

10   relationships between the various data inside the database.

11   And if someone was trying to design malware, they would need

12   that information to do that.  Georgia has a slightly different

13   version of a GEMS database than other states.  And as a result,

14   an attacker without the knowledge of the structure of the

15   database can't -- is going to have a harder time designing

16   something.

17        In addition, there are other non- -- other

18   confidential information like the particular numbers assigned

19   to candidates.  And if you're going to try to manipulate votes,

20   you have got to know the candidate numbers and the placements

21   to be able to do that.  That would also be revealed in the

22   database.

23        So from our perspective, the plaintiffs' desire to

24   look for malware can be addressed through several other means

25   that we have been working towards.  The first obviously was the

reports.  So look for anomalies there.  We understand the

plaintiffs don't like that option.  We have a software called

GEMS Verify that checks the executable files of the GEMS server

against a trusted version of the GEMS -- of the GEMS executable

files that we can run on the database and ensure that the

executable files have not been altered in any way and share

those results with the plaintiff.

We also have from our understanding from our computer

science folks and others an Access database, which is what the

database is that the plaintiffs are seeking.  The only malware

that could reside in the Access database -- so, you know, the

executables of the server files are one thing.  Check those

with GEMS Verify.

The database can only have malware through a macro

inside the database.  And we would be more than happy to

provide the plaintiff with all of the macros if we find any

that are currently in the GEMS database.

We think that addresses their concerns.  It lets them

look at the -- see that server files have not been altered and

also see that the database does not have macros in it without

having to reveal the structure and the relationship of the

database and all that is inside there.

THE COURT:  Well, I guess --

MR. BROWN:  Your Honor, if I may, this is Bruce

Brown.

```
 1              THE COURT:  Let me just stop y'all for a second.  I
 2    have a general idea of what you are speaking about.  But it
 3    obviously would have been better if Mr. Halderman --
 4    Dr. Halderman had -- and Mr. Beaver or his representative had
 5    spoken before this conversation so that we're not just playing
 6    it out in kind of rigid lawyer form now rather than their
 7    having really talked and seeing if there is anything else.
 8              I understand that what the plaintiffs want is what
 9    they think is ultimately necessary.  And I'm not dismissing
10    that.  But at the same time, there is some concern about
11    proportionality that I have particularly in that we're going --
12    the state is moving to a different data system.
13              I realize that it all may fall apart.  But,
14    nevertheless, that is not the expectation, and I can't operate
15    on that expectation.  So I'm looking at the amount -- the
16    number of elections we have, the nature of the elections.  And
17    I'm saying I have some proportionality concerns and what -- are
18    there any work-arounds at all at this juncture, even though the
19    ideal might be from Dr. Halderman's perspective and the
20    plaintiffs' perspective something else?
21              Is there anyway I could persuade you-all to put the
22    two of them on the phone for 15 or 20 minutes to talk?  And we
23    would -- I mean, I'm not saying that you-all can't be present.
24    But that they are actually talking.  I mean, I would have hoped
25    that that would have happened.  But it hasn't happened.
```

```
1              Is that -- is that feasible?

2              MR. TYSON:  For the state, Your Honor, we would be

3    more than happy to make Mr. Beaver available.

4              MR. CROSS:  I thought Mr. Beaver was with you guys.

5    Can we do that now?

6              MR. TYSON:  Yeah.  And we're fine to have the

7    discussion now or with Dr. Halderman directly.  We're very open

8    to that.

9              MR. BROWN:  We are -- Your Honor, this is Bruce

10   Brown.  Our expert would like to participate as well.

11             THE COURT:  Yes.  I'm sorry.  I missed what the name

12   of your expert was.

13             MR. BROWN:  It is Matt Bernhard.

14             THE COURT:  Right.  I remember the affidavit now.

15             All right.  Well, why don't I get off the phone and

16   you-all -- I can go even on mute if you want to.  But that is

17   an extra -- which is -- which is fine.  But you could also

18   arrange it differently and call each other.  But I don't know

19   who has a line there, and then you-all have to get connected

20   again.

21             But why don't I just go on mute.  Then when you are

22   ready to -- you can -- you can always then have them talk

23   separately or whatever you want to do.  You can make the

24   arrangements.  And then when you are ready to actually talk,

25   you can email Mr. Martin as soon as you are ready to talk and
```

```
 1    he will be looking every few minutes at the -- at his email to
 2    see that you are ready.
 3              MS. CHAPPLE:  Thank you, Your Honor.
 4              THE COURT:  All right.  Very good.  Thanks.  All
 5    right.  I'm going on mute now.  But you are still connected.
 6                 (A brief break was taken at 2:38 P.M.)
 7              THE COURT:  Hello.  This is Judge Totenberg again.
 8              MR. CROSS:  Hi, Judge.
 9              MS. CHAPPLE:  Hi, Judge.
10              THE COURT:  So did you make any progress?
11              MR. CROSS:  I'm not sure we made much progress, Your
12    Honor.  We had a lot of discussion.  Where we ended up was
13    Mr. Brown on behalf of plaintiffs proposed a compromise in
14    limiting the data down to 25 of 159 counties.  We would choose
15    those counties.  So it would be a much smaller sample, which I
16    think was one of the things Your Honor had suggested.
17              We also agreed that we would adhere to similar
18    security protocols that the state has in place for each of the
19    159 counties, which also have a copy of this system and run
20    that system to address their security concerns.  And we offered
21    any other security protocols that they would offer.
22              The end result was they would not offer, as I
23    understood it, anything more than they had originally offered.
24    Although they proposed something additional concerning macros.
25              But where we seem to be divided on really is the
```

1    issue of security.  Their position seems to be that they won't

2    produce the GEMS database, either the database itself for a

3    forensic image or what are called MGB files under any

4    circumstances because it sounds like they just don't trust our

5    experts to keep that secure, even though we have offered again

6    to abide by the same or similar protocols as the 159 counties.

7         I'm not sure where we get at the end of the day.  The

8    other challenge was Dr. Halderman asked Mr. Beaver whether --

9    if he wanted to conduct the same sort of analysis that we are

10   trying to do that our experts have described to look for

11   malware in the system, to identify vulnerabilities with respect

12   to the system, is there an alternative approach, is there

13   something less that he would look at beyond what we have

14   requested.  And Mr. Russo would not allow him to answer that

15   question.

16        So we seem to be at an impasse.  I wish I had a

17   better answer.

18        THE COURT:  Let me just -- go ahead.  Who is that?

19        MR. TYSON:  On behalf of the state, Your Honor, I

20   just wanted to give a little bit different view.  I'm not

21   surprised we disagree on this.  But the scenario really comes

22   down to Dr. Halderman and the plaintiffs, even if they are

23   narrowing the number of counties, they are still insisting on

24   the actual raw Access database file.  And those are the ones

25   that show the structure and reveal the structure on everything.

1    So that doesn't meet our main concern.

2         The other challenge where the databases are located

3    in other places, the counties don't have the same kinds of

4    tools that they would be using and other things that are

5    happening.

6         And to Mr. Cross' characterization that Mr. Beaver

7    was refusing to answer or we wouldn't allow him to answer, the

8    questions were turning into a cross-examination and a

9    deposition of whether Mr. Beaver would concede certain points.

10   That is why we decided to come back to you to just go ahead and

11   address this.  I want to be clear about where we were.

12         THE COURT:  Okay.  So --

13         MR. CROSS:  Your Honor, the question was posed by

14   Dr. Halderman.  If we could get an answer to that question on

15   this call, I think that would help us go a long way.  It was

16   not a cross-examination.

17         THE COURT:  Well, I guess the question --

18         MR. CROSS:  It was a conversation between the

19   parties.

20         THE COURT:  All right.  I'll get to that in a second.

21         All right.  I'll just myself ask if there is any

22   alternatives.  But I guess just -- I wanted to ask about the

23   database itself.  I'm not clear why as the database itself the

24   defendant is not willing to provide that on a CD as Mr. Russo,

25   I believe, you conceded to Adele Grubbs in the Superior Court

1     of Cobb County, I guess it is, that the database itself was

2     public record.  It was the programming that was not -- that you

3     maintained.

4             MR. RUSSO:  Your Honor, I mean -- this is Vincent

5     Russo.  Our concern with the database has always been that it

6     is a roadmap to being able to -- for anybody who wants to

7     conduct -- try to put any malicious -- for putting malware on

8     the system, the database is the roadmap.  And I think the

9     plaintiffs have said so much.

10            What we have offered is the macros.  That, you know,

11    if there was -- if there was some -- there was some malware in

12    that -- might have been in that database, it is our

13    understanding that is where it would exist.  In addition to on

14    the servers, which are the additional reports that we offered

15    to run, it is a test.  It is called the GEMS Verify test that

16    would check the servers to see if there were any files that had

17    been changed.

18            So those two together provide them with the

19    information that is proportional and without necessarily

20    providing the roadmap that someone would need to write -- write

21    malicious -- you know, malicious software.

22            MR. CROSS:  Your Honor, David Cross, if I may.

23                    **(Unintelligible crosstalk.)**

24            THE COURT:  One person.  I know you can't all see

25    each other.  But wait until Mr. Russo is really complete.

```
 1              MR. RUSSO:  So it sounds like my co-counsel, Bryan
 2    Tyson, was going to add something to that.
 3              THE COURT:  Okay.
 4              MR. TYSON:  Yes, Your Honor.  I'm sorry.  Just very
 5    briefly.  Bryan Tyson.  I just wanted to also make the point
 6    that in front of Judge Grubbs the plaintiffs made the same
 7    argument that they are making here.  And Judge Grubbs -- the
 8    state took a consistent position.  Judge Grubbs did not allow
 9    them to have the database files after a similar argument and
10    believed that the reports that were offered, which was our
11    first offer to the plaintiffs here, were sufficient.
12              I know the plaintiffs disagree about that.  But it
13    was the same argument, and the state took the same position
14    that we can't give you the actual database.
15              THE COURT:  All right.
16              MR. CROSS:  Your Honor, this is David Cross, if I
17    may.  Mr. Russo's argument really highlights and I would say
18    implicitly concedes the point, which is he says the database is
19    the roadmap if someone wanted to hack the system.  Well, that
20    is our point, Your Honor.
21              The only way to evaluate the infection points as
22    Dr. Halderman describes them and to identify the
23    vulnerabilities is to see that roadmap, what a hacker would
24    would want to see.  The hacker -- the way that they would
25    navigate that roadmap to get into the system.
```

1          What they are offering, as I understand it, is a

2   small subset of data.  Dr. Halderman has explained in detail

3   why it is not sufficient.  But one of the things that Mr. Russo

4   said, as I understand it, that might let us see if there is

5   existing malware in a small portion of the database.  Again,

6   that doesn't get us where we need to go, which is assessing

7   whether there is malware in other portions of the database but

8   also to the broader point of what the vulnerabilities are

9   because the focus of our case is not just that there's already

10  malware there but that the vulnerabilities themselves are so

11  severe as to vitiate the right to vote in the State of Georgia.

12          And I would say Mr. Russo seems to be conceding the

13  point.  Although he doesn't obviously intend to.  The roadmap

14  is what we need to see.

15          The last point of this, Your Honor, on this issue of

16  security, which really seems to be their only objection here,

17  we have not heard anything from Mr. Beaver or from them that

18  the analysis that needs to get done here can be done on less

19  than what we have requested, which again has been narrowed

20  quite significantly.

21          The last point is Dr. Halderman deals with some of

22  the most sensitive data all the time.  He is one of the leading

23  experts in this field.  He deals with cryptographic protocols

24  affecting tens of millions of websites.  This is what he does.

25  They have specific facilities at the University of Michigan to

1    deal with highly sensitive data.

2            Mr. Bernhard actually is also at the University of

3    Michigan.  So they would have access to similar facilities.  I

4    will offer as a last resort -- Dr. Halderman may kick me for

5    saying this -- if we had to actually go to Georgia in some

6    facility they set up, it would be difficult.  It is not ideal.

7    It would, I gather, hinder the analysis.  But we could explore

8    that, if it is necessary.

9            But the bottom line is their objection is one of

10   confidentiality.  And that is dealt with with the protective

11   order, and we're talking about experts that deal with equally

12   similar, if not more, sensitive data in the regular course of

13   their work.

14           THE COURT:  Let me ask this.  The GEMS database

15   itself -- I just want to confirm -- is going to still be the

16   foundation to draw on when you -- when the state moves on into

17   the next -- the ballot marking device system or not?

18           MR. RUSSO:  That is correct, Your Honor.  When the

19   state moves to the new system, they will not be using the GEMS

20   database.

21           THE COURT:  All right.  And what will be used -- it

22   will not be using it you are saying?

23           MR. RUSSO:  That is correct.

24           THE COURT:  All right.  And how will the data be

25   transferred?  I don't obviously mean all the nitty-gritty

1   details.  But is there anticipated a transfer of all of the

2   voter data?

3           MR. RUSSO:  I mean, I guess I can say we don't -- we

4   don't have a system yet.  So I don't know which system they

5   will be using in lieu of the equivalent to a GEMS database.

6   But, you know, there will be -- there will be something.  I'm

7   just not sure what it is.  And they don't know either.

8           THE COURT:  All right.

9           MR. RUSSO:  Until they know the vendor, they won't

10  know what that will look like.

11          THE COURT:  What again is the date by which the

12  vendor is going to be selected?

13          MR. TYSON:  I believe that was supposed to be

14  mid-July.  But I don't know what the current timeline is.  I

15  think they are still on track on that.  I'm not certain, Your

16  Honor.

17          MR. RUSSO:  I was just confirming.  They are still on

18  target for the original timeline.

19          THE COURT:  Okay.  So I think that the question

20  was -- and I don't see it just as a rhetorical question.  But I

21  understand why counsel for the state prefers not to be -- have

22  their -- Mr. Beaver directly questioned.  And I don't want to

23  be in that position of examining him either.

24          But if there is -- why -- I would like to understand

25  why -- given what you've projected, why do you think -- why

1    Mr. Beaver or the state believes that those are adequate

2    alternatives, knowing what the purpose is in this case?  It is

3    not just -- of the analysis.

4             MR. RUSSO:  Just so we understand your question,

5    you're asking why the macros and the GEMS Verify report are a

6    sufficient alternative versus the entire -- producing the

7    entire database?

8             THE COURT:  Well, the database for 25 localities,

9    which I thought they had agreed on alternatively.

10            MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.  I

11   think the important piece is we don't see a distinction between

12   25 and the entire database because our concern is not the

13   amount.  Our concern is the structure.  And if you produce even

14   one database, you are showing the structure.  So on that point,

15   that is there.

16            I think for us the GEMS Verify looks at the

17   executable files that are in use on the server.  The macro test

18   within Access will show any code that can run.  And so it

19   covers that basis.  I think the plaintiffs' view is that there

20   could be something lurking deep inside the database.  But that

21   is our view in terms of the security risks that are associated

22   with it verifying that the executables have not changed,

23   verifying there is not anything else on the server that is

24   obviously there.  And verifying that there is nothing

25   executable within the database covers the concerns about

1    malware.

2         I understand the plaintiffs disagree.  But that is

3    our view of why that is a sufficient resolution short of

4    exposing the relationships and the structure in the database.

5         THE COURT:  So, Mr. Brown and Mr. Cross and I guess

6    to your experts as well, while it is obviously not what you

7    think in full that you need -- and it is your burden of

8    proof -- why wouldn't this at least begin to be helpful at all

9    to you and your experts in proceeding so that at least it is a

10   major first step or first and second step?

11        MR. CROSS:  Your Honor, I would suggest that

12   Dr. Halderman handle that, if you don't mind.  I think he can

13   better articulate rather than hearing from the lawyers.  And,

14   frankly, I would suggest it is probably better that both sides'

15   experts speak to you directly.

16        Dr. Halderman, do you want to take that?

17        DR. HALDERMAN:  Yes.  So the alternatives that are

18   being proposed about looking for macros or using this hash

19   verifier, they cover entirely different parts of the data than

20   what we are talking about.  What we're talking about is looking

21   for -- looking for kinds of corruption or manipulation that

22   could spread malicious code, which just wouldn't be revealed if

23   they are there by these other tests in which I think are

24   entirely plausible means for malicious software to spread from

25   this nexus of the system to wide areas of Georgia.

1          And does that answer your question, Your Honor?

2          THE COURT:  Well, sort of.  But the original request

3     at least from the Coalition was just give us the -- basically

4     give us CDs of the voter -- of the GEMS database.  And as I

5     understand the conversation is that the state's concern is that

6     would identify the structure and information that goes to the

7     sort of secure operation of the system and that you're hoping

8     that it will though you don't think it is necessary but not

9     sufficient from your perspective; is that right?

10         DR. HALDERMAN:  That is right.  But if I may say, I

11    think it can be argued that almost any information about the

12    operation of the system could potentially aid an attacker.  And

13    that is why we're proposing to protect the data in the same way

14    that we would protect -- that the counties already protect the

15    data and even to take steps beyond that we routinely take to

16    protect arguably even more dangerous data, if released,

17    including that what we have taken in the past to protect actual

18    flaws in the software running on people's voting machines.

19         THE COURT:  Well, why -- let me just segue for a

20    moment on to the conflict over that protective order.  Why is

21    it that the plaintiffs' counsel cannot agree to the terms

22    proposed by the defendants?

23         I looked at it.  And I understand that there is this

24    disagreement about somehow a printout of the -- of the

25    ballot -- the ballot results in some way on an individual

1    ballot basis.  But there also seemed -- because that was

2    allegedly already a public record -- had been yielded -- had

3    been -- but I wasn't -- there seemed to be other concerns on

4    the part of the plaintiffs that I didn't -- I really couldn't

5    fully understand.

6            MR. BROWN:  Your Honor, this is Bruce Brown for the

7    Coalition plaintiffs.  And I think David -- the plaintiffs are

8    speaking with one voice on these issues.  And I note that the

9    disagreement here is primarily with Fulton County.  I believe

10   the Secretary of State and the plaintiffs are largely in

11   agreement on these terms.  I could be mistaken.

12           But one -- one issue is whether the protective order

13   should have retroactive effect, meaning that it could cover

14   documents that have already been produced without a

15   confidentiality agreement and produced without a

16   confidentiality stamp.

17           THE COURT:  And this is the one that we got a sample

18   of; is that right?  Or are there others like that?

19           MR. BROWN:  There are many others.  There are --

20   there are scores of ballot image reports that we have that have

21   been produced as open records.  And there's simply no way that

22   we can -- I can let my client agree to a court order that binds

23   us to keep confidential an unspecified universe of documents

24   that the state may later determine are confidential.

25           And, frankly, in my experience you really never do

1  that.  A protective order covers documents that are produced in

2  discovery.  It is a narrow set.  It doesn't cover information

3  sort of out in the world.

4          THE COURT:  And that has mostly been produced by

5  Fulton County?

6          MR. BROWN:  No.  Other counties -- today, we got a

7  whole trove of the same documents from Bartow County.  They are

8  public.  There is nothing secret about them, Your Honor.  And

9  so the counties are producing them as they should.

10          THE COURT:  All right.  Is it only Fulton or the

11  state also that is asking for this provision?

12          MR. BROWN:  I do not believe -- well, I'll let the

13  state speak for itself.  But I don't think the state was

14  insisting on retroactive application of the protective order.

15          MR. RUSSO:  Your Honor, this is Vincent Russo.  Our

16  issue is we want to be able to -- if there is something

17  produced in this case by a county, we don't have the ability to

18  control the counties and what they are necessarily producing.

19  In fact, Bartow County produced something today, and we didn't

20  even know about it.

21          And so we want to be able to mark that confidential

22  when we do find out about it, if it actually needs to be

23  confidential.  And by allowing us to mark it confidential and

24  if the plaintiffs then disagree, we can go through the dispute

25  resolution process set out in the protective order.

1        But to just deem something that has been -- that has

2   been produced now as deemed a public record and it is no

3   longer -- we can no longer try to maintain the confidentiality

4   over is our concern.  And we think that the protective order

5   has a process in it that if the plaintiffs disagree over

6   confidentiality designation we can go through the dispute

7   process in the protective order.

8        MR. CROSS:  Your Honor, I want to make --

9        **(Unintelligible crosstalk.)**

10       MR. BROWN:  I want to make sure the issues are clear

11  because we are bleeding several issues together.  The first

12  issue is whether or not the protective order ought to have

13  retroactive effect and to be able to cover a universe of

14  information regardless of when or even whether it was produced

15  by a party.  And I think no protective order does that.  And

16  that it ought to be explicit that this one does not.  That is

17  the first issue.

18       The second issue is whether or not it is explicit on

19  the first page of the protective order that we have all agreed

20  to that if a third party wants to designate something as

21  confidential they may do something under the protective order.

22  They may do it.

23       What the state wants to be able to do is to sort of

24  reach across the table and intercept documents that other third

25  parties are quite willing to share with the public or with the

1    plaintiffs and to capture those sort of in mid-discovery and

2    stamp them confidential.

3           And I have never heard of that happening and don't

4    know mechanically how that could ever happen.  So we would

5    strenuously object to that in that if somebody is releasing

6    something that the Secretary of State doesn't want them to that

7    is between the Secretary of State and whoever that third party

8    is.  They don't get to sort of intercept discovery like that.

9    Then the third -- so those are the first two.

10          The third has to do with the attorney's eyes only

11   provision, which the Coalition plaintiffs don't want at all.

12   It is not appropriate for this kind of information.  There

13   should be one singular confidential designation and that --

14          THE COURT:  Well, let me just say I have never heard

15   of an attorney's eyes only that was not attorney's eyes only or

16   with their expert on the other side of it.  I mean, you have --

17   with the greatest of respect to your clients, the fact is that

18   they are committed activists in this area.  And they have a --

19   hats off to them for their activities and their concerns.

20          But they don't have the same obligations on them in

21   terms of confidential information that you might or somebody

22   who is a direct agent like an expert who works in a very secure

23   field.

24          MR. BROWN:  Your Honor, let me explain sort of the

25   background of that provision.  We took the draft protective

1    order from the protective order that was entered in the Common

2    Cause case.  That was our template.  And that had a similar

3    provision that had two Common Cause activists on it.

4           Like I said, we don't like the attorney's eyes only

5    designation at all but figured, well, if we can get our client

6    on there we didn't -- it wasn't as big a deal.  So I'm just --

7    we're not going to fight over something that has no material

8    impact.  But that is certainly the source of the -- that

9    agreement and the terms.

10          We would much prefer not having an attorney's eyes

11   only provision because an attorney's eyes only provision in my

12   experience relates to trade secrets when the disclosure to the

13   client itself causes damage.  And confidentiality provisions

14   are designed for information which damage does not happen when

15   you disclose it to the other party.  It happens when that party

16   discloses it to the world.

17          So it just sort of conceptually does not belong in a

18   case other than trade secrets where you have got competitors

19   suing each other.  That is our background on the attorney's

20   eyes only provision.

21          THE COURT:  Mr. Russo or Mr. Tyson, what is the

22   concern about disclosing information to the plaintiffs' experts

23   who work with secure data systems and secured data all the time

24   and are very well aware of their obligations in this area and

25   their own professional standing depends on maintaining those

1    obligations?

2           MR. RUSSO:  Your Honor, this is Vincent Russo.  I

3    don't think with respect to the attorney's eyes only provision

4    that we had a concern particularly with the experts.  I'll

5    defer to Fulton County on some of this issue.

6           THE COURT:  Well, let me just say -- let me just

7    finish the data system.  I mean, if you were to show the

8    information to the -- the data system and the database that we

9    were talking about, one or -- both or one like -- let's just

10   start off with the GEMS database.

11          Is there -- what is the reason you would believe that

12   the plaintiffs' experts would expose you to hacking or would do

13   something that would compromise themselves the system or create

14   trouble?

15          MR. RUSSO:  Yes, Your Honor.  I think our concern, of

16   course, is that the information gets put on their server at the

17   University or wherever they are working and someone else --

18   grad students end up taking that information and using it or

19   leaves it exposed.  And so then that information is out in the

20   public sphere, you know, especially when we get into the GEMS

21   database.

22          Yes.  We have talked about this -- it is the roadmap.

23   And, you know, the whole point of keeping that information out

24   of the public realm is so that nobody has the roadmap so they

25   easily write or more easily write malware that could infect the

1    system.

2              DR. HALDERMAN:  May I -- this is Dr. Halderman.  May

3    I suggest respectfully that we could address those concerns, I

4    believe, by analyzing the data on an air-gapped system in an

5    independently secured room where others not related to the case

6    wouldn't have physical access to it and where it would be

7    electronically safeguarded against any kind of intrusion.

8              MR. RUSSO:  Can you repeat that proposal?

9              DR. HALDERMAN:  I think we can largely mitigate these

10   concerns, at least reduce them below the threshold that the

11   danger already exists in existing GEMS servers maintained by

12   the state if we apply -- if we apply both a physically

13   separated facility and a completely disconnected system.

14             MR. TYSON:  So essentially -- this is Bryan Tyson.

15   So essentially duplicate our current setup in terms of how we

16   protect the information?  Card key access?  I think Michael

17   Barnes testified yesterday it is only five people.  But I think

18   that is consistent with our current setup.

19             DR. HALDERMAN:  Let's propose -- let's propose

20   either a card key or an independently locked door on a separate

21   security key from the rest of the building with a video camera

22   on the work station and a disconnected work station.

23             Would that be roughly equivalent or greater than the

24   normal security that is applied?

25             MR. TYSON:  Merritt -- Mr. Beaver, do you want to

1   answer that in terms of what our current security is?  I think

2   that's less than we currently do.  But it is close.

3           THE COURT:  Mr. Beaver, are you going to respond or

4   are you going to talk to your counsel and at least respond via

5   that way?

6           MR. RUSSO:  Yes, ma'am.  Sorry about that.  Go ahead,

7   Merritt.

8           MR. BEAVER:  I think anything more than looking at it

9   within our environment means it is out of our environment.  No

10  matter what people say, they have got to control -- we don't

11  know what their controls are.  But we can't -- I can't sit in

12  front of a judge and say -- answer the question how could it

13  have gotten out.  If I said, well, I did release it, and they

14  said it was safe but now I can't explain how it got out there.

15          So anything less or anything more than looking at it

16  in our environment would still leave us exposed.

17          THE COURT:  Are you able to make it available to the

18  experts in your environment if they come -- I mean, do you have

19  actual -- a capacity to do that?

20          MR. RUSSO:  Well, Your Honor, I think some of that

21  would depend on are they looking to run software on the system

22  or what kind of protocol would be around that process.  Just

23  look and our folks are there -- I think one of Judge Grubbs --

24  her points in the case before her, if we were going to let them

25  look at stuff, our folks had to be the ones touching it.  Their

1    folks couldn't touch it.  At least the Coalition had agreed to

2    that in that case also.

3         But I think we would need to have some protocol

4    around what they would be doing or whether our folks would be

5    the only ones touching the system and they are just there to

6    watch.

7         THE COURT:  Let me just say there are different

8    focuses of this lawsuit versus a challenge in an election and

9    also the time frame that she had to deal with.  So I respect

10   she did everything she could that she thought was proper in

11   that time frame.

12        But you don't -- I mean, let's say you made a copy of

13   whatever you had as if you had another computer doing this so

14   that it wouldn't in any way interfere with your functioning and

15   your system.  Could they do it basically in your quarters so it

16   would be basically the same conditions?  And maybe that is too

17   much of a layperson's question.  But I think you get the drift

18   of what I'm saying probably.

19        MR. RUSSO:  So I'm trying to make sure I understand

20   exactly what we're talking about here.  So they would come --

21   they would be copying our system.  I think we would have a

22   concern with the copying.  We would be copying.

23        THE COURT:  You would be copying.

24        DR. HALDERMAN:  It would create --

25             **(Unintelligible crosstalk.)**

```
 1                 MR. RUSSO:  We would create a separate duplicate
 2      system.
 3                 DR. HALDERMAN:  A mirror of the system -- the GEMS
 4      system.  Hold on a second.
 5                 MR. RUSSO:  Your Honor, obviously our folks -- we're
 6      concerned we're expanding even farther where we were before
 7      because previously we were just talking about the GEMS
 8      database.  Now we're talking about copying the system.
 9                 THE COURT:  I'm just -- let me just say I'm not
10      trying to do any one thing.  I'm trying to throw out some other
11      ideas that could be massaged by people who understand the
12      issues probably better than me and how to do this in a way that
13      would satisfy some of your concerns but also actually deal with
14      the gravamen of also what the plaintiffs' claims are.
15                 DR. HALDERMAN:  Well, Your Honor, I gather that what
16      you are suggesting -- I think it is potentially a reasonable
17      proposal -- is to have a separate work station in a facility of
18      the State of Georgia's under Georgia's control where we
19      could -- the state could copy the data that we're asking for on
20      to a separate system or machine and we could go in and perform
21      the analysis ourselves on this independent computer there.
22                 And that way there is no -- then it would be
23      protected to the same extent that it is in Georgia's existing
24      system.  Is that -- is that what you were suggesting?
25                 THE COURT:  Yes.
```

1          DR. HALDERMAN:  And I think we could perform the

2   analysis under those conditions.  Although I think we could, in

3   fact, protect the data as well or better at our own laboratory

4   facilities where we routinely do deal with extremely serious

5   vulnerabilities in some of the internet's most -- most

6   dangerous malicious software.

7          But if the state insists, I think it would be

8   possible to perform the analysis on an independently setup

9   computer in their facility.

10          MS. CHAPPLE:  Your Honor, this is Catherine Chapple.

11  I think we would also want to have assurance that they would

12  give Dr. Halderman and Mr. Bernhard the access and time that

13  they needed to do the analysis that they need to do.  That it

14  wouldn't be an instance where our experts were told that they

15  only had a certain amount of time.

16          THE COURT:  These are details that we'll put off for

17  now.  All right.  I mean, I understand that, the whole purpose

18  of this, especially if he doesn't have the computer to work on.

19  Yes.  But let's just --

20          MS. CHAPPLE:  Sorry, Your Honor.

21          THE COURT:  That is all right.  I don't mean to jump

22  on you about it.  But I'm just trying to get any -- any sense

23  of what could be done here.

24          MR. RUSSO:  Your Honor, I think we would want to get

25  a better understanding of what they mean by perform the

1   analysis on the machine and what tools they expect to be

2   introducing or -- I mean, we would be concerned about someone

3   introducing anything into the machines.

4           MR. BEAVER:  It would have to be done based on what

5   is in the environment.  As soon as you introduce other tools,

6   you, of course, bring the opportunity to bring something

7   foreign into that environment.

8           DR. HALDERMAN:  Perhaps the state misunderstands the

9   proposal.  We're talking about having a work station available

10   on which we can perform forensics and other tests on files

11   provided to us by the state.

12           MR. CROSS:  And the key point just to add -- this is

13   David Cross -- is this is a stand-alone work station.  So it is

14   not connected to the actual GEMS server.  It would be whatever

15   room the state sets up as a stand-alone distinct machine that

16   is a mirror image of the GEMS server so that it wouldn't matter

17   what tools Dr. Halderman or Mr. Bernhard bring in because they

18   can only affect what is sitting on that stand-alone machine.

19   It is not connected to the internet.  You can't infect

20   anything.

21           THE COURT:  Well, it sounds like that is a

22   potentially reasonable alternative I have to say, and I'm not

23   expecting everyone to make a decision on the spot on a Friday

24   afternoon.  But I am expecting you to think about it seriously

25   and -- but I do want to address -- I guess that was

1   Mr. Beavers' comment.  But it might have been Mr. Russo's

2   comment.

3             Are we talking about when he asked -- one of you

4   asked, at least, were you talking about the GEMS database or

5   were you talking about the actual other operational -- the

6   server functioning?  Is that what I understood you were asking,

7   one of you at least?

8             MR. RUSSO:  Yes, ma'am.  That is what we were trying

9   to get an understanding of.

10            THE COURT:  All right.  So knowing that -- I know

11  that the plaintiffs would like the whole deal.  But,

12  Dr. Halderman and Mr. Bernhard, would it still be of value to

13  you, first of all, to do it just simply with the GEMS database

14  or not?

15            DR. HALDERMAN:  This is Dr. Halderman.  The GEMS

16  database would be of value to us.  We would also like to

17  examine the rest of the server configuration and the data on

18  the GEMS server because the GEMS database is one in separate

19  places where malware could reside if the state says it is sort

20  of the nexus or the roadmap or the nerve center of the system.

21  So that might be the first place that would be fruitful to

22  examine.

23            THE COURT:  What if you were allowed to do -- look at

24  the database and then they gave you whatever -- I mean, I

25  realize it is not what -- all the things you want, not quite

1   understanding what the macros are, but as a supplement to that.

2          DR. HALDERMAN:  The macros are actually not a

3   substantial utility to us.  I presume that that is a standard

4   check that the state runs in the normal course of business and

5   that it has already shown that there is not an infection there.

6          MR. CROSS:  If I understand Your Honor's question

7   right, if the question is is the database itself a valuable

8   starting point, the answer is definitely yes.

9          THE COURT:  If you were to do it under those

10  protected circumstances?

11         MR. CROSS:  Yes.  I mean the short answer is yes.  I

12  guess I would want to explain though that, again, if we're

13  going to go to the trouble of looking even just at the database

14  on a stand-alone computer under the conditions we have

15  described, I would ask, Your Honor, we should just go ahead and

16  take the mirror image of the server because those conditions

17  are so secure that there is no reason to break it up.  And it

18  is just going to create inefficiency and more work if we first

19  look at the database in that situation and then later have to

20  come back and create a whole new station that has the full

21  configuration of the server.

22         I mean, if we're going to go to those extreme

23  conditions, I would respectfully ask that we just do it all at

24  once and be done with it.  If we're just getting the database,

25  then I would submit we don't need to do the level of

1    protections that they are talking about.

2           MR. BROWN:  Your Honor, this is Bruce Brown.  I have

3    to concur with what Dave said to this extent.  The GEMS

4    database is set up in 159 counties.  It is a public record in

5    other states.  It is not the kind of data that needs the

6    protection anything close to what Dr. Halderman is describing.

7           Now, in terms of it is an order of magnitude and that

8    is why we chose it initially as the first thing that we wanted

9    discovery on because we didn't want to fight this thing on a

10   big forensic battle that, frankly, we had just gone through

11   with them in the lieutenant governor's case.  We thought let's

12   just ask for the low hanging fruit, which is the GEMS database.

13   That will be a good start to try to get an overview of the

14   system and maybe spot some vulnerabilities or some

15   configuration errors.

16          And so it remains a good starting place.  And we can

17   get those by CD.  We don't need to have a safe room or anything

18   else.  And we can evaluate them.  And then that would probably

19   speed up what substantive review that could be entertained or a

20   concurrent review, even better, of the actual GEMS server.

21          But I think the difficulty that we had in our

22   discussion with the experts is that it is almost in a situation

23   where if what we are seeking discovery of is likely to reveal

24   malware or a vulnerability then the state is going to take the

25   position that it is beyond discovery every time, not just for

1    the GEMS database.  But you will see that in discovery in this

2    case, I think, over and over again.

3            And so that is not a position that we feel

4    comfortable arguing because it just can't be so or else as

5    Justice Nahmias said in our oral argument in the other case it

6    is just this black box that the state gets to know how the

7    votes are counted and no one else does.

8            And so I think our discovery is limited.  We have cut

9    it back to 25.  If they have particular fields, like personal

10   information, that can be redacted.  And we will treat them just

11   as carefully as they require the counties to treat them.  And

12   whether that is done concurrently or in advance of making a

13   full image of the GEMS database -- you know, Mr. Cross has got

14   a good point.  We'll take the GEMS database separately now.

15           Thank you.

16           THE COURT:  Well, let me ask you this.  We're talking

17   about the actual functioning of the GEMS server and the way it

18   operates.  How further, Dr. Halderman, are you suggesting -- if

19   you were to happen to be in their shoes, what would you want,

20   in fact, to be able to protect -- when you have responsibility

21   for protecting the system, what would you want under these

22   circumstances?

23           They still have to run an election.  Of course, it is

24   always possible as the plaintiffs have pointed out that things

25   won't be ready by the point of the primary or -- so it becomes

1   all the more important.  So I may have unfairly put the shoe on

2   your foot about it.

3        DR. HALDERMAN:  Yes.  No.  I think that is a fair

4   question.  And I think that although the -- the information --

5   the most sensitive risk is that information on the real GEMS

6   servers will be changed, more so than information on the GEMS

7   servers will leak.

8        I think information on the GEMS servers needs to be

9   protected.  And I think that the protective order is a good

10  place to work out the logistics of that.  But the logistics to

11  me, the most important things, are to ensure that the data is

12  transferred in an encrypted way.  Wherever it will be analyzed,

13  that it is analyzed on a system that is physically secured and

14  that physically secured system is disconnected from the

15  internet, in addition to the controls that the protective order

16  places on who would have access to that -- to that machine.

17       But that seems like -- that is a fairly standard

18  protocol for handling other kinds of dangerous or sensitive

19  software that, if released, could cause harm.

20       That is what we do to protect against -- to protect

21  actual virus samples.  That is what we do sometimes to protect

22  the most severe vulnerabilities we discover is just make sure

23  that they are stored in encrypted form, that they are kept on

24  systems that are not connected to the internet, and to make

25  sure that those systems are physically secured.

1          THE COURT:  All right.  Let me just -- we were on the

2     protective order.  And I had gotten everyone's position a

3     little more fully on the retroactivity issue and the state

4     wanting to assert an interest also to protect itself from the

5     disclosure of a third party.

6          I'm looking to see if there is anything else.  I

7     would like the state to think about this alternative that we've

8     been discussing about the -- having this done in a state

9     facility on a mirrored machine computer.  And obviously there

10    are two levels of this.  And I hear what the plaintiffs are

11    saying.  And I'm not -- I haven't necessarily heard anything

12    further from plaintiffs as to any sort of heightened obligation

13    of security relative to the experts who are using -- might be

14    doing this if they were actually looking at the server relative

15    to your desire to include your clients in the loop about

16    whatever they are doing.

17         And I think that I would be -- it is really no

18    disrespect to the clients.  But I just -- I think under the

19    circumstances I couldn't probably authorize that.  I don't see

20    any need to.  I mean, the experts are going to do what they are

21    going to do and be looking at it.

22         But all of the details of all of that, as they are

23    running it, doesn't seem to be essential to be sharing with

24    clients until we -- obviously they will come to an opinion.

25    And that is something else when we get to the point that I have

```
 1    an expert opinion.
 2            MR. CROSS:  Your Honor, this is David Cross for the
 3    Curling plaintiffs.  We have no objection.  We certainly
 4    understand and appreciate that.  Our clients are fine with
 5    that.
 6            MR. BROWN:  Your Honor --
 7                    (Unintelligible crosstalk.)
 8            MR. BROWN:  Your Honor, our client has no need or
 9    desire to be a party to the examination of the server.  If
10    we -- if you -- if I could explain better what the GEMS
11    database does, it is an Access database that is very much a
12    user-oriented application involving elections and how elections
13    are constructed.
14            And the knowledge of my client in terms of that field
15    of information is necessary for us to be able to review the
16    GEMS database itself.  And that is why we would need to have my
17    client, Ms. Marks, included with any circle of people who were
18    reviewing the GEMS database.  It is also simply a matter of
19    resources that we have to get this work done, quite frankly.
20            THE COURT:  Are you saying she would need to be in
21    the room while they are looking at the database and they are
22    running the tests on the database?
23            MR. BROWN:  She would not need to have --
24            THE COURT:  So what are you saying?  I mean, because
25    it wasn't like you wanted a printout of the database.
```

1          MR. BROWN:  I may not -- we may have to put something

2    in writing to make sure it is clear.  Because this is sort of

3    overtaken a little bit of my own understanding of how you could

4    view one and not the other.

5          But what we would want Ms. Marks to have access to

6    would be the functionality of the GEMS database, which is the

7    same thing that a county clerk in Georgia would have access to.

8    And we want to see the same thing that someone in an elections

9    office in Morgan County would have access to.  And they, of

10   course, don't have access to the kinds of things that

11   Dr. Halderman is talking about.  So that would be sort of a

12   rough way of explaining it.  We would need it to be able to get

13   our work done with our resources and would appreciate that.

14          THE COURT:  When it is made available in Morgan

15   County -- and the state may be -- I assume can answer that

16   question whether directly Mr. Beaver or his giving the

17   information to counsel.

18          What does that mean?  Are they -- when the county

19   elections officer is looking at it, is he or she looking at it

20   on a computer and able to do all the things that Mr. -- that

21   the plaintiffs want to do or are they looking at it -- pulling

22   it up in some other less informative mode but that you can run

23   it?

24          MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.

25   We had an extensive discussion of this in Mr. Barnes'

1    deposition yesterday.  And the county election officials have

2    separate GEMS computers that house the Access database.  But an

3    important distinction is that the county computers do not have

4    Microsoft Access installed on them.  So the county officials

5    cannot open the database in Microsoft Access.

6              They use the GEMS system that then provides the

7    interaction to the Access database.  But they do not and cannot

8    open it because those computers are not connected to anything

9    and Microsoft Access is not installed on those computers.

10             THE COURT:  Okay.  So back to you, Mr. Brown.  I

11   mean, is that -- if you want to see it the way that the Morgan

12   County elections is, then you would be looking at it and your

13   client would be looking at it --

14             MR. BROWN:  Well, I think --

15             THE COURT:  -- in a separate way without access --

16   without the --

17             MR. BROWN:  What we would want is -- what we have

18   asked for is to have it saved as a Microsoft Access database.

19   Then we simply open it in Microsoft Access and be able to

20   analyze it like that.

21             THE COURT:  Well, I just don't understand why your

22   client has to be part of that, frankly.  I mean, you originally

23   say you want it just like the Morgan County head of elections

24   is.  But then you actually wanted something else, which is what

25   basically I'm saying, well, I can understand why the experts

1  might need it but I'm not sure why that makes -- why your

2  client has to be part of that process.

3       All right.  Well, you can all think about that.  And

4  the state should think what -- what we have been discussing.

5  And I would like to know by 11:00 on Monday what your

6  respective positions are.

7       MR. BROWN:  Thank you, Your Honor.  We will brief the

8  issue of who should have access and why to the GEMS database

9  and also provide a little bit more information on the GEMS

10 database and how it is helpful and should be disclosed.  But

11 thank you very much for your time.

12      THE COURT:  And if the state would indicate -- mull

13 over what we have been discussing and indicate its -- its

14 position as well by 11:00.

15      MR. RUSSO:  Yes, ma'am.  We will do that.  This is

16 Vincent Russo.  We will do that and follow up by 11:00.

17      Should we just email your clerk, or would you --

18      THE COURT:  You can file it under seal.  I mean, it

19 is just the simplest thing at this point given the subject

20 matter.  Everyone can file it under seal, and then we'll --

21 once I see it, then I'll decide whether all of it needs to be

22 under seal.

23      MR. RUSSO:  Yes, Your Honor.

24      THE COURT:  And if there is something that is

25 relevant from the deposition, I guess you'll need to file the

1   deposition.

2          MR. RUSSO:  Just so we fully understand here, you're

3   referring to Michael Barnes' deposition?

4          THE COURT:  That is what I understood from the state

5   was that there was a deposition that dealt with these issues.

6          MR. RUSSO:  Correct.

7          THE COURT:  Okay.  I'm just looking at the protective

8   order statement so I can see if there was anything else I

9   needed to ask you about.

10          All right.  I think I have -- if there is anything

11   else that arose today that you have further information about

12   or a modified position on, please provide that for me.  And if

13   either of the experts have anything -- further clarification

14   that they want to provide, they should -- you should attach an

15   affidavit or from Mr. Beaver.

16          All right.  Thank you very much.  Have a good

17   weekend.

18          MS. CHAPPLE:  Thank, Your Honor.

19          MR. BROWN:  Thank, Your Honor.

20                  **(The proceedings were thereby concluded at 4:25**

21                  **P.M.)**

22

23

24

25

1                       C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA

4    NORTHERN DISTRICT OF GEORGIA

5

6         I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

7    the United States District Court, for the Northern District of

8    Georgia, Atlanta Division, do hereby certify that the foregoing

9    53 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   29th day of June, 2019.

14

15

16

17                       _____
                         SHANNON R. WELCH, RMR, CRR
18                       OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25