Dec. 13. 2018  3:42PM     CIVIL SERVICE GWINNETT COUNTY          No. 4206  P. 1

*long return to 401 1-812-2664*
*Attn: Sgt. Sneed*

SHERIFF'S ENTRY OF SERVICE

Civil Action No. 2018CV313418

SUPERIOR COURT

Date Filed 11/23/18

GEORGIA, FULTON COUNTY

Fulton County Superior Court
***EFILED***DG
Date: 12/28/2018 9:06 AM
Cathelene Robinson, Clerk

*Coalition for Good*
*Governance, et al*

Attorney's Address

Plaintiff

*Bruce P. Brown*
*1123 Zonolite Rd. St. 6*
*Atlanta, GA 30306*

VS.

Name and Address of Party to be Served

*Robyn A. Crittenden*

*Gwinnett County Board of Registration &*
*c/o William Linkers     Elections*
*75 Langley Dr. Lawrenceville GA 30046*
*450  Grayson  Highway   Lawrenceville, GA 30046*
*455*

Defendant

SHERIFF'S ENTRY OF SERVICE

___

I have this day served the defendant _____ personally with a copy
of the within action and summons.

**PERSONAL** ☐

I have this day served the defendant _____ by leaving a copy
of the action and summons at this most place notorious place of abode in this county.

Delivered same into hands of _____ described as follows
age, about____years; weight, about____pounds; height about____feet and____inches, domiciled at the residence of the
defendant.

**NOTORIOUS** ☐

Served the defendant *Gwinnett County Board of Registration & Elections* a corporation
by leaving a copy of the with in action and summons with *Lynn Ledford*
in charge of the office and place of doing business of said Corporation in this County.

**CORPORATION** ☒

I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the
door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of the same
in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said
summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the
place stated in the summons.

**TACK & MAIL** ☐

Diligent search made and defendant _____
not to be found in the jurisdiction of this court.

**NON EST** ☐

This _____13_____ day of ___Dec_____ 20_18_.

_____ DEPUTY

SHERIFF DOCKET _____ PAGE _____

WHITE - CLERK; CANARY - PLAINTIFF; PINK - DEFENDANT

Fulton County Superior Court
***EFILED***LS
Date: 1/2/2019 3:00 PM
Cathelene Robinson, Clerk

**SHERIFF'S ENTRY OF SERVICE**

SHERIFF'S ENTRY OF SERVICE

| | |
|---|---|
| Civil Action No. 2018CV313418 | Superior Court ☒  Magistrate Court ☐ |
| | State Court ☐  Probate Court ☐ |
| Date Filed November 23, 2018 | Juvenile Court ☐ |
| | Georgia, _____Fulton_____ COUNTY |

Attorney's Address

Bruce P. Brown
Bruce P. Brown Law LLC
1123 Zonolite Rd. Suite 6
Atlanta, GA 30306

Coalition for Good Governance, et al.

Plaintiff

Name and Address of Party to be Served.

VS.

Fulton County Board of Registration and Elections

Robyn A. Crittenden, et al.

141 Pryor St. SW #4075
Atlanta GA 30303

Defendant

30303

Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL** ☐

I have this day served the defendant_____ personally with a copy of the within action and summons.

I have this day served the defendant_____ by leaving a copy of the action and summons at his most notorious place of abode in this County.

**NOTORIOUS** ☐

Delivered same into hands of_____ described as follows: age, about _____ years; weight _____ pounds; height, about_____ feet and_____ inches, domiciled at the residence of defendant.

**CORPORATION** ☐

Served the defendant_____a corporation by leaving a copy of the within action and summons with _____ in charge of the office and place of doing business of said Corporation in the County.

**TACK & MAIL** ☐

I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST** ☑

Diligent search made and defendant _Robyn Crittenden_ not to be found in the jurisdiction of this court. _Wrong Address_

This _19_ day of _December_, 20 _18_.

_____ 2280
DEPUTY

SHERIFF DOCKET          PAGE          WHITE-CLERK   CANARY-PLAINTIFF   PINK-DEFENDANT

Fulton County Superior Court
***EFILED***LW
Date: 1/2/2019 12:00 AM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
### STATE OF GEORGIA

| | | |
|---|---|---|
| COALITION FOR GOOD GOVERNANCE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | FILE NO. 2018CV313418 |
| ROBYN A. CRITTENDEN, Secretary of State of Georgia, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### VERIFICATION

Personally appeared before the undersigned officer duly authorized to administer oaths, **ROBYN A. CRITTENDEN**, who, after first being duly sworn, states that the ***RESPONSE TO PETITION TO CONTEST ELECTION RESULT*** was prepared with the assistance and advice of counsel and with the assistance of employees of the Office of the Georgia Secretary of State, upon which I have relied, and that the facts and information contained therein are true and correct to the best of my knowledge, information, and belief.

This 28th day of December, 2018.

**ROBYN A. CRITTENDEN**
**SECRETARY OF STATE**

Sworn to and subscribed before me
this 28th day of December, 2018.

NOTARY PUBLIC, Georgia
My Commission expires:

December 11, 2021

Fulton County Superior Court
***EFILED***LS
Date: 1/3/2019 2:45 PM
Cathelene Robinson, Clerk

**SHERIFF'S ENTRY OF SERVICE**

## SHERIFF'S ENTRY OF SERVICE

Civil Action No. _2018CV__313418_

Date Filed __November 23, 2018__

| | | | |
|---|---|---|---|
| Superior Court | ☒ | Magistrate Court | ☐ |
| State Court | ☐ | Probate Court | ☐ |
| Juvenile Court | ☐ | | |

Georgia, _____Fulton_____ COUNTY

Attorney's Address

Bruce P. Brown
Bruce P. Brown Law LLC
1123 Zonolite Rd. Suite 6
Atlanta, GA 30306

Coalition for Good Governance, et al.

Plaintiff

Name and Address of Party to be Served.
Robyn A. Crittenden

VS.

Robyn A. Crittenden, et al.

Defendant

Secretary of State of Georgia

214 State Capitol

Garnishee

Atlanta, Georgia 30334

### SHERIFF'S ENTRY OF SERVICE

**PERSONAL**

☐ I have this day served the defendant_____ personally with a copy
of the within action and summons.

I have this day served the defendant_____ by leaving a
copy of the action and summons at his most notorious place of abode in this County.

**NOTORIOUS**

☐ Delivered same into hands of_____ described as follows:
age, about_____ years; weight _____ pounds; height, about_____ feet and_____ inches, domiciled at the residence of
defendant.

**CORPORATION**

☐ Served the defendant _SECRETARY OF STATE OF GEORGIA / ROBYN_ a corporation
by leaving a copy of the within action and summons with _Ryan Germany, General Counsel_
in charge of the office and place of doing business of said Corporation in the County.

**TACK & MAIL**

I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the
premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail,
First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed
thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST**

Diligent search made and defendant_____
not to be found in the jurisdiction of this court.

This _10th_ day of _DEC_, 20_18_.

_____ DEPUTY

SHERIFF DOCKET          PAGE

WHITE-CLERK   CANARY-PLAINTIFF   PINK-DEFENDANT

Fulton County Superior Court
***EFILED***MH
Date: 1/7/2019 12:00 AM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

COALITION FOR GOOD
GOVERNANCE, RHONDA J.
MARTIN, SMYTHE DUVAL, AND
JEANNE DUFORT,

                Plaintiffs,

          v.

ROBYN A. CRITTENDEN, Secretary
of State of Georgia, FULTON
COUNTY BOARD OF
REGISTRATION AND ELECTIONS,
GWINNETT COUNTY BOARD OF
REGISTRATION AND ELECTIONS,
DEKALB COUNTY BOARD OF
REGISTRATION AND ELECTIONS
and GEOFF DUNCAN,

             Defendants.

Civil Action No. 2018CV313418

## PLAINTIFFS' JOINT CONSOLIDATED RESPONSE
## TO PENDING MOTIONS TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ ii

I.    INTRODUCTION AND SUMMARY ........................................ 1

II.   FACTS ............................................................................. 3

    A.    Georgia's DRE Voting System ................................................ 3

    B.    Universally Acknowledged Vulnerability of DRE System ................ 5

    C.    Georgia Secretary's Neglect Aggravates Vulnerability ..................... 6

    D.    Irregularities in the 2018 Election ........................................... 8

    E.    Anomalous Undervote in the Lieutenant Governor's Election .......... 10

III.  STANDARDS FOR MOTIONS TO DISMISS ............................. 15

    A.    Motions to Dismiss Are Not Permitted in Election Contests ............. 15

    B.    Standard of Review ........................................................... 16

IV.  ARGUMENTS IN DEFENSE OF THE CONTEST CLAIM ..................... 17

    A.    The Contest Claim Is Sufficiently Plead ................................... 17

        1.    Grounds for a Contest ................................................ 18

        2.    Sufficient Grounds Are Alleged to State a Contest Claim ...... 19

    B.    The Contest Claim Names Proper Defendants ................................... 22

        1.    The Secretary of State Is A Proper Contest Defendant ........... 23

            a)    The Election Code Contains At Least Three Waivers of Sovereign Immunity by the State in Contests ............... 23

            (1)    O.C.G.A. § 21-2-520(2)(C) ............................................. 23

            (2)    O.C.G.A. § 21-2-520(2)(D) ............................................. 26

ii

(3)    This Court Has "Plenary Power" Over Any Person, Including the Secretary, in a State-wide Contest............ 28

b)    The Election Code Requires the Secretary to Be Served in Election Contests........................................ 29

c)    The Secretary Has Historically Not Asserted Sovereign Immunity in State-wide Election Contests.................... 29

2.    All of Georgia's 159 Counties Are Not Necessary Parties...... 30

3.    Amico's Ten Notable Counties Are Not Necessary Parties .... 33

4.    Fulton County Is A Proper Contest Defendant......................... 34

C.    Service of Process .................................................................. 34

D.    Coalition for Good Governance Is A Permitted Plaintiff in Federal Constitutional Claims, Not Election Contest ...................................... 35

V.    ARGUMENTS IN DEFENSE OF THE § 1983 CLAIMS ........................... 36

A.    The Eleventh Amendment Does Not Bar the § 1983 Claims ............ 36

B.    The Complaint States Valid Claims Under § 1983 ............................. 38

1.    Required Elements and Corresponding Allegations................ 38

a)    Fundamental Right to Vote ............................................ 38

b)    Equal Protection ............................................................. 39

2.    Objections to the Due-Process Claim Are Meritless ............... 40

3.    Objections to the Equal-Protection Claim Are Meritless ........ 43

C.    Gwinnett County Is A Proper Defendant to the § 1983 Claims.......... 44

VI.    CONCLUSION ........................................................................................ 45

iii

Plaintiffs Coalition for Good Governance ("Coalition"), Rhonda J. Martin, Smythe Duval, and Jeanne Dufort ("Plaintiffs") state the following as their joint consolidated response to all pending motions to dismiss (and joinders) filed by Defendants Robyn A. Crittenden (the "Secretary"), Fulton County Board of Registration and Elections ("Fulton County"), Gwinnett County Board of Registration and Elections ("Gwinnett County"), and Geoff Duncan ("Duncan") (together, "Defendants"[1]).

## I.    INTRODUCTION AND SUMMARY

The conduct of the November 6, 2018 general election for Lieutenant Governor of the State of Georgia ("the Contested Election") was so defective and marred by material irregularities "as to place in doubt the result" of the election under Georgia law. O.C.G.A. § 21-2-527(d). (Petition, ¶ 1). As detailed in the Petition, going into the elections, the entire national intelligence and computer science communities were warning the State of Georgia that its Direct Electronic Recording ("DRE") voting system was profoundly vulnerable to malicious attack, programming glitches, and irregularities. As the experts predicted, Georgia's November 2018 General Election was marred by multiple unexplained and widespread failures of the DRE voting system: incorrect, and therefore illegal, electronic ballots being displayed to voters; inaccurate tabulations; touch screens

---

[1] The DeKalb County Board of Registration and Elections was initially a Defendant, but DeKalb County was dropped as a party defendant on December 27, 2018, by Order of this Court granted upon motion of the Plaintiffs.

1

malfunctioning causing incorrect votes to be cast and recorded; precincts with more votes counted than there were voters; unauthorized and improper changes to eligible voters' registration records; failures of the smart cards; and "glitches" in the electronic pollbooks creating long lines and disenfranchising voters.

The malfunctioning of the DRE machines had a direct and substantial impact on the race for Lieutenant Governor, the second-most important state office and second race on the November 6 ballot. The election for Lieutenant Governor received far fewer votes than all other state-wide races, including even races that were further "down ballot," such as Attorney General, and much less prominent races of Commissioner of Agriculture, Commissioner of Labor, and Public Service Commission. This unprecedented pattern of election results lacks any reasonably plausible innocent explanation, and alone would cast doubt on the elections results. Even more alarming, this aberrant pattern appears only in the reported results of votes cast on the DRE machines: votes on paper ballots conformed to the expected pattern, with the election for Lieutenant Governor receiving slightly fewer paper-ballot votes than Governor, and slightly more paper-ballot votes than Secretary of State.

The only reasonable explanation for such an anomalous vote discrepancy in the DRE votes cast in the Contested Election is that a voting system malfunction – whether the result of maliciousness or programming errors - caused an outcome-changing number of votes in the Lieutenant Governor's race to not be recorded,

2

placing in doubt the result of the Contested Election under O.C.G.A. §§ 21-2-521(1) and 21-2-521(3), and requiring a new election.

Based on the allegations in the Petition, which must be accepted as true, Defendants have failed to carry their heavy burden of showing that Plaintiffs "would not be entitled to relief under any state of provable facts asserted" in the complaint or that Plaintiffs "could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought." *Scouten v. Amerisave Mortg. Corp.,* 283 Ga. 72, 73 (2008) (citations omitted). Also as explained below, Defendants' other technical and procedural arguments for dismissal are also without merit: the Georgia Legislature has waived the Secretary's sovereign immunity by defining her as the "election superintendent" in a state-wide election contest; the Fulton and Gwinnett Boards of Registration and Election are also obviously proper parties; all the Defendants have been properly and timely served; and the arguments with respect to Plaintiffs' federal claims are meritless.

## II.    FACTS

### A.    Georgia's DRE Voting System

The voting system used in Georgia during the Contested Election consists of the Diebold Global Election Systems ("Diebold")  AccuVote DRE touchscreen voting units ("DREs"),  the Diebold optical scanners for tabulating paper ballots, and the Diebold General Election Management Software ("GEMS") for tabulation

3

and reporting of data generated by DRE and Diebold optical scanners, as well as the electronic pollbook components and electronic accessories that interface with the DRE vote recording system.  (Petition, ¶ 21).

DREs are configured for an election by inserting a memory card into a slot on the side of the machine.  Before the election, the file system on the memory card stores the election definition, sound files, interpreted code that is used to print reports, and other configuration information.  When operating properly, DREs use software to translate the voter's physical act of touching a particular place on the touchscreen into a vote for the corresponding candidate or issue, which vote is then recorded on both the DRE's removable memory card and internal flash memory. Both records of the votes are unreadable to humans.  Crucially, Georgia's DREs do not create or retain any verifiable or auditable non-electronic record of the voter's selections. Hence, programming errors or malicious manipulation of the software are likely to be undetected.  (Petition, ¶ 22).

Each DRE internally contains much of the same hardware that might typically be found in a very low-end general-purpose personal desktop computer in use in the early 2000s.  Georgia's DREs run a Diebold-modified version of Microsoft's Windows CE operating system, the most recent version run in Georgia is Windows CE 4.1—which Microsoft stopped supporting in early January 2013. As a consequence, Microsoft is no longer issuing updates or security patches for that software.  As the operating system is over twenty years old, it lags behind the

4

two decades of computer security research and is extremely vulnerable to a wide variety of attacks that Diebold's software, regardless of version, cannot defend against. (Petition, ¶ 23).

**B.    Universally Acknowledged Vulnerability of DRE System**

The unreliability and vulnerability of electronic voting systems like the one used by the State of Georgia has attracted widespread and uniform alarm at all levels of government.  On July 26, 2018, House Intelligence Committee Chairman Devin Nunes joined many federal officials and agencies concerned with national security to call for a complete ban on electronic voting.  In May, the Senate Select Committee on Intelligence concluded that paperless DREs "are at highest risk of security flaws," and stated that "[s]tates should rapidly replace outdated and vulnerable voting systems" with machines that "[a]t a minimum . . . have a voter-verified paper trail." Similarly, in March, DHS Secretary Nielsen labeled electronic voting systems "a national security concern."  (Petition, ¶ 24).

In January 2018, the Congressional Task Force on Election Security issued a Final Report concluding that the DRE machines used in Georgia "have been shown over and again to be highly vulnerable to attach" and that "it is near impossible to detect whether results have been tampered with."  (Petition, ¶ 25).[2]

---

[2] These recent alarms from the federal government amplify years of warnings from computer scientists, who have uniformly concluded that paperless balloting is unreliable, unquestionably insecure, and unverifiable.  California's 2007 "Top-to-Bottom Review" ("TTBR") found that DREs were "inadequate to ensure accuracy and integrity of the election results…"; that the system contained "serious design flaws that have led directly to specific vulnerabilities, which attackers could exploit to affect election outcomes…"; and that "attacks could be carried out in a manner that is not subject to detection by audit,

On September 6, 2018, the National Academy of Sciences, Engineering, and Medicine and the associated National Research Council issued a consensus report[3] entitled "Securing the Vote: Protecting American Democracy." The National Academy of Sciences recommended that DREs of the kind used in Georgia's elections *not* be used in the 2018 federal election because of their inherent unreliability and vulnerability.   (Petition, ¶ 27).

### C.    Georgia Secretary's Neglect Aggravates Vulnerability

The already unacceptable extreme vulnerability of Georgia's system was greatly increased by the Secretary's failure to secure the State's central election server before and after the 2016 elections.  Between at least August 2016 and March 2017, and likely for a much longer time, this server (at the time being maintained by Kennesaw State University at the Center for Election Studies) was fully accessible to any computer user with Internet access, causing all 50,000 plus components in the DRE voting system state-wide to be vulnerable to malicious attack.  (Petition, ¶ 30).

---

including review of software logs."  Citing these vulnerabilities of the Diebold's AccuVote DREs, California Secretary of State Debra Bowen decertified California's voting system. Ohio's 2007 "Evaluation and Validation of Election-Related Equipment, Standards and Testing ("EVEREST") concluded that Ohio's AccuVote "system lacks the technical protections necessary to guarantee a trustworthy election under operational conditions." Any number of published studies are in accord.  *See* Petition, ¶ 26 and *id.,* footnotes 4 – 9.

[3] A consensus report of the National Academy of Sciences represents the highest authority that the U.S. Government can rely upon when it seeks to be advised on matters of science, technology and engineering.

6

Despite knowing that the State's entire electronic election infrastructure had been exposed for months on the internet, the Secretary has never conducted a forensic examination to determine whether the server had been altered or manipulated. As a consequence, the compromised software, passwords, and encryption keys were used on the equipment employed in the Contested Election. (Petition, ¶ 32).

Two months prior to the November 6, 2018 election, the District Court in *Curling v. Kemp,* N.D. Ga., No. 17-cv-02989, made the following findings in the Court's September 17, 2018 Order denying injunctive relief relating to the 2018 Elections: "Plaintiffs have so far shown that the DRE system, as implemented, poses a concrete risk of alteration of ballot counts that would impact their own votes. Their evidence relates directly to the manner in which Defendants' alleged mode of implementation of the DRE voting system deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted)." Order at 39.

Ignoring the recommendations and warnings of officials at the highest levels of the Federal Government and the entire computer science community, Defendants Election Officials deployed the DRE election system in the 2018 General Election with predictable results, as explained below. The Defendant Election Officials took this reckless action even though they had and have the

7

statutory authority and means to conduct verifiable and safe paper-ballot elections. (Petition, ¶ 35).

### D.    Irregularities in the 2018 Election

As could have been predicted after the warnings by the entire national intelligence, election integrity, and computer science communities, Georgia voters in the 2018 General Election experienced massive and varied election irregularities, any of which alone, but especially all in combination, places the results in serious doubt.  Voters reported thousands of problems during the November 6, 2018 election, including DRE malfunctions, voting problems, improper disenfranchisement of eligible voters, electronic pollbook malfunctions, improper absentee ballot application and absentee ballot rejections, tabulation errors, and voter registration database errors resulting in incorrect polling place assignments or total disenfranchisement of eligible voters.

For example:

a.  A voter attempted to vote for Amico at the Henry County Voting Registration office in McDonough. When she saw her summary screen on the touchscreen machine before casting her ballot, despite her original choice for Amico, no candidate choice was listed for Lieutenant Governor, and her "YES/NO" vote on one of the ballot questions had been changed, reflecting the opposite of her choice. Upon expressing her concern to a poll worker, the poll worker dismissed her concern.

b.  On November 6, at Allen Temple AME church polling place in Fulton County a senior voter asked the manager for assistance voting. However, at the end screen when the voter and manager were verifying the vote review page, they saw that the lieutenant governor and one other race were unvoted on the summary screen.

8

The manager asked the voter if she had intended to vote for those and had mistakenly skipped them. The voter said that she wanted to vote for lieutenant governor. The voter touched on the screen where it said lieutenant governor so that she could vote on that race. The machine did not respond properly, but instead jumped and displayed the message that her ballot had been cast. The manager witnessed that the voter did *not* press cast ballot, which was far away from where the voter touched. The manager reportedly took the machine offline right away. The polling place manager noted that the voter did not get to vote for lieutenant governor.

c. Allgood Elementary School in DeKalb County is in the 4th U.S. Congressional District. A voter on Election Day at the Allgood Elementary School in DeKalb County reported to a pollwatcher that her screen ballot featured Karen Handel as the Democratic candidate; there was no Republican candidate. Handel, of course, was the Republican candidate in the race for the 6th U.S. Congressional District.

d. At a polling place in Lithonia, a voter checked in and was given a yellow card to use in the machine. On page one of the electronic ballot, only the governor's race appeared on the ballot; the Lieutenant Governor's race was not displayed. Amico's name appeared for the first and only time when the summary page was viewed.

e. At the Red Rock Community Center in Worthy County, a voter reported being given one voter access card to vote for the governor etc., and an entirely separate card to vote for solely for "the commissioner." The second ballot/card (that reportedly had only "the commissioner") did not list the candidates' parties - simply the candidate's names. The voter is certain that the second card she was given and associated ballot had only one race, a "commissioner." Additionally, the machine flipped her vote for Sarah Riggs Amico to the Republican candidate for Lieutenant Governor multiple times, forcing her to click several times to make the cursor stay on Amico's name.

f.  At Grady High School polling place in Atlanta, Election Night DRE machine results tapes show anomalies that suggest DRE programming problems. Although the polling place and associated precincts are squarely within Congressional District 5, the tapes showed available choices as having included Congressional District 6, 11 and 13. The Secretary's official results website shows these three available Congressional District choices in the Grady High School polling place although no votes for those choices were reported.  Additionally, two machine results tapes show a total of 123 less votes cast than the public counter of ballots cast reported for the machine.

g.  There were hundreds of reports of DRE machines "flipping" votes from one candidate to the opposite candidate. Voters reported being instructed to "fix" the flip in many different ways, and sometimes required trial and error and multiple attempts to press various parts of the screen. Voters presumably assumed that machines are properly recording their final vote, but there is no way to confirm that the vote is recorded as intended and as displayed on the screen.

h.  In Midvale Elementary precinct in DeKalb County, candidates for the Lt. Governor's rage received a collective 796 votes according to the Secretary's official results; the precincts poll tapes, however, shows them only receiving a collective 698 votes.

(Petition, ¶¶ 40-48).

## E.    Anomalous Undervote in the Lieutenant Governor's Election

The malfunctioning of the DRE voting system caused the anomalous and illegal rejection of a large number of legitimate votes validly cast in the Lieutenant Governor's race – the Contested Election.

The Lieutenant Governor is the state's second highest ranking official, and the officeholder occupies the particularly coveted position of President of the State Senate.  As such, the Lieutenant Governor's is a hotly contested race that is of keen

10

interest to most voters. (Petition, ¶ 50). In the 2018 General Election, however, the reported totals show that voters purportedly "skipped" the election for Lieutenant Governor more than any other state-wide election, causing the DRE to record an "under-vote," which means no vote was cast on that race—despite other votes being cast by the same voter for other races on the same ballot. (Petition, ¶ 51).

According to the Secretary's reports, 99.73% of voters in the 2018 state-wide election voted for Governor, but only 95.71% of voters recorded votes for Lieutenant Governor candidates. This percentage differential translates into more than 159,000 Georgia voters who supposedly made no selection for Lieutenant Governor when they voted. Every lower "down ballot" race also received significantly higher percentages, as shown by the following chart:

11



(Petition, ¶ 52).

The conclusion that a malfunctioning or malicious manipulation of the DRE voting system is responsible for the illegal rejection of votes for the Lieutenant Governor's race is unavoidable and is further reinforced by comparing the reported results of votes on DRE touchscreen machines to votes on paper ballots (i.e., mailed ballots and provisional ballots).   The reported votes on paper ballots *do not show* any pattern of aberrant "under-voting" on the race for Lieutenant Governor that corresponds to the pattern of under-voting reflected in the DRE totals; instead, almost the same number of voters who voted on paper for Governor voted on paper

12

for Lieutenant Governor.  This consistency is exactly what would be expected—
and what would be normal—in a high-profile race for the state's second highest
ranking officer.  (Petition, ¶ 53).

The following table shows the participation[4] rate, as reported by the
Secretary of State, for the ten state-wide races, on paper ballots only:



[4]Plaintiffs note that because of limitations of the data set that it is using from the Secretary of State's web site, this table shows percentage of vote as a percentage of the electors who did vote for Governor (therefore, the percentage for Governor is 100%); while the chart on page 12 shows a percentage of electors who voted.  Since 99.73% of the electors who voted, voted for Governor, the difference is very minor.

13

Other than machine malfunction or other election irregularity, there is no plausible explanation for there being such a huge difference in voter participation in the Lt. Governor's race based on the mode of casting votes. The hundreds of thousands of voters who voted on paper came from the same geographic, demographic and political universe as the voters who voted by DRE machine. The only difference between the two groups is that one of them voted on DRE machines, and the other voted on paper. (Petition, ¶ 53).

Curiously, the drop off in votes for Lieutenant Governor on the malfunctioning DRE machines appears to have had a much greater negative impact upon Democratic Candidate Sara R. Amico than upon Defendant Duncan. On the DRE machines, Amico received only 94.8% of Democratic gubernatorial candidate Stacey Abrams' total, while Defendant Duncan received 98.5% of Republican gubernatorial candidate Brian Kemp's total. This shows a causal connection between the DRE use and lower *reported* participation rate among Democratic voters for Lieutenant Governor. (Petition, ¶ 54).

The anomalous voting pattern and totals described above, together with the known compromise of the vulnerable DRE system used in the election described in the Petition, are sufficient to make the election so defective as to the race for Lieutenant Governor as to place in doubt the result of the Contested Election. (Petition, ¶ 57). The Petition, which alleges all of these facts, clearly states a valid claim for relief under Georgia's election-contest statute, as well as federal claims

14

for prospective relief to prevent these harms from recurring. The motions to dismiss should be denied.

## III.   STANDARDS FOR MOTIONS TO DISMISS

The motions to dismiss are directed at two different kinds of claims—an election contest brought under O.C.G.A. § 21-2-520 to -529 (Count I); and two federal civil rights claims brought under 42 U.S.C. § 19083 (Counts II and III). Motions to dismiss for failure to state a claim are only permissibly directed at the latter.

### A.   Motions to Dismiss Are Not Permitted in Election Contests

To the extent the motion to dismiss for failure to state a claim are directed at the election contest claim, they are not permissible pleadings and should be rejected at the outset. "[A]n election contest is 'a special statutory proceeding[.]'" *Blackburn v. Hall*, 115 Ga. App. 235, 237 (1967). In special statutory proceedings, the "specific rules of practice and procedure" that are set out by the applicable statute control over conflicting provisions in the Civil Practice Act. O.C.G.A. § 9-11-81.

The Georgia Election Code provides for specific procedures to be followed once a contest petition is filed. O.C.G.A. § 21-2-524(f) states that "the defendant shall appear and answer such petition and may set up by way of answer or cross action any right of interest he or she may have or claim in such proceeding." O.C.G.A. § 21-2-524(g) goes on to state that "[a]fter filing, any petition, cross

15

action, or answer may be amended with leave of the court." The Election Code does not contemplate or authorize motions to dismiss for failure to state a claim as a response to a contest petition. The Code requires an answer and provides for no other pleadings because election contests would otherwise become unnecessarily bogged down with procedural motions and would be delayed in getting to the merits. If defenses to a contest claim exist, they must be presented on the day of the hearing, not through a mélange of pre-hearing motions to dismiss and cross-joinders.

### B.    Standard of Review

To the extent that this Court does decide to consider the arguments of the motions to dismiss for failure to state a claim (which it should only do with respect to the arguments directed at the federal claims), the standard for granting dismissal is high.

A motion to dismiss for failure to state a claim should *only* be granted where:

> (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought.

*Scouten v. Amerisave Mortg. Corp.,* 283 Ga. 72, 73 (2008) (quoting *Anderson v. Flake,* 267 Ga. 498, 501 (1997)).

16

Under this standard, all pleadings are to be construed most favorably to the nonmovant. *Scouten,* 283 Ga. at 73. "The main consideration of [a] motion to dismiss is whether, under the assumed set of facts, a right to some form of legal relief would exist." *Northway v. Allen,* 291 Ga. 227, 229 (2012) (quoting *Charles H. Wesley Educ. Found. v. State Election Bd.,* 282 Ga. 707, 714 (2007)). When the foregoing standard is applied, the motions to dismiss must be rejected as to all claims in the Petition.

## IV.   ARGUMENTS IN DEFENSE OF THE CONTEST CLAIM

The Defendants challenge the contest claim (Count I) on three main grounds. First, they say that the election-contest claim lacks allegations necessary to state a claim under the Election Code. Second, they insist that certain named parties—the Secretary and Fulton County—are not proper contest defendants and that a number of unnamed Georgia counties are necessary parties.[5] These argument arguments are without merit and should be rejected.

### A.   The Contest Claim Is Sufficiently Plead

The first main argument made against the contest claim is that Count I fails to state claim for relief. Gwinnett County, joined by the Secretary and Duncan, argues that Count I is deficient because Plaintiffs "have not alleged irregularities totaling anywhere close to the margin of victory...." (Gwinnett MTD, Pt. III;

---

[5] Defendants also contend that Plaintiff Coalition is not a proper party to Count I, the election contest claim. As explained in Part IV(D), below, this is correct; Plaintiff Coalition is, however, a proper plaintiff in the federal constitutional counts.

17

Crittenden Joinder; Duncan MTD & Joinder, at 2, ¶¶ 4(c), 6.)  Fulton County and

the Secretary makes the added assertion that a third-party hearsay statement in

Exhibit B to the Petition concedes the point.  (Fulton MTD, at 3; Crittenden MTD,

at 9–13, § III.)

These arguments must be rejected because Count I alleges facts sufficient to

demonstrate all the elements required for a statutory election-contest claim.

Nothing in the attachments to the Petition undermines these allegations, and the

Petition makes no use of any legal theories that are not already well-established to

be valid grounds for contesting a Georgia election.

### 1.    Grounds for a Contest

The grounds for a statutory election contest are enumerated at O.C.G.A.

§ 21-2-522.  These grounds include:

> (1) Misconduct, fraud, or irregularity by any primary or
> election official or officials sufficient to change or place
> in doubt the result;
>
> (2) When the defendant is ineligible for the nomination or
> office in dispute;
>
> (3) When illegal votes have been received or legal votes
> rejected at the polls sufficient to change or place in doubt
> the result;
>
> (4) For any error in counting the votes or declaring the
> result of the primary or election, if such error would
> change the result; or
>
> (5) For any other cause which shows that another was the
> person legally nominated, elected, or eligible to compete
> in a run-off primary or election.

18

O.C.G.A. § 21-2-522.

### 2.     Sufficient Grounds Are Alleged to State a Contest Claim

Defendants' motion on this basis should be rejected because they address the merits of this dispute – which will be the subject of hearing scheduled for January 17 – rather than addressing the sufficiency of Plaintiffs' allegations. The Petition alleges numerous facts that, when construed most favorably to Plaintiffs, plainly establish the existence of several of the statutory grounds for contesting the results of the Lieutenant Governor's race—namely the grounds set out in O.C.G.A. § 21-2-522(1), (*see, e.g.,* Petition, 32, ¶ 59  (alleging misconduct and irregularity)); § 21-2-522(3), (*see, e.g.,* Petition, 32, ¶ 61 (alleging legal votes rejected and illegal votes received); and 22–24, ¶¶ 40–43 (alleging defective and malfunctioning illegal electronic ballots)); § 21-2-522(4), (*see, e.g.,* Petition, 32–33, ¶ 62 (alleging errors in counting)); and § 21-2-522(5), (*see, e.g.,* Petition, 31, ¶ 57 (alleging defects so severe as to place in doubt the result of the Lieutenant Governor's race)).

These allegations easily are sufficient to withstand a motion to dismiss for failure to state a claim, even if such motions were available under the special election statute. The Secretary argues repeatedly that the Petition is asking the Court "to *assume*" that the results of the election should be placed in doubt. (Crittenden MTD, at 9, 12). The Petition does no such thing. Instead, like any other well-plead complaint, the Petition alleges facts which, if proven, establish

19

that the election "is so defective" "as to place in doubt" the result." O.C.G.A.
§ 21-2-527(d). If the Court determines that these allegations are supported by the
evidence, O.C.G.A. § 21-2-527(d) requires the Court to call for a second election.
If, on the other hand, Plaintiffs fail to prove these allegations, the Petition will fail
on the merits. This is not, however, the occasion for the Court to weigh the
evidence.

Significantly, the cases cited by Defendants followed evidentiary hearings in
which the contestants were allowed to present evidence to prove their case. *Mead
v. Sheffield,* 278 Ga. 268, 276 (2004); *Middleton v. Smith,* 273 Ga. 202 (2000). In
this case, therefore, Plaintiffs should be given the opportunity to prove their case in
an evidentiary hearing. In addition, Plaintiffs should be given the opportunity to
conduct discovery, as explained in further detail in Plaintiffs' pending Emergency
Motion for Inspection of Electronic Election Equipment and Production of
Documents, filed on November 29, 2018.

Defendants also contend that the Petition must be dismissed because there is
no proof that, absent the alleged irregularities, the result would have been different.
There are at least three fatal flaws with this argument. First, this argument is
contrary to the allegations, which must for present purposes be accepted as true.[6]
Second, this argument misreads the statute, which is carefully drafted to provide

---

[6] According to the Secretary of State's records, Duncan's certified vote total is only 123,172 greater than
Amico's total, but the drop-off in votes from the Governor's race to the Lieutenant Governor's race was
more than 159,000 votes.

for relief in two different situations: one in which the irregularity would be sufficient to "change" the result, the other where the irregularity would be sufficient to "place in doubt the result." Third, consistent with the statutory command that a new election be ordered when the irregularity is sufficient to "place in doubt the result," Georgia case law holds that, when it is not possible to determine how electors would have voted, absent the alleged misconduct or irregularities, the presumption of regularity does not defeat an election contest. *Stiles v. Earnest*, 252 Ga. 260, 261 (1984) (even without any proof of impact of irregularities upon vote tally, new referendum ordered: "[U]pon review of the record, we conclude that the illegality attendant upon the referendum is such as is 'sufficient to change or place·in doubt the result' thereof, OCGA § 21–2–522, (Code Ann. § 34–1703) and another referendum must be held.") *See also Mead v. Sheffield,* 278 Ga. 268 (2004) (reversing trial court's rejection of election challenge and ordering new election: "The fallacy in the trial court's analysis is demonstrated by the impossibility of determining how the 481 electors would have voted had they been supplied with proper ballots.").

Finally, the Gwinnett Board states: "Plaintiffs must show to a mathematical certainty that the outcome would be place in doubt. *Mead v. Sheffield,* 278 Ga. 268, 271 (2004)." *Mead* does not remotely so hold. Moreover, the Gwinnett Board does not explain how a non-quantifiable quality such as "doubt" can be reduced to "mathematical certainty." If the Gwinnett Board means that the

21

plaintiff in an election contest must prove what the tally would have been absent the irregularity, such a suggestion is directly contrary to the holdings in *Mead* and *Stiles,* cases in which the Georgia Supreme Court ordered new elections notwithstanding a total absence of proof, much less "mathematical certainty," as to what the tally would have been, absent the irregularities involved.[7]

## B.     The Contest Claim Names Proper Defendants

The second main argument made against the contest claim is that Count I improperly names some defendants (such as the Secretary and Fulton County), while improperly failing to name others (such as Georgia's other 156 counties or at least the 10 counties mentioned in an attachment to the Petition.)  These arguments should be rejected because Count I properly names the Secretary and Fulton County and because no other counties need to be named as defendants.

---

[7]Defendants contend that the Petition does not state a claim for relief because, in an attachment to the Petition, candidate for Lt. Governor Sarah R. Amico "has even admitted that even if all the irregularities alleged were true, they would not change the results of her election." (Gwinnett MTD at 5-6; *see also* Crittenden MTD at 13).  There are many mistakes in this argument.  First, Amico is not a plaintiff and her statements are therefore not "admissions" binding upon plaintiffs, who as voters have their own independent right to seek relief from an election marred by incorrect results.  Second, Amico was not referring to "all the irregularities alleged"; indeed, her letter did not even reference the Petition (and could not have done so, as it was written eleven days before the Petition was filed).  Third, Amico did not state that the irregularities "would not change the results of her election."  Instead, Amico, respectfully urging the Secretary to conduct an investigation, stated as follows:

> While the number of residual votes in the Lieutenant Governor's race is unlikely to affect the outcome of my race, more needs to be understood about the functioning of the DRE machines used on Election Day in 2018 to assure the voters of Georgia that their votes were not only duly cast, but fully counted.

Petition, Exhibit B, page 3.

22

### 1.     The Secretary of State Is A Proper Contest Defendant

The Secretary argues that she is not a proper party to an election contest—supposedly because the State of Georgia has not waived sovereign immunity in election contests. (Crittenden MTD, at 2–8, § I.)  This argument is wrong for several reasons.

### a)     The Election Code Contains At Least Three Waivers of Sovereign Immunity by the State in Contests

Contrary to the Secretary's argument, O.C.G.A. § 21-2-520(2) contains two separate waivers of sovereign immunity that make the Secretary of State a proper defendant in an election contest.  In addition, O.C.G.A. § 21-2-525(b) grants this Court plenary power over any election officer, which necessarily makes the Secretary amenable to this Court's jurisdiction and amounts to yet a third waiver of sovereign immunity.

### (1)     O.C.G.A. § 21-2-520(2)(C)

The Election Code provides a waiver of sovereign immunity that permits the Secretary's office to be a party to an election contest by defining "Defendant" as follows:

> "Defendant" means: …. (C) The election superintendent or superintendents who conducted the contested primary or election….

O.C.G.A. § 21-2-520(2)(C).

The definition of "superintendent" at O.C.G.A. § 21-2-2(35) gives a meaning that does not include the Secretary.  The definition of "election

23

superintendent" at O.C.G.A. § 21-4-3(3)(A), involving recall elections, however, states that, "'Election superintendent' means: (A) In the case of any elected state officers, the Secretary of State. ..." *Id.* The question becomes: in a state-wide race, who is the "election superintendent"—is it each of the 159 county "superintendents," as the Secretary contends, or is the term "election superintendent" meant to include the Secretary herself?

Statutory construction tells us that the latter answer must be correct. An "election superintendent" must be construed to be something more than a "superintendent" because Georgia courts "avoid a construction that makes some language mere surplusage." *Slakman v. Cont'l Cas. Co.*, 277 Ga. 189, 191 (2003). The meaning of the term "election superintendent" has an extra word and thus must mean something different than does the defined term "superintendent," used by itself. The term "election superintendent" expressly includes the Secretary. O.C.G.A. § 21-4-3(3)(A).

The definition of "election superintendent" at O.C.G.A. § 21-4-3 is included in a list of definitions that defines terms "as used in [Chapter 4]," whereas the definition of "superintendent" is defined in Chapter 2. However, there is no reason to conclude that the phrase "election superintendent," when used in Chapter 2 (where it is not separately defined), should have a different meaning than it does in Chapter 4 (where it is defined). The Secretary herself cites to statutory provisions outside Chapter 2 in support of her arguments, stating correctly that "statutes

24

relating to the same subject matter, must be construed together." As the Secretary correctly notes: "courts must 'presume that the General Assembly meant what it said and said what it meant.' *Deal v. Coleman,* 294 Ga. 170, 172 (2013)." (Secretary's Brief at 5). The problem with the Secretary's argument is that she ignores Chapter 4's dispositive definition of "election superintendent" in state-wide races while presuming that "superintendent" means the same thing as "election superintendent." Because an "election superintendent" is a proper defendant under O.C.G.A. § 21-2-520(2)(C), the proper meaning of that term is the meaning given in the only place where it is actually defined—in O.C.G.A. § 21-4-3(3)(A).

Since this case involves a contest over "elected state officers," namely the Lieutenant Governor, the Secretary is a proper defendant in this state-wide election contest because she is the "election superintendent . . . who conducted the election in question." O.C.G.A. § 21-2-520(2)(C). The General Assembly chose language for the definitional section of the contest statute that expressly waives the Secretary's sovereign immunity. That section uses the term "election superintendent" and imports its meaning from O.C.G.A. § 21-4-3(3)(A). The Secretary is a proper defendant in a state-wide election contest.

This plain reading of the statute simply confirms what common sense demands: of course the Secretary is the proper defendant in a state-wide election, for no other officer or entity is responsible for the conduct of a state-wide election

25

and certifies the results. The Secretary's suggestion that all 159 counties must be joined reveals the absurdity of her position.

### (2)    O.C.G.A. § 21-2-520(2)(D)

The Election Code provides a second waiver of sovereign immunity that permits the Secretary's office to be a party to an election contest by defining "Defendant" as follows:

> "Defendant" means: .... (D) The public officer who formally declared the number of votes for and against any question submitted to electors at an election.

O.C.G.A. § 21-2-520(2)(D).

O.C.G.A. § 21-2-2(31) defines a "question" as any "a brief statement of such constitutional amendment, charter amendment, or *other proposition as shall be submitted to a popular vote at any election.*" (emphasis added). An election between candidates qualifies as an "other proposition submitted to a popular vote at *any election.*" (emphasis added). The General Assembly deliberately left this phase broad to allow all elections in which the Secretary certifies the result to fall within its purview. Any other interpretation would allow Georgia's Chief Elections Officer to escape election-contest cases for which she tabulated and certified the results, even though the Secretary's fulfilment of her duties is necessary to afford complete relief.

In this case, the Secretary was the public officer who formally declared the number of votes for and against the respective candidates in the Lieutenant

26

Governor's election. Thus, O.C.G.A. § 21-2-520(2)(D) dictates that she is a proper and necessary party to this action, which is why the General Assembly waived sovereign immunity in election contests such as this one.

It makes no sense for the Secretary of State to suggest that she is not a proper party to a state-wide election contest.  Should a new election be ordered, it would be the Secretary's office that would prepare the ballots, the election forms and the materials; it would be the Secretary's office that would prepare the tabulation programs for each county; it would be the Secretary's office that would maintain the voter registration lists; it would be the Secretary's office that would enforce the state election rules, and it would be the Secretary's office that would tabulate and certify the results of the new election. Indeed, in any multiple-county election, such as this state-wide race, it is the Secretary's office that counts, tabulates, and certifies the election. If the Secretary's views of her own immunity from suit in a contest were correct, then candidates would have no avenue to remedy an administrative electoral mistake or tabulation error made by the Secretary herself or by her own office, which is delegated the most critical functions of an election, for no other election officer would be at fault. It is inconceivable that the General Assembly intended the people of Georgia to have no remedy in case of such an occurrence.  The Secretary is clearly a necessary party should a new election be required to take place, and she is thus also a proper party to this action.

27

### (3) This Court Has "Plenary Power" Over Any Person, Including the Secretary, in a State-wide Contest

Yet a third waiver of sovereign immunity lies in the contest statute's provision giving this Court "plenary power, throughout the area in which the contested primary or election was conducted, to make, issue, and enforce all necessary orders, rules, processes, and decrees for a full and proper understanding and final determination and enforcement of the decision of every such case." O.C.G.A. § 21-2-525(b). This plenary power expressly includes "authority to subpoena and compel the attendance of any officer of the primary or election complained of and of any person capable of testifying concerning the same." *Id.*

The phrase "any officer of the primary or election complained of" plainly encompasses the Secretary of State, who certifies all state-wide election results and is therefore an officer of state-wide elections under any reasonable interpretation. The sweeping language of O.C.G.A. § 21-2-525(b) giving this Court plenary power over the Secretary of State "throughout the area in which the contested primary or election was conducted" cannot be construed as anything other than a waiver of sovereign immunity by the State. Under this statutory waiver of immunity, this Court is expressly empowered "to make, issue, and enforce all necessary orders, rules, processes, and decrees for a full and proper understanding and final determination and enforcement of the decision of every such case." O.C.G.A. § 21-2-525(b). In the face of this language, the Secretary cannot

28

plausibly claim to be immune from involvement in election contests for state-wide offices.

### b) The Election Code Requires the Secretary to Be Served in Election Contests.

The foregoing three waivers of sovereign immunity are further buttressed by O.C.G.A. § 21-2-524(b)'s provision for the State Election Board to be served—via its chairperson, who is the Secretary of State—with any petition filed under the statute, using the same service methods required for named parties. Although this provision is not itself an express waiver of sovereign immunity, it plainly amounts to a recognition of the State Election Board's (and the Secretary's) interest in all election contest proceedings and supports a construction of the remainder of the statute as containing express waivers by the State of its sovereign immunity.

### c) The Secretary Has Historically Not Asserted Sovereign Immunity in State-wide Election Contests

That the Legislature has waived the Secretary's sovereign immunity for state-wide election contests is further confirmed by a review of *Mead v. Sheffield* 278 Ga. 268 (2004), the only reported state-wide election contest case. The case reached the Supreme Court, and the trial court papers are attached hereto as Exhibit A. Howard Mead, a candidate for the Court of Appeals, filed his election contest against Secretary of State Cathy Cox and other named defendants in the Superior Court of Cobb County. (Exhibit A, "Bates" page 5). The Secretary, as a defendant, filed an answer and in so doing did not claim that the Secretary was not

29

a proper defendant to a state-wide election contest, did not raise the defense of sovereign immunity, and did not make the argument that all 159 counties had to be added as party defendants.  (Exhibit A, page 94 et seq.).  Instead, the Secretary in *Mead* did what the Secretary should do in this case: she appeared and defended—on the merits—the results of the state-wide election that she certified.  (Other important aspects of the *Mead* case are discussed below).

In conclusion, the Secretary is a proper defendant in this case and does not benefit from sovereign immunity in state-wide election contests.  The Secretary and other Defendants' arguments to the contrary should be rejected.

## 2. All of Georgia's 159 Counties Are Not Necessary Parties

Next, Gwinnett County, joined by the Secretary and Duncan, argues that this Court lacks jurisdiction because the Plaintiffs have failed to join necessary parties—namely, "all of the 159 election superintendents that would hold the new election." (Gwinnett MTD, Pt. II; Crittenden Joinder; Duncan MTD & Joinder, at 2, ¶¶ 4(b), 5–6.)  Fulton County independently makes this same argument, referencing O.C.G.A. § 9-11-19 and joins in the Secretary's argument on the issue. (Fulton MTD, § II.D.)

These arguments are wrong for two reasons.  First, Defendants cite to no provision of the contest statute that requires all 159 counties of Georgia to be named as necessary parties.  Nor could the statute contain such a requirement, for it would be wildly impractical, if not impossible, for contestants of state-wide races

30

to effect service on 159 counties within the extremely tight time limits provided by O.C.G.A. § 21-2-524(a).

Far from there being cases or statutory language requiring the naming and service of all 159 counties in a state-wide contest for the claim to be valid, in fact, Georgia cases recognize that defendants can be added to an election contest by amendment if they turn out to be truly necessary. *Hanson v. Wilson*, 257 Ga. 5, 6–7 (1987) (citing *Smith v. Merchs. & Farmers Bank*, 226 Ga. 715, 718 (1970) ("the failure to name the proper parties is an amendable defect, correctable by the parties or upon the court's own motion")); *Brodie v. Champion*, 281 Ga. 105, 107-8 (2006) (ruling that it was unnecessary to decide whether the elections board should have been specifically named because "[i]n an election contest, 'the failure to name the proper parties is an amendable defect, correctable by the parties or upon the court's own motion'"). Indeed, *Hanson* established that, in election contests, substantial compliance with the contest statute is sufficient to satisfy the statute's requirements. 257 Ga. at 6–7 ("While such service, if perfected, again does not meet the technical requirements of the statute, we cannot say that Hanson has not substantially complied with its requisites[.]").

Because substantial compliance with the contest statute is all that is required, the defendants that are enumerated by O.C.G.A. § 21-2-520(2) are simply not indispensable parties. Amendments to add parties are allowed and the Georgia Election Code "does not address, much less expressly limit, the addition of

31

parties." *Flaherty v. Poythress*, 263 Ga. 178, 181 (1993) (Sears, J., dissenting). The Georgia Civil Practice Act provides an independent basis for permitting the addition of parties in election-contest proceedings. *See* O.C.G.A. § 9-11-81 ("[CPA] provisions . . . [for] joinder of parties and causes . . . shall apply to all [special statutory] proceedings").

Finally, the provision of O.C.G.A. § 21-2-525(b) that gives this Court "plenary power, throughout the area in which the contested primary or election was conducted" contemplates that persons not named as defendants will nonetheless be subject to the jurisdiction and authority of this Court when it hears a state-wide contest claim. The Court has power under O.C.G.A. § 21-2-525(b) to "make, issue, and enforce all necessary orders, rules, processes, and decrees for a full and proper understanding and final determination and enforcement of the decision of every such case[.]" This power includes "authority to subpoena and compel the attendance of any officer of the primary or election complained of and of any person capable of testifying concerning the same[.]" *Id.* In view of these statutory provisions, any election officer in any county in Georgia is within the power of this Court, whether named as a defendant or not. There is no person in the State who is a necessary party, because all persons in the State are subject to the plenary power of this Court. Anyone who needs to be present can be required to attend. Thus there is no need for other counties to be made defendants.

32

### 3.   Amico's Ten Notable Counties Are Not Necessary Parties

Next, the Secretary independently argues that this Court lacks jurisdiction because the Plaintiffs have failed to join a *different* (and smaller subset) of necessary parties—namely, "election superintendents from any of the ten counties that appear, in Plaintiffs' eyes, to be the primary source of the 'residual vote' question at issue in this lawsuit." (Crittenden MTD, at 13 & 13–14, § IV.) Duncan joins this argument.  (Duncan MTD & Joinder, at 2, ¶ 5.)

Exhibit B to the Petition is a letter from Sarah Amico to the Secretary raising concerns about the unusual pattern of missing DRE votes in the Lieutenant Governor's race.  The "ten counties" that the Secretary fixates upon were only noted in Amico's letter because they had "a residual rate for Lieutenant Governor well over 10 percent."  (Pet. Ex. B, at 2.)  In other words, these were not the *only* relevant counties, or even the *most* relevant counties.  Rather, they were simply counties that had particularly high percentages of missing DRE votes.

For all the same reasons identified in the preceding section, none of these counties need to be named as defendant because they are all already subject to the plenary power of this Court in this case.  To the extent their attendance is required "for a full and proper understanding and final determination and enforcement of the decision" of the case, this Court already has the power to obtain their attendance.  The claim that these counties are necessary parties should be rejected.

33

### 4.   Fulton County Is A Proper Contest Defendant

Finally, Fulton County argues that it should *not* be named as a defendant in the contest claim because it lacks authority to "determine the voting system used in Georgia" and thus "cannot provide Petitioners with the relief they seek." (Fulton MTD, at 3.)  Initially, Fulton County does have the authority to determine the voting system used *in Fulton County*.[8]  Fulton County does not cite to any law for the proposition that it must be capable of providing complete relief for it to be a proper defendant, or any other legal basis for this argument.  Fulton County is a proper defendant.

### C.   Service of Process

Fulton County and the Secretary argue that the dismissal should be granted because they have not been served.  This argument is now moot: the Secretary was served on December 18, 2018, and again on December 26, 2018,[9] and Fulton County was served on December 26, 2018, more than two weeks before the hearing, as reflected in the as-filed Affidavits of Service (copies attached hereto as Exhibit B).

---

[8] There is nothing in Georgia statutory law that requires counties to use DREs generally (particularly not defective DREs), and the counties are specifically authorized to use paper ballots and optical scanners.  O.C.G.A. §§ 21-2-383(b), 21-2-366.

[9] The Secretary was served twice because the Fulton County Sheriff inexplicably waited from December 18, 2018 to January 3, 2019 to file the Affidavit of Service.  Though Plaintiffs' counsel had been informed verbally by the Sheriff that the Secretary had been served on December 18, given the failure of the Sheriff to file the Affidavit of such service, and in an abundance of caution, Plaintiffs engaged a private process server to perfect service, and she did so on December 26, 2018.

34

The suggestion that Plaintiffs have not acted diligently with respect to the issuance and service of the special summons is frivolous. Most important, all defendants had actual notice of the contest in November and were formally and properly served with process *more than two weeks prior* to the hearing on the motion to dismiss. In the case relied upon by Fulton County, *Swain v. Thompson,* 281 Ga. 30, 31 (2006), that contest petition was dismissed because the defendant still had not been properly served with the special summons by the day of the hearing on the defendant's motion to dismiss for failure to perfect service. Defendants do not cite to any authority,[10] and Plaintiffs are not aware of any authority, that would authorize the dismissal of the complaint on the facts of this case based upon the adequacy or timeliness of service.

### D.     Coalition for Good Governance Is A Permitted Plaintiff in Federal Constitutional Claims, Not Election Contest

The third main argument made against the contest claim is that the Coalition for Good Governance cannot serve as a party plaintiff with respect to Count I, the Election Contest claim. This is correct; the Coalition is a proper plaintiff with respect to the federal constitutional claims in Count II and III, and Defendants do not contend otherwise. The other plaintiffs, as "electors" under the statute, are

---

[10] The weakness of Fulton County's argument is betrayed by its citation to *Day v. Savage,* 213 Ga. App. 792 (1994). In *Day,* the plaintiff did not serve the complaint *for nine months* and the trial court still did not dismiss the case. The trial court instead gave the plaintiff another thirty days to perfect service. After the plaintiff again failed to perfect service, the trial court dismissed the case and the Court of Appeals affirmed.

35

proper plaintiffs in the Election Contest claim, *see* O.C.G.A. § 21-2-521, and Defendants do not contend otherwise.

## V.   ARGUMENTS IN DEFENSE OF THE § 1983 CLAIMS

The Defendants also seek dismissal of the two federal claims brought under 42 U.S.C. § 1983.  Their arguments for dismissal should be rejected because the two federal claims are not barred by the Eleventh Amendment, state valid claims for relief under § 1983, and properly name Gwinnett County as a Defendant. Plaintiffs note that all of these arguments were recently rejected by the United States District Court in a detailed opinion by Judge Totenberg in *Curling v. Kemp*, a copy of which has been attached hereto as Exhibit C.  In her opinion, Judge Totenberg held that the plaintiffs in that case were substantially likely to prevail on substantially identical federal constitutional claims.

### A.   The Eleventh Amendment Does Not Bar the § 1983 Claims

The Secretary, joined by Duncan, argues that the Eleventh Amendment bars Plaintiffs' federal claims since those claims are supposedly claims for retrospective relief, rather than claims for prospective relief. (Crittenden MTD, at 15–16, § V; Duncan MTD & Joinder, at 2, ¶¶ 4(d), 5.)  But these Defendants have clearly misread the § 1983 claims in Counts II and III.  Both of Plaintiffs' federal claims expressly seek *prospective* injunctive relief, not retrospective relief (such as damages) for prior constitutional violations.

36

The plain language of Counts II and III specifically requests relief in the form of "an order enjoining the Defendant[s] to permit the individual Plaintiffs to exercise their right to vote in a new election for Lieutenant Governor conducted by means other than DRE voting machines and free from the foregoing violations." (Petition, 35–36, ¶¶ 71–72 (Count II); at 37–38, ¶¶ 75–76 (Count III).)

The Secretary concedes that, "an exception to Eleventh Amendment immunity exists under *Ex Parte Young* ... for *prospective* injunctive relief." (Crittenden MTD, at 16 (emphasis in original).) Plaintiffs' federal claims plainly seek exactly the kind of relief that *Ex Parte Young* allows—an *injunction* requiring the Defendants to engage in *future* conduct that conforms to the requirements of the U.S. Constitution. It is not a valid basis for asserting immunity to object, as the Secretary does, that Plaintiffs are challenging the "unconstitutional manner in which the November 6, 2018 general election *was* held." (Crittenden MTD, at 16 (emphasis in original).) The Defendants' focus on allegations of past conduct is misplaced. Past conduct is alleged to show the threat of future injury—and making such allegations of past conduct is entirely proper in a claim for prospective relief because "[p]ast wrongs ... constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of

37

an injunction." *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984).  For all of these reasons, the Eleventh Amendment does not bar Plaintiffs' § 1983 claims.[11]

## B.    The Complaint States Valid Claims Under § 1983

Defendants raise a variety of meritless objections to the pleading sufficiency of Counts II and III—the federal claims brought under 42 U.S.C. § 1983.  All of the Defendants' arguments why the § 1983 claims are supposedly deficient should be rejected for reasons that follow

### 1.    Required Elements and Corresponding Allegations

The Petition properly alleges facts sufficient to demonstrate the elements of federal constitutional claims for prospective injunctive relief from threatened violations of the fundamental right to vote and the right to equal protection.

#### a)    Fundamental Right to Vote

To state a fundamental-right-to-vote claim under § 1983, the Plaintiffs need only allege that the challenged conduct burdens the right to vote. Then, "a court evaluating a constitutional challenge to an election regulation weigh[s] the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.'"  *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 190 (2008); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353–54 (11th  Cir. 2009) (applying *Crawford*).

---

[11] The Secretary and Fulton County made this identical Eleventh Amendment argument in federal court, and were soundly rejected. *See Curling, et al. v. Kemp, et al.*, No. 17-cv-02989 (N.D. Ga., Sept. 17, 2018) at 29 (attached hereto as Exhibit C) (citing *Ex Parte Young*, 209 U.S. 123 (1908), rejecting Secretary's Eleventh Amendment arguments as "meritless").

38

"However slight that burden may appear, … it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191. A private cause of action under 42 U.S.C. § 1983 exists if the violation will occur "under color of state law."

There is simply no basis for Defendants to claim that the required elements of a fundamental-right-to-vote claim are not alleged in the Petition. Count II of the Petition contains all the required elements of a § 1983 claim. (Petition, 34–36, ¶¶ 66–72.) Construed most favorably to the Plaintiffs, Count II's allegations are plainly sufficient to state a *prima facie* fundamental-right-to-vote claim under § 1983.

### b)   Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a claim, the Coalition Plaintiffs "must establish that they are being treated differently than a similarly situated comparator." *Crystal Dunes Owners Ass'n v. City of Destin*, 476 Fed. Appx. 180, 185 (11th Cir. 2012). "[T]o be considered 'similarly situated,' comparators must be prima facie identical in all relevant respects." *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006). A

39

cause of action exists if the violation will occur "under color of state law." 42 U.S.C. § 1983.

All the elements of a valid equal-protection claim are alleged in the Petition. Count II of the Petition contains all the required elements of a § 1983 claim. (Petition, 36–38, ¶¶ 73–76.)  Construed most favorably to the Plaintiffs, Count III's allegations are plainly sufficient to state a *prima facie* equal-protection claim under § 1983.

### 2.    Objections to the Due-Process Claim Are Meritless

The Secretary, joined by Duncan, argues that Plaintiffs fail to state a valid due-process claim because *Favorito.v. Handel*, 285 Ga. 795, 797–98 (2009), and *Wexler v. Anderson*, 452 F.3d 1226, 1233 (11th Cir. 2006), supposedly stand for the proposition that DRE voting machines are constitutional as a general matter and because strict scrutiny does not apply.  (Crittenden MTD, at 16–18, § VI; Duncan MTD & Joinder, at 2, ¶¶ 4(e), 5.)  Fulton County joins in this argument and also argues that the fundamental rights to vote and to equal protection are not protected against burdens and infringements that result from malfunctions and irregularities.  (Fulton MTD, §§ II.C, II.D.)  These arguments must be rejected for the following reasons.

First, Defendants misrepresent *Favorito* and *Wexler* as unqualified blessings of the constitutionality of DREs as a general matter.  This is not accurate.  In *Favorito*, the Georgia Supreme Court addressed a general challenge to an entirely

40

different, outdated configuration of Georgia's 2006-era, now irrelevant DRE voting system. *See Favorito*, 285 Ga. at 795. *Favorito* also involved none of the factual allegations of actual, observed security breaches and operating errors that are present in this case. This case, by contrast, does not challenge the constitutionality of DREs in general, but rather challenges only *this* DRE voting system, under the particular factual circumstances alleged in *this* case. *Favorito* is inapposite on the facts.

Similarly, in *Wexler* the 11th Circuit considered a general challenge to DRE machines, but without any allegations that the DREs there had specific vulnerabilities to attack or had been compromised by particular instances of unauthorized access to the voting system—allegations that are present in this case. Instead, the plaintiffs' more generic theory in *Wexler* was that "by certifying touchscreen voting systems that are incapable of providing for the type of manual recounts contemplated by Florida law, the defendants have violated the equal protection and due process rights of voters in touchscreen counties." *Wexler*, 452 F.3d at 1226. In rejecting that claim, the Eleventh Circuit was careful to note that the kinds of allegations that the Plaintiffs make in this case—that voters using touchscreen systems might be less likely to cast an "effective vote" than voters using paper ballots—*would* have stated an equal protection violation. *Id.* at 1231. The Petition in this case makes exactly such allegations. (Petition, 35, ¶ 68 (Count II); at 37, ¶ 74 (Count III).) The Defendants' reliance upon *Favorito* and *Wexler* is

41

thus unavailing. *See also Curling, et al. v. Kemp, et al.,* at 39-40 (No. 17-cv-02989, N.D. Ga., Sept. 17, 2018) (attached hereto as Exhibit C) (distinguishing *Wexler,* holding that Plaintiffs challenging State's use of DRE machines established likelihood of success on the merits of due process and equal protection claims).

Second, by asking this Court to dismiss the fundamental-right-to-vote claim simply because strict scrutiny supposedly does not apply, the Defendants call improperly upon this Court to resolve, at the pleading stage, the merits question of whether the alleged violation is permissible or prohibited. But applying the "flexible standard" that courts use to evaluate whether election regulations violate the Due Process and Equal Protection Clauses is a merits determination. Under this standard, "a court must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." *Common Cause/Georgia v. Billups,* 554 F.3d 1340, 1352 (11th Cir. 2009) (quoting *Crawford,* 553 U.S. at 190). Such determinations are reserved for a later stage of proceedings than the motions-to-dismiss stage.

Third, Fulton County is simply wrong that there exists some sort of exception to the Constitution that permits the violation of fundamental rights as long as the violations are due to nothing more than "malfunctions and irregularities" in an election system. But even if there were such an exception, the

42

kind of mere random malfunctions and irregularities that Fulton County alludes to are emphatically *not* the kinds of defects that have been alleged in the Petition in this case. On the contrary, the Petition alleges—in great detail—that Georgia's DRE system currently suffers from very serious, very fundamental, systemic security compromises, unauthorized access, and ongoing security vulnerabilities, the specifics and wide-ranging impacts of which will be demonstrated at trial. These alleged deficiencies make Georgia's DRE hardware and software utterly untrustworthy and unreliable for use in conducting public elections. (Petition, 13–21, ¶¶ 24–35.)

The fundamental-right-to-vote claim is sufficiently plead, and all of Defendants' objections to Count II should be rejected.

### 3.    Objections to the Equal-Protection Claim Are Meritless

The Secretary, joined by Duncan, also argues that Plaintiffs fail to state a valid due-process claim because both "intentional discrimination" and a "recognizable distinct class [that] is singled out for different treatment" are required to be alleged. (Crittenden MTD, at 18–20, § VII; Duncan MTD & Joinder, at 2, ¶ 5.) These arguments are false. No intent to discriminate is required for an equal-protection violation where the equal-protection violation arises from application of a rule that "discriminates on its face." *See E & T Realty v. Strickland*, 830 F.2d 1107, 1112–13 (11th Cir. 1987) (comparing the "three broad categories" of equal protection claims). Here, a state election regulation that the

43

Defendants will administer—SEB Rule 183–1–12–.01— is just such a rule, which discriminates on its face between two (recognizable and distinct) classes of people—namely, voters who vote in person (who are required to use DREs) and voters who vote absentee by mail (who are not required to use DREs).

The equal-protection claim is sufficiently plead, and all of Defendants' objections to Count III should be rejected.

### C.    Gwinnett County Is A Proper Defendant to the § 1983 Claims

Finally, Gwinnett County asserts that the § 1983 claims in Counts II and III should be dismissed as against Gwinnett County, in particular, because Plaintiffs' claims "apparently focus on administration of a new election." (Gwinnett MTD, at 6.)  Gwinnett County offers no authority and no explanation for why a claim that has an "apparent focus" on election "administration" should mean that the County is not a proper party.  It is within Gwinnett County's authority to stop violating Plaintiffs' constitutional rights by deciding to use a paper ballot system, *see supra* note 8, and its threatened continued use of the DRE system is actionable under the § 1983.

44

## VI.   CONCLUSION

All pending motions to dismiss should be denied.

Respectfully submitted this 6th day of January, 2019.

/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com
Bruce P. Brown Law LLC
1123 Zonolite Rd. NE, Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*Attorney for Plaintiffs*

45

## **CERTIFICATE OF SERVICE**

I have this day served a copy of the foregoing via the Court's e-filing system to the attorneys of record who have made appearances.

This 6th day of January, 2019.

/s/Bruce P. Brown
Bruce P. Brown

46

EXHIBIT

A



**HAROLD D. MELTON, CHIEF JUSTICE**
**DAVID E. NAHMIAS, PRESIDING JUSTICE**
**ROBERT BENHAM**
**CAROL W. HUNSTEIN**
**KEITH R. BLACKWELL**
**MICHAEL P. BOGGS**
**NELS S.D. PETERSON**
**SARAH HAWKINS WARREN**
**CHARLES J. BETHEL**
  **JUSTICES**

*Supreme Court*
*State of Georgia*
STATE JUDICIAL BUILDING
*Atlanta 30334*

**THÉRÈSE S. BARNES, CLERK/COURT EXECUTIVE**
**JEAN RUSKELL, REPORTER**

## SUPREME COURT OF THE STATE OF GEORGIA
CLERK'S OFFICE, ATLANTA

December 31, 2018

I, Therese "Tee" Barnes, Clerk, of the Supreme Court of Georgia, do hereby certify that the foregoing PAGES, hereto attached, is a true and correct copy, in the Supreme Court of Georgia Case No. **S04A1982, HOWARD MEAD V. MIKE SHEFFIELD et al.**, as appears from the records and files in this office.



Witness my signature and seal of the said court hereto affixed the day and year first above written.

*Thirese S Barnes* , Clerk

HOWARD HEAD                                    *        COBB SUPERIOR COURT

APPELLANT                                      *

VS                                             *
                                               *
MIKE SHEFFIELD, DEBRA BERNES,                  *
HELEN W. HARPER, in her official               *
capacity as Lawrens County
Probate Judge, and CATHY COX in                *
her official capacity as Secretary             *
of State and as Chairperson of the
State Election Board, WILLIAM                  *
ASHLEY HAWKINS, THOMAS C. RAWLINGS,
and LEE ELIZABETH TARTE WALLACE,               *
Other Candidates for the Office of
Judge of the Court of Appeals                  *

APPELLEE                                       *        CIVIL ACTION NO. 04-1-6082-18

## I N D E X

|                                                                                          | PAGE   |
|------------------------------------------------------------------------------------------|--------|
| 1. NOTICE OF APPEAL, Filed August 9, 2004.........................                       | 1 - 3  |
| 2. SUMMONS/PETITION TO CONTEST ELECTION, Filed July 30, 2004...................................... | 4 - 18 |

|  |  | **PAGE** |
|---|---|---|
| 3. | DISCLOSURE STATEMENT, Filed July 30, 2004 | - 19 |
| 4. | GENERAL CIVIL CASE FILING INFORMATION FORM (Non-Domestic), Filed July 30, 2004 | - 20 |
| 5. | CERTIFICATE OF SERVICE ON STATE ELECTIONS BOARD, Filed August 2, 2004 | - 21 |
| 6. | ORDER RULE NISI, Filed August 2, 2004 | 22 - 23 |
| 7. | AFFIDAVIT OF ATTEMPTED SERVICE, for Lee Elizabeth Tarte Wallace, Filed August 3, 2004 (a) Attachment | 24 - 26 |
| 8. | AFFIDAVIT OF SERVICE, for Debra Barnes, Filed August 3, 2004 | 27 - 28 |
| 9. | AFFIDAVIT OF SERVICE, for Mike Sheffield by serving Susan Sheffield, wife, Filed August 3, 2004 | 29 - 30 |
| 10. | ANSWER OF THOMAS C. RAWLINGS, RESPONDENT/CANDIDATE, Filed August 3, 2004 | 31 - 33 |
| 11. | ORDER APPOINTING JUDGE, Filed August 3, 2004 | - 34 |
| 12. | ACKNOWLEDGMENT OF SERVICE OF PROCESS, Filed August 4, 2004 | - 35 |
| 13. | ACKNOWLEDGMENT OF SERVICE OF PROCESS, Filed August 4, 2004 | - 36 |
| 14. | ACKNOWLEDGMENT OF SERVICE OF PROCESS, Filed August 4, 2004 | - 37 |

|  | PAGE |
|---|---|
| 15. ACKNOWLEDGMENT OF SERVICE OF PROCESS, Filed August 4, 2004......................................... | - 38 |
| 16. ANSWER OF WILLIAM ASHLEY HAWKINS ONE OF THE "OTHER CANDIDATES FOR THE OFFICE OF JUDGE OF THE COURT OF APPEAL" -RESPONDENT, Filed August 4, 2004...................................... | 39 - 43 |
| 17. ANSWER OF THOMAS C. RAWLINGS, RESPONDENT/ CANDIDATE, Filed August 4, 2004..................... | 44 - 46 |
| 18. AFFIDAVIT OF SERVER, Filed August 5, 2004.................... (a) Attachment | 47 - 48 |
| 19. AFFIDAVIT OF SERVER, Filed August 5, 2004.................... (a) Attachment | 49 - 50 |
| 20. AFFIDAVIT OF SERVER, Filed August 5, 2004.................... (a) Attachment | 51 - 52 |
| 21. AFFIDAVIT OF SERVER, Filed August 5, 2004.................... (a) Attachment | 53 - 54 |
| 22. AFFIDAVIT OF SERVER, Filed August 5, 2004.................... (a) Attachment | 55 - 56 |
| 23. AFFIDAVIT OF SERVER, Filed August 5, 2004.................... (a) Attachment | 57 - 58 |
| 24. ENTRY OF APPEARANCE, Filed August 5, 2004.................... | 59 - 60 |
| 25. DEFENDANT DEBRA BERNES' RESPONSE, ANSWER AND DEFENSES TO CONTESTANT/PETITIONER'S PETITION TO CONTEST ELECTION, Filed August 5, 2004............................................. | 61 - 75 |

                                                              **PAGE**

26. REQUEST TO INSTALL RECORDING AND/OR PHOTO-
    GRAPHING EQUIPMENT PURSUANT TO RULES AND
    GUIDELINES FOR ELECTRONIC AND PHOTOGRAPHIC
    NEWS COVERAGE OF JUDICIAL PROCEEDINGS/APPR-
    OVED, Filed August 6, 2004....................................   76 - 77

27. REQUEST TO INSTALL RECORDING AND/OR PHOTO-
    GRAPHING EQUIPMENT PURSUANT TO RULES AND
    GUIDELINES FOR ELECTRONIC AND PHOTOGRAPHIC
    NEWS COVERAGE OF JUDICIAL PROCEEDINGS/APPRO-
    VED, Filed August 6, 2004....................................   78 - 79

28. DEFENSES AND ANSWER OF DEFENDANT MIKE
    SHEFFIELD, Filed August 6, 2004.............................   80 - 93

29. RESPONSE AND ANSWER OF SECRETARY OF STATE,
    Filed August 6, 2004........................................   94 - 103

30. MOTION TO DISMISS OR TRANSFER, Filed August
    6, 2004.....................................................  104 - 106

31. EVIDENCE LIST, filed by Defendant, Filed
    August 6, 2004..............................................    - 107

32. EVIDENCE LIST, filed by Plaintiff, Filed
    August 6, 2004..............................................    - 108

33. BENCH BRIEF REGARDING INADMISSIBILITY OF
    PAROL EVIDENCE, Filed August 6, 2004........................  109 - 113

34. ORDER, Dismissing case, Filed August 6,
    2004........................................................  114 - 117

Filed In Office Jul-30-2004 11:48:45
IDN 2004-0893396-CV
Page 1

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

Jay C. Stephenson
Clerk of Superior Court Cobb County

HOWARD MEAD,

    Contestant/Petitioner,

v.

MIKE SHEFFIELD, DEBRA BERNES, HELEN W.
HARPER in her official capacity as Laurens
County Probate Judge, and CATHY COX in
her official capacity as Secretary of State and
as chairperson of the State Election Board,

    Defendants,

and

WILLIAM ASHLEY HAWKINS, THOMAS C.
RAWLINGS, and LEE ELIZABETH TARTE
WALLACE,

    Other Candidates for the Office of
    Judge of the Court of Appeals.

Civil Action File
No. 04-1-6083-19

## SUMMONS

**TO THE ABOVE NAMED DEFENDANTS AND ALL OTHER CANDIDATES FOR THE OFFICE OF JUDGE OF THE COURT OF APPEALS:**

    You are hereby summoned and required to file with the Clerk of said court and serve upon the Contestant/Petitioner's attorney, whose name and address is:

        **Charles W. Byrd, Esq.**
        **909 Ball Street**
        **P.O. Box 1770**
        **Perry, Georgia 31069**

an answer to the Petition to Contest Election, which herewith is served upon you, no later than August 6, 2004, or 5 days after this Summons and Petition to Contest Election is served upon you, whichever is later. If you fail to do so, judgment by default may be taken for the relief demanded in the Petition to Contest Election.

This ___30___ day of ___July___, 2004.

        Clerk of the Superior Court of Cobb County

By: _____
                Clerk

**000004**

ORIGINAL

Filed in Office Jul-30-2004 11:41:45
IDN 2004-0093393-CV
Page 1

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

Jay C. Stephenson
Clerk of Superior Court Cobb County

HOWARD MEAD,

    Contestant/Petitioner,

v.

MIKE SHEFFIELD, DEBRA BERNES,
HELEN W. HARPER in her official
capacity as Laurens County Probate Judge,
and CATHY COX in her official capacity as
Secretary of State and as chairperson of the
State Election Board,

    Defendants,

and

WILLIAM ASHLEY HAWKINS, THOMAS
C. RAWLINGS, and LEE ELIZABETH
TARTE WALLACE,

    Other Candidates for the Office of
    Judge of the Court of Appeals.

Civil Action File
No. 04-1-6052-/5

## PETITION TO CONTEST ELECTION

COMES NOW Howard Mead and files this Election Contest pursuant to Article 13 of

Title 21 of the Official Code of Georgia Annotated and shows the Court as follows:

**1.**

On July 20, 2004, an election for the office of Judge of the Court of Appeals was held

throughout the State of Georgia.

**2.**

Howard Mead, Mike Sheffield, Debra Bernes, William Ashley Hawkins, Thomas C.

Rawlings, and Lee Elizabeth Tarte Wallace were duly qualified candidates for the office

-1-

**000005**

IN THE 2004-8893393-CV
Page 2

Judge of the Court of Appeals.

3.

Howard Mead is a resident of DeKalb County, residing at 1277 Oakdale Road, Atlanta, Georgia 30307.

4.

Mike Sheffield is a resident of Gwinnett County, residing at 4111 Alley Court, Norcross, Georgia 30092.

5.

Debra Bornes is a resident of Cobb County, residing at 1201 Lexham Drive, Marietta, Georgia 30068.

6.

William Ashley Hawkins is a resident of Monroe County, residing at 105 Chambless Road, Forsyth, Georgia 31029.

7.

Thomas C. Rawlings is a resident of Washington County, residing at 257 W. Adams Street, Tennille, Georgia 31089.

8.

Lee Elizabeth Tarte Wallace is a resident of Fulton County, residing at 3183 Argonne Drive, Atlanta, Georgia 30305.

9.

Helen W. Harper is the Probate Judge for Laurens County.

10.

Cathy Cox is Georgia's Secretary of State and chairperson of Georgia's State Elections Board.

- 2 -

**000006**



**11.**

This Court has subject matter jurisdiction.

**12.**

Venue is proper in this Court pursuant to O.C.G.A. § 21-2-523.

**13.**

On July 26, 2004, Cathy Cox, in her official capacity as Secretary of State, certified the following vote totals for the July 20, 2004 election for the office of Judge of the Court of Appeals:

| Candidate | Vote | % |
|---|---|---|
| Debra Bernea | 309,005 | 29.5 |
| Mike Sheffield | 207,416 | 19.8 |
| Howard Mead | 207,068 | 19.8 |
| Thomas C. Rawlings | 124,027 | 11.9 |
| Lee Elizabeth Tarte Wallace | 120,470 | 11.5 |
| William Ashley Hawkins | 80,128 | 7.6 |

**14.**

By certification of the above-detailed vote totals, Debra Bernes and Mike Sheffield were declared eligible to compete with each other in a runoff election for the office of Judge of the Court of Appeals as no candidate for that office received the requisite number of votes necessary to be declared elected pursuant to O.C.G.A. § 21-2-501.

**15.**

On July 26, 2004, Howard Mead requested a recount pursuant to his rights under O.C.G.A. § 21-2-495.

- 3 -

**000007**



ID# 2004-8893393-CV
Page 4

16.

After a recount pursuant to O.C.G.A. § 21-2-495, on July 29, 2004 Cathy Cox, in her official capacity as Secretary of State, certified the following vote totals for the July 20, 2004 election for the office of Judge of the Court of Appeals:

| Candidate | Vote | % |
|---|---|---|
| Debra Bernes | 309,058 | 29.5 |
| Mike Sheffield | 207,473 | 19.8 |
| Howard Mead | 207,091 | 19.8 |
| Thomas C. Rawlings | 124,038 | 11.8 |
| Lee Elizabeth Tarto Wallace | 120,473 | 11.5 |
| William Ashley Hawkins | 80,153 | 7.6 |

17.

By certification of the above-detailed vote totals after a recount pursuant to O.C.G.A. § 21-2-495, Debra Bernes and Mike Sheffield were declared eligible to compete with each other in a runoff election for the office of Judge of the Court of Appeals as no candidate for that office received the requisite number of votes necessary to be declared elected pursuant to O.C.G.A. § 21-2-501.

18.

The runoff election for the office of Judge of the Court of Appeals, unless postponed by court order, is scheduled to be held on Tuesday, August 10, 2004.

19.

Section 21-2-522 of the Official Code of Georgia Annotated provides:

A result of a primary or election may be contested on one or more of the following grounds:

(1) Misconduct, fraud, or irregularity by any primary or election official

- 4 -

000008



ID 2004-2093393-CV
Page 5

or officials sufficient to change or place in doubt the result;

(2)   When the defendant is ineligible for the nomination or office in dispute;

(3)   When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result;

(4)   For any error in counting the votes or declaring the result of the primary or election, if such error would change the result;

(5)   For other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

20.

Howard Mead contests the result of the July 20, 2004 election for the office of Judge of the Court of Appeals on the ground that 481 irregularly prepared official absentee ballots omitting Howard Mead's name were voted in the July 20, 2004 general primary and non-partisan election and that such ballots are sufficient to place in doubt the result of the election.

21.

Articles 8 and 9 of Chapter 2 of Title 21 of the Official Code of Georgia Annotated require that the "name" of each candidate appear on the ballot.

22.

A person's "name" is the word or combination of words by which a person is distinguished from other individuals and consists, in law, of a given Christian or first name and a family surname. *Mays v. Pundt*, 267 Ga. 248, 245 (1996).

23.

Helen W. Harper, in her official capacity as Probate Judge of Laurens County, was responsible for preparing the official absentee ballots which were used throughout Laurens County in conjunction with the July 20, 2004 general primary and non-partisan election.

-5-

**000009**

 

ID 2004-0093393-CV
Page 6

24.

The official absentee ballots for Laurens County listed the following candidates for the office of Judge of the Court of Appeals:

Debra Barnes
William Ashley Hawkins
Thomas Mead
Thomas C. Rawlings
Mike Sheffield
Lee Elizabeth Tarte Wallace

25.

A copy of the portion of the official absentee ballot for Laurens County which includes the candidates for the office of Judge of the Court of Appeals is attached hereto as Exhibit A.

26.

Howard Mead's name, "Howard Mead," did not appear on the official absentee ballots for Laurens County.

27.

The Georgia Supreme Court has recognized that a person's Christian or first name has been used from early times to distinguish a particular individual from his fellow and, consequently, it has always been considered an essential part of a person's name.   *Maye v. Pundt*, 267 Ga. 243, 245 (1996).

28.

"Thomas Mead" is not "Howard Mead."

29.

Even if votes cast for Thomas Mead were counted as being for Howard Mead, it cannot be said that voters would know that a vote cast for Thomas Mead would be counted for Howard Mead.

- 6 -

000010

 

**30.**

The official absentee ballots which did not contain Howard Mead's name were issued to 528 voters or electors throughout Laurens County.

**31.**

On or about July 6, 2004, Judge Harper became aware that the official absentee ballots prepared by her office were irregular and her office undertook to print correct official absentee ballots for future use which included the name of candidate Howard Mead.

**32.**

Four hundred eighty-one (481) voters cast votes in the July 20, 2004 general primary and non-partisan election using the irregular official absentee ballots which did not include the name of candidate Howard Mead.

**33.**

As detailed above, by a margin of 382 votes, Mike Sheffield was declared eligible over Howard Mead to compete with Debra Bernes in a runoff election for the office of Judge of the Court of Appeals.

**34.**

Section 21-2-527(d) of the Official Code of Georgia provides that

Whenever the court trying a contest shall determine that the primary, election, or runoff is so defective as to the nomination, office, or eligibility in contest as to place in doubt the result of the entire primary, election, or runoff for such nomination, office, or eligibility, such court shall declare the primary, election, or runoff to be invalid with regard to such nomination, office, or eligibility and shall call for a second primary, election, or runoff to be conducted among all of the same candidates who participated in the primary, election, or runoff to fill such nomination or office which was declared invalid and shall set the date for such second primary, election, or runoff.

- 7 -

**000011**



ID: 2004-0093393-CV
Page 6

35.

"It [is] not incumbent upon [the petitioner] to show how the [affected] voters would have voted if their ballots had been regular. He only ha[s] to show that there were enough irregular ballots to place in doubt the result." *Howell v. Fears*, 275 Ga. 627, 628 (2002). To satisfy that burden, all he must show is that the number of irregular ballots exceeded the margin of victory. *Id.*

36.

This Court may neither inquire nor speculate as to how the voters who voted using the irregular absentee ballot would have cast their vote had the ballot been regular because "[i]t is basic in the American democratic process of elections that an individual voter's right to privacy as to how he cast his ballot is inviolate. It is improper and erroneous for courts to engage in presumptions of any kind in that exclusive area of privacy." *Miller v. Kilpatrick*, 140 Ga. App. 193, 194 (1976).

37.

The number of votes cast with irregular ballots voted in the July 20, 2004 general primary and non-partisan election which did not include the name of Howard Mead, 481, exceeds the margin by which Mike Sheffield was declared eligible over Howard Mead to compete with Debra Barnes in a runoff election for the office of Judge of the Court of Appeals, 382 votes. Since the number of irregular ballots exceeds Mike Sheffield's margin of victory, Georgia law mandates that the court void the entire election and order that a new election be held. *Howell v. Fears*, 275 Ga. 627, 628 (2002).

38.

Howard Mead also contests the result of the July 20, 2004 election for the office of Judge of the Court of Appeals on the grounds that misconduct, fraud, or irregularity by any primary

- 8 -

**000012**



ID: 2004-0093393-CV
Page 1

or election official or officials is sufficient to change or place in doubt the result; illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result; there were errors in counting the votes and declaring the results of the election; and there were other causes which show that Howard Mead and not Mike Sheffield was the person legally eligible to compete in the runoff election.

39.

Once a court finds irregularities "sufficient to change or place in doubt the result[s]" of an election, O.C.G.A. § 21-2-527(d) requires that the court must declare the election to be invalid and call for a second election to be conducted among all of the same candidates who participated in the election which was declared invalid.

40.

Georgia law prohibits narrower remedies. At one time, it was possible to order a special runoff among two candidates to determine which of them was eligible to compete in the regular runoff. *See Daniel v. Barrow*, 256 Ga. 318 (1986). However, the Georgia General Assembly legislatively overruled *Daniel v. Barrow* in 1987 by amending O.C.G.A. § 21-2-527 to require that when an election is declared invalid, a second election must be conducted among the same candidates who participated in the election which was declared invalid. *See* Ga. L. 1987, p. 1360, § 19.

41.

Similarly, even though the irregular ballots may have been cast in only one county or even a single precinct, O.C.G.A. § 21-2-527(d) requires that an entire new election be held, not just a re-vote for the county or precinct in which the irregular ballots were cast. *Howell v. Fears*, 275 Ga. 627, 628 (2002).

-9-

**000013**

5.    That petitioner have such other and further relief as is just and proper.

Respectfully submitted this 30th day of July, 2004.

Charles W. Byrd
Georgia State Bar No. 100580

909 Ball Street
P.O. Box 1770
Perry, Georgia 31069
478-987-1415 (office)
478-396-3696 (cell)
478-987-1077 (fax)

MARC B. HERSHOVITZ, P.C.

By:

Marc B. Hershovitz
Georgia State Bar No. 349510

4060 Peachtree Road
Suite D-315
Atlanta, Georgia 30319
404-262-1425
404-262-1474 (fax)

Attorneys for Contestant/Petitioner Howard Mead

-11-

000015

# Exhibit A

000016



$\mathfrak{Supreme\ Court}$
$\mathfrak{State\ of\ Georgia}$

STATE JUDICIAL BUILDING
$\mathfrak{Atlanta\ 30334}$

HAROLD D. MELTON, CHIEF JUSTICE
DAVID E. NAHMIAS, PRESIDING JUSTICE
ROBERT BENHAM
CAROL W. HUNSTEIN
KEITH R. BLACKWELL
MICHAEL P. BOGGS
NELS S.D. PETERSON
SARAH HAWKINS WARREN
CHARLES J. BETHEL
    JUSTICES

THÉRÈSE S. BARNES, CLERK/COURT EXECUTIVE
JEAN RUSKELL, REPORTER

# SUPREME COURT OF THE STATE OF GEORGIA
## CLERK'S OFFICE, ATLANTA

December 31, 2018

I, Therese "Tee" Barnes, Clerk, of the Supreme Court of Georgia, do hereby certify that the foregoing PAGES, hereto attached, is a true and correct copy, in the Supreme Court of Georgia Case No. **S04A1982, HOWARD MEAD V. MIKE SHEFFIELD et al.**, as appears from the records and files in this office.

Witness my signature and seal of the said court hereto affixed the day and year first above written.

*Therese S Barnes* , Clerk



In Office 04-05-2004 15:21:39
IDX 2004-0095913-CV
Page 1
J. C. Stephenson
Joy L. Stephenson
Clerk of Superior Court Cobb County

IN THE SUPERIOR COURT OF COBB COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| HOWARD MEAD, | * | CIVIL ACTION |
| | * | |
| Contestant/Petitioner, | * | FILE NO. 04-1-6082-18 |
| v. | * | |
| | * | |
| MIKE SHEFFIELD, DEBRA BERNES, | * | |
| HELEN W. HARPER in her official | * | |
| capacity as Laurens County Probate | * | |
| Judge, and CATHY COX in her official | * | |
| capacity as Secretary of State and chair- | * | |
| person of the State Election Board, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| and | * | |
| | * | |
| WILLIAM ASHLEY HAWKINS, | * | |
| THOMAS C. RAWLINGS, and | * | |
| LEE ELIZABETH TARTE WALLACE, | * | |
| | * | |
| Other Candidates for the Office of | * | |
| Judge of the Court of Appeals. | * | |

## DEFENDANT DEBRA BERNES' RESPONSE, ANSWER AND DEFENSES TO CONTESTANT/PETITIONER'S PETITION TO CONTEST ELECTION

COMES NOW DEBRA BERNES, Defendant in the above-styled matter and files

this her Response, Answer and Defenses to the Contestant/Petitioner's Petition to Contest

Election and shows to the Court the following:

## FIRST DEFENSE

The Petition fails, is barred and should be dismissed in that Petitioner has failed to

state a claim upon which relief can be granted.

000061
Page 1 of 14

 ID 2804-0095913-CV
Page 3

### SEVENTH DEFENSE

The Petition fails and is barred in that of the 481 absentee ballots at issue in
Laurens County, there were only 314 absentee ballots containing the name "Thomas
Mead" which were verified as cast in the Court of Appeals judicial race by the Secretary
of State on July 26, 2004 and as to the recount on July 29, 2004, as statewide vote totals
for each of the six candidates in the Court of Appeals July 20, 2004 primary election. Of
those 314 absentee ballots, 243 of those ballots were cast for other Court of Appeals
judicial candidates. In accord with Johnson v Rheney, 245 Ga. 316 (1980), these votes
represent the expressed will of the voters. Of the 481 absentee ballots at issue, the
expressed will of those 243 voters, when subtracted from the 481 absentee ballots at issue
do not result in a difference greater than the 382 margin suggested by Petitioner. Thus,
Petitioner has failed to demonstrate any irregularity sufficient to change or place in doubt
the result of the July 20, 2004 election for the Court of Appeals.

### EIGHTH DEFENSE

The Petition fails and is barred in that of the 481 absentee ballots at issue in
Laurens County, there were only 314 total absentee ballots, as described above, cast in
the statewide Court of Appeals judicial race. These 314 ballots cast in the judicial race
when subtracted from the 481 absentee ballots at issue do not result in a difference
greater than the 382 margin of votes suggested by Petitioner. Thus, Petitioner has failed
to demonstrate any irregularity sufficient to change or place in doubt the result of the July
20, 2004 election for the Court of Appeals.



ID 2004-0095913-CV
Page 3

### THIRTEENTH DEFENSE

Defendant answers each numbered paragraph of Petitioner's Petition as follows:

### ANSWER

**1.**

The allegations contained in Paragraph 1 of Petitioner's Petition are admitted.

**2.**

The allegations contained in Paragraph 2 of Petitioner's Petition are admitted.

**3.**

The Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 3 of Petitioner's Petition.

**4.**

The Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 4 of Petitioner's Petition.

**5.**

The allegations contained in Paragraph 5 of Petitioner's Petition are admitted.

**6.**

The Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 6 of Petitioner's Petition.

**7.**

The Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 7 of Petitioner's Petition.

**000065**
Page 5 of 14

 

ID 2004-8055913-CV
Page 6

**8.**

The Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 8 of Petitioner's Petition.

**9.**

The allegations contained in Paragraph 9 of Petitioner's Petition are admitted.

**10.**

The allegations contained in Paragraph 10 of Petitioner's Petition are admitted.

**11.**

The allegations contained in Paragraph 11 of Petitioner's Petition are denied. By way of further answer, Defendant alleges that the circumstances surrounding the 481 absentee ballots at issue in Laurens County are clearly insufficient to change or place in doubt the result of the July 20, 2004 election for the Court of Appeals.

**12.**

The allegations contained in Paragraph 12 of Petitioner's Petition are admitted.

**13.**

The allegations contained in Paragraph 13 of Petitioner's Petition are admitted.

**14.**

The allegations contained in Paragraph 14 of Petitioner's Petition are admitted.

**15.**

The allegations contained in Paragraph 15 of Petitioner's Petition are admitted.

**16.**

The allegations contained in Paragraph 16 of Petitioner's Petition are admitted. By way of further answer, Defendant alleges that of the 481 absentee ballots at issue in

**000066**
Page 6 of 14



ID# 2004-0695913-CV
Page 7

Laurens County, Petitioner admits that 314 absentee ballots containing the name "Thomas Mead" were regular and correct in that the 314 absentee ballots were verified by the Secretary of State on July 26, 2004 and as to the recount on July 29, 2004, as statewide vote totals for each of the six candidates in the Court of Appeals July 20, 2004 primary election.

17.

The allegations contained in Paragraph 17 of Petitioner's Petition are admitted.

18.

The allegations contained in Paragraph 18 of Petitioner's Petition are admitted.

19.

The allegations contained in Paragraph 19 of Petitioner's Petition are admitted.

20.

The allegations contained in Paragraph 20 of Petitioner's Petition are denied.

21.

The allegations contained in Paragraph 21 of Petitioner's Petition are admitted.

22.

The allegations contained in Paragraph 22 of Petitioner's Petition are denied. By way of further answer, allegations contained in Paragraph 22 are conclusions of law and an attempt by Plaintiff to paraphrase and characterize said case law.

23.

The allegations contained in Paragraph 23 of Petitioner's Petition are denied.

24.

The allegations contained in Paragraph 24 of Petitioner's Petition are denied.

**000067**

Page 7 of 14



ID 2004-0095913-CV
Page 8

**25.**

The allegations contained in Paragraph 25 of Petitioner's Petition are denied.

**26.**

The allegations contained in Paragraph 26 of Petitioner's Petition are denied.

**27.**

The allegations contained in Paragraph 27 of Petitioner's Petition are denied. By way of further answer, allegations contained in Paragraph 27 are conclusions of law and an attempt by Plaintiff to paraphrase and characterize said case law.

**28.**

The allegations contained in Paragraph 28 of Petitioner's Petition are denied.

**29.**

The allegations contained in Paragraph 29 of Petitioner's Petition are denied.

**30.**

The allegations contained in Paragraph 30 of Petitioner's Petition are denied.

**31.**

The allegations contained in Paragraph 31 of Petitioner's Petition are denied as stated.

**32.**

The allegations contained in Paragraph 32 of Petitioner's Petition are denied.

**33.**

The allegations contained in Paragraph 30 of Petitioner's Petition are admitted.

**34.**

The allegations contained in Paragraph 34 of Petitioner's Petition are admitted.

**000068**

**Page 8 of 14**



**15.**

The allegations contained in Paragraph 35 of Petitioner's Petition are denied.  By way of further answer, allegations contained in Paragraph 35 are conclusions of law and an attempt by Plaintiff to paraphrase and characterize said case law.

**36.**

The allegations contained in Paragraph 36 of Petitioner/Plaintiff's Petition are denied.  By way of further answer, allegations contained in Paragraph 36 are conclusions of law and an attempt by Plaintiff to paraphrase and characterize said case law.

**37.**

The allegations contained in Paragraph 37 of Petitioner's Petition are denied.  By way of further answer, allegations contained in Paragraph 37 are conclusions of law and an attempt by Plaintiff to paraphrase and characterize said case law.

**38.**

The allegations contained in Paragraph 38 of Petitioner's Petition are denied.

**39.**

The allegations contained in Paragraph 39 of Petitioner's Petition are denied.  By way of further answer, allegations contained in Paragraph 39 are conclusions of law and an attempt by Plaintiff to paraphrase and characterize said case law.

**40.**

The allegations contained in Paragraph 40 of Petitioner's Petition are denied.  By way of further answer, allegations contained in Paragraph 40 are conclusions of law and an attempt by Plaintiff to paraphrase and characterize said case law.



ID#2004-0095913-CV
Page 10

41.

The allegations contained in Paragraph 41 of Petitioner's Petition are denied. By way of further answer, allegations contained in Paragraph 41 are conclusions of law and an attempt by Plaintiff to paraphrase and characterize said case law.

42.

The allegations contained in Paragraph 42 of Petitioner's Petition are denied. By way of further answer, allegations contained in Paragraph 42 are conclusions of law and an attempt by Plaintiff to paraphrase and characterize said case law.

43.

Any allegations not responded to by prior defenses or answers are hereby specifically denied.

WHEREFORE Defendant having fully answered the Petitioner's Petition, hereby respectfully prays and demands

1)   That the Petition be dismissed with all costs cast upon the Petitioner.

2)   That the Court permit the runoff election for the office of the Judge of the Court of Appeals be carried out on August 10, 2004 as prescribed by Georgia law and pursuant to the verification of vote totals by the Secretary of State on July 29, 2004, and

3)   That the Defendant have such other and further relief as deemed necessary and proper by this Court.

ID:2004-8095913-CV
Page 11

This the 5 day of August, 2004.

BENTLEY, BENTLEY & BENTLEY

FRED D. BENTLEY, SR.
GEORGIA BAR NO. 052850

241 Washington Avenue
Marietta, Georgia 30060
(770)-422-2300

KING & SPALDING LLP

MICHAEL C. RUSS
GEORGIA BAR NO. 620200

191 Peachtree Street
Atlanta, Georgia 30303-1763
(404) 572-5100

NANCY INGRAM JORDAN, P.C.

NANCY INGRAM JORDAN
GEORGIA BAR NO. 383407

231 Washington Avenue
Marietta, Georgia 30060
(770) 422-2300

**000071**

Page 11 of 14



ID# 2004-0095913-CV
Page 11

STATE OF GEORGIA

COUNTY OF COBB

### VERIFICATION

Personally appeared before the undersigned administrating officer duly authorized by law to administer oaths, Debra Bernes, who having first been sworn deposes and states on oath, that the facts set forth in the within and foregoing Response, Answer and Defenses are true and correct to the best of her knowledge.

Sworn to and subscribed before me
this 5th day of Aug.., 2004.

DEBRA BERNES

Notary Public

My Commission Expires:
7-11-05

000072



IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

HOWARD MEAD                                        )
                                                   )
        Plaintiff/Contestor,                       )
                                                   )
    v.                                             )
                                                   )
MIKE SHEFFIELD, DEBRA BERNES                       )
HELEN W. HARPER, in her official                   )
capacity as Laurens County Probate                 )
Judge, and CATHY COX, in her                       )        CIVIL ACTION
official capacity as Secretary of State            )        NO. 04-1-6082
of Georgia,                                        )
                                                   )
        Defendants/Respondents.                    )
                                                   )
and                                                )
                                                   )
WILLIAM ASHLEY HAWKINS,                            )
THOMAS C. RAWLINGS and LEE                         )
ELEIZABETH TARTE WALLACE,                          )
                                                   )
        Other Candidates/Third Parties            )

### RESPONSE AND ANSWER OF SECRETARY OF STATE

COMES NOW CATHY COX in her official capacity as the Secretary of State of

Georgia and Chairperson of the State Elections Board and, by and through her undersigned

counsel, Thurbert Baker, Attorney General of the State of Georgia, shows as follows:

I.      POSITION OF THE SECRETARY OF STATE ON THE MERITS OF THE CASE

1.

This case involves an election contest challenging pursuant to O.C.G.A. § 21-2-520 et

seq.  As such, Contestor Howard Mead bears the burden of establishing that there was an

irregularity sufficient to change or place in doubt the result.  O.C.G.A. § 21-2-522(1); see Bailey

000094



II 2004-0096116-CV
Page 2

*v. Colwell*, 263 Ga. 111 (1993).  To meet this burden, Mr. Mead must show a specific number of

irregularly cast ballots; it is not sufficient to show irregularities which erode confidence in the

election, and the election result cannot be overturned on mere speculation.  *Middleton v. Smith*,

273 Ga. 202, 203 (2000).  The election is presumed valid unless it is demonstrated not to be.  *Id.*;

*Streeter v. Pascal*, 267 Ga. 207, 208 (1996); *cf.* O.C.G.A. § 21-2-522.1.

### 2.

The Secretary of State anticipates that the evidence on the hearing of this matter will

show that the highest vote total (in an election held on July 20, 2004 for a seat of the Court of

Appeals) was Debra Bernes, but she did not receive a majority of the votes.  The second and

third highest vote totals were for Mike Sheffield and Howard Mead, respectively, who were

separated statewide by 382 votes.

### 3.

The Secretary further anticipates the evidence will show that a printers error resulted in

an uncertain number of absentee ballots being printed and distributed in Laurens County bearing

the erroneous name "Thomas Mead" instead of "Howard Mead."  Of these absentee ballots, 481

were voted in some manner.  Of the voted absentee ballots that contained the error, 71 were

cast for "Thomas Mead" and were counted as votes for "Howard Mead."  An additional 243

votes were cast for other candidates in the Court of Appeals race, and 167 did not vote in the

Court of Appeals race at all (although voting for candidates in other races).

### 4.

Georgia law, while not involving a situation involving the specific fact situation before

this Court, establishes that it is not appropriate to speculate how voters would have voted or to

effectively disenfranchise them by assuming they would have voted differently.  *Middleton,*

**000095**
2



*supra*; *Holton v. Hollingsworth*, 270 Ga. 591, 592 (1999); *May v. Pindt*, 267 Ga. 243 (1996); *Johnson v. Rheny*, 245 Ga. 316 (1980); *Cf. Howell v. Fears*, 275 Ga. 627 (2002).

5.

Of the 481 absentee ballots cast, 243 were voted for other candidates, leaving 283 ballots in doubt. (This includes the 71 overtly cast for "Thomas Mead" and all ballots who did not vote for any other candidate in the Court of Appeals race.) Mr. Mead, however, must establish that there were at least 382 ballots in doubt. The Secretary of State, therefore, anticipates that the evidence will not support a meritorious claim to re-hold part of all of the election.

6.

Should this Court find, however, that another election is appropriate, the appropriate remedy is determined by O.C.G.A. § 21-2-527(d). It provides:

> Whenever the court trying a contest shall determine that the primary, election, or runoff is so defective as to the nomination, office, or eligibility in contest as to place in doubt the result of the entire primary, election, or runoff for such nomination, office, or eligibility, such court shall declare the primary, election, or runoff to be invalid with regard to such nomination, office, or eligibility and shall call for a second primary, election, or runoff to be conducted among all of the same candidates who participated in the primary, election, or runoff to fill such nomination or office which was declared invalid and shall set the date for such second primary, election, or runoff.

(Emphasis added.)

7.

In determining the geographic scope of a new primary, the result should be limited to Laurens County. As the Supreme Court of Georgia has held: "a rerun election should be held only to the extent necessary to address the illegalities in a contested election." *Haynes v. Wells*,

000096

3



273 Ga. 106, 106 n.1 (2000); *Daniel v. Barrow*, 256 Ga. 318 (1986); *Ingram v. Loft*, 238 Ga. 513 (1977).

8.

Limiting the election to Laurens County, should one be necessary (and the Secretary of State believes it is not), is in accord with the equities in the case, since the error in this case was limited to one county. Holding a new election statewide would not only disenfranchise the voters statewide who have already cast their votes, but would also cost the counties around the state, who had no part in the irregularity, hundreds of thousands of dollars, with the total cost around the State in the millions of dollars.

**II.    ANSWER TO THE SPECIFIC ALLEGATIONS OF THE COMPLAINT**

In response to the specific allegations of Mr. Mead's "Petition to Contest Election" the Secretary of State shows as follows:

1.

Paragraph 1 of the Petition is admitted.

2.

Paragraph 2 of the Petition is admitted.

3.

Paragraph 3 of the Petition is admitted on information and belief.

3.

Paragraph 3 of the Petition is admitted on information and belief.

4.

Paragraph 4 of the Petition is admitted on information and belief.

**000097**

4



ID 2004-0096116-CV
Page 5

**5.**

Paragraph 5 of the Petition is admitted on information and belief.

**6.**

Paragraph 6 of the Petition is admitted on information and belief.

**7.**

Paragraph 7 of the Petition is admitted on information and belief.

**8.**

Paragraph 8 of the Petition is admitted on information and belief.

**9.**

Paragraph 9 of the Petition is admitted.

**10.**

Paragraph 10 of the Petition is admitted.

**11.**

Paragraph 11 of the Petition is admitted.

**12.**

Paragraph 12 of the Petition is admitted.

**13.**

Paragraph 13 of the Petition is admitted.

**14.**

Paragraph 14 of the Petition is admitted.

**15.**

Paragraph 15 of the Petition is admitted.

**000098**

5

ID 2004-0896116-CV
Page 5

16.

Paragraph 16 of the Petition is admitted.

17.

Paragraph 17 of the Petition is admitted.

18.

Paragraph 18 of the Petition is admitted.

19.

Paragraph 19 of the Petition is admitted.

20.

In response to paragraph 20 of the Petition, the Petition speaks for itself.  The Secretary of State denies that Mr. Mead has shown a right to relief.

21.

Paragraph 21 of the Petition calls for a legal conclusion or interpretation and require no response from the Secretary of State.

22.

Paragraph 22 of the Petition calls for a legal conclusion or interpretation and requires no response from the Secretary of State.

23.

Paragraph 23 of the Petition is denied as stated.

24.

Paragraph 24 of the Petition is denied to the extent that it implies that all absentee ballots in Laurens County contained this error.

000099
6

Filed in Office Apr-26-2004 Pi:08:01
IDN ECB42-4096069-CV
Page 1

Clerk of Superior Court Cobb County

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

HOWARD MEAD,                                       )
      Contestant/Petitioner,                     )
                          )
v.                                                 )
                          )    Civil Action File No. 04-1-6082-18
MIKE SHEFFIELD, DEBRA BERNES,                      )
HELEN W. HARPER in her official                    )
capacity as Laurens County Probate Judge,          )
and CATHY COX in her official capacity             )
as Secretary of State and as chairperson of        )
the State Election Board,                          )
      Defendants,                                )
                          )
and                                                )
                          )
WILLIAM ASHLEY HAWKINS,                            )
THOMAS C. RAWLINGS, and LEE                        )
ELIZABETH TARTE WALLACE,                           )
      Other Candidates for the Office of          )
      Judge of the Court of Appeals.              )

## MOTION TO DISMISS OR TRANSFER

COMES NOW, Defendant MIKE SHEFFIELD ("Sheffield"), by and through undersigned counsel, and hereby moves this honorable Court to dismiss the Petition to Contest Election filed by Contestant/Petitioner HOWARD MEAD ("Mead") or, in the alternative, to transfer this case to the Superior Court of Gwinnett County, Georgia; and in support thereof Movant Sheffield shows:

    (1)    O.C.G.A. §21-2-523(a) provides that an election contest case shall be tried and determined by the Superior Court of the county wherein the Defendant resides;

**000104**



IN THE SUPERIOR COURT OF COBB COUNTY

**STATE OF GEORGIA**

HOWARD MEAD,

    Petitioner,

v.

MIKE SHEFFIELD, et al.,

    Respondents.

CIVIL ACTION FILE

NO. 04-1-6082-18

## ORDER

The above election contest was heard on August 6, 2004 and after hearing evidence, argument of counsel, and reviewing the record, it is:

HEREBY ORDERED, that we must presume that the result of an election or primary are valid unless the contesting party demonstrates an irregularity or illegality sufficient to change or place in doubt the result. It does not appear that Petitioner has carried this burden.

There were 529 total absentee ballots printed in the Laurens County non-partisan primary showing Petitioner's first name as being "Thomas" rather than "Howard." Of those 529 ballots, only 315 were voted in the Court of Appeals race. The difference between the second and the third place candidate was 382 votes. Of those votes, 243 were cast for someone other than the Petitioner.

The best Petitioner could have done was to have received all 284 remaining votes, which is still considerably less than the 382 vote difference.

Even if Petitioner had received all 315 votes cast in the Court of Appeals race, this is still shy of the 382 difference.

**000114**



While *Mayer v. Pindi*, 267 Ga. 243 (1996), states that "name" has been defined as the word or combination of words distinguishing one person from another, it does not require that the first name be used in all situations. In this case, only one (1) person named "Mead" was qualified to run in the Court of Appeals election.

There is no indication that anything illegal or improper was done, only that the printer made a mistake and placed the wrong first name on the ballot. It is doubtful this would have changed or placed in the doubt the outcome.

The above captioned case is hereby DISMISSED and the run-off election in the Court of Appeals non-partisan primary is to CONTINUE as directed by the Secretary of State.

SO ORDERED this 6th day of _____ August _____, 2004.

Arthur W. Fudger, Senior Judge
Acting in Cobb Superior Court
Cobb Judicial Circuit

 

IDB-6B4-6B9639B-CV
Page 3

## CERTIFICATE OF SERVICE

This is to certify that I have delivered via U.S. Mail a copy of the foregoing Order

to the following:

Thomas C. Rawlings
P.O. Box 5746
Sandersville, GA 31082

Honorable Cathy Cox
Sec. of State
214 State Capital
Atlanta, GA 30334

Ms. Lee E. T. Wallace
3183 Argonne Dr.
Atlanta, GA 30305

Honorable Helen Harper
Laurens County Probate Court
P.O. Box 2098
Dublin, GA 31040

Mr. W. Ashley Hawkins
105 Chambless Rd.
Forsyth, GA 31029

Honorable Thurbert Baker
Atty General
40 Capital Square
Atlanta, GA 30334

Mr. Charles Byrd
P.O. Box 1770
Perry, GA 31069

Mr. Mike Sheffield
4111 Ailey Court
Norcross, GA 30092

Fred Bentley
241 Washington Ave.
Marietta, GA 30060

**000116**



Nancy L. Jordan
231 Washington Ave.
Marietta, GA 30060

This _6_ day of _____ MAY _____ 2004.

Leanne E. Dolin
Law Clerk to Judge James G. Bodiford
Cobb Superior Court

**000117**

IN THE SUPREME COURT
STATE OF GEORGIA

HOWARD MEAD,      *
     *
     Appellant/Contestant,      *
     *
     v.      *
     *
MIKE SHEFFIELD, DEBRA      *     CASE NO. S04A1982
BERNES, HELEN W. HARPER      *
in her official capacity as Laurens      *
County Probate Judge, CATHY      *
COX in her official capacity as      *
Secretary of State and      *
Chairperson of the State Elections      *
Board, WILLIAM ASHLEY      *
HAWKINS, THOMAS C.      *
RAWLINGS and ELIZABETH      *
TARTE WALLACE,      *
     *
     Appellees/Respondents.      *

## BRIEF OF APPELLEE
## SECRETARY OF STATE CATHY COX

THURBERT E. BAKER      033887
Attorney General

DENNIS R. DUNN      234098
Deputy Attorney General

STEFAN RITTER      606950
Senior Assistant Attorney General

Please serve:
STEFAN RITTER
Senior Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone: (404) 656-7298
Facsimile: (404) 657-9932

IN THE SUPREME COURT
STATE OF GEORGIA

HOWARD MEAD,                                   •
                                               •
        Appellant/Contestant,                  •
                                               •
v.                                             •
                                               •
MIKE SHEFFIELD, DEBRA                          •        CASE NO. S04A1982
BERNES, HELEN W. HARPER                        •
in her official capacity as Laurens            •
County Probate Judge, CATHY                    •
COX in her official capacity as                •
Secretary of State and                         •
Chairperson of the State Elections             •
Board, WILLIAM ASHLEY                          •
HAWKINS, THOMAS C.                             •
RAWLINGS and ELIZABETH                         •
TARTE WALLACE,                                 •
                                               •
        Appellees/Respondents.                 •

## BRIEF OF APPELLEE
## SECRETARY OF STATE CATHY COX

### OVERVIEW

The core facts governing this appeal are not in dispute. Following the

election held on July 20, 2004 for the Court of Appeals seat being vacated by

Frank Eldridge, candidate Mike Sheffield led candidate Howard Mead by a

difference statewide of 382 votes. In Laurens County, of over 1500 absentee

ballots distributed, 529 contained a misprint of Mr. Mead's first name, referring to

it as "Thomas" rather than "Howard." 481 of the absentee ballots with the

misnomer were voted in some fashion in Laurens County, with 243 voted for a candidate in the Court of Appeals race other than Mr. Mead. (In addition, 71 voted for "Thomas Mead," which were counted in Mr. Mead's statewide total, and 314 overall voted in the Court of Appeals race.) The ballots of the 243 voters who expressed a preference for a candidate other than Mr. Mead cannot be disregarded; under this Court's precedents it is improper to speculate as to how the voters *would* have voted, but rather one must count properly cast votes. Considering the 243 properly cast votes in the Court of Appeals race, Mr. Mead unfortunately still had less than the 382 he must show to be in error to call the election into doubt regardless of the beginning number of errant ballots (I.e. 529 or 481).

## STATEMENT OF THE CASE

On July 20, 2004, in conjunction with the statewide primaries, a statewide election was held in Georgia for the Court of Appeals seat being vacated at the end of the year by Judge Frank Eldridge. (R. 5; *see* O.C.G.A. §§ 21-2-138, 21-2-139.) Following a recount, the statewide vote was certified as follows:

| Candidate | Votes | % |
|---|---|---|
| Debra Bernes | 309,058 | 29.5 |
| William Ashley Hawkins | 80,153 | 7.6 |
| Howard Mead | 207,091 | 19.8 |
| Thomas C. Rawlings | 124,036 | 11.8 |
| Mike Sheffield | 207,473 | 19.8 |
| Lee Elizabeth Tarte Wallace | 120,473 | 11.5 |

(R. 8, 56; T. Exhibits.)

3

Although Debra Barnes led in the votes cast, she received an insufficient number of votes to avoid a runoff. O.C.G.A. § 21-2-501. The second and third highest vote recipients, Mike Sheffield and Howard Mead, respectively, were separated by 382 votes statewide. (R. 114.)

In Laurens County, however, a printer's error occurred and 529 absentee ballots were distributed with the misnomer "Thomas Mead" instead of "Howard Mead." (R. 114.) Of these absentee ballots distributed, 481 were actually voted in some race in Laurens County. (R. 8; response by trial court to Supreme Court's interrogatories.) Of these, 243 cast votes for candidates other than Mr. Mead in the Court of Appeals race. (R. 114.) Seventy-one (71) of the absentee ballots with the misnomer were cast for "Thomas Mead"; these were counted in Mr. Mead's statewide totals. (T. Exhibits; response by trial court to Supreme Court's interrogatories.) Overall, there were 314 absentee ballots with a misnomer cast in Laurens County in the Court of Appeals race.

After the initial vote totals were certified, Mr. Mead sought a recount -- which resulted in the vote totals, above -- and then he timely filed an election challenge pursuant to O.C.G.A. § 21-2-520 et seq. (R. 5, 7, 114.) A hearing was held on his challenge on August 6, 2004,[1] at which the evidence was largely

---

[1] All interested parties were present at this hearing except Lee Elizabeth Tarte Wallace, who apparently Mr. Mead was unable to serve and filed an affidavit of diligence documenting his service efforts. (R. 24.) Ms. Wallace called during the

4

uncontested.[2]  Following the hearing the trial court dismissed the petition, issuing a

written order that day, which was immediately transmitted to the Supreme Court.

Mr. Mead then immediately sought supercedeas, which was granted by this Court,

staying the runoff election that would have occurred on August 10 between Ms.

Bernes and Mike Sheffield.  Once the case was docketed, it was ordered to be

briefed on an expedited basis, and, consistent with that order, Secretary of State

now files her brief as Appellee showing that the order of the trial court dismissing

the Petition should be affirmed.

### STANDARD OF REVIEW

In an election contest, the findings and conclusion of the trial court are

subject to an abuse of discretion standard and are affirmed if they are supported by

any evidence.  *Cf. Hendry v. Smith*, 270 Ga. 17, 18 (1998); *Streeter v. Pascal*, 267

Ga. 207, 208 (1996); O.C.G.A. § 21-2-522.1.  Findings of law are reviewed *de*

*novo.  Town of Tyrone v. Tyrone, LLC,* 275 Ga. 383, 385 (2002); *Talbot County*

*Bd. of Comm'rs v. Woodall,* 275 Ga. 281 (2002).  At the trial court

Appellant/contestor Mead bore the burden of establishing that there was an

---

hearing to state that she had previously been unaware of it but that she didn't think
she needed to be there.  (R. 83-84.)
[2] Most of this evidence was documentary, consisting of certified returns and
ballots.  (T. Exhibits.)  Live testimony was taken regarding notice the Laurens
County election officials provided to some voters of the error in Mr. Mead's first
name once the error was discovered.  Testimony as to ninety-three
(93) absentee ballots cast with this correct was permitted into evidence, with
testimony as to an additional 12 excluded.  (T. 81-82, 102, 104.)

5

irregularity sufficient to change or place in doubt the result. O.C.G.A. § 21-2-522(1); *see Bailey v. Colwell*, 263 Ga. 111 (1993). To meet this burden, Mr. Mead had to show a specific number of irregularly cast ballots; it is not sufficient to show irregularities which erode confidence in the election, and the election result cannot be overturned on mere speculation. *Middleton v. Smith*, 273 Ga. 202, 203 (2000). Election results are presumed valid unless they are affirmatively demonstrated not to be. Id.; *Streeter v. Pascal, supra*.

### ARGUMENT AND CITATION OF AUTHORITY[3]

**I.     THE ABSENCE OF MR. MEAD'S FIRST NAME ON SOME ABSENTEE BALLOTS IS NOT SUFFICIENT, ALONE, TO THROW THE RESULTS OF THE ELECTION INTO DOUBT.**

The first argument presented by Mr. Mead is that "Howard Mead's Name Was Not on the Ballot."[4] Of course, Mr. Mead's name was partially on some of the ballots (and entirely on others). The question is whether the omission of his first name on some of the ballots, standing alone, was sufficient to throw the election into doubt.

No evidence was presented to the trial court as to the relevance of a candidate's first name to a voter. The Secretary of Stat suggests, however, that this is fundamentally a question of fact (while the importance of a last name may be

---

[3] The arguments presented in Mr. Mead's brief on the merits do not appear to track the order of his Enumerations of Error. For the sake of clarity, response is made here in the order presented in Mr. Mead's Argument and Citation of Authority.
[4] This appears to relate to Appellant's second enumeration of error.

6

accepted as necessary as a matter of law). For some candidates a first name may be critical, for others it may be irrelevant.[5] But the only way a court can know this without speculating is to have evidence presented on the subject. The duty to present this evidence, as an initial matter, lies in the challenger. As noted above regarding the Standard of Review, it is not sufficient to show irregularities which erode confidence in the election, and the election result cannot be overturned on mere speculation. *Middleton v. Smith*, 273 Ga. 202, 203 (2000).

Mr. Mears's reliance on *Maye v. Pundt*, 267 Ga. 243 (1996), and *Weathers v. Modern Masonry Materials*, 107 Ga. App. 34 (1962), do not *require* a that a candidate's first name be provided in an election case. The discussion names there is not directly applicable here. But it must be noted that, even if this court were to find that first names are required, this does not mean that all ballots *distributed* or even all ballots *voted* are the basis to overturn the election.[6] Rather the critical question is whether there were enough ballots cast (specifically 382) with such

---

[5] The importance of a first name may, in fact, be much more important in local races, where candidates are more likely to be personally known, than in statewide races. As to lawyers, even laymen understand them by reference to their surname). For example, the Court of Appeal's seat in question was the seat of Judge Eldridge, not the seat of Judge Frank. (And one does not need to know what seat we are talking about to call it the seat of Judge Frank Eldridge.)

[6] Indeed, the Secretary of State assumed, for the purpose of her arguments to the trial court as she does in her arguments here, that the absence of a first name was such an error to call these ballots into question. This issue is hardly clear, however.

7

uncertainty that the result of the election is in doubt. O.C.G.A. § 21-2-522(1); *see Bailey v. Colwell*, 263 Ga. 111 (1993).

## II.   THE CONTROLLING QUESTION IS HOW MANY IMPOPER BALLOTS WERE CAST.

Mr. Mead's second argument is that the number of absentee ballots *distributed* with an error governs the outcome of this case. Of course, many voters who received an absentee ballot decided not to vote *at all*. There may be many reasons why they did not vote an absentee ballot (including the fact that they voted in person instead), but one fact is clear, their decision not to vote an absentee ballot was not limited to the Court of Appeals race.

Consistent with Georgia law the proper number, when beginning to look for an error that could change the result, is the number of ballots *cast*, not the number of votes possible -- here the number of absentee ballots distributed. This is because one should not assume all electors will vote. To hold otherwise could call every election into doubt, since it is well known (and not disputed) that many (if not most) electors do not vote each election. *See, e.g., Holton v. Hollingsworth*, 270 Ga. 591 (1999) (challenger failed to show that a sufficient number of unqualified voters actually cast ballots); *Bailey v. Colwell*, 263 Ga. 111 (1993) (discussed below); *Johnson v. Byrd*, 263 Ga. 173 (1993) (discussed below); *cf. Howell v. Frears*, 275 Ga. 627 (2002) (decision relied upon by Petitioner, but court

8

looked to ballots voted). The number of ballots actually cast for any race was 481; the number cast specifically in the Court of Appeals race was 314. Mr. Mead can only prevail if the number of ballots in issue is expanded beyond the 314 cast in the Court of Appeals race is disregarded and the ballots actually cast for other candidates is disregarded. His argument is to reach for the highest possible number -- 529 -- even though the error on some of these ballots is plainly irrelevant.

In the last analysis though, while 529 is not the correct number, this issue is also irrelevant. In the Secretary of State's view, it ultimately should not matter which number one selects, because the 243 votes specifically cast for other Court of Appeals candidates brings the number of votes in question below 382 regardless of what number one begins with.

**III.  THE RESULT OF THE ELECTION IS NOT IN DOUBT BECAUSE 243 VOTERS PLAINLY CAST THEIR VOTES AND THEIR VOTES CANNOT BE DISREGARDED.**

At the center of this case is the question of whether the 243 votes that were specifically cast for Court of Appeals candidates other than Howard Mead can be disregarded or not. Mr. Mead's case turns completely on throwing such votes out.

Georgia law is well established, however, that the courts are not to speculate as to how voters might have voted under different circumstances. The Supreme Court's election precedents -- and, indeed, the primary case relied upon by Mr.

9

Mead[7] — establish that it is improper to speculate as to how voters might have voted. *Middleton v. Smith*, 273 Ga. 202, 203 (2000); *Holton v. Hollingsworth*, 270 Ga. 591, 592 (1999); *May v. Pundt*, 267 Ga. 243 (1996); *Johnson v. Rheny*, 245 Ga. 316 (1980). In this regard, it is clear and undisputable that 243 voters did not voted for Court of Appeals candidates other than Mr. Mead.[8] Mr. Mead's argument turns on speculating that these voters might have voted for him if his first name had been correctly listed. Such speculation is impermissible. It must be assumed that voters acted with all of their faculties; that they are intelligent and mean the choices they make. Regardless, of whether Mr. Mead's first name was misprinted, these voters made a choice, and their choice must be respected. To do otherwise is to disenfranchise their votes.

The 243 votes cast for other candidates resolves this case. regardless of the beginning number in determining errant ballots (I.e. 529 or 481), Mr. Mead unfortunately still had less than the 382 he must show to be in error to call the election into doubt.

IV   **THE PROPER REMEDY HAS NOT BEEN DETERMINED BY THE TRIAL COURT.**

At the trial court the secretary of State asked that the remedial issues be

---

[7] *Howell v. Fears*, 275 Ga. 627 (2002).
[8] Although this was the primary fact relied upon by the Secretary of State at the trial court it is ignored in Mr. Mead's Motion for Supercedeas.

10

bifurcated, a request that the trial court granted. (T. 102-03.) The issue of remedy

is controlled by O.C.G.A. § 21-2-527(d). It provides:

> Whenever the court trying a contest shall determine that the
> primary, election, or runoff is so defective as to the nomination,
> office, or eligibility in contest as to place in doubt the result of the
> entire primary, election, or runoff for such nomination, office, or
> eligibility, such court shall declare the primary, election, or runoff
> to be invalid with regard to such nomination, office, or eligibility
> and shall call for a second primary, election, or runoff to be
> conducted among all of the same candidates who participated in
> the primary, election, or runoff to fill such nomination or office
> which was declared invalid and shall set the date for such second
> primary, election, or runoff.

(Emphasis added.)

The Secretary of State anticipates that the evidence she would have

presented on the remedial issues would have been as to the enormous cost of a new

election. For the sake of minimal burden on State resources, the proper result now

appears to be to hold a re-election with the general election, using the elector list

available at the time of the general election. If a runoff is then necessary, it could

be scheduled at such time. No additional election with write-in candidates need be

held, since write-in candidates can be offered at the general elelction.

## CONCLUSION

For the foregoing reasons the Secretary of State requests that the trial court's

decision be affirmed.

11

Respectfully submitted,

THURBERT E. BAKER          033887
Attorney General

DENNIS R. DUNN                      234098
Deputy Attorney General

STEFAN RITTER          606950
Senior Assistant Attorney General

40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone:  (404) 656-7298
Facsimile: (404) 657-9932

12



**SUPREME COURT OF GEORGIA**
Case No.  S04A1982

Atlanta    August 27, 2004

The Honorable Supreme Court met pursuant to adjournment.
The following order was passed:

**MEAD v. SHEFFIELD et al.**

It appearing that Presiding Justice Sears is not participating in this case; it is ordered that
The Honorable Neal W. Dickert of the Augusta Circuit be and hereby is designated to act in her
place.



**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I hereby certify that the above is a true extract from
The minutes of the Supreme Court of Georgia
Witness my signature and the seal of said Court hereto
Affixed the day and year last above written.

, Clerk

 **SUPREME COURT OF GEORGIA**
Case No.  S04A1982

Atlanta    September 2, 2004

The Honorable Supreme Court met pursuant to adjournment.
The following order was passed:

**MEAD v. SHEFFIELD et al.**

It is ordered that any motion for reconsideration must be physically filed in the Clerk's

office by noon Tuesday, September 7, 2004.  A motion  may be faxed to (404) 656-2253 or e-

mailed to stinchcl@gasupreme.us.

 **SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I hereby certify that the above is a true extract from
the minutes of the Supreme Court of Georgia
Witness my signature and the seal of said court hereto
affixed the day and year last above written.

,Clerk



**SUPREME COURT OF GEORGIA**
Case No.  S04A1982

Atlanta     September 3, 2004

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed.

**HOWARD MEAD   v.   MIKE SHEFFIELD et al.**

Upon consideration of the Motion to Expedite the Remittitur in this case, it is ordered that the Motion is granted and the remittitur is to be transmitted instanter.

SUPREME COURT OF THE STATE OF GEORGIA
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

Lynn M. Stinchison, Chief Deputy Clerk

E
X
H
I
B
I
T

B

Fulton County Superior Court
***EFILED***LS
Date: 1/3/2019 2:45 PM
Cathelene Robinson, Clerk

**SHERIFF'S ENTRY OF SERVICE**

---

**SHERIFF'S ENTRY OF SERVICE**

Civil Action No. _2018CV_313418_

Date Filed _November 23, 2018_

| | | |
|---|---|---|
| Superior Court | ☒ | Magistrate Court ☐ |
| State Court | ☐ | Probate Court ☐ |
| Juvenile Court | ☐ | |

Georgia, _____Fulton_____COUNTY

Attorney's Address

Bruce P. Brown
Bruce P. Brown Law LLC
1123 Zonolite Rd. Suite 6
Atlanta, GA 30306

Name and Address of Party to be Served.
Robyn A. Crittenden

Secretary of State of Georgia

214 State Capitol

Atlanta, Georgia 30334

Coalition for Good Governance, et al.

Plaintiff

VS.

Robyn A. Crittenden, et al.

Defendant

Garnishee

**SHERIFF'S ENTRY OF SERVICE**

**PERSONAL** ☐ I have this day served the defendant_____personally with a copy
of the within action and summons.

I have this day served the defendant_____by leaving a
copy of the action and summons at his most notorious place of abode in this County.

**NOTORIOUS** ☐ Delivered same into hands of_____described as follows:
age, about _____ years; weight _____ pounds; height, about _____ feet and_____ inches, domiciled at the residence of
defendant.

**CORPORATION** ☐ Served the defendant _SECRETARY OF STATE OF GEORGIA/ ROBYN_ a corporation
by leaving a copy of the within action and summons with _Ryan Germany, General Counsel_
in charge of the office and place of doing business of said Corporation in the County.

**TACK & MAIL** ☐ I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the
premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail,
First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed
thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST** ☐ Diligent search made and defendant_____
not to be found in the jurisdiction of this court.

This _19_ day of _DEC_, 20_18_.

_____#2527
DEPUTY

SHERIFF DOCKET          PAGE          WHITE-CLERK   CANARY-PLAINTIFF   PINK-DEFENDANT

Fulton County Superior Court
***EFILED***MH
Date: 12/26/2018 6:16 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

COALITION FOR GOOD
GOVERNANCE, RHONDA J. MARTIN,
et al.,

    Plaintiffs,

v.

ROBYN A. CRITTENDEN, Secretary of
State of Georgia, FULTON COUNTY
BOARD OF REGISTRATION AND
ELECTIONS, et al.,

    Defendants.

CIVIL ACTION
FILE NO. 2018 CV 313418

### AFFIDAVIT OF SERVICE

COMES NOW AMY FERRERO, before the undersigned officer duly authorized to administer oaths and, after being duly sworn on oath deposes and states that she has been permanently appointed by this Court for service of process per Order attached, she is a citizen of the United States, over the age of eighteen (18), and is a party having no interest in the above styled case, states that on December 26, 2018 at 2:33 PM, she served the ROBYN A. CRITTENDEN, Secretary of State of Georgia, by personally serving ROBIN HERRON, Executive Assistant, authorized to accept, at her business located at 214 State Capitol, Atlanta, Georgia 30334, with SUMMONS and PETITION TO CONTEST ELECTION RESULT.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 26 day of December , 2018

Legal Ease Attorney Services, Inc.
645 Waldo Street
Atlanta, GA 30312
404-849-1240

Sworn to and subscribed before me
this 26 day of December 2018

_____
Notary Public

My commission expires:

# Page(S)

# Intentionally

# Left Blank

JAN 0 8 2018
OFFICE ... CLERK SUPERIOR COURT
FULTON COUNTY, GA.

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

Administrative Order No. _2018 EK 000003_

## ORDER FOR APPOINTMENT FOR PROCESS SERVICE

Having read and considered the petitions and criminal records, and it appearing to the Court that sufficient grounds exist that each petitioner meets the requirements for appointment by the Court, it is hereby

ORDERED and ADJUDGED that the following:

| | | | |
|---|---|---|---|
| Adams Jr., John | Dreeman, Douglas | Hudson, Hakimah | Nichols, Lathan |
| Allen, Lakeitha | Durkin, Deborah | Hudson, Kyle | Nolen, Milton |
| Anderson, William | Bekeh, Eric | Humphrey, Joviera | Novik, Dennis |
| Andrews, Gene | Beleh, Patrick | James, Frank | O'Brien, Christopher |
| Armstrong, Christopher | Edwards, Donnie | Johnson, Christina | O'Leary, Christine |
| Bailey, Anna | Elliott, Maurice | Johnson, Earl | Owen III, Michael |
| Baker, Wanda | Evans, Alonzo | Jones, Alicia | Perkins, Karen |
| Banks, Randy | Faulkner, Dana | Kahoan, Halle | Ponchak, Richard |
| Benney, Steven | Ferraro, Amy | Kennedy, Richard | Pyle, Robert |
| Berry, Paul | Fisher, Dawn | Kidd, Elizabeth | Rausen, Jayne |
| Basham, James | Fitzgerald, Flaretta | Kim, Leonard | Recinella, Kevin |
| Bass, Susan | Folds, Catherine | King, Amos | Reithik, Derek |
| Benito, Richard | Folds, George | Kohlar, Michael | Redd, Cletis |
| Bento, Robert | Ford, Ronnie | Lair, Aaron | Rhodes, Kathryn |
| Benson, James | Fox, Ishani | Lane, Madeline | Rice, Robert |
| Bolling, Katherine | Franklin, Anthony | Lennon, Martin | Richardson, Leroy |
| Brezeman, Craig | Freese, Jessica | Leon, William | Riven, Michael |
| Briley, Donnie | Fuller, Thomas | Lewis, Kevin | Roberton, Brad |
| Brown, Reginald | Gallo, Elizabeth | Lobin, Javone | Robertson, Marissa |
| Bunch, Kim | Gayle, Earl | Lutwick, William | Robinson, Jerry |
| Byne, Edmund | George, Randal | Maggard Jr., Andrew | Ruddock, Leopold |
| Cardinez, Gregory | Gibbs III, Thomas | Maggard III, Andrew | Rudlock, Margaret |
| Carthery, Adrian | Greenway, Kimberly | Maggard J, Daniel | Sadler Jr., John |
| Chastain, Michael | Grimshaw, Shante | Mailes, Nicholas | Saxon, Jasmine |
| Clark, Ezell | Gruim, Tammie | McClellan, Rodney | Saxon, Rachael |
| Clemmons, Joyce | Handley, Wiley | McGabee, Larry | Saxon, Robin |
| Cline, Travis | Harris, Constance " | Mitchell, Kevin | Saxon, Virginia |
| Cross, Charles | Harris, Perka | Morgan, Todd | Sekteki, Christian |
| Cunningham, Sally | Heasing, Melvin S. | Morrison, Zuri | Self, Abagail |
| Daniels, Alysa | Helmerich, Richard | Mott, Cynthia | Self, Curvin |
| Daniels, Sonia | Highsmith, Amos | Murphy Jr., Gregory | Sexton, Traici |
| Davenport, Alterick | Hightower, Anthonio | Murphy, Herbert | Shadix, Jimmy |
| Davidson, Donny | Hill, Hollis | Murrieta, Francesco | Shepherd, Elizabeth |
| Day, Duane | Hindsman, Charrod | Nadler, Jonathan | Sizbald, John |
| DeVaughn, Carl | Horton, Christopher | Nealey, Cedric | Singleton, Wesley |
| Dolbize, Jeffrey | Howard, Ricky | Nichols, Jean | Smith, Delacie |

| | | | |
|---|---|---|---|
| Smith, Ronald | Stinyard, Kelvin | Underwood, Robert | Wolfe, Lisa |
| Smith, Virginia | Stone, Rodney | Velasquez, Julius | Wright, Christopher |
| Smith Jr., Bruce | Swindle, Frank | Walker, Reginald | Yeste, John |
| Snellings, Sharon | Tamaroff, Paul | Washington, Sabrina | Zayas, Roberto |
| Spears, Joye | Tassaw, Berhane | Webber, Melina | |
| Stanton, Christopher | Thompson, Vanessa | Weeks, Frances | |
| Starks, Marc | Thrash, Nancy | West, Eric | |
| Steidl, David | Tort, Henry | Williams, Lavern | |
| Stevenson, Nosiba | Trumble, Garfield | Wingo, Michael | |
| Stewart, Ronnie | Tucker, Paul | Winkleman, Nan | |

be appointed and authorized to serve as a Permanent Process Server in the Fulton County Superior Court, for the Calendar Year 2018, without the necessity of an order for appointment in each individual case.

BY ORDER OF THE Court this 2nd day of January, 2018.

Gail S. Tusan, Chief Judge
Fulton County Superior Court
Atlanta Judicial Circuit

Fulton County Superior Court
***EFILED***MH
Date: 12/26/2018 6:21 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
### STATE OF GEORGIA

| | |
|---|---|
| **COALITION FOR GOOD GOVERNANCE, RHONDA J. MARTIN, et al.,** | **CIVIL ACTION FILE NO. 2018 CV 313418** |
| **Plaintiffs,** | |
| **v.** | |
| **ROBYN A. CRITTENDEN, Secretary of State of Georgia, FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS, et al.,** | |
| **Defendants.** | |

### AFFIDAVIT OF SERVICE

COMES NOW AMY FERRERO, before the undersigned officer duly authorized to administer oaths and, after being duly sworn on oath deposes and states that she has been permanently appointed by this Court for service of process per Order attached, she is a citizen of the United States, over the age of eighteen (18), and is a party having no interest in the above styled case, states that on December 26, 2018 at 2:22 PM, she served the FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS, by personally serving RICK BARRON, Director of Registration and Election, at his business located at 130 Peachtree Street, SW, Suite 2186, Atlanta, Georgia 30303, with SUMMONS and PETITION TO CONTEST ELECTION RESULT.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 26 day of December , 2018

Legal Ease Attorney Services, Inc.
645 Waldo Street
Atlanta, GA 30312
404-849-1240

Sworn to and subscribed before me
this 26 day of December 2018

_____
Notary Public

My commission expires:

# Page(S)

# Intentionally

# Left Blank

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

Administrative Order No. 2018 EX 000003

# ORDER FOR APPOINTMENT FOR PROCESS SERVICE

Having read and considered the petitions and criminal records, and it appearing to the Court that sufficient grounds exist that each petitioner meets the requirements for appointment by the Court, it is hereby

ORDERED and ADJUDGED that the following:

| | | |
|---|---|---|
| Adams Jr., John | Dressman, Douglas | Hudson, Habimah |
| Allen, Lakeitha | Dueltan, Deborah | Hudson, Kyle |
| Anderson, William | Eshola, Eric | Humphrey, Jovien |
| Andrews, Gene | Eshola, Patricia | Jamey, Frank |
| Armstrong, Christopher | Edwards, Donnie | Johnson, Christina |
| Bailey, Anna | Elliott, Maurice | Johnson, Earl |
| Baker, Wanda | Evans, Alonzo | Jones, Alicia |
| Banks, Randy | Faulkner, Dena | Kobam, Halle |
| Barney, Steven | Ferraro, Amy | Kennedy, Richard |
| Barry, Paul | Fisher, Dawn | Kidd, Elizabeth |
| Basham, James | Fitzgerald, Florette | Kim, Leonard |
| Bass, Susan | Folds, Catherine | King, Amos |
| Benite, Richard | Folds, George | Kotler, Michael |
| Benite, Robert | Ford, Ronnie | Lair, Aaron |
| Benson, James | Fox, Jahani | Lang, Madeline |
| Bolling, Katherine | Franklin, Anthony | Laseman, Marsha |
| Brennon, Craig | Freese, Jessica | Letts, William |
| Briley, Donnie | Fuller, Thomas | Lewis, Kevin |
| Brown, Reginald | Gallo, Elizabeth | Lohm, Jerome |
| Bunch, Kim | Gayle, Earl | Lutwack, William |
| Byer, Edmund | George, Randal | Maggard Jr., Andrew |
| Carithers, Gregory | Gibbs III, Thomas | Maggard III, Andrew |
| Carney, Adrian | Greenway, Kimberly | Maggard Jr., Daniel |
| Chastain, Michael | Grimshaw, Shane | Mellin, Nicholas |
| Clark, Erail | Gueinn, Themie | McClellan, Rodney |
| Clemmons, Joyce | Handley, Wiley | McGehee, Larry |
| Cline, Travis | Harris, Constance | Mitchell, Kevin |
| Cross, Charles | Harris, Parke | Morgan, Todd |
| Cunningham, Sally | Hassan, Mahsan S. | Morrison, Zuri |
| Daniels, Alysa | Helmerich, Richard | Mott, Cynthia |
| Daniels, Sonia | Highsmith, Amos | Murphy Jr., Gregory |
| Devenport, Allerick | Highhower, Anthonio | Murphy, Herbert |
| Davidson, Danny | Hill, Hollis | Maurten, Francisco |
| Day, Dania | Hinderman, Cherrod | Nadler, Jonathan |
| DeVaughn, Carl | Horton, Christopher | Nealey, Cedric |
| Doihler, Jeffrey | Howard, Ricky | Nichols, Jean |

| |
|---|
| Nichols, Lathan |
| Nolan, Milton |
| Nowik, Dennis |
| O'Brien, Christopher |
| O'Leary, Christine |
| Owens III, Michael |
| Perkins, Karen |
| Poornima, Richard |
| Pyle, Robert |
| Ranser, Jayne |
| Reennelle, Kevin |
| Reddick, Derek |
| Rhodes, Kathryn |
| Rice, Robert |
| Richardson, Leroy |
| Rivers, Michael |
| Robertson, Brad |
| Robertson, Marlene |
| Robinson, Jerry |
| Ruddock, Leopold |
| Rurlock, Margaret |
| Sadler Jr., John |
| Saxon, Jasmine |
| Saxon, Rashad |
| Saxon, Robin |
| Saxon, Virginia |
| Sekleeki, Christian |
| Self, Abagail |
| Self, Curvin |
| Sexton, Traici |
| Shadir, Jimmy |
| Shepherd, Elizabeth |
| Sibbald, John |
| Singleton, Wesley |
| Smith, Deiscie |



| | | | |
|---|---|---|---|
| Smith, Ronald | Stinyard, Kelvin | Underwood, Robert | Wolfe, Lisa |
| Smith, Virginia | Stone, Rodney | Velasquez, Julius | Wright, Christopher |
| Smith Jr., Bruce | Swindle, Frank | Walker, Reginald | Yeste, John |
| Snellings, Sharon | Tamaroff, Paul | Washington, Sabrina | Zayas, Roberto |
| Spears, Joye | Tassaw, Berhane | Webber, Melina | |
| Stanton, Christopher | Thompson, Vanessa | Weeks, Frances | |
| Starks, Marc | Thrash, Nancy | West, Eric | |
| Steidl, David | Tort, Henry | Williams, Lavern | |
| Stevenson, Nosiba | Trumble, Garfield | Wingo, Michael | |
| Stewart, Ronnie | Tucker, Paul | Winkleman, Nan | |

be appointed and authorized to serve as a Permanent Process Server in the Fulton County Superior Court, for the Calendar Year 2018, without the necessity of an order for appointment in each individual case.

BY ORDER OF THE Court this _2nd_ day of January, 2018.

Gail S. Tusan, Chief Judge
Fulton County Superior Court
Atlanta Judicial Circuit

2 of 2

E
X
H
I
B
I
T

C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DONNA CURLING, *et al.*,

     **Plaintiffs,**

v.

BRIAN KEMP, *et al.*,

     **Defendants.**

:
:
:
:
:
:
:
:
:
:
:
:

**CIVIL ACTION NO.
1:17-CV-2989-AT**

## ORDER

I.    **Introduction** ............................................................... 2

II.   **Background** ................................................................ 4

III.  **Threshold Jurisdictional Issues** ................................ 16

     A. Standing .............................................................. 16

     B. Eleventh Amendment Immunity ........................ 29

IV.  **Plaintiffs' Motions for Preliminary Injunction** ....... 31

V.   **Conclusion** .............................................................. 45

## I.   Introduction

This case involves colliding election and voting rights dynamics and dilemmas.  The State of Georgia Defendants have delayed in grappling with the heightened critical cybersecurity issues of our era posed for the State's dated, vulnerable voting system that provides no independent paper audit trail.  The Plaintiffs did not bring their preliminary injunction motions in a sufficient time span to allow for thoughtful, though expedited, remedial relief, despite the important, substantive content of their evidentiary submissions in connection with their preliminary injunction motions.  There are no easy answers to the conflicts posed here.  In a democracy, citizens want to be assured of the integrity of the voting process, that their ballots are properly counted and not diluted by inaccurate or manipulated counting, and that the privacy of their votes and personal information required for voter registration is maintained.  But citizens also depend on the orderly operation of the electoral and voting process.  Last-minute, wholesale changes in the voting process operating in over 2,600 precincts, along with scheduled early voting arrangements, could predictably run the voting process and voter participation amuck.  Transparency and accountability are, at the very least, essential to addressing the significant issues that underlie this case.

Currently before the Court in this matter are Defendants' motions to dismiss [Docs. 82, 83, 234] and Plaintiffs' more recently filed motions for preliminary injunction [Docs. 258, 260, 271].  Given the time sensitivity of Plaintiffs' motions with respect to the upcoming November 2018 elections, the Court held an extended

2

full-day hearing on Plaintiffs' motions on September 12, 2018 as well as the threshold jurisdictional issues of standing and Eleventh Amendment immunity raised in Defendants' motions to dismiss.[1]  The Court, out of an abundance of caution, addressed the issues of standing and Eleventh Amendment immunity first and determined whether it could properly exercise jurisdiction over this case before considering Plaintiffs' request for emergency injunctive relief.  After hearing argument on these issues, the Court announced orally its determination that it could properly exercise jurisdiction for purposes of proceeding with the hearing on Plaintiffs' preliminary injunction motions.  The Court further announced that a written order would follow setting forth more specifically the basis for this finding. Accordingly, this Order addresses issues of standing and Eleventh Amendment immunity as well as Plaintiffs' motions for preliminary injunction.

---

[1] Defendants' motions to dismiss also raise other non-jurisdictional arguments that Plaintiffs have failed to state viable claims for relief and that their claims are barred by res judicata and collateral estoppel.  The Court notes that only Fulton County Defendants move to dismiss based on collateral estoppel; the State Defendants do not move on this basis.  With respect to res judicata and collateral estoppel in particular, Plaintiffs have effectively argued at this stage that their current claims are not barred.  Moreover, even if a few Plaintiffs were deemed estopped, it appears that at least some Plaintiffs would still proceed with their claims.  The Court will more fully address these and all other issues raised in Defendants' motions to dismiss in a separate, subsequent order.

3

## II.   Background[2]

In their complaints, their motions for preliminary injunction, and their presentations during the September 12th hearing, Plaintiffs[3] paint an unsettling picture of the vulnerabilities of Georgia's voting system along with the recent, increased, and real threats of malicious intrusion and manipulation of the system and voter data by nation states and cyber savvy individuals.

Plaintiffs start by describing Georgia's voting system.  The system relies on the use of Direct Recording Electronic voting machines ("DREs") for electors to cast their votes in public elections.  This computer voting equipment is used in tandem with the State's Global Election Management Systems ("GEMS") server and County GEMS servers that communicate voting data.[4]   DRE touchscreen computer voting machines are located at polling stations in every precinct during elections and are otherwise stored in various county facilities throughout the state. Electors use DRE machines if they are voting early and in-person with absentee ballots or if they are voting in-person on election day.  "The voting machines are

---

[2] This section provides a brief factual summary based on the allegations in the Curling Plaintiffs' Second Amended Complaint (Doc. 70), the Coalition Plaintiffs' Third Amended Complaint (Doc. 226), the Curling Plaintiffs' Motion for Preliminary Injunction (Doc. 260), the Coalition Plaintiffs' Motion for Preliminary Injunction (Doc. 258), information presented during the September 12, 2018 hearing, and supplemental affidavits as well as Defendants' responses to Plaintiffs' filings.
[3] There are two sets of Plaintiffs in this case represented by separate counsel.  Donna Curling, Donna Price, and Jeffrey Schoenberg are referred to as the "Curling Plaintiffs."  The Coalition for Good Governance ("CGG"), Laura Digges, William Digges III, Ricardo Davis, and Megan Missett are referred to as the "Coalition Plaintiffs."
[4] A related software program is used to create the ExpressPoll pollbooks providing confidential voter identification information by precinct.  Poll workers access this data by computer to verify voter registration and to create the DRE Voter Access Card that activates the specific electronic ballot on the DRE machine that should be linked to the voter's address.

computers with reprogrammable software." (Halderman Affidavit, Doc. 260-2 ¶ 16.) The DRE machines record votes electronically on a removable memory card, and each card is later fed into the county GEMS server to tabulate the vote totals by candidate and the results of other ballot questions. When the polls have closed, poll workers prompt the DRE machines to internally tally the electronic total number of votes and print a paper tape of the vote totals per machine.

Most significantly, the DREs do not create a paper trail or any other means by which to independently verify or audit the recording of *each* elector's vote. i.e., the actual ballot selections made by the elector for either the elector's review or for audit purposes.    Instead, at the hearing, Dr. Alex Halderman, a Professor of Computer Science and Engineering and Director of  the Center for Computer Security and Society at the University of Michigan in Ann Arbor, discussed and demonstrated how a malware virus can be introduced into the DRE machine by insertion of an infected memory card (or by other sources) and alter the votes cast without detection.[5]   Dr. Halderman gave a live demonstration in Court with a Diebold DRE using the same type of equipment and software as that used in Georgia. The demonstration showed that although the same total number of votes were cast, the contaminated memory card's malware changed the actual votes cast between candidates.   There was no means of detection of this as the "malware modified all of the vote records, audit logs, and protective counters stored by the

---

[5] Dr. Halderman's affidavit provides additional detail and context related to his testimony. (Doc. 260-2.)

machine, so that even careful forensic examination of the files would find nothing amiss." (Halderman Affidavit, Doc. 260-2 ¶ 19.) The DRE machine's paper tape simply confirmed the same total number of votes, including the results of the manipulated or altered votes. Viruses and malware have also been developed by cyber specialists that can spread the "vote stealing malware automatically and silently from machine to machine during normal pre- and post-election activities," as the cards are used to interface with the County and State GEMS servers. (*Id.* ¶ 20.)

Other cybersecurity elections experts have shared in Professor Halderman's observations of the data manipulation and detection concealment capacity of such malware or viruses, as well as the ability to access the voting system via a variety of entry points. Plaintiffs filed affidavits in the record for several of these experts.[6] Professor Wenke Lee (Professor of Computer Science at Georgia Tech and a member of a new study commission convened by the Secretary of State) also prepared a PowerPoint presentation summary on the topic for the Commission that identified this malware detection and manipulation capacity. (Pl. Ex 5, Preliminary Injunction Hearing.) Professor Halderman's analysis of the severe limitations of the "logic and accuracy" and "parallel testing" auditing processes used by Georgia to test ballot counting are summarized in his affidavit and will be

---

[6] *See* DeMillo Affidavit, Doc. 277, Ex. C; Buell Affidavit, Doc. 260-3; Stark Affidavit, Doc. 296-1; Bernhard Affidavit, Doc. 258-1 at 33-42. Professor DeMillo, who also testified at the hearing, is the Chair of Computer Science at Georgia Tech and has served as Dean of the College of Computing at Georgia Tech and as Director of the Georgia Tech Center for Information Security.

6

discussed later. (Doc. 260-2 at ¶¶ 37-48.) Suffice it to say, at this juncture, that national- and state-commissioned research-based studies by cybersecurity computer scientists and elections experts consistently indicate that an independent record of an elector's physical ballot is essential as a reliable audit confirmation tool.

The DREs record individual ballot data in the order in which they are cast, and they assign a unique serial number and timestamp to each ballot. This design for recording ballots, according to Plaintiffs, makes it possible to match the ballots to the electors who cast them. Additionally, the Georgia DREs use versions of Windows and BallotStation (developed in 2005) software, both of which are out of date – to the point that the makers of the software no longer support these versions or provide security patches for them. (Halderman Affidavit, Doc. 260-2 ¶¶ 24-28.) The DRE machines and related election software are all the product of Premier Election Solutions, formerly known as Diebold Election Systems. A large volume of the voting machines were purchased when the DRE initiative was first implemented in the 2002 to 2004 period in Georgia.

Statewide, Georgia uses its central GEMS server at the Secretary of State's offices to build the ballots for each election for each county.[7] The central GEMS server communicates the election programming and other files onto the memory cards before an election. From 2002 to December 2017, the Secretary of State

---

[7] The ballot software also programs the location of candidates and other ballot options on the touchscreens of the DRE machines. Ballot adaptations, thus, are created for 159 counties and their over 2,600 precincts.

7

contracted with Kennesaw State University to maintain the central server for the State at a unit in the University called the Center for Election Services ("CES"). Plaintiffs allege that the central server was accessible via the internet for a time – at least between August 2016 and March 2017.

In August 2016, Logan Lamb, a professional cybersecurity expert in Georgia, went to CES's public website and discovered that he was able to access key election system files, including multiple gigabytes of data and thousands of files with private elector information. The information included electors' driver's license numbers, birth dates, full home addresses, the last four digits of their Social Security numbers, and more. Mr. Lamb was also able to access, for at least 15 counties, the election management databases from the GEMS central tabulator used to create ballot definitions, program memory cards, and tally and store and report all votes. He also was able to access passwords for polling place supervisors to operate the DREs and make administrative corrections to the DREs. Immediately, Mr. Lamb alerted Merle King, the Executive Director overseeing CES, of the system's vulnerabilities. The State did not take any remedial action after Mr. King was alerted.

In February 2017, a cybersecurity colleague of Mr. Lamb's, Chris Grayson, was able to repeat what Mr. Lamb had done earlier and access key election information. Mr. Lamb also found, around this time, that he could still access and download the information as he had before. On March 1, 2017, Mr. Grayson notified a colleague at Kennesaw State University about the system's

vulnerabilities, and this led to notification of Mr. King again. Days later, the FBI was alerted and took possession of the CES server.

The Secretary of State has since shut down the CES and moved the central server internally within the Secretary's office. But on July 7, 2017, four days after this lawsuit was originally filed in Fulton Superior Court, all data on the hard drives of the University's "elections.kennesaw.edu" server was destroyed. And on August 9, 2017, less than a day after this action was removed to this Court, all data on the hard drives of a secondary server – which contained similar information to the "elections.kennesaw.edu" server – was also destroyed. As discussed more fully later in this Order, the State offered little more than a one-sentence response to these data system incursions and vulnerabilities at CES.

The Premier/Diebold voting machine models at issue have been the subject of comprehensive critical review both by university computer engineer security experts independently as well as under the auspices of the States of Maryland, California, and Ohio. These studies identified serious security vulnerabilities in the software and resulted in the three states' adoption of different voting systems. (Halderman Affidavit, Doc. 260-2 ¶¶ 17-23; *see also* Atkeson Affidavit, Doc. 276-1 ¶¶ 8-9 (also discussing the states of New Mexico and Virginia transitioning away from DREs after identifying several issues with the machines).)[8]

---

[8] By contrast, the Secretary of State certified in April 2018 the accuracy and safety of the Georgia DRE system. This certification was based on a pre-announced examination of voting facilities and the conducting of a tiny mock election in several Georgia counties on November 27-29, 2017 by a combination of staff from the Secretary of State's Office and the Center for Election Services at Kennesaw State University. (Def. Ex. 2 from Preliminary Injunction Hearing.) No

Plaintiffs point to several national authorities which, in the last year, have raised the alarm about U.S. election security – and particularly about the use of DREs in elections. For instance, in March 2018, the Secretary of the U.S. Department of Homeland Security (DHS) declared DRE voting systems to be a "national security concern," (Coalition Complaint, Doc. 258-1 at 10 n. 3) – approximately 14 months after the Department declared election systems to be "critical infrastructure" pursuant to 42 U.S.C. § 5195c.[9] (U.S. Department of Homeland Security, "DHS Cybersecurity Services Catalog for Election Infrastructure," at 3.)[10] In May 2018, the Senate Select Committee on Intelligence concluded that DREs are "at highest risk of security flaws" and that states "should rapidly replace outdated and vulnerable voting systems" with systems that have a verified paper trail. (*Id.* at 11 n. 5.) And on September 6, 2018, after it was commissioned to consider the future of voting in the United States, the National Academies of Sciences, Engineering, and Medicine[11] and associated National

---

cybersecurity experts or computer engineering scientists are listed as participants in this review. There is no indication in the description of the examination that any effort was made to go beyond a simple running of the equipment and observation of election procedures to reach this determination. In other words, there is no indication that any effort was made to evaluate the trove of software and data security and accuracy issues identified in studies performed on behalf of other states or by cybersecurity and computer engineers in the field.

[9] Critical infrastructure is defined as "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." Section 5195c(b) of the Critical Infrastructures Protection Act makes clear that information systems and their interdependence constitute a central concern of Congress.

[10] *See* https://www.eac.gov/assets/1/6/DHS_Cybersecurity_Services_Catalog_for_Election_Infrastructure.pdf.

[11] Congress established the National Academies of Sciences, Engineering, and Medicine in 1863 as an independent body, which has the obligation to provide scientific and technical advice to any department of the Government upon request and without compensation. *See*

Research Council ("NAS") issued a consensus report about the need to secure and improve state and local election systems.[12] The report, titled "Securing the Vote: Protecting American Democracy," made a number of recommendations, including that "[e]very effort should be made to use human-readable paper ballots in the 2018 federal election." (Doc. 285-1 at 35.) The report further recommended that voting machines that do not produce paper audit trails for each elector's vote "should be removed from service as soon as possible" and that each state "should require a comprehensive system of post-election audits of processes and outcomes." (*Id.* at 35-36.)

Similarly, the Board of Advisors of the U.S. Elections Assistance Commission (EAC) passed a resolution in 2018 recommending that the EAC "not certify any system that does not use voter-verifiable paper as the official record of voter intent."[13]

Dr. Wenke Lee, Professor of Computer Science at Georgia Tech University and Co-Executive Director of the Institute for Information Security – the sole computer scientist appointed to the Secretary of State's new Secure Accessible Fair Elections ("SAFE") Commission – has echoed these same paper ballot and audit

---

http://www.nasonline.org/about-nas/leadership/governing-documents/act-of-incorporation.html.

[12] As noted by Professor Richard A. DeMillo in his supplemental affidavit, "a consensus report of the NAS . . . represents the highest authority that the U.S. Government can rely upon when it seeks to be advised on matters of science, technology and engineering." (Doc. 285-1 ¶ 9.)

[13] *See* discussion of EAC action and audit outcome issues in the affidavit of Philip B. Stark, Professor of Statistics and Associate Dean of Mathematical and Physical Sciences and faculty member in Graduate Program in Computational Data Science and Engineering at University of California, Berkeley. (Doc. 296 ¶¶ 20-25.)

verification recommendations in his August 30, 2018 presentation on cybertechnology to the Commission. He has also stressed the essential need for installation on an ongoing basis of new hardware and software components designed to provide security protection to ensure voting system security. (Pl. Ex. 5, Preliminary Injunction Hearing.)

In the midst of the events involving the breach of the CES at Kennesaw State University, Plaintiffs filed the current case against Defendants[14] in August 2017. Plaintiffs essentially claim that the DRE voting system in Georgia is unsecure, is unverifiable, and compromises the privacy and accuracy of their votes, and therefore they claim that Defendants' continued use of the DRE system violates their constitutional rights. A brief overview of the particular claims brought by each set of Plaintiffs is instructive here.

The Coalition Plaintiffs bring two federal claims in their Third Amended Complaint:

(1) a 42 U.S.C. § 1983 claim for violation of the Fourteenth Amendment's guarantee of due process, based on the substantial burden placed on their fundamental right to vote; and

---

[14] Defendants are largely classified in two groups: (1) the "State Defendants," which include Brian Kemp in his official capacity, the State Election Board, and members of the State Election Board (David J. Worley, Rebecca N. Sullivan, Ralph F. Simpson, and Seth Harp) in their official capacities; and (2) the "Fulton County Defendants," which include Richard Barron in his official capacity, the Fulton County Board of Registration and Elections, and members of the Fulton County Board of Registration and Elections (Mary Carole Cooney, Vernetta Nuriddin, David J. Burge, and Aaron Johnson) in their official capacities.

(2) a 42 U.S.C. § 1983 claim for violation of the Fourteenth Amendment's guarantee of equal protection, based on the more severe burdens placed on the Plaintiffs' right to vote, right to freedom of speech and association, and the Georgia constitutional right to a secret ballot[15] as a result of Plaintiffs choosing to vote by DRE relative to other similarly situated electors choosing to vote another way.

For each of these claims, the Coalition Plaintiffs seek declaratory and injunctive relief against Brian P. Kemp in his official capacity as the Secretary of State of Georgia and as Chairperson of the State Election Board; the members of the State Election Board (David J. Worley, Rebecca N. Sullivan, Ralph F. "Rusty" Simpson, and Seth Harp) in their official capacities; and the members of the Fulton County Board of Registration and Elections (Mary Carole Cooney, Vernetta Nuriddin, David J. Burge, Stan Matarazzo, and Aaron Johnson) in their official capacities. The Coalition Plaintiffs' Third Amended Complaint seeks a range of relief that is broader than their Motion for Preliminary Injunction now before the Court. Specifically, the Coalition Plaintiffs' Third Amended Complaint seeks the following:

- A court order declaring it unconstitutional to conduct public elections using any DRE model,

---

[15] The Coalition Plaintiffs clarify, in their Response to the State Defendants' Motion to Dismiss, that they are not bringing a state-law claim for violation of the Georgia Constitution. They are instead bringing a federal § 1983 claim based on unequal enforcement of state law.

- An injunction enjoining Defendants from enforcing O.C.G.A. § 21-2-383(b)[16] and Georgia State Election Board Rule 183–1–12–.01[17] and from requiring voters to cast votes using DREs,

- An injunction prohibiting Defendants from conducting public elections with optical scanned paper ballots without also requiring post-election audits of paper ballots to verify the results, and

- An injunction prohibiting Defendants from conducting public elections without also requiring subordinate election officials to allow meaningful public observation of all stages of election processing.

The Curling Plaintiffs bring essentially the same two constitutional claims as those brought by the Coalition Plaintiffs.  As a slight variation, the Curling Plaintiffs bring their constitutional claims against the Defendants listed above as well as one additional defendant: Richard Barron in his official capacity as the Director of the Fulton County Board of Registration and Elections.  The Curling

---

[16] "Notwithstanding any other provision of this Code section, in jurisdictions in which direct recording electronic (DRE) voting systems are used at the polling places on election day, such direct recording electronic (DRE) voting systems shall be used for casting absentee ballots in person at a registrar's or absentee ballot clerk's office or in accordance with Code Section 21-2-382, providing for additional sites." O.C.G.A. § 21-2-383(b).

[17] "Beginning with the November 2002 General Election, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia shall be conducted at the polls through the use of direct recording electronic (DRE) voting units supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State. In addition, absentee balloting shall be conducted through the use of optical scan ballots which shall be tabulated on optical scan vote tabulation systems furnished by the Secretary of State or purchased by the counties with the authorization of the Secretary of State; provided, however, that the use of direct recording electronic (DRE) voting units is authorized by the Secretary of State for persons desiring to vote by absentee ballot in person." Ga. Comp. R. & Regs. r. 183–1–12–.01.

14

Plaintiffs also seek somewhat varied relief for these claims in their Second
Amended Complaint:

- A court order declaring that Defendants violated the Fourteenth
  Amendment, and

- An injunction prohibiting Defendants from using DREs or other voting
  equipment that fails to satisfy state requirements.[18]

As stated above, both sets of Plaintiffs seek more limited and immediate
relief in their motions for preliminary injunction.  The Curling Plaintiffs ask the
Court to order the following relief prior to the November 2018 general election: (1)
enjoin the State Defendants to direct all counties that the use of DREs in the
November 2018 election (and the December 2018 runoff election) is prohibited,
with the exception for electors with disabilities; (2) enjoin the State Defendants to
direct all counties to conduct elections using paper ballots; and (3) require the
State Defendants to promulgate rules requiring and specifying appropriate
procedures for conducting manual audits of election results.  Similarly, the
Coalition Plaintiffs ask the Court to: (1) prohibit Defendants from conducting the
November 2018 election (and the December 2018 runoff election) with DRE

---

[18] Additionally, the Curling Plaintiffs bring a state-law claim under O.C.G.A. § 9-6-20 for a writ of
mandamus ordering Defendants to discontinue the use of DRE machines and to either use (a) an
optical scanning voting system or (b) hand-counted paper ballots.  The Curling Plaintiffs seek a
writ of mandamus against the following Defendants: the members of the State Election Board in
their official capacities; the State Election Board; Richard Barron in his official capacity as the
Director of the Fulton County Board of Registration and Elections; the members of the Fulton
County Board of Registration and Elections in their official capacities; and the Fulton County
Board of Registration and Elections.

machines for in-person voting; (2) order Defendants to conduct such elections using paper ballots, as permitted by Georgia law, with certain exceptions made for persons with disabilities; (3) order the State Election Board Members to promulgate rules requiring and specifying appropriate procedures for conducting manual audits of election results; and (4) order the Secretary of State, before October 1, 2018, to audit and correct any identified errors in the DRE system's electronic pollbook data that will be used in both such elections.

The Court now turns to the jurisdictional issues raised in Defendants' motion to dismiss before addressing the Plaintiffs' motions for preliminary injunction.

## III.   Threshold Jurisdictional Issues

### A.   Standing

The State Defendants argue that both the Curling Plaintiffs and the Coalition Plaintiffs lack standing to bring their claims in federal court. According to the State Defendants, Plaintiffs fail to establish each of the three elements required for standing. The Fulton County Defendants' Motion to Dismiss incorporates by reference the State Defendants' arguments on standing. (*See* Fulton Mot. to Dismiss, Doc. 82-1 at 5.)

The Supreme Court has set forth the standard for determining whether a party has standing:

> It is by now well settled that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest

> that is (a) concrete and particularized, and (b) actual or imminent, not
> conjectural or hypothetical. Second, there must be a causal connection
> between the injury and the conduct complained of. . . . Third, it must
> be likely, as opposed to merely speculative, that the injury will be
> redressed by a favorable decision.

*United States v. Hays*, 515 U.S. 737, 742–43 (1995) (quoting *Lujan v. Defenders*

*of Wildlife*, 504 U.S. 555, 560–561 (1992)) (internal quotation marks omitted).

"[A] plaintiff must demonstrate standing for each claim he seeks to press and for

each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*,

137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S.

724, 734 (2008)).

As to the first element, Defendants contend that Plaintiffs have not

sufficiently alleged a concrete "injury in fact." Defendants argue that Plaintiffs'

allegations that the DRE voting machines are vulnerable to hacking and are

"presumed to be compromised" convey only a speculative, generalized fear, thus

falling short of establishing a concrete injury.

These arguments are unavailing. For one, Plaintiffs have alleged that the

DRE voting system was *actually* accessed or hacked multiple times already – albeit

by cybersecurity experts who reported the system's vulnerabilities to state

authorities, as opposed to someone with nefarious purposes. (Curling Complaint,

Doc. 70 ¶¶ 42-43, 45-49; Coalition Complaint, Doc. 226 ¶¶ 95-106.) Contrary to

Defendants' characterizations, Plaintiffs' allegations are not premised on a

theoretical notion or "unfounded fear"[19] of the hypothetical "possibility" that Georgia's voting system might be hacked or improperly accessed and used. Plaintiffs allege that harm has in fact occurred, specifically to their fundamental right to participate in an election process that accurately and reliably records their votes and protects the privacy of their votes and personal information. (Curling Complaint, Doc. 70 ¶ 14 ("Curling also chose to exercise her right to cast her vote using a verifiable paper ballot in the Runoff, so as to ensure that her vote would be permanently recorded on an independent record. To do so, Curling persisted through considerable inconvenience – only to be incorrectly told by Defendants Kemp and the Fulton County Board of Registration and Elections that she had not, in fact, cast a ballot, creating irreparable harm that her ballot was not counted."); ¶ 16 (Donna Price "cast her vote on a DRE in the 2016 General Election," and "[w]ithout the intervention of this Court, Price will be compelled to choose between relinquishing her right to vote and acquiescing to cast her vote under a system that violates her right to vote in absolute secrecy and have her vote accurately counted"); ¶ 38 ("DREs produce neither a paper trail nor any other means by which the records of votes cast can be audited."); ¶¶ 42-43 ("Lamb was able to access key components of Georgia's electronic election infrastructure . . . . In accessing these election system files, Lamb found a startling amount of private information," including driver's license numbers, birth dates, and the last four digits of Social

---

[19] *See* State Defendants' Motion to Dismiss Coalition Plaintiffs' Third Amended Complaint, Doc. 234-1 at 1.

18

Security numbers); Coalition Complaint, Doc. 226 ¶ 152 (member of CGG, Brian

Blosser, "was prohibited from voting on April 18, 2017 . . . when his name did not

appear on the eligible voter rolls" for the Sixth Congressional District and "was

instead erroneously listed" as a resident of another district, an error that Fulton

County Board members blamed on a "software glitch"); ¶ 154 (members of CGG,

Mr. and Ms. Digges, previously in 2017 "chose to vote by mail-in paper absentee

ballot because they were aware that an electronic ballot cast using an AccuVote

DRE was insecure," and they "were required to undergo the inconvenience of

requesting paper ballot[s] and the cost of postage to mail their ballots" "well before

Election Day"); ¶ 72 ("Georgia's AccuVote DREs do not record a paper or other

independent verifiable record of the voter's selections."); ¶ 92 ("[D]esign flaws

render the electronic ballots cast on AccuVote DREs capable of being matched to

voter records maintained by pollworkers and pollwatchers," and thereby expose

citizens' candidate selections to poll workers); ¶ 97 ("Lamb freely accessed files

hosted on the 'elections.kennesaw.edu' server, including the voter histories and

personal information of all Georgia voters . . . . Lamb noted that the files had been

publicly exposed for so long that Google had cached (i.e., saved digital backup

copies of) and published the pages containing many of them."); ¶ 138 ("Fulton

Board Members have adopted voting procedures under which individual electronic

ballots bearing a unique identifier are transmitted from Fulton County's AccuVote

DREs located in satellite voting centers to Fulton County's central GEMS

tabulation server in clear text (i.e., unencrypted) over an ordinary, unsecured

telephone line on Election Night. This practice violates fundamental security principles because it subjects the transmitted votes to manipulation (such as man-in-the-middle interception and substitution of votes) and exposes the votes with their unique identifier to third-party interception, violating voters' rights of secrecy in voting.").)

Plaintiffs also allege the threat of future harm. For instance, in upcoming elections, Plaintiffs allege that Defendants are requiring them to vote early, mail a paper absentee ballot, and pay for postage to avoid having to use unsecure DRE machines, thereby subjecting them to unequal treatment. Furthermore, Plaintiffs plausibly allege a threat of a future hacking event that would jeopardize their votes and the voting system at large. Despite being aware of election system and data cybersecurity threats and vulnerabilities identified by national authorities and the DRE system's vulnerability to hacking as early as August 2016 – when Logan Lamb, the computer scientist, first alerted the State's Executive Director of the CES of his ability to access the system – Defendants allegedly have not taken steps to secure the DRE system from such attacks. (Curling Complaint, Doc. 70 ¶ 46 ("[N]ot only did Georgia fail to take remedial action when alerted to the problem Lamb raised, it failed to act even in the face of the detailed information on the cybersecurity threats facing the nation's election systems, and the recommended specific steps to reduce the risk, which were disseminated by the FBI, the DHS and

the EAC[20]."); Coalition Complaint, Doc. 226 ¶ 112 ("[N]o efforts have been made to remediate the compromised software programs and machines or to identify and remove any malware that was likely introduced during the lengthy security breaches referred to herein on the 'elections.kennesaw.edu' server that hosted the election-specific software applications and data that are re-installed on every piece of voting and tabulation equipment used to conduct Georgia's elections in advance of each election conducted using Georgia's Voting System.").)

Importantly, courts have recognized these sorts of alleged harms as concrete injuries, sufficient to confer standing. In particular, courts have found that plaintiffs have standing to bring Due Process and Equal Protection claims where they alleged that their votes would likely be improperly counted based on the use of certain voting technology. *See, e.g., Stewart v. Blackwell*, 444 F.3d 843, 855 (6th Cir. 2006) ("The increased probability that their votes will be improperly counted based on punch-card and central-count optical scan technology is neither speculative nor remote."), *vacated* (July 21, 2006), *superseded*, 473 F.3d 692 (6th Cir. 2007) (vacated and superseded on the grounds that the case was rendered moot by the county's subsequent abandonment of the DRE machines at issue); *Banfield v. Cortes*, 922 A.2d 36, 44 (Pa. Commw. Ct. 2007) (finding that the plaintiffs had sufficiently alleged standing under similar Pennsylvania law, based on "the fact that Electors have no way of knowing whether the votes they cast on a

---

[20] DHS is the acronym for the U.S. Department of Homeland Security, and EAC is the acronym for the U.S. Election Assistance Commission.

DRE have been recorded and will be counted," which "gives Electors a direct and immediate interest in the outcome of this litigation"); *c.f. Stein v. Cortes*, 223 F. Supp. 3d 423, 432-33 (E.D. Pa. 2016) (where plaintiffs sought a vote recount, post-election, based on the use of unsecure DREs, finding no standing based on the plaintiffs' "less than clear" allegations that the DRE machines are "hackable"; that the Pennsylvania Election Code's recount provisions are "labyrinthine, incomprehensible, and impossibly burdensome"; and that the past vote count was inaccurate – which plaintiffs merely posed as a "seemingly rhetorical question").

Turning to causal connection, the second element of standing, Defendants raise different arguments in response to the Curling Plaintiffs' claims versus the Coalition Plaintiffs' claims.  For the Curling Plaintiffs, Defendants argue that any injury would be traced to illegal hacking into the DREs, not the use of the DREs themselves.  Here, as discussed above, the Curling Plaintiffs have alleged that Defendants were aware of serious security breaches in the DRE voting system and failed to take adequate steps to address those breaches.  Notably, even after Mr. Lamb first alerted the State about his access of the voting system, he and another cybersecurity expert were able to access the system *again* about six months later. (Curling Complaint, Doc. 70 ¶ 47.)  Plaintiffs allege that Defendants have continued to fail to take action to remedy the DRE system's vulnerabilities.  (*Id.* ¶¶ 46, 61, 62, 72.)  And they allege that this failure, in turn, impacts the integrity of the voting system and their ability as citizens to rely upon it when casting votes in this system.  (*Id.*)  At the motion to dismiss stage, these allegations plausibly show

22

causal connection, even if indirectly, between Defendants' continued use of unsecure DREs and the injury to Plaintiffs' constitutional rights. *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action . . . .").

For the Coalition Plaintiffs, Defendants make the same argument above regarding causation (which fails) and another slightly different argument. Defendants take issue with the Coalition Plaintiffs' request for relief enjoining the State Defendants from enforcing O.C.G.A. § 21-2-383(b) and State Election Board Rule 183–1–12–.01. Defendants assert that the State Defendants (the Secretary and the State Election Board) do not mandate the use of DREs; rather, state law requires the use of DREs. Defendants maintain that the State Defendants are merely implementing the governing state law, which they are bound to do, and therefore Plaintiffs miss the mark by seeking to enjoin the State Defendants' actions instead of challenging the state law itself. In this way, Defendants argue that Plaintiffs have not linked their injury to any action by the State Defendants.

But O.C.G.A. § 21-2-383(b) does not *require* the use of DREs as Defendants claim it does. The statute requires absentee electors who vote in-person in the advance voting period to vote by DRE, but only "in jurisdictions in which direct recording electronic (DRE) voting systems are used at the polling places on election day." The statute simply specifies the use of DREs under certain circumstances. Rather, it is the State Election Board that issued a rule requiring

the use of DREs in "all federal, state, and county general primaries and elections, special primaries and elections, and referendums," and requiring the use of DREs by "persons desiring to vote by absentee ballot in person." Ga. Comp. R. & Regs. r. 183–1–12–.01. When read together, the state statute and the State Election Board rule indicate that the State Defendants have chosen to enforce state law so as to generally require the use of DREs in elections statewide.

Even apart from the statutory language, the Coalition Plaintiffs have plausibly alleged that the State Defendants play a critical role in directing, implementing, programming, and supporting the DRE system throughout the state. The Coalition Plaintiffs allege that the Secretary provided the counties with the DRE machines and the software on which they operate. (Coalition Complaint, Doc. 226 ¶ 59.) Additionally, from 2002 to December 2017, the Secretary allegedly contracted with Kennesaw State University to create the Center for Election Services ("CES") "to assist the Secretary in the fulfillment of his statutory duties to manage Georgia's election system." (*Id.* ¶ 93.) The CES maintained a central computer server containing sensitive voting-related information such as software applications, voter registration information, ballot building files, and "other sensitive information critical to the safe and secure operation of Georgia's Voting System." (*Id.* ¶¶ 94, 119.) These factual allegations, when considered with the Third Amended Complaint as a whole, show that the Coalition Plaintiffs have alleged enough of a causal link between the State Defendants' conduct and their injury for standing purposes.

Finally, on the third element of redressability, Defendants raise some of the same arguments as they do for the second element. Defendants argue that an injunction prohibiting the State Defendants from using DREs would not actually stop the deployment of DREs. Defendants maintain that county officials not included in this suit would continue to use DREs, as the State is not the entity that enforces the law requiring DREs. Defendants also argue that a different balloting system would not eliminate potential third-party interference, as no election system is flawless.

As stated above, the Court finds that the Coalition Plaintiffs have sufficiently alleged that the State Defendants play a significant role in the continued use and security of DREs, and therefore the requested injunction would help redress some of the Coalition Plaintiffs' injury. The Secretary of State both has the authority and obligation to investigate complaints regarding the accuracy and safety of the DRE voting system and to take appropriate corrective action in connection with the continued use of the DRE system. O.C.G.A. § 21-2-379.2. The Third Amended Complaint describes how the Secretary of State could play a critical role in conducting an in-depth investigation and formulating a remedy. As alleged in the Complaint, the State of California commissioned a study in 2007 to examine the security of its own Diebold AccuVote DRE system, the same type of system used in Georgia. Upon the study's findings that the DRE system was inadequate, had serious design flaws, and was susceptible to hacking, California's Secretary of State then decertified its DRE system in 2009. (Coalition Complaint, Doc. 226 ¶¶ 81,

25

84, 86.)  The Complaint similarly alleges that the Secretary of State for Ohio commissioned an independent expert study of a newer version of the DREs than those used in Georgia and reached similar conclusions as to the lack of trustworthy design and vulnerability to attack of the election system.  (*Id.* ¶¶ 81, 83, 85.)

The State Defendants here are similarly in a position to redress the Plaintiffs' alleged injury.  Thus, if the Court were to grant at least part of the requested injunctive relief as to the suspended use of the DRE voting system, any injunction would likely enjoin both the State Defendants as well as the Fulton County Defendants (as there is no argument that the County would not be enjoined). Furthermore, as to Defendants' argument that no election system is flawless, the Coalition Plaintiffs rightly point out that this is not the standard for redressability. Plaintiffs are seeking relief to address a particular voting system which, as currently implemented, is allegedly recognized on a national level to be unsecure and susceptible to manipulation by advanced persistent threats through nation state or non-state actors.  Plaintiffs are not asking for a system impervious to all flaws or glitches.

Defendants assert three additional arguments related to standing: that the Coalition Plaintiffs cannot manufacture standing by inflicting harm on themselves, that the individual Plaintiff Coalition for Good Governance ("CGG") lacks organizational and associational standing, and that Plaintiffs must reside in the jurisdiction for which they seek to enjoin DRE use.

The first of these arguments fails because the cases relied on by Defendants are distinguishable. Here, the Coalition Plaintiffs are suffering injury from the voluntary exercise of their *fundamental right to vote*, not from just any sort of activity that they decide to engage in. In *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), the plaintiffs voluntarily spent money to take certain protective measures, based on a hypothetical fear of being subject to surveillance. And in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the plaintiffs expressed an intent to voluntarily return to certain places they had visited before, which would deprive them of the opportunity to observe animals of an endangered species. These activities do not invoke the protection associated with exercising fundamental rights, such as the right to vote. The Coalition Plaintiffs aptly point out that Defendants' logic would bar many voting rights cases, based on individuals choosing to vote by one method or another, which certainly is not how courts have assessed standing in this context.

Defendants' challenge of CGG's standing similarly fails. "An organization has standing to enforce the rights of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) (internal quotation marks omitted). The State Defendants argue that the Coalition Plaintiffs merely "presume" harm to their own members, without sufficiently

alleging harm to one or more of their members.  (State Mot. to Dismiss, Doc. 234-1 at 31.)  They also argue that CGG cannot assert that individuals are "members" merely because they are listed on CGG's mailing list.  (*Id.*)  The Coalition Plaintiffs, however, have alleged that the individual Plaintiffs – Laura Digges, William Digges III, Ricardo Davis, and Megan Missett – are all members of CGG.  Contrary to Defendants' assertion, these particular Plaintiffs do not allege that they are members of CGG solely because they are on the mailing list.  Furthermore, at least one of these Plaintiffs also alleges harm to his or her individual rights under the federal Constitution, as discussed above, so that they could presumably sue Defendants in their own right.  (Coalition Complaint, Doc. 226 ¶¶ 24-27.)  The Court finds these allegations sufficient to confer associational standing to CGG.[21]

As for Defendants' argument that Plaintiffs must reside in the county where they seek injunctive relief, this argument misses the mark.  The Court need only find that one plaintiff (from each of the two sets of Plaintiffs) has sufficiently alleged standing, and that is the case here. *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009) ("Because Balzli has standing to raise those claims, we need not decide whether either of the organizational plaintiffs also has standing to do so.").  Specifically, the Curling Plaintiffs allege that Donna Curling is a resident of Fulton County and intends to vote in the upcoming elections in Fulton County.  (Curling Complaint, Doc. 70 ¶

---

[21] The Court need not reach Defendants' challenge to CGG's *organizational* standing, as the Court has already found the Coalition Plaintiffs sufficiently alleged *associational* standing for CGG. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009).

28

13.)  The Coalition Plaintiffs likewise allege that Megan Missett is a resident of Fulton County who intends to vote in the County's upcoming elections.  (Coalition Complaint, Doc. 226 ¶ 27.)  Based on the current allegations, both Ms. Curling and Ms. Missett have established the required elements of injury in fact, causation, and redressability as discussed above.

In sum, the Court finds that both sets of Plaintiffs have sufficiently alleged standing to bring their claims at this juncture.

## B.   Eleventh Amendment Immunity

Defendants argue that Plaintiffs' two federal claims are barred by the Eleventh Amendment.  Defendants acknowledge the *Ex Parte Young*[22] exception to Eleventh Amendment immunity, which allows claims against state officers in their official capacities for prospective injunctive relief.  But Defendants assert that the exception does not apply here for the following reasons: Plaintiffs seek to enjoin the enforcement of a state law that they do not challenge as unconstitutional; Plaintiffs have not alleged an ongoing or continuous violation of federal law; Plaintiffs seek to remedy past, not prospective, conduct; and Plaintiffs' requested relief implicates special state sovereignty interests.

Defendants' arguments are meritless.  First, Plaintiffs rightly point out that the *Ex Parte Young* exception applies to as-applied challenges to state statutes, not just facial challenges as Defendants imply.  Here, Plaintiffs specifically challenge the application of Georgia's law by Defendants to require in-person voting by DRE.

---

[22] 209 U.S. 123 (1908).

Second, Plaintiffs clearly allege an ongoing and continuous violation of federal law. The injunctive relief they request is designed to prevent injury by enjoining the use of DREs in upcoming elections and other future elections. Third, and likewise, Plaintiffs seek to remedy prospective harm.[23] Fourth, the requested relief does not implicate special state sovereignty interests by essentially usurping the State's role in regulating elections. Plaintiffs are not asking the Court to direct how the State counts ballots. They are asking the Court to bar the use of DREs based on the specific circumstances, history, and data security issues presented in this case and where the State has alternative options of using optical scanners and hand counting ballots. And they seek to require the State to implement a fully auditable ballot system designed to ensure the accuracy and reliability of the voting process in this challenging era when data system vulnerabilities pose a serious risk of opening election data, processes, and results to cyber manipulation and attack.

Thus, pursuant to *Ex Parte Young*, the Court finds that the Eleventh Amendment does not bar Plaintiffs' federal claims.[24]

For the reasons stated above, the Court finds that it has jurisdiction at this juncture for purposes of considering Plaintiffs' motions for preliminary injunction.

---

[23] Defendants' arguments opposing Plaintiffs' motions for preliminary injunction belie this argument, as Defendants claim that the requested injunctive relief, if granted, would harm them on the eve of the *upcoming* November 2018 election.

[24] At one point, State Defendants cite to cases involving state sovereign immunity issues. The Court clarifies that state sovereign immunity is not at issue here – only Eleventh Amendment sovereign immunity. Plaintiffs do not allege violations of the Georgia Constitution. They allege violations of the U.S. Constitution based in part on the enforcement of state law requiring the use of DREs for in-person voting. (*See* SEB Rule 183–1–12–.01.)

30

The Court therefore **DENIES IN PART** Defendants' Motions to Dismiss [Docs. 82, 83, 234] as discussed herein.

## IV.  Plaintiffs' Motions for Preliminary Injunction

To obtain preliminary injunctive relief, the moving party must show that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).  In the Eleventh Circuit, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four prerequisites." *Id.* (internal citations omitted).

Furthermore, the Supreme Court has recognized that there are special considerations involved with impending elections and the critical issues at stake. In *Reynolds v. Sims*, the Court stated:

> [O]nce a State's [election-related] scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.  However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid.  In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.

377 U.S. 533, 585 (1964); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (holding that courts are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures").

Considering the totality of the evidence and affidavits presented at this juncture, the Court finds with a measure of true caution that Plaintiffs are likely to satisfy the first element for a preliminary injunction – a likelihood of success on the merits – for at least some of their claims. The Court's caution is that though the parties have filed endless briefs on Defendants' multiple motions to dismiss and amended complaints, largely due to Plaintiffs' changes in counsel, the case did not move substantively forward until the motions for preliminary injunction were filed in August 2018. The subject matter in this suit is complex, even if well-presented, and there is still key information that needs to be gathered. For instance, the voting system and data handling deficiencies in one county, Fulton County, could possibly impact all other counties in the state. The State also never called the Chief Information Officer for the Secretary of State's Office to testify, and substantive answers from other state officials were limited by their lack of computer science expertise and apparent knowledge. In short, the case would benefit from some discovery and a full evidentiary hearing on the merits over several days.

32

That said, the Supreme Court has held that "[i]t is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotation marks omitted). The Court goes on to recognize that "[i]t does not follow [] that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Id.* Thus, courts apply a more flexible standard in this context:

> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. . . . Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. . . . But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.

*Id.* at 434 (internal quotation marks omitted).

Here, Plaintiffs have shown that their Fourteenth Amendment rights to Due Process and Equal Protection have been burdened. Put differently, the State's continued reliance on the use of DRE machines in public elections likely results in "a debasement or dilution of the weight of [Plaintiffs'] vote[s]," even if such conduct does not completely deny Plaintiffs the right to vote. *Bush v. Gore*, 531 U.S. 98, 105 (2000) (quoting *Reynolds*, 377 U.S. at 555).

33

Plaintiffs shine a spotlight on the serious security flaws and vulnerabilities in the State's DRE system – including unverifiable election results, outdated software susceptible to malware and viruses, and a central server that was already hacked multiple times. Mirroring the truncated affidavit statement of Merritt Beaver, the Chief Information Officer in the Office of the Secretary of State, the State Defendants' response brief merely states, without more, that the central server is no longer an issue because the way Kennesaw State University maintained the system "is not the way that those tasks are undertaken now." (*See* Response, Doc. 265 at 22; Beaver Affidavit, Doc. 265-1.) The Defendants presented no witness with actual computer science engineering and forensic expertise at the preliminary injunction hearing to address the impact of the Kennesaw State University breach or the specifics of any forensic evaluation of the servers, DREs, removable media used for transfer of data, analog phone modems, and other connected devices that together constitute the election system. The Defendants' response brief is close to non-responsive to the concerns that Plaintiffs raise about the serious vulnerability of the server and the election data system at large to intrusion, virus, or attack. Defendants' response is bare-boned in the absence of evidence of installation of updates to software or equipment or evidence of statewide software and hardware scrubbing – after at least one or more portions of the database system operated by Kennesaw State University was left accessible for at least six months. In fact, Defendants presented scant evidence to rebut Plaintiffs' expert evidence regarding Georgia's persistent failure to update or

34

replace software systems, despite security flaws identified by the software industry.[25]

Michael Barnes, the Director of the CES at Kennesaw State University,[26] was the sole staff member at the CES to move over to the State when the Center's functions were taken over by the Secretary of State's office. He in turn became the Center's Director once this transfer occurred. The State presented his testimony at trial. Mr. Barnes professed effectively no knowledge about the ramifications for the state's voter system or remedial measures in connection with Mr. Lamb's accessing the CES's voter registration databases – which was filled with millions of voter records with personally identifiable information, passwords for election day supervisors, and the software used to create ballot definitions, memory cards, and vote tabulations. Mr. Barnes also appeared not to recognize the full scope of the contamination risks posed by his own use of a plug-in USB drive (which he connects both to the central GEMS "air-gapped" server and his own "public facing" computer that is connected to the Internet) to transfer vital elections programming data to the counties. Mr. Barnes similarly did not appear to recognize the risks associated with the use of analog phone connections for the transfers of election results.

---

[25] Indeed, after Fulton County experienced a meltdown in the tabulation of the vote in the primary for the Sixth Congressional District in 2017, Richard Barron, the Director of Registration and Elections for Fulton County, vocally expressed his view that the software system of 2000 vintage should be investigated and should have been replaced. (Pl. Ex. 9, Preliminary Injunction Hearing.)

[26] Mr. Barnese is not a computer scientist.

As discussed earlier, the Curling Plaintiffs' voting-systems cybersecurity expert, Alex Halderman, demonstrated at the hearing how malware could be introduced into a DRE machine via a memory card and actually change an elector's vote without anyone knowing. (*See also* DeMillo Affidavit, Doc. 277 Ex. C; Buell Affidavit, Doc. 260-3; Bernhard Affidavit, Doc. 258-1 at 33-42.) Additionally, Professor Halderman explained in his testimony in detail the reasons why the DRE auditing and confirmation of results process used by state officials on a sample basis is generally of limited value. This process is keyed to matching the *total* ballots cast, without any independent source of individual ballot validation, and it can be defeated by malware similar to that used by the Volkswagen emissions software that concealed a car's actual emissions data during testing. (Halderman testimony at hearing; Halderman Affidavit, Doc. 260-2 ¶¶ 35-48; *see also* DeMillo Affidavit, Doc. 277, Ex. C ¶¶ 10-20.) Further, parallel testing of DREs is of limited value. "If the testing reveals, at the close of the election, that the machines were counting incorrectly, there will likely be no way to recover the true results, since the machines used in Georgia have no paper backup records." (Halderman Affidavit, Doc. 260-2 ¶ 41.)

Plaintiffs also emphasize current cybersecurity developments regarding election security and the heightened, legitimized concerns of election interference. Contrary to Defendants' assertions, Plaintiffs' claims do not boil down to paranoia or hypothetical fear. National security experts and cybersecurity experts at the highest levels of our nation's government and institutions have weighed in on the

specific issue of DRE systems in upcoming elections and found them to be highly vulnerable to interference, particularly in the absence of any paper ballot audit trail.[27]  Indeed, the evidence and testimony presented conforms with the patterns of heightened cybersecurity breach and data manipulation attacks now regularly appearing in civil financial cases as well as criminal cases.[28]

Defendants assert that the state election laws at issue are "narrowly drawn to effect the State's regulatory interest in maintaining fair, honest and efficient elections."  (Response, Doc. 265 at 15.)  This conclusory re-statement of an overarching principle of Fourteenth Amendment voting jurisprudence[29] does not by itself answer the issues before the Court.  However, the Court recognizes the important policy changes and objectives achieved by the State's adoption via the Secretary of State's Office of the statewide integrated DRE voting system in approximately 2002.  But the DRE system also originally was intended to include the capacity for an independent paper audit trail of every ballot cast, and this feature was never effectuated.  (Report of the 21st Century Voting Commission, Pl. Ex. 10 at 38, introduced at Preliminary Injunction hearing; testimony of Cathy Cox.)

---

[27] The PowerPoint presentation of Dr. Wenke Lee, the sole cybersecurity scientist serving on the Secretary of State's new SAFE Commission, identifies similar overarching risks and solutions, including paper ballots as durable evidence of election results.  (Pl. Ex. 5 at Preliminary Injunction Hearing.)

[28] But in contrast to the circumstances where there is no independent vote audit trail, when money is stolen through cybercrime, ultimately the theft is clearly obvious – the funds are gone.

[29] See Burdick, 504 U.S. at 433.

As the Court noted at the preliminary injunction hearing, rapidly evolving cybertechnology changes and challenges have altered the reality now facing electoral voting systems and Georgia's system in particular.  And it is this reality that Plaintiffs substantiated with expert affidavits and testimony as well as an array of voter affidavits and documentation.  Defendants sidestep the fact that Georgia is only one of five states that rely on a DRE voting process that generates no independent paper ballot or audit record.  Yet the Plaintiffs' evidence as to the problems of security, accuracy, reliability, and currency of Georgia's system and software have hardly been rebutted by Defendants except via characterizations of the issues raised as entirely hypothetical and baseless.  Ultimately, an electoral system must be accurate and trustworthy.  The State's apparent asserted interest in maintaining the DRE system without significant change cannot by itself justify the burden and risks imposed given the circumstances presented.  *Burdick*, 504 U.S. at 434.

Plaintiffs are substantially likely to succeed on the merits of one or more of their constitutional claims, though this finding is a cautious, preliminary one, especially in light of the initial state of the record.  Plaintiffs have so far shown that the DRE system, as implemented, poses a concrete risk of alteration of ballot counts that would impact their own votes. Their evidence relates directly to the manner in which Defendants' alleged mode of implementation of the DRE voting system deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted).

38

*United States v. Classic*, 313 U.S. 299, 315 (1941); *Stewart*, 444 F.3d at 868.

Plaintiffs' evidence also goes to the concern that when they vote by DRE, their vote

is in jeopardy of being counted less accurately and thus given less weight than a

paper ballot.[30] As the Supreme Court held in *Bush v. Gore*:

> The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. . . . It must be remembered that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."

531 U.S. 98, 104-05 (2000) (internal citations omitted).

The Defendants rely on *Wexler v. Anderson*, 452 F.3d 1226 (11th Cir. 2006)

in maintaining that Plaintiffs cannot establish the viability of their Fourteenth

Amendment claims described above. But *Wexler* and this case are distinguishable.

The Eleventh Circuit noted that the *Wexler* plaintiffs "did not plead that voters in

touchscreen counties are less likely to cast effective votes due to the alleged lack of

a meaningful manual recount procedure in those counties," and therefore their

"burden is the mere possibility that should they cast residual ballots, those ballots

will receive a different, and allegedly inferior, type of review in the event of a

manual recount." *Id.* at 1226. *Wexler* distinguishes this situation from the one in

---

[30] Plaintiffs allege other theories under these constitutional claims, including that their right to cast a secret ballot is violated and that they must incur greater costs to cast an absentee ballot if they choose to avoid voting by DRE. Plaintiffs may be less likely to prevail on these theories, though the Court will not reach that conclusion now, especially given the incomplete status of the evidentiary record.

*Stewart v. Blackwell*, 444 F.3d at 868-72, where strict scrutiny was applied based on the plaintiffs' allegations of "vote dilution due to disparate use of certain voting technologies." 444 F.3d at 871. Thus, in contrast with *Stewart*, the Eleventh Circuit in *Wexler* did not apply strict scrutiny and instead reviewed "Florida's manual recount procedures to determine if they are justified by the State's 'important regulatory interests.'" *Wexler*, 452 F.3d at 1233 (citing *Burdick*, 504 U.S. at 434)).

Here, Plaintiffs appear to present facts that fall somewhere between *Wexler* and *Stewart*. Unlike *Wexler*, Plaintiffs are alleging that they are less likely to be able to cast accurate or effective ballots when voting by DRE. The evidence here is not as well developed as that in *Stewart*, which was decided on a fully factually developed summary judgment record. Still, Plaintiffs in this case have presented sufficient evidence so far that their votes cast by DRE may be altered, diluted, or effectively not counted on the same terms as someone using another voting method – or that there is a serious risk of this under the circumstances.

Turning to the second element for a preliminary injunction, the Court also finds that Plaintiffs have demonstrated a real risk of suffering irreparable injury without court intervention. This analysis to some extent parallels the "injury in fact" standing analysis above. Absent an injunction, there is a threat that Plaintiffs' votes in the upcoming elections will not be accurately counted. Given the absence of an independent paper audit trail of the vote, the scope of this threat is difficult

40

to quantify, though even a minor alteration of votes in close electoral races can make a material difference in the outcome.

Finally, the Court considers together the last two factors in evaluating whether preliminary injunctive relief should be granted: whether the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and, if issued, whether the injunction would not be adverse to the public interest. The Court considers these factors in tandem, as the real question posed in this context is how injunctive relief at this eleventh-hour would impact the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast.

*This assessment involves a true catch-22.*

While Plaintiffs have shown the threat of real harms to their constitutional interests, the eleventh-hour timing of their motions and an instant grant of the paper ballot relief requested could just as readily jeopardize the upcoming elections, voter turnout, and the orderly administration of the election. Defendants introduced substantial evidence from Elections Directors from counties with major populations (e.g., Fulton, Cobb, Gwinnett, Muscogee, and Richmond Counties) regarding the fiscal, organizational, and practical impediments and burdens associated with a court order that would require immediate implementation of paper ballot and ballot scanning voting systems for the 2018 election cycle. (*See* Testimony of Richard Barron at Preliminary Injunction Hearing; Doc. 265-3; Doc. 265-6.) Various representatives of the

41

Secretary of State's office provided testimony regarding similar organizational and fiscal challenges. Some of these concerns, such as authority for emergency purchase orders of ballot paper or scanners, clearly are resolvable based on emergency purchase provisions under state and local law. The Court's greater concern, in considering the evidence, is that the massive scrambling required to implement such injunctive relief in roughly 2,600 precincts and 159 countries will seriously test the organizational capacity of the personnel handling the election, to the detriment of Georgia voters.

Plaintiffs have submitted evidence from various jurisdictions in other states of their ability to smoothly roll out a paper ballot/optical scanning system in an expedited time frame as well an affidavit from the administrator overseeing Maryland's transition over an expedited, but still far longer, time frame. The challenges presented in these jurisdictions are not comparable to managing a rapid implementation of a balloting system, associated technology, and administrative transition in less than seven weeks on a statewide basis in large population centers as well as tiny ones simultaneously. Nor is it likely simple to roll out a paper ballot system with proper, efficient scanning, when many polling station personnel throughout the state have never handled this scope of a paper ballot exercise -- or used accompanying scanners on a massive basis.

Further, early elections begin mid-October. This poses an even earlier deadline for action and organization. Fulton County's Elections Director testified that the County would only be able to cope with the challenges of an immediate

42

ballot requirement by limiting early voting to one central location, rather than offering it at 20 locations spread throughout the county. This, of course, would likely directly impact voter turnout and access to voting.

Ultimately, any chaos or problems that arise in connection with a sudden rollout of a paper ballot system with accompanying scanning equipment may swamp the polls with work and voters – and result in voter frustration and disaffection from the voting process. There is nothing like bureaucratic confusion and long lines to sour a citizen. And that description does not even touch on whether voters themselves, many of whom may never have cast a paper ballot before, will have been provided reasonable materials to prepare them for properly executing the paper ballots.

The Court attempted to expedite this case at earlier times to no avail. The Court understands some of the reasons why Plaintiffs may have been unable to file a preliminary injunction motion before new counsel for the Coalition Plaintiffs filed a Third Amended Complaint in June 2018. But the *August* filing of their motion for preliminary injunction effectively put the squeeze on their proposed remedial relief. Requiring injunctive relief on this broad of a scale, and on an abrupt, time-limited basis, would likely undermine a paper ballot initiative with a scanned audit trail that appears in reality to be critically needed.

Meanwhile, the State Defendants have also stood by for far too long, given the mounting tide of evidence of the inadequacy and security risks of Georgia's DRE voting system and software. The Court is gravely concerned about the State's

43

pace in responding to the serious vulnerabilities of its voting system – which were raised as early as 2016 – while aging software arrangements, hardware, and other deficiencies were evident still earlier.  The Secretary of State's Secure, Accessible, & Fair Elections (SAFE) Commission has held just two meetings since its establishment in April 2018, though it is tasked with making recommendations to the legislature that convenes in January 2019.  The State and the County's arguments about the time and resource constraints at issue, in the event the Court granted the requested injunctive relief, are compelling right now, with the November election just weeks away.  But these arguments only weaken the more that time passes and if Defendants continue to move in slow motion or take ineffective or no action.  For upcoming elections after November 2018, Defendants are forewarned that these same arguments would hold much less sway in the future – as any timing issues then would appear to be exclusively of Defendants' own making at that point.

Upon considering the totality of the evidence in connection with the four factors that must guide the Court's determination regarding the grant of extraordinary relief as to Plaintiffs' constitutional claims, the Court finds that the Plaintiffs have not carried their burden of persuasion to establish these prerequisites for such extraordinary injunctive relief in the immediate 2018 election time frame ahead.

## V.   Conclusion

While Plaintiffs' motions for preliminary injunction [Docs. 258, 260, 271] are **DENIED,** the Court advises the Defendants that further delay is not tolerable in their confronting and tackling the challenges before the State's election balloting system.  The State's posture in this litigation – and some of the testimony and evidence presented – indicated that the Defendants and State election officials had buried their heads in the sand.  This is particularly so in their dealing with the ramifications of the major data breach and vulnerability at the Center for Election Services, which contracted with the Secretary of State's Office, as well as the erasure of the Center's server database and a host of serious security vulnerabilities permitted by their outdated software and system operations.

A wound or reasonably threatened wound to the integrity of a state's election system carries grave consequences beyond the results in any specific election, as it pierces citizens' confidence in the electoral system and the value of voting.

Advanced persistent threats in this data-driven world and ordinary hacking are unfortunately here to stay.  Defendants will fail to address that reality if they demean as paranoia the research-based findings of national cybersecurity engineers and experts in the field of elections.  Nor will surface-level audit procedures address this reality when viruses and malware alter data results and evade or suppress detection.  The parties have strongly intimated that this case is headed for immediate appeal.  But if the case stays with or comes back to this Court, the Court will insist on further proceedings moving on an expedited

45

schedule.  The 2020 elections are around the corner.  If a new balloting system is to be launched in Georgia in an effective manner, it should address democracy's critical need for transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote.

**IT IS SO ORDERED** this 17th day of September, 2018.

**Amy Totenberg**
**United States District Judge**

46

Fulton County Superior Court
***EFILED***JT
Date: 1/7/2019 2:24 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
### STATE OF GEORGIA

| | |
|---|---|
| COALITION FOR GOOD GOVERNANCE, *et al* | ) ) ) Civil Action File No. 2018CV313418 |
| Plaintiff, | ) ) |
| v. | ) ) |
| ROBYN A CRITTENDEN, Secretary of State of Georgia, *et al* | ) ) ) ) |
| Defendant | ) ) ) |

### ANSWER AND DEFENSES OF DEFENDANT FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS

**COMES NOW,** Defendant Fulton County Board of Registration and Elections ("FCBRE"), by and through its undersigned counsel of record, and respectfully files its Response to Plaintiffs' Petition to Contest Election Result as follows:

### AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Petitioner's claims are barred, in whole or in part for failure to state a claim upon which relief can be granted.

### SECOND DEFENSE

The Petition fails to name necessary and indispensable parties.

### THIRD DEFENSE

Petitioners' Claims against Defendant are barred for lack of personal jurisdiction.

1

## FOURTH DEFENSE

Petitioners' claims against Defendant are barred due to improper service and/or insufficient service of process.

## FIFTH DEFENSE

There are not sufficient votes at issue to cause the election results to be placed in doubt or to change the outcome.

## SIXTH DEFENSE

The unnumbered Introduction to the Petition contains legal argument and a summary of Plaintiffs' claims and does not require a response. To the extent that any response is required, Defendant FCBRE denies that Plaintiffs are entitled to any relief.

## SEVENTH DEFENSE

Petitioners lack a clear legal right to the relief sought.

## EIGHTH DEFENSE

Defendant has not breached a duty owed to Petitioners.

## NINTH DEFENSE

Defendant's compliance with Georgia law is being carried out in good faith, without conscious, reckless or negligent disregard for the rights of any voter.

## TENTH DEFENSE

Defendant has not subjected Plaintiffs to the deprivation of any rights, due process or equal protection guaranteed by the Unites States Constitution.

## ELEVENTH DEFENSE

Defendant is not capable of providing a remedy to Plaintiffs since its powers and duties do not include the ability to determine what voting system is used in Georgia.

2

## TWELFTH DEFENSE

Subject to and without waiving the foregoing affirmative defenses, Defendant responds to the individually numbered paragraphs of Plaintiff's Petition as follows:

1.

Defendant FCBRE admits that the general election for Lieutenant Governor for the State of Georgia was held on November 6, 2018, but denies the remaining allegations contained in Paragraph 1.

2.

Defendant FCBRE denies the allegations contained in Paragraph 2 and further states that it was not "repeatedly and formally warned" of any of the issues outlined in Paragraph 2.

3.

Defendant FCBRE admits that the race for Lieutenant Governor received fewer votes than other races that were farther down the ballot, but denies the remaining allegations contained in Paragraph 3.

4.

Defendant FCBRE denies the allegations contained in Paragraph 4 and further states that a number of reasonable explanations exist for the vote discrepancy in the Lieutenant Governor's race.

5.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 5, and for this reason, the allegations contained in Paragraph 5 are denied.  FCBRE further states that the Coalition is not a proper party plaintiff under O.C.G.A. §21-2-521.

3

6.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 6, and for this reason, the allegations contained in Paragraph 6 are denied.   FCBRE further states that the Coalition is not a proper party plaintiff under O.C.G.A. §21-2-521.

7.

Defendant FCBRE denies the allegations of Paragraph 7 and further states that the Coalition is not a proper party plaintiff under O.C.G.A. § 21-2-521.

8.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 8, and for this reason, the allegations contained in Paragraph 8 are denied.

9.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 9, and for this reason, the allegations contained in Paragraph 9 are denied.

10.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 10, and for this reason, the allegations contained in Paragraph 10 are denied.

4

11.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 11, and for this reason, the allegations contained in Paragraph 11 are denied.

12.

Defendant FCBRE admits that Robyn A. Crittenden is the Secretary of State of Georgia, that the Secretary's office operates the GEMS tabulation server and Election Night Reporting System, that the Secretary certifies election results, and that the Secretary is involved with the design and preparation of electronic ballots. Defendant denies the remaining allegations of Paragraph 12.

13.

Defendant FCBRE admits that it is the election superintendent for Fulton County elections; that it conducted the November 6, 2018 general election, including the Lieutenant Governor's election, in Fulton County; and that other counties' election superintendents conducted the same election. Defendant denies the remaining allegations of Paragraph 13.

14.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 14, and for this reason, the allegations contained in Paragraph 14 are denied.

15.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 15, and for this reason, the allegations contained in Paragraph 15 are denied.

16.

Paragraph 16 does not require a response, but to the extent a response is required, Defendant FCBRE states that the paragraph speaks for itself.

17.

Defendant FCBRE admits the allegations contained in Paragraph 17.

18.

Paragraph 18 contains legal argument that does not require a response. To the extent a response is required, Defendant FCBRE denies that jurisdiction and venue is proper in this Court because it is where Defendant Crittenden resides, because Defendant Crittenden is not a proper party to an election contest. Defendant FCBRE admits that Fulton County is an allowable venue for a statewide election contest under the statute, but denies that jurisdiction is proper in this Court and further denies that it is a proper party for the non-election-contest counts of Plaintiffs' Petition. Defendant FCBRE denies the remaining allegations of Paragraph 18.

19.

Paragraph 19 contains legal argument that does not require a response. To the extent a response is required, Defendant FCBRE admits that the Secretary of State certified the statewide results on November 17, 2018. Defendant FCBRE denies that the Petition was timely filed because it did not name all required parties within the statute of limitations and denies any remaining allegations contained in Paragraph 19.

6

20.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 20, and for this reason, the allegations contained in Paragraph 20 are denied.

21.

Defendant FCBRE admits that it used the Diebold AccuVote DRE touchscreen units for in-person voting, Diebold optical scan-machines for absentee and provisional ballots, and GEMS software for tabulation and reporting of results for the November 6, 2018 election. Defendant FCBRE denies that the electronic poll book components "interface" with the DRE machines but admits that it used ExpressPoll units for poll book functions. Defendant FCBRE denies the remaining allegations of Paragraph 21.

22.

Defendant FCBRE admits that the DREs use memory cards and store information regarding voters' actions to memory cards and internal memory. Defendant denies the remaining allegations of Paragraph 22.

23.

Defendant FCBRE admits that the DREs run a version of Microsoft Windows CE, but is without knowledge or information sufficient to form a response to the remaining allegations contained in Paragraph 23, and for this reason, the allegations contained in Paragraph 23 are denied.

7

24.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 24 and footnotes 1 and 2, and for this reason, the allegations contained in Paragraph 24 and footnotes 1 and 2 are denied.

25.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 25 and footnote 3, and for this reason, the allegations contained in Paragraph 25 and footnote 3 are denied.

26.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 26 and footnotes 4-9, and for this reason, the allegations contained in Paragraph 26 and footnotes 4-9 are denied.

27.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 27, and for this reason, the allegations contained in Paragraph 27 are denied.

28.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 28, and for this reason, the allegations contained in Paragraph 28 are denied.

8

29.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 29, and for this reason, the allegations contained in Paragraph 29 are denied.

30.

Defendant FCBRE admits that the Secretary of State contracted with Kennesaw State University for a period of time and that the functions previously carried out by KSU are now housed in the Secretary's office. Defendant FCBRE is without knowledge or information sufficient to form a response to the remaining allegations contained in Paragraph 30, and for this reason, the remaining allegations contained in Paragraph 30 are denied.

31.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 31, and for this reason, the allegations contained in Paragraph 31 are denied.

32.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 32, and for this reason, the allegations contained in Paragraph 32 are denied.

33.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 33, and for this reason, the allegations contained in Paragraph 33 are denied.

9

34.

Defendant FCBRE states that the quoted order speaks for itself as to content and legal effect and denies any allegation inconsistent therewith.

35.

Defendant FCBRE denies that it acted recklessly in complying with state law and using the DRE election system in the 2018 general election. Defendant is without knowledge or information sufficient to form a response to the remaining allegations contained in Paragraph 35, and for this reason, the remaining allegations contained in Paragraph 35 are denied.

36.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 36, and for this reason, the allegations contained in Paragraph 36 are denied.

37.

In response to Paragraph 37, Defendant FCBRE states that the quoted order speaks for itself as to content and legal effect and denies any allegation inconsistent therewith. Defendant FCBRE is without knowledge or information sufficient to form a response to the remaining allegations contained in Paragraph 37, and for this reason, the remaining allegations contained in Paragraph 37 are denied.

38.

Defendant FCBRE admits that Fulton County voters reported problems during the November 6, 2018 election but denies that those problems resulted in voter disenfranchisement. Defendant FCBRE is without knowledge or information sufficient to

10

form a response to the remaining allegations contained in Paragraph 38, and for this reason, the remaining allegations contained in Paragraph 38 are denied.

39.

Paragraph 39 does not require a response. To the extent a response is required, Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 39, including what "campaigns, non-profit voter protection groups, and the press" that it covers, and for this reason, the allegations contained in Paragraph 39 are denied.

40.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 40, and for this reason, the allegations contained in Paragraph 40 are denied.

41.

Upon information and belief, Defendant FCBRE admits the allegations contained in Paragraph 41.

42.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 42, and for this reason, the allegations contained in Paragraph 42 are denied.

43.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 43, and for this reason, the allegations contained in Paragraph 43 are denied.

11

44.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 44, and for this reason, the allegations contained in Paragraph 44 are denied.

45.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 45, and for this reason, the allegations contained in Paragraph 45 are denied.

46.

Defendant FCBRE denies the allegations contained in Paragraph 46.

47.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 47, and for this reason, the allegations contained in Paragraph 47 are denied.

48.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 48, and for this reason, the allegations contained in Paragraph 48 are denied.

49.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 49, and for this reason, the allegations contained in

12

Paragraph 49 are denied.   Defendant further states that there are a number of possible explanations for the lower vote total in the Lieutenant Governor's race.

50.

Defendant FCBRE admits that the Lieutenant Governor is the second highest state official and that the Lieutenant Governor is also the President of the State Senate. Defendant is without knowledge or information sufficient to form a response to the remaining allegations contained in Paragraph 50, and for this reason, the allegations contained in Paragraph 50 are denied.

51.

Defendant FCBRE admits that the reported vote totals show that there were less total votes cast for Lieutenant Governor than for other statewide races, but is without knowledge or information sufficient to form a response to the remaining allegations contained in Paragraph 51, and for this reason, the remaining allegations contained in Paragraph 51 are denied.

52.

Defendant FCBRE admits that the reported vote totals show there were less total votes cast for Lieutenant Governor than for other statewide races, but is without knowledge or information sufficient to form a response to the percentages and remaining allegations contained in Paragraph 52, and for this reason, the remaining allegations contained in Paragraph 52 are denied.

53.

Defendant FCBRE admits that the reported vote totals show there were less total votes cast for Lieutenant Governor than for other statewide races, but is without knowledge

13

or information sufficient to form a response to the remaining allegations contained in Paragraph 53, and for this reason, the allegations contained in Paragraph 53 are denied. Defendant further states that there are a number of possible explanations for the lower vote total in the Lieutenant Governor's race.

54.

Defendant FCBRE is without knowledge or information sufficient to form a response to the allegations contained in Paragraph 54, and for this reason, the allegations contained in Paragraph 54 are denied. Defendant further states that there are a number of possible explanations for the lower vote total in the Lieutenant Governor's race.

55.

In response to Paragraph 55, Defendant FCBRE states that the letter from Ms. Amico to Secretary Crittenden speaks for itself as to content and legal effect. Defendant is without knowledge or information sufficient to form a response to the remaining allegations contained in Paragraph 55, and for this reason, the remaining allegations contained in Paragraph 55 are denied. Defendant further states that there are a number of possible explanations for the lower vote total in the Lieutenant Governor's race.

56.

In response to Paragraph 56, Defendant FCBRE states that the letter from Secretary Crittenden to Ms. Amico speaks for itself as to content and legal effect. Defendant is without knowledge or information sufficient to form a response to the remaining allegations contained in Paragraph 55, and for this reason, the remaining allegations contained in Paragraph 55 are denied. Defendant further states that there are a number of possible explanations for the lower vote total in the Lieutenant Governor's race.

14

57.

Defendant FCBRE denies the allegations contained in Paragraph 57.

58.

Defendant incorporates by reference its responses to the foregoing paragraphs of the Complaint.

59.

Defendant FCBRE denies the allegations contained in Paragraph 59.

60.

Defendant FCBRE denies the allegations contained in Paragraph 60.

61.

Defendant FCBRE denies the allegations contained in Paragraph 61.

62.

Defendant FCBRE denies the allegations contained in Paragraph 62.

63.

Defendant FCBRE denies the allegations contained in Paragraph 63.

64.

Defendant FCBRE denies the allegations contained in Paragraph 64.

65.

Defendant FCBRE denies the allegations contained in Paragraph 65.

66.

Defendant incorporates by reference its responses to the foregoing paragraphs of the Complaint.

15

67.

Paragraph 67 contains legal argument that does not require a response. Defendant states that the United States Constitution and the Due Process Clause of the Fourteenth Amendment speak for themselves.

68.

Paragraph 67 contains legal argument that does not require a response.

69.

Defendant FCBRE denies the allegations contained in Paragraph 69.

70.

Defendant FCBRE denies the allegations contained in Paragraph 70.

71.

Defendant FCBRE denies the allegations contained in Paragraph 71.

72.

Defendant FCBRE denies the allegations contained in Paragraph 72.

73.

Defendant incorporates by reference its responses to the foregoing paragraphs of the Complaint.

74.

Defendant FCBRE denies the allegations contained in Paragraph 74. Defendant further states that hand-marked ballots do not necessarily provide clear and determinable records of voter intent.

75.

Defendant FCBRE denies the allegations contained in Paragraph 75.

16

76.

Defendant FCBRE denies the allegations contained in Paragraph 76.

## GENERAL DENIAL

Defendant that Plaintiffs are entitled to any of the relief sought and denies each numbered paragraph of the Prayer for Relief.  Defendant further denies each and every allegation of the Complaint not specifically admitted denied or otherwise contradicted herein responded to

WHEREFORE, Defendant FCBRE requests:

(a) That the Petition be dismissed entirely or that Defendant FCBRE be dismissed as a party;

(b) That all relief sought by Plaintiffs be denied;

(c) That judgment be issued in Defendant FCBRE's favor;

(d) That attorneys' fees and costs be assessed against Plaintiffs;

(e) That the Petition be dismissed for lack of jurisdiction; and

(f) Any other further relief as this Court deems just and proper.

Respectfully submitted this 7th day of January, 2019.

OFFICE OF THE FULTON COUNTY ATTORNEY
Patrise Perkins-Hooker
County Attorney
Georgia Bar No. 572358
Patrise.perkins-hooker@fultoncountyga.gov

/s/ Kaye Woodard Burwell
Kaye Woodard Burwell
Georgia Bar No. 775060
Kaye.burwell@fultoncountyga.gov
Cheryl Melissa Ann Ringer
Georgia Bar No. 557420
Cheryl.ringer@fultoncountyga.gov

17

David Lowman
Georgia Bar No. 460298
David.lowman@fultoncountyga.gov
Attorneys for Defendant Fulton County BRE

141 Pryor Street, S.W.
Suite 4038
Atlanta, Georgia 30303
Office: (404) 612-0246
Fax:   (404)730-6540

18

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

COALITION FOR GOOD )
GOVERNANCE, *et al* )
 ) Civil Action File No. 2018CV313418
Plaintiff, )
 )
v. )
 )
ROBYN A CRITTENDEN, Secretary of )
State of Georgia, *et al* )
 )
Defendant )
 )

## CERTIFICATE OF SERVICE

This is to certify that on this day, I have caused to be electronically filed the foregoing

**ANSWER AND DEFENSES OF FULTON COUNTY BOARD OF REGISTRATIONS**

**AND ELECTIONS** with the Fulton County Superior Court using the Odyssey efile GA system

which will provide automatic notification of this filing to all counsel of record.

This 7th day of January, 2019.


/s/ Kaye Woodard Burwell
Kaye Woodard Burwell
Georgia Bar No. 775050

19

**IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA**

| | |
|---|---|
| COALITION FOR GOOD GOVERNANCE, *et al* | ) |
| | ) |
| | ) Civil Action File No. 2018CV313418 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBYN A CRITTENDEN, Secretary of State of Georgia, *et al* | ) |
| | ) |
| Defendant | ) |
| | ) |

## VERIFICATION

Personally appeared before the undersigned officer duly authorized to administer oaths, DWIGHT BROWER, who having first been duly sworn, deposes and says that the ANSWER AND DEFENSES OF DEFENDANT FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS, filed in the Superior Court of Fulton County, was prepared with the assistance and advice of counsel, and that the facts contained therein are true and correct to the best of my knowledge, information, and belief.

This _7ᵀᴴ_ day of January, 2019.

DWIGHT BROWER
Elections Chief, Fulton County Department of
Registration and Elections

SWORN to and subscribed
before me this 7 day
of January, 2019.



20

_Breauna Jenkins_
Notary Public
My Commission Expires: 4 | 7 | 20 20

21

Fulton County Superior Court
***EFILED***MH
Date: 1/8/2019 5:07 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

COALITION FOR GOOD
GOVERNANCE,
RHONDA J. MARTIN, SMYTHE
DUVAL, and JEANNE DUFORT,

                 **Plaintiffs,**

**v.**

ROBYN A. CRITTENDEN,
SECRETARY STATE OF GEORGIA,
FULTON COUNTY BOARD OF
REGISTRATION AND ELECTIONS,
GWINNETT COUNTY BOARD OF
REGISTRATIONS AND ELECTIONS,
DEKALB COUNTY BOARD OF
REGISTRATIONS AND ELECTIONS,
and GEOFF DUNCAN,

                 **Defendants.**

**Civil Action No.: 2018CV313418**

## SUPPLEMENTAL BRIEF IN SUPPORT OF GEOFF DUNCAN'S MOTION TO

## DISMISS

NOW COMES the Defendant, Geoff Duncan, and files this Supplemental Brief in

Support of his Motion to Dismiss by showing the following:

### Argument

### *It's About Simple Math*

Under Georgia law, "It is presumed that election returns are valid, and the party

contesting the election has the burden of showing an irregularity or illegality sufficient to change

or place in doubt the result of the election." *Hunt v. Crawford*, 270 Ga. 7(1), 507 S.E.2d 723

(1998); *Baker v. Cole*, 278 Ga. 532, 535 (2004). O.C.G.A. 21-2-527 provides that regardless of

the nature or seriousness of the electoral irregularities claimed, the Petitioners must establish that such irregularities were so sufficient to "place in doubt the result of the entire . . . election."

Numerous cases have addressed what must be shown by the Petitioners to prevail. In *Mead v. Sheffield*, 278 Ga. 268, 271 (2004), the Supreme Court held that the "the focus in an election contest involving illegal ballots is on whether they "exceeded ... the margin of victory." Similarly, in *Howell v. Fears*, 275 Ga. 627, 628 (2002) the Court held that "the contestor must affirmatively show that a sufficient number of voters voted illegally or were irregularly recorded in the contest being challenged to make a difference or cast doubt on the outcome." In *Fuller v. Thomas*, 284 Ga. 397,398 (2008), the Supreme Court set out the required test as follows: "Where the focus is on improperly cast ballots or irregularities in the conduct of the election, the number of illegal or irregular ballots necessary to cast doubt on an election is derived by taking the difference between the total votes cast in the election and the race at issue, and adding the margin of victory in the race at issue."

The Petitioners' claims that the DRE voting machines utilized in Georgia resulted in a flawed election for Lt. Governor. Plaintiffs' Notice of Proffer of Evidence. In support of this they allege the following facts: 1. There were substantially fewer votes cast in the Lt. Governor's race than in other "down ballot" statewide races; 2. The drop off in voting between the Governor and Lt. Governor's race was substantially higher with voters voting electronically than voters voting by paper ballots; and the shortfall in ballots cast electronically disproportionately impacted the Democratic Candidate for Lt. Governor Ms. Sarah Riggs Amico over Mr. Duncan. Petitioners' Petition Paragraphs 52, 53, and 54. Even if these drop offs were the result of malfunctioning election voting, which all Defendants have denied, Petitioners' Petition must as matter of law still be dismissed. The reason is simple math.

According to the Secretary of State's certified results, the total number of ballots cast in the various statewide races in Georgia on November 6, 2018, were as follows:

Governor:  3,939,328

Lt. Governor:  3,780,304

Secretary of State: 3,883,594

Attorney General:  3,862,370

Commissioner of Insurance:  3,861,625

State School Superintendent:  3,862,464

Commissioner of Labor:  3,849,450

PSC, District 3:  3,858,554

PSC, District 5:  3,855,670

Mr. Duncan's margin of victory over Ms. Amico was 123,172 votes (1,951,738 vs. 1,828,566).

Looking first at the difference between the Lt. Governor's race and other down ballot races, the highest number of votes cast in a down ballot race was in the Secretary of State Race in which 103,290 more votes were cast.  This is 19,882 votes short of Mr. Duncan's margin of victory.

In relation to the Governor's race, Petitioners argue two things:  1.  There was a substantial difference between the drop off voting between the paper ballot voters and the electronic ballot voters; and 2. The greater drop off had a disproportionately higher percentage impact on Ms. Amico.

In regards to the drop off in paper ballot voters versus the drop off in electronic ballot voters, the Petitioners assert that with paper ballots 98.9% of those voters who voted in the Governor's race also in the Lt. Governor's race and argue that the same drop off percentage should have occurred in the electronic balloting.  They further argue that this shortfall had a

disproportionate impact on Ms. Amico, asserting that the shortfall resulted in Mr. Duncan

receiving 98.5% of votes cast for Mr. Kemp but Ms. Amico only received 94.8% of the vote

received by Ms. Abrams.  Petitioners' Petition Paragraph 54, Petitioners' Response Brief, p. 13.

  First let us look at what this means in terms of a raw vote number increase.  Assuming

the Petitioners' allegation to be true, it would have still resulted in only 3,895,955 votes being

cast in the Lt. Governor's race, an increase in only 115,691 votes, which is once again less than

Mr. Duncan's margin of victory.

  The shortfall from Mr. Duncan's margin of victory increases further when you accept the

Petitioners' assertion that she should have gotten the same percentage of her Democratic

Governor running mates' votes that Mr. Duncan received from his Republican counterpart.  In

this Petitioners' scenario, Mr. Duncan would have received 1,948,732 votes and Ms. Amico

should have received 1,894,830 votes.  This results in a margin of victory for Mr. Duncan of

53,902 votes.

### Conclusion

  These simple mathematical flaws in the Petitioners' Petition and Brief is why Ms. Amico

herself in a letter attached to the Petition admitted:  "The number of residual votes in the

Lieutenant Governor's race is unlikely to affect the outcome of my race ..."

  Therefore, the Petitioners' Petition seeking a new election should be dismissed as a

matter of law.

This 8 day of January, 2019.

DENTONS US LLP

Edward H. Lindsey Jr.
Georgia Bar No. 453075

Samuel S. Olens
Georgia Bar No. 551540

DENTONS US LLP
303 Peachtree St NE, Suite 5300
Atlanta, GA  30308
Telephone:  (404) 527-4000
Facsimile:  (404) 527-4198

Attorneys for Defendant, Geoff Duncan

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing SUPPLEMENTAL BRIEF IN SUPPORT OF GEOFF

DUNCAN'S MOTION TO DISMISS has been served upon all interested parties by

electronically filing with the Clerk of the Court using the Odyssey eFileGA System, which will

automatically send an e mail notification of such filing to counsel for the parties.


This ___ day of January, 2019.