**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
**Transcript of Hearing Proceedings on 01/17/2019**

```
 1              IN THE SUPERIOR COURT OF FULTON COUNTY

 2                            STATE OF GEORGIA

 3

 4  COALITION FOR GOOD         .  CIVIL ACTION
      GOVERNANCE, RHONDA J.    .  FILE NO.:  2018-CV-313418
 5

 6  MARTIN, SMYTH DUVAL, and   .
      JEANNE DUFORT,           .  Taken at:
 7

 8      Plaintiffs,            .  Superior Court of Cobb County

 9  vs.                        .  70 Haynes Street

10  ROBYN A. CRITTENDEN,       .  Courtroom 2000

11  Secretary of State of      .  Marietta, Georgia 30090
      Georgia, et. al.         .
12

13      Defendants.            .
      . . . . . . . . . . . . . . ..
14

15

16                    TRANSCRIPT OF HEARING PROCEEDINGS

17                       THURSDAY, JANUARY 17, 2019

18                        9:02 a.m. to 4:53 p.m.

19

20          STATE OF GEORGIA SENIOR JUDGE ADELE P. GRUBBS
      REPORTED BY:
21

22  PRISCILLA GARCIA, COURT REPORTER
      NOTARY PUBLIC, STATE OF GEORGIA
23

24  TRANSCRIBED BY:

25  CHRISTIAN NAADEN
```

Fulton County Superior Court
***EFILED***AC
Date: 2/18/2019 11:58 AM
Cathelene Robinson, Clerk

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 155

```
 1

 2

 3

 4   APPEARANCES:
             Plaintiff's Counsel:    BRUCE P. BROWN, ESQUIRE
 5

 6                                   BRUCE P. BROWN LAW
                                     FLOATAWAY BUSINESS COMPLEX
 7

 8                                   1123 ZONOLITE ROAD N.E.

 9                                   SUITE 6

10                                   ATLANTA, GEORGIA 30306

11                                   404-881-0700
                                     bbrown@brucepbrownlaw.com
12

13
             Plaintiff's Counsel:    MARILYN MARKS, ESQUIRE
14

15                                   COALITION FOR GOOD GOVERNANCE
                                     7035 MARCHING DUCK DRIVE
16

17                                   SUITE E-504

18                                   CHARLOTTE, NORTH CAROLINA 28210
                                     704-552-1618
19

20                                   marilyn@uscgg.org

21

22   Defendant's Counsel:    JOHN BELINFANTE, ESQUIRE
                             ROBBINS, ROSS, ALLOT, BELINFANTE
23

24                                   & LITTLEFIELD, LLC

25                                   500 14TH STREET N.W.
```

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 156

Case 1:17-cv-02989-AT   Document 449-11   Filed 07/03/19   Page 3 of 389

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019          Page 3

```
 1                                ATLANTA, GEORGIA 30318

 2                                404-856-3262
                                  jbelinfante@robbinsfirm.com
 3

 4    CONTINUATION OF APPEARANCES:

 5

 6        Defendant's Counsel:    VINCENT R. RUSSO, ESQUIRE
                                   ROBBINS, ROSS, ALLOT, BELINFANTE
 7

 8                                & LITTLEFIELD, LLC

 9                                999 PEACHTREE STREET N.E.

10                                SUITE 1120

11                                ATLANTA, GEORGIA 30309
                                   404-856-3260
12

13                                vrusso@robbinsfirm.com

14

15        Defendant's Associate Counsel:
                                  ALEXANDER F. DENTON, ESQUIRE
16

17                                ROBBINS, ROSS, ALLOT, BELINFANTE

18                                & LITTLEFIELD, LLC
                                   500 14TH STREET N.W.
19

20                                ATLANTA, GEORGIA 30318
                                   404-856-3276
21

22                                adenton@robbinsfirm.com

23

24

25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 157

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019                    Page 4

```
 1

 2

 3

 4   CONTINUATION OF APPEARANCES:

 5

 6      Defendant's Counsel:        EDWARD H. LINDSEY, JR., ESQUIRE
                                      DENTONS US, LLP
 7

 8                                   303 PEACHTREE STREET N.E.

 9                                   SUITE 5300

10                                   ATLANTA, GEORGIA 30308

11                                   404-527-4580
                                      edward.lindsey@dentons.com
12

13      Defendant's Counsel:        SAMUEL S. OLENS, ESQUIRE
14

15                                   DENTONS US, LLP
                                      303 PEACHTREE STREET N.E.
16

17                                   SUITE 5300

18                                   ATLANTA, GEORGIA 30308
                                      404-527-4108
19

20                                   sam.olens@dentons.com

21

22      Defendant's Counsel:        KAYE WOODARD BURWELL, ESQUIRE
                                      OFFICE OF THE COUNTY ATTORNEY
23

24                                   141 PRYOR STREET S.W.

25                                   SUITE 4038
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 158

```
 1                              ATLANTA, GEORGIA 30303

 2                              404-612-0251
                                kaye.burwell@fultoncountyga.gov
 3

 4   CONTINUATION OF APPEARANCES:

 5

 6       Defendant's Counsel:    BRYAN P. TYSON, ESQUIRE
                                 STRICKLAND, BROCKINGTON &
 7

 8                               LEWIS, LLP

 9                               1170 PEACHTREE STREET N.E.

10                               ATLANTA, GEORGIA 30309

11                               404-219-3160
                                 bryan.tyson@sbllaw.com
12

13
         Defendant's Co-Counsel: RICHARD A. CAROTHERS, ESQUIRE
14

15                               CAROTHERS & MITCHELL, LLC
                                 1809 BUFORD HIGHWAY
16

17                               BUFORD, GEORGIA 30518

18                               770-932-3552
                                 richard.carothers@carsmith.com
19

20

21

22

23

24

25
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 159

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
**Transcript of Hearing Proceedings on 01/17/2019**                                          Page 6

```
 1

 2

 3

 4                              I N D E X
       WITNESS              DIRECT      CROSS          REDIRECT        RECROSS
 5

 6             WITNESSES CALLED ON BEHALF OF THE PLAINTIFF
       Marilyn Marks        31        38,51,54        43,56               50
 7

 8   Sara LeClerc        60,72      74,77,78

 9   Jeanne Dufort         80

10   Christopher Brill    84        89,91,127,128    93,120       113,114

11   Matthew Bernhard    137        150,188,198     156,187,204
      Michael Barnes     210,243    254,276            279           286,287
12

13             WITNESSES CALLED ON BEHALF OF THE DEFENDANT

14

15   None
               EXHIBITS MARKED ON BEHALF OF THE PLAINTIFF
16

17                                        PAGE          PAGE

18   NO.    DESCRIPTION                   OFFERED     RECEIVED
     P-1   -   Secretary of State Email      41      Not Admitted
19

20   P-2   -   LBJ Notes Excel Spreadsheet    64         66
     P-3   -   Brill's Affidavit             98         98
21

22   P-7   - National Academies of Science
                 Engineering and Medicine's report,
23

24             Secured Boot, from 2018       168        168

25   P-8   - Center for Election Systems at
```

www.huseby.com         Huseby, Inc.  Regional Centers         800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 160

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                    Page 7

```
 1            Kennesaw State Email

 2            Communication 2017            243              243

 3

 4        EXHIBITS MARKED ON BEHALF OF THE DEFENDANT
                                          PAGE          PAGE
 5

 6  NO.    DESCRIPTION                   OFFERED      RECEIVED
    1  -   Duncan-Tweet Regarding Fundraising  52        54
 7
    2  -   Ballot Design                  236              236
 8
    3  -   Base Precinct with Reports     264              265
 9
    4  -   Base Precinct with Reports     264              265
10
    5  -   Active Voter TS Status         266              266
11
    6  -   Active Voter TS Status         266              266
12
    7  -   Certified Returns Fulton County  273            273
13
    8  -   Certified Returns Gwinnett County 273           273
14
    9  -   Certified Returns Dekalb County 273            273
15
   10  -   Official Election Returns 2010  273             274
16
   11  -   Official Election Returns 2014  273             274
17
   12  -   Official Election Returns 2018  273             274
18
   13  -   Turnout Percentage Document    273              274
19

20

21

22

23

24

25
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 161

1
                    COBB COUNTY, GEORGIA
2
                    THURSDAY, January 17, 2018 - 9:02 a.m.
3

4
                         * * * * * * *
5

6
        THE COURT:  Good morning, ladies and gentlemen.
7
        MALE:  Good morning, Your Honor.
8
        THE COURT:  Take your seats, if you will.
9
        THE COURT:  First of all, if you are here for the
10
   uncontested divorce calendar, that includes name changes
11
   and all those kind of things, you are in the wrong place.
12
   That is in Juvenile Court Number One.  You have to go back
13
   across the bridge if you're in here by mistake.
14
        Okay.  And we have some recordings.  Rule 22.  Is
15
   everybody in here on -- you're here on the -- supposed to
16
   be some others.  Ms. McDonald.
17
        MS. MCDONALD:  Yes, ma'am.
18
        THE COURT:  You're here.  Mr. Wilke?
19
        MR. WILKE:  Yes, ma'am.
20
        THE COURT:  Yeah, he's here.  And who's the other
21
   one?
22
        THE COURT:  Kauffman.  Mr. Kauffman.
23
        MR. KAUFFMAN:  That's me.
24
        THE COURT:  How'd you get up there?
25

```
 1        MR. KAUFFMAN:  I asked Mr. Davis earlier if it was

 2   okay if I sit here because recording.
          THE COURT:  And you did what, Mr. Davis?
 3

 4        MR. DAVIS:  [Inaudible].
          THE COURT:  Why did he get preference than everybody
 5

 6   else?
          MR. DAVIS:  No one else asked.
 7

 8        THE COURT:  Nobody else asked.  Okay. Good statement.

 9   Anybody else want to come in and [inaudible] -- okay.

10   We'll do that.

11        This is mainly on the case of Rhonda Martin, Smyth
     Duval, and Jeanne Dufort versus Geoff Duncan, Fulton
12

13   County Board of Registration and Elections, Gwinnett
      County Board of Registration and Elections.  Mr. Brown,
14

15   where are your clients?
          MR. BROWN:  Jeanne Dufort is here.
16

17        THE COURT:  She's what?

18        MR. BROWN:  Your question was what, Your Honor?
          THE COURT:  Where are your clients?
19

20        MR. BROWN:  My client, this is Jeanne Dufort.
          THE COURT:  Okay.
21

22        MR. BROWN:  She is the plaintiff in the case.
          THE COURT:  Okay.  And are the other two here too?
23

24        MR. BROWN:  Smyth Duvall.

25        THE COURT:  Mr. Duvall is here?
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 163

 1        MR. BROWN:  He is here.  Yes, Your Honor.

 2        THE COURT:  Okay.  Just trying to identify.  Do you
    need seats to bring them to the table?
 3

 4        MR. BROWN:  We're sort of crowded so this is fine.
          THE COURT:  You all need to be at this table?
 5

 6        MR. BROWN:  No.  He doesn't -- you're fine.  I mean,
    we're okay.
 7

 8        THE COURT:  You are?

 9        MR. BROWN:  Yeah.

10        THE COURT:  And then on this side.  Everybody's
11  together.
          MR. BROWN:  I would like to make a request that
12

13  Marilyn Marks, who is the executive director of the former
     plaintiff, Coalition, and it's been -- helping me in this
14

15  case, it would be an -- it would be a great assistance to
    me, just professionally, if she could also ask specific --
16

17        THE COURT:  She can't sit at the table.

18        MR. BROWN:  Thank you, Your Honor.
          THE COURT:  She can't sit at the table.
19

20        MALE:  My only concern is that we do intend to invoke
    the Rule.  She going be a witness?
21

22        MR. BROWN:  She may and we will decide whether she
    goes first or not.  So she can stay out here.
23

24        MR. LINDSEY:  If she stays -- if she's the first

25  witness then I would object to her staying.

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
**Transcript of Hearing Proceedings on 01/17/2019** Page 11

```
 1        THE COURT:  I'm sorry?

 2        MR. LINDSEY:  If she's the first witness knows the
      Rule, which I guess I have no objections --
 3

 4        THE COURT:  Okay.
          MR. LINDSEY:  -- to her staying.
 5

 6        THE COURT:  Okay.  We'll follow that.  Everybody else
      agree?  I see Fulton and Gwinnett?
 7

 8        MS. BURWELL:  Yes, Your Honor.

 9        THE COURT:  Okay.

10        MR. LINDSEY:  [Inaudible] she could come in.

11        THE COURT:  Okay.  On the Rule 22 request, you cannot
      take anything at each individual table to the lobbies.
12

13   Okay.  I know you were here last time and you did a good
      job, but you can't -- or any conversation between lawyers
14

15   and witnesses.  You have to honor the confidentiality.
          MR. BROWN:  Yes, Your Honor.
16

17        THE COURT:  Okay.  You all are standing up.  I think

18   that Mr. Brown we filed a mandatory trial.
          MR. BROWN:  Yes, Your Honor.
19

20        THE COURT:  And I know I got a response from Fulton
      County.
21

22        MALE:  Yeah.  We also have a response as well that
      simply mimic the county's and we are filing it today.
23

24        THE COURT:  Okay.

25        MALE:  Can I approach the bench?
```

www.huseby.com          **Huseby, Inc.  Regional Centers**          800-333-2082
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 165

```
 1        THE COURT:  Mr. Groton does that.  There's no clerk

 2   because this is a Fulton County case.  So he has to do
     that.  Okay.  I guess -- will I hear first from is -- let
 3

 4   me hear from -- Mr. Brown, why do you think juror demand
     is appropriate?
 5

 6        MR. BROWN:  Your Honor, the statute is very clear.
     It says that the case should be tried to the court unless
 7

 8   a jury demand is made.  And that is explicit and without

 9   exception.  And we have made a demand for a jury trial and

10   the facts that will be tried, or triable to a jury both in

11   the election case and in any other case.
          THE COURT:  Okay.
12

13        MR. BROWN:  So that's our request.  Thank you.
          THE COURT:  What order are you going in over at that
14

15   time?
          MALE:  She filed -- Fulton County filed first of all
16

17   --

18        THE COURT:  Are you Ms. Blackwell?
          MS. BURWELL:  Burwell.  Burwell.
19

20        THE COURT:  Burwell.  I'm trying to get names right.
     Okay.
21

22        MS. BURWELL:  Kaye.  Right.  Yes.  Kaye Burwell on
     behalf of Fulton County.
23

24        MALE:  Judge --

25        THE COURT:  I got it.
```

```
 1         MALE:  Judge, I'm sorry.  We have one more Rule 22

 2    from the AJC that you haven't had a chance to review.
           THE COURT:  So I have not written [inaudible].
 3

 4    Anybody -- who's here from the AJC?
           FEMALE:  I am.
 5

 6         THE COURT:  Okay.  Anybody have an objection to the
      AJC covering this?  Mr. Brown.
 7

 8         MR. BROWN:  No, Your Honor.

 9         MR. LINDSEY:  In fact, they're more than welcome to

10    sit in the jury.

11         THE COURT:  You're welcome to sit in the jury box.
      Come sit over here if you want to.
12

13         MS. BURWELL:  Think at a better angle.
           THE COURT:  Okay.  Go ahead.
14

15         MS. BURWELL:  Your Honor, it is Fulton County's
      position that the demand for a jury trial by the
16

17    petitioners is insufficient.  We cited the Court to the

18    Henderson case, which clearly provides that there is a
      two-step analysis for determining whether or not a jury
19

20    trial is available to a petitioner and they have satisfied
      the first, which was merely to demand.
21

22         They haven't satisfied the second.  They haven't
      provided this Court with any information or argument to
23

24    support that under other laws at issue in the case, there

25    is a matter upon which they are entitled to have a trial
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 167

 1   by jury.  And that's the second part and they haven't

 2   presented this Court with anything that would be
      sufficient for them to satisfy that burden.  And so based
 3

 4   upon the statute itself, which is 21-2-522, as well as the
      Henderson case, because they utterly failed to allege
 5

 6   issues that would be triable to a jury, we believe that a
      jury trial demand is inappropriate.
 7

 8           Further, Your Honor, as we pointed out in our

 9   response, the statute provides that if there are issues

10   that need to be tried, a jury from that particular county

11   needs to be impaneled.  And in this instance, they are --
      they have allegations in their complaint about Worth
12

13   County, Henry County, DeKalb County, and perhaps other
      counties that we don't know about yet.  And so the Court
14

15   would be required if they had alleged something that was
      triable to a jury, would need to impanel juries from each
16

17   of those jurisdictions in order to hear whatever issues

18   would need to be heard.
              And for that reason, Your Honor, obviously the ins of
19

20   the election contest statute, which is the swift and
      expedient determination of a contest, would be forwarded.
21

22   Thank you.
              THE COURT:  Thank you.  Any additional arguments?
23

24           MR. TYSON:  Your Honor, Bryan Tyson on behalf of

25   Gwinnett County, just very briefly.  As the Fulton County

```
 1   counsel, Ms. Burwell, has correctly pointed out, the cases

 2   that they have cited control there is no constitutional
      right to a jury trial in an election contest case.
 3

 4       And I think under the circumstances that the demand
      only came after the motion of continuance had been denied
 5

 6   in the case that this is an attempt by the plaintiffs to
      delay this case when this case under the Election Code
 7

 8   needs to be resolved quickly and brought to a conclusion,

 9   especially considering that the Legislature is already in

10   session and the lieutenant governor is presiding this

11   morning, even in the State Senate.  Thank you.
             THE COURT:  Anything from you, Mr. Lindsey?
12

13       MR. LINDSEY:  Your Honor, we simply just joined with
      two other co-defendants with their positions.
14

15       THE COURT:  Mr. Brown.
             MR. BROWN:  Your Honor, quickly, three points.
16

17   Gwinnett raises the timeliness issue.  Again, the statute

18   is clear and the demand needs to be made before the case
      is called.
19

20       Second, counsel for Fulton County says that we
      haven't made allegations about facts that are triable to a
21

22   jury.  We have a very detailed fact-bound complaint and
      each of the factual allegations in there, in any civil
23

24   case, would be triable to a jury and I know of no

25   exception.  For example, were significant programming
```

www.huseby.com                Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 169

```
 1   errors made?  Can the vote tallies be reconciled?  Are

 2   there signs of malicious manipulation of the vote tallies?
      All of those things are factual issues.  Thank you, Your
 3

 4   Honor.
            THE COURT:  Okay.  I strike the demand for jury.
 5

 6   This is a bench trial.  It does not comport with the
      statute.  Okay.  You want to make an opening statement --
 7

 8   whoa.   Let's not do that.  Okay.

 9       MR. LINDSEY:  I'm sorry.  Sorry.  And just as a

10   reminder, Your Honor, we have invoked the Rule.

11       THE COURT:  The Rule is invoked.  So witnesses, you
      have need to be outside.
12

13       MR. BROWN:  Starting now, Your Honor?
          THE COURT:  Starting right now.
14

15       MR. BROWN:  Yes, Your Honor.
          THE COURT:  Starting right now.
16

17       MS. BURWELL:  Your Honor, on behalf of Fulton County,

18   we have our [inaudible] representative, Mr. Barron.  We'd
      like him to be able to stay to my --
19

20       THE COURT:  He's who?
          MS. BURWELL:  Mr. Barron.  Mr. Richard Barron.  He's
21

22   the election superintendent for --
          THE COURT:  Is he being told to stay?
23

24       MS. BURWELL:  -- Fulton County.

25       MR. BROWN:  Clarification, Your Honor.
```

 1          THE COURT:  Yes, sir.

 2          MR. BROWN:  We have two expert witnesses and
        typically they are not sequestered because they may be
 3

 4      relying upon the client testimony.  And so we would
        request Your Honor's clarification that it does not apply
 5

 6      to expert witnesses.
               MR. LINDSEY:  And we believe that in this case that
 7

 8      it should unless they intend -- we have no objection to

 9      them remaining in the courtroom --

10          THE COURT:  Once they testify.

11          MR. LINDSEY:  -- once they testify in case they need
        to be brought back up on rebuttal based on any fact that
12

13      need to be brought.  But in terms of their initial
        testimony, we would ask the rule be [inaudible].
14

15          THE COURT:  I think Mr. Brown, you -- we do that when
        you have experts and they have experts.  We have dueling
16

17      experts, but you've got two of the same.  So once they've

18      testified, they can stay.
               MR. BROWN:  Thank you, Your Honor.
19

20          THE COURT:  Okay.  And that means you cannot discuss
        each other's testimony.
21

22          MR. LINDSEY:  And for that matter, Your Honor, I just
        wanted to clarify for both sides.  Once the witness has
23

24      testified, as long as there is an assurance by the lawyer

25      that that person will not be brought back up for any

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 171

```
 1   further reason, I -- any purpose, but I don't have any

 2   problem with them remaining in the courtroom once they've
      testified.
 3

 4       THE COURT:  Okay.
         MR. BROWN:  My understanding of the rule, Your Honor,
 5

 6   is that if a witness is in the courtroom, the witness is
      thereafter disqualified from being called.
 7

 8       MR. LINDSEY:  Yeah.  That's all I'm saying.

 9       THE COURT:  That's correct.

10       MR. LINDSEY:  But I'm saying I don't have a problem

11   with them staying after they've testified.
         THE COURT:  Okay.  Opening statement, Mr. Brown.
12

13   Open?  Want to make an opening statement?
         MR. BROWN:  Oh, yes, Your Honor.  Initially, we -- as
14

15   a matter of procedure, we have still pending a motion to
      compel.
16

17       THE COURT:  I've denied that motion to compel.

18       MR. BROWN:  Okay.  In addition -- just for the
      record, Your Honor, we would like to make a motion for
19

20   additional discovery under the Civil Practice Act.
         THE COURT:  Sir, I've denied all that.
21

22       MR. BROWN:  I understand.
         THE COURT:  We've been through it.  I looked.  I have
23

24   17 filings in this case in the last two days; okay?

25   Nobody's going to believe my list of work in this case.
```

1    Those all have been denied.  They are preserved for the

2    record.
          MR. BROWN:  Right.
3

4        THE COURT:  I've ruled on them.  The record is clear
     that -- I've ruled.  If that's what you're concerned
5

6    about, I've ruled; okay?
          MR. BROWN:  Thank you, Your Honor.  Your Honor, the
7

8    issue in this case is whether the election was so

9    defective as to place in doubt the result of the

10   lieutenant governor's contest.  This case is not like any

11   other election case.  In every other election case the
      evidence of defectiveness, of a defective election, is
12

13   hard documentary evidence.  It is misspelled names on an
      absentee ballot.
14

15       It is a person who was ineligible to vote.  It is
     some flaw in the electoral process that can be
16

17   demonstrated with hard evidence in court.  The State of

18   Georgia has chosen a voting system which embeds in it the
      results, the true results of an election never to be
19

20   discovered after the vote is made.
          The distinction between this case and every other
21

22   voting case is that there is no tangible evidence of the
      result of the election.  There is none at all.  Instead,
23

24   all we have are traces, secondary evidence, giving some

25   hint as to whether or not the voting totals are correct or

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 173

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019                    Page 20

```
 1   not.

 2        And what are those and what are those hints here?
     What evidence do we have that this vote is reliable?  We

 3

 4   have none, Your Honor.  What -- instead, what we have, and
     our experts will testify -- Your Honor, is there a issue

 5

 6   that I should address or is there --
          THE COURT:  Mm-hmm?

 7

 8        MR. BROWN:  Are you -- let me --

 9        THE COURT:  A gentleman just came in and I'm not sure

10   if he's trying to record, that's the only thing.

11        MR. BROWN:  Okay.
          THE COURT:  Sir, do you have anything to record?

12

13        MALE:  No, Your Honor.  I was sitting back here and I
     was having trouble hearing so I moved up.

14

15        THE COURT:  No problem.  Go ahead.
          MR. BROWN:  Sorry, Your Honor.

16

17        THE COURT:  Sure.

18        MR. BROWN:  Thank you.  The --
          THE COURT:  I'm just trying to preserve the

19

20   courtroom.  Go ahead.  But I'm hearing you.
          MR. BROWN:  But what the evidence we do have are the

21

22   traces of what happened and all of that evidence shows
     that this election was defective.  The most obvious

23

24   evidence is the vote patterns.  And as Your Honor has read

25   in our briefs already, these voting patterns were aberrant
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 174

1   in the extreme.

2       And the reason we know they were aberrant, the
    reasons we know they were aberrant is that this has never

3

4   -- nothing like this has ever happened before, but to me
    most probative is that the pattern that we see in the

5

6   electronic voting, the under-vote for the lieutenant
    governor's contest, is not seen in the paper votes.  We

7

8   have 200,000 paper votes, Your Honor.

9       It's a huge sample of people in all walks of life,

10  all around the state, of every political persuasion, and

11  for some reason they all, or 99 percent of them, voted in
    the lieutenant governor's race.  One or a little bit more

12

13  than one or less than one out of 100 decided not to vote.
    Historically, that is exactly what you would expect.  For

14

15  the last 20 years, the consistent under-vote for the
    lieutenant governor's contest in Georgia is .8 percent,

16

17  less than 1 in 100.

18      In Georgia, the history is if you're going to take
    the trouble to vote, and not everybody does sadly, but if

19

20  you're going to take the trouble to vote, whether in-
    person, early, absentee, or live, is that 1 out of 100

21

22  will not vote for the lieutenant governor.  That is what
    happened in the paper ballots this year.  One out of 100

23

24  decided not to vote for the lieutenant governor's race.

25  Now for some reason we have many, many thousands more on

```
 1   the electronic ballot, a gap of 4 or 5 percent in the

 2   electronic vote.
            There is no legitimate explanation for that.  It
 3

 4   could not have happened by chance.  The samples are too
      large for that to be simply random chance.  So it's not
 5

 6   chance.  Could it be because the lieutenant governor's
      race was not very interesting to people?  There's no
 7

 8   reason to believe that, Your Honor.  And even if you were

 9   inclined to believe that prima facie, then why did 99 out

10   of 100 vote on paper?

11       The same goes for every other explanation for this
      anomaly.  Let the defendants make that out.  In a criminal
12

13   case a convicted -- a defendant may be sent to the
      electric chair if the prosecution eliminates every
14

15   plausible alternative to their guilt.  Here what we will
      do, and what the evidence will show, is that every other
16

17   plausible explanation other than machine defect caused

18   this other vote and because it was machine defect it's a
      defective election; so defective that its results are in
19

20   doubt.
            A couple things to clarify our position to make sure
21

22   that Your Honor understands what our claim is.  The
      defendants claim that this is a matter of simple math.
23

24   Our response to that is two-fold.  First is that their

25   simple math is wrong.  It's just bad arithmetic, Your
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 176

```
 1   Honor.  Our second response -- and we'll explain that to

 2   Your Honor in the course of these proceedings.
            The second response to that is that it's not simple
 3

 4   math.  You can't -- Your Honor understands this quite well
      is that it's not simple math if you have multiple unknown
 5

 6   variables.  Because this election was so defective the
      State does not know the true vote got Mr. Duncan, does not
 7

 8   know the true for Ms. Amico.  And third, it doesn't know

 9   why there's a gap in the under-vote.

10        Our position isn't that there were some votes that

11   were lost.  Our position is that the entire contents is
      tainted because the under-vote shows that the machines
12

13   simply were not working -- that they were defective; so
      defective as to cast the entire election in doubt and
14

15   require a new election.
            The second point I wanted to make sure we were clear
16

17   on in terms of our position is that what we need to show

18   today and tomorrow is that the election was defective.  We
      do not need to show malice.  We do not need to show that
19

20   the defendants or anybody else did something intentionally
      to rig the vote or anything like that.  That's not what
21

22   this case is about.
            This case is about machines and whether or not they
23

24   worked and the evidence will show manifestly that they did

25   not.  Your Honor, the course of these proceedings, and I
```

```
 1   caution your understanding of this, is that this argument

 2   is not rearguing the motions that we have lost, but is
      instead to take the case as it's presented right now.  And
 3

 4   that is the plaintiffs have shown prima facie and will
      show prima facie that this election was defective.
 5

 6       I call Your Honor's attention to OCGA 24-14-22.  That
      statute says, and I'll quote it, "If a party has evidence
 7

 8   in such party's power and within such party's reach by

 9   which he or she may repel a claim or charge against him,

10   but omits to produce it or if a party has more certain and

11   satisfactory evidence in his or her power but relies on
      that which is of weaker or inferior nature, a presumption
12

13   arises that the charge or claim against such party is well
      founded; but this presumption may be rebutted."
14

15       Your Honor, what this law -- this law is commonsense
      but it's also fundamentally important in terms of fairness
16

17   and accuracy and decision-making by the courts.  We will

18   show that there's no plausible explanation other than
      machine malfunction.  The defendants can escape that
19

20   charge if they prove that they have investigated, they've
      done their own, and they can bring into court evidence
21

22   that this -- these machines are working.
            Instead, they will not do so and as Your Honor is
23

24   well aware, they have resisted doing so, and they have not

25   done so in discovery.  And so when the plaintiff makes his
```

1   case, or her cas, and the defendant's position is, well,

2   it's just a black box; we don't know what's in that black
    box, then the plaintiff wins, Your Honor.

3

4        Your Honor, in terms of the order of proof we have
    some witnesses -- the sequence of the witnesses may change

5

6   a little bit because of the sequestration.  In addition,
    we will have applied witnesses, people who actually

7

8   attended -- actually voted or trying to vote.  We will

9   have an expert on forensics and on these particular DRE

10  machines, and we will have an expert on the numbers and on

11  the politics behind the numbers.
             And at the conclusion of this matter, we believe that

12

13  the Court will be authorized, if not compelled, to
     conclude that this election was so defective as to place

14

15  the results in doubt.  Thank you, Your Honor.
             THE COURT:  [Inaudible] Mr. Lindsey?  Okay.

16

17       MR. LINDSEY:  Thank you, Your Honor.  Your Honor, on

18  behalf of myself and Mr. Olens, we are here representing
     the Lieutenant Governor Geoff Duncan who won his election

19

20  on November 6, 2018, by a significant margin, 123,172
     votes.

21

22       The statutory in case law is clear as set forth in
     the case of Hart versus Crawford, which said, and I quote,

23

24  "The setting aside of an election in which the people have

25  chosen the representative is a dramatic remedy that should

```
 1   not be taken lightly but instead should be reserved for

 2   cases in which the person challenging an election has
      clearly established that the violation has placed the
 3

 4   result of the election in doubt."
             This requires, Your Honor, more than mere speculation
 5

 6   or guess work.  More than saying that things might have
      possibly happened but they must show by clear evidence
 7

 8   that a -- that some type of problem occurred and that it

 9   was a problem of great enough significance to wipe out a

10   margin of victory of over 123,000 votes.

11       In this case, not only are the plaintiffs not going
      to be able to show that they were the breach of Georgia's
12

13   election system, but we will also show why Ms. Amico
      received the vote counts she did, which I want to state
14

15   right here at the beginning, which is that within the
      range of the other unsuccessful Democratic candidates in
16

17   2006 [sic].  Ms. Amico received 1,828,566 votes.

18       Granted, this was less than the votes received by the
      more profiled Democratic candidates, such as Ms. Abrams,
19

20   but it is a vote count much higher than four other
      Democratic candidates and is within a few thousand votes
21

22   of two other ones.  So in other words, she -- her vote
      count as a Democratic in the 2016 election was right
23

24   square in the middle among all the various Democrats who

25   ran statewide here in Georgia.  That's number one.
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 180

1          Number two, in terms we will be able to establish why

2     the vote count for Ms. Amico was what it was and why there
       was a differentiation between the paper and electronic

3

4     ballots.  The fact of the matter is, Your Honor, we were
       dealing with an ahistorical election; and never before has

5

6     Georgia had this many new voters vote in one election.  In
       2014, there were approximately 98,000 new voters that

7

8     voted.

9          In 2018, there were almost four times that number

10    that voted.  The fact of the matter is when you have this

11    many new voters, you have a greater number amount of
       confusion that takes place.  You also have the fact that

12

13    the way in which the ballot was configured on paper
       ballots versus the electronic system could have added to

14

15    that confusion inadvertently by virtue of how the various
       individuals on the ballot were placed.

16

17         In the case of the electronic ballots, they were in a

18    -- what you might call an east-west position.  In the
       paper ballots they were in a north-south position right

19

20    next to each other, which would add to the confusion for
       many voters, particularly many new voters here in Georgia

21

22    as to whether or not Ms. Amico and Ms. Abrams were running
       on a ticket.

23

24         This is aggravated further by the way in which Ms.

25    Amico chose to run her campaign, which was to seek to run

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 181

```
 1   as a team with Ms. Abrams.  So that alone would suffice to

 2   show why there was a difference between the paper and the
      electronic ballots.  In addition, quite frankly, unlike a

 3

 4   lot of the other candidates, Ms. Amico received a lot of
      negative press in the closing days of the campaign.

 5

 6        And that closing -- that negative press was
      particularly being likely to dampen Democratic enthusiasm

 7

 8   for her candidacy given the fact that there were

 9   allegations while she was a senior officer of a

10   corporation, that that corporation was engaged in

11   systematic racial discrimination.
                So there were multiple reasons, Your Honor, not
12

13   simply one as to why there was the down-ballot voter gap
      that existed in this race as opposed to others.  And we
14

15   will look forward to presenting those to you.  Thank you,
      Your Honor.
16

17        THE COURT:  Okay.  [inaudible]?

18        MS. BURWELL:  Thank you, Your Honor.  The Fulton
      County Board of Registrations and Elections is charged
19

20   with following State law and to follow State law in order
      to ensure that citizens of Fulton County receive a fair
21

22   and accurate election when they go to the polls.  And we
      believe the evidence will show that the Fulton County
23

24   Board of Registrations and Elections did just that.

25        We believe the evidence will show that the Board
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 182

 1   accurately recorded the will of the Fulton County voters.

 2   As this Court knows, there's no such thing as a perfect
     election.  There never has been and there never will be.
 3

 4      But in this instance, these petitioners have a heavy
     burden and a burden we believe the evidence, with respect
 5

 6   to Fulton County, will now bear out their claims.  And
     that's because the case is very clear that not every
 7

 8   garden variety irregularity entitles anyone to a new

 9   election and that's because elections are designed to

10   carry out the will of the people.

11      And again, we believe that this election did just
     that. And at the close of the evidence we're going to ask
12

13   the Court to deny petitioner's request.
          THE COURT:  Okay.  Mr. Tyson.
14

15      MR. TYSON:  Thank you, Your Honor.  Bryan Tyson for
     Gwinnett County.  We are in agreement with the prior two
16

17   defendants.  The key point for this Court is that the

18   burden on the plaintiffs is high.
          The election is presumed valid.  These are the
19

20   certified results, unless the plaintiffs can bring forward
      specific evidence of what was the irregularity that could
21

22   have caused the result to be placed in doubt, they cannot
      succeed in their claim.  The availability of any number of
23

24   plausible explanations, which the evidence will show, will

25   defeat that.  The ballot design question, the fact that

1    this election was the first time in a governor's election

2    that we've not had a U.S. Senate race also happening at
     the same time, and so that affected the ballot design

3

4    worked and affected the way -- on the DRE's particularly
     that voters were looking at those ballots.

5

6         Voter decisions obviously could play a role.  Lack of
     a third party candidate could play a role.  Any number of

7

8    factors could explain the dip in the votes for Ms. Amico's

9    candidacy.  And the Supreme Court is abundantly clear that

10   speculation alone is not enough to overturn an election.

11        Plaintiffs have the burden of showing hard evidence,
     of demonstrating exactly what the cause was, and also

12

13   demonstrating that literally no other cause could have
     happened.  They have to come forward with affirmative

14

15   evidence that demonstrate that fact.  The constitutional
     claims, Your Honor, had been dismissed.

16

17        The only thing left in this case is a statutory

18   election contest and that is ultimately a mathematical
     issue.  123,000 votes have to be shown to be in question

19

20   in addition to the -- so that the plaintiffs can carry
     their burden and if they're not able to demonstrate that

21

22   or show an irregularity that places the entire result in
     doubt through hard evidence, then they will not be able to

23

24   succeed in their claims and we do not believe they'll be

25   able to and believe the election should be upheld.  Thank

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 184

1   you.

2        THE COURT:  First witness, Mr. Brown.
         MR. BROWN:  Your Honor, we will call Marilyn Marks as
3

4   our first witness.
         THE COURT:  Would you swear the witness, please, Mr.
5

6   Brown?
         MR. BROWN:  Ms. Marks, please raise your right hand.
7

8   Do you promise to tell the truth, the whole truth, and

9   nothing but the truth?

10       MS. MARKS:  Yes.

11       MR. BROWN:  Have a seat.

12

13  Thereupon:

14

15                        MARILYN MARKS

16

17       was called as a witness by the Petitioner; and,

18  having been duly sworn, testified as follows:

19

20                     DIRECT EXAMINATION
                       OF MARILYN MARKS
21

22
    BY MR. BROWN:
23

24            Q.   Please state your full name for the record?

25            A.   Marilyn Marks.

```
 1            Q.   Ms. Marks, by whom are you currently

 2       employed?
              A.   I am the executive director of Coalition
 3

 4       for Good Governance.
              Q.   And what is the Coalition for Good
 5

 6       Governance?
              A.   Coalition for Good Governance is a
 7

 8       nonprofit, charitable organization, non-partisan

 9       organization, that works on election transparency,

10       election integrity, voter privacy.  We have a few

11       core issues of that nature that we really focused on
          and we're a small organization.
12

13            Q.   Is electronic voting one of those core
          issues?
14

15            A.   In fact, we probably -- yes, it is.  In
          fact, we've probably spent the better part of the
16

17       last three years with 100 percent of our resources

18       focused on problems with electronic voting in the
          fact that electronic voting is not verifiable --
19

20       cannot be on the table --
          MR. LINDSEY:  Your Honor, we object [inaudible] --
21

22       THE COURT:  [inaudible] not responsive to the
       question.
23

24       MR. BROWN:  That's right.  That's fine.  Thank you.

25       THE COURT:  Just answer -- you'll get there.
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 186

```
 1        MR. BROWN:  That's right.

 2        THE COURT:  He'll get to everything you need to say.
      Give him a chance; okay?
 3

 4   BY MR. BROWN:
              Q.   And what in particular about electronic
 5

 6        voting has caused the Coalition to focus upon that as
           one of their issues?
 7

 8        MR. LINDSEY:  Your Honor, I'm going to object.  She

 9   hasn't been qualified as an expert and this isn't a case

10   as to whether or not there are doubts.  It's the terms of

11   whether or not electronic voting versus paper ballots or
      some other system would be better.  That's an argument
12

13   that needs to be done -- as a matter of fact, being done
      down at the State Capitol.
14

15        The question today is whether or not there was an
      actual taking place in this election, in this particular
16

17   election.  So there are two objections.  Number one, she

18   hasn't been qualified as an expert; and number two, the
      question is irrelevant to the issues before the Court at
19

20   this time.
              THE COURT:  Mr. Brown?
21

22        MR. BROWN:  Your Honor, I asked her a factual
      question as to what the Coalition's focus was on and she
23

24   was answering it.

25        THE COURT:  Well, but she got beyond -- she started
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 187

```
 1    to testify as an expert and she can't testify as an expert

 2    unless you can qualify her.  I understand your position
      and I know what the law is.  I'm going to give them a
 3

 4    little latitude in this case.
            MR. BROWN:  I understand.  Sure.
 5

 6    BY MR. BROWN:
            Q.   What is your -- I'm going to ask you some
 7

 8        questions about your background.  And first, your

 9        organization is based where?

10            A.   Yes.  Our headquarters is in Charlotte,

11        North Carolina.
            Q.   And what is your personal connection to
12

13        Georgia?
            A.   Well, actually I had my business career
14

15        here before I retired.
            Q.   And what was your business career?
16

17            A.   I was the CEO and owner of a truck-trailer

18        manufacturing reorganization and we're headquartered
          here in Atlanta.
19

20            Q.   And skipping back to -- so you've lived
          many years in Georgia; correct?
21

22            A.   I lived in -- I plan to move back shortly.
            Q.   Okay.
23

24            A.   I've been spending the vast majority of my

25        time here for the last four or five months.
```

www.huseby.com                Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 188

 1        Q.   Ms. Marks, what is your experience

 2   generally with electronic voting systems and whether
      that's a good method of recording votes?

 3

 4        A.   Okay.  Ten years ago I got very interested
      in elections; in fact, ran for Mayor of Aspen,

 5

 6   Colorado.  And at that time, they were using the
      Diebold voting system that is also used in Georgia.

 7

 8   They were using it slightly differently.  But at that

 9   time is when I began to be concerned about the

10   electronic portion of the system.

11        And I tested the system as part of my work as a
      citizen and I became an election judge, and ended up

12

13   spending a considerable amount of time getting to
      know the system.  And over the last ten years I

14

15   devoted myself -- having lost the election I devoted
      myself to the problems that were begin to be

16

17   uncovered in my own loss in the election.

18        And I have spent the last ten years doing work
      around troubled elections [inaudible] organization

19

20   tends to called into troubled elections, particularly
      when there are unverifiable electronic elections

21

22   where the results cannot be audited like this one.
           Q.   Have you ever been involved in a post-

23

24   election audit?

25        A.   I have.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 189

1          THE WITNESS:  Your Honor, would it be all right if I

2   have a cup of water?
           MR. BROWN:  Yeah.  Here.  I'll get that, Your Honor.
3

4          THE COURT:  Actually, your lawyer's got some.
           THE WITNESS:  Thank you.
5

6   BY MR. BROWN:
               Q.   I believe you were testifying about post-
7

8      election audits, Ms. Marks.

9          A.   Yes.  I have been involved in various forms

10     of post-election audits starting with my own loss in

11     the election in 2009 and then primarily in Colorado,
        although some in North Carolina, South Carolina, and
12

13     whereas in Georgia there is no post-election audit.
        But, yes, I've been both in server; I've helped plan;
14

15     I've a poll watcher for post-election audits.
               I've trained what in Colorado called canvas
16

17     board members who conduct the post-election audit.

18     So I've trained those for Libertarian Party and some
        of the nonpartisan candidates -- not candidates,
19

20     excuse me, members of canvas boards.  So I've spent
        hundreds of hours in post-election auditing.
21

22         Q.   Have you testified in court before, Ms.
        Marks?
23

24         A.   Yes, many times.  Coalition for Good

25     Governance has done a lot of work in litigat- -- in

www.huseby.com          **Huseby, Inc.  Regional Centers**          **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 190

```
 1   election litigation and so I have been in court a

 2   lot.
            Q.    You mentioned paper ballots and the --

 3

 4   based upon your understanding of the allegations in
      this petition, do you understand that the petitioners

 5

 6   are seeking a new election; do you understand that?
            A.    Yes.

 7

 8       Q.    And do you have an understanding of whether

 9   the petitioners want the new election to be on paper

10   ballot on the one hand or on the electronic ballot on

11   the other?
            A.    It is clear that the petitioners want only

12

13   a verifiable election, which has to be on paper
      ballots.

14

15       Q.    And you -- based upon your work, have you
      become familiar with Georgia's processes and

16

17   procedures for conducting electronic and paper

18   elections?
            A.    Yes, I'm very familiar with those

19

20   procedures.  I began my work in Georgia in the spring
      of 2017 and began to analyze the problems in the

21

22   unverifiable DRE system.  The debunked DRE system at
      the time actually -- should I tell you about when --

23

24       Q.    Just wait.

25       A.    Okay.
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 191

```
 1           Q.   Based upon your understanding of Georgia's

 2      practices and procedures in voting, would it be
         feasible for Georgia to conduct a paper ballot for
 3

 4      any re-elect new election?
         MR. TYSON:  Your Honor, I'll object to that question.
 5

 6  The foundation hasn't be laid for that; it's a legal
     conclusion.  She's not qualified as an expert.
 7

 8      MR. BROWN:  Your Honor, I would -- thank you, Mr.

 9  Tyson, if I may interrupt.  I should have before asking

10  that question and I'll withdraw it -- ask that Ms. Marks

11  be qualified as a witness about DRE machines generally and
     their use in Georgia and the practices and procedures of
12

13  the State of Georgia for paper ballots and for electronic
     ballots.
14

15      MR. TYSON:  If I could ask [inaudible] show of
     questions of Ms. Marks.
16

17      THE COURT:  Surely. Go ahead.

18      MR. TYSON:  Good morning, Ms. Marks.  My name is
     Bryan Tyson.  I represent the Gwinnett County Board of
19

20  Elections -- Registrations and Elections.  I just had a
     couple additional questions for you.  You mentioned you
21

22  testified in court before.

23

24                  CROSS-EXAMINATION

25                  OF MARILYN MARKS
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 192

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
**Transcript of Hearing Proceedings on 01/17/2019**                    **Page 39**

```
 1

 2   BY MR. TYSON:
                Q.    Have you ever qualified as an expert in a
 3

 4        court proceeding?
                A.    No.  And have never intended to be.
 5

 6                Q.    Okay.  Have you ever been involved in the
          administration of an election in Georgia a member of
 7

 8        the Board of Elections, a staff member in elections

 9        office?

10                A.    No, I have not been a Georgia resident so I

11        would not have been qualified for that.  I have been
          a poll watcher several times for candidates and for
12

13        the Libertarian Party in Georgia.
                Q.    Mr. Brown asked you about your work with
14

15        electronic voting machines.  Do you have any degrees
          or specialized training in computer science?
16

17                A.    No.  I just have a practical hands-on

18        experience.
                Q.    Do you -- have you -- I'm sorry.  It's
19

20        correct, isn't it, that you have no first-hand
          knowledge of any DRE machine that you personally
21

22        reviewed for the 2018 Georgia general election; is
          that correct?
23

24                A.    I'm sorry.  Do you mind repeating the

25        question?
```

www.huseby.com            **Huseby, Inc.  Regional Centers**            **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 193

```
 1        Q.   Sure.  It's correct, isn't it, that you

 2   have not personally reviewed any DRE machines that
     were used in the 2018 Georgia general election?
 3

 4        A.   No.  That is incorrect.
          Q.   Okay.  Which machines have you reviewed?
 5

 6        A.   Okay.  So I'll not be able to tell you the
     serial numbers, not off the top of my head,
 7

 8   certainly.  The machines that I observed as I was a

 9   poll watcher and I watched them operate -- I looked

10   at the data that was coming up on the screen in a

11   number of poll locations, and did so in a number of
     the 2018 elections.
12

13        So, I did watch the operations, I watched the
     shutdown of the machines, and then watched the
14

15   progression records through the compilation tallies.
     So, yes, I have observed the operation of the
16

17   machines as a authorized statewide poll watcher.

18        Q.   So, it would be correct to say, wouldn't
     it, that you've observed them from a distance, but
19

20   you've not personally examined any of the DRE
     machines; is that correct?
21

22        A.   That would not be correct.
          Q.   Have you personally ever touched a DRE
23

24   machine?

25        A.   Oh, certainly.
```

1          Q.    Have you ever voted on a DRE machine?

2          A.   I have.
           Q.   Have you voted on a Georgia DRE machine?
3

4          A.   I have not voted in -- wait, excuse me.  I
      think I was about to not get that correct.  When I
5

6      was a resident here, I believe they were just
       bringing in the DRE machines and so I believe I did
7

8      vote many years ago on the DRE machine.

9          Q.    But you're not sure?

10         A.   I -- I voted on a DRE machine in North
11     Carolina.
           Q.   And you personally believe that Georgia
12

13     should move to a paper ballot system; correct?
           A.   Certainly.
14

15     MR. TYSON:  I don't have any other questions at the
       moment.
16

17     THE COURT:  Anybody else have questions for her?

18     MR. TYSON:  Your Honor, we renew our objection.
       She's never been qualified as an expert.
19

20     THE COURT:  Go ahead.
           MR. TYSON:  For one, she just finished saying that
21

22     she doesn't consider herself an expert.  So -- and she's
       not demonstrated any expertise on the technical issues
23

24     that are involved in this case.  She certainly has some

25     very strong opinions and we understand it's good for her

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 195

```
 1   to get up on the stand to sort of lay out what the

 2   plaintiffs want.  But in terms of providing any factual
      evidence to support their claim, she's simply not been
 3

 4   qualified as an expert [inaudible].
            MR. LINDSEY:  And, Your Honor, we would also object
 5

 6   to Ms. Marks being qualified as an expert.  We already her
      expertise on the DRE machines.  She's testified that it's
 7

 8   limited to just observing them from a distance.

 9        And that we don't believe that that will in any way

10   assist the Court in determining fact in issue under 702(b)

11   because that's not one of the issues here in terms of what
      someone saw on the machine.  The issue is what was the
12

13   vote in that issue.
            In addition, we would also object to her
14

15   qualification regarding Georgia practices and procedures
      in that those are ensconced in the election code and Your
16

17   Honor is capable of determining those without the

18   assistance from an expert.
            THE COURT:  Mr. Brown?
19

20       MR. BROWN:  Your Honor, she's not being -- a lot of
      what Mr. Lindsey said I didn't quite follow, but she is
21

22   not being qualified as to the technical aspects of the
      DRE.  We have another expert for that.  She instead is
23

24   being qualified for the procedure.  Thank you.

25       THE COURT:  The question you asked would have
```

```
 1    required her to be an expert and she's not qualified as an

 2    expert.  You asked, you know, could Georgia conduct paper
      -- I am listening.  I don't look like I am sometimes but
 3

 4    that helps me intensely listen.
             You asked her really about whether paper ballots
 5

 6    could be done and she has no expertise to be able to
       testify to something like that.
 7

 8        MR. BROWN:  Thank you, Your Honor.

 9

10                        REDIRECT EXAMINATION

11                        OF MARILYN MARKS

12

13    BY MR. BROWN:
             Q.    Let me ask you some questions and you --
14

15        you have not been qualified as an expert, so when I
           ask you a question it's going to have be based on
16

17        your personal knowledge; do you understand that?

18             A.    Yes.  Yes, I do.  Uh-huh.
               Q.    Okay.  Who is Taran Greenwald?
19

20             A.    Taran Greenwald is an analyst for Coalition
           for Good Governance.
21

22             Q.    Okay.
          MR. BROWN:  And has the Coalition -- let me hand you
23

24    what I'll have marked --

25        THE WITNESS:  Uh-huh.
```

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 197

1      MR. BROWN:  -- as Exhibit 1.

2
       [Thereupon, the referred-to document was entered into
3
evidence as Plaintiff's Exhibit No. 1]
4

5

6      MR. TYSON:  If we may, Your Honor, could we see a
copy first?  Thank you, Your Honor.
7

8      THE COURT:  [inaudible].

9   BY MR. BROWN:

10         Q.  Ms. Marks, what is Exhibit 1?

11         A.  Exhibit 1 is a voting records request that
was made by Mr. Greenwald and the response from the
12

13      Secretary of State to his request to review certain
of the records.
14

15         Q.  Did Coalition for Good Governance send a
number of Open Records Act requests to the Secretary?
16

17         A.  Yes, we did.

18      MR. LINDSEY:  Your Honor, I object.  I'm not real
sure where we're going here.
19

20      THE COURT:
        MR. LINDSEY:  The Court -- I assume you're trying to
21

22   -- just trying to lay down proper evidence -- evidence you
couldn't get in.  No, you couldn't obtain.
23

24      THE COURT:  Well, so far -- so far -- I haven't seen

25   the document; okay, he hasn't admitted.  So far he hasn't

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019                    Page 45

```
 1   asked --

 2        MR. LINDSEY:  [inaudible]
          THE COURT:  -- an objectionable question yet.
 3

 4        MR. LINDSEY:  Thank you, Your Honor.
          THE COURT:  I think -- I think both Mr. Lindsey --
 5

 6        MR. LINDSEY:  I'm anticipating -- my apologies, Your
     Honor.
 7

 8        THE COURT:  -- Mr. Lindsay and I are anticipating; we

 9   may be absolutely wrong.  Go ahead.

10        MR. LINDSEY:   My apologies, Your Honor.

11   BY MR. BROWN:
                Q.   Ms. Marks, is this a true and correct copy
12

13        of a January 9 email from open records at the
          Secretary of State to your company's analyst, Taran
14

15        Greenwald?
                A.   Yes.  It is.
16

17              Q.   And without going through everything, what

18        does the letter say?
          THE COURT:  Well, you'll have to tender it before --
19

20        MR. BROWN:  Your Honor, I would move to introduce
     Exhibit 1 into evidence.
21

22        THE COURT:  Now, Mr. Lindsay.
          MR. LINDSEY:  Objection, Your Honor.  It's hearsay
23

24   and it's lay -- you have to also lay a foundation as to

25   what's relevant to the particular issue before us.
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 199

1       THE COURT:  Is it certified, Mr. Brown?

2       MR. BROWN:  It is not.  It's an email.  It's a
    business record, Your Honor.  It's an email from the
3

4   Secretary of State to her organization.
        THE COURT:  I -- it's not -- it's not tendered --
5

6       MR. BROWN:  Thank you, Your Honor.
        THE COURT:  -- I mean, it's tendered; it's not
7

8   admitted.

9       MR. BROWN:  Okay.

10  BY MR. BROWN:

11          Q.  Ms. Marks, you testified that you were a
        poll watcher.
12

13          A.  Yes.
            Q.  And was that in the November 2018 election?
14

15          A.  I did.  I wasn't a poll watcher in 2018,
        but I was also a poll watcher in previous 2018
16

17  elections and in Georgia.

18          Q.  Okay.  And were you ever a poll watcher in
        early voting for the 2018 election?
19

20          A.  Yes.  I was a statewide poll watcher for
        the Libertarian Party and the poll watcher
21

22  credentials covered the period of early voting
        through the of the election.
23

24          Q.  Were you a poll watcher at the Ponce de

25  León Library polling location?

```
 1            A.   Yes, I was.  And the way it works is that

 2       we're a poll watcher for all locations.
              Q.   And -- but you were a poll watcher -- you
 3

 4       went to poll -- you went to the Ponce de León Library
          polling location; correct?
 5

 6            A.   Yes.  During early voting.
              Q.   And what did you personally observe at the
 7

 8       -- that polling location?

 9            A.   The first thing I noticed when I got there

10       were two-hour long lines for people to get in and

11       then how hard it was for people to get into vote, and
          I saw many people leaving because they couldn't vote.
12

13       And I could go through with you the troublesome --
              Q.   Well, let me ask you.  Let me ask you that.
14

15            A.   Uh-huh.
              Q.   Did you observe the DREs in operation from
16

17       an appropriate distance?

18            A.   I did.
              Q.   Were they operating correctly?
19

20            A.   They were not.
              Q.   And why so?
21

22       MR. LINDSEY:  Your Honor, I'll object.  I think this
          requires Ms. Marks to have a degree of expertise regarding
23

24       the operation of the DRE machines for her to opine about

25       whether they were operating properly or not.  There's not
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 201

1   a foundation for that.

2        THE COURT:  I -- I --
         MR. BROWN:  I'll withdraw the question, Your Honor --
3

4        THE COURT:  Withdraw --
         MR. BROWN:  -- and make it easier. I can make this
5

6   easy.
    BY MR. BROWN:
7

8            Q.   Were some of the voting machines not

9        working in that they were not taking votes at all?

10       MR. LINDSEY:  Your Honor, I'll object again.

11  [inaudible] foundation, Ms. Marks can testify to that.
         MR. BROWN:  Your Honor --
12

13       THE COURT:  She -- I think you're making much too
     general of a question.  I understand there's a specific
14

15  allegation.  Get to the specific allegation.
         MR. BROWN:  Okay.
16

17       THE COURT:  Okay.

18  BY MR. BROWN:
             Q.   Ms. Marks, was the long line the result of
19

20       some of the machines not working?
             A.   Yes, it was.
21

22           Q.   And how do you know that?
             A.   I -- the work of a poll watcher is to
23

24       observe the entirety of what's going on.

25       THE COURT:  Okay.  Just answer the question, please,

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
**Transcript of Hearing Proceedings on 01/17/2019**                    **Page 49**

```
 1   ma'am.

 2        MR. BROWN:  Yeah, just --
          THE WITNESS:  And I could see that the machines were
 3

 4   malfunctioning.  I could see the screen, the machines were
      malfunctioning.  It was taking a very long time for those
 5

 6   voters to go back --
      BY MR. BROWN:
 7

 8        Q.   How were they malfunctioning, from your

 9   perspective?

10        A.   Okay.  I was standing about five feet away

11   --
          Q.   And what --
12

13        A.   -- it was a small place.
          Q.   And what did the machines do?
14

15        A.   And so what would happen is a screen would
      come up that would say, vote cancelled.  As the voter
16

17   was attempting to enter their vote and a big red

18   warning sign came up, and the machine stopped
      working.  I observed that happening three times
19

20   during the 30 minutes I was at the library.
          Q.   Did you speak with any officials at the
21

22   polling location about that problem?
          A.   I attempted to.  I was denied the ability
23

24   to talk to them.

25        Q.   Okay.  Thank you.  Other than the
```

www.huseby.com          **Huseby, Inc.  Regional Centers**          **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 203

1     malfunctioning machines and the long lines, anything

2     else about the Ponce de León poll watching experience
      that is -- that struck you as unusual?

3

4       MR. LINDSEY:  Your Honor, I'll just object to the
   question as worded.  I don't think there's of the machine

5

6   were malfunctioning.  I think there is testimony they
    displayed a red box; I don't think there's any testimony

7

8   that indicates that's that a malfunction.

9       MR. BROWN:  I'll withdraw the question.

10      THE COURT:  You'll have her on direct.

11      MR. BROWN:  Thank you, Ms. Marks.

12

13                  RECROSS-EXAMINATION
                     OF MARILYN MARKS

14

15

    BY MR. TYSON:

16

17          Q.   Ms. Marks, just one question before you

18      leave.  I'll try to keep it short.  You said that you
        saw three instances of the machine saying, vote

19

20      cancelling; is that correct?
                A.   That is correct.

21

22          Q.   And you didn't witness any other
        indications of red screens coming on the machines

23

24      while you were at the Ponce precinct; is that

25      correct?

www.huseby.com          **Huseby, Inc.  Regional Centers**          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 204

1          A.   I witnessed three in 30 minutes and that is

2     all --
          Q.   Thank you.
3

4          A.   -- and that was a sign that the machine
     malfunctioning and the [inaudible] --
5

6          Q.   I'm sorry.  Yes.  I don't believe there's
     any evidence to explain it --
7

8     MR. BROWN:  Your Honor, that's not a question.  That

9  is a statement and I'd like to strike that from the

10 record.

11    MR. TYSON:  Your Honor, I request that the rest of
     Ms. Marks' answer about the machine malfunction be
12

13 stricken; that there was no foundation for that statement.
          THE COURT:  You need to just answer the question.  I
14

15 know -- I know your position; I know where you're coming
     from; okay?  No problem.  I've already got that.  You
16

17 don't have to impress me with that.  Just answer the

18 questions.
          MR. TYSON:  All right.  That's all I have.  Thank
19

20 you.
          THE COURT:  Anybody else?
21

22    MR. LINDSEY:  Just real briefly.

23

24                    CROSS-EXAMINATION

25                    OF MARILYN MARKS

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 205

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019                    Page 52

```
 1

 2   BY MR. LINDSEY:
            Q.   Ms. Marks, is your position at the
 3

 4        Coalition a volunteer or paid position?
            A.   It is a volunteer position.
 5

 6            Q.   Okay.  Do you receive any compensation for
          it?
 7

 8            A.   None at all.

 9            Q.   Okay.  Nevertheless, Ms. Marks, is it not

10        true --

11        MR. LINDSEY:  Let me show you what we'll tender as
          Duncan Defense 1.
12

13
            [Thereupon, the referred-to document was entered into
14

15   evidence as Defendant's Duncan Exhibit No. 1]

16

17   BY MR. LINDSEY:

18            Q.   This is a Tweet you sent out last night; is
          it not?  Is that not a Tweet you sent out last night?
19

20            A.   It is.
            Q.   And does it not show that basically you are
21

22        using this trial as a fundraising mechanism for your
          organization?
23

24            A.   No, it does not show that.

25            Q.   It does show that you are seeking to raise
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 206

1    money as part of this trial; correct?

2         A.   Not as part of this trial; in order to pay
     attorney's fees and other legal cost.

3

4         Q.   Okay.
          A.   That this trial will cost.

5

6         Q.   Okay.  And then you just sent out
     soliciting contributions as part of this trial;

7

8    correct?

9         A.   Not as part of this trial, sir, but as part

10   -- routine requirements to raise money for a very

11   small organization with a high level of expenses.
          Q.   Okay.

12

13        A.   We've been raising money for many years.
          Q.   All right.  And this trial -- you sent this

14

15   out in anticipation of the trial today; correct?
          A.   This is consistent with fundraising

16

17   messages I've been sending out for years.

18        Q.   Okay.  So otherwise, you send other
     fundraising messages out when there are other trials

19

20   that are going on; correct?
          A.   Whether or not there are trials going on,

21

22   we are always in fundraising mode.
          Q.   Okay.

23

24        A.   We need to be more.

25        Q.   All right.

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 207

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019          Page 54

```
 1        MR. LINDSEY:  Your Honor, we would tender this

 2   Exhibit.
          THE COURT:  [inaudible] Let me have it, please.
 3

 4        MR. BROWN:  No, Your Honor.  No objection, Your
     Honor.
 5

 6        MR. LINDSEY:  Defense Exhibit -- I guess it would be
     Duncan 1.
 7

 8        THE COURT:  Duncan 1. [inaudible], admitted.  Go

 9   ahead.

10

11                    CROSS-EXAMINATION
                      OF MARILYN MARKS
12

13

     BY MS. BURWELL:
14

15        Q.   Ms. Marks, are you familiar with the
          process for disabled voting on Georgia's DRE
16

17   machines?

18        A.   I'm generally familiar with it.  I've never
          tested it myself as I have in other states.
19

20        Q.   And so, what is your understanding of the
          process?
21

22        A.   To make sure I understand your question,
          are you asking about an in-person disabled voter who
23

24   needs to use the assistive devices, is that what

25   you're --
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 208

```
 1        Q.   Yes.

 2        A.   -- asking me?
          Q.   Yes.
 3

 4        A.   Okay.  So I think that the process
     generally is that the disabled voter can identify
 5

 6   themselves as needing the assistive device and the
      poll worker ushers to a device, make sure they know
 7

 8   how to use it, and it's generally a vision-impaired

 9   voter who would need the type of assistive device

10   that Georgia polls use and that they begin to mark

11   the ballots generally through a pad as they are
      listening to what's called an audio ballot.
12

13        Q.   So, are you familiar with how the actual
     machine is set up for a disabled voter?
14

15        A.   I am.
          Q.   Okay.  And how would you be familiar with
16

17   that?

18        A.   I've set one up before.  Not in Georgia,
      but just like them in other locations and I've tested
19

20   audio in other locations on the machine.
          Q.   So, are you familiar with what happens if
21

22   it is in disabled mode and someone uses it who is not
      disabled?
23

24        A.   Generally nothing very different happens,

25   not supposed to.  Those machines are used frequently,
```

```
 1   particularly when there are long lines.  Those

 2   machines are used frequently by voters in the
      standard mode.
 3

 4       Q.   When you say, are used by voters in the
      standard mode, you mean a disabled voter?
 5

 6       A.    No.  I meant that while they do have the
      DREs with assistive devices, that they are not -- any
 7

 8   voter can, and they're not required to use the

 9   assistive device.

10       Q.   So, my question is, if -- and for a Georgia

11   machine it is set up for using an assistive device,
      but the person doesn't need it -- my question is, do
12

13   you know what happens on the machine?  Do you know if
      it reveals anything or do you know what the machine
14

15   will show under those circumstances?
             A.   I don't think it shows if it is -- operates
16

17   as I believe it does -- I don't believe it shows

18   anything different than it does -- than a normal
      standard DRE setup does.
19

20       Q.   Okay.
      MR. BURWELL:  Thank you.
21

22   THE WITNESS:  Uh-huh.

23

24             RE-DIRECT EXAMINATION

25             OF MARILYN MARKS
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 210

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019                    Page 57

1

2    BY MR. BROWN:
            Q.    Ms. Marks, if you would turn to Duncan 1, I
3

4        have a follow-up question for you.
            A:    I need a copy of it.
5

6        MR. BROWN:  Your Honor, would you like my copy?
            THE COURT:   That's all right.  I have it.  But I
7

8    need to keep it in the stack.

9    BY MR. BROWN:

10           Q.    Ms. Marks, your Tweet, which has been

11       identified as -- and introduced into evidence as
         Duncan Number 1.  In that you state, the state and
12

13       counties are opposing us at every turn in the court.
         Do you see that?
14

15           A.    I do.
             Q.    How has the Secretary opposed your efforts
16

17       in this matter?

18       MR. TYSON:  Your Honor, objection to relevance.
     Those have all been issues that have been raised to the
19

20   Court and by their very able attorney, Mr. Brown.  He's
      raised motions and you have denied each and every one of
21

22   those motions.  And so --
             THE COURT:   Mr. Brown, why is that relevant to the
23

24   election contest we're trying right now?  That's all we're

25   trying, is the election contest.

www.huseby.com             Huseby, Inc.  Regional Centers             800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 211

1        MR. BROWN:  Your Honor, Mr. Lindsey opened the door

2  by introducing this into evidence in an effort to smear
   Ms. Marks and I'm --

3

4        THE COURT:  He's not talking -- let's -- you know, I
   told you the other day about inflammatory language.  He's

5

6  not trying to smear.  He's trying to challenge her
   credibility.

7

8        MR. BROWN:  Sure.

9        THE COURT:  That's a whole -- that's a different

10  thing.

11        MR. BROWN:  Thank you, Your Honor.  It was -- it was
   not my intention to smear Mr. Lindsey, I assure you.

12

13        THE COURT:  I understand.
          MR. BROWN:  And -- thank you.  I have no further

14

15  questions.  Oh, well, I do.  I'm sorry.  If I may, Your
   Honor.

16

17        THE COURT:  Go ahead.

18  BY MR. BROWN:
          Q.    HAVA.  Do you know what HAVA is?

19

20          A.    I do.
          Q.    And what does it stand for?

21

22          A.    The Help America Vote Act.
          Q.    And are the -- is the examination of --

23

24  from Ms. Burwell, did that relate to that federal

25  law?

1        MR. LINDSAY:  Your Honor, I'll object.  That calls

2   for a legal conclusion.
         MR. BROWN:  Okay.  Let me back up.  I'll withdraw the

3

4   question.
         THE COURT:  [inaudible].  Sometimes it's just

5

6   rephrasing.
         MR. BROWN:  True.  Thank you, Your Honor.

7

8   BY MR. BROWN:

9            Q.   You -- is it your understanding, and this

10           is to follow up on the questions from Ms. Burwell --

11           is it your understanding that in some instances it is
             required to use a DRE system that has the mechanisms

12

13           for assisting disabled voters?
         MR. LINDSAY:  Your Honor, I'll object again.  I don't

14

15   think there's a foundation laid for this question and I
      think we're back to a relevance objection again, as well,

16

17   that this is not relevant to the election contest.

18       THE COURT:  I think -- and he's right.  You've got
      other experts coming in, so it's really neces- -- she's

19

20   not been qualified as an expert; she's not an expert.  She
      has a lot of information but she's not an expert.  So I

21

22   think you need to wait for your experts for some of this.
         MR. BROWN:  That's fine, Your Honor.  Thank you.  I

23

24   have no further questions.  Thank you, Ms. Marks.

25       THE COURT:  You may go down.  Next witness?

1        MR. BROWN:  Your Honor, just to confirm, we are

2    excusing Ms. Marks -- is Ms. Marks excused so she can
     remain in the courtroom?

3

4        THE COURT:  Yes.  She is excused.
         MR. BROWN:  Thank you, Your Honor.

5

6

         [Thereupon, the testimony of the witness concluded at

7

8    10:25 a.m.]

9

10       MR. BROWN:  Your Honor, the plaintiffs would call

11   Sara LeClerc.
         THE COURT:  You'll have to go get her.  We -- we only

12

13   see to have one deputy so you'll have to get her, or have
     someone go get her.

14

15       MR. BROWN:  Please raise your right hand.  Do you
     promise to tell the truth, the whole truth and nothing but

16

17   the truth?

18       THE WITNESS:  I do.

19

20   Thereupon:

21

22                    SARA LECLERC

23

24       was called as a witness by the Petitioner; and,

25   having been duly sworn, testified as follows:

```
 1
 2                        DIRECT EXAMINATION
                         OF SARA LECLERC
 3

 4
      BY MR. BROWN:
 5
 6           Q.   Please state your full name for the record.
             A.    Sara M. LeClerc.
 7
 8           Q.   Please have a seat.  Okay.  Could you spell
 9      your last name for the court reporter, please?

10           A.   Absolutely.  It's L-E- capital C-L-E-R-C.

11           Q.   Is it LeClerc; is that correct?
             A.    It's LeClerc, but --
12
13           Q.   LeClerc.
             A.    -- [inaudible] doesn't matter.
14
15           Q.   Ms. LeClerc, by whom are you currently
        employed?
16
17           A.   I work for myself.  I'm an attorney and I -
18      -
        THE COURT:  I'm sorry.
19
20      THE WITNESS:  I just work for myself.  And I'm an
        attorney and I -- so I work on a contract basis for other
21
22      firms.
        BY MR. BROWN:
23
24           Q.   And where did you go to law school?
25           A.   The University of Virginia.
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 215

```
 1        Q.    Okay.  And when did you graduate?

 2        A.    2007.
          Q.    And did there come a time that you
 3

 4   participated in the 2018 elections in any way?
          A.    Yes.
 5

 6        Q.    And what was your role?
          A.    Well, my first role I would say other --
 7

 8   well, other than actually in the election as a

 9   citizen, I volunteered to observe, be a poll watcher,

10   a poll observer, so.

11        Q.    And with whom did you volunteer?  Was it an
     organization that --
12

13        A.    Yeah.  I went to a training with the
     Georgia Democrats.
14

15        Q.    And did you end up observing any election?
          A.    Yes, I did.
16

17        Q.    And where did you -- where were you?

18        A.    Well, I did some early voting observations,
     as well as Election Day, and then also the runoff
19

20   Election Day in December.  So I was at different
     locations for each of those days.
21

22        Q.    And on November 7th, where were you
     located?
23

24        A.    It was November 6th.

25        Q.    November 6th, I'm sorry.
```

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 216

1        A.   And November 6th I was at Allen Temple AME

2    Church.
     THE COURT:   Which one?
3

4        A.   Allen Temple AME.  It's on Joseph Boone
     Boulevard in Atlanta.
5

6        Q.   And in the course of being an observer, do
     you take contemporaneous notes of what you are
7

8    observing?

9        A.   Yes.  So, if something happens, it's not

10   just a perfectly smooth process, then I use my iPhone

11   and I have an app at the direction of to an LBJ
     reporting tool.  So I took notes directly to the
12

13   iPhone and website.
              Q.   And what does LBJ stand for, if you know?
14

15   In this instance.
              A.   Probably Lyndon Baines Johnson.
16

17       Q.   Okay.

18       A.   I believe it was named after him, given
     [inaudible].
19

20       Q.   Okay.  And did you, in fact, enter your
     notes and observations when you were at the AME
21

22   location on November 6th?
              A.   Yeah, I did; well, multiple times
23

24   throughout that day.

25   MR. BROWN:   And I'm going to hand you a -- an Exhibit

 1   and let me -- if I may explain this to counsel.

 2
          [Thereupon, the referred-to document was entered into
 3
     evidence as Plaintiff's Exhibit No. 2]

 4

 5

 6        MR. LINDSEY:  [inaudible].
          MR. BROWN:  Understood.  Put it on the record while I
 7
     hand it to you because it's hard to read.
 8

 9        MR. LINDSEY:  [inaudible] with my glasses.

10   BY MR. BROWN:

11        Q.   And what I've handed to counsel is a large-
          print version for Mr. Lindsey, like the books you get
12
     from Amazon, and then the actual Excel spreadsheet,
13
     which is too small even for me to read, and you could
14
     just see that these blocks were copied onto this.
15
          MR. LINDSEY:  I understand.  Which one do I get?
16

17   Both of these?

18        MR. BROWN:  This is what I'm using as evidence.
          MR. LINDSEY:  Okay.  Do I have a copy of that?
19

20        MR. BROWN:  And you have that so you can verify it.
          MR. LINDSEY:  For the record, Your Honor, I had the
21
22   Lasix surgery.  I can still read this.
          THE COURT:  This one?  This is P-2?
23

24        MR. BROWN:  This is P-2, Your Honor.

25   BY MR. BROWN:

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                              Page 65

```
 1              Q.   Now, Ms. LeClerc, the notes that you take

 2       on the LBJ system appear on what looks like an Excel
         spreadsheet; is that correct?  And that is not what's
 3

 4       in front of you.  That's what I handed to Mr.
         Lindsey.
 5

 6              A.   I have the large print of what you said is
     the Excel spreadsheet.
 7

 8              Q.   And does that appear to be a large-print

 9       version of the very small print on the Excel

10       spreadsheet?

11              A.   Yes.
                Q.   And does the Excel spreadsheet have a true
12

13       and correct recording of the notes that you took on
         the LBJ system as you were observing things in the
14

15       AME voting location?
                A.   Yes.  All of the notes that start with Sara
16

17       LeClerc, that's -- those notes are all on, yes.

18              Q.   And if it's someone else -- excuse me.  And
         if it's someone else, their name would appear, like,
19

20       Benjamin Thorpe [ph]; correct?
                A.   Right.  There were maybe one or two notes
21

22       by a different person and their name appears next to
         those notes.
23

24       MR. BROWN:  Your Honor, I would like to introduce

25    Defendant's 2 into the record.  I mean, sorry.  P-2 into
```

www.huseby.com          **Huseby, Inc.  Regional Centers**          800-333-2082
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 219

 1    the record.

 2         MR. LINDSEY:  If I understand it, these are
      contemporaneous notes that are from your observations; is
 3

 4    that correct?
           THE WITNESS:  Yes.
 5

 6         MR. LINDSEY:  Okay.  No objection.
           THE COURT:  [inaudible].  Yeah.  Thank you.
 7

 8    BY MR. BROWN:

 9         Q.   Now, Ms. LeClerc, the way this prints out,

10    where do we start?

11         A.   You actually start at the back, so these
      are my first pages and my last.
12

13         Q.   Okay.
           A.   [inaudible].
14

15         Q.   And let's just walk through your notes and
      I'll ask you some questions on what you were
16

17    observing.  Looking at page four --

18         A.   If I can clarify that.
           Q.   Sure.
19

20         A.   Actually these are by incidence --
           Q.   Okay.
21

22         A.   -- so the first incident actually starts at
      the bottom of page three.
23

24         Q.   Okay.  And what was that incident that you

25    observed?

1        A.    There was an issue where the Express

2   machines were to pick up their ballots.  The number
    that was on the machines -- well, there -- there were

3

4   two machines at this location.  So, they -- the two
    poll workers were comparing the machines and noticed

5

6   that one machine was a couple numbers different from
    the other machine's count.  So they seemed to be out

7

8   of sync and having discrepancies.

9        Q.    And was that issue resolved?

10       A.    Yes.  That did get resolved.  The poll

11  manager called in for a technical help but was told
    that it would self-correct in time and it did self-

12

13  correct [inaudible].
         Q.    And then what was the next incident?

14

15       A.    The next incident that I started taking was
    that just one of the voters who came in had --

16

17  started ac- -- oh, I'm sorry.

18       Q.    Could you -- I was going to ask you to
    refer to your notes, so maybe we could follow along

19

20  with your observations.  Was this the senior voter?
         A.    Yes.

21

22       Q.    Okay.  Turn with me to the bottom of page
    two.

23

24       A.    Yes.

25       Q.    Are those your notes relating to that

```
 1   senior voter?

 2        A.   Yes.
          Q.   And just go ahead and explain without
 3
     looking at this what you recall.  That's fine.
 4
          A.   So, I noticed that -- well, a voter came in
 5
     to check in, got their ballot.  She was a rather
 6
      elderly lady walking on a cane, very kind, and she
 7
     went to the machine to vote.  At that point, nothing
 8
     out of the ordinary had happened, but she started
 9
     turning around and asking for some help with the
10
     machine.
11        So, we pulled to help her, to assist her.  And
12
     the two of them were at the machine for a brief time.
13
      I think the manager left and the voter continued
14
     voting.  Then she called the manager back again and
15
      the manager went back to assist.  And so the two of
16
     them were at the machine together for a little while
17
     and appear to me ordinary but the manager is allowed
18
      to assist the voter if the voter asks for help.
19
          It lasted for a little while longer than I would
20
      have anticipated and at the end of that, the voter
21
     went down -- went over to some chairs to sit and
22
      wait, and I noticed that the manager started shutting
23
     that DRE machine down, closing it up, and so that was
24
     unusual to me and I wanted to figure out what was
25
```

```
 1      going on.  Why was that machine getting closed?  Was

 2      there a problem?
              So at first I was just observing.  I didn't want
 3

 4      to get in the way of whatever the manager was doing.
        And I went over to talk to the voter.  She was
 5

 6      actually just sitting and waiting for her ride so
        that she could get back to her home.  So I went up to
 7

 8      her and asked her if everything okay.  Was she able

 9      to vote?  And --

10      MR. LINDSEY:  And, Your Honor, I'll object. Ms.

11   LeClerc's been asked [inaudible] what the voter said to be
      hearsay.
12

13      THE COURT:  [inaudible].  She asked her, fine.  Go
     ahead, what's next?
14

15   BY MR. BROWN:
              Q.   Did you have a conversation with the voter?
16

17              A.   I had a conversation with the voter.

18              Q.   And based upon that conversation, did you
        have an understanding of what was happening?
19

20      THE COURT:  No.  Understanding what's happening is
     hearsay.
21

22      MR. BROWN:  Okay.
        THE COURT:  Did you did anything as a result of it?
23

24   BY MR. BROWN:

25              Q.   What did you do in response to receiving
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 223

1        the information from the voter?

2               A.   So, I waited for the manager to finish up
         what she was doing with the machine and then

3

4        approached her to ask what happened, what -- why was
         the machine had been closed, what was going on.

5

6               Q.   And what did the manager tell you?
         MR. LINDSEY:  Again, I'll object, on hearsay.

7

8        MR. BROWN:  That is an admission.  The manager is

9    employed by the defendants.  That's an admission.

10   THE COURT:  Well, does Fulton County -- does Fulton

11   County have anything to say about that?
         MR. LINDSEY:  [inaudible].

12

13       MS. BURWELL:  Well, Your Honor, the -- it is true
        that the poll manager would be employed by Fulton County,

14

15   but I don't believe that the poll manager is in a position
        to bind the County.

16

17       THE COURT:  I -- I -- I agree with that, but I'm

18   going to let the witness say what she said.
         MR. BROWN:  Thank you, Your Honor.

19

20       THE WITNESS:  So, the poll manager told me that she
        needed to close the machine because that machine had self-

21

22   cast the voter's ballot before the voter had finished
        voting.  And the manager told me that she was assisting

23

24   the voter on the review screen.  So after you make your

25   selection to get the review screen.

```
 1        And the manager noticed that the -- there was no

 2   selection made for the race for lieutenant governor and
      for one other race, which the manager didn't name to me.
 3

 4   And so she had asked the voter -- the voter intended to
      vote in those races.  The voter said, yes --
 5

 6        MR. LINDSEY:  That would be an objection, Your Honor.
      That's what the voter said.
 7

 8        THE COURT:  That's hearsay at this point.

 9        MR. LINDSEY:  Yes.

10        THE COURT:  But as a result of that -- I'm going to

11   let it go ahead on this one.
          MR. BROWN:  Okay.
12

13        THE COURT:  Uh --
          MR. BROWN:  Go ahead, Ms. LeClerc.
14

15        THE WITNESS:  So, the manager pointed to where the
      lieutenant governor race was, and the voter put her finger
16

17   on the area for the lieutenant governor race selection so

18   she could vote for the lieutenant governor race.  And
      instead -- which is nowhere near the area for submit
19

20   ballot, but when she touched lieutenant governor, the
      machine said, your ballot has been submitted and there was
21

22   nothing they could do at that point.
          So, it just self-cast before the voter could actually
23

24   make her selection on the lieutenant governor or the other

25   race.
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 225

```
 1   BY MR. BROWN:

 2          Q.   Did you observe whether the poll officials
         took that machine out of service at that time?
 3

 4          A.   Yes.  The manager did take it out of
         service immediately.
 5

 6          Q.   And then was that machine put back in
         service?
 7

 8          A.   It was put back in service later in the

 9      day.  Yes.

10      THE COURT:  Let's -- let's take a morning break, take

11   a 10-minute break.
           MR. BROWN:  Thank you, Your Honor.
12

13
           [Off the record at 10:25 a.m., and back on the record
14
      at 10:37 a.m.]
15

16

17      THE COURT:

18
                   CONTINUATION DIRECT EXAMINATION
19

20                   OF SARA LECLERC

21

22   BY MR. BROWN:
           Q.   Ms. LeClerc, returning to your testimony
23

24      about your observations at the AME Church, did you

25      take any photographs of the poll tapes when you were
```

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 226

1    there?

2         A.   Yes.  I took photographs of the tops of the
     poll tapes that were able to print.

3

4         Q.   And did you have the opportunity to observe
     any issues with the electronic polling?

5

6         A.   Yes.  And --
          Q.   And what did you see?  What did you

7

8    observe?

9         A.   So as far as the poll tapes were concerned

10   it's -- was my understanding that he receives at the

11   end of the night they print out a tape giving a
      record of whatever votes have been cast or at least a

12

13   breakdown by races, by each race.
              At this location there were five DRE machines,

14

15   but this instance one of the machines would not print
      at all and the manager and workers tried many

16

17   different ways to try to get it to print.  They

18   called the technical support, but they were never
      able to successfully from the fifth machine.  So I

19

20   was not able to observe the tape of that fifth
      machine.

21

22        Q.   Ms. LeClerc, what was the manager's
      reaction, if any, to the difficulties that you

23

24   described that the senior voter experienced?

25        A.   To me she appeared very alarmed by what had

1        happened.  When I spoke with her, she -- her tone of

2        voice was just kind of frantic and her -- you know,
         she just with her arms and she couldn't believe that

3

4        the vote had cast because the voter's finger was
         nowhere near the area for the submit ballot.  So she

5

6        was just -- just incredulous to me.
                 Q.   Did she indicate to you whether she was

7

8        going to file some sort of complaint with the

9        Secretary of State?

10               A.   She did at one point that day.  She said

11       she was going to -- she planned to file some
         complaints because there were multiple technical

12

13       issues that day that they experienced.
                 MR. BROWN:  Your Honor, that is the last question I

14

15   have for Ms. LeClerc.  I have misplaced the photographs
     that I was going to have tendered to her and I will --

16

17       THE COURT:  [inaudible] to put them in, [inaudible].

18       MR. BROWN:  Thank you, Your Honor.
         THE COURT:  [inaudible].

19

20       MR. BROWN:  Oh, okay.
         MS. LECLERC:  May -- I'm sorry; may I make --

21

22       THE COURT:  No.  You can't say anything else.

23

24                    CROSS-EXAMINATION

25                    OF SARA LECLERC

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 228

1

2   BY MR. LINDSEY:
            Q.   Ms. LeClerc, your primary role that day was
3

4       to try to tabulate the votes that were being cast
         from Ms. Abrams, correct --
5

6            A.   Uh --
            Q.   -- and report back to the Democratic Party;
7

8       would that be fair?

9            A.   No. No. That would not be fair.

10           Q.   Well, that's what you did, though, didn't

11      you?
            A.   That was one component of what I did but it
12

13      was not about Ms. Abrams.  It was just about
         reporting total numbers --
14

15           Q.   Oh, okay.
            A.   -- of votes cast, not by race or anything
16

17   like that.  It wouldn't -- [inaudible] like that.

18           Q.   I'm sorry.  No problem.  What I'm saying --
         so some -- I want to make sure I understand.  Your
19

20      job was to try to report back to the Democratic Party
         the total votes that were cast from that precinct;
21

22      correct?
            A.   That was one of the [inaudible].
23

24           Q.   Okay.  Thank you.

25           A.   [inaudible].

```
 1              Q.   And you reported what you understood to be

 2         the total number of votes that were cast in that
             precinct; correct?
 3

 4              A.   Yes, I did.
                Q.   Okay.  Were you ever informed that there
 5

 6         was any kind of discrepancy with what was ultimately
             reported to the Secretary of State's office about the
 7

 8         total number of votes that were cast in -- from that

 9         precinct?

10              A.   I don't know what was reported to the

11    Secretary of State --
                Q.   Okay.
12

13              A.   -- I just know what the poll workers and
             managers told me and what was printed on the --
14

15              Q.   Okay.
                A.   -- four out of five tapes that printed.
16

17              Q.   Okay.  And you reported that -- my question

18         is, did you ever receive back word from the
             Democratic Party that they was a discrepancy?
19

20              A.   No.
                Q.   Okay.  Thank you.  In regards to this
21

22         elderly worker from this report that you did, the
             elderly worker thought -- rather the elderly voter
23

24         thought that her vote had been properly cast;

25         correct?
```

1          A.    She thought it had been submitted; that her

2     ballot had been submitted.
            Q.   Yes.  And she didn't have any objections,

3

4     correct, when you talked to her?
            A.   No.

5

6          Q.    Let me -- I think I've asked in the form of
      a negative.  Let me clean it up.  My momma told me

7

8     never to do that.  Did this voter ever report to you

9     any complaints about whether her vote had been

10    properly recorded?

11         A.    No.
            Q.   Okay.

12

13                    CROSS-EXAMINATION

14

15                    OF SARA LECLERC

16

17    BY MR. TYSON:

18         Q.    Good morning, Ms. LeClerc.  My name's Bryan
      Tyson with the Gwinnett Board of Elections.  I just

19

20    wanted to ask you briefly.  You indicated you were a
      poll watcher, but later you said you were observing.

21

22    Were you a registered poll watcher or were you still
      an observer?

23

24         A.    Yes.  I was a -- I was officially appointed

25    as a, I'm not sure if it's called poll watcher or

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 231

1        poll observer.  But yes, I got a credential so that I

2        could be there and observe.
                 Q.    And that was by the Democratic Party;

3

4        correct?
                 A.    Yes.

5

6                 Q.    Okay.  And regarding the voter that you
         testified about, do you know what her name was?

7

8                 A.    I do not.

9                 Q.    Okay.

10       MR. TYSON:  Thank you.

11                         CROSS-EXAMINATION

12

13                      OF SARA LECLERC

14

15    BY MS. BURWELL:
                 Q.    Ms. LeClerc, the Exhibit 2 that had your

16

17       notes?

18                 A.    Yes.
                 Q.    Does that include the incidents -- all the

19

20       incidents you testified about today?
                 A.    Yes.  Everything I talked about today,

21

22       those incidents are in the notes.
                 Q.    Okay.  Is there anything that's not in your

23

24       notes that you found -- excuse me?

25                 A.    Yes -- I mean, of course there -- I had

```
 1        many observations that I didn't put in my notes, yes.

 2             Q.   But the things that you thought were
          important were the things that you put in the notes
 3

 4        that are Exhibit 2?
               A.   That's right.
 5

 6             Q.   Okay.  Thank you.
          MR. BROWN:  I don't have any further questions, Your
 7

 8   Honor.

 9        THE COURT:  Okay.  You may go back to your seat.

10   Thank you.  Next witness?

11

          [Thereupon, the testimony of the witness concluded at
12

13   _ a.m.]

14

15        MR. BROWN:  The plaintiffs would call plaintiff
     Jeanne Dufort.
16

17        Please raise your right hand.  Do you promise to tell

18   the truth, the whole truth and nothing but the truth?
          THE WITNESS:  I do.
19

20        MR. BROWN:  Please have a seat.

21

22   Thereupon:

23

24                      JEANNE DUFORT

25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 233

```
 1          was called as a witness by the Petitioner; and,

 2     having been duly sworn, testified as follows:

 3

 4                        DIRECT EXAMINATION
                          OF JEANNE DUFORT
 5

 6
       BY MR. BROWN:
 7

 8          Q.   Please have a seat so we can hear you

 9     through the microphone.  Please state your full name

10     for the record.

11          A.   My name is Jeanne Dufort.
            Q.   Ms. Dufort, are you a plaintiff in this
12

13     election?
            A.   I am.
14

15          Q.   In this litigation?  Where are you from?
            A.   I live in Madison, Georgia, in Morgan
16

17     County.

18          Q.   Are you a registered elector of the State
       of Georgia?
19

20          A.   I am.
            Q.   Are you a resident of Morgan County?
21

22          A.   I am.
            Q.   And were you entitled to vote for either
23

24     Mr. Duncan or Ms. Amico in the contested election?

25          A.   Yes.
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 234

1          Q.   Mr. Dufort, what interest, just generally

2      and be very brief, but just to introduce yourself to
       the Court.  What is your interest generally in

3

4      political activities and the election activities?
                A.   So, when I turned 18, I did two things.  I

5

6      registered to vote and I registered to donate funds.
       And I've been doing both ever since.  Gave --

7

8      THE COURT:  [inaudible]

9      THE WITNESS:  -- because I can do that, right?  And

10  both of them --

11     THE COURT:  It wasn't in the context.  Go ahead.
           THE WITNESS:  Both of them lifelong habits, just

12

13     depends. Thanks to Sister Aletha, my high school
     civics teacher, I became very interested in American

14

15  political science and I was a major in that at the
     University of Chicago, which also while I was there as a

16

17  student was the first time, I was a poll watcher.  So I

18  would say it's a lifelong habit of mine to be passionate
     about moving and about the wonderful and amazing system we

19

20  have of self-governance in the United States.
     BY MR. BROWN:

21

22          Q.   Ms. Dufort, have you been a poll watcher in
       Georgia?

23

24          A.   Yes.  Most recently in the 2018 general

25     election I was a registered poll watcher.

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 235

```
 1              Q.   Thank you.

 2         MR. BROWN:  I don't have any further questions.
           MR. LINDSEY:  Your Honor, I have four pages of
 3

 4    detailed cross-examination [inaudible].
           THE WITNESS:  Thank you.
 5

 6         MR. LINDSEY:  Just have to thank you for being a poll
      watcher and I apologize to the young woman for not
 7

 8    thanking her for being a poll watcher as well.  That's

 9    hard work, all.

10         THE COURT:  I assume you're just trying to establish

11    qualifications as planned.
           MR. BROWN:  That's correct.
12

13         THE COURT:  Okay.
           MALE:  [inaudible]
14

15         MS. BURWELL:  Nothing for Fulton County.
           THE COURT:  Okay.
16

17         THE WITNESS:  Thank you.

18
           [Thereupon, the testimony of the witness concluded at
19

20    11:41 a.m.]

21

22         MR. BROWN:  As long as you stipulate that they are
      voters and they voted in the election.  That's all
23

24    [inaudible].

25         We're going to enter into a stipulation, Your Honor,
```

1   to accelerate this and that is that the plaintiffs are

2   registered voters, that they were entitled to vote in the
    November 6th election for the contested election and that

3

4   would satisfy -- it would eliminate the need to call the
    other -- thank you, Your Honor.

5

6       MR. LINDSEY:  No objection
        THE COURT:  And does Gwinnett agree with that --

7

8       MR. BROWN:  Thank you, Your Honor.

9       THE COURT:  Fulton agree with that?

10      MR. BROWN:  Thank you.

11      THE COURT:  Yeah. They have to be. I understand.
        MR. BROWN:  Just a short break, Your Honor.

12

13      THE COURT:  Okay.  Can we go forward, please?
        MR. BROWN:  The plaintiffs will call Chris Brill and

14

15  we're going to get him now.
        THE COURT:  Yeah. [inaudible] go do that.

16

17  [inaudible].

18      MR. BROWN:  Please raise your right hand.  Do you
    promise to tell the truth, the whole truth and nothing but

19

20  the truth?
        THE WITNESS:  I do.

21

22      MR. BROWN:  Please have a seat.

23

24  Thereupon:

25

1                        CHRISTOPHER BRILL

2
         was called as a witness by the Petitioner; and,
3

4    having been duly sworn, testified as follows:

5

6                        DIRECT EXAMINATION
                         OF CHRISTOPHER BRILL
7

8

9    BY MR. BROWN:

10            Q.    Please state your name for the record.

11            A.    Christopher Brill.
              Q.    And Mr. Brill, by whom are you currently
12

13       employed?
              A.    A company called TargetSmart.  TargetSmart.
14

15            Q.    And have you been engaged by the plaintiffs
         to give expert advice in this matter?
16

17            A.    Yes.

18            Q.    I would like to go through your background
         a little bit and your experience, if I may.  Where
19

20       did you graduate from college?
              A.    University of New Mexico.
21

22            Q.    And what did you study?
              A.    Political science.
23

24            Q.    And what have you been doing since

25       graduating from University of New Mexico?

www.huseby.com            Huseby, Inc. Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 238

1       A.    I'm working mostly with political

2   consulting, so working with political campaigns,
    nonprofits, activist organizations on electoral

3

4   strategies and how to reach hard-to-reach
    electorates.

5

6       Q.    And have you -- you've at TargetSmart since
    graduating?

7

8       A.    No, I have not.  Just for the past six

9   years.

10      Q.    Okay.  And to get a little better idea of

11  your actual work experience, describe the business of
    TargetSmart.

12

13      A.    So, TargetSmart puts together -- our core
    business is putting together databases, such as

14

15  individual voter -- voter-level databases using the
    statewide voter files, election results, other types

16

17  of publicly available information, consumer data, to

18  try to build advice and help clients determine how to
    target voters, how to reach voters, and how to engage

19

20  in local campaigns.  So that's kind of our main
    business focus.

21

22      Q.    And describe who your clients would be or
    the different categories of clients.

23

24      A.    So, clients could be (C) -- you know (C)(3)

25  or (C)(4) organizations so that our nonprofits or

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 239

```
 1    other organizations.  They could political committees

 2    such as national party committees.  They could also
       be other nonprofits.  So kind of a range of -- from
 3
 4    nonprofits to political campaigns and the like.
             Q.   And describe, if you will, a -- the kind of
 5
 6    work that you would do for a nonprofit or a political
       party, let's say, or political organization, and go
 7
 8    through exactly what you, Chris Brill, would do if

 9    you could.

10          A.   Yes.  So if a political party or candidate,

11    you know, approached us, usually it's about they want
       to study the election they're about to run in and,
12
13    you know, how they want -- how to go about trying to
       get to essentially a win.  So we go in and -- myself.
14
15    I'll analyze the election.
             I will see what happened the past, how many
16
17    votes were cast in the past; you know, how different

18    candidates perform and then we usually try to -- we
       call it election math, essentially, so we try to, you
19
20    know, game out, okay, this is what's happened before,
       this is what we think is likely to happen in this
21
22    next election, and so let's develop a strategy to
       kind of get you potentially to win.
23
24          So we use the voter file.  We use election

25    results.  We use other types of modeling and other
```

1    strategies to try to help them be as efficient as

2    they can with the resources usually limited and how
     they can go about trying to be successful, and so on.

3

4         Q.   Mr. Brill, do you have any experience
     evaluating the voting trends among various

5

6    demographics?
          A.   Yes.

7

8         Q.   And do you have -- describe that

9    experience.

10        A.   Yes.  So generally it usually breaks down.

11   We look at individual -- different individual
     demographics and trends.  So, for instance, we'll

12

13   look at everything from a voter's age to race,
     gender, ethnicity.  We use polling to try to tease

14

15   out, you know, where our voters kind of coming down
     on an issue or candidate based on those demographics.

16

17        We'll also use the geographic information that's

18   available so, you know, whatever comes in from the
     census.  There's also election results and try to

19

20   package all that together into a strategy that they
     could use to try and contact these specific voters in

21

22   certain areas.  And again, it's really about trying
     to find these deficiencies because there's a lot of

23

24   voters and trying to figure out which ones you want

25   to try to engage with and how to engage with them.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 241

1       Q.   And I take it in your experience you have

2   experience analyzing voting trends; correct?
        A.   Yes.
3

4       Q.   Do you have experience -- have you ever
    been an expert witness before?
5

6       A.   I have not, no.
        Q.   Okay.  Have you -- do you have experience
7

8   in evaluating voting participation?

9       A.   Yes.

10      Q.   Okay.  And what is that experience?

11      A.   Generally, that will -- we'll look at, you
    know, past turnout trends.  So we'll see, you know,
12

13  what does turnout look like in previous elections.
    We will look at things like drop-off, especially for
14

15  our clients that are down-ticket to try to determine
    -- you know, how to mitigate drop-off if you can, and
16

17  we'll work with, you know, trying to, you know, use

18  again, the voter file, kind of geographic data to
    kind of craft -- you know, look at the trends that
19

20  especially, you know, demographically is also
    politically to try to see, you know, how leverage
21

22  those trends to be, again, successful in their
    campaign and for everyone.
23

24      Q.   Let me take one piece of that and ask you

25  another question on it.  Did you say that you might

```
 1      be engaged by a down-ballot candidate?

 2           A.   Yes.
             Q.   And is one of the concerns they would have
 3

 4      being under-voting?  Is that -- might be a concern?
             A.   Correct.  Yes.
 5

 6           Q.   Okay.  And would your work involve
        evaluating why people don't vote for a particular
 7

 8      race if they are voting at all?

 9           A.   Correct.  Yes.

10           Q.   Okay.

11      MR. BROWN:  Your Honor, I would like to tender Mr.
        Brill as an expert witness on voting trends and on reasons
12

13  for under-voting and for his evaluation of specific
        results of the 2018 election.
14

15      MR. TYSON:  I'd like to ask more questions of Mr.
        Brill, if I may.
16

17      THE COURT:  Yes.  Go ahead.

18      MR. TYSON:  Good morning, Mr. Brill.  My name is
        Bryan Tyson.  I represent the Gwinnett County Board of
19

20  Registrations and Elections.  I just had a couple of
        questions for you.
21

22                    CROSS-EXAMINATION
23

24                    OF CHRISTOPHER BRILL

25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 243

```
1    BY MR. TYSON:

2          Q.   You were explaining earlier to Mr. Brown
          about your role with voting trends and those kinds of
3
4          things.  Have you ever had any study or done any
          analysis of ballot design?
5
6          A.   Ballot design?  No.
           Q.   Have you had any experience in election
7
8          administration in terms of you personally helping

9          administer an election?

10         A.   No.

11         Q.   Do you have any knowledge of DRE machines
          in Georgia or how they function technically?
12
13         A.   No.
           Q.   Okay.  So it's correct, isn't it, you have
14
15         no firsthand knowledge of any DRE machine in the
          state of Georgia that was used in the 2018 general
16
17         election; correct?

18         A.   Correct.
           Q.   Okay.
19
20         MR. TYSON:  All right, Your Honor, at this time we
          would -- Gwinnett County would object mostly on those
21
22    questions I'd asked first.
           THE COURT:  Anybody else got any questions?
23
24         MR. TYSON:  Your Honor, we object to Mr. Brill's --

25         THE COURT:  No, I understand that.  Let me do --
```

1          MR. TYSON:  Yes.  I'm sorry.

2          MR. LINDSEY:  Your Honor, just a couple questions.

3

4                      CROSS-EXAMINATION
                     OF CHRISTOPHER BRILL
5

6
     BY MR. LINDSEY:
7

8          Q.    You've never worked on a campaign in

9     Georgia; is that correct?

10         A.    Like a candidate campaign?

11         Q.    Yeah.
           A.    No.
12

13         Q.    Okay.
           MR. LINDSEY:  No further questions.
14

15         MS. BURWELL:  I have no questions.
           THE COURT:  Okay.
16

17         MS. BURWELL:  Okay.

18         MR. TYSON:  Your Honor, we do object to Mr. Brill's
     admission as an expert on this case.  First of all, on the
19

20    issue of voting trends, that has nothing to -- under
     702(b) facts and issues of the case; voting trends are not
21

22    an issue in this case.
           As to -- in terms of the reasons for the under-vote,
23

24    Mr. Brill just testified that he has no experience in

25    terms of ballot design, election administration, what's

 1    going on with the DREs; and as to the specific results of

 2    this particular under-vote we would, on the same issue,
      that he has no experience that's relevant to the Court to

 3

 4    determine the issue of this particular case.
              THE COURT:  Anyone else at this time?  Nope?  Okay.

 5

 6        MR. LINDSEY:  We would join in the objection, Your
      Honor.

 7

 8        MR. BROWN:  Yeah, Your Honor, the argument that Mr.

 9    Tyson made was not about what he's being tendered as an

10    expert in.  In that end, I have established that he does

11    have expertise in what he's going to testify about.  And
       it is abundantly clear under Georgia law that he should be

12

13    qualified as a witness to both discuss the actual election
       results and what possible reasons for the under-vote there

14

15    might be.  And it may go to wait, but it certainly does
       not go to admissibility.  Thank you, Your Honor.

16

17        THE COURT:  I'm not going to qualify him as an

18    expert.  I don't think that's an area of expertise.  And
       I'm having trouble with that.  He's going to say why the

19

20    numbers were this way and what could have happened.  An
       expert usually says what has happened, and I'm not going

21

22    to let you qualify him as an expert.  You can ask him
       questions and see where we go.

23

24        MR. BROWN:  Sure.  I'm going to ask you some

25    questions about what has happened.

```
 1
 2                    REDIRECT EXAMINATION
                      OF CHRISTOPHER BRILL
 3

 4
      BY MR. BROWN:
 5

 6              Q.   You with me, Mr. Brill?
                A.   Yes.
 7

 8        MR. BROWN:  Your Honor, this is a borderline issue

 9   and it may be rearguing and if it is, I apologize, but I -

10   - this is an important witness to us and an important line

11   of inquiry.
                We would be asking Mr. Brill to explain possible
12

13   causes for under-voting and the point of that testimony is
       to rebut the -- is to address the issues of why other than
14

15   machine malfunction there might be for an under-vote.  And
       he has testified that he advises clients on that issue and
16

17   that that is something that he is knowledgeable about.

18        THE COURT:  Years ago I was trying a case in front of
       old Judge [inaudible], he was quite a character, and me
19

20   and the DA -- I was defending -- me and the DA were going
       at it and he goes, doesn't a judge get time to think?
21

22        Give me time to think about this one a little bit.
       Let me -- and make sure I understand you.  He wants to put
23

24   up a bunch of ideas about why there was an under-vote.

25   And you think that's an expertise?
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 247

```
 1        MR. BROWN:  Based upon his experience and his

 2   knowledge about what to address, the possible areas of
      under-voting, of why it would be under-voting and why it

 3

 4   might not be based upon his knowledge and experience.
          THE COURT:  Well, I don't see that he has any

 5

 6   expertise.  I'm having trouble with that.  You know, he's
      done some things and he's got some ideas; that doesn't

 7

 8   make him an expert.  He doesn't have any training; he

 9   doesn't have any background; he doesn't have -- I'll let

10   you ask the questions and we'll see where we go.

11        MR. BROWN:  Thank you, Your Honor.
          THE COURT:  Uh-huh.

12

13   BY MR. BROWN:
              Q.   Did you review the results of the 2018

14

15       election in Georgia?
              A.   Yes.

16

17          Q.   And describe for the Court where you looked

18       at and what you reviewed.
              A.   Yeah.  So I examined the totals that were

19

20       cast for eight ticket races that were on the ballot
          from governor down to I believe commissioner of

21

22       labor.  And then I examined the under-vote that took
          place for each of those races to try to see, you

23

24       know, what that trend looked like and that's when I

25       first saw, you know, the outlier and the anomaly that
```

1    was the lieutenant governor's vote totals.

2        So what my analysis kind of focused on was
     trying to figure out exactly what -- where that

3

4    under-vote came from, what counties, why -- you know,
     why vote the way it did and what kind of reasons, you

5

6    know, that could possibly, you know, entail for it.

7        Q.    And the information that you received came

8    from the Secretary of State's databases; is that

9    right?

10       A.    Correct.  Yes.

11       Q.    And in the course of your work, do you
     sometimes also review data from other states?

12

13       A.    Correct.  Uh-huh.

         Q.    And do you also review historical data,

14

15   like say, from Georgia?
         A.    Yes.

16

17       Q.    And did you look at the Secretary of

18   State's information in Georgia on older Georgia
     races?

19

20       A.    Yes.
         Q.    And did you compare the voting trends and

21

22   patterns between this race and prior Georgia races in
     other states, lieutenant governor races?

23

24       A.    Yes.

25       Q.    And is that the kind of work that you do

1      for a living also for your clients?

2            A.   Yes.
             Q.   And does that require you to look at

3

4      various databases and to sift a lot of different
       information in a systematic way?

5

6            A.   Yes.
       MR. TYSON:  Your Honor, Mr. Brown is leading the

7

8   witness on a lot of these points and he's testifying.  I

9   think he needs to ask questions that are directly

10  addressing the witness.

11  BY MR. BROWN:
             Q.   Mr. Brill, in your experience, have you

12

13     developed an expertise or understanding of reasons
       for under-voting?

14

15           A.   Yes.
             Q.   And without disclosing the reasons for

16

17     under-voting can you testify as to how you gained

18     that experience and expertise?
             A.   By examining thousands of elections across

19

20     all 50 states.
       MR. BROWN:  Your Honor, I would like to retender Mr.

21

22  Brill as an expert on under-voting and the particular
     reasons for under-voting, and how his understanding of

23

24  under-voting relates to what he's observed in the results

25  which are in evidence of the Georgia election.

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 250

 1      MR. TYSON:  Your Honor, we'll renew our objection on

 2  this point as to Mr. Brill; that he certainly could have
    looked at a lot of numbers, but numbers alone are not

 3

 4  going to tell you why something is happening and I think
    that's what Mr. Brown is trying to get at as to Mr.

 5

 6  Brill's opinion about why and he has not shown Mr. Brill
    has expertise from just looking at various numbers on that

 7

 8  point.

 9      MR. LINDSEY:  I'll also add to that objection, Your

10  Honor.  There's been no testimony whatsoever that this

11  individual has any intimate knowledge regarding the
    details of this particular race that took place;

12

13  therefore, he would not be qualified to be a --
            THE COURT:  I'm not going to qualify him as an

14

15  expert.  I mean, the reasons why, I mean, there are some
    pretty obvious simple statements in any race, but I have

16

17  trouble with reasons why.  You can testify to numbers and

18  all that kind of thing.  I don't see -- reasons why, this
    isn't going.  Next question.

19

20      MR. BROWN:  Thank you, Your Honor.
            THE COURT:  P-3?

21

22      MR. BROWN:  Yes.
    BY MR. BROWN:

23

24          Q.  Mr. Brill, is P-3 your affidavit?

25          A.  I'm sorry?

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 251

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
**Transcript of Hearing Proceedings on 01/17/2019**                    **Page 98**

```
 1                Q.   Is P-3 your --

 2           MR. BROWN:  Well, Plaintiff's Exhibit 3 your
        affidavit?
 3


 4
             [Thereupon, the referred-to document was entered into
 5

 6      evidence as Plaintiff's Exhibit No. 3]

 7

 8           THE WITNESS:  Oh, I -- yes.

 9      BY MR. BROWN:

10                Q.   And without disclosing any contents yet --

11           MR. TYSON:  Counsel, could I get a copy?
             MR. BROWN:  Oh, I'm very sorry.  Sorry about that.
12

13           THE COURT:  Let me cycle the record to everybody.
        Various people made proffers of evidence; I did not look
14

15      at any of them.  Everything should come in the courtroom.
        BY MR. BROWN:
16

17                Q.   Mr. Brill, without disclosing the contents

18      of it yet, at the plaintiff's request you prepared a
         report on the analysis of the 2018 Georgia lieutenant
19

20      governor under-vote; correct?
                  A.   Correct.
21

22                Q.   And in the course of that you observed
         certain numbers that came from the Secretary of
23

24      State; correct?

25                A.   Correct.
```

www.huseby.com          **Huseby, Inc.  Regional Centers**          **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 252

```
 1        Q.   And did you analyze those -- well, did you

 2   present those numbers on page two of your report to
     the Coalition?

 3

 4        A.   Yes.  I did.
          Q.   Okay.  Let me refer you to Table 1, which

 5

 6   is entitled, Total 2018 Under-Vote by Office; do you
     see that?

 7

 8        A.   Yes.

 9        Q.   Does that -- is that table an accurate

10   report of information from the Secretary of State's

11   website?
          A.   Yes.

12

13        Q.   And it shows -- and just explain in terms
     of your terminology these columns.  The first column

14

15   is the name of the race; correct?
          A.   Correct.

16

17        Q.   The second one is the total number of votes

18   that that race attracted; correct?
          A.   Correct.

19

20        Q.   And the third is what you call the under-
     vote; is that right?

21

22        A.   Yes.
          Q.   And here -- the way you do it, the under-

23

24   vote is a comparison between the particular race and

25   the governor's race; is that --
```

1          MR. LINDSEY:  Your Honor, if I could object.  Mr.

2     Brill can testify to what these terms mean instead of Mr.
       Brown explaining those and he's the leading the witness

3

4     again on that.
             MR. BROWN:  Sure.  I'll withdraw the question.  I'm

5

6     just trying to speed it up, Your Honor.
       BY MR. BROWN:

7

8          Q.   Mr. Brill, what is the under-vote -- what

9     is the calculation for the under-vote?

10         A.   I calculated it by comparing the total that

11    was cast for the governor's election and comparing
       that against the total that was cast for every other

12

13    election [inaudible].
             Q.   Is the under-vote different than the under-

14

15    vote of the total number of people who voted?
             A.   It would be, yes.  Yes.

16

17         Q.   Is that because some people don't even vote

18    for a governor?
             A.   Correct.

19

20         Q.   Okay.  Do you have an understanding of how
       many, just in general terms, people in this election

21

22    did not vote for governor?
             A.   I would have to double check, but I think

23

24    it was something along the lines of 10 to 15,000,

25    maybe.  I don't have an exact number in front of me.

```
 1        Q.    Fair to say it would be a small portion of

 2   even 1 percent?
               A.    It's a fraction of a percent.
 3

 4        Q.    And then in the last column it says,
     dropout versus governor; do you see that?
 5

 6        A.    Yes.
               Q.    And that would reflect the percent -- what

 7

 8   does that -- what is that calculation?

 9        A.    So that calculation again is just taking

10   the under-vote and -- as the percentage of the total

11   cast for governor.  So, example, lieutenant governor,
      the under-vote was about 4 percent lower than the
12

13   total that was cast for governor; and then secretary
      of state, 1.4 percent and so forth.  It's just taking
14

15   the under-vote number there and dividing it by the
      total votes cast for governor.
16

17        Q.    Let me direct your -- you testified earlier

18   that you reviewed data on the Secretary of State's
      website relating to prior elections in Georgia; is
19

20   that correct?
               A.    Yes.
21

22        Q.    And are those presented in Table 2?
               A.    Yes, they are.
23

24        Q.    And if you would just describe to the Court

25   what those rows and columns show.
```

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                    Page 102

1        A.   Yes.  So, it's again the same calculation

2    as in Table 1, except looking at elections from 2002
     to 2018, and so essentially in calculating that
3

4    under-vote percentage for each of those races across
     election -- across each election cycle up to 2018.
5

6        Q.   And which has the highest under-vote total?
         A.   The 2018 lieutenant governor's race.
7

8        Q.   And looking at the four prior races, have

9    you calculate the average under-vote for the

10   lieutenant governor's race for those four years?

11       A.   Yes.  It was around 0.8 percent.
         Q.   And can you do in your head -- doing the
12

13   math it would be necessary to determine what the
     under-vote number would be if the historical trend of
14

15   .8 were applied today?
         A.   If you have a percentage, the under-vote
16

17   would be around 31,532 -- thousand votes on under-

18   vote assumption.
     THE COURT:  Say that again.  Someone coughed.
19

20   THE WITNESS:  31,532, I believe.  In that range.  I
     can double check exactly -- that exact amount.
21

22   BY MR. BROWN:
         Q.   And so rather than the under-vote being --
23

24   let me direct your attention back up to Table 1.

25       A.   Uh-huh.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 256

```
 1            Q.   Rather than the under-vote being 159,024,

 2       if it had tracked the historical trend, it would be
         that number less 31,000-something; correct?
 3

 4            A.   Correct, yeah.
              Q.   Okay.
 5

 6            A.   Given all the -- what we know about
         elections, yes.  That would be correct.
 7

 8            Q.   Okay.  Now, did you review data from other

 9       states lieutenant governor elections?

10            A.   I did, yes.

11            Q.   And is -- does Chart 1 on the next page of
         your affidavit show that information?
12

13            A.   Yes.
              Q.   That chart --
14

15       MR. BROWN:  Your Honor, did I neglect to give you a
         copy of this affidavit?
16

17       THE COURT:  No.  That's not in evidence.

18  BY MR. BROWN:
              Q.   The long bar here is from California?
19

20            A.   Correct.
              Q.   And did you do research to determine why
21

22       California had a much higher under-vote percentage?
              A.   Yes.
23

24            Q.   And did you -- and what did you find?

25       MR. TYSON:  Your Honor, I'll object.  Mr. Brill's
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 257

```
 1    going to be testifying to why California had a higher

 2    under-vote percentage.  I think under your prior
       explanation of terms in the opinion that's not an
 3

 4    appropriate area for him to testify to.
            THE COURT:  Sustained.
 5

 6    BY MR. BROWN:
                Q.   Mr. Brill, I'm not going to ask you about
 7

 8         why California looked that way.  My next question is,

 9         apart from California, what state had the highest

10         under-vote total?

11                A.   Georgia.
                Q.   Let me direct your attention to the next
12

13         page of your analysis.
                Did you have the opportunity to compare the
14

15         under-voting in the Georgia race between votes that
            were cast electronically on the one hand in votes
16

17         that were cast on paper?

18                A.   Yes.
                Q.   And where did you get that information
19

20         from?
                A.   From the Secretary of State's website.
21

22         They make that county-level canvas available that I
            use.
23

24                Q.   Okay.  And does Chart 2, on the next page

25         of your report, show the under-vote percentage by
```

1    office and vote method?

2         A.   It does.
          Q.   And if you would just explain to the Court,
3
4    first for the lieutenant governor, what those bars
     show.
5

6         A.   So, I had to look at three here.  The first
     was Election Day under-vote and what that shows is
7

8    that lieutenant governor was about 4.5 percent rate

9    of under-vote.  Advanced voting of the early vote

10   person was around 3.9 percent.  But then absentee

11   voting was down to 1 percent.
          Q.   And is your understanding that advanced
12
13   voting is electronic voting?
          A.   That's my understanding, yes.
14

15        Q.   And so looking at the -- these bars, paper
     voting had only a 1 percent under-vote; is that
16
17   correct?

18        A.   Yes.
          Q.   But the electronic had over 4 percent
19
20   under-vote; is that correct?
          A.   Correct.
21

22        Q.   Okay.  Did you see that same -- those same
     types of numbers when you reviewed the Secretary of
23
24   State race or the attorney general race?

25        A.   I did not.

```
 1              Q.    And what did you find when you reviewed

 2        those?
                A.    When I reviewed those, I found that the

 3

 4        under-vote percentages were relatively even across
           all those methods.
 5

 6        THE COURT:  Say that again.  Way too fast.
           THE WITNESS:  I'm sorry.  I found that the under-vote
 7

 8   was relatively consistent percentage-wise across all three

 9   methods of voting when you look at Secretary of State,

10   attorney general.

11   BY MR. BROWN:
                Q.    And so, you don't -- to make sure I'm clear
12

13        on this.  So you don't see the disparity between
           paper votes and electronic votes in the Secretary of
14

15        State's race or the attorney general's race that you
           saw in the lieutenant governor's race; is that
16

17        correct?

18        MR. TYSON:  Objection, Your Honor.  Leading.
           THE COURT:  Rephrase.  Sometimes when there's an
19

20   objection you don't bother responding and I -- on the
      record it looks like I didn't give you a chance to speak.
21

22   Well, I'm giving you a chance to speak; okay?
           MR. BROWN:  Your Honor, I'll withdraw the question.
23

24        THE COURT:  Okay.

25   BY MR. BROWN:
```

```
 1        Q.   Let's go through these individual numbers,

 2   Mr. Brill.  The Secretary of State's office, what was
      the Election Day percent under-vote?
 3

 4        A.   1.5 percent.
          Q.   What was the advanced voting percentage
 5

 6   under-vote for the Secretary of State?
          A.   1.3 percent.
 7

 8        Q.   And then what was the absentee voting

 9   percent?

10        A.   1.4 percent.

11        Q.   And then for the attorney general, what was
      the under-vote for Election Day?
12

13        A.   2.2 percent.
          Q.   What was the percentage for advanced
14

15   voting?
          A.   1.8 percent.
16

17        Q.   And what was the percentage for absentee

18   voting?
          A.   1.7 percent.
19

20        Q.   And just to review for the record to make
      sure I have it in there, on the lieutenant governor's
21

22   race, what was the percentage for Election Day
      voting?
23

24        A.   4.5.

25   THE COURT:  4.5 percent.  3.9 percent, 1 percent.
```

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 261

```
 1   Got it.

 2       MR. BROWN:  Thank you, Your Honor.
         THE COURT:  Paying attention.
 3

 4       MR. BROWN:  Thank you, Your Honor.  Thank you, Your
     Honor.
 5

 6   BY MR. BROWN:
              Q.   Mr. Brill, in your experience have you seen
 7

 8       a voting pattern ever before that looks like the

 9       voting pattern in the vote for the lieutenant

10       governor's race in Georgia?

11       MR. TYSON:  Your Honor, I'll object that Mr. Brill is
     not qualified as an expert on this.
12

13       THE COURT:  He's not qualified as an expert, Mr.
     Brown.  I'm not -- he's putting numbers -- he can put in
14

15   the numbers.  There's other things you can argue.
         MR. BROWN:  May I ask him what numbers he's never
16

17   seen that resemble this, Your Honor.

18       THE COURT:  Well, just -- just watch where you go.  I
     mean, you ask the questions, I'll rule as we go.
19

20       MR. BROWN:  Your Honor, I'll ask this.
     BY MR. BROWN:
21

22              Q.   And Mr. Brill, don't answer, because there
         may be an objection.  Have you seen numbers in your
23

24       review of all of the races that you've reviewed in

25       the course of your work that resemble the pattern
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 262

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                    Page 109

```
 1       seen in Georgia, ever?

 2       MR. TYSON:  And Your Honor, I'll object on that
    point, as we haven't laid a foundation for any --
 3

 4       THE COURT:  We're dealing with this -- this race.
    I'm not dealing with California, Nevada, wherever.  I'm
 5

 6  dealing with Georgia.
         MR. BROWN:  And I would like to ask a question for
 7

 8  the record.

 9  BY MR. BROWN:

10           Q.   Were you able to reach any conclusions

11       about whether the data that you reviewed cast a doubt
         over the accuracy of the final vote?  And don't
12

13       answer yet.
         MR. TYSON:  Your Honor, objection for the same reason
14

15  that was stated.
         THE COURT:  I mean, you got the information from the
16

17  Secretary of State.  Whether it's valid or not; who knows?

18       MR. BROWN:  Your Honor, let me --
         THE COURT:  He -- he got the number [inaudible] that
19

20  what's he testified to. So I'm taking the numbers.
         MR. BROWN:  Yes, Your Honor.  The reason for asking
21

22  it is that it is, in my view, it is probative and it goes
    to weight as to whether this witness based upon his
23

24  experience believes that the numbers cast doubt upon the

25  election.  That's the reason for asking.
```

www.huseby.com          **Huseby, Inc. Regional Centers**          **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 263

```
 1          THE COURT:  No.  He can't -- he can't say that one

 2   way or the other.  That's -- that's -- can be my decision,
     I'm afraid.  Okay.
 3

 4          MR. BROWN:  Your Honor, if I may have just a --
            THE COURT:  Surely.
 5

 6          MR. BROWN:  -- minute.
     BY MR. BROWN:
 7

 8              Q.   Mr. Brill, have you had the opportunity to

 9         review the voting numbers that appear in the brief

10         that was filed by Defendant Duncan in this case?

11              A.   I believe so, yes.
            THE COURT:  Didn't you stipulate that at the last
12

13   hearing?
            MR. BROWN:  Huh?
14

15          THE COURT:  Wasn't there a stipulation that those
     numbers were correct at the last hearing?
16

17          MR. BROWN:  Yes, Your Honor.

18          THE COURT:  Hmm?  I thought there was.  I thought we
     --
19

20          MR. BROWN:  Yes.
            THE COURT:  So you would -- because I remember the
21

22   statement that you wouldn't have to prove them again.  So
     they're stipulated so you can talk about them.
23

24          MR. BROWN:  Yes, Your Honor.  Okay.

25   BY MR. BROWN:
```

```
 1             Q.   Mr. Brill, did you identify any misleading

 2       or incorrect statements in the brief?
              MR. LINDSEY:  Your Honor, I'm going to object to --
 3

 4       THE COURT:  You stipulated, Mr. Brown.
              MR. LINDSEY:  I'm going to object to this.
 5

 6       THE COURT:  You stipulated.
              MR. BROWN:  No, Your Honor, this is --
 7

 8       THE COURT:  You can talk about -- okay.  And the

 9  language misleading and all this kind of stuff.  Are your

10  numbers different from their numbers?

11       MR. LINDSEY:  Yes.  Your Honor, we're here today to
         listen to -- to present evidence to you as to our
12

13  particular points.  Both sides have delivered a brief to
         you beforehand.  I have no intention to simply bring up
14

15  their briefs and, you know, let's stick to the evidence as
         presented here today.  That being said --
16

17       THE COURT:  Get -- get to your --

18       MR. LINDSEY:  -- got my math off a little, Your
         Honor.
19

20       THE COURT:  Get to your point.
              MR. LINDSEY:  Right.
21

22       THE COURT:  If you will, Mr. Brown.
    BY MR. BROWN:
23

24             Q.   Did you have a chance to review the numbers

25       reflected in Paragraph 1 under District 4?
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 265

```
 1          THE COURT:  Paragraph 1, Exhibit 4.

 2               A.   I don't think I have that document with me.
                 Q.   Okay.
 3

 4          THE COURT:  Exhibit A, you mean?  You're talking
       about Exhibit A?
 5

 6          MR. BROWN:  This is in their brief, Your Honor.
            THE COURT:  Well, let me see what I'm looking at.
 7

 8     [inaudible] numbers, okay.  Go ahead, see where we're

 9     headed.

10     BY MR. BROWN:

11               Q.   Looking at brief -- do you have that in
            front of you?
12

13               A.   I do.
            THE COURT:  Which brief?  There are --
14

15          MR. BROWN:  This is Exhibit 4.  This is the response
       to Defendant Geoff Duncan to plaintiff's renewed discovery
16

17     demands and motion for continuance and --

18          THE COURT:  That's not the one I'm looking at.  I'm
       looking at the numbers on the back of the opposition to
19

20     plaintiff's motion for continuance.
            MR. BROWN:  Sorry.
21

22          THE COURT:  I don't know which other set you got.
            MR. BROWN:  Okay.  Sorry.
23

24          THE COURT:  Go ahead.  Ask him the question.

25     BY MR. BROWN:
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 266

1          Q.   Did you have an opportunity to -- if you

2     would look at that -- point number one, the impact of
      third-party candidates; do you see that?

3

4          A.   I don't have that in front of me at the
      moment.  I remember going over it but that's not the

5

6     brief that's in front of me.
           Q.   Okay.  Okay.

7

8     MR. BROWN:  I don't have any further questions.

9     Thank you.

10    MR. TYSON:  Very briefly, Your Honor.

11
                     RECROSS-EXAMINATION
12

13                   OF CHRISTOPHER BRILL

14

15    BY MR. TYSON:
           Q.   Mr. Brill, when you looked at the historic
16

17    patterns, the numbers you testified to earlier, the

18    past Georgia races, did you look at any races for
      Public Service Commission?
19

20         A.   I did not, no.
           Q.   And you know that's a statewide race in
21

22    Georgia; correct?
           A.   I do, yes.
23

24         Q.   Did you look at any races where Georgia had

25    a U.S. Senate race at the same time as a governor's

www.huseby.com          Husby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 267

```
 1      race?

 2              A.   I did not.
                Q.    Thank you.
 3

 4      MR. LINDSEY:  Just a few questions, sir.

 5

 6                    RECROSS-EXAMINATION
                      OF CHRISTOPHER BRILL
 7

 8

 9  BY MR. LINDSEY:

10              Q.   Did you in any way do any review of the

11      conduct of the campaign in the closing days of the
        campaign?
12

13              A.   I did not.
                Q.   Okay.  You, as someone who's been a
14

15      political consultant does, that the conduct in the
        campaign can often change how voters vote in the last
16

17      days; correct?

18              A.   Right.
                Q.   Okay.  A candidate, and sometimes that
19

20      changes the numbers between early voting and the day
        of the voting; correct?
21

22              A.   Correct.
                Q.   And sometimes it can even change whether or
23

24      not voters choose to vote in a particular race on

25      Election Day that earlier voters may vote for;
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 268

```
 1   correct?

 2        A.   That would -- I mean, that would, I
     suppose.
 3

 4        Q.   Yeah, fair enough.  That would [inaudible].
     For instance, if you had a particular candidate
 5

 6   running for lieutenant governor as a Democrat and in
      the closing days of the campaign she had several very
 7

 8   negative press articles about her firm, about her

 9   company that she headed up, in which there was

10   allegation of racial discrimination, [inaudible]

11   racial discrimination, that would have a negative
      impact on Democratic voters in particular; correct?
12

13        A.   It could, yeah.
          Q.   It probably would dampen their enthusiasm
14

15   to vote for her; correct?
          A.   It could, but I don't know the context, so
16

17   I'd have to [inaudible].  It would take quite a bit

18   of effort, thought to --
          Q.   Okay.
19

20        A.   -- [inaudible] votes.
          Q.   And you don't know the context because you
21

22   didn't follow the details of this race; correct?
          A.   Correct.
23

24        Q.   Okay.  And you have no knowledge as -- for

25   instance, as to tracking polling that took place in
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 269

1        the closing days of the campaign; correct?

2            A.   Correct.
             Q.   Now Ms. Amico -- now, you sort of focused
3

4        on the total number of votes that were cast.  Ms.
         Amico did not receive the least number of votes for a
5

6        Democrat in this -- in the 2018 -- in statewide races
         in 2018; correct?
7

8            A.   Correct.

9            Q.   As a matter of fact, her votes were

10       somewhere in the middle of all the votes along the

11       various folks who ran statewide in Georgia who were
         Democrats; correct?
12

13           A.   I'd have to look into that [inaudible] --
             Q.   Okay.
14

15           A.   -- [inaudible].
             Q.   All right.  So -- but you didn't -- but you
16

17       are familiar that she did sort of run -- one the

18       better term, the middle one, the pack among
         Democrats; correct?
19

20           MR. BROWN:  Your Honor, this is not relevant.  The
         claim is that there were under-votes for this election,
21

22       not that one particular candidate received less votes.
         Obviously, it's the total number of votes that are
23

24       claimed.

25           THE COURT:  He went into what the attorney general

www.huseby.com              Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 270

 1   did, what the secretary of state, so I think -- you did,

 2   so he's entitled to respond to that.
          MR. LINDSEY:  Yeah.

 3

 4      THE WITNESS:  I didn't specifically analyze
     performance in this analysis.  It was mostly just actual

 5

 6   vote totals.
     BY MR. LINDSEY:

 7

 8           Q.   Okay.  For instance, you're not aware that

 9       the Democratic candidates for agriculture, school

10       board superintendent, Public Service Commission, and

11       commissioner of insurance, Democratic candidates all
          received fewer votes than Ms. Amico in this

12

13       particular race?
              A.   And again, I'd have to double-check.

14

15           Q.   Okay.  And in fact, for two other races,
          those being another Public Service Commission and

16

17       Labor Commission race, Ms. Amico was within 8,000 or

18       less votes of the Democrats in those races; are you
          aware of that?

19

20           A.   Again, I have to study that independent
     study --

21

22           Q.   Okay.
              A.   -- candidate performance.

23

24           Q.   All right.  In fact, the only races in

25       which she received fewer votes than other Democrats

www.huseby.com          Husby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 271

 1    was Ms. Abrams' race, Mr. Barrow's race, and Mr.

 2    Charles Bailey's race for attorney general.  Are you
      aware of that?

 3

 4         A.   Again, I'd have to study --
           Q.   Okay.

 5

 6         A.   -- I didn't study candidate performance.
           Q.   All right.  Even though you haven't studied

 7

 8    the performance, you are aware of the fact that Ms.

 9    Abrams was a very high-profile candidate for

10    governor?

11         A.   Correct.
           Q.   Okay.  And are you familiar with the fact

12

13    that Mr. Barrow was a very high-profile candidate for
      Secretary of State on the Democratic side?

14

15         A.   I'm not aware.
           Q.   Okay.  Are you aware of the fact, for

16

17    instance, that he had been prior to this race a five-

18    term Congressman in Georgia?
           A.   I was not aware of that.

19

20         Q.   Okay.  And voter ID is very important in
      regards to individuals -- in regards to folks --

21

22    getting folks to vote for you; correct?
           A.   Voter ID?

23

24         Q.   Yeah.

25         A.   I'm sorry.  I don't quite understand that,

1   the link.

2       THE COURT:  Explain that application.  I think you
    mean one thing and he's thinking another thing.
3

4       MR. LINDSEY:  Okay.
    BY MR. LINDSEY:
5

6       Q.   You said you looked at other races in
        Georgia's past.  Did you look at the number of new
7

8   voters that were -- that cast votes in 2018 versus

9   previous years?

10      A.   No, I did not.

11      Q.   Okay.  So, are you aware of the fact that
        there was almost -- where there was a -- possibly a
12

13  three-and-a-half-time increase in new voters?
        A.   That I -- I don't know that exact number
14

15  but that would not surprise me.
        Q.   Okay.  And based on your experience as a
16

17  political consultant, you know, that when it comes to

18  new voter, particularly down-ballot, it takes a lot
        more education to try to educate those new voters
19

20  than someone who's voted year in and year out;
        correct?
21

22      A.   That's right.
    MR. LINDSEY:  No further questions.
23

24  THE COURT:  [inaudible]?

25  MS. BURWELL:  No questions, Your Honor.

1      [inaudible]

2      THE COURT:  [inaudible]

3

4                    REDIRECT EXAMINATION
                     OF CHRISTOPHER BRILL
5

6
   BY MR. BROWN:
7

8           Q.   You testified in response to a question by

9      Mr. Lindsey, about whether you looked at the

10     lieutenant governor total in a race in which there

11     was a U.S. Senate race and there was a race in the
       governor's race; do you recall that?
12

13          A.   Yes.
            Q.   And let me direct your attention to the
14

15     year 2014 and was there a Senate -- a U.S. Senate
       race in Georgia in 2014 involving David Perdue?
16

17          A.   I believe so, yes.

18          Q.   And what was the under-vote total in 2014?
            A.   Between -- I'm sorry?
19

20          Q.   What was the under-vote for lieutenant
       governor in 2014?
21

22          A.   The percentage?
            Q.   Yes.
23

24          A.   0.8 percent.

25          Q.   Okay.  You were asked some questions, and I

```
 1       want to explore your answers to the questions on

 2       cross-examination a little bit more.  In particular,
          you were asked to give your opinion on some matters.
 3

 4       Now, you were asked whether under-voting could be
          caused by new voters being -- not having enough
 5

 6       attention on the -- about it; do you recall that
          testimony?
 7

 8            A.   Yes.

 9       MR. TYSON:  Your Honor, I'll object to that.  I don't

10   believe that's the question Mr. Brill was asked, but the

11   question was --
          THE COURT:  He didn't -- he didn't phrase it that
12

13   way.  I will let you ask a question --
          MR. BROWN:  Okay.
14

15   BY MR. BROWN:
               Q.   In that regard, in your experience, what
16

17       are the more common reasons for under-voting?

18       THE COURT:  No.  That's -- that's not the appropriate
          question.
19

20       MR. TYSON:  Yeah.
          THE COURT:  The question is about new voters.  You
21

22   can ask him about new voters.
          MR. BROWN:  Just for the record, Your Honor, the
23

24   question called for the same type of expertise that my

25   question calls for.
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 275

```
 1        THE COURT:  Sir, I said you can -- you can only go

 2   into what he talked about as to new voters.
          MR. BROWN:  Okay.
 3

 4   BY MR. BROWN:
              Q.   Are -- do new voters sometimes vote less in
 5

 6        campaigns for various reasons?
              A.   It depends on the context of the election,
 7

 8        but new voters -- you know, we don't find any sort

 9        of, you know, when they under-vote generally -- or it

10        can be -- for starters, we don't know exactly who

11        under-votes.  I mean, I think that's point number
          one.  We don't know that.  We don't have any way of
12

13        getting that information.
              It's speculation when we see high turnout
14

15        elections and that encourages more infrequent newer
          voters that come to the polls and if we see higher
16

17        rates of under-voting, that is sort of, you know,

18        something that we consider, but generally when we see
          that under-vote it's very consistent, and so it
19

20        starts at one level at the top of the ballot and then
          it goes down, then that under-vote kind of -- it will
21

22        increase as you go down the ballot.
              I've never seen a type of under-vote where
23

24        voters, who generally don't know who these candidates

25        are anyway, decides to skip one race and then start
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 276

1       voting for commission of agriculture at higher rates

2       or commissioner of insurance at higher rates.  That
        would be the first time I've ever seen something like

3

4       those.
                Q.   Thank you.  You were asked by Mr. Lindsey a

5

6       number of questions of whether there were some other
        candidates who had received fewer votes than Ms.

7

8       Amico; do you recall that?

9               A.   Yes.

10              Q.   And in fact he actually had better

11      questions to ask and one would have been, isn't it
        true that the libertarian candidate got way more

12

13      votes -- way fewer votes than Ms. Amico in the
        governor's race?

14

15              A.   I believe so, yeah.
                Q.   And so is it germane to your understanding

16

17      of the voting patterns that there might be some

18      candidates that got fewer votes down ballot or up
        ballot if they're third-party candidates or not

19

20      popular?  Do you have anything to do with that?
        MR. TYSON:  Your Honor, gets back to the why.  It

21

22  gets back to the why.  He can testify as to what, but he's
    now entering into the why again.  He's trying to get his

23

24  witness as an expert to the back door.  He couldn't do it

25  through the front, he shouldn't be allowed to do it

```
 1    through the back.  [inaudible]

 2         MR. BROWN:  I'll withdraw the question, Your Honor.
      BY MR. BROWN:
 3

 4         Q.   I want to get back to the numbers because
           you were asked about other down ballot races by Mr.
 5

 6    Lindsey, did you review the numbers on the state
           representative seats up for election in 2018?
 7

 8         A.   I did, yes.

 9         Q.   And did -- what did you find with respect

10    to whether -- about the voting patterns with respect

11    to those contests?
           A.   So, in those contests I examined the number
12

13    of votes that were cast for state representative to
           try to establish the baseline in an election that I
14

15    know usually has, you know, high rates of under-
           voting.  What I found in that case was that there
16

17    were about a thousand precincts statewide where there

18    were actually fewer votes cast for lieutenant
           governor than there were for state representative,
19

20    which again is odd.
           Q.   Let me direct your -- well, did you --
21

22    THE COURT:  [inaudible]
           THE WITNESS:  I'm sorry.  I'm sorry.  I'm sorry, Your
23

24    Honor.

25    BY MR. BROWN:
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 278

1          Q.   Did you determine in how many of the

2     precinct -- precincts the Democratic candidate for
       state representative received all of the votes cast?
3

4          A.   One -- yeah.  Yes.  137 precincts.
           Q.   Okay.  And in those -- did you determine
5

6     whether in those precincts --
       THE COURT:  137 precincts?
7

8     THE WITNESS:  Correct.  137.

9     THE COURT:  What counties?

10    THE WITNESS:  Across the state.

11    THE COURT:  Are those [inaudible] 137 precincts in
   the whole state?
12

13    THE WITNESS:  No, no.  There are about 137 precincts
   where the candidate for state representative for the
14

15 Democratic --
       THE COURT:  Got more votes --
16

17    THE WITNESS:  Got 100 percent of the votes, which
18 goes back to my points in the first part of the paper,
   which generally when a race is --
19

20    THE COURT:  Okay.  Don't go -- don't go --
       MR. BROWN:  Sorry.  Thanks.
21

22    THE COURT:  Because that'll get [inaudible].
       MR. BROWN:  Okay.
23

24 BY MR. BROWN:

25          Q.   Did you determine in the races for state

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 279

```
 1    representative in how many precincts the state

 2    representative race got more votes than the
      lieutenant governor race?
 3

 4         A.   Yes.
           Q.   And what did you find?
 5

 6         A.   I found a thousand -- 1,012 precincts; 38
      percent of the precincts statewide when the state
 7

 8    representative had more votes cast than the

 9    lieutenant governor.

10         Q.   Did you have the opportunity -- or did you

11    undertake to -- you were talking about other races.
      Did you compare the lieutenant governor race to the
12

13    race for attorney general?
           A.   I compared.  Yes.
14

15         Q.   And what did you find?
           A.   So in that case I found that there were
16

17    much fewer -- I'd have to go, I'd have to see the

18    exact number, but it was --
           Q.   Let me correct that.  My question was
19

20    poorly framed.
           A.   410.
21

22         Q.   Did you compare the votes for state
      representative and attorney general?
23

24         A.   Yes.

25         Q.   And what did you find there?
```

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 280

1          A.    What I found there, there were about 410

2     precincts statewide where there were more votes cast
       for state representative for -- than lieutenant

3

4     governor.
              Q.    Okay.  Thank you.  [inaudible]

5

6     MR. TYSON:  Just briefly, Your Honor.

7

8                      CROSS-EXAMINATION

9                   OF CHRISTOPHER BRILL

10

11  BY MR. TYSON:
              Q.    Mr. Brill, you'd agree with me, wouldn't

12

13     you, that the 2018 election in Georgia was a very
        high turnout election, right?

14

15          A.    Yes.
              Q.    And I asked you a question that I had not

16

17     worded quite correctly previously.  Did you in any of

18     your analyses look at a race where there was a
        governor's race and no U.S. Senate race happening at

19

20     the same time, like what happened in 2018?
              A.    A governor's race with no U.S. Senate race?

21

22          Q.    Yes.
              A.    I didn't look at that specifically.

23

24          Q.    Okay.  Mr. Brown asked you about the

25     precincts you analyzed for state representative; did

```
 1        you break out those based on the DRE machines versus

 2        absentee by mail or early voting categories, or did
          you look totally -- solely at precinct totals?
 3

 4            A.   For this I looked at solely precinct
          totals.
 5

 6            Q.   Okay.  Thank you.
          MR. TYSON:  That's all I have.
 7

 8        MR. LINDSEY:  Just real briefly.

 9

10                     CROSS-EXAMINATION

11                 OF CHRISTOPHER BRILL

12

13    BY MR. LINDSEY:
              Q.   You were aware that in the AG's race there
14

15        was an incumbent running; correct?
              A.   Yes.
16

17            Q.   And in the lieutenant governor's race there

18        were two newcomers coming -- running; correct?
              A.   Correct.
19

20        MR. LINDSEY:  No further questions.
          THE COURT:  Mr. Brown, anything else?
21

22        MR. BROWN:  I do not have anything further.
          THE COURT:  Okay.  The witness may be excused.
23

24    Whatever he says.  He's in charge of all that.

25    [inaudible].
```

```
 1          MR. BROWN:  Your Honor, at this point we have another

 2  --
            THE COURT:  [inaudible] Are you taking notes on the

 3
    laptop?

 4          THE NEWS REPORTER:  Yes.

 5
            THE COURT:  Did you comply with Rule 22?

 6          THE NEWS REPORTER:  Yes.  [inaudible]

 7
            THE COURT:  [inaudible]

 8
            THE NEWS REPORTER:  Jordan [inaudible].

 9
            THE COURT:  Who?

10
            THE NEWS REPORTER:  Jordan [inaudible], Your Honor.

11          MALE:  [inaudible]

12
            THE COURT:  Okay.

13          MALE:  Mr. [inaudible] did.

14
            THE COURT:  Making me nervous.  Go ahead.

15          MR. BROWN:  Your Honor, logistically we have another

16
    long witness.  It would be convenient to have that go more

17
    smoothly if we took our lunch break now, but of course

18  I'll defer to your schedule.

19
            THE COURT:  Anybody have an objection to taking lunch

20  now and coming back at 1:00?  Let's take lunch now and

21
    we'll back at 1:00.

22          MR. BROWN:  Thank you, Your Honor.

23

24

25          [Off the record at 11:41 a.m., and back on the record
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 283

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                    Page 130

```
 1    at 1:00 p.m.]

 2
            MR. LINDSEY:  Your Honor, in order to keep things
 3

 4    moving along, I just want to make sure I get all my
       witnesses here or are here.  This is our last witness.
 5

 6            THE COURT:  You need time to do something?
              MR. LINDSEY:  No, no.  I just want to make sure -- if
 7

 8    this is his last witness, I want to make sure I have

 9    everybody here ready to go.

10            MR. BROWN:  It depends on the ruling that she will

11    make.  I have one live witness and one witness who I would
       like to testify by telephone if the Court allows.  Just to
12

13    give you an idea.
              MR. LINDSEY:  Okay, that's fine.  I just want to --
14

15    I'll call my folks and make sure everybody's here.  That's
       all I wanted to know.
16

17            THE COURT:  Okay.  You understand that I cannot see

18    the clock from here because it's dark back there.  I
       cannot see that clock.  I see the circle and I see the
19

20    exit sign but I can't see the hands from back here because
       it's black; there's no light back there.  So I have to go
21

22    by my own watch, which is not --
              MR. LINDSEY:  Well, let the record reflect that Mr.
23

24    Brown has already insulted my eyesight once today.

25    Therefore [inaudible].
```

www.huseby.com               **Huseby, Inc.  Regional Centers**               **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 284

1          THE COURT:  Ready when you're ready.

2          MR. BROWN:  Your Honor, two introductory items.
       First, we would like to tender into evidence Defendant

3

4      Robyn A. Crittenden's notice of limited offer -- proffer
        of evidence.  And let me explain this.  The -- when she

5

6      was a party, the Secretary of State submitted this as a
        proffer of evidence and it is the testimony of a witness

7

8      in the Curling versus Kemp case, and so I'm going to

9      accept their proffer and I'm tendering it into evidence.

10     And so it --

11         THE COURT:  Any comment on that?
           MR. LINDSEY:  I'm going to object to it, Your Honor.

12

13     The Secretary of State is no longer in the case and we
        haven't had a chance to cross-examine that witness.

14

15         THE COURT:  It's hearsay.  I'm absolute hearsay; I'm
       not going to allow it into evidence.  And as I said, I

16

17     didn't read it.  I didn't read any of the stuff that was -

18     - I'm sorry.  I'm old school.  I believe that the evidence
        should come out in the courtroom; there ought to be a rite

19

20     of cross-examination.
           I happen to believe in the Constitution because I

21

22     wasn't raised with one; okay?  So I'm partial to it.  I'm
       not going to let that in.  It's not evidence.

23

24         MR. BROWN:  May I respond just briefly, Your Honor?

25         THE COURT:  You may respond.

 1        MR. BROWN:  This is evidence that the other side

 2   introduced into evidence.
              THE COURT:  I don't -- I don't care who introduced

 3
     it.  It's not admissible.  It's hearsay.  And one party

 4    who's not in the case introduced it, the rest [inaudible].

 5
     I'm not going to allow it.

 6        MR. BROWN:  Thank you, Your Honor.  I'll go ahead and

 7
     mark it for --

 8        THE COURT:  You can put it in the record as a

 9
     proffer. Just --

10

11        MR. BROWN:  -- as a proffer and proffer it as
      evidence.

12
          THE COURT:  -- it's hearsay.  They have a right, as

13    Mr. Lindsay said, to cross-examine it, and they didn't. So

14
     --

15        MR. BROWN:  That will -- what number is that?  That's

16

17   number 4.  Thank you, Your Honor.

18        The next witness we would like to call is Philip
      Stark and Professor Stark is a professor at Berkeley and

19
     we would like to introduce his testimony, with your

20    Court's permission, by telephone.  And so, we would move

21
     for that --

22            THE COURT:  What does the defense say?

23

24        MR. LINDSEY:  Your Honor, that's usually something

25   that's worked out before.  There is a lot to be learned by

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019          Page 133

```
1    having the witness live to be able to cross-examine them

2    live right here.  Now there are circumstances in which the
     parties do agree to do things by telephone.  I've done it
3

4    a hundred times, if not more.
          But this was not something that was worked out
5

6    previously.  We would prefer to be able to cross-examine
      someone, and I'm sure Mr. Tyson would as well be able to
7

8    see someone in the eye to cross-examine them directly.  So

9    we would object.

10        THE COURT:  Mr. Tyson?

11        MR. TYSON:  Yes, Your Honor.  I'm pulling up the Rule
      right now but we'd be in the same boat.  We'd like to have
12

13   -- this hearing has been on the books for over a month.
      We know it was going to be; we want to talk to Professor
14

15   Stark and cross-examine him live.
          THE COURT:  This case actually was set back December
16

17   5th.  I'm reading things that say that's not so but it is

18   so.  It was set November 5th [sic]; everybody's know- --
      December 5th.  Everybody's known about it.
19

20        I'm not going to do a witness by telephone.  Part of
      -- it isn't words they say sometimes; it's the mannerisms.
21

22   And I've done them by Skype.  I did some dear old ladies
      who've been ripped with that -- grandson calls and says
23

24   he's in the jail, those kinds of cases.

25        And we did those by Skype, which is much better and
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 287

```
 1   you've got a full view and you can see the witnesses.  But

 2   I'm not going to do this one by telephone.
          MR. BROWN:  Thank you, Your Honor.  If we have the
 3

 4   opportunity, could we set up a Skype tomorrow for this
     witness?
 5

 6        THE COURT:  It's up to you.  I'm not telling you.
     I'm saying what I won't do; I'm not going to tell you what
 7

 8   to do.

 9      MR. BROWN:  Thank you, Your Honor.  Your Honor, we

10   would call --

11        THE COURT:  And the defense haven't been heard on
     that. They should --
12

13      MR. TYSON:  Your Honor, our position is, we're here
     today.  [inaudible]
14

15      THE COURT:  Okay.  Next witness.
          MR. BROWN:  Your Honor, we would call Matthew
16

17   Bernhard as a witness.

18        THE COURT:  Okay.
          MR. BROWN:  Your Honor, I apologize.  My client has
19

20   Skype on her laptop and --
          THE COURT:  Has what on her laptop?
21

22      MR. BROWN:  Has Skype on her laptop and we would move
     to -- for -- to allow us to examine Mr. Stark by Skype.
23

24        THE COURT:  What says the defense?

25      MR. TYSON:  Same objection, Your Honor.
```

```
 1        MS. BURWELL:  Your Honor, I would ask the Court to

 2   look at Superior Court Rule 9.2 with respect to video
       conferencing, which requires any request for video
 3

 4   conference be done by notice of intention prior to the
       [inaudible]
 5

 6        THE COURT:  Rule 9.2?
          MS. BURWELL:  Yes.
 7

 8        THE COURT:  At this time I've got the computer where

 9   I'm supposed to be able to get into it, and I can see.

10   Let me look at it.

11        Okay.  Let's see.  I'll get it; just a minute.  I've
       got LexisNexus.  It's Superior Court Rule 9.2?
12

13        MS. BURWELL:  Yes, Your Honor.
          THE COURT:  Okay. Let's see.  [inaudible]. Okay.
14

15   Yeah, Rule -- yeah.  9.2(c) says that you have to file as
       of your intent 30 days prior to the date scheduled and
16

17   then we have to have a hearing on the matter.  That's what

18   it says.
          MR, BROWN:  Your Honor, with all due respect, I
19

20   believe that the -- some of these rules like the jury
       demand need to be read in context of the nature of this
21

22   proceeding.  The nature of this proceeding is an
       accelerated process.
23

24        I understand that Your Honor did schedule this on

25   December 5th.  Nevertheless, given the challenges
```

```
 1   preparing a case of this complexity, we would ask for your

 2   indulgence to -- as an exception to that rule to allow the
      testimony.
 3

 4        THE COURT:  Mr. Lindsey?
          MR. LINDSEY:  Your Honor, we've had several weeks to
 5

 6   prepare for trial and would have been available to do it
      by deposition, notice the person that's necessary to go --
 7

 8   to take a deposition.  The plaintiffs have chosen not to

 9   do so, but instead to do so at trial to set up [inaudible]

10   procedure.  So we state our objections.

11        MR. TYSON:  Your Honor, [inaudible] declaration he
      filed for him much earlier in the case as recently as 10
12

13   days ago, possibly earlier than that, opportunity to bring
      that before the Court [inaudible].
14

15        THE COURT:  Well, I understand.  We're in an
      expedited situation and we've had some service and other
16

17   issues.  But we did have a hearing on January 9 and I

18   think that's the notice should have been given.  Given the
      nature of the case I understand bending the rules because
19

20   of where we are.
              But to suddenly walk in in the afternoon of trial and
21

22   say I want to call somebody by Skype or by phone is not in
      compliance with the rules at all.  And so, yeah, if you
23

24   got up on January 9th and said you were going to do it,

25   then I'd given you a chance to be heard and we'd gone
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 290

1    through it. But I'm not going to violate the rule at this

2    time.

        MR. BROWN:  Thank you, Your Honor.  And I believe --

3

4       THE COURT:  What are you doing, ma'am?  Go sit down,

    please.

5

6       MR. BROWN:  I had lost something.  I have a copy now.

    I'm just looking for my copies.

7

8       THE COURT:  If you need to ask for something you can.

9       MR. BROWN:  Thank you, Your Honor.  We would call --

10      THE COURT:  Matthew Bernhard.

11      MR. BROWN:  Yes.

        Please raise your right hand.  Do you promise to tell

12

13   the truth, the whole truth and nothing but the truth?

        THE WITNESS:  I do.

14

15
    Thereupon:

16

17

18                     MATTHEW BERNHARD

19

20      was called as a witness by the Petitioner; and,

    having been duly sworn, testified as follows:

21

22
                       DIRECT EXAMINATION

23

24                     OF MATTHEW BERNHARD

25

```
 1   BY MR. BROWN:

 2          Q.   Please sit down and state your name for the
       record.
 3

 4          A.   My name is Matthew Bernhard.
            Q.    Mr. Bernhard, what do you do?
 5

 6          A.   I am a Ph.D. candidate at the University of
       Michigan studying computer science.
 7

 8          Q.   Have you been engaged by the plaintiffs as

 9     an expert in this case?

10          A.   Yes.

11     THE COURT:  You're a PhD candidate where?
       THE WITNESS:  At the University of Michigan.
12

13     THE COURT:  Michigan.  Okay.
       THE WITNESS:  Yes.
14

15   BY MR. BROWN:
            Q.    Mr. Bernhard, I would like to go over your
16

17     qualifications, and do you have a CV that you have

18     prepared?
            A.    Yes.
19

20          Q.   I'd like to briefly go over your education
       and experience.  You -- where'd you go to college?
21

22          A.    I went to Georgia Tech and graduated from
       Rice University.
23

24          Q.   Okay.  And what did you study at Rice?

25          A.   Computer science.
```

1          Q.   And did you go to graduate school?

2          A.   Yes.
           Q.   And what did you study at graduate school?
3

4          A.   Computer science.
           Q.   And that was --
5

6      THE COURT:  You're going to have to speak up because
     you're mumbling and I can't hear you.  I got the Georgia
7

8    Tech bit for reasons of my allegiance but what was the

9    rest of it?

10     THE WITNESS:  Rice University.

11     THE COURT:  Rice.  Okay.
       THE WITNESS:  Yes.
12

13   BY MR. BROWN:
           Q.   And then did you attend graduate school?
14

15         A.   Yes.  At the University of Michigan.
           Q.   And what did you study at the University of
16

17     Michigan?

18         A.   Computer science.
           Q.   And did you obtain a degree at Michigan?
19

20         A.   Yes, I got a Master's degree.
           Q.   And did you continue your studies at
21

22     Michigan?
           A.   I am currently still there.
23

24         Q.   And how far are you along in your Ph.D.

25     work?

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 293

```
1              A.   I'm -- this is my fourth year.

2              Q.   Okay.  And so if you graduated or obtained
        your degree, when would that be?
3

4              A.   Probably about a year from now.
               Q.   Okay.  And are you working on a
5

6       dissertation?
               A.   Yes, sir.
7

8              Q.   And what's the subject matter of your

9       dissertation?

10             A.   Election integrity and election security.

11             Q.   Okay.  Now have you --
        THE WITNESS:  Security.
12

13      THE COURT:  Okay.  [inaudible]
        THE WITNESS:  I'm sorry.
14

15      THE COURT:  [inaudible]
    BY MR. BROWN:
16

17             Q.   Have you -- do you teach?

18             A.   Yes, sir.  I taught the undergraduate cyber
        security course, introductory course, and I've also
19

20      recently conducted a -- an undergraduate research
        seminar in election security.
21

22             Q.   Okay.  Have you ever published anything?
               A.   Yes.  I have published several papers
23

24      pertaining to election security and, you know,

25      election audits, and in several other things that
```

1   aren't related to election [inaudible].

2        Q.   I mean, are these -- have you published
    peer review articles?

3

4        A.   I guess almost every article I publish has
    been peer review.

5

6        Q.   Okay.  Have you -- outside of your academic
    work, have you worked with election systems?

7

8        A.   Yes, sir.  I -- in addition to working for

9   Verified Voting, who collects data about elections, I

10  worked with election officials all over the country

11  helping run audits, you know.  And helping them
    better secure their election [inaudible].

12

13       Q.   Let me go over your work experience, also
    then.  You mentioned Verified Voting.  You -- are you

14

15  -- do you work for them now?
         A.   Currently, yes, as a consultant.

16

17       Q.   Okay.  And what sort of work do you do for

18  Verified Voting?
         A.   I collect data about current -- the current

19

20  generation of election technology and its security
    properties, what kinds of operating systems they run

21

22  and, you know, what program languages it's programmed
    in and so forth.

23

24       Q.   And what employment did you have

25  immediately before Verified Voting?

1        A.    So before that I did a summer internship at

2    a company named CloudPlayer and then before that I
     was at Microsoft Research.

3

4        Q.    And what did you do for Microsoft?
         A.    I researched Trusted Boot, which is a

5

6    particular way that computers can ensure the
     application if the running is the right one.

7

8        Q.    Did you say boot?

9        A.    Yeah.   Boot.

10       Q.    Okay.

11       A.    With specific applications for voting
     machines.

12

13       Q.    And why was Microsoft -- what's the
     connection between voting machines and working for

14

15   Microsoft?
         A.    Well, so most of the machines run through

16

17   Windows operating system, the ones in Georgia do, and

18   so they have a vested interest in making sure that,
     you know, they can support it and develop technology

19

20   scoring.
         Q.    And did your work at Microsoft relate to

21

22   the operating systems that are used generally or just
     for voting systems or both?

23

24       A.    Generally; it's all Windows.   I was mostly

25   focused on the more recent versions of Windows,

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 296

1    Windows 8 and Windows 10, both of which are used in

2    the current generation of voting technology.

          Q.    And skipping ahead, is that the voting

3

4    system used in Georgia --

          A:    No.

5

6         Q.    -- the operating system used in Georgia?

          A.    No.

7

8         Q.    Okay.

9         A.    It is a -- the -- that operating system is

10   about 15 years down the line from the one that's used

11   in Georgia voting machines.

          Q.    Have you ever been qualified as an expert

12

13   in a case?

          A.    Yes, sir. I'm an expert -- qualified expert

14

15   witness in the Curling v. Kemp case in the Northern
     District of Georgia.

16

17        Q.    It --

18        A.    [inaudible] federal court.

          Q.    And has -- have your opinions, your expert

19

20   opinions ever been cited by a court with approval or
     indicating that the court does not disagree with your

21

22   conclusions?

          A.    Yes.  In one of the rulings in the

23

24   [inaudible] and the Curling v. Kemp case she did cite

25   my opinions in the affirmative.

```
 1           Q.   Do you have either academic or hands-on

 2      experience and knowledge about the operations
        generally of a DRE machine?
 3

 4           A.   Yes, sir.  I have worked in many different
        ways with DREs.
 5

 6           Q.   And have you worked with the Diebold DREs?
             A.   Yes.  We have about ten of them in my lab
 7

 8      in Michigan.

 9           Q.   And you have access to those?

10           A.   Yes.

11           Q.   And did you obtain those machines legally?
             A.   Yes.  On Ebay.
12

13           Q.   Are you able to tear it apart, study all
        the components?
14

15           A.   Yes.
             Q.   Okay.  Do you have knowledge and experience
16

17      through your training and your education about

18      whether DREs as a class of voting systems are
        vulnerable or not vulnerable?
19

20           A.   Yes, I do.
        MR. LINDSEY:  Your Honor --
21

22           Q.   And how have you --
        MR. LINDSEY:  Your Honor, I would at this point
23

24      object.  The questions today are not -- whether or not the

25      system could potentially be vulnerable and whether or not
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 298

1    some other system would be better.  That's a decision

2    that's now being debated at the capitol.  The questions
     today are whether the system was in fact compromised.

3

4         MR. BROWN:  Your Honor, I don't -- I'm not quite sure
     what the form of that objection was.

5

6         MR. LINDSEY:  We object to the relevancy.  I mean,
     I'm trying to keep the case focused on what not that was

7

8    in fact a compromise of the system.

9         MR. BROWN:  Okay.  Your Honor, I can ask him more

10   questions that establish the -- that connect the dots.

11        THE COURT:  Do that.
     BY MR. BROWN:

12

13        Q.   Would the background vulnerability of a
          system like these DREs increase the likelihood that

14

15        it's defective today in Georgia?
               A.   Yes.

16

17        MR. LINDSEY:  Your Honor, [inaudible] background

18   vulnerabilities [inaudible] foundation yet for what
      vulnerability is or [inaudible] this thing.  If we're

19

20   trying to qualify him, that's one thing; but if we're
      trying get into the facts I think that's something else.

21

22        MR. BROWN:  May I respond, Your Honor?
          THE COURT:  Well, whether the machines generally are

23

24   not very good doesn't really matter in this case.  I'm

25   going to let you, if you're using it, to lay a foundation

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 299

```
 1   to get somewhere, I'm going to let you do that for a

 2   little bit.
            But the fact that the machines, all wherever they may
 3

 4   be used, aren't the best is not relevant --
            MR. BROWN:  Your Honor --
 5

 6        THE COURT:  -- in this case is the one [inaudible].
            MR. BROWN:  Your Honor, if I may.  The witness'
 7

 8   testimony is different than what Your Honor said.  What

 9   his testimony was that it --

10        THE COURT:  I'm going to let you ask that question;

11   okay?
            MR. BROWN:  Okay.  Thank you.
12

13        THE COURT:  I was just trying to give you some
      direction.
14

15        MR. BROWN:  Okay.
            THE COURT:  If not, they can get exercise jumping up
16

17   and down.

18        MR. BROWN:  Okay.  I want to get -- to focus your
      attention more closely on the machines that were used in
19

20   this case.
            BY MR. BROWN:
21

22            Q.    Do you have any experience or knowledge or
            expertise about whether Georgia's systems are more
23

24       vulnerable or less vulnerable than these machines are

25       generally?
```

1        A.   Yes, I do.

2        Q.   What's the basis for your expertise in
that?

3

4        A.   I reviewed -- so in addition to my
knowledge about the Diebold voting system, in

5

6   particular, I reviewed Georgia's use of the system.
I've been into, you know, particularly the Fulton

7

8   County election preparations and multiple times.

9   I've reviewed testimony from Michael Barnes, Rick

10  Barron, and other election officials in the state of

11  Georgia and have been observing Georgia's election
since 2016.

12

13       Q.   Have you -- in the course of your education
and your experience, have you -- do you have

14

15  experience and expertise about problems, specific
types of problems, that DREs can experience, Georgia

16

17  or elsewhere?

18       A.   Yes.
         Q.   Would that include software problems?

19

20       A.   Yes.
         Q.   And hardware problems also?  You need to

21

22  say, yes.
         A.   Yes.

23

24       Q.   Okay.  Have you developed -- and now I'm

25  going to explore this in a little bit greater detail,

1    but have you developed an -- do you have experience

2    or developed expertise in how to detect problems with
     DREs forensically?

3

4        A.   Yes.  In fact, in 2017 I published a paper
     looking at how to do that with the machines.

5

6        Q.   And when I use the word -- we use the word,
     forensically, when you use it -- and the reason I'm

7

8    asking this is that to many it might have connotation

9    of a criminal conduct; do you follow me?

10       A.   Yes.

11       Q.   In your field when you use the word,
     forensic investigation, do you mean to imply that

12

13   you're looking necessarily for criminal activity?
             A.   No.  Typically it's a post hoc application

14

15   of the scientific method to determine what happens,
     whether it be criminal or not.

16

17       Q.   But it's looks -- is it looking for the

18   causes of a mistake or a problem?
             A.   Yes, and to try to understand how that

19

20   problem came to be.
             Q.   Do you have any expertise in determining or

21

22   identifying what I would call the telltale signs from
     the outside as to whether there are system defects on

23

24   the inside?

25       A.   Yes.  See, for example, that paper that I

1   just mentioned.

2       Q.   Okay.  And have you -- do you have real
    hands-on experience with DREs trying to determine

3

4   whether and how they are defected?
        A.   Yes.  In fact, we just talked to some

5

6   undergraduates how to do a forensic analysis of the
    Diebold DREs in particular.

7

8       Q.   Do you have any experience in post-election

9   auditing?

10      A.   Yes.  I assisted the State of Michigan and

11  observed the audits in Colorado, the responding
    audits in Colorado.

12

13      Q.   And what is a risk limiting audit?
        A.   The risk limiting audit is a statistical

14

15  way where you define hypothesis tests and you use
    that to sample a small subset of ballots and answer

16

17  the question, is the reporting elections all correct

18  or not.
        Q.   And just -- does your work -- does that

19

20  work require knowledge and use of methods of
    statistics?

21

22      A.   Yes, it does.  In particular, the
    development of new [inaudible] paper we just

23

24  published.

25      Q.   Okay.

1       MR. BROWN:  And, Your Honor, I would like to qualify

2  and tender Mr. Bernhard as an expert in DRE operation, DRE
   vulnerability, Georgia; and generally, the internal

3

4  mechanics and software of the DREs, problems with DREs,
   how to detect those problems, the telltale signs of those

5

6  problems --
            THE COURT:  Okay, you're drawing a huge, huge list of

7

8  stuff.  Let's be a little bit -- yeah, I'm not going to go

9  through and say yes, no, yes, no.  What you're wanting to

10 qualify him as an expert generally in what, DRE?

11      MR. BROWN:  DREs, their problems, their repair, how
   to detect them, and how to fix them.

12

13      THE COURT:  Okay.  You keep adding to it.  What say
   the defendant?

14

15      MR. TYSON:  Your Honor, a few more questions for
   Bernhard.

16

17

18                    CROSS-EXAMINATION
                   OF MATTHEW BERNHARD

19

20

   BY MR. TYSON:

21

22         Q.   Good afternoon, Mr. Bernhard.  My name is
        Bryan Tyson.  I represent the Gwinnett County Board

23

24      of Registrations and Elections.  So you mentioned to

25      Mr. Brown that you worked for Verified Voting.  Does

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 304

1          Verified Voting have a position on the use of DREs,

2      generally?
                A.    Yes.

3

4                Q.    And what is that position?
                A.    That DREs are unfit for us in U.S.

5

6  elections.
                Q.    And it would be correct to say that

7

8      Verified Voting wants to return to an all-paper

9      ballot system; correct?

10              A.    A handwritten paper ballot system; correct.

11              Q.    You mentioned that you were qualified as
           expert in Curling versus Kemp case; do -- can you

12

13     explain to the Court briefly what the issues are in
           that case that you're -- gave expert testimony on?

14

15              A.    Yeah.  The argument is that the inherent
           vulnerability of Georgia's DRE voting system puts

16

17     voters in Georgia at a fundamentally different level

18     of -- you know, it abridges their constitutional
           rights to a fair election in comparison to other

19

20     states, like Alabama next door
                Q.    And those claims were all [inaudible] in

21

22     that case?  And are the same plaintiffs involved in
           that case?

23

24              A.    I don't believe so.

25              Q.    Okay.  And is Mr. Brown counsel for the

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                    Page 152

1   plaintiffs in that case?

2        A.   Yes, sir.
         Q.   Okay.  You mentioned you had several DREs
3

4   in your lab; do any of those DREs -- the Diebold DREs
    specifically, run the same operating system as in use
5

6   in Georgia?
         A.   Yes, sir.
7

8        Q.   Okay.  How many of those run the same

9   operating system?

10       A.   All of them.

11       Q.   Do all of them run the same version of the
    software that's used for voting in Diebold machines
12

13  in Georgia?
         A.   No, sir.
14

15       Q.   And so do any of them have the same
    software that is use in Georgia for running the
16

17  actual voting system?

18       A.   No, sir.  They all have the -- a more
    recent version.
19

20       Q.   So, it would be correct to say that none of
    the Diebold machines in your lab are -- will match up
21

22  to any of the Diebold machines that are in Georgia
    from a software perspective; correct?
23

24       A.   There will be a significant amount of

25  similarities, but it won't be 100 percent the same.

---

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 306

```
 1              Q.   Okay.  Great.  Do you have any experience

 2         in the field of election administration?
                A.   Yes, sir.  I'm a trained poll worker in the
 3
    state of Michigan.
 4
                Q.   Okay.  Have you done any personal review of
 5
           any voting machines that were used in the November
 6         2018 general election in Georgia?

 7

 8              A.   [inaudible] personal reviews.

 9              Q.   So have you physically touched the

10    machines, inspected them, taken any steps to review

11         any machines that were used in the 2018 general
           election in Georgia?
12

13              A.   No, sir.
         MR. BROWN:  Your Honor, that's compound.
14

15    THE COURT:  [inaudible]
         MR. BROWN:  He asked about eight questions in --
16

17    MR. TYSON:  I'll -- I'm going to try to rephrase.

18  I'm sorry.
         THE COURT:  Rephrase.
19

20  BY MR. TYSON:
                Q.   Mr. Bernhard, have you personally inspected
21
           any machines that were used in 2018 election in
22         Georgia in general election?

23

24              A.   No, sir.

25              Q.   And so it would be correct to say, isn't
```

1       it, that you have no firsthand knowledge of any DRE

2       machine that was used in the 2018 Georgia election
        because you haven't inspected them; correct?

3

4            A.   I suppose that's correct.
        MR. TYSON:  Okay.  That's all I have.

5

6       THE COURT:  Anybody else for the defendant have
        questions?

7

8       MR. LINDSEY:  No, Your Honor.

9       THE COURT:  Okay.

10      MR. BROWN:  Just one follow-up question.

11      I don't have any further questions for him.
        THE COURT:  Okay.  Anyone want to be heard on whether

12

13    he's an expert on DREs?  That's basically what the issue
      is.  All that other stuff I'm not going to rule on,

14

15    [inaudible] credibility [inaudible].
        MR. TYSON:  Yes, Your Honor.  So we would object to

16

17    Mr. Bernhard serving as an expert in this case, both under

18    702(b) because he's testified he has no personal knowledge
      about the voting machines in use in Georgia.  The machines

19

20    in his lab do not line up to ones that were in use in
      Georgia.

21

22      He has not personally inspected the voting machines
      that were used in the 2018 general election, so we don't

23

24    believe that he can offer anything to help the Court

25    determine if that's an issue which is required by that.

1      In addition, we don't believe there is anything

2  relevant that relates to the issue in the case.  Mr.
   Bernhard can certainly testify about DREs generally.  The

3

4  issue for this Court is focused on the lieutenant
   governor's election and Mr. Bernhard has not indicated he

5

6  has anything that would be useful to finder of facts in
   this case.

7

8      MR. LINDSEY:  Your Honor, we adopt the issue of

9  Gwinnett County and also make the same objections.

10     MR. BROWN:  First -- the first objection was based

11 upon his line of personal knowledge.  That, of course, is
   not an objection to an expert qualification of an expert.

12

13 The second was personal knowledge about inspection.
   That's also not a relevant objection.

14

15     I mean, if there's another idea lurking behind that,
   I'd like to hear it and respond to it, but that's not a

16

17 proper objection.  The single objection that I could

18 understand, that's applicable to here, was that his
   particular model -- models that he has and that he can

19

20 take apart, is a different -- he uses a different version
   of the Microsoft operating system.

21

22     He testified that it is substantially identical and
   that is -- even if it were different, he has been

23

24 established as a leading expert in this field.

25     THE COURT:  I'm not going to say he's a leading

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 309

1    expert.  I have no evidence of him being an expert.  But

2    leading expert -- I am going to allow him to testify as an
     expert.  The weight and credibility of his testimony is
3

4    for me, and I can listen to it and I can [inaudible].
            MR. BROWN:  Thank you, Your Honor.
5

6
                       REDIRECT EXAMINATION
7

8                      OF MATTHEW BERNHARD

9

10   BY MR. BROWN:

11          Q.   Mr. Bernhard, the first part, I would like
            to review your -- of what materials you have reviewed
12

13          in connection with your work on this case.  Are you
            with me?
14

15          A.   Uh-huh.
            Q.   And have you reviewed the scholarly
16

17   literature?

18          A.   Yes, sir.  I've done a thorough survey of
     all of the academic works specifically about the Diebold
19

20   machines and [inaudible].
            Q.   Have you reviewed government publications
21

22   on [inaudible]?
            A.   Yes, sir.  [inaudible] National Academy of
23

24   Sciences as well as various other government

25   agencies.

```
 1               Q.   Have you ever reviewed the source code for

 2         the TS system?
                 A.   Yes, sir.  I've reviewed an early release

 3

 4    of the source code.
                 Q.   Have you reviewed the voting results in the

 5

 6         Georgia 2018 election?
                 A.   Yes, sir.

 7

 8               Q.   Have reviewed studies of those results?

 9         A.   Yes, sir.

10               Q.   Have you reviewed statements from voters

11         with their accounts of trying to vote on the machines
           in Georgia?
12

13         A.   Yes, sir.
                 Q.   And who in -- focusing just on the -- on

14

15         those individual statements, what statements have you
           -- let me back up a little bit.  Let me finish.  Have
16

17    you reviewed the testimony of the agents of the

18    defendants, including Michael Barnes and Rick Barron
           in other cases?
19

20         A.   Yes, sir.
                 Q.   Have you reviewed the reported

21

22    vulnerability in the Georgia voter registration page
           recorded during the 2018 election?
23

24         A.   Yes.

25               Q.   Have you spoken with other people who have
```

1      expert knowledge to gain a better understanding of

2      the issues?
            A.    Yes, sir.

3

4            Q.    And who would those be?
            A.    For one, [inaudible] who published one of

5

6      the original security analyses of the DREs, I've
        spoken with -- excuse me [inaudible] Philip Stark,

7

8      who is a leading expert on audits and [inaudible],

9      among others.

10           Q.    Okay.  Okay.  Let's dive into then to some

11     of your opinions.  First, with respect to the Diebold
        DRE machine, do you have an opinion as to whether

12

13     that machine generally is defective or not defective?
            MR. TYSON:  Your Honor, I'm going to object to the

14

15 way that the question is asked.  I don't think we've
    established if there one [inaudible] DRE machine.  We've

16

17 already heard there's different versions of software, are

18 there different hardware -- I think we need to be specific
    about what's being asked.

19

20     MR. BROWN:  Fair enough, Your Honor.
            THE COURT:  Well, it's a lot of different types of

21

22 machines.  At least be able to identify which ones he's
    done and which ones he hasn't.

23

24     MR. BROWN:  Exactly.  Your Honor, exact -- the

25 objection is well taken and let me reframe it.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 312

```
 1   BY MR. BROWN:

 2            Q.   Have you developed an opinion as to whether
         the DRE systems like the ones used in Georgia
 3

 4       generally are defective?
              A.   Yes.
 5

 6            Q.   And to get to the point of different DRE
         machines, other states use Diebold DRE machines; is
 7

 8       that correct?

 9            A.   Correct.

10            Q.   Are they all identical or are they

11       different?
              A.   From a hardware perspective, they're all
12

13       identical.  The software is different depending on
          the state; though there are only three major versions
14

15       of the software out there.
              Q.   With respect to whether they are defective
16

17       or not, is there any different -- material difference

18       in the different types of Diebold DRE machines?
              A.   No, sir.  They all come with the same
19

20       software and they have the same aging hardware.
              Q.   And what is your opinion about the
21

22       defectiveness of the DRE machines that are used
          nationwide and in Georgia?
23

24            A.   They're defective both from an

25       architectural standpoint, the actual implementation,
```

www.huseby.com                Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 313

```
 1    and the way they were designed and built, as well as

 2    the way they are used in many places.
            Again, these machines are 15 years old at this
 3

 4    point.  The glue that holds the screens together is
       starting to come apart, you know, as well as, you
 5

 6    know, who knows how many times they've been dropped
       and so forth.  And so I think it's -- they were
 7

 8    defective to begin with but they've only become more

 9    defective over time.

10        Q.   Mr. Bernhard, have you reviewed academic

11    literature on the subject of whether DRE systems are
       generally defective?
12

13        A.   Yes, sir.
          Q.   And just give me an example of some of the
14

15    things that you reviewed.
          A.   Yeah, so there was a forensic study in 2006
16

17    of the Diebold system that was actually published by

18    [inaudible].  There was the California top to bottom
       review.  There was the Ohio Everest report; the state
19

20    of Florida and Maryland both issued independent
       reports.  And then more recently we've seen the
21

22    National Academy of Science's report on the usage of
       DREs, as well as numerous others.
23

24        Q.   And what -- do they have a general

25    consensus or not?
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 314

1        A.   Yeah, they -- unanimous conclusion is that

2    DRE machines, and particularly the kind of DRE that's
     used in Georgia are unsafe and unfit for use for

3

4    voting.
              Q.   And are the unsafe and unfit for voting

5

6    because they don't -- they're not accurate or they
     might not be accurate?

7

8        A.   Yeah.  They are, you know -- as I mentioned

9    before, inherently defective and on top of that, they

10   don't provide any recourse if the defect is detected.

11       Q.   And what do you mean by no recourse?
              A.   You know, typically there's this notion of

12

13   software independence where even if the software does
     go bad, we can, one, detect it if it's happened; and

14

15   two, correct for it.
              Because the DRE machines don't have any -- you

16

17   know, there's no paper trail.  There's no external

18   source of evidence of how many votes are cast, who
     they were cast for.  There is no way that the DREs

19

20   can provide significant evidence to the outcome of an
     election.

21

22       Q.   But isn't that the case in any sort of
     computer program that there's no independence --

23

24       A.   Yes.

25       Q.   -- of verification?

```
 1          A.   Anything that doesn't have an external

 2     source of evidence, yes.
            Q.   The -- let me ask the same question.  You

 3

 4     were -- you responded with discussion of governmental
        agencies.  Have you reviewed opinions or publications

 5

 6     from the computer science community --
            A.   Yes.

 7

 8          Q.   -- about the vulnerability or defectiveness

 9     of the DREs?

10          A.   Yes.  That was the majority of the

11     literature is from.
            Q.   Okay.  And what is the computer science --

12

13     is there a consensus or differences of opinion in the
        computer science community with respect to the

14

15     defectiveness of the DREs?
        MR. LINDSEY:  Your Honor, I object on the relevancy.

16

17   This has been going on for a little while.  I'm not sure

18   when -- where general problems of the DREs is relevant to
      allegations regarding the Georgia lieutenant governor's

19

20   election on a specific [inaudible] Georgia machines.
      These are general allegations, not something specific.

21

22     MR. BROWN:  Your Honor --
        THE COURT:  I understand that. He can answer that

23

24   question [inaudible].

25     MR. BROWN:  Okay.
```

1      THE WITNESS:  Again, the overall consensus is that

2   the machines are vulnerable and can cause problems.
    MR. BROWN:
3

4          Q.   Are you aware of any peer review computer
       science publication that takes a contrary view to the
5

6   view that the DREs are defective?
              A.   No, sir.  The community is unanimous.
7

8          Q.   Have you developed an opinion about whether

9   Georgia's system is less defective than the systems

10  used in other parts of the country or more defective?

11     MR. TYSON:  Your Honor, I'll just object for lack of
    foundation.  I don't think we've had testimony about
12

13  Georgia yet.  We've talked generally about that --
    [inaudible]
14

15     THE COURT:  I'll let you ask the question but if he
    doesn't give a basis for it I'll disregard it.
16

17     THE WITNESS:  Okay.  Yes, sir, I have.

18  BY MR. BROWN:
              Q.   And if I asked you this before, I
19

20  apologize.  But have you talked to people or have you
       done some investigation about the vulnerability of
21

22  Georgia's system in particular, not as a general
    matter?
23

24         A.   Yes, sir.

25         Q.   And what's -- what did you do or what have

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 317

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
**Transcript of Hearing Proceedings on 01/17/2019                    Page 164**

```
 1        you done?

 2             A.   Again, reviewing testimony and interviewing
          voters in Georgia, reviewing Georgia electronic
 3

 4        regulation; like I said, testimony from Michael
          Barnes and Rick Barron in the Curling v. Kemp where
 5

 6        they explain more carefully the layout of the system.
          I talked with Michael Barnes a couple times, also,
 7

 8        about how Georgia's election system works.

 9             Q.   And have you evaluated, for example, the

10        testimony of Logan Lamb?

11             A.   Yes.
          THE COURT:  Of who?
12

13        MR. BROWN:  Logan Lamb.  And have you --
          THE COURT:  So he's repeating somebody else's
14

15   testimony in another case?  Is that what you're saying?
          MR. BROWN:  That's not the purpose.  It was to
16

17   provide a foundation for his knowledge in determining --

18        THE COURT:  Does he have any personal knowledge?
          MR. BROWN:  Your Honor, he's an expert in --
19

20        THE COURT:  I understand he's an expert.  Go ahead.
          [inaudible].
21

22        MR. BROWN:  Okay.
     BY MR. BROWN:
23

24             Q.   Have you personally examined the

25        architecture of the system, from your perspective,
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 318

```
 1        sufficient to understand whether the State of Georgia

 2        by leaving it open to the internet for six months
          might have exposed the system to greater danger?
 3

 4        Have you looked at that personally?
          MR. TYSON:  Your Honor, I'll object to that again.  I
 5

 6   don't think there's any evidence about an exposure for six
      months on the internet.  There's no foundation for the
 7

 8   question -- that's also compounds [inaudible].

 9        THE COURT:  [inaudible] no time, no -- we're talking

10   about one day of one election.  That's all we're talking

11   about.
          MR. BROWN:  Yeah.  I'll establish a foundation for
12

13   that.  The relevance -- I think there was a -- related to
      relevancy.
14

15   BY MR. BROWN:
               Q.   Mr. Bernhard, in your experience and in
16

17        your expertise, would the likelihood of a defect in

18        the election on November the 6th, 2018, be increased
          or decreased based upon how Georgia's particular
19

20        system was maintained?
               A.   It would be increased.
21

22             Q.   Okay.  Now what did Georgia do or not do to
          increase the vulnerability of the DRE machine that it
23

24   uses?

25             A.   We first found in 2016 from Logan Lamb that
```

```
 1   there was a server that is connected to the

 2   [inaudible] system or at least adjacent to it that
     was open to the internet running an incredibly
 3

 4   vulnerable version of a software called Drupal.  To
     give you an idea of how vulnerable it is, I set up my
 5

 6   Drupal residence and within 24 hours it was
     compromised.
 7

 8        We also saw in 2018 leading up to the election

 9   that the voter registration page has significant

10   vulnerabilities in it.  And all of these could serve

11   as potential records for malware or, you know, other
     -- they all show a tendency for a lack of
12

13   fastidiousness and, you know, a general carelessness
     from a technical perspective that may indicate that
14

15   errors were made or there was malware in the system
     or -- you know.
16

17        Q.   And did that contribute to your assessment

18   of the level risk in Georgia?
          A.   Yes.
19

20        Q.   And what was your conclusion about whether
     the risk was increased or decreased?
21

22        A.   So, based on the inherent vulnerability of
     the DREs, they're used and based on the repeated
23

24   security mistakes by the State of Georgia, my opinion

25   is that the -- Georgia's elections are far more
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 320

```
 1   vulnerable than most other states and most other

 2   elections in general.
           Q.   Now you identified -- you stated mistakes,
 3

 4   of what I interpreted to be mistakes.  Could you list
      those again for us, please?
 5

 6       A.   Yeah.  The file system that used to
      distribute sample ballots and voter registration data
 7

 8   was left open to the internet.  And the voter

 9   registration page had two major vulnerabilities and

10   then one less significant vulnerability in it; and

11   because of the central nature of Georgia's election
      system, you know, they -- the Secretary of State's
12

13   office does distribute programming to all of the
      machines indirectly.
14

15       Those two vulnerabilities at the state level
      could potentially cause trouble, you know, everywhere
16

17   in the state; as well as, you know, again, show a

18   general lack of care for technical correctness, you
      know.  Getting the technical stuff right and making
19

20   programming errors or for other things are more
      likely as well.
21

22       Q.   Okay.  Anything else?  Any other problems,
      any other mistakes?
23

24       A.   None come to mind.

25       Q.   Okay.  Let me -- to back up a little bit, I
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 321

1        do want to get something into the record.

2        THE COURT:  This P-5?  Is that P-5?  P-7.  Okay.  I
    don't look at it until it's been admitted.

3

4   BY MR. BROWN:
              Q.   Do you have Plaintiff's Exhibit 7 in front

5

6       of you?
              A.   Yes, sir.

7

8        Q.   And what is Plaintiff's 7?

9        A.   It is the National Academies of Science

10      Engineering and Medicine's report, Secured Boot, from

11      2018.
              Q.   And is it your understanding the entire

12

13      report is public and on the internet?
              A.   Yes, it is.

14

15       Q.   And is Plaintiff 7 just a selection of
         those pages?

16

17       A.   Yes, it appears to be.

18       Q.   And what is your understanding of what the
         National Academy of Science's -- what study it

19

20      undertook and what the purpose of that was.
              A.   The National Academy of Scientists

21

22      attempted to kind of understand the overall --
              MR. TYSON:  Your Honor, I'm going to pose an

23

24   objection as to what another group of experts may have

25   said.  Plus, it is what he said and he's the expert here.

```
 1   He's the one that we can cross-examine.  These folks

 2   aren't here so we would object this line of testimony.
          MR. BROWN:  Your Honor, he already testified.
 3

 4   [inaudible] kind of information -- he already testified
      that this is the --
 5

 6        THE COURT:  He can testify to what he's read and who
      he's talked to, what all he's done.  He can't just read
 7

 8   off a document that somebody else has -- based on having

 9   done all that, then he has certain opinions, which I've

10   heard pretty loud and clear.  Those are all his opinions

11   based on all this information and training and everything
      he's done.
12

13        But we're not having the documents here.
          MR. BROWN:  Your Honor, I believe that it's
14

15   admissible because it is -- he has established that this
      is the kind of information that expert --
16

17        THE COURT:  No. No.

18        MR. BROWN:  Okay.
          THE COURT:  It becomes a substitute for evidence and
19

20   we're not going to do that.
          MR. BROWN:  Okay.
21

22        THE COURT:  But I understand.  He read it; it formed
      part of the decision that he's made in this case.
23

24        MR. BROWN:  Is the -- and let me ask a foundation --

25   I understand your ruling but to get on the record, is --
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 323

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                              Page 170

```
 1   BY MR. BROWN:

 2          Q.   Are opinions such as the one in the
      National Academy of Sciences, things that experts in
 3
 4      your field rely upon to develop your expert opinion?
            A.   Yes.
 5
 6          Q.   And is it standard in your profession to
      rely upon that information?
 7
 8          A.   Yes.

 9      MR. BROWN:  Your Honor, I would suggest again this is

10   the kind -- albeit hearsay, it is exactly the kind of

11   hearsay --
            THE COURT:  No.  It's hearsay.  He's relied on it;
12
13   he's read it; it's part of what -- you know, if he's up to
      PhD he's probably read thousands of pages of stuff.  We're
14
15   not putting it all in.
            MR. BROWN:  Thank you, Your Honor.
16
17   BY MR. BROWN:

18          Q.   You testified before that there are some
      telltale signs of actual defective machines; do you
19
20      recall that?
            A.   Yes, sir.
21
22          Q.   And have you reached an opinion about
      whether those telltale signs were apparent in Georgia
23
24      for the 2018 election?

25          A.   Yes, sir.
```

www.huseby.com          **Huseby, Inc.  Regional Centers**          **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 324

```
 1           Q.   And what in your expert opinion were those

 2      telltale signs and what is the basis that you have
        for saying that it is?
 3

 4           A.   So there is a -- to say that the literature
        is the [inaudible] where they lay out the foundation
 5

 6      for forensic election investigation --
        MR. LINDSEY:  Your Honor, same objection.
 7

 8      THE COURT:  Hm?

 9      MR. LINDSEY:  You know, he could -- the question here

10   is, what were the telltale signs, not what another paper

11   may say --
        THE COURT:  You cannot quote what the paper said.
12

13      MR. LINDSEY:  -- [inaudible] what another paper said.
        MR. BROWN:  That's right.
14

15      THE COURT:  Let me make that -- you can say I relied
     on it to make my decision; don't have any problem with
16

17   that.  That's what experts do.  To get an expert in

18   anything you've got to read lots of stuff.  But you can't
        say what it said; okay?
19

20      MR. BROWN:  Bear that in mind.
     BY MR. BROWN:
21

22           Q.   Mr. Bernhard, what telltale signs did you
        observe of system defectiveness?
23

24           A.   The significant under-vote rate in the

25      lieutenant governor's race, as well as reporting
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 325

1        various errors, you know.  There were errors with the

2        review screen; voters were reporting the machines
         were [inaudible] in the middle of the voting

3

4        sessions, that error messages were popping up.
              Q.   Let's -- let me -- I can't -- I'm sorry.

5

6        Focusing on the election results, you said there was
         a significant under-vote and what is the basis of

7

8        your opinion that there was a significant under-vote?

9        MR. LINDSEY:  Your Honor, first off, the objection is

10   that he hasn't established any kind of expert regarding

11   under-voting and whether or not the under-voting could be
     caught by machine or through other sources.  He hasn't

12

13   laid that foundation.
              As a matter of fact, they tried to lay that

14

15   foundation with the last expert and the judge ruled
     against them.  So he simply has not laid any proper

16

17   foundation of kind of testimony.

18        MR. TYSON:  Your Honor, the same objection, that
     there's not a foundation.  Mr. Bernhard is not an expert

19

20   on election administration or under-votes.  I think the
     numbers are already in the evidence -- we know what the

21

22   numbers are, so --
              THE COURT:  Yeah.  We've already had testimony about

23

24   it live.  So I sustain the objection.

25        MR. BROWN:  Let me reframe it.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 326

```
 1    BY MR. BROWN:

 2          Q.   Do the voting results in some instances
         tell an expert like you that there may be a defect in
 3
         the system that needs to be investigated?
 4
         MR. LINDSEY:  Your Honor, same objection as before.
 5

 6       THE COURT:  That's a little bit different.
         MR. LINDSEY:  Same objection as before.  I might also
 7
   add that he's asking for speculation of the word "may."
 8
   The --
 9
       THE COURT:  I said weight and credibility is mine.
10
       MR. LINDSEY:  Huh?
11       THE COURT:  Okay.  I'm going to let him answer that
12
   question.
13       MR. LINDSEY:  Okay.  Thank you.
14
       THE WITNESS:  Yes.  I do believe that based on the
15    data there were defects.
16
   BY MR. BROWN:
17
         Q.   And what is it about the data that leads
18       you to the opinion that there were defects in the
19
         machines?
20          A.    There would be -- there's a statically
21
         significant correlation between the mode of voting
22        and the amount of under-voting; and there's also a
23
         statistic -- at least in one statistically
24
         significant aberration in the [inaudible] where one
25
```

1        voting machine reported, you know, significantly

2        different results than every other voting machine in
         the precinct, which is highly unlikely.
3

4            Q.   In your field -- well, let me back up a
         little bit.  You said statistically significant
5

6        under-voting.  Do you mean under-voting in the
         abstract or the comparison between under-voting on
7

8        the electronic machines and under-voting on the paper

9        machines?

10           A.   Yes, that's correct.  The under-voting rate

11       for paper ballots was significantly lower than it was
         for DRE machines in a statistically significant
12

13       [inaudible].
             Q.   And what is the statistical basis for what
14

15       you're saying?
             MR. LINDSEY:  Your Honor, objection.  He's laid no
16

17   basis that he's in any way an expert on statistics.

18       MR. TYSON:  Same objection, Your Honor.
         MR. BROWN:  Your Honor --
19

20       THE COURT:  I mean, we've got all the figures.
     [inaudible]  We've got all the figures.  We know what
21

22   happened.  We know what the numbers are.  He says it's
     because the machines are defective.  That's his opinion,
23

24   expert opinion, it's why all that happened.

25       Okay, beyond that, where are we going?

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 328

 1        MR. BROWN:  Your Honor, the -- if I may back up a

 2   little bit.  With any phenomena, there's either direct
      evidence, eyewitness testimony, or you go through and you

 3

 4   eliminate every other alternative.  That's -- you do --
          THE COURT:  But I've taken his opinion.  His opinion

 5

 6   is because of those numbers and because of the
      differential between the paper and the machines, something

 7

 8   has to be wrong with the machines; am I right?

 9        MR. BROWN:  Okay.

10        THE COURT:  I'm simplistic; I'm sorry.

11        MR. BROWN:  Is there a way to --
          THE COURT:  I don't have a PhD.

12

13        MR. BROWN:  Okay.
      BY MR. BROWN:

14

15          Q.   And let me ask this.  Is there a way to
      quantify the likelihood of that voting pattern

16

17   happening simply by chance?

18          A.   Yes, there is.
            Q.   And what is the answer?

19

20          A.   Typically, you use a hypothesis test.  In
      the two examples I cited [inaudible] one of them, the

21

22   -- I believe the under-vote has a less -- less than 1
      to 10,000 chance of being  -- happen -- sorry.  A

23

24   less than 1 in 10,000 chance of appearing at random

25   or monthly in the course of an election.

1          Q.    And then you -- you also testified about

2     Winterville?
                A.    Yes.  The -- assuming that the voters were

3

4     randomly -- you know, that you didn't go to a machine
       based on your party or something like that.  The odds

5

6     that one machine would have significantly more votes
       for one party but not the other machines have votes

7

8     for the other party is also incredibly low.

9          Q.    And could you just explain -- we -- in case

10    the court has not heard about the Winterville

11    problem, could you just explain to the Court what you
       observed about the numbers at the Winterville voting

12

13    location?
            MR. LINDSEY:  Your Honor --

14

15       THE COURT:  About what?  I missed the question.  You
      went round and round and I didn't get it.

16

17       MR. BROWN:  The question is, just to get -- he

18    testified about Winterville and what happened in
       Winterville, and I was just asking him to explain in

19

20    greater detail what did happen in Winterville in case that
       hadn't been made clear.

21

22       MR. TYSON:  And Your Honor, this assumes facts that
      are not in evidence and I believe the evidence that

23

24    [inaudible] was submitted was not an avenue that Mr.

25    Bernhard regarding that precinct.  So Mr. Barnhard [sic]

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 330

1    may need to lay a foundation and Mr. Barnhard needs to

2    talk about his personal analysis, if he conducted one.
     BY MR. BROWN:

3

4         Q.   Again, are you familiar with the voting
     totals from the Winterville district?

5

6         A.   Yes, sir.
          Q.   And where did you get that from?

7

8         A.   The Secretary of State's vote results.

9         Q.   And what did those numbers show?

10        A.   In that precinct, I believe there were

11   eight DRE machines.  On every DRE machine the
     Democratic candidate won every race, except one where

12

13   a Republican candidate won every race by
     approximately the same margin as the Democrat voting

14

15   on the other machines.
          Q.   And as a forensic expert, why is that -- is

16

17   that a telltale sign of a system defect?

18        A.   Yeah.  If you assume that the voters are
     probably going to machines at random, you know, not

19

20   based on the party affiliation or anything like that,
     it's extremely unlikely that you would see seven

21

22   machines with this incredibly regular pattern and
     then one machine that's completely opposite of those

23

24   same machines.

25        Q.   And from your background and experience in

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 331

1   software, is there an explanation for why that might

2   happen?
            A.   To me it seems like it might be a

3

4   programming error where you, you know -- all of the
     machines you have A as the Republican, B as the

5

6   Democrat, but on this one machine for whatever reason
     it was B as the Democrat -- or A as the Democrat, B

7

8   as the Republican.

9        Q.   Just a code problem?

10       A.   Yeah.  Or I believe the other could be, you

11  know, obviously some other kind of error that the
     machine incurred that wasn't even -- that was

12

13  programmed into it.
            Q.   And it could be an innocent mistake or a

14

15  malicious virus; correct?
            A.   Correct.

16

17       Q.   Okay.  And -- now, did you review

18  statements by eyewitnesses that led you to consider
     one way or the other whether there may be telltale

19

20  signs of a defective system?
            A.   Yes.

21

22       Q.   And what did you review?
            A.   I reviewed three affidavits from voters, as

23

24  well as the voter hotline report for -- for one

25  precinct.

1      Q.   And from your perspective as an expert,

2   what sort of issues were reported that might have
    been telltale signs of defective equipment?
3

4      A.   Voters were reporting machines were
    rebooting spontaneously.  Some people were citing
5

6   that there were raw error codes showing up in logs on
    the machines, which is exceptionally rare in good
7

8   software.

9      There were also voters who had issues with the

10  review screen where they, you know -- one voter

11  reported that they voted their whole ballot, but they
    didn't see the lieutenant governor choice on it at
12

13  all.  And then they get to the review screen and they
    see that it's there.  Other voters were reporting
14

15  once they got to their review screen, they quit on a
    particular race to go back and change their answer or
16

17  review it or whatever.  And it would just cast their

18  vote instead of taking them back to that screen.
    There were numerous errors that seemed to have
19

20  manifested.
       Q.   From your perspective, and based upon your
21

22  expertise, is there a way to -- just -- is there a
    way, one or the other, whether you can generalize
23

24  from those specific instances, any system-wide sort

25  of problems?

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 333

```
 1          A.   Generalized, no, I don't think so.

 2          Q.   And what would you need to do to determine
        whether the extent of the defect?
 3

 4          A.   A forensic analysis of the software that
        was running on those machines would be necessary.
 5

 6          Q.   Okay.  And have you undertaken or started
        or tried to do a forensic analysis of these DRE
 7

 8      machines?

 9          A.   Yes, sir.  I showed up to Fulton County

10      Election [inaudible] on Monday and was told that I

11      would not be allowed to do it.
            Q.   Okay.  And this is just this Monday, three
12

13      days ago?
            A.   Correct.
14

15          Q.   Okay.  And have you had the opportunity to
        review the internal memory or examine the internal
16

17      memory of any of these machines?

18          A.   No, sir.
            Q.   And if -- explain, if you will, sort of the
19

20      back and forth of the industry and I know it's all
         collegial, but just what the back and forth was
21

22      between you and the technicians down there.
            MR. TYSON:  Your Honor, objection to the relevance.
23

24  The Court has heard their motions to compel, have heard

25  the motions for discovery.  The Court has heard their
```

```
 1   proffer regarding what they believe that she should have

 2   been entitled to, but they -- but the Court ruled against
     them.  So I would object as this is not relevant.  The

 3

 4   Court's already ruled on this.
             MR. LINDSEY:  Your Honor, we further object on this
 5

 6   as it is hearsay, the conversations he had with the
      technicians.  He can say what he said, but what the

 7

 8   technician said is hearsay.

 9       MR. BROWN:  I'll take that as -- in reverse.  It's

10   not hearsay because it's statements by the adverse party

11   and --
             THE COURT:  Well, I have seen everybody's briefs on
12

13   this point, and I see both sides of it.  I did not order a
      forensic investigation.  I specifically left that word

14

15   out.
             I set out certain things to be done.  Did you get a
16

17   forensic?  No, we didn't get a forensic because I didn't

18   order a forensic.  I'm not going beyond that.
             MR. BROWN:  Your Honor, would you take testimony of
19

20   what it means -- what the word, internal memory, means?
             THE COURT:  I have some knowledge.
21

22       MR. BROWN:  And I understand.
             THE COURT:  I'm not completely stupid.
23

24       MR. BROWN:  Your Honor --

25       THE COURT:  I happen to be a math/physics major.
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 335

Case 1:17-cv-02989-AT   Document 449-11   Filed 07/03/19   Page 182 of 389

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                    Page 182

```
 1         MR. BROWN:  Your Honor.

 2         THE COURT:  Yeah.  I got sidetracked.  Yeah. So if
      you want to do it, go ahead.  Don't worry about it.
 3

 4    BY MR. BROWN:
                Q.   Were you offered access to the internal
 5

 6         memory of a DRE machine?
           THE COURT:  I'm not going into that either. That's
 7

 8    what they objected to.

 9         MR. BROWN:  Okay.

10         THE COURT:  Okay?  The question was, how did he do

11    it?  Okay?  That was the issue.  I was available; nobody
      called, except Mr. [inaudible].
12

13         MR. BROWN:  Okay.
           THE COURT:  He emailed; right?  Repeatedly.  And I
14

15    repeatedly responded.  This case has been my life for a
      week and a half.  Go ahead.
16

17         MR. BROWN:  I think we've --

18    BY MR. BROWN:
                Q.   Mr. Bernhard, why didn't you inspect the
19

20         DRE machine?
                A.   Turning on the machine would affect the
21

22         internal state, so we were ordered to review the
           internal memory of the machine.  That includes the
23

24         ROM, the read-only memory where the operating system

25         and the boot loader as well as the election data is
```

www.huseby.com          **Huseby, Inc.  Regional Centers**          **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 336

1       stored.  Turning on the machine would necessarily

2       alter that data.  There are ways to extract that data
         without damaging it in that way.  But, of course, we
3

4       couldn't perform that operation.
                 Q.   So, you could have accessed it -- is it --
5

6       let me try to unpack that a little bit.  Had you
         accessed it -- you could access but you would have
7

8       altered the evidence?  Is that what you're saying?

9            A.   I would have altered some of the evidence

10      and would only have seen a very small part, but I

11      would have only seen the election archive, which is
         not the internal memory.  It's just a very small part
12

13      of it.
                 Q.   Okay.  And so the -- faced with the
14

15      alternative of altering evidence and not getting the
         evidence that you were looking for, you decided not
16

17      to conduct the investigation; correct?

18           A.   That's correct.
                 Q.   And can you explain to the Court in a
19

20      little bit greater detail how and why booting the
         system without making a copy of the internal memory
21

22      first can alter evidence.
         MR. LINDSEY:  Your Honor, this was an issue that was
23

24   raised to the Court; both sides briefed it.  The Court

25   ordered if there were any further questions to request a

www.huseby.com                Huseby, Inc.  Regional Centers                800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 337

```
 1   conference call or anything like that.  No such call was

 2   requested.
          The Court then heard, I believe -- I may be terming -
 3
     - the term [inaudible] -- but that you didn't file a very
 4    extensive brief saying that you needed additional

 5
     discovery that wasn't being allowed to you.  The Court
 6    considered that brief and ruled against you.  And now

 7
     today we're dealing with an evidentiary trial as to
 8
     whether or not there was a defect in the election system
 9
     in Georgia, that it -- was it great enough to overturn a
10
     margin of victory over 123,000 votes.
11        That's the sole issue here today.  If all of this is
12
     simply regurgitating the same concerns that were
13    previously raised and [inaudible].
14
          MR. TYSON:  Your Honor, we just object on relevance
15    along the same line.  What -- how did you turn on the
16
     machines and a forensic examination not relevant to the
17
     lieutenant governor's race, [inaudible].
18        THE COURT:  Mr. Brown.
19
          MR. BROWN:  Your Honor, the -- this is the foundation
20    for establishing that the petitioners have not been given
21
     any --
22        THE COURT:  No.  The petitioner was given.  You
23
     refused to take it; you wanted to do it some other way.
24
     That issue is done.  So go -- move on to another subject.
25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 338

```
 1         MR. BROWN:  Okay.  Your Honor, if I may -- and I'm

 2    not --
               THE COURT:  No.  Not if you may.  You always want an
 3

 4    if you may.  No.  We've been through this over and over
      and over again.  You email me at 11:00 at night.  You
 5

 6    email me at 2:30 in the morning.  You would not believe
      all the stuff in this case.
 7

 8         I've looked at it.  I've made the best decisions I

 9    know how; move on to something else.  Question of

10    discovery is done.

11         MR. BROWN:  Your Honor, just one more thing.  I'm
      going to --
12

13         THE COURT:  You don't listen to me, do you, sir?
           MR. BROWN:  It's a different topic.
14

15         THE COURT:  Okay.  Different topic's fine.
           MR. BROWN:  This is a different topic.  Different
16

17    topic.  The diff -- but I -- I would like to say the

18    different topic is going to sound like the same topic.
      It's different.
19

20         MR. LINDSEY:  Can I just object now?
           THE COURT:  This is just -- I guess I'm on the record
21

22    -- this is just really good lawyering on both sides.  I
      mean, it's like -- no.  If it sounds -- what is it?  If it
23

24    looks like a duck and it quacks like a duck, it is a duck;

25    is that the one where you talk about in the South?
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 339

```
 1        MR. BROWN:  And I never agree with that, Your Honor.

 2        THE COURT:  Try one more question and we'll see where
      we go.  You might get to testify.  Go ahead.
 3

 4        MR. BROWN:  Yeah.
      BY MR. BROWN:
 5

 6        Q.   If the State of Georgia wanted to
           investigate the causes of apparent anomalies, what
 7

 8      could it do?

 9        A.   It could perform a --

10        MR. LINDSEY:  Objection, Your Honor.

11        THE COURT:  I'm going to let him.  I'm going to let
      him answer that, what the state could do.
12

13        THE WITNESS:  It could perform a forensic
      investigation, which are the best practices recommended by
14

15    experts and have been for decades.
      BY MR. BROWN:
16

17        Q.   And based upon your interactions with the

18      State and your knowledge of the --
           THE COURT:  No.  Not based upon his interactions with
19

20    the State.  We're not going there.
      BY MR. BROWN:
21

22        Q.   Did the State conduct that kind of forensic
           examination?
23

24        A.   No.

25        Q.   Okay.
```

```
 1         MR. BROWN:  Your Honor, I would like to take a break

 2    just to get a glass of water and then finish up with this
      witness, quickly.
 3

 4         THE COURT:
           MR. BROWN:  Thank you.  Thank you, Your Honor.
 5

 6
           [Off the record at 2:09 p.m., and back on the record
 7

 8    at 2:22 p.m.]

 9

10         THE COURT:  [inaudible]

11
                 CONTINUATION OF REDIRECT EXAMINATION
12

13                    OF MATTHEW BERNHARD

14

15    BY MR. BROWN:
                Q.  Mr. Bernhard, do you have experience
16

17    evaluating GEMS databases?

18              A.  Yes, sir.
                Q.  Have you in the course of your work
19

20    reviewed or had access to GEMS databases?
                A.  Yes, sir.  I've been sent to GEMS databases
21

22    from the State of Colorado, State of California, I
      believe the State of Alaska as well.
23

24              Q.  And were those treated as nonconfidential?

25              A.  Yeah.  They were public records.
```

1          Q.    Okay.  Have you received that from the

2     State of Georgia?
            A.    No.

3

4     MR. LINDSEY:  Your Honor, he's going back down the
      same rabbit hole again and I object.  This is once again a

5

6     matter that should have been taken up regarding discovery.
      We're here today to hear the evidence as to whether or not

7

8     there was some kind of breach and whether or not it was

9     significant enough to change the election votes, not

10    whether or not they should get something they didn't get.

11          THE COURT:  I sustain the objection.
            MR. BROWN:  Thank you, Your Honor.  No further

12

13    questions.

14

15                    CROSS-EXAMINATION
                  OF MATTHEW BERNHARD

16

17

18   BY MR. TYSON:
            Q.    [inaudible], Mr. Bernhard.  So let me ask

19

20      you first, is it your personal belief that only paper
         should be used for elections, hand-marked paper

21

22      ballots?
            A.    Hand-marked paper ballots that are

23

24      [inaudible].

25    THE COURT:  [inaudible]

www.huseby.com         Huseby, Inc.  Regional Centers         800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 342

```
 1        THE WITNESS:  Hand-marked paper ballots [inaudible].

 2   BY MR. TYSON:
             Q.   Have you ever worked on a political
 3
     campaign before?
 4
             A.   No, sir.
 5

 6        Q.   Now you talked about your research and
     various studies and what you've looked at.  It's
 7
     correct, isn't it, that you're not aware of a single
 8
     instance anywhere in Georgia where there was a piece
 9
     of malware that was somehow propagated from a server
10
     that creates the ballot format, down through memory
11    card, onto the DRE; is that correct?

12
             A.   Correct.  But again, that's just because
13    they're machines.  There's no [inaudible].

14
             Q.   But you're not aware of an instance where
15    that's occurred; correct?  Okay.  And you're not

16
     aware of an instance where anywhere in the nation
17
     where a piece of malware has been propagated onto a
18    DRE in an actual election, are you?

19
             A.   Not on the DRE voter registration systems,
20    I guess.

21
             Q.   But as the DRE you're not?
22           A.   [inaudible]

23
             Q.   Okay.  Now you talked a little bit about
24
     the Winterville precinct in Clarke County; is that
25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 343

1     correct?

2          A.   Yes, sir.
           Q.   Okay.  And you said that -- did you perform
3

4     a statistical analysis at that precinct?
           A.   No, sir.
5

6          Q.   Who performed that statistical analysis?
           A.   I think it was Philip Stark.
7

8     MR. LINDSEY:  Your Honor?

9     MR. TYSON:  And so -- sorry.

10    MR. LINDSEY:  He testified earlier as to the results

11    from that machine as if he himself performed that
      examination after this Court specifically ruled that that
12

13    testimony from Mr. Stark was hearsay.
           I'm going to move that that testimony that had been
14

15    previously raised regarding this be stricken from the
       record because it's contrary to a prior ruling that he
16

17    could not testify as to what other people had done.  And -

18    -
           THE COURT:  Mr. Brown?
19

20    MR. LINDSEY:  -- and [inaudible] that he
      mischaracterizes earlier testimony as well.
21

22    MR. BROWN:  Your Honor, I believe that the record
      would say what the record says about what he says and
23

24    [inaudible] attempt to characterize it.  The testimony was

25    that he had reviewed the evidence relating to the

```
 1    Winterville.

 2        I asked him what telltale signs and he used that as
      an example.  We further established early on that the
 3

 4    reports of people like Stark are something that an expert
      in his capacity looks at and that he reviews the evidence
 5

 6    from all different sources.
               MR. LINDSEY:  He -- I'm sorry, go ahead.  I'm sorry.
 7

 8        MR. BROWN:  I don't --

 9        MR. LINDSEY:  I didn't mean to --

10        MR. BROWN:  I don't remember him saying that he did

11    the math on Winterville, but that he knew the answer and
      he knew how to get it.
12

13        MR. LINDSEY:  But he -- but -- but he has been
      specifically told on multiple occasions despite attempts
14

15    to solicit such testimony that he was not to testify as to
      what other people had done or what other people reported.
16

17    He was specifically admonished not to do that; and through

18    ambiguity and a question, he led this Court to believe
      that he, himself -- and I'm sorry, I --
19

20        MR. BROWN:  Your Honor --
          MR. LINDSEY:  [inaudible]
21

22        THE COURT:  Let him finish.
          MR. LINDSEY:  That he, himself, had conducted this
23

24    investigation of these tapes.  He has not admitted that he

25    has not and I ask that his previous testimony be stricken.
```

1          MR. BROWN:  Your Honor, same response.  I would -- to

2    get at the truth --
           THE COURT:  Well, he gets -- it's his motion, so I'm

3

4    -- he testified as that he got the numbers from the
     Secretary of State, and that I will accept.

5

6          MR. TYSON:  But he's now [inaudible].
           THE COURT:  But the rest of it I will not accept.

7

8          MR. TYSON:  Okay.  But he's now testified that he

9    didn't actually do that investigation.

10         MR. BROWN:  But now [inaudible]?

11         THE COURT:  Not yet.  But that's how I heard it.  I
     heard it that he got the numbers from Clarke County and

12

13   the rest of it -- he sounded -- he moved into it as if
     he'd done it all, but no, he -- obviously he hadn't do it

14

15   all --
           MR. LINDSEY:  Just by testifying that he didn't do

16

17   it, that's [inaudible].

18         THE COURT:  -- it wouldn't be admissible.  Okay.
           MR. LINDSEY:  Make sure that's on [inaudible].  I'm

19

20   sorry.
     BY MR. TYSON:

21

22         Q.   Mr. Bernhard, so you -- I believe we had
           just been through that Professor Stark had done the

23

24         statistical analysis of the Winterville precinct; is

25         that correct?

1      A.   That's correct.  I pulled the numbers

2   though beforehand.
             Q.   And so, when you say you pulled the

3

4   numbers, could you explain to us what that means?
             A.   I --

5

6   THE COURT:  Did you pull the numbers?
       THE WITNESS:  Yes, I pulled the numbers.

7

8   THE COURT:  I thought you said he pulled the numbers.

9   THE WITNESS:  Okay.

10   THE COURT:  And by moving into that you make it sound

11   like he did it all, but he didn't.  He just pulled the
    numbers.

12

13   BY MR. TYSON:
             Q.   So, Mr. Bernhard, after you pulled the

14

15   numbers it's correct isn't it that Professor Stark
    did then the statistical analysis?

16

17      A.   Correct.

18      Q.   Okay.  And you didn't personally perform
    the statistical analysis in that precinct?

19

20      A.   No, sir. Because Philip had already done
    it.  I didn't see a point in doing it again.

21

22      Q.   How did you go about selecting or had -- do
    you know how anybody selected the Winterville

23

24   precinct?

25      A.   It was brought to my attention just because

```
 1    of this oddity of his one machine having drastically

 2    different vote totals than the other seven.
              Q.   And was that from plaintiff's counsel?
 3

 4         A.   I believe so.
              Q.   And if I'm recalling correctly, the
 5

 6    machines on that precinct had anywhere between 117
       and 144 votes per machine; is that correct?
 7

 8         A.   That sounds about right.

 9         Q.   Okay.  So the maximum number of votes on

10    the one machine would have been 144 votes; is that

11    correct?
              A.   That sounds about right.
12

13         Q.   Okay.  Mr. Bernhard, you don't have any
       expertise in the process of ballot design; is that
14

15    correct?
              A.   I have designed ballots, but I suppose I
16

17    don't have that expertise; that's correct.

18         Q.   And you never read any literature or
       studies regarding design -- design of ballots and
19

20    voter behavior?
              A.   I have, yes.
21

22         Q.   On voter behavior specifically?
              A.   Yes.
23

24         Q.   Okay.  So in scenarios where voters face a

25    high turnout a year -- strike that.
```

1            I believe your testimony earlier was that there

2       was an analysis of two precincts, the Winterville
        precinct and what was the other precinct?
3

4            A.   I don't think I said there was an analysis.
        I -- two precincts were pointed out to me -- well,
5

6       more than two actually.  Winterville [inaudible] the
        numbers off.  Grady High School had machine errors
7

8       that were reported.  The AME Church had errors that

9       were reported.

10           Q.   So, in terms of an analysis though in your

11      expert opinion, you've only looked at the Winterville
        precinct; is that correct?
12

13           A.   In terms of numerical analysis, yes.  In
        terms of assessing how many errors that occurred, no.
14

15           Q.   But let me just make sure I'm clear on
        that.  So I thought you testified that Professor
16

17      Stark did the analysis on Winterville.

18      MR. BROWN:  Objection.
             Q.   So have you --
19

20      MR. BROWN:  Object, Your Honor.  It's unclear as to
        what analysis he's talking about and there's a confusion
21

22  between the forensic [inaudible] --
        THE COURT:  Okay.  Rephrase the question.
23

24      MR. TYSON:  Okay.  I'll be happy to rephrase.  Thank

25  you.

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 349

```
 1   BY MR. TYSON:

 2          Q.   So, correct me if I'm wrong, but I believe
        you testified Professor Stark performed the
 3

 4      statistical analysis of the Winterville precinct;
        correct?
 5

 6          A.   That's correct, yes.
            Q.   Did you perform a statistical analysis of
 7

 8      any precinct?

 9          A.   No, sir.

10          Q.   Did you conduct a forensic analysis of any

11      DRE machine in the state of Georgia for the November
        2018 election?
12

13          A.   No, sir.
            Q.   And so sitting here today, it's correct to
14

15      say that you have no idea whether any malware resides
        on any DRE machine in the state of Georgia; is that
16

17      correct.

18          A.   Yes, that's correct and I reckon that no
        one else does either.
19

20      MR. TYSON:  All right.  That's all I've got.

21

22                      CROSS-EXAMINATION
                      OF MATTHEW BERNHARD
23

24

25   BY MR. LINDSEY:
```

www.huseby.com                 Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 350

```
 1                Q.   Winterville's located in Clarke County;

 2       correct?
                  A.   I believe so.
 3

 4                Q.   Okay.  Clarke County is not in this
         lawsuit, you're aware of that, right?
 5

 6          MR. BROWN:  I object.  It calls for a legal
        conclusion and it's the wrong conclusion.
 7

 8          MR. TYSON:  Clarke County is not a named party to

 9    this case.

10          THE COURT:  Well, Mr. Lindsay, what he said is in the

11    lawsuit --
                  MR. TYSON:  I apologize.
12

13    BY MR. TYSON:
                  Q.   Clarke County is not a named party in the
14

15       lawsuit; correct?
                  A.   I believe so, yes.
16

17                Q.   Okay.  The voting strips haven't been --

18       you didn't bring the voting strips with you, did you?
                  A.   You mean the pap- -- the poll tapes?
19

20                Q.   Yeah.
                  A.   No, sir. I don't have those [inaudible].
21

22                Q.   And as you previously testified, it was Mr.
         Stark that did the analysis of the eight machines
23

24       [inaudible]; correct?

25                A.   He did the statistical analysis.
```

1   [inaudible].

2           Q.   Okay.  Now let's talk for a minute about
        your -- the odds that you raised.  You've never done

3

4       any kind of -- well, let me back up.  You're not a
        political science expert; correct?

5

6           A.   No, sir.
            Q.   Okay.  So you don't know the impact that an

7

8       -- that a large influx of new voters would have in

9       terms of their voting patterns with down-ballot

10      races?  You don't know anything about that?

11      MR. BROWN:  Your Honor, I'll object to that and
        here's my objection.  Cross-examination needs to be based

12

13  upon a good faith belief that there's going to be some
    submission of evidence to support the inference or the

14

15  predicate of the question.
            That's the first point.  In this case we know that

16

17  the State does not have any predicate because there's no

18  person on earth who could be qualified as an expert to
    render that opinion.

19

20      THE COURT:  You're arguing.  That's an argument.
    I'll overrule that objection.

21

22      THE WITNESS:  Can you repeat the question?
    BY MR. TYSON:

23

24          Q.   I don't remember the question.  I was

25      simply just by establishing that you have no

1    knowledge as to the pattern, behavior of new voters.

2        A.   That's not true.  I have -- I mean I've
     reviewed the political science literature insofar as
3

4    it informs my work.
         Q.   Okay.  And if I understand correctly, you
5

6    don't have -- or rather you haven't done any
     investigation as to the particularities of this race;
7

8    correct?

9        A.   I'm familiar with the races and the

10   candidates.

11       Q.   Yeah.  Are you familiar, for instance, with
     the fact -- with how the paper ballots were
12

13   configured in terms of the names versus the
     configuration of candidates on the electronic?
14

15       A.   I can't say that I'm familiar with every
     electronic configuration because there can be
16

17   different -- on a county-by-county basis; the same

18   with paper ballots, but I'm generally familiar, yes.
         Q.   Okay.  You are aware that the configuration
19

20   was different from the paper ballots versus the
     electronic; correct?
21

22       A.   Yes, sir.
         Q.   Okay.  Have you done any kind of analysis
23

24   regarding voter familiarity with Ms. Amico in terms

25   of how well they knew her?  In terms of -- strike

```
 1    that.

 2          Are you familiar with any kind of data regarding
      Ms. Amico's name identification versus other
 3

 4    candidates running?
              A.   No, sir.
 5

 6          Q.   You hadn't -- you hadn't reviewed any kind
      of polling that was conducted in this race prior to
 7

 8    the election; correct?

 9          A.   Not in this particular race, no.

10          Q.   You haven't considered any kind of negative

11    treatment Ms. Amico received in the press shortly
      before the election; correct?
12

13          A.   Correct.  All of these factors can impact
      [inaudible].
14

15          Q.   Uh-huh.
              A.   But the fact that this under-vote is so
16

17    incredibly different from all the other races on the

18    ballot, that seems incredibly suspicious.  It's way
      different than, you know, any other case in Georgia
19

20    or anywhere else in the nation.
              So even if there are factors like likability,
21

22    like lagging the polls, like ballot design, you would
      not normally expect to see that level of under-voting
23

24    distributed as uniformly across the state of Georgia

25    as it is and to defer between the votes voted [ph].
```

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 354

1       Q.   Okay.   Quite frankly -- and you're not

2   familiar with how the other races went in this state
    either are you?

3

4       A.   I would with some of them.
        Q.   Yeah.   You're familiar with the fact that

5

6   Ms. Abrams was, for want of a better term, on the
    Democratic side considered a superstar?

7

8       A.   Yes, sir.

9       Q.   Yeah.   And you're familiar with the fact

10  that John Barrow running for Secretary of State, for

11  instance, was a well-known figure in Georgia
    politics?

12

13      A.   Yes, sir.
        Q.   And are you aware of the fact that Mr.

14

15  Amico was still a relative unknown?
        A.   Yes.   But I want to stress that the

16

17  particulars of the candidate would not necessarily

18  impact the under-votes.   We saw under-votes impacting
    both candidates in this race.

19

20      Q.   Uh-huh.   And you don't know -- let me ask
    you this.   While there was under-votes, you are aware

21

22  of the fact that, you know, in terms of the overall
    vote count for Ms. Amico vis-à-vis other Democratic

23

24  candidates, it's not like she got the least number of

25  votes; correct?

```
 1              A.   I'm afraid I don't understand your

 2       question.
                Q.   Let me ask you this.  There were ten

 3

 4       Democrats on the State ballot in 2006; correct?
                A.   2006?

 5

 6              Q.   I'm sorry.  Wait a minute.  2018.
                A.   Yes.

 7

 8              Q.   Okay.  [inaudible]  And there were other

 9       Democratic candidates who received significantly

10       fewer number of votes that Ms. Amico received;

11       correct?
                A.   In the State races?

12

13              Q.   Yes.
                A.   Statewide races? [inaudible].

14

15              Q.   Yeah.  As a matter of fact, Ms. Amico was
          somewhere in the middle of the pack in terms of the

16

17       voters that she received versus other Democrats

18       running; correct?
                A.   Sure.

19

20         MR. LINDSEY:  Your Honor, I renew my motion -- my
          objection to his testimony regarding Winterville and ask

21

22       that it be stricken in as much as he was not the
          individual who did the analysis nor has the plaintiff

23

24       brought forth any of this --

25         THE COURT:  I think I've ruled that the fact that --
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 356

 1        MR. LINDSEY:  -- [inaudible] testimony.

 2        THE COURT:  -- he looked at the numbers is admissible
    and the rest of it's not.
 3

 4        MR. LINDSEY:  Thank you, Your Honor.  Oh, one last
    question.
 5

 6        THE COURT:  I'm glad you have Mr. Olens to help you,
    Mr. Lindsey.
 7

 8        MR. LINDSEY:  Thank you.

 9   BY MR. LINDSEY:

10          Q.   You've been asked about Georgia when it

11     comes to machines and a -- [inaudible] involving the
        machines.  You're not aware of any actual election,
12

13     not -- not a tested election but an actual election,
        where an actual vote cast on a DRE machine was -- was
14

15     not counted, are you?
               A.   No.  But again, that's because of the way
16

17     the machine built, it's impossible to tell.  You

18     cannot know.
               Q.   Okay.
19

20        MR. LINDSEY:  No further questions.
          THE COURT:  Ms. Burwell, do you have anything?
21

22     MS. BURWELL:  No, Your Honor.
          THE COURT:  Okay.  Mr. Brown?
23

24        MR. BROWN:  Thank you, Your Honor.

25

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 357

```
 1                   REDIRECT EXAMINATION

 2                   OF MATTHEW BERNHARD

 3

 4   BY MR. BROWN:
               Q.   Mr. Bernhard, I want to go -- I want to go
 5

 6        over some of your answers.
               When you were speaking about the under-vote as
 7

 8        being suspicious, were you referring to the under-

 9        vote for the Democratic candidate or were you

10        referring to the under-vote the Democratic candidate

11        and the Republican candidate?
               A.   I was referring to both candidates.
12

13             Q.   You testified that there -- I think Mr.
          Tyson asked you whether they're in the actual
14

15        election any bad code had been found or something to
          that effect; do you recall that?
16

17             A.   Malware specifically.

18             Q.   Malware.  And I believe your response was
          not what the DREs, but yes in the registration
19

20        system?
               A.   Correct.
21

22             Q.   And could you explain your answer a little
          bit in greater detail?
23

24        MR. TYSON:  I'll object to the question.  The voter

25   registration system is not an issue as far as I know at
```

www.huseby.com           Huseby, Inc.  Regional Centers           800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 358

 1   any point in this lawsuit.  This is about the election and

 2   the DREs; it's not the voter registration system.
          MR. LINDSEY:  And it -- I'd add to that, Judge.
 3

 4        THE COURT:  Mr. Brown?
          MR. BROWN:  Is the vote -- let me ask one more
 5

 6   question if I may help.
     BY MR. BROWN:
 7

 8          Q.    Is the voter registration system also a

 9        part of the Diebold DRE system generally or is it

10        something else?

11          A.    Yes, sir.  Diebold makes the Express Poll
     units.
12

13        THE COURT:  Voter registration is not involved in
     this matter.
14

15        MR. BROWN:  Okay.  Thank you, Your Honor.
     BY MR. BROWN:
16

17          Q.    You testified and then you were asked very

18        quickly a question.  I'm not sure if you finished
           your answer, but that the anomalous voting pattern
19

20        was distributed evenly throughout Georgia.  What did
           you -- what was the basis of that testimony?
21

22          A.    I believe something like 101, 159 counties
           had an under-vote rate that was abnormal, and it
23

24        didn't seem to be, you know, tied to -- are they

25        left-leaning counties or right-leaning counties or

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 359

```
 1      anything like that.  It was only tied in with the

 2      equipment.
              Q.    And would you -- sorry, you testified

 3

 4      earlier that you have expertise in a post-election
        audit; is that right?

 5

 6            A.    That's correct.  Yes.
              Q.    And based upon your past post-election

 7

 8      audit experience and expertise, what would you

 9      recommend the State of Georgia do to audit these

10      systems?

11      MR. TYSON:  Your Honor, I'll object.  What Mr.
        Bernhard thinks or what he should do is a policy question

12

13    about a legislator is not relevant or pertaining to this
        proceeding.

14

15      THE COURT:  I'm going to let him say that solely
        because they're asking for a brand-new election with paper

16

17    ballots and it would go to that issue should I get that

18    far.
              MR. TYSON:  Thank you, Your Honor.  I just want to

19

20    object to one point related to that.
              THE COURT:  Yes.

21

22      MR. TYSON:  I believe that the new election paper
        ballots are the constitutional claims that are gone at

23

24    this point.

25      THE COURT:  I understand that.
```

```
 1        MR. TYSON:  I think.

 2        THE COURT:  I understand that.
          MR. BROWN:  That's -- that's not correct.  That's not
 3
   correct.  That's not correct.
 4
          THE COURT:  I understand what I can and can't do;
 5
   okay?
 6        MR. BROWN:  Okay.
 7
          THE WITNESS:  Yes.  I do recommend that Georgia run a
 8
   post-election audit.  Given the anomalies that we saw, you
 9
   would likely have to target your auditing a little bit
10
   more specifically.  If we had a paper ballot system, we'd
11  be counting more ballots than if they weren't all these
12
   [inaudible].
13  BY MR. BROWN:
14
          Q.   If you were doing a forensic examination in
15  place of an actual recounting audit, what would be
16
   the first thing that you would look at if you were
17
   the State of Georgia?
18        A.   I would start with the programming.  You
19
   know, starting with the most innocent explanation and
20  working our way through all others, so looking at the
21
   GEMS database, making sure it was coded correctly,
22  that there weren't errors with what you saw in
23
   Winterville that may be a coding error.  And making
24
   sure, then after that you proceed.
25
```

1          Q.    You -- I believe, your testimony was that

2     the first opportunity that you had to forensically
      inspect a DRE machine was Monday?
3

4     THE COURT:  Let's not go there.  I told you not o go
   there.  You just did it and had the question and nobody
5

6 objected; they stood up but you didn't see them.
      MR. BROWN:  Okay.
7

8     THE COURT:  Don't go there.  The ruling has been

9 made.

10     MR. BROWN:  Yes, Your Honor.

11     THE COURT:  I don't care what his was.  This case was
   set for December 5th, period.
12

13     MR. BROWN:  Thank you, Your Honor, we -- this is --
      THE COURT:  Sir, I don't want to hear --
14

15     MR. BROWN:  I'll move on.
      THE COURT:  -- any more about that.
16

17     MR. BROWN:  All right.

18     THE COURT:  I am tired about hearing about that.  I
   have gobs and gobs of paperwork about it; I've ruled.
19

20 Let's move on.
      MR. BROWN:  Your Honor.
21

22     THE COURT:  To what real issue is here today.
      MR. BROWN:  Your Honor, I'm moving on.
23

24     THE COURT:  You always want to get the last word;

25 I've noticed that, Mr. Brown.

1        MR. BROWN:  No.  I -- I want to not get the last word

2   out.  I want to ---
         THE COURT:  You want to what?
3

4        MR. BROWN:  I will -- I will stop right now.
         THE COURT:  Okay.  Anybody else?
5

6        MR. LINDSEY:  No, Your Honor.
         THE COURT:  You may go.  Thank you, sir.
7

8        MR. BROWN:  Now, Your Honor, I'm not -- it sounds

9   like I'm arguing with you and this is just simply a matter

10  of procedure.  We do not have the ruling yet on --- if you

11  issued a -- I mean clearly --
         THE COURT:  Ruling on what?
12

13       MR. BROWN:  On the motion to compel.
         THE COURT:  I denied the motion to compel.
14

15       MR. BROWN:  Okay.  We -- was that -- you don't have
    that?
16

17       MR. LINDSEY:  I think she said, she denied all that.

18       THE COURT:  It was somewhere in that last order I put
    -- was it -- if it wasn't clear to you, it should be clear
19

20  now.  The motion to compel was denied.
         MR. BROWN:  Thank you, Your Honor.  We -- we -- just
21

22  for the record we did not know that.
         THE COURT:  Okay.
23

24       MR. BROWN:  Your Honor, the petitioners would call

25  Michael Barnes.

```
 1         THE COURT:  Okay.  Someone get Michael -- he's in the

 2    courtroom.  What's he -- who are those people?
           MR. BROWN:  Please raise your right hand.  Do you
 3

 4    promise to tell the truth, the whole truth and nothing but
       the truth?
 5

 6         THE WITNESS:  I do.

 7

 8    Thereupon:

 9

10                    MICHAEL WILLIAM BARNES

11

12         was called as a witness by the Petitioner; and,

13    having been duly sworn, testified as follows:

14

15                    DIRECT EXAMINATION
                    OF MICHAEL WILLIAM BARNES
16

17

18    BY MR. BROWN:
                Q.    Please state your full name for the record?
19

20              A.    Michael William Barnes.
                Q.    By whom are you currently employed?
21

22              A.    The Secretary of State's office.
           MR. BROWN:  You may sit down.  Thank you.
23

24    BY MR. BROWN:

25              Q.    And what is your position with the
```

1    Secretary of State?

2         A.   I am the director for the Center for
     Election Systems.
3

4         Q.   And what is the Center for Election
     Systems?
5

6         A.   We oversee the voting for in the state of
     Georgia.  We also deal with the database programming
7

8    for all county elections executed in the state.

9         Q.   Does --- was CES formally housed at

10   Kennesaw State University, for a lack of a better

11   expression?
              A.   It was.
12

13        Q.   Okay.  And when did it move to be a part of
     the Secretary of State's Office?
14

15        A.   It ceased operations at Kennesaw State on
     December 31st of 2017 and was relocated to the
16

17   Secretary of State's office on January 1st.

18        Q.   And when that happened, which staff members
     came -- which staff members were let go and which
19

20   staff members came with them?
              A.   I was the only staff member that came from
21

22   Kennesaw to the Secretary of State's office.
              Q.   And the other people were fired or let go
23

24   or whatever?

25        A.   The other people were retained by the

1   university I believe for -- through the end of

2   January 3- -- January of 2018 and then with no
    funding to maintain the operation of the center, the

3

4   center was closed.

5       Q.   Did your office manage the state's election

6   system in the November 2018 election?

7       A.   Our center, as I stated earlier, oversees

8   the voting equipment that's used in the state of

9   Georgia for federal, state and county elections.  And

10  we've constructed the GEMS database for all the 159

11  counties for the November 2018 election.

12      Q.   And you said, "You constructed it for all

13  of the counties;" does each county get a different
    GEMS database?

14

15      A.   Yes.

16      Q.   And the GEMS database is a Microsoft Access

17  product, is that correct?

18      A.   The GEMS database is -- stands for Global
    Election Management Systems and a data file is

19

20  produced from that executable program.

21      Q.   And what is the executable program called?

22      A.   GEMS, Global Elections Management System.

23      Q.   Okay.  And does the GEMS database contain

24  programming for the DRE machine memory cards?

25      A.   The GEMS database is where -- from the

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 366

1    memory cards that are used to power the DRE units.

2    They're used for advance voting and in-person
      Election Day use.  The memory cards are created from

3

4    GEMS database.
              Q.   And could you just describe to the court

5

6    sort of physically the chain of custody of the -- of
      the programming and I'm -- the purpose for this is to

7

8    distinguish between what the secretary does and what

9    the county does having to do with the county's

10   office?  You said, that "the Secretary of State's

11   office is responsible for creating," I think you
      said, "the GEMS database for all 159 counties," is

12

13   that right?
              A.   That's correct.

14

15        Q.   All right.  So, the counties then get a
      GEMS database that's already done, for a lack of a

16

17   better expression?

18        A.   Correct.
              Q.   And then what do the counties do with that

19

20   GEMS database or what is it used for?
              A.   Okay.  Let me start first with the

21

22   Secretary of State's office; constructs the GEMS
      database for the need of the given election.  So

23

24   what's qualified and closest and we know what races

25   will be in specific election.

```
 1        We know the candidates.  We know the precincts

 2   that will be involved based upon what the county has
      relayed back to us as their need for a given
 3

 4   election.  With that information collected from the
      county, a database is then constructed for that given
 5

 6   election.
                  Once the database has been constructed by the
 7

 8   Secretary of State's office, it's then reviewed at

 9   the Secretary of State's office for completeness to

10   validate that all of the races for that given

11   election and that have been included in the database,
      not only all of the races, but also all the
12

13   candidates.
                  Once our review of that process has been
14

15   completed we then provide to the jurisdiction, for
      lack of a better word -- sample ballots that are
16

17   produced from the GEMS database along with reports

18   that are detailing what ballots' files will be
      related to which precincts and to what district
19

20   combinational values those ballots are related to
      within those given precincts.
21

22        And that report packet is forwarded to each and
      every individual county with copies of their sample
23

24   ballots for them to review for their completeness,

25   for correctness.  Once we then receive signoff from
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 368

```
 1   the county and not until you receive signoff from the

 2   county -- but once the signoff is received from the
     county, then the database is saved to a CD, burned to
 3

 4   a CD and that CD encrypted, and then that CD is
     forwarded to the local jurisdiction for them to then
 5

 6   take that CD, contact our office via phone, provide a
     verification ID and return the CD back to our office,
 7

 8   so that we know that they have the CD that we've

 9   provided.

10        And then once we've validated, we're talking to

11   who we're supposed to be talking to at the county, we
     then give them the passcode to be able to then
12

13   decrypt the CD to access the data file that's saved
     to the CD; and then that file is loaded to the
14

15   county's local GEMS computer where they then -- the
     county -- inspects the file to validate that what has
16

17   then been provided to them is what they signed off

18   on.
          Once it is loaded to their system then the
19

20   county begins configuring the database for that
     election.  And what I mean by that is, is putting
21

22   information into the database that says we will be
     using x number of devices at these given locations
23

24   for advance voting, for Election Day voting, and also

25   preparing the memory cards that are used for the
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 369

1   optic scanners that scan the mailout absentee

2   ballots.
            Q.    And then just the -- what -- what in that

3

4   process then drives the actual programing of a
     specific DRE machine, taking it from the GEMS

5

6   database to me voting or you voting on a machine?
            A.    Okay.  All right.  Once the county has

7

8   loaded the GEMS database into their GEMS computer,

9   they then tell -- instruct the database that they

10  need to correct a certain number of individual memory

11  cards.
            So if they have a voting location that has the -

12

13  - I think they use five DRE units -- they have to put
     that information into the GEMS database and say that

14

15  for location A we will be creating a five memory
     cards.  They then go through a process of

16

17  transferring the information within GEMS onto a

18  memory card that is read by a DRE machine.
            Once that memory card is created, that memory

19

20  card is then taken into the DRE unit, which it will
     married with for that given election.  When that

21

22  process takes place there're labels on the memory
     cards that notate what machine ID this memory card

23

24  is.

25          The county's also normally notate on those

1   little print-on labels the physical device and put

2   the physical device serial number to which they are
    placing that memory card into, so that when the

3

4   memory card is removed at a later point in time and
    something happens, they know what machine to give it

5

6   back to if they needed to access the machine for some
    reason.

7

8       The memory card is inserted, and then the

9   counties go through a logic and accuracy test where

10  they bring up -- they power on the device and they go

11  through testing it.  This testing is done to
    validate, to calibrate the test screen to make sure

12

13  it's receptive to touch.  They also set the date and
    time on the device to make sure it's set to the

14

15  proper date so that when tapes are printed out of the
    machine pre- and post-election, so that it has a

16

17  proper date stamp.

18      The date stamp doesn't affect the operation of
    the system, but it's helpful to have when you're

19

20  trying to make sure that things are done in the
    proper order.  Once the memory card's loaded and they

21

22  go through their diagnostics testing, which is where
    they're testing the printer, they're testing

23

24  calibration or setting the calibration to make sure

25  it's proper, saving the date and time, testing the

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 371

```
 1   printer.

 2        Also testing the card reader that's used to read
     the voter access card that the voter will be
 3

 4   inserting.  Once they complete that diagnostic
     testing, then they start doing -- they start
 5

 6   inputting test ballots, where they will take normally
     a test date that is prefilled by the jurisdiction.
 7

 8        It says we're going to cast X number of votes to

 9   validate all touch positions on the DRE are

10   responsive; and also to validate that all races and

11   candidates are visible on the screen and are showing
     up on the all ballot as needed for the given
12

13   election.
               That logic [inaudible] testing is publicized.
14

15   It is put into notification so that any member of the
     public that would wish to observe the testing and
16

17   come and observe the testing.

18        And it has to be included by a certain point in
     time so that the machines, once it clears logic and
19

20   active testing, they can be set for election, sealed
     and get ready for distribution to the polling
21

22   location or to the advance voting location.
               Q.   Have -- are you aware of any time when a
23

24   logic and accuracy test has picked up a programming

25   error?
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 372

Case 1:17-cv-02989-AT   Document 449-11   Filed 07/03/19   Page 219 of 389

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
**Transcript of Hearing Proceedings on 01/17/2019**                     **Page 219**

 1          A.    Can you provide me -- programming errors,

 2     what do you mean by programming errors?
                 Q.    Sure.   Let me give you an example.   Suppose
 3

 4     -- well, let me back up two steps.   The -- there
        would be some programming to instruct the system and
 5

 6     then if the voter presses here the vote goes there,
        are you with me?
 7

 8          A.    Mm-hmm.

 9          Q.    The mapping of the votes from the screen to

10     the actual vote, are you with me?

11          A.    Sure.
                 Q.    Now, it would --- if you want, I'm not
12

13     suggesting you did this, but if you wanted to switch
        that, so that pressing, you know, voting for the
14

15     Republican recorded a Democrat voter or a
        Libertarian, where would that programming reside, and
16

17     could you do it?

18          A.    As my knowledge based on the system,  I can
        speak to it as a user of the program --
19

20          Q.    Sure.
                 A.    -- of how you lay candidates out
21

22     specifically within a race.   I'm not aware of a way
        to organize the candidates to get one display and
23

24     then once where you touch it next to a candidate,

25     that their results show up next to another candidate

www.huseby.com           **Huseby, Inc.  Regional Centers**           **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 373

```
 1   in another order.  I'm not aware of how you would do

 2   that.
           Q.    Now, there has been some testimony about
 3

 4   voting totals in a particular district where you had
     -- it was heavily -- I'll just give you like a hypo
 5

 6   and then the purpose of this is not to or get you to
      agree with the facts, but simply to pull out your
 7

 8   testimony on the program, but -- but just assume

 9   there is a voting location in which is heavily

10   Democrat voting location and six of the machines show

11   heavily Democrat votes and the seventh machine shows
      very heavy Republican votes, which some might lead
12

13   some access it didn't have, like you know, a six-pack
      of beer on it or something that was attracting
14

15   everybody to win a particular vote, but that they
      went evenly, there might be some sort of coding error
16

17   in which it was switching from one candidate to the

18   other now by mistake.
           If that were a programming error and I just want
19

20   to know where would that be?
           MR. LINDSEY:  Your Honor, I'm going to object to
21

22   the questioning; assuming facts that are not in
      evidence that the court has already stricken.
23

24      MR. BROWN:  That's not --

25      THE COURT:  Let him --
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 374

```
 1          MR. BROWN:  I'm -- I'm sorry.  I'm sorry.  I'm

 2   sorry.
            MR. LINDSEY:  I believe the court has ruled to
 3

 4   strike that analogy that it lead to those to -- to
      that allegation and for that reason, Your Honor, we
 5

 6   would object.
            MR. TYSON:  Your Honor, that also calls for Mr.
 7

 8   Brown speculates as far as what might have happened

 9   or what did happen.

10          THE COURT:  Well, it's a hypothetical and I'm

11   going to let him answer to the best of his knowledge.
            MR. LINDSEY:  Okay, Your Honor.
12

13          THE COURT:  He's one of the experts on this
      stuff.  But I take it as a hypothetical.
14

15          MR. LINDSEY:  Thank you, Your Honor.
            THE COURT:  Do you understand all that?
16

17          THE WITNESS:  I'm -- I'm trying, yes, I am.  I'm

18   trying to figure out the best way to answer the
      question to the best of my knowledge.
19

20          THE COURT:  Okay.
            THE WITNESS:  When -- when the GEMS database is
21

22   built, it builds a particular race, with a particular
      set of candidates, in a particular order.  When it
23

24   creates a memory card for a given location and it

25   creates that image and places it to the memory card.
```

```
 1    And then that memory card is loaded to a device.

 2        If that -- if I create five memory cards for a
      given location, those five memory cards are the same
 3

 4    content in structure and layout and in operation;
      they don't know what machine their going to be placed
 5

 6    in.  The memory card just contains data. The memory
      card is read by the machine; the machine then shows
 7

 8    then that.

 9        Q.   And so, have you ever seen it in doing the

10    logic and accuracy test?  Has that ever yielded, you

11    know, if it's not logical; it's not accurate and we
      need to go back and look at the coding to see why
12

13    that happened?
          A.   I have never seen in any of the testing
14

15    that we have -- that I've been involved with since
      2001, with using this equipment where something that
16

17    was placed in during the testing environment did not

18    feedback the expected result that was in the testing.
          Also, when doing various tests within elections
19

20    mode -- my work within -- at Kennesaw State and also
      with the Secretary of State's office -- not just
21

22    testing in election -- pre-election test mode, which
      is where an LMA testing is done -- but also testing
23

24    in election mode which is when election -- the mode

25    where elections are executed, I have never
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 376

```
 1   encountered a situation where I put in one particular

 2   vote and this way and it came out differently in the
      report.
 3

 4        Q.   Is it -- in one of the responses is
      collecting and reviewing complaints that you've
 5

 6   received from voters about problems with elections?
           A.   We -- if we do receive a complaint -- and
 7

 8   the majority of the complaints come into the

 9   elections division, that arm of the office.  Our main

10   collection point are election officials themselves.

11        And if we get a notification from a county
      election official that, you know, we encountered this
12

13   instance when doing our testing, then that would be
      something that we would go and look into, find out if
14

15   there was something out of order.
           Q.   Now, you've received complaints about the -
16

17   - the operations of the machines in the November

18   election, right?
           A.   In November -- I mean, it was a general
19

20   election where there were a few million people
      voting, so we did get complaints about a touch screen
21

22   not powering on.  We got complaints about a voter
      access card being rejected prematurely; about a
23

24   touchscreen apparently not being calibrated properly.

25   Things that we hear about with every election and
```

1   we've heard every election since 2002.

2        Q.   How -- the -- did the complainant know that
    the screen was miscalibrated?
3

4        A.   How do I know that they know --
         Q.   No.  How did --
5

6        A.   How did they know it was miscalibrated?
         Q.   Right?
7

8        A.   I can't speak for how they knew.  It's just

9   that they said that, you know, they encountered a

10  calibration issue.

11       Q.   So, what the original touchscreen was
    different then the summary screen or something like
12

13  that?
         A.   Or they, you know, felt like they were
14

15  touching one area, but another area it was -- was
    appearing.
16

17       Q.   Okay.  What other complaints -- you've

18  mentioned a number, but what other complaints did you
    receive in 2018?
19

20       A.   Any of the complaints that I've already
    outlined are the general complaints that I've heard.
21

22  And I did not personally take a lot of complaints on
    Election Day.  I think I wrote down in my notes maybe
23

24  five or six complaints on Election Day.

25       Q.   Okay.  And then what was the office that

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 378

1       you said takes the ones from voters themselves, not

2       from officials?
             A.    That's the election division.
3

4            Q.    Okay.
             A.    That's a different section, Secretary of
5

6       State's office.
             Q.    And -- and those -- okay.  Let me take you
7

8       back to the weekend before the November election; are

9       you familiar with the alleged hacking of the voter

10      registration database on that weekend?

11           A.    [inaudible] --
        MR. TYSON:  Your Honor, I would object on this.  This
12

13  does not -- in any issue of the voter registration
    database in this case; lieutenant governor's race.  This
14

15  is not about the DREs.  I don't think it's relevant to
    anything in this court.
16

17      MR. LINDSEY:  Same objection, Your Honor.  We're here

18  to deal with one race and one election.
        THE COURT:  Mr. Brown?
19

20      MR. BROWN:  Your Honor, this is hacking into the
    election system that the Secretary of State --
21

22      THE COURT:  I'm not going to let you go into that
    unless you can show hacking into the -- into the actual
23

24  voting system, not the voter registration system.

25      MR. BROWN:  Let me ask a ---

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 379

```
 1   BY MR. BROWN:

 2            Q.   Could -- could -- could hacking into the
          registration --- the hacking into the registration
 3

 4        system could affect the number of people who are
          allowed to vote for a particular election; correct?
 5

 6        MR. TYSON:  Your Honor.
          MR. LINDSEY:  Your Honor, the same objection as
 7

 8   before.  That's not the issue here today.  The issue here

 9   today that you've raised to overturn this election is that

10   there was some type of -- of breakdown in the election

11   system; not that there - a certain voter was not allowed
          to vote, which we would also deny, but that's a different
12

13   issue.  That's the issue here, so we object to the
          relevance.
14

15        THE COURT:  Sustained.
          MR. LINDSEY:  Thank you, Your Honor.
16

17   BY MR. BROWN:

18            Q.   All right.  Let me ask you this; are you
          aware of any investigation that the Secretary of
19

20        State did into hacking relating to the 2018 election?
          MR. LINDSEY:  Your Honor, he's being vague.
21

22        THE COURT:  That's the same question.
          MR. LINDSEY:  It's just leading.
23

24        THE COURT:  Artfully.  Phrased differently.

25        MR. TYSON:  I disagree that it was artful, and I
```

1  disagree it was different; it's just simply broader.

2          MR. BROWN:  I'm asking if there was any.
           MR. LINDSEY:  Your Honor, I'm asking --
3

4          THE COURT:  If it goes to the election system itself,
   not to the voter registration, the actual -- actual -- was
5

6  there any hacking in the actual voting system?
           THE WITNESS:  [inaudible].
7

8  BY MR. BROWN:

9          Q.   And you did not investigate any hacking

10         into the election system as distinguished from the

11         registration system; correct?
           A.    Correct.
12

13         Q.   And the Secretary of State's -- okay --
           you've testified about it before I know there's been
14

15         a lot of testimony about the exposure of the system
           at Kennesaw State in 2016 and 2017; are you familiar
16

17         generally with that issue?

18         A.    I am.
           Q.   What has -- has the state undertaken a
19

20         forensic examination of the components of the
           election's system to determine whether or not it was
21

22         infected with any malware because of that it's the --
           -
23

24         MR. LINDSEY:  Your Honor, once again, we're talking

25  about two entirely different systems; and unless he's

```
 1   dealing with specifically the voter system we're going to

 2   object to relevancy.
          MR. TYSON:  We would object to the lack of foundation
 3

 4   as far as the 2016 incident that affected any sort of like
      databases.  This is two years ago.  There's no explanation
 5

 6   as to how --
          THE COURT:  I sustain it as to whether there's been
 7

 8   something because of something that happened that isn't in

 9   front of me.  I mean, you know, did they investigate

10   routinely for malware?  I mean, that's one thing.  But --

11   not going back and try to put something else on the record
      that's not before me.
12

13      MR. BROWN:  Well, I'll get it before you, Your Honor.
      BY MR. BROWN:
14

15          Q.   Now, Mr. Barnes, the -- what was exposed to
      the public internet in 2016 and 2017?
16

17      MR. TYSON:  Your Honor, we going to renew the

18   objection again.
          THE COURT:  Sustained.
19

20      MR. BROWN:  Okay.
      BY MR. BROWN:
21

22          Q.   Mr. Barnes, what forensic review has your
      office done with respect to the DRE machine voting
23

24   systems that were used in the 2018 election?

25          A.   The Secretary of State's office in 2017
```

1    undertook a recertification of the voting system and

2    examined the equipment in three separate counties;
      Muskogee County, Richmond County and Bibb County, to

3

4    examine and verify the voting equipment was working
      as had been previously certified.  And the

5

6    examination found that the equipment was working in
      the same fashion and the same way as it had done

7

8    through previous certification tests.

9         Q.   I had asked you if you -- if the Secretary

10   of State had done a forensic analysis and I guess the

11   answer is no, but they have done -- they have
      recertified it, is that fair to say?

12

13        A.   That's fair to say.
          Q.   Okay.  Has the Secretary of State

14

15   undertaken an investigation into possible causes of
      the voting pattern that was seen on the May 2018

16

17   election?

18        A.   Undertaken an investigation, like, opened
      an investigation to present to the state election

19

20   board?
          Q.   I -- I didn't mean to -- to wrap too much

21

22   into the word investigation, what I mean is if have
      they looked into it to see what happened?

23

24        A.   With every election with the Secretary of

25   State's office and elections division always look at

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 383

1       their election to see is there anything that we can

2       learn from this election.
                And every election there's always an opportunity

3

4       to learn more about doing the next election even
         better.  So to the circumstance, has the Secretary of

5

6       State's office looked at the elections to, you know,
         garner what can we do better in the future?

7

8       Absolutely.

9           Q.    Has the Secretary of State considered that

10      whether there was a system error that caused the

11      voting pattern that was actually experienced in the
         2018 race?

12

13          A.    To my knowledge, no.
                Q.    Has that issues been raised just in casual

14

15      discussion in -- in your office?
                MR. TYSON:  I'll object to that.  That requires

16

17   hearsay.  What other people have said to Mr. Barnes in his

18   office is not at issue, Your Honor.
                MR. BROWN: I'll -- I'll rephrase it.

19

20   BY MR. BROWN:
                Q.    Have -- have -- have you discussed with

21

22      your colleagues' potential causes of the -- of the
         voting pattern that was going on 2018?

23

24          A.    Well, being hypothetical of what, you know,

25      what may cause people to act the way they do in

1          certain situations?

2               Q.   No.  This is -- this is -- I'm not -- back
           up a little bit.  I'm not -- this is a factual

3

4          question.
           THE COURT:  Well, it's kind of very, very broad and

5

6     he's interpreting it one way and you're meaning it some
      other way.

7

8          MR. BROWN:  Right. Have -- let me ask it in several

9  different ways, okay.

10     BY MR. BROWN:

11               Q.   Has the Secretary of State undertaken an
           investigation to determine whether system defects

12

13          caused the voting pattern in the 2018 race?
           A.   No, sir.

14

15               Q.   Has the Secretary of State done any
           forensic examination of any of the components of the

16

17          system to determine whether or not they're were

18          infected with any malware or misprogramming that
           might have affected the vote, period?

19

20               A.   The Secretary of State's office received a
           letter from one of the lieutenant governor candidates

21

22          post-election stating one of -- stating a concern and
           listed some counties in that letter.  Upon receiving

23

24          that letter, Secretary of State's office went to one

25          of the counties in question and did look at the

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 385

1      uploaded records into the GEMS computer.

2          They also extracted information from individual
       machines that wer used on Election Day to validate

3

4      that the records contained on the machine matched
       what has been uploaded previously into the GEMS

5

6      computer.  Those valid images were produced and
       examined and found that everything was balancing and

7

8      showing as what was reported initially by the county

9      on Election Night.

10         Q.   So that if the vote was wrong at the

11     precinct level, it was wrong exactly the same way at
       the Secretary of State's office, is that what I'm

12

13     hearing?
       MR. TYSON:  I'll object.  I think that assumes facts

14

15  that aren't in evidence.  I don't understand what the
    question is on that.

16

17     MR. BROWN:  I think he can answer it.  I think he

18  knows where I'm going.
       THE COURT:  No.  I sustain the objection.  You've got

19

20  to rephrase it.  You keep assuming a bunch of things.
    That's just --

21

22     MR. BROWN:  Okay.  [inaudible]
    BY MR. BROWN:

23

24         Q.   So the analysis showed that the vote total

25     in the precinct matched the vote total at the

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 386

1        Secretary of State's office; correct?

2            A.    The analysis showed that the vote total
     calculated by the individual devices examined and the

3

4     vote total tabulated by the separate GEMS computer
      using the data extracted directly from the machine

5

6     and compared against the data uploaded from the
      memory card used on Election Day was identically the

7

8     same, in that the vote totals calculated being

9     exactly the same in all instances examined.

10           Q.    Okay.  If the machine itself had

11    incorrectly recorded the vote, your testing would not
      have detected that; correct?

12

13           A.    The testing that was done was to validate
      that -- what the machine had produced, the machine

14

15    continued to produce and show that result
      [inaudible].

16

17           Q.    Okay.  Let me ask it to you again because

18    you didn't answer the question.  I'm going to get
      there, okay.  If the machine did not correctly record

19

20    the vote, you would not have detected then in your
      review; correct?

21

22      MR. TYSON:  Your Honor, I'm going to object to that.
      I guess assuming things are in evidence here as far was

23

24   what's happening in the sequence of the technology.  I

25   don't -- I don't see how this --

```
 1        THE COURT:  I understand what you're saying.

 2        MR. TYSON:  Okay.
       BY MR. BROWN:
 3

 4            Q.   Go ahead and answer.
              A.   What our examination did is show that the
 5

 6        machine collected a result and reported what it
           collected.  All of my testing has always shown in
 7

 8        pre-election, in the testing, that anything that goes

 9        in is what the machine shows coming out.  And we were

10        seeing the back end of what the machine was pushing

11        outward and it was matching up on what was reported
           on Election Night, what was printed on Election Night
12

13        from the memory card, extracted from the device.  It
           was matching up with what was calculated by the GEMS
14

15        computer upon receipt of that memory card and also it
           was matching of what was on the record contained by
16

17        the devices, so.

18            Q.   But none of that -- again, none of that
           could tell you if the machine itself is recording the
19

20        vote, right?
              A.   All I can speak to is what the machine has
21

22        in memory, what it reported, and what it's saying is
           on record.
23

24            Q.   And you're familiar with the expression

25        garbage in, garbage out?
```

www.huseby.com                Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 388

1        A.    I've heard it before, yes, sir.

2        Q.    Okay.  And in response to Candidate Amico's
letter, did the Secretary of State conduct any

3

4    machine-level investigation with any of the memory
chips or anything like to determine if there were any

5

6    flaws there?
         A.    We inspected two machines on site in Ben

7

8    Hill County.  We recovered from the machine's

9    internal memory the election result file that was

10   stored on the machine.  We then -- once that image

11   file was restored, we then looked at the ballot
images that were collected in that file through the

12

13   DRE.
         So we looked at the physical DRE display of

14

15   those collected ballots and that requires us to touch
the screen to maneuver through and we did not

16

17   encounter any issues when touching the screen that

18   lead us to believe that the screen was not responsive
to proper touch or use.  And we then from those

19

20   devices printed out new totals from that device and
those totals match all previous introduced totals.

21

22        Q.    You say you looked at the election reports
[inaudible]?

23

24        A.    The election result data.  The file --

25   result file.

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**

1        THE COURT:  I have no idea what that is.

2        MR. BROWN:  It sounds like a machine.
         THE COURT:  Huh?
3

4        MR. BROWN:  Printing machine.
         THE COURT:  The printing machine.
5

6        MR. BROWN:  [inaudible]
         THE COURT:  What printing machine?
7

8        MR. BROWN:  It's very fast.

9        THE COURT:  I was going to say it was on the roof but

10   we're on the second floor and there's seven floors on this

11   building.  It's information for the presiding judge who's
     not in here.  Yeah.  It's information for the presiding
12

13   judge that's not in here, so.  There's some -- they move
     us all around all the time.  So I'll put that back there.
14

15   There's Judge [inaudible].  Go ahead.
         MR. BROWN:  Thank you, Your Honor.
16

17   BY MR. BROWN:

18        Q.   Is the election -- well, what was the name
          of that file again?
19

20        A.   The ballot results on.
          Q.   The ballot results on.  Okay.  And so the
21

22   Secretary of State didn't look at other parts of the
     internal memory, did it?
23

24        A.   No.

25        Q.   Okay.  So it didn't look at the boot

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 390

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                    Page 237

```
 1      loader?

 2           A.   No.
             Q.   It didn't look at the operating system?
 3

 4           A.   When the machine powered on we did a review
        of what operating system was displayed and it was the
 5

 6      standard certified operating system that was found on
        those devices; as well as the install [inaudible] for
 7

 8      servers, that certified for use in the State of

 9      Georgia.

10           Q.   And the Secretary of State didn't give you

11      any actual sort of code-level review to look for
        malware in the data?
12

13           A.   Correct.
        MR. BROWN:  Your Honor, I caution that I'm entering
14

15   in an area that you've already ruled upon, but I want to
     make a clarification.
16

17      The suggestion was made by the defendants in your

18   objection [inaudible] our case, it's not raised, issues
     involving the registration --
19

20      THE COURT:  Just ask the questions, please.  Just ask
     the questions.  Don't ask me to prove judgment.  Let's
21

22   just -- for the question, ask it, and we'll go from there.
             MR. BROWN:  I want to be careful --
23

24      THE COURT:  If they don't like, they'll jump, and

25   we'll do it then.
```

www.huseby.com                    Huseby, Inc.  Regional Centers                    800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 391

```
 1       MR. BROWN:  I just want to be careful [inaudible]

 2   respect to --
         THE COURT:  [inaudible]
 3

 4       MR. BROWN:  Okay.
     BY MR. BROWN:
 5

 6         Q.   Now the election's registration system has
           been plagued with difficulties over the last --
 7

 8       THE COURT:  I have ruled on that.  Don't go there.

 9       MR. BROWN:  Okay.  The reason I'm asking --

10       THE COURT:  And like I said, they jumped up.  Okay.

11       MR. BROWN:  Your Honor, I would just point out just
     for the record is that is our allegation paragraph
12

13   [inaudible].
         THE COURT:  I ruled on it.  Quit pushing me all the
14

15   time.
     BY MR. BROWN:
16

17         Q.   Let me direct your attention to the ballot

18       design.  Now what kind of role does your office have
         in ballot design for the electronic system?
19

20         A.   When using GEMS, we first lay out the
           ballots so that -- structurally is what we focus on
21

22   first, make sure we have the right local districts in
     play, have the right precincts in play, and have the
23

24   right split precincts in play when a precinct is

25   divided.
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 392

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                    Page 239

1      Q.    Okay.

2      A.    And then have the right races and have the
right candidates and have the right polling

3

4    locations.  GEMS then takes all of that relationship
information and produces a ballot style.  It is a

5

6    layout of individual races.  It does it in two
formats.

7

8      It lays out a ballot style for optical scan

9    purposes that we set the number of columns in the

10   ballot format for the general election in 2013.  The

11   predominant format was three columns on the front
side of the ballot and three columns on the back side

12

13   of the ballot.  Some locations had to go to a four
column in the front and four column in the back

14

15   because of the sheer number of races that were
included on the ballot.

16

17      That's the configuration that we set up for the

18   printer op scan ballot.  For the configuration of the
touch screen we set up a two-column ballot and that

19

20   has been the format that we've had in place since
before 2010.  When we initially started using the

21

22   DREs in 2002, it was three-column ballot on the DRE.
It's now currently transitioned to a two-column

23

24   ballot around 2008 or 2002.  The decision was made at

25   that time that the State wanted to give more space on

www.huseby.com              **Huseby, Inc.  Regional Centers**              800-333-2082
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 393

1   the ballot for each individual race that was seen on

2   the DRE.  So we set up a configuration from building
    the data set that we're going to have a two-column

3

4   ballot displayed on the DRE.
         Q.   Okay.  Now the -- in terms of this

5

6   accessibility or fairness, are there some guidelines
    that you use for designing a ballot?

7

8        A.   There are rules in the -- State Election

9   Board rules for displaying of candidate name, the

10  font size that you use, whether you do all caps.  The

11  position of candidates is set by statute in general
    elections whether the Republican candidate or the

12

13  Democratic candidate is listed first or second.  The
    order of races is set again by statute of what race

14

15  comes first in the ballot, what race is second,
    third, and so forth and so on.

16

17       Q.   Are there rules or regulations governing

18  whether a ballot can go from one -- if a race can be
    on two pages?  In other words, the first candidate on

19

20  one page and then the second candidate on the other
    page.

21

22       A.   When we are building the database, I'm not
    aware there are rules that says it can't be that way.

23

24  But when we are building the database we -- one of

25  the things that we look at once we have built that

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 394

1   structure, we look at on a DRE to see if any of these

2   circumstances may be arising.  Are the number of
    candidates so large in a given race that we have to

3

4   change the -- what we call the scaling of the image
    that is shown on the screen?

5

6       We did encounter this in 2016 with the
    presidential preference primary on the Republican

7

8   side.  When we first built the database there -- when

9   we first built the first arrangement of the database

10  for proof of purpose it had 16 candidates.  The

11  scaling size that we used was actually pushing
    candidates to a second screen.  We adjusted the

12

13  scaling -- reduced the scaling so that all of the
    candidates showed up on one screen all together under

14

15  the same header so that we would produce any voter
    confusion.

16

17      Q.   Now in this election, 2018, did you design

18  any ballots that had the lieutenant governor's race
    split between one screen and the next?

19

20      A.   To my knowledge the -- every voter in the
    state of Georgia on Election Day when they were using

21

22  a DRE unit and it is the normal display, the standard
    display, it had two races on the first frame.  It had

23

24  -- on the left-hand side it had the governor's race

25  and all the candidates, and on the right-hand side

```
 1        it had the lieutenant governor's race and all

 2        candidates.  And those were the only two races on the
          screen.
 3

 4             Q.   And if some other configuration appeared it
          would have been the result of a machine mistake or
 5

 6        error; correct?
               A.   If a voter had put it into magnifying mode,
 7

 8        which the voter has the ability to do so, they would

 9        have only been showing one race on the first screen,

10        and that would have been the governor, and then the

11        second race would have been the lieutenant governor
          on the second screen.
12

13             Q.   By that orientation, where would the
          splitting of the lieutenant governor race that you're
14

15        aware of [inaudible].
               A.   That I am aware of.
16

17        MR. BROWN:  Your Honor, if I could take a minute

18   break --
          THE COURT:  Sure.
19

20        MR. BROWN:  -- [inaudible]
          THE COURT:  Why don't we take a few minutes then.
21

22   I'll be back in about ten minutes.  Okay.
          MR. BROWN:  Thank you, Your Honor.
23

24        MR. TYSON:  Thank you, Your Honor.

25        [Off the record at 3:30 p.m., and back on the record
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 396

1    at 3:37 p.m.]

2                  CONTINUATION DIRECT EXAMINATION

3

4               OF MICHAEL WILLIAM BARNES

5

6    BY MR. BROWN:
               Q.   I'm going to hand you what's been marked as
7

8         Plaintiff's 8 and [inaudible]

9         THE COURT:  Exhibit 8?  Okay.

10             Q.   Let me direct you to the last page of

11        Exhibit 8.  Is the first email on the last page of
          Exhibit 8 an email from a Steven [phonetic] Clay to
12

13        you and others?
          MR. TYSON:  I object on this.  This is related to the
14

15   [inaudible] state issue in 2016 it looks like in these
     emails, so.
16

17        THE COURT:  Okay.  You're going to identify what 8 is

18   --
          MR. BROWN:  All right.
19

20        THE COURT:  I know you're trying to identify the last
     page, but what's the dates on it?
21

22        MR. BROWN:  I can do all of [inaudible].
     BY MR. BROWN:
23

24             Q.   Mr. Barnes, does Exhibit 8 appear to be

25   true and correct [inaudible] emails between various people

```
 1   at your office [inaudible]?

 2          A.   It appears to be email communications from
        the Center for Election Systems at Kennesaw State in
 3

 4      2017.
        MR. BROWN:  Move to admit, Your Honor.
 5

 6      MR. TYSON:  Your Honor, this appears to be once again
     related to the incident at Kennesaw State --
 7

 8      THE COURT:  In '17?  In '17?

 9      MR. BROWN:  In '17 is related to the Kennesaw State

10   matter that does [inaudible].

11      THE COURT:  You're going to have to [inaudible].
     Based on what you just said does not [inaudible] for me to
12

13   admit.  We're talking about 2018, November race, that's
     all we're talking about.
14

15      MR. BROWN:  Your Honor, we have alleged and proven
     that [inaudible] in 2017 could still impact the system --
16

17      THE COURT:  No, you haven't proven that.

18      MR. BROWN:  Well, I haven't [inaudible]
        THE COURT:  [inaudible] You haven't done that.  I'll
19

20   let it in; okay?  I'm going to let it in, because you
     misstate so many things, Mr. Brown.  You really do.  And
21

22   if it's -- [inaudible].  I'll shut up and let you run the
     show.
23

24      MR. BROWN:  No, ma'am, the reason why I said that is

25   the record was --
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 398

1          THE COURT:  Sir, you have not proved it.  I am the

2    one that determines what's proved.  Whether you will, I
     don't know, let's find out.

3

4          MR. BROWN:  I understand.  Let me back up a little
     bit and I understand --

5

6          THE COURT:  Don't argue with me all the time.  Just
     ask the gentleman questions, please, sir.

7

8          MR. BROWN:  Okay.  [inaudible]  I move to admit this

9    Exhibit --

10         THE COURT:  I said I'll admit it.  How many more

11   times do you want me to say that?
           MR. BROWN:  Turn to page 8.

12

13         THE COURT:  Can I get a copy of it now, please?
     [inaudible] discretion.

14

15   BY MR. BROWN:
           Q.   Mr. Barnes, what is the compromise that is

16

17        referred to on page 8 of Exhibit 8?  And it's in the

18        email from Mr. Gay [ph] to Michael Barnes
           [inaudible].

19

20         A.   I believe this is referring to the web
          server that was attacked at the Center for Election

21

22        Systems.
           Q.   And the web server housed what programs or

23

24        information?

25         A.   It didn't house any programs.  It was a

```
 1    distribution server that counties would obtain, like,

 2    ballot proofs, data files that power their Express
       Poll devices; data that the Center for Election
 3

 4    Systems constructed at Kennesaw State while it was
       under contract with the Secretary of State's office
 5

 6    and supporting counties in state and federal
       elections.
 7

 8         Q.   And how was the -- that site compromised?

 9         A.   It was a web server and somebody

10    infiltrated the portions of the web server files that

11    were behind password protection.
                Q.   Let me direct your attention to the next
12

13    page [inaudible] and this may not be in [inaudible]
       sequence so I'm going to assume that they are
14

15    [inaudible].  On page 7 in Exhibit 8, do you recall
       receiving this email?  Or recall being cc'd on this
16

17    email?

18         A.   [inaudible]
                Q.   Did you have an understanding when you
19

20    received this what the author meant, or what it meant
       to you, that obviously this is kind of untenable in
21

22    the current atmosphere?
                MR. LINDSEY:  Your Honor, while you have
23

24    admitted this document --

25    THE COURT:  [inaudible] I've just got to see it.  The
```

1    first page refers to [inaudible] investigation in regard

2    to voter registration records.
          MR. LINDSEY:  Yes, Your Honor.
3

4        THE COURT:  I've already ruled that out repeatedly;
     ruled that out.
5

6        MR. LINDSEY:  [inaudible] with whether or not the
     system that --
7

8        THE COURT:  And these are not in any kind of order.

9        MR. LINDSEY:  -- whether or not the system has --

10   whether or not this has anything to do with the system

11   that collects voters' actual votes in 2018.  What about
     the system [inaudible] --
12

13       MR. BROWN:  [inaudible]
          MR. LINDSEY:  Well, let me back up.  I'm here to
14

15   state my [inaudible].  My objection, Your Honor, this
     dealt with an entirely different system.  You've already
16

17   ruled it dealt with an entirely different system and we

18   would object --
          THE COURT:  I think the question was, there were
19

20   errors then, have they been corrected?  That's the only
     question on the floor.
21

22       MR. LINDSEY:  My --
          THE COURT:  [inaudible] isn't relevant.
23

24       MR. LINDSEY:  Yeah, my objection is that this dealt

25   with a situation you've already ruled on, which was

```
 1   [inaudible]

 2        THE COURT:  I can see we might want to [inaudible].
          MR. LINDSEY:  Is there a -- I mean, if we could
 3

 4   stipulate that whatever [inaudible] have not been fixed,
      maybe that will speed things up.  [inaudible] stipulate
 5

 6   that it's relevant because it's not [inaudible] with the
      system at issue here regarding the 2018 election.
 7

 8        MR. BROWN:  I would love to put Mr. Lindsey on the

 9   witness stand for that but --

10        THE COURT:  Why do you talk over the top of

11   everybody?  Now you're talking over the top of Mr.
      Lindsey.
12

13        MR. LINDSEY:  Your Honor, I'm simply just restating
      the fact that you've already previously ruled that the
14

15   issue at Kennesaw State had nothing to do with the
      election in 2018 because it dealt with [inaudible]
16

17        THE COURT:  I sustain your objection, Mr. Lindsey.

18        MR. LINDSEY:  Thank you, Your Honor.
      BY MR. BROWN:
19

20             Q.  When did the Secretary of State change the
           system after Kennesaw State?
21

22             A.  The -- when operations transitioned from
           Kennesaw State to the Secretary of State's office --
23

24           the transition began before the physical transition.

25           The Secretary of State began constructing their
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 402

```
 1   internal --

 2        Q.  I apologize for interrupting you, but I'm
     asking you a date question.
 3

 4        A.  January 1, 2018.
          Q.  [inaudible] January 1, 2018.  And what did
 5

 6   they change?
          A.  The entire air gap private network that's
 7

 8   used to -- that houses the election programming

 9   software, GEMS, at the state level was transitioned

10   to a new air gap system maintained by the Secretary

11   of State Information Technology office and became
     operational when the Center for Election Systems took
12

13   up residency within the Secretary of State's office.
     Prior to the use of that system, that system was put
14

15   through an analysis by [inaudible], which the voting
     system testing lab out of Huntsville, Alabama to
16

17   validate that the installation of GEMS owned that

18   system matches the installation that [inaudible] had
     previously inspected.
19

20        Q.  Okay.  So is it your testimony that the --
     that everything was changed over on January 1, 2018?
21

22        A.  That the system that's used to generate the
     GEMS databases that are designed -- that are
23

24   developed and issued to counties to execute their

25   elections, the system that those -- that work was
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 403

1    done on was a brand new system as of January 1, 2018.

2         Q.  Okay.  A brand new what?  A brand new
     hardware, brand new programming?
3

4         A.  Brand new hardware.
          Q.  Okay.  What about --
5

6         A.  We were still using the certified copy of
     GEMS that we had been using in the state of Georgia
7

8    since 2000 -- late 2011.

9         Q.  Okay.  So it was the same GEMS system?

10        A.  We have been using the same GEMS program

11   throughout the state of Georgia uniformly since late
     2011.
12

13        Q.  And that same program that has continued in
     use was on -- was it on the web server --
14

15        A.  No, sir.
          Q.  Okay.  Was it put on a web server?
16

17        A.  No, sir.

18        Q.  Okay.  So did anything on the web server
     get put on the same place as the GEMS database?
19

20        A.  No, sir.
          Q.  Okay.  The -- if the GEMS -- well, so you
21

22   said it's -- Mr. Lindsey said everything was changed,
     it's a different system, the GEMS database is the
23

24   same; correct?

25        A.  We have been using the same GEMS program in

1          Georgia since late 2011.

2               Q.   Thank you.  Sorry to interrupt [inaudible].
          Let me direct your attention to page 4 on Exhibit 8.
3

4          THE COURT:  These were written before he said
          everything was changed.  So let's not go into --
5

6          MR. BROWN:   Your Honor, he said the GEMS database
          was not a change.
7

8          THE COURT:  I understand.

9          MR. BROWN:  [inaudible] Let me get right to the point

10    [inaudible] overtake I think an objection.

11    BY MR. BROWN:
               Q.   Mr. Barnes, did any of the 45-plus critical
12

13          vulnerabilities -- 40-plus critical vulnerabilities
          relate in any way to any -- to the GEMS database?
14

15               A.   No, sir.
               Q.   Did the critical vulnerabilities relate to
16

17          -- into the DREs or in the way the DREs were current?

18               A.   No, sir.
               Q.   What did they relate to?
19

20               A.   They're related to a web server that was
          distributing the data to counties -- counties for
21

22          elections.  It was the portal that the Center for
          Elections use as their outside communication tool,
23

24          their website.

25               Elections.Kennesaw.edu was housed on that

1    server.  Counties have a sign-in to that location to

2    obtain some information like ballot proofs for review
      purposes, where they could portal in and access that

3

4    information.

           Q.   Mr. Barnes, I want to go back to your

5

6    testimony about the ballot design; do you recall
      that?  And I want to clarify first, you were

7

8    describing the scalability of the ballot design,

9    different challenges.  There's a lot of candidates,

10   like, in the presidential preference primary for the

11   Republicans in 2016.  Does the county have an
      opportunity to participate in ballot designs?

12

13        A.   The county has an opportunity to review the
      data set at any given time during the review process.

14

15   Most counties take the reports that we generate and
      provide to them that are sample ballots in the

16

17   optical scan format, because that's the easiest thing

18   to produce, the PDF format, and provide the counties
      for a layout -- of validating that the right races

19

20   are in the right place on the ballot.

           But some counties choose, Gwinnett County being

21

22   one of them in November of 2018, to obtain a copy of
      the GEMS database while it is in production.  For

23

24   them then to then take that database, install it onto

25   a DRE so they can see what it's going to look like on

```
 1   the DRE themselves.  And if they see anything that

 2   they would like adjusted, then they notify our office
     of what needs to be adjusted and that adjustment is
 3

 4   made.
             Q.    [inaudible] and Gwinnett was a longer
 5

 6   ballot because it was in two languages; is that
     right?  Was that one of the issues?
 7

 8       A.    It was a more complicated ballot.  It was

 9   the first election that Gwinnett County was having

10   with multiple language, so they were doing a lot of

11   proofing in multiple languages to make sure the
     ballot was being displayed as they needed it
12

13   displayed to be in adherence with federal statute.
             Q.   I asked you before with respect to the work
14

15   that you -- your office had done with respect to the
     ballot design whether in any other various -- the
16

17   ballots had been out, the election for the lieutenant

18   governor was split between two pages and you said,
     no.  Do you know if that's the case with respect to
19

20   what the counties ended up using [inaudible]?
             A.    We have the same DRE equipment at our
21

22   disposal as the counties have at their disposal.  The
     image that we can generate on the DRE should be equal
23

24   to what a county is seeing on display when they are

25   generating.  That's the best to which I can answer
```

```
 1      that question.

 2              Q.  To the best of your knowledge.
                A.   To the best of my knowledge.
 3

 4              Q.   To the best of your knowledge the ballots
        displayed in the county, did -- would not have shown
 5

 6      on the lieutenant governor's race on two different
        screens; is that right?
 7

 8              A.   That is correct.

 9              Q.   That's all I have.  Thanks, again.

10      THE COURT:  Any questions?

11
                        CROSS-EXAMINATION
12

13                 OF MICHAEL WILLIAM BARNES

14

15   BY MR. TYSON:
                Q.   Mr. Barnes, let's pick up where Mr. Brown
16

17      had been talking ballot design.  Let me show you what

18      would be marked as -- where is it I'm at?  Duncan 2?
        Duncan 2.
19

20              And I'm going to ask you if you will -- if you
        could identify this and tell me what it -- what is
21

22      shows, [inaudible] design of the [inaudible] ballots
        in I believe 200- -- 2018, 2014, and 2010.  Does this
23

24      accurately show the ballot design of the governor and

25      lieutenant governor's races for those three election
```

```
 1      cycles?  [inaudible]

 2           A.   Yes, sir, it does.
        MR. TYSON:  Your Honor, I would tender these into
 3
    evidence.
 4
        MR. BROWN:  No objection, Your Honor.
 5

 6      THE COURT:  Received.
        MR. TYSON:  [inaudible]
 7

 8  BY MR. LINDSEY [inaudible]:

 9           Q.   There is in this packet two pictures of

10      each year.  Could you explain to the Court why?

11           A.   Sure.  The two pictures -- the picture --
        there are two DRE models that are used in the state
12

13      of Georgia.  There is the TSx model and there is the
        R6 model.
14

15           The TSx is -- has the gray case around it.  The
        screen and the R6 model has the white case around the
16

17      screen.  So these are images of both models

18      displaying the ballot from November of 2018.
             Q.   And let me go back and show to the 2010
19

20      screen and that screen -- rather, in these screens
        the U.S. Senate race and the governor's race is on
21

22      the first page and the next page has the lieutenant
        governor and other races; correct?
23

24           A.   Correct.

25           Q.   In 2014, there was once again U.S. Senate
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 409

1    race and once again the U.S. Senate is -- and the

2    governor's race is on the first page and the race for
     lieutenant governor and other state constitutional

3

4    offices are on the next page; correct?
          A.    Correct.

5

6         Q.    Now, the situation is different in 2018; is
     it not?

7

8         A.    That's correct.

9         Q.    Why?

10        A.    There was no United States Senate race on

11   the ballot in 2018.  The first race on all ballots
     across the state was for governor.

12

13        Q.    So as a result, so instead of being on two
     different screens, the governor and lieutenant

14

15   governor's race are both on the same screen.
          A.    That's correct.

16

17        Q.    Correct?  Okay.  Now, you are as part of

18   your job, concerned about ballot design; correct?
          A.    Correct.

19

20        Q.    And for instance you are knowledgeable, for
     instance, what happened in Broward County; correct?

21

22        A.    Correct.
          Q.    Tell the Judge what happened in Broward

23

24   County.

25        A.    In November 2018 in Broward County, they

```
 1   had a -- I believe it's -- the United States Senate

 2   race was at the bottom of the first column on the
     ballot.
 3

 4       It came below the set instructions.  So at the
     very -- after those instructions ended, they had
 5

 6   enough space at the bottom of this piece of paper
     that they could include the United States senate race
 7

 8   at the bottom of that column and then the governor's

 9   race was at the top of the second column on the

10   ballot.  Other counties -- that was Broward County --

11   is the United States senate was at the bottom of --
     underneath the instructions.
12

13       Q.   So as a result in Broward County fewer
     people voted in the U.S. Senate race than they did in
14

15   other counties?
             A.   The layout in Broward County was different
16

17   than it was in other counties.

18       Q.   Yeah.
             A.    In other counties the United States Senate
19

20   race was at the top of the second column.  There was
     no race below the instructions on other county
21

22   ballots in Florida.
             Q.   And did that have an impact on voter
23

24   participation?  Was that the concern that had

25   impacted the voter [inaudible]?
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 411

Case 1:17-cv-02989-AT   Document 449-11   Filed 07/03/19   Page 258 of 389

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019          Page 258

1          A.    There was concern that because the race was

2     at the -- below the instructions that voters might
      not have noticed that it was below the instructions

3

4     and then may have just bypassed it and ignored it.
              Q.    Yeah.   Now after this election, Mr. Brown

5

6     asked you, had you had any discussions about why
       there's a difference between the paper ballot down-

7

8     ballot voting for lieutenant governor and the

9     electronic ballot down-ballot race?   Do you recall

10    him asking you that?

11          A.    Yes, sir.
              Q.    And have you in fact had any discussion

12

13    about whether or not the ballot design may have
       impacted that race?

14

15          A.    Post-election, you know, looking at the
       design of the ballot, we have always been very

16

17    pleased with the two-column ballot because it gives,

18    you know -- you know, two races very clearly separate
       apart but when we, you know, start thinking about the

19

20    election of what all was going on with the given
       election, could this ballot layout been confusing to

21

22    voters.
              And there's a possibility that it could have

23

24    been confusing, especially for new voters that are

25    voting for the first time in the state of Georgia

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 412

```
 1        that may not have had an interaction in voting in

 2        Georgia or using a DRE.  You know, a cursory glance
           of the screen like this you may feel like because the
 3

 4        Republican candidates are line up and the Democratic
           candidates are lining up that you make one selection
 5

 6        and you're voting for a ticket.
                    So that could be how a voter interprets that or
 7

 8        it may not be.  I could just be that they see the

 9        first race and they are focused on when they get to

10        the next element.  Each individual voter's actions

11        that -- are their own.
                    Q.   And in fact you are aware that program's

12

13        [inaudible]?
              MR. BROWN:  Your Honor, this is already leading and,

14

15    Your Honor, I would [inaudible] leading the witness.
              MR. LINDSEY:  That doesn't matter.  It has to be

16

17    adverse.  [inaudible].

18        THE COURT:  [inaudible], therefore he's got him on
       cross.

19

20        MR. LINDSEY:  Thank you, Your Honor.
              MR. BROWN:  Thank you, Your Honor.

21

22    BY MR. LINDSEY:
                    Q.   So obviously, you know, you're aware of the

23

24    fact that the president and my president, for instance,

25    run on a ticket; correct?
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 413

```
 1            A.    Correct.

 2            Q.    and are you aware that, I believe, in 25
        states that have lieutenant governors and governors, they
 3

 4      run on a ticket; are you aware of that?
              A.    I learned something today that -- I know
 5

 6      that there are some jurisdictions where they on a ticket
        with a number.
 7

 8            Q.    Okay.  Are you aware that, for instance, in

 9      Florida they run on a ticket?

10            A.    Yes.

11            Q.    Are you aware that in South Carolina, two
        of our neighboring states, they also run on a ticket?
12

13            A.    Yes.
              Q.    So it is common, is it not, that in many
14

15        states that the governor and lieutenant governor
          weren't on a ticket?
16

17            A.    Yes.

18            Q.    Okay.  Now, in addition to the general
          design, did you also do a analysis in terms of the
19

20        number of new voters voting in Georgia for the first
          time --
21

22            A.    Post --
              Q.    -- in 2014 and 2018?  Post-election.
23

24            A.    Secretary of State's office did reach out

25        to their vendor of the voter registration system to
```

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019                     Page 261

```
 1        ask the question of how many new voters participated

 2        for the -- or how many voters participated for the
          first time in 2018, also in 2014.  In 2014, I believe
 3

 4        the number was --
          MR. BROWN:  Your Honor, I object.  This is hearsay.
 5

 6   It's [inaudible].
          MR. LINDSEY:  Your Honor, he's doing this in his
 7

 8   official capacity to basically analyze the number of new

 9   voters.

10        MR. BROWN:  Your Honor, I'm not aware of any official

11   capacity except to the hearsay ruled upon.
          MR. LINDSEY:  Your Honor, this is part of his
12

13   official duties is to --
          THE COURT:  We've talked about numbers all over the
14

15   place.
          MR. LINDSEY:  Your Honor, these are not --
16

17        THE COURT:  And all other kinds of ways.  I'll allow

18   it.
          MR. LINDSEY:  Thank you, Your Honor.
19

20   BY MR. LINDSEY:
              Q.  That in 2014, there were just over 98,000
21

22        voters in Georgia that participated for the first
          time in the November 2014 election, but in the 2018
23

24        election there were a number of 336,000 voters or a

25        little over that that voted for the first time on --
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 415

1      in November of 2018.  And as far as your discussions,

2      was the concern about confusion by new voters coming
       in from other states?

3

4          A.   Yes.
           Q.   And that's part of the concerns you had in

5

6      terms of the inadvertent layout that was created as a
       result of the U.S. Senate race not being on the

7

8      ballot?

9          A.   Correct.

10         Q.   Okay.  Now Mr. Brown also asked you about

11     -- several questions about getting necessary reports
       from GEMS and elsewhere about verifying that the --

12

13     that the election results.
                And at one point you were asked to run a report

14

15     that formed this lawsuit, a report that was given to
       the parties assuring every voter received lieutenant

16

17     governor on the ballot.  Do you recall being asked

18     about that before?
           A.   Yes.

19

20         Q.   Okay.  You did not run a report for every
       county; correct?

21

22         A.   That's correct.
           Q.   Okay.  But you did run a report on the

23

24     counties that are all on -- named parties in this

25     lawsuit; correct?

```
 1        A.    That's correct.

 2        Q.    And that would be Fulton and Gwinnett;
      correct?
 3

 4        A.    Correct.
      MR. TYSON [inaudible]:   [inaudible] what?
 5

 6  MR. LINDSEY:  Fulton and Gwinnett.
          Q.    Let me first show you Gwinnett -- let me
 7

 8  show you both [inaudible].  First let me show you

 9  Gwinnett and ask you to please identify Gwinnett

10  [inaudible].  If you could identify that for the

11  Court.
          A.    This is the base precinct with reports --
12

13  base precinct with races report for Gwinnett County
      and note there were 2018 election.
14

15        Q.    And you -- tell the Court what that means
      -- what that means.
16

17        A.    What this report shows is every -- a voter

18  is connected to a base precinct within a GEMS
      database.  And what this shows is the base precinct
19

20  associated to the precinct and then what races are
      associated to that base precinct.  So this show --
21

22  and a voter is going to be associated to the base
      precinct.  So this is showing what races each
23

24  individual voter within a precinct would see when

25  they were given their ballot.
```

1          Q.   Okay.

2          MR. LINDSEY:  We would tender Exhibits 3 and 4.
     [inaudible] 3 and 4.  [inaudible]
3

4          MR. BROWN:  I have no objection, Your Honor.
           THE COURT:  They're admitted.
5

6   BY MR. LINDSEY:
           Q.   And what do these reports -- you would tell
7

8      the Court what these reports show.

9          A.   It shows, again, all races for that given

10     base precinct or present all statewide races that

11     were being contested in November are shown with every
       base precinct listed in the report.
12

13         Q.   Okay.  So if I understand you correctly
       what you're telling me is that Mr. Duncan and Ms.
14

15     Amico appeared on every electronic ballot then in
       those two counties?
16

17         A.   Yes.

18         Q.   And did you ever receive any complaint from
       anywhere in the state that this race did not appear
19

20     on an electronic ballot?
           A.   We did not.
21

22         Q.   To go back to the issue of configuration
       about how was the ballot that we just finished
23

24     discussing, the electronic ballot, differed from the

25     paper ballots that folks would receive when they did

www.huseby.com          Husebv, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 418

```
 1    write-in?

 2         A.    In relation to layout?
           Q.    Layout, particularly the governor and
 3

 4    lieutenant governor's race.
           A.    The optical scan ballot, again being three
 5

 6    or four columns in display, front and back, the
       governor's race would have been the first race below
 7

 8    the ballot that are -- in the -- on the left -- far

 9    left column and then the race right below that would

10    have been the lieutenant governor and then the race

11    below that would have been Secretary of State.
           Q.    So you wouldn't have had simply the
12

13    governor and lieutenant governors on the -- on only
       one page?
14

15         A.    That's correct.
           Q.    Plus you had a north-south situation as
16

17    opposed to east-west?

18         A.    Correct.
           Q.    Now in addition to checking to make sure
19

20    that this race appeared on all the ballots, you also
       were asked as part of the discovery in this case, to
21

22    prepare from GEMS a report testing to ensure that the
       votes that are made on a machine are actually
23

24    calculated in the system; correct?

25         A.    Correct.
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 419

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019          Page 266

1          Q.   Okay.  And you did this for both Fulton and

2     Gwinnett, correct --
            A.   Correct.
3

4          Q.   -- were named parties in this case.  And if
      you would explain to the Court -- let me show you the
5

6     -- and ask you if this is [inaudible] would be and
      then explain to the Court what actually this report
7

8     shows.

9          A.   These are the active voter TS status

10    reports from the Fulton and Gwinnett county databases

11    and what these reports show are the number of memory
      cards created for their voting locations and the
12

13    upload status of those memory cards.
            Q.   Okay.  In English what do they [inaudible]?
14

15         A.   It shows that the touch screen unit that
      was used that the information collected by that
16

17    machine has been uploaded into GEMS [inaudible].

18    MR. LINDSEY:  Your Honor, we would tender these two
      Exhibits which would be 5 and 6 [inaudible].
19

20    MR. BROWN:  No objection, Your Honor.
            THE COURT:  So admitted..
21

22  BY MR. LINDSEY:
            Q.   And  after analyzing the report once again,
23

24    what are they -- tell the Court what they showed.

25         A.   They showed that there are no outstanding

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 420

```
 1    memory cards.  That all memory cards that were

 2    created that would have collected that would have
       collected votes, have been uploaded and accounted for
 3

 4    by GEMS.
             Q.   Okay.  Now you were asked by Mr. Brown also
 5

 6    about what you at the Secretary of State's office
       does beforehand to get ballots ready for voting.   Do
 7

 8    you recall that last question?

 9         A.   Yes.

10         Q.   Let me ask you, do you do any testing,

11    parallel testing for instance, on Election Day to
       make sure that the systems are operating correctly?
12

13         A.   We do.
           Q.   Tell the Judge what you do.
14

15         A.   In the days leading up to the election we
       will make -- Secretary of State's office will make a
16

17    request to a county in Georgia to provide to us a

18    copy of their GEMS database from their GEMS computer.
       The State constructs the database and sends it to the
19

20    county.
             But for parallel testing we ask that whatever
21

22    the county has loaded into their system, that they
       make a copy of that database and send it back to the
23

24    State so that we at the Secretary of State's office

25    can then create our own memory cards from their copy
```

1  of their database, load into touch screen equipment

2  that we have in our possession, do a logic and
   accuracy test on the device to make sure it's working

3

4  as it should, and then on Election Day itself we
   videotape the input of a test deck into the device in

5

6  election mode.
            So we will have an individual that is holding

7

8  the pre-filled ballot out and instructing the test

9  voter on what selections to make while that is all

10  being videotaped.  And that's done within the voting

11  period on Election Day.  And then at the end of that
    timeframe we'll end the election on those devices and

12

13  printout tapes from those devices, and validate the
    results being produced by the device match the known

14

15  results of the test deck.
            Q.   Okay.  And you do that to make sure that if

16

17  Edward Lindsey cast a vote for Mike Boland for

18  governor, that it's properly counting?
            A.   Correct.

19

20       Q.   And when you did that parallel testing on
    Election Day, did you discover any irregularities?

21

22       A.   We did not.
            Q.   And among the races that you tested for was

23

24  the lieutenant governor's race; correct?

25       A.   That's correct.

```
 1       Q.    Thank you.  Now you were talking about

 2  after the election Ms. Amico came and raised some
    concerns.  And you mentioned that you went and

 3

 4  checked a county.  What county was that, just for the
    record?

 5

 6       A.    Ben Hill County.
         Q.    Ben Hill County.  And you went to Ben Hill

 7

 8  because that was somebody Ms. Amico was concerned

 9  about; correct?

10       A.    Correct.

11       Q.    Okay.  And the results were the same things
    that were tabulated on the card were being uploaded

12

13  to the Secretary of State's office; correct?
         A.    That's correct.

14

15       Q.    Okay.  Now were you asked earlier why --
    well, you were asked earlier whether the Secretary of

16

17  State had done any testing or discovered there was

18  any kind of malware on the system; correct?
         A.    Correct.

19

20       Q.    Been asked that.  Given what you do on the
    parallel testing, the outcome, did you believe there

21

22  was any reason to do any forensic testing for
    malware?

23

24       A.    Based on what we have encountered, no, sir.

25       Q.    Okay.  Now you -- there have been several
```

1    questions raised about hacking, this, that, and the

2    other; could you explain -- from my understanding,
     and I'm not a math major and a physics major, I'm a

3

4    history major with a specialty in Florentine
     brimstone, so --

5

6         THE COURT:  That's really helpful
          Q.   -- so I'm going to talk really slowly to

7

8    make this explanation here.  Could you please explain

9    the difference between an open system that would be

10   on the web page, and a closed system?

11        A.   A closed system has no external connection
     port is that it is a device directly connected to

12

13   another device and there is not a line from that pair
     going outward placing so that someone can portal

14

15   inward into that device.  They can't access an IP
     address.  It's closed off.

16

17        The only way to interact with the system is

18   through direct interaction with the system.  An open
     network is akin to the internet.  When you have

19

20   computers and multiple locations communicating to one
     another through a public means.

21

22        Q.   So someone [inaudible] Putin in Russia
     could not use a computer there utilizing the internet

23

24   to be able to get into your system and hack it;

25   correct?

1          A.   Correct.

2          Q.   Okay.  Were there any other anomalies in
   this election, particularly regarding the lieutenant

3

4   governor's race, in regards to write-in votes?
           A.   When looking at the certified returns for

5

6   various counties in the Metro area, we saw that there
   were -- for the statewide races that the lieutenant

7

8   governor's office seemed to have the highest number

9   of write-in votes collected.

10         Q.   Okay.  Now you didn't check every county,

11  did you?
           A.   No, sir.

12

13         Q.   All right.  You checked, I believe, three
   counties; Fulton, Gwinnett, and DeKalb; correct?

14

15         A.   Correct.
           Q.   Let me show you Fulton [inaudible] and let

16

17  me ask you to explain what these three documents --

18  certified documents I might add, show.
           A.   These appear to be the certified returns

19

20  from Dekalb County, Gwinnett County, and Fulton
   County, and they are -- they contain the election

21

22  summary reports for those counties.
           And the election summary report shows each

23

24  individual race that was present in the database for

25  that given county.  It shows the total number of

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 425

 1   precincts involved in that election shows the number

 2   of precincts reporting by race.  It shows the number
     of times that particular race was seen by the

 3

 4   tabulating system.
             It shows the total number of votes that were

 5

 6   counted for that race and it shows the number of
      votes collected for each individual candidate listed

 7

 8   in that race, including write-ins.

 9       Q.   All right.  Write-ins, if I understand

10   correctly, they are write-ins in which someone goes

11   to the trouble to get their vote tabulated and there
      are write-ins for Mickey Mouse, that sort of thing.

12

13       A.   That's correct.  There are certified write-
      in candidates and then there are candidates that are

14

15   not certified write-ins.
             Q.   And that includes those who are not

16

17   certified write-in candidates; correct?

18       A.   This includes all write-ins collected by
      the system.

19

20       Q.   When you reviewed that, what did you
      discover for these three counties, for instance,

21

22   using [inaudible] because they were named parties in
      this case?  What did you discover about the number of

23

24   write-ins in the lieutenant governor's race versus

25   other races that were statewide?

```
 1              A.    That the highest number of write-ins cast

 2       for statewide office was in the lieutenant governor's
         office.
 3

 4              Q.   Okay.
            MR. LINDSEY:  Your Honor, we would tender Exhibits --
 5

 6    [inaudible] 7, 8, and 9.
            THE COURT:  Mr. Brown.
 7

 8       MR. BROWN:  You're tendering those?

 9       MR. LINDSEY:  [inaudible] I'm tendering --

10    THE COURT:  He tendered his exhibits.

11       MR. LINDSEY:  I'm tendering the exhibits.
         MR. BROWN:  [inaudible]
12

13       THE COURT:  Okay.  No objection.  That's [inaudible].
         MR. LINDSEY:  Your Honor, I just have one last
14

15    [inaudible] and I will release him, I guess, [inaudible].
       Your Honor, I believe the parties have stipulated to the
16

17    admissibility of Secretary of State certified statewide

18    races.
            I just want to let it [inaudible] in the record.  I
19

20    would, first of all, tender Exhibits 10, 11, and 12.  Is
       that what I'm up to?  Ten being the election for 2010, 11
21

22    being for '14, and 12 being for '18.  Let me show you what
       I have here.  '18 and '14, rather, and '10.
23

24    BY MR. LINDSEY:

25              Q.    [inaudible] Let me simply ask you to look
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 427

1        at those.  Those are in fact the official election

2        returns from those three years that are located on
         the Secretary of State's website; correct?
3

4        [inaudible]    I don't think I have those
         [inaudible].  Okay.  These are in fact the election
5

6        returns from the Secretary of State's office
         [inaudible]; correct?
7

8             A.    Appear to be.

9        MR. LINDSEY:  Your Honor, we tender the Exhibits.

10       THE COURT:  Any objections from --

11       MR. BROWN:  No, Your Honor.
         THE COURT:  Okay.  Do you have extra copies of those,
12

13   the last three, Mr. Lindsey?
         MR. LINDSEY:  Your Honor, [inaudible].
14

15   BY MR. LINDSEY:
              Q.   And looking at the front page of '10 and
16

17       '14, does it not show, sir, the percentage of voters

18       from that year?  For both '10 and '14 at the top?
              A.    The turnout percentage?
19

20            Q.   Yes, sir.
              A.    The turnout percentage for November of '14
21

22       -- 2014, voter turnout 50.03 percent?
              Q.    Yes, sir.  Now for a '18 -- for '18
23

24       [inaudible].

25       MR. LINDSEY:  [inaudible], Your Honor.  [inaudible].

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 428

1    And also, Your Honor, we tender this next Exhibit,

2    [inaudible] turnout and '18, just for the record.
             Q.   If you would identify what would be marked

3

4        as Exhibit 13, tell us what that is.
             A.   This is for November 2018 --

5

6            Q    Yes, sir.
             A.   -- general turnout 61.34 percent.

7

8        MR. LINDSEY:  We tender this document as well.

9        MR. BROWN:  No objection.

10   BY MR. LINDSEY:

11           Q.   So the turnout -- well, first of all, if
         you were to look at '14 and '18, we've already talked

12

13       about the new votes.  Let me just also sort of close
         the loop on this line of questioning.  If you would

14

15       look at '14 first and tell me how many registered
         voters there were in '14.

16

17           A.   In '14, there were 5,191,182.

18           Q.   Okay.  And in '18, how many were there?
             A.   6,400,200 -- let's see.  6,428,584.

19

20           Q.   Okay.  And you've already testified that we
         had high voter participation in '18?

21

22           A.   [inaudible]
             Q.   So in '18, we have a larger number of

23

24       registered voters than in '14; correct?

25           A.   Correct.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 429

```
 1              Q.   And in '18, we had a larger turnout than we
 2        did in '14; correct?
                A.   Correct.
 3

 4              Q.   And in '18, we had a increase of about
          three-and-a-half times the number of new voters
 5

 6        voting for the first time; correct?
                A.   Correct.
 7

 8              Q.   All of those, based on your concern about -

 9        - your knowledge about Broward County as you're

10        looking at the web design -- at the design of the

11        electronic ballot could have led to greater voter
          confusion when they voted electronically versus when
12

13        they voted on a paper ballot; correct?
                A.   Correct.
14

15        MR. LINDSEY:  That's all I have, Your Honor.
          THE COURT:  Mr. Tyson.
16

17        MR. TYSON:  Thank you, Your Honor.  I'll be brief.

18                          CROSS-EXAMINATION
19

20                      OF MICHAEL WILLIAM BARNES

21

22   BY MR. TYSON:
                Q.   [inaudible] pick up real quickly on the
23

24        Broward review, that senate race that Mr. Lindsey was

25        asking you about.  Do you know if Broward County uses
```

1    paper or DRE ballots?

2         A.   I believe Broward uses centralized
     [inaudible].

3

4         Q.   Okay.  So those would be paper ballots;
     correct?

5

6         A.   Yes.
          Q.   Mr. Brown earlier asked you about

7

8    complaints that he received around the election

9    administration, were the complaints in 2018 any more

10   unusual than complaints in prior years?

11        A.   No.
          Q.   And Mr. Brown also asked you now

12

13   [inaudible] issues he said that, you know, if you
      push a button [inaudible] record votes somewhere else

14

15   for somebody else.  Now would you consider that a
      programming issue or a calibration issue?

16

17        A.   I would consider that a calibration issue.

18        Q.   And is -- if the machine doesn't respond as
      expected on a calibration issue during testing, what

19

20   was the process for addressing that?
          A.   The counties normally do not allow that

21

22   system to pass.  It is set aside and not used for
      that given election.

23

24        Q.   And in the calibration you repair or fixed

25   electronic voting machines?

```
 1        A.   You can recalibrate the screen as part of

 2   the initial LMA process of, say, [inaudible]
      calibration on the machines is like one of the first

 3

 4   steps done.  But even after setting calibration if
      the county interacts with the system and they feel

 5

 6   like it's not responsive as it should be, then they
      will take that unit out of operation.

 7

 8        Q.   And so a programming error then would be

 9   something like a candidate's name is missing; is that

10   correct?

11        A.   That's correct.
          Q.   And how would you know that it was a

12

13   programming error of that nature where somebody's
      name was omitted, for example?

14

15        A.   It would be not present on the ballot.  You
      would not see the name or if there was a voting

16

17   position with no name associated to it, you would see

18   that.
          Q.   And how would you do that?  Would you do

19

20   that from a GEMS report or some other method?
          A.   You do that for a GEMS reports.  You do

21

22   that through the sample ballots that are generated
      and provided to the counties for proofing purposes.

23

24        Q.   And reviewing the DRE post-election mode

25   also show that problem with the candidate missing
```

```
 1      name?

 2          A.   In post-election mode you can print out
        reports that show candidates listed by race.  You
 3

 4      also have the ability to access the ballot -- the
        ballot view, which is the reported ballots that the
 5

 6      system recorded and it shows what races were on that
        ballot and what candidates were listed under those
 7

 8      races.

 9          Q.   So lieutenant governor's race didn't appear

10      on a DRE.  The machine in post-election [inaudible]

11      to determine that [inaudible].
            A.   That's correct.
12

13          Q.   Okay.  Thank you.
        MR. LINDSEY:  I don't have anything else.
14

15      THE COURT:  Wait a minute.  Wait, wait, wait.
        MR. BROWN:  I'm sorry.
16

17      MS. BURWELL:  I have no questions.

18      THE COURT:  She's got -- okay.  Okay.  Now you can
    go.
19

20      MR. BROWN:  Thank you, Your Honor.

21

22                  REDIRECT EXAMINATION
                 OF MICHAEL WILLIAM BARNES
23

24

25  BY MR. BROWN:
```

www.huseby.com         Huseby, Inc.  Regional Centers         800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 433

```
 1        Q.    When did you first hear of the theory that

 2   the under-vote might be -- have been the result of
     people thinking that it was a [inaudible]
 3

 4        A.    It would probably be close to the time of
     certification.
 5

 6        Q.    And who did you hear it from?
          A.    It was just sort of hypothesized.   There
 7

 8   was no one person that said it.   It was just sort of

 9   again looking at the election and seeing, you know,

10   what could -- what could be reasons for these things.

11        Q.    For the under-vote that you noticed, right?
          A.    Yes.
12

13        Q.    Okay.  So you noticed the under-vote at the
     Secretary of State's office and one of the things
14

15   that was just thrown out was, maybe people thought it
     was a ticket, right?
16

17        A.    Correct.

18        Q.    And have you undertaken -- get any sort of
     expert opinion or analysis of that theory?
19

20        A.    We have heard from people in relation to
     ballot design that are starting that for ballot
21

22   design moving forward that it's best for voters to
     see one race per screen when they're interacting with
23

24   a DRE device or a ballot-marking device.   So, you

25   know, that's -- to eliminate that confusion that may
```

 1    be present.

 2         Q.   Right.  But that would mean that -- that
      doesn't relate to under-votes, does it; or does it

 3

 4    [inaudible]?
             A.   I'm not sure of the question.

 5

 6         Q.   Is the concern there that people will skip
      a vote if there's more than one ballot on a page?  Is

 7

 8    that the concern?

 9         A.   There's always concern that voters are not,

10    you know, receptive of what they're seeing.  But each

11    individual voter is going to do what they want to do.
             Q.   Right.  And in -- but in this election, if

12

13    you turn the page for this election, you have
      multiple ballots; correct?

14

15         A.   If you hit the next button you go to the
      next screen, you have multiple races appearing, yes.

16

17         Q.   And which races appeared on the second page

18    of November 6th ballot?
             A.   Let's see --

19

20         Q.   And just go ahead and look at the
      [inaudible].

21

22         A.   The November '18 -- for the 2018 ballot?
             Q.   Yes, sir.

23

24         A.   There are four races present.  Secretary of

25    State, attorney general, commissioner of agriculture,

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 435

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
**Transcript of Hearing Proceedings on 01/17/2019**                    **Page 282**

1        commissioner of insurance.

2            Q.   Okay.  So in those -- even though there
         were four ballots on that screen, the voters were

3

4        able -- electronic and paper ballot voters had a
         significantly higher participation rate than the

5

6        lieutenant governor's race; correct?
         MR. TYSON:  Objection, Your Honor.  It's leading.

7

8        THE COURT:  Sustained.

9   BY MR. BROWN:

10           Q.   Mr. Barnes, did -- before the other races

11       that were on the second page have a higher voter
         participation rate than lieutenant governor's race?

12

13           A.   Based on the certified results from those
         counties that there were fewer under-votes in those

14

15       races, yes.
             Q.   Okay.  Thank you.  Now the -- there was

16

17       some testimony about calibration issue.  Are you with

18       me?
             A.   Uh-huh.

19

20           Q.   Okay.  And what -- one calibration problem
         is a screen dysfunctioning, physical screen problem,

21

22       if you follow me, where what you're pushing doesn't
         connect with the code -- with whatever electronics

23

24       [inaudible].  You with me?  It's a physical problem

25       with the screen.  Is that a calibration problem?

www.huseby.com          **Huseby, Inc.  Regional Centers**          **800-333-2082**
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

Page 436

1      A.   Where -- the point that you're touching is

2  -- the response is showing in a different location?
   The response where you touch --

3

4      Q.   Or doesn't respond or it blinks or
   something else, is that a calibration problem?

5

6      A.   Potentially.
       Q.   The -- but there is software that tells the

7

8  computer, if you press this button, put another --

9  add one to the voter total for Mr. Duncan; correct?

10     A.   The test screen basically is a grid.  It's

11 a pressure-point grid.  It says -- [inaudible]
   analysis and, you know, it comes up with an average

12

13 of pressure it says, if you see pressure here, then
   that should be indicated as a mark in this position

14

15 on the ballot.
       Q.   Right.  And that's programming that does

16

17 that; correct?  That says, if you [inaudible], add

18 one to the vote total for Amico, right?
       A.   Correct.

19

20     Q.   Okay.  And that program resides where?
       A.   That program resides on the DRE.

21

22     Q.   On the individual DRE machines.
       A.   That's correct.

23

24     Q.   And is that -- and is that -- and where on

25 those DRE machines does it reside?

```
 1            A.    That resides on an EPROM chip that's

 2      connected to the motherboard.
              Q.    And is the EPROM chip connected to the
 3

 4      motherboard of something that the State --
              MR. BROWN:  Your Honor, bear with me here.  I just
 5

 6  have one question on this.
              Q.    Is the EPROM chip that you referred to that
 7

 8      contains the programming for doing that something the

 9      State offered to allow the petitioners to inspect?

10      MR. LINDSEY:  Your Honor, objection again.  He's once

11  again [inaudible] re-litigate what the Court has already
    ruled upon in discovery [inaudible].
12

13      THE COURT:  Sustained.
    BY MR. BROWN:
14

15            Q.    Is the EPROM the same thing as the election
    archive?
16

17            A.    The election archive information is saved

18      to the internal memory on the device and the internal
    memory is contained in EPROM.  [inaudible]
19

20            Q.    Okay.  And the internal -- okay.  Can you
    say that again?
21

22            A.    The internal memory is where the archive
    file is maintained and the internal memory resides on
23

24      EPROM.

25            Q.    Okay.  So the answer is no if they're on
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 438

1      the same thing, right?

2           A.   The election archives is a data file that
       is saved to an internal memory and the internal

3

4      memory is -- resides on the EPROM.
            Q.   And other things other than the election

5

6      archive are on the internal memory, right?
            A.   I believe I already said that.

7

8           Q.   Just yes or no.

9           A.   Yes.

10          Q.   Okay.  And one of those other things

11     controls the mapping of the vote from the touch
       screen to the place in your system where it says, add

12

13     one more vote to somebody; correct?
            A.    Correct.

14

15          Q.   Let me direct your attention to one of Mr.
       Lindsey's printouts and I'll just give you -- you

16

17     don't need to look at it.

18          Of course you may, but the -- he was asking you
       about write-in votes and how the lieutenant

19

20     governor's race had a lot of write-in votes, do you
       know whether that was because Libertarians who were

21

22     voting on the lieutenant governor's race did not have
       an option, therefore wrote in?  Do you know --

23

24     MR. LINDSEY:  Your Honor, I believe that calls for

25  speculation [inaudible].

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 439

```
 1        THE COURT:  That would be speculation.  [inaudible]

 2   argue that it's not.  [inaudible].
          MR. BROWN:  Thank you.
 3

 4   BY MR. BROWN:
               Q.   Now the EPROM chip is the erasable, read-
 5

 6        only [inaudible], right?  Or I guess erasable program
          [inaudible], right?
 7

 8        A.   Well, that's what EPROM stands for, yes.

 9        Q.   Now does the software reside on an EPROM

10   chip or in [inaudible] memory, if you know?

11        A.   I can't answer that in an absolutely -- I
          don't [inaudible].
12

13        Q.   Okay.
          MR. BROWN:  That's all I have [inaudible].
14

15   THE COURT:  [inaudible]

16

17                    RECROSS EXAMINATION

18               OF MICHAEL WILLIAM BARNES

19

20   BY MALE:
               Q.   Mr. Brown -- I've just got [inaudible].
21

22   Mr. Brown did ask about whether it was a touch screen
          problem [inaudible] whether or not that could be a
23

24   system error; correct?

25        A.   Correct.
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 440

```
 1            Q.   That would have shown up if it was a system

 2       problem in your parallel testing on Election Day;
          correct?
 3

 4            A.   Correct.
              Q.   And you didn't detect any problems;
 5

 6       correct?
              A.   We did not detect any problems.
 7

 8       MALE:  No further questions.

 9

10                      RECROSS EXAMINATION

11                 OF MICHAEL WILLIAM BARNES

12

13   BY MR. TYSON [inaudible]:
              Q.   Mr. Barnes, Mr. Brown asked you about when
14

15       the voter information was recorded.  When you push a
          button, when you push the part of the screen, it's
16

17       [inaudible] cast ballot that is recorded in the

18       internal memory of the unit; correct?
              A.   That is correct.
19

20            Q.   All right.  Are you familiar with the
          notices that are posted to voter -- polling places
21

22       regarding pressing the cast ballot button?
              A.   I am.
23

24            Q.   I'm going to hand you what's been marked as

25       Gwinnett 1.  Is this the notice for voter to be
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 441

```
 1        posted in the polling places regarding pressing the

 2        cast ballot button [inaudible], I'm sorry.
               A.   It is.
 3

 4          Q.   And it very specifically says, you should
          notify a poll worker if you have a problem or
 5

 6        question about the unit before you press the cast
           ballot button; correct?
 7

 8          A.   That's correct.

 9          Q.   Okay.  Thank you.

10     MR. TYSON:  I have no further questions.  Oh, I'm

11   sorry, Your Honor.  I tender Gwinnett 1.
          MR. BROWN:  No objection.
12

13     THE COURT:  It's admitted.
       THE COURT: Ms. Burwell, questions?
14

15     MS. BURWELL:  [inaudible]
       THE COURT:  Mr. Brown.
16

17     MR. BROWN:  I don't have anything further.

18     THE COURT:  Okay.  You may get down.
       THE WITNESS:  Thank you.
19

20     MR. BROWN:  Your Honor, may this witness be excused?
       THE COURT:  Yes.
21

22     MR. BROWN:  [inaudible]
       THE COURT:  Let me ask you, Mr. Brown, how much
23

24   longer do you think your case is going to last?  I'm just

25   trying to work out logistics and various other things.
```

```
 1        MR. BROWN:  If I may have literally 30 seconds, I can

 2   give you an answer if I could talk to my clients.
             THE COURT:  Okay.  Go ahead.
 3

 4        MR. BROWN:  Your Honor.
             THE COURT:  Go ahead.
 5

 6        MR. BROWN:  We have about an hour with Mr. Barron
        probably total.  He is here.  He has a -- Mr. Barron is an
 7

 8   employee of Fulton County.  [inaudible] Fulton County.  He

 9   has a childcare issue and we would be happy that he

10   [inaudible] in the morning and then starting [inaudible].

11        THE COURT:  Start in the morning.  You've got about
        another hour?
12

13        MR. BROWN:  Yes, Your Honor.
             THE COURT:  What does the defendants -- I'm looking
14

15   -- can we finish tomorrow?
             MALE:  [inaudible], Your Honor.  I don't think the
16

17   [inaudible].

18        THE COURT:  You want to take an oath on that?
             MALE:  What?
19

20        THE COURT:  Do you want to take an oath on that?
             MALE:  No, Your Honor.  I will not take an oath and I
21

22   will not [inaudible] in my place.
             I will not take an oath.  But [inaudible] some of my
23

24   preceding circumstances --

25        THE COURT:  Okay.  Tomorrow, so you know -- now you
```

```
 1  have to understand I'm a senior judge [inaudible]

 2  courtroom and therefore we won't have a courtroom
     [inaudible] in two or three weeks with luck.  But in the
 3
 4  meantime, they move us around.
         So tomorrow we're back in the Magistrate's court on
 5
 6  the fourth floor.  It's the old courtroom annex, 402.
     Okay.  Mr. Groban [ph] will be over there early to let you
 7
 8  in.  I always bring my -- I've got so much stuff I'll

 9  bring it.

10      MALE:  Is there anywhere that we can store some of

11  our stuff?  Because of the stuff I don't necessarily
     [inaudible].
12
13      THE COURT:  That's why I'm looking at all that but I
     don't have a choice.  They've got a mock trial in here
14
15  tomorrow.
         MALE:  No, I understand.  [inaudible]
16
17      THE COURT:  I don't know they were locked.  Okay.

18  There's a jury room in here that you could use, but you'd
     have to come real early to get in it and get it out.
19
20      MALE:  I'd be happy to.  I mean, that's --
     [inaudible] take home.
21
22      THE COURT:  Yeah.  The other place that might do it
     is the Bar office.  Dekalb [inaudible] County Bar office
23
24  is right over there.

25      MALE:  All right.
```

```
 1        THE COURT:  It's on this floor and they might let you

 2   keep some stuff in there.
          MALE:  I'll tell you, we'll [inaudible].
 3

 4        THE COURT:  Well, I mean they might let you --
     they've got two conference rooms over there.  They're
 5

 6   empty.  You go out here and turn left.  You know where it
     is Mr. [inaudible].
 7

 8        MALE:  Yes.  [inaudible]

 9        THE COURT:  Okay.  [inaudible] I'll see you in M-42

10   tomorrow.  And if you want to use the [inaudible] now he

11   gets here at the crack of dawn anyway.
          MALE:  Well, I mean, do you think that that's a safe
12

13   place?  If you get here at the crack of dawn, would it be
     okay [inaudible]?  I mean, is it inconveniencing you?
14

15   [inaudible]  It's just a couple of boxes.  [inaudible]
          MALE:  I get here by 7:30, 20 minutes to 8.
16

17        THE COURT:  We start at 9:00 tomorrow.

18        MALE:  [inaudible]
          THE COURT:  Okay.
19

20        MALE:  Thank you, Your Honor.
          THE COURT:  We'll see you tomorrow.
21

22     [Whereupon, the hearing was concluded at 4:53 p.m.]

23

24

25
```

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 445

```
 1                          CERTIFICATE

 2   STATE OF GEORGIA    ]
                         ] SS.
 3

 4   COUNTY OF DOUGLAS   ]

 5

 6          I, PRISCILLA GARCIA, A COURT REPORTER IN THE STATE OF
        GEORGIA, DO HEREBY STATE THAT THE FOREGOING IS A TRUE AND
 7

 8      ACCURATE TRANSCRIPT AS TAKEN DOWN BY ME AT THE TIME,

 9      PLACE, AND THE DATE HEREINBEFORE SET FORTH.

10          I DO FURTHER STATE THAT I AM NEITHER A RELATIVE NOR

11      EMPLOYEE NOR ATTORNEY NOR COUNSEL OF ANY OF THE PARTIES TO
        THIS ACTION, AND THAT I AM NEITHER A RELATIVE NOR EMPLOYEE
12

13      OF SUCH ATTORNEY OR COUNSEL, AND THAT I AM NOT FINANCIALLY
        INTERESTED IN THIS ACTION.
14

15          WITNESS MY HAND IN THE CITY OF DOUGLASVILLE, COUNTY
16

17      OF DOUGLAS, STATE OF GEORGIA, ON THIS 28th DAY OF JANUARY

18      2019.                  Priscilla Garcia
                         BY: _____
19

20                       PRISCILLA GARCIA, COURT REPORTER
                         NOTARY PUBLIC, STATE OF GEORGIA
21

22                       COMMISSION NO.: W-00379933
                         COMMISSION EXPIRES: 08/14/2022
23

24                       CERTIFICATE NO.: 5503-2677-8304-9216

25                       LICENSE EXPIRES: 04/01/2019
```

www.huseby.com              Huseby, Inc. Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 446

1

2

3        I, Chris Naaden, a transcriber, hereby declare

4    under penalty of perjury that to the best of my

5    ability the above 291 pages contain a full, true and

6    correct transcription of the tape-recording that I

7    received regarding the event listed on the caption on

8    page 1.

9

10       I further declare that I have no interest in the

11   event of the action.

12

13       January 28, 2019

14

15

16       Chris Naaden

17

18

19

20   (Transcript of Hearing Proceedings)

21

22

23

24

25

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019          Index: (C)..2010

**(**

**(C)**   85:24

**(C) (3)**   85:24

**(C) (4)**   85:25

**0**

**0.8**   102:11
  120:24

**1**

**1**   21:17,20
  44:1,4,10,
  11 45:20
  52:11,15
  54:6,8
  57:2,11
  99:4 101:2
  102:2,24
  103:11
  105:11,15
  107:25
  111:25
  112:1
  175:22,24
  249:4,20
  250:1
  287:25
  288:11

**1,012**   126:6

**1,828,566**
  26:17

**1.3**   107:6

**1.4**   101:13
  107:10

**1.5**   107:4

**1.7**   107:18

**1.8**   107:15

**10**   100:24
  136:11
  143:1
  273:20,22
  274:15,18

**10,000**
  175:22,24

**10-minute**
  72:11

**100**   21:13,
  17,20,22
  22:10
  32:17
  125:17
  152:25

**101**   205:22

**10:25**   60:8
  72:13

**10:37**   72:15

**11**   273:20

**117**   194:6

**11:00**   185:4

**11:41**   82:20
  129:25

**12**   273:20,
  22

**123,000**

26:10
  30:18
  184:11

**123,172**
  25:20

**13**   275:4

**137**   125:4,
  6,8,11,13

**14**   273:22
  274:17,18,
  20 275:11,
  15,17,24
  276:2

**144**   194:6,
  10

**15**   143:10
  160:2

**15,000**
  100:24

**159**   205:22
  212:10
  213:11

**159,024**
  103:1

**16**   241:10

**17**   8:2
  18:24
  244:8,9

**18**   81:4
  273:22
  274:22
  275:2,11,
  18,20,22
  276:1,4

281:22

**1:00**
  129:20,22
  130:1

**1st**   211:17

**2**

**2**   64:4
  65:25
  78:15 79:4
  101:22
  104:24
  254:18

**2.2**   107:13

**20**   21:15
  291:15

**200,000**   21:8

**200-**   254:22

**2000**   250:8

**2002**   102:2
  224:1
  239:22,24

**2006**   26:17
  160:15
  202:4

**2007**   62:2

**2008**   239:24

**2009**   36:11

**2010**   239:20
  254:22
  255:18
  273:20

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 448

**2011**   250:8
  251:1

**2013**   239:10

**2014**
  120:15,18,
  20 254:22
  255:25
  260:22
  261:2,20,
  22 274:22

**2016**   26:22
  147:11
  165:25
  227:15
  228:4,15
  241:6
  243:15
  252:11

**2017**   37:20
  148:4
  211:15
  227:15
  228:15,25
  244:4,15

**2018**   8:2
  25:20 27:9
  39:22
  40:2,11
  46:13,15,
  18 62:4
  81:24
  89:13
  90:15
  94:13
  98:18 99:6
  102:2,4,6

116:6
119:8
124:6
127:13,20
153:11,22
154:2,22
157:6,22
165:18
166:8
168:11
170:24
202:6
212:2,6,11
224:18
226:20
228:24
229:15
230:22
231:13
241:17
244:13
247:11
248:6,15
249:4,20
250:1
252:22
254:22
255:18
256:6,11,
25 260:22
261:2,22
262:1
263:13
275:4
277:9
281:22

**21-2-522**
  14:4

**22**   8:14
  11:11 13:1
  129:6

**24**   166:6

**24-14-22**
  24:6

**25**   260:2

**2:09**   187:6

**2:22**   187:8

**2:30**   185:6

---

**3**

**3**   98:2,6
  264:2

**3-**   212:2

**3.9**   105:10
  107:25

**30**   49:20
  51:1
  135:15
  289:1

**31,000-
something**
  103:2

**31,532**
  102:17,20

**31st**   211:15

**336,000**
  261:24

**38**   126:6

**3:30**   242:25

**3:37**   243:1

---

**4**

**4**   22:1
  101:11
  105:18
  111:25
  112:1,15
  132:17
  251:2
  264:2

**4.5**   105:8
  107:24,25

**40-plus**
  251:13

**402**   290:6

**410**   126:20
  127:1

**45-plus**
  251:11

**4:53**   291:22

---

**5**

**5**   22:1
  266:18

**5,191,182**
  275:17

**50**   96:20

**50.03**   274:22

**5th**   133:17,
  18 135:25
  208:11

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 449

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019      Index: 6..accounted

**6**

**6**   25:20
266:18

**6,400,200**
275:18

**6,428,584**
275:18

**61.34**   275:6

**6th**   62:24,
25 63:1,22
83:2
165:18
281:18

**7**

**7**   168:4,8,
15 246:15
273:6

**702(b)**   42:10
154:18

**7:30**   291:15

**7th**   62:22

**8**

**8**   21:15
102:15
143:1
243:8,9,
11,17,24
245:11,17
246:15
251:2

273:6
291:15

**8,000**   117:17

**9**

**9**   45:13
136:17
273:6

**9.2**   135:2,
6,11

**9.2(c)**
135:15

**98,000**   27:6
261:20

**99**   21:11
22:9

**9:00**   291:17

**9:02**   8:2

**9th**   136:24

**A**

**a.m.**   8:2
60:8
72:13,15
79:13
82:20
129:25

**aberrant**
20:25 21:2

**aberration**
173:25

**ability**

49:22
242:8
279:4

**abnormal**
205:22

**Abrams**   26:18
27:22 28:1
75:4,13
118:9
201:6

**Abrams'**
118:1

**abridges**
151:18

**absentee**
19:13
21:20
105:10
107:8,17
128:2
216:1

**absolute**
131:15

**absolutely**
45:9 61:10
230:8
286:11

**abstract**
174:6

**abundantly**
30:9 92:11

**ac-**   67:17

**academic**
141:6

144:1
156:18
160:10

**Academies**
168:9

**Academy**
156:22
160:22
168:18,20
170:2

**accelerate**
83:1

**accelerated**
135:22

**accept**   131:9
192:4,6

**access**   144:9
182:4
183:6
187:20
212:15
215:13
217:6
218:2
220:13
223:22
252:2
270:15
279:4

**accessed**
183:4,6

**accessibility**
240:6

**accounted**
267:2

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 450

accounts
157:11

accuracy
24:17
109:11
217:9
218:24
222:10
268:2

accurate
28:22 99:9
161:6
222:11

accurately
29:1
254:24

act  18:20
44:15
58:22
230:25

actions
259:10

active
218:20
266:9

activist
85:2

activities
81:4

activity
148:13

actual  33:15
55:13
64:13

85:11
92:13
117:4
152:17
159:25
170:18
189:18
203:11,13
204:13
207:15
216:4
219:10
225:22
227:4,6
237:11
247:11

add  27:20
97:9 173:8
205:2
271:18
283:9,17
285:11

added  27:13

adding
150:13

addition
18:18 25:6
28:2 30:20
42:13
141:8
147:4
155:1
260:18
265:18

additional
14:22

18:20
38:20
184:4

address  20:6
93:13 94:2
270:15

addressing
96:10
277:20

adherence
253:13

adjacent
166:2

adjusted
241:11
253:2

adjustment
253:2

administer
90:9

administration
39:6 90:8
91:25
153:2
172:20
277:9

admissibility
92:15
273:17

admissible
132:4
169:15
192:18
203:2

admission
70:8,9
91:18

admit  244:4,
13 245:8,
10

admitted
44:25 46:8
54:8 168:2
191:24
246:24
264:4
266:20
288:13

admonished
191:17

adopt  155:8

advance
213:2
215:24
218:22

advanced
105:9,11
107:4,13

adverse
181:10
259:17

advice  84:15
85:18

advises
93:15

affect
182:20
217:18

www.huseby.com           Huseby, Inc.  Regional Centers           800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 451

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019    Index: affected..Amico

226:4

**affected**
30:2,4
228:4
231:18

**affidavit**
97:24 98:2
103:11,15

**affidavits**
178:22

**affiliation**
177:20

**affirmative**
30:13
143:25

**afraid** 110:2
202:1

**afternoon**
136:20
150:22

**AG's** 128:13

**age** 87:13

**agencies**
156:25
162:4

**agents**
157:17

**aggravated**
27:24

**aging** 159:20

**agree** 11:6
70:17
83:6,9

127:11
133:2
186:1
220:6

**agreement**
29:15

**agriculture**
117:9
123:1
281:25

**ahead** 13:13
20:15,20
38:17
41:20 45:9
54:9 58:17
68:2 69:13
71:11,13
81:11
89:17
112:8,24
129:15
132:6
143:2
164:20
182:2,15
186:2
191:6
234:4
236:15
281:20
289:2,4

**ahistorical**
27:4

**air** 249:6,
10

**AJC** 13:2,4,

6

**akin** 270:18

**Alabama**
151:20
249:15

**alarmed**
73:25

**Alaska**
187:22

**albeit**
170:10

**Aletha** 81:13

**all-paper**
151:8

**allegation**
48:15
115:10
221:4
238:11

**allegations**
14:11
15:20,22
28:9 37:4
162:18,20

**allege** 14:4

**alleged**
14:15
225:9
244:15

**allegiance**
139:8

**Allen** 63:1,4

**allowed**

68:18
123:25
180:11
184:6
226:4,11

**alter** 183:2,
22

**altered**
183:8,9

**altering**
183:15

**alternative**
22:15
175:4
183:15

**amazing**
81:18

**Amazon** 64:13

**ambiguity**
191:18

**AME** 63:1,4,
20 65:15
72:24
195:8

**America**
58:22

**American**
81:13

**Amico** 23:8
26:13,17
27:2,22,25
28:4 80:24
116:2,4
117:11,17

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 452

123:8,13
199:24
200:11
201:15,22
202:10,15
264:15
269:2,8
283:18

**Amico's** 30:8
200:2
235:2

**amount** 27:11
35:13
102:20
152:24
173:22

**analogy**
221:4

**analyses**
127:18
158:6

**analysis**
13:18 90:4
95:2 98:18
104:13
117:4
149:6
177:2
180:4,6
190:4,6
192:24
193:15,18
195:2,4,
10,13,17,
20 196:4,
6,10

197:22,25
199:22
202:22
229:10
232:24
233:2
249:15
260:18
280:18
283:11

**analyst**
43:20
45:13

**analyze**
37:20
86:15 99:1
117:4
261:8

**analyzed**
127:25

**analyzing**
88:2
266:22

**angle** 13:13

**annex** 290:6

**anomalies**
186:6
207:9
271:2

**anomalous**
205:18

**anomaly**
22:11
94:25

answering
33:24

**answers**
121:1
204:6

**anticipated**
68:20

**anticipating**
45:6,8

**anticipation**
53:15

**apologies**
45:6,10

**apologize**
82:6 93:9
134:18
163:20
197:11
249:2

**app** 63:11

**apparent**
170:22
186:6

**apparently**
223:24

**appeared**
73:25
242:4
264:15
265:20
281:17

**appearing**
175:24
224:15

281:15

**appears**
65:22
168:17
244:2,6

**applicable**
155:18

**application**
119:2
142:6
148:13

**applications**
142:11

**applied** 25:6
102:15

**apply** 17:4

**appointed**
77:24

**approach**
11:25

**approached**
70:4 86:11

**approval**
143:20

**approximately**
27:6
177:13

**architectural**
159:25

**architecture**
164:25

**archive**
183:11

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 453

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019 Index: archives..attracting

284:15,17,
22 285:6

**archives**
285:2

**area** 71:17,
18 74:4
92:18
104:4
224:15
237:15
271:6

**areas** 87:22
94:2

**argue** 108:15
245:6
286:2

**arguing**
198:20
209:9

**argument**
13:22 24:1
33:11 92:8
151:15
198:20

**arguments**
14:22

**arises** 24:13

**arising**
241:2

**arithmetic**
22:25

**arm** 223:9

**arms** 74:2

**arrangement**
241:9

**artful**
226:25

**Artfully**
226:24

**article**
141:4

**articles**
115:8
141:2

**asks** 68:18

**aspects**
42:22

**Aspen** 35:4

**assessing**
195:13

**assessment**
166:17

**assist** 42:10
68:11,15,
18

**assistance**
10:15
42:18

**assisted**
149:10

**assisting**
59:13
70:22

**assistive**
54:24
55:6,9

56:6,9,11

**assume** 44:20
82:10
177:18
220:8
246:13

**assumes**
176:22
232:13

**assuming**
176:2
220:22
232:20
233:22

**assumption**
102:18

**assurance**
17:24

**assure** 58:11

**assuring**
262:15

**Atlanta**
34:18 63:4

**atmosphere**
246:22

**attacked**
245:20

**attempt** 15:6
190:24

**attempted**
49:22
168:22

**attempting**

49:17

**attempts**
191:13

**attend**
139:13

**attended**
25:8

**attention**
24:6
102:24
104:11
108:2
120:13
121:6
146:18
193:25
238:17
246:11
251:2
285:15

**attorney**
57:20
61:17,20
105:24
106:10,15
107:11
116:25
118:2
126:13,22
281:25

**attorney's**
53:2

**attracted**
99:18

**attracting**

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 454

220:13

**audio**   55:11,
  20

**audit**   35:24
  36:13,17
  149:13
  206:4,8,9
  207:9,15

**audited**
  35:22

**auditing**
  36:20
  149:9
  207:10

**audits**   36:8,
  10,15
  140:25
  141:11
  149:11
  158:8

**author**
  246:20

**authorized**
  25:13
  40:17

**availability**
  29:22

**avenue**
  176:24

**average**
  102:9
  283:11

**aware**   24:24
  117:8,18

118:2,8,
  15,18
  119:11
  128:13
  163:4
  189:8,15,
  17 197:4
  199:18
  201:13,20
  203:11
  218:22
  219:22
  220:1
  226:18
  240:22
  242:15
  259:11,22
  260:2,4,8,
  11 261:10

---

**B**

---

**back**   8:12
  17:11,25
  20:13
  34:20,22
  49:6 59:2,
  15 66:11
  68:15 69:6
  72:6,8,13
  75:6,20
  76:18 79:9
  102:24
  112:18
  123:20,22,
  24 124:1,4
  125:18
  129:20,22,

25 130:18,
  20 133:15
  157:15
  167:25
  174:4
  175:1
  179:15,18
  180:20
  187:6
  188:4
  198:4
  214:2
  215:6
  217:6
  219:4
  222:11
  225:8
  228:11
  231:2
  234:10
  236:13
  239:11,13
  242:22,25
  245:4
  247:13
  252:4
  255:18
  264:22
  265:6
  267:22
  290:4

**background**
  34:8 84:18
  94:9
  145:13,17
  177:25

**bad**   22:25

161:13
  204:15

**Bailey's**
  118:2

**Baines**   63:15

**balancing**
  232:6

**ballot**   19:13
  22:1
  27:13,15
  29:25 30:2
  37:10 38:2
  41:13
  55:11 68:6
  70:22
  71:20 74:4
  77:2 90:4,
  6 91:25
  94:20
  122:20,22
  123:18
  124:4
  151:9,10
  179:11
  189:11
  194:13
  200:18,22
  202:4
  207:11
  218:11
  235:11
  236:20
  238:17,18
  239:4,8,
  10,11,13,
  15,18,22,
  24 240:1,

4,6,15,18
246:2
252:2,6,8,
11,20
253:6,8,
11,15
254:17,24
255:18
256:11,18
257:2,10
258:6,8,9,
13,15,17,
20 262:8,
17 263:25
264:15,20,
22,24
265:4,8
268:8
276:11,13
278:15
279:4,6
280:20
281:6,18,
22 282:4
283:15
287:17,22
288:2,6

**ballot-marking**
280:24

**ballots**
21:22
27:4,13,
17,18 28:2
30:4 33:11
37:2,13
38:13 43:4
55:11 67:2

149:15
167:6
174:11
188:22
189:1
194:15,18
199:11,18,
20 206:17,
22 207:11
214:15,20,
24 216:2
218:6
235:15
238:20
241:18
252:15
253:17
254:4,22
256:11
257:22
264:25
265:20
267:6
277:1,4
278:22
279:4
281:13
282:2

**ballots'**
214:18

**bar**  103:18
290:22

**Barnes**  147:9
157:18
164:4,6
209:25
210:10,15,

20 228:15,
22 230:17
243:4,24
245:15,18
251:11
252:4
254:13,15
276:20
279:22
282:10
286:18
287:11,13

**Barnhard**
176:25
177:1

**Barron**
16:18,20
147:10
157:18
164:4
289:6

**Barrow**
118:13
201:10

**Barrow's**
118:1

**bars**  105:4,
15

**base**
263:11,13,
18,20,22
264:10,11

**based**  14:2
17:11 34:9
37:4,15

38:1 43:15
69:18
87:15
94:1,4
109:22
119:15
128:1
155:10
165:18
166:22
169:8,11
173:15
176:4
177:20
179:20
186:17,18
198:11
206:6
214:2
219:18
244:11
269:24
276:8
282:13

**baseline**
124:13

**basically**
52:20
154:13
261:8
283:10

**basis**  61:20
147:2
163:15
171:2
172:6
174:13,17

www.huseby.com          Husebу, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 456

199:17
205:20

**bear** 29:6
171:20
284:4

**beer** 220:13

**began** 35:9
37:20
248:24,25

**begin** 35:15
55:10
160:8

**beginning**
26:15

**begins**
215:20

**behalf** 12:22
14:24
16:17
25:18

**behavior**
194:20,22
199:1

**belief**
188:20
198:13

**believes**
109:24

**Ben** 235:6
269:6

**bench** 11:25
16:6

**bending**

136:18

**Benjamin**
65:20

**Berkeley**
132:18

**Bernhard**
134:17
137:10,18,
24 138:4,
15 150:2,
15,18,22
153:20
154:17
155:2,4
156:8,11
160:10
165:15
171:22
172:18
176:25
182:18
187:13,15
188:15,18
192:22
193:13
194:13
196:22
204:2,4
206:11

**Bibb** 229:2

**big** 49:17

**bind** 70:15

**bit** 21:11
25:6 84:18
93:22
115:17

121:2
139:8
146:2
147:25
150:8
157:15
167:25
173:6
174:4
175:2
183:6,20
189:24
204:22
207:10
231:2
245:4

**black** 25:2
130:20

**Blackwell**
12:18

**blinks** 283:4

**blocks** 64:15

**board** 9:13
28:18,24,
25 36:17
38:18 39:8
77:18
89:18
117:10
150:22
229:20
240:9

**boards** 36:20

**boat** 133:11

**Boland**

268:17

**books** 64:11
133:13

**Boone** 63:4

**boot** 142:4,
8,9 168:10
182:25
236:25

**booting**
183:20

**borderline**
93:8

**bother**
106:20

**bottom** 66:22
67:22
160:18
257:2,6,8,
11

**Boulevard**
63:4

**box** 13:11
25:2 50:6

**boxes** 291:15

**brand** 250:1,
2,4

**brand-new**
206:15

**breach** 26:11
188:8

**break** 72:10,
11 83:11
128:1

www.huseby.com       Huseby, Inc.  Regional Centers       800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 457

129:18
187:1
242:18

**breakdown**
73:13
226:10

**breaks**   87:10

**bridge**   8:13

**briefed**
183:24

**briefly**
14:25
51:22
77:20
113:10
127:6
128:8
131:24
138:20
151:13

**briefs**   20:25
111:15
181:11

**Brill**   83:13
84:1,6,11
86:8  87:4
89:11,15,
18,24
91:4,24
93:2,6,11
96:11,22
97:2,6,24
98:17
100:2,8
104:6
107:2

108:6,11,
22  110:8
111:1
113:13,15
114:6
120:4
121:10
127:9,11
128:11

**Brill's**
90:24
91:18  97:6
103:25

**brimstone**
270:4

**bring**   10:2
24:20
29:20
111:13
136:13
197:18
217:10
290:8,9

**bringing**
41:6

**broad**   231:4

**broader**
227:1

**brought**   15:8
17:11,13,
25  193:25
202:24

**Broward**
256:20,22,
25  257:10,

13,15
276:9,24,
25  277:2

**Brown**   9:13,
15,18,20,
22,24
10:1,4,6,
9,11,18,22
11:15,18
12:4,6,13
13:6,8
15:15
16:13,15,
25  17:2,
15,18
18:4,11,
13,18,22
19:2,6
20:8,11,
15,18,20
31:2,6,11,
22  32:24
33:1,4,20,
22  34:4,6
36:2,6
38:8  39:13
42:18,20
43:8,13,22
44:1,9
45:11,20
46:1,2,6,
9,10  48:2,
4,6,11,15,
18  49:2,6
50:9,11
51:8  54:4
57:2,6,9,
20,22

58:1,8,11,
13,18
59:2,6,8,
22  60:1,4,
10,15
61:4,22
63:25
64:6,10,
18,20,24,
25  65:24
66:8
69:15,22,
24  70:8,18
71:11,13
72:1,11,22
74:13,18,
20  79:6,
15,20  80:6
81:20
82:2,11,22
83:8,10,
11,13,18,
22  84:9
89:11  90:2
92:8,24
93:4,8
94:1,11,13
96:6,11,20
97:4,20,22
98:2,9,11,
15  100:2,
4,6  102:22
103:15,18
104:6
106:11,22,
25  108:2,
4,6,13,15,
20  109:6,

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 458

| | | | |
|---|---|---|---|
| 9,18,20 | 156:4,10 | 203:22,24 | 258:4 |
| 110:4,6, | 158:20,24 | 204:4 | 259:13,20 |
| 13,17,20, | 159:1 | 205:4,6,15 | 261:4,10 |
| 24,25 | 162:22,25 | 207:2,6,13 | 262:10 |
| 111:4,6,22 | 163:2,18 | 208:6,10, | 264:4 |
| 112:6,10, | 164:13,15, | 13,15,17, | 266:20 |
| 15,20,22, | 18,22 | 20,22,25 | 267:4 |
| 25 113:8 | 165:11,15 | 209:1,4,8, | 273:6,8,11 |
| 116:20 | 168:4 | 13,15,20, | 274:11 |
| 120:6 | 169:2,13, | 24 210:2, | 275:9 |
| 121:13,15, | 18,20,24 | 18,22,24 | 277:6,11 |
| 22 122:2,4 | 170:1,9, | 220:24 | 279:15,20, |
| 124:2,25 | 15,17 | 221:1,8 | 25 282:9 |
| 125:20,22, | 171:13,20 | 225:18,20, | 284:4,13 |
| 24 127:24 | 172:25 | 25 226:1, | 286:2,4, |
| 128:20,22 | 173:1,17 | 17 227:2,8 | 13,20,22 |
| 129:1,15, | 174:18 | 228:13,20 | 287:13 |
| 22 130:10, | 175:1,9, | 230:18,20 | 288:11,15, |
| 24 131:2, | 11,13 | 231:8,10 | 17,20,22 |
| 24 132:1, | 176:17 | 232:17,22 | 289:1,4,6, |
| 6,11,15 | 177:2 | 234:2 | 13 |
| 134:2,9, | 181:9,18, | 236:2,4,6, | |
| 15,18,22 | 22,24 | 8,15,17 | **Bryan** 14:24 |
| 135:18 | 182:1,4,9, | 237:13,22 | 29:15 |
| 137:2,6,9, | 13,17,18 | 238:1,4,9, | 38:18 |
| 11 138:1, | 184:18,20 | 11,15 | 77:18 |
| 15 139:13 | 185:1,11, | 242:17,20, | 89:18 |
| 140:15 | 13,15 | 22 243:6, | 150:22 |
| 145:4,9, | 186:1,4, | 18,22 | |
| 11,22 | 15,20 | 244:4,9, | **build** 85:18 |
| 146:4,6, | 187:1,4,15 | 15,18,20, | **building** |
| 11,15,18, | 188:11 | 24 245:4, | 236:11 |
| 20 150:1, | 190:18,22 | 8,11,15 | 240:2,22, |
| 11,25 | 191:8,10, | 247:13 | 24 |
| 151:25 | 20 192:1, | 248:8,18 | |
| 153:13,15 | 10 195:18, | 251:6,9,11 | **builds** |
| 154:10 | 20 197:6 | 254:15 | 221:22 |
| 155:10 | 198:11 | 255:4 | **built** 160:1 |
| | | | 203:17 |

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 459

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019 Index: bunch..candidate

221:22
240:25
241:8,9

**bunch** 93:24
232:20

**burden** 14:2
29:4,18
30:11,20

**burned** 215:2

**Burwell** 11:8
12:18,20,
22 13:13,
15 15:1
16:17,20,
24 28:18
54:13
56:20
58:24
59:10
70:13
78:15
82:15
91:15,17
119:25
135:1,6,13
203:20,22
279:17
288:13,15

**business**
34:13,15
46:2
85:11,13,
20

**button**
277:13
281:15

283:8
287:15,22
288:2,6

**bypassed**
258:4

—————————

**C**
—————————

**C-L-E-R-C**
61:10

**calculate**
102:9

**calculated**
100:10
233:2,8
234:13
265:24

**calculating**
102:2

**calculation**
100:9
101:8,9
102:1

**calendar**
8:10

**calibrate**
217:11

**calibrated**
223:24

**calibration**
217:24
224:10
277:15,17,
18,24
278:2,4

282:17,20,
25 283:4

**California**
103:18,22
104:1,8,9
109:4
160:18
187:22

**call** 24:6
27:18 31:2
60:10
79:15
83:4,13
86:18
99:20
130:15
132:18
134:10,15
136:22
137:9
148:22
184:1
209:24
241:4

**called** 15:18
18:6 31:17
35:20
36:15
55:11
60:24
67:11
68:15
73:18
77:25 80:1
84:2,13
121:24
137:20

166:4
182:11
210:11
212:20

**calls** 59:1
121:25
133:22
197:6
221:6
285:24

**campaign**
27:25 28:4
88:22
91:8,10
114:11,15
115:6
116:1
189:4

**campaigns**
85:2,20
86:4 122:6

**cancelled**
49:15

**cancelling**
50:20

**candidacy**
28:8 30:9

**candidate**
30:6 86:10
87:15 89:1
91:10
114:18
115:4
116:22
117:22

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 460

118:6,9,13
123:11
125:2,13
138:6,11
177:11,13
201:17
204:9,10,
11 219:24,
25 220:17
235:2
240:9,11,
13,18,20
272:6
278:25

**candidate's**
278:9

**candidates**
26:15,18,
20 28:4
36:18
39:11
86:18
113:2
117:9,11
122:24
123:6,18
199:10,13
200:4
201:18,24
202:9
204:11
214:1,13
218:11
219:20,22
221:22
231:20
239:2

240:11
241:2,10,
11,13,25
242:2
252:9
259:4
272:13,17
279:2,6

**cane**   68:6

**canvas**
36:15,20
104:22

**capable**
42:17

**capacity**
191:4
261:8,11

**capital**
61:10

**capitol**
33:13
145:2

**caps**   240:10

**card**   189:11
216:18,20,
22 217:2,
4,8 218:2
221:24,25
222:1,6
223:22
233:6
234:13,15
269:11

**card's**
217:20

**cards**   212:24
213:1,2
215:25
216:11,15,
22 222:2
266:11,13
267:1,25

**care**   132:2
167:18
208:11

**career**
34:13,15

**careful**
237:22
238:1

**carefully**
164:6

**carelessness**
166:13

**Carolina**
34:11
36:11
41:11
260:11

**carry**   29:10
30:20

**cas**   25:1

**case**   9:11,
22 10:15
12:2,6,11
13:18,24
14:4 15:2,
6,18,24
17:6,11
18:24,25

19:8,10,
11,20,22
22:13
23:22 24:2
25:1,22
26:11
27:17 29:6
30:17 33:9
34:4 41:24
91:18,20,
22 92:4
93:18
110:10
124:15
126:15
131:8,13
132:4
133:15
136:1,11,
18 138:9
143:13,15,
24 145:6,
24 146:6,
20 151:11,
13,22
152:1
154:17
155:2,6
156:13
161:22
164:15
169:22
176:9,20
182:15
185:6
197:9
198:15
200:18

208:11
225:13
237:18
253:18
255:15
265:20
266:4
272:22
288:24

cases   15:1
26:2
133:24
157:18

cast   23:13
70:22
73:11 74:4
75:4,15,20
76:2,8,24
86:17
94:20
100:11
101:11,13,
15 104:15,
17 109:11,
24 116:4
119:8
124:13,18
125:2
126:8
127:2
161:18
179:17
203:13
218:8
268:17
273:1
287:17,22

288:2,6

casual
230:13

categories
85:22
128:2

caught
172:11

caused   22:17
29:22 33:6
121:4
230:10
231:13

caution   24:1
237:13

cc'd   246:15

CD   215:2,4,
6,8,13

ceased
211:15

census   87:18

center
211:2,4
212:2,4,6
244:2
245:20
246:2
249:11
251:22

central
167:11

centralized
277:2

CEO   34:17

certification
229:8
280:4

certified
29:20 46:1
229:4
237:6,8
250:6
271:4,18
272:13,15,
17 273:17
282:13

CES   211:9

chain   213:6

chair   22:13

chairs   68:22

challenge
58:6

challenges
135:25
252:9

challenging
26:2

chance   13:2
22:4,6
33:2
106:20,22
111:24
131:13
136:25
175:17,22,
24

change   25:4

114:15,22
179:15
188:9
241:4
248:20
249:6
251:6

changed
249:20
250:22
251:4

character
93:18

characterize
190:24

charge   24:9,
13,20
128:24

charged
28:18

charitable
32:8

Charles
118:2

Charlotte
34:10

chart
103:11,13
104:24

check   68:6
100:22
102:20
271:10

checked

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 462

269:4
271:13

**checking**
265:18

**Chicago**
81:15

**childcare**
289:9

**chip** 284:1,
2,6 286:4,
10

**chips** 235:4

**choice**
179:11
290:13

**choose**
114:24
252:20

**chose** 27:25

**chosen** 19:18
25:25
136:8

**Chris** 83:13
86:8

**Christopher**
84:1,6,11
89:24 91:4
93:2
113:13
114:6
120:4
127:9
128:11

**Church** 63:2
72:24
195:8

**circle**
130:18

**circumstance**
230:4

**circumstances**
15:4 56:15
133:2
241:2
289:24

**cite** 143:24

**cited** 13:17
15:2
143:20
175:20

**citing** 179:4

**citizen**
35:11 62:9

**citizens**
28:20

**civics** 81:13

**civil** 15:22
18:20

**claim** 22:22
24:9,13
29:22 42:2
116:20

**claimed**
116:24

**claims** 29:6
30:15,24

151:20
206:22

**clarification**
16:25 17:4
237:15

**clarify**
17:22
22:20
66:18
252:6

**Clarke**
189:25
192:11
197:1,4,8,
13

**class** 144:18

**Clay** 243:11

**clean** 77:6

**clear** 12:6
15:18 19:4
23:15
25:22 26:6
29:6 30:9
37:11
92:11
106:11
169:10
176:20
195:15
209:18

**clears**
218:18

**clerk** 12:1

**client** 9:20

17:4
134:18

**clients**
9:15,18
85:18,22,
24 88:15
93:15 96:1
289:2

**clock** 130:18

**close** 29:11
70:20
275:13
280:4

**closed** 69:1
70:4 212:4
270:10,11,
15

**closely**
146:18

**closest**
213:24

**closing**
28:4,6
68:24
114:11
115:6
116:1

**Cloudplayer**
142:2

**co-defendants**
15:13

**Coalition**
10:13
32:2,4,6

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 463

33:6 36:24
43:20,22
44:15 52:4
99:2

Coalition's
33:22

COBB   8:1

code   15:6
42:15
157:1,4
178:9
204:15
282:22

code-level
237:11

coded   207:22

codes   179:6

coding
207:24
220:15
222:11

colleagues'
230:22

collect
141:18

collected
214:4
234:6
235:11,15
266:15
267:2
271:9
272:6,18

collecting

223:4

collection
223:10

collects
141:9
247:11

college
84:20
138:20

collegial
180:20

Colorado
35:6
36:11,15
149:11
187:22

column   99:13
101:4
239:13
257:2,8,9,
20 265:9

columns
99:13
101:25
239:9,11
265:6

combinational
214:20

comment
131:11

commission
113:18
117:10,15,
17 123:1

commissioner
94:20
117:11
123:2
281:25
282:1

committees
86:1,2

common
121:17
260:13

commonsense
24:15

communicating
270:20

communication
251:22

communications
244:2

community
162:6,13
163:6

company
84:13
115:9
142:2

company's
45:13

compare
95:20
104:13
126:11,22

compared
126:13

233:6

comparing
67:4
100:10,11

comparison
99:24
151:18
174:6

compel
18:15,17
180:24
209:13,20

compelled
25:13

compensation
52:6

compilation
40:15

complainant
224:2

complaint
14:11
15:22 74:8
223:6
264:18

complaints
74:11 77:9
223:4,8,
15,20,22
224:17,18,
20,22,24
277:8,9,10

complete
218:4

www.huseby.com          Husby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 464

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019   Index: completed..connected

completed
 214:15

completely
 177:22
 181:22

completeness
 214:9,24

complexity
 136:1

compliance
 136:22

complicated
 253:8

comply   129:6

component
 75:11

components
 144:13
 227:20
 231:15

comport   16:6

compound
 153:13

compounds
 165:8

compromise
 145:8
 245:15

compromised
 145:2
 166:6
 246:8

computer

39:15
135:8
138:6,25
139:4,18
161:22
162:6,11,
13 163:4
215:15
216:8
232:1,6
233:4
234:15
267:18
270:22
283:8

computers
 142:6
 270:20

concern
 10:20 89:4
 231:22
 257:24
 258:1
 262:2
 276:8
 281:6,8,9

concerned
 19:4 35:9
 73:9
 256:18
 269:8

concerns
 89:2
 184:13
 262:4
 269:2

conclude
 25:13

concluded
 60:6 79:11
 82:18
 291:22

conclusion
 15:8 25:11
 38:6 59:2
 161:1
 166:20
 197:6

conclusions
 109:10
 143:22

conduct
 36:17 38:2
 43:2
 114:11,15
 148:9
 183:17
 186:22
 196:10
 235:2

conducted
 140:20
 177:2
 191:22
 200:6

conducting
 37:17

conference
 135:4
 184:1
 291:4

conferencing
 135:2

confidentialit
y   11:15

configuration
 199:13,15,
 18 239:17,
 18 240:2
 242:4
 264:22

configured
 27:13
 199:13

configuring
 215:20

confirm   60:1

confusing
 258:20,24

confusion
 27:11,15,
 20 195:20
 241:15
 262:2
 276:11
 280:25

Congressman
 118:18

connect
 145:10
 282:22

connected
 166:1
 263:18
 270:11
 284:2

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 465

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019     Index: connection..correct

connection
   34:11
   142:13
   156:13
   270:11

connotation
   148:8

consensus
   160:25
   162:13
   163:1

considerable
   35:13

considered
   184:6
   200:10
   201:6
   230:9

consistent
   21:15
   53:15
   106:8
   122:18

Constitution
   131:20

constitutional
   15:2 30:15
   151:18
   206:22
   256:2

constructed
   212:10,11
   214:4,6
   246:4

constructing

   248:25

constructs
   213:22
   267:18

consultant
   114:15
   119:17
   141:15

consulting
   85:2

consumer
   85:17

contact
   87:20
   215:6

contained
   232:4
   234:15
   284:18

contemporaneou
s  63:6 66:2

content
   222:4

contents
   23:11
   98:10,17

contest
   14:20 15:2
   19:10
   21:6,15
   30:18
   57:24,25
   59:17

contested

   80:24 83:2
   264:11

contests
   124:11

context
   81:11
   115:15,20
   122:6
   135:20

continuance
   15:4
   112:17,20

CONTINUATION
   72:18
   187:11
   243:2

continue
   139:20

continued
   68:13
   233:15
   250:13

contract
   61:20
   246:4

contrary
   163:4
   190:15

contribute
   166:17

contributions
   53:6

control   15:2

controls
   285:11

convenient
   129:17

conversation
   11:13
   69:15,17,
   18

conversations
   181:6

convicted
   22:13

copied   64:15

copies   137:6
   214:22
   274:11

copy   44:6
   45:11
   57:4,6
   64:18
   98:11
   103:15
   137:6
   183:20
   245:13
   250:6
   252:22
   267:18,22,
   25

core   32:11,
   13 85:13

corporation
   28:10

correct   18:9

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 466

19:25
34:20
39:20,22
40:1,18,
20,22
41:4,13
45:11 47:4
50:20,25
53:1,8,15,
20 61:11
65:2,13,20
66:4 67:13
75:4,22
76:2,25
77:4 78:4
82:11 88:2
89:4,9
90:13,17,
18 91:9
95:10,13
98:20,24,
25 99:15,
18 100:18
101:20
103:2,4,6,
20 105:17,
20 106:17
110:15
113:22
114:17,20,
22 115:1,
11,15,22
116:1,2,6,
8,11,18
118:11,22
119:20
125:8
126:18

128:15,18
149:17
151:6,9,10
152:20,22
153:25
154:2,4
159:8,9
161:15
174:10
178:15
180:13
183:17,18
189:8,11,
13,15
190:1
192:25
193:1,15,
17 194:6,
11,15,17
195:11
196:2,4,6,
13,17,18
197:2,15,
24 198:4
199:8,20
200:8,11,
13 201:25
202:4,11,
18 204:20
206:6
207:2,4
212:17
213:13,18
216:10
226:4
227:11
233:1,11,
20 237:13

242:6
243:25
250:24
254:8
255:22,24
256:4,8,
15,17,18,
20,22
259:25
260:1
262:9,20,
22,25
263:1,2,4
265:15,18,
24,25
266:2
268:18,24,
25 269:9,
10,13,18
270:25
271:1,13,
15 272:13,
17 274:2,6
275:24,25
276:2,6,13
277:4
278:10,11
279:11
280:17
281:13
282:6
283:9,17,
18,22
285:13
286:24,25
287:2,4,6,
18 288:6,8

**corrected**
247:20

**correctly**
15:1 47:18
127:17
194:4
199:4
207:22
233:18
264:13
267:11
272:10

**correctness**
167:18
214:25

**correlation**
173:22

**cost** 53:2,4

**coughed**
102:18

**counsel**
15:1,20
64:1,11
98:11
151:25
194:2

**count** 26:20,
22 27:2
67:6
201:22

**counted**
203:15
272:6

**counties**
14:13

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 467

57:13 95:4
125:9
205:22,25
212:11,13
213:11,15,
18 217:9
229:2
231:22,25
246:1,6
249:24
251:20
252:1,15,
18,20
253:20,22
257:10,15,
17,18
262:24
264:15
271:6,13,
22 272:20
277:20
278:22
282:13

counting
207:11
268:18

country
141:10
163:10

counts   26:13

county   8:1
9:13 11:20
12:2,15,22
14:10,13,
25 15:20
16:17,24
28:18,20,

22 29:1,6,
15 38:18
70:10,11,
13,15
80:17,20
82:15
89:18
90:20
147:8
150:22
155:9
180:9
189:25
192:11
197:1,4,8,
13 211:8
212:9,13
213:9
214:2,4,22
215:1,2,
11,15,20
216:6
223:11
229:2
232:8
235:8
252:11,13,
20 253:9,
24 254:4
256:20,24,
25 257:10,
13,15,20
262:20
263:13
266:10
267:17,20,
22 269:4,6
271:10,20,

25 276:9,
25 278:4
289:8
290:22

county's
11:22
13:15
213:9
215:15
216:25

county-by-
county
199:17

county-level
104:22

couple   22:20
38:20 67:6
89:20 91:2
164:6
291:15

court   8:6,8,
9,12,18,
20,22,24
9:2,4,8,
17,18,20,
22,25
10:2,4,8,
10,17,18
11:1,4,6,
9,11,17,
20,24
12:1,6,11,
13,18,20,
25 13:2,6,
11,13,17,
22 14:2,

13,22
15:11,15
16:4,11,
13,15,20,
22 17:1,
10,15,20
18:4,9,11,
17,20,22
19:4,17
20:6,9,11,
15,17,18
24:20
25:13,15
28:17
29:2,13,17
30:9 31:2,
4 32:22,25
33:2,18,
20,25
36:4,22
37:1
38:17,22
39:4
41:17,20
42:10,18,
25 44:8,
20,24
45:2,4,8,
18,22
46:1,4,6
48:2,4,13,
17,25
50:10
51:13,20
54:2,8
57:6,13,
20,22
58:4,9,13,

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 468

| | | | |
|---|---|---|---|
| 17 59:4, | 6,8,17,20, | 153:15,18 | 193:6,8,10 |
| 18,25 | 22 112:1, | 154:6,9, | 195:22 |
| 60:4,11 | 4,6,13,18, | 11,24 | 197:10 |
| 61:9,18 | 22,24 | 155:4,25 | 198:20 |
| 63:2 64:22 | 116:25 | 158:20 | 202:25 |
| 66:6 | 119:2,24 | 162:22 | 203:2,6, |
| 69:13,20, | 120:2 | 163:15 | 20,22 |
| 22 70:10, | 121:11,18, | 164:11,13, | 205:4,13 |
| 17 71:8, | 20 122:1 | 18,20 | 206:15,20, |
| 10,13 | 124:22 | 165:9 | 25 207:2,4 |
| 72:10,17 | 125:6,9, | 168:2 | 208:4,8, |
| 74:17,18, | 11,15,20, | 169:6,17, | 11,13,15, |
| 22 79:9 | 22 128:20, | 18,22 | 18,22,24 |
| 81:2,8,11 | 22 129:2, | 170:11 | 209:2,4,6, |
| 82:10,13, | 6,8,10,13, | 171:8,11, | 11,13,18, |
| 15 83:6,9, | 15,20 | 15 172:22 | 22 210:1 |
| 11,13,15 | 130:6,11, | 173:6,10, | 213:4 |
| 89:17 | 17 131:1, | 11 174:20 | 220:22,25 |
| 90:22,25 | 11,15,25 | 175:4,10, | 221:2,10, |
| 91:15 | 132:2,9, | 11 176:10, | 13,15,20 |
| 92:2,4,17 | 13,22 | 11,15 | 225:15,18, |
| 93:18 | 133:10,15 | 180:24,25 | 22 226:15, |
| 94:4,11,17 | 134:6,11, | 181:2,11, | 22,24 |
| 97:13,20 | 15,18,20, | 20,22,25 | 227:4 |
| 98:13 | 24 135:1, | 182:2,6, | 228:6,18 |
| 101:24 | 2,6,8,11, | 10,13 | 231:4 |
| 102:18 | 13 136:4, | 183:18,24 | 232:18 |
| 103:17 | 13,15 | 184:2,6, | 234:1 |
| 104:4 | 137:4,8,10 | 18,22 | 236:1,2,4, |
| 105:2 | 138:11,13 | 185:2,13, | 6,9 |
| 106:6,18, | 139:6,11 | 15,20 | 237:20,24 |
| 24 107:25 | 140:13,15 | 186:2,11, | 238:2,8, |
| 108:2,13, | 143:18,20 | 18 187:4, | 10,13 |
| 18 109:4, | 145:11,22 | 10 188:11, | 242:18,20 |
| 15,18 | 146:6,10, | 25 190:11, | 243:9,17, |
| 110:1,4, | 13,15 | 18 191:18, | 20 244:8, |
| 11,15,18, | 150:6,13 | 22 192:2, | 11,17,18 |
| 20 111:4, | 151:13 | 6,11,18 | 245:1,6, |

10,13
246:25
247:4,8,
18,22
248:2,10,
17 251:4,8
254:10
255:6,10
259:18
261:13,17
263:11,15
264:4,8
266:4,6,
20,24
270:6
273:6,10,
13 274:10,
11 276:15
279:15,18
282:8
284:11,13
286:1,15
288:13,15,
18,20,22
289:2,4,
11,13,18,
20,25
290:4,13,
17,22
291:1,4,9,
17,18,20

**Court's**
132:20
181:4

**courtroom**
17:9 18:2,
6 20:20

60:2 98:15
131:18
210:2
290:2,6

**courts** 24:17

**covered**
46:22

**covering**
13:6

**crack**
291:11,13

**craft** 88:18

**Crawford**
25:22

**create** 222:2
267:25

**created**
213:2
216:18
262:6
266:11
267:2

**creates**
189:11
221:24,25

**creating**
213:11
216:15

**credential**
78:1

**credentials**
46:22

**credibility**

58:6
154:15
156:2
173:10

**criminal**
22:11
148:9,13,
15

**critical**
251:11,13,
15

**Crittenden's**
131:4

**cross** 259:18

**cross-
examination**
38:24
51:24
54:11
74:24
77:13
78:11 82:4
89:22 91:4
121:2
127:8
128:10
131:20
150:18
188:15
196:22
198:11
254:11
276:18

**cross-examine**
131:13
132:13

133:1,6,8,
15 169:1

**crowded** 10:4

**cup** 36:2

**Curling**
131:8
143:15,24
151:11
164:4

**current**
141:18
143:2
246:22
251:17

**cursory**
259:2

**custody**
213:6

**CV** 138:17

**cyber** 140:18

**cycle** 98:13
102:4

**cycles** 255:1

─────────────

**D**

─────────────

**DA** 93:20

**damaging**
183:2

**dampen** 28:6
115:13

**danger** 165:2

**dark** 130:18

www.huseby.com                Huseby, Inc.  Regional Centers                800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 470

**data** 40:10
  85:17
  88:18
  95:11,13
  101:18
  103:8
  109:11
  141:9,18
  167:6
  173:15,18
  182:25
  183:2
  200:2
  212:18
  215:13
  222:6
  233:4,6
  235:24
  237:11
  240:2
  246:2
  251:20
  252:13
  285:2
**database**
  207:22
  211:6
  212:10,13,
  15,18,22,
  25 213:4,
  11,15,20,
  22 214:4,
  6,11,17
  215:2,20,
  22 216:6,
  8,9,13
  221:20
  225:10,13

  240:22,24
  241:8,9
  250:18,22
  251:6,13
  252:22,24
  263:18
  267:18,22
  268:1
  271:24
**databases**
  85:13,15
  95:8 96:4
  187:17,20
  228:4
  249:22
  266:10
**date** 135:15
  217:13,15,
  17,18,25
  218:6
  249:2
**dates** 243:20
**David** 120:15
**Davis** 9:1,2,
  4,6
**dawn**
  291:11,13
**day** 58:4
  62:18,20
  63:24 72:9
  74:10,13
  75:2 105:6
  107:2,11,
  22 114:20,
  25 165:10

  213:2
  215:24
  224:22,24
  232:2
  233:6
  241:20
  267:11
  268:4,11,
  20 287:2
**days** 18:24
  28:4 62:20
  114:11,17
  115:6
  116:1
  135:15
  136:13
  180:13
  267:15
**de** 46:24
  47:4 50:2
**deal** 211:6
  225:18
**dealing** 27:4
  109:4,6
  184:8
  228:1
**dealt**
  247:15,17,
  24 248:15
**dear** 133:22
**debated**
  145:2
**debunked**
  37:22
**decades**

  186:15
**December**
  62:20
  133:15,18
  135:25
  208:11
  211:15
**decide** 10:22
**decided**
  21:13,24
  183:15
**decides**
  122:25
**decision**
  110:2
  145:1
  169:22
  171:15
  239:24
**decision-
making** 24:17
**decisions**
  30:6 185:8
**deck** 268:4,
  15
**declaration**
  136:11
**decreased**
  165:18
  166:20
**decrypt**
  215:13
**defeat** 29:25

**defect**
22:17,18
161:10
165:17
173:2
177:17
180:2
184:9

**defected**
149:4

**defective**
19:9,11
20:22
22:18
23:6,13,18
24:4 25:13
145:15
158:13
159:4,15,
24 160:8,
9,11 161:9
163:6,9,10
170:18
174:22
178:20
179:2

**defectiveness**
19:11
159:22
162:8,15
171:22

**defects**
148:22
173:15,18
231:11

**defendant**

22:13
110:10
112:15
131:2
150:13
154:6

**defendant's**
25:1 52:15
65:25

**defendants**
22:11,22
23:20
24:18
29:17 70:9
157:18
237:17
289:13

**defending**
93:20

**defense**
52:11 54:6
132:22
134:11,24

**defer** 129:18
200:25

**deficiencies**
87:22

**define**
149:15

**degree** 47:22
139:18,20
140:2

**degrees**
39:15

**Dekalb** 14:13
271:13,20
290:22

**delay** 15:6

**delivered**
111:13

**demand** 12:4,
8,9 13:15,
20 14:6
15:4,18
16:4
135:20

**demands**
112:17

**Democrat**
115:6
116:6
177:13
178:6
219:15
220:10,11

**Democratic**
26:15,18,
20,22 28:6
75:6,20
76:18 78:2
115:11
117:9,11
118:13
125:2,15
177:11
201:6,22
202:9
204:9,10
240:13
259:4

**Democrats**
26:24
62:13
116:11,18
117:18,25
202:4,17

**demographicall
y** 88:20

**demographics**
87:6,11,15

**demonstrate**
30:15,20

**demonstrated**
19:17
41:22

**demonstrating**
30:11,13

**denied** 15:4
18:17,20
19:1 49:22
57:20
209:13,17,
20

**deny** 29:13
226:11

**depending**
159:13

**depends**
81:13
122:6
130:10

**deposition**
136:6,8

**deputy** 60:13

describe
85:11,22
86:4 87:8
94:17
101:24
213:4

describing
252:8

design   29:25
30:2 90:4,
6 91:25
194:13,18
200:22
238:18
241:17
252:6,8
253:15
254:17,22,
24 256:18
258:13,15
260:18
276:10
280:20,22

designed
29:9 160:1
194:15
249:22

designing
240:6

designs
252:11

detail
147:25
176:20
183:20
204:22

detailed
15:22 82:4

detailing
214:18

details
97:11
115:22

detect   148:2
150:4,11
161:13
287:4,6

detected
161:10
233:11,20

determination
14:20

determine
85:18
88:15 92:4
102:13
103:20
125:1,4,25
148:15
149:2
154:25
180:2
227:20
231:11,17
235:4
279:11

determines
245:2

determining
13:18
42:10,17

148:20
164:17

develop
86:22
142:18
170:4

developed
96:13
147:24
148:1,2
159:2
163:8
249:24

development
149:22

device   55:6,
9 56:9,11
217:1,2,
10,13
222:1
234:13
235:20
268:2,4,13
270:11,13,
15 280:24
284:18

devices
54:24 56:6
215:22
233:2
234:17
235:20
237:6
246:2
268:11,13

devoted

35:15

diagnostic
218:4

diagnostics
217:22

Diebold   35:6
144:6
147:4
149:6
152:4,11,
20,22
156:18
158:11
159:6,18
160:17
205:9,11

diff   185:17

differed
264:24

difference
28:2
159:17
258:6
270:9

differences
162:13

differential
175:6

differentiatio
n   27:2

differently
35:8 223:2
226:24

difficulties

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 473

73:22
238:6

**dip** 30:8

**direct** 31:20
50:10 61:2
72:18 80:4
84:6
101:17
102:24
104:11
120:13
124:20
137:22
175:2
210:15
238:17
243:2,10
246:11
251:2
270:18
285:15

**direction**
63:11
146:13

**directly**
63:11 96:9
133:8
233:4
270:11

**director**
10:13 32:2
211:2

**disabled**
54:15,22
55:4,13,22
56:4 59:13

**disagree**
143:20
226:25
227:1

**disclosing**
96:15
98:10,17

**discover**
268:20
272:20,22

**discovered**
19:20
269:17

**discovery**
18:20
24:25
112:15
180:25
184:6
185:10
188:6
265:20
284:11

**discrepancies**
67:8

**discrepancy**
76:6,18

**discretion**
245:13

**discrimination**
28:11
115:10,11

**discuss**
17:20
92:13

**discussed**
230:20

**discussing**
264:24

**discussion**
162:4
230:15
258:11

**discussions**
258:6
262:1

**dismissed**
30:15

**disparity**
106:13

**display**
219:22
235:13
241:22
253:24
265:6

**displayed**
50:6 237:4
240:4
253:11,13
254:4

**displaying**
240:9
255:18

**disposal**
253:22

**disqualified**
18:6

**disregard**

163:15

**dissertation**
140:6,9

**distance**
40:18 42:8
47:17

**distinction**
19:20

**distinguish**
213:8

**distinguished**
227:10

**distribute**
167:6,13

**distributed**
200:24
205:20

**distributing**
251:20

**distribution**
218:20
246:1

**district**
111:25
143:15
177:4
214:18
220:4

**districts**
238:22

**dive** 158:10

**divided**
238:25

dividing
    101:15

division
    223:9
    225:2
    229:25

divorce   8:10

document
    44:2,25
    52:13 64:2
    98:4 112:2
    169:8
    246:24
    275:8

documentary
    19:13

documents
    169:13
    271:17,18

donate   81:6

door   58:1
    123:24
    151:20

dots   145:10

double
    100:22
    102:20

double-check
    117:13

doubt   19:9
    22:20
    23:13
    25:15 26:4
    29:22

30:22
109:11,24

doubts   33:10

down-   258:6

down-ballot
    28:13 89:1
    119:18
    198:9
    258:9

down-ticket
    88:15

dramatic
    25:25

drastically
    194:1

drawing
    150:6

DRE   25:9
    37:22
    38:11
    39:20
    40:2,20,22
    41:1,2,6,
    8,10 42:6,
    22 47:24
    54:15
    56:18
    59:11
    68:24
    73:13
    90:11,15
    128:1
    144:2
    150:2,10
    151:15

154:1
158:11,15
159:2,6,
18,22
160:11
161:2,15
165:22
174:11
177:11
180:6
182:6,20
189:11,18,
20,22
196:11,15
203:13
205:9
208:2
212:24
213:1
216:4,13,
18,20
218:9
228:22
235:13
239:22
240:2,4
241:1,22
252:25
253:1,20,
22 255:11
259:2
277:1
278:24
279:10
280:24
283:20,22,
25

DRE's   30:4

DRES   47:15
    56:6 92:1
    144:4,6,18
    145:13
    147:15
    148:2
    149:2,6
    150:4,11
    151:1,4
    152:2,4
    154:13
    155:2
    158:6
    160:22
    161:18
    162:9,15,
    18 163:6
    166:22
    204:18
    205:2
    225:15
    239:22
    251:17

drives   216:4

drop-off
    88:13,15

dropout
    101:4

dropped
    160:6

Drupal
    166:4,6

duck   185:24

due   135:18

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 475

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019   Index: dueling..election

dueling
  17:15

Dufort   9:11,
  15,20
  79:15,24
  80:4,11
  81:1,22

duly   31:18
  60:25 80:2
  84:4
  137:20
  210:13

Duncan   9:11
  23:6 25:18
  52:11,15
  54:6,8
  57:2,11
  80:24
  110:10
  112:15
  254:18
  264:13
  283:9

duties
  261:13

Duval   9:11

Duvall   9:24,
  25

dysfunctioning
  282:20

─────────
        E
─────────

earlier   9:1
  90:2
  101:17

113:17
114:25
136:11,13
190:10,20
195:1
206:4
212:6
269:15
277:6

early   21:20
  46:18,22
  47:6 62:18
  105:9
  114:20
  128:2
  157:2
  191:2
  290:6,18

earth   198:18

easier   48:4

easiest
  252:17

east-west
  27:18
  265:17

easy   48:6

Ebay   144:11

educate
  119:18

education
  119:18
  138:20
  144:17
  147:13

Edward
  268:17

effect
  204:15

efficient
  87:1

effort   58:2
  115:18

efforts
  57:15

elderly   68:6
  76:22

election
  12:11
  14:20
  15:2,6
  16:22
  19:8,11,
  18,22
  20:22
  22:18
  23:6,13,
  15,18 24:4
  25:13,18,
  24 26:2,4,
  13,22
  27:4,6
  28:22
  29:2,9,11,
  18 30:1,
  10,18,25
  32:9,10
  33:15,17
  35:11,15,
  17,24
  36:8,11

37:1,6,9,
  13 38:4
  39:6,22
  40:2 42:15
  46:13,18,
  22 57:24,
  25 59:17
  62:8,15,
  18,20
  80:13,24
  81:4,25
  82:22 83:2
  85:15
  86:11,15,
  18,22,24
  87:18
  89:13
  90:6,9,17
  91:25
  92:13
  94:15
  96:25
  100:11,13,
  20 102:4
  105:6
  107:2,11,
  22 109:25
  114:25
  116:20
  122:6
  124:6,13
  127:13
  140:10,20,
  24,25
  141:1,6,
  10,11,20
  147:8,10,
  11 151:18

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 476

153:2,6,
11,22
154:2,22
155:4
157:6,22
161:20
162:20
164:8
165:10,18
166:8
167:11
170:24
171:6
172:6,20
175:25
180:10
182:25
183:11
184:9
188:9
189:18
196:11
200:8,11
203:11,13
204:15
205:1
206:15,22
211:2,4
212:4,6,
11,18
213:2,22,
25 214:4,
6,11
215:20,24
216:20
218:13,20
222:22,24
223:10,11,

18,20,25
224:1,22,
24 225:2,
8,18,20
226:4,9,
10,20
227:4,10
228:24
229:17,18,
24 230:1,
2,4 232:2,
9 233:6
234:11
235:9,22,
24 236:18
239:10
240:8
241:17,20
244:2
245:20
246:2
248:6,15
249:8,11
253:9,17
254:25
258:4,20
261:22,24
262:13
263:13
267:11,15
268:4,6,
11,20
269:2
271:2,20,
22 272:1
273:20
274:1,4
277:8,22

280:9
281:11,13
284:15,17
285:2,4
287:2

**election's**
227:20
238:6

**elections**
9:13
28:18,24
29:9 35:4,
18,20
37:18
38:20 39:8
40:11
46:17 62:4
77:18
88:13
89:20
96:18
101:18
102:2
103:6,9
122:15
141:9
149:17
150:24
151:6
166:25
167:2
188:20
211:8
212:9,22
222:18,25
223:6,9
229:25

230:6
240:11
246:6
249:25
251:22

**Elections.
kennesaw.edu**
251:25

**elector**
80:18

**electoral**
19:15 85:2

**electorates**
85:4

**electric**
22:13

**electronic**
21:6 22:1,
2 27:2,13,
17 28:2
32:13,18
33:4,11
35:2,10,20
37:10,17
38:13
39:15 73:4
105:13,18
106:13
164:2
174:8
199:13,15,
20 238:18
258:9
264:15,20,
24 276:11
277:25

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 477

282:4

**electronically**
104:15
276:11

**electronics**
282:22

**element**
259:10

**eliminate**
83:4 175:4
280:25

**eliminates**
22:13

**else's**
164:13

**email** 45:13
46:2
185:4,6
243:11
244:2
245:18
246:15,17

**emailed**
182:13

**emails**
243:15,25

**embeds** 19:18

**employed**
32:2 61:15
70:9,13
84:13
210:20

**employee**
289:8

**employment**
141:24

**empty** 291:6

**encounter**
235:17
241:6

**encountered**
223:1,11
224:9
269:24

**encourages**
122:15

**encrypted**
215:4

**end** 62:15
68:20
73:11
92:10
212:1
234:10
268:11

**ended** 35:11
253:20
257:4

**engage** 85:18
87:25

**engaged**
28:10
84:15 89:1
138:8

**Engineering**
168:10

**English**
266:13

**ensconced**
42:15

**ensure** 28:20
142:6
265:22

**entail** 95:6

**enter** 49:17
63:20
82:25

**entered** 44:2
52:13 64:2
98:4

**entering**
123:22
237:13

**enthusiasm**
28:6
115:13

**entire**
23:11,13
30:22
168:11
249:6

**entirety**
48:24

**entitled**
13:25
80:22 83:2
99:6 117:2
181:2

**entitles**
29:8

**environment**
222:17

**EPROM** 284:1,
2,6,15,18,
24 285:4
286:4,8,9

**equal** 253:22

**equipment**
179:2
206:2
212:8
222:15
229:2,4,6
253:20
268:1

**erasable**
286:4,6

**error** 172:4
178:4,11
179:6
207:24
218:25
220:15,18
230:10
242:6
278:8,13
286:24

**errors** 16:1
166:15
167:20
172:1
179:18
195:6,8,13
207:22
219:1,2
247:20

**escape** 24:18

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 478

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019   Index: essentially..excused

essentially
86:13,18
102:2

establish
27:1 82:10
124:13
145:10
165:11

established
26:2 92:10
155:24
158:15
169:15
172:10
191:2

establishing
184:20
198:25

ethnicity
87:13

evaluated
164:9

evaluating
87:4 88:8
89:6
187:17

evaluation
89:13

evenly
205:20
220:15

Everest
160:18

everybody's

10:10
130:15
133:18
181:11

evidence
19:11,13,
17,22,24
20:2,20,
22,24
22:15
23:24
24:6,11,20
26:6
28:22,25
29:4,11,
20,24
30:11,15,
22 42:2
44:4,22
45:20 51:6
52:15
57:11 58:2
64:4,18
96:25
98:6,13
103:17
111:11,15
131:2,4,6,
9,15,18,22
132:1,2,11
156:1
161:18,20
162:2
165:6
169:18
172:20
175:2
176:22

183:8,9,
15,22
188:6
190:25
191:4
198:13
220:22
232:15
233:22
255:4

evidentiary
184:8

exact  100:25
102:20
119:13
126:18
158:24

examination
31:20
43:10
56:24
58:22 61:2
72:18 80:4
84:6 93:2
120:4
137:22
156:6
184:17
186:22
187:11
190:11
204:1
207:15
210:15
227:20
229:6
231:15

234:4
243:2
279:22
286:17
287:10

examine
134:22
180:15
229:4

examined
40:20
94:18,22
124:11
164:24
229:2
232:6
233:2,9

examining
96:18

examples
175:20

Excel  64:13
65:2,6,9,
11

exception
12:9 15:25
136:2

exceptionally
179:6

excuse  36:20
41:4 65:18
78:24
158:6

excused
60:2,4

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 479

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019  Index: excusing..experts

128:22
288:20

**excusing**
60:2

**executable**
212:20

**execute**
249:24

**executed**
211:8
222:25

**executive**
10:13 32:2

**exercise**
146:15

**Exhibit**
44:1,4,10,
11 45:20
52:15
54:2,6
63:25 64:4
78:15 79:4
98:2,6
112:1,4,15
168:4
243:9,11,
24 245:9,
17 246:15
251:2
275:1,4

**exhibits**
264:2
266:18
273:4,10,
11,20

274:9

**existed**
28:13

**exit** 130:20

**expect** 21:13
200:22

**expected**
222:18
277:18

**expedient**
14:20

**expedited**
136:15

**expenses**
53:11

**experience**
35:1 39:18
50:2 84:18
85:11
87:4,9
88:1,2,4,
6,10 90:6
91:24 92:2
94:1,4
96:11,18
108:6
109:24
119:15
121:15
138:20
141:13
144:2,15
146:22
147:13,15
148:1

149:2,8
153:1
165:15
177:25
187:15
206:8

**experienced**
73:24
74:13
230:11

**expert** 17:2,
6 25:9,10
33:9,18
34:1 38:6
39:2
41:18,22
42:4,6,18,
22 43:1,2,
15 59:20
84:15 88:4
89:11
91:18
92:10,18,
20,22 94:8
96:22
97:15
108:11,13
123:24
138:9
143:11,13,
18 150:2,
10 151:11,
13 154:13,
17 155:11,
24 156:1,2
158:1,8
164:18,20

168:25
169:15
170:4
171:1,17
172:10,15,
18 173:2
174:17,24
177:15
179:1
191:4
195:11
198:4,18
280:18

**expertise**
41:22 42:6
43:6 47:22
92:11,18
93:25 94:6
96:13,18
97:6
121:24
146:22
147:2,15
148:2,20
165:17
179:22
194:13,17
206:4,8

**experts**
17:15,17
20:4
59:18,22
168:24
170:2
171:17
186:15
221:13

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 480

**explain** 23:1
30:8 51:6
64:1 68:2
93:11
99:13
105:2
119:2
131:4
151:13
164:6
176:9,11,
18 180:18
183:18
193:4
204:22
255:10
266:4,6
270:2,8
271:17

**explaining**
90:2 100:2

**explanation**
22:2,11,17
24:18
104:2
178:1
207:20
228:4
270:8

**explanations**
29:24

**explicit**
12:8

**explore**
121:1
147:25

**exposed**
165:2
228:15

**exposure**
165:6
227:15

**Express** 67:1
205:11
246:2

**expression**
211:11
213:17
234:24

**extensive**
184:4

**extent** 180:2

**external**
161:17
162:1
270:11

**extra** 274:11

**extract**
183:2

**extracted**
232:2
233:4
234:13

**extreme** 21:1

**extremely**
177:20

**eye** 133:8

**eyesight**
130:24

**eyewitness**
175:2

**eyewitnesses**
178:18

---

**F**

---

**face** 194:24

**faced** 183:13

**facie** 22:9
24:4

**fact** 13:9
17:11
27:4,10,11
28:8 29:25
30:15
32:15,18
33:13 35:4
42:10
63:20
116:9
117:15,24
118:8,11,
15 119:11
123:10
145:2,8
146:2
148:4
149:4
172:13
199:11
200:15
201:4,9,
13,22
202:15,25
248:13
258:11

259:11,24
274:1,4

**fact-bound**
15:22

**factors** 30:8
200:13,20

**facts** 12:10
15:20
91:20
145:20
155:6
176:22
220:6,22
232:13

**factual**
15:22 16:2
33:22 42:2
231:2

**failed** 14:4

**fair** 28:20
75:8,9
101:1
115:4
151:18
158:20
229:11,13

**fairness**
24:15
240:6

**faith** 198:13

**familiar**
37:15,18
54:15,18
55:13,15,
20 116:17

118:11
177:4
199:9,11,
15,18
200:2
201:2,4,9
225:9
227:15
234:24
287:20

**familiarity**
199:24

**fashion**
229:6

**fast** 106:6
236:8

**fastidiousness**
166:13

**feasible**
38:2

**federal**
58:24
143:18
212:9
246:6
253:13

**feedback**
222:18

**feel** 259:2
278:4

**fees** 53:2

**feet** 49:10

**felt** 224:13

**FEMALE** 13:4

**fewer**
117:11,25
123:6,13,
18 124:18
126:17
202:10
257:13
282:13

**field** 148:11
153:2
155:24
170:4
174:4

**figure** 68:25
87:24 95:2
201:11
221:18

**figures**
174:20

**file** 74:8,
11 86:24
88:18
135:15
167:6
184:4
212:18
215:13,15
235:9,11,
24,25
236:18
284:22
285:2

**filed** 11:18
12:15
110:10

136:11

**files** 85:15
214:18
246:2,10

**filing** 11:22

**filings**
18:24

**final** 109:11

**find** 87:22
103:24
106:1
122:8
124:9
126:4,15,
25 223:13
245:2

**finder** 155:6

**fine** 10:4,6
32:24
59:22 68:4
69:13
130:13
185:15

**finger** 71:15
74:4

**finish** 70:2
157:15
187:2
191:22
289:15

**finished**
41:20
70:22
205:18

264:22

**fired** 211:22

**firm** 115:8

**firms** 61:22

**first-hand**
39:20

**firsthand**
90:15
154:1

**five-** 118:17

**fix** 150:11

**fixed** 248:4
277:24

**flaw** 19:15

**flaws** 235:6

**floor** 236:10
247:20
290:6
291:1

**floors**
236:10

**Florentine**
270:4

**Florida**
160:20
257:22
260:9

**focus** 33:6,
22 85:20
146:18
238:20

**focused**

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 482

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019   Index: focusing..Fulton

32:11,18
95:2 116:2
142:25
145:6
155:4
259:9

**focusing**
157:13
172:6

**folks** 116:11
118:20,22
130:15
169:1
264:25

**follow** 11:6
28:20
42:20
59:10
67:18
115:22
148:9
282:22

**follow-up**
57:4
154:10

**font** 240:10

**forensic**
148:11
149:6
160:15
171:6
177:15
180:4,6
181:13,17,
18 184:17
186:13,22

195:22
196:10
207:15
227:20
228:22
229:10
231:15
269:22

**forensically**
148:2,6
208:2

**forensics**
25:9

**form** 77:6
145:4

**formally**
211:9

**format**
189:11
239:10,11,
20 252:17,
18

**formats**
239:6

**formed**
169:22
262:15

**forms** 36:9

**forward**
28:15
29:20
30:13
83:13
280:22

**forwarded**
14:20
214:22
215:4

**found** 78:24
106:2,6
124:15
126:6,15
127:1
165:25
204:15
229:6
232:6
237:6

**foundation**
38:6 45:24
48:1,11
51:13
59:15
109:2
145:18,25
163:11
164:17
165:6,11
169:24
171:4
172:13,15,
17,18
177:1
184:20
228:2

**founded**
24:13

**fourth** 140:1
290:6

**fraction**

101:2

**frame** 241:22

**framed**
126:20

**frankly** 28:2
201:1

**frantic** 74:2

**frequently**
55:25 56:2

**front** 65:4
93:18
100:25
112:11
113:4,6
123:25
168:4
228:9
239:11,13
265:6
274:15

**full** 31:24
61:6 80:9
134:1
210:18

**Fulton** 9:11
11:6,20
12:2,15,22
13:15
14:25
15:20
16:17,24
28:18,20,
22 29:1,6
70:10,13
82:15 83:9

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 483

147:6
180:9
263:2,6
266:1,10
271:13,15,
20 289:8

function
90:11

fundamentally
24:15
151:17

funding
212:2

fundraising
52:22
53:15,18,
22

funds  81:6

future  230:6

G

gain  158:1

gained  96:17

game  86:20

gap  22:1
23:9 28:13
249:6,10

garbage
234:25

garden  29:8

garner  230:6

gave  81:6

151:13

Gay  245:18

GEMS
187:17,20
207:22
212:10,13,
15,18,22,
25 213:4,
11,15,20,
22 214:17
215:15
216:4,8,
13,17
221:20
232:1,4
233:4
234:13
238:20
239:4
249:9,17,
22 250:6,
9,10,18,
20,22,25
251:6,13
252:22
262:11
263:18
265:22
266:17
267:4,18
278:20

gender  87:13

general
39:22 40:2
48:13
81:24
90:15

100:20
105:24
106:10
107:11
116:25
118:2
126:13,22
153:6,11,
22 154:22
160:24
162:18,20
163:22
166:13
167:2,18
223:18
224:20
239:10
240:11
260:18
275:6
281:25

general's
106:15

generalize
179:22

Generalized
180:1

generally
35:2 38:11
54:18
55:4,8,11,
24 81:1,2
87:10
88:11
122:9,18,
24 125:18
142:22,24

144:2
145:22
146:25
150:2,10
151:2
155:2
158:13
159:4
160:11
163:13
199:18
205:9
227:17

generate
249:22
252:15
253:22

generated
278:22

generating
253:25

generation
141:20
143:2

gentleman
20:9 245:6

gentlemen
8:6

Geoff  9:11
25:18
112:15

geographic
87:17
88:18

Georgia  8:1

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 484

19:18
21:15,18
26:25
27:6,20
34:13,20
35:6 36:13
37:20
38:2,11,13
39:6,10,
13,22 40:2
41:2,11
42:15 43:2
46:17
55:10,18
56:10
62:13
80:15,18
81:22
90:11,15
91:9 92:11
94:15
95:15,18,
22 96:25
98:18
101:18
104:11,15
108:10
109:1,6
113:18,22,
24 116:11
118:18
120:15
127:13
138:22
139:6
142:17
143:4,6,
11,15

145:15
147:11,15
150:2
151:17
152:6,13,
15,22
153:6,11,
22 154:2,
18,20
157:6,11,
22 159:2,
22 161:2
162:18,20
163:13
164:2
165:1,22
166:18,24
170:22
184:10
186:6
188:2
189:9
196:11,15
200:18,24
201:11
203:10
205:20
206:9
207:8,18
211:6
212:9
237:9
241:20
250:6,11
251:1
255:13
258:25
259:2

260:20
261:22
267:17

**Georgia's**
26:11
37:15 38:1
54:15
119:6
146:22
147:6,11
151:15
163:9,22
164:8
165:18
166:25
167:11

**germane**
123:15

**get all**
130:4

**give** 33:2
34:2 84:15
93:22
103:15
106:20
121:2
130:13
146:13
160:13
163:15
166:4
215:11
217:4
219:2
220:4
237:10
239:25

285:15
289:2

**giving** 19:24
73:11
106:22

**glad** 203:6
**glance** 259:2
**glass** 187:2
**glasses** 64:9
**Global**
212:18,22
**glue** 160:4
**gobs** 208:18
**good** 8:6,7
9:8 11:13
32:4,6
35:2 36:24
38:18
41:25
43:20
44:15
77:18
89:18
145:24
150:22
179:6
185:22
198:13

**Governance**
32:4,6
36:25
43:20
44:15

**governing**

240:17

**government**
156:20,24

**governmental**
162:4

**governor**
15:10
21:22
25:18
71:2,15,
17,18,20,
24 94:20
95:22
98:20
100:18,22
101:4,11,
13,15
103:9
105:4,8
115:6
118:10
120:10,20
124:18
126:2,9,11
127:4
179:11
231:20
242:10,11,
13 253:18
254:24
255:22
256:2,11,
13 258:8
260:15
262:17
265:2,10,
13 268:18

**governor's**
19:10
21:6,11,
15,24 22:6
30:1 95:1
99:25
100:11
102:6,10
106:15
107:20
108:10
113:25
120:11
123:13
127:18,20
128:17
155:4
162:18
171:25
184:18
225:13
241:18,24
242:1
254:6,25
255:20
256:2,15
257:8
265:4,6
268:24
271:4,8
272:24
273:2
279:9
282:6,11
285:20,22

**governors**
260:2
265:13

**graduate**
62:1 84:20
139:1,2,13

**graduated**
138:22
140:2

**graduating**
84:25 85:6

**Grady**   195:6

**grandson**
133:22

**Granted**
26:18

**gray**   255:15

**great**   10:15
26:9 153:1
184:10

**greater**
27:11
147:25
165:2
176:20
183:20
204:22
276:11

**Greenwald**
43:18,20
44:11
45:15

**grid**
283:10,11

**Groban**   290:6

**Groton**   12:1

**group**   168:24

**guess**   11:2
12:2 26:6
54:6 141:4
185:20
189:20
229:10
233:22
273:15
286:6

**guidelines**
240:6

**guilt**   22:15

**Gwinnett**
9:13 11:6
14:25
15:17
29:15
38:18
77:18 83:6
89:18
90:20
150:22
155:9
252:20
253:4,9
263:2,6,9,
13 266:2,
10 271:13,
20 287:25
288:11

---

**H**

---

**habit**   81:18

**habits**   81:11

www.huseby.com          Husuby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 486

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019     Index: hack..helpful

hack   270:24

hacking
  225:9,20,
  22 226:2,
  20 227:6,9
  270:1

half   182:15

hand   31:6
  37:10
  43:22
  60:15
  63:25 64:8
  79:17
  83:18
  104:15
  137:11
  210:2
  243:6
  287:24

hand-marked
  188:20,22
  189:1

handed   64:11
  65:4

hands   130:20

hands-on
  39:17
  144:1
  149:2

handwritten
  151:10

happen   49:15
  86:20
  131:20
  175:22

176:20
178:2
181:25
221:9

happened
  20:22
  21:4,22
  22:4 26:6
  30:13 68:9
  70:4 74:1
  86:15,20
  92:20,25
  127:20
  161:13
  174:22,24
  176:18
  211:18
  221:8
  222:13
  228:8
  229:22
  256:20,22

happening
  30:2 49:18
  69:18,20
  97:4
  127:18
  175:17
  233:24

happy   195:24
  289:9
  290:20

hard   19:13,
  17 30:11,
  22 47:11
  64:8 82:9

hard-to-reach
  85:4

hardware
  147:20
  158:18
  159:11,20
  250:2,4

Hart   25:22

HAVA   58:18

He'll   33:2

head   40:6
  102:11

headed   112:9
  115:9

header
  241:15

headquartered
  34:18

headquarters
  34:10

hear   12:2,4
  14:17 80:8
  139:6
  155:15
  188:6
  208:13
  223:25
  280:1,6

heard   14:18
  134:11
  136:25
  154:11
  158:17
  169:10

176:10
180:24,25
184:2
192:11
224:1,20
235:1
280:20

hearing
  20:13,20
  110:13,15
  133:13
  135:17
  136:17
  208:18
  232:13
  291:22

hearsay
  45:22
  69:11,20
  70:6 71:8
  131:15
  132:4,13
  170:10,11
  181:6,8,10
  190:13
  230:17
  261:4,11

heavily
  220:4,9,11

heavy   29:4
  220:11

helped   36:13

helpful
  217:18
  270:6

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 487

helping
  10:13 90:8
  141:11

helps   43:4

Henderson
  13:18 14:4

Henry   14:13

high   29:18
  53:11
  81:13
  122:13
  124:15
  127:13
  194:25
  195:6
  275:20

high-profile
  118:9,13

higher   26:20
  103:22
  104:1
  122:15
  123:1,2
  282:4,11

highest
  102:6
  104:9
  271:8
  273:1

highly   174:2

Hill   235:8
  269:6

hint   19:25

hints   20:2

historic
  113:15

historical
  95:13
  102:13
  103:2

Historically
  21:13

history
  21:18
  270:4

hit   281:15

Hm   171:8

Hmm   110:18

hoc   148:13

holding
  268:6

holds   160:4

hole   188:4

home   69:6
  290:20

honor   8:7
  9:18 10:1,
  18 11:8,
  15,18 12:6
  13:8,15
  14:8,18,24
  15:13,15
  16:4,10,
  13,15,17,
  25 17:18,
  22 18:4,
  13,18 19:6
  20:4,13,

15,24 21:8
22:8,22
23:1,2,4,
25 24:15,
22 25:2,4,
15,17 26:4
27:4
28:11,15,
18 29:15
30:15 31:2
32:20
33:8,22
36:1,2
38:4,8
41:18
42:4,17,20
43:8 44:6,
18 45:4,6,
10,20,22
46:2,6
47:22
48:2,10,11
50:4 51:8,
11 54:1,4
57:6,18
58:1,11,15
59:1,6,13,
22 60:1,4,
10 64:20,
24 65:24
69:10
70:13,18
71:6 72:11
74:13,18
79:8 82:2,
25 83:4,8,
11 89:11
90:20,24

91:2,18
92:6,8,15
93:8 94:11
96:6,20
97:1,10,20
100:1,6
103:15,25
106:18,22
108:2,4,
11,17,20
109:2,13,
18,20
110:4,17,
24 111:2,
6,11,18
112:6
113:10
116:20
119:25
121:9,22
123:20
124:2,24
127:6
129:1,11,
15,22
130:2
131:2,11,
24 132:6,
17,24
133:11
134:2,9,
13,15,18,
25 135:1,
13,18,24
136:4,11
137:2,9
144:20,22
145:4,9,

www.huseby.com        Husebey, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 488

17,22
146:4,6,8
150:1,15
153:13
154:8,15
155:8
156:4
158:13,20,
24 162:15,
22 163:11
164:18
165:4
168:22
169:2,13
170:9,15
171:6
172:9,18
173:4
174:15,18
175:1
176:13,22
180:22
181:4,18,
24 182:1
183:22
184:15,20
185:1,11
186:1,10
187:1,4
188:4,11
190:8,22
191:20
192:1
195:20
198:11
202:20
203:4,22,
24 205:15

206:11,18
208:10,13,
20,22
209:6,8,
20,24
220:20
221:4,6,
11,15
225:11,17,
20 226:6,
15,20
227:2,24
228:13,17
230:18
233:22
236:15
237:13
238:11
242:17,22,
24 244:4,
6,15
246:22
247:2,15
248:13,18
251:6
255:2,4
259:13,15,
20 261:4,
6,10,11,
15,18
264:4
266:18,20
273:4,13,
15 274:9,
11,13,25
275:1
276:15,17
279:20

282:6
284:4,10
285:24
288:11,20
289:4,13,
15,20
291:20

**Honor's** 17:4
24:6

**hotline**
178:24

**hour** 289:6,
11

**hours** 36:20
166:6

**house** 245:25

**housed** 211:9
245:22
251:25

**houses** 249:8

**How'd** 8:24

**huge** 21:9
150:6

**hundred**
133:4

**hundreds**
36:20

**Huntsville**
249:15

**hypo** 220:4

**hypothesis**
149:15
175:20

**hypothesized**
280:6

**hypothetical**
221:10,13
230:24

I

**ID** 118:20,
22 215:6
216:22

**idea** 85:10
130:13
155:15
166:4
196:15
236:1

**ideas** 93:24
94:6

**identical**
155:22
159:10,13

**identically**
233:6

**identification**
200:2

**identified**
57:11
167:2

**identify**
10:2 55:4
111:1
158:22
243:17,20
254:20

263:9,10
275:2

identifying
  148:22

image   221:25
  235:10
  241:4
  253:22

images   232:6
  235:11
  255:17

immediately
  72:4
  141:25

impact   113:2
  115:11
  198:6
  200:13
  201:18
  244:15
  257:22

impacted
  257:25
  258:13

impacting
  201:18

impanel
  14:15

impaneled
  14:11

implementation
  159:25

imply   148:11

important
  24:15 79:2
  93:10
  118:20

impossible
  203:17

impress
  51:17

in-   21:20

in-person
  54:22
  213:2

inadvertent
  262:6

inadvertently
  27:15

inappropriate
  14:6

inaudible
  9:4,9
  11:10 13:2
  16:18
  17:13
  25:15
  28:17
  32:20,22
  35:18
  38:15 42:4
  44:8 45:2
  48:11 51:4
  54:2,8
  59:4 61:13
  63:18
  64:6,9
  66:6,13

67:13
69:11,13
70:11
74:17,18
75:17,22,
25 81:8
82:4,13,24
83:15,17
93:18
100:13
109:18
112:8
115:4,10,
17,20
116:13,15
119:24
120:1,2
124:1,22
125:11,22
127:4
128:25
129:2,6,8,
9,11,13
130:25
132:4
134:13
135:4,13
136:9,11,
13 140:13,
15 141:1,
11 143:18,
24 145:17,
18 146:6
149:22
151:20
153:8,15
154:15
156:4,20,

22 158:4,
6,8,15
160:18
162:20,24
163:13
164:20
165:8,9
166:2
169:4
171:4,13
172:2
173:25
174:13,20
175:20
176:24
180:10
182:11
184:4,13,
18 187:10
188:18,24,
25 189:1,
13,22
190:20,24
191:20
192:6,10,
17,18
195:6,22
197:20,24
198:1
200:13
202:8,13
203:1,11
207:13
218:13
225:11
227:6
232:22
233:15

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 490

235:22
236:6,15
237:6,18
238:1,2,13
242:15,20
243:8,15,
22,25
244:1,10,
11,15,18,
22 245:8,
13,18
246:13,15,
18,25
247:1,6,
11,13,15,
22 248:1,
2,4,6,15
249:4,15,
18 251:2,
9,10
253:4,20
254:22
255:1,6,8
257:25
259:13,15,
17,18
261:6
263:4,8,10
264:2
266:6,13,
17,18
270:22
271:15
272:22
273:6,9,
11,13,15,
18,25
274:4,6,

13,24,25
275:2,22
276:22
277:2,13
278:2
279:10,11
280:2
281:4,20
282:24
283:11,17
284:11,18
285:25
286:1,2,6,
10,11,13,
15,20,22
287:13,17
288:2,15,
22 289:8,
10,15,17,
22 290:1,
2,11,15,
20,22
291:2,6,8,
9,10,13,
15,18

**incidence**
66:20

**incident**
66:22,24
67:13,15
228:4
244:6

**incidents**
78:18,20,
22

**inclined**
22:9

**include**
78:18
147:18
257:6

**included**
214:11
218:18
239:15

**includes**
8:10
182:22
272:15,18

**including**
157:18
272:8

**inconveniencing**
291:13

**incorrect**
40:4 111:2

**incorrectly**
233:11

**increase**
119:13
122:22
145:13
165:22
276:4

**increased**
165:18,20
166:20

**incredibly**
166:2
176:8
177:22
200:17,18

**incredulous**
74:6

**incumbent**
128:15

**incurred**
178:11

**independence**
161:13,22

**independent**
117:20
160:20

**indicating**
143:20

**indications**
50:22

**indirectly**
167:13

**individual**
11:11
85:15
87:11
97:11
107:1
157:15
202:22
214:22
216:10
232:2
233:2
239:6
240:1
259:10
263:24
268:6
271:24

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 491

272:6
281:11
283:22

**individuals**
27:15
118:20

**indulgence**
136:2

**industry**
180:20

**ineligible**
19:15

**infected**
227:22
231:18

**inference**
198:13

**inferior**
24:11

**infiltrated**
246:10

**inflammatory**
58:4

**influx**   198:8

**information**
13:22
59:20  70:1
85:17
87:17
95:6,18
96:4  99:10
103:11
104:18
109:15

122:13
169:4,11,
15  170:6
214:4
215:22
216:13,17
232:2
236:11
239:4
245:24
249:11
252:2,4
266:15
284:17
287:15

**informed**
76:4

**informs**
199:4

**infrequent**
122:15

**inherent**
151:15
166:22

**inherently**
161:9

**initial**
17:13
278:2

**initially**
18:13
232:8
239:20

**innocent**
178:13

207:20

**input**   268:4

**inputting**
218:6

**inquiry**
93:11

**ins**   14:18

**inserted**
217:8

**inserting**
218:4

**inside**
148:24

**inspect**
182:18
208:2
284:9

**inspected**
153:10,20
154:2,22
235:6
249:18

**inspection**
155:13

**inspects**
215:15

**install**
237:6
252:24

**installation**
249:17,18

**instance**
14:11  29:4

63:15
73:15
87:11
115:4,25
117:8
118:17
189:9,15,
17  199:11
201:11
223:13
256:20
259:24
260:8
267:11
272:20

**instances**
50:18
59:11
173:2
179:24
233:9

**instruct**
216:9
219:4

**instructing**
268:8

**instructions**
257:4,11,
20  258:2

**insufficient**
13:17

**insulted**
130:24

**insurance**
117:11

www.huseby.com                Huseby, Inc.  Regional Centers                800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 492

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019   Index: integrity..issue

123:2
282:1

**integrity**
32:10
140:10

**intend**  10:20
17:8

**intended**
39:4 71:4

**intensely**
43:4

**intent**
135:15

**intention**
58:11
111:13
135:4

**intentionally**
23:20

**interact**
270:17

**interacting**
280:22

**interaction**
259:1
270:18

**interactions**
186:17,18

**interacts**
278:4

**interest**
81:1,2
142:18

**interested**
35:4 81:13

**interesting**
22:6

**internal**
150:2
180:15
181:20
182:4,22
183:11,20
235:9
236:22
249:1
284:18,20,
22 285:2,6
287:18

**internet**
165:2,6
166:2
167:8
168:13
228:15
270:18,22

**internship**
142:1

**interpreted**
167:4

**interpreting**
231:6

**interprets**
259:6

**interrupt**
38:9 251:2

**interrupting**
249:2

**interviewing**
164:2

**intimate**
97:11

**introduce**
45:20
65:24 81:2
132:20

**introduced**
57:11
132:2,4
235:20

**introducing**
58:2

**introductory**
131:2
140:18

**investigate**
186:6
227:9
228:9

**investigated**
24:20
173:4

**investigation**
148:11
163:20
171:6
181:13
183:17
186:13
191:24
192:9
199:6
226:18

229:15,18,
22 231:11
235:4
247:1

**invoke**  10:20

**invoked**
16:10,11

**involve**  89:6

**involved**
35:22 36:9
39:6 41:24
151:22
205:13
214:2
222:15
272:1

**involving**
120:15
203:11
237:18

**IP**  270:15

**iphone**
63:10,13

**irregularities**
268:20

**irregularity**
29:8,20
30:22

**irrelevant**
33:18

**issue**  13:24
15:17 19:8
20:4 30:18
42:10,11,

www.huseby.com      Huseby, Inc.  Regional Centers      800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 493

13 45:25
67:1,9
87:15
91:20,22
92:2,4
93:8,15
154:13,25
155:2,4,8
182:11
183:22
184:11,25
204:25
206:17
208:22
224:10
225:13
226:8,13
227:17
230:18
243:15
248:6,15
264:22
277:15,17,
18 282:17
289:9

**issued**
160:20
209:11
249:24

**issues**  14:6,
9,17 16:2
32:11,13
33:6,18
41:22
42:11
57:18 73:4
74:13

91:20
93:13
136:17
151:13
158:2
179:2,9
230:13
235:17
237:18
253:6
277:13

**items**  131:2

---
### J

**jail**  133:24

**January**  8:2
45:13
136:17,24
211:17
212:2
249:4,20
250:1

**Jeanne**  9:11,
15,20
79:15,24
80:4,11

**job**  11:13
75:20
256:18

**John**  201:10

**Johnson**
63:15

**join**  92:6

**joined**  15:13

**Jordan**
129:9,11

**Joseph**  63:4

**judge**  12:24
13:1 35:11
93:18,20
172:15
205:2
236:11,13,
15 256:22
267:13
290:1

**judgment**
237:20

**jump**  237:24

**jumped**
238:10

**jumping**
146:15

**juries**  14:15

**jurisdiction**
214:15
215:4
218:6

**jurisdictions**
14:17
260:6

**juror**  12:4

**jury**  12:8,
9,10
13:10,11,
15,18
14:1,6,10,
15 15:2,

22,24 16:4
135:20
290:18

**Juvenile**
8:12

---
### K

**Kauffman**
8:22,23
9:1

**Kaye**  12:22

**Kemp**  131:8
143:15,24
151:11
164:4

**Kennesaw**
211:10,15,
22 222:20
227:15
244:2,6,9
246:4
248:15,20,
22

**key**  29:17

**kind**  8:11
68:6 74:2
76:6 85:20
86:2,4,22
87:15
88:18
95:2,4,25
97:18
111:9
122:20
161:2

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 494

168:22
169:4,15
170:10
172:10,17
178:11
186:22
188:8
198:4
199:22
200:2,6,10
231:4
238:18
246:20
247:8
269:18

**kinds** 90:2
133:24
141:20
261:17

**knew** 191:11
199:25
224:8

**know-** 133:18

**knowledge**
39:20
43:17
90:11,15
94:2,4
97:11
115:24
144:2,15
146:22
147:4
149:20
154:1,18
155:11,13
158:1

164:17,18
181:20
186:18
199:1
219:18
221:11,18
230:13
241:20
254:2,4
276:9

**knowledgeable**
93:17
256:20

---

**L**

**L-E-** 61:10

**lab** 144:6
152:4,20
154:20
249:15

**labels**
216:22
217:1

**labor** 94:22
117:17

**lack** 30:6
163:11
166:11
167:18
211:10
213:15
214:15
228:2

**ladies** 8:6
133:22

**lady** 68:6

**lagging**
200:22

**laid** 38:6
59:15
109:2
172:13,15
174:15

**Lamb**
164:10,13
165:25

**language**
58:4 111:9
253:10

**languages**
141:22
253:6,11

**laptop** 129:4
134:20,22

**large** 22:4
65:6 198:8
241:2

**large-** 64:11

**large-print**
65:8

**larger**
275:22
276:1

**Lasix** 64:22

**lasted** 68:20

**late** 250:8,
11 251:1

**latitude**

34:4

**law** 24:15
25:22
28:20 34:2
58:25
61:24
92:11

**laws** 13:24

**lawsuit**
197:4,11,
15 205:1
262:15,25

**lawyer** 17:24

**lawyer's**
36:4

**lawyering**
185:22

**lawyers**
11:13

**lay** 42:1
44:22
45:24
145:25
171:4
172:13
177:1
219:20
238:20

**layout** 164:6
222:4
239:6
252:18
257:15
258:20
262:6

www.huseby.com       Huseby, Inc.  Regional Centers       800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 495

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019   Index: lays..lieutenant

265:2

**lays**  239:8

**LBJ**  63:11,
13  65:2,13

**lead**  220:11
221:4
235:18

**leading**  96:6
100:2
106:18
155:24,25
156:2
158:8
166:8
226:22
259:13,15
267:15
282:6

**leads**  173:18

**learn**  230:2,
4

**learned**
132:25
260:4

**leave**  50:18

**leaving**
47:11
165:2

**Leclerc**
60:11,22
61:2,6,11,
13,15
65:1,17
66:9  71:13

72:20,22
73:22
74:15,20,
25  75:2
77:15,18
78:13,15

**Leclerc's**
69:11

**led**  178:18
191:18
276:11

**left**  30:17
68:13
167:8
181:13
265:8,9
291:6

**left-hand**
241:24

**left-leaning**
205:25

**legal**  38:6
53:2  59:2
197:6

**legally**
144:11

**legislator**
206:13

**Legislature**
15:9

**legitimate**
22:2

**letter**  45:18
231:20,22,

24  235:2

**level**  53:11
122:20
151:17
166:18
167:15
200:22
232:11
249:9

**leverage**
88:20

**Lexisnexus**
135:11

**León**  46:25
47:4  50:2

**libertarian**
36:18
39:13
46:20
123:11
219:15

**Libertarians**
285:20

**library**
46:25  47:4
49:20

**lieutenant**
15:10
19:10
21:6,11,
15,22,24
22:6  25:18
71:2,15,
17,18,20,
24  95:1,22

98:18
101:11
102:6,10
103:9
105:4,8
106:15
107:20
108:9
115:6
120:10,20
124:18
126:2,9,11
127:2
128:17
155:4
162:18
171:25
179:11
184:18
225:13
231:20
241:18
242:1,11,
13  253:17
254:6,25
255:22
256:2,13
258:8
260:2,15
262:15
265:4,10,
13  268:24
271:2,6
272:24
273:2
279:9
282:6,11
285:18,22

www.huseby.com          Husby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 496

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.

Transcript of Hearing Proceedings on 01/17/2019          Index: life..literally

**life**  21:9
  182:15

**lifelong**
  81:11,18

**light**  130:20

**lightly**  26:1

**likability**
  200:20

**likelihood**
  145:13
  165:17
  175:15

**limited**  42:8
  87:2  131:4

**limiting**
  149:13

**Lindsay**
  45:8,22
  59:1,13
  132:13
  197:10

**Lindsey**
  10:24
  11:2,4,10
  13:9
  15:11,13
  16:9  17:6,
  11,22
  18:8,10
  25:15,17
  32:20  33:8
  42:4,20
  44:18,20
  45:2,4,6,
  10,22

47:22
48:10  50:4
51:22
52:2,11,17
54:1,6
58:1,11
64:6,9,11,
15,18,20
65:4  66:2,
6  69:10
70:6,11
71:6,9
75:2  82:2,
6  83:6
91:2,6,13
92:6  97:9
100:1
111:2,4,
11,18,20
114:4,9
117:2,6
119:4,22
120:9
123:4
124:6
128:8,13,
20  130:2,
6,13,22
131:11
132:24
136:4
144:20,22
145:6,17
154:8
155:8
162:15
171:6,9,13
172:9

173:4,6,
11,13
174:15
176:13
181:4
183:22
185:20
186:10
188:4
190:8,10,
20  191:6,
9,13,20,22
192:15,18
196:25
202:20
203:1,4,6,
8,9,20
205:2
209:6,17
220:20
221:2,11,
15  225:17
226:6,15,
20,22
227:2,24
246:22
247:2,6,9,
13,22,24
248:2,8,
11,13,17,
18  250:22
255:8
259:15,20,
22  261:6,
11,15,18,
20  263:6
264:2,6
266:18,22

268:17
273:4,9,
11,13,24
274:9,13,
15,25
275:8,10
276:15,24
279:13
284:10
285:24

**Lindsey's**
  285:15

**lines**  47:10
  50:1  56:1
  100:24

**lining**  259:4

**link**  119:1

**list**  18:25
  150:6
  167:4

**listed**
  231:22
  240:13
  264:11
  272:6
  279:2,6

**listen**  43:4
  111:11
  156:4
  185:13

**listening**
  43:2  55:11

**literally**
  30:13
  289:1

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 497

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019 Index: literature..lurking

literature
156:17
160:11
162:11
171:4
194:18
199:2

litigat-
36:25

litigation
37:1 80:15

live 21:20
80:15
130:11
133:1,2,15
172:24

lived 34:20,
22

living 96:1

LMA 222:22
278:2

load 268:1

loaded
215:13,18
216:8
217:20
222:1
267:22

loader
182:25
237:1

lobbies
11:11

local 85:20

215:4,15
238:22

located
62:22
197:1
274:2

location
46:25
47:4,8
49:22
63:22
65:15 67:4
73:13
176:13
216:11,15
218:22
220:9,10
221:24
222:2
252:1
283:2

locations
40:11 47:2
55:18,20
62:20
215:22
239:4,13
266:11
270:20

locked
290:17

Logan
164:10,13
165:25

logic 217:9
218:13,18,

24 222:10
268:2

logical
222:11

logistically
129:15

logistics
288:25

logs 179:6

long 17:24
47:10
48:18 49:4
50:1 56:1
82:22
103:18
129:17

longer 68:20
131:13
253:4
288:24

looked 18:22
40:9
94:17,24
97:2 104:8
113:15
119:6
120:9
128:4
165:4
185:8
189:6
195:11
203:2
229:22
230:6

235:11,13,
22

loop 275:13

loss 35:17
36:10

lost 23:11
24:2 35:15
137:6

lot 28:4
36:25 37:2
42:20
59:20
87:22
96:4,8
97:2
119:18
132:25
158:20
224:22
227:15
252:9
253:10
285:20

lots 171:18

loud 169:10

love 248:8

low 176:8

lower 101:11
174:11

luck 290:2

lunch
129:18,20

lurking
155:15

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 498

Lyndon   63:15

---

**M**

---

**M-42**   291:9

**machine**
22:17,18
24:18
39:20
40:24
41:1,2,8,
10  42:11
49:18
50:4,18
51:4,11
55:13,20
56:11,13
67:6  68:8,
11,13,17,
24  69:1
70:2,4,20
71:20
72:2,6
73:18,20
90:15
93:15
144:2
154:2
158:11,13,
15  165:22
172:11
174:1,2
176:4,6
177:11,22
178:6,11
182:6,20,
22  183:1
190:11

194:1,6,10
195:6
196:11,15
203:13,17
208:2
212:24
216:4,6,
18,22
217:4,6,15
220:11
222:4,6
228:22
232:4
233:4,10,
13,18
234:6,9,
10,18,20
235:10
236:2,4,6
237:4
242:4
265:22
266:17
277:18
279:10

**machine's**
67:6  235:8

**machine-level**
235:4

**machines**
23:11,22
24:22
25:10
38:11
39:15
40:2,4,8,
13,17,20

41:6  42:6
47:24
48:8,20
49:2,4,13
50:1,22
54:17
55:25  56:2
67:2,4
73:13,15
90:11
128:1
142:11,13,
15  143:11
144:11
145:22
146:2,18,
24  148:4
152:11,20,
22  153:6,
10,11,22
154:18,22
156:20
157:11
158:22
159:6,18,
22  160:2
161:2,15
162:20
163:2
167:13
170:18
172:2
173:20
174:8,9,
11,22
175:6,8
176:6
177:11,15,

18,22,24
178:4
179:4,6
180:4,8,17
184:17
189:13
194:6
197:22
203:11
218:18
220:10
223:17
232:2
235:6
277:25
278:2
283:22,25

**made**   12:8,9
15:18,20
16:1  19:20
44:11  71:2
92:9  98:13
166:15
169:22
176:20
185:8
208:9
237:17
239:24
253:4
265:22

**Madison**
80:15

**Magistrate's**
290:4

**magnifying**
242:6

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 499

**mail** 128:2

**mailout**
216:1

**main** 85:20
223:9

**maintain**
212:2

**maintained**
165:20
249:10
284:22

**major** 81:15
159:13
167:9
181:25
270:2,4

**majority**
34:24
162:10
223:8

**make** 10:11
16:6
18:13,18
22:11,20
23:15 48:4
54:22 55:6
70:24
71:24
74:20
75:18
93:22 94:8
104:22
106:11
107:20
130:4,6,8,

11,15
155:9
171:15
192:18
193:10
195:15
217:11,13,
20,24
237:15
238:22
253:11
259:4
265:18
267:11,15,
22 268:2,
9,15 270:8

**makes** 24:25
205:11

**making** 48:13
129:15
142:18
167:18
183:20
207:22,24

**MALE** 8:7
10:20
11:22,25
12:15,24
13:1 20:13
82:13
129:11,13
286:20
287:8
289:15,18,
20 290:10,
15,20,25
291:2,8,

11,15,18,
20

**malfunction**
24:18 50:8
51:11
93:15

**malfunctioning**
49:4,8
50:1,6
51:4

**malice** 23:18

**malicious**
16:2
178:15

**malware**
166:11,15
189:10,18
196:15
204:17,18
227:22
228:10
231:18
237:11
269:18,22

**manage** 212:4

**Management**
212:18,22

**manager**
67:11
68:13,15,
18,22 69:4
70:2,6,8,
13,15,20,
22 71:1,2,
15 72:4

73:15

**manager's**
73:22

**managers**
76:13

**mandatory**
11:18

**maneuver**
235:15

**manifested**
179:20

**manifestly**
23:24

**manipulation**
16:2

**mannerisms**
133:20

**manufacturing**
34:18

**mapping**
219:9
285:11

**margin** 25:20
26:10
177:13
184:11

**Marilyn**
10:13
31:2,15,
20,25
38:25
43:11
50:13
51:25

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 500

54:11
56:25

**mark** 55:10
132:8
283:13

**marked** 43:24
243:6
254:18
275:2
287:24

**Marks** 10:13
31:2,6,10,
15,20,25
32:1 35:1
36:8,22
38:10,15,
18,25 42:6
43:11
44:10
45:11
46:11
47:22
48:11,18
50:11,13,
17 51:25
52:2,9
54:11,15
56:25
57:2,10
58:2 59:24
60:2

**Marks'** 51:11

**married**
216:20

**Martin** 9:11

**Maryland**
160:20

**Master's**
139:20

**match** 152:20
235:20
268:13

**matched**
232:4,25

**matches**
249:18

**matching**
234:11,13,
15

**material**
159:17

**materials**
156:11

**math** 22:22,
25 23:4
86:18
102:13
111:18
191:11
270:2

**math/physics**
181:25

**mathematical**
30:18

**matter** 13:25
17:22
18:15
22:22
25:11

27:4,10
33:13
57:17
61:13
84:15
116:9
135:17
140:8
145:24
163:22
172:13
188:6
202:15
205:13
209:9
244:10
259:15

**matters**
121:2

**Matthew**
134:15
137:10,18,
24 138:4
150:18
156:8
187:13
188:15
196:22
204:2

**maximum**
194:9

**Mayor** 35:4

**Mcdonald**
8:16,17

**meaning**
231:6

**means** 17:20
181:20
193:4
263:15
270:20

**meant** 56:6
246:20

**meantime**
290:4

**mechanics**
150:4

**mechanism**
52:22

**mechanisms**
59:11

**Medicine's**
168:10

**member** 39:6,
8 211:20
218:15

**members**
36:17,20
211:18,20

**memory**
180:15,17
181:20
182:6,22,
24 183:11,
20 189:11
212:24
213:1,2
215:25
216:10,15,
18,22
217:2,4,8,

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 501

20 221:24,
25 222:1,
2,6 233:6
234:13,15,
22 235:4,9
236:22
266:11,13
267:1,25
284:18,22
285:2,4,6
286:10
287:18

**mentioned**
37:2 38:20
141:13
149:1
150:24
151:11
152:2
161:8
224:18
269:2

**mere** 26:4

**messages**
53:17,18
172:4

**method** 35:2
105:1
148:15
278:20

**methods**
106:4,9
149:20

**Metro** 271:6

**Mexico**

84:20,25

**Michael**
147:9
157:18
164:4,6
209:25
210:1,10,
15,20
243:4
245:18
254:13
276:20
279:22
286:18
287:11

**Michigan**
138:6,11,
13 139:15,
17,18,22
144:8
149:10
153:4

**Mickey**
272:11

**microphone**
80:9

**Microsoft**
142:2,4,
13,15,20
155:20
212:15

**middle** 26:24
116:10,18
172:2
202:15

**Mike** 268:17

**million**
223:20

**mimic** 11:22

**mind** 39:24
167:24
171:20

**mine** 81:18
173:10

**minute** 110:6
135:11
198:2
202:6
242:17
279:15

**minutes**
49:20 51:1
242:20,22
291:15

**miscalibrated**
224:2,6

**mischaracteriz
es** 190:20

**misleading**
111:1,9

**misplaced**
74:15

**misprogramming**
231:18

**missed**
176:15

**missing**
278:9,25

**misspelled**
19:13

**misstate**
244:20

**mistake** 8:13
148:18
178:13
220:18
242:4

**mistakes**
166:24
167:2,4,22

**mitigate**
88:15

**Mm-hmm** 20:6
219:8

**mock** 290:13

**mode** 53:22
55:22
56:2,4
173:22
222:20,22,
24 242:6
268:6
278:24
279:2

**model** 155:18
255:13,15

**modeling**
86:25

**models**
155:18
255:11,17

**moment** 41:15

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 502

113:4

**momma**   77:6

**Monday**
180:10,11
208:2

**money**   53:1,
10,13

**month**   133:13

**monthly**
175:25

**months**   34:25
165:2,6

**Morgan**
80:15,20

**morning**   8:6,
7 15:11
38:18
72:10
77:18
89:18
185:6
289:10,11

**motherboard**
284:2,4

**motion**   15:4
18:15,17,
18 112:17,
20 192:2
202:20
209:13,20

**motions**   24:2
57:20,22
180:24,25

**Mouse**   272:11

**move**   34:22
41:13
45:20
132:20
134:22
184:25
185:9
190:13
208:15,20
211:13
236:13
244:4
245:8
290:4

**moved**   20:13
192:13

**moving**   81:18
130:4
193:10
208:22
280:22

**multiple**
23:4 28:11
63:22
74:11
147:8
191:13
253:10,11
270:20
281:13,15

**mumbling**
139:6

**Muskogee**
229:2

## N

**name's**   77:18

**named**   63:18
142:2
197:8,13
262:24
266:4
272:22

**names**   12:20
19:13
199:13

**nation**
189:17
200:20

**national**
86:2
156:22
160:22
168:9,18,
20 170:2

**nationwide**
159:22

**nature**   24:11
32:11
135:20,22
136:18
167:11
278:13

**neces-**   59:18

**necessarily**
148:13
183:1
201:17
290:11

**needed**   70:20
184:4
217:6
218:11
253:11

**needing**   55:6

**negative**
28:4,6
77:6
115:8,11
200:10

**neglect**
103:15

**neighboring**
260:11

**nervous**
129:15

**network**
249:6
270:18

**Nevada**   109:4

**newcomers**
128:18

**newer**   122:15

**NEWS**   129:4,
6,9,11

**night**   52:18
73:11
185:4
232:9
234:11

**Nobody's**
18:25

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 503

non-partisan
   32:8

nonconfidentia
l   187:24

nonpartisan
   36:18

nonprofit
   32:8 86:6

nonprofits
   85:2,25
   86:2,4

normal   56:18
   241:22

North   34:11
   36:11
   41:10

north-south
   27:18
   265:15

Northern
   143:15

notate
   216:22,25

note   263:13

notes   63:6,
   11,20
   65:1,13,
   15,17,20,
   22 66:2,15
   67:18,25
   78:17,22,
   24 79:1,2
   129:2
   224:22

notice   131:4
   135:4
   136:6,18
   287:25

noticed   47:9
   67:4 68:4,
   22 71:1
   208:25
   258:2
   280:11,13

notices
   287:20

notification
   218:15
   223:11

notify   253:2
   288:4

notion
   161:11

November
   25:20
   46:13
   62:22,24,
   25 63:1,22
   83:2
   133:18
   153:6
   165:18
   196:11
   212:6,11
   223:17,18
   225:8
   244:13
   252:22
   255:18
   256:25

261:22
262:1
264:11
274:20
275:4
281:18,22

number   8:12
   26:25
   27:1,9,11
   29:22 30:6
   33:17,18
   40:11
   44:15
   57:11 67:2
   76:2,8
   99:17
   100:15,25
   101:15
   102:13
   103:2
   109:18
   113:2
   116:4,22
   119:6,13
   122:11
   123:6
   124:11
   126:18
   132:15,17
   194:9
   201:24
   202:10
   215:22
   216:10
   217:2
   218:8
   224:18
   226:4

239:9,15
241:2
260:6,20
261:4,8,24
266:11
271:8,25
272:1,2,4,
   6,22 273:1
275:22
276:4

numbers
   25:10,11
   40:6 67:6
   75:13
   92:20
   97:2,6,17
   98:22 99:2
   105:22
   107:1
   108:13,15,
   22 109:20,
   24 110:9,
   15 111:10,
   24 112:8,
   18 113:17
   114:20
   124:4,6
   172:20,22
   174:22
   175:6
   176:11
   177:9
   192:4,11
   193:1,4,6,
   8,11,15
   195:6
   203:2
   261:13

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 504

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019 Index: numerical..obtain

**numerical**
195:13

**numerous**
160:22
179:18

---
O
---

**oath**
289:18,20,
22

**object** 10:25
32:20 33:8
38:4 42:4,
13 44:18
47:22
48:10 50:4
59:1,13
69:10 70:6
90:20,24
91:18
100:1
103:25
108:11
109:2
111:2,4
121:9
131:11
133:9
144:24
145:6
154:15
158:13
162:15
163:11
165:4
169:2

181:2,4
184:15
185:20
188:4
195:20
197:6
198:11
204:24
206:11,20
220:20
221:6
225:11
226:13
228:2
230:15
232:13
233:22
243:13
247:18
261:4

**objected**
182:8
208:6

**objection**
13:6 17:8
41:18
45:22 54:4
57:18
59:15 66:6
71:6 83:6
92:6 97:1,
9 106:18,
20 108:22
109:13
129:20
134:25
145:4

155:10,11,
13,17
158:25
168:24
171:6
172:9,18,
24 173:4,6
174:15,18
180:22
186:10
188:11
195:18
198:11,20
202:20
225:17
226:6
228:18
232:18
237:18
247:15,24
248:17
251:10
255:4
264:4
266:20
273:13
275:9
282:6
284:10
288:11

**objectionable**
45:2

**objections**
11:2 33:17
77:2
136:10
155:9

274:10

**observations**
62:18
63:20 66:2
67:20
72:24 79:1

**observe**
47:6,15
48:24 62:9
72:2 73:4,
8,20 78:2
171:22
218:15,17

**observed**
40:8,15,18
49:18
66:25
96:24
98:22
149:11
176:11

**observer**
62:10 63:6
77:22 78:1

**observing**
42:8 62:15
63:8 65:13
66:17 69:2
77:20
147:11

**obtain** 44:22
139:18
144:11
246:1
252:2,22

obtained
 140:2

obvious
 20:22
 97:15

occasions
 191:13

occurred
 26:8
 189:15
 195:13

OCGA  24:6

odd  124:20

oddity  194:1

odds  176:4
 198:2

offer  131:4
 154:24

offered
 182:4
 284:9

office  39:9
 76:6 99:6
 105:1
 107:2
 167:13
 210:22
 211:13,17,
 22 212:4
 213:10,11,
 22 214:8,9
 215:6
 222:20
 223:9

224:25
225:6
228:22,25
229:25
230:6,15,
18 231:20,
24 232:11
233:1
238:18
244:1
246:4
248:22
249:11,13
253:2,15
260:24
267:6,15,
24 269:13
271:8
273:2
274:6
280:13
290:22

officer  28:9

offices
 256:4

official
 223:11
 261:8,10,
 13 274:1

officially
 77:24

officials
 49:20 72:2
 141:10
 147:10
 223:10

225:2

Ohio  160:18

older  95:18

Olens  25:18
 203:6

omits  24:10

omitted
 278:13

op  239:18

open  18:13
 44:15
 45:13
 165:2
 166:2
 167:8
 270:9,18

opened  58:1
 229:18

opening  16:6
 18:11,13

operate  40:9

operates
 56:15

operating
 47:18,25
 141:20
 142:17,22
 143:6,9
 152:4,9
 155:20
 182:24
 237:2,4,6
 267:11

operation
 40:15
 47:15,24
 150:2
 183:4
 212:2
 217:18
 222:4
 278:6

operational
 249:11

operations
 40:13
 144:2
 211:15
 223:17
 248:22

opine  47:24

opinion  97:6
 104:2
 121:2
 158:11
 159:2,20
 162:13
 163:8
 166:24
 170:4,22
 171:1
 172:8
 173:18
 174:22,24
 175:4
 195:11
 198:18
 280:18

opinions

41:25
143:18,20,
25 158:11
162:4
169:9,10
170:2

opportunity
73:4
104:13
110:8
113:1
126:10
134:4
136:13
180:15
208:2
230:2
252:11,13

opposed
28:13
57:15
265:17

opposing
57:13

opposite
177:22

opposition
112:18

optic   216:1

optical
239:8
252:17
265:4

option
285:22

order   12:13
14:17 25:4
28:20 53:2
130:2
181:13,18
209:18
217:20
220:1
221:22
223:15
240:13
247:8

ordered
182:22
183:25

ordinary
68:9,18

organization
32:8,9,11
34:9 35:18
46:4 52:22
53:11
62:11 86:6

organizations
85:2,25
86:1

organize
219:22

orientation
242:13

original
158:6
224:11

other's
17:20

outcome
161:20
269:20

outlier
94:25

outlined
224:20

outstanding
266:25

outward
234:11
270:13

overrule
198:20

oversee
211:6

oversees
212:6

overtake
251:10

overturn
30:10
184:10
226:9

owned   249:17

owner   34:17

_____
        P
_____

P-2   64:22,
 24 65:25

P-3   97:20,
 24 98:1

P-5   168:2

P-7   168:2

p.m.   130:1
187:6,8
242:25
243:1
291:22

pack   116:18
202:15

package
87:20

packet
214:22
255:9

pad   55:11

pages   66:11
82:2
168:15
170:13
240:18
253:18

paid   52:4

pair   270:13

pap-   197:18

paper   21:6,
8,22 22:10
27:2,13,18
28:2 33:11
37:2,9,13,
17 38:2,13
41:13
43:2,4
104:17
105:15

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019   Index: papers..people

106:13
125:18
148:4,25
149:22
151:10
161:17
171:10,11,
13 174:8,
11 175:6
188:20,22
189:1
199:11,18,
20 206:15,
22 207:11
257:6
258:6
264:25
276:13
277:1,4
282:4

papers
140:22

paperwork
208:18

paragraph
111:25
112:1
238:11

parallel
267:11,20
268:20
269:20
287:2

part   14:1
32:15
35:11

53:1,2,6,9
125:18
133:20
156:11
169:22
170:13
183:10,11
205:9
211:13
256:17
261:11
262:4
265:20
278:1
287:15

partial
131:22

participate
252:11

participated
62:4
261:1,2,22

participation
88:8
257:24
275:20
282:4,11

particularitie
s  199:6

particulars
201:17

parties
133:2
262:15,24
266:4
272:22

273:15

parts   163:10
236:22

party   24:6,
10,13 30:6
36:18
39:13
46:20
75:6,20
76:18 78:2
86:2,6,10
131:6
132:4
176:4,6,8
177:20
181:10
197:8,13

party's   24:8

pass   277:22

passcode
215:11

passionate
81:18

password
246:11

past   85:8
86:15,17
88:11
113:18
119:6
206:6

pattern   21:4
108:8,9,25
175:15
177:22

199:1
205:18
229:15
230:11,22
231:13

patterns
20:24,25
95:22
113:17
123:17
124:10
198:9

pay   53:2

Paying   108:2

PDF   252:18

peer   141:2,
4 163:4

pending
18:15

people   21:9
22:6 25:6,
24 29:10
47:10,11
89:6 98:13
100:15,17,
20 157:25
163:20
179:4
190:17
191:4,15
210:2
211:22,25
223:20
226:4
230:17,25

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 508

243:25
257:13
280:2,15,
20 281:6

**percent**
21:11,15
22:1 32:17
101:2,6,
11,13
102:11
105:8,10,
11,15,18
107:2,4,6,
9,10,13,
15,18,25
120:24
125:17
126:6
152:25
274:22
275:6

**percentage**
101:10
102:4,15
103:22
104:2,25
107:4,13,
17,22
120:22
274:17,18,
20

**percentage-
wise** 106:8

**percentages**
106:4

**Perdue**

120:15

**perfect** 29:2

**perfectly**
63:10

**perform**
86:18
183:4
186:9,13
190:2
193:18
196:6

**performance**
117:4,22
118:6,8

**performed**
190:6,11
196:2

**period** 46:22
208:11
231:18
268:11

**permission**
132:20

**person** 17:25
19:15
21:20 26:2
56:11
65:22
105:10
136:6
198:18
280:8

**personal**
34:11
43:17

153:4,8
154:18
155:11,13
164:18
177:2
188:20

**personally**
39:20
40:2,20,22
41:11 47:6
90:8
153:20
154:22
164:24
165:4
193:18
224:22

**perspective**
49:9
152:22
159:11
164:25
166:13
179:1,20

**persuasion**
21:10

**pertaining**
140:24
206:13

**petition**
37:4

**petitioner**
13:20
31:17
60:24 80:1
84:2

137:20
184:22
210:11

**petitioner's**
29:13

**petitioners**
13:17 29:4
37:4,9,11
184:20
209:24
284:9

**ph** 65:20
200:25
245:18
290:6

**Ph.d.** 138:6
139:24

**Phd** 138:11
170:13
175:11

**phenomena**
175:2

**Philip**
132:18
158:6
190:6
193:20

**phone** 136:22
215:6

**phonetic**
243:11

**photographs**
72:25 73:2
74:15

www.huseby.com       Huseby, Inc.  Regional Centers       800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 509

Case 1:17-cv-02989-AT   Document 449-11   Filed 07/03/19   Page 356 of 389

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019 Index: phrase..politically

**phrase**
121:11

**Phrased**
226:24

**physical**
217:1,2
235:13
248:24
282:20,24

**physically**
153:9
213:6

**physics**
270:2

**pick**  67:2
254:15
276:22

**picked**
218:24

**picture**
255:11

**pictures**
255:9,11

**piece**  88:24
189:9,18
257:6

**place**  8:11
19:9 25:13
27:11
33:15
49:13
94:22
97:11
115:25

207:15
216:22
239:20
250:18
252:20
261:15
285:11
289:22
290:22
291:13

**places**  30:22
160:2
221:25
287:20
288:1

**placing**
217:2
270:13

**plagued**
238:6

**plaintiff**
9:22 10:13
24:25 25:2
79:15
80:11
168:15
202:22

**plaintiff's**
44:4 64:4
98:2,6,18
112:15,20
168:4,8
194:2
243:8

**plaintiffs**
15:6 24:4

26:11
29:18,20
30:11,20
42:2 60:10
79:15
83:1,13
84:15
136:8
138:8
151:22
152:1

**plan**  34:22
36:13

**planned**
74:11
82:11

**plausible**
22:15,17
24:18
29:24

**play**  30:6
238:22,24

**pleased**
258:17

**point**  23:15
29:17 68:8
71:8,22
74:10
93:13
97:2,8
109:2
111:20
113:2
122:11
129:1
144:22

159:6
160:4
181:13
193:20
198:15
205:1
206:20,24
217:4
218:18
223:10
238:11
251:9
262:13
283:1

**pointed**  14:8
15:1 71:15
195:4

**points**  15:15
96:8
111:13
125:18

**policy**
206:11

**political**
21:10
81:4,15
84:22
85:1,2
86:1,4,6,
10 114:15
119:17
189:2
198:4
199:2

**politically**
88:20

www.huseby.com    Husebu, Inc. Regional Centers    800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 510

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019   Index: politics..precinct

politics
  25:11
  201:11

poll  36:15
  39:11
  40:9,11,17
  46:11,15,
  18,20,24
  47:2,4
  48:22 50:2
  55:6 62:9,
  10 67:4,10
  70:13,15,
  20 72:2,25
  73:2,9
  76:13
  77:20,22,
  25 78:1
  81:17,22,
  25 82:6,8
  153:2
  197:18
  205:11
  246:2
  288:4

polling
  46:25
  47:4,8
  49:22 73:4
  87:13
  115:25
  200:6
  218:20
  239:2
  287:20
  288:1

polls  28:22

55:10
122:15
200:22

Ponce  46:24
  47:4 50:2,
  24

poorly
  126:20

popping
  172:4

popular
  123:20

port  270:11

portal
  251:22
  252:2
  270:13

portion
  35:10
  101:1

portions
  246:10

pose  168:22

position
  13:15
  22:20
  23:10,11,
  17 25:1
  27:18 34:2
  51:15
  52:2,4
  70:15
  134:13
  151:1,4

210:25
240:11
278:17
283:13

positions
  15:13
  218:9

possession
  268:2

possibility
  258:22

possibly
  26:6 95:6
  119:11
  136:13

post  148:13
  260:22

post-  35:22
  36:6

post-election
  36:10,13,
  15,17,20
  149:8
  206:4,6
  207:9
  217:15
  231:22
  258:15
  260:22
  278:24
  279:2,10

posted
  287:20
  288:1

potential

166:11
230:22

potentially
  86:22
  144:25
  167:15
  283:6

power  24:8,
  11 213:1
  217:10
  246:2

powered
  237:4

powering
  223:22

practical
  39:17

Practice
  18:20

practices
  38:2,11
  42:15
  186:13

pre-  217:15

pre-election
  222:22
  234:8

pre-filled
  268:8

preceding
  289:24

precinct
  50:24
  75:20

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 511

76:2,9
125:2
128:2,4
174:2
176:25
177:10
178:25
189:25
190:4
192:24
193:18,24
194:6
195:2,11
196:4,8
232:11,25
238:24
263:11,13,
18,20,22,
24 264:10,
11

**precincts**
124:17
125:2,4,6,
11,13
126:1,6
127:2,25
195:2,4
214:1,18,
20 238:22,
24 272:1,2

**predicate**
198:15,17

**predominant**
239:11

**prefer**   133:6

**preference**

9:4 241:6
252:10

**prefilled**
218:6

**prematurely**
223:22

**preparations**
147:8

**prepare**
136:6
265:22

**prepared**
98:18
138:18

**preparing**
136:1
215:25

**present**   99:2
111:11
229:18
264:10
271:24
278:15
281:1,24

**presented**
14:2 24:2
101:22
111:15

**presenting**
28:15

**preserve**
20:18

**preserved**
19:1

**president**
259:24

**presidential**
241:6
252:10

**presiding**
15:10
236:11

**press**   28:4,6
115:8
200:11
283:8
288:6

**presses**
219:6

**pressing**
219:13
287:22
288:1

**pressure**
283:13

**pressure-point**
283:11

**presumed**
29:18

**presumption**
24:11,13

**pretty**   97:15
169:10

**previous**
46:15
88:13
119:9
191:25

229:8
235:20

**previously**
127:17
133:6
184:13
190:15
197:22
229:4
232:4
248:13
249:18

**prima**   22:9
24:4

**primarily**
36:11

**primary**   75:2
241:6
252:10

**print**   64:11
65:6,9
73:2,11,
15,17
279:2

**print-on**
217:1

**printed**
76:13,15
217:15
234:11
235:20

**printer**
217:22
218:1
239:18

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 512

printing
 236:4,6

printout
 268:13

printouts
 285:15

prints   66:9

prior   29:15
 95:22
 101:18
 102:8
 104:2
 118:17
 135:4,15
 190:15
 200:6
 249:13
 277:10

privacy
 32:10

private
 249:6

probative
 21:4
 109:22

problem
 18:2,10
 20:15
 26:8,9
 49:22
 51:15  69:2
 75:18
 148:18,20
 171:15
 176:11

178:9
278:25
282:20,24,
25 283:4
286:22
287:2
288:4

problems
 32:18
 35:15
 37:20
 147:15,18,
 20 148:2
 150:4,6,11
 162:18
 163:2
 167:22
 179:25
 223:6
 287:4,6

procedure
 18:15
 42:24
 136:10
 209:10

procedures
 37:17,20
 38:2,11
 42:15

proceed
 207:25

proceeding
 39:4
 135:22
 206:13

proceedings

23:2,25

process
 19:15
 54:15,20
 55:4 63:10
 135:22
 194:13
 214:13
 216:4,15,
 22 252:13
 277:20
 278:2

processes
 37:15

produce
 24:10
 233:15
 241:15
 252:18

produced
 212:20
 214:17
 232:6
 233:13
 268:13

produces
 239:4

product
 212:17

production
 252:22

profession
 170:6

professionally
 10:15

professor
 132:18
 133:13
 192:22
 193:15
 195:15
 196:2

proffer
 131:4,6,9
 132:10,11
 181:1

proffers
 98:13

profiled
 26:18

program
 141:22
 161:22
 212:20
 219:18
 220:8
 250:10,13,
 25 283:20
 286:6

program's
 259:11

programing
 216:4

programmed
 141:22
 178:13

programming
 15:25
 167:13,20
 178:4

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 513

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019    Index: programs..put

207:18
211:6
212:24
213:6
218:24
219:1,2,4,
15 220:18
249:8
250:2
277:15
278:8,13
283:15
284:8

**programs**
245:22,25

**progression**
40:15

**promise**  31:8
60:15
79:17
83:18
137:11
210:4

**proof**  25:4
241:10

**proofing**
253:11
278:22

**proofs**  246:2
252:2

**propagated**
189:10,18

**proper**  44:22
155:17
172:15

217:15,17,
20,25
235:18

**properly**
47:25
76:24
77:10
223:24
268:18

**properties**
141:20

**prosecution**
22:13

**protection**
246:11

**prove**  24:20
110:22
237:20

**proved**
245:1,2

**proven**
244:15,17

**provide**
161:10,20
164:17
214:15
215:6
219:1
252:15,18
267:17

**provided**
13:22
215:9,17
278:22

**providing**
42:2

**public**
113:18
117:10,15
168:13
187:25
218:15
228:15
270:20

**publication**
163:4

**publications**
156:20
162:4

**publicized**
218:13

**publicly**
85:17

**publish**
141:4

**published**
140:22
141:2
148:4
149:24
158:4
160:17

**pull**  193:6
220:6

**pulled**  68:11
193:1,2,6,
8,11,13

**pulling**

133:11

**purpose**  18:1
164:15
168:20
213:6
220:6
241:10

**purposes**
239:9
252:2
278:22

**push**  277:13
287:15

**pushing**
234:10
238:13
241:11
282:22

**put**  64:6
71:15
72:6,8
74:17
79:1,2
93:22
108:13
132:9
209:18
216:13
217:1
218:15
223:1
228:11
236:13
242:6
248:8
249:13

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 514

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019    Index: Putin..questions

250:15,18
283:8

**Putin**   270:22

**puts**   85:13
151:15

**putting**
85:13
108:13
170:15
215:20

---

**Q**

---

**quacks**
185:24

**qualification**
42:15
155:11

**qualifications**
82:11
138:17

**qualified**
33:9,18
38:6,11
39:2,11
41:18
42:4,6,22,
24  43:1,15
59:20
92:13
97:13
108:11,13
143:11,13
151:11
198:18
213:24

**qualify**   34:2
92:17,22
97:13
145:20
150:1,10

**quantify**
175:15

**question**
9:18 29:25
30:18
32:22
33:15,18,
22  38:4,10
39:25
42:25
43:15  45:2
48:2,13,25
50:4,9,17
51:8,13
54:22
56:10,11
57:4  59:4,
15  74:13
76:17
88:25
97:18
100:4
104:8
106:22
109:6
112:24
120:8
121:10,11,
13,18,20,
24,25
124:2
126:18

127:15
146:10
149:17
154:10
158:15
162:2,24
163:15
165:8
171:9
173:13
176:15,17
182:10
185:9
186:2
191:18
195:22
198:15,22,
24  202:2
203:4
204:24
205:6,18
206:11
208:4
221:18
226:22
231:4,25
232:15
233:18
237:22
247:18,20
249:2
254:1
261:1
267:8
281:4
284:6
288:6

**questioning**
220:22
275:13

**questions**
34:8
38:15,20
41:15,17
43:13
51:18
58:15
59:10,24
66:15  79:6
82:2
89:15,20
90:22
91:2,13,15
92:22,25
94:10  96:9
108:18
113:8
114:4
119:22,25
120:25
121:1
123:6,11
128:20
144:24
145:2,10
150:15
153:15
154:6,11
183:25
188:13
203:20
237:20
245:6
254:10
262:11

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 515

270:1
279:17
287:8
288:10,13

**quickly**
15:8,15
187:2
205:18
276:22

**quit** 179:15
238:13

**quote** 24:6
25:22
171:11

———————

**R**

———————

**R6** 255:13,
15

**rabbit** 188:4

**race** 21:11,
24 22:6
28:13 30:2
71:2,15,
17,18,25
73:13
75:15
87:13 89:8
95:22
97:11,15
99:15,18,
24,25
102:6,10
104:15
105:24
106:15

107:22
108:10
109:4
113:20,25
114:1,24
115:22
117:13,17
118:1,2,17
120:10,11,
15 122:25
123:13
125:18
126:2,11,
13 127:18,
20 128:13,
17 171:25
177:11,13
179:15
184:18
199:6
200:6,9
201:18
219:22
221:22
225:13,18
230:11
231:13
240:1,13,
15,18
241:2,18,
24 242:1,
9,11,13
244:13
254:6
255:20
256:1,2,
10,11,15
257:2,6,9,

13,20
258:1,9,13
259:9
262:6
264:18
265:4,6,9,
10,20
268:24
271:4,24
272:2,6,8,
24 276:24
279:2,9
280:22
282:6,11
285:20,22

**races** 71:4
73:13
94:20,22
95:18,22
102:4,8
108:24
113:18,24
116:6
117:15,18,
24 119:6
124:4
125:25
126:11
198:10
199:9
200:17
201:2
202:11,13
213:24
214:10,11
218:10
239:2,6,15
240:13

241:22
242:2
252:18
254:25
255:22
258:18
263:13,20,
22 264:9,
10 268:22
271:6
272:25
273:18
279:6,8
281:15,17,
24 282:10,
15

**racial** 28:11
115:10,11

**raise** 31:6
52:25
53:10
60:15
79:17
83:18
137:11
210:2

**raised**
57:18,20
131:22
183:24
184:13
190:15
198:2
226:9
230:13
237:18
269:2

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 516

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019    Index: raises..received

270:1

**raises** 15:17

**raising**
53:13

**ran** 26:25
35:4
116:11

**random** 22:4
175:24
177:18

**randomly**
176:4

**range** 26:15
86:2
102:20

**rare** 179:6

**rate** 105:8
171:24
174:10
205:22
282:4,11

**rates** 122:17
123:1,2
124:15

**raw** 179:6

**RE-DIRECT**
56:24

**re-elect**
38:4

**re-litigate**
284:11

**reach** 24:8
85:4,18

109:10
260:24

**reached**
170:22

**reaction**
73:22

**read** 20:24
64:8,13,22
131:17
135:20
169:6,22
170:13
171:18
194:18
216:18
218:2
222:6

**read-** 286:4

**read-only**
182:24

**reader** 218:2

**reading**
133:17

**ready** 130:9
131:1
218:20
267:6

**real** 44:18
51:22
128:8
149:2
208:22
276:22
290:18

**rearguing**
24:2 93:9

**reason** 14:18
18:1 21:2,
11,25 22:8
109:13,20,
25 148:6
178:6
217:6
221:4
238:9
244:24
269:22

**reasons** 21:2
28:11
89:11
91:22
92:13 95:4
96:13,15,
22 97:15,
17,18
121:17
122:6
139:8
280:10

**rebooting**
179:4

**rebut** 93:13

**rebuttal**
17:11

**rebutted**
24:13

**recalibrate**
278:1

**recall** 68:4

120:11
121:6
123:8
170:20
204:15
246:15
252:6
258:9
262:17
267:8

**recalling**
194:4

**receipt**
234:15

**receive**
28:20 52:6
76:18
116:4
214:25
215:1
223:6
224:18
264:18,25

**received**
26:13,17,
18 28:4
95:6
116:22
117:11,25
123:6
125:2
188:1
200:11
202:9,10,
17 215:2
223:6,15
231:20

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 517

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019   Index: receives..refused

246:20
255:6
262:15
277:8

**receives**
73:10

**receiving**
69:25
231:22
246:15

**recent**
142:25
152:18

**recently**
81:24
136:11
140:20
160:20

**receptive**
217:13
281:10

**recertificatio
n**   229:1

**recertified**
229:11

**reckon**
196:18

**recommend**
206:9
207:8

**recommended**
186:13

**reconciled**
16:1

**record**   18:18
19:2,4
20:10,11
31:24  46:2
51:10  61:6
64:6,20
65:25  66:1
72:13
73:11
80:10
84:10
98:13
106:20
107:20
109:8
121:22
129:25
130:22
132:9
138:2
168:1
169:25
185:20
187:6
190:15,22
209:22
210:18
228:11
233:18
234:15,22
238:11
242:25
244:25
269:4
273:18
275:2
277:13

**recorded**
29:1  77:10
157:22
219:15
233:11
279:6
287:15,17

**recording**
9:2  35:2
65:13
234:18

**recordings**
8:14

**records**
40:15
44:11,13,
15  45:13
166:11
187:25
232:1,4
247:2

**recounting**
207:15

**recourse**
161:10,11

**recovered**
235:8

**RECROSS**
286:17
287:10

**RECROSS-
EXAMINATION**
50:13
113:11
114:6

**red**   49:17
50:6,22

**REDIRECT**
43:10  93:2
120:4
156:6
187:11
204:1
279:22

**reduced**
241:13

**refer**   67:18
99:4

**referred**
245:17
284:6

**referred-to**
44:2  52:13
64:2  98:4

**referring**
204:8,10,
11  245:20

**refers**   247:1

**reflect**
101:6
130:22

**reflected**
111:25

**reframe**
158:25
172:25

**refused**
184:24

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 518

**regard**
121:15
247:1

**registered**
77:22
80:18
81:6,25
83:2
275:15,24

**registration**
9:13
157:22
166:9
167:6,9
189:20
204:18,25
205:2,8,13
225:10,13,
24  226:2
227:4,11
237:18
238:6
247:2
260:25

**Registrations**
28:18,24
38:20
89:20
150:24

**regular**
177:22

**regulation**
164:4

**regulations**
240:17

**regurgitating**
184:13

**rejected**
223:22

**relate**  58:24
142:20
251:13,15,
18  281:2

**related**
141:1
165:13
206:20
214:18,20
243:13
244:6,9
251:20

**relates**
96:24
155:2

**relating**
67:25
101:18
190:25
226:20

**relation**
265:2
280:20

**relationship**
239:4

**relative**
201:15

**relayed**
214:2

**release**

157:2
273:15

**relevance**
57:18
59:15
165:13
180:22
184:15
226:13

**relevancy**
145:6
162:15
165:13
228:2

**relevant**
45:25
57:22
59:17  92:2
116:20
146:4
155:2,13
162:18
181:2
184:17
206:13
225:15
247:22
248:6

**reliable**
20:2

**relied**
170:11
171:15

**relies**  24:11

**relocated**

211:15

**rely**  170:4,
6

**relying**  17:4

**remain**  60:2

**remaining**
17:9  18:2

**remedy**  25:25

**remember**
110:20
113:4
191:10
198:24

**reminder**
16:10

**removed**
217:4

**render**
198:18

**renew**  41:18
97:1
202:20
228:17

**renewed**
112:15

**reorganization**
34:18

**repair**
150:11
277:24

**repeat**
198:22

repeated
  166:22

repeatedly
  182:13,15
  247:4

repeating
  39:24
  164:13

repel  24:9

rephrase
  106:18
  153:17,18
  195:22,24
  230:18
  232:20

rephrasing
  59:6

report  75:6,
  20 76:22
  77:8 98:18
  99:2,10
  104:25
  160:18,22
  168:10,13
  178:24
  214:22
  223:2
  262:13,15,
  20,22
  263:13,17
  264:11
  265:22
  266:6,22
  271:22
  278:20

reported
  76:1,6,10,
  17 157:20
  174:1
  179:2,11
  191:15
  195:8,9
  232:8
  234:6,11,
  22 279:4

reporter
  61:9
  129:4,6,9,
  11

reporting
  63:11
  75:13
  149:17
  171:25
  172:2
  179:4,13
  272:2

reports
  160:20
  191:4
  214:17
  235:22
  252:15
  262:11
  263:11
  264:6,8
  266:10,11
  271:22
  278:20
  279:2

represent
  38:18

89:18
  150:22

representative
  16:18
  25:25
  124:6,13,
  18 125:2,
  13 126:1,
  2,8,22
  127:2,25

representing
  25:18

Republican
  177:13
  178:4,8
  204:11
  219:15
  220:11
  240:11
  241:6
  259:4

Republicans
  252:11

request
  10:11
  11:11
  12:13 17:4
  29:13
  44:11,13
  51:11
  98:18
  135:2
  183:25
  267:17

requested
  184:2

requests
  44:15

require
  23:15 96:2
  149:20

required
  14:15 43:1
  56:8 59:11
  154:25

requirements
  53:10

requires
  26:4 47:22
  135:2
  230:15
  235:15

research
  103:20
  140:20
  142:2
  189:6

researched
  142:4

resemble
  108:17,25

reserved
  26:1

reside
  219:15
  283:25
  286:9

residence
  166:6

residency

249:13

resident
  39:10 41:6
  80:20

resides
  196:15
  283:20
  284:1,22
  285:4

resisted
  24:24

resolved
  15:8 67:9,
  10

resources
  32:17 87:2

respect  29:4
  124:9,10
  135:2,18
  158:11
  159:15
  162:13
  228:22
  238:2
  253:13,15,
  18

respond
  117:2
  131:24,25
  145:22
  155:15
  277:18
  283:4

responded
  162:4

182:15

responding
  106:20
  149:11

response
  11:20,22
  14:9 22:24
  23:1,2
  44:11
  69:25
  112:15
  120:8
  192:1
  204:18
  235:2
  283:2

responses
  223:4

responsible
  213:11

responsive
  32:22
  218:10
  235:18
  278:6

rest  51:11
  132:4
  139:9
  192:6,13
  203:2

restating
  248:13

restored
  235:11

result  19:9,

22 26:4
29:22
30:22
48:18
69:22
71:10
222:18
233:15
234:6
235:9,24,
25 242:4
256:13
257:13
262:6
280:2

results
  19:18
  22:18
  25:15
  29:20
  35:22
  85:15
  86:25
  87:18
  89:13
  92:1,13
  94:13
  96:24
  157:4,8
  172:6
  173:2
  174:2
  177:8
  190:10
  219:25
  236:20
  262:13
  268:13,15

269:11
282:13

retained
  211:25

retender
  96:20

retired
  34:15

return  151:8
  215:6

returning
  72:22

returns
  271:4,18
  274:2,6

reveals
  56:13

reverse
  181:9

review  13:2
  44:13
  70:24,25
  94:13
  95:11,13
  103:8
  107:20
  108:24
  110:9
  111:24
  114:10
  124:6
  141:2,4
  153:4,10
  156:11
  160:18

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 521

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019Index: reviewed..running

163:4
172:2
178:17,22
179:10,13,
15,17
180:15
182:22
214:13,24
228:22
233:20
237:4,11
252:2,13
276:24

**reviewed**
39:22
40:2,4
94:18
101:18
105:22
106:1,2
108:24
109:11
147:4,6,9
156:11,15,
20 157:1,
2,4,8,10,
17,20
160:10,15
162:4
178:22
187:20
190:25
199:2
200:6
214:8
272:20

**reviewing**

**reviews**
153:8
191:4

**Rhonda** 9:11

**Rice**
138:22,24
139:10,11

**Richard**
16:20

**Richmond**
229:2

**Rick** 147:9
157:18
164:4

**ride** 69:6

**rig** 23:20

**right-hand**
241:25

**right-leaning**
205:25

**rights**
151:18

**ripped**
133:22

**risk** 149:13
166:18,20

**rite** 131:18

**Robyn** 131:4

**role** 30:6

62:6 75:2
90:2
238:18

**ROM** 182:24

**roof** 236:9

**room** 290:18

**rooms** 291:4

**round** 176:15

**routine**
53:10

**routinely**
228:10

**rows** 101:25

**rule** 8:14
10:20
11:2,11
13:1
16:10,11
17:13 18:4
108:18
129:6
133:11
135:2,6,
11,15
136:2
137:1
154:13

**ruled** 19:4,6
172:15
181:2,4
184:6
190:11
202:25
208:18

221:2
237:15
238:8,13
247:4,17,
25 248:13
261:11
284:11

**rules** 135:20
136:18,22
240:8,9,
17,22

**ruling**
130:10
169:25
190:15
208:8
209:10,11

**rulings**
143:22

**run** 27:25
86:11
116:17
141:11,20
142:15
152:4,8,11
207:8
244:22
259:25
260:4,9,11
262:13,20,
22

**running**
27:22
115:6
128:15,18
142:6

www.huseby.com     Huseby, Inc. Regional Centers     800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 522

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019  Index: runoff..secretary

152:15
166:2
180:4
200:4
201:10
202:18

**runoff**   62:18

**Russia**
270:22

---

**S**

---

**sadly**   21:18

**safe**   291:11

**sample**   21:9
149:15
167:6
214:15,22
252:15
278:22

**samples**   22:4

**Sara**   60:11,
22  61:2,6
65:15
72:20
74:25
77:15
78:13

**satisfactory**
24:11

**satisfied**
13:20,22

**satisfy**   14:2
83:4

**saved**   215:2,
13  284:17
285:2

**saving**
217:25

**scalability**
252:8

**scaling**
241:4,11,
13

**scan**   216:1
239:8,18
252:17
265:4

**scanners**
216:1

**scenarios**
194:24

**schedule**
129:18
135:24

**scheduled**
135:15

**scholarly**
156:15

**school**   61:24
81:13
117:9
131:18
139:1,2,13
195:6

**science**
39:15
81:15

84:22
138:6,25
139:4,18
162:6,11,
13  163:4
168:9
198:4
199:2

**Science's**
160:22
168:18

**Sciences**
156:24
170:2

**scientific**
148:15

**Scientists**
168:20

**scoring**
142:20

**screen**   40:10
49:4,15
70:24,25
172:2
179:10,13,
15,18
217:11
218:11
219:9
223:20
224:2,11
235:15,17,
18  239:18
241:4,11,
13,18
242:2,9,11

255:15,17,
20  256:15
259:2
266:15
268:1
278:1
280:22
281:15
282:2,20,
25  283:10
285:11
286:22
287:15

**screens**
50:22
160:4
254:6
255:20
256:13

**sealed**
218:20

**seat**   31:11
61:8  79:9,
20  80:8
83:22

**seats**   8:8
10:2  124:6

**secondary**
19:24

**seconds**
289:1

**secretary**
44:13,15
45:13  46:4
57:15  74:9

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 523

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
**Transcript of Hearing Proceedings on 01/17/2019   Index: section..sessions**

76:6,11
95:8,17
98:22
99:10
101:13,18
104:20
105:22
106:9,13
107:2,6
109:17
117:1
118:13
131:6,13
167:11
177:8
192:4
201:10
210:22
211:1,13,
17,22
213:8,10,
22 214:8,9
222:20
225:4,20
226:18
227:13
228:25
229:9,13,
24 230:4,9
231:11,15,
20,24
232:11
233:1
235:2
236:22
237:10
246:4
248:20,22,

25 249:10,
13 260:24
265:11
267:6,15,
24 269:13,
15 273:17
274:2,6
280:13
281:24

**section**
225:4

**secure**
141:11

**Secured**
168:10

**security**
140:10,11,
18,20,24
141:20
158:6
166:24

**seek**   27:25

**seeking**   37:6
52:25

**selected**
193:22

**selecting**
193:22

**selection**
70:25
71:2,17,24
168:15
259:4

**selections**

268:9

**self-**   67:11
70:20

**self-cast**
71:22

**self-correct**
67:11

**self-
governance**
81:20

**seminar**
140:20

**senate**   15:11
30:2
113:25
120:11,15
127:18,20
255:20,25
256:1,10
257:1,6,
11,13,18
262:6
276:24

**send**   44:15
53:18
267:22

**sending**
53:17

**sends**   267:18

**senior**   28:9
67:20 68:1
73:24
290:1

**separate**

229:2
233:4
258:18

**sequence**
25:4
233:24
246:13

**sequestered**
17:2

**sequestration**
25:6

**serial**   40:6
217:2

**serve**   166:10

**server**   36:13
166:1
189:10
245:20,22
246:1,9,10
250:13,15,
18 251:20
252:1

**servers**
237:8

**service**
72:2,4,6,8
113:18
117:10,15
136:15

**serving**
154:17

**session**
15:10

**sessions**

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 524

172:4

**set**  25:22
55:13,18
56:11
112:22
133:15,18
134:4
136:9
166:4
181:15
208:11
217:13
218:20
221:22
239:9,17,
18 240:2,
11,13
252:13
257:4
277:22

**setting**
25:24
217:24
278:4

**setup**  56:18

**seventh**
220:11

**sheer**  239:15

**short**  50:18
83:11

**shortly**
34:22
200:11

**show**  22:15
23:17,18,

24 24:4,18
26:6,11,13
28:2,22,25
29:24
30:22
38:15
52:11,20,
24,25
56:15
101:25
103:11
104:25
105:4
166:11
167:17
177:9
219:25
220:10
225:22
233:15
234:4
244:22
254:17,24
255:18
263:6,8,20
264:8
266:4,11
271:15,18
273:22
274:17
278:25
279:2

**showed**  180:9
232:24
233:2
241:13
266:24,25

**showing**
30:11
179:6
218:11
232:8
242:9
263:22
283:2

**shown**  24:4
30:18 97:6
234:6
241:4
254:4
264:11
287:1

**shows**  20:22
23:11
56:15,17
99:13
105:6
220:11
222:6
234:9
254:22
263:17,18
264:9
266:8,15
271:22,25
272:1,2,4,
6 279:6

**shut**  244:22

**shutdown**
40:13

**shutting**
68:22

**sic**  26:17

133:18
176:25

**side**  10:10
118:13
132:1
201:6
239:11
241:8,24,
25

**sides**  17:22
111:13
181:13
183:24
185:22

**sidetracked**
182:2

**sift**  96:4

**sign**  49:18
51:4
130:20
177:17

**sign-in**
252:1

**signed**
215:17

**significance**
26:9

**significant**
15:25
25:20
152:24
161:20
166:9
167:10
171:24

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 525

172:6,8
173:22,25
174:4,11
188:9

**significantly**
174:1,11
176:6
202:9
282:4

**signoff**
214:25
215:1,2

**signs** 16:2
148:22
150:4
170:18,22
171:2,10,
22 178:20
179:2
191:2

**similarities**
152:25

**simple**
22:22,25
23:2,4
97:15

**simplistic**
175:10

**simply** 11:22
15:13 22:4
23:13
28:13 42:2
111:13
172:15
175:17

184:13
198:25
209:9
220:6
227:1
248:13
265:11
273:25

**single**
155:17
189:8

**sir** 17:1
18:20
20:11 53:9
114:4
122:1
140:6,18
141:8
143:13
144:4
152:2,6,
13,18
153:2,13,
24 156:18,
22 157:2,
6,9,13,20
158:2
159:18
160:13
163:6,17,
24 168:6
170:20,25
177:6
180:9,18
185:13
187:18,20
189:4

190:2,4
193:20
196:9,13
197:20
198:6
199:22
200:4
201:8,13
205:11
208:13
209:6
231:13
235:1
245:1,6
250:15,17,
20 251:15,
18 255:2
258:11
269:24
271:11
274:17,20,
22 275:6
281:22

**Sister** 81:13

**sit** 9:2
10:17,18
13:10,11
68:22
137:4
138:2
210:22

**site** 235:6
246:8

**sitting**
20:13 69:6
196:13

**situation**
136:15
223:1
247:25
256:6
265:15

**situations**
231:1

**six-pack**
220:13

**size** 240:10
241:11

**skip** 122:25
281:6

**skipping**
34:20
143:2

**Skype**
133:22,25
134:4,20,
22 136:22

**slightly**
35:8

**slowly** 270:6

**small** 32:11
49:13
53:11
64:13 65:9
101:1
149:15
183:10,11

**smear** 58:2,
6,11

**smooth** 63:10

www.huseby.com          Husеby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 526

**smoothly**
129:18

**Smyth** 9:11,
24

**software**
147:18
150:4
152:11,15,
22 158:17
159:13,15,
20 161:13
166:4
178:1
179:8
180:4
249:9
283:6
286:9

**sole** 184:11

**solely**
128:2,4
206:15

**solicit**
191:15

**soliciting**
53:6

**somebody's**
278:13

**sort** 10:4
42:1 74:8
116:2,17
122:8,17
141:17
161:22
179:2,24

180:18
213:6
220:15
228:4
237:11
272:11
275:13
280:6,8,18

**sound** 185:18
193:10

**sounded**
192:13

**sounds**
185:22
194:8,11
209:8
236:2

**source**
157:1,4
161:18
162:2

**sources**
172:11
191:6

**South** 36:11
185:25
260:11

**space** 239:25
257:6

**speak** 49:20
106:20,22
139:6
219:18
224:8
234:20

**speaking**
204:6

**specialized**
39:15

**specialty**
270:4

**specific**
10:15
29:20
48:13,15
87:20
89:13 92:1
142:11
147:15
158:18
162:20
179:24
213:25
216:4

**specifically**
117:4
127:22
152:4
156:18
181:13
190:11
191:13,17
194:22
204:17
207:11
219:22
228:1
288:4

**speculates**
221:8

**speculation**

26:4 30:10
122:13
173:8
285:25
286:1

**speed** 100:6
248:4

**spell** 61:8

**spending**
34:24
35:13

**spent** 32:15
35:18
36:20

**split** 238:24
241:18
253:18

**splitting**
242:13

**spoke** 74:1

**spoken**
157:25
158:6

**spontaneously**
179:4

**spreadsheet**
64:13
65:2,6,10,
11

**spring** 37:20

**square** 26:24

**stack** 57:8

**staff** 39:8

211:18,20

stamp
217:17,18

stand  42:1
58:20
63:13
248:9

standard
56:2,4,18
170:6
237:6
241:22

standing
11:17
49:10

standpoint
159:25

stands
212:18
286:8

Stark  132:18
133:15
134:22
158:6
190:6,13
191:4
192:22
193:15
195:17
196:2
197:22

start  65:15
66:10,11
122:25
207:18

213:20
218:4
258:18
289:11
291:17

started
33:25
67:15,17
68:9,22
180:6
239:20

starters
122:10

starting
16:13,15
36:10
160:4
207:20
280:20
289:10

starts  66:22
122:20

state  15:11
19:17
21:10 23:6
26:13
28:20
31:24
33:13
38:13
44:13
45:13 46:4
57:11 61:6
74:9 76:11
80:9,18
84:10

90:15
98:24
101:13
104:9
105:24
106:9
107:6
109:17
117:1
118:13
124:6,13,
18 125:2,
10,11,13,
25 126:1,
6,22
127:2,25
131:6,13
136:10
138:2
147:10
149:10
153:4
159:13
160:18
165:1
166:24
167:15,17
182:22
186:6,11,
18,20,22
187:22
188:2
192:4
196:11,15
198:17
200:24
201:2,10
202:4,11

206:9
207:18
210:18
211:1,6,8,
10,15
212:8,9
222:20
225:20
226:20
227:15,18
229:10,13,
18 230:9
231:11,15
235:2
236:22
237:8,10
239:25
240:8
241:20
243:15
244:2,6,9
246:4,6
247:15
248:15,20,
22,25
249:9,11
250:6,11
255:11
256:2,11
258:25
264:18
265:11
267:18,24
269:17
273:17
281:25
284:4,9

**state's** 76:6
95:8,18
99:10
101:18
104:20
106:15
107:2
167:11
177:8
210:22
211:13,17,
22 212:4
213:10,22
214:8,9
222:20
225:6
227:13
228:25
229:25
230:6
231:20,24
232:11
233:1
246:4
248:22
249:13
260:24
267:6,15,
24 269:13
274:2,6
280:13

**stated**
109:15
167:2
212:6

**statement**
9:8 16:6

18:11,13
51:9,13
110:22

**statements**
97:15
111:2
157:10,15
178:18
181:10

**states** 54:18
81:20
95:11,22
96:20
103:9
151:20
159:6
167:1
256:10
257:1,6,
11,18
260:2,11,
15 262:2

**statewide**
26:25
40:17
46:20
85:15
113:20
116:6,11
124:17
126:6
127:2
202:13
264:10
271:6
272:25
273:2,17

**statically**
173:20

**stating**
231:22

**statistic**
173:24

**statistical**
149:13
174:13
190:4,6
192:24
193:15,18
196:4,6
197:25

**statistically**
173:24
174:4,11

**statistics**
149:20
174:17

**status**
266:9,13

**statute** 12:6
14:4,9,20
15:17 16:6
24:6
240:11,13
253:13

**statutory**
25:22
30:17

**stay** 10:22
16:18,22
17:18

**staying**
10:25 11:4
18:11

**stays** 10:24

**steps** 153:10
219:4
278:4

**Steven**
243:11

**stick** 111:15

**stipulate**
82:22
110:11
248:4

**stipulated**
110:22
111:4,6
273:15

**stipulation**
82:25
110:15

**stood** 208:6

**stop** 209:4

**stopped**
49:18

**store** 290:10

**stored** 183:1
235:10

**strategies**
85:4 87:1

**strategy**
86:22
87:20

www.huseby.com          Husby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 529

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019    Index: stress..sustain

stress
201:15

stricken
51:13
190:15
191:25
202:22
220:22

strike   16:4
51:9
194:25
199:25
221:4

strips
197:17,18

strong   41:25

struck   50:2

structurally
238:20

structure
222:4
241:1

student
81:17

studied
118:6

studies
139:20
157:8
189:6
194:18

study   84:22
86:11 90:4
117:20

118:4,6
138:24
139:2,15
144:13
160:15
168:18

studying
138:6

stuff   111:9
131:17
150:8
154:13
167:18
170:13
171:18
185:6
221:13
290:8,11
291:2

stupid
181:22

style   239:4,
8

subject
140:8
160:11
184:25

submission
198:13

submit   71:18
74:4

submitted
71:20
77:1,2
131:6

176:24

subset
149:15

substantially
155:22

substitute
169:18

succeed
29:22
30:24

successful
87:2 88:22

successfully
73:18

suddenly
136:20

suffice   28:1

sufficient
14:2 165:1

suggest
170:9

suggesting
219:13

suggestion
237:17

summary
224:11
271:22

summer   142:1

superintendent
16:22
117:10

Superior
135:2,11

superstar
201:6

support
13:24 42:2
73:18
142:18
198:13

supporting
246:6

suppose
115:2
154:4
194:15
219:2

supposed
8:15 55:25
135:9
215:11

Supreme   30:9

Surely   38:17
110:4

surgery
64:22

surprise
119:15

survey
156:18

suspicious
200:18
204:8

sustain
172:24

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 530

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019 Index: Sustained..taking

188:11
228:6
232:18
248:17

**Sustained**
104:4
226:15
228:18
282:8
284:13

**swear** 31:4

**swift** 14:20

**switch**
219:13

**switching**
220:17

**sworn** 31:18
60:25 80:2
84:4
137:20
210:13

**sync** 67:8

**system** 19:18
26:13
27:13
33:11
35:6,10,
11,13
37:22
41:13
59:11
65:2,13
81:18
142:17
143:4,6,9

144:25
145:1,2,8,
13 147:4,6
148:22
151:9,10,
15 152:4,
9,17
155:20
157:2
160:17
163:9,22
164:6,8,25
165:2,20
166:2,15
167:6,11
171:22
173:4
177:17
178:20
182:24
183:20
184:9
204:20,25
205:2,8,9
207:11
212:6,22
215:18
217:18
219:4,18
225:20,24
226:4,11
227:4,6,
10,11,15,
20 228:1
229:1
230:10
231:11,17
237:2,4,6

238:6,18
244:15
247:6,9,
10,11,15,
17 248:6,
20 249:10,
13,15,18,
22,25
250:1,9,22
260:25
265:24
267:22
269:18
270:9,10,
11,17,18,
24 272:4,
18 277:22
278:4
279:6
285:11
286:24
287:1

**system-wide**
179:24

**systematic**
28:11 96:4

**systems** 35:2
141:6,20
142:22
144:18
146:22
159:2
160:11
163:9
189:20
206:10
211:2,4

212:18
227:25
228:24
244:2
245:22
246:4
249:11
267:11

---

**T**

---

**table** 10:2,
4,17,18
11:11
32:20
99:4,9
101:22
102:2,24

**tabulate**
75:4

**tabulated**
233:4
269:11
272:11

**tabulating**
272:4

**tainted**
23:11

**takes** 27:11
119:18
163:4
216:22
225:1
239:4

**taking** 33:15
48:9 49:4

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 531

67:15
101:9,13
109:20
129:2,20
179:18
216:4

**talk** 49:24
69:4
110:22
111:8
133:13
177:2
185:25
198:2
248:10
270:6
289:2

**talked** 77:4
78:20
122:2
149:4
163:13,20
164:6
169:6
189:6,24
261:13
275:11

**talking** 58:4
112:4
126:11
165:9,10
195:20
215:10,11
227:24
244:13
248:11
254:17

269:1

**tallies**
16:1,2
40:15

**tangible**
19:22

**tape** 73:11,
20

**tapes** 72:25
73:2,9
76:15
191:24
197:18
217:15
268:13

**Taran** 43:18,
20 45:13

**target** 85:18
207:10

**Targetsmart**
84:13
85:6,11,13

**taught**
140:18

**teach** 140:17

**teacher**
81:13

**team** 28:1

**tear** 144:13

**tease** 87:13

**Tech** 138:22
139:8

**technical**
41:22
42:22
67:11
73:18
74:11
166:13
167:18

**technically**
90:11

**technician**
181:8

**technicians**
180:22
181:6

**technology**
141:20
142:18
143:2
233:24
249:11

**telephone**
130:11
132:20
133:2,20
134:2

**telling**
134:6
264:13

**tells** 283:6

**telltale**
148:22
150:4
170:18,22
171:2,10,

22 177:17
178:18
179:2
191:2

**Temple** 63:1,
4

**ten** 35:4,
13,18
144:6
202:2
242:22
273:20

**tendency**
166:11

**tender** 45:18
52:11 54:1
89:11
131:2
150:2
255:2
264:2
266:18
273:4,20
274:9
275:1,8
288:11

**tendered**
46:4,6
74:15 92:9
273:10

**tendering**
131:9
273:8,9,11

**term** 116:18
118:18
184:4

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 532

201:6

**terming**
184:2

**terminology**
99:13

**terms**  17:13
23:17
24:15 25:4
27:1 33:10
42:2,11
90:8
91:22,25
99:13
100:2,20
104:2
195:10,13
198:9
199:13,24,
25 201:22
202:15
240:4
260:18
262:6

**test**  175:20
217:9,11
218:6,24
222:10,22
268:2,4,8,
15 283:10

**tested**  35:11
54:18
55:18
203:13
268:22

**testified**
17:18,24

18:2,11
31:18
36:22
38:22 42:6
46:11
60:25
78:6,20
80:2 84:4
91:24
93:15
101:17
109:20
113:17
120:8
137:20
154:18
155:22
169:2,4
170:18
176:1,18
190:10
192:4,8
195:15
196:2
197:22
204:13
205:17
206:2
210:13
227:13
275:20

**testify**
17:10,11
20:4 34:1
43:6 48:11
92:11
96:17
97:17

100:2
104:4
123:22
130:11
155:2
156:2
169:6
186:2
190:17
191:15

**testifying**
36:6 96:8
104:1
192:15

**testimony**
17:4,13,20
50:6 60:6
72:22
79:11
82:18
93:13
97:10
121:6
131:6
132:20
136:2
146:8,9
147:9
151:13
156:2
157:17
163:11
164:2,4,
10,15
169:2
172:17,22
175:2

181:18
190:13,20,
24 191:15,
25 195:1
202:20
203:1
205:20
208:1
220:2,8
227:15
249:20
252:6
282:17

**testing**
217:11,22,
25 218:2,
4,13,15,
17,20
222:13,17,
18,22
223:13
233:11,13
234:6,8
249:15
265:22
267:10,11,
20 268:20
269:17,20,
22 277:18
287:2

**tests**  149:15
222:18
229:8

**thanking**
82:8

**that'll**
125:22

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 533

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.

theory
280:1,18

there're
216:22

thing   20:10
29:2 30:17
47:9 58:10
97:18
119:2
145:18,20
185:11
207:17
228:10
252:17
272:11
284:15
285:1

things   8:11
16:2 22:20
26:6 65:13
79:2 81:4
88:13 90:4
94:6
108:15
130:2
133:2,17
140:25
160:15
167:20
170:2
181:15
217:20
223:25
232:20
233:22
240:25
244:20

248:4
269:11
280:10,13
285:4,10
288:25

thinking
119:2
258:18
280:2

thinks
206:11

third-party
113:2
123:18

Thorpe   65:20

thought
76:22,24
77:1 79:2
110:18
115:18
193:8
195:15
280:15

thousand
26:20
102:17
124:17
126:6

thousands
21:25
96:18
170:13

three-and-a-
half   276:4

three-and-a-
half-time
119:13

three-column
239:22

thrown
280:15

THURSDAY   8:2

ticket   27:22
94:20
259:6,25
260:4,6,9,
11,15
280:15

tied   205:24
206:1

time   11:13
12:15
30:1,2
33:20
34:25
35:6,9,13
37:22 49:4
62:2 67:11
68:13 72:2
81:17
90:20 92:4
93:20,22
113:25
123:2
127:20
130:6
135:8
137:2
160:9
165:9

217:4,13,
25 218:18,
22 236:13
238:15
239:25
245:6
252:13
258:25
260:20
261:2,22,
25 276:6
280:4

timeframe
268:11

timeliness
15:17

times   27:9
36:24
39:11
49:18
63:22
133:4
147:8
160:6
164:6
245:11
272:2
276:4

tired   208:18

today   11:22
23:18
33:15
53:15
78:20
102:15
111:11,15

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 534

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019          Index: told..trial

130:24
134:13
144:24
145:2,15
184:8,11
188:6
196:13
208:22
226:8,9
260:4

told   16:22
58:4  67:11
70:20,22
76:13  77:6
180:10
191:13
208:4

tomorrow
23:18
134:4
289:15,25
290:4,15
291:10,17,
20

tone   74:1

tool   63:11
251:22

top   40:6
122:20
160:18
161:9
248:10,11
257:9,20
274:18

topic
185:13,15,

17,18

topic's
185:15

tops   73:2

total   75:13,
20  76:2,8
99:6,17
100:10,11,
15  101:10,
13,15
102:6
104:10
116:4,22
120:10,18
232:24,25
233:2,4
271:25
272:4
283:9,18
289:6

totally
128:2

totals   19:25
94:18  95:1
117:6
128:2,4
177:4
194:2
220:4
233:8
235:20

touch   217:13
218:9
219:24
223:20
235:15,18

239:18
266:15
268:1
283:2
285:11
286:22

touched
40:22
71:20
153:9

touching
224:15
235:17
283:1

touchscreen
223:24
224:11

traces   19:24
20:22

tracked
103:2

tracking
115:25

trail   161:17

trained
36:15,18
153:2

training
39:15
62:13  94:8
144:17
169:11

transferring
216:17

transition
248:24

transitioned
239:22
248:22
249:9

transparency
32:9

treated
187:24

treatment
200:11

trend   94:24
102:13
103:2

trends   87:4,
11  88:2,
11,18,22
89:11  90:2
91:20
95:20

triable
12:10
14:6,15
15:20,24

trial   11:18
12:9
13:15,20,
25  14:6
15:2  16:6
52:22
53:1,2,4,
6,9,13,15
136:6,9,20
184:8

www.huseby.com          Husebý, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 535

290:13

**trials**
53:18,20

**trouble**
20:13
21:18,20
92:18 94:6
97:17
167:15
272:11

**troubled**
35:18,20

**troublesome**
47:13

**truck-trailer**
34:17

**true** 19:18
23:6,8
45:11
52:10 59:6
65:11
70:13
123:11
199:2
243:25

**Trusted**
142:4

**truth** 31:8,9
60:15,17
79:18
83:18,20
137:13
192:2
210:4

**TS** 157:2

266:9

**TSX** 255:13,
15

**turn** 57:2,
13 67:22
184:15
245:11
281:13
291:6

**turned** 81:4

**turning**
68:10
182:20
183:1

**turnout**
88:11,13
122:13
127:13
194:25
274:18,20,
22 275:2,
6,11 276:1

**Tweet** 52:18
57:10

**two-column**
239:18,22
240:2
258:17

**two-fold**
22:24

**two-hour**
47:10

**two-step**
13:18

**type** 26:8
55:9
121:24
122:22
226:10

**types** 85:15
86:25
105:22
147:15
158:20
159:18

**typically**
17:2
148:13
161:11
175:20

**Tyson** 14:24
29:13,15
38:4,9,15,
18 39:2
41:15,18,
20 44:6
50:15
51:11,18
57:18
77:17,18
78:10
89:15,18
90:1,20,24
91:1,18
92:9 96:6
97:1 98:11
103:25
106:18
108:11
109:2,13
113:10,15

121:9,20
123:20
127:6,11
128:6
133:6,10,
11 134:13,
25 136:11
150:15,20,
22 153:17,
20 154:4,
15 158:13
163:11
165:4
168:22
172:18
174:18
176:22
180:22
184:15
188:18
189:2
190:9
192:6,8,20
193:13
195:24
196:1,20
197:8,11,
13 198:22
204:13,24
206:11,18,
22 207:1
221:6
225:11
226:6,25
228:2,17
230:15
232:13
233:22

www.huseby.com     Huseby, Inc.  Regional Centers     800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 536

Case 1:17-cv-02989-AT   Document 449-11   Filed 07/03/19   Page 383 of 389

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019 Index: U.S...understanding

234:2
242:24
243:13
244:6
254:15
255:2,6
263:4
276:15,17,
22 282:6
287:13
288:10

**U**

**U.S.** 30:2
113:25
120:11,15
127:18,20
151:4
255:20,25
256:1
257:13
262:6

**Uh-huh**
43:18,25
47:15
56:22
94:11
95:13
102:25
156:15
200:15
201:20
282:18

**ultimately**
30:18 76:6

**unanimous**

161:1
163:6

**unclear**
195:20

**uncontested**
8:10

**uncovered**
35:17

**under-**
99:20,22
100:13
102:17
124:15
204:8

**under-vote**
21:6,15
23:9,11
91:22
92:2,13
93:15,24
94:22 95:4
98:20 99:6
100:8,9,13
101:10,11,
15 102:4,
6,9,13,15,
22 103:1,
22 104:2,
10,25
105:6,9,
15,20
106:4,6
107:2,6,11
120:18,20
122:9,18,
20,22

171:24
172:6,8
175:22
200:15
204:6,10
205:22
280:2,11,
13

**under-votes**
116:20
122:11
172:20
201:18,20
281:2
282:13

**under-voting**
89:4,13
93:13 94:2
96:13,17,
22,24
104:15
121:4,17
122:17
172:11
173:22
174:6,8,10
200:22

**undergraduate**
140:18,20

**undergraduates**
149:6

**underneath**
257:11

**understand**
18:22
34:2,4

37:4,6
41:25
43:17
48:13
54:22
58:13
64:15 66:2
75:18
83:11
90:25
93:22
118:25
130:17
135:24
136:15,18
148:18
155:18
162:22
164:20
165:1
168:22
169:22,25
181:22
199:4
202:1
206:25
207:2,4
221:15
232:15
234:1
245:4
251:8
264:13
272:9
290:1,15

**understanding**
18:4 24:1
37:4,8

**COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.**
Transcript of Hearing Proceedings on 01/17/2019 Index: understands..versions

38:1 54:20
59:9,11
69:18,20
73:10
96:13,22
100:20
105:11,13
123:15
158:1
168:11,18
246:18
270:2

**understands**
22:22 23:4

**understood**
64:6 76:1

**undertake**
126:11

**undertaken**
180:6
227:18
229:15,18
231:11
280:18

**undertook**
168:20
229:1

**unfit**   151:4
161:2,4

**uniformly**
200:24
250:11

**unit**   216:20
241:22
266:15

278:6
287:18
288:6

**United**   81:20
256:10
257:1,6,
11,18

**units**   205:11
213:1
216:13

**university**
61:25
81:15
84:20,25
138:6,11,
22 139:10,
15 211:10
212:1

**unknown**   23:4
201:15

**unlike**   28:2

**unpack**   183:6

**unsafe**
161:2,4

**unsuccessful**
26:15

**untenable**
246:20

**unusual**   50:2
68:25
277:10

**unverifiable**
35:20
37:22

**upheld**   30:25

**upload**
266:13

**uploaded**
232:1,4
233:6
266:17
267:2
269:11

**usage**   160:22

**user**   219:18

**ushers**   55:6

**utilizing**
270:22

**utterly**   14:4

────────────

**V**

**vague**   226:20

**valid**   29:18
109:17
232:6

**validate**
214:10
215:15
217:11
218:9,10
232:2
233:13
249:17
268:13

**validated**
215:10

**validating**

252:18

**values**
214:20

**variables**
23:6

**variety**   29:8

**vast**   34:24

**vendor**
260:25

**verifiable**
32:18
37:13

**verification**
161:25
215:6

**Verified**
141:9,13,
18,25
150:25
151:1,8

**verify**   64:20
229:4

**verifying**
262:11

**version**
64:11 65:9
152:11,18
155:20
166:4

**versions**
142:25
158:17
159:13

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 538

COALITION FOR GOOD GOVERNANCE, ET AL. vs ROBYN A. CRITTENDEN, ET AL.
Transcript of Hearing Proceedings on 01/17/2019    Index: versus..voter

**versus**  9:11
25:22
27:13
33:11
101:4
119:8
128:1
131:8
151:11
199:13,20
200:2
202:17
272:24
276:11

**vested**
142:18

**victory**
26:10
184:11

**video**  135:2

**videotape**
268:4

**view**  109:22
134:1
163:4,6
279:4

**violate**
137:1

**violation**
26:2

**Virginia**
61:25

**virtue**  27:15

**virus**  178:15

**vis-à-vis**
201:22

**visible**
218:11

**vision-
impaired**
55:8

**voice**  74:2

**volunteer**
52:4 62:11

**volunteered**
62:9

**vote**  16:1,2
19:15,20
20:2,24
21:13,18,
20,22,24
22:2,10,18
23:6,20
25:8
26:13,20,
22 27:2,6
41:8 42:13
47:11
49:15,17
50:18
58:22 68:8
69:9 71:4,
18 74:4
76:24 77:9
80:22 81:6
83:2 89:6
95:1,4
99:20,24
100:15,17,
22 102:18

105:1,9
108:9
109:11
114:15,24,
25 115:15
117:6
118:22
122:4
157:11
177:8
179:18
194:2
201:22
203:13
204:9
205:4
219:6,10
220:15
223:2
226:4,11
231:18
232:10,24,
25 233:2,
4,8,11,20
234:20
268:17
272:11
281:6
283:18
285:11,13

**voted**  21:11
25:8 27:8,
10 41:1,2,
4,10 82:22
100:15
119:20
179:11
200:25

257:13
261:25
276:11,13

**voter**  28:13
30:6 32:10
49:15
54:22
55:4,9,13
56:4,8
67:20
68:1,4,13,
18,20
69:4,11,
15,17
70:1,22,24
71:4,6,15,
22 73:24
76:22 77:8
78:6 85:15
86:24
88:18
118:20,22
119:18
157:22
166:9
167:6,8
178:24
179:10
189:20
194:20,22
199:24
204:24
205:2,8,13
218:2
219:6,15
223:22
225:9,13,
24 226:11

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 539

227:4
228:1
241:15,20
242:6,8
247:2
257:22,25
259:6
260:25
262:15
263:17,22,
24 266:9
268:9
274:22
275:20
276:11
281:11
282:11
283:9
287:15,20,
25

**voter's**
70:22 74:4
87:13
259:10

**voter-level**
85:15

**voters** 27:6,
11,20 29:1
30:4 49:6
56:2,4
59:13
67:15
82:22 83:2
85:18
87:15,20,
24 114:15,
24,25

115:11
119:8,13,
18 121:4,
20,22
122:2,4,8,
15,24
151:17
157:10
164:2
172:2
176:2
177:18
178:22
179:4,9,13
194:24
198:8
199:1
202:17
223:6
225:1
258:2,22,
24 260:20
261:1,2,9,
22,24
262:2
274:17
275:15,24
276:4
280:22
281:9
282:2,4

**voters'**
247:11

**votes** 21:6,8
23:10
25:20
26:10,17,

18,20
30:8,18
35:2 48:9
73:11
75:4,15,20
76:2,8
86:17
99:17
101:15
102:17
104:15
106:13
115:20
116:4,9,
10,22
117:11,18,
25 119:8
123:6,13,
18 124:13,
18 125:2,
15,17
126:2,8,22
127:2
161:18
176:6
184:11
188:9
194:6,9,10
200:25
201:25
202:10
218:8
219:9
220:11
247:11
265:22
267:2
271:4,9

272:4,6
275:13
277:13
285:18,20

**voting**
19:18,22,
25 20:25
21:6
32:13,18
33:6,11
35:2,6
38:2 39:15
44:11
46:18,22
47:6 48:8
54:15
62:18
65:15
68:15
70:22 87:4
88:2,8
89:8,11
90:2 91:20
95:20
105:9,11,
13,15
106:9
107:4,8,
15,18,22
108:8,9
110:9
114:20
123:1,17
124:10,15
128:2
141:9,13,
18,25
142:11,13,

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 540

22 143:2,
11 144:18
147:4
150:25
151:1,8,15
152:11,17
153:6
154:18,22
157:4
161:4
172:2
173:2,22
174:1,2
175:15
176:11
177:4,13
197:17,18
198:9
205:18
211:6
212:8
213:2
215:24
216:6,11
218:22
219:13
220:4,9,10
223:20
225:24
227:6
228:22
229:1,4,15
230:11,22
231:13
249:15
258:8,25
259:1,6
260:20

266:11
267:6
268:10
276:6
277:25
278:15
285:22

**vulnerabilities**  145:18
166:10
167:9,15
251:13,15

**vulnerability**
145:13,18
150:2
151:15
157:22
162:8
163:20
165:22
166:22
167:10

**vulnerable**
144:18,25
146:24
163:2
166:4
167:1

─────────────

**W**

─────────────

**wait**  37:24
41:4 59:22
68:22
92:15
202:6
279:15

**waited**  70:2

**waiting**  69:6

**walk**  66:15
136:20

**walking**  68:6

**walks**  21:9

**wanted**  17:22
23:15
68:25
77:20
130:15
184:24
186:6
219:13
239:25

**wanting**
150:9

**warning**
49:18

**watch**  40:13
108:18
130:22

**watched**
40:9,13

**watcher**
36:15
39:11
40:9,17
46:11,15,
18,20,24
47:2 48:22
62:9
77:20,22,
25 81:17,

22,25
82:6,8

**watching**
50:2

**water**  36:2
187:2

**ways**  73:17
144:4
183:2
231:9
261:17

**weaker**  24:11

**web**  245:20,
22 246:9,
10 250:13,
15,18
251:20
270:10
276:10

**website**
63:13
99:11
101:18
104:20
251:24
274:2

**week**  182:15

**weekend**
225:8,10

**weeks**  136:4
290:2

**weight**
109:22
156:2

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 541

173:10

**well-known**
  201:11

**wer** 232:2

**whatsoever**
  97:10

**where'd**
  138:20

**white** 255:15

**who've**
  133:22

**whoa** 16:8

**Wilke** 8:18,
  19

**William**
  210:10,15,
  20 243:4
  254:13
  276:20
  279:22
  286:18
  287:11

**win** 86:13,
  22 220:15

**Windows**
  142:17,24,
  25 143:1

**wins** 25:2

**Winterville**
  176:2,10,
  11,18,20
  177:4
  189:25

191:1,11
192:24
193:22
195:2,6,
11,17
196:4
202:20
207:24

**Winterville's**
  197:1

**wipe** 26:9

**withdraw**
  38:10
  48:2,4
  50:9 59:2
  100:4
  106:22
  124:2

**witness'**
  146:6

**witnessed**
  51:1

**witnesses**
  11:15
  16:11
  17:2,6
  25:4,6
  130:4
  134:1

**woman** 82:6

**won** 25:18
  177:11,13

**wonderful**
  81:18

**word** 76:18
  148:6,11
  173:8
  181:13,20
  208:24
  209:1
  214:15
  229:22

**worded** 50:4
  127:17

**words** 26:22
  133:20
  240:18

**work** 18:25
  26:6
  35:11,18
  36:25
  37:15,20
  39:13
  48:22
  61:17,20
  82:9 85:11
  86:6 88:17
  89:6
  95:11,25
  108:25
  139:25
  141:6,13,
  15,17
  142:20
  149:18,20
  156:13
  187:18
  199:4
  222:20
  249:25
  253:13

288:25

**worked** 23:24
  30:4 91:8
  132:25
  133:4
  141:6,10
  144:4,6
  150:25
  189:2

**worker** 55:6
  76:22
  153:2
  288:4

**workers** 67:4
  73:15
  76:13

**working**
  23:13
  24:22
  48:9,20
  49:18
  85:1,2
  140:4
  141:8
  142:13
  207:20
  229:4,6
  268:2

**works** 32:9
  47:1
  156:18
  164:8

**worry** 182:2

**Worth** 14:11

**wrap** 229:20

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 542

**write-**
272:13

**write-in**
265:1
271:4,9
272:17
285:18,20

**write-ins**
272:8,9,
10,11,15,
18,24
273:1

**written**  13:2
251:4

**wrong**  8:11
22:25 45:9
175:8
196:2
197:6
232:10,11

**wrote**  224:22
285:22

----

**Y**

----

**year**  21:22
119:20
120:15
140:1,4
194:25
255:10
274:18

**years**  21:15
32:17
34:20
35:4,13,18

41:8
53:13,17
85:9 93:18
102:10
119:9
143:10
160:2
228:4
274:2
277:10

**yielded**
222:10

**young**  82:6

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

Page 543