# IN THE SUPREME COURT
# STATE OF GEORGIA

## CASE NO. S19A0769

---

COALITION FOR GOOD GOVERNANCE,
RHONDA J. MARTIN, SMYTHE DUVAL AND JEANNE DUFORT

Plaintiffs,

v.

BRAD RAFFENSPERGER, Secretary of State, FULTON COUNTY BOARD OF
REGISTRATION AND ELECTIONS, GWINNETT COUNTY BOARD OF
REGISTRATIONS AND ELECTIONS, and GEOFF DUNCAN

Appellees.

---

## BRIEF OF APPELLANTS

---

SUPERIOR COURT OF FULTON COUNTY
CASE NUMBER 2018CV313418

**BRUCE PERRIN BROWN**
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE, Suite 6
Atlanta, Georgia 30306
(404) 881-0700

# **TABLE OF CONTENTS**

**Page**

I.  STATEMENT OF JURISDICTION ............................................................. 1

II.  OVERVIEW OF RULINGS BELOW .......................................................... 1

III.  FACTS .......................................................................................................... 2

    A.  Extreme Undervote in Lieutenant Governor's Race ........................... 3

    B.  The Vulnerable and Unreliable DREs Generally ................................ 6

    C.  Georgia's DREs Even More Unreliable ............................................... 7

    D.  External Evidence of Programming Defects ........................................ 8

    E.  Presumption of Defect Never Rebutted ............................................... 9

IV.  DECISION BELOW ................................................................................... 10

V.  ENUMERATION OF ERROR ................................................................... 10

VI.  ARGUMENT .............................................................................................. 11

    A.  Plaintiffs' Efforts to Obtain Discovery ............................................. 11

    B.  Enumeration of Error One and Two:  Failure to Allow Reasonable
         Time for Discovery and Refusal to Grant a Continuance ................. 16

    C.  Enumeration of Error Three and Four:  Refusal to Allow Discovery of
         Relevant Evidence and Failure to Grant Motion to Compel ............. 20

    D.  Enumeration of Error Five and Six:  Incorrect Factual and Legal
         Analysis of Election Contest Claim ................................................... 23

    E.  Enumeration of Error Seven:  Wrongful Striking of Jury Demand ... 28

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bowden v. The Medical Center, Inc.*,
  297 Ga. 285 (2015) ................................................................... 23

Curling v. Kemp,
  334 F. Supp. 3d 1303 (N.D. Ga. 2018) .................................... 6

*Elrod v. McConnell*,
  170 Ga. 892 (1930) ................................................................. 29

*Frank v. Atlanta St. R.R.*,
  72 Ga. 338 (1884) ................................................................... 29

*Fuller v. Thomas*,
  284 Ga. 397 (2008) ...................................................... 24, 28, 29

*McCarty v. Nat'l Life & Acc. Ins. Co.*,
  107 Ga. App. 178 (1962) ........................................................ 29

*Mead v. Sheffield*,
  278 Ga. 268 (2004) ...................................................... 18, 26, 27

*Oppenheimer Fund, Inc. v. Sanders*,
  437 U.S. 340 (1978) ................................................................ 23

*Payne v. Chatman*,
  267 Ga. 873 (1997) ............................................................ 12, 19

*Scoggins v. Collins*,
  288 Ga. 26 (2010) ................................................................... 29

*Stiles v. Earnest*,
  252 Ga. 260 (1984) ................................................................. 27

*Taggart v. Phillips*,
  242 Ga. 454 (1978) .............................................................. 2, 18

**Statutes**

28 U.S.C. § 1983 ................................................................................................... 1

O.C.G.A. § 5-6-34 .............................................................................................. 1

O.C.G.A. § 9-11-12(b)(6) ................................................................................ 30

O.C.G.A. § 9-11-26 (b) ........................................................................... 21, 23

O.C.G.A. § 9-11-26(d) ..................................................................................... 12

O.C.G.A. § 9-11-27 ........................................................................................... 12

O.C.G.A. § 9-11-40 ........................................................................................... 17

O.G.C.G. § 9-11-41(b)……………………………………………………………10

O.C.G.A. § 9-11-56 ........................................................................................... 30

O.C.G.A. § 21-2-522(1) .............................................................................. 2, 26

O.C.G.A. § 21-2-522 (3) ................................................................................. 26

O.C.G.A. §§ 21-2-522(4) ................................................................................ 26

O.C.G.A. § 21-2-525(b) ................................................................................... 17

O.C.G.A. § 21-2-526 (a) ................................................................................. 30

O.C.G.A. § 21-2-527(d) .......................................................................... 1, 2, 26

O.C.G.A. § 21-2-528 ......................................................................................... 1

O.C.G.A. § 24-14-22 ................................................................................ 10, 25

## BRIEF OF PLAINTIFFS

Appellants Coalition for Good Governance, Rhonda J. Martin, Smythe DuVal and Jeanne Dufort ("Plaintiffs") file this Brief of Appellants.

## I.    STATEMENT OF JURISDICTION

This is a direct appeal from a final order of the trial court (Grubbs, J.) in an election contest case ("Final Order") (R-14).  This Court has exclusive jurisdiction of this appeal pursuant to Article VI, Section 6, Paragraph II of the Georgia Constitution.  The Final Order is a "final judgment" under O.C.G.A. § 5-6-34 and an appealable "final determination" under O.C.G.A. § 21-2-528.

## II.    OVERVIEW OF RULINGS BELOW

On November 23, 2018, Plaintiffs timely filed the Petition below contesting the 2018 election for Lieutenant Governor ("the Contested Election") and alleging that the extreme disparity in the reported voting pattern between votes cast on electronic voting machines and votes cast on paper ballots, the proven vulnerability of the electronic voting machines, and the numerous instances of voting system malfunction combined to render the election "so defective" "as to place in doubt the result" requiring a new election under O.C.G.A. § 21-2-527(d).[1]  (R-19).  On November 29, 2018, Plaintiffs filed an Emergency Motion for Inspection of Electronic Equipment and Production of Documents ("the Emergency Discovery Motion").  (R-96).  On December 5, 2018, the trial court scheduled a hearing on

---

[1] Plaintiffs also brought claims under 28 U.S.C. § 1983 for violations of due process and equal protection. These claims were dismissed on January 9, 2019, (R-871), and are not a subject of this appeal.

1

motions to dismiss for January 9, 2019, and the trial of the case for January 17, 2018. (R-171). On December 7, 2018, the trial court circulated an email stating that Petitioner's Emergency Discovery Motion would not be addressed until the January 9, 2018 hearing, but added that if it were necessary to "move the trial date at that time the Court will consider it." (R-1102). After the Motions hearing on January 9, 2019, the Court denied the defendants' motions to dismiss in relevant part, but refused to consider moving the trial date. (T-112-113). Plaintiffs obtained no discovery of the electronic voting equipment, its programming, or documentary reports.

Plaintiffs' filed a timely demand for a jury trial on January 16, 2019. (R-1012). The trial court struck the jury demand on January 17, 2019, the first day of trial. (T-170). On January 18, 2019, after Plaintiffs rested their case, the trial court granted Defendants' Motion for Involuntary Dismissal. (R-14).

## III.   FACTS

As discussed below, the trial court committed reversible error by not allowing any discovery prior to trial. *See infra* Part VI(A). Even without the evidence that might have been uncovered in discovery, however, Plaintiffs established that the election was so defective "as to place in doubt the result." O.C.G.A. § 21-2-527(d); O.C.G.A. § 21-2-522(1); *see Taggart v. Phillips,* 242 Ga. 454, 455 (1978) ("doubt may be cast on an election by showing improper maintenance of the voting machines resulting in votes being miscast").

### A.    Extreme Undervote in Lieutenant Governor's Race

In the ballots for the 2018 general election, the race for Lieutenant Governor between Geoff Duncan and Sarah Riggs Amico appeared second after the race for Governor and was followed by the race for Secretary of State and seven other statewide races.  Typically, almost everyone who casts a ballot votes for the race at the "top of the ticket," but there is a slight decline in votes cast for down-ballot races.  In the four gubernatorial elections before the 2018 election, the race for Lieutenant Governor received an average of 99.2% of the number of votes cast for Governor; the race for Secretary of State received 98.6%; and the other down ballot state-wide races averaged about 98%.  (T-256:11).[2]

In this election, however, the Lieutenant Governor's race received far fewer votes than all other state-wide races, including much less prominent races such as Commissioner of Agriculture and School Superintendent, and, in many precincts, fewer votes than far less prominent regional races.  Even more alarming, this unprecedented pattern appears only in the results of votes cast on the direct-recording election ("DRE") voting machines; votes on paper ballots conformed to the historical pattern, with the election for Lieutenant Governor receiving only slightly fewer paper-ballot votes than Governor, and slightly more paper-ballot votes than Secretary of State.  The following chart compares the voter participation

---

[2] The parties stipulated to the admissibility of the election results posted on the Secretary of State's website, which is the source of the numbers here and throughout this Brief.  (T-113).  *See https://results.enr.clarityelections.com/GA/91639/Web02-state.221451/#/.*

rates (as a percentage of votes cast for Governor) of ballots cast in the 2018 election on paper (blue bars); ballots cast on the DREs (black bars); and the average participation rate in the four previous elections (gray bars):



As this chart shows, the magnitude of the undervote for the Lieutenant Governor's race was substantial: if the historical average percentage of voters (99.2%) actually voted on the Lieutenant Governor's race in 2018, then over 127,000 votes for Lieutenant Governor were not counted. Such a massive number of lost votes is itself sufficient to cast doubt on the election,[3] but also is like the

---

[3] As the trial court found, Geoff Duncan's reported margin of victory over Sarah Riggs Amico was only 123,172. (R-8).

clock that struck thirteen: if the electronic voting system "lost" over 127,000 votes, the accuracy of the tally of the other 3.54 million votes reported in the Lieutenant Governor's race is also in substantial doubt.

The significance of the disparity in the reported voting patterns between electronic and paper ballots cannot be overemphasized. People make the decision to vote or not vote on a particular race for a number of reasons, such as interest in the race, the quality of the candidates, how far "down ballot" the race appears, the presence of third-party candidates, etc. But these factors would be the same whether the person voted on paper or electronic machine. The results of paper balloting also serve as a kind of control: in this election, over 230,000 votes were cast on paper, a sample size large enough to make accurate projections about the likely behavior of the universe of voters as a whole.

If a voter was equally likely to vote in the Lieutenant Governor's race whether they were voting on paper or on the DREs, there is less than one in 10,000 chance that in this election the disparity in participation would have been as large as it was. (T-328:10-329:25). In other words: based solely on the undisputed election results, to a 99.99% certainty, there was something about the electronic machines that caused people's vote in the Lieutenant Governor's race to not be counted, or to not be counted correctly. Defendants did not contest this statistical analysis or present any evidence to the contrary.

## B.     The Vulnerable and Unreliable DREs Generally

What was it about Georgia's DREs that caused no vote for Lieutenant Governor to be recorded by many voters, or for votes for Lieutenant Governor to not be counted?  At trial, all of the evidence pointed to electronic voting system irregularities.

Plaintiffs presented undisputed evidence that, in the run-up to the 2018 general elections, the entire national intelligence and computer science communities were warning the State of Georgia that its DRE voting system was profoundly vulnerable to malicious attack, programming errors, and irregularities. There is a staggering number of government reports,[4] academic literature,[5] and court opinions[6] that reach the identical conclusion:  DREs should not be used because they have been "shown over and again to be highly vulnerable to attack."

---

[4] On July 26, 2018, House Intelligence Committee Chairman Devin Nunes joined many federal officials and agencies concerned with national security to call for a ban on electronic voting.  *http://thehill.com/ hilltv/rising/398949-house-intel-chair-calls-for-ban-on-electronic-voting-systems*.  Similarly, in March, 2018, DHS Secretary Nielsen labeled such systems "a national security concern." *https://www.reuters.com/article/us-usa-trump-russia-security/inability-to-audit-u-s-elections-a-national-security-concern-homeland-chief-idUSKBN1GX200*.

[5] Scholars at Princeton's Center for Information Technology Policy analyzed a Diebold AccuVote-TS machine and found it "vulnerable to serious attacks."  Feldman, et al., "Security Analysis of the Diebold AccuVote-TS Voting Machine," *Proc. 2007 USENIX/ACCURATE Electronic Voting Technology Workshop, 1* (Aug. 2007); *see also* Candice Hoke, *Judicial Protection of Popular Sovereignty: Redressing Voting Technology*, 62 Cas. W. Res. L. Rev. 997 (2012), *available at*, http://scholarlycommons.law.case.edu/caselrev/vol62/iss4/6.

[6] *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1327 (N.D. Ga. 2018) ("The Court is gravely concerned about the State's pace in responding to the serious vulnerabilities of its voting system – which were raised as early as 2016 – while aging software arrangements, hardware, and other deficiencies were evident still earlier.").

Congressional Task Force of Election Security, January 2018, *Final Report*;[7] *see also* Senate Select Comm. on Intelligence, *Russian Targeting of Election Infrastructure During the 2016 Election* 4, 6 (May 8, 2018) (the states should replace DREs as soon as possible with machines that "[a]t a minimum . . . have a voter-verified paper trail").

DRE machines like the ones used in Georgia "are inherently defective" because they are vulnerable to undetectable malicious attacks and innocent programming mistakes *and* there is no "external source" of the actual vote; there is no "paper trial." (T-315:9, 17-21). Plaintiffs' expert Mr. Bernhard testified: "There is no way that the DREs can provide significant evidence of the outcome of an election." (T-315:1-20). Mr. Bernhard concluded:

> Q: Are you aware of any peer reviewed computer science publication that takes a contrary view to the view that the DREs are defective.
>
> A: No sir. The community is unanimous.

(T-317:4-7). Defendants did not challenge this testimony or introduce any evidence disputing it.

### C. Georgia's DREs Even More Unreliable

Defendants did not defend the reliability or accuracy of DREs generally, but instead argued that Georgia's DRE system was no worse than the other, universally condemned, systems. This tactical retreat failed, however, because it is undisputed

---

[7] *See democrats-homeland.house.gov/sites/democrats.homeland.house.gov/files/documents/ TFESReport.pdf* (Feb. 14, 2018), at 24.

7

that Georgia's system was left exposed to the public internet for months in 2016 and 2017. (T-321:6-20). The background vulnerability of a system like Georgia's DREs, coupled with Georgia's complete lack of security,[8] greatly increased the likelihood that a defect in the November 2018 general election was the cause of the extreme irregularities in the election results. (T-299:13-15, 319:15-321:2).

### D. External Evidence of Programming Defects

As explained below, Plaintiffs were not allowed to examine the programming of Georgia's electronic election system, and therefore had no direct evidence of defective programming. Plaintiffs' expert testified, however, that there was other evidence that reflected internal defective programming, including most prominently the aberrant pattern that appears only in the votes recorded on electronic machines, as shown above in the chart on page 4. (T-173-180). This election featured other "telltale" signs of defective programming, such as reports of machines rebooting spontaneously, "raw error codes" appearing in the logs of the machines, the Lieutenant Governor's race not appearing on the electronic ballot, and the machine prematurely casting the electronic ballot. (T-333:1-20).

Eye-witness testimony confirmed electronic voting machine irregularities. A poll-watcher testified about an incident reported by a voter, and confirmed by the precinct manager, in which the DRE machine cast the voter's entire ballot

---

[8] *See Curling, supra, note* 6; *see also Common Cause Georgia v. Kem*p, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018) ("Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted.").

before the voter could vote for Lieutenant Governor. The precinct manager was "very alarmed" because the vote had cast but "the voter's finger was nowhere near the area for he submit ballot." (T-227:22-228:6). A voter testified that the lieutenant governor's race initially did not even appear on the first several pages of the electronic ballot. (T-553:24-554:1).

Plaintiffs' expert also testified about the highly unusual results reported by a precinct in Winterville, Georgia, where on every DRE machine except one the Democratic candidate won every race, and on the other DRE machine a Republican won every race by approximately the same margin. Given the extreme unlikelihood of one machine attracting voters from the same party, Plaintiffs' expert testified, an innocent or malicious programming mistake was a possible cause of the irregularity. (T-331:4-332:15).

To determine the cause of these irregularities, a forensic examination of the software running on the system (resident in the internal memory), as well as an examination of the GEMS database, was required. (T-334:2-8). The trial court, however, did not allow any such discovery. (T-335:11-15).

E.    Presumption of Defect Never Rebutted

Defendants had access to the programming, but did not introduce any evidence about the programming — or any other evidence explaining the cause of these irregularities. Under Georgia law, therefore, a rebuttable presumption arose that Plaintiffs met their burden of proving a system defect:

> If a party has evidence in such party's power and within such party's reach
> by which he or she may repel a claim or charge against him or her but omits
> to produce it . . . a presumption arises that the charge or claim against such
> party is well founded; but this presumption may be rebutted.

O.C.G.A. § 24-14-22. Defendants offered no evidence rebutting the presumption of defect which arose by operation of law.

## IV. DECISION BELOW

After Plaintiffs rested, the trial court granted Defendants' Motion for Involuntary Dismissal under O.C.G.A. § 9-11-41(b), concluding that Plaintiffs failed to prove a sufficient number of irregular or illegal votes. (R-5).

## V. ENUMERATION OF ERROR

1.     The trial court erred in not affording Plaintiffs reasonable time for discovery.

2.     The trial court erred in denying Plaintiffs' Motion for Continuance.

3.     The trial court erred by refusing to allow Plaintiffs to discover relevant evidence of misprogramming of the election system.

4.     The trial court erred by denying Plaintiffs' Motion to Compel when Defendants did not permit Plaintiffs to examine the internal memory of the electronic voting machines, as the trial court's order required.

5.     The trial court's factual finding that "the most votes that the Plaintiff has shown that could be in any way arguably considered irregular or illegal is approximately 32,000 votes" is clearly erroneous.

6.     The trial court applied the incorrect legal standards in rejecting

Plaintiffs' claim that systemic irregularities in the State of Georgia's electronic

voting system rendered the system so defective as to cast doubt on the result of the

election.

7.     The trial court erred in rejecting Plaintiffs' demand for jury trial.

## VI.   ARGUMENT

### A.     Plaintiffs' Efforts to Obtain Discovery

Plaintiffs' first four enumerations of error arise from the trial court's failure

to afford Plaintiffs reasonable discovery.  The procedural history of the case

relating to Plaintiffs' efforts to obtain discovery, and the trial court's response, will

therefore be presented here in some detail.

#### 1.   *November 29, 2018 Emergency Discovery Motion*

On November 29, 2018, shortly after filing suit, Plaintiffs' filed the

Emergency Discovery Motion requesting the opportunity to examine the "GEMS

programming CD," conduct a forensic examination of DREs from 20 select

counties, and for the production of associated election documentation.  (R-96-108).

Given the time-sensitivity of the matter, Plaintiffs requested that the inspection of

the DREs proceed the week of December 3, 2018.  The Motion states: "This

examination must occur immediately because of an imminent trial and because the

Supreme Court of Georgia has repeatedly instructed that 'litigants should make

11

every effort to dispose of election disputes with dispatch.' *Payne v. Chatman,* 267 Ga. 873, 876 (1997)." (R-97).

### 2.    December 4, 2018 Status Report

After the appointment of Senior Superior Court Judge Adele Grubbs on November 30, 2018 (R-119), Plaintiffs' filed a Status Report which reemphasized the urgency of the Emergency Discovery Motion. [9] "Of immediate concern is the need to preserve and inspect the electronic equipment and electronic records that the State used to conduct this election." (R-160). Plaintiffs explained: "Vital to the determination of the causes of these irregularities is an expert forensic examination of the electronic equipment and related records." (R-163).

### 3.    December 5, 2018 Status Conference

At a December 5, 2018 Status Conference, the trial court engaged in a colloquy with counsel about potential hearing and trial dates in January and February, 2019, and then settled on a motions deadline of December 20, 2018, a hearing on the motions on January 9, 2019, and the trial on January 17, 2019. (R-171). The trial court made it very clear that the dates could be moved if necessary:

> I'll do an order on the days, just to protect on the different rules and regulations. We can move them. It doesn't say we cannot move them. And we can move them.

---

[9] As Plaintiffs noted in the Status Report, the trial court had the express and inherent authority to order the requested inspection and discovery prior to Defendants' answer "in the interests of justice" under O.C.G.A. § 9-11-26(d) or O.C.G.A. § 9-11-27. (R. 164).

(T-16: 21-23).  Plaintiffs' counsel notified the trial court again of the pending

Emergency Discovery Motion, but the court did not rule on it.  (T-8:9-13).

### 4.   *December 7, 2018 Email*

On December 7, 2018, the trial court sent an email to counsel, stating: "The

Plaintiff's Motion for expedited discovery will be heard on January 9th 2019 along

with all the other Motions."  (R-1102).  Crucially, the trial court added:*"If it is*

*deemed necessary to move the trial date at that time the Court will consider it."*

*Id*.  (emphasis added).  The trial court, therefore, stayed discovery until January 9,

but also expressed a willingness to consider a continuance of trial if necessary.

### 5.   *The Murray and Gordon County Elections*

On December 21, 2018, Plaintiffs restated the urgency of discovery in their

Motion for Preservation of Specific Electronic Election Records in Gordon and

Murray Counties.  (R-246).  The motion was necessary because reusing electronic

election equipment in subsequent elections alters its internal memory and destroys

evidence.  (R-260).  The Motion was mooted by the elections.

### 6.   *January 9, 2019 Motions Hearing*

At the hearing on January 9, 2019, the Court, *inter alia,* denied the motions

to dismiss the election contest claim filed by Defendants Duncan, the Fulton

County Board and the Gwinnett County Board.  As to Plaintiffs' Emergency

Discovery Motion, the trial court engaged in a colloquy with counsel in an effort to

determine the contours of the needed discovery on the electronic voting equipment

and associated evidence.  Plaintiffs' counsel explained that Plaintiffs' experts would be "examining the internal memory to see if there are programming flaws in the DRE machines that are causing these problems," which the trial court seemed to acknowledge was reasonable.  ("THE COURT:  See if they were programmed wrong, okay.  Simple language, okay."  (T-109:25-110:9)).

Counsel for the Secretary of State asked for clarification from the Court on the scope of discovery (T-110:10-11).  The Court did not provide clarification and the parties agreed to attempt to work out the details and submit a proposed order. (T-110:13-18).  Plaintiffs' counsel asked that the trial be postponed; the Court rejected the possibility of a continuance. (T-112:19-25).

> 7.    *January 9 – 11:  Parties Confer, Submit Competing Proposed Orders on Discovery*

Over the next two days, the parties attempted without success to reach agreement on the meaning of the Court's instructions from the bench relating to discovery, resulting in the submission of competing proposed orders.  (R-1153-60). On January 11, 2018, the trial court entered an Order on Pending Motions that, among other things, did not require Defendants to produce the crucial GEMS database but did appear to require Defendants to permit Plaintiffs to examine the internal memory of the DRE machines from five polling locations.  (R-874, 878-79).[10]

---

[10] What the trial court ordered was not the discovery that Plaintiffs had requested, although there was some overlap. In the Emergency Discovery Motion, Plaintiffs identified suspect DREs from specific polling locations in 20

14

8.    *January 11:  Trial Court Rejects Suggestions that a Special
      Master be Appointed and the Case be Continued*

Given the impossibility of conducting an examination of electronic voting

machines in the three business days before trial, and the technical issues facing the

parties and the trial court in connection with forensic and other discovery, counsel

for Plaintiffs wrote an email to the court on Friday afternoon, January 11, 2019,

stating that counsel would be conferring with Defendants' counsel about the

possibility of consenting to a motion for the appointment of a Special Master and

the continuance of the trial.  (R-1069).  In an immediate email response, (R-1071),

the trial court stated:

> There will be no continuance or Special Master.  This is an election
> contest only case that must be expedited.  If there is an issue as the
> Plaintiffs conduct discovery I will take them up by e mail or
> conference call if necessary.

9.    *January 14 "Examination" Bears No Fruit*

The "examination" of the electronic equipment was scheduled to begin on

January 14, 2019, with the assemblage by Fulton County of several dozen DRE

machines in its English Street warehouse.  Plaintiffs' expert appeared for the

examination, but Defendants did not allow examination of the actual internal

memory of any of the machines.  Based on their interpretation of the trial court's

---

counties.  Rather than allowing examination of these DREs and their related paper records, the trial court ordered the
Defendants to allow Plaintiffs to examine the internal memory of DREs in only three counties in polling places that
Plaintiffs had illustratively discussed in the Petition.  Two of the counties and polling places that were the subject of
the trial court's order were not included in the discovery sought by Plaintiffs.  Although this brief focuses on the trial
court's failure to allow discovery of programming, Plaintiffs also sought, and were denied, discovery of relevant
documentary evidence, such as polling place machine tapes and other election records.  (R-96-108).

order, Defendants agreed to produce only the "election archive files," (R-1023-24), an on-screen human readable report (not the programming). According to Plaintiffs' expert, election archive files would be virtually useless in a forensic examination. (R. 993-94).

> 10. *January 15 and 16: Trial Court Denies Motion for Continuation and Motion to Compel*

Even without the ongoing discovery dispute, a continuation was necessary for discovery to be meaningful. In the evening on January 14, 2019, Plaintiffs filed a formal Motion for Continuance explaining, again, the impossibility of completing any forensic examination of the electronics prior to trial. The trial court denied the motion on January16, 2019. (R-1037, R-1035). On January 15, 2019, Plaintiffs filed a Motion to Compel. On January 17, the first day of trial, the trial court denied the Motion to Compel from the bench. (T-172:17).

> 11. *January 17: Renewed Motion for Additional Discovery at Trial*

On the morning of trial, Plaintiffs moved "for additional discovery under the Civil Practice Act." The trial court stated: "Sir, I've denied all that." (T-172:21).

**B. Enumeration of Error One and Two: Failure to Allow Reasonable Time for Discovery and Refusal to Grant a Continuance**

In this Part B, Plaintiffs address the first two enumerations of error: failure to allow reasonable time for discovery and the related denial of a continuance.

> 1. *Statutory Requirement of "Reasonable Time for Discovery"*

The Civil Practice Act states: "*All* civil cases . . . shall be triable any time after the last day upon which defensive pleadings were required to be filed therein; provided, however, *that the court shall in all cases afford to the parties reasonable time for discovery procedures,* subsequent to the date that defensive pleadings were required to be filed." O.C.G.A. § 9-11-40 (emphasis added). An election contest is a "civil case" governed by O.C.G.A. § 9-11-40. Although the Election Contest Statute alters civil practice in some other ways, it does not curtail the right to discovery.

The "reasonable time for discovery" required by the Civil Practice Act[11] also is necessary to fulfil the objectives of the Election Contest Statute. O.C.G.A. § 21-2-525(b) grants trial courts "plenary power" "to make, issue, and enforce all necessary orders, rules, processes, and decrees" so that the trial court can gain "a full and proper understanding" of the case. Without reasonable discovery, a "full and proper understanding" of the case is not possible. O.C.G.A. § 21-2-525(b) goes on to grant the trial court state-wide authority "to compel the production of evidence which may be required at such hearing, in like manner and to the same extent as in other civil cases litigated before such court." This provision confirms the legislature's understanding that election contests are "civil cases" in which a

---

[11] A "reasonable time" for discovery is not necessarily the standard 6-month period and trial courts have discretion to shorten the period under Rule 5.1 of the Uniform Superior Court Rules. This discretion does not, however, qualify the statutory command to allow a "reasonable time" for discovery.

"reasonable time for discovery" must be afforded.

In its review of election contests, this Court has never strayed from the clear statutory command to allow reasonable discovery. In every case found, the plaintiff in an election contest has been given reasonable discovery, whether that entailed an opportunity to find and count every misspelled absentee ballot, *Mead v. Sheffield,* 278 Ga. 268 (2004), or to investigate fully allegedly mis-calibrated voting machines, *Taggart v. Phillips*, 242 Ga. 454, 455 (1978).

> 2. *The trial court did not afford Plaintiffs a Reasonable Time for Discovery as Required by Law*

The trial court did not give Plaintiffs a reasonable time for discovery, or anything close to it. The trial court's order allowing discovery to proceed was entered Friday afternoon, January 11, with trial scheduled to begin the next Thursday, January 17. This left the weekend for the parties to negotiate and execute a protective order (completed on Sunday, January 13), and then three business days of actual discovery, analysis, and preparation of reports. Three days of discovery in a case involving technology of this complexity plainly is not reasonable.

There is no contention that Plaintiffs delayed initiating discovery. To the contrary: Plaintiffs filed its Emergency Discovery Motion before Judge Grubb's appointment, and repeatedly stressed the urgency of discovery. (*E.g.* R-96, 160, 246). The scope of the emergency discovery that Plaintiffs sought also was reasonable: Plaintiffs did not seek depositions, interrogatories, or requests for

18

admission, and focused exclusively on the single factual question of whether defective programming caused the irregularities. (R-96).

The trial court's sole reason for not allowing Plaintiffs reasonable time for discovery was because "[t]his is an election contest only case that must be expedited." (R-1071). But Plaintiffs had been asking for expedition since November 29, 2018, reminding the trial court, over and over again, that "'litigants should make every effort to dispose of election disputes with dispatch.' *Payne v. Chatman,* 267 Ga. 873, 876 (1997)." (R-97, 164). If the trial court believed that the trial date could not be continued because this "was an election contest only," then it should not have stayed discovery until three days before trial.

Furthermore, if the trial court never had any intention of moving the trial date, it should not have told the parties in the December 5 hearing that "[w]e can move" the calendared trial dates (T-16:22-23) or in the December 7 email that the court would consider continuing the case when the time came. (R-1102). When the time came on January 9, the trial court refused to consider any continuance, stating from the bench: "No, nothing postponed. . . . The rules are – in fact I'm getting some pressure as to why this isn't going through faster than it's been. It needs to be done; it needs to be completed; it needs to be over. I'm not going to move it." (T-112:25-113:5).

There is nothing in the record explaining the source or nature of this "pressure." Whatever the source of this pressure, by denying Plaintiffs a

reasonable time for discovery, which could easily have been achieved by starting discovery earlier or granting a continuance, the trial court erred and the decision below must be reversed.

## C.  Enumeration of Error Three and Four:  Refusal to Allow Discovery of Relevant Evidence and Failure to Grant Motion to Compel

In this Part C, Plaintiffs will address the third and fourth enumerations of error:  the trial court's refusal to allow discovery of relevant evidence and the failure to grant Plaintiffs' Motion to Compel.

### 1.  *Background*

Plaintiffs' discovery efforts focused on programming found in two places: the GEMS database, which is a worksheet stored on a CD that the Secretary of State sends to every county, and the internal memory of the DRE voting machines themselves.  The trial court did not allow discovery of either the GEMS database or the internal memory of the DREs. [12]

### 2.  *Trial Court Refuses to Allow Examination of GEMS databases*

Plaintiffs sought discovery of the GEMS databases that the Secretary of State prepares and sends to the counties.  As Plaintiffs repeatedly explained to the trial court, with the support of expert affidavits, the GEMS database "would be the first, most efficient, and easiest place an expert would look for the cause and to

---

[12] Plaintiffs have focused in this brief on the examination of the programming on the DREs and in the GEMS database, but in discovery also sought related documents.  (R-96-108).  The trial court denied all of this discovery.  *See also supra* note 9.

quantify the impact of the irregularities." (R-1124). The Secretary and the counties could have produced the data within minutes (they are stored on CDs) and the databases could have been examined forensically in a matter of days. The GEMS database contains no proprietary information and any confidential information would be protected by the protective order that the parties had already agreed to execute. (R-907, 1080-81).

In her January 11 Order, the trial court denied Plaintiffs' request for discovery of the GEMS database. Instead, the trial court directed the Defendants to produce certain reports generated by the GEMS database, reports that are already public records under the Open Records Act and were not requested by Plaintiffs. (R-878-79). As Plaintiffs repeatedly explained to the trial court, these unneeded eports were unrelated to Plaintiffs' discovery request and a review of these reports would not reveal any programming flaw in the system. (R-984, 1158). The trial court did not explain its decision to limit discovery to records that are subject to the Open Records Act. What evidence the state is required to produce to the public is unrelated to the scope of discovery under O.C.G.A. § 9-11-26 (b), as discussed below.

### 3. *Trial Court Refuses to Allow Examination of DRE internal memory*

The procedural history relating to the discovery of the internal memory of the DRE machines is more convoluted, but the result was the same as with the GEMS databases: Plaintiffs were completely denied discovery. In its January 11,

2019 Order on Pending Motions, the trial court stated that Plaintiffs may "examine the internal memory storage of each DRE unit." (R-879). On January 14, 2019, the DRE machines were assembled at Fulton County's warehouse. Instead of allowing Plaintiffs to examine the internal memory of the machines, however, Defendants offered to allow Plaintiffs to examine a report from one file generated by the internal memory called the "election archive." The election archive, however, is a human readable report, not the programming. (R-993-94). Plaintiffs accordingly filed a Motion to Compel on January 16, 2019. (R-979). On the first day of trial, the trial court stated that the Motion to Compel had already been denied (T-172:17), which was not the case, but then denied the Motion (or denied it again) from the bench, stating that the court had not ordered "a forensic investigation." (T-335:11-15). The trial court did not explain *why* it had not ordered "a forensic investigation," but stated clearly that it had not done so. *Id.*

The trial court's January 17 statement from the Bench that no forensic examination had been ordered is directly contrary to the trial court's written order, which states that Plaintiffs were to be allowed to "examine the internal memory storage of each DRE unit." There is no dispute that Defendants did not allow Plaintiffs to examine the internal memory of any DRE machine. The trial court's denial of Plaintiffs' Motion to Compel, therefore, was an abuse of discretion.

More fundamentally, not allowing examination of the internal memory of the DREs (either by wrongfully denying the Motion to Compel or not allowing

22

such discovery in the first place) was in error because the evidence plainly was relevant to Plaintiffs' claim that the anomalous vote tallies and other malfunctions were caused by programming errors sufficient to place in doubt the election results.

### 4. Conclusion: The GEMS databases and DRE Internal Memory were Relevant to the Subject Matter of the Action

O.C.G.A. § 9-11-26 (b) states that parties may obtain discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." In *Bowden v. The Medical Center, Inc.*, 297 Ga. 285, 290-291 (2015), this Court quoted with approval the following interpretation from the United States Supreme Court of the analogous federal rule:

> The key phrase in this definition—"relevant to the subject matter involved in the pending action"—has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) (footnote and citations omitted). Under a narrow definition of relevance or discoverability, and clearly under the broad interpretation mandated by this Court in *Bowden*, Plaintiffs were entitled to discovery of the GEMS databases, related reports, and the internal memory of the DRE machines. The trial court's failure to allow such discovery constituted reversible error.

### D. Enumeration of Error Five and Six: Incorrect Factual and Legal Analysis of Election Contest Claim

Enumeration of error five and six concern errors of fact and law in the trial court's Final Order.

23

The trial court's reasoning is not clear. Quoting the *Fuller* case, the trial court held: "'the number of illegal or irregular ballots necessary to cast doubt on an election is derived by taking the difference between the total votes cast in the election and the race at issue, and adding the margin of victory in the race at issue.'" (R-1092). The trial court did not explain why this formula applies to this case or why the Plaintiffs' burden of proof should increase with the number of undervotes.[13] The trial court, however, did not actually make this calculation; instead, it appears from other language in the Final that the trial court intended to use the reported margin of victory (123,172) as the threshold for establishing sufficient doubt to warrant a new election. (R-7-8). The trial court found as a matter of fact that "the most votes that the Plaintiff has shown that could be in any way arguably considered irregular or illegal is approximately 32,000," and, based on this (incorrect) finding, dismissed the case. (R-9).

The trial court's decision is riddled with factual and legal mistakes, requiring reversal.

### 1. Failure to Gain Understanding of the Case

The trial court's decision reflects the failure of the trial court to gain "a full and proper understanding" of the case, as the law requires. *See* O.C.G.A. § 21-2-525(b). In the ruling, the trial court did not address the most important fact of the

---

[13] For example, if the DREs had reported *zero* votes for Ms. Amico, it would seem that the election result would be in doubt without any further evidence. If the trial court's formula were applied to this hypothetical, however, the petitioner would have the impossible task of proving 3,939,320 illegal or irregular ballots. (In this hypothetical, the undervote would be 1,987,590, and Mr. Duncan's margin of victory would be 1,951,730).

case: the unexplained difference between voting participation on electronic machines and on paper. The trial court also did not address the undisputed evidence that the existing vulnerability of the compromised DRE voting system increased the risk of malicious attack or programming mistakes. The trial court also did not address the law, repeatedly cited by Plaintiffs, that, given that Defendants had in their possession evidence that could have repelled Plaintiffs' claim of system defect, Plaintiffs were entitled to a presumption under O.C.G.A. § 24-14-22 that the DRE machines were defective.

2. *Clear Error of Fact*

In ruling from the bench, the trial court explained that the 32,000 figure is the sum of several dozen individual instances of irregularities and the "undervote," which the trial court calculated to be 31,000. (T-623:14-16). The trial court's finding that the undervote was 31,000 is clearly erroneous. The undisputed evidence from the Secretary of State's records shows that the undervote was 159,124; Plaintiffs showed that the undervote *should have been* only 31,515, which is .8% of the vote on the Governor's race. (T-257:1-4).[14] The difference between the actual reported undervote and the historical undervote – the number the trial court should have used – is 127,504, which is *more* than Mr. Duncan's reported margin of victory over Ms. Amico. Thus, applying the trial court's rationale to the

---

[14] Because this was such an obvious mistake, immediately after the trial court's ruling, Plaintiffs' counsel three times attempted to bring this error to the court's attention, but the trial court would not allow counsel to explain. (T-624:1-23).

stipulated numbers, Plaintiffs proved that the defect in the system was sufficient to place in doubt the result.

### 3.   *Fundamentally Incorrect Legal Analysis*

The trial court's holding is inconsistent with Georgia law for additional, more fundamental, reasons.  The Election Contest Statute does not require the petitioner to prove that but for the irregularity or illegal votes the result would have been different.  To the contrary:  in the section setting for the "grounds" for an election contest, the statute requires a new election if the petitioner shows that the irregularity or illegal votes would "change" the result *or "place in doubt the result."*  O.C.G.A. §§ 21-2-522(1) and (3) (emphasis added).  And, in the section governing when a new election is required, the Election Contest Statute states:

> *Whenever* the court trying a contest shall determine that the primary, election, or runoff is so defective as to the nomination, office, or eligibility in contest *so as to place in doubt the result of the entire primary, election, or runoff . . .* such court shall declare the primary, election, or runoff to be invalid . . . and shall call of a second primary, election, or runoff to be conducted. . . .

O.C.G.A. §§ 21-2-527(d) (emphasis added).  The qualitative language in these provisions should be contrasted with the provision governing contests based on an error in "counting the votes," which requires proof the error would have changed the result; placing in doubt the result is insufficient.  O.C.G.A. §§ 21-2-522(4).

This Court does not require a petitioner to prove that the result would have been different but for the alleged irregularity or illegal voting.  In *Mead,* this Court

26

ordered a new election even thought there was no evidence that the misnomer caused electors to not vote on the race in question or vote for the wrong candidate. In *Stiles v. Earnest*, 252 Ga. 260, 261 (1984), there was no proof of the impact of the irregularities upon the vote tally. Still, the Court ordered a new election: "upon review of the record, we conclude that the illegality attendant upon the referendum is such as is 'sufficient to change or place in doubt the result' thereof."

*Mead* and *Stiles* teach that determining whether an irregularity places an election result in doubt cannot be achieved by the rote application of a formula devised for an entirely different kind of election contest, but instead must be tailored to the facts of the case based upon the nature of the irregularity and technology involved.

Without doubt, a petitioner must establish that the irregularity was material; elections are too important to allow an immaterial irregularity to overturn an otherwise proper election. In this case, however, Plaintiffs established to a near metaphysical certainty that these profoundly vulnerable machines caused thousands of voters using electronic machines to either not vote for Lieutenant Governor or for those votes to not be counted. A programming defect that could cause such wide-spread errors easily is material enough to place the election result in doubt.

Application of the "place in doubt" standard here must also take into account the undisputed fact that Georgia's election results cannot be audited. If Georgia

27

used an auditable election system (for example, with paper ballots and computerized scanners and tabulators), then the impact of a programming defect in the scanners or tabulators could be proven simply by recounting the paper ballots by hand. By choosing an election system that cannot be audited, Defendants have eliminated any ability to *remove* the doubt that is cast on election results when anomalies such as those proven in this case appear.

For these reasons, the trial court erred in finding that the Plaintiffs' failed to establish that the election was so defective as to place the result in doubt.

### E.    Enumeration of Error Seven:  Wrongful Striking of Jury Demand

Plaintiffs filed a timely demand for a jury trial on January 16, 2019, a day before the "call of the case" on January 17, 2019. (R-1012). The trial court denied the jury demand from the bench on January 17, 2019, stating only that the demand "does not comport with the statute." (T-170:4-6). The Final Order dismissing the case addressed the jury demand as follows: "Plaintiffs having made Motions for Jury trial, see Fuller v. Thomas, 284 Ga. 397 (2008), . . . . and the Court having denied the same. . . ." (R-1089).

O.C.G.A. § 21-2-526 provides:

(a) All issues of a contest shall be fully tried and determined by the court without the aid and intervention of a jury, unless a litigant to the contest shall demand a trial by jury at any time prior to the call of the case; and the court shall determine that it is an issue which under other laws of this state the litigant is entitled to have tried by a jury. Upon such determination, a jury shall be impaneled and the cause shall proceed according to the practice and procedure of the court in jury cases.

Given that the jury demand was timely made, the only possible basis for denying the jury trial is that there were no issues "which under other laws of this state the litigant is entitled to have tried by a jury." *Id*. In Georgia, the rule has always been: "facts for the jury, law for the judge." *Frank v. Atlanta St. R.R.,* 72 Ga. 338, 344 (1884). This case raised numerous factual issues, such was whether there were defects in the programming or machines, and the impact of those defects. These factual issues were for the jury to decide. As Chief Justice Richard B. Russell stated in *Elrod v. McConnell*, 170 Ga. 892 (1930): "Although there may be no conflict in the evidence, the matter should be left to the jury, where reasonable men might differ as to the inferences to be drawn from certain evidence." *See McCarty v. Nat'l Life & Acc. Ins. Co.,* 107 Ga. App. 178, 179 (1962) ("where more than one inference can be drawn from the evidence, the duty of solving the mystery should be placed upon the jury and not the trial judge").

In striking the jury demand, the trial court cited *Fuller v. Thomas,* 284 Ga. 397 (2008). *Fuller* stands for the unremarkable proposition that if the allegations, taken as true, are insufficient to put the results of an election in doubt, a jury trial is not required. 284 Ga. at 589.[15] In sharp contrast to this Court's analysis in *Fuller,* in this case the trial court did not assume that Plaintiffs' allegations were true

---

[15] In *Fuller,* this Court was careful to state that relief was not warranted even "[a]ssuming, arguendo," the allegations to be true, and for that reason, a jury trial was unnecessary. Similarly, in *Scoggins v. Collins*, 288 Ga. 26, 28–29 (2010), the plaintiffs had failed to make any showing placing the result in doubt. Therefore, "the trial court did not err by granting the motion for directed verdict" and denying plaintiffs' motion for a jury trial.

29

under O.C.G.A. § 9-11-12(b)(6) or construe the evidence in a light most favorable to Plaintiffs under O.C.G.A. § 9-11-56. Instead, the trial court sat as the trier of fact, heard testimony, weighed the evidence "straight up" under O.C.G.A. § 9-11-41, and found, as a matter of fact, that Plaintiffs' evidence fell short of proving sufficient voting irregularities. This fact-bound resolution of the case is facially and fatally inconsistent with the trial court's denial of a jury trial.

Plaintiffs were "entitled to have tried by a jury," O.C.G.A. § 21-2-526 (a), and the trial court erred in striking the jury demand.

For the foregoing reasons, the decision below should be reversed.

Respectfully submitted this 7th day of March, 2019.

/s/Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*Counsel for Appellants*

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of the foregoing Brief of

Appellants upon all counsel of record by email addressed to:

Kaye Woodard Burwell
Office of the Fulton County Attorney
141 Pryor Street, NW
Suite 4038
Atlanta, Georgia 30303
Kaye.burwell@fultoncountyga.gov

*Counsel for Appellee Fulton County*
*Board of Registrations and Election*

Bryan P. Tyson
Strickland Brockingham Lewis LLC
Midtown Proscenium Suite 2200
1170 Peachtree St. NE
Atlanta, Georgia 30309
bpt@sbllaw.net

*Counsel for Appellee Gwinnett*
*County Board of Registrations and*
*Elections*

Josh Belinfante
Robbins Ross Alloy Belinfante
Littlefield LLC
500 Fourteenth St. NW
Atlanta, Georgia 30318
Josh.Belinfante@robbinsfirm.com

*Counsel for Appellee Secretary of*
*State*

Edward H. Lindsey, Jr.
Dentons
303 Peachtree St. NE
Suite 5300
Atlanta, Georgia 30308
edward.lindsey@dentons.com

*Counsel for Appellee Geoff Duncan*

This 7th day of March, 2019.

/s/Bruce P. Brown
Bruce P. Brown
*Counsel for Appellants*

31