# IN THE SUPREME COURT OF GEORGIA
## STATE OF GEORGIA

SUPREME COURT CASE No. S19A0769
Fulton County Superior Court Case No. 2018CV313418

---

COALITION FOR GOOD GOVERNANCE, RHONDA J. MARTIN, SMYTHE DUVAL, AND JEANNE DUFORT,

Plaintiffs/Appellants

v.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State; FULTON COUNTY BORAD OF REGISTRATION AND ELECTIONS; GWINNETT COUNTY BOARD OF REGISTRATIONS AND ELECTIONS; and GEOFF DUNCAN,

Defendants/Appellees.

---

## BRIEF OF APPELLEE GWINNETT COUNTY BOARD OF REGISTRATIONS AND ELECTIONS

---

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
770.434.6868 (Telephone)

Richard A. Carothers
Georgia Bar No. 111075
richard.carothers@carmitch.com
Brian R. Dempsey
Georgia Bar No. 217596
Brian.dempsey@carmitch.com
CAROTHERS & MITCHELL, LLC
1809 Buford Highway
Buford, GA 30518
(770) 932-3552 (Telephone)

*Counsel for Appellee Gwinnett Board of Registrations and Elections*

# **TABLE OF CONTENTS**

I. RESPONSE TO STATEMENT OF JURISDICTION............................................1

II. INTRODUCTION.............................................................................................1

III. STANDARD OF REVIEW .............................................................................2

IV. STATEMENT OF FACTS ...............................................................................3

    A. The 2018 election for Lieutenant Governor. ....................................................3

    B. The filing of the present election contest. .......................................................3

    C. Plaintiffs' efforts to gain access to DRE machines and GEMS databases. .......6

    D. Motions filed before trial. ...............................................................................8

    E. Evidence presented at trial. ..............................................................................8

    F. The involuntary dismissal of Plaintiffs' claims................................................10

V. ARGUMENT AND CITATION OF AUTHORITY ..........................................11

    A. The trial court properly dismissed Plaintiffs' claims because there was no evidence of irregularities. (Enumerations of Error 5 and 6)...............................11

        1. The evidence showed there were no irregularities. ....................................13

        2. Plaintiffs were not entitled to a presumption of defectiveness.....................15

        3. The trial court properly found that Plaintiffs had not met their burden. .......16

    B. The trial court properly limited the scope of discovery, Plaintiffs did not use that limited discovery, and they cannot now complain about it. (Enumerations of Error 1, 3, and 4)......................................................................................18

        1. Entitlement to discovery in an election contest............................................18

        2. The trial court properly limited discovery.....................................................20

            a. GEMS databases...................................................................................21

            b. DRE machine memory ........................................................................22

c. Other potential items.................................................................23

3. Plaintiffs did not utilize the opportunity available to them to engage in discovery.......................................................................................23

C. The trial court properly denied Plaintiffs' delaying tactics. (Enumerations of Error 2 and 7)....................................................................................25

1. Motion for continuance. .............................................................25

2. Jury trial demand. .....................................................................26

CONCLUSION ...............................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Anderberg v. Ga. Elec. Membership Corp.*,
  175 Ga. App. 14 (1985) ........................................................................20

*Baxley v. Hakiel Indus.*,
  282 Ga. 312 (2007) .............................................................................16

*Bowden v. Med. Ctr., Inc.*,
  297 Ga. 285 (2015) ................................................................. 2, 20, 22

*Broughton v. Douglas Cty. Bd. of Elections*,
  286 Ga. 528 (2010) .............................................................................25

*Estate of Caplanis v. Morone*,
  No. A-0495, 2015 N.J. Super. Unpub. LEXIS 2148 (N.J. App. Ct. Sept. 8, 2015)
  ........................................................................................................24

*Favorito v. Handel*,
  285 Ga. 795 (2009) ......................................................................... 13, 14

*Fuller v. Thomas*,
  284 Ga. 397 (2008) ......................................................................... 17, 27

*Gibson v. Gibson*,
  301 Ga. 622 (2017) ..............................................................................2

*Head v. Williams*,
  269 Ga. 894 (1998) ......................................................................... 18, 25

*Henderson v. Cty. Bd. of Registration & Elections*,
  126 Ga. App. 280 (1972) ............................................................. 26, 27, 28

*Howell v. Fears*,
  275 Ga. 627 (2002) .............................................................................11

*Hunt v. Crawford*,
  270 Ga. 7 (1998) ................................................................................11

*McCranie v. Mullis,*
    267 Ga. 416 (1996) ..........................................................................................17

*McCray v. Hunter,*
    157 Ga. App. 509 (1981) .................................................................................28

*McIntosh Cty. Bd. of Elections v. Deverger,*
    282 Ga. 566 (2007) .......................................................................................2, 15

*Mead v. Sheffield,*
    278 Ga. 268 (2004) .................................................................................. passim

*Meade v. Williamson,*
    293 Ga. 142 (2013) .................................................................................2, 13, 15

*Middleton v. Smith,*
    273 Ga. 202 (2000) .................................................................................. passim

*Pacheco v. Regal Cinemas, Inc.,*
    311 Ga. App. 224 (2011) .................................................................................16

*Payne v. Chatman,*
    267 Ga. 873 (1997) .................................................................................... 20, 23

*Pfeiffer v. Ga. DOT,*
    275 Ga. 827 (2002) ..........................................................................................15

*Precise v. Rossville,*
    261 Ga. 210 (1991) ............................................................................................5

*Rary v. Guess,*
    129 Ga. App. 102 (1973) .................................................................................19

*Smith v. DeKalb County,*
    288 Ga. App. 574 (2007) .................................................................................21

*Smith v. Northside Hosp., Inc.,*
    302 Ga. 517 (2017) .......................................................................................2, 18

*Stiles v. Earnest,*
    252 Ga. 260 (1984) ..........................................................................................12

iv

*Streeter v. Paschal*,
  267 Ga. 207 (1996) ...................................................................................2, 15

*Swain v. Thompson*,
  281 Ga. 30 (2006) ............................................................................................25

*Taggart v. Phillips*,
  242 Ga. 454 (1978) ................................................................................... 12, 19

*Tenet Healthcare Corp. v. La. Forum Corp.*,
  273 Ga. 206 (2000) .....................................................................................2, 20

**Statutes**

O.C.G.A. § 21-2-2(35) .........................................................................................4

O.C.G.A. § 21-2-521...........................................................................................5

O.C.G.A. § 21-2-522.........................................................................................11

O.C.G.A. § 21-2-525.........................................................................................19

O.C.G.A. § 21-2-525(a) ............................................................................. 25, 26

O.C.G.A. § 21-2-525(b)....................................................................................19

O.C.G.A. § 21-2-525(c)....................................................................................19

O.C.G.A. § 21-2-526(a)....................................................................................26

O.C.G.A. § 21-2-526(b)....................................................................................26

O.C.G.A. § 24-14-22 .................................................................................. 15, 16

O.C.G.A. § 9-11-41(b) ............................................................................... 10, 18

**Other Authorities**

*Misleading Graphs in Real Life: An Overview*,
  https://www.statisticshowto.datasciencecentral.com/misleading-graphs/ (last
  accessed March 25, 2019)..................................................................................3

# I. RESPONSE TO STATEMENT OF JURISDICTION

Appellee Gwinnett County Board of Registrations and Elections (the Gwinnett Board) agrees that this Court has exclusive jurisdiction of this appeal because it is an election contest. GA. CONST. Article VI, Section 6, Paragraph II.

# II. INTRODUCTION

Elections are presumed valid after certification. Any individual contesting an election faces a daunting task—he or she must show that the number of illegal votes cast, legal votes rejected, or irregularities were sufficient to place the result in doubt.

Plaintiffs filed this contest to the 2018 Lieutenant Governor's election based on speculation that the undervote[1] in that race was caused by "hacking" of the state's electronic voting machines. At trial, Plaintiffs presented only general evidence of possible vulnerabilities in electronic voting machines in other states. They utterly failed to carry their burden, as they presented no evidence that a vulnerability in any Georgia electronic voting machine led to the undervote in the Lieutenant Governor's race. The evidence at trial conclusively demonstrated that the voting machines worked properly in the 2018 election. And, given the margin

---

[1] "Undervote" refers to individuals who voted in the 2018 general election, but did not vote for certain offices, including the Lieutenant Governor's race. (T-254:8-19).

of more than 123,000 votes, the trial court properly dismissed Plaintiffs' case at the close of their evidence.

Apparently recognizing this lack of evidence, Plaintiffs spend most of their brief to this Court complaining that the trial court disagreed with them about the scope of discovery. But Plaintiffs were not entitled to the discovery they sought and did not even utilize the discovery authorized by the trial court. This Court should affirm the trial court's ruling because it is supported by the facts and law.

### III. STANDARD OF REVIEW

Elections are presumed valid and this Court does not disturb the findings of a trial court in an election contest unless those findings are "clearly erroneous." *Meade v. Williamson*, 293 Ga. 142, 143 (2013); *McIntosh Cty. Bd. of Elections v. Deverger*, 282 Ga. 566, 567 (2007); *Streeter v. Paschal*, 267 Ga. 207, 208 (1996). Because the trial court granted a motion for involuntary dismissal under O.C.G.A. § 9-11-41(b), this Court reverses only "if the evidence demands a contrary finding." *Smith v. Northside Hosp., Inc*., 302 Ga. 517, 520 (2017) quoting *Gibson v. Gibson*, 301 Ga. 622, 624 (2017).

A trial court's decisions about discovery are reviewed for abuse of discretion. *Bowden v. Med. Ctr., Inc*., 297 Ga. 285, 290 (2015); *Tenet Healthcare Corp. v. La. Forum Corp*., 273 Ga. 206, 210 (2000).

## IV. STATEMENT OF FACTS

**A. The 2018 election for Lieutenant Governor.**

The certified results for the 2018 General Election show that Lieutenant Governor Geoff Duncan received 1,951,738 votes and Sarah Riggs-Amico received 1,828,566 votes, a margin of 123,172. (R-7-8, 194; T-113:18-114:11). The *margin* of victory was consistent with other statewide races. But the vote *totals* were not consistent with other statewide races. Testimony at trial indicated that, while 1.5% of Election-Day voters who voted for Governor skipped the Secretary of State's race and 2.2% of Election-Day voters who voted for Governor skipped the Attorney General's race, 4.5% of voters who voted for Governor did not vote in the Lieutenant Governor's race.[2] (T-254:20-255:6; 261:1-261:25).

**B. The filing of the present election contest.**

Within the five-day period allowed for election contests, Plaintiffs filed the present action, styled as an election contest, but including several constitutional claims. (R-19-79). The allegations in the Complaint centered on the speculative concept that "a malfunctioning, erroneous programming, or malicious

---

[2] The Democratic candidate for Lieutenant Governor did not receive the fewest votes among statewide Democrats in the 2018 election. (T-270:3-8). Plaintiffs' chart of voter participation as a percentage of voters on page 4 of their brief manipulates the scale to make a small disparity seem larger. For a broader discussion of this technique, see *Misleading Graphs in Real Life: An Overview*, https://www.statisticshowto.datasciencecentral.com/misleading-graphs/ (last accessed March 25, 2019).

3

manipulation of the DRE machines caused a material number of votes in the Lieutenant Governor's race to not be recorded." (R-22 at ¶ 4). Plaintiffs sought not only a new election for Lieutenant Governor, but also a requirement that the State conduct the new election solely using hand-marked paper ballots. (R-56-57).

The Complaint's allegations focused on two primary areas: (1) Plaintiffs' security concerns about electronic voting machines generally (R-29-39 at ¶¶ 21-35); and (2) complaints made by voters about the 2018 general election. (R-39-44 at ¶¶ 38-48). Plaintiffs then allege that there was a causal link between these two subjects, which led to the lower vote totals in the Lieutenant Governor's race. (R-45-49 at ¶¶ 49-57). Plaintiffs also attached a letter from Ms. Riggs-Amico to the Secretary of State, where Ms. Riggs-Amico conceded that "the number of residual votes in the Lieutenant Governor's race is unlikely to affect the outcome of my race," but called for further investigation of the undervote in her election. (R-68).

Though Plaintiffs were challenging a statewide election, the Complaint only named the election superintendents[3] from Fulton, Gwinnett, and DeKalb Counties (along with the Secretary of State and Lieutenant Governor Duncan) as defendants.

---

[3] As the trial court properly found in dismissing the Secretary of State as a defendant in an election contest, an "election superintendent" is either a board of elections or the probate judge. *See* O.C.G.A. § 21-2-2(35), (R-875-876). Plaintiffs have not appealed the trial court's correct ruling that the Secretary of State is not a proper party for an election contest.

(R-26-27). Plaintiffs later voluntarily dismissed the DeKalb County Board of Elections and Registration with the trial court's permission. (R-181-185, 279-282).

All of the Defendants moved to dismiss. (R-138-159, 186-213). The Gwinnett Board specifically moved to dismiss because (1) the Coalition for Good Governance was not a proper party to an election contest; (2) the Plaintiffs had not joined all 159 election superintendents; and (3) the Complaint failed to state a claim upon which relief could be granted, because it had not alleged that more than the margin of 123,172 votes had been illegally cast or improperly rejected. (R-190-198).[4]

After a motions hearing on January 9, 2019, the trial court dismissed Plaintiffs' constitutional claims for failure to state a claim, leaving only the election contest count to be tried.[5] (R-871-873). The court also dismissed the Secretary of State as a defendant because he is not an election superintendent and therefore not a proper party to an election contest (R-875-876), and denied the

---

[4] While the Gwinnett Board did not appeal the denial of its motion, this Court can affirm the trial court's judgment dismissing Plaintiff's case as right for any reason—including the failure to state a claim in the initial complaint. *Precise v. Rossville*, 261 Ga. 210, 211 (1991).

[5] Plaintiffs do not appeal the dismissal of these constitutional claims. Brief of Appellants, p. 1 n.1. As a result, the Coalition for Good Governance is not a proper party for this appeal because corporations are not authorized to file election contests under O.C.G.A. § 21-2-521. The trial court dismissed the Coalition as a plaintiff for the election contest count of the Complaint. (R-877).

motion of Fulton and Gwinnett that all of the other 157 county election

superintendents were necessary parties (R-876).

## C. Plaintiffs' efforts to gain access to DRE machines and GEMS databases.

At the January 9 hearing, the trial court also considered Plaintiffs' motion

for discovery. Specifically, Plaintiffs sought discovery from the memory of the

electronic voting machines (also called Direct-Recording Electronic voting

machines or DREs) and the complete GEMS[6] server database. (R-96-103), (T-

96:10-97:9, 104:18-19). At the hearing, the Secretary of State's representative

expressed concerns about the security of both systems. (T-107:22-24 (GEMS

Server)); (T-110:19-111:9 (DREs)). The trial court allowed Plaintiffs to have some

access to information from the voting machines and the GEMS database, but in a

carefully controlled manner. (R-878-879).

The trial court allowed the Plaintiffs to review the DREs from precincts

identified in the Complaint for programming errors. (R-879). Testimony at trial

indicated that a review of the machines' internal memory in post-election mode,

which is what the trial court permitted, would allow for the discovery of

---

[6] GEMS is an acronym for Global Election Management System and is the
database used to prepare ballots to be loaded onto electronic voting machines. (T-
366:22). Each county maintains its own GEMS server and the state maintains a
central server. (T-367:21-370:2).

programming errors.[7] (T-432:8-433:13). Plaintiffs were not allowed to open the machines, introduce any information to the machines, or otherwise conduct destructive testing. (R-879).

The trial court did not allow the Plaintiffs to receive the entire GEMS database structure, given the Secretary's concerns that unfettered access to the structure would have compromised the security of that system. (T-107:22-24; R-878-879). The trial court instead required the production of several major reports, which would show the information maintained in the GEMS database without exposing its structure. (R-878).

Recognizing the expedited nature of the case, the trial court made itself available to mediate any discovery dispute or issue by "email or conference call." (R-1035; T-110:14-18). The trial court also advised all parties that there would be no continuances from the January 17 trial date. (T-110:14-18). As the trial court later found, Plaintiffs never emailed or otherwise contacted the trial court about any alleged failings in discovery prior to filing a motion for continuance on January 14. (R-881-914, 1034-1035). Plaintiffs never even touched the Fulton County voting machines that were made available to them, complaining that the

---

[7] Testimony also indicated that other possible errors Plaintiffs claimed existed were calibration errors that would have been discovered during the logic and accuracy testing of the machines prior to each election. (T-431:12-432:7).

review allowed by the trial court was too limited to be useful—a complaint they

continued in this Court. (T-334:6-18, T-336:19-337:18).

**D. Motions filed before trial.**

Between the entry of the "Order on Pending Motions," which dealt with the

discovery issues, and the trial date of January 17, Plaintiffs continued filing

additional motions. In addition to the motion for continuance, Plaintiffs also filed a

motion to compel and a jury trial demand. (R-979-1011, 1012-1013). The trial

court denied each of these requests and the case proceeded to trial. (R-1034-1037).

**E. Evidence presented at trial.**

During opening statements, counsel for Plaintiffs made clear that there

would be evidentiary challenges for their case: "The distinction between this case

and every other voting case is that there is no tangible evidence of the result of the

election. There is none at all. Instead, all we have are traces, secondary evidence,

giving some hint as to whether or not the voting totals are correct or not." (T-

173:21-174:1).

Plaintiffs introduced evidence about the vulnerability of DRE machines

generally, but did not identify any vulnerabilities specific to Georgia.[8] Their "cyber

---

[8] In their brief to this Court, Plaintiffs cite various Internet reports about DREs.
Brief of Appellants, p. 6. But Plaintiffs did not introduce these reports in the trial
court proceedings. The trial court properly limited testimony about a National
Academy of Sciences report (T-322:5-326:24) and did not allow further hearsay
into evidence. This Court should disregard the reports cited by Plaintiffs because

security expert" was not aware of any incident where malware had been propagated into DREs in an actual election in Georgia or anywhere in the country. (T-343:6-21). The researcher[9] did not even run the same version of the software on his test DRE units as is run in Georgia (T-306:15-25), and had no idea whether any malware resided on any DRE machine in Georgia (T-350:10-19). He admitted that he had no firsthand knowledge of any DRE machines used in Georgia in the 2018 elections. (T-307:25-308:4).

As the trial court ultimately found in dismissing Plaintiffs' petition, Plaintiffs could not cross the causal bridge from possible vulnerability to actual compromise of the 2018 election in Georgia. To the contrary, the evidence before the trial court disproved Plaintiffs' case—it showed that no hacking or compromise of Georgia's electronic voting system had taken place.

Reports used by the Secretary of State's office showed that (1) the Lieutenant Governor's race appeared on *all* DRE units in the challenged counties (T-416:14-418:5, 418:13-21), and (2) *all* memory cards had been uploaded (T-419:19-421:4). The Secretary of State's office performed parallel testing of the DRE units on Election Day and did not discovery any irregularities. (T-421:10-

they were not considered by the trial court and Plaintiffs have not enumerated the exclusion of these reports as error.

[9] The researcher relied on by Plaintiffs is employed by Verified Voting, which is an organization that believes that "DREs are unfit for us[e] in U.S. elections" and seeks to implement a "handwritten paper ballot system." (T-305:1-10).

422:25). The office performed additional tests on DREs in Ben Hill County after receiving the letter from Ms. Riggs-Amico, and did not find any anomalies. (T-389:2-25; 423:1-14). The evidence also showed that the number of write-in votes was higher for the Lieutenant Governor's race than for any other statewide race in Fulton and Gwinnett Counties and that those votes would not appear in vote totals, which could partially explain the undervote. (T-425:16-427:13).

The only votes Plaintiffs even placed into question during the trial were (1) a single vote from Ms. Terri Thomas, who said that the Lieutenant Governor's race did not appear on her ballot (T-553:24-17) but who was ultimately able to vote in the race (T-555:4-11); (2) up to 144 votes on voting machines from the Winterville precinct in Clarke County (T-347:22-348:12); and (3) possibly one vote in Fulton County from a voter whose name was unknown (T-225:15-25, 232:6-10). The trial court's reading of Plaintiffs placing up to 32,000 votes in contention was generous but still nowhere near the 123,172-vote margin, which was Plaintiffs' burden to prove in an election contest.

**F. The involuntary dismissal of Plaintiffs' claims.**

At the close of the Plaintiffs' evidence, Defendants jointly moved to dismiss Plaintiffs' Complaint involuntarily under O.C.G.A. § 9-11-41(b). (T-607-613). The trial court granted that motion, finding that Plaintiffs had failed to carry their burden to place the results in doubt. (R-1089-1094). This appeal followed.

10

## V. ARGUMENT AND CITATION OF AUTHORITY

Every election contest begins with a high bar—the result of the election being challenged is presumed valid. *Hunt v. Crawford*, 270 Ga. 7, 8 (1998), *Middleton v. Smith*, 273 Ga. 202, 203 (2000). Only if a plaintiff can show that the results of the election would be placed into doubt can he or she succeed in overturning the election. O.C.G.A. § 21-2-522. Irregularities that "simply erode confidence in the outcome of an election" are not sufficient to overturn an election, because elections "cannot be overturned on the basis of mere speculation." *Middleton*, 273 Ga. at 203.

The burden Plaintiffs faced at trial was showing to a mathematical certainty that the outcome was in doubt. *Mead v. Sheffield*, 278 Ga. 268, 271 (2004); *Howell v. Fears*, 275 Ga. 627, 628 (2002). That is a staggeringly high burden in this case. The totals for the Lieutenant Governor's race show Geoff Duncan receiving 1,951,738 votes and Sarah Riggs Amico receiving 1,828,566, for a difference of 123,172 votes. (R-7-8, 194; T-113:18-114:11). Plaintiffs did not come close to meeting their burden.

**A. The trial court properly dismissed Plaintiffs' claims because there was no evidence of irregularities. (Enumerations of Error 5 and 6).**

Plaintiffs' entire theory was premised on the idea that they could eliminate every other possibility to explain the undervote in the Lieutenant Governor's race, leaving a compromise of the DRE machines as the only remaining explanation. (T-

11

176:12-20). While this approach does not find support in cases involving election contests, Plaintiffs were unable to clear even this creative approach to their case.

When a plaintiff advances a theory that irregularities in the ballot caused the result to be placed in doubt, he or she has to show that there were irregularities that were larger than the margin. *Mead*, 278 Ga. at 270 (name of candidate did not appear on more absentee ballots than margin of victory); *Middleton*, 273 Ga. at 203 (plaintiff alleged irregularities but did not prove illegal ballots or votes). A plaintiff may also show that "improper maintenance of the voting machines" cast doubt on an election, but only if that improper maintenance resulted in "votes being miscast." *Taggart v. Phillips*, 242 Ga. 454, 455 (1978). In every election contest, the key issue is whether a plaintiff can carry his or her burden through admissible evidence. *Id*.

Plaintiffs cite only one case for the concept that irregularities without further proof of the number of votes can overturn an election. In *Stiles v. Earnest*, 252 Ga. 260 (1984), this Court considered a referendum in Seminole County where proponents interacted with voters and checked names off a list closer to polling locations than was allowed by law. *Id*. The Court overturned the referendum results due to the illegal activity and ordered a new election. *Id*. at 261. While this Court has not overruled *Stiles*, it has recognized that *Stiles* is the only case where an election was overturned without proof that "a sufficient number of votes was

12

placed in doubt to change the result." *Meade*, 293 Ga. at 148; see also *Middleton*, 273 Ga. at 204 (distinguishing *Stiles*). The more-recent precedent from this Court is clear: Plaintiffs must place the result in doubt by showing a sufficient number of doubtful votes. *Mead*, 278 Ga. at 270; *Middleton*, 273 Ga. at 203. Under either standard, Plaintiffs failed to carry their burden. Instead, the evidence conclusively showed that the election was conducted properly.

   *1. The evidence showed there were no irregularities.*

   The evidence demonstrated that there were no irregularities in the ballots or the voting machines. Unlike the situation in *Mead*, 278 Ga. at 270, the Lieutenant Governor's race appeared on every DRE machine and all memory cards were uploaded. (T-416:14-418:5, 418:13-21, 419:19-421:4). Plaintiffs never even examined the voting machines to determine if there was some improper maintenance, as was alleged in *Taggart*, 242 Ga. at 455. (T-334:6-18, T-336:19-337:18). There was no evidence of improperly maintained voting machines. Indeed, the Secretary of State's office completed extensive parallel testing and additional checks, which confirmed that the machines were functioning correctly. (T-421:10-422:25, 389:2-25; 423:1-14). *See also Favorito v. Handel*, 285 Ga. 795, 800 (2009) ("the undisputed evidence shows that the touch-screen machines accurately record each vote when they are 'properly operated.'").

Ultimately, Plaintiffs were left with nothing but speculation about possible machine malfunctions. They obviously believe that DREs are unreliable. But in the face of overwhelming evidence that the machines were "properly operated," *id.*, and functioned correctly, they did not put forward *any* evidence that eliminated the other explanations for the undervote in the Lieutenant. Governor's race.

The evidence at trial showed that a large undervote can occur for any number of extremely plausible and lawful reasons:[10]

- Ballot design and the layout of the DRE units may have led voters to inadvertently skip over the election,[11] as has occurred in other undervote scenarios such as a U.S. Senate race in Florida (T-410:17-412:4; 412:12-22);

- Voters may have been confused because this was the first gubernatorial election without a U.S. Senate race since at least 2006, leading to the Governor and Lieutenant Governor appearing on the same page of the DRE screen instead of on separate screens (T-409:19-410:16);

---

[10] These reasons are in addition to fact that write-in votes are not counted in the overall vote totals. The Lieutenant Governor's race in Fulton and Gwinnett Counties showed the highest number of write-in votes of any race. (T-425:16-427:13).

[11] This explanation would also account for the difference in the undervote in absentee-by-mail ballots and ballots cast on DREs.

- Given the massive influx of new voters in the 2018 election, voters may have believed that the Governor and Lieutenant Governor ran on a ticket and that casting a vote for Lieutenant Governor was unnecessary (T-412:23-413:11; 414:2-17; 415:21-416:9); or

- Some supporters of Democratic candidates may have disliked Ms. Riggs-Amico or her position on issues and simply chose not to vote in that race (T-269:5-23).

*2. Plaintiffs were not entitled to a presumption of defectiveness.*

Facing the reality that they did not eliminate other possible explanations, Plaintiffs raise an issue they raised only in passing to the trial court—that they were entitled to a *presumption* under O.C.G.A. § 24-14-22 that the DREs were defective. Brief of Appellants, p. 25. Plaintiffs' counsel only mentioned this statute during his opening statement and did not raise it again for the remainder of the trial. (T-178:6-22). The failure to obtain a ruling on this issue from the trial court alone precludes the review of this new argument. *Pfeiffer v. Ga. DOT*, 275 Ga. 827, 829 (2002).

Plaintiffs cite no election contest cases where such a presumption was imposed, likely because of the presumption of validity of elections and the burden of proof on an individual contesting an election. *Meade*, 293 Ga. at 143; *McIntosh Cty. Bd. of Elections*, 282 Ga. at 567; *Streeter*, 267 Ga. at 208. Other than in their

15

opening statement, Plaintiffs never asked the trial court to make any inferences or presumptions regarding the defectiveness of voting machines. The presumption under O.C.G.A. § 24-14-22 is a penalty that arises in a case of spoliation of evidence or willful refusal to produce evidence. *Pacheco v. Regal Cinemas, Inc.*, 311 Ga. App. 224, 225 (2011). And even if a presumption had been warranted, the overwhelming evidence of the proper functioning of DREs presented to the trial court rebutted any arguable presumption of defectiveness. *Id.*, *Baxley v. Hakiel Indus.*, 282 Ga. 312, 313 (2007) (presumption arising under O.C.G.A. § 24-14-22 is rebuttable).

Plaintiffs are not entitled to any presumption related to the improper functioning of DREs, especially in light of the extensive evidence of proper functioning presented at trial.

### 3. The trial court properly found that Plaintiffs had not met their burden.

This Court has applied two approaches to calculating a plaintiff's burden in election-contest cases. First, in a challenge based on illegal voting, a plaintiff must show that the number of illegal votes cast or legal votes rejected is equal to or greater than the margin of victory. *Mead*, 278 Ga. at 270; *Middleton*, 273 Ga. at 203. Second, the burden in a challenge based on irregularities is calculated "by taking the difference between the total votes cast in the election and the race at issue, and adding the margin of victory in the race at issue." *Fuller v. Thomas*, 284

Ga. 397, 398 (2008). This alternative calculation is apparently designed to take into

account the possibility of missing votes. *See McCranie v. Mullis*, 267 Ga. 416, 416

(1996).

In this case, Plaintiffs did not meet the burden under either approach. Using

the first approach, Plaintiffs did not show that *any* illegal votes were cast or that

*any* legal votes were rejected. As a result, they did not show that the margin of

victory in the Lieutenant Governor's race was in doubt. Plaintiffs have instead

pointed to the discrepancy between the vote total and the ballots cast in the election

for Lieutenant Governor and simply *assumed* that the difference is entirely due to

properly cast ballots being rejected. But Plaintiffs do not and cannot point to any

evidence in support of their position and instead rely upon their own speculative

beliefs. Plaintiffs rejected any opportunity for discovery out of hand (as discussed

below) and now base their claim for reversal of the trial court on their own self-

serving conclusions drawn from an incomplete picture of the evidence.

Moreover, the trial court chose to use the second approach, which required a

formula: (number of total votes cast in the election (3,939,328)) – (number of votes

cast in Lieutenant Governor's race (3,780,304)) + (margin of victory in Lieutenant

Governor's race (123,172)). That calculation yielded 159,024. Even under this

approach and giving Plaintiffs every benefit, the number was nowhere near the

burden necessary for Plaintiffs to succeed on their claim.

As this Court has previously noted, "[i]n reviewing a bench trial, we view the evidence in the light most favorable to the trial court's rulings . . ." *Northside Hospital,* 302 Ga. at 520. Involuntary dismissals under O.C.G.A. § 9-11-41(b) will be disturbed only where "the evidence *demands* a contrary finding." *Id.* (emphasis added). As shown above, not only does the weight of the evidence fail to demand a different outcome, it fully supports the result reached by the trial court. Where, as here, Plaintiffs have failed to show the requisite "clear error" necessary to support reversing the trial court's ruling, there is but one appropriate outcome on appeal: affirmance. In light of the foregoing, this Court should uphold the ruling of the trial court dismissing Plaintiffs' election contest.

**B. The trial court properly limited the scope of discovery, Plaintiffs did not use that limited discovery, and they cannot now complain about it. (Enumerations of Error 1, 3, and 4).**

*1. Entitlement to discovery in an election contest.*

Plaintiffs spend most of their brief complaining about the scope of discovery allowed by the trial court. *See*, *e.g.*, Brief of Appellants, pp. 16-20. Election contests are designed to move quickly, with a verified complaint being followed by a trial that can be held as soon as the date the defendant has to answer the complaint. *See*, *e.g.*, *Head v. Williams*, 269 Ga. 894, 896 (1998). That kind of speed does not accommodate a normal discovery process.

Because there may be a need to obtain additional evidence, the trial court is empowered to "to make, issue, and enforce all necessary orders, rules, processes, and decrees for a full and proper understanding and final determination and enforcement of the decision of every such case, according to the course of practice in other civil cases under the laws of this state." O.C.G.A. § 21-2-525(b). This is not a wide-open grafting of all of the requirements of the Civil Practice Act into every election contest. The trial court still has the power to limit testimony, depending on the circumstances. O.C.G.A. § 21-2-525(c). Plaintiffs' unsupported statement that the trial court had "stayed discovery," Brief of Appellants, p. 13, is not correct, because there was no discovery process underway—that required the intervention of the trial court in an election contest. *See generally* O.C.G.A. § 21-2-525.

Georgia appellate courts have upheld limits on the scope of discovery in at least one election contest case. *Rary v. Guess*, 129 Ga. App. 102, 103 (1973) (upholding denial of hand-inspection of machine-tabulated ballots). The cases cited by Plaintiffs do not discuss or otherwise limit the power of the trial court to set the necessary scope of discovery. In both cases cited by Plaintiffs, the facts were either undisputed, *Mead*, 278 Ga. at 268, or the case was decided before any evidence had been taken by the trial court, *Taggart*, 242 Ga. at 455. Neither case provides any insight about the reasonable amount of discovery in an election contest, if any.

19

2. *The trial court properly limited discovery.*

While the scope of discovery under all civil cases can be broad, it is within the discretion of the trial court to limit discovery when justice requires to avoid "oppression" and other dangers. *Anderberg v. Ga. Elec. Membership Corp*., 175 Ga. App. 14, 17 (1985). A trial court's decisions about discovery are reviewed for abuse of that discretion. *Bowden*, 297 Ga. at 290; *Tenet Healthcare Corp.*, 273 Ga. at 210.

The trial court did not abuse its discretion in limiting discovery regarding the DREs or the GEMS server information sought by the Plaintiffs. The evidence introduced at trial demonstrated that there was no compromise of the state's election systems. (T-416:14-418:5, 418:13-21, 419:19-421:4, 421:10-422:25). And, as the Secretary of State's office explained, there are legitimate state interests in avoiding the disclosure of security information regarding the state's voting systems. (T-107:22-24; R-878-879). Given the facts and the importance of not disclosing otherwise-secure information, the trial court allowed Plaintiffs to obtain enough information to determine if programming errors occurred while maintaining the confidentiality of the structure of the voting system. The trial court balanced the need for discovery with the requirement that election contests be disposed of "with dispatch." *Payne v. Chatman*, 267 Ga. 873, 876 (1997).

### a. GEMS databases

The GEMS databases contained confidential information that could have compromised the security of the system. (T-107:22-24). This non-public nature of the database structure was explained in detail by the Court of Appeals when it reviewed an earlier attempt to access that information through the Open Records Act. *Smith v. DeKalb County*, 288 Ga. App. 574 (2007).

In *Smith*, an individual attempted to gain access to information from the GEMS database, including "all ballot images and ballot styles" and other information in the database. *Id.* at 575. The Court of Appeals found that the information contained in the database could "compromise election security" and thus was not subject to disclosure under the Open Records Act. *Id.* at 577.

In light of the important security considerations explained by the Secretary of State and recognized by the Court of Appeals, the trial court authorized the release of five reports from the GEMS server, which would allow Plaintiffs to access the information needed to determine if a programming error existed. (T-432:8-433:13). This reasonable limitation on the scope of discovery allowed the protection of the security of the GEMS database structure, while also providing Plaintiffs with the information needed for their claims.[12] (R-878). Given the

---

[12] While Plaintiffs claim that they submitted "expert affidavits" about their proposed scope of discovery of the GEMS database, Brief of Appellants, p. 20,

security concerns of the release of information from the GEMS databases, this was a reasonable limitation of discovery and the trial court did not abuse its discretion. *Bowden*, 297 Ga. at 290.

### b. DRE machine memory

The trial court specifically authorized Plaintiffs to review the DREs at precincts identified in the Complaint. (R-879). Testimony at trial indicated that a review of the machines' internal memory in post-election mode would allow for the discovery of programming errors.[13] (T-432:8-433:13). Plaintiffs were not allowed to open the machines or otherwise introduce any information to the machines. (R-879).

The Secretary of State's office expressed concerns about unfettered access to the DREs. (T-110:19-111:9 (DREs)). And so, the trial court allowed Plaintiffs to have some access to information from the voting machines and the GEMS database, but in a carefully controlled manner that would have revealed programming errors. (R-878-879); (T-432:8-433:13). This was not an abuse of discretion. Rather, it was a reasonable limitation on the scope of discovery given the circumstances.

they do not cite any expert testimony presented to the trial court on this topic beyond pretrial filings.

[13] As noted above, testimony also indicated that any calibration errors in the DREs would have been discovered and resolved during the logic and accuracy testing of the machines prior to each election. (T-431:12-432:7).

### c. Other potential items.

In two footnotes, Plaintiffs mention additional documentary evidence which they claim they were unable to access, including "polling place machines tapes and other election records." Brief of Appellants, p. 14 n.10 and p. 20 n.12. Plaintiffs never raised these additional requests to the trial court at the January 9 hearing and instead focused on their requests for DRE internal memory and GEMS databases. (T-96:4-17 (DREs), 104:17-20 (GEMS databases)). Plaintiffs apparently had no difficulty obtaining polling place machine tapes because they submitted copies of some machine tapes in a proffer but never introduced them as evidence at the trial. (R-772-808).

### 3. *Plaintiffs did not utilize the opportunity available to them to engage in discovery.*

Plaintiffs took an unusual position in the course of the limited discovery allowed by the trial court. After receipt of the order that discovery would be limited to examination of "the internal memory storage of each DRE unit," (R-879), Plaintiffs flatly refused to inspect the DREs that were made available to them. (T-334:6-18, T-336:19-337:18). Instead, they filed a Motion to Compel (R-979-1011), which was denied (R-1035-36, T-363:13-23).

Plaintiffs' refusal to engage in the limited discovery permitted by the trial court's order is in direct conflict with the requirements of *Payne* that litigants "make every effort to dispose of election disputes with dispatch." 267 Ga. at 873.

23

Indeed, Plaintiffs' argument that discovery under the trial court's order could not be "meaningful" rests entirely on its expert's conclusory—and self-serving—opinion that "election archive files would be virtually useless in a forensic examination." Brief of Appellants, p. 16. Even their own expert, however, cannot say this with any real degree of certainty because he was unaware of the actual machines used in Georgia. (T-307:25-308:4). Thus, because Plaintiffs did not engage in the limited discovery, this Court is left only to speculate about whether they would or would not have uncovered information or evidence leading to timely resolution of this matter. The accelerated timeline of election contests and the expediency requirements of *Payne* create obligations of litigants that the Plaintiffs have not satisfied.

Moreover, at least one court has found, "discovery not made was waived." *Estate of Caplanis v. Morone*, No. A-0495, 2015 N.J. Super. Unpub. LEXIS 2148 at *8 (N.J. App. Ct. Sept. 8, 2015). In this case, Plaintiffs were granted ample opportunity to examine information that the trial court deemed useful to their case, but they declined to do so. Where a litigant is permitted limited discovery by a trial court, their failure to engage in such discovery should be held against them.

24

## C. The trial court properly denied Plaintiffs' delaying tactics. (Enumerations of Error 2 and 7).

### 1. Motion for continuance.

Facing the looming deadline of trial, Plaintiffs attempted to delay the trial several times, starting with the filing of a motion for continuance. As the trial judge noted on multiple occasions, the Election Code provides very tight timelines for the resolution of cases. *See Broughton v. Douglas Cty. Bd. of Elections*, 286 Ga. 528, 529 (2010) ("Certainly, the swift resolution of election contests is vital for the smooth operation of government"). Specifically, the hearing date must be set within "20 days after the return day fixed in the notice" O.C.G.A. § 21-2-525(a). While the trial court is empowered to hold additional hearings, *id*., the statutory structure is designed for a swift resolution. *Swain v. Thompson*, 281 Ga. 30, 31 (2006).

This Court grants wide latitude to trial courts to set hearing dates in light of this interest of swift resolution. *Head*, 269 Ga. at 896. In *Head*, the petitioner only had six days' notice that the date was being set and three days' notice of the hearing. *Id*. This Court upheld that timeline as reasonable. *Id*. In this case, Plaintiffs had an extended period of time to prepare for the hearing and they bore the burden of proof. *Id*.

The trial court properly held Plaintiffs to their proof—they brought their claim on a verified complaint and should have been ready to make their case,

especially when they were given the information provided by Defendants. The fact that the Plaintiffs were not ready does not mean the trial court abused its discretion—in fact, it acted reasonably under the circumstances to ensure that this case could be resolved in a timely way.

### 2. Jury trial demand.

Plaintiffs also demanded a jury trial on the eve of the bench trial. (R-1012-1013). In election-contest cases, there is a two-step process to obtain a jury trial. *Henderson v. Cty. Bd. of Registration & Elections*, 126 Ga. App. 280, 285 (1972); O.C.G.A. § 21-2-526(a). First, the challenger must demand a jury trial, as Plaintiffs did here. O.C.G.A. § 21-2-526(a). Second, the trial court must determine "that it is an issue which under other laws of this state the litigant is entitled to have tried by a jury." *Id*. Only after these two determinations, "a jury shall be impaneled and the cause shall proceed according to the practice and procedure of the court in jury cases." *Id*.[14]

Because Plaintiffs requested a jury trial prior to the start of the hearing, their enumeration of error regarding the jury demand rests on the claim that Plaintiffs

---

[14] One potential problem not discussed by the trial court or Plaintiffs is the difficulty of applying this statute to a statewide election contest which alleges statewide problems. Specifically, the statute requires "each issue to be tried by a jury shall be tried by a jury impaneled in the county where such issue or a part thereof arose." O.C.G.A. § 21-2-526(b). In this case, where Plaintiffs alleged problems in several counties, the statute may possibly have required a separate jury in every county if Plaintiffs were allowed to proceed with a jury trial.

were otherwise entitled to have their claims tried by a jury. Plaintiffs failed to show this entitlement, instead taking issue with the trial court's legal analysis in its application of the test delineated in *Fuller*, 284 Ga. at 397. Proper application of a legal test, however, fits squarely within the "questions of law" delegated to the sound discretion of the court.

It is not error to deny a jury trial when the alleged irregularities are insufficient to place the results in doubt. *Id.* at 399. As shown above, Plaintiffs never placed the results in doubt at any point during the proceeding—from their Petition, which included Ms. Riggs-Amico's admission that the outcome in her race would not have been different, to the trial, where they did not place a sufficient number of votes in doubt even under the most charitable reading.

Like the contestants in *Henderson*, Plaintiffs also never identified which issues they thought should have been tried to a jury while they participated in the trial. 126 Ga. App. at 285. And, again, Plaintiffs never even placed into contention anywhere close to the number of votes necessary to cause anyone to question the outcome. *Id*. at 286.

Ultimately, there is no constitutional right to a jury trial in an election contest. *Fuller*, 284 Ga. at 399; *Henderson*, 126 Ga. App. at 285. Plaintiffs only identify a single issue they contend should have been decided by a jury: "whether there were defects in the programming or the machines, and the impact of those

27

defects." Appellants' Brief, p. 29. There was no issue of voter intent or irregularities at certain precincts, *Henderson*, 126 Ga. App. at 285, but simply the question of whether Plaintiffs' theories about potential hackings could withstand scrutiny. *See McCray v. Hunter*, 157 Ga. App. 509 (1981) ("[W]hile there may be some shadowy semblance of an issue, the case may nevertheless be decided as a matter of law where the evidence shows clearly and palpably that the jury could reasonably draw but one conclusion").

The trial court was well within its discretion to deny the jury trial demand given the overwhelming evidence that the DREs were not hacked in the 2018 general election.

## CONCLUSION

Plaintiffs' appeal is an intricately spun web of speculation and innuendo. But this Court must decide based on the facts. The evidence conclusively demonstrates that the electronic voting machines used in the 2018 Lieutenant Governor's election were not compromised. Anything offered to the contrary by Plaintiffs is "mere speculation," which is insufficient to overturn any election. *Middleton*, 273 Ga. at 203. This Court should affirm the judgment of the trial court and allow the 2018 Lieutenant Governor's election to stand.

Respectfully submitted this 27th day of March, 2019.

s:\Bryan P. Tyson
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
770.434.6868 (Telephone)

Richard A. Carothers
Georgia Bar No. 111075
richard.carothers@carmitch.com
Brian R. Dempsey
Georgia Bar No. 217596
Brian.dempsey@carmitch.com
CAROTHERS & MITCHELL, LLC
1809 Buford Highway
Buford, GA 30518
(770) 932-3552 (Telephone)

*Attorneys for the Gwinnett County Board of Registrations and Elections*

**CERTIFICATE OF SERVICE**

This is to certify that I have this day filed the foregoing BRIEF OF

APPELLEE GWINNETT BOARD OF REGISTRATIONS AND ELECTIONS

with the Court's e-filing system which will provide service to all counsel of record.

This 27th day of March, 2019.

s:\Bryan P. Tyson
Bryan P. Tyson
Georgia Bar No. 515411