# IN THE SUPREME COURT
# STATE OF GEORGIA

## CASE NO. S19A0769

---

COALITION FOR GOOD GOVERNANCE,
RHONDA J. MARTIN, SMYTHE DUVAL AND JEANNE DUFORT

Appellants,

v.

BRAD RAFFENSPERGER, Secretary of State, FULTON COUNTY BOARD OF
REGISTRATION AND ELECTIONS, GWINNETT COUNTY BOARD OF
REGISTRATIONS AND ELECTIONS, and GEOFF DUNCAN

Appellees.

---

## BRIEF OF APPELLEE GEOFF DUNCAN

---

SUPERIOR COURT OF FULTON COUNTY
CASE NUMBER 2018CV313418

**EDWARD H. LINDSEY, JR.**
Georgia Bar No.453075
edward.lindsey@dentons.com
Dentons US
303 Peachtree Street, N.E., Suite 5300
Atlanta, Georgia 30308
404-527-4580

# TABLE OF CONTENTS

**Page**

I.  STATE OF JURISDICTION ................................................................ 1

II.  OVERVIEW OF RULINGS BELOW ............................................... 1

III.  FACTS ............................................................................................ 2

    A.  Geoff Duncan was elected Lieutenant Governor of Georgia by an Overwhelming Margin ........................ 2

    B.  No Evidence of Tampering with Georgia's Electronics Voting System in 2018 ............................... 5

IV.  DECISION BELOW ....................................................................... 8

V.  ARGUMENT .................................................................................. 9

    A.  Appellants' Argument regarding Discovery is Without Merit (Appellee's Response to Enumerations of Error 1, 2, 3, and 4) ................................................................... 9

    B.  The Trial Court Properly Granted the Defendants' Motion for Involuntary Dismissal (Appellee's Response to Enumerations of Error 5 and 6) ........................... 17

    C.  Appellants Last Minute Demand for Jury Trial Was Properly Denied by the Trial Court and is Moot (Appellee's Response to Enumeration of Error 7) ............... 21

VI.  CONCLUSION .............................................................................. 24

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Allstate Insurance Company v. Spillers et al.,*
 252 Ga. App. 26 (2001)........................................................ 18

*Atlanta Journal-Constitution v. Jewell,*
 251 Ga. App. 808 (2001)............................................... 15, 16, 17

*Banker v. Cole,*
 278 Ga. 532, 604 S.E. 2d 165 (2004)................................... 18

*Expedia, Inc. v. City of Columbus,*
 305 Ga. App. 450, 699 S.E.2d 600 (2010)............................. 9

*Ford Motor Co. v. Conley,*
 294 Ga. 530 (2014)......................................................... 9

*Fuller v. Thomas,*
 284 Ga. 397, 667 S.E. 2d 587 (2008)................................. 19

*Heindel v. Andino,*
 2019 WL 498388 (D.S.C. February 8, 2019)......................... 15

*Henderson* v. *County Bd. of Registration and Elections,*
 126 Ga App. 280, 190 S.E. 2d 280 (1972)............................ 22

*Howell v. Fears,*
 275 Ga. 627, 571 S.E. 2d 392 (2002)................................. 18

*Hunt v. Crawford,*
 270 Ga. 7, 507 S.E.2d 723 (1998)..................................... 18

*Mead v. Sheffield,*
 278 Ga. 268, 601 S.E. 2d 99 (2004)................................... 18

*Mills v. Berlex Laboratories Inc.,*
 235 Ga. App. 873, 510 S.E. 2d 621 (1999)........................... 17

*Resurgens, P.C. v. Elliott,*
 301 Ga. 589 (2017)...................................................... 9, 15

i

*Smith v. DeKalb Cnty.*,
  288 Ga. App. 574 (2007)........................................................................ 15

*Taggart* v. *Phillips*,
  242 Ga 454, 249 S.E. 2d 245 (1978)...................................................... 22

*Waldrip v. Head*,
  272 Ga. 572 (2000).................................................................................. 12

*Washington v. Harrison*,
  299 Ga. App. 335, 682 S.E. 2d 679 (2009)............................................ 17

*Wilbanks v. Arthur*,
  257 Ga. App. 226, 570 S.E. 2d 664 (2002)............................................ 18

## Statutes

Official Code of Georgia Annotated
  § 9-11-41(b)........................................................................................ 8, 17
  § 21-2-522 ............................................................................................... 23
  § 21-2-525(a).................................................................................... 13, 14
  § 21-2-526(a)........................................................................................... 21
  § 21-2-527 ............................................................................................... 18

## Other Authorities

Georgia Constitution
  Article VI, Section 6, Paragraph II......................................................... 1

*http://sos.ga.gov/index.php/Elections/current_and_past_elections_res
ults* ............................................................................................................. 2

## BRIEF OF APPELLEE GEOFF DUNCAN

Appellee Geoff Duncan files this Brief of Appellee with the Georgia Supreme Court showing the following:

### I.    STATE OF JURISDICTION

Appellee Duncan agrees with the Appellants that the Georgia Supreme Court has exclusive jurisdiction of this appeal pursuant to Article VI, Section 6, Paragraph II of the Georgia Constitution.

### II.    OVERVIEW OF RULINGS BELOW

Appellee Duncan supplements Appellants' brief as follows in terms of the rulings below:

The Trial Court granted the Appellants' discovery of the electronic voting system in Georgia.  (R 878-880). The Trial Court further stated to the parties involved that it would "handle discovery disputes by e-mail or conference call." Despite this offer, "None were made."  (R 1035).  Finally, Appellants refused to partake in the discovery process expressly permitted by the Trial Court. (R 1513).

## III. FACTS

### A. Geoff Duncan was elected Lieutenant Governor of Georgia by an Overwhelming Margin

On November 6, 2018, Republican candidate for Lieutenant Governor Geoff Duncan defeated Democrat Sarah Riggs Amico by a vote margin of 123,172 votes (1,951,738 versus 1,828,563). [1] [2]

While it is correct that fewer votes were cast in the Lieutenant Governor's race than in other races, Ms. Amico nevertheless finished in the middle of the pack in terms of the total number of votes received when compared to other state-wide Democratic candidates. She received more votes than the Democratic candidates for State Agriculture Commissioner, State School Board Superintendent, State Insurance Commissioner, and one of the two Public Service Commission's positions. She also came within 8,000 votes of the Democratic candidate for State Labor Commissioner and the Democratic candidate for a second Public Service Commission. The only races in which she significantly lagged behind fellow state-

---

[1] As accurately noted in Appellants brief, the parties stipulated to the admissibility of election results in Georgia on the Secretary of State's website, which is the source of the numbers here and throughout this brief. *See* http://sos.ga.gov/index.php/Elections/current_and_past_elections_results.

[2] Appellants on pages 6 and 7 of their Brief on repeated occurrences cited to purported evidence not in the record. Despite Appellants' attempts to enter similar such evidence into the record at trial, the Trial Court ruled that such evidence was inadmissible hearsay ( R 1497-99) and Appellee Duncan raises the same objection to Appellants' attempt in introduce such evidence in their Appellant brief.

wide Democratic candidates were in the far more high profile races for Governor, Secretary of State, and Attorney General. [1] (R 1531).

The reasons why a voter may choose to vote in one race but not another or vote in a way some may characterize as odd varies. Peculiarities exist that are often not be easily explained. For instance, even in the highly publicized 2018 race for Governor in Georgia, between 10,000 to 15,000 participating Georgia voters choose not to cast a vote. (R 1429). Moreover, the lieutenant governor's race had the highest number of write in votes for uncertified mythical and real individuals of any statewide race in 2018. (R 1600-02).

Nevertheless, there were certain factors that made the 2018 election different from previous years that election officials believe could have affected down ballot voting, including an unusually high level of voter turnout as a result of heightened public interest in the Governor's race as compared to previous years. In 2018, Georgia had a 61.34 percent registered voter turnout amounting to 6,428,534 votes. By comparison, in 2014 only 50.03 percent of registered voters cast ballots leading to a turnout of only 5,191,182 voters. In addition, first time voters cast over three times more ballots in 2018 as compared to 2014.[1] ( R 1603-04). In 2014, there were slightly more than 99,000 new voters but in 2018 there were over 336,000 new voters. (R 1590-91).

Appellants in their Brief attempt to highlight the difference in down ballot non-voting between those who cast paper ballots and those who utilized the electronic system as evidence of a deficiency in the electronic ballot system. However, the ballot design in the electronic system in 2018 was very different from the design in the state races in both 2010 and 2014 and was also different from the design of the paper ballots in 2018. In 2010 and 2014, in addition to the Governor's race there was a state-wide race for the U.S. Senate. Notably, on the first ballot screen in 2010 and 2014, the U.S. Senate race was side-by-side with the Governor's race. In 2018, by contrast, there was no U.S. Senate race, so instead the Governor's race was side-by-side with the Lieutenant Governor's race. (R 1583-85).

After the election, Secretary of State's officials raised concerns that the placement of the Governor's and Lieutenant Governor's race side-by-side confused some voters, in particular new voters, into believing that the Governor and the Lieutenant Governor candidates for each party were running as a ticket. This would be an understandable assumption given that Presidential and Vice Presidential candidates run on a single ticket. Moreover, many other states utilize the joint ticket system. For instance, in both Florida and South Carolina, the political parties Gubernatorial and Lieutenant Governor candidates run as a single ticket. (R 1587-89).

Conversely, the design for those voting by paper ballot in Georgia in 2018 was very different and would have led to less confusion. On the paper ballots, all the races ran "north-south" on the ballot removing the visual view of candidates for Governor and Lt. Governor appearing side by side. (R 1593-94).

The impact of ballot design on voters' participation in particular races is well documented. For instance, in the recent U.S. Senate race in Florida in 2018, the ballot design in Broward County, Florida, in terms of the placement of the U.S. Senate race on the ballot, was different than the placement of the race in all other counties in the state. As a result, there was a drop-off in voting in the U.S. Senate race in Broward County compared to voting levels in other parts of the state. (R 1585-87).

### B. No Evidence of Tampering with Georgia's Electronics Voting System in 2018

Multiple tests were run before, during, and after the 2018 election to verify, re-verify, and confirm the integrity of Georgia's electronic voting system.

Prior to the election, county election boards performed at "logic and accuracy testing" on each machine. This involves physically testing each electronic voting machine to ensure that when a voter touches a particular candidate's name in an effort to cast a particular vote that the candidate receives the vote that was intended. (R 1767-68).

On Election Day, the Georgia Secretary of State's office performs "parallel testing" to ensure that the system is working properly.  Specifically:

> [Answer]:  [F]or parallel testing we ask that whatever
> the county has loaded into their system, that they
> make a copy of that database and send it back to the
> State so that we at the Secretary of State's office
> can then create our own memory cards from their copy
> of their database, load into touch screen equipment
> that we have in our possession, do a logic and
> accuracy test on the device to make sure it's working
> as it should, and then on Election Day itself we
> videotape the input of a test deck into the device in
>  election mode.
>
> So we will have an individual that is holding
> the pre-filled ballot out and instructing the test
> voter on what selections to make while that is all
> being videotaped. And that's done within the voting
> period on Election Day. And then at the end of that
> timeframe we'll end the election on those devices and

printout tapes from those devices, and validate the

results being produced by the device match the known

results of the test deck.

[Question]: Okay. And you do that to make sure that if

Edward Lindsey cast a vote for Mike Boland for

governor, that it's properly counting?

[Answer]:  Correct.

[Question]: And when you did that parallel testing on

Election Day, did you discover any irregularities?

[Answer]: We did not.

[Question]: And among the races that you tested for was

the lieutenant governor's race; correct?

[Answer]:  That's correct.

(R 1596-97).

Finally, after the 2018 election, in response to concerns raised by the losing

Democratic candidate for Lieutenant Governor regarding voting in Ben Hill

County, officials with the Georgia Secretary of State's office checked the voting

machines in that county and did not discover any malfunction.  (R 1598).

The Secretary of State's office further testified that based on this extensive

testing that there was no reason to doubt the accuracy of the electronic voting

system. (R 1598). The Appellants offered no evidence to dispute the accuracy or the meaning of these tests performed on the electronic voting system.

In addition, it should be noted that the electronic voting system in Georgia is a "closed system." This means:

> A closed system has no external connection
> port is that it is a device directly connected to
> another device and there is not a line from that pair
> going outward placing so that someone can portal
> inward into that device. They can't access an IP
> address. It's closed off.

(R 1599).

In other words, the Georgia electronic voting system is not susceptible to remote, internet based hacking. (R 1599-1600).

## IV. DECISION BELOW

After a day and a half bench trial, the Trial Court granted the Defendants' Motion for Involuntary Dismissal under O.C.G.A. § 9-11-41(b). The court found no evidence of misconduct, fraud, or irregularity by any primary or general election officials or officials. The court further found that while there had been fewer votes cast in the Lieutenant Governor's race than in other races that "these numbers do not show any irregularity or illegality in themselves." Therefore, the

court found that there was insufficient evidence to place the outcome of this election in doubt.  (R 1089-94).

## V.    ARGUMENT

### A.    Appellants' Argument regarding Discovery is Without Merit (Appellee's Response to Enumerations of Error 1, 2, 3, and 4)

1.    *The Trial Court Has Broad Discretion in Managing Discovery And It Did Not Abuse Its Discretion.*

Appellants' Enumerations of Error 1, 2, 3, and 4 in their brief involves discovery issues which were correctly decided by the Trial Court.  In general, trial courts have broad discretion to control discovery, including the imposition of sanctions, and absent a showing of a clear abuse of discretion, a court's exercise of that broad discretion will not be reversed on an appeal.  *Expedia, Inc. v. City of Columbus*, 305 Ga. App. 450, 699 S.E.2d 600 (2010).

Appellants have not shown that the January 11th Order granting discovery (R 878-880) or subsequent discovery and continuance orders constituted a "clear abuse of discretion." *Resurgens, P.C. v. Elliott*, 301 Ga. 589, 598 (2017) (quoting *Smith v. Glass*, 273 Ga. App. 327, 328 (2005) and *Ford Motor Co. v. Gibson*, 283 Ga. 398, 401 (2008)) (citation and punctuation omitted in original).  *See also Ford Motor Co. v. Conley*, 294 Ga. 530, 547 (2014) (describing heightened deference afforded to trial courts on discovery matters).

9

Appellants cannot satisfy their heavy burden because (1) Appellants refused to engage in discovery, including the Trial Court's discovery dispute resolution process; (2) Appellants concede that they still could not prove their case even if they were given the type of intrusive and insecure discovery they sought; and (3) bona fide security concerns warrant the limitations imposed by the January 11th Order.

Indeed, Appellants' arguments here are impractical -- if adopted, the Trial Court could not have decided the case promptly as Appellants themselves suggest that their proposed discovery could take several weeks to analyze. (R-888–89). The Appellants arguments are also speculative because they cannot say that the protocol proposed by the Secretary of State and Appellees pursuant to the January 11th Order would not provide meaningful discovery when they chose not to engage in it. Appellants' contentions are also futile, because according to their own expert Appellants' proposed discovery still would not provide them with the information they need to prove their case. Further, Appellants' proposed discovery is unsafe as their preferred protocol would place in jeopardy the very issue complained of – the cybersecurity of Georgia's election systems.

> 2. *Reasonable Discovery Was Permitted But Appellants Simply Refused to Participate.*

Appellants contend, generally, that the Trial Court refused to allow discovery of relevant evidence and that it specifically refused to permit discovery

10

as it pertains to the GEMS database and the internal memory of the DRE's. (Appellant's Br. 20–23.) Appellants are wrong. The January 11th Order granted some of Appellants' Motion for Inspection. (R-878). Indeed, Appellants were granted access to GEMS reports; they were just not allowed to pull the information themselves. (R-878.) Appellants produced no evidence that the data provided to them from the Fulton Board and Gwinnett Board was flawed, incomplete, or otherwise inconsistent with the January 11th Order.

The January 11th Order also allowed Appellants to inspect certain DRE machines. (R-879.) For good cause, it limited the examination of the DRE's internal memory by specifying that the machines or information contained therein could not be damaged or altered in any way and that the Appellants could not copy, image, save, or retain the machines or information contained therein, nor upload or introduce any information to the machines. *Id.* It was Appellants who refused to comply with the Trial Court's decision. Consequently, Appellants are forced to rely only on speculation that the protocol established by the January 11th Order would be insufficient to allow them the type of evidence they needed to prove their case.

Mere speculation, however, does not demonstrate an abuse of discretion. In addition to engaging in the permitted discovery, Appellants could have utilized the Trial Court's ordered dispute resolution mechanism before filing additional

11

discovery motions. (R 1035). Had the Appellants informally and earlier raised their concerns about the purported need to remove the casing of DRE machines, insert computer chips and adapters into voting machines, temporarily alter the hardware of the DRE's, and copy or image the unit, the Trial Court may have issued a different decision. (R. 1023–24). Instead, Appellants insisted on not only going outside the scope of the January 11th Order, but also ignoring the Trial Court's ordered means of resolving discovery disputes. *Id.* Once again, they are forced to speculate as to what might have been instead of demonstrating a concrete abuse of discretion.

Independent of Appellants' sitting on their hands, it cannot be shown that the January 11th Order either denied discovery or is inconsistent with the Election Code or the law of this state regarding discovery. Appellants ignore that the same statute which permits discovery also allows the trial court to "'make any order which justice requires to protect a party or person' . . . [it] may deny discovery, limit its scope to certain matters, or specify the terms and conditions under which it may be had." *Waldrip v. Head*, 272 Ga. 572, 579–80 (2000) (quoting O.C.G.A. § 9-11-26(c)).

In sum, discovery of relevant evidence was, in fact, permitted. Rather than operate within the confines of the Trial Court's reasonable January 11th Order, however, Appellants instead chose not to engage in the permitted discovery and

12

sought to expand it by proposing a discovery protocol which was radically different from the terms of the Order.

      3.     *Appellants' Discovery Requests Ignore Statutory Time Constraints and Likely Would Not Prove Their Case In Any Event.*

In many ways, the discovery dispute that is central to this Appellants' appeal is purely academic -- Appellants' own witness acknowledged that it would be "impossible" to prove their case. (R 1532). Specifically, Mr. Bernhard was asked whether he was "aware of any actual election – not a tested election but an actual election where an actual vote cast on a DRE machine was – was not counted." *Id.* He answered "No. But again, that's because of the way the [DRE] machine is built, *it's impossible to tell. You cannot know*." *Id.* (emphasis added). Thus, Appellants own witness concedes that, under their theory, there is no amount of discovery that would permit them to satisfy their burden of showing voting irregularities.

Moreover, this admission is particularly relevant given the time constraints that the Election Code imposes on trial courts deciding election contests. *See* O.C.G.A. § 21-2-525(a) (mandating that election disputes be decided "promptly"). While the statute does not provide a specific timeline for the trial court to issue an order in such a contest, there is no doubt that the General Assembly mandated a timely decision so that elected officials can get on with the business of governing.

Appellants suggest that discovery in this case should be like "any other civil case of this complexity." (R 12). But, in doing so they ignore the statutory mandate to move quickly.

Matthew Bernhard's admission belies the entire purpose of Appellants' discovery request. It also calls into question Appellants' interests in such far-reaching requests when the information would bear no fruit for their claim. Supposing the trial court did grant destructive discovery as requested by the Plaintiffs, it would remain true that nothing discovered in the DRE's would show what Appellants allege and Appellants may very well then seek further discovery claiming the issues were not discoverable as ordered. Regardless, Appellants made the choice to insist on a much broader protocol that was contrary to the Trial Court's Order and decline inspection under the protocol offered by the Secretary of State and Appellees. They now seek a decision from this Court to amend their own error.

In short, Appellants seek broad discovery which, they contend, could take several weeks to analyze (R 888–89), but which will their own expert admits would not bear fruit, needlessly delaying the case and defeating the statutory mandate for a "prompt" disposal of election contest. O.C.G.A. § 21-2-525(a). Under these facts, the Trial Court did not abuse its "broad discretion to control

discovery" when the requested information would ultimately lead nowhere. *Elliott*, 301 Ga. at 598.

    4. *Bona Fide Security Concerns Support the Trial Court's Decision.*

Not only did Appellants refuse to engage in discovery permitted by the Trial Court and demand relief which would be futile for their case, their requested relief would be harmful and against public interest. When a party seeks access to unprivileged but sensitive materials, the trial court must still balance "the party's specific need for the material against the harm that would result by its disclosure." *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 812 (2001). In this case, there was no demonstrated need to destroy or otherwise damage, image, or copy the DRE's and have *personal* access to the GEMS servers as opposed to reports provided by Fulton and Gwinnett Board staff.

Indeed, the discovery sought by Appellants would have jeopardized the security of Georgia's election systems. The Georgia Court of Appeals has noted the extensive statutory, regulatory, and procedural scheme employed by the Secretary of State to keep election information secure. *Smith v. DeKalb Cnty.*, 288 Ga. App. 574, 577-78 (2007) (Ellington, J.) (discussing State's interest in Open Records context). Similarly, federal courts have recognized the important security interests at stake with respect to disclosure and discovery of the programming and operation of elections equipment and databases. *Heindel v. Andino*, 2019 WL

15

498388 *5 (D.S.C. February 8, 2019) (Noting various FBI and Department of Homeland Security Reports about potential election hacking). The important interest of the state and the Secretary of State in securing the state's elections is without question and a trial court is properly permitted to look to public policy considerations in limiting discovery. *Jewell*, 251 Ga. App. at 812 (holding that trial court did not abuse its discretion by weighing public policy of confidential sources against need for discovery).

Considering the relevant security concerns, it is eminently reasonable for the Trial Court to deny Appellants' motion to compel seeking to remove the casing of the DRE's, insert computer chips and image the machines, alter the underlying data and possibly the motherboard of the machine. (R 1024.) The Trial Court received arguments that Appellants' proposed protocols would expose sensitive information and provide a "roadmap or schematic of the [GEMS servers and DRE's]" that could be used to create a virus for those systems. (R 1117).

Moreover, the protocol proposed by Appellees would have been sufficient to show a GEMS programming failure, show whether any programming of the server had been altered, and demonstrate whether, with respect to DRE's, any names were missing from ballots, calibration issues occurred, ballots were cancelled, and whether any vote count discrepancies occurred on precinct poll tapes. (R 1117).

16

The Trial Court weighed the availability of evidence through other means and the security risk posed by Appellants' proffered discovery procedure. By doing so, the Trial Court certainly did not abuse its discretion. *Jewell*, 251 Ga. App. at 812.

### B. The Trial Court Properly Granted the Defendants' Motion for Involuntary Dismissal (Appellee's Response to Enumerations of Error 5 and 6)

O.C.G.A. § 9-11-41(b) states in part: "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to a relief. The court as trier of the facts may then determine the facts and render judgement against the plaintiff . . ."

As to findings of fact by the trial court in a bench trial: "factual findings made after a bench trial shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the creditability of witnesses." *Washington v. Harrison*, 299 Ga. App. 335, 682 S.E. 2d 679 (2009). Furthermore, "when the facts found by the trial court were authorized by the evidence, such findings will not be set aside." *Mills v. Berlex Laboratories Inc.*, 235 Ga. App. 873, 510 S.E. 2d 621 (1999). Finally, in a bench trial, factual findings of the trial court will not be set aside unless clearly erroneous, and the

17

decision of the trial court will be affirmed if it is right for any reason. *Allstate Insurance Company v. Spillers et al.*, 252 Ga. App. 26, 555S.E. 489 (2001) [emphasis added]; and *Wilbanks v. Arthur*, 257 Ga. App. 226, 570 S.E. 2d 664 (2002).

In the present case, Georgia law governing election contests is clear. "It is presumed that election returns are valid, and the party contesting the election has the burden of showing any irregularity or illegality sufficient to change or place in doubt the result of the election." *Hunt v. Crawford*, 270 Ga. 7, 507 S.E.2d 723 (1998); *Banker v. Cole*, 278 Ga. 532, 535, 604 S.E. 2d 165 (2004). O.C.G.A. § 21-2-527 provides that regardless of the nature or seriousness of the electoral irregularities claimed, petitioners must establish that such irregularities were sufficient to "place in doubt the result of the entire . . . election."

Numerous cases have addressed what must be shown by petitioners to prevail. In *Mead v. Sheffield*, 278 Ga. 268, 271, 601 S.E. 2d 99 (2004), the Supreme Court held: "the focus on any election contest involving illegal ballots is on whether they "exceeded . . . the margin of victory." Similarly, in *Howell v. Fears*, 275 Ga. 627, 628, 571 S.E. 2d 392 (2002), the court held that "the contester must affirmatively show that a sufficient number of voters voted illegally or were irregularly recorded in the contest being challenged to make a difference or cast doubt on the outcome."

In *Fuller v. Thomas*, 284 Ga. 397, 398, 667 S.E. 2d 587 (2008), the Supreme Court set out the required test as follows: "Where the focus is on improperly cast ballots or irregularities in the conduct of the election, the number of illegal or irregular ballots necessary to cast doubt on an election is derived by taking the difference between the total votes cast in the election and the race in issue, and adding the margin of victory in the race at issue."

In the present case, despite the fewer number of votes cast in the Lieutenant Governor's race as compared to other races, there is no evidence that the electronic voting system did not operate properly. Extensive tests were run before, during, and after the election to determine if malware was present or if the system was somehow operating improperly. In each of these tests, the system was verified to be accurately recording a voter's preference in the election and that the votes were being accurately tabulated.

Furthermore, the appellant put up only two fact witnesses who testified to possible electronic voting irregularities. The first testimony was from a poll watcher who observed something she believed was questionable; however, she admitted that when she questioned the voter herself immediately after she had cast her ballot, the voter told the poll watcher that she believed that her vote had been properly cast and "submitted." (R 1405-06). The second testimony was from a voter who testified that she did not see the lieutenant governor's race her first time

through but admitted that when she went back she found the race and voted for the Democratic candidate. (R 1734).

Furthermore, while Appellants put forth two other witnesses to establish the under-votes in the Lieutenant Governor's race, each admitted that they had no knowledge of the particularities involved in the 2018 Georgia General election. Christopher Brill, who provided numerical data on the down ballot voting, admitted that he had no knowledge of how the lieutenant governor race was conducted in the closing days of the campaign which may have impacted voter turnout for the candidates on election day. Moreover, he did not have knowledge as to Ms. Amico's vote count versus other statewide Democratic candidates, other Democratic candidates possible superior name recognition, nor how many new voters had voted in 2018 as opposed to previous years. (R 1443-48). He did, however, admit:

> [Question]: [B]ased on your experience as a political consultant, you know, that when it comes to new voter[s], particularly down-ballot, it takes a lot more education to try to educate those new voters than someone who's voted year in and year out; correct?
>
> [Answer]: That's right.

(R 1448).

Matthew Bernhard, a computer scientist, also had only limited knowledge of the Georgia General Election in 2018 and of state politics more generally. He admitted that he has never worked as a political consultant, has no professed or personal knowledge regarding the impact of ballot design, is not a political science expert, and has only superficial knowledge of the particular conduct of the Georgia campaigns in the closing days of the campaign. (R 1517, 1523, 1527-29).

As a result of the Appellants' and their witnesses' limited understanding of the particular dynamics involved in the 2018 General election in Georgia, they have fallen victim to a timeless axiom, "if the only thing you have is a hammer, the whole world looks like a nail." In the present case, however, there is simply no evidence that Georgia's electronic voting system did not work properly so as to place into doubt Lieutenant Governor Geoff Duncan's substantial election victory by more than 123,000 votes.

### C. Appellants Last Minute Demand for Jury Trial Was Properly Denied by the Trial Court and is Moot (Appellee's Response to Enumeration of Error 7)

O.C.GA. § 21-2-526 (a) provides: All issues of a contest shall be fully tried and determined by the court without the aid and intervention of a jury, unless a litigant to the contest shall demand a trial by jury at any time prior to the call of the case; and ***the court shall determine that it is an issue which under other laws of***

21

*this state the litigant is entitled to have tried by a jury.* Upon such determination, a jury shall be impaneled and the cause shall proceed according to the practice and procedure of the court in jury cases." [Emphasis added].

While the Appellants did make a last minute demand for a jury trial, they did not assert that there were issues which entitled them to a jury trial. (R 1012-13). As a result, the Court had the discretion to deny a jury trial in an election contest when there is no issue which entitles a litigant to a jury. *See Taggart* v. *Phillips,* 242 Ga 454, 249 S.E. 2d 245 (1978).

In Georgia, there is no constitutional right to a jury trial in an election contest. "[U]nlike other situations where demand alone is sufficient, here there are two requirements: 1) demand, and 2) a determination that there are issues which under other laws of this State the litigant is entitled to have tried by a jury." *Henderson* v. *County Bd. of Registration and Elections,* 126 Ga App. 280, 190 S.E. 2d 280 (1972).

In both the *Taggart* and *Henderson* cases, the issues were particular to the proper conduct of the election by election officials -- whether voters were properly entitled to vote and whether the votes themselves were accurately counted. The issues here are no different -- whether Georgia's electronic voting system was somehow corrupted preventing an accurate count of votes. That is a proper issue for determination by a judge in a bench trial in an election contest.

Furthermore, the jury trial demand issue is moot in this case as the Appellants failed to meet their burden that there was any evidence that placed "in doubt the result" of the election for lieutenant governor as required under Georgia law. O.C.G.A. §21-2-522. The undisputed evidence is that the electronic voting system is a closed system which is not susceptible to outside hacking. It is further undisputed that pre-election, election day, and post-election tests were conducted to certify the electronic voting system, the resulting reports showing zero evidence of system malfunctions. The results of these tests were not contradicted by the Appellants or their expert. In addition, the Appellants put up only two witnesses claiming election day problems with the electronic voting system and both of the voters involved believed that their votes had been properly cast. Therefore, the undisputed evidence is that Geoff Duncan was properly elected the Lieutenant Governor of Georgia.

## VI.   CONCLUSION

Appellee Geoff Duncan was duly elected Lieutenant Governor of Georgia in 2018 by a vote margin of 123,172 votes.  After hearing the Appellants' evidence at trial, the trial court properly determined that there was insufficient evidence to place in doubt the result of the entire election.  Therefore, Appellee Geoff Duncan respectfully requests that the Georgia Supreme Court affirm this decision.

Respectfully submitted this 27th day of March, 2019.

/s/ Edward H. Lindsey, Jr.
Edward H. Lindsey, Jr.
Georgia Bar No.453075
Edward.lindsey@dentons.com
Dentons US
303 Peachtree Street, N.E.
Suite 5300
Atlanta, Georgia  30308
404-527-4580

*Counsel for Appellee Geoff Duncan*

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing

**BRIEF OF APPELLEE GEOFF DUNCAN** upon all counsel of record by email

addressed to:

Kaye Woodare Burwell
Office of the Fulton County
Attorney
141 Pryor Street, N.W., Suite 4038
Atlanta, Georgia 30303
Kaye.burwell@fultoncountyga.gov

Counsel for Appellee Fulton County
Board of Registrations and Election

Bryan P. Tyson
Strickland Brockingham Lewis LLC
Midtown Proscenium Suite 2200
1170 Peachtree Street, N.E.
Atlanta, Georgia 30309
bpt@sbllaw.net

Counsel for Appellee Gwinnett
CountyBoard of Registrations and
Elections

Josh Belinfante
Robbins Ross Alloy Belinfante
Littlefield LLC
500 Fourteenth Street, NW
Atlanta, Georgia 30318
Josh.belinfante@robbinsfirm.com

Counsel for Appellee Secretary of
State

Bruce Perrin Brown
Bruce P. Brown Law LLC
1123 Zonolite Road, N.E.
Suite 6
Atlanta, Georgia 30306
bbrown@brucepbrownlaw.com

Counsel for Appellants

This 27th day of March, 2019.

/s/ Edward H. Lindsey, Jr.
Edward H. Lindsey, Jr.
Counsel for Appellee Geoff Duncan