# IN THE SUPREME COURT
# STATE OF GEORGIA

## CASE NO. S19A0769

---

COALITION FOR GOOD GOVERNANCE,
RHONDA J. MARTIN, SMYTHE DUVAL AND JEANNE DUFORT

Appellants,

v.

BRAD RAFFENSPERGER, Secretary of State, FULTON COUNTY BOARD OF
REGISTRATION AND ELECTIONS, GWINNETT COUNTY BOARD OF
REGISTRATIONS AND ELECTIONS, and GEOFF DUNCAN

Appellees.

---

## SUPPLEMENTAL BRIEF OF APPELLANTS

---

SUPERIOR COURT OF FULTON COUNTY
CASE NUMBER 2018CV313418
**BRUCE PERRIN BROWN**
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE, Suite 6
Atlanta, Georgia 30306
(404) 881-0700

# TABLE OF CONTENTS

**Page**

I.  INRODUCTION ............................................................................. 1

II.  DISCUSSION.................................................................................. 4

    A.  Enumeration of Error One and Two: Failure to Allow Reasonable Time for Discovery and Refusal to Grant a Continuance ................... 4

    B.  Enumeration of Error Three and Four:  Refusal to Allow Discovery of Relevant Evidence and Failure to Grant Motion to Compel.............. 12

    C.  Enumeration of Error Five and Six:  Incorrect Factual and Legal Analysis of Election Contest Claim .................................................. 19

    D.  Enumeration of Error Seven:  Wrongful Striking of Jury Demand ... 22

# TABLE OF AUTHORITIES

**Cases**

*Frank v. Atlanta St. R. R.,* 72 Ga. 338 (1884)………………………………23

*Fuller v. Thomas,* 284 Ga. 397 (2008)………………………………...……19

*McIntosh Cty. Bd. of Elections v. Deverger*,
      282 Ga. 566 (2007)…………………………………………………....21

*Mead v. Sheffield,* 278 Ga. 268 (2004)…………………………………...19

*Pierce v. Underwood,* 487 U.S. 552 (1988)……………………………….9

*Stiles v. Earnest,* 252 Ga. 260 (1984) ……………………………………21

*Taggert v. Phillips,* 242 Ga. 454 (1978) ……………………….…*passim*

*Taggart v. Phillips,* 242 Ga. 484 (1978)……………………………*passim*

**Statutes**

O.C.G.A. § 9-11-26……………………………………………………………2

O.C.G.A. § 9-11-40……………………………………………………………2, 5

O.C.G.A. § 21-2-525(b)……………………………………………………3, 22

O.C.G.A. § 21-2-526(a)……………………………………………………....22

O.C.G.A. § 21-2-526 (b)…………………………………………………....23

O.C.G.A. § 21-2-527(d)………………………………………………….…….3

## SUPPLEMENTAL BRIEF OF APPELLANTS

Appellants Rhonda J. Martin, Smythe DuVal and Jeanne Dufort

("Plaintiffs") file this Supplemental Brief.

## I.    INRODUCTION

The Court's decision in this case will determine for the first time how

contests of elections conducted on electronic voting systems will be litigated and

resolved in Georgia.  Until this case, election contests tried by Georgia courts

involved primarily paper ballots that could be provided relatively easily as

evidence to permit the trial court to resolve a controversy.  Electronic voting

systems, like the DREs that the State now uses, and the electronic "ballot marking

devices" that the State plans to deploy for the 2020 Presidential elections (amidst

substantial controversy and litigation), do not yield a paper trail or an auditable

result.   When legitimate questions are raised as to the accuracy of election results

on these systems, therefore, electors and candidates must have a meaningful

opportunity in litigation to discover and test the programming that controls how

ballot content is displayed to the voters, and how votes are recorded, processed,

tabulated, and reported.

Without such discovery, it will be impossible for a litigant to contest even

the most obviously flawed result of an election conducted on electronic voting

systems.  The election will be presumed valid and the evidence of any irregularity

will remain in the exclusive possession of election officials.  Without meaningful

election contests, election officials in effect will be given the final responsibility to

determine the outcome of questionable Georgia elections, a result that is not

consistent with Georgia law or sound public policy.  Final review of questionable

election results is not a responsibility that election officials have the expertise,

independence, or willingness to undertake.  In this case, for example, the Secretary

of State's representative testified that the Secretary's office undertook no

investigation to determine whether system defects caused the unusual vote pattern

at issue in this case.  (T-385:11-14).

Although elections conducted on electronic systems present new challenges

in election contest litigation, the laws are already in place to ensure a fair and

thorough proceeding.  The Civil Practice Act requires that in all civil cases litigants

are entitled to reasonable time for discovery of relevant evidence.  O.C.G.A. § 9-

11-40; O.C.G.A. § 9-11-26.  Common sense planning and scheduling can balance

the need for reasonable discovery with the imperative that election contests be

resolved on an expedited basis. Additionally, trial courts have the ability to engage

additional resources, such as special masters, to assist in the prompt and efficient

resolution of difficult technical issues or confidentiality and security concerns.

The Election Contest Statute anticipates that the trial court will gain a "full and

proper understanding" of the case so that it can decide whether the election was

"so defective" "as to place in doubt the result" and, if so, to fashion an appropriate remedy.  O.C.G.A. §§ 21-2-525(b), 21-2-527(d).

In their opening Brief, Plaintiffs explained how the trial court committed reversible error by not allowing a reasonable time for discovery, not allowing Plaintiffs to discover relevant evidence, not evaluating the evidence under the controlling rules of law, and issuing a decision that is riddled with mistakes and inconsistencies.  In their Responses, Defendants make a number of arguments, all addressed below, but significantly do not challenge the evidence establishing, to a 99.99% certainty, that there was something about the operation of the electronic voting system that caused the unprecedented undervote that was reported in the Lieutenant Governor's election -- an undervote that does not appear in the 230,000 votes that were cast on paper.  Defendants also do not contest the obvious proposition that determining whether this unprecedented undervote was caused by defective programming[1] required discovery of the programming itself.  Defendants do not defend or explain the trial court's decision to allow a three-day period in which to conduct all discovery.  Defendants argue that Plaintiffs were allowed discovery of the programming – which is completely refuted by the record – but do

_____

[1] Appellants use the term "programming" to include all electronic instructions and configuration of ballots and machines used in the election, not only the election management system software.

3

not dispute that examination of the programming, even if allowed, could never have been completed in the three days of discovery allowed by the trial court.

Defendants do not address, or even mention, the trial court's repeated statements to the parties that the court would move the date of the trial, if necessary, after the motions hearing, only to refuse to consider a continuance when the time came. Defendants also do not address the trial court's statement that it was "getting some pressure" to expedite the case. (T-113). Finally, Defendants do not defend the trial court's mistaken calculations in its Final Order, or explain why the trial court cited the law for one mathematical formula for deciding the case and then applied another.

Plaintiffs respectfully submit that, to adjudicate this action properly, and to set the correct precedent for modern elections, the Court should reverse and remand the case to allow for the orderly and systematic discovery of relevant evidence and an adjudication consistent with statutory law and the decisions of this Court.

## II.    DISCUSSION

### A.    Enumeration of Error One and Two: Failure to Allow Reasonable Time for Discovery and Refusal to Grant a Continuance

#### 1.    Introduction

In their opening Brief, Plaintiffs explained that contestants are entitled to reasonable discovery in election contests under both the Civil Practice Act and the

4

Election Contest Statute and that the trial court committed reversible error by restricting discovery to the three-day period immediately prior to the trial. O.C.G.A. § 9-11-40 provides that "the court *shall* in all cases afford to the parties reasonable time for discovery procedures." (Emphasis added). In their Responses, Defendants do not address the Civil Practice Act rule or challenge its applicability to this case.[2]

As to whether the trial court allowed Plaintiffs a "reasonable time for discovery procedures," there were fifty days between the filing of Plaintiffs' Emergency Motion for Discovery on November 29, 2018 and the start of the trial on January 17, 2019. The discovery period allowed by the trial court began on the 47th day. Three days plainly was not a "reasonable time for discovery procedures."

## 2. *Defendants Had Insufficient Time to Produce Ballot Images*

Though Defendants do not explain how, as a practical matter, Plaintiffs could have conducted a reasonable amount of discovery in the three-day period, the general theme of their responses is that, had Plaintiffs simply taken advantage of what was offered to them, a three-day period would have been sufficient. Yet Defendants did not even have the time to produce what they were ordered to produce. Fulton, for example, on the first morning of the three-day discovery

---

[2] Fulton County states that the Election Code does not explicitly provide for discovery (Fulton Resp. at 11), but does not disagree that Plaintiffs are entitled to a "reasonable time for discovery procedures" under the Civil Practice Act.

period (January 14, 2019), did not produce the ballot image reports,[3] one of the five categories of reports that it was required to produce from the GEMS database. (R-896; R-878 ¶ 1). Fulton officials explained to Plaintiffs' representatives that locating, generating and printing the reports from 2,000 memory cards (on which all the individual ballots were stored as ballot images) was simply taking too much time. (R-896).[4] As Plaintiffs' expert explained, a far more efficient method for the production would have been for Defendants to produce a soft copy of the electronic GEMS database (easily copied to a CD); Plaintiffs did not wish to, and could not efficiently analyze, over 400,000 Fulton DRE ballot printouts in hard copies, or PDFs.[5] Plaintiffs accordingly included in their Motion to Compel the request that the trial court order Defendants to produce the electronic GEMS database. (R-979). The trial court denied the motion on the first day of trial, and Plaintiffs never received Fulton's ballot image reports.

Ironically, the availability of the ballot image reports was one of the reasons the Secretary of State's counsel gave the Court for denying Plaintiffs' request for the actual database. In an email to the Court, counsel stated, "if there were

---

[3] Ballot image reports are reports of each individual ballot recorded on the DRE voting machine.

[4] In its brief, Fulton states: "These reports were provided," referring to the GEMS reports that were the subject of the Court's Order. (Fulton Resp. at 11). Fulton does not, however, cite to the record for this statement, and Plaintiffs, in their own review of the record, find that the ballot image reports were not produced on January 14, 2019 (R-896), and find no record of them being produced thereafter.

[5] If printed out on hard copy, there is one page for each vote and, according to Secretary of State records, there were over 400,000 votes cast in Fulton County.

irregularities or failures with respect to programming, vote recordation, the appearance of candidates on a ballot in a given election, they would appear" in copies of the ballot image reports. (R-1072). Given the time-constraints imposed by the trial court, Defendants were unable to produce court-ordered evidence that Defendants admitted was highly probative.[6]

### 3.  *Plaintiffs Did "Advance" Discovery*

Fulton blames the short discovery period on Plaintiffs: "Plaintiffs filed an Emergency Motion for Inspection on November 29, 2018. (R-96). Plaintiffs waited 41 days until January 9, 2019 to advance this request." (Fulton at 12). This is not correct. First, Plaintiffs styled the motion an "emergency" and filed it before Judge Grubbs was even assigned. Then, on December 4, Plaintiffs' filed a "Status Report" with the trial court, stating that "[v]ital to the determination of the causes of these irregularities is an expert forensic examination of the electronic equipment and related records." (R-163), and specifically "advanced" the Emergency Motion by asking the trial court to grant it instanter. (R-164). At the December 5, 2018 status conference, Plaintiffs reminded the Court of the pending Emergency Motion, to no avail. (T-8:9-13). On December 7, the trial court stated that it would not

---

[6] In addition, displaying a discouraging lack or curiosity into the causes of the unprecedented undervote in the Lieutenant Governor's race, there is no evidence that the Secretary of State undertook a review of the ballot image reports, a review that might have yielded indications of programming defects that could have been further investigated.

consider the Emergency Motion until the pending motions to dismiss were resolved. (R-1102). At this point, Plaintiffs had done everything possible to "advance" the request to expedite discovery.

Plaintiffs also insisted from the beginning that the electronic evidence, including the internal memory of the DREs, be preserved until the discovery period began. In its December 7, 2018 Preservation Order (R-175), the trial court directed the Defendants to maintain the status quo with respect to all "Voting System Evidence," including DRE internal memory and many other categories of evidence. Though the trial court ordered this evidence preserved, it never gave Plaintiffs the opportunity to examine it for trial.

### 4. Trial court suggests extending discovery if necessary, but then does not do so

It was lost on no party that the trial court had scheduled the trial for just a week after the hearing on the motions to dismiss and that more time would be necessary to conduct discovery if the motions to dismiss were denied. The trial court twice addressed the issue explicitly. In the December 5, 2018 Status Conference, the trial court, after tentatively scheduling the motions hearing and trial for January 9 and January 17, 2019, respectively, told the parties that the January dates could be moved. "We can move them." (T-16:21-23). Then, in the December 7, 2018 email to the parties, the trial court stated that the Emergency Motion would not be addressed until the January 9, 2019 hearing, but: "If it is

8

deemed necessary to move the trial date at that time the Court will consider it."
(R-1102).

Defendants do not address the trial court's December 5 statements or the
December 7 email, despite the emphasis Plaintiffs placed on these communications
in their opening Brief. Defendants also make no attempt to explain why the Court,
having stated to the parties that it would consider moving the trial if necessary,
refused to do so when the time came.

Defendants also do not address the trial court's puzzling statement on
January 9, 2019 that the trial court had been "getting some pressure" to speed the
resolution of the case. The trial court cited this "pressure" as the reason for
denying Plaintiffs' request to postpone the trial. (T-113). Yielding to this pressure
constituted textbook abuse of discretion. *Cf. Pierce v. Underwood,* 487 U.S. 552,
573 (1988) (Scalia, J.) (relying on irrelevant factors constituted abuse of discretion,
requiring reversal).

### 5. *Taggart and the Appropriate Remedy Here*

Finally, Fulton relies on *Taggert v. Phillips,* 242 Ga. 454, 455 (1978), for the
proposition that it "is in the trial court's discretion to allow discovery in such a
contest." (Fulton Resp., at 11). But the short *Taggert* opinion does not say this or
anything like it, and its holding broadly supports reversal and remand here. In
*Taggert*, the plaintiff alleged that "his name was improperly aligned on one voting

machine with the result that voters were misled and unintentionally voted for his opponent." 242 Ga. at 245. The trial court dismissed the petition without an evidentiary hearing. This Court acknowledged the time sensitivity of election contests but still reversed, holding that the plaintiff should have been allowed the opportunity to prove his case. *Id.* The Court also held that "doubt may be cast on an election by showing improper maintenance of the voting machines resulting in votes being miscast." *Id.* at 246. "All of this is a matter of proof." *Id.*

*Taggart* is directly on point and supports reversal on the first four enumerations of error. Both *Taggart* and this case involve the same evidentiary issue: whether the voting system had correctly converted the choice of the voters – via mechanical lever in *Taggart* and electronic screen selections here – to the reported cast votes. The Plaintiffs here, like the plaintiff in *Taggart,* are entitled to reasonable time (Enumerations of Error One and Two) to inspect the actual mechanism that controls this conversion (Enumerations of Error Three and Four). In *Taggart,* the mechanism was a 20th Century lever style voting machine that, if properly aligned, registers a vote for the selected candidate or ballot question; in this case, it is the actual 21st Century digital programming that electronically does, or is supposed to do, exactly the same thing.

The *Taggart* cases also support the relief Plaintiffs seek in this appeal. In the first *Taggart* appeal, this Court acknowledged the time sensitivity of election

10

contests, but still reversed and remanded for further proceedings because integrity in the election process and outcome was more important than speed. On remand, the plaintiff was given the opportunity to present evidence as to whether the machine's alignment was causing votes to be cast incorrectly. As it turned out, in *Taggart* no defect was discovered; the trial court rejected the challenge on the merits; this Court in the second appeal affirmed. *Taggart v. Phillips,* 242 Ga. 484, 485 (1978).[7]

### 6. Conclusion

Plaintiffs ask for nothing more than what this Court granted the plaintiff in *Taggart* – the time and opportunity to determine on remand whether programming defects in the electronic voting system cast in doubt the election results to a sufficient degree to require the trial court to void the Lieutenant Governor's election. If, on remand, Plaintiffs are granted reasonable time to examine the actual programming of the system, and fail to detect any defects, then, as in *Taggart*, Plaintiffs' claim will fail on the merits. If, on the other hand, Plaintiffs discover that programming defects were sufficient to cast doubt on the results of the Lieutenant Governor's race, then a new election should be ordered in accordance with Georgia law. If the decision below is reversed and remanded,

---

[7] The Supreme Court's record in the *Taggart* appeals includes records of discovery in the matter and an order from the trial court describing the evidence that was taken on whether the machine was misaligned. (Ga. Supreme Ct. No. 34338, Order dated October 30, 1978, Record at Page 98).

regardless of the final result, the integrity of the election will be secured. If the decision below is affirmed, the integrity of the 2018 election for Lieutenant Governor will forever be in doubt.

> **B.  Enumeration of Error Three and Four:  Refusal to Allow Discovery of Relevant Evidence and Failure to Grant Motion to Compel**

As Plaintiffs explained in their opening brief, even if the trial court had afforded Plaintiffs reasonable time for discovery, the trial court committed reversible error by not allowing Plaintiffs to examine the programming of the electronic voting systems.  In their responses, Defendants argue that Plaintiffs were offered discovery of the programming but, in the words of Defendant Duncan, "did not partake." (Duncan Resp., at 1).  The record contradicts this argument by showing: 1) the trial court initially ordered Defendants to allow Plaintiffs to examine the internal memory for programming defects; 2) Defendants, in violation of the trial court's order, did not provide such discovery; and 3) the trial court then reversed course, ruling that Plaintiffs were not entitled to any forensic discovery of the internal memory.

Since the trial court did not allow a reasonable time period for discovery in any event, *see supra* Part A, Plaintiffs would have been unable to complete any meaningful discovery even if the trial court had ordered discovery of the programming.  Given that the Defendants' primary defense is the incorrect

assertion that Plaintiffs "did not partake" of the discovery offered, however,

Plaintiffs are compelled to set the record straight with more detail than might

otherwise be unnecessary.

> 1.    *Trial Court Initially Orders Discovery of Programming*

On January 9, 2019, the trial court finally heard argument on Plaintiffs'

November 29, 2018 Emergency Motion.  At the hearing, the trial court asked

Plaintiffs' counsel about the experts' examination of the internal memory in the

individual DRE machines:

> MR. BROWN: …[O]ur experts will be examining the internal memory to see if there are programming flaws in the DRE machines that are causing these problems.
>
> THE COURT: I got you. For programming flaws only?
>
> MR. BROWN: Pardon me?
>
> THE COURT:  For programming flaws.
>
> MR. BROWN: For programming flaws, yes, Your Honor.
>
> THE COURT: See if they were programmed wrong, okay.  Simple language okay.

(T-109:25-110:9).  The trial court did not rule definitively on discovery at the

hearing and directed the parties to submit proposed orders.   Plaintiffs submitted a

proposed order allowing Plaintiffs "to conduct a forensic inspection of the DRE

machines, including the internal memories of those machines," but to "conduct the

13

inspection and copying so as to not in any way damage the DRE machines."  In response, the Secretary of State objected to any examination of the internal memory because doing so would "damage the voting machines" and "expose highly confidential information about Georgia's voting system that would leave it vulnerable to attack."  (R-1071).  Defendants instead proposed to allow Plaintiffs to inspect the "post-election memory cards."  (R-1072).

In the trial court's January 11, 2019 Order on Pending Motions, as to the inspection of the internal memory, the trial court sided with Plaintiffs.  The Order states that Plaintiffs were entitled "to inspect the DRE machines in post-election mode, using post-election memory cards," which is what Defendants had offered to produce.  The Order goes on to provide, however, that "Plaintiffs may also examine the internal memory storage of each such DRE unit."  (R-879).

Plaintiffs efforts to obtain discovery electronic GEMS databases is discussed in detail in Plaintiffs' opening Brief at pages 20 to 21.  The trial court, despite the court's and all parties' awareness of the need for prompt resolution, inexplicably denied access to these records in favor of far more complex and time-consuming examination of internal memories of DREs. It is possible that the apparent erroneous programming could have been identified in the GEMS databases in a matter of hours or days---a fraction of the time required to retrieve the same information from the far more complex internal memory.  (R-1124).

2.      *Defendants Refuse to Allow Plaintiffs to Examine the Internal Memory of the DREs*

Immediately after the January 9, 2019 hearing, Plaintiffs' counsel conferred with Defendants' counsel in an effort to agree upon the logistics for the upcoming examination of the DREs.  (R-1053).  Over the January 12-13, 2019 weekend, Plaintiffs' counsel circulated to counsel for Fulton County proposed protocols for the examination of the DREs consistent with the trial court's Order, with emphasis on the court's admonitions regarding record preservation, but received no substantive response.  (R-1080-82). The following Monday, January 14, 2019, Defendant Fulton assembled their DRE machines at Fulton County's English Street warehouse for examination by the Plaintiffs.

It is not disputed that Defendants *never* allowed Plaintiffs to examine the internal memory storage of any DRE unit.  Instead, as a close reading of Defendants' cleverly worded briefs confirms, what Defendants offered to allow Plaintiffs to view on the DRE machines were reports of the "election archive file" or the "election result file." (R-1023-1024) (Fulton County brief describing what was offered to Plaintiffs).   As Defendant Fulton County acknowledged, and as Plaintiffs' expert explained, the displayed reports of the "election archive file" is *not* "the internal memory" of the DREs, but is instead a display of data in a single file that, in the words of Fulton County, is "extracted *from* the DRE's internal memory."  (R-1024) (emphasis added).

15

It is crucially important that this Court not accept Defendants repeated statements that Plaintiffs were allowed discovery of the programming of the DRE system. Defendants' incorrect narrative is based two distinct incorrect assertions. First, Defendants equate what they offered – the "election archive file" – with the internal memory, but it is *not* the internal memory. As Fulton County's statement quoted above discloses (the election archive file is "extracted from the DRE's internal memory" (R-1024)), the elective archive file is only one small file in the internal memory. The difference between the two is displayed in a diagram prepared by Plaintiffs' expert and submitted to the trial court in support of Plaintiffs' Motion to Compel. (R-994). As shown in the diagram and the sources cited by Plaintiffs' expert, malicious or defective software can reside *anywhere* in internal memory, as can electronic evidence of machine malfunction.

Second, Defendants did not offer to produce programming associated with the "election archive file," but merely offered to allow Plaintiffs to *view* elements of the election archive file through a DRE machine display screen. (R-995). This limitation rendered the entire exercise pointless, like examining a screen shot of this page of this brief for programming defects in Google Chrome or Microsoft Word. Or, as Plaintiffs' expert Mr. Bernhard states: "merely reading the information presented on the screen is not remotely equivalent to examining what underlying code is executing on the device and what such code contains." (R-995).

16

At trial, Mr. Bernhard, testified that the only way to determine whether the anomalies that had been reported in the election results had been caused by a programming defect was to perform a forensic analysis of the software that was running the machines.  (T-333-334).  Mr. Bernhard testified that he had not "had the opportunity to review the internal memory or examine the internal memory" of any of the DRE machines.  (T-334: 15-18).

Plaintiffs refused to accept Fulton's invitation to power up the machines, manipulate the displays or observe the reports that could have been viewed as Defendant Fulton encouraged.  Plaintiffs and their experts repeatedly explained that operating the DRE machines without first making a back-up copy of the internal memory would alter the electronic memory in violation of the trial court's order.  (R-887, 897).

### 3. Trial Court Reverses Course and Holds No Forensic Examination Allowed

On Tuesday, January 15, 2019, Henry County informed Plaintiffs' that it also was not going to allow Plaintiffs to examine the internal memory of the DREs. Early the next morning, on Wednesday, January 16, Plaintiffs' emailed to the court (and filed simultaneously with the clerk) a Motion to Compel.  (R-979).  In the email, Plaintiffs stated that Defendants were refusing to comply with the court's discovery order and that the Motion to Compel "offers additional grounds for

continuing the case," which was scheduled to begin the next day.[8]  By the time of

the filing of the Motion to Compel, the trial court had already denied informal and

formal requests for a continuance and had via email rejected out of hand Plaintiffs'

suggestion that a Special Master be appointed to assist in the technical aspects of

discovery disputes.  (R-1134).

> The trial court stated:
>
> I did not order a forensic investigation.  I specifically left that word
> out.  I set out certain things to be done.  Did you get a forensic?  No,
> we didn't get a forensic because I did not order a forensic.  I'm not
> going beyond that.

(T-335:11-18).

For purposes of this appeal, it does not matter whether the trial court's

decision to not allow Plaintiffs to forensically examine the internal memory of the

DREs was a reversal of the trial court's earlier ruling,  a clarification of the trial

court's earlier ruling, or an enforcement of the trial court's earlier ruling.  What

matters is that, at the end of the day, Plaintiffs were denied forensic discovery of

the programming of the DREs and the GEMS database, the only likely means of

determining whether programming defects caused the undervote.

---

[8] This email does not appear to be in the record transmitted from the Superior Court.  The email is
referenced by the trial court in the Order Denying Continuance.  (R-1035).

18

C.    **Enumeration of Error Five and Six: Incorrect Factual and Legal Analysis of Election Contest Claim**

In Enumerations of Error Five and Six, Plaintiffs identified errors of fact and law in the trial court's Final Order. As with the other enumerations of errors, none of the Defendants mount a defense of the trial court's decisions. Defendants do not defend the trial court's failure to address the most important facts in the case, the trial court's obvious math error, or the trial court's stated rule of decision. *See* Brief of Appellants at 24 – 28. Instead of addressing these arguments, or the trial court's actual analysis, Defendants string cite boilerplate quotations about how elections are presumptively valid, (*e.g.,* Duncan Resp. 17-19; Fulton County Resp. 18 – 20), and, predictably, invoke the "right for any reason" doctrine. (Duncan Resp., 17-18). The trial court's indefensible analysis is not defended.

As explained in Plaintiffs' Opening Brief, the formula cited by the trial court from *Fuller v. Thomas,* 284 Ga. 397 (2008), to determine whether an election has been cast in doubt does not withstand analysis. Neither the trial court nor Defendants explain the variables in the formula or why the formula applies to this election.

If this Court should hold that voters alleging an irregularity in the results of electronic voting must identify a specific number of illegal votes, then electronic voting results will not only be incapable of being audited, they will be incontestable. In *Mead v. Sheffield,* 278 Ga. 268 (2004), Howard Mead could

point to a finite number of absentee ballots that had his name wrong and was given

access to discovery of government records to determine that number; no voters

challenging the results of electronic voting can ever do the same. Since with

electronic voting there is no independent record of voter intent, there is no baseline

to determine how a programming defect may have had a quantifiable impact upon

the vote tally, and programming defects, even innocent ones, do not permit after-

the-fact reconstruction of a proper vote count.

Defendants have no answer to this dilemma, preferring that results from

electronic voting systems (results which are already incapable of being audited or

defended) become incontestable. Plaintiffs respectfully urge the Court to not

employ, articulate or enforce a standard that would, in essence, place the outcome

of all electronic voting elections beyond judicial review.

Gwinnett argues that Plaintiffs failed to prove a causal link between

irregularities and a particular number of illegal votes. (Gwinnett Resp. at 9). But

this Court has *not* required quantification of votes *or* causation when it would be

impossible to do so. In *Mead,* for example, this Court did not require that Howard

Mead prove that the voters who received an incorrect absentee ballot would have

voted in his race, or that they would have voted for him. Since these facts would

be impossible to prove, this Court held that all Mead had to prove was that the

number of incorrect absentee ballots that were voted was greater than the margin of victory. 278 Ga. at 271.

In *Mead,* the evidence sufficient to cast the election in doubt consisted of tangible paper ballots. With electronic voting, however, it is not even possible to determine how many illegal or miscounted ballots exist in the first place, much less what the result would have been but for the irregularity. Thus, challenges to electronic voting resemble *Stiles v. Earnest,* 252 Ga. 260, 261 (1984), where there was proof of misconduct at polling places, but no practical means of measuring the impact upon the vote tally. In that case, despite the total absence of proof of causation, this Court ordered a new election: "upon review of the record, we conclude that the illegality attendant upon the referendum is such as is 'sufficient to change or place in doubt the result' thereof." 252 Ga. at 261. Further, in no case does the Court require proof that "but for" the irregularity, the result of the election would have been different; "but for" causation can never be satisfied in election cases because who or what voters would have voted for, because of the secrecy of ballots, can never be established. *E.g., McIntosh Cty. Bd. of Elections v. Deverger*, 282 Ga. 566, 566, (2007).

Election contests of electronic elections do not lend themselves to rigid formulas: defects in programming may cast doubt on the result in many different ways. Each case must be determined on the facts specific to each case. What is

imperative, in every case, is that the trial court gain "a full and proper understanding" of the facts of the case, O.C.G.A. §§ 21-2-525(b), whether the facts are embedded in electronic programming or appear in traditional paper artifacts.

### D. Enumeration of Error Seven: Wrongful Striking of Jury Demand

Plaintiffs filed a timely demand for a jury trial on January 16, 2019, a day before the "call of the case" on January 17, 2019. (R-1012). Should the Court reverse the case and remand for further proceedings on one of the other enumerations of error, it may not need to reach the jury trial issue.[9] If the Court does reach the issue, Plaintiffs right to a jury trial under the Election Contest Statute is abundantly clear: Plaintiffs were "entitled to have tried by a jury," O.C.G.A. § 21-2-526 (a), and the trial court abused its discretion[10] in striking the jury demand.

In response, Defendants make a technical pleading argument, contending Plaintiffs' demand for a jury trial "did not assert that there were issues which entitled them to a jury trial." (Duncan Resp. at 22; *see also* Fulton Resp. at 23 (same)). There is no requirement in the statute or the case law, however, that the demand include such a formalistic recitation. Instead, the statute states that, upon a

---

[9] Plaintiffs would also request that, on remand, the case be assigned to a different Superior Court judge.

[10] *See Taggart v. Phillips,* 242 Ga. 454, 455 (1978) (reviewing denial of a jury trial under abuse of discretion standard).

jury demand having been made before the call of the case, "the *court* shall determine that it is an issue which under other laws of this state the litigant is entitled to have tried by a jury." O.C.G.A. § 21-2-526(a) (emphasis added).

In addition, when Plaintiffs' counsel repeated the jury demand in open court, counsel explained that the Plaintiffs "have a very detailed fact-bound complaint and each of the factual allegations in there, in any civil case, would be triable to a jury and I know of no exception." (T-169:20-25). Counsel went on to detail examples of fact issues, including "Were significant programming error made? Can the vote tallies be reconciled? Are there signs of malicious manipulation of the vote tallies?" (T-169:25-170:3). Since these clearly[11] are jury issues "under other laws of this state," the trial court abused its discretion in denying Plaintiffs' demand for a jury trial.[12]

For the foregoing reasons, the decision below should be reversed.

---

[11] Defendant Duncan states that "whether Georgia's electronic voting system was somehow corrupted" is an issue for the judge, but cites no authority for the proposition. *But see Frank v. Atlanta St. R. R.,* 72 Ga. 338, 344 (1884) ("facts for the jury, law for the judge").

[12] Fulton County speculates that, had the trial court granted Plaintiffs' request for a jury trial, a jury would have had to be impaneled in each of Georgia's 159 counties under O.C.G.A. § 21-2-526 (b). Notably, Defendants Gwinnett and Duncan do not make this argument. In any event, since the trial court did not grant a jury trial, the trial court did not rule on this issue and it is not reviewable on appeal.

Respectfully submitted this 30th day of April, 2019.

/s/Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
bbrown@brucebrownlaw.com
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*Counsel for Appellants*

24

# **CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of the foregoing

Supplemental Brief of Appellants upon all counsel of record by email addressed to:

| | |
|---|---|
| Kaye Woodard Burwell<br>Office of the Fulton County Attorney<br>141 Pryor Street, NW<br>Suite 4038<br>Atlanta, Georgia 30303<br>Kaye.burwell@fultoncountyga.gov | Bryan P. Tyson<br>Strickland Brockingham Lewis LLC<br>Midtown Proscenium Suite 2200<br>1170 Peachtree St. NE<br>Atlanta, Georgia 30309<br>bpt@sbllaw.net |
| *Counsel for Appellee Fulton County Board of Registrations and Election* | *Counsel for Appellee Gwinnett County Board of Registrations and Elections* |
| Josh Belinfante<br>Robbins Ross Alloy Belinfante Littlefield LLC<br>500 Fourteenth St. NW<br>Atlanta, Georgia 30318<br>Josh.Belinfante@robbinsfirm.com | Edward H. Lindsey, Jr.<br>Dentons<br>303 Peachtree St. NE<br>Suite 5300<br>Atlanta, Georgia 30308<br>edward.lindsey@dentons.com |
| *Counsel for Appellee Secretary of State* | *Counsel for Appellee Geoff Duncan* |

This 30th day of April, 2019.

/s/Bruce P. Brown
Bruce P. Brown
*Counsel for Appellants*