# IN THE SUPREME COURT
# STATE OF GEORGIA

CASE NO. S19A0769

_____

RHONDA J. MARTIN, SMYTHE DUVAL AND JEANNE DUFORT

Appellants,

v.

FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS, GWINNETT COUNTY BOARD OF REGISTRATIONS AND ELECTIONS, and GEOFF DUNCAN

Appellees.
_____

**THIRD SUPPLEMENTAL BRIEF OF APPELLANTS**
_____

Superior Court of Fulton County
Case Number 2018CV313418

**BRUCE PERRIN BROWN**
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com
Bruce P. Brown Law LLC
1123 Zonolite Rd. NE, Suite 6
Atlanta, Georgia 30306
(404) 881-0700

## THIRD SUPPLEMENTAL BRIEF OF APPELLANTS

Appellants Rhonda Martin, Smythe DuVal and Jeanne Dufort file this Third Supplemental Brief to address issues raised during oral argument and in the Supplemental Briefs filed on May 9, 2019 by Defendants Fulton and Gwinnett, and May 10, 2019 by Mr. Duncan:

1. *Redressability and Mead v. Sheffield*

During oral argument, Justice Warren asked whether the claims were redressable with only two counties as defendants. As a further response: in the only other statewide election contest to reach this Court, *Mead v. Sheffield,* 278 Ga. 268 (2004), this Court ordered a new statewide election, even though only one county official was joined as a defendant. The other defendants were two of the other candidates (Sheffield and Bernes), one county official, and the Secretary of State. This Court's published opinion in the case does not disclose all the defendants' names, but all are shown in the certified trial court record in *Mead*, which Plaintiffs provided to the trial court below and which appear in this record at R-360 *et seq.*

As Defendants point out in their Supplemental Brief, *Mead* involved ballot design irregularities in only one county. But the issue here is redressability, and the new election in *Mead* was enforced statewide, despite the fact that none of the other 158 counties were parties to the case. This case primarily involves systemic

1

programming errors that originated with the Secretary of State in his office in Fulton County but, to the extent that discovery is required in other counties, those counties do not need to be made parties because the trial court has express "plenary power, throughout the area in which the contested primary or election was conducted, to make, issue, and enforce all necessary orders, rules, processes, and decrees," including compelling witnesses and "the production of evidence." O.C.G.A. § 21-2-525(b).

In its briefing in the trial court (R-345), Plaintiffs also noted that, although it would be wildly impractical to require joinder of all 159 counties, and inconsistent with the need for expedition of election contests, the failure to join all counties would not be grounds for dismissal because, in election cases, "failure to join proper parties is an amendable defect." *Brodie v. Champion,* 281 Ga. 105, 107–08 (2006).[1] In this case, however, the trial court correctly denied the motion to dismiss, and no amendment to add the other counties was necessary.

---

[1] In their Supplemental Brief, Defendants attempt to limit *Brodie,* but the clear holding and language of the case does not permit it. Chief Justice Melton explained:

> Pretermitting the question whether Brodie should have specifically named the Board as superintendent in his lawsuit, the omission here did not subject his case to dismissal. In an election contest, "the failure to name the proper parties is an amendable defect, correctable by the parties or upon the court's own motion." *Hanson v. Wilson,* 257 Ga. 5, 6(2), 354 S.E.2d 126 (1987). Thus, the trial court did not err in denying Fauver's motion to dismiss.

2

2.  *Plain Language: O.C.G.A. § 9-11-40(a)*

Justice Nahmias asked whether the pendency of the motions to dismiss had an impact upon the trial court's statutory obligation to afford all parties reasonable time for discovery under O.C.G.A. § 9-11-40(a). It does not. The statute, which is entitled "Time and Place of Trial," describes when cases may be tried, and then states: "Provided, however, that the court shall in all cases afford the parties reasonable time for discovery procedures, subsequent to the date that defensive pleadings were required to be filed." This legislative command could not be more clear: regardless of when the trial is scheduled, in "all cases" the trial court "shall," – not "may in the trial court's discretion," but "shall" – afford the parties reasonable discovery.

The pendency of a motion to dismiss, or the tentative scheduling of the trial,[2] does not change or qualify this statutory command: the trial cannot be held until the parties have had a reasonable time for discovery. In this case, the motions to dismiss were resolved on January 9 with a ruling from the bench, but the scope of

---

[2] When setting the January 17, 2019 trial date, the court, referencing the trial dates, stated: "we can move them. It doesn't say we cannot move them. We can move them." (T-16:21-23). Two days later, the trial court said in an email to the parties: "if it is deemed necessary to move the trial date at that time [that is, on the date the motions were to be heard, January 9] the Court will consider it." (R-1102). When the time came, in the January 9, 2019 hearing, Plaintiffs' counsel stated: "The trial is scheduled for the 17th would it make sense to postpone that ---" and before the sentence could be finished, the trial court stated: "No, nothing postponed." The trial court added: "The rules are – in fact I'm getting some pressure as to why this isn't going through faster than it's been." (T-112:20-T:113:5). In none of their briefs do the Defendants or the Secretary address any of these statements by the trial court.

3

discovery was left unresolved. After taking briefs from the parties, the trial court, on January 11, issued its order on discovery. (R-879). At that moment, the trial court had the statutory obligation to afford give the parties reasonable time for discovery prior to trial.

There is no argument that three days of discovery before trial was a reasonable time for discovery. This is a complex case involving electronic records in the sole possession of the Secretary of State and the county election officials. Complex electronic election records require well-organized discovery conducted by experts, with great care taken to preserve the integrity of the evidence. Non-disclosure agreement, when appropriate, need to be negotiated and executed. Logistical and technical issues have to be resolved before any actual forensic examination may begin. Forensic examination itself takes time, and then any results need to be professionally analyzed. These steps are routine in other complex civil litigation involving electronic records, but they are difficult and take time. Three days for such discovery is on its face absurdly inadequate.

The "reasonable time for discovery" statute plainly applies to this election contest.[3] There is no longer[4] an argument that the trial court had the discretion to

---

[3] O.C.G.A. § 9-11-40 applies by its terms to "all civil cases." The Election Contest Statute in turn states that the trial court may compel the production of evidence and witnesses "in like manner and to the same extent as in *other* civil cases litigated before such court." O.C.G.A. § 21-2-525 (b) (emphasis added).

[4] Fulton County initially took the position that the trial court had discretion to allow discovery in election cases, citing *Taggart v. Phillips,* 242 Ga. 454, 455 (1978) (Fulton's Brief of Appellee, at 11). As Plaintiffs explained in

4

ignore the statute. The Defendants' arguments that Plaintiffs "did not partake" in discovery have all been refuted and, in any event, would not excuse the failure of the trial court to comply with the law. In summary, the only way the trial court's decision can be affirmed is to re-write the plain language of the statute and, in doing so, effectively insulate elections on electronic systems from judicial review.

### 3. *Mr. Duncan Mischaracterizes Testimony*

Mr. Duncan states that Plaintiffs' expert Mr. Bernhard testified that "there was a 99.99% chance of computer errors in Georgia's electronic voting system." (Supplemental Brief of Defendant Duncan, May 10, 2019, at 3). This is a misstatement of the record. Mr. Bernhard testified that using a statistical hypothesis test, the reported undervote had "less than 1 in 10,000 chance of appearing at random." (T-329:24-25).[5] Plaintiffs' position has been very clear, very consistent, very accurate, and never refuted by Mr. Duncan or anyone else: based solely on the reported election results, to a 99.99% certainty, the electronic

---

their April 30, 2019 Supplemental Brief at page 9, however, *Taggart* does not say this or anything like it. In its May 9, 2019 Supplemental Brief, Fulton does not correct its prior misstatement of the law or address the issue.

[5] To answer Justice Warren's question during oral argument on the statistics, Mr. Bernhard was not asked on direct or cross to explain his calculations. In briefing on the Motion to Dismiss in the trial court (R-500), however, Plaintiffs filed an expert opinion by Dr. Philip Stark which arrives at the same conclusion, that is, that there was a 1 in 10,000 chance that, if voters on DREs and on paper were equally likely to vote for Lieutenant Governor, that the undervote would have been as large as it was. Dr. Stark's opinion contains a detailed and technical explanation for his statistical conclusions. (R-509, 513-514).

5

machines either caused people to not vote for Lieutenant Governor or caused their vote to not be counted.

### 4. *Forensic Examination Denied*

Mr. Bernhard further testified that to determine the actual causes of the undervote on the electronic machines, he would need to perform a forensic examination of the DREs. (T-334). Mr. Bernhard testified that the meaning of "forensic examination" in the contest of a voting system examination is a scientific examination to determine "how that problem came to be." (T: 308:14). This is the discovery that Plaintiffs had explicitly sought since the filing of the November 29, 2018 Motion. (R-97).[6] Mr. Bernard testified that Fulton County had not allowed him to perform a forensic examination. (T-334: 4-5). After Mr. Duncan's counsel objected to this line of testimony, the trial court confirmed that Mr. Bernhard had not been allowed to do a forensic examination "because I did not order a forensic." (T 341:13-14).

Crucially, in their post-argument Supplemental Briefs, and in his May 6 Amicus Brief, the Defendants and the Secretary offer no response to Plaintiffs' factual account on the Defendants' failure to produce the internal memory storage of the DREs and the reports from the GEMS database. *See generally* Appellants'

---

[6] In their November 29, 2018 Emergency Motion, Plaintiffs stated: "Vital to the determination of the causes of these irregularities is an expert forensic examination of the electronic equipment itself," (R-97).

6

Supplemental Brief, April 30, 2019, at 5-6, 15-17.  With respect to the internal memory storage, as the trial court's statement quoted above confirms, Plaintiffs ultimately were not allowed forensic discovery.  Instead, what Defendants offered to allow Plaintiffs to view on the DRE machines were reports of the "election archive file" or the "election result file." (R-1023-1024) (Fulton County brief describing what was offered to Plaintiffs).   As Defendant Fulton County acknowledged, and as Plaintiffs' expert explained, the displayed reports of the "election archive file" is *not* "the internal memory" of the DREs, but is instead a display of data in a single file that, in the words of Fulton County, is "extracted *from* the DRE's internal memory."  (R-1024) (emphasis added).

As to the GEMS database, even if the Secretary's implausible position that access to the five pdf reports generated by the GEMS database would reveal any programming defects, it is now undisputed that Fulton and Gwinnett did not have time to produce the largest, most detailed pdf reports (the ballot image reports) prior to trial.[7]

In sum, the trial court had no legal basis to deny forensic discovery of the programming of the DREs or the GEMS databases, and Plaintiffs' did not obtain

---

[7] In its Brief of Appellee, at page 11, Fulton County stated: "These reports were provided," but did not cite to the record for that statement.  In their April 30, 2019 Supplemental Brief, Plaintiffs explained that this unsupported statement was not correct: Fulton never produced the ballot image reports because it was taking too long to print them out.  (Appellants' Supplemental Brief, at 6 (citing to R-896)).  In their post-argument Supplemental Brief, Fulton does not correct the record or address the issue.

7

discovery of this clearly relevant evidence, or the complete set of pdf reports Defendants themselves claimed were needed to detect programming errors. As a result, even if the trial court had afforded Plaintiffs reasonable time for discovery, the trial court's decision must be reversed.

5.     *Secretary of State Performed no Forensic Examination*

At trial, Defendants' representatives confirmed that neither Fulton County nor the Secretary of State had conducted a forensic examination of the DREs used in the 2018 elections. (T-385:11-14 (Q: Has the Secretary of State undertaken an investigation to determine whether system defects caused the voting patterns in the 2018 race? A: No, sir."); T-598:12-14 ("Q: You – has Fulton County forensically examined the machines? A: No."))[8]

6.     *Preservation*

Whether Defendants have violated their duty to preserve evidence is not an issue raised in this appeal. Plaintiffs note that Defendants and the Secretary are also under the duty to preserve the DREs and the GEMS databases (and related components) in pending federal cases. In it reasonable to assume that the DREs and GEMs databases involved in this case will be the subject of forensic discovery

---

[8] There was testimony that the Secretary or the counties had unilaterally performed "logic and accuracy" and "parallel" testing of some of the machines, but no results of those tests were produced in discovery or admitted into evidence. Plaintiffs' note that the United States District Court, after taking evidence on the issue, found that Georgia's "logic and accuracy" and "parallel" testing to be of "limited value" in determining whether the system had been compromised. *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1323 (N.D. Ga. 2018).

8

in the federal cases in the near future. *Curling v. Raffensberger,* No. 17-CV-2989-AT (N.D. Ga.).

       7.    *Trial court's decision cannot be saved under "right for any reason" rule.*

During oral argument, the "right for any reason" doctrine was addressed, in given the clear factual error made by the trial court in its calculations: using an .8% dropoff from the Governor's race as the baseline, there should have been 127,504 more votes, and only a 31,515 dropoff from the Governor's race totals. The trial court, however, reversed these two numbers, which constituted clear error.[9] In their post-argument briefs, Defendants in essence concede the mistake and offer no other explanation for the 32,000 figure in the trial court's order. Reversal is therefore required: the trial court's finding has no factual basis and is clearly erroneous.

In their post-argument Supplemental Briefs, Defendants make a futile attempt to salvage the trial court's decision. (Supplemental Brief of Gwinnett and Fulton, May 9, 2019, at 1-2; Supplemental Brief of Defendant Duncan, May 10, 2019, at 4-7). The Defendants focus on other language in the trial court's order in which the trial court offers the conclusion that the "irregular or illegal" votes were

---

[9] Further making affirmance impossible under the "right for any reason" doctrine is that, embedded in the trial court's findings is the acceptance of .8% dropoff from the Governor's race as the baseline, and any affirmance would have to reject this implicit finding of fact, which was based on the undisputed evidence of prior election results.

9

insufficient "to change or place in doubt the result." But the trial court then disclosed the factual basis for its conclusion: it found that "only" approximately 32,000 votes were arguably illegal or irregular. The 32,000 figure is likely based on the trial court's mistake in using the 31,515 figure instead of the correct, 127,504 figure. A holding is clearly erroneous when it is based on a factual finding that is materially inaccurate.

At oral argument, counsel for Mr. Duncan suggested that there might be some other explanation (such as undervote count from Gwinnett and Fulton Counties) for the 32,000 figure. There has never been a factual basis for this statement, and, in his May 10, 2019 Supplemental Brief, Mr. Duncan makes no attempt to substantiate it.

Instead of substantiating the statements made at oral argument, Mr. Duncan now takes a different tact, arguing that the trial court could have used other "yardsticks" other than .8%. Defendants did not make this argument at trial. Moreover, the suggestion that the trial court might have made other factual findings does not cure the trial court's clear error or provide a means for affirming the trial court's opinion as "right for any reason." Indeed, at this point, to use any yardstick other than .8% would be to reject an implicit factual finding of the trial court even though there was evidence to support it. *See supra* note 7.

10

Even if Defendants could explain away the trial court's error on the facts, none even attempt to defend the trial court's mistake on the law. The trial court quoted the formula from *Fuller v. Thomas,* 284 Ga. 397 (2008)*,* which calculates the contestant's hurdle by *adding the challenged undervote* to the stated margin of victory, a formula is so obviously wrong even the Defendants do not defend it. In prior briefings, Plaintiffs have repeatedly pointed this out,[10] but Defendants have never answered, effectively conceding the point. The trial court applied the wrong law to the facts, stacking error upon error. Even if the trial court's decision can be construed (despite what it says) as applying the *Mead* "margin of victory" standard, that too is not the correct standard in a case involving allegedly defective electronic voting: as Justice Peterson observed, the "margin of victory" formula would insulate from challenge an election result featuring a popular candidate who receives only 1% of the reported electronic vote. Where, as in this case, the electronically generated and unauditable reported totals (including the undervote

---

[10] Supplemental Brief of Appellants, April 30, 2019, at 19 ("Neither the trial court nor the Defendants explain the variables in the [*Fuller*] formula or why the formula applies to this election."); Brief of Appellants, at 24 ("The trial court did not explain why this formula applies to this case of why the Plaintiffs' burden of proof should increase with the number of undervotes."); *id.,* at n. 13 (illustrating absurd results caused by adding the challenged undervote total to margin of victory). For its part, Gwinnett reads the trial court's order as employing the *Fuller* formula, but does not explain why that standard applies to this case. (Gwinnett Brief of Appellee, at 17-18).

11

total) themselves are being challenged,[11] using the challenged reported totals to set the standard for relief is circular and illogical.

At some point, rewriting the trial court's analysis to force logic into it, to have it comply with the law, or to conform it to the evidence, is not fair to the process, to the parties, or to the institution. Here, the trial court not only cited to *Fuller*; the court quoted the *Fuller* formula in full. With all due respect, in doing so, and in making the plain error of fact in the same order, the trial court used the same level of care, attention and discretion that the trial court employed in making the other decisions in this case, such as affording only three days of discovery; rejecting out of hand the suggestion that a special master be engaged (R-1071); stating that the trial date could be moved if needed (T-16:21-23; R-1102) but then not moving the trial date because the court was "getting some pressure" to finish the case (T-112:25-113:5); stating the first day of trial that Plaintiffs' Motion to Compel had been denied (T-172:17) (it had not been); after giving the final opinion from the bench, refusing to allow Plaintiffs' counsel to speak on the court the trial court's math error (T-624:2, 10), and so on. This kind of arbitrary decision-

---

[11] Every election challenge, of course, features a challenge to the reported totals, but there are cases in which only a subset of the reported result is challenged. In *Mead*, for example, it was possible to determine the margin of victory, excluding the illegal ballots, by simply counting (in discovery) the ballots that correctly identified Howard Mead, and it was sensible to use that margin as a data point in making the determination as to whether the defects in the election cast in doubt the result. No comparative process can be used in a case like this one involving alleged configuration and tabulation defects in electronic elections. With discovery, however, the magnitude of the impact of defective programming or malfunctions can be assessed.

12

making cannot be affirmed in any case, much less a case of statewide importance addressing the integrity of the votes of millions of Georgians in a statewide election.

An affirmance in this case would be a precedent-setting opinion of national importance featuring a strained reconstruction of a facially flawed trial court decision on a factual record that was not developed because the trial court, in violation of the law, did not afford any party reasonable discovery. If ever there were a case that should not be affirmed as right for any reason, it is this one.

Respectfully submitted this 13th day of May, 2019.

/s/Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*Counsel for Appellants*

# CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing Third Supplemental Brief of Appellants upon all counsel of record by email addressed to:

Kaye Woodard Burwell
Office of the Fulton County Attorney
141 Pryor Street, NW
Suite 4038
Atlanta, Georgia 30303
Kaye.burwell@fultoncountyga.gov

*Counsel for Appellee Fulton County Board of Registrations and Election*

Bryan P. Tyson
Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
btyson@taylorenglish.com

*Counsel for Appellee Gwinnett County Board of Registrations and Elections*

Josh Belinfante
Robbins Ross Alloy Belinfante Littlefield LLC
500 Fourteenth St. NW
Atlanta, Georgia 30318
Josh.Belinfante@robbinsfirm.com

*Counsel for Appellee Secretary of State*

Edward H. Lindsey, Jr.
Dentons
303 Peachtree St. NE
Suite 5300
Atlanta, Georgia 30308
edward.lindsey@dentons.com

*Counsel for Appellee Geoff Duncan*

This 13th day of May, 2019.

/s/Bruce P. Brown
Bruce P. Brown
*Counsel for Appellants*