UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, et al.,          )
                                )
      Plaintiffs,               )
                                )     CIVIL FILE ACTION
vs.                             )
                                )     NO. 1:17-cv-02989-AT
                                )
BRAD RAFFENSPERGER, et al.,     )
                                )
      Defendants.               )
_____

DEPOSITION OF

JENNIFER DORAN

June 28, 2019

10:04 a.m.

Hall Booth Smith, PC

440 College Avenue

Suite 120

Athens, Georgia


Marsi Koehl, CCR-B-2424




**APG USA, INC.**
www.APGreporting.com
(770) 827-1223

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

1                        C O N T E N T S

2                    E X A M I N A T I O N

3

4                                                        Page

5    Examination by Mr. Brown............................5

6    Examination by Mr. Sparks..........................83

7    Examination by Ms. Anderson........................84

8    Further Examination by Mr. Brown...................88

9    Further Examination by Ms. Anderson................91

10

11                        E X H I B I T S

12   Plaintiff's
     Exhibit No.          Description              Page
13
     Exhibit 32           Subpoena
14
     Exhibit 33           Direct Record Electronic
15                        Voting Machine Recap

16   Exhibit 34           Ballot Image Report

17   Exhibit 35           Official Election Bulletin

18   Exhibit 36           November 6, 2018 General
                          Election Undervote
19                        Information

20   Exhibit 37           Rockdale County Board of
                          Elections Voting Equipment
21                        Issues

22

23
     (Original exhibits attached to original transcript.)
24

25

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

```
 1   APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiffs:

 3        BRUCE P. BROWN
          Attorney at Law
 4        BRUCE P. BROWN LAW, LLC
          1123 Zonolite Road
 5        Suite 6
          Atlanta, Georgia  30306
 6        (404) 881-0700
          bbrown@brucepbrownlaw.com
 7
          ADAM M. SPARKS
 8        Attorney at Law
          KREVOLIN HORST
 9        One Atlantic Center
          1201 West Peachtree Street, NW
10        Suite 3250
          Atlanta, Georgia  30309
11        (404) 888-9700
          sparks@khlawfirm.com
12
     On behalf of the Witness:
13
          CHRISTIAN HENRY
14        Attorney at Law
          HALL BOOTH SMITH, PC
15        440 College Avenue
          Suite 120
16        Athens, Georgia  30601
          (706) 316-0231
17        chenry@hallboothsmith.com

18   On behalf of the Defendants:

19        DAVID R. LOWMAN
          Attorney at Law
20        OFFICE OF THE COUNTY ATTORNEY
          FULTON COUNTY
21        141 Prior Street, SW
          Suite 4038
22        Atlanta, Georgia  30303
          (404) 612-0246
23        david.lowman@fultoncountyga.gov

24

25
```

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

```
 1    APPEARANCES OF COUNSEL CONTINUED

 2    On behalf of the Defendants:

 3         KIMBERLY ANDERSON
           Attorney at Law
 4         THE ROBBINS FIRM
           500 14th Street, NW
 5         Atlanta, Georgia   30318
           (404) 856-3265
 6         kanderson@robbinsfirm.com

 7
      Also present:
 8
           Marilyn Marks, Coalition for Good Governance
 9

10

11

12

13

14

15

16

17

18              (Pursuant to OGCA 15-14-37 (a) and (b) a

19         written disclosure statement was submitted

20         by the court reporter and is attached

21         hereto.)

22

23

24

25
```

APG USA INC.

```
1              P R O C E E D I N G S

2                  JENNIFER DORAN,

3    having been first duly sworn, was examined and

4    testified as follows:

5                    EXAMINATION

6    BY MR. BROWN:

7         Q.   Please state your name for the record.

8         A.   Jennifer Doran, D-O-R-A-N.

9         Q.   Ms. Doran, my name is Bruce Brown and I

10   represent the Coalition plaintiffs in this case.  I'm

11   going to be is asking you a number of questions that

12   I hope are clear, but if you don't understand the

13   question, please ask me just to rephrase it and I'll

14   try to do better.

15            It's important for the court reporter for us

16   not to talk on top of each other so that there's

17   question, break, answer.  Sometimes it's a little

18   unnatural, but we need to make sure we're not talking

19   on top of each other.  I'll try to do my best not to

20   interrupt you.

21            You've never had your deposition taken

22   before; correct?

23        A.   No.  Correct.

24        Q.   That's fine.

25            What is your current position?
```

APG USA INC.

1          A.   Elections supervisor for Morgan County.

2          Q.   How long have you been elections supervisor?

3          A.   Two years.

4          Q.   What did you do before then?

5          A.   I was at -- I was at home for a little while

6     and I was a real estate attorney before that.

7          Q.   So you've been to college and law school?

8          A.   Yes.

9          Q.   Where did you go to school?

10         A.   I went to Mercer University in Macon for

11    undergraduate and then University of Tulsa College of

12    Law in Tulsa, Oklahoma.

13         Q.   When did you graduate from law school?

14         A.   2001.

15         Q.   Describe generally your responsibilities as

16    elections supervisor for Morgan County.

17         A.   It's sort of all encompassing.  I do

18    candidate qualifying for municipal elections, also

19    for independent and county elections.

20              I am the ethics filing officer for all the

21    elected officials in the county and in the city.  And

22    then I conduct and oversee the elections which

23    includes scheduling polling place locations, which

24    are already set but -- excuse me -- setting up L&A,

25    the logistics and analysis testing.

1        Doing all of the legal notices that are

2   required.  Training poll workers.  Setting up

3   schedules.  And overseeing early voting.  And then

4   obviously postelection, getting all the reports

5   prepared for certification and sending over to the

6   Secretary of State and the Clerk of Superior Court.

7        Q.   To whom do you report?

8        A.   I -- the Board of Elections and

9   Registration.  It's a combined board.  They are the

10   ones that oversee the elections and do the

11   certification.  And I'm also secretary to the Board.

12        Q.   You described a number of responsibilities.

13        What staff do you have to help out in those

14   responsibilities?

15        A.   I have one deputy registrar and her

16   responsibilities are mostly voter registration.  And

17   then she does the absentee ballots.  She's the

18   absentee ballot clerk and she does the credit for

19   voting during early voting.

20        Q.   What's "credit for voting"?

21        A.   When you do early voting, you're actually

22   doing an application for early voting.  So when

23   you're going through the process of early voting, the

24   voter fills out that application and certificate.

25   And she enters it into ElectioNet that shows that the

Case 1:17-cv-02989-AT  Document 469  Filed 07/10/19  Page 8 of 115  Page 8
Curling et al. v.        Deposition of
Raffensperger et al.    JENNIFER DORAN              6/28/2019

1  voter has come in for early voting and voted, so it
2  gives them credit for voting.

3      Q.  Any other people who report to you?

4      A.  The poll workers, which are seasonal
5  workers.  And then I have a technical independent
6  contractor who comes in and helps me do L&A and helps
7  me on election day.

8      Q.  What is the name of your deputy?

9      A.  Sue Doorenbos, D-O-O-R-E-N-B-O-S.

10     Q.  What is the name of your independent
11  contractor?

12     A.  Jan Wilbanks, W-I-L-B-A-N-K-S.

13     Q.  And is she with a company or is she on her
14  own?

15     A.  She's on her own.

16     Q.  In a typical year, say last time you had to
17  hire poll workers, how many would you have to hire on
18  a temporary basis?

19     A.  For the 2018 elections, we had 31 poll
20  workers on election day.  And then we had two to
21  three poll workers who were not able to work on
22  election day but worked early voting.  So I think we
23  had 34 total that were trained.

24     Q.  How many different polling locations do you
25  have for election day voting?

1     A.   On election day, we have seven polling

2   locations.

3     Q.   And how many on early voting?

4     A.   One.

5     Q.   One.

6          I think you said January Wilbanks; is that

7   correct?

8     A.   Correct.

9     Q.   Can you describe the kind of work that she

10  does, in little bit greater detail, for you?

11    A.   She helps me with the machines doing the

12  L&A.   We -- she -- from the very beginning where we

13  program the memory cards that go into the TS units,

14  she helps me set up the L&A testing.

15         It's a pretty long process for each machine

16  and we have 50 to 70 machines that we work with, so

17  it's at least a two-person job.

18    Q.   Does she have like a license with the

19  manufacturer to do that or to work on those machines

20  or a certificate of some kind?

21    A.   She has done the training through the KSU

22  and she was doing this before I started.  So I'm not

23  sure when that happened.

24    Q.   Does she have some sort of nondisclosure

25  agreement or confidentiality agreement about the work

Curling et al. v.         Deposition of
Raffensperger et al.   JENNIFER DORAN            6/28/2019

1    that she does on your system?

2         A.   She has not signed one since I've been

3    there.

4         Q.   Okay.

5         A.   I am not sure what she signed before --

6         Q.   Sure.

7         A.   -- because she has been there multiple

8    years.

9         Q.   When you say "L&A," you mean logic and

10   accuracy?

11        A.   Correct.

12        Q.   I'm going to go through different topics and

13   I may jump around a little bit, but I'm going to try

14   to cohere around different groups of questions.

15             And the first topic that I want to talk

16   about is the concerns expressed by the Board about

17   the new implementation.  And have you discussed with

18   your Board the anticipated implementation of a new

19   voting system for Georgia?

20        A.   Yes, sir.  We had discussed in general

21   before HB 316 was voted into law or signed into law

22   the general guidelines -- or the general schedule.

23             And then after 316 was implemented, the

24   Secretary of State published a tentative schedule of

25   the machines, who would get the voting equipment,

Curling et al. v.          Deposition of
Raffensperger et al.    JENNIFER DORAN          6/28/2019

1  what phase.

2           And we have spoken briefly about that in one

3  meeting and then it was discussed in greater detail

4  the last meeting on June -- the June meeting.  I'm

5  not sure the date on that one.

6           Right now we are not going to get the

7  machines until phase 2 part 1.  And my understanding,

8  it's obviously after the November election but before

9  the March presidential preference primary.

10          And one of our board members expressed

11 concern about the timing, that we would only have

12 two months from the time we received the first

13 equipment to the time we can train the public, the

14 poll workers and staff until the presidential

15 preference primary in March.

16      Q.  Now, when did the Board -- which of these

17 meetings did she express those concerns?

18      A.  This was the June 2019 meeting.

19      Q.  Is that the most recent meeting?

20      A.  It is.

21      Q.  Meeting generally once a month or...

22      A.  The third Thursday.

23      Q.  Did you respond to the board member's stated

24 concerns about the implementation schedule?

25      A.  Yes, sir.  I did inform them that there had

Curling et al. v.           Deposition of
Raffensperger et al.    JENNIFER DORAN              6/28/2019

1   not been a contract -- has not been signed as far as

2   I know, that a new vendor has not been decided by the

3   Secretary of State.  So the -- the schedule of when

4   we would receive things has not been solidified.

5        Q.  I understand that Morgan County is not a

6   pilot -- is not on a pilot program; is that right?

7        A.  Correct.  We are not.

8        Q.  And your understanding is that -- is it your

9   understanding that all the counties have been

10  allocated into which phase or which part they are in

11  in terms of the implementation?

12       A.  Yes, sir.

13       Q.  And that Morgan slots into the phase 2

14  part 1; is that correct?

15       A.  Correct.

16       Q.  Your understanding is that that is -- that

17  the earliest that you would get machines, not

18  necessarily in November but after the November

19  elections.  Is that fair to say?

20       A.  Correct.

21       Q.  Do you have any more sort of definite

22  information on the time frame or will that have to

23  wait until the contract is signed?

24       A.  During that meeting, the Board asked that I

25  contact the Secretary of State.  So I reached out to

1   Chris Harvey, the elections director, and asked him
2   if there was a more definite timeline because our
3   board was concerned.

4          And he did say because they have not settled
5   on the contract -- I'm not exactly -- his exact
6   words.   But since the vendor had not been finalized,
7   there is no definite time frame and that he would let
8   us know as soon as he knew.

9      Q.   I'm not suggesting you should have, but I
10  just need to sort of get the lay of the land.

11         Did you express any concerns back to the
12  Board about the anticipated implementation schedule
13  and the burden it would place upon Morgan County
14  voters or your office?

15     A.   I did not express any concern.   Generally,
16  we train our poll workers about a month before the
17  election.   Obviously, with new voting equipment, we
18  want to do more extensive training.   But if we have
19  training in January, I feel like that would be enough
20  time.

21         However, the public probably would want more
22  time.   And the phase -- as far as I know, phase 2
23  part 1, we're only getting a limited number.   We're
24  not getting our full number of equipment.   So we're
25  getting five BMDs, one precinct scanner, the new GEM

1  server but not everything.  So we'll have a limited

2  number to train on and to show the public.

3       Q.  And then do you get the full complement

4  before the elections themselves?  Is that the

5  thinking?

6       A.  Yes, sir.

7       Q.  So you get sort of a training package first.

8  Is that the idea?

9       A.  Correct.

10       Q.  But is -- the first live real election would

11  be the presidential preference primaries in March?

12       A.  Yes, sir.

13       Q.  You mentioned poll worker training.

14           Who will train the poll workers and when

15  will they be trained, if that makes any sense?

16       A.  Yes.  The Secretary of State has tentatively

17  set up -- actually, there's not a tentative date.

18  But they have said the election officials will be

19  trained sometime in the fall of 2019.  So we will get

20  our training, just like we were trained initially on

21  the DRE equipment.

22           And then we -- I will do the training.  And

23  we have already -- I've already spoken with one of

24  our poll managers -- a couple of our poll managers,

25  that we will have the poll managers come in and do

Curling et al. v.              Deposition of
Raffensperger et al.   JENNIFER DORAN              6/28/2019

1  extra training who will then help me do full training

2  on all the poll workers, which gives them, the poll

3  managers, more training when you're having to teach

4  somebody else how to do it.

5       Q.   Try to break down all that's involved in

6  this.

7            It will be new voting machines; right?

8       A.   Yes, sir.

9       Q.   New electronic poll machines; correct?

10      A.   Yes, sir.

11      Q.   New scanners?

12      A.   Yes, sir.

13      Q.   You will have physical inventory of the

14  paper ballots that are produced by the ballot marking

15  device; correct?

16      A.   Yes, sir.

17      Q.   And then you mentioned GEMS software.

18           Do you mean sort of the equivalent of GEM

19  software for the new system or will it be the --

20      A.   My understanding --

21      Q.   -- same?

22      A.   I'm sorry.  My understanding is that we are

23  getting a whole new computer system --

24      Q.   Yeah.

25      A.   -- with new software that's updated.

1    Q.  And the system hasn't been selected yet, so

2   I guess the software hasn't been selected either

3   because it would -- one company is going to use

4   different software than another company; right?

5    A.  Correct.

6    Q.  And then I may have some more questions

7   about this in a second.  But the way the system works

8   now is that the Secretary of State builds the ballots

9   in the GEMS database in Atlanta.  And then the GEMS

10  database gets down to the counties to program the

11  GEMS servers in the counties.

12       Is it your understanding all that is going

13  to be done differently with the new system or has

14  that been established?

15   A.  To my knowledge, it has not been

16  established.

17   Q.  Getting back to your own sort of schedule.

18  You mention the poll worker training would be one

19  month before elections or early voting or what would

20  that be before?

21   A.  I usually do it one month before the

22  elections, so it usually falls about one to two weeks

23  before early voting starts.

24   Q.  Do you think that will be sufficient for the

25  new system to do it a month before or do you think

Case 1:17-cv-02989-AT  Document 469  Filed 07/10/19  Page 17 of 115 Page 17
Curling et al. v.        Deposition of
Raffensperger et al.    JENNIFER DORAN            6/28/2019

1  you need more time?

2      A.  I definitely need more time to train the

3  poll managers because they have -- everybody should

4  be competent to do the same job.  But the poll

5  managers are always the ones that do troubleshooting,

6  answer questions.  They are sort of a man of many --

7  or women of many hats.  So we plan on doing an

8  initial training on just the poll managers before

9  that and then the training for the poll workers.

10      Q.  So the election supervisors will get -- you

11  will get oriented to the new system in the fall?

12      A.  Correct.

13      Q.  And then after that, you will train the poll

14  managers?

15      A.  Yes.

16      Q.  And then after that, the poll managers and

17  you will train the poll workers?

18      A.  Correct.

19      Q.  Is that a fair summary?

20      A.  Yes.

21      Q.  This would be on -- at least for you in the

22  fall and for the poll managers thereafter, that would

23  cover probably every piece of the election system,

24  right, the electronic poll books, voting machines,

25  scanners, the whole process; correct?

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

1          A.   Correct, along with the paper ballots.

2          Q.   Paper ballots inventory, paper ballot

3    security; things like that?

4          A.   Correct.

5          Q.   And then the poll workers would get some

6    subset of that or most of that also of that training

7    or would it depend?

8          A.   They all receive the same training.  The

9    assistant poll managers -- by law you have to have

10   one poll manager and two assistants and then we have

11   poll workers.

12              We train them all exactly the same so that

13   if something were to happen, the poll manager

14   assistant can move up to poll manager.  They should

15   all be able to do the exact same job.

16         Q.   With your scanners, do you have -- currently

17   do you have a scanner in each precinct?

18         A.   We do not have a scanner in each precinct.

19         Q.   Do you have a central scanner?  I mean, do

20   you have centralized scanning?

21         A.   We do.  Yes, sir.

22         Q.   Where is that?  Is that the county office?

23         A.   It is in our office.

24         Q.   How would that work with BMDs, do you know,

25   with the new system?

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN                6/28/2019

1        A.   My understanding is that each precinct would

2   have their own scanner.   We've -- I've gone to the

3   capitol.   I've gone to a couple of the safety

4   commission meetings that actually have the equipment.

5   I'm not overly familiar but a general idea.

6             And then we had an ES&S presentation at one

7   of our regional meetings where you do the scanner at

8   the precinct and then the tabulation where you have

9   the -- the paper which is what you print out on each

10  DRE, you would only have one of those -- excuse me --

11  plus the electronic data plus the paper ballot.   And

12  you would take that in and do a central -- excuse

13  me -- a central tabulation at the precinct -- I mean

14  at the office.

15             MS. ANDERSON:   I'm sorry.   Were you just

16        describing the process for DREs or BMDs?

17             THE WITNESS:   Of the BMDs, but I was

18        talking about the poll tape from the scanner

19        like the poll tape from each DRE.

20             MS. ANDERSON:   Okay.   Got it.   Thank

21        you.

22  BY MR. BROWN:

23        Q.   When is it anticipated that you would

24  actually be trained on sort of the software

25  management system that would be equivalent to the

1   GEMS system today?  Do you know when that's going to

2   happen?

3        A.   I do not.  I assume -- excuse me -- it will

4   be in the fall when we get our hands on and training

5   for the BMDs.  So that would be part of it.

6        Q.   It sounds like you've been sort of thinking

7   ahead.

8             Have you been asked by the Secretary of

9   State to sort of publish a schedule that you

10  anticipate or is this just something you're doing on

11  your own to do your job?

12       A.   This is something I've been doing on my own

13  sort of trying to look ahead.

14       Q.   Sure.  So you haven't been required by the

15  Secretary of State or somebody saying, Give me your

16  plan for implementation, or anything like that?

17       A.   No, sir.  I have not.

18       Q.   Do you know -- well, it's your understanding

19  that the State is going to pay for the machines

20  themselves; is that right?

21       A.   That's my understanding.

22       Q.   And then the counties are going to pay for

23  the maintenance on the machines.  Is that your

24  understanding?

25       A.   I spoke with Ted Duval at the Secretary of

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN              6/28/2019

1   State's Office during our GEOA-VRAG -- G-E-O-A dash
2   V-R-A-G -- conference in March this year and asked
3   him -- someone in our community had expressed
4   concerns about the maintenance and upgrade fees.  And
5   so I asked him.  And he said at that time they did
6   not know.  That was something they didn't know, so we
7   don't know.
8        Q.   Same thing with -- I mean, not just
9   maintenance but other sorts of operational costs,
10  like service or license fees.
11            Do you know how that is going to be handled,
12  just sort of the ongoing costs of using the
13  equipment?  Do you know how that's going to be
14  handled?
15       A.   That was part of the question I asked,
16  license, maintenance.  I know that some -- when they
17  were doing the RFIs, they had some breakdown of, you
18  know, the warranty and then the extended warranty,
19  but we do not know.
20       Q.   Do you have in your budget a line item for
21  that or has that been allocated for you?
22       A.   We have not put that in our budget.
23  Unfortunately, since we do not know what system we're
24  going to be using and the cost for that system, we
25  have not budgeted for that.

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

```
 1        Q.  You don't know the cost or how much the
 2   State is going to pay of it?
 3        A.  Correct.
 4        Q.  Do you know how many machines you will get
 5   ultimately?  You said five for training, but what's
 6   the total number for Morgan County, plus or minus?
 7        A.  Somewhere between 50 and 70.
 8        Q.  Is that about how many DREs you have?
 9        A.  That is.
10        Q.  How many registered voters are there in
11   Morgan County?
12        A.  We currently have a little over 14,100
13   registered voters.
14        Q.  Let me ask you some questions about the work
15   that your office does for municipalities.
16        A.  Okay.
17        Q.  Just by way of background, there's --
18   municipalities will conduct their own elections in
19   some instances; correct?
20        A.  Correct.
21        Q.  And in Morgan County, there are a lot of
22   municipalities, but which ones do their own elections
23   from time to time in Morgan County?
24        A.  Currently, we have -- we have four
25   municipalities and all four municipalities have IGAs
```

APG USA INC.

1   with our Board for us to conduct their elections.

2        Q.   That's Madison.   Who else?

3        A.   Madison, Bostwick, Buckhead and Rutledge.

4        Q.   By "IGAs," you mean intergovernmental

5   agreements?

6        A.   Correct.

7        Q.   So you by contract run their elections?

8        A.   Yes, sir.

9        Q.   Okay.   Your staff -- as if it were a county

10  election, you're just doing it through contract with

11  the municipalities; is that correct?

12       A.   Yes, sir.

13       Q.   And would that continue as far as you know

14  with the BMDs?

15       A.   Yes, sir.   They have not made any

16  indications -- I think most of our IGAs are 40 years

17  unless there are any changes.

18       Q.   Stepping back to the implementation of the

19  new system, have any plans been made for how the

20  county is going to audit the election results?

21       A.   Currently, there are no steps that we've

22  taken to set up an audit system.   I know that the

23  Secretary of State will be setting up the required

24  audit.

25            So we've been waiting -- obviously, we have

 1  to wait for the new system and then the new processes

 2  which would include the postelection audit process.

 3       Q.   Have you received from the Secretary of

 4  State, or otherwise, procedures for how to secure the

 5  paper ballots once they are -- either before or after

 6  they are voted upon, if that's the right expression?

 7       A.   We have not yet.

 8       Q.   Today you -- you use paper ballots today,

 9  correct --

10       A.   Right.

11       Q.   -- for provisional and for absentee ballots;

12  correct?

13       A.   Yes, sir.

14       Q.   And you have processes in place now for the

15  security of the ballots themselves; is that right?

16       A.   Yes, sir.

17       Q.   Do you know what the ballots themselves are

18  going to look like with the new system, just

19  physically?

20       A.   I have seen the ballots for the vendors that

21  have come to the meetings, you know, either this

22  or -- they don't look like our paper ballots that we

23  send out for early voting and that we do on

24  provisional -- I know one vendor and -- I don't

25  remember the name -- actually produces a ballot that

1  looks like a ballot that we would produce.

2       Q.  That's the Clear -- what's it called?  The

3  Clear --

4            MS. MARKS:  Clear Ballot.

5  BY MR. BROWN:

6       Q.  Yeah, Clear Ballot.  Is that their name?

7       A.  I think so.

8       Q.  And then the others look more like long

9  receipt from Staples; right?

10      A.  Right.

11      Q.  Do you know what I'm talking about?  They

12  give you --

13           MS. ANDERSON:  You mean CVS?

14  BY MR. BROWN:

15      Q.  It just goes on.

16      A.  I think it was Old Dominion -- let me take

17 that back.  I don't know because we saw so many.

18           At the beginning there were about eight that

19 were presenting.  And then, of course, HB 316 changed

20 how it has to look.  You can't just have a QR code.

21 It actually has to be printed.

22           So early in the process we saw ones that

23 just had a little QR code that were a small piece of

24 paper.  And, of course, we see the ones that are like

25 the thermal that have the bar code and then --

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN              6/28/2019

1   printed on there.

2       Q.   And then so the thermal one would be blank

3   before it gets fed into the machine; is that right?

4       A.   Correct.

5       Q.   And the machine would print everything that

6   you see on that; is that right?

7       A.   Yes, sir.

8       Q.   So there's nothing distinctive about a blank

9   one?

10      A.   Correct.

11      Q.   And that would be different than the way you

12  inventory and manage paper ballots now; correct?

13      A.   Correct.

14      Q.   Are there any guidelines that you've seen

15  for how you secure the -- you might secure the blank

16  to-be-printed ballots in a new system?

17      A.   We have not seen any of those guidelines

18  yet.

19      Q.   Describe for me just once again -- I was a

20  little unclear on your understanding of how with the

21  new system, the votes results get transferred or

22  would get transferred from the precinct to the

23  central and the various media that that would

24  involve.

25      A.   Okay.   I'm just going to use ES&S

1   just because that's what we currently use and I'm

2   familiar.

3           Once you print out the ballot on the ballot

4   marking device, you go over to the scanner.  It scans

5   in.  It reads it.  It drops it into a secure ballot

6   box in the big box that the scanner is sitting on.

7           At the end of the night, you print the

8   results tape just like you would on a DRE.  There is

9   a removable media, whether it's a USB or a memory

10  card.  So you have them electronically, but then you

11  have the paper that you pull out the ballot box.  You

12  seal it and carry back to the precinct.

13      Q.  So you probably have three things

14  altogether.  You would have the results tape that's

15  printed by the scanner is one; correct?

16      A.  Correct.

17      Q.  And then you would have on some type of

18  memory card, an electronic version of the results

19  tape; is that correct?

20      A.  Correct.

21      Q.  And then the third thing you would have is

22  the box of the actually receipts that the individual

23  voter prints out and puts into the scanner; is that

24  right?

25      A.  Right.  The paper ballots is --

1       Q.   Okay.  And then those get toted to the

2   central office --

3       A.   Correct.

4       Q.   -- for appropriate tabulation?

5       A.   (Witness nods head affirmatively.)

6       Q.   You need to say "yes"?

7       A.   Yes.  I'm sorry, yes.

8       Q.   And I take it it would probably be -- the

9   memory card would be shoved into some sort of

10  tabulator.  Is that how they would do it?

11      A.   My understanding is that those would be fed

12  into the GEMS server, however it gets there.  And

13  then we centrally process through the GEMS server.

14          MS. ANDERSON:  And, Bruce, I'm just

15      going to object to this line.  I know you

16      were talking about the implementation as

17      going forward.  But know I feel like we're

18      really getting into BMDs and what they do.

19          As you know, we've kind of objected to

20      go -- we think that's outside the scope of

21      discovery at this point.  You know, and

22      obviously there's not a system in place, so

23      there's only limited knowledge about that

24      security.

25          So I'm just going to object and have

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

```
1            that on the record.  We believe a lot of
2            this is outside the scope of discovery at
3            this point.
4    BY MR. BROWN:
5        Q.   Today, how do you secure provisional
6    ballots, blank provisional ballots?
7        A.   They are sent in a manager's bag that's
8    picked up and it's in a provisional bag that has a
9    seal on it, which is then broken at -- when we first
10   do the provisional ballot, the first provisional
11   ballot.
12            It's a bag that has two openings where we
13   put the supplies in.  And then it also has another
14   secure section that you put the voted provisional
15   ballots.
16       Q.   I may come back to some of these questions.
17            Did you in 2018 consider the possibility of
18   Morgan County moving to hand-marked paper ballots
19   instead of using the DREs?
20       A.   During -- after the plaintiffs in the
21   Curling case had filed a motion to move to paper
22   ballots, the judge had not made a decision at that
23   point.  There were some local citizens who came to
24   our board meetings to ask the Board to consider
25   moving to paper ballots.
```

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

1           There was a resolution from one of our board
2    members that was presented to the Board for
3    consideration to move to paper ballots.

4           Before -- let me back up.  Before the
5    resolution was, about that time -- I can't say one
6    way or the other.  It's been a few months.  A
7    resolution had been presented to move to paper
8    ballots and it was voted down two to three.

9           We had -- the Board asked me to reach out to
10   Christian Henry and to the State to see if that was
11   even an option.  And the feedback we received from
12   both of them was that we could not.

13          And during that process, the Board in a
14   three to two decision decided to wait until the Court
15   or the law changed how we did voting.

16       Q.   In connection with that consideration, did
17   you evaluate the feasibility of Morgan County
18   switching to hand-marked paper ballots from an
19   operational standpoint?

20       A.   Yes.  As part of the Board asking me to
21   reach out to the county attorney and the Secretary of
22   State, they also asked me to do a cost analysis on
23   that, which included precinct scanners, the cost,
24   because currently we do not have precinct scanners at
25   the precincts.

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN                6/28/2019

```
 1              We would -- so I did -- I looked up -- or I
 2    got price quotes for precinct scanners along with
 3    secure ballot boxes.  They do have it where the --
 4    once you feed the ballot into the scanner, it drops
 5    into a ballot box.  So it's automatically secured,
 6    so we don't have -- you know, as long as you've
 7    secured that box, you have a secure ballot.  And I
 8    presented that information to the board.
 9         Q.   So that the unit is a precinct scanner with
10    a secure ballot box attached to it.  Is that what it
11    is?
12         A.   Correct.
13         Q.   How much did those cost?
14         A.   They cost -- the scanner plus the ballot box
15    was about $1,300 per precinct.
16         Q.   So for you, it would be times seven?
17         A.   It would be times eight for the early
18    voting.
19         Q.   Are these the -- does this use the same sort
20    of AccuVote software as the current system?  Are they
21    compatible with what's used now, if that makes any
22    sense?
23         A.   Yes.
24         Q.   And those would -- the output would feed
25    into your current system the same way?
```

1      A.   They would, yes.

2      Q.   Because you have scanners now that feed into

3 your county GEMS database; correct?

4      A.   Right.   We do.

5      Q.   So you would just be adding precinct

6 scanners to handle the additional paper ballots that

7 would be coming in if you switch to paper ballots.

8 Fair to say?

9      A.   Yes, sir.

10      Q.   Did you price ballots themselves?

11      A.   I did.   Currently, our paper ballots -- of

12 course, we only print paper ballots for absentee and

13 provisionals.   It's not a very large number.   We

14 don't have a large population.

15          We pay 40 cents -- we pay 40 cents a ballot,

16 so I priced it at that.

17      Q.   Did you suggest that you might get a better

18 deal if you -- was it your suggestion you might get a

19 better deal if you had more volume or do you know if

20 you would?

21      A.   I remember when I was compiling the

22 information for the subpoena that I had asked our

23 ballot printer if we would get a per-ballot discount

24 for a larger -- and he had called me to talk to me

25 and, as I recall, he never gave me an answer.

1        Q.   Okay.

2        A.   But --

3        Q.   Just like anybody else you do business with.

4        A.   Yeah.

5        Q.   If you ask three questions, you get an

6   answer to the first one.

7        A.   Right.

8        Q.   I've been there.

9             And then how many -- if you were -- if you

10   were making the switch to hand-marked paper ballots,

11   how many paper ballots would you order?

12        A.   Unfortunately, that's hard to say.  In 2018,

13   as we all know, we had a tremendous turnout in the

14   general election.  If we had looked at the numbers

15   for 2014, which are the same races that you would

16   think would be the same percentage, we would have

17   been quite a bit short.  We had a 20 percent increase

18   in voters.

19             So, you know, and then like 2020 -- in 2016

20   we had over 80 percent turnout.  If you have that

21   much of a change, you would want to have at or close

22   to a hundred percent.

23        Q.   That's based upon your projection of turnout

24   plus a reasonable margin, is that fair to say --

25        A.   Correct.

1    Q.   -- would be the thinking that you would use?

2    A.   Yes, sir.

3    Q.   You would need those at the start -- by the

4  start of early voting, you need to have your stock

5  already printed?  Right?  You'd have your whole

6  carton of ballots by the start of early voting?

7    A.   We would.

8    Q.   Did you consider any other sort of

9  logistical issues in moving to hand-marked paper

10  ballots other than the cost of the scanners and the

11  price of the ballots?

12    A.   The actual procedure.  Right now we have a

13  set procedure that is guided by the Secretary of

14  State of how you handle a voter from the time he

15  walks in to the time he walks out.  Like every

16  procedure we do is dictated already.  Every poll

17  worker in the state knows that you do this, this and

18  this.

19         There is no real procedure that I am aware

20  of of how you do paper ballots, how you make sure

21  that you're getting the right district combo so that

22  you have the right ballot style; that you make sure

23  that somebody is not bringing in their own ballot

24  already made up or that they are putting more than

25  one in.

1        We don't have that procedure in place, so we

2   would have to have some type of procedure and

3   guidance on the actual procedure and logistics of

4   that.

5        Q.   One option is -- just to sort of cut to the

6   chase, is the option that we're advocating in our

7   lawsuit is that the -- at least preliminarily for

8   this year and for next year, that the GEMS system,

9   ballot building, GEMS database, delivery to the

10  counties, ballot printing; and then on the other side

11  of the vote, the scanning and tabulation remain the

12  same but that the interface with the voter change

13  from the electronic machine to the tender of a paper

14  ballot.

15       So that's -- in broad strokes, that's the

16  relief that we're seeking.  And I want to focus on

17  that particular relief.

18       If done that way, there would be many steps

19  that would be the same; correct?

20       A.   Correct.

21       Q.   Today, you receive from the Secretary of

22  State the GEMS database with -- with the

23  information -- wait, wait.  Let me back up a second

24  because I had the wrong understanding of this.

25       Today the Secretary of State will actually

1   order the paper ballots for you, is that correct,

2   pursuant to your instructions?

3        A.   They do not.

4        Q.   How does that work?  How do you order your

5   paper ballots?

6        A.   I'm going to back up just a little bit.

7        Q.   Sure.

8        A.   We do our ballot proofing to make sure all

9   our candidates are on there, that the names are

10  spelled right, that the audio is all correct.

11       Once we sign off on the ballot proofing back

12  to the Secretary of State, they have -- they send

13  that information to our ballot printer, but then I

14  send how many of each type of ballot.

15       Q.   Are they like PDFs that go to the printer

16  from the Secretary of State then?  Is that the form

17  or is there some other type of media that goes from

18  the Secretary of State to the printer?

19       A.   I do not know that.  I know that I sign

20  off -- there's actually a ballot sign-off sheet.  I

21  list our printer that we've been using for multiple

22  years, that the ballots that they send me, the proofs

23  are correct, and I do not know how that's

24  transmitted.

25       Q.   But the ballots go from the Secretary of

1   State to your printer and you tell the Secretary of

2   State which printer to use; correct?

3        A.   Correct.

4        Q.   And then you tell the printer how many you

5   want?

6        A.   Correct.

7        Q.   And you pay them?

8        A.   Correct.

9        Q.   And then today, how do you decide how

10  many -- what number per ballot style you order?  Is

11  that based upon the same anticipated turnout or --

12  for absentee or how do you know that?

13       A.   We -- I do.  We kind of look at the trend of

14  this is a more voted year -- I don't know how to say

15  that, but more people are voting; and that we look at

16  the numbers compared to the same races.

17            So we looked at 2018 -- or we looked at 2014

18  to kind of gauge '18.  And we woefully miscalculated.

19  We had quite a few -- large number of turnout.  We

20  also had -- I know there was an initiative to do

21  paper ballots, so we had a very large paper ballot

22  voting.

23            So we did a couple of reprints for certain

24  precincts.  But that's what we do.  We just sort of

25  do a, you know, hopefully educated guess but a guess.

1    Q.  Back to the feasibility.  Did you understand

2  the vote was three to two --

3    A.  Correct.

4    Q.  -- to not adopt paper ballots?

5        And a part of what -- well, the advice you

6  received -- just to sort of skip steps, the advice

7  you received from the lawyers was that Morgan County

8  could not on its own decide to conduct a paper ballot

9  election; is that correct?

10    A.  Correct.

11    Q.  Have you received any additional new advice

12  on that issue from anybody?

13    A.  At the same time Chris Harvey also gave me

14  very similar to what the legal opinion that we had

15  received from our county attorney.

16    Q.  Have you received any update since Judge

17  Totenberg issued her decision in September as to

18  whether the counties have the authority on their own

19  to conduct hand-marked paper ballots?

20    A.  We have not.

21    Q.  Okay.  So you looked at the pricing of the

22  scanners and the ballots and you considered sort of

23  the general feasibility.

24        Were you favorably inclined just yourself --

25  I know you would follow what the Board told you.  But

Curling et al. v.          Deposition of
Raffensperger et al.    JENNIFER DORAN                    6/28/2019

```
 1   were you favorably inclined to go with hand-marked
 2   paper ballots then?
 3       A.   I didn't really have -- I can see the
 4   argument both ways.  I thought that it would create
 5   more confusion because I know the HB 316 -- I don't
 6   think it was HB 316 at the time, but it was in the
 7   works.  It had already failed in the previous
 8   legislation and I know they were going to reintroduce
 9   it.
10            I was not in favor of moving to paper
11   ballots for one election and then starting a new
12   voting equipment system another year.
13       Q.   Right.
14       A.   I know that that was one of -- one of the
15   concerns is switching so late, but also if we're
16   going to get some type of new voting equipment,
17   whether it was BMDs or hand-marked or whatever, that
18   we switch and then we switch again.
19       Q.   I take it part of your assessment is based
20   upon your presumption that the DREs are secure;
21   correct?
22       A.   Correct.
23       Q.   If your assessment of that changed, you
24   could very well change your judgment on whether
25   hand-marked paper ballots are better to go with right
```

1   now; right?

2        A.   Correct.

3        Q.   I'm not suggesting that this is your job or

4   that you should have.  Right?  I just need to ask.

5            But have you reviewed the material from, for

6   example, the National Academy of Sciences or other --

7   or from the federal government about the

8   vulnerability of DRE machines?

9        A.   I have read several articles and papers that

10  have been submitted and have been written.  I cannot

11  tell you exactly who wrote those because there is a

12  plethora of it out there.

13       Q.   Sure.

14       A.   But I have seen articles about the security

15  about the DREs.

16       Q.   And your board has presumably seen some of

17  those reports also; is that right?

18       A.   Correct.

19       Q.   A subselection of it?

20       A.   Yes.

21       Q.   Is the Board going to reconsider that issue

22  this year 2019 about hand-marked paper ballots as far

23  as you know?

24       A.   I know that there is one board member that

25  would like hand-marked paper ballots, so I'm -- my

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

1  guess is that it would be brought up again for

2  discussion in the next couple of months.

3          Obviously, with the municipal elections in

4  November, it would have to be discussed fairly

5  quickly.

6      Q.   So in November you have elections in some of

7  your municipalities or all of them?

8      A.   Three of our municipalities have elections:

9  Buckhead, Rutledge and Madison.

10     Q.   Are there any other elections between now

11 and the end of 2019 in your world?

12     A.   No, sir.  None scheduled.

13     Q.   How about in 2020 before the presidential

14 preference primaries; are there any scheduled?

15     A.   No, none scheduled.

16     Q.   Could a SPLOST sort of kick up quickly or

17 something like that?

18     A.   We just passed a T SPLOST in March of '19

19 and the regular SPLOST was in May of '18.

20          I know that the E SPLOST will be coming up

21 in the next year or two.  I'm not really sure when

22 that's set to renew.

23     Q.   What's the E SPLOST?

24     A.   Education.

25     Q.   You don't know when that's coming up?

1       A.   No.   It's either going to be '20 or 2021.

2       Q.   Any other elections that you -- you have the

3  presidential preference primary.   You have the

4  November municipal elections.   And then to the best

5  of your current knowledge, you don't have any

6  contrary information, there may be SPLOSTs sometime

7  later in 2020.   Is that a fair summary?

8       A.   Possibly.

9       Q.   Because some of these elections like a

10  SPLOST can come up quicker?

11       A.   Correct.   Generally, it's considered a

12  special election.   And if you do a special election

13  in conjunction with a general election, which is what

14  they try to do because it minimizes cost, you get a

15  better voter turnout.   If they are coming in for

16  something else, you might as well put it on there.

17       Q.   If you want a bigger turnout?

18       A.   Right.   Or you may not.   But you have to do

19  the call 90 days in advance, so we have at least a

20  three-month notice.   If it's done in November of

21  2020, it would have -- the call would have to be in

22  early August.   So we would know by late July of 2020

23  if that's going to be added on there.   Unless it's a

24  separate election, then they only have to do it

25  30 days in advance.

1       Q.  Have you -- have you considered -- well, let

2   me back up little bit.

3            You have 50 to 70 DRE machines; is that

4   right?

5       A.  Correct.

6       Q.  To do a DRE voting machine election, just

7   walk with me at sort of a medium level what you have

8   to do with those DRE machines, like taking them out

9   of storage, using them, putting them back into

10  storage; sort of the whole process.

11      A.  Okay.  We have a storage room on site at my

12  office.  It's a secured storage room.  We actually

13  store and do our L&A process in there, so we don't

14  have to move it from one location or one room to

15  another.  We do it all in the same location.

16           Once we do our L&A, obviously, we keep them

17  sealed and stored.  And then we have our maintenance

18  staff and usually a board member comes out and helps

19  us set up the equipment.

20           The election happens.  And then the same

21  people then go and do the reverse where we then pack

22  everything up.

23      Q.  Seal it --

24      A.  Well, the sealing is done by me, the initial

25  sealing after L&A is done ready for election.  As

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

1  part of the closing process, the poll workers seal

2  them again and then they are brought back sealed to

3  our office.

4      Q.  If you switch to hand-marked paper ballots,

5  you could do it with the same staff that you have

6  now; correct?

7      A.  We could.

8      Q.  Right.  And you'd be shifting work around,

9  but it would be labor that you'd use your existing

10  overhead if it were to take care of.  Does that make

11  sense?

12      A.  Yes.  And that's correct.

13          MR. BROWN:  I need to get some water.

14      You want to take about a five-minute break?

15      Is that okay with you?

16          THE WITNESS:  Yes.

17          (Recess from 11:02 a.m. to 11:14 a.m.)

18  BY MR. BROWN:

19      Q.  First, I want to go through and clarify.

20  Some of my questions weren't very good.  And so this

21  is going to review a little bit, but I just need to

22  make sure the record is clear.

23          On the provisional ballots today, the way

24  they are secured today, you -- you will make an order

25  for paper provisional ballots today, correct --

Curling et al. v.            Deposition of
Raffensperger et al.   JENNIFER DORAN                    6/28/2019

1        A.   Correct.

2        Q.   -- based upon some calculation that you make

3    on your need for them, the number of those; correct?

4        A.   Correct.

5        Q.   Could you walk me through how those

6    provisional ballots are secured?

7             You get them from the printer and then what

8    happens?

9        A.   Until election day they are secured in my

10   storage room, which is -- well, there's no access but

11   me.  And then they are put in a bag that has a seal

12   on it, which is on the paperwork the poll manager

13   has.

14            And then it's given to the poll manager

15   directly.  They're not left at the precinct.  So she

16   or he have it in their possession until they get to

17   the precinct.

18       Q.   And the provisional ballots will be in use

19   for early voting and election day voting?

20       A.   The paper ballots that we received -- or we

21   receive, they are marked as absentee, slash,

22   provisional, slash, challenged.  So they do have

23   stubs on them and we pull off the first however many

24   we set aside for provisionals.  But they are the

25   exact same ballot as if you send in an absentee

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN                6/28/2019

1   ballot request.

2        Q.   So walk me through.   You give them to the

3   poll manager in the sealed envelope?

4        A.   Correct.

5        Q.   And then as he needs them, he pulls them out

6   and gives them to a provisional voter; is that right?

7        A.   Correct.

8        Q.   And then what do you do with the unused

9   ballots?

10        A.   Those are returned on election night.   The

11   poll managers come by on Monday when they pick up the

12   express polls and they have a big manager's bag that

13   has all their instructions, the provisional ballots

14   and various supplies that they need.

15            And they bring that bag back that has the

16   completed provisional or used provisional, any spoil

17   provisional and unused ones and they are returned

18   back to me that night.

19        Q.   And then do you keep a record of what you

20   get back?

21        A.   Correct.   There is a provisional ballot

22   recap sheet that I fill out some of the information

23   for the poll manager.   I list how many ballots that I

24   provide.

25            Say there's -- in a small election they

```
 1    might get 10.  It has it on the recap sheet that 10

 2    were provided.  And she -- I say "she" because until

 3    this last election, all of our poll managers were

 4    women.  So I'm just going to keep saying "she."

 5            She goes through the paperwork along with

 6    the assistant poll managers because it requires three

 7    signatures, but she actually has to record how many

 8    were used or completed, how many were spoiled and

 9    then how many were returned unused.

10            And by the time you finish the paperwork,

11    spoiled, used and unused should match the number that

12    I gave you that is 10.

13        Q.   It better add up?

14        A.   Yes.

15        Q.   And then the voted -- what happens with the

16    voted provisional ballots?

17        A.   On the back of that bag is a sealed

18    container that the voter actually puts the first seal

19    on it when it's sealed so that it's empty to begin

20    with.  And then there's a little slot that you slide

21    it into.  And then at the end of night, we break the

22    seal and pull out the provisionals.

23        Q.   The end of the night on election day?

24        A.   On election night.

25        Q.   And then there's a process for reviewing the
```

1  provisional ballots?

2      A.  Correct.

3      Q.  Do the provisional ballots come on a -- like

4  a stub with a number on them or something or are they

5  just loose?  Are they in a pad?

6      A.  They are not in a pad, but there is a stub

7  with a number on it, one through 50.  Generally, in a

8  smaller election, that's something we order.  We

9  never have used more than 50 until this last year.

10         But -- so what we do is -- that it would say

11  that we gave number one to John Smith, who's a

12  provisional voter.  However, because it's pulled

13  apart and you have to keep the stub, so the stubs are

14  returned to us.  If there are two provisional

15  ballots, you're going to give me a stub that says one

16  and two and that's part of the paperwork with the

17  provisionals.

18         And, obviously, because you separate it,

19  there's not a one or a two on the ballot.  So we know

20  that one and two were used, but we don't know which

21  is which.

22      Q.  Let me switch gears, you mentioned a Mr. Ted

23  Duval.  Was that the name?

24      A.  I know his name is Ted and for some reason I

25  think -- he is the assistant election director or

1  deputy election director.  I'm not sure his title.

2  He's fairly new, but he works under Chris Harvey.

3      Q.  The subject matter of that discussion was

4  who was going to pay what for the license and the

5  warranty and maintenance; is that right?

6      A.  Correct.

7      Q.  And has the Board expressed any concern over

8  those costs?  Do you recall?

9      A.  I don't recall.

10      Q.  Are you aware of any estimates of those

11  costs for 50 to 70 BMDs?

12      A.  Actually, one of our citizens had sent

13  something to, I think, one of our county managers or

14  county managers and one of our commissioners with

15  concerns of how much they are.  She had provided the

16  RFI from ES&S which is one of the vendors that

17  submitted that has the breakdown per BMD, per express

18  poll and per the GEMS server, any license fee, update

19  maintenance; and then provided those numbers and

20  said, you know, the county will most likely be

21  responsible for that.  And that's when -- about the

22  time I had the conversation.  We went to the

23  conference and I asked Ted about that.

24      Q.  Okay.  Did he give you any estimates?  Did

25  Ted give you any estimates that corroborated that or

1  conflicted with the numbers that you had received

2  from the citizen?

3       A.   I didn't ask specific numbers.  I did ask

4  him who will be paying those fees.  And he said

5  because they hadn't even started the RFP process

6  because this was in March of '19 and I think the due

7  date was mid-April of when they were going to turn in

8  their proposals, that they did not -- they had no

9  idea who was -- who was going pay what.

10      Q.   That's still the case right now from all you

11  know.  You don't know --

12      A.   Correct --

13      Q.   -- any other information.

14      A.   -- as far as I know.

15      Q.   On the hand-marked paper ballots, not the

16  BMDs but the real hand-marked paper ballots, have you

17  discussed with your board about the benefits of the

18  auditability of hand-marked paper ballots?

19      A.   Obviously, right now there's very limited

20  auditability in what we have.

21      Q.   Right.

22      A.   We -- we will do a postelection audit.  We

23  actually -- you-all had filed a motion for injunctive

24  relief probably in September, October of '18 that

25  requested -- there are about five requests from

1  you-all to Totenberg.  And I'm not sure if it was
2  ever ruled on or ruled on in time.

3        But I had reviewed that motion.  And one of
4  them was to do -- require the counties to do an audit
5  on paper ballots.  And I presented that to the Board,
6  all of those.  There were a couple of them that were
7  on a state level that we could not do, you know, with
8  express polls or things that are outside of our
9  purview.

10        And the Board voted.  So we did do an
11  election -- postelection audit precertification on
12  some of the precincts on some of the races, the
13  contested races.  So we did that.

14        One of the other ones was doing an audit of
15  the poll tapes from the DREs that, obviously, we post
16  a copy on the precinct, but we have a copy in our
17  office.

18        We reviewed the polling precinct tapes
19  versus what the GEMS database came up with those
20  numbers and compared that they were the same.

21     Q.  Have you -- those audits were audits that
22  had been recommended with respect to the existing
23  system; is that right?

24     A.  Correct.

25     Q.  Okay.  Has -- have you or the board

1  considered the benefits of the true auditability that

2  you would gain from having hand-marked paper ballots?

3  Has that been something the Board has addressed?

4      A.  We have had informal discussions about BMD

5  versus hand-marked paper ballots.  I know that we had

6  a discussion outside the meeting with one board

7  member and someone from the public about

8  auditability -- auditability of BMDs.

9           And I know that that is one of the concerns

10 that's brought up; that you can, in that board

11 member's opinion -- you can do a postelection audit

12 on BMD paper ballots when you compare what the

13 electronic count is versus the hand count later on.

14           I'm not sure if that answered --

15     Q.  Right.  Was there some discussion about the

16 problems with the auditability of a BMD result or how

17 reliable that is?

18     A.  Informal discussions outside of the board

19 meeting.

20     Q.  And then -- okay.

21           I think it's because I used too many

22 pronouns, but I asked you some questions about the

23 discussions and the communications you had with the

24 Secretary of State about whether Morgan County had

25 paper ballots by themselves.  I need to ask those

1   again.

2        A.   Okay.

3        Q.   Is it my understanding that the Secretary of

4   State informed Morgan County that Morgan County did

5   not have the authority to switch to hand-marked paper

6   ballots on its own?

7        A.   Correct.

8        Q.   And since you received that initial

9   guidance, there has been no additional guidance in

10  that respect?

11       A.   There has been reiteration of that point.

12  The Coalition for Good Governance has sent, I'm

13  assuming, all election officials to the state a

14  response -- or something about saying that they

15  interpret it this way, that the counties can make

16  that decision.  And then the Secretary of State then

17  sent a response to all of us as a response to that

18  communication reiterating that individual counties do

19  not have that authority.

20       Q.   Do you know about when that last

21  communication from the Secretary of State was?

22       A.   (No response.)

23       Q.   Let me ask it this way.  Would it have been

24  before or after Judge Totenberg's September 2018

25  opinion?

1          A.    I believe it was after that.

2          Q.    Okay.  We'll find it.

3          A.    It is in the document --

4          Q.    In your production?

5          A.    Yes.

6          Q.    Okay, great.

7                Focusing just on the DRE system, not new

8     proposals from any source, have -- has Morgan County

9     undertaken any effort to improve the DRE system in

10    terms of security or vulnerability?

11         A.    Can I ask for clarification?

12         Q.    Sure.

13         A.    Security like cyber security or physical

14    security?

15         Q.    Both.

16         A.    Cyber security and vulnerability we have

17    not.   Physical security, the Department of Homeland

18    Security offered all our counties a physical security

19    assessment which we took advantage of.  He came out

20    and did an assessment.

21         Q.    Did he give you some advice?  Did he or she

22    give you some advice as to how you could improve?

23         A.    As he said, they do not give advice; they

24    give options, which we have reviewed.  Yes.

25                MR. BROWN:  Off the record.

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

```
 1              (Discussion ensued off the record.)
 2    BY MR. BROWN:
 3         Q.   Did you follow any of the options and change
 4    your procedure -- physical security procedures?
 5         A.   We have adopted some of those options.
 6         Q.   What were those?
 7         A.   Umm...
 8         Q.   If you feel free in disclosing that.
 9         A.   The document where he gave us all that
10    information has been listed as a critical
11    infrastructure that is protected information.
12         Q.   Okay.  And so you don't feel comfortable
13    disclosing it?
14         A.   I do not.
15              MR. BROWN:  I understand.  Fair enough.
16              Let me get some things on the record.
17         Did we get a number yet?  What number are we
18         on?
19              (Discussion ensued off the record.)
20              (Plaintiff's Exhibit 32 was marked for
21         identification.)
22    BY MR. BROWN:
23         Q.   Let me hand you what's been marked as
24    Plaintiff's Exhibit No. 32.
25              Is that a copy of the subpoena that you
```

1  received in this case?

2        A.  Yes.  It is.

3        Q.  I believe you have produced some documents

4  in response to this subpoena; is that correct?

5        A.  I have.

6        Q.  I want to direct your attention Exhibit 1 to

7  your subpoena.  Have you seen that document before?

8        A.  I have.

9        Q.  Okay.  Other than in connection with your

10 subpoena, had you seen it before?

11       A.  These -- I started -- excuse me.  I started

12 at the elections office in 2017.  So at the time I

13 started, that website was no longer in use.  So I

14 know the files but not in relation to the website.

15       Q.  Okay.  When -- just in general, what access

16 does the County have to the information or data at

17 the Secretary of State's Office, if any, today?

18       A.  The only data that we have access to is the

19 data that they send us.

20            (Witness coughing.)

21            THE WITNESS:  I'm so sorry.

22            MR. BROWN:  That's okay.

23 BY MR. BROWN:

24       Q.  How do they send it to you?

25       A.  We meet an investigator with the Secretary

1  of State's office and receive --

2          MR. BROWN:  If you need to take a break

3      at any time --

4          THE WITNESS:  Okay.

5          And receive most of the data that way.

6          MR. BROWN:  Can you repeat the answer?

7          (Whereupon, the record was read by the

8      reporter as requested.)

9  BY MR. BROWN:

10     Q.  You say you meet, like physically?

11     A.  Physically meet.

12     Q.  And so they would give you what?

13     A.  At the time, they give us the GEMS database

14 and the express poll cards, memory cards.

15     Q.  And then at some point you review advance

16 proofs of the ballots; is that right?

17     A.  Yes.

18     Q.  How do you get those?

19     A.  We get it through the FTP server.

20     Q.  Are those -- am I correct that that's not

21 the database itself but is better PDFs of your

22 ballots; is that right?

23     A.  Correct.

24     Q.  And then you will sign off or not sign off

25 on the ballots depending if they are accurate or not;

Curling et al. v.        Deposition of
Raffensperger et al.   JENNIFER DORAN              6/28/2019

1  correct?

2       A.   Correct.

3       Q.   You do not see anything that would show how

4  a ballot would appear on the DRE; is that right?

5       A.   Not at that time.

6       Q.   When would you?

7       A.   When we start the L&A process, when we test

8  the equipment, that is part of the L&A.  We actually

9  program a yellow card from the express poll and put

10  it on the machine to make sure that all of the races

11  appear.

12           We go through and hit them as part of our --

13  there's a calibration process, but then we also go

14  through on some of the machines and actually vote on

15  them to make sure that they show up in the review

16  that they are recording our cast ballots.

17       Q.   The first time you actually receive the GEMS

18  database from the Secretary of State is after you've

19  reviewed the ballots and signed off on the ballots;

20  is that correct?

21       A.   Truthfully, I don't know.  I can't remember

22  the timeline of when that happens.

23       Q.   But at some point, you do get the

24  GEMS database for your elections and then that's when

25  you start the logic and accuracy testing; is that

1  right?

2       A.   Correct.

3       Q.   Then the GEMS database goes into your

4  server, your computer; correct?

5       A.   Yes.

6       Q.   And then at the appropriate time, you will

7  create memory cards that will be inserted into each

8  of your DRE machines; is that right?

9       A.   Correct.

10           MR. BROWN:   Can you see which folder has

11       this one?

12           MS. MARKS:   Mm-hmm.

13           (Discussion ensued off the record.)

14           (Plaintiff's Exhibit 33 was marked for

15       identification.)

16  BY MR. BROWN:

17       Q.   What is Exhibit 33?

18       A.   This is the direct record electronic voting

19  machine recap.

20       Q.   Is that a document that you produced in

21  response to your subpoena?

22       A.   Correct.

23       Q.   Just for the record, it's Morgan, dash, 1;

24  is that right?

25       A.   Correct.   Yes.

Curling et al. v.          Deposition of
Raffensperger et al.    JENNIFER DORAN              6/28/2019

1      Q.   Why are the serial numbers blacked out on
2  this copy?
3      A.   The State's attorney said the seal numbers
4  needed to be redacted, that they felt they were
5  confidential.
6      Q.   Did they explain to you why they thought it
7  was confidential?
8      A.   No.
9      Q.   Do you have an independent basis for
10 believing they are confidential?
11     A.   During --
12     Q.   I'm not suggesting you have to.  I'm just --
13     A.   Okay.  I know during the L&A process, that
14 any public -- anyone in the public that's observing
15 L&A -- which is open to the public.  No one ever
16 shows up, but it is open -- that the seal numbers are
17 not supposed to be observed or recorded by the
18 public.
19          If you have a seal number, one, two, three,
20 four, you can bring in your own one, two, three,
21 four.  You can go in there and mess with the machine
22 and put a new seal number.
23          The seal number, the opening seal number,
24 the first redacted, those are numbers that I put on
25 there so that when the poll worker goes in and

1   confirms the DRE unit number, that the seal number

2   matches the seal number that I put on there.

3           And that's part of the quality assurance,

4   part of the process.  Before they even open the

5   machines, they have to check the seal numbers.

6           Obviously, that's not disclosable before

7   because you don't want someone who could then go in

8   and change the seal numbers.

9       Q.  But after, does it matter?  Now does that

10  information matter?

11      A.  I didn't realize there was -- I didn't know.

12      Q.  You're not aware of a problem?

13      A.  Correct.

14      Q.  Would the same apply to the

15  after-the-polls-close seal number?

16      A.  Yes.  Because the DREs are left in the

17  polling place until the next morning.  So the poll

18  manager, as part of their closing process, they seal

19  the DREs.  And when they come back, I always go

20  through and just do a quality assurance to make sure

21  that the seal numbers that they put on there are the

22  seal numbers that came back to me.

23          But at that point, they are locked in my

24  storage room with very limited access.

25      Q.  But the number -- just like with the ones

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

1   before, the number today is not of consequence?

2        A.   They are not.

3             (Plaintiff's Exhibit 34 was marked for

4        identification.)

5   BY MR. BROWN:

6        Q.   Let me hand you what has been marked as

7   Exhibit 34.  And I'll represent to you this is not

8   from your production.

9        A.   Yes.

10       Q.   But do you know what that is?

11       A.   A ballot image report.

12       Q.   And what is a "ballot image report"?

13       A.   It's a vote cast record that shows what a

14   voter chose for each race.

15       Q.   Is there a way, looking at that particular

16   document, to determine who the voter was?

17       A.   No.  There's not.

18       Q.   Does that document disclose any information,

19   which if combined with other information, would

20   disclose the identity of the voter?

21       A.   Not that I'm aware of.

22       Q.   Are you aware of the position stated by some

23   people that a ballot image report printed out does

24   disclose the identity of the voter?  Are you aware of

25   that position?

1        A.   I am aware of that.

2        Q.   And do you understand the basis for that?

3        A.   I do not.

4        Q.   Putting aside that report -- well, let me

5   back up just a little bit.

6             Your understanding, the ballot image report

7   is something that is generated by the GEMS database;

8   correct?

9        A.   It's generated by the DRE.  It's in the DRE

10  is my understanding.

11       Q.   In the DRE voting machine or something else?

12       A.   I apologize.  That would come from the

13  memory card and then you could pull it on the GEMS

14  database.

15       Q.   So it would be recorded onto the memory card

16  and then the memory card would go to the

17  GEMS database?

18       A.   Correct.

19       Q.   So moving to the GEMS database for the

20  purpose of my next question, apart from the piece of

21  paper, the report that's generated that we call the

22  ballot image report, are you aware of any data in the

23  GEMS database system that could be used whether by

24  itself or in combination with any other information

25  to connect a voter to their actual vote?

1      A.   I am not aware of any.

2      Q.   Has anyone ever explained to you a different

3  theory as to how you could connect the two?

4      A.   I have -- no.

5      Q.   Are you aware of any other information on a

6  ballot image report like that that is sensitive or

7  might cause harm if disclosed?

8          MS. ANDERSON:   Object to the form.

9      Cause harm to?

10          MR. BROWN:   Cause harm to the State, to

11      the County, to the election system, to the

12      integrity of the elections.

13          THE WITNESS:   I'm sorry.  I'm trying --

14      I'm thinking.

15  BY MR. BROWN:

16      Q.   That's all right.

17      A.   I don't know.

18          (Plaintiff's Exhibit 35 was marked for

19      identification.)

20          MR. BROWN:   For the record, I'll

21      identify this and then I'm going to pass it

22      around, so you all can see it.

23          For the record, Plaintiff's Exhibit 35

24      is a January 30, 2019 memo from Chris

25      Harvey, state elections director, to county

Curling et al. v.       Deposition of
Raffensperger et al.    JENNIFER DORAN          6/28/2019

```
 1        election officials regarding open records
 2        requests.
 3             Just take a look at that.
 4             (Witness reviewing document.)
 5   BY MR. BROWN:
 6        Q.   Exhibit 35 is a memo you received?
 7        A.   Correct.
 8        Q.   Did you receive any additional communication
 9   from the Secretary of State that explained the basis
10   for or content of the advice of the Attorney
11   General's Office with respect to whether ballot
12   images are subject to the Open Records Act?
13        A.   There was communication regarding GEMS --
14   reports from GEMS that reference the Attorney
15   General's opinion from the Smith versus DeKalb Court
16   of Appeals opinion, but I don't know if that was
17   directly in conjunction.
18             There were quite a few OEBs, official
19   election bulletins, regarding open records requests
20   and in a couple of months' period.  So I'm not sure
21   if it was directly with that or if it was with
22   another OEB.
23        Q.   Okay.  Thanks.  Keep that with the
24   originals.
25             Are you familiar with the issue of the
```

1   undervotes in the lieutenant governor's race?

2        A.   Yes.

3        Q.   And just for the record, what is your

4   understanding of the issue?

5        A.   That there was a disproportionate number of

6   undervotes for the lieutenant governor's race that

7   was uncharacteristic of past elections that -- or the

8   increase in undervotes was more than what is

9   generally seen.

10       Q.   The increases in undervotes and the decrease

11   with voter participation with respect to that one

12   race?

13       A.   Correct.

14       Q.   Did you discuss this with the Board?

15       A.   I did.

16       Q.   What did you discuss with the Board about

17   it?

18       A.   It was brought to our attention with the

19   discussions and then the lawsuit that eventually was

20   filed, that there was an undervote.  And so I -- I'm

21   not even sure how it got started, but you can see

22   that I prepared the numbers to show where the

23   undervote was because it -- it was discussed that --

24   not in our board meeting but in the public, that the

25   undervote was in certain precincts.

```
1              So I went through and looked at the
2    statement of votes cast, which kind of gives you a
3    more detailed breakdown of votes per precinct per
4    race.  And I pulled up that document that you have.
5              (Plaintiff's Exhibit 36 was marked for
6         identification.)
7              MR. BROWN:  Let me hand you what will be
8         marked as Exhibit No. 37.
9              THE REPORTER:   36.
10             MR. BROWN:  36.
11   BY MR. BROWN:
12        Q.  Ms. Doran, is Exhibit 36 a spreadsheet that
13   you prepared?
14        A.  Yes, sir.
15        Q.  What does this show?
16        A.  This shows the number of voters.  I broke
17   it by precinct, by race -- contested races only
18   because we had a few uncontested races and we did not
19   do them in the amendments or the referendums -- the
20   number of votes cast in each precinct, the number
21   that voted -- because that was the big issue was the
22   percentage that dropped down for that race.
23             So I broke it down per precinct that voted
24   for that, how many number of votes.  I did the
25   percent of voters in each precinct and then the
```

1  percentage of the undervotes per precinct.

2       Q.  Did you discuss with the Board any

3  additional research that you would have recommended

4  be done on the undervote issue?

5       A.  Not that I remember.

6       Q.  Did you discuss getting an outside analyst

7  to look at the GEMS database itself?

8       A.  I did not.

9       Q.  Are you aware of that suggestion being

10  raised, that some analysis be done on the GEMS

11  database?

12       A.  Actually, let me correct.  Earlier you said

13  analysts.  That actually was discussed earlier this

14  year when our first subpoena was -- actually, before

15  the subpoena was served, but we had gotten a copy of

16  the subpoena.  We discussed it in the board meeting

17  and there was a suggestion about having -- if we did

18  not turn over the GEMS database, if we could hire our

19  own experts to do an analysis.

20       Q.  Did you hire your own expert to do that

21  analysis?

22       A.  We did not.

23       Q.  Why didn't you?

24       A.  We -- I spoke with the county attorney and

25  with the Secretary of State.  And the opinion is that

Case 1:17-cv-02989-AT   Document 469   Filed 07/10/19   Page 69 of 115   Page 69
Curling et al. v.          Deposition of
Raffensperger et al.    JENNIFER DORAN                    6/28/2019

1   the county does not own the GEMS database so that we
2   are not -- we cannot hire someone to work on
3   something that does not belong to us.
4        MR. HENRY:  Just for the record, I'll
5     object to any attorney-client privileged
6     conversations.  I don't think what she
7     stated necessarily violates that.
8   BY MR. BROWN:
9        Q.   The -- did you understand any -- was the
10  suggestion from the Secretary of State, it would do
11  some harm to have it analyzed or just you didn't have
12  the authority to do it?
13       A.   My understanding is we did not have the
14  authority to do it.
15       Q.   Was the suggestion from the Secretary of
16  State, Don't worry, we're looking at that?  Did you
17  get that sense?
18       A.   I think it was, No, you don't have the
19  authority, period.
20       Q.   Without any indication that someone else is
21  going to do it; correct?
22       A.   Correct.
23       Q.   Did you get -- I'm not suggesting that you
24  needed to or anything else.  But did you get any sort
25  of written opinion as to why ownership of the GEMS

1  database -- license was necessary to conduct an

2  analysis of the public data that's on the GEMS

3  database?

4       A.  I did not.

5           MR. BROWN:  Okay.  I'm going to take a

6       little break here.

7           (Recess from 11:56 a.m. to 12:07 p.m.)

8  BY MR. BROWN:

9       Q.  I want to return a little bit to the

10  connection between a ballot image record and the

11  identity of the voter.

12          Do you recall when Citizen Dufort asked the

13  County for her ballot image?  Do you recall that?

14      A.  Yes.

15      Q.  Would it have been possible for the County

16  to find her ballot image?

17      A.  To my knowledge, no.

18      Q.  Have you received any advice that maybe you

19  could if you did this or anything at all?

20      A.  Part of the -- one, I think the first

21  subpoena requested cast vote records for the first

22  and last five voters for a couple of different

23  precincts.  And I spoke to Michael Barnes at the

24  Secretary of State in anticipation of trying to

25  produce it.  And he told me that it is not stored in

1   a one, two, three, four order; that it's a

2   randomized -- so if I were to print the first five,

3   it may be -- it would not be the first five people

4   that used that machine.  It would be -- all of them

5   are sort of random.

6           And when he told me that, that was

7   sufficient for me.  I didn't ask a lot more questions

8   about how that works or anything, but -- so that is

9   my understanding is that if I pull the first ballot

10  image, it would not be necessarily the first person

11  who voted on that machine.

12      Q.  So even if you knew who the first person who

13  voted was, you could not guarantee that the ballot

14  image report that you pulled was that person's

15  ballot; is that right?

16      A.  To the best of my knowledge, yes.

17      Q.  And you're not aware of any other

18  information in the system, whether it's e-Poll books

19  or the Smart Cards or anything else that could be

20  used to connect a voter to their cast ballot?

21      A.  I am not aware.

22      Q.  You mentioned the Secretary of State a

23  couple of times in recent discussions about your

24  subpoena and about the documents that you produced.

25          Could you describe for me your interaction

1   with the Secretary of State on what you were allowed

2   to produce or should produce just in general?  And

3   I'll come back and ask more specific questions if I

4   need to.

5        A.   The technical of how to produce was a very

6   different conversation of can I produce.

7        Q.   Right.

8        A.   That -- that part -- the second part of what

9   I can was turned over to our attorney for him to do.

10            Of course, we've gotten the official

11  election ballots with general -- these are not

12  producible; these are not open.  But with the

13  subpoena, I went ahead and was asking the actual

14  technical procedures and those were the conversations

15  I had with Michael Barnes.  And he did, again,

16  reiterate, Talk to your attorney before you do any of

17  these.

18       Q.   But you were talking to Barnes about how

19  physically to retrieve the information; is that

20  correct?

21       A.   Correct.

22       Q.   And you talked with him about the ballot

23  image report that -- we already discussed that;

24  right?

25       A.   Yes.

1     Q.   What other information did you talk to

2   Mr. Barnes about retrieving?

3     A.   I asked him how to do -- I can't remember.

4   It's a document that I pulled off the GEMS.  It was

5   an administrative report that I produced for this

6   subpoena.

7     Q.   What else did you talk to him about?

8     A.   I also asked about the -- I think I asked

9   for the digital image of what the ballot would look

10  like on the DRE and how that -- how I could do that.

11  And he had told me that it's not something that --

12  like I can't pull that up and it will actually show a

13  picture.

14         I can pull up what a paper ballot looks

15  like, obviously, but I can't pull up like a screen

16  that would show a DRE.  The only way he said I could

17  do a digital image -- which I understood that I

18  actually load the election to the machine again like

19  I'm getting ready for the election and just take a

20  picture of it.

21     Q.   When he was advising you about what you can

22  do, you're using the word "can" in its literal sense;

23  in that what you were able to do not what you were

24  permitted to do; correct?

25     A.   Right.  I'm talking about like what I'm

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

1    physically able to do, not legally able to do.

2         Q.   You used the right words.  I want to make

3    sure, so --

4         A.   Yes.

5         Q.   -- there was no confusion.

6              On the electronic screen, I wanted to go

7    back to a question about the review process before

8    the vote.

9              You will review the PDFs of the paper

10   ballot; correct?

11        A.   Yes, the ballot proof.

12        Q.   The ballot proofs and those would show you

13   exactly what a paper ballot is going to look like;

14   correct?

15        A.   Correct.

16        Q.   Not just the information but the

17   presentation?

18        A.   Right.

19        Q.   With the electronic screen on the DRE,

20   you're not given the opportunity before you do the

21   L&A testing of seeing or reviewing the presentation

22   of the ballots or of the races on the electronic

23   screen; is that right?

24        A.   Correct.

25        Q.   And there's really no occasion for you to

1  sign off or not sign off on how the races appear on

2  the electronic screen; is that right?

3       A.   Correct.

4       Q.   You testified that you had received advice

5  and options from the Department of Homeland Security

6  relating to physical security here in Morgan

7  County -- or in Morgan County; correct?

8       A.   Correct.

9       Q.   Did DHS give you any sort of security that

10  was nonphysical, either cyber security or software or

11  any other kind of advice?

12       A.   There is -- he has -- Dennis Mott is the DHS

13  representative who came --

14       Q.   How do you spell his last name?

15       A.   M-O-T-T.

16       Q.   Okay.

17       A.   I'm not sure; I'm assuming he's an agent.

18  But he did talk to me and said that they do have a

19  computer security assessment done or they have that

20  availability and I spoke with our IT director

21  regarding that.  But that is -- obviously, I don't

22  have access to our servers.  That would be something

23  that IT would do.

24       Q.   That Morgan County IT would do?

25       A.   Correct.

1    Q.  So as far as you know, that was not pursued
2  in terms of DHS computer security work; right?
3    A.  I know that our IT director regularly
4  works -- there's -- Department of Homeland Security
5  offers something -- IASC.  I don't remember what it
6  stands for.  It's government election security -- or
7  security and then they have election-specific
8  security and they are already a part of that program.
9    Q.  So Morgan County IT is already a part of the
10  Homeland Security's general government security
11  program --
12    A.  Correct.
13    Q.  -- of which elections is one piece?
14    A.  Correct.
15    Q.  But you're not aware of any scanning that
16  the Department of Homeland Security did with respect
17  to your elections?
18    A.  I am not aware of any.
19    Q.  Moving away from DHS to the Secretary of
20  State, since you have been the elections director at
21  Morgan County, has the Secretary of State done any
22  sort of security review of Morgan County's election
23  offices, either physical security or cyber security
24  or any other kind of security?
25    A.  I do know someone from the Secretary of

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

 1  State, they come out and do something on our GEMS
 2  database to make sure that there are not additional
 3  programs or software, like some kind of scanning log.
 4  And that has -- they do it not on an annual basis
 5  because I've been there for over two years and it's
 6  only happened once.
 7       Q.   Do you know when that happened?
 8       A.   Last month.
 9       Q.   Last month?
10       A.   Mm-hmm.
11       Q.   What did they find?
12       A.   That everything that was on there the last
13  time they scanned is what's on there now.
14       Q.   Do you know the last time they scanned
15  before that?
16       A.   2015.
17       Q.   Did they give you any documentation of their
18  scanning work or is this just verbal?
19       A.   He took his documentation.
20       Q.   When you vote on a DRE, there appears --
21  after you cast your vote, there appears a number on
22  the DRE screen that I will try to describe to you and
23  see if you know what it is.  And if you don't have
24  enough information, that's fine.
25       A.   Okay.

1    Q.  But the number appears to be a race number.
2    So let's say it's a primary.  It says REP and then
3    five numbers or three numbers and then a space and
4    then a precinct number and then a space and then a
5    two-digit number.
6         Do you know what the last number -- those
7    last two numbers are for?
8    A.  I do not.
9    Q.  Do you know what I'm talking about?  Do you
10   know the image I'm referring to?  Does that ring a
11   bell?
12   A.  It does not.
13   Q.  Okay.
14   A.  Is it at the -- where would that be?
15   Q.  It appears on -- right after you mash the
16   cast-vote button, there's a number that appears.
17   It's that number right in the center.
18   A.  Okay.  Where it says, Your ballot has been
19   cast?
20   Q.  Yes, ma'am.
21   A.  I do not know what that is.
22   Q.  Who was the person who came from the
23   Secretary of State to review your -- to scan your
24   system last month?
25   A.  Chris Bellew, B-E-L-L-E-W.

1          (Plaintiff's Exhibit 37 was marked for

2      identification.)

3   BY MR. BROWN:

4      Q.   Let me hand you what has been marked as

5   Exhibit 37.  And I'll represent to you this is

6   something from Rockdale County not Morgan County.

7   And the purpose of this is to highlight an issue that

8   some people have identified in the 2018 vote -- and

9   that is, if you look at the second row of this table

10  corresponding to unit four and then you'll see also

11  the third row and the fourth row and then down in the

12  middle of the page, half a dozen or so instances in

13  which the voter complained that the ballot was cast

14  before the voter had the opportunity to review the

15  summary screen or to hit the cast-ballot button.

16          First of all, in your testing, did you

17  observe that problem in any of the L&A or other

18  testing that you did before the election?

19      A.   I did not see that problem.

20      Q.   Would you have seen it in the steps that you

21  go through in the logic and accuracy testing?

22      A.   As -- one of the tests that we do is we

23  actually go through and just make choices.  And then

24  go to -- right before you hit "cast ballot" is the

25  summary screen, which it appears that that's where

1  this was happening.  We would have -- we would have

2  been at that point on the machines, so that would

3  have been when it happened, but we did not have that

4  issue.

5       Q.  Did you get reports of that issue from poll

6  managers, poll workers or voters?

7       A.  We did not.  We had one woman who wanted to

8  review everything and she kept hitting and hit "cast

9  ballot," but she actually hit the "cast ballot."  But

10  we did not have any complaints that it cast before

11  they hit the "cast ballot."

12       Q.  Did you have complaints about just goofy

13  machines that were -- the display not being proper or

14  racing ahead or stalling or anything like that?

15       A.  No.

16       Q.  Did you -- not that you should have, but did

17  you prepare a report like that that summarizes the

18  problems, if any, that you encountered in the

19  election?

20       A.  We did not.  We had one issue and it was

21  a -- that we did document because it was -- and I'll

22  go ahead and explain it to you.  It happened with

23  older women in early voting.  I'm not sure how, but

24  they were using their fingertips or fingernails to

25  press and it wasn't registering.

1      When we told them to use the pad of it, it
2   would register.  But it was -- it was a common issue
3   with only -- and I don't know why but only older
4   women that were doing it basically with their
5   fingernails or the tip of it.  And as soon as they
6   started pressing like this with the pad, it would
7   read it.

8      Q.   I guess younger women or younger men with
9   fingernails are more used to maybe --

10     A.   -- using the pad.

11     Q.   -- using the pad.

12          Did you receive an FBI news flash -- that is
13   before she got there probably.

14          (Discussion ensued off the record.)

15   BY MR. BROWN:

16     Q.   Do you recall receiving a forwarded FBI news
17   flash about the targeting of state board election
18   systems?

19     A.   I do not.

20     Q.   In one of the earlier meetings, did you
21   discuss with the Board the threat of a cyber-attack
22   from foreign countries?

23     A.   During -- there was some report, a federal
24   report, and I don't remember where it was.  It was in
25   the summer or fall of '18, that it said that they

1  attacked or tried to access many election offices

2  including in Georgia.

3          And the Board directed me and I asked Chris

4  Harvey if that -- if there were any attacks.  And I

5  think they said there were about six counties.  And

6  so we wanted to make sure that -- we had not been

7  aware of anything, so we wanted to make sure that we

8  were not part of that.

9          And his reply was that their election

10  websites were accessed, but not -- or visited but

11  not --

12      Q.  -- penetrated?

13      A.  -- penetrated.

14      Q.  Right.  Do you remember the counties that

15  were accessed?

16      A.  He did not list it -- he did not list the

17  six counties.

18      Q.  And you don't independently know which ones

19  those are?

20      A.  I do not.

21          MR. BROWN:  That's all I have.  Thank

22      you very much for your good work and for

23      your testimony today.  Very much appreciate

24      it.

25          MR. HENRY:  I don't know if anybody else

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN                6/28/2019

```
 1        has any questions.

 2              MR. LOWMAN:  None from Fulton County.

 3              MR. SPARKS:  I have one.

 4              MS. ANDERSON:  You go ahead.

 5                        EXAMINATION

 6   BY MR. SPARKS:

 7      Q.  Adam Sparks for the plaintiffs.  And thank

 8   you again for your time today, Ms. Doran.

 9            I just was unclear about one of the answers

10   you gave and I want to make sure I understand.

11            When you were talking about the Board's

12   discussion of postelection precertification audits on

13   paper ballots for some contested races -- do you

14   remember talking about that?

15      A.  I do.

16      Q.  -- I was unclear whether the Board merely

17   discussed that proposal or actually approved an audit

18   at some time or engaged in an audit.

19            Could you clarify that for me?

20      A.  We did.  During the discussion, the Board

21   voted to adopt the proposal that I had presented to

22   the Board, which included doing a postelection

23   precertification review of the polling tapes as

24   compared to the GEMS summary report.  But that also

25   included doing a manual recount of paper ballots in
```

Curling et al. v.        Deposition of
Raffensperger et al.   JENNIFER DORAN              6/28/2019

1   certain precincts.  And we did complete it before we

2   certified the election.

3        Q.   This is for the November 2018 election?

4        A.   Yes, sir.

5        Q.   Did you find any discrepancies in the audit?

6        A.   We did not.

7        Q.   Is that something the Board intends to

8   undertake again if DREs are used in 2019?

9        A.   That has not been discussed.  But since the

10  Board -- I believe it was a three to two vote and it

11  was a successful -- the board members felt that, you

12  know, it gave confidence to the public that it was --

13  that our machines are operating or our scanners are

14  operating as they should.

15            And my guess is that they would incorporate

16  that in the November elections.

17            MR. SPARKS:  Thank you for the

18       clarification.  I appreciate it.  No further

19       questions at this time.

20            MS. ANDERSON:  I just have a few

21       questions.

22                     EXAMINATION

23  BY MS. ANDERSON:

24       Q.   This is going back to the beginning.  You

25  were discussing optical scanners here in Morgan

Curling et al. v.          Deposition of
Raffensperger et al.    JENNIFER DORAN          6/28/2019

1 | County.

2 |      A.   Yes.

3 |      Q.   How many -- you may have mentioned this and
4 | I missed it.  But how many optical scanners does
5 | Morgan County have?

6 |      A.   We have two, one for absentee and one for
7 | provisional.

8 |      Q.   Do you know if Morgan County went to entire
9 | hand-marked paper ballots using optical scanners, do
10 | you know how many scanners you would need to perform
11 | that?

12 |      A.   We would need 10, seven precinct, one early
13 | voting.  We would likely update the absentee and
14 | provisional so that we had the same scanners.

15 |      Q.   Are you aware of how much optical scanners
16 | cost to obtain, to purchase?

17 |      A.   Yes.  We had received a quote from ES&S.
18 | And I can't remember the breakdown, but the scanner
19 | plus the secure ballot box which we would want if it
20 | were in each precinct was about $1,300.

21 |      Q.   I'm sorry.  You had mentioned that earlier.

22 |           And would the County -- to obtain these
23 | optical scanners, would the County have to go through
24 | any procurement process, place bids out or anything
25 | of that nature?

1      A.  My understanding is generally there is a

2   procurement process.  However, because the State

3   certifies only certain vendors or certain companies,

4   that we would only get it from them.

5      Q.  Is there more than one vendor, do you know,

6   for optical scanners?

7      A.  I'm sure there are, but since we only use

8   the one, that's where I got the quote from.

9      Q.  If you needed to obtain optical scanners,

10  could you go to that one vendor to receive more

11  optical scanners or would you have to go through the

12  procurement process to obtain the optical scanners if

13  you were making the switch?  Does that make sense?

14     A.  Yes.  I think right now they are the only

15  vendor that sells the ones that are certified for the

16  state of Georgia.  So you would have to use them.

17     Q.  Okay.  Do you know about how long of a

18  turnaround time it would take to obtain all of the

19  optical scanners if you moved to the hand-marked

20  paper ballots?

21     A.  I had ordered two new express polls, which I

22  know are very different equipment, because two of

23  ours had died and it was just cheaper to buy them

24  than get them fixed.

25          To go through the process of buying them and

1  getting them -- they had to go to the State so that
2  they are certified and tested before they're sent to
3  us was about two months.

4      Q.  Would it be a similar process for optical
5  scanners?

6      A.  They do have to go through the State.  So
7  even if we purchased them, they don't come directly
8  to us.  Even if they were going to ship them that
9  day, they have to go to the State and the State has
10 to certify -- they have to do their testing and
11 certification.

12     Q.  As you know, there are two separate
13 plaintiffs here, the Coalition plaintiffs and then
14 you also have the Curling plaintiffs.

15         The Curling plaintiffs have requested that
16 instead of using DREs for ADA purposes for a
17 preliminary injunction -- I believe Mr. Brown
18 discussed this earlier generally.  But the Curling
19 plaintiffs suggested or seek to have BMDs to be used
20 for the upcoming municipal election for ADA purposes.

21         Do you know if that would even be possible
22 for the County to purchase BMDs before the upcoming
23 municipal elections?

24     A.  I don't think it's possible because I think
25 there is a rollout in place.  And the 10 to

Curling et al. v.          Deposition of
Raffensperger et al.    JENNIFER DORAN          6/28/2019

1   12 counties who are getting them, they are getting

2   them for the municipal elections in November.

3       Q.   And I know you've mentioned about having

4   certified vendors through the State.

5           Are there any vendors currently certified

6   for the use of BMDs?

7       A.   Because the Secretary of State has not

8   certified them, no.

9           MS. ANDERSON:   I believe that's all I

10      have.

11          MR. BROWN:   I just have one follow-up

12      question.

13                      FURTHER EXAMINATION

14  BY MR. BROWN:

15      Q.   You -- you testified that you'd have to buy

16  10 scanners.   It would cost about $1300.   But you

17  could do a central count scanner, right, at your

18  office?   You don't have to have a scanner in every

19  precinct?

20      A.   When we discussed it back at the end of

21  2018, when the board was batting around the idea, my

22  suggestion, just for security, is that they get

23  scanned at the precinct.

24          Not only security, people kind of do crazy

25  things with their ballots.   Sometimes they circle

Curling et al. v.              Deposition of
Raffensperger et al.    JENNIFER DORAN              6/28/2019

1   them; they scratch them out and do that.  If they
2   make a mark and our scanner is not going to read it,
3   it's better, in my opinion, to have the voter fix it
4   then.  Otherwise, if it doesn't get scanned at the --
5   my office, we have to do a vote review panel.  And
6   you have three people who have to make a
7   determination of what you intended.

8            So to me a precinct scanner not only where
9   you're dropping it in after it's scanning, you
10  have -- you know that your ballot has already been
11  scanned and there's not going to be a three-person
12  panel that decides how you voted.

13       Q.  Have you looked at the pricing or the
14  potential of purchasing used scanners of these
15  AccuVote scanners?

16       A.  I have not looked at those.  I just went
17  ahead and got the quote from ES&S.

18       Q.  For the new ones?

19       A.  Mm-hmm.

20       Q.  You mentioned --

21       A.  Vote review panel.

22       Q.  Before -- there was something you said in
23  one of your answers that I didn't understand before
24  and it was in connection with the different types of
25  voters or elections.  And you said -- I think you

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

1   said absentee, provisional and challenged.

2       A.  Correct.

3       Q.  What's the "challenged"?  What does that

4   mean?

5       A.  Occasionally, it doesn't happen often, but a

6   vote -- someone can challenge another voter and say,

7   I don't believe you live here or I don't believe you

8   live in that precinct.

9           We would mark that person challenged.  And

10  it's the exact same process as a provisional.  But

11  then the Board decides after a hearing if that person

12  is an elector or he is not.

13      Q.  And then back to the -- the Board -- to your

14  answer to the prior question about determining voter

15  intent.

16      A.  Mm-hmm.

17      Q.  That's if there's a paper ballot that's not

18  clear?

19      A.  Correct.

20      Q.  Is it usually fairly easy for the Board to

21  determine voter intent in that instance?

22      A.  Every one we've ever had to review, it was

23  very clear.  We had someone in November turn in one

24  and she circled all of her answers.  Very obvious

25  that she chose this person rather than the other

1   one --

2       Q.   Just didn't know how to follow instructions?

3       A.   Right.  Or we've had people who do

4   checkmarks.

5            MR. BROWN:  I wonder what she made on

6       her SAT.

7            MS. ANDERSON:  Or if she took it.

8            THE WITNESS:  But we've never had any

9       where there was any disagreement.  It's a

10      three-person panel.  And the intent is

11      always clear in our county.  I know there

12      are other counties that have -- that's not

13      always as clear.

14  BY MR. BROWN:

15      Q.   But in your experience it has been?

16      A.   Correct.

17           MR. BROWN:  Thank you very much for your

18      time.

19           MS. ANDERSON:  I just have a few.

20                    FURTHER EXAMINATION

21  BY MS. ANDERSON:

22      Q.   How often do those challenged ballots occur?

23      A.   We have had -- so I've gone through about

24  five elections now.  I've had one challenged.

25      Q.   And then for the three-person-review panel,

1 | about -- you may not be able to tell.

2 |         How many ballots under the current system

3 | does the three -- do they normally have to review,

4 | the panel?  And you can give a percentage, too.

5 |     A.  Oh, a very low percentage.  I would say one

6 | to two.  But then also we use that vote review panel

7 | as a duplication team for provisional ballots that

8 | people who are out of precinct, we then have to

9 | duplicate it on the correct one, so we use those.

10 | They've actually been more duplicators than

11 | reviewing.

12 |     Q.  And if you would have to go to a fully

13 | hand-marked paper ballot system with the optical

14 | scanners, would you anticipate that the number of

15 | reviewed ballots to increase?

16 |     A.  Yes.  Generally, our -- until this last

17 | election cycle, we tend to have about the same number

18 | of early voters.  So these are people who have -- or

19 | absentee by mail voters.  These are the people who

20 | always do paper ballots, who've always done paper

21 | ballots.  They know what they are doing.

22 |         If we were to switch to hand-marked paper

23 | ballots, we have people -- like I've never even voted

24 | on a hand-marked paper ballots.  I've always done

25 | machines.

1    And I'm sure there are quite a few of us
2   since it's been in effect 17 years.  There's a lot of
3   new voters who have only done machines.  So I would
4   assume that at least the first couple of elections,
5   that we would have people who would be checking or
6   circling or choosing one and marking it out and go,
7   "This one."

8    People have done that where they've
9   accidentally chose one person, realized they chose
10   the wrong one, and they wrote, "Not this one" and
11   they'll put like an arrow and circle it.  And the
12   intent is very clear, but we still have to review it
13   and duplicate it.

14    Q.  Would it be -- do you think it would be a
15   strain on your staff -- or that three-person-review
16   panel if you moved to all hand-marked paper ballots?

17    A.  Our vote review panel is comprised of a
18   local Democrat and a local Republican and then either
19   myself or the board chair as the third person.  And
20   they come in and they are going to sit there all
21   night anyway.

22    I do think that we start fairly late in the
23   evening, way after seven o'clock because we've got to
24   wait for the provisionals to come in and the absentee
25   ballots.  We start right at 7:00 for those.  But it

Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

1   would be a longer night.

2        Q.   But you believe you could get it done in

3   time for the reporting and under the time limits

4   under Georgia law to report?

5        A.   Yes.   Our board -- we have a five-member

6   board.   And on big elections all five of us -- or all

7   five of them are there, plus me and the registrar and

8   Jan Wilbanks.

9            So our registrar starts the absentee ballot

10  opening and the board members start scanning.   So,

11  you know, the vote review panel could be off to the

12  side doing it where it's not just we have to finish

13  this and then this.   It's sort of a multifaceted

14  thing going on at the same time.

15           MS. ANDERSON:   No further questions.

16           MR. BROWN:   That's it.

17           David?

18           MR. LOWMAN:   No questions.

19           THE REPORTER:   Is she reading and

20       signing?

21           (Counsel explains read and sign

22       procedure to witness.)

23           THE WITNESS:   I'll waive it.

24           THE REPORTER:   I know everybody ordered

25       a copy last time.

Curling et al. v.          Deposition of
Raffensperger et al.     JENNIFER DORAN          6/28/2019

```
1              Did you want a copy --

2              MS. ANDERSON:  Electronic.

3              THE REPORTER:  Mr. --

4              MR. SPARKS:  Electronic.

5              MR. LOWMAN:  Electronic.

6              (Deposition concluded at 12:44 p.m.)

7              (Signature waived.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          CERTIFICATE

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6              I hereby certify that the foregoing

7    transcript was taken down, as stated in the caption,

8    and the colloquies, questions, and answers were

9    reduced to typewriting under my direction; that the

10   transcript is a true and correct record of the

11   evidence given upon said proceeding.

12             I further certify that I am not a relative

13   or employee or attorney of any party, nor am I

14   financially interested in the outcome of this action.

15             This the 5th day of July, 2019.

16

17

18

19   _____

20              Marsi Koehl, CCR-B-2424

21                                          

22

23

24

25

1                          DISCLOSURE

2

3    STATE OF GEORGIA:

4    COUNTY OF DEKALB:

5              Deposition of JENNIFER DORAN.

6              Pursuant to Article 8.B. of the Rules and
     Regulations of the Board of Court Reporting of the
7    Judicial Counsel of Georgia, I make the following
     disclosure:
8

9              I am a Georgia Certified Court Reporter
     acting as an agent of APG USA, Inc., who was contacted
     by the offices of Bruce P. Brown, PC, to provide court
10   reporting services for this deposition.  I will not be
     taking this deposition under any contract that is
11   prohibited by O.C.G.A. 15-14-37 (a) and (b).

12             APG USA, Inc., has no contract to provide
     reporting services with any party to the case, any
13   counsel in the case, or any reporter or reporting
     agency from whom a referral might have been made to
14   report this deposition.  APG USA, Inc., will charge
     its usual and customary rate to all parties in the
15   case, and a financial discount will not be given to
     any party to this litigation.
16

17

18

19

20   Marsi Koehl, CCR-B-2424            Date: 7/5/19

21

22

23

24

25

Curling et al. v.
Raffensperger et al.

Deposition of
JENNIFER DORAN

6/28/2019

**A**

**able** 8:21, 18:15
73:23, 74:1
74:1, 92:1
**absentee** 7:17
7:18, 24:11
32:12, 37:12
45:21, 45:25
85:6, 85:13
90:1, 92:19
93:24, 94:9
**Academy** 40:6
**access** 45:10
56:15, 56:18
61:24, 75:22
82:1
**accessed** 82:10
82:15
**accidentally**
93:9
**accuracy** 10:10
58:25, 79:21
**accurate** 57:25
**AccuVote** 31:20
89:15
**Act** 65:12
**acting** 97:9
**action** 1:5
96:14
**actual** 34:12
35:3, 63:25
72:13
**ADA** 87:16
87:20
**Adam** 3:7, 83:7
**add** 47:13
**added** 42:23
**adding** 32:5
**additional** 32:6
38:11, 53:9
65:8, 68:3, 77:2
**addressed** 52:3
**administrative**
73:5
**adopt** 38:4

83:21
**adopted** 55:5
**advance** 42:19
42:25, 57:15
**advantage**
54:19
**advice** 38:5
38:6, 38:11
54:21, 54:22
54:23, 65:10
70:18, 75:4
75:11
**advising** 73:21
**advocating** 35:6
**affirmatively**
28:5
**after-the-polls-...**
61:15
**agency** 97:13
**agent** 75:17
97:9
**agreement** 9:25
9:25
**agreements**
23:5
**ahead** 20:7
20:13, 72:13
80:14, 80:22
83:4, 89:17
**al** 1:4, 1:7
**allocated** 12:10
21:21
**allowed** 72:1
**altogether** 27:14
**amendments**
67:19
**analysis** 6:25
30:22, 68:10
68:19, 68:21
70:2
**analyst** 68:6
**analysts** 68:13
**analyzed** 69:11
**ANDERSON**
4:3, 19:15
19:20, 25:13

28:14, 64:8
83:4, 84:20
84:23, 88:9
91:7, 91:19
91:21, 94:15
95:2
**Anderson**............
2:7
**Anderson**............
2:9
**annual** 77:4
**answer** 5:17
17:6, 32:25
33:6, 57:6
90:14
**answered** 52:14
**answers** 83:9
89:23, 90:24
96:8
**anticipate** 20:10
92:14
**anticipated**
10:18, 13:12
19:23, 37:11
**anticipation**
70:24
**anybody** 33:3
38:12, 82:25
**anyway** 93:21
**apart** 48:13
63:20
**APG** 97:9
97:12, 97:14
**apologize** 63:12
**Appeals** 65:16
**appear** 58:4
58:11, 75:1
**APPEARANC...**
3:1, 4:1
**appears** 77:20
77:21, 78:1
78:15, 78:16
79:25
**application** 7:22
7:24
**apply** 61:14

**appreciate**
82:23, 84:18
**appropriate**
28:4, 59:6
**approved** 83:17
**argument** 39:4
**arrow** 93:11
**Article** 97:6
**articles** 40:9
40:14
**aside** 45:24
63:4
**asked** 12:24
13:1, 20:8, 21:2
21:5, 21:15
30:9, 30:22
32:22, 49:23
52:22, 70:12
73:3, 73:8, 73:8
82:3
**asking** 5:11
30:20, 72:13
**assessment**
39:19, 39:23
54:19, 54:20
75:19
**assistant** 18:9
18:14, 47:6
48:25
**assistants** 18:10
**assume** 20:3
93:4
**assuming** 53:13
75:17
**assurance** 61:3
61:20
**Athens** 1:21
3:16
**Atlanta** 1:2, 3:5
3:10, 3:22, 4:5
16:9
**Atlantic** 3:9
**attached** 2:23
4:20, 31:10
**attacked** 82:1
**attacks** 82:4

**attention** 56:6
66:18
**attorney** 3:3
3:8, 3:14, 3:19
3:20, 4:3, 6:6
30:21, 38:15
60:3, 65:10
65:14, 68:24
72:9, 72:16
96:13
**attorney-client**
69:5
**audio** 36:10
**audit** 23:20
23:22, 23:24
24:2, 50:22
51:4, 51:11
51:14, 52:11
83:17, 83:18
84:5
**auditability**
50:18, 50:20
52:1, 52:8, 52:8
52:16
**audits** 51:21
51:21, 83:12
**August** 42:22
**authority** 38:18
53:5, 53:19
69:12, 69:14
69:19
**automatically**
31:5
**availability**
75:20
**Avenue** 1:17
3:15
**aware** 34:19
49:10, 61:12
62:21, 62:22
62:24, 63:1
63:22, 64:1
64:5, 68:9
71:17, 71:21
76:15, 76:18
82:7, 85:15

Curling et al. v.
Raffensperger et al.

Deposition of
JENNIFER DORAN

6/28/2019

| | | | | |
|---|---|---|---|---|
| **B** | 70:13, 70:16 | 53:6, 57:16 | 89:3 | 84:11, 88:21 |
| | 71:9, 71:13 | 57:22, 57:25 | **bids** 85:24 | 90:11, 90:13 |
| **B-E-L-L-E-W** | 71:15, 71:20 | 58:16, 58:19 | **big** 27:6, 46:12 | 90:20, 93:19 |
| 78:25 | 72:22, 73:9 | 58:19, 72:11 | 67:21, 94:6 | 94:5, 94:6 |
| **back** 13:11 | 73:14, 74:10 | 74:22, 83:13 | **bigger** 42:17 | 94:10, 97:6 |
| 16:17, 23:18 | 74:11, 74:12 | 83:25, 85:9 | **bit** 9:10, 10:13 | **Board's** 83:11 |
| 25:17, 27:12 | 74:13, 78:18 | 86:20, 88:25 | 33:17, 36:6 | **books** 17:24 |
| 29:16, 30:4 | 79:13, 79:24 | 91:22, 92:2 | 43:2, 44:21 | 71:18 |
| 35:23, 36:6 | 80:9, 80:9 | 92:7, 92:15 | 63:5, 70:9 | **Booth** 1:15, 3:14 |
| 36:11, 38:1 | 80:11, 85:19 | 92:20, 92:21 | **blacked** 60:1 | **Bostwick** 23:3 |
| 43:2, 43:9, 44:2 | 89:10, 90:17 | 92:23, 92:24 | **blank** 26:2, 26:8 | **box** 27:6, 27:6 |
| 46:15, 46:18 | 92:13, 94:9 | 93:16, 93:25 | 26:15, 29:6 | 27:11, 27:22 |
| 46:20, 47:17 | **ballots** 7:17 | **bar** 25:25 | **BMD** 49:17 | 31:5, 31:7 |
| 61:19, 61:22 | 15:14, 16:8 | **Barnes** 70:23 | 52:4, 52:12 | 31:10, 31:14 |
| 63:5, 72:3, 74:7 | 18:1, 18:2, 24:5 | 72:15, 72:18 | 52:16 | 85:19 |
| 84:24, 88:20 | 24:8, 24:11 | 73:2 | **BMDs** 13:25 | **boxes** 31:3 |
| 90:13 | 24:15, 24:17 | **based** 33:23 | 18:24, 19:16 | **BRAD** 1:7 |
| **background** | 24:20, 24:22 | 37:11, 39:19 | 19:17, 20:5 | **break** 5:17, 15:5 |
| 22:17 | 26:12, 26:16 | 45:2 | 23:14, 28:18 | 44:14, 47:21 |
| **bag** 29:7, 29:8 | 27:25, 29:6 | **basically** 81:4 | 39:17, 49:11 | 57:2, 70:6 |
| 29:12, 45:11 | 29:6, 29:15 | **basis** 8:18, 60:9 | 50:16, 52:8 | **breakdown** |
| 46:12, 46:15 | 29:18, 29:22 | 63:2, 65:9, 77:4 | 87:19, 87:22 | 21:17, 49:17 |
| 47:17 | 29:25, 30:3 | **batting** 88:21 | 88:6 | 67:3, 85:18 |
| **ballot** 2:16, 7:18 | 30:8, 30:18 | **bbrown@bruc...** | **board** 2:20, 7:8 | **briefly** 11:2 |
| 15:14, 18:2 | 32:6, 32:7 | 3:6 | 7:9, 7:11, 10:16 | **bring** 46:15 |
| 19:11, 24:25 | 32:10, 32:11 | **beginning** 9:12 | 10:18, 11:10 | 60:20 |
| 25:1, 25:4, 25:6 | 32:12, 33:10 | 25:18, 84:24 | 11:16, 11:23 | **bringing** 34:23 |
| 27:3, 27:3, 27:5 | 33:11, 34:6 | **behalf** 3:2, 3:12 | 12:24, 13:3 | **broad** 35:15 |
| 27:11, 29:10 | 34:10, 34:11 | 3:18, 4:2 | 13:12, 23:1 | **broke** 67:16 |
| 29:11, 31:3 | 34:20, 36:1 | **believe** 29:1 | 29:24, 29:24 | 67:23 |
| 31:4, 31:5, 31:7 | 36:5, 36:22 | 54:1, 56:3 | 30:1, 30:2, 30:9 | **broken** 29:9 |
| 31:10, 31:14 | 36:25, 37:21 | 84:10, 87:17 | 30:13, 30:20 | **brought** 41:1 |
| 32:15, 32:23 | 38:4, 38:19 | 88:9, 90:7, 90:7 | 31:8, 38:25 | 44:2, 52:10 |
| 34:22, 34:23 | 38:22, 39:2 | 94:2 | 40:16, 40:21 | 66:18 |
| 35:9, 35:10 | 39:11, 39:25 | **believing** 60:10 | 40:24, 43:18 | **Brown** 3:3, 3:4 |
| 35:14, 36:8 | 40:22, 40:25 | **bell** 78:11 | 49:7, 50:17 | 5:6, 5:9, 19:22 |
| 36:11, 36:13 | 44:4, 44:23 | **Bellew** 78:25 | 51:5, 51:10 | 25:5, 25:14 |
| 36:14, 36:20 | 44:25, 45:6 | **belong** 69:3 | 51:25, 52:3 | 29:4, 44:13 |
| 37:10, 37:21 | 45:18, 45:20 | **benefits** 50:17 | 52:6, 52:10 | 44:18, 54:25 |
| 38:8, 45:25 | 46:9, 46:13 | 52:1 | 52:18, 66:14 | 55:2, 55:15 |
| 46:1, 46:21 | 46:23, 47:16 | **best** 5:19, 42:4 | 66:16, 66:24 | 55:22, 56:22 |
| 48:19, 58:4 | 48:1, 48:3 | 71:16 | 68:2, 68:16 | 56:23, 57:2 |
| 62:11, 62:12 | 48:15, 50:15 | **better** 5:14 | 81:17, 81:21 | 57:6, 57:9 |
| 62:23, 63:6 | 50:16, 50:18 | 32:17, 32:19 | 82:3, 83:16 | 59:10, 59:16 |
| 63:22, 64:6 | 51:5, 52:2, 52:5 | 39:25, 42:15 | 83:20, 83:22 | 62:5, 64:10 |
| 65:11, 70:10 | 52:12, 52:25 | 47:13, 57:21 | 84:7, 84:10 | 64:15, 64:20 |

| | | | | |
|---|---|---|---|---|
| 65:5, 67:7 | 27:18, 28:9 | 7:11, 87:11 | citizens 29:23 | 19:4 |
| 67:10, 67:11 | 58:9, 63:13 | certified 84:2 | 49:12 | commissioners |
| 69:8, 70:5, 70:8 | 63:15, 63:16 | 86:15, 87:2 | city 6:21 | 49:14 |
| 79:3, 81:15 | cards 9:13 | 88:4, 88:5, 88:8 | CIVIL 1:5 | common 81:2 |
| 82:21, 87:17 | 57:14, 57:14 | 97:8 | clarification | communication |
| 88:11, 88:14 | 59:7, 71:19 | certifies 86:3 | 54:11, 84:18 | 53:18, 53:21 |
| 91:5, 91:14 | care 44:10 | certify 87:10 | clarify 44:19 | 65:8, 65:13 |
| 91:17, 94:16 | carry 27:12 | 96:6, 96:12 | 83:19 | communications |
| 97:9 | carton 34:6 | chair 93:19 | clear 5:12, 25:2 | 52:23 |
| Brown.................. | case 5:10, 29:21 | challenge 90:6 | 25:3, 25:4, 25:6 | community 21:3 |
| 2:5 | 50:10, 56:1 | challenged | 44:22, 90:18 | companies 86:3 |
| Brown.................. | 97:12, 97:13 | 45:22, 90:1 | 90:23, 91:11 | company 8:13 |
| 2:8 | 97:15 | 90:3, 90:9 | 91:13, 93:12 | 16:3, 16:4 |
| Bruce 3:3, 3:4 | cast 58:16 | 91:22, 91:24 | clerk 7:6, 7:18 | compare 52:12 |
| 5:9, 28:14, 97:9 | 62:13, 67:2 | change 33:21 | close 33:21 | compared 37:16 |
| Buckhead 23:3 | 67:20, 70:21 | 35:12, 39:24 | closing 44:1 | 51:20, 83:24 |
| 41:9 | 71:20, 77:21 | 55:3, 61:8 | 61:18 | compatible |
| budget 21:20 | 78:19, 79:13 | changed 25:19 | Coalition 4:8 | 31:21 |
| 21:22 | 79:24, 80:8 | 30:15, 39:23 | 5:10, 53:12 | competent 17:4 |
| budgeted 21:25 | 80:9, 80:10 | changes 23:17 | 87:13 | compiling 32:21 |
| building 35:9 | 80:11 | charge 97:14 | code 25:20 | complained |
| builds 16:8 | cast-ballot | chase 35:6 | 25:23, 25:25 | 79:13 |
| Bulletin 2:17 | 79:15 | cheaper 86:23 | cohere 10:14 | complaints |
| bulletins 65:19 | cast-vote 78:16 | check 61:5 | college 1:17 | 80:10, 80:12 |
| burden 13:13 | cause 64:7, 64:9 | checking 93:5 | 3:15, 6:7, 6:11 | complement |
| business 33:3 | 64:10 | checkmarks | colloquies 96:8 | 14:3 |
| button 78:16 | CCR-B-2424 | 91:4 | combination | complete 84:1 |
| 79:15 | 1:25, 96:20 | chenry@hallbo... | 63:24 | completed |
| buy 86:23 | 97:20 | 3:17 | combined 7:9 | 46:16, 47:8 |
| 88:15 | center 3:9 | choices 79:23 | 62:19 | comprised |
| buying 86:25 | 78:17 | choosing 93:6 | combo 34:21 | 93:17 |
| | central 18:19 | chose 62:14 | come 8:1, 14:25 | computer 15:23 |
| **C** | 19:12, 19:13 | 90:25, 93:9 | 24:21, 29:16 | 59:4, 75:19 |
| | 26:23, 28:2 | 93:9 | 42:10, 46:11 | 76:2 |
| calculation 45:2 | 88:17 | Chris 13:1 | 48:3, 61:19 | concern 11:11 |
| calibration | centralized | 38:13, 49:2 | 63:12, 72:3 | 13:15, 49:7 |
| 58:13 | 18:20 | 64:24, 78:25 | 77:1, 87:7 | concerned 13:3 |
| call 42:19, 42:21 | centrally 28:13 | 82:3 | 93:20, 93:24 | concerns 10:16 |
| 63:21 | cents 32:15 | Christian 3:13 | comes 8:6 | 11:17, 11:24 |
| called 25:2 | 32:15 | 30:10 | 43:18 | 13:11, 21:4 |
| 32:24 | certain 37:23 | circle 88:25 | comfortable | 39:15, 49:15 |
| candidate 6:18 | 66:25, 84:1 | 93:11 | 55:12 | 52:9 |
| candidates 36:9 | 86:3, 86:3 | circled 90:24 | coming 32:7 | concluded 95:6 |
| capitol 19:3 | certificate 7:24 | circling 93:6 | 41:20, 41:25 | conduct 6:22 |
| caption 96:7 | 9:20, 96:1 | citizen 50:2 | 42:15 | 22:18, 23:1 |
| card 27:10 | certification 7:5 | 70:12 | commission | 38:8, 38:19 |

Case 1:17-cv-02989-AT Document 469 Filed 07/10/19 Page 101 of 115 Page 4
Curling et al. v.              Deposition of
Raffensperger et al.       JENNIFER DORAN                    6/28/2019

70:1
conference 21:2
49:23
confidence
84:12
confidential
60:5, 60:7
60:10
confidentiality
9:25
confirms 61:1
conflicted 50:1
confusion 39:5
74:5
conjunction
42:13, 65:17
connect 63:25
64:3, 71:20
connection
30:16, 56:9
70:10, 89:24
consequence
62:1
consider 29:17
29:24, 34:8
consideration
30:3, 30:16
considered
38:22, 42:11
43:1, 52:1
contact 12:25
contacted 97:9
container 47:18
content 65:10
contested 51:13
67:17, 83:13
continue 23:13
CONTINUED
4:1
contract 12:1
12:23, 13:5
23:7, 23:10
97:10, 97:12
contractor 8:6
8:11
contrary 42:6

conversation
49:22, 72:6
conversations
69:6, 72:14
copy 51:16
51:16, 55:25
60:2, 68:15
94:25, 95:1
correct 5:22
5:23, 9:7, 9:8
10:11, 12:7
12:14, 12:15
12:20, 14:9
15:9, 15:15
16:5, 17:12
17:18, 17:25
18:1, 18:4, 22:3
22:19, 22:20
23:6, 23:11
24:9, 24:12
26:4, 26:10
26:12, 26:13
27:15, 27:16
27:19, 27:20
28:3, 31:12
32:3, 33:25
35:19, 35:20
36:1, 36:10
36:23, 37:2
37:3, 37:6, 37:8
38:3, 38:9
38:10, 39:21
39:22, 40:2
40:18, 42:11
43:5, 44:6
44:12, 44:25
45:1, 45:3, 45:4
46:4, 46:7
46:21, 48:2
49:6, 50:12
51:24, 53:7
56:4, 57:20
57:23, 58:1
58:2, 58:20
59:2, 59:4, 59:9
59:22, 59:25

61:13, 63:8
63:18, 65:7
66:13, 68:12
69:21, 69:22
72:20, 72:21
73:24, 74:10
74:14, 74:15
74:24, 75:3
75:7, 75:8
75:25, 76:12
76:14, 90:2
90:19, 91:16
92:9, 96:10
corresponding
79:10
corroborated
49:25
cost 21:24, 22:1
30:22, 30:23
31:13, 31:14
34:10, 42:14
85:16, 88:16
costs 21:9, 21:12
49:8, 49:11
coughing 56:20
counsel 3:1, 4:1
94:21, 97:7
97:13
count 52:13
52:13, 88:17
counties 12:9
16:10, 16:11
20:22, 35:10
38:18, 51:4
53:15, 53:18
54:18, 82:5
82:14, 82:17
88:1, 91:12
countries 81:22
county 2:20
3:20, 3:20, 6:1
6:16, 6:19, 6:21
12:5, 13:13
18:22, 22:6
22:11, 22:21
22:23, 23:9

23:20, 29:18
30:17, 30:21
32:3, 38:7
38:15, 49:13
49:14, 49:20
52:24, 53:4
53:4, 54:8
56:16, 64:11
64:25, 68:24
69:1, 70:13
70:15, 75:7
75:7, 75:24
76:9, 76:21
79:6, 79:6, 83:2
85:1, 85:5, 85:8
85:22, 85:23
87:22, 91:11
96:4, 97:4
County's 76:22
couple 14:24
19:3, 37:23
41:2, 51:6
65:20, 70:22
71:23, 93:4
course 25:19
25:24, 32:12
72:10
court 1:1, 4:20
5:15, 7:6, 30:14
65:15, 97:6
97:8, 97:9
cover 17:23
crazy 88:24
create 39:4
59:7
credit 7:18, 7:20
8:2
critical 55:10
Curling 1:4
29:21, 87:14
87:15, 87:18
current 5:25
31:20, 31:25
42:5, 92:2
currently 18:16
22:12, 22:24

23:21, 27:1
30:24, 32:11
88:5
customary
97:14
cut 35:5
CVS 25:13
cyber 54:13
54:16, 75:10
76:23
cyber-attack
81:21
cycle 92:17

**D**

D-O-O-R-E-N-...
8:9
D-O-R-A-N 5:8
dash 21:1, 59:23
data 19:11
56:16, 56:18
56:19, 57:5
63:22, 70:2
database 16:9
16:10, 32:3
35:9, 35:22
51:19, 57:13
57:21, 58:18
58:24, 59:3
63:7, 63:14
63:17, 63:19
63:23, 68:7
68:11, 68:18
69:1, 70:1, 70:3
77:2
date 11:5, 14:17
50:7, 97:20
David 3:19
94:17
david.lowman...
3:23
day 8:7, 8:20
8:22, 8:25, 9:1
45:9, 45:19
47:23, 87:9

Curling et al. v.          Deposition of
Raffensperger et al.    JENNIFER DORAN                      6/28/2019

| | | | |
|---|---|---|---|
| 96:15 | detailed 67:3 | discovery 28:21 | 83:22, 83:25 | 7:21, 7:22, 7:23 |
| days 42:19 | determination | 29:2 | 92:21, 94:12 | 8:1, 8:22, 9:3 |
| 42:25 | 89:7 | discrepancies | Dominion 25:16 | 16:19, 16:23 |
| deal 32:18 | determine 62:16 | 84:5 | DONNA 1:4 | 24:23, 25:22 |
| 32:19 | 90:21 | discuss 66:14 | Doorenbos 8:9 | 31:17, 34:4 |
| decide 37:9 | determining | 66:16, 68:2 | Doran 1:12, 5:2 | 34:6, 42:22 |
| 38:8 | 90:14 | 68:6, 81:21 | 5:8, 5:9, 67:12 | 45:19, 80:23 |
| decided 12:2 | device 15:15 | discussed 10:17 | 83:8, 97:5 | 85:12, 92:18 |
| 30:14 | 27:4 | 10:20, 11:3 | dozen 79:12 | easy 90:20 |
| decides 89:12 | DHS 75:9, 75:12 | 41:4, 50:17 | DRE 14:21 | educated 37:25 |
| 90:11 | 76:2, 76:19 | 66:23, 68:13 | 19:10, 19:19 | Education |
| decision 29:22 | dictated 34:16 | 68:16, 72:23 | 27:8, 40:8, 43:3 | 41:24 |
| 30:14, 38:17 | died 86:23 | 83:17, 84:9 | 43:6, 43:8, 54:7 | effect 93:2 |
| 53:16 | different 8:24 | 87:18, 88:20 | 54:9, 58:4, 59:8 | effort 54:9 |
| decrease 66:10 | 10:12, 10:14 | discussing 84:25 | 61:1, 63:9, 63:9 | eight 25:18 |
| Defendants 1:8 | 16:4, 26:11 | discussion 41:2 | 63:11, 73:10 | 31:17 |
| 3:18, 4:2 | 64:2, 70:22 | 49:3, 52:6 | 73:16, 74:19 | either 16:2, 24:5 |
| definite 12:21 | 72:6, 86:22 | 52:15, 55:1 | 77:20, 77:22 | 24:21, 42:1 |
| 13:2, 13:7 | 89:24 | 55:19, 59:13 | DREs 19:16 | 75:10, 76:23 |
| definitely 17:2 | differently | 81:14, 83:12 | 22:8, 29:19 | 93:18 |
| DeKalb 65:15 | 16:13 | 83:20 | 39:20, 40:15 | elected 6:21 |
| 97:4 | digital 73:9 | discussions 52:4 | 51:15, 61:16 | election 2:17 |
| delivery 35:9 | 73:17 | 52:18, 52:23 | 61:19, 84:8 | 2:18, 8:7, 8:20 |
| Democrat 93:18 | direct 2:14, 56:6 | 66:19, 71:23 | 87:16 | 8:22, 8:25, 9:1 |
| Dennis 75:12 | 59:18 | display 80:13 | dropped 67:22 | 11:8, 13:17 |
| Department | directed 82:3 | disproportionate | dropping 89:9 | 14:10, 14:18 |
| 54:17, 75:5 | direction 96:9 | 66:5 | drops 27:5, 31:4 | 17:10, 17:23 |
| 76:4, 76:16 | directly 45:15 | distinctive 26:8 | due 50:6 | 23:10, 23:20 |
| depend 18:7 | 65:17, 65:21 | district 1:1, 1:1 | Dufort 70:12 | 33:14, 38:9 |
| depending | 87:7 | 34:21 | duly 5:3 | 39:11, 42:12 |
| 57:25 | director 13:1 | DIVISION 1:2 | duplicate 92:9 | 42:12, 42:13 |
| deposition 1:11 | 48:25, 49:1 | document 54:3 | 93:13 | 42:24, 43:6 |
| 5:21, 95:6, 97:5 | 64:25, 75:20 | 55:9, 56:7 | duplication 92:7 | 43:20, 43:25 |
| 97:10, 97:10 | 76:3, 76:20 | 59:20, 62:16 | duplicators | 45:9, 45:19 |
| 97:14 | disagreement | 62:18, 65:4 | 92:10 | 46:10, 46:25 |
| deputy 7:15, 8:8 | 91:9 | 67:4, 73:4 | Duval 20:25 | 47:3, 47:23 |
| 49:1 | disclosable 61:6 | 80:21 | 48:23 | 47:24, 48:8 |
| describe 6:15 | disclose 62:18 | documentation | | 48:25, 49:1 |
| 9:9, 26:19 | 62:20, 62:24 | 77:17, 77:19 | **E** | 51:11, 53:13 |
| 71:25, 77:22 | disclosed 64:7 | documents 56:3 | | 64:11, 65:1 |
| described 7:12 | disclosing 55:8 | 71:24 | e-Poll 71:18 | 65:19, 72:11 |
| describing | 55:13 | doing 7:1, 7:22 | earlier 68:12 | 73:18, 73:19 |
| 19:16 | disclosure 4:19 | 9:11, 9:22, 17:7 | 68:13, 81:20 | 76:6, 76:22 |
| Description | 97:1, 97:7 | 20:10, 20:12 | 85:21, 87:18 | 79:18, 80:19 |
| 2:12 | discount 32:23 | 21:17, 23:10 | earliest 12:17 | 81:17, 82:1 |
| detail 9:10, 11:3 | 97:15 | 51:14, 81:4 | early 7:3, 7:19 | 82:9, 84:2, 84:3 |

Case 1:17-cv-02989-AT  Document 469  Filed 07/10/19  Page 103 of 115  Page 6

Curling et al. v.        Deposition of
Raffensperger et al.   JENNIFER DORAN              6/28/2019

87:20, 92:17
election-specific
76:7
ElectioNet 7:25
elections 2:20
6:1, 6:2, 6:16
6:18, 6:19, 6:22
7:8, 7:10, 8:19
12:19, 13:1
14:4, 16:19
16:22, 22:18
22:22, 23:1
23:7, 41:3, 41:6
41:8, 41:10
42:2, 42:4, 42:9
56:12, 58:24
64:12, 64:25
66:7, 76:13
76:17, 76:20
84:16, 87:23
88:2, 89:25
91:24, 93:4
94:6
elector 90:12
electronic 2:14
15:9, 17:24
19:11, 27:18
35:13, 52:13
59:18, 74:6
74:19, 74:22
75:2, 95:2, 95:4
95:5
electronically
27:10
employee 96:13
empty 47:19
encompassing
6:17
encountered
80:18
engaged 83:18
ensued 55:1
55:19, 59:13
81:14
enters 7:25
entire 85:8

envelope 46:3
equipment 2:20
10:25, 11:13
13:17, 13:24
14:21, 19:4
21:13, 39:12
39:16, 43:19
58:8, 86:22
equivalent
15:18, 19:25
ES&S 19:6
26:25, 49:16
85:17, 89:17
established
16:14, 16:16
estate 6:6
estimates 49:10
49:24, 49:25
et 1:4, 1:7
ethics 6:20
evaluate 30:17
evening 93:23
eventually
66:19
everybody 17:3
94:24
evidence 96:11
exact 13:5
18:15, 45:25
90:10
exactly 13:5
18:12, 40:11
74:13
Examination
2:5, 2:6, 2:7, 2:8
2:9, 5:5, 83:5
84:22, 88:13
91:20
examined 5:3
example 40:6
excuse 6:24
19:10, 19:12
20:3, 56:11
Exhibit 2:12
2:13, 2:14, 2:16
2:17, 2:18, 2:20

55:20, 55:24
56:6, 59:14
59:17, 62:3
62:7, 64:18
64:23, 65:6
67:5, 67:8
67:12, 79:1
79:5
exhibits 2:23
existing 44:9
51:22
experience
91:15
expert 68:20
experts 68:19
explain 60:6
80:22
explained 64:2
65:9
explains 94:21
express 11:17
13:11, 13:15
46:12, 49:17
51:8, 57:14
58:9, 86:21
expressed 10:16
11:10, 21:3
49:7
expression 24:6
extended 21:18
extensive 13:18
extra 15:1

**F**

failed 39:7
fair 12:19, 17:19
32:8, 33:24
42:7, 55:15
fairly 41:4, 49:2
90:20, 93:22
fall 14:19, 17:11
17:22, 20:4
81:25
falls 16:22
familiar 19:5

27:2, 65:25
far 12:1, 13:22
23:13, 40:22
50:14, 76:1
favor 39:10
favorably 38:24
39:1
FBI 81:12
81:16
feasibility 30:17
38:1, 38:23
fed 26:3, 28:11
federal 40:7
81:23
fee 49:18
feed 31:4, 31:24
32:2
feedback 30:11
feel 13:19, 28:17
55:8, 55:12
fees 21:4, 21:10
50:4
felt 60:4, 84:11
FILE 1:5
filed 29:21
50:23, 66:20
files 56:14
filing 6:20
fill 46:22
fills 7:24
finalized 13:6
financial 97:15
financially
96:14
find 54:2, 70:16
77:11, 84:5
fine 5:24, 77:24
fingernails
80:24, 81:5
81:9
fingertips 80:24
finish 47:10
94:12
FIRM 4:4
first 5:3, 10:15
11:12, 14:7

14:10, 29:9
29:10, 33:6
44:19, 45:23
47:18, 58:17
60:24, 68:14
70:20, 70:21
71:2, 71:3, 71:9
71:10, 71:12
79:16, 93:4
five 13:25, 22:5
50:25, 70:22
71:2, 71:3, 78:3
91:24, 94:6
94:7
five-member
94:5
five-minute
44:14
fix 89:3
fixed 86:24
flash 81:12
81:17
focus 35:16
Focusing 54:7
folder 59:10
follow 38:25
55:3, 91:2
follow-up 88:11
following 97:7
follows 5:4
foregoing 96:6
foreign 81:22
form 36:16
64:8
forward 28:17
forwarded
81:16
four 22:24
22:25, 60:20
60:21, 71:1
79:10
fourth 79:11
frame 12:22
13:7
free 55:8
FTP 57:19

Case 1:17-cv-02989-AT   Document 469   Filed 07/10/19   Page 104 of 115

Page 7
Curling et al. v.          Deposition of
Raffensperger et al.   JENNIFER DORAN          6/28/2019

| | | | | |
|---|---|---|---|---|
| **full** 13:24, 14:3 15:1 | 42:11, 48:7 66:9, 86:1 | 86:10, 86:11 86:25, 87:1 | **guess** 16:2 37:25, 37:25 | **Harvey** 13:1 38:13, 49:2 |
| **fully** 92:12 | 87:18, 92:16 | 87:6, 87:9 | 41:1, 81:8 | 64:25, 82:4 |
| **Fulton** 3:20 83:2, 96:4 | **generated** 63:7 63:9, 63:21 | 92:12, 93:6 **goes** 25:15 | 84:15 **guidance** 35:3 | **hats** 17:7 **HB** 10:21, 25:19 |
| **further** 2:8, 2:9 84:18, 88:13 91:20, 94:15 96:12 | **GEOA-VRAG** 21:1 **Georgia** 1:1 1:21, 3:5, 3:10 | 36:17, 47:5 59:3, 60:25 **going** 5:11, 7:23 10:12, 10:13 | 53:9, 53:9 **guided** 34:13 **guidelines** 10:22 26:14, 26:17 | 39:5, 39:6 **head** 28:5 **hearing** 90:11 **help** 7:13, 15:1 |
| | 3:16, 3:22, 4:5 10:19, 82:2 | 11:6, 16:3 16:12, 20:1 | | **helps** 8:6, 8:6 9:11, 9:14 |
| **G** | 86:16, 94:4 96:3, 97:3, 97:7 | 20:19, 20:22 21:11, 21:13 | **H** | 43:18 **Henry** 3:13 |
| **G-E-O-A** 21:1 **gain** 52:2 | 97:8 **getting** 7:4 | 21:24, 22:2 23:20, 24:18 | **half** 79:12 **Hall** 1:15, 3:14 | 30:10, 69:4 82:25 |
| **gauge** 37:18 **gears** 48:22 | 13:23, 13:24 13:25, 15:23 | 26:25, 28:15 28:17, 28:25 | **hand** 52:13 55:23, 62:6 | **hereto** 4:21 **highlight** 79:7 |
| **GEM** 13:25 15:18 | 16:17, 28:18 34:21, 68:6 | 36:6, 39:8 39:16, 40:21 | 67:7, 79:4 **hand-marked** | **hire** 8:17, 8:17 68:18, 68:20 |
| **GEMS** 15:17 16:9, 16:9 | 73:19, 87:1 88:1, 88:1 | 42:1, 42:23 44:21, 47:4 | 29:18, 30:18 33:10, 34:9 | 69:2 **hit** 58:12, 79:15 |
| 16:11, 20:1 28:12, 28:13 | **give** 20:15 25:12, 46:2 | 48:15, 49:4 50:7, 50:9 | 38:19, 39:1 39:17, 39:25 | 79:24, 80:8 80:9, 80:11 |
| 32:3, 35:8, 35:9 35:22, 49:18 | 48:15, 49:24 49:25, 54:21 | 64:21, 69:21 70:5, 74:13 | 40:22, 40:25 44:4, 50:15 | **hitting** 80:8 **home** 6:5 |
| 51:19, 57:13 58:17, 58:24 | 54:22, 54:23 54:24, 57:12 | 84:24, 87:8 89:2, 89:11 | 50:16, 50:18 52:2, 52:5, 53:5 | **Homeland** 54:17, 75:5 |
| 59:3, 63:7 63:13, 63:17 | 57:13, 75:9 77:17, 92:4 | 93:20, 94:14 **good** 4:8, 44:20 | 85:9, 86:19 92:13, 92:22 | 76:4, 76:10 76:16 |
| 63:19, 63:23 65:13, 65:14 | **given** 45:14 74:20, 96:11 | 53:12, 82:22 **goofy** 80:12 | 92:24, 93:16 **handle** 32:6 | **hope** 5:12 **hopefully** 37:25 |
| 68:7, 68:10 68:18, 69:1 | 97:15 **gives** 8:2, 15:2 | **gotten** 68:15 72:10 | 34:14 **handled** 21:11 | **HORST** 3:8 **hundred** 33:22 |
| 69:25, 70:2 73:4, 77:1 | 46:6, 67:2 **go** 6:9, 9:13 | **Governance** 4:8 53:12 | 21:14 **hands** 20:4 | |
| 83:24 **general** 2:18 | 10:12, 27:4 28:20, 36:15 | **government** 40:7, 76:6 | **happen** 18:13 20:2, 90:5 | **I** |
| 10:20, 10:22 10:22, 19:5 | 36:25, 39:1 39:25, 43:21 | 76:10 **governor's** 66:1 | **happened** 9:23 77:6, 77:7, 80:3 | **IASC** 76:5 **idea** 14:8, 19:5 |
| 33:14, 38:23 42:13, 56:15 | 44:19, 58:12 58:13, 60:21 | 66:6 **graduate** 6:13 | 80:22 **happening** 80:1 | 50:9, 88:21 **identification** |
| 72:2, 72:11 76:10 | 61:7, 61:19 63:16, 74:6 | **great** 54:6 **greater** 9:10 | **happens** 43:20 45:8, 47:15 | 55:21, 59:15 62:4, 64:19 |
| **General's** 65:11 65:15 | 79:21, 79:23 79:24, 80:22 | 11:3 **groups** 10:14 | 58:22 **hard** 33:12 | 67:6, 79:2 **identified** 79:8 |
| **generally** 6:15 11:21, 13:15 | 83:4, 85:23 | **guarantee** 71:13 | **harm** 64:7, 64:9 64:10, 69:11 | **identify** 64:21 **identity** 62:20 |

Case 1:17-cv-02989-AT   Document 469   Filed 07/10/19   Page 105 of 115   Page 8
Curling et al. v.            Deposition of
Raffensperger et al.      JENNIFER DORAN                    6/28/2019

| | | | | |
|---|---|---|---|---|
| 62:24, 70:11 | informal 52:4 | 18:2, 26:12 | 4:3 | 82:25, 84:12 |
| IGAs 22:25 | 52:18 | investigator | kind 9:9, 9:20 | 85:8, 85:10 |
| 23:4, 23:16 | information | 56:25 | 28:19, 37:13 | 86:5, 86:17 |
| image 2:16 | 2:19, 12:22 | involve 26:24 | 37:18, 67:2 | 86:22, 87:12 |
| 62:11, 62:12 | 31:8, 32:22 | involved 15:5 | 75:11, 76:24 | 87:21, 88:3 |
| 62:23, 63:6 | 35:23, 36:13 | issue 38:12 | 77:3, 88:24 | 89:10, 91:2 |
| 63:22, 64:6 | 42:6, 46:22 | 40:21, 65:25 | knew 13:8 | 91:11, 92:21 |
| 70:10, 70:13 | 50:13, 55:10 | 66:4, 67:21 | 71:12 | 94:11, 94:24 |
| 70:16, 71:10 | 55:11, 56:16 | 68:4, 79:7, 80:4 | know 12:2, 13:8 | knowledge |
| 71:14, 72:23 | 61:10, 62:18 | 80:5, 80:20 | 13:22, 18:24 | 16:15, 28:23 |
| 73:9, 73:17 | 62:19, 63:24 | 81:2 | 20:1, 20:18 | 42:5, 70:17 |
| 78:10 | 64:5, 71:18 | issued 38:17 | 21:6, 21:6, 21:7 | 71:16 |
| images 65:12 | 72:19, 73:1 | issues 2:21, 34:9 | 21:11, 21:13 | knows 34:17 |
| implementation | 74:16, 77:24 | item 21:20 | 21:16, 21:18 | Koehl 1:25 |
| 10:17, 10:18 | informed 53:4 | | 21:19, 21:23 | 96:20, 97:20 |
| 11:24, 12:11 | infrastructure | **J** | 22:1, 22:4 | KREVOLIN |
| 13:12, 20:16 | 55:11 | | 23:13, 23:22 | 3:8 |
| 23:18, 28:16 | initial 17:8 | Jan 8:12, 94:8 | 24:17, 24:21 | KSU 9:21 |
| implemented | 43:24, 53:8 | January 9:6 | 24:24, 25:11 | |
| 10:23 | initially 14:20 | 13:19, 64:24 | 25:17, 28:15 | **L** |
| important 5:15 | initiative 37:20 | Jennifer 1:12 | 28:17, 28:19 | |
| improve 54:9 | injunction | 5:2, 5:8, 97:5 | 28:21, 31:6 | L&A 6:24, 8:6 |
| 54:22 | 87:17 | job 9:17, 17:4 | 32:19, 33:13 | 9:12, 9:14, 10:9 |
| inclined 38:24 | injunctive 50:23 | 18:15, 20:11 | 33:19, 36:19 | 43:13, 43:16 |
| 39:1 | inserted 59:7 | 40:3 | 36:19, 36:23 | 43:25, 58:7 |
| include 24:2 | instance 90:21 | John 48:11 | 37:12, 37:14 | 58:8, 60:13 |
| included 30:23 | instances 22:19 | judge 29:22 | 37:20, 37:25 | 60:15, 74:21 |
| 83:22, 83:25 | 79:12 | 38:16, 53:24 | 38:25, 39:5 | 79:17 |
| includes 6:23 | instructions | judgment 39:24 | 39:8, 39:14 | labor 44:9 |
| including 82:2 | 36:2, 46:13 | Judicial 97:7 | 40:23, 40:24 | land 13:10 |
| incorporate | 91:2 | July 42:22 | 41:20, 41:25 | large 32:13 |
| 84:15 | integrity 64:12 | 96:15 | 42:22, 48:19 | 32:14, 37:19 |
| increase 33:17 | intended 89:7 | jump 10:13 | 48:20, 48:24 | 37:21 |
| 66:8, 92:15 | intends 84:7 | June 1:13, 11:4 | 49:20, 50:11 | larger 32:24 |
| increases 66:10 | intent 90:15 | 11:4, 11:18 | 50:11, 50:14 | late 39:15, 42:22 |
| independent | 90:21, 91:10 | | 51:7, 52:5, 52:9 | 93:22 |
| 6:19, 8:5, 8:10 | 93:12 | **K** | 53:20, 56:14 | law 3:3, 3:4, 3:8 |
| 60:9 | interaction | | 58:21, 60:13 | 3:14, 3:19, 4:3 |
| independently | 71:25 | kanderson@ro... | 61:11, 62:10 | 6:7, 6:12, 6:13 |
| 82:18 | interested 96:14 | 4:6 | 64:17, 65:16 | 10:21, 10:21 |
| indication 69:20 | interface 35:12 | keep 43:16 | 76:1, 76:3 | 18:9, 30:15 |
| indications | intergovernme... | 46:19, 47:4 | 76:25, 77:7 | 94:4 |
| 23:16 | 23:4 | 48:13, 65:23 | 77:14, 77:23 | lawsuit 35:7 |
| individual 27:22 | interpret 53:15 | kept 80:8 | 78:6, 78:9 | 66:19 |
| 53:18 | interrupt 5:20 | kick 41:16 | 78:10, 78:21 | lawyers 38:7 |
| inform 11:25 | inventory 15:13 | KIMBERLY | 81:3, 82:18 | lay 13:10 |

Case 1:17-cv-02989-AT   Document 469   Filed 07/10/19   Page 106 of 115   Page 9

Curling et al. v.          Deposition of
Raffensperger et al.       JENNIFER DORAN            6/28/2019

| | | | | |
|---|---|---|---|---|
| left 45:15, 61:16 | 25:8, 31:6 | 59:8, 61:5, 80:2 | 59:14, 62:3 | 27:9, 27:18 |
| legal 7:1, 38:14 | 86:17 | 80:13, 84:13 | 62:6, 64:18 | 28:9, 57:14 |
| legally 74:1 | longer 56:13 | 92:25, 93:3 | 67:5, 67:8, 79:1 | 59:7, 63:13 |
| legislation 39:8 | 94:1 | Macon 6:10 | 79:4 | 63:15, 63:16 |
| level 43:7, 51:7 | look 20:13 | Madison 23:2 | marking 15:14 | men 81:8 |
| license 9:18 | 24:18, 24:22 | 23:3, 41:9 | 27:4, 93:6 | mention 16:18 |
| 21:10, 21:16 | 25:8, 25:20 | mail 92:19 | Marks 4:8, 25:4 | mentioned |
| 49:4, 49:18 | 37:13, 37:15 | maintenance | 59:12 | 14:13, 15:17 |
| 70:1 | 65:3, 68:7, 73:9 | 20:23, 21:4 | Marsi 1:25 | 48:22, 71:22 |
| lieutenant 66:1 | 74:13, 79:9 | 21:9, 21:16 | 96:20, 97:20 | 85:3, 85:21 |
| 66:6 | looked 31:1 | 43:17, 49:5 | mash 78:15 | 88:3, 89:20 |
| limited 13:23 | 33:14, 37:17 | 49:19 | match 47:11 | Mercer 6:10 |
| 14:1, 28:23 | 37:17, 38:21 | making 33:10 | matches 61:2 | merely 83:16 |
| 50:19, 61:24 | 67:1, 89:13 | 86:13 | material 40:5 | mess 60:21 |
| limits 94:3 | 89:16 | man 17:6 | matter 49:3 | Michael 70:23 |
| line 21:20, 28:15 | looking 62:15 | manage 26:12 | 61:9, 61:10 | 72:15 |
| list 36:21, 46:23 | 69:16 | management | mean 10:9 | mid-April 50:7 |
| 82:16, 82:16 | looks 25:1 | 19:25 | 15:18, 18:19 | middle 79:12 |
| listed 55:10 | 73:14 | manager 18:10 | 19:13, 21:8 | minimizes 42:14 |
| literal 73:22 | loose 48:5 | 18:13, 18:14 | 23:4, 25:13 | minus 22:6 |
| litigation 97:15 | lot 22:21, 29:1 | 45:12, 45:14 | 90:4 | miscalculated |
| little 5:17, 6:5 | 71:7, 93:2 | 46:3, 46:23 | media 26:23 | 37:18 |
| 9:10, 10:13 | low 92:5 | 61:18 | 27:9, 36:17 | missed 85:4 |
| 22:12, 25:23 | LOWMAN 3:19 | manager's 29:7 | medium 43:7 | Mm-hmm 59:12 |
| 26:20, 36:6 | 83:2, 94:18 | 46:12 | meet 56:25 | 77:10, 89:19 |
| 43:2, 44:21 | 95:5 | managers 14:24 | 57:10, 57:11 | 90:16 |
| 47:20, 63:5 | | 14:24, 14:25 | meeting 11:3 | Monday 46:11 |
| 70:6, 70:9 | **M** | 15:3, 17:3, 17:5 | 11:4, 11:4 | month 11:21 |
| live 14:10, 90:7 | | 17:8, 17:14 | 11:18, 11:19 | 13:16, 16:19 |
| 90:8 | M-O-T-T 75:15 | 17:16, 17:22 | 11:21, 12:24 | 16:21, 16:25 |
| LLC 3:4 | ma'am 78:20 | 18:9, 46:11 | 52:6, 52:19 | 77:8, 77:9 |
| load 73:18 | machine 2:15 | 47:3, 47:6 | 66:24, 68:16 | 78:24 |
| local 29:23 | 9:15, 26:3, 26:5 | 49:13, 49:14 | meetings 11:17 | months 11:12 |
| 93:18, 93:18 | 35:13, 43:6 | 80:6 | 19:4, 19:7 | 30:6, 41:2 |
| location 43:14 | 58:10, 59:19 | manual 83:25 | 24:21, 29:24 | 65:20, 87:3 |
| 43:15 | 60:21, 63:11 | manufacturer | 81:20 | Morgan 6:1 |
| locations 6:23 | 71:4, 71:11 | 9:19 | member 40:24 | 6:16, 12:5 |
| 8:24, 9:2 | 73:18 | March 11:9 | 43:18, 52:7 | 12:13, 13:13 |
| locked 61:23 | machines 9:11 | 11:15, 14:11 | member's 11:23 | 22:6, 22:11 |
| log 77:3 | 9:16, 9:19 | 21:2, 41:18 | 52:11 | 22:21, 22:23 |
| logic 10:9, 58:25 | 10:25, 11:7 | 50:6 | members 11:10 | 29:18, 30:17 |
| 79:21 | 12:17, 15:7 | margin 33:24 | 30:2, 84:11 | 38:7, 52:24 |
| logistical 34:9 | 15:9, 17:24 | Marilyn 4:8 | 94:10 | 53:4, 53:4, 54:8 |
| logistics 6:25 | 20:19, 20:23 | mark 89:2, 90:9 | memo 64:24 | 59:23, 75:6 |
| 35:3 | 22:4, 40:8, 43:3 | marked 45:21 | 65:6 | 75:7, 75:24 |
| long 6:2, 9:15 | 43:8, 58:14 | 55:20, 55:23 | memory 9:13 | 76:9, 76:21 |

76:22, 79:6
84:25, 85:5
85:8
**morning** 61:17
**motion** 29:21
50:23, 51:3
**Mott** 75:12
**move** 18:14
29:21, 30:3
30:7, 43:14
**moved** 86:19
93:16
**moving** 29:18
29:25, 34:9
39:10, 63:19
76:19
**multifaceted**
94:13
**multiple** 10:7
36:21
**municipal** 6:18
41:3, 42:4
87:20, 87:23
88:2
**municipalities**
22:15, 22:18
22:22, 22:25
22:25, 23:11
41:7, 41:8

**N**

**name** 5:7, 5:9
8:8, 8:10, 24:25
25:6, 48:23
48:24, 75:14
**names** 36:9
**National** 40:6
**nature** 85:25
**necessarily**
12:18, 69:7
71:10
**necessary** 70:1
**need** 5:18, 13:10
17:1, 17:2, 28:6
34:3, 34:4, 40:4

44:13, 44:21
45:3, 46:14
52:25, 57:2
72:4, 85:10
85:12
**needed** 60:4
69:24, 86:9
**needs** 46:5
**never** 5:21
32:25, 48:9
91:8, 92:23
**new** 10:17
10:18, 12:2
13:17, 13:25
15:7, 15:9
15:11, 15:19
15:23, 15:25
16:13, 16:25
17:11, 18:25
23:19, 24:1
24:1, 24:18
26:16, 26:21
38:11, 39:11
39:16, 49:2
54:7, 60:22
86:21, 89:18
93:3
**news** 81:12
81:16
**night** 27:7
46:10, 46:18
47:21, 47:23
47:24, 93:21
94:1
**nods** 28:5
**nondisclosure**
9:24
**nonphysical**
75:10
**normally** 92:3
**NORTHERN**
1:1
**notice** 42:20
**notices** 7:1
**November** 2:18
11:8, 12:18

12:18, 41:4
41:6, 42:4
42:20, 84:3
84:16, 88:2
90:23
**number** 5:11
7:12, 13:23
13:24, 14:2
22:6, 32:13
37:10, 37:19
45:3, 47:11
48:4, 48:7
48:11, 55:17
55:17, 60:19
60:22, 60:23
60:23, 61:1
61:1, 61:2
61:15, 61:25
62:1, 66:5
67:16, 67:20
67:20, 67:24
77:21, 78:1
78:1, 78:4, 78:5
78:6, 78:16
78:17, 92:14
92:17
**numbers** 33:14
37:16, 49:19
50:1, 50:3
51:20, 60:1
60:3, 60:16
60:24, 61:5
61:8, 61:21
61:22, 66:22
78:3, 78:3, 78:7
**NW** 3:9, 4:4

**O**

**o'clock** 93:23
**O.C.G.A** 97:11
**object** 28:15
28:25, 64:8
69:5
**objected** 28:19
**observe** 79:17

**observed** 60:17
**observing** 60:14
**obtain** 85:16
85:22, 86:9
86:12, 86:18
**obvious** 90:24
**obviously** 7:4
11:8, 13:17
23:25, 28:22
41:3, 43:16
48:18, 50:19
51:15, 61:6
73:15, 75:21
**occasion** 74:25
**Occasionally**
90:5
**occur** 91:22
**October** 50:24
**OEB** 65:22
**OEBs** 65:18
**offered** 54:18
**offers** 76:5
**office** 3:20
13:14, 18:22
18:23, 19:14
21:1, 22:15
28:2, 43:12
44:3, 51:17
56:12, 56:17
57:1, 65:11
88:18, 89:5
**officer** 6:20
**offices** 76:23
82:1, 97:9
**official** 2:17
65:18, 72:10
**officials** 6:21
14:18, 53:13
65:1
**OGCA** 4:18
**Oh** 92:5
**okay** 10:4, 19:20
22:16, 23:9
26:25, 28:1
33:1, 38:21
43:11, 44:15

49:24, 51:25
52:20, 53:2
54:2, 54:6
55:12, 56:9
56:15, 56:22
57:4, 60:13
65:23, 70:5
75:16, 77:25
78:13, 78:18
86:17
**Oklahoma** 6:12
**Old** 25:16
**older** 80:23
81:3
**once** 11:21, 24:5
26:19, 27:3
31:4, 36:11
43:16, 77:6
**ones** 7:10, 17:5
22:22, 25:22
25:24, 46:17
51:14, 61:25
82:18, 86:15
89:18
**ongoing** 21:12
**open** 60:15
60:16, 61:4
65:1, 65:12
65:19, 72:12
**opening** 60:23
94:10
**openings** 29:12
**operating** 84:13
84:14
**operational**
21:9, 30:19
**opinion** 38:14
52:11, 53:25
65:15, 65:16
68:25, 69:25
89:3
**opportunity**
74:20, 79:14
**optical** 84:25
85:4, 85:9
85:15, 85:23

Curling et al. v.
Raffensperger et al.    Deposition of
JENNIFER DORAN                6/28/2019

86:6, 86:9
86:11, 86:12
86:19, 87:4
92:13
**option** 30:11
35:5, 35:6
**options** 54:24
55:3, 55:5, 75:5
**order** 33:11
36:1, 36:4
37:10, 44:24
48:8, 71:1
**ordered** 86:21
94:24
**oriented** 17:11
**original** 2:23
2:23
**originals** 65:24
**outcome** 96:14
**output** 31:24
**outside** 28:20
29:2, 51:8, 52:6
52:18, 68:6
**overhead** 44:10
**overly** 19:5
**oversee** 6:22
7:10
**overseeing** 7:3
**ownership**
69:25

**P**

**p.m** 70:7, 95:6
**pack** 43:21
**package** 14:7
**pad** 48:5, 48:6
81:1, 81:6
81:10, 81:11
**page** 2:4, 2:12
79:12
**panel** 89:5
89:12, 89:21
91:10, 91:25
92:4, 92:6
93:16, 93:17

94:11
**paper** 15:14
18:1, 18:2, 18:2
19:9, 19:11
24:5, 24:8
24:22, 25:24
26:12, 27:11
27:25, 29:18
29:21, 29:25
30:3, 30:7
30:18, 32:6
32:7, 32:11
32:12, 33:10
33:11, 34:9
34:20, 35:13
36:1, 36:5
37:21, 37:21
38:4, 38:8
38:19, 39:2
39:10, 39:25
40:22, 40:25
44:4, 44:25
45:20, 50:15
50:16, 50:18
51:5, 52:2, 52:5
52:12, 52:25
53:5, 63:21
73:14, 74:9
74:13, 83:13
83:25, 85:9
86:20, 90:17
92:13, 92:20
92:20, 92:22
92:24, 93:16
**papers** 40:9
**paperwork**
45:12, 47:5
47:10, 48:16
**part** 11:7, 12:10
12:14, 13:23
20:5, 21:15
30:20, 38:5
39:19, 44:1
48:16, 58:8
58:12, 61:3
61:4, 61:18

70:20, 72:8
72:8, 76:8, 76:9
82:8
**participation**
66:11
**particular** 35:17
62:15
**parties** 97:14
**party** 96:13
97:12, 97:15
**pass** 64:21
**passed** 41:18
**pay** 20:19, 20:22
22:2, 32:15
32:15, 37:7
49:4, 50:9
**paying** 50:4
**PC** 1:15, 3:14
97:9
**PDFs** 36:15
57:21, 74:9
**Peachtree** 3:9
**penetrated**
82:12, 82:13
**people** 8:3
37:15, 43:21
62:23, 71:3
79:8, 88:24
89:6, 91:3, 92:8
92:18, 92:19
92:23, 93:5
93:8
**per-ballot** 32:23
**percent** 33:17
33:20, 33:22
67:25
**percentage**
33:16, 67:22
68:1, 92:4, 92:5
**perform** 85:10
**period** 65:20
69:19
**permitted** 73:24
**person** 71:10
71:12, 78:22
90:9, 90:11

90:25, 93:9
93:19
**person's** 71:14
**phase** 11:1, 11:7
12:10, 12:13
13:22, 13:22
**physical** 15:13
54:13, 54:17
54:18, 55:4
75:6, 76:23
**physically** 24:19
57:10, 57:11
72:19, 74:1
**pick** 46:11
**picked** 29:8
**picture** 73:13
73:20
**piece** 17:23
25:23, 63:20
76:13
**pilot** 12:6, 12:6
**place** 6:23
13:13, 24:14
28:22, 35:1
61:17, 85:24
87:25
**Plaintiff's** 2:12
55:20, 55:24
59:14, 62:3
64:18, 64:23
67:5, 79:1
**plaintiffs** 1:5
3:2, 5:10, 29:20
83:7, 87:13
87:13, 87:14
87:15, 87:19
**plan** 17:7, 20:16
**plans** 23:19
**please** 5:7, 5:13
**plethora** 40:12
**plus** 19:11
19:11, 22:6
31:14, 33:24
85:19, 94:7
**point** 28:21
29:3, 29:23

53:11, 57:15
58:23, 61:23
80:2
**poll** 7:2, 8:4
8:17, 8:19, 8:21
11:14, 13:16
14:13, 14:14
14:24, 14:24
14:25, 15:2
15:2, 15:9
16:18, 17:3
17:4, 17:8, 17:9
17:13, 17:16
17:17, 17:22
17:24, 18:5
18:9, 18:10
18:11, 18:13
18:14, 19:18
19:19, 34:16
44:1, 45:12
45:14, 46:3
46:11, 46:23
47:3, 47:6
49:18, 51:15
57:14, 58:9
60:25, 61:17
80:5, 80:6
**polling** 6:23
8:24, 9:1, 51:18
61:17, 83:23
**polls** 46:12, 51:8
86:21
**population**
32:14
**position** 5:25
62:22, 62:25
**possession**
45:16
**possibility** 29:17
**possible** 70:15
87:21, 87:24
**Possibly** 42:8
**post** 51:15
**postelection** 7:4
24:2, 50:22
51:11, 52:11

Curling et al. v.
Raffensperger et al.

Deposition of
JENNIFER DORAN

6/28/2019

83:12, 83:22
potential 89:14
precertification
51:11, 83:12
83:23
precinct 13:25
18:17, 18:18
19:1, 19:8
19:13, 26:22
27:12, 30:23
30:24, 31:2
31:9, 31:15
32:5, 45:15
45:17, 51:16
51:18, 67:3
67:17, 67:20
67:23, 67:25
68:1, 78:4
85:12, 85:20
88:19, 88:23
89:8, 90:8, 92:8
precincts 30:25
37:24, 51:12
66:25, 70:23
84:1
preference 11:9
11:15, 14:11
41:14, 42:3
preliminarily
35:7
preliminary
87:17
prepare 80:17
prepared 7:5
66:22, 67:13
present 4:7
presentation
19:6, 74:17
74:21
presented 30:2
30:7, 31:8, 51:5
83:21
presenting
25:19
presidential
11:9, 11:14

14:11, 41:13
42:3
press 80:25
pressing 81:6
presumably
40:16
presumption
39:20
pretty 9:15
previous 39:7
price 31:2
32:10, 34:11
priced 32:16
pricing 38:21
89:13
primaries 14:11
41:14
primary 11:9
11:15, 42:3
78:2
print 19:9, 26:5
27:3, 27:7
32:12, 71:2
printed 25:21
26:1, 27:15
34:5, 62:23
printer 32:23
36:13, 36:15
36:18, 36:21
37:1, 37:2, 37:4
45:7
printing 35:10
prints 27:23
prior 3:21
90:14
privileged 69:5
probably 13:21
17:23, 27:13
28:8, 50:24
81:13
problem 61:12
79:17, 79:19
problems 52:16
80:18
procedure
34:12, 34:13

34:16, 34:19
35:1, 35:2, 35:3
55:4, 94:22
procedures 24:4
55:4, 72:14
proceeding
96:11
process 7:23
9:15, 17:25
19:16, 24:2
25:22, 28:13
30:13, 43:10
43:13, 44:1
47:25, 50:5
58:7, 58:13
60:13, 61:4
61:18, 74:7
85:24, 86:2
86:12, 86:25
87:4, 90:10
processes 24:1
24:14
procurement
85:24, 86:2
86:12
produce 25:1
70:25, 72:2
72:2, 72:5, 72:6
produced 15:14
56:3, 59:20
71:24, 73:5
produces 24:25
producible
72:12
production 54:4
62:8
program 9:13
12:6, 16:10
58:9, 76:8
76:11
programs 77:3
prohibited
97:11
projection
33:23
pronouns 52:22

proof 74:11
proofing 36:8
36:11
proofs 36:22
57:16, 74:12
proper 80:13
proposal 83:17
83:21
proposals 50:8
54:8
protected 55:11
provide 46:24
97:9, 97:12
provided 47:2
49:15, 49:19
provisional
24:11, 24:24
29:5, 29:6, 29:8
29:10, 29:10
29:14, 44:23
44:25, 45:6
45:18, 45:22
46:6, 46:13
46:16, 46:16
46:17, 46:21
47:16, 48:1
48:3, 48:12
48:14, 85:7
85:14, 90:1
90:10, 92:7
provisionals
32:13, 45:24
47:22, 48:17
93:24
public 11:13
13:21, 14:2
52:7, 60:14
60:14, 60:15
60:18, 66:24
70:2, 84:12
publish 20:9
published 10:24
pull 27:11
45:23, 47:22
63:13, 71:9
73:12, 73:14

73:15
pulled 48:12
67:4, 71:14
73:4
pulls 46:5
purchase 85:16
87:22
purchased 87:7
purchasing
89:14
purpose 63:20
79:7
purposes 87:16
87:20
pursuant 4:18
36:2, 97:6
pursued 76:1
purview 51:9
put 21:22, 29:13
29:14, 42:16
45:11, 58:9
60:22, 60:24
61:2, 61:21
93:11
puts 27:23
47:18
putting 34:24
43:9, 63:4

## Q

QR 25:20, 25:23
qualifying 6:18
quality 61:3
61:20
question 5:13
5:17, 21:15
63:20, 74:7
88:12, 90:14
questions 5:11
10:14, 16:6
17:6, 22:14
29:16, 33:5
44:20, 52:22
71:7, 72:3, 83:1
84:19, 84:21

94:15, 94:18
96:8
quicker 42:10
quickly 41:5
41:16
quite 33:17
37:19, 65:18
93:1
quote 85:17
86:8, 89:17
quotes 31:2

**R**

race 62:14, 66:1
66:6, 66:12
67:4, 67:17
67:22, 78:1
races 33:15
37:16, 51:12
51:13, 58:10
67:17, 67:18
74:22, 75:1
83:13
racing 80:14
RAFFENSPER...
1:7
raised 68:10
random 71:5
randomized
71:2
rate 97:14
reach 30:9
30:21
reached 12:25
read 40:9, 57:7
81:7, 89:2
94:21
reading 94:19
reads 27:5
ready 43:25
73:19
real 6:6, 14:10
34:19, 50:16
realize 61:11
realized 93:9

really 28:18
39:3, 41:21
74:25
reason 48:24
reasonable
33:24
recall 32:25
49:8, 49:9
70:12, 70:13
81:16
recap 2:15
46:22, 47:1
59:19
receipt 25:9
receipts 27:22
receive 12:4
18:8, 35:21
45:21, 57:1
57:5, 58:17
65:8, 81:12
86:10
received 11:12
24:3, 30:11
38:6, 38:7
38:11, 38:15
38:16, 45:20
50:1, 53:8, 56:1
65:6, 70:18
75:4, 85:17
receiving 81:16
Recess 44:17
70:7
recommended
51:22, 68:3
reconsider
40:21
record 2:14, 5:7
29:1, 44:22
46:19, 47:7
54:25, 55:1
55:16, 55:19
57:7, 59:13
59:18, 59:23
62:13, 64:20
64:23, 66:3
69:4, 70:10

81:14, 96:10
recorded 60:17
63:15
recording 58:16
records 65:1
65:12, 65:19
70:21
recount 83:25
redacted 60:4
60:24
reduced 96:9
reference 65:14
referendums
67:19
referral 97:13
referring 78:10
regarding 65:1
65:13, 65:19
75:21
regional 19:7
register 81:2
registered 22:10
22:13
registering
80:25
registrar 7:15
94:7, 94:9
registration 7:9
7:16
regular 41:19
regularly 76:3
Regulations
97:6
reintroduce
39:8
reiterate 72:16
reiterating
53:18
reiteration
53:11
relating 75:6
relation 56:14
relative 96:12
reliable 52:17
relief 35:16
35:17, 50:24

remain 35:11
remember
24:25, 32:21
58:21, 68:5
73:3, 76:5
81:24, 82:14
83:14, 85:18
removable 27:9
renew 41:22
REP 78:2
repeat 57:6
rephrase 5:13
reply 82:9
report 2:16, 7:7
8:3, 62:11
62:12, 62:23
63:4, 63:6
63:21, 63:22
64:6, 71:14
72:23, 73:5
80:17, 81:23
81:24, 83:24
94:4, 97:14
reporter 4:20
5:15, 57:8, 67:9
94:19, 94:24
95:3, 97:8
97:13
reporting 94:3
97:6, 97:10
97:12, 97:13
reports 7:4
40:17, 65:14
80:5
represent 5:10
62:7, 79:5
representative
75:13
reprints 37:23
Republican
93:18
request 46:1
requested 50:25
57:8, 70:21
87:15
requests 50:25

65:2, 65:19
require 51:4
required 7:2
20:14, 23:23
requires 47:6
research 68:3
resolution 30:1
30:5, 30:7
respect 51:22
53:10, 65:11
66:11, 76:16
respond 11:23
response 53:14
53:17, 53:17
53:22, 56:4
59:21
responsibilities
6:15, 7:12, 7:14
7:16
responsible
49:21
result 52:16
results 23:20
26:21, 27:8
27:14, 27:18
retrieve 72:19
retrieving 73:2
return 70:9
returned 46:10
46:17, 47:9
48:14
reverse 43:21
review 44:21
57:15, 58:15
74:7, 74:9
76:22, 78:23
79:14, 80:8
83:23, 89:5
89:21, 90:22
92:3, 92:6
93:12, 93:17
94:11
reviewed 40:5
51:3, 51:18
54:24, 58:19
92:15

Case 1:17-cv-02989-AT   Document 469   Filed 07/10/19   Page 111 of 115
Page 14
Curling et al. v.            Deposition of
Raffensperger et al.        JENNIFER DORAN              6/28/2019

reviewing 47:25
  65:4, 74:21
  92:11
RFI 49:16
RFIs 21:17
RFP 50:5
right 11:6, 12:6
  15:7, 16:4
  17:24, 20:20
  24:6, 24:10
  24:15, 25:9
  25:10, 26:3
  26:6, 27:24
  27:25, 32:4
  33:7, 34:5
  34:12, 34:21
  34:22, 36:10
  39:13, 39:25
  40:1, 40:4
  40:17, 42:18
  43:4, 44:8, 46:6
  49:5, 50:10
  50:19, 50:21
  51:23, 52:15
  57:16, 57:22
  58:4, 59:1, 59:8
  59:24, 64:16
  71:15, 72:7
  72:24, 73:25
  74:2, 74:18
  74:23, 75:2
  76:2, 78:15
  78:17, 79:24
  82:14, 86:14
  88:17, 91:3
  93:25
ring 78:10
Road 3:4
ROBBINS 4:4
Rockdale 2:20
  79:6
rollout 87:25
room 43:11
  43:12, 43:14
  45:10, 61:24
row 79:9, 79:11

79:11
ruled 51:2, 51:2
Rules 97:6
run 23:7
Rutledge 23:3
  41:9

**S**

safety 19:3
SAT 91:6
saw 25:17
  25:22
saying 20:15
  47:4, 53:14
says 48:15, 78:2
  78:18
scan 78:23
scanned 77:13
  77:14, 88:23
  89:4, 89:11
scanner 13:25
  18:17, 18:18
  18:19, 19:2
  19:7, 19:18
  27:4, 27:6
  27:15, 27:23
  31:4, 31:9
  31:14, 85:18
  88:17, 88:18
  89:2, 89:8
scanners 15:11
  17:25, 18:16
  30:23, 30:24
  31:2, 32:2, 32:6
  34:10, 38:22
  84:13, 84:25
  85:4, 85:9
  85:10, 85:14
  85:15, 85:23
  86:6, 86:9
  86:11, 86:12
  86:19, 87:5
  88:16, 89:14
  89:15, 92:14
scanning 18:20

35:11, 76:15
  77:3, 77:18
  89:9, 94:10
scans 27:4
schedule 10:22
  10:24, 11:24
  12:3, 13:12
  16:21, 20:9
scheduled 41:12
  41:14, 41:15
schedules 7:3
scheduling 6:23
school 6:7, 6:9
  6:13
Sciences 40:6
scope 28:20
  29:2
scratch 89:1
screen 73:15
  74:6, 74:19
  74:23, 75:2
  77:22, 79:15
  79:25
seal 27:12, 29:9
  43:23, 44:1
  45:11, 47:18
  47:22, 60:3
  60:16, 60:19
  60:22, 60:23
  60:23, 61:1
  61:2, 61:5, 61:8
  61:15, 61:18
  61:21, 61:22
sealed 43:17
  44:2, 46:3
  47:17, 47:19
sealing 43:24
  43:25
seasonal 8:4
second 16:7
  35:23, 72:8
  79:9
secretary 7:6
  7:11, 10:24
  12:3, 12:25
  14:16, 16:8

20:8, 20:15
  20:25, 23:23
  24:3, 30:21
  34:13, 35:21
  35:25, 36:12
  36:16, 36:18
  36:25, 37:1
  52:24, 53:3
  53:16, 53:21
  56:17, 56:25
  58:18, 65:9
  68:25, 69:10
  69:15, 70:24
  71:22, 72:1
  76:19, 76:21
  76:25, 78:23
  88:7
section 29:14
secure 24:4
  26:15, 26:15
  27:5, 29:5
  29:14, 31:3
  31:7, 31:10
  39:20, 85:19
secured 31:5
  31:7, 43:12
  44:24, 45:6
  45:9
security 18:3
  24:15, 28:24
  40:14, 54:10
  54:13, 54:13
  54:14, 54:16
  54:17, 54:18
  54:18, 55:4
  75:5, 75:6, 75:9
  75:10, 75:19
  76:2, 76:4, 76:6
  76:7, 76:8
  76:10, 76:16
  76:22, 76:23
  76:23, 76:24
  88:22, 88:24
Security's 76:10
see 25:24, 26:6
  30:10, 39:3

58:3, 59:10
  64:22, 66:21
  77:23, 79:10
  79:19
seeing 74:21
seek 87:19
seeking 35:16
seen 24:20
  26:14, 26:17
  40:14, 40:16
  56:7, 56:10
  66:9, 79:20
selected 16:1
  16:2
sells 86:15
send 24:23
  36:12, 36:14
  36:22, 45:25
  56:19, 56:24
sending 7:5
sense 14:15
  31:22, 44:11
  69:17, 73:22
  86:13
sensitive 64:6
sent 29:7, 49:12
  53:12, 53:17
  87:2
separate 42:24
  48:18, 87:12
September
  38:17, 50:24
  53:24
serial 60:1
served 68:15
server 14:1
  28:12, 28:13
  49:18, 57:19
  59:4
servers 16:11
  75:22
service 21:10
services 97:10
  97:12
set 6:24, 9:14
  14:17, 23:22

Case 1:17-cv-02989-AT   Document 469   Filed 07/10/19   Page 112 of 115

Page 15

Curling et al. v.          Deposition of
Raffensperger et al.    JENNIFER DORAN          6/28/2019

34:13, 41:22
43:19, 45:24
setting 6:24, 7:2
  23:23
settled 13:4
seven 9:1, 31:16
  85:12, 93:23
sheet 36:20
  46:22, 47:1
shifting 44:8
ship 87:8
short 33:17
shoved 28:9
show 14:2, 58:3
  58:15, 66:22
  67:15, 73:12
  73:16, 74:12
shows 7:25
  60:16, 62:13
  67:16
side 35:10
  94:12
sign 36:11
  36:19, 57:24
  57:24, 75:1
  75:1, 94:21
sign-off 36:20
Signature 95:7
signatures 47:7
signed 10:2
  10:5, 10:21
  12:1, 12:23
  58:19
signing 94:20
similar 38:14
  87:4
sir 10:20, 11:25
  12:12, 14:6
  14:12, 15:8
  15:10, 15:12
  15:16, 18:21
  20:17, 23:8
  23:12, 23:15
  24:13, 24:16
  26:7, 32:9, 34:2
  41:12, 67:14

84:4
sit 93:20
site 43:11
sitting 27:6
six 82:5, 82:17
skip 38:6
slash 45:21
  45:22
slide 47:20
slot 47:20
slots 12:13
small 25:23
  46:25
smaller 48:8
Smart 71:19
Smith 1:15, 3:14
  48:11, 65:15
software 15:17
  15:19, 15:25
  16:2, 16:4
  19:24, 31:20
  75:10, 77:3
solidified 12:4
somebody 15:4
  20:15, 34:23
soon 13:8, 81:5
sorry 15:22
  19:15, 28:7
  56:21, 64:13
  85:21
sort 6:17, 9:24
  12:21, 13:10
  14:7, 15:18
  16:17, 17:6
  19:24, 20:6
  20:9, 20:13
  21:12, 28:9
  31:19, 34:8
  35:5, 37:24
  38:6, 38:22
  41:16, 43:7
  43:10, 69:24
  71:5, 75:9
  76:22, 94:13
sorts 21:9
sounds 20:6

source 54:8
space 78:3, 78:4
Sparks 3:7, 83:3
  83:6, 83:7
  84:17, 95:4
Sparks..................
  2:6
sparks@khlaw...
  3:11
special 42:12
  42:12
specific 50:3
  72:3
spell 75:14
spelled 36:10
SPLOST 41:16
  41:18, 41:19
  41:20, 41:23
  42:10
SPLOSTs 42:6
spoil 46:16
spoiled 47:8
  47:11
spoke 20:25
  68:24, 70:23
  75:20
spoken 11:2
  14:23
spreadsheet
  67:12
staff 7:13, 11:14
  23:9, 43:18
  44:5, 93:15
stalling 80:14
standpoint
  30:19
stands 76:6
Staples 25:9
start 34:3, 34:4
  34:6, 58:7
  58:25, 93:22
  93:25, 94:10
started 9:22
  50:5, 56:11
  56:11, 56:13
  66:21, 81:6

starting 39:11
starts 16:23
  94:9
state 5:7, 7:6
  10:24, 12:3
  12:25, 14:16
  16:8, 20:9
  20:15, 20:19
  22:2, 23:23
  24:4, 30:10
  30:22, 34:14
  34:17, 35:22
  35:25, 36:12
  36:16, 36:18
  37:1, 37:2, 51:7
  52:24, 53:4
  53:13, 53:16
  53:21, 58:18
  64:10, 64:25
  65:9, 68:25
  69:10, 69:16
  70:24, 71:22
  72:1, 76:20
  76:21, 77:1
  78:23, 81:17
  86:2, 86:16
  87:1, 87:6, 87:9
  87:9, 88:4, 88:7
  96:3, 97:3
State's 21:1
  56:17, 57:1
  60:3
stated 11:23
  62:22, 69:7
  96:7
statement 4:19
  67:2
STATES 1:1
Stepping 23:18
steps 23:21
  35:18, 38:6
  79:20
stock 34:4
storage 43:9
  43:10, 43:11
  43:12, 45:10

61:24
store 43:13
stored 43:17
  70:25
strain 93:15
Street 3:9, 3:21
  4:4
strokes 35:15
stub 48:4, 48:6
  48:13, 48:15
stubs 45:23
  48:13
style 34:22
  37:10
subject 49:3
  65:12
submitted 4:19
  40:10, 49:17
subpoena 2:13
  32:22, 55:25
  56:4, 56:7
  56:10, 59:21
  68:14, 68:15
  68:16, 70:21
  71:24, 72:13
  73:6
subselection
  40:19
subset 18:6
successful 84:11
Sue 8:9
sufficient 16:24
  71:7
suggest 32:17
suggested 87:19
suggesting 13:9
  40:3, 60:12
  69:23
suggestion
  32:18, 68:9
  68:17, 69:10
  69:15, 88:22
Suite 1:19, 3:5
  3:10, 3:15, 3:21
summarizes
  80:17

**summary** 17:19
42:7, 79:15
79:25, 83:24
**summer** 81:25
**Superior** 7:6
**supervisor** 6:1
6:2, 6:16
**supervisors**
17:10
**supplies** 29:13
46:14
**supposed** 60:17
**sure** 5:18, 9:23
10:5, 10:6, 11:5
20:14, 34:20
34:22, 36:7
36:8, 40:13
41:21, 44:22
49:1, 51:1
52:14, 54:12
58:10, 58:15
61:20, 65:20
66:21, 74:3
75:17, 77:2
80:23, 82:6
82:7, 83:10
86:7, 93:1
**SW** 3:21
**switch** 32:7
33:10, 39:18
39:18, 44:4
48:22, 53:5
86:13, 92:22
**switching** 30:18
39:15
**sworn** 5:3
**system** 10:1
10:19, 15:19
15:23, 16:1
16:7, 16:13
16:25, 17:11
17:23, 18:25
19:25, 20:1
21:23, 21:24
23:19, 23:22
24:1, 24:18

26:16, 26:21
28:22, 31:20
31:25, 35:8
39:12, 51:23
54:7, 54:9
63:23, 64:11
71:18, 78:24
92:2, 92:13
**systems** 81:18

**T**

**table** 79:9
**tabulation** 19:8
19:13, 28:4
35:11
**tabulator** 28:10
**take** 19:12
25:16, 28:8
39:19, 44:10
44:14, 57:2
65:3, 70:5
73:19, 86:18
**taken** 5:21
23:22, 96:7
**talk** 5:16, 10:15
32:24, 72:16
73:1, 73:7
75:18
**talked** 72:22
**talking** 5:18
19:18, 25:11
28:16, 72:18
73:25, 78:9
83:11, 83:14
**tape** 19:18
19:19, 27:8
27:14, 27:19
**tapes** 51:15
51:18, 83:23
**targeting** 81:17
**teach** 15:3
**team** 92:7
**technical** 8:5
72:5, 72:14
**Ted** 20:25

48:22, 48:24
49:23, 49:25
**tell** 37:1, 37:4
40:11, 92:1
**temporary** 8:18
**tend** 92:17
**tender** 35:13
**tentative** 10:24
14:17
**tentatively**
14:16
**terms** 12:11
54:10, 76:2
**test** 58:7
**tested** 87:2
**testified** 5:4
75:4, 88:15
**testimony** 82:23
**testing** 6:25
9:14, 58:25
74:21, 79:16
79:18, 79:21
87:10
**tests** 79:22
**thank** 19:20
82:21, 83:7
84:17, 91:17
**Thanks** 65:23
**theory** 64:3
**thermal** 25:25
26:2
**thing** 21:8
27:21, 94:14
**things** 12:4
18:3, 27:13
51:8, 55:16
88:25
**think** 8:22, 9:6
16:24, 16:25
23:16, 25:7
25:16, 28:20
33:16, 39:6
48:25, 49:13
50:6, 52:21
69:6, 69:18
70:20, 73:8

82:5, 86:14
87:24, 87:24
89:25, 93:14
93:22
**thinking** 14:5
20:6, 34:1
64:14
**third** 11:22
27:21, 79:11
93:19
**thought** 39:4
60:6
**threat** 81:21
**three** 8:21
27:13, 30:8
30:14, 33:5
38:2, 41:8, 47:6
60:19, 60:20
71:1, 78:3
84:10, 89:6
92:3
**three-month**
42:20
**three-person**
89:11, 91:10
**three-person-r...**
91:25, 93:15
**Thursday** 11:22
**time** 8:16, 11:12
11:13, 12:22
13:7, 13:20
13:22, 17:1
17:2, 21:5
22:23, 22:23
30:5, 34:14
34:15, 38:13
39:6, 47:10
49:22, 51:2
56:12, 57:3
57:13, 58:5
58:17, 59:6
77:13, 77:14
83:8, 83:18
84:19, 86:18
91:18, 94:3
94:3, 94:14

94:25
**timeline** 13:2
58:22
**times** 31:16
31:17, 71:23
**timing** 11:11
**tip** 81:5
**title** 49:1
**to-be-printed**
26:16
**today** 20:1, 24:8
24:8, 29:5
35:21, 35:25
37:9, 44:23
44:24, 44:25
56:17, 62:1
82:23, 83:8
**told** 38:25
70:25, 71:6
73:11, 81:1
**top** 5:16, 5:19
**topic** 10:15
**topics** 10:12
**total** 8:23, 22:6
**toted** 28:1
**Totenberg**
38:17, 51:1
**Totenberg's**
53:24
**train** 11:13
13:16, 14:2
14:14, 17:2
17:13, 17:17
18:12
**trained** 8:23
14:15, 14:19
14:20, 19:24
**training** 7:2
9:21, 13:18
13:19, 14:7
14:13, 14:20
14:22, 15:1
15:1, 15:3
16:18, 17:8
17:9, 18:6, 18:8
20:4, 22:5

Curling et al. v.
Raffensperger et al.

Deposition of
JENNIFER DORAN

6/28/2019

transcript 2:23
96:7, 96:10
transferred
26:21, 26:22
transmitted
36:24
tremendous
33:13
trend 37:13
tried 82:1
troubleshooting
17:5
true 52:1, 96:10
Truthfully
58:21
try 5:14, 5:19
10:13, 15:5
42:14, 77:22
trying 20:13
64:13, 70:24
TS 9:13
Tulsa 6:11, 6:12
turn 50:7, 68:18
90:23
turnaround
86:18
turned 72:9
turnout 33:13
33:20, 33:23
37:11, 37:19
42:15, 42:17
two 6:3, 8:20
11:12, 16:22
18:10, 29:12
30:8, 30:14
38:2, 41:21
48:14, 48:16
48:19, 48:20
60:19, 60:20
64:3, 71:1, 77:5
78:7, 84:10
85:6, 86:21
86:22, 87:3
87:12, 92:6
two-digit 78:5
two-person 9:17

type 27:17, 35:2
36:14, 36:17
39:16
types 89:24
typewriting
96:9
typical 8:16

**U**

ultimately 22:5
Umm 55:7
uncharacteristic
66:7
unclear 26:20
83:9, 83:16
uncontested
67:18
undergraduate
6:11
understand
5:12, 12:5, 38:1
55:15, 63:2
69:9, 83:10
89:23
understanding
11:7, 12:8, 12:9
12:16, 15:20
15:22, 16:12
19:1, 20:18
20:21, 20:24
26:20, 28:11
35:24, 53:3
63:6, 63:10
66:4, 69:13
71:9, 86:1
understood
73:17
undertake 84:8
undertaken
54:9
undervote 2:18
66:20, 66:23
66:25, 68:4
undervotes 66:1
66:6, 66:8

66:10, 68:1
Unfortunately
21:23, 33:12
unit 31:9, 61:1
79:10
UNITED 1:1
units 9:13
University 6:10
6:11
unnatural 5:18
unused 46:8
46:17, 47:9
47:11
upcoming 87:20
87:22
update 38:16
49:18, 85:13
updated 15:25
upgrade 21:4
USA 97:9, 97:12
97:14
USB 27:9
use 16:3, 24:8
26:25, 27:1
31:19, 34:1
37:2, 44:9
45:18, 56:13
81:1, 86:7
86:16, 88:6
92:6, 92:9
usual 97:14
usually 16:21
16:22, 43:18
90:20

**V**

V-R-A-G 21:2
various 26:23
46:14
vendor 12:2
13:6, 24:24
86:5, 86:10
86:15
vendors 24:20
49:16, 86:3

88:4, 88:5
verbal 77:18
version 27:18
versus 51:19
52:5, 52:13
65:15
violates 69:7
visited 82:10
volume 32:19
vote 35:11, 38:2
58:14, 62:13
63:25, 70:21
74:8, 77:20
77:21, 79:8
84:10, 89:5
89:21, 90:6
92:6, 93:17
94:11
voted 8:1, 10:21
24:6, 29:14
30:8, 37:14
47:15, 47:16
51:10, 67:21
67:23, 71:11
71:13, 83:21
89:12, 92:23
voter 7:16, 7:24
8:1, 27:23
34:14, 35:12
42:15, 46:6
47:18, 48:12
62:14, 62:16
62:20, 62:24
63:25, 66:11
70:11, 71:20
79:13, 79:14
89:3, 90:6
90:14, 90:21
voters 13:14
22:10, 22:13
33:18, 67:16
67:25, 70:22
80:6, 89:25
92:18, 92:19
93:3
votes 26:21

67:2, 67:3
67:20, 67:24
voting 2:15
2:20, 7:3, 7:19
7:19, 7:20, 7:21
7:22, 7:23, 8:1
8:2, 8:22, 8:25
9:3, 10:19
10:25, 13:17
15:7, 16:19
16:23, 17:24
24:23, 30:15
31:18, 34:4
34:6, 37:15
37:22, 39:12
39:16, 43:6
45:19, 45:19
59:18, 63:11
80:23, 85:13
vs 1:6
vulnerability
40:8, 54:10
54:16

**W**

W-I-L-B-A-N-...
8:12
wait 12:23, 24:1
30:14, 35:23
35:23, 93:24
waiting 23:25
waive 94:23
waived 95:7
walk 43:7, 45:5
46:2
walks 34:15
34:15
want 10:15
13:18, 13:21
33:21, 35:16
37:5, 42:17
44:14, 44:19
56:6, 61:7, 70:9
74:2, 83:10
85:19, 95:1

APG USA INC.

Curling et al. v.          Deposition of
Raffensperger et al.    JENNIFER DORAN                    6/28/2019

| | | | | |
|---|---|---|---|---|
| wanted 74:6 | work 8:21, 9:9 | 81:8 | 37:17 | **4** |
| 80:7, 82:6, 82:7 | 9:16, 9:19, 9:25 | | **2015** 77:16 | |
| warranty 21:18 | 18:24, 22:14 | **Z** | **2016** 33:19 | **40** 23:16, 32:15 |
| 21:18, 49:5 | 36:4, 44:8, 69:2 | | **2017** 56:12 | 32:15 |
| water 44:13 | 76:2, 77:18 | Zonolite 3:4 | **2018** 2:18, 8:19 | **4038** 3:21 |
| way 16:7, 22:17 | 82:22 | | 29:17, 33:12 | **404** 3:6, 3:11 |
| 26:11, 30:6 | worked 8:22 | **1** | 37:17, 53:24 | 3:22, 4:5 |
| 31:25, 35:18 | worker 14:13 | | 79:8, 84:3 | **440** 1:17, 3:15 |
| 44:23, 53:15 | 16:18, 34:17 | 1 11:7, 12:14 | 88:21 | |
| 53:23, 57:5 | 60:25 | 13:23, 56:6 | **2019** 1:13, 11:18 | **5** |
| 62:15, 73:16 | workers 7:2, 8:4 | 59:23 | 14:19, 40:22 | |
| 93:23 | 8:5, 8:17, 8:20 | **1,300** 31:15 | 41:11, 64:24 | **50** 9:16, 22:7 |
| ways 39:4 | 8:21, 11:14 | 85:20 | 84:8, 96:15 | 43:3, 48:7, 48:9 |
| we've 19:2 | 13:16, 14:14 | **1:17-cv-02989-...** | **2020** 33:19 | 49:11 |
| 23:21, 23:25 | 15:2, 17:9 | 1:6 | 41:13, 42:7 | **500** 4:4 |
| 28:19, 36:21 | 17:17, 18:5 | **10** 47:1, 47:1 | 42:21, 42:22 | **5th** 96:15 |
| 72:10, 90:22 | 18:11, 44:1 | 47:12, 85:12 | **2021** 42:1 | |
| 91:3, 91:8 | 80:6 | 87:25, 88:16 | **28** 1:13 | **6** |
| 93:23 | works 16:7 | **10:04** 1:14 | | |
| website 56:13 | 39:7, 49:2, 71:8 | **11:02** 44:17 | **3** | **6** 2:18, 3:5 |
| 56:14 | 76:4 | **11:14** 44:17 | | **612-0246** 3:22 |
| websites 82:10 | world 41:11 | **11:56** 70:7 | **30** 42:25, 64:24 | |
| weeks 16:22 | worry 69:16 | **1123** 3:4 | **30303** 3:22 | **7** |
| went 6:10, 49:22 | written 4:19 | **12** 88:1 | **30306** 3:5 | |
| 67:1, 72:13 | 40:10, 69:25 | **12:07** 70:7 | **30309** 3:10 | **7/5/19** 97:20 |
| 85:8, 89:16 | wrong 35:24 | **12:44** 95:6 | **30318** 4:5 | **7:00** 93:25 |
| West 3:9 | 93:10 | **120** 1:19, 3:15 | **30601** 3:16 | **70** 9:16, 22:7 |
| who've 92:20 | wrote 40:11 | **1201** 3:9 | **31** 8:19 | 43:3, 49:11 |
| Wilbanks 8:12 | 93:10 | **1300** 88:16 | **316** 10:21, 10:23 | **706** 3:16 |
| 9:6, 94:8 | | **14,100** 22:12 | 25:19, 39:5 | |
| witness 3:12 | **Y** | **141** 3:21 | 39:6 | **8** |
| 19:17, 28:5 | | **14th** 4:4 | **316-0231** 3:16 | |
| 44:16, 56:20 | **Yeah** 15:24 | **15-14-37** 4:18 | **32** 2:13, 55:20 | **8.B** 97:6 |
| 56:21, 57:4 | 25:6, 33:4 | 97:11 | 55:24 | **80** 33:20 |
| 64:13, 65:4 | year 8:16, 21:2 | **17** 93:2 | **3250** 3:10 | **856-3265** 4:5 |
| 91:8, 94:22 | 35:8, 35:8 | **18** 37:18, 41:19 | **33** 2:14, 59:14 | **881-0700** 3:6 |
| 94:23 | 37:14, 39:12 | 50:24, 81:25 | 59:17 | **888-9700** 3:11 |
| woefully 37:18 | 40:22, 41:21 | **19** 41:18, 50:6 | **34** 2:16, 8:23 | |
| woman 80:7 | 48:9, 68:14 | | 62:3, 62:7 | **9** |
| women 17:7 | years 6:3, 10:8 | **2** | **35** 2:17, 64:18 | |
| 47:4, 80:23 | 23:16, 36:22 | | 64:23, 65:6 | **90** 42:19 |
| 81:4, 81:8 | 77:5, 93:2 | **2** 11:7, 12:13 | **36** 2:18, 67:5 | |
| wonder 91:5 | yellow 58:9 | 13:22 | 67:9, 67:10 | |
| word 73:22 | you-all 50:23 | **20** 33:17, 42:1 | 67:12 | |
| words 13:6 | 51:1 | **2001** 6:14 | **37** 2:20, 67:8 | |
| 74:2 | younger 81:8 | **2014** 33:15 | 79:1, 79:5 | |