# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

DONNA CURLING, *et al.*

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## STATE DEFENDANTS' COMBINED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

FACTUAL BACKGROUND ...................................................... 2

   I.    Overview ................................................................. 2

   II.   Increased security since last preliminary-injunction hearing. .............. 3

   III.  Feasibility of relief. ................................................... 5

   IV.  Procedural posture ...................................................... 6

ARGUMENT AND CITATION OF AUTHORITY .................................. 6

   I.    This Court cannot grant the relief sought because State Defendants do not control municipal elections. ................................................. 9

       A.   The law governing Georgia municipal elections. ........................ 9

       B.   Plaintiffs lack standing to challenge municipal elections. .......... 12

       C.   Plaintiffs failed to join necessary parties. ...................... 13

   II.   Plaintiffs' proposed remedy is unconstitutional and violates the Americans with Disabilities Act. ............................................. 14

   III.  Plaintiffs are not entitled to an injunction. ........................... 16

       A.   Plaintiffs are not likely to succeed on the merits of their claims about DREs. ................................................................. 16

           1.   Relevant legal standards regarding Plaintiffs' claims ....... 16

           2.   Plaintiffs cannot succeed when the only types of evidence they rely on are vulnerabilities—not actual compromises. 18

           3.   State Defendants made significant increases to the security of Georgia's Election Systems since Plaintiffs' 2018 motions. ........................................................... 22

a. State Defendants took concrete steps to address security concerns after the alleged breaches at Kennesaw State University ("KSU"). ...................... 23

b. The General Assembly has addressed security concerns raised by Plaintiffs. .................................... 28

4. The alleged irregularities involving individual voters do not provide support to Plaintiffs' motions................................. 31

5. The vote totals in the Lieutenant Governor's race provide no support for Plaintiffs' motions........................................ 39

6. Claims about the electronic pollbooks are moot due to statutory changes, as the plaintiffs in Common Cause recognized. ........................................................................... 42

7. Coalition Plaintiffs' claim of ballot secrecy is based on a flawed understanding of Georgia law and the underlying facts.................................................................................... 45

a. Coalition Plaintiffs have a fundamental factual misunderstanding of ballot image reports. .............. 46

b. "Ballot Secrecy" under Georgia law does not mean no traceability whatsoever. ............................................ 48

B. Plaintiffs will not suffer an irreparable injury absent a preliminary injunction.................................................................... 51

C. The balance of equities and the public interest do not favor Plaintiffs. ...................................................................................... 54

1. Implementing a statewide hand-marked paper ballot system would require a significant expenditure of taxpayer dollars. ................................................................................ 56

2. Plaintiffs' requested relief would necessitate new election administration policies, impose new training costs, and impede the State's transition to a new elections system... 61

a. State Defendants must develop new training materials and policies for a new election system..... 62

b. State Defendants must certify any election equipment used by counties in the operation of municipal elections. .................................................. 64

c. State Defendants will have to divert resources from certifying, implementing, and designing policies for a new election system to implement Plaintiffs' preferred equipment. ................................................ 65

3. The change to an all-paper election system would lead to voter confusion. .................................................. 66

4. The equities do not favor Plaintiffs because the injury caused to State Defendants outweighs the speculative injury to Plaintiffs.................................................. 67

5. Plaintiffs' proposed costs would be borne by cities, which is not in the public interest. .................................................. 72

6. Plaintiffs have not shown the public interest favors an injunction.................................................. 74

CONCLUSION.................................................. 74

CERTIFICATE OF COMPLIANCE.................................................. 77

CERTIFICATE OF SERVICE .................................................. 78

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. U.S. Army Corps of Engineers,*
424 F.3d 1117 (11th Cir. 2005) .................................................................. 51

*All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.,*
887 F.2d 1535 (11th Cir. 1989) ...................................................................... 6

*Am. Ass'n of People with Disabilities v. Smith,*
227 F. Supp. 2d 1276 (M.D. Fla. 2002).......................................................... 49

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ...................................................................................... 17

*Banfield v. Cortés,*
631 Pa. 229 (2015) ........................................................................................ 18

*Benisek v. Lamone,*
138 S. Ct. 1942 (2018) .................................................................................... 7

*Bonner v. City of Prichard,*
661 F.2d 1206 (11th Cir.1981) ........................................................................ 7

*Burdick v. Takushi,*
504 U.S. 428 (1992) ................................................................................ 17, 62

*Bush v. Gore,*
531 U.S. 98 (2000) ........................................................................................ 15

*Citizen Ctr. v. Gessler,*
770 F.3d 900 (10th Cir. 2014) ...................................................................... 50

*City of Los Angeles v. Lyons,* 461 U.S. 95 (1983)........................................... 52

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ...................................................................................... 53

*Curling v. Kemp,*
334 F. Supp. 3d 1303 (2018) .................................................................. 62, 69

*Democratic Executive Comm. of Fla. v. Lee,*
915 F.3d 1312 (11th Cir. 2019) .................................................................... 17

*Favorito v. Handel,*
285 Ga. 795 (2009)............................................................................ 54, 65, 70

*Fla. Ass'n of Med. Equip. Dealers v. Apfel*,
194 F.3d 1227 (11th Cir. 1999) .................................................................. 12

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
344 F.3d 1263 (11th Cir. 2003) .................................................................. 14

*Grizzle v. Kemp*,
634 F.3d 1314 (11th Cir. 2011) ............................................................... 9, 11

*Heindel v. Andino*,
359 F. Supp. 3d 341 (D.S.C. 2019) ............................................................ 72

*Hohe v. Casey*,
868 F.2d 69 (3d Cir. 1989) ......................................................................... 52

*Hughey v. JMS Dev. Corp.*,
78 F.3d 1523 (11th Cir. 1996) ................................................................... 44

*Lassiter v. Northhampton Cty. Bd. of Elections*,
360 U.S. 45 (1959) ..................................................................................... 29

*Lumpkin Cty. v. Ga. Insurers Insolvency Pool*,
292 Ga. 76 (2012) ...................................................................................... 71

*Martinez v. Matthews*,
544 F.2d 1233 (5th Cir. 1976) ........................................................ 7, 67, 70

*McDonald's Corp. v. Robertson*,
147 F.3d 1301 (11th Cir. 1998) ...................................................... 6, 54, 67

*Nat'l Broad. Co. v. Cleland*,
697 F. Supp. 1204 (N.D. Ga. 1988) ........................................................... 49

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
896 F.2d 1283 (11th Cir.1990) .................................................................. 51

*Nelson v. Miller*,
170 F.3d 641 (6th Cir. 1999) ..................................................................... 49

*New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977) ................................................................................. 68

*Pennsylvania Republican Party v. Pa. Democratic Party*,
No. 16-5664, 2016 WL 6582659 (E.D. Pa. Nov. 7, 2016) ........................... 68

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ............................................................................. 7, 54, 74

*Republic of Sudan v. Harrison*,
   139 S. Ct. 1048 (2019) ................................................................ 11

*Robinson v. Boyd*,
   288 Ga. 53 (2010) ....................................................................... 71

*Scott v. Taylor*,
   405 F.3d 1251 (11th Cir. 2005) ................................................... 13

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) ................................................... 51

*Socialist Workers Party v. Attorney General of U. S.*,
   419 U.S. 1314 (1974) .................................................................. 52

*Steele v. Nat'l Firearms Act Branch*,
   755 F.2d 1410 (11th Cir. 1985) ................................................... 12

*Stein v. Cortés*,
   223 F. Supp. 3d 423 (E.D. Pa. 2016) .................................... 18, 68

*Sugarman v. Dougall*,
   413 U.S. 634 (1973) .................................................................... 70

*Walker v. City of Calhoun*,
   682 F. App'x 721 (11th Cir. 2017) ............................................... 44

*Wash. State Grange v. Wash. State Republican Party*,
   128 S. Ct. 1184 (2008) .................................................................. 8

*Weber v. Shelley*,
   347 F.3d 1101 (9th Cir. 2003) ......................................... 18, 65, 70

*Wexler v. Anderson*,
   452 F.3d 1226 (11th Cir. 2006) ................................................... 18

*White v. Baker*,
   696 F.Supp.2d 1289 (N.D. Ga. 2010) ......................................... 52

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .......................................................................... 7

## Statutes

42 U.S.C.A. § 12131(1)(a) ................................................................. 16

42 U.S.C.A. § 12132 .......................................................................... 16

Americans with Disabilities Act of 1990 .................................................. 15, 16

O.C.G.A. § 20-2-51(c)(2) ......................................................................... 11

O.C.G.A. § 21-2-300 ............................................................................ 13, 29

O.C.G.A. § 21-2-300(a) ....................................................................... 10, 11

O.C.G.A. § 21-2-300(a)(2) .................................................................. 29, 65

O.C.G.A. § 21-2-300(e)(1) ....................................................................... 11

O.C.G.A. § 21-2-31 ................................................................................... 63

O.C.G.A. § 21-2-320 ................................................................................. 10

O.C.G.A. § 21-2-33 ................................................................................... 56

O.C.G.A. § 21-2-379.1 .............................................................................. 49

O.C.G.A. § 21-2-379.4 .............................................................................. 12

O.C.G.A. § 21-2-379.7 (b) ........................................................................ 38

O.C.G.A. § 21-2-386 ................................................................................. 50

O.C.G.A. § 21-2-418 ................................................................................. 37

O.C.G.A. § 21-2-418(a) ............................................................................ 44

O.C.G.A. § 21-2-45(c) .............................................................................. 56

O.C.G.A. § 21-2-498 ................................................................................. 29

O.C.G.A. § 21-2-499 ................................................................................. 29

O.C.G.A. § 21-2-50 ................................................................................... 63

O.C.G.A. § 21-2-50(a) .............................................................................. 56

O.C.G.A. § 21-2-50(a)(15) ....................................................................... 11

O.C.G.A. § 21-2-500(a) ............................................................................ 47

O.C.G.A. § 21-2-70.1 ........................................................................... 12, 56

O.C.G.A. § 21-2-70.1(a) ........................................................................... 10

O.C.G.A. § 45-13-20(14.1) ....................................................................... 30

O.C.G.A. § 50-13-2 ................................................................................... 30

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §
2947 (2d ed.) .................................................................................................. 52

**Rules**

Fed. R. Civ. P. 19 ............................................................................................... 14

Fed. R. Civ. P. 19(a) ......................................................................................... 14

**Constitutional Provisions**

Ga. Const. Art. 2, Sec. 1, Par. 1 ...................................................................... 10

U.S. Const. amend. X ......................................................................................... 29

U.S. Const. amend. XIV ..................................................................................... 15

U.S. Const. amend. XIV, § 1 ............................................................................. 17

**INTRODUCTION**

Plaintiffs are activists with a clear policy goal: eliminate direct recording electronic voting machines ("DREs") and require the use of hand-marked paper ballots. Counsel for Coalition Plaintiffs summed up their position clearly: "whenever you put a computer in between the voter and the permanent record of that voter's choice, you have an unconstitutional election system." [Doc. 363 at 31:7-9]. Instead, Plaintiffs want this Court to force Georgia to use paper ballots, while ignoring the extensive evidence of vulnerabilities in paper-ballot systems in elections that stands in sharp contrast to the complete lack of evidence of anyone compromising DREs in actual elections. Declaration of Michael Shamos,[1] attached as Ex. A ("Shamos Dec.") at ¶¶ 33, 45.

Plaintiffs continue to pretend that nothing has changed since September 2018 and the only remaining question is timing. But since this Court's order, the State took substantial steps to replace the entire voting

---

[1] Dr. Shamos is the Distinguished Career Professor in the School of Computer Science at Carnegie Mellon University in Pittsburgh, Pennsylvania and has 39 years of experience in examining computerized voting systems. He has performed over 120 electronic voting system certifications and testified on electronic voting four times before the U.S. House of Representatives, one time before the U.S. Senate, and before the legislatures of three states.

system, appropriating $150 million to purchase a new system and updating statutes to address the issues raised in litigation following the 2018 election. While the State is currently engaged in the procurement of a new election system, Plaintiffs now ask this Court to require the State (or possibly counties and cities) to spend millions of dollars to purchase optical scanners and ballot-marking devices ("BMDs") for local elections in 2019.

The Court does not face a choice between a secure system and an insecure system. Every election system has vulnerabilities, but hand-marked paper-ballot voting systems exhibit numerous vulnerabilities and have a track record of actual compromise. Plaintiffs cannot carry their burden to show entitlement to a preliminary injunction, and putting yet another intermediate system in place while the State is transitioning to a new voting system places an impossible burden on both state and local election officials and may result in voter frustration and disaffection from the voting process, which previously troubled this Court.

## **FACTUAL BACKGROUND**

### I.   **Overview.**

This Court is well aware of the underlying allegations made by Plaintiffs regarding the vulnerabilities of Georgia's voting system. After their first attempt at injunctive relief was denied last year, they are asking for an

injunction again, but this time for significantly more expansive relief—
seeking a dramatic shift in upcoming municipal elections in 2019. But in so
doing, Plaintiffs ignore the dramatically changed world that now exists. They
ignore the concrete steps taken by State Defendants to increase the security
surrounding Georgia's election system. They ignore how those increased
security measures impact their claims about continuing vulnerabilities. They
ignore documented vulnerabilities inherent in hand-marked paper ballots.
They ignore the reality of how municipal elections are conducted in Georgia.
And they ignore the feasibility of their requested relief.

## II.   Increased security since last preliminary-injunction hearing.

Following this Court's ruling last fall [Doc. 309], the Georgia General
Assembly took significant steps to address many of the issues raised during
this litigation and other cases following the 2018 election. Specifically, the
legislature and Governor:

- Appropriated $150 million to purchase the latest voting
  technology for the entire state;

- Updated statutes to include BMDs as an election system and to
  require certification;

- Added statutory requirements for post-election audits;

- Added required cybersecurity protections for election systems;

- Expanded statutory requirements for ensuring provisional ballots are counted to include all available voter registration information;

- Gave the Secretary of State the option to extend certification deadlines to conduct pre-certification audits; and

- Required additional notifications in the casting of provisional ballots.

The Secretary of State's office also took additional steps to increase security of the election systems in use in the state. Those steps include:

- Joining nationwide organizations that support election support and monitoring such as the Multi-State Information Sharing & Analysis Center ("MS-ISAC"), Election Infrastructure Information Sharing & Analysis Center ("EI-ISAC"), and Electronic Registration Information Center ("ERIC"), Declaration of Merritt Beaver, attached as Ex. B ("Beaver Dec.") at ¶ 28;

- Establishing a multi-tiered security environment, which includes monitoring support from the United States Department of Homeland Security ("DHS"), MS-ISAC and two different private sector security monitoring firms, *id.* at ¶ 5;

- Establishing a new hardened, air-gapped, Secretary of State IT-managed network which houses both the GEMS ballot building process and the ExpressPoll data set production, *id*. at ¶ 14;

- Updating GEMS database transmittal using encrypted CDs that have to be verified by each county, *id*. at ¶ 15; and

- Engaging outside cybersecurity experts to conduct independent penetration testing and installing sensors to assist with identifying external attempts to breach systems, *id*. at ¶ 24, 27; Declaration of Theresa Payton,[2] attached as Ex. C ("Payton Dec.") at ¶¶ 4-6.

## III.   Feasibility of relief.

At this point, the Secretary of State has not yet announced which vendor it will select for the new BMDs. But both motions focus solely on the existing DREs, seeking to make changes that would require the purchase of a significant amount of new equipment, including optical scanners.  Curling Plaintiffs go a step further—seeking to replace DREs with BMDs even though currently there is no certified vendor for the State as required by law.

---

[2] Ms. Payton is the CEO of Fortalice, a full-service cybersecurity firm and previously served as Chief Information Officer in the White House.

## IV.   Procedural posture.

Faced with this dramatically changed world, Plaintiffs continue to proceed as if nothing has changed. After the mandate returned from the Eleventh Circuit on March 8, 2019 [Doc. 341], this Court set a status conference for April 9, 2019. [Doc. 355]. At that conference, Plaintiffs informed the Court they would not be amending their complaints. [Doc. 363 at 30:2-10] (Coalition Plaintiffs); [Doc. 363 at 39:17-23] (Curling Plaintiffs). Plaintiffs then proceeded to file the present motions for preliminary injunction. Because there are no statewide elections until 2020, Plaintiffs are left focusing on a set of municipal elections being held in 2019 (and possibly some county SPLOST elections).

## <u>ARGUMENT AND CITATION OF AUTHORITY</u>

Because preliminary injunctions are such extraordinary and drastic remedies, courts may not grant this type of relief "unless the movant clearly established the 'burden of persuasion' as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) quoting *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989). Plaintiffs must demonstrate: (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) that the

balance of equities tips in Plaintiffs' favor; and (4) that an injunction is in the

public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.

Ct. 365, 374 (2008).

Preliminary injunctions are never granted as of right, even if a plaintiff

can show a likelihood of success on the merits. *Benisek v. Lamone*, 138 S. Ct.

1942, 1943–44 (2018); [Doc. 309]. Moreover, Plaintiffs seek to impose a

specific elections procedure in November. Mandatory injunctions are

"particularly disfavored, and should not be issued unless the facts and law

clearly favor the moving party." *Martinez v. Matthews*, 544 F.2d 1233, 1243

(5th Cir. 1976).[3] And the extraordinary nature of the relief sought by

Plaintiffs is heightened in the context of elections, because of the public

interest in orderly elections and the integrity of the election process. *Purcell*

*v. Gonzalez*, 549 U.S. 1, 4-5, 127 S.Ct. 5 (2006). Each state has "'broad power

to prescribe the '[t]imes, [p]laces and [m]anner of holding [e]lections for

[s]enators and [r]epresentatives,' Art. I, § 4, cl. 1, which power is matched by

state control over the election process for state offices.'" *Wash. State Grange*

---

[3] The Eleventh Circuit adopted as binding precedent all decisions of the
former Fifth Circuit issued prior to October 1, 1981. *Bonner v. City of
Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

*v. Wash. State Republican Party*, 128 S. Ct. 1184, 1191, 170 L. Ed. 2d 151 (2008) (citations omitted).

As an initial matter, Plaintiffs seek relief that this Court is not able to grant. All parties agree that the only elections that would be subject to the requested preliminary injunction would be some municipal elections and potential county-level SPLOST elections in 2019.[4] This creates a fatal problem for Plaintiffs: unlike other issues addressed by this Court, the State does not control, direct, or dictate means of *municipal* elections. Consequently, this Court cannot order the relief Plaintiffs seek because Plaintiffs: (1) lack standing, and (2) failed to join necessary parties. Plaintiffs' proposed relief also raises significant constitutional questions about required access to voting by secret ballot for voters with disabilities.

But even if this Court finds the correct parties are before the Court, Plaintiffs are not likely to succeed on the merits. Plaintiffs fundamentally misunderstand the facts and fail to account for the concrete steps taken by the Secretary of State and the State of Georgia since this Court's order last

---

[4] The Court has also made clear that Plaintiffs will not be able to obtain relief for upcoming Fulton County elections held before November [Doc. 391, Tr. of Scheduling Conference, May 31, 2019 at 76:5-8].

year. Plaintiffs also continue to raise claims that have already been resolved against them in other contexts.

But even if they could show a likelihood of success on any claim, the remaining prongs do not favor Plaintiffs. They cannot identify an irreparable harm and the equities and public interest *still* do not favor Plaintiffs. The State is moving to a new election system and requiring another change at this time would be incredibly disruptive. Plaintiffs completely ignore the purchases that would be required for a paper-ballot election and the massive burden on election officials to administer such an election. Finally, Plaintiffs continue to ignore the real vulnerabilities that paper ballots present.

## I.   This Court cannot grant the relief sought because State Defendants do not control municipal elections.

### A.   *The law governing Georgia municipal elections.*

Georgia municipal elections are conducted in a very different manner than state and county elections. The Georgia Code effectively treats municipal election superintendents as independent actors, especially as it pertains to the method of conducting city elections. *Compare Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (describing the Secretary as having plenary power over candidate qualifications), *with* O.C.G.A. § 21-2-300(a) (requiring equipment used for casting and counting votes in only county,

state, and federal elections to be the same in each county), O.C.G.A. § 21-2-379.3 (authorizing municipalities to purchase or lease their own DREs), *and* O.C.G.A. § 21-2-320 (authorizing cities to choose to use "voting machines," specifically lever machines).[5]

Specifically, the Georgia Constitution empowers the General Assembly to establish the methods and procedures to conduct elections in this State. Ga. Const. Art. 2, Sec. 1, Par. 1. Several sections of the Election Code create significant autonomy for municipal election superintendents who "shall conduct … all municipal elections held within his or her municipality." O.C.G.A. § 21-2-70.1(a). In addition to municipal election superintendents' general authority, cities are not subject to the requirements that vote casting and counting be on the same equipment: "the equipment used for casting and counting votes in county, state, and federal elections shall … be the same in this state." O.C.G.A. § 21-2-300(a).[6] These are key differences that

_____

[5] The State continues to maintain that Plaintiffs threatened allegations about matters outside of DRE equipment should be raised against county governments and not State Defendants.

[6] Municipal elections are mentioned in the same Code Section, which allows municipalities to contract with counties for the use of "such voting equipment in municipal elections." O.C.G.A. § 21-2-300(e)(1). This means that the omission of municipalities from the list of jurisdictions required to use identical voting equipment is deemed intentional. *See Republic of Sudan v.*

distinguish this case from decisions like *Grizzle* and its progeny. *See* 634 F.3d
at 1319. Specifically, *Grizzle* involved an election to a *county* school board
(and a challenge to a Code Section addressing school board elections). *Id.* at
1315 (addressing O.C.G.A. § 20-2-51(c)(2)). The relief articulated in Plaintiffs'
Motions would only affect municipal elections which operate under a different
statutory scheme than those at issue in *Grizzle*.

Plaintiffs' arguments to the contrary fail. [Doc. 419-1 at 13-14].
Plaintiffs rely on the revised O.C.G.A. § 21-2-50(a)(15), which empowers the
Secretary to "develop, program, build, and review ballots for use by counties
and municipalities on voting systems in use in the state," as evidence that
State Defendants have the authority to "control" municipal elections. This
argument fails for three reasons. First, O.C.G.A. § 21-2-50(a)(15) is not an
exclusive grant of authority to the Secretary. Second, the proposed injunction
would be to the DRE machines and not ballot design. Third, even if ballot
design were enjoined, Georgia law still authorizes local superintendents to
prepare the form and arrangement of ballots for DRE systems. O.C.G.A. § 21-
2-379.4; *see also* O.C.G.A. § 21-2-70.1 (authorizing municipal superintendents
to conduct elections consistent with Chapter 2 of Title 21).

---

*Harrison*, 139 S. Ct. 1048, 1058 (2019) (deciding that the inclusion of terms in
one section of a code and not another is intentional).

State Defendants have no control over the upcoming municipal elections, and as such, any injunctive relief against State Defendants would not achieve Plaintiffs' desired results.

**B.      *Plaintiffs lack standing to challenge municipal elections.***

Given that Georgia's cities control their own elections, Plaintiffs cannot show either the causation or redressability prongs of constitutional standing. *See generally Steele v. Nat'l Firearms Act Branch*, 755 F.2d 1410, 1413-14 (11th Cir. 1985). Causation and redressability are often considered together. *Fla. Ass'n of Med. Equip. Dealers v. Apfel*, 194 F.3d 1227, 1230 (11th Cir. 1999).

Here, nothing Plaintiffs have argued demonstrates that the State can cause the municipalities to use paper or any other form of ballots. *Steele* involved a challenge to a government regulation prohibiting certain transfers of firearms. 755 F.2d at 1412-14. The Eleventh Circuit concluded that the plaintiff lacked standing, in part because he could not trace his injury—the inability to sell certain firearms—to the government entities he sued (as opposed to certain government actors). *Id.* at 1214-15. The same reasoning applies here. The Secretary could ask cities to allow voters without disabilities to use something other than DREs in upcoming municipal

elections, but the cities are free to disregard that request and choose their own method of voting. *See* O.C.G.A. §§ 21-2-70.1, 21-2-300.

Similarly, in *Scott v. Taylor*, 405 F.3d 1251, 1256 n.8 (11th Cir. 2005), the Eleventh Circuit concluded that the plaintiff did not seek "actual relief" against the party that enforced the allegedly unconstitutional voting district. There, the plaintiff challenged the drawing of a county commission map. The Eleventh Circuit rejected the plaintiff's strategy of naming as defendants those state legislators (and the Lieutenant Governor) who enacted the district map. Her remedy, the court concluded, was against the county board of elections and not state legislators. *Id.* at 1256-57. Here, the remedy Plaintiffs seek—imposing the manner of conducting municipal elections— should also be against the party that has the "role with respect to the relief sought": municipal election superintendents. *Id.* at 1256.[7]

## C. *Plaintiffs failed to join necessary parties.*

Given how Georgia law treats municipal elections, Plaintiffs should have joined those Georgia cities against whom they seek relief. Their failure to do so precludes relief under Federal Rule of Civil Procedure 19.

---

[7] Plaintiffs purport to address the standing requirement in the briefs, but they fail to acknowledge or overcome the unique aspects of municipal elections that are critical to their Motions.

Rule 19(a) provides that: persons who are "subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a). Under decisions by the Eleventh Circuit, this inquiry focuses on whether joining the party in question is "feasible … [and] pragmatic concerns … control." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1279-80 (11th Cir. 2003). Here, Plaintiffs have not shown that the joinder of the municipalities is not feasible. And, as shown above, "complete relief" may not be afforded without the cities, because municipal governments maintain total discretion on the method of conducting the upcoming city elections. This should end this Court's inquiry.

## II.    Plaintiffs' proposed remedy is unconstitutional and violates the Americans with Disabilities Act.

What is perhaps most egregious about Plaintiffs' claims is that their requested relief violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Americans with Disabilities Act ("ADA"). Plaintiffs' overall theory (with some distinction between them) is that DREs (and potentially BMDs, although not alleged in their complaints) are so unreliable that they violate individuals' right to vote.

- 14 -

*See generally* [Docs. 70 at ¶ 3, 226 at ¶ 2]; *see also* [Docs. 387-1, 419-1]. The problem is that to achieve their goals, they are willing to sacrifice the rights of people with disabilities who need to vote on electronic equipment like DREs or BMDs. Specifically, both sets of Plaintiffs acknowledge that some form of BMDs or DREs must be available for voters with disabilities. *See* [Doc. 419-1 at 2 n.1]; [Doc. 387-1 at 23]. In other words, Plaintiffs claim the equipment violates constitutional rights, but voters with disabilities should be forced to use them anyway. This conclusion is wholly incompatible with the United States Constitution and Title II of the ADA.

The constitutional violation Plaintiffs seek is clear. The Supreme Court of the United States has held:

> The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.

*Bush v. Gore*, 531 U.S. 98, 104–05 (2000). That Plaintiffs seek two methods of voting—one for people with disabilities that they believe is unconstitutional and one for people without disabilities that they believe is constitutional— creates exactly the kind of disparate treatment the Court warned against in *Bush*. This Court should deny the Motions on this ground alone.

Moreover, Title II of the ADA prevents discrimination against people with disabilities in the provision of services from government entities. 42 U.S.C.A. § 12132. The ADA reaches municipalities. 42 U.S.C.A. § 12131(1)(a). The Plaintiffs ask this Court to create a situation where some voters—people with disabilities—are provided a different (and according to Plaintiffs, lesser) means of voting because of their disability. This is a completely untenable result and one that demonstrates the absolute futility of Plaintiffs' theory.

## III.   Plaintiffs are not entitled to an injunction.

### A.   *Plaintiffs are not likely to succeed on the merits of their claims about DREs.*

#### 1.   *Relevant legal standards regarding Plaintiffs' claims.*

Plaintiffs generally claim that Defendants infringe on their Constitutional right to vote and their right under Georgia law to a secret ballot, particularly under the Equal Protection and Due Process clauses of the Fourteenth Amendment. *See* [Docs. 387-1 at 11, 14-15; 419-1 at 30-31]. Under the United States Constitution, no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Likewise, no state shall "deprive any person of life, liberty, or property, without due process of law." *Id*. The right to vote, specifically, is certainly considered an important right under the First and Fourteenth

Amendments of the United States Constitution, but it is not subject to the strictest scrutiny under the law. *See Democratic Executive Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019) (stating that "[v]oting is . . . a 'fundamental political right'" but applying a standard lower than strict scrutiny) (internal citations omitted).

When considering the constitutionality of state laws that allegedly burden the right to vote, strict scrutiny is not automatically applied. *See Burdick v. Takushi*, 504 U.S. 428, 428 (1992) ("Petitioner assumes erroneously that a law that imposes any burden on the right to vote must be subject to strict scrutiny"). Instead, courts apply a more flexible sliding-scale standard, weighing the burden against the interests put forward by the State. *Id.* Only when a state imposes "severe" restrictions on voters' right to vote must the state's interest in doing so be compelling. *Id.* Indeed, the lighter the burden on citizens' right to vote, the less strict the scrutiny Courts apply. *See Democratic Exec. Comm. of Fla.*, 915 F.3d at 1319. Where a state "imposes only 'reasonable, nondiscriminatory restrictions' upon th[e right to vote], the State's important regulatory interests are generally sufficient." *See Burdick,* 504 U.S. at 428 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

In particular, where a plaintiff challenges a state's electronic-voting method and requests the use of paper ballots, the lower-scrutiny *Burdick* test is applied. *See Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006) (applying *Burdick* to challenge to touchscreen voting procedure); *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) (applying the *Burdick* test because the "use of paperless, touchscreen voting systems [does not] severely restrict[] the right to vote"). As discussed below, Plaintiffs have not shown any basis to determine that Georgia's current voting system is unconstitutional.

>    2.    *Plaintiffs cannot succeed when the only types of evidence they rely on are vulnerabilities—not actual compromises.*

"No balloting system is perfect." *Weber*, 347 F.3d at 1106. As a result, "the mere possibility of error" is not enough to bar the use of a particular voting system, especially given the state interest in the orderly conduct of elections. *Banfield v. Cortés*, 631 Pa. 229, 260 (2015); *see also Stein v. Cortés*, 223 F. Supp. 3d 423, 441-42 (E.D. Pa. 2016).

Plaintiffs continue to rely exclusively on risks and vulnerabilities in the DRE system—the mere possibility of problems as opposed to showing any actual compromise. When this Court considered the issues last year, the evidence before it led the Court to conclude that there were risks associated

with the use of a DRE voting system. [Doc. 309 at 38]. But even given the benefit of discovery and the additional time since last year's hearing, Plaintiffs still cannot identify any actual compromise of any election system.

The lack of evidence of actual compromise becomes even clearer when comparing the use of DREs to Plaintiffs' preferred method of hand-marked paper ballots. In the 35-year period in which DREs have been in use nationwide, there has never been a verified incident of tampering with a machine being used in an election. Shamos Dec. at ¶ 33. But there have been thousands of convictions in that same period for voter fraud connected with paper ballots. *Id*.

Unlike DREs, paper ballots have a track record of actual compromise— not just vulnerabilities. Paper ballots create a single record of the voter's choice that, if lost, cannot be recovered. Shamos Dec. at ¶ 36. Hand-marked paper ballots can also be manipulated by overvoting the ballot when it is handled,[8] causing the loss of a legitimate vote. *Id*. Paper ballots are often found after elections in places that demonstrate they were not counted. Shamos Dec. at ¶ 39. Indeed, the original reason for the invention of lever

---

[8] Paper ballots marked by BMDs do not suffer from the same potential dangers because of the types of marks made on the ballots. Shamos Dec. at ¶ 52.

voter machines in the 1800s were the *actual* compromises associated with

paper ballots.[9] Shamos Dec. at ¶ 40.

In sharp contrast to the actual evidence of compromise of paper ballots,

Plaintiffs continue to offer nothing but speculation about DREs. Dr.

Halderman's first declaration offered extensive conjecture about how an

attacker could compromise DREs—but he was unable to identify any actual

compromise of a DRE being used in an election:

- The comparison to the hacking in Ukraine was of a completely different, Internet-based system and even that hacking did not involve the alteration of any votes. Shamos Dec. at ¶¶ 61-64.

- He completely ignores the voting system in actual use when explaining his various pieces of malware, and instead assumes a level of access to a voting machine to replace its software that could not be duplicated under actual election conditions. Shamos Dec. at ¶¶ 67, 69-72, 76-77.

- There is no evidence that a buffer overflow vulnerability could be exploited on a DRE. Shamos Dec. at ¶¶ 78-83.

---

[9] Optical scanners can also be manipulated, Shamos Dec. at ¶¶ 54-58, but the only possible error check—a hand recount—cannot account for ballot stuffing or ballot tampering. Shamos Dec. at ¶ 57.

- The Stuxnet virus that was placed into an air-gapped system was installed by an employee at Siemens, not by the use of an infected device plugged into the system. Shamos Dec. at ¶ 88. A Stuxnet-style attack could not succeed in Georgia. Shamos Dec. at ¶ 89.

- Parallel testing would ensure that any software seeking to manipulate votes would be discovered. Shamos Dec. at ¶¶ 97-101.

Dr. Halderman's testimony at the 2018 hearing also does not support a finding that a DRE unit could be compromised under actual election conditions, because he only manipulated votes with unfettered access to a machine—bypassing all security measures taken in an actual election. Shamos Dec. at ¶ 131-134. Further, the malware would be revealed through parallel testing, which the State conducts, so even if the results were compromised, the malware would still be detected. Shamos Dec. at ¶¶ 131-133; *see also* Beaver Dec. at ¶ 18.

Dr. Halderman's latest declaration continues the pattern of discussing vulnerabilities but offering no evidence of any actual compromise. Shamos Dec. at ¶¶ 138-139. Even Dr. Halderman's identified "new information" does not support his ultimate conclusions because he continues to ignore the actual changes made in Georgia. Shamos Dec. at ¶¶ 139-140.

Dr. DeMillo similarly offers only evidence of "hacks" that occur in laboratory testing, not in actual election conditions. Shamos Dec. at ¶ 111. While discussing advanced persistent threats and other types of attacks, he offers no evidence of how those threats could be utilized against standalone DRE machines. Shamos Dec. at ¶¶ 113-119. Even the Stuxnet virus was not able to evade detection. Shamos Dec. at ¶ 120.

Plaintiffs do not and cannot provide any evidence of an actual compromise of the current DRE system or any DRE system in an actual election. They also fail to account for the vulnerabilities in a hand-marked-paper-ballot system. Given the lack of evidence of any actual compromise, Plaintiffs have failed to carry their burden on the first prong.

3.   *State Defendants made significant increases to the security of Georgia's Election Systems since Plaintiffs' 2018 motions.*

Plaintiffs rely on their prior preliminary injunction motions as a basis for their new, separate motions, claiming "[n]othing has changed with respect to the vulnerability, insecurity or unreliability of the DREs or GEMS system." [Doc. 387-1 at n. 2; *see also* Doc. 419-1 at 6 (alleging "Defendants have taken no discernable action...")]. This is not the case. State Defendants have taken measurable steps to address the alleged "security vulnerabilities" at all levels of the election system. The Secretary has made changes to the

physical security surrounding the Center for Election Services ("CES"), engaged private cybersecurity firms as well as DHS to perform security assessments, and updated security related to the other aspects of Georgia's election system, including GEMS ballot building, ExpressPoll, and Election Net ("ENET"). These changes refute Plaintiffs' claims that Georgia's election system remains "as vulnerable as ever," further undermining the bases for Plaintiffs' Motions. [Doc. 387-1 at 5].

a. State Defendants took concrete steps to address security concerns after the alleged breaches at Kennesaw State University ("KSU").

The Secretary made substantial changes to the security surrounding CES after the alleged access at KSU. It has comprehensively increased its security measures, which impacts the overall ability (or rather, inability) to access Georgia's voter information. The Secretary of State's office has installed "Albert sensors" in the Secretary of State network, which detect traffic coming into and out of a computer network. Beaver Dec. at ¶ 24. Secretary of State employees must establish complex 16-character passwords to access the internal network and complete cyber-defense training. *Id.* at ¶ 25. The Secretary of State's office now uses Cloudflare for network security to monitor and block external attempts to breach the Georgia Voter Registration System. *Id.* at ¶ 26. It also employs an external source for

complete independent penetration testing of its connected network environment. *Id.* at ¶ 27.

The Secretary of State's office has joined several nationwide organizations that provide security election support and monitoring: MS-ISAC, EI-ISAC, and ERIC. *Id.* at ¶ 28. The Secretary has encouraged Georgia counties to join EI-ISAC, of which over 60 counties have. *Id.* at ¶ 29. State Defendants also have attended, and continue to attend, confidential security briefings from DHS as well as election security workshops and conferences. *Id.* at ¶ 30.

Additionally, State Defendants have substantially altered CES operations. The changes include:

- Establishing a multi-tiered security environment, which includes monitoring support from DHS, MS-ISAC, and two different private sector security monitoring firms (*Id.* at ¶ 5);

- Transitioning CES into the Secretary of State's network, for around-the-clock monitoring (*Id.* at ¶ 6);

- Requiring an annual cybersecurity assessment for CES (*Id.* at ¶ 7);

- Establishing endpoint protection on all computer servers and desktops in CES that are not in the air-gap environment (*Id.* at ¶ 8);

- Implementing fully monitored and managed firewall protection of all networks (*Id.* at ¶ 9);

- Establishing network segmentation to limit access to secure networks to only those individuals with "Need Access" privileges (*Id.* at ¶ 10);

- Utilizing DHS weekly vulnerability scanning of all internet-connected networks to identify any vulnerabilities accessible to external bad actors (*Id.* at ¶ 11); and

- Implementing policies and procedures for CES that mirror the Secretary of State's policies and procedures (*Id.* at ¶ 12).

State Defendants have also altered how the Secretary's office transmits information and data related to GEMS ballot building, GEMS, ExpressPoll, and ENET to the counties for Georgia elections. They have moved all ballot building and ExpressPoll data set production to the Secretary of State's office. Deposition of Michael Barnes, attached as Ex. J[10] ("Barnes Dep.") at 34:7-23; Beaver Dec. at ¶ 13. State Defendants have established a new hardened, air-gapped, Secretary of State IT-managed network which houses both the GEMS ballot building process and the ExpressPoll data set production. Beaver Dec. at ¶ 14.

The Secretary of State has also updated its GEMS database transmittal procedure. To transmit the GEMS database, the password-protected file is zipped, encrypted, and placed on a watermarked CD. *Id.* at ¶ 15. In order to obtain the encryption key to access the password-protected

---

[10] The court reporter has completed the transcript but has not uploaded all exhibits. Rather than file an incomplete deposition on the docket, State Defendants attached the transcript as an exhibit to this brief. When the exhibits are available, the entire deposition can be uploaded to the Court's docket.

file, a specific individual documented as the county contact in each county election office must call the Secretary of State's office and provide a verification code for the watermarked CD. *Id.* After the information provided by the county contact is validated, the Secretary of State's Office releases the encryption key to the county. *Id.*

Additionally, all watermarked ballot proofs and database structure reports prepared for each county are in PDF only and placed within a county-specific folder on a Secretary of State IT-managed and secured file transfer protocol ("FTP") site. *Id.* at ¶ 16. These files are automatically removed after 60 days. *Id.* Likewise, the only non-PDF files made available to counties through the Secretary of State's FTP site cannot contain personally identifying information about voters and are the ExpressPoll Logic and Accuracy testing, ExpressPoll absentee, and ExpressPoll bulk update data sets. *Id.* at ¶ 17. The Logic and Accuracy testing set contains only a subset of voters and includes no personal identifying information. *Id.* The absentee data set contains no voter information and the bulk update file only contains a list of voter registration IDs. *Id.* These files are also automatically removed from the FTP site after 60 days. *Id.* The Secretary of State's office has further protected ExpressPoll Election Day data. For instance, all ExpressPoll Election Day files that contain the full list of voters for an election are placed

in locked bags and physically delivered and picked up from counties by Secretary of State Investigators. *Id.* at ¶ 18; Deposition of Lynn Ledford [Doc. 471] ("Ledford Dep.") at 62:10-17; Barnes Dep. at 37:11-18.

State Defendants have also increased the security surrounding other aspects of the voting system. State Defendants conduct parallel testing on election day in which a copy of an actual county GEMS database is used with a DRE set up in the Secretary of State's office and set in election mode for a specific real county precinct. Beaver Dec. at ¶ 19. Ballots are entered hourly and videotaped to verify accuracy of the system at the end of the day. *Id.* The equipment is set to mimic what is in use at the precinct that day. *Id.*

Access to ENET now requires a multifactor authentication. *Id.* at ¶ 20. State Defendants employ other security methods, including expiring passwords, anti-brute force software, and mandatory time-outs for ENET use. *Id.* at ¶ 21. The Secretary of State's office also performs a complete audit of ENET users at least annually, and users are automatically moved to inactive status after seventy-five (75) days of inactivity. *Id.* at ¶ 22.

Finally, State Defendants have assisted counties in increasing the security of the voting system on their end. State Defendants engaged DHS for physical security assessments for all local election offices and warehouses. *Id.* at ¶ 11. And counties have implemented options provided by DHS to increase

security. Deposition of Jennifer Doran [Doc. 469] ("Doran Dep.") at 54:7-55:15.

State Defendants have taken meaningful action to increase security regarding Georgia's voting system, undercutting Plaintiffs' claims that "DREs are simply too unsecure, unreliable and potentially already compromised." [Doc. 387-1 at 2; *see also* Doc. 419-1 at 6].

> b.  The General Assembly has addressed security concerns raised by Plaintiffs.

In addition to the increase in physical security surrounding CES and Georgia's election system, Georgia has also passed legislation to combat many of Plaintiffs' complaints related to Georgia's voting system. These efforts should not go unnoticed.

Recognizing the concerns raised by Plaintiffs in this case and in others, the General Assembly passed two pieces of legislation aimed to address such security concerns—H.B. 316 and H.B. 392. H.B. 316 requires the replacement of current voting machines with new machines "as soon as possible." O.C.G.A. § 21-2-300(a)(2). These machines must be certified by the United States Election Assistance Commission and provide an "elector verifiable" audit trail that allows each elector to see a printout *of who they voted for in each election*. O.C.G.A. § 21-2-300(a)(3). As Plaintiffs recognize, security changes to

Georgia's voting system cannot occur overnight, and a procurement is underway. *See generally* [Doc. 357, Exhibits 1–5 (Request for Proposal Documents)].

Coalition Plaintiffs further request that this Court impose an audit on all future elections in Georgia. H.B. 316 also provides for an audit of all elections, and Georgia law requires audits of any federal or state general election prior to certification of the election results, which are to commence "as soon as possible." O.C.G.A. § 21-2-498; *see also* O.C.G.A. § 21-2-499. Rather than allow the State to comply with its new law, Coalition Plaintiffs request that this Court impose a process "monitored by the Court to have the Parties work together beginning immediately to recommend to the Court practical, immediate and effective audit plans for implementation in all future elections." [Doc. 419-1 at 41]. This is a bridge too far. The State has broad powers to determine how such audits should be conducted, and Plaintiffs have no right to infringe upon the State Defendants' sovereignty regarding this issue (so long as the audit procedures remain within U.S. and Georgia constitutional bounds). *See Lassiter v. Northhampton Cty. Bd. of Elections*, 360 U.S. 45, 50 (1959).

Even though not included in their Complaints, Plaintiffs allege that there are vulnerabilities with Georgia's voting registration database

("GVRS"). [*See, e.g.,* Doc. 391, Tr. of Scheduling Conf. dated May 31, 2019 at 17:4-18:5]. H.B. 392 squarely addresses Plaintiffs' concerns by requiring (1) the Secretary to promulgate a regulation establishing industry-based security standards (which is currently in the rule-making process under the Georgia Administrative Procedures Act); and (2) annually certify that the State is complying with its own security regulations. *See* O.C.G.A. § 45-13-20(14.1). Indeed, litigants who *actually challenged* GVRS security stipulated to the joint dismissal of their complaint with prejudice, finding that its provisions made "further litigation of [the] matter unnecessary." Joint Stipulation of Dismissal, *Common Cause Ga. v. Raffensperger*, No. 1:18-cv-05102-AT (N.D. Ga. Jun. 14, 2019).

State Defendants take their role to safeguard elections seriously. Since this Court's consideration of Plaintiffs' initial motions for preliminary injunctions, State Defendants have overhauled significant components of security surrounding Georgia's election system, addressing the vulnerabilities raised by Plaintiffs and undercutting Plaintiffs' likelihood of success on the merits.

4.     *The alleged irregularities involving individual voters do not provide support to Plaintiffs' motions.*

To disguise their lack of any evidence showing an actual compromise, Coalition Plaintiffs take a shotgun approach: offering a litany of affidavits—mostly repeated from the Coalition Plaintiffs' failed challenge to the 2018 Georgia Lieutenant Governor's election—alleging disparate "concerns" or irrelevant problems experienced by individual voters during the 2018 election. Almost none of these individuals raised these alleged issues with election officials, opting instead to bring them directly to Coalition Plaintiffs or other partisan groups. *See*, *e.g.*, [Doc. 412 at 13 (K. Polattie Decl.) ("I was so troubled about not having the Lt. Governor race appear on my ballot that I contacted the Stacy Abrams campaign . . . ."); at 39 (D. Shah Decl.) ("I was concerned about my vote and whether or not it was counted and contacted 866OurVote [The Lawyers Committee for Civil Rights] for guidance.")].

Even if true, however, most of these voters' alleged complaints fail to support (or even relate to) Plaintiffs' allegations regarding DREs and the security of Georgia's elections. Coalition Plaintiffs simply seek to throw everything against the wall in the hopes that something—anything—might stick. Unfortunately for Coalition Plaintiffs, the assertions in these affidavits

do not, and cannot, carry Coalition Plaintiffs' burden of demonstrating a likelihood to succeed on the merits in this case.

Coalition Plaintiffs first allege that the 2018 Lieutenant Governor's race was not properly displayed on DREs for four individual voters. This happened, they contend, either because that particular race did not appear correctly on the ballot or did not appear until the ballot's review page. Coalition Plaintiffs fail to acknowledge that at least three of those four voters, by their own admission, did, in fact, vote in the 2018 Lieutenant Governor's race. *See* [Doc. 412 at 8 (C. Ramirez Decl.) ("I wanted to vote for Amico and pressed the area beside her name to cast my vote for her."); at 10 (K. Polattie Decl.) ("I saw that the Lt. Governor's race was not voted, so I marked my choice electronically and proceeded to cast my ballot."); and at 13 (T. Thomas Aff.) ("[W]hen I got to the review screen [ ] I saw the Lt. Governor's race, and I was able to then select Amico's name for that race.")].

Contrary to Coalition Plaintiffs' first allegation, Coalition Plaintiffs' own evidence shows that (a) the Lieutenant Governor's race *did* appear on these voters' ballots; (b) these voters did, in fact, cast their votes in the Lieutenant Governor's race; (c) even if true, this allegation had no material effect on that particular election; and (d) these voters likely simply overlooked the Lieutenant Governor's race in their first passes through the

ballot, either because of the ballot's design or some other benign reason. *See infra* Section III.A.5. Secretary of State election officials did not receive any complaints of the Lieutenant Governor's race not appearing on the ballot of voting machines in the 2018 election and verified that the race was present on all machines using reports from the GEMS Database. [Doc. 449-11 at 262:14-264:21] (Testimony of M. Barnes in *Martin v. Fulton Co. Bd. of Registration and Elections et al.,* Case No. S19A07791 (Ga. Sup. Ct. 2019)).

Coalition Plaintiffs next allege that one Cobb County voter received a ballot from the wrong congressional district, while another anonymous voter reported to one of Coalition Plaintiffs' poll watchers that she saw the name of a candidate from another district on her ballot. The latter is hearsay which, although admissible at the preliminary injunction stage, is uncorroborated by any other evidence and therefore its probative value is minimal at best. Even assuming that each of these incidents actually did occur, it is unclear how they relate to Coalition Plaintiffs' claims. At most, these are unremarkable episodes of election workers accidentally providing voters with the wrong ballots, which could occur under any voting system under discussion in this litigation including elections using hand-marked paper ballots. This offers no support for the technical security allegations Coalition Plaintiffs have advanced in this case.

Coalition Plaintiffs next offer the affidavits of various individuals who claim to have experienced "self-casting ballots," "vote-flipping," "glitches," or other disparate technical issues when attempting to vote. Again, to the extent that such occurred, each alleged issue is better explained by mistake or accident than a malicious, systemic compromise of Georgia's DREs. Given the large number of voters who participated in the 2018 election—almost four million total ballots were cast—there were undoubtedly instances of user error or potentially poor viewing angles or long fingernails causing inadvertent touches to register with the machine. Ledford Dep. at 103:20-107:4; Doran Dep. at 79:4-81:11. Regardless, most of the individuals who claim to have experienced technical problems when attempting to vote again admit that they ultimately were successful in doing so, either by DRE, [*see* Doc. 412 at 44 (T. Adams Decl.) ("On the third time my Abrams vote was properly cast."); at 50 (A. Bish Decl.) ("I was able to cast a correct ballot."); at 66 (J. Lester Decl.) ("the machine finally corrected."); at 58 (S. Francois Decl.) ("I was able to cast my ballot with my selections . . . ."); and at 96 (N. Lack Decl.) ("I did receive the confirmation screen which showed all of the selections I made.")], or by submitting a provisional ballot, [*see* Doc. 412 at 86 (C. Fore Decl.); and at 93 (M. Herndon Decl.)].

Coalition Plaintiffs' contention that what they interpret as a mismatch in publicized vote totals at one Fulton County precinct ("Grady High School" or "GHS") constitutes an "irregularit[y]" has no material basis in fact. [Doc. 419-1 at 20-21]. Coalition Plaintiffs' continue to profess confusion in this apparent difference in reported vote total despite the fact that the subject was addressed in their challenge to the Lieutenant Governor's election last year.

As explained in the Declaration of Michael Barnes, attached as Ex. D (Barnes Dec.), the vote totals reported on the Secretary's website and on that precinct's poll tapes are consistent. Coalition Plaintiffs and the affiants on whom they rely—Michael S. Johnson and Taran Greenwald—are confused about the operation of the vote-total reporting process. During Johnson's twenty-minute visit to GHS on the morning of November 6, 2018 election, he observed ten DREs in use; however, fifteen total DREs were used at GHS over the course of that election day. Barnes Dec. at ¶ 4, Ex. A (Final GHS recap sheet). Greenwald's collection of GHS voting data also is incomplete: the recap sheet he includes is not the final, signed one, and his photographs do not include all of the poll tapes from GHS. The inclusion of a tape for "Machine ID: 14," however, makes clear that more than ten DREs used at

GHS that day since the poll tape machine IDs count up from zero at each site. *Id.*

Fulton County, Georgia includes portions of the State's Fifth, Sixth, Eleventh, and Thirteenth Congressional Districts. *Id.* GHS, which is located within Fulton County and Georgia's Fifth Congressional District, was a polling site for three Fulton County precincts (06G, 02J, and 02K) for the November 6, 2018 election. *Id.* GEMS must account for "federal-only ballots"—ballots built for voters, such as citizens living abroad, who are entitled to vote only for federal races—by assigning them to a particular precinct in each county, even though those voters do not vote in state races. *Id.* at ¶¶ 4-5. For the November 6, 2018 election, all of the Fulton County federal-only ballots were assigned to precinct 02J at GHS. *Id.* at ¶ 5. Thus, in addition to federal races in Georgia's Fifth Congressional District, the poll tapes for GHS also will reflect races for other Congressional Districts located within Fulton County (*i.e.*, the Sixth, Eleventh, and Thirteenth Congressional Districts) but show zero votes cast on the DREs at GHS on election day for those other federal races. *Id.*

In short, because Coalition Plaintiffs do not understand the operation of Georgia polling sites and the GEMS system as used in an actual election, what they perceive as "irregularities" in fact amount to nothing. There is not

an actual discrepancy, nor does Coalition Plaintiffs' submission contain

evidence of any successful attack on Georgia's election system.

Coalition Plaintiffs also argue that voters in the 2018 election

experienced long wait times at the polls, in some cases allegedly due to

machine malfunctions. Of course, as Coalition Plaintiffs note in their brief,

procedures are already in place to handle such occurrences. *See* O.C.G.A. §

21-2-418 ("Notwithstanding any other provision of this chapter to the

contrary, in the event that the voting machines or DRE units at a polling

place malfunction and cannot be used to cast ballots or some other emergency

situation exists which prevents the use of such equipment to cast votes,

provisional ballots may be used by the electors at the polling place to cast

their ballots."). And, even if a polling place failed to abide by these

procedures, such failure does not constitute a security issue and is unrelated

to Coalition Plaintiffs' claims. Moreover, Coalition Plaintiffs offer no legal

authority or argument to suggest that allegedly long wait times constitute a

constitutional violation. Therefore, these affidavits and the assertions

contained therein are irrelevant for purposes of Plaintiffs' Motions.

In sum, all of the one-off issues alleged by Coalition Plaintiffs do not

and cannot establish that any Georgia DRE was compromised or that any

other breach of Georgia's election security occurred. The Secretary of State's

office performed numerous security and operational checks leading up to and during the 2018 election, including performing parallel testing of DRE units on Election Day that confirmed no irregularities or compromises existed. [Doc. 449-11 at 267-268] (Testimony of Michael Barnes). Election officials independently test, inspect, and certify that DREs are operating properly and that their tabulations are secure both before and during an election day. *See* O.C.G.A. § 21-2-379.7(b) (requiring "each DRE unit be thoroughly tested, inspected, and sealed prior to the delivery of each DRE unit to the polling place"); (c) (election officials "shall provide ample protection against molestation of and injury to the DRE units, and, for that purpose, the superintendent and poll manager may call upon any law enforcement officer to furnish such assistance as may be necessary"); and (d)(2) (superintendent shall "[e]nsure that each DRE unit's tabulating mechanism is secure throughout the day during the primary or election").[11]

These safeguards have been proven effective: there is no evidence of a compromise of any Georgia DRE or any breach of Georgia's election security. In fact, following a record year for voter turnout, Coalition Plaintiffs cannot

---

[11] Machine malfunctions are addressed by pollworkers taking machines out of service after determining whether a vote was cast. Ledford Dep. at 110:19-114:7. If a machine has to be repaired, it is repaired by the vendor and then returned to the State for certification before returning to the county. *Id*.

offer anything more than a small handful of voters claiming one-off problems—in most cases unreported to election officials—that ultimately had little or no impact on the races in question, usually because those voters actually cast ballots for their chosen candidates. Coalition Plaintiffs do not, and cannot, offer any legal authority to suggest that isolated instances of, for example, ballot display or access card problems are indicative of a compromise of Georgia's election security. Without such evidence or legal support, Coalition Plaintiffs cannot carry their burden of establishing a likelihood of success on the merits and their request for a preliminary injunction must fail.

> 5. *The vote totals in the Lieutenant Governor's race provide no support for Plaintiffs' motions.*

In a clear effort to obtain a second bite at the apple, the Coalition Plaintiffs again offer their failed "undervote" or "dropoff" argument from their earlier challenge of the 2018 Lieutenant Governor's race. Coalition Plaintiffs simply speculate that the "undervote" or "dropoff" in the Lieutenant Governor's vote totals, when compared to those for the Governor, is *necessarily* the result of a compromise to Georgia's election security. As Coalition Plaintiffs' counsel admitted during the trial in that case, however, they do not, and cannot, offer any evidence to put the result of that election in

doubt. *See* [Doc. 449-11 at 19-20] (Statement of Bruce Brown) ("The

distinction between this case and every other voting case is that there is no

tangible evidence of the result of the election. There is none at all. Instead, all

we have are traces, secondary evidence, giving some hint as to whether or not

the voting totals are correct or not."). Put simply, Coalition Plaintiffs contend

that the election *must* be flawed—and, in fact, that the source of that "flaw" is

an actual compromise or hack of Georgia's election system—because they do

not like the result.[12] This Court should reject this self-serving argument, just

as the Fulton Superior Court did the first time Coalition Plaintiffs raised it.

*See* [Doc. 449-12 at 79] (Ruling of the Court) (dismissing case where "[t]here

was no illegal votes received. There's no legal votes rejected and in this race

in the evidence.").

　　As discussed above, there is ample evidence to demonstrate that—

contrary to Coalition Plaintiffs' unsubstantiated theory—no compromise of

the 2018 election occurred. The Secretary of State's office issued reports

demonstrating that the Lieutenant Governor's race appeared on all DREs,

---

[12] Strangely, Coalition Plaintiffs offer this argument despite Dr. Halderman discounting the use of statistical evidence in identifying fraud, [Doc. 260-2, ¶¶ 43-48]. The State even utilized Dr. Halderman's proposed solution—to reexamine machines in the Lieutenant Governor's race where an outlier was located—and found no problems. [Doc. 449-11 at 235-237] (Testimony of Michael Barnes).

[Doc. 449-11 at 235-237] (Testimony of M. Barnes), and performed parallel testing of DRE units on Election Day that confirmed no irregularities or compromises existed [*id*. at 267-268] (Testimony of M. Barnes). Moreover, while it is not Defendants' burden to disprove Coalition Plaintiffs' unsubstantiated theories, there are a multitude of other potential causes for the 2018 Lieutenant Governor's race's lower vote totals:

- Write-in votes are not counted in the overall vote totals. The Lieutenant Governor's race in large Metro Atlanta counties had the highest number of write-in votes of any race. [Doc. 448-11 at 271-273];

- Ballot design and the layout of the DRE units may have led voters to inadvertently skip over the election,[13] as has occurred in other undervote scenarios such as a U.S. Senate Race in Florida [Doc. 449-11 at 257-259];

- Voters may have been confused because this was the first gubernatorial election without a U.S. Senate race since at least 2006, leading to the Governor and Lieutenant Governor appearing on the same page of the DRE screen instead of on separate screens [Doc. 449-11 at 255-256];

---

[13] This explanation would also account for the difference in the undervote in absentee-by-mail ballots and ballots cast on DREs.

- Given the massive influx of new voters in the 2018 election, voters may have believed that the Governor and Lieutenant Governor ran on the same ticket and that casting a vote for Lieutenant Governor was unnecessary [Doc. 449-11 at 259-61]; or

- Some supporters of Democratic candidates may have disliked Ms. Riggs-Amico or her position on issues and simply chose not to vote in that race.

Coalition Plaintiffs' argument regarding the 2018 Lieutenant Governor's race amounts to nothing more than speculation; unsupported by any evidence.  Coalition Plaintiffs also do not, and cannot, offer any legal support for their contentions. Coalition Plaintiffs' simply offer nothing new beyond what was already addressed, at length, in the Fulton Superior Court and wholly rejected. The Court should likewise reject these arguments.

> 6.    *Claims about the electronic pollbooks are moot due to statutory changes, as the plaintiffs in Common Cause recognized.*

Coalition Plaintiffs also seek an injunction regarding electronic pollbook data, [Doc. 419-1, pp. 37-39], but cannot succeed on these claims. These arguments make little sense—especially the statement that the State

has done nothing since this Court's September 2018 order regarding those pollbooks.[14]

As this Court is aware, the *Common Cause* case addressed issues related to potential vulnerabilities in electronic pollbooks, seeking relief focused on individuals who had to vote provisional ballots because their names did not appear on the electronic pollbooks. Doc. 62, p. 52-53, Case No. 1:18-cv-05102-AT. Following this Court's order, the Georgia General Assembly made significant changes to the provisional ballot laws that resulted in the *Common Cause* plaintiffs agreeing that their case was moot. Doc. 116, Case No. 1:18-cv-05102-AT.

The changes in Georgia law through H.B. 316 included notification to the Secretary of State regarding the casting of provisional ballots, a requirement to review all available voter registration information (not just electronic information), notification provisions for the voter, extension of certification deadlines, and an option to further extend deadlines to conduct a pre-certification audit. Doc. 116, pp. 2-3, Case No. 1:18-cv-05102-AT. Additional protections were added in H.B. 392 for the security of GVRS,

---

[14] Some of the relief sought by Plaintiffs is already part of current law and practice, such as maintaining paper backups of voter lists located at each precinct. *See* Transcript of 11/8/2018 hearing in Case No. Case No. 1:18-cv-05102-AT at 53:21-55:1.

requiring cybersecurity standards and annual certifications. Doc. 116, pp. 3, Case No. 1:18-cv-05102-AT. The plaintiffs in *Common Cause* agreed that these statutory changes fully addressed the claims in that case and dismissed the case. Doc. 116, pp. 4, Case No. 1:18-cv-05102-AT.

Coalition Plaintiffs only attempt to distinguish *Common Cause* is to claim that the Court's relief did not address proactive relief. [Doc. 419-1, p. 42]. But Coalition Plaintiffs do not explain how they will be likely to succeed on this claim. Instead, they recognize the problem with adding prospective relief: the only thing State Defendants can do is instruct county superintendents to offer provisional ballots to individuals who do not appear on the voting rolls. Under O.C.G.A. § 21-2-418(a), these individuals are already entitled to cast a provisional ballot, so Coalition Plaintiffs essentially request an invalid obey-the-law injunction. *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996); *see also Walker v. City of Calhoun*, 682 F. App'x 721, 724 (11th Cir. 2017).

The other grounds of relief sought by Coalition Plaintiffs regarding electronic pollbooks are not necessary in light of the changes in Georgia law. Coalition Plaintiffs allege that massive disenfranchisement will occur, but do not explain how such disenfranchisement could continue under the new law—especially when the legislature codified almost all of the relief granted

by this Court in *Common Cause*. As discussed above, H.B. 316 already requires a series of precertification audits. [Doc. 357-2, Section 42]. Finally, Coalition Plaintiffs also seek to require a review of pollbook software, when the State is already in the process of procuring a new system that includes new electronic pollbooks. *See* [Doc. 357-4, p. 4].

Coalition Plaintiffs have not shown they are likely to succeed on the merits of their claims regarding electronic pollbooks because they have not explained how their claims differ in any way from existing law or from the claims in *Common Cause*.

> 7.   *Coalition Plaintiffs' claim of ballot secrecy is based on a flawed understanding of Georgia law and the underlying facts.*

In their motion, Coalition Plaintiffs also assert that because the State and several Georgia counties refuse to produce ballot image reports, those reports *must* reveal the identity of the voter. This strained argument misconstrues both the law and facts. All witnesses agree that any purported "unique identifier" on a ballot cannot reveal the identity of a voter, eliminating Coalition Plaintiffs' claim of a violation of ballot secrecy.[15]

---

[15] Coalition Plaintiffs also admit that their current complaint does not include a claim related to ballot secrecy. [Doc. 419-1 at 35].

a.   <u>Coalition Plaintiffs have a fundamental factual</u>
<u>misunderstanding of ballot image reports.</u>

To support their motion, Coalition Plaintiffs make assumptions based on written responses to Open-Records-Act requests to come to the conclusion that these short responses somehow mean the identity of a voter can be disclosed through the ballot image reports. Direct testimony by county superintendents and the Director for CES at the Secretary of State's office make clear that the identity of the voter *cannot* be determined through the ballot image reports alone, or in connection with any other part of Georgia's election system.

To support their contention that a claim of ballot secrecy would likely succeed, Coalition Plaintiffs point to Morgan County's response to Ms. Jeanne Dufort's Open Records request seeking a copy of her ballot image record for her votes in 2016 and 2019 elections. [Doc. 419-1 at 28]. They conclude that because Morgan County cited to the Georgia Constitutional provision that elections "shall be by secret ballot" in its refusal to produce the requested ballot image reports, that response necessarily indicates Morgan County could identify Ms. Dufort's ballot.

This is incorrect. First, the refusal to produce the ballot image report is not based on the potential disclosure of a voter's identity, but rather on

Georgia's prohibition on the disclosure of ballots generally without a court order. O.C.G.A. § 21-2-500(a) (noting ballots must be kept under seal absent an order "unless otherwise directed by the superior court"); *id.* at (c) (applying same process to municipal elections). Second, direct testimony by the Morgan County superintendent makes clear that Coalition Plaintiffs' assumptions are not accurate:

> Q: And what is a "ballot image report"?
> A: It's a vote case record that shows what a voter chose for each race.
> Q: **Is there a way, looking at that particular document, to determine who the voter was?**
> A: **No.  There's not.**
> **...**
> Q: …**[A]re you aware of any data in the GEMS database system that could be used whether by itself or in combination with any other information to connect a voter to their actual vote**?
> A: **I am not aware of any**.

Doran Dep. at 62:12–17, 63:19–64:1 (emphasis added).

Lynn Ledford, who served as Elections Director of Gwinnett County, and Michael Barnes, Director of CES at the Secretary of State's office, also confirmed that ballot image reports, alone or in conjunction with other information from Georgia's election system, do not disclose voter identity. *See* Barnes Dep. at 93:20–95:12 (random number generated and no longer associated with voter); Ledford Dep. at 103:6-9, 123:2-8 ("We wouldn't have

any idea which ballot was that voter[']s"; "nobody but the voter sees their

ballot"). Rockdale County's response to Coalition Plaintiffs' subpoena further

confirms this fact. When requested to produce "cast vote records for first 5

ballots cast and last 5 cast" at a certain precinct, Rockdale County stated it

"has no way to determine the order a ballot was cast on a DRE [because]

[b]allots cast are not recorded in the order they were cast."[16] The remaining

examples—one document produced under the Open Records Act without

explanation or testimony (and contradictory to representations made in

Exhibit E) and a declaration containing hearsay about Gwinnett County

which contradicts sworn testimony—fail to rise to the level necessary to

demonstrate a likelihood of success on the merits of Coalition Plaintiffs' ballot

secrecy claim.[17]

> b.   "Ballot Secrecy" under Georgia law does not mean no
> traceability whatsoever.

Even if Coalition Plaintiffs' understanding of ballot image reports was

correct, which it is not, Coalition Plaintiffs improperly assume that ballot

---

[16] *See* June 17, 2019 – Rockdale County Board of Elections Subpoena
Response to *Coalition for Good Governance*, et al. v. *Raffensperger, et al.*,
Civil Action No. 1:17-cv-2989-AT, attached as Exhibit E.

[17] Contrary to Coalition Plaintiffs' assertions, once a ballot is cast, it cannot
be recovered from the machine. Georgia has not used the "challenged voter"
functions of the DREs for more than a decade. Barnes Dep. at 279:9-19.

secrecy laws require absolute secrecy from all individuals at all times. It does

not. Ballot secrecy does not mean absolute secrecy from all individuals, but

from the general public. *See, e.g.*, O.C.G.A. § 21-2-379.1(6) (direct recording

electronic voting systems "shall permit voting in absolute secrecy so that no

person can see or know for whom any other elector has voted or is voting,

*save an elector whom he or she has assisted or is assisting in voting*")

(emphasis added); *Am. Ass'n of People with Disabilities v. Smith*, 227 F.

Supp. 2d 1276, 1285 (M.D. Fla. 2002) (for ballot secrecy, "the term ['secret'] . .

. may be construed . . . so as to contemplate information known only by a few

or information not publicly known"); *Nelson v. Miller*, 170 F.3d 641, 652 (6th

Cir. 1999) (noting a right to a secret ballot does "not mean[] 'absolute secrecy'

in all instances."). This is particularly true where, as here, in addition to

state constitutional protections, other state laws prohibit public officials from

disclosing voter information. *See Am. Ass'n of People with Disabilities*, 227 F.

Supp. 2d at 1285; *see also* O.C.G.A. § 21-2-386.

The policy behind Georgians' right to ballot secrecy bolsters this

understanding: "This guarantee was added specifically for the purpose of

maintaining the sanctity of the *polling place* by preventing any possible

influence on the voter." *Nat'l Broad. Co. v. Cleland*, 697 F. Supp. 1204, 1207

(N.D. Ga. 1988) (emphasis added). Thus, as opposed to protecting electors'

decisions from the eyes of election officials after an election, the purpose of ballot secrecy protections is to protect electors *at the polls*, such that they are not unduly influenced, by outside influences or individuals, to vote one way or another at that time.

Moreover, even if a ballot image report could identify a voter (which it cannot), traceability alone does not automatically violate citizens' right to a "secret ballot," particularly where the risk of tracing is speculative and the state has safeguards in place to prevent tracing. *Citizen Ctr. v. Gessler*, 770 F.3d 900, 911 (10th Cir. 2014) (the risk of officials tracing votes "is speculative because of existing safeguards in the [state] Constitution. For example, [such] constitution forbids election officials from inquiring about how a person voted"). Coalition Plaintiffs' allegations that public officials "know" how Georgians voted are wrong, but even if not, they are speculative at best and fail to rise to the level necessary to carry Plaintiffs' burden.

Plaintiffs are not likely to succeed on the merits of any of the claims they presented to this Court at this stage of the proceeding. Georgia made significant changes to the security of the election system and the other claims asserted have on basis in fact or law.

### B.    Plaintiffs will not suffer an irreparable injury absent a preliminary injunction.

To succeed under the second factor, Plaintiffs must show "a substantial likelihood of irreparable injury" in the absence of a preliminary injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). The likelihood of irreparable harm necessary for a preliminary injunction "must be neither remote nor speculative, but actual and imminent." *Id.* (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir.1990)). In considering judicial intervention before the entire case has been fully and fairly heard, "great care must be taken to assure that the power of a court to require or deter action does not result in unwarranted harm to the defendant or the public." *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005) (citing Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2947 (2d ed.)). In this case, the harm that Plaintiffs have alleged is neither actual nor imminent. In order to find Plaintiffs' irreparable harm, the Court has to speculate as to what third-party hackers *may* attempt to do based on studies, testimony of self-interested activists, or voting systems in other states.

"Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v.*

*Casey*, 868 F.2d 69, 73 (3d Cir. 1989) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 112-13 (1983)); *see also White v. Baker*, 696 F.Supp.2d 1289, 1313 (N.D. Ga. 2010). Indeed, the mere assertion of a First-Amendment claim does not automatically establish irreparable injury sufficient for a preliminary injunction. *See Socialist Workers Party v. Attorney Gen. of U. S.*, 419 U.S. 1314, 1319 (1974).

Since Plaintiffs filed this lawsuit, numerous county and municipal elections were held in 2017, and state and federal primary, general, and runoff elections were held in 2018. Already this year, regularly scheduled municipal and other local and state special elections have occurred. Given Plaintiffs' self-inflicted delays in this case, *see* [Doc. 309 at 43], Plaintiffs cannot complain two years into this litigation that they will now suffer irreparable harm if this Court does not grant their second attempt at a preliminary injunction.

Notwithstanding Plaintiffs' delays in this case, Plaintiffs have failed to show an impending injury from the threat of third-party hackers to Georgia's voting system. Plaintiffs have relied on false equivalencies to bolster their claims that Georgia's voting system is highly susceptible to exploitation by a hacker. Plaintiffs continually cite to an incident at KSU involving Logan Lamb. However, beyond Mr. Lamb's statements, there is still no evidence

that Mr. Lamb accessed any component of Georgia's voting system that is used to conduct actual elections in Georgia. *See generally* Barnes Dep. at 47:13–55:19. Further, security measures implemented by the Secretary of State since the Logan Lamb incident prevent any future possibility that it will reoccur. *See supra* Section III.A.3. Similar to the plaintiffs' harm in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013),[18] Plaintiffs' assertion that their right to vote will be deprived by the threat of third-party hackers and a vulnerable voting system rests upon a speculative chain of possibilities.

The Coalition Plaintiffs have also failed to show any actual or threatened harm supporting their ballot-secrecy claim. Based on the evidence in this case thus far, it appears that the Coalition Plaintiffs' ballot secrecy-claim is based on a misunderstanding of how Georgia's voting system works. *See supra* Section III.A.7. As such, there is no real risk of suffering irreparable injury based on those claims.

The Supreme Court of Georgia has previously held, "absentee voters 'have not been treated differently from the polling place voters, except in a manner permissible under the election statutes' and as a result of their own

---

[18] As this Court noted in its September 17, 2018 Order [Doc. 309 at p. 40], the analysis of the second element for a preliminary injunction parallels to some extent the "injury in fact" standing analysis.

choice." *Favorito v. Handel*, 285 Ga. 795, 798 (2009). Moreover, Georgia

voters can cast an absentee ballot or vote on the DRE voting machines as

they please. *Favorito*, 285 Ga. at 798. Given Plaintiffs' significant delay in

this case and the reality that they can continue to vote an absentee ballot, as

they have in past elections, Plaintiffs will not suffer irreparable harm if this

Court does not grant a preliminary injunction.

### C.   *The balance of equities and the public interest do not favor Plaintiffs.*

The third prong requires Plaintiffs to bear "the burden of persuasion"

that the "threatened injury to the movant outweighs whatever damage the

proposed injunction may cause the opposing party." *McDonald's Corp.*, 147 F.

3d at 1306. The fourth prong considers whether the requested injunction is in

the public interest. *Id.* As this Court has recognized, these two prongs are

closely related. [Doc. 309 at 41]. State Defendants first address the issues

related to the equities if State Defendants are required to implement a hand-

marked paper ballot system before turning to the larger questions of public

interest if cities or counties are required to do so.

Litigation involving elections is unique because of the interest in the

orderly administration and integrity of the election process. *Purcell*, 549 U.S.

at 4. The risks of voter confusion and conflicting orders counsel against

changing election rules, especially when there is no time to resolve factual disputes. *Id.* at 5–6. In order to show they are entitled to a preliminary injunction, Plaintiffs must show they exercised reasonable diligence. *Benisek*, 138 S. Ct. at 1944.

As discussed above, both Plaintiffs ignore the Georgia Election Code's structure of administering municipal elections but, even assuming their theory of state responsibility for municipal elections is true, they refuse to acknowledge the impact of their proposed relief on State Defendants.

Given Plaintiffs' fundamental misunderstanding of Georgia law, the full scope of the costs to the State Defendants (as opposed to the local elections officials who are statutorily responsible for the elections) is difficult to quantify. As explained above, municipalities are solely responsible for conducting their own elections, O.C.G.A. § 21-2-70.1, they may purchase their own voting equipment, O.C.G.A. § 21-2-70(a)(5), and/or they may contract with the county to conduct their own elections. O.C.G.A. § 21-2-45(c), *see also, generally* [Doc. 367]. Georgia's municipalities conducting elections will be the ones who bear the brunt of Plaintiffs' proposed relief, even if that is not what Plaintiffs believe or intend.

1.     *Implementing a statewide hand-marked paper ballot system would require a significant expenditure of taxpayer dollars.*

Assuming this Court orders State Defendants to implement a hand-marked paper ballot system, the fiscal cost of the relief sought by Plaintiffs is staggering. Curling Plaintiffs propose scrapping the entirety of Georgia's current election system (including optical scanners), which would require the procurement of: (1) new ballot-building software and equipment, (2) at least one BMD for every precinct, (3) at least one optical scanner and secure storage box for every precinct, and (4) paper ballots. [Doc. 387-1 at 27]. Coalition Plaintiffs propose scrapping part of the existing system, which would still require procurement of: (1) new optical scanners for every precinct, (2) at least one BMD or DRE for every precinct, and (3) paper ballots. [Doc. 419-2]. While both groups of Plaintiffs try to pass these changes off as simple and easy, the cost to implement them is tremendous.

The Brennan Center for Justice attempted to estimate the cost of replacing the remaining DREs in use across the entire country with optical scan voting machines and BMDs (for use by voters with disabilities).[19] The

---

[19] *Estimate for the Cost of Replacing Paperless, Computerized Voting Machines*, *Brennan Center for Justice*, *available at* https://www.brennancenter.org/sites/default/files/analysis/New_Machines_Cost_Across_Paperless_Jurisdictions%20%282%29.pdf.

Brennan Center found that the approximate cost for the necessary new equipment could range from $2,500 to $5,000 for each optical scanner and $2,000 to $5,000 for each BMD.[20] While Coalition Plaintiffs avoid requesting this Court mandate one piece of each equipment per precinct in Georgia, Curling Plaintiffs explicitly request the Court require the state provide a minimum of one BMD and one ballot scanner at each polling location. *Compare* [Doc. 419-1 at 2, n.2] ("Coalition Plaintiffs recommend leaving [the decision of whether to conduct scanning at a polling place or a central location] to each county superintendent's discretion. . .") *with* [Doc. 387-1 at 23].

County election officials also believe, if either Plaintiffs' proposed relief is imposed, placing at least one ballot scanner (and sometimes two) at each precinct is the best approach because of the difficulty of scanning all ballots at once and the likelihood of improper marks or votes on ballots. *See, e.g.*, Doran Dep. at 88:24–89:12; Declaration of Russell Bridges ("Bridges Dec."),

---

[20] Indeed, due to the requirements of disability access, more than 3,000 BMDs would have to be purchased or counties would have to continue using existing DREs to facilitate for voters with disabilities. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016) (finding offering absentee voting only through hand-marked paper ballots violated the ADA). This cost is in sharp contrast to the current costs of the DREs—which are already in use and cost nothing for many counties to store. Ledford Dep. at 32:10–19.

attached as Ex. F at ¶ 15; Ledford Dep. at 180:6-24. As such, at least 2,634 items of each equipment type would be required for a statewide solution covering all of the state's precincts which were utilized in 2018, totaling a high-end estimate of $26,340,000 and a low-end estimate of $11,853,000 for the Curling Plaintiffs' relief. For the Coalition Plaintiffs' proposed relief, the estimate still amounts to between $6,585,000 and $13,170,000.

Even assuming that fewer precincts will be utilized in the November 5, 2019 municipal elections compared with the statewide general election in 2018, and thus fewer pieces of new equipment would be required, the costs are still extraordinary. Due to the unique nature of municipal elections, State Defendants are not in possession of the total number of municipal precincts which will likely be utilized in the November 5, 2019 elections. However, Chatham County, for example, is scheduled to conduct elections for Savannah—the state's third-largest city—and the cities of Garden City, Pooler, Port Wentworth, Tybee Island, and Vernonburg. *Id.* at ¶ 3. The costs for Chatham County to obtain the required equipment to conduct those elections could easily run from $500,000 to $950,000. *Id.* at ¶¶ 13-15. When using similar estimates to account for elections occurring in 88 counties in

2015,[21] a representative sample which includes only elections which may require services of the Secretary (thus they were either conducted by the county or were provided ENET data), costs quickly climb into the millions.

The fiscal cost is not mitigated by the utilization of existing equipment either. Gwinnett County, for example, currently only has 32-36 optical scanners. Ledford Dep. at 179:1-5. To conduct a paper-ballot election, it would need more than 350 (two per precinct[22] plus early-voting locations). *Id.* at 180:6-24. Similarly, Chatham County possesses only eight optical-scan units. Bridges Dec. at ¶ 15. It would need to procure approximately 130-140 additional scanners before early voting in October. *Id.*

There are other costs as well. Paper ballots currently cost 40–55 cents per page. Doran Dep. at 32:10-16; Ledford Dep. at 84:3-9. While Plaintiffs acknowledge that 250,000 paper ballots were used in 2018, that was less than seven percent of the ballots cast in that election. Even at the 40-cents-per-page rate, printing 3.9 million ballots would cost over $1.5 million and, given

---

[21] *See* Exhibit B to State Def's Response to Order Dated April 16, 2019 [Doc. 367-2] (historical data indicating the number of elections conducted in 2015 which required assistance of the Secretary).

[22] Director Ledford estimated two per precinct so there would be a backup if there was a mechanical failure during the election. She served as assistant director of elections during the two-year use of hand-marked paper ballots in Gwinnett County prior to the adoption of DREs.

the rate of spoiled ballots in paper-ballot elections, even more would have to be printed. Ledford Dep. at 37:8–38:4. Indeed, Mr. Bridges anticipates he would need approximately 125,000–135,000 paper ballots for Chatham County's municipal elections this November, a cost of over $60,000 in that county alone. Bridges Dec. at ¶ 14.

In sum, a cursory review of *only the election equipment* required to comply with Plaintiffs' relief belies the notion that "the Secretary of State's resources should be more than sufficient," [Doc. 387-1 at 23], or that "the counties would merely order more paper ballots." [Doc. 419-1 at 4]. In reality, a transition to a new voting system—under the proposed scheme of either Plaintiff—would impose significant costs from a fiscal standpoint alone. For comparison, the entire budget for the Elections Division of the Secretary of State's Office is $6,118,907 for Fiscal Year 2020 in both state and federal funds, and the majority of those funds cover expenses like personnel or other items that could not be adjusted to hastily implement a new voting system.[23] *See* H.B. 31, item 305.100, Elections. If the State were forced to shoulder the cost of a temporary replacement elections system, to be used only for the November 5, 2019 elections, there is simply no pot of discretionary funds

---

[23] As this Court is aware, purchasing new voting machines requires a separate appropriation of state funds.

available to State Defendants for buying the necessary equipment. Indeed, it is more likely than not that such an obligation would necessitate the calling of a Special Session by the Governor to seek appropriation of additional state taxpayer dollars. Further, given the implementation timeline for the November 5, 2019 elections, there would not be sufficient time to purchase the equipment using bond funds, which are being used to purchase the new voting system contemplated by H.B. 316. The upshot is that cash-funding this purchase would require the General Assembly to cut other items or seek new revenues to implement a temporary replacement—used for only one set of local elections—and still comply with Georgia's balanced budget requirement. Ga. Const. Art. 3 Sec. 9 Para. IV.

2.   *Plaintiffs' requested relief would necessitate new election administration policies, impose new training costs, and impede the State's transition to a new elections system.*

In addition to the substantial fiscal impact of Plaintiffs' proposed relief, the requested remedy would impose significant logistical and practical weights on State Defendants—requiring the State to develop and implement new election processes, train elections workers, and certify new equipment in, at most, a three-month window. Just like when Plaintiffs previously moved for a preliminary injunction, the scale of this hurried implementation will "seriously test the organizational capacity of the personnel handling the

election." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (2018). Moreover, implementing a temporary system for the November 2019 elections will impede the state's ability to implement a new voting system. That Plaintiffs' relief would impede implementation of a constitutionally valid voting system additionally violates the fundamental constitutional principle that "[s]tates retain the power to regulate their own elections." *Burdick*, 504 U.S. at 432.

a.   State Defendants must develop new training materials and policies for a new election system.

Plaintiffs' proposed relief will require the State to develop new training materials and policies for the use of local elections officials. As Plaintiffs have acknowledged, in multiple filings, State Defendants have statutory duties to generally encourage and foster the orderly execution of elections and provide training to the local registrars and superintendents throughout the State. *See* O.C.G.A. § 21-2-31 (Duties of the State Election Board); O.C.G.A. § 21-2-50 (Powers and Duties of the Secretary of State). State Defendants have promulgated extensive rules and policies regarding the conduct of elections on DREs and the voting system mandated by state law. They also have provided training and resources for local elections officials to assist in the orderly execution of elections throughout the State. *See, e.g.*, O.C.G.A. § 21-2-100; Ga. Comp. R. & Reg. Title 183.

State Defendants would be stuck with a Hobson's choice—provide no direction for county officials who contract with cities or provide emergency assistance in the implementation of Plaintiffs' drastic request for relief to mitigate the "chaos and problems that arise in connection with a sudden rollout of a paper ballot system" and attempt to offset the fact that local elections officials "have never handled this scope of a paper ballot exercise—or used accompanying scanners on a massive basis." *Curling*, 334 F. Supp. 3d at 1326–27; *see also* Bridges Dec. at ¶ 17 (recognizing the need for additional state resources)

Current training has never included the process to use an optical-scan ballot or the process for setting up a scanner in a precinct. Barnes Dep. at 247:1-18. There are no current procedures for how to handle paper ballots at precincts, so those would also have to be designed. Doran Dep. at 34:8-35:4. Optical scanners also have more limited memory than DREs, Barnes Dep. at 220:23-222:2 and are not high-speed scanners. Ledford Dep. at 191:20-192:20. Counting paper ballots also requires significant staff time. By statute, once election officials begin counting ballots, they must continue counting until that process is completed. *Id*. at 194:10-195:19. In the 2018 elections, with most ballots cast on DREs, the counting process still took from 7:00 p.m. on Tuesday evening until Wednesday at 4:00 p.m. in Gwinnett County—after

most election officials had started work on 5:00 a.m. on Tuesday morning or nearly 36 hours of continuous work. *Id.* Conducting a paper-ballot recount also takes significant time. *Id.* at 41:6-42:8. These administrative difficulties would have to be addressed by staffing, policies, and training and demonstrate how neither the equities nor the public interest favor the relief sought by Plaintiffs.

b.  State Defendants must certify any election equipment used by counties in the operation of municipal elections.

In addition to the need of additional training and policies should this Court grant Plaintiffs' requested relief, the Secretary would need to inspect and certify any and all new election equipment prior to its use by a county (even if to operate a city election).[24] Under Georgia law, the Secretary is required to certify election equipment as "safe and practicable for use" prior to its use in federal, state, and county elections. O.C.G.A. § 21-2-300(a)(2). As such, for any county conducting an election for municipalities, the Secretary, in addition to potentially procuring Plaintiffs' preferred equipment, would be required to inspect and certify the equipment prior to its use. Indeed,

---

[24] As discussed above, this requirement does not apply to equipment used by a municipality. But a large number of cities contract with counties to run city elections.

Jennifer Doran, Elections Supervisor for Morgan County, noted this logistical problem in her deposition, stating that "even if they were going to ship them that day, they have to go to the State and the State has to . . . do their testing and certification" first, a process which took about two months for new ExpressPoll machines. Doran Dep. at 86–87. To require the State to conduct such a process for localities holding elections in November 2019, and prior to early voting in October 2019, would impose a substantial burden on the State and, given the short timeframe, may be practically infeasible.

        c.    <u>State Defendants will have to divert resources from certifying, implementing, and designing policies for a new election system to implement Plaintiffs' preferred equipment.</u>

The State has a strong interest in implementing "even-handed legislation to ensure that elections are carried out in a fair and orderly manner." *Favorito*, 285 Ga. at 796  (quoting *Weber*, 347 F.3d at 1105). As this Court is aware, the State is currently purchasing a new voting system that will require large-scale implementation. Requiring State Defendants to also implement Plaintiffs' preferred method of voting for a single election is disruptive. The State already plans to pilot this new technology in ten counties for the very same election in which Plaintiffs seek to begin using a new hand-marked paper ballot system. [Doc. 357, Exhibits 1–5 (Request for

Proposal Documents)]. Curling Plaintiffs even acknowledge this plan but make no attempt to suggest how any of those counties could simultaneously comply with their preferred method of voting and test the new elections equipment. [Doc. 387-1 at 22]. Plaintiffs complain about the quick implementation of a new election system to replace the allegedly defective one, while simultaneously seeking to cause a diversion of resources from that rollout to work on an even-quicker rollout for one election in the interim—an absurd contradiction.

3.    *The change to an all-paper election system would lead to voter confusion.*

Any time a change is made in election systems, voter education is critical. For example, when Gwinnett County moved from a punch-card system to an optical-scan system in 2000, voters were confused about the change. Ledford Dep. at 49:8-50:1. When voters are confused, they can spoil ballots, which causes problems for optical scanners. *Id.* at 50:4-51:21. Spoiled ballots can also require ballot duplication, which is the process of creating a new paper ballot that can be read by an optical-scan machine. *See* O.C.G.A. § 21-2-483. That process is extremely time-consuming for election workers. Ledford Dep. at 192:24-194:9.

Plaintiffs' proposed relief leaves no time for educating voters about the paper-ballot system. Georgia voters have been using electronic voting machines for almost two decades and moving to a completely altered system (unlike the BMDs being procured by the State) has the potential to cause massive confusion, which is not in the public interest.

        4.     *The equities do not favor Plaintiffs because the injury caused to State Defendants outweighs the speculative injury to Plaintiffs.*

Plaintiffs bear the burden to show that their threatened injury outweighs the damage their proposed relief would impose upon State Defendants, *Robertson*, 147 F.3d at 1306. Plaintiffs fail to meet this burden as the significant damage threatened to State Defendants by Plaintiffs' proposed relief outweighs the speculative nature of the threatened harm. Plaintiffs' burden is further heightened when the reality of the relief they seek is considered: neither Plaintiff seeks merely a prohibitory injunction to prevent Defendants from taking some action, instead Plaintiffs seek to impose a specific election system in November. Such mandatory preliminary relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez*, 544 F.2d at 1243. Finally, regardless of Plaintiffs' intent, their motions effectively deprive the State's elected representatives of their ability to enact laws under the State's

sovereign authority to "effectuat[e] statutes enacted by representatives of its people," in and of itself a "form of irreparable injury." *New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977).

    As explained above, Plaintiffs have failed to show in any form that their harm is beyond theoretical or possible, indeed their relief is premised on the susceptibility or vulnerability of voting equipment. *See, e.g.*, [Doc. 387-1 at 22] ("vulnerabilities" necessitate replacement of voting equipment); [Doc. 419-1 at 46] ("universal condemnation of Georgia's DRE voting system" and "vulnerabilities" require relief). History tells us that DREs are in fact more resistant to vote tampering and less vulnerable than Plaintiffs' proposed paper ballots. Shamos Dec. at ¶ 33 (Since the early 1980s "there has never been a single verified incident of tampering with an electronic voting machine in an election."); ¶ 40 (From 1851 to 2006, "the *New York Times* has published over 4700 news articles on manipulation of paper ballots."); ¶ 41 (recent paper absentee ballot tampering in North Carolina). "Plaintiffs have not made out even the possibility—much less the likelihood" that any vote tampering or hacking of the DREs or GEMS database actually occurred. *Stein*, 223 F. Supp. 3d at 441–42 (quoting *Pa. Republican Party v. Pa. Democratic Party*, No. 16-5664, 2016 WL 6582659, at *7 (E.D. Pa. Nov. 7, 2016)).

Such speculative threatened harm also stands in stark contrast to the reality of the harm imposed upon Defendants in a fiscal and practical context. Plaintiffs seek to diminish the nature of the harm to Defendants with vague statements about the small scale of the 2019 elections and the ability of the State to easily accommodate their choice of voting method using existing resources (without further explanation). Regardless of Plaintiffs' obfuscation, the certainty of the impact on State Defendants resulting from the proposed relief is clear and is the same reality that this Court faced previously: implementation of new technology in both large and small population centers at the same time is a substantial burden. *Curling*, 334 F. Supp. 3d at 1326. Only this time, the time for such a rollout leaves, at best, eleven weeks to spare rather than seven before voters arrive at early voting locations, *id.*, but is further complicated by a simultaneous rollout of the state's new voting system.

Moreover, the speculative nature of the harm imposed by Plaintiffs and the concrete damage likely to befall Defendants cannot satisfy the heightened threshold required of mandatory injunctions. Here, Plaintiffs do not simply seek to enjoin the use of DREs in the 2019 elections, instead they ask this Court to impose specific—and differing—methods of voting for these elections. Indeed, when faced with such a request, the Court must not only

find that the Plaintiffs carry the burden of persuasion required for an injunction seeking to alter the status quo, but also that "the facts and law clearly favor the moving party." *Matthews*, 544 F.2d at 1243. This is not the case in the context of the equities analysis, where Plaintiffs' facts regarding vulnerabilities and susceptibility are speculative at best.

Plaintiffs' ability to carry their burden is further called into question by the nature of the relief they seek: supplanting their policy preference for the reasoned decision of the State's elected representatives. "[T]he framers of the Constitution intended the States to keep for themselves, as provided by the Tenth Amendment, the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452, 461–62 (1991) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)). Indeed, "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." *Favorito*, 285 Ga. at 797 (quoting *Weber*, 347 F.3d at 1106–07). Curling and Coalition Plaintiffs insistence on their choice of voting method impinges on that authority by disregarding the current duly-enacted elections system and frustrating the implementation of the state's new elections system.

As discussed above, hand-marked paper ballots have a track record of actual compromise—not just vulnerabilities. Facing these vulnerabilities, the State reviewed its options, with the understanding that no balloting system

is perfect, and elected to transition from its current DRE system to an approach recommended by the National Academies of Science—BMD-marked optical-scan ballots. Shamos Dec. at ¶¶ 129, 147. While Plaintiffs obviously disagree with that decision, they cannot show their proposed injunction is in the public interest because they propose the State procure an entirely different (and vulnerable) election system for municipal elections in 2019. In addition to the risks associated with paper, the monetary costs associated with the proposed injunction are significant, the potential for voter confusion is high, and the injunction would require massive changes in training on a very short timeline. The duly-elected representatives of Georgia selected the method of voting that Plaintiffs assail with hypotheticals and possibilities. This weighs in favor of denying their relief.[25]

Plaintiffs' alleged injury does not outweigh State Defendants' likely damage in terms of fiscal or practical cost and further impinges on the State's sovereign right to impose reasonable voting methods. Ultimately, "[t]here is substantial space between elections administered perfectly" and those administered in an unconstitutional manner, "[t]his space is the domain of

---

[25] Plaintiffs' proposed relief also requires this Court to do something the Georgia Supreme Court cannot—rewrite the state's Election Code. *See Robinson v. Boyd*, 288 Ga. 53, 56, 701 S.E.2d 165, 168 (2010); *Lumpkin Cty. v. Ga. Insurers Insolvency Pool*, 292 Ga. 76, 78, 734 S.E.2d 880, 882 (2012).

the states." *Heindel v. Andino*, 359 F. Supp. 3d 341, 357 (D.S.C. 2019). In light of Plaintiffs' speculative harm and State Defendants' concrete damage if Plaintiffs' relief is imposed, this Court should deny Plaintiffs' motion.

> **5.** *Plaintiffs' proposed costs would be borne by cities, which is not in the public interest.*

As State Defendants have explained, nearly all of the elections taking place in 2019 are municipal elections. [Doc. 367]. Cities are responsible for their own elections. O.C.G.A. § 21-2-70.1. Some cities contract with counties to conduct those elections, Doran Dep. at 22:17-23:12, while other cities conduct the elections on their own or use leased county equipment. Ledford Dep. at 54:21–58:12.

Because of the nature of the elections that will be held in 2019, cities would be left to navigate the implementation of this Court's order. If a county was under contract to hold a city election, the county would have to decide whether to void the agreement with the city or seek new funding for the new system. Bridges Dec. at ¶ 12. The cost of that decision would then be borne by cities through their intergovernmental agreements.

Further, just as State Defendants cannot simply implement Plaintiffs' relief with sufficient existing resources, [Doc. 387-1 at 23], Georgia's local governments cannot either. Plaintiffs' suggestion that these local elections

are so small that they present the proper opportunity for wholesale change

ignores the reality of government resources and also the municipal elections

that are actually scheduled to occur. For example, the City of Savannah—the

State's third largest municipality—is scheduled to hold its election this

November. Bridges Dec. at ¶ 3. And, as discussed above, it would be required

to shoulder an anticipated cost of Plaintiffs' relief amounting to anywhere

from $500,000 to $950,000, *id.* at ¶¶ 14–15, exceeding and perhaps doubling

the entire 2019 budget for the Office of the City Clerk, Savannah's chief

elections official.[26] Savannah is not alone. Cities varying in size from

Braselton, to Chickamauga, to Albany have elections scheduled for November

5, 2019. Those cities' available resources vary significantly. Albany, for

example—one of the most distressed communities in Georgia[27] and the state's

tenth-largest city—would potentially be subject to Plaintiffs' dramatic relief

and the attendant costs for their November 2019 elections.

---

[26] Savannah Office of Management and Budget, 2019 Adopted Budget at 100, *available at* https://www.savannahga.gov/DocumentCenter/View/16256/2019-Adopted-Budget.

[27] *See Economic Innovation Group, 2017 Distressed Communities Index* at 36, *available at* https://eig.org/wp-content/uploads/2017/09/2017-Distressed-Communities-Index.pdf.

6.    *Plaintiffs have not shown the public interest favors an injunction.*

The public has a significant interest in orderly elections and the integrity of the election process. *Purcell*, 549 U.S. at 4-5. Avoiding voter confusion and conflicting orders is particularly acute in the context of elections. *Id.* at 5-6.

Plaintiffs' proposed remedy would lead to massive confusion. Voters will have to learn a new election system. Election officials will have to purchase massive amounts of equipment that would likely be only used in the 2019 municipal elections. Training for pollworkers will have to be changed at a time when the State is going to be conducting additional training for a new system.

The public interest in orderly elections does not favor spending enormous amounts of time and money on a system that will be used only for municipal elections in 2019. The costs and burdens imposed on elections officials and the taxpayers are huge—and are a significant distraction while the State is transitioning to a new voting system that eliminates DREs.

## <u>CONCLUSION</u>

The State heard this Court's concerns and its elected representatives made a choice to select a new voting system. The State is rolling out an

orderly process to transition away from DREs to the latest voting technology. To require an intermediate system that has its own vulnerabilities and which would require the purchase of a large amount of additional equipment for a single election would cause massive disruption in that process. This Court should deny the injunctive relief sought by Plaintiffs.

This 10th day of July, 2019.

<div style="margin-left:40%">

Vincent R. Russo
GA Bar No. 242628
Josh Belinfante
GA Bar No. 047399
Carey A. Miller
GA Bar No. 976240
Kimberly Anderson
GA Bar No. 602807
Alexander Denton
GA Bar No. 660632
Brian E. Lake
GA Bar No. 575966
ROBBINS ROSS ALLOY
BELINFANTE LITTLEFIELD LLC
500 14th Street NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3250
vrusso@robbinsfirm.com
jbelinfante@robbinsfirm.com
cmiller@robbinsfirm.com
kanderson@robbinsfirm.com
adenton@robbinsfirm.com
blake@robbinsfirm.com

</div>

*/s/Bryan P. Tyson*
Bryan P. Tyson
GA Bar No. 515411
Bryan F. Jacoutot
Georgia Bar No. 668272
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678)336-7249
btyson@taylorenglish.com
bjacoutot@taylorenglish.com

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing STATE DEFENDANTS' COMBINED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION has been prepared in Century Schoolbook 13-point, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson
GA Bar No. 515411

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I electronically filed the foregoing STATE DEFENDANTS' COMBINED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF system, which will automatically send counsel of record e-mail notification of such filing.

This 10th day of July, 2019.

*/s/ Bryan P. Tyson*
Bryan P. Tyson
GA Bar No. 515411