# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING,    et al.,    )
      Plaintiffs,    )
          )    CIVIL ACTION FILE
v.         )
          )    NO. 1:17-cv-02989-AT
BRAD RAFFENSPERGER, et al.,  )
      Defendants.    )

_____

DEPOSITION OF
TERESA LYNN LEDFORD

June 24, 2019



APG USA, INC.
www.APGreporting.com
(770) 827-1223

Curling et al. v.          Deposition of
Raffensperger et al.   T. LYNN LEDFORD          6/24/2019

1  Office.
2       Q.  Did you think that the county's processes
3  for counting the hand-marked paper ballots were
4  affected?
5       A.  "Counting" meaning for the poll officials or
6  for the main office?
7       Q.  Both.
8       A.  Well, it was difficult for the poll
9  officials because optical scan ballots carry a
10  different set of problems just like any set does.
11  And if you had a voter who overvoted a ballot or had
12  something wrong with it and the unit wouldn't take
13  it, that ballot would be spoiled.  The voter would be
14  given an addition ballot.  They would have to go
15  down --
16            (Reporter requests that witness slow
17       down.)
18            THE WITNESS:  The voter would be given
19       the option to take a second ballot or
20       continue to have that ballot spoiled and not
21       cast.  And we had that happen more
22       frequently than I think people realize
23       because they didn't want to go back and do
24       that.  And so it created, you know, a
25       significant issue with that.

Curling et al. v.          Deposition of
Raffensperger et al.    T. LYNN LEDFORD          6/24/2019

```
 1            The machines themselves were not
 2        problems.  As far as the tabulation, the
 3        aggregation of the results, it was not an
 4        issue.
 5   BY MR. POWERS:
 6        Q.   Mm-hmm.  Do you recall how many complaints
 7   you -- strike that.
 8            Do you recall receiving any complaints from
 9   voters about having to cast the second paper ballot
10   or not having their paper ballots scanned properly?
11        A.   Yes.
12        Q.   How many complaints do you recall receiving?
13        A.   I don't.  It's been too long.  And like I
14   said, we only used it for two years.  It was
15   significant enough that it stuck in my mind is the
16   only way I know how to describe that.
17        Q.   Sure.  Do you have any -- strike that.
18            Did you have any concerns about the
19   integrity of the elections that were conducted in
20   Gwinnett County using the hand-marked paper ballots?
21        A.   I don't remember.
22        Q.   Sitting here today, do you have any concerns
23   about the integrity of the elections that were
24   conducted in Gwinnett County using hand-marked paper
25   ballots?
```

Curling et al. v.          Deposition of
Raffensperger et al.   T. LYNN LEDFORD          6/24/2019

1  BY MR. POWERS:

2      Q.  So before we move on, perhaps, do a little

3  bit of clean up on some questions that I posed to you

4  before the break.

5          Before the break you spoke about moving from

6  the punch card voting system to the optical scan

7  system in 2000.

8          I wanted to ask what general response you

9  received from voters upon the change from the punch

10  card voting system to the optical scan system?

11     A.   Initially it was confusion.  Anytime you

12  have a change, you have to do public education and

13  voter education.  So they were confused to begin

14  with.

15         But the problem we had with that we still

16  continue to have today.  When you have a general

17  election, you have a write-in candidate.  Say you

18  have voters that want to bubble in Mickey Mouse and

19  then come in and bubble in the write-in space for

20  Mickey Mouse and then write Mickey Mouse's name on

21  it.  That is just a continuing problem with that type

22  of ballot.

23         But, again, initially, it was just

24  confusion.  And then about the time, you know, we

25  used it for the last election, they were used to it

Curling et al. v.          Deposition of
Raffensperger et al.   T. LYNN LEDFORD          6/24/2019

1   and then we changed them over.

2        Q.  When you say "they were used to it," what do

3   you mean by that?

4        A.  We just didn't get as many complaints as we

5   did the first election that we used it for because

6   they had gotten used to -- you know, they knew to

7   bubble in and put it in the scanner and what they

8   were looking for.

9        Q.  From an election administration's

10  standpoint, was the optical scan system an

11  improvement over the punch card system that had been

12  employed before?

13       A.  I don't know that it was an improvement.  It

14  was just a change.  You know, of course, with what

15  happened in 2000, we were glad we weren't on punch

16  card.  I don't necessarily think it was an

17  improvement.  I don't necessarily think it was not an

18  improvement.  It was just a change.

19       Q.  You had mentioned the write-in issue on the

20  optical scan system.  Isn't it true that there's --

21  you can still write in candidates on the current

22  voting system?

23       A.  Yes.  On the DRE and the optical scan but

24  the DRE won't let you cast an overvote.  That's the

25  difference.

Curling et al. v.          Deposition of
Raffensperger et al.    T. LYNN LEDFORD                6/24/2019

1        Q.   I wanted to talk about the spoiling issue
2   that you had mentioned earlier.  You had mentioned
3   overvotes.
4              Could you explain to difference between when
5   a voter casts an overvote and other situations in
6   which casting a vote by paper ballot can result in a
7   particular vote getting caught up for some reason?
8        A.   Sure.  Again, first, there is the overvote
9   and that's when someone votes for more than the
10   number of candidates allowed in a particular race.
11   So if you're only allowed to vote one and you vote
12   two, then it kicks that out.  That's considered an
13   overvote.
14              If a voter happens to make a stray mark in
15   the timing marks around the ballot, sometimes that
16   will kick it out.  If the ballot isn't printed
17   exactly correctly, if it's just a millisecond
18   issue -- I don't know.  I'm not a tech person.  But
19   if it's the least bit off, it will not accept the
20   ballot, which would be a broader problem with more
21   ballots, but you can see that as well.
22              If for some reason a ballot was damaged,
23   perhaps, if an absentee ballot, at someone's home
24   they spill coffee or tea on it or if they used
25   Wite-Out ®, the liquid Wite-Out ®, it considers it an

Curling et al. v.          Deposition of
Raffensperger et al.    T. LYNN LEDFORD          6/24/2019

1      A.   No.   Prior to that, I believe, it was
2  electronic transmission.
3      Q.   Mm-hmm.   And let's talk about that.
4           First, when was the switch made from the
5  electronic transmission to the current system of
6  physically going and picking it up?
7      A.   I don't remember.
8      Q.   Five years ago?
9      A.   It's been within the last five years.
10     Q.   That's helpful.
11          Please describe to me what the -- how the
12  electronic transmission of the ballot was completed.
13     A.   Before the switch or...
14     Q.   Before the switch, yes.   Thank you.
15     A.   It was put onto a CD and we would go and
16  pick it up and bring it back to the office.   So it
17  wasn't a sealed bag like it is now.
18     Q.   Mm-hmm.   And after the election is over,
19  what would you do with that CD?
20     A.   With the ballot layout on it?
21     Q.   Yes.
22     A.   I don't remember.
23     Q.   Okay.   Now, let's shift from the ballot
24  design to the electronic poll books.
25          How long have electronic poll books been

Curling et al. v.          Deposition of
Raffensperger et al.    T. LYNN LEDFORD          6/24/2019

1  turn around a print order once you give it to them?

2        A.  I don't know.

3        Q.  Does the price of printing paper ballots

4  depend on the type of printer that's used?

5        A.  No.  We have Ballot On Demand.  We have our

6  own printers and it's 55 cents a page regardless.

7        Q.  Got it.  So for Ballot On Demand printers,

8  the cost is 55 cents per page?

9        A.  Correct.

10       Q.  Do you know what the cost per page is on

11  other types of printers?

12       A.  You're talking from other vendors?

13       Q.  (Counsel nods head affirmatively.)

14       A.  No.  I don't remember.

15       Q.  Let's consider the whole absentee ballot

16  process sort of from the beginning.

17            How long in advance do you need to know what

18  the ballot style is to be able to get them printed in

19  time to conduct the absentee ballot process?

20       A.  I'm sorry.  Can you say that question again?

21       Q.  Sure.  I'll say it a little more simply.

22            How long before an election do you need to

23  start preparing for the absentee balloting process?

24       A.  Well, we vote -- whatever the beginning

25  deadline is for that because we have -- depending on

Curling et al. v.          Deposition of
Raffensperger et al.    T. LYNN LEDFORD              6/24/2019

1   anything that can be done to allow that voter to --
2   allow me to recast the ballot or once it's in, it's
3   in?
4        A.   Once it's cast, it's cast.  There's no way
5   to retrieve a ballot.
6        Q.   There's no way to retrieve a ballot on the
7   DRE machine?
8        A.   Yeah because it's randomized.  We wouldn't
9   have any idea which ballot was that voters.
10       Q.   Got it.  Perhaps we could flip to the second
11  page of Plaintiff's Exhibit 4.
12       A.   Sure.  When I touch a candidate on the right
13  side of the screen, it selects another candidate.
14  The right side of the screen is faulty on the third
15  to the last machine on the right side of the front
16  section of the voting booth.  The machine made a
17  selection for me.
18       Q.   What is the name of the voter?
19       A.   Oh, Archel Bernard.
20       Q.   Is essentially what Mr. Bernard saying is
21  that he tried to vote for candidate X and instead
22  candidate Y's name lights up as having been selected?
23       A.   Mm-hmm.  I think so, yes.
24       Q.   How does that kind of problem occur?
25       A.   I have no idea because I don't know --

Curling et al. v.          Deposition of
Raffensperger et al.    T. LYNN LEDFORD          6/24/2019

1   without being there, I don't know if the voter

2   touched something.  If he had a big finger and put

3   his whole finger down and it registered one instead

4   of the other.  I don't know if he had something on

5   him that touched the screen.

6           You know, without having been there, we

7   don't know.  And that's, you know, another reason why

8   you have that review screen at the end, so if

9   something is incorrect, they can go back and correct

10   it before they cast their ballot.  Like I said, it

11   would be pure speculation to guess that was what

12   caused that.

13       Q.  Has this kind of issue cropped up in

14   elections before the November 2018 election?

15       A.  Usually only in general elections when

16   there's parties involved --

17       Q.  And --

18       A.  -- which lead you to believe it's a voter

19   issue not a machine issue.

20       Q.  Mm-hmm.  Are you aware of any instances in

21   which you or a poll worker has seen this issue occur

22   where you tap one candidate's name and then a

23   different candidate's name lights up?

24       A.  I have never seen it.  I assume the poll

25   officials have since they are in the field with the

Curling et al. v.          Deposition of
Raffensperger et al.   T. LYNN LEDFORD            6/24/2019

1   voters.  And if we get those phone calls, usually

2   that's what we determine is we will have them walk

3   the voter back through what they did.  And oftentimes

4   it was -- like I said, something touched or whatever.

5   It didn't flip the vote.

6        Q.  Just to make sure I understand, so poll

7   officials have called in to the Board of Elections

8   and said, Hey, I'm having an issue with a voter and a

9   machine where ballot flipping is occurring?

10       A.  No.  They don't use the word "ballot

11  flipping" because that's not what it is.

12       Q.  Sorry, sorry.  My words.

13       A.  Something is different with the machine and

14  we can't tell if it's the voter or the machine.  And

15  what we usually find out is it's the voter and not

16  the machine.

17       Q.  Got it.  Thank you.

18       A.  Just make sure you get that correct.

19       Q.  I appreciate that.

20          So have there been at least some instances

21  where the issue was not the voter?

22       A.  Not to my knowledge.

23       Q.  Could we please turn to the third page of

24  Plaintiff's Exhibit 4?

25       A.  Cassandra Smith.

Curling et al. v.        Deposition of
Raffensperger et al.   T. LYNN LEDFORD              6/24/2019

1      Q.   What is the nature of Cassandra Smith's
2   complaint?
3      A.   Hers is similar to the first one, that she
4   was on her voting summary screen and the card popped
5   out before she intended for it to.
6      Q.   So this is the same problem where the voter
7   is saying that --
8      A.   It is.
9      Q.   The voter is saying that the vote ended up
10   getting cast without her --
11      A.   -- touching a ballot.
12      Q.   -- initiating it?
13      A.   Yes.
14      Q.   Let's turn to the next page.
15      A.   Patrice Tillman.  This is where she said
16   she's touching the Democratic candidate, but the
17   Republican's name came up instead.  And she was shown
18   how to unselect and reselect the vote.
19           And that was like very similar to what we
20   see all the time.  And because the Democratic
21   candidate is below the Republican candidate, when you
22   go to touch it, if you're a female and you have a
23   long fingernail or you don't press it in the right
24   spot, it will pick up whichever one it reads the most
25   of.  So it would have picked up the Republican

1  candidate.

2       Q.  Got it.

3            The fat finger issue?

4       A.  Yes.

5       Q.  Mm-hmm.  Could we turn to the next page of

6  Plaintiff's Exhibit 4?

7       A.  James Lamb.  Similar issue to the first --

8  the first one where he was on his summary screen and

9  he says that it cast the vote.  He saw the -- what's

10 he calling it -- the sand timer, the timer thing.  I

11 can't think of what it's called.

12           MR. STEPHENS:  The hourglass?

13           THE WITNESS:  The hourglass.  I'm sorry.

14 BY MR. POWERS:

15      Q.  If you wouldn't mind taking me through --

16 was it Mr. Lamb's --

17      A.  Yes.

18      Q.  -- complaint and how an hourglass would show

19 up?

20      A.  When you touch the screen, just like you do

21 on your computer, as it's going through thinking, it

22 has an hourglass and it just rotates.  It doesn't do

23 anything.  It's just there to show you that it's

24 thinking.

25           And so he saw the hourglass come up and

1   to experience the total disappointment.

2        Q.  So does that mean that the machine was taken

3   offline and no longer used afterwards?

4        A.  Correct.  And there may not have been

5   anything wrong with it.  It's just what the poll

6   official decided to do based on this.  I don't know,

7   so...

8        Q.  Great.  You can turn to the next page.

9        A.  Sue Nash.  Same thing, it's on the summary

10  screen and it cast her ballot.

11       Q.  Can we turn to the next page?

12       A.  Mm-hmm.  I can't read this one.  This one

13  sounds like a bad memory card.  It said -- this is

14  from the poll official talking about a voter and said

15  When they put the card in, it came out and said it

16  was invalid.  The count showed that the voter had not

17  cast their ballot, so they were reissued another

18  ballot and they voted on another machine.

19       Q.  Can you help explain what happened with the

20  memory card?  Was it a Ms. Lewis -- was it then --

21  what's the name of the poll worker?

22       A.  Yes.  Occasionally, you will have a memory

23  card -- a memory card?  I apologize -- a voter access

24  card that has the little chip on it just like your

25  credit card does.  And if that gets very, very

Curling et al. v.        Deposition of
Raffensperger et al.   T. LYNN LEDFORD          6/24/2019

1   dirty -- we try to get them to wipe them off multiple

2   times throughout the day, but there could be just

3   something has gone bad with that card.

4            And, oftentimes, if you put that in a

5   machine, it will come and tell you it's invalid.  And

6   so when that happens, it won't cast a ballot.  So the

7   voter has to be issued a second card.  And sometimes

8   they'll vote on the same machine and sometimes they

9   want to go to a different machine.  It's totally up

10  to a voter.

11       Q.  How does the poll worker ascertain in a

12  situation like that, whether or not a vote was

13  actually cast?

14       A.  They have to stop voting.  And they go

15  around and take a count off of each of the machines.

16  And then they take a count of the number list of

17  voters off of the express poll and they match those

18  numbers up.  If they are one less or one over, then

19  they determine the voter either did or did not cast

20  that ballot.

21       Q.  That seems like a -- strike that.

22            So if we're at a polling place where there's

23  a lot of machines, am I getting it right, that you

24  have to take -- or stop voting at all of the other

25  machines and essentially count all of the ballots

1  that have been cast at the precinct that day?

2      A.  The number, yes.  And they have to do that

3  on -- hourly anyway.  And so it's not like they have

4  to start -- you know, if someone casts that -- if

5  that happens at five o'clock in the afternoon,

6  they're really just reconciling from their four

7  o'clock number on, not all throughout the day.

8      Q.  Got it.  Got it.

9          That process -- strike that.

10         How often does that happen on a given

11  election?

12     A.  I couldn't tell you.  Sometimes we know

13  about it and sometimes we don't.  So we don't know.

14     Q.  Mm-hmm.  What is the Gwinnett County Board

15  of Elections' retention policy with respect to

16  complaint intake forms?

17     A.  Two years, 24 months.  And there's no --

18  that is just a county thing because we keep

19  everything 24 months by law, so we just include that

20  in that.

21     Q.  So if there were complaint intake forms from

22  prior elections, say the November 2016 election, that

23  would have been disposed of 24 months after they had

24  been received?

25     A.  Correct.

Curling et al. v.          Deposition of
Raffensperger et al.    T. LYNN LEDFORD            6/24/2019

1      Q.  Have you received similar complaints about
2  DRE voting machines and elections prior to 2018?
3      A.  Yes.
4      Q.  What kind of investigation do you do to try
5  to figure out what the -- what the problems were and
6  what can be done about it?
7      A.  Well, if the machine does not continue to
8  have problems, there's nothing to investigate.  We
9  have no way of doing forensics on machines and that's
10  not our job.
11       If another voter -- and the poll officials
12  pay attention.  If another voter has a problem with
13  the same machine, then they'll call us and say, Hey,
14  we've got this.  And we would take that out of
15  service.  We wouldn't allow it to be used the rest of
16  the day.
17      Q.  You mentioned that the County doesn't have
18  an ability to conduct a forensic analysis of the
19  machines?
20      A.  Correct.
21      Q.  Have you had any situations where you
22  thought a forensic analysis of a particular machine
23  might be necessary?
24      A.  No.  If we take a machine out of service and
25  we get it back, it gets a ticket put on it and it

1  goes straight back to the vender.  And they look at

2  it.  If there's anything wrong with it, they fix it,

3  correct it, retest it.

4       It comes back.  It gets tested by Ken --

5  well, it used to be Kennesaw State, now the State.

6  It gets recertified and then gets sent back to the

7  County.

8       Q.  Got it.  And how frequently do you send

9  machines back to the vendor?

10      A.  We send them every year, but the number is

11 relatively low.  Maybe 10, if it's that many.

12      Q.  Did you send roughly 10 machines back to the

13 vendor after the 2018 election?

14      A.  I don't know.

15      Q.  Could would you say 10 is a relatively

16 typical number --

17      A.  Ten or less, yes.

18      Q.  Who is the vendor that you're sending the

19 machines to for maintenance?

20      A.  ES&S.

21      Q.  When you send a machine to ES&S, do they

22 send you back the same machine or do they send you a

23 new one?

24      A.  It depends.  Ninety-nine point nine percent

25 of the time, it's the same machine because it's

1    strike that.

2            Let's take a hypothetical where a voter

3    votes in the wrong party's primary and actually casts

4    a ballot and comes back and says, I'm sorry, I voted

5    in the wrong party's primary, can I get a new ballot,

6    what happens next?

7        A.  They can't -- once you touch "cast ballot,"

8    you have casted your ballot.

9        Q.  We touched on this a little bit before, but

10   could you please describe the policies and procedures

11   currently in place to make sure that each voter's

12   ballot remains secret?

13       A.  DRE?  Absentee by mail?  Provisional?

14       Q.  Let's take DRE machines.

15       A.  Okay.  Well, obviously, nobody but the voter

16   sees their ballot.  So once they are given their card

17   and they put it into the machine, it pulls up their

18   ballot -- which it only pulls up their ballot.

19           They go through and they make their

20   selections.  They touch "cast ballot."  When they do,

21   the machine -- the machine -- they yellow card pops

22   out.  The card has nothing on it at that point; it's

23   reused throughout that day.

24           Absentee ballots, once they are received in

25   the office, once they are certified and good to be

Curling et al. v.          Deposition of
Raffensperger et al.    T. LYNN LEDFORD              6/24/2019

1        Q.   How many optical scan units does the

2   Gwinnett County Board of Elections currently own?

3        A.   I think we have 36 -- 32 or 36.

4        Q.   Thirty-two or 36?

5        A.   Yes.

6        Q.   So in a situation where cities were

7   conducting elections using optical scan units, would

8   you anticipate receiving a request from --

9   for optical scan units from all Gwinnett County

10  municipalities or only those that currently request

11  DRE voting machines from you?

12       A.   Well, we have 16 cities wholly or partially

13  located in Gwinnett and there is no rhyme or reason

14  as to when or how they choose to use the equipment.

15            So I'm not qualified to answer that question

16  based on I just don't have the history -- it's just

17  all over the place and I wouldn't want to speculate

18  on that.

19       Q.   Got it.

20            So there are 16 municipalities in Gwinnett

21  County?

22       A.   Yes.

23       Q.   Are they all conducting their own elections

24  in November of 2019?

25       A.   For the ones that are having them except for

Curling et al. v.          Deposition of
Raffensperger et al.    T. LYNN LEDFORD          6/24/2019

1  Braselton and Jackson County because it's the City of

2  Braselton and, actually, Walton County conducts the

3  City of Auburn.

4       Q.   What about Buford?

5       A.   They conduct their own.

6       Q.   Let's consider now the March primary

7  election.

8            If Gwinnett County were holding an election

9  using optical scanners for the March 2020 primary,

10  how many optical scanners would the County need?

11       A.   I don't know.  We would need -- it would

12  have to be a minimum of two for 156 polling

13  locations.  That would be a bare minimum.

14            You've got people standing in line.  It

15  takes a while to read those.  In Gwinnett County, our

16  ballots usually are a little bit longer, so we have

17  to account for that as well.

18            We also have eight advance voting locations.

19  We would need a minimum of five at those so whatever

20  that number would be.  And, like I said, that would

21  be just the bare minimums.  That would not suffice.

22  You would have to have three or four units at the

23  site and probably 10 at the advance voting sites

24  because those scanners are not very quick either.

25       Q.   You've reminded me of something.

Curling et al. v.        Deposition of
Raffensperger et al.   T. LYNN LEDFORD          6/24/2019

1  and nobody's ever really asked.

2          So I think that there's oftentimes a rush to

3  judgment without asking proper questions or getting

4  more detailed information.  And, you know, for those

5  of us in elections administration, we take our jobs

6  very, very seriously.  And we want every election to

7  be as good as it can.

8          There's no perfect election.  There's

9  absolutely no perfect election equipment, but we've

10 not had -- to my knowledge, we've not had problems

11 with ours or it's not questionable.

12     Q.  We definitely appreciate your work and all

13 the work of your staff.

14     A.  Thank you.

15         MR. POWERS:  And I do, too.

16 BY MR. STEPHENS:

17     Q.  Mr. Powers asked you as well about feeding

18 ballots through optical scanners for recounts?

19     A.  Mm-hmm.

20     Q.  When you have a ballot that is long or

21 additional size, does that take longer to feed

22 through the optical scanner?

23     A.  The optical scanners that we have are not

24 high speed scanners as most people who have watched

25 us count those things knows and if you have -- you

Curling et al. v.          Deposition of
Raffensperger et al.   T. LYNN LEDFORD          6/24/2019

1  know, and different ones react different ways to
2  different ballots.
3          So sometimes you have what's called
4  shuffling.  You put it in.  It will shuffle it three
5  or four times and then it takes it.  The next one it
6  will take and the next one it will shuffle it.  Well,
7  it won't take, so then you have to turn it upside
8  down.  You have to do it backwards.  You have to do
9  it different orientations.
10          So, you know, like I said, you can try to
11  average an amount of time to do a ballot, but if
12  you've got a two-page 18-inch ballot, which is what
13  we had in November and especially when you have
14  multiple folds within the ballot as well, it creates
15  additional time to read those ballots.
16          The easiest ballots to read are the
17  provisionals because they're straight.  We print
18  them, we duplicate them and they go straight into the
19  optical scan.  But the provisional -- absentee
20  ballots are very, very difficult to scan.
21      Q.  Then there was some discussion earlier about
22  the process.  You mentioned having to duplicate
23  98 percent of the provisional ballots.
24          Can you explain a little bit what ballot
25  duplication means for paper ballots?

Curling et al. v.         Deposition of
Raffensperger et al.    T. LYNN LEDFORD          6/24/2019

1       A.  Yes.  One of the reasons that people can

2   choose to vote a provisional ballot is if they show

3   up at an incorrect poll and they don't have time or

4   make a fuss and don't want to go to the correct poll.

5   Poll officials are -- at that point will offer them a

6   provisional ballot.

7           Well, if they're at the wrong polling

8   location, the ballot at that poll are only for -- or

9   the precinct are only for that precinct.  So if you

10  have a voter that lives in Dacula but they are trying

11  to vote in Snellville, that ballot is not going to be

12  the same.

13          So when that ballot comes in on election

14  night, we have to research that and we pull the

15  correct ballot for the voter.  And then we take the

16  ballot that they actually voted and anything that

17  they were eligible to vote for, we transfer onto that

18  duplicate ballot.  And they're labeled "original" and

19  "duplicate."  And then the duplicate is what is

20  actually read for tabulation.

21          And the duplication process involves three

22  people.  You have to have one person read the

23  original ballot, one person mark the duplicate ballot

24  and one person to monitor that process.

25      Q.  Would you consider the ballot duplication

Curling et al. v.        Deposition of
Raffensperger et al.   T. LYNN LEDFORD        6/24/2019

1  process a time consuming exercise?

2       A.  Yes.  Because it's very manual.  It's a

3  very, very laborious process.  When people are tired,

4  you know, we came in at four, five o'clock on

5  election morning and we only have three days to get

6  these things done and you're trying to do everything

7  else.  You've got to wrap up an election.

8            It's an accurate process but, again, it

9  takes a very long time to get there.

10      Q.  Once you start counting ballots after the

11  polls close on election night, is there a requirement

12  that you continue counting until you finish?

13      A.  Yes.  We would love that law to be changed.

14  They missed that House Bill 316.  I'm just saying.

15           And I understand.  You don't want to lose

16  the integrity of the system.  And there are people

17  who would think that some Keebler elves come in and

18  manipulate ballots or do something.

19           So, yes, we stay there until we're done,

20  which is oftentimes -- depending on the election

21  could be two or three o'clock in the morning or it

22  could be like this last election where it was four

23  o'clock in the afternoon the next day.

24      Q.  So Wednesday afternoon at four o'clock is

25  when you finished the 2018?

Curling et al. v.          Deposition of
Raffensperger et al.   T. LYNN LEDFORD          6/24/2019

```
 1                      CERTIFICATE

 2

 3   STATE OF GEORGIA:

 4   COUNTY OF FULTON:

 5

 6          I hereby certify that the foregoing

 7   transcript was taken down, as stated in the caption,

 8   and the colloquies, questions, and answers were

 9   reduced to typewriting under my direction; that the

10   transcript is a true and correct record of the

11   evidence given upon said proceeding.

12          I further certify that I am not a relative

13   or employee or attorney of any party, nor am I

14   financially interested in the outcome of this action.

15          This the 28th day of June, 2019.

16

17

18

19   _____

20          Marsi Koehl, CCR-B-2424

21

22

23

24

25
```

APG USA INC.