# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, et al; | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION |
| | ) FILE NO: 1:17cv02989-AT |
| BRAD RAFFENSBERGER, et al.; | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## FULTON COUNTY DEFENDANTS' CONSOLIDATED RESPONSE TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

The Members of the Fulton County Board of Registration and Elections, Mary Carole Cooney, Vernetta Nuriddin, David J. Burge, Stan Matarazzo, Mark Wingate and Aaron Johnson, (hereafter "Fulton County Defendants") hereby file this Response to Coalition Plaintiffs' and Curling Plaintiffs' Motions for Preliminary Injunction. Defendants show that Plaintiffs are not entitled to the equitable relief requested in either Motion for Preliminary Injunction filed on May 30, 2019 or June 21, 2019[1], for the following reasons:

---

[1] The Court's Order of June 5, 2019 calls for a Consolidated Response to both groups of Plaintiffs' motions.

## INTRODUCTION

This case has gone far afield from the Complaints initially filed by these plaintiffs.  This case began as a challenge to the Congressional District 6 Race.  *See* [Doc. 1-2 at 63-69].  Through amendments to the Complaint, which then became two Complaints, [Docs. 70 and 226], the litigation turned squarely into an attack on DRE machines *See* [Doc. 226 at 25-33] [Doc. 70 counts I – V].

Now, through the current injunctive relief requested by both sets of Plaintiffs, the case has grown to encompass, among other things, provisional ballots, electronic pollbook data, and voter registration databases.  *See* [Doc. 419 at 37-39].  Consequently, Plaintiffs have taken the opportunity to turn this case into a fishing expedition to attempt to uncover any potential problem or issue that may exist with Georgia's voting system.

Most of the relief sought by the Coalition Plaintiffs cannot be provided by the Fulton County Defendants, and is specifically requested of the Secretary of State. *See* [Doc. 419 at 37-39].

Further, the Fulton County Defendants, in conjunction with Fulton County elections staff, are already engaged in preparation for the September 2019 elections.  At this date, converting to a paper ballot election system cannot be accomplished without compromising the public interest and diminishing the fundamental right to vote.  This is true statewide.

## PROCEDURAL POSTURE

Both the Coalition Plaintiffs and the Curling Plaintiffs have previously filed motions for preliminary injunction in this case. [Docs. 258 and 260]. After a full-day hearing on September 12, 2018, the court entered an Order denying Plaintiffs' motions for preliminary injunction on September 17, 2018. [Doc. 309].

After the Court entered a subsequent Order on May 21, 2019, granting in part and denying in part Defendants' Motions to Dismiss [Doc. 375], both groups of Plaintiffs have again filed motions for preliminary injunction. [Docs. 387 and 419].

The Curling Plaintiffs ask the Court to "grant a preliminary injunction prohibiting the Defendants from conducting any further elections through direct recording electronic (DRE) voting units for in person voting." [Doc. 387 at 1]. In so moving, the Curling Plaintiffs request this Court to order Defendants (1) to conduct elections using hand-marked paper ballots, (2) to make available at each polling place at least one electronic or mechanical ballot-marking device (BMD) that is in compliance with the Americans with Disabilities Act and Help America Vote Act, and (3) to provide a minimum of one ballot scanner at each polling place for casting, tabulation, and secure storage of voted paper ballots.

Further, the Curling Plaintiffs request this Court to order the State Defendants to institute post-election audits of the paper ballots to verify election results. [Doc. 387-1 at 1-2].

The Coalition Plaintiffs are now asking the court to (1) order the Secretary of State to audit the electronic pollbook data and its source record, the voter registration database, to the fullest extent possible to identify and correct discrepancies between electronic pollbook voter data and the most accurate official voter registration data maintained by the Secretary; (2) to require that, after voter-database discrepancies are corrected and the voter registration database is updated to reflect early voting and create electronic pollbooks, updated paper backup copies of the pollbooks be required to be delivered to and maintained at all polling places on Election Day; (3) to enjoin the Secretary to immediately undertake a review of the pollbook software to determine the source of the defect or malware and promptly undertake remedial action, making a report to the Court of his findings and software remediation plan within 30 days of the Court's Order; and to (4) enjoin the Secretary of State and the State Board to immediately instruct every Superintendent in every election to ensure that every person attempting to vote but is denied a ballot (electronic or paper) is immediately notified that they are entitled to cast a provisional ballot.  [Doc. 419 at 37-39].

For the reasons set forth below, Defendants request that Plaintiffs' Motions for Preliminary Injunction be denied in their entirety.

## FACTS

State law provides that counties, through their Superintendents must conduct elections. O.C.G.A. § 21-2-70. Fulton County is currently preparing for two elections on September 17, 2019. On July 10, 2019, the Fulton County Election Department presented (and had passed) the September 17, 2019 election budget soundings request to the Fulton County Board of Commissioners for the Board of Commissioners District 6 contest. (Declaration of Joseph Blake Evans Decl., at ¶ 11) The Department has also executed its contract with Atlanta Public Schools to conduct its September 2019 election. *Id.* The Department has also projected the amount of temporary staff needed for the September election (many temporary staff are slated to begin on July 24th.) and has projected the number of poll workers that will be needed. *Id.*

Online poll worker training will begin by July 22, 2019, and in-person training will begin on August 17, 2019. Approximately 451 poll workers will be trained. *Id.*

Plaintiffs who live in Fulton County can vote absentee by requesting an absentee ballot. On August 26, 2019, absentee voting will commence for the September 2019 special election, with the mailing of absentee ballots. (Evans

Decl., at ¶ 10)   Absentee ballots are paper ballots. *Id.* Electors have until September 13, 2019 to request absentee ballots. *Id.*

Fulton County cannot only use paper ballots in September and have a safe and secure election.  See (Evans Decl., at ¶¶ 13 - 15)

Plaintiffs filed initial disclosures that admit they have no facts to support their theories.  [Docs. 428 and 448 at ¶ 5].

## Standard for Granting Preliminary Injunctions

In order to obtain preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65, the moving party must show: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  Injunctive relief "is an extraordinary and drastic remedy, not to be granted unless the movant clearly established the 'burden of persuasion'" as to **each of the four prerequisites***." Id.; McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (internal citations and quotations omitted); see also *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) (injunctive relief "is the exception rather than the rule," and movant must clearly carry the burden of persuasion).  In order to be entitled to injunctive relief,

plaintiffs must meet the burden of persuasion on all four of the delineated factors.

*Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 435 (5th Cir. 1981).

## ARGUMENT AND CITATION OF AUTHORITY

**I.    Plaintiffs Have Failed to Establish that They Are Entitled to a Preliminary Injunction.**

Injunctive relief such as that requested by Plaintiffs has been held to be "an extraordinary and drastic remedy [that is] not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990).  Plaintiffs' Motions for Preliminary Injunction, even when considered in tandem with all other pleadings of record in this matter, fail to present this Court with any evidence as to the four prerequisites for the issuance of the requested injunctions. *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 435 (5th Cir. 1981).

Plaintiffs have provided this Court with no evidence as to the likelihood that their underlying claims will succeed on the merits or that this Court's refusal to issue the requested orders would cause them any harm, much less irreparable harm. The initial disclosures of both sets of Plaintiffs are weak and do not present any evidence that demonstrates a likelihood of success on the merits.[2]  Plaintiffs' initial

---

[2] For example, in support of their motion, Curling Plaintiffs contend that "Richard Barron falsely claimed that this Court was to blame for the State's failure to

disclosures admit that they have no evidence supporting their theories and "that they are investigating their claims." [Docs. 428 and 448 at para. 5]. Discovery is proceeding and evidence may be uncovered or gathered as the case moves toward a trial on the merits. However, at this point in the litigation; the preliminary injunction stage, Plaintiffs simply do not have evidence to support the relief they are requesting.

Plaintiffs have failed to support their theories and allegations with any evidence that the alleged future potential injury to Plaintiffs outweighs the harm to Defendants and the citizens of all of Georgia's 159 counties, if the requested order is issued. Plaintiffs have also downplayed the impact of the requested injunction and ignored the public interest.

## 1.    Plaintiffs Have Not and Can Not Show a Likelihood of Success on the Merits.

Plaintiffs have not shown a likelihood of success on the merits in the case. Plaintiffs are alleging infringement on their right to vote, resulting in violations of the Fourteenth Amendment of the U.S. Constitution. *See* [Doc. 70 at 23-36 and Doc. 226 at 62-67]. However, Plaintiffs have not been able to demonstrate that any such violation is present in this case. Plaintiffs have not presented evidence of

---

properly administer its elections in several heavily populated precincts." [Doc 387-1 at p. 3]. However, there is no context for this assertion and it is based on inadmissible hearsay contained in a newspaper article and not on evidence presented or facts.

a single incursion or hacking of a DRE machine in any election in the State of Georgia.

Plaintiffs cite a litany of alleged "errors" or mishaps, but fail to connect them to malicious hacking that would result in a loss of their votes. The probity of evidence that DREs might be "hacked" in an academic setting is negligible. Plaintiffs cannot show a substantial likelihood their votes are in danger by someone attempting to hack a DRE in the presence of election officials and other members of the public.

The most Plaintiffs have demonstrated is a potential vulnerability in equipment that their experts purchased off of the internet, had full access to and manipulated in their own laboratory environments. *See* Declarations of Matthew Bernhard and J. Alex Halderman. [Docs. 258-1 and 260-2]. Further, the DRE machines and system Plaintiffs have manipulated are not the same as the system used in Georgia *See* (Testimony of J. Alex Halderman at September 12, 2018 hearing, Transcript at p. 144, lines 9-19 and p. 118, lines 2-25) [Doc. 307]. Plaintiffs do not have evidence of any incursion into the election system. *See* (Testimony of Michael Barnes at September 12, 2018 hearing, Transcript at p. 207, line 25 – p. 208, line 8) [Doc. 307].

A potential vulnerability does not amount to a constitutional violation. In fact, even if there were actual proven irregularities present in Georgia's DRE

system, this would not rise to the level of a constitutional violation.   The
Constitution does not mandate flawless or perfect elections. *Bodine* v. *Elkhart
County Election Board*, 788 F.2d 1270, 1272 (7th Cir. 1986).   Absent invidious
discrimination or "fraudulent interference with a free election by stuffing the ballot
box," voter irregularities do not amount to constitutional violations.   *Pettengill v.
Putnam County R-1 School District*, 472 F.2d 121, 122 (8th Cir. 1973).

Further, Georgia courts have upheld the use of DRE machines; therefore,
Plaintiffs are not likely to succeed on the merits.   *See Favorito v. Handel*, 285 Ga.
795 (2009).   In *Favorito*, the Georgia Supreme Court rejected a constitutional
challenge to the use of DRE machines for Georgia elections.   In so doing, the
Court held that voters are not entitled to have their votes cast and tabulated in a
particular manner.   Id. at 797.   Plaintiffs assert that various persons agree that
Georgia's system is susceptible, but this "consensus" is not evidence that anyone's
constitutional rights have been violated, and does invalidate *Favorito* controlling
Georgia law regarding Georgia elections.

Plaintiffs also ignore the tests that have been conducted by the Secretary of
State on the DRE machines [Doc. 49-6] with regard to the reliability of the DREs.
Plaintiffs have put forth no evidence of illegal access to Fulton County's voting
machines.   In fact, there is no evidence in the record of an actual problem with a
Fulton County voting machine that has denied an elector the right to have his or

10

her vote counted.  Yet, Plaintiffs proclaim that Fulton County's and the entire State of Georgia's voting machines are unreliable and must be replaced by paper ballots immediately.

With respect to Fulton County, contrary to Coalition Plaintiffs' contention that there was "clear evidence of irregularity," at the Grady High School precinct during the November 2018 election [Doc. 419-1 at p. 20-21], there is simply nothing more than misinterpretation and a misstatement of the facts by the Coalition Plaintiffs. First, the reason that additional votes reflected on the tapes at that precinct is because the Grady High School precinct is where all of the federal based precincts are designated to be counted.  Therefore, all federal ballots are counted there.  (Declaration of Derrick Gilstrap at ¶ 4).  Second, the reason additional machine tapes were posted is because the Elections Chief ordered five additional units be sent to the Grady High School precinct, after he received reports of long lines.  (Gilstrap Decl., ¶ 5).  The additional machines were delivered after Plaintiffs' Declarant, Michael S. Johnson, spent twenty minutes at the precinct.  [Doc. 419-1, Exh. C at ¶¶ 4, 5].

## 2.    Plaintiffs Cannot Show that They Will Suffer Irreparable Harm.

Plaintiffs are not entitled to a preliminary injunction based on theories alone. First, not every alleged constitutional violation regarding voting rights constitutes an irreparable injury. *See, e.g., Greater Birmingham Ministries v. State,*

161F.Supp.3d 1104, 1117 (N.D. Ala. 2016).   Second, "Plaintiffs' allegations that voting machines may be 'hackable,' and the seemingly rhetorical question they pose respecting the accuracy of the vote count, simply do not constitute injury-in-fact." *Stein v. Cortes,* 223 F.Supp.3d 423, 432 (E.D. Pa. 2016), citing *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 133 S.Ct. 1138, 1148 (2013).

Throughout the course of this litigation, Curling Plaintiffs' expert has demonstrated that given enough time in a lab, he can create malicious software that can alter a machine to display false results and that he can load said software onto a memory card.   *See* (Testimony of J. Alex Halderman at September 12, 2018 hearing, Transcript at p. 81, lines 18-22) [Doc. 307].   Yet, no Plaintiff, nor any Plaintiffs' expert, has shown that there has in fact been a hacking or incursion into the State's system that has caused any harm, let alone caused irreparable harm.

"[T]he absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."   *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).   DRE machines have been used in Georgia for decades.   When challenged, they passed constitutional muster with the Supreme Court of Georgia and the Eleventh Circuit.   *Favorito v. Handel*, 285 Ga. 795 (2009) (DRE voting machines do not violate voters state or federal constitutional rights); *Wexler v. Anderson*, 452 F.3d 1226 (11th Cir. 2006).   The Plaintiffs should not now be heard to complain that they will suffer irreparable harm if this Court

12

does not grant them a preliminary injunction halting the operation of a duly-enacted State statute that designates the manner of voting within the State of Georgia.

Plaintiffs have failed their burden to show irreparable harm. Indeed, allowing elections to proceed with the use of DRE machines does not prevent Plaintiffs from securing the relief that they ultimately seek (i.e., use of paper ballots that are verified via optical scanners). This relief is available to each and every person who seeks to take advantage of the absentee voting process. If Plaintiffs want to vote through the use of paper ballots, they can request an absentee paper ballot without the need of disrupting ongoing[3] election preparation. O.C.G.A. §21-2-381; *Favorito*, 285 Ga. at 798. In-person early voting will begin on August 26, 2019 for the September 2019 special election. (Evans Decl., ¶ 14). Absentee by-mail ballots can begin being mailed on August 26, 2019. (Evans Decl., ¶ 10).

All Georgia voters "have the option of casting an absentee ballot or using the touch screen electronic voting machines on Election Day." *Favorito,* 285 Ga. at 798. Plaintiffs cannot possibly show irreparable harm when they may easily cast the paper ballot they perceive as more secure. O.C.G.A. § 21-2-380(b); *see also* Doc. 260-4 at 5 (Curling intends to vote absentee using a paper ballot); Doc. 258-1

---

[3] *See* Evans Decl., ¶ 11.

at 76 (Bowers planned to vote by mail-in paper ballot in Nov. 2018); Doc. 258-1 at 123 (Kadel plans to vote by mail-in paper ballot); Doc. 258-1 (same as to Luse)[4]. As the *Favorito* Court recognized, "absentee voters 'have not been treated differently from the polling place voters, except in a manner permissible under the election statutes' and as a result of their own choice." 285 Ga. at 798.

Not every alleged constitutional violation regarding voting rights constitutes irreparable injury. *See, e.g., Greater Birmingham Ministries v. State*, 161 F.Supp.3d 1104, 1117 (N.D. Ala. 2016). "Plaintiffs' allegations that voting machines may be 'hackable,' and the seemingly rhetorical question they pose respecting the accuracy of the vote count, simply do not constitute injury-in-fact." *Stein v. Cortes*, 223 F.Supp.3d 423, 432 (E.D. Pa. 2016), citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 1148, 185 L.Ed.2d 264 (2013). Plaintiffs' litany of supposed "errors" or attenuated discrepancies neither connect causally to an actual hack of the DRE machines, nor prove these Plaintiffs will suffer imminent loss of their voting rights. Because of the *sine qua non* of injunctive relief, absent evidence that Georgia's DRE machines—much less the individual votes of these Plaintiffs—will be manipulated in any future Georgia election, Plaintiffs' failure to show substantial likelihood of irreparable injury,

---

[4] There is no legal authority holding that having to choose between voting by absentee paper ballot or on election-day burdens Plaintiffs' right to vote.

especially when they have ample time to exercise their right to vote by paper absentee ballots, as many apparently will, is fatal to their quest for an injunction.

### 3. Plaintiffs Have Failed to Show that the Threatened Injury Outweighs the Harm to the Defendants.

Plaintiffs have also failed to establish that the balance of equities tips in their favor. The Supreme Court has long recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

In contrast to the lack of injury to Plaintiffs outlined above, requiring the counties to not use DRE machines in the upcoming 2019 elections would cause significant administrative upheaval, disruption of the election process, extreme financial cost, and voter disenfranchisement and voter confusion. (Evans Decl., ¶ 13). These outcomes, in turn, would undermine voter confidence in the electoral process, the integrity of that process, and trust in the governmental entities and officials who administer the electoral system. Plaintiffs assert that they are seeking

to protect the integrity of the voting system, but the requested relief, haphazardly being applied to the upcoming election, would have the opposite effect.

Fulton County has 36 operable and non-sequestered optical ("OS") units available for the September 2019 special election.  (Evans Decl., ¶ 6).  The OS units are used to read absentee ballots.  To conduct the September 2019 special election via paper ballots, the County would need approximately 130 OS machines for Election Day and absentee ballots.  (Evans Decl., ¶ 6).  Accordingly, Fulton County does not currently have enough optical scanners to use for counting all of the ballots expected to be cast in September of 2019.  The cost of procuring and deploying adequate numbers of optical scanners for the September 2019 election would carry exorbitant and unbudgeted cost.  (Evans Decl., ¶ 6).

Fulton County has budgeted $696,932 for conducting the September 2019 special election; not including funds for a potential runoff.  (Evans Decl., ¶ 12). There are no additional funds to purchase the more than 94 additional OS machines that would be needed; assuming that 94 OS machines were available for sale to Fulton County. (Presumably any other of the 158 Georgia counties with September elections would be similarly affected).

There would also have to be additional poll worker training.  (Evans Decl., ¶ 17).  For instance, Fulton County's procedures for absentee ballots, when there are random marks or illegible handwriting, is to have three staff members assist with

providing a legible ballot; one worker reads the ballot as best they can, one worker marks another ballot, the third worker verifies that the person marking the ballot has done so consistent with what has been read.  It is anticipated that a similar process would need to be employed if paper ballots are encountered that have stray marks or are illegible or not fully completed. Additional personnel would need to be trained and procedures would need to be put in place for dealing with markings on paper ballots that make the voter's intention ambiguous.  (Evans Decl., ¶ 17).

As it stands now, for the September 2019 special election, it is anticipated that 451 poll workers will be trained in Fulton County.  (Evans Decl., ¶ 11). Online poll worker training will begin on July 22, 2019, and in-person training will begin on August 17, 2019.  (Evans Decl., ¶ 11).

Additionally, the Fulton County Defendants are already preparing for election via DREs.  Elections have been called; candidates have qualified and are being prepared for submission to the Secretary of State.  (Evans Decl., ¶¶ 7, 8).  By August 26, 2019, electronic ballot proofs will be submitted and reviewed and the GEMS database will be approved.  (Evans Decl., ¶ 17).  Fulton County anticipates commencing Logic and Accuracy testing on August 15, 2019 for the September 2019 special election.  (Evans Decl., ¶ 9).

On a motion for preliminary injunction, the Plaintiffs bear the burden of showing that the perceived injury outweighs the damages that the preliminary

injunction might cause to the defendants. *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988). Here, the harm to Defendants is significant. An injunction would interfere with the County election processes which are already being planned and would require Fulton and other counties to expend additional taxpayer dollars.  Plaintiffs make casual assertions that the switch to paper ballots could be quickly and easily achieved.  However, Plaintiffs ignore the fact that the OS machines that they assert should be used to provide an audit trail for the paper ballots, have also been alleged by Plaintiffs to be faulty (Coalition Plaintiffs' Third Amended Complaint, ¶¶ 79-91) and are programmed by the very same system that is alleged to be susceptible to hacking.  (Evans Decl., ¶ 5).  Accordingly, it is curious how the use of this alleged faulty OS equipment would be acceptable for scanning paper ballots, but is unacceptable as currently used alongside the DREs.

Plaintiffs' demands are unlike injunctions that would merely require the State to refrain from implementing a newly-enacted law or requiring the continuation of a familiar procedure as the status quo pending a decision on the merits of a new one.  *Cf. League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247-48 (4th Cir. 2014) (finding balance of equities leaned towards plaintiffs because challenged changes to North Carolina's voting laws involved systems that "have existed, do exist, and simply need to be resurrected" or "merely require[d] the revival of previous practices or, however accomplished,

the counting of a relatively small number of ballots"). Instead, Plaintiffs seek an injunction requiring the 159 counties to expend considerable resources to implement paper ballots even though Plaintiffs have provided no evidence that a Georgia election has been hacked.

No balloting system is perfect. Traditional paper ballots, as became evident during the 2000 presidential election, are prone to over-votes, under-votes, "hanging chads," and other mechanical and human errors that may thwart voter intent. *See generally, Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Meanwhile, touchscreen voting systems remedy a number of these problems, albeit at the hypothetical price of vulnerability to programming "worms." The unfortunate reality is that the possibility of electoral fraud can never be *completely* eliminated, no matter which type of ballot is used. *Hennings v. Grafton,* 523 F.2d 861, 864 (7th Cir.1975). Plaintiffs' speculation that a paper balloting system would eliminate potential third-party interference with voting ignores reality. Again, no election system is flawless. *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("The unfortunate reality is that the possibility of electoral fraud can never be *completely* eliminated, no matter which type of ballot is used.") (emphasis in original); *Favorito v. Handel*, 285 Ga. at 797 (voters to not have a right to a particular ballot system). Plaintiffs are naïve to think paper ballots do not have tradeoffs and problems, just of different types, gravities and levels of

risk. *See* (Testimony of Cathy Cox at September 12, 2018 hearing, Transcript at p. 284) [Doc. 307].

"There [is] no guarantee that the [Plaintiffs'] proposed remedy, i.e. the implementation of specific security measures and a paper ballot option, would [result], in fact, in a 'secure' election." *See, e.g. Schade v. Maryland Board of Elections*, 930 A.2d 304, 327 (Md. App. 2007) (denying preliminary injunction against use of DRE machines or use without paper trail, saying "[n]o system is infallible").  "[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." *Favorito*, 285 Ga. at 797-798.  The balance of the equities favors shielding the voters from the chaos and disruption of an injunction so that the State's interest and the counties' role in promoting fair and orderly elections are respected.

### 4.    Plaintiffs Have Failed to Show that Granting the Proposed Injunctive   Relief Would Serve the Public Interest.

If granted, the relief sought by Plaintiffs would not serve the public interest. The State of Georgia has used a DRE voting system for decades.  As the Court is aware, the Secretary of State is in the process of changing the State of Georgia's voting system to a Ballot Marking Device ("BMD") - based system. *See* H.B. 316, 155th Gen. Assemb. (2019). It is anticipated that this system will be in place for all elections beginning in 2020.  The Curling Plaintiffs have asked the Court to "grant a preliminary injunction prohibiting the Defendants from conducting any further

elections through direct recording electronic (DRE) voting units for in person voting." [Doc. 387 at 1].   After the transition to the BMD system, elections will no longer be conducted by DRE beginning in 2020, and Plaintiffs' request will become moot.

To change to a third distinct system for less than one year, would cause significant administrative upheaval, voter confusion and unnecessary costs on the County and its citizens.  (Evans Decl., ¶¶ 12, 13).  The right to vote and the right to fair and accurate elections belong to every citizen of the State of Georgia, not only to two groups of Plaintiffs.  The public interest does not lie in simply changing to paper ballots for the remaining elections of 2019 and the Presidential Preference Primary of early 2020.

Plaintiffs raise only spectral fears that DREs will be hacked and votes miscounted.  A theoretical possibility that a voting machine somewhere in the State might be susceptible to tampering is outweighed by the State's legitimate interest in protecting its elections from the mad scramble that would certainly ensue if the Plaintiffs' motions were granted.

Mandating paper ballots by preliminary injunction "ha[s] the potential to cause voter confusion, particularly when implemented at such a late date in the election process." *Schade*, 930 A.2d at 327.  It would also force the Georgia counties to absorb substantial costs in terms of implementation, education and

training.  Fulton County urges the Court "to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

## II.     Relief Sought By Each Group of Plaintiffs

Although the relief requested by Plaintiffs will affect all 159 counties and superintendents throughout the State of Georgia, not all of the relief sought is directed toward, nor can it be implemented by, the Fulton County Defendants. The specific requests for relief of each group of Plaintiffs are discussed below:

### 1.     Relief Request by Curling Plaintiffs

The Curling Plaintiffs ask the Court to "grant a preliminary injunction prohibiting the Defendants from conducting any further elections through direct recording electronic (DRE) voting units for in person voting." [Doc. 387 at 1].  In so moving, the Curling Plaintiffs request this Court to order Defendants (1) to conduct elections using hand-marked paper ballots, (2) to make available at each polling place at least one electronic or mechanical ballot-marking device (BMD) that is in compliance with the Americans with Disabilities Act and Help America

Vote Act, and (3) to provide a minimum of one ballot scanner at each polling place for casting, tabulation, and secure storage of voted paper ballots.[5]

These requests place an undue burden on the Fulton County Defendants:

**"(1) to conduct elections using hand-marked paper ballots,"**

As explained above, Fulton County has 36 operable and non-sequestered OS units available for the September 2019 special election.  The OS units are used to read absentee ballots.  To conduct the September 2019 special election via paper ballots, the County would need approximately 130 OS machines for Election Day and absentee ballots. Accordingly, Fulton County does not currently have enough optical scanners to use for counting all of the ballots expected to be cast in September of 2019.

**"(2) to make available at each polling place at least one electronic or mechanical ballot-marking device (BMD) that is in compliance with the Americans with Disabilities Act and Help America Vote Act,"**

Each BMD would cost additional funds that Fulton County has not planned for or budgeted.[6]  Because Fulton County has 113 precincts for the September

---

[5] Further, the Curling Plaintiffs request this Court to order the State Defendants to institute post-election audits of the paper ballots to verify election results. [Doc. 387 at 1-2].

[6] There is no way to know the actual costs of each BMD at this time, as the vendor has not been selected nor has the contract/ pricing been set.

2019 special election, this would necessitate a substantial amount of funds to be added to the budget for the September 2019 special election.

**"(3) to provide a minimum of one ballot scanner at each polling place for casting, tabulation, and secure storage of voted paper ballots."**

As explained above, the cost of procuring and deploying adequate numbers of optical scanners for the September 2019 election would carry exorbitant and unbudgeted cost.  (Evans Decl., ¶ 6).  Further, Plaintiffs ignore the fact that the OS machines that they assert should be used to provide an audit trail for the paper ballots, have also been alleged by Plaintiffs to be faulty (Coalition Plaintiffs' Third Amended Complaint, ¶¶ 79-91) and are programmed by the very same system that is alleged to be susceptible to hacking.  (Evans Decl., ¶ 5).

### 2.    Relief Requested by Coalition Plaintiffs

The Coalition Plaintiffs are now asking the Court to (1) order the Secretary of State to audit the electronic pollbook data and its source record, the voter registration database, to the fullest extent possible to identify and correct discrepancies between electronic pollbook voter data and the most accurate official voter registration data maintained by the Secretary; (2) to require that, after voter-database discrepancies are corrected and the voter registration database is updated to reflect early voting and create electronic pollbooks, updated paper backup copies of the pollbooks be required to be delivered to and maintained at all polling

places on Election Day; (3) to enjoin the Secretary to immediately undertake a review of the pollbook software to determine the source of the defect or malware and promptly undertake remedial action, making a report to the Court of his findings and software remediation plan within 30 days of the Court's Order; and to (4) enjoin the Secretary of State and the State Board to immediately instruct every Superintendent in every election to ensure that every person attempting to vote but is denied a ballot (electronic or paper) is immediately notified that they are entitled to cast a provisional ballot.  [Doc. 419 at 37-39].

All of the Coalition Plaintiffs' requests for relief seek action on the part of the Secretary of State, except number (4).  Request 4, if granted, would require the Fulton County Defendants to immediately notify every person that is denied a ballot that they are entitled to cast a provisional ballot.  With respect to Fulton County, the requested relief is moot, as this is already the policy and practice utilized in Fulton County.  (Evans Decl., ¶ 23).

## III.    The Requested Relief Has a History of Problematic Results

Plaintiffs are requesting that the Court require that all future elections throughout the State of Georgia be conducted using hand-marked paper ballots.  If the reason for this request is to ensure secure elections, such relief will not provide any such thing.

No election system is flawless.  *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003).  Speculation that a different balloting system would eliminate potential third-party interference with voting ignores reality.  No balloting system is perfect. Traditional paper ballots, as became evident during the 2000 presidential election, are prone to over-votes, under-votes, "hanging chads," and other mechanical and human errors that may thwart voter intent.  *See generally, Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

Paper ballots and optical scanners for voting is not a panacea.  As former Secretary of State Cathy Cox testified at the September 12, 2018 hearing, after the 2000 general election, it was found that statewide, there were 94,000 votes that could not be accounted for.[7]  *See* (Testimony of Cathy Cox at September 12, 2018 hearing, Transcript at p. 284, lines 18-20) [Doc. 307].  Interestingly enough, optical scan equipment led to the highest number of error rates in vote count in that election.  [Doc. 307 at p. 284, lines 9-23].

Further, there are security and chain of custody problems with paper ballots themselves.  As former Secretary Cox, testified, "[F]raud opportunity with paper ballots is limited only by one's imagination."  *Id.* at 289, lines 24-25.  In the past,

---

[7] Prior to the DRE based voting system presently in use, the State of Georgia was using four different election systems; paper ballots, punch card ballots, lever machines and optical scans.  *See* (Testimony of Cathy Cox at September 12, 2018 hearing, Transcript at p. 280, lines 6-19) [Doc. 307].  There were issues with each. *Id.* at 278, line 8 – p. 279; line 15.

there have been issues with ballot boxes disappearing during elections, paper ballots going missing, suspicion of marks made on ballots by poll workers while counting votes, and failure of optical scans to record votes properly or at all. *Id.* at 290, lines 1-25; and p. 291, lines 1-4.

Again, ". . . reality is that the possibility of electoral fraud can never be *completely* eliminated, no matter which type of ballot is used." *Favorito v. Handel*, 285 Ga. at 797. Moving to paper ballots for presumably less than one year is fraught with issues and potential failures and will not serve the public interest in having secure and fair elections.

## CONCLUSION

For all of the above reasons, the Fulton County Defendants respectfully request that the Court deny Plaintiffs' Motions for Preliminary Injunction in their entirety.

Respectfully submitted this 10th day of July, 2019.

**OFFICE OF THE COUNTY ATTORNEY**

**/s/David R. Lowman**
**Kaye Burwell**
**Georgia Bar Number: 775060**
**kaye.burwell@fultoncountyga.gov**
**Cheryl Ringer**
**Georgia Bar Number: 557420**
**cheryl.ringer@fultoncountyga.gov**

**David Lowman**
**Georgia Bar Number: 460298**
**david.lowman@fultoncountyga.gov**

**ATTORNEYS FOR**
**DEFENDANTS RICHARD**
**EVANS MARY CAROLE**
**COONEY, VERNETTA**
**NURIDDIN, DAVID J. BURGE,**
**STAN MATARAZZO, AARON**
**JOHNSON, AND THE FULTON**
**COUNTY BOARD OF**
**REGISTRATION & ELECTIONS**

**Office of the County Attorney**
141 Pryor Street, S.W.
Suite 4038
Atlanta, Georgia 30303
P:\CALitigation\Elections\Curling, Donna v. Kemp, Brian (Curling II) 1.17-CV-02989-AT- (DRL)\Pleadings\7.10.19 DEF's RESP to PLTFS
MOTIONS for Prelminary Injunctions(DRL).doc

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I have electronically filed the foregoing

**<u>FULTON COUNTY DEFENDANTS' RESPONSE TO PLAINTIFFS'</u>**

**<u>REQUESTS FOR PRELIMINARY INJUNCTIONS</u>** with the Clerk of Court

using the CM/ECF system, with the Clerk of Court using the CM/ECF system,

which will send email notification of such filing to all attorneys of record.

This 10th day of July, 2019.

**/s/ David R. Lowman**
Georgia Bar Number: 460298
david.lowman@fultoncountyga.gov