```
                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
                         ATLANTA DIVISION


DONNA CURLING, ET AL.,            )
                                  )
        PLAINTIFFS,               )
                                  ) DOCKET NO. 1:17-CV-2989-AT
        -VS-                      )
                                  )
BRAD RAFFENSPERGER, ET AL.,       )
                                  )
        DEFENDANTS.               )
```

**TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

**BEFORE THE HONORABLE AMY TOTENBERG**

**UNITED STATES DISTRICT JUDGE**

**JULY 11, 2019**

```
              PENNY PRITTY COUDRIET, RMR, CRR
                   OFFICIAL COURT REPORTER
                 UNITED STATES DISTRICT COURT
                      ATLANTA, GEORGIA
```

```
 1                    A P P E A R A N C E S:

 2  ON BEHALF OF THE PLAINTIFFS:  DONNA CURLING, DONNA PRICE, JEFFREY
    SCHOENBERG:
 3
         DAVID D. CROSS
 4       CATHERINE CHAPPLE
         MORRISON & FOERSTER, LLP
 5
         HALSEY G. KNAPP
 6       ADAM SPARKS
         KREVOLIN & HORST, LLC (VIA TELEPHONE)
 7
         ALSO PRESENT:  DR. ALEX HALDERMAN (VIA TELEPHONE)
 8
    FOR THE PLAINTIFF COALITION FOR GOOD GOVERNANCE:
 9
         BRUCE BROWN
10       BRUCE P. BROWN LAW (VIA TELEPHONE)

11       DAVID R. BRODY
         LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW (VIA
12       TELEPHONE)

13       ALSO PRESENT:  MARILYN MARKS (VIA TELEPHONE)

14  FOR THE DEFENDANTS STATE OF GEORGIA:

15       VINCENT ROBERT RUSSO, JR.
         JOSHUA BELINFANTE
16       BRYAN EDWARD LAKE
         KIMBERLY K. ANDERSON
17       ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC. (VIA
         TELEPHONE)
18
         BRYAN P. TYSON
19       BRYAN JACOUTOT
         TAYLOR ENGLISH DUMA (VIA TELEPHONE)
20
         ALSO PRESENT:  CAREY MILLER (VIA TELEPHONE)
21
    FOR THE DEFENDANTS FULTON COUNTY:
22
         KAYE WOODARD BURNWELL
23       CHERYL RINGER
         OFFICE OF THE FULTON COUNTY ATTORNEY (VIA TELEPHONE)
24
    ALSO PRESENT:  MICHAEL BARNES, RYAN GERMANY, MERRITT BEAVER (VIA
25  TELEPHONE)
```

1                         (JULY 11, 2019)

2              (PROCEEDINGS HELD IN CHAMBERS AT 1:19 P.M.)

3         THE COURT:  All right.  I would like plaintiffs' counsel

4    to explain to me why you need this at this juncture.  I mean, I

5    don't know that it's moot, but I don't know why you need it.

6    There are still obviously issues and concerns that the defendants

7    have about production of this, so I think you've got to explain it

8    better to me because I can't -- I don't know quite the difference

9    between the database that you're saying that you need now and what

10   the experts and you have been given and given the right-to-use

11   tools that the state originally wasn't agreeing to have the

12   experts use.

13        MR. BROWN:  Your Honor, this is Bruce Brown.  If I may

14   answer that.

15        THE COURT:  Go ahead.

16        MR. BROWN:  What the plaintiffs are seeking in the

17   extraction and production of what we call the Phase 1 document is

18   the voluminous data that is in -- is contained in the actually 330

19   or so GEMS databases that will be produced.  As the experts

20   themselves had stated in their own declarations, the review and

21   analysis of that information, which includes candidates' names,

22   the races, the voter groups and the various different constraints

23   that are used in the database to construct the ballots, the review

24   of that, although some of it can be automated, is extremely

25   time -- would take a lot of time, labor intensive.  And it also

1   does not involve the same skill set.

2           This is an analysis of reams and reams of paper

3   cross-referencing that information to other information about the

4   elections that physically cannot --

5           THE COURT:  Like what?  I mean, that doesn't -- you've

6   described that before, I got that, but I'm -- and there's

7   something that you want to do with this and maybe you don't want

8   to be disclosing what it is but you have to if you even want to

9   have a chance of doing it at this point.  I don't understand what

10  they're going to be doing.  I don't understand why it's necessary.

11  And I don't understand why it doesn't -- I went to great lengths,

12  and you did too, to address some of the confidentiality issues,

13  even if you didn't agree with them, that the state had and has a

14  legitimate interest in, even if you disagree with it.  So I really

15  don't understand suddenly why this doesn't run amuck of all that.

16          MR. BROWN:  This is Bruce Brown again.

17          Your Honor, first is, of course, this information is not

18  confidential, although we have agreed in our most recent

19  submission to treat it as confidential.  And so we have --

20  although we originally saw it and continue to believe that we're

21  entitled to simply the release of this data, that's not the

22  position we're taking right now.

23          The position we're taking right now is that the experts

24  should be permitted to extract this voluminous data and give it to

25  non-experts on a confidential basis subject to the terms of the

```
 1  protective order so that there is two tiers of protection.  One is
 2  for the database itself and the source code and cryptographic keys
 3  and the other things that only the experts would be entitled to
 4  review.  And then it's the output from the database that
 5  non-experts would be entitled to review for -- to find where -- to
 6  find the source of these mistakes that keep on cropping up and
 7  whether it's in the relationships between the races, the ballots,
 8  some feature of the ballot building or some flaw in that data that
 9  it might be caught by the experts in an either automated review or
10  their review of other code that the non-experts would not have
11  access to, but we think that we also need to review the
12  non-confidential data itself.  However, we're agreeing to treat
13  that as confidential and don't see, you know, that the state
14  should have a problem with that.  And they may not.
15          THE COURT:  Well, what are the -- we had this back and
16  forth this morning about even the accuracy of the field titles
17  that you were referencing and that you really -- you haven't
18  correctly identified --
19          MR. BROWN:  Yes, your Honor.
20          THE COURT:  -- the ones that you are wanting to keep
21  confidential or not or what you're referencing.
22          MR. BROWN:  Yes, your Honor.  This is Bruce Brown again.
23          We did the best we could having not seen the databases
24  yet to identify the different -- the 51 different categories, and
25  we obtained those categories from a 2002 Cobb County GEMS
```

1  database.  So we're doing the best we can since the state parties

2  have not really responded to that listing or told us what the

3  correct list is.

4          And then I may -- I would like to call upon

5  Dr. Halderman to help us on how -- when he and Mr. Bernhard are

6  reviewing the GEMS databases he could or would propose to

7  translate the document categories that we have -- we have listed

8  on Exhibit B into --

9              (Interruption by the court reporter)

10      MR. BROWN:  Parenthetically, Judge, we can't thank you

11  enough to take the time to hear this.

12          Dr. Halderman, maybe if you could tell us how once you

13  and Mr. Bernhard are reviewing the GEMS database you would take

14  the taxonomy of the various categories of information that's on

15  Exhibit B and translate that into how the state does it now.

16      DR. HALDERMAN:  This is Alex Halderman, expert for the

17  plaintiffs.

18          So the taxonomy that we've included, as Mr. Brown has

19  indicated, is extracted from a Cobb County database, GEMS database

20  from 2002.  It's -- the state has indicated that some of the table

21  names in their current database differ from the 2002 database

22  and -- so there's some amount of translation or further

23  investigation that would be necessary to identify any additional

24  tables that are non-confidential.

25          At this point I believe the position that the plaintiffs

1  want to take is that the tables that have already been disclosed

2  in the 2002 database are public -- the structure is publicly

3  known, and the state, I don't believe, has identified any of those

4  tables from 2002 as containing confidential structure.

5      THE COURT:  They have maintained that it's -- and I

6  don't mean to make you into counsel, but they have maintained that

7  the entire arrangement of them is relational and somehow vital to

8  their security interest.

9      DR. HALDERMAN:  Well, your Honor, I -- we've tried to

10  explain how the relationships to the tables that are present in

11  the 2002 database are just the obvious structure of how a

12  candidate relates to a name --

13      THE COURT:  All right.  I got that's your view.  And I'm

14  not -- you know, I've taken days off of vacation to study and work

15  on this order and then to work on this part of it, so I'm telling

16  you I have read everything and I understand that.  I'm just trying

17  to find out -- and I understand that you all have a different view

18  about it, but I am trying to understand from plaintiffs' counsel,

19  which has not been explained really still, is that you're hoping

20  to mine the status, I understand it, and extract something which I

21  don't know, which you do believe is confidential, but because you

22  have the wrong names I don't know what it really is that you're

23  trying to extract, that you're trying to say we'll agree that this

24  is confidential, and we're going to basically provide your clients

25  with a CD with all the other data in its current format.  Is that

1  right?  I'm not asking Dr. Halderman about this, I'm asking

2  counsel.

3          MR. BROWN:  We're asking for the information to produce

4  and not -- yeah, in just a regular Microsoft -- blank Microsoft

5  Access database, just the lists and the tables of the information

6  that is -- that is public information, list of candidates, how it

7  links to the list of elections, et cetera, for each of the CDs.

8          DR. HALDERMAN:  If I may clarify.  This is

9  Dr. Halderman.

10         The databases that the state produces, as the state say,

11 do have differences from the databases that have been publicly

12 disclosed.  And what we're saying is that the structure that has

13 been publicly disclosed, that information ought to be things that

14 we can extract because the structure is already known.

15         To the extent that there are other tables and structures

16 that aren't publicly known, I think that is a place where we may

17 have to have a further conversation about whether the data is

18 confidential or not based on what that structure is.

19         THE COURT:  All right.  So let me have the state's

20 counsel, or whoever you all identify, respond to simply why is it

21 that they can't make available what is tables that might appear --

22 as they have in Cobb County and other places that they've

23 obtained, the counties have obtained data from without anything

24 else, without any other accoutrements that might be in this -- of

25 information that may be in what's loaded in there.

1          MR. TYSON:  Your Honor, this is Brian Tyson.

2          I think the key for this is what Dr. Halderman just

3    said, that the database -- our databases are different.  So the

4    key to these databases is there's information in each table, and

5    Mr. Beaver or Mr. Barnes can speak to this in more detail if you

6    need it, that refers to other tables within the database.  And

7    it's those relationships that the plaintiff has indicated are

8    necessary for their evaluation because they need to be able to see

9    the relational structure because that carries relevant

10   information.  But given the fact that we don't have a one-to-one

11   list of what tables they're saying are public versus which ones we

12   have, that's the challenge in terms of how these databases relate

13   to each other.

14          I don't think we have enough information at this point

15   to say what information is public and if you strip the relational

16   information out, as the plaintiff has indicated, it becomes

17   useless to them in terms of their analysis.

18          THE COURT:  Okay.  Well, does either Mr. Barnes or

19   Mr. Beaver have anything more they can add about that?

20          MR. BEAVER:  This is Merritt Beaver.  I think what we're

21   trying to say is what the plaintiffs are saying is public would be

22   things that they can identify.  We have said all along that the

23   Georgia database has unique elements which Mr. Halderman knows

24   that if you're writing malware, you need to know specifically

25   table names to make your malware work.  As long as those are not

1  known, malware won't work on our database.

2          So if he says there are public-available tables, he

3  should generate that list of tables that he knows that -- then

4  we'll look at which ones those actually map to -- up to something

5  we have, but there's a lot of tables in the database that they

6  don't know about, which is what the whole secrecy is.

7          THE COURT:  Okay.  So, Dr. Halderman, can you do that?

8          DR. HALDERMAN:  We have produced a list of tables that

9  we know about from the databases that are available publicly.  And

10  those are --

11          THE COURT:  That's in Exhibit B?

12          DR. HALDERMAN:  That's right.  To the extent those

13  tables are present in the database that the state has, those are

14  what we're proposing that we would like to -- we would like to be

15  able to extract or have the state extract.  If there are other

16  tables, then that's a question that after we examine -- after

17  experts examine the database we propose to defer the question of

18  their confidentiality.

19          THE COURT:  Mr. Beaver, have you looked -- I realize

20  that the numbers may be somewhat different but I don't know that

21  the titles of those tables are different, though I realize there's

22  a real passage of time obviously since 2002.  The listing in

23  Exhibit B that counsel indicated there were some errors in the --

24  they're not called that any longer, something isn't called that

25  any longer, have you looked at that to determine whether those

1   are, in fact, available in a form that you are willing to produce?

2           MR. BEAVER:  To start with, the whole table structure is

3   confidential.  Now, comparing B to our table structure, only a

4   handful of tables are common.  So out of 49, there's probably less

5   than 10.

6           THE COURT:  Do you know what those are?

7           MR. BEAVER:  No, I would have to go back through and

8   relook at them again.  I don't have that with me.  That was not

9   prepared for doing this level of analysis on the phone.  But from

10   what I can tell whatever they have from 2002 was never an actual

11   GEMS database that was used in Georgia.  I'm guessing it was some

12   training database that the original company used for educational

13   purposes but did not reflect what Georgia had.

14           THE COURT:  Does plaintiffs' counsel or expert have any

15   response to that?  Does plaintiffs' counsel or expert have any

16   response to that?

17           UNIDENTIFIED SPEAKER:  Mr. Bernard, can you just

18   disclose where you got the database from.

19           MR. BERNHARD:  Sure, it was made available to us by an

20   activist who acquired it through, I assume, a leak or something, I

21   don't know.

22           UNIDENTIFIED SPEAKER:  But it's on the Internet, right?

23           MR. BERNHARD:  That's correct, yeah.

24           THE COURT:  It may be on the Internet, but I don't know

25   where it came from.

1          DR. HALDERMAN:  Right.  Well -- excuse me, this is

2     Dr. Halderman, your Honor.  And it also does appear to be the 2002

3     ballot from Cobb County.  So if this was something that was used

4     in testing or training, it was made specific to that election in

5     Georgia.

6          THE COURT:  I'm not doubting that, but on the other hand

7     it is not like it was an -- and it may well be so but, you know, I

8     don't have it from a source that I can rely on exactly for the

9     purposes of this conversation either.  I understand why you can

10    rely on it and it's informative but why is it -- I realize that

11    you want to spend -- this is a part the plaintiffs' analysis

12    strategy, but I would think that we would at least be in a less

13    theoretical territory if we had this conversation after the

14    plaintiffs' experts had actually looked at the database.

15         MR. BERNHARD:  This is Matt Bernhard.

16         If I can just add, while we -- the provenance of this

17    particular Cobb County database is not well-known.  It does match

18    very well with other GEMS databases that we have seen all over the

19    country that have been in use for decades.

20         THE COURT:  And I'm not doubting that, I'm just saying

21    it's 2002, its provenance is likely under the circumstances but

22    things could have changed, and the state says they used also

23    different information on their own databases, the way they

24    construct it, and you're asking them to produce information from

25    their database.  So I'm not doubting that it was Cobb County's but

```
 1  there are all sorts of distinguishing circumstances too.

 2          And I'm just wondering -- getting back to my question,

 3  why wouldn't we be, even if I wouldn't be better off, discussing

 4  this again after you've actually looked at the database, once you

 5  get it?

 6          MS. CHAPPLE:  Your Honor, this is Catherine Chapple.

 7          I think that part of this for us is that it's just a

 8  matter of timing and resources.  We have very little time before

 9  the hearing before you on July 25th and we're talking about

10  hundreds of databases with millions of lines of data, so we really

11  need help with individuals familiar with this type of election

12  data to review it beyond just our cyber security expert.  And

13  so --

14          THE COURT:  Well, I understand that, you know, but I

15  would frankly feel more comfortable if I had -- if there was a --

16  somebody trained in security protocols, if you actually need some

17  expert assistance, if there's your own either individuals from --

18  who are paralegals in Morrison & Foerster or individuals who are

19  trained in this, who are at a high enough level to be trained in

20  security protocols from the University of Michigan to assist.

21          I understand why you want to use the people you want to

22  use, and I'm not critical of them in any way, but that would,

23  though, seem to me to address the state's concerns more.  And even

24  though you dismiss them, I can't entirely dismiss them.  And so I

25  don't -- it doesn't give me an assurance if you're just saying the
```

1  plaintiffs themselves are going to be looking at the data.

2           And I, you know, to some extent felt -- understood why

3  you thought Mr. Digges would be called to do that, and I have

4  that, but he still is a plaintiff in the case, I do understand

5  that.  And there may be other ways that they can be identified as

6  helpful or there may be particular tables once the experts look at

7  this that they can say this is something that really seems like it

8  wouldn't expose relational data in this set of tables, or that

9  they are going to say we could use -- that you're just going to

10  end up having to use some of their own immediately trained staff

11  who have signed off on protocols and people at the law firm who

12  are actually operating under their supervision.  But you're

13  telling me what you've proposed is that it's basically people who

14  are not going to be working under their supervision.

15           MR. BROWN:  Your Honor, this is Bruce Brown.  It's a

16  manpower --

17           THE COURT:  I understand that.  I understand that.  And

18  if you want to put off the hearing, that's up to you.

19           MR. BROWN:  We do not want to put off the hearing.

20           THE COURT:  Okay.  I mean --

21           MR. CROSS:  Your Honor, this is David Cross.  Could I

22  offer one suggestion?

23           THE COURT:  Sure.

24           MR. CROSS:  As I understand what they're proposing -- or

25  what the defendants are saying -- sorry, I'm in an airport,

1    hopefully it's not loud -- as I understand the concern, the

2    defendants' only confidentiality concern they've identified, other

3    than I think three specific fields, is the structure, which they

4    attribute to the relationships.

5            If we were to extract the data without the

6    relationships, just pull the data, swap files, get the blank

7    databases, would that obviate the issue at least at this phase and

8    we would deal with the relationship issue later as you've

9    suggested after we've seen the databases?

10            THE COURT:  Well, I don't know what that would look

11   like, but I think it's certainly a more constructive proposal

12   relative to their concerns.  Let me hear from Mr. Russo or

13   Mr. Beaver or both.

14            MR. TYSON:  Your Honor, this is Bryan Tyson.

15            THE COURT:  I'm sorry.

16            MR. TYSON:  I think our conversation yesterday was

17   that -- or I can't remember which day, that without the relational

18   information that you couldn't really tell much from the database.

19   And I don't want to mischaracterize what Dr. Halderman said about

20   that, but my understanding from the plaintiffs was that they

21   needed the relational information to conduct this analysis.

22            So if there's a proposal in terms of what that would

23   look like, I think we could look at it, but my understanding was

24   that was not a reasonable accommodation for Dr. Halderman.  I may

25   be incorrect about that.

1          MR. CROSS:  This is David Cross.  We're talking about

2     two different things, right?  Dr. Halderman will have access to

3     the complete database, so will Mr. Bernhard, so will counsel.

4     What we're talking about is data to be reviewed by the

5     non-experts.

6          So to Mr. Tyson's point, this won't restrict what

7     Dr. Halderman could do, the relationships, he'll have that access.

8     What we're trying to get help with from non-experts is just the

9     sheer fact that you're talking millions of lines of data across

10    databases.  In the ideal world we would have the relationship but

11    it will strain our ability to understand that data without the

12    relationships.  Just as a compromise, to try to move this forward,

13    the idea was to just take that off the table since that's the only

14    data security issue they've identified is to say just -- we'll

15    just extract the data itself, no relationship, XY files and blank

16    Access databases; basically spreadsheets is what we're talking

17    about, the simple spreadsheets, we'll look at the data and do the

18    best we can with it.

19          If it turns out we do need those relationships or some

20    of them, as your Honor suggested, we'll come back to the

21    defendants, come back to the Court if we have to but then it's

22    less abstract, that would be the idea.

23          THE COURT:  Do the defendants need to just go offline

24    for a few minutes to talk?

25          UNIDENTIFIED SPEAKER:  Is Mr. Beaver still on the line,

1   I know he had to leave for a flight.

2          MR. BEAVER:  This is Merritt Beaver.

3          Okay.  So the plaintiffs know that the database is very

4   simple.  It's like GEMS database.  What's critical in security are

5   the table names.  So even extracting spreadsheets, unless we

6   change all the table names, they will have the structure.  That's

7   what the key is, is the table name.  So they're trying to make it

8   sound like they're asking for a lot less when they're asking for

9   nothing different.

10          DR. HALDERMAN:  This is Dr. Halderman.

11          If that's the main concern, we could change the table

12   names in what we extracted to generic descriptive names of the

13   data in the tables.

14          THE COURT:  Would that address your concern, Mr. Beaver?

15          MR. BEAVER:  No, they would have the names then.  This

16   is Merritt Beaver.  They would have the names.  Once it's out,

17   it's out and it --

18          THE COURT:  You would have to change the name to a

19   generic name?

20          MR. BEAVER:  "He," once "he" has it, it's out.  That has

21   been the whole security --

22          THE COURT:  Well, he is -- I mean, Dr. Halderman will

23   have it but that's not the point, the point --

24          MR. TYSON:  Your Honor.  I'm sorry, this is Bryan Tyson.

25   I just wanted to clarify what Dr. Halderman was saying.

```
 1            Dr. Halderman, were you saying that you would basically
 2    extract the database information to its table, change the name of
 3    the table, remove all the fields that include relationships with
 4    other tables within the database so you're left with nothing but
 5    just rows and rows of data that doesn't have any association to
 6    another table and that's what would be the extracted product?
 7            DR. HALDERMAN:  This is Dr. Halderman.
 8            I'm trying to find a way to address the specific
 9    concerns.  So, yes, what we could do is rename a table, for
10    instance, if the table is something like an actual name of a table
11    and there is V and -- R and V center or something like that, we
12    could change it to a description, so races and vote centers, for
13    instance, expanding on that.  So it's addressing Mr. Beaver's
14    concern that the specific table name could somehow be used.
15            We could replace places where there are relational
16    identifiers with just whatever the data that relation is pointing
17    to is.  So, for instance, if there's a relational identifier that
18    is pointing to a candidate in another table, we could replace it
19    with the name of the candidate.  And I -- if this is necessary to
20    address state's concerns, we could also change the names of the
21    specific fields in place where -- in places where those fields
22    would otherwise be specific identifiers, so a field that was the
23    string V center, we could expand to vote center name, something
24    like that, that would allow an analyst to know what that
25    information is but wouldn't be the specific string representation
```

1  in the database that is, I believe, if I'm understanding

2  Mr. Beaver correctly, what he is concerned about being released.

3          MR. TYSON:  Your Honor, Brian Tyson again.

4          It sounds like we're getting way down in the weeds

5  obviously.  It seems like to me this is appropriate for

6  Dr. Halderman and the folks in DC to get the databases pursuant

7  to the protective order, do an analysis, maybe come back with a

8  proposal, here's what we propose to do, here's what it would look

9  like, and then we can look at that, because we're talking through

10  a lot of details in terms of the database structure, so I wanted

11  to make sure that -- I think it makes sense to get them to look at

12  it first and then bring it to us, maybe there's some other

13  proposal after looking at the database that makes more sense.

14          MS. CHAPPLE:  This is Catherine Chapple.

15          That would be -- the problem is that there's just so

16  little time before the preliminary injunction hearing and we've

17  described what we would be doing and how we would protect the

18  information that the state says is confidential and we're -- and

19  we're not hearing why those proposals would not work.  And to ask

20  for further briefing next week, putting us closer and closer to

21  the hearing, is just -- isn't going to be -- isn't usable or --

22  and is highly prejudicial to us at this point.

23          THE COURT:  Well, I'll tell you, I'm going -- it's

24  Thursday afternoon and I understand you have a significant time

25  frame issue but you're going -- I don't know when the -- exactly

1  the delivery will occur but it will be Friday, and presumably in

2  compliance with the Court order by 2:00.  And you can look at it

3  then and then -- I don't know.  Mr. Beaver is apparently going off

4  somewhere, I don't know if he's going on vacation or what.  Is he

5  going to be available late on Friday or on Saturday?

6          MR. BEAVER:  This is Merritt.  I'll be back on Sunday.

7          THE COURT:  You'll be back on Sunday.  And is that

8  Sunday -- I hate to ask you but is that Sunday evening or Sunday

9  during the day?

10          MR. BEAVER:  Evening.

11          THE COURT:  Okay.  So, you know, you can all schedule

12  something -- you know, I would basically say schedule something

13  for early, very early on Monday morning, and if you can't agree on

14  something, then I'll hear from you.  But I understand what the

15  plaintiffs are saying, and I understand that some of the -- I

16  think it's a creative solution that Mr. Cross and Dr. Halderman

17  now suggests.  I don't know if it would really work.  And I don't

18  want the state to simply say no, no, no, because that's sort of --

19  is not helpful either.

20          But one of the things that you -- it seems to me that

21  Dr. Halderman and you, Mr. Bernhard, could do is actually

22  basically create what you're saying you would -- do an excerpt

23  like you're suggesting you would give to the plaintiffs' counsel

24  and provide it to counsel to share with counsel and for them to

25  share with Mr. Beaver so that that's the subject of your

 1  conversation at 9:00 in the morning on Monday.

 2          MS. CHAPPLE:  This is Catherine Chapple, your Honor.

 3  Thank you.

 4          Before we get off the phone, if we could address one

 5  further issue and that's the issue of the protective order.

 6  There's --

 7          THE COURT:  No, we can't discuss that yet, we have to

 8  finish what we're doing right now.

 9          MS. CHAPPLE:  Sorry.

10          THE COURT:  That's all right.

11          So I wanted to, first of all, find out that that's

12  doable for all counsel and the parties and the experts.

13          MR. TYSON:  Yes, your Honor.  This is Brian Tyson.  I

14  think that suggestion works.

15          Can we get some clarity as far as the database delivery.

16  Are the environments as ordered by the Court ready and are the

17  staff who have executed the confidentiality agreement ready to

18  receive those databases tomorrow?

19          THE COURT:  Can plaintiffs' counsel and Dr. Halderman

20  respond.

21          MS. CHAPPLE:  This is Catherine Chapple.

22          Yes, we are putting the finishing touches on the secure

23  facility here in the Morrison & Foerster office in DC, and we will

24  send around the confidentiality agreement as well.  The

25  confidentiality agreement should come around if not tonight by

1   tomorrow morning.

2           THE COURT:  What about in Michigan?

3           DR. HALDERMAN:  Excuse me, this is Dr. Halderman, your

4   Honor.

5           Yes, we expect to have everything ready by 2:00

6   tomorrow.

7           MR. TYSON:  This is Bryan Tyson.

8           Could Dr. Halderman or someone circulate an address at

9   the University of Michigan where the delivery would need to take

10  place, we would appreciate that.

11          DR. HALDERMAN:  Yes, we will.

12          THE COURT:  And is the state intending to send a

13  representative or to send this by courier service?

14          MR. RUSSO:  Your Honor, this is Vincent Russo.

15          We are -- we're working on coordinating that between

16  ourselves right now.  We have a deposition in this case tomorrow

17  that is of a third party that the plaintiffs are taking and a

18  number of other responses to --

19          THE COURT:  All right.

20          MR. RUSSO:  -- discovery.  So it will be personal

21  delivery, though, is what I'm expecting.

22          THE COURT:  Obviously share that information with

23  plaintiffs' counsel so everyone is ready when we expect -- and

24  that they'll be there, who's arriving.

25          MR. RUSSO:  Yes, ma'am.  We don't have flights yet but

1  soon.

2        THE COURT:  I just want y'all to confirm that you

3  will be available for a Monday 9:00 phone conference and for

4  Dr. Halderman to confirm that he can get the information to

5  counsel in time that counsel can distribute whatever you're

6  proposing.

7        DR. HALDERMAN:  This is Dr. Halderman.

8        Yes, your Honor.

9        THE COURT:  Okay.  All right.  All right.

10        What do you want to address now on the protective order?

11        MR. BROWN:  Your Honor, this is Bruce Brown for both

12  sets of plaintiffs.

13        We had submitted that -- the joint dispute over the

14  productive order some time ago.  Technically it's still pending.

15  Your Honor made a number of observations about the protective

16  order issues.

17        THE COURT:  I thought I entered a text order that

18  basically said or -- and Ms. Cole can correct me if I'm wrong,

19  it's fine.  I thought we entered something basically that said I

20  was going to defer all the disputes that you had as to making --

21  the plaintiffs said there would be no such thing as retroactive

22  confidentiality, and I'm just not dealing with that until I -- I'm

23  basically deferring all the confidentiality issues as to

24  publication of things until we come back in Atlanta and when I can

25  see -- the whole case has been rolling on and I can understand

1  some things more clearly about what the issues are than I did a

2  few weeks ago.

3          And I just don't see why you can't keep -- I thought

4  what we said was raise any objections you have and I'll deal with

5  them the week of the 20th.

6          MR. BROWN:  As a practical matter, the defendants and

7  the third parties are not producing any documents, your Honor,

8  because they -- the position they're taking, not unreasonably, is

9  there not being a protective order entered, those documents, you

10 know, they don't know what to do, I guess.  And if they -- we

11 will -- if they produce them as confidential, we will treat them

12 as confidential as if our proposed protective order were granted,

13 if that's sufficient.

14         THE COURT:  Well, they don't think your protective order

15 is sufficient, that's why it's not going to work.

16         MR. BROWN:  I have submitted a revised protective --

17 this is Bruce Brown still.

18         THE COURT:  But it still has retroactive, doesn't it,

19 basically -- there are things that I know that they'll object to

20 likely.

21         MR. BROWN:  Our -- well, the -- what needs to happen,

22 your Honor -- this is Bruce Brown again.  What needs to happen is

23 that the new documents that have not been produced, we need to

24 get.

25         THE COURT:  I understand that and we'll enter something

1  but there's no point in our entering something that basically

2  grants you broader access than the state's willing to agree and I

3  haven't ruled on it actually as a matter of substance.

4          MR. BROWN:  If I may make this clarification, your

5  Honor, I'm not arguing with you on that, our proposed order,

6  just -- this is just for information.  Our proposed order changes

7  the "attorneys' eyes only" designation so that it excludes parties

8  and party representatives.  That was an observation that you made

9  several weeks ago in our last telephone conferencing.  We made

10 that change.  And it -- it does not -- it does not give the --

11 anybody the power to retroactively designate these confidential

12 documents, that's what that one is.

13          THE COURT:  Has the state looked at it?  I know it just

14 came in.

15          MR. RUSSO:  This is Vincent Russo.

16          Your Honor, we have not looked at the newest proposal;

17 however, we did propose to plaintiffs that if counsel could agree

18 that documents that we would be marking confidential under the

19 proposed protective order would be treated as confidential under

20 that order and then -- until the order is entered and then from

21 there on be subject to the order, we don't mind producing those

22 right now, but we -- we did have -- we never got confirmation from

23 all their counsel on that.  Mr. Cross confirmed it was okay with

24 them but we never got confirmation from Mr. Brown.

25          So we did not want to produce those confidential

documents until we knew that everybody agreed because we didn't

want to have this fight over what is public and what is not at

that point, what's not retroactive and what is retroactive after

the fact.

THE COURT:  Do all plaintiffs' counsel agree with that?

MR. BROWN:  Yes, we do, your Honor.  This is Bruce

Brown.  We agree to treat confidential whatever they produce as

confidential.

MR. RUSSO:  Your Honor, that does segue nicely into

issues regarding document production we still have.

THE COURT:  Let me finish this one so I can mechanically

effectuate this.  Do you want us to simply -- do you want to look

at their draft order or do you want us to just simply enter a very

short protective order that simply summarizes that and says that

anyone can designate it but it will be limited to how it's limited

and that everyone is free to make the objection as they see fit by

next weekend?

MR. RUSSO:  We would like to take a look at their new

proposed --

THE COURT:  All right.  Go ahead and look at it, but I

would like to enter it so that some version of it -- look at it

and then mark it up and indicate your objections and fix it the

way you are suggesting also and, if you would, then send it -- you

can send your comments and -- then put your comments on the record

and you can send the marked-up version to opposing counsel and

1    to -- I guess they filed their marked-up version, so go ahead and

2    file your marked-up version also.  But we want to get this entered

3    so everyone knows by tomorrow morning that they're producing

4    documents.

5            MR. BROWN:  Thank you, your Honor.

6            MR. RUSSO:  Yes, ma'am.  Thank you.

7            THE COURT:  What did you have next?  I cut you off.

8            MR. RUSSO:  Yes, ma'am.  The state defendants have two

9    outstanding issues, the first being -- also involving production

10   of documents.  We've requested all of the materials that

11   Dr. Halderman relied on for, amongst other things, his

12   presentation that was done at the hearing last year.  And we're at

13   an impasse regarding production of the memory card that was used

14   in that demonstration.

15           Plaintiffs are willing to allow us to go to Ann Arbor to

16   inspect it on Dr. Halderman's -- I guess his equipment; however,

17   similar to, you know, state's production of confidential

18   information to them, we think that they should be producing that

19   to us.  And we'll agree to confidentiality agreements, just like

20   they're going to have to sign, but, you know, we think we should

21   be able to look at it in our own environment.

22           MR. CROSS:  Your Honor, this is David Cross.

23           THE COURT:  Yes.

24           MR. CROSS:  The challenge we have with this is the

25   memory card contains the malware that Dr. Halderman uses to

1   manipulate the election results as your Honor saw in the

2   demonstration in the hearing last September.  This is -- we're

3   talking worlds of sensitivity beyond anything to do with the GEMS

4   databases.  There's a false equivalency to suggest they're

5   anywhere near the same.  And we're just not comfortable giving

6   that type of software to anyone, including a state government.

7            Dr. Halderman has secured that in all the time that he's

8   had it.  There's no reason they can't go to look at it -- they've

9   already agreed to go to Michigan to inspect other equipment, like

10  the DRE machines used in the demonstration.  They're going to have

11  to go to Michigan regardless, there's no additional burden on

12  them.  But it is just -- the risk of that getting out is just too

13  high, it's way too high.

14            THE COURT:  Well, are you objecting to them bringing a

15  laptop themselves, a separate laptop, same sort of thing that --

16            MR. CROSS:  David Cross again.

17            They have not proposed that.  If there is equipment they

18  need to bring, we certainly can discuss that, and Dr. Halderman

19  can weigh in on that.  As long as they're not taking a copy of the

20  malware with them, we have no problem with them using whatever

21  equipment they need to inspect it, to look at it, to understand

22  it, and Dr. Halderman can speak more to that specifically.  But

23  the key is that that software cannot leave Dr. Halderman's

24  environment, it is just way too big of a risk.

25            MR. RUSSO:  Your Honor, this is Vincent Russo.

1       The state defendants are not -- we're not going to Ann
2  Arbor to depose Dr. Halderman as of right now and we -- not before
3  the PI it does not appear but possibly.  However, there's no -- we
4  don't have plans to go up and inspect the DRE that he did the
5  demonstration on.  And, frankly, it's the memory card that really
6  is the main ingredient anyway.
7       THE COURT:  Well, you know what, the way this has arisen
8  is just -- most recently is my seeing the state's response to
9  Mr. -- today that was filed, or late last night.  I can't remember
10 which any longer, but late last night, whatever time it was
11 yesterday evening.  I looked at it late last night, so I don't
12 know when you filed it.
13       But what I would suggest is that if -- there has to be a
14 way that they can really look at it and whether it's Friday or a
15 different day, at least I'm going to give Dr. Halderman the
16 same -- you know, go through the same process I tried to before
17 with the state, is that plaintiffs' counsel for Dr. Halderman
18 should actually provide a proposal for how they can actually
19 evaluate it because it is a basis of his opinion.  And I have no
20 idea what's involved, and I haven't gotten any information about
21 that.  And I hear the concerns about gross threats but that's
22 generally stated and I would have to have more.
23       But I think, you know, to start off with from a
24 problem-solving perspective, it seems to me that, Mr. Cross, you
25 and Dr. Halderman, or Ms. Chapple and Dr. Halderman, need to be

1  thinking about what you're going to propose, and then

2  Dr. Halderman would have to provide some sort of affidavit as to

3  why other alternatives are not -- why this is the best alternative

4  and why other alternatives are not a factor.

5          MR. BROWN:  We can do that, your Honor, thank you.

6          THE COURT:  I don't want to keep on dealing with this

7  obviously, but, you know, time is of an essence to the state too.

8  So, you know, I doubt we're going to have all that resolved by

9  Friday, and it might be that Mr. Beaver wants to go up with

10  somebody at a different day, but obviously time is of the essence.

11  So I would like you to have something that addresses that out to

12  the state by tomorrow.

13          Can you do that?  I know you're trying to get the labs

14  done and everything else.  Are you going to be able to do that by

15  noon tomorrow in terms of at least a proposal so you can talk

16  about it?

17          MR. BROWN:  Yes, your Honor.

18          MR. CROSS:  This is David Cross.  Are you asking that

19  we file that with the Court or send that to the defendants?

20          THE COURT:  I would prefer you be able to first talk,

21  obviously, so that you can talk and if you can't all resolve it,

22  you can file whatever you're going to file, but they would -- it

23  seems to me to have something in writing to them about what you're

24  proposing is important so they can review it and have something

25  concrete and they can go over with either Mr. Beaver or Mr. Barnes

 1   or their designees tomorrow.  And then if you can't resolve any of

 2   it, you'll have to file something by Monday at noon.

 3            MR. CROSS:  Thank you, your Honor.

 4            MR. RUSSO:  Thank you, your Honor.  And that goes into

 5   our other issues with one of our own experts, Dr. Michael Shamos,

 6   who has a declaration attached to plaintiffs' response to the

 7   preliminary injunction motion that was filed yesterday.  He's a

 8   professor at Carnegie Mellon in computer science.  He actually

 9   has -- he's on vacation with his grandchildren the week of the

10   hearing, and we've been trying to figure out alternatives to allow

11   him to be able to testify.

12            We presume the Court would like to hear from him live,

13   and maybe you'll know more after you see his declaration, but

14   we've discussed potentially a video deposition.  He could be

15   deposed on the 19th that we could do to preserve his testimony for

16   the hearing or possibly have him phone in to the -- to the hearing

17   on the 26th.  Of course, he wouldn't be able to hear plaintiffs'

18   testimony --

19            THE COURT:  Where will he be?  This is a terrible

20   circumstance but where will he be?

21            MR. RUSSO:  My understanding is he's out of the country.

22   Actually -- so apparently some trip he had planned with his

23   grandkids for some time.  And we just retained him.

24            And the other offer we propose is he could come on

25   Monday after the weekend and testify live if that's what you would

1  like.  We wanted to make sure that you were aware of the issue

2  and, you know, I wanted to put that on the table.

3          THE COURT:  What do opposing counsel think?

4          MR. BROWN:  We don't think you need to deal with this

5  right now.  This is Bruce Brown.  I think that the arrangements

6  for his deposition, whether it gets taken or whether or not he can

7  appear, may go into the weight that you give his affidavit, his

8  declaration, but that the arrangements I think is something that

9  we'll try to work out.  And if one side or the other isn't

10 reasonable about making accommodation, then you can take that into

11 consideration in the weight that you give his declaration.

12         THE COURT:  Well, why don't y'all keep on talking about

13 it and, you know, obviously if somebody's taking his deposition,

14 you have a right to do so, it would be better to have it on video.

15 It doesn't mean I wouldn't have questions, though, that's the only

16 issue.  But why don't you try to figure that out because I know

17 the week afterwards I have a trial, a criminal trial, and I don't

18 know when anyway the expert is coming back or would be available

19 anyway, but it would be useful for me to know when that would be.

20         MR. RUSSO:  Yes, ma'am.  We can do -- one suggestion

21 would be a video deposition, although the deposition would be

22 prior to many additional supplemental declarations of plaintiffs'

23 experts and then -- if you have questions, then have him available

24 by phone for additional questions or video conference so that way

25 we can kind of cut down on some of the time.  Also you would have

1  the video deposition that would be as direct and I guess -- at

2  cross and then we could address any further rebuttal and questions

3  you have on a video conferencing --

4           THE COURT:  All right.  I think y'all need to work on

5  this some more.  I haven't looked at the affidavit.  It's

6  difficult for me to assess at this juncture and it sounds like you

7  all haven't gone through the whole process.  I always try to

8  accommodate everyone and obviously try to accommodate people who

9  have long-term vacation plans with their families, but it's

10 important too, so we have to figure out something that's going to

11 be viable.  And, of course, I did consider experts in the last

12 preliminary -- their affidavits in the last injunction hearing who

13 didn't appear in front of me too and really studied them as well.

14          So I guess we'll have to talk about it next week after

15 you all spend some more time trying to hash that out.

16          MR. CROSS:  Your Honor, this is David Cross.  The only

17 point I want to make is that we oppose any extension for altering

18 the schedule of the hearing.  The one fact that I think is

19 important here is that we've learned from the defendants that they

20 retained Dr. Shamos when they knew he would not be available for

21 the hearing.  This isn't a situation that was rushed upon them.

22          And I agree, it's not something that has to get resolved

23 today.  If we have to do this by deposition, we could probably

24 work that out.  But I just wanted to make clear --

25          THE COURT:  I heard that.  I heard that.

1          MR. RUSSO:  Vincent Russo.

2          I just point out there's only so many experts in this

3     field across the country.

4          THE COURT:  And I understand that too.  I understand

5     that.  I live in the real world.

6          So we're going to get something back from you basically

7     ASAP so that Ms. Cole and I can get out an order on the protective

8     order, right?

9          MR. RUSSO:  Yes, ma'am.  This is Vincent Russo. I'm

10    going to do it right when we get off this call.

11         THE COURT:  Thank you.  It's 2:09.  So you think you can

12    get it to us in an hour?

13         MR. RUSSO:  Yes, ma'am.

14         THE COURT:  And I think that when you're -- I mean, go

15    ahead and file it but e-mail it to Ms. Cole before you do anything

16    else simply so if you're having to get somebody else to do the

17    filing process for you, we get it as soon as possible.

18         MR. RUSSO:  Yes, ma'am.

19         THE COURT:  And, you know, as we're talking about the

20    issues about the card, obviously Dr. Halderman has his own

21    proprietary interest in that as well besides the security issue,

22    so I don't know how that factors in but obviously it probably is

23    one other factor that you need to all discuss when you're trying

24    to get this resolved.  But I haven't been in, you know -- that

25    whole business about Dr. Halderman's card only has just arisen.

1  I'm just throwing it out to get you to deal with all issues at

2  once and we don't have this, you know, sputtering on and on and

3  on, okay.

4       All right.  Well, hopefully we've moved forward a little

5  bit.  Good luck and I know we'll be hearing from you all.

6            MR. RUSSO:  Thank you for your time, Judge.

7            MR. BROWN:  Thank you, your Honor.

8            MR. CROSS:  Thank you, your Honor.

9            (PROCEEDINGS REPORTED WERE CONCLUDED AT 2:20 P.M.)

10                    _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3

4   UNITED STATES DISTRICT COURT

5   NORTHERN DISTRICT OF GEORGIA

6

7            I do hereby certify that the foregoing pages are a true

8   and correct transcript of the proceedings taken down by me in the

9   case aforesaid.

10           This the 12th of July, 2019.

11

12

13

14

15

16

17           _____
                 PENNY PRITTY COUDRIET, RMR, CRR
18               OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```