UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING,      et al.,          )
        Plaintiffs,                  )
                                     )        CIVIL ACTION FILE
v.                                   )
                                     )        NO. 1:17-cv-02989-AT
BRAD RAFFENSPERGER, et al.,          )
        Defendants.                  )
_____

DEPOSITION OF
JOSEPH KIRK

July 11, 2019



APG USA, INC.
www.APGreporting.com
(770) 827-1223

```
               UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
                    ATLANTA DIVISION


DONNA CURLING, et al.,        )
                              )
      Plaintiffs,             )
                              )    CIVIL FILE ACTION
vs.                           )
                              )    NO. 1:17-cv-02989-AT
                              )
BRAD RAFFENSPERGER, et al.,   )
                              )
      Defendants.             )
_____)
```

DEPOSITION OF

JOSEPH KIRK

July 11, 2019

9:46 a.m.

Frank Moore Administration & Judicial Center

135 West Cherokee Avenue

Cartersville, Georgia


Marsi Koehl, CCR-B-2424




APG USA, INC.
www.APGreporting.com
(770) 827-1223

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

                    C O N T E N T S

                E X A M I N A T I O N


                                                    Page

Examination by Mr. Powers.........................6


                    E X H I B I T S

Plaintiff's
Exhibit No.            Description                   Page

Exhibit 38            Notice of Deposition            5

Exhibit 39            Subpoena                        9

Exhibit 40            Coalition's Request for        10
                      Documents

Exhibit 41            Incident Reports               12

Exhibit 42            Agreement for the              13
                      Conduct of Elections

Exhibit 43            What to Keep and Who           14
                      Gets It

Exhibit 44            Center for Elections           14
                      Systems

Exhibit 45            Election Update                15

Exhibit 46            Incident Report                17

Exhibit 47            Election Update                21

Exhibit 48            Invoices                       23

Exhibit 49            Subpoena                        23

Exhibit 50            Daily Tribune Article          67

Exhibit 51            Bartow 000241                  69
                      E-mail String

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                    7/11/2019

```
 1                     E X H I B I T S

 2   Plaintiff's
     Exhibit No.            Description              Page
 3

 4   Exhibit 52            Bartow County Election     72
                           Board Meeting Minutes
 5
     Exhibit 53            Bartow 000286              97
 6                         Voter Complaints

 7   Exhibit 54            Article                   101

 8   Exhibit 55            Daily Tribune Article     109

 9   Exhibit 56            Bartow 000058             144
                           Certification of Returns
10
     Exhibit 57            Bartow 000261             146
11                         E-mail String

12   Exhibit 58            Bartow 000270             154
                           E-mail String
13
     Exhibit 59            Ballot and Audio Proofs   169
14                         Sign-off Sheet

15   Exhibit 60            State-Defendants-00000001 179
                           Contract for Ballot
16                         Building Support Services

17   Exhibit 61            Election Results Report   199

18   Exhibit 62            Direct Record Electronic  202
                           Voting Machine Recap
19

20

21   (Original exhibits attached to original transcript.)

22

23

24

25
```

APG USA INC.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

```
 1   APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiffs:
          JOHN POWERS
 3        Attorney at Law
          LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
 4        1500 K Street NW
          Suite 900
 5        Washington, D.C.  20005
          (202) 662-8600
 6        jpowers@lawyerscommittee.org

 7   On behalf of the Defendants:
          CAREY MILLER
 8        Attorney at Law
          THE ROBBINS FIRM
 9        500 14th Street, NW
          Atlanta, Georgia  30318
10        (404) 856-3286
          cmiller@robbinsfirm.com

11
          DAVID R. LOWMAN
12        Attorney at Law
          OFFICE OF THE COUNTY ATTORNEY
13        FULTON COUNTY
          141 Prior Street, SW
14        Suite 4038
          Atlanta, Georgia  30303
15        (404) 612-0246
          david.lowman@fultoncountyga.gov

16
      On behalf of the Witness:
17        J. JAYSON PHILLIPS
          Attorney at Law
18        TALLEY RICHARDSON & CABLE, PA
          367 West Memorial Drive
19        Dallas, Georgia  30132
          (770) 445-4438
20        jphillips@trc-lawfirm.com

21   Also present:

22        Marilyn Marks, Coalition for Good Governance
          Justin Berger, Esq.
23

24        (Pursuant to OGCA 15-14-37 (a) and (b) a
     written disclosure statement was submitted by the
25   court reporter and is attached hereto.)
```

```
 1                P R O C E E D I N G S
 2            (Plaintiff's Exhibit 38 was marked for
 3        identification.)
 4                    JOSEPH KIRK
 5   having been first duly sworn, was examined and
 6   testified as follows:
 7                    EXAMINATION
 8   BY MR. POWERS:
 9        Q.   Good morning.
10        A.   Good morning.
11        Q.   My name is John Powers.  I'm an attorney
12   with the Lawyers' Committee for Civil Rights Under
13   Law.  I'm one of the counsels representing the
14   plaintiffs today and I'll be taking your deposition.
15        A.   Okay.
16        Q.   Could you please state and spell your full
17   name for the record.
18        A.   Joseph Kirk.  J-O-S-E-P-H.  K-I-R-K.
19        Q.   And, Mr. Kirk, have you ever been deposed
20   before?
21        A.   No.
22        Q.   Have you ever offered sworn testimony in any
23   other capacity?
24        A.   I've offered sworn statements before.
25        Q.   In what context were those?
```

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                   7/11/2019

1      A.  Usually, the ones spring to mind, are times

2    where noncitizens register to vote and I -- due to a

3    mistake of a clerk, or error, too, by the Department

4    of Driver Services, I need to --

5    (incomprehensible) -- immigration and they get

6    deported.

7          THE REPORTER:  I'm sorry, sir.  You're

8          going to have to slow down.  I'm having a

9          hard time understanding you.

10         THE WITNESS:  I apologize.

11         THE REPORTER:  Thank you.

12         THE WITNESS:  The last sworn statement I

13         can think of is giving it to the immigration

14         department because someone was registered to

15         vote but was a non-citizen and -- because of

16         a clerical error.  So they would back that

17         out and not deport the person.

18   BY MR. POWERS:

19     Q.  Got it.  And this is through Georgia's

20   automatic voter registration process?

21     A.  This was over 10 years ago --

22     Q.  Got it.

23     A.  -- so before that.

24     Q.  Got it.  And for the benefit of the court

25   reporter, perhaps, I'll go through some rules.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK               7/11/2019

1           And, first, as she mentioned, because she

2    has to be taking the record today, if you could

3    please wait until I finish my sentence before you

4    start answering, I'd greatly appreciate it.  And if

5    you could speak at a steady pace, so she can follow

6    along, it would be most appreciative.

7           Second, if you don't understand one of my

8    questions, feel free to ask for clarification and

9    I'll try to rephrase it so that you do understand.

10          And, finally, I want to make sure that you

11   understand that you're testifying under oath today

12   just the same as if you're in a court of law.

13      A.  I understand.

14      Q.  And you should feel free to take a break at

15   any time as long it's not while a question is

16   pending.

17          MR. PHILLIPS:  Just so I'm clear, where

18       do we stand on objections?

19          MR. POWERS:  In terms, of -- you can

20       state --

21          MR. MILLER:  Yeah, I was going to wait

22       until whenever we did the documents, but

23       I'll go ahead and state my objection for the

24       record.

25          We electronically served objections last

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK                7/11/2019

```
 1        night on all of the parties.  If you have
 2        not received copies of those, please let me
 3        know now.  I believe, Mr. Phillips, we also
 4        cc'd you on that --
 5             MR. PHILLIPS:  Yes.
 6             MR. MILLER:  -- again, as the parties
 7        had consented to in that context.
 8             Most of our depositions -- excuse me.
 9        Most of our objections aren't anything new,
10        but, nonetheless, just to put that on the
11        record.
12             Repeated out of the letter that was sent
13        to you last night, with respect to request
14        1, 2 and 19 that seek post- and pre-election
15        GEMS database files; and request 3, 4 and
16        16, which may also contain information which
17        is protected under state law and at a bare
18        minimum should be subject to a protective
19        order.
20             MR. PHILLIPS:  Just to echo that, on
21        behalf of nonparty Joseph Kirk, I did file
22        an objection yesterday.  I think you-all
23        received that.
24             And the essence of that objection is on
25        those items enumerated by Mr. Miller, I
```

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

```
 1        believe it was 1, 2 and 19, for state law
 2        reasons.
 3             MR. POWERS:  Just kind of for
 4        clarification and housekeeping purposes, I
 5        will, Mr. Phillips [sic], hand you what I've
 6        marked for identification as Plaintiff's
 7        Exhibit 39.
 8             (Plaintiff's Exhibit 39 was marked for
 9        identification.)
10   BY MR. POWERS:
11        Q.  I'll represent that this is the subpoena
12   that we sent out for documents in your deposition.
13             Have you seen this document before,
14   Mr. Phillips?
15        A.  I have.
16             MR. POWERS:  Great.
17             MR. PHILLIPS:  Just for clarification,
18        Mr. Kirk -- you keep calling him,
19        Mr. Phillips.
20             MR. POWERS:  Oh, sorry.
21             MR. PHILLIPS:  That's all right.  I'm
22        Phillips.  He's Kirk.
23             MR. POWERS:  Got it.
24             MR. PHILLIPS:  It's like a Star Trek
25        deposition.
```

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                7/11/2019

```
1              MR. POWERS:  That's right.  That's
2         right.
3              Sorry, Mr. Kirk.
4    BY MR. POWERS:
5         Q.  So I understand, counsel has raised some
6    objections to certain requests within this subpoena
7    attached to this Plaintiff's Exhibit 39.
8              Did you bring any documents with you today
9    in response to the subpoena?
10        A.  I did.
11        Q.  And what documents did you bring?
12        A.  You want me to list all of them?
13        Q.  Yeah.  Why don't we go through them?
14             (Witness hands counsel document.)
15             MR. POWERS:  Okay.  You've handed me a
16        document, Mr. Kirk, that I'm marking
17        Plaintiff's Exhibit 40.
18             THE WITNESS:  And that's all documents I
19        brought with me, either specifically or in
20        general terms.
21             (Plaintiff's Exhibit 40 was marked for
22        identification.)
23   BY MR. POWERS:
24        Q.  And, Mr. Kirk, are these the same documents
25   that your counsel has previously produced to
```

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK        7/11/2019

1  plaintiffs in this matter?

2       A.  Some of them.

3       Q.  Are there -- perhaps, for efficiency's sake,

4  can you distinguish between documents that you --

5       A.  These?

6       Q.  Yeah.

7       A.  That one.  So this is for -- I guess, let's

8  go through it line by line.

9       Q.  Yeah.

10      A.  The first three items -- excuse me, the

11  first two items, we objected to.

12          No. 3 you asked for documents that describe

13  ballot proofing.  I gave you the same documents I

14  gave you last time that were used to proof the

15  ballots for that election.

16          In No. 5, you asked for investigations for

17  duplicate ballots for the reasons of canceling or

18  just investigating.  You can't investigate a ballot

19  canceled.  It's not possible once it's cast.

20          But I have had people vote twice in the

21  past, in that time frame, and those are records of

22  the investigations into those double votes.

23          And there's at least one thing in there

24  that's new to you that you didn't get last time.

25      Q.  Okay.  If we can just stop for a second,

Curling et al. v.         Deposition of
Raffensperger et al.      JOSEPH KIRK                    7/11/2019

1  what I'll do is as we're going through and you're
2  handing me stuff, I'll go ahead and mark it as an
3  exhibit and then we can move on to the next one.
4          Does that work for you?
5      A.   That's fine.
6          (Plaintiff's Exhibit 41 was marked for
7      identification.)
8  BY MR. POWERS:
9      Q.   So I'm marking the documents you just
10  referenced as Plaintiff's Exhibit 41.
11     A.   Okay.
12     Q.   So add it to the pile.
13     A.   So just leave it in the middle of the table?
14     Q.   Yeah, and we can move on.
15     A.   That brings us to No. 6.  I have nothing in
16  response for that request.
17          No. 7, information on retrieval of specific
18  cast vote record for the purpose of research and
19  canceling, no response to that request.
20          No. 8, I gave you the same official election
21  bulletin I gave you the last time.  That's the only
22  thing I've got for that.
23          No. 9, you asked for contracts I had with
24  municipalities to conduct their elections on their
25  behalf.  That's a copy of each of them.  They are all

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK            7/11/2019

```
 1  basically the same.
 2            MR. POWERS:  Great.  Thank you.
 3            And I am going ahead and marking those
 4       contracts you just referenced as Plaintiff's
 5       Exhibit 42.
 6            (Plaintiff's Exhibit 42 was marked for
 7       identification.)
 8  BY MR. POWERS:
 9       Q.  All right.  Let's move on.
10       A.  That brings us to 10.  You asked for a
11  document that describes the number of databases that
12  were created for the November 6, 2018 election, I
13  believe.
14       Q.  Yeah.
15       A.  I wasn't entirely clear what you meant by
16  that, whether it's back-ups or just where each copy
17  of the database that's external to my office went.
18  That's the direction I went with it.
19            (Reporter instructs witness to slow down
20       and speak clearly.)
21            THE WITNESS:  In this case, this is a
22       document called, Who Gets What and Who Gets
23       to Keep It from the Secretary of State's
24       Office that describes record retention
25       policies after the election.  That includes
```

```
 1        the two databases that's external to my

 2        office.

 3             MR. POWERS:  Great.  And I am marking

 4        that as Plaintiff's Exhibit 43.

 5             (Plaintiff's Exhibit 43 was marked for

 6        identification.)

 7             MR. MILLER:  Just to be clear, we're on

 8        request 10 right now or 11?  I'm sorry.  I

 9        missed that.

10             THE WITNESS:  Ten.

11             MR. MILLER:  Ten, okay.

12   BY MR. POWERS:

13        Q.  Okay.

14        A.  The next one, you've asked for changes in

15   procedure for the DRE voting system, specifically for

16   the security.  This is a training presentation for

17   the Center of Election Systems.

18             MR. POWERS:  Great.  And I will go ahead

19        and mark this as Plaintiff's Exhibit 44.

20             (Plaintiff's Exhibit 44 was marked for

21        identification.)

22             MR. POWERS:  Okay.

23             THE WITNESS:  You asked for all

24        communications from the Secretary of State's

25        Office related to security threats to the
```

1    voting system or election-related equipment

2    after January 1st, 2016.

3        Sorry.  I'm not sure what in here you

4    haven't had before I didn't give you last

5    time.

6        MR. POWERS:  I'll go ahead and mark this

7    as Plaintiff's Exhibit 45.

8        (Plaintiff's Exhibit 45 was marked for

9    identification.)

10  BY MR. POWERS:

11      Q.  And could you explain -- it looks like it's

12  a pretty big stack, so could you explain it in a

13  little more detail?

14      A.  They are election updates.  I'm assuming at

15  this point you're familiar with what election updates

16  are.

17      Q.  Yeah.  Sorry, but for the sake of the

18  record, why don't you explain what election updates

19  are?

20      A.  Basically, communication from the Secretary

21  of State's Office to election officials about changes

22  to procedure or reminding us of things or pretty much

23  anything they need to tell us in an official

24  capacity.

25      Q.  Are these election updates the same thing as

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK          7/11/2019

1  OEBs?

2      A.  No.  Which is the next thing I was about to

3  say.  There are also official election bulletins in

4  there which are usually more formal than the election

5  updates.

6          MR. POWERS:  I see.  And I'm, again,

7      marking for the record Plaintiff's

8      Exhibit 45.

9          THE WITNESS:  There are also a couple of

10     E-mails in there from Chris Harvey that went

11     out statewide, as well as a memo from the

12     Department of Homeland Security and a -- at

13     the back, a respective document from the

14     Department of Homeland Security about

15     security issues for elections that came from

16     the Secretary of State's office.

17 BY MR. POWERS:

18     Q.  Got it.  Very good.  What's next?

19     A.  Next, you asked for any alleged voting

20 system malfunction for the November 6, 2018

21 elections.  I gave you all that last time, so there's

22 nothing new.

23     Q.  Mm-hmm, right.

24     A.  No. 14, you asked for any kind of analysis

25 or investigation of the undervotes of the lieutenant

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1   governor's race.  I have nothing in response to that

2   request.

3          No. 15, any communications received from

4   pretty much anybody about alleged inaccuracies in the

5   express poll data for the November 6, 2018 general

6   election.  I have two incident reports from one of my

7   polling places where voters alleged that they had

8   submitted change of address forms that were not

9   reflected at the polling place on election day.

10          I say "alleged" because the data was

11   correct; voters just thought they changed their

12   address.

13          MR. POWERS:  Thank you.  And I will mark

14       that as Plaintiff's Exhibit 46.

15          (Plaintiff's Exhibit 46 was marked for

16       identification.)

17   BY MR. POWERS:

18       Q.  How are you able to determine for the voters

19   in -- referenced in Plaintiff's Exhibit 46 that the

20   information in their voter registration file was

21   accurate?

22       A.  That was a long time ago when I did that

23   investigation, at least it feels that way now.  But

24   I'm assuming that I went back and looked at the

25   paperwork we had on file to see why either it wasn't

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1   processed or if it wasn't even submitted.

2          In many cases voters think they submit

3   something when it never happened or the card is

4   filled incorrectly at the polling place on election

5   day where they put their new address on the bottom of

6   the form, their old address at the top of form so

7   that they're confirming their old address rather than

8   changing it.

9          That's been a big problem for us.

10     Q.   Mm-hmm, got it.

11          So take -- I hand you back Plaintiff's

12   Exhibit 46.  And if you could describe what this

13   voter is alleging said happened to him or her.

14     A.   What the form says, Darrin Prewett.  Wrong

15   precinct.  Express poll says he should vote at the

16   ATCO Baptist Church -- or ATCO Baptist.  This was at

17   the Woodland precinct.

18          His wife is registered at this precinct.  He

19   said he voted here in the presidential election.  He

20   was not happy.

21          I told him to go to the Elections Office to

22   get it fixed.  And I cannot tell you the specifics of

23   that situation.

24     Q.   Just to make sure I understand it,

25   Mr. Prewett and his wife were registered at different

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1  polling places; is that correct?

2       A.   Mm-hmm.

3       Q.   And he's saying -- and, sorry, again, for

4  the sake of the record, when I ask a question -- and

5  I do this sometimes, too -- instead of saying

6  "mm-hmm," if you could please say "yes" or "no."

7            So Mr. Prewett and his wife were at

8  different polling places in terms of their voter

9  registration; is that correct?

10      A.   That's what the document says.

11      Q.   And Mr. Prewett is saying, I submitted a

12 change of address information to be at the same

13 address as my wife; is that right?

14           MR. MILLER:  John, if you don't mind,

15      I'm going to go ahead and state an objection

16      with respect to the scope of discovery in

17      this case.  As long as we're talking about

18      documents that are here, you know, okay for

19      now.  But just to go ahead and put it on the

20      record.

21           This is venturing into common cause

22      territory, a case that's already been

23      settled, not regarding the DRE voting

24      machines.  It's items that we've mentioned

25      before but just to go ahead and put it on

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK          7/11/2019

```
 1        the record.
 2  BY MR. POWERS:
 3        Q.  You may answer.
 4        A.  And, no, that's not what it says.
 5        Q.  Okay.  Sorry.
 6        A.  It says nothing about when he changes his
 7  registration, just that he was upset he wasn't
 8  registered at the same location as his wife.
 9        Q.  And turning to the next page in Plaintiff's
10  Exhibit 46, could you please explain the complaints
11  raised by Ms. Bell?
12        A.  This one is also at the Woodland Precinct.
13  It says, Sharon Bell.  Wrong precinct.  She said this
14  happened the last four times.  I suggested she come
15  by the office to get it corrected.
16            And this I suspect -- and this is
17  speculation without going back and researching it.
18  But this is an issue we've had a lot of problems with
19  at our polling places, where a voter tries to change
20  their address and because the form -- the voter
21  registration form bottom says "change of address" and
22  requests a previous address, the voter thinks that
23  means that the change goes at the bottom and the
24  current address goes at the top.
25            The poll worker doesn't catch it because
```

1   they're in a hurry.  We get it back at the office.

2   Have to process it the way the voter submitted it.

3   They come back the next election and say, I did this

4   last time.

5         And this is an issue I've been taking care

6   of with training.  We're chipping away at it.  It's

7   getting better, but it happens.

8        Q.  Okay.  Got it.  Thank you.

9         Are there any other sets of documents that

10  you've brought with you today that you haven't

11  brought with you before?

12       A.  Let's see.  That was 15.

13        Sixteen, you requested -- oh, yes -- any and

14  all documents talking about transmission of files to

15  and from the Center for Election Systems.

16        MR. POWERS:  I am marking these

17     documents as Plaintiff's Exhibit 47.

18        (Plaintiff's Exhibit 47 was marked for

19     identification.)

20        THE WITNESS:  Just to run through these

21     documents real quick.  Most of it is

22     communication from the State on a statewide

23     level about timing and things of that nature

24     and logistics.

25        There are a coupling of buzz posts on

1              there, which I guess for the record is a

2              message board on a statewide website called

3              Firefly that most administers use to

4              communicate both either statewide guidance

5              or a couple of questions from counties on

6              how to proceed.  And then some schedules for

7              pickup and delivery of express poll files or

8              GEMS database.

9    BY MR. POWERS:

10         Q.  Great.  Thank you.

11              Aside from those documents, any other others

12   that you didn't produce in response to plaintiff's

13   first subpoena?

14         A.  Next one, 17, is completely the same as last

15   time about the pilot project.

16              Invoices -- No. 18 is invoices for paper

17   ballot cost for the 2012 election -- or 2018, excuse

18   me.

19         Q.  Thank you.

20         A.  Those are invoices.

21              MR. POWERS:  And I'll go ahead and --

22              THE WITNESS:  And, of course, we object

23         to -- which is No. 19.

24              MR. POWERS:  Sorry.  Just to go back, I

25         will mark the invoices that you just

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

```
 1        referenced as Plaintiff's Exhibit 48.
 2            (Plaintiff's Exhibit 48 was marked for
 3        identification.)
 4  BY MR. POWERS:
 5      Q.  Great.  And, again, for -- so those are all
 6  the documents?
 7      A.  Those are all the documents that I believe
 8  are different from the documents you got in the past
 9  and then I have other documents that I think are
10  duplicates.
11            MR. POWERS:  Great.  Again, for
12        housekeeping purposes, I am handing you what
13        I've marked for identification as
14        Plaintiff's Exhibit 49.
15            (Plaintiff's Exhibit 49 was marked for
16        identification.)
17  BY MR. POWERS:
18      Q.  I'll represent to you that this was the
19  first subpoena that we sent out on June 13th, 2019.
20            Do you see that date?
21      A.  I see June 27th.
22            Oh, there it is.  There it is.  Yes.
23      Q.  And you -- Mr. Kirk, you previously provided
24  documents in response --
25            MR. PHILLIPS:  Just to be clear,
```

APG USA INC.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

```
 1         Mr. Powers.  There are multiple dates on
 2         this document.  Can you just clarify which
 3         date you're referring to?
 4              MR. POWERS:  Sure, sure.  I'm -- that's
 5         fair.
 6    BY MR. POWERS:
 7         Q.  Mr. Kirk, do you see where I'm, at the
 8    bottom of the page, referring to the date of service
 9    right above clerk of court and the attorney Bruce
10    Brown's signature?
11         A.  I do see that now.  It does say June 13th
12    and I apologize.  I said the document production date
13    the first time.
14         Q.  No problem.
15              And, Mr. Kirk, you previously before today
16    produced documents in response to this subpoena;
17    correct?
18         A.  I did.
19         Q.  Thank you for bearing with me through the
20    housekeeping.  We may return to some of those
21    documents later.
22              Let's go through a little bit about your
23    background.  Mr. Kirk, how long have you been a
24    resident of Bartow County?
25         A.  Since September of 2007.
```

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                  7/11/2019

1      Q.   Great.   And let's go back a little further.
2           Would you mind telling me little bit about
3  your educational background?
4      A.   I have a degree in computer science from the
5  University of Georgia.
6      Q.   Are you a lifelong Georgia resident?
7      A.   I am.   I moved out briefly to Mississippi
8  for a couple of years after college, but then I moved
9  back.
10     Q.   Where were you born, Mr. Kirk?
11     A.   Rome, Georgia.
12     Q.   Could you please tell me a little bit about
13 your postgraduate professional background?
14     A.   After I graduated, I worked for the
15 Secretary of State of Mississippi for around two
16 years implementing their statewide DRE voting
17 solution and was working as a contractor.   Decided
18 I'd like to be a regular employee and be closer to
19 home.   Applied for the job here in Bartow County.
20 Was successful and have been here since.
21     Q.   Thank you.   And, roughly, during what years
22 did you work for the Mississippi Secretary of State's
23 Office?
24     A.   Roughly 2005 to 2007.
25     Q.   Could you describe a little more what work

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK          7/11/2019

1  you were doing with respect to implementing the
2  State's DRE voting solution statewide?
3      A.  My role was to interface with the vendor,
4  with the county election officials.  I was in
5  charge -- well, not in charge of, but I wrote the
6  bulk of the training documentation for the voting
7  system.
8          We developed a statewide document for how to
9  conduct elections in Mississippi starting with
10 qualifying and ending with certification and
11 retention.
12         And mostly focused on training.  And if
13 you're familiar with the liaison role here in
14 Georgia, similar to that.
15     Q.  For the sake of the record, would you mind
16 describing what the liaison role --
17     A.  The liaison role at the Secretary of State's
18 Office is one that the county election officials
19 interface with as their first point of contact with
20 the State.
21         So if we have a question, if we have a
22 concern, if we need information or need to send
23 something in, that's our first point.
24     Q.  Right now, who's the liaison at the
25 Secretary of State's Office who you work with when

Curling et al. v.      Deposition of
Raffensperger et al.   JOSEPH KIRK          7/11/2019

```
1  you have questions?
2       A.  Lee Combs.
3       Q.  I'm sorry.  I didn't quite hear that myself.
4  Kemps?
5       A.  Lee Combs.
6       Q.  Combs.  Got it.
7       A.  I think that's her last name.  She's a
8  little new to the role.  I haven't talked to her too
9  much yet, so if I have her last name wrong, I
10 apologize.
11      Q.  No problem.
12          Who was the liaison before that?
13      A.  Melanie Frechette.
14      Q.  What was the DRE voting system that you were
15 working to implement in Mississippi during that 2005
16 to 2007 period?
17      A.  The -- I guess the best way to describe it
18 is the AccuVote TSX voting system with attached paper
19 trail, which I think at the beginning was produced by
20 Diebold and then changed to Premier and then...
21      Q.  As part of your work, were you involved at
22 all in any programming or database building kind of
23 work?
24      A.  I was.
25      Q.  Could you describe to me what work you were
```

Curling et al. v.         Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1  doing along those lines?

2      A.  Not much.  Mississippi chose to heavily rely

3  on the vendor to help them through that process.  And

4  as such, a lot of the database development was done

5  that way.

6          My role was more, like I said, training and

7  run training documentation.  So, yes, I knew how to

8  do it, but I wasn't actually doing it for the

9  counties.

10         Some other thing to mention about

11 Mississippi is that it's opposite of the State of

12 Georgia where it's bottom up rather than top down.

13 So we were -- there was more negotiation with the

14 counties than telling them what to do.

15     Q.  Could you explain how Georgia differs from

16 Mississippi in that regard?

17     A.  In Georgia, the Secretary of State's Office

18 had statutory authority through role making

19 capability to specify how we do certain things.  Now,

20 our local board retains a lot of authority for

21 interpretation and how we actually implement the

22 laws.  But the State can tell us what to do in

23 certain cases, where in Mississippi we had no

24 authority to tell them to do anything.

25     Q.  Got it.  And I'm trying to make sure I

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1  understand this correctly.

2          Is it fair to say that in Mississippi the

3  vendor did the vast majority of the programming of

4  the DRE machines?

5      A.  While I was there.  Now, after I left, I

6  couldn't tell you what happened.

7      Q.  Is it fair to say that in Mississippi during

8  the period you were there the vendor did the bulk of

9  the database building, for example, building ballots

10  and that sort of thing?

11      A.  Yes.

12      Q.  Does that differ at all from how things work

13  in Georgia?

14      A.  I think so.  The difference is in

15  Mississippi they were never trained on how to do it

16  on the county level.  While I was there, we were to

17  the point they could be absolutely autonomous in that

18  process.

19          Not to go too deep into that, but the

20  intention was for two pieces of software to interface

21  with each other.  And the two vendors never managed

22  to make it work.  So the vendor doing all the

23  programming was a stopgap measure --

24          THE REPORTER:  I'm sorry.  The vendor

25      doing all the what?

Curling et al. v.          Deposition of
Raffensperger et al.       JOSEPH KIRK          7/11/2019

```
 1          THE WITNESS:  Doing all the programming
 2      was a stopgap measure to try to get by until
 3      the software worked properly.
 4          This interface was an export out of the
 5      voter registration system into the election
 6      system and it was -- the data types didn't
 7      match.
 8  BY MR. POWERS:
 9      Q.  And with respect to that, you're talking
10  about Mississippi; correct?
11      A.  Absolutely.  In Georgia, we can program the
12  databases ourselves if we want to.  And some of us do
13  have that knowledge.  I've never chosen to go down
14  that path, but we can.
15      Q.  Mm-hmm, mm-hmm.  And let's talk about
16  specifically when you say "programming databases,"
17  what specifically are you talking about?
18      A.  How do I word this?
19          I'm talking about configuring the GEMS
20  software and election file with all the underlying
21  information that creates the ballots, the candidate
22  names, the race names, the headers, all that, to
23  appear correctly on the paper ballot or a voting
24  machine screen.
25      Q.  Got it.  Thank you.
```

APG USA INC.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK            7/11/2019

1          This is something that you'd have the

2    capability of doing yourself if you want to?

3          A.   Yes.

4          Q.   Is training provided on how to do that by

5    the Georgia Secretary of State's Office?

6          A.   I'm actually not sure.

7          Q.   Did you train yourself to be able to do that

8    kind of programming?

9          A.   I was trained on it.  Going back farther in

10   my career, while I was in college I worked for the

11   Center for Election Systems.  In fact, I was one of

12   the first people that was hired there.  So I received

13   training through that job to create a database.

14         Q.   Oh.  When did you work at the Center for

15   Election Systems?

16         A.   From 2001 or 2002 throughout my college

17   career.  I started working there the summer of my

18   freshman year.  I helped write the original

19   acceptance test.  And then after that I worked as an

20   acceptance tester during the summers going to between

21   counties, testing the old equipment to any new

22   equipment or initial all new equipment to make sure

23   it functioned properly.

24         Q.   Let's break that down a little bit.  Help me

25   out.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1          You said that you helped write the
2   acceptance test.  What does that mean?
3          A.  It's a test that each piece of equipment is
4   put through at the time of its purchase or at the
5   time of its repair to ensure that the hardware
6   functions properly, the software functions properly,
7   the proper software is on the equipment and nothing
8   else is on the equipment.
9          Q.  Mm-hmm.  Did you have any other
10  responsibilities while you were at the Center for
11  Election Systems?
12          A.  I operated a call center.
13          Q.  What kind of calls were you dealing with at
14  the call center?
15          A.  Frankly, not many.  That was right when the
16  system was purchased and KSU got that contract.  And
17  most counties didn't have their equipment yet while I
18  was working at the call center to call to have any
19  questions...
20          Q.  Your role is essentially to help
21  troubleshoot in case counties called --
22          A.  Back then it was mostly logistics.  When are
23  we getting it?  When are you-all coming?  That sort
24  of thing.
25          Q.  What time was that around?

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

```
 1        A.  That was -- that was the summer of my
 2   freshman year.  So 2001, 2002, right around there.
 3        Q.  Who were you working with while you were at
 4   the Center for Election Systems?
 5        A.  I cannot remember my boss's name for the
 6   life of me.  In fact, I've tried to remember that
 7   recently.
 8             There was another person there that I worked
 9   with in the call center named Robby.  I couldn't tell
10   you his last name.  And all this was under the
11   direction of Merle King.
12             And then while I was there, Tara Robey
13   (phonetic) and Anthony -- I cannot think of his last
14   name -- were also there.
15        Q.  Did you work with someone by the name of
16   Britt Williams?
17        A.  Yes.  Thank you.  He was the main author of
18   that test.
19        Q.  Who were you interacting with most
20   frequently on sort of a day-to-day basis?
21        A.  Robby, my boss -- I cannot think of his
22   name -- and then Britt, of course, because of that
23   test.
24        Q.  So is it fair to say you've been working
25   with the current generation of DRE voting machines
```

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1  basically since the inception?

2      A.  Sort of.  When I went to Mississippi, that's

3  a different version of the software on all levels, a

4  different version of the equipment.  There are

5  changes between those.  But theirs was a little bit

6  newer because they bought it a little bit later.  But

7  besides that, yes, I've been working with this my

8  entire career.

9      Q.  Could you explain in more detail for me the

10  differences between the voting machines used in

11  Mississippi versus those used in Georgia?

12      A.  Well, the main difference besides different

13  software numbers and small changes there is their

14  system had a paper trail which was problematic.

15      Q.  Elaborate on that.

16      A.  It's hard to install.  It's hard for the

17  poll workers to operate.  If it jams, there's no

18  indication that it's jammed once the voter looks at

19  the actual paper trail.

20          The question comes up:  What's the vote of

21  record?  The paper receipt that you know is missing

22  votes or the electronic copy that you've tested and

23  are confident that all the votes are there as they

24  should be.

25      Q.  Just so I make sure I understand this.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

```
 1          So with the Mississippi AccuVote TSX
 2  machines that you described earlier, those machines
 3  had an issue where sometimes the voters' choices
 4  would not be recorded on the actual paper receipt
 5  that got spit out after voting?
 6          MR. MILLER:  And, Mr. Kirk, if you don't
 7      mind, I'm just going to object as we
 8      continue to go down the past of Mississippi
 9      on scope and relevance grounds.
10      We've already -- Mr. Kirk has already
11      noted it's different software, different
12      version of the equipment; things of that
13      nature.  I just want to put that on the
14      record.
15  BY MR. POWERS:
16      Q.  You may answer.
17      A.  I apologize.  What was your question?
18          MR. POWERS:  Marsi, would you mind?
19          (Whereupon, the record was read by the
20      reporter as follows:
21      Q.  Just so I make sure I understand
22      this.
23          So with the Mississippi AccuVote TSX
24      machines that you described earlier, those
25      machines had an issue where sometimes the
```

1        voters' choices would not be recorded on the

2        actual paper receipt that got spit out

3        after voting?)

4            THE WITNESS:  The way that paper trail

5        works, there's a security strip.  And after

6        the choices are printed, it rolls up into

7        the canister.  And it clicks.  The voters

8        can hear it.

9            If the printer jams, then that doesn't

10       happen.  And there is no noise.  There is no

11       indication.  And if a voter didn't notice it

12       then, no, their choices were not printed.

13  BY MR. POWERS:

14       Q.  Could you describe the kind of paper trail

15  that was generated by these machines?

16       A.  A sequential record.

17       Q.  What did the sequential record look like on

18  the paper itself?

19       A.  I'm trying to give you an example.

20           There's a window about two inches by

21  six inches, maybe, and it would print their

22  selections, you know, for this race you voted for

23  this person.  It would roll up.  If it was two

24  wanting to fit in that window, you'd have to confirm

25  each print as it went.

Curling et al. v.       Deposition of
Raffensperger et al.    JOSEPH KIRK                7/11/2019

1       If you changed your mind, it would print out
2   a notation saying the previous record shouldn't be
3   counted for a recount.  And then it would start
4   printing again when you got to that final summary
5   screen.
6       Once you confirmed it, it would roll up in
7   the security canister completely.  And that's it.
8       Q.  In contrast, Georgia does not have a paper
9   trail on the DRE voting machines that are currently
10  in use; correct?
11      A.  Correct.
12      Q.  So you worked for -- at KSU.  You worked at
13  the Mississippi Secretary of State's Office.  After
14  that you moved to Bartow County?
15      A.  Mm-hmm.  Excuse me, yes.
16      Q.  What year was that?
17      A.  2007.
18      Q.  2007.
19      What position did you take with the Bartow
20  County Board of Elections?
21      A.  Elections supervisor.
22      Q.  And you've held that role ever since?
23      A.  I have.
24      Q.  What responsibilities do you have as
25  elections supervisor in Bartow County?

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

```
 1        A.   In Bartow County, the board that I serve is
 2   the election superintendent as well as the chief
 3   registrar for county.
 4             By the local -- (incomprehensible) -- of the
 5   board, I'm their -- I'm the secretary of that board
 6   and their administrative designee to take care of
 7   their day-to-day office matters.
 8             THE REPORTER:   Secretary of that
 9        board and?
10             THE WITNESS:   Their administrative
11        designee to take care of day-to-day office
12        matters.   I'm also department head for
13        Bartow County.
14             Anything relating to voter registration
15        and elections for Bartow County is my
16        responsibility.
17   BY MR. POWERS:
18        Q.   Have you received trainings or
19   certifications in the election administration field?
20        A.   I'm certified through the State of Georgia
21   as required by law.   I do not hold any other
22   professional certifications for elections.
23        Q.   Have you served in any different roles at
24   the state level with respect to elections
25   administration?
```

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1       A.   No.   My role was steady while I was at the

2   Secretary of State's Office for Mississippi.   And

3   while I was here, if you consider my work for the

4   Center at the state level, which I guess you could

5   argue either way, no, I was pretty much just a

6   tester.   When I was out in the field, that's what I

7   did.

8       Q.   When you were out in the field with the

9   Center for Election Systems?

10      A.   Yes.   Exactly.

11      Q.   What's your role with respect to

12   implementing the use of voting machines in Bartow

13   County for elections today?

14      A.   I'm not sure how to answer that question.

15   It is my role to implement voting machines for the

16   next system.

17      Q.   Let's talk about the current system first.

18      A.   Okay.

19      Q.   On a day-to-day level, what are you doing

20   with respect to -- or what might you do to -- with

21   respect to implementing voting machines so that they

22   are functioning on election day?

23      A.   Again, I'm not sure of your question.   The

24   current system has been implemented.   Are you asking

25   what I would do --

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK            7/11/2019

1      Q.   Fair enough.   I'll rephrase the question.

2           With respect to the maintenance and

3   preparation of voting machines for elections, what

4   are you doing on a day-to-day level with respect to

5   the current DRE machines?

6      A.   There are certain maintenance procedures

7   that we go through.   Charging batteries is the one

8   that comes to mind.   We make sure they stay secure.

9   I have a staff member who is charged with these

10  duties.   This is part of her regular job of making

11  sure these maintenance duties are performed.   We also

12  charge the express polls.   We charge the optical

13  scanners.   That's pretty much it.

14          I haven't necessarily had a machine repaired

15  in a very long time because it's more cost effective

16  just to buy another one.

17     Q.   How many voting machines does -- strike

18  that.

19          How many DRE voting machines does Bartow

20  County currently have?

21     A.   Just under 250.   I couldn't rattle off the

22  number off the top of my head but right around there.

23     Q.   How frequently do you have to buy new

24  machines to replace old ones?

25     A.   Not often.   We've been very fortunate here

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK            7/11/2019

1  that machines haven't had mechanical defects at a

2  high enough level to justify buying a lot of them.

3  Not to mention, I've been trying not to buy machines

4  for quite a few years in anticipation of a new voting

5  system.  Why spend money on something that's about to

6  go out?

7        Q.  Sure, sure.

8            Let's say for a typical election that would

9  have occurred before this transition to the new BMDs

10 was taking place, so, say, 2012 or something like

11 that.  How many new machines might you order for a

12 typical election in a situation like that?

13       A.  Like I said not many.  The system has done

14 well for me, so...

15       Q.  Does that mean like two or five?

16       A.  No.  I mean, I can't remember the last time

17 I actually ordered a machine from the manufacturer.

18           There was one instance a year or two ago

19 where another county purchased machines from another

20 state and asked if anybody wanted their old machines.

21 I went and got them.

22           They were tested.  And that's something in

23 our inventory in that I didn't have to worry about

24 machines last year for the higher turnout.

25       Q.  And how many optical scanners does Bartow

1  County currently have?

2       A.   That's a good question, actually.

3            I think six, but two are broken.

4       Q.   Got it.

5            Do you also try to have broken optical

6  scanners replaced as opposed to having them fixed?

7       A.   No.   Those have done pretty well for me.

8  There was a time, I can't remember how long ago, when

9  those optical scanners weren't produced anymore and

10  we went ahead and bought a couple then.   And that's

11  gotten us by until now.

12       Q.   When was that?

13       A.   That, I couldn't tell you.   I do not recall.

14       Q.   How many optical scanners did you buy?

15       A.   I believe two.

16       Q.   Did you buy new optical scanners or used?

17       A.   Those would have been new.   Those would have

18  been new.

19       Q.   Did you buy them directly from the

20  manufacturer?

21       A.   Yes.

22       Q.   And who's the manufacturer?

23       A.   At the time, I'm not sure.   I mean,

24  originally, it was global.   Then it was Diebold.   And

25  then it was Premier.   Global was before my time.   But

1 at what point in the process we were at when I

2 purchased those, I'm not sure.

3      Q.  Mm-hmm, got it.

4      Do you recall roughly how much those optical

5 scanners cost?

6      A.  I do not.

7      Q.  Did you look into whether you could buy them

8 used?

9      A.  At the time, there was a prohibition on

10 buying used equipment.

11      Q.  And that prohibition was a state law?

12      A.  Yes, or a rule from the Secretary of State's

13 Office.

14      Q.  Got it.  Is there currently a prohibition on

15 buying used optical scanners?

16      A.  No.  There is not.

17      Q.  Today would you -- you mentioned you had a

18 couple of broken optical scanners.

19      If you wanted to replace them, would you

20 look at buying used optical scanners?

21      A.  I'm not sure where I could.

22      Q.  Would you say that you're the primary person

23 in the Bartow County elections office responsible for

24 ensuring that the DRE voting system functions

25 properly?

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1        A.   Yes.   The way I see it, I'm responsible for

2   everything my office does.

3        Q.   How many other employees are there in the

4   Bartow County office?

5        A.   Four full-time employees and numerous,

6   numerous temporary employees.

7        Q.   For a typical election, how many temporary

8   employees do you hire?

9        A.   I need you to be more specific.

10        Q.   Fair enough.   Let's take the 2018 election

11   in November.   Could you please tell me about the

12   temporary employees that you would hire for an

13   election like that?

14        A.   I can't think of how many we hired for that

15   election off the top of my head.   Around 150, I would

16   think.   More than we normally get for gubernatorial

17   elections.

18        Q.   What are the responsibilities of the

19   part-time employees that you hire?

20        A.   That all depends what I hire them for.   Can

21   you be more specific?

22        Q.   What different things might you hire

23   part-time employees for?

24        A.   Work as poll workers.   To work as

25   transporters.   To work in the office on general sort

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK        7/11/2019

1  of paperwork or filing tasks.  Pretty much everything

2  that we do.

3      Q.  Who is responsible for testing the DRE

4  voting machines?

5      A.  The primary individual is Beth Howard who is

6  my electronic voting machine technician.  She

7  performs those duties under my direction.  And then

8  if she needs help, we get her however much help she

9  needs, whether that's someone with a strong back to

10 move machines around and set them up for her or

11 people that are there actually helping with the test.

12     Q.  Let's go back to the example of the November

13 2018 election.

14         How far in advance of the November election

15 do you start making preparations with respect to

16 getting the voting machines ready?

17     A.  We'll usually start testing at least two or

18 three weeks before advance voting starts if at all

19 possible.

20     Q.  Can you take me through the process of what

21 happens with respect to testing the machines?

22     A.  Well, I can do my best.  It's been a while

23 since I've performed those tests from start to finish

24 on all the machines.

25         But the first step is to make sure that all

Curling et al. v.          Deposition of
Raffensperger et al.   JOSEPH KIRK                    7/11/2019

1   the machines are physically sound; the legs are
2   operational, the case is in good shape, that sort of
3   thing.
4           After that, machines are turned on.  The
5   software versions are verified -- numerous software
6   versions are verified, actually.
7           Then there's a test to make -- or a series
8   of tests to make sure the hardware functions properly
9   so that the external peripherals, the card reader,
10  the printer, the screen.
11          The screens are calibrated.  If it's an R6,
12  the TSX's screens are not necessarily calibrated.
13          And then you test the ballot to make sure
14  the ballot is -- ballot counts properly.
15          So for each person on the ballot, you check
16  their name off; make sure that transfers to the
17  summary screen.  Then the machine is tested to make
18  sure it counts accurately.
19          Then it's turned off.  Sealed up -- assuming
20  it passed all those tests, turned off, sealed up and
21  the proper paperwork is filled out and it's not
22  unsealed again until election day.
23      Q.  And --
24      A.  Oh, excuse me.  Last step is to reset the
25  counter to zero and prepare for election day.

Curling et al. v.         Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1      Q.   Thank you.

2           What happens if a machine doesn't pass the

3    test?

4      A.   It depends the reason it didn't pass the

5    test.  If say the printer just didn't work, you know,

6    we can't send that machine out.  On an R6 unit, we

7    can't replace the printer.  So that will be set aside

8    and we'll save the case to use on a different machine

9    when the case breaks.

10          If it's a case issue, then we fix it and put

11   the machine back into service.

12     Q.   How frequently does something like that

13   happen?

14     A.   That one is fairly frequent.  The legs have

15   a tendency to be fragile especially as they get

16   older.  So if a leg breaks, of course, we need to

17   replace that leg.  If a proxy panel is cracked, we

18   need to replace that.  There's probably a few each

19   election that she has to go through and repair.

20     Q.   And --

21     A.   To be clear, when I say "repair," I mean the

22   cases not machines themselves.

23     Q.   Right.  So you might be, for example, fixing

24   a broken leg or putting a new privacy panel on?

25     A.   That's correct.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1     Q.   Thank you.
2          And who does those repairs?
3     A.   Either myself or Beth.
4     Q.   Where do you get the -- strike that.
5          How much time does it take to replace a
6  privacy panel or fix a broken leg?
7     A.   Fifteen minutes, maybe.  It's not too bad.
8     Q.   In the event that it's close to an election,
9  is there anyone other than you or Beth who might
10 be -- sorry -- Ms. Howard who might be working on the
11 machines?
12    A.   Not usually, no.  We usually have enough to
13 worry that if -- one machine is not going to stop us.
14    Q.   How much time does it take to complete --
15 well, strike that.
16         How much time does it take all total to
17 complete testing on one DRE voting machine?
18    A.   That's very much dependent on the tester,
19 but I would say on average 15 to 20 minutes.
20    Q.   How much time does it take to test all of
21 the 250 machines for an election such as the November
22 2018 election?
23    A.   That, I couldn't tell you.  The reason is
24 people have other jobs besides just testing voting
25 machines.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1          In a large election, using, say, the last

2    years as an example, November 2018 I, might have to

3    pull employees to go help with the voting because the

4    line is around the building and we need to focus on

5    that and prioritize the current issue.

6          If she was able to just focus on that, I

7    have no idea.  A lot faster, I'm sure.

8          Q.  Fair enough.

9          Sort of -- I'll rephrase the question.

10         What period of time in terms of days or

11   weeks does it take to complete the testing of the 250

12   voting machines?

13         A.  I would be surprised if it takes longer than

14   two or three weeks to complete.  But that's her

15   moving at a very leisurely pace because we try to

16   give her enough time, so she can take the time she

17   feels she needs to to make sure things are working

18   for election day.

19         Q.  Going back, when did Bartow County begin

20   using the current DRE voting system?

21         A.  At the same time as the rest of the state.

22         Q.  When was that?

23         A.  That one I should actually know because I

24   was working at the time.  Was it 2002 or so?  2003.

25   Somewhere around there.  I can't remember when that

1  version was completed.

2        Q.   Somewhere in the 2002 to 2003 period?

3        A.   Right.

4        Q.   Do you know what voting system Bartow County

5  was using before they moved to the current DRE

6  machine system?

7        A.   Optech Eagles.  Optech Eagles.  O-P-T-E-C-H

8  Eagles.

9        Q.   Could you explain to me what that is?

10        A.   Well, the system they had when I got here --

11  in storage when I got here was a precinct based paper

12  ballot scanner.  It's the one where you complete the

13  arrow to vote.

14        Q.   Could you explain what that means, complete

15  the --

16        A.   I'm not sure how else to say that.  There

17  was a partial arrow that you completed to vote.  I

18  mean, it is what it is.

19        Q.   By hand?

20        A.   Excuse me?  Yes.

21             Yes, they were hand marked and they were not

22  HAVA compliant.

23        Q.   How are they not HAVA compliant?

24        A.   They didn't offer a second chance to voters

25  that overvoted or there was another problem with the

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1  ballot; it couldn't be scanned.

2      Q.  Just to make sure I'm clear, what does HAVA

3  require with respect to offering voters a second

4  chance to complete a ballot?

5      A.  That, if there is an undervoted race or an

6  overvoted race that they are notified prior to

7  casting the ballot.

8      Q.  Thank you.

9          Do you know how long that voting system was

10 used for?

11     A.  No.  I do not.

12     Q.  Under the Optech system, was Bartow County

13 using optical scanners for -- for scanning paper

14 ballots?

15     A.  Yes.  They were precinct based ballot

16 scanners.

17     Q.  Just to make sure I'm clear, you weren't at

18 the Bartow County Board of Elections when the Optech

19 system was in place?

20     A.  No.  I was at the Center for Election

21 Systems.

22     Q.  Got it.  Did you have any experience

23 firsthand working with county election officials who

24 were implementing the Optech system?

25     A.  That system specifically, no, and very

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1  little for anything else.

2      Q.  Let's switch gears.

3          What is Bartow County's election calendar

4  for 2019?

5      A.  As of right now we have municipal elections

6  in November.  I couldn't tell you which

7  municipalities are having elections yet.  It all

8  depends on their election cycle and, frankly, who's

9  running.

10      Q.  Are there any county level elections planned

11  for November?

12      A.  There's nothing scheduled right now.

13      Q.  What is Bartow County's election calendar

14  for 2020?

15      A.  The same as the rest of the state's.  As of

16  right now, I don't know of any special elections.

17      Q.  Let's talk about the March presidential

18  primary election for a second.

19          Do you know whether any races beyond the

20  presidential primary itself are going to be on the

21  ballot on the March 24th, 2020 election date?

22      A.  I can't think of anything.

23      Q.  In a situation like a presidential primary,

24  would there only be one ballot style?

25      A.  As long as that's the only race on the

1  ballot -- well, yes.  This year yes.  Otherwise,

2  you'd have us splitting parties.

3       Q.  Let's -- you had mentioned some

4  municipalities will likely be holding elections this

5  coming November?

6       A.  Yes.

7       Q.  Let's talk about -- well, first, what voting

8  system will Bartow County municipalities be using for

9  the November 2019 elections?

10      A.  The new system the State is planning on

11  purchasing or is in the process of purchasing right

12  now.

13      Q.  In past municipal elections, what voting

14  systems were the Bartow County municipalities using?

15      A.  How far back?

16      Q.  Fair enough.  I'll rephrase the question.

17          In the 2017 elections -- strike that.

18          In any municipality elections in 2015 and

19  2017 what voting systems did Bartow County

20  municipalities use?

21      A.  The same system as the county does, the DRE

22  voting system.

23      Q.  How long have municipalities in Bartow

24  County been using the current DRE voting systems?

25      A.  Since before I got here.  When I arrived in

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                7/11/2019

1   Bartow County, they were -- we had contracts from all

2   the cities for them to utilize our equipment.  We

3   programmed it.  We tested it.  We trained them on how

4   to use it and then we tabulated the results for them.

5          About halfway through my time here I started

6   getting contracts from municipalities to conduct

7   elections on their behalf.

8          THE REPORTER:  To what?

9          THE WITNESS:  To conduct the elections

10      on their behalf.  So that, frankly, it's too

11      much for a city clerk to keep track of, to

12      do it properly, and it's easier for us to do

13      it for them.

14          And that's the documents you have there

15      is all the contracts with the cities that

16      specify who's responsible for what.

17  BY MR. POWERS:

18      Q.  Why is it too much for a city clerk to do

19  the elections properly themselves?

20      A.  Well, this is a year-round job for me.  This

21  is my career.  City clerks have a multitude of

22  responsibilities beyond just elections.  And to ask

23  them to have every bit of knowledge that I do to do

24  my job on top of all their other responsibilities, I

25  think is asking a lot of them.  And it's for the

1  benefit of the voters for us to do it correctly.

2      Q.  I know you know all of this.  Help explain

3  to me the pieces of knowledge that city clerks would

4  need to know to run an election themselves using the

5  current DRE machines.

6      A.  Not to be flippant, but all the training on

7  how to use the system and Title 21 of the Georgia

8  Code.

9      Q.  That would require a substantial body of

10  knowledge; correct?

11      A.  I believe so.  Yes.

12      Q.  What responses did you receive from city

13  clerks when you started working as elections

14  supervisor and the clerks were running the elections

15  themselves?

16      A.  A lot of questions.  A lot of problems.  A

17  lot of, This just happened, what should I do?  Even

18  getting supplies from me.  Things like that.

19          There was an SEB case from one of our cities

20  because they assumed that the poll workers that I

21  used came pre-trained when they hired them and

22  weren't actually trained.  They're poll workers.

23  Things like that.

24      Q.  And so in this SEB case, the municipality

25  hadn't trained the poll workers in advance of the

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1  election?

2      A.  No.  They just -- you trained them last

3  November so obviously they're still trained.

4      Q.  Oh --

5      A.  Like I said, it's a lot easier if I just go

6  ahead and do it for them.

7      Q.  Is it fair to say that the technical aspects

8  of maintaining and troubleshooting issues with DRE

9  machines prove to be a problem for at least some of

10  the city clerks with whom you are working?

11     A.  No.  They all understood how to use the

12  machines pretty well.  Their role in that process

13  wasn't to do much besides turn them on like a poll

14  manager does on election day or during advance

15  voting.

16         The issues they faced were very much legal

17  issues and procedural issues not the technology.

18     Q.  Okay, okay.  That's helpful.

19         So how long has Bartow County been running

20  elections on behalf of the municipalities?

21     A.  Well, let me correct something I said wrong

22  the first time.  Since I've been here, we've always

23  done it for the city of Cartersville.

24         The other cities, the earliest contract on

25  this list is 2011.  The latest is 2017.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK        7/11/2019

1      Q.   What elections -- sorry.   Strike that.

2           What municipalities does Bartow County

3  conduct elections for.

4      A.   Adairsville, Cartersville, Emerson,

5  Euharlee, Kingston, Taylorsville and White.

6      Q.   How many polling places -- strike that.

7           Do each of these municipalities have a

8  single polling place for their municipality

9  elections?

10     A.   Cartersville has two.  Everyone else has

11 one.  And those are all combined with the county

12 voting places.

13     Q.   Do the municipalities hold in-person early

14 voting?

15     A.   As a general rule, yes.  The way we've

16 interpreted that statute is once they sign a contract

17 with us, their advance voting site automatically

18 shifts to my office.

19          The way -- there's a main site.  The way we

20 charge for that -- and this is how I got them to sign

21 these contracts -- in a lot of ways, it's cheaper for

22 them.  We charge them on a sliding scale.  So however

23 many -- you know, a percentage of the polling voters

24 that show up at my office, that's their percentage of

25 the cost of those employees.

APG USA INC.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

1       Some cities will go ahead and pay for an

2   additional week for advance -- or a week of advance

3   voting a week prior to the election at their

4   municipal polling place.  The majority of them do not

5   because there was not enough turnout to justify it.

6       Q.  Got it.  Let's break that down.

7       Let's say municipal elections in 2015.

8   There was an advanced early voting location at the

9   Bartow County BOE office?

10      A.  Mm-hmm.  Excuse me, yes.

11      Q.  Thank you.  Which municipalities had their

12  own early voting locations?

13      A.  In 2015?  First, I can't remember which

14  municipalities had elections in 2015 off the top of

15  my head.  Cartersville would have for sure.

16  Adairsville would have for sure if they had an

17  election.

18      Euharlee has had advanced voting

19  consistently.  Taylorsville does not.  Kingston does

20  not.  White does, but I don't think in 2015 I did

21  their elections.  They would have done that for

22  themselves.

23      Who am I missing off that list?  I just said

24  six.  So Adairsville, Cartersville -- oh, Emerson

25  does.

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                7/11/2019

1       Q.  How long is that early voting period for --
2   well, strike that.
3            Let's talk about 2019 for example.
4            How long will the advance in-person early
5   voting period be before the November 2019 municipal
6   elections?
7       A.  It's the period set by law, three weeks.  We
8   won't do a Saturday voting day for municipal
9   elections, but besides that, it's the same as any
10  other election.
11      Q.  Got it.  Got it.
12           Will the Bartow County Board of Elections be
13  hiring temporary staff for assisting with the conduct
14  of municipal elections?
15      A.  Yes.
16      Q.  Typically, how many temporary employees does
17  Bartow County hire for a municipal election cycle?
18      A.  For every municipality?  For every location?
19  Three hundred and fifty or sixty assuming that no one
20  serves in more than one capacity.
21      Q.  And that includes poll workers?
22      A.  Yes.  That is poll workers.
23      Q.  When do municipalities need to start
24  preparing ballots for the November municipal
25  elections?

1    A.   Would you clarify what you mean by

2  "preparing ballots"?

3    Q.   When do you need to know -- need to start --

4  strike that.

5         When will you start building the ballots for

6  the November municipal elections?

7    A.   During the qualifying period -- and we'll

8  start from there.  I couldn't rattle off what that is

9  off the top of my head -- they will send me their

10 qualifying paperwork as it happens because I need

11 to -- they retain their qualifying duties as part of

12 that contract, but they have to use my office to

13 verify the perspective candidates' eligibility for

14 voter registration.

15        So they send me that paperwork then.  And

16 I'll start creating the paperwork -- I can't remember

17 how they do that now.  Either I file a form to send

18 into the Center or send the paperwork directly.

19 Usually, I think, it's a form.

20        And by the end of the process, I can tell

21 them -- excuse me.  At the end of the process I send

22 them all that information.  And then a little while

23 later, I get the information to proof for the

24 database.

25    Q.   So let's go back to the 2015 municipal

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                7/11/2019

1  elections, which on the -- we're on the current DRE

2  machines.

3          Can you take me kind of through the timeline

4  as best you know in terms of starting with

5  the candidate qualifying period and then going

6  through your preparations to election day?

7      A.  Well, so candidate qualifying period.  At

8  the end of the candidate qualifying period, we send

9  the information to the ballot builder.

10          A little after that, we got the information

11  back in to proof.  Proofed it.  Sent the sample

12  ballot to the city clerks to double check for me.

13  Sent the order to the printer to get the ballots

14  printed.

15          Around the time those came back in is when

16  L&A would have been up and running and the ballots

17  would have been tested as well.

18          L&A wouldn't have taken too long for that

19  number of machines.  Now, in 2015 there may have been

20  a county-wide election; I'm not sure.  I don't try to

21  memorize that stuff.

22          And then after everything is tested and

23  allocated, transport the stuff to the different

24  polling places as needed, train the poll workers

25  throughout this process, that usually starts a month

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

1  or two ahead of the election because there's a lot of

2  training to be done.

3      Q.  When you say a month or two ahead of the

4  elections --

5      A.  Now, for a municipal not that far ahead.

6  But for a big election, yeah, a month or two ahead we

7  start training poll workers.

8      Q.  That would be a month before the start of

9  in-person early voting?

10      A.  I'm basing off election day.  We don't want

11  to start training them too early, but at the same

12  time, we have to have enough time to get all the

13  classes in.

14          A little while back I set a cap to my class

15  sizes, so that has greatly increased the number of

16  sessions we have to do.  So we have to back up that

17  far.

18      Q.  What are you training these poll workers out

19  of these sessions?

20      A.  It depends the session.  We have one

21  specifically for advance voting, one new employee

22  class -- and I'm not sure all this was in place in

23  2015.  But I as it stands right now, advance voting,

24  a new employee class, a basic core class for folks

25  who don't have any special duties, they just need the

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK              7/11/2019

1  statutory training to do their jobs.

2          A comprehensive class for the managers that

3  sometimes is broken into two parts.  It goes into

4  depth of everything.  And then an express poll class

5  for people who need to know how to operate the

6  express polls.

7      Q.  How much of that training involves getting

8  poll workers up to speed on using the DRE voting

9  machines?

10      A.  The only session that doesn't cover in any

11  way, shape or form is probably that express poll

12  class.  Every other class covers it in some way,

13  including security, paperwork that goes along with it

14  and then the comprehensive class for the people that

15  are in charge goes into some of the troubleshooting

16  and things like that.

17      Q.  Turning back to building the ballots for the

18  municipal elections.  I have a question about the

19  method of elections in the municipalities.

20          Do each of the municipalities in Bartow

21  County conduct elections at large?

22      A.  No.

23      Q.  Which municipalities have district elections

24  in Bartow County?

25      A.  The City of Cartersville has actual wards.

1  And then if I remember correctly, the City of

2  Kingston has elections by post number, but they might

3  as well be at large because anybody can vote.

4          But just to point this out, every city is

5  different, vastly different in how they are operated.

6  Before every municipality election, I have to go back

7  and look at all the stuff to make sure I'm doing it

8  right for that city.

9      Q.  What differences are there between the

10  municipalities?

11      A.  Whether they run at large or not.

12  Districts.  If the -- how a winner is declared, if

13  it's plurality or majority.  That's the big one,

14  actually.

15      Q.  Anything else?

16      A.  That's all that springs to mind besides just

17  how each city -- each -- (incomprehensible).

18          THE REPORTER:  Each?

19          THE WITNESS:  Each city has a life of

20      its own, so it might not be in the charter

21      but things are done slightly different, say

22      the method of entry or where the poll is or

23      how much employees need to sign up for

24      different reasons.

25  BY MR. POWERS:

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1      Q.   And in terms of ballot files, let's go
2  through them, the municipalities quickly.
3           Is it fair to say that the City of White has
4  a single ballot style for their municipality
5  elections?
6      A.   Yes.
7      Q.   Would the same be true for the City of
8  Taylorsville?
9      A.   Yes.
10     Q.   And the City of Adairsville would have a
11 single ballot style?
12     A.   Yes.
13     Q.   The City of Emerson has a single ballot
14 style?
15     A.   Yes.
16     Q.   The City of Euharlee has a single ballot
17 style?
18     A.   Yes.
19     Q.   And you had mentioned Kingston has
20 residential wards?
21     A.   No.  Each council member is assigned a post
22 number, but it doesn't actually correspond to
23 anything geographic.  So that's one ballot style as
24 well.
25     Q.   And Cartersville would have difference

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK          7/11/2019

1 ballot styles for each district; is that correct?

2     A.  Well, I mean, that depends on whether or not

3 that district is actually on that ballot.  But they

4 have more than one ballot style partially because

5 they have more than one polling location.

6     Q.  Cartersville has two polling places; right?

7     A.  Yes.

8     Q.  Who is responsible for programming the

9 ballots that will be used in municipal elections in

10 Bartow County?

11     A.  I utilize the services of the Center for

12 Election Systems same as I do for any other election.

13     Q.  Who at the Center for Election Systems do

14 you work with with respect to preparing the ballots

15 for municipal elections?

16     A.  At this point, I'm not sure.

17     Q.  Help me understand this.

18     I know that the Secretary of State took some

19 responsibilities with respect to election

20 preparations from the Center for Election Systems,

21 but that doesn't extend to ballot preparation or

22 is -- strike that.

23     Is the Center for Election Systems now in

24 the Georgia Secretary of State's Office?

25     A.  That's correct.

1    Q.   And I should have asked this question as

2  well.

3         Has this always been the case that the

4  Center for Election Systems programs the ballots for

5  municipal elections in Bartow County?

6    A.   Since I've been here, I've used their

7  services.  I can't tell you what happened before I

8  got here.

9    Q.   From your time working at the Center for

10 Election Systems, do you have any knowledge in terms

11 of whether the Center for Election Systems prepares

12 all of their ballots inhouse or whether any of that

13 work is outsourced to a vendor?

14    A.   I have never heard of them outsourcing

15 anything.

16    Q.   Now, Bartow County is participating in a

17 pilot program for the new ballot marking devices for

18 the November 2019 election; correct?

19    A.   Absolutely.

20    Q.   You've spoken publicly about this; correct?

21    A.   I have.

22         (Plaintiff's Exhibit 50 was marked for

23         identification.)

24 BY MR. POWERS:

25    Q.   I'm handing you what I'm marking for

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK              7/11/2019

1  identification as Plaintiff's Exhibit 50.

2          What is Plaintiff's Exhibit 50?

3      A.   This is an article from the Daily Tribune --

4  I'm not sure what date it's published -- about House

5  Bill 316 and the pilot project for the new voting

6  system.

7      Q.   Do you see you are quoted in the article?

8      A.   Any particular place or just in general?

9      Q.   Let's just look at the first page.

10     A.   Okay.

11     Q.   Have you had a chance to read it?

12     A.   Oh, yes.

13     Q.   Do you recall giving these quotes to a

14 reporter for this article?

15     A.   I do.

16     Q.   Let's talk about, I guess, the timeline.

17          First, do you currently know what machines

18 you're going to be receiving?

19     A.   I have no idea.  I know it'll be one of,

20 well, a few different things, but I don't know what

21 the State's decision will be on that.

22     Q.   When did you find out that you were going to

23 be participating in the pilot program?

24     A.   For sure when the RFP was posted.  I was

25 approached before that asking if I'd be willing, but

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                7/11/2019

1   I didn't for sure until I saw my county on the list
2   for the first phase of the project.
3           (Plaintiff's Exhibit 51 was marked for
4       identification.)
5   BY MR. POWERS:
6       Q.  I'm handing you what I'm marking for
7   identification as Plaintiff's Exhibit 51.
8       A.  Mm-hmm.
9       Q.  In particular, I would like to direct your
10  attention to -- I'm looking at the numbers at the
11  bottom -- page 249.
12      A.  Yes.
13      Q.  Let's first talk about who's on this E-mail
14  thread.
15          Who are the people other than yourself who
16  are listed on the E-mail thread in Plaintiff's
17  Exhibit -- on page 249 of Plaintiff's Exhibit 51?
18      A.  So you just want the names of the people
19  involved with the E-mail?
20      Q.  Yes.
21      A.  Deidre Holden.  Janine Eveler.  Richard
22  Barron.  Lynn Ledford.  And myself.
23      Q.  Who are those individuals?
24      A.  They are election directors.
25      Q.  Looking down at -- well, first, do you

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1  recognize these E-mails?

2      A.  Yes.

3      Q.  Do you recall sending and receiving --

4  strike that.

5          You recall receiving these E-mails?

6      A.  Yes.

7      Q.  Is March 16th, 2019, on or about the time

8  that you learned about the new pilot program?

9      A.  Yes.  That's the date on the E-mail.

10 Somewhere around that time.

11     Q.  Turning now to page 245.

12     A.  Yes.

13     Q.  Tell me about the nature of the conversation

14 that you're having with -- well, first, do you recall

15 sending and receiving these E-mails?

16     A.  I do.

17     Q.  Tell me about the E-mail exchange that

18 you're having here with Ms. Ghazal and Ms. Carter.

19     A.  Sara Ghazal is with the Democratic Party for

20 the state of Georgia.  She was informing me that they

21 were planning on sending an attorney named Kendall

22 Carter to observe our board meetings.

23         I respond saying that I was excited to hear

24 that partially because with being part of the pilot

25 project for the new system, I needed all the help I

Curling et al. v.          Deposition of
Raffensperger et al.       JOSEPH KIRK          7/11/2019

1  could get educating the public about the process and

2  was planning on asking the party for help.  So having

3  someone there at the meeting was great news.

4        Q.  Why is it important to educate the public

5  about the new voting machines?

6        A.  Because you don't want the first time

7  somebody to see something is when they show up to use

8  it in any election.  You know, you want that process

9  to go as smoothly as possible and a lot of that comes

10  down to education, both the employees and the general

11  public, on what to expect and what the process is

12  going to be like.  And it really helps crowd control

13  on election day, not to mention not having to

14  troubleshoot issues and things like that.

15        Q.  What types of technical pieces do you need

16  to employ to -- strike that.

17            What are the kinds of technical aspects

18  about using the machines that you want voters to be

19  aware of before election day?

20        A.  I'm assuming you're talking about our new

21  system that we're getting?

22        Q.  Yes.

23        A.  The answer depends on the system.

24        Q.  Yeah, let's talk about the new machines.

25        A.  Well, the two pieces -- well, three pieces

Curling et al. v.         Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1   of information that I really need the public to know
2   about the new system is, one, that we have new
3   equipment.  Two, that they are going to -- where to
4   put the piece of paper in, to expect it to come back
5   to them and that's their chance to examine it.  And
6   then to make sure they cast their ballot before they
7   leave and not wander out the door with it.
8        Q.  Why would that be a concern?
9        A.  Because if they wander out the door with it,
10  I can't count it.
11       Q.  Has Bartow County been making preparations
12  for educating the public?
13       A.  We have started, but I haven't gotten too
14  far with that process yet mostly because I'm waiting
15  to hear what the decision on the system is before I
16  decide how to proceed.
17           (Plaintiff's Exhibit 52 was marked for
18       identification.)
19  BY MR. POWERS:
20       Q.  I'm handing you what I've marked for
21  identification as Plaintiff's Exhibit 52.  I'd like
22  to focus just on the first page here.
23       A.  Yes.
24       Q.  First, what is on pages 237 and 238 of
25  Plaintiff's Exhibit 52.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK           7/11/2019

1      A.   They are the minutes for the meeting for the
2  Bartow County Board of Elections and Voter
3  Registration from August 15, 2019 [sic].
4      Q.   I'd like to direct your attention to Item
5  No. 6.
6      A.   Under which?
7      Q.   Under the elections supervisor's report.
8      A.   Okay.
9      Q.   What is -- if you wouldn't mind reading Item
10  No. 6 from the elections supervisor report.
11      A.   2019 voting system pilot project.  Bartow
12  County has been selected as one of the 12 counties to
13  be part of the pilot program for the new voting
14  machines.  The new voting machines should be here in
15  August/September just in time for the November
16  general election.
17      Q.   Is that still your current understanding of
18  when the Bartow County Board of Elections will be
19  receiving the new machines?
20      A.   Yes.  But that's not based on anything
21  besides my own knowledge of the process and my best
22  guess.
23      Q.   What have you heard with respect to when the
24  new voting system decision will actually be made?
25      A.   The same time I've heard the entire process,

1  mid-July.

2      Q.  Once you find out what system is going to be

3  used, what is your plan for implementing the new

4  ballot marking devices for the November 2019

5  election?

6      A.  Honestly, I'm still working on it.  It's

7  going to be very dependent on what the Secretary of

8  State's Office does with educational materials, how

9  far I have to go creating my own.

10         The plan is -- and in another set of board

11  minutes we discuss creating a committee of community

12  leaders and stake holders to help push educational

13  information out to the public.

14         This shouldn't be a hard process.  It's just

15  a matter of having it documented well, having a good

16  script for folks to follow and getting all the help

17  we can in pushing the message out.

18      Q.  I'd like to direct your attention to

19  page 240.  I think it's the last page.

20      A.  Yes.

21      Q.  And in particular, to the item that says,

22  New business.

23      A.  Mm-hmm.

24      Q.  Do you see where it refers to the voting

25  machine committee?

Curling et al. v.      Deposition of
Raffensperger et al.   JOSEPH KIRK          7/11/2019

1      A.  I do.

2      Q.  Could you tell me -- well, first, if you

3  could tell me what date is reflected in the minutes

4  on page 239 and 240.

5      A.  This is -- these are the minutes from the

6  May 23rd, 2019 Bartow County Board of Elections and

7  Voter Registration meeting.

8      Q.  Thank you.  Now, if you wouldn't mind

9  telling me about your proposal to the board to

10  establish a new voting machine committee.

11      A.  Well, it's pretty much what I just

12  described.  It's -- the idea is to get community

13  stake holders together, whoever we can think of from

14  every segment of the community, to brainstorm and

15  talk about the new voting machines; to give them

16  educational materials to push out to the public they

17  interact with.  And then I'd like their feedback on

18  other things we can do to make the process better.

19          And then, frankly, I plan on keeping that

20  group together to use for future election things.

21  It's a good way to get people together on new things

22  and I hope I can keep them together afterwards.

23      Q.  Let's talk a little bit about testing and

24  preparation.

25          When you receive the new machines in August

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK                7/11/2019

1  or September, what are you going to have to do to
2  make sure that the machines are ready to be used in a
3  real election?
4       A.  I honestly don't know.  I know what's been
5  done in the past, but I do not know what -- I'm
6  assuming they'll be tested before we get them.  I'm
7  assuming there will be testing we have to perform
8  after we get them.  If nothing else, there will be an
9  L&A testing procedure prior to the election.  Beyond
10 that, those procedures haven't been written yet that
11 I know of.
12      Q.  Has the Secretary of State's Office told you
13 anything about what you need to be doing with the new
14 BMDs to get them ready for the November 2019
15 election?
16      A.  No.
17      Q.  Has anyone else told you anything about what
18 you need to do with the new BMDs ready for the
19 November 2019 elections?
20      A.  The only thing I can think of was -- I'm a
21 regional facilitator for election officials in the
22 state of Georgia.  We're in Region 1.  And all the
23 other directors for Region 1 get together once every
24 month or two to talk about topics of interest, we'll
25 say.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1          And we invited each major vendor to our
2    meetings to see the machines.  Those vendors may have
3    made proposals for -- mostly this will be so easy to
4    do here; this is all you have to do.
5          I didn't pay too much attention to those.
6          Q.  You described this role as regional
7    facilitator.  Could you tell me a little more about
8    that?
9          A.  The counties in the state are broken up into
10   different regions.  And, honestly, I can't remember
11   why that was originally done.
12          The way it works now, each region has a
13   facilitator.  And either they're used to push
14   information from the Secretary of State's Office out
15   to people.  But, normally, it's just an opportunity
16   for us to get together and talk about how things are
17   going in our offices, best practices amongst each
18   other; that sort of thing.
19          Different counties host each month.  It's a
20   good chance to get out of the office, see your peers
21   and share information.
22          Q.  Sure, sure.
23          So at some point your -- what counties are
24   in your region?
25          A.  That's a great question.  The northwest

Curling et al. v.         Deposition of
Raffensperger et al.      JOSEPH KIRK              7/11/2019

1  portion of the state.  I couldn't list them all for

2  you.

3       Q.  Fair enough.

4       A.  If you -- (incomprehensible) -- I can

5  probably tell you...

6       Q.  Roughly, how many counties?

7       A.  About a dozen.

8       Q.  At some point a bunch of the vendors who

9  currently have submitted RFPs for new BMDs came to

10  one of these regional meetings to show off their

11  various machines?

12       A.  This was long before the RFP was ever sent

13  out from the Secretary of State's Office.  I

14  approached them actually to come out and show us what

15  they had mostly because I was curious about the new

16  technology.  It was a good excuse to get them out

17  there.

18       Q.  Roughly, when would this meeting have taken

19  place?

20       A.  Last year.

21       Q.  2018?

22       A.  Yeah, I think so.  It sounds about right.

23  Along the same time as the safety commission meetings

24  and all that.

25       Q.  That was before House Bill 316 had been

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1  adopted; right?

2      A.   Absolutely.

3      Q.   It might not have been talking about --

4  strike that.

5           So implementation of new BMDs for the 2019

6  election would not have been a subject that would

7  have been on the agenda list for a 2018 meeting with

8  vendors; correct?

9      A.   Not necessarily.   We may have discussed, you

10  know, what they thought the timeline would be once

11  the selection was made; that sort of thing.

12           I think I always expected there would be

13  some kind of pilot project in 2019.   Just common

14  sense.   But beyond that, no, we didn't talk about

15  specifically municipal elections in 2019.

16      Q.   What did the vendors tell you with respect

17  to new legislation that -- regarding voting machines?

18      A.   For the most part, they were very careful

19  not to tell us what to say.   They just encouraged us

20  to make our opinions known to the legislature,

21  whatever opinions may be.

22      Q.   Did they provide any kind of educational

23  materials to you in the course of that meeting?

24      A.   Oh, no.   When we brought them out, both

25  sides were clear what our roles were.   They never

Curling et al. v.          Deposition of
Raffensperger et al.       JOSEPH KIRK          7/11/2019

1   thought we had any role in that decision.  They just

2   thought we'd like to see what they had to offer.

3        Q.  Earlier you had mentioned that educational

4   materials might need to be created for the -- or

5   related to the new ballot marking devices; correct?

6        A.  No matter what you're doing, educational

7   materials are always a good idea.  So, yes, whatever

8   new thing we do, we need to educate people on.

9        Q.  New educational materials will need to be

10  created for poll workers; is that correct?

11       A.  Absolutely.

12       Q.  And new poll workers -- sorry.  Strike that.

13            New educational materials will need to be

14  created for voters as well?

15       A.  Absolutely.  If you look back to any voting

16  machine implementation, you'll see little postcards

17  or something graphical to say, It's going to be okay,

18  here's step by step what you're going to do just to

19  demystify it before they go to the poll.

20            We can't get a machine in front of every

21  single person for them to see it, touch it and play

22  with it no matter how hard we try.  We have to have

23  stuff that people can carry around to educate them in

24  some way.

25       Q.  For these municipal elections that are

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                    7/11/2019

1  coming up in 2019, what's the timeline going to be --

2  strike that.

3          Have you already made a proposal for a

4  certain number of voting machines and optical

5  scanners in 2019?

6      A.   You mean to be used for the polling places?

7  For the specific --

8      Q.   (Counsel nods head affirmatively.)

9      A.   No.  In fact, I need to go back and look at

10  House Bill 316 because I'm not sure it actually

11  mandates the number of machines per voter or not.

12  The code section they updated was not necessarily in

13  line with that law.

14      Q.   So is it fair at this point to say that you

15  don't know for certain how many new ballot marking

16  devices you're going to need for the November 2019

17  municipal elections?

18      A.   I plan on using the same number as I would

19  have used DREs.  The process should be a similar

20  enough that that logic works.

21      Q.   So just make sure I'm following.  So your

22  plan right now is to order 250 ballot marking devices

23  for the November 2019 municipal elections?

24      A.   No.  I'm not going to order anything.  The

25  numbers are in the RFP.

1    Q.  Fair enough.

2         So explain to me the process of how the RFP

3    was -- strike that.

4         Explain to me the process of how the

5    machines -- new ballot marking devices are going to

6    be sent to and received by you for the November 2019

7    elections?

8    A.  It'll be sent by the State and they'll be

9    received by me.  And that's about as much as I know

10   right now.

11   Q.  Do you anticipate receiving approximately

12   250 --

13        MR. MILLER:  I'm going to object at that

14        question at this point.  You've asked the

15        same form of this question about three or

16        four different times.  I think he's answered

17        it.

18   BY MR. POWERS:

19   Q.  You may answer.

20   A.  In the RFP, it specifies a delivery

21   schedule.  I anticipate that's how they are going to

22   be delivered.  That's as much as I know.

23        MR. POWERS:  I'd like to turn your

24        attention back to --

25        THE REPORTER:  Is this a good time for a

Curling et al. v.          Deposition of
Raffensperger et al.       JOSEPH KIRK          7/11/2019

1      break?  It's been almost two hours.

2           (Discussion ensued off the record.)

3           (Recess from 11:43 a.m. to 12:43 a.m.)

4  BY MR. POWERS:

5      Q.  Before we broke for lunch, we were chatting

6  about the new -- the new devices and we were talking

7  a little bit about how the implementation is going to

8  go.

9           Do you have a point of contact with the

10 Secretary of State with respect to the pilot program?

11     A.  Not specifically to that.  I have a point of

12 contact through my liaison Lee, but beyond that no.

13     Q.  Have you spoken with your liaison about the

14 pilot program?

15     A.  No.  I have not.  I did speak briefly with

16 their training manager about it to -- you know, sort

17 of an idea how the training is going to go, but that

18 was a very vague conversation.

19     Q.  What did you talk about?

20     A.  The plan to train regions -- to break the

21 state down that way and have multiple phases of

22 training in each region.  What those phases would be,

23 I'm not sure.

24     Q.  Are you going to be using any of the old DRE

25 machines for the November 2019 elections?

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1      A.   No.

2      Q.   Who is paying for the equipment for the

3  pilot program?

4      A.   The State.

5      Q.   Turning back to the news article -- it might

6  have been Plaintiff's Exhibit --

7      A.   -- 50.

8      Q.   -- 50.  And turning to the second page right

9  at the very top, do you -- would you mind reading, I

10  guess, the first sentence that starts on the first

11  line of that page and reading through to the second

12  paragraph?

13      A.   The one that starts, And although?

14      Q.   Yes, sir.

15      A.   And although Kirk said the machines don't

16  represent an unfunded mandate, he also said he

17  expects the new equipment to saddle Bartow County

18  with several ongoing maintenance and material costs.

19      Q.   Could you please read the next paragraph?

20      A.   With a purchase this size, we're counting on

21  the Secretary of State to negotiate it, so it's a

22  good price, both the initial purchase as well as any

23  additional equipment we have to buy moving forward,

24  he said.  Until that negotiation happens, we really

25  don't know what they're going to cost.  I know

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK            7/11/2019

1   that -- I know what the off-the-shelf cost are for

2   the piece of equipment, but I hope we don't pay full

3   sticker price.

4        Q.   Thank you.

5            Do you remember giving this quote to the

6   reporter for this article?

7        A.   Yes.

8        Q.   What are the -- strike that.

9            Could you please describe for me what types

10  of ongoing maintenance and material costs there would

11  be for the new devices?

12       A.   Well, at this point this is speculation.

13  Until the decision is made, until the contract is

14  signed, all of that is still up in the air.  The

15  current system doesn't have any ongoing costs.  We

16  might get that lucky.

17           But for a paper based system, we have to buy

18  paper.  There could be an ongoing licensing

19  agreement.  That's part of negotiations I have no

20  part in.  And then ongoing costs similar to the

21  existing equipment of just parts for it, you know,

22  buying legs.  And no matter what equipment you have,

23  there will be parts that are consumable that have to

24  be replaced.

25       Q.   Just so I'm clear, under the new BMDs, the

1  counties will be responsible for buying paper?

2      A.  That's my --

3          MR. MILLER:  I'm just going to go ahead

4      and object here.  I probably should have

5      objected on the last one, but as long as

6      we're talking about implementation, that's

7      one thing.  But we're starting to move into

8      the operations of a new system that has not

9      yet been procured.  It's likely outside the

10     specific knowledge of Mr. Kirk.

11         You know, I'm just going to notate it's

12     outside the scope of discovery right now.

13     Not relevant to the case.  Not relevant to

14     the claim in plaintiff's complaint.

15         THE WITNESS:  And that's actually what I

16     was about to say is without being part of

17     those negotiations, without seeing that

18     documentation, I'm not sure.  I said to

19     begin with it's all speculation.

20 BY MR. POWERS:

21     Q.  When will the -- from your perspective, the

22 Bartow County Board of Elections need to receive the

23 new BMDs in time to get them tested and programmed

24 and used for the November 2019 elections?

25     A.  I need enough time to train a small -- at

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1   the bare minimum, time to test the equipment, train a

2   small number of poll workers to use the equipment and

3   get the people previous to those elections trained.

4          I anticipate the scope being larger than

5   that, so I should have plenty of time, but I could do

6   it in a month.

7      Q.  Would that be a month prior to the start of

8   early voting or a month prior to the actual November

9   election date?

10     A.  Well, if it's a month prior to the actual

11  November election date, that only gives us -- that's

12  not enough time to get the machines tested per law.

13         I can't give you a specific date to say as

14  long as I have them by this date, I can make them

15  work.  What I can tell you is that I have full

16  confidence in a small time frame I can implement this

17  current -- the new system.

18     Q.  That would be a month before early voting

19  starts?

20     A.  I mean, a month before early voting starts

21  would give me enough time.  I could probably do it in

22  less than that.

23     Q.  If the judge in this case were to order that

24  hand-marked paper ballots were to be used scanned by

25  the existing optical scanners equipment that's

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1   currently used for absentee and provisional ballots,

2   how long in advance of the election would you need to

3   know that in order to be able to implement it?

4        A.   If we're talking about using our existing

5   equipment in compliance with state and federal law, I

6   don't have enough equipment to make that work and I

7   could not procure enough equipment to make that work.

8            Just buying out the scanned system doesn't

9   work.  It has to be certified by the State.  I do not

10  know where to buy more optical scanners that are

11  already certified, the type that are already

12  certified.

13       Q.   Have you looked into whether the Secretary

14  of State or other counties have additional optical

15  scanners?

16       A.   To be clear, to make that work you need an

17  optical scanner at every single polling place.

18  That's -- well, including advance voting sites for me

19  for that election -- well, for the November election

20  we're talking about eight election day polling

21  places, at least four advance polling places, so

22  that's 12 right there.  Those requirements would be

23  the same for every county statewide.  And I don't

24  know of a single county that has enough equipment

25  that can make that work nor do I know the State has

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1  enough equipment to make that work.

2      Q.  Are you knowledgeable about the number of

3  optical scanners in other counties in Georgia?

4      A.  Not specifically, no.

5      Q.  So you would need -- well, assuming every

6  county holds an election --

7      A.  Okay.

8      Q.  -- you currently have four working optical

9  scanners?

10      A.  I believe so.  I'd have to go back and

11  double check because I only use two or three in a

12  given election.  So I think I have four optical

13  scanners.

14      Q.  To have onsite scanning at each polling

15  place, you would need eight additional optical

16  scanners?

17      A.  For the November election this year, I

18  believe so.  My math may be wrong depending on who's

19  having an election and if I'm thinking of all the

20  correct polling places in my head.

21      Q.  Can you use the same -- strike that.

22          Can you use optical scanners both for early

23  voting, in person and also on election day?

24      A.  We don't have any procedures in place to do

25  that, but I would say no because we have a

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1  requirement that every polling place has to report

2  their results and that's done by the machine.

3          So to share the machine between different

4  polling places would be very problematic for that.

5  Would you get a total count?  Yes, but it would be in

6  violation of state law.

7      Q.  Would it be possible to do a central count

8  in which ballots are stored onsite and then

9  transported to the Board of Elections for scanning as

10 is done, for example, with provisional ballots?

11     A.  I guess you could for municipal elections

12 because there's no federal requirements for those.

13 For any other elections, no, because it'd violate

14 law.

15     Q.  But for municipal elections, you could do a

16 central count at the Board of Elections office?

17     A.  If that's what the City chose to do, yes, I

18 guess I could do that.  I guess that's how it used to

19 be done, but I've never conducted an election that

20 way.

21     Q.  Let's -- strike that.

22         Is central count -- well, let's go back.

23         First, what is -- what does the term

24 "central count" mean as you understand it?

25     A.  Well, as I understand what you're

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK           7/11/2019

1   describing, you would take the -- when the voter
2   casts their ballot at the polling place, it'd be a
3   paper ballot.  They would hand mark.  They would put
4   it into a secured container, which would be under
5   seal and then transported back to the office similar
6   to how we transport memory cards for the current
7   voting system.
8           Once they got back to the office, we'd need
9   to put procedures in place to account for how many
10  ballots are there; to ensure they are all counted
11  once and only once; and to secure them in that -- you
12  know, throughout that process.
13          I'm not sure how long that would take.  The
14  scanners we have are precinct based scanners not
15  central count scanners.  That's why you see results
16  getting in so late on election night in some cases
17  because you're having to feed them through one and at
18  a time.
19          Once you have a decent size turnout in any
20  way higher than the absentee turnout for a normal
21  election, normal presidential and gubernatorial
22  election, which is not that high around here, we'd be
23  there until the wee hours of the morning trying to
24  get those things counted if not until the next day.
25      Q.  What is the typical turnout in the municipal

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK        7/11/2019

1  election in Cartersville?

2       A.  That is very much depending on how mad the

3  population is.  I've seen it be very, very low and

4  I've seen it be decently high, say, getting up to 40

5  to 50 percent of the turnout, just off the top of my

6  head, of the regular registration depending on what's

7  on the ballot.

8       Q.  Fair enough.  What is the registered voter

9  population in Cartersville?

10      A.  I couldn't tell you off the top of my head.

11  Over 10,000 I think.

12      Q.  And --

13      A.  Now that I think about it, it may not have

14  been Cartersville that got that high.  It may have

15  been another city in terms of percentage of turnout,

16  but that could just be because Cartersville hasn't

17  been upset in recent memory.

18      Q.  Mm-hmm, fair enough.  And -- but -- strike

19  that.

20          What are the registered voter populations in

21  the other municipalities --

22      A.  I can't rattle it off.  If you'd like, send

23  me a request; I'll be happy to send you the numbers.

24      Q.  Tell me about how long it takes to scan

25  paper ballots through the optical scanners?

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                    7/11/2019

1      A.  A long time.  If you get a good rhythm

2  going, you can usually scan them about -- (witness

3  rhythmically knocking on table).  I'm not sure how to

4  say this in a way you can do it -- at a decent speed

5  until once's been folded too many times.  It's got a

6  stray mark on it.  The paper got a little damp.  And

7  then you're trying to feed it through different ways

8  to get the scanner to take it, so you don't have to

9  go duplicate it.

10         It varies.  But it is not a fast process at

11  all, especially considering the age of those

12  scanners.  Those scanners predate the current voting

13  system.

14      Q.  How long did it -- strike that.

15         You use this optical scan system for

16  scanning both absentee and provisional ballots; is

17  that correct?

18      A.  That's correct.  Different scanners but the

19  same process, the same equipment.

20      Q.  How much time does it take to scan the

21  provisional ballots?

22      A.  Well, a lot less because there are a lot

23  fewer of them.  And that's usually done going into

24  our certification meeting in a very calm manner.

25  It's my permanent staff scanning those.  They know

Curling et al. v.      Deposition of
Raffensperger et al.   JOSEPH KIRK            7/11/2019

1   what they are doing.  They are sitting there and it

2   doesn't take them too long.  But, again, that's

3   because you have maybe a few dozen provisional

4   ballots for any given election and hundreds or

5   thousands of absentee ballots.

6        Q.  What was the total period of time in which

7   it took to count the paper absentee ballots from,

8   say, the November 2018 election?

9        A.  I can't remember what time we started off

10  the top of my head, but I know we opened early

11  because I remember the bailiff being there and

12  getting that process started early.  And we still

13  didn't stop until eleven o'clock, midnight; something

14  like that.  It's when we actually reported the

15  results in for the final results of the state.  But,

16  again, I'd have to go back and look at that time

17  exactly.

18       Q.  Your recollection is that you reported the

19  absentee ballot results around 11:00 p.m. or --

20       A.  Somewhere around there.

21       Q.  I'd like to switch gears.

22           What process does Bartow County have in

23  place with respect to dealing with the election

24  related complaints that the board receives from

25  voters?

Curling et al. v.          Deposition of
Raffensperger et al.       JOSEPH KIRK          7/11/2019

1      A.   That all depends on the complaint and the

2   situation surrounding it.

3           After each election, I go through

4   everything.  And with these incident reports, you see

5   are what -- is our catch-all documentation method.

6   What we tell them is if you think I should know about

7   this later -- they are usually pink -- do a pink

8   sheet on it.

9           A lot of voter complaints come in that way.

10  If they call me directly, I usually take care of them

11  at the time they call me.  And then after the

12  election, I'll go over all the records and figure out

13  kind of what the board needs to hear about.  And I

14  give them the complaints and the resolution if

15  applicable.  And that's usually where that stops.

16          Voters are always welcome to complain to the

17  State or to an organization if they'd like to.  I

18  prefer that they come to me with their issues, so I

19  can take care of them or try to do the right thing

20  and make sure everybody has the chance to vote.

21          And beyond that, record everything and keep

22  moving.  Go to the poll the next election and make

23  sure we're not doing the same thing again.  Oh, and I

24  might have to discipline employees as a result.

25      Q.   Do you have to discipline employees from

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK            7/11/2019

1   time to time?

2        A.  Yes, as my employer does.

3        Q.  What kind of employee infractions come up?

4        A.  Well, everything from being late to work to

5   having fights with fellow employees.  I'm trying to

6   think of a violation that you'd be interested in.

7            Anything to do with following the rules or

8   procedures that we have in place.  We have a

9   temporary employee personnel policy, if they violate

10  their policies, if they violate their training, then

11  actions have to be taken.

12       Q.  Do you or the Bartow County Board of

13  Elections receive complaints from voters regarding

14  their experiences voting on the current DRE machines?

15       A.  I have in the past and I've submitted those

16  to you.

17       Q.  Do you -- have you received -- strike that.

18           For which elections have you received

19  complaints from voters about problems with the DRE

20  voting machines beyond the November 2018 election?

21       A.  I can't list out for you every time I

22  received a complaint off the top of my head.  I

23  apologize.

24           There was a traumatic upturn of those in

25  2018.  With everything in the media, folks were more

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1  likely to come to us with concerns, which I

2  appreciate.  I can't address them until I know about

3  them.

4          But before that, I couldn't tell you.  The

5  bigger the election, the more complaints we receive

6  just as a general rule.

7          MR. POWERS:  I'm handing you what I've

8      marked for identification as Exhibit 53.

9          (Plaintiff's Exhibit 53 was marked for

10      identification.)

11  BY MR. POWERS:

12      Q.  Let's start -- well, first, if you want --

13  if you wouldn't mind just taking a second to thumb

14  through it.

15      A.  Is this everything I submitted to you for

16  complaints with the last subpoena?

17      Q.  Yeah.  I'll represent that these are --

18      A.  And computer issues, too.

19      Q.  And let's start with the first page.

20      A.  Okay.

21      Q.  Do you recall receiving the complaint

22  reflected on page 286 of Plaintiff's Exhibit 53?

23      A.  I do.

24      Q.  Who was the voter that wrote it?

25      A.  Beatrice Lee Baker.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

1    Q.   What date did she write it?

2    A.   The document's dated November 2nd, 2018.

3    Q.   What was the nature of Ms. Baker's letter?

4         (Witness reviewing document.)

5         THE WITNESS:   Ms. Baker had an issue

6    while she was voting that she wanted to

7    write candidates' names in.  And when she

8    tried to write candidates in, she had to

9    push the submit button more than one once.

10   And when that happens there was a lag in the

11   machine and it pushed the button that was

12   about to appear, for lack of a better way of

13   saying that, the next buttons underneath

14   where that submit button is.

15        So it went to the next screen.  And

16   rather than trying to go back, she assumed

17   that she'd have a chance to go back from the

18   summary screen to write in her desired

19   write-in names.

20        And when she got to the summary screen,

21   again, there was a lag and the machine cast

22   the ballot before she had a chance to go

23   back.  There was a lag so that the next

24   button or view summary screen button became

25   the cast ballot button before she saw it and

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1     the ballot was cast.

2  BY MR. POWERS:

3     Q.  So Ms. Baker was not able to write in her --

4  the write-in candidates that she wanted?

5     A.  That's correct.  And she went home.  She

6  thought about it.  She decided that she really needed

7  to tell somebody that, which again I appreciated.

8        She came into the office and sat with me

9  personally.  We went over everything.  That's why I

10  know exactly what happened after I read over this.

11       I told her that I was so sorry she didn't

12  get to vote for the candidates she vote on, we can't

13  give her another ballot and this is one I had to take

14  to my board because she wanted to make sure they knew

15  what happened.

16     Q.  Got it.  Got it.

17        So in a situation like this -- strike that.

18        So she came in during the early voting

19  period?

20     A.  Yes.

21     Q.  Did she ask you if you would be able to,

22  essentially, fix her vote and vote for the people she

23  wanted to?

24     A.  I don't think she asked me.  She asked one

25  of my employees, which is the end of her statement.

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK          7/11/2019

1   And I believe he told her that.

2             Just to be clear, I couldn't help her

3   because we can't get ballots back once they're cast.

4   I could not retrieve that ballot for her to correct,

5   cancel or redo.

6        Q.  So at that point there's nothing that could

7   be done with respect to Ms. Baker's ballot; correct?

8        A.  That's why there's a sign on every voting

9   machine in Georgia that says, Once you hit cast

10  ballot, it's final, we can't get it back.  I'm

11  paraphrasing.

12       Q.  Have you heard complaints similar to this

13  one in the past?

14       A.  Oh, yes.  In fact, I was in the news for

15  this in the 2018 election cycle.  Not that one; a

16  different news story.

17            We were having issues with -- there you go.

18  We were having issues with the machines because of

19  the age of the machines.  That's what it was.  There

20  was a lag time to them.  The calibration was more apt

21  to shift on the screen which is the reports of vote

22  clipping.  That's what that was, was a calibration

23  error.

24            Not to mention, folks -- because of all the

25  media reporting about it -- they are more apt to

Curling et al. v.       Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

```
 1  blame the machine rather than their hand when, say,

 2  one finger touches the screen rather than the finger

 3  they intended.

 4          MR. POWERS:  You just referenced the

 5      news article.  I'm going to hand you what

 6      I've marked for identification as

 7      Plaintiff's Exhibit 54.

 8          (Plaintiff's Exhibit 54 was marked for

 9      identification.)

10  BY MR. POWERS:

11      Q.  What is the title of this news article?

12      A.  Old technology creating new problems with

13  voting machines.

14      Q.  Is this -- strike that.

15          What date is the news article?

16      A.  October 25th, 2018.

17      Q.  Is this the news article that you were

18  referring to in the prior --

19      A.  I believe this was the situation I was

20  referring to.  I believe this is a reprint of a

21  different article than the ones that originally

22  carried it, but yeah.

23      Q.  And are you -- let's turn to the second

24  page.

25          Do you recall -- well, first, let me know
```

Curling et al. v.         Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1   when you've had a chance to take a look at it.

2            (Witness reviewing document.)

3            THE WITNESS:   Go ahead.

4   BY MR. POWERS:

5        Q.   Do you see where you're quoted on the second

6   page of Plaintiff's Exhibit 54?

7        A.   Yes.

8        Q.   Do you recall giving those quotes to a

9   reporter for a news story?

10       A.   I couldn't tell you which reporter it was,

11  but yes.

12       Q.   Would you mind reading the portion of the

13  news article that quotes you?

14       A.   This is a calibration error on the voting

15  machines Kirk told CBS 46 News.

16           The thing to remember is this is older

17  technology.   These have been around since 2002.

18  Remember PalmPilots?   You had to calibrate the screen

19  of a PalmPilot.   The machines are no different.

20           Kirk says they calibrate every voting

21  machine before it is used, but sometimes the machines

22  need recalibration.   He also says sometimes the

23  voter's height can be a factor.   Sometimes the

24  screens are set at a certain angle.   Depending on how

25  tall you are, your view changes a little bit, says

Curling et al. v.         Deposition of
Raffensperger et al.     JOSEPH KIRK           7/11/2019

1  Kirk.
2         Kirk says the machine question was
3  recalibrated Wednesday morning as soon as he heard
4  about the issue.  He also told voters to take their
5  time.  I know there is a long line, but don't feel
6  rushed.  That's your time with the machine.  That's
7  your time to make your voice heard, said Kirk.
8         Q.  These quotes are accurate?
9         A.  I'm assuming so.
10        Q.  You refer to calibration error on the voting
11  machines.  Could you tell me more about what that
12  calibration error is?
13        A.  Like I said in the article, the machines --
14  the screens on the machines function similar to the
15  screens in PalmPilots.  There's more than one layer
16  to the screen.  And how those layers interact when
17  you touch them is how it determines where you're
18  touching.  So you have to tell the machine, When I
19  touch here, this is what that is.
20             Over time that calibration drifts either
21  because of the machine being physically moved -- and
22  I'm not sure why, but sometimes dropping it will
23  change the calibration -- or just over time with
24  heavy use, it shifts.  So you're always going to see
25  more calibration errors in a high turnout election,

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1  which 2018 was, as opposed to a municipal election

2  where we might get a few dozen voters in any given

3  day.

4          Does that answer your question?

5      Q.  Yes.  Let's roll with it a little bit.

6          And I apologize if I might re-ask a question

7  or two here, but I just want to make sure it's in a

8  format that the court reporter can get down.

9          So you talked about -- is it fair to say

10 that the effect of the calibration error is that

11 when -- when the calibration is off, I hit candidate

12 X, but instead candidate Y's name lights up?

13     A.  That would be one example.  I think a better

14 way to say it would be when you touch one portion of

15 the screen, the machine interprets it as touching

16 another portion of the screen.  It doesn't

17 necessarily have to be for another candidate.  It may

18 be for -- and this is the one you don't hear about.

19         Let's say you're voting for candidate A and

20 the calibration shifted up.  When you touch

21 candidate A, nothing happens at all.

22         And then folks naturally -- because of touch

23 technology these days, people start touching around

24 and all of a sudden it works.  The only thing that's

25 nefarious is if it's not the candidate's name.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                  7/11/2019

1        Q.  Got it.  Got it.

2            So the change in calibration means that --

3    it can mean that clicking on one portion of the

4    screen functionally means clicking on another portion

5    of the screen; is that correct?

6        A.  That's correct.

7        Q.  Going back to what you said earlier with the

8    current DRE machines, that can occur when a DRE

9    machine is dropped?

10       A.  It can or it can occur just with heavy use.

11   That's why we calibrate them for every election to

12   make sure going into that election, they are as

13   accurate as we can get them.

14           And then if we need to go in and recalibrate

15   them, that's not hard to do.  So as soon as a voter

16   tells us there's an issue, we go in and correct that

17   issue.  But if they don't tell us, we don't know to

18   correct it.  That's why I appreciate stories like

19   this because it helped raise that awareness.

20       Q.  You also mention here that -- strike that.

21           Let's take the November 2018 election.

22           Do you recall how many times a machine

23   needed to be recalibrated over the course of that

24   election?

25       A.  Not off the top of my head.  No dramatic

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                    7/11/2019

1   number.  A handful of times.  But at any given

2   location between advance voting location, maybe a

3   machine or two on election day, it was really advance

4   voting that was the issue.

5        Q.  You mention that the voter's height can be a

6   factor.

7            With respect to the voters trying to cast a

8   ballot on a DRE machine, could you explain that to me

9   a little bit?

10       A.  I'm sorry.  I have to use a visual aid for

11  this one.

12           So let's say this is the screen in front of

13  you.  If you're sitting like you're sitting right now

14  and you push forward on the screen, it's going to go

15  this way.  If you're standing and push forward on the

16  screen, it's going to go that way.

17           So the underlying area that's actually

18  according to touch, you're touching different

19  portions based on your height.  So we try to keep the

20  screens at the same angle at all times and have

21  someone sort of average height calibrate them.  And

22  that's the best we can do.

23       Q.  So tell me how you became aware of this

24  issue with respect to voters' heights impacting their

25  experience attempting to click on the DRE machines?

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1       A.  I honestly don't remember.  I've been
2   involved with a lot of testing on a lot of different
3   levels and I'm six-foot-two.
4           So if someone a lot shorter than me
5   calibrates something, I'm going to notice when I go
6   test later that, wait, this is not going on here.
7       Q.  Got it.  So this is something you've noticed
8   based on personal experience testing DREs machines?
9       A.  Let's just say personal experience working
10  with DRE machines.
11      Q.  Okay.  I apologize for paraphrasing.  Please
12  feel free to correct me if I'm not getting this
13  right.
14          But the basic ideas is that if -- if a voter
15  is very tall or very short and they're looking at the
16  screen from a different vantage point, they might
17  think that they are trying to press the screen for
18  candidate A; and based on their high or low vantage
19  point, they may actually be clicking higher or lower?
20      A.  Right.  And keep in mind that in most cases
21  this isn't a problem.  It's just input and feedback.
22          So in most cases, if they touch the name --
23  let's say they touch toward the top of the box, touch
24  the one on the top of it, they see they highlighted
25  the wrong name.  They deselect it or call someone

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK              7/11/2019

1  over to help them deselect it and they instruct them

2  how, then touch the right name realizing you touched

3  lower that time.

4       Q.  Mr. Kirk, if you wouldn't mind turning to

5  page 287.

6       A.  Are we done with this one now?

7       Q.  Yeah, you can put -- what is it, 54?  Put 54

8  back in the pile.

9       A.  What's the page number?

10      Q.  Yeah.  Let's turn back to -- I believe this

11  is Exhibit 53 and page 287.

12      A.  Okay.

13      Q.  Could you first tell me the time and

14  location of the incident reported on page 287?

15      A.  This happened at my office during advance

16  voting for the 2018 election on October 16th at 8:36

17  in the morning.

18      Q.  What is the nature of the incident

19  description on this page?

20      A.  A voter complained to the poll manager that

21  she kept pressing the box over and over and over

22  again to make the X show up.  The manager instructed

23  her that if she kept pressing the box over and over

24  again, she was selecting it and then deselecting it

25  and if she just took the time and let the X appear,

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                    7/11/2019

1   that she would be in good shape.

2           That's where the incident report stops.  I'm

3   assuming that took care of her issue.

4       Q.  Do you see that happen from time to time

5   where voters have issues pressing on the screen?

6       A.  Pressing on the screen or pressing on the

7   screen the way it was described in the incident

8   report?

9       Q.  Let's talk about the way that's described in

10  incident report.

11      A.  No.  I don't see that very often.  Normally

12  folks are pretty savvy on the voting system these

13  days and knows how it operates.

14          That election, a lot of first-time voters,

15  not to mention an aging voting system that

16  exasperated existing issues like the lag time.  I

17  think that accounts for what's described here.

18      Q.  Is it your perception that because the

19  current DRE machines are aging, that there are more

20  issues now than there used to be, say, 10 years ago?

21      A.  I think that as anything gets older, with

22  the exception of wine, you're going to see more

23  issues with it.

24          (Plaintiff's Exhibit 55 was marked for

25          identification.)

Curling et al. v.          Deposition of
Raffensperger et al.       JOSEPH KIRK          7/11/2019

```
 1  BY MR. POWERS:
 2       Q.  I hand you what I've marked for
 3  identification as Plaintiff's Exhibit 55.
 4            What is Plaintiff's Exhibit 55?
 5       A.  It's an article published in the Daily
 6  Tribune on October 27, 2018, that addresses a few
 7  different issues that the reporter had some questions
 8  about.
 9       Q.  What's the title of the article?
10       A.  Election Supervisor Addresses Voting
11  Concerns in Bartow.
12       Q.  What is the date of the article?
13       A.  October 27th, 2018.
14       Q.  Could you please read for me the -- well,
15  strike that.
16            Do you recall speaking with a reporter for
17  this news article?
18       A.  I do.
19       Q.  Could you please read the first two
20  paragraphs of the news article?
21       A.  Bartow County elections supervisor Joseph
22  Kirk admits the county's voting technology leaves
23  much to be desired.  But as outdated as the hardware
24  may be, he nonetheless says residents shouldn't be
25  worried about their ballots not being tallied.
```

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK            7/11/2019

```
 1            I'll be the first to say it, we need to
 2   update our voting system, he said.  That being said,
 3   it is accurate; it counts votes properly.  It is a
 4   system that does one thing and does it well.  It
 5   counts votes.
 6        Q.  With respect -- well, strike that.
 7            First, do you believe that the current
 8   voting system needs to be updated?
 9        A.  Yes.
10        Q.  Why is that?
11        A.  Because it's old.  Because it's failing.
12   They don't manufacture it anymore.  I can't buy spare
13   parts for it anymore.  We need to update it.
14        Q.  When you say "it's failing," what do you
15   mean by that?
16        A.  I mean, the specific -- the hardware
17   components of the system are starting to wear out and
18   cannot be replaced.  So, say, a printer -- you know,
19   every printer eventually is going to stop printing,
20   even the ones on voting machines.
21        Q.  Mm-hmm.  You mentioned the -- let's talk
22   about the hardware components.  You mentioned the
23   printer wearing out.
24            What's the function of the printer on the
25   current DRE machines?
```

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

1        A.   To print information off the DRE machines.

2        Q.   The current DRE machines don't have a paper

3    trail?

4        A.   No, but you still can get reports out of

5    them.

6        Q.   What kinds of reports do they print?

7        A.   From a poll workers perspective, they print

8    an opening report at the beginning of the day -- or a

9    zero total report to demonstrate there's no vote that

10   has been cast on the system at the time of opening.

11   And at the end of the day, they print summary total

12   reports, which give a tally of votes per machine.

13   And then there's a function that we do not use to

14   accumulate the votes in that polling place and print

15   the accumulated totals for that polling place.

16            You can also print an audit log off those

17   machines.  You can -- there's a printer test page

18   that prints to verify that everything works properly

19   during L&A testing.

20            That's everything I can think of off the top

21   of my head, but that's probably not an exhaustive

22   list.

23        Q.   Fair enough.

24            And you mentioned a -- that you can print

25   accumulated vote totals off the machine; is that

1  correct?

2        A.   That's correct.

3        Q.   But you don't print those out?

4        A.   No.   I think it's a useless step.   If folks

5  want to know the accumulative total of the polling

6  place, they have a calculator on their phone.

7        Q.   Fair enough.

8            So these printers are wearing out?

9        A.   Well, yes.   Not all of them, not at the same

10  time, but hardware will eventually fail.

11       Q.   And are there any other -- you mentioned

12  hardware components.   Are there other components that

13  are wearing out?

14       A.   Well, batteries are starting to wear out.

15  That's why we have to charge them periodically to

16  keep a charge on them.   They're similar -- well, on

17  one system they are similar to the battery in a car

18  that needs a charge on it at certain points to keep

19  it from failing.

20           The card reader, we had some issues with

21  where you put the voter access card or the supervisor

22  card in, either failing to retain the cards inside

23  the machine and lock them in place or to read them.

24           Oh, and screens are starting to fail every

25  once in a while.

Curling et al. v.       Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1      Q.  I'd like to go back to talking about the

2  voter cards that you just referenced.

3          Are these -- are you referring to the voter

4  access cards?

5      A.  Yes.

6      Q.  First explain for the record, if you don't

7  mind, the function of the voter access cards.

8      A.  A voter access card is -- I believe it's --

9  the technology is called a smart card similar to the

10  chips on credit cards these days -- the voter access

11  cards are used to create -- well, to activate the

12  machine with the proper ballot style for the voter

13  and then to ensure the voter doesn't vote twice by

14  clearing the card out or saying it's been used after

15  the vote's cast.

16      Q.  I think I might be -- you had mentioned

17  something about the voter cards failing to retain

18  information?  Am I getting --

19      A.  No, no.  The machines failing to retain the

20  voter access cards inside the machine.  There's a

21  lever that pops up to hold them there.  The lever

22  doesn't work.

23      Q.  Is the voter access card inserted when the

24  voter is casting the ballot?

25      A.  The voter access -- so to vote on a voting

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK              7/11/2019

```
 1   machine in Georgia -- we'll just run through the

 2   voter's experience real quick.

 3         You enter the poll.  You fill out the

 4   paperwork.  You show your ID.  And then you go to an

 5   electronic poll book and express poll.  That's where

 6   your eligibility is determined --

 7   (incomprehensible) -- that sort of thing.

 8         At that point, once they determine

 9   eligibility --

10         THE REPORTER:  Slow down.

11         THE WITNESS:  -- they create a voter

12      access card.  I apologize.

13         And that's your ballot, per se, although

14      it's not linked to you in any way.  It's

15      just basically a blank piece of paper.

16         You take that to a machine.  Put it in.

17      That activates the machine and it informs

18      the machine what ballot style to display to

19      you.

20         You vote your ballot.  Review your

21      ballot.  And once you cast your ballot, the

22      last thing that machine does before it

23      ejects the card, it changes it from "not

24      voted" to "voted."

25         Pops the card back out.  And then you're
```

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

 1      supposed to take it to the poll worker, give
 2      it back and get a sticker.
 3  BY MR. POWERS:
 4      Q.  Is the basic issue that you were talking
 5  about with the lever that it's hard to get the voter
 6  card in the machine because --
 7      A.  No, not -- I think you're thinking of the
 8  wrong kind of lever.  I mean the lever a person uses.
 9  You put a card in the machine.  A lever pops up
10  behind it to hold it there, so it's just not popping
11  up.
12      Q.  What happens when the lever doesn't pop up?
13      A.  The card pops back out and nothing happens;
14  or if it's not been there long enough, it displays a
15  small error message on the screen saying, Could not
16  read card or card inserted improperly.
17      Q.  At that point is the machine usable?
18      A.  Absolutely.  And sometimes what happens is
19  they put it in too fast.  Back when folks were used
20  to going to an ATM and swiping their card, they pull
21  it in and pull it out so fast that they couldn't
22  retain it in there.
23          The poll worker would go over and say, Here,
24  let me help you.  Put it in here.  Push it until it
25  clicks.  Okay, you're good.  And they have a good

Curling et al. v.         Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1  experience from that point on.

2       Q.  So is the issue just that -- so what's the

3  impact ultimately of the lever not popping up and the

4  voting card not being able to be inserted?

5       A.  Potentially?

6       Q.  (Counsel nods head affirmatively.)

7       A.  I'm down a machine.  That's it.  It's not

8  going to affect the voter's right to vote.  It's not

9  going to affect them being able to vote.  It's not

10  going to affect that the count on the machines -- if

11  the machine dies, I can still get the votes off of

12  it.

13          So the worse scenario there is I'm either

14  down a machine in a polling place or during testing I

15  have to swap it out and they can't use that machine

16  for that election.

17      Q.  Say in the November 2018 election, if a

18  machine has to be taken offline, are you made aware

19  of that?

20      A.  Oh, absolutely.  I'm usually informed as to

21  everything going on technologically related on

22  election day, if not when it happens, as soon as I

23  get back to the office and touch base with everybody.

24          And then in most cases -- or all cases --

25  they're supposed to do it in all cases.  Any time

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK          7/11/2019

1  there's a weird issue with a piece of equipment, an

2  error message, something outside the normal course of

3  business of, well, the voter didn't know how to

4  insert the card, or something like that, they do an

5  incident report on it.  They are supposed to give me

6  the full text of the error messages, the complete

7  scenario of what happened, what machine it happened

8  on, everything.

9          Now, poll workers are notorious for not

10 reporting everything they should and in the manner

11 they should.  They might say, Machine died, had to

12 reboot it.  Meaning the power went out and they had

13 to turn the machine back on.  They might not tell me

14 which one it was or when it happened, but I'll get

15 word that it happened.

16     Q.  Were machines taken offline during the

17 November 2018 election?

18     A.  Off the top of my head, I'm not -- well, I

19 know I took -- I also don't remember.  I had to

20 recalibrate a few of them.  If I did, it's in here.

21     Q.  And you're pointing to Plaintiff's

22 Exhibit 53?

23     A.  Yes.  Is that 53?  Yeah.

24     Q.  If we could turn to the second page --

25     A.  This is on 55?

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                  7/11/2019

1        Q.   Yeah, sorry.  Let's turn back to Exhibit 55.
2   I apologize.
3             Second page, if you could look down at the
4   bottom of the page.  And if you could -- do you see
5   the portion of the article that refers to double
6   votes being cast in local election?
7        A.   Count paragraphs from the bottom for me.
8        Q.   Let's see.  One, two, three, four, five,
9   six.
10       A.   Yes.
11       Q.   And, yeah, so do you see where it refers to
12   double votes being cast in local elections?
13       A.   Yes.  I do.
14       Q.   Could you describe to me -- well, first,
15   perhaps, describe to me what double voting is?
16       A.   It's when one person casts two ballots in
17   one election.  At least that's what I'm calling it
18   here.
19       Q.   Fair enough.
20            How does it happen that voters cast more
21   than one ballot in an election?
22       A.   Well, I guess the simplest way to explain it
23   would be employee error.  One thing I talk about in
24   this article is that poll workers make mistakes.
25   Everybody makes mistakes.

APG USA INC.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK        7/11/2019

```
 1           And these are temporary employees with as
 2  much training we can give them in a short amount of
 3  time.  They're being asked to do a very difficult job
 4  for a 12-hour period.  I mean, mistakes do happen.
 5  That would be, of course, on election day.
 6           So when the person said, I didn't get a
 7  chance to vote, they didn't go back to confirm
 8  properly that vote had already been cast, whether
 9  that was through determining eligibility again or
10  through accounting for the votes on the voting
11  machines, they didn't follow some step of the
12  procedure because if they follow their procedures,
13  that wouldn't happen.
14           Now, we do have people sometimes at no fault
15  of their own, usually the elderly come in.  Because
16  the advance voting goes on for long, especially on
17  those 45 days, they come in on the first day and come
18  in the last day thinking it's a whole different
19  election trying to vote twice.  So if the poll worker
20  didn't catch it, they might have cast two ballots.
21           The example I use in the article, the card
22  reader on the express poll does not lock the card in.
23  There's an LED that turns green -- or red when
24  creating the card, green when it's safe to remove.
25  There's an indication on the screen saying, Remove
```

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK            7/11/2019

1   the card, give it to the voter.

2          When they're in a hurry and when there's a

3   line of people -- you know, a hundred people in front

4   of you waiting for you to do your job, you're in a

5   hurry.  You pull it out a split second too soon.  It

6   doesn't encode all the information properly.  They go

7   to the machine and this card doesn't work.

8          Well, there's also people who get to the

9   machine and go ahead and cast that ballot either

10  because they got confused and cast a blank ballot or

11  thought they were being clever or something -- and

12  come back and try to get another card.  Well, I

13  didn't vote because I didn't vote for anything.

14          And they are supposed to go through and

15  count the number of votes on the voting system.  The

16  number of cards they've issued as opposed to the

17  number of votes they received.  If all of them are

18  matched, yes, that person's already voted.  They

19  can't vote again.

20          If it's one less on the machines, then that

21  card was bad.  We need to remake that for the person.

22  At a large polling place in a big election, that's

23  extraordinarily difficult to do without stopping the

24  process completely.  We tried to avoid that.  So,

25  again, mistakes happen.

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1      Q.  Mm-hmm.  The article refers to -- I'm

2   looking at a paragraph or two from the bottom of the

3   second page.

4      A.  Okay.

5      Q.  So I see the part about -- that you just

6   described about taking it out of the machine a little

7   too quickly.  The paragraph above you says that

8   sometimes it's a matter of voter access cards not

9   functioning.

10        Is voter access cards not functioning a

11   separate issue from --

12        MR. MILLER:  I'm sorry.  Can you clarify

13     where you are here?  Are you looking at the

14     paragraph above the one he just referenced

15     or --

16        MR. POWERS:  Fair enough.

17        MR. MILLER:  Okay.

18   BY MR. POWERS:

19      Q.  Do you see where the paragraph that says,

20   Sometimes Kirk said it's simply a matter of voter

21   access cards not functioning?  It's the second

22   paragraph from bottom.

23      A.  To answer your question, yes, those two

24   issues are -- that's not two issues.  That's the same

25   issue.

1        Sometimes Kirk said it's simply a matter of

2   voter access cards not functioning.  They just don't

3   get programmed properly.  The person usually takes it

4   out of the machine a little too quickly and all the

5   information doesn't get put on there.

6        Q.  Got it.  And so how does the -- how does the

7   programming affect the issue with respect to double

8   voting?

9        A.  Well, the program we're discussing in this

10  article is specifically the programming of the voter

11  access card by the express poll.  And I probably used

12  the wrong phrase and actually called it "encoding" or

13  something of that nature.

14        Q.  Okay.

15        A.  That's not really an issue for double

16  voting.  That's explaining why we would have to

17  examine if a person's voted or not.

18        So just because somebody claims they haven't

19  voted yet doesn't mean they haven't voted yet,

20  especially if they have the card in their hand.

21  Chances are they already voted because that's how you

22  get it back out of the machine.

23        So then we have to follow these procedures.

24  And the most common cause for us following these

25  procedures, the express poll operator pulling the

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1  card -- the voter access card out the express poll

2  too quickly.

3      Q.  Does that mean the voter access card isn't

4  functioning or --

5      A.  It means they did not give the equipment a

6  chance to do its job.

7      Q.  Thank you.

8      A.  I guess the IT way of saying that is there's

9  a short between the keyboard and the chair.

10     Q.  Is it the poll worker or the voter who's

11 pulling the voter access card out?

12     A.  The poll worker.

13     Q.  So in short, the poll worker pulls out the

14 card too quickly and that's how the problem occurs?

15     A.  Mm-hmm.

16         Are we good on this one?

17     Q.  First, let's turn back to Exhibit 53.

18     A.  Okay.

19     Q.  If you could turn to pages 290 and 291, I

20 think they refer to the same voter.

21     A.  They do.

22     Q.  And looking at page 291, it looks like you

23 spoke with Brenda Hudson --

24     A.  Wait one second.

25         MR. POWERS:  Strike that.  Let me know

1    when you've had a chance to read it.

2          (Witness reviewing document.)

3          THE WITNESS:  Go ahead.

4    BY MR. POWERS:

5    Q.  Do you see the incident report that you

6    filled out on page 291?

7    A.  I do.

8    Q.  Who was the voter who had the issue

9    reflected on page 291?

10   A.  Brenda Hudson.

11   Q.  Can you please describe for me what happened

12   with Ms. Hudson and trying to vote in the 2018

13   election?

14   A.  Ms. Hudson came to advance voting in my

15   office.  I'm not sure what day she came in because

16   this all talks about the phone calls into the office

17   after she left.

18         She says that -- she told one of my staff

19   members that she was unable to cast her ballot, that

20   when she went to the review screen, the voter access

21   card popped out and the screen went blank.  She then

22   notified the person that was manning the exit door

23   what happened.

24         From my recollection of this, what's

25   described here isn't actually what happened.  Rather

Curling et al. v.         Deposition of
Raffensperger et al.    JOSEPH KIRK                7/11/2019

1   than it popping out and the screen going blank, it

2   returned to the screen to prepare for the next voter.

3   The machine didn't turn actually turn off.  The

4   screen did not go blank.  And when I talked to her

5   later, I confirmed that.

6          What this was was one of the issues I talked

7   about earlier about lag where she hit "next."

8   There's a -- when you hit that last button before the

9   summary screen on a DRE, it parses all your

10  selections into a displayable format for the review

11  screen.

12          In that lag, at that split second or two,

13  she touched the screen again.  At that point, the

14  machine interpreted that touch as cast ballot because

15  that's where the button is on the next screen.

16          So as soon as it displayed the review

17  screen, the card popped out.  Said, Thank you for

18  casting your ballot.  Please return to a poll worker.

19          At that point, she approached one of my

20  employees to explain what happened.  He did his job

21  in telling her, you know, once you vote, it's final.

22  We apologize.  And I hate having to say that in an

23  election, but it's an ageing system.

24          She contacted us again to make sure we knew

25  what was going on --

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                7/11/2019

1            MR. MILLER:  Can we pause for a second?

2            (Discussion ensued off the record.)

3            MR. POWERS:  For the record, we had

4        counsel join us.

5            MR. BERGER:  I'm just helping out.

6            MR. POWERS:  Could you just state --

7            MR. BERGER:  My name is Justin Berger,

8        attorney with Coalition.

9            MR. POWERS:  Thank you.

10           THE WITNESS:  I explained to her what

11       happened.  I explained there was nothing to

12       be done about it.  She was never -- I don't

13       think she ever understood what I was trying

14       to tell her.  She was elderly and just

15       didn't get the concept.  It's hard to

16       explain over the phone especially.  And she

17       was never satisfied and finally just hung up

18       on me.

19  BY MR. POWERS:

20       Q.  And, basically, what was the nature in terms

21  of her complaint about her actual vote?

22       A.  She was concerned that she didn't have a

23  chance to review her ballot to make sure all of her

24  selections were what she wanted them to be.

25       Q.  If we could turn to page 295.  I suppose I

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1   should ask actually, are the -- it looks like there

2   are pages 294 and 295.

3        A.   Those are related.

4        Q.   Okay.  Let's -- first, who is the voter?

5        A.   The voter in question here is -- I have her

6   identified as Ms. Maddox.

7        Q.   What date did this incident occur?

8        A.   The date of the first incident report is

9   October 25th at 10:30 a.m.  The second, which is the

10  resolution, is October 25th at 11:00 a.m.

11       Q.   What happened with Ms. Maddox's voting

12  experience in the 2018 election?

13       A.   This is another one who came back and it

14  looks like at a later date to tell me what happened;

15  that when she came in to vote, she touched one

16  candidate and says that another candidate was

17  selected as we talked about earlier.

18            She was looking for some assurance that her

19  vote was recorded properly.

20            Let's see here.  So it looks like in this

21  case, I described how the system worked.  I told her

22  my experience with it and all the testing I've done

23  on it.  And that seemed to reassure her that what she

24  saw in her summary screen was how the vote was

25  recorded.  And she left satisfied.

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                7/11/2019

1      And then she identified which machine she
2  was talking about, so we immediately went and
3  recalibrated it.
4      Q.  Before you recalibrate a machine, do you
5  check to see if there's an actual issue that requires
6  fixing or if it was just something perceived by --
7      A.  I have no way of doing that that I'm
8  comfortable doing during an active election because
9  that would involve me touching the screen in
10  different places to see what's going on.  I normally
11  just take them at their word mostly to say that I
12  took an action.
13      But, for example, in this case we're talking
14  about a machine -- anybody know what day of week
15  October 25th was?
16      MR. BERGER:  Was that a Monday or
17      Tuesday?  Is that the first day of early
18      voting?
19      MR. MILLER:  It was a Thursday.
20      THE WITNESS:  Okay.  She came in to vote
21      on the Friday before that and then came in
22      the next Thursday to tell me about it.  In
23      that time I could not tell you how many
24      voters voted on that machine without a
25      problem that was never reported to us.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

```
 1              So I have to think that was very much
 2        her experience and not everyone's
 3        experience, probably based on where she
 4        touched the screen.
 5   BY MR. POWERS:
 6        Q.  If we could turn to pages 296 and 297.
 7              Are the incident reports on pages 296 and
 8   297 related?
 9        A.  No.  It's different pieces of equipment.
10   Let me make sure.  Hold on.
11              No, they are related.  You're absolutely
12   right.  One is the problem.  The other is the
13   resolution.
14        Q.  And this, for the record, was an incident
15   that occurred at the Cartersville Civic Center?
16        A.  Yes.  And that would be during advance
17   voting.
18        Q.  Could you describe the -- was there an issue
19   with the DRE machine at the Cartersville Civic
20   Center?
21        A.  It looks what -- oh, this is not DRE at all.
22   This is express poll.
23        Q.  Oh, sorry.
24        A.  In advance voting, all the express polls do
25   is create ballot styles.  They are not linked to
```

Curling et al. v.          Deposition of
Raffensperger et al.       JOSEPH KIRK          7/11/2019

1  voters at all.  There are no names on the express

2  poll in advanced voting.

3         So what this is describing is as they tried

4  to boot it up, it tried to load the database off the

5  memory card and was unsuccessful and generated an

6  error message.  They tried to reboot it multiple

7  times to give it a chance to reload the database.

8  Like any computer, oftentimes rebooting solves the

9  issue.

10        When they were unsuccessful, we sent out a

11 new express poll to them to keep them up and running

12 and brought the other one back to the office.  And

13 that was probably set aside to be tested after the

14 election or going into the next election if we needed

15 to use it again.

16     Q.  And in that situation, you'll just test the

17 machine afterwards to see if it can be used in future

18 elections?

19     A.  Right.  There's a chance that the memory

20 card, there's something wrong with it and there's

21 actually nothing wrong the express poll at all.

22        I have a tendency while voting is going on

23 to solve the issue in the fastest easiest way

24 possible and go back and address it later if

25 necessary.  In this case, I'm not sure we went back

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1  to this express poll because we don't plan on using

2  it again.

3      Q.  What issue would happen with the memory card

4  that would cause that --

5      A.  The same as any kind of removable media.

6  Every once in a while, some data gets corrupted and

7  you have to restore the media.  This is no different.

8      Q.  Let's turn to page 307.

9          What was the time and place of the incident

10 on page 307?

11     A.  November 6, 2018, 8:01 a.m. at the White

12 polling place.

13     Q.  Do you see where Ms. Bagwell says that --

14 well, strike that.

15         Could you summarize for me what the issue is

16 on page 307?

17     A.  Ms. Bagwell called the manager over to

18 explain that she was concerned about the calibration

19 on the machine because when she went to touch it,

20 another candidate was selected.

21         Corey, the manager, told her about

22 calibration issues and I remember talking to the

23 manager about this after that election.  I had to

24 call her about something else and we discussed this.

25         The woman had a -- Ms. Bagwell had a long

1  sleeve and as I understand was fairly stiff.  So when

2  she reached out, the sleeve was touching the screen

3  before -- and this is the voter's admission.

4          The screen was -- the sleeve was touching

5  the screen before the voter did.  Therefore, that's

6  where it was recorded rather where her finger was

7  pointed.

8          Remember, these are old touch screens.  Back

9  in the day, it was physical touch not capacitive.

10     Q.  So with the current DRE machines, is it

11  accurate that pieces of clothing can be registered as

12  a touch on a screen?

13     A.  I think it's more accurate to say anything

14  that can touch the screen can register a touch on the

15  screen, whether you're using your finger, a pencil

16  eraser, your sleeve, your tie, hair.  Anything that

17  touches it can register as touch.

18     Q.  Sometimes voters will accidently touch the

19  screen with something other than their hand and not

20  realize that it's registering the machine?

21     A.  Or another good example is -- because it

22  averages all the points that are touched.  So if you

23  touch both sides of the screen at the same time, it's

24  going to record that as a touch in the middle.

25  That's how that technology works.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

1            So when they're gripping the screen, holding
2   onto it when they're voting, it's registering halfway
3   between their finger and their thumb.
4        Q.   Interesting.  Interesting.
5            So, for example, if I'm touching the top of
6   the screen with my finger, but my sleeve is touching
7   the bottom portion of the screen, the touch will be
8   registered at some point in the middle?
9        A.   Assuming that both things touch the screen
10  at exactly the same time.  Otherwise, it's whatever
11  one touches first.
12       Q.   Got it.  And if it touches first, then
13  you -- you -- if it's not the choice you need, you
14  need to unselect it and retouch the correct portion
15  of the screen?
16       A.   Exactly.
17       Q.   Last one of these.  Let's turn to page 317.
18       A.   Yeah.  I know what this one is.
19       Q.   Would you tell me about the time and place
20  of the incident reported on page 317?
21       A.   November 6, 2018 at 7:15 p.m. at the Pine
22  Log polling place.
23       Q.   What was the incident recorded and reflected
24  on page 317?
25       A.   Remember I told you poll workers aren't

1  always good about explaining things?  She couldn't

2  get the machine to print.

3          There's a little lever next to the printer

4  on the R6s.  If that lever comes up, the part that

5  holds the paper down comes up and it can't write to

6  the printer.

7          So when she saw the error message, she

8  called me.  I told her to put the lever back down and

9  she printed with no problem.  It had nothing to do

10 with counting votes.

11     Q.  Mm-hmm, mm-hmm.  Who was the poll worker

12 that you spoke to about this?

13     A.  Lorai Bell spelled L-O-R-A-I.

14         MR. POWERS:  Why don't we take a brief

15     break?

16         (Recess from 2:01 p.m. to 2:19 p.m.)

17 BY MR. POWERS:

18     Q.  Mr. Kirk, sometimes does it happen there are

19 long lines at early voting locations or polling

20 places on election day in Bartow County?

21     A.  Occasionally, yes.

22     Q.  What are the circumstances that cause long

23 lines at early voting locations -- or, excuse me,

24 election day polling places?

25     A.  In general, a lot of folks decide to show up

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1   at the same time.

2          One specific example is my office and -- my

3   office is not designed for what we use it for.  It's

4   the old state patrol barracks with the attached DDS

5   facility next door that's about twice the size of

6   this room.

7          I can only fit at most six machines in that

8   space to be used for voting.  When everybody in their

9   brother decides to show up for a

10  presidential/gubernatorial election, that line is

11  wrapped around the building.  You can only make the

12  line go so fast when you're fitting six machines in

13  the facility.

14         Besides that, there are times that we just

15  can't get the voters processed fast enough,

16  especially during advanced voting where there's more

17  to the process of paperwork than just grabbing a

18  birth certificate from his hand and seeing a driver's

19  license on an express poll.

20         Usually, it depends -- it depends on the

21  election where the bottleneck will be.  In a primary

22  election, we see a lot of bottlenecking at the

23  express polls or in the process in general as folks

24  change their mind as to what party's ballot they want

25  to vote; or in an election with a lot of

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1   constitutional amendments; or a big SPLOST election.

2   That's probably the first time a voter ever saw those

3   questions.  They get to the machine.  It takes them a

4   while to read those questions once they get there.

5          That's basically what causes it.

6       Q.  Are there times where -- what's the maximum

7   number of DRE machines you had to take offline at

8   your office at any given point in time during early

9   voting?

10       A.  In what election?  Or just in general?

11       Q.  In general.

12       A.  I can't think of a time where I've taken one

13  out of service at a time.  I usually go ahead and

14  create a couple of spares for that office because of

15  a three-week period for older -- and I'll go ahead

16  and swap those out throughout the process to get

17  tabulation easier on election night.  But because of

18  actual problems, not that often.

19       Q.  Are you aware of voters ever having been

20  issued an incorrect ballot when voting in person on a

21  DRE machine?

22       A.  Yes.  Unlike election day voting -- so on

23  election day the express poll ties that voter to

24  their ballot style, so there's no choice to be made

25  by the poll voter.  During advance voting, they have

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1   to choose that ballot style and location off a list,

2   which is fairly small text.  And, again, when there's

3   a bunch of people staring at you, you have a tendency

4   to rush.

5           So even though there's a few points in the

6   process you're supposed to stop and double check

7   themselves, every once in a while someone gets the

8   wrong ballot style.  And if it's an informed voter,

9   they'll let us know.  But in most cases they don't

10  know what districts they're in in the first place.

11  And they go ahead and vote and cast it.  I don't

12  catch it until after the election when I'm looking at

13  numbers.

14      Q.  Once that voter has cast a ballot in the --

15  strike that.

16          So is the result of being cast an incorrect

17  ballot sometimes mean that voters cast ballots in

18  specific election races or contests that they are not

19  supposed to be voting in?

20      A.  Absolutely.  Well, that's exactly what

21  getting the wrong ballot style means.

22      Q.  Once that happens, is there anything that

23  can be done to allow the voter to vote in all the

24  correct races?

25      A.  Not legally.  The only thing you can do to

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1   let the voter in other races is give them another

2   ballot vote and let them cast it again.

3       Q.  You find that this happens when you're

4   checking vote totals after an election?

5       A.  Yeah.  Sometimes then, we -- you know, I

6   used to see a lot of them when we used encoders

7   rather than express polls.  When the poll worker had

8   to determine for every voter based on their district

9   combination what ballot style to give them, what

10  party's ballot to give them.  Now we see it a lot

11  less because the express polls automate that process.

12           We have a tendency to put our better

13  employees on the equipment.  And with proper

14  training, that gets cut down dramatically.

15      Q.  Just to make sure I understand this

16  correctly, because of the express polls, you do not

17  see this issue so much on election day?

18      A.  Right because the express polls ties the

19  voter to their ballot style.  And express polls

20  during advance voting do not have any names on them.

21  They do not tie anybody to a ballot style.  The voter

22  has to look at the screen or the computer for the

23  voter registration system, determine the ballot style

24  and then select the proper information off the

25  express poll.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

1      Q.  So for advance voting, in the case of every

2   voter, the poll worker has to make the determination

3   themselves as to the correct ballot that must be

4   given to that voter?

5      A.  I think the term "selection" is more

6   appropriate.  We've already determined what ballot

7   style they should get, what district combination they

8   should get.  They have to take that information from

9   one screen and input it on a second screen.

10     Q.  For in-person early voting?

11     A.  And select it on a second screen -- yes.

12     Q.  Are you aware of any issues occurring with

13  respect to voters being issued the wrong ballot

14  because of the voter access card being miscoded?

15     A.  No.  Well, when you say "miscoded," what do

16  you mean?

17     Q.  I mean that the wrong ballot style is on

18  that voter access card?

19     A.  Okay.  I apologize.  I thought you meant the

20  issue we talked about earlier with them pulling the

21  card out too early.

22          Well, yeah, by definition if they get the

23  wrong ballot style, the card was encoded improperly.

24  That was based on the poll worker's selection not on

25  the equipment.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1     Q.   Thank you.

2          Do you ever receive complaints from voters

3  who've said, In the polling place, I think I've been

4  issued an incorrect ballot, or do the complaints

5  always come afterwards?

6     A.   Well, if they catch it before the ballot is

7  cast and they tell the poll worker, I don't consider

8  it a complaint.  That's just the process happening

9  the way it's supposed to.

10         People are human.  They make mistakes.  And

11  as long as the ballot hasn't been cast and canceled

12  off the screen on the machine, get that card back and

13  then redo it, giving them the proper ballot style.

14         One instance that sticks out in my head from

15  soon after I started my job -- I'm assuming you're

16  familiar with the federal ballot style?  This is a

17  ballot style that only includes federal races for

18  people who live overseas.  For some reason, that's

19  actually available on the express polls during

20  advance voting because it's how the software works.

21         So at one point the poll worker saw the

22  federal ballot style, rather than the full ballot

23  style that the person needed.  He ended up casting

24  that ballot before he realized -- you know, human,

25  thinking, Well, I'll cast the federal races first and

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK        7/11/2019

1   then I'll vote the state races.

2           Nothing I could do.  He actually called Fox

3   News from my office on me.  And they said, Well, did

4   you tell them before you cast your ballot?

5           This is an example of even when they see it,

6   they don't tell us.  If they don't tell us before

7   they cast their ballot, there's nothing we can do.

8   We cannot retrieve a vote once it's cast.

9       Q.  About how frequently does it happen that

10  someone gets the wrong DRE ballot during early voting

11  and it gets corrected before the person casts the

12  ballot?

13      A.  Not very often.  Again, these are not things

14  I usually record in an incident report.  On election

15  day, there's a way for them to record that that

16  happened, not so much during advance voting.  We can

17  see in the computer that the ballot was reissued --

18  no, no, we wouldn't reissue on the system there, so

19  there wouldn't be a lot of records for that.

20          But I think that's -- well, it's partially

21  because my employees have been trained better now and

22  do a better job.  There's also the issue of folks not

23  knowing what districts they are in to begin with to

24  know what ballot style they should be given.  It's a

25  two-prong issue.  I can only take care of half of it.

Curling et al. v.          Deposition of
Raffensperger et al.       JOSEPH KIRK            7/11/2019

1      Q.  It's more frequent that you see the issue
2  after the fact when you're reviewing --
3      A.  And even then I'm reviewing to look at stuff
4  to update training, to know what I need to emphasize
5  next time around.
6      Q.  Thank you.  I'd like to switch gears.
7      A.  Okay.
8      Q.  Let's talk about undervotes.
9      A.  Okay.
10      Q.  Can you explain to me what an undervote is?
11      A.  As far as I know, the working definition of
12  the term "undervote" is when someone chooses, for
13  whatever reason by choice or by circumstance, votes
14  for less candidates than they are allowed to in a
15  race based on how many -- you know, vote for one,
16  vote for two, vote for three.  And that's part of
17  HAVA.  They're aware of that prior to casting the
18  ballot.
19      Q.  Is it often the case that there's some
20  amount of roll-off and down-ballot contest in
21  statewide elections?
22      A.  I believe so.  It's not something I normally
23  look at much.  You know, the explanation I've had to
24  give a few times after I got to the county, I'd have
25  unopposed candidates call me to say, Well, there's

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK                7/11/2019

1  obviously a problem with your machines.  If 500

2  people vote, yet -- were given ballots -- only 400

3  voted for me, what happened to the other hundred

4  ballots?

5          I'm sorry.  They don't like you.  Straight

6  out how the conversation went.  They finally stopped

7  asking me.

8          But beyond that, I don't -- if something

9  jumps out at me, I'll look into it.  But I don't

10 remember any instance of an undervote rate jumping

11 out at me.

12     Q.  Are you aware of reports of an undervote in

13 the November 2018 lieutenant governor's race in

14 Georgia at the statewide level?

15     A.  You mean a strange undervote percentage?

16     Q.  Yes.

17     A.  I've heard reports of that.  I've not seen

18 it myself.  As far as I know, it didn't happen much

19 here.

20          MR. POWERS:  I'm handing you what I've

21     marked for identification as Plaintiff's

22     Exhibit 56.

23          (Plaintiff's Exhibit 56 was marked for

24     identification.)

25 BY MR. POWERS:

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK               7/11/2019

1        Q.   And, Mr. Kirk, what is Plaintiff's

2   Exhibit 56?

3        A.   These are the certified results for the

4   November 6, 2018 election, including the official

5   election summary report for all races, it looks like,

6   and then some pages of the statement of votes cast

7   report.  There's one page for governor here and then

8   turnout and then lieutenant governor.

9        Q.   Turning to page 60 --

10       A.   Yes.

11       Q.   -- could you tell me what the total number

12  of votes for governor in Bartow County was in

13  November of 2018.

14       A.   A total of 37,379 ballots were cast in that

15  election -- or votes in that election.

16       Q.   Could you tell me the number of votes that

17  were cast in the lieutenant governor's race in

18  November of 2018?

19       A.   Thirty-six thousand nine hundred and two.

20       Q.   And for the secretary of state?

21       A.   Thirty-six thousand seven hundred and

22  thirty-seven.

23       Q.   And for attorney general?

24       A.   Thirty-six thousand six hundred and

25  thirty-four.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK            7/11/2019

```
 1        Q.   Thank you.
 2             Do these vote totals look pretty typical to
 3   you?
 4        A.   I would think so.
 5        Q.   Have you spoken or communicated with
 6   individuals about the undervote race in the
 7   lieutenant governor's race in the November 2018
 8   election?
 9        A.   I can think of two specific conversations
10   about it, one with Garland Favorito about why --
11   fighting an idea why my undervote rate was so low
12   compared to the other counties; and then with Sara
13   Ghazal with the Democratic party.  You've got that
14   E-mail there somewhere in your stack.
15             I think that discussion was mostly through
16   E-mail rather than on the phone.
17             MR. POWERS:  Go ahead and mark this a
18        Plaintiff's Exhibit 58 --
19             THE REPORTER:  57.
20             MR. POWERS:  57, thank you.
21             (Plaintiff's Exhibit 57 was marked for
22        identification.)
23   BY MR. POWERS:
24        Q.   Is Plaintiff's Exhibit 57 the E-mail
25   discussion with Ms. Ghazal that you were just
```

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                7/11/2019

1  referring to?

2      A.  It is.

3      Q.  You had --

4      A.  Yes.

5      Q.  You had mentioned -- you had mentioned

6  speaking with -- was it Mr. Favorito?

7      A.  Yes.

8      Q.  Based on your conversations with Ms. Ghazal

9  and Ms. Favorito [sic], did you take a look at the

10  undervote rates in Bartow County in the lieutenant

11  governor's race?

12      A.  Well, I mean, I was curious when they

13  brought it up to me and looked, but I still don't see

14  anything that looks untoward.

15      Q.  Mm-hmm.  Did you look at the other counties

16  to see how your -- the undervote rate in your county

17  compared to those in other counties?

18      A.  No.  I asked Sara there if she had any idea

19  about the counties around me, but that was more out

20  of curiosity.  I can only speak for what my office

21  does.

22      Q.  Sure, sure.

23          Did you do any -- make any other inquiries

24  with --

25      A.  Not beyond what's documented in the E-mails.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK        7/11/2019

1   The -- she asked me one question about a setting she

2   found online for the GEMS database about how counts

3   are displayed.  I answered that question for her.  I

4   think that's about it.

5       Q.  Tell me about her question.

6       A.  I'm trying to remember.  It was some setting

7   in the database she found talking about how -- you

8   know, the split between screens.  And I think -- my

9   response -- and it was just me speculating was that I

10  thought that setting was designed for races that

11  couldn't fit on one screen on the DREs.

12          The way it's supposed to work is if a race

13  can't be displayed on one screen, it just goes to the

14  next screen.  And I think the setting she is found

15  was from a different state, allows the split between

16  the screens.

17          I couldn't confirm.  It wasn't in my

18  database and I couldn't confirm that anything like

19  that happened in Georgia.

20      Q.  Did you check the GEMS database?

21      A.  I went and looked for the setting to see if

22  it was there because I was curious.  I didn't see it.

23      Q.  Did you find any other issues when you

24  looked at the GEMS database for Bartow County?

25      A.  No.

APG USA INC.

1      Q.   I should ask a related question.

2           Did you review the GEMS database before the

3   November 2018 election or afterwards?

4      A.   Reviewed it for what?

5      Q.   Weren't you just referring to reviewing the

6   GEMS database?

7      A.   Well, this whole conversation was after the

8   election, so after the election.

9      Q.   Did you review the GEMS database before the

10  November 2018 election?

11     A.   Well, again, for what?  Do you mean the

12  normal course of business or do you mean looking for

13  a specific issue?

14     Q.   Did you conduct any type of review --

15     A.   Well, just we normally would through L&A

16  testing.  We test to make sure -- yeah, that's part

17  of the testing I described earlier.  The test starts

18  on the server when the card is created and ends when

19  we put the results back to the server.

20          So through that, yes, we reviewed the

21  database, but I didn't go through point by point,

22  line by line to make sure that -- you know, box by

23  box to make sure everything was set the way it needed

24  to be set.  If it wasn't, it would become very clear

25  once we used the equipment.

1     Q.  Tell me about the kind of review or testing

2   that you do of the GEMS database before the election.

3     A.  Pretty much we test functionality that's

4   going to be used for that election; so the ability to

5   download memory cards, to upload memory cards.  We

6   test every single memory card to make sure it will

7   upload back to the server.

8          And then at the end of that -- and there are

9   reports that are printed off of there during the time

10  that show we did the test.  And at the very end, we

11  export the results like we would on election night

12  and upload them to the State's election night

13  reporting website to make sure that everything

14  transfers correctly that way.

15    Q.  But you're not going line by line through

16  the database yourself?

17    A.  No.

18    Q.  Is anyone else --

19    A.  I don't want to make it sound like I'm going

20  through lines of code.  I used the wrong term there.

21  There's different sections of the database that are

22  configured for races, for candidates, for base

23  precincts.

24          And I've already checked most of that

25  information by the time I get to the database.  I've

1  checked to make sure the district combinations are

2  associated with the right ballot styles, all the

3  ballot styles are there, all the information is

4  contained on the ballots that is needs to be

5  contained on the ballots.

6          So there's not much to need to look at the

7  database.  You know, everything that we need to look

8  at, we look at the output not how it's created.

9      Q.  So is the pre-election review of the GEMS

10 database more of a perfunctory, making sure it looks

11 like you already believe it does based on your --

12     A.  You mind saying that again?

13     Q.  So is the review of the GEMS database kind

14 of more of a perfunctory procedure before the

15 election?

16     A.  At no point in time do I say, Okay, it's

17 time to review the database; let's sit down and do

18 that.  This is all part of other procedures.

19          So, no, they are not perfunctory.  They are

20 important and we take it very seriously.  And if we

21 see something that doesn't look right as we're going

22 through and looking at the ballots on the touch

23 screens, as we're trying to run the ballots through

24 the scanners, that sort of thing, then we'll

25 investigate that.  If everything functions properly,

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                7/11/2019

1  there's no need to dive deeper.

2      Q.  Understood.  And have you ever found errors

3  as part of this review process of the GEMS database?

4      A.  Yes.  Sometimes we find some misspelled

5  words.  Again, I'm looking at ballots.  I'm not

6  looking at the database.  We find some misspelled

7  words.

8          One thing I have started to do with the

9  database is I listen to audio files as soon as I get

10 it because there was an instance maybe it was in 2018

11 where an audio file was left off.  We didn't catch it

12 until halfway through L&A testing and we had to go

13 back and redo some stuff.

14          So now the first step is, before she

15 downloads memory cards, run through and make sure

16 there is audio associated with all the races and all

17 the candidates before we go any farther.

18     Q.  Mm-hmm, mm-hmm.

19     A.  So I guess that would be a review of the

20 database.

21     Q.  Have you found any other errors?

22     A.  No.  What sorts of errors are you looking

23 for?

24     Q.  Errors in terms of ballot configurations or

25 anything of that nature.

1      A.  No because, again, by the time I get that

2   database, we've already submitted -- well, they get

3   their information to build the database straight out

4   of the voter registration system.  So we've already

5   checked that.  That's what we use every day.

6           Once we get the ballot proofs in -- and I've

7   given you copies of all that -- there's reports there

8   where you see this ballot style is going to this

9   polling place; it has these races on it.

10          So I can tell from that that the output is

11  correct.  So any configuration errors will be taken

12  care of before I ever get the database to even

13  attempt to review it.

14      Q.  Sure.  Who prepares the GEMS database

15  currently?

16      A.  The Center for Election Systems.

17      Q.  Has that always been the case while you were

18  working as --

19      A.  I've chosen to use their services since I've

20  gotten here.

21      Q.  Are vendors involved at all in the

22  preparation of the GEMS database?

23      A.  They better not be.

24      Q.  Why do you say that?

25          MR. MILLER:  I'm going to object to this

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

```
 1         point on relevance.  I'm just curious the
 2         path we're trying to go down here.
 3              MR. POWERS:  I think it's --
 4              MR. MILLER:  I mean, he can answer
 5         anyway.  I'm just putting my objection.  I'm
 6         going to object as to relevance and to the
 7         scope of discovery here.
 8              I'm not sure where this line is leading,
 9         but I'm just putting it on the record.
10              THE WITNESS:  As a matter of policy from
11         my department, I choose not to use selection
12         vendors for anything related to the
13         equipment, coding, anything that's my
14         statutory responsibility.  And that's just a
15         personal decision that I made.
16              MR. POWERS:  Let's turn back to the
17         E-mails with Ms. Ghazal.  Where was that at?
18              Let me see if I can find it.  If not,
19         we'll turn back to it later.
20              Let's move on.  I'm handing you what I'm
21         marking for identification as Plaintiff's
22         Exhibit 58.
23              (Plaintiff's Exhibit 58 was marked for
24         identification.)
25    BY MR. POWERS:
```

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1      Q.  In particular, I'd like to ask you to turn

2   to page 273.  And I think there's a tiny little bit

3   that's spills onto 274, just so you can see that.

4          Could you tell me who is on the E-mails --

5   well, first, did you print out and produce these

6   E-mails in response to plaintiff's subpoena?

7      A.  I did.

8      Q.  Can you tell me who is on the E-mail threads

9   on page 273?

10      A.  Beth Howard, who's my electronic voting

11   machine technician, and Melanie Frechette, who was at

12   the time, I believe, my liaison at the Secretary of

13   State's Office.

14      Q.  What dates were these E-mails sent?

15      A.  November 1st, 2018.

16      Q.  Could you describe for me what Ms. Howard

17   and Ms. Frechette are E-mailing about here on page

18   273?

19      A.  When the results were exported from the GEMS

20   database to go to the election night reporting

21   system -- each candidate in a race is assigned an

22   export ID to tie it from one system to the other, so

23   they know the votes are being dropped in the right

24   bucket in the election night reporting system.

25          When they created the database for this

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1   election -- I forget who did that -- they didn't type

2   in enough digits for one of the export IDs.  So when

3   Beth tried to upload to the state the L&A testing to

4   make sure everything worked right, those votes didn't

5   drop into the governor's race, I believe.

6          It should be five characters.  It was only

7   four characters long.  Beth had to go into the server

8   and update the export ID.  That's something that's

9   apart from the rest of the system.  That's not locked

10  down with the election.  You can change that as you

11  need to.

12         So she was able to make the change.  It was

13  no problem.  We uploaded it fine.  Kept on moving.

14     Q.  Mm-hmm.  Could you tell me again where is

15  that change physically made?

16     A.  You want the actual screen?

17     Q.  Yeah.  I'll rephrase the question.

18         What's the process by which you go by fixing

19  this issue?

20         MR. MILLER:  And at this point I'm going

21         to have to state for the record that this,

22         in as much as it's relating to the GEMS

23         database and ongoing discovery issues with

24         the Court, that has been settled between the

25         parties.  As to outside third parties, it's

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

```
1        a separate issue.
2            And to the extent we're starting to talk
3        about the framework, interrelation of coding
4        cells or anything of that nature, these
5        items need to be talked about subject to a
6        protective order that we've been asking for
7        for some time.
8    BY MR. POWERS:
9        Q.  You may answer.
10       A.  I'm going to choose to answer in a general
11   sense.  Is that okay?
12           MR. MILLER:  Okay.  And I'm going to
13       have to also further state that this is not
14       a situation where it's just for kicks.  This
15       is state law that dictates what information
16       needs to be kept confidential and may
17       influence the election.
18           I don't know where this line of
19       questions is leading.  If that's not the
20       case, then by all means let me know.  But
21       that's what it sounded like.
22           MR. PHILLIPS:  Joseph, I'll say, as you
23       answer this question, make sure that you do
24       not run afoul of the statutes that you and I
25       previously discussed regarding the state law
```

APG USA INC.

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1          confidentiality and state law protection for

2          the GEMS database system, the election

3          process.

4               THE WITNESS:  I understand.  So I'm

5          going to answer in general terms.

6               You log into the database.  You navigate

7          to the appropriate screen that contains this

8          information and you make the change.  Is

9          that fair?

10  BY MR. POWERS:

11          Q.  Is that change made at your office or

12  remotely?

13          A.  At my office.

14          Q.  Was it Ms. Howard who made the change in

15  this particular instance?

16          A.  It was.

17          Q.  Explain to me on the back end, if this error

18  had not been corrected, what would the impact have

19  been with respect to the tabulation of votes?

20          A.  None.  The only thing impacted was the

21  State's election night reporting system on election

22  night until we noticed there were no numbers

23  reporting for that race.

24               And just to say, those numbers aren't

25  official anyway.  It's what caused little bit of

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1  confusion, why those numbers weren't being reported.

2       Q.  So just to make sure I'm understanding this

3  right, the election night reporting would not have

4  shown any votes that were cast in the governor's

5  race?

6       A.  I'm not sure if it's the governor's race or

7  as a whole or just one of the candidates in the

8  governor's race but something along those lines.

9       Q.  Going back to the lieutenant governor's

10 race, you had mentioned talking with Mr. Favorito

11 about potential causes for the undervote.

12          What did you discuss with him regarding the

13 undervote?

14      A.  That was a long time ago.

15          I remember him asking me if I did anything

16 differently than other counties that might have

17 caused us not to have the undervote rate.  My answer

18 was, No, we do everything the same as everybody else

19 does as far as I know.

20          We talked about some social factors that may

21 have had an impact on it, but that was pretty much

22 it.

23      Q.  Do you have any explanation as to why the

24 undervote rate in Bartow County was -- or might have

25 been lower than the undervote rate in other counties?

1      A.  No.  I have no idea.

2      Q.  The export code for election night

3  reporting, is that a different -- is that separate

4  from the code for the actual tabulation of results?

5      A.  When you say the code for tabulation of

6  results, what are you referring to?

7      Q.  I guess my question is:  Is counting votes

8  for purposes of election night reporting different in

9  some way than the actual counting of votes, sort of

10 more broadly?

11     A.  I think it's important to clarify what we

12 mean when we say "counting votes."  The votes are

13 counted when the ballot is cast.  Later on, it's

14 tabulated and the results are put together.  And

15 that's done by the server to generate the final

16 results, countywide results.

17         That export ID is for transmission of data

18 to another system not for counting anything or

19 tabulating anything.

20     Q.  The reports for the results are generated

21 from the GEMS database itself?

22     A.  Are we talking about precinct-based reports

23 or the county reports?

24     Q.  Both.

25     A.  Well, no.  They don't have a GEMS server at

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1 the precincts, so those reports are printed out of
2 the DREs.  The reports on election night and after
3 for certification are produced off the server.
4      Q.  Turning back to Plaintiff's Exhibit 58.  If
5 we could turn to pages, really, 276 and 280.  I think
6 they are dealing with the same issue.  Perhaps, we
7 could deal with them all as a group instead of --
8      A.  Okay.  I don't have much to tell you about
9 this one, but what would you like to know?
10     Q.  If you could -- well, first, tell me the
11 date of these E-mails.
12     A.  October 27 through October 30.
13     Q.  Did you produce these E-mails in response to
14 plaintiff's subpoena?
15     A.  I did.
16     Q.  Are you E-mailing with John Hallman in these
17 E-mails?
18     A.  I am in the first one.  I am in the second
19 one.  And the third one, Cheryl is E-mailing with
20 them and including me on it.  Cheryl Billard is my
21 assistant department head.
22     Q.  Turning to --
23     A.  And I should go ahead and say, I have no
24 knowledge of the voter registration system's
25 architecture.  I mean, that's what we're discussing

1    is the servers for the voter registration system.

2        Q.  So tell me what you are E-mailing

3    Mr. Hallman about?

4        A.  During advanced voting, there are a lot of

5    users on the voter registration system.  That's how

6    we issue absentee ballots.

7            The State, as far as I understand it, has

8    multiple servers to handle that load and they can

9    expand them as they need to.

10           John had asked us to let him know if we

11   started noticing a slowdown, so he could react on his

12   end to expand things as needed and reallocate the

13   workload.  So that's all this is.

14       Q.  Got it.  Got it.  Thank you.

15           Now, how does -- actually, I'll come back to

16   that.

17           Let's talk about updates to DRE machines and

18   processes for maintaining and using them.

19       A.  Okay.

20       Q.  Have you received any instructions, advice

21   or guidance from the Secretary of State with respect

22   to improving the security of the existing DRE voting

23   system in the past year or two?

24       A.  That depends what you consider a change in

25   security and advice.  Security of the voting system

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK        7/11/2019

1  is very much a wholistic approach and based on

2  physical security and chain of custody.  A lot of our

3  security hasn't changed because what we were doing

4  worked and it continues to work.

5       We are more cognizant now.  For example, I'm

6  a member of a group at the State's recommendation

7  called MS-ISAC, which is the Multi-State Information

8  Sharing and Analysis Center.  It's looking at threats

9  to our operation as a whole that way and dealing with

10 cyber threats that way.

11      But as far as DRE specifically, we haven't

12 updated that software.  We haven't updated any

13 antivirus by definition because there's no vector for

14 the antivirus -- do you see what I'm saying?

15      Q.  Yeah.

16      A.  It's a standalone system that's frozen in

17 time.  We keep it isolated and that's how we keep it

18 secured.

19      Q.  What changes to the processes with respect

20 to the security of the existing DRE voting machines

21 have been made in the past year or two?

22      A.  I secure my voting machines the same way

23 I've always secured my voting machines, through a

24 security system, through controlled access, through

25 chain of custody, through numbered seals.

1    I guess there's one change I've made in the
2 last year to how the database is transmitted to us
3 where it's being hand-delivered rather than sent via
4 a courier or a -- I can't remember whose service they
5 used to send that, but they would send it overnight
6 with somebody.
7    Besides that, I'm doing what I've always
8 been doing.
9    Q.  Yeah.  Let's -- so you're -- in your answer,
10 you were just talking about receiving.
11    What were you receiving by hand delivery as
12 opposed to through courier?
13    A.  The GEMS database I use to run the election.
14    Q.  At any time in the past was the GEMS
15 database transmitted through an FTP site or
16 electronically?
17    A.  Not to my knowledge.
18    Q.  I'm not sure exactly the best way to deal
19 with this, but I'm handing you what's been previously
20 marked as Plaintiff's Exhibit -- I'll grab some
21 copies.
22    Mr. Kirk, what is Plaintiff's Exhibit 8?
23    A.  I'm actually not sure.  What am I looking
24 at?
25    It's a document titled, Election Related

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK            7/11/2019

1   Files, dated March 3rd, 2017.  And I'm not sure who

2   produced it or for what purpose.

3        Q.  Have you seen a document such as -- or

4   similar to Plaintiff's Exhibit 8 in the past?

5        A.  No.

6        Q.  So let's talk about how you used to receive

7   the GEMS database.

8             How did the process work in the past?

9        A.  Once I approve the proofing package that I

10  receive from the Center, I send them that approval.

11  They send my print files to my print vendor and I

12  can't tell you how that was done.  They would turn

13  around and send me my database.

14             That was done through overnight delivery.  I

15  believe it was password protected and Beth had to

16  call to get the password from them.  But it's been

17  years and years since I've had anything to do with

18  that.  That's what I have employees for.

19        Q.  How does the process work today?

20        A.  Well, the same as I just described except

21  that there's a time -- and you've got in my documents

22  somewhere, listings of where a state election

23  inspector, a law enforcement official would drive to

24  a central location for the counties to come and pick

25  up the files from him or her directly.  And then we

Curling et al. v.        Deposition of
Raffensperger et al.   JOSEPH KIRK               7/11/2019

1  had to do stuff ahead of time to say who's he picking
2  it up from, approve the ID when they got there.  Then
3  once they got back, they had to call for the
4  password.  In my case, they used the Secretary of
5  State's Office here in Cartersville, so I'm very
6  fortunate.
7         Q.  Who receives the GEMS database on behalf of
8  the Bartow County BORE?
9         A.  I usually send Beth Howard to get it since
10 she's the one who needs it, but I have gone myself to
11 pick it up once.  But whoever I designate will.
12        Q.  Previously, I asked you if there had been
13 any updates to security-related processes and
14 procedures with respect to the DRE machines.
15            Other than the one you just described with
16 respect to transmission of the GEMS database, have
17 there been any other updates or changes within the
18 last year or two?
19        A.  Not that I can think of.
20        Q.  Are you aware of plans for any such changes
21 in the future?
22        A.  For the current system?
23        Q.  Correct.
24        A.  No.
25        Q.  Now, I'm going to... Mr. Kirk, have you

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                    7/11/2019

1  heard of the elections.kennesaw.edu server being used

2  by election officials to pull materials from in the

3  past?

4      A.  Yes.  In fact, I pulled materials in the

5  past because that's how we used to get our proofing

6  package.  That's how they used to distribute

7  procedural guides.  There was a document library on

8  there we'd go to to get information we needed.  And

9  then there were files that were sent to us -- other

10 files that were sent to us through that that didn't

11 contain personal information occasionally.

12          But in most cases, we're talking about

13 policy documents, procedural documents and proofing

14 information.

15     Q.  You mentioned other files.

16         Can you describe for me what other files

17 you're referring to?

18     A.  We talked about proofing.  We talked

19 about -- oh, for example, they put the numbered list

20 back on there for us to get after the election, I

21 think.  Not everybody has the capability to generate

22 numbered lists off their express polls anymore.  It's

23 outdated software.  We have to keep a special laptop

24 in the office that's old enough to pull the file.  So

25 for counties who don't have the capability, they'll

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK               7/11/2019

1  put the numbered list back on there to send them back

2  to.

3      Q.  What are the "numbered lists"?

4      A.  Numbered lists are required by law for every

5  polling place to list the people who came in to vote

6  and the order they came in to vote.

7      Q.  Got it.  Got it.

8          And those lists would sometimes be put by

9  counties back on the election --

10     A.  No.  The counties who couldn't generate

11  their own numbered lists would request the center to

12  do it for them and the center would send it back to

13  them that way.

14     Q.  Got it.  Got it.  Thank you.

15         Other than the numbered lists, the material

16  guides and the proofing package, any other kinds of

17  files?

18     A.  Nothing I can think of, at least not that I

19  used.

20     Q.  Sure.  Could you explain to me what the

21  proofing package you're referring to is?

22     A.  Envelope one.  And you already have that in

23  the last --

24         MR. POWERS:  Got it.  Got it.

25         Just for housekeeping purposes, I'll go

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1          ahead and mark envelope one as Plaintiff's

2          Exhibit 59.

3              (Plaintiff's Exhibit 59 was marked for

4          identification.)

5   BY MR. POWERS:

6          Q.  Are you aware of any security measures ever

7   having been taken in Bartow County to try to search

8   for malware or other signs of electronic intrusion

9   into the County's selection infrastructure?

10         A.  Well, yes.  Every time the system is

11  acceptance tested, they check for that.

12         Q.  How do they do that?

13             THE WITNESS:  I'm sorry.  Can I answer

14         that one?

15             MR. MILLER:  How does the acceptance

16         test operates?

17             THE WITNESS:  How they check for malware

18         during the acceptance test.

19             MR. MILLER:  On the GEMS or -- I'm not

20         your attorney.

21             MR. PHILLIPS:  Let's take a break.

22             MR. MILLER:  That works.

23             MR. PHILLIPS:  Take a break.

24             MR. MILLER:  While we're taking a break,

25         I just want to note where we are timewise.

Curling et al. v.         Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1      I think we're at about five hours or so
2      including the breaks, so just making sure
3      where we are timewise.
4            (Discussion ensued off the record.)
5            (Recess from 3:15 p.m. to 3:24 p.m.)
6            (Whereupon, the record was read by the
7      reporter as follows:
8            Q.  Are you aware of any security
9      measures ever having been taken in Bartow
10     County to try to search for malware or other
11     signs of electronic intrusion into the
12     county's selection infrastructure?
13           A.  Well, yes.  Every time the system is
14     acceptance tested, they check for that.
15           Q.  How do they do that?)
16           THE WITNESS:  Talking about the election
17     infrastructure, when the voting system is
18     acceptance tested.
19           One of the steps they take is to run a
20     hash code verification on the GEMS server.
21           What that does is it examines specific
22     files and folders on a binary level.  Runs
23     it through an algorithm.  And if there's a
24     single bit of information in that -- in
25     those files or folders that's changed, it

APG USA INC.

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK               7/11/2019

1        changes the output, so we know everything is

2        exactly the way it should be.

3            And through the server, they also test

4        the machines because for a vector attack,

5        for it to go through the server -- for it to

6        be on different machines, it would have to

7        go through the server first.  And if it

8        changed it on the server, we will know.

9    BY MR. POWERS:

10       Q.  I mean, might there be ways to cover one's

11   tracks if one is -- if a hacker is trying to

12   electronically infiltrate the --

13       A.  I apologize.  That is not my area of

14   expertise.

15       Q.  That's totally fine.

16           Now, were you aware that the

17   elections.kennesaw.edu server was ever used to

18   transmit bulk updates for electronic poll books?

19       A.  Yes.  I should have mentioned that earlier.

20   That is one that comes in through there.  That was a

21   fairly consistent use of that server.

22       Q.  Let's see.  I have that here somewhere.

23           So let's talk about bulletin updates.

24           First, could you explain for me what bulk

25   updates of the electronic poll books is in layman's

Curling et al. v.          Deposition of
Raffensperger et al.       JOSEPH KIRK          7/11/2019

```
 1  terms?
 2       A.  In layman's terms we're updating the
 3  electronic poll books to say who's voted absentee
 4  during -- before election day, so they can't vote
 5  again on election day.
 6       Q.  And how -- strike that.
 7            At what point in time before election day is
 8  that bulk update transmitted?
 9       A.  Transmitted or used?
10       Q.  Let's start with transmitted since that was
11  the question pending and then move to used.
12       A.  Normally, unless something -- well,
13  normally, at some point in the evening of the last
14  Friday of advance voting, everybody works late that
15  night to make sure all the records are in the
16  computer properly.  So when the center pulls that
17  file out of the voter registration system, it's
18  complete because the last thing we want to do is have
19  to stare name by name adding names later.
20            Because where it's a very automated process
21  using a bulk update, if you don't use that, you have
22  to sit at the express poll and look up each person's
23  name, go into the different screens, select them as
24  absentee, back up and look up the next name.  It's
25  very labor-intensive.
```

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

```
 1             So we get it late Friday night.  We don't
 2   usually use it Friday -- well, we have to use it at
 3   some point that week, usually Saturday, if not
 4   Saturday, then Sunday in preparation to check out the
 5   express poll with the poll managers on Monday.
 6        Q.  To clarify my earlier question, is it
 7   currently the practice of -- that these bulk updates
 8   are transmitted through the elections.kennesaw.edu
 9   site?
10        A.  As far as I know, that site doesn't exist
11   anymore.  So, no.
12        Q.  Fair enough.
13            How are bulk updates currently transmitted?
14        A.  Through a secured FTP site.
15        Q.  Got it.  How long -- strike that.
16            For what period of time were bulk updates in
17   the past previously submitted through the
18   elections.kennesaw.edu site?
19        A.  I'm trying to remember if they'd -- if we
20   did the bulk update like that when it came to the
21   county.  I think we did.
22            So from my knowledge, from the time I
23   started this job through whenever they changed to the
24   FTP site.  And I can't remember when exactly that
25   was.  It was sometime in the last couple of years.
```

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK            7/11/2019

1    Q.  Is Bartow one of the counties that receives

2  the -- or strike that.

3       Is Bartow County one of the counties that

4  received the bulk updates electronically from the

5  Secretary of State's Office?

6    A.  You mean currently?  Right now?  If I was

7  having an election, I would receive it electronically

8  from the State?

9    Q.  Yes.

10    A.  Yes.

11    Q.  Did you ever download bulk updates from the

12  elections.kennesaw.edu website?

13    A.  I'm sure I did if that's where they posted

14  them.

15    Q.  How would the -- I apologize if this is

16  super basic.  But basically the process is that you

17  would E-mail someone from the Secretary of State and

18  say, I need a -- I need you to send me the bulk

19  update, they post it on the elections.kennesaw.edu

20  website and then you pull it down manually?

21    A.  No.  The one that talks about -- the

22  transmission of data to and from the center shows it

23  to you.  There's a -- very rarely do I tell them when

24  I'm ready for them to pull that file.  In fact, I can

25  only think of one time -- and it's documented

1   there -- that it's happened because of a special

2   election -- a special primary that Bartow employees

3   were having; it was just the two of us.

4          Besides that, the State tells us, You better

5   have your job done by this time because that's when

6   it's happening and it'll be there as soon as we're

7   done.

8          Q.  Got it.  Got it.

9          So I just handed you --

10          A.  There we go.

11          Q.  Yeah, I just handed you what's been marked

12   as -- or was previously marked as Plaintiff's

13   Exhibit 47.

14          Could you describe to me what's on the first

15   page where it says, Bulk upload for KSU reminder?

16          A.  The -- this is an election update dated

17   February 23rd, 2016.  And it's saying that -- to

18   remember that we need to make sure we have everything

19   in the system by 8:30 p.m. Friday, February 26, 2016;

20   and that after the center receives the file from the

21   State -- because that's back when they were

22   separate -- they'll begin preparing bulk update

23   files.  They'll be available on the website at 11:00

24   p.m., Friday the 26th, depending on the first thing

25   that's used.  And then it describes where to find the

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

1   instructions for how to use that file and where to

2   call if you have any issues.

3        Q.   Got it.

4             When you wanted to download the bulk update,

5   would you just go to the website and just click

6   "download" off of that?

7        A.   No.  There's a few steps in between that.

8   There's a username, a password.  Navigating to the

9   proper place.  And then if I remember correctly, it

10  was a link that you clicked to download the file.

11       Q.   Got it.  So it's like a password protected

12  website?

13       A.   Yeah.  Think of it as going and downloading

14  your bank statement.  You've got to log into the

15  website first, go to the right screen and then

16  download your bank statement.  Same basic process.

17       Q.   Perfect.  Thank you.

18            Now let's talk about the current process,

19  the secure FTP site.

20            Is the process essentially the same as

21  before -- strike that.  I'll ask a better question.

22            How has the process for downloading the bulk

23  update changed since the move to the secure FTP site

24  instead of using the elections.kennesaw.edu site?

25       A.   Rather to than going to a web browser, we go

Curling et al. v.         Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

1   to an FTP client.  Log into the State's server on the
2   client.  Navigate to the proper folder on the client.
3   And then download the file that we need to our book
4   reader.
5        Q.  Got it.  Does that process occur in roughly
6   the same time frame --
7        A.  Yes.
8        Q.  -- the weekend before the election?
9        A.  Mm-hmm.  Excuse me, yes.
10       Q.  Thank you.
11       A.  I'll get it eventually.
12       Q.  I do the same thing.
13           Which county would -- strike that.
14           Which employee with the Bartow County Board
15   of Elections is responsible for downloading the bulk
16   update?
17       A.  Actually, the way I see it, it's me and then
18   I delegate the responsibility to Beth Howard, who is
19   the electronic voting technician.  But the ultimate
20   responsibility to make sure that happens is mine.
21       Q.  Got it.
22           I want to go back to a subject that we
23   touched on briefly before.  And I want to -- we're
24   essentially talking about building ballots for the
25   election.

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

1           I think you had testified earlier that the

2    Center for Election Services -- strike that.  I'm not

3    going to try to characterize what you testified to.

4           Remind me who is primarily responsible for

5    building the ballots that you ultimately proof for

6    use in Bartow County elections?

7        A.  I usually use the Center for Election

8    Systems to build my ballots for me -- to build my

9    database for me.

10       Q.  Who would you communicate with at the Center

11   for Election Systems regarding building the ballots?

12       A.  Here lately I've been communicating with

13   Michael Barnes directly.  He has employees that do

14   work for him, but I'm not sure whose role is what

15   right now, so...

16       Q.  Fair enough.

17           Has Mr. Barnes said anything about vendors

18   having a role in the process of building ballots?

19       A.  No.

20       Q.  And that includes under the old system as

21   well as any new system that's eventually implemented?

22       A.  I haven't had any conversation with the

23   State about would will build databases in the future.

24           MR. POWERS:  I'm handing you what I'm

25       marking for identification as Plaintiff's

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

```
 1        Exhibit 60.
 2             (Plaintiff's Exhibit 60 was marked for
 3        identification.)
 4   BY MR. POWERS:
 5        Q.  What is Plaintiff's Exhibit 60?
 6             MR. PHILLIPS:  Joseph, if you don't know
 7        what it is, feel free --
 8             THE WITNESS:  No, I just want to read
 9        it --
10             MR. POWERS:  It's not a test.
11             THE WITNESS:  No, I'm actually curious.
12        It's a contract amendment between the
13        Elections System Software and the Secretary
14        of State's Office for ballot building
15        support in 2019.
16   BY MR. POWERS:
17        Q.  Are you aware of the Secretary of State
18   entering into -- well, first, just looking at the
19   document, could you read what's under Item No. 1?
20             MR. MILLER:  I object here.  I don't
21        think we've established that he has a
22        foundation as to knowledge of this document
23        or any personal knowledge as to what we're
24        talking about here.
25             So if you're just looking to smuggle the
```

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                    7/11/2019

```
 1        document in through him reading it into the
 2        transcript, that's -- you know, it's up to
 3        you.  I'm putting my objection on the record
 4        here.
 5  BY MR. POWERS:
 6        Q.  You may answer.
 7        A.  Number one, Ballot layout, coding and voice
 8  file services.  Scope of all services include the
 9  data entry and maintenance of county-level databases
10  in the state of Georgia for counties, including
11  municipal elections that are administered by
12  counties, state and federal elections and the
13  Georgia -- in Georgia in the calendar year 2019,
14  including primary, primary runoffs, general
15  elections, general election runoffs and special
16  elections.
17        ESS will receive the data required to
18  facilitate the creation of paper and electronic
19  ballots as well as audio file recordings to the State
20  of Georgia for review and approval -- ESS will
21  receive the data required to facilitate -- yeah.
22        Q.  Were you aware that the Secretary of State
23  had entered into an agreement with ES&S for these
24  purposes in 2019?
25        A.  In 2019?  No.
```

1        Q.   What about in past years?

2        A.   Now that you show me this, I remember

3    something in 2018 about somebody I know going to work

4    for ES&S.  I heard a rumor, but I never actually

5    validated that rumor.  And that makes sense for that.

6        Q.   What rumor did you hear?

7        A.   That somebody who used to work in Cobb

8    County had gone to over ES&S.  I thought I recognized

9    her voice on my database, so -- I hadn't thought

10   about that recently.

11       Q.   Did you do any kind of inquiry or

12   investigation at that time into --

13       A.   No.

14       Q.   If I can finish my question.

15       A.   I'm sorry.

16       Q.   Did you do any inquiry or investigation at

17   that time into who was working on creating and

18   building ballots in Georgia?

19       A.   No.  Out of respect and what I thought was

20   good for her.

21       Q.   I wanted to ask about electronic poll books

22   for a second.

23       A.   Okay.

24       Q.   Are you aware of any software glitches

25   occurring with respect to electronic poll books on

Curling et al. v.        Deposition of
Raffensperger et al.    JOSEPH KIRK                7/11/2019

1   election day or during in-person early voting?

2       A.   What do you mean by "glitch"?

3       Q.   Fair -- well, maybe I'll start with a

4   specific question and then we can, I guess, sort of

5   broaden out more generally.

6           Let's take a situation where you have a

7   voter who appears at the wrong polling place on

8   election day and he or she is voting in a local or

9   district level election.  Are you aware of any kind

10  of glitch that might result in a poll worker getting

11  inaccurate information about where that voter's

12  correct polling place is?

13          MR. MILLER:  I'm going to object to the

14      form of the question in that you lead a

15      pretty long -- "lead" is not the proper

16      word.  I'm tired.  You've led a pretty long

17      way down here and then also just the

18      assumption that a glitch is baked into

19      there.

20          I ask if you can rephrase it.  I think

21      the way it's compounded on itself is

22      difficult.

23          MR. POWERS:  Sure.

24  BY MR. POWERS:

25      Q.   Are you aware of any kind of glitches that

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK            7/11/2019

1   resulted in poll workers sometimes receiving

2   inaccurate information from the electronic poll books

3   about where a voter's correct polling place might be?

4        A.  No.  To my knowledge, the information in the

5   express polls always match the information on the

6   voter registration system.

7        Q.  Got it.

8        A.  That's not to say there might not have been

9   something that changed after the express poll file

10  was pulled.  Let's say that a card was mistakenly

11  sent to Barrow County Voter Registration -- rather

12  than Bartow County.

13          Barrow County didn't get it to me -- I'm not

14  saying they have -- until, let's say, two weeks

15  before the election.  At that point, that file has

16  already been pulled, but we're still obligated to

17  process that application because it was timely

18  submitted in this example.

19          So that's when the supplementals to voters

20  come into play.  We'll go into the express poll and

21  say, They are not here anymore, delete them off the

22  express poll and put the information somewhere else.

23  So the information might change when it's posting.

24          I've never seen anything that's not supposed

25  to change be changed between the voter registration

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK            7/11/2019

1  system and the express poll.

2      Q.  Let's talk about ballot secrecy for a

3  second.

4          Could you describe the policies and

5  procedures that Bartow County election officials

6  employ to ensure that each voter's ballot remains

7  secret?

8      A.  Well, the only time there's a chance they

9  wouldn't be secret is with a paper ballot.  There's

10  no way to tie an electronic ballot back to a voter,

11  not through you unique identifiers on the ballot

12  image, not any other way.

13          So the procedures in place would be when you

14  open the absentee ballots, you make sure to separate

15  the outer envelope from the inner envelope first.

16  Keep those things separate; have two separate files.

17  Verify you have the right number of inner envelopes

18  on the table in front of you.

19          With the names somewhere else, start opening

20  the inner envelopes separating the ballots out and

21  you ensure voter secrecy.

22      Q.  Have you generally found that process to be

23  effective with respect to ensuring --

24      A.  Yes.  It's just the only time that we have a

25  problem with that is, let's say, one person chooses

Curling et al. v.         Deposition of
Raffensperger et al.    JOSEPH KIRK                 7/11/2019

1   to vote through the mail in the city of Kingston's
2   municipal election.  That's public record.  You got
3   it through the mail.  And you can see on the reports
4   that one vote there.  Besides that, the procedures we
5   use are very effective.
6        Q.  Have you ever had a situation occur where
7   you had a voter's right to a secret ballot violated?
8        A.  Possibly in the method I just described of,
9   you know, just through a circumstance.  The only
10  person to show up to vote in a certain district
11  combination, certain ballot style; something like
12  that.  But besides that, no.
13       Q.  Are you aware of any specific examples
14  sitting here right now?
15       A.  Not off the top -- I know we've had concerns
16  in the past and we've actually changed precinctwise
17  as a result of that or changed districtwide.  But I
18  can't tell you specifically when or what happened
19  with that.
20       Q.  I'm going see if I can find it in the stack
21  of documents we've put together.  I'm looking for the
22  first subpoena --
23       A.  I've got that one right here.
24       Q.  Okay, great.
25       A.  This one.

1    Q.  We would want the first page --

2    A.  Go about three from the back.

3    Q.  Oh, okay.

4    A.  Sorry, three from the front.  I just put the

5  pages --

6    Q.  Got it, 49.

7        I'm going to point you to question -- or

8  document request No. 16 and 17.

9    A.  Right.

10   Q.  You had mentioned that you can't -- strike

11 that.

12       Is it possible for you to retrieve the

13 specific ballots requested in numbers 16 and 17 of

14 Exhibit 49?

15   A.  No.  It's not.  We went on in our response

16 to say that if we could, it would violate their

17 secret ballot requirement, but it's not possible in

18 the first place.

19   Q.  Do you know if there's anyone, for example,

20 at the Secretary of State's Office or at the vendor

21 who could retrieve that information?

22       MR. MILLER:  I'm going to object to

23       that.  That calls for speculation on matters

24       that are outside of his personal knowledge,

25       potentially as something similar to an

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1        expert opinion.  But, nonetheless, just

2        outside his knowledge.

3            MR. POWERS:  I'll ask a different

4        question, rephrase the question.

5            THE WITNESS:  And the answer is no.

6   BY MR. POWERS:

7        Q.  Are you aware of anyone who can retrieve

8   specific ballots in Georgia --

9        A.  No.

10       Q.  -- on casting DRE machines?

11       A.  I know of no way to retrieve -- no way and

12  no one to retrieve a ballot once it's cast on DRE.

13       Q.  Do you know if there was a change in policy

14  during the time that you've been serving as election

15  supervisor with respect to being able to retrieve

16  individual votes cast on DRE machines?

17       A.  The only time that I've ever been able to do

18  that was when early voting first started.  Back then

19  the law specified that any individual -- any

20  registered voter had the right to challenge any

21  registered voter's vote, absentee ballot prior to

22  election night.  And, of course, early voting ballots

23  are absentee ballots.

24            So there's a way on the DRE system to mark a

25  voter access -- or a ballot if a voter's access card

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                      7/11/2019

1   is challenged when you give it to the voter.  When

2   you do that, you give it a specific number associated

3   with that voter.  If you're the first person that

4   came in, you'd probably be number one.  The next

5   person would be number two.  On a numbered list, we

6   have a record of who got what number.

7            And then if somebody came in later and said,

8   I'm going to challenge Joseph's ballot, he doesn't

9   live in Bartow County anymore, if the board upheld

10  that challenge, I go find Joseph's number in the

11  paperwork on election night.  Remove that ballot from

12  being counted and then accept everything else to be

13  counted.  But that's only possible if you challenge

14  each and every voter that comes in electrically to do

15  that.

16           We stopped doing that when the law changed.

17  Now, you have to challenge them before the ballot is

18  cast not before it's counted.  So I don't know when

19  that change happened, but since then, I have no way

20  of doing that.  And even then, I couldn't tell you

21  the content.

22           It's like an envelope.  I could tell you --

23  I could throw out the envelope.  I could take the

24  envelope.  I couldn't open the envelope.

25      Q.  Fair enough.  When -- trying to understand

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK                7/11/2019

1  this.

2          Let's talk about the process where you

3  would -- say, an early voter had been challenged

4  under the old system.  So you know -- say, I know

5  voter X is -- their vote needs to be thrown out for

6  some reason.  How would you --

7      A.  Let's not say the vote needs to be thrown

8  out.  Needs to be challenged.

9      Q.  Sorry, sorry.  I'll rephrase the question.

10         Let's say voter X has been challenged under

11  the old system and you needed to identify or locate

12  that vote by voter that had been cast on the DRE

13  machine, what would the process be for saying, Here's

14  voter X to locating that record?

15     A.  Well, if you remember, when the voter came

16  in, we recorded the voter's name and number we

17  assigned that voter when we issued that card.

18         So a week later, somebody comes in.  There's

19  a challenge hearing.  We go through the whole

20  process.  The challenge is upheld.  We go back to

21  that same piece of paper and say, Okay, that's No.

22  103.

23         If I remember correctly -- it's been a

24  while -- we didn't remove it.  That night we would

25  say "select all."  Go through, uncheck the ones that

```
 1   we didn't want to accept.  Accept everything else.
 2   That would chug away for a while and that was it.
 3        Q.  So you wouldn't actually see whose -- strike
 4   that.
 5            So you wouldn't see who person X was
 6   necessarily voting for --
 7        A.  No.  That's what I was saying.  It's like an
 8   envelope.  I can take the envelope.  I can put the
 9   envelope somewhere else, but I can't open it.
10        Q.  Got it.  Where was the number associated
11   with that voter's ballot maintained?
12        A.  This was a while back.  But I think what we
13   did was use the ballot number that we issued as that
14   number, but I don't know that for sure.  That was a
15   long time ago.
16        Q.  What is the ballot number?
17        A.  The ballot number would be a number
18   generated by the voter registration system we issue,
19   the ballot in that system.  And part of the confusion
20   here is that issuing a ballot happens a few times, a
21   few different ways, not all of which is handing
22   somebody a piece of paper.
23        Q.  Fair enough.  When that voter cast his or
24   her ballot on the DRE system, would his or her ballot
25   number pop up on the screen?
```

Curling et al. v.      Deposition of
Raffensperger et al.    JOSEPH KIRK            7/11/2019

1       A.  No.

2       Q.  No?

3       A.  To my knowledge, the voter never knew that

4  was going on.  We just did our job behind the

5  counter.  Gave them a card and they voted the same

6  way they had always voted; the same way we vote

7  today.

8            But then at the end, when the absentee

9  ballot crew was counting the ballots on election

10  night, there was additional couple of steps they had

11  to go through to accept all those ballots off the

12  machines.

13      Q.  You mentioned that these counties would

14  essentially look at the screen and could exclude the

15  counting of a ballot by a certain voter.

16            What program were they in or screen were

17  they looking at where that would happen?

18      A.  When they end the election and they follow

19  the procedures and end the election on the voting

20  machine, the machine goes into post-election mode.

21            Again, if I remember correctly -- this was a

22  long time ago -- one of the buttons on that screen

23  takes you to the screen to accept challenged ballots.

24            So we go to that screen, perform those

25  duties and go back and print the reports they need to

APG USA INC.

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1  print.  But this is all contained on the machine

2  before the memory card is ever taken out of the

3  machine.

4        If we had 20 machines in service at five

5  different locations, they have to do it a hundred

6  pieces of equipment.

7        Twenty per five, a hundred.  So that would

8  be a hundred pieces of equipment they would have to

9  go through and perform the same duties over and over

10  again on each individual machine.

11     Q.  Got it.  Sounds time consuming.

12     A.  It was.

13     Q.  At any time while you were elections

14  supervisor, was it true that all early voters were

15  considered challenged voters?

16     A.  Yeah.  That's what I was saying before.

17        When I took my job, that's how we did it

18  statewide and that's how we continue to do it until

19  the law changed about the time...

20     Q.  You noted that no longer there's -- strike

21  that.

22        You noted that there's no longer a way to

23  essentially pull the ballot number for voter X;

24  correct?

25     A.  What I'm saying is for that to work, every

1  time somebody came in to vote, we had to manually

2  type a number, a new number for each person onto the

3  screen before we created the voter access card as

4  part of the process of creating the voter access

5  card.  If that's not done, the procedure I'm

6  describing cannot happen.

7          Q.  Got it.  Got it.  Okay.

8              So before you manually typed in a number --

9          A.  Right.

10         Q.  -- for each voter?  Now you don't?

11         A.  Right.  And it's in no way like an

12  identifiable driver's license number, voter

13  registration number.  It was just a sequential number

14  to track that envelope and that was it.

15         Q.  Right.  Are ballot numbers currently

16  generated?

17         A.  Yes.  I'm not sure why.  They are not very

18  useful for things.

19         Q.  Do you currently use ballot numbers for any

20  reason?

21         A.  We track them because the law says we need

22  to, but as far as investigating things, I don't find

23  them to be extraordinarily useful.

24             You know how when we order absentee ballots,

25  each ballot has a stub on it.  Those stubs are

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK        7/11/2019

1    numbers.  It's the same concept only electronically.

2        Q.  Do you know what the state law requires --

3        A.  No.  I wasn't around when that law was

4    written.

5            MR. POWERS:  Maybe we can take a brief

6        break.

7            (Recess from 3:49 p.m. to 4:14 p.m.)

8            MR. MILLER:  Can we just reiterate what

9        we just talked about with respect to where

10       we are?

11           MR. POWERS:  Sure.  It's 4:15.  We

12       understand that the courthouse is probably

13       going to be closing at 5:00.  We've got to

14       leave.

15           So I'll go until 4:45 or 5:00, until

16       it's time to leave.  And then we can

17       continue this and come back another day to

18       finish up.

19           THE WITNESS:  Okay.

20           MR. MILLER:  Just to make a note, I've

21       requested that we wrap up while we're in

22       here with the air-conditioning on.  We may

23       not get kicked out at 5:00, but I've

24       requested time for questions from defense

25       counsel during this single-day deposition

Curling et al. v.         Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1          that complies with the Federal Rules.
2                MR. POWERS:  And I think we're at about
3          four hours and 45 minutes of time.  We
4          certainly reserve our right to take all the
5          time that we need to -- you know, up to the
6          seven-hour limit.
7                MR. MILLER:  Understood.
8   BY MR. POWERS:
9          Q.  So let's talk about the paper backup for
10  electronic poll books.
11         A.  Okay.
12         Q.  Under the current procedures that your
13  office implements, do you have paper backup for
14  electronic polling books on election day?
15         A.  Yes.
16         Q.  How long has that practice been in place?
17         A.  As far as I know, as long as we've used
18  express polls.
19         Q.  Could you tell me about the process by which
20  paper backups are created?
21         A.  How they are created?  No.
22              From my perspective, they let me -- the
23  Secretary of State's Office lets me know when they
24  plan to pull that list or if it's a busy time for
25  voter registration applications, they ask us to let

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1   them know when we're done processing applications.

2          At that point, they'll pull the file.  I'm

3   not sure how they pull it or in what format.  Send it

4   to print vendor.  That print vendor in turn sends it

5   to me.

6          When I get it in, I use our stapler and

7   staple it together for each polling place.  Put it at

8   the bottom of the manager's box and that's where it

9   stays until it's boxed up to be retained.

10      Q.  Roughly, how soon before an election day do

11  you receive the paper backups?

12      A.  That depends the election and the amount of

13  registration activity that's going on going into that

14  election because they can't pull that list until

15  we're done processing applications.  Otherwise, it'll

16  be an incomplete list.

17         Now going into advance voting, they put a --

18  there's an electronic copy of it.  And I couldn't

19  tell you where we get that from because we have

20  somebody pull that and print it for me.

21         Actually, we just pull it and save it and

22  never print it out; it's a waste of paper.  So it's

23  available on a countywide level then.  And then

24  sometime before election day, we'll get it in and put

25  it in their box.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1          I have had that come in due to a shipping
2     error -- it wasn't the State's fault.  It was UPS
3     refused to deliver it here because my office wasn't
4     here.  I got it a week before the election and quick
5     put it in the box.
6          Q.   What information is contained in the paper
7     backup to the electronic poll books?
8          A.   Everything that's in the electronic poll
9     books with the exception of the driver's license
10    number.
11         Q.   Could paper backups -- strike that.
12              Are paper backups for electronic poll books
13    currently created before or after early voting has
14    ended?
15         A.   Before.
16         Q.   Could paper backups be created after
17    election -- after early voting has ended?
18         A.   I'm sure that's possible, but that's not my
19    job, so I don't really feel comfortable saying what
20    the timeline should be.
21         Q.   Fair.  I'm not talking about what the
22    timeline should be but just logistically speaking as
23    a practical matter --
24         A.   Again, we're talking about someone else's
25    office and operation.  I don't want to say what they

1  are capable of doing and the time frame they are

2  capable of doing it in.

3      Q.  Fair enough.  Let's talk specifically about

4  the vantage point of your office.

5      A.  Okay.

6      Q.  From your perspective, could you manage a

7  situation in which paper backups for electronic poll

8  books were created and sent to you after early voting

9  has ended?

10      A.  I'm getting confused as to your question

11  here because -- I mean, are you saying with all the

12  absentee information contained on them?  Is that what

13  you're driving at or --

14      Q.  No.  The same paper backups that you

15  currently receive.

16      A.  So if I receive them after the end of early

17  voting, could I still use them on election day?

18      Q.  Correct.

19      A.  Well, yes.

20      Q.  I want to hand you an invoice you provided

21  that was previously marked as Plaintiff's Exhibit 48.

22  And I want to direct your attention to the left-hand

23  column.

24          Do you see where there's the column that

25  says, NP absentee?

1      A.   Mm-hmm.

2      Q.   What does "NP" mean?

3      A.   Nonpartisan.

4      Q.   Why does -- is that for a primary election

5  or --

6      A.   No.   This is for the general election of

7  last year.   What he's distinguishing here is they are

8  nonpartisan ballot as opposed to Republican ballots

9  or Democratic ballots.   It was an invoice for a

10  primary, it would have all three listed.

11          MR. POWERS:   Got it.   Thank you.

12          (Plaintiff's Exhibit 61 was marked for

13      identification.)

14  BY MR. POWERS:

15      Q.   I'm now handing you what I'm marking for

16  identification as Plaintiff's Exhibit 61.

17          What is Plaintiff's Exhibit 61?

18      A.   These are copies of the election -- the

19  election results reports off of the individual DRE

20  voting machines from the Zena Drive polling place for

21  the November 6, 2018 general election as signed off

22  by the poll workers.

23      Q.   Got it.   And I'd like to just look at this

24  first page here, page 24, and just the very first

25  column on the left.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                7/11/2019

1          Do you see where it says -- the column that
2    says, Time, about seven columns down?
3          A.  The row that says 2014 11/6/2018?
4          Q.  Correct.
5          A.  Yes.  I see that.
6          Q.  What information is being reflected in
7    the -- in that row?
8          A.  That's the date and time the report was
9    printed as indicated by the clock on the voting
10   machine itself.
11         Q.  Again, looking at the column on the left,
12   that means that this particular tape was generated at
13   8:14 on November 6, 2018?
14         A.  That's correct.
15         Q.  In your mind -- strike that.
16         Can you think of a situation where the tape
17   would read a time, for example, that -- and I'm
18   talking about election day here -- would have a time
19   that reflected before the end of the close of polls.
20         A.  Yes.  The clock was wrong.
21         Q.  How can the clock be wrong?
22         A.  A couple of different ways.  One would just
23   be human error when they set the clock.  The buttons
24   are pretty small.  If they are moving fast, I've seen
25   that happen before; or in some cases -- and this is

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1  one on the TSXs, there's -- they try to automatically

2  update themselves for daylight savings time.  And if

3  you've already updated them for daylight savings time

4  in preparation for the election and put in the proper

5  time, it might change out from under you later.

6      Q.  Got it.

7          Do you have situations where your ballot

8  tapes will have times that are radically different

9  than the close of polls?

10     A.  I'm trying to think if that's ever happened

11 before.  I vaguely remember some issue like that, but

12 when I went back to investigate, it was just the

13 clock was set wrong was the problem.

14     Q.  What about a situation where the date was --

15 for example, had a different year than the year of

16 the election?

17     A.  Well, that one's definitely human error.

18 Well, sometimes.  Your testers will pay attention to

19 the month and day and not so much the year because,

20 obviously, that's going to be -- it was the same as

21 the other ones, but sometimes you have to go back and

22 actually change that.  So usually that's just a human

23 error issue, at least in my experience.

24     Q.  You've seen that -- you've seen that happen

25 sometimes?

1        A.   I've been guilty of that before and gone

2   back and caught myself later.

3              (Plaintiff's Exhibit 62 was marked for

4        identification.)

5   BY MR. POWERS:

6        Q.   I'm handing you what I've marked for

7   identification as Plaintiff's Exhibit 62.

8              I'd like to -- first, what is Plaintiff's

9   Exhibit 62?

10        A.   Is this all of them that I gave you?

11        Q.   (Counsel nods head affirmatively.)

12        A.   This is a copy of polling places' record

13   electronic voting machine recount from election day

14   November 6, 2018.

15        Q.   What information is contained in each of the

16   columns in these recap sheets?

17        A.   In section A, it lists each unit's serial

18   number.  The seal number that they found on that

19   equipment when they arrived that morning after they

20   verified it was correct, what the -- before the polls

21   opened count number was before the poll opens.

22   There's a count on the screen of the machine.

23              Actually, there's two numbers:  one is like

24   the odometer in your car.  There's a little trip

25   meter.  One is how many votes have been cast in the

1   life of the machine.  The count number is how many

2   votes have been cast for that election.  It should be

3   zero before the day starts.

4        The next column is after the polls close

5   seal number, which, of course, has been redacted.

6   That is the seal they use to seal the machine at the

7   end of that election.

8        And then the last column, final column, is

9   after the polls close, what that count number was at

10  the end of the day, which is also reflected on these.

11       Q.  You mentioned that the after the poll closes

12  seal numbers are redacted.  Why is that?

13       A.  Because there is a chance that those seals

14  are still on the equipment right now.  And, I'm

15  sorry, while they are being used, that's confidential

16  information.

17       Q.  Let's turn to page 7.  In particular, I want

18  to turn your attention to section D.

19       A.  Page 7 you said?

20       Q.  Yeah.

21       A.  Okay.

22       Q.  In section D --

23            MR. MILLER:  I'm sorry.  Excuse me.  Are

24       these numbered or are -- oh, I see the

25       number.  I apologize.

Curling et al. v.        Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1          THE WITNESS:  You want the one for

2      Allatoona.

3          MR. MILLER:  I see it.  Go ahead.

4  BY MR. POWERS:

5      Q.  Could you tell me about the columns and the

6  rows in section D, numbers one through four?

7      A.  In section D, they are supposed to -- number

8  one, it's almost like doing your taxes.  Bring down

9  the number from box B above, which is the total

10 number of votes cast based on the after polls close

11 count number all matted together.

12          The second one is how many voters marked and

13 for that you can go to the express poll recap or

14 you've already gone to the express poll recap in

15 section C -- I'm sorry -- and bring that number down

16 to line two, plus how many voters were marked on the

17 supplement list of voters, which is not indicated --

18 that's not indicated above there.  So you have to go

19 to the supplemental list to get that.  And that

20 should -- they add that up in the far column.

21          Number three is a numbered list on the

22 express poll.  That's a different location on the

23 express poll recap sheet.  They have to record that

24 number.  They copy that over.  Then they go to their

25 supplemental numbered list, which has a handwritten

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK          7/11/2019

1  list for the supplemental voters.  Add those voters

2  in.  Add them together.  Then they are supposed to

3  give me the total number of voter certificates

4  accepted that day which is recorded in section C

5  above in the final column.  And then they copy that

6  number down to line four.

7        This is one of the hardest forms I have to

8  get them to fill out properly; that they just don't

9  understand copying numbers over from different

10  places.  And sometimes -- what happened in this case

11  was the reason she has her initials there.  I had to

12  call her in after election day to have her amend it

13  because she told me she had zero folks on the voting

14  machines at the bottom there which I knew couldn't be

15  right.

16        So we came in, did some remedial training on

17  how to fill that form out and then she adjusted

18  appropriately.

19    Q.  You're pointing out that's where -- under

20  the number one, there's a zero with a cross-out --

21    A.  Exactly.

22    Q.  -- and then you went back and put in the

23  1067?

24    A.  Actually, I made her do it as part of her

25  training.

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                    7/11/2019

1      Q.  Got it.

2          Looking at No. 6 and some of the other

3  columns, it seemed like all of the columns one

4  through four matched up.

5      A.  Well, what are we talking about now?

6      Q.  I was looking at the page before --

7      A.  Oh, page No. 6.  I gotcha.

8      Q.  Yeah, yeah.

9          Turning back to page 7, how do you have

10 situations occur where the four different columns

11 don't always match up with one another?

12     A.  Usually human error.  In this case -- and

13 you have these pages somewhere in there.  There were

14 three certificates in their binders that should have

15 been rejected.  They told someone, You're not able to

16 vote here; you're not on the list.  And rather than

17 filing them in the proper binder of rejected

18 certificates like they are supposed to, they got in a

19 rut and put them in the accepted binders.

20         So when they counted them like they were

21 supposed to, there were 1070 certificates and that

22 was the accurate number, but three of them were

23 rejected and had "rejected" written across them.

24     Q.  Got it.

25         So are we talking about -- what happened

1  with those three votes?  They just weren't -- they

2  weren't counted, but --

3       A.  When we talked about the voter experience

4  earlier, come in and fill out the paperwork and their

5  eligibility is determined.

6            When that happens, if they were determined

7  not to be eligible for any reason, that certificate

8  has already been filled out.  It's already an

9  official piece of paperwork.  They can't take it with

10  them.  The poll workers are directed to write

11  "rejected" across the face of the voter certificate

12  and file it in the rejected voter certificate binder.

13            So they just misfiled those three, but they

14  went through and counted properly like they were

15  supposed to.  Got the right number based on how many

16  pieces of paper were in the binders.  What I tell

17  them at that point is, It's been a long day.  I told

18  them, With some training -- you've been there for 14

19  hours at that point.  The numbers don't add up.

20  Don't just fudge the numbers.  Write down what you

21  think is accurate.  Send everything back to me and

22  I'll figure it out later and tell you what happened.

23       Q.  Fair enough.  And so turning to page 10.

24  Looking at section D again.  We're at the -- I guess

25  this is the Cassville precinct?

1    A.   Yes.

2    Q.   Looking at section D where it says, Had

3  supplemental voters.

4    A.   Yeah.   Sylvia had a long day that day.

5  That's our, by far, biggest polling place by now.

6  And I'm proud to say just to say it, the longest wait

7  they had that day was an hour and they got overrun.

8         So I understand her being a little frazzled

9  at that point.

10    Q.   Mm-hmm, mm-hmm.

11    A.   So what happened here was -- well, for one,

12  she didn't file the supplement certificates

13  separately, but I don't think that's what caused this

14  issue.

15         There's no big deal here.   They had 2,598

16  votes on the voting machines.   The express polls

17  issued 2,546 ballots that were voted off the express

18  polls.   They issued two additional ones off the

19  supplemental list.   And then they had -- they

20  miscounted their certificates.   They actually had

21  2,598 voter certificates when we went back and

22  checked.

23         They number them as they go and sometimes

24  they just misnumber and keep on moving.   So they

25  don't sit there at the end of the day and count every

1  single certificate.  They have stacks of a hundred.

2          So one of the things we do after the

3  election is audit the certificates and make sure the

4  count is proper, all the ballots were issued in the

5  proper name and make any -- you know, we do it based

6  on that information.

7          But at that time I didn't make her come in

8  to update it.  Either I hadn't done the audit yet or

9  I didn't deem it to be that big of a deal to have her

10  come in and update the paperwork.

11      Q.  How does the post-election audit process

12  work using the current DRE machines?

13      A.  It's very much a procedural audit.  The way

14  I do this is I divide -- and if you want to come

15  watch this process, you're more than welcome -- it's

16  pretty spread out.

17          Each staff member has a different

18  responsibility.  For example, Beth Howard, who does

19  the machines, is generating a numbered list for me

20  and getting those ready for me while other staff

21  members are auditing certificates and getting that

22  information ready.

23          And while all that is going on, Cheryl is

24  working on provisional ballots and I'm going through

25  all the paperwork from election day and advance

1  voting.  I send it out in a notebook, so everything

2  is sort of a snapshot of that day.

3          So I go through and that's where I make

4  these notes that I turned over to you.  I do a

5  one-pass to sort of see where we're at, if anything

6  needs a deeper dive to see what happened.

7          At that point, I figure out which managers I

8  need to talk to, to call in and find out what

9  happened, file incident reports.  If there's any kind

10 of investigation into looking at, say, numbers like

11 this, okay, you know, we need to prioritize these

12 voter certificates so I can go back and determine if

13 there's actually an issue or if it's just a

14 misnumbering problem.

15         And then I go very much where the

16 investigation takes me.  I put everything in front of

17 me that I can pull and see if anything jumps out at

18 me.  In most cases it's a training issue.  I make

19 notes on how to train them differently the next time

20 and if I need to inform the board that it happened

21 and how we're going to take care of it.

22         If there's ever an issue that's big enough

23 to take to the board for a decision, then -- as part

24 of that auditing process, then I leave those

25 decisions to them.

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

1    Q.  What impact from your perspective does the

2  lack of paper trail on existing DRE voting machines

3  have on --

4          THE WITNESS:  Excuse me one second.

5          (Discussion ensued off the record.)

6          THE WITNESS:  I apologize.  Please

7      continue.

8  BY MR. POWERS:

9    Q.  So a little while ago we talked about voter

10  experience casting a ballot.  And I wanted to turn to

11  specifically what displays on the screen after the

12  voter actually casts the ballot.

13    A.  Before the voter access card is removed from

14  the machine, there's a message that I believe says

15  something along the lines of, Thank you for voting,

16  please return your card to a poll worker.  That's not

17  a direct quote; that's paraphrasing.

18          After you remove the card, the screen

19  reverts back to the screen that you normally see

20  while you're waiting for a voter to get to a machine;

21  so a picture of a card being inserted and the numbers

22  and all that.

23    Q.  At any point after the voter casts the

24  ballot, does a set of numbers display on the screen?

25    A.  There are numbers on the screen.  The public

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

1  count -- what I talked about earlier, the system

2  counter, the battery charge, the machine seal number

3  and I think the machine ID number.

4       Q.  Is that number the same throughout the day

5  or does the number change as different voters cast

6  ballots?

7       A.  Which number?

8       Q.  Any one of the sets of numbers that's being

9  displayed on the screen?

10      A.  Well, the battery charge changes if the

11  machine becomes unplugged.  If the battery drains,

12  then it'll tell us.

13          The machine ID number and serial number are

14  static.  The machine ID number is generated by the

15  database itself.  The serial number is programmed, I

16  think, at the factory and I have no way of changing

17  that.

18          The other numbers, the counters of course

19  will increment as people use the machine.  So if

20  there have been 10 voters on that machine, both

21  counters should have increased by 10.  The public

22  counter should say 10 and the system counter should

23  say whatever the day started out at plus 10.

24      Q.  Okay.  Thank you.

25          Now, I want to go back to a subject that

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

1   we discussed a while ago related to central counting

2   of ballots at optical -- using optical scanners

3   maintained at the county Board of Elections' office.

4        A.   Right.

5        Q.   If the Court were to order the use of

6   hand-marked paper ballots, could the Board of

7   Elections count hand-marked paper ballots using a

8   central count system with optical scanners located at

9   the Board of Elections office?

10        A.   For an election?

11        Q.   For the November 2019 municipal elections.

12        A.   Municipal elections, yes, that's possible.

13   Anything federal, it's not possible.

14        Q.   Would Bartow County Board of Elections

15   employ the same practices that are currently used for

16   counting provisional ballots on a larger scale for --

17   strike that.

18             Let's talk specifically about the scanning

19   of the ballots.

20             Would the procedure for transporting and

21   scanning election day paper ballots involve the same

22   practices that are currently used for counting

23   provisional ballots?

24             MR. MILLER:   I'm going to object to this

25        for two reasons.   Number one, we're

1        speculating as to what a court order may be.

2              But, second, the witness to my knowledge

3        has answered these questions earlier.  I

4        think pretty early in the deposition, we

5        started talking about central scanning,

6        precinct scanning, the speed at which the

7        scanners scan ballots currently, the ones

8        that are currently in possession, the

9        battery life of those.

10             I think we've been down this road

11       already.

12  BY MR. POWERS:

13       Q.  You may answer.

14       A.  Make sure I understand.  You're asking if we

15  use the same procedure as provisional ballots to scan

16  ballots cast by regular voters on election day at the

17  polling place or once they're transported back to my

18  office?

19       Q.  Exactly.  Let me rephrase the question.

20             Using a system where you're counting paper

21  ballots cast on election day, what differences would

22  there need to be, if any, from the procedures that

23  are currently in place for counting provisional

24  ballots?

25       A.  First of all, besides the fact they are both

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1  on paper, it's apples and oranges.

2          Provisional ballots, there's a question of

3  while they are in count, they are in envelopes.

4  There's only a few of them there to be verified that

5  we have the right number when they get back to the

6  office.

7          What we do right now is when those

8  provisional ballots come back, I have a set of

9  employees who checks the supplies on election night,

10  who verifies the number of ballots in that -- it's a

11  bag, secured bag that we use before the polling

12  manager leaves.

13          The chain out of custody is extraordinarily

14  important.  So for them to turn in those ballots --

15  I've never done this before.  I'm trying to think

16  through how we would validate how many ballots this

17  poll manager turned into me as opposed to how many

18  we're actually accepting from them to keep track of

19  at each point in the process.

20          So we need new procedures to -- for them to

21  verify, I guess, how many ballots are in the

22  container at the polling place.  Verify that again

23  once it gets back to the office.  Then start a

24  process of scanning those one poll at a time.  And

25  since we need to -- I guess we can still identify

1   which poll they were cast at based on the coding on

2   the ballot.

3       Q.  You have one polling place per municipality

4   except for Cartersville --

5       A.  Except for Cartersville, but it's all one

6   database.

7            Yes, there would be differences.  And it

8   would require changes.  And, again, I'm very

9   concerned about the number of paper ballots we're

10  talking about on a system that I -- the more ballots

11  you put through, the faster you put them through, the

12  more chance they have of failing.  Those optical

13  scanners are old.

14            And, again, we're not giving the voter a

15  chance for overvotes, undervotes, anything like that

16  in this scenario.

17      Q.  Just to be clear, currently, you count

18  provisional ballots at the Board of Elections office;

19  correct?

20      A.  Absolutely.  We don't know until after the

21  election if those ballots are going to count or not.

22  In fact, in some cases that's not even our decision.

23      Q.  How do you account for the security of the

24  provisional ballots between the polling place and the

25  central office?

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK              7/11/2019

1      A.  We send the provisional ballot bags, the

2   secure bags they are put in and are sealed.  The

3   first time a voter uses it, the poll manager is

4   supposed to show them that the bag is empty and then

5   seal it in front of them.

6           After that, the bag is not unsealed that day

7   and they have to keep notes on how many ballots are

8   dropped into that bag to fill out their paperwork at

9   the end of the day.

10          When they get back and supplies are checked

11   in, then they go through and validate that the number

12   of ballots in that bag match the numbers on the form

13   and record that.

14          Then they are taken to our ballot room, our

15   secured room upstairs that they are stored in, and

16   they are put there until it's time to count them or

17   retain them.

18          And then at that point we make the

19   determination based on the paperwork if we're going

20   to count those or not.  And then we remove them from

21   that room downstairs to be counted.

22      Q.  So, in other words, you have to sort of hold

23   them in a bay for a certain period of time while the

24   eligibility determination is made?

25      A.  Absolutely.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK              7/11/2019

1      Q.  Now, speaking with respect to securing and

2  transportation, could those same transportation

3  procedures that you're using for the provisional

4  ballots also be used for paper ballots cast on

5  election day by regular in-person voting?

6      A.  What I'm trying to think through as you're

7  asking me this question, they sell secure ballot

8  containers big enough to make this work.  I know they

9  do.  But how I would check them in when they got

10  there, I need to give that some thought.

11      Q.  When they get to the Board of Elections

12  office?

13      A.  Never having conducted an election like

14  that, I'd have to give it some thought on how it's

15  actually handled.

16      Q.  I take it then -- strike that.

17          Have you ever inquired what the -- about the

18  possibility of using hand-marked paper ballots in

19  Bartow County?

20      A.  To who?

21      Q.  To the Georgia Secretary of State's Office?

22      A.  No.

23          MR. POWERS:  All right.  I know we've --

24      I'd like a couple of minutes to look through

25      my stuff to make sure I get through all the

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

```
 1        questions I want to get through.
 2             MR. PHILLIPS:  Just to be clear, we
 3        already took a few minutes for you to look
 4        through your stuff.  And every time we take
 5        time, it keeps pushing this process out.
 6             Now, every time we take time, these
 7        folks get less time to ask questions.  I'm
 8        just -- we've done this once.  I don't know
 9        why you couldn't figure out how much more
10        you had to do when you went out and looked
11        at it the first time.
12             I assume that you are ready to wind up.
13        Now, are you going to leave and we're going
14        to come back and there's going to be another
15        45 minutes of questions.
16             MR. POWERS:  No.
17             MR. PHILLIPS:  Okay.  Thank you.
18             (Discussion ensued off the record.)
19             MR. MILLER:  At this point, and correct
20        me if I state anything incorrectly that
21        we're summing up here -- State defendants
22        and potentially Fulton defendants intend to
23        ask questions of the witness pursuant to the
24        subpoena.
25             We've been in here since -- with a start
```

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                7/11/2019

```
 1        time of 9:30.  It's now five o'clock.  The
 2        court is closing.  We raise the issue of
 3        early closing time at 5:00, much earlier.
 4        We've objected at least one time on the
 5        grounds that questions had been repeated.
 6            We reserve our right and object on the
 7        basis of being unable to cross-examine the
 8        witness in this deposition.  And it's
 9        unclear right now what the plan is going
10        forward.  If you want to --
11            MR. PHILLIPS:  So I'm clear, I'm going
12        to object to the extent that the duration of
13        this deposition lasts longer than Rule 30
14        allows.  I think we're getting very close,
15        if not surpassed.
16            MR. POWERS:  How much time have we spent
17        on the record?
18            THE REPORTER:  Five hours and
19        24 minutes.
20            MR. POWERS:  We've spent five hours and
21        24 minutes.  That's nowhere near --
22            MR. PHILLIPS:  That's on the record; is
23        that correct?
24            THE REPORTER:  That's just on the
25        record.  No breaks.
```

1        MR. PHILLIPS:  That does not include the

2     break times we've taken, probably four

3     breaks.

4        MR. MILLER:  And I wouldn't say that

5     we're nowhere close.  One hour and a half on

6     the record.

7        THE REPORTER:  We've been now a couple

8     of minutes on the record, so we're at five

9     and-a-half.

10        MR. PHILLIPS:  Let me say this, too,

11     from my client's perspective, that is a case

12     number with a 2017 case number.  You've

13     asked a lot of questions.  I've not objected

14     to hardly any of your questions except those

15     dealing with the security issues.

16        As we continue with the duration of the

17     deposition, you know, I think that my

18     understanding is this started out as an

19     election contest and we're asking questions

20     about what a judge issues in the future in

21     an order regarding the printed ballots.  I

22     don't see the relevance or the tie-in

23     between an election contest and what's going

24     to happen in the future.

25        But then again, I haven't been privy to

Curling et al. v.       Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1        the 400-plus pleadings in the docket either.

2        So I think that if we would focus in on the

3        issues related to the merits of the case a

4        little more, that we can get through this

5        deposition a lot quicker.

6            MR. POWERS:  Mr. Phillips, you might be

7        aware that plaintiffs are seeking

8        preliminary relief for the 2019 election and

9        the feasibility of implementation is central

10       to this case and that motion.

11           I would -- I understand it's late and,

12       you know, unfortunately, I would prefer not

13       to have to continue this either.  I do have

14       a few more questions.  I don't think I'm

15       going to come anywhere close to the seven

16       hours, but we need to be out of here by 5:00

17       and it's 4:57.  I think -- I think --

18           MR. PHILLIPS:  I think regardless of our

19       good ideas or desire, they are going to move

20       us out of here.

21           (Deposition concluded at 4:57 p.m.)

22           (Signature reserved.)

23

24

25

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

```
1                        CERTIFICATE

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6           I hereby certify that the foregoing

7    transcript was taken down, as stated in the caption,

8    and the colloquies, questions, and answers were

9    reduced to typewriting under my direction; that the

10   transcript is a true and correct record of the

11   evidence given upon said proceeding.

12          I further certify that I am not a relative

13   or employee or attorney of any party, nor am I

14   financially interested in the outcome of this action.

15          This the 17th day of July, 2019.

16

17

18

19   _____

20          Marsi Koehl, CCR-B-2424

21

22

23

24

25
```

APG USA INC.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

```
 1                        DISCLOSURE

 2

 3   STATE OF GEORGIA:

 4   COUNTY OF DEKALB:

 5          Deposition of JOSEPH KIRK.

 6          Pursuant to Article 8.B. of the Rules and
     Regulations of the Board of Court Reporting of the
 7   Judicial Counsel of Georgia, I make the following
     disclosure:

 8
            I am a Georgia Certified Court Reporter
 9   acting as an agent of APG USA, Inc., who was contacted
     by the offices of LAWYERS' COMMITTEE FOR CIVIL RIGHTS
10   UNDER LAW, to provide court reporting services for
     this deposition.  I will not be taking this deposition
11   under any contract that is prohibited by O.C.G.A.
     15-14-37 (a) and (b).

12
            APG USA, Inc., has no contract to provide
13   reporting services with any party to the case, any
     counsel in the case, or any reporter or reporting
14   agency from whom a referral might have been made to
     report this deposition.  APG USA, Inc., will charge
15   its usual and customary rate to all parties in the
     case, and a financial discount will not be given to
16   any party to this litigation.

17

18

19

20

21    Marsi Koehl, CCR-B-2424          Date: 7/17/19

22

23

24

25
```

APG USA INC.

Curling et al. v.          Deposition of
Raffensperger et al.      JOSEPH KIRK                  7/11/2019

```
 1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3

 4  DONNA CURLING, et al.,        )
                                  )
 5       Plaintiffs,              )
                                  )      CIVIL FILE ACTION
 6  vs.                           )
                                  )      NO. 1:17-cv-02989-AT
 7                                )
    BRAD RAFFENSPERGER, et al.,   )
 8       Defendants.              )

 9

10

11      The preceding deposition taken in the matter, on

12  the date, and at the time and place set out on the

13  title page hereof.

14

15      It was requested that the deposition be taken by

16  the reporter and that same be reduced to typewritten

17  form.

18

19      It was agreed by and between counsel and the

20  parties that the Deponent will read and sign the

21  transcript of said deposition.

22

23

24

25
```

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK                    7/11/2019

```
1                           CERTIFICATE

2    STATE OF
     COUNTY/CITY OF
3

4        Before me, this day, personally appeared, JOSEPH
     KIRK, who, being duly sworn, states that the foregoing
5    transcript of his deposition, taken in the matter, on
     the date, and at the time and place set out on the
6    title page hereof, constitutes a true and accurate
     transcript of said deposition.
7

8

9                        _____

10                            JOSEPH KIRK

11

12

13   SUBSCRIBED and SWORN to before me this

14   _____ day of _____, 2019 in the

15   jurisdiction aforesaid.

16

17   _____

18   My Commission Expires        Notary Public

19

20

21    []  No changes made to the Errata Sheet; therefore, I

22   am returning only this signed notarized certificate.

23

24    []  I am returning this signed, notarized certificate

25   and Errata Sheet with changes noted.
```

APG USA INC.

Curling et al. v.          Deposition of
Raffensperger et al.    JOSEPH KIRK          7/11/2019

1   DEPOSITION ERRATA SHEET

2   Deponent:  JOSEPH KIRK

3   Deposition Date:  July 11, 2019

4   To Reporter:

5   I have read the entire transcript of my deposition

6   taken in the captioned matter or the same has been

7   read to me.  I request that the following changes be

8   entered upon the record for the reasons indicated.  I

9   have signed my name to the Errata Sheet and

10  appropriate Certificate and authorize you to attach

11  both to the original transcript.

12

13  Page No.          Line No.

14  Change to:

15  Reason for Change:

16

17  Page No.          Line No.

18  Change to:

19  Reason for Change:

20

21  Page No.          Line No.

22  Change to:

23  Reason for Change:

24

25

APG USA INC.

Curling et al. v.          Deposition of
Raffensperger et al.     JOSEPH KIRK                    7/11/2019

```
 1              Deposition of JOSEPH KIRK

 2

 3   Page No.         Line No.

 4   Change to:

 5   Reason for Change:

 6

 7   Page No.         Line No.

 8   Change to:

 9   Reason for Change:

10

11   Page No.         Line No.

12   Change to:

13   Reason for Change:

14

15   Page No.         Line No.

16   Change to:

17   Reason for Change:

18

19   Page No.         Line No.

20   Change to:

21   Reason for Change:

22

23

24   Signature:                    Date:

25              JOSEPH KIRK
```