1     IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,            :
                                      :
5          PLAINTIFFS,                :
    vs.                               :   DOCKET NUMBER
6                                     :   1:17-CV-2989-AT
    BRAD RAFFENSPERGER, ET AL.,       :
7                                     :
           DEFENDANTS.                :
8

9

10        **TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

11          **BEFORE THE HONORABLE AMY TOTENBERG**

12             **UNITED STATES DISTRICT JUDGE**

13                  **JULY 17, 2019**

14                    **1:35 P.M.**

15

16

17

18

19

20

21   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22                *TRANSCRIPT PRODUCED BY:*

23

     *OFFICIAL COURT REPORTER:*        *SHANNON R. WELCH, RMR, CRR*
24                                     *2394 UNITED STATES COURTHOUSE*
                                       *75 TED TURNER DRIVE, SOUTHWEST*
25                                     *ATLANTA, GEORGIA  30303*
                                       *(404) 215-1383*

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:

 4

 5       DAVID D. CROSS
         CATHERINE CHAPPLE
 6       MORRISON & FOERSTER, LLP

 7       HALSEY G. KNAPP, JR.
         KREVOLIN & HORST, LLC
 8

 9

10   FOR THE PLAINTIFF COALITION FOR GOOD GOVERNANCE:

11

         BRUCE BROWN
12       BRUCE P. BROWN LAW

13

     FOR THE STATE OF GEORGIA DEFENDANTS:

14

15       VINCENT ROBERT RUSSO, JR.
         CAREY A. MILLER
16       JOSHUA BELINFANTE
         KIMBERLY ANDERSON
17       BRIAN LAKE
         ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
18
         BRYAN P. TYSON
19       BRYAN JACOUTOT
         TAYLOR ENGLISH DUMA
20

21   FOR THE FULTON COUNTY DEFENDANTS:

22

         DAVID LOWMAN
23       OFFICE OF THE FULTON COUNTY ATTORNEY

24

25                                    ...cont'd....
```

1   ...cont'd....

2

3   **ALSO PRESENT:**

4

5       J. ALEX HALDERMAN, Ph.D.
        THERESA PAYTON
6       MELISSA O'LEARY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; July 17, 2019.)**

COURTROOM DEPUTY CLERK:  Good afternoon, everyone.
We're here for the telephone conference in the case of Curling,
et al., vs. Raffensperger, et al., Civil Action
Number 17-CV-2989.

Beginning with the Curling plaintiffs, would you
please identify yourself for the record.

MR. CROSS:  Hi.  This is David Cross.  And I have
with me my colleague, Catherine Chapple, and our expert,
Dr. Alex Halderman.

MR. KNAPP:  Halsey Knapp is also present on the line.

COURTROOM DEPUTY CLERK:  Thank you.

Coalition?

MR. BROWN:  This is Bruce Brown for the Coalition
plaintiffs.  I initially had Marilyn Marks with me.  But given
that this may cover confidential information, she will be
getting off the line now.

COURTROOM DEPUTY CLERK:  Thank you very much.

State of Georgia?

MR. TYSON:  Good afternoon.  Bryan Tyson -- I'm
sorry.  Bryan Tyson and Bryan Jacoutot from Taylor English here
for the state defendants.

MR. RUSSO:  Yeah.  Vincent Russo and Carey Miller and
Josh Belinfante and Brian Lake and Kimberly Anderson for the

```
 1   state defendants.
 2           THE COURT:  All right.
 3           MR. MILLER:  And this is Carey Miller.  I believe we
 4   also have on the line Theresa Payton and Melissa O'Leary from
 5   Fortalice; is that correct?
 6           MS. PAYTON:  Yes, sir.  That is correct.  This is
 7   Theresa.
 8           THE COURT:  Just one second.
 9           (There was a brief pause in the proceedings.)
10           COURTROOM DEPUTY CLERK:  Fulton County?
11           THE COURT:  Mr. Martin, do you have everyone's names
12   on the call?
13           COURTROOM DEPUTY CLERK:  Everyone but Fulton County
14   at this point.
15           MR. LOWMAN:  David Lowman for Fulton County here.
16           COURTROOM DEPUTY CLERK:  Thank you.
17           I've got them all, Judge.
18           THE COURT:  Okay.  Thank you very much, everybody,
19   for working in this time frame.  I would like to understand
20   sort of on a foundation level because I sort of have just
21   proceeded to try to move this as fast as I can.  But there is a
22   fundamental question that the defendants need to answer more
23   specifically that I just -- in the effort to try to get the
24   other information, I sort of didn't make you look -- address
25   the global issue, which I don't think you addressed, which was
```

1  plaintiffs make the argument that is understandable that they

2  had an enormous amount of data to look at and to sort through

3  and, you know, perhaps -- perhaps they could have gotten more

4  directly to some of these issues if I had said go ahead to the

5  server and permitted them to do that.  But there was strong

6  concerns about this.  And so this was sort of a compromise

7  measure.  But it involves an enormous amount of data analysis

8  and coordination in that context.  And still I limited who

9  could look at the data.

10         Here, what the plaintiffs argue is that this is a

11  very small amount of data on the card.  So they shouldn't --

12  that the need for -- what is the need, in fact, for having,

13  first of all, it reviewed at any place other than Michigan and

14  then what is the need -- since it is such a small amount of

15  data?  And what is the need, secondarily, for having it

16  reviewed at two different sites under these circumstances?

17         MR. TYSON:  Thank you, Your Honor.  This is Bryan

18  Tyson.  I'll just initially talk about the sites.  Our thought

19  there was to offer two alternatives to the Court.  We would

20  prefer a location in Atlanta.  But if the Court had concerns

21  about the law firm, we wanted to also offer our cybersecurity

22  location.  So I think we don't mind having one or the other.

23         THE COURT:  I see.

24         MR. TYSON:  To the issue of the review itself, we

25  want to -- our experts want to conduct a review of the memory

card that includes testing it with Georgia electronic voting machines and the version of the software that we use, in addition to looking at it with other tools and pieces that really wouldn't be easy to do carrying it -- carrying the DRE to Michigan, carrying other things to Michigan to analyze that there.

Our original document request was to all documents relied on by Dr. Halderman for his deposition or his declaration. I'm sorry. And the response about the memory card that we specifically requested was that it was just too confidential and there wasn't a confidence that we would be able to safeguard the information.

It seems much simpler to us to bring a very small memory card to Georgia and allow us to look at it here and have our experts conduct an analysis here rather than having to go to Michigan to do that and having to bring multiple experts there, bring equipment, all the things we would need to bring to the location in Michigan.

We had previously talked with the plaintiffs about reviewing the DRE that Dr. Halderman used in Michigan. And we understand that is a little bit more difficult to transport. But the memory card itself, the only objection the plaintiffs have given is they didn't think we could safeguard the information on it. And we believe that we could conduct a less burdensome review here or at a Fortalice location as opposed to

1   having to go to Dr. Halderman's lab to do it.

2            THE COURT:  But you see this is time-consuming.  I

3   guess that is part of what their explanation is, that they

4   had -- what the data analysis required for purposes of what

5   they were looking at it was going to take days and days.  It

6   doesn't seem to me that the testing you're talking about is but

7   a day potentially.  And, you know, that easily could be

8   accommodated given the significance of the concerns as to how

9   this might impact other systems, not just your system -- not

10  just Georgia's system -- could be accomplished in Michigan.

11  And so I guess that is what I'm trying to determine in terms of

12  the practical needs.

13            Obviously everyone -- I understand everyone always

14  wants to have it close to home.  But I did understand that the

15  volume of the data in their circumstances and the fact that I

16  wasn't allowing them lay people made it all the more necessary.

17  And that is what I'm not clear about in terms of the burden.

18  Why is it a burden given the fact that you're dealing with such

19  a smaller kind of inquiry?

20            MR. TYSON:  Yes, Your Honor.  The information in

21  Dr. Halderman's declaration about the total size of the malware

22  was at least -- and I apologize.  I had not seen that

23  information before I got Mr. Cross' email with that declaration

24  just a few minutes ago about the total size.

25            I think the concerns in terms of the length of review

1    are, Number 1, we're not going to know how much review is

2    necessary until we get in there in determining what -- if there

3    are particular versions of the software it works on versus

4    others.  And the -- I know Dr. Halderman, I believe, said it

5    took him almost a year to develop this particular piece of

6    software.  And so getting into it even if it is small in size,

7    we won't be able to assess the complexity until we are able to

8    get in and look at it.  So it may be that it is a short review.

9    But I think at this point we simply don't know because we

10   haven't been given access to it.

11          And I still am -- I am still at a loss for what the

12   concerns about disclosure would be if it is kept under the

13   protocol that we proposed yesterday evening.

14          THE COURT:  And what is the -- obviously you could

15   take the equipment to Michigan and you would have -- is the

16   equipment already -- the DRE database and software already at

17   Fortalice?  I know that they have worked with you.  Or are you

18   bringing it up there?

19          MR. TYSON:  We would need to transport it, Your

20   Honor.  We haven't located a DRE in those units at the

21   Fortalice location yet.

22          THE COURT:  Dr. Halderman, do you have a separate

23   room that you're saying that they could work at and -- is that

24   your proposal?

25          DR. HALDERMAN:  Yes, Your Honor.  I could establish a

1    separate independently secured room for them to work in in the

2    same way that we have for the GEMS data analysis.

3              MR. CROSS:  Your Honor, this is David Cross.

4              THE COURT:  Yes.

5              MR. CROSS:  I wanted to respond to Mr. Tyson unless

6    you had further questions for Dr. Halderman.

7              THE COURT:  No.  You can go ahead.

8              MR. CROSS:  I think what Mr. Tyson said a moment ago

9    really should resolve the issue, at least for now.  He said

10   that as we sit here right now they actually have no reason to

11   believe that they cannot get this done under the circumstances

12   that Dr. Halderman has proposed because they haven't looked at

13   it.  And it is a small program.  It amounts to five pages of

14   printed text, as I understand it from Dr. Halderman.

15             And at the very least, since they are going to

16   Michigan anyways to look at the DREs as they proposed or as we

17   proposed and they agreed, have them go up, look at it there.

18   If it turns out they can't get done what they need there, which

19   we think is not going to be the issue because it is a small

20   program to inspect and review, then they can come back to the

21   Court.  But there is no prejudice.  There is no wasted time or

22   effort because they are going anyways.

23             On the issue of the DRE --

24             THE COURT:  When are they going?  Because I missed

25   that.

1          MR. CROSS:  It has not been scheduled.  We have been

2     waiting to hear from them on when they plan to do that.

3          THE COURT:  And who is going?

4          MR. CROSS:  I don't have any details.  Mr. Tyson can

5     speak to that.

6          MR. TYSON:  Your Honor, there were -- this is Bryan

7     Tyson.  There was a sequence of events kind of starting back

8     with the 26(f) conference where we discussed the production of

9     documents that were relied on by declarant in preparation for

10    the preliminary injunction hearing.

11         And our initial understanding out of that was that

12    there was going to be a production of documents from the

13    plaintiff to us prior to a deposition of Dr. Halderman that we

14    planned to take in early July.  We ultimately had to cancel

15    that deposition because those documents were not made available

16    to us until July the 9th.  Then we had the issue with the

17    memory cards.

18         So I think the initial discussions about us going to

19    Michigan to take Dr. Halderman's deposition related to that

20    earlier date.  And we are at this point not planning to take

21    Dr. Halderman's deposition prior to the preliminary injunction

22    hearing.  We all obviously have a lot to do to get ready for

23    that.  We don't think it is the best use of our time at the

24    moment.  So we don't currently have plans to go to Michigan

25    prior to the hearing.

1       MR. CROSS:  Your Honor, if I may, just a couple of

2  quick points.  The fact that they decided not to go to Michigan

3  is up to them.  If they don't want to do their inspection that

4  they agreed to, as Mr. Tyson acknowledged weeks ago, that is up

5  to them.  That is not a reason to provide vote-stealing malware

6  to them.

7       It is tempting to get in and correct the

8  misstatements about the deposition.  But I will save Your Honor

9  from that.  But what was represented is not accurate.  But it

10  doesn't bear on the issue today.

11       The other point I wanted to note is the equipment on

12  the DRE, Your Honor may recall, Dr. Halderman brought a DRE

13  with him to the courthouse.  It is not that hard.  The issue

14  with the DRE inspection had never been about the transportation

15  of it.  There is no reason they can't bring one to Michigan

16  just as he brought to Atlanta.  It is the same security issue.

17       And so this has always been about security.  We have

18  made that clear from the start.  And as we sit here today,

19  we're not asking for anything unusual.  I'm sure Your Honor has

20  probably dealt with cases before -- intellectual property cases

21  that involve software.  It is routine that the software is made

22  available on a stand-alone computer for the experts to come in

23  and look at.  And that is purely for commercial reasons.

24  Purely commercial reasons are sufficient that software does not

25  get presented as a copy.

1          This is way beyond a commercial sensitivity.  This is

2    the most sensitive software that we can imagine.  And they have

3    not offered any basis to just disregard that, that sensitivity,

4    and depart from regular practice with sensitive software.

5          THE COURT:  Well, let me just -- the analysis, it

6    sounds like, is completely being done by people with the

7    Fortalice firm; is that right?  Because Dr. Shamos is not

8    around is my understanding.

9          MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.

10   The plan had been for Ms. Payton and her crew at Fortalice to

11   conduct the additional analysis and for Dr. Shamos to go to

12   either our offices or Fortalice for a further analysis as well.

13         THE COURT:  But I thought Dr. Shamos is going away to

14   Europe with his grandchildren.

15         MR. TYSON:  Yes, Your Honor.  We wanted to conduct --

16   the terms of the analysis prior to the hearing, I think that is

17   going to be a Fortalice event.  And if we could get the memory

18   card in time, Dr. Shamos is not leaving until the beginning of

19   next week.

20         THE COURT:  When next week?

21         MR. TYSON:  I believe his flight departs on Sunday.

22   I don't know, Mr. Miller or Mr. Russo, if you remember more

23   specific.

24         MR. RUSSO:  That is correct.  But, of course, he will

25   be here on Friday for his deposition that the plaintiffs are

1    taking.

2              UNIDENTIFIED SPEAKER:  And I believe Dr. Halderman

3    will also be in Atlanta for that deposition as well.

4              THE COURT:  The thing is were you thinking that --

5    I'm a little -- the -- the arrangements here are a little bit

6    confusing to me.  So you are thinking that Fortalice would come

7    down to the law firm and do it in Atlanta, alternatively -- is

8    that what you are suggesting? -- simultaneous to Dr. Shamos'

9    deposition?

10             MR. TYSON:  Your Honor, ideally, yes, that Fortalice

11   would be able to conduct its analysis in Virginia.  Our ideal

12   scenario is they conduct their analysis in Virginia, the

13   Fortalice folks, and that Dr. Shamos does his analysis while he

14   is here on Friday in Atlanta.  If it is one location or the

15   other, we'll obviously have to figure out travel arrangements.

16   But that would be our ideal scenario.

17             THE COURT:  Well, under those circumstances really,

18   frankly, it seems to me then why doesn't two or three members

19   of the -- two identified members -- I don't know that you need

20   more than that -- Ms. Payton and Mr. Brandau to simply go to

21   Michigan.  Book a flight for this evening and be there tomorrow

22   if that is what you are -- if that is really the time frame

23   that you're thinking you are going to cycle around.  And then

24   at that point if there is a problem, you are going to let me

25   know obviously.

```
 1              But if you are really trying to function on that time

 2    frame, besides everything else, if there is a problem, it is

 3    something that the experts can talk about while they are there.

 4    And if there is some human communication problem and might have

 5    to involve the Court, that is a whole other thing.  But just

 6    simply it seems simple enough if they are going to be doing --

 7    because, otherwise, they have got to get this to you.  And it

 8    is a whole other period of time.

 9              So if you are really aiming for the Friday time frame

10    besides any of the other concerns, the simplest thing is for

11    Ms. Payton and whoever else she designates on staff to assist

12    her to go to Michigan.

13              MR. MILLER:  Your Honor, I think the concerns are

14    related to timing as far as the question of Shamos being in

15    Atlanta on Friday as being separate from the consideration of

16    the examination in Virginia.  And with respect to the staff

17    that Ms. Payton would like to have with her and to examine it

18    and that process, you know -- as far as Dr. Shamos' ability to

19    look at it, it may very well be that based on timing we just --

20    it is not just not going to work prior to the preliminary

21    injunction hearing.

22              But just on the basis of having the ability to

23    prepare a defense on a demonstration that was given at the

24    hearing last year that apparently Dr. Halderman intends to rely

25    on again this year kind of leads us to this situation and with
```

1    respect to the Fortalice staff having sufficient staffing in

2    Virginia and security in Virginia that is equal to, if not

3    better than, what Dr. Halderman can provide in Michigan.

4           THE COURT:  So who -- I mean, I thought that the

5    affidavit was helpful but extremely vague about who else was

6    going to be helping her.  And you just used the word staff.

7           MR. MILLER:  Your Honor, that was intended to simply

8    point to the necessary staff.  And I will let -- if it is okay

9    with the Court, Your Honor, I will let Ms. Payton speak to what

10   she anticipates as far as staffing and the types of security

11   that they can provide and the types of information analysis

12   they previously provided, if that would be helpful.

13          THE COURT:  Well, the first question is simply --

14   because, you know, I really fairly significantly limited who

15   was going to be present.  And I know everyone who is going to

16   be present at this juncture at least as I understand it from

17   Dr. Halderman.

18          So I need to understand -- and it is not -- frankly,

19   it isn't as sensitive data.  So I would like to understand,

20   first and foremost, from Ms. Payton who is going to be

21   present -- who she is thinking she is pulling on as staff

22   other --

23          MR. MILLER:  Your Honor, if I may, this is Carey

24   Miller.  We were intending to track the order with the GEMS

25   database.  And we, of course, understand the Court's

```
 1    consideration in limiting who had access to it, who controlled
 2    that access.
 3            You know, we subsequently received new
 4    confidentiality agreements from a gentleman in Michigan who
 5    we're unaware of as to exactly who he is but is assisting
 6    Dr. Halderman.  And so it was all intended to kind of be within
 7    the same context.
 8            THE COURT:  Okay.  But I still want to understand --
 9            MR. MILLER:  I understand.
10            THE COURT:  The thing is I understood there was a lot
11    of data to pore through.  And I had prevented them from using
12    lay people.  So it was people he had worked with normally.  And
13    I don't know the nature of the staff that she is talking about
14    or you're talking about.
15            MR. MILLER:  Yes, Your Honor.
16            Ms. Payton, would you like to answer that question
17    from the Court.
18            MS. PAYTON:  Yes, Your Honor.  Thank you.
19            And just a couple of things -- and I know you have my
20    background and a little bit about the company.  But we've
21    worked on similar processes in cases -- some of us -- from our
22    time at the White House and in regards to other clients'
23    processes.  We do have a facility clearance at our company.  So
24    because of that, we follow chain of custody protocols for any
25    types of cases that we work.
```

1          So as it relates to sort of physically, our

2    perspective would be everything would be done with a very

3    detailed logging of chain of custody.  We understand the

4    sensitivity around software like this.  We have handled

5    different types of software, you know, malware, worms, viruses,

6    et cetera, in other types of cases.  And so we do understand

7    the sensitivity around this, and we would be handling it that

8    way.

9          We have a controlled area.  We have cameras on it,

10   card access, fob access, logging.  We would create a controlled

11   environment.  As it relates to this, it would be myself

12   supervising Paul Brandau.  Paul Brandau is former U.S. Air

13   Force.  He runs our offensive and threat hunting team.  He has

14   actually worked previously with the Department of Homeland

15   Security specifically around election security.

16          I myself -- from a background besides the different

17   cases that we've worked, I'm actually researching and writing a

18   book on the very topic of election security.  We may -- as we

19   get in, as was mentioned earlier, sometimes you don't know what

20   you don't know until you start to get into your analysis.  And,

21   again, we would have a very specific controlled access and

22   chain of custody.

23          It is my hunch that we will also be reading into this

24   a gentleman on my team.  And all of the people that I'm naming

25   here are full-time employees.  They are not contractors.  And

1    they all go through an extensive background check.  We use a

2    third-party -- third-party private sector firm to do all of our

3    background checks, in addition to any Government background

4    checks.

5         The gentleman would be Matt Shirley.  Matt Shirley is

6    an expert in understanding internet (inaudible) devices and

7    other types of devices and sort of the injection of anything

8    like malicious software, viruses, worms, keyloggers, spyware.

9         So he has a really in-depth understanding of sort of

10   when hardware meets software what the implications are.  And

11   what is between him and Paul and myself will be able to kind of

12   determine what we're looking at here.

13        Again, it would all be in a controlled environment.

14   We will make every effort to make sure we accelerate.  We

15   understand the sense of urgency that is presented by this.  We

16   would welcome, Your Honor, any other instructions from you and

17   the Court as far as how you would want to have chain of

18   custody, the logging of analysis, the logging of who is coming

19   and going, dates and timestamps, the overall handling of the

20   software itself and the memory card itself and the logging of

21   our findings.

22        THE COURT:  So if it goes to your office -- I mean, I

23   do need to have something in writing about Mr. Shirley --

24   Mr. Shirley.  Because my understanding was anyone else

25   assisting Dr. Halderman was basically poring through the data,

1   not doing software analysis in the same way.  And it doesn't

2   have the same sensitivity, frankly.

3           I respect the state's confidentiality assertions.

4   But it simply does not have the same level of sensitivity about

5   malware that might be replicated.

6           Do you -- so you really don't, in fact, need to have

7   the software at the law firm in Atlanta?  It is going to be

8   at -- it is going to be at Fortalice?  That is where the

9   analysis is being done?

10          MS. PAYTON:  Yes, Your Honor.  Yes, Your Honor.

11          MR. CROSS:  Your Honor, this is David Cross.  I'm

12  sorry.

13          THE COURT:  Yes.  Go ahead.

14          MR. CROSS:  I just want to respond briefly to a

15  couple of points.

16          One thing to correct.  The individual that Carey

17  Miller mentioned, Mr. Ritchie, is working with the Coalition

18  plaintiffs' expert, Mr. Bernhard, not Dr. Halderman.  It is not

19  a big deal, but I just wanted to correct the record on that.

20          THE COURT:  I'm sorry.  It is Mr. Bernhard you are

21  saying?  It was not Mr. Ritchie?

22          MR. CROSS:  Mr. Bernhard has someone named

23  Mr. Ritchie who is assisting him with the review of the data.

24  It is not Dr. Halderman.  It is not a big point.  I just wanted

25  to correct that.

1          THE COURT:  All right.

2          MR. CROSS:  What I did want to address on the

3    substantive points for this were again we still haven't heard a

4    need in any of the discussions here.  And under Rule 26, that

5    has to get balanced.  And as Your Honor has observed, the

6    sensitivity of what we're talking about is so far beyond the

7    GEMS data.  It is small.  It is easy for them to come look at.

8    That is the initial step.

9          And as state defendants' counsel have acknowledged,

10   they agreed to do this weeks ago at the Rule 26(f) conference.

11   And I get that they changed their minds.  But to say now that

12   the only -- the only need they have articulated is it is just

13   too late for them to go to Michigan, that is the situation they

14   created by suddenly reversing course last week and saying they

15   are not going to Michigan, they are not going to depose him,

16   even though they got his documents a week before the

17   deposition, by the way.  They have made these series of

18   decisions to put themselves in this situation.

19          And even if Your Honor were to order a copy of the

20   memory card, the earliest we could get them a memory card is

21   next week.  Dr. Halderman is in my office in D.C.  He is going

22   directly to Boston tomorrow for a peer review meeting of some

23   sort.  It is mandated.  Then he's going directly to Atlanta for

24   Shamos' -- Dr. Shamos' deposition.

25          So even if they -- no matter what gets ordered here,

1  Your Honor, respectfully they are not getting this at any point

2  until just before the eve of the hearing.  You gave them, I

3  think, four days or so to get the databases to us.  And so it

4  is -- we are here because of the way they handled this.  And so

5  they haven't offered any --

6           THE COURT:  All right.  Let me ask you this:  Are you

7  saying as well that there is no one in his place who could

8  arrange for them to look at this tomorrow or Friday in

9  Michigan?

10          I understand that he doesn't want somebody else

11 reproducing it and sending it out someplace.  He wants to make

12 sure that he is part of the chain.

13          But are you saying then, in fact, that they can't see

14 it on Thursday or Friday, even if they flew out there?

15          MR. CROSS:  So I just talked to him a moment ago on

16 that.  If Your Honor orders them to review it in Michigan, we

17 will get it set up.  He has said he won't be there.  But there

18 is someone who works with him that can set that up.  So that

19 would certainly be the only way they are getting it before next

20 week is if they go to Michigan.  And I don't mean any

21 disrespect to the Court.  We'll do whatever Your Honor orders.

22 But there is no one that can get that to them -- the memory

23 card.

24          THE COURT:  Well, how is he going to arrange the

25 memory card -- let's say they are going to come and look at it

1    on Friday.  I don't know what they are doing.  But I don't

2    know -- let's say they are going to look at it on Friday or

3    Thursday or Saturday because somebody may want to look at it on

4    a Saturday instead.  Just review on it to be able to have that

5    access.

6             MR. CROSS:  Dr. Halderman -- I'm sorry.

7             THE COURT:  Is there somebody there who is going to

8    be able to copy it and at least make that available and keep it

9    there?  And what is the difference between that and their being

10   able to have it in hand so that somebody can pick it up?  They

11   have to send a designated representative who can't be just a

12   courier.

13            MR. CROSS:  So Dr. Halderman will be back Friday

14   night once Dr. Shamos' deposition ends.  So he will be

15   available over the weekend to coordinate.  If Your Honor wanted

16   them to get there tomorrow or Friday, we can't say with

17   certainty that it is doable.  But he is expecting that he would

18   try to work with someone to do that just to accommodate the

19   Court.

20            But as of the weekend, he will be back so that we can

21   definitely represent that he will be there to set them up by

22   Saturday.  If it is Thursday or Friday, we will certainly make

23   our best efforts and try to find somebody who can do that.

24            MR. MILLER:  Your Honor, I apologize.  This is Carey

25   Miller again.  I just want to reference what we're talking

```
1    about here.  It appears as though it would be just as easy for
2    a representative of state defendants or Fortalice, a named
3    person with certain security, round up and assuring who it is,
4    to be able to get to Michigan and back and provide it in
5    Virginia in the secure environment.
6              Of course, plaintiffs' counsel in Washington would be
7    welcome to inspect that environment, as you also offered for
8    the state defendants on the other -- with respect to the GEMS
9    database.
10             And, second, with respect to Mr. Cross' comments
11   about how we got here, you know, without delving into a long
12   discussion of where we are in terms of document production
13   before a hurried preliminary injunction hearing, you know,
14   there are many other issues that are at hand here.  And, of
15   course, we're all trying to work diligently to get to that
16   hearing date.  But this is not happening in a vacuum.  And, of
17   course, you know, we have been discussing with them wanting to
18   inspect this for some time now.
19             MR. CROSS:  Your Honor, there is no one available to
20   fly from Michigan to Virginia to provide them a copy of this.
21   As I said, Dr. Halderman is not there.  He certainly doesn't
22   have the time to add an additional flight from Michigan to
23   Virginia.
24             MR. MILLER:  Your Honor --
25             **(Unintelligible crosstalk.)**
```

1          MR. CROSS:  -- proposing to do that.

2          MR. MILLER:  To be clear, when I was referring to

3    that, it would either be a representative of Fortalice or one

4    of the counsels of record for the state defendants in this

5    case.  We could provide somebody and, of course, somebody that

6    is bound by the Court's order regarding confidentiality and

7    potentially also bound by the rules of ethics governing

8    lawyers.

9          MR. CROSS:  Your Honor, this is David Cross.  That

10   ignores that they had the opportunity per your order to come

11   and inspect our facilities.  The idea that they would send

12   someone, pick up a copy of this in Michigan, take it to

13   Virginia, and we would have to trust that their facility

14   complies and is truly secure --

15         THE COURT:  All right.  Listen, I understand your

16   great concerns.  But I don't have any indication from you

17   either that there is a basis for thinking that Fortalice isn't

18   capable of handling this with the experience and focus of their

19   staff.  And you had raised earlier maybe they have no election

20   experts, that Dr. Shamos has no election experience.  But

21   Dr. Shamos, whatever it is, is not touching this data at this

22   juncture.  So I don't even have to deal with that.  I'll see

23   his deposition and judge that for myself.

24         But I don't have any notion of why you really think

25   that the firm itself, given its focus, is not capable of

```
 1   maintaining the security protocol.  I know, you know, you are
 2   saying it is a greater need, et cetera.  But I don't -- but
 3   obviously people -- there is a reality in terms of the way
 4   people work that it may make it easier for them just for the
 5   same reason it is for you.
 6             And I mean, I was not prepared upon the showing to
 7   let it go to the law firm that I had here.  But I don't -- I
 8   don't really understand why -- I can't believe it would be
 9   better for Dr. Halderman to have to fly to Washington.  I
10   can't -- I don't know why he would not, given all that he has
11   on his plate.
12             So, you know, he could suggest -- you-all could
13   designate somebody who is acceptable versus not acceptable.
14   That is something different.  But -- and I certainly am
15   prepared to put protocols in for basically the destruction of
16   the card and its return.
17             But I'm not clear at this juncture why you think they
18   are not capable of protecting it given the showing you have
19   made.
20             MR. CROSS:  Your Honor --
21             THE COURT:  And I know you want -- I know, Mr. Cross,
22   you have made all the arguments.  And I'm not -- I'm not
23   discarding those.  It certainly seems to me from the
24   perspective of the defendants it would seem like you just would
25   want to get there on Saturday when Dr. Halderman is there.
```

1      But -- and I can understand why he is not willing to

2  release it to anyone until he is actually present and can

3  oversee that.  But -- so it delays the defendants.  But you

4  haven't told me what is wrong -- what is inadequate at this

5  juncture.

6      Given all that they have presented and also what they

7  have articulated today on the phone call, what is the

8  inadequacy of their showing?

9      MR. CROSS:  Your Honor, I'm going to let

10  Dr. Halderman speak briefly to that as well.

11      But a couple of things, if I may, before he gets to

12  that.  One is:  When we dealt with the GEMS databases, the onus

13  was on us at least throughout that to establish our need for

14  that.  The concern we have with what Ms. Payton describes is it

15  is vague.  And Dr. Halderman can speak more to that.

16      But the problem is it is not entirely clear the

17  particular steps they are taking.  So we don't have a showing

18  that they actually can secure this.  And to the more precise

19  point, while they have maybe some sort of election experience,

20  there is nothing that indicates that they have ever dealt with

21  this type of malware and how it would need to be secured.

22      THE COURT:  But, you know, the thing is that is sort

23  of jumping -- jumping around because, you know, the thing is,

24  of course, as they testify it may be that these are very good

25  points.  But for me to prejudge this -- and I think that is in

1  some ways what Dr. Halderman's affidavit is asking me basically

2  to say is there is no one else prepared to do this and no one

3  else who has expertise to do that.  And it is basically

4  contrary to the way that we normally would deal with expert

5  testimony.

6          And they have to -- the defendants have to be

7  prepared to examine Dr. Halderman too even if they -- even if

8  there is information that, you know, you might disagree with or

9  the approach or it is short-sided or is uninformed as much as

10  Dr. Halderman thinks is appropriate, that is something that you

11  bring out.

12          MR. CROSS:  Right, Your Honor.  To be clear, I'm not

13  talking about their substantive expertise.  One of the big

14  distinctions and concerns I have is when they delivered their

15  GEMS disc to us and Dr. Halderman they did not release them to

16  us until they inspected our facility.

17          Mr. Miller came.  He looked at the room.  We walked

18  him through the camera, the key.  He took screenshots of the

19  computers.  Our IT guy had to come in and walk him through the

20  software.  He literally inspected the software on the

21  computers.

22          THE COURT:  But you're not proposing that.  You are

23  saying just no.

24          MR. CROSS:  Well, I was going to answer your question

25  as to how do we know.  The question was what basis do we have

1    to believe that they can't do that.  My only point is if you

2    were going to order this to be disclosed to them we would have

3    to be under the same circumstances where Dr. Halderman, who is

4    the only one for our team that could do a meaningful

5    inspection, would have to go and do that inspection to confirm.

6            But I wanted to offer an alternative that might work.

7    Since the defendants are comfortable with the setup we have

8    here and they are -- and I understand Ms. Payton is located in

9    Virginia and not far from us -- and hopefully Dr. Halderman

10   doesn't bite my head off when I say this.  But would it be

11   feasible to set this up at our office in D.C. assuming -- he's

12   nodding.  He's nodding.  It sounds like Dr. Halderman would

13   live with that as a compromise if we could set that up.

14           Do you want to speak to that?

15           DR. HALDERMAN:  So I'm not -- before we offer that,

16   there is -- I would just like to respond to the Court's

17   question about -- about what is the worry about having the

18   analysis conducted in Virginia.

19           And the predominant worry I have is that every

20   additional site and every additional copy that we make of this

21   program causes added risk.  And yes, there are procedures you

22   can follow that will to a greater or lesser extent reduce that

23   risk.

24           But to suffer that added risk to the public solely on

25   the basis of convenience is what worries me.  And I think I

1    would have -- in response to David' proposal now, I think I

2    would have those same additional -- site risk additional

3    concerns about doing it here in the D.C. office, not that I

4    don't trust the security of the office here.  I think it is

5    likely to be good.  But that is still another kind of risk that

6    will be borne by the public.

7            MR. MILLER:  Your Honor, this is Carey Miller.  I

8    just want to kind of respond to a couple of points there.

9            Number 1, with respect to the facility at Fortalice

10   and their capability to handle these types of situations, the

11   security at Morrison Foerster -- it certainly met -- and I did

12   indeed inspect the premises -- met the requirements of the

13   Court's order, was sufficient for us to turn over the GEMS

14   database.

15           But to suggest for some reason that that is somehow

16   more secure or otherwise is a bit confusing for the state

17   defendants.  But to also suggest that -- this would not be the

18   first time that this malware has traveled.  There are numerous

19   news articles about Dr. Halderman taking malware to DEF CON

20   conventions and showing demonstrations there and, of course,

21   traveled to Atlanta for a demonstration with the Court.

22   Again --

23           THE COURT:  He just always says it travels with him

24   on his body still.  That is the issue.

25           MR. MILLER:  Yes, Your Honor.  And, of course, we

1    would be happy to set up any opportunity for any of the

2    attorneys at Morrison Foerster in D.C. to come over and inspect

3    the premises, for Dr. Halderman himself to inspect the premises

4    before the memory card is there.  We are, of course, willing to

5    work with the Court on all of these things.

6            But just at a baseline level for equitable

7    consideration for the defendants to be able to examine the

8    malware and adequately defend themselves for a preliminary

9    injunction hearing that plaintiffs chose to file and chose to

10   bring forth at this time, that is kind of where we are on that

11   stance.

12           And it may be helpful to the Court -- and Ms. Payton

13   recognized some of these types of things that they secure.

14   This would not be the first item of high risk security that

15   Fortalice has had to make sure was secure and to keep away from

16   wrongdoers truthfully.

17           THE COURT:  All right.  Well, is Dr. Halderman

18   available to come on Monday to Fortalice -- to Virginia?  Or --

19   what is the -- is it preferable for him to come -- if he is

20   already in Atlanta to go from Atlanta on Saturday?  I mean, I

21   would expect the state to pay for this just as I expected the

22   defendants -- plaintiffs to absorb the other cost.

23           MR. CROSS:  Your Honor, this is David Cross.  He is

24   available in Michigan over the weekend after the Shamos

25   deposition.  Getting to Virginia next week, I gather, is not

1    very realistic with other commitments.

2         Again, we would ask that he -- Dr. Halderman has a

3    lot to do to prepare for next week.  And the idea of him

4    traveling out there as opposed to their -- I'm sorry -- their

5    expert coming to do the inspection they agreed -- it seems the

6    prejudice should cut that way.

7         MR. MILLER:  Your Honor --

8         THE COURT:  You didn't answer my question.  Can he

9    come on Saturday or not to -- I mean, I understand he --

10        MR. CROSS:  I apologize.  I thought you were asking

11   if he would be in Michigan on Saturday.  Can --

12        THE COURT:  No.  I knew he was planning to be in

13   Michigan on Saturday.  But I'm asking basically what would be

14   the problem with his flying to D.C., whether it was your firm

15   or seemingly -- are you proposing alternatively that he is

16   going to bring the card with him if I order it to be in D.C.,

17   whether at your firm or at Fortalice, and he is going to then

18   give it to you to bring to D.C. or Virginia?

19        MR. CROSS:  No, Your Honor.  I apologize.  The

20   proposal -- the thought was that he would bring himself, since

21   he is comfortable with securing it himself, the card to our

22   office in D.C.  If he had to, we could do that early next week.

23        The weekend would be challenging since he would have

24   to fly back to Michigan Friday night, get the memory card, come

25   back to D.C. sometime on Saturday.

```
 1            THE COURT:  Where is he right now?  Where is
 2   Dr. Halderman now?
 3            MR. CROSS:  He is sitting with me here in D.C.
 4            THE COURT:  I see.  All right.
 5            MR. CROSS:  So he won't be back in Michigan until
 6   Saturday.  I mean, if their issue is expedience, the most
 7   expedient mechanism is for us to figure out if we can get
 8   somebody set up in Michigan for them to go inspect it tomorrow
 9   or Friday or just simply to go there this weekend and he will
10   set them up.
11            That would seem to resolve everyone's concern.  They
12   get to do it in advance of the hearing.  Ms. Payton hasn't
13   identified any tools or equipment that she can't have with her
14   to do it there.
15            Worst case, if they arrive over the weekend or
16   tomorrow or Friday and they can't do it then, then they just
17   alert us.  And we will, if we have to, make it available next
18   week in D.C. ideally at our office so that we can keep it
19   secure.  The issue is copying.
20            THE COURT:  The issue is what?
21            MR. CROSS:  Copying.  It is not the transportation.
22   As Mr. Miller pointed out, he does transport this.  But it is
23   creating copies for others.  So it is why he would feel more
24   comfortable if it is in our office instead of theirs.
25            But in any event, just to net it out, if they go to
```

1    Michigan tomorrow or the weekend, we will figure out if we can

2    set it up.  We certainly can set it up for Saturday with

3    Dr. Halderman.

4           If they then say we really can't do everything we

5    need, there is nothing lost.  They said they are going there

6    anyways at some point.  And in the worst case, we'll figure out

7    a way to get it to D.C. by next week in advance of the hearing,

8    if Your Honor orders that.

9           MR. MILLER:  Your Honor, respectfully -- and this is

10   Carey Miller again -- I think that the question is not

11   expedience in a vacuum.  But that proposal, you know, in terms

12   of the downside of doing it requires our experts' time and

13   expense.  And, again, I realize that we are not the only ones

14   preparing for a preliminary injunction hearing.  But we all

15   have matters to prepare for before early next week.  So it is a

16   little bit of a formula of all things above.

17          I believe at this point with what the state

18   defendants have shown is that we can adequately secure this

19   malware at the office of Fortalice.  And at this point, we're

20   just unaware of -- and, you know, Ms. Payton may correct me.

21   But at this point, we're just unaware as to what we may need

22   because we haven't been provided the card.

23          THE COURT:  Ms. Payton?

24          MS. PAYTON:  Yes, ma'am.

25          THE COURT:  Do you have other states that you're

1   representing on election systems?

2          MS. PAYTON:  No, ma'am.

3          THE COURT:  Are you representing any federal agencies

4   in connection with election systems?

5          MS. PAYTON:  No.

6          THE COURT:  And what -- I mean -- what -- what would

7   be the protection that the Court could be assured of that

8   somebody wouldn't make a copy of this card?

9          MS. PAYTON:  Yes.  Correct.  So we welcome any

10  additional instruction from the Court.  We would definitely add

11  any other precautions or requests into our processes.  But we

12  would -- we have cameras.  We would have a chain of custody.

13         THE COURT:  Right.  You can have a camera, but it

14  doesn't mean that -- it doesn't mean that anyone can know

15  whether you are making a copy of a card.

16         MS. PAYTON:  Yes, Your Honor.  You are right about

17  that.  What we can do, because we can have people present, is

18  we can actually tell what we are doing at the command line and

19  explain what we're doing and allow people to examine what we're

20  doing at the command line.

21         We have done that in certain cases before where there

22  is kind of an observation of the activities that are taking

23  place.  As different things are happening, we can explain what

24  the system is doing, what our anticipation is, why we're doing

25  this, how we're doing it.  So we can explain step by step by

1    step.

2           I think the other thing that is important to note is

3    that when you do an investigation like this to kind of

4    review -- when I say investigation, what I mean is for us what

5    we're charged with doing is evaluating how this software has

6    been developed, how it behaves on the voting machine.  And so

7    our process would be we would want to be the ones setting up

8    and understanding and documenting the environment, having --

9    using the standard configuration and then going through our

10   processes.

11          It is not impossible.  But it is a very different

12   analysis to walk into somebody else's lab where everything is

13   set up.  And then you have to take some things for granted what

14   they tell you was done during setup and then do some

15   examination of config files and other operating system files to

16   say, okay, what you told me you did, that is what I see.  I do

17   or I do not have any questions.

18          And so there are different ways to do this type of

19   analysis.  Obviously in order to both replicate what the good

20   doctor has said he has observed in his lab and with the

21   software and what is going on here, we would want to be able to

22   set up the environment, go over the configuration, and follow

23   our processes.

24          We would welcome anybody sitting side-by-side.  We

25   call it shoulder surfing.  We would welcome anybody to shoulder

1    surf what we are doing.  We would step them through

2    step-by-step.  We would -- just ethically, we would not make a

3    copy.  But we know that people have to have assurances.  And so

4    we would -- again, like I said, we would welcome -- there is

5    the camera.  There is our chain of custody process.  There is

6    documentation.  And then we also welcome people to inspect

7    everything that we are doing.

8         THE COURT:  Well, you understand that this is not the

9    sole basis -- in fact, it is not -- the card is not the primary

10   basis of his opinion.  There are many other issues that he has

11   identified.

12        MS. PAYTON:  Correct.

13        THE COURT:  All right.  So what are the -- what is

14   the inadequacy in that either from Mr. -- either Mr. Cross or

15   Dr. Halderman in terms of the question of the copying of the

16   card from your perspective?

17        MR. CROSS:  Your Honor, the challenge that we have

18   with that -- we will put aside for the moment the security of

19   it because we would want to inspect that.  So we will assume

20   for the sake of the moment that what she has identified could

21   get to a level of security for this.

22        It sounds like she's agreeing to supervised

23   inspection with Dr. Halderman.  Or one of his associates could

24   do that, the shoulder surfing, while they did their

25   examination.

1           The challenge we have is just one of timing.  Right.

2    We're not weeks out or months out from a hearing.  We need

3    Dr. Halderman supporting us getting ready for a hearing that is

4    next week, including a deposition of their expert on Friday.  I

5    don't see any world in which he has time to fly back to

6    Michigan, get this, come back to D.C., and shoulder surf with

7    their team to do all of this instead of them just sending

8    someone to Michigan and getting it done over the weekend.  They

9    can bring a DRE.  It is very simple.  You saw Dr. Halderman

10   bring it to the court.  They can bring a laptop.  Those are the

11   only two things that they have identified that they would need.

12           The alternative that we have offered is to set it up

13   in D.C. -- I'm sorry -- at our office, at MoFo.  At least that

14   addresses Dr. Halderman's copying concern.  And everyone

15   already knows -- we don't have to worry about a new facility

16   security.  We have a setup that everyone agrees is secure.  We

17   can just set it up in that room.  And so we're not starting

18   from scratch.

19           The bottom line on this, Your Honor, is --

20           THE COURT:  All right.  Listen, I mean -- while I

21   don't completely accept any of your positions, what I'm afraid

22   of is this blowing up next week and everyone saying I have

23   got -- now we can't proceed because of X, Y, Z.

24           So this is what I'm going to do.  I'm going to -- the

25   defendants' expert, Ms. Payton, and any of the staff she wants

1    can come over to MoFo and do this.  At least then they are

2    going to be in the same vicinity.  They are not traveling.  If

3    they need something, somebody can come and get some additional

4    software from their office and it is not the same issue.

5         And then I'm not going to have also Dr. Halderman

6    saying, well, something is inadequate over here, one thing or

7    another, and a whole blowup that I can't deal with next week.

8         So, you know, this has been nothing but difficult.

9    And I can expect anything that is going to go wrong is going to

10   go wrong.  So I understand Dr. Halderman wants it to be in

11   Michigan.  But I think some convenience issues for the

12   defendant are also appropriate.  They have to prepare for trial

13   too.  This at least more deals with everyone's convenience

14   issues.

15        I assume that the plaintiffs' counsel is going to be

16   meeting with Dr. Halderman.  So, you know, you will be able to

17   do it there.  And I just don't have the ability to have more

18   and more conversations about this next week and for something

19   to go wrong.

20        And at least in this circumstance then, Ms. Payton

21   and the two staff members she's talking about can be close to

22   their offices.  And if there is something else that they --

23   other software, other sorts of evaluations they want to go back

24   and think about getting done, they are able to do that and then

25   come back.  And it won't be a burden to them.

1            And I think that is the best I can do in resolving

2    this.

3            I have broad concerns of -- with the proposal that

4    Mr. Barnes be part of the team reviewing things.  I didn't find

5    in the last hearing that I had that he had requisite

6    experience.  I understand you want somebody from the party.

7    But I'm not prepared at this juncture with this showing.  I

8    don't understand what he adds to this mix at this point.

9            It doesn't mean you can't come back about that.  But

10   I don't see it.  And I would like to see an additional

11   affidavit -- a supplemental affidavit that deals with the other

12   gentleman that you mentioned whose name I'm not remembering

13   this second but the third person.

14           And there was -- in the proposed protection, it was

15   that the defendants could take videos and screenshots.  And I

16   didn't mention authorizing the video in the last -- the process

17   for the plaintiffs and what it was was that they had to -- if

18   they wanted to have a select number of images that they needed

19   to identify what they wanted to have images of.  And, you know,

20   maybe you need a video and both sides need one but you would

21   have to agree on what that is.

22           No images can be taken, no videos can be taken

23   without your having conversed about it and agreed upon it in

24   advance.

25           MR. CROSS:  Thank you, Your Honor.  That is a very

1    fair solution.  We appreciate that.

2         THE COURT:  I'm sorry.  It was Matt Shirley who

3    Ms. Payton identified.

4         MR. MILLER:  Your Honor, this is Carey Miller for the

5    state defendants.  I think we're largely able to work in some

6    direction towards that suggestion and compromised route.  We

7    would have to have conversations with Ms. Payton assuming that

8    is doable.  I think based on what she said so far it likely is.

9         Of course, the state, you know, does want to register

10   its kind of general objection as to doing this in the

11   plaintiffs' attorney's offices.  But, of course, given the

12   time, given the considerations, we're willing to work towards

13   something.

14        THE COURT:  Okay.  All right.  I appreciate that.

15   And your general objection is certainly noted.  And we'll see

16   where you're at.  But I think it will be more viable in terms

17   of just getting it done so we don't have a blowup before the

18   preliminary injunction hearing.

19        MR. MILLER:  Your Honor, this is Carey Miller again.

20   I don't believe I missed this.  But to clarify as to the

21   timeline and based on Dr. Halderman's availability that we

22   discussed earlier, I'm assuming this looks like Monday or is

23   this Friday or -- I just --

24        THE COURT:  Well, he's attending the deposition.  He

25   has to go back to Michigan and get this.  So I think you're

1    talking about Monday.  He still has to fly in to D.C.  I'm

2    assuming we're talking about Monday.  And I don't know, you

3    know, what -- that is something you-all are going to have to

4    work out if you're talking about 10:00 on Monday or what time

5    -- 11:00 on Monday.  I don't know what -- and I don't know what

6    the flight schedule is.  I know he is in Ann Arbor.  He has to

7    go to Detroit to get out.

8            MR. MILLER:  Your Honor, if I may, just a couple of

9    points of clarification.  And this may be better answered by

10   Mr. Cross.

11           Is the proposed work area, work space -- are we

12   sharing that space with the GEMS work space?

13           COURT REPORTER:  Is that Mr. Russo?

14           MR. MILLER:  This is Carey Miller.  I apologize.

15           THE COURT:  Are you able to -- Mr. Cross, can you

16   give them a private -- a similar space that is private

17   because --

18           MR. CROSS:  My thought, Your Honor, was to give them

19   the same room since everyone is comfortable with it but they

20   will have it to themselves.  Dr. Halderman has been doing our

21   review.  And our trial team is focused on the hearing.  So they

22   will be alone in that room with the shoulder surfing that

23   Ms. Payton described with Dr. Halderman.

24           MR. MILLER:  Just to be clear, Your Honor, with

25   respect to the shoulder surfing, I think our -- I don't want to

```
1    put words in Ms. Payton's mouth.  But I think what we're
2    talking about is internal checks as to what is occurring.  I
3    think in terms of having the plaintiffs' expert shoulder surf
4    to see what we're looking at kind of prejudices the defendants'
5    ability to fully examine this and to examine it and be ready
6    for trial to rebut any evidence at the trial that they may
7    produce as a basis of it.
8              As I mentioned earlier, we're willing to work toward
9    something creative.  But for the same reasons that plaintiffs
10   objected to our staff or our attorneys being in the room or
11   taking notes or doing notes, we would have the same --
12             THE COURT:  I understand.  And the same thing is that
13   one of the things you get, Mr. Cross, is that it is a laptop.
14   You are going to be able to -- I assume you can agree on some
15   mechanism to ensure that you have an ability to see if there is
16   ever a copy -- an order for a copying of the disc.
17             And that is what you-all need to think about is what
18   is the mechanism you are going to have for that.
19             MR. CROSS:  Understood, Your Honor.
20             THE COURT:  Okay.  Because I don't -- I do think it
21   is a legitimate concern on everyone's part.  No one wants
22   everyone looking over your shoulder on everything you are doing
23   in order to really create a -- privately look at the
24   information.
25             And I'm expecting this to be attorney's eyes only
```

1    plus the individuals identified and an affidavit with the

2    restriction as to the videography and the imaging, which would

3    be all of you agreeing to it.

4            I don't know about the time.  I don't know what the

5    planes out of -- and whether Dr. Halderman was going to be in

6    D.C. anyway on Monday.

7            MR. CROSS:  He was not going to be in D.C. anyway.

8    But we will look, and we'll coordinate with the defendants and

9    get it set up as early on Monday as we can.

10           THE COURT:  Okay.

11           MR. CROSS:  Thank you again, Your Honor.

12           THE COURT:  Okay.

13           MR. MILLER:  Thank you, Your Honor.

14           THE COURT:  Does that resolve everything at least for

15   now?

16           All right.  Hearing nothing, I am going to determine

17   it is.

18           Thank you very much.  Good luck.

19           MR. CROSS:  Thank you.

20           THE COURT:  All right.  Bye-bye.

21               **(The proceedings were thereby concluded at 2:38**

22               **P.M.)**

23

24

25

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

the United States District Court, for the Northern District of

Georgia, Atlanta Division, do hereby certify that the foregoing

44 pages constitute a true transcript of proceedings had before

the said Court, held in the City of Atlanta, Georgia, in the

matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the

18th day of July, 2019.

_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT