**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>　　　　　　**Plaintiffs,**<br>　　**v.**<br>**BRAD RAFFENSPERGER, ET AL.,**<br>　　　　　**Defendant.** | **Civil Action No. 1:17-CV-2989-AT** |

**CURLING PLAINTIFFS' REPLY
MEMORANDUM OF LAW IN FURTHER SUPPORT
OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Preliminary Statement ..........................................................................1

I.    Georgia Must be Made to Implement Paper Ballot Voting Now ................4

      A.    The State's Efforts at Securing the System are Completely
            Inadequate ................................................................................5

      B.    Dr. Shamos's "Fears" About Paper Ballots are Misleading and
            Unfounded .................................................................................8

II.   Curling Plaintiffs Have Demonstrated Their Entitlement to Injunctive
      Relief ............................................................................................10

      A.    Curling Plaintiffs Are Likely to Succeed on the Merits ....................10

            1.    Defendants' Arguments Regarding the Need to Show an
                  "Actual Compromise" Are Incorrect and Misleading ..................11

      B.    Curling Plaintiffs and Georgia Voters Will Suffer Irreparable
            Harm Absent Relief .....................................................................17

      C.    The Balance of Equities and the Public Interest Strongly Favor
            Injunctive Relief .........................................................................20

            1.    State Defendants Misconstrue Curling Plaintiffs' Requested
                  Relief .................................................................................22

            2.    Curling Plaintiffs' Requested Relief Overlaps with State
                  Defendants' New Election System ...........................................23

            3.    A Paper Ballot System Would Benefit Georgia Voters and
                  Election Administrators .........................................................26

III.  State Defendants Can be Made to Implement Curling Plaintiffs'
      Proposed Solution ...........................................................................28

            1.    Georgia's Secretary of State is Chief Elections Official of the
                  State and Controls Its DREs ...................................................28

            2.    Curling Plaintiffs Continue to Have Standing .............................30

            3.    Curling Plaintiffs Have Joined All Necessary Parties ..................33

            4.    Plaintiffs' Requested Relief Is Consistent with the ADA .............34

IV.   Conclusion ....................................................................................35

i

# TABLE OF AUTHORITIES

## Cases

*Am. Ass'n of People with Disabilities v. Hood*,
310 F. Supp. 2d 1226 (M.D. Fla. 2004), *clarification denied* 2004
WL 1925009, *remanded*, 605 F.3d 1124, *opinion vacated and
superseded on rehearing*, 647 F.3d 1093 ............................................................31

*Askew v. Sheriff of Cook Cty., Ill.*,
568 F.3d 632 (7th Cir. 2009) ................................................................................30

*Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.*,
669 F.2d 667 (11th Cir. 1982) ..............................................................................30

*City of Marietta v. CSX Transp., Inc.*,
196 F.3d 1300 (11th Cir. 1999) ............................................................................30

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)...............................................................................................16

*Curling v. Kemp*,
334 F. Supp. 3d 1303 (N.D. Ga. 2018).........................................................*passim*

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
344 F.3d 1263 (11th Cir. 2003) ............................................................................30

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby
Lobby Stores, Inc.*, 573 U.S. 682 (2014) .............................................................17

*Holton v. Hollingsworth*,
270 Ga. 591 (1999) ................................................................................................29

*League of Women Voters of Fla. v. Detzner*,
314 F. Supp. 3d 1205 (N.D. Fla. 2018) ..........................................................8, 14

*Liberty Coins, LLC v. Goodman*,
748 F.3d 682 (6th Cir. 2014) ................................................................................17

# TABLE OF AUTHORITIES

*McCann v. Atlanta Pub. Schs.*,
  No. 2002 CV 56058, 2002 WL 34158804 (Fulton Cty. Super. Ct.
  Oct. 16, 2002) ..........................................................................................29

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .................................................................17

*Moore v. Ashland Oil, Inc.*,
  901 F.2d 1445, 1447 (7th Cir. 1990) .....................................................30

*New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977)...............................................................................20

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) .................................................................14

*Reynolds v. Sims*,
  377 U.S. 533 (1964)..................................................................................14

*Scott v. Taylor*,
  405 F.3d 1251 (11th Cir. 2005) .............................................................29

*Stein v. Cortés*,
  223 F. Supp. 3d 423 (E.D. Pa. 2016)......................................................9

*Stewart v. Blackwell*,
  444 F.3d 843 (6th Cir. 2006) ...................................................................8

*Weber v. Shelley*,
  347 F.3d 1101 (9th Cir. 2003) .................................................................9

*Wexler v. Anderson*,
  452 F.3d 1226 (11th Cir. 2006) ...............................................................9

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
  746 F.3d 1008 (11th Cir. 2014) .............................................................31

# TABLE OF AUTHORITIES

**Statutes**

O.C.G.A. § 21-2-31...................................................................26, 29, 31

O.C.G.A. § 21- 2-50(a)(11) ................................................26

O.C.G.A. § 21-2-50(a)(15) (*as amended* Apr. 2, 2019) .........................26

O.C.G.A. § 21-2-50(b)................................................26

O.C.G.A. § 21-2-70(1)................................................28

O.C.G.A. § 21-2-70(7)................................................28

O.C.G.A. § 21-2-300................................................11

O.C.G.A. §§ 21-2-386................................................11

O.C.G.A. § 21-2-540................................................29

O.C.G.A. §§ 21-3-1 *et seq*. ................................................28

**Other Authorities**

U.S. Const. amend. XIV, § 1 ................................................28

## PRELIMINARY STATEMENT

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████

State Defendants attempt to relitigate the security of their election system, relying almost entirely on Michael Shamos's repeated claims that paper ballots are much less secure than the current system and should be avoided.  This position is nothing short of astonishing because State Defendants have committed to doing

1

exactly what their own expert says will make elections less secure: moving to a paper-ballot-based system. State Defendants make no effort to reconcile this stark contradiction between their self-serving litigation positions here and their assurances to the public that the forthcoming paper-ballot-based system will be no less secure than the antiquated DRE-based system it will replace. Nor do State Defendants try to reconcile Shamos's sweeping, scathing indictment of paper ballots with State Defendants assurances to the millions of voters who vote on absentee or provisional paper ballots that each of their votes is counted. In short, State Defendants confirm that they will say anything—no matter how baseless or contradictory—to defend their indefensible election system.

The reality is that Dr. Shamos is a hopelessly biased advocate for the very company that supports the Georgia DREs—a company that has paid him substantial sums to represent its interests in numerous proceedings. He also is entirely out of his depth, lacking any expertise in election cybersecurity. He admits that as a voting examiner, he repeatedly approved machines that were later found to suffer from many, severe security vulnerabilities. He stands alone in his opinions against the scientific consensus on known vulnerabilities with electronic voting, railing against the opinions of intelligence experts, the national academies, the President of the United States, and even State Defendants themselves given

their adoption of the very system he denounces.  That he is the best "expertise" State Defendants can present to defend the current system says it all.

Unlike the system in Georgia that Dr. Shamos lauds, Curling Plaintiffs' solution for Georgia meets the standards recommended by the National Academies of Science, Engineering, and Medicine ("NASEM") – it is based on hand-marked paper ballots, involves precinct-based optical scanning, and incorporates post-election, manual audits to make sure that the results of the elections in the state actually reflect the intent of Plaintiffs and voters in Georgia.

The only way to protect voters' constitutional rights to safe and secure elections is to implement a new system in Georgia immediately.  The Curling Plaintiffs' proposed system (1) is paper-ballot based, (2) meets ADA requirements, (3) protects against paper-ballot fraud by incorporating precinct-count optical (PCOS) voting, and (4) takes advantage of the work Georgia will already be doing to move to the system required by H.B. 316.  It would be implemented by the Secretary of State, who has control over elections in the State of Georgia.  It is secure, it is feasible to implement before November, and it is necessary to protect the rights of Plaintiffs and voters across Georgia.

## I.     GEORGIA MUST BE MADE TO IMPLEMENT PAPER BALLOT VOTING NOW

Since September 2018, numerous events have confirmed that problems with

Georgia's voting system are at least as urgent and serious as Plaintiffs have

alleged:

- Georgia's voter registration system was shown to have serious, remotely

  exploitable vulnerabilities on the eve of a major election, despite being

  operated by the SOS and presumably subject to the benefit of other

  protections the state has in place.[1]

- The National Academies of Science, Engineering, and Medicine concluded

  that "Elections should be conducted with human-readable paper ballots",

  and that paperless DREs "should be removed from service as soon as

  possible."[2]

---

[1] Associated Press, *Security experts say Georgia's voter database vulnerable to hackers* (Nov. 5, 2018), https://www.nbcnews.com/politics/elections/security-experts-say-georgia-s-voter-database-vulnerable-hackers-n931266.

[2] The National Academies of Science, Engineering, and Medicine (NASEM) concluded that "[e]lections should be conducted with human-readable paper ballots," voting machines should provide the capacity for independent auditing, states should mandate risk-limiting audits, and paperless DREs "should be removed from service as soon as possible."  NASEM, *New Report Identifies Steps to Secure Americans' Votes*, (Sept. 6, 2018), https://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=25120

- The Mueller Report outlined the scale and sophistication of Russia's efforts to interfere in the 2016 election, leaving no doubt that they and other adversaries will strike again.

The State has indicated that it does not appreciate the severity of the threat to its woefully vulnerable election system.  Therefore, the State must be made to transition to a paper ballot system now before further elections are run on a system that is almost certainly compromised ███████████████████████████████ ██████

## A.     The State's Efforts at Securing the System are Completely Inadequate

Despite the events of late 2018 and the many critical vulnerabilities identified during last year's hearing, the State seems to have done nothing to actually identify and resolve the issues that might exist within the system.  They provide declarations that show they have taken some steps toward increasing security, but while these measures are a step in the right direction, they fail to address the glaring vulnerabilities evidenced by Curling Plaintiffs.  The State must be made to implement paper ballot voting now.

First, the State engaged Fortalice consultant Theresa Payton to conduct independent penetration tests, not a forensic analysis of the system.[3]  (Dkt. No. 472 ("State Opp.") at Ex. C ¶¶ 4-6)  Ms. Payton is most notable for what she does not say.  The strongest endorsement Ms. Payton can give about the State's security is that they have a "proper mindset aimed at iterative improvement" – she does not say that their system is safe or secure.  (*Id.* ¶ 6.) ████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████

---

[3] "Penetration testing" means playing the role of an attacker and trying to break into the network.  It is different from forensic analysis, which is looking at the data to try to figure out whether an attack happened in the past.

████████████████████████████████████████

████████████████

Mr. Beaver outlined a number of purported improvements to the SOS's cybersecurity.  (State Opp. Ex. B ¶¶ 5-23.)  But upon closer examination, they amount to window dressing.  As Dr. Halderman explains, these "improvements" are largely procedural controls—that is, controls based entirely on SOS employees' diligence in following procedures.  (Halderman Decl. ¶ 14.)  But SOS employees have a history of failing to follow proper procedure and Georgia law.  (*Id.* ¶ 15.) Director of the State's Center for Election Security, Michael Barnes, is prime evidence of this.  In one revealing example from his deposition, Director Barnes explained how he "protects" the USB drive he uses to transfer files between GEMS system and his laptop—a USB drive that, if infected with malware, could subvert entire Georgia election system.  (State Opp. Ex. J at 228:22-230:5; 233:19-234:1.) Of course he keeps the USB drive under lock and key—but then he admits the key is just sitting in an unlocked drawer in the same desk.  (*Id.* at 224:2-17.)  If CES Director Barnes still does not take cybersecurity seriously, why should his employees?   Notably absent from the State's list of improvements is enhanced cybersecurity training for its employees—that is, training designed to prevent exactly these incidents.  ████████████████████████████

██████████████████████████████████████

████████████████████████████

Finally, intervening events have shown the Secretary of State's efforts were not sufficient to protect its system. Despite monitoring and sharing of threat information from DHS, MS-ISAC, and "two private security firms," (State Opp. Ex. B ¶ 5), the voter registration system was vulnerable to simple attacks on the eve of the November 2018 election. It is imperative that the State be made to move to a paper-ballot based system now, and the solution proposed by Curling Plaintiffs is secure, feasible, and necessary.

### B. Dr. Shamos's "Fears" About Paper Ballots are Misleading and Unfounded

Dr. Shamos' contentions regarding paper ballots are outdated or do not apply to Curling Plaintiffs' proposed relief. Dr. Shamos contends that with paper ballot systems, "the paper ballot is the only record of the voter's choice" and references the hand counting of paper ballots. (Shamos Decl. ¶¶ 36, 38, 46-47.) Dr. Shamos' understanding of paper ballot technology is decades old. Curling Plaintiffs request that the State implement precinct-count optical scan ("PCOS") voting. PCOS voting creates an electronic record of votes, in addition to the paper ballot marked by the voter. (Halderman Decl. ¶ 31-32; Appel Decl. ¶ 12.)

Therefore, PCOS voting creates a readily available means of determining whether an election has been tampered with.  (*Id.*)  Dr. Shamos's references to optical-scan voting machines with "optical scan sensor[s] (and there is one for each column of the ballot)" betrays his ignorance with respect to this technology.  (Shamos Decl. ¶ 19.)  As Dr. Appel explains "[s]uch voting machines were made in the 20th century, but 21st-century optical-scan voting machines" no longer function in this manner. (Appel Decl. ¶ 19.)

Dr. Shamos confirms his stale understanding of modern voting systems with the examples he provides of supposed paper ballot tampering.  He cites paper ballot fraud and other "rascaldom" from the days of Tammany Hall.  (Shamos Decl. ¶ 40.)  But such concerns simply do not apply to auditable PCOS voting systems.  He cites to occasions when ballot boxes were discarded or left behind. (*Id.* ¶ 39 n.4.)  He fails to mention, however, that optical scanners had already made complete counts of the ballots.  (Appel Decl. ¶ 17.) He cites tampering with ballot drop-boxes, a device not relied upon in Georgia nor requested by Curling Plaintiffs.  (Shamos Decl. ¶ 39 n.7.)  He curiously cites fraud involving paper absentee ballots, blithely ignoring the fact that Georgia uses paper absentee ballots. (Shamos Decl. ¶¶ 39 n.10, 41.)  Ultimately, however, Dr. Shamos' dated and disproven fears fail to distract from the primary benefit to a paper-ballot system:  a

paper-ballot system provides voters with a reliable, secure, and auditable means of voting; DREs do not.  This presumably is the reason Georgia has committed to implementing such a system.

## II.   CURLING PLAINTIFFS HAVE DEMONSTRATED THEIR ENTITLEMENT TO INJUNCTIVE RELIEF

### A.   Curling Plaintiffs Are Likely to Succeed on the Merits

Defendants' arguments demonstrate that they have not taken the Court's prior Order to heart and that their collective "heads" are still stuck in the sand.[4] *See Curling v. Kemp*, 334 F. Supp. 3d 1303, 1327 (N.D. Ga. 2018).  Defendants make the legally baseless contention that Curling Plaintiffs must show "an actual compromise … in an actual election" to demonstrate likelihood of success on the merits.  (State Opp. at 22.)  But this Court has already rejected this recycled argument.  *See Curling*, 334 F. Supp. 3d at 1324 (finding likelihood of success on the merits because "Plaintiffs have so far shown that the DRE system, as implemented, poses a concrete risk of alteration of ballot counts that would impact their own votes.")

Defendants showcase a number of alleged changes to their election security protocols since the Court's prior Order, but none of those protocols resolve the

---

[4] Curling Plaintiffs do not address Sections A.4-7 which are inapplicable to the Curling Plaintiffs' Motion.

core vulnerabilities associated with DREs.  Indeed, Defendants own witness has confirmed that many weaknesses remain.  Unable to defend the vulnerability of DREs, Defendants resort to attacking the integrity of paper ballots.  This notwithstanding the fact that Georgia is in the process of implementing a paper ballot system.  Distilled of inapposite case law, improper attacks on Dr. Halderman, and irrelevant security "enhancements," Defendants' arguments demonstrate that the restriction on Curling Plaintiffs' right to vote remains severe, and that Defendants still have not articulated a compelling reason to justify this restriction.  *See League of Women Voters of Fla. v. Detzner*, 314 F. Supp. 3d 1205, 1220 (N.D. Fla. 2018); *see also Stewart v. Blackwell*, 444 F.3d 843, 869 (6th Cir. 2006) ("Administrative convenience is simply not a compelling justification in light of the fundamental nature of the right.").

### 1.   Defendants' Arguments Regarding the Need to Show an "Actual Compromise" Are Incorrect and Misleading

Defendants argue that the Curling Plaintiffs are not entitled to relief because there is a "lack of evidence of any actual compromise" involving a DRE in an "actual election."  (State Opp. at 22; Dkt. No. 473 ("Fulton Opp."). at 14.)  State Defendants made this exact same argument nearly a year ago (Dkt. No. 265 at 22), and it was already rejected by the Court.  The Court specifically found that the evidence presented by the Plaintiffs then was sufficient because it indicated that

votes cast on DREs "*may* be altered, diluted, or effectively not counted on the same terms as someone using another voting method – or that there is a ***serious risk of this under the circumstances***." *Curling*, 334 F. Supp. 3d at 1325 (emphases added). The Court did not find an "actual compromise" necessary then, and now, nearly a year later Defendants have failed to identify a single case supporting their claim that there must be evidence of an actual security breach before a preliminary injunction may issue.[5] This is unsurprising. If Defendants were correct, Defendants could knowingly and recklessly operate a wildly insecure election system, and the Court would have to wait until an individual took advantage of that system before intervening. Defendants cite nothing to support such a disturbing result.

Instead, State Defendants resort to misstating the facts by claiming that the

---

[5] The Court previously found *Wexler v. Anderson* inapposite because the burden on the voters' right in that case was "the mere possibility that should they cast residual ballots, those ballots will receive a different, and allegedly inferior, type of review in the event of a manual recount." *Curling*, 334 F. Supp. 3d at 1325 (citing *Wexler v. Anderson*, 452 F.3d 1226 (11th Cir. 2006)). Defendants also cite to two cases from Pennsylvania, but in *Stein v. Cortés*, the court found little evidence of tampering in Pennsylvania in 2016, given the state's robust processes throughout its "highly dispersed system." 223 F. Supp. 3d 423, 441-42 (E.D. Pa. 2016). Despite claiming improvements have been made, Defendants have not presented any evidence that the previous exposure detected by Logan has not already been exploited. Unlike *Weber v. Shelley*, 347 F.3d 1101 (9th Cir. 2003), Defendants' conduct here *increased the likelihood of electoral interference* by their refusal to respond to an imminent threat of harm and to address important vulnerabilities.

Curling Plaintiffs have had "the benefit of discovery and [] additional time since last year's hearing." (State Opp. at 19.) State Defendants know this is not true. Instead, State Defendants have repeatedly delayed discovery in this matter. *First*, they delayed by demanding that the Court rule on their pending motion to dismiss before commencing discovery. (*See* Dkt. Nos. 186 at 26:13-22; 228 at 3-4.) *Second*, once that motion was properly denied, Defendants requested that the case be put on hold for nearly seven months in order to pursue a meritless appeal. (Dkt. No. 336.) ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████ Nor have the parties negotiated for the inspection or testing of any of the DREs or other components of Georgia's system that have been used in "actual elections." Therefore, even if evidence of a compromise were required, Curling Plaintiffs have not yet had the ability to actually discover such a compromise.

State Defendants inexplicably attack paper ballots as having a "track record of actual compromise" in order to detract from the vulnerabilities of DREs, but this undermines their own solution which they claim obviates the need for relief. (State

Opp. at 19.)  This argument is puzzling, given that the new system to which

Georgia is purportedly moving ***is a paper-based system***.[6]

Additionally, State Defendants' counsel has previously emphasized to this

Court that, regardless of the vendor ultimately selected, the new system will

include "a piece of paper that is a paper ballot," a system which they now attack.

(Dkt. No. 363 at 13:14-18.)[7]  Defendants also claim that "[p]aper ballots create a

single record of the voter's choice that, if lost, cannot be recovered."  (State Opp.

at 19.)  This is false—under the Curling Plaintiffs' relief (as with BMD's), the

paper ballot would serve merely as a back-up to the tabulation stored in the

scanner's memory.  The claim that paper ballots may be manipulated or misplaced

---

[6]  O.C.G.A. § 21-2-300 (providing that all federal, state, and county elections in Georgia shall be conducted by electronic ballot markers and "that such electronic ballot markers shall produce paper ballots which are marked with the elector's choices in a format readable by the elector."); *see also* Interview by Chelsea Beimfohr, WMAZ-TV Reporter, with Brad Raffensperger, Georgia Secretary of State (Feb. 27, 2019), https://www.13wmaz.com/article/news/we-need-to-update-those-voting-machines-secretary-of-state-brad-raffensperger-on-proposed-voting-system-change/93-bc8d7e30-7ddd-4b20-badd-defc5430c2a2 ("We'll have a paper ballot to do physical recounts and it'll also let us do will also let us to do risk-limiting audits. Then you'll be able to say this person really won and this person really lost.").

[7] Defendants also ignore the extent to which the State already relies upon paper ballots both for absentee voting and for provisional ballots and the procedures that are in place to ensure the integrity of those votes; *see, e.g.*, O.C.G.A. §§ 21-2-386 (detailing procedures for safekeeping of absentee ballots), 21-2-334 (requiring use of paper ballots when machine use impossible or impracticable).

merely illustrates the extent to which third parties may target an election, regardless of the system in use.[8]   And Dr. Shamos' list of paper ballot tampering incidents only underscores that, unlike DREs, there is a much higher likelihood that tampering will be discovered with paper ballots.  (*See* State Opp. Ex. A ¶ 39 nn.4-10.)

Defendants attempt to dismiss Dr. Halderman's opinions as "speculation" and "conjecture," with their new expert Dr. Michael Shamos.  (State Opp. at 20.) Dr. Shamos recites a litany of ways in which Dr. Halderman's courtroom demonstration could be detected using a variety of security protocols, including parallel testing.  Fatal to Defendants' arguments, however, is the fact that they provide no evidence that Georgia actually performs any of these security measures. (Halderman Decl. ¶ 47.)

Indeed, as discussed above, noticeably absent from either of Defendants'

---

[8] Notably, the use of an electronic system does not prevent the misplacement of important election components.  For example, Michael Barnes testified to at least one instance where a county sold a file cabinet on eBay which contained a number of voter access cards. (State Opp. Ex. J at 190:17-191:21.)   During the December 2018 runoff, a polling station in Fulton County had to resort to provisional ballots for the first part of voting because the poll manager had lost the voter access cards for the location.  Ben Brach & Arielle Kass, *Two Fulton precincts to remain open later due to early morning issues*, The Atlanta Journal-Constitution (Dec. 4, 2018), https://www.ajc.com/news/local/two-fulton-precincts-remain-open-later-due-early-morning-issues/tjEYsoja0NyJIlTyoCnrgN/.

oppositions is any evidence that the Defendants performed a "forensic evaluation" of any of the machines used in Georgia's elections to ensure that there has been no compromise.  *Curling*, 334 F. Supp. 3d at 1322-23.  Despite submitting declarations from five witnesses, none of the State Defendants' witnesses testified that they had performed any analysis that would allow them to reasonably say that the exposures that sat unfixed for months and other lapses in security measures (which have only been recently implemented) did not result in a breach.  To the contrary, during his deposition Michael Barnes admitted:

(1) the State has not conducted a statewide examination of the executable GEMS files given to counties since *2015* (Mr. Barnes did not know how many counties' GEMS files were tested in any year) (State Opp. Ex. J at 118:9-119:12);

(2) the memory cards inserted into DRE machines have not been collected or reformatted since at least 2015 and maybe not since *2013* (*id.* at 119:20-120:10); and

(3) there has been no testing of the internal memory of any DRE machine for a compromise *ever* (*id.* at 120:11-15).

Instead, Defendants merely attempt to deflect by claiming the Curling Plaintiffs do not have evidence of a compromise on a system to which, until recently, Defendants have refused to provide any access, and provide vague

assertions about the adequacy of their purported security enhancements to that system. These arguments fail to show that the burden on the Curling Plaintiffs' right to vote is any less onerous than previously found by the Court.

### B. Curling Plaintiffs and Georgia Voters Will Suffer Irreparable Harm Absent Relief

Continued use of DREs will result in irreparable harm for the Curling Plaintiffs and Georgia voters. In opposition, Defendants ignore the fact that "irreparable injury is presumed when 'a restriction on the fundamental right to vote' is at issue," because the injury inflicted cannot be undone or redressed once an election occurs. *League of Women Voters of Fla.*, 314 F.Supp.3d at 1223 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). Such a presumption is particularly warranted here—as Dr. Halderman's demonstration illustrated, election interference leads to a distorted view of democracy, regardless of whether it is targeted at a single machine, a single precinct, or an entire state. As this Court already explained, "even a minor alteration of votes in close electoral races can make a material difference in the outcome."[9] *Curling*, 334 F. Supp. 3d at

---

[9] Defendants' recycled argument that the Curling Plaintiffs can vote by absentee ballot to avoid the DRE's misses the point on this issue – regardless of whether the Curling Plaintiffs vote by absentee ballot, there is still the substantial risk that their votes will be discounted or diluted. *See Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (the right to vote includes "the right to have the vote counted at full value without dilution or discount").

1326.  And Defendants cannot rebut that they have no ability to determine whether results are legitimate or the product of manipulation when voting on a DRE.  In other words, they can provide no assurances to Plaintiffs or any Georgia voter that their votes will properly be counted.

Despite parading out new declarants and allegedly new security measures, Defendants still cannot rebut this presumption of harm for the reasons discussed, *supra*.  Defendants claim that it has enacted security measures to prevent the exposure of the election system, but none of those recently enacted measures address the core problems with relying on a paperless, untraceable system, and many of the same vulnerabilities caused by Defendants' negligence are still in place today.  Defendants have also presented no forensic analysis that would give the Court comfort that the integrity of the election system is intact.  *Id.*  Moreover, Defendants do not dispute that the threat of interference that existed in 2016 and in 2018 still persists today.  Rather than urgency, Defendants have responded to the imminent threat of election interference (and the evidence of past exposure) with vague and unsubstantiated assurances that "all is well."

Knowing they cannot rebut this presumption of harm, Defendants resort to personal attacks on Plaintiffs as "self-interested activists" and once again falsely claim that the threat to the Curling Plaintiffs' right to vote (as confirmed by

national security officials and industry experts) "rests upon a speculative chain of possibilities." (State Opp. at 53).[10]  This assertion directly contradicts this Court's previous finding of likelihood of irreparable harm based on the "threat that Plaintiffs' votes in the upcoming elections will not be accurately counted," even if "the scope of th[e] threat is difficult to quantify." *Curling*, 334 F. Supp. 3d at 1326.  Defendants also claim that Plaintiffs have caused "self-inflicted" delays (State Opp. at 52.)  But this ignores the fact that it was ***Defendants*** who put this case on hold for months while pursuing a baseless immunity argument, which the Eleventh Circuit found ran "counter to the complaints' allegations and settled precedent." (Dkt. No. 338 at 9.) ████████████████████████

███████████████████████████████████████████

Defendants' insistence on casting false aspersions underscores why relief from this Court is the only way to prevent irreparable harm.

---

[10] Defendants claim that the Curling Plaintiffs' harm is similar to the plaintiffs in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), but that case is readily distinguishable.  The plaintiffs there had not been able to show the risk of injury because, even at summary judgment, they could only present their "subjective fear" of government surveillance.  *Id.* at 416.  Here there is no question that the State Defendants will continue to impose DREs on the Curling Plaintiffs until a new system is implemented sometime next year.  Moreover, the plaintiffs in *Clapper* had failed to show any "concrete facts showing" a "substantial risk of harm" caused by the defendants.  *Id.* at 414 n.5.  Even without the benefit of full discovery the Curling Plaintiffs have already made this showing.

As the State Defendants observe, "numerous" elections have been held in 2017 and 2018 since the Curling Plaintiffs first sought relief and more will be held this year.  (State Opp. at 52.)  Throughout this time period, the threat of election interference has only grown, while the State Defendants have only just begun to take long-needed steps that would be necessary to secure Georgia's election. Those steps are insufficient to offset the threat for the reasons previously discussed, and Georgia voters should not be forced to continue to vote on unreliable DRE's while the state figures out a new system.  The Curling Plaintiffs, and Georgia voters, have waited long enough.

### C.     The Balance of Equities and the Public Interest Strongly Favor Injunctive Relief

As this Court previously recognized, "Plaintiffs have shown the threat of real harms to their constitutional interests."  *Curling*, 334 F. Supp. 3d at 1326. Absent the requested relief, Plaintiffs will be forced to vote using insecure voting machines, with the fear that their vote will not be counted.  (Dkt. No. 387 ("Curling Mot.") at Curling Decl. ¶ 4, Price Decl. ¶¶ 12-13, Schoenberg Decl. ¶ 10.)  And courts have repeatedly emphasized in the context of preliminary injunctions involving constitutional rights "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd*

*sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).  In opposition, State Defendants largely repeat the same arguments as to time and resource constraints they advanced in opposition to Plaintiffs 2018 injunction request.  But State Defendants ignore two critical distinctions between the relief sought today and that sought in 2018.  *First*, the requested relief is far narrower than the relief requested in 2018.  *Second*, the State is already in the process of implementing a paper ballot system that in many ways overlaps with Plaintiffs' requested relief, therefore rendering the requested relief imminently feasible.  Moreover, State Defendants' arguments fly in the face of this Court's previous admonition:  "The State and the County's arguments about the time and resource constraints at issue . . . only weaken the more that time passes and if Defendants continue to move in slow motion or take ineffective or no action. For upcoming elections after November 2018, Defendants are forewarned that these same arguments would hold much less sway in the future – as any timing issues then would appear to be exclusively of Defendants' own making at that point."  *Curling*, 334 F. Supp. 3d at 1327.  The Court should not continue to credit Defendants' tired excuses for failing to deliver to Georgia's voters a secure election system.

21

### 1. State Defendants Misconstrue Curling Plaintiffs' Requested Relief

Contrary to Defendants' dramatic misrepresentation, Curling Plaintiffs do not "propose scrapping the entirety of Georgia's current election system." (State Opp. at 56.)  Rather, the requested relief is limited to the implementation of hand-marked paper ballots only in the limited number of precincts holding municipal or special elections this fall.[11]  Curling Plaintiffs request that these paper ballots be scanned using an optical scanner located at each precinct.  To the extent that a precinct cannot obtain an optical scanner, paper ballots could be collected and scanned at a central location.  By misconstruing Curling Plaintiffs' requested relief, State Defendants wildly overestimate the likely cost.  For example, State Defendants' estimates of 2,634 ballot scanners, 3.9 million paper ballots, costing millions, are based on a full statewide implementation, not the limited implementation sought by Curling Plaintiffs.  Further, State Defendants' estimates presume that Georgia would need to purchase new equipment for those precincts hosting municipal or special elections.  Georgia undoubtedly could lease this equipment, or even rely on equipment from those precincts not hosting municipal or special elections, thereby minimizing any costs.

---

[11] As noted above, each precinct would also need to employ a HAVA-compliant means of voting for those voters with disabilities.

## 2.   Curling Plaintiffs' Requested Relief Overlaps with State Defendants' New Election System

State Defendants are in the process of implementing an election system, portions of which could be used to satisfy Plaintiff's requested relief.  Indeed, Curling Plaintiffs are largely requesting that State Defendants implement certain of their planned policy changes on an expedited schedule for a limited number of precincts.[12]  In April 2019, Georgia enacted H.B. 316, which expressly provides for the use of paper ballots scanned using optical scanners.  *See* Act 24, H.B. 316, 155th Gen. Assemb. (Ga. 2019) (enacted), http://www.legis.ga.gov/Legislation/en-US/display/20192020/HB/316.  As the Georgia House of Representatives explained:  "The bill provides for touchscreen-marked paper ballots and will transition [Georgia] to a deliberately-designed election system with a paper ballot, so that voters can rest assured with physical proof that their choice has been counted at the ballot box."[13]  Georgia will begin implementing its new voting

---

[12] For this reason State Defendants claims that Curling Plaintiffs seek to "effectively deprive the State's elected representatives of their ability to enact laws under the State's sovereign authority to 'effectuat[e] statutes enacted by representatives of its people'" is nonsensical.  (State Opp. at 67-68 (quoting *New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)).  Curling Plaintiffs' requested relief would assist Georgia in rolling out portions of its planned paper ballot system on an expedited basis.

[13] Ga. Sec'y of State, *Georgia House Passes Bipartisan Bill for More Secure, Accessible, and Transparent Elections* (Apr. 3, 2019),

technology in the upcoming 2019 elections, through a pilot program in ten

counties.[14]  (State Opp. at 65; Dkt. No. 357-4 at 7.)  Georgia has issued requests for

proposals to election equipment manufacturers for the upcoming 2019 elections.

*See* Dkt. No. 357-3.  Therefore, Georgia will have purchased the necessary paper

ballots, optical scanners, and HAVA-compliant ballot marking devices for at least

ten counties by November 2019.  Moreover, Georgia will necessarily have

developed policies, procedures, and training protocols for the ten pilot counties by

November 2019.[15]  Further, in connection with its implementation of its paper

ballot voting system, Georgia has indicated that it plans on distributing a minimum

of five ballot marking devices and two optical scanners to *every* precinct by

December 31, 2019.  Therefore, the only equipment Georgia may not currently

---

https://sos.ga.gov/index.php/elections/georgia_house_passes_bipartisan_bill_
for_more_secure_accessible_and_transparent_elections.

[14] Notably, this is not the first pilot test of paper ballots using optical scanners in
Georgia.  *See* Mark Niesse, *Paper ballots pass Election Day test in Georgia*,
Atlanta Journal-Constitution (Nov. 22, 2017), https://www.ajc.com/news/state--
regional-govt--politics/paper-ballots-pass-election-day-test-
georgia/aSxtI3JO1voMq2X2ukxzxK/.  In November 2017, Georgia conducted a
pilot test of paper ballot voting in Conyers County.  *Id.*  Indeed, 97 percent of
Conyers voters surveyed indicated that they were satisfied with that system.  *Id.*
Policies, procedures, and training protocols from the Conyers pilot could be relied
on in implementing a paper ballot system in the upcoming November 2019
election.
[15] These policies and procedures will presumably also include provisions for the
creation, distribution, and counting of absentee ballots.

have in sufficient numbers are pens.

For these reasons, State Defendants complaints of cataclysmic costs ring hollow.  (State Opp. at 54-74.)  Georgia has already committed to purchasing the equipment necessary for Curling Plaintiff's requested relief.  Curling Plaintiffs simply request that Georgia expand its pilot program from the ten counties to include any precinct holding a special or municipal election.  To the extent that any of the ten pilot counties are not holding a special or municipal election, the equipment from those counties could be used by a precinct that is holding a special or municipal election.  Further, Georgia has already committed to purchasing equipment for *every* precinct by December 31, 2019.  Georgia could request that this equipment be delivered early for the limited number of precincts holding special or municipal elections.  Moreover, to the extent any of this equipment will be delivered prior to December 31, 2019, such equipment could be used to satisfy Plaintiff's requested relief.  While State Defendants claim that no funds are available to fund Plaintiff's requested relief, they ignore the fact that Georgia specifically appropriated $150 million for the purchase of new voting equipment. (State Opp. at 2, 3.)  Because Plaintiffs' requested relief overlaps with Georgia's planned election system upgrade, these funds can and should be used in the limited precincts holding special and municipal elections.

State Defendants similarly cry wolf with respect to the costs of election training and administration, claiming that it will require Georgia to develop brand new election procedures and training materials.  But State Defendants already have committed to holding elections in November 2019 using paper ballots in the ten pilot counties, and undoubtedly have developed the necessary procedures and training materials for these upcoming elections.  Indeed, and as State Defendants note, if they failed to develop such policies and procedures, it could violate their "statutory duties to generally encourage and foster the orderly execution of elections and provide training to the local registrars and superintendents throughout the State."  (State Opp. at 62.)  State Defendants provide absolutely no explanation for why the pilot procedures and materials cannot be scaled to the limited number of precincts hosting special or municipal elections.

Ultimately, far from diverting resources away from Georgia's planned transition to a paper ballot system, Curling Plaintiffs' requested relief would assist in expediting such the transition.  That is, any investments Georgia makes in its paper ballot system for the November 2019 elections would be investments that Georgia would not need to make for subsequent elections.

### 3.   A Paper Ballot System Would Benefit Georgia Voters and Election Administrators

State Defendants also claim that a transition to paper ballots would cause

widespread voter confusion, but fail to cite a single instance in which transition to a new voting system caused a single voter to vote in a manner that he or she did not intend. Curling Plaintiffs, however, have presented evidence that a transition to paper ballots would not be confusing and ultimately would be preferable for voters. Rebecca Wilson, a Republican/Unaffiliated Chief Election Judge in Maryland, stated that when Maryland transitioned to a paper ballot system, "[e]lection officials were concerned that the new system would confuse voters . . . [b]ut I found that voters were very comfortable with marking paper ballots. Most had completed standardized tests or been in similar situations where they indicated choices by filling in ovals." (Curling Mot. at Wilson Decl. ¶ 16.) This was the case even though Maryland did not conduct any widespread voter outreach campaign, instead relying on "a few news stories and public events" to educate the public. (*Id.*) Notwithstanding the lack of public outreach, Maryland voters provide overwhelmingly positive feedback about their use of paper ballots, even expressing more confidence that their vote would accurately counted. (*Id.* ¶¶ 16-17.) Maryland's election administrators also benefitted from the transition to paper ballots. According to Ms. Wilson, the paper "ballot-scanning system is far easier and faster to set up, manage, and close than the previous DRE equipment was." (*Id.* ¶ 4.) Indeed, Ms. Wilson found that "[a]fter the switch to paper ballots in

27

2016, it was far easier to set up the equipment on Election Day morning and to open the polls on time."  (*Id.* ¶ 5; *see also* Curling Mot. at Finley Decl. ¶ 13 ("Based on my experience in California, it is my opinion that a switch from voting on DREs to voting on hand-marked paper ballots for the vast majority of voters is absolutely feasible in Georgia.")  These benefits are in addition to the clear security benefits of paper ballots.  (*Id.* ¶¶ 9-17; Curling Mot. at Finley Decl. ¶¶ 11-12; Curling Mot. at Halderman Decl. ¶¶ 12-13.)  Given the benefits to Georgia voters and election officials, the public interest clearly favors granting the requested relief.

## III.   STATE DEFENDANTS CAN BE MADE TO IMPLEMENT CURLING PLAINTIFFS' PROPOSED SOLUTION

It is entirely appropriate to require Defendants to move to the system proposed by Curling Plaintiffs.  State Defendants make a number of straw-man arguments in an effort to distract from the true issue – the DREs and the rest of Georgia's system are too vulnerable and insecure to continue to be used.

### 1.   Georgia's Secretary of State is Chief Elections Official of the State and Controls Its DREs

The State's DREs are controlled by the Secretary of State and therefore mandates to the Secretary of State related to those machines necessarily will flow down to the municipalities.  As an initial matter, it is simply false to claim that the

"Georgia Code effectively treats municipal election superintendents as independent actors." (State Opp. at 9.)  In doing so, State Defendants conveniently overlook the State's considerable and ongoing role in municipal elections.  First and foremost, Georgia law designates the Secretary of State as chief elections official of the State.  *See* O.C.G.A. § 21-2-50(b).  Georgia's Attorney General has issued an Official Opinion recognizing that Georgia's Constitution and official code confers primary authority on Georgia's Secretary of State to manage Georgia's electoral system. *See* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("[I]t is clear that under both the Constitution and the laws of the State the Secretary is *the* state official with the power, duty, and authority to manage the state's electoral system").  The Secretary of State and State Election Board also have significant statutory oversight authority to train local elections officials, set election standards, and investigate failures of local elections officials.  *See* O.C.G.A. § 21-2-31; O.C.G.A. § 21- 2-50(a)(11)).  Additionally, it is the "duty of the State Election Board" to "promulgate rules and regulations so as to obtain … the legality and purity ***in all primaries and elections***."  O.C.G.A. § 21-2-31(1) (emphasis added).  Finally, the Secretary of State is required by law "[t]o develop, program, build, and review ballots for use by counties and municipalities on voting systems in use in" Georgia. O.C.G.A. § 21-2-50(a)(15) (*as amended* Apr. 2, 2019).  Notably, no

provision of Georgia law appears to limit or curtail the State Election Board's or
Secretary of State's authority as applied to municipal elections.

### 2.    Curling Plaintiffs Continue to Have Standing

Curling Plaintiffs also continue to have standing, as they are Georgia voters
who would have no choice but to vote in elections in which the DREs are used
absent relief from this Court.  The State Defendants' contention that "Georgia's
cities control their own elections" does not rob Curling Plaintiffs' of standing.
(State Opp. at 12.)  As noted above, the Secretary of State has considerable
authority in overseeing all elections in the State.  The fact that Georgia law does
not exclusively grant authority to the Secretary of State over municipal elections in
no way prevents Georgia from establishing uniform state-wide election policies
and procedures or providing equipment and training to municipal officials.  And
critically, it does not prevent the Court from granting the requested relief.  Indeed,
State Defendants argument would require the Court to believe that were Curling
Plaintiffs' requested relief to be granted, municipal officials would simply refuse to
accept and use equipment, policies, and procedures provided by the State.

Curling Plaintiffs' requested relief involves the State rolling out its proposed
paper ballot system on an expedited basis.  Notably, the State's RFPs for its
proposed paper ballot system expressly reference municipal elections.  *See* Dkt.

No. 357-4 (including "municipal elections" within the proposed election structure and requiring any proposed vender to "[p]roduce state, county, precinct, district, precinct combo, and municipal results.")  If the Court were to order the State to expedite the proposed rollout of its paper ballot system to those municipalities holding elections, the potential threat to Curling Plaintiffs' constitutional right to vote would be addressed in full.  Therefore, Curling Plaintiffs have standing.

State Defendants claim that the Georgia code "create[s] significant autonomy for municipal election superintendents," referring to O.C.G.A. § 21-2-70(1).  (State Opp. at 10.)  That provision, however, does not grant municipalities the discretion to ignore the provisions of state laws, directives from state officials, or, for that matter, the protections of the Fourteenth Amendment.  Indeed, other provisions within Georgia code make clear that each county and municipality is only permitted to "make and issue such [election] rules, regulations, and instructions, consistent with law, *including the rules and regulations promulgated by the State Election Board*."  O.C.G.A. § 21-2-70(7).  In other words, were this Court to order the State to bar the use of DREs statewide, all Georgia counties and municipalities would be obligated to do so.

Further belying State Defendants' arguments regarding municipalities' purported autonomy, Georgia's election code was revised in 1999 to repeal the

chapter titled "Municipal Elections and Primaries." *See* O.C.G.A. §§ 21-3-1 *et seq*. Georgia courts interpreted this repeal as a signal that Georgia state law—not municipal law—was to govern municipal elections.  *See Holton v. Hollingsworth*, 270 Ga. 591, 591 (1999) (noting that the Georgia Election Code and repealed Municipal Election Code were "very similar"); *McCann v. Atlanta Pub. Schs.,* No. 2002 CV 56058, 2002 WL 34158804 (Fulton Cty. Super. Ct. Oct. 16, 2002) (noting the repeal of the Georgia Municipal Election Code and applying O.C.G.A. § 21-2-540 to control the special election the APS Board of Education was required to call).

State Defendants' reliance on *Scott v. Taylor*, 405 F.3d 1251 (11th Cir. 2005) is similarly unavailing.  *Scott* is a legislative immunity case in which it was "undisputed" that the state legislator defendants had "absolutely no role to play" in enforcement and implementation of the voting district challenged—moreover, the plaintiff sought no relief from them at all.  *Id.* at 1256 n.8.  Here, immunity issues have been decisively addressed, and it is obviously disputed whether the Secretary has a role to play in guiding municipal elections.

State Defendants ask this Court to believe that if a municipality chose to elect its councilmembers in a citywide game of rock-paper-scissors, the Secretary of State would have no authority to invalidate the election.  Not only does this

violate common sense, it violates Georgia law.  *See* O.C.G.A. § 21-2-31.

### 3.    Curling Plaintiffs Have Joined All Necessary Parties

State Defendants' related contention that Curling Plaintiffs should have

joined each and every Georgia city against whom relief is sought fares no better.[16]

(State Opp. at 13.)  "The purpose of Rule 19 is to 'permit joinder of all materially

interested parties to a single lawsuit so as to protect interested parties and avoid

waste of judicial resources.'" *Askew v. Sheriff of Cook Cty., Ill*., 568 F.3d 632, 634

(7th Cir. 2009) (citing *Moore v. Ashland Oil, Inc*., 901 F.2d 1445, 1447 (7th Cir.

1990)). "Dismissal, however, is not the preferred outcome under the Rules." *Id*.

(citations omitted).  "Rule 19 states a two-part test for determining whether a party

is indispensable." *Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc*., 669

F.2d 667, 669 (11th Cir. 1982).  "The first question is whether [under Rule

19(a)(1)] complete relief can be afforded in the present procedural posture." *City

of Marietta v. CSX Transp., Inc*., 196 F.3d 1300, 1305 (11th Cir. 1999). In deciding

this question, "pragmatic concerns, especially the effect on the parties and the

litigation, control." *Focus on the Family v. Pinellas Suncoast Transit Auth*., 344

---

[16] It should go without saying that joining all Georgia municipalities as defendants
to this lawsuit against the chief elections official of the State and the board of
registration and elections of Georgia's largest county is not "pragmatic" by any
definition.

F.3d 1263, 1280 (11th Cir. 2003) (citations omitted).

As noted above, this Court can provide "complete relief" among the current parties without joining any Georgia city.  *See*, *e.g.*, *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1039 (11th Cir. 2014) (affirming the denial of joinder where district court could provide complete relief among the existing parties).  State Defendants have the statutory oversight ability to ensure constitutional elections.  *See* O.C.G.A. § 21-2-31.  If this Court were to order State Defendants to bar the use of DREs in Georgia and expedite the State's proposed paper ballot system, it would provide Curling Plaintiffs with complete relief.  As the Court can afford complete relief among the existing parties, State Defendants argument must be rejected.

### 4.    Plaintiffs' Requested Relief Is Consistent with the ADA

State Defendants posit the straw man that Curling Plaintiffs' requested relief "sacrifice[s] the rights of people with disabilities who need to vote on electronic equipment like DREs or BMDs."  (State Opp. at 15.)  This is nonsense.  Curling Plaintiffs' relief expressly requires the State to provide all voters with constitutional means of casting ballots by supplying at least one voting device per precinct "that meets HAVA/ADA requirements and is transparent and verifiable for assistive voting by paper ballot."  (Curling Mot. at 23.)  This proposal permits

disabled voters to receive "an equal opportunity to participate in and enjoy the benefits of voting" as required by law. *Am. Ass'n of People with Disabilities v. Hood*, 310 F. Supp. 2d 1226, 1238 (M.D. Fla. 2004), *clarification denied* 2004 WL 1925009, *remanded*, 605 F.3d 1124, *opinion vacated and superseded on rehearing*, 647 F.3d 1093.  By contrast, if Curling Plaintiffs' relief is not granted, disabled voters will be forced to use unconstitutionally vulnerable and defective DREs.[17] State Defendants attempt to pit the constitutional rights of disabled voters against those of non-disabled voters.  The Court should reject this false choice and grant Curling Plaintiffs' requested relief which would provide reliable, secure, and auditable voting means to all Georgia voters.

## IV.   CONCLUSION

Curling Plaintiffs' requested relief undoubtedly will impose certain costs on Georgia.  But these costs are necessary to ensure that Georgia's voters are able to quickly, securely, and effectively exercise their constitutional right to vote. Moreover, these costs would benefit Georgia election officials with a more

---

[17] Dozens of election cybersecurity experts agree with this proposed relief.  *See* Dkt. No. 419-1 at 426,  Ltr. to Secretary of State-elect Raffensperger, et al., Jan. 7, 2019 ("Our strong recommendation is to reject computerized ballot marking devices (BMDs) as an option for Georgia's voting system, except when needed to accommodate voters with disabilities that prevent them from hand-marking paper ballots.").

efficient election system and in expediting the introduction of Georgia's planned paper ballot system.  For all these reasons, the equities and public interest favor granting Curling Plaintiffs' requested relief.

 Dated: July 18, 2019                          Respectfully submitted,

                                         _/s/ David D. Cross_
                                        David D. Cross (*pro hac vice*)
                                        John P. Carlin (*pro hac vice*)
                                        Catherine L. Chapple (*pro hac vice*)
                                        Jane P. Bentrott (*pro hac vice*)
                                        Robert W. Manoso (*pro hac vice*)
                                        MORRISON & FOERSTER LLP
                                        2000 Pennsylvania Avenue, NW
                                        Suite 6000
                                        Washington, DC 20006
                                        Telephone: (202) 887-1500
                                        DCross@mofo.com
                                        JCarlin@mofo.com
                                        CChapple@mofo.com
                                        JBentrott@mofo.com
                                        RManoso@mofo.com

                                        Halsey G. Knapp, Jr.
                                        GA Bar No. 425320
                                        Adam M. Sparks
                                        GA Bar No. 341578
                                        KREVOLIN & HORST, LLC
                                        1201 West Peachtree Street, NW
                                        Suite 3250
                                        Atlanta, GA 30309
                                        HKnapp@khlawfirm.com
                                        Sparks@khlawfirm.com

                                        *Counsel for Plaintiffs Donna Curling,*
                                        *Donna Price & Jeffrey Schoenberg*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ David D. Cross*
David D. Cross

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>v.<br><br>**BRAD RAFFENSPERGER , ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2019, a copy of the foregoing **CURLING**

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT**

**OF THEIR MOTION FOR PRELIMINARY INJUNCTION** was electronically

filed with the Clerk of Court using the CM/ECF system, which will automatically

send notification of such filing to all attorneys of record.

*/s/ David D. Cross*
David D. Cross

38