## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,** **Plaintiffs,** **v.** **BRIAN KEMP, ET AL.,** **Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## COALITION PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' NOTIFICATION AS TO APPARENT SUCCESSFUL OFFEROR

Coalition Plaintiffs submit this Response to State Defendants' Notification (Doc. 552) identifying Dominion Voting Systems, Inc. as the apparent successful offeror on the State's new voting system.  Coalition Plaintiffs file this response to bring to the Court's attention information about Dominion's product – in which votes are recorded as barcodes – and the multiple reasons the State will be unable to successfully implement the system in time for the March 24, 2019 Presidential Primaries, much less any of the hundreds of elections in November and December 2019 and the many elections anticipated in January and February, 2020.  The difficulties caused by the State's decision to purchase the ImageCast X system also underscore the sensibility of the Coalition Plaintiffs' proposed injunctive relief.

### A. Dominion's Product

Dominions' ImageCast X is *not* a paper ballot voting system. It is an electronic voting system. The ImageCast X system converts the voter's selection on the screen *to a barcode* and it is the *barcode* that is printed on the printed vote record and then fed into and read by the scanner.  Although the ImageCast X's printed vote record also includes human-readable information that is supposed to be an interpretation of the barcoded votes cast by the voter, it is the barcode (not readable by the voter) that is read and counted by the scanner and tabulated.[1]  In other words, the voter cannot know what vote he or she is casting or verify the accuracy of what is counted by the system.  The "Master Solution and Purchase Agreement" between Dominion and the Secretary states: "The printed ballot contains a written summary of the voter's choices, as well as a 2D barcode which is read by Dominion's ImageCast Precinct or Central tabulator." [2]  A copy of a sample barcoded ballot from Dominion's RFP Response[3] is attached hereto as Exhibit A.

---

[1] Coalition Plaintiffs note that two other vendors whose bids were rejected (Hart and Clear Ballot) offered a product that (while defective in other respects) at least produced a human-readable ballot, not a bar code, that would be read by the scanner and tabulated.

[2] The "Master Solution Purchased and Services Agreement" may be found under "Award Information" at https://sos.ga.gov/index.php/general/securevoting.  The quoted passage is found on page 54 at Section 3.1 The same description appears in Dominions' RFP response, which is posted on the same site, on the third page of the pdf (numbered page 1 of 11).

[3] Dominion RFP Response, fourth page of the pdf (numbered page 2 of 11).

Even without a finding that a barcoded ballot like the one produced by ImageCast X violates "each citizen's fundamental right to cast an accountable vote" as a matter of federal constitutional law, *see Curling v. Kemp,* 334 F. Supp. 1303, 1328 (N.D. Ga. 2018),[4] the State's selection of ImageCast X requires the granting of Coalition Plaintiffs' Motion for Preliminary Injunctive Relief because the ImageCast X does not even comply with *Georgia law,* as is explained below. As a result, there is a substantial likelihood that its procurement will be successfully challenged by a vendor that has a product producing a human-readable ballot or delayed because the system cannot be certified under State law. As the Court will recall, the State Defendants have forewarned that the March 24 deadline is "tight even if everything goes right" (Testimony of M. Beaver).  Things are already going wrong.

O.C.G.A. § 21-2-379.22(6) requires that "ballots" produced by electronic ballot markers be in a format "readable by the electors."  O.C.G.A. § 21-2-379.23(d) states that such paper ballot "printed by the electronic ballot marker shall constitute the official ballot *and* shall be used for, and govern the result in, any

---

[4] It is the Coalition Plaintiffs' position that ballot marking devices, including the ImageCastX, are not a constitutional alternative because, among other reasons, they do not produce an auditable result.  The Coalition Plaintiffs' position is explained in greater detail in its March 9, 2019 Status Report (Doc. 351 at 5-7).  *See also id.* at 17 – 19 (letter from twenty-four leading national experts advising against ballot marking device purchase and explaining why results from such devices are not auditable).

recount conducted pursuant to Section 21-2-495 and any audit conducted pursuant to Section 21-2-498." (Emphasis added). A fatal problem with the ImageCast X system is that the paper record that is "readable by the elector" is *not* the ballot that is tabulated or that governs *any* result at any stage of ballot processing. Instead, the unreadable bar code is the official vote and ballot that governs the result of every election. This and other material violations of Georgia law are explained in greater detail in the Coalition Plaintiffs' counsel's letters to counsel for the State Defendants. (*E.g.,* Doc. 351 at page 22). Counsel for the State Defendants have never responded to those letters.

The failure to comply with the Georgia Election Code may also cause the Dominion ImageCastX system to fail Georgia's system certification testing, which is required prior to purchase.[5] The ImagecastX voting system cannot meet several of the fundamental certification requirements in the Georgia Secretary of State's Voting System Certification Rule 590-8-1 (attached as Exhibit B), and is unlikely to be legally certified[6] without formal challenge in the foreseeable future.

---

[5] State certification is required prior to purchase. O.C.G.A. §21-2-379.24 (d).

[6] For example: the State's Voting System Certification requires that the system be certified to the 2002 EAC *Voting System Standards."* The Dominion ImageCastX system is not certified under that specific set of standards but is certified to a different set of standards, called "Voluntary Voting System Standards 1.0." In order for Georgia to move forward with a certification of the Dominion ImageCastX system, State Rule-making procedures will be required to promulgate new rules on technical certification requirements. By selecting a system that does not meet either the Voting System Certification requirements or the statutory requirements adopted in

The State Defendants, correctly anticipating the argument that the ImageCast X procurement will be subjected to a bid protest, contend that the implementation may proceed during a bid protest and that "the vendor is at risk of any adverse ruling on the procurement." (Doc. 552 at 2). More accurately: *every voters'* constitutional right to have their vote counted, and counted accurately, is at risk because, absent an injunction, an adverse ruling in a procurement contest will condemn Georgia voters to the hopelessly defective DRE machines for the foreseeable future.

## B. Injunctive Relief Cannot be Denied in Anticipation of the Implementation of the New System

The only defense raised by the State Defendants' to the Plaintiffs' motions for injunctive relief is the notion that the cost of switching to hand marked paper ballots for "just" the elections in November, December, January and February is too great. At the hearing, the evidence showed that the Defendants' arguments about cost were wildly inflated. But given the increased risk that the new system will not even be deployed by March, 2020, this feeble defense collapses entirely.

Notably, the State Defendants are not even committing to install the new system in March 2020. Instead, the State Defendants simply state that the

---

HB316, the State has created significant built in delays to achieve compliance before such a system can be purchased.

"contract requires that the system be fully implemented in all Georgia counites for the March 24, 2020 Presidential Preference Primary." (Doc. 522 at 2). But the State can unilaterally extend that deadline, even if it is not forced to do so by a bid protest or other obstacle. The Court will recall that the State Defendants in April represented to the Court that "potential vendors must be able to initiate a ten-county pilot by August 2019." (Doc. 362 at 4). Now, the Court is told that "State Defendants anticipate up to six (6) counties will be selected to pilot the new systems in the 2019 November elections." (Doc. 522 at 2). The "up to" language, of course, means as few as zero counties, and today's November date for the pilot, and March date for state-wide implementation, are no more reliable than the State's April estimate that ten counties would be piloted in August.

Coalition Plaintiffs are not aware of any authority that would allow a defendant to avoid otherwise appropriate injunctive relief based on the promise of future compliance with constitutional requirements. But here the State is not even promising compliance by the 2020 Presidential Preference Primaries. If it misses this deadline, it will be able to say, truthfully, that it warned everyone that the March deadline was "tight even if everything goes right." But by then it will again be too late for voters to obtain a constitutional alternative.

## C.     The Sensibility of Coalition Plaintiffs' Request Relief

Coalition Plaintiffs are aware of the Court's July 29, 2019 inquiry to the

State Defendants as to whether and how Dominion's system will import data from

the GEMS system.  This is a crucial question, but even if this question is answered

to the Court's satisfaction (given the difficulties the State Defendants' have had

with "candor" on technical matters, to say the least), there are far too many issues

and questions for the Court to be assured that the new system will be ready by

March 2020 *until March 2020*, and by then it will be too late to switch to a

constitutional alternative.  And, even if the system is ready for March 2020

statewide primaries, all the voters in the 2019 elections, and the scores of elections

in January and February, 2020, will be denied their constitutional right to vote on a

secure and reliable system.[7]

The Coalition Plaintiffs' requested relief, on the other hand, is reasonable

and achievable.  It is the same sensible and constitutional relief that the Coalition

*and* Curling Plaintiffs sought in 2018.  It is the same sensible and constitutional

relief that this Court would have granted in the Fall of 2018 but for the immediacy

of the upcoming 2018 elections.  This year, the timing is ideal: there is more time

---

[7] The State's choice of a barcode solution, and to cut its pilot program back even further, makes the Curling Plaintiffs' requested relief, though well-intentioned, problematic.  Even if the new system complied with Georgia law, it is not realistic to expect the State to be able to expand its pilot from "up to six" counties to 130 counties and hundreds of municipalities.

before the elections and, although there are a number of elections and each one is vital, each 2019 election will be much smaller and far more manageable.  It is also appropriate, however, to leave the option open for modification if and when the State is actually ready to select and deploy a constitutional alternative.  Granting Coalition Plaintiffs' motion will also give the State the time to consider and purchase a system that complies with Georgia law and the U.S. Constitution, and to deploy such a system at a sensible and responsible pace.

Respectfully submitted this 30th day of July, 2019.

*/s/ Bruce P. Brown*                          */s/ Robert A. McGuire, III*
Bruce P. Brown                                Robert A. McGuire, III
Georgia Bar No. 064460                        Admitted Pro Hac Vice
BRUCE P. BROWN LAW LLC                          (ECF No. 125)
1123 Zonolite Rd. NE                          ROBERT MCGUIRE LAW FIRM
Suite 6                                       113 Cherry St. #86685
Atlanta, Georgia 30306                        Seattle, Washington 98104-2205
(404) 881-0700                                (253) 267-8530

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges, Ricardo Davis and Megan Missett*

/s/ John Powers
Ezra Rosenberg (*pro hac vice motion pending*)
John Powers*
David Brody*
jpowers@lawyerscommittee.org
dbrody@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

*Attorneys for Plaintiffs Coalition for Good Governance, William Digges III, Laura Digges, Ricardo Davis, and Megan Missett*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*<u>/s/ Bruce P. Brown</u>*
Bruce P. Brown

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day caused the foregoing to be served upon all other parties in this action by via electronic delivery using the PACER-ECF system.

This 30st day of July, 2019.

/s/ Bruce P. Brown
Bruce P. Brown

EXHIBIT

A

**Official Primary Election Ballot - Colorado Party**
County of Anywhere, Colorado - Tuesday, June 28, 2016

**Ballot Style: 2**

Clerk and Recorder



**United States Senator**
  Vote for THOMAS EDISON
**Representative to the 115th United States Congress - District 2**
  Vote for (WRITE-IN) MARIE CURIE
**Regent of the University of Colorado - At Large**
  BLANK CONTEST
**State Representative - District 13**
  Vote for ISAAC NEWTON
**District Attorney - 1st Judicial District**
  BLANK CONTEST
**County Commissioner District 1**
  BLANK CONTEST
**County Commissioner District 3**
  BLANK CONTEST




EXHIBIT

B

NOTICE OF TERMS OF USE OF THIS WEBSITE: By accessing and/or using this website, you agree to the following **terms and conditions.**



# Rules and Regulations of the State of Georgia

Hierarchy | Search | ... | ▼ | of | ▼ | Search GA R&R....  [ Go ]

**Home** | **Browse** | **Help** | **Go to Georgia SOS**     Go to Citation....  [ Go ]

**R**oute : **GA R&R** » **Department 590** » **Chapter 590-8** » **Subject 590-8-1**       **S**earch tips

## Subject 590-8-1 CERTIFICATION OF VOTING SYSTEMS

### Rule 590-8-1-.01 Certification of Voting Systems

(a) **Purpose.**

   1.  These Rules establish performance requirements and characteristics for voting systems and their components used in the State of Georgia and identify performance characteristics of these systems and components.

   2.  Compliance with the requirements of these Rules shall be assessed by means of code analysis, formal tests, and documentation review.

   3.  The intent of these Rules is to assure that hardware, firmware, and software have been shown to be reliable, accurate, and capable of secure operation before they are used in elections in the State. Hardware, firmware, and software products with performance proven in commercial applications are deemed inherently acceptable, provided that they are shown to be compatible with the operational and administrative requirements of the voting environment. Products not in wide commercial use, regardless of their performance histories, shall require Qualification, Certification, and Acceptance tests before they can be used.

   4.  These rules are intended to assist local jurisdictions in identifying products and provide a standardized terminology which shall facilitate the specification and demonstration of system requirements.

(b) **Applicability.**

   1.  These Rules are applicable to voting systems first used in the State of Georgia on or after the effective date of these Rules. These Rules are waived for all voting systems in use in the State of Georgia as of the effective date of these Rules. Successful performance during past elections are deemed sufficient evidence of adequate design. These Rules shall apply to systems developed by non-governmental third parties and those developed in-house by a local government.

2. These Rules apply to all equipment and computer programs used in a voting system including, but not limited to, the hardware, firmware, and software required for defining an election, formatting ballots, setting up precincts for voting, recording votes, tallying the results, and producing all reports.

3. These Rules apply to any agency, group, or individual responsible for the analysis, design, manufacture, procurement, or use of voting systems, their subsystems, or their components.

4. Any modification to the hardware, firmware, or software of a voting system which has completed Qualification, Certification, or Acceptance testing in accordance with these Rules shall invalidate the State certification unless it can be shown that the modification does not affect the overall flow of program control or the manner in which the ballots are recorded and the vote data are processed, *and* the modification falls into one of the following classifications listed below. The Secretary of State shall be the sole judge of whether or not a modification requires additional testing.

    (i) The modification is made for the purpose of correcting a defect and procedural and test documentation is provided which verifies that the installation of the hardware change or corrected code does not result in any consequence other than the elimination of the defect.

    (ii) The modification is made for the purpose of enabling interaction with other general purpose or approved equipment or computer programs and databases, and procedural and test documentation is provided which verifies that such interaction does not involve or adversely affect vote counting and data storage.

5. The addition or alteration of utility software and device handlers which do not interact with vote counting software except through the intended input/output channels in the manner originally intended does not constitute a requirement for a mandatory retest.

(c) **Reciprocity.** The Secretary of State may accept the results of the Qualification tests and/or Certification tests from another state or testing agency that has performed the tests described in these Rules. This reciprocity does not extend to the Acceptance tests or any portion of the Certification tests, which are considered to be unique to the State of Georgia.

(d) **Procedure.** This review and approval procedure is limited to those voting systems and equipment that have passed the prototype stage and are in full production and available for immediate installation and use. Qualification tests shall be performed to evaluate the degree to which a system complies with the requirements of the *Voting Systems Standards* issued by the Election Assistance Commission (EAC). Whenever possible, Qualification tests shall be conducted by Independent Test Agencies (ITA) certified by the EAC. In the event that tests by an ITA are not feasible, these tests shall be conducted by a Georgia Certification Agent designated by the Secretary of State.

Certification tests shall be performed to certify that the voting system complies with the Georgia Election Code, the Rules of the Georgia State Election Board, and the Rules of the Secretary of State. A Georgia Certification Agent designated by the Secretary of State shall conduct certification tests. The Qualification and Certification testing of a voting system for use in the State of Georgia shall proceed in the following steps.

1. **Qualification.** Prior to submitting a voting system for certification by the State of Georgia, the proposed voting system's hardware, firmware, and software must have been issued Qualification Certificates from the EAC. These EAC Qualification Certificates must indicate that the proposed voting system has successfully completed the EAC Qualification testing administered by EAC approved ITAs. If for any reason, this level of testing is not available, the Qualification tests shall be conducted by an agency designated by the Secretary of State. In either event, the Qualification tests shall comply with the specifications of the *Voting Systems Standards* published by the EAC.

2. **Letter of Request.** After the voting system has completed EAC Qualification testing, the evaluation procedure to obtain certification for use of the voting system in the State of Georgia shall be initiated by letter from the vendor of the voting system to the Office of the Secretary of State requesting certification for a specific voting system. The Secretary of State or her representative shall notify the vendor of the earliest date after which the requested evaluation may begin and provide the vendor with the name and telephone number of the designated Georgia Certification Agent.

3. **Submission of Complete Technical Data Package.** The vendor shall submit the Technical Data Package described in section (g) to the Certification Agent designated by the State. The Certification Agent shall review the submission of the Technical Data Package and notify the vendor of any

deficiencies. Certification of the voting system shall not proceed
until the Technical Data Package is complete.

4. **Preliminary Review.** The Georgia Certification Agent shall
   conduct a preliminary analysis of the Technical Data Package
   and prepare an Evaluation Proposal containing the following
   information:

   (i) Components of the voting system requiring evaluation.

   (ii) Identification of any hardware or software components
   requiring additional testing by the EAC ITAs.

   (iii) Description of the activities required to complete that
   portion of the evaluation which is to be performed by
   the Georgia Certification Agent.

   (iv) Estimate of time required to complete the portion of the
   evaluation, which is to be performed by the Georgia
   Certification Agent.

   (v) Estimate of cost of tests which are to be performed by
   the Georgia Certification Agent.

5. **Authorization to Proceed.** The vendor shall review the
   Evaluation Proposal and notify the Secretary of State, in writing,
   of the desire to continue or terminate the evaluation process.
   The evaluation of the system shall not begin until the
   manufacturer or vendor notifies the Secretary of State to
   proceed. A copy of this notification shall be sent to the Georgia
   Certification Agent. A decision to continue shall obligate the
   vendor to the cost of the evaluation contained in the Evaluation
   Proposal.

6. **Evaluation.** The vendor shall arrange with the EAC ITAs for any
   additional required ITA testing identified in the Evaluation
   Proposal. After any required ITA tests have been successfully
   completed, the Georgia Certification Agent shall conduct the
   tests described in the Evaluation Proposal and submit a report
   of the findings to the Secretary of State.

7. **Certification.** Based on the information contained in the report
   from the Georgia Certification Agent, and any other information
   in her possession, the Secretary of State shall determine
   whether the proposed voting system shall be certified for use in
   the State of Georgia and so notify the vendor.

8. **Local Jurisdiction Acceptance.** After a voting system is
   delivered to a local jurisdiction, acceptance tests shall be

performed in the user's environment to demonstrate that the voting system as delivered and installed is identical to the system that was certified by the State and satisfies the requirements specified in the procurement documents.

(e) **Proprietary Information.** The State of Georgia shall make every effort to protect the proprietary nature of information provided to the State or its agents during the course of these evaluations in accordance to Georgia law for protecting proprietary information. Any proposed non-disclosure agreements shall be of the type and form in common commercial usage appropriate to similar situations and shall be subject to review and approval by the Georgia Attorney General.

(f) **Audit and Validation of Certification.**

1. It shall be the responsibility of the vendor to ensure that any voting system or component of a voting system that it markets or supplies for use in the State of Georgia has been certified by the Secretary of State. It is also the responsibility of the vendor to submit any modifications to a previously certified system or component to the Secretary of State for re-certification and to update the Technical Data Package on file in the Office of the Secretary of State to accurately reflect the modifications.

2. If any question arises involving the certification of a voting system or a component of a voting system in use in the State, the Technical Data Package and Certification documentationon file in the Office of the Secretary of State shall be used to verify that the system or component in question is *identical* to the system or component that was submitted for certification.

(g) **Technical Data Package.** Before evaluation can begin, the vendor must submit to the Georgia Certification Agent the Technical Data Package required to complete the evaluation of the proposed voting system. Each item in the Technical Data Package must be clearly identified. If the Technical Data Package is incomplete or the items in the package are not clearly identified, the entire package may be returned to the vendor and the evaluation of the voting system rescheduled. In most cases, the Technical Data Package submitted to the ITAs shall be sufficient for State certification.

The Technical Data Package shall contain the following items in hard copy and in electronic form when available.

(i) *Customer Maintenance Documentation*. Documentation describing any maintenance that the vendor recommends that can be performed by a customer with minimal knowledge of the system.

(ii) *Operations Manual*. Operations documentation that is normally supplied to the customer for use by the person(s) who shall operate the equipment.

(iii) *Software Source Code*. Source code of all software and firmware in the voting system. The source code shall be supplied in the form of a listing <u>and</u> in a machine-readable form on media that is acceptable to the Georgia Certification Agent. If there is any chance of ambiguity, the required compiler(s) and/or development environment must be specified.

(iv) *Software System Design*. Documentation describing the logical design of the software. This documentation should clearly indicate the various modules of the software, their functions, and their interrelationships. The minimum acceptable documentation is a system flowchart. Deviation of the source code from the system design may be cause for rejection of the voting system.

(v) *Customer Documentation*. A complete set of all documentation which is available to the purchaser/user of the voting system. Clearly identify that documentation which is included in the cost of the system and that documentation which is available for an additional charge.

(vi) *ITA Qualification Reports*. Copies of the ITA reports for the hardware and software qualification of the voting system. These reports must be sent directly from the ITA to the Georgia Certification Agent.

(vii) *Formal Complaints and Decertification Notices.* Copies of any formal complaints and/or decertification notices that have been filed against the proposed system. This documentation must clearly identify the jurisdiction filing the complaint or decertification notice and give the details of the resolution.

(viii) *Test Data/Software (Optional)*. Any available test data, ballot decks, and/or software that can be used to demonstrate the various functions of the voting system. Although optional, these items can significantly reduce the effort, and hence the time and cost, involved in the evaluation of the system.

## **Rule 590-8-1-.02 Verification of Voter Registration Information**

(1) The board of registrars shall enter the information contained on voter registration applications into the statewide voter registration database in a timely manner.

(2) Verification of applicant's United States citizenship.

(a) Georgia driver's license number or identification card number.

    1. If an applicant submits an application for registration and uses the applicant's Georgia driver's license number or identification card number for evidence of United States citizenship purposes, the Secretary of State shall attempt to match such number to the Department of Driver Services database.

    2. If the Department of Driver Services records indicate that the applicant is not a United States citizen in the Department of Driver Services database, the Secretary of State shall attempt to verify the applicant's United States citizenship status with the United States Citizenship and Immigration Services utilizing the Systematic Alien Verification for Entitlements program. Such verification will indicate whether the applicant is designated as a citizen of the United States within the Verification Information System database.

    3. If the Department of Driver Services cannot confirm that the applicant has provided satisfactory evidence of United States citizenship to the Department of Driver Services and the Secretary of State cannot confirm the applicant's United States citizenship through the Systematic Alien Verification for Entitlements program, the board of registrars shall take the following steps:

        (i) The board of registrars shall ensure that the Georgia driver's license number or identification card number was entered correctly into the statewide voter registration system. If the board of registrars determines the number was not entered correctly, the board of registrars shall correct the driver's license number or identification card number in the statewide voter registration system. The Secretary of State shall match the new driver's license number or identification card number to the Department of Driver Services database.

(b) Alien registration number.

    1. If only the alien registration number from an applicant's naturalization documents is provided for United States citizenship purposes, the Secretary of State shall attempt to verify the applicant's alien registration

number with the United States Citizenship and Immigration Services utilizing the Systematic Alien Verification for Entitlements program.

[Rule 590-8-1-.01 Certification of Voting Systems](#)

[Rule 590-8-1-.02 Verification of Voter Registration Information](#)

Copyright © 2019 Lawriter LLC - All rights reserved.| Email Us | 844-838-0769 | Live Chat