# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DONNA CURLING, ET AL.**

~~Plaintiff,v.~~ Plaintiffs, v.

~~BRIAN KEMP~~BRAD RAFFENSPERGER, ET AL.

~~Defendant~~, Defendants.

~~)~~)~~)~~)
~~)~~
Civil Action ~~File~~ No. 1:17-~~cv~~CV-
~~)~~  2989-AT
~~)~~)~~)~~)~~)

——————————————————)

~~SECOND~~

**THIRD AMENDED COMPLAINT**

Plaintiffs Donna Curling, Donna Price, and Jeffrey Schoenberg~~, Laura Digges, William Digges III, Ricardo Davis, Edward Curtis Terry and the Coalition for Good Governance,~~ hereby allege and plead for their ~~Second~~Third Amended Complaint as follows:

**PRELIMINARY STATEMENT**

1.    The right to vote is the most fundamental and sacrosanct of all of the

rights conferred on U.S. citizens by the Constitution as well as by the Georgia Constitution and Georgia state law. It is the foundation of our democracy. As the Supreme Court has set out in unambiguous terms, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17

(1964). *See also Wexler v. Anderson*, 452 F.3d 1226, 1232 (III) (11th Cir. 2006)

("The right to vote is fundamental, forming the bedrock of our democracy."). The Georgia Constitution as well reflects the drafters' recognition of the vital role that the right to vote plays in the management of the State's affairs by explicitly providing that "[e]lections by the people shall be by secret ballot and shall be conducted in accordance with procedures provided by law." Ga. Const. Art. II § 1, ¶ 1.

2.     In reaction to the profound challenges that emerged from the 2000 Bush-Gore presidential election, many states, Georgia among them, turned to paperless electronic voting systems in the expectation that this technology would prevent a reprise of that election's problems. Plaintiffs raise no questions regarding the intent behind that change. However, over the years, it has been increasingly apparent that paperless electronic voting systems have not, and could not, live up to expectations. Indeed, the system is now known to be so vulnerable to intrusion and manipulation that the nation's leading cybersecurity experts have been going to great lengths to educate both the states and Congress about the perils inherent in those systems, and to urge the return to paper ballots.

3.     Despite the inclination to put great faith in the wonders of technology, it is decidedly not the answer when it comes to voting systems. The Direct Recording Equipment ("DRE") voting system ("DRE Voting System") used in

Georgia

 is a prime illustration of the regrettable incompatibility between the functioning of the current electronic voting system and the voters' right to cast a ~~secret~~ ballot and have that vote accurately counted. Because of such concerns, states across the country, in increasing numbers, have been returning to the safety of paper ballots, with only five states remaining, like Georgia, using all electronic voting.

4.      The inherent vulnerabilities of DREs tremendously compromise the rights of voters in any jurisdiction. Furthermore, the integrity of Georgia's DRE Voting System was significantly eroded as a consequence of the misfeasance and malfeasance of the Defendants: The central server used both to store voters' personal identifying data and to program every electronic voting machine in Georgia was readily accessible in the many months (and possibly years) leading up to the 2016 Presidential election, and subsequent 2017 elections -- and accessible not merely to cybersecurity experts, but to anyone with a modicum of familiarity with computer use. The central server was wide open for anyone to enter the system and readily access personal data of Georgia voters. Furthermore, such an intruder could also easily manipulate the server's data and voter registration software, and thereby render legitimate voters ineligible, add fictitious voters to the

list, and switch votes so as to increase the numbers for the candidate of the intruder's choosing.

5.     The gross abrogation of the Constitutional and statutory obligations to protect the franchise rights of Georgia voters did not stop there. Instead, when the security failure was discovered by a local cybersecurity expert and brought to the attention of two of the Defendants, the expert was warned to drop the issue. And it was not only the warnings from this cybersecurity expert that these Defendants ignored. Later, they would turn a blind eye to other critical warnings from more than twenty leading cybersecurity and voting system experts, from the Department of Homeland Security ("DHS"), from the Federal Bureau of Investigation ("FBI"), and from the Election Assistance Commission ("EAC").

6.     Indeed, Georgia's Secretary of State ~~Brian P. Kemp ("Kemp" or "Secretary Kemp~~("GA SOS") not only ignored each of these warnings, but also refused the offers of assistance in remedying the problems that the DHS and the FBI ~~made to him, and~~ urged ~~him~~it to accept. Rather, ~~Kemp went public with~~GA SOS publicized completely unfounded allegations of an attempted takeover of Georgia's electoral system by the federal government. ~~Notably, the FBI eventually seized control of Georgia's central server.~~

7.     Even under the very best of circumstances – with the current voting

systems properly installed, programmed, and operated – the inherent flaws in the DREs render it not possible for the state to comply with the election law or to

protect the rights of Georgia voters. Yet, these are not the best of circumstances; far from it. Rather, there is compelling evidence that the rights of Georgia voters guaranteed by Georgia statute and the U.S. and Georgia constitutions (1) to vote in absolute secrecy and (2) to have their votes counted accurately, have been flagrantly and repeatedly breached by Defendants' conduct.

8.      This case is not merely about a technical violation or a theoretical risk. It is about forcing voters to choose between totally relinquishing their right to vote and acquiescing to cast their vote despite very real risks: the risk that how they voted will be exposed; the risk that their vote will not be properly counted; the risk that the declared results will be contrary to the will of voters,; and furthermore, the risk that there will be no way to verify the validity of the election.

9.      Any question of convenience of Defendants and their commitment to a woefully flawed and wholly indefensible voting system must not be permitted to take priority over the statutory and Constitutional rights of Georgia voters.

10.      This complaint sets forth the violations of law and the other serious irregularities that occurred during the November 8, 2016 General Election, ("2016 General Election"), the April 18, 2017, 6th Congressional District Special Election

("Special Election"), ~~and~~ the June 20, 2017, 6th Congressional District Runoff

Election ("Runoff ") , and the May 2018 and November 2018 General Elections


(collectively, the "Relevant Previous Elections") causing the results of such

elections to be indeterminable.


     11.   This complaint also sets forth violations of law resulting from

Defendants' continued failure to implement a constitutionally-acceptable election

system. Despite warnings from cybersecurity experts, government officials, and

even this Court, Defendants still intend to utilize their flawed DRE Voting System

in upcoming elections during Fall 2019. Additionally, while Defendants are

implementing a paper ballot system for certain 2020 elections, they have chosen to

force all of Georgia's voters to use ballot-marking devices ("BMDs") which suffer

from the same security vulnerabilities as Defendants' flawed DRE Voting System.

     12.    ~~11.~~For these reasons and those demonstrated below, Plaintiffs

respectfully ask the Court: (1) to hold Defendants liable for the violations of

Georgia voters' rights in connection with the Relevant Previous Elections, and to

ensure that those rights are protected in connection with the scheduled ~~November,~~

~~2017, May, 2018, and November, 2018 General Elections, as well as any~~Fall 2019

and all future ~~Runoff or Special Elections~~elections, (collectively, the "Relevant

Pending Elections") and~~(2)~~ (2) to enter an order providing such relief as is

necessary and appropriate to protect Georgia's voters from such future, irreparable

harm.

**PLAINTIFFS**

13.   ~~12.~~Plaintiffs are electors who are residents of Georgia as well as ~~an association that includes, among its members,~~ electors of the State of Georgia who are concerned about the integrity, credibility, security, and reliability of the electoral process. All Plaintiffs have cast ballots in one or more of the Relevant Previous Elections, and all ~~but Plaintiff Davis~~ have cast ballots on the DRE Voting System in one or more of the Relevant Previous Elections. ~~All Plaintiffs are members of the Coalition for Good Governance.~~

14.   ~~13.~~DONNA CURLING ("Curling") is an elector of the State of Georgia, and a resident of Fulton County~~, and a member of the Coalition for Good Governance~~. Curling voted in the Relevant Previous Elections, and intends to vote in all future elections for which she is eligible.

15.   ~~14.~~Due to concerns over the integrity of prior Georgia elections, Curling requested that ~~Secretary of State Brian P. Kemp ("Secretary Kemp")~~GA SOS reexamine Georgia's DRE Voting System. Curling also chose to exercise her right to cast her vote using a verifiable paper ballot in the Runoff, so as to ensure that her vote would be permanently recorded on an independent record. To do so, Curling persisted through considerable inconvenience – only to be incorrectly told

by ~~Defendants Kemp~~GA SOS and the Fulton County Board of Registration and Elections that she had not, in fact, cast a ballot, creating irreparable harm that her ballot was not counted. Without the intervention of this Court, Curling will be compelled to choose between relinquishing her right to vote and acquiescing to cast her vote under a system that violates Georgians' rights ~~to absolute secrecy~~ and

cannot reliably determine election outcomes that can be legally certified. As such, Curling has standing to bring her claims.

16.   ~~15.~~Plaintiff ~~COALITION FOR GOOD GOVERNANCE ("CGG")~~

~~(formerly Rocky Mountain Foundation) is a non-profit corporation organized and~~

~~existing under the laws of the State of Colorado. CGG's purpose is to advance the~~

~~constitutional liberties and individual rights of citizens, with an emphasis on~~

~~elections. CGG is a membership organization, and its membership includes all~~

~~named individual Plaintiffs, as well as other electors of the State of Georgia who~~

~~reside in, variously, Fulton County, Cobb County, DeKalb County, the 6th~~

~~Congressional District of the State of Georgia, and other municipalities within the state~~
~~that will conduct Relevant Pending Elections. CGG's members were subjected to a~~
~~system that violated their rights to vote in absolute secrecy and to have their votes~~
~~counted accurately. Plaintiff CGG has associational standing to bring this complaint on~~
~~behalf of CGG's Georgia individual elector members: (1) those members would~~
~~otherwise have standing to sue in their own right; (2) the interests CGG seeks to protect~~
~~are germane to CGG's purpose; and (3) with the exception of Counts VI and VII, the~~
~~relief requested herein does not require the participation of CGG's individual Georgia~~
~~elector members in the lawsuit.~~

16.Plaintiff DONNA PRICE ("Price") is an elector of the State of Georgia, and a resident of DeKalb County, and a member of CGG. Due to concerns over the integrity of prior Georgia elections, prior to the Runoff, Price joined the group of 13 other electors who exercised their right under O.C.G.A § 21-2-379.2(a) to request that Secretary KempGA SOS reexamine Georgia's DRE Voting System, — — a request Secretary KempGA SOS effectively denied, abridging her rights to assure that future elections would be conducted on compliant systems. She cast her vote on a DRE in the 2016 General Election, and intends to vote in all future elections for which she is eligible. Without the intervention of this Court, Price will be compelled to choose between relinquishing her right to vote and acquiescing to cast her vote

under a system that violates her right to vote in absolute secrecy and to have her vote accurately counted. As such, Price has standing to bring her claims.

17.    Plaintiff JEFFREY SCHOENBERG ("Schoenberg") is an elector of the State of Georgia and a resident of DeKalb County. He castscast his ballot on DRE machines in all the Relevant Previous Elections and intends to vote in all future elections for which he is eligible. In casting his ballot in a voting system that violated his right to a secret ballot and abridged his right to participate in a legally conducted election with a determinable

and certifiable result, Schoenberg suffered irreparable harm.    Without the

intervention of this Court, Schoenberg will be compelled to choose between

relinquishing his right to vote and acquiescing to cast his vote under a system that

violates his right to vote in absolute secrecy and to have his vote accurately counted.

As such, Schoenberg has standing to bring his claims.

18.Plaintiff LAURA DIGGES ("L. Digges") is an elector of the State of

Georgia and a resident of Cobb County. She intends to vote in all future elections

for which she is eligible. Due to concerns over the integrity of prior Georgia

elections, L. Digges chose to exercise her right to cast her vote using a verifiable

paper ballot in the Runoff, so as to ensure that her vote would be permanently

recorded on an independent record that could be recounted accurately. L. Digges

persisted through considerable inconvenience to do so. In the Special Election and

the 2016 General Election, L. Digges cast her ballot on DRE machines. In casting her
ballot in a voting system that violated her right to a secret ballot and abridged her right
to participate in a legally conducted election with a determinable and certifiable result,
L. Digges suffered irreparable harm. Without the intervention of this Court, L. Digges
will be compelled to choose between relinquishing her right to vote and acquiescing to
cast her vote under a system that violates her right to vote in absolute secrecy and to
have her votes accurately counted. As such, L. Digges has standing to bring her claims.

19.Plaintiff WILLIAM DIGGES III ("W. Digges") is an elector of the State

of Georgia and a resident of Cobb County. Due to concerns over the integrity of

prior Georgia elections, W. Digges chose to exercise her right to cast his vote using

a verifiable paper ballot in the Runoff, so as to ensure that his vote would be

permanently recorded on an independent record that could be recounted accurately. W. Digges persisted through considerable inconvenience to do so. In the Special Election and the 2016 General Election, W. Digges cast his ballot on DRE machines. In casting his ballot in a voting system that violated his right to a secret ballot and abridged his right to participate in a legally conducted election with a determinable and certifiable result, L. Digges suffered irreparable harm. W. Digges plans to vote in all future elections in which he is eligible. Without the intervention of this Court, W. Digges will be compelled to choose between

relinquishing his right to vote and acquiescing to cast his vote under a system that violates his right to vote in absolute secrecy and to have his votes accurately counted. As such, he has standing to bring his claims.

20. Plaintiff RICARDO DAVIS ("Davis") is an elector of the State of Georgia, and a resident of Cherokee County. Due to concerns over the integrity of prior Georgia elections, prior to the Runoff, Davis joined the group of 13 other electors who exercised their right under O.C.G.A §21-2-379.2(a) to request that Secretary Kemp reexamine Georgia's DRE Voting System, – a request Secretary Kemp effectively denied, abridging Davis' rights to assure that future elections would be conducted on compliant systems. Davis intends to vote in all future elections in which he is eligible. Without the intervention of this court, Davis will be compelled to choose between relinquishing his right to vote and acquiescing to cast his vote under a system that violates his right to vote in absolute secrecy and to

~~have his votes accurately counted. As such, he has standing to bring his claims.~~

~~21. Plaintiff EDWARD CURTIS TERRY ("Terry") is a registered voter in the State of Georgia, a resident of the City of Clarkston ("Clarkston") in DeKalb County, and the Mayor of Clarkston. Terry is a candidate for re-election in the upcoming November 7, 2017 municipal election, and as such has an interest in ensuring that the rights of his supporters to cast their votes in secrecy and to have their votes, as well as those of other Terry supporters, counted accurately, are~~

~~honored, and that his personal rights as an elector are as well. Terry, both as a voter and as a candidate, along with his voters, will suffer irreparable harm not only because of the anticipated violation of the secrecy of the November 2017 municipal election ballots, but because of the chilling effect that will impact his voters and likely Clarkston's voter turnout because of the growing understanding of the DRE's violation of voter privacy. Terry voted in the 2106 General Election on election day in his neighborhood precinct on a DRE machine. In casting his ballot in a voting system that violated his right to a secret ballot and abridged his right to participate in a legally conducted election with a determinable and certifiable result, Terry suffered irreparable harm. Terry plans to vote in every Relevant Future Elections for which he is eligible. It is well established that political candidates have the right to challenge election procedures that impact their ability to compete for votes. Terry has standing as a voter, and as a candidate and third party standing representing voters to bring his claims.~~

**DEFENDANTS**

18. ~~22.~~ Defendant ~~BRIAN P. KEMP~~ BRAD RAFFENSPERGER ("~~Kemp"~~

~~or "~~Secretary ~~Kemp~~ Raffensperger") is the Secretary of State of Georgia and, in that role, also serves as Chair of the State Election Board. Secretary Raffensperger's

predecessor, current Georgia Governor Brian P. Kemp, was, responsible for the

Relevant Previous Elections, and ~~for~~ the Relevant Pending Elections, ~~continues to~~

~~be~~ Secretary Raffensperger is responsible for the orderly and accurate

administration of Georgia's electoral processes and the Relevant Pending Elections.

This responsibility

    includes the duty to ensure that legally compliant voting systems are in

place, and to conduct any reexaminations of Georgia's DRE Voting System

currently in use, upon request or at his own discretion.

    19.    ~~23.~~Defendants DAVID J. WORLEY, REBECCA N. SULLIVAN,

~~RALPH F. "RUSTY" SIMPSON~~ANH LEE, and SETH HARP ("~~Members of the~~

State Election Board Members") are members of the State Election Board in

Georgia. As ~~members, they were~~such, for the Relevant Previous Elections, and, for

the Relevant Pending Elections, they were responsible and continue to be

responsible for (1) promulgating rules and regulations to ensure the legality and

purity of all elections, (2) investigating ~~frauds~~fraud and irregularities in elections, and

(3) reporting election law violations to the Attorney General or appropriate district

attorney.

    ~~24.Defendant STATE ELECTION BOARD ("State Board") was, for the~~

~~Runoff and for the Relevant Pending Elections, continues to be responsible for (1)~~

~~promulgating rules and regulations to ensure the legality and purity of all elections,~~

~~(2)   investigating frauds and irregularities in elections, and (3) reporting election law~~

~~violations to the Attorney General or appropriate district attorney. The State Board~~

~~promulgated Rule 183-1-12.01 requiring the use of DRE's in the state's elections,~~

~~other than municipal elections.~~

~~25.Defendant RICHARD BARRON ("Barron") is the Director of the~~

~~Fulton County Board of Registration and Elections. As such, he was, for the~~

~~Relevant Previous Elections, and, for the Relevant Pending Elections, continues to be~~
~~responsible for conducting the elections in Fulton County.~~

<u>20.</u>      ~~26.~~Defendants MARY CAROLE COONEY, VERNETTA

NURIDDIN, ~~DAVID J. BURGE~~<u>KATHLEEN D. RUTH, MARK WINGATE</u>, and

AARON JOHNSON ("~~Members of Fulton~~ County <u>Election</u> Board ~~of Registration~~

~~and Elections~~<u>Members</u>") are members of the Fulton County Board of Registration

and Elections who were, for the Relevant Previous Elections, and, for the Relevant

Pending Elections, continue to be, responsible for conducting the elections in

Fulton County.

~~27.Defendant FULTON COUNTY BOARD OF REGISTRATION AND~~

~~ELECTIONS ("Fulton Board") was, for the Relevant Previous Elections, and, for~~

~~the Relevant Pending Elections, continues to be responsible for conducting~~

~~elections in Fulton County.~~

~~28.Defendant MAXINE DANIELS ("Daniels") is the Director of the~~

~~DeKalb County Board of Registration and Elections for DeKalb County. As such,~~

~~she was, for the Relevant Previous Elections, and, for the Relevant Pending~~

Elections, continues to be responsible for conducting elections in DeKalb County.

21.    29.Defendants MICHAEL P. COVENY, ANTHONY LEWIS, LEONA PERRY, SAMUEL E. TILLMAN, and BAOKY N. VU ("Members of DeKalb County Board of Registration and Elections") are members of the DeKalb County Board of Registration and Elections. As members, they were, for the Relevant

Previous Elections, and for Relevant Pending Elections, continue to be responsible for conducting elections in DeKalb County.All Defendants are sued only in their official capacities.
30.Defendant DEKALB COUNTY BOARD OF REGISTRATION AND

ELECTIONS ("DeKalb Board") was, for the Relevant Previous Elections, and, for

the Relevant Pending Elections, continues to be responsible for conducting

elections in DeKalb County.

31.Defendant JANINE EVELER ("Eveler") is the Director of the Cobb

County Board of Elections and Registration. As such, she was, for the Relevant

Previous Elections, and, for the Relevant Pending Elections, continues to be

responsible for conducting elections in Cobb County.

32.Defendants PHIL DANIELL, FRED AIKEN, JOE PETTIT, JESSICA

BROOKS, and DARRYL O. WILSON ("Members of Cobb County Board of

Elections and Registration") are members of the Cobb County Board of Elections

and Registration. As members, they were, for the Relevant Previous Elections, and

for the Relevant Pending Elections, continue to be responsible for elections in Cobb

County.

33.Defendant COBB COUNTY BOARD OF ELECTIONS AND

~~REGISTRATION ("Cobb Board") was, for the Relevant Previous Elections, and~~

~~for the Relevant Pending Elections, continues to be responsible for election in~~

~~Cobb County.~~

~~34. Defendant MERLE KING ("King") is Executive Director of the Center for Election Systems at Kennesaw State University ("CES"). As such, he was, for Relevant Previous Elections, and is expected to remain, for the Relevant Pending Elections, responsible for overseeing, managing, and securing the electronic election infrastructure for the State of Georgia, including portions of the DRE System, and to be responsible for creating Georgia's ballots.~~

## I.   JURISDICTION AND VENUE

22.   ~~35.~~ On August 8, 2017, Defendants consented to jurisdiction when they

removed this action on the basis of Federal Question jurisdiction under 28 U.S.C. §

1331. Dkt. No. 1-14.

23.   ~~36.~~ Further, this Court has jurisdiction over this action pursuant to

28 U.S.C. §§ 1331, 1343, 1367, 2201, and 2202.

24.   ~~37.~~ Venue lies in this court pursuant to 28 U.S.C. § 1391(b) because all

reside in the district and a substantial part of the events or omissions giving rise to

the Plaintiffs' claims occurred in this judicial district.

## II.   FACTUAL BACKGROUND

A.   **Georgia's DRE Voting System is Fundamentally Flawed and Vulnerable**

25.   ~~38.~~ Georgia's DRE Voting System relies primarily of the use of DRE

voting computers, which, by design, directly record an elector's vote on an

electronic medium ("DRE System"). *See* O.C.G.A. §§ 21-2-379.1 to -379.12; *see*

*also* Ga. Comp. R.

R.   & Regs. 183-1-12.01. The DREs used in Georgia provide no method

 through which voters can be assured that their vote has been accurately recorded, in

contrast with an anonymous paper ballot which the voter marks and reviews before

he casts his ballot. DREs produce neither a paper trail nor any other means by which

the records of votes cast can be audited.

39.In addition, it is possible, by accessing memory card data in a DRE to

obtain a list of when voters voted on the DRE to determine for whom a particular

voter cast his or her ballot, presuming the DRE is operating properly. Because DREs

record individual ballot data with unique serial numbers in chronological, as

opposed to randomized, order, someone present in the polling place (such as a poll

worker or political poll watcher) could take note of the order in which voters cast

their ballots, and then match a particular voter with the individual electronic ballot

data from the DRE machines. While this may not be practicable during busy voting

times in large urban or suburban precincts with a significant number of DRE

machines used by a large number of voters, it remains a very real prospect for voters

during off-peak voting times, especially in early voting periods and in small towns

and rural precincts.

26.   40.These inherent problems are exacerbated by the fact that Georgia

uses DREs that run on antiquated software that is programmed by and downloaded

from one central location, the Center for Elections Systems ("CES"), formerly

located at Kennesaw State University ("KSU"), and now located within GA SOS's

office. Relying on a single site renders Georgia's

 DRE Voting System far more vulnerable than systems that are managed

through numerous sites at the county level across

the state. In Georgia, only one server needs to be compromised in order for an

intruder to exploit it, making Georgia elections a tempting target.

27.   The Georgia Global Election Management System ("GEMS") is beset

by vulnerabilities.

28.   Defendants have publicly represented that because Georgia's GEMS

database was unique and confidential, hackers could not design malware

compatible with that database. In reality, however, the Georgia GEMS database is

structured identically to databases that have been available on the internet since

2002. Therefore, by Defendants' own admission, the GEMS system is critically

vulnerable.

29.   Compounding these concerns is the fact that Georgia has not updated

or provided patches to its GEMS database software since approximately 2005.

30.    Despite these vulnerabilities, Georgia has not collected all of the approximately 50,000 DRE memory cards employed by Georgia during elections for testing or reformatting since 2013 or 2015. Similarly, Georgia has never tested or otherwise checked the internal memory of its DRE voting machines.

31.    41.In addition to the problems associated with the DRE systemVoting System in general, and the added vulnerabilities created by Georgia's antiquated software and

single point of entry, Georgia's DRE Voting System has long been at further risk because of Defendant King's gross mismanagement.

32.    For example, CES Director Michael Barnes transfers data directly from the GEMS central server using a USB drive to a public computer that is connected to the internet. After being exposed to the internet, this USB drive is then reinserted back into the GEMS server. Notably, while Barnes maintains this USB drive in a locked desk drawer, he leaves the key to this drawer unlocked in the same desk.

33.    Additionally, outside contractors working from their own homes on their own personal computers, construct the GEMS database used for Georgia's elections.

**B.    The Exposure and Breaches of Georgia's ElectronicDRE Voting System Have Been Undeniably Established**

34.    42.In August of 2016, a professional cybersecurity expert residing in Georgia, Logan Lamb ("Lamb"), who was interested in the state's election system, accessed CES's public website. Shockingly, Lamb was able to access key components of Georgia's electronic election infrastructure, without so much as entering a password. It should be noted that these actions were in accordance with both the law and the general standards followed by most professionals in the cybersecurity industry.

35.    43.In accessing these election system files, Lamb found a startling amount of private information, including: driver license numbers, birthdates, and the last four digits of social security numbers for over six-and-a-half million Georgia voters; the passwords given to polling place supervisors on election day to control the opening and closing of the DREs and to make administrative corrections in the event a DRE encountered a problem; and executable programs that could be used to implant malware and vote stealing programs in the system.

36.    44.This publicly available information easily found by Lamb provided everything a bad actor would need to interfere with an election and to manipulate its outcome – while likely avoiding detection.

## C.    The Defendants' Unwillingness to Recognize and Respond to the Problems

37.    45.Lamb immediately alerted DefendantMerle King ("King"), the

Georgia official responsible for overseeing, managing, and securing Georgia's electronic election infrastructure, to the serious security vulnerabilities he had discovered. In response, Lamb was cautioned by ~~Defendant~~ King that if he talked about it, he would be "crushed by the politicians downtown."

38.   ~~46.~~Upon information and belief, not only did Georgia fail to take remedial action when alerted to the problem Lamb raised, it failed to act even in the face of the detailed information on the cybersecurity threats facing the nation's

election systems, and the recommended specific steps to reduce the risk, which were disseminated by the FBI, the DHS, and the EAC. The press reported that Georgia was the only state to refuse all federal assistance to help ensure the security of its election infrastructure. Neither did the state officials respond to a letter that had been drafted by a group of over twenty voting system and cybersecurity experts expressing their heightened concerns about Georgia's DRE Voting System.

**D.    The Consequences of Georgia's Failure to Act**

39.   ~~47.~~In February 2017, a cybersecurity colleague of Lamb's, Chris Grayson ("Grayson"), was able to repeat what Lamb had done seven months earlier. Around that same time, Lamb also found that, not only could he still easily access and download the same information as he had previously done, he discovered additional and updated information, including more recent database

files and passwords.

40. 48.Upon information and belief, Grayson notified a colleague and a

faculty member at KSU of his findings. This colleague then notified KSU's

University Information Technology Services ("UITS") Information Security

Office, which in turn notified Defendant King. The day after Grayson's

notification, the KSU

UITS Information Security Office seized CES's server. Two days after Grayson's

notification, the FBI had been alerted and took possession of the server.

41. 49.On at least two occasions prior to the seizure by the FBI,

Defendant King and Defendant CES were made aware of this data breach. KSU

issued a press release as to this data breach on March 1, 2017, and press accounts

report that Defendant KempGA SOS was aware of this breach by March 3, 2017.

42. 50.In a separate incident, on April 15, 2017, four electronic pollbooks

and memory cards containing the PII of voters in Cobb County were stolen. Press

accounts have quoted Cobb County election officials as stating that these pollbooks

contained state-wide voter information.

43. 51.OnUpon information and belief, Defendants Kemp, King, and KSU

failed to notify the consumer reporting agencies and the 6.5 million Georgia voters

whose personal identifying information had been compromised by the CES system, as required by O.C.G.A § 10-1-912. Their failure to do so exposed those voters to substantially greater risk of their personal data being misused in ways that would harm them. And even after the occurrence of an actual security breach in April 2017 – the theft of electronic pollbooks containing statewide voter registration database and software to program voter access cards – no action was taken to properly report either security breach of voter data.

44.     52.The DRE systemVoting System did not, and cannot ever, meet Georgia's constitutional statutory requirements, and caused each of the Relevant Previous Elections to generate indeterminable results, abridging numerous state and federal rights of the Plaintiffs and all other Georgia voters.

**E.     Georgia's Own Experts Have Confirmed These Vulnerabilities**

45.     GA SOS engaged cybersecurity experts Fortalice to conduct assessments of their cybersecurity infrastructure. Notably, GA SOS did not engage Fortalice to conduct any assessment of its *election* cybersecurity, include its DREs or the GEMS database and servers, despite Fortalice's ability to conduct such analysis.

46.     Fortalice identified significant cybersecurity deficiencies with GA SOS's network.

47.     ~~E.Discrepancies in the Election Returns and the Denial of a Right to Recanvass~~For example, in an October 2017 assessment, Fortalice identified twenty-two cybersecurity risks within GA SOS's IT operations, categorizing most of these risks as significant.

48.     One of these risks was widespread local administrative rights, meaning that all GA SOS users who had any level of log-in credentials also were granted administrative rights on their work stations. This increased the likelihood that malware or a malicious actor could successfully compromise a user's work

station through email, web, or removal media. GA SOS's experts found that the problem was particularly acute because not only did users have administrative rights on their own work stations, but they also had administrative rights on all work stations. This meant that if an attacker gained access to a single work station, they could quickly access any other work station, gain administrative rights, and spread malware, install remote access tools, or access sensitive data.

49.     Another risk identified by Fortalice in their October 2017 assessment was a lack of two-factor authentication for remote access. This meant that GA SOS users were able to remotely access the GA SOS network using only a user name and a password. According to Fortalice, this level of security was insufficient, particularly given the possibility of phishing attacks or the potential theft of GA

SOS credentials.

50.     Fortalice also expressed an overarching concern for the lack of control and oversight GA SOS was able to maintain over its voter registration database. Indeed, GA SOS employees informed Fortalice that the voter registration database represented GA SOS's greatest cybersecurity vulnerability.

51.     As part of its October 2017 assessment, Fortalice conducted a penetration test of GA SOS's networks. Fortalice was able to successfully penetrate GA SOS's network and gain administration rights to that network.

52.     In February 2018, Fortalice conducted an additional cybersecurity assessment, focusing on the independent vendor that Georgia retained to manage its voter registration database. Fortalice identified fifteen additional security risks involving Georgia's voter registration database. For example, Fortalice found that the contract between GA SOS and the independent vendor did not contain any cybersecurity requirements. Fortalice found that the vendor was relying on outdated software that was known to contain critical security vulnerabilities. Fortalice noted that an attacker with sufficient time and resources could exploit those vulnerabilities. Fortalice also identified certain remote access vulnerabilities. Specifically, the vendor did not block VPN connections from the IP addresses of known threats or foreign countries. Additionally, Fortalice identified a number of

missing critical operating system patches, unsupported software, and vulnerable third-party software.

53.    In November 2018, Fortalice conducted a third assessment of GA SOS's cybersecurity. As part of this assessment, Fortalice made an additional twenty recommendations to GA SOS to improve its cybersecurity.

54.    Notably, of the twenty-two risks identified by Fortalice in October 2017, only three had been remediated as of November 30, 2018, just weeks after the November 2018 midterm elections.

55.    Based on this assessment, on a scale of zero to one hundred, Fortalice graded GA SOS' cybersecurity as a 53.98.

56.    Despite the fact that Fortalice had identified significant cybersecurity vulnerabilities with Georgia's voter registration database in its October 2017 and February 2018 assessments, GA SOS instructed Fortalice not to review the voter registration database in November 2018.

57.    Notwithstanding Fortalice's warnings, in November 2018, on the eve of an election, it was publicly revealed that Georgia's voter registration database had serious, remotely-exploitable vulnerabilities.

58.    Another expert retained by GA SOS, Dr. Michael Shamos, has repeatedly criticized GA SOS's election cybersecurity practices.

59.    For example, while Dr. Shamos believes that Georgia should test each memory card before it places it into a DRE machine, upon information and belief, Georgia does not do so.

60.    Similarly, while Dr. Shamos believes that Georgia should conduct comparative and forensic analyses to determine whether its DRE machines and software are properly functioning, upon information and belief, Georgia does not do so.

61.    Additionally, while Dr. Shamos believes that Georgia should conduct parallel testing on its DRE machines, by selecting at least one machine to test in every single county, upon information and belief, Georgia does not conduct parallel testing in this manner. Instead, Georgia tests only a single machine out of the approximately 27,000 machines used in Georgia elections. Dr. Shamos, Defendants' own expert, does not have confidence in Georgia's testing procedures, which test only one machine out of approximately 27,000.

**F.    Georgia Failed to Act Despite Growing Threats to U.S. Election Security**

62.    Georgia's stubborn failure to address these critical security vulnerabilities comes amidst revelations that Russia and other foreign nations are increasingly targeting U.S. election systems with increasing sophistication.

63.    The Mueller Report revealed that "[t]he Russian government

interfered in the 2016 presidential election in sweeping and systematic fashion." Notably, evidence of Russian interference "began to surface in mid-2016."

64.     In July 2018, Special Counsel Robert Mueller released an indictment that confirmed that Georgia was specifically targeted by a Russian operative.

65.     The Senate Intelligence Committee confirmed these findings in a bipartisan report. According to the Senate Intelligence Committee, hackers likely tried to access election systems in all fifty states during the 2016 elections. Russia

"directed extensive activity, beginning in at least 2014 and carrying into at least 2017, against U.S. election infrastructure at the state and local level." The report specifically found that "[s]tate election officials, who have primacy in running elections, were not sufficiently warned or prepared to handle an attack from a hostile nation-state actor."

66.     The Senate Intelligence Committee noted that Russian operatives engaged in operations to scan the election-related state infrastructure of all fifty states, conducting research on election-related web pages, voter ID information, election system software, and election service companies.

67.     Further, Robert Mueller confirmed during his July 2019 testimony to Congress that Russia's interference in our elections continues to this day. And, as he testified, "[m]any more countries are developing the capability to replicate what the

Russians have done."

68.    Given this extensive risk, cybersecurity experts and government officials have instructed that states implement paper ballot systems with optical scanners that include a voter-verified paper trail.

69.    Georgia has ignored this guidance.

**G.**   ~~53.~~**Georgia** ~~voters were also denied their right to recanvas, and therefore, the ability to investigate whether these security breaches and irregularities resulted in a detectable manipulation of the Relevant Previous Election processes.~~

~~54.In June 2017, certain Electors who are Members of Plaintiff CGG petitioned the DeKalb Board and the Cobb Board to recanvass certain precincts in both counties following the Runoff. The precincts in which recanvassing was sought were selected based on anomalous-appearing results, such as extreme swings between purported absentee results and purported results.~~

~~55.Certain Electors who are Members of Plaintiff CGG questioned whether Georgia's DRE System caused substantial discrepancies or errors in returns. Given the fundamental insecurity and lack of auditability of the DRE System, these anomalous results may not be apparent on the face of the returns. Members therefore sought a recanvass.~~**'s Proposed Election System Remains Unconstitutional**

70.    In April 2019, Georgia passed H.B. 316, which provided for the use of a paper ballot system to be marked by BMDs. In July 2019, Georgia confirmed that it had awarded the contract for this new system to Dominion Voting Systems, Inc. ("Dominion").

71.    The system described in Georgia's contract with Dominion calls for in-precinct scanners/tabulators for 2D barcodes generated by BMDs (the "Proposed

Election System"). The BMDs, identified as Image Cast X models, are also capable of producing a text summary, as opposed to an image of the actual ballot, of an elector's candidate selections. The ballot scanners tabulate votes from each ballot based on the 2D barcode generated by the BMD and not based on the written text summary of a voter's selections. Therefore, no elector can visually review and confirm whether the bar code accurately conveys their intended selections.

72.    The Proposed Election System will not be substantially safer than the current system because BMDs remain susceptible to manipulation, and the proposed system does not provide a meaningful way for a voter to audit their vote.

73.    The 2D barcode produced by the BMD is not readable by a voter, but is relied upon by the precinct scanner to tabulate votes in each precinct. The legible written summary of a voter's choice is not relied upon by the precinct scanner at all.

74.    Therefore, while the Proposed Election System purports to provide a voter with an auditable voting record, the voter is only able to audit the written summary and not the actual barcode on the ballot used to tabulate votes.

75.    In other words, despite the fact that cybersecurity experts and government officials recommended a voting system that included a voter-verified paper trail, the Proposed Election System will rely on a non-voter-verified barcode

as the elector's actual vote.

76.     Further, these BMD systems have the same demonstrated security vulnerabilities as those that plague Georgia's DREs.

77.     Like any computer, a BMD is vulnerable to intentional forms of manipulation (such as hacking, installation of malware, or alteration of installed software), as well as unintentional forms of manipulation (such as bugs and misconfiguration).

78.     Indeed, specific vulnerabilities have already been identified with Dominion's election software and hardware.

79.     Dominion's election system was certified under a 14-year old standard (Voluntary Voting System Guidelines ("VVSG") 1.0) rather than the more recent VVSG 1.1 or VVSG 2.0 standards.

80.     56.Upon information and belief, Defendants Daniels, Members of the DeKalb Board, the DeKalb Board, Eveler, Members of the Cobb Board, and the Cobb Board, despite being presented with a recanvass request which explicitly informed them of their obligation to recanvass the requested precincts, refused to recanvass these precincts.

57.Upon information and belief, Secretary Kemp was informed of these proper requests for recanvassing and the denials of the requests, did not act toIn

February 2019, Texas voting systems examiners refused to certify Dominion's

election management system based upon several problems with the software.

According to these examiners, "several of the problems did not appear to have

ready-made or simple solutions." These problems included:

~~permit such recanvassing, and certified the election result, despite his knowledge that~~
~~voters had concerns about anomalies in identified precincts and voters' rights to~~
~~recanvass prior to certification had been violated.~~

(a)    The ability of Dominion's hardware to be connected to the

internet;

(b)    If the printer tray became ajar during the voting process the

system would wipe out all selections and require a voter to start over,

therefore requiring poll worker intervention and slowing down the

voting process;

(c)    The audit trail stored voter selections in sequential order, which

would permit the secrecy of the ballot box to be compromised;

(d)    Portions of the power cord connections are easily accessible

and may be unplugged by anyone;

(e)    The paths for import of election data into the election

management program revealed multiple opportunities for mistakes

and during testing required three separate restarts of the adjudication

process.

81.     During the 2019 DEFCON Voting Village,[1] Dominion's precinct scanners were made available to participating hackers. These hackers identified twenty vulnerabilities. One vulnerability was the ability of remote attackers to implement a DNS attack. Another vulnerability was the existence of an exposed flash card containing an .xml file that, if manipulated, would allow for scanned votes to be redirected to a different candidate.

82.     Additionally, the ImageCast X BMDs rely on software released in February 2015, which has not received security updates since March 2018.

83.     These many vulnerabilities could cause the BMD to print votes to the 2D barcode that do not match what the voter entered, or could cause a precinct scanner to improperly tabulate votes.

84.     Moreover, these vulnerabilities are not alleviated by the text summary available to an elector, because the 2D barcode actually relied upon to tabulate the vote may not necessarily match the text summary.

85.     Further, even if the 2D barcode is identical to the text summary,

---

[1] DEFCON is a hacking conference held annually since its founding in 1993. Since 2017, DEFCON has featured a Voting Machine Hacking Village, in which hackers attempt to infiltrate U.S. election infrastructure such as voting machines,

research has demonstrated that most voters are unlikely to review these summaries even when specifically directed to do so.

86.    Additionally, polling place exit interviews of voters who do choose to review a text summary of their vote reveal that some are unable to recall details of the ballots they cast even moments before. Voters fail to recognize errors in ballots presented to them for verification, or fail to recognize that the ballots presented to them for verification were not the ones they actually cast.

87.    On those occasions where a voter does notice a discrepancy in a 2D barcode, research suggests that they are far more likely to attribute the discrepancy to their own mistake. Therefore, they are unlikely to raise concerns about a systemic attack on an election.

88.    Even Dr. Shamos, the expert retained by GA SOS with respect to its election cybersecurity testified that if a BMD is going to be used, the more reliable approach is to use a BMD that produces a ballot readable by a human voter, rather than a bar code.

89.    Georgia's Proposed Election System is also susceptible to manipulation because Georgia has not committed to risk-limiting audits for its

upcoming elections.[2] The limited assurance offered by the Proposed Election

registration databases, and election office networks, to highlight potential cybersecurity vulnerabilities.
[2] For example, the National Academies of Sciences, Engineering, and Medicine's September 2018 report regarding voting

System's barcode verification is undermined by the absence of any commitment to actually auditing those barcodes.

90.    For these reasons, Georgia's Proposed Election System provides Georgia's voters with no greater guarantee than the current system that their votes will be accurately recorded and tabulated.

### III.  CLAIMS

**COUNT I: VIOLATION OF FUNDAMENTAL RIGHT
TO VOTE UNDER THE DUE PROCESS CLAUSE OF
THE 14TH AMENDMENT AND OF 42 U.S.C. § 1983**

**(All Plaintiffs against All Defendants in their Official ~~and Individual~~ Capacities~~, except State Board, Fulton Board, DeKalb Board, and Cobb Board~~)**

91.    ~~58.~~Plaintiffs incorporate the allegations of paragraphs 1 through ~~57~~90 above as if expressly realleged herein.

92.    ~~59.~~The right to vote is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

93.    ~~60.~~The fundamental right to vote encompasses the right to have that vote counted accurately, and it is protected by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

---

system integrity recommended the use of risk-limiting audits, in which individual randomly selected paper ballots are examined until sufficient statistical assurance as to the integrity of an election is achieved.

94.   61.Defendants violated Plaintiffs' fundamental right to vote by

deploying a DRE voting equipment system that by its design and management by

Defendants:

> (a)    Failed to provide reasonable and adequate protection against the
>
> real and substantial threat of electronic and other intrusion and
>
> manipulation by individuals and entities without authorization to do
>
> so;
>
> (b)    Failed to include the minimal and legally required steps to
>
> ensure that such equipment could not be operated without
>
> authorization; to provide the minimal and legally required protection
>
> for such equipment to secure against unauthorized tampering; to test,
>
> inspect, and seal, as required by law, the equipment to ensure that
>
> each DRE unit would count all votes cast and that no votes that were
>
> not properly cast would not be counted; and to ensure that all such
>
> equipment, firmware, and software is reliable, accurate, and capable
>
> of secure operation as required by law;
>
> (c)    Failed to provide a reasonable and adequate method for voting
>
> by which Georgia electors' votes would be accurately counted; and
>
> (d)Failed to provide reasonable, adequate and legally mandated methods
>
> and steps to ensure that the votes of Georgia electors were accurately

~~counted, including, but not limited to, by failing to allow for mandatory vote recanvassing in DeKalb and Fulton Counties in the Runoff, and required pre-Runoff re-examination of the DRE voting system by Defendant Kemp as formally and timely requested by certain Plaintiffs.~~.

95. ~~62.~~By choosing to move forward in using the non-compliant system, Defendants willfully and negligently abrogated their statutory duties and abused their discretion, subjecting voters to cast votes on an illegal and unreliable system—a system that must be presumed to be compromised and incapable of producing verifiable results.

96. ~~63.On~~Upon information and belief, despite their knowledge that the DRE Voting System ~~do~~does not comply and cannot be made to comply with the Election Code, these Defendants willfully and knowingly plan to continue to use ~~the~~this non- compliant ~~DRE System~~system in the Relevant Pending Elections.

97. ~~64.On~~Upon information and belief, Plaintiffs received no notice that their votes under the DRE ~~system~~Voting System could not be counted accurately due to ~~Defendant~~Defendants's material non-compliance with the Election Code.

98. ~~65.~~Defendants' violation of the Due Process Clause is patently and fundamentally unfair and therefore relief under 42 U.S.C. § 1983 is warranted.

Accordingly, Plaintiffs ask this Court to (a) declare that these Defendants violated the Due Process Clause of the Fourteenth Amendment; (b) enjoin Defendants' use of Georgia's DRE Voting System for future elections; and (c) award ~~nominal compensatory relief in the amount of $1, in recognition of these Defendants' violation of applicable federal and state laws and, as subsequent causation, the rights of Plaintiffs; and (d) award~~ attorneys' fees and costs for Defendants' causation of

concrete injury to Plaintiffs, whose fundamental right to have their vote counted as cast was thwarted.

### COUNT II: VIOLATION OF FUNDAMENTAL RIGHT TO VOTE
### UNDER THE EQUAL PROTECTION CLAUSE
### OF THE 14TH AMENDMENT AND OF 42 U.S.C. § 1983

### (Denial of Equal Protection to DRE Voters)

**(All Plaintiffs against All Defendants in their Official ~~and Individual~~ Capacities~~, except State Board, Fulton Board, DeKalb Board, and Cobb Board~~)**

99.   ~~66.~~Plaintiffs incorporate the allegations of paragraphs 1 through ~~65~~90 above as if expressly realleged herein.

100.   ~~67.~~The Equal Protection Clause of the Fourteenth Amendment mandates that "[n]o State shall ~~. . .~~. . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1.

101.   ~~68.~~The Equal Protection Clause protects the manner of the exercise of the right to vote, and a state may not value one person's vote over that of another. U.S. Const. amend. XIV § 1.

102.   ~~69.On~~Upon information and belief, ~~the Secretary of State~~GA SOS and the County ~~Boards~~Election Board Members allowed electors to vote in the Relevant Previous Elections using two different methods: (a) voting using the DRE Voting System and (b) voting using paper ballots (available to provisional and absentee voters).

103.   70.OnUpon information and belief, absentee paper ballots are verifiable, recountable ballots, which can be counted, reviewed, and discrepancies corrected under the supervision of a court.

104.   71.DRE ballots are counted electronically and cannot reliably prevent or detect errors or reliably determine the election results. The DRE Voting System:

> (a)   a.Produces only an electronic representation of a vote, with no independent reference document, and cannot therefore provide for a means by which the accuracy of the recording of DRE ballots can be tested or verified;

> (b)   b.Does not provide reasonable and adequate protection, as required by the Georgia Election Code, against the real and substantial threat of electronic and other intrusion and manipulation by individuals and entities without authorization to do so; or

> (c)   c.Provide a reasonable and adequate method for voting by which Georgia electors' votes would be accurately counted.

105.   72.The injuries suffered by Georgia electors were compounded dramatically by Defendants' failure to include the minimal and legally required steps to ensure that such equipment could not be manipulated or operated without authorization; to provide the minimal and legally required protection for such

equipment to secure against unauthorized tampering; to test, inspect, and seal as

required by law the equipment to ensure that ~~each~~the DRE ~~unit~~Voting

System would properly count all cast votes ~~cast~~ and ~~that no votes that were not~~

~~properly cast for that election would be counted~~discount any improperly cast votes;

and to ensure

that all such equipment, firmware, and software is reliable, accurate, and capable

of secure operation as required by law, and properly certified to comply with

Georgia Election Code and Election Rules.

106.   ~~73.On~~Upon information and belief, these Defendants failed to take

such steps to attempt to mitigate the security failures, and conduct an election on a

system that could comply with the Georgia Election Code. Instead, they continued

to rely on the DRE Voting System knowing that ~~these~~this voting ~~systems had~~

~~been~~system was unsecured, breached, and compromised, could not be presumed to

be safe, and ~~were~~was materially non-compliant with applicable Election Code

statutes and governing regulations.

107.   ~~74.~~By choosing to move forward in using the non-compliant

system, Defendants willfully and negligently abrogated their statutory duties and

abused their discretion, subjecting voters to cast votes on an illegal and

unreliable system—a system that must be presumed to be compromised and

incapable of producing verifiable results.

108. ~~75.~~The voters of the respective ballots have not been treated equally in that the votes of those who voted by DRE cannot be meaningfully recounted, reviewed against an independent record to verify, or have discrepancies detected and corrected. DRE votes are unequally weighted, with greater weight given to

those who vote by absentee paper ballot, whose votes can be verified as to voter

intent, can be accurately recounted, and can have processing errors identified and corrected, while votes cast by DRE, whose votes do not share those essential advantages.

~~76.Additionally, DRE voters' ballots are cast in a system that permits records to be kept to connect the voter with his or her, violating the DRE voter's rights to a secret ballot, while paper ballots are not marked with unique, potentially traceable identifiers, and cannot be connected to the voter.~~

109. ~~77.~~The rights of Georgia electors using DRE voting equipment to cast their ballots in the Relevant Previous Elections were also not treated equally by virtue of the egregious security failures in the CES election management server. Although the CES security failures put all voting system components at risk, the majority of the security failures could be mitigated for paper ballot votes, but not

for DRE votes. In an election contest, the paper ballots could be counted manually and voter intent and accurate tabulation determined, regardless of security failures that may impact DRE ~~system~~Voting System tabulations. DRE ~~system~~Voting System failures cannot be so mitigated nor the impact determined, creating unequal weighting between the two types of ballots cast.

110.    ~~78.~~The Plaintiffs who voted in Relevant Previous Elections using the DRE Voting System are all similarly situated to other registered electors in the same

elections who voted using the DRE Voting System. All Plaintiffs are eligible to vote in ~~Future~~the Relevant Pending Elections which may employ the improper DRE Voting System.

111.    ~~79.Defendant~~Defendants's conduct described herein violated the Fourteenth Amendment right of these Plaintiffs to enjoy equal protection of the law.

112.    ~~80.~~Accordingly, Plaintiffs ask this Court to (a) declare that these Defendants violated the Equal Protection Clause of the Fourteenth Amendment; (b)  enjoin Defendants' use of Georgia's DRE Voting System for future elections; ~~(c) award nominal compensatory relief in the amount of $1, in recognition of these Defendants' violation of federal laws and, as subsequent causation, the rights of~~

Plaintiffs; and (dand (c) award attorneys' fees and costs for Defendants' causation

of concrete injury to Plaintiffs, whose fundamental right to have their vote counted

as cast was unequally burdened.

**COUNT III: DENIALVIOLATION OF
PROCEDURALFUNDAMENTAL RIGHT TO VOTE
UNDER THE DUE PROCESS UNDERCLAUSE OF THE
FOURTEENTH14TH AMENDMENT AND
INFRINGEMENT OF THE FUNDAMENTAL RIGHT
TO VOTE;OF 42 U.S.C. § 1983**

**(All Plaintiffs against All Defendants in their Official and Individual
Capacities, except State Board, Fulton Board, DeKalb Board, and Cobb
Board)**

113.   81.Plaintiffs incorporate the allegations of paragraphs 1 through 8090

above as if expressly realleged herein.

82.The Due Process Clause of the Fourteenth Amendment declares that "no State shall
... deprive any person of life, liberty, or property, without due process of law." U.S.
Const. amend. XIV, §1.

114.   83.The right to vote is a fundamental right protected by the Due

Process Clause of the Fourteenth Amendment of the U.S. Constitution.

115.   84.The fundamental right to vote encompasses the right to have that

vote counted accurately, and it is protected by the Due Process Clause of the

Fourteenth Amendment of the U.S. Constitution.

116.   85.The systems, practices, policies, and procedures adopted and

~~implemented by Defendants substantially and unduly burdens, chills, and infringes~~

~~upon the fundamental right to vote using a secret ballot, in violation of the~~

~~substantive protections of the Due Process Clause of the Fourteenth Amendment~~

~~without due process of law by:~~ Defendants threaten to violate Plaintiffs'

fundamental right to vote by deploying the Proposed Election System that by its

design:

(a)     ~~a.Failing~~ Fails to provide reasonable and adequate protection ~~of~~

~~the voting system~~ against the real and substantial threat of electronic

and other intrusion and manipulation by individuals and entities

without authorization to do so;

(b)     ~~b.Failing~~ Fails to include the minimal and legally required ~~to~~

steps to ensure that such equipment ~~could not~~ cannot be operated

without authorization; to provide the minimal and legally required

protection for such equipment to

 secure against unauthorized tampering; to test, inspect, and seal, as

required by law, the equipment to ensure that ~~each DRE unit would~~

~~count all votes cast and that no votes that were not~~ all properly cast

~~for~~ votes are counted and that ~~election would be~~ votes improperly cast

are not counted; and to ensure that all such equipment, firmware, and

software is reliable, accurate, and capable of secure operation as

required by law;

(c)    c.~~Failing~~Fails to provide a reasonable and adequate method

for voting by which Georgia electors' votes ~~would~~will be accurately

counted~~; and~~

~~d.Failing to provide reasonable, adequate and legally mandated~~

~~methods and steps to ensure that the votes of Georgia electors were~~

~~accurately counted, including, but not limited to, by failing to allow for~~

~~mandatory vote recanvassing in DeKalb and Fulton Counties in the Runoff,~~

~~and required pre-Runoff re-examination of the DRE voting system by~~

~~Defendant Kemp as formally and timely requested by certain Plaintiffs.~~

~~86.These burdens and infringements are neither justified by, nor~~

~~necessary to promote, a substantial and compelling state interest that cannot be~~

~~accomplished by other, less restrictive means.~~

~~87.As a direct and proximate result of the continuing implementation of the~~

~~DRE Voting System by Defendants that deprives Georgia electors of their rights to~~

~~have their counts accurately recorded and counted, to vote in elections in which~~

~~election results can be accurately and confidently reported and legally~~

~~certified, and in which they can have confidence that the candidates~~

~~who won the most votes are seated, Plaintiffs and others similarly~~

~~situated have suffered and will suffer deprivation of and irreparable~~

~~harm to their fundamental constitutional right to vote, and will a suffer a chilling effect on their decisions to vote in Relevant Pending Elections. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize this harm. Unless Defendants are enjoined from continue to deploy systems and mechanisms for voting, including, but not limited to, the DRE system, that deprive Georgia electors of their electoral rights, Plaintiffs and others similarly situated will continue to suffer great and irreparable harm.~~

~~88.~~ ~~The foregoing deprivations of federal constitutional rights have been and will be effected by Defendants acting under color of state law.~~.

117.   By choosing to move forward with the Proposed Election System, Defendants willfully and negligently abrogated their statutory duties and abused their discretion, subjecting voters to cast votes on an illegal and unreliable system—a system that must be presumed to be compromised and incapable of producing verifiable results.

118.   Upon information and belief, despite their knowledge that the Proposed Election System does not comply and cannot be made to comply with the Election Code, these Defendants willfully and knowingly plan to use this system in

the Relevant Pending Elections.

119.   Defendants' violation of the Due Process Clause is patently and fundamentally unfair and therefore relief under 42 U.S.C. § 1983 is warranted. Accordingly, Plaintiffs ask this Court to (a) declare that Defendants' Proposed Election System violates the Due Process Clause of the Fourteenth Amendment; (b)  enjoin Defendants' use of the Proposed Election System for future elections; and (c) award attorneys' fees and costs for Defendants' causation of concrete injury to Plaintiffs, whose fundamental right to have their vote counted as cast will be thwarted.

**COUNT IV: DENIALVIOLATION OF PROCEDURAL DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND INFRINGEMENT OF THE FUNDAMENTAL RIGHT TO VOTE; 42 U.S.C. § 1983**

**(All Plaintiffs against All Defendants in their Official and Individual Capacities, except State Board, Fulton Board, DeKalb Board, and Cobb Board)**

89.Plaintiffs incorporate the allegations of paragraphs 1 through 88 above as if expressly realleged herein.

90.The Due Process Clause of the Fourteenth Amendment declares that "no State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

91.The systems, practices, policies, and procedures adopted and implemented by Defendants substantially and unduly burdens, chills, and infringes upon the fundamental right to vote using a secret ballot in violation of the

~~substantive protections of the Due Process Clause of the Fourteenth Amendment.~~

~~92.These burdens and infringements are neither justified by, nor necessary to promote, a substantial and compelling state interest that cannot be accomplished by other, less restrictive means.~~

~~93.As a direct and proximate result of the continuing implementation of the DRE machines by Defendants, which makes ballots cast by some voters individually identifiable, Plaintiffs and others similarly situated have suffered and will suffer deprivation of and irreparable harm to their fundamental constitutional right to vote using a secret ballot. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize this harm. Unless Defendants are enjoined from implementing the DRE machines, Plaintiffs and others similarly situated will continue to suffer great and irreparable harm.~~

~~94.The foregoing deprivations of federal constitutional rights have been and will be effected by Defendants acting under color of state law.~~

### ~~COUNT V: DENIAL OF~~ UNDER THE EQUAL PROTECTION CLAUSE OF THE ~~FOURTEENTH~~14TH AMENDMENT AND ~~THE INFRINGEMENT OF THE RIGHT TO VOTE;~~OF 42 U.S.C. § 1983

**(All Plaintiffs against All Defendants in their Official ~~and Individual~~ Capacities~~, except State Board, Fulton Board, DeKalb Board, and Cobb Board~~)**

120.    ~~95.~~Plaintiffs incorporate the allegations of paragraphs 1 through ~~94~~90

above as if expressly realleged herein.

121. ~~96.~~The Equal Protection Clause of the Fourteenth Amendment mandates that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1.

~~97.Plaintiffs who voted using DRE machines are, in all material respects, similarly situated to each other and to other persons who have voted and will vote in elections conducted by the Secretary by using optical scan systems or paper ballots.~~

122. ~~98.~~The ~~systems, practices, policies, and procedures adopted and implemented by Defendants treat Plaintiffs who use DRE machines differently than persons who vote by paper ballots by creating a disparate likelihood of their ballots being made identifiable, because DRE electronic ballots are permanently marked with a serial number that denotes the chronological order of voting on the DRE. When individual ballots are recorded chronologically, records can be maintained to connect the ballot with the voter. This is not true for absentee paper~~

~~ballots which are anonymous and contain no unique marks and are not maintained in a fashion that can be connected with the voter.~~
~~99.The systems, practices, policies, and procedures adopted and implemented by Defendants have deprived and will deprive Plaintiffs of their right to equal protection of the laws in violation of the~~ Equal Protection Clause ~~of the Fourteenth Amendment.~~

100.The burdens and infringements imposed on these fundamental rights are differentially imposed upon Plaintiffs and other voters without justification by any substantial or compelling state interest that cannot be accomplished by other, less restrictive means.

101.Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize this harm. Unless Defendants are enjoined from applying and approving systems, practices, policies and procedures that deprive Plaintiffs of equal protection of the laws, Plaintiffs will continue to suffer great and irreparable harm.

102.The foregoing deprivations of federal constitutional rights have been and will be effected by Defendants acting under color of state law.

**COUNT VI: VIOLATION OF STATE BALLOT SECRECY LAWS – Ga. Const. Art. II § 1 Par. 1, O.C.G.A. § 21-2-379.1(6)**

**(All Plaintiffs against All Defendants in their Individual Capacities, except State Board, Fulton Board, DeKalb Board, and Cobb Board)**

103.Plaintiffs incorporate the allegations of paragraphs 1 through 102 above as if expressly realleged herein.

104.The Georgia Constitution expressly guarantees to Georgia electors the right to vote by "secret ballot." Ga. Const. Art. II, §1, ¶1.

105.Georgia's election law codifies and builds upon this constitutional mandate by expressly providing that no voting machine can be used in George unless it "permit[s] and require[s] voting in absolute secrecy and shall be so

constructed that no person can see or know for whom any other elector has voted or is voting." Ga. Code Ann. § 21-2-379.1(6). protects the manner of the exercise of the right to vote, and a state may not value one person's vote over that of another. U.S. Const. amend. XIV § 1.

123.  106.The Secretary of State has violated this statutory obligation and deprived Georgia electors of their right to vote by absolutely secret ballot by deploying DRE system throughout Georgia that does not provide for "absolute secrecy." To the contrary, the DRE's used throughout the state would enable those who wish to determine how particular electors voted to do exactly that. This is a design flaw, violating federal voting system standards, that is inherent to the particular Diebold DRE system used through Georgia that is well-recognized by leading computer scientists and voting systems experts, and would be therefore known to Defendant King.

107.In particular, Georgia's Diebold DRE system records votes in the order in which they were cast in a numerical sequence, permanently marking the

electronic ballot with a unique serial number that can always be used to determine where it fell in the chronology of votes cast on the machine. Georgia's DRE units do not reorder or randomize the order of the ballots in any way to protect ballot secrecy, although federal voting system standards require such protection. Collecting votes in random order so that they cannot be traced to electors has been a

~~fundamentally important function in election administration since the late 1800's~~

~~when states began adopting the right to absolute secrecy in voting, which now all 50~~

~~states recognize.~~

~~108.But the DRE system used in Georgia does not provide even this most~~

~~basic, obvious, and critical feature to protect the secrecy of the ballot. By recording~~

~~votes in the sequence in which they were cast, the DRE allows votes to become~~

~~traceable to anyone who knows the order of the voters. As such, votes can be~~

~~matched to pollworker or pollwatcher records, polling place security video, or~~

~~ExpressPoll book timestamps to determine how voters voted.~~

~~109.For example, it is possible for election workers who have access to the~~

~~electronic ballot records and who have observed the order in which individuals have~~

~~cast their ballots to discover how those individuals voted.~~

~~110.A voter's identity could therefore be easily linked to their ballot by~~

~~observation of the order in which they voted. Plaintiffs who voted in the Relevant~~

~~Previous Elections were among those~~ Upon information and belief, GA SOS and the County Election Board Board Members plan on allowing electors to vote in the Relevant Pending Elections using two different methods: (a) voting using the

~~DRE machines, and thus their ballots were subject to being traced~~ Proposed Election System and (b) voting using paper ballots (available to provisional and absentee voters).

- 56 -

124.   Upon information and belief, absentee paper ballots are verifiable, recountable ballots, which can be counted, reviewed, and discrepancies corrected under the supervision of a court.

125.   The Proposed Election System, particularly its BMD system which generates an unreadable 2D barcode, cannot reliably prevent or detect errors or reliably determine the election results. The Proposed Election System:

(a)     Produces an unreadable 2D barcode to generate vote totals, and cannot therefore provide for a means by which its accuracy can be tested or verified;

(b)     111. Even if this vulnerability is not exploited, knowledge that a voter's electronic ballot may be connected back to the voter creates a chilling effect on voting one's conscience, or voting at all. This knowledge creates harm to the Plaintiffs and other voters at the time that they make their decision on whether to vote and how to vote, which may vary by election and their personal fear of reprisal.

112. The Secretary and Defendant King, by deploying throughout the State a DRE Voting System with this known design flaw that prevents Georgia electors from voting e in "absolute secrecy," violated Ga. Const. Art. II § 1 Par. 1, and Ga. Code Ann. § 21-2-379.1(6), and will continue to do so unless enjoined.

## COUNT VII: VIOLATION OF STATE ELECTRONIC VOTING SYSTEM LAW

### (All Plaintiffs against All Defendants in their Individual Capacities, except State Board, Fulton Board, DeKalb Board, and Cobb Board)

113.Plaintiffs incorporate the allegations of paragraphs 1 through 112 above as if expressly realleged herein.

114.The Georgia Constitution requires that elections be conducted in accordance with the laws and procedures of the State of Georgia. Ga. Const. Art. II, § 1, ¶ 1.

115.Georgia's election law requires that DRE Systems "shall, when properly operated, record correctly and accurately every vote cast." O.C.G.A. § 21-2-379.1(8) Does not provide reasonable and adequate protection, as required by the Georgia Election Code, against the real and substantial threat of electronic and other intrusion and manipulation by individuals and entities without authorization to do so; and

(c)     Does not provide a reasonable and adequate method for voting by which Georgia electors' votes would be accurately counted.

126.   116.In addition, Georgia's election law requires that prior to using each DRE System for voting, the superintendent of each county or municipality take certain steps to examine and then secure each DRE System so it cannot be

operated without authorization. O.C.G.A. § 21-2-379.6(a).117.Georgia's election law also requires that within days prior to an election, the superintendent take certain steps to test the DRE Systems to ascertain that each will correctly count the votes cast and to take additional testing measures in runoff elections that include the testing of all memory cards. O.C.G.A. § 21-2-379(6)(c).

118.Georgia's election law also requires the superintendent to take certain steps to have each DRE System tested, inspected, and sealed prior to delivery to the polling place and, prior to opening the polls each day on which the units will be used, requires the poll manager to break the seal on each unit, turn on each unit, certify that each unit is operating properly, and take and keep records that each unit is set to zero. O.C.G.A. § 21-2-379.7(b).

119.Furthermore, Georgia's election law requires the superintendent and poll managers to protect against molestation of and injury to the DRE Systems at

polling places and to call upon law enforcement officers for assistance when necessary. O.C.G.A. § 21-2-379.7(c).
120.Also, Georgia's election law requires that, on the day of any election, the superintendent ensure that each DRE System's tabulating mechanism is secure throughout the day during the primary or election. O.C.G.A. § 21-2-379.7(d)(3).

121.Georgia's election law also requires that the superintendent store the DRE Systems under his or her supervision or designate another party to provide secure storage of the DRE Systems when not in use at an election. O.C.G.A. § 21-

2. 379.9(b)

122. Furthermore, Georgia's voting systems must be certified, The injuries likely to be suffered by Georgia electors will be compounded dramatically by Defendants' failure to include the minimal and legally required steps to ensure that such equipment cannot be manipulated or operated without authorization; to provide the minimal and legally required protection for such equipment to secure against unauthorized tampering; to test, inspect, and seal, as required by law, the equipment to ensure that the Proposed Election System will count all votes cast and that no votes that were not properly cast for that election would be counted; and to "assure ensure that hardware all such equipment, firmware, and software have been shown to be is reliable, accurate, and capable of secure operation before they are used in elections in the State." Ga. Comp. R. & Regs. 590-8-1-.01(a)(3). as

required by law, and properly certified to comply with Georgia Election Code and Election Rules.

127.   123. On Upon information and belief, these Defendants violated Georgia failed to take such steps to attempt to mitigate the security failures, and conduct an election law and knew on a system that these voting systems had been could comply with the Georgia Election Code. Instead, they intend to rely on the Proposed Election System knowing that this system is unsecured, could be

breached~~,~~ and compromised~~; could not~~, cannot be presumed to be safe~~;~~, and ~~were~~is

materially non- compliant with applicable Election Code statutes and governing

regulations. ~~These Defendants were aware of numerous expert opinions advising~~

~~against the use of these systems in the Relevant Previous Elections because they~~

~~were neither safe nor accurate and should have been presumed to be compromised.~~


128.    ~~124.~~By choosing to move forward in using the proposed

non-compliant system, Defendants willfully and negligently abrogated their

statutory duties and abused their discretion, subjecting voters to cast votes on an

illegal and unreliable system—a system that must be presumed to be compromised

and incapable of producing verifiable results.

129.    The ~~DRE Voting System did not and cannot meet Georgia's statutory~~

~~and regulatory requirements for safety, security, and accuracy of the equipment.~~

~~125.On information and belief, despite their knowledge that the DRE Voting~~

~~System does not~~ comply with the Election Code, these Defendants willfully and

knowingly plan to ~~continue to use the non-compliant DRE System in Relevant~~

~~Pending Elections. This Court should enjoin these Defendants' illegal use in future~~

~~elections of Georgia's DRE System.~~

~~COUNT VIII: WRIT OF MANDAMUS~~

~~O.C.G.A.      § 9-6-20~~Requiring Exercise of the Public Duty to Reexamine
~~Georgia's DRE System Established by O.C.G.A. § 21-2-379.2(b) and to Use~~

**Optical Scan System or Paper Ballots in Lieu of DRE Machines to Comply with Requirements for Voting Machines**

**(All Plaintiffs against Defendant Secretary Kemp)**

126. Plaintiffs incorporate the allegations of paragraphs 1 through 125 above as if expressly realleged herein.

127. Under O.C.G.A. § 21-2-379.2(a), the Secretary of State may, at any time, in his or her discretion or upon request of electors, reexamine any DRE System.

128. The purpose of the Secretary of State's power to reexamine any DRE system at his discretion is to ensure that the DRE System can be "safely and accurately used by electors at primaries and elections." O.C.G.A. § 21-2-379.2(b).

129. Under O.C.G.A. § 21-2-379.2(c), a voting system that can no longer be safely or accurately used by electors because of any problem concerning its ability to accurately record or tabulate votes cannot be used.

130. O.C.G.A. § 21-2-334 states that when the use of voting machines is not possible or practicable, voting may be conducted by paper ballots.

131. Secretary Kemp was aware of numerous security breaches and statutory non-compliance of the DRE System, but acted in an arbitrary and capricious manner by ignoring security threats and grossly abused his discretion by failing to reexamine Georgia's DRE System before the Runoff after receiving the formal request for re-examination from citizens provided for in O.C.G.A. § 21-2-379.2(a).

132. On information and belief, Secretary Kemp plans to maintain approval of

the systems for use again in Relevant Pending Elections and beyond—despite being

fully aware of the burden the systems impose on Georgia electors' right to

vote and of the fact that the systems do not, and cannot, comply with

numerous provisions of the Election Code.

133. In failing to carry out this duty, Secretary Kemp deprived Plaintiffs of

rights secured by the Constitution and the laws of the United States as well as the

Constitution and the laws of the State of Georgia.

134. Apart from this Court's issuance of the writ of mandamus, Plaintiffs

have no other legal remedy to compel enforcement of Secretary Kemp's official,

public duty to conduct the reexamination required by Georgia Code Sections 21-2-

379.2(b), nor do they have any other remedy to compel enforcement of Secretary

Kemp's duties to remove from commission voting machines that are non-

compliant, and replace them with a safe, accurate, and legally compliant system.

135. For the reasons provided, Plaintiffs respectfully ask this Court to issue a

writ of mandamus for Secretary Kemp to fulfill his public duty to timely reexamine

the DRE System, to discontinue the use of the DRE System, and to utilize either a

fully compliant and certified optical scanning voting system, pursuant to Georgia

Code Section 21-2-366, or, pursuant to §§ 21-2-281 and 21-2- 334, use

hand-counted paper ballots in the conduct of Relevant Pending Elections. voters of

the respective ballots have not been treated equally in that the votes of those who

will vote using the Proposed Election System cannot be meaningfully recounted, reviewed against an independent record to verify, or have discrepancies detected and corrected. These votes are unequally weighted, with greater weight given to those who vote by absentee paper ballot, whose votes can be verified as to voter intent, can be accurately recounted, and can have processing

errors identified and corrected, while votes cast under the Proposed Election System, whose votes do not share those essential advantages.

130.   The Plaintiffs who intend to vote in the Relevant Pending Elections using the Proposed Election System are all similarly situated to other registered electors in the same elections who will vote using the Proposed Election System. All Plaintiffs are eligible to vote in the Relevant Pending Elections which may utilize the Proposed Election System.

131.   Defendants' conduct described herein violates the Fourteenth Amendment right of these Plaintiffs to enjoy equal protection of the law.

132.   Accordingly, Plaintiffs ask this Court to (a) declare that the Proposed Election System violates the Equal Protection Clause of the Fourteenth Amendment; (b) enjoin Defendants' use of the Proposed Election System for future elections; and (c) award attorneys' fees and costs for Defendants' causation of concrete injury to Plaintiffs, whose fundamental right to have their vote counted as

cast will be unequally burdened.

136.Apart from this Court's issuance of the writ of mandamus, Plaintiffs

have no other legal remedy to compel enforcement of Defendants Kemp, King,

CES and Eveler's official, public duty to issue the notice required under Georgia law
after a disclosure of PII.

137.For these reasons, Plaintiffs respectfully ask this Court to issue a Writ of

Mandamus ordering Defendants Kemp, King, CES and

## COUNT ~~IX~~V: ~~WRIT OF MANDAMUS~~DECLARATORY JUDGMENT

~~Requiring Exercise of~~Declaring that the ~~Public Duty to Use Optical Scan System or Paper Ballots in Lieu of DRE Machines to Comply with "Practicable" Requirements of O.C~~Proposed Election System Violates Act No. 24, H.~~G~~B.A. § ~~9-6-20~~ 316 (All Plaintiffs ~~against~~Against All Defendants ~~Members of State Board, State Board, Daniels, Members of the DeKalb Board, DeKalb Board, Eveler, Members of the Cobb Board, Cobb Board, Barron, Members of the Fulton Board, and Fulton Board, in their~~In Their Official Capacities)

133.   ~~138.~~Plaintiffs incorporate the allegations of paragraphs 1 through

~~137~~90 above as if expressly realleged herein.

134.   ~~139.O.C.G.A. § 21-2-334 states that when the use of voting machines is not possible or practicable, voting may be conducted by paper ballots. O.C.G.A.   § 21-2-366 states that authority may be given by any county or~~

~~municipality to authorize by majority vote to direct the use of optical scanning voting~~

~~systems.~~Act No. 24, House Bill No. 316 provides that "[a]s soon as possible . .

. all federal, state, and county general primaries and general elections as well as

special primaries and special elections in the State of Georgia shall be conducted with

the use of scanning ballots marked by electronic ballot markers." The law further

provides "that such electronic ballot markers shall produce paper ballots which are

marked with the elector's choices in a format readable by the elector."

135.  ~~140.State Board, County Board, and County Election Officials were~~

~~aware of numerous security breaches and statutory non-compliance of the DRE~~

~~System, but acted in an arbitrary and capricious manner by ignoring security threats~~

~~and~~"Scanning ballot" is defined, in relevant part, as "a printed paper ballot designed

to be marked by an elector with a ballot marking device or electronic marker or a

blank sheet of paper designed to be used in a ballot marking device or electronic

ballot marker, which is then inserted for casting into a ballot scanner."

136.  "Electronic ballot marker" is defined, in relevant part, as "an electronic

device that . . . uses electronic technology to independently and privately mark a

paper ballot at the direction of an elector . . . and print an elector verifiable paper

ballot."

137.  The Proposed Election System violates the clear mandates of Act No.

24, H.B. 316.

138.

grossly abused their discretion by failing remove from use DRE Systems that are not practicable.

141. On information and belief, State Board, County Board, and County Election Officials plan to use the systems again in Relevant Pending Elections and beyond—despite being fully aware of the burden the systems impose on Georgia electors' right to vote and of the fact that the systems do not comply with numerous provisions of the Election Code.

142. In failing to carry out this duty, State Board, County Board, and County Election Officials deprived Plaintiffs of rights secured by the Constitution and the laws of the United States as well as the Constitution and the laws of the State of Georgia.

143. Apart from this Court's issuance of the writ of mandamus, Plaintiffs have no other legal remedy to compel enforcement of State Board, County Board, and County Election Officials' official, public duty to remove from commission voting machines that are not "practicable," and replace them with a safe, accurate, and legally compliant system.

144. For the reasons provided, Plaintiffs respectfully ask this Court to issue a writ of mandamus ordering State Board, County Board, and County Election Officials to discontinue the use of the DRE System and to utilize either a fully

compliant and certified optical scanning voting system, pursuant to Georgia Code

Section 21-2-366, or, pursuant to §§ 21-2-281 and 21-2-334, use

hand-counted paper ballots in the conduct of Relevant Pending Elections.

**COUNT X: VIOLATION OF STATE LAW REQUIRING NOFITICATION OF UNAUTHORIZED DISCLOURE OF PERSONAL IDENTIFYING INFORMATION**

**(As to Plaintiffs Curling, Terry, Price, Schoenberg, L. Digges, W. Digges and Davis Against Defendants Kemp, King and Eveler)**

145. Plaintiffs incorporate the allegations of paragraphs 1 through 144 above as if expressly realleged herein.

146. Georgia law requires that "Any information broker or data collector that maintains computerized data that includes personal information of individuals shall give notice of any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of this state whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person. The notice shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subsection (c) of this Code section, or with any measures necessary to determine the scope of the breach and restore the reasonable integrity, security, and confidentiality of the data system." O.C.G.A. § 10-1-912.

147. During the period in question, the Secretary of State and KSU were "data collectors" as defined in O.G.A.C. §10-1-911(2), and collected or maintained

personal information of individuals ("PII"), including their names, birthdates, driver's license numbers and the last four digits of their SSNs. This information was collected for purposes of maintaining voter registration rolls and not for purposes of traffic safety, law enforcement, or licensing purposes or for purposes of providing public access to court records or to real or personal property information.

148. From at least August 2016 to March 2017, PII resident on a server maintained by CES could be accessed by the public without the use of a password or other authentication through the *elections.kennesaw.edu* website. From August 2016 to March 2017, this PII was known to be accessed at least five times by unauthorized individuals. And in each case, the unencrypted voter PII was successfully downloaded by the unauthorized individuals.

149. On at least two occasions during this period, Defendant King was made aware of this data breach. KSU issued a press release as to this data breach on March 1, 2017, and press accounts report that Defendant Kemp was aware of this breach by March 3, 2017.

150. From August 2016 until the filing of this Second Amended Complaint, Plaintiffs Curling, Terry, Price, Schoenberg, L. Digges, W. Digges and Davis have received no notice of this data breach from the Secretary of State in any form

permitted by O.G.A.C. §10-1-911(4).

151. In a separate incident, on April 15, 2017, four electronic pollbooks and memory cards containing the PII of voters in Cobb County were stolen.                    Press accounts have quoted Cobb County election officials as stating that these pollbooks contained state-wide voter information.

152. The Cobb County Board of Elections and Registration is a "data collector" as defined in O.G.A.C. §10-1-911(2), and collected or maintained personal information of individuals ("PII"), including their names, birthdates, driver's license numbers and the last four digits of their SSNs. This information was collected for purposes of maintaining voter registration rolls and not for purposes of traffic safety, law enforcement, or licensing purposes or for purposes of providing public access to court records or to real or personal property information.

153. From April 2017 until the filing of this Second Amended Complaint, Plaintiffs Curling, Terry, Price, Schoenberg, L. Digges, W. Digges and Davis have received no notice of this data breach from the Defendant Eveler in any form permitted by O.G.A.C. §10-1-911(4). Instead of producing "paper ballots which are marked with the elector's choices in a format readable by the elector," the Proposed Election System's BMDs produce an illegible and unverifiable 2D barcode along with a text summary of an elector's choices.

139. Similarly, the proposed BMDs do not print an "elector verifiable paper ballot." Instead, the proposed BMDs produce a 2D barcode purportedly

constituting an elector's paper ballot that is unverifiable by that elector.

140. 154.This Court should direct Defendants to issue the notice

required under Georgia law to Plaintiffs whose PII was disclosed as a

result of the two aforementioned breaches, and any other relief that this

Court deems proper.

**COUNT XI: WRIT OF MANDAMUS - O.C.G.A. § 9-6-20**

**Requiring Exercise of the Public Duty to Recanvass by Defendants DeKalb
Board, Cobb Board, Eveler, Daniels, and Kemp**

155.Plaintiffs incorporate the allegations of paragraphs 1 through 154

above as if expressly realleged herein.

156.Georgia election rules dictate that the "election superintendent shall,

either of his or her own motion, or upon petition of any candidate or political party

or three electors of the county or municipality, as may be the case, order a recanvass

of all the memory cards (PCMCIA cards) for a particular precinct or precincts for

one or more offices in which it shall appear that a discrepancy or error, although not

apparent on the face of the returns, has been made." Ga. Comp. R. & Regs.

183-1-12-.02(7)(a).

157.Georgia's DRE System must be presumed to have caused substantial

discrepancies or errors in returns, even if not apparent on the face of the returns.

Given the fundamental insecurity and lack of auditability of the DRE System,

direct evidence of manipulation is not required to establish the substantial

likelihood that discrepancies or errors did, in fact, occur in these particular returns.

158.On information and belief, at least three electors who are members of Plaintiff CGG petitioned the DeKalb Board and the Cobb Board to recanvass certain precincts in both counties.

159.Defendants Daniels, Members of the DeKalb Board, the DeKalb Board, Eveler, Members of the Cobb Board, and the Cobb Board, despite being presented with a recanvass request which explicitly informed them of their obligation to recanvass the requested precincts, refused to recanvass these precincts. The electors have a clear legal right to have the recanvass performed. Defendants' knowing refusal to recanvass is a violation of their duty and amounts to willful misconduct.

160.On information and belief, Secretary Kemp was informed of these proper requests for recanvassing and the denials of the requests, did not act to permit such recanvassing, and certified the election result, despite his knowledge that voters had concerns about anomalies in identified precincts and voters' clear legal rights to recanvass prior to certification had been violated. His knowing refusal to recanvass is a violation of his duty and amounts to willful misconduct.

161.Apart from this Court's issuance of the writ of mandamus, Plaintiffs have no other legal remedy to compel enforcement of Defendants' official, public duty to order a recanvass as requested and as required under Georgia law.

162.For these reasons, Plaintiffs respectfully ask this Court to issue a writ of mandamus ordering Defendants Daniels, Members of the DeKalb Board, the DeKalb Board, Eveler, Members of the Cobb Board, the Cobb Board, and Kemp to

recanvass these precincts permitting electors to explore presumed discrepancies, and any other relief that this Court deems proper.Accordingly, Plaintiffs request that the Court declare that the Proposed Election System violates Act No. 24, H.B. 316.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask this court:

141.   163.To grant declaratory relief deeming that Defendants have violated the Georgia Constitution, the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983, and Georgia election law, including Georgia's system certification regulations and safety and security provisions;

164.To grant declaratory relief deeming that Defendants Daniels, Members of the DeKalb Board, the DeKalb Board, Eveler, Members of the Cobb Board, and the Cobb Board are in violation of their duty to re-canvass these precincts permitting electors to explore presumed discrepancies and propose their correction prior to election certification;

142.   165.To grant injunctive relief prohibiting Defendants from using any system or devices for voting, including, but not limited to, Direct Recording

Electronic ("DRE") voting equipment the DRE Voting System and the Proposed

Election System, that does not fully satisfy the obligations of the Defendants under

Georgia Code Sections 21-2-322, 21-2-379.1(8), 21-2-379.2 (a),

21-2-379.2 (b), 21-2-379.2 (c), 21-2-379.6 (a), 21-2-379.6 (c), 21-2-379.7 (b), 21-

2-379.7 (c), 21-2-379.7 (d)(3), and 21-2-379.9 (b), 21-2-379.22(6), 21-2-379.22(8),

21-

2-379.23(d), 21-2-379.24, and 21-2-379.26; Georgia Rule and Regulation Section

590-8-1-.01(a)(3); and Georgia Constitution Article II, Section

 1, Paragraph 1 that protect the rights of Georgia electors under Georgia law and

under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

143.    166. To grant an Order directing Defendants to submit to the Court

within thirty days of entry of the Court's Order a plan providing in sufficient detail

for the Court to evaluate the specific steps they intend to take to comply with the

terms of the Court's Order.

167. To issue a writ of mandamus ordering Secretary Kemp to fulfill his

public duty to timely reexamine the DRE System, to discontinue the use of the

DRE System, and to utilize either a fully compliant and certified optical scanning

voting system, pursuant to Georgia Code Section 21-2-366, or, pursuant to §§ 21-

2-281 and 21-2-334, use hand-counted paper ballots in the conduct of Relevant

Pending Elections.

168. To issue a writ of mandamus ordering State Board, County Board, and County Election Officials to discontinue the use of the DRE System and to utilize either a fully compliant and certified optical scanning voting system, pursuant to Georgia Code Section 21-2-366, or, pursuant to §§ 21-2-281 and 21-2-334, use hand-counted paper ballots in the conduct of Relevant Pending Elections.

169. To issue a writ of mandamus ordering Defendants Kemp, King, CES, and Eveler to issue the notice required under O.C.G.A. § 10-1-912 to Plaintiffs whose Personal Identifying Information (PII) was disclosed as a result of security breaches, and any other relief that this Court deems proper.

170. To issue a writ of mandamus ordering Defendants Daniels, Members of the DeKalb Board, the DeKalb Board, Eveler, Members of the Cobb Board, the Cobb Board, and Kemp to recanvass these precincts permitting electors to explore presumed discrepancies.

171. To grant nominal compensatory damages in the amount of $1, in recognition of Defendants' violation of applicable federal and state laws, which have caused harm to Plaintiffs;

144. 172. To award attorneys' fees and costs for the deprivation of civil rights arising from alleged Defendants' patent and fundamental unfairness in conducting elections on Georgia's Voting System, causing 42 U.S.C. § 1983 violations; and

145. 173. To grant all other relief this Court deems proper.

Dated: ~~September 15~~August 16, ~~2017~~2019 Respectfully submitted,

~~/s/Bryan M. Ward BRYAN M. WARD~~
/s/ David D. Cross
David D. Cross
~~Georgia Bar No.~~
~~736656 MARVIN LIM~~
~~Georgia Bar No. 147236~~
~~HOLCOMB AND WARD, LLP Suite~~
~~400~~(admitted *pro hac vice*) John
P. Carlin (admitted *pro hac vice*)
Robert W. Manoso (admitted *pro
hac vice*) Jane P. Bentrott
(admitted *pro hac vice*)
MORRISON & FOERSTER LLP 2000
Pennsylvania Avenue, NW Suite 6000
Washington, DC 20006 Telephone: (202)
887-1500 DCross@mofo.com
JCarlin@mofo.com JBentrott@mofo.com
RManoso@mofo.com
~~3399~~

Halsey G. Knapp, Jr.
GA Bar No. 425320
Adam M. Sparks GA
Bar No. 341578
KREVOLIN & HORST, LLC 1201 West
Peachtree ~~Road, NE~~Street, NW Suite 3250
Atlanta, GA ~~30326~~30309 Telephone: (404)
~~601-2803 Facsimile: (404)~~
~~393-1554~~888-9700
HKnapp@khlawfirm.com
Sparks@khlawfirm.com

*Counsel for Plaintiffs Donna Curling,
Donna Price & Jeffrey Schoenberg*

PROOF

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, ET AL., Plaintiffs, v. BRIAN RAFFENSPERGER, ET AL., Defendants. | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

 /s/ David D. Cross
David D. Cross

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| DONNA CURLING, ET AL., Plaintiffs, v. BRIAN RAFFENSPERGER, ET AL., Defendants. | **Civil Action No. 1:17-CV-2989-AT** |

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2019, a ~~true~~ copy of the ~~above~~ ~~document~~foregoing was ~~served upon the attorneys of record through the Court's~~ ~~electronic filing service on September 15, 2017.~~ ~~/s/ Bryan M. Ward~~

~~Bryan M. Ward~~electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.
/s/ David D. Cross
David D. Cross