```
1               IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,           :
                                     :
5           PLAINTIFFS,              :
    vs.                              :  DOCKET NUMBER
6                                    :  1:17-CV-2989-AT
    BRAD RAFFENSPERGER, ET AL.,      :
7                                    :
            DEFENDANTS.              :
8

9

10          TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11             BEFORE THE HONORABLE AMY TOTENBERG

12               UNITED STATES DISTRICT JUDGE

13                    AUGUST 27, 2019

14                      10:33 A.M.

15

16

17

18

19

20

21   MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                 TRANSCRIPT PRODUCED BY:

23

    OFFICIAL COURT REPORTER:          SHANNON R. WELCH, RMR, CRR
24                                    2394 UNITED STATES COURTHOUSE
                                      75 TED TURNER DRIVE, SOUTHWEST
25                                    ATLANTA, GEORGIA  30303
                                      (404) 215-1383
```

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:

 4

 5        DAVID D. CROSS
          MORRISON & FOERSTER, LLP

 6
          ADAM M. SPARKS
 7        KREVOLIN & HORST, LLC

 8

 9   FOR THE PLAINTIFF COALITION FOR GOOD GOVERNANCE:

10

          BRUCE BROWN
11        BRUCE P. BROWN LAW

12        ROBERT A. McGUIRE III
          ROBERT McGUIRE LAW FIRM

13

14   FOR THE STATE OF GEORGIA DEFENDANTS:

15

          VINCENT ROBERT RUSSO, JR.
16        CAREY A. MILLER
          JOSHUA BELINFANTE
17        KIMBERLY ANDERSON
          BRIAN LAKE
18        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

19

          BRYAN P. TYSON
20        BRYAN JACOUTOT
          TAYLOR ENGLISH DUMA

21

22   FOR THE FULTON COUNTY DEFENDANTS:

23

          CHERYL RINGER
24        DAVID LOWMAN
          OFFICE OF THE FULTON COUNTY ATTORNEY
25                                       (...cont'd....)
```

1     (...cont'd....)

2


3     **FOR THE OBJECTORS CARE IN ACTION, INC., ET AL:**

4
           DARA LINDENBAUM
5          SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.

6          KURT G. KASTORF
           THE SUMMERVILLE FIRM, LLC
7

8     **ALSO PRESENT:**

9

10         J. ALEX HALDERMAN, Ph.D.
           MARILYN MARKS
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      P R O C E E D I N G S

2      (Atlanta, Fulton County, Georgia; August 27, 2019.)

3                 COURTROOM DEPUTY CLERK:  Good morning, everyone.

4      We're here for a teleconference in Curling vs. Raffensperger,

5      Civil Action Number 17-CV-2989.

6                 Beginning with the Curling plaintiffs, would counsel

7      please make their appearance for the record.

8                 MR. TYSON:  Mr. Martin, this is Bryan Tyson for the

9      state defendants.  I have seen a couple of emails from

10     Mr. Cross and Mr. McGuire that the access code was not working

11     correctly for them.  So I'm not sure there is anybody from the

12     plaintiff that is on the phone.

13                COURTROOM DEPUTY CLERK:  Okay.  Thank you.  Let me go

14     and check that out real quick.

15                      (There was a brief pause in the proceedings.)

16                LAW CLERK COLE:  Counsel, this is Ms. Cole.  Is

17     everyone on the line now?

18                MR. CROSS:  David Cross is on for Curling plaintiffs.

19     I think our expert, Dr. Halderman, may dial in any minute.  I

20     just sent him the correct code.

21                      (There was a brief pause in the proceedings.)

22                COURTROOM DEPUTY CLERK:  Okay.  Let's try this again.

23     We are here for the teleconference in Curling vs.

24     Raffensperger, Civil Action Number 17-CV-2989.

25                Beginning with the Curling plaintiffs, would counsel
```

1    make their appearance for the record.

2         MR. CROSS:  Good morning.  This is David Cross from

3    Morrison Foerster.  And also on the line is Dr. Alex Halderman.

4         MR. BROWN:  This is Bruce Brown for the Coalition

5    plaintiffs.

6         MR. McGUIRE:  This is Robert McGuire for Coalition

7    plaintiffs, as well.  I believe Marilyn Marks is on the line,

8    as well, for the Coalition as the executive director.

9         COURTROOM DEPUTY CLERK:  Thank you.

10        State of Georgia?

11        MR. RUSSO:  Vincent Russo with Robbins Ross Alloy

12   Belinfante Littlefield.

13        MR. TYSON:  And Bryan Tyson with Taylor English,

14   along with Bryan Jacoutot.

15        MR. RUSSO:  And I have here with me Kimberly

16   Anderson, Josh Belinfante, Carey Miller, and Brian Lake.

17        THE COURT:  Thank you.

18        COURTROOM DEPUTY CLERK:  Fulton County?

19        MS. RINGER:  Good morning.  Cheryl Ringer and David

20   Lowman.

21        COURTROOM DEPUTY CLERK:  Thank you.

22        Did anyone else just join recently?

23        MR. SPARKS:  Yes.  This is Adam Sparks with Krevolin

24   & Horst for the Curling plaintiffs.

25        MR. KASTORF:  This is Kurt Kastorf with the

1    Summerville Firm.  I represent some nonparty subpoena targets

2    who are also plaintiffs in the Fair Fight litigation.

3            COURTROOM DEPUTY CLERK:  I'm sorry.  State your name

4    again, please.

5            MR. KASTORF:  Kurt Kastorf.

6            COURTROOM DEPUTY CLERK:  Spell your last name,

7    please.

8            MR. KASTORF:  K-A, S like Sam, T like Tom, O, R like

9    Roger, F like Frank.

10           THE COURT:  This is Judge Totenberg.  Is that -- has

11   everyone on the phone announced themselves?

12           MS. LINDENBAUM:  This is Dara Lindenbaum.  I also

13   represent a number of the third parties that received

14   subpoenas.

15           COURTROOM DEPUTY CLERK:  I'm sorry.  State your name

16   again and spell your last name, please.

17           MS. LINDENBAUM:  Dara Lindenbaum,

18   L-I-N-D-E-N-B-A-U-M.

19           THE COURT:  Okay.  I'm going to need everyone who is

20   a third party to immediately email, even if you are just from

21   your phone, Mr. Martin and indicate your name and who exactly

22   you are representing.  I can't proceed with your just not

23   having identified yourself in advance.  And I'm not expecting

24   you to put it on the docket at this late point, though I think

25   it would have been a courtesy to do so and appropriate.

```
1              But I need you to go ahead and -- do you have

2    Mr. Martin's email?

3              MS. LINDENBAUM:  Yes.

4              THE COURT:  So each one of you who is representing a

5    third party -- one or more third parties needs to go ahead and

6    email him this moment.  Indicate your name, your law firm, and

7    who you are representing specifically.  Not just a third

8    party -- you can't just say a third party.

9              MR. KASTORF:  Understood, Your Honor.

10             THE COURT:  Are there any other -- I have now had two

11   attorneys identify themselves as having been served with a

12   subpoena.  And I'm not really sure what the purpose of your

13   presence is on the phone calls.  But I'm going to start with

14   you.  So that is why I want to know exactly who you are.

15             Is there anyone else here representing a third party?

16             Okay.  All right.  Meanwhile, of the defendants --

17   state defendants' counsel who identified themselves, the only

18   one I actually heard clearly was Mr. Tyson.  I heard originally

19   Mr. Russo clearly.  But not or maybe -- maybe not.  But there

20   was a lot of electricity like you were on a -- are you-all on a

21   speakerphone?  Mr. Belinfante and Mr. Russo and at least one

22   other was unclear.

23             MR. RUSSO:  Yes, ma'am.  This is Vincent Russo.  Is

24   that -- can you hear me right now?

25             THE COURT:  I can hear you.  But there is a lot of
```

```
1   static.  Are you on a speakerphone?
2           MR. RUSSO:  We are on a speakerphone in our
3   conference room.  And I'm getting a little bit of echo also.
4   We can try to call back in.
5           THE COURT:  All right.  All right.  That would be
6   great.  We might not get better than that.  I can hear you, but
7   it is just more annoying than indecipherable.
8           MR. RUSSO:  Yes, ma'am.  We'll call right back.
9           THE COURT:  Thank you very much.  We're going to wait
10  here until we get the emails from the counsel for the third
11  parties.
12          (There was a brief pause in the proceedings.)
13          THE COURT:  That's better, Mr. Russo.  Thank you very
14  much.
15          MR. RUSSO:  Yes, ma'am.
16          Do you need me to clarify who all is here with me?
17          THE COURT:  No.  We could hear it.  It was going to
18  make it very unpleasant to listen to you, which we have enough
19  communication issues without -- without your communication
20  issues.
21          All right.
22          (There was a brief pause in the proceedings.)
23          MR. KASTORF:  Your Honor, this is Kurt Kastorf, one
24  of the attorneys representing the third-party subpoena targets.
25  I just sent an email to Mr. Martin with my name and who I
```

1  represent, and it also included Dara Lindenbaum, who is the

2  other counsel on the call representing those -- the subpoena

3  targets named in that email.

4          THE COURT:  So you are saying that you included the

5  information for the other third-party defendant also?

6          MR. KASTORF:  Yes, Your Honor.  Ms. Lindenbaum and I

7  are both representing the same set of third-party subpoena

8  targets.

9          THE COURT:  I see.

10          MR. KASTORF:  So there were subpoenas sent in this

11  litigation to the plaintiffs -- the named plaintiffs in the

12  Fair Fight litigation in front of Judge Jones.  We received an

13  email from Mr. Martin notifying us of this telephone

14  conference.  So we joined in case any issues related to those

15  subpoenas would be discussed.

16          If the Court doesn't need us for anything, we are

17  happy to get off of the phone.  But that is why we called.

18          THE COURT:  All right.  So I'm sorry.  Who served you

19  with a subpoena?

20          MR. KASTORF:  The defendants in this litigation.

21  I'll need to check the subpoenas to see if it is each of the

22  named defendants -- but served subpoenas on the various named

23  plaintiffs in the Fair Fight litigation.  And then we filed

24  objections on behalf of each of those plaintiffs.  Those are

25  Docket Entries 515 through 521 on this docket.  And there

1   hasn't been any further movement on that since we filed the

2   objections.

3           THE COURT:  All right.

4           MR. BELINFANTE:  Your Honor, this is Josh Belinfante.

5   It was the state defendants that did so.  Just for some

6   background, as part of that, we received the joint litigation

7   document.  And we had notified the third-party subpoena

8   recipients that we would put a placeholder on everything until

9   after the preliminary injunction hearing.  And we have not

10  moved to do anything with the subpoenas since.

11          As we are now trying to determine what is the scope

12  of discovery going forward, there is no immediate deadline

13  there given where things stand currently.

14          THE COURT:  But you sent them a subpoena in this

15  case, not in the Fair Fight case?

16          MR. BELINFANTE:  That's correct.

17          THE COURT:  And is there anything that Mr. Kastorf or

18  Ms. Lindenbaum need to be present for in this phone conference?

19          MR. BELINFANTE:  From the state's perspective,

20  depending on what the Court, you know, provides in terms of

21  guidance on the future scope of discovery, I don't think so.

22  We have actually worked relatively well with the third-party

23  subpoena recipients.  And as of now, there is nothing that we

24  are saying compels them to produce anything.

25          So depending on how this Court rules, then we may

1    have to go through a meet-and-confer and then revisit the

2    issue.  But even that, Your Honor, has not been fully decided

3    as the joint defense or -- excuse me -- the joint litigation

4    document has been produced.  And that would raise additional

5    issues that we're, frankly, not ready to address today.

6                THE COURT:  All right.  Is there any reason from the

7    perspective of the -- any of the plaintiffs that Ms. Lindenbaum

8    and Mr. Kastorf need to participate today?

9                MR. BROWN:  This is Bruce Brown.  No, Your Honor.

10               THE COURT:  From the Curling plaintiffs?

11               MR. CROSS:  No, Your Honor.

12               THE COURT:  Is that Mr. Cross?

13               MR. CROSS:  Yes.  Sorry.

14               THE COURT:  All right.  Mr. Kastorf and

15   Ms. Lindenbaum, you are not maintaining that you need to

16   participate, I gather?

17               MR. KASTORF:  No.  We called in because we received

18   the telephone conference notice.

19               THE COURT:  All right.  I think that it simply is on

20   the docket.  That is the -- it is the notice on the docket as a

21   whole.

22               All right.  Well, then you are excused from

23   participation, and we'll try to get -- in the future make clear

24   who is needed in a more specific way then.

25               Thank you very much for participating in this long

1    introduction and piece of confusion.  I appreciate it.

2              MS. LINDENBAUM:  Thank you, Your Honor.

3              THE COURT:  All right.  So back to square one,

4    you-all have filed lots of different things about what you want

5    to talk about today.  So it sort of has a little bit ballooned.

6    It likely will take a little more time than I initially

7    envisioned.

8              I think that the most fundamental question here is

9    this about where the case is moving forward and what the status

10   of discovery is and how -- just the welter of disputes that

11   exist.  Obviously I issued a very long and comprehensive order.

12             Your scheduling order anticipated that there would be

13   still another trial on the merits in January and a final

14   decision.  It is hard to imagine, frankly, any more litigation

15   resources being devoted to the current dispute in terms of the

16   DRE GEMS system as currently configured for a variety of

17   reasons, but not the least of which is that I think that the

18   Court has exhausted the resources of looking at this.  And I

19   don't think there is more useful information for purposes of a

20   trial or more that would be achieved.

21             So I'm trying to understand what would be the purpose

22   of further discovery at this juncture about this old system.  I

23   understand that there may be some in connection with

24   implementation of a remedy.  But that is the first sort of

25   piece of confusion.  And it is really, frankly, for both sides.

1        On one hand, I see that the plaintiffs are trying to

2   want discovery more on the DRE equipment.  And on the other

3   side, the defendants appear to want to do more discovery on

4   Dr. Halderman's card that he used in the first preliminary

5   injunction hearing.

6        And so I'm just wondering where you-all are going on

7   both sides because it is hard for me to conceptualize what we

8   would be dealing with in January even if I said we could

9   actually proceed in January at this point given the amount of

10  information that already -- and evidence that has already been

11  filed and the fact that in some way or form something is going

12  to move forward.

13       Now, I understand that the plaintiffs and petitioners

14  who have challenged are seeking to challenge the new system.

15  But I'm just asking about this system.  Are you-all

16  conceptualizing that you would actually go forward and seek a

17  full trial on the merits after what we've already gone through?

18       MR. CROSS:  Your Honor, this is David Cross for the

19  Curling plaintiffs.  I think for the Curling plaintiffs -- and

20  Mr. Brown and Mr. McGuire can obviously speak for their

21  plaintiffs.  I think the short answer on that is no, with a

22  caveat, which is we have asked the defendants a number of times

23  a couple of important questions that they have declined to

24  answer.

25       One is will they stipulate to the preliminary

1    injunction as a permanent injunction.  If they will, then I

2    think that certainly resolves any need for a trial on the

3    merits.  But if they are going to refuse to do that, then I'm

4    not sure where we go.  There would have to be some further

5    proceeding.

6            I certainly agree Your Honor doesn't need any further

7    evidence to turn that into a permanent injunction.  But until

8    we have a permanent injunction that is either stipulated to by

9    defendants or is entered by the Court, then it is a live case.

10   It has to go forward.

11           And if they are going to take the position to keep

12   open the possibility that they will oppose a permanent

13   injunction, we have to get discovery to be in a position to

14   respond to whatever defenses they are going to assert.

15           And related to that, of course, is whether they are

16   going to appeal.  They have not been willing to answer that

17   either.  And that, of course, puts them in the permanent -- I'm

18   sorry -- the preliminary injunction becomes an open question if

19   they are going to exercise their appeal on that as well.  So

20   the first point I would make is:  As long as they are keeping

21   their rights open, the case is live and it goes forward.

22           The second point I would make, Your Honor, is there

23   are aspects of Your Honor's order that are going to require

24   some amount of cooperation and discovery between the parties.

25   Dr. Halderman's declaration -- and I apologize.  We got it in

1    as quickly as we could.  I know it went in late last night.

2          But if you have had an opportunity to just peruse

3    that --

4          THE COURT:  I read it.

5          MR. CROSS:  -- he identifies -- great -- he

6    identifies a number of areas where we think some amount of

7    discovery will be needed to make sure that prospective relief

8    is effected.

9          Then the last point I would make, Your Honor, is we,

10   of course, understand Your Honor's ruling on the 2019

11   elections.  But I would just offer this.  It still remains the

12   fact that no one has ever examined the system despite

13   Dr. Shamos himself emphasizing a number of ways that that needs

14   to be done before the election.

15         And so our concern is from a prospective basis just

16   imagine the situation where the system actually is compromised

17   and no one knows because no one will look.  We believe we do

18   have a fundamental constitutional right to continue with that

19   discovery until we've confirmed that.

20         The problem is you've got the Secretary of State

21   repeatedly telling the public that they have complete

22   confidence in this system and the voters should have confidence

23   in the system and it will get used this year.

24         The reality is that the Secretary of State does not

25   have confidence in the system because, if he did, he would

1    allow Dr. Shamos or Ms. Payton or someone to examine it.  We

2    think that it is important.  As Your Honor pointed out in your

3    own order, as Dr. Shamos emphasized, voter confidence is

4    critical.

5              They have no basis to oppose the examination in a

6    live case.  And if they are right that the system is fine, then

7    it is a win-win.  Right.  We'll confirm that.  Voters will

8    confirm that.  They will confirm that.  And it can get done

9    before the 2019 election.

10             If they are wrong, then it doesn't matter what timing

11   is left.  The system cannot be used.  And I would hope we would

12   all agree on that.

13             So it seems there are only two paths forward on this.

14   One is:  They are right.  We do this.  We get it done, and

15   everybody wins because voter confidence is confirmed.  Or they

16   are wrong.  And no matter if we figure that out a week before

17   the election, everyone would have to agree that the system

18   could not be used if it is compromised in a way that affects

19   the outcome.

20             And so that is where we come down on this, Your

21   Honor.  It is a live case with prospective relief on the

22   election that is going forward.  And to this day, no one has

23   done what their own experts said needs to get done for voters

24   to have confidence or even know that the results are going to

25   count in the way that they are intended.

1          MR. BROWN:  Your Honor, this is Bruce Brown for the

2    Coalition plaintiffs.  We would substantially agree with

3    Mr. Cross' statement.  You introduced -- Your Honor, you

4    introduced the issue by referencing the implementation issues

5    that are still very much alive.  And this is complex, of

6    course, significant injunctive relief that has a lot of

7    different aspects to it.  The Court has a lot of flexibility in

8    fashioning relief to meet the equities in the underlying facts.

9          There are open issues with respect to whether the new

10   system will be certified and will be deployed in time, which

11   issues will aggravate the problems with the existing underlying

12   system as being deployable with hand-marked paper ballots.

13         So we believe that -- the other point that I would

14   make is that the state's position is not that this discovery

15   that is being sought is burdensome on the state because it is

16   not.  This is forensic discovery, whether it is with respect to

17   the FBI image server, an issue that we had hoped to have to you

18   by this conference but was delayed -- and we will submit that

19   as soon as we can under the joint dispute resolution process --

20   or the forensic discovery of the servers.  This is efforts that

21   will be undertaken by the plaintiffs.

22         And what we're asking of the defendants is simply to

23   allow us to do it for the most part.  That is not all the

24   discovery.  But that is sort of the most urgent right now that

25   Mr. Cross has been referring to.

1          And so we agree about the nature of this preliminary

2     injunction.  It has been and is a material alteration of the

3     relationship between the parties.  And in many ways, if it is

4     not like a TRO, it resembles much more a permanent injunction

5     already in practical effect.  And so the utility of a trial on

6     these issues -- a formal trial is uncertain.

7          However, given the implementation issues and the

8     other issues that Mr. Cross mentioned, particularly the lack of

9     burden on the defendants, this kind of discovery needs to go

10    forward at this time.

11          THE COURT:  All right.

12          MR. RUSSO:  Your Honor, this is Vincent Russo for the

13    state defendants.  You asked where is this case going and the

14    status of discovery.  And I think that from our perspective

15    there is no need to expend additional resources on further

16    discovery related to the DREs and the GEMS.

17          Your order has laid out what we can and cannot do,

18    minus the need for clarification on a few issues that we have

19    raised, which are really more in terms of what we need to

20    provide to you.  There is in our mind nothing else to do here.

21    And the order is the order.

22          Compliance with the order though does not require

23    additional discovery.  So, you know, while I understand that

24    the plaintiffs are continuing to go on a mission to get more

25    information and would like to be able to review everything,

1     there is just no need for that at this point in the case.

2          And we have a motion to -- for leave to amend to file

3     a third amended complaint as to the BMDs.  That is also on the

4     table for consideration.  The case is going and appears to be

5     going in that direction.  But, you know, there is no need for

6     us to continue to have to address these other -- these other

7     discovery issues.  We had the hearing.  And, you know,

8     compliance with the order does not require further discovery.

9          As to your question about Dr. Halderman and our

10    request for information about the memory card that was produced

11    to state defendants, that was simply part of the email chain

12    and could have -- should have just been ignored.  That was more

13    a result of us leaving that in the email chain instead of

14    blacking it out.  But it was also something that we had

15    requested prior to the preliminary injunction order being

16    issued.  So that is no longer an issue at this juncture.

17         THE COURT:  All right.  Well, it seemed to me that

18    there were two major strands that the plaintiffs were focusing

19    on.  One was the contention that because the elections still

20    are going on and the case is alive, even if I have already

21    ruled as to appropriate -- the relief I'm willing to grant at

22    this juncture, that you -- the plaintiffs' counsel still have

23    an obligation and right to complete discovery with respect to

24    the functionality and potential compromise of the hardware and

25    equipment, if I hear you correctly.  And the second issue was

1     with respect to implementation of the remedy.

2             Is that a fair summary?

3             MR. CROSS:  This is David Cross.  Yes, I think that

4     is fair, Your Honor.

5             MR. BROWN:  Yes, Your Honor.

6             THE COURT:  Well, I think that I am going to just --

7     before we proceed, I'm going to take a few minutes and just go

8     offline.  And I guess, you know, I really didn't know what your

9     position was.  So I need to think about what you are all saying

10    for a moment.  And then we'll resume.

11            All right.  So it will be a few minutes.

12            MR. RUSSO:  Your Honor, this is Vincent Russo.  If I

13    could just clarify --

14            THE COURT:  Sure.

15            MR. RUSSO:  -- now that the plaintiffs have clarified

16    their two positions.  Just regarding Number 1, on the

17    contention that elections are still going on and so discovery

18    is needed, you know, we don't see what relief the discovery

19    would lead to at this point in light of the preliminary

20    injunction -- in the light of the preliminary injunction order.

21            As to the implementation of the remedy, the order

22    requires certain updates and filings to be made.  And that is

23    merely compliance with the order and not necessarily the need

24    for discovery.  And if their amended complaint goes forward,

25    then we'll address these BMD issues when the time comes.

1          MR. CROSS:  Your Honor, this is David Cross.  Could I

2     just very briefly respond to the first point?

3          THE COURT:  Yes.

4          MR. CROSS:  The reason why the discovery is important

5     on the examination that we've requested -- and there are two

6     respects to it.  Mr. Brown pointed out one, which is the KSU

7     server that we have been trying to get a copy of.  And the

8     other, of course, is the GEMS servers and the DREs that are

9     still in use -- is because there is an upcoming election.

10         Again, we understand the order that Your Honor

11    entered.  But that was on a particular record that we were able

12    to put together in the time that we had.  And Your Honor may

13    recall that we did table the issue of the broader GEMS and DRE

14    examination when we first raised it just as a matter of time

15    and necessity to get what we could get to move forward in the

16    time frame that we had.

17         I think the reality is:  As we sit here, no one can

18    say that this system is not compromised.  And we have

19    prospective relief.  So if Dr. Halderman can do the analysis

20    that Dr. Shamos has emphasized is needed before these machines

21    are used again, he could do that relatively quickly.  He is on

22    the line, so he can talk to you about what that might involve.

23    Then we can at least figure that out.

24         And to the point that Mr. Russo made, I just think it

25    is not accurate as a matter of fact or law to say that there is

1    no relief to be had.  Imagine the worst case scenario that

2    Dr. Halderman finds that there is malware that is actually

3    influencing the elections in the State of Georgia on the

4    existing system.

5          With all due respect, Your Honor, I would hope Your

6    Honor would agree that your existing order would not preclude

7    relief that would be vital under the Constitution in that

8    circumstance.  The state would figure something out, whether it

9    is hand-marked paper ballots or something.

10         Surely we all agree on this call that the state would

11   have to figure something out, other than what would be in use.

12   Maybe it is a remedy.  But it is something.  So we're asking

13   for relief on an election that is going forward.  And someone

14   has got to do what has never been done and that Dr. Shamos said

15   is critical.

16         Thank you, Your Honor.

17         DR. HALDERMAN:  Your Honor, this is Alex Halderman.

18   If I could make one more point --

19         THE COURT:  No, you really can't.  I've got just a

20   threshold issue of really whether I'm allowing discovery and

21   what the posture of the case is.  And I think that is -- you

22   know, that is really a legal issue as much as anything else,

23   Dr. Halderman.  I appreciate the marvelous resource that you

24   provide to plaintiffs.  But I don't think it is appropriate for

25   me to hear from you at this juncture.

1          DR. HALDERMAN:  Yes, Your Honor.  Thank you.

2          MS. RINGER:  Your Honor, if we may, this is Cheryl

3     Ringer from Fulton County.  I'm trying to make sure I

4     understand the point, particularly since we have two elections

5     going forward in 2019, September and November and a possible

6     one in October.

7          Am I to understand that plaintiffs are now seeking to

8     possibly have a renewed motion for preliminary injunction?

9          MR. CROSS:  This is David Cross.  I would say it

10    depends on what happens.  I mean, my hope is no.  My hope is

11    that we do an examination and that representations made by the

12    state prove to be what is accurate.

13         The reality is nobody knows.  So I would think all

14    voters across the state would want to confirm that they are

15    voting on a system that has actually been confirmed to be

16    reliable.

17         MS. RINGER:  And so Fulton County would submit that

18    was the whole reason for us having the preliminary injunction

19    hearing that we had.  And we note that early voting has started

20    today -- I'm sorry -- yesterday on our September election.

21         So any changes to what we are supposed to be doing

22    would do, you know, harm to voters that are already out there

23    using the system if you are proposing that we would change it

24    at this late date.

25         MR. CROSS:  I think we are putting the cart before

1    the horse.

2         MS. RINGER:  It is.  But actually we thought we had

3    direction, and we're just not understanding that you want to

4    change the direction that we were given.  Thank you.

5         THE COURT:  All right.  I think that the only -- the

6    thing I would like to just explore before I take the few

7    minutes to think about what you've all said is that clearly it

8    is suggested to me in the motion for clarification that the

9    state filed that the state is determining whether it wants to

10   appeal or not appeal.  And, you know, this is sort of a

11   triangulation in that decision between the state's wanting to

12   figure out whether it wants to appeal and the plaintiffs saying

13   on the other side, well, basically we might need more relief

14   right now and if we don't know -- if we don't have a

15   disposition of this case then there is no reason for us not to

16   continue to be proceeding towards basically getting a final

17   judgment -- final permanent injunction.

18        And that seems a little thornier in terms of if the

19   state is not -- I mean, you know, the state obviously can

20   decide what it wants to do.  But if, in fact, it is going to be

21   an open question, then, of course, it is understandable -- more

22   understandable that the plaintiffs want to proceed -- figure

23   out a mechanism so that they can get a more -- a dispositive

24   ruling, though, you know, obviously what more exactly would

25   have to be produced for that is a whole other question.

```
 1              But that is -- Mr. Russo, that part of things -- the

 2    equation you didn't address.  I don't know if there is anything

 3    more you want to say about it from that angle.

 4              MR. RUSSO:  Your Honor, this is Vincent Russo.

 5    Regarding the appeal, we're not -- we don't have the ability to

 6    say what direction our client will want to go, which is the

 7    reason for the motion for clarification.  I do think though,

 8    however, that some of the issues raised in the motion for

 9    clarification would be more determinative of whether there was

10    an appeal than the others.

11              And, Your Honor, I don't know even if we were to

12    appeal that there would be a stay of the preliminary injunction

13    anyway or that we would even seek one.

14              THE COURT:  All right.  So I'm going to take a few

15    moments.  And don't talk among yourselves because then I can

16    hear it.  So just talk -- if you want to speak with the people

17    that you're present with, just go away from the phone and talk

18    with them off that and put yourself -- then we'll be back in a

19    few minutes.  All right.

20              **(There was a brief pause in the proceedings.)**

21              THE COURT:  Mr. Cross or -- this is a limited

22    question for Dr. Halderman.  So don't make -- don't construe my

23    question as an opportunity to go beyond the scope of the

24    question.

25              My question is this:  Are you proposing that you're
```

1    going to sample a statistically significant representative

2    range of the DRE machines in the jurisdictions where there are

3    elections being held?  Is that your proposal, or what is it?

4              MR. CROSS:  Yes, Your Honor.  This is David Cross.

5    We have statistical experts that have been engaged in the case

6    to address that.  Certainly, they will work with Dr. Halderman.

7    But Dr. Halderman is not a statistician.

8              But the short answer to your question is:  We would

9    want a statistical sample of DREs and memory cards of whatever

10   set that is being rolled out for elections this year and then,

11   of course, the GEMS servers as well.

12             And so our statistical experts would figure out what

13   is an appropriate sample.  Dr. Halderman would do the forensic

14   analysis.

15             THE COURT:  This is a very -- besides everything

16   else, it is a very peculiar election.  You know, you've got --

17   you don't have anyone from Gwinnett.  I'm not sure what it

18   tells you in terms of your confidence building.  Many of your

19   major population areas have at best minor elections.  You have

20   lots of small elections in very small jurisdictions.  So I'm

21   not sure it is the -- it is meaningful for purposes of if you

22   actually -- if your true anxiety is that this system may

23   continue to live, it really may not tell you that much on that.

24   It may.  But I don't -- but it may not.

25             MR. CROSS:  I guess two thoughts on that, Your Honor,

1     if I may.  One is:  These machines and the GEMS servers are

2     going to get used this year.  So at least looking at the GEMS

3     servers would give us some insight into whether that aspect of

4     the system has been compromised.  And as Dr. Shamos agreed, if

5     you compromise GEMS, you likely compromise everything.  So at

6     least getting that portion of it I think would be a critical

7     step.

8          The other point that I would make -- and

9     Dr. Halderman is better equipped to explain, but I understand

10    the reasons you don't want to get into a lengthy discussion

11    with him.  So I'll give it my best shot.

12         The new system is not entirely new.  There are

13    aspects of the existing system that are going to continue to

14    live even with the BMD system that would get rolled out.  And

15    so the concern that we have is if the current system is

16    infected in any respect, certainly beyond just a handful of

17    DREs or memory cards, of course, again, as Dr. Shamos

18    acknowledged, those are penetration points to the broader

19    system.

20         But if the current system is infected, whether it is

21    in the voter registration database as a penetration point that

22    was acknowledged or something else, that very likely has the

23    potential to carry on into the BMD system because they are not

24    building something entirely from scratch.  And so that is a big

25    concern we have.

1          Everyone needs to figure out now for the elections

2    this year and going forward is the system compromised.  It is a

3    head scratcher to me that we don't all agree on that.  But

4    apparently we don't.  It is not just about the 2019 elections.

5    It is about the future elections as well.

6          THE COURT:  All right.  Well, to the extent it is

7    about the voter registration database and the way -- and

8    infection going forward, I'm willing to talk about that.  And I

9    had questions for the defendants because I was -- even on the

10   record before because I was being told somewhat two different

11   things about how they were going to proceed forward.  And

12   there's just some factual questions I have.

13         But I am just highly reluctant at this juncture to --

14   though I recognize the merits of the plaintiffs' position as

15   to, well, we still -- you know, it is not like your claims have

16   been dismissed, so why can't you go ahead and do discovery

17   but -- and potentially request again that on the eve of the

18   election or in October or perhaps it is even in the end of

19   September for other relief because you found contamination.

20         And I think I've given my level best here and I think

21   that -- in terms of trying to figure out a way that respects

22   the degree to which the jurisprudence in the area counsels

23   against excessive intervention and at the same time counsels to

24   ensure the protection of fundamental rights in the voting

25   system.

```
 1                And so to get involved with this messiness on a part
 2     of the system that is not going to proceed -- now, I can
 3     understand that we might -- that if -- if the state ends up
 4     having to use -- not be able to use the ballot marking device
 5     and is required to use some sort of hand ballot, it may end up
 6     needing to use the ballots created by the GEMS system.  But
 7     those would be printed ballots.
 8                So I'm not sure, you know, why I would have to worry
 9     about that.  So it is a lot of resources still it seems to me
10     and potentially sort of dragging me into a whole other
11     preliminary injunction hearing come October revisiting issues
12     that I have attempted to balance as best as I can in terms of
13     equitable relief.
14                And I'm just -- and, you know, of course, I don't
15     have anything from Dr. Halderman at this point telling me, oh,
16     I also saw this and that and I have an affidavit from him where
17     he's actually also reviewed the materials he does have, which I
18     understood were very much a fourth choice on his part as a mode
19     of looking at evidence of manipulation or hacking.  But,
20     nevertheless, I have nothing about that.
21                So I'm just -- I'm not sure where it gets us.  I
22     understand that from a policy perspective and from a protection
23     perspective at the highest level one would say yes.  But how
24     would I pragmatically even operate come October if that were
25     to -- you were to find some indication that in five counties
```

1    the machines were in some way infected or not functioning

2    correctly?

3         I don't -- I can't even conceive of what I would do

4    and whether I would say, well, I should infer that other --

5    everything else is corrupted, which maybe I should.  But, you

6    know, this has been some degree of rough justice about this for

7    sure.

8         MR. CROSS:  Your Honor, this is Davis Cross, if I

9    may.  I think you are making exactly the right point.  But I

10   think it cuts in favor of doing it, and here is why for two

11   reasons.

12        One, we're only at the discovery phase.  So whatever

13   relief might be needed down the road, as Rule 26 makes clear,

14   doesn't drive the determination of whether we get the

15   discovery.

16        The second point is I would say the more important

17   practical point.  The only way we end up in the world in which

18   you are envisioning where Your Honor would have to figure

19   something out late in the day is if the defendants are wrong

20   and that the system is compromised.  That is the only way we

21   end up there.

22        And if we were in a situation where the defendants

23   had come forward and said, we've had an independent expert look

24   at this, examine it, and verify it, then we might be in a very

25   different posture.  Right.  Because they would have something

1    to present to the Court and to the public to say we have a

2    reasonable basis to believe that the system is secure and for

3    voters to have confidence and now we're just quibbling over

4    whether Dr. Halderman should do his own analysis.  That would

5    be a different posture.  They would have, I would confess, at

6    least a better position depending on the expert and what was

7    done to push back and say the equities weigh against doing

8    this.

9           But it is acknowledged by everyone that this has

10   never been done.  And so where it leaves us is going forward

11   with an election this year and continuing to have some

12   components of that going into a new system where no one has

13   actually figured out whether anything coming out of that

14   election is reliable and accurate.

15          And so I would say, Your Honor, I completely

16   understand and share the concern.  But that concern only arises

17   if we find something.  And that is really the perversity of the

18   defendants' objection.  If they are confident and they tell the

19   public time and time again that this is a secure system, then

20   they have no basis to object to an examination at all.  They

21   should say, great, come in, take a look, spend several weeks,

22   we know what you're going to find, let's move forward.

23          The fact that they are objecting indicates to the

24   Court that they do not have confidence, that they are worried

25   something is going to get found here.  And we can run it

1    together with Dr. Shamos if they want to have their own expert

2    involved to make sure that they are comfortable with the way it

3    happens.  There are ways to do this.

4         But the mere fact that they are objecting is the very

5    reason it should be ordered because it says they are not

6    confident in their system.

7         THE COURT:  Well, let's talk about right now the

8    parts of the system that are going forward, and I will continue

9    to think about what your argument is.  And so let me have some

10   questions for the state.

11        Originally I get -- I get notified that ES&S is going

12   to no longer be housing the data for the voter registration

13   database -- I'm sorry -- PCC is not going to be doing that and

14   that -- and that the state itself will but that the

15   application -- that you'll maintain -- the state will maintain

16   the contract for the application and updates to the

17   application.

18        So while I am writing the order, that is what I'm at

19   first under the impression of.  Then when I look at the

20   contract with the new vendor, Dominion, there is clearly a

21   provision instead for Dominion to run its software for the

22   voter registration database and the ExpressPoll function.

23        And then -- there is also then we get the notice

24   about the database being transferred.  So I ask you-all which

25   database it is.  Because at this point I'm wondering.  And the

1    state very clearly responds and says it is the voter

2    registration database.

3            But -- so the order is drafted with that in mind,

4    though I wasn't 100 percent sure still then why -- where the

5    data was being housed and how did that all relate to the

6    responses to PCC and the use of their software.

7            And I operated on the presumption you were not using

8    the PCC software.  But, in fact, you might be using it because

9    of the fact that the contract provided for Dominion's software

10   to be used.  But maybe they are one and the same.  That I don't

11   know.

12           Clearly, the Fortalice evaluation indicated lots of

13   issues about the software that PCC was using and access issues.

14   And, obviously, that is something -- those are some issues that

15   Dr. Halderman has raised.  But I didn't know -- and I guess I

16   operated on the -- on the face of the information that Dominion

17   had its own software and so that all we were talking about was

18   an infection through the database potentially, not through the

19   software.

20           But I would think that, Mr. Russo, if you or one of

21   your co-counsel could clarify this issue and how you are

22   proceeding as to PCC's software and what does it mean -- are

23   you permanently housing the data and that host of questions

24   I've just laid out.

25           MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.  I

1  think I can clarify some of those points for you.  So

2  initially -- you are correct -- the state is going to continue

3  to use eNet, which is PCC's software, for the voter

4  registration database going forward.  The housing of all of

5  that data and software into the Secretary of State's data

6  center and the state maintaining control over that system will

7  allow for the Dell SecureWorks, the other monitoring software

8  that the state has in place, to work to protect the voter

9  registration information that is present there.

10        THE COURT:  Wait just one second.  There is a word I

11  didn't get.  It will allow what to monitor?  Dell you said?

12        MR. TYSON:  Yes.  I believe Mr. Beavers' testimony

13  was there is Dell SecureWorks it is called is a monitoring

14  system, along with Fortalice and others, that kind of police,

15  as we talked about, the boundaries of the castle of the

16  Secretary of State's network.  So if an intruder was trying to

17  get in, those systems would detect that.  And that was the

18  advantage of having that system housed in the existing data

19  centers because it falls under the protection schemes that

20  Fortalice had recommended.

21        So both the PCC software and the database will be

22  housed in that environment and will be continued to be used.

23  That system -- the voter registration system is separate and

24  distinct from the -- not to get into far away from your

25  question.  But it is separate and distinct from the My Voter

1    page.  It is separate from the online voter registration

2    system, and it is separate from the electronic pollbook

3    function that is used for election day and early voting

4    operations.

5          So what happens for the Dominion system is at the

6    time of an election a flat text file is taken out of the eNet

7    system.  And that flat text file contains the voters'

8    information for all the voters in the state, along with the

9    ballot combinations or the type of ballot that that voter is

10   entitled to vote.

11         That information has to be matched up with the ballot

12   combinations that are built in the new Dominion system.  So

13   there is going to be no connection between the prior GEMS

14   ballot building process and the Dominion ballot building

15   process.

16         But there has to be a reconciliation to be sure that

17   if Bryan Tyson is entitled to receive this particular ballot

18   combination in this particular county that that particular

19   plaintiff ballot combination exists in the Dominion system for

20   the ballot marking device so that it can generate that and also

21   so that when the voter comes to check in at the ExpressPoll

22   location that information can be reconciled -- not the

23   ExpressPoll because it is the new devices, the Poll Pads.  But

24   those will be the devices that are used.  So those are also

25   populated with that information.

1          Under the new rules under House Bill 392 and the

2    rules that went along with that, there has to be a malware scan

3    of the information coming out of eNet.  So that will be an

4    important kind of sequence in that process.  So whatever goes

5    into the Dominion system will be coming through that.

6          But I want to make sure we're clear on the database

7    itself that the Secretary of State is maintaining the data on

8    its own server.  That is separate and distinct from PCC

9    maintaining the data on its server, which was the previous

10   setup and the previous setup about which Fortalice was

11   concerned.

12         So that's basically the interaction between those two

13   systems.  And I am sure I have created more questions in trying

14   to answer yours.  But I'll stop and see where we are.

15         THE COURT:  So is that the permanent plan, or are you

16   at some point planning to use Dominion software?  Because I saw

17   the provision for Dominion to be running an ExpressPollbook

18   software.  So that is why I'm still just trying to get that

19   clarified.

20         MR. TYSON:  Yes, Your Honor.  So the e-pollbook

21   software is the Poll Pad units, which will replace the

22   ExpressPoll check-ins.  So that is a distinct system.  That

23   governs the voter coming in and checking in.  It is that

24   system.  That necessarily has to have information from the

25   voter registration database in it.  But that is different from

1    the voter registration database itself, which will remain

2    housed with the Secretary of State's office.

3            So the database is the database.  That is the thing

4    that county election officials, county registrars, will update

5    for individual voters as their information is updated.  When it

6    is time for an election, the database is not exported.  But

7    information from that database is used to populate the Poll Pad

8    e-pollbooks that will be used to check in voters.  So we'll be

9    able to look up Bryan Tyson or Vincent Russo.  Yes, you are a

10   Georgia voter.  Yes, you have not already voted absentee.  You

11   are eligible to go and generate a paper ballot off of the

12   ballot marking device in the polling place.

13           THE COURT:  Well, let me ask sort of a simple

14   question sort of going back to the response that Mr. Barron

15   gave both in the hearing, as well as in the interrogatory

16   answers on behalf of Fulton County, about the way the software

17   worked to pull up the last individual who had been referenced

18   and how you could get stuck in the -- the poll worker you could

19   say erred by looking at the statewide voter registration data

20   system when looking for -- when looking for an individual

21   rather than the precinct or you could say the software looked

22   incorrectly and had this sort of misdirection.

23           Is that something that -- is the software that

24   operates the Poll Pads -- will it have that same feature?  I'm

25   really not -- I understand you are saying it is a flat file of

1   information.  But I'm not sure whether -- whether that is baked

2   in to the way that the information is provided or not.

3          MR. TYSON:  Yes, Your Honor.  So the thing that

4   Mr. Barron described -- and I'll be happy to let Ms. Ringer

5   jump in as well.  But basically the way e-pollbook -- the

6   ExpressPoll itself was programmed when the software -- for

7   example, when you click the red X in Windows, it closes the

8   window that you currently have open.  That is the way the

9   software is written.  That was the way that the user was

10  interacting with data.

11         If you have looked up someone who is outside the

12  precinct and don't follow the correct sequence that you are

13  trained to do as the poll worker, the next voter will display

14  information that is different than what should be displayed.

15  So that was a user error issue.

16         That is limited to the ExpressPoll units.  So the new

17  Poll Pad units will still allow a poll worker to look up

18  someone on a statewide basis because we want to provide that

19  convenience for voters to direct them to the correct place.

20  But it will be running -- this is not a correct analysis, but

21  it is like a Windows versus a Mac.  It is going to be running a

22  different version -- a different type of software.

23         So I don't expect and we don't expect that there will

24  be a similar user sequence for a lookup on the Poll Pads.  We

25  can get you some more information on that specifically, if you

1      would like it.  But it is a completely different software that

2      is accessing the information that has been exported from eNet

3      into the e-pollbook software on the new system.

4              THE COURT:  All right.  Well, that was one of many

5      concerns.  But it didn't seem to me that the Fortalice reports'

6      concerns regarding the integrity of the database -- of the

7      voter database was -- and the software issues were limited

8      simply to -- were as limited as you are indicating.

9              First of all, because of the scope of the exposure

10     issues, they clearly had concerns about the integrity of the

11     database that would be impacted.  And that was one of the

12     reasons why obviously I also ordered relief in this area.

13             So I'm hearing you say though that, well, just

14     because we now have the database housed at the state, which

15     also has had its own issues, it is safe and it is fine.  But

16     that sort of is inconsistent with what has happened with any

17     requirement that you look at what has happened to the database

18     thus far.

19             And it doesn't mean that there hasn't been some

20     fundamental problems when you end up having also people being

21     left out; people in the same home, husband and wife, being

22     assigned to different precincts; or simply, in fact, malware

23     having been inserted that would have eliminated or changed

24     people's voting status.

25             So I'm not clear from what you are saying whether you

1    are thinking that the -- that kind of the remedy that you have

2    implemented, which is we've brought the data into our own home,

3    our own castle, that that is sufficient by itself.  And I'm not

4    clear also, you know, whether you are talking about the

5    standard malware that one runs or anything more sophisticated

6    than that as well.

7           But the first issue really is the data itself.  I

8    guess you are saying that you're not going to be using your

9    software there -- but I'm not 100 percent sure -- that you've

10   maintained from PCC to opt -- to manage the data.  But if you

11   are, there may be other issues of concern.  Because I guess I

12   would say I had thought from looking at the contract it was --

13   that you maintained the option of using PCC but that you were

14   planning to use Dominion's software instead.  But I think that

15   might have been an error.

16          MR. TYSON:  Well, Your Honor, this is Bryan Tyson.

17   If I could, maybe I'll try to make sure I've closed the point.

18   I apologize for not being clearer on this.

19          The system that Dominion uses -- the Dominion system

20   is replacing DRE and GEMS and ExpressPoll books.  That is what

21   that is replacing --

22          THE COURT:  Right.

23          MR. TYSON:  -- separate and apart from eNet and what

24   is there.  The security benefit that we get from bringing the

25   database into the Secretary of State's environment is,

1    Number 1, we have been able to then take further control, the

2    two-factor authentication for users, the having users time out

3    over time.  All of those are steps that are taken to address

4    the security issues surrounding the voter registration

5    database.  So I don't want you to hear me say that the mere act

6    of bringing it in the Secretary of State's office alone is what

7    we believe is sufficient.  There has been a continuing effort

8    and will be a continuing effort to harden that, especially

9    given the focus of Homeland Security and others on voter

10   registration databases.

11          The other thing I think you should be aware of

12   related to that is the Secretary of State's office has looked

13   at the number of provisional ballots cast in 2018 versus 2016,

14   which had similar turnouts of raw total voters, around 4

15   million voters.  There were about 21,000 provisional ballots

16   cast in 2018, about 6000 in 2016.  So there is an increase.

17          But almost the entirety of the increase was due to

18   properly registered voters who were following the instructions

19   of voter turnout groups to vote in a precinct -- a wrong

20   precinct in their home county.  So when a precinct was held

21   open late, voters would be directed to -- say if you are a

22   Gwinnett County voter and you have not yet voted, you can go to

23   this precinct that will be open until 9:00 and cast a

24   provisional ballot there.

25          Those ballots are then counted for all the races for

1    which the voter was eligible to do.  That was all but about 100

2    in terms of the raw vote increase in provisional ballots in

3    2018.

4            So if there were widespread database problems in the

5    voter registration database, we would expect to see a higher

6    number of those kind of issues.  The issues related to husband

7    and wife being in different voting -- being directed to

8    different precincts, those kind of issues -- those we have to

9    look at really kind of on a person-by-person basis since the

10   county registrar may have taken some action.  If the husband

11   had updated a driver's license or some other action had been

12   taken, the voter may not have understood that that was also

13   updating their voter registration record due to Georgia's

14   automated voter registration system.

15           So there are some unique issues like those.  But we

16   obviously are extremely concerned about database security and

17   will remain focused on that in the new system.  But that really

18   is unrelated to what is happening with Dominion and the

19   system -- the new system that is being unveiled.

20           THE COURT:  Well, I don't know what your plan is at

21   this point to look at this.  And I mean, it seemed to me that

22   the record obviously is as I saw it.  And I obviously

23   identified the variety of concerns and regardless of the -- I

24   don't know what -- I am going to assume and take you at your

25   representation as to your analysis of the provisional ballots.

1   However, I will say that also there was a lot of evidence as to

2   people not being able to cast provisional ballots or being

3   discouraged from doing it and giving up.

4          So this is a many-headed monster in some ways.  But

5   the point really is -- where I started was I really wasn't sure

6   how you were proceeding from -- because of the two sources of

7   information as to -- that suggested that you were possibly just

8   giving it over to Dominion to completely handle or possibly

9   keeping it on your own.  So I tried to write it to accommodate

10  either possibility.

11         I would have been a little bit more specific if I had

12  known for sure.  But I think that it was -- the state was not

13  100 percent clear about this, frankly.  And it was something we

14  didn't go into in as much depth as probably would have been

15  helpful.  But it was late on the last night of the hearing.

16         Is the state planning to have its contractor follow

17  my order and have Fortalice do more work on this issue?  Or are

18  you only looking at -- and I think that is a really important

19  thing to me to understand what are you planning.  And I know

20  you wanted to know what you were -- I was expecting.  But I

21  think the first threshold issue is what is -- how are you

22  planning to use your contractor in this regard.

23         MR. TYSON:  Your Honor, this is Bryan Tyson.  I don't

24  know that all of those decisions have been made quite yet.

25  Mr. Russo obviously can fill me in on that.  I know the state

1    obviously plans to comply with the order.

2          We asked the questions we asked to try to make sure

3    we had a good grasp on those points.  But I don't think the

4    decisions have been made yet in terms of exactly what we're

5    going to do.  We obviously plan to follow your order.

6          THE COURT:  All right.  Well, one of the questions

7    that you asked was -- the quite simple question of are you

8    going to -- is the state required to file its plan to deal

9    with -- address the voter registration information and database

10   on the docket.

11         And I didn't provide for that because I actually was

12   trying to encourage you-all to have conversations with

13   plaintiffs' counsel about this.  And, you know, it was not that

14   I was thinking I was going to be actively engaged unless there

15   was evidence that you hadn't done it in good faith and had

16   made -- and made -- and had a true plan for proceeding that you

17   had also shared with plaintiffs and had dialogue about.

18         But -- and that is why I'm just also trying to

19   clarify where we're at.  I didn't perceive myself as having,

20   you know, weekly monitoring or anything like that.  But I was

21   hoping to encourage better communication and dialogue about the

22   plans and things that might, in fact, address some of the

23   plaintiffs' concerns and hoping to avoid the tenor of the

24   conversation that seemed to manifest itself in the

25   correspondence apparently that I didn't need to have part of

1    but that was part of the submissions that were provided to me.

2    There was very bitter communications on both parties' side --

3    all parties' side.

4         So because I do understand how this can keep on

5    moving -- keep on going, going, going.  But I don't -- it is

6    not my role to be at this juncture monitoring.  On the other

7    hand, I do have an obligation to make sure that the injunctive

8    relief is -- ultimately that it is implemented in good faith.

9         So I guess that is my answer to the question you

10   posed.  I was not expecting it to be filed.  But I was

11   certainly trying to encourage -- I did require you to share it

12   with the plaintiffs' counsel.  And the purpose for that was so

13   that you could actually have some true dialogue and

14   communication about it and hoping that would move us forward as

15   well.

16        With respect to the state's question as to what were

17   the precise requirements for -- as to the filing -- are state

18   defendants to file the referenced rules -- that is Number 2 in

19   your motion for clarification -- when they are made available

20   for public comment or after they have been promulgated and

21   adopted.

22        This was really so that I would have notice of really

23   what you were doing.  Just simply if you were putting up

24   proposed rules for comments, I would like to know that.  And

25   that is just -- it is not that I'm expecting that I'm going to

1  jump in and give any comments.  But it will give me notice of

2  what is going on.

3           I don't want to be having to have the court librarian

4  maintain a Google alert for when you are doing it since it is

5  easy enough for you to file it.  This is a matter of public

6  record, and that is the same thing for when your rules have

7  been adopted.

8           But I am not myself intending at this juncture to do

9  a substantive review of the proposed regulations as part of

10 this litigation unless it somehow becomes a part of the

11 litigation for the BMDs in some way.  But I mean, there are

12 other mechanisms obviously that the interested parties can do

13 that.  But to the extent that auditing is a central part of

14 whatever you are doing, it is obviously of some concern to the

15 Court.  But I'm not the reviewer of the regulations.  But it is

16 relevant to the litigation.  I hope that answers that question

17 to your satisfaction.

18          I have answered Question 3 regarding the plan being

19 filed.  I mean, obviously I know that if the plaintiffs think

20 that you haven't done it in good faith they are going to file

21 the plan.  Or you may want to file the plan to show that you're

22 in good faith compliance and the process that you have gone

23 about.  But that is up to you.

24          And if the plaintiffs don't think you have, then that

25 is up to them whether they are going to file it.  But I am

1    trying not to put myself in a monitoring -- an independent

2    monitoring role.

3            If something comes up and I have to have an actual

4    hearing about something -- relief not being entered, that is

5    another matter.  But I'm not independently monitoring.  We're

6    already discussing the question of Number 4.

7            I have one question about the -- that I wanted to

8    understand.  The scanners in the Dominion system that you're

9    planning to purchase, are those scanners -- the ones at the

10   precinct level, are they able to scan a -- the full ballot for

11   counting purposes, if that was necessary?

12           MR. TYSON:  Your Honor, this is Bryan Tyson.  Yes.

13   The precinct scanners from Dominion are the more advanced

14   technology scanners that we had discussed in the hearing.  And

15   just so you're aware, Dominion equipment has already started

16   arriving in Georgia.  We're on the -- there is some in the

17   Secretary of State's warehouse already that is being prepped

18   for acceptance testing.  So that process is well underway.  But

19   they are the precinct scanners that will take a full image of

20   the ballot for processing.

21           THE COURT:  So if you ended up having to have a hand

22   ballot, they would be able to count a hand ballot?

23           MR. TYSON:  Yes, Your Honor.  They could be

24   programmed to count a hand ballot or programmed to count a

25   ballot marked device ballot.  That is correct.

1          THE COURT:  All right.  And you also asked in

2     Question 1, regarding the pilot project required at

3     Document 579 on Page 148, Paragraph 2, does the requirement to

4     implement a pilot election November 2019 utilizing hand-marked

5     paper ballots include all advanced in-person voting or is it

6     limited to election day voting.

7          It includes the whole process.  The advanced

8     in-person voting.  So you get a full run-through.

9          Have you been able to identify three potential

10    counties or jurisdictions alternatively?

11         MR. RUSSO:  Yes, Your Honor.  This is Vincent Russo.

12    The pilot project counties are -- as we understand them, are

13    currently to be Carroll, Catoosa, Bartow, Decatur, Paulding,

14    Lowndes.  There is a potential that Bacon and Treutlen will

15    also be included.  We understand that they are -- will be

16    attending the training.  But it is not definite whether they

17    will be pilot project counties.

18         And then Cobb County -- we understand that they have

19    agreed to do a hand-marked paper ballot pilot in four cities.

20         THE COURT:  So you are basically saying the Cobb

21    County running of the -- of the hand -- Cobb County will run

22    the pilot project for hand ballots in the four cities -- the

23    four -- use those as four jurisdictions?

24         MR. RUSSO:  Yes, Your Honor.  I misheard you.  I was

25    giving you the full overview on both pilots.  But that is

correct.

        THE COURT:  And do you know what cities those are?

        MR. RUSSO:  Let me check my email.  I asked that question.  Yes.  It is Smyrna, Austell, Powder Springs, and Kennesaw.

        THE COURT:  All right.  Thank you.

        MR. RUSSO:  You're welcome.

        THE COURT:  Have I addressed the state's questions?

        MR. TYSON:  Your Honor, this is Bryan Tyson.  Yes, I believe that answers all of our questions except for the fourth one, which I know we're still talking through that.  But yes, that is very helpful and we appreciate that very much.  Thank you.

        THE COURT:  I want to bring one point to your attention, which is it may be that the Secretary of State was frustrated or his spokesperson.  But I don't think it is helpful for him to be -- a representative of the Secretary of State's office -- they are free to say whatever they want to say.  But I don't think it is helpful in this process for a representative to be saying all of this is silly and just rhetorical.  You know, they are free to say what they want.

        But it doesn't inspire confidence that we're going to be able to collaborate.  That is my focus is being able to resolve these issues.  But I hope that that is not representative of a different viewpoint on their part.

1          And I don't know who has reviewed anything within the

2    department.  But I would say that -- as Dr. Halderman pointed

3    out, that the Court -- it is a minor, minor thing in the larger

4    scheme of things.  But the Court identified this problem of

5    getting a bad voter -- bad website message that you do not

6    proceed on the My Voter page at Document -- on the order at

7    Footnote 59.  And it still remains.  The same -- you pull it

8    up, and the same thing happens.  It doesn't matter what browser

9    you use.

10          MR. CROSS:  Your Honor, this is David Cross.  Could I

11   offer one thing?

12          THE COURT:  Yes.

13          MR. CROSS:  On Question 4, the debate raised about

14   discovery, Your Honor made a good point earlier, which reminded

15   me.  We actually have not put into the record some of the

16   disconcerting anomalies that Dr. Halderman found in the GEMS

17   databases.  I'm wondering if we could have an opportunity,

18   understanding Your Honor is struggling with what the right path

19   forward is with respect to discovery, whether there is any at

20   all -- if we could have an opportunity this week to put in just

21   a concise filing including a declaration from him that details

22   things.

23          Just to give Your Honor an example, one of the things

24   we did discover is that there are discrepancies between the

25   vote totals that were reported for certain counties and the

1    actual number of votes cast that was reflected.  In their

2    numbers, over a thousand in some counties.  Meaning they are

3    reporting in some counties 1600 more votes totaled in terms of

4    the election results than actually show up as votes cast in the

5    GEMS databases for those counties.

6           And so he's done some preliminary analysis, and that

7    is at least preliminarily what we found.  If it is helpful to

8    the Court, we can put in a declaration that provides more

9    factual predicate for why we think the examination that we're

10   asking to do is important.

11          THE COURT:  You can submit that.

12          MR. CROSS:  Okay.  Thank you, Your Honor.  We'll do

13   that as soon as possible this week.

14          MR. RUSSO:  Your Honor, this is Vincent Russo.  We

15   would just ask if that is okay that we respond to whatever is

16   submitted.

17          THE COURT:  Of course.  Just --

18          MR. BROWN:  Your Honor, this is Bruce Brown.

19          THE COURT:  I'm sorry.  Just one second.

20          Since -- so we don't end up eating up too much time,

21   if they file it this week on Friday, when would the state want

22   to be able to file something in response by?

23          MR. RUSSO:  Your Honor, we would ask until the

24   following Friday.

25          THE COURT:  All right.

1      MR. RUSSO:  We have a response to their motion for

2  leave due this Friday.

3      THE COURT:  All right.  Mr. Brown?

4      MR. BROWN:  Thank you, Your Honor.  Circling back to

5  one issue that I wanted to make sure that I presented clearly,

6  because it may relate to several of these issues, in our status

7  report the issue -- one of the issues that we raised was the

8  possibility that in 20 -- for the 2020 elections that proceed,

9  the presidential preference primaries in March -- that would be

10  elections in January, February, and March.

11      THE COURT:  What are those?  I looked at the

12  Secretary of State's page, and I didn't see any identified.

13      So what are those?

14      MR. BROWN:  Every year there are a slew of special

15  elections in January and February that are not on the Secretary

16  of State's -- anticipated on the Secretary's web page.  And we

17  have some data on that.  I do not have it in front of me.  I

18  think we probably submitted it as evidence in the hearing.

19  Although I can't cite to it this second.

20      But there are special elections -- my understanding

21  is there are special elections throughout the state in January

22  and February as they come up every year.  And the reason why

23  that is -- that may be important is that -- and this could go

24  into the pilots in November '19 as well.  If and to the

25  extent -- first, of course, paper ballots will be used for

1    those elections because those are -- that is required under

2    your order.  Of course, that is certainly what we asked.

3    There's not a quarrel with that.

4          The issue is the ballot building infrastructure that

5    is used to print those ballots and to build those ballots and

6    ultimately to scan them and tabulate them.  Currently, that is

7    done by the GEMS system.  Your order contemplates that after

8    January 1, 2020, that infrastructure, which is the ballot

9    building and the scanning tabulation, will be done by the

10   state's new system.  There is the possibility that the state's

11   new system will not be ready either because of certification or

12   because of the delays that -- it is a tight schedule, et

13   cetera, given the complexity of the implementation.

14         And so there is a little bit of a gap, if you will,

15   or potential gap in the coverage of your order as to what will

16   be the infrastructure for implementing the hand paper ballots.

17         In our status report, what we're suggesting is that

18   provided -- this is a gigantically important proviso.  Provided

19   there are robust audits, hand-marked paper ballots may safely

20   be used with the existing GEMS infrastructure, which composes

21   the ballots and gives the print orders to the printers for

22   those ballots.

23         And then after the votes are hand marked actually

24   using the AccuVote scanners, like I said, if the new scanners

25   are not available.  And so anticipating that, the state should

1    be on notice that if the new system is not going to be

2    available to use with the hand-marked paper ballots, then they

3    are going to need to have something.

4         And what we're suggesting is, again, provided there

5    are robust audits, which will be used with the artifact of the

6    voter's choice, because you will have hand-marked paper

7    ballots, that the old GEMS systems could be used.  However, I

8    think this underscores sort of the live nature of the case in

9    that we need to get to the truth of what the GEMS system and

10   the DREs actually are infected with, if anything.  But that is

11   what we --

12                **(Unintelligible crosstalk)**

13        THE COURT:  Well, listen, first of all, you could

14   obviously have this conversation between yourselves.  If there

15   is something that is a reasonable modification -- if you need

16   the ballot builder to print ballots, then I mean that is -- to

17   print the ballots to be done by hand, that is a simple enough

18   thing.  You're not worrying about what happens then.

19        I don't know what the -- if they have -- you know,

20   the whole question about the AccuVote scanners and how they

21   count, et cetera, and do they have them, that is a whole other

22   question.  Those are -- I mean, those are things that you could

23   all explore, and I would hope you might rather than having to

24   come on an emergency hearing if there are, in fact, elections

25   that they are not ready to handle in January, February, and

1    March.

2          That is why I'm trying to give you some mechanisms

3    all to talk to each other and not to have to be coming always

4    here.  But --

5          MR. BROWN:  Your Honor, we hear you loud and clear.

6    And in our submission, I suggested that we be able to talk with

7    the state defendants.  I wanted to raise that today since we

8    are having this thing.  But we will do so.

9          THE COURT:  All right.  All right.  So you can -- the

10   plaintiffs may submit additional information about the results

11   to the extent he's completed -- Dr. Halderman's review of the

12   GEMS database and any outstanding issues that he would want to

13   review in the hardware.  The defendants may respond the

14   following Friday.

15         So we're talking about this Friday and the following

16   Friday.  And I am not sure that my position has changed very

17   much.  But if you actually do have a -- if your statisticians

18   actually have already their statistical proposal, you can

19   provide it.  If not or if it is going to take a lot more work,

20   I would not bother if I were you.

21         I have really my major concerns about our going down

22   this pathway.  But if it is already done, that is something

23   else.  I just don't think it is useful.  I'm more concerned

24   about the database at this point that is going to continue --

25   clearly going to continue on, no matter what, in terms of the

1    the voter database.

2            And I do encourage you-all to continue talking.  I

3    didn't get a very clear idea about what -- what the state is

4    thinking about at this juncture.  But I realize it has not been

5    very long since I issued the order and there are a lot of

6    moving parts.

7            But I will say that the requirement that you use your

8    consultant to be involved in looking at this was to have, in

9    fact, a genuine, fulsome review of the issues raised.  And I --

10   it would require likely other analyses.  That was my thought of

11   what you were going to be doing with the assistance of your

12   expert.  And I saw that, in fact, in many different ways

13   Fortalice had not been able to do the complete type of analysis

14   it thought was essential as to the database and that there were

15   limits to looking at anything only from the perspective of the

16   castle perimeter and that they hadn't been able to focus the

17   way they would have if they had been authorized to do so.

18           So that was my expectation.  But, you know, I also

19   thought it was something that you were -- with the proper

20   incentive would do -- were well capable of doing and guiding.

21   And counsel would be able to make sure it happened.  At least

22   that is the hope.

23           So I think that those issues in terms of how they

24   have a continuing impact are the ones that are the greatest

25   concern to me in terms of the old -- what gets carried forward

1  from the old system to the future.  And the Court is future

2  focused.

3          Tell me what the schedule -- the schedule exactly is

4  on the state's response to the motion to amend the complaint.

5  I haven't really tried to plot it out.  When is the briefing

6  going to be complete?

7          MR. RUSSO:  Your Honor, this is Vincent Russo.  Our

8  response is due -- state defendants' response is due this

9  Friday.

10          THE COURT:  All right.  The plaintiffs' reply?

11          MR. RUSSO:  I didn't actually calculate their

12  deadline.

13          THE COURT:  That is fine.  I can figure it out.

14          All right.  Many different things were provided to

15  me.  Is there something else that I missed in your papers?  I

16  know that I had Dr. Halderman's affidavit.  I had the Coalition

17  plaintiffs' status report.  And we discussed some part of that

18  and in particular about the use of the GEMS system and the

19  AccuVote scanners.

20          But is there anything else that you-all wanted to

21  discuss?

22          All right.  Well, hearing nothing, I am going to

23  assume not.  Because I know all of you are very capable of

24  making 5 million points.  So I'll look to the submissions on

25  Friday -- this Friday and the following Friday.

 1          I had one last issue myself, which was about the

 2     servers.  I just wanted to understand what the basis of -- what

 3     was happening about the servers.  Have they first of all been,

 4     in fact, picked up?  The copies of the servers from the FBI

 5     that is.

 6          MR. BELINFANTE:  Your Honor, this is Josh Belinfante.

 7     The FBI has delivered the servers to our office.  They are now

 8     with a forensic expert of the plaintiffs.  We have made -- we

 9     had all agreed that they would copy the hash information, which

10     as I understand it is the way you can tell if after that

11     anything had been changed.

12          There was a misunderstanding on Saturday.  There was

13     an email sent around asking whether that could be copied.  I

14     took it to mean the hash information.  The plaintiffs took it

15     or were intending for it to mean the actual image itself.  So I

16     agreed to it thinking it was the hash information, even though

17     on just the day before we had all agreed that it would be just

18     the hash information.

19          And so there is a copy now with the expert.  The FBI

20     drive is with the expert.  And we had agreed to not provide it

21     to either party unless and until we had some further guidance

22     from this Court on the scope of the remaining discovery issues.

23          MR. BROWN:  Your Honor, this is Bruce Brown.  We will

24     be submitting pursuant to your standing order a summary of the

25     dispute and the positions of the parties on that issue probably

1    today.  And that will tee that issue up.  The issue there is

2    whether we can look at it or whether the plaintiffs' experts

3    can review the FBI image, which is a copy of the original CES

4    image that the state ended up destroying.  And so it is highly

5    relevant for the reasons that will be apparent anyway but also

6    as explained in our submission.

7            THE COURT:  All right.  It is a joint submission

8    though?

9            MR. BROWN:  It is.

10           THE COURT:  All right.  Well, then I'll deal with it

11   when it gets here.  All right.

12           MR. BROWN:  Thank you, Your Honor.  Thank you for

13   your time today.

14           THE COURT:  All right.  Thank you, everybody.  Have a

15   good day.

16           MR. CROSS:  Thank you.

17           MR. RUSSO:  Thank you.

18           MR. TYSON:  Thank you, Your Honor.

19                **(The proceedings were thereby concluded at**

20                **12:22 P.M.)**

21

22

23

24

25

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 59 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

In testimony whereof, I hereunto set my hand on this, the 28th day of August, 2019.




_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT