**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br><br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

**COALITION PLAINTIFFS' BRIEF IN SUPPORT OF RULE 59(e) MOTION TO ALTER OR AMEND THE JUDGMENT**

Coalition Plaintiffs file this Brief in Support of their Rule 59(e) Motion to Amend or Alter the Judgment. The Rule 59 Motion seeks to make more explicit the requirements that this Court has imposed upon the State Defendants in the Order of August 15, 2019 (Doc. 579).

## Introduction

Coalition Plaintiffs, having conferred with counsel for Defendants, file the Rule 59(e) Motion to Amend or Alter the Judgment for two reasons. First, it has become increasingly clear that, while the State Defendants may intend to comply with the letter of this Court's Order, they have no intention of complying with the spirit of the Order. Rather than actually developing and testing a comprehensive

backup plan using hand-marked paper ballots that could provide Georgia with a reliable state-wide alternative in the event the new BMD system is enjoined or not deployed in time, the State Defendants are engaging in token pilot elections that will accomplish little. Without an amendment to the Order that gives the State Defendants more explicit direction, there is a substantial risk that the State Defendants will not have a constitutional voting system in place when Georgia voters go to the polls for the 2020 elections.

Second, there are several aspects of the Court's Order relating to epollbooks that require minor clarification in the form of relatively straightforward but important amendments to the Court's Order.

## I. PROCEDURAL FRAMEWORK

Rule 59(e) states: "A motion to alter or amend the judgment must be filed no later than 28 days after the entry of the judgment." The word "judgment" as used in the Federal Rules of Civil Procedure is defined in Rule 54(a) and "includes a decree or any order from which an appeal lies." *Id.* Thus, the word "judgment" encompasses final judgments and appealable interlocutory orders, such as the Court's Order here. *Alabama v. U.S. Army Corps of Engineers,* 424 F.3d 117, 1129-1130 (11th Cir. 2005) (preliminary injunction is an appealable order). This

Motion is filed no later than 28 days after the entry of this Court's August 15, 2019 Order, as required by Rule 59(e).

Rule 59(e) is the appropriate procedural mechanism for prevailing parties[1] like Coalition Plaintiffs to seek alterations to the relief granted, such as making the relief granted more explicit. *See Herzog Contracting Corp. v. McGowen Corp.,* 976 F.2d 1062, 1065 (7th Cir. 1992) (Posner, J.) (prevailing plaintiff's motion to make relief granted in judgment more explicit was proper motion to alter or amend the judgment under Rule 59(e), tolling the time for appeal). Rule 59(e) is also the appropriate vehicle for obtaining major or minor clarifications of the Court's ruling. *Barry v. Bowen,* 825 F.2d 1324, 1328 n.1 (9th Cir. 1987) ("Although the precise contours of this relief [under Rule 59(e)] have never been authoritatively defined, a motion seeking minor alterations in the judgment is properly one under Rule 59(e).")

This Motion does not "'present new arguments or evidence that should have been raised earlier, introduce novel legal theories, or repackage familiar argument

[1] Plaintiffs, having obtained injunctive relief, are entitled and expected to monitor the Defendants' compliance with the Court's decree. *See Miller v. Carson*, 628 F.2d 346, 348 (5th Cir. 1980); *Dillard v. City of Greensboro*, 34 F. Supp. 2d 1330, 1339 (M.D. Ala. 1999), *vacated on other* grounds, 213 F.3d 1347 (11th Cir. 2000).

to test whether the Court will change its mind.'" *Perdum v. Wells Fargo Bank, N.A.,* 2014 WL 12703276 (July 17, 2014) (citations omitted). Instead, this Motion seeks only to make the relief granted by the Order itself more likely to be effective in view of the State Defendants' post-judgment actions. In short, Coalition Plaintiffs seek amendments to the Order that will make the injunctive relief granted more explicit, *see Herzog, supra,* and will make important clarifications to some of the Order's terms, *Barry, supra.*

## II. AMENDMENTS RELATING TO THE 2020 BACKUP PLAN

In this Court's Order granting in part Plaintiffs' motions for preliminary injunction, the Court stated: "Based on its current plan of a progressively-phased rollout by county, the State must have a backup plan ready to be put in place because the risk inherent in the aggressive implementation schedule and the State's own demonstrated functionality issues may compromise the schedule." (Doc. 579, at 146). Coalition Plaintiffs file this Motion because it has become apparent that the State Defendants, absent the amendment to the Order to make its commands more explicit, will not "have a backup plan ready to be put in place." *Id.* Amendment of the Order to make the relief more explicit is very important because a backup plan will almost certainly be necessary for elections in 2020 and beyond.

### A. State Defendants Are Not Readying a Backup Plan

The State Defendants are not taking the Court's directive to develop a backup plan seriously.

#### *1. Inadequate Selection of Pilot Elections*

In its Order, the Court directed the State Defendants to "identify a select number of counties or jurisdictions that agree to implement a pilot election in November 2019 using hand-marked paper ballots along with optical scanners ad voter-verifiable, auditable ballot records." (Doc. 579, at 148). In response, State Defendants have identified only four municipal elections, all in Cobb County. (Tr. August 27, 2019 Tel. Conf., page 49, line 4). Four pilot elections is woefully insufficient. Four small municipal elections in one county is simply not enough to conduct any kind of meaningful troubleshooting or to test the ability of the State to use hand-marked paper ballots with the new Dominion election management system and the optical scanners in state-wide elections in 2020.

In addition, all four of the Cobb County elections are municipal elections, not county-wide elections. The purpose of the pilots is for the State to develop, and meaningfully test, a state-wide backup plan for using the Dominion election management system with hand-marked paper ballots, rather than DREs. After the

State's planned pilots, only *one county* will have any actual experience using the voting method that will be used state-wide in 2020 if the Dominion BMD system is not ready or is itself enjoined. An amendment of the Order is necessary to require the State Defendants to conduct genuine pilot testing of the backup plan that the State has been directed to develop.

*2. The State Does Not Plan to Pilot Runoffs*

State Defendants apparently have no plans to conduct pilots of any December runoff elections using either Dominion BMDs or hand marked paper ballots counted using Dominion scanners. The pilots ordered by this Court should include runoff elections to give more time to debug the equipment and give election personnel more experience.

*3. No Plans for First Quarter 2020 Elections*

Counsel for the State Defendants disclosed that the State had no plans at all for how they would conduct elections in January, February and March 2020 and had assumed that there would be none. Yet, there are special elections the first quarter of each year, *every year*, and the Secretary's office builds ballots and GEMS databases for these elections. Since the Secretary of State does not have information on upcoming elections, Coalition Plaintiffs' staff members have

surveyed approximately 110 counties regarding first quarter elections from 2010 through 2019. *See generally,* Marks Decl., attached as Exhibit A. This survey shows that January and February elections alone have ranged from a low of 3 counties with elections (in 2010) to as many as 24 counties (in 2013). On average, using 110 counties as the total population, approximately 8 counties will conduct special elections in January or February every year. These special elections are frequently for state legislative seats and can sometimes include numerous counties, particularly if the legislative district is in less populous counties. For example, the January 2013 State Senate District 11 election and February 2013 runoff included six less populous counties, counties with small staffs that would likely have difficulty making a quick transiton to the new Dominion system were that situation to occur for a first quarter 2020 election. Further, there is no assurance that counties and municipalities will coordinate their special elections in March with the March 24 presidential primary because of statutory or logistical constraints. These first quarter special elections are frequently vacancy elections and are generally unpredictable until several weeks before the election.

Counties must be ready to conduct these first-quarter elections without the DRE system (which cannot be used after 2019 under the Order), even though the new system is not scheduled to be implemented until the March 24, 2020 primary

(at the earliest). The risks of failure for these first quarter elections is very high, given that the Dominion system will have to be operational ahead of schedule if it is to be used in counties with January and February elections. The State must have a viable fail-safe plan to conduct such elections.

*4. No Auditing*

The State Defendants have no plans to audit or check the results of either type of pilot – had marked paper ballot or BMD. Although election results cannot be properly audited when BMDs are used, certain partial checks on tabulation accuracy are still essential. The relief granted by the Order should be altered to expressly require precertification testing of all pilots and audits of results of hand-marked paper ballot elections.

*5. No Metrics or Post-Pilot Plans*

The State Defendants have disclosed no plans for determining how they will measure the success or failure of the piloted elections or how they will use the operational performance of the piloted elections to determine whether to (1) move forward with the statewide implementation of the Dominion BMD voting system or (2) develop some other "backup plan ready to be put in place" in time for state-wide elections in 2020.

**B. Mastery of Strategic Incompetence**

State Defendants have weaponized their own professed inability to correct deficiencies in how they run elections to prevent this Court from being able to mandate necessary changes. This strategic incompetence has been the State Defendants' most successful defense so far in this case. The State Defendants may not be able to prevail on the merits, but they can achieve their own kind of success by simply "running out the clock" over and over again by appearing to be incapable of taking timely action, even when the action is necessary to comply with the Court's Order. "The Defendants have previously minimized, erased, or dodged the issues underlying his case." (Doc. 579 at 152).

It is easy to see the State already laying the groundwork to use this strategy in response to the Order. The Order should be made more explicit so that the Defendants cannot, after it is too late to do anything about it, claim that they are incapable of taking necessary action in time for upcoming elections.

**C. Need for Backup Plan Increasing**

The Court ordered the State Defendants to develop a backup plan "because the risk inherent in the aggressive implementation schedule and the State's own

demonstrated functionality issues may compromise the schedule." (Doc. 579, at 146). These risks have only increased since the entry of the Order.

First, the constitutionality of the Dominion BMD system is being challenged by both groups of Plaintiffs in substantial proposed amended and supplemental complaints. (Doc. 581 and 601).

Second, the State Defendants have not even begun the re-examination of the Dominion system in response to the petition on August 19, 2019, by thousands of Georgia voters (Doc. 586 at 10), despite the Georgia law requiring them to do so. The potential delays that may result from this reexamination are unknown, given the numerous deficiencies noted. Neither the petitioners nor Coalition counsel have been able to obtain a response from the Secretary regarding the status of the petitioners' request.

Third, there is no indication from the State Defendants that they have acceptance tested sufficient quantities of the new equipment to be ready to deploy the new system in the First Quarter 2020 elections, nor considered how county employees will be trained in time. Finally, the lack of planning that the State Defendants have displayed with respect to the pilot elections further demonstrates the State's own "functionality issues that may compromise the schedule." (Doc. 579 at 146).

For all these reasons, the requirements of the Order should be made more explicit in order to ensure that a backup election system is actually put in place by the State Defendants promptly, so that Georgia voters can count on having a constitutional election system available for use in the 2020 elections.

**D. Necessary Amendments**

To decrease the real risk of a 2020 catastrophe, the Court's Order should be amended to make more explicit and comprehensive the actions that the State Defendants must take to meet the objectives of the Court's Order. In the Motion, the Coalition Plaintiffs have detailed their proposed amendments relating to the pilot elections and related issues in Paragraph 1, which would amend the Court's directives on page 148 of the Court's Order. These include increasing the number of pilot elections using hand-marked paper ballots in the November 2019 election to ten; extending the pilot to the December 2019 runoff elections; using the GEMS (not DREs) and Accuvote Scanners in two pilot elections; and auditing the hand marked ballot piloted election results.

The amendments in Paragraph 1 also include the requirement that the Secretary report to the Court on the January, February and March 2020 elections as soon as that information is available, and state that the "Secretary should be

prepared for the possibility that the Court will order additional hand-marked paper ballot elections be conducted in January, February and March 2020 elections," and to be prepared to use the GEMS election management system (not DREs) and Accuvote Scanners in the event the Dominion system is unavailable or enjoined. Paragraph 1 also includes a proposed requirement that the State Defendants report to the Court on their plan for evaluating the effectiveness of the pilots.

The amendments in Paragraph 2 of the Motion describe the pre-certification audits to be performed on the hand-marked paper ballot elections.

Each of these amendments are sensible measure to ensure that the State Defendants are actively and genuinely pursuing the development of a reliable backup system for use if the Dominion system is unavailable, as the Court's Order, in more general terms, requires.

## III. Amendments and Clarifications Relating to Electronic Pollbooks

In the Order, the Court found that the "voter database problems extensively identified" in this case "present an imminent threat to voters' exercise of their right to vote." (Doc. 579, at 149). The Court quoted the findings of the National Academies of Science Report "detailing the various methods in which contamination of voter registration data and electronic pollbooks used in

conjunction with voting systems disrupts elections and its recommendation that all jurisdictions using electronic pollbooks 'should have backup plans in place to provide access to current voter registration lists in the event of any disruption. (NAS Report 72).” (Doc. 579, at 149 n.101).

In Pargraph 3 through 6 of the Motion, the Coalition Plaintiffs propose amendments to the Court's Order relating to Electronic Pollbooks. In Paragraph 3, Coalition Plaintiffs move to amend the first sentence of directive 1 on page 149, after the words “voter registration database” to add the words “and express pollbooks, whether the flaws are in the software of the data sets used in the pollbooks ….” Given the context of the statements in the Court's Order, it should be clear to the State Defendants that the State Defendants should include an analysis of the “electronic pollbooks” without additional explicit direction from the Court. However, in an abundance of caution, those words should be added to the Order. In addition, the analysis should not be limited to data, but should also include the software. The “glitch” identified by Richard Barron, for example, was a defect in the electronic pollbooks software, not the data. (*See* Doc. 579 at 82-83).

Paragraph 4 clarifies the time deadlines in directive 1 on page 149 relating to the State Defendants' development of a plan to address electronic pollbook and voter registration database errors and discrepancies. The Court's Order states that

the plan should be implemented by January 3, 2020. Paragraph 4 would amend directive 1 to require the State Defendants to develop the plan itself by October 1, 2019, and to provide that plan to the Court (in addition to Plaintiffs' counsel).

Paragraph 5 proposes to amend the directive 2 on page 150 to require County Election Officials to provide paper copies of the pollbook, rather than the full voter registration database. While the voter registration database called for by the Court's order may produce a very complete record of voter history and information, it is likely to be unwieldy, delayed in printing, and may contain private voter information not appropriate for polling place use. Coalition Plaintiffs seek a Court order that gives the Defendants no excuses in having the most efficient and updated means of paper back up records to promptly resolve eligibility questions in the polling place. Paragraph 6 proposes to amend directive 3 to refer to pollbooks, consistent with the proposed amendment to directive 2.

## Conclusion

Given what is at stake, every reasonable measure needs to be taken to protect the rights of Georgians to vote and to have their vote counted in the 2020 elections. The reasonable amendments proposed in Coalition Plaintiffs' Motion will advance the paramout objective of ensuring that the State Defendants will

have the Court-ordered backup system fully developed in "the event the Secretary of State and its contractor are unable to fully and properly rollout the new BMD system in time for the 2020 Presidential Preference Primary or any of the ensuing elections." (Doc. 579 at 152).

Respectfully submitted this 12th day of September, 2019.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III
Admitted Pro Hac Vice
(ECF No. 125)
ROBERT MCGUIRE LAW FIRM
113 Cherry St. #86685
Seattle, Washington 98104-2205
(253) 267-8530

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,*
*Ricardo Davis & Megan Missett*

*/s/ Ezra D. Rosenberg*
Ezra D. Rosenberg
John Powers
David Brody
Lawyers' Committee for Civil Rights
Under Law
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8300

*Counsel for Coalition Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

**CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL., Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER , ET AL., Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2019, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Bruce P. Brown*
Bruce P. Brown

E
X
H
I
B
I
T

A

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, et al.**<br>**Plaintiff,**<br>**vs.**<br>**BRAD RAFFENSPERGER, et al.**<br>**Defendant.** | **CIVIL ACTION FILE NO.: 1:17-cv-2989-AT** |

**DECLARATION OF MARILYN MARKS**

**MARILYN MARKS** hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.
2. I am the Executive Director of Plaintiff Coalition for Good Governance.
3. Coalition Staff under my supervision has surveyed 110 Georgia counties to obtain documentation of elections conducted in the first quarter of years 2010 through 2019. This survey shows that January and February elections in those 110 counties alone have ranged from a low of 3 counties with elections in 2010 to as many as 24 counties in 2013. On average, using 110 as the total population of counties, approximately 8 counties conduct elections in January or February every year.

4. The documents described herein were obtained under my supervision by staff of Coalition for Good Governance through public records requests and official public election officials' websites. I have personally reviewed the documents referenced which are available to the Court upon request.

Executed on this date, September 12, 2019.

Marilyn Marks