**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

DONNA CURLING, *et al.*

     *Plaintiffs,*

v.

BRAD RAFFENSPERGER, *et al.*,

     *Defendants.*

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## STATE DEFENDANTS' RESPONSE IN OPPOSITION TO COALITION PLAINTIFFS' MOTION TO ALTER OR AMEND THE JUDGMENT

### INTRODUCTION

Coalition Plaintiffs ask the Court yet again to give them relief the Court did not impose in its Preliminary-Injunction Order [Doc. 579] (the "Order"). While attempting to take a second bite at the apple, Coalition Plaintiffs again betray their lack of understanding of election administration in Georgia. State Defendants are moving to comply with all aspects of the Order and Coalition Plaintiffs have provided no reason why this Court should revisit the relief it carefully designed and later clarified for all parties.

### STATEMENT OF FACTS

Coalition Plaintiffs continue their personal attacks on Georgia's election officials, claiming without factual basis that "strategic incompetence" is

driving the State Defendants' approach to this case. [Doc. 605-1, p. 9]. In reality, where election officials must operate, election officials across the state are working diligently to implement many significant updates to the election system that have been underway since last year, including the new Dominion BMD system pursuant to the July 29, 2019 contract entered by the Secretary of State. Declaration of Chris Harvey, attached as Ex. A ("Harvey Dec.") at ¶ 3.

As this case shows, the process of running elections is an area of government activity that requires prudent decision-making and a rational approach when making changes to procedures or systems. *Id.* at ¶ 4. For example, no state has implemented risk-limiting audits without running pilot projects of those audits first—policymakers must review the best way to implement audits prior to implementation, because there is not a "one-size-fits-all" approach. *Id.* at ¶ 5.

## I.  Current status of the BMD rollout.

The new Dominion BMD system combines the superior features of paper ballots (efficient audit trails, multiple copies through precinct scanning) with the best features of electronic voting (disability access, clear voter intent, avoiding overvotes). *Id.* at ¶ 6. While there is no perfect election system, according to Verified Voting, BMDs were used in 41 states in 2018 and will be

2

used in 44 states in 2020.[1] Georgia policymakers determined a paper-ballot system marked by BMDs provided the best option for Georgia's voters. *Id*. at ¶ 7.

State Defendants are making significant progress in their efforts to implement the new BMD System: BMDs with printers, new optical scanners, new central computers, and secure ballot boxes for all of the pilot election counties have been delivered to those counties. *Id*. at ¶¶ 8-9. County and State election officials have begun and are continuing to assess processes and procedures for handling the new components.[2] *Id*.

Within the next 10 days, the next priority on the delivery schedule— delivering to every Georgia county a BMD System (*i.e.*, a BMD with printer, optical scanner, and ballot box) loaded with a demonstration election—should be complete. *Id*. at ¶ 11. That deployment will provide local election officials the chance to begin training voters, poll workers, and others on the new system. *Id*. Disrupting the delivery and training schedule to add additional

---

[1] *See* https://www.verifiedvoting.org/verifier/  This number includes any states in which at least one county was using the type of equipment.

[2] Details for the processes and procedures as small as whether to use carts or bags to transport components, how to handle sealing the components, and other items that require testing. The pilot program will help further refine the final decisions on these details. *Id*. at ¶ 10.

pilot counties when early voting begins on October 14 (18 days from today), as Coalition Plaintiffs now request, is simply not possible at this point, because the deployment schedule was designed around the existing pilot program's scope. *Id.*

As the BMDs are deployed, DREs and the existing GEMS components will be removed from counties and preserved by the State. *Id.* at ¶ 12. Most counties do not have the space to store both DREs and BMDs. *Id.* The existing DREs and GEMS components will be stored by a state vendor after their removal from each county, but the two systems will not exist side-by-side in any county. *Id.* It is not practical to continue programming and using the existing GEMS/DRE system in a county once the rollout of the BMD system is complete in that county. *Id.*

## II.    Status of pilot programs.

The six pilot counties are prepared to begin early voting on BMDs on October 14. *Id.* at ¶ 13. The same system used for the early voting and election-day voting in November will also be used in any runoffs. *Id.* The State has always intended to use the same system for runoffs as is used for the November

elections. *Id.* It would not make sense to bring back software and hardware that are obsolete in light of the Dominion contract.[3] *Id.*

The State is also implementing this Court's Order on the hand-marked-paper-ballot pilot program. *Id.* at ¶14. State Defendants selected Cobb County as the jurisdiction in which to operate the Court's required pilot program. *Id.* Each of the four Cobb County municipalities that have elections in November 2019—Austell, Kennesaw, Powder Springs, and Smyrna—have a significant number of voters, totaling more than 80,934 registered voters, which is more than the number of active registered voters in each of the 139 other Georgia counties. *Id.* at ¶ 15. In other words, this is not a "small" or insubstantial pilot program: Austell has 5,288 registered voters, Kennesaw has 22,943 registered voters, Powder Springs has 12,235 registered voters, and Smyrna has 40,468 registered voters. *Id.* at ¶16. It is also likely that some runoffs will occur in the Cobb County elections, providing further data for the Court's required pilot program. *Id.* at ¶17. For example, the Smyrna mayor's race has five candidates

---

[3] The contract with Dominion was signed on July 29, 2019, before this Court's Order. Based on the rollout schedule required in the contract, DREs were not going to be used for any elections after 2019 and BMDs would be used for all elections beginning with the March 2020 Presidential Preference Primary. To require the continued use of a system that the State had already planned to abandon is not logical, even given Plaintiffs' doubts about the rollout of the BMD System.

and the Austell mayor's race has four candidates. *Id*. The State already planned to develop an emergency backup plan in case the BMDs were not available, such as in the case of a power outage. *Id*. at ¶ 18. The data from the Cobb County elections and the large number of registered voters (80,000) will be helpful in drafting this emergency backup plan. *Id*.

The State is also moving forward with plans to develop the audits required by H.B. 316. *Id*. at ¶ 19. State officials will be conducting a pilot risk-limiting audit or hybrid-risk-limiting audit for the 2019 City of Cartersville elections in Bartow County.[4] *Id*. The State will then use the data from the pilot audit to develop the audit processes required by H.B. 316.[5] *Id*.

## III.    Likelihood of first-quarter 2020 elections.

The likelihood of elections in January, February, or March 2020 before the full implementation of the BMD system is remote. *Id*. at ¶ 20. As explained below, under the current statutory structure, the only way that *any* election would be held between January 1, 2020 and the March 2020 Presidential

---

[4] Bartow County is one of the pilot-program counties for the BMD system. *Id*. at ¶ 19.

[5] Once the design of the auditing process is complete and reduced to a rule, it will be filed with this Court, as required. [Doc. 579, pp. 148-149].

Preference Primary is if a vacancy occurs[6] in the General Assembly between December 2, 2019 and January 14, 2020. *Id.* at ¶ 21. The remoteness of the possibility that a vacancy occurs in the General Assembly in a county that does not have at least the new Dominion scanners does not warrant adding additional hand-marked paper-ballot pilot elections (especially using AccuVote optical scanners and the GEMS system that are being removed from counties) or additional orders from this Court. *Id.*

For vacancies in county and municipal offices, any special election in 2020 would have to be held on the date of the Presidential Preference Primary (or later) by statute. O.C.G.A. § 21-2-540(c)(1)(B). For vacancies in the General Assembly, the election date is subject to the discretion of state officials within certain limits. Harvey Dec. at ¶ 20. If a vacancy occurs during session, the Governor must issue the writ of election to the Secretary of State within 10 days of the vacancy and the special election must be held 30-60 days from the date of the writ. O.C.G.A. § 21-2-544(1). Because of this date window, any vacancy occurring on the second day of the session (Jan. 14, 2020) or thereafter

---

[6] A state office is vacated upon (1) the death of the incumbent, (2) resignation, (3) a court order declaring the office vacant, (4) an incumbent voluntarily becoming ineligible, (5) an incumbent ceasing to be a resident of the state or district, (6) failing to obtain commissions within the time required by law, (7) by the incumbent abandoning the office, or (8) by the final conviction of a felony. O.C.G.A. §§ 45-5-1(a), 45-5-2.

will allow for a special election to be held on the March 2020 Presidential Preference Primary. *Id*. If a vacancy occurs between now and the start of the 2020 legislative session, the Governor must issue the writ of election to the Secretary of State within 10 days of the vacancy and the special election must be held 30-60 days from the date of the writ. O.C.G.A. § 21-2-544(3). That means that December 1, 2019 is the last day that a writ could be issued for a special election to be held in 2019 and only a vacancy occurring between December 2, 2019 and January 14, 2020 would require a special election to be held prior to the Presidential Preference Primary in 2020. *Id*.

Likewise, no further direction is needed regarding the voter-registration database or check-in units. The State is replacing the current ExpressPoll check-in units with new Poll Pads as part of the implementation of the BMD system. *Id*. at ¶ 22. It would not be reasonable to require election officials to change the software on systems (like the ExpressPolls) that will not be used after the 2019 elections, regardless of whether it is even possible.[7] *Id*. But even

---

[7] As local election officials have explained extensively in the course of this litigation, what Coalition Plaintiffs wrongly characterize as "glitches" in the ExpressPolls are the result of user error or software limitations, not the result of any errors or problems inherent to the voter-registration database. [Doc. 571-1 at 310:22-311:24] (testimony of L. Ledford regarding Rep. Clark's vote); [Doc. 571-1 at 239:4-241:19] (testimony of R. Barron regarding software limitation for less-than-countywide election).

if it was, Plaintiffs' proposed remedies are not needed. Under existing state law, the State provides the files so counties can print paper voter-registration lists for each precinct and advises counties to ensure that each precinct has a paper voter-registration list. *Id.* at ¶ 23. Existing state law also requires the use of ExpressPolls "in lieu of the printed electors list" for each precinct. Ga. Comp. R. & Regs. r. 183-1-12-.07(1).

If a voter believes he or she should be registered but does not appear on the electors' list, the proper remedy is to vote a provisional ballot and allow election officials to determine eligibility after the election.[8] Harvey Dec. at ¶ 24. O.C.G.A. § 21-2-419(b) (as amended by H.B. 316) provides for a full search of all records beyond just the voter-registration database when determining eligibility of a provisional-ballot voter. *Id.* The paper voter list is generated from the ENET voter-registration database, which is the same database used

---

[8] According to the Secretary of State's post-election analysis, there was essentially no change in the number of voters voting a provisional ballot between 2016 and 2018 because they did not appear on the electors list at a precinct. Almost all of the 4,861-ballot increase in provisional ballots over the 2016 election was due to voters voting provisional ballots out of their precinct (4,793 of the 4,861 ballot increase were out-of-precinct provisionals). *Id.* at ¶ 25; *see also* United States Election Assistance Commission, *Election Administration and Voting Survey, 2018 Comprehensive Report* at 33 (June 2019) available at https://www.eac.gov/assets/1/6/2018_EAVS_Report.pdf (showing 55% of all provisional ballots in the 2018 election in Georgia were counted).

to create the information in the ExpressPolls. *Id*. at ¶ 24. There is no reason to have a paper copy of a county's entire elector list at each precinct because the voter would still be required by law to vote a provisional ballot and the county officials are better equipped to resolve questions of eligibility with the complete information available at a central elections office and greater transparency after the election. *Id*.

<u>ARGUMENT AND CITATION OF AUTHORITY</u>

**I.   The Court should not modify its Order, because Coalition Plaintiffs have not made the required showing under Rule 59(e).**

Coalition Plaintiffs admit that their Fed. R. Civ. P. 59(e) motion is an effort to do three things: (1) make the relief "more likely to be effective," (2) make the relief "more explicit," and (3) make "important clarifications in some of the Order's terms." [Doc. 605-1, p. 4]. These efforts fall far short of the requirements of Rule 59(e), because the Motion does not allege "any newly discovered evidence, nor establish[] any intervening development or change in the controlling law, or need to correct a clear error or manifest injustice." *Hood v. Perdue*, 300 F. App'x 699, 700 (11th Cir. 2008) citing *Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs*, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995). Coalition Plaintiffs ultimately offer nothing new—they simply "repackage familiar arguments to test whether the Court

will change its mind." *Brogdon v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1338 (N.D. Ga. 2000).  As a result, their Motion must be denied.

Coalition Plaintiffs submit five pages of changes they wish this Court to make to the Order's carefully worded relief paragraphs. [Doc. 605, pp. 2-6]. The modifications are significant and substantial. Specifically, Coalition Plaintiffs seek:

- To add 10 additional counties to the Court's hand-marked paper-ballot pilot program, with two counties using the existing GEMS system and existing AccuVote optical scanners to count votes. [Doc. 605, p. 2].

- To require post-election audits[9] within 15 days and full reports to the Court on those audits within 17 days of election day. *Id*.

- To require the Secretary to order all counties to notify him of any special elections called for January, February, or March 2020 and to notify the Court of such 2020 special elections upon receiving such notices. *Id*., pp. 2-3.

---

[9] Coalition Plaintiffs do not specify whether their proposed audits are pre- or post-certification audits.

- To prepare for the Court to order additional hand-marked paper ballot elections in 2020, apparently anticipating this Court will order further relief. *Id.*, p. 3.

- To prepare to use hand-marked paper ballots counted using the existing GEMS system and existing AccuVote optical scanners in future elections. *Id.*

- To require a plan for evaluation of the pilot programs to be filed with the Court by next week including a number of specific items that interest Coalition Plaintiffs. *Id.*

- To require a response to a recertification petition filed with the Secretary of State that is not part of this case and that is unrelated to this case. *Id.*, pp. 3-4.

- To require the filing of a status report with the Court about the "performance" of the new voting system based on the above-referenced pilot program evaluation plan due next week. *Id.*, p. 4.

- To require pre-certification audits with a specific audit protocol specified by Coalition Plaintiffs, which includes provision for altering election results, and a requirement to file all audit reports with the Court within three days of the audit. *Id.*

- To require the development of a pre-certification audit plan for submission to the Court no later than October 15, 2019. *Id.*

- To require a redesign of the ExpressPoll software prior to the November 2019 elections. *Id.*, p. 5.

- To require filing with the Court of the voter-registration-database plan by October 1, 2019, despite this Court's earlier statement in the August 27, 2019 teleconference that no such filing was necessary. *Id.*, p. 5; [Doc. 590 at 44:6-45:15].

- To require new relief that the paper printout of the pollbook supplied to each precinct to be the "official document to adjudicate questions of voter eligibility." [Doc. 605, p. 5].

- To require the printing of the county's voter-registration database for placement in each precinct. *Id.*, pp. 5-6.

- To require what existing law already requires about review of voter records and provisional ballots. *Id.*, p. 6.

The sheer volume of these proposed amendments alone demonstrates that Coalition Plaintiffs are asking this Court to implement their preferred policies regarding election administration—which they have already extensively briefed and addressed to this Court, and which this Court chose not to adopt. Coalition Plaintiffs simply offer their preliminary-injunction

arguments in a different vehicle in the apparent hope that the Court will change its mind this time. *Brogdon*, 103 F. Supp. 2d at 1338. This Court should reject the Rule 59(e) motion on this basis alone.

## II. Coalition Plaintiffs' proposed amendments are not necessary and may actually harm the ongoing efforts of the State to implement actual elections.

Throughout this case, Coalition Plaintiffs have made allegations of errors and problems that show they did not understand how elections are actually administered in Georgia. For example, a claimed "error" in database programming at Grady High School was actually the way federal-only ballots were normally programed. [Doc. 472 at 44-46]. Claims that voter secrecy was being compromised in some way were not supported by any evidence—in fact, every election official said it was not possible to do what Coalition Plaintiffs claimed could be done. [Doc. 472 at 54-57]. With their Motion, Coalition Plaintiffs continue this unfortunate pattern.

*A. Response to proposed amendments to 2020 backup plan.*

Coalition Plaintiffs allege, without offering any factual basis, that State Defendants will not have the Court's required backup plan ready. That is flatly untrue.

As explained above, Cobb County was selected because of its four municipal elections and the significant number of registered voters. Harvey

Dec. at ¶¶ 14-16. These are not "small municipal elections" but rather elections with more active registered voters than 139 Georgia counties. *Id*. at ¶ 15. Coalition Plaintiffs also waited until September 12 to request this change to the Order, slightly more than a month before the start of early voting on October 14. The planning of the equipment rollout was based on the pilot program designed during the summer and it is not possible to increase the number of participating counties on this short a timeline without disrupting the statewide rollout schedule. *Id*. at ¶ 11.

Coalition Plaintiffs' unsupported statements that there are "no plans to conduct pilots of any December runoff elections" using the new system is simply untrue. The State has always intended to use the same system used in November (either BMD or hand-marked paper ballot) in December. *Id*. at ¶ 13. Several of the Cobb County municipal elections will likely go to a runoff, given the number of candidates. *Id*. at ¶ 17. The Coalition Plaintiffs' unsupported allegations simply fail to satisfy their burden; this is particularly true when considering the sworn testimony provided by State Defendants.

B.    *Response to proposed amendments on first-quarter 2020 special elections.*

Coalition Plaintiffs also misunderstand Georgia law governing special elections, claiming an average of eight counties will conduct special elections

in January or February of 2020. But, as explained above, the only window in which a special election would have to be held after 2019 but before the March 2020 Presidential Preference Primary is a vacancy in a legislative seat between December 2, 2019 and January 14, 2019. *See supra*, Statement of Facts, Section III. Aside from the possibility of a vacancy in that six-week window, there will not be any special elections in the first quarter.

The rollout of the BMD system requires the collection of the components of the DRE/GEMS system. Harvey Dec. at ¶ 12. It is not practical to maintain both systems simultaneously in the field, and the State will ensure that any special elections prior to the March 2020 Presidential Preference Primary will be consistent with this Court's directives regarding the DRE/GEMS system. No further fallback plan is required, especially when the rollout remains on track to conduct the March 2020 Presidential Preference Primary with the new system. *Id*. at ¶¶ 8, 12.

C.    *Response to proposed amendments on audits.*

Coalition Plaintiffs also incorrectly claim there is "no plan to audit or check the results of either type of pilot." [Doc. 605-1, p. 8]. As explained above, the pilot audit is being conducted in the City of Cartersville elections. *See supra*, Statement of Facts, Section II. Coalition Plaintiffs' proposed solution—precertification audits of every hand-marked-paper-ballot pilot election—is

16

reckless because there is no opportunity to run a pilot of any kind of audit first. Harvey Dec. at ¶¶ 5, 19.

County and State election officials are hard at work designing the structure of the new BMD election system and have every incentive for the system to work correctly on a statewide level. Coalition Plaintiffs' continued attacks and assumption of bad faith on the part of these election officials is unnecessary and distracting to the work necessary to make the new BMD system work for all Georgia voters in compliance with Georgia law.

State officials are taking all necessary action to implement this Court's order. No further clarification is required and, as explained above, State Defendants are moving rapidly to accomplish the goal that everyone seeks— fair and accurate elections.

## III. Coalition Plaintiffs seek a major expansion of the case to attack BMDs when that new system is not before this Court.

Coalition Plaintiffs next complain about the BMD system, which is not part of this case. [Doc. 605-1, pp. 10-11]. The Order did not address BMDs in its relief because this Court specifically found that those issues were not yet before it. *See* [Doc. 579, pp. 137, 139] ("The adequacy of the newly chosen BMD election system is not before the Court at this time"). Despite this clear language, Coalition Plaintiffs seek to have this Court supervise the BMD-

rollout process, proposing amendments to require (1) a response to a petition for reexamination that is unrelated to any issue before this Court (any claim about the reexamination would be brought under state law) and (2) status reports on the performance of the pilot programs. [Doc. 605, pp. 3-4]. These proposed amendments are supported by absolutely nothing other than Coalition Plaintiffs' speculation about acceptance testing and training and should be rejected by this Court. The evidence shows that the State is on track with its equipment and training processes for the March 2020 Presidential Preference Primary. Harvey Dec. at ¶ 8. Coalition Plaintiffs have shown no basis for any amendment to require any action involving a system the Court already said was not before it at this time.

## IV.   This Court already considered and rejected Coalition Plaintiffs' arguments regarding additional clarification for electronic pollbooks.

Coalition Plaintiffs' last shot at remaking the Order is a rehash of their prior arguments about electronic pollbooks. [Doc. 605-1, pp. 12-14]. As this Court is aware, Coalition Plaintiffs sought extensive relief related to electronic pollbooks in their motion for preliminary injunction. *See* [Doc. 419-2, pp. 4-5]. Their proposed amendments simply repackage those arguments, which is improper in a Rule 59(e) motion. *Brogdon*, 103 F. Supp. 2d at 1338.

Coalition Plaintiffs first seek what is essentially impossible—a change to ExpressPoll *software* prior to the November elections. [Doc. 605-1, pp. 13-14]. Their claimed problems are not the result of database errors, as they admit. Instead, the claimed problems were user error or software limitations. *See* [Doc. 571-1 at 310:22-311:24] (testimony of L. Ledford regarding Rep. Clark's vote); [Doc. 571-1 at 239:4-241:19] (testimony of R. Barron regarding software limitation for less-than-countywide election). To require the State to change *software* in a component of a system that is being collected and removed from counties as the new BMD system is rolled out borders on bizarre. While Coalition Plaintiffs obviously dislike ExpressPoll units, they are being replaced and this Court focused its relief on a plan beginning in January 2020 to address any potential database issues.[10]

Coalition Plaintiffs next ask the Court to expend resources and reopen its Order for the purpose of incorporating a requirement that already exists in Georgia law. A paper copy of the registered voters for each precinct is already located in each precinct on Election Day. Ga. Comp. R. & Regs. r. 183-1-12-.07(1); Harvey Dec. at ¶ 23. No further clarification of the Order is required to generate the required lists and the lists contain only necessary identifying

---

[10] The replacement of the ExpressPolls was also included in the July 29, 2019 contract with Dominion.

information for voters—the same data is included in the ExpressPolls. Harvey Dec. at ¶ 24. It also makes no sense from an election-administration perspective to require full copies of entire county databases at each polling place. *Id*.

Finally, Coalition Plaintiffs seek to change existing Georgia law governing the official record of voter information and provisional ballots. Georgia law requires pollworkers to use the ExpressPolls instead of printed lists. Ga. Comp. R. & Regs. r. 183-1-12-.07(1). If questions about eligibility cannot be resolved using the resources at the polling location, then the proper approach is for voters to vote by provisional ballot and have their eligibility determined by the county election officials with all the relevant data, as is required under current law. Ga. Comp. R. & Regs. r. 183-1-12-.06. That approach is consistent with the requirements of O.C.G.A. § 21-2-419(b) (as updated by H.B. 316), which requires a thorough search of relevant registration records, which is not possible at each precinct.

No amendment of this Court's order is required to address any issues surrounding the voter-registration database or the ExpressPoll units used for check-in.

## **CONCLUSION**

This Court should deny Coalition Plaintiffs' renewed attempt to change the Court's Order—one with which they elsewhere proclaim such satisfaction that they assert an entitlement to attorney fees—because no further amendment or modification of this Court's order is necessary and the State is moving expeditiously to the new, secure voting system that was selected by Georgia policymakers.

Respectfully submitted this 26th day of September, 2019.

<div style="margin-left:2em">

Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Kimberly Anderson
Georgia Bar No. 602807
kanderson@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318

</div>

Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678)336-7249

*Counsel for State Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing STATE DEFENDANTS' RESPONSE IN OPPOSITION TO COALITION PLAINTIFFS' MOTION TO ALTER OR AMEND THE JUDGMENT has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

/s/ Bryan P. Tyson
Bryan P. Tyson

23