IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*

　　　*Plaintiffs*,

　　v.

BRAD RAFFENSPERGER, *et al.*,

　　*Defendants*.

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## STATE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' JOINT MOTION FOR SANCTIONS

### INTRODUCTION

On October 11, 2019, Plaintiffs jointly filed a Motion for Sanctions ("Motion") [Doc. 623] against State Defendants for attorneys' fees and costs related to the resolution of the security parameters surrounding the production of the GEMS Databases. Plaintiffs' Motion should be denied because all parties and this Court worked in good faith to resolve the question of how to protect this component of critical election infrastructure.

From the outset of this case as an election contest in 2017, Plaintiffs have attempted to obtain the *public* release of the GEMS Databases. That goal is why the discovery dispute on which their Motion is based would still have occurred regardless of the structure of the GEMS Databases—because

Plaintiffs insisted on releasing a component of critical election infrastructure without adequate security protocols. The idea that the table names and comparisons alone caused or exacerbated the dispute is false because Plaintiffs refused to agree to anything less than a hardheaded and wholly unnecessary policy of full disclosure.

Plaintiffs' entire case was premised on the idea that State Defendants had paid *too little* attention to election security. Plaintiffs now seek to sanction State Defendants for putting *too great* a priority on the security of election systems. Plaintiffs' Motion is completely illogical and must be denied.

## FACTUAL BACKGROUND

This Court understands that election systems are designated as critical infrastructure by federal law. [Doc. 309, p. 10]. The security of election systems has been the focus of this entire case. Because of the sensitivity of election systems (and rarity of this type of litigation), properly protecting the security of these systems in discovery is an issue that rarely arises. Not only is the election system designated as critical infrastructure by federal law—State Defendants are bound by state laws that *prohibit* them from releasing ballots and significantly limit disclosure of other election-related information unless compelled to do so by court order. *See, e.g.*, O.C.G.A. §§ 21-2-379.24(g); 21-2-500.

As technological advancements have increased in recent years, so too has the complexity of our election systems. Because the general public and lawyers alike are increasingly relying on specialists to explain the details of the voting systems, the possibility for misinterpretation of technical details is rampant. For example, Plaintiffs filed a summary document purporting to be a list of tables in GEMS Databases that turned out to be incorrect. Contrary to the deluge of innuendo and accusations of bad faith made by Plaintiffs in their Motion, the entire basis of their requests for sanctions—that State Defendants misled the Court about the uniqueness of the structure of Georgia's GEMS Databases—was not the result of any bad faith. Moreover, the discovery process surrounding those databases was exacerbated by the intransigence of Plaintiffs and their refusal to even consider common ground on a very real issue of election security, insisting from the outset that the GEMS Databases be publicly released.

Plaintiffs claim to have been unduly prejudiced by the State Defendants' inability to hand over unfettered access to a critical component of the state's election system without a court order, but this is ridiculous on its face. In the first place, Plaintiffs are plainly wrong in their description of what occurred up to this point, insisting that State Defendants "refused" to provide them access to the GEMS database. In reality, State Defendants worked diligently both

with Plaintiffs and with this Court to satisfy the discovery needs of Plaintiffs while simultaneously adhering to their own statutory and security obligations.

State Defendants *never* refused to hand over the databases and Plaintiffs cannot point to anything in the record to the contrary. State Defendants proposed multiple possible solutions and engaged in the discovery-dispute process mandated by this Court's Standing Order in good faith. All GEMS Databases requested by Plaintiffs were disclosed within the security parameters directed by this Court.

Critically, once Plaintiffs obtained the GEMS Databases, *they uncovered no malware or any other anomalies*. Despite all of the invective about the potential for infection, they ultimately were not able to identify any issues with the GEMS Databases, even after extensive review. *See* [Doc. 599]. So any delay Plaintiffs experienced, to the extent there was any, was harmless. And as further discussed below, any cost increases Plaintiffs experienced as a result of the delay stemmed almost entirely from their refusal to accept any security parameters.

## I.   State Defendants never "refused" to provide the GEMS databases.

From the start of discovery in this case, State Defendants raised reasonable security concerns about compromising the election systems of

Georgia by producing broad swaths of sensitive and confidential election data requested by both sets of Plaintiffs. State Defendants made this concern known early on, including advising all parties and the Court on May 30, 2019:

> Ultimately, State Defendants will insist on discovery that implicates the lowest risk to critical infrastructure. Similarly, State Defendants note now that any data which can be obtained from a system without access to the system architecture, should be obtained through those more secure means. This Court's order in *Common Cause* provides a roadmap for a workable protective order governing the disclosure of any secured election systems.

[Doc. 386 at pp. 6–7]. Following the Rule 26(f) conference, State Defendants again noted the importance of having a protective order "in place prior to any inspection of a Georgia DRE or other aspect of the voting system, *including documents related to the GEMS database,* that may contain sensitive or confidential information." [Doc. 410 at pp. 15–16]. The protective order, which was of obvious and fundamental importance to State Defendants given the security concerns, was not issued until July 11, 2019 due to Plaintiffs' refusal to agree to a protective order that other plaintiffs in this Court in election cases readily agreed to. [Doc. 477]. Because of this intransigence, even if the parties had agreed to a GEMS-Database-inspection protocol and secured the Court's order for their release (as required by state law), its ultimate production would still have been delayed.

II.   **State Defendants' reasonable concerns and Plaintiffs' rigid refusal to accept anything but their own proposals.**

Discovery commenced in this matter on May 21, 2019 following this Court's Order on Defendants' motion to dismiss. [Doc. 375, p. 61]. The parties first needed to set the scope and schedule of such discovery due to the accelerated timeline requested by Plaintiffs. On June 5, 2019, State Defendants responded to the Coalition Plaintiffs' March 27, 2019 discovery requests, noting that the response occurred before the parties' 26(f) conference. State Defendants objected to the Coalition Plaintiffs' requests on a number of legitimate, reasonable grounds, including the security issues surrounding the release of the GEMS Databases. *See* [Doc. 416-2]. Importantly, State Defendants proposed a possible solution—the first of many options State Defendants offered to Plaintiffs to avoid a dispute over the GEMS Databases:

> As discussed at the May 31, 2019 conference with the Court, Defendant Secretary is amenable to production of certain documents related to the GEMS database and has proposed a protocol which, in conjunction with a protective order, would provide information relevant to the parties' claims and defenses and proportional to the needs of the case without jeopardizing election security.

[*Id.* at 416-2, pp. 7–8].

But Plaintiffs would accept nothing less than unfettered access to the GEMS Databases despite the legitimate security concerns raised by State

Defendants. On June 28, 2019, Counsel for the Coalition Plaintiffs summed it up for the Court: "[F]rankly, I think it is fair to both sides . . . that we are at a pretty fundamental disagreement over the discovery of the GEMS database. We have advanced it to a point where it is appropriate to seek Your Honor's guidance." [Doc. 438 at 11:3–6]. This statement set the tone for the entire call with the Court and much of the remainder of discovery. State Defendants were dealing with two separate and distinct discovery requests from the Plaintiffs, which, though they did not mirror one another, neither plaintiff was willing to depart from.

A.   *June 28, 2019 teleconference before this Court.*

Following the filing of the discovery dispute statements about the GEMS Databases [Docs. 416, 420], this Court scheduled a phone conference. At the outset of the June 28 teleconference, this Court posed the same question State Defendants raised throughout discovery: "Why is it that the plaintiffs need the *entire* state GEMS database." [Doc. 438 at 5:23–24] (emphasis added). Further, as noted earlier, Coalition Plaintiffs wanted something different from Curling Plaintiffs, who also insisted on the entire image of the GEMS *server*. [*Id.* at 8:13–18]. Despite State Defendants' earlier requests to have State Defendants' experts discuss directly with Plaintiffs' experts some solution that would allow a secure production, no such conversation took place until the time of the call.

[*Id.* at 15:20–16:1]. When it did take place, it required some prodding by the

Court to finally get Plaintiffs to acquiesce:

> THE COURT: Well, what have you-all done to have Dr. Halderman talk with Mr. Beaver or somebody else designated by the state so that you could explore that very question.
>
> MS. CHAPPLE: Your Honor, that is a good suggestion, and we would be open to a conversation like that.
>
> …
>
> MR. CROSS: Your Honor, this is David Cross. I guess the one thing that I would offer is we don't have a lot of time… So our view is let's just do it in the most efficient way, which is take a forensic image of the server – multiple servers as it may be… ***So I'm just not convinced further conversation is going to get us there***. But we'll explore that obviously if the Court wants.
>
> …
>
> THE COURT: I understand that what the plaintiffs want is what they think is ultimately necessary. And I'm not dismissing that. But at the same time, there is some concern about proportionality… Is there anyway [sic] I could persuade you-all to put [Dr. Halderman and Mr. Beaver] on the phone for 15 or 20 minutes to talk?

[*Id.* at 14:2–18-12]. Although this impromptu conference of specialists proved

fruitless, had Plaintiffs earlier agreed to engage with Mr. Beaver, their

professed concerns regarding the timeline might have appeared less daunting.

State Defendants made multiple offers of alternatives that did not

implicate the same security concerns as Plaintiffs' requests for open access.

State Defendants offered the same discovery protocol used in a state proceeding before Judge Grubbs. [*Id.* at 24:4-14]. State Defendants also offered a review of data plus any macros, which were understood by State Defendants through consultation with its expert to be the only method by which malware could be introduced into the GEMS Databases (both of these methods would allow reasonable discovery without compromising the structure of the entire database). [*Id.* at 17:8–22]. Neither of these options were acceptable to Plaintiffs. Dr. Halderman then proposed a series of security protocols, which the Court ultimately utilized in part. But Plaintiffs would not agree—and Coalition Plaintiffs continued to seek to force State Defendants to release the entire GEMS Databases in the public domain. This was directly contrary to Dr. Halderman's agreement with State Defendants' longstanding position that "information on the GEMS servers needs to be protected." [*Id.* at 47: 2–25].

Later in the call, the Court's proposal to set up a "mirrored" version of the servers was discussed, and Dr. Halderman stated he thought he "could perform the analysis under those conditions." [*Id.* at 41:1–2]. Still, the State had reservations, with counsel noting "we're concerned we're expanding even farther where we were before because previously we were just talking about the GEMS database. Now we're talking about copying the system." [*Id.* at 40:5–8]. While no definitive action was taken with respect to such an analysis, the

Court instructed State Defendants "to think about this alternative…" [*Id.* at 48:7].

The Court then directed the parties to file their respective positions by the following Monday at 11:00 AM. Understanding that there remained significant, legitimate security issues with respect to the topics being discussed, including the GEMS Databases and servers, the Court instructed, "[e]veryone can file it under seal… then I'll decide whether all of it needs to be under seal." [*Id.* at 52:20–22].

B. *The parties' filings and the final weeks before the Preliminary Injunction hearing*

On July 1, 2019, the parties filed their respective positions with the Court under seal, as instructed. State Defendants proposed an inspection protocol consistent with their statutory obligations and the fact that Plaintiffs sought discovery of and access to critical election infrastructure. [Doc. 440]. In sharp contrast, Plaintiffs proposed a production without any restrictions at all, demonstrating their renewed commitment to a discovery policy of "their way, or the highway" despite this Court's clear direction. [Doc. 441, p. 18; Doc. 446, pp. 3–4]. The Court later noted this new posture departed from Plaintiffs' seeming willingness to engage the State Defendants' legitimate discovery concerns during the teleconference:

> Although the Court understood Plaintiffs to be initially receptive to the Court's proposal during the June 29, 2019 telephone conference regarding this dispute, Plaintiffs' counsel have subsequently objected to the proposal as being entirely unnecessary and unduly burdensome.

[Doc 463, p. 9]. Given the Plaintiffs' now-unified rigidity, State Defendants were forced to object to their requested unlimited access on the grounds that, "disclosure of sensitive and secure information in the GEMS database could jeopardize election system security." [Doc. 446, p. 2; Doc. 463, pp. 1–2]. State Defendants also still needed the court order required by state law to release any GEMS Databases. The Court seemed inclined to follow State Defendants' proposed GEMS-Database-review protocols, but instructed Plaintiffs to identify what portions of State Defendants' proposal would "severely impair their ability to perform the necessary examination," and to propose alternatives to the Court for consideration. [*Id.*, p. 3]. The Court ordered this response to be filed by July 3, 2019, and the Defendants could file objections or respond by July 5, 2019. [*Id.*, p. 4]. The parties complied with their respective deadlines.

After these filings were complete, Plaintiffs then filed an unsolicited reply to State Defendants' July 5th Response [Doc. 455], further delaying this Court's ability to rule on production of the GEMS Databases. State Defendants

addressed questions posed directly by the Court regarding the examination process. [Doc. 456].

The Court ruled on the dueling proposals on July 9, 2019, permitting the release of data subject to many of the conditions requested by State Defendants. [Doc. 463]. Importantly, the Order "recognized that the State retains an essential interest in protecting the integrity of the election system and the confidentiality of the functioning of the election data system," and that the case was on a "fast track" towards a preliminary-injunction hearing. [*Id.,* p. 13]. Finally, the Court agreed with State Defendants and recognized that for the information requested by Plaintiffs to be released by State Defendants, a court order was required. [*Id.*, p. 15]. State Defendants then produced the GEMS Databases as this Court instructed.[1]

## III.   The preliminary-injunction hearing and testimony of State Defendants' experts.

During the preliminary-injunction hearing, the testimony of Merritt Beaver confirmed the complexity of the type of data Plaintiffs were requesting. While Mr. Beaver explained that he reviewed Plaintiffs' expert's declaration,

---

[1] Plaintiffs are not the only party that incurred additional expenses related to the resolution of this dispute. Despite this Court's direction that Plaintiffs reimburse State Defendants for "courier or airline travel costs incurred," [Doc. 463, p. 17], State Defendants have not been reimbursed.

including the exhibits, he did not review certain screenshots attached to Exhibit B of the declaration [Doc. 455 pp. 26-27]—which Plaintiffs prepared and which included incorrect names of the table headings:

> **Q.** You still maintain today that out of the fields on Exhibit B that was filed with this Court that only nine of the tables match?
>
> **A.** Correct.
>
> **Q.** Okay.
>
> **A.** Nine match the table header spelling, structure. That is what a table heading is. It is a structure. If you are a programmer, you have to know the exact name of a table. Anything different, your program doesn't work.
>
> **Q.** And do you understand that Exhibit B included screenshots of every table from this public Cobb County database?
>
> **A.** No, I did not see any screenshots in Exhibit B that I received.

[Doc. 570, p. 26].  If Plaintiffs' summary list of table names had been prepared correctly, State Defendants would have been able to review the similarities between the publicly available GEMS Databases from Cobb County and those utilized by the State during elections. Plaintiffs' failure to prepare a summary list that matched actual table names obstructed an effective review at the least.

Mr. Beaver's testimony at the hearing is consistent with what he had previously told this Court, based on Plaintiffs' incorrect summary list. For

example, on a July 15, 2019 teleconference with the Court, Mr. Beaver stated, "[Dr.] Halderman knows that if you're writing malware, ***you need to know specifically table names*** to make your malware work***. As long as those are not known***, malware won't work on our database." [Doc. 482, pp. 9–10]. Due to the complex and highly technical nature of the GEMS Databases and software, all parties had to rely on their experts. Even Plaintiffs readily conceded the complexity and difficulty of the task to the Court. As counsel for Curling Plaintiffs explained, "[w]e have very little time before the hearing before you on July 25th and we're talking about hundreds of databases with millions of lines of data, so we really need help with individuals familiar with this type of election data to review it beyond just our cybersecurity expert." [*Id.* at 13:8–12].

After Mr. Beaver testified regarding the GEMS-Database-comparison issue, Mr. Barnes discussed the process for their design and configuration. Mr. Barnes noted that while this database building took place at the individual residences of pre-approved contractors, the facilities were "subject to the same purviews [of the Secretary of State's office] in relation to their equipment." [Doc. 570, pp. 85–86].

14

## ARGUMENT AND CITATION OF AUTHORITY

Plaintiffs offer three possible bases on which this Court could award sanctions. Plaintiffs' preparation of a flawed summary list of table names and State Defendants' reasonable conduct in light of the complex circumstances, the security environment, and the rapid timeline to resolve the dispute demonstrates that an effort to sanction State Defendants is frivolous.

## I.   Rule 37(a)(5) does not mandate sanctions.

State Defendants put all parties and this Court on notice in May 2019 that the security interests surrounding the GEMS Databases would have to be resolved through a protective order. [Doc. 386, pp. 6–7]. The process in which the Court engaged was not an effort to *compel* the production but was instead the process to determine the reasonable security parameters—and those parameters were required whether the structure of the GEMS Databases was the same as any other database or not.

Given the lack of any motion to compel on Plaintiffs' part, Plaintiffs' motion should be denied because Rule 37(a)(5) does not apply under the circumstances when this Court never granted a motion to compel. Fed. R. Civ. P. 37(a)(5) states:

> If the motion [to compel] is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the

party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fee

Plaintiffs' request for sanctions under this theory fails for two reasons. First, they never filed a motion to compel, instead utilizing the discovery-dispute structure ordered by this Court. Discovery of election systems required a balancing of interests that neither party would be likely to concede, especially given Plaintiffs' extreme position regarding the public release of the GEMS Databases and refusal to accept the protective order used in other election cases before this Court. Plaintiffs conflate their discovery statements filed under the Standing Order with motions to compel for purposes of Rule 37, but there is no authority for this misleading tactic.

Plaintiffs cite one case from the Northern District of Florida for the concept that Rule 37 can be used without a motion to compel—but nothing in *Murphy v. Cooper Tire & Rubber Co.,* No. 5:08cv40/RS/EMT, 2008 WL 5273548 at *6 (N.D. Fla. Dec. 18, 2008), supports the Plaintiffs' sanctions request. *Murphy* actually undermines the claims made by Plaintiffs, because it involved a situation where the Court 1) *granted* a motion to compel that 2) was actually *filed. Id.* Here, the Court engaged in a collaborative process with both sides to fashion a Protective Order that ultimately *denied* Plaintiffs' unreasonable

16

request for unlimited access to the GEMS Databases and servers and that provided the required court order for production under state law. Plaintiffs refused to agree to the security parameters that were ultimately put in place for their inspection of critical election infrastructure. Instead, the Court *ordered* those protocols over Plaintiffs' objections. [Doc. 623, p. 12].

Second, even if this Court determines that Rule 37 applies to these unique circumstances, State Defendants were substantially justified in their reluctance to hand over crucial election infrastructure without a required court order and without any protection. As Plaintiffs correctly point out, "[s]ubstantially justified means that reasonable people could differ as to the appropriateness of the contested action." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). The Court recognized on numerous occasions the legitimate security interests of the State Defendants in disclosing the GEMS Databases—indeed, the protection of critical infrastructure is the key issue in this case. Plaintiffs' position that a piece of critical infrastructure should be released without restriction flies in the face of their own expert's assessment that "information on the GEMS servers needs to be protected." [Doc. 438 at 47:2–25]. State Defendants were also unquestionably bound by a statutory obligation not to release election-related documents unless compelled by court order. *See, e.g.* O.C.G.A. §§ 21-2-379.24(g); 21-2-500.

17

While Plaintiffs never accepted State Defendants' concerns as valid, those concerns were more than reasonable—especially when Plaintiffs submitted a list with improper table names and refused to accept any security protocols. The fact that GEMS Databases ended up having the same structure as other databases obtained by Plaintiffs' experts also does not negate the security value in declining to confirm that fact in a publicly available court document without an appropriate order from the court.

## II.     Sanctions requested pursuant to Rule 26(g) are unavailing.

Due to the highly technical nature of Plaintiffs' GEMS Database and server inquiries, State Defendants' counsel's reliance on Mr. Beaver—especially when he was relying on Plaintiffs' own summary of table names in GEMS Databases—does not trigger liability under Rule 26(g). Indeed, Rule 26(g) mandates only "reasonable inquiry," not an *expert* inquiry. And as emphasized throughout this Response, any disclosure of the GEMS Databases (as requested by Plaintiffs) required an order from the Court before that disclosure could be made in compliance with state law. Defendants ultimately obtained that order in the form of [Doc. 463] and promptly released the GEMS Databases under the parameters specified by the Court. Releasing anything related to GEMS prior to that order would have violated state law.

Counsel for State Defendants clearly laid out their concerns to Plaintiffs and conferred with Plaintiffs on numerous occasions in an attempt to find middle ground, consistent with this Court's Standing Order. Plaintiffs refused. In keeping with the requirements of Rule 26(g), Defendants' counsel certified "to the best of the person's knowledge," that representations made by Mr. Beaver were true and correct. As Mr. Beaver testified, he was also making representations to the best of his knowledge based on his review of *Plaintiffs'* documents.

Plaintiffs mischaracterize the efforts required to confirm the similarities and differences between GEMS Databases. In their Motion, Plaintiffs diminish the task by saying all it would have taken is the "simple step of comparing the current GEMS databases to publicly available databases." Motion, p. 17. Given the complexity of the analysis required to determine whether the structure of databases with almost 50 tables was the same, this is a shocking statement— how was anyone but a specialist conduct this analysis? Further, when confronted by the Court with the possibility of engaging in the same task in order to alleviate the discovery dispute, Plaintiffs bemoaned such an outcome, saying they simply could not effectively review the databases without bringing in a team of "individuals familiar with this type of election data," guided by their expert, Dr. Halderman, to sift through the "hundreds of databases with

millions of lines of data…" [Doc. 482 at 13:9–12]. State Defendants faced similar constraints—the lawyers in this case lacked the ability to perform the comparison required. Plaintiffs also refused to alter the timeline for the preliminary-injunction hearing, unequivocally telling the Court: "We do not want to put off the hearing." [Doc. 482 at 14:19].

**III. Sanctions are not warranted under 28 U.S.C. § 1927 and the Court should decline such an award pursuant to its inherent authority.**

Section 1927 deals with sanctions resulting from unreasonable or vexatious multiplication of proceedings. 28 U.S.C. § 1927. It is ironic that Plaintiffs accuse State Defendants of such conduct when any unreasonable delay in receiving the data they sought stemmed from their unwavering refusal to accommodate the State's legitimate security concerns about critical election infrastructure. Time and again, State Defendants attempted to compromise with Plaintiffs by providing enough information to Plaintiffs so that they could achieve their discovery goals without simply handing over everything Plaintiffs requested without restriction. The Court, as well, repeatedly asked them to consider such a path. "But why wouldn't it [the GEMS report offered by Defendants] be sufficient from your perspective?" [Doc. 438 at 11:10–11]; "But you're not proposing that [placing conditions on discovery]. You are just

saying no." [Doc. 513-1 at 28:22–23]. But Plaintiffs insisted, and as a result of that insistence, the resolution of the dispute was delayed.

Further, State Defendants' reliance on their expert (and the expert's reliance on the information provided by Plaintiffs) in such a technical field can hardly be considered "objectively reckless," as Plaintiffs suggest. To the contrary, it was the only reliable way State Defendants could sift through the onslaught of discovery requests by both Plaintiffs while also attempting to prepare for the preliminary-injunction hearing. State Defendants did not proceed in bad faith. State Defendants' actions were a direct result of Plaintiffs' outright refusal to accommodate any of State Defendants' reasonable security concerns or recognition of controlling state law on the release of the information. This cannot trigger liability under 28 U.S.C. § 1927 because it is eminently reasonable conduct.

For similar reasons as those stated above, the Court should decline to exercise its inherent authority to impose sanctions on Defendants.

## IV.   Plaintiffs' proposed fee and expense awards are excessive.

Plaintiffs seek "their reasonable attorneys' fees and costs incurred in litigating the production of the GEMS databases and in litigating this motion." [Doc. 623, p. 21]. As discussed above, Plaintiffs are not entitled to any sanctions against State Defendants because of the unique nature of this

discovery dispute. But if this Court is inclined to award some fees against Defendants,[2] the amount sought by Plaintiffs must be dramatically reduced.

Courts imposing fees must avoid being "generous with the money of others." *American Civil Liberties Union of Ga. v. Barnes*, 168 F. 3d 423, 428 (11th Cir. 1999). Applicants bear the burden of "establishing entitlement and documenting appropriate hours and hourly rates." *Barnes*, 168 F. 3d at 427; *Loranger v. Stierheim*, 10 F. 3d 776, 782 (11th Cir. 1994) (burden on submitting party to make a request that will enable the court to determine what time was spent on the litigation).

In this case, Plaintiffs are moving for fees against government entities, which will be paid with taxpayer dollars. It is important to remember that the purpose of fee statutes is not to "produce windfalls to attorneys," *Farrar v. Hobby*, 506 U.S. 103, 115, 113 S. Ct. 566, 575 (1992), but rather to compensate parties. Any award of fees against the Secretary of State's office will be paid by the taxpayers of the State of Georgia.

---

[2] Both groups of Plaintiffs include the amount sought as sanctions in this motion *and* in their primary attorney-fee motion, which provides a separate basis for fees and to which State Defendants' response is not due until November 13, 2019. *See* [Docs. 631, p. 8; 632 p. 39]. Seeking the same fees in two separate motions is an unusual method of proceeding to say the least.

If this Court proceeds to impose fees as a sanction, it should utilize the process for fee awards generally: calculating the lodestar and then considering any adjustment. This will allow an effective review of the reasonableness of the proposed fees.

A court must calculate the "lodestar" amount of the fees, which is the product of the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Bivins v. Wrap It Up, Inc.*, 548 F. 3d 1348, 1350 (11th Cir. 2008); *Hensley*, 461 U.S. at 433. The court first must determine the reasonable hourly rate, which is the "prevailing market rate in the relevant legal community." *Barnes*, 168 F. 3d at 436. After determining that rate, the court then evaluates the tasks performed, determines what time was spent "on the litigation," and excludes both time that would be unreasonable to bill to a client and time spent on discrete and unsuccessful claims. *Duckworth*, 97 F. 3d at 1397; *Bivins*, 548 F. 3d at 1351. The court may then adjust the lodestar amount up or down, considering the 12 factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714 (5th Cir. 1974).[3] *Duckworth*, 97 F. 3d at 1399; *Norman v. Housing Auth. of City of*

---

[3] In *Bonner v. City of Prichard*, 661 F. 2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all decisions of the former Fifth Circuit handed down prior to September 30, 1981 as binding precedent.

*Montgomery*, 836 F. 2d 1292, 1302 (11th Cir. 1988). Plaintiffs are apparently not seeking an enhancement above the lodestar.[4]

### A.    *Plaintiffs' proposed hourly rates should be reduced.*

The key question for the proposed hourly rates is whether those rates are in line with other rates in the Atlanta market for attorneys with similar skill. *Norman*, 836 F. 2d at 1299. The burden is on the moving party to present sufficient evidence on the hourly rate and "the affidavit of the attorney performing the work" is not satisfactory evidence. *Norman*, 836 F.2d at 1299, 1303. In addition, the Court is a recognized expert on attorney's fees. *Id.* at 1303 (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)).

There is some usefulness in considering the *Johnson* factors to determine the proper hourly rate, especially in an election case. *Carey v. Rudeseal*, 721 F.  Supp. 294, 298-99 (N.D. Ga. 1989). Two of the *Johnson* factors are the novelty and difficulty of the questions presented and the skill requisite to perform the legal service properly. 488 F. 2d at 717-719.

---

[4] As the Supreme Court explains, enhancements above the lodestar are for "rare" and "exceptional" circumstances. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552, 130 S. Ct. 1662, 1673 (2010). If this Court elects to review the *Johnson* factors, the majority of them are already captured by the lodestar, with the exception of the factor regarding the undesirability of the case. Given the amount of positive press coverage attained by Plaintiffs' counsel, that factor is not relevant in this case.

In this dispute, the legal issues were straightforward—how to structure an appropriate protective order for sensitive election data. While the technical aspects played a large role in that question, the primary legal skill was making experts available for the Court. In other election cases, this Court reduced hourly rates for similarly situated plaintiffs by 25%, focusing on the similarity of other election-related cases where such a reduction was found appropriate. *Ga. State Conf. of the NAACP v. Kemp*, Case No. 1:17-cv-1397-TCB, Order on Fees at *7-8 (N.D. Ga. April 11, 2018); *see also Martin v. Kemp*, Case No. 1:18-cv-04776, Order on Fees (Doc. 101) at *11 (N.D. Ga. July 24, 2019) (reducing fee application by 75%).

1.    Hourly rates of Curling Plaintiffs.

The Curling Plaintiffs seek the following hourly rates for their work:

| Attorney | Years of Experience | Requested Hourly Rate |
|---|---|---|
| Halsey Knapp | 39 years | $500 |
| David Cross | 17 years | $1,065 |
| Adam Sparks | 9 years | $350 |
| Catherine Chapple | 7 years | $800 |
| Cameron Tepfer | 6 years | $750 |
| Marcie Brimer | 4 years | $650 |
| Jenna Conway | Paralegal | $375 |
| Michael Stoler | Research Analyst | $300 |

Curling Plaintiffs do not support their proposed rates with any declaration other than that of the primary timekeepers. In contrast to Mr.

Cross's declaration, Mr. Knapp's declaration posits that the appropriate market rates in Atlanta is $350-$500 per hour for private-practice counsel. (For further reference, State Defendants' counsel is paid at a rate of $225 per hour for work on this case.[5]) *Norman*, 836 F. 2d at 1299.

Recognizing this significant differential, the only support for a variation from the Atlanta market rate is Mr. Cross's self-serving statement that "specialized institutional cybersecurity expertise" was required and that the Curling Plaintiffs were unable to locate local counsel. [Doc. 623-1 at ¶ 25]. Given the prevalence of capable Atlanta lawyers,[6] this unsupported statement provides no basis for Curling Plaintiffs' proposed hourly rates.

Given the straightforward legal issues, the involvement of Plaintiffs in delaying the resolution of the GEMS disclosure issues due to the unreasonable positions they took, and the excessive rates sought by counsel from DC, a 75% reduction in the rates proposed by DC counsel and a 25% reduction in rates proposed by Atlanta counsel is appropriate. State

---

[5] See generally *SAAG Rates and Fees FY2018*, https://law.georgia.gov/document/publication/fyr2018-saag-rates-name/download

[6] A Google search yields a variety of Atlanta firms and firms with Atlanta offices that specialize in cyber and data security. That list includes Krevolin & Horst (https://www.khlawfirm.com/html/atlanta-data-privacy-security-compliance-litigation-attorney-lawyer-atlanta-georgia.html).

Defendants submit that the following rates should be utilized if this Court

chooses to impose sanctions:

| Attorney | Requested Hourly Rate | Reduction % | Proper Hourly Rate |
|---|---|---|---|
| Halsey Knapp | $500 | 25% | $375 |
| David Cross | $1,065 | 75% | $266.25 |
| Adam Sparks | $350 | 25% | $262.50 |
| Catherine Chapple | $800 | 75% | $200 |
| Cameron Tepfer | $750 | 75% | $187.50 |
| Marcie Brimer | $650 | 75% | $162.50 |
| Jenna Conway | $375 | 75% | $93.75 |
| Michael Stoler | $300 | 75% | $75 |

### 2. Hourly rates of Coalition Plaintiffs.

The Coalition Plaintiffs seek the following hourly rates for their work:

| Timekeeper | Years of Experience | Requested Hourly Rate |
|---|---|---|
| Bruce Brown | 35 years | $625 |
| David Brody | 7 years | $400 |
| Matthew Bernhard | Database Review | $200 |
| Ritchie Wilson | Database Review | $200 |
| Marilyn Marks | Plaintiffs | $200 |

Like the Curling Plaintiffs, Coalition Plaintiffs do not support their

proposed rates with any declaration other than that of the primary

timekeepers. For the same reasons as explained above, Mr. Brown's rate

should be reduced to the same rate as Mr. Knapp and Mr. Brody's rate should

be reduced to match Catherine Chapple, also a DC attorney with similar

experience.

As explained below, this Court should not allow for recovery of expert time spent reviewing the databases, which was part of discovery and not any dispute over the method of production of the GEMS databases. But if this Court does allow such a recovery, the hourly rates sought by Coalition Plaintiffs' experts are excessive.

Ms. Marks owned a truck-trailer manufacturing company and does not have any specialized knowledge about GEMS databases or computer science. [Doc. 449-11 at 34:16-19, 39:14-18]. She became involved in elections after losing a race for Mayor of Aspen, Colorado on a Diebold voting system. *Id*. at 35:4-22. Judge Grubbs specifically found Ms. Marks was not an expert in election administration in a case involving the 2018 Lt. Governor election. [Doc. 449-11 at 42:25-43:8]. While Ms. Marks certainly has an opinion about electronic voting and is an activist for hand-marked paper ballots, there is no reason she should be reimbursed for time she spent on this effort.

Mr. Wilson holds only an undergraduate degree in computer science and does not appear to have any specialized training in database review. [Doc. 597-2 at ¶¶ 2-3]. His testimony and work also apparently did not begin until after the dispute over how to produce the GEMS Databases was complete. *Id*. at ¶ 5. Mr. Brown's declaration only mentions the participation of Mr. Bernhard on calls with the Court, not Mr. Wilson. [Doc. 623-4 at ¶ 12].

Mr. Bernhard has testified in this proceeding and does appear to have some specialized knowledge, but there is no support in the record for the rate proposed by Coalition Plaintiffs. Given the Court's ultimate decision, it did not appear to rely on Mr. Bernhard's participation in the dispute process. Coalition Plaintiffs have put forward no evidence to support the proposed rate for Mr. Bernhard.

State Defendants submit that the following rates should be utilized if this Court chooses to impose sanctions:

| Attorney | Requested Hourly Rate | Reduction % | Proper Hourly Rate |
|---|---|---|---|
| Bruce Brown | $625 | 60% | $375 |
| David Brody | $400 | 50% | $200 |
| Matthew Bernhard | $200 | 100% | $0 |
| Ritchie Wilson | $200 | 100% | $0 |
| Marilyn Marks | $200 | 100% | $0 |

### 3.   Hourly rate of Dr. Halderman.

Dr. Halderman proposes an hourly rate of $750 per hour for his work on the production of the GEMS Database. The only support for this proposed rate is Dr. Halderman's statement that this is the rate he usually charges for expert consulting services.

Despite the lack of support for this rate, Dr. Halderman has specialized training and knowledge that this Court utilized in the dispute. But taxpayer

dollars will be used to make any payment to Dr. Halderman for his time. As a result, State Defendants submit that a reduction of 50% is appropriate for Dr. Halderman's hourly rate, reducing it to $375 per hour.

B.    *Plaintiffs' submitted hours should be reduced.*

Plaintiffs seek recovery for a total of 255.9 hours of attorney time and 403 hours of expert time spent on a dispute that began on June 21, 2019 [Doc. 416] with the filing of the joint discovery statement and effectively concluded with the entry of this Court's order on July 9, 2019 [Doc. 463]. That totals to 14 hours per day of attorney time for each of the 18 days in that period and 22 hours per day of expert time for each of the 18 days. These numbers alone show a lack of billing judgment. Also, as discussed previously, Plaintiffs contributed to the delay in resolution of this case because of their position that the GEMS Databases should be released publicly or released without the accompanying security measures this Court ultimately ordered. [Docs. 416, 460].

As discussed below, a court faced with a fee application can only include in its award those hours that were reasonably expended on the litigation. *Barnes*, 168 F. 3d at 428. The burden is on the fee applicant to submit a request in a manner that allows a court to conduct a "task-by-task examination of the hours billed." *Id.* at 429. The request should also include a

"summary, grouping the time entries by the nature of the activity or stage of the case." *Id*. at 427.

While Curling Plaintiffs included categories for their work by attorney, they did not include an overall summary and Coalition Plaintiffs and Dr. Halderman did not include any summary at all. [Docs. 623-1, pp. 5-9; 623-3, 623-4]. Because any objections must be made with specificity, *Barnes*, 168 F. 3d at 428, State Defendants are limited in their ability to respond to the entries.

The second difficulty for the Court in assessing reasonableness is also related to categorization. The use of "block billing" for a number of time entries makes it difficult for others to assign tasks to categories. "'Block billing' occurs when an attorney lists all the day's tasks on a case in a single entry, without separately identifying the time spent on each task." *Ceres Envtl. Servs., Inc. v. Colonel McCrary Trucking, LLC*, 476 F. App'x 198, 203 (11th Cir. 2012). Block billing leads to imprecision and also makes it difficult to determine the reasonableness of particular entries, which, in turn, can lead to a determination that the applicant failed to carry his or her burden. *Id*.; *see Welch v. Metro Life Ins. Co.*, 480 F. 3d 942, 948 (9th Cir. 2007).

### 1.   Curling Plaintiffs' time entries.

Curling Plaintiffs seek a total of 146.5 hours of attorney, paralegal, and researcher time. This proposed amount raises at least three problems. Given Plaintiffs' counsels' expertise and experience in election litigation, [Doc. 623-1, p. 10], this total is excessive, especially when most of the space in their briefs was spent summarizing expert recommendations related to the GEMS database. Second, extensive conferences among attorneys raise the possibility of duplication of effort, a key to unreasonableness. *Duckworth*, 97 F. 3d at 1398; *Barnes*, 168 F. 3d at 435 (issue raised but not decided). Third, a number of entries are block-billed, making it impossible to distinguish between time spent on compensable activities such as drafting briefs and time conferring with other lawyers. *Ceres Envtl. Servs., Inc.*, 476 F. App'x at 203.

For example, Mr. Cross spent more than 15 hours solely on research and coordinating strategy with counsel and clients. [Doc. 623-1, p. 5]. These entries are block-billed and cannot be further broken out. [Doc. 623-1, p. 21-23] (6/29, 6/30, 7/3, 7/7 entries). Ms. Chapple spent hours conferring with Mr. Cross, including conferences that appear to have lasted up to eight and nine hours in a day. [Doc. 623-1, pp. 25, 27] (7/9 and 7/10 entries). Other entries from Ms. Chapple also do not distinguish between time spent drafting briefs

32

and time spent in conference with other lawyers. [Doc. 623-1, p. 31] (7/16 entry for C. Chapple). Block billing makes it impossible to determine the total time spent on conference activities (which can be unreasonable, *Duckworth*, 97 F. 3d at 1398) and time spent on the issues before this Court.

Curling Plaintiffs likewise seek time after this Court's order on July 9, including more than five hours spent setting up the secure facility [Doc. 623, p. 28] (7/12 entries for D. Cross and C. Chapple). And time spent on dealing with Defendants' efforts to obtain a copy of Dr. Halderman's malware [Doc. 623, p. 30] (7/14 entry for D. Cross). This is not time reasonably spent on the discovery issues in this case that should be ordered as part of any sanctions motion.

Given the extensive problems with the time records presented by Curling Plaintiffs and Curling Plaintiffs' role in extending the litigation on the proper method of disclosing the GEMS Databases, State Defendants propose a 60% reduction in all time records for Curling Plaintiffs. This would yield the following amounts:

| Timekeeper | Hours Sought | Hours after 60% Reduction | Reduced proposed hourly rate | Total |
|---|---|---|---|---|
| D. Cross | 45.5 | 18.2 | $266.25 | $4,845.75 |
| C. Chapple | 65.75 | 26.3 | $200 | $5,260.00 |
| C. Tepfer | 11.25 | 4.5 | $187.50 | $843.75 |

| M. Brimer | 12.5 | 5 | $162.50 | $812.50 |
|:---:|:---:|:---:|:---:|:---:|
| J. Conway | 6.25 | 2.5 | $93.75 | $234.38 |
| M. Stoler | 1.25 | 0.5 | $75 | $37.50 |
| H. Knapp | 0.4 | 0.16 | $375 | $60.00 |
| A. Sparks | 3.6 | 1.44 | $262.50 | $378.00 |
| **TOTAL** | **146.5** | **58.6** | | **$12,471.88** |

### B.   Coalition Plaintiffs' time entries.

Coalition Plaintiffs seek 109.4 hours for time they say was spent on the GEMS Databases dispute by attorneys. [Doc. 623-4 at ¶¶ 6, 10]. But their time entries include a number of flaws that also require significant reductions.

First, the time entries include a significant amount of time that was not spent on the GEMS Databases dispute. *Loranger*, 10 F. 3d at 782. Mr. Brown appears to have included the entirety of his work on this case from June 5 through July 15. He includes time for attending the Rule 26(f) conference (6/10 entry[7]), work on the joint discovery plan (6/13 entry), time drafting the preliminary-injunction motion (6/17 entry), preparing for and taking Ms. Doran's deposition (6/28 entry), work responding to the third-party subpoenas (7/6 and 7/8 entries), and time reviewing State Defendants' response to Plaintiffs' motion for preliminary injunction (7/11 entry). None of this time can reasonably be said to have been expended on the issue before

---

[7] All references are to the time entries contained in [Doc. 623-4, pp. 12-14].

this Court on the GEMS Databases and all of the entries are block-billed, making it impossible to determine how much time was spent on each discrete task. Mr. Brown likewise spends a significant amount of time conferring with his client in his entries (6/29, 7/1, 7/4, 7/7, 7/9, 7/11 entries). These entries show a lack of billing judgment and work that was not necessary to the outcome of this Court's order.

Mr. Brody apparently spent much of the time drafting the relevant briefs, spending more than 17 hours drafting the joint discovery statements (6/12, 6/14, 6/17, 6/20, 6/21, and 6/24 entries[8]). Mr. Brody's entries are block-billed and time spent, for example, drafting and revising the protective order cannot be separate from other activities (6/24, 6/25 entries).

Coalition Plaintiffs likewise seek 349.5 hours of "expert" time related to the GEMS Databases dispute in addition to $1,390.25 in expenses. [Doc. 623-4 at ¶ 12]. State Defendants should not be required to pay for any of this time.

First, Coalition Plaintiffs admit that this time was spent analyzing the databases, not time spent on the GEMS Databases dispute. *Id*. This fact alone indicates that this time was not reasonably spent on the dispute.

---

[8] These entries are found at [Doc. 623-4, pp. 3-5].

Second, Coalition Plaintiff submitted no time records to substantiate any of the time they claim was spent by Mr. Bernhard, Mr. Wilson, or Ms. Marks. The burden is on the fee applicant to submit a request in a manner that allows a court to conduct a "task-by-task examination of the hours billed." *Barnes*, 168 F. 3d at 429. The burden is also on the applicant to submit a request that allows this Court to determine "what expenses were incurred" on this litigation. *Loranger*, 10 F. 3d at 784. Coalition Plaintiffs have done neither in this case. State Defendants and this Court are unable to determine what time was spent on any task in this matter. Because Coalition Plaintiffs have failed to carry their burden regarding this time, no recovery should be permitted.

Third, Coalition Plaintiffs did not submit any receipts or documentation of the expenses they seek. In order for reasonableness to be determined, expenses must be documented. *Dzwonkowski v. Dzwonkowski*, CIV.A. 05-0544-KD-C, 2008 WL 2163916 at *19 (S.D. Ala. May 16, 2008) (refusing to award expenses when no documentation was provided); *Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d 1313, 1330 (M.D. Fla. 2001) ("As with an attorneys' fee, expense requests unaccompanied by adequate supporting documentation will result in a reduction or elimination of the expense."). Without proper documentation, it is impossible to tell whether the sought

36

expenses were unrecoverable overhead or expenses required for this issue in the litigation. *Barnes*, 168 F. 3d at 438-439.

Given the billing for items unrelated to the GEMS Databases dispute, the block-billing of attorney time, and the lack of any records to substantiate the sought "expert" time, State Defendants submit that an 80% reduction in attorney time and a complete elimination of expert time is appropriate. This would yield the following results:

| Timekeeper | Hours Sought | Hours after Reduction | Reduced proposed hourly rate | Total |
|---|---|---|---|---|
| B. Brown | 73.5 | 14.7 | $375 | $5,512.50 |
| D. Brody | 35.9 | 7.18 | $200 | $1,436.00 |
| M. Bernhard | 102 | 0 | 0 | 0 |
| R. Wilson | 179 | 0 | 0 | 0 |
| M. Marks | 68.5 | 0 | 0 | 0 |
| TOTAL | 109.4 | 21.88 | | $6,948.50 |

C.     Dr. Halderman's time and expense entries.

Dr. Halderman seeks 53.5 hours for the time spent on the dispute and $856.99 in expenses. [Doc. 623-3 at ¶¶ 11-12]. Like the other declarations, Dr. Halderman's time entries do not include a summary, but contain sufficient detail to determine what entries were appropriate.

Dr. Halderman seeks recovery for time spent on analyzing GEMS Databases (7/12, 7/15, 7/21 entries[9]). He also seeks time for moving the secure facility to another location at the university (8/15, 8/19, and 8/21 entries).

Like the Coalition Plaintiffs, Dr. Halderman also does not include any documentation for the $856.99 in expenses he seeks. *Barnes*, 168 F. 3d at 438-439.

Given the role Plaintiffs played in prolonging the litigation on the GEMS Databases Dispute by their arguments, not all of Dr. Halderman's time was reasonably expended on this issue. The lack of documentation also prevents the award of any expense recovery. State Defendants submit that a 50% reduction in Dr. Halderman's time and no recovery of expenses is appropriate if this Court orders sanctions. This would yield the following:

| Timekeeper | Hours Sought | Hours after Reduction | Reduced proposed hourly rate | Total |
|---|---|---|---|---|
| A. Halderman | 53.5 | 26.75 | $375 | $10,031.25 |

C.   *Summary calculations of fees and expenses.*

Without conceding that Plaintiffs are entitled to any award of sanctions, State Defendants calculate the maximum recovery the Court may allow against State Defendants for attorneys' fees and expenses as follows:

---

[9] These entries are located at [Doc. 623-3, pp. 8-12].

| Timekeeper | Hours Sought | Hours after Reduction | Reduced proposed hourly rate | Total |
|---|---|---|---|---|
| D. Cross | 45.5 | 18.2 | $266.25 | $4,845.75 |
| C. Chapple | 65.75 | 26.3 | $200 | $5,260.00 |
| C. Tepfer | 11.25 | 4.5 | $187.50 | $843.75 |
| M. Brimer | 12.5 | 5 | $162.50 | $812.50 |
| J. Conway | 6.25 | 2.5 | $93.75 | $234.38 |
| M. Stoler | 1.25 | 0.5 | $75 | $37.50 |
| H. Knapp | 0.4 | 0.16 | $375 | $60.00 |
| A. Sparks | 3.6 | 1.44 | $262.50 | $378.00 |
| B. Brown | 73.5 | 14.7 | $375 | $5,512.50 |
| D. Brody | 35.9 | 7.18 | $200 | $1,436.00 |
| M. Bernhard | 102 | 0 | 0 | 0 |
| R. Wilson | 179 | 0 | 0 | 0 |
| M. Marks | 68.5 | 0 | 0 | 0 |
| A. Halderman | 53.5 | 26.75 | $375 | $10,031.25 |
| **TOTAL** | **658.9** | **107.23** | | **$29,451.63** |

## CONCLUSION

Plaintiffs filed an unnecessary motion, based on the flawed idea that State Defendants failed to comply with their discovery obligations. State Defendants and this Court worked in good faith to resolve the legitimate security concerns identified by all experts involving the GEMS Database. The ultimate disclosure of the GEMS Databases showed no malware and no compromises. This Court should deny Plaintiffs' motion or, at the very least, significantly reduce the fees sought.

Respectfully submitted this 25th day of October, 2019.

Vincent R. Russo
GA Bar No. 242628
Josh Belinfante
GA Bar No. 047399
Carey A. Miller
GA Bar No. 976240
Kimberly Anderson
GA Bar No. 602807
Alexander Denton
GA Bar No. 660632
Brian E. Lake
GA Bar No. 575966
ROBBINS ROSS ALLOY
BELINFANTE LITTLEFIELD LLC
500 14th Street NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3250
vrusso@robbinsfirm.com
jbelinfante@robbinsfirm.com
cmiller@robbinsfirm.com
kanderson@robbinsfirm.com
adenton@robbinsfirm.com
blake@robbinsfirm.com

*/s/Bryan P. Tyson*
Bryan P. Tyson
GA Bar No. 515411
Bryan F. Jacoutot
Georgia Bar No. 668272
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678)336-7249
btyson@taylorenglish.com
bjacoutot@taylorenglish.com

*Counsel for State Defendants*

40

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing STATE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' JOINT MOTION FOR SANCTIONS has been prepared in Century Schoolbook 13-point, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson
GA Bar No. 515411
