IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*

    *Plaintiffs,*

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants.*

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## STATE DEFENDANTS'[1] COMBINED RESPONSE IN OPPOSITION TO CURLING PLAINTIFFS'[2] AND COALITION PLAINTIFFS'[3] MOTIONS FOR PRELIMINARY INJUNCTION

Plaintiffs were unsuccessful in their lobbying efforts to have their preferred paper-ballot system selected by the Georgia General Assembly. So, they now seek to have this Court force the State of Georgia to use Plaintiffs' preferred paper-ballot election system instead of the paper-ballot system selected by election experts and policymakers. In seeking this relief when the

---

[1] State Defendants are Defendants Secretary of State Brad Raffensperger and State Election Board Members David J. Worley, Rebecca N. Sullivan, Anh Le, and Seth Harp.

[2] Plaintiffs Donna Curling, Donna Price, and Jeffrey Schoenberg are referred to as the "Curling Plaintiffs."

[3] Plaintiffs Coalition for Good Governance, Laura Digges, William Digges III, Ricardo Davis, and Megan Missett are referred to as the "Coalition Plaintiffs."

Constitution *specifically* reserves most election-administration decisions to States, Plaintiffs rely on a series of inaccurate and misleading allegations about the paper ballots marked by ballot-marking devices ("BMDs") that have already been piloted in six counties in the November 2019 elections.

Plaintiffs cannot establish a likelihood of success on the merits to warrant a mandatory preliminary injunction in their favor. BMDs are far more like hand-marked paper ballots than they are like DREs. Both BMDs and hand-marked systems use paper ballots; provide paper trails of cast ballots; are auditable; are recommended by the National Academy of Sciences and the U.S. Senate Intelligence Committee; are certified by the Election Assistance Commission; and use optical scanners to count votes in the same manner. Where BMDs and hand-marked systems differ, BMD-marked paper ballots offer significant advantages: there are no questions of voter intent; all voters have accessibility options like large print; and disabled voters are not forced to vote on a separate system, among other benefits. After weighing all the competing interests—including hearing from Plaintiffs in their role as lobbyists—the State of Georgia selected a paper-ballot system marked by BMDs. Georgia is not an outlier in that decision: 44 states will use BMDs in one form or another in the 2020 elections. [Doc. 616-1 at ¶ 7]. Even Curling

Plaintiffs' expert, Dr. Halderman, acknowledges the scientific community recommends using BMDs that create paper ballots. [Doc. 571-1 at 151:1-23].

Even if Plaintiffs could demonstrate a likelihood of success, they still cannot meet the other requirements for a mandatory preliminary injunction. Ultimately, Plaintiffs' position—unsupported by any authority—fails as a matter of law. Accordingly, and for the reasons that follow, the Court should deny Plaintiffs' Motions for Preliminary Injunction.

## STATEMENT OF FACTS

Plaintiffs advocate for a policy of exclusive use of hand-marked paper ballots. Both Donna Curling and Donna Price are on the staff of Georgians for Verified Voting [Docs. 619-3 at ¶ 5, 619-4 at ¶5], which advocates for a hand-marked paper ballot election system and advocates against BMDs. *See* Georgians for Verified Voting, Take Action page.[4] Jeffrey Schoenberg likewise personally disagrees with Georgia's decision to purchase BMDs. [Doc. 619-5 at ¶¶ 7-8].

Coalition Plaintiffs Megan Missett, Ricardo Davis, Laura Digges, and William Digges all personally oppose BMD-marked paper ballots. [Doc. 640-1, pp. 151-152, 157-158, 163, 168]. The Coalition for Good Governance works to

---

[4] Available at http://gaverifiedvoting.org/action.html (last accessed Nov. 13, 2019).

advance its mission in the context of elections, [Doc. 628 at ¶ 214], and explains that bringing "paper ballots to Georgia" is its work. *See* Donate Coalition For Good Governance, [https://coalitionforgoodgovernance.org/donate/.](https://coalitionforgoodgovernance.org/donate/.)

In their attempt to turn a policy disagreement about which paper-ballot system is best into a federal constitutional claim, Plaintiffs seek to confuse the Court about the use of barcodes and other components of BMDs. While lengthy, their efforts are ultimately unavailing.

## I.   Plaintiffs are attempting to confuse and mislead the Court.

Plaintiffs first try to persuade the Court that BMDs are just like DREs. But that is simply untrue. Plaintiffs further offer only speculation to support their argument that the new BMD system is more susceptible to a security breach than their preferred system. Plaintiffs make vague, baseless statements that data *might* be transmitted from the DRE/GEMS system to the BMDs. But remote, unfounded speculation is insufficient to meet the high burden necessary for this Court to issue a mandatory injunction.

### A.   *BMDs are safe, recommended, and widely-used voting systems.*

Experts recognize BMDs as a safe and secure voting system. The National Academy of Sciences, while critical of DREs, recommends paper ballots (1) marked by either BMDs or by hand and (2) counted using optical

scanners or by hand.[5] Even Dr. Halderman recognizes that the scientific community currently recommends BMDs.[6] [Doc. 571-1 at 151:1-23]. Similarly, the U.S. Senate Intelligence Committee, as part of its recommendations regarding its Russia investigation, recommends U.S. Election Assistance Commission ("EAC")-certified machines that have a voter-verified paper trail—two features of Georgia's BMDs. Report of the Select Committee on Intelligence, United States Senate, on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election ("Senate Report"), attached as Ex. 1, at 59; *see also* [Doc. 571-1 at 156:9-13].

Plaintiffs cannot point to any real security risk or hacking potential the use of BMDs poses. Plaintiffs rely exclusively on prior security allegations regarding DREs as justification to challenge the new system. But Georgia's new BMD system is completely separate from the old DRE/GEMS systems. Dec. of Dr. Eric Coomer, attached as Ex. 2 ("Coomer Dec.") at ¶ 7; Dec. of Juan E. Gilbert, PH.D., attached as Ex. 3 ("Gilbert Dec.") at ¶ 43.

---

[5] [Doc. 285-1 at 34 ("4.11 Elections should be conducted with human-readable paper ballots. These may be marked by hand or by machine (using a ballot-marking device); they may be counted by hand or by machine (using an optical scanner).")].

[6] Dr. Halderman's personal disagreement with that recommendation runs counter to the expert consensus. [Doc. 571-1 at 151:1-23].

Contrary to Coalition Plaintiffs' vague allegations that "legacy GEMS files" will be converted and transferred to the new BMD system, this new system replaces the *entirety* of the existing DRE system, including the GEMS servers, DREs, and ExpressPoll units, and **will not import any data from the current GEMS Servers or GEMS Databases**.[7] [Doc. No. 556]; *see also* [Doc. 571-1 at 46:18-23]; Coomer Dec. at ¶ 7. The Dominion Election Management System (EMS) is completely replacing the GEMS/DRE system, the system currently used to build ballots, receive votes, and tabulate those votes. [Doc. 556 at 2]; Coomer Dec. at ¶ 7. The Dominion BMD system, which includes an electronic ballot-marking device, a printer, and an optical scanner connected to a locked ballot box, is replacing DREs. Coomer Dec. at

---

[7] There are at least five different systems that are part of the overall election process in Georgia. Three of those systems do not connect to the BMD voting system and are *not* changing: (1) The voter registration database (ENET), which is used by county registrars to maintain and update voter registration records. A flat-text extract from ENET is loaded into pollbooks for each election, but this system does not connect to the Dominion BMD system; (2) The My Voter Page (MVP), which is a separate, outward-facing system used to provide information to voters and does not input any information into ENET or any other part of the Georgia election system; and (3) The Online Voter Registration system (OLVR), which is a separate system used by voters to register to vote or update their voter registration by sending information to the local registrar for review. OLVR does not input any information directly into ENET or any other part of the Georgia election system—any applications or changes submitted by voters are sent to the county registrar for processing.

¶ 7. A system of KNOWink Poll Pads, which will receive text-file data from ENET after the security scans required by Georgia law, is completely replacing the ExpressPoll system. Coomer Dec. at ¶¶ 3, 8.

Plaintiffs' criticism that Dominion's system is only certified under the EAC's Voluntary Voting System Guidelines ("VVSG") 1.0 is equally misleading. In fact, **no** election system in the country has been certified under the most recent VVSG standards (*i.e.* VVSG 1.1). VVSG 2.0 has not even been completed yet. U.S. Election Assistance Commission, Certified Voting Systems, About the Testing & Certification Program[8]; Gilbert Dec. at ¶ 24. Every system currently certified by the EAC, including Georgia's, is certified to VVSG 1.0. Plaintiffs can hardly even claim ignorance that no election system in the country has been certified under the VVSG 1.1 or VVSG 2.0 standards given that Plaintiffs' expert, Phillip Stark, is on the Advisory Board of the Election Assistance Commission.  [Doc. 419-1 at 169].

> B. *Plaintiffs' attacks on the Dominion system are incorrect and are about the optical scanners.*

Curling Plaintiffs also attack the Dominion system, relying heavily on the Texas denial of certification of Dominion's system and a single DEF CON

---

[8] Available at https://www.eac.gov/voting-equipment/certified-voting-systems (last accessed Nov. 13, 2019).

report. But almost all the alleged vulnerabilities they identify *apply equally* to their proposed hand-marked paper ballot system.

The alleged deficiencies identified by Texas examiners primarily relate to the *optical scanners* (ICP units), not the BMDs,[9] which Curling Plaintiffs advocate the State continue using. [Doc. 619-2 at ¶ 20] (identifying paper jams in *optical scanners* and the quality of the scans they produce, especially concerning the quality of scans for hand-written components); Coomer Dec. at ¶¶ 6, 9. Dr. Halderman likewise criticizes the *optical scanners* that would be used in Curling Plaintiffs' proposed system as open to hacking, [Doc. 619-2 at ¶ 5], and he criticizes the Dominion ICP units for lacking a memory-management unit[10] [Doc. 619-2 at ¶ 21]. The DEF CON report[11] hacked a

---

[9] The Dominion BMD system includes a large tablet used for the voter to make selections on a screen that then prints onto a paper ballot. After an opportunity to review, the voter then places the paper ballot into an optical-scan unit (ICP) to create an image of the ballot. The paper ballot is automatically placed into a locked ballot box by the ICP after scanning.

[10] Dr. Halderman ignores the fact that the independent testing confirmed that no votes were lost when the unit was rebooted and the entire voting process could continue normally. [Doc. 619-7 at 17] (Pro V&V explanation that there is no loss of data). He only offers speculation about the type of software used and does not claim to have personally examined it, unlike the EAC-certified testing lab, Pro V&V, which undertook detailed certification testing. [Doc. 619-2 at ¶ 21].

[11] The DEF CON Voting Village efforts have been specifically criticized by the U.S. Department of Homeland Security because of the extended physical

Dominion *optical scanner* (ICP unit) not—despite Curling Plaintiffs' claim it was a "hybrid BMD and ballot scanner"—a BMD or other component of the election system. [Doc. 619-9 at 19-20]. And it didn't even hack the type of optical scanner that will be used in Georgia. Gilbert Dec. at ¶¶ 70-71; Coomer Dec. at ¶ 13.

If these alleged deficiencies are a sufficient basis to find a constitutional violation regarding the Dominion System, it makes no sense why Curling Plaintiffs seek to have this Court order the continued use of the same *optical-scan units* they criticize. Despite their best efforts, the vulnerabilities Curling Plaintiffs identified are not the same as those of the GEMS/DRE system and in fact cut against their own argument for the use of Dominion optical scanners in their preferred election system.

C.     *There is no peer-reviewed evidence that voters do not verify their ballots.*

Plaintiffs also can offer no peer-reviewed evidence that voters "do not or cannot verify human-readable summaries" of BMD-marked ballots. [Doc. 619-1 at 15]. The article attached as Exhibit 4 to Curling Plaintiffs' brief as support for the lack of voter verification has not been peer-reviewed and is

---

access to the machines that did not replicate actual election conditions. Senate Report at 41.

only posted to SSRN, a research site.[12] [Doc. 619-10 at 2]; Gilbert Dec. at

¶¶ 48-49. Moreover, as Dr. Gilbert explains, new research suggests that an

increased number of voters actually review their ballots when prompted to do

so. Gilbert Dec. at ¶ 51.[13] [14]

 Dr. Lee notes that a voter can ignore requests to verify, but does not

cite any support for the concept that mass numbers of voters ignore

instructions to review their ballots. [Doc. 615-2 at 3]. The article attached as

Exhibit 4 to Curling Plaintiffs' brief also acknowledges that voters can make

mistakes using either BMDs or hand-marked paper ballots. [Doc. 619-10 at

2]. So does Dr. Halderman, when explaining a single experiment he

---

[12] Dr. DeMillo acknowledged this on Twitter in response to criticism of this article. @rad_atl, twitter.com (September 29, 2019 2:36 PM) https://twitter.com/rad_atl/status/1178423229880426496 ("Publication in open access journals is meant for rapid dissemination of preprints; it's not a substitute for publication in peer reviewed archival journals.").

[13] Dr. Halderman also admits that prompting voters to review may increase their rates of review. [Doc. 619-2 at FN. 4.]

[14] Coalition Plaintiffs' first expert, Mr. Bernhard, also sharply criticized the article attached as Exhibit 4 to Curling Plaintiffs' brief for assuming that "no voter anywhere will or can verify their ballot, which is just not true" and noting that the article does not look at "actual voter behavior or polling place practices." @umbernhard, twitter.com (September 29, 2019 3:06 PM), https://twitter.com/umbernhard/status/1178430774653177856 and @umbernhard, twitter.com (September 29, 2019 3:06 PM) https://twitter.com/umbernhard/status/1178430778209964033. He likewise recognized that the paper "heavily relies on another deeply flawed study that also hasn't been peer-reviewed." @umbernhard, twitter.com (September 29, 2019 6:16 AM) https://twitter.com/umbernhard/status/1178297516162473987.

conducted that is still undergoing peer review and which is not yet complete. [Doc. 619-2 at ¶¶ 14, 16]. However, research also shows that voters will verify their ballots when posted instructions are given, such as those required by H.B. 316. Gilbert Dec. at ¶ 50.

In short, Plaintiffs do not allege any harms different than those that theoretically could occur in their preferred system. Hand-marked ballots are prone to overvotes, and stray marks or voter confusion can cause problems in counting hand-marked paper ballots. [Doc. 472-1 at ¶¶ 36, 48, 52]. Hand-marked paper ballots are *more* susceptible than BMDs to fraud and manipulation because they can be manipulated without any technology. [*Id.* at ¶¶ 40, 45]; Gilbert Dec. ¶ 37(C).

## II.  BMDs and hand-marked ballots are substantially similar.

BMD election systems and hand-marked paper ballot voting systems are similar in many ways. Both use paper ballots; both are considered paper-ballot systems by the EAC; and both provide auditable paper trails of cast ballots.[15] Gilbert Dec. at ¶¶ 33-35. H.B. 316 requires that the new voting machines provide an "elector verifiable" audit trail. O.C.G.A. § 21-2-300(a)(3). The legislation also provides for a post-election audit of elections and requires

---

[15] *See* U.S. EAC, 2005 VVSG, Vol. 1, V. 1.0 § 4.3.5 (referring to ballot marking as a paper-based system).

audits of federal or state general elections prior to certification of the election results. O.C.G.A. § 21-2-498; *see also* O.C.G.A. § 21-2-499; Gilbert Dec. at ¶¶ 19-20.

As this Court is aware, the Secretary of State's office selected the Dominion BMD Voting System on July 29, 2019 after a competitive procurement process that included evaluators from multiple State agencies and county election offices. The Dominion system includes an electronic BMD, a printer, and an optical scanner (ICP) connected to a locked ballot box. Coomer Dec. at ¶ 3. The Dominion BMD allows the voter to make selections on a screen and then prints those selections onto a paper ballot. *Id*. at ¶ 4. The voter has an opportunity to review the paper ballot before placing it into the scanner. *Id*. BMDs thus create an auditable, verifiable ballot, as required by statute. O.C.G.A. § 21-2-300(a)(2) ("electronic ballot markers shall produce paper ballots which are marked with the elector's choices **in a format readable by the elector**" (emphasis added)); Gilbert Dec. at ¶¶ 33-35.

An optical scanner is programmed to look for information at particular coordinates and then tabulates votes based on the information at that location—the scanner does not read the text portion of either a BMD-marked ballot or a hand-marked ballot. Coomer Dec. at ¶ 9. What matters is not the candidate information, but rather the programming for where the computer

looks for information at particular coordinates. *Id*. The method by which a BMD-marked ballot and hand-marked ballot are read by the optical scanner is identical. *Id*.

BMDs that print barcodes are used in six of the ten largest counties in the country, including Los Angeles, California; Cook County/City of Chicago; Maricopa, Arizona; San Diego, California; Dallas, Texas; and Riverside, California. Coomer Dec. at ¶ 5.  Of those six counties, five are using the Dominion BMD. *Id*.

Because Georgia's new voting system produces paper ballots that clearly indicate voters' selections, they can be audited to verify results. Georgia is implementing an auditing process with the help of multiple experts in the elections field.[16] Gilbert Dec. at ¶¶ 19-23. Even the experts, like Dr. Halderman, most resistant to BMDs acknowledge that a sufficient audit of a BMD-generated ballot can "detect and correct" the kinds of hypothetical hacking attacks about which he warns. [Doc. 619-2 at ¶¶ 6-7]; Gilbert Dec. at ¶ 39(D). He is only left with speculation about the scope of

---

[16] This approach is consistent with expert recommendations: the Senate Intelligence Committee recommends audits for BMD and hand-marked paper systems as a way to "ensure confidence in the integrity of the vote." Senate Report at 59. The NAS also recommends recounts and audits of the "**human-readable portion** of the paper ballots." [Doc. 185-1 at 108].

audits that have not yet been designed as a basis for him to disagree with the National Academy of Sciences and the Senate Intelligence Committee. [Doc. 619-2 at ¶ 8]. But state and county officials earlier this week conducted pilot audits on elections held in the City of Cartersville. [Doc. 616-1 at ¶ 19]. The information from that pilot will be used to develop the state-wide audits H.B. 316 requires.

Curling Plaintiffs make much of Colorado announcing it is abandoning bar codes on its BMD-marked ballots. [Doc. 619-1 at 19]. But they conveniently ignore the fact that Colorado is *not* moving its existing Dominion system immediately to a non-barcode system because "an enhanced system **is being developed** and it will be tested and **certified** before it is deployed." Colorado Secretary of State News Release, *Colorado Secretary of State Takes Action to Increase Cyber Security, Announces Initiative to Remove QR Codes from Ballots* (August 16, 2019).[17] Even the article cited by Curling Plaintiffs noted that the change away from barcodes will not take effect until 2021—more than a year away. Kevin Collier, *First on CNN: Colorado becomes first state to ban barcodes for counting votes over security concerns*,

---

[17] Available at https://www.sos.state.co.us/pubs/newsRoom/pressReleases/2019/PR20190916QRCodes.html (last accessed Nov. 13, 2019).

CNN (September 16, 2019).[18] Dr. Halderman knows this, because he explains that an upgrade that allows for non-barcode ballots on the Dominion system *has not yet been certified* by the EAC. [Doc. 619-2 at ¶ 9].

Finally, Georgia's BMD System is compliant with federal and state law. Unlike some states, Georgia requires EAC certification for its election machines. O.C.G.A. § 21-2-300(a)(3). The Help America Vote Act ("HAVA") created the EAC, which set up a rigorous process for voting-equipment certification, working with committees of experts and coordinating with the National Institute of Standards and Technology. 52 U.S.C. § 20962; *see also* 52 U.S.C. §§ 20962, 20971 (test lab standards). The Dominion system certified by Georgia is certified to the standards developed by these rigorous processes.

## III. BMDs are preferred over hand-marked ballots for a number of reasonable policy considerations.

Plaintiffs consistently overlook the fact that the General Assembly, not the Plaintiffs in this litigation, has the authority to determine the method of voting for Georgia elections. Taking into consideration the concerns raised by many Georgians regarding Georgia's old DRE voting system, the General

---

[18] Available at https://www.cnn.com/2019/09/16/politics/colorado-qr-codes-votes/index.html (last accessed Nov. 13, 2019).

Assembly passed H.B. 316, which authorized a new voting method for Georgians to be implemented by the Presidential Preference Primary in 2020. There are a number of reasonable policy considerations that explain the decision to choose BMDs over Plaintiffs' preferred system.

A.    *BMDs are accessible for disabled voters.*

Hand-marked paper ballots are not an option for many voters with disabilities. Gilbert Dec. at ¶ 40(A). Without the use of technology, voters with disabilities are unable to mark paper ballots privately and independently. *Id.* Nor can many voters with disabilities visually verify that the completed paper ballot is correct. Technology does not exist that would allow voters with disabilities complete independence while voting on a paper ballot system, and Plaintiffs' preferred voting system—hand-marked ballots counted by optical scan units—are not equipped for all voters to independently mark and verify their ballots, resulting in the disenfranchisement of voters with disabilities. *Id.*

Utilizing a single, accessible voting system—*i.e.,* BMDs—bypasses many legal and practical issues that may arise when a State employs a default system of hand-marked ballots with a separate system for voters with disabilities. A separate system for voters with disabilities results in two systems that are inherently "separate and unequal." Dec. of M. Riccobono,

attached as Ex. 4 ("Riccobono Dec.") at ¶¶ 8, 13. Having only voters with disabilities vote on BMDs can result in the loss of the right to vote by secret ballot. *Id*. at ¶ 9. Using BMDs only for voters with disabilities can create a greater risk to election security than using BMDs more broadly. *Id*. at ¶ 11.

These are not isolated concerns. Disability advocacy groups have issued position papers against the general movement towards exclusive hand-marked ballot voting systems in the United States. *See* NAT'L DISABILITY RIGHTS NETWORK, *National Disability Rights Network Statement on Balancing Security and Accessibility in Voting*[19] (noting **"A return to hand-marked paper ballots will inevitably, inexcusably disenfranchise voters**—even as access to the vote for people with disabilities has improved under the Help America Vote Act (HAVA)") (emphasis added). Specifically, requiring hand-marked ballots for all Georgia voters except for voters with disabilities results in:

> (1)  State-sanctioned segregation of disabled voters as it would require that only disabled voters can use BMDs;

---

[19] Available at https://leg.mt.gov/content/Committees/Interim/2017-2018/State-Administration-and-Veterans-Affairs/Meetings/Mar-2018/NDRN%20Statement%20on%20Balancing%20Security%20%20Access%20in%20Voting%20%20(December%202017).pdf (last accessed Nov. 13, 2019).

(2)  Violation of the constitutional right to ballot
secrecy given the limited number of disabled
voters at precincts and the readily-
distinguishable nature of the BMD ballot from
a HMPB; and

(3)  Concerns regarding poll workers' abilities to
run the BMDs and the poll workers' authority
to determine which voters are "disabled
enough" to use a BMD for any given election.

Letter from Curt Decker to House Representatives Zoe Lofgren and Rodney
Davis dated June 25, 2019;[20] *see also* Riccobono Dec. at ¶ 10 (voters
encountered BMDs that had not been plugged in or set up because they were
so infrequently used).

In fact, should this Court mandate that the State of Georgia move to an
exclusively hand-marked system (except for one BMD at each precinct, as
proposed by Plaintiffs), the State of Georgia would likely be subject to
additional litigation from voters with disabilities based on Title II of the
Americans with Disabilities Act and Section 504 of the Rehabilitation Act of
1873.  *See,* Riccobono Dec. at ¶ 12; Complaint, *Nat'l Federation of the Blind,
Inc. v. Lamone*, Civil Action No. 1:19-cv-02228-SAG (D. Md. filed Aug. 1,

---

[20] Available at https://republicans-
cha.house.gov/sites/republicans.cha.house.gov/files/documents/Concerns%20w
ith%20SAFE%20Act%20Final.pdf (last accessed Nov. 13, 2019).

2019) (challenging Maryland's policy decision to have hand-marked ballots as the default voting option with BMDs for voters with disabilities).

And accessibility is a benefit for all voters: even voters without disabilities but who prefer larger text have the option to increase the text size on a BMD. Gilbert Dec. at ¶ 40(B).

B.    *BMDs provide clear voter intent, unlike hand-marked ballots.*

BMD-marked paper ballots provide clear voter intent, unlike hand-marked ballots, where voters often circle or "x" through selections instead of filling in bubbles. Ledford Dep. at 37:8-38:4 (discussing issues with spoiled ballots); 49:8-22; [Doc. 571-1 at 262:11-20] (Bridges describing voter errors); Gilbert Dec. at ¶ 39(C).

As Dr. Gilbert explains, a voter's mark may be evidence of the intention of a voter to cross-out or circle a candidate in disregard of the ballot's instructions. Gilbert Dec. at ¶ 53. Of course, even the article cited by Curling Plaintiffs acknowledges that voters can make mistakes using either BMDs or hand-marked ballots. [Doc. 619-10 at 2]. In addition, the *Report of the 21st Century Voting Commission*[21] shows that overvotes and undervotes on hand-

---

[21] Available at
https://www.sos.state.co.us/pubs/elections/VotingSystems/files/2015/21stCenturyReport.pdf (last accessed Nov. 12, 2019).

marked paper ballots were far more prevalent in majority-minority precincts, suggesting errors do not "cancel each other out" as Dr. Halderman assumes. Gilbert Dec. at ¶ 54. In contrast, Dr. Halderman, for his part, provides no evidence to support his assertions that hand-marked paper ballot errors are "random" or that the errors favoring one candidate or the other equalize or cancel each other out.

## IV.   Coalition Plaintiffs' Theories about Ballot Secrecy are Incorrect.

Coalition Plaintiffs offer a theory that ballot secrecy will be lost due to the auditing capabilities of the Dominion system. [Doc. 640-1 at 23-30]. But this is simply wrong and completely mischaracterizes the reality of how the Dominion system operates.

When a ballot is scanned into a Dominion optical scanner, whether that ballot is hand-marked or marked by a BMD, the scanner creates a digital image of the front and back of the ballot. Coomer Dec. at ¶ 10. The tabulating software also adds a feature called an "AuditMark" to each image. *Id*. The AuditMark is a text representation of how the tabulating software interpreted the ballot when it was scanned. *Id*. That scanned image can later be used as part of an audit of the election. *Id*.

Contrary to Coalition Plaintiffs' theorizing, each AuditMark includes only (1) what tabulating unit scanned the ballot and (2) a randomized sequence number. *Id*. There is no way to correlate the sequence number to an individual voter or any point in time that the ballot was cast. *Id*. The optical scanner does not store any date or time-stamp information with the ballot image. *Id*. In short, it is impossible to re-recreate the sequence of the order in which the ballots were cast—meaning it is impossible to determine how someone voted. *Id*. Further, the paper ballots jumble in the ballot box, making the precise order in which they were cast unknowable. Dec. of Chris Harvey, attached as Ex. 5 ("Harvey Dec.") at ¶ 7.

Like their concerns with challenged voter panels and Grady High School federal-only ballots earlier in this case [Doc. 472 at 44-46], Coalition Plaintiffs do not understand how the voting system works and assume it can be hacked. The evidence before this Court demonstrates that Georgians' ballot-secrecy cannot be compromised on the new voting system.

## V.    Georgia Remains on Track for Rollout of BMDs and Risk-Limiting Audits.

Georgia's rollout of the BMD system is on track to be completed by the Presidential Preference Primary in 2020. Just last week, voters in six counties used the Dominion BMD system. [Doc. 616-1 at ¶ 13.]

The State is also on track for the development of the auditing processes required by H.B. 316. The audit pilot in the City of Cartersville will take place in coordination with Verified Voting and VotingWorks and it will include risk-limiting features. Harvey Dec. at 10. Once the pilot audit is complete using different methods, the Secretary of State's office will prepare rules for statewide audits. Only four other states currently use risk-limiting audits in any capacity. [Doc. 571-1 at 166:23–167:7]. Georgia will be using those audits to detect any problems with the election system.

## ARGUMENT AND CITATION TO AUTHORITY

### I.   Standard of review.

To obtain preliminary-injunctive relief, the moving party must show that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). In the Eleventh Circuit, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four prerequisites." *Id.* (internal citations omitted).

The Court may not grant a preliminary injunction "unless the movant clearly establishes the burden of persuasion as to the four requisites. *Am. Civil Liberties Union of Fla., Inc. v. Miami–Dade Cnty. Sch. Bd.*, 557 F. 3d 1177, 1193–94 (11th Cir. 2009)). "Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits." *Id.*

The extraordinary nature of the relief sought by Plaintiffs is heightened in the context of elections, because of the public interest in orderly elections and the integrity of the election process. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5, 127 S.Ct. 5 (2006). Each state has "'broad power to prescribe the '[t]imes, [p]laces and [m]anner of holding [e]lections for [s]enators and [r]epresentatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices.'" *Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1191 (2008) (citations omitted).

## II.   Plaintiffs are unlikely to succeed on the merits.

### A.   *Plaintiffs have failed to state a claim for relief.*

1.   <u>Plaintiffs' claims pertain to the method of tabulating and counting votes, which is outside the scope of federal-court jurisdiction.</u>

Essentially, Plaintiffs' injunction motions take issue with the method by which the State of Georgia has chosen to tabulate and count votes.  [*See*

Docs. 619-1 at 16-25; 640-1 at 14-18.]  Plaintiffs spin a wild tale of problems with the Dominion BMD system, including vulnerability to malware, voter verification issues, and auditing deficiencies that is not based in reality. [*See* Doc. No. 619-1 at 21]. Plaintiffs assert that State Defendants have repeatedly insisted on "their way or the proverbial highway," [*id.* at 23], but the irony of this statement must be lost on Plaintiffs, given their never-ending quest to force their preferred policy choice—hand-marked paper ballots—onto Georgia voters.

The United States Constitution authorizes states to proscribe the "time, place, and manner" of elections—both federal and state. U.S. CONST. ART. I § 4, CL.1. Congress has the authority to impose regulations and laws regarding elections—which it did when it passed HAVA in 2002—but it has yet to mandate that states employ particular voting equipment or methods for elections. *See* 52 U.S.C. § 21081(a) (providing requirements for lever voting systems, optical scanning voting systems, direct recording electronic systems, and paper ballot voting systems[22]). Instead, HAVA provides general requirements for a voting system, including, among other things, voter

---

[22] Plaintiffs must also believe that Congress was mistaken when it passed HAVA, because it allowed states to select from a variety of voting methods Plaintiffs claim are unconstitutional.

verification of selections prior to casting the ballot, providing the voter the opportunity to change or correct any error prior to casting a ballot, notifying a voter if he or she overvotes and provide an opportunity to correct such error, and voter education regarding overvotes. 52 U.S.C. § 21081(a)(1)(A), (B). The voting system must have the ability to conduct an audit and be accessible for individuals with disabilities. *Id.* at (a)(2)-(3).

Unlike some states, Georgia requires its election machines to be certified by the EAC. O.C.G.A. § 21-2-300(a)(3). The EAC was created by HAVA and set up a rigorous process for the certification of voting equipment. There are three bodies charged with developing the voting-system standards and requirements by HAVA:

- A 110-member Standards Board is made up of 55 state election officials and 55 local election officials. 52 U.S.C. § 20943.

- A 37-member Board of Advisors representing relevant government agencies and associations in the fields of science and technology. 52 U.S.C. § 20944.

- A 15-member Technical Guidelines Development Committee chaired by the Director of the National Institute of Standards and Technology ("NIST"). 52 U.S.C. § 20961.

The Technical Guidelines Developments Committee is charged with creating the VVSG standards that are also reviewed by the Standards Board and Board of Advisors, as well as the full EAC prior to implementation. 52 U.S.C. § 20962. The expert-led development process culminated in not only the VVSG 1.0 and 1.1 standards but also the certification requirements for Voting System Test Labs ("VSTLs" also called Independent Testing Authorities or ITAs). *See* 52 U.S.C. §§ 20962, 20971. The EAC publishes an 84-page manual governing the VSTLs and what is required for their certification. *See* EAC, *Voting System Test Laboratory Program Manual Version 2.0* (May 31, 2015).[23] The VSTLs are then required to utilize a 99-page manual governing testing when analyzing voting equipment for certification. *See* EAC, *Testing and Certification Program Manual Version 2.0* (May 31, 2015)[24]  The VSTLs following those guidelines test voting systems against the VVSG standards. The VVSG 1.0 guidelines, for example, run more than 200 pages covering usability, functionality, accessibility, security,

---

[23] Available at https://www.eac.gov/assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf (last accessed Nov. 13, 2019).
[24] Available at https://www.eac.gov/assets/1/28/Cert.Manual.4.1.15.FINAL.pdf (last accessed Nov. 13, 2019).

quality assurance, among dozens of other guidelines. *See Voluntary Voting System Guidelines Version 1.0.*[25]

Both BMDs and hand-marked ballots are certified by the EAC as voting systems for elections in the United States. *See id.* at Vol. I, V. 1.l, Section 2.3.1.2 (referring to ballot marking devices as a part of a paper-based voting system).

HAVA recognizes the substantial discretion states enjoy in creating and implementing election procedures within these parameters. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1080 (N.D. Fla. 2004) (holding that provisions voting section of HAVA must be interpreted in accordance with state law on that issue); *see also Paralyzed Veterans of Am. v. McPherson*, Case No. C-06-4670-SBA, 2006 WL 3462780, at *9 (N.D. Cal. 2006) ("HAVA section 301 is framed in terms of requirements for voting systems, *which are chosen by state and county officials*.") (emphasis added).

Moreover, given the specific direction in the Constitution and discretion allowed to states, courts have long been reticent to encroach on the state's chosen election system absent severe circumstances that are not present in Georgia's BMDs. *See*, *e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1077-78 (1st Cir.

---

[25] Available at https://www.eac.gov/assets/1/28/VVSG.1.0_Volume_1.PDF (last accessed Nov. 13, 2019).

1978) (treating the election process as "including as part thereof the state's administrative and judicial corrective process" and holding that federal courts should not intervene in state election administration as long as "the alleged misconduct is lacking in 'enormity' " and the state administrative remedy is adequate); *Curry v. Baker*, 802 F.2d 1302, 1304 (11th Cir. 1986) (noting that state courts constitute "far better forums" for resolving state and local election disputes); *Minn. Voters All. v. Ritchie*, 890 F. Supp. 2d 1106, 1112 (D. Minn. 2012) (explaining that the Eighth Circuit has held that there is not a federal constitutional basis for a federal court to oversee administrative details of a local, state election absent aggravating factors). Plaintiffs' subjective apprehensions concerning the Dominion BMD system are completely different than their claims about DREs and do not displace the State of Georgia's broad leeway to decide and implement election procedures for Georgia elections.

The State of Georgia, through the General Assembly, must "weigh the pros and cons of various balloting systems" to make state policy and "[s]o long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Weber v. Shelley*, 347 F.3d 1101, 1107 (9th Cir. 2003); *see also McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 808-09 (1969) (noting that "a legislature need not run the risk of losing an entire remedial

[electoral] scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked."); *Green Party of N.Y. v. Weiner*, 216 F.Supp.2d 176, 190–91 (S.D.N.Y. 2002) (dismissing the Green Party's challenge to the state's use of paper ballots during its primary on the ground that "[i]t may or may not be desirable for New York to purchase more or newer voting machines, or to adopt some more modern technology for conducting election[s] . . . [b]ut that debate is for the elected representatives of the people to decide, after balancing the pros and cons of different systems against their expense."). "[T]he mere possibility of error" is not enough to bar the use of a particular voting system, especially given the state interest in the orderly conduct of elections. *Banfield v. Cortés*, 631 Pa. 229, 260 (2015); *see also Stein v. Cortés*, 223 F. Supp. 3d 423, 441-42 (E.D. Pa. 2016).

Given the Constitution's clear delineation of state sovereignty in the realm of elections, state election procedures should only be challenged in federal court in limited circumstances, "such as when the complained of conduct discriminates against a discrete group of voters . . . or when the willful and illegal conduct of elections officials" result in a fraudulent election. *Nolles v. State Comm. for Reorganization of Sch. Dists.*, 524 F.3d 892, 898-99 (8th Cir. 2008). Despite their rhetoric, Plaintiffs' allegations

about BMDs do not suggest that discrimination against a discrete group of voters or willful and illegal conduct of elections officials will occur in BMD elections. Rather, Plaintiffs' allegations are largely technical, claiming that theoretical hacking, verification, and auditing concerns with the Dominion BMD system infringes on their fundamental right to vote. [*See* Doc. No. 619-1 at 20-29; Doc. No. 640-1 at 14-30.]. Unlike their claims about DREs, Plaintiffs have not alleged actual violations and their claims are outside the jurisdiction of the Court. *Nolles*, 524 F.3d at 898-99.

### 2.   Plaintiffs' claims ignore disability access issues.

Both Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act prohibit discrimination against individuals with disabilities. Title II of the ADA provides that "no qualified individual with a disability shall by reason of such disability be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In enacting the ADA, Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to both eliminate discrimination and to integrate disabled individuals into the social mainstream of American life. 42 U.S.C. § 12101(a)(5).

HAVA also requires the state to provide persons with disabilities access to voting technology that provides them with the means to vote in private and independently "through the use of at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place." 52 U.S.C. § 21081(a)(3). These federal laws require that disabled individuals receive an opportunity to participate that is equal to that afforded to others. *See Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016); *see also* 28 C.F.R. § 35.130(b)(1)(ii). Specific to elections, requiring blind and visually impaired individuals to vote with the assistance of a third party, for example, at best provides these individuals with a voting experience not equal to that afforded others. *Cal. Council of the Blind v. Cty. of Alameda*, 985 F. Supp. 2d 1229, 1239 (N.D. Cal. 2013); *see also Lamone*, 813 F.3d at 506.

Plaintiffs' legal theory is that any use of BMDs by the general public is unconstitutional and necessitates this Court's intervention. [Docs. 619-1 at 6-7; 640-1 at 18]. Purporting to account for protections for disabled voters, Plaintiffs call for hand-marked ballots with one BMD at each precinct for use by disabled individuals. [Docs. 619 at 2; 640-1 at 3].

Plaintiffs theory is inherently illogical—that BMDs (or at least BMDs that use barcodes) are an unconstitutional election system for all voters

except for disabled voters. Should this Court agree with Plaintiffs' theory and grant their requested relief, the Court would force Georgia's most vulnerable voters to use a voting system the Court has deemed unconstitutional. At minimum, Plaintiffs' theory would run afoul of HAVA and ADA, requiring the Georgia's voters with disabilities, relegated to a position of "political powerlessness in our society," *Tennessee v. Lane*, 541 U.S. 509, 516 (2004), to utilize a sharply disparate means of voting that Plaintiffs claim would place those voters' actual votes and private information at risk of harm. At its worst, Plaintiffs' theory asserts that it is permissible for disabled voters to use an unconstitutional election system that is insufficient for the general populace, raising obvious Equal-Protection concerns.

The decision to utilize BMDs for all voters also avoids the likelihood of litigation under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1873. *See* Riccobono Dec. at ¶ 12; Complaint, *Nat'l Federation of the Blind, Inc. v. Lamone*, Civil Action No. 1:19-cv-02228-SAG (D. Md. filed Aug. 1, 2019) (challenging Maryland's policy decision to have hand-marked ballots as the default voting option with BMDs for disabled voters). The State of Georgia's reasonable policy position to avoid an inherently "separate and unequal" system, Riccobono Dec. at ¶¶ 8, 13, is completely eviscerated by Plaintiffs' proposed relief.

3.   <u>Plaintiffs' arguments amount to policy disagreements, not colorable legal claims.</u>

As stated above, states—including the State of Georgia—retain constitutional and regulatory authority to ensure the integrity and efficiency of elections.  U.S. CONST. ART I, § 4, CL. 1; *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006). "[T]he framers of the Constitution intended the States to keep for themselves, as provided by the Tenth Amendment, the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452, 461-62 (1991) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)); *see also Favorito v. Handel*, 285 Ga. 795, 796 (2009) (noting "states are entitled to broad leeway in enacting reasonable, even-handed legislation to ensure that elections are carried out in a fair and orderly manner"). This leeway extends specifically to the selection of balloting systems. *Weber*, 347 F.3d at 1107 ("[I]t is the job for democratically elected representatives to weigh the pros and cons of various balloting systems," not the federal courts.); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (holding that voters do not have an absolute right to vote in any way they choose). Georgia's discretion in these decisions is entitled to the same respect as an individual's right to vote. *See Shelby Cnty Advocates for Valid Elections v. Hargett*, 348 F.Supp.3d 764, 774 (W.D. Tenn. 2018) ("The

balance of power between the state and federal government is no less
deserving of vigilant respect than the individual's right to vote.").

Essentially, Plaintiffs seek a preliminary injunction in order to usurp a
policy decision properly reserved and exercised by the State of Georgia with a
judicial order of this Court. *See V. Yankee Nuclear Power Corp. v. Nat. Res.
Defense Council, Inc.*, 435 U.S. 519, 557–558 (1978) ("The fundamental policy
questions appropriately resolved in Congress and in the state legislatures are
not subject to reexamination in the federal courts under the guise of judicial
review"). Plaintiffs' claims are borne out of their policy preferences (and
failures) before the Georgia legislature. Curling Plaintiffs are members of
Georgians for Verified Voting, which has a particular policy agenda of
ensuring that hand-marked ballots are the sole balloting system in Georgia.
*See Georgia Verified Voting Legislation: How A Hand-Marked Paper Ballot
Works*.[26] As part of this effort, Curling Plaintiffs lobbied to defeat the
ultimately successful H.B. 316 bill. *See To Democratic Caucus in Georgia:
Withdraw Support of Dominion All BMD Voting System*.[27] Further, the
arguments in Plaintiffs' briefs relating to costs associated with the Dominion

---

[26] Available at http://gaverifiedvoting.org/legislation.html (last accessed Nov.
13, 2019).
[27] Available at http://gaverifiedvoting.org/action.html (last accessed Nov. 13,
2019).

BMD system underscores their continued policy-oriented approach. [Doc. 619-1 at 5-6]. These cost-centered arguments do not speak to any alleged constitutional injury Plaintiffs may suffer, but, rather, emphasize the strong fiscal differences Plaintiffs maintain with the State of Georgia and its elected representatives. Plaintiffs' unsuccessful lobbying efforts and strong policy disagreements cannot be allowed to morph into a judicial action that overturns a decision rightfully entrusted to the State of Georgia.

Also, Plaintiffs' preferred policy choice—hand-marked ballots—ignores the problems that particular balloting system poses for minority communities. In the *Report of the 21st Century Voting Commission*, the Commission evaluated data concerning undervote variations that existed by race. The data indicated that, when hand-marked ballots are used, the percentage of undervotes is higher in predominately black precincts than in predominately white precincts in the same county. *See Report of the 21st Century Voting Commission* at 19.[28]  Thus, Plaintiffs' preferred policy choice will only substitute their theoretical problems with BMDs with the actual problems of a hand-marked system.

---

[28] Available at https://www.sos.state.co.us/pubs/elections/VotingSystems/files/2015/21stCenturyReport.pdf (last accessed Nov. 13, 2019).

Plaintiffs seek to upend the policy choice the State of Georgia has made regarding the appropriate balloting system for Georgia elections. This type of wholesale alteration of the status quo is not the purpose of preliminary injunctions. *Amer. Radio Ass'n v. Mobile Steamship Ass'n, Inc.*, 483 F.2d 1, 4 (5th Cir. 1973) (holding that the chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated).[29] Accordingly, given the deference due to the State of Georgia in these policy decisions and Plaintiffs' inappropriate use of a preliminary injunction motion to subvert this deference, Plaintiffs cannot carry their burden to establish a likelihood of success on the merits.

B.     *Plaintiffs'* Anderson/Burdick *arguments fail.*

The evaluation of voting regulations under a fundamental-right-to-vote claim takes place under a sliding scale, which considers the alleged burden on the right to vote against the interest of government. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's

---

[29] Cases decided by the former Fifth Circuit prior to October 1, 1981 are binding on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

'important regulatory interests' will usually be enough to justify 'reasonable,

nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*,

520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434

(1992)).

In particular, where a plaintiff challenges a state's electronic-voting

method and requests the use of paper ballots, the lower-scrutiny *Burdick* test

is applied. *See Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006)

(applying *Burdick* to challenge to touchscreen voting procedure); *Weber*, 347

F.3d at 1106 (applying *Burdick* test because the "use of paperless,

touchscreen voting systems [does not] severely restrict[] the right to vote").

As discussed below, Plaintiffs have not shown any basis to determine that

Georgia's current voting system is unconstitutional.[30]

1.    <u>Any burden on the right to vote by BMDs is slight at most.</u>

Curling Plaintiffs claim their vote is severely burdened because State

Defendants are:

> (1) persisting in using machines that are both susceptible to
> viruses and other malicious code and produce unverifiable results;
> (2) memory cards that can be easily compromised and used as a
> vehicle for malicious; and (3) issuing ballots that the voter has no

[30] Again, the claims about BMDs are dramatically different than those regarding DREs. This Court previously found a likelihood of success when there was "no independent paper ballot or audit record." [Doc. 309 at 38]. BMDs generate voter-verifiable paper ballots and will be audited.

opportunity or capacity to verify accurately reflects his or her choices.

[Doc. 619-1 at 21]. Plaintiffs further claim it is "also highly likely that an attack would be undetectable or unknown, not least because the State has declined to forensically examine its own systems to look for one." *Id.* Coalition Plaintiffs rely on alleged shared "security issues" as DREs that could possibly issue incorrect ballots. [Doc. 640-1 at 15-18].

Not only are Plaintiffs' characterizations wrong when applied to the BMDs, they have introduced no evidence that they have suffered any burden as a result of State Defendants' implementation of BMDs. The State of Georgia is not "persisting" in using any machine, but have instead rolled out an entirely new, widely accepted system currently used in over forty states. Plaintiffs likewise have not identified any incident where a BMD memory card was or could be compromised, nor have they explained how such a compromise could go undetected—Dr. Halderman even agreed that robust enough audits would capture even these kinds of hacks. *See* [Doc. 619-2 at ¶ 7]; Gilbert Dec. at ¶ 39(D).

It is disingenuous of Plaintiffs to claim that BMD ballots provide the voter "no opportunity or capacity" to verify their accuracy. Plaintiffs lean on their contention that "[m]any (if not most) voters do not or cannot verify

*human-readable* summaries" of their ballots." [Doc. 619-1 at 15] (emphasis added). The irony here is palpable. Plaintiffs base the entirety of their identified burden on the claim that Georgia voters cannot verify the accuracy of the bar code accompanying their human-readable paper ballot produced by BMDs, and that a human readable hand-marked paper ballot would be better. Yet, by their own admission, voters *regularly misread the text portion of paper ballots* and they have identified no evidence beyond a single non-peer-reviewed article and an in-progress experiment as support for their theory that voters do not verify their ballots.

Plaintiffs are also incorrect that voters will not verify their ballots. They rely on a single, non-peer-reviewed study that was more a test of memory than of ballot verification. Gilbert Dec. at ¶¶ 48-50. Other studies demonstrate that, when voters are instructed to review their ballots with signs or poll worker instructions, they review their selections. Gilbert Dec. at ¶ 51. Plaintiffs cannot cite to any studies that evaluate conditions that will actually be used in Georgia on the verification of ballots. Gilbert Dec. at ¶¶ 48-50.

Finally, Plaintiffs' claim that an attack would be undetectable because, "the State has declined to forensically examine its own systems to look for one," bears no rational relationship to the BMD system; the BMD system

retains no components of the prior GEMS/DRE system. Coomer Dec. at ¶ 7; Gilbert Dec. at ¶ 43.

Plaintiffs have not shown any burden on their right to vote through the use of BMDs. Every voter has the opportunity to verify their paper ballot. Plaintiffs' arguments about barcodes are a red herring to distract the Court from the reality that *every* paper-ballot system utilizes computer programming to read voter input. Coomer Dec. at ¶¶ 9; Gilbert Dec. at ¶¶ 34(A)-(B). Any errors or problems with the election system can be resolved through the normal processes of the Election Code, including election contests. O.C.G.A. § 21-2-520 *et seq.*

     2.   <u>The compelling interests of the State outweigh any burden on Curling Plaintiffs.</u>

Even if there is some burden on the right to vote as a result of using BMDs, the State has highly compelling interests for carrying out the elections in the manner chosen by Georgia citizens.

First, State Defendants seek to ensure both a uniform application of election processes within the state, as well as provide its citizens with mobility restrictions and/or other disabilities individuals with adequate ability to exercise their fundamental right to vote. To that end, as Plaintiffs must acknowledge, the BMD system is the best vehicle for ensuring proper

access to the voting booth. If such a voting system is appropriate for those among Georgia's most vulnerable population, surely it is appropriate for the remainder of the citizens of Georgia and Georgia has the freedom to make the policy decision of having *all* of its voting machines accessible to voters with disabilities and elderly voters.

As discussed above, BMDs provide clear voter intent, are easier to administer and count than hand-marked paper ballots, and are harder to manipulate after the election. The State of Georgia has used electronic voting for almost two decades, so Georgia voters are already familiar with an electronic in-person voting experience. Further, BMDs avoid the concerns about the negative impact of hand-marked paper ballots on minority communities. [Doc. 307 at 283:20-285:16].

Ultimately, Defendants and the State of Georgia had a litany of interconnected and overlapping compelling reasons for choosing the election system at issue. For Plaintiffs to now attempt to override the eminently reasonable—and perfectly constitutional—choice of the State of Georgia shows they are willing to go to any length to corrupt the "means," provided they reach the appropriate "end." The States have original authority over the time, place, and manner of their elections. And absent a constitutional or other unlawful infraction of that authority, they are charged with making

reasonable policy decisions to effectuate orderly elections. *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970) ("Were we to embrace plaintiffs' theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law"). Plaintiffs have not shown how the interests of the State in selecting a BMD-marked paper ballot system unconstitutionally burdens their right to vote.

C. *Plaintiffs' state-law claims regarding the Georgia Election Code are not properly before this Court.*

It is unclear if any of the preliminary injunctive relief sought by Plaintiffs relate to their improperly alleged state law claims.  Nonetheless, for the same reasons stated in State Defendants' motion to dismiss (which is incorporated herein), Plaintiffs cannot succeed on their allegations of state law violations as those claims are not properly before this Court. [*See* Doc. 645-1 at 22-23.] Plaintiffs' state law claims are not tethered to any federal right and do not create a private right of action. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105-106 (1984). Indeed, Curling Plaintiffs do not object to the dismissal of their state law claims. [Doc. 651 at 28-29.]

D.   *Coalition Plaintiffs' claims about ballot secrecy are based on incorrect information.*

As explained above, Coalition Plaintiffs have not shown any likelihood of success on their claims about ballot secrecy, because those allegations are based on incorrect information. The AuditMark provides an audit capability without identifying the time or the voter who cast the ballot. Coomer Dec. at ¶ 10. Further, the system about which Coalition Plaintiffs complain is identical for hand-marked or BMD-marked paper ballots. *Id.*

Coalition Plaintiffs have not shown any likelihood of success on the merits of their ballot secrecy claim because there is no evidence that Georgia's system compromises ballot secrecy in any way.

E.   *Plaintiffs lack standing.*

This Court earlier found that Plaintiffs met the three elements of standing, (1) injury in fact that is concrete and particularized and actual or imminent, (2) traceability, and (3) redressability. [Doc. 309 at 16-17]; *United States v. Hays*, 515 U.S. 737, 742-43 (1995) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). But that determination was focused on DREs and was based on the allegations of actual hacking of those units. [Doc. 309 at 17-19].

Unlike that earlier state of this case, no Plaintiff has voted on a BMD nor have Plaintiffs alleged any actual hacking. Curling Plaintiffs identify three possible bases for the alleged unconstitutionality of the Dominion system in their motion: (1) the theoretical possibility of hacking, (2) the use of bar codes, and (3) the lack of audits. [Doc. 619-1 at 2-3]. Coalition Plaintiffs add ballot secrecy and an imminent threat to the right to vote. [Doc. 640-1 at 11-12]. None of these injuries are concrete and particularized for purposes of standing because they are all based on theoretical future occurrences.

While this Court found that an allegation of a "future hacking event" that could jeopardize their votes constituted a valid threat of future harm as to DREs, [Doc. 309 at 20], here, that threat is far more attenuated. Unlike their claims about DREs, the only way Plaintiffs could be injured by a "future hacking event" is *if* a malicious actor hacked the BMD tablets, *if* Curling Plaintiffs (or other voters) refused to review the human-readable portion of their paper ballot, *if* the optical-scan unit incorrectly counted their vote, *if* the post-election audits of the human-readable portion did not catch the error, and *if* no election contest or subsequent review of ballots resulted in the discovery of the error. In short, the standing claim regarding BMDs is limited to an "attenuated chain of inferences," *Heindel v. Andino*, 359 F. Supp. 3d

341, 358 (D.S.C. 2019), and not something that is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

The Coalition's claim that it has organizational standing, [Doc. 640-1 at 13-14], is also not a sufficient injury because it is also speculative. But even if the injury is not speculative, the Coalition's purpose is to advance its interest in paper ballots through advocacy and litigation. Standing is not established when the alleged harm that befalls an organization is to act consistently with its existing mission. This includes plaintiffs that engage in advocacy efforts. *Int'l Acad. of Oral Med. & Toxicology v. Food & Drug Admin.*, 195 F. Supp. 3d 243, 256 (D. D.C. 2016). To the contrary, Plaintiffs must show State Defendants' allegedly "illegal acts *impaired* the organization's ability to engage in its own projects by *forcing the organization to divert resources* in response." *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1341-1342 (11th Cir. 2014) (emphasis added). *See also Food & Water Watch, Inc.* v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015) (injury must inhibit "organization's daily operations"); *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (conflict between policy and organizational mission not enough for Article III standing). Coalition Plaintiffs have not shown any concrete injury for purposes of standing because the Coalition is merely fulfilling its purpose to advocate for hand-marked paper ballots.

Plaintiffs likewise cannot trace any alleged injury from BMD-marked paper ballots to State Defendants because there is an intervening event—the decision by voters to review their ballots. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Traceability is not established when the injury is the result of "the independent action of some third party not before the court." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000). Because BMDs create paper ballots that can be verified by voters, any injuries are not traceable to the actions of State Defendants, but rather to the *independent* actions of voters. Finally, Plaintiffs also cannot show redressability because they admit that the same dangers exist with hand-marked paper ballots as exist with BMDs—components of the election system could possibly be hacked. The reality that those hacks can be detected and addressed because of the paper audit trail in both systems does not confer standing on Plaintiffs to challenge the State's policy decision to select one paper-ballot system over another.

This Court should deny Plaintiffs' motion because they lack standing due to the lack of evidence that they have standing or have stated a valid claim. The debate about the proper method of preparing and tabulating paper-ballot votes is not properly before this Court.

### III.    Plaintiffs will not suffer irreparable injury absent a preliminary injunction.

Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper. *See Snook v. Trust Co. of G. Bank of Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990) (affirming denial of preliminary injunction even though plaintiff established likelihood of prevailing because plaintiff failed to meet burden of proving irreparable injury).  As the Eleventh Circuit has emphasized the asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." *Northeastern Fla. Chapter of Ass'n of General Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

Here, Plaintiffs' fundamental right to vote will not be irreparably harmed absent injunctive relief. First, the State of Georgia has a no-excuse absentee voting system, conducted via hand-marked paper ballot, that the Plaintiffs are more than welcome to use. *See* O.C.G.A. § 21-2-380, *et seq*. Plaintiffs are free to exercise their right to vote, using their preferred balloting system, through this avenue. Second, Plaintiffs' subjective apprehensions regarding the BMD system fail to establish that their right to vote will be irreparably injured because the inclusion of a paper trail allows

errors to be detected and addressed, as even Dr. Halderman admits. [Doc. 619-2 at ¶¶ 6-7]. Plaintiffs argue that their right to vote is subject to the same dangers as under the DRE system. However, as shown above, the DREs and BMDs are entirely different, and Plaintiffs' speculations to the contrary are insufficient to establish irreparable injury. Therefore, Plaintiffs are not entitled to injunctive relief.

## IV.  The balance of the equities does not favor Plaintiffs and public interest weighs in favor of State Defendants.

On balance, the interests of equity and the public favor denying Plaintiffs' requests for injunctive relief.  When considering whether to grant a preliminary injunction, the Court must consider the balance of the equities carefully; cursory analysis is insufficient.  *See Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 26 (2008) ("Despite the importance of assessing the balance of the equities and the public interest in determining whether to grant a preliminary injunction, the District Court addressed these considerations in only a cursory fashion"). Indeed, the "balance of equities and consideration of the public interest . . . are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Id.* at 32.  The purpose of a preliminary injunction is to preserve the status quo only when the balance of equities so heavily favors the movant that justice requires the

court to intervene pending judgment. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

Here, the balance of the equities and public interest weigh heavily in favor of State Defendants, not Plaintiffs. State Defendants have expended substantial time, resources, and effort in selecting and implementing the Dominion BMD balloting system in order to comply with Georgia legislation enacted during the pendency of this case and this Court's recent preliminary-injunction Order. *See generally* Harvey Dec. at ¶¶ 3-6; 8-13. To this end, the State of Georgia has instituted a large-scale effort to make the Dominion BMD system available to voters according to the Court's timeframe. While that effort is proceeding in a timely fashion, requiring the State to change course now and commence implementation of a new, statewide election system in the depths of a rollout of another new, statewide election system mere months before significant 2020 elections would be inequitable for State Defendants and those they represent—the taxpayers, voters, and citizens of the State of Georgia.

Election officials across the state are working diligently to implement many significant updates to the election system that have been underway since last year, including implementing the new Dominion BMD system pursuant to the July 29, 2019 contract entered into by the Secretary of State.

Harvey Dec. at 3. As of this week, Georgia has accepted 13,386 touchscreen devices, 5,855 printers, 1,921 polling place scanners, 202 ballot boxes, and 1,616 poll pads. *Id*. at 4. Every county currently has at least one BMD system in place. *Id*. at 5. Training for county election officials regarding the use of BMD systems is active and ongoing, and it includes training on the new election management system, poll pads, BMDs, printers and scanners. *Id*. at 6.

Likewise, the State of Georgia is engaged in sweeping voter-education efforts regarding the use of BMDs in upcoming elections, which will continue into next year. *Id*. at 8. In fact, BMDs have already been demonstrated in the following locations in Georgia: Gwinnett, Houston, Peach, Columbia, Catoosa, Jones, and Bibb counties, as well as the NAACP state convention and the Association of County Commissioners of Georgia annual meeting. *Id*. at 9.

Furthermore, the State of Georgia has partnered with Verified Voting and VotingWorks to conduct a risk-limiting audit of the November 2019 election in the City of Cartersville, Georgia, which was conducted using BMDs, and develop best practices for future tabulation audits in Georgia. *Id*. at 10. Indeed, the Secretary of State's office plans to prepare rules for statewide audits of BMDs once these audit pilot programs are complete and other methods of auditing are evaluated. *Id*. at 11.

Beyond the time and effort, the State's BMD implementation, training, and education efforts have required significant monetary expenditures. *Id*. at 12. As of this week, the State of Georgia has spent $45,018,302.68 on rolling out BMDs, including upfront costs of equipment and other expenditures. *Id*. In sum, the State of Georgia has spent significant time and expense toward the rollout and implementation of the Dominion BMD system.

Balancing the State of Georgia's substantial resource expenditures and anticipated time constraints against Plaintiff's burden, it is clear that any burden on Plaintiffs pales in comparison, and Plaintiffs' arguments to the contrary miss the mark. First, Plaintiffs brazenly maintain that the Court has already concluded there is a "threat of real harms" to the constitutional interest at stake in this case. [Doc. 619-1 at 22.] This is a blatant mischaracterization of the Court's prior rulings. In denying Plaintiffs' preliminary-injunction relief, the Court stated that Plaintiffs had shown that *DRE voting systems* posed a threat of real harms to Plaintiffs' voting rights. [*See* Doc. 309 at 41.] ("While Plaintiffs have shown the threat of real harms to their constitutional interests, the eleventh-hour timing of their motions and an instant grant of the paper ballot relief requested could just as readily jeopardize the upcoming elections, voter turnout, and the orderly administration of the election."). The Court did not—and could not—make

that determination regarding BMDs. [*See* Doc. 579 at 137.] ("The adequacy of the newly chosen BMD election system is not before the Court at this time").

Further, Plaintiffs conjecture that injunctive relief will free them from "known, preventable risk[s]" associated with the BMD system ignores the reality that their injunctive relief will bring about a system with its own well-documented set of problems. *Weber*, 347 F.3d at 1106 (citing *Bush v. Gore*, 531 U.S. 98 (2000)) ("Traditional paper ballots, as became evident during the 2000 presidential election, are prone to overvotes, undervotes, 'hanging chads,' and other mechanical and human errors that may thwart voter intent"); [Doc. 619-1 at 22]. Moreover, their requested injunctive relief, rather than enhancing the integrity of the electoral process, would plunge the State of Georgia into an abrupt change that would drastically increase the prospect of voter and ballot problems.

Plaintiffs also underestimate the time and effort that would be required to convert to a hand-marked paper ballot system, despite their casual declaration that the "proposed injunction here would not cause damage to the Defendants." [Doc. 640-1 at 18.] Though Plaintiffs' declarant, Virginia Martin, asserts that "an immediate switch to hand-marked paper ballots" in Georgia is feasible, Ms. Martin conducts elections in New York, not in Georgia, and her referenced declaration is not about a switch from BMDs to

hand-marked paper ballots. [Doc. 640-1 at 20; Doc. 413 at 270-87.] Given the efforts already made as evidenced by Mr. Harvey's declaration, changing the educational efforts of election officials and poll workers to the hand-marked pilot program utilized in Cobb County will involve a significant effort.

Finally, Plaintiffs' burden, if any, is minimal. Plaintiffs frame their burden in binary terms: either (1) their injunctive relief is granted and their voting rights are preserved; or (2) their injunctive relief is not granted and their rights are infringed. [*See* Doc. 619-1 at 21; Doc. 640-1 at 18.] However, as has been shown above, Plaintiffs do not have a constitutional right to their preferred balloting system, and, therefore, their "burden" in using the Dominion BMD system is negligible. Further, even if Plaintiffs had a constitutional right to a specific balloting system (which they do not), Georgia's no-excuse absentee ballot system, which allows the Plaintiffs to use their preferred version of paper ballots to exercise their voting rights, also minimizes any alleged burden.  Accordingly, when balancing the equities, which the Court is required to do before issuing any type of injunctive relief, there is no question that this balance tips in State Defendants' favor. *See Winter.*, 555 U.S. at 26.  The Court should deny Plaintiffs' request for injunctive relief.

## V.    Coalition Plaintiffs' proposed relief regarding paper pollbooks is unnecessary.

Yet again, Coalition Plaintiffs ask the Court to expend resources and reopen its August 15th, 2019 Order for the purpose of incorporating a requirement that already exists in Georgia law.  It asks that the Court order State Defendants to require counties to provide paper copies of pollbooks in every polling place.  [Doc. 640-1 at 33.]  A paper copy of the registered voters for each precinct is already located in each precinct on Election Day. Ga. Comp. R. & Regs. r. 183-1-12-.07(1); [Doc. 616 at 19.]  No order is required to generate the required lists and the lists contain only necessary identifying information for voters—the same data is included in the ExpressPolls.  *Elend v. Basham*, 471 F.3d 1199, 1209 (2006) (noting "obey the law" injunctions are unavailable in the 11th Circuit); [Doc. 616 at 19-20.]  It also makes no sense from an election-administration perspective to require full copies of entire county databases at each polling place. *Id*.  Irrespective of the foregoing, however, this Court has already denied this requested relief because it "endeavored to provide meaningful relief without intruding excessively into the State's and counties' operational administration of the voting system." [Doc. 637 at 1.]

## CONCLUSION

Plaintiffs ask for sweeping relief, spending most of their briefs attacking bar codes, but then jumping straight to hand-marked ballots as the only possible solution. In so doing, Plaintiffs ask this Court to second-guess the certification process of the EAC, the actions of more than 40 states, and the reasonable policy decision of the State of Georgia that followed the recommendations of a variety of national organizations that focus on elections to purchase a paper-ballot system that marks ballots using BMDs. Plaintiffs have not provided any evidence sufficient to make this large of a leap into the administration of elections in Georgia.

This Court should allow the rollout of the BMDs to continue and allow Georgia to continue to implement the paper-ballot system selected by its policymakers.

Respectfully submitted this 13th day of November, 2019.

*/s/ Vincent R. Russo*
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com

Kimberly Anderson
Georgia Bar No. 602807
kanderson@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678)336-7249

*Counsel for State Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing **STATE DEFENDANTS' COMBINED RESPONSE IN OPPOSITION TO CURLING PLAINTIFFS' AND COALITION PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION** has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*<u>/s/ Vincent R. Russo</u>*
Vincent R. Russo

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I electronically filed the foregoing

**STATE DEFENDANTS' COMBINED RESPONSE IN OPPOSITION TO CURLING PLAINTIFFS' AND COALITION PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system, which will automatically send counsel of record e-mail notification of such filing.

This 13th day of November, 2019.

*/s/ Vincent Russo*
Vincent R. Russo