## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DONNA CURLING, *et al.*

     *Plaintiffs,*

v.

BRAD RAFFENSPERGER, *et al.*,

     *Defendants.*

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## STATE DEFENDANTS' CONSOLIDATED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR ATTORNEYS' FEES AND COSTS

## INTRODUCTION

Plaintiffs[1] cannot recover fees unless they have achieved prevailing-party status. This Court granted in part Plaintiffs' motions for preliminary injunction, but also denied them in substantial part. In a very real sense, neither party "prevailed" and this Court should deny all fees and expenses to Plaintiffs. But if this Court determines that Plaintiffs are prevailing parties, the relief they ultimately obtained is so limited (and significantly unlike the

---

[1] Plaintiffs Donna Curling, Donna Price, and Jeffrey Schoenberg are referred to as the "Curling Plaintiffs." Plaintiffs Coalition for Good Governance, Laura Digges, William Digges III, Ricardo Davis, and Megan Missett are referred to as the "Coalition Plaintiffs."

relief they actually requested), that their recovery of fees should be likewise drastically reduced.

Notwithstanding their distinct lack of success on their ultimate goals of requiring hand-marked paper ballots, Curling Plaintiffs and Coalition Plaintiffs seek to recover the combined sum of more than $6,000,000.00 in fees and expenses from the State Defendants[2] and the taxpayers of the State of Georgia. As further explained below, the twenty attorneys the Plaintiffs have thus far engaged on this matter have little to show for their efforts beyond this Court's approval of the State's predetermined course of action regarding the 2020 elections. In spite of this limited success, Plaintiffs brazenly request fees as if they prevailed in every aspect of this lengthy case. But actions speak louder than words, and the decision by *both* Plaintiffs to file yet another Amended Complaint with this Court demonstrates their own unequivocal acknowledgement that they have *not* yet succeeded in their ultimate goals. Litigants who have prevailed simply do not request to stay in court. Yet despite their obvious shortcomings in this action, the Plaintiffs characterize themselves as "prevailing parties" and claim entitlement to an

---

[2] State Defendants are Defendants Secretary of State Brad Raffensperger and State Election Board Members David J. Worley, Rebecca N. Sullivan, Anh Le, and Seth Harp.

amount of attorneys' fees and expenses that exceeds the cost to operate the entire Elections Division of the State of Georgia for a year. *See* House Bill 31, Act 319, Line 305.100 ($5.5 million total state funds for operation of Elections Division).

As already noted, the Plaintiffs are not prevailing parties. Moreover, each of the twenty attorneys seek hourly rates that are divorced from both geographic and market realities. Together, Plaintiffs seek a total of 7,451.75 hours of reimbursement—equal to more than ten months of continuous 24-hour days, or more than 745 10-hour days of attorney time. That total alone is staggering and excessive when compared to the limited results achieved by Plaintiffs in this case. The Plaintiffs seek outrageously high expert fees in addition to lavish travel costs. The Coalition Plaintiffs, meanwhile, seek to be paid for non-lawyer staff time and summer intern work by their organization despite the fact they have spent years publicly fundraising off this case.

In short, Plaintiffs apparently see State Defendants as their own personal financiers, and expect to be paid by the taxpayers for their policy advocacy regarding elections. While Section 1988 certainly permits recovery

of *reasonable* attorneys' fees and costs spent in successful litigation, it is not a statutory license to raid the coffers of the State.[3]

It is worth remembering at the outset that this case began as an *election contest* to the Sixth Congressional District election in 2017. And a major contributing factor to its protracted nature was the continuing disagreements between the groups of plaintiffs—at one point, Plaintiffs disagreed so strongly that Curling Plaintiffs represented that they were being "hindered by the strategic decisions and delays of the Coalition Plaintiffs," and that the choices of Coalition Plaintiffs "needlessly slowed this case." [Doc. 329-1, pp. 2-3].

## ARGUMENT AND CITATION OF AUTHORITY

Recovery of fees and expenses requested is not automatic; a court may only award "reasonable" fees and expenses and must avoid being "generous with the money of others." *American Civil Liberties Union of Ga. v. Barnes*, 168 F. 3d 423, 428 (11th Cir. 1999). Applicants bear the burden of "establishing entitlement and documenting appropriate hours and hourly

---

[3] This response addresses the initial motions of both groups of Plaintiffs regarding entitlement to fees [Docs. 595 and 596] and the detailed itemizations filed by both sets of Plaintiffs [Docs. 629, 631, and 632]. In the interest of efficiency, this Court allowed a single response to both motions. [Doc. 604].

rates." *Barnes*, 168 F. 3d at 427; *Loranger v. Stierheim*, 10 F. 3d 776, 782 (11th Cir. 1994) (burden on submitting party to make a request that will enable the court to determine what time was spent on the litigation).

In this case, Plaintiffs are moving for fees against government entities, which will be paid with taxpayer dollars. It is important to remember that the purpose of fee statutes is not to "produce windfalls to attorneys," *Farrar v. Hobby*, 506 U.S. 103, 115, 113 S. Ct. 566, 575 (1992), but rather to compensate parties for attorney time and expenses *reasonably* spent on litigation. Additionally, the fact that any compensation awarded by this Court against the State Defendants will be paid by the taxpayers of the State of Georgia is a critical consideration. A proper fee petition has several distinct elements, each of which affect the overall recovery sought.

First, Plaintiffs must demonstrate that they have prevailed on the claims for which they seek fees. *Farrar*, 506 U.S. at 111-112; *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933 (1983); *Duckworth v. Whisenant*, 97 F. 3d 1393, 1398 (11th Cir. 1996). Specifically, "[t]he plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought," *Farrar*, 506 U.S. at 111, and such judgment must constitute a "material alteration of the legal relationship of the parties." *Common Cause/Georgia v. Billups,* 554 F. 3d 1340, 1356 (11th Cir. 2009). As discussed by the State

Defendants in more detail below, the Plaintiffs here did not prevail on every claim they asserted. Indeed, this Court denied most of the relief sought by Plaintiffs, so any award of fees must be limited only to those claims upon which Plaintiffs were successful and should be adjusted downward to reflect the actual change in the legal relationship of the parties.

Second, a court must calculate the "lodestar" amount of the fees, which is the product of the number of hours *reasonably* expended on the litigation multiplied by a *reasonable* hourly rate. *Bivins v. Wrap It Up, Inc.,* 548 F. 3d 1348, 1350 (11th Cir. 2008); *Hensley*, 461 U.S. at 433. The court first must determine the reasonable hourly rate, which is the "prevailing market rate in the relevant legal community." *Barnes*, 168 F. 3d at 436. After determining that rate, the court then evaluates the tasks performed, determines what time was spent "on the litigation," and excludes both time that would be unreasonable to bill to a client and time spent on discrete and unsuccessful claims. *Duckworth*, 97 F. 3d at 1397; *Bivins*, 548 F. 3d at 1351. As detailed below, the fee application includes time that would be unreasonable to bill to a client, such as (1) time entries for duplicative work, (2) excessive amounts of time for tasks performed by lawyers ostensibly with expertise in election cases, and (3) other work not necessary to successful resolution of the litigation. Examples of the latter is the first preliminary injunction sought by

Plaintiffs that this Court denied or the extensive briefing surrounding the change of counsel among the Plaintiff groups.

As the third and final step, a court may adjust the lodestar amount up or down, considering the 12 factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714 (5th Cir. 1974); *Duckworth*, 97 F. 3d at 1399; *Norman v. Housing Auth. of City of Montgomery*, 836 F. 2d 1292, 1302 (11th Cir. 1988). Despite Curling Plaintiffs' attempt to obtain out-of-market rates, this Court should decline to indulge the Curling Plaintiffs' in this transparent effort to unreasonably line their own pockets.[4]

## I.   Plaintiffs are not prevailing parties in this case.

Plaintiffs' petitions for fees were filed pursuant to Fed. R. Civ. P. 54(d), under the theory that they are "prevailing parties" for purposes of their claims brought pursuant to 42 U.S.C. § 1988 and, therefore, are entitled to attorneys' fees. Local Rule 54.2 is the vehicle through which Plaintiffs seek attorneys' fees from this Court.

Both Plaintiffs seem to conflate this Court's partial grant and partial denial of their second motions for preliminary injunction on August 15, 2019,

---

[4] As Curling Plaintiffs have previously represented to this Court, Curling Plaintiffs "are not in this for notoriety, attention, or any other self-aggrandizing goals, nor are their counsel in this for money." [Doc. 329-1, p. 2].

7

[Doc. 579], with success on the merits of every discrete aspect of this lengthy case. But, as Plaintiffs note, one is entitled to prevailing party status only where there is "material alteration of the legal relationship of the parties." [Doc. 632, p. 15; Doc. 596-1, p. 7]. Any alleged alteration could only be achieved through the August 2019 Order [Doc. 579], but even that order does not grant the core relief sought by Plaintiffs and ultimately enforces the State Defendants' predetermined path for the 2020 elections, with the exception of requiring a hand-marked paper ballot pilot program. As the Court has already noted, "Plaintiffs do not challenge the constitutionality of the Georgia election statute per se. Rather they challenge Georgia's continued use of the chosen DRE/GEMS voting system pursuant to that law…" [Doc. 579, p. 132]. At bottom, the Court recognized that passage of HB 316 and the subsequent statutorily required move to a BMD election system massively undercut the Plaintiffs' claims. Plaintiffs wanted hand-marked paper ballots implemented in Georgia for all elections. But this Court declined their invitation. As the Court noted, "Plaintiffs effectively seek implementation of hand-marked paper ballots for a single election cycle before the State transitions to an entirely new system..."[5] [Doc. 579, p. 139]. But this Court did not grant that

---

[5] This Court also noted the context, explaining "[t]he current posture of this case presents an added wrinkle: this Court is reviewing Plaintiffs' challenge

relief. "[T]he Court finds it would be unwise to require the State to implement an intermediate hand-marked paper ballot system for the 2019 elections." [Doc. 579, p. 141].

Plaintiffs seem to at least tacitly acknowledge the reality that they did not prevail in any meaningful respect on their core claims. [Doc. 632, § II (focusing on the Order at Doc. 579); Doc. 596-1, p. 5]. Perhaps more telling is the fact that Plaintiffs cannot point to a material alteration of the legal relationship between the parties resulting from the Court's first order. [Doc. 309]. Indeed, the Curling Plaintiffs' Motion appears entirely silent on this issue. And Coalition Plaintiffs appear to hinge their success at this stage of the case on a highly caveated statement from this Court based upon a limited record. To be sure, while the Court did state, "*with a true measure of caution,*" that the Plaintiffs are likely to succeed on "at least some of their claims," this equivocal statement in no way altered the legal status among the parties. In fact, the Court proceeded to deny the Plaintiffs' respective motions for Preliminary Injunction in no uncertain terms. [Doc. 309, p. 45].

---

to the fraught DRE/GEMS system also in the context of the State Legislature's recent passage of new legislation requiring the Secretary of State to implement an entirely new voting system – to replace the existing DRE system, including the GEMS servers, DREs, and ExpressPoll units…" [Doc. 579, p. 137].

In light of the foregoing, this Court should decline to award the Plaintiffs *any* recovery for the time spent on this litigation. The Plaintiffs failed to satisfy the touchstone requirement of altering the legal relationship among the parties throughout this litigation, and this Court's recent Order largely endorsed what the State already planned to do. [Doc. 579]. The modest relief the Court granted, much of which was *already* in motion as a result of the General Assembly's legislative work and the State's own electoral and administrative mechanisms, should not warrant a recovery of fees spent on this action and the unsuccessful claims they have made over the course of this lengthy litigation. At the very least, this should weigh heavily against the amount sought, given that most of the efforts of Plaintiffs did not result in a change in the legal relationship between the parties.

## II.     Plaintiffs' hourly rates must be reduced.

The key question for the proposed hourly rates is whether those rates are in line with other rates in the Atlanta market for attorneys with similar skill. *Norman*, 836 F. 2d at 1299. The burden is on the moving party to present sufficient evidence on the hourly rate and "the affidavit of the attorney performing the work" is not satisfactory evidence. *Norman*, 836 F.2d at 1299, 1303. In addition, the Court is a recognized expert on attorney's fees. *Id.* at 1303 (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)).

There is some usefulness in considering the *Johnson* factors to determine the proper hourly rate, especially in an election case. *Carey v. Rudeseal*, 721 F. Supp. 294, 298-99 (N.D. Ga. 1989). Two of the *Johnson* factors are the novelty and difficulty of the questions presented and the skill requisite to perform the legal service properly. 488 F. 2d at 717-719.

In this case, the legal issues were straightforward—whether the Direct Recording Electronic ("DRE") voting machines violated existing law or the United States Constitution. While the technical aspects of DREs played a large role in making that question seem more challenging, the primary legal skill was making experts available for the Court and arguing basic statutory and constitutional law subjects. In other election cases, this Court reduced hourly rates for similarly situated plaintiffs by 25% and as much as 75%, focusing on the similarity of other election-related cases where such a reduction was found appropriate. *Ga. State Conf. of the NAACP v. Kemp*, Case No. 1:17-cv-1397-TCB, Order on Fees at *7-8 (N.D. Ga. April 11, 2018); *see also Martin v. Kemp*, Case No. 1:18-cv-04776, Order on Fees (Doc. 101) at *11 (N.D. Ga. July 24, 2019) (reducing fee application by 75%).

A.    *Hourly rates of Curling Plaintiffs.*

The Curling Plaintiffs seek the following hourly rates for their work:

| Attorney | Years of Experience | Requested Hourly Rate |
| --- | --- | --- |

| David Cross | 17 years | $1,065 |
|---|---|---|
| Catherine Chapple | 7 years | $800 |
| Arvind S. Miriyala | 3 years | $550 |
| Jane Bentrott | 4 years | $695 |
| Cameron Tepfer | 6 years | $750 |
| Rob Manoso | 7 years | $800 |
| Jenna Conway | Paralegal | $375 |
| Michael Stoler | Research Analyst | $300 |
| John P. Carlin | 20 years | $1,425 |
| Michael Qian | 2 years | $595 |
| Joseph Palmore | 21 years | $1,125 |
| Reema Ali | Security Analyst | $525 |
| Austin Uhler | 1 year | $490 |
| Halsey Knapp | 39 years | $500 |
| Adam Sparks | 9 years | $350 |
| Joyce Gist Lewis | 20 years | $350 |
| Sada Baby | 8 years | $250 |
| Paralegals at K&H | N/A | $95-$100 |
| Bryan Ward | 15 years | $375 |
| Scott Holcomb | 19 years | $375 |
| Marvin Lim | 6 years | $250 |
| Aaron Wright | 10 years | $250 |

Curling Plaintiffs do not support their proposed rates with any declaration other than that of the primary timekeepers. [Doc. 631, pp. 2, 449, 520]. It bears noting that in contrast to the rates requested by Curling Plaintiffs, the Secretary of State's counsel is paid at a rate of $225 per hour for work on this case.[6] *Norman*, 836 F. 2d at 1299.

---

[6] See *SAAG Rates and Fees FY2018*, https://law.georgia.gov/document/publication/fyr2018-saag-rates-name/download

Recognizing this significant differential, the only support for a variation from the Atlanta market rate is Mr. Cross's self-serving statement that "specialized institutional cybersecurity expertise" was required and that the Curling Plaintiffs were unable to locate local counsel.[7] [Doc. 631 at p. 17, ¶ 49]. Given the prevalence of capable Atlanta lawyers,[8] this unsupported statement provides no basis for Curling Plaintiffs' proposed hourly rates.

In light of the straightforward *legal* issues in this case  and the excessive rates sought by counsel from Washington, D.C., a 75% reduction in the rates proposed by D.C. counsel and a 25% reduction in rates proposed by Atlanta counsel is appropriate. The rates sought by Coalition Plaintiffs further demonstrate how excessive the Washington D.C. rates are relative to the Atlanta market. State Defendants submit that the rates identified in Exhibit E should be utilized if this Court chooses to impose an award of attorneys' fees:

---

[7] Ms. Curling's declaration that she limited her search to attorneys that could represent her plaintiff group *pro bono* or at heavily-discounted rates likewise does not provide further support for a non-market rate. [Doc. 631, pp. 445-446].

[8] A Google search yields a variety of Atlanta firms and firms with Atlanta offices that specialize in cyber and data security. That list includes Krevolin & Horst (https://www.khlawfirm.com/html/atlanta-data-privacy-security-compliance-litigation-attorney-lawyer-atlanta-georgia.html) and Alston & Bird (https://www.alston.com/en/services/practices/litigation/privacy--cybersecurity-litigation).

B.      *Hourly rates of Coalition Plaintiffs.*

The Coalition Plaintiffs seek the following hourly rates for their work:

| Timekeeper | Years of Experience | Requested Hourly Rate |
|---|---|---|
| Bruce Brown | 35 years | $625 |
| Robert McGuire | 20 years | $615 |
| Carey Ichter | 35 years | $625 |
| William Ney | 20 years | $450 |
| Ezra Rosenberg | 45 years | $650 |
| John Powers | 6 years | $400 |
| Jon Greenbaum | 26 Years | $650 |
| David Brody | 7 years | $400 |
| Jacob Conarck | 1 year | $250 |
| Ryan Snow | 1 year | $250 |
| Marilyn Marks | 0 years – Plaintiff | $200 |

Unlike Curling Plaintiffs, Coalition Plaintiffs provide at least some evidence for their hourly rates through the Declaration of Robert Remar. [Doc. 632, pp. 64-69]. But Mr. Remar's declaration compares this case to cases involving private parties, not government clients, [Doc. 632, p. 66-67], and thus its usefulness to the Court is limited. Given that the Court is also an expert on hourly rates in this jurisdiction, it should also reduce these rates by a minimum of 25% for all partners and by 50% for all associate-level work and lower in order to bring them in line with their D.C. counterparts. Additionally, the work of William Ney should be reduced by 50% because a review of his time entries reveals most of the work he did as transition

counsel constituted non-legal related communications between the parties, as explained below.

Reimbursement for Ms. Marks deserves unique attention because not only is she not a lawyer in this case, she is a representative and employee of the Coalition Plaintiffs. For purposes of calculating the lodestar it is worth noting Ms. Marks' inexperience and disconnect from the legal profession. Ms. Marks owned a truck-trailer manufacturing company and does not have any specialized knowledge about GEMS databases or computer science. [Doc. 449-11 at 34:16-19, 39:14-18]. She became involved in elections after losing a race for Mayor of Aspen, Colorado on a Diebold voting system. *Id*. at 35:4-22. Judge Grubbs specifically found Ms. Marks was not an expert in election administration in a case involving the 2018 Lt. Governor election. [Doc. 449-11 at 42:25-43:8]. Moreover, she was never qualified as an expert for the purposes of this litigation. While Ms. Marks certainly attempts to make a career out of being a professional litigant, there is no reason she should be reimbursed for time she spent on this effort.

State Defendants submit that the following rates should be utilized if this Court chooses to award fees, matching the rates for the Curling Plaintiffs based on approximate years of experience, as outlined in Exhibit F.

### III.   Plaintiffs' submitted hours should be reduced.

The Plaintiffs seek the following recovery of fees and expenses:

| Entity | Attorney Fees Sought | Expenses Sought | Total Sought |
|---|---|---|---|
| Morrison & Foerster | $3,562,471.25 | $337,456.70 | $3,899,927.95 |
| Krevolin & Horst | $229,627.50 | $1,815.87 | $231,443.37 |
| Holcomb + Ward | $92,780.37 | $0 | $92,780.37 |
| Coalition Plaintiffs | $1,408,558.00 | $415,984.00 | $1,824,542.00 |
| **TOTALS** | **$5,293,437.12** | **$755,256.57** | **$6,048,693.69** |

For Coalition Plaintiffs, their proposed fee award encompasses a total of 2,693 hours of attorney time. Curling Plaintiffs request fees for a total 4,758.75 hours of attorney time. The total of 7,451.75 hours is equal to more than ten months of continuous 24-hour days, or more than 745 10-hour days of attorney time. That total alone is staggering and excessive when compared to the limited results achieved by Plaintiffs in this case.

As discussed below, Plaintiffs' fee applications include a number of problems that limit effective review. First, a court faced with a fee application can only include in its award those hours that were reasonably expended on the litigation. *Barnes*, 168 F. 3d at 428. The burden is on the fee applicant to submit a request in a manner that allows a court to conduct a "task-by-task examination of the hours billed." *Id.* at 429. The request should also include a

"summary, grouping the time entries by the nature of the activity or stage of the case." *Id*. at 427. Because any objections must be made with specificity, *Barnes*, 168 F. 3d at 428, the lack of effective summaries for some of the entities limits State Defendants' ability to respond to the entries. The Coalition Plaintiffs also provided one summary by phase and timekeeper. [Doc. 632, p. 27]. While Morrison & Foerster provided summaries by stage and timekeeper, Krevolin and Horst provided no summaries whatsoever of spending by the nature of activity, timekeeper, expense categories, or stage of the case. Holcomb + Ward likewise provided no summaries of the time spent, stage of the case, timekeeper or category. Given this lack of specificity or ability to determine the reasonableness of the amount of time spent, this Court should reduce the Krevolin & Horst and Holcomb + Ward fees by 80%. Summaries are required of fee applicants and the lack of an effective or useful summary should lead this Court to deny the applications. *Id*. at 427.

The second difficulty for the Court in assessing reasonableness is also related to categorization. The use of "block billing" for a number of time entries makes it difficult for others to assign tasks to categories. "'Block billing' occurs when an attorney lists all the day's tasks on a case in a single entry, without separately identifying the time spent on each task." *Ceres Envtl. Servs., Inc. v. Colonel McCrary Trucking, LLC*, 476 F. App'x 198, 203

17

(11th Cir. 2012). Block billing leads to imprecision and also makes it difficult to determine the reasonableness of particular entries, which, in turn, can lead to a determination that the applicant failed to carry his or her burden. *Id*.; *see Welch v. Metro Life Ins. Co*., 480 F. 3d 942, 948 (9th Cir. 2007).

The filed itemizations includes more than 900 pages of time and expense entries. [Docs. 631, 632]. But the billing practices of Plaintiffs' counsel leaves State Defendants and this Court with the tedious task of culling each and every individual billing entry over a period of more than two years when the burden is on Plaintiffs to show their entitlement to fees. This brief examines the practices of the attorneys in a general fashion, and highlights the extensive examples of poor billing practices and entries that are not recoverable under Section 1988. In addition, the section dealing with Coalition Plaintiffs' billing entries also addresses the issue of compensating Marilyn Marks, the lead representative of the Coalition Plaintiffs, for the time she personally spent on this case.

A.    *Coalition Plaintiffs' time should be significantly reduced.*

Two major defects permeate the Coalition Plaintiffs' Corrected Detailed Specification in Support of Motion for Attorneys' Fees. [Doc. 632]. The first issue, which ultimately taints all the time entries for the Coalition Plaintiffs, is the fact that they have actively been using this litigation for fundraising

for their core purpose for several years. A deluge of tweets from Marilyn Marks on the social media microblogging platform, Twitter, indicates exactly that. *See generally,* Exhibit A. One such solicitation directed individuals to a donation page, a copy of which is attached as Exhibit B. Of particular importance is the commitment made by Coalition to its donors and potential donors that all of their donations will "exclusively cover the direct costs of the Georgia federal lawsuit." Exhibit B, p. 1. Coalition further stated that such costs include "attorneys' fees… filing fees and travel expenses…" *Id*. In other words, Coalition Plaintiffs solicited from the general public the very costs and fees Coalition now seeks to recover directly from State Defendants in order to advance the purpose of their organization. Moreover, the many replies containing some form of the phrase "donated" indicates that these solicitations were successful and directly funded this litigation. They even were able to obtain matching contributions from an activist organization, Fair Fight Action. *See*, e.g. Tweet from "Friends of Coalition for Good Governance, Exhibit A, p. 1, "… Fair Fight Action will match your donations to support [Coalition Plaintiffs]."

As this Court has previously acknowledged, Coalition Plaintiffs are "committed activists." Doc. 438 34:14–23. Their ability to solicit donations using this litigation to fund their organization should be taken into account

when awarding attorneys' fees. It is important to remember that the purpose of fee statutes is not to "produce windfalls to attorneys…" *Farrar*, 506 U.S. at 115. In this situation, to award the Coalition Plaintiffs attorneys' fees that they had previously fundraised would be to effectively allow an award of attorneys' fees to both compensate the attorneys and require taxpayers to subsidize Coalition Plaintiffs' advocacy efforts. Such is not and has never been the purpose of attorneys' fee provisions and this Court should not require taxpayers to subsidize the policy positions of the Coalition.

Second, the time records demonstrate that attorneys representing Coalition Plaintiffs spent inordinate amounts of time discussing the case with Ms. Marks. This had a two-pronged effect that led to wild increases in the cost of litigation for the Coalition Plaintiffs. Ms. Marks' constant correspondence with her many attorneys meant that they were adding significant time to their bills that were both unreasonable and unnecessary, increasing  the costs Coalition Plaintiffs actually seek recovery for in their fee petition. This time is reflected twice in Coalition Plaintiffs' petition: once as attorney time, and once again as the nearly $400,000 Coalition Plaintiffs seek to recover for their own work in this lawsuit.

The financial impact of this wasteful and redundant strategy is staggering. When coupled with the propensity of the attorneys for Coalition

Plaintiffs to block-bill their time with vague and imprecise time entries, the unnecessary billing permeates the entire application. The net effect is that it is nearly impossible for State Defendants or this Court to determine which of the Coalition Plaintiffs' time entries are actually *reasonably spent* on the litigation.

Indeed, a keyword search of Coalition Plaintiffs' fee petition reveals more than *seven hundred time entries* related to the word "Marks," aptly demonstrating the ubiquity with which Ms. Marks was responsible for creating time entries beyond the requirements of the litigation. Several significant examples for each attorney is discussed below.

### 1. Bruce Brown Time Entries.

Mr. Brown's time entries do not comport with the requirements for adequately showing attorneys' fees pursuant to Section 1988 motions. Coalition Plaintiffs, not the State Defendants, bear the burden of demonstrating the entitlement to fees. This includes submitting a request in a manner that allows a court to conduct a "task-by-task examination of the hours billed." *Barnes,* 168 F. 3d at 429. Notwithstanding this requirement, Mr. Brown's billing entries are almost all block-billed and rarely identify the time spent on each discrete task contained in each entry. Accordingly, it is difficult, if not impossible, for State Defendants and this Court to adequately

determine whether the entries meet the standard of reasonableness. This difficulty is even more pronounced where, as here, the entries are riddled with time dedicated to tasks that are obviously not compensable (*i.e.* excessive communications with Ms. Marks). Below are some examples reflecting the challenges of Mr. Brown's billing practices:

| Date | Time Spent | Description |
|------|-----------|-------------|
| 7/23/18 | 5.9 | **Extensive telephone conferences with M. Marks, and then M. Marks and R. McGuire**, about strategy in case, specifics of remedy, whether to file a motion for preliminary injunction; legal research on equitable relief; draft preliminary outline of motion. |
| 7/26/18 | 6.5 | Work on motion papers; **conference with M. Marks and C. Ichter**; further extensive work on motion papers |
| 7/31/18 | 5 | Review law on injunctive relief; **extensive telephone conference with M. Marks and R. McGuire;** further work on motion papers |
| 9/19/18 | 3.5 | **Conference call with M. Marks and continue preparation for the hearing**; legal research on several issues; consider filing motion for appointment of special master |

While some of this time may be compensable (legal research or drafting motions, for example), it is impossible to separate the time reasonably spent on the case from other work performed by Mr. Brown. This pattern is reflected throughout Mr. Brown's entries. Not only is the sheer volume of

conferences with the client and multiple other attorneys a strong indicator of duplicative and unreasonable time entries, *Duckworth*, 97 F. 3d at 1398; *Barnes*, 168 F. 3d at 435 (issue raised but not decided), Mr. Brown continually fails to account for how much time these calls absorbed from the total time entry. Apart from using vague modifiers like "extensive," State Defendants are left to simply guess at the total time contribution that was spent on the duplicative tasks. Moreover, the substance of the conversations is rarely described in a way that would allow a determination of the reasonableness of the particular entry. Occasionally, Mr. Brown characterizes the conversations as dealing with "next steps" (Time Entries for 11/15/18 – 11/16/18; [Doc. 632, p. 120]). The lack of a description means it is impossible to determine if the entries are duplicative of prior entries. While an individual client is, of course, free to seek as much or as little of her attorneys' time as she deems desirable, surely Section 1988 does not provide a vehicle for payment by State Defendants of idle and imprecise tasks.

Because of the block billing, imprecision, and duplicative entries of Mr. Brown, State Defendants submit that a reduction of 75% of Mr. Brown's time on this matter is appropriate across all phases of the litigation and a 95% reduction in the time for the phase encompassing the first preliminary-injunction motion, as discussed below under Curling Plaintiffs' fees.

<u>2.     Carey Ichter Time Entries.</u>

Mr. Ichter's time entries suffer from many of the same deficiencies as those of Mr. Brown. Ms. Marks again monopolizes her attorneys' time in inefficient and inexplicable ways. Effectively every entry in the ten hours comprising Phase I of Mr. Ichter's time entries deals in some way with Ms. Marks. The 74.3 hours comprising Phase II operates quite the same. And like Mr. Brown, there is few, if any, accounting for discrete tasks. Moreover, obviously non-compensable time is included. For example, on July 27, 2018, Mr. Ichter has a two hour time entry containing the following items:

> Meeting with Ms. Marks and Mr. Brown **regarding media coverage issues**; settlement issues; motion for preliminary injunction; conference call with Mr. Kent and Ms. Marks.

[Doc. 632, p. 145] (emphasis added). Coalition Plaintiffs are apparently seeking reimbursement for their media strategy under Section 1988, which cannot reasonably be time spent on the case. *Loranger*, 10 F. 3d at 782. Still other entries reveal a pattern of irresponsible billing and unexplained block entries. Further examples from Phase II, which involved a preliminary-injunction motion that Coalition Plaintiffs ultimately lost, are listed below.

| Date | Time | Description |
|------|------|-------------|
| 5/3/18 | 4.3 | Conference calls with **Ms. Marks** and Mr. White; **Ms. Marks** and Mr. Bryan; **Ms. Marks** and Mr. Maguire; all counsel regarding preservation issues. |

| 5/5/18 | 2.3 | Prepare emails to Fulton, DeKalb and Cobb counsel regarding dealing with release of DREs; review email from **Ms. Marks** regarding issue in DeKalb County; email to Mr. Salter and Mr. Bennett, various communications with **Ms. Marks** regarding DeKalb issue and spoliation. |
| 5/10/18 | 4.5 | Review various emails from Mr. Salter, **Ms. Marks**, Mr. Brown and Mr. Cross; conference with **Ms. Marks**; review email from court, conference call regarding position regarding preservation of DREs and memory cards; additional emails from DeKalb, **Ms. Marks**, Mr. Salter, court; travel to courthouse; attend meeting of all parties. |

Much like her dealings with Mr. Brown, Ms. Marks absorbs an uncharacteristically large amount of Mr. Ichter's time on communications. And, much like Mr. Brown, Mr. Ichter does not identify any time value for those communications or to any of his block time entries. He has failed to carry his burden to show entitlement to fees.

As summarized below, Mr. Icther's time should be eliminated for Phase 1 and reduced by 75% for the remaining phases with a 95% reduction in the time for the phase encompassing the first preliminary-injunction motion, as discussed below under Curling Plaintiffs' fees.

### 3.     Lawyers Committee time entries.

The time entries of the Lawyers Committee are generally not block billed. Thus, the task of determining whether they are reasonable is made far more achievable. As with the other attorneys, Ms. Marks can be traced to a litany of time entries, further emphasizing the duplicative nature of her

conversations. Additionally, 6.8 hours are recorded for tasks that take place before the Lawyers Committee even decided to take on representation of the Coalition Plaintiffs. [Doc. 632, p. 181]. While most of the Lawyers Committee lawyers indicated they did not charge their hourly rate for time spent traveling, Messrs. Rosenberg and Brody did so on several occasions. As a result, they included 17.5 hours and approximately 5 hours of travel time, respectively. They also included their travel expenses as part of their overall expenses. The State Defendants should not be required to pay the already above-market hourly rates of the Lawyers Committee attorneys for time spent traveling. Accordingly, to the extent this Court awards a fee based on time worked by the Lawyers Committee, it should be adjusted down by $13,375 to account for this overbilling alone.

Additionally, the Lawyers Committee claims to have spent nearly 700 hours of attorney time in just under eight weeks of litigation. Of those, 338 hours occurred in Phase 2 alone,[9] which represents *just two weeks* from July 12, 2019 to July 26, 2019. While this was obviously a busy season for this litigation, even assuming the Lawyers Committee worked weekends, that number equates to more than 24 hours per day for two weeks straight.

---

[9] The Lawyers' Committee summary phases [Doc. 632, p. 176] do not align with the phases in the Coalition's summary and are treated separately below.

Further, this number actually *omits* the approximately 25 hours of travel time that was excluded during the same short time period. In a case with two separate sets of lawyers for two separate plaintiffs, this astronomical number alone shows a lack of billing judgment.

Moreover, as with other portions of their billing history, a great many tasks reflect redundant time entries. There were many conferences with Marilyn Marks, most of which contained multiple attorneys. And there were still more conferences and e-mail correspondence among the many attorneys serving the Plaintiffs in this case. While "there is nothing inherently unreasonable about a client having multiple attorneys," *Norman,* 836 F. 2d at 1302, the attorneys must sufficiently demonstrate "the distinct contribution of each lawyer to the case…" *Barnes,* 168 F. 3d at 432. Far from reflecting a distinct contribution, the Lawyers Committee lawyers seemed to double, triple, and, at times, quadruple a singular effort. An example of such redundancy can be found at [Doc. 632, p. 192] where, in a span of two days, four attorneys spent significant time apparently carrying out the same task:

| Name | Date | Time | Task |
|------|------|------|------|
| Brody | 7/17/19 | 4.5 | Drafting/revising P[reliminary] I[njunction] reply brief |
| Conarck | 7/17/19 | 5.6 | Legal research and drafting section of P[reliminary] I[njunction] reply brief relating to security of paper ballots (1.3); Line editing and |

| | | | formatting P[reliminary] I[njunction] reply brief (4.3) |
|---|---|---|---|
| Walter | 7/17/19 | 8 | Researching academic articles about ADA and ballot security – 1 hour<br>Compiling number of elections data – 3 hours<br>Cite-checking/editing reply brief – 4 hours |
| Wilson | 7/17/19 | 8 | 1 hour: researching articles on disability community and voting machines; email team and present findings<br>3.5 hours: compiling election data; revising number of elections section; compiling citations; call with Marilyn's intern re background info and spreadsheet<br>3.5 hours: entering Kirk depo cites; cite checking and editing |

Far from providing "distinct contributions," the 26 hours these four attorneys billed on July 17, 2019 all dealt with the exact same topic. Moreover, Mr. Walter and Mr. Wilson billed the *exact* same amount of time (8 hours each) for what appears to be the *exact* same tasks. A similar circumstance occurred the following day among the same four billers, totaling approximately 16 hours instead of 26. This pattern abounds throughout the Lawyers Committee bills, and significant downward adjustment is warranted as a result.

Given the duplication of effort of the Lawyers' Committee, the attempt to recover for activities prior to joining the case (and unrelated to actually filing it), and the excessive conferences with Ms. Marks, State Defendants submit that elimination of the investigation phase, 70% reduction for Phase

1, a 95% reduction for Phase 2 for the reasons discussed below under Curling

Plaintiffs' fees, and a 50% reduction of Phase 3 are appropriate.

### 4.     William Brent Ney time entries.

The vast majority of time entered by Attorney William Brent Ney is the

result of significant email communications primarily with Ms. Marks and, at

times, other attorneys. The entries relating to e-mail communications

generally describe the number of emails exchanged but do not describe what

the communications pertain to or their individual duration. A typical block

entry from *a single day* is as follows:

> Telephone conference with Marks; Edit letter to Renigar; Email
> from Court; Review Order; Meet with Law Clerk; Twenty one
> emails from Marks; Fifteen emails from Ward; Email from Law
> Clerk; Six emails from McGuire; Five emails from Caldwell;
> Email from Salter; Email from Highsmith; Email from Lewis;
> Email from Waldron; Email from Hoke; Email from White; Email
> from Ringer; Email from Bennett; Email from Schnell; Eighjt [sic]
> emails to marks; Email to law Clerk; Two emails to McGuire;
> Two emails to Ward; Email to Renigar; Email to Salter; Email to
> Hoke.

[Doc. 632, p. 271]. While the billing references numerous emails, it is unclear

what, if anything, these emails had to do with the litigation. Moreover, it is

impossible to say how much of the three-hour block entry went to actual time

spent on the litigation. Section 1988 does not permit recovery of anything for

which a lawyer bills time. Instead, the time must be reasonably related to the litigation.

Because Mr. Ney's billing entries are so convoluted, it is impossible to undertake a meaningful assessment as to their reasonableness. And because they deal almost exclusively with e-mail communications between his client and other third parties but carry no description as to their substance, it can only be assumed that they are duplicative and/or unrelated to the litigation. Indeed, it appears Mr. Ney seeks almost $50,000 in attorneys' fees for little more than several months of e-mail correspondence with his client and others. This is simply not recoverable under Section 1988.

Further, Mr. Ney includes only 99.4 hours for himself [Doc. 632, p. 282], with 13.6 hours for his law clerk [Doc. 632, p. 283] and 12.5 hours for his paralegal. *Id*. But all of this time is included as his time on the Coalition's summary sheet. [Doc. 632, p. 27]. Given these discrepancies in records and the non-legal nature of Mr. Ney's entries, Mr. Ney's claimed total fees for each phase should be reduced by 90% with a 95% reduction in the time for the phase encompassing the first preliminary-injunction motion, as discussed below under Curling Plaintiffs' fees.

### 5.   Robert McGuire's time entries.

Mr. McGuire also block-bills many of his entries and seeks to recover for time spent when this case was an election contest in superior court. While Mr. McGuire may be able to recover for some of his time, Ms. Marks notes that Mr. McGuire's contributions were limited at the outset [Doc. 632, p. 288]. Mr. McGuire also appears to be functioning in a non-litigation advisory role for the Coalition for Good Governance, because he seeks to recover time for "Setting Coalition's independent litigation strategy at the outset of 2018." [Doc. 632, p. 88]. In addition, a significant amount of Mr. McGuire's time was devoted to the first preliminary-injunction motion, which was denied by this Court, as discussed previously. [Doc. 632, p. 88].

Like the other attorneys for the Coalition Plaintiffs, this Court should reduce Mr. McGuire's hours by 75% to account for the lack of success and unrecoverable entries identified in his time entries and a 95% reduction in the time for the phase encompassing the first preliminary-injunction motion, as discussed below under Curling Plaintiffs' fees.

> 6. Marilyn Marks and the Coalition for Good Governance time entries.

Non-attorney Marilyn Marks and her organization, the Coalition for Good Governance, seek almost $400,000 in expenses for time they spent on this case. While this is considered an expense, State Defendants deal with

31

that time here because Coalition Plaintiffs attempt to analogize their time to that of a paralegal—which they are not. Regardless of whether Ms. Marks considers herself an expert in election law, she is not a lawyer, has no legal education to speak of, and is not qualified as an expert in this case.[10]

Despite this army, however, Ms. Marks makes the curious claim in declaration that she saved money by completing many tasks herself that would have otherwise been outsourced and more expensive. But she relies only on her own statement for this proposition. Ms. Marks is clearly a far more active party in litigation than most, as was demonstrated by her counsel's attempts to have this Court allow her to view information during discovery that was designated "attorney eyes only." [Doc. 438, 34:14 – 35:9]. But as this Court properly pointed out, Ms. Marks is an activist, not an attorney. *Id*. And because she is not an attorney, neither she nor her summer interns performed legal tasks recoverable under Section 1988.

Further, this Court has only Ms. Marks' self-serving conclusion that her efforts during this litigation actually *saved* time and money for that proposition. To the contrary, the many bills from her many attorneys suggest

---

[10] In fact, Ms. Marks' primary competency appears to be organizing "election-related lawsuits," because she proclaims that she has filed more than 30 such lawsuits, in addition to other administrative and protest actions in "numerous jurisdictions." [Doc. 632, p. 286].

quite the opposite. As earlier noted, Ms. Marks is mentioned by name more than 700 times in this application alone. Each one of these mentions carries with it an accompanying cost from the lawyers on the other side of the billing entry. As a result, and as more fully explored above, Ms. Marks' actions resulted in multiple instances of redundant and unnecessary time entries.

Finally, as mentioned above, Ms. Marks and her organization minced no words that they were fundraising directly off this litigation. Ms. Marks does not get two bites at the apple and her claimed time expenses should be eliminated entirely.

B.   *Curling Plaintiffs' time entries must be significantly reduced.*

Curling Plaintiffs provide a breakdown by timekeeper and by phase of the case, splitting the case into four stages. [Doc. 631, pp. 4-10, 18-19]. But Curling Plaintiffs must also have their fees significantly reduced.

The block billing problems that plagued Coalition Plaintiffs' application rear their heads again in Curling Plaintiffs' fee application. For example, Catherine Chapple, one of the lead associates on this case, billed approximately 32 hours in three days between May 8, 2018 and May 10, 2018. Each of the three days contained multiple block-billed entries with no allocation of the time to discrete activities. The entries include a variety of supposedly compensable activities including "Continue to discuss sample

size," "Travel to Atlanta for meeting and hearing," and "telephone call with statisticians." [Doc. 631, p. 33]. The failure to adequately account for the individualized time entries makes it impossible to determine the reasonableness of these block-billed entries. Curling Plaintiffs' fee application contains years of similarly poor timekeeping for multiple attorneys. As discussed below, the block billing should lead to significant reductions in any recovery by the Curling Plaintiffs' counsel.

Because the fee application for Curling Plaintiffs includes clearer breakdowns of activities for each phase and involve far more timekeepers than those of Coalition Plaintiffs, State Defendants will evaluate each of the phases and propose appropriate reductions.

### 1.      No recovery is allowed for any fees included in Phase 2.

First, Curling Plaintiffs seek fees to which they are not entitled under law—the fees for Phase 2, the appeal. As Coalition Plaintiffs correctly concede, this is not the appropriate forum in which to seek recovery of such fees because they did not seek those fees from the Eleventh Circuit. [Doc. 632, p. 35]; *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1356–57 (11th Cir. 2009); 11th Cir. R. 39-2. Any fees relating to the appeal stage of this action are not recoverable and must be removed from the Plaintiffs' requested fees and expenses. *Id*. While Curling Plaintiffs mention several other activities in

this phase of work, those items also do not apparently relate to this litigation.

"Whistleblower report" is not an issue that has been briefed or decided by this

Court and "Open Records Requests" are unrelated to this case, as explained

in State Defendants' response to the Bill of Costs, [Doc. 618, pp. 6-7], because

those documents could have been obtained through the discovery process.

Curling Plaintiffs do not provide a breakdown of tasks within this

phase, so the time on the appeal and the time spent on tasks unrelated to the

case cannot be easily separated. This Court should not allow the recovery of

any of the $647,370.00 in fees and $70,114.00 in expenses that Curling

Plaintiffs seek related to the appeal stage [Doc. 631, p. 7].

> 2.    Any recovery for Phase 1 should be significantly reduced.

Curling Plaintiffs seek $1,458,588.75 in fees and $75,459.04 in

expenses related from the beginning of their involvement in this case through

the first preliminary-injunction hearing. [Doc. 631, p. 6]. But, as explained

above, this Court denied Plaintiffs' motion, assigning at least some blame to

Plaintiffs for the denial, and finding that Plaintiffs have not carried their

burden as to the third and fourth factors required for a preliminary-

injunction motion. [Doc. 309, pp. 43-44]. Plaintiffs were not the prevailing

party for this phase of the litigation and recognize this—only arguing that

the first motion set up the second one. The first preliminary-injunction

motion did not change the legal relationship of the parties and cannot form the basis for a recovery of fees, as the U.S. Supreme Court recognized when it rejected the "catalyst theory" and required a "judicially sanctioned change in the legal relationship of the parties." *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605, 121 S. Ct. 1835, 1840 (2001). The first preliminary injunction did not change the legal relationship of the parties in any fashion.

In addition to the lack of recovery for the first preliminary-injunction motion, the tasks included in this phase also include a variety of tasks that either were not reasonably related to the litigation or show that litigation between the Plaintiffs caused the increase in billed time. Those tasks include "recruiting core team of attorneys and staff," setting up a database for document review, opposing the *Coalition's* motion for leave to amend, and data entry. [Doc. 631, pp. 4-5].

Even with all of these limitations, there are several tasks that could form the basis for a recovery if this Court grants fees. Those include drafting oppositions to the motions to dismiss and legal research. But the lack of any further breakdown of tasks makes further analysis difficult.

Given the lack of success on the first preliminary-injunction motion, the delays caused by Plaintiffs, and the tasks unrelated to the litigation, but also

recognizing that some entries may be recoverable, this Court should reduce the fee entries for Phase 1 by 95%.

3.    Any recovery for Phase 3 should be significantly reduced.

The third phase includes the second preliminary-injunction and discovery issues. While Curling Plaintiffs take the position that there is no duplication in their entries with the Motion for Sanctions, this is less than clear in their time entries. The tasks listed for this phase include "GEMS database discovery dispute." [Doc. 631, p. 8]. Those hours appear to be deducted on the next spreadsheet, but do not precisely match the number of hours sought in the Motion for Sanctions. State Defendants recognize that this is the only stage of the case where any change in the legal relationship between the parties took place—even if that change was extremely limited, as explained above, because the State was already undertaking a conversion to a new system based on the legislative action of the General Assembly.

Curling Plaintiffs seek recovery for 1,968 hours totaling more than $1.4 million for this phase of the litigation. [Doc. 631, p. 9]. This Court should reduce the fee recovery for this phase by 70%, recognizing the limited nature of the relief ultimately obtained by Plaintiffs in the preliminary-injunction order compared to the relief they sought.

4.    Any recovery for Phase 4 should be significantly reduced.

37

The fourth phase of Curling Plaintiffs' efforts include seeking reimbursement for the bill of costs that this Court denied for being filed prematurely. [Doc. 631, p. 9] (seeking time for Bill of Costs); [Doc. 639] (denying Bill of Costs). State Defendants recognize that, if this Court authorizes a recovery of fees, the time associated with preparation of that motion are recoverable. Given the limited nature of any fee recovery and the premature filing of the Bill of Costs, this Court should reduce the fee recovery for this phase by 50%.

## IV.   Plaintiffs' submitted expenses should be reduced.

In addition to attorneys' fees, a prevailing plaintiff is also entitled to recover reasonable litigation expenses in the discretion of the court. 42 U.S.C. § 1988. As with attorneys' fees, the burden is on the applicant to submit a request that allows this Court to determine "what expenses were incurred" on this litigation. *Loranger*, 10 F. 3d at 784. Any reasonable expense, with the exception of routine office overhead, may be taxed as costs, but the expenses must be reasonable in order to allow recovery. *Barnes*, 168 F. 3d at 438-439. In order for reasonableness to be determined, expenses must be documented. *Dzwonkowski v. Dzwonkowski*, CIV.A. 05-0544-KD-C, 2008 WL 2163916 at *19 (S.D. Ala. May 16, 2008) (refusing to award expenses when no documentation was provided); *Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d

1313, 1330 (M.D. Fla. 2001); Local Rule 54.2.A(2) (movant must file "other supporting documentation" within 30 days of motion).

The Curling Plaintiffs seek expenses totaling $427,476.33 through their counsel at Morrison Foerster. The Coalition Plaintiffs, through their various counsel, seek $20,384.31 and an additional $395,779.82 for expenses incurred directly by Coalition for Good Governance.

A. *Coalition Plaintiffs seek unrecoverable expenses.*

1. Lack of documentation.

Much of the Coalition Plaintiffs' expenses are simply unsupported by adequate documentation. Mr. McGuire, for example, requests $4,808.02 in expenses without providing a single receipt as evidence. [Doc. 632, p. 108]. Mr. Brown similarly failed to provide receipts in support of his expense reimbursement claims. [Doc. 632, p. 135]. Mr. Ichter failed to do so as well. [Doc. 632, p. 155]. Section 7.4 of the Statewide Accounting Policy and Procedure Manual provides that, "[n]o expense should be approved if a required receipt is missing." *See,* Exhibit C. This Court should employ a similarly prudent approach and decline to award any expenses that do not have supporting third-party documentation like receipts. *Wales*, 192 F. Supp. 2d at 1330. The expenses submitted by Mr. Brown, Mr. Ichter, and Mr. McGuire should be eliminated for lack of documentation.

While the Lawyers' Committee provided receipts for their submitted expenses, they were often for things entirely too far removed from this case. For example, Mr. Powers seeks recovery for desserts like Berry Cobbler [Doc. 632, p. 232], Key Lime Pie [Doc. 632, p. 239], and Pound Cake [Doc. 632, p. 240]. Not all of these expenses are reimbursable or reasonably tied to the litigation and this Court should reduce those expenses by 50%.

### 2.    Office expenses.

The Coalition Plaintiffs' attorneys seek an additional $617.21 in fees for researching tools like Westlaw. [Doc. 632, pp. 155, 178]. Research expenses are part of general law firm overhead expenses and should not be awarded as expenses. *Barnes*, 168 F. 3d at 438-439. These should be removed from their expenses.

### 3.    Expenses incurred by the Coalition for Good Governance

This brief has already discussed at length the reason Ms. Marks' time entries should receive separate reimbursement under Section 1988. For those reasons alone, $125,330.00 should be stricken from the Coalition Plaintiffs' alleged expenses. [Doc. 632, pp. 306, 345 – 363]. Additionally, Ms. Marks claims she paid her interns at $17/hr to perform work for the Coalition for Good Governance organization. Yet the Coalition Plaintiffs seek fees in the amount of $29,826 for Taran Greenwald, who the Coalition Plaintiffs claim is

40

a "litigation support intern." [Doc. 632, p. 305].  At a $17/hr rate, that
amounts to 1,764 hours of work performed by Ms. Greenwald, but not a
single invoice is provided to demonstrate the tasks or time undertaken. The
timeframe for Ms. Greenwald's work is listed as "Nov. 2018 – July 25, 2019,"
or 8 months. That amounts to 7.35 hours per day, *every single day,* including
weekends. This was quite the internship. If this invoice is any indication of
the Coalition Plaintiffs' billing judgment more broadly, reductions must be
made.

Three other interns billed an additional $3,392.00, $4,225.00, and
$790.53. The State Defendants should not be covering work for interns, which
is by its nature duplicative and/or unnecessary. Accordingly, an additional
$38,233.53 should be completely removed from the Coalition Plaintiffs'
internal expenses. The remaining expenses involve expert consulting and
database analysis, to which this Response now turns.

a.    *Phillip Stark*

At $1,500 per hour, Mr. Stark claims the highest hourly rate of any
billing party in this action, including the most experienced counsel out of
Washington, D.C. The Coalition Plaintiffs seek to recover $39,450 for Mr.
Stark's work based on a completely generic invoice with almost no detail
concerning what work was actually performed. Mr. Stark claimed two entries

totaling five hours, for example, and the only descriptions were "email, call, writing." [Doc. 632, p. 309]. This is simply insufficient detail to recover for any sort of work performed, but particularly when the hourly rate is so high. The State Defendants recommend reducing Mr. Stark's rate by 95%, because it is impossible to tell whether his entries are reasonable.

### b.   Matthew Bernhard

Matthew Bernhard seeks $19,200 for services rendered at a $200 hourly rate. But his invoice reflects a price reduction of $14,400, bringing the total amount due to $5,617. [Doc. 632, p. 311]. It is unclear whether Mr. Bernhard ever sought the full sum from the Coalition Plaintiffs. Elsewhere, Mr. Bernhard listed his hourly rate as $45 with no explanation for the discrepancy. [Doc. 632, p. 322]. Accordingly, the State Defendants submit that Mr. Bernhard should be paid the lower rate of $45/hr for his services.

### c.   Expert fees that were subject to reduced rates

Several other individuals reduced their rates for the Coalition Plaintiffs, but the Coalition Plaintiffs nonetheless seek reimbursement for the services at full price. *Compare,* [Doc. 632, pp. 331, 335, 365] *with* [Doc. 632, p. 305]. The State Defendants submit that Coalition Plaintiffs are not entitled to fees under Section 1988 to fees they did not pay. Accordingly, the invoice provided by Ritchie Wilson [Doc. 632 p. 335], and Candace Hoke [Doc.

632, p. 332] should have been submitted at their reduced rates. They should be further adjusted downward for failing to provide adequate billing descriptions. This Court should reduce Mr. Wilson and Ms. Hoke's billing entries by 80% to account for these differences.

B.    *Curling Plaintiffs seek unrecoverable expenses.*

1.    Lodging and travel expenses.

Other expenses sought are contrary to the State Accounting and Reimbursement Policy ("Policy"), demonstrating the *per se* unreasonableness of such expenditures. With respect to lodging, for example, Section 3.1 of the Policy provides that "[t]he traveler should select the least expensive option available taking into consideration proximity to the business destination and personal safety." Yet the Curling Plaintiffs' attorneys selected lodgings at the Ritz-Carlton Hotel, which is well-known to be one of the more expensive hotels in the Atlanta area. *See, e.g.* [Doc. 631 at pp. 174; 181; 183; 194 – 195]. Room rates show multiple nights by multiple attorneys at well over $300/night. While State Defendants appreciate that counsel and experts for Curling Plaintiffs may have grown accustomed to a certain standard of living, surely the taxpayers of the State of Georgia need not pay for their decision to select premium lodging.

Given the propensity both the attorneys and experts for Curling Plaintiffs to seek premium travel arrangements, particularly with respect to lodging, the State Defendants submit that their total travel costs requested ($55,103.31) should be reduced by a minimum of 50%.

### 2.    Expert expenses.

Curling Plaintiffs also seek $146,250.00 for expert fees for Dr. Halderman for 195 hours of work performed on this case. [Doc. 631, p. 290]. Apart from the high hourly rate, many of Dr. Halderman's time entries do not adequately describe alleged work performed for large sums of time. For example, on July 5 and 6, 2019, Dr. Halderman performed 10.5 hours on what is apparently one task: "Collect Basis Documents." This description does not permit State Defendants to perform an analysis as to the reasonableness of the time spent. Dr. Halderman's expenses also indicate premium lodging. For example, Dr. Halderman booked one night, July 16, 2019, in Washington D.C. for $573.60. This is a very high rate for one night of weekday lodging. If this Court is inclined to award some expert fees, Dr. Halderman's fees should be reduced by 75% to account for these problems.

### 3.    Office expenses.

Curling Plaintiffs seek a combined total of $116,105.56 for use of research services like Westlaw and Lexis. As earlier noted, research expenses

44

are part of general law firm overhead expenses and should not be awarded as expenses. *Barnes*, 168 F. 3d at 438-439.  The State Defendants submit that the proper amount of Westlaw and Lexis charges is zero. As previously discussed in the Response to the Bill of Costs, the attempt to recover Open-Records Act fees is not appropriate. [Doc. 618, pp. 6 – 7]. Further, the amounts sought for "document preparation," "long distance telephone," "data entry," "hotel and inflight Wifi," and "photocopies" also refers to items of office overhead and should be excluded.

## CONCLUSION

In seeking more than $6 million in fees and expenses, Plaintiffs ask the taxpayers of the State of Georgia to spend more on their efforts than the taxpayers spend in a year to operate the State's Elections Division. This Court should deny the entire motion for attorneys' fees. But if this Court allows any recovery, it should be substantially limited as outlined above and consistent with the attached summaries.

Respectfully submitted this 14th day of November, 2019.

> Vincent R. Russo
> Georgia Bar No. 242628
> vrusso@robbinsfirm.com
> Josh Belinfante
> Georgia Bar No. 047399
> jbelinfante@robbinsfirm.com

Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Kimberly Anderson
Georgia Bar No. 602807
kanderson@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

*/s/Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678)336-7249

*Counsel for State Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing STATE DEFENDANTS' CONSOLIDATED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR ATTORNEYS' FEES AND COSTS has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson
