```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
 2                   ATLANTA DIVISION

 3

 4   DONNA CURLING, ET AL.,          :
                                     :
 5         PLAINTIFFS,               :
     vs.                             :  DOCKET NUMBER
 6                                   :  1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,     :
 7                                   :
           DEFENDANTS.               :
 8

 9

10        TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

11          BEFORE THE HONORABLE AMY TOTENBERG

12             UNITED STATES DISTRICT JUDGE

13                   DECEMBER 6, 2019

14                     11:17 A.M.

15

16

17

18

19

20

21   MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22              TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:

 4

 5        DAVID D. CROSS
          MARY G. KAISER
 6        MORRISON & FOERSTER, LLP

 7        HALSEY G. KNAPP, JR.
          ADAM M. SPARKS
 8        KREVOLIN & HORST, LLC

 9

10   FOR THE PLAINTIFF COALITION FOR GOOD GOVERNANCE:

11
          BRUCE BROWN
12        BRUCE P. BROWN LAW

13        ROBERT ALEXANDER McGUIRE, III
          ROBERT McGUIRE LAW FIRM

14

15   FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
     WILLIAM DIGGES, III, AND RICARDO DAVIS:

16

17        CARY ICHTER
          ICHTER DAVIS, LLC

18

19   FOR THE STATE OF GEORGIA DEFENDANTS:

20
          VINCENT ROBERT RUSSO, JR.
21        CAREY A. MILLER
          JOSHUA BELINFANTE
22        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

23
          BRYAN P. TYSON
24        TAYLOR ENGLISH DUMA

25                                      (...cont'd....)
```

1   (...cont'd....)

2

**FOR THE FULTON COUNTY DEFENDANTS:**

3

4       KAYE BURWELL
        CHERYL RINGER
        OFFICE OF THE FULTON COUNTY ATTORNEY

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1                    P R O C E E D I N G S

 2     (Atlanta, Fulton County, Georgia; December 6, 2019.)

 3              THE COURT:  Morning.  Have a seat.  Good morning,

 4     Counsel.

 5              We are having Mr. McGuire participate by long

 6     distance; is that right?  Are you connected okay?

 7              MR. McGUIRE:  I think so.

 8              THE COURT:  All right.  Can anyone else hear him --

 9     everyone else hear him?

10              MR. TYSON:  Yes.

11              THE COURT:  All right.  Very good.

12              I do want to note -- and I have authorized this

13     before.  But I realize what an integral part of the team -- in

14     the Coalition's team here that Ms. Marks is but -- and that she

15     has access to electronic equipment as well, which, you know, is

16     within my authority.

17              But it is -- I want to make clear to you, Ms. Marks,

18     that it is really permissive -- you cannot be recording

19     anything and you cannot be in any way live tweeting or anything

20     else like that.  And I hope that is clear.

21              Because if you were to do that, you would never be

22     allowed to have access to electronic equipment again.  And I

23     know you are a vital aide to your counsel.  And that is why,

24     you know, it is almost functioning as -- both as a client,

25     paralegal, and in all capacities.
```

1          But I just want to be 100 percent clear about that,

2    that it would be in violation of my directives and in contempt

3    of these directives if you were to record or to tweet while you

4    are in here.

5          MS. MARKS:  Thank you, Your Honor.

6          THE COURT:  The parties asked for a status conference

7    in this matter about a variety of issues ranging from the

8    Coalition plaintiffs asking about implementation issues, to

9    asking about how we're proceeding on -- and if the Court is

10   proceeding on scheduling a preliminary injunction hearing and

11   what the schedule would be as to that, and asking for oral

12   argument, as well as a variety of other items that the

13   plaintiffs asked about.

14         And I have indicated in my -- and summarized in my

15   order of December 3rd, 2019, at Document 671, the state

16   defendants seek to address modifications in the current

17   scheduling order in particular with respect to whether the

18   Court is going to actually have a final trial or are we going

19   to cancel that trial that we referenced earlier in the spring

20   of 2019 and June 21st, 2019, and whether -- and directions

21   related to the preservation and decertification of the DRE GEMS

22   voting system.

23         So, first of all, the two issues raised by the state

24   defendants might be easiest.  But the second one as to the

25   preservation and decertification of the DRE GEMS system might

1    relate to some of the other issues.  I'll just put a pin on
2    that one but address the question of the scheduling of the
3    final trial.

4           While I never thought there needed to be a final
5    trial -- I thought we had done everything possible -- the
6    defendants had asked, I thought, originally to preserve that
7    possibility.  And it still remains sort of lurking there
8    because the state has never indicated exactly what it was
9    prepared to do regarding -- on a final basis as to the Court's
10   preliminary injunction ruling.  And yet we both have mootness
11   arguments that the state has made and, on the other hand, not
12   understandably wanting to be relieved of the possible specter
13   of a trial in January, which I concur with.

14          But it is a confusing posture.  And all is related to
15   the argument, on one hand, that the DRE claims are moot and my
16   having issued a pretty comprehensive order already on the
17   evidence and then the state wanting to preserve the possibility
18   of appealing as a final -- in terms of the final order.  It is
19   obviously not preceded with an interlocutory order -- appeal.

20          So if the state could clarify how it approaches this,
21   it would be -- as to the DRE claims and trial and contentions
22   of mootness and yet at the same time the contention you may
23   want to appeal what I have already issued on -- issued an order
24   on, it would be helpful to the Court and also helpful in
25   addressing your question.

1          MR. TYSON:  Thank you, Your Honor.  Good morning.

2    Bryan Tyson.  I'll take the lead on addressing that question

3    for you.

4          I think to start with we kind of have to distinguish

5    between the question of the mootness of the DRE claims and the

6    new claims that are in as part of the ballot marking device

7    claims.  The state is not going to use DREs ever again.  They

8    were used for the last time on Tuesday in the runoff elections.

9          Not only does the state law prohibit the use now that

10   the ballot marking devices are being rolled out, Your Honor's

11   order has that in place.  The state has purchased the new

12   system.  And going forward, there will not be any use of the

13   DREs.  And the state will not be appealing to try to obtain the

14   use of the DREs again.

15         There may be an appeal related to some of the legal

16   issues with the injunction on standing and some of those other

17   legal issues related to the case.  But from the state's

18   perspective, we have abandoned DREs.  We are not going back to

19   DREs.  And we will not appeal anything related to trying to use

20   DREs again.

21         As far as the mootness piece goes in light of that,

22   we're now at a point where we have the DREs.  We have ceased

23   using those.  The Secretary of State in the coming weeks plans

24   to decertify that election system.  And once the DREs are

25   decertified, they also cannot be used in Georgia.

1        We're at a place now where the collection of the

2   30,000 or 27,000 DREs, 8000 ExpressPolls is underway.  Counties

3   don't have room to store both the new system -- the new

4   components and the old components.  And the state is at a point

5   where we are ready to begin the process of recycling those

6   units and disposing of those.

7        THE COURT:  You had -- this issue is -- you came up

8   first when I realized -- I think it was Page 12 or something of

9   your -- one of your briefs.  And I just remember it jumping out

10  that you were representing at that point earlier in the fall

11  that you were collecting all of the -- and that you were

12  storing them.  And that is why I assumed you were because you

13  represented you were.

14       MR. TYSON:  Yes, Your Honor.  And at that point, that

15  was the only process that was underway.  Now that we've gotten

16  farther down the line, we're now at a point where the vendor

17  storing those DREs -- the vendor estimate is around $300,000

18  per year to store all 35,000 different components of that

19  system.

20       And so since we are not going to use it again since

21  the ballot marking device rollout is on track, we are now at a

22  point where we don't want to continue to pay to store all of

23  those DREs, especially in light of the fact that there is

24  really nothing else that can be done related to those.

25       I think the only claim the plaintiffs can say in

1   response is, well, maybe some part of the election system is

2   still going to be used.  You have Dominion on our preliminary

3   injunction motion saying they are not using any part of the

4   existing system.  And I think the voter registration database

5   is the only piece that could still be used going forward.  No

6   component of GEMS or DREs is going -- is going forward with

7   that.

8           And so we don't see a reason since those claims are

9   moot -- we're not going back to them, there is no further

10  relief that you can order on that front -- for the state to

11  continue to bear the cost of that storage.  And there is no

12  reason to conduct discovery on claims that are moot.

13          THE COURT:  So in whatever fangled way, your thought

14  was if you are going to appeal you are going to do it on some

15  of the procedural standing issues that, I would assume, might

16  arise in connection with the BMD issue?  That you would say it

17  is an ongoing problem?  Because you wouldn't be able to just

18  appeal a standing issue independent of the substantive claim --

19  a Fourteenth Amendment claim.

20          MR. TYSON:  Yes, Your Honor.  That is correct.  And

21  the -- in terms of kind of how we're approaching this, we see

22  that there are continuing maybe issues related to jurisdiction

23  on the standing, those kind of questions.  That is why we

24  didn't appeal from an interlocutory basis.  We weren't

25  attempting to use the DREs again.

1          But at the conclusion of the case, there may be those

2   jurisdictional issues that can be reviewed on appeal.  But like

3   you said, those would continue throughout.

4          THE COURT:  Well, not to try to say that you don't

5   have a basis for any appeal, but I'm just trying to -- I

6   wouldn't understand logically here -- let's say that the -- for

7   whatever reason the BMD claims don't proceed.  Are you saying

8   that you would have -- be in a legal posture to be able to

9   appeal these procedural issues of jurisdiction and standing?

10         MR. TYSON:  So if the BMD claims cannot proceed, for

11  example, if they are dismissed, then I think we are probably at

12  the point of final judgment at that point or dismissal for

13  mootness.  And I think -- I have not looked specifically at

14  that from a jurisdictional perspective.  But I think that would

15  put us in a very different posture, yes.

16         THE COURT:  Okay.  So with respect to the eNet system

17  and the voter registration system, what are the -- what is the

18  machinery and equipment that you -- and databases that you

19  think are -- would be pertinent if you were on the other side

20  you would say you might want to keep that but all these other

21  machines can be disposed of?

22         MR. TYSON:  Yes, Your Honor.  The only component is

23  the eNet database itself, which is the in-use database.  We

24  have snapshots of it at points in time if there needs to be a

25  review of it.  That system is ongoing.  It is not being

1    replaced.

2            And it is really the only thing, I think as you have

3    noted, that it was used to program the ExpressPoll check-in

4    units for the GEMS DRE system and to create -- and then that

5    system would then create the ballot access cards.

6            The same database and same data, a flat text file,

7    will be used to populate the Poll Pads.  And also eNet is used

8    to create a paper backup that is used and has been used in

9    Georgia elections for years under both SEB rules and statutes.

10           So the only thing that we could think of and identify

11   is that if the plaintiffs want to study or look at the

12   architecture of that database they can do that.  That database

13   isn't going anywhere.  But, otherwise, none of the election

14   management systems are going to continue to be used.  None of

15   the tabulation processes are going to be used.

16           Basically no component of that system -- of the GEMS

17   DRE system is going to continue after -- and I have been handed

18   a note.  There is a runoff in the City of Morrow on

19   December 31st that will use DREs.  That will be the last use of

20   DREs in the state.

21           THE COURT:  And what about My Voter page and the

22   voter registration?  Then you kind of used a new term actually

23   in one of your briefs that basically said that you had a

24   separate program from My Voter page to enter your change in the

25   address.  Though when you go to the My Voter page, that is

1    where you get -- you, in fact, access whatever it is, which

2    I've asked about before, where you put your new address in --

3            MR. TYSON:  Yes, Your Honor.

4            THE COURT:  -- where it is not -- where it is

5    actually a two-way system.  But you are saying that is routed

6    someplace else?

7            MR. TYSON:  Correct, Your Honor.  So the distinct

8    systems related to voter registration are eNet, which is the

9    voter registration database itself.  That is the one that

10   registrars will edit.  When you register to vote at DDS, it

11   appears on the dashboard of the registrar that you have

12   registered.

13           When you register to vote through online voter

14   registration, it also appears on the dashboard for the local

15   county in eNet.  They then must take action before that

16   information is inputted into the actual voter registration

17   database.

18           The My Voter page is a snapshot of the eNet database

19   at a particular point in time.  So it is a read only.  A voter

20   can look up their information.  But if they click to say I want

21   to change something, they are taken to the online voter

22   registration system.  That system will then send information to

23   the county registrars that they are then able to say we're not

24   going to put this in or will put this in.

25           So it is not like a voter is able to actively edit

1    the eNet database themselves.  They have to do that -- all of

2    those systems will remain in place, the eNet system, the My

3    Voter page, the online voter registration.  None of those

4    systems are changing with the adoption of the new voting system

5    for the election process.

6            THE COURT:  So just to roll back here, in summary,

7    are you basically saying that is not an equipment or

8    server-based or are you -- or are you saying -- is that the

9    bottom line?  Or are you saying it is both -- it has a basis in

10   terms of the servers for any of the facilities that are

11   coordinating the databases or working with them plus the

12   database?

13           MR. TYSON:  Right.  So these will function on servers

14   that people can access.  But these systems don't have any --

15   they are not the same and don't have to share any components

16   with the DREs and the programs used to program DREs.  They

17   don't share any components with the ExpressPoll units and what

18   is used to program ExpressPolls.  And they don't share any

19   components with GEMS and what is used to program then those

20   other components.

21           So those systems and components are separate and

22   apart from the eNet online voter registration and My Voter page

23   servers and setup.

24           THE COURT:  Let me just be literal and ask

25   plaintiffs' counsel to respond to that and go back and see if

1    we can do one thing at a time.

2            MR. TYSON:  Yes, Your Honor.  Thank you.

3            MR. BROWN:  Your Honor, Bruce Brown for the Coalition

4    plaintiffs.  We would separate the discussion as I think as

5    anticipated by the prior discussion between the jurisdictional

6    and formal disposition of Your Honor's preliminary injunction

7    and its future status as a preliminary or a permanent

8    injunction, on the one hand, from the discoverability and

9    preservation issues of the GEMS system, on the other.

10           And so we would not have an objection to the

11   conversion of your preliminary injunction into a permanent

12   injunction and would agree that a trial doesn't seem to fit

13   anybody's desire or necessity at this point and that it can be

14   treated as a permanent injunction because it is so exhaustive

15   and so extensive and because the state isn't suggesting

16   otherwise.

17           But that on the discoverability of the old GEMS and

18   DRE systems, it is a separate issue.  We can address that.  But

19   we have -- there is a need to conduct discovery on the entire

20   system for the claims going forward.  That is one aspect of it.

21   And there are many different reasons.

22           The long story short is the state is asserting that

23   the systems are separate and has made that representation in

24   the past.  But this is discovery, and we're entitled to test

25   that with our experts to see exactly how all of this data is

1    migrating and what care is being taken to disinfect whatever is

2    coming from the GEMS system into the new one.

3         So we would think there is an entirely different

4    argument, if you will, on the discoverability.  But on simply

5    your jurisdictional question, we would agree that it could be

6    treated as a permanent.

7         THE COURT:  Well, what would be a credible basis for

8    my thinking at this juncture that the GEMS data is being

9    imported?  I understand you have a credible basis as to

10   anything involving eNet and the voter databases.  But I don't

11   understand it as to the other -- the structure of the GEMS

12   system and the way it functions.  And I don't understand what

13   the facts are that you have alleged that would make me conclude

14   that that is credible.

15        MR. BROWN:  We don't have the facts either, and that

16   is part of why discovery would be necessary.  But the GEMS

17   database is a gigantic access database that could be copied

18   into the new system in many different ways.  You could

19   conceivably do it with a series of key strokes that would just

20   simply convert that access database into a table of

21   comma-separated values that could just be copied, malware and

22   all, into the new system.

23        Now, they claim that is not what they are doing.  But

24   we don't know if they are rekeying it or how exactly -- what

25   sort of process they are taking that old database and that

1   structure and putting it into the new one.  So that would be

2   one of the issues.

3            The other on sort of a different plane is that --

4            THE COURT:  But even if that is so -- and I don't

5   know -- you are candid in saying you don't have any basis one

6   way or the other for thinking it is so.  But let's say it is

7   so.  Wouldn't that be the state system and the state servers,

8   not every one of the very large number of counties' systems

9   that are extant?

10           MR. BROWN:  Yes, Your Honor.  I think the degree and

11   the extent of discovery that would be reasonable is open to

12   question.  And we would not have any desire to undertake more

13   than we needed to be able to see -- to determine the sources of

14   the anomalies that were present in the old DRE system,

15   including the undervotes on the lieutenant governor, the truly

16   alarming data from the African-American precincts, and a number

17   of other things that we have never had discovery on.

18           THE COURT:  I just don't -- I don't get it.  I mean,

19   I understand if the state -- if we were continuing on this old

20   system, absolutely.  And -- but if I don't -- there is no

21   indication that the Dominion system is being programmed with

22   the GEMS data system and you have no basis for alleging it, how

23   do I allow -- basically say at this juncture they shouldn't at

24   least be able to dispose of their machines or are there 20 you

25   want kept?  Are you wanting Fulton County's kept elsewhere so

1    that Fulton County can continue to have room?  But presumably
2    if all the other major ones are cleared out, that you have got
3    Fulton County and some other county, that is something
4    different even just to preserve the possibility but -- or if
5    you want three or four counties.
6             But I mean, I just don't see what they are saying is
7    unreasonable because -- and you haven't explained to me why you
8    should be able to go really fishing back at this juncture.  It
9    might be that the people in Fair Fight have something that they
10   are particularly interested in.  They have claims about --
11   Fourteenth Amendment issues also.  And I understand that that
12   is a separate lawsuit though.
13            So whatever they do is something else about
14   Fourteenth Amendment equal protection issues.  But I just -- I
15   don't understand what you are -- what is the factual or legal
16   basis for my saying that they shouldn't be able to dispose of
17   all of -- or most of the county's machines.  The state server
18   is something completely different.
19            MR. BROWN:  Right.  You are right, Your Honor.  There
20   is the separate -- I think we have separately docketed a
21   dispute over the discovery on the state servers.  That is
22   separate.  And then we also have the FBI server, which we --
23            THE COURT:  I understand that.  That is something
24   different.
25            MR. BROWN:  On the rest of that, we would agree that

```
 1    it would be reasonable and it would be fine with us to limit

 2    our discovery to a subset of the gigantic universe of this old

 3    equipment into something that is targeted that cannot be a

 4    burden on the state because they are not -- it is not

 5    disrupting the state at all.

 6            THE COURT:  Well, at the point that they have to keep

 7    more machines than they have room for and they have to pay a

 8    lot of money for it, it is disruptive.

 9            MR. BROWN:  Sure.  That would be -- you are right,

10    Your Honor.  Of course.  I'm not belittling any expense of the

11    state.  But it would be a narrow subset of that big universe

12    that would be important on that.

13            THE COURT:  I understand what you are saying -- your

14    position.  I'm not saying -- making -- in any way acknowledging

15    anything about the right to discovery on anything.  You just

16    want -- but I'm looking at it as a preservation of an

17    opportunity but without knowing exactly where you are going

18    with all of that, frankly.

19            Did counsel attempt to or -- go ahead, Mr. Cross.

20            MR. CROSS:  Just briefly, Your Honor.  On the

21    mootness issues, my colleague, Ms. Kaiser, will address that

22    within the context of the motion to dismiss if you have

23    questions on that.

24            There are two issues here.  There's preservation, and

25    there is schedule.  I wanted to, I guess, take those separately
```

1    because I know they overlap.

2         I guess the starting point that I would make, Your

3    Honor, is where Your Honor was, which is we're in an unusual

4    posture.  I'm not sure how this gets resolved.  And it

5    implicates the schedule.  It implicates preservation, which is

6    the defendants have taken conflicting positions.  On the one

7    hand, when we want discovery, they say, no, no, no, the case is

8    over.  The DRE claims have been resolved by the Court.  But

9    then, for example, when we seek fees and costs as a prevailing

10   party, they say, no, no, no, those are still live claims, they

11   haven't been resolved.  Those are diametrically opposite

12   positions.

13        And I'm not sure where it gets us at the end of the

14   day.  Because if, for example, Your Honor takes the trial off

15   the schedule in January or spring, where does that leave us?

16   This case just sits forever on your court's docket?  You have

17   got to get to a judgment.  Either they can consent to a

18   judgment, which we have asked them to do.  They have declined.

19   Or Your Honor presumably could enter a judgment on the record

20   before you since they themselves have said there is no more

21   discovery needed, there is no more discovery that should be

22   allowed.  Then I would ask Your Honor then just enter a

23   judgment that just takes your existing order that says they

24   have declined to -- declined any opportunity to put any more

25   evidence in.  Your Honor has resolved those issues.  Let's get

1    a judgment at least on the DRE claims and move forward.

2          But absent that, if they are not going to consent or

3    if they are going to object to Your Honor doing that, these are

4    live claims that have to get resolved in one way or another.

5    If that means a hearing and that means additional discovery,

6    then that bears on the preservation issue.

7          And so my bottom line position, Your Honor, is they

8    can't have it both ways.  They can't say the claims are dead,

9    there is no more discovery, so let's move on, and they can

10   destroy everything but then at every opportunity oppose any

11   final judgment on those claims.  They have got to pick a

12   position, one or the other.

13         And if they are going to continue to say no judgment,

14   Your Honor has to resolve that on the merits in some fashion,

15   then everything we're talking about has to get preserved or at

16   least to Mr. Brown's point a statistical sample that we could

17   work something that keeps alive what we would need to resolve

18   those claims on the merits.

19         The burden issue, Your Honor, again, if we can take a

20   small sample.  He said it is 300,000 a year for 35,000

21   components.  We have statistical experts that have been ready

22   for years to try to work this out to some sample.  We could get

23   that down to probably a really small number if you take a

24   fraction of $300,000 out of 35,000 components.

25         The last point, I won't repeat what Mr. Brown said

1  but other than just to say discovery is important on this.  It

2  is not enough for them to come to the Court, Your Honor, and

3  say, well, Dominion says they are not going to use any of the

4  existing components.  But then at the same time Mr. Tyson says,

5  but we are using eNet.  There is going to be overlap with the

6  registration.  We don't know are these people that are building

7  ballots in their home -- are they continuing to build ballots

8  in their home?  No one has ever looked at the GEMS server.  So

9  we don't know the reach of the vulnerabilities that exist in

10  the current system and what may transfer to the new system

11  without discovery, Your Honor.  Thank you.

12          THE COURT:  Well, let me ask you this:  The state

13  argues that they might want to still appeal some procedural

14  issues like jurisdiction or standing.

15          MR. CROSS:  I'll confess I don't understand the

16  procedural possibility of that either.  I mean, maybe that is

17  an issue for the appellate court.  But I don't -- I don't

18  understand how you appeal something when you are not entitled

19  to the relief.

20          THE COURT:  Is there something as to -- remaining as

21  to discovery on DREs for the original claims that you are

22  saying that must be maintained given the current factual

23  posture of the case where -- and elections in Georgia?

24          MR. CROSS:  Again, it is hard to answer because I

25  don't understand where they really are on this.  So if they are

1  still disputing the factual findings in Your Honor's order --

2  right?  If they are still telling this Court that there are no

3  significant vulnerabilities with the existing equipment with

4  DREs and GEMS and Your Honor has gotten some aspect of that

5  wrong and they are not willing to consent to a judgment and

6  they are not willing to let Your Honor decide that on the

7  existing record, enter a final judgment that turns on the prior

8  briefing in the hearing, then those are live claims.  We would

9  have to come forward and prove up to Your Honor not just a

10 likelihood of success as we did before but actual success on

11 the merits.

12        And that will require, I suspect, given the defenses

13 they have offered before that our vulnerabilities are

14 speculative -- that would require some analysis of the GEMS

15 servers, like their own experts emphasized.

16        And I'm struggling because I don't know where to go

17 here because they are taking conflicting positions to try to

18 get to an outcome they like.  But they have got to pick a horse

19 and ride it.  And right now they are riding in opposite

20 directions.

21        THE COURT:  So do you have any -- do the Curling

22 plaintiffs have any issues with basically winnowing down

23 significantly the number of DRE machines that need to be in

24 storage?  I gather not from what you said.

25        MR. CROSS:  If we can do that in a cooperative

1   fashion with statistical experts and get Your Honor's help if

2   needed, then no.  I think we have always felt comfortable that

3   there is a statistical sample of the components that we would

4   use.

5           THE COURT:  And have you ever determined what that

6   is?

7           MR. CROSS:  We haven't because there is additional

8   information that would be needed on that.  I know when you get

9   back to the summer of 2018 they did provide some information

10  that our experts were able to at least get some ideas where I

11  think we were talking -- I would say somewhere between -- maybe

12  the smallest number would be a few or several hundred, I think,

13  was kind of in the ball park of what our statistical experts

14  were thinking.  So a small number.

15          THE COURT:  But why in the context -- are you

16  maintaining still what Mr. Brown is, that there might have been

17  an importation of GEMS data into the new Dominion system?

18          MR. CROSS:  Yes.  And Dr. Halderman has addressed

19  that in his testimony.  We are very concerned that there is

20  taint from the existing system to the new system because we

21  don't yet know because we don't have discovery on what the

22  different vector points are.  What are the touch points between

23  the new system and the old system?

24          They say they are not using any of the old

25  components.  But, again, they are using eNet.  There is going

1    to be voter registration overlap.  We still don't have much

2    visibility into the ballot builders working out of their homes.

3    Are those people going to continue to build ballots?  Are they

4    using the same computers that they used before?  We don't know.

5    So it is -- we just don't know what we don't know.

6              And with all due respect to opposing counsel, we have

7    learned through this case that their representations to the

8    Court are often not accurate.  So we're not comfortable just

9    taking as a given that because they say there is no overlap

10   that means there is no overlap.

11             THE COURT:  Well, there is information available to

12   your experts and in the election software literature as to what

13   software Dominion uses on these versus -- BMDs -- excuse me --

14   versus what was used for the GEMS system.

15             MR. CROSS:  And Dr. Halderman has testimony we have

16   put into the record that walks through that on the -- I think

17   the preliminary injunction addresses that.  Then we had a call

18   back in August -- Your Honor may recall -- a discovery call

19   where that was the first time that they seemed to walk back the

20   idea that there was a complete divide, that these were two

21   totally separate systems.  And if I remember correctly, it

22   seemed everyone was a bit surprised to hear that on that call.

23             So Dr. Halderman is in the best position to walk

24   through that.

25             THE COURT:  Well, you would have to point that out to

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1    me.  Because I understand it as to the voter database and to

2    eNet and have continually expressed my concern about that.  But

3    you would have to explain that to me.

4            MR. CROSS:  That is why we would ask --

5            THE COURT:  Point that out to me.

6            MR. CROSS:  Understood.  We would ask for some

7    discovery and a hearing on that to resolve that, Your Honor.

8            THE COURT:  Well, you are saying he's already opined

9    on it.  I just don't remember him opining on it other than as

10   to the voter database.

11           MR. CROSS:  I believe he talked about eNet as well.

12   I thought --

13           THE COURT:  Well, as to eNet, I understand.  But I'm

14   just -- we're talking about the rest of the DRE functions.  And

15   eNet is a different system.  I mean, I understand it draws on

16   some of the GEMS material.  But that is from the state server

17   as I understood it.

18           MR. CROSS:  Right.  But we don't -- I guess the point

19   I come back to, Your Honor, is we don't know how the ballots,

20   for example, are going to be built.  One of the biggest

21   infection points or vector points in the existing system is the

22   internet connections, for example, and then how the ballots get

23   built.

24           And so we've not heard anything -- we don't have

25   discovery on that.  And so, again, if it is the same people

1    building the ballots on the same equipment --

2          THE COURT:  That is not really the focus of your

3    current complaint though.

4          MR. CROSS:  I guess respectfully I would disagree,

5    Your Honor, because it is all part of the same election system.

6    If those folks are still being used and if their equipment is

7    infected in the same way that the GEMS database or GEMS servers

8    might be --

9          THE COURT:  Well, certainly your original

10   complaint -- and you filed an amended complaint.  Your folks

11   and the Coalition folks filed a supplemental claim so it is --

12   you know, you obviously incorporated some of your old concerns.

13   But it doesn't have allegations in my mind -- and you would

14   have to point them out to me -- about the dysfunctionality of

15   the system as to the new system in this way and the taint of

16   it.

17         And it may well be so.  But it sort of goes --

18   frankly, while you are up here, it goes to the problem I'm

19   having with the new counts, which may be completely viable

20   counts in the long run.  But I'm concerned that it is not

21   right.  We don't have experience yet with how it has been

22   impacted, how it is operational.

23         You have to complain and do complain understandably

24   about the -- from your perspective about the -- the whole way

25   that the bar code functions and that we don't really have a

1    verifiable ballot and that there are other components of that

2    as well.

3          But it was not old software, dysfunctional software.

4    It was just the state's decision to select the vendor's

5    cheapest option apparently, which was a bar code that isn't

6    verifiable and that no one can be sure what it actually is

7    recording and that we can't -- we can't on a ballot by ballot

8    basis be auditing it from your -- as I understand your

9    argument.

10         MR. CROSS:  At an essential level, yes.  I guess two

11   thoughts, Your Honor, on the ripeness.  One, this system has

12   been rolled out.  It was rolled out in 2019.  We have got

13   information in the record on the PI motion.  We'll have more on

14   the reply.

15         Mr. Brown can speak to this as well.  We do know that

16   this system has lots of fundamental flaws.  So I would say if

17   Your Honor is concerned that we're not there yet we're there

18   and we are beyond because there has been an election on the new

19   system.

20         But more importantly I would say, Your Honor --

21         THE COURT:  But -- all right.  You have some

22   experience.  And they ran these trials so that they would get

23   some experience, just as they ran the paper ballot so they

24   would get some experience in case there was a need.

25         But I'm not sure it is fair and meaningful to say,

1    well, that is indicative of everything that is going to happen

2    in terms of the operational dimension as opposed to simply the

3    design.  Because the whole purpose of this was to try to -- the

4    sample runs -- and they were also in small -- relatively small

5    counties -- was to see how it functioned and to correct the

6    dysfunctionalities in operation.

7              MR. CROSS:  Right.  And the second point I was going

8    to get to, Your Honor, is the bar codes.  I don't want to jump

9    the gun on the PI hearing.  But if you read -- they have

10   submitted two briefs in this case now to defend the new system,

11   the motion to dismiss and the PI.

12             In the motion to dismiss, I think they didn't utter

13   the word bar code at all.  Maybe once.  In the PI, it is quite

14   similar.  What they are doing is they are trying to defend a

15   system that has not been adopted in the State of Georgia.  They

16   are defending BMDs without bar codes.

17             And all of the evidence almost exclusively they cite

18   in their arguments are BMDs are great.  They say there are

19   election experts that support BMDs.  But there are no election

20   experts they pointed to that support bar-coded BMDs except the

21   one person they have a declaration from, who by the way sells

22   his own bar-coded BMDs.  This is a man that is heavily invested

23   in defending bar-coded BMDs.

24             The only point I would make is we have a system that

25   we know doesn't even comply with the Georgia law.  Right?  It

1    is supposed to be voter verifiable.  There can be no dispute

2    that this is not a voter verifiable system.  So I would submit,

3    Your Honor, the ripeness and the standing are even easier here

4    than with the DREs.

5            With the DREs, that turned on election

6    vulnerabilities.  Right?  And their refrain was always this is

7    speculative.  You are saying it can be hacked.  There has been

8    no hack.  Put aside the fact they would never allow anyone to

9    look.  Here, we know that there is a system that, one, doesn't

10   meet what the state has said is the minimum requirement, voter

11   verifiability, and, secondly, isn't consistent with your own

12   prior orders in terms of -- and Supreme Court law on how the

13   voter should be able to have confidence and know that the vote

14   they cast at the moment they cast it is what they intended.

15   That cannot happen in this system.

16           So the claim is absolutely ripe, Your Honor.  And I

17   think you could probably resolve it pretty quickly because it

18   is an indefensible system to say bar codes.  Notice absent in

19   all their briefing is not even an explanation of why they chose

20   bar codes.  They didn't have to.

21           They could have chosen a system that scans the human

22   readable portion.  We already know from the pilot elections.  I

23   think it was Cobb County's superintendent that said the hand

24   marked paper ballots went far better, much easier than any of

25   the BMDs.  They were thankful with Your Honor's order because

```
 1   they got hand marked paper ballots and didn't deal with that
 2   disaster.
 3            And so the final point I'll make is I don't think it
 4   is fair or appropriate or legally sufficient to say, well, yes,
 5   they get a little bit of a pass on the pilot because it is a
 6   pilot.
 7            What we know is that they have got a system that does
 8   not look like it will be in place ready for March.  And if we
 9   wait, the ripeness becomes a real constitutional crisis.
10   Right?  Because if the primary falls apart or goes like the
11   2019 election did, that is a serious problem and you can't fix
12   that other than what do we do.  We do a redo.  So now is the
13   time to deal with that.
14            THE COURT:  Maybe this is a better question for Mr.
15   Russo or one of his colleagues.  The state represents in its
16   brief that the voter organization -- I can't remember the name.
17   Voter -- it is not AccuVote obviously -- but indicates that
18   there are 44 jurisdictions or states that are using some form
19   of BMD.
20            Of course, some of them are probably -- it is not --
21   most states don't do it statewide.  So I am assuming what you
22   mean is that there are jurisdictions within 44 states that use
23   the BMD.
24            How many -- in how many locations are they using a
25   bar code BMD?
```

1            MR. TYSON:  Your Honor, that would be almost all of

2    them.  I believe there is only one or two EAC-certified BMD

3    systems that do not use bar codes.  Currently, the vast

4    majority, if not 90-plus percent of the EAC-certified ballot

5    marking device systems, use bar codes.

6            There is a reference cited in the plaintiffs' brief

7    to Colorado moving away from bar codes.  They acknowledge in

8    that article that there is no certified system that they can

9    use right now that currently doesn't use a bar code.  I know

10   that is under development and is underway.  But that is the

11   scope of kind of where things stand right now on the use of bar

12   codes nationwide.

13           THE COURT:  I thought that when the ballots go into

14   the central office they are scanning the whole -- they had

15   another machine that simply scanned -- gave an entire

16   non-condensed ballot page that you could actually go and read

17   the entire page, first of all.

18           Is that right?

19           MR. TYSON:  So are you referring to an absentee

20   ballot where you would bubble that in and the scanner would

21   scan the absentee ballot?

22           THE COURT:  Right.

23           MR. TYSON:  Yes.  So that is that.  That is referred

24   to as a full ballot printout.  The EAC-certified ballot marking

25   device system -- I think it is Hart and maybe one other

1     manufacturer that have that -- generate that same kind of

2     information when they print that out.  That uses a lot more

3     paper.  If you have double-sided ballots, it is a lot more

4     complicated to deal with.

5            So when the ballot marking device prints out a

6     ballot, it is one page with a bar code and then a human

7     readable portion.  Then the audit that takes place afterwards

8     audits the human readable portion of the ballot.

9            THE COURT:  So recently there was eNet and ES&S --

10    and now that vendor is gone.  I'm forgetting the exact

11    initials -- enormous snafu in Pennsylvania, which you probably

12    are aware of --

13           MR. TYSON:  Yes.

14           THE COURT:  -- where they -- thousands of votes were

15    missing.  And they had to go back and look at the -- what type

16    of system -- was there a bar code there?

17           MR. TYSON:  Yes, Your Honor.  There was a bar code

18    used there.  But that is a dramatically different system.

19    Dr. Gilbert, our expert in the PI, actually criticizes the

20    kinds of systems that were used in Pennsylvania because they

21    combined both the printing and the scanning in the same unit.

22           The voter sees the ballot behind glass but doesn't

23    get to actually handle it.  The scanning takes place in the

24    unit.  He is very critical of those kinds of systems and

25    prefers systems like Georgia's where there is a printout, the

1  voter has a chance to verify it, and a separate scanning

2  system.  So it is not taking place in the same unit.

3          So our technology and our manufacturer are

4  dramatically different than the ES&S system that was used in

5  Pennsylvania.

6          THE COURT:  Let me just ask you a very kind of

7  operational issue.  Do you have to close out your ballot in

8  order to print the ballot?

9          MR. TYSON:  Yes, Your Honor.  So the equivalent of

10 pushing the cast ballot button on the DREs right now, the

11 similar functionality there is what initiates the printout.

12 You then have a chance to review it.  If you say, oh, no, that

13 is not what I -- I meant to vote for this person instead of

14 this person, the election officials can then spoil that ballot.

15 It is disposed of.  You go create another ballot on the unit.

16         And so the electronic memory of the ballot marking

17 device does not maintain an electronic copy of the ballot.  The

18 paper is the governing copy.

19         THE COURT:  So you can't stand next to your -- to the

20 machine and look at your ballot and look at the screen?

21         MR. TYSON:  The screen?

22         THE COURT:  That's right.

23         MR. TYSON:  Correct.

24         THE COURT:  All right.

25         MR. CROSS:  Your Honor, just to clarify a couple of

1    points, included in the RFP that Georgia had, one of the

2    vendors was a vendor that had BMDs where there was no bar code.

3    So the suggestion that there is no currently available system

4    that uses BMDs without a bar code, that is not accurate.  They

5    rejected that.  There is no explanation as to why.

6          And you will see this when we file our PI reply.  The

7    statistics they have provided on other jurisdictions using BMD

8    bar codes, those numbers, as I understand, are exaggerated.

9    And we will lay that out for Your Honor.

10          But, again, that is getting beyond where we should be

11   on a ripeness issue, which turns on the face of the complaint.

12   And, again, Ms. Kaiser will answer any questions on the motion

13   to dismiss.

14          But the central point I want to be careful about here

15   is they wrote a brief on a motion to dismiss that reads like a

16   summary judgment.  It has a literal statement of facts.  You

17   don't see that in a Rule 12 motion because the statement of

18   facts in a Rule 12 is our complaint.

19          And so it is not appropriate for them to come in and

20   say, well, on jurisdictional issues, we can go a little beyond

21   the scope of the complaint.  If you look at the law, there is

22   some flexibility there.  But, one, we're entitled to discovery

23   and a hearing on that if it is disputed facts -- these facts

24   are disputed -- if Your Honor is going to resolve those.

25          Your Honor is not permitted respectfully, Your Honor,

1    to just simply take their representations and say, well, I'll

2    just take those as the facts and decide a jurisdictional issue.

3    That is not how it works.

4         THE COURT:  Well, I understand that.  And this is a

5    question of a factual versus a facial challenge.  And I plan to

6    ask the defendants about that.

7         But what is true is that there had been considerable

8    experience and a considerable record as to the DRE system and

9    lots of literature about it as well but -- lots of

10   experience -- hands-on experience and hands-on misadventures,

11   kindly stated, of individual voters with the DRE system and the

12   operation of the state system.

13        Whereas, here, that is not so.  That is why I raised

14   the ripeness issue.  I mean, because under Eleventh Circuit law

15   if I find there is a ripeness issue, it is dismissed without

16   prejudice.  It is simply, you know -- yes, you wait for a

17   potential disaster, from your perspective.

18        But it is not -- it is this -- it is what it is.  And

19   you have to start anew.

20        MR. CROSS:  Your Honor, again, that is why I think it

21   is important to focus on the system here and why it is so

22   telling in their briefing that they don't defend this system.

23   They don't defend bar codes.

24        And if we -- to be candid with Your Honor, if they

25   had adopted a non-bar code BMD system, whether we would have

1   filed the supplemental claims, I don't know.  We're not in that

2   posture but if we had -- or the amended complaints.  If we had,

3   I will confess that is a much harder case.  There are election

4   experts that they could pull in that would say BMDs are okay.

5   But the overwhelming view is, if you are going to use bar

6   codes, that is a problem.  Remember, Dr. Shamos agreed.  Their

7   own expert said, don't use bar codes.  Then a week later, they

8   adopted bar codes.

9          I think it is -- I would submit, Your Honor, it

10  should be, I would hope, an easy decision for the Court to say

11  on ripeness and on standing, if you are using a bar code, that

12  is not voter verifiable.  There can be no dispute about that.

13  And --

14          THE COURT:  But it is not voter verifiable in the way

15  perhaps that the state statute intended originally.  But then

16  isn't that a state claim?

17          MR. CROSS:  Well, but we have a constitutional claim.

18  What I would say, Your Honor, is what the state -- they like to

19  tell us the state legislature adopted this -- right? -- and

20  that we're circumventing the state legislature's authority.  I

21  would say no.  The Secretary of State has done that.  Because

22  the state legislature acknowledged what we say, which is the

23  minimum threshold for a constitutional vote in an election

24  system is voter verifiability.  They wrote that into the law.

25          Could we bring a state claim?  Sure.  But we don't

1    need to.  Because what the legislature said was any system has

2    to meet that basic threshold.  That is what the Constitution

3    requires.  If it is not voter verifiable, it doesn't just

4    violate the state law, it violates the federal law because that

5    is what the legislature was recognizing.

6         Voters need to have confidence.  They need to walk

7    in, look at their ballot, be able to read it, and know that

8    what is going to get counted is what they intended.  At least

9    at that moment, the moment it goes into the scanner, what is

10   getting tabulated is what they intended.

11        Instead, it is almost worse than a DRE.  At least

12   with a DRE, they can read their selections and hit send.  So

13   they know the moment they hit cast ballot that what they are

14   casting is what they intended.  Now, what happens --

15        THE COURT:  Maybe, maybe not.

16        MR. CROSS:  Well, on the back end, maybe, maybe not.

17   That was what we litigated here.

18        THE COURT:  I mean, if the problem is partly the

19   circuitry of old machines, et cetera.

20        MR. CROSS:  Fair enough.  Fair enough.  That is true.

21   But I would say here it is worse because in every single ballot

22   cast -- every single ballot cast, the moment they cast it, they

23   have no idea what is being tabulated.  So it is far worse than

24   where we were with the DREs.  And it should just be inherently

25   unconstitutional.

1          And the fact that other states have adopted it, lots

2   of states used DREs for a long time.  That doesn't tell us it

3   is constitutional.

4          MR. BROWN:  Your Honor, if I may just as a point of

5   reference, a couple of things.

6          As Your Honor is aware, both sets of plaintiffs make

7   a broad claim that as designed these systems are

8   unconstitutional -- as designed for the reasons that Mr. Cross

9   expressed and that we have said before is that if you put a

10  computer between the voter and that --

11         THE COURT:  All right.

12         MR. BROWN:  It is -- however, the Coalition

13  plaintiffs also claim -- and this is at Paragraph 177 about 10

14  paragraphs after that.  Specifically, we make plausible

15  allegations that the new system, in fact, contains the malware

16  from the old system.  We lay that out in some detail.

17         So we also make a more specific operational issue.

18  And those -- those are allegations of fact, which are plausible

19  and for the purposes of the motion to dismiss and for ripeness

20  need to be accepted as true for now.

21         In terms of the numbers of bar code devices, the

22  record is that many, many jurisdictions use bar codes for ADA,

23  not for the entire population as they do in Georgia.  And so

24  those numbers are indeed exaggerated.

25         Thank you, Your Honor.

```
1              THE COURT:  You say 177?

2              MR. BROWN:  I believe it is 177 to 181, Your Honor.

3                 (There was a brief pause in the proceedings.)

4              THE COURT:  Mr. Brown, are your procedural due

5    process claims still -- you are still proceeding with?  I know

6    that the -- it seemed to me that the Curling plaintiffs had --

7    at least to the extent that they appeared to be -- I don't

8    think that you were proceeding with a -- am I incorrect as to

9    the Curling plaintiffs?  I'm sorry.  Let me just finish up with

10   Mr. Cross.

11             Were you proceeding with the procedural due process

12   claim?

13             MS. KAISER:  Your Honor, Mary Kaiser for the Curling

14   plaintiffs.  No, Your Honor.

15             THE COURT:  Go ahead, Mr. Brown.

16             MR. BROWN:  Your Honor, I would like to defer to Mr.

17   McGuire who is on your TV screen.  And I neglected to mention

18   my appreciation to Mr. Martin for taking the time to set that

19   up.  We do appreciate that.

20             THE COURT:  Mr. McGuire, did you hear?  Are you on?

21             Can you speak up?

22             MR. McGUIRE:  Can you hear me?

23             THE COURT:  Let me see whether we can get you a

24   little louder.

25             COURTROOM DEPUTY CLERK:  Try again, please.
```

1          MR. McGUIRE:  Can you hear me?

2          THE COURT:  Yes.

3          MR. McGUIRE:  So, Your Honor, you are asking about

4    the procedural due process claim in our third amended complaint

5    against DREs or about the different procedural due process

6    claim that we are now pursuing?

7          THE COURT:  The ones you are now pursuing.

8          MR. McGUIRE:  Yes, we are pursuing those.  We think

9    that they are actually different -- some of the same violations

10   but some different underlying violations of underlying

11   state-created rights and liberty interests that are affected by

12   BMDs in a manner slightly different.  Some similar, some

13   different with the BMD system as opposed to the DRE.  We are

14   pursuing those claims.

15         THE COURT:  What do you say with respect -- in

16   response to the argument under *McKinney*?  That you -- basically

17   you had to go through -- pursue your state remedies, that you

18   don't have -- it is not a final due process -- procedural due

19   process claim until you have actually gone through your state

20   remedies, which would be that you have adequate state remedies

21   to address any of your state law claims -- state law-based

22   claims?

23         MR. McGUIRE:  Well, I'm not sure what the -- I guess

24   I'm not understanding what exactly the state law remedies are

25   that they believe exist that are adequate.  Because none of the

1    ones that are available to us to pursue would allow us to

2    address the problem directly, for example, by bringing a state

3    law injunction.  And we're not allowed to do that under

4    state -- in a state court under sovereign immunity directly as

5    a pure state law violation.

6           The underlying -- the underlying violations of state

7    law are all insulated from attack by Georgia's sovereign

8    immunity doctrine.  So for us there is no real mechanism

9    outside of the federal claim to obtain a remedy for these

10   violations of underlying state rights, such as the Georgia's

11   state right to a secret ballot, the Georgia state right to vote

12   on a voting system that has been properly certified that is

13   safe to use.

14          These are not things that we can challenge in state

15   court.  So the federal remedies is the only remedy available to

16   us.  So we've alleged that there is not an adequate legal

17   remedy, and they haven't placed anything in front of the Court

18   that is a specific alternative.

19          The Court's already found in connection with the DRE

20   claims that the reexamination procedure doesn't -- doesn't seem

21   to qualify, not least of all because it doesn't appear to be

22   being handled by the state in good faith.

23          It has been prejudged that whatever hoops they have

24   to jump through for the reexamination process they have

25   prejudged.  It won't have any impact on their rollout of the

1    BMD system.  And that's similar to the way they handled an

2    analogous reexamination request directed at the DRE system.

3    And this Court found previously or at least said in a footnote

4    of one of its orders previously that the reexamination process

5    was not -- did not appear to be sufficient as a remedy.

6            So we have alleged there is not an adequate legal

7    remedy.  And I think at this point the burden would be on them

8    to show what the legal remedy is that we could pursue because

9    there isn't one that we see, other than the federal due process

10   angle.

11           THE COURT:  Were defense counsel able to hear?

12           MR. TYSON:  Yes.

13           THE COURT:  I should have asked beforehand, but I

14   would expect you to jump up if you couldn't.

15           MR. TYSON:  Yes, Your Honor, we were.  Of course, if

16   we could direct our opposing counsel to the *Lathrop* case from

17   the Georgia Supreme Court about dealing with sovereign

18   immunity -- of course, they can proceed against -- I'm sorry.

19   *Lathrop vs. Deal*, 301 Ga. 408.  You can proceed against

20   individuals.  There is official capacity limitations with

21   sovereign immunity.  But there are remedies that can be pursued

22   through state court that are available to them.

23           THE COURT:  I have asked both of plaintiffs' counsel

24   to address the ripeness issues.  I want to give the state an

25   opportunity as well.

1          MR. TYSON:  Yes, Your Honor.  I'll touch briefly on a

2     few of those points because I think it is important to

3     recognize the difference in the claims about ballot marking

4     devices from the claims about DREs.

5          With DREs, you had the history that you have

6     identified that went along with that.  With ballot marking

7     devices, you have a paper ballot system that generates paper

8     ballots and is auditable.  Mr. Cross identified problems with

9     bar codes.  The problem is Dr. Halderman in his declaration

10    with the preliminary injunction identified optical scan units

11    can also be affected from a programming standpoint.

12         So when a voter places a hand marked paper ballot

13    into an optical scanner, it still is a computer reading the

14    information on the voter's ballot.  So ultimately that is why

15    we do audits.  We do audits because we want to be sure that the

16    electronics are doing what the paper says is happening.

17         So from a ripeness perspective, we do think that

18    there is an issue with that.  A concern in terms of we haven't

19    fully implemented the system yet.  There is not a full

20    background.  And if the sole claim is bar code -- the use of

21    bar codes is unconstitutional, then that may be the one area

22    where you could find something is ripe as a legal matter.  But

23    that then is a sweeping case that would have nationwide

24    implications about the use of ballot marking devices.

25              I also wanted to correct one other component of what

1   Mr. Cross said that there was a vendor who bid that did not use

2   bar codes.  That is not correct.  Hart chose not to put a bid

3   in.  They were a vendor that has a non-bar code ballot marking

4   device system.  All of the systems from my understanding that

5   did were bar code-based ballot marking devices.

6            THE COURT:  So are you raising the jurisdictional

7   argument as a -- on a facial basis or a factual basis or both?

8            MR. TYSON:  I'm sorry.  Could you repeat the

9   question.

10           THE COURT:  Are you raising your jurisdictional

11   objections on a facial or factual basis or both?

12           MR. TYSON:  On both, Your Honor.  We believe that

13   there is a failure to state a claim as it relates to the

14   specific type of claim that the plaintiffs are bringing.  The

15   factual basis that is included is the public record items.  We

16   specifically did not attach a declaration.  We weren't trying

17   to make this a motion for summary judgment or a PI.

18           We wanted to address this from the information in the

19   public record, which as we noted in our reply, the Court is

20   able to consider.  And it is important to understand the

21   contours of the claim because of how different this claim is

22   from the DREs.

23           With the DREs, the allegation was you have a system

24   that had a record of issues.  It was old.  There were a number

25   of problems with it.  And there was no way to determine from an

1    auditing standpoint whether or not those problems affected

2    elections.

3             That is not -- I'm not saying that was correct.  I'm

4    saying that is a summary of the plaintiffs' claims.

5             In the ballot marking device claims, now you have a

6    claim where a system can be used.  It generates a paper record

7    that is auditable.  That is a completely different kind of

8    claim.  And some of the information in our brief was to help

9    inform the Court about the differences in those claims.  But it

10   is both facial and factual.

11            THE COURT:  So when you say it is auditable, maybe

12   you could help clarify for me exactly how it is auditable, what

13   you are thinking is the audit plan, because you must have made

14   progress on that by now.

15            MR. TYSON:  Yes, Your Honor.  So --

16            THE COURT:  And I didn't ask for any of the

17   regulations or proposed regulations to be submitted to me at

18   this juncture.  But give me an idea of what you are saying.

19            MR. TYSON:  Yes, Your Honor.  So the National Academy

20   of Sciences and the other literature about ballot marking

21   devices recommends audits of the human readable portion.

22            In the City of Cartersville elections in November,

23   the Secretary of State staff conducted a series of various

24   types of pilot audits.  There were a number of different ways

25   you can conduct an audit.  And I don't profess to have the

1    technical knowledge of what all of those are.

2          But several types of audits were used along with

3    verified voting and some other third-party organizations that

4    are interested in election integrity to try to begin developing

5    the audit procedures for the state.  Those results have all

6    been brought back, and there is a working group from the State

7    Election Board that is currently in the process of working on

8    rules related to the implementation of ballot marking devices

9    and developing an audit plan that then can be used on a going

10   forward basis.

11         That will likely be phased.  It probably is not going

12   to be jumping to full risk-limiting audits right off the bat as

13   very few states do that on a statewide basis.  But there will

14   be a process whereby we begin to ramp up the auditing capacity.

15   And by statute, we must audit as soon as the November 2020

16   election.  I believe the expectation is that there will be

17   audits of the elections prior to that as well.

18         THE COURT:  But are you -- the most basic question

19   is:  Are you -- is it the state's view that each ballot itself

20   is verifiable, or is it the total for the precinct is versus

21   the count on the -- from the paper ballots for that precinct?

22         MR. TYSON:  So every ballot can be verified by that

23   voter.  They can look at it and see what the selection is.

24         THE COURT:  I understand that.  But they can't

25   obviously verify the bar code.  So the question is:  When you

1    are looking at the vote of Precinct 5, are you able to -- you

2    don't have a computer that the person put their vote on.  So

3    you can't basically compare the vote -- the paper ballot to

4    something that was conceivably relatable to that individual.

5    So you are looking at the total number of, let's say, votes for

6    John Jones that were cast versus Amy Jones on the paper ballots

7    and you are looking and comparing that to the total number

8    counted by the bar code?

9             MR. TYSON:  Yes, Your Honor.  And one of the auditing

10   methods includes putting each paper ballot onto a screen and

11   what is the computer reading.  We can see what the human

12   readable portion reads, what that matches up to.

13            THE COURT:  Well, that is what I was trying to find

14   out.

15            MR. TYSON:  Yes.

16            THE COURT:  But if you put up on the screen the

17   individual choices of the voter, aren't those -- shouldn't we

18   expect those to be whatever the bar code says it is?

19            MR. TYSON:  Yes, Your Honor, we should.

20            THE COURT:  So is that in its own way sort of

21   automatically self-verifying?  Because I realize that a lot of

22   what the plaintiffs say is people simply don't -- are not able

23   to carefully examine all of their votes.  So maybe they are

24   able to absolutely verify, yes, I meant to vote for Donald

25   Trump for President.  But they are not going to go down to the

1    lower end of the ballot and be able to verify that.

2         They don't do that?  They don't remember the names?

3    I don't remember the names half the time.

4         MR. TYSON:  Your Honor, the problem with that is

5    there is not yet at this point peer-reviewed evidence of what

6    that rate is in terms of how voters verify their ballots.  So

7    the kind of theory that the plaintiffs engage in is if voters

8    don't verify their ballots, which is a third-party taking

9    action, then it might not be possible to uncover a programming

10   error if the audits also did not uncover that programming

11   error.

12        So there's several layers of speculation.  And that

13   gets into our brief of *Clapper* in terms of what we're dealing

14   with of how speculative the potential harm is here.  It has to

15   assume that every voter fails to verify or that only the ones

16   in a particular place don't, that the audits don't turn up

17   anything unusual, that no programming errors emerge otherwise.

18        It is the chain of speculation to get to that point

19   because we do now have a piece of paper unlike the situation

20   with the DREs.  And I think it is --

21        THE COURT:  But let me just interrupt you.  So the

22   state's notion in terms of -- one notion at least in terms of

23   auditing is you put up the screen -- on the screen what the

24   individual has actually -- it looks like that they picked,

25   subject to some debate but anyway -- and then -- then you'll be

1    able to scan the bar code on another screen and see is it the

2    same?

3             MR. TYSON:  Yes.  Another method is a hand count of a

4    select number of ballots.  We hand count what the human

5    readable portion says, and then we run that group through a

6    scanner and see if the results match up.  Those are the kinds

7    of things that can be done to verify those issues.

8             I think it is important to recognize though that the

9    programming issues with the hand marked paper ballots when you

10   have voters you have questions of voter intent.  On a hand

11   marked paper ballot, that can also lead to additional problems.

12            THE COURT:  Well, I'm not comparing anything at this

13   point.  I'm out of the world of comparing.  I'm just looking at

14   what is happening in this system.

15            MR. TYSON:  Yes.

16            THE COURT:  And what are you doing -- what is the

17   pre-vote -- election verification process options?

18            MR. TYSON:  Yes, Your Honor.  So there is a similar

19   logic and accuracy testing that can happen in terms of you can

20   generate out a set of test ballots.  This is the process that

21   would happen.  You can run those through the scanner, ensure

22   the results, the programming is what you expect it to be.

23            The other advantage of a ballot marking device system

24   is, unlike a DRE system, you have the ability to come into a

25   particular precinct at random in the middle of election day,

1    generate a stack of test ballots that you can then use to

2    further check the programming along the way there.

3              So those are all the things that are being considered

4    in terms of the design.  And the December 17 State Election

5    Board meeting will have a number of these.  I don't think it

6    will have a final audit rule at that meeting.  But the intent

7    is to get to the December 17 meeting a number of the ballot

8    marking device rules being put in place.

9              THE COURT:  Is the intent to audit more, whether it

10   is preelection or postelection, than what was done in the past?

11   Because it was a very small sample.  I mean the tiniest of

12   samples done beforehand.

13             MR. TYSON:  Yes, Your Honor.  You are referring to

14   the parallel testing that was done previously?

15             THE COURT:  Yes.

16             MR. TYSON:  Yes.  I don't know for sure.  I don't

17   want to speculate on the state's plans on that point.  But I

18   know the state is aware of the need for a look at those types

19   of issues on a broader scale with the ballot marking device

20   system.

21             THE COURT:  Let me ask you this question, which I did

22   before but I'm just going to return to in different form.

23             Let's say I were to determine that the claims are

24   premature that are raised here and dismiss without prejudice.

25   What does that -- where does that put us relative to the DRE

1    claims, the injunction I have already issued, the very long

2    order I have already issued?

3           If you are going -- if you are thinking -- and I

4    tried to pin you down before, but I'm still trying to pin you

5    down about this.

6           Where does that leave us in terms of:  Are you

7    agreeing to a judgment based on that, or are you -- and that

8    you may or may not appeal or -- because if you may appeal it,

9    then, of course, the plaintiffs may want more -- they might, in

10   fact, then want to pursue some of this DRE discovery to do

11   still more to prove that things got hacked, that there was more

12   misconduct in the handling of the DREs, and et cetera, which

13   might not be of a great value of time and resources for anyone,

14   much less money.

15          But to preserve their position, they might indeed

16   want to do that.  So where does this leave -- so I want to

17   return again to what if we're just stripped down back in this

18   case to the original claims and they have to start again at

19   some later point with their BMD claims.

20          MR. TYSON:  Yes, Your Honor.  I think a couple of

21   things.  Number 1, if you found that the BMD claims were not

22   ripe and they are not going to come in at this point, then

23   we're left with the situation where the remaining claims are

24   moot.

25          Under House Bill 316 and OCGA 21-2-300(a)(2), the

1    state elections -- once we have the new system certified, the

2    state elections shall be conducted with the use of scanning

3    ballots marked by electronic ballot markers.

4           So state law at this point would then and your

5    injunction already has made this case moot now going forward.

6    So I think that the proper procedural posture would be a

7    dismissal of claims, the DRE claims, as moot.  And that would

8    be the conclusion of this case.

9           Mr. Russo may have something he wants to add on that

10   point.

11          MR. RUSSO:  I will just add that, Your Honor, we have

12   asked about preservation of the machines and recycling of the

13   machines under the statewide contract that Georgia has for all

14   computer equipment.  I mean, once the machines are recycled,

15   there is no -- the machines aren't going to be used again in

16   the State of Georgia.

17          The harm is not capable of being repeated in the

18   future because the state will not have the machines.  As the

19   plaintiffs have noted throughout this case, these machines --

20   you can't go buy new DRE machines.  They are not on the market.

21   So the state is not going to be able to move back to DREs in

22   addition to the fact that the Secretary of State will decertify

23   the machines.  And under state law, you cannot use decertified

24   machines.  The counties can only use certified machines.  So --

25          THE COURT:  All right.  So you are saying it is moot,

1    and therefore there is no appeal?

2                MR. TYSON:  Yes.

3                THE COURT:  Is that right?

4                MR. BROWN:  I didn't hear an answer.

5                MR. RUSSO:  What was your question?

6                THE COURT:  I said:  If it is moot, then there is no

7    appeal?

8                MR. RUSSO:  That is correct, Your Honor.

9                MR. TYSON:  Yes.

10               THE COURT:  So when the state referred to third

11   parties in its brief at Page 28 of, I think it is, 645, you

12   were referring to individuals or you were referring to hackers,

13   whether they be foreign countries or individuals, that the

14   state couldn't be responsible for?

15               MR. TYSON:  Your Honor, I believe in that portion of

16   the brief as far as the traceability goes, that because there

17   is independent actions, i.e., both voters would have to fail to

18   verify their ballots and then it would require the actions of

19   third parties who would try to come in and compromise that, I

20   believe that is referring to both -- the interference obviously

21   is referring to outside actors and the redressability point.

22               But on the traceability point, I believe that portion

23   was referring to voters' actions, that there is no showing that

24   at this point we have voters failing to verify.  That is an

25   independent action that would be necessary for plaintiffs to

1    have standing.

2             THE COURT:  I think that is what I wanted to cover as

3    to the motion to dismiss.  I know that there was in addition

4    that the plaintiffs wanted me to identify what the schedule

5    would be for a motion -- hearing a motion for preliminary

6    injunction.

7             I'm just somewhat concerned that it puts the cart

8    before the horse.  I mean, I think that the issues are real.

9    But I'm happy to hear from counsel.  You are standing up.

10            MS. KAISER:  Yes, Your Honor.

11            THE COURT:  Would you introduce yourself again.

12            MS. KAISER:  Yes, Your Honor.  I am Mary Kaiser with

13   Morrison Foerster on behalf of the Curling plaintiffs.

14            Just briefly, Your Honor, we --

15            THE COURT:  Could you pull the microphone a little

16   closer to you or stand in front of it.  Thank you.

17            MS. KAISER:  Sure.  We just want to make a few points

18   in rebuttal to the defendants.

19            THE COURT:  All right.  Go ahead.

20            MS. KAISER:  With respect to mootness, under the

21   mootness doctrine, it is not enough for the defendants to just

22   say we're not going to do this again.  If the claims were

23   dismissed -- if the DRE-related claims were dismissed as moot,

24   there would be a question as to whether Your Honor's relief

25   granted in the preliminary injunction is defunct.  And at that

1   point, it would just kind of open this whole can of worms back

2   up again.

3          The defendants do have the DRE machines.  It is not a

4   question of whether they can go out and buy them again.  They

5   have them.  And they could reverse course and decide to use

6   DREs again if the claims are just dismissed as moot at this

7   point.

8          With respect to Your Honor's questions regarding

9   ripeness, I think one thing to keep in mind is just in terms of

10  the bar codes what else we could learn, what else would we

11  learn in the March primary elections with respect to bar

12  code-based BMDs in terms of voter verification.

13         I think it is undisputed and we know at this point

14  that voters will not be able to verify the bar code portion of

15  the ballot that would be scanned by the optical scanners.  We

16  don't need to go through a primary vote to know that that is

17  the case.

18         And I think for, Your Honor, we would just like to

19  draw one metaphor.

20         THE COURT:  Just one moment.

21              **(There was a brief pause in the proceedings.)**

22         THE COURT:  Okay.  Go ahead.

23         MS. KAISER:  If the state were to build a bridge and

24  there were questions about the fundamental safety and

25  structural reliability of that bridge, we wouldn't tell drivers

1    to go out and drive over the bridge and see what happens.  We

2    would say, okay, let's stop.  Let's pause here.  Let's test the

3    structural reliability of this bridge before we put -- put

4    individuals in danger.

5              We think there is a metaphor to be drawn here, Your

6    Honor.  Whereas, we're not talking about physical harm.  But we

7    know that there is a structural unreliability problem with this

8    BMD-based system.  And so we don't see the point of forcing

9    voters to go through an election using such a system when we

10   know that there is a real constitutional threat to their

11   fundamental right to vote.

12             THE COURT:  Well, how would you suggest that I

13   address the mootness problem you pose in terms of if I've --

14   they contend that it was moot but there is actual relief and

15   there are actual findings that might bear relevance to the

16   future is it really moot?  Because there was a lot of findings

17   as to the management of the voter database and of the data

18   systems, which conceivably are relevant.

19             MS. KAISER:  Yes, Your Honor.  I mean, we obviously

20   do not think that these claims are moot.  We think that there

21   are aspects of the old system that will continue into the new

22   system.  And that is something that we should -- we're entitled

23   to discovery on.

24             And, you know, with respect to the DRE system itself,

25   there needs to be permanent relief here.  There needs to be a

```
1    permanent solution.  And if they are unwilling to stipulate to
2    that and to agree to convert Your Honor's preliminary
3    injunction into a permanent injunction, then I think we do have
4    to go forward with a hearing and address these claims on the
5    merits.
6              THE COURT:  The DRE claims?
7              MS. KAISER:  Yes, Your Honor.
8              THE COURT:  But even though they are not proceeding
9    with the DRE system and even though I have already -- I realize
10   any ruling I have is subject to revision until it is a final
11   judgment.  But even though they are not proceeding with the
12   DREs?
13             MS. KAISER:  Yes, Your Honor.  I mean, at the end of
14   the day, this is --
15             THE COURT:  We decommission your bridge, and then we
16   say we still need to have a -- proceed with litigation about it
17   even though we know -- I understand you are saying they build
18   bad bridges.
19             MS. KAISER:  I mean, Your Honor, we obviously think
20   that the better use of the Court's time and resources is to
21   just convert the preliminary injunction into a permanent one.
22   However, if the defendants are unwilling to agree to that, then
23   we do think that we would need to move forward on those claims
24   and resolve them permanently.
25             THE COURT:  All right.  Thank you.
```

1          MS. KAISER:  Thank you, Your Honor.

2          THE COURT:  Well, as to the DRE GEMS voting

3    equipment, at least as an initial matter, it sounds like there

4    is a pragmatic solution that can be negotiated between the

5    parties at least so that you aren't having to store thousands

6    of machines.  I'm reluctant to say exactly how many.  And

7    clearly all the state's own server equipment and related

8    machines should be kept and so should any equipment given to

9    contractors or that they are using.

10         But I think that the plaintiffs need to talk with

11   your experts and think about what -- what you actually are

12   asking to be kept, whether it is -- and whether it is based on

13   particular counties or it is actually -- are you really asking

14   for it to be representative of the state.

15         But either way, I would encourage you to think very

16   much also in light of the expense and what you really

17   realistically might need rather than the maximum because it

18   really -- I don't know that it would make a difference.

19         And I think that the state agreed with they would be

20   hard-pressed later on to say, oh, that sample or that group is

21   not representative or doesn't -- is not helpful.

22         And maybe it is a particular county issue that you

23   want to zone in on instead.  So I mean, the state did provide

24   some reasonable explanations of one or two of the examples you

25   provided before where things had gone astray.  And so -- and

1    that doesn't mean that those were the only data issues with

2    those counties.  But those were the particular ones that you

3    flagged.  By you, I mean the plaintiffs.

4         So I think that I respect the fact that the

5    plaintiffs don't want to be boxed in and the defendants haven't

6    let themselves be boxed in about what is going to happen

7    either.  So -- but given the status of where things are going

8    forward, I would -- if everyone is really worried that they are

9    going to reignite the system, then decommissioning and disposal

10   of two-thirds of the machines seems to suggest otherwise.

11        MR. TYSON:  Your Honor, on that point, I just wanted

12   to emphasize that time is of the essence for the state at this

13   point.  I mean, we're now over 20,000 ballot marking devices

14   that have been acceptance tested and are ready to be deployed

15   to counties.

16        THE COURT:  And you don't have room -- they don't

17   have room --

18        MR. TYSON:  The sooner we can -- and we are doing the

19   change.  So the sooner we can have some direction on that the

20   better.

21        MR. CROSS:  Your Honor, could I ask just a quick

22   question.

23        THE COURT:  Yes.

24        MR. CROSS:  I mean, if the state is serious about

25   decommissioning and as you pointed out if they are going to

1    destroy the machines and not use them, why can't we consent to

2    a judgment here?

3              THE COURT:  Well, that is what I'm getting back to.

4              MR. CROSS:  I'm struggling with understanding why we

5    are having this.  Why don't we just consent to a judgment and

6    we are done with this?  We have never gotten an answer to that.

7              MR. TYSON:  And, Your Honor, the simple answer is the

8    case is moot.  There is no more jurisdiction to this Court to

9    enter a judgment under the state's position in this case.  So

10   that is where we are from a jurisdictional perspective at this

11   point.

12             THE COURT:  What, on the other hand, if the -- I know

13   you have brought the BMDs in.  But at minimum, you know, I have

14   an order in there saying, listen, if the whole thing doesn't

15   work, what is your fallback plan.  And I have an order in there

16   saying that you then need to have the hand backed up -- hand

17   marked backup voting system as a backup.

18             And so that seems to me still relevant because that

19   was the second part of the order is simply you've got to have a

20   backup under these circumstances.  And where you have also

21   engaged in -- because of the prior years of delay having to be

22   basically the largest rollout that anyone has done all at once

23   in such a compressed time period.

24             So I'm not sure that the relief that I ordered is

25   moot under the circumstances.  So I understand why you are

1   saying it is moot.  But I would perhaps beg to differ.  But it

2   doesn't mean that you couldn't craft a judgment that you would

3   all agree on alternatively and clean this up.

4           MR. TYSON:  Well, Your Honor, I think it is important

5   to remember the State Election Board, like I mentioned, is

6   working on the rules now.  At the December 17 hearing, I think

7   we're planning to have the rules that will lay out all the

8   backup planning that happens.  Under current law, if DREs go

9   down, people start voting on provisional ballots.  It happened

10  in the 2018 elections in a couple of Gwinnett precincts.

11          We expect a similar process would be used if the

12  ballot marking devices were down or not functional.  So, again,

13  I think the key is the legislature changed the law under

14  300(a)(2).  Now that those machines are implemented and

15  certified, we cannot go back.  And in the Eleventh Circuit, a

16  Government cessation of activity is entitled to a presumption

17  that we're not going to return to that.

18          MR. CROSS:  Your Honor, again, that ignores the

19  critical point you have made.  A component of the relief that

20  we sought and obtained is a default of hand marked paper

21  ballots.  If the claims are dismissed as moot, that is all out.

22  They can do whatever they want come March and come November of

23  next year.  In terms of if the system goes down or if they

24  can't implement it, what do they go to?  So that has got to

25  survive.

1              I understand that may be why they don't want to work

2    out a consent judgment.  But that has got to survive.  That is

3    actually a win on the merits of this case is they would

4    implicitly concede since they won't -- they say the claims have

5    been resolved.  Then fine.

6              I guess the bottom line I'll say, Your Honor, just

7    enter a judgment.  They have said no more discovery is needed.

8    Your Honor doesn't need anything else to resolve our DRE

9    claims.  They are on record with that position.  They have said

10   you don't need a trial.  You don't need a hearing.  Okay.  Then

11   in your court, Your Honor has everything you need to take your

12   existing order and turn it into a final judgment.  And that is

13   what we would say.  That is what they are inviting.  That would

14   be the proper outcome on those claims, Your Honor.

15             THE COURT:  What is your response?

16             MR. TYSON:  Your Honor, with the -- there is no

17   chance we're going to return to DREs.  We are trying to get rid

18   of these units.  So the fact that there is a backup system will

19   be -- if the ballot marking devices are not fully deployed,

20   then yes, paper ballots that would be hand marked would likely be

21   the backup system.

22             The State Election Board will clarify that rule in

23   the next couple of weeks here.  But it is not as if we are

24   going to be able to return to a DRE system.  That is why the

25   claims are moot because the legislature has brought us to this

1    point and the Secretary has implemented that by removing the

2    DREs, which was the subject of the complaint.

3         Choosing a different paper ballot system is not the

4    claim.  What Mr. Cross is talking about appears to be related

5    to the ballot marking device claims.  That if the ballot

6    marking devices are employed or deployed fully, there will be

7    issues.  But the DREs as to the claim that those are an

8    unconstitutional election system, we're not going back to

9    those.  Those claims are all moot at this point.

10        MR. CROSS:  Your Honor, that is not quite right.  The

11   hand marked paper ballot fallback was with the DRE claims.

12   Your Honor will recall we got that order before we ever

13   asserted BMD claims because their position at the time was that

14   BMD-related claims weren't ripe.

15        There is a lot of other stuff.  The hand marked paper

16   ballot is part of it.  Your Honor wrote a very comprehensive,

17   as you noted, opinion that has lots of requirements in it

18   beyond just the hand marked paper ballots.  Those have to

19   survive.

20        We litigated that.  We won on those issues.  So to

21   say it is moot, that all disappears.  That is not appropriate.

22   We are way beyond mootness at this.  We litigated it.  We won.

23        They have two paths forward.  They can consent to a

24   judgment, or they can continue to insist that these are somehow

25   live claims and they have to get resolved.  But if they are

1    going to say no discovery is needed, Your Honor has it.  Just

2    enter a judgment.

3           His response is not answering your question.  He's

4    just repeating himself.  They have one of two paths.  And

5    mootness is not at play.

6           MR. TYSON:  Your Honor, the existing code provides

7    for provisional ballots.  When the electronic machines are not

8    working, a provisional ballot is a hand marked paper ballot.

9    So with the DREs gone, there is no other path forward for the

10   state under the existing statutes that govern elections in the

11   State of Georgia.

12          MR. CROSS:  I'm glad he said that.  But this gives

13   you a sense of the shifting positions.  Remember in 2018 when

14   we were in front of you on DREs, Your Honor, that was a key

15   part of our argument to this Court was that the existing

16   statute said if DRE is unreliable you go to hand marked paper

17   ballots.  That is the provisional.

18          They disputed that.  They said we were misreading the

19   law, that that was not required.  So it is just -- they are

20   going to take whatever position they want in the moment.  And

21   the most he says today is that hand marked paper ballots

22   likely -- his word likely -- would be the backup if they have

23   an issue with the BMDs.

24          It is not likely.  Your Honor has ordered it.  So I

25   don't want to keep beating this horse.  But they want to escape

1    a judgment.  I get they don't like the concept of a judgment.

2    But they have either got to consent to it or let Your Honor

3    rule on the existing record, which they have told Your Honor

4    time and again is a closed record.

5         And we know how that comes out because you have ruled

6    on it before.  And they have suggested nothing to get to a

7    different outcome.

8         MR. TYSON:  Your Honor, just briefly --

9         THE COURT:  Mr. Tyson, I mean provisionals have their

10   own hoops and are not -- it is not the same as casting a

11   regular vote.

12        MR. TYSON:  Except for the situation when the

13   electronic machines are not functioning.  And so we ran into

14   this issue in Gwinnett County in 2018.  There were machines

15   that went down.  Voters were given provisional ballots.  They

16   voted those ballots.  They were given a letter of instruction

17   saying you must take some action to ensure your vote is

18   counted.

19        A judge in Gwinnett County, superior court judge,

20   ordered the letter be changed in the middle of the day because

21   that was not a correct statement of the law.  The correct

22   statement of a provisional ballot that is cast when the

23   machines are down is it is counted, period.

24        What Mr. Cross is talking about is the idea that you

25   could just move to paper ballots sua sponte -- a jurisdiction

1    could do that.  The statute says when the electronic is not

2    available then you vote provisional ballots.

3            The same thing would apply in this situation.  If the

4    ballot marking devices, which are required under 300(a)(2) are

5    available, people would vote a hand marked paper ballot that

6    would then be counted without any further action by the

7    elector, which, again, is why from where we sit here there is

8    no longer jurisdiction to address these issues.  They are --

9    they will be addressed consistent with how this Court has ruled

10   but under the statutory structure of the State of Georgia.

11           THE COURT:  That is your plan?  That is the fallback

12   plan?

13           MR. TYSON:  Yes, Your Honor.

14           THE COURT:  But the state has to adopt it you said?

15   There was sort of -- I understand what the code provided.  I

16   understood that then.  But though I thought, frankly, back then

17   no one was saying that they would do that.

18           But you are saying that is what the State Election

19   Board is prepared to now adopt?

20           MR. TYSON:  Let me give two pieces to that.

21   Number 1, existing law is already if your electronic things are

22   not functioning -- it is not like you can just throw them away

23   and say we are going to vote hand marked paper ballots.  But if

24   your electronic units are not functioning, you vote

25   provisionals.

1          What the State Election Board -- that is the statute.

2    That has been the statute.  That will be the statute going

3    forward.  What the State Election Board is doing for the

4    December 17 meeting is setting out the parameters for how many

5    emergency backup ballots do you need to have in a particular

6    jurisdiction in the event that a ballot marking device goes

7    down.  And those will be hand marked paper ballots.

8          So those are the rules that will be put in place

9    fleshing out the statutory structure.  But if the electronic

10   machines do not work, that is how voters will vote, on those

11   hand marked ballots.

12         THE COURT:  So who determines when the electronic

13   system is not working?  Does it have to be an utter failure

14   systemwide or precintwide or does it -- what if some of the

15   machines work and some of them don't, which is more of what we

16   have lived through in more recent years?

17         MR. TYSON:  Yes, Your Honor.  It is the backup plan.

18   If the machines are not working or --

19         THE COURT:  If all of them are not working?

20         MR. TYSON:  Correct.  Yes.  In a precinct, yes.  At a

21   precinct if they are not working --

22         THE COURT:  So the whole precinct has to be down?

23   Not just some of the machines?

24         MR. TYSON:  Correct, Your Honor.

25         MR. BROWN:  To answer your question as to who

```
 1    decides, under your order our position is you decide.  This is
 2    a part of your remedy.  And that is not mooted.
 3              THE COURT:  Well, I was asking for purposes of the --
 4    what they were -- under their system.  Not whatever the Court
 5    provided.
 6              MR. TYSON:  Yes, Your Honor.  Your order was if the
 7    rollout doesn't occur, if something goes wrong with that.
 8              THE COURT:  If something goes fatally wrong with it
 9    but doesn't -- it might occur and some portions of it may not,
10    in fact, successfully.
11              So I just want to get the election code here.  And we
12    just want to make sure.  I mean, the code -- old code section
13    referred to provisionals.  It didn't refer to hand marked
14    ballots.  That is what you are talking about that you -- tell
15    me again the provision.
16              MR. TYSON:  I'm sorry, Your Honor.  Let me see if I
17    can find the exact code provision.  But a provisional ballot
18    under the Georgia code is a hand marked paper ballot.  There is
19    no other way.
20              There are some methods of technology where you could
21    generate a provisional ballot through electronic means.  But in
22    Georgia, a provisional ballot is a hand marked paper ballot.
23              THE COURT:  If one of you will go look.
24              I guess I'm just asking you is that the code
25    section -- at least the old one -- said that the remedy --
```

1   doesn't say the remedy is a provisional ballot.  It just says a

2   hand marked paper ballot.

3         So just tell me how I translate that into a

4   provisional ballot.

5         MR. TYSON:  Yes, Your Honor.  Maybe if I could file

6   something -- a letter brief after this.  I think we're looking

7   in the statute.  I'm not sure we're finding it right offhand.

8         THE COURT:  I'm sorry.  You can go ahead and file a

9   letter brief.  That is fine.

10        The other items that I think were a lot of the

11  Coalition's concerns -- the Coalition plaintiffs wanted me to

12  reconsider about the paper pollbook backups at each precinct.

13  I mean, all of the items that I identified under Items 1 and 2

14  for the agenda at Document 671.  But it is really Number 1

15  because we've discussed the question of the BMD preliminary

16  injunction.

17        MR. BROWN:  Yes, Your Honor.  On the paper copies of

18  the e-pollbooks, that is an issue that has become even more

19  imperative recently with the -- the pilots show the

20  difficulties that the state was having with the new pollbooks

21  throughout.  It was a large-scale problem.

22        But even without those problems, our position is that

23  the sort of universally accepted best practice is to have paper

24  copies of the pollbooks.  Not of the voter registration

25  database but of the pollbooks in each polling place.

```
1              THE COURT:  The pollbook for that precinct?

2              MR. BROWN:  For that precinct.  And there is really

3    no reason not to do that.  It is probably --

4              THE COURT:  Precinct is not always identical to the

5    polling place.  I mean, you could have a precinct that

6    encompasses multiple --

7              MR. BROWN:  That is correct.

8              THE COURT:  -- polling locations.

9              So you want the entire precinct?

10             MR. BROWN:  I believe our proposed modification to

11   the order in our Rule 59(e) has the wording the way -- that is

12   very precise about a polling place.  And I believe we say the

13   polling place needs to have the e-pollbooks for the entire

14   precinct.

15             MS. MARKS:  All the precincts in the polling place.

16             MR. BROWN:  All the precincts in the polling place.

17   I got the thing reversed.

18             And all of the experts from --

19             THE COURT:  This is because you are saying the

20   pollbooks were -- basically are not -- the software is not

21   always working in terms of checking in?

22             MR. BROWN:  Right.  It could be just because of

23   communication issues.  These new ones operate on WiFi and

24   Bluetooth, which is a whole host of other security issues.  But

25   even if it is nothing serious, if there is a problem, it can
```

1    really stop voting in its tracks and has in the past.

2         And so what --

3         THE COURT:  They are different machines.  I realize

4    they are using some of the same data.  Some of the same -- they

5    are inheriting some of the same software.

6         MR. BROWN:  Right.  And it probably -- it is

7    different.  And all indications are it is worse than the others

8    because they are just -- they are still getting the bugs out.

9         So there is really no reason not to have paper copies

10   of the pollbooks.  It is no more difficult than the literal

11   remedy that Your Honor ordered in Document 579.

12        THE COURT:  What is the problem with that?  I mean,

13   maybe -- why wouldn't -- just as a matter of ease in

14   facilitating voter access and rationality in the voting

15   process, putting aside any kind of positional argument, why

16   wouldn't the state just do that?

17        MR. BELINFANTE:  Your Honor, I'm going to defer to

18   Mr. Russo on that.  I have got to get to the State Capitol for

19   a swearing in ceremony for a judge where I'm speaking.

20        THE COURT:  Well, you have got to get there then.

21        MR. BELINFANTE:  I didn't want you to think that I

22   was being rude or anything of that nature.  So thank you, Your

23   Honor.  May I be excused?

24        THE COURT:  Thank you.  Who are you speaking on

25   behalf of?

1              MR. BELINFANTE:  One of our former colleagues,

2     Kimberly Anderson, is being sworn in to the State Court of

3     Dekalb County today.

4              THE COURT:  Great.

5              MR. BELINFANTE:  Yes.  Thank you, Judge.

6              MR. RUSSO:  Your Honor, the state already provides a

7     paper pollbook backup in each precinct.  And Mr. Harvey had

8     that in his declaration at 616-1, which is Paragraph 23 of that

9     declaration.  And state law, Your Honor, also provides that the

10    registrars place in the possession of the managers in each

11    precinct one copy of the certified electors list for that

12    precinct.

13             I'm not entirely sure if we're just talking past each

14    other or what because Mr. Brown referred to the pollbook.  The

15    electors list is the -- it is the voter registration list.

16    That is the information that is in the pollbook.  It is all

17    pulled from eNet.

18             So the information that is printed in the paper --

19    paper pollbooks is the same information that goes into the

20    electronic pollbooks.  But I mean, I'm just not sure --

21             MR. BROWN:  The difference is that what we're asking

22    for is updated pollbooks.  What happens now is that if, for

23    example, Mr. Ichter goes in to vote and they don't have his

24    name up, they don't -- and it doesn't work or the pollbook

25    mechanism doesn't work and there is no way to tell --

1          THE COURT:  It is because, for instance, they think

2    he voted already?

3          MR. BROWN:  He already voted.  And he's trying to

4    vote again.  So they will not use what the paper pollbook --

5    the paper that they have to actually adjudicate whether or not

6    he can vote or not.

7          That is the problem.  And if you multiply that times

8    the number of different permutations or problems you are going

9    to have, that is why our relief is so simple and so necessary.

10          THE COURT:  What is the date when they produce the

11    pollbook for each precinct?  What is the -- because that is the

12    most obvious issue is that you have -- if they are doing it way

13    in advance, it will basically reflect different data

14    potentially than if it was produced --

15          MR. RUSSO:  It says that -- the statute refers to at

16    least prior -- prior to the hour appointed for opening of the

17    polls.  So at least one hour before.

18          THE COURT:  Well, I would encourage you-all to talk

19    about it.  Because my experience is that you can't vote after

20    Friday of -- you can't do early voting after Friday.  So you

21    have got Monday to produce these when you know -- when the

22    database shows who has actually voted, who can legitimately

23    come in and cast a vote.

24          I mean, I -- I would encourage you to do that.

25    But -- and it might make for a smoother operation that would

yield -- be to your benefit and the counties' and the voters'
benefits.

Why don't we move -- I would strongly encourage you
to do that.  Because there is a lot of frustration obviously in
the check-in process.  And it could only benefit the state in
my mind.

But I will just say relative to many of the things,
Mr. Brown, that your client wants me to do is I have -- it is
true that I have tried not to get into the weeds.  I have been
a special master monitoring institutions.  I understand what
that involves.

But, you know -- and I know that Cuyahoga County
ultimately in Ohio had to have someone basically doing that.
But that is not where I'm at.  So, you know, I try to make
clear what I think has gone wrong at times on a very weed basis
because I am ever hopeful that somebody might pay attention.

But -- all right.  What else do you want to zone in
on?  I know you were concerned about the audit process.  We
have talked some about that.  But I'm not going to have a
hearing on auditing beyond what I have today.  I may ask for
some information if I still am maintaining the case.

MR. BROWN:  Your Honor, we would -- depending on some
of the other things that are happening, we would want to just
advance the idea that there may be a point in time where we
should approach Your Honor about the state's actual readiness

1    to deploy the BMDs.  I'm not talking about the motion for

2    preliminary injunction.  I'm talking about the old relief.

3            But our information is much more alarming about the

4    readiness than the state has presented.  That is not in front

5    of you today.  But there may be a moment where Your Honor does

6    need to make a decision as to whether or not the default plan

7    needs to be the plan so that the state can start executing that

8    by printing paper ballots.  And so we may be approaching Your

9    Honor not immediately but in the near future with some sort of

10   proposal so that decision can be made.

11           THE COURT:  So what do you mean by in the near

12   future, and what are the nature of the issues?

13           MR. BROWN:  The nature of the issues --

14           THE COURT:  Because what I know is only what I read

15   in the newspaper.

16           MR. BROWN:  Well, the nature of the issues is whether

17   or not Your Honor in your ruling in 579 said, given the

18   challenges of the implementation, you need to have a default

19   plan ready to go in case the implementation goes haywire.  That

20   is, I think, a fair summary of that.

21           That is -- that was obviously the correct ruling and

22   stands.  And -- but the next question is when -- when does that

23   decision actually get executed as to which is used.  Because to

24   fulfill your order is not just simply to have a default plan

25   but to use it if it is necessary.

1          So to determine whether it is necessary, we need much
2    more visibility into what the state is doing.  Part of what we
3    asked for in our motion for the conference was to get better
4    information from the state.

5          We will be conducting discovery on -- sort of
6    post-judgment discovery that we think will give us more
7    information.  So we hope to be able to come to the Court
8    probably within several weeks with some better understanding of
9    exactly how ready the state is to use the BMDs, apart from the
10   constitutionality, entirely separate issue, but whether or not
11   they will be ready to do that.

12         And we believe that is consistent with post-judgment
13   discovery and do not -- we are very mindful, Your Honor, as to
14   what you just said about the role of a federal court in this
15   process and to keep it at the larger issues that you have
16   focused on in your order and to not get into the weeds of the
17   administration of the election but simply the big choices that
18   the state needs to be ready for so that the March primaries --
19   so that the state is ready for the March primaries.  And so
20   that would be the other issue that we would anticipate raising
21   with you.

22         We have already --

23         THE COURT:  Does the state anticipate giving a
24   presentation to the -- that there will be a presentation at the
25   next state board meeting regarding any of these issues?

```
 1              MR. TYSON:  Yes, Your Honor.  I believe that at the
 2    December 17 State Election Board meeting there is going to be
 3    the rules that will govern the backup plan for what happens if
 4    there is not a complete rollout in time.  So this may address
 5    itself through that process.  And I believe those issues will
 6    be addressed by the State Election Board.
 7              Obviously, as you collect the DREs, you have got to
 8    put something in their place.  So the state has every interest
 9    in ensuring that there is a functioning backup system in
10    addition to your Court's order.
11              THE COURT:  It is a very delayed production on the
12    state website of the -- of the audio or the minutes of the
13    meeting.
14              But you do keep an audio, don't you?
15              MR. TYSON:  I believe we do.
16              THE COURT:  It is just --
17              MR. RUSSO:  That has happened different ways over the
18    years.  Sometimes they have filmed, and it has been up.  I
19    don't know what the current Secretary of State is necessarily
20    doing.
21              THE COURT:  Having a transcription or whatever?
22              MR. RUSSO:  There is usually a transcript.  There are
23    always minutes, of course.
24              THE COURT:  Let's just make sure that there is a
25    transcript.
```

```
1              MR. BROWN:  Then, Your Honor, with respect to the
2      next bundle of issues concerns the scheduling for the new
3      motion for preliminary injunction.  And Mr. Cross is going to
4      take the lead on that --
5              THE COURT:  All right.
6              MR. BROWN:  -- discussion if you're ready for that.
7              THE COURT:  A/K/A Ms. Kaiser.
8              MS. KAISER:  It will actually be Mrs. Kaiser.
9              THE COURT:  Mrs. Kaiser.  Excuse me.
10             MR. CROSS:  Trade up, Your Honor.  We are trading up.
11             MS. KAISER:  Your Honor, we would propose that we
12     schedule a hearing on the preliminary injunction motion with
13     regard to the BMD-related claims no later than the last week of
14     January.  We realize that we need to get through the holidays.
15     But we are very interested in moving this forward as quickly as
16     possible.
17             We can be ready earlier if the Court is ready
18     earlier.  And -- but we think that the last week of January is
19     the latest that we should go in terms of -- in terms of
20     scheduling a hearing.
21             And in the interim, Your Honor, we do think that both
22     parties should have some expedited discovery prior to that
23     hearing.  We are willing to discuss with defendants what is
24     reasonable.
25             But we could also make some proposals to Your Honor
```

1    today.  For example, we think each party should be permitted to

2    between five to ten depositions -- I'm sorry -- each side that

3    would be allocated between the different plaintiff groups and

4    defendant groups.  And in addition, we think there should be

5    some written discovery along the lines of approximately 30

6    RFAs, approximately 5 interrogatories, and approximately 5

7    requests for production of documents.

8         And we also think, Your Honor, that we should -- that

9    the Court should require expedited responses to the discovery

10   requests.  I believe under the current -- under the Court's

11   current order that each side gets 15 days to respond.  But that

12   would just be responses and objections and that there is 30

13   days to actually produce documents in response to document

14   requests.  I think we would propose to shorten that to

15   something more like 15 to 20 days.

16        THE COURT:  Thank you.

17        MS. KAISER:  Thank you.

18        THE COURT:  Well, I know that the state doesn't think

19   there should be anything.  And I understand that.  You know, I

20   have obviously considered it strongly.

21        But if we were in a position that I was going to have

22   a hearing, what would you think would be a reasonable schedule

23   and would you comment on that?

24        MR. RUSSO:  Your Honor, we think that having a

25   hearing in January, especially late January -- there is just a

1    practical issue with having that hearing then because we're

2    going to be running up against early voting in February for the

3    2020 presidential preference primary.

4              THE COURT:  The election is March what?

5              MR. RUSSO:  I have brought actually a copy of the

6    state's election calendar.

7              THE COURT:  Thank you.

8              MR. RUSSO:  So, your Honor, this is the 2020 state

9    election calendar.  You'll see that the voter registration

10   deadline is, of course, February 24 for the PPP with the

11   election being March 24.  Early voting is scheduled to begin on

12   March 2nd.

13             So if we have a hearing at the end of -- at the end

14   of January and depending on when Your Honor issues an order and

15   what that order says, we would -- we do think we would be

16   running up against that early voting deadline.

17             You know, there is also the practical issue of the

18   impact on the rollout of the new -- of the new system.  If the

19   claims are just about the bar code, I'm not sure there is that

20   much discovery that really needs to be conducted.

21             So, Your Honor, our position is that the motion to

22   dismiss is still pending.  We think the Court should enter a

23   decision on that.  And the parties should set a trial date.

24   And discovery can go through the regular process rather than

25   another expedited process.  This is the third PI hearing we

1    would be having in this case.  And move forward in a normal

2    manner.

3         THE COURT:  So I feel a little bit in the dark still

4    though about what the process is for the state's evaluation of

5    the rollout and whether there are some critical issues that

6    have to be addressed in the next -- and what the time frame for

7    doing that is and what the fallback plan is, other than my

8    fallback plan.

9         MR. RUSSO:  Yeah.  As Mr. Tyson mentioned, of course,

10   there is -- the State Election Board is going to have rules

11   promulgated later this month as to the backup plan on hand

12   marked paper ballots.  So that is clear.

13        THE COURT:  Is there a formal evaluation that has

14   been done of the trial?

15        MR. RUSSO:  There was a document --

16        THE COURT:  I read in the newspaper, as I candidly

17   have said.  But I don't have the evaluation.

18        MR. RUSSO:  I believe attached as Exhibit A to the

19   Coalition's filing last night --

20        THE COURT:  The evaluation is attached?

21        MR. RUSSO:  There is an evaluation attached to it.

22   It is -- we can provide you this copy if you would like.

23        THE COURT:  Thank you.

24        MR. RUSSO:  There is an overview on issues.  In none

25   of the materials that were filed last night were there any

```
 1   claims of vote flipping or any of the issues that we typically
 2   saw with -- being raised with respect to the DREs.
 3           You know, at the end of the day, Your Honor, it is a
 4   pilot program.  It is intended to go find any kind of problems,
 5   technical issues that can then be resolved.
 6           There were, I guess, issues with the hand marked
 7   paper ballot pilot also in Cobb County.  I think those are
 8   referenced in one of the articles included in the plaintiffs'
 9   materials that were filed last night also.
10           Also just regarding voters not voting the ballots
11   properly, frankly crossing out names of the candidates that
12   they didn't want to select and putting Xs through the bubbles.
13   And I can point you to that.
14           But that is where we are in terms of reports.  We
15   will ask our client if they expect the counties to provide more
16   reports to them.  And we can report back to you.  I just do not
17   know.
18           THE COURT:  All right.  Even if the answer is no,
19   just let me know.
20           MR. RUSSO:  Yes, ma'am.
21           THE COURT:  All right.  Thank you.  I'll give you
22   back Exhibit A.  I'll print it out if it was filed.  I didn't
23   see it.
24           MR. BROWN:  Your Honor, on the timing, what the
25   motion for a preliminary injunction will be focused on is the
```

1    narrow issue of the interface between the voter and the vote,

2    which is either the BMD or paper ballot.

3            Your Honor has already ordered that they have a

4    default system of the paper ballot ready.  And so that because

5    of that, Your Honor will not be in the catch 22 that you found

6    yourself back in 2018 because the remedy has already been

7    ordered by Your Honor.  And the question -- the only question

8    will be whether as a matter of constitutional law that remedy

9    is required.

10           And so we believe that the schedule outlined by the

11   Curling plaintiffs is realistic and that it will not put any of

12   the parties in a prejudicial position going forward into the

13   March 24th elections and that if -- and the presidential

14   primaries actually -- the March 24th election, although

15   enormously important obviously, the complexity of the ballot

16   building is limited because it is only the federal presidential

17   primary.  There is no other elections on it.  So there is some

18   clarity there as well.

19           We would -- our main concern -- from the Coalition

20   standpoint, our main concern is with the timing of the hearing

21   and then we can back up from that reasonable discovery.  And it

22   will be limited discovery and very focused.  We may want to

23   have a little bit more of the written discovery to make it

24   easier than was outlined by the Curling plaintiffs.  But

25   certainly --

1          THE COURT:  You agree that no one else has litigated

2     the question of the bar code?

3          MR. BROWN:  I think that is correct.

4          THE COURT:  And when is the earliest usage of the bar

5     code?

6               **(There was a brief pause in the proceedings.)**

7          MR. BROWN:  Our understanding is in the last five

8     years or so.

9          THE COURT:  Have there been any -- I realize this is

10    getting into the facts.  But have there been any evaluations of

11    the efficacy of the bar code systems?  You don't have to tell

12    me what they are.  I just want to know.

13         MR. CROSS:  Do you mean by the states or by experts?

14         THE COURT:  By experts.  By independent experts.

15         MR. BROWN:  Not by experts.  We don't -- not yet.

16         MR. CROSS:  There are tests of the efficacy of the

17    bar codes by election security experts.  If you're asking like

18    a formal sanctioned by a state, I'm not aware of that, if that

19    is what you are asking.

20         MR. RUSSO:  I also wanted to raise one additional

21    issue with regards to the timing and how it will affect

22    elections in Georgia.  As you know, Representative Powell

23    passed away.  He's House District 171.  The state will be

24    having to have a special election for that seat.  Decatur

25    County is one of the counties, which had the BMDs already

1   rolled out.  That district also covers Mitchell and Colquitt

2   Counties.

3          The Governor is going to have to issue a writ of

4   election for that.  We understand right now that the date of

5   that election will be January 28th.  And a writ should be

6   issued sometime today.  And early voting, of course, will then

7   start 30 days prior to that.  Although early voting will start

8   in 2019, the state is going to use BMDs, of course, for all of

9   them.  And those counties are being prioritized for the

10  rollout.

11         MS. KAISER:  Your Honor, just two quick points if I

12  may.  To our knowledge, there are no other states that are

13  using bar codes on a statewide basis.  We think Georgia is

14  unique in that aspect.

15         The second point, Your Honor, just reiterating what

16  Mr. Brown said, you know, last time we were challenging the

17  entire election system.  This time, the remedy would really

18  just be swapping out hand marked paper ballots for the BMDs.

19  And that would require a lot less time, money, and effort.  And

20  in addition, the defendants already have to have that in place

21  under Your Honor's existing order.  Thank you.

22         THE COURT:  All right.  Well, I think I have covered

23  everything I planned to cover at least as I articulated in

24  Document 671.

25         Is there something else that I missed that I needed

1      to -- you are all going to meet and talk about the disposition

2      of the machines.  I would like you to do that -- it is

3      Friday -- to have it done by -- try today to figure out your

4      schedule and have an objective for trying to get it done by

5      next Friday.

6                MR. TYSON:  Your Honor, I just wanted to provide the

7      code section, 21-2-281, that references paper ballots.  The

8      only paper ballots at a precinct on election day are

9      provisional ballots.  And so the statute says paper ballots.

10     The state uses provisionals, the provisional ones that are at

11     the site of the precinct on that particular day.

12               THE COURT:  I think really the issue for me is that

13     21-2-281 -- and you are properly representing what it says --

14     really deals with -- in any primary election in which the use

15     of voting equipment is impossible or impracticable.  And you

16     have indicated that essentially the construction of that is

17     that it is -- either that it is -- the whole election is not

18     possible, rather than some of the machines may work and some of

19     the machines may not work and people may be out the door or

20     that it is not recording things properly for some of the

21     machines.

22               MR. TYSON:  Yes, Your Honor.  That's correct.

23               The only other issue I did want to raise about the

24     FBI server image, just so you are clear on that, we had worked

25     out with the plaintiffs previously on that point.  The

1    plaintiffs' vendor currently has all of the copies of the FBI

2    server.  We don't have a copy of that right now.  So we'll

3    arrange with them to work that out in accordance with your

4    order.  But I wanted to flag that for you.

5              THE COURT:  Have you drafted a protective order that

6    you have all agreed on?

7              MR. CROSS:  That lies with me unless they want to

8    send one.

9              Do you want us to draft that?  I think --

10             MR. TYSON:  Yeah.

11             THE COURT:  Because you might as well try to -- if

12    you are having to talk to get it done on the same time line as

13    next Friday.

14             MR. CROSS:  Right.

15             MR. TYSON:  Okay.  Of course, Your Honor.

16             THE COURT:  Since I am going to disappear on you on

17    the 21st.  So if you use the 20th, it will just waste time.

18             MR. TYSON:  Your Honor, we still obviously take the

19    position it is not relevant to any claims.  We don't want to

20    concede that.

21             THE COURT:  I understand.

22             MR. TYSON:  Thank you.

23             THE COURT:  All right.  Well, I think that is it

24    then.  Thank you for your patience and your presentations.  I'm

25    most appreciative.

1           Thank you for the audience, which it is not that I'm

2    looking for an audience.  But I very much appreciate that

3    citizens are always interested and come here and are engaged.

4    Thank you.

5           Any reason we shouldn't adjourn at this time?

6           MR. BROWN:  No, Your Honor.

7           THE COURT:  Thank you very much.

8           MR. TYSON:  Thank you, Your Honor.

9           COURTROOM SECURITY OFFICER:  All rise.  Court is in

10   recess.

11              **(The proceedings were thereby concluded at 1:23**

12              **P.M.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1                 C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   88 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   8th day of December, 2019.

14

15

16

17                      _____
                        SHANNON R. WELCH, RMR, CRR
18                      OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```