## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## COALITION PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION (DOC. 640)

December 16, 2019

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. ii

I.      INTRODUCTION ..........................................................................1

II.     REPLY TO STATE'S EVIDENCE AND STATEMENT OF FACTS .........3

        A.      Safety Of BMDs And Separateness Of The Old And New Systems ....7

        B.      Voters' Inability To Verify BMD Ballot Cards. ....................................9

        C.      Functioning Of BMDs And Auditability Of BMD Elections. ............10

        D.      Considerations of Accessibility And Clarity Of Voter Intent ............10

        E.      Ballot Secrecy .........................................................................................11

        F.      Status Of Implementation ......................................................................11

III.    ARGUMENT IN REPLY TO THE STATE ..................................................12

        A.      The State Fails To Overcome Coalition Plaintiffs' Initial Showing
                That They Are Likely To Succeed On The Merits. ...........................13

                1.      Coalition Plaintiffs Have Stated Valid Claims. ........................13

                        a)      This Court Has Jurisdiction Over Claims Arising From
                                How Votes Are Tabulated And Counted .......................13

                        b)      Relief Will Not Disadvantage The Disabled. ................14

                        c)      The Claims Involve Constitutional Violations, Not Policy
                                Preferences ....................................................................16

                2.      No State Interest Outweighs The Burdens On Voters. ............18

                3.      *Pennhurst* Does Not Bar Procedural Due Process Claims
                        Involving Underlying Violations Of Georgia Law ..................20

4.      The State Fails To Refute Coalition Plaintiffs' Evidence Of
        Threatened Ballot Secrecy Violations. ......................................21

5.      Coalition Plaintiffs Have Standing. ..........................................23

B.      Irreparable Injury Will Occur Without An Injunction. ......................24

C.      The State Fails To Overcome Coalition Plaintiffs' Showing That The
        Balance of Equities And Public Interest Favor An Injunction. ..........25

D.      The State Fails To Overcome Coalition Plaintiffs' Showing That
        Paper Pollbook Relief Is Necessary. ...................................................26

IV.     ARGUMENT IN REPLY TO FULTON COUNTY ...................................29

V.      CONCLUSION..............................................................................................30

The Coalition Plaintiffs[1] respectfully reply as follows in support of their pending motion for preliminary injunction (Doc. 640.)

## I.   INTRODUCTION

Coalition Plaintiffs do not seek to supplant Georgia's government in its role of regulating the time, place, and manner of Georgia's elections.  Plaintiffs do, however, insist upon the supremacy of their own civil rights guaranteed by the United States Constitution, including the fundamental right to vote, the right to equal protection, and the right to due process.  Georgia has constitutional authority to regulate and administer elections, but the State's discretionary preferences are subordinate to its obligation to respect the individual constitutional civil rights of the people.  The State Defendants[2] are absolutely wrong when they tell this Court that, "Georgia's discretion in these decisions is entitled to the same respect as an individual's right to vote."  (Doc. 658, at 33.)[3]  To the contrary, the State utterly

---

[1] The "Coalition Plaintiffs" are Plaintiffs Coalition for Good Governance, Laura Digges, William Digges III, Megan Missett, and Ricardo Davis.
[2] The "State Defendants" (or "the State") are official-capacity Defendants Brad Raffensperger, David J. Worley, Rebecca N. Sullivan, Anh Le, and Seth Harp and their automatic substitutes under Fed. R. Civ. P. 25(d). (Doc. 628, at 10, ¶ 15; Doc. 226, at 20–21, ¶¶ 35–37.)
[3] Pin citations to particular pages of PACER-docketed documents refer to the blue PACER pagination, not the docketed document's internal page numbering.

lacks lawful discretion to violate constitutional rights.  State discretion operates freely only within those spaces of life that individual rights do not already fill.

Coalition Plaintiffs are not asking this Court to take their side in a "policy disagreement."  What they *do* ask for is protection of their civil rights—rights that this Court has already held require the State to adopt "transparent, fair, accurate, and verifiable election processes that guarantee *each citizen's* fundamental right to cast an accountable vote."  *Curling v. Kemp*, 334 F. Supp. 3d 1303, *aff'd in part, appeal dismissed in part*, No. 18-13951, 2019 WL 480034 (11th Cir. Feb. 7, 2019) (Doc. 309, at 46) (emphasis added).  Georgia's Dominion Voting System not only fails to meet this requirement, but it is in many ways *worse* than the DRE system that it is meant to replace.  For all the reasons Coalition Plaintiffs have urged, this Court should act urgently to enjoin the State's planned enforcement of HB 316's requirements for all in-person voters to vote using Georgia's new BMD system.

The constitutional issues that Coalition Plaintiffs seek to vindicate could not be more ripe for judicial action than they are at this moment.  Millions of voters' individual rights, as well as the legitimacy of the 2020 elections in Georgia, are under imminent threat.  The State has already been ordered to prepare a "default" fallback plan to use in case its BMD system fails.  That fallback—hand marked paper ballots—can be ordered and implemented immediately.  There is no good

2

reason why a foreseeable electoral disaster must first be endured before judicial relief from an *a priori* illegal voting system may be granted.

## II.    REPLY TO STATE'S EVIDENCE AND STATEMENT OF FACTS

At the outset it is critical to note the material facts that the State concedes, either by omission or by outright admission.

*First*, the State's own Dominion witness, Dr. Coomer, admits that the Dominion scanners do not interpret the human-readable text summaries printed on the BMD ballot card, but are only programmed to read the QR barcodes.  (Doc. 658-2, at  5, ¶ 9.)  This admission establishes that Georgia's elections will henceforth be decided by *computer* tabulations of *computer* interpretations of *computer*-encrypted digital barcodes—barcodes that encode "votes" that their human voters (who are forced to use these computers as proxies in order to exercise a fundamental right) cannot even read, much less verify to be correct.

Dr. Coomer attests that the integrity of the election results that this system produces can be "audited" using the AuditMark feature.  (Id. at 5–6, ¶ 10; see also Doc. 658, at 20.)  AuditMark is a *computer*-created "text representation of how the tabulator interpreted the ballot at scan time."  This means the computer-generated AuditMark is only appended to a computer-generated digital image of the voter's computer-generated ballot card after the card is "cast" into the Dominion scanner.

In other words, voters will *never* see the digital image of their ballot card, the AuditMark, or their "interpreted" votes—and thus will never have any chance to verify any of them.  The State's *own evidence* conclusively establishes that what the Dominion Voting System actually counts directly is the system's own unverified computer-generated proxy for the voter's choices, not the voters' actual votes.  This process does not just *burden* the fundamental right to vote; it deprives voters completely of their right to "cast a ballot and to have it counted." *United States v. Classic*, 313 U.S. 299, 318 (1941).  This evidence by itself warrants a finding that Coalition Plaintiffs are likely to succeed on their fundamental-right-to-vote-claim.

*Second*, the State fails to make any showing disputing the feasibility of Coalition Plaintiffs' principal request for relief—hand marked paper ballots with pollbook protections and pre-certification audits.  It would border on contempt for the State to argue now that such relief is not feasible because this Court affirmatively ordered the State four months ago to develop a "default" plan to conduct all voting by hand marked paper ballots as a contingency in case the timely rollout of the Dominion Voting System fails.  (Doc. 579, at 148.)  All that the State really says against the feasibility of Coalition Plaintiffs' requested relief is that switching to paper ballots from ongoing efforts to implement the Dominion

Voting System "will involve significant effort."  (Doc. 658, at 53.)  This empty statement concedes that it is feasible for Georgia to conduct the 2020 elections using hand marked paper ballots instead of BMDs, if this Court so orders.

In reply to the State's declarations and Statement of Facts, Coalition Plaintiffs submit rebuttal testimony from four experts—Dr. Philip B. Stark (**Exhibit H**); Kevin Skoglund (**Exhibit I**); Harri H. Hursti (**Exhibit J**); and Dr. Richard DeMillo (**Exhibit K**), as well as pertinent rebuttal testimony from six lay fact witnesses—Rhonda Martin (**Exhibit L**); Elizabeth Throop (**Exhibit M**); Aileen Nakamura (**Exhibit N**); Jeanne Dufort (**Exhibit O**); Floyd Rose (**Exhibit P**); and Elisa Goldklang (**Exhibit Q**).

Dr. Stark, the inventor of the risk limiting audit, emphasizes in his third supplemental declaration that risk limiting audits can only check tabulations of BMD output; they cannot verify that the BMDs have printed correct votes in the first place.  (Ex. H, at 2–3, ¶¶ 5–10.)  This deficiency demonstrates why any assurance of election integrity in BMD elections is illusory.  Dr. Stark also rebuts the State's erroneous misreading of the 2018 NASEM report's recommendations, (id. at 7–10, ¶¶ 24–26), and rebuts pertinent criticisms proffered by the State through its witness, Dr. Juan Gilbert, (id. at 10–22, ¶¶ 27–54.)

Kevin Skoglund's supplemental declaration rebuts criticisms of his opinions that are proffered by the State's witness, Dr. Gilbert. (Ex. I.)

Harri Hursti, a technologist whose experience includes participation in the Ohio EVEREST report and co-founding and organizing the annual DEF CON Voting Machine Hacking Village, explains why "Georgia's Dominion Voting System can and will be targeted by adversarial parties" and that "a well-funded and motivated adversary can plan and execute a hard-to-detect attack, if not impossible-to-detect the attack against the system." (Ex. J, at ¶¶ 16–17.)

Dr. Richard DeMillo refutes the State's claims regarding BMDs' supposed lack of system vulnerabilities, highlights the insufficiency of audits, and rebuts the State's claim that voters are able to verify that BMDs have correctly recorded their votes. (Ex. K.)

Rhonda Martin, Elizabeth Throop, Aileen Nakamura, and Jeanne Dufort each proffer separate testimony about the pilot elections they observed. (Exs. L, M, N, O.)  These witnesses observed issues with pollbooks, violations of ballot secrecy, and voters unable or unaware of their need to verify BMD printouts, and the burdens on voters caused by the Dominion system. Jeanne Dufort attests to concerns about BMD secrecy problems aired before the Morgan County Board of Election.  (Ex. O, at ¶ 19 & Ex. 1.)  Elizabeth Nakamura attests to the adverse

impact that publicly known security vulnerabilities of the Dominion system and implementation "slippage" are having on confidence in the integrity of upcoming elections.  (Ex. N, at ¶¶ 52–53 & Ex. 1–2.)

Floyd Rose proffers testimony that he was disfranchised when he attempted to vote in Lowndes County in November 2018 because of pollbooks errors.  Mr. Rose was only permitted to vote a provisional ballot, which was rejected, even though his wife residing at his same address was allowed to cast a regular ballot. (Ex. P.)

Finally, Elisa Goldklang's declaration proffers testimony about Cobb County Clerk Janine Eveler's public admission that Cobb's pilot election, which Ms. Eveler conducted for the State using hand marked paper ballots, was more successful than anticipated and ran more smoothly than the State's other elections piloting BMDs. (Ex. Q, at ¶¶ 3–8 & Ex. 1.)

These declarations, in addition to Coalition Plaintiffs' evidence already submitted, refute the State's opposing declarations and its Statement of Facts ("Facts"), in each of the areas emphasized by the State, as follows:

### A.    Safety Of BMDs And Separateness Of The Old And New Systems.

In Facts Section I.A. at pages 4–7 of the Response, the State recites its evidence proffered to show that BMDs are recommended by the scientific

community, that security concerns about BMDs are speculative, that the entirety of the DRE system is being replaced with no points of overlap between it and the new BMD system and that the Dominion Voting System is properly certified to an appropriate EAC standard.

The State's review of literature supposedly describing BMDs as a secure and recommended election technology is refuted by the declaration of experts Dr. Stark (Ex. H, at 7–9, ¶¶ 24–26) and Dr. DeMillo (Ex. K, at ¶¶ 10–14.)

The State's exceedingly thin affirmative evidence for the separateness of the old DRE system and the new Dominion system is notable for what it omits to say. None of the State's witnesses denies that the new Dominion system, like the old DRE system, interfaces with the State's and counties' existing IT infrastructures, nor do the State's witnesses claim that the State has either inspected or remediated the existing State's and counties' IT infrastructures after the Kennesaw State elections server was exposed to the world without any security for at least six months in 2016–17.  The State's own Dominion witness is careful to say that "existing components" of the DRE system will not be used and that no information, software or source code "from the existing DREs" will be utilized. (Doc. 658-2, at 4, ¶ 7.)  But these statements are artfully worded.  The new epollbooks, for example, would never be expected to use information "from the

8

existing DREs." The flaw in the State's epollbook system does not stem from the DREs, but from a separate system that is not included in the superficially reassuring statements by Dr. Coomer.

Finally, Dr. Stark explains why the State's claim that its system is validly certified by the EAC is nonsensical. (Ex. H, at 23, ¶ 55.) The State's attempt to show that BMDs are safe and unexposed to compromised components of the old DRE system are unpersuasive.

### B. Voters' Inability To Verify BMD Ballot Cards.

In Facts Section I.C. at pages 9–11 of the Response,[4] the State recites its evidence proffered to dispute Coalition Plaintiffs' claims that voters do not and cannot verify the human-readable portions of their BMD ballots. Coalition Plaintiffs rebut the State's claims with both expert testimony about, and lay fact witness observations of, actual voter behavior. (Decls. DeMillo, Stark, Martin, Throop, Nakamura.) Coalition Plaintiffs conducted many dozens of hours of polling place observation during the pilot elections through volunteer observers and authorized pollwatchers. Observers consistently reported that most voters did not even attempt to review their ballot cards prior to casting ballots into the

---

[4] Facts Section I.B. of the State's Response addresses issues raised by the Curling Plaintiffs so is not addressed by this Reply.

scanner.  (Decls. Throop, ¶¶ 30–33; Martin, ¶¶ 30–33; Nakamura, ¶¶ 33–40.)

Given the fact that voters do not check their BMD ballot cards for machine

recording accuracy, there is no reliable source record of the vote for auditing or

validation of the reported outcome.  In addition, as voters themselves, observers

stated in their declarations the difficulty they would personally have in attempting

to verify ballot cards in an election with several contests. (Exs. L, M, N, O (Decls.

Martin, ¶¶ 16–17; Throop, ¶¶ 31–32; Nakamura, ¶¶ 39–40; Dufort, ¶ 8).)  The

State presents no evidence of its own to suggest either that voters review their

ballot cards, or that they are able effectively to do so when they try.

C.    **Functioning Of BMDs And Auditability Of BMD Elections.**

In Facts Section II at pages 11–15 of the Response, the State recites its

evidence proffered to show how BMDs function and why BMD elections can be

audited.   Coalition Plaintiffs' expert declarations show that the State is wrong—

BMDs suffer from massive security vulnerabilities, and they cannot be

meaningfully audited.  (Exs. H, I, J, K (Decls. Stark, Skoglund, Hursti, DeMillo).)

D.    **Considerations of Accessibility And Clarity Of Voter Intent.**

In Facts Sections III, III.A., and III.B. at pages 15–20 of the Response, the

State attempts to show that mandatory use of BMDs by all in-person voters is

preferable to hand marked paper ballots for purposes of accommodating disabled

voters.  As discussed further below, the real and legitimate concerns of disabled voters must be accommodated, but these concerns are simply not addressed by requiring all in-person voters to vote using BMDs.  The State cannot present evidence to the contrary because no such evidence exists.

**E.   Ballot Secrecy.**

In Facts Section IV at pages 20–21 of the Response, the State recites its evidence proffered to show why Georgia's Dominion Voting System preserves ballot secrecy. Even before getting to the technical aspects of how the scan software creates unique and identifiable images, fundamental ballot secrecy is irrefutably violated by the size and positioning of the BMD screens, where numerous people in the polling place can observe how others are voting. Although this problem was widely reported in the November 5 election, the Secretary had found no solution a month later in the runoffs where the same violations were repeated. (Exs. L, N, O (Decls. Martin, ¶ 7; Nakamura, ¶ 5; Dufort, ¶¶ 5–6 & Ex 1).)

**F.   Status Of Implementation.**

In Facts Section V at pages 21–22 of the Response, the State recites its evidence proffered to show that "rollout of the BMD system is on track" for March 2020.  Not only do witnesses testify that their own observations show the rollout is

not on track, (Exs. M, N, O (Decls. Throop, ¶ 29; Nakamura, ¶¶ 44–54 & Exs. 1–2; Dufort, ¶¶ 10, 19–21)), but the minuscule pilot elections were widely considered a failure and demonstrated that the State is simply not ready to scale a major system overhaul in time to avoid massive voter disfranchisement in the March 2020 presidential preference primary election.  Military and Overseas ballots must be mailed, using the Dominion ballot building and database system, by February 4, 2020.  Early voting will begin on March 4, 2010. An effective simultaneous transition to a new voting system in 159 counties on a scale never before attempted in the nation is impractical, if not reckless, and clearly subjects voters to a real risk of disfranchisement.

## III.    ARGUMENT IN REPLY TO THE STATE

For this Court's convenience, the Coalition Plaintiffs reply to each of the State's counterarguments in the same order, and according to the same organization, used by the State in its response.  In Section III.A. below, Coalition Plaintiffs reply to Argument Sections II(A)–II(E) of the response and explain why the State's laundry list of arguments discounting the Plaintiffs' likelihood of success on the merits should be rejected. In Section III.B. below, Coalition Plaintiffs reply to Argument Section III of the response and explain why irreparable injury will occur in the absence of an injunction.  In Section III.C.

below, Coalition Plaintiffs reply to Argument Section IV of the response and show why the balance of equities and the public interest weigh in favor of granting the requested injunction.  In Section III.D. below, Coalition Plaintiffs reply to Argument Section V of the response and explain why the proposed relief regarding paper pollbooks is necessary.

### A.   The State Fails To Overcome Coalition Plaintiffs' Initial Showing That They Are Likely To Succeed On The Merits.

The State offers a laundry list of arguments for discounting the Plaintiffs' likelihood of success on the merits.  None of the State's arguments has any merit.

### 1.   Coalition Plaintiffs Have Stated Valid Claims.

The State assembles disparate arguments about jurisdiction, accommodation for the disabled, and state sovereignty under the inapt caption of failure to "state a claim for relief."  None of these arguments actually suggests a failure to plead or prove a cause of action, and each argument is unavailing on its own terms.

### a)   This Court Has Jurisdiction Over Claims Arising From How Votes Are Tabulated And Counted.

In Argument Section II(A)(1) at pages 23–30 of the Response, the State emphasizes that Georgia has constitutional authority to regulate the "time, place, and manner" of elections subject to federal law, such as HAVA, which established the EAC.  According to the State, this legal regime gives Georgia "state

sovereignty in the realm of elections," (Doc. 658, at 29), and the mere fact that Georgia may not have selected a perfect election system is not sufficient grounds to subject Georgia's "reasonable and neutral" selection to judicial second-guessing.

This persistent claim by the State to have "sovereignty" over the question of how it conducts elections must be rejected. First, the Supreme Court has long held that the constitutional authority of States to regulate elections must be exercised "in conformity to the Constitution," *United States v. Classic*, 313 U.S. 299, 314 (1941), which, of course, includes conformity with the Fourteenth Amendment. And *Bush v. Gore* plainly stated that, "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the *manner* of its exercise." 531 U.S. 98, 104-05 (2000) (emphasis added). Second, this Court previously considered and rejected this same sovereignty argument when the State invoked it to defend a preference for DREs. Nothing has changed just because the State now defends BMDs.

### b) Relief Will Not Disadvantage The Disabled.

In Argument Section II(A)(2) at pages 30–32 of the Response, the State invokes the ADA, the Rehabilitation Act, and HAVA to argue that disabled voters will be subject to unequal treatment unless all in-person voters are required to vote

14

using BMDs.  The State claims that Plaintiffs thus invite discrimination against the disabled when they seek relief from all in-person voters being required to use BMDs.  The State makes much of the supposed disconnect between Plaintiffs supposedly claiming that BMDs are "insufficient for the general populace" while allowing that BMDs are "permissible for disabled voters." (Doc. 658, at 32.)

The State's accessibility arguments are misplaced.  Neither HAVA nor Georgia law *requires* disabled voters to use BMDs.  HAVA requires only that a DRE or "other voting system equipped for individuals with disabilities" must be available for use at each polling place.  52 U.S.C. § 21081(a)(3)(B). Georgia law requires the same.  *See* O.C.G.A. § 21–2–379.21.  But Georgia law does not compel voters with disabilities to use this accessibility option. Like other voters, people with disabilities may vote absentee. *See* O.C.G.A. § 21–2–384(c).  If they vote in person, then (unlike other voters) they may already choose to vote with a paper ballot instead of by machine, if they prefer. *See* O.C.G.A. § 21–2–452(h).  In doing so, they also have the right, with few exceptions, to receive assistance from any person the voter selects. *See* O.C.G.A. § 21–2–409(b).  The State's argument that *all* in-person voters must be required to vote on BMDs, and have their constitutional rights violated, simply because Georgia has chosen to make BMDs

available as an *optional* voting system for disabled persons turns the very idea of constitutional protections on its head.

As Coalition Plaintiffs explained in their response to the State's motion to dismiss the FSC on these same grounds, if compelled use of the Dominion BMD System is found to be unconstitutional (as it should be), then this Court can fashion an appropriate equitable remedy, including appropriate provisions for those with disabilities, when it renders judgment.  (Doc. 650, at 25.)

### c)   The Claims Involve Constitutional Violations, Not Policy Preferences.

In Argument Section II(A)(3) at pages 33–36 of the Response, the State reiterates its persistent objection that Plaintiffs' voting rights claims amount to a disagreement with the State over "a policy decision properly reserved and exercised by the State of Georgia."  (Doc. 658, at 34.)  The State adds that hand marked paper ballots—the relief already ordered by this Court to be used as a fallback if the BMD system fails—will produce disproportionate undervotes among minority communities.  Finally, the State argues that the requested relief will effect a "wholesale alteration of the status quo" that is not the purpose of preliminary injunctions.

These arguments must be rejected.  First, the sovereignty argument has already been addressed. Georgia's discretion to regulate the time, place, and

manner of elections is constrained by its duty to do so "in conformity to the Constitution," *Classic*, 313 U.S. at 314.

Second, it is odd for the State to argue that hand marked paper ballots will have a disproportionate impact upon minority communities after spending years defending DREs, which produced the infamous and inexplicable DRE-only minority undervote in Georgia's 2018 Lieutenant Governor's race.  (Doc. 419-1 at 61–62, ¶¶ 22-23 (Stark Decl.); Doc. 421 at 4–5, ¶¶ 17–19 (Brill Decl.).) Setting aside the irony, the State's preference for BMDs has no factual basis in the outdated 2001 report that the State cites.  The *Report of the 21st Century Voting Commission* anecdotally reviewed Georgia's voting systems at a time when 17 Georgia counties used punch card voting systems and 73 Georgia counties used lever machines.[5]  Contrary to Defendants' claims, the report found that "across the board [*i.e.*, regardless of the voting system used], the percentage of undervotes is higher in predominately black precincts than in predominately white precincts in the same county."  Report at 19.

In any event, BMDs simply do not solve concerns about minority undervotes, as Dr. Stark extensively explains.  (Ex. H, at 17–19, ¶¶ 39–44 (Stark

---

[5] Available at https://www.sos.state.co.us/pubs/elections/VotingSystems/files/2015/21stCenturyReport.pdf (last accessed Dec. 16, 2019)

Decl.).) On top of failing to reduce undervotes, BMDs are far less secure than paper ballots.  As Dr. Stark observes, "BMD printouts have every security vulnerability that hand-marked paper ballots do, *plus* cyber risks that cannot feasibly be mitigated." (Id., at 15, ¶ 34 (emphasis in original).)

Last, the State's argument that enjoining BMD's will alter the status quo is irrelevant.  There is no status quo to preserve: the State has already been prohibited from using DREs, and the question is whether it should use BMDs or the default plan—hand marked paper ballots.  Moreover, the preservation of the status quo until trial on the merits may justify some injunctions, but it is not a necessary prerequisite, or even a factor, in granting preliminary injunctions generally in federal court.  *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) (listing factors for granting injunctive relief, not including the preservation of the status quo).

### 2.   No State Interest Outweighs The Burdens On Voters.

In Argument Sections II(B), II(B)(1), and II(B)(2) at pages 36–42 of the Response, the State argues that the applicable standard of review for considering a fundamental-right-to-vote challenge to voting regulations is a sliding scale and that the State's interest outweighs the burden on voters.

As for the applicable standard,[6] when this Court decided the 2018 injunction motions against DREs, the Court concluded that the DRE claims warranted a level of scrutiny "somewhere between" strict scrutiny, on one hand, and a simple review that asked only whether election regulations were justified by important regulatory interests, on the other hand.  *Curling*, 334 F. Supp. 3d at 1325 (Doc. 309, at 39–40) No less stringent scrutiny is warranted here, since both BMDs and DREs alike make an inscrutable, unverifiable, computer-created artifact the record of the voter's vote for counting—with DREs, this record is stored on the unit's memory card; with BMDs, it is stored in the encrypted and non-human-readable QR barcode.  By placing computer software between the voters and their recorded votes, both systems deprive voters of the ability to know what votes are being recorded and that are actually being cast.  Both systems expose voters to numerous opportunities for votes to be diluted, changed, or lost by error or malicious manipulation.

The State's argument that its interest in utilizing the Dominion Voting System outweighs the burdens to the constitutional rights of individual voters is profoundly wrong.  Comparison of the State's expenditures against the intangible

---

[6] The State only appears to direct Argument Section II(B) at the Curling Plaintiffs, but the standard of review determination applies also to Coalition Plaintiffs.

value of voting rights is inapt.  *See Riverside v. Rivera*, 477 U.S. 561, 574 (1986)

("Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate

important civil and constitutional rights that cannot be valued solely in monetary

terms.")  Nor can BMDs be thought to provide clearer voter intent than hand

marked paper ballots because voters are unable to read and verify that the

encrypted QR barcodes actually record their intent in the first place.

The State plainly has a purely litigation-oriented interest in prevailing before

this Court.  Otherwise, however, there can be no legitimate government interest in

utilizing an unconstitutional voting system, especially where state law expressly

permits hand marked paper ballots to be used instead.  *See* O.C.G.A. § 21–2–281.

### 3.  *Pennhurst* Does Not Bar Procedural Due Process Claims Involving Underlying Violations Of Georgia Law.

In Argument Section II(C) at page 42 of the Response, the State says that

Plaintiffs' "improperly alleged state law claims" are precluded by *Pennhurst State*

*Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105–06 (1984).  *Pennhurst* does not

apply.  *Pennhurst* dealt only with whether *Ex Parte Young* permits a federal court

to exercise pendent jurisdiction over direct claims of state-law violations.

*Pennhurst* did not consider violations of state-created liberty interests as predicates

for a federal due process claim.  465 U.S. at 104–05, 117–18.  The Eleventh

Circuit has expressly recognized that, "liberty interests protected by the fourteenth

amendment may arise … from state law." *Barfield v. Brierton*, 883 F.2d 823, 935 (11th Cir. 1989).  The threatened state-law violations that underlie Coalition Plaintiffs' procedural due process claim are not "state-law claims."  They are elements of a federal claim that is properly before this Court.  *Id.*  (*See also* Doc. 650, at 15–16, 18–20 (defending the claim stated by Count III of the FSC).)

### 4.    The State Fails To Refute Coalition Plaintiffs' Evidence Of Threatened Ballot Secrecy Violations.

In Argument Section II(D) at page 43 of the Response, the State disputes that the Dominion scanners record information that identifies when a ballot is cast or what voter cast it and asserts that there is "no evidence" that the Dominion Voting System "compromises ballot secrecy in any way."  (Doc. 658, at 43.)

The State's cursory treatment of the ballot secrecy issue relies solely on the declaration of Dominion's Director of Product Strategy and Security, Dr. Eric Coomer.  Dr. Coomer attests, in carefully crafted language, that the randomized sequence number included in AuditMark cannot be correlated to an individual voter or a specific point in time and that no date-timestamp information is stored on the scanners' removable compact flash cards. These statements fail, however, to explain the contrary conclusions that are compelled by Dominion's own documentation, which states both that timestamps *are* recorded when ballot cards are scanned and that physical ballots can still be correlated to the scanned image

21

"[e]ven if ballots for a given batch are mixed after scanning." (Doc. 640-1, at 81 (Dominion's Response to Georgia's RFI).)[7]

Ballots that have been time-stamped can *easily* be associated with identifiable voters in all the ways Coalition Plaintiffs thoroughly explained in their initial brief.  (Doc. 640-1, at 23–27.)  In addition, simple logic dictates that, if digital ballot images can be "correlated" with their physical paper counterparts, the ballot card must contain some unique identifier that makes this possible.  Unique identifiers, scanning timestamps, and ballot image metadata all compromise ballot secrecy.

The Coalition Plaintiffs' documentary evidence (indicating that the Dominion Voting System violates ballot secrecy) should not be disregarded on the basis of a single self-serving and artfully crafted declaration by a Dominion executive.  Further discovery and rigorous cross-examination at a hearing are essential before Dr. Coomer's testimony may be taken at face value.  In any event, Dr. Coomer says nothing about the secrecy violations caused by enormous BMD screens that can be read from across the room. (Exs. L, M, N, O (Decls. Martin,

---

[7] Close examination of the top edge of the bottom image on Page 11 of Dominion's RFI response to the State shows, in very fine print, a filename ending in .TIF, followed by the words, "scanned at 14:31:37 on 02/09/14."  (Doc. 640-1, at 81.)

¶ 7; Throop, ¶ 35; Nakamura, ¶ 8; Dufort, ¶ 6).)  Such obvious threats to ballot secrecy clearly burden voters and require mitigation.

### 5. Coalition Plaintiffs Have Standing.

In Argument Section II(E) at pages 43–46 of the Response, the State attacks Coalition Plaintiffs' standing on three grounds.  First, the State argues that "theoretical future occurrences" of hacking fail to confer standing because they are attenuated or speculative.  Second, the State argues that Coalition lacks organizational standing because its mission is fulfilled, not impaired, by its participation in this litigation.  Third, the State argues that individual voters will not be injured by the State requiring them to vote using BMDs, but only by the voters' own intervening failure to verify their BMD ballot card.

Throughout this case, this Court has consistently (and correctly) rejected Defendants' challenges to the Coalition Plaintiffs' standing.  The current claims against the Dominion Voting System may be different in detail from the analogous claims made by the same parties against DREs, but for purposes of standing they are identical.  Coalition Plaintiffs rest on the analysis of standing in their initial brief and in their response to the State's motion to dismiss the FSC. (Doc. 640-1, at 11–14; Doc. 650, at 20–24.)

**B.     Irreparable Injury Will Occur Without An Injunction.**

In Argument Section III at pages 47–48 of the Response, the State offers two reasons why Coalition Plaintiffs will not suffer any irreparable injury without an injunction.  The State argues that Georgia "has a no-excuse absentee voting system" that will permit Plaintiffs to avoid the injury of voting on BMDs and that voters' review of their BMD ballots "allows errors to be detected and addressed." (Doc. 658, at 47–48.)

This Court discounted both of these arguments when it found a threat of irreparable injury existed in connection with the 2018 motion against DREs. *Curling*, 334 F. Supp. 3d at 1325–26 (Doc. 309, at 40).  When the Court later granted in part the 2019 injunction motions against DREs, the Court elaborated, "The threatened, ongoing injury here is an irreparable injury — one that goes to the heart of the Plaintiffs' participation in the voting process and our democracy." (Doc. 579, at 131, *Curling v. Raffensperger*, __ F. Supp. 3d __, 2019 WL 3822123, at \*160.)  This Court's earlier findings of irreparable injury are no less correct here, where the threatened injuries will be caused by the Dominion Voting System rather than DREs.

### C.     The State Fails To Overcome Coalition Plaintiffs' Showing That The Balance of Equities And Public Interest Favor An Injunction.

In Argument Section IV at pages 48–53 of the Response, the State argues that the balance of equities and public interest favor the Defendants. The State argues the "substantial time, resources, and effort" it has put into implementing Georgia's Dominion Voting System outweighs any minimal burden on Plaintiffs. (Doc. 658, at 49, 51, 53.)

When it recently granted in part the 2019 injunction motions seeking relief against DREs, this Court considered the balance of equities and the public interest and concluded that both weighed in favor of restraint.  The Court reasoned then that it had "no basis at this juncture to order a handmarked paper ballot scheme for the upcoming 2020 elections for which the Secretary of State is planning to conduct using the new BMD voting process."  (Doc. 579, at 139, *Curling v. Raffensperger*, __ F. Supp. 3d __, 2019 WL 3822123, at *172.)  But the Court also expressed its concerns about "whether the State is prepared to fully implement the new system statewide in all 159 Georgia counties in time" for the March 2020 primary and noted that there was "reason to doubt" the State would succeed.  (Id. at 138, 142.)

Now that the faltering status and quality of the Dominion Voting System rollout has proved the Court's doubts to be well founded, the calculus of the public

interest must shift.  The very consideration that previously weighed *against* requiring the State to move to hand marked paper ballots—"the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast"—now weighs strongly in *favor* of a move to hand marked paper ballots.  *Curling*, 334 F. Supp. 3d at 1326  (Doc. 309, at 41).  The results of the BMD pilot elections show that the State confronts a real danger of electoral disaster if it persists in using the Dominion Voting System for the March 2020 presidential preference primary election. The best way to avoid an outcome adverse to the public interest is to enjoin the State's planned use of the Dominion Voting System and to instruct the State instead to conduct the upcoming elections according its "default" plan for using hand marked paper ballots, already proven successful.

> **D.    The State Fails To Overcome Coalition Plaintiffs' Showing That Paper Pollbook Relief Is Necessary.**

In Argument Section V at page 54 the Response, the State argues that the requested pollbook relief is "unnecessary."  After observing the use of the new PollPad electronic pollbooks in the pilot elections, Coalition Plaintiffs are gravely concerned about the likelihood of widespread and systemic voter disfranchisement in 2020.  The relief sought has therefore become a most urgent priority in the near term.

The State's only argument against granting the relief that the Coalition Plaintiffs seek on the epollbooks is that it is unnecessary because a "paper copy of the registered voters for each precinct is already located in each precinct on Election Day," citing Ga. Comp. R. & Regs. r. 183-1-12-.07(1).  (Doc. 658, at 54).  This argument is completely wrong on a number of levels.  First, what is needed is not the "paper copy of the registered votes for each precinct," as the States recites, but the *updated* copy of the pollbook (sometimes called a "printer electors lists"), as Coalition Plaintiffs have repeatedly explained.  Second, the State cites the regulation as if the regulation requires printed copies of voter lists to be provided, thereby obviating the need for injunctive relief.  The State goes on to argue that enjoining the State to do what the State regulation already requires is a prohibited "obey the law" injunction.  *But the cited regulation does not require paper copies of anything*.  In fact, it says just the opposite.  It states:

> Beginning July 1, 2006, counties shall use ExpressPoll units at precincts within the county during primaries, elections, and runoffs. The ExpressPoll units shall be utilized in lieu of the printed electors list and ballot encoders in each precinct where in use.

 Ga. Comp. R. & Regs. r. 183-1-12-.07(1).

Not only does the regulation not say what the State says it says, it conflicts with State statutory law, which the State has not, since the promulgation of the regulation, followed.  O.C.G.A. 21-2-401(b) requires a printed certified electors

27

list that is ***updated for absentee mail and early voting*** delivered to every precinct—i.e., a paper pollbook.  The existence of this ignored statute further supports the public interest in granting Coalition Plaintiffs' requested equitable relief.

Third, regardless of the what Georgia law requires, the evidence from the most recent election shows that the State is not providing paper copies of even the list of registered voters (which the Court ordered in its DRE injunction), much less an updated electors list.  The pollbook problems are addressed in detail in the declarations filed herewith. (See Exs. L, M, N (Decls. Martin, ¶¶ 5–6; Throop, ¶¶ 5–29; Nakamura, ¶¶ 15–25).)

There is great need for this injunction relief, and the State has never explained how it would burden the State to comply with the injunction.  In ruling on the motions against DREs, this Court said it "views the significant voter registration database and related ExpressPoll deficiencies and vulnerabilities demonstrated in this case as a major concern both relative to burdening or depriving voters' ability to actually cast ballots."  (Doc 579, at 152–52.)  Given that many of the same electronic pollbook problems that plagued the DRE voting system recurred in a number of the Dominion Voting System pilots, Coalition Plaintiffs' requested relief addressing the pollbooks is warranted regardless of what

system Georgia ultimately uses to conduct the March 2020 presidential preference primary election.

## IV.   ARGUMENT IN REPLY TO FULTON COUNTY

The Fulton Defendants[8] make only two arguments:  First, that the requested relief can only be provided by enjoining the State Defendants, since the Secretary is mandating Fulton's use of the BMD system; and second, that the requested relief should be rejected as an improper attempt to obtain reconsideration and revision of this Court's previous Order (Doc. 579) enjoining the use of the "GEMS/DRE system" after 2019.  (Doc. 657.)  Both arguments lack merit.

As to the first objection, it repeats the same argument the Fulton Defendants unsuccessfully asserted when they opposed the Plaintiffs' motions to enjoin the use of DREs—namely, that only relief against the State could provide redress. (Doc. 473, at 22–25.)  This Court rejected that argument when it expressly enjoined both the State and Fulton County from requiring in-person voters to use DREs.  (Doc. 579, at 12–13 (citing *Curling*, 334 F. Supp. 3d at 1318  Doc. 309).)  A different outcome is not warranted now, merely because in-person voters must now use

---

[8] The "Fulton Defendants" are official-capacity Defendants Mary Carole Cooney, Vernetta Nuriddin, Kathleen D. Ruth, Mark Wingate and Aaron Johnson and their automatic substitutes under Fed. R. Civ. P. 25(d). (Doc. 628, at 11, ¶ 16; Doc. 226, at 21, ¶¶ 38–39.)

BMDs instead of DREs.  If Fulton County could previously be enjoined from requiring voters to use DREs (as this Court correctly held), so too can it be enjoined from requiring voters to use BMDs.

As to the second objection, it is false that this Court's injunction against DREs affirmatively *requires* the use of BMDs, so of course this Motion does not seek to revisit or revise that (non-existent) requirement.  (Doc. 579, at 148–50.) This Court has broad discretion to fashion equitable relief on the anti-BMD claims. If the Court sees fit to order Defendants to utilize GEMS and AccuVote scanners— without DREs—it may do so even if it means amending its earlier Order.  *See* Fed. R. Civ. P. 54(b).  But Fulton County is wrong that granting such relief would amount to a revision of the earlier injunction because using GEMS with AccuVote scanners to tabulate hand marked paper ballots is different than using the "GEMS/DRE system," of which DREs are an integral part.  The Fulton Defendants are wrong when they assert that the Court should reject Coalition Plaintiffs' motion to enjoin the use of BMDs as some kind of back-door effort to revise this Court's existing injunction.  It is not.

## V.  CONCLUSION

For the foregoing reasons, Coalition Plaintiffs Motion for Preliminary Injunction (Doc. 640) should be granted.

30

Respectfully submitted this 16th day of December, 2019.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com

Bruce P. Brown Law LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III
Pro Hac Vice (ECF No. 125)

ROBERT MCGUIRE LAW FIRM
113 Cherry Street PMB 86685
Seattle, WA  98104-2205
Tel.: (253) 267-8530

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
cichter@IchterDavis.com

Ichter Davis, LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, GA 30326
(404) 869-7600

*/s/ John Powers*
John Powers
Pro Hac Vice (5/17/19 text-only order)

Ezra D. Rosenberg
Pro Hac Vice (ECF No. 497)

Lawyers' Committee for Civil Rights
Under Law
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8300

*Counsel for William Digges III,*
*Laura Digges, Ricardo Davis*
*& Megan Missett*

*Counsel for Coalition Plaintiffs*

31

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Robert McGuire*
Robert McGuire

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER , ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2019, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Robert McGuire*
Robert McGuire