# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CURLING PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' REQUEST FOR STATUS CONFERENCE AND NOTICE OF DECERTIFICATION OF GEMS/DRE SYSTEM AND <u>CURLING PLAINTIFFS' REQUEST FOR HEARING</u>

## TABLE OF CONTENTS

I.  Introduction .................................................................................................1

II.  Implementation of the New Election System and Compliance
with the August 15, 2019 Order.......................................................................3

III.  Preservation of Election Equipment ................................................................9

# TABLE OF AUTHORITIES

## Cases

*Alcoa, Inc. v. Universal Alloy Corp.*,
  No. 1:15-CV-01466-ELR, 2016 WL 9175820 (N.D. Ga.
  Mar. 2, 2016) .......................................................................................13

*Ga. Power Co. v. Sure Flow Equip., Inc.*,
  No. 1:13-CV-1375-AT, 2014 WL 4977799 (N.D. Ga. July
  22, 2014) (Totenberg, J.) .....................................................................13

*Henderson v. Holiday CVS, L.L.C.*,
  269 F.R.D. 682 (S.D. Fla. 2010) .........................................................13

*Hibbett Patient Care, LLC v. Pharmacists Mut. Ins. Co.*,
  No. CA 16-00231-WS-C, 2017 WL 4817992 (S.D. Ala.
  Jan. 26, 2017) .......................................................................................13

*Rhodes v. JLG Indus., Inc.*,
  No. 1:13-CV-00872-TCB, 2015 WL 11199066 (N.D. Ga.
  Apr. 30, 2015) ......................................................................................14

## I.     INTRODUCTION

Defendants persuaded this Court in the summer of 2018 that too little time was available merely to implement hand-marked paper ballots with the then-*existing* GEMS and AccuVote system.  Plaintiffs did not seek to replace the entire election system, but simply sought to replace DREs with hand-marked paper ballots using the existing scanners and election management system (EMS).  Now, Defendants claim that they will somehow replace tens of thousands of DREs with tens of thousands of BMDs plus thousands of new scanners and implement a new EMS—as well as training countless election workers on this complicated new system—statewide in even *less* time than remained for the far more modest changes Plaintiffs sought in 2018.  It simply is not possible, especially given that they already appear way behind and elections begin in less than three weeks (with early voting already underway).

A prompt hearing is needed to protect the right to vote in Georgia, including enforcing this Court's August 15, 2019 Order.  Defendants have refused to provide information for Curling Plaintiffs to confirm their compliance with that Order, including the required default plan for hand-marked paper ballots should the new BMD system be infeasible.  This plan is critically important given that the little information publicly available regarding the implementation of that new system

raises serious concerns about timely completion for upcoming elections, beginning as early as January 28, 2020, with early voting already underway.  Defendants' persistent refusal to provide information regarding the implementation of the new system and compliance with the Court's August 15, 2019 Order heightens growing concerns about rapidly-approaching elections and an inevitable deprivation of the constitutional right to vote for Curling Plaintiffs and voters across the state.

As to State Defendants' preservation complaints, they offer no reason to burden this Court with a dispute that is entirely of their own making.  They acknowledge that this Court directed the parties to cooperate regarding State Defendants' desire "to dispose of the DRE units that are being collected from the counties" across the state.  (Dkt. No. 689 at 1-2.)  In another misleading filing, State Defendants attempt to obscure their obstruction with mischaracterizations of Curling Plaintiffs' counsel's prior statements.  The reality is that they have long refused to provide basic information required to prepare a statistical sample of the equipment at issue, and they offer no evidence—much less testimony of a statistical expert—to support their meritless claim that the mere "inventories" they have provided are sufficient.  Their new claim that they do not "possess" the basic usage information Curling Plaintiffs' statistical experts need directly contradicts information Defendants provided in the summer of 2018 and, if true, suggests

2

widespread spoliation of highly relevant information. Defendants alone are responsible for any cost and inconvenience they incur from the preservation obligations they bear, and they fail to meet their burden to modify the Court's existing preservation orders.

In sum, the Court should schedule a hearing at its earliest opportunity to address the looming disaster that looks to await Georgia voters in fast-approaching elections, as the Cobb County Election Supervisor observed after last year's pilot elections; and the Court should again direct State Defendants to cooperate regarding the preservation issues they raise, or live with the consequences of their own obstruction.

## II.    IMPLEMENTATION OF THE NEW ELECTION SYSTEM AND COMPLIANCE WITH THE AUGUST 15, 2019 ORDER

The Court's intervention is urgently needed to address serious concerns regarding Defendants' implementation of the BMD-based voting system and compliance with this Court's August 15, 2019 Order. Defendants have refused to provide information regarding the status of the BMD rollout, and the little information publicly available indicates that Defendants will be unable to complete implementation in time for upcoming elections.

Special elections for Georgia House District 171 (which covers three counties) and Georgia Senate District 13 (which covers nine counties) are

scheduled for January 28 and February 4, 2020, respectively—beginning less than

three weeks from now.[1]  Early voting on BMDs has already begun in the House

District 171 race.[2]  Nevertheless, according to emails obtained through an Open

Records Request, it appears that at least some counties do not yet have access to

the new EMS and do not know when they will receive it.  (Cross Decl. Ex. 2.)  The

EMS "is essentially the nexus of the whole election system," and the "place from

which ballot programming is [] produced and distributed down through the

counties to the voting machines throughout the state."  (Dkt. No. 438 at 9:13-21.)

If the EMS is not ready, it will not matter if new equipment is in place; that

equipment would be unusable.  Defendants have not provided any information

about when the new EMS system will be operational or even delivered to each of

the 159 counties holding elections.

Just this week, in requesting that this Court quash a subpoena, Election

Supervisor for the Cobb County Board of Elections & Registration, Janine Eveler,

described for the Court numerous steps she must complete in what she

---

[1] Ga. Sec'y of State, *Special Election Set for District 171* (Dec. 9, 2019),
https://sos.ga.gov/index.php/elections/special_election_set_for_district_171; Ga.
Sec'y of State, *Special Election Set for Senate District 13* (Jan. 2, 2020),
https://sos.ga.gov/index.php/elections/special_election_set_for_senate_district_13.
[2] Ga. Sec'y of State, *Raffensperger Says Agency is Ready for Potential Cyber
Attacks Following Strikes Against Senior Iranian Military Official* (Jan. 6, 2020),
https://sos.ga.gov/index.php/elections/raffensperger_says_agency_is_ready_for_po
tential_cyber_attacks_following_strikes_against_senior_iranian_military_official.

4

characterized as "a very short timeframe in which to prepare for the March 24,
Presidential Primary, due to the implementation of the new voting system," (Dkt.
No. 690-4 ¶ 13), including, among other things, "coordinat[ing] with the Center for
Election Systems and Dominion Voting Systems to build the election database that
contain all precincts, polling places, district combinations, races, and candidates
for each party's ballot and defines the number of voting units to be provided at
each location." (*Id*. ¶ 14.)  This is the same Election Supervisor who previously
praised the hand-marked paper ballot pilot this Court ordered for 2019 because it
avoided the many problems the counties piloting the new BMD system suffered at
the same time.  On November 12, 2019, Ms. Eveler spoke publicly about the Cobb
County hand-marked paper ballot pilot at a Board of Elections meeting and
indicated that it ran more smoothly than the BMD pilots in other counties.  She
described multiple aspects of the hand-marked paper ballot pilot that she and her
team were "a little bit surprised about and pleased about," while stating "the
counties that were doing the ballot marking device pilot were dead in the water."[3]

State Defendants have merely dismissed the many problems that arose in the
November 2019 BMD pilots (such as machines rebooting in the middle of voting

---

[3] GA VOTERS FOR HMPBs, *Cobb HMPB Pilot*, YouTube (Nov. 15, 2019),
https://www.youtube.com/watch?v=rL_4rihgbhc&feature=youtu.be.

and issues with the poll pads used to check-in voters) as "mainly human-based."[4]
Although this does not accurately describe the extent and complexity of the BMD
problems that arose, it does at least confirm what Curling Plaintiffs and the
election integrity expert community have long maintained:  that BMDs frequently
lead to "human-based" problems (in addition to computer-based problems, such as
hacking and glitches) that undermine voter confidence and election outcomes
because BMDs are needlessly complex as compared to the simplicity and ease of
hand-marked paper ballots.  Defendants have not explained how they will attempt
to remedy these and other problems, providing only vague claims that they will
continue to train personnel, as if that were somehow enough.

In its August 2019 Order, this Court ordered Defendants to take steps to
prepare for a scenario in which the new BMD system is not ready for 2020
elections.  (Dkt. No. 579 at 147-48.)  Defendants have provided no visibility into
where they stand with respect to those Court-ordered steps, and Curling Plaintiffs
fear little to no such steps have been taken regarding at least the following critical
mandates in the August 2019 Order:

---

[4] Tyler Estep, *State Confident in Timeline for Delivery of New Voting Equipment*,
Atlanta Journal-Constitution (Dec. 30, 2019),
https://www.ajc.com/news/local/state-confident-timeline-for-delivery-new-voting-equipment/ilPFCzSNquDCipgB97rzeP/.

- **Default plan for use of hand-marked paper ballots,** (Dkt. No. 579 at 148): Despite Plaintiffs' requests, Defendants have not provided any default plan or even an indication that they have, in fact, created such a plan.

- **November 2019 hand-marked paper ballot pilots,** (Dkt. No. 579 at 148): While Defendants carried out such a pilot in Cobb County, they have not released any information about the results of the pilot. However, Ms. Eveler's comments on behalf of Cobb County regarding the experience of the hand-marked paper ballot pilot as compared to that of the BMD pilots indicates that the BMD pilots confirmed the need for hand-marked paper ballots in 2020 elections—lest all 159 counties soon find themselves "dead in the water" with BMDs as the pilot counties did last year.[5]

- **Rules regarding audits,** (Dkt. No. 579 at 148-49): Defendants have not filed any proposed or Final Rules regarding audit protocols, indicating that none have been issued.[6] Thus, despite Defendants' insistence that they will audit the results of elections conducted on the new BMD system (*see, e.g.,* Dkt. No. 658 at 21-22), they have not identified any specific auditing procedures, despite elections as early as January 28 with presidential primaries soon to follow in March.

- **Cybersecurity review of voter registration database,** (Dkt. No. 579 at 150): Defendants have not provided any indication that they have undertaken a security review of the voter registration database, much less the results of any such cybersecurity assessment.

In August 2018, Plaintiffs requested that Defendants implement hand-

---

[5] GA VOTERS FOR HMPBs, *Cobb HMPB Pilot*, YouTube (Nov. 15, 2019), https://www.youtube.com/watch?v=rL_4rihgbhc&feature=youtu.be.

[6] While the Secretary of State announced in November 2019 that he had requested that the State Election Board pass a rule regarding procedures for post-election audits, it does not appear that the Board has done so. *See* Ga. Sec'y of State, *Secretary of State Proposes Rules for Election Audit Transparency* (Nov. 22, 2019), https://sos.ga.gov/index.php/elections/secretary_of_state_proposes_rules_for_election_audit_transparency.

marked paper ballot for the November 2018 elections, but did not seek replacement of the remaining components of the existing election system. (*See* Dkt. No. 271 at 1-2.) Defendants claimed at that time that they could not possibly make that modest change in the nearly three months remaining. (*See* Dkt. No. 265 at 6-12.) Now, Defendants maintain they can somehow replace the entire election system—including tens of thousands of DREs with tens of thousands of BMDs, nearly a thousand AccuVote scanners with even more Dominion scanners, and an entirely new EMS that will have to get installed on at least one server for each of the 159 counties plus one or more state servers, and then implement training for tens of thousands of election workers across the state on this entirely new, complex system that involves new technology, new machines, and many new steps at each polling place—all in less time than they had to implement Plaintiffs' far more modest relief in the fall of 2018. This is not possible, as Defendants themselves implicitly conceded in their feasibility arguments opposing hand-marked paper ballots in 2018. Two elections are less than a month away—with early voting already underway in at least one race—and early voting for the statewide presidential primaries begins March 2, less than two months from today. Georgia voters are facing a dire situation.

Defendants' vague and unsubstantiated implementation assurances ring hollow, particularly given their refusal to provide any meaningful information regarding the status of the implementation of the BMD voting system or to address the significant problems that arose with the BMD pilots.  The Court needs to hold a hearing promptly—with the first election scheduled to take place in just three weeks and early voting already underway—to address these very serious issues and to ensure that necessary steps are taken immediately to protect Curling Plaintiffs' and all other Georgia voters' constitutional right to vote.  This Court invested considerable time, attention, and care in its detailed August 2019 Order, including the specific measures it ordered to protect future elections in Georgia.  The Court now needs to ensure that those measures are timely and fully enforced, lest the right to vote become illusory in Georgia.

## III.   PRESERVATION OF ELECTION EQUIPMENT

State Defendants claim that "Plaintiffs represented that they could easily create a statistical sample of machines they wished for the State to maintain." (Dkt. No. 689 at 2.)  But no such statement appears in the December 6 conference transcript because no such statement was made.  To the contrary, Curling Plaintiffs' counsel—in response to a direct question from the Court about whether they already had identified a statistical sample—explained that they "haven't

because there is additional information that would be needed on that."  (Dkt. No.

679 at 22:21-23:14.)  Curling Plaintiffs' counsel also emphasized the need to

develop a statistical sample "in a cooperative fashion with statistical experts."  (*Id.*)

Curling Plaintiffs have informed State Defendants that, in order to determine

a statistical sample, they require for each piece of equipment, the precinct and

election for which the machine was last used.  (Dkt. No. 689-3.)  This could not

have come as a surprise to Defendants given they previously provided that

information in the summer of 2018 for Fulton, Cobb, and DeKalb counties.

(Woods Decl. ¶ 12.)  Curling Plaintiffs seek the same information for all 159

counties also reflecting usage since the 2018 and 2019 elections.

State Defendants, however, have refused to cooperate, instead insisting on

the impossible—that Curling Plaintiffs' statistical experts somehow fashion a

reliable sample from among some 30,000 pieces of equipment deployed across

multiple elections in multiple years and 159 counties based merely on vague

"inventories" lacking critical usage information.  (Dkt. No. 689 at 2.)  Tellingly,

State Defendants offer no statistical expertise to support their position.  Nor could

they.  Even common sense refutes it.  Without basic usage information, Curling

Plaintiffs' experts have no means of ensuring that any sample would be statistically

representative of recent elections across the state's 159 counties.  (Woods Decl.

¶¶ 15-16.)  Any "sample" invariably would end up unreliable in a variety of ways, such as too few DREs to be representative of various elections because too few (if any) among those picked were used in certain elections.  As Dr. Woods explains, the most recent election and precinct in which each DRE was used is critical.  (*Id*.) His expert testimony is unrebutted.

State Defendants attempt to justify their obstruction by now claiming that "the State does not possess" the usage information needed for a statistical sample. (Dkt. No. 689 at 3.)  But they offer no evidence to substantiate this self-serving claim.  They have refused to answer even a single question about this representation, including whether any of the counties possess the necessary usage information (which would put it within the State's custody or control).  (Cross Decl. Ex. 1 at 2-3.)  Their refusal to support or even explain this representation raises serious concerns about its reliability—and unfortunately, this Court is all too familiar with the unreliability of State Defendants' representations in this case. (*See* Dkt. No. 579 at 6, 26-31; Dkt. No. 571 at 377:9-14.)

Nevertheless, if true, State Defendants' claim is a very troubling revelation. In June 2018, three Georgia counties—Fulton, Cobb, and DeKalb—provided Plaintiffs and their experts with "Direct Electronic Voting (DRE) Machine Recap Sheets" that contained the sort of usage information Curling Plaintiffs currently

11

seek—i.e. a list of DRE machines with serial numbers and the election and precinct in which the machine was most recently used.[7]  (Woods Decl. ¶ 12.)  Dr. Woods used this information to design statistical samples for Cobb and DeKalb counties. (*Id.*)  New or supplemental samples are needed for those and all other counties since there have been intervening elections in the last two years.  (*Id.* ¶ 13.)  The previously-provided "Recap Sheets" show that counties track the usage information Curling Plaintiffs have requested.  If State Defendants truly do not "possess" such information, either they have not obtained it from the counties, or they failed to take reasonable steps to preserve it in violation of this Court's preservation Orders.  (Dkt. Nos. 122, 668.)  State Defendants have refused to explain this or engage in any way.  (Cross Decl. Ex. 1 at 2.)

The election equipment at issue is subject to multiple preservation orders in this case, and State Defendants have not requested—nor met their burden—to modify each of those orders.[8]  State Defendants must show good cause to modify

---

[7] The information Fulton County provided at the time proved incomplete, unlike for Cobb and DeKalb, and Fulton County declined to further cooperate at that time as the other two counties did.  (Woods Decl. ¶ 12 n.6.)

[8] State Defendants request that the Court amend its November 22, 2019 Order, in which the Court ordered the State Defendants "to preserve all GEMS servers, DREs, memory cards, AccuVote scanners, and Express Poll books until further order of the Court in the event a forensic examination is deemed necessary at some point for the purposes of this litigation."  (Dkt. No. 668 at 3.)  However, this Court previously issued a general preservation order in this case on December 15, 2017,

the December 15, 2017 preservation order.  *See*, *e.g.*, *Alcoa, Inc. v. Universal Alloy Corp.*, No. 1:15-CV-01466-ELR, 2016 WL 9175820, at *1 (N.D. Ga. Mar. 2, 2016) ("A party seeking to modify a previously entered protective order must make a particularized showing of 'good cause' in order to justify the amendment."); *Ga. Power Co. v. Sure Flow Equip., Inc.*, No. 1:13-CV-1375-AT, 2014 WL 4977799, at *3 (N.D. Ga. July 22, 2014) (Totenberg, J.) (good cause standard precludes modification of scheduling orders).  State Defendants have not shown good cause to modify the Court's December 15, 2017 or November 22, 2019 Orders, instead resorting to unsubstantiated claims about the information they possess, the cost of preservation, and the usability of the mere "inventories" they have provided for statistical sampling.  *See, e.g., Henderson v. Holiday CVS, L.L.C.*, 269 F.R.D. 682, 686 (S.D. Fla. 2010) ("[T]o even merit consideration, an objection must show specifically how a discovery request is overly broad, burdensome or oppressive, by submitting evidence or offering evidence which reveals the nature of the burden." (internal quotation marks and citation omitted)); *Hibbett Patient Care, LLC v. Pharmacists Mut. Ins. Co.*, No. CA 16-00231-WS-C,

---

directing the parties to preserve "relevant data; data storage; media devices, discs, and tapes; and other relevant software, data, and hardware in this case."  (Dkt. No. 122 at 2.)  The DRE units that are being collected from the counties are unquestionably encompassed by the December 15, 2017 Order, which State Defendants have not requested to modify.

2017 WL 4817992, at *7 (S.D. Ala. Jan. 26, 2017) (overruling defendant's burden

objections to multiple discovery requests because the defendant did not

"demonstrate how the discovery requested . . . would be unduly burdensome");

*Rhodes v. JLG Indus., Inc.*, No. 1:13-CV-00872-TCB, 2015 WL 11199066, at *5

(N.D. Ga. Apr. 30, 2015) (overruling defendant's undue burden objection where

defendant "offered little to no indication of how much time and effort it would take

to produce documents").

Preservation of the election equipment is critical because forensic analysis of

at least a reliable statistical sample of that equipment is needed to assess the

security of Georgia's new, BMD-based voting system.  (Halderman Decl. ¶ 1.)

Components of the state's DRE-based election technology will remain in use,

including at least the Secretary of State's computer network that encompasses the

election system, non-"air gapped" computers used by state and county workers and

contractors to transfer data into and out of the EMS, and the eNet voter registration

database software and data.  (*Id.* ¶ 2.)  If attackers infiltrated any of these

components as Logan Lamb did twice—and given the substantial vulnerabilities

with these components for years, as even State Defendants' own experts

acknowledged—attackers likely still have access to those components now, which

would provide an avenue for attack on the state's new election equipment.  (*Id.*

¶¶ 3, 5.)  If the State is permitted to destroy or recycle all the DRE-related equipment, evidence regarding whether attackers infiltrated that equipment and the state's overarching election system will be lost.  (*Id*. ¶ 9.)  It is not feasible to conduct a reliable forensic analysis of the state's overarching election system because of its scope and complexity; nor is that necessary if an appropriate forensic analysis can be conducted on a statistical sample of the primary election equipment.  (*Id*. ¶¶ 6, 8.)  State Defendants need only provide the necessary usage information for Dr. Woods and his team to identify a reliable statistical sample of the equipment at issue.  (Woods Decl. ¶ 16.)

Dated:  January 8, 2019                    Respectfully submitted,

  */s/ David D. Cross*
David D. Cross (*pro hac vice*)
John P. Carlin (*pro hac vice*)
Jane P. Bentrott (*pro hac vice*)
Mary G. Kaiser (*pro hac vice*)
Robert W. Manoso (*pro hac vice*)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
Telephone: (202) 887-1500
DCross@mofo.com
JCarlin@mofo.com
JBentrott@mofo.com
MKaiser@mofo.com

15

RManoso@mofo.com

Halsey G. Knapp, Jr.
GA Bar No. 425320
Adam M. Sparks
GA Bar No. 341578
KREVOLIN & HORST, LLC
1201 West Peachtree Street, NW
Suite 3250
Atlanta, GA 30309
HKnapp@khlawfirm.com
Sparks@khlawfirm.com

*Counsel for Plaintiffs Donna Curling,
Donna Price & Jeffrey Schoenberg*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

  */s/ David D. Cross*  
David D. Cross

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2019, a copy of the foregoing **CURLING PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' REQUEST FOR STATUS CONFERENCE AND NOTICE OF DECERTIFICATION OF GEMS/DRE SYSTEM AND CURLING PLAINTIFFS' REQUEST FOR HEARING** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

_/s/ David D. Cross_____
David D. Cross

18