**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

**COALITION PLAINTIFFS' STATUS REPORT REGARDING BMD
IMPLEMENTATION AND RESPONSE TO STATE DEFENDANTS'
<u>REQUEST TO DESTROY DRE SYSTEM RECORDS</u>**

Pursuant to this Court's order by docket entry only dated January 15, 2020,

Coalition Plaintiffs[1] respectfully submit this status report and further response to

the State Defendants' Request for Status Conference.

**I.     Implementation of BMDs and Compliance with the Court's August 15,
2019 Order**

In their Response to Defendants' request for a status conference (Doc. 692),

Curling Plaintiffs presented a good overview of the substantial voting-system-

implementation risks, which are escalating daily. Coalition Plaintiffs have

repeatedly expressed concerns to Defendants about the impact on voters'

---

[1] The "Coalition Plaintiffs" are Plaintiffs Coalition for Good Governance, Laura
Digges, William Digges III, Megan Missett, and Ricardo Davis.

constitutional rights of a failed voting system implementation stemming from an
unrealistic rollout schedule, as described in the First Supplemental Complaint
(Doc. 628, ¶¶ 187–99). Convincing new evidence continues to indicate that the
March 2020 elections and two state legislative vacancy elections for 12 counties[2]
cannot be conducted without depriving Georgia voters of their ability to freely
exercise their right to vote unless an effective backup hand-marked paper-ballot
default plan is utilized in the vast majority of counties.

On August 15, 2019, this Court ordered the State Defendants to develop a
"default back-up plan" for the use of hand-marked paper ballots that "addresses the
contingency that the new BMD system enacted by the State Legislature may not be
completely rolled out and ready for operation…" at the time of the March 2020
elections. (Doc. 579, at 148.) A hand-marked paper-ballot election pilot was
ordered and successfully completed in Cobb County "to *assist in the development*
of the contingency plan." (Doc. 570, at 148 (emphasis added).) Coalition Plaintiffs
have repeatedly requested information about the Court-ordered contingency default
plan through interrogatories and by email. (Exhibit 1 (email thread).) The
Defendants failed to provide substantive responses to the interrogatories, have

---

[2] State House District 171's special election includes 3 counties with election date
of January 28, 2020. State Senate District 13 includes 9 counties with a special
election date of February 4, 2020.

referred counsel to the Proposed Election Board Rules, and have deflected questions concerning the contingency plan. (E.g., Exhibit 2 (interrogatory response); see also Doc. 684-1.)

During the December 6, 2019, Status Conference, in response to the Court's inquiry about a "fallback plan" in the event of a troubled implementation, Defendants referenced their traditional "back up plans" using provisional ballots when polling place emergencies occur. (Exhibit 3 (transcript), at 60:12-61:12, 66:1-69:4.) Defendants apparently have not complied with the Court's directive to develop a pre-March primary contingency plan capable of being triggered in the event of BMD-implementation difficulties, but instead have proposed rules for a post-implementation polling-place "back up plan" for localized isolated emergency situations such as power outages or polling-place machine malfunctions. (Doc. 684-1 at 83, ¶ 2(d); id. at 85, ¶ 11(a). )

A sample of relevant evidence of the imminent need to utilize hand-marked paper ballots in upcoming elections is summarized below:

### A.    Significantly Delayed Equipment Deliveries

Apparently only half of Georgia's 159 counties have received (partial) equipment deliveries or have equipment scheduled for delivery. The other 80 counties do not know when to expect delivery, despite the fact that mail ballots

must be prepared by February 4. While Defendant Secretary publicly asserts that deployment of the BMD system is "ahead of schedule," that is patently false. (Exhibit 4; see also Doc. 357-5, attached for convenience, (describing State Defendants' proposed phases of expected equipment and EMS software delivery).)

For one thing, delivery of the Phase 1 equipment (essential training, programming and testing equipment for all counties) is running weeks later than the plan detailed in the contract. (Exhibit 5 (Dominion's implementation schedule).)[3] Dominion's Response to the RFI noted its commitment to fully deliver equipment by mid-January.[4] Mid-January completion of delivery is consistent with the Secretary of State's communication to counties made on an October 10, 2019, conference call, stating that all equipment should be in all counties by mid-January. By January 10, the Secretary of State's office was communicating that one half of the counties were either delivered or scheduled. (Exhibit 6, ¶ 5 (Marks Decl.).) The attached compilation of public records and excerpted press reports

---

[3] Exhibit 5 is an excerpt of Dominion contract, which is available at https://sos.ga.gov/securevoting/ (last visited Jan. 15, 2020).

[4] Id. ("The Dominion plan is to deliver fully by the end of 2019 or no later than January 15, 2020 so the State, the counties, and the poll workers all have adequate time to install, train and establish the support model for the statewide election in March.") (Dominion Response Document 12-6, at 1).

shows county officials' anxiety about implementation and demonstrates the conflicting, changing information local officials are receiving from the State. (Id. ¶ 9)

More importantly, the critical central county server installed with Election Management System ("EMS") software, which is required for running *any* type of Dominion voting system election (hand-marked-ballot or BMD) and which was due in *all* counties between November 6 and December 31, has not been received by any county (with the possible exception of counties already voting). The State has given counties no clear understanding of when the required EMS software will be available. As of January 7, there was no anticipated date, and later, on January 10, the State's expectation of delivery of EMS by February 1 was communicated. Secretary of State staff further acknowledged on a call that EMS and related county level training and testing is "very technical." (Ex. 6, ¶ 4.) The EMS software should have been readily available in August, given that it is simply certified Dominion EMS software version 5.5-A, installed on an off-the-shelf Dell computer, and is the gating requirement for a county's voting system implementation and operation. None of a county's voting systems, including optical scanners and tabulators for hand-marked paper ballots or BMD barcode

ballots, can be programmed, used for training, tested or deployed until the EMS system is delivered, debugged, tested and staff trained on its use (not an easy task).

Approximately 80,000 computerized components must be integrated, programmed, tested, and installed in polling places after the EMS server and software are delivered to the counties. Even if EMS delivery happens immediately, the schedule for BMD equipment delivery, acceptance testing, programming, Logic and Accuracy Testing, training and deployment of 80,000 components would still be far behind the already "tight schedule,"[5] creating a high risk of failure with no meaningful ability to recover. Fulton County expects more than 3,000 BMDs (6,000+ pieces of equipment) which have not been delivered. (Ex. 2.)[6]

Athens-Clarke County Board of Elections expressed considerable concern in its meeting Tuesday, January 7, 2020, about the fact that there is no schedule for delivery of its voting equipment. (Exhibit 7, ¶ 14 (Supp. Decl. Dufort).) Additionally, Athens-Clarke does not know how many of its traditional polling

---

[5] Hearing Tr. Vol. 1 (7/26/2019), Doc. 570, at 52 (Beaver testimony).

[6] *See also* WABE interview with Rick Barron, Jan. 9, 2020, *available at* https://www.wabe.org/episode/closer-look-fulton-elections-director-talks-2020-voting-city-councilmember-farokhi-responds-to-tensions-between-us-and-iran/ (timestamp 16:35).

places can support the required number of machines because electrical inspections have not been completed. (Id. ¶ 11.)  These issues are likely to be common to all counties.

### B.    Failure to Promulgate Essential Administrative Rules

Two special legislative vacancy elections are currently being conducted using BMDs in twelve counties, and statewide preparations are underway for the March 24, 2020, election. The State is required by O.C.G.A. § 21-2-31 to promulgate election rules that will govern these elections and the March 24 primary using a new voting system. But the eventual effective date and final content of the presently proposed rules, for which the State Election Board is only now accepting public comment, are currently unclear.[7]

State Defendants' failure to provide for timely mandatory election rules means that state and county election officials are unprepared to properly administer fair and reasonably uniform first quarter 2020 BMD elections. For example, poll worker training for the new procedures and equipment is awaiting the adoption of

---

[7] Numerous substantive comments on the Proposed Rules have been submitted such as those proposed by Brennan Center and Common Cause (https://www.brennancenter.org/our-work/research-reports/brennan-center-submits-comment-georgia-state-board-elections-proposed) and the Democratic Party of Georgia (https://brambleman.com/georgia-democrats-response-to-state-election-boards-proposed-rules/) (last visited Jan. 15, 2020).

new Election Rules because training requires the printing of pollworker manuals

incorporating new rules, according to Fulton County Election Director Richard

Barron.[8] Critical rules for testing the complex BMD-integrated equipment will not

be in force or enforceable for some time, nor will cybersecurity rules or physical

security rules. Scores of pages of administrative rules specifically related to DREs

were required to conduct DRE-based elections. Analogous, essential rules for

BMD-based elections are not yet in place for first quarter 2020 election activities,

putting the uniform administration, equal treatment of voters, and integrity of the

elections at risk. The State Election Board failed to meet to discuss BMD election

rules until December 17, 2019.[9] The State Board will consider revisions to draft

rules based on public comments that will be submitted through at least January 22,

2020. *See* Doc. 684-1 at 2. Once approved, there is a 20 day period for potential

challenges before the rules are effective.  These circumstances portend chaos.

---

[8] *See also* WABE interview with Rick Barron, Jan. 9, 2020, *available at*
https://www.wabe.org/episode/closer-look-fulton-elections-director-talks-2020-
voting-city-councilmember-farokhi-responds-to-tensions-between-us-and-iran/
 (timestamp 19:50).

[9] The State Election Board met only three times during 2019.

### C.     Ballot Secrecy Violations Are Unresolved

Large, vote-revealing screens make it impossible to conduct legal first quarter 2020 Elections using the Dominion ICX ballot-marking device.  An effective ballot secrecy protection solution is required to permit voters to preserve ballot secrecy. This secrecy violation is described in both the Coalition Plaintiffs' Reply Brief filed in support of a preliminary injunction (Doc. 680, at 11) and in the Help America Vote Act Complaint that Coalition for Good Governance filed on December 30, 2019, pursuant to O.C.G.A. § 21-2-50.2 and Election Rule 590-8-2-.01. (Ex. 6, ¶ 6.) A recent picture published in the Atlanta Journal Constitution (taken in the Cartersville, Bartow County, precinct) illustrates this pervasive voter-privacy problem. (Id.. ¶ 7.)

### D.     Special Legislative Elections In Process

Two special elections covering twelve counties (HD 171 and SD 13 elections) are already underway and demonstrate the State's extreme lack of preparedness for a first quarter conversion to Georgia's Dominion Voting System. State Defendants previously told this Court that the chance of such elections occurring during the first quarter was remote and inaccurately asserted that vacancies occurring before December 2, 2019, would not result in special vacancy elections prior to the March 24, 2020, primary. (Doc. 616, at 7.) Now 135,000 voters are forced to vote in

these two special elections without benefit of required pre-election testing or formal Election Code Rules that control the conduct of BMD elections.

The twelve counties conducting these special vacancy elections have experienced a variety of problems that have impacted election preparation, equipment testing, and early voting. Such problems include late equipment deliveries, missed deadlines for conducting mandated Logic and Accuracy Testing, inadequately trained workers, and inadequate public notice of pre-election testing. The nine counties in Senate District 13 were informed on January 2 that a special election would occur on February 4, with early voting to begin on January 13, requiring completed equipment testing by January 10, although some did not receive equipment until the week of January 6th and had no prior pollworker training.

The BMD system cannot be properly operated or tested by county election officials (nor can proper oversight be conducted by board of elections members) in the absence of an EMS system that has yet to be delivered.

### E.      Failure to Determine What Constitutes A Vote

State Defendants have failed to satisfy their federal and state statutory duties to define how BMD votes are to be officially counted. The paper ballot card produced by the BMD includes both an encrypted barcode containing the voter's

selections and a text list of those selections, making essential a rule concerning which of the ballot markings is the official vote. As experts have repeatedly explained, the information contained in the barcode can differ from the text because of configuration errors or malicious attacks. Federal and state laws alike recognize the important requirement to define "what constitutes a vote" in each new voting system and mandate such a determination *prior* to the conduct of the election: "It shall be the duty of the State Election Board: To promulgate rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state." O.C.G.A. § 21-2-31(7); *see also* 52 U.S.C. § 21081(a)(6).

The State Defendants have failed to fulfill this statutory duty, which is necessary given the vague and conflicting requirements of Georgia's BMD statutes with respect to which markings are the official votes that must be counted. (Doc. 628 ¶ 52-55.) This determination must be made prior to counting BMD-barcoded ballots, but special elections involving 135,000 voters are already underway and the question is not even scheduled to be addressed before voting begins in the March 2020 presidential primary.

**F.      Insufficient Voting Stations Available**

Defendant Secretary of State's office has acknowledged that, because of BMD demands on electricity and space in polling places, "some counties will not be able to meet the minimum" number of BMDs required to be deployed by HB316, which is 1 BMD per 250 registered voters. (Ex. 6, ¶ 8.) The State Election Board has responded to the capacity constraints created by the large footprint and energy demands of the BMD system by proposing an Election Rule, (Proposed Rule 183-1-13-.01; Doc. 684, at 104), that attempts to circumvent the new statutory minimum voting machine availability protections, with the absurd result that a single BMD in most polling places would satisfy the proposed Rule.

Such arbitrary and capricious allocation of voting machines circumvents statutory minimum requirements and foreseeably will result in unfair, disenfranchising, discriminatory, and chaotic polling place administration. With new machines, new software, and inadequate pollworker training, the voting process will already entail longer-than-normal voting times, which were already unacceptable in some jurisdictions. A dearth of equipment can only exacerbate the effects of these mounting, turnout-suppressing problems—all to the detriment of voters.

G.    **Summary**

The State must be ordered to conduct the upcoming elections using the default of hand-marked paper-ballots, something this Court previously ordered the State to prepare to do. The State must also determine whether those hand-marked paper ballots can realistically be counted at scale by the yet-to-be installed Dominion software, scanners, and tabulators for all first quarter Elections. Unless action is taken now, the State risks jeopardizing the fundamental voting rights of every Georgia voter who participates in the presidential primary. Failsafe measures can still be adopted to ensure a fair election in the March primary, but only if immediate simplifying actions are taken to correct and streamline the current complex (and transparently failing) course of implementation.

## II.    **Preservation of Election Equipment**

The Curling Plaintiffs have explained why preservation of the GEMS/DRE equipment and related electronic records that the State Defendants seek to destroy is essential to resolving Plaintiffs' remaining claims and why the GEMS/DRE evidence bears on this Court's determination as to whether the State's new, BMD-based voting system will sufficiently protect voters' rights and the reliability of election results. (Doc. 692, at 12-17.) Coalition Plaintiffs join in the Curling Plaintiffs' explanations.

13

Coalition Plaintiffs agree that past infection of the DRE voting system and election infrastructure has created a realistic risk of transferring malware to the new BMD voting system, which may have already occurred. Dominion's own contract states, "Dominion will work with the State to develop the appropriate workflow to import the candidate/contest information directly *from the State of Georgia's current Election Information Management System* and create the absentee ballot, BMD ballot, and sample ballot from the same imported file." (Doc. 619-8, at 64 (emphasis added).)

Several other important points also require the attention of the Court and are addressed next.

## A. Federal and State Laws Require Continued Preservation

First, even if preservation of the GEMS/DRE equipment were not required by this Court's orders (which it is), it would still be required by federal and state law. Federal and state laws require the preservation of ***all*** election records for 22 months (federal) and 24 months (state). *See* 52 U.S.C. § 20701; O.C.G.A. § 21-2-52; O.C.G.A. § 21-2-73.

These laws protect the vast majority of electronic records covered by the Defendants' request for authorization to destroy GEMS/DRE equipment, which would necessarily result in the destruction of the hard drives (the internal memory)

on the machines. Those hard drives contain crucial election records that will

become unavailable once the equipment is destroyed. Thus, destruction or disposal

of the GEMS/DRE equipment containing electronic records, including memory

cards and servers, will violate both this Court's existing preservation orders and

federal and state laws. Coalition Plaintiffs have no objection to destruction of items

of DRE system equipment that have no ability to store or transmit electronic

records. State Defendants' motion for authorization to immediately dispose of all

DRE machines and attendant equipment ignores both the continuing need for these

records in this litigation and the Defendants' (and counties') obligations to comply

with election-record-retention statutes.

Coalition Plaintiffs have repeatedly reminded Defendants of their statutory

obligations to retain these electronic election records regardless of any additional

obligations imposed by the Court. It is therefore especially concerning that,

according to numerous public records obtained by Coalition Plaintiffs, Defendant

Secretary has instructed all county superintendents to release their servers, DREs,

and memory cards to a recycler over whom the counties have no control. Such

instruction violates the requirement of *local* election office preservation required

by federal and state law. In addition to a blatant violation of records retention

mandates, even if the recycler were to preserve the records, the State effectively

puts many recent public election records out of reach of the press and the public. Millions of election records are maintained in electronic format only, and officials access DREs, memory cards, GEMS databases, and GEMS servers to obtain needed electronic records. Storing the records in warehouses hours away from the local official makes ongoing records access nearly impossible and unaffordable for a public records request related to prior elections.

### B.   The FBI Drive Contains Evidence of Actual Hacking; Further Forensic Review of DRE System Components Is Required

Second, as Coalition Plaintiffs and their expert explain in more detail in their separate submission under seal, it is absolutely critical that the GEMS/DRE electronic records and related documents be preserved to enable a full forensic analysis of the security of Georgia's new, BMD-based voting system, and to permit the State to develop mitigation and prophylactic measures where possible.

It is critical that the Defendants preserve the disputed electronic records contained on the voting equipment so that Coalition Plaintiffs can evaluate the security of Georgia's new voting systems. As cybersecurity experts have explained, if attackers could have infiltrated components of the old GEMS/DRE system, "[s]uch access would provide the attacker a foothold from which to attack the new EMSes, BMDs, scanners, and pollbooks." (Doc. 692-3, ¶ 3.) The

vulnerability is greatly exacerbated because, as Plaintiffs have made clear, the BMD system results cannot be audited as a mitigation to cybersecurity risks.

Cybersecurity expert Logan Lamb has found evidence that components of Georgia's old voting infrastructure were actually infiltrated. (Exhibit 10 (Decl. Lab).). Through his preliminary forensic analysis of the KSU server, Lamb has found evidence that an unknown number of attackers illegally gained access to the server. At least one attacker gained access using an exploit called "shellshock," which CES left unpatched for months after the bug was the subject of significant media attention and dire warnings from the Department of Homeland Security. (Id. ¶¶ 13-14.) Evidence on the server shows that the attacker illegally infiltrated the server, edited files, and deleted almost all records of their activities. (Id. ¶¶ 13-20.) So it is not mere speculation that Georgia's old systems were compromised. There is strong evidence they were compromised using a known unauthorized hacking tool. The "shellshock" attack would have given the unknown attacker "almost total control of the server including abilities to modify files, delete data, and install malware." (Id. ¶ 20.)

This compromised KSU server is of special concern because of its close connection to the rest of Georgia's voting infrastructure. The server stored the software and configuration files of the type routinely loaded onto the DRE

machines. (Id. ¶¶ 25-27.) It stored databases of voter registration data that was used in electronic pollbooks. (Id. ¶ 28.) The server was used to "distribute GEMs databases, software, and other files that could be used to spread malware." (Doc. 692-3, ¶ 4.) This KSU server was one of the prime footholds from which it was possible to launch attacks on Georgia's computer networks, IT infrastructure, and voting machines. Evidence exists that demonstrates this server was hacked. Because this compromised server is inextricably connected to Georgia's voting systems past and present, it is "unreasonable to assume that the new BMD election system and supporting infrastructure is not already potentially compromised or exposed to malware." (Ex. 10, ¶ 30.)

Determining the scope of damage from the breach will be difficult. The "shellshock" attacker appears to have hidden evidence of their activities. Mr. Lamb found that website access logs "which would be critical for forensic work only go back to November 10, 2016, two days after the 2016 election." (Ex. 10, ¶ 11.) The most relevant logs from before and during the election were all inexplicably deleted. Because of limitations of the server image, forensic analysis of other DRE/GEMS system components is essential "to properly assess the current and future threat to the BMD system." (Id. ¶ 31.) This is a key reason why the Defendants must preserve the old GEMS/DRE electronic records until the

Plaintiffs are able to utilize their forensic experts to determine the extent of the damage done by previous attacks, the potential sources of the attack that are subject to recurrence, and the extent to which attackers should be understood to have access to and control over the new BMD system as a result of the compromise of the former DRE system components.

### C.    Other DRE Equipment Also Must Be Preserved

Third, Coalition Plaintiffs have long stated their intent to undertake a forensic analysis of targeted samples of specific DREs, memory cards and other electronic records, focused particularly on anomalies in reported election results in several recent elections. Examples of such anomalies include the pervasive and statistically unlikely results of reported high undervote rates in the 2018 Lieutenant Governor's contest, including in heavily African American precincts, (Doc. 419-1, at 24-28), and anomalous DRE machine results in the Clarke County Winterville Train Depot, (Id. ¶¶ 24-29.) Coalition Plaintiffs have identified races, counties and precincts for which the electronic records are desired.  Further, in June 2018, Coalition Plaintiffs provided Defendants with a list of attributes of machines for which preservation of unaltered electronic records would be required.[10]

---

[10] The list included (1) all DREs from polling places in which the difference is greater than 3 between voter applications and the total number of ballots cast according to the machine tapes; (2) all DREs in a polling place for which ballots

Preservation of all such equipment and documents is specifically required by this Court's November 22, 2019 Order. (Doc. 668, at 3). In addition, Coalition Plaintiffs specifically requested, in a June 27, 2018, email to the State Defendants, that all DREs that evidenced voting anomalies and related memory cards be preserved. (Exhibit 8 (Ichter email).)

**D.      Either The State Possesses Materials Or Spoliation Has Occurred**

Fourth, State Defendants' assertion that the State "does not possess," "[f]or each piece of equipment at issue, the precinct and election during which it was last used" (Doc. 689, at 3) either is false or discloses a violation of the above-cited federal and state laws by the Secretary of State that suggests spoliation. The "Recap Sheets" used by counties to track the usage of individual DRE machines are routinely provided to the Secretary of State and on their face say, "WHITE sheet to Secretary of State." (Exhibit 9 (examples of recap sheets).) At a minimum, the Secretary of State should possess these documents.

---

cast per machine tape differs from the total ballots voted in that polling place as reported in GEMS; (3) all DREs in a polling place for which total electronic ballots case on election day, according to the machine tapes, differs from the Clarity report published on the Secretary of State's website; (4) all DRE machines in polling places where there is a difference between the quantity of voted ballots for each ballot combination and the quantity of each ballot combination in the electronic pollbook assigned for actual voters; (5) the counties' GEMS servers; and (6) memory cards for all DREs.

### E.      Other Evidence Of Spoliation Exists

Finally, Coalition Plaintiffs fear destruction of DRE equipment is already occurring. In October of 2019, the Secretary of State's office informed counties that, if they kept the DRE machines, "you will have to destroy them and pay for that on your own"; whereas "[the SOC is] willing to take the equipment and destroy it for free." (Ex. 6, ¶ 5) This communication appears to be totally inconsistent with the assurance of preservation that the State Defendants gave this Court when they said,

> As the BMDs are deployed, DREs and the existing GEMS components will be removed from counties and preserved by the state because most counties do not have the space to store both DREs and BMDs. The existing DREs and GEMS components will be stored by a state vendor …

(Doc. 616-1, ¶ 12 (Harvey Decl.).)

On January 10, 2010, Mr. Harvey blamed the Court's preservation order for the delay in new equipment delivery, communicating to election officials that the State, "Lost 3-4 weeks at the beginning when Judge said they have to keep all old equipment, not just some." (Ex. 6, ¶ 5) This suggests that some destruction may have already occurred. At a minimum, after representing to the Court that they would preserve DRE components, the State's plan apparently was to destroy the DREs rather than to preserve them as required.

The significance of the DRE evidence cannot be overstated. As Logan Lamb's expert declaration indicates, troubling evidence has been identified that suggests the necessity and continued relevance of forensic analysis of the old system for purposes of determining the security of the new system.

## III.   Conclusion

Counsel for Coalition Plaintiffs will be prepared to answer questions and to address these matters further at the Status Conference.

Respectfully submitted this 16th day of January, 2020.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Robert A. McGuire, III* |
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Admitted Pro Hac Vice |
| BRUCE P. BROWN LAW LLC | (ECF No. 125) |
| 1123 Zonolite Rd. NE | ROBERT MCGUIRE LAW FIRM |
| Suite 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 881-0700 | (253) 267-8530 |

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,*
*Ricardo Davis & Megan Missett*

*/s/ John Powers*
Ezra Rosenberg
John Powers
David Brody
Lawyers' Committee for Civil Rights
Under Law
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8300

*Counsel for Coalition Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III

24

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER , ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 16, 2020, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Cary Ichter*
Cary Ichter

25