```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF GEORGIA
 2                           ATLANTA DIVISION

 3


 4   DONNA CURLING, ET AL.,            )
                                       )
 5          PLAINTIFFS,                )
                                       ) DOCKET NO. 1:17-CV-2989-AT
 6          -vs-                       )
                                       )
 7   BRAD RAFFENSPERGER, ET AL.,       )
                                       )
 8          DEFENDANTS.                )

 9


10          TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11             BEFORE THE HONORABLE AMY TOTENBERG

12                  UNITED STATES DISTRICT JUDGE

13                       JANUARY 17, 2020

14

15

16

17

18

19

20

21

22

23                  PENNY PRITTY COUDRIET, RMR, CRR
                         OFFICIAL COURT REPORTER
24                  UNITED STATES DISTRICT COURT
                          ATLANTA, GEORGIA
25
```

```
 1                    A P P E A R A N C E S:

 2   ON BEHALF OF THE PLAINTIFFS:  DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:
 3
          DAVID D. CROSS
 4        MARY KAISER
          MORRISON & FOERSTER, LLP (VIA TELEPHONE)
 5
          ADAM SPARKS
 6        KREVOLIN & HORST, LLC (VIA TELEPHONE)

 7
     FOR THE PLAINTIFF COALITION FOR GOOD GOVERNANCE:
 8
          BRUCE BROWN
 9        BRUCE P. BROWN LAW (VIA TELEPHONE)

10        CARY ICHTER
          ICHTER DAVIS, LLC (VIA TELEPHONE)
11
          ROBERT ALEXANDER MCGUIRE, III
12        ROBERT MCGUIRE LAW FIRM (VIA TELEPHONE)

13        MARILYN MARKS
          COALITION FOR GOOD GOVERNANCE (VIA TELEPHONE)
14
     FOR THE DEFENDANTS STATE OF GEORGIA:
15
          VINCENT ROBERT RUSSO, JR.
16        JOSHUA BELINFANTE
          CAREY A. MILLER
17        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC. (VIA
          TELEPHONE)
18
          BRYAN P. TYSON
19        TAYLOR ENGLISH DUMA (VIA TELEPHONE)

20
     FOR THE DEFENDANTS FULTON COUNTY:
21
          KAYE WOODARD BURNWELL
22        CHERYL RINGER
          DAVID LOWMAN
23        OFFICE OF THE FULTON COUNTY ATTORNEY (VIA TELEPHONE)

24

25
```

```
 1              COURTROOM DEPUTY CLERK:  Good morning everyone.  We're

 2    here for the teleconference in the case of Curling vs.

 3    Raffensperger, Civil Action Number 1:17-CV-2989.

 4              Beginning with the Curling plaintiffs, will counsel make

 5    your appearance for the record.

 6              MS. KAISER:  David Cross and Mary Kaiser with Morrison &

 7    Foerster on behalf of Curling plaintiffs.

 8              MR. SPARKS:  Adam Sparks from Krevolin & Horst, also on

 9    behalf of Curling plaintiffs.

10              COURTROOM DEPUTY CLERK:  Thank you.  Coalition.

11              MR. McGUIRE:  Robert McGuire and I'm also joined by Cary

12    Ichter, Bruce Brown and Marilyn Marks for the Coalition

13    plaintiffs.

14              COURTROOM DEPUTY CLERK:  State of Georgia.

15              MR. RUSSO:  Vincent Russo, State of Georgia, Robbins

16    firm.  I have with me Josh Belinfante, Bryan Tyson and Carey

17    Miller.

18              COURTROOM DEPUTY CLERK:  Thank you.  Fulton County.

19              MS. BURWELL:  Kate Burwell, Cheryl Ringer and David

20    Lowman.

21              COURTROOM DEPUTY CLERK:  Thank you.

22              We are having this taken down by a court reporter,

23    please state your name prior to speaking.  This is not our normal

24    court reporter, so please be cognizant of that.

25              Judge.
```

1          THE COURT:  Good morning.

2          This is the first time we've really tried this because

3   we had to have a new audio system placed in the court for phone

4   conferences or for being able to hear and participate with plug-in

5   witnesses in the latter part of the summer and we just haven't had

6   an occasion to use it.  That's the good part of the new year.  The

7   bad part of the new year is we don't know how it really works.

8          As I advised counsel, there were a number of members of

9   the press who asked to be present and it was the only way I

10  thought was reasonable under the circumstances.  So I don't know

11  who is press and who is not because we also have members -- some

12  folks from our court who are attending who may be interns or law

13  clerks.  But we have at least one, two, three, four, five, and I

14  believe two of them probably are an associate of the court.

15         And if at any point you cannot hear, obviously please

16  flag that.

17         How is it going so far, can you hear me clearly?

18         UNIDENTIFIED SPEAKER:  Yes, ma'am, at least the

19  (unintelligible) can.

20         THE COURT:  I want to remind you to identify yourself

21  before you speak each time.  Ms. Welch is covering a trial for

22  Judge Story, so we have a different court reporter today who

23  doesn't necessarily also recognize your voices as quickly; a great

24  court reporter, though, but just doesn't recognize your voices.

25         You all asked for this conference to -- for two

1 purposes, and I have another one or two purposes, things I wanted

2 to talk to you about as well.

3           Is that somebody who is joining or who got cut off?

4           (No response)

5           THE COURT:  Well, whatever.

6           So the state filed a proposed -- in response to the

7 request for a hearing and the two different items that were put

8 on, one being basically what's the schedule of rollout of the new

9 system, and we don't see -- we're having trouble seeing it and you

10 not getting information.

11           Another one was what was the fall -- associated back, we

12 don't see actually any plans for the fallback plan in the event

13 the state's not ready.

14           And finally, also the issue of what is the -- the state

15 was very concerned that it's still having to preserve the voting

16 machines from all the counties and assist in the storage, and that

17 they have not gotten a sample from the plaintiffs as to what is

18 the -- what are the numbers or way they want to select the -- a

19 sample of voting machines, DRE voting machines that is, so that

20 the rest of them can be disposed of.

21           The flip of that is the plaintiff saying that they have

22 been persistently refused the information that they require in

23 order to identify the sample.

24           Does that fairly characterize the items that you all

25 wanted to talk about?

```
 1            MR. RUSSO:  Yes, ma'am.  Vincent Russo.  Yes, ma'am,
 2    that does.
 3            MR. ICHTER:  Your Honor, this is Cary Ichter.
 4            We also were hoping to get some guidance from the Court
 5    during the course of the status conference on the subject of some
 6    discovery that the Coalition plaintiffs wish to take on the
 7    subject of implementation and the status of the default backup
 8    system.
 9            We understand that there's been a report from the state
10    with respect to that, but over the course of the past three weeks
11    or so we have been attempting to engage in some discovery in order
12    to gain some information both from the Secretary of State's office
13    and from Cobb County on the subject of implementation and on the
14    subject of the backup plan.  And we've been told that we can have
15    none of it because discovery is not currently ongoing.
16            So during the course of the call, we're hoping to get
17    some guidance with respect to that.
18            THE COURT:  Okay.
19            MR. McGUIRE:  Your Honor, this is Robert McGuire for the
20    Coalition plaintiffs.
21            We have one other I guess I would characterize it as a
22    housekeeping request, but perhaps it's not exactly that.  As your
23    Honor knows, our fee claim reply is due today.  And our team has
24    been pretty absorbed in preparing for this conference as the Court
25    is aware because of our filing yesterday, so we would like to make
```

1   an oral motion, if possible, to just extend our deadline until

2   Tuesday, which is the next business day, rather than have it be

3   due today.

4         And I sent an e-mail out last night to confer with

5   opposing counsel, and I haven't had a chance to hear back from any

6   of the defendants, so I don't know what is their position.  But

7   it's just a very short weekend extension, so our hope is that the

8   Court will extend us that.

9         THE COURT:  That's fine, I'll extend it.

10        MR. CROSS:  Your Honor, this is David Cross.  Just for

11  equity, can we have that for both?

12        THE COURT:  Yes.  I do not think it will make a

13  difference.  There are many other things on my plate at the

14  moment.  Thank you.

15        MR. CROSS:  I imagine that's right.  Thank you, your

16  Honor.

17        THE COURT:  And, as I said, I had some other items to

18  discuss with you, but I'm going to defer for a moment in

19  identifying them because I want to see how long it takes to deal

20  with the items that we've already addressed.

21        So what's -- I know that it seems to be of great import

22  to the state to deal with this question of being able to dispose

23  of the DRE machines.  And I know it's been a consistent concern of

24  the plaintiffs, on the other hands, to be able to review the

25  machines.  And then there is also the associated question always

```
 1  when we talk about this, which is, you know, is it essential or
 2  not.  And I remain concerned about that issue as well, which is
 3  really basically having to do with the status of the case, but I'm
 4  going to just put a pin on that for now.
 5          And I went back and read the transcript of the last
 6  hearing, and I've gone back and looked at other materials as well
 7  as the ones that you submitted in your argument.  And I well
 8  understand what the Government wants to proceed with and I -- and
 9  I understand the basis about it.  I do have to say, again, that
10  originally, you know, the state represented all the machines were
11  going to be preserved in the early fall or late summer, and that
12  was a clear representation in the documents provided.  I'm not
13  trying to make you do that, we're trying to find a solution.
14          I do find it objectionable, I want to just say, that --
15  I think it's Mr. Harvey, I don't want to in any way slam
16  Mr. Harvey because it might be another member of the state --
17  Secretary of State's staff who basically said that the whole
18  reason they screwed up for the first four months was because of
19  the judge had delayed them.  And I have no conceivable notion what
20  that was about.  And I really -- you know, I don't think that's a
21  helpful way of engendering compliance with the Court's orders or
22  moving yourselves forward.  And I don't know what was the
23  misperception but I don't -- I would not like to see it again.
24          So is there something that was of particular concern
25  that defense counsel know that Mr. Harvey or whoever else had
```

1  indicated that to him was referring to?

2          MR. TYSON:  And, your Honor, this is Bryan Tyson.

3          I believe those -- that statement was in some notes that

4  were not really identified in Ms. Mark's exhibit, and we are not

5  exactly aware what was going on with that particular

6  representation.  We can work on that and see, but I'm not really

7  sure where -- I see on the 6996 where that statement appears, but

8  I'm not aware of the specifics of what was actually communicated

9  on that call.

10          THE COURT:  And from the notes of that same -- one of

11  the same calls, this was October 30th, was the question provided:

12  Can we keep equipment?  And, yes, but you'll have to destroy them

13  and pay for that on your own.  We are willing to take the

14  equipment and destroy it for free, which I assume is practice --

15  what the state would plan to potentially do if -- once this is

16  worked out.  Is that right?

17          MR. TYSON:  Your Honor --

18          THE COURT:  I know you can't vouch for the notes, but

19  I'm just trying to understand, is that in fact the plan?

20          MR. TYSON:  Yes, your Honor.  This is Bryan Tyson again.

21          I mean, the plan is we are never going to use these

22  machines again.  They have a recyclable value and the state has an

23  existing vendor that handles these types of electronic disposal

24  issues and decommissioning issues for the state.  And so the end

25  game for the state, if we're authorized to do so, is to have that

```
1   vendor impose their normal processes for electronics disposal and,
2   you know, recovering anything of value from them in that process,
3   that's our preferred approach.
4            THE COURT:  So let me ask the plaintiffs this about the
5   sample.  I know Mr. Woods would like to have them -- the most
6   perfect statistical sample possible.  I don't know whether that's
7   all so simple.  I can see that the election return reports that
8   are used and they were in the record before for Fulton County with
9   respect to the 2018 and 2017 off-year election, and I presume that
10  they're used on every election, is that your understanding or is
11  that -- I mean, these were used not just for Fulton County but
12  there was one for Charlton and -- is that your understanding?
13           MS. KAISER:  Your Honor, Mary Kaiser for the Curling
14  plaintiffs.
15           Yes, that is our understanding, that these sheets --
16           THE COURT:  And is your issue that you don't have them
17  for any time past the Governor's race on November 8 of 2018, that
18  that's the last ones that you have?
19           MS. KAISER:  No, your Honor.  Those are the last ones
20  that we have only for DeKalb and Cobb Counties, we have never been
21  provided the recap sheets for the remaining counties.
22           THE COURT:  How come I have one for Charlton then?  That
23  wasn't in DeKalb.
24           MS. KAISER:  I believe that was an attachment to the
25  defendant's filing, your Honor.
```

```
 1              THE COURT:  I see.  So is that information that you're
 2   looking for, those returns?
 3              MS. KAISER:  Yes, your Honor.
 4              THE COURT:  All right.
 5              MR. McGUIRE:  Your Honor.
 6              THE COURT:  Yes.
 7              MR. McGUIRE:  Pardon me, your Honor, this is Robert
 8   McGuire for the Coalition side.
 9              Our information needs are similar but not exactly the
10   same as the Curling plaintiffs.  So we're -- we're looking for a
11   different subset of machines and information about machines in
12   order to be able to determine which ones we need to see.  We're
13   not looking to build a representative sample as they are, we are
14   looking to identify machines that we want based on anomalies that
15   occurred in polling places.
16              So we need the same information as the Curling
17   plaintiffs and a little bit of unique information as well which
18   the defendants have all been aware of for like a year and a half
19   in order to identify the machines we want.  But I just wanted
20   to -- sometimes our differing approaches to this discovery gets
21   sort of mixed together, and I just want to be clear we're actually
22   seeking a slightly different methodology, seeking to use a
23   slightly different methodology that requires slightly different
24   information.
25              THE COURT:  All right.  Well, who is speaking about this
```

1   for the state?

2          MR. TYSON:  Your Honor, this is Bryan Tyson.  I'll take

3   the initial cut at this and maybe help with some of the context.

4          First of all, I think it might be helpful just in case

5   it was not clear, the state has not destroyed any machines that

6   had been used in elections.  We are holding all of those in a

7   warehouse that is secure, it is where they -- under security

8   measures, all that kind of thing.

9          The machines are -- as far as the storage, I know

10  Mr. McGuire referenced finding particular machines, they are being

11  stored by county as I understand it but they are not being stored

12  necessarily in serial number order or something along that line.

13  They're in a -- kind of a container setup by county, so we know

14  where county units are but not necessarily what particular serial

15  numbers are in a particular county, so I wanted to get that piece

16  of context.

17         For the information that's been requested by the Curling

18  plaintiffs about the statistical sample, as you indicated we

19  attached the recap sheets.  The way those are stored, they're

20  provided to the state at the conclusion of each election as part

21  of a packet of information from each county that is then placed in

22  a file folder for each county for each election.

23         So, for example, the November 2018 election there will

24  be 159 file folders that will contain a variety of sheets related

25  to the election, including the DRE recap sheet and the daily logs

1  for the early voting machines.  As you can imagine with the size

2  of counties, those file folders go from a half inch or so thick up

3  to more than a foot thick worth of paper that is included

4  depending on the size of the county.  And each precinct will have

5  a DRE recap sheet.  And we know there's over 3,000 precincts in

6  the state.  And then each DRE unit used for early voting will have

7  its own daily action recap sheet.

8          So in terms of what would be necessary to assemble the

9  information, we would have to have Secretary of State staff go

10  through each folder for each election and pull out the DRE recap

11  sheets and the daily access sheet, assemble those, scan them.

12  We're talking probably 4- to 5,000 pieces of paper per election.

13          And if we're talking about that for a statewide

14  election -- I went and pulled the list -- since 2016, which is the

15  request to get the information, there have been eight statewide

16  elections.  So for the 159 counties, we're talking about 1,272

17  files -- file folders they would have to physically go through.

18  In addition we have had over that time 24 non-statewide elections

19  and an unknown number of county and municipal elections on top of

20  that.

21          In terms of where those files are located, the 2018 and

22  2019 files are in the Secretary's office, they were being prepared

23  to be shipped to the Georgia archives.  Anything prior to 2018 the

24  state is going to have to go get that from the archives, have them

25  delivered to the state and then have people go through that.

1          All in all, I guess what we're talking about I guess is

2  40- or 50,000 pieces of paper that would then have to be entered

3  into some kind of database in order to determine what the last

4  election each DRE by serial number was used.  So that's kind of

5  from a context perspective where we are.

6          If we're just doing November 2018, that is not as heavy

7  of a list, we still have the pull staff to do that.  But if we're

8  going to be pulling each statewide election or every election

9  going back to 2016, that's an incredibly burdensome process.

10          MS. KAISER:  Your Honor, this is Mary Kaiser for the

11  Curling plaintiffs.

12          First of all, we're willing to forego information about

13  the non-statewide elections and only focus on the eight statewide

14  elections since November of 2016.

15          Secondly, you know, our expert, Dr. Halderman, believes

16  that this information may exist within the GEMS database.

17  Unfortunately he's out of the country and is not able to look in

18  the GEMS database himself to see.  But we know that the GEMS

19  database has a sealed machine ID, and if that is the same thing as

20  the machine serial code, this information may exist electronically

21  in the GEMS database.  And we would at least like to hear from the

22  state defendants whether they have gone and looked to see if that

23  information exists electronically.

24          MR. McGUIRE:  Your Honor, adding to that -- Robert

25  McGuire -- we actually agree that this information, at least the

1   information that we need that is on recap sheets, is available in

2   the GEMS databases and we communicated that to the defendants as

3   early as -- as recently as May of 2018, we gave them detailed

4   instructions how to extract the information they need from the

5   GEMS databases.

6          Now the Court gave us some GEMS databases from the three

7   prior elections back in November -- the November '18.  We

8   basically just need CDs from the GEMS databases updated and we can

9   generate all this information for ourselves, or the state can

10  produce it consistent with the instructions we've already provided

11  to them for over a year and a half.  We just haven't encountered

12  cooperation.  We want to be able to move forward, but the state is

13  not giving us what we need to do it.

14         THE COURT:  Just clarify for me what you're saying that

15  you need from them in order -- from the GEMS database for you to

16  be able to identify this.

17         MR. McGUIRE:  So from the Coalition plaintiff's

18  perspective, our discovery is going to be focused on anomalies

19  that are known to have occurred in various precincts.  For

20  example --

21         THE COURT:  I understand that.  I understand what your

22  approach is.  Don't go over that again.  Just tell me what you

23  need in terms of when you're saying that you -- that you believe

24  that it's -- for whatever reason believe that also that they

25  can -- it can be extracted from the state GEMS database, the

1  question of what machines were used and their ID.

2           MR. McGUIRE:  The information we need is to know what

3  DREs were used in which elections in which polling places and that

4  information is in the databases.

5           THE COURT:  And that one you think is in the DRE, in the

6  GEMS database, is that what you just said?

7           MR. McGUIRE:  Yes, your Honor.

8           THE COURT:  And you have -- you all have reviewed that

9  so you have a relatively high degree of confidence in that

10 statement?

11          MR. McGUIRE:  We do.  I mean, we sent them instructions

12 for running the report that we believe we need back in 2018.

13          THE COURT:  And then if I take the -- one wrinkle is

14 that you wanted to look at the machines and the Curling plaintiffs

15 maintain that basically you might not be able to see if it

16 wasn't -- if the machine has been used since 2018, then you might

17 not be able to see the data that you're interested in that you

18 think is the anomaly from 2018 unless that machine has never been

19 used again.  So then you're looking -- at least for Mr. Woods, and

20 I know he's not your expert, he's looking to do a sample of both

21 those that have been used again and those which have not been used

22 again.

23          What is the -- I'm not clear what the approach of your

24 clients would be.

25          MR. McGUIRE:  Well, I think we are -- our goal is to

1   identify the machines that were used in the areas where there were

2   anomalies.  And then once we have that list of machines, to look

3   at those machines in particular.  And obviously a forensic analyst

4   who would conduct that evaluation would determine whether there's

5   recoverable information on it.  We wouldn't want to prejudge that,

6   but our initial screen, which would reduce their preservation

7   burden, is simply to identify the very small subset of machines we

8   actually want to look at.  And then without prejudging whether the

9   information on there has been destroyed or is recoverable, we

10  would then want to look at those particular machines.

11          But given that the state's goal is to reduce their

12  preservation burden, our initial pass at it is to select a small

13  subset, but we want to look at -- in our view that frees them up

14  from their burden with respect to the remainder of the universe.

15          THE COURT:  Mr. Tyson, is there any reason why the state

16  has not been willing to, or maybe I'm assuming that it hasn't been

17  and you are willing to, provide the runs on the state DRE -- for

18  the -- in the state GEMS system for the -- looking for the

19  information that's been outlined by Mr. McGuire and to some extent

20  also counsel for plaintiffs?

21          MR. TYSON:  Your Honor, this is Bryan Tyson.

22          Again, I don't think we have an objection.  Our concern

23  is -- again, I know we put a pin in the jurisdictional question,

24  but this is a lot of work for something that's moot, number one.

25          But in terms of the GEMS databases, I apologize, I have

```
 1  not heard from the plaintiff at all that this was a possible route
 2  for obtaining the information that they wanted.  And if they want
 3  to go about that route, I don't think we have any problem using
 4  that approach if that's something that they can do.  I have not
 5  previously seen instructions about how to extract information, nor
 6  have they identified it in the e-mail correspondence back and
 7  forth that I have seen, but I don't think we would have a problem
 8  approaching that if the Court finds this is still a live issue as
 9  to the DREs.
10      MS. KAISER:  Your Honor, this is Ms. Kaiser for the
11  Curling plaintiffs.
12      You know, we would just like to point out the defendants
13  know exactly what information that we're looking for and have
14  known for a long time.
15      THE COURT:  All right.  I know that it's predictable, I
16  know that you say that.  I'm not saying that you don't.  I'm just
17  trying -- you all asked for me to resolve this but -- and I
18  appreciate that there is a breakdown in communication and that's
19  why we're here today.  And it's not useful for me to at this point
20  point fingers.  It's not productive for any of the parties.
21      But I want to just make sure the record is really clear
22  what you're asking for because, Ms. Kaiser, you indicated that
23  you're not 100 percent sure that it will, in fact, work, this will
24  work, and you haven't been able to get in touch with
25  Dr. Halderman.
```

1          On the other hand, Mr. McGuire seems to indicate

2    that they're confident enough that they're willing to go that

3    route.  Is that a fair description?

4          MS. KAISER:  Yes, your Honor.  And just to be perfectly

5    clear, the information that we're seeking is the same as the

6    Coalition plaintiffs in terms of we just need the last election in

7    which the DRE machine was used and the precinct in which the

8    machine was used.  So we also believe this information exists in

9    the GEMS database, and it sounds like the Coalition plaintiffs

10   have even more confidence than we do, so we are willing to go that

11   route and think that's a workable solution.

12         MR. TYSON:  Your Honor, this is Bryan Tyson.

13         Again, just one question I think we have is what are we

14   talking about in terms of a timeline here?  Because as

15   Mr. Sterling's declaration made clear, part of our delivery

16   challenges relate to the capture and storage and we've now gotten

17   our first bill for storage of the DREs and it's going to be a

18   continuing cost.  Are we talking a week to get this information?

19   I guess that's one thing I'm unclear about, is how long it will

20   take to get the information that the plaintiffs need.

21         THE COURT:  Well, you know, in the original filing the

22   state provided about the storage of these things, it wasn't a

23   limited time issue and it was just a money and you knew it was

24   going to be storage, that's fine.  But I thought that what they

25   were saying is you would run it from the state system rather than

1  from any individual machines.  Is that the understanding
2  Mr. McGuire and Ms. Kaiser have?

3          MR. McGUIRE:  Your Honor, this is Robert McGuire.

4          We're talking about running, of course, on the GEMS
5  database, that could either happen on a state system or they could
6  provide us through the GEMS database under the protective order if
7  they want to and we could run it ourselves and generate those
8  numbers.  But the information is in the databases so, you know,
9  who runs it isn't of particular concern to us.  We're happy to do
10 it ourselves if that spares them any burden.

11         THE COURT:  Well, it doesn't seem like it would be that
12 complicated, but I have no idea.  I mean, Mr. Tyson, that -- and
13 the question of how long it's going to take your folks to do and
14 whether you want them -- that's a segregateable duty that can be
15 handled in a few days.  I mean, it is still a run and I think that
16 I will take Ms. Kaiser's word that they -- or, I guess, one or the
17 other of them who said that they had provided instructions about
18 how they would suggest it be done or you can have them run it.

19         MR. TYSON:  I mean, your Honor, I think from our
20 perspective they've had the 2018 databases for months now.  I
21 mean, we're fine with them running it, we can get everything to
22 them, I guess.  But I don't -- I guess I'm still at a little bit
23 of a loss to understand what exactly the sequence is that somebody
24 runs the report of what election by serial number or machine ID
25 was used, that goes to the plaintiffs, and then they develop a

1   sample, how long are we talking with that?

2           THE COURT:  First of all, before we get to the sample,

3   let me -- it sounds like, though, that it's 2018 and what other

4   years are the plaintiffs seeking, because the GEMS database may

5   not be -- have the information for all the 2019 elections that are

6   off-year elections?

7           MR. McGUIRE:  Your Honor, this is Robert McGuire.

8           We want some of the earlier databases, too, so -- some

9   machines were not used in later elections that were used in prior

10  elections, and those may well be machines on which there were

11  anomalies, that might be why they weren't reused, so they would

12  actually be useful sources of discovery.

13          THE COURT:  For what years are we talking about?

14          MR. McGUIRE:  Well, the hacking that has been

15  identified occurred in -- was identified in 2016, so I think from

16  2016 on would be ideal.  And since these are just CDs that we can

17  load and run the reports for the various years, it would be pretty

18  ministerial to do it from any number of databases.

19          THE COURT:  Well, so, if you already have the 2018

20  database and I -- what you're looking for, then, is the 2016 and

21  2017 databases on CD, is that what you're saying?

22          MR. McGUIRE:  Well, yes, your Honor.  2016, '17 and '19

23  would be great.

24          MR. TYSON:  Your Honor, this is Bryan Tyson.

25          And I determined there were nine elections in 2019,

1 │ there were six -- seven -- or six elections in 2017.  Which

2 │ elections from 2017, 2019 and 2016 is the Coalition asking for?

3 │         MR. McGUIRE:  Your Honor, I can identify -- we can

4 │ circle back to the state defendants and identify a smaller amount

5 │ of elections, we could pick four that we have, you know,

6 │ independent reports of anomalies and just request those.  I'm

7 │ happy to work with them off-line on this.  We don't need to take

8 │ the Court's time for it if in principle they agree to provide us

9 │ what we need.  I mean, we could tell them a smaller subset and

10 │ just do it by e-mail after the call.

11 │         MR. TYSON:  Your Honor, this is Bryan Tyson.

12 │         My only hesitation with that is that, as we've seen,

13 │ trying to do e-mail after a conversation tends to not work very

14 │ well because things tend to change.  So from our perspective we

15 │ would like to go ahead and nail that down while we're all here,

16 │ which elections do you want, is it just statewide, is it a

17 │ particular one?  Can we identify those while we're here and get

18 │ that clear.

19 │         THE COURT:  Is plaintiffs' counsel prepared to do that?

20 │         MR. McGUIRE:  Here on the call?  I would have to go

21 │ back -- it's not in the set of notes that I have ready for this

22 │ discussion, so I would have to go back and confer with Coalition

23 │ about the exact elections that we're interested in.  I assume the

24 │ Lieutenant Governor's race would be one we would be very

25 │ interested in.

```
 1            THE COURT:  I don't want to do it on a piece meal basis
 2   at this moment.
 3            Ms. Kaiser, are you prepared to address that?
 4            MS. KAISER:  Your Honor, we're willing to just take the
 5   statewide elections for those years, 2016, 2017 and 2019.
 6            THE COURT:  Okay.
 7            MR. TYSON:  And, your Honor, this is Bryan Tyson.
 8            There were no statewide elections in 2019 and 2017.  So
 9   the 2016 statewide elections are four elections.  The -- I
10   guess -- again, I want to understand what we're looking for.
11            MS. KAISER:  We would like the GEMS database for 2016
12   that has the data from the four statewide elections for 2016 for
13   all counties in Georgia.
14            THE COURT:  Well, I'll tell you what I'm going to do, I
15   agree with Mr. Tyson that I don't really want to keep on doing
16   this forever but we're going to move on, we're going to end up
17   taking a break towards the end so you can do whatever calls y'all
18   need and talking amongst yourselves and then we're going to nail
19   this down.
20            MR. TYSON:  Thank you, your Honor.  This is Bryan Tyson.
21            And, again, I want to make sure that everyone is clear
22   that once we do the analysis of the -- where the plaintiffs
23   conduct the analysis of the GEMS databases and determine the
24   machines, that then we're talking a whole different process to
25   actually go and locate those machines within the containers.  In
```

1    some of the units -- you say I want these hundred serial numbers

2    in Fulton County, well, there are 3,000 DREs from Fulton County

3    sitting there not in a serial number order.  So we're still in a

4    situation of trying to get the physical machines, but I want to

5    make sure we're clear the sequence of what's happening here in

6    terms of what the plaintiffs are seeking.

7             THE COURT:  What sort of -- I had heard before what the

8    plaintiffs have indicated that it would be several hundred but not

9    more than several hundred.  Has that estimate changed?  You can

10   address that later as well, but I want you to be prepared to

11   address that.

12            And I'm still kind of confused for the Curling

13   plaintiffs, Ms. Kaiser, is that the affidavit of Mr. Woods made it

14   very clear that he -- that he wanted to have -- make sure that he

15   had some DREs that hadn't been used again.  So if you get a 2016

16   DRE and it's been used in 2018, he seemed to be worried about it

17   being -- and Dr. Halderman seemed to be worried about it being --

18   basically the memory being wiped as to the preceding --

19   overridden.  So I just -- I can't resolve that right this second,

20   but if we're going to take a 15- or 20-minute break at the

21   conclusion here, you have to keep -- and we're going down this

22   line of approach, then I think you need to be prepared to address

23   that even if you need to take a five-minute break now so that

24   somebody will go call and begin to -- in your team to talk to

25   whoever they need to talk to.

```
 1              MS. KAISER:  Your Honor, this is Ms. Kaiser.  Thank you.

 2              Our understanding is that our information that we're

 3      seeking from the plaintiffs, we can identify machines that were

 4      used in 2016 and were not then reused in later elections, and so

 5      they would still have -- they would not have been overwritten,

 6      they would have the data from the --

 7              THE COURT:  All right.  So you think that when you have

 8      all -- the information from all four -- three or four times, that

 9      you're going to be able to do that, you can compare it?

10              MS. KAISER:  Yes, your Honor.

11              MR. TYSON:  Your Honor, this is Bryan Tyson.

12              One other component of this is there still are machines

13      subject to the litigation hold in this case that have not been

14      used that are being held by DeKalb and Fulton and I believe Cobb

15      that have not been used.  And so if there's a subset we're looking

16      for that has not been used, those are already -- they're still

17      segregated, we still know exactly where they are, those are still

18      easily identifiable.

19              THE COURT:  Great.

20              MR. McGUIRE:  Your Honor.

21              THE COURT:  Yes.  Who is talking?

22              MR. McGUIRE:  This is Robert McGuire for Coalition

23      plaintiffs.  If the purpose of, you know, taking a break is to

24      accommodate us, I actually can give you the four elections that we

25      would be interested in now, if you're ready, if you want me to.
```

1          THE COURT:  I want to make sure that Ms. Kaiser's ready

2    to be talking about this.

3          MR. McGUIRE:  Okay.  We can wait for her.

4          THE COURT:  Ms. Kaiser, are you going to be ready to

5    talk about this or -- we can finish this subject off, I'm great

6    with that if you're both ready?

7          MS. KAISER:  We're ready, your Honor.

8          THE COURT:  All right.  That's wonderful.

9          So, Mr. McGuire, go for it.

10          MR. McGUIRE:  Sure.  Thank you.

11          So the four elections we would be interested in getting

12    this information for from the GEMS database are November of 2016,

13    both of the CD Sixth elections in 2017 and the 2018 primary.  And

14    we already have the November 2018 databases from the earlier

15    discovery period in November 2018.

16          MS. KAISER:  Your Honor, this is Ms. Kaiser for the

17    Curling plaintiffs.

18          As I said, we would like the data for the four statewide

19    elections in 2016.  And we believe there was actually a statewide

20    election in 2017, the special election for the Ossoff/Handel race

21    in 2017, so we would like to include that statewide election from

22    2017 as well.

23          MR. TYSON:  Your Honor, I believe the Congressional

24    District Sixth race with Ossoff was just a congressional district

25    in 2017, but those are included in Mr. McGuire's.

1          So I have the November 2016 General Election, the two

2   Congressional District Sixth elections in 2017, the 2018 General

3   Primary Election, and then the primary and runoff statewide in

4   2016 and the Presidential Preference Primary in 2016.

5          THE COURT:  Has Mr. Tyson summarized correctly the

6   requests in total?

7          MR. McGUIRE:  From our perspective, your Honor, yes.

8   From the Coalition's perspective, yes.

9          THE COURT:  That's Mr. McGuire speaking?

10          MR. McGUIRE:  Yes.  I'm sorry, your Honor, yes.

11          THE COURT:  What about from your perspective,

12   Ms. Kaiser?

13          MS. KAISER:  Your Honor, I just want to make sure we do

14   want to include that Ossoff election from 2017, even if it was not

15   statewide.  I'm sorry, I missed whether Mr. Tyson included that in

16   his summary.

17          MR. TYSON:  Your Honor, this is Bryan Tyson.

18          Yes, the Offsoff/Handel race was Congressional District

19   Sixth elections held in 2017, and those are on the list that

20   Mr. McGuire had provided.

21          MS. KAISER:  This is Ms. Kaiser, your Honor.

22          Then that list represents what we would like as well.

23   Thank you.

24          THE COURT:  And, Mr. McGuire and Ms. Kaiser, do you have

25   the list of all the machines that are being held for Fulton,

1  DeKalb and Cobb that are already being -- have been held back?

2          MR. McGUIRE:  We may -- this is Robert McGuire.

3          I believe we do, and I will go back and double-check

4  that.  Obviously those machines will also show up in the databases

5  if they've been used, so we'll be able to quickly -- once we're

6  able to identify the machines we want, we'll cross-reference it

7  against that holdback list.

8          THE COURT:  Ms. Kaiser, do you know that, whether you

9  have the list?

10         MS. KAISER:  Your Honor, I don't know off the top of my

11 head.  We can look as soon as we get off the call.

12         THE COURT:  Well, I would just point out to you this:

13 If you want to use machines that haven't been used after, I don't

14 know, the 2017 Ossoff election, I believe they ended up being held

15 back, it would be preferable, to the extent they're from those

16 counties, I think they're likely separately segregated, maybe

17 they're not, and it would be easier to find, if finding the

18 machines is an issue.

19         Mr. Tyson, do you know whether they're separately being

20 stored or am I just assuming that?

21         MR. TYSON:  I'm sorry, your Honor, this is Bryan Tyson.

22         Yes, those -- currently the machines that were

23 segregated are still at the county locations.  The counties have

24 been asking us to come get them on the state side, and we have

25 said we're not doing anything with them yet until we get further

1   directions.  So those are already segregated and are being stored

2   in the counties.

3          THE COURT:  Okay.  So to -- at the point you're through

4   with this I think that -- I say this to the plaintiffs.  To the

5   extent you have not identified machines that obviously will be

6   helpful to the state to know and to -- so they can proceed.

7          How long is Dr. Halderman, if he's going to be doing

8   some of the work, going to be out of the country and not available

9   to you, plaintiffs?

10         MR. CROSS:  This is David Cross.  Dr. Halderman is back

11  on the 27th.  He's reachable by phone, but he doesn't have access

12  to the databases.

13         THE COURT:  I understand that, but I'm just thinking

14  about their desire to not be paying for the storage and to move

15  forward with this task.

16         And he basically -- if he's not going to be back until

17  the 27th, he's not going to be coming back and starting the

18  evening of the 27th to start working, doing data analysis, and he

19  already indicated in his affidavit that he hadn't gotten a chance

20  to look at various things because of other obligations.

21         Well, I think you need to talk with him and -- as well

22  as whoever else the Coalition is talking with so you are able

23  once -- to determine how long once you get this additional

24  information it is before you're able to give the sample so that we

25  can get a timeline here because they can't -- if it's going to

1  take two days to run it, that's fine.  If it's going to take ten

2  days, that's more into the storage business.  They obviously don't

3  want to be running around looking for machines at the worse of

4  times in March.

5          MR. CROSS:  Your Honor, this is David Cross.

6          One thing that occurs to me that we may be able to at

7  least try to try to move this forward is we did have the GEMS

8  database set up here in our office.  We took that down and locked

9  it up.  I can see if we can set that back up under the conditions

10 we had before.  Candidly, I don't think those conditions are

11 necessary, but we won't get into that at this point.

12         But Dr. Woods is located here in -- Nathan's here, yeah.

13 Our statistical expert is here, so let me see if we can set up

14 what we have in our office and bring Dr. Woods to our office, and

15 he may be able to look at the databases himself without

16 Dr. Halderman's help to figure that out, at least to get it going

17 while Dr. Halderman's away, so we'll try that.

18         MR. McGUIRE:  Your Honor, this is Robert McGuire.

19         We would respectfully request that those onerous

20 conditions not be imposed on the databases at this time.  They

21 were unnecessary before and they will make it very difficult for

22 us in a cost effective way to accomplish what we need to

23 accomplish.

24         We can certainly honor a protective order and the

25 confidentiality requirements of it, but the exceptional -- the

1    exceptional protection that was put in place previously proved to

2    be completely unnecessary.  And, you know, it would just impose

3    needless cost on my clients if we had to replicate those again,

4    travel to DC to do this in a secure room.  You know, we have a lot

5    of confidential information that they have designated confidential

6    and we have handled that without any problem whatsoever to date.

7    We think that the protective order should be sufficient to govern

8    these CDs.  And our people need to be able to work with them in

9    Atlanta.  So that would be our requests.

10          THE COURT:  Are you saying that you -- you keep them

11   confined to the offices of the lawyers, though?

12          MR. McGUIRE:  Of course, your Honor.  Yes, we would do

13   that.

14          MR. CROSS:  We would do the same, your Honor.  This is

15   David Cross.

16          THE COURT:  Mr. Tyson, do you have any objection?

17          MR. TYSON:  Your Honor, this is Bryan Tyson.  I think

18   part of our concern here is we're kind of getting into the

19   discovery as opposed to preservation.  I thought we were having a

20   conversations about what machines need to be preserved, not doing

21   an analysis of various other things.

22          THE COURT:  Well, I think they're still saying if they

23   have to run the data and compare.  I don't know that we're dealing

24   with discovery, but I can get that clarified.  But I think they

25   were saying that it would be -- Mr. McGuire is saying they have

 1   law offices in Atlanta that they could run this data to from their

 2   perspective.  And if they have to go to Washington, go up there to

 3   Mr. Cross's office, take turns, do it from -- and it's much more

 4   expensive and less efficient.

 5          MR. TYSON:  And, your Honor, this is Bryan Tyson again.

 6          I think if we could have some clarity about who is going

 7   to be doing this.  I think we're agnostic as to the location where

 8   it takes place.  If it's in a lawyer's office and subject to a

 9   protective order, that's fine.  But we would like to have some

10   clarity just in terms of who are the experts that are going to be

11   doing this analysis.

12          We know it's Dr. Woods for the Curling plaintiffs.  If

13   the Coalition plaintiffs can identify who is going to be doing

14   that, I think that will give us some comfort as well.

15          THE COURT:  Mr. McGuire, do you know that?  Are you able

16   to respond to that?

17          MR. McGUIRE:  I mean, I can tell you that this is a

18   fairly ministerial task, we can have lawyers do it.  We're in a

19   position where people are concerned about legal fees and things

20   like that, but we can have lawyers who are -- who are on the case

21   do it.  Ideally we would have people who sign the confidentiality

22   doing it, whether it's paralegals or assistants doing it.  But,

23   you know, if they want it to be done by senior personnel --

24          THE COURT:  I don't think they're saying that it has to

25   be senior personnel but it has to be under the supervision of

```
 1   senior personnel.  And I don't know whether you have -- I mean,
 2   that's -- obviously the level of efficiency in managing the
 3   database is going to be somebody who is skilled in that, but you
 4   haven't identified that person.
 5           So I heard them saying, okay, that's fine, but you need
 6   to do -- who is going to be responsible for ensuring security and
 7   who are the -- who are the designated people with the skills and
 8   also the -- and understanding their confidentiality obligations
 9   who are going to be working on it?
10           MR. McGUIRE:  Your Honor, Robert McGuire here.  My
11   understanding is that Mr. Ichter's office on our side has
12   facilities that could house this and that he would be able to be
13   the attorney on the ground there supervising any work on the
14   databases.
15           THE COURT:  All right.  Well, that sounds like that's
16   fine, but you need to go ahead and identify who is going to be
17   heading up the actual hands-on data work, okay?
18           MR. McGUIRE:  Yes, your Honor.
19           THE COURT:  And the expert or quasi expert who is going
20   to be doing it.  I mean, I've worked with a lot of data and I've
21   worked with people who are graduate students and I've worked with
22   people over the course of my career and people who are -- who are
23   just tech geeks who would know how to do that, but I think you at
24   least -- we have to know who they are and who is going to be
25   supervising them.
```

1           MR. McGUIRE:  Your Honor, this is Robert McGuire.

2           I can definitely provide that information.  Do you want

3    me to do it on the course of this call or is it something that I

4    just simply need to share with the opposing counsel when we decide

5    who that is?

6           I will just say, these are reports that are typically

7    run by non-expert personnel in clerk's offices.  So it's not --

8    it's not a particularly --

9           THE COURT:  All right.  Let me just be pointblank.  You

10   cannot just have the person who you think is spectacular who is

11   running the PR for the Coalition running it.  That's not going to

12   happen.  That's what their concern is.  So you have to have

13   somebody who is at least a step removed from that.

14          MR. McGUIRE:  Your Honor, this is Robert McGuire.

15          I understand.  We will identify someone who can do that.

16   It will be someone who is an expert or quasi expert, as you said.

17   I --

18          THE COURT:  I don't mean that they would be expert in

19   this court -- as an expert in this court, but you've got to have

20   somebody who is -- I think I've made clear, who is capable and

21   going to provide -- do this in a way that's efficient and

22   responsive to Mr. Ichter and is not -- also going to keep the

23   confidentiality obligations.  I don't know who that is.  You can

24   basically summarize who the person is, or persons are, all right?

25          MR. McGUIRE:  Yes, your Honor.

1          THE COURT:  Okay.  Then just in terms of the calendar

2    here, Mr. Tyson's going -- how long do you think it's going to

3    take to get the CDs?

4          MR. TYSON:  Your Honor, this is Bryan Tyson.

5          We checked during the interim here and that is at the

6    archives, so we're going to have to contact the Georgia Archives,

7    but we hope it will not be a very long process.  Obviously Monday

8    is a state holiday but we'll move as expeditiously as we can.

9          THE COURT:  All right.  Well, I'm going to presume

10   you're going to be able to do this by the end of next week, is

11   that fair?

12         MR. TYSON:  Yes, your Honor.  Bryan Tyson.  That is

13   reasonable and I think that's accomplishable for us as a goal.

14         THE COURT:  And they'll get it by Friday, whatever time

15   on Friday, Friday afternoon.  And if they have to come pick it up,

16   somebody will pick it up, or obviously if you have to Fed Ex it to

17   Mr. Cross's office, you will send it off on Friday, no later than

18   Friday.

19         MR. TYSON:  Yes, your Honor.

20         THE COURT:  And then I don't know -- I think that the --

21   how long it's going to take for the plaintiffs to review it.  Is

22   it going to take you all about a week, is that --

23         MR. McGUIRE:  Your Honor, this is Robert McGuire.

24         A week ought to be sufficient for us on the Coalition

25   side.

1          MS. KAISER:  Your Honor, this is Ms. Kaiser for Curling

2    plaintiffs.

3          We'll confirm with Dr. Woods, but we will ask if a week

4    is sufficient as well.

5          THE COURT:  Well, somebody in your group needs to call

6    Mr. Woods, Dr. Woods right now, all right, or try to send him a

7    text or something else, because I don't want to have this coming

8    back again.  I am sick of it, you are sick of it.

9          MS. KAISER:  Understood, your Honor.  We'll reach out

10   right now.

11         MR. TYSON:  Your Honor, this is Bryan Tyson.

12         I just want to be clear that the analysis that's being

13   conducted for these databases is for the purposes of them

14   identifying the machines and the sample, not for kind of general

15   discovery, mining through GEMS databases and those kinds of things

16   as well.

17         THE COURT:  That is the purpose.

18         MR. TYSON:  Thank you.

19         THE COURT:  Is there anything else in connection -- so

20   they have through Friday and then if Mr. Cross doesn't get it

21   until Monday, or Saturday, then the state would get it the

22   following -- an identification the following Monday.

23         MR. McGUIRE:  Yes, your Honor.  This is Robert McGuire.

24         That will work for the Coalition plaintiffs, your Honor.

25   A week from when we receive the CDs we can get back to the state

1   with a list of the machines that we believe require further

2   discovery, and the rest we will be able to release, as far as the

3   DRE machines go.

4          And we do still believe the state is going to be

5   preserving the memory cards that came out of all the various

6   machines since those are essentially costless to preserve.  And

7   they haven't discussed these specifically, but that should get us

8   going on this DRE discovery and should allow for us to free them

9   up from our request of preservation of things that we don't need.

10          THE COURT:  I think the memory cards, I assume they

11   don't take that much space, so they should be preserved.  And we

12   can revisit after this any other larger items that need to be

13   preserved or not, but let's just get through this.

14          So by the 24th you're going to get the CDs, that's the

15   24th of January.  And by Monday the 3rd you're going to -- the

16   plaintiffs will provide an identification of which machines they

17   would need.  And right now someone from the Curling plaintiffs is

18   trying to reach Dr. Woods to confirm the doability of that.

19          MS. KAISER:  Your Honor, this is Ms. Kaiser.

20          We were able to reach Dr. Woods and his team and we can

21   commit to that timeline as well.

22          THE COURT:  All right.  Excellent.

23          All right.  So let me ask a question about the pending

24   rule regarding usage of the fallback of a -- basically a paper

25   ballot that is scanned.  I think the state provided that or one

1 party or another provided that.  When was that initially basically

2 presented as a proposed rule to the Board of Elections, State

3 Board of Elections that is?

4          MR. RUSSO:  Your Honor, this is Vincent Russo.

5          I believe it was originally presented to the State Board

6 on the 17th of December.  It was posted on the 20th, and that

7 triggered the comment period, which I believe closes on the 22nd

8 of January, which is when the State Election Board will meet to

9 consider approving the proposed rules.

10          THE COURT:  And have there been any -- do you know

11 whether there have been any volume of comments about the proposed

12 rule, this particular one?

13          MR. RUSSO:  Your Honor, I've not -- I do not know the

14 answer to that question.  I mean, we can check.  I do know there

15 have been comments provided, but these proposed rules touch on a

16 number of areas.  So with regard to the emergency paper ballots

17 specifically, I'm not sure.  I believe the plaintiffs, though,

18 might have referenced some comments that they submitted in their

19 response.

20          THE COURT:  Mr. Russo, does the state regard this as

21 their sort of -- their fallback -- your fallback arrangement in

22 the event particular -- whether statewide or on a particular

23 precinct or a particular county that this is -- that there's a

24 significant problem with the BMDs?

25          MR. RUSSO:  Yes, your Honor, the state does view this as

1  the fallback if there's an emergency situation that makes

2  utilizing the electronic ballot markers impracticable or not

3  possible.

4          THE COURT:  You have enough scanners at this point that

5  are actually on place or you can buy if you see that you're

6  getting squeezed?

7          MR. RUSSO:  I'm sorry, your Honor, you --

8          THE COURT:  Are there -- I don't know what the volume of

9  the scanner buy is.  Do you have enough scanners so that if, in

10 fact, let's say half of DeKalb is not functioning in some way,

11 that there are scanners --

12         MR. RUSSO:  Yes.

13         THE COURT:  -- that will accommodate this?

14         MR. RUSSO:  Yes, your Honor.  The optical scanners, the

15 Dominion optical scanners read both the bar code ballots and the

16 hand-marked paper ballots with the same programming.  So those

17 scanners would be used in an emergency backup situation, the same

18 as if there was not an emergency situation, and the state has

19 enough.

20         THE COURT:  And have -- I know this is not what you

21 really want to be doing but do you have -- do you have -- is there

22 enough paper and containers and devices or will there be any

23 training provided as to precinct-level people as well as the

24 personnel from each county running as to these options and things

25 they have to plan for in the event of the failure of the machines?

1          MR. RUSSO:  Your Honor.  Yes, your Honor.

2          The state -- there is a mobile ballot printer that the

3     counties are then able to use at the polling places to print

4     additional emergency paper ballots.  So there should -- we don't

5     anticipate any issues with not having -- not being able to produce

6     enough backup ballots in the event that they are needed.

7          In terms of the scanners, if there was an emergency

8     situation and they needed to be counted at a central location,

9     that's also a possibility.

10         THE COURT:  So let me ask plaintiffs' counsel, I mean,

11    you may not think the plan is sufficient in some regard, but tell

12    me why you're representing to the Court that they do not have a

13    plan.  They have a plan that is supposed to be before the State

14    Board of Education -- I'm sorry, State Board of Elections the end

15    of January, so why would that not constitute a plan?

16         MR. RUSSO:  Your Honor, this is Vincent Russo.  I just

17    want to make one point of clarification because I misspoke.  The

18    mobile ballot printers are at the county offices, so paper ballots

19    will be preprinted ahead of time already but the counties will

20    have the ability to print additional ballots using the mobile

21    ballot printer if they need additional emergency ballots.

22         THE COURT:  You mean that they would move the mobile

23    ballot printer to particular precincts?

24         MR. RUSSO:  No, your Honor.  The county would then have

25    to deliver them to the precincts.  But the paper ballots are

1  preprinted, so they're supposed to have enough preprinted ballots

2  to begin with, but in the event that there was a situation where

3  they needed additional ballots --

4          THE COURT:  I see.

5          MR. RUSSO:  -- they can print, they have a mobile ballot

6  printer at the county level.  And then -- I apologize for that.

7          THE COURT:  That's all right.

8          MR. McGUIRE:  Your Honor, this is Robert McGuire.  To

9  answer your question about why we are concerned, first off the

10  Court ordered them to put in place a statewide fallback plan, is

11  our understanding, and what they've done is they have basically

12  pointed to two, you know, updated versions of election rules that

13  are -- require local precinct level decisions about whether it's

14  impracticable to use their machine.  And they -- they've limited

15  them really to malfunctions that -- you know, like electrical

16  outages and waiting times.  And these are rules that, you know,

17  have -- comparable rules have existed prior to this Court's order,

18  so we don't believe this is a good-faith effort to satisfy the

19  Court's order to do a statewide backup plan involving paper

20  ballots.

21          But even taking what they pointed the Court to at face

22  value, it won't operate -- it won't work to rely on scanning paper

23  ballots in the absence of an election management system which is

24  an integral part of all of the components that -- in this system.

25  And the scanners won't work without the EMS and the EMS has not

1  been rolled out according to schedule.  So the reasons we put into

2  our filing of the status report, it appears that -- it appears

3  very risky to assume that they'll accomplish that.

4          So I think what they've done is they haven't put in

5  place a statewide backup plan but rather they've kind of put in

6  place a very decentralized set of decisions based on limited

7  criteria that allow people to use paper ballots, and they're still

8  relying upon scanners that require a part of the system that

9  hasn't been delivered.  So --

10         THE COURT:  You mean the scanner or do you mean

11  something else that hasn't been delivered?

12         MR. McGUIRE:  The election management system.

13         THE COURT:  And you think that the EMS system is

14  necessary for the scanner to function?

15         MR. McGUIRE:  It is according to the demanding documents

16  that have been filed in connection with the Georgia configuration

17  of the system.  The EMS is the sort of the brains of the

18  operation, it's what -- it totals the numbers, it's what allows

19  the scanners to understand, you know, what parts of the paper

20  that's running through it correspond to what voter selections.

21  These are not off-the-shelf scanners, they're Dominion scanners

22  and they require Dominion software and the election management

23  system is key to that.

24         So without that, without a guarantee that that's in

25  place there's no way to count on even being able to use the

1  scanners.  Our concern is that this plan doesn't -- it appears to

2  be just crossing your fingers and hoping that we meet our

3  schedule.

4          MR. CROSS:  Your Honor, this is David Cross.  I agree

5  with what Mr. McGuire said.  I think the context is important to

6  keep in mind, which is the -- the impetus for your Honor's order

7  coming out of the preliminary injunction motions with respect to

8  the new system was the rollout of a statewide system that is

9  entirely new in virtually every respect that the defendants have

10 represented it.

11         So what they're pointing to, as Mr. McGuire noted, is

12 they've got a rule that really just replicates what's long been

13 standing in the law, which is if you have some sort of disaster

14 that renders the machines impracticable or unusable, then the

15 local election officials have authority to figure out what to do

16 so that the election can continue in that precinct or that county,

17 whatever is affected.

18         That is not a plan, it is certainly not a statewide plan

19 and it is nothing remotely close to what we thought your Honor had

20 in mind, which was if the statewide rollout looks like it is not

21 going to work, and we believe where we are there can be no

22 question it's not going to work, putting that aside for a moment,

23 there's got to be a plan that says here is what we're going to do

24 at a statewide level, this is the instructions that are given and

25 this is how it's going to work.  And Mr. McGuire has noted just a

1  couple of examples of how there is no plan, for example.

2            What happens with the ballots, right?  Let's say they do

3  hand-marked paper ballots, they print them out -- they get the

4  paper, how are they going to count them, right, without the EMS,

5  which they're saying they expect to roll out by February 1, they

6  have not given any hard deadline, they expect February 1?  And

7  then what about the scanners?

8            So what really needs to happen is a good-faith effort

9  that says if this is not going to be implemented statewide or if

10 there are half the counties or some number of counties that fall

11 through the cracks, there is a specific step-by-step plan that

12 says this is how we're going to do this, and that does not exist.

13           At most you would end up with a whole bunch of ad hoc

14 decisions at a local level, people scrambling to figure out county

15 by county, precinct by precinct what to do.  I would not call that

16 a plan.

17           MR. BELINFANTE:  Your Honor, this is Josh Belinfante.

18           You know, this is part of the problem we've had.  If

19 the plaintiffs think we're in contempt of the order, there's a

20 procedural mechanism for them to file.  File a motion to hold us

21 in contempt, let's have an evidentiary hearing, not a debate over

22 a teleconference about what is happening and what is not because

23 we will submit what has been represented is simply factually not

24 true.

25           I'm not saying that they are intentionally misleading

1  the Court, I just think we have more information than they do.

2  But this is not the time or place to have this type of discussion,

3  certainly if there's going to be any relief ordered from the

4  Court.

5          MR. ICHTER:   Your Honor, this is Cary Ichter.

6          This is exactly why we sought to conduct some discovery

7  on implementation in the backup plan.  Mr. Belinfante says we have

8  all the information, you have none of it, you can't confirm any of

9  your suspicions or concerns about what's going to happen when we

10  can't actually implement the Dominion system, so we can go on our

11  merry way and have essentially an election disaster down the road

12  because we don't have a plan and we don't have a system and we

13  haven't been able to take any discovery to monitor whether or not

14  there's been compliance with the Court order.

15          We can't file a motion for contempt with no evidence.

16  What we see -- the information that's been supplied, and we've

17  tried to do some follow-up on it and find out what the actual

18  facts are, and we get stiff-armed.

19          MR. BELINFANTE:   This is Josh Belinfante again.

20          There is simply no open discovery.  And despite their

21  attempts, the plaintiffs are not some type of court monitor that

22  are there to enforce your order.  If they believe we're in

23  contempt -- and they've filed a 22- or 23-page brief citing

24  various open records requests that they've received documents

25  from, so it's not as if they're operating in the dark.  If they

1  believe we're in contempt, file away, we will respond.  We will

2  have this in an orderly manner based on Rules of Procedure and

3  Rules of Evidence but not an ad hoc demand for discovery when

4  discovery is closed, not e-mail traffic that goes back and forth

5  and almost never fails to contain some accusation of lying or

6  spoliation or something else that is simply not being produced in

7  good faith and makes it impossible to respond in good faith.

8          That's the reason for the communication breakdown.

9  That's the reason why we need a formal process.  And the

10  plaintiffs simply have remedies if they think they're available,

11  they just need to take advantage of them.

12          MR. CROSS:  Your Honor, this is David Cross, if I may.

13          I guess I'm not sure that I understand Mr. Belinfante's

14  complaint because we actually did file a motion for hearing,

15  that's literally what we filed.  And what we would like to do is

16  to have an evidentiary hearing, which is what we articulated in

17  our brief.  We understood that your Honor scheduled this status

18  conference for the purpose of getting the status of where things

19  stand, and we assume your Honor will decide what the next

20  procedural step is.

21          I do think Mr. Belinfante's argument highlights the

22  problems, which is there is an information asymmetry and it is

23  because they have declined to provide any information at all.  The

24  only thing we can get is through public records, so we have done

25  the best we can.  We believe an evidentiary hearing at this point

1   would be productive.

2            The last point I will make, your Honor, there is a

3   singular reason why the communications in this case have gone the

4   way they have since the substitution of counsel, and it is

5   abundantly clear that the other side is under a directive not to

6   cooperate.  They don't like when we express concerns about the

7   reliability of the things they say, but look at just what has

8   happened today.

9            THE COURT:  All right.  I really don't want to go

10  into -- go further in this.  I understand your perspective.  I

11  don't -- I'm not trying to argue about it, but I don't think it

12  will be helpful in the time that I have for you to basically go

13  over what has happened today.  I am capable of sorting that out

14  myself one way or the other, so...

15           MR. CROSS:  Thank you, your Honor.

16           THE COURT:  Let me -- I understood both parties -- or

17  all three parties sets of views on that, and I will take that into

18  consideration in to how to proceed.

19           You were given a tentative schedule on the BMDs, and it

20  looked like, though, that the servers are -- what is the

21  anticipated schedule for delivery of the servers?

22           MR. RUSSO:  Your Honor, this is Vincent Russo.

23           The election management system has -- there's some

24  counties, of course, that already have it because they've run

25  elections and about to be running elections, special elections.

1  The remaining counties, all of the EMSs will be rolled out by

2  February 1st and in place.  That is what was included in our

3  filing yesterday, in Mr. Sterling's affidavit.  And the ballot --

4  for the ballot building process and getting paper ballots out by

5  February 4th for Uocava purposes we are in line to have that

6  completed.  Of course, it's not -- it's for the Presidential

7  Preference Primary, so we know who is on the ballot already and

8  it's not a large ballot.

9       And in regards to the rollout of the BMDs, your Honor,

10  we have -- currently 95 counties are either scheduled or have had

11  their BMDs delivered for the Presidential Preference Primary.  The

12  scheduling issue is really just -- counties have to have space to

13  receive the ballot marking devices.  They have to have the

14  warehouse ready and some counties still have to have their DREs

15  picked up.  Other counties may have space that -- in their

16  warehouse to store both DREs and BMDs.  I don't believe that there

17  are a number of counties that have that type of warehousing space.

18       But the process for scheduling is that once the DREs

19  have been picked up, unless the county has adequate space to house

20  the BMDs, the county notifies the state that they're ready to

21  receive the ballot marking devices, and then the delivery is then

22  scheduled.

23       So that's where we're at.  The state believes

24  mid-February point to have everything delivered.  That would be in

25  plenty of time before the March -- before early voting begins in

 1  March.  And, you know, there's 95 counties right now that -- I

 2  understand that's about 86 percent of the population of the state

 3  is covered.  So the large counties -- the state prioritized

 4  getting them out to the large counties and the counties that have

 5  the special elections and then going from there.

 6        Additionally, in terms of counties being ready to

 7  receive ballots and the logistics around that, as you know, the

 8  counties, we have a wide variety of differences in some of these

 9  counties in more rural areas of the state.  Some counties do not

10  have loading docks at their facilities, which means hand trucks

11  have to be brought down also and used to unload and deliver

12  machines.

13        So there are those logistics that prevent just setting a

14  hard date and, you know, a schedule that I think the plaintiffs

15  are believing needed to be done.  This is a fluid schedule but the

16  state is on track.

17        MR. CROSS:  Your Honor, this is David Cross.

18        THE COURT:  Yes.

19        MR. CROSS:  Let's just accept everything -- all the

20  dates that they've put on the table, that those are workable and

21  they're met, it still is just not feasible.  And look at what

22  they've represented in the past.  I guess the challenge that I

23  have here, your Honor, is twofold:

24        One, it's disserving that in their filing they don't

25  actually have a document prepared by the state that says here's

1   our schedule.  One would have expected that appended to their

2   filing is here is our schedule, it's on a page, it's on two pages,

3   deadline by deadline, step by step, here's how it's going to

4   happen.  Instead we get a narrative that says various expectations

5   and anticipations.  This is the most that we've gotten for how

6   this is going to happen.

7           Let's assume their expectations and anticipations

8   actually play out on the timeline they've described, by their own

9   arguments in this case they cannot possibly get this done in an

10  orderly fashion because they're saying by mid-February is the

11  earliest they expect to have the system in place physically there,

12  right?  That means the EMS, the scanners, the BMDs, everything.

13  That doesn't include the installation that has to happen when the

14  equipment arrives, it doesn't include the testing that has to

15  happen, all of the logistics that go into this.  It doesn't

16  include the training of all these different people on a very new

17  complicated system that includes steps that no one has ever dealt

18  with in the State of Georgia, right, now including two sets of

19  machines for every single voter and paper ballots that they

20  haven't dealt with.  And they're telling the Court when

21  Presidential primaries begin in person on March 2nd, they're

22  saying under the best case scenario that these counties will have

23  maybe two weeks to do all of that, to take equipment that's going

24  to show up at their counties in mid-February, with new systems,

25  new software and figure all of that out in two weeks for one of

1    the most important elections in our country.  And yet when we're

2    before the Court twice before with months to go before elections

3    and the only change we wanted was hand-marked paper ballots, keep

4    all the other equipment, the GEMS system stayed, everything, or at

5    least folding in the new EMS, in 2018 it was keeping GEMS, it was

6    keeping -- they said it couldn't be done, it was too heavy a lift

7    just to swap out paper ballots for DREs and keep every other

8    aspect of their system.  Now they want the Court to believe

9    they're going to get this done in two weeks.  I just -- I don't

10   know what more to say about it, your Honor.  It can't get done.

11        And if we have to file a motion for contempt to get an

12   evidentiary hearing and relief, I suppose we'll do that, but I was

13   hoping not to have to go that route.  But we are way beyond

14   anything that anybody can realistically say is going to be a

15   reliable, orderly election in the state.

16        Just last week Chris Harvey responded in e-mail to a

17   county saying he did not know when all the equipment that they

18   were asking about, the EMS, the servers, the BMDs, when it was

19   even going to come to them; couldn't even answer the question of

20   when it was coming.

21        THE COURT:  Mr. Russo, it might -- or, Mr. Tyson, I

22   don't know which one of you want to answer this, or

23   Mr. Belinfante:  Are you able to provide a more concrete schedule

24   that is not simply based on the affiant's statement?  I think it's

25   fine to have an affiant and it's helpful sometimes to be able to

1  understand that there may be other factors and it's helpful to be

2  able to say this is 86 percent of the population, but I don't know

3  what else is remaining to be done, but I'm just trying to look at

4  the -- right now where we're at.

5          And you said something was February 2nd, the EMS you

6  anticipated would be delivered.  And I guess February 2nd, I'm

7  just looking at the calendar, is a Sunday.  So I'm assuming you're

8  thinking the 3rd, or that it was going to be the 31st?

9          MR. RUSSO:  Your Honor, this is Vincent Russo.

10          No, it's February 1st is when the election management

11  system will be completely rolled out.  Some counties already have

12  it, of course, and that's -- that's the equivalent of the old

13  GEMS.  We're not talking about the ballot marking devices.  Every

14  county has had two ballot marking devices for a month or so now --

15  or, excuse me, since October, and those were used for training and

16  demonstrations.

17          THE COURT:  What's going to be delivered by the 1st

18  then?

19          MR. RUSSO:  That is the election management system,

20  that's the EMS, the new GEMS for lack of a better term.

21          THE COURT:  Are you able on the 3rd to provide --

22  basically provide an update -- and let's say the 4th, so that I

23  have one by -- file one with the Court by the 4th as to the status

24  of everything that's been delivered?

25          MR. RUSSO:  Yes, your Honor, we can -- so just to be

1   clear, you want a status update on the EMS delivery or on the

2   whole system?

3          THE COURT:  On the whole package, yeah, the whole thing.

4          MR. RUSSO:  We can give you -- we can do that, we can

5   provide you with an update where we're at on the 4th regarding the

6   whole system.

7          THE COURT:  It's fine to have an affidavit, but I would

8   like to have some sort of spreadsheet attached so we know exactly

9   if there are holes, where are the holes, okay?

10         MR. RUSSO:  Your Honor, we can do that.

11         MR. CROSS:  Your Honor, this is David Cross.

12         If I may briefly, I think that's really helpful and we

13  appreciate your Honor requiring the update.  The one thing I do

14  just want to caution is because there's not this statewide

15  hand-marked paper ballot plan we envisioned in place or something

16  that's reliable, I do have a concern the longer we wait the harder

17  it's going to be to get relief.

18         Let's say that February 3rd comes and they're not where

19  they thought they would be -- I mean as of right now there's 65

20  counties that are not even scheduled yet according to what they've

21  filed.  They said 94 counties are delivered or are scheduled for

22  delivery for the BMD rollout, which leaves 65 not even on the

23  schedule.  But if February 3rd comes and they're woefully behind,

24  what happens then?  At that point we are, what, less than a month,

25  with the shortest month of the year, away from in-person voting.

1  They've told us --

2          THE COURT:  Well, I don't know whether -- if it's -- the

3  counties that are left behind are smaller counties, it may be less

4  of an issue at some point, though, in terms of trying to think of

5  a centralized option.  I don't know.  But, I mean, I am -- I'm not

6  the election guarantor here no matter what.  I mean, there needs

7  to be a plan, that's what I said.  I don't find the plan that's in

8  the new proposed rule as insufficient as you but -- because the

9  superintendent of the county has an ability to take action.  Yes,

10  I mean, this is an effort at giving guidance and it's obviously

11  one that a superintendent could work with.

12          There are certainly other things that should be being

13  thought about, and I don't know whether they are or not.  And I

14  guess what the defendant is saying, if you don't believe us,

15  then -- there's not enough, then move for contempt, and maybe that

16  is an option.  But I would prefer not to go that route.  And I

17  would say I prefer for the -- if there's anything else additional

18  in mind, obviously, in plans, I would hope that the state -- the

19  Secretary of State would share that with the plaintiffs so that we

20  don't waste time here because everyone recognizes this is a

21  remarkable undertaking to do this on a statewide basis and there

22  will be glitches, everyone -- and it's fortunate at one level it's

23  a Presidential Primary and not the November election, but, of

24  course, people's primary choices are important to them as well.

25  And it is the choice of who -- at least one group of people in one

1  party is putting up for election, and we hope that Georgian's get

2  a meaningful vote and don't end up having frustration and

3  difficulties at the polls.  But we know that also this is a very

4  challenging process, and I'm not trying to make it more so.

5          I appreciate the fact that I had the rule shared with

6  me, but I would think it would be important if there are other --

7  I know we have election specialists here.  This is a big rollout.

8  And to the extent there are -- come February 4th real expected

9  holes or possible holes, I would have thought that the state would

10 have some other plans that might be beyond the proposed rules that

11 could be shared.

12         I think for me to go through a contempt hearing would be

13 very unfortunate.  I'm willing -- if we get to that, I will have

14 to consider whether it's warranted or not, but I would certainly

15 like to avoid that.  I mean, in the same vein, I have really

16 sought to avoid having to consume everyone's time with further

17 proceedings that relate to the question of liability in the

18 underlying lawsuit that I have already ruled on in a lengthy order

19 in a preliminary injunction.

20         But the defendants basically, I have to say, you want it

21 both ways; you want the whole thing to be declared moot and at an

22 end and at the same time -- and I have basically, as you have

23 stated, foreclosed discovery for now because I have two issues.

24 One, I have the former -- basically the DRE system, which is not

25 going to be used, but there were other relief issues that were in

1   my order that -- and if the defendant is going to be appealing and

2   thinking still that it wants to challenge this and that there's

3   never been any proof that this is really sufficient to uphold this

4   in the event other relief, then I may end up having to say to you

5   basically, you know, put up or be quiet, and being a more kind

6   version of this, about this, because that's ultimately --

7   if you're saying that the evidence was not sufficient to support

8   the injunction, which has other provisions, then I'm going to have

9   to either, you know, have a -- say I'm giving you seven, eight

10  days to decide whether you want to, in fact, go to an additional

11  trial, a final trial, or you want -- so, I mean, I think it's not

12  a great use of resources, especially at this very delicate time of

13  introduction of a new system, but I don't have a choice because

14  we're just basically going in circles about this.

15          You know, I don't know what has been done about some of

16  these other items.  I have tried not to be pushy because I

17  understood the scope of the work being undertaken.  But, you know,

18  I think that -- I sent out a request for information regarding

19  what's happening with the audit standards and have been advised

20  that nothing is in process at this point, but maybe it is in

21  process but nothing has been issued at this point, but I certainly

22  want to know about that.

23          And I think everyone -- it's an important issue when you

24  introduce a new electronic system to have an audit process.  I

25  think that was the intent.  And I thought you all had told me that

1   there would be December -- at the December board meeting that the

2   Board, State Board was going to be considering audit standards.

3   So I'm a little bit -- I don't know.  And I, again, have tried not

4   to be pushy about this because these are things that could be

5   shared, and I'm not trying to distract everyone, but I'm expecting

6   good faith implementation of the Court's injunctive relief

7   provisions.  And that is also, you know -- when I look at each of

8   the items of injunctive relief that start at page 149, they could

9   be obviously a true update.  And some of them they -- we're

10  hearing some about and some we are not.

11          I've got a lot of extremely smart, capable lawyers in

12  front of me and you know how to read pages 149 through the end of

13  the order.  So that's the bedeviling posture we're in.  And I'm

14  not going to jump for the invitation to have a contempt hearing or

15  jump for the invitation to start screaming about, my God, it's

16  almost February either from the plaintiffs.  But, you know, I am

17  going to have to get some information from the state what you're

18  planning to do, and I will issue an order that deals with some of

19  these issues in terms of just the posture of the case and the

20  pending motions, try to give some clarity to it.

21          And I did want to let the state know that I was going to

22  give you sort of a real defined time to tell me what you're going

23  to do about this discussion that we had I think all the way back

24  in the last December hearing.  And I know you think it's just moot

25  and that the whole thing is therefore dead.  But besides

1  everything else, just to put it out in your mind, that -- I could

2  decide it's not moot, but, you know, you've agreed -- whatever

3  you've agreed, if it's something that the Court can live with

4  or -- because ultimately it's me who has to decide at this

5  juncture, I can always determine that I'm going to close the case

6  with authority for the Court to enforce the provisions of the

7  order, the injunctive order, too.  We do that all the time in

8  dissent decrees, and with final decrees as well.  And you could

9  appeal that.

10         But if, in fact, there's -- well, there are fact issues

11 still that relate to the evidentiary foundation upon which my

12 relief order relies, I need to know and -- that potentially could

13 be raised in front of the Eleventh Circuit because then I would

14 have to have a concluding proceeding.

15         So there's a lot moving here.  I am really trying to

16 move very delicately at the same time because it doesn't matter

17 what I think about the new system itself at this juncture, I want

18 the state to be able to have absolutely a fair shot at being able

19 to do what it thinks is appropriate and efficient in being able to

20 implement the system.

21         And I know the plaintiffs are very anxious, and I

22 understand that, there's certainly good reason to be.  There was

23 probably good reason before even in terms of just simply the mere

24 challenge of this rollout.  But I do not perceive myself being

25 able to be a complete guarantor of what's going to happen in the

1  next months, next two months before the primary.  It's just not

2  feasible, but I can make things -- I can ensure that the

3  expectations I have from the prior order are implemented in a

4  reasonable way.

5          MR. CROSS:  Your Honor, this is David Cross.

6          One thing that I think would help on that with respect

7  to the hand-marked paper ballot default plan is getting clarity

8  from the state on what is the plan for actually having paper

9  ballots to mark by hand, because the plan that they have doesn't

10 seem to speak to that.

11         So, for example, if it does turn out that in February

12 they're too far behind with a lot of the counties, and

13 particularly if it were to include some of the bigger counties,

14 how will they have paper ballots ready to go if the BMD printers

15 that they are going to rely on aren't available?  We've heard in

16 the past when we were trying to get hand-marked paper ballots that

17 the lead time on that is very long and that they would have to

18 have ballot printers lined up -- I mean, vendors, not physically

19 printers, vendors lined up to do that.

20         So getting some clarity from them on what is the backup

21 plan if they have to go to hand-marked paper ballots would help.

22         THE COURT:  Well, I think just simply having an adequate

23 supply -- I know defense counsel has referenced that they do plan

24 to have paper ballots but, of course, it depends on the scope of

25 the problem.  So I think it's a reasonable request for

1  information, but I think we ought to wait until they get this

2  equipment out and give them enough time.  They're trying to get

3  you the CDs, you're trying to do what you need to do in this time

4  frame also.

5          So does defense -- can defense counsel provide that

6  information by the Wednesday or Thursday of the -- I think it's --

7  I'm sorry, my calendar just went on me.  You're providing one

8  piece of information to me about the delivery on the 4th.  Do you

9  think by the 5th that you can also provide me the -- what you're

10  thinking about in the event of something more significant is a

11  problem in light of the information you have, what would be a

12  backup plan for getting the paper ballots available, assuming

13  you're going to scan them still because, of course, you could scan

14  them any number of places?  Yes, it's a transportation issue and a

15  security issue, but at least we could get them -- make sure that

16  there's a supply.

17          MR. RUSSO:  Your Honor, this is Vincent Russo.

18          Just to ensure we understand what you're asking for, you

19  want us to provide information about how many paper ballots will

20  be preprinted in each county by the election or -- I just want to

21  make sure what you're asking us to provide you, we know what it is

22  so we're on the same page.

23          THE COURT:  Let me ask, Mr. Cross, what would satisfy

24  you at least concretely because that's a very specific question

25  that defense counsel posed?

1          MR. CROSS:  Yes, your Honor.  It would help to have

2   concrete numbers on what -- how many paper ballots they will have

3   for each election for each precinct because what we don't want to

4   have happen at any given precinct there are not sufficient ballots

5   for folks to vote.

6          THE COURT:  But obviously they could move the ballots,

7   too.

8          MR. CROSS:  Sure, and they would have to have a plan for

9   that.  I mean, the county --

10         THE COURT:  Why don't we just simply -- it's one

11  thing -- that's a whole other level of things.  Why don't we just

12  simply say how many the county will have and what is its

13  distribution plan for the paper ballots.

14         MR. CROSS:  That's great.  Thank you, your Honor.

15         MR. TYSON:  Your Honor, this is Bryan Tyson.

16         Before we leave that topic, just so we're all clear, I

17  want to be fully -- appraise everybody of this, that the

18  decision -- just like printing of provisional ballots, the

19  decision on how many ballots to print is generally a county

20  election superintendent's function.  There's not a directive from

21  the state that says you must have one ballot for every active

22  voter in your precinct.  I think that's what a lot of counties

23  would end up using if they were doing a full hand-marked paper

24  ballot election.  But I just want to be clear, it's not like we're

25  going to be able to say Fulton County will have 75,000 or 200,000

1  ballots.  We'll get you as much as we can, but I want to be honest
2  about what you expect to see in terms of that response based on
3  who does what on the part of the election process.
4         THE COURT:  I understand that.  I think that the -- and
5  the problem really is is that everyone's asking you what do you
6  think is a reasonable amount to have given the fact you have a new
7  system where you don't know if everything is going to work
8  necessarily completely smoothly and, in fact, you may end up
9  needing to generate more.  But at this juncture, knowing what they
10 do and knowing they're getting into a new system and working with
11 people who have done this before, what would be -- what is a
12 reasonable amount which they should -- you know, obviously get the
13 benefit of also somebody in the state who is working for other
14 people who have rolled out systems which may -- and to have as
15 backup amounts and a distribution system -- basically what they're
16 thinking about how they distribute them, because the thing about
17 it is it's easy to distribute if you -- Fulton County, let's just
18 say Fulton County, and we've got representatives of Fulton County
19 here, they may decide that they want to have some extras that are
20 in North Fulton County, some in south, I mean a central place in
21 the center of the county, I don't know, but I think that might be
22 one way of addressing it when you've got a large county and lots
23 of traffic.
24         But, you know, there are people obviously, and I know
25 this from -- you know, we've heard these great people who came and

1  testified here and who gave -- and who also have given affidavits

2  for both sides, that this is a whole world of expertise about

3  rollouts and this is information available and not to take

4  advantage of it -- and I'm assuming that your contractor has it,

5  they've rolled out the system lots of places, it seems a

6  reasonable thing that can be done that also may be of concrete use

7  to the citizens of Georgia and the counties and the electorate as

8  a whole that is not just for the Court and paper-keeping and

9  dotting one's Is and crossing one's Ts.

10        MR. RUSSO:  Yes, your Honor.  This is Vincent Russo

11  again.

12        We just want to make sure that you understand and that

13  the folks who are on the line with us understands that the state

14  has been getting equipment out for months now and anticipates a

15  February 14th, 15th, mid-February deadline to have all of the BMDs

16  rolled out and the February 1st deadline to have all of the

17  election management systems rolled out.

18        In regards to printing, we will work on tallying up what

19  each county's superintendent intends to have preprinted for the

20  March Presidential Preference Primary, in addition to what they --

21  if they need to use the mobile ballot printer.  That is -- the

22  real reason the state bought those was so that if there was an

23  emergency situation, counties would have the ability to print

24  those at their central facility.

25        THE COURT:  All right.  But you'll address the

1 distribution issue too?

2          MR. RUSSO:  Yes, ma'am.

3          THE COURT:  All right.  Very good.

4          MR. ICHTER:  Your Honor, this is Cary Ichter.

5          It sounds like the one thing that everybody agrees on is

6 that nobody wants there to be a contempt motion or a contempt

7 hearing, but it sounds as though the defendants are saying that

8 the reason that this issue even exists is because of what

9 Mr. Cross referred to as an informational asymmetry.  And it seems

10 to me that the way we fix that is by allowing the plaintiffs to

11 conduct some limited discovery on implementation on the backup

12 plan.

13          I have yet to hear anybody explain why it is a bad idea

14 for us to be able to conduct the kind of discovery regarding those

15 important issues that we conduct in every other kind of case and

16 find out --

17          THE COURT:  Well, I'll tell you why, the reason is this:

18 These folks are trying to roll out an election system and if they

19 are -- and they also need counsel, and if they are tied up trying

20 to explain anything and everything to plaintiff's counsel at this

21 moment, it is intrusive and it is disruptive and it is not giving

22 them a fair shot.

23          Now, they may -- through fault of their own, no fault of

24 their own or a combination of circumstances, it may be a mess, end

25 up being a mess, but that's on their heads at that point also.

1            I mean, the Court's relationship to the state in terms

2    of allowing the state to run its own election system is one still

3    of deference and absent there being something that goes completely

4    haywire, discriminatory, deprives people of their effective

5    capacity to cast votes in a meaningful way and deprives them of

6    that.

7            And, you know, I've already ruled on that part, but it

8    doesn't mean that I preemptively do that here and open up the

9    process.  So I'm going to answer your question, I am not at this

10   juncture going to do that.  Now if there's a contempt motion

11   because of something that happens in this process, then I'll have

12   to look at it again.  I hope we're not going to be there.

13           I would like to know what's going on with the audit

14   procedures.

15           MR. TYSON:  Your Honor, this is Bryan Tyson.

16           I can provide you at least a partial update on the audit

17   procedures and we can get you some more details as we go.  As we

18   had indicated previously, the November pilot audit in Cartersville

19   was our first step working with verifying voting and another

20   national organization, that the name is escaping me at the moment,

21   on trying a variety of different options for how you can do

22   audits.

23           The state is going to be conducting an additional test

24   audit in the Senate District 13 special election for Senator

25   Kirk's Senate seat.  And the -- Democracy Works is the other

 1    organization we were partnered with on the development of the

 2    audit.

 3            Again, like we explained, we're trying to make sure we

 4    get the process workable and appropriate.  We'll be doing an

 5    additional test on it for Senate District 13 and then we'll be

 6    continuing to hone the rule surrounding that, they can be put in

 7    place.

 8            As the Court is aware we have to have -- it has to be

 9    ready to audit the November 2020 elections and expect to be able

10    to audit elections prior to that, but we can also keep you

11    apprised as to how that process continues.

12            THE COURT:  So it was Democracy Works and what was the

13    other organization you said that you were working with?

14            MR. TYSON:  This is Bryan Tyson.

15            The other organization is Verified Voting.

16            THE COURT:  Okay.  And do you anticipate being able to

17    provide the specific methodology that you're likely going to use?

18            MR. TYSON:  Your Honor, I don't think we're prepared yet

19    just because of the design of the test audit, but the purpose is

20    to conduct several different auditing methods to determine what

21    will work best, so that's still in progress.

22            I don't think we're ready yet to say exactly what the

23    method and process is going to be, that's the purpose of doing an

24    additional test in Senate District 13.

25            THE COURT:  Okay.  If the state could provide the

1  Court -- I didn't want to have to have this plan -- and maybe

2  you've already done it but the number -- item number one in the

3  Court's order at 149 called for you to provide this information,

4  which was a plan for implementation that addresses errors and

5  discrepancies in the voter registration database and et cetera.

6          MR. TYSON:  Yes, your Honor.

7          THE COURT:  And have you already provided that to

8  plaintiffs' counsel?

9          MR. TYSON:  Yes, your Honor.  This is Bryan Tyson.

10         We provided that on January the 3rd, extensive kind of

11 look at the polls and other processes that we've put in place.  So

12 we have provided that, developed it and provided it.

13         THE COURT:  And tell me what the status of item five was

14 that dealt with the work with your cyber security firm, the

15 formal -- to do an in-depth review and formal assessment of issues

16 relating to the accuracy of the database and exposure.  And I have

17 reporters here, so I'm not asking you to tell me the inside

18 details but have -- is that proceeding?

19         MR. TYSON:  Your Honor, this is Bryan Tyson.

20         I apologize, I do not know the answer to that sitting

21 here.  We will check with the Secretary's office.  I know they're

22 aware of their obligations and aware of those requirements in the

23 order.

24         THE COURT:  If you would provide an update by the end of

25 the month, that would be most appreciative, all right?

1        MR. TYSON:  Yes, your Honor.  Should we include that in

2   the February 3rd filing?

3        THE COURT:  That's fine.  And if some portion of it

4   needs to be for some reason under seal, you can make a motion

5   accordingly.  All right?

6        Did I lose you?

7        MR. TYSON:  We're here.  Yes, your Honor.

8        THE COURT:  You heard it?  All right.

9        MR. TYSON:  Thank you.

10       THE COURT:  Is there anything else we need to address at

11   this time?

12       MR. RUSSO:  This is Vincent Russo, your Honor.

13       We do not have anything else at this time.

14       THE COURT:  Anything else from the plaintiffs?  Yes, go

15   ahead.

16       MR. McGUIRE:  This is Robert McGuire for the Coalition

17   plaintiffs.  We have nothing further.

18       MR. CROSS:  Nothing more for Curling plaintiffs, your

19   Honor.  Thank you.

20       THE COURT:  Very good.  Thank you all and have a very

21   good weekend.  Look forward to hearing from you all.

22            (PROCEEDINGS REPORTED WERE CONCLUDED)

23            _____

24

25

```
 1                    C E R T I F I C A T E

 2

 3   UNITED STATES DISTRICT COURT

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6      I do hereby certify that the foregoing pages are a true and

 7   correct transcript of the proceedings taken down by me in the case

 8   aforesaid.

 9      This the 19th day of January, 2020.

10

11

12

13

14

15

16   _____
                                              PENNY PRITTY COUDRIET, RMR, CRR
17                                            OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25
```