IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


DONNA CURLING, ET AL.,               :
                                     :
          PLAINTIFFS,                :
vs.                                  :   DOCKET NUMBER
                                     :   1:17-CV-2989-AT
BRAD RAFFENSPERGER, ET AL.,          :
                                     :
          DEFENDANTS.                :


**TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS**

**BEFORE THE HONORABLE AMY TOTENBERG**

**UNITED STATES DISTRICT JUDGE**

**MARCH 6, 2020**

**2:05 P.M.**


*MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

*TRANSCRIPT PRODUCED BY:*

*OFFICIAL COURT REPORTER:*        *SHANNON R. WELCH, RMR, CRR*
                                  *2394 UNITED STATES COURTHOUSE*
                                  *75 TED TURNER DRIVE, SOUTHWEST*
                                  *ATLANTA, GEORGIA  30303*
                                  *(404) 215-1383*

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3      FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
        SCHOENBERG:

 4

 5          DAVID D. CROSS
            MARY G. KAISER
 6          MORRISON & FOERSTER, LLP

 7          HALSEY G. KNAPP, JR.
            ADAM M. SPARKS
 8          KREVOLIN & HORST, LLC

 9

10      FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
        WILLIAM DIGGES, III, AND RICARDO DAVIS:

11

12          BRUCE BROWN
            BRUCE P. BROWN LAW
13
            ROBERT ALEXANDER McGUIRE, III (VIA VIDEO CONFERENCE)
14          ROBERT McGUIRE LAW FIRM

15          JOHN MICHAEL POWERS
            LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
16

17      FOR THE STATE OF GEORGIA DEFENDANTS:

18
            VINCENT ROBERT RUSSO, JR.
19          CAREY A. MILLER
            ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
20

21          BRYAN P. TYSON
            TAYLOR ENGLISH DUMA
22

23

24

25                                      (...cont'd....)
```

(...cont'd....)


**FOR THE FULTON COUNTY DEFENDANTS:**

        CHERYL RINGER
        DAVID LOWMAN
        OFFICE OF THE FULTON COUNTY ATTORNEY


**ALSO PRESENT VIA TELEPHONE CONFERENCE:**

        ALEX HALDERMAN, Ph.D.
        ERIC COOMER, Ph.D.
        MICHAEL FRONTERA, ESQ.
        PHILIP STARK, Ph.D.
        DONNA PRICE
        KIRK KASTORF, ESQ.

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; March 6, 2020.)**

THE COURT:  Good afternoon.  Please have a seat.

Counsel, how is our technology going?  Can you hear me?

MR. McGUIRE:  I can.  Yeah.  It is quiet.

THE COURT:  All right.  I'm just looking to see if there is anyone I don't know here present.  I don't see anyone. But if counsel -- I'm not sure I know the gentleman on the far end of the table with the state.

MR. TYSON:  Yes, Your Honor.  This is Ryan Germany. He is general counsel for the Secretary of State's office.

THE COURT:  Great.  I'm sure you have been around then, and I just didn't eyeball you closely enough before. Excuse me.

MR. TYSON:  And as far as other new attorneys for our side, Loree Anne Paradise is entering the case as well shortly. So she's joined Taylor English, and she will be joining us in this case as well.  I think everybody else has been here before.

THE COURT:  All right.  I don't see anyone new over on this side of the room.  But if there is, somebody should introduce themselves.

MR. KASTORF:  Your Honor, this is Kirk Kastorf.  I'm not sure you will recognize my name.  I am a counsel in the

1  Fair Fight case in front of Judge Jones.  We had had a lawyer

2  who was planning on observing the hearing today, and she had a

3  sudden emergency.  So I am on my way to the courthouse now.

4  But I was wondering if under the circumstances I might be able

5  to just listen by mute on the phone line instead.

6          THE COURT:  As long as it doesn't screw up the

7  transmission to the people who are on the case actually.

8          Is everyone here who is trying to participate by

9  phone able to hear?  And I don't know who all those people are.

10  So maybe we could do a little roll call of who is on the phone.

11          DR. COOMER:  Yeah.  I can start.  This is Dr. Eric

12  Coomer from Dominion Voting Systems.  I'm on the call and can

13  hear.

14          THE COURT:  Thank you, Dr. Coomer.

15          MR. FRONTERA:  This is Mike Frontera, general counsel

16  for Dominion Voting Systems.  And I also can hear great.

17          THE COURT:  Great.

18          DR. HALDERMAN:  This is Alex Halderman, expert for

19  the plaintiffs.  And I can also hear just fine.

20          DR. GILBERT:  This is --

21          THE COURT:  I'm sorry.  Who was next?

22          DR. GILBERT:  This is Juan Gilbert, and I can hear

23  fine.

24          THE COURT:  That was Mr. Gilbert -- Juan Gilbert.

25          If you are speaking -- I'm sorry.  Just one second.

I just want to say:  I realize people may be on speakerphones.
But when you actually talk with us, if you end up talking, be
sure to pick up the phone.

All right.  Go ahead.

MS. PRICE:  I'm Donna Price, and I'm a plaintiff in
Curling vs. Raffensperger.

THE COURT:  That is Donna Price, who is a plaintiff
in the Curling case.

Thank you, Ms. Price.

Anyone else?

DR. STARK:  Philip Stark, expert for the plaintiffs.

THE COURT:  That is Dr. Stark, who is an expert for
the plaintiffs.  We'll get you his first name.

Anyone else?

All right.  And Mr. McGuire is participating via
video hookup.

And you are in Seattle; is that right?

MR. McGUIRE:  Yes.  Near Seattle.

THE COURT:  And you are healthy?

MR. McGUIRE:  For now.

THE COURT:  Well, good luck.

MR. McGUIRE:  Thank you.

THE COURT:  All right.  I appreciate the state's
submission, and the Coalition also had a filing in advance.
And thank you for that.

1          Let me just say briefly:  With respect to the
2    defendants' expressed concerns about the hearing being held and
3    the Court's questioning, obviously I think there's sufficient
4    colorable grounds at least at this juncture for me to believe
5    that the Court has jurisdiction.  I will be addressing this and
6    kind of absolutely making a final conclusion in the order to be
7    issued on the motion to dismiss.  And I expect that to be
8    issued sometime in the next ten days.
9          But, obviously, as well the motion for preliminary
10   injunction has been pending, and I'm trying to get that out at
11   the same time.  And there just was no point in my not trying to
12   understand the questions that I had after reviewing the
13   defendants' responses -- response to the motion for preliminary
14   injunction.
15         And the questions are based on the materials that the
16   government has provided.  And, obviously, these are issues I
17   follow that are in the -- not just simply only informed by what
18   I read in the materials.  But I do know there have been
19   developments.  And you have provided information regarding
20   developments.
21         And so I'm just trying to understand the entire
22   picture.  And it is a new one.  So it really is necessary for
23   me to be able to fully evaluate what defendants' position is as
24   to why -- just on the merits, if I get to the merits, why from
25   the defendants' perspective I should not grant relief.

1        So the purpose of the hearing is penultimately for me

2   to really understand what is going on and the essence of the

3   issues that relate to the audits.  I realize the government

4   views it as, well, that is really just fine-tuning or I

5   shouldn't -- it is perhaps not my business.  But I think it is

6   part -- a central part of the conversation in these briefs in

7   some ways in terms of also the accuracy, reliability of the

8   system, and why I should or should not in any way intervene.

9        So that's -- so I had really a very basic question

10  of -- for the state's counsel about the statute itself and how

11  you are reading it so I can understand.  This deals with OCGA

12  21-2-374.  I don't know if you have a copy of the statute with

13  you or you can access it.  We can go print a copy right now if

14  you want.

15       MR. TYSON:  We were pulling it up at the moment or we

16  can pull a copy.

17       THE COURT:  Whatever is better for you.

18       MR. TYSON:  Probably a printed copy would be easier.

19       THE COURT:  Holly, would you want to do that?

20       LAW CLERK COLE:  I'm pulling up Westlaw, and I can

21  print it.

22       THE COURT:  Nate says he will go get it if you send

23  it to the printer.

24       This is a section -- I'll wait so you are just not

25  doing two things at once.

1          LAW CLERK COLE:  Should we maybe go check out the

2    book in the library?  And they can have the entire section.

3          THE COURT:  I don't have mine up.  So I have the

4    book.

5          You mean go over to the --

6          LAW CLERK COLE:  I could get the code book from the

7    library.

8          THE COURT:  Sure.  Do you have the full code there?

9          MR. RUSSO:  Yes, ma'am.

10         MR. TYSON:  We're good now, Your Honor.

11         THE COURT:  Okay.  And have plaintiffs' counsel been

12   able to pull up the section?

13         MR. BROWN:  We can get it.

14         THE COURT:  Are you all right?

15         MR. CROSS:  We're working on it.  We'll get there.

16         THE COURT:  Do you want to wait until we have it --

17   have a copy for you?  Do you want Ms. Cole to go over to the

18   library to get you a copy of the statute, OCGA 21-2-374?

19         Have you printed it?

20         LAW CLERK COLE:  I did.

21         MR. CROSS:  We have it, Your Honor.

22         THE COURT:  Okay.  So midway down the paragraph, it

23   says -- we're talking about, I think, getting -- running the

24   election and getting -- the superintendent is getting

25   everything in order beforehand.  And -- and there are tests

1    that are being run at that point.

2           The test -- and it says about a third or a half down,

3    the test shall be conducted by processing a preaudited group of

4    ballots so marked as to record a predetermined number of valid

5    votes for each candidate and on each question and shall include

6    for each office one or more ballots which are improperly marked

7    and one or more ballots which have votes in excess of the

8    number allowed by law in order to test the ability of the

9    ballot scanner to reject such votes.  The ballot scanner shall

10   not be approved unless it produces an errorless count.  Then it

11   goes on from there in a similar vein.

12          And then basically the pretested ballot scanners then

13   can be placed at various polling stations.  I'm trying to

14   understand because one of the things it looks at is whether it

15   catches whether -- the test is trying to catch whether there is

16   an overvote, whether there are votes in excess of the number.

17          I'm assuming that that really is just dealing with --

18   is this just dealing with paper ballots that are used for

19   absentee ballots?

20          MR. TYSON:  If you'll let us consult just briefly.

21          THE COURT:  All right.  Sure.

22          **(There was a brief pause in the proceedings.)**

23          MR. TYSON:  Your Honor, yes, you are correct.  The

24   test deck that would be involved with this test of an optical

25   scanner will involve both ballot-marked device created ballots

1   and hand-marked paper ballots.  But because the ballot-marked

2   device ballot is not going to create an overvote situation, the

3   errors that are referenced here would be on the hand-marked

4   paper ballots for purposes of testing.

5        I think it is important to note that the optical

6   scanners themselves, once they are programmed for an election,

7   if you put a BMD-marked ballot with a bar code in, it will read

8   and tabulate based off that.  If you put a hand-marked paper

9   ballot into the same unit, it will also retabulate based off

10  that.  The scanner is programmed for both when it is programmed

11  for the election.

12        THE COURT:  So what does it mean the test shall be

13  conducted by processing a preaudited group of ballots?  What

14  does that mean?

15        MR. TYSON:  So in that scenario, it is a test deck of

16  ballots where they have been manually counted.  So we know

17  exactly what the result should be.  And so when we run them

18  through the optical scanner, if the optical scanner returns the

19  same result that has been determined by the hand preparation of

20  that test deck, then we can have confirmation that the scanner

21  is performing as it was programmed.

22        THE COURT:  And when we are -- when you are speaking

23  of having counted the test deck, this is sort of when the -- in

24  terms of the BMD portion of the ballot, you are really talking

25  about you are going to count the ultimate selection that you

have made, George Washington or whatever else, and I vote to

suspend the Constitution or whatever it is as the referendum or

to confirm it?  You are going to count those choices, and then

you are going to say there are 40 for George Washington, and

you are going to check and see when you run it through does

it -- I know it says scanner here.  But as I -- the more I read

about it, it is a scanner/tabulator; right?

MR. TYSON:  Yes, it is a scanner that is tabulating,

yes.

THE COURT:  Tabulating.  So then you are going to

look at what the tabulation -- does it come to what you

actually manually counted?  40 George Washington votes?

MR. TYSON:  Correct.  Does it match?  That is just to

confirm that the scanner has been programmed and is behaving as

it is expected to behave.

THE COURT:  And are you anticipating you are going to

go all the way through the ballot when you -- or are you just

talking a few races when this is done?  Because there is

nothing in the regs that kind of enlightens me.  So I'm just

trying to understand that.

MR. TYSON:  So, Your Honor, there is a set of

instructions that relates to logic and accuracy testing, which

is what this process is that outlines that.  We believe that it

covers the entire ballot and all the races on the ballot.  But

we can file for the Court, if that would be assistive to you,

1   the entirety of the instructions about logic and accuracy for

2   this context, if that would be helpful.

3          THE COURT:  It probably would be.  I wanted to be

4   sure I was understanding it correctly.

5          And would those instructions indicate how large the

6   deck should be?

7          MR. TYSON:  From the look on Mr. Rayburn's face, I'm

8   thinking they probably don't.  But we can determine that as

9   well.  I don't know that we know that sitting right here.

10         THE COURT:  Well, I mean, I assume this is something

11  that people who are working in the precinct management have

12  been trained on?

13         MR. TYSON:  Your Honor, the election -- not the

14  precinct officials.  But the county election officials who are

15  confirming the structure and the logic and accuracy piece, that

16  is not going to be precinct workers.  That would be county

17  officials.  And there has been training on this point.

18         THE COURT:  And they are the ones who would be doing

19  this?

20         MR. TYSON:  Yes, Your Honor.  This would be

21  preelection preparation of the voting machines.

22         THE COURT:  Well, it just was because the

23  superintendent shall have the ballot scanners tested to

24  ascertain that they will accurately count the votes cast for

25  all offices.  So -- and there was going to be public notice and

representatives of the political parties and news media, et cetera, could observe that.

So that is all at the county elections office?

MR. TYSON:  Yes, Your Honor, it is.

One thing that might also be helpful:  The State Election Board at its last meeting adopted some additional rules that I don't think we filed with the Court yet as it relates to recounts, which outlines a similar procedure for testing scanners for recounts.

If I could, I can provide you with that.

THE COURT:  Okay.  I think I do have that.

MR. TYSON:  There has been a further update to the rule at this most recent State Election Board meeting.

THE COURT:  All right.  Thank you.

MR. TYSON:  I'm sorry, Your Honor.  It is a proposed rule.  It will be considered at the April 15 meeting.  It has been put out for notice and comment.  And it is an expansion and clarification of some additional pieces.  The underlined portions are the added language regarding how recounts will be conducted by electronic tabulation, and it involves some of the similar issues that are in this statute for logic and accuracy at the outset.

Your Honor, one --

THE COURT:  So I had what was filed at Document Number 717-1 -- I'm sorry -- 183-1-15.

        So this is -- was on the issue of optical scan
recount procedure, and you are saying this supplements?

        MR. TYSON:  Yes, Your Honor.  There is a set of rules
that were adopted at a meeting that become effective on
March 22nd.  That's the group that we filed yesterday.  There
has been further updates to those rules that will be considered
at the April 15 meeting that have been put out for notice and
comment.

        I also have one other rule that is referenced in the
recount piece that is the definition of a vote that has also
been updated.  If I can hand that up and provide it to you.  I
have provided it to opposing counsel.

        THE COURT:  Sure.

        MR. TYSON:  And to be clear, these rules are not the
procedure involved in 374, the statute.  But it is a similar
procedure.  And then we'll file the full logic and accuracy
instructions referenced in 374 for you.

        THE COURT:  Why don't I take a minute to just look at
this so I don't have to have your folks whipsawed by my asking
two different times questions about this.

        I know that -- do you have an electronic copy that
you could provide to counsel in Washington who is here by
standby?

        MR. TYSON:  Yes, Your Honor.  I believe it has been
posted to the Secretary of State website.  But we will -- it

1    has been.  I'm sorry.  State Election Board website.  These

2    rules have now been posted to the State Election Board website.

3            THE COURT:  Can you send counsel -- do you have a

4    computer with you?  Yes?

5            MR. McGUIRE:  Yes.  Yes.

6            THE COURT:  All right.  Can you send him where it is

7    located so that he can get it if he needs to?

8            MR. TYSON:  Mr. Russo sent that to Mr. McGuire.

9    Hopefully, it will come through on his system momentarily.

10           THE COURT:  All right.

11           So as I understand from briefly looking at this, if

12   this is correct, in the event the State Board adopts the

13   proposed regulation at its April meeting, Election Board Rule

14   183-15-.2(2) would be modified so that in doing recounts, if

15   the electronic tabulated result was inconsistent with a printed

16   text vote count on any particular item, the printed text would

17   control?  That is the most significant item for purposes of

18   this case; is that correct?

19           MR. TYSON:  Yes.  Paragraph (j) in that list, yes;

20   that if there is a discrepancy between what is tabulated and

21   the printed text, the human readable text controls in that

22   situation.

23           MR. CROSS:  So, Your Honor, could I get clarification

24   on that?  So in what situation does the human readable text

25   control?

1          MR. TYSON:  I think you are referring to .02 or .03.

2          MR. CROSS:  What you just said.  You said there was

3    a --

4          MR. TYSON:  .02, (j).

5          THE COURT:  There are two different areas where it is

6    discussed.  And he was -- my understanding now is that you

7    were -- counsel for the state was referring to Section (j) of

8    183-1-15-.02; right?  Then there was another similar discussion

9    in (j) in the section above.  Is that what you are referring

10   to?

11         MR. TYSON:  Yes, Your Honor, (j).  And it refers to

12   21-2-495, which is the recount or recanvass provision, and then

13   21-2-498, which is the auditing provision of the statutes.

14   That is when that review occurs.

15         MR. CROSS:  Could I ask, Your Honor -- just so I

16   understand, so what (j) is saying, if I understand Mr. Tyson,

17   is that in the context of an audit, if they discover that the

18   way the QR code is tabulated is different than what the human

19   readable text says, the human readable text is the ballot of

20   record and it controls?

21         MR. RUSSO:  I don't think it is just the QR code.  I

22   think it is if the results -- if there is a discrepancy between

23   the tabulated results when they are run through the scanner --

24   because you run everything through the scanner -- and what is

25   on the paper, whether it is a hand-marked paper ballot or just

1  the BMD printout, what is on the human readable portion is what

2  controls.  And so that is part of (j) -- Subsection (j) of .02.

3  Then .03 is on how the recounts work.  And so if you

4  look at the first section, recount by electronic tabulation,

5  that is how you -- you run through a certain number of test

6  ballots to make sure that the scanner is working properly and

7  compare that to the ballot -- paper ballot.

8  If the scanner doesn't -- if the scanner is coming up

9  with different results, you go to the next scanner.  If none of

10  the scanners are working properly, then you go to all

11  hand-marked -- excuse me -- hand-counted -- a completely

12  hand-counted process.

13  So either way you are looking, the paper ballot is

14  what controls in the event of a discrepancy.  There is either a

15  discrepancy or there is not between what the scanner is reading

16  and what is on the paper ballot.

17  So I don't know if that helps to answer your

18  question.

19  MR. CROSS:  It does.  I see a concern.  But I don't

20  want to jump in if Your Honor has questions.

21  THE COURT:  Well, I just want to walk through and

22  make sure I understand because it is a material addition here.

23  So if we look at Page 4 of what you've provided, just

24  simply to make sure we -- this deals with the definition of a

25  vote?

1          MR. TYSON:  Yes.

2          MR. CROSS:  Are you looking at Subparagraph (h)?

3          THE COURT:  Right.  In Subparagraph (h), it says, a

4  vote cast on an optical scanned ballot marked by an electronic

5  ballot marker shall be the choices indicated by the printed

6  paper ballot.

7          So are we -- are we talking about the printed paper

8  ballot that might be in a box -- in a box somewhere, or are we

9  talking about the choices indicated in the summary section of

10  the BMD part of the ballot?

11          MR. TYSON:  So, Your Honor, I think it is important

12  to clarify.  Mr. Rayburn may be able to offer some more detail

13  on this.  But there are some states that would utilize just the

14  images retained by the ballot scanner, by the actual scanning

15  unit, for purposes of conducting a recount.

16          In this situation, we're talking about the printed

17  paper ballot is what must be handled.  So we're not going to

18  look at just the images that were captured by the scanner.

19  We're going to return back to the paper ballot itself.  And

20  that's just to give everybody confidence that nothing has

21  happened that is causing the scanner to misread the ballot when

22  it reads it.

23          THE COURT:  So you are going to go back to the paper

24  ballots that were cast that were stored in the ballot boxes?

25          MR. TYSON:  Yes, Your Honor.

1         THE COURT: All right. And so if it is a statewide

2 election, you're going to have a massive recount of the

3 paper -- the printed paper ballots that are stored everywhere?

4         MR. TYSON: Yes, Your Honor. So a recount -- the

5 procedures for recount are in the statute. And if it was a

6 statewide recount, the Secretary would notify all the

7 superintendents to conduct a recount. And the recount must be

8 of the paper ballots that are rescanned in accordance with the

9 .03 rule that we have outlined and just provided to the Court.

10         THE COURT: The new one?

11         MR. TYSON: Yes, Your Honor, assuming the State

12 Election Board adopts it. Yes.

13         THE COURT: Would it be possible for you just simply

14 to walk us through these? Because I feel that I'm -- because

15 then I think it might be more logical and easier for us to ask

16 any questions we have. Because I think a lot of -- many of the

17 questions we have and some of the questions I had of

18 Dr. Gilbert's understanding -- and maybe he understood things

19 that he had been told that were not yet fully articulated or

20 presented that -- you know, I just wondered what the basis of

21 his thinking was about a variety of things. So maybe if you

22 walk us through this, it would be helpful.

23         MR. TYSON: Yes, Your Honor. And it might be -- just

24 in the interest of efficiency, it might be best to have

25 Mr. Rayburn do this for us since he is the one that is

1    involved, if that is all right.

2              THE COURT:  That is fine.

3              MR. RAYBURN:  Hello, Your Honor.

4              THE COURT:  Just identify yourself for the record, if

5    you would.

6              MR. RAYBURN:  Sure.  My name is Kevin Rayburn,

7    K-E-V-I-N R-A-Y-B-U-R-N.  I'm the deputy elections director and

8    deputy general counsel for the Georgia Secretary of State.

9              THE COURT:  Thank you very much, sir.

10             MR. TYSON:  So, Your Honor, I have handed Mr. Rayburn

11   a copy of what we have provided to you of the recount

12   procedure, Rule .03.  And he can walk us through the process of

13   that and how that recount would be conducted.

14             MR. RAYBURN:  So with the proposed changes before the

15   recount begins, the county superintendents will conduct a test

16   of each of the central scanning devices that will be used in a

17   recount.

18             During a normal election, we have most of our ballots

19   cast on precinct scanners.  There will be at least one in each

20   polling place.  And then absentee by mail ballots are centrally

21   scanned at the county offices on central scanners.  They are

22   separate pieces of equipment.

23             For a recount, we'll have all of the ballots scanned

24   on those central scanners.  So there is some independence there

25   between what was tabulated on election day, that equipment, and

1    what would be used in a recount.

2         But before you can begin the recount, there is

3    essentially a mini audit that is conducted on each of the

4    central tabulators that will be used in the recount.  And at

5    least 100 ballots are to be selected from four different ballot

6    boxes.  Three of those ballot boxes need to be ballot-marking

7    device.  So the in-person voting that has the QR code and the

8    human text that 95 percent of voters will be voting on -- or at

9    least traditionally have voted in person.  So three of the four

10   ballot boxes should take at least 25 ballots from each of those

11   three ballot boxes, which adds up to 75.  Those are hand

12   counted.

13        Similar to the L&A procedure we talked about earlier,

14   you determine what those votes are by human review, hand to

15   eye.  Then you run them through the central scanner.  And it

16   will produce a result.  Then you compare those two, and they

17   should match.

18        Then we will also take 25 absentee by mail ballots,

19   which are the hand-marked, filled in the bubbles.  And then

20   those will also be hand counted.

21        THE COURT:  When we say hand counted, you literally

22   mean basically I'm Joe Blow, Jenny Turner, et cetera?

23        MR. RAYBURN:  Absolutely.

24        THE COURT:  Somebody is going to call out the name,

25   and it is going to be recorded?

1          MR. RAYBURN:  Absolutely.  One ballot at a time, hold

2     the ballot up, review the voter's intent, and then mark it down

3     so you can keep that tally.  Then you compare that tally to the

4     electronic tally.

5          THE COURT:  All right.

6          MR. RAYBURN:  And so if a scanner, after going

7     through that, it matches -- the hand tally matches the

8     electronic tally, that scanner can then be used in a recount.

9          If none of the scanners can be used in a recount --

10    so if we have the scanners failing that test -- then the other

11    new part of this rule that was proposed is that then there

12    would be a manual hand recount audit.

13         So there is a mechanism in place.  If the tabulators

14    are not performing as they should before you begin the recount,

15    there is another mechanism to do that recount manually.

16         Do you want me to go further through the recount

17    process?

18         THE COURT:  Yes.  Because that was the first question

19    I had when it said -- in the currently adopted provision where

20    it said a manual hand count of the test deck shall be made.

21    And I was trying to understand what was being looked at.

22         At that point when you are looking at that, you are

23    doing the manual hand count, you are looking at the

24    BMD-produced ballot -- is that right? -- to do the manual hand

25    count?

1          MR. RAYBURN:  Just to be clear, are we talking about

2     the recount process or going back to the logic and accuracy

3     process in the statute?

4          THE COURT:  No.  I'm looking at the version of the

5     optical scan recount procedure that was adopted by the State

6     Board already.

7          MR. RAYBURN:  Sure.

8          THE COURT:  And that has the provision that you are

9     talking about, the 75 ballots and the 25 ballots.  And it

10    uses -- when it is talking about a manual hand count, I

11    wondered whether it was only talking about a manual hand count

12    of the absentee ballots or what was being -- what do we mean by

13    manual hand count.

14          And you are saying it means that you are going to go

15    over all of the choices on the printout portion of the ballot?

16          MR. RAYBURN:  So for a recount, you are manually --

17    you are targeting a single race.  So there is usually one race

18    that is going through the recount.  So that is what they are

19    going to tally, whatever that one race is.  It might be top of

20    the ticket.  It might be the bottom or somewhere in between.

21          THE COURT:  Right.  But it is the BMD ultimately

22    produced ballot -- isn't that right? -- that you are hand

23    counting the portion of the ticker tape that was produced?  Is

24    that --

25          MR. RAYBURN:  So with the recount, when you pull the

1  original -- these are original ballots that were actually cast.

2  So we're not doing a made-up ballot to test.  We're actually

3  going to be using actual ballots that were used in the election

4  for the test deck.

5          THE COURT:  All right.

6          MR. RAYBURN:  And that is --

7          THE COURT:  That is what I'm trying to -- is this the

8  physical ballot that was in the boxes, or is this the scanned

9  ballot where there is a portion of the ballot that just has --

10 has the bar code and there is a portion that just says all --

11 everyone you selected?

12         MR. RAYBURN:  So these are the physical paper ballots

13 that were actually cast.  Right.  The rule lays out that 75 of

14 the ballots at least need to be from the BMDs and 25 percent

15 will be hand marked.

16         MR. TYSON:  All of them are manually counted.  So the

17 BMD ballots are manually counted by the human readable portion.

18 The absentee ballots are counted by the voter intent under the

19 definition of a vote.

20         THE COURT:  Right.  And no judgment implied here.  I

21 just want to make 100 percent sure that I'm not making a

22 mistake in understanding this.  This is the -- what is -- when

23 you ended up -- the voter -- you are looking at what the

24 BMD/scanner produced and you are saying, all right, it just has

25 a summary, Johnny Smith picked, and Johnny -- it is -- let's

say it is a Congressional race for Johnny Smith and you are

only doing a recount for the Johnny Smith race.

That is what -- you are looking at the

electronically-produced document at that point?  You are not --

is that right?

MR. RAYBURN:  That's correct.  The recount team that

is preparing and testing the equipment is looking at in human

words the voter's choice.

THE COURT:  All right.  But you are not going -- but

what I'm just trying to get to is you are or you are not going

back to the ballot boxes produced at that point in time?

MR. RAYBURN:  So based on the proposed rules that

were posted, the test deck would be actual ballots.  So they

would actually open up four ballot boxes.  Three of which were

ballot-marking device in-person voting.  One was vote by mail.

THE COURT:  All right.  Go ahead.

MR. RAYBURN:  So once the equipment has presumably

passed the recount pretest, the county would then ballot box by

ballot box remove the ballots and rescan them through a central

tabulator so that they are tabulated again.

The whole time, they need to keep close and careful

watch of those ballots, make sure they are together so that

they can be put back into that same ballot box.  So they will

do that one at a time.  If they place -- like Fulton County

will probably have multiple scanners.  But one ballot box per

scanner.  And the ballots will be scanned through and be

tabulated.

If there are any overvotes detected, the scanner will

stop and that ballot will be identified.  And a ballot -- and a

recount committee will review that ballot and determine what

was the voter's intent.

So it might be that there is an overvote, or it might

be that you could tell with human review what the voter's clear

intent was.  And then you could what's called duplicate that

ballot, recreate it with the voter's intent reflected, and then

scan that instead.

So you go through the whole -- the recount goes

through every ballot that was cast -- is rescanned.  Then you

have that retabulation at the end, and that is the new official

result.

THE COURT:  All right.  How does this work in the

audit context?  Do one of these relate to an audit context

also?

MR. TYSON:  Your Honor, it might be helpful for

Mr. Rayburn to kind of walk through the development of the

audit process.  It might be helpful at this point, if we're

switching to that track.

THE COURT:  This proposal was posted today; is that

right?

MR. RUSSO:  It was posted today, yes, ma'am.

1          MR. TYSON:  Yes, Your Honor.

2          THE COURT:  All right.  Go ahead.  Thank you.

3          MR. RAYBURN:  The state right now is in the process

4    of drafting audit rules.  And part of that is going through a

5    series of test audits, pilot audits in various elections.  We

6    did our first one back in November of 2019.  We conducted

7    another one in February --

8          THE COURT:  That is the one in Cartersville?

9          MR. RAYBURN:  Yes, ma'am.  Another one was in

10   February of 2020.  That was in Lee County of a senate district

11   13 race.  We will be doing another audit pilot in Fulton County

12   of the presidential preference primary for the democratic

13   party.

14         We intend to keep every election this year -- build

15   and do more and more complex pilot audits so that we build that

16   confidence in that and understand the processes that should go

17   into the rule.

18         There's no such thing as just an audit.  That is a

19   vague term.  There's different types of audits.  There's a

20   traditional post-election tabulation audit that takes, for

21   example, a batch of ballots.  Think of all the ballots that

22   went through a scanner into a ballot box.  That is a batch.

23         The scanner, like you mentioned earlier, has a ticker

24   tape that told you what that result was.  And we can take those

25   ballots out, hand count them, and compare them to the ticker

1    tape.

2          So you compare the manual human tally that was

3    looking at the human words of the voters' choices and comparing

4    it to what the scanner interpreted those voters' choice as.  So

5    that is a traditional comparison batch audit.

6          And then you may have heard of something called a

7    risk-limiting audit, which is a different type of audit that is

8    being tested throughout the country.  There's one state right

9    now that does that statewide.  And that is Colorado.

10          But even with the risk-limiting audit, there are

11   three different types of risk-limiting audits.  There is a

12   ballot comparison audit.  There is a ballot polling

13   risk-limiting audit.  And there is a batch comparison

14   risk-limiting audit.

15          So the state has lots of options, and there might be

16   times you would want to do one type of audit versus another.

17   So we are testing these various types of audits.  We're

18   conversing with experts nationally from the Brennan Center,

19   VotingWorks, Democracy Fund, Verified Voting.

20          So we have really good experts that are helping us

21   through this process.  We're still drafting those rules.  And,

22   like I mentioned, we're doing more and more pilots and

23   building -- Fulton will be definitely the largest election and

24   largest county we will do that with.

25          And then thereafter we want to do a multicounty

1    audit.  Because part of this is making sure multiple counties

2    can audit at the same time.

3            THE COURT:  All right.  So just getting back to the

4    proposed rule that you gave me, I'm just trying to -- one of

5    them was for recounts, and one of them was the definition of a

6    vote.

7            And is this for purposes -- for all purposes, whether

8    for audit or other purposes; is that right?

9            MR. RAYBURN:  Correct.

10           THE COURT:  This proposed rule on what is the

11   definition of a vote?

12           MR. RAYBURN:  That's correct.

13           MR. CROSS:  Your Honor, while you are on that, could

14   I ask a quick question?

15           THE COURT:  Yes.

16           MR. CROSS:  So Subparagraph (h) --

17           THE COURT:  In which one?

18           MR. CROSS:  183-1-15-.02, definition of a vote.  The

19   one that is definition of a vote, Subparagraph (h) looks to be

20   the provision that defines the vote, as I read this.  And it

21   says, as we read earlier, the vote cast on an optical scanned

22   ballot marked by an electronic ballot marker shall be the

23   choices indicated by the printed paper ballot.

24           Is that not the human readable text?  Because if you

25   look at (j), (j) specifically refers to the printed text on the

ballot. So I'm trying to understand: Is the exclusion of the word text there meant that it is the whole ballot that controls and so it could be the QR code in terms of the definition of the ballot?

THE COURT: Well, let's just have him walk -- I was just about to have him walk us through that. I did note the differences. But that is part of my question.

Why don't you just -- why don't you walk us through what the relevant additions are and how they work together. I think it was --

MR. RAYBURN: So (h) is a good place to start, I think. So (h) is saying that the vote on a ballot-marking device ballot is the choices indicated on the physical paper.

So a ballot has the voter's intent manifested in two different ways. And that's true whether it is a hand-marked paper ballot or a ballot-marking device ballot.

With a hand-marked paper ballot, you have an oval that is circled in. And that is a coordinate. And so the coordinate is the first manifestation of the voter's vote. And that is what is detected by an optical scanner, a coordinate.

The other manifestation of a voter's vote is the oval next to human words. And so when a human looks at that, they don't know what the coordinates are. They don't know what the programming is. They know I have a mark next to human words. And so I'm interpreting that to mean that the voter wanted

1    their vote to be for the candidate where the mark was next to

2    the human words.

3           So a hand-marked paper ballot has the vote manifested

4    in two ways.  So too does a ballot-marking device ballot.  With

5    a ballot-marking device, you have the QR code with coordinates.

6    That is what is in the QR code.  So it is using the same

7    coordinate programming in the optical scanner to interpret both

8    types of ballots.

9           You also have the human words written out and only

10   the choices of the voter.  So you can see exactly the voter's

11   choice written in human form -- human readable form on the

12   ballot.  So it is manifested in two places.

13          THE COURT:  On the same piece of paper?

14          MR. RAYBURN:  On the same piece of paper.  That is

15   right.  So in both cases, those choices are identical but it is

16   manifested in two ways.  Humans can see one of those two ways.

17   The scanner reads the other way.

18          THE COURT:  All right.

19          MR. RAYBURN:  So --

20          THE COURT:  Getting back to (h) --

21          MR. RAYBURN:  Yes, ma'am.

22          THE COURT:  -- a vote cast on an optical scan ballot

23   marked by an electronic ballot marker shall be the choices

24   indicated by the printed paper ballot.  So that is on the one

25   with the two different choices, the QR code and the -- and also

1   the summary choices.

2            Or is it the -- that is what I think the question was

3   here.

4            MR. RAYBURN:  Sure.  So the choices are in two

5   places.  So they are saying the same things.  They are

6   indicating the same vote.

7            THE COURT:  You hope.  We hope.

8            MR. RAYBURN:  So when you go to (j), that is where it

9   says, if there is somehow a discrepancy, which there should

10  never be -- but if there is a discrepancy, then the human words

11  are the controlling choice of the voter.  That is the

12  manifestation of the voter's intent.

13           Then the same thing occurs in (e) regarding

14  hand-marked paper ballots.  If the coordinate is different --

15  the coordinate programming is different than the voter's choice

16  as seen with human eyes by having a mark next to a name, then

17  the mark next to the name is the voter's choice that should be

18  counted.

19           So there are parallel provisions dealing with both

20  ballots acknowledging that both ballot types have the voter's

21  choice manifested in two different ways.

22           THE COURT:  I think the thing that is a little

23  confusing is that, for purposes of the recount, you go back and

24  look at the original physical ballot.  But for purposes of

25  auditing, you don't do that -- right? -- as I understand it?

1          You are relying -- the vote that is deemed the

2    real -- and maybe not just for auditing -- for definition of

3    vote optical scanned voting systems that the vote is not what

4    is in the boxes but is whatever is on the ticker tape summary

5    of your vote?

6          MR. RAYBURN:  So the audit is comparing the count of

7    the paper ballots to the ticker tape to see was the tabulator

8    accurate.

9          THE COURT:  All right.

10          MR. RAYBURN:  So you are needing both pieces of

11    information.

12          MR. TYSON:  And you have to go back to the paper

13    ballots to do the audit.  You use the paper ballots for

14    purposes of the audit in different ways depending on the type

15    of the audit.

16          MR. RAYBURN:  And in both cases on election night,

17    whether it is the coordinates on a hand-marked paper ballot or

18    the coordinates in the QR code on a ballot-marking device

19    ballot, that is what is the initial count.

20          THE COURT:  Right.

21          MR. RAYBURN:  So the point of the recount is to

22    retabulate.  But, first, you check to make sure the tabulators

23    are working accurately.

24          THE COURT:  I understand the recount process.  I'm

25    back to the questioning about if this is what applies as to an

audit process, which is what I had understood at some point. But maybe I'm in error.

I'm trying to understand:  If you were auditing it, are you -- are you getting the ballots that were deposited in the box or not?  That is -- because the way I read this is that it is the text on the BMD-produced ballot that is on the image.

MR. RAYBURN:  I think I understand where we are at. So the ballot images that are taken by the scanner and stored in the scanner, those are not used in an audit.  They are not used in a recount.

For an audit, you go back and you touch the physical paper.  You actually pull the ballot boxes.  And depending on the type of audit would determine how you select the individual ballots.  You might select at the ballot box level, or you might select at an individual ballot level.

But you are touching the paper ballots.  You don't even use the images.  And so you go to the paper ballots.  You look at the human readable choice of the voter for the BMD ballot.  And you mark that down.  You keep that tally as you go through the sample ballot you are reviewing.  Then you'll need to compare that to something to check the tabulator.

So with a risk-limiting audit, it depends on the type of risk-limiting audit.  You would be comparing it to the aggregate totals.  With a batch comparison audit, if you have ballot box A, you then look at the electronic results from

ballot box A, the hand count of ballot box A, and you can
compare those two things and look for discrepancies between the
two results.

THE COURT:  When we talk about the printed paper
ballot or the printed text, you are talking about the original
ballot that the voter basically shot through the system and it
ended up in a box?

MR. RAYBURN:  Yes, Your Honor.

THE COURT:  That is kind of a stupid way of
describing it.  But I'm trying to make sure that we're -- we're
talking about the same item.  Because we have different things
that might be characterized as the ballot, which I guess is
what you are trying to address here.  And I'm still trying to
make sure I have got it right.

All right.  Are there follow-up questions from
plaintiffs' counsel, just so we are sure that we are all
understanding the same thing?

MR. CROSS:  I'm just reviewing my notes.  Hold on one
second.

THE COURT:  All right.

**(There was a brief pause in the proceedings.)**

MR. CROSS:  So I do have a few questions, Your Honor.

THE COURT:  Okay.

MR. CROSS:  So the mini audit that was described, is
that done just for the purpose of the recount?  Meaning, if you

1  are doing a recount, the mini audit is the -- what is described

2  in Subparagraph (1)(c) of Rule 183-1-15.03?  Is that the mini

3  audit and so that is only done if you are going to do a recount

4  to confirm the accuracy of the machine according to how that is

5  described here?

6        MR. RAYBURN:  So you've got two different testings.

7  You've got the preelection testing that is done.  The logic and

8  accuracy testing, which someone might call a mini audit.

9        But then what you seem to be describing is what is in

10  the recount rule.  That would be done specifically before you

11  begin a recount.  And there are certain circumstances where a

12  recount can be conducted by law.

13        And if one of those circumstances is invoked, then

14  this is the first process to make sure you can use the voting

15  equipment such that the recount would be an electronic

16  retabulation.  And if it fails the testing process, then the

17  recount would have to be done by hand.

18        MR. CROSS:  So when you said mini audit, what were

19  you referring to?

20        MR. RAYBURN:  The description in Rule (1)(c).

21        MR. CROSS:  Okay.  So we are talking about the same

22  thing.  That is the mini audit you were talking about.

23        That is done only for the purpose of a recount; is

24  that right?

25        MR. RAYBURN:  This specific paragraph, yes.  There

will be different audit rules that would govern an audit of the results.

MR. CROSS:  Okay.  We don't yet have audit rules?

MR. RAYBURN:  That's correct.

MR. CROSS:  And then just so I understand this, you said that, still looking at 183, the recount procedure, if you turn to Page 5 under recount by manual count, (2)(a), does (2)(a) 1 and (2)(a) 2 --

THE COURT:  Are we on the recount one?  I'm sorry.

MR. CROSS:  Yes.  I'm sorry, Your Honor.  Still on that recount one.

THE COURT:  What page?

MR. CROSS:  Page 5.

THE COURT:  Okay.

MR. CROSS:  There is a heading that reads recount by manual hand count.  Under (2)(a), there's two provisions, 1 and 2.

Do I read this right that those are the only circumstances under which a recount can be performed by manual count -- manual hand count?

MR. RAYBURN:  Yes.  This rule is saying these are the two different provisions that would allow for a manual recount. So one of these two conditions would have to be present. Either the equipment that you are testing with the mini audit before the recount -- all that equipment has failed.  That

would be (a)(1) when it says as provided under

Rule 183-1-15-.03(1)(c).  That is referencing the mini audit

provision.

So if your equipment has failed the pre-recount mini

audit, then that would be an allowable instance where you could

do a manual recount.  The other allowable instance would be

pursuant to a court order.

THE COURT:  So, you know, we have recounts in the

state when there is less than 5 -- .5 percent or something like

that --

MR. RAYBURN:  Yes, Your Honor.

THE COURT:  -- difference.  So that wouldn't trigger

one -- a manual recount?

MR. RAYBURN:  So that would trigger a recount.  So

once a recount is authorized, then you have to do that testing.

So if it fails the testing, that is when the recount goes from

an electronic recount or a retabulation to a manual recount.

MR. CROSS:  The question I had, Your Honor, if I'm

reading this right, this seems to say that this rule would

prohibit a manual hand count unless it satisfies one of those

two provisions?  Meaning the rule prohibits a manual hand count

unless it fails the mini audit described in (1)(c) or a court

orders it.

Is that right?

MR. RAYBURN:  So for a recount to be a manual

recount, it has to meet one of those two conditions per the rule. Once again, the audit rules are not yet promulgated so that obviously an audit is a manual count. So audits and recounts do play -- interplay together. But for now, for a manual recount, these are the two provisions allowed by the rule and only the two provisions allowed by the rule.

MR. CROSS: So in Your Honor's example, if we had a close election, this rule would prohibit a manual recount for that unless it failed the mini audit or a court ordered it?

MR. RAYBURN: That was kind of compounded.

MR. CROSS: Sorry.

MR. RAYBURN: But if there is less than half a percent difference between the winner and the loser, then the law allows for the losing candidate to request a recount.

If a recount is requested, you test the equipment. If the equipment fails the test provided for in the rule, then the backup option is a manual recount.

MR. TYSON: As Your Honor is aware, in the election contest procedures as well, there is a range of remedies a superior court judge has when faced with an election contest in a close election. And that would be, I think, our primary method of getting to a court order under this particular rule.

THE COURT: All right.

MR. CROSS: Could I ask two more questions on this?

THE COURT: Yes.

1       MR. CROSS:  Still on the recount procedure, the mini

2  audit described in (1)(c), that would not capture a ballot that

3  at the time it was printed did not accurately capture the

4  selections the voter intended?  Meaning, if the ballot had

5  selections that corresponded with the QR code but it was not

6  the selections the voter intended and the voter didn't see

7  that, that would not be captured in the mini audit; right?

8       MR. RAYBURN:  So, Your Honor, just like if you were

9  marking a hand-marked paper ballot and you did not mark it

10  correctly, it would also not reflect the voter's intent.

11       MR. CROSS:  Except here it is the BMD that is marking

12  it, not the -- the error would be on the part of the BMD, not

13  the voter since the voter is not marking that by hand?

14       MR. RAYBURN:  In this hypothetical, you are assuming

15  that the BMD is not accurately recording the voter's vote.

16       MR. CROSS:  That is the question.  If we have a

17  ballot where the BMD is not accurately recording the vote in

18  the human readable portion but the human readable portion

19  matches the QR code, the mini ballot -- I'm sorry -- the mini

20  audit in (1)(c) would not capture that situation; right?

21       MR. RAYBURN:  I mean, the recount is a hand count of

22  that ballot.  So if the human words -- it is counting the human

23  words.  So you're talking about the ballot itself being wrong.

24       MR. CROSS:  Correct.  That would not get captured in

25  the mini audit in (1)(c); right?

1          MR. RAYBURN:  True.  Just like if the ballot -- the

2    hand-marked paper ballot is itself wrong, it would not.

3          MR. CROSS:  The last question I had, Your Honor, if

4    we can turn back to the definition of voting rule just quickly

5    on this.  So under Subparagraph (h) that we looked at, the

6    definition of voting -- so my understanding was the definition

7    of voting includes both manifestations of the vote?  So the QR

8    code and the human readable portion unless --

9          Well, let me just start there.  Is that right?  Both

10   are captured on the paper ballot?

11         MR. RAYBURN:  Yes, with both types of paper ballots.

12         MR. CROSS:  So the only time the human readable

13   portion --

14         THE COURT:  All right.  Just ask a question.  Don't

15   cross-examine him.

16         MR. CROSS:  I'm sorry.  I understand.  I don't mean

17   to cross-examine him.  I'm just want to make sure I understand.

18         Is it the case that the only time the human readable

19   portion would become the ballot of record is if the ballot has

20   failed the mini audit in (1)(c) of the recount procedure?  Or

21   is there another circumstance in which the human readable

22   portion would become the ballot of record?

23         MR. RAYBURN:  I don't understand your question.

24         MR. CROSS:  So I'm trying to figure out in what

25   situation does the human readable portion become the ballot --

1  it is defined as the vote.  It becomes the ballot of record as

2  opposed to the QR code.

3         As I read this, it sounds like that would only happen

4  if the ballot is found to have a discrepancy in the -- only if

5  some discrepancy arises in the mini audit portion of (1)(c).

6         MR. RAYBURN:  Well, the initial tally for all ballots

7  is based on coordinates.  So the initial tally is not looking

8  at any -- for any type of ballot.  Anything except coordinates

9  that were the manifestations of the voter's intent.

10        MR. CROSS:  Let me just -- I'll take the Court's

11 instruction and try a better question.  In (h), as you said,

12 there's two manifestations of the voter's intent, assuming the

13 QR code is right and the text is right.

14        In what situation does the human readable portion

15 become the ballot of record under these rules?

16        MR. RAYBURN:  What do you mean by ballot of record?

17        MR. CROSS:  The portion that counts to tabulate the

18 vote.

19        MR. RAYBURN:  So in a recount, if you've -- if there

20 is an electronic retabulation, it is running the ballots

21 through the tabulators again.  So it is checking the

22 coordinates.  If there is a discrepancy, then the human

23 readable portion becomes the vote -- becomes the vote for that

24 ballot.

25        MR. CROSS:  Okay.  So the human readable portion of

1    the ballot is what counts for the vote only if we're under

2    (1)(c) of the tabulation procedure -- the recount procedure;

3    right?  Meaning, something has failed, and so now you are going

4    to rely on the human readable portion?  That is what I'm trying

5    to understand.  Is that right?

6           MR. RAYBURN:  No tabulator looks at the human

7    readable portion.  So the tabulators are tabulating based on

8    coordinates.

9           MR. CROSS:  Do you understand what I'm asking, Your

10   Honor?  It doesn't seem complicated.

11          MR. TYSON:  Your Honor, I don't understand what we

12   are talking about.

13          MR. MILLER:  I'm sorry.  But at this point, I think

14   we've repeated the same question and we're going down a line of

15   cross-examination and asking Mr. Rayburn for a legal conclusion

16   as to the rules and regulations that were posted this morning.

17          MR. CROSS:  I don't mean it to be cross.  It is just

18   really important.

19          THE COURT:  All right.  I understand.  The thing is

20   there are a variety of things being asked here.  And I mean,

21   these are significant questions.  It is a little hard because

22   everyone just is looking at it for the first time, frankly.

23          MR. CROSS:  We just got it.

24          THE COURT:  And because -- I mean, we use the word

25   printed paper ballot in different ways too.  So I think what I

1    would suggest is the last question -- because you are trying to

2    get at something, but it is not 100 percent clear.

3              If you need -- if you need a minute to actually try

4    to ask in a more basic term what the question is and think

5    about it, then let's just pause for a minute so you can do

6    that.

7              MR. CROSS:  So I can explain the context of what I'm

8    asking.  And I don't mean this to be cross.  I'm genuinely

9    trying to understand this.

10             Dr. Gilbert in his declaration many times relies on

11   what he refers to as the human readable record controls.  I'll

12   give you an example.

13             THE COURT:  I think they remember.

14             MR. CROSS:  Okay.  That is what I'm trying to

15   understand.  Oftentimes when he is saying this system is okay,

16   he is saying it is okay because in his language the human

17   readable record controls.  The human readable record is that

18   portion.

19             My question is:  Under their rules, when does the

20   human readable record control in the way that Dr. Gilbert has

21   described that?  That is all I'm trying to understand.  It

22   seems like that is only if the mini audit fails.

23             THE COURT:  No.  That is --

24             MR. MILLER:  Your Honor --

25             MR. TYSON:  I'm sorry.

1          MR. MILLER:  At this point, the question has been

2  compounded not only within itself but also with someone else's

3  declaration and presupposing a characterization of it.  But,

4  you know, Mr. Rayburn --

5          THE COURT:  I don't think there was anything wrong

6  with the characterization.  But let's just try to answer this.

7  And then we will try to move on.

8          But I think it is such a -- it is a central question.

9  And it is what is lurking obviously here in one form or another

10 in some of the questions I have asked beforehand.

11         But -- so -- because I didn't understand why

12 Dr. Gilbert was saying things -- it was the human readable

13 portion that controls and thought it was kind of an unfair -- I

14 wanted to start with the state because I didn't want to put him

15 in that position because he said I haven't used the system, I

16 don't know, it is my understanding.  So I understood he knew

17 from somebody that this was so.  So -- but I have got two of

18 you here.

19         MR. MILLER:  I'm sorry.  If I may, just on

20 Dr. Gilbert, since he is on the phone, I think just two points

21 that will -- he can explain on the phone as well.  But the

22 timing of when his declaration was written was obviously before

23 any rule.

24         THE COURT:  Right.  I understand that.

25         MR. MILLER:  And also the delineation between

1    recounts and audits is part of what is in his declaration too.

2    So --

3         THE COURT:  Right.

4         MR. TYSON:  So we have a whole section of what

5    defines a vote.  So I guess, Mr. Rayburn, can you try to

6    answer?  I mean, we have a whole section outlining what a vote

7    is.  So in light of all that...

8         MR. RAYBURN:  So I mean, the audit will look only at

9    the human readable portion.  So in an audit, 100 percent the

10   human readable portion controls.  And with a recount, there is

11   the two-step process.  First, you check the equipment by

12   looking at the human readable portion of a sample of ballots;

13   comparing it to a retabulation of that sample to make sure that

14   the scanners are accurate.

15        If the scanners are accurately interpreting those

16   votes, then you do the recount through a retabulation.  And if

17   there is a discrepancy between what the scanner is reading and

18   the human readable portion, the human readable portion would

19   control.

20        THE COURT:  All right.  Just with respect to the

21   recount, let me ask you this:  We're talking about 75

22   BMD-created votes that you are running -- well, you have got

23   the ballots I realize.  You have got the original ballots, and

24   then you are able to see how they come up.

25        And this is sort of an errant question.  But,

```
 1   obviously, there might be circumstances though that are
 2   different throughout the state, if you are talking about a
 3   statewide election.  It is kind of a simpler thing if you're
 4   doing a recount and assessing this from a local election
 5   that -- but are there any concerns that if you are dealing with
 6   a statewide or much larger -- a Congressional election covering
 7   a lot of different types of polling circumstances that you have
 8   a -- I realize that you are saying we're just testing the
 9   scanners we're using for the recount.
10          But is there any chance that it makes a difference
11   about where these ballots are coming from?
12          MR. RAYBURN:  So each county is going to have to do
13   this test on their own equipment.  So it is kind of divided up
14   by county.
15          THE COURT:  Okay.
16          MR. RAYBURN:  So if there is a multijurisdictional --
17   let's say a Congressional district.  Every county in that
18   district is doing this mini audit on their equipment.  Each of
19   them are picking at least four ballot boxes from their portion
20   of the ballots that were cast for that race and testing the
21   equipment against that test deck.
22          THE COURT:  Okay.  All right.  That is helpful.
23   Thank you very much.
24          MR. TYSON:  Your Honor -- I'm sorry.
25          THE COURT:  All right.  So we had some -- I know we
```

1    just sort of plunged into a direction.  I didn't know where we

2    were going at all.

3              So let me just go back to the questions that I

4    originally asked as well.  And I'm assuming that you are going

5    to be answering a lot of these.

6              MR. RAYBURN:  Yes, Your Honor.

7              THE COURT:  So the first question was, what is the

8    status of the State Election Board rules on precertification

9    tabulation audits required under OCGA 21-2-498?  What is the

10   expected date of notice and comment on those proposed rules?

11             I know that you said everything is in process.  Do

12   you have a projected date though?

13             MR. RAYBURN:  Not a date certain.  I think the

14   earliest possible date would be the April 15.  But I think that

15   would be a very tight time frame.  With the March PPP election

16   coming up and that very large audit that we're going to do in

17   Fulton, that is going to be very informative.  And I think that

18   is going to largely drive a lot of the tweaks to these draft

19   rules.

20             We have a working group made up of State Election

21   Board members, county election officials, and Secretary of

22   State staff that is reviewing and fine-tuning rule drafts

23   before they are presented to the State Election Board.

24             And so this would go through that process as well to

25   make sure -- especially the State Election Board members,

1 | Secretary of State staff, and counties are all in agreement

2 | that this is something that will work and is feasible.  And

3 | then it would be presented to the State Election Board for

4 | posting, if they approve posting it, for public comment, going

5 | through that period.  And I know this will be of great

6 | interest.  So we'll probably get very good public comment that

7 | might require further revisions.

8 | THE COURT:  When you say very large, can you give us

9 | an idea of how large that is?

10 | MR. RAYBURN:  Oh, so looking back at 2016, I want to

11 | say there was 177,000 votes cast.  This potentially could be,

12 | you know, a good bit more.  We've registered a lot more people

13 | here in Georgia.  We have larger population.  There is a lot of

14 | interest in this democratic presidential preference primary.

15 | So it could be more than 200,000.

16 | THE COURT:  And the audit itself would be in that

17 | range you are saying?

18 | MR. RAYBURN:  So the audit that we are preparing to

19 | conduct in Fulton is called a ballot polling risk-limiting

20 | audit.  I would be happy to talk about that in more detail,

21 | Your Honor, if you would like.

22 | THE COURT:  Well, the question was really:  When you

23 | think about 200,000 people casting a vote, which is the number

24 | I heard, what percent -- I'm just trying to understand what the

25 | percentage would be likely audited.  Are you talking about

1  200,000?  Are you talking about some other number?  That is

2  what I didn't know.

3          MR. RAYBURN:  Sure.  So with a ballot polling

4  risk-limiting audit, the sample size, the percentage of ballots

5  you are looking at, actually depends on the margin of victory.

6          So if the winning candidate has 20 percentage points

7  more than the second highest most vote receiver, then the

8  sample size goes down.  If it is a very close election between

9  first and second place in Fulton County -- and that might

10  actually cause it to be rather large.  With a ballot polling

11  risk-limiting audit, it fluctuates based on that margin.  So

12  that margin is the unknown right now where we are today that

13  will dictate the percentage.

14          It could be one percent of the ballots cast.  It

15  could be a good bit more than that.  It just depends on the

16  margin.  If we were to do, for example, a batch comparison, you

17  often see one percent, three percent, and in a really close

18  election maybe five percent of the ballots cast are looked at.

19          One of the advantages of a risk-limiting audit is

20  that they are supposed to be more efficient.  You are supposed

21  to be able to look at fewer ballots and still have confidence

22  that the outcome was correct.

23          MR. TYSON:  Your Honor, as far as the time line goes,

24  I believe we have determined that July, August is the latest

25  that the rule could be promulgated to be effective for the

1  November election.

2        So in terms of this program that the state is engaged

3  in, there is kind of an outward limit of when the rule is going

4  to have to be promulgated so there is time to notify county

5  officials, to train people on the processes since these

6  pre-tabulation audits will have to go into effect for

7  November 2020.

8        THE COURT:  I think many of the other questions here

9  have been answered.

10        Is a visual image of each BMD ballot cast by votes

11  being maintained by each county or the state?

12        MR. RAYBURN:  Yes.  So the instructions are for them

13  to -- let me back up.  Each tabulator has a memory card that is

14  recording the vote tabulations, audit log, and the ballot

15  images.  That is where the images originally are because they

16  are coming from that scanner tabulator.

17        On election night, those items are uploaded into the

18  air-gapped election management system that is in each county.

19  So they are physically plugged in to the computer.  And that

20  computer is not hooked up to the internet.  And that is

21  downloaded to that computer in each county.

22        So the counties are to keep a copy of all those

23  ballot images that are on that computer.  And then they will

24  also -- before the state can certify, we do what is called a

25  ballot run.  Paperwork and a copy of that election database is

provided to the state.  We gather that from 159 counties.  So

the state would also have a copy.  So those will be preserved.

THE COURT:  And, meanwhile, the physical ballots

are -- each county is responsible for keeping preserved?

MR. RAYBURN:  That is right.  After the election is

certified and, you know, any contest period has expired, those

actual physical ballots, along with the tabulation sheets and

voter certificates -- all that information actually goes under

seal with the superior court clerk.  And that is held for, I

believe, at least 22 months.

THE COURT:  I don't know whether you are the right

person and probably are from what I can tell.  But Question 3

of the ones I asked before -- and I still have that question

when I looked at the election procedures that were distributed.

And this goes -- the question, again, just for the

record was, the state's counsel addressed at the last hearing

the state's preliminary plans -- and I will just say I

recognize they were very preliminary -- for handling voter

identified concerns regarding the accuracy or operation of

particular BMD machines or ballot scanner/printers flagged

during the voting process at specific precincts.

What is the status of those plans?  What are the

plans?  Because when I looked at -- let's see -- the rules as

to conducting elections -- and I'm referring to 183-1-12-.11,

which is on the filing provided by the state at Document 717 --

1   it deals with recorded malfunctions and emergencies at Pages 10
2   and 12.

3          And -- but I couldn't see anything that was supposed
4   to happen in particular other than the election -- the poll
5   manager was supposed to call the superintendent and bring it to
6   his or her attention immediately.

7          MR. RAYBURN:  So what this rule says is that they are
8   to document on a state-provided form the incident.  So that
9   incident -- that documentation would go to the county
10  superintendents as the election materials are leaving the
11  polling places.  So the superintendent would have those.

12         Part of our ballot run where we gather copies of the
13  county election paperwork, we expect that that document to also
14  be provided to the state so that the state would have
15  visibility, the county which runs the election has visibility
16  over their equipment so that those incidents -- malfunction
17  incidents are preserved and can be reviewed.

18         THE COURT:  I guess the question really is -- maybe
19  you view this as not relevant.  But let's talk about the old
20  machinery.  Let's say that you -- or the sort of problem that
21  was identified with a different system in Pennsylvania where --
22  that you're not anticipating because there's different
23  technology.

24         But let's say that a particular machine keeps on --
25  you get one voter and then you get an hour later another voter

1　who says this is not producing my actual selections.  And you

2　correct it for that person, but it doesn't mean you correct it

3　for everybody else.

4　　　　When is the plug pulled on that machine essentially?

5　This doesn't tell me that.  You just document those two

6　individuals.  But they really perhaps should -- that is your

7　flag at that point or the head of the precinct's flag.  So that

8　is -- just documenting it doesn't take care of all the people

9　who might have voted on a machine that was not, in fact,

10　properly recording.

11　　　　MR. RAYBURN:  Sure.  So it is going to be a judgment

12　call at the poll manager level in conversation with the

13　superintendent.  So there's certainly times where a voter might

14　misremember as they mark.  And so they may think it is a

15　discrepancy when it is not.

16　　　　And so the discrepancy form, the incident form,

17　should document which particular piece of equipment the voter

18　used, describe the incident because it is going to be important

19　whether it is a printer jammed and my ballot smeared versus, as

20　you describe, I know what I marked on that screen and it didn't

21　print.  Those are different things.  And they need to be

22　recorded differently.

23　　　　And then the poll manager will make -- there is not a

24　set threshold when it reaches this number.  That is not

25　currently the rule.  It is -- what it says is significant

number, and it is a judgment call that the poll manager has to make.

And there is authority though for them to shut down that machine and for it not to be used. So the point of this is to document it. That machine could be reviewed. The audit log can be reviewed to determine what was happening inside that machine.

And Paragraph 11 is the provision that talks about being able to shut down the machine.

THE COURT: All right.

MR. RAYBURN: But, Your Honor, it is a balance. Because when you shut down a machine, now you've reduced your capacity. So that is why I think it needs to be a judgment call. The poll manager needs to assess the situation, almost kind of interviewing a witness. You are talking to this voter and trying to understand what experience they had. So that is why I think the State Election Board went this route.

And it also interplays with other parts of the rule where the poll workers at every ballot scanner are asking the voters to review their ballots. So if there is a recurring problem with a particular machine, it should be -- this should appear more -- you know, quite often. And it would be readily apparent if there is a significant issue.

THE COURT: So in 11(b) when it says, when the ballot scanner malfunctions, the voter shall place their voted ballot

1  in the emergency bin, that is going to be run by -- by some

2  other scanner later on; is that right?

3        MR. RAYBURN:  Yes.  So if the issue with the scanner

4  that is on the ballot box -- if that keeps ballots from being

5  able to be scanned, they use the emergency bin.  If it can be

6  resolved -- let's say it was a paper jam.  You want people to

7  keep moving.  So all right.  We're going to transition to the

8  emergency bin until we can clear the paper jam.  Once that is

9  cleared, poll workers at the end of the poll day can scan their

10 ballots there at the precinct level.

11       If that particular scanner cannot be fixed at the

12 polling place, they would be taken to the central office and

13 scanned centrally.

14       THE COURT:  All right.

15       MR. CROSS:  Your Honor, could I ask a quick question

16 on 11(b) that you were just on?

17       THE COURT:  Yes.

18       MR. CROSS:  If the ballot scanner is found to

19 malfunction, it says that ballots can go in the emergency bin

20 and then those will be scanned later.  What about the ballots

21 that were already scanned by that scanner?  What happens with

22 those?

23       MR. RAYBURN:  So the ballots that are rescanned are

24 in the ballot box, and they are in a different compartment.  So

25 they are separated from the emergency bin.  So those ballots at

1  the end of the day would be removed.  We would also run a tape,

2  if you can, from that central scanner.

3        And so you segregate those two ballots.  You have the

4  ballots that have already been tabulated.  They go into a

5  ballot box.  You have to keep those emergency bin ballots

6  separate so they can be retabulated.

7        If -- once you take all the election equipment to the

8  central office, you have that memory card in hand.  And they

9  attempt to physically attach it to their election management

10 system and download the results, the ballot images.  If for

11 some reason that card does not have those ballots -- it has

12 been damaged, whatever -- it depends on the malfunction -- then

13 they can rescan those ballots -- both sets of ballots at this

14 point and then retabulate them.

15       MR. BROWN:  I have a follow-up question to that, Your

16 Honor.

17       If there are complaints with respect to a particular

18 machine toward the end of the day after, say, 200 votes have

19 been cast on that machine, what happens to the votes that were

20 cast?  Are those counted or not counted?

21       And what if -- in follow-up to that, what if it is

22 sporadic instances of complaints on all of the machines or not

23 defects, just people reporting defects?  Maybe they are telling

24 the truth.  Maybe they are not.

25       How do you know if the voter is telling the truth

          1    when they are complaining about their vote?  And if you can't,

          2    couldn't a relatively small number of people force a new

          3    election just by complaining that the BMD did not accurately --

          4              THE COURT:  That's a lot of questions.  Let's start

          5    with the beginning one.

          6              MR. TYSON:  Mr. Brown, are you talking about the

          7    optical scanners or the ballot-marking devices?  You said the

          8    machine records the votes.  The ballot-marking devices don't

          9    record the votes.

         10              MR. BROWN:  That leads me to about six other

         11    questions.

         12              THE COURT:  All right.  Let's take five minutes of a

         13    break, and you get your questions -- Mr. Brown, just

         14    consolidate them so that we have a clear record of what that

         15    is.

         16              I mean, we're going fine on time -- because it is not

         17    the way I thought it was going to be.  But that is fine.

         18              MR. RUSSO:  Your Honor, I just want to point out that

         19    Mr. Sterling and Dr. Coomer, on the phone, may be able to also

         20    answer some of these.  I believe Dominion is going to have at

         21    least one technician in every county.  So --

         22              THE COURT:  That would be great.

         23              MR. RUSSO:  I don't know how long we will have Dr.

         24    Coomer.  But we do have him for now.

         25              THE COURT:  So tell me what Dr. -- maybe when you

1  come back, you can tell us what each of them would best be able

2  to address so that we use our time wisely.  All right?

3        And I really do mean five minutes.  I probably will

4  stay here because I'm the worst offender.

5        All right.  So, Mr. Brown, if you could relay what

6  your question is also to them in advance when you -- or your

7  three or four questions together, that would be useful.

8        All right.  I'll see you in five minutes, 25 of 4:00.

9        COURTROOM SECURITY OFFICER:  Court stands in recess.

10       **(A brief break was taken at 3:33 P.M.)**

11       THE COURT:  All right.  So has Mr. Brown relayed to

12  Mr. Rayburn the questions?

13       MR. TYSON:  Yes, Your Honor.  I think we

14  significantly consolidated the question-and-answer portion

15  here.

16       THE COURT:  Good.

17       MR. BROWN:  As we discussed, if a ballot-marking

18  device late in the day -- late in the day, let's say, starts

19  having a lot of complaints such that it should be taken out of

20  service, my understanding is that all of the votes that had

21  been cast up until that time would be counted in the election

22  anyway; is that correct?

23       MR. RAYBURN:  So once a paper ballot goes into the

24  scanner, it is accepted by the scanner and drops into the

25  ballot box.  It is cast.  And you cannot trace that ballot back

1  to an individual ballot-marking device or an individual voter

2  or anything.  So you would not be able to later take that out

3  and say not to count the ballot.  It is counted.

4          MR. BROWN:  Thank you.  And then there is really no

5  way to tell -- since there is no way to tell whether a voter is

6  telling the truth about whether his or her ballot was accurate,

7  the system is vulnerable to fake complaints about the accuracy

8  of the system; correct?

9          MR. RAYBURN:  I think every election would be

10 vulnerable to fake complaints.

11         MR. BROWN:  And with the BMDs, malicious actors could

12 shut down a number of different BMDs if they were coordinated

13 and complained a lot about the outcome -- correct? -- in ways

14 that they couldn't do with hand-marked paper ballots?

15         MR. RAYBURN:  I don't think it would be different.  I

16 think malicious actors can dump paper on a stack of hand-marked

17 paper ballots and keep elections from being conducted.  So a

18 malicious actor is going to do what they do.  And it breaks the

19 law, and they are taking that risk.

20         But we have -- a lot of this equipment, it is a

21 judgment call.  That is why, you know, the poll manager has to

22 make that decision based on the complainant.

23         MR. BROWN:  We discussed this also during the break.

24 The logic and accuracy testing that you described is vulnerable

25 to what is called the dieselgate kind of malware --

THE COURT: All right. You know, I really didn't anticipate you going that far, frankly. I mean, I'm sure that there are a host of other questions that one could ask. And the plaintiffs might want to, if I conducted a full hearing. But this is what I was interested in.

MR. BROWN: Thank you, Your Honor.

MR. TYSON: Your Honor, one question we haven't covered related to your question about the 90-day report on the pilot program.

THE COURT: Right.

MR. TYSON: And I think -- I believe Mr. Rayburn has explained adequately. It is a program. It is not a single audit. So it has not been triggered yet to provide that report. And that will be coming at a later point.

Am I saying that right?

MR. RAYBURN: That is right.

MR. TYSON: Okay. I just wanted to make sure we had that clear in the record.

And then Dr. Gilbert and I know the folks --

THE COURT: So does that mean though 90 days after -- for instance, if the Fulton County audit is the penultimate one, 90 days after that or --

MR. RAYBURN: If it is. But the next iteration of our due diligence would be to do multicounty. Then the final kind of true test and possibly in July if we have a

statewide -- for example, democratic senate primary runoff,

that would be a great opportunity to do something statewide.

And that would be the best then to do a comprehensive report

from.

        THE COURT:  All right.  Okay.

        MR. TYSON:  And then, Your Honor, Dr. Gilbert and I

know the folks from Dominion are under some time constraints.

Dr. Gilbert is at a conference.

        So if there are specific questions for them, it might

be good to cover those and return.  I think we have covered

most of Mr. Rayburn's topic areas.

        THE COURT:  All right.

        MR. CROSS:  Your Honor, could I ask just two very

discrete questions of Mr. Rayburn before he --

        THE COURT:  But he is not going to be leaving.

        MR. CROSS:  Oh, okay.  All right.

        THE COURT:  I don't think.  I think he is here for

the duration.

        MR. CROSS:  It looks like he was running away, as I

would if I were him, in fairness to him.

        THE COURT:  I do have -- Mr. Rayburn, when did you

join the department?

        MR. RAYBURN:  July 2016.

        THE COURT:  And you have been in the same capacity

throughout the time?  I just haven't seen you before.

1        MR. RAYBURN:  I have been in the back watching.

2        THE COURT:  I'm so sorry that I didn't see you or

3   hear from you before.  Thank you.

4        So the question was about the state contract -- who

5   is creating the ballot.  And I don't know whether that is --

6   whether they are involved in that question.  Obviously,

7   Dr. Gilbert is not.

8        MR. RUSSO:  Yes, Your Honor.  I think the two people

9   that would be best would be Dr. Coomer and Gabe Sterling on the

10  contractors.  And then I think it kind of also ties into your

11  second question from the March 2nd order about the systemic

12  modifications.

13        THE COURT:  All right.  So if you are trying to use

14  your person on the phone, why don't we start with them.

15        MR. RUSSO:  Dr. Coomer would be best.

16        THE COURT:  All right.

17        MR. RUSSO:  I suppose he can hear us.

18        DR. COOMER:  Yes.  This is Dr. Coomer.  I can hear.

19  I wasn't sure if there was a specific question or if it was

20  more of a general question.

21        THE COURT:  Does he have these questions in front of

22  him?

23        MR. RUSSO:  Yeah.  Dr. Coomer, do you have -- I don't

24  think -- you do not have the order in front of you that set out

25  the questions about the state contractor.  But I can just read

1   them --

2           THE COURT:  Thank you.  I'm looking for

3   Dr. Coomer's --

4           MR. RUSSO:  -- if that is easiest.

5           THE COURT:  That would be fine.

6           MR. RUSSO:  Dr. Coomer, are you familiar with the

7   ballot-building process?

8           DR. COOMER:  Yes, I am.

9           MR. RUSSO:  And the question from the order -- the

10  first one is -- I'll just go through it quickly, and we can

11  clarify --

12          THE COURT:  Dr. Coomer is director of product

13  strategy and security for Dominion Voting Systems; is that

14  right?

15          DR. COOMER:  That's correct.

16          THE COURT:  All right.

17          MR. RUSSO:  And, Dr. Coomer, who -- well, could you

18  let us know -- is Dominion doing the ballot-building process?

19          DR. COOMER:  Yes.  It is 100 percent Dominion

20  employees.  For the current election, it is actually one

21  employee, █████████████.  She has done all of the ballot

22  programming for all 159 counties.

23          MR. RUSSO:  Okay.  And are there any -- are there

24  any -- is there anyone who is modifying the ballots at the

25  county and precinct level use?

1          DR. COOMER:  No, there is not.

2          MR. RUSSO:  Okay.  And what security measures does

3   Dominion take to protect against the threat of intrusions

4   during the ballot-building process?

5          DR. COOMER:  So all of the -- all of the ballot

6   programming is being done on-site in our warehouse.  That is

7   done in a secure area.  So the warehouse itself has physical

8   security.  Everybody has a photo badge.  There is an electronic

9   key access into the building.

10         The actual work station where the ballot programming

11  is done is in a separate locked room, which ███████████ has

12  access to, as well as a couple other of the senior project

13  managers.

14         The main computer server where all the data is stored

15  is actually in a secure server room, which even ███████████

16  does not have access to.  That is only accessible by the senior

17  project managers.

18         All of the areas are under 24-hour camera

19  surveillance.  There are also 24-hour camera surveillance

20  externally to the building as well.

21         MR. RUSSO:  And you mentioned that ███████████ is

22  the only person doing the ballot-building process for the

23  presidential preference primary?

24         DR. COOMER:  That's correct.

25         MR. RUSSO:  How many -- if you know, how many people

1   will be doing it for the May primary?

2            DR. COOMER:  Likely two to three.  Again, these are

3   full-time Dominion employees.  There is not any contractors

4   that are involved in the process.

5            Obviously, one person doing 159 counties was quite a

6   workload.  So we're hoping to spread that workload a little bit

7   more across some people.

8            THE COURT:  What do you anticipate -- this is the

9   judge.

10           What do you anticipate will be necessary for the full

11  election -- the general election?

12           DR. COOMER:  The workload is about the same.  And,

13  actually, because this was the first full election, a lot of

14  the base data has already been entered.  So that can be reused.

15  So the turnaround time will be much more efficient.  And, like

16  I said, I think we anticipate probably two to three ballot

17  programmers.

18           MR. RUSSO:  Was there any data that was taken from

19  the old -- the old GEMS system that was used in the

20  ballot-building process?

21           DR. COOMER:  No.  No.  All of the data that is in the

22  current system was keyed in by hand from original source

23  documents, being Excel spreadsheets or Word documents.  And

24  that was all hand keyed directly into the new system.  There

25  was no data extracted or reused from the prior system.

          MR. RUSSO:  And I might have missed this answer.  But

did you say that there were any modifications that would be

made at the county level?

          DR. COOMER:  No, no modifications at the county level

to the ballot.

          MR. RUSSO:  So once the ballot is built, it is

complete from Dominion?

          DR. COOMER:  That's correct.  Correct.

          MR. RUSSO:  And does Dominion conduct background

checks on its employees?

          DR. COOMER:  Yes.  So we do initial background checks

on hire, including criminal background checks, as well as

financial backgrounds, credit checks.  And we are implementing

a yearly annual background check process as well currently.

          MR. RUSSO:  Your Honor, I think this might have

gotten through all of the questions you had on Number 2.  I

mean -- excuse me -- on Number 1.

          THE COURT:  So I want to just make sure I understand

that the -- any type of modification needed for particular

local races your ballot builders are responsible for?

          DR. COOMER:  Yes.  That is correct.

          THE COURT:  Once you are through with developing the

ballot, what happens then?  Is it -- it is going to the state?

It is going to the counties?  Where is it going?  And how is it

going -- being transmitted?

1          DR. COOMER:  So when Dominion is complete with the

2     project, it is my understanding that we deliver that on secure

3     removable media.  It is basically an external hard drive.  We

4     deliver that directly to the state by hand.  We do not transfer

5     anything electronically.  We're not using any FTP sites for

6     data transfer or anything like that.  It is literally walked

7     over to the state and hand delivered.  And these are

8     password-protected, encrypted drives.

9          THE COURT:  And do you have -- does Dominion have any

10    responsibility in any way for interface between your software,

11    your equipment, and the server equipment that is -- and

12    connectivity at the local, county, or precinct level?

13         DR. COOMER:  No.  All the fielded systems are

14    air-gapped.  There is no electronic means of communication

15    between any of those systems.

16         THE COURT:  But does Dominion itself have any -- any

17    engagement or relationship with the rollout on a local level as

18    opposed to with the state staff, or is that something -- go

19    ahead.

20         DR. COOMER:  We certainly assisted in configuring and

21    installing the equipment and verifying that everything was

22    installed according to certification guidelines.

23         THE COURT:  All right.  And I do understand that

24    Dominion has equipment and software that is being used in a

25    host of other places.

1          But what other places has a statewide system with

2     your software and this configuration?

3          DR. COOMER:  So we do have statewide implementation

4     in Louisiana, and we are currently installing a statewide

5     implementation in Alaska.

6          THE COURT:  And the Louisiana one dates back to what

7     time?

8          DR. COOMER:  Mike can -- Mike Frontera can probably

9     answer that better than I can.  But under various prior

10    companies that have been acquired by Dominion, this goes back

11    into the early, I believe, 2000s.

12         Is that right, Mike?

13         MR. FRONTERA:  Yes.  So in the state -- Your Honor,

14    this is Mike Frontera, general counsel for Dominion.

15         In the State of Louisiana, that contract goes back to

16    a company called Sequoia Voting Systems, and it was assigned to

17    Dominion as part of an asset transfer from Sequoia to Dominion.

18    It goes back to ultimately the late '90s.  It was revised in

19    2005 with another major revision in 2011.

20         That is inclusive of a very similar system that is

21    being used in Georgia for both central counts and for early

22    voting.  And we continue to use kind of a hybrid of legacy

23    equipment in the State of Louisiana, as well as newer equipment

24    similar to what is being used in Georgia.

25         THE COURT:  Thank you.  All right.  Is there any

```
 1    further --
 2           DR. COOMER:  Sorry.  We also have a statewide
 3    contract in New Mexico.  It is hard to remember all of the
 4    accounts that we have.
 5           THE COURT:  And is it for comparable equipment and
 6    software?
 7           DR. COOMER:  It is similar.  They use slightly
 8    different voting terminals.  But all of the back-end and
 9    tallying equipment and recording infrastructure is the same.
10           MR. FRONTERA:  And, Your Honor, this is Mike again.
11    One other that just comes to mind and to Dr. Coomer's point,
12    sometimes it is hard to remember them all.  But in the State of
13    Colorado, which I am in, we also have a statewide contract.
14    And the system is very comparable, albeit a little different
15    flavor in terms of how voting is done.  But it is similar to
16    the system that is used in Georgia.
17           THE COURT:  Colorado has a large amount of people --
18    they have -- you can mail out the vote, don't you?  Don't they
19    have a huge -- don't they send out the vote to everyone so that
20    you can use -- by hand?
21           DR. COOMER:  Colorado is predominantly vote by mail.
22    But since they went to same day registration, they do have a
23    portion that vote in person on the ballot-marking devices.  It
24    is somewhere between five and ten percent depending on the
25    election.
```

1          THE COURT:  Okay.  Thank you.  All right.

2          MR. RUSSO:  Your Honor --

3          THE COURT:  Were there any other questions that are

4    really related to the ones -- the limited area that he has

5    covered from plaintiffs' counsel?

6          MS. KAISER:  Your Honor, we just have one follow-up

7    question.  Sorry.  This is Mary Kaiser for the Curling

8    plaintiffs.  Just one follow-up question.

9          Dr. Coomer, have you personally done any examination

10   of the system, the servers and computers, that are being used

11   to build the ballots for the Georgia system?

12         DR. COOMER:  I have not been on-site in Georgia, no.

13         MS. KAISER:  Thank you.

14         THE COURT:  Who is the person responsible in Georgia?

15         MR. RUSSO:  ███████████████, Your Honor.  ███████

16   ████████.  She would be -- we would try to get her here today.

17   But she is in the ballot-building process now.

18         THE COURT:  That is fine.  I understand.  And

19   Mr. Brown?

20         MR. BROWN:  This is Bruce Brown, sir.  Just one

21   follow-up question to your comment that all data was being hand

22   keyed into the new system.

23         That wouldn't include the 7 million records of the

24   voters that is used through the e-pollbooks and tied into your

25   system, is it?

          DR. COOMER:  No.  No.  We do not have any part in the

voter registration end of the system.

          MR. BROWN:  But your e-pollbooks are -- all that

feeds the e-pollbooks that you do use; correct?

          DR. COOMER:  Yeah.  And to be clear, the e-pollbook

is -- that is a contracted third-party system.  That is not a

Dominion-owned product.

          THE COURT:  So you-all aren't responsible then for

the e-pollbook?  Is that what you are saying?

          MR. FRONTERA:  Well, this is Mike.  I can answer that

question.

          So as part of the Georgia contract, we do have a

subcontractor for the e-pollbook.  And for particular clarity,

because there was a word used that is not accurate in terms of

linked to our system, there is no link between the e-pollbook

and our system.

          The e-pollbook is based on the fact that the voter

activates a card that ultimately tells the voting unit what

ballot style, i.e., what precinct, what party, et cetera, that

that voter should be presented based on their voter

registration.

          There is no direct link of voter registration

information or otherwise between the two systems.  It is only

the activation of a card that brings up the appropriate ballot.

          THE COURT:  All right.  But I guess what my question

1  was focused on:  This is a subcontractor of Dominion's, and

2  really the subcontractor you are saying is wholly responsible

3  for the programming, the integrity of the data, et cetera?

4          MR. FRONTERA:  So, ultimately, Dominion is

5  responsible because we are the prime contractor, for clarity.

6  However, from a technology standpoint, it is a completely

7  separate system.  That is what I wanted to make clear.

8          THE COURT:  Slow down when you are talking because

9  the court reporter is having trouble getting your words.

10          I understand that you are saying legally you are

11  ultimately responsible.  But I'm asking in terms of

12  pragmatically is it -- the subcontractor, remind me, is who?

13          DR. COOMER:  The subcontractor is KnowInk.  That is

14  K-N-O-W.

15          THE COURT:  But KnowInk is responsible for delivery

16  of this product; is that right?

17          DR. COOMER:  Correct.

18          THE COURT:  And is responsible for basically ensuring

19  its functionality and accuracy; is that correct?

20          MR. FRONTERA:  That's correct.  But we do work with

21  them closely because of the installation and the practicalities

22  of the installation.  But they are ultimately responsible for

23  the intellectual property and the technology that is being used

24  in Georgia for pollbooks.

25          THE COURT:  So just -- I think that what their -- the

question really relates to the interphase between what happens

with the Dominion system and your system.

And as I understand it, that when the card is -- when

somebody goes in and their information hopefully is identified,

that it is going to pull up the correct ballot?

MR. RUSSO:  Your Honor, I can maybe help a little bit

here.  Yeah.  That, I think, is partially right.  But the Poll

Pads that are used for check-in, those are used for -- it

doesn't matter whether you are voting a paper ballot or if you

are voting on a BMD.  The Poll Pads are going to be the same

Poll Pads, regardless.

THE COURT:  Right.  And they are going to be -- but

it is a new company that is running --

MR. RUSSO:  It is.  That is true.  It is a new

company.  But the -- there is no -- whatever type of vote

anyone -- if we were all voting on hand-marked paper ballots

and scanning them, it would be the same check-in process.

I don't want us to necessarily go too far off the

path here with the voter registration system and the new

scanning of the malware that they have put in place.

And I don't know if -- Dr. Coomer would probably not

be the right person for that.

THE COURT:  That is what I'm trying to find out, what

his interaction with this is, because he says --

MR. RUSSO:  That is right.  So he probably would not

be the right person to talk about Georgia's voter registration

system and that -- the process that they go through to run

checks for malware and the third parties that they use -- the

state uses to monitor that server.

THE COURT:  I was just trying to get at what was the

interface between Dominion's programs, ballot-building, its

entire operation.  Because something was suggested -- and I

don't know what it was.

Can the Dominion representatives clarify where is the

interface or what you do with KnowInk?

DR. COOMER:  Yes, I can speak to that.  Obviously we

have to --

THE COURT:  I'm sorry.  Which person is speaking now?

MR. RUSSO:  It is the general counsel.

DR. COOMER:  I'm sorry.  This is Dr. Coomer.

So from the ballot-building system, the project, we

export essentially a mapping file that gives KnowInk

information of what codes correspond to what ballot styles for

the voter.  So they import that mapping file into their system

so that they know when they look up a particular voter and that

voter lives in this -- you know, at this address, it

corresponds to this ballot style.  They know what code to put

on the smart card that then activates the ballot-marking device

to bring up the correct ballot.

MR. RUSSO:  Those are what are hand input; correct?

             DR. COOMER:  Oh, yes.  Yes.  Absolutely.

             THE COURT:  All right.

             MR. CROSS:  Your Honor, could I make a quick request.
Dr. Halderman sent us an email and pointed out the name of the
person building the ballots -- we should strike that name from
the record because we don't want that person becoming --

             THE COURT:  We'll deal with that later.

             MR. CROSS:  Okay.  We just -- it is not a name that
should be public.

             THE COURT:  Let's deal with that sort of thing later.

             MR. RUSSO:  We have no objection to -- we are just
trying to provide you information.

             MR. CROSS:  It is no fault.  I just thought people
shouldn't be using -- we don't want to continue to use the
name.

             THE COURT:  We'll deal with it later.  All right.
All right.

             MS. KAISER:  Your Honor, may I ask just two quick
follow-up questions of Dr. Coomer about the machines on which
the ballot-building is done?

             THE COURT:  Yes.

             MS. KAISER:  Dr. Coomer, are those machines ever
connected to the internet?

             DR. COOMER:  Absolutely not.

             MS. KAISER:  And is there ever removable media

1    plugged into those computers?

2         DR. COOMER:  Yes.  As I stated, that is how we

3    transfer the project data to the state.  So these are -- it is

4    a particular encrypted hard drive that we use.  It is

5    password-protected.

6         MS. KAISER:  Are those hard drives ever connected to

7    a machine that is connected to the internet?

8         DR. COOMER:  No.

9         MS. KAISER:  Thank you.

10        MR. RUSSO:  Dr. Coomer, those machines are new

11   machines; is that right?

12        DR. COOMER:  Yes, it is.

13        THE COURT:  Anything else for Dominion's

14   representatives while they are on the phone relating to this

15   subject?

16        Thank you.

17        MR. RUSSO:  Thank you.  We have Mr. Sterling here.

18        THE COURT:  Yes.  Go ahead.

19        MR. STERLING:  My name is Gabriel Sterling.

20   G-A-B-R-I-E-L S-T-E-R-L-I-N-G.  I'm the statewide voting system

21   implementation manager for the Secretary of State's office.

22        MR. RUSSO:  And Judge Totenberg had started asking a

23   little bit about the process that occurs after the ballots are

24   built and how they are transmitted to the counties.

25        Can you just walk us through that process?

1          MR. STERLING:  So I can pick up from when the

2    Dominion representative brings the data over to our Center for

3    Elections.  It is then put on to our air-gapped EMS, which is

4    also all new equipment.

5          COURT REPORTER:  Could I ask you to slow down a

6    little bit and speak up.

7          MR. STERLING:  This is going to be hard for me.  I

8    talk fast.  I will work hard not to do that.

9          THE COURT:  If it goes a little closer to you, it

10   might go higher too.  It is moveable.  But you are welcome --

11         MR. STERLING:  I have got a lot more gray hair now

12   than I did about six months ago.

13         So what happens is it comes into our office.  And

14   then our team would take it and provide the specific USB drives

15   to the counties.  What they do is they take them.  They put

16   them in a bag that is marked for the county.  We have a key.

17   We lock it.  And the county has a unique key to then unlock it

18   on their side.  So we FedEx that to them.  They have to unlock

19   it with their unique key.

20         THE COURT:  It is only because we are hearing this

21   information and may not completely have a portal for it

22   ourselves.  So just go -- go slower.

23         So, again, you said, our team would take it and

24   provide the specific USB drives to the counties.  And then you

25   would provide it to them in what -- you would drive it there?

1    Would you --

2          MR. STERLING:  I was about to say we take that sealed

3    bag.  We then put it into a FedEx.  That FedEx is then

4    overnighted to the county.  They receive it.  They would have

5    to have their unique key to then get back into that bag.

6          Once they do that, they have to call back to the

7    Center for Elections to get the password for that

8    password-protected drive.  They put it into their air-gapped

9    election management system at their office.  And that is how

10    they get the ballot combinations for their ballots.

11          MR. RUSSO:  Those are new systems that they are

12    putting in?

13          MR. STERLING:  Everything is new.  There is nothing

14    left over from the old.  There's new screens, new keyboards,

15    new mice.  Everything is brand-new.

16          THE COURT:  New computers?

17          MR. STERLING:  New computers.  And the Dominion techs

18    were there to help assure that everything is air-gapped and put

19    in properly because we have a tech in every single county.  And

20    in larger counties, we have multiple techs.  And there's

21    regional techs that manage those techs.

22          So we have Dominion people who are there on-site with

23    each county to make sure this is done properly while we're in

24    this learning process.

25          MR. RUSSO:  So one of the questions that was asked is

what systemic modifications and changes have been made on a county level to server equipment and connectivity in the last year. I think you -- can you speak to that?

MR. STERLING: Considering the main thing is that modifications are necessary because all of the stuff that was with the old GEMS system is now gone and in storage. So there is nothing left to modify. Everything there is new.

And like I said, with the election supervisors and the Dominion techs and their teams, they have installed all new equipment that is air gapped. So there is no need to make modifications on that front.

MR. RUSSO: I think that answers the second question, Your Honor. And I'll see if I have anything else for you.

**(There was a brief pause in the proceedings.)**

MR. RUSSO: I don't have anything else for Mr. Sterling that Dr. Coomer didn't cover.

THE COURT: Were there any questions from counsel?

MR. BROWN: Just one question, Mr. Sterling. This is Bruce Brown.

The counties still have the same PCs that they had before the new system that are hooked up to the internet with the election night software on it so that that is how it is communicated to the state; is that right?

MR. RUSSO: Are you talking about the servers that --

COURT REPORTER: I'm sorry. I can't hear you when

1    your back is to me.

2         MR. RUSSO:  I'm sorry.  Are you referring to the EMS

3    servers -- the new EMS servers or old computer equipment?

4         MR. BROWN:  I'm talking about the old computer

5    equipment that was in counties before with the -- you know,

6    that is just connected to the internet.  Those are still there,

7    and those are the computers that communicate with the Secretary

8    of State; right?

9         MR. STERLING:  The Election Night Reporting Scytl

10   system is when we take -- when we get the election night

11   reporting done, that data will be taken off the air-gapped

12   system and then put onto the -- whatever computer they have

13   that can upload the tallies that are unofficial tallies to the

14   Scytl system, which then loads into the state reporting system

15   after we verify that that is the correct upload.

16        We don't have any transparency -- they could have new

17   computers.  I haven't been to 159 counties to check for certain

18   yet.  But that system remains in place as it was previously.

19        But also Election Night Reporting, on that front, all

20   the actual ballot-building and actual tabulation equipment is

21   all air gapped from that front.

22        MR. BROWN:  So if there were malware on the old

23   system infected by the DREs, it would still be there?

24        MR. STERLING:  I'm not a fully technical person.  So

25   I'm not sure I'm the best person to answer that question.  If

there is a malware designed for a DRE, I don't know if it does anything else different.  So I'm not really the person to get into that.

MR. RUSSO:  Y'all use new -- the USBs are all new?

MR. STERLING:  The USBs are all new.

MR. RUSSO:  So those aren't -- and after an election, what happens with those USBs?

MR. STERLING:  Well, actually, I don't know if we are fully satisfied yet.  We think we will take the USBs and give them replacements on some of those.  And we'll store those like we do with the CDs now.  I know there's some people in our office who would prefer to burn everything onto a CD.  But that particular process has not been fully vetted out yet.

MR. RUSSO:  I think what Mr. Brown is asking ultimately about is is there a USB stick going back and forth. And it sounds like what you are saying is a USB comes out and goes in and reports and then it is done?

MR. STERLING:  It should not be used again.  Correct.

THE COURT:  But you are working out that part of the process?

MR. STERLING:  The final steps, yes.

MR. RUSSO:  Right.  So if it would be used in a future election, what you are saying is it would be either you are going to get a new one or you are going to get -- I guess you would have to format it or something?

           MR. STERLING:  Something along those lines.  We don't
know the answer just yet.

           MR. RUSSO:  And that is the same process that would
occur with the hand-marked paper ballot?

           MR. STERLING:  If we had a hand-marked paper ballot
system, we would have the exact same upload process, yes, from
the same -- the EMS would tally the votes the same way, and you
would have the same upload with the hand-marked paper ballots.
There would be no difference from either one of those systems
going into the Scytl upload for Election Night Reporting.

           MR. RUSSO:  That is because the tabulators for both
of them are the same?

           MR. STERLING:  Are the same, correct.

           THE COURT:  I want to make sure I understand the
significance or lack of significance of this.  You have -- your
new computers tally the vote.  And you put -- so those are
separate and apart and are at least supposedly pristine.  And
then you have -- you basically are going to transfer the data
from those in through -- I can't recall what you said.

           MR. STERLING:  A jump drive.

           THE COURT:  A jump drive.  And you are bringing it
over to the --

           MR. STERLING:  The outward facing machine.

           THE COURT:  -- the old machine, the ones that are in
use, to be able to transfer that data to the state at that

1  point?

2           MR. STERLING:  Correct.

3           THE COURT:  To the Secretary of State's office for

4  the Election Night Reporting?

5           MR. RUSSO:  That is just the reporting piece.  It is

6  not -- that is not the official vote counting.

7           MR. STERLING:  Correct.

8           THE COURT:  And is the official report when they have

9  the State Patrol bringing information in -- is that coming from

10  the -- the new computer -- the so-called new computers?

11           MR. STERLING:  That is coming from the pristine, new

12  Dominion EMS.

13           MR. RUSSO:  But, again, so you have the BMD that has

14  the paper ballot.  We have the hand-marked paper ballot.  The

15  tabulators are the same for both of those.  And it is the

16  tabulator that then tabulates and goes into that ENR.

17           MR. STERLING:  As Mr. Rayburn went into, you take the

18  memory card from that and that is what is put into the EMS to

19  do the overall tabulation of the entire county's results.  You

20  take the memory card from the tabulator, which is the polling

21  place scanner from each of the precincts.  You bring those into

22  the county -- to their single EMS.  And that is where they are

23  tabulated and then tallied together.

24           THE COURT:  Their single new -- supposedly new

25  computer EMS?

1    MR. STERLING:  Correct.

2    THE COURT:  They are tabulated then and --

3    MR. STERLING:  They are tabulated on the precinct

4  scanner.  They are tallied into the EMS.

5    THE COURT:  They are tallied.  And then you are going

6  to get a jump drive that is going to contain the tally --

7    MR. STERLING:  Uh-huh (affirmative).

8    THE COURT:  -- and bring it over to another garden

9  variety computer or server and send that data up for Election

10 Night --

11   MR. STERLING:  -- Reporting.

12   THE COURT:  Informal reporting or unofficial

13 reporting?

14   MR. STERLING:  Unofficial results.

15   MR. RUSSO:  Then they will decide whether -- they

16 will decide whether they are going to get new USBs for the next

17 election or whether they will format those and use them.

18   MR. STERLING:  To reinforce Mr. Russo's point, it is

19 the same process whether it is a hand-marked paper ballot or a

20 BMD-produced ballot.

21   THE COURT:  All right.

22   MR. RUSSO:  Should we go to Dr. Gilbert next?

23   THE COURT:  You know, the thing is is Dr. Gilbert --

24 I think I went through the questions posed by the assertions in

25 some of -- that Dr. Gilbert made.

1          The only one that I think was not completely covered

2     was -- and I don't really want to quibble with Dr. Gilbert,

3     frankly -- is his statement that the human readable portion of

4     the paper ballot printout is the official vote record.  And he

5     says the human readable portion of the paper ballot printout

6     controls in any recount.

7          And I guess just going backwards, I'm not --

8     Dr. Gilbert, your understanding here is one you had in what --

9     you filed this -- the affidavit is from November?

10          MR. RUSSO:  I'm going to let -- Mr. Miller's going to

11     step in here.

12          MR. MILLER:  Thank you, Your Honor.

13          Dr. Gilbert, are you still with us?

14          DR. GILBERT:  Yes, I'm here.

15          MR. MILLER:  Dr. Gilbert, the Court had posed a few

16     questions to you in an order, Doc. 714, dated March 2, 2020.

17          Have you seen that order?

18          DR. GILBERT:  I believe so.  Let me look here.  I may

19     have it.  Okay.

20          MR. MILLER:  And, Dr. Gilbert, I believe Judge

21     Totenberg just referred to a couple of those questions with

22     respect to your statements regarding recounts and audits.

23          Did you hear that question?

24          DR. GILBERT:  Yes, I did.

25          MR. MILLER:  In your declaration, were you providing

1    a legal opinion as to the recount law in Georgia?

2              DR. GILBERT:  No.

3              MR. MILLER:  And with respect to audits -- and I know

4    you heard Mr. Rayburn earlier today speak a good bit about

5    risk-limiting audits.

6              Is it your understanding that in Georgia under a

7    risk-limiting audit procedure as contemplated that the human

8    readable text would control?

9              DR. GILBERT:  It is my understanding that whenever

10   the human readable portion is used that is the appropriate way

11   to conduct an audit.

12             MR. MILLER:  Because, more or less, it would not be

13   an audit if you weren't looking at the human readable portion;

14   right?

15             DR. GILBERT:  I agree, yes.

16             MR. MILLER:  Okay.

17             THE COURT:  But I guess what I wanted to just get at

18   was there seemed to be some concern on the part of the

19   plaintiffs here regarding the limitation of -- limitations

20   imposed on what -- for recounts as to what -- what times and

21   what circumstances the human readable original ballot would be

22   looked at.

23             And I just -- since you haven't looked at the system,

24   I don't know how much you really -- what the scope of your

25   knowledge is.  But you seem to indicate that you were

1  comfortable with the recount also because you could look at the

2  human readable -- because the human readable ballot would

3  always control.

4        I guess the plaintiffs would argue that is not always

5  so.  It is only so in very narrow circumstances.  But -- so all

6  I really want to know is what was the basis of your

7  determination that that human readable -- the human readable

8  ballot would always control also in a recount.

9        DR. GILBERT:  I believe that determination was made

10  by House Bill 316, as I recall.  I saw that prior to these --

11  the information that was given today, obviously, I didn't have

12  that at the time I had written that.

13        THE COURT:  Okay.  So, really, when you are referring

14  to the human readable ballot here and the safeguard that it

15  provides, it being what controls, that is based on your review

16  of the statute?  Is that the basis of your opinion?

17        DR. GILBERT:  Yes.

18        THE COURT:  All right.

19        MR. MILLER:  Your Honor, if I may, just one or two

20  questions.

21        THE COURT:  Sure.

22        MR. MILLER:  Dr. Gilbert, with respect to the

23  auditing procedure, that is a different type of process than a

24  recount; right?

25        DR. GILBERT:  That -- yes.

1          MR. MILLER:  They achieve two different goals;

2     correct?

3          DR. GILBERT:  From my understanding of how things

4     apply here, yes.

5          MR. MILLER:  And, of course, you didn't intend to

6     provide a --

7          THE COURT:  Don't lead the witness.  It doesn't help

8     me.

9          MR. MILLER:  Sure.  It is a little -- I apologize,

10    Your Honor.

11         THE COURT:  That's all right.

12         MR. MILLER:  Dr. Gilbert, just one question.  If a

13    recount is not governed by the human readable text as the Court

14    has described, is it your opinion the Georgia BMD system is so

15    unsafe that it cannot be used?

16         DR. GILBERT:  That is not my opinion.  I see it as --

17    my understanding is that there will be audits, and there is a

18    work in progress to define how that will be conducted.  I

19    believe that the idea of just using a QR code -- again, that

20    doesn't secure anything.  But at the same time, the QR code is

21    forensic evidence.

22         To my knowledge, I haven't seen a QR code rewrite

23    itself yet such that once it is written it is written.  So

24    there is also the ability to examine the QR code and human

25    readable portion to determine if they are a match.  And that is

1   an infinite opportunity and that it can't rewrite itself.  So

2   that can be done at any time.

3           MR. MILLER:  Your Honor, I don't have --

4           THE COURT:  Let me just make sure I understand what

5   you just articulated.  You said just using a QR code doesn't

6   secure anything.  But at the same time, the QR code is forensic

7   evidence and that you hadn't seen a QR code itself yet that --

8   and I wasn't clear what you meant here such that it is

9   written -- it is as it is written -- that is what I was trying

10  to understand.

11          DR. GILBERT:  Yes, Your Honor.  So what I'm getting

12  at is, when the ballot is printed, it is written in paper and

13  that once we have the QR code, if it doesn't match the human

14  readable portion, that can be identified.

15          If you have hand-marked paper ballots that go through

16  a scanner and you don't inspect it with your eye, the scanner

17  could be giving you the wrong results.  And you won't know.  It

18  is no different than if the QR code is flawed or if the scanner

19  is flawed.  In other words, the machine is giving you the wrong

20  result.  And you have to have human eyes inspect that in order

21  to determine if the other machine and the scanner is giving you

22  the correct result.

23          THE COURT:  So would that mean you should be

24  regularly during the course of the election checking whether it

25  is giving you the accurate results or at the end -- what are

1    the implications -- I guess I'm trying to understand -- of that

2    assessment on your part in practical terms?

3            DR. GILBERT:  The implication is that I would support

4    the recommendation that an audit is done on the human readable

5    portion of a hand-marked paper ballot or a ballot-marking

6    device ballot and indicate where you have a scanner being used,

7    simply because the scanner could be giving you the wrong

8    result.

9            THE COURT:  All right.  Thank you.  I think that

10   Mr. Cross had a follow-up question.

11           MR. CROSS:  So, Dr. Gilbert, have you had a chance to

12   take a look at the new rule that was provided this morning on

13   recount tabulation procedures?

14           DR. GILBERT:  I have not, unfortunately.

15           MR. CROSS:  Just briefly on this, did you hear the

16   way it was described what they call the mini audit where they

17   take -- they look at 75 ballots that are marked on election

18   day, 25 absentee, and they run those back through the scanners

19   to see if the scanner results are accurate?  Did you follow

20   that earlier?

21           DR. GILBERT:  Yes, I did.

22           MR. CROSS:  It is fair to say that that is -- what

23   they are describing in your line of work would be called logic

24   and accuracy testing; is that right?

25           DR. GILBERT:  I have seen it used that way.  I have

1   seen that term used that way.

2          MR. CROSS:  One other point.  In Paragraph 35 in your

3   declaration, you write both are auditable.  Both BMD and

4   hand-marked paper ballot voting systems can audited by an RLA

5   or a recount to confirm the tallies of the optical scanners.

6   And then you explain, since the human readable record controls

7   under either system, an audit or recount can reveal any issues

8   with the tally.  You go on from there.

9          Do you recall this, or do you have this in front of

10  you?

11         DR. GILBERT:  I recall it.

12         MR. CROSS:  So do I understand correctly at the time

13  of your declaration you were under the understanding that the

14  human readable record would control in a recount in Georgia?

15  That is what this says; right?

16         DR. GILBERT:  Yes.

17         MR. CROSS:  Two last questions:  If you have got

18  Paragraph 39(d), it relates to a similar point we just covered

19  where you wrote, some will argue that the QR code is not human

20  readable.  Therefore, this is a problem.  You go on, this is

21  only an issue if the QR code is the ballot of record and there

22  is no RLA and/or preelection testing.

23         Do you see that?

24         DR. GILBERT:  Yes.

25         MR. CROSS:  When you wrote this, were you under the

1   understanding that the state would have risk-limiting audits in

2   place for the elections this year?

3           DR. GILBERT:  No.  I wrote that with the

4   understanding that there would be some mechanism to audit.  So

5   I didn't know exactly what form, a risk-limiting audit or what

6   name they would use or how they would do it.

7           MR. CROSS:  But you referenced risk-limiting audits

8   here; right?

9           DR. GILBERT:  I do reference risk-limiting audits.

10          MR. CROSS:  Last question:  Logic and accuracy

11  testing -- malware can be designed such that the malware will

12  not be detected during logic and accuracy testing?  You have

13  seen that; right?

14          DR. GILBERT:  I have seen that occur in some tests.

15  It is not my opinion that it is impossible to detect.

16          MR. CROSS:  But you have seen it occur?

17          DR. GILBERT:  I have not seen it occur.  I have seen

18  it reported.  But, again, it is not my opinion that it is

19  impossible to detect.

20          MR. CROSS:  Okay.  Thank you.

21          MR. BROWN:  Couple of follow-up questions, Your

22  Honor.  This is Bruce Brown.

23          Would you agree that a proper audit, including a

24  risk-limiting audit, requires a reliable source record?

25          DR. GILBERT:  A reliable source record?  I'm not sure

1    I understand what that means.

2         MR. BROWN:  Would you agree that an audit, including

3    a risk-limiting audit, is based upon a record and those records

4    need to be reliable for the audit to be effective?

5         DR. GILBERT:  I still don't understand.  What is the

6    record?  What is the record?

7         MR. BROWN:  A record of a vote let's say.

8         DR. GILBERT:  I'm having a hard time -- I mean, I'm

9    not understanding your question.  I'm sorry --

10        MR. BROWN:  I didn't mean it to be a hard question.

11   Let me ask it a different way.

12        The Dominion BMD system that we are here about, the

13   audits with respect to that system assume that the output of

14   the ballot-marking device is correct; correct?

15        DR. GILBERT:  Assume that the output is correct?

16   Yes.  Yes.

17        MR. BROWN:  So you are starting from the assumption,

18   not the proof, that the vote that you are auditing is correct;

19   right?

20        MR. MILLER:  Your Honor, at this point I think we're

21   venturing into the territory that Mr. Rayburn was testifying on

22   regarding risk-limiting audit process.  So --

23        THE COURT:  Let him answer, and then we'll just --

24        DR. GILBERT:  Can you repeat that question again?

25        MR. BROWN:  Sure.  You were assuming that the output

1  of the BMD is correct?  And then based upon that assumption,

2  you are doing your audit; right?

3         DR. GILBERT:  I don't know what you mean by assuming

4  that the output is correct.  But the understanding is that a

5  ballot is being produced under private conditions by a voter

6  and that ballot is then moved into the scanner or the next

7  process of the election.

8         THE COURT:  All right.  You know, the thing is my

9  questions really for Dr. Gilbert were really just trying to

10 understand the basis of his opinion.  And I'm really not trying

11 to explore it much further than the very most basic issue.

12        So I think that is sufficient.  Thank you.

13        Thank you, Dr. Gilbert.

14        DR. GILBERT:  Thank you.

15        THE COURT:  So let me just ask counsel a question.

16 Dr. Gilbert's affidavit says that if the QR codes are

17 inconsistent with the human readable portion of the ballot this

18 will be detected during the risk-limiting audit and may signal

19 a full manual recount.

20        I don't see a provision for a -- in your new proposed

21 regulation for an audit to trigger a full manual recount.  I do

22 understand that you talked about --

23              **(There was a brief pause in the proceedings.)**

24        MR. TYSON:  I'm sorry.  Your Honor, I was getting

25 clarity on this point so we can answer the question.

1      So, Your Honor, that would be part of an audit rule

2  of what the effect would be.  A risk-limiting audit, if there

3  are -- if you can't make a reconciliation, it can lead up to a

4  full manual recount by design.  So we would expect that what

5  would happen if you discover a discrepancy is going to be

6  covered by the auditing rules because we'll have to make a

7  decision at that point whether you are filing an election

8  contest, whether there was an additional full manual recount

9  from that.

10      MR. CROSS:  Can I ask a follow-up?  It is a narrow --

11      THE COURT:  I want to just make sure that they fully

12  answered.

13      MR. CROSS:  Sure.  I'm sorry.

14      MR. TYSON:  I think -- Mr. Russo, do you want to

15  address that?

16      MR. RUSSO:  It depends on if it is a pre- or

17  post-certification audit and then the timing of when you can

18  under the law either challenge an election and file an election

19  contest, which would then maybe trigger a court order to do a

20  manual recount under the rule, or whether, as Mr. Tyson was

21  saying, the audit rule then in and of itself triggers a

22  recount.

23      MR. TYSON:  I think the pre- and post-certification

24  point is important because it is part of the design.  If you

25  are doing your audit before you certify, the whole structure of

1   the election law is different than post-certification.

2          And so a post-certification audit looking at other

3   issues and looking more broadly at the system has different

4   implications that would have to be covered.

5          So, again, all that is going to go into the design of

6   what we do when we -- when we go through and audit these paper

7   ballots.

8          THE COURT:  And we don't have any information at this

9   point about how long it would take or how -- and I don't know

10  how that interfaces with certification in the sense of I

11  cannot -- it has been a while since I was involved in an

12  election challenge.  So I can't remember what the number of

13  days is.  But it is not forever that you have.

14         MR. TYSON:  I believe it is five days after

15  certification, Your Honor.  Yes.

16         THE COURT:  So this is a short period of time in

17  order to know that things have gone awry.  And if it is post --

18  if you were -- so if you only get the results a month later, it

19  can't really result in a recount?

20         MR. TYSON:  Yes, Your Honor.  One other provision I

21  have been reminded of that is in the new law is the Secretary

22  does have authority to suspend certification to conduct an

23  audit.  There can be a review there if there are discrepancies

24  found.

25         There are also other remedies under Georgia law.  If

you want to challenge an office holder's right to hold an office after the fact, there's a variety of options available beyond just what we can kind of think in terms of the initial recount certification and election contest provisions.

MR. CROSS: Do I understand correctly this means that, if one of the pilot audits were to find a discrepancy that would suggest the results of that particular election are unreliable, the rules as written would prohibit any kind of a recount? Is that right?

MR. TYSON: I don't think we have an audit rule that would specify. So you are saying it prohibits it. I don't think there is a prohibition on that. I think that is -- there is no provision for that.

MR. CROSS: I thought we --

MR. TYSON: You file a contest. I mean, that is what you do if you find in a pilot audit something was wrong. That would be a good basis for a contest, most likely.

MR. CROSS: I thought we covered earlier that in 2(a)(1) of the recount rule prohibits recounts unless two things are satisfied and an audit is not one of them.

THE COURT: That is what I was asking about.

MR. CROSS: That is what I thought. I thought that was the answer. But now that is why I wanted to confirm because it seems like they have a different view.

MR. MILLER: Your Honor, we can clarify. Mr. Tyson

1    is pulling out the statute.  But I seem to recall under the

2    recount statute that a county election superintendent can also

3    call a recount under certain circumstances.

4             THE COURT:  There is some music.  They must be

5    saying, it is Friday.  Why are you here?

6             What section do you want to point me to?

7             MR. TYSON:  I'm sorry, Your Honor.  I'm looking at

8    495 trying to find this in the statute -- the recount statute.

9             Yes, Your Honor.  495(a) --

10            THE COURT:  So 21-2-495(a).

11            MR. TYSON:  The superintendent may, either on his or

12   her own motion or upon a petition, order the recount -- let's

13   see.  I'm sorry -- in which it shall appear that a discrepancy

14   or error, although not apparent on the face of the returns, has

15   been made.  Such recount may be held at any time prior to

16   certification.

17            MR. CROSS:  I think the confusion, Your Honor -- and

18   it may have been my fault.  And the way I phrased it is:  I

19   understand there are certain rules that trigger recounts.  But

20   the only way to get a manual recount, which would address the

21   concerns we have, is you have to -- you have to satisfy one of

22   these circumstances under 2(a) in the recount rule.

23            And so it either fails the logic and accuracy testing

24   in Subsection (c) or a court has to order it.  So that means if

25   the audit found that an election result was wrong or

1   unreliable, you still would have no manual recount.

2           MR. RUSSO:  I mean, I would say that that is what --

3   if I had a client who had lost and we had found an issue with

4   the results as a result of a post-election audit, you would

5   file an election challenge and ask the court for an order --

6           THE COURT:  Post-certification.

7           MR. RUSSO:  -- for a manual recount.  That is right.

8           MR. CROSS:  Post-certification?

9           THE COURT:  But -- and what are the limits on doing

10  that under Georgia law post-certification?  I mean, you might

11  not have the audit results obviously in five days.  That is the

12  only concern.

13          MR. RUSSO:  I don't want to get ahead of myself here.

14  But I think there's a precertification audit that was --

15  precertification tabulation audit in your first question that

16  Mr. Rayburn was speaking to earlier.

17          So I guess there is some additional policy pieces

18  here that the state is still finishing with the audit process.

19  But I don't think it would prohibit a candidate from filing a

20  challenge within the time frame under the law, even if the

21  audit hadn't been completed.  You could still file a challenge.

22          MR. TYSON:  And, Your Honor, under 21-2-498(b) that

23  you referenced, the audits that have to take place starting no

24  later than November 2020 are required to be precertification

25  audits.  So you would get the results of the audit prior to

certification.  Certification is the triggering point for the

time of filing an election contest.

So a candidate would have more than enough time to

learn the results of the audit and then file an election

contest and seek a court order seeking a manual recount, if

they chose to do so.

MR. CROSS:  That leaves two problems, Your Honor.

THE COURT:  Let me just absorb what --

MR. CROSS:  Okay.

THE COURT:  -- what Mr. Tyson has said first.  All

right?

**(There was a brief pause in the proceedings.)**

THE COURT:  Okay.  Go ahead.

MR. CROSS:  Two problems, Your Honor.  One, we have

elections that are ongoing that have audits going with them to

some limited degree, including a presidential primary.

So we would be in a situation where, if there was an

audit of the presidential primary in some particular county,

the only recourse if the audit shows those election results are

unreliable is -- which gets to my second point -- a pretty

draconian measure.

As I understand it, election challenges have very

strict limits.  And so we're basically saying the only way to

have a reliable election for a presidential primary is you've

got the nuclear option if an audit finds that it is unreliable

1    instead of doing it precertification.

2           And so that is the essential premise of our concern

3    about this case.

4           THE COURT:  Well, your case is more than about the

5    presidential primary.

6           MR. CROSS:  Oh, no.  Agreed.  I'm just saying --

7           MR. RUSSO:  Your Honor, I just point out that the

8    presidential preference primary is not really an election.  It

9    is a fancy poll so that both political parties can figure out

10   how to apportion delegates at a convention.  So I don't know

11   if --

12          MR. CROSS:  I suspect voters feel very strongly --

13          THE COURT:  I am sure that they do.  But I am looking

14   at the long run.

15          MR. CROSS:  Understood.  But that is the challenge we

16   have, Your Honor, is we keep looking at the long run and then

17   we get up to that point and we find it is too late.

18          And we don't have audit rules even now.  They have

19   got an expert whose premise for what he is saying are

20   risk-limiting audits.  So I just feel like we just keep chasing

21   this dog and that dog is always ahead of us and we're never

22   going to get there.  And I don't know how to bring us to a

23   close.

24          THE COURT:  Well, you know, the reality is though it

25   doesn't mean the state couldn't tweak that rule.  All right.

1    This is their rule right now.  It may be a little bit -- there

2    has been some improvement.  It might be defective for the

3    reasons we have flagged about this particular issue.  It

4    doesn't mean it is not within the authority of the board to

5    change it too.  Obviously, it is.

6            MR. CROSS:  No.

7            THE COURT:  I understand your point.  Your point is

8    taken, and I understand your point.

9            MR. CROSS:  And for what it is worth, Your Honor,

10   Mr. Russo may tell me I am wrong.  But I suspect it is not a

11   coincidence that we got these changes today before this

12   hearing.  So we do -- this is why we think Your Honor has to be

13   involved.

14           THE COURT:  Well, I understand that is your view.

15   And I appreciate the -- probably we could have been a little --

16   in a little bit of a different state in terms of moving

17   efficiently if we had seen it beforehand.  But it is what it

18   is.  And I appreciate their bringing it.

19           MR. RUSSO:  Your Honor, it was just posted today.  I

20   was not at the meeting.  I suspect they had plenty of folks at

21   the meeting last week, given the affidavits that were attached

22   to their notice filing yesterday.  But today is when it was

23   posted, and we didn't want to give you a Word document.

24           THE COURT:  I appreciate that.  I did try -- the

25   minutes don't allow you to so simply figure out what happened.

1   I did go and look at whatever I could on the website.  I saw

2   what was adopted.  But I didn't see the proposal.

3           MR. RUSSO:  I appreciate that.  Given what Mr. Cross

4   said, I just didn't want you to think we were withholding

5   something.

6           MR. CROSS:  No.  I'm not suggesting anything

7   nefarious, just to be clear.  My only point is that I think

8   this case has spurred certain action that I agree has been

9   progressive.  That was my only point.

10          I'm not suggesting this was nefarious.  I like to

11  think that they are reacting to this case in positive ways.  I

12  think there is a lot more that needs to happen.  But I'm not

13  suggesting this is insidious.  I'm just saying Your Honor's

14  involvement, we think, has brought about some progress.  And

15  that is my only point.

16          THE COURT:  Good.  Thank you.  It is 10 of 5:00.  I

17  think I have learned a lot.  I had some questions answered.

18  And I appreciate it.  I appreciate that people turned heaven

19  and earth around in their schedules to get here.  And I

20  appreciate the people on the phone also had to deal with all of

21  the peculiarities of listening to a lot of going back and forth

22  on the phone.  And that is not necessarily the most fascinating

23  thing in the world, especially when you are hearing it

24  disconnected.

25          And, Mr. McGuire, if you are in Seattle or you are

1    back at home, I wish you well.

2        I wish everyone well.  And I think that is -- unless

3    somebody has something for the good of the order that they

4    desperately need to bring to my attention, I'm going to

5    adjourn.

6        All right.  There was the signal.

7        **(The proceedings were thereby concluded at 4:50**

8        **P.M.)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of
the United States District Court, for the Northern District of
Georgia, Atlanta Division, do hereby certify that the foregoing
106 pages constitute a true transcript of proceedings had
before the said Court, held in the City of Atlanta, Georgia, in
the matter therein stated.

        In testimony whereof, I hereunto set my hand on this, the
9th day of March, 2020.

_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT