IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,

    Plaintiffs,

    v.

BRAD RAFFENSPERGER, *et al.*,

    Defendants.

CIVIL ACTION NO.
1:17-CV-2989-AT

**BRIEF OF THE ELECTRONIC PRIVACY INFORMATION CENTER
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

**Marc Rotenberg**
  EPIC President and Executive Director

**Alan Butler (pro hac vice)**
  EPIC General Counsel

**Caitriona Fitzgerald**
  EPIC Policy Director

ELECTRONIC PRIVACY
  INFORMATION CENTER
1519 New Hampshire Avenue NW
Washington, D.C. 20036
(202) 483-1140
*Counsel for the Electronic Privacy Information Center*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii
INTEREST OF THE AMICUS ............................................................................... 1
ARGUMENT ............................................................................................................ 2
   I.    Voter privacy is widely recognized as critical to election integrity. ....... 3
   II.   The secret ballot is vital for democracy. ................................................... 7

# TABLE OF AUTHORITIES

**Cases**
*Buckley v. Valeo*,
  424 U.S. 1 (1976) ................................................................................. 4
*Cox v. Williams*,
  216 Ga. 535 (1961) ........................................................................... 2, 3
*Minnesota Voters Alliance v. Mansky*,
  138 S. Ct. 1876 (2018) ......................................................................... 5
*Moon v. Seymour*,
  182 Ga. 702 (186 S.E. 744) (1936) ...................................................... 3

**Statutes**
2019 Georgia Laws Act 24 (H.B. 316) ...................................................... 4
22 U.S.C. § 8203(6)(B). ............................................................................ 6
Ga. Code. Ann § 21-2-267 (2019) ............................................................ 4

**Other Authorities**
Alessandro Acquisti, Roger Dingledine, and Paul Syverson, *On the Economics of Anonymity*, Financial Cryptography 84 (2003) ......................... 2
Alexander Hertel-Fernandez, *Employer Political Coercion: A Growing Threat*, Am. Prospect (Nov. 23, 2015) ............................................. 9
Anita Allen, *Coercing Privacy*, 40 WM. & MARY L. REV. 723 (1999) ................. 2
Caitriona Fitzgerald, Susannah Goodman, and Pamela Smith, *The Secret Ballot at Risk: Recommendations for Protecting Democracy* (Aug. 2016). ............................................................................................ 5
Charlotte Garden, *The Boss Can Tell You to Show Up for a Trump Rally*, The Atlantic (Aug. 28, 2019) ............................................................ 8
David Chaum, *Achieving Electronic Privacy*, Scientific American 96 (Aug. 1992) ............................................................................................ 2
David L. Dill, Bruce Schneier & Barbara Simons, *Voting and Technology: Who Gets to Count Your Vote?*, 46 Communications of the ACM 29 (Aug. 2003) ................................................................. 2
Douglas W. Jones & Barbara Simons, *Broken Ballots: Will Your Vote Count* (Center for the Study of Language and Information, 2012) .............. 2
Gary T. Marx, *What's in a Concept? Some Reflections on the Complications and Complexities of Personal Information and Anonymity*, 3 U. OTTAWA L. & TECH. J. 1 (2006) .......................................... 2
Jerry Kang, *Cyberspace Privacy*, 50 STAN. L. REV. 1193, 1209 (1998) ............ 2

Jonathan W. White, Opinion, *How Lincoln Won the Soldier Vote*, N.Y. Times (Nov. 7, 2014) ................................................................................. 8

Julie E. Cohen, *Examined Lives: Informational Privacy and the Subject as Object*, 52 STAN. L. REV. 1373 (2000)....................................................... 2

Latanya Sweeney, A*nonymity: A Model for Protecting Privacy*, International Journal on Uncertainty, Fuzziness and Knowledge-based Systems, 10 (5) (2002) ................................................................... 2

Lee Fang, *How Companies Pressure Workers to Vote for Corporate Interests Instead of their Own*, The Intercept (Nov. 6, 2018) ......................... 9

Nat'l Acad. of Sci., Eng'g, and Med., et al. *Securing the Vote: Protecting American Democracy* 42, 87 (Nat'l Acad. Press, 2018) .................................. 7

Peter G. Neumann, National Computer Security Conference, *Security Criteria for Electronic Voting* (1993)............................................................. 2

Ronald L. Rivest & Warren D. Smith, *Three Voting Protocols: ThreeBallot, VAV, and Twin*, USENIX/ACCURATE Electronic Voting Technology Workshop (2007)...................................................................... 2

Stefan Brands, *Non-Intrusive Cross-Domain Digital Identity Management*, Presented at Proceedings of the 3rd Annual PKI R&D Workshop (Apr. 2004) ............................................................................... 2

U.S. Election Assistance Commission's Technical Guidelines Development Committee, Voluntary Voting System Guidelines 2.0: Draft Recommendations for Requirements for Voluntary Voting System Guidelines 2.0 Principle 6 (Jan. 31, 2020)......................................... 6

## INTEREST OF THE AMICUS

EPIC seeks to preserve the secret ballot, the well-established right of individuals to remain anonymous while voting. The Electronic Privacy Information Center ("EPIC") is a public interest research center established to focus public attention on emerging privacy and civil liberties issues. EPIC frequently participates as *amicus curiae* in cases that implicate emerging privacy issues, including voter privacy. *See, e.g.*, Brief of *Amici Curiae* EPIC et. al, *Crawford v. Marion County Election Board*, 128 S. Ct. 1610 (2008) (opposing voter photo-ID requirements as infringing on citizens' right to cast a secret ballot); Brief of *Amici Curiae* EPIC et al., *Doe v. Reed*, 561 U.S. 186 (2010) (arguing that the First Amendment protects the right to anonymity in referenda signatures); *Brief of Amici Curiae* EPIC et al., *Watchtower Bible and Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002) (supporting First Amendment Right to anonymous door-to-door speech). EPIC previously filed a brief as *amicus curiae* in this case concerning the vulnerabilities of DRE voting systems to manipulation, attack, and fraud. EPIC's advisory board includes distinguished experts in law, technology, and

public policy, including several who have pioneered techniques for election security and privacy protection.[1]

## ARGUMENT

Plaintiffs have submitted evidence into the record establishing that the ballot-marking devices in use in Georgia elections makes the ballot preferences of the voter easily viewable by others in the polling place, including poll workers, and possibly family members, neighbors, colleagues, and friends. Declarations were filed by multiple voters stating that they could see other voters' choices due to the large touchscreen on the voting machines

---

[1] *See, e.g.*, Douglas W. Jones & Barbara Simons, *Broken Ballots: Will Your Vote Count* (Center for the Study of Language and Information, 2012); Ronald L. Rivest & Warren D. Smith, *Three Voting Protocols: ThreeBallot, VAV, and Twin*, USENIX/ACCURATE Electronic Voting Technology Workshop (2007); Gary T. Marx, *What's in a Concept? Some Reflections on the Complications and Complexities of Personal Information and Anonymity*, 3 U. Ottawa L. & Tech. J. 1, 19 (2006); Stefan Brands, *Non-Intrusive Cross-Domain Digital Identity Management*, Presented at Proceedings of the 3rd Annual PKI R&D Workshop (Apr. 2004), *available at* http://www.idtrail.org/files/cross_domain_identity.pdf; Alessandro Acquisti, et al., *On the Economics of Anonymity*, Financial Cryptography, 84-102 (2003); David L. Dill, Bruce Schneier & Barbara Simons, *Voting and Technology: Who Gets to Count Your Vote?*, 46 Communications of the ACM 29 (Aug. 2003); Latanya Sweeney, *Anonymity: A Model for Protecting Privacy*, International Journal on Uncertainty, Fuzziness and Knowledge-based Systems, 10 (5), 557-70 (2002); Julie E. Cohen, *Examined Lives: Informational Privacy and the Subject as Object*, 52 STAN. L. REV. 1373, 1425 (2000); Anita Allen, *Coercing Privacy*, 40 Wm. & Mary L. Rev. 723, 756 (1999); Jerry Kang, *Cyberspace Privacy*, 50 Stan. L. Rev. 1193, 1209 (1998); Peter G. Neumann, National Computer Security Conference, *Security Criteria for Electronic Voting* (1993); David Chaum, *Achieving Electronic Privacy*, Scientific American 96-101 (Aug. 1992).

and lack of privacy enclosure around them. The blue "privacy" panels provided to polling places by the Secretary of State are ineffective and do not ensure ballot secrecy, given the configuration of the ballot marking device screen that is easily viewed by others.

The right to cast a secret ballot in a public election is a core value in the United States' system of self-governance. Secrecy of the ballot is guaranteed in state constitutions and statutes nationwide, including in Georgia. Ballot secrecy and voter privacy in elections prevent coercion and are essential to integrity in the electoral process.

## I. Voter privacy is widely recognized as critical to election integrity.

Voter privacy has been widely recognized by federal and state courts, as well as legislatures, as essential for election integrity. Voter privacy includes the right to secrecy of voters' ballot selections as well as privacy when marking, verifying, and casting one's ballot.

Georgia has historically taken steps to protect voter privacy. Georgia statute requires that election officials provide polling places where:

> [E]lectors may conveniently mark their ballots, with a curtain, screen, or door in the upper part of the front of each compartment or booth so that in the marking thereof they may be screened from the observation of others. A curtain, screen, or door shall not be required, however, for the self-contained units used as voting

> booths in which direct recording electronic (DRE) voting units or electronic ballot markers are located ***if such booths have been designed so as to ensure the privacy of the elector***. […] In the case of direct recording electronic (DRE) voting units or electronic ballot markers, the ***devices shall be arranged in such a manner as to ensure the privacy of the elector while voting on such devices***, to allow monitoring of the devices by the poll officers while the polls are open, and ***to permit the public to observe the voting without affecting the privacy of the electors as they vote***.

Ga. Code. Ann § 21-2-267 (2019) (emphasis added). This provision was most recently amended in 2019 to add references to "electronic ballot markers," but the provisions requiring voter privacy remained unchanged. 2019 Georgia Laws Act 24 (H.B. 316).

In *Cox v. Williams*, 216 Ga. 535 (1961), the Supreme Court of Georgia found that the duty of election officers to adhere to the above voter privacy statute and other polling place requirements is so critical that violations could lead to a declaration that the election is null and void. *Id.* (violations included "there was no screen, curtain, or door on the front of such [voting] booths to exclude vision of the voter while marking his ballot.") In an earlier case where an election was also declared null and void after violations of the requirements for voting booths, the Georgia Supreme Court said:

> It was intended that in counties holding elections under the Australian ballot system there should be privacy in the preparation of the ticket by a voter, so that he might exercise his

4

> own volition in the choice of candidates, and that he might feel, when he is preparing his ballot to express his volition or election as to the different candidates, that he is free from all observation by the prying eyes of those who might be interested in having him vote for certain other candidates. […] [W]here there is a total disregard of the statute, it cannot be treated as an irregularity, but it must be held and adjudicated to be cause for declaring the election void and illegal.

*Moon v. Seymour*, 182 Ga. 702 (186 S.E. 744) (1936). Without adequate voter privacy and ballot secrecy protections in place, Georgia risks its elections being held null and void.

The right to voter privacy and ballot secrecy is recognized nationwide. A 2016 state survey conducted by EPIC, Common Cause, and Verified Voting found that the vast majority of states (44) have constitutional provisions guaranteeing secrecy in voting, while the remaining states have statutory provisions referencing secrecy in voting. Caitriona Fitzgerald, Susannah Goodman, and Pamela Smith, *The Secret Ballot at Risk: Recommendations for Protecting Democracy* (Aug. 2016).[2]

The current draft of the Election Assistance Commission's Guidelines makes clear that voting systems should protect voter privacy:

> Principle 6: Voter Privacy
> Voters can mark, verify, and cast their ballot privately and independently.

---

[2] https://secretballotatrisk.org.

5

> 6.1 - The voting process preserves the privacy of the voter's interaction with the ballot, modes of voting, and vote selections.
> 6.2 - Voters can mark, verify, and cast their ballot or other associated cast vote record, without assistance from others.

U.S. Election Assistance Commission's Technical Guidelines Development Committee, Voluntary Voting System Guidelines 2.0: Draft Recommendations for Requirements for Voluntary Voting System Guidelines 2.0 Principle 6 (Jan. 31, 2020).[3]

As EPIC previously told this Court, ballot secrecy is so essential to the free exercise of the right to vote that the United States, by law, will not recognize foreign states as democracies unless they vote "by secret ballot." 22 U.S.C. § 8203(6)(B). (In determining whether a country is democratic, the Secretary shall "conduct assessments of such conditions in countries and whether the country exhibits the following characteristics" including whether the "national legislative body of such country . . . are chosen by free, fair, open, and periodic elections, by universal and equal suffrage, and by secret ballot.")

The U.S. Supreme Court recently noted the importance of voter privacy in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018), the Court

---

[3] https://collaborate.nist.gov/voting/pub/Voting/VVSG20DraftRequirements/vvsg-2.0-2020-01-31-DRAFT-requirements.pdf.

proclaimed that universal political speech restrictions at polling places emerge from a respect for ballot secrecy:

> Between 1888 and 1896, nearly every State adopted the secret ballot. Because voters now needed to mark their state-printed ballots on-site and in secret, voting moved into a sequestered space where the voters could "deliberate and make a decision in . . . privacy."

*Id.* at 1883.

## II.   The secret ballot is vital for democracy.

Ballot secrecy is a cornerstone of modern democracies. The secret ballot reduces the threat of coercion, vote buying and selling, and tampering. For individual voters, it provides the ability to exercise their right to vote without intimidation or retaliation. As the National Academy of Sciences recently found, "[i]f anonymity is compromised, voters may not express their true preferences." Nat'l Acad. of Sci., Eng'g, and Med., et al. *Securing the Vote: Protecting American Democracy* 42, 87 (Nat'l Acad. Press, 2018).

Prior to the adoption of the secret ballot in the United States in the late 19th century, coercion was commonplace. It was particularly strong in the military. According to Jonathan White, significant pressure was put on military rank and file to vote for Lincoln (though the soldier vote ultimately did not change the result of the election):

> Secretary of War Edwin M. Stanton used immense power to bring military voters into line, […] When Republican Senator Edwin D. Morgan of New York informed Stanton that a number of quartermaster clerks had endorsed Gen. George B. McClellan for president, Stanton dismissed 20 of them. When one of the clerks protested his dismissal, an unsympathetic Stanton replied, "When a young man receives his pay from an administration and spends his evenings denouncing it in offensive terms, he cannot be surprised if the administration prefers a friend on the job."

Jonathan W. White, Opinion, *How Lincoln Won the Soldier Vote*, N.Y. Times (Nov. 7, 2014).[4] Establishment of the secret ballot helped prevent that type of coercion in the military and in the workplace.

The risk of political coercion in the workplace is just as strong today, making the secret ballot as important now as when it was first adopted. An Ohio coal mining company required its workers to either attend a Presidential candidate's rally or take paid time off (and, as a result, not receive overtime pay that week). Charlotte Garden, *The Boss Can Tell You to Show Up for a Trump Rally,* The Atlantic (Aug. 28, 2019).[5] Executives at Georgia-Pacific, a subsidiary of Koch Industries which employs approximately 35,000 people, distributed a flyer and a letter indicating which candidates the firm endorsed. "The letters warned that workers might 'suffer

---

[4] http://opinionator.blogs.nytimes.com/2014/11/07/how-lincoln-won-the-soldier-vote/.
[5] https://www.theatlantic.com/ideas/archive/2019/08/employers-unfairly-coerce-workers/596935/

the consequences' if the company's favored candidates were not elected." Alexander Hertel-Fernandez, *Employer Political Coercion: A Growing Threat*, Am. Prospect (Nov. 23, 2015).[6] In 2018, employees of Western National Group, a private developer, received a letter from the company's Chief Executive Officer to "please join" him in opposing a California ballot initiative on rent control. Lee Fang, *How Companies Pressure Workers to Vote for Corporate Interests Instead of their Own*, The Intercept (Nov. 6, 2018).[7]

Thanks to the secret ballot, employers cannot lawfully go so far as to "check" on how an employee actually voted. But if ballots were no longer secret, or if voter privacy at the polls were compromised, many employees would risk losing their jobs if they voted against the recommendations of management.  Our democracy would no longer be free and fair.

Because of the documented history of voter intimidation, coercion, and fraud associated with third-party knowledge of how individual voters cast their ballots, voter privacy remains central to election integrity. No community is immune to the effects of voter manipulation, but some

---

[6] http://prospect.org/article/employer-political-coercion-growing-threat.
[7] https://theintercept.com/2018/11/06/midterms-2018-voting-coercion-bosses-employees.

communities are more vulnerable than others. The secret ballot is an integral requirement of democratic governance.

## CONCLUSION

For the foregoing reasons, the Court should grant the Coalition Plaintiffs' motion for a preliminary injunction.

Dated: March 13, 2020                Respectfully submitted,

**Marc Rotenberg**
  EPIC President and Executive Director

/s/ Alan Butler
**Alan Butler (pro hac vice)**
  EPIC General Counsel

**Caitriona Fitzgerald**
  EPIC Policy Director

ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Avenue NW
Washington, D.C. 20036
(202) 483-1140

s/ Russell T. Abney
**Russell T. Abney (Ga. Bar No. 000875)**
Ferrer Poirot Wansbrough
2100 RiverEdge Parkway Suite 1025
Atlanta, GA 30328
(800) 661-8210

Counsel for *Amici Curiae* Electronic Privacy Information Center

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

DONNA CURLING, *et al.*,

    Plaintiffs,

v.

BRAD RAFFENSPERGER, *et al.*,

    Defendants.

**CIVIL ACTION NO.
1:17-CV-2989-AT**

## CERTIFICATE OF COMPLIANCE

I hereby certify that I have read the Court's Standing Order in Cases Proceeding Before the Honorable Amy Totenberg and that I will comply with its provisions during the pendency of this litigation.

/s/ Alan Butler
**Alan Butler (pro hac vice)**
General Counsel
Electronic Privacy Information Center
1519 New Hampshire Avenue NW
Washington, D.C. 20036
(202) 483-1140
*Counsel for Amicus*

s/ Russell T. Abney
**Russell T. Abney (Ga. Bar No. 000875)**
Ferrer Poirot Wansbrough
2100 RiverEdge Parkway Suite 1025
Atlanta, GA 30328
(800) 661-8210

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

DONNA CURLING, *et al.*,

    Plaintiffs,

v.

BRAD RAFFENSPERGER, *et al.*,

    Defendants.

**CIVIL ACTION NO. 1:17-CV-2989-AT**

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Century Schoolbook and a point size of 13.

/s/ Alan Butler
**Alan Butler (pro hac vice)**
General Counsel
Electronic Privacy Information Center
1519 New Hampshire Avenue NW
Washington, D.C. 20036
(202) 483-1140
*Counsel for Amicus*

s/ Russell T. Abney
**Russell T. Abney (Ga. Bar No. 000875)**
Ferrer Poirot Wansbrough
2100 RiverEdge Parkway Suite 1025
Atlanta, GA 30328
(800) 661-8210

# CERTIFICATE OF SERVICE

I certify that I have this 13th day of March, 2020, served the foregoing Certificate of Compliance upon all counsel of record by way of the Court's electronic case filing (ECF) system.

/s/ Alan Butler
**Alan Butler (pro hac vice)**
General Counsel
Electronic Privacy Information Center
1519 New Hampshire Avenue NW
Washington, D.C. 20036
(202) 483-1140
*Counsel for Amicus*

s/ Russell T. Abney
**Russell T. Abney (Ga. Bar No. 000875)**
Ferrer Poirot Wansbrough
2100 RiverEdge Parkway Suite 1025
Atlanta, GA 30328
(800) 661-8210