IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, *et al.* <br><br> *Plaintiffs,* <br><br> v. <br><br> BRAD RAFFENSPERGER, *et al.,* <br><br> *Defendants.* | CIVIL ACTION <br><br> FILE NO. 1:17-cv-2989-AT |

**STATE DEFENDANTS' CONSOLIDATED MOTION TO MODIFY
ORDER WITH BRIEF IN SUPPORT**

Defendants Secretary of State Brad Raffensperger, State Election Board, and the State Election Board Members (collectively, the "State Defendants") respectfully request that this Court modify its Order requiring preservation of "all GEMS servers, DREs, memory cards, AccuVote scanners, and Express Poll books" [Doc. 668, p. 3] and other orders in this case regarding preservation, including [Docs. 122, 123]. Specifically, State Defendants request that the Court allow the immediate disposal of the DREs, AccuVote scanners, and Express Poll books that are currently being maintained so that the taxpayers of the State of Georgia do not have to incur further expense—an annual cost of more than $430,000—to maintain

obsolete voting equipment in the midst of massive cuts to the state budget. [Doc. 210].

## FACTUAL BACKGROUND

**I.     DRE identification issues.**

There are two different numbers used to identify DREs used in an election. Declaration of Michael Barnes, attached as Ex. A ("Barnes Dec.") at ¶ 3. The first is a serial number on the DRE unit itself, which is fixed and unchanging. *Id*. The second is a "Machine ID" that is part of the programming for each election, and can change for each election. *Id*. The Machine ID can change from election to election because it is created and assigned when information from the GEMS Database on a particular memory card is inserted into a DRE and programs the particular DRE for use in an election. *Id*. The particular Machine ID assigned to a DRE for an election depends on the order that memory cards are programmed, starting with Machine ID zero. *Id*.

Those wishing to find out which DRE was used in a particular precinct in a particular election have to go through one of two processes, both of which are manual and not computerized. *Id*. at ¶ 4.

A. *Locating serial numbers by using DRE Recap Sheets.*

The first method of locating a DRE is to utilize a manual review of the "DRE Recap Sheet" or a "Daily Recap of Absentee Voting on TS Machines," where the serial number of each DRE used in a precinct or early-voting site is recorded by hand. *Id.* at ¶ 5. Those sheets are returned by counties to the Secretary of State at the end of each election. *Id.*

The Secretary stores those papers by county, but not necessarily in any order because they are combined with numerous other paper documents for each election. *Id.* at ¶ 6. If an individual pulled every recap sheet for a particular election, he or she could assemble a list of DREs used by precinct by manually entering the handwritten information into a database. *Id.*

B. *Locating serial numbers by Machine ID.*

Machine IDs are created when the memory cards are programmed from the GEMS Database for each election. *Id.* at ¶ 3. The Machine ID for a particular election is assigned to the DRE unit when the memory card is inserted into the particular DRE unit during the Logic and Accuracy (L&A) process for a particular election. *Id.* at ¶ 7. In a subsequent election, the same DRE unit may be programmed with a different Machine ID. *Id.* at ¶ 8. For example, in one election, a DRE unit with a serial number of 12345 may be identified in the GEMS Database as Machine ID 11. *Id.* In the next election,

the same DRE unit with a serial number of 12345 may be identified in the GEMS Database as Machine ID 12. *Id.*

There are two possible locations where the Machine ID would be connected to a particular serial number for a DRE unit. *Id.* at ¶ 9. First, for each election, counties might record the Machine ID on the L&A checklist form (but are not required to do so). *Id.* Those checklist forms are for the use of the county and are not returned to the Secretary of State. *Id.*

Second, the Machine ID and serial number appear on the tapes printed from each DRE unit on election night after the polls close. *Id.* at ¶ 10. One of the printed tapes is maintained under seal with the Superior Court Clerk under the requirements of O.C.G.A. § 21-2-500. *Id.* No tapes are sent to the Secretary of State's office. *Id.*

In order to take a list of Machine IDs and determine the serial numbers of particular DRE units for a single county, officials would have to either (1) find the L&A checklists for each election and assemble a list from the handwritten materials, or (2) obtain a court order to unseal the records of that county, locate the correct tapes, and then manually enter the Machine IDs and serial numbers for each election. *Id.* at ¶ 11.

## II. Preservation of DREs in this litigation and most recent discussions.

This case was originally filed as an election contest to the 2017 special election for Congressional District 6. [Doc. 1]. About a year into the litigation, several of the then-county defendants agreed to sequester a limited number of DREs that would be preserved while the remaining machines could be released back into service for use in subsequent elections. [Doc. 210, p. 3]. Shortly thereafter, Plaintiffs agreed to dismiss the defendants from Cobb and DeKalb Counties. [Docs. 223, 225]. Those machines remain sequestered with the counties and have not been collected by the Secretary of State's office. Barnes Dec. at ¶ 12.

On November 11, 2019, in its denial of Plaintiffs' requests for a forensic examination of the DREs, this Court required continued preservation of all of the more than 30,000 DREs collected by the State as it rolled out the BMDs. [Doc. 668]. At a subsequent status conference on December 6, 2019, this Court urged the parties to meet and discuss the disposition of the DREs, in consideration of the estimated cost of almost a half-million dollars per year to store the units that, if not for this litigation, would have already been securely disposed of because the State cannot use them in any subsequent elections. [Doc. 679 at 85:25-86:5]. State Defendants then made multiple

requests of Plaintiffs for a statistical sample of DREs to preserve so that the remainder could be destroyed. [Doc. 689-1, 689-2].

On December 20, 2019, Plaintiffs advised that they not only needed a comprehensive inventory of all machines (which they had received years ago during discovery in this litigation) but also needed to know "the precinct and election during which it was last used." [Doc. 689-3]. Curling Plaintiffs further explained that, as soon as this "usage" information was provided, they could create a statistical sample in coordination with their experts. [Doc. 692, p. 18].

During a subsequent teleconference with the Court on January 17, 2020—after the decertification of the DREs by the Secretary of State—the Court proposed a resolution, that the "State will provide CDs of the GEMS databases to Plaintiffs['] counsel by January 24th. Plaintiffs will provide the State with a list of DREs for preservation by February 3rd." [Doc. 701].

On January 24, 2020, State Defendants provided the GEMS databases they were able to locate, explained in detail the process used, and answered several questions from Plaintiffs. See email from B. Tyson on January 24, attached as Ex. B. While some databases were missing as a result of the actions of counties, State Defendants produced 743 of the 795 requested GEMS databases on January 24, or more than 93% of the databases

requested. *Id.* At that time, State Defendants continued to search for the remaining 52 databases. *Id.*

On January 31, Curling Plaintiffs notified State Defendants that "We may also need additional information from Defendants since we have learned that the *GEMS databases do not contain machine serial numbers needed to isolate specific machines*." See email from M. Kaiser on January 31, attached as Ex. C (emphasis added). In other words, Plaintiffs had now identified the exact concern State Defendants had raised previously. [Doc. 703 at 12:2-14:9].

State Defendants then notified Plaintiffs that there was apparently no need to continue searching for GEMS databases if the serial numbers were not included—as previously explained, reconciling "Machine ID" codes to serial numbers on individual DRE units would be practically impossible. *Id.*; email from B. Tyson on February 3 (9:25 AM), attached as Ex. D. Email correspondence continued explaining these issues, but ultimately reaching the same point—a statistical sample of DREs by Machine ID would be useless because it would still require a manual county-by-county search for additional paper records. See email from B. Tyson on February 3 (3:51 PM), attached as Ex. E.

### III. Plaintiffs' proposed samples.

In spite of these limitations, Plaintiffs persisted and created separate samples based almost exclusively on Machine IDs. On February 10, Curling Plaintiffs emailed a spreadsheet[1] containing a statistical sample of DREs and optical scanners they proposed the State continue to maintain. It consisted of **10,242 individual DRE units**—more than a third of the entire inventory of DREs—with only Machine ID information and not serial numbers.[2] Coalition Plaintiffs' list was more reasonable, consisting of 473 DREs by Machine ID and another 140 units identified by serial number. It is practically unknowable whether there is any overlap within the various lists included in Plaintiffs' samples or between their separate lists of samples because a list by Machine ID serves no purpose without the serial number for the particular DRE unit, which would require additional manual research. Barnes Dec. at ¶ 13. And, as State Defendants previously explained, the DREs are not currently stored in serial-number order. [Doc. 703 at 12:9-16].

---

[1] Given the limitations of uploading large spreadsheets as exhibits in the ECF system, State Defendants have not attached the spreadsheets as exhibits. If the Court wishes to review them, State Defendants will provide those spreadsheets to the Court.

[2] Curling Plaintiffs' spreadsheet included serial numbers for a handful of units used to aggregate memory cards but not for the DREs used in actual elections.

## IV. Current cost of storing DREs.

The Elections Division's budget for the Secretary of State is slightly over $6.2 million for Fiscal Year 2020. *See* H.B. 792 (2020), line 304.100. The Secretary is currently paying $36,000 per month to store the DREs that will never be used again. Barnes Dec. at ¶ 14.

This Court is well-aware of the deficits the State must address due to the COVID-19 pandemic and the Secretary's expenditure of additional funds to expand access to absentee voting under the circumstances. [Doc. 733 at 6]. In early May, the Governor ordered agencies to prepare cuts of 14% of their existing budgets due to the impact of COVID-19. Cutting 14% of the Elections Division's budget to meet the Governor's requirements will require a cut of $868,343. In other words, the cost of storing the DREs is more than $430,000 per year—almost half of the required cuts.

Recognizing the dire budget situation, State Defendants notified Plaintiffs in a letter sent by email on May 9, requesting a response by May 13 to proposals to avoid continuing this significant outlay of taxpayer funds. See letter from B. Tyson, attached as Ex. F. Aside from an initial email response from Curling Plaintiffs asking questions that were either already answered by the letter or had been the subject of prior communications, Plaintiffs have not responded at all.

## ARGUMENT AND CITATION OF AUTHORITY

Fed. R. Civ. P. 1 explains that the reason for the Federal Rules is to "secure the just, speedy, *and inexpensive* determination" of cases (emphasis added). Continuing to maintain more than 30,000 DREs that will never be used again—at a significant cost to the State—is inconsistent with this requirement.

Further, in other cases involving physical property that a party seeks to analyze, such as airplane or boat wreckage, courts have held that "it would be unreasonable to expect the owner to store the [property] indefinitely at a cost that far exceeds the value of the [property]." *Fanning v. Honeywell Aero.*, No. 3:14-1650, 2016 U.S. Dist. LEXIS 165873 at *8 (M.D. Tenn. Dec. 1, 2016) quoting *Pirello v. Gateway Marina*, 2011 U.S. Dist. LEXIS 113632 at *5 (E.D.N.Y. Sept. 30, 2011). This is especially true when the State is spending sums approaching a half-million dollars a year for machines that have a value of exactly zero to the State of Georgia.[3]

---

[3] The question of which entity pays for storage of the DREs is separate from the question of whether any examination of the DREs should be permitted given the significant jurisdictional issues regarding DREs. State Defendants reiterate their earlier arguments that no such examination is necessary and do not waive any objections to any future examination.

Given the inability of Plaintiffs to create any useful statistical sample, the decertification of the GEMS/DRE system, and the lack of any basis to continue to preserve the DREs at a significant cost to the State, State Defendants request this Court allow the immediate disposal of all DRE units, ExpressPoll units, and AccuVote scanners. In the alternative, State Defendants request that (1) State Defendants be allowed to immediately dispose of all DRE units, ExpressPoll units, and AccuVote scanners that are not part of the sequestered machines currently held by Cobb, Fulton, and DeKalb Counties; or (2) this Court require Plaintiffs to reimburse State Defendants for the cost of storing the DREs, ExpressPoll units, and AccuVote scanners to ensure this burden does not fall on the citizens of the state of Georgia.[4]

## CONCLUSION

Georgia will never use DREs again. If not for this litigation, the taxpayers of the State of Georgia would not have to pay more than $430,000 annually—money that could be used to offset the deep budget cuts required

---

[4] The machines are only being maintained pending further order of this Court regarding any examination. Plaintiffs should not be allowed to take possession of the DREs, but should be required to pay for storage until such time as this Court gives further direction regarding any potential examination.

by COVID-19 and possibly allow the Secretary of State to maintain additional staff with expertise in elections. This Court should modify its previous orders because any future examination of DREs could be conducted on the sequestered machines.

Respectfully submitted this 1st day of June, 2020.

>Vincent R. Russo
>Georgia Bar No. 242628
>vrusso@robbinsfirm.com
>Josh Belinfante
>Georgia Bar No. 047399
>jbelinfante@robbinsfirm.com
>Carey A. Miller
>Georgia Bar No. 976240
>cmiller@robbinsfirm.com
>Alexander Denton
>Georgia Bar No. 660632
>adenton@robbinsfirm.com
>Brian E. Lake
>Georgia Bar No. 575966
>blake@robbinsfirm.com
>Robbins Ross Alloy Belinfante Littlefield LLC
>500 14th Street, N.W.
>Atlanta, Georgia 30318
>Telephone: (678) 701-9381
>Facsimile:  (404) 856-3250
>
>*/s/Bryan P. Tyson*
>Bryan P. Tyson
>Georgia Bar No. 515411
>btyson@taylorenglish.com
>Bryan F. Jacoutot

                              Georgia Bar No. 668272
                              bjacoutot@taylorenglish.com
                              Diane F. LaRoss
                              Georgia Bar No. 430830
                              dlaross@taylorenglish.com
                              Loree Anne Paradise
                              Georgia Bar No. 382202
                              lparadise@taylorenglish.com
                              TAYLOR ENGLISH DUMA LLP
                              1600 Parkwood Circle, Suite 200
                              Atlanta, GA 30339
                              Telephone: 678-336-7249

                              *Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing **STATE DEFENDANTS' CONSOLIDATED MOTION TO MODIFY ORDER WITH BRIEF IN SUPPORT** has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson