1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,              :
                                        :
5           PLAINTIFFS,                 :
    vs.                                 :   DOCKET NUMBER
6                                       :   1:17-CV-2989-AT
    BRAD RAFFENSPERGER, ET AL.,         :
7                                       :
            DEFENDANTS.                 :
8

9

10       **TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

11          **BEFORE THE HONORABLE AMY TOTENBERG**

12             **UNITED STATES DISTRICT JUDGE**

13                   **JUNE 12, 2020**

14                    **3:37 P.M.**

15

16

17

18

19

20

21   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22                *TRANSCRIPT PRODUCED BY:*

23

     *OFFICIAL COURT REPORTER:*          *SHANNON R. WELCH, RMR, CRR*
24                                       *2394 UNITED STATES COURTHOUSE*
                                         *75 TED TURNER DRIVE, SOUTHWEST*
25                                       *ATLANTA, GEORGIA  30303*
                                         *(404) 215-1383*

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
      SCHOENBERG:
 4

 5        DAVID D. CROSS
          MARY G. KAISER
 6        REEMA S. ALI
          MORRISON & FOERSTER, LLP
 7

          HALSEY G. KNAPP, JR.
 8        ADAM M. SPARKS
          KREVOLIN & HORST, LLC
 9

10

11    FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
      WILLIAM DIGGES, III, AND RICARDO DAVIS:

12

13        BRUCE BROWN
          BRUCE P. BROWN LAW

14        ROBERT ALEXANDER McGUIRE, III
          ROBERT McGUIRE LAW FIRM
15

16        JOHN MICHAEL POWERS
          LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

17

18    FOR THE STATE OF GEORGIA DEFENDANTS:

19

20        VINCENT ROBERT RUSSO, JR.
          CAREY A. MILLER
          JOSH BELINFANTE
21        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

22

23        BRYAN P. TYSON
          BRYAN JACOUTOT
          LOREE ANNE PARADISE
24        TAYLOR ENGLISH DUMA

25
                                        (...cont'd....)
```

```
1    (...cont'd....)

2

     FOR THE FULTON COUNTY DEFENDANTS:
3
         KAYE BURWELL
4        DAVID LOWMAN
         OFFICE OF THE FULTON COUNTY ATTORNEY
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S

 2    (Atlanta, Fulton County, Georgia; June 12, 2020.)

 3              THE COURT:  Good afternoon.  This is Judge Totenberg.

 4    Sorry to keep you-all waiting.  Running between the court and

 5    the house was not what I had in mind quite as much.

 6              All right.  Ms. Welch, are we ready?

 7              COURT REPORTER:  Yes, ma'am.  I think all parties are

 8    represented.  I think we have about 18 or 19 people on the

 9    call.

10              THE COURT:  All right.  Can we just go through the

11    names of counsel here for each -- for the parties?

12              MR. BROWN:  Your Honor, this is Bruce Brown for the

13    Coalition plaintiffs.

14              MR. McGUIRE:  And Robert McGuire for Coalition as

15    well.

16              MR. CROSS:  Your Honor, this is David Cross for

17    Curling plaintiffs.

18              MS. KAISER:  Mary Kaiser is on for Curling plaintiffs

19    as well.

20              MR. SPARKS:  Adam Sparks for the Curling plaintiffs.

21              MR. POWERS:  John Powers for the Coalition

22    plaintiffs.

23              COURT REPORTER:  Mr. Knapp, are you still on?

24              Judge, Mr. Knapp was on the call.  He may have

25    dropped off.  But Mr. Sparks is on as well.
```

```
1              THE COURT:  Okay.

2              COURT REPORTER:  So he will probably call back in.

3              THE COURT:  What about the State?

4              MR. TYSON:  Your Honor, Bryan Tyson for State

5    defendants.

6              MR. RUSSO:  Your Honor, Vincent Russo for the State

7    defendants.

8              MR. BELINFANTE:  Good afternoon, Your Honor.  This is

9    Josh Belinfante for the State defendants.

10             MS. BURWELL:  Kaye Burwell and David Lowman for

11   Fulton County.

12             MR. MILLER:  Your Honor, this is Carey Miller also

13   here for the State defendants.

14             MS. PARADISE:  Your Honor, Loree Paradise here for

15   the State defendants.

16             MR. JACOUTOT:  Bryan Jacoutot here for the State

17   defendants.

18             THE COURT:  All right.  I obviously would have

19   preferred if we didn't have to have this phone conference and

20   it didn't have to get to this point.  Let me just ask really a

21   few basic questions.

22             First of all, to the plaintiff, why is it -- if there

23   are something like two-thirds of the DREs that you basically

24   know from just an overall number perspective you are not going

25   to use or need, why are you not just releasing those?
```

1          MR. CROSS:  Your Honor, this is David Cross.  We did.

2   I mean, to be honest, I guess we have been confused since

3   February 10 when we sent a letter identifying by machine ID the

4   machines that we thought needed to be preserved on a sample

5   basis.  And it is actually a lot more than two-thirds because

6   the machine IDs get reused.

7          So even though I think it is roughly maybe 10,000 or

8   so machine IDs that are on our request, we think it is a small

9   fraction of that that actually corresponds to individual units.

10         But in any event, candidly, Your Honor, I think that

11   is a question for defendants.  I don't understand why those

12   haven't been released.

13         One thing we have also learned is there are a variety

14   of ways for the State to match the machine IDs to individual

15   units, to serial numbers, whether it is the recap sheets that I

16   think Mr. Barnes points out in his declaration.  I think

17   Mr. Barnes' declaration also suggests that you could do this

18   with the memory cards.

19         We have talked to Dr. Halderman and looked into this.

20   It looks like he could do it electronically fairly easily using

21   the memory cards.  Because if the memory cards are plugged in

22   to the DRE machine, the serial number for that machine, as I

23   understand it, is imprinted on the card.  So they have been

24   preserving or supposed to preserve the memory cards as well.

25   That would be another easy way to do this.

1    So the short answer is, Your Honor, I don't know why

2    the machines haven't been released.

3    THE COURT:  So is the estimate of $36,000 roughly a

4    month including every single machine?  The question is to the

5    State.  Or is it for a smaller segment of the case -- of the

6    machines?

7    MR. TYSON:  Your Honor, this is Bryan Tyson.  The

8    $36,000 a month is the charge from the vendor to store the

9    entirety of the universe of machines.  And I think it is an

10   important point to recognize that the list of machine IDs tells

11   us nothing about which machines we could release and which ones

12   we cannot release.

13   It is almost like if you had license plates or cards

14   and in each election you change the license plate for each

15   vehicle.  A list of license plates numbers is not going to tell

16   you what the vehicle identification numbers are for particular

17   vehicles you are trying to locate.

18   And so while we have a list of 10,000 machine IDs,

19   there's additional steps that would have to be taken, as this

20   is the first I have heard of a memory card method.  But even

21   using that would require inserting one memory card at a time

22   for each election to determine what serial numbers were used.

23   So we are at a point where we have no idea what

24   serial number units the plaintiffs wish to be preserved.  So we

25   can't release 20,000 of the machines.

1      THE COURT:  Is that how many you think you have is

2   20,000?

3      MR. TYSON:  No, Your Honor.  We have --

4      THE COURT:  Or do you have 30?

5      MR. TYSON:  No.  We have roughly 30,000 DREs and

6   several thousand optical scanners as well.  I think it is close

7   to 40,000 pieces of equipment in total, if I'm correct about

8   that.

9      THE COURT:  You-all never talked about using a card

10   to determine before today?

11      MR. TYSON:  No, Your Honor.  But even if we did, the

12   card method would still require us to put one card at a time.

13      And, remember, these cards are with the counties.

14   These cards are not maintained by the State.  So we still would

15   have to go county by county to locate this information, even

16   assuming a card method would work.

17      THE COURT:  Okay.  Did you give the numbers to the

18   plaintiff -- let's just clarify for me what exactly you have

19   given the plaintiffs in terms of information.

20      And what -- I understand the whole business that

21   every year that the number may have a different machine ID from

22   election to election because it is assigned based on when

23   information from the GEMS database on a particular memory card

24   is inserted.

25      MR. TYSON:  Right.

 1          THE COURT:  But -- so what information did you give

 2   to the -- precisely to the plaintiffs so that they could

 3   attempt to do a meaningful statistical sample?

 4          MR. TYSON:  Yes, Your Honor.  So this is Bryan Tyson

 5   again.  The first thing the plaintiffs received several years

 6   ago in discovery -- it may have been last year.  I don't want

 7   to -- I'm not exactly certain when.  But I know it was at least

 8   a year ago the plaintiffs received a full list of all serial

 9   numbers for the DREs and optical scan units that the State has.

10          In roughly December, the plaintiff said that was

11   not --

12          THE COURT:  All right.  Let's just stop there so I

13   can make -- so that I understand.

14          MR. TYSON:  Certainly.

15          THE COURT:  You would think I would understand by

16   now.  But I want -- so you gave them a list of all machines and

17   you identified it by what?

18          MR. TYSON:  By the serial number and by the county

19   where that machine would be used.

20          THE COURT:  Okay.

21          MR. TYSON:  And so in December after we first

22   discussed this topic in December of 2019, the plaintiffs

23   indicated that they were going to also have to have the usage

24   information.  So for which election was each DRE used by serial

25   number.

And in order to determine that information, at our January call that we had after some discussion, we reached the conclusion that the plaintiff believed that -- the Coalition plaintiffs were confident, the Curling plaintiffs were a little less confident -- that the serial number information may be stored in the GEMS databases.

So at the end of January, we provided an almost -- I believe it was in the 750 to 800 GEMS database range of databases for six elections that the plaintiff had identified.

The plaintiff then notified -- there were several that we were not able to locate due to the county sending a different post-election database than they should have.  But 93 percent of the databases that the plaintiffs requested we turned over to them.

They then proceeded to create -- basically to notify us that the serial number -- they could not identify that in the GEMS database, if I'm recalling the sequence correctly, and instead sent us a sample based only on machine ID.  That was in the middle of February roughly.

And a list based on machine ID does nothing to help us identify which DREs were -- which serial numbers we needed to try to locate and maintain.  And, frankly, at that point, we had the preliminary injunction hearing with Your Honor at the beginning of March.  And then COVID took over most things and especially for the Elections Office for the Secretary of

1    State's office.  And this became a lower priority until the

2    Governor's instructions on May 1st that all agencies were to

3    propose 14 percent cuts, which was roughly $800,000 for the

4    Elections Division of the Secretary of State's office.  And the

5    Secretary's office immediately began asking again what the

6    status of this was, considering it was a

7    400-or-so-thousand-dollar-a-year expense to the State.

8              And our primary concern is that since we have -- we

9    have been working on this now on and off for six months.  And

10   we still only have a list that would require an extensive

11   manual process of either going memory card by memory card.  If

12   this is a method -- first I have heard of it.  If this is a

13   method that works, it would still require one memory card at a

14   time.

15             Otherwise, it is a hand search through paper -- DRE

16   recap sheets and other methods to go try to reconcile machine

17   IDs to serial numbers and then remove duplicates from the list

18   and then try to locate those serial numbers in the machines

19   that are currently only stored in county order, not in any sort

20   of serial number order as we have explained.

21             THE COURT:  Okay.  So let me ask the plaintiff.  I

22   know you say you only needed portions of these and it is a

23   small portion of these.  So -- but you don't know precisely

24   what because of the challenges that are identified by all of

25   you.

1          But why not just take a -- kind of a somewhat more

2     generous group than you would have normally -- why is that --

3     from different counties?  It is imperfect.  But it at least

4     could -- it would release a large number even of the DREs

5     for -- because I'm assuming you are not really offering to take

6     responsibility for all of the DREs.

7          I have seen you saying that you are willing to pay

8     the cost for -- I don't know -- some.  But I don't -- I'm not

9     sure -- it seems like a very difficult place to go right now to

10    have everyone chasing after -- looking for the right serial

11    number.  And, you know, right now -- I mean, you thought -- and

12    I don't say anything negative about it.

13         But obviously your folks thought that they were going

14    to be able to tell this from the GEMS database, and they

15    couldn't.  And maybe they will be based on the card.  But you

16    don't know really whether it got wiped or what has happened

17    with it.

18         So -- and maybe you'll be able to get that and be

19    able to determine that.  But my recollection of the origin of

20    this all, which sort of kind of goes back to both sides, is

21    that one of the principal reasons you thought it was necessary

22    was because the defendants might appeal on the merits and you

23    wanted to be able not to be deprived of your evidence, which I

24    understood, and no one would agree to having the -- on the

25    defendants' side to having the last preliminary injunction

1    ruling be a decision on the merits.

2         But at the same time, you know, there is a reality of

3    the budget and of utility of this and the fact that we are

4    dealing with a lot of counties.  So I mean -- it looks like the

5    perfect -- it could be the enemy of getting this done.

6         MR. CROSS:  Your Honor, this is David Cross.  I guess

7    a few thoughts to answer your question a bit.  The original

8    thinking with the sampling was to get to as small a number as

9    we could based on the information we had.

10        THE COURT:  Yeah.

11        MR. CROSS:  With all due respect to Mr. Tyson, it is

12   not really accurate to say the machine IDs do nothing to help

13   move this forward.  Again, Mr. Barnes' own declaration talks

14   about ways to match up, as I recall his declaration, using

15   recap sheets or other things to match up the machine IDs to

16   serial numbers.

17        We think there is a way to do that with the memory

18   cards.  We think the memory cards -- our understanding is they

19   match also with the vendor, not be distributed across the

20   counties --

21        THE COURT:  Go slower.  Because I'm not catching it.

22   And if I'm not, then Ms. Welch isn't.

23        Go ahead.

24        MR. CROSS:  So with respect to doing it by the memory

25   cards, we have not had that discussion because the defendants

1   decided that they would only communicate with us through a

2   briefing with the Court, which is what Mr. Tyson --

3           THE COURT:  All right.  All right.  We're not going

4   to spend time on all of that.  Here we are.

5           MR. CROSS:  I understand.  Yeah, I understand.  But

6   the question was raised on why we haven't talked about it.

7   That is why.

8           THE COURT:  Okay.

9           MR. CROSS:  As to whether -- as to whether it can be

10  done, Dr. Halderman thinks it can be done.  There are a couple

11  of ways to do that.  They could give us the -- give us access

12  to the memory cards and let us do the work.  He has written a

13  script that he thinks will pull the serial numbers

14  automatically.

15          So this is the type of discussion we would love to

16  have with them to try to work that out.  We think there may be

17  a way to do it.

18          Another possibility would be:  If the machines are

19  all sitting in a single vendor in a single location, then it

20  could be that we could just take a random sampling from that --

21  that room.

22          The challenge for us is we do want to make sure we're

23  getting a representative sample from each of the relevant

24  elections, like the midterm elections in 2018.  And so if you

25  just take a random sampling from any given county, for example,

1  you could end up with machines that were used, say, in 2019 but

2  not 2018.  Or you might miss entire precincts that might be

3  significant.

4       And so if they are all now grouped together in one

5  place, depending on how they are organized in the room, it may

6  be there is a simpler way to do this.  We just don't really

7  have the information to figure that out.

8       The last point I'll make on the cost piece is, you

9  know, one of the key reasons we wanted more time -- part of

10 that was to try to figure out other ideas to make this work.

11 But it is also to try to understand the cost.  Because that is

12 the principal, if not the only, basis on which the State seems

13 to be seeking the relief.

14      And we don't have any information on where that

15 number is coming from.  We have sent out an Open Records

16 request beginning over a week ago.  We are told it would take

17 time to get responses.  But one county, Cobb, has responded.

18 And according to Cobb County from the election director there,

19 with respect to preserving DREs, what they conveyed to us

20 today -- and I quote -- there is no cost associated with

21 storage.  And so I imagine --

22      THE COURT:  Well, is it all being stored though at

23 one facility though?  That is what --

24      MR. CROSS:  That is what we don't know.  What the

25 Cobb County director conveyed to us was she identified a

1    location where DREs were being stored.  It looks like it is

2    maybe a county fire department from what we can tell.  She said

3    there is no cost associated with that.

4          So the challenge we have is the defendants will

5    communicate with us only through you.  And so we can't really

6    get the information we need to figure out where are the

7    machines.  That influences what type of methodology we might be

8    able to use.  If they are all in one location together, that is

9    one thing.  If they are spread out across counties, that is

10   another.

11         We don't really understand what the cost actually is.

12   So we can't respond to whether we can cover that cost.  We

13   can't evaluate whether we could reduce that cost.  We just

14   don't know.  And so we would really like to work this out.

15   With some additional time to respond to the motion and maybe a

16   bit more information at least from the folks who are willing to

17   give it to us from the counties or the State would put us in a

18   better position to maybe resolve this.

19         MR. TYSON:  Your Honor, this is Bryan Tyson.  I think

20   I can answer some of Mr. Cross' questions with the discussion

21   we had in January on this point.  There are three counties that

22   are storing DREs under separate preservation orders from the

23   Court.  And as we discussed in January, Cobb, Dekalb, and

24   Fulton all have DREs that the county is still maintaining, the

25   State has not picked up, because they are subject to the

1    preservation orders this Court entered shortly after this case

2    arrived in your courtroom several years ago.

3              Those are separate and distinct from the DREs that

4    were picked up from the vendor as the BMDs were deployed to

5    each county.  And as we talked about in January, they were

6    loaded into essentially units per county and brought to a

7    central storage place that the vendor maintains.

8              This is a vendor, as we explained in January, that

9    takes care of electronic disposal for the State.  And they bill

10   the State a flat $36,000 a month for the warehouse space to

11   store the DREs that they collected as part of the preservation

12   process.  And as soon as the DREs are released from the Court's

13   preservation orders, those DREs can then be disposed of using

14   the existing electronic disposal process the State uses.

15             I understand Ms. Kaiser sent an Open Records request

16   to Cobb County today.  But the reality is that is not the DREs

17   we're talking about.

18             That we think is actually an excellent subset of a

19   sample.  If we could dispose of the ones that are being stored

20   centrally by the State and just proceed with the sample of the

21   units that was already being maintained by Cobb, Fulton, and

22   Dekalb, that is already an identified subsample that has not

23   been used in subsequent elections and could be the ideal

24   sample.

25             So in our minds, that is the ideal solution here

1   rather than having the State maintain all 30,000 units.

2         THE COURT:  So what is wrong with that proposal?

3   This is to the -- this is to plaintiffs' counsel.

4         MR. CROSS:  Your Honor, this is David Cross.  I'm not

5   sure what is in that sample.  If it is -- if it is -- if it

6   includes the machines that were sequestered beginning in, I

7   think, 2017 or 2018, what would pop out to me is I don't think

8   that would include any of the recent elections, like the 2018

9   midterm, which is a key election.

10        Again, I don't know what is in that.  This is the

11   first I recall hearing that there are still machines that are

12   at the counties.  I mean, the filing that just came in

13   certainly read to us to indicate that all of the machines were

14   collected by the State.

15        And so, again, this is part of what we're trying to

16   figure out is where are the machines.  It is not clear to us

17   why the State collected them and is incurring a lot of money

18   when it looks like the counties were storing them for free.

19        And there is no indication whether the State has

20   explored other means of preserving some of these things as

21   opposed to paying this vendor which looks to be quite

22   exorbitant fees.

23        But in any event, I think if we could have a

24   discussion and exchange information, we could probably work

25   this out.  And Your Honor doesn't want to hear it.  But we

1    haven't been able to do that.  So I'm not sure how to go

2    forward.

3              THE COURT:  Well --

4                    **(Unintelligible cross-talk)**

5              THE COURT:  Right.  Let me just say this.  I mean,

6    you want until the 29th.  Or on the practical litigation

7    perspective, you want until June 29.  And there are

8    approximately ten days left in the legislative session.  I

9    don't know how they are going to space those.  They only count

10   the days they actually have proceedings.  I don't -- you know,

11   the way the legislature works is not necessarily always

12   100 percent, let me say, transparent about what days they are

13   going to be counting or not.

14             But it is one thing to actually -- certain sorts of

15   meetings are held and committee meetings don't count

16   necessarily and -- but -- but I'm sure no matter what they are

17   aiming to be out by July 2nd, if not beforehand.

18             And so, you know, it doesn't really do us much good

19   for you to -- unless you can resolve this, it doesn't do us

20   much good to resolve this on the Friday before the July 4th

21   week because -- or the 30th because then basically the budget

22   is about to be approved.  That is why they are hot to trot.

23             MR. CROSS:  Your Honor, I understand that.

24   There's --

25             THE COURT:  So I don't -- I mean, I don't know what

```
1    you are looking for further.  I mean, to me, I wasn't clear

2    whether there were more Open Records Act requests that you were

3    wanting to make in the -- or you were trying to hold -- or you

4    were waiting for the responses still pending the Open Records

5    Act requests or both.

6              MR. CROSS:  So we have Open Records requests that

7    went out last week.  We're waiting for the responses.  What has

8    been indicated so far is that it will take more than the three

9    days.  We don't know exactly when that will come.

10             We have some additional ones that we sent out this

11   week.  And so we are trying to build in a window to get those

12   responses.  We also need to work with our experts in trying to

13   figure out things like, you know, whether the memory card piece

14   works.  So that's why we were building in the time.

15             Again, we are sensitive to the situation the State is

16   in.  But as Mr. Tyson began this call, he said this was not --

17   his words are low priority for the State.  So just to say that

18   we're going to get crunched because they decided not to address

19   this for three months, that doesn't -- that doesn't seem

20   like --

21             THE COURT:  Well, you didn't address it either for a

22   while, I mean, it looks like.  I mean, it wasn't like you sent

23   out Open Records requests a month ago.

24             MR. CROSS:  We --

25             THE COURT:  I mean, I --
```

```
 1            MR. CROSS:  We did what we were supposed to do, and
 2    we sent samples.  I'm not sure what more we could have done.
 3    They could have released lots of machines.  In those three
 4    months, they could have matched up the machine IDs and the
 5    serial numbers probably for less than they are paying per
 6    month.
 7            They could have worked their best to figure that out.
 8    But they didn't.  So now they want to say it is a time crunch
 9    of their making.  We -- respectfully, Your Honor, I think we're
10    entitled to enough time to get the information we need to
11    respond and not be squeezed just because they made it a low
12    priority for half a year.
13            THE COURT:  Well, it is a complicated thing about the
14    low priority let me just say.
15            But did I correctly summarize why you want them, or
16    is there some other reason you want them beyond what I said?
17    I'm not trying to diminish the importance of that.  I'm just
18    trying to make sure I understand.
19            Is that what you want so far?  How much -- what is
20    the -- I mean, it does seem like real work to be able to -- to
21    trace all of this down.  It seems like, you know, it is at
22    least a pain in the neck at a time when there is not a lot of
23    extra resources.  And I don't mean money.  I mean people in
24    some ways.
25            MR. CROSS:  And we're happy to do that.  I mean, if
```

1  we could get, for example, the recap sheets or the memory

2  cards, we're happy to do the tedious work of matching.  It is

3  just a matter of collecting on their part and providing it.

4       THE COURT:  Well, you are willing to do that work and

5  not bill for that work?

6       MR. CROSS:  You mean not seek fees later?  Sure.

7  Absolutely.  We would absolutely do that.

8       THE COURT:  What is wrong with that proposal,

9  Mr. Tyson?

10       MR. TYSON:  Your Honor, certainly I'll refer us back

11  to our January conversation about how the DRE recap sheets are

12  stored by the Secretary's office.  All the post-election

13  information is stored in a folder for each county after each

14  election.  And there is a variety of documents that is more

15  than just the DRE recap sheet.

16       And a county may range from a half inch thick up to a

17  foot or two thick of paper documents for that particular

18  election.  The DRE recap sheets aren't in any particular point

19  in that folder.

20       And so in order for us to even begin to give

21  documents to the plaintiffs to start this process, if they were

22  going to conduct this analysis, we would have to engage

23  Elections Office staff, which frankly is already stretched very

24  thin trying to run the elections in the midst of COVID, to go

25  pull out all that information and then turn it over to the

1    plaintiff and have them, I guess, do a manual entry of all the

2    DREs -- all the DREs used in a particular election.

3         So I mean, I appreciate Mr. Cross' willingness to

4    take on a Herculean task.  But it would require a lot of work

5    on the front end.  And we would also for past elections have to

6    go back to the archives, get all the election documents out.

7         And I'm still struggling to understand from a

8    mootness and relevance standpoint why we're engaging in all of

9    this activity.  We have-- I feel like we have been very, very

10   clear from the January call, from our filings, from the

11   documents.

12        On Page 5 of our filing about this, we talked about

13   the fact that there were machines sequestered with the counties

14   that we have not collected and those are different than the

15   machines that we have collected.

16        So the reality for us is we're now six months down

17   the road here.  We're now in a budget crisis that no one

18   anticipated.  And we're trying to do the best we can to free up

19   resources to allow the elections process to be funded for

20   people to have it function in Georgia.  And this is an expense

21   that obviously -- these are about machines that are -- the

22   claims are moot.  There is no relevance to going through this

23   process and digging these out at this point.

24        THE COURT:  Well, obviously, they dispute that the

25   claims are moot.  And I guess to the -- on that point, I'm more

1   likely to agree with them.  Whether, you know -- whether this

2   volume of work at this juncture is worth it is another matter.

3   But, of course, it depends on if -- you know, what we went

4   round and round about before, which is, you know, is the State

5   going to appeal on the -- on the preliminary injunction and

6   what -- where do we go from here.  Because if you are saying

7   that they -- if I were to rule that they are not moot, you seek

8   an interlocutory appeal on that or something else, you know, we

9   are just -- and then I'm in a position where I wouldn't have

10  allowed them to do this -- I didn't allow them to do discovery.

11  So, you know, it is sort of a rock and a hard place.

12          That is why the first part of this was originally,

13  well, is the State willing to agree to judgment on -- at least

14  partial judgment, which I never -- you know, no one ever

15  indicated you were.  So that is why we are -- partly why we are

16  here.

17          MR. BROWN:  Your Honor, this is Bruce Brown with the

18  Coalition.  Just a couple of very quick points.

19          First, the State, you know, continues to not address

20  the federal law that requires them to keep the DREs anyway for

21  22 months after the 2018 election.  And we keep on like -- I

22  know we're like a broken record.  We keep on citing that law

23  and the state law that requires these DREs to be maintained for

24  two years.

25          And in response to that, we get crickets.  Just

1   nothing.  And so what they are asking is to violate federal and

2   state law by -- and I don't want to get into sort of a

3   scrimmage over that issue.  But it has never been addressed by

4   the State.

5          And so we have -- we briefed that in Document 699,

6   which was our response back in January.  And they have never

7   explained why they have any federal authority to be destroying

8   these election records.  That is part of, I think, the 1960

9   Civil Rights Act or Voting Rights Act.  And it is so that the

10  Justice Department can do an investigation of a federal

11  election up to two years after the election.

12         So that, I think, should sort of decimate their claim

13  that they should be able to destroy these records or, as they

14  have done in the media, blame this litigation for these costs.

15  It is just not -- that is just not so.

16         And, also, they can't have it both ways.  They can't

17  complain about the costs to narrow the discovery because it

18  takes them a long time with all the records and complain about

19  the cost of keeping all of them.  They have got to make -- and

20  the other -- other claim they are making is that, although they

21  are not going to consent to a final judgment, they want to

22  pretend that it is.

23         So they have got to make some choices here.  But we

24  are behind -- with the Curling plaintiffs, we're behind

25  narrowing the load for everybody.  And we'll do what we can to

 1    work with the State to do that.

 2            Thank you, Your Honor.

 3            THE COURT:  So at 699, which of the documents is it

 4    that you are --

 5            MR. BROWN:  It is Document 699.  I'm trying to get

 6    the page number.

 7            THE COURT:  I mean, there are a variety of documents

 8    in there.

 9            MR. BROWN:  I'm sorry.  Page --

10            THE COURT:  No.  It is just that there are some

11    exhibits.  But that is all right.

12            MR. BROWN:  Document 699, that is the pleading

13    number.

14            THE COURT:  Right.  Yeah.  I've got it.

15            MR. BROWN:  We cite in there on Page 14 the federal

16    law and the two state laws that control.

17            MR. TYSON:  Your Honor, this is Bryan Tyson.  Just to

18    quickly dispose of that, I believe that we addressed that in

19    our reply.  I don't have the reply in front of me.  But the

20    State maintains for the two-year period all of the electronic

21    records on CDs that are held under seal with the Clerk of

22    Superior Court.

23            There's not -- I have never seen a case where there

24    is an independent obligation to preserve voting machines for

25    the two-year period.  And if Mr. Brown believes that is

1    correct, I'm sure he can try to persuade the U.S. Attorney to

2    bring an action against us.  But none of that is relevant to a

3    discovery dispute here about these machines that are right now

4    only being maintained because of the Court's orders to maintain

5    them right now.

6          And that is what we've tried to do for six months

7    now, find a resolution that was workable for everybody.  And

8    we're still here.  So --

9          MR. BROWN:  I mean, it is just like with any

10   discovery dispute or any obligation to preserve evidence.  The

11   law says records.  Those DREs are records.  And yeah, there may

12   be some copy or supposed copy or rendition or printout from

13   those DREs.

14         But absent any guidance from the Justice Department

15   that it doesn't apply to these electronic records, I think it

16   is a very scary position to take that the internal DRE memory,

17   which contains this information, is somehow exempt from an act

18   that says it applies to all records.

19         MR. CROSS:  Your Honor, this is David Cross.  One

20   suggestion, if I may.  Mr. Tyson said that part of what they

21   would have to do with the recap sheets is to go through

22   files -- I think he said it was half an inch to a foot thick.

23   It sounds like there would be 159 of those, one for each

24   county.

25         However many there are, if all they opine to do is

1    just literally pull the files and stick them in a room

2    somewhere where we can have people go in and go through all the

3    recap sheets, we're happy to absorb that cost as well.

4           THE COURT:  What if you did that and we're just

5    interested in whatever -- some sample of the counties?  Why

6    would they have to pull them for every single county?  Why do

7    you need that?

8           MR. CROSS:  So that is a good question.  And it is

9    literally the same question I asked Dr. Halderman.  The concern

10   is that if you don't get a representative sample for each

11   relevant election in each county and trying at least to give a

12   representative sample of the precincts across the county you

13   run the risk of missing something, if there was, for example,

14   hacking that was done.

15          One of the things that Dr. Halderman and others have

16   shown is you can hack the system by getting access to a single

17   machine because of the way the data moves between the one

18   machine and the GEMS database or the GEMS server.

19          So what we were looking to do was to get a

20   representative sample across the state.  I'm not sure how you

21   pick counties.  We talked about that.  You know, Dr. Halderman

22   explained, you know, how might you hack it.  You might say,

23   well, let's flip a small number of votes at a single precinct

24   or a few machines in one precinct in Fulton and we'll switch

25   the Republican instead of Democrat.  Or, vice versa, you may go

1  to a county that traditionally votes heavily Republican and

2  just switch a small number of votes.

3          So you don't know how it happens.  So that is why we

4  wanted a representative sample.  And, again, I mean, pulling

5  the file folders doesn't seem like it should be a difficult

6  task.

7          We're happy --

8          THE COURT:  Then there is an extra step after that

9  though, as I understood it.  I mean, are you going --

10                    **(Unintelligible cross-talk)**

11         MR. CROSS:  And the matching we would do.  The first

12  step would be pulling the folders.  The second step is going

13  through the folders to identify the recap sheets.  It sounds

14  like they are included with some other documents.

15         We would -- we would ask them to do step one, pull

16  the folders.  We would send people in to identify the recap

17  sheets, get them copied.  And then we would take it from there.

18         We would match the machine IDs per election to the

19  corresponding serial numbers.  Again, we think this could

20  actually be done much easier with the memory cards.  But we'll

21  take either route.  We could deal with the recap sheets.

22         We could do the matching.  Then we could come back to

23  them and say, here are the serial numbers for these machines.

24  And so we will narrow it down to specifically identified units.

25  We anticipate that would be a relatively small percentage of

1    what we're talking about.

2            And then it is a matter of identifying those

3    machines.  And we're happy to do that too.  If they are sitting

4    in a big warehouse, we're more than happy to send a team in.

5    They can be supervised to track down the serial numbers in the

6    warehouse.

7            Literally, the only thing we would be asking the

8    State to do is to just pull those folders.  We would take

9    everything from there, and we would absorb the cost.

10           THE COURT:  What happens for the other counties -- I

11   mean, the large counties of Fulton, Dekalb, and Cobb, which are

12   considerable?

13                   **(Unintelligible cross-talk)**

14           MR. CROSS:  They are all in the same location is what

15   I understood from Mr. Tyson.  Except for the ones that are

16   sequestered specifically for this litigation separately, all of

17   those other machines are sitting in a single location.

18           So that's why if we can get the serial numbers we can

19   walk in to that one big warehouse, identify each machine by

20   serial number, say these are the ones we would like you to

21   keep, do what you want with the rest.

22           If there are any serial numbers that pop up in what

23   just Cobb, Dekalb, and Fulton are preserving, then we could

24   work with the counties to identify those machines.  Although,

25   again, Cobb tells us they are not incurring any costs.

1          So we are prepared to do every single step, other

2     than them just pulling the folders.  Frankly, we'll do that too

3     if there is a way for us to do it.  But we're trying to absorb

4     everything.

5          MR. McGUIRE:  Your Honor -- I'm sorry, David.  I

6     didn't mean to interrupt you.

7          MR. TYSON:  No.  Go ahead.  This is Bryan.  You can

8     proceed.

9          MR. McGUIRE:  This is Robert McGuire for the

10    Coalition plaintiffs.  I just wanted to add:  We fully support

11    everything Mr. Cross just said.  But I do just want to make

12    sure our unique, distinct position doesn't get lost in this.

13         We're not looking for a representative sample.  We

14    are looking for particular machines that we have identified

15    based on criteria, such as known aberrant behavior, known

16    malfunctions.

17         And we believe that we have a different approach that

18    is aimed at getting the same results.  But ours is based on

19    looking at specific machines that we have identified, not based

20    on getting a representative sample.

21         So I don't think a solution that looks to pulling a

22    representative sample will serve us.

23         MR. TYSON:  This is Bryan -- I'm sorry.

24         MR. CROSS:  One quick question.

25         Rob, you can identify those machines in a way that I

 1    said though; right?  It is a similar process?

 2           MR. McGUIRE:  Yes, of course.  And we could pull data

 3    into what David is proposing.

 4           MR. CROSS:  That is what I was going to clarify.

 5    Thanks.

 6           MR. TYSON:  Your Honor, this is Bryan Tyson.  Is part

 7    of this proposal also that the plaintiffs are going to absorb

 8    the storage costs of the entirety of DREs in the meantime?

 9    Because this is an incredibly laborious process.

10           MR. CROSS:  No.

11           MR. TYSON:  And I am sure the plaintiffs are

12    incredibly efficient.

13           MR. CROSS:  No.

14           THE COURT:  How long do you think it will take?  I

15    mean, if we're talking about -- what sort of numbers are you

16    envisioning?  Because basically Mr. Brown might be right or

17    wrong, but I'm not going to likely rule on that.

18           So, you know, if you are saying, all right, the

19    State, you're going to have to have this for another 30 -- for

20    another month, but we're going -- it is going to be off your --

21    it will be off your back basically or the vast majority of

22    these after that, they can look at what that is going to be for

23    budgetary purposes.

24           MR. CROSS:  So, Your Honor, I'm not sure who you were

25    asking.  This is David Cross.

1        What I would say is my guess is they have already

2   paid for the month of June.  Mr. Tyson can tell me if that is

3   wrong.  The sooner that they can get us in with the information

4   we're happy to knock it out.  It is hard for me to say in the

5   abstract how fast we can do it.  Maybe we could do it in a

6   week, maybe two weeks.  It just depends on how quickly we get

7   the information.

8        But we may be able -- I mean, it is only -- what? --

9   June 12th?  It is at least theoretically possible if they get

10  the stuff to us really quickly, like early next week or at

11  least get our folks in to look at the documents, we could

12  probably have this done by the end of the month.  And they are

13  not incurring any additional costs, depending on how they are

14  being billed.

15        MR. TYSON:  David, this is Bryan.  You think you will

16  be able to get in and pull over 200,000 pieces of paper and

17  then put it all in databases and be able to use it in three

18  weeks?

19        MR. CROSS:  I don't know.  I have got to see the

20  paper and then sit down with our folks and figure out what is

21  doable.  We will certainly move heaven and earth to do what we

22  can.

23        MR. TYSON:  The other --

24        THE COURT:  Go ahead.

25        MR. TYSON:  I was just going to say:  The other thing

1    that the State has been trying to figure out too is is there a

2    lower cost method of storage.  And we had identified a lower

3    cost state facility we could move these to.  But the cost of

4    moving them was such that it wouldn't be worth doing unless it

5    was going -- the machines had to be preserved for at least

6    three more months.

7         So there are those considerations we have to figure

8    out with our client too depending on the time line.  Because if

9    this is a four-month process, we want to go ahead and get them

10   into a cheaper storage facility and accede the cost of moving.

11   If this is a one-month process, then maybe that looks

12   different.

13        But, again, I just keep coming back to:  We have

14   raised this issue in the first of December.  These machines

15   have been decommissioned since December 31st.  And we are still

16   at this point.

17        So it is difficult for our client, especially with

18   the legislature asking what is going on.

19        THE COURT:  Well, listen, you know, it seems to me

20   the plaintiffs are willing to look at all the paper.  I mean,

21   they could -- you could send them some cards.  They could

22   actually verify is there -- is Dr. Halderman's theory correct

23   that he is going to be able to run the cards and it is going to

24   be simpler that way.  I don't know if it is true.

25        I assume that you-all looked at that.  But maybe you

1   don't want them to have the cards.  I don't know what the

2   answer is to that.  So that is sort of -- you know, that would

3   obviously be -- if it was available with the cards, that would

4   be potentially the simplest thing to do.  But I don't know that

5   that is so.

6          What if you were to give them a range of the cards

7   and they could run them to see so we know by Monday evening?

8          MR. TYSON:  I mean, Your Honor, I honestly don't

9   know.  I know the cards are somewhere.  I have been focused on

10  DREs and optical scanners.

11         I think if we were going to do any sort of electronic

12  component, we're going to have to have clear boundaries in the

13  protective order that the plaintiffs aren't conducting

14  unlimited discovery of everything on the memory card, that it

15  is for the sole purpose of drawing this out.  Because, again,

16  we are not -- we are passed discovery on these units.  So --

17         THE COURT:  So why does Dr. Halderman -- does he have

18  some concrete basis for believing that they record this

19  information in a way that is going to be ascertainable --

20         MR. CROSS:  He does, Your Honor.

21         THE COURT:  -- and not erased?

22         MR. CROSS:  Well, that is the question.  What we

23  don't know is -- well, let me take a step back.

24         Our understanding is that the memory cards from the

25  elections since this lawsuit was filed and whatever memory

1    cards they had when it was filed -- that those have all been

2    subject to preservation.  And so the memory cards for the

3    elections that we're concerned about should all be preserved.

4         If that is accurate, then -- I was just looking at

5    what Dr. Halderman said -- yeah.  So he thinks -- he says an

6    alternative way to identify which AccuVote DREs were used in

7    each precinct would be to use data from the DREs' removable

8    memory cards.  The memory cards store digital records of each

9    vote, which are later uploaded to GEMS.  They also store an

10   audit log file containing time stamped entries for each

11   election event, such as polls being opened or closed and

12   individual ballots being cast.

13        An example audit log from an election -- let's see --

14   when the memory card is inserted into the DRE, it writes -- the

15   DRE writes its serial number to the audit log.

16        So his understanding is that if the memory cards are

17   preserved we should be -- he should be able -- he has written a

18   script to do this, having tested it.  He can pull the audit log

19   from the memory card, which will give him the serial number

20   that corresponds to the machine IDs.  And then we can match up

21   the machine ID in a particular election to the serial number

22   for the DRE that was used.  And then that gets us to what

23   should be a relatively small universe of machines.

24        THE COURT:  But he thought that about the GEMS data

25   he was going to get too.

1          MR. CROSS:  Yeah.  And in fairness, Your Honor, we

2   did make clear that we just didn't know, that we were happy to

3   explore that.  And Mr. Tyson was kind enough to say at the

4   start of this that we did not know whether we would make that

5   work.  It did not work unfortunately.

6          All we could get was the machine IDs.  Dr. Halderman

7   thinks this will work because he has tested it.  But one of the

8   reasons we're happy to get a recap sheet and just get that

9   going is we -- in fairness to the State, we don't want to waste

10  more time.  We don't want them to incur more costs than they

11  have to.

12          So we also could run these in parallel.  They could

13  send us the sample of the memory cards while getting us set up

14  to go to the recap sheets.  Dr. Halderman can look at those.

15  If it works, great, we go that route.

16          THE COURT:  Well, I guess the question really is:

17  What sample of memory cards would he need to have in order to

18  actually see this was going to work?  Because, you know, maybe

19  some other memory cards have it and some of them don't.

20          MR. CROSS:  Unless the memory card is, you know,

21  erased or overwritten, it will have an audit log and the audit

22  log will have the serial number is my understanding.  But,

23  again, we're happy to do the recap sheet route.  I mean, it

24  doesn't -- and we would absorb, it sounds like, 95 percent of

25  the work.

1     THE COURT:  Well, here is my view.  They can make

2     their budget and know what they are doing if you're able to

3     give them -- if you're obligated basically to give them the

4     information about what you want so that they can basically move

5     on the machines by the end of July.

6     I mean, that gets -- that seems to me -- allows them

7     to do what they see fit, despite what Mr. Brown says, which I'm

8     not saying he is wrong, it is just simply not really ultimately

9     mine to deal with.  If you think you're able to do it so that

10    you can give it to them and they can basically get this done by

11    the end of July, then they know what is in -- they reduce their

12    budget accordingly.

13          MR. CROSS:  Right.

14          THE COURT:  Why doesn't that --

15          MR. CROSS:  I think that is fair.  Again, if we can

16    get access to the recap sheets early next week or as soon as

17    they can do it, I don't see why we couldn't do this by the end

18    of July.

19          MR. BROWN:  Your Honor, this is Bruce Brown.

20          THE COURT:  Well, I don't mean that you are just

21    giving it to them the end of July.

22          MR. CROSS:  Oh, I understand.  No.  No.  But --

23    sorry.  I understood, Your Honor.  They would be in a position

24    to release the machines by the end of July.

25          Could I ask one quick question?

1            Bryan, what was the transportation cost to move it to

2    another facility?

3            MR. TYSON:  I don't recall exactly, David.  I think

4    it was in the 80-something-thousand-dollar range.  But I

5    don't -- I have not seen any specifics on that at all.  So I

6    can't tell you what the different -- I don't have the cost

7    breakdown.  I just know that the office was working on other

8    options trying to figure out a way to save money.

9            MR. CROSS:  Okay.  Thank you.

10           THE COURT:  So, Mr. Tyson, what about that?

11           MR. TYSON:  Your Honor, I think we can -- we can take

12    that to our client.  I know that there is a lag time to get

13    documents out of archives.  And these are pretty voluminous

14    obviously records.

15           So why don't we do this?  We can discuss this with

16    our client, and then can we get -- I mean, our clients are

17    literally still -- everybody is working on trying to get

18    towards certification of the June 9th election right now.

19           THE COURT:  I know.

20           MR. TYSON:  So would Monday -- Monday -- Monday

21    afternoon be acceptable to get an answer back to everybody?

22           THE COURT:  Sure.  I mean, I'm going to extend the

23    time for them to file their response until we can get through

24    the end of this discussion in any event.

25           So I don't remember what the due date was that -- you

1   were saying you wanted a response by the -- I think it was

2   Monday.  So I'm going to extend it at least -- at least through

3   the end of -- basically until Thursday of next week.  But I'm

4   presuming that not everything -- not every single day of the

5   week is going to end up being used for the legislative session.

6               I would like you to be able to be talking together on

7   Monday.  If you -- I have a sentencing that is at 2:30.  So if

8   you needed me, I would have to be available more like at the

9   very end of the -- at 4:30.

10              I could not find today when I went to the office the

11  sentencing documents.  And Mr. Martin is away.  So I sort of

12  don't know what is involved exactly.  He will be back on Monday

13  morning.

14              All right.  If you're able to talk first yourselves

15  and agree, that is great.  Let me know.  We'll save 4:30 for

16  you otherwise.  That might end up slipping depending on how the

17  sentencing goes because I don't know what is involved.

18              MR. CROSS:  Thank you, Your Honor.

19              THE COURT:  Hopefully, you can do this without me and

20  come to a written agreement.

21              All right?

22              Okay.  Thank you very much.

23              MR. BROWN:  Thank you very much, Your Honor.

24              THE COURT:  All right.  Very good.  Take care.

25              MR. CROSS:  Thank you, Judge.

1          MR. RUSSO:   Thank you.

2                  **(The proceedings were thereby concluded at 4:32**

3          **P.M.)**

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

the United States District Court, for the Northern District of

Georgia, Atlanta Division, do hereby certify that the foregoing

41 pages constitute a true transcript of proceedings had before

the said Court, held in the City of Atlanta, Georgia, in the

matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the

15th day of June, 2020.




_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT