1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2               ATLANTA DIVISION

3

4  DONNA CURLING, ET AL.,         :
                           :
5        PLAINTIFFS,       :
  vs.                     : DOCKET NUMBER
6                        : 1:17-CV-2989-AT
  BRAD RAFFENSPERGER, ET AL.,   :
7                        :
        DEFENDANTS.       :
8

9

10     **TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

11       **BEFORE THE HONORABLE AMY TOTENBERG**

12         **UNITED STATES DISTRICT JUDGE**

13            **JUNE 15, 2020**

14              **5:08 P.M.**

15

16

17

18

19

20

21   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22            *TRANSCRIPT PRODUCED BY:*

23

*OFFICIAL COURT REPORTER:*     *SHANNON R. WELCH, RMR, CRR*
24                         *2394 UNITED STATES COURTHOUSE*
                               *75 TED TURNER DRIVE, SOUTHWEST*
25                         *ATLANTA, GEORGIA  30303*
                               *(404) 215-1383*

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
      SCHOENBERG:

 4

 5        DAVID D. CROSS
          MARY G. KAISER
 6        MORRISON & FOERSTER, LLP

 7        HALSEY G. KNAPP, JR.
          ADAM M. SPARKS
 8        KREVOLIN & HORST, LLC

 9

10    FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
      WILLIAM DIGGES, III, AND RICARDO DAVIS:

11

12        ROBERT ALEXANDER McGUIRE, III
          ROBERT McGUIRE LAW FIRM
13

14    FOR THE STATE OF GEORGIA DEFENDANTS:

15

16        VINCENT ROBERT RUSSO, JR.
          CAREY A. MILLER
          JOSH BELINFANTE
17        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

18

19        BRYAN P. TYSON
          BRYAN JACOUTOT
          LOREE ANNE PARADISE
20        TAYLOR ENGLISH DUMA

21

22    FOR THE FULTON COUNTY DEFENDANTS:

23        CHERYL RINGER
          DAVID LOWMAN
24        OFFICE OF THE FULTON COUNTY ATTORNEY

25
```

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; June 15, 2020.)**

COURTROOM DEPUTY CLERK:  We have got quite a few on here.  Would you like me to call the case and have everybody make an appearance for the record?

THE COURT:  Call the case.  And if you know everyone who is on the -- who is on -- do we, Mr. Martin? -- you could just read their names.

COURTROOM DEPUTY CLERK:  Okay.  All right.  We're here for the teleconference in the case of 17-CV-2989, Curling vs. Raffensperger.

Counsel of record are David Cross, Mary Kaiser, Halsey Knapp, Adam Sparks, Robert McGuire, Bruce {sic} Tyson, Mr. Jacoutot, Ms. Paradise, Vincent Russo, Josh Belinfante, Carey Miller, Cheryl Ringer, and -- I'm sorry -- Mr. -- for the Fulton County defendants?

MR. LOWMAN:  David Lowman.

COURTROOM DEPUTY CLERK:  Lowman.  I couldn't read my own writing.  I apologize.

That should be everyone, Judge.

THE COURT:  Is there anyone who didn't hear their names and are present in a representational capacity?

Okay.  All right.  I have just gotten off of a long criminal sentencing.  So I basically looked very briefly at your letter.  And I can't tell you that I completely understand

1    what is going on.  So I'm just going to have to start from

2    scratch.  And I'm not sure I'm not coming in the middle of it

3    anyway.

4         So let's just start with square one.  What happened

5    with where we were last at the end of last week?  What happened

6    with the question of being able to make the documents available

7    so that the plaintiff said they could have a team look at

8    things and be ready within a few weeks and that we were -- that

9    was it seemed to be at that point the easiest way of resolving

10   the conflict.

11        MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.  I

12   can kind of start for the State defendants.

13        We spoke with our clients about that approach with

14   the documents, and they agree and consent to that process.  Our

15   concern that we wanted to raise was that apparently the time

16   line for getting all the documents from the Georgia archives is

17   apparently a two- to three-month process to retrieve all of the

18   documents.

19        And as a result, instead of, you know, with us being

20   like pulling out a box and handing it to plaintiffs to begin

21   reviewing right away, we are -- we wanted to raise to the Court

22   the tension where we're trying to balance the cost against the

23   need here, that we're looking at another $70- to $100,000 worth

24   of storage expenses before we even get to the part of the

25   process where the plaintiffs are able to make their review.

```
 1              So we wanted to raise that to the Court just because
 2    we still view that as pretty steep in the current situation
 3    where we are.  But I wanted to give you that.  But we do
 4    consent to having the plaintiffs go through a document-based
 5    approach and doing this.  We don't have a problem with that at
 6    all.
 7              THE COURT:  And so what is -- what currently is in
 8    archives, and what is currently available --
 9              MR. TYSON:  So we are --
10              THE COURT:  -- without having to go through the
11    archives?
12              MR. TYSON:  Correct.  This is Bryan Tyson again.  So
13    the Secretary's office is still trying to figure out how many
14    of the 2018 elections that they have.  The plaintiff had
15    requested originally the 2018 general primary and the 2018
16    runoff.
17              I think they have a high degree of confidence that
18    the 2018 general election is there.  And they are relatively
19    confident the 2018 election is in the office.  So that review
20    could begin quickly.  But it is possible that one of the 2018
21    elections or both have already been sent to archives.  So that
22    is what they were looking at for us today.  And I have not
23    heard back at this point.
24              The 2016 and 2017 are definitely at the archives
25    right now.
```

1          THE COURT:  So you -- they think that most of the

2     2018 and the general election is available?

3          MR. TYSON:  Yes, Your Honor.  And the concern there

4     would be that it could be -- we're fine for that process to

5     begin.  There is no issue there.  But we couldn't begin

6     disposing of any machines until the entirety of the process is

7     complete.  Because we have to have all of the records in place

8     to get that done.  So that is -- that is the issue for us from

9     a cost perspective.

10         THE COURT:  And what is the problem with the

11    archives -- what is the archives challenge that it takes two to

12    three months?

13         MR. TYSON:  I don't fully understand what the process

14    is there.  But the Secretary's office has advised us that to

15    get all these records, since they are so voluminous and since

16    they cover so many elections -- apparently that's the time line

17    they have worked on for getting documents in the past.

18         I'm sure it is possible it could be faster.  But that

19    is the time line the Secretary's office has had in trying to

20    obtain voluminous paper records like this from archives in past

21    issues they have had.

22         THE COURT:  Okay.  All right.  So did that lead

23    you -- is that how you-all started revisiting the issue of the

24    cards?

25         MR. TYSON:  No, Your Honor.  When we proposed our

email this morning to the plaintiff advising them of that, we wanted to try to be very specific to lay out what we understood the proposal we are presenting to be.  And so we presented the list that we had in our email there of what the proposal was.

Mr. Cross' recollection was that part of the proposal was we must also provide a random and reliable sample of memory cards that Dr. Halderman could examine to match machine IDs. And I think one of our points of dispute is that was not -- we thought though that had come up at the conference that we had on Friday we did not understand that to be the kind of fully fleshed-out concept that we were ready to bring to the clients and try to analyze there.  And I think that is one of our major points of disagreement in the emails.

THE COURT:  Are there any other points of disagreement that are -- that I should know about --

MR. TYSON:  I believe --

THE COURT:  -- from your perspective?

MR. TYSON:  Yes.  Certainly.  I'm sorry.  Yes.

The only other one that I'm aware of relates to -- there seems to be kind of a floated proposal from the Curling plaintiffs about maybe just looking at 2018 only and not looking at 2016 and 2017.  We are not sure whether that approach would be okay with the Coalition plaintiffs.

But as we understand it, I think those are the points of contention that we are aware of at this point.

1          THE COURT:  Before we get to the card issue, let me

2   just try to sort out the -- there appeared to be some

3   difference between what the Coalition wanted and what the

4   Curling plaintiffs wanted.

5          Could the -- is that reconciled at this point or not?

6          I'll ask the Coalition.  Mr. Brown?

7          MR. McGUIRE:  Your Honor, Rob McGuire.  Mr. Brown is

8   actually not on the phone.

9          THE COURT:  I'm sorry.  All right.

10          MR. McGUIRE:  So our -- as we have told the Court

11   before, our approach is to look at the machines that we know

12   have shown anomalies because we think that from our perspective

13   those are more likely to be machines that have malware.

14          And we on February 10 gave them a list of the

15   machines we wanted.  139 of them already had serial numbers

16   identified.  So those machines are identifiable, 139 of them.

17          The remainder that we identified, we only had machine

18   IDs.  So this current discussion from our perspective pertains

19   only to attaching serial numbers to the 472 that we identified

20   by machine ID.

21          So we still want to look at the machines that we want

22   to look at.  And the whole idea of a random sample doesn't

23   really work for us because we know the machines we want.  The

24   ones we don't have serial numbers already for we just need to

25   attach serial numbers to them.  And that is why we wanted to go

1    through the memory card exercise to see if we could use those

2    to make that attribution of the serial number to a machine.

3         THE COURT:  What is the process that you are looking

4    to go through to make that attribution with the memory cards?

5         MR. McGUIRE:  It is the same one that I believe

6    Mr. Cross -- his expert, Dr. Halderman, was going to do, which

7    is basically just look at the memory cards to see if his script

8    can actually really produce a correspondence between machine ID

9    and serial number.  Because if it will, then there's no need

10   for us to wade through hundreds of thousands of pieces of paper

11   because we can do it just by running the script on the memory

12   cards and it is easy.

13        We can identify the serial numbers, and then we can

14   release all the machines that we don't want for our specific

15   selection and they don't want for their random sample.  And

16   then all of this concern about cost from the State's point of

17   view could be mitigated.

18        So the memory cards from our perspective is an

19   important thing to try because we think it is just going to

20   shortcut a lot of this.

21        THE COURT:  I'm going to just tell you that my

22   distinct view -- impression when we last talked was you-all

23   understood that there were all sorts of potential -- there

24   was -- there might be conflict over the memory cards.

25        I did get the fact that the Coalition had a

1    completely different approach to trying to identify what

2    machines you wanted to look at.  But I didn't hear you saying,

3    well, we really need the cards at that point.  And I didn't --

4    and, in fact, everyone seemed sort of prepared to roll up your

5    sleeves and look at the documents, even if it seems like a

6    floppy method because there was no -- no way to know whether or

7    not Dr. Halderman's approach was correct and you were going to

8    end up having to negotiate once again a slippery situation

9    about regarding the cards and security and everything else, you

10   know, we have had problems with every single time.

11            So, you know, I thought y'all frankly -- it is not

12   that you had given it up altogether.  But that was definitely

13   not the focus of what the plaintiffs were talking about to me.

14   And I didn't hear it from the Coalition that this is what you

15   think was the only way of getting it done in a reliable,

16   cost-efficient way.

17            You know, if that had been your drumbeat, maybe we

18   would have spent more time on that instead.  But instead we are

19   really looking at it in terms of these records.

20            Now, you didn't know it was going to take two to

21   three months either, on the other hand.  And I get that.  That

22   is a whole other -- in order to get a complete set of records.

23            But are you -- is the Coalition still looking to

24   examine machines based on the 2017 or 2016 elections?

25            MR. McGUIRE:  Well, our -- so the list we gave them

1    in February of this year has machines from all of the

2    elections -- machines where there were anomalies in all of the

3    elections that are sort of within the time frame we're talking

4    about.  So from 2016 through 2018, we have got machines from

5    each of the elections that showed weird behavior.  And we

6    identified them either by serial number in the case of 139 of

7    them, which those could be preserved right now based on that

8    alone, or 472 additional ones for which we only have the

9    machine ID.

10           Now, Your Honor is absolutely right we didn't make a

11   big deal about it on the last call because we -- I think the

12   Curling plaintiffs' needs for a representative sample kind of

13   makes our -- our problem is solved when their problem is

14   solved.

15           And we are ready to help them do what they need to do

16   in order to go through the papers the way it has to be done.

17   From our perspective, looking at the cards would be a lot

18   faster and cheaper for everybody.  So it is preferable.  But

19   we're not saying it is the only way it can be done.

20           We are certainly -- we are certainly prepared to help

21   sift through if the Curling plaintiffs do that the hard way if

22   that is what we have to do.

23           THE COURT:  All right.  Mr. Cross?

24           MR. CROSS:  Yes, Your Honor.  I guess I should begin

25   with an apology because I was not as clear as I intended to be

1    given your remarks.

2         What I thought we were discussing and what we were

3    going to get on today from the State was a response to --

4    because what I thought I said -- and obviously I was not as

5    clear about this as I needed to be -- was that these two

6    efforts would move in parallel in the sort of initial stage to

7    figure out what we could do.

8         As I indicated before, I mean, we are prepared to do

9    the paper recap route.  But we've had further conversations

10   with Dr. Halderman.  And he really believes based on what he

11   has seen in his past experience that this can be done with the

12   memory cards.

13        And so what I had tried to articulate on Friday was

14   that we could begin with just a very simple sample.  Right?

15   The memory cards are about the size of a credit card.  And my

16   understanding -- and Mr. Tyson can tell me if I have this

17   wrong.  But my understanding is they collected the memory cards

18   at the same time they collected the DREs and other equipment.

19        So there are memory cards -- at least most of them,

20   maybe all of them are sitting in a single facility where all of

21   this equipment is.  So they could put -- I mean, pick a number.

22   Dr. Halderman tells me he can put 1000 of them in a bankers

23   box.  You could take something that feels like a good sample.

24   1000 may be right.  Maybe he could do something smaller.

25        We'll pay to ship those to Michigan.  He can then

1    look at them.  I'm trying to pull up his email.  He thinks he

2    can probably go with a team and look at these cards in a matter

3    of minutes for each of them.  And he just needs to look and see

4    if he can extract the audit logs.  And the audit logs should

5    then have the serial numbers of the corresponding DREs.

6              If he is right about that, it really is as simple as

7    them gathering a random sample of these cards, putting them in

8    a box, shipping them to Michigan, letting them look at them.

9    And this can all get done in a matter of days.  And then we

10   would know -- you know, neither the State nor us has to spend a

11   lot of time and money dealing with paper.

12             That is what I had tried to articulate on Friday but

13   evidently did a poor job of that.

14             THE COURT:  Well, given all of that and the State

15   would like to be done with this, let me ask you this:  Why is

16   it necessary even for him to go through 1000?  Either he

17   knows -- first of all, if they give them 20 cards, would he

18   know one way or the other whether his -- this works or not?  I

19   mean, isn't that the first step, rather than sending 1000

20   cards?

21             MR. CROSS:  So there's two things -- yeah.  I

22   apologize, Your Honor.

23             THE COURT:  Go ahead.

24             MR. CROSS:  And this is David Cross again.

25             There are two things that we need to figure out.  One

1   is confirm that the audit logs do have the serial numbers.

2   Again, he has a high confidence of that just because he has

3   seen it.

4         The other piece -- the reason why we were suggesting

5   a larger number is we don't know how many times these cards

6   have been reused in the machines and we don't know to what

7   degree the information on the machines -- on the cards

8   themselves has been preserved.

9         Our understanding and our position has always been

10  that these cards should not get reused from election to

11  election.  They are very inexpensive.  It is not like a DRE

12  where you don't -- you are not going to buy a new DRE for every

13  election.  It is easy to do for a memory card.

14        And our position is they shouldn't have been wiped or

15  altered in any way.  So assuming that is the case, then yeah,

16  you can look at 20 of them, confirm the serial numbers are

17  there, and then have a high amount of confidence that if you

18  get the rest of the cards you can find the other serial

19  numbers.

20        But it is also possible that he could look at 20 and

21  think that the larger universe of the cards has the information

22  but then we get into them and it turns out some of them have

23  not been preserved in some way.

24        So I wouldn't -- that is why we are suggesting a

25  random sample so that we address both of those points.  It

1    could be that the State is in a position to answer that

2    question.  And so they may know what exactly has been preserved

3    on the cards and how they have been used.  We don't.  So that

4    was the idea.

5            THE COURT:  Mr. Russo, do you know?

6            MR. TYSON:  Your Honor, this is Bryan Tyson.  Our --

7    I will give you my current understanding.  Actually, it is as

8    Mr. Cross has described.  That if the cards are used in regular

9    order, that no information is erased from the cards.  A folder

10   is just renamed for the particular election.

11           I think in terms -- I think, Your Honor, you hit on

12   one of the concerns that we had raised earlier in this process

13   though is if we're going to be having Dr. Halderman look at the

14   original memory cards -- this isn't like the GEMS databases

15   where we can easily copy them on to a CD.  If he is looking at

16   the original card, you know, what is his script doing?  Is it

17   altering the card?  How are we handling chain of custody on

18   that?

19           There's kind of a lot of issues there.  There is also

20   a lot more information on the cards than just the audit log.

21   There are ballot image reports.  There are a variety of other

22   election-related details about the operations of the DRE

23   itself.  And you haven't yet ordered a forensic examination,

24   but it would give a lot of information to Dr. Halderman on that

25   front too.

1    So I think, again, we're kind of -- when we get into

2    the electronic world, we're going down the slope, which is why

3    we had understood as well that we were talking about the

4    paper-based record search on Friday so we could avoid a lot of

5    these, you know, sticky questions that we have had to deal with

6    previously.

7                    **(Unintelligible cross-talk)**

8           THE COURT:  Go ahead.

9           MR. CROSS:  I was just going to say some of those --

10   this is David Cross.

11          Some of the questions I can answer from

12   Dr. Halderman.  What he has explained on the -- so these are

13   the questions I had from Mr. Tyson.  What is being extracted?

14   It would be the audit log entries that show the serial numbers

15   of the DREs that the cards were inserted into.  We understand

16   it also shows the elections and precincts where they were used.

17   So that would enable us to match everything up by machine ID.

18          To the answer will the cards be altered, no.  He said

19   he would use write blocker -- a write blocker device, which is

20   common forensic practice so it won't alter the card.  In fact,

21   it won't allow any information to be written to the card at

22   all.  He would only be copying information.

23          On the question of whether we need original memory

24   cards, we are happy to take copies as long as everyone is

25   comfortable that these are -- the copies themselves are made in

1    such a way as not to alter any information on the cards.  That

2    is going to add time and expense.  Since they are going to

3    destroy the cards anyway, we thought maybe they could just ship

4    them out.  Dr. Halderman will extract his information and send

5    them back.  That was our thinking anyways.

6               Oh, and the last point he made -- sorry, Your Honor.

7               THE COURT:  That's all right.

8               MR. CROSS:  To the question of -- we're not

9    suggesting any forensic examination.  And as I proposed to

10   Mr. Tyson earlier today, if there are parameters they want to

11   set about what Dr. Halderman can do with the cards, what he can

12   extract, what he can analyze, we are totally open to that.

13              I mean, this will save literally months and thousands

14   of hours and hundreds of thousands of dollars in expense if it

15   works the way we think it will.  So we are all in in trying to

16   make the memory card piece work.  And we think we can get to an

17   answer in a matter of days if we can get some sample of the

18   cards on that.  I think we can address this -- the issues he is

19   raising pretty simply if we can talk through it.

20              THE COURT:  How is he basically -- you know, this is

21   sort of the elephant in the room.  Obviously, they don't want

22   him to go look at all sorts of other things.  How is he --

23   other than -- obviously, he is representing he won't.  But,

24   obviously, that is their concern.

25              So how would you propose to address that?

1          MR. CROSS:  Two ideas come to mind, Your Honor.  One

2  is Your Honor could enter an order that makes clear he is only

3  allowed to extract the audit log.  I want to confirm with him

4  that that is really all he needs.  But the point would be the

5  order can specify he is only allowed to extract what he needs

6  for this particular purpose and not anything else.  He's a

7  professional expert.  There is no reason to think that he would

8  ignore that.

9          The other thing is it may be possible -- I have to

10  ask him this.  I have not asked him this as to whether it may

11  be possible for him to send (unintelligible) that we can pass

12  on to the State a copy of the script that he plans to run.  And

13  then they can see exactly what it is going to do.

14          Because my understanding from him is all he will do

15  is literally plug the card into a computer, run the script, the

16  script will extract the information he needs, and that is the

17  only thing that will come off the cards.  So I think we can

18  probably provide the script, and they can verify that for

19  themselves.

20          MR. TYSON:  Your Honor, this is Bryan Tyson.  Again,

21  I appreciate Mr. Cross' and Dr. Halderman's work on that.  I

22  guess my concern is we have kind of been down this road in

23  January of we thought we had a good solution to do this.  And

24  maybe this one will work.  I don't know.

25          But my concern is:  Okay.  We engage in this process.

1   We go through it.  We do all these steps, and then we're back

2   at square one again.

3          We know the paperwork.  We know where the paper is.

4   I guess I am just concerned that we are going to have to check

5   a bunch of boxes for a process that the plaintiffs think will

6   work but we're not sure yet, which is where we were, you know,

7   five months ago.

8          THE COURT:  Well, you know where the cards are.  I'm

9   just trying to be -- how many -- how many -- you want -- he

10  wants them to send how many -- how many cards so that he has

11  some -- just let's say initially just so we don't -- we're not

12  just sort of spending time and money.  I mean, just trying to

13  get through this no later than the end of July but really

14  preferably this June, what is he saying he needs?  How many

15  cards again, just so that he knows if he were to run a first --

16  a first -- a first kind of set so that he knows this is

17  actually going to work?

18         MR. CROSS:  Right.  Your Honor, this is David Cross.

19  To that question of just to figure out whether it works, he

20  hasn't given us a number.  Again, he said you could put 1000 in

21  a bankers box.  If they don't want to send 1000, I mean, I

22  would say probably at least 100 would give us enough of a

23  number, if it is truly a random sample, for us to make sure

24  that the audit logs are there and he can extract the

25  information.

1          If they want to drop 500 in a box and ship them,

2    we'll pay for it.  It sounds like he could get through that by

3    the end of the week if they were to ship those quickly or

4    certainly by early next week.  And so we would know definitely

5    whether he can do this.

6          To Mr. Tyson's point, the only expense is literally

7    shipping this to him.  They know where the cards are, and they

8    can grab them.  Given what is on the flip side of the paper,

9    the expense and time of that, it just seems to me we should run

10   this to ground.

11         MR. TYSON:  David, if he wants 100, that is not even

12   one per county.  Is the random sample like you are describing

13   going to be at least one per county, or is it going to be some

14   other grouping?  I mean --

15         THE COURT:  100 doesn't sound like enough for

16   anyone --

17         MR. TYSON:  Right.

18         THE COURT:  -- for us just not to end up being in

19   trouble.

20         MR. TYSON:  I'm also not certain exactly -- we have

21   got to figure out how these are stored.  I don't know if they

22   are stored by county with the DREs or if they are stored in

23   some other method.  I honestly don't know the answer to that

24   right now either.

25         MR. CROSS:  Yeah.  I mean, this is David Cross.  I

```
 1    can follow up with Dr. Halderman and our statistician -- the

 2    two of them are working together -- to figure this out.  I

 3    think if we could get -- again, the first step isn't to figure

 4    out a sample for preservation.  The first step is just to

 5    figure out whether this process works.  So that is why I wasn't

 6    coming in with a bigger number.  I mean, it sounds like --

 7              THE COURT:  Yeah.  But you still want to have -- you

 8    want to know enough --

 9              MR. CROSS:  Got it.

10              THE COURT:  -- so that you know that there are --

11    there are some cards that reflect it and some cards that don't.

12    I mean, it may be whatever they were supposed to do in one

13    county they did and in another county they didn't.  That is the

14    thing in terms of overwriting the data.  It could be anything.

15              MR. CROSS:  Yeah.  I mean, if we really want to short

16    circuit it, Your Honor, the easiest way is to just take all the

17    memory cards they have, ship them to Dr. Halderman.  We will

18    pay for that, and he can just go through the whole thing right

19    now.

20              THE COURT:  Yeah.  That is true.  But on the other

21    hand, what if it is basically a process -- you find out that 80

22    percent of it doesn't work and so we are back -- and they

23    haven't ordered their -- anything up in terms of paper and then

24    you are saying you want to have paper?  I mean, yeah.  We could

25    get -- I can understand the 1000.  I could understand 500
```

1    depending -- as a sample.  But you have to at some point -- I

2    guess the thing is in judging the relative worth of this

3    exercise I have been conscious of the fact that on one hand the

4    State doesn't want to basically say it is not going to appeal

5    and that there is a -- and I can't deny you information that

6    you have been trying to get that is based on the merits of your

7    claims.

8              But it has -- you know, arguably it might -- as the

9    Court has found, it certainly could impact anything else going

10   forward that might be -- have been asserted.  But,

11   nevertheless, there comes a point where the value of we want to

12   do this and we want to do that doesn't really work.

13             So I don't know why he thinks that the script will

14   work.  I respect his knowledge.  But he thinks other things --

15   you know, he thought the GEMS would work too.  So that is --

16   I'm just really -- I think the State should go ahead and find

17   out how they are collected.  It doesn't take -- I guess what --

18   from Mr. McGuire's perspective on his client, they -- it may

19   take care of their concerns that there are particular machines

20   they want.  But I don't know where the cards are kept, if those

21   are in archives as well, if they are for anything but the 2018

22   election.

23             MR. TYSON:  Your Honor --

24             THE COURT:  I'm sorry.

25             Mr. Tyson, do you know?

1          MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.

2    The archives would not maintain the cards since the cards used

3    are put into the DRE.  They would just maintain the paper

4    records and the CDs that are sent by the counties.

5          THE COURT:  All right.  So where are the cards for

6    the 2017 and '16 elections, or are they -- have they been

7    maintained?

8          MR. TYSON:  So they are the same cards that are used

9    for the DREs.  So the same set of cards are used --

10          THE COURT:  The same set of cards.

11          MR. TYSON:  -- and it renames something, but it

12    doesn't delete it.

13          THE COURT:  All right.  All right.  Well, none of us

14    want to go through this another number of times.  I mean, it

15    is -- I don't know the way the cards are kept.  And, obviously,

16    Mr. Tyson doesn't know precisely in terms of the counties they

17    come from, the jurisdictions they come from.

18          But -- and, you know, it would seem like you --

19    without saying that this is the sample, it just would seem like

20    you would want to have a large enough number that everyone

21    would feel confident that the same protocols are used and they

22    come from a diverse enough set of counties.  I don't know if

23    they are kept that way, that Fulton County's are kept and

24    Chatham County's are kept separately.

25          Are they?

1          MR. TYSON:  Your Honor, this is Bryan Tyson.  That

2    was one thing I was just writing down here.  I don't know the

3    answer to that either.  I don't know if the cards were

4    aggregated together after they were collected or if they were

5    maintained county by county.  So that is something we will run

6    to ground as well.

7          But, again, if they are all together, then that is

8    not going to be much use for a sample I don't think because we

9    couldn't figure out which county was which without looking at

10   each individual card electronically.  But we can find that out.

11         THE COURT:  Well, let's say that is so, that they

12   were just -- they were only kept collectively without

13   separating the counties, which doesn't make much sense.  But

14   anything is possible.

15         I guess Dr. Halderman would say, well, I would like

16   to have every county and that is why I should just have them

17   all at that point because there is no other way of proceeding.

18   So I don't think we have to reach that until we know how they

19   are kept.

20         I mean, it seems to me it would be the fastest and

21   you would take care of your money issues about the -- but on

22   the other side of it, if Dr. Halderman is really making this

23   commitment, I don't know, frankly, if he is not looking at

24   all -- you know, the entire collection initially at least,

25   Mr. Cross, I don't know why -- even when we talk about the 1000

```
1    why he is talking about it will take til next week.  Time is of
2    the essence here for the purposes of the legislative session
3    and their budget.
4              MR. CROSS:  Your Honor, this is David Cross.  We
5    agree.  The only reason I was -- if he got 1000 cards, it
6    sounds like he could turn that in a couple of days, maybe even
7    faster, depending on how many people he has to help him.
8              I'm just thinking about how long it is going to take
9    the State to pull these and get them to us.  I mean, if they
10   ship them tomorrow and he got them in Michigan on Wednesday, I
11   believe he can get it done this week.  I just don't know -- I
12   don't know when he will have them.
13             THE COURT:  Well, the point is to see whether it
14   works and works consistently enough.  And if not, then you are
15   basically in this paper process, which does seem like it is --
16   is going to have all sorts of problems.
17             MR. CROSS:  Your Honor, one other thought if I may.
18   This is David Cross again.
19             I mean, to your point, it could be we get into this
20   with the memory cards and it turns out -- let's say half the
21   counties for whatever reason -- their cards don't have the
22   information.  My understanding is it is automatically coded on
23   the cards from the machines.  So anytime they are used, that
24   information should be there.  So it wouldn't be they are only
25   there if somehow the card got altered or overwritten.
```

         1          But in any event, even if we found out, you know,

         2   through this sample to suggest that half the counties don't

         3   have it, that would still cut the work in half on the paper.

         4   So that is why my original thinking --

         5          THE COURT:  Yeah.  I mean, at some point, you have to

         6   decide if you really want to have the cards and half the

         7   counties have them it may be that is what it is.  I mean, I'm

         8   just -- you know -- because, you know, it may not be.  It

         9   depends on really -- you know, it may be -- you know, if the

        10   only counties that didn't override were in south Georgia, that

        11   wouldn't be fair.

        12          But if it is just, you know -- it really depends.  It

        13   is not that it is just that you get everything and we keep

        14   everything for three months waiting for the archives.  So I

        15   just want to be clear about that.

        16          Besides everything else, I mean, the Coalition is

        17   looking for particular machines.  That may end up being the

        18   most efficient way.  I don't know.  Of course, if they can't

        19   find any of their machines, that is a whole other -- that is

        20   something else.

        21          All right.  Why don't -- Mr. Tyson, why don't you try

        22   to find out tomorrow morning how these are kept.  I'm certainly

        23   happy to enter into any order and -- any order that will ensure

        24   the confidentiality and restriction of the use of the cards or

        25   that you -- that they will get copies of the cards rather than

1   the original cards, which is understandable, if you are able to

2   do that.  Otherwise, I mean, I don't know what is involved in

3   running the cards.  And we'll get to that as an alternative.

4          But I mean, tell me about the budget process in terms

5   of how the Secretary of State -- what are the requirements

6   that -- you know, there were 11 days.

7          Is today the first day of the session?

8          MR. TYSON:  Yes, Your Honor.  I'll give as much

9   context as I can.  And Mr. Belinfante and Mr. Russo may have

10  some better context than I do.

11         I know the session started back today with 11 days

12  left.  I know that all agencies were required to propose

13  14 percent cuts originally.  And I believe the Governor has now

14  directed that down to an 11 percent cut across the board.

15         I do not know the status of the appropriations

16  process.  But I am certain that the House and the Senate have

17  been working on that.  Mr. Belinfante and Mr. Russo may have

18  more insight.  That is as much as I know at this point.

19         THE COURT:  Okay.

20         MR. BELINFANTE:  This is Josh Belinfante.  There is

21  really nothing to add.  But no budget was on the floor of the

22  Senate today.  So it is still being worked out.

23         THE COURT:  I mean, I think we can have confidence

24  that at least -- either that you don't have to enter -- I would

25  love to say it would be -- the whole thing -- this whole thing

1     is going to be over by July -- June 30th or at minimum

2     July 30th.  But if it takes -- if you can't get the documents

3     for another two or three months, then -- you know, then it

4     looks more like six months that you have to have this stuff for

5     another six months -- keep it around for six months.  It seems

6     crazy.  And that is why, you know, hopefully on all sides we

7     can figure this out.

8           But I will be tomorrow available if you try to --

9     hopefully, you can come up with a consent order for him to look

10    at in a very narrow -- just for one processes.  And I don't

11    know what alternatives there are other than that at this

12    juncture in order to get this over with very rapidly.

13          But if this is where we're at, then Mr. Halderman has

14    to be prepared actually to move heaven and earth in order to

15    get -- go this way.

16          MR. CROSS:  Your Honor, this is David Cross.  I'm --

17          MR. TYSON:  I'm sorry.  Go ahead, David.

18          MR. CROSS:  I'm sorry.  Thanks.  One other idea that

19    I could run by Dr. Halderman is whether we could actually have

20    people just do the extraction of the memory cards locally in

21    Atlanta.  But, again, it is a simple process from what I

22    understand.

23          It could be that if we get his script and get folks

24    set up on whatever laptop he was going to use -- you can also

25    do it by just plugging it into the DRE itself.

1    (Unintelligible).  So I will explore that as well, and I can

2    let Mr. Tyson know.  But it may be we can make this even faster

3    by not having to ship the cards anywhere.

4            THE COURT:  Well, it occurred to me.  I mean, if the

5    State wasn't in such a state of stress, I would say they could

6    run it themselves -- the script.  But I don't see that

7    happening without everyone getting into another state --

8    another mess.  So let's -- but certainly it could be done

9    locally, potentially at least.

10           MR. TYSON:  Well, Your Honor, this is Bryan Tyson

11   again.  As far as deliverables go, we will look at finding out

12   where the -- how the memory cards are stored and kind of what

13   order they are stored.  I hope I can ask somebody who has

14   personal knowledge of that because obviously the election staff

15   is kind of running around right now with the certification

16   process.

17           But we'll get that as quickly as we can.  And then we

18   can look at a set of parameters that we think might be

19   reasonable on that.  And then if I could have from Mr. Cross a

20   proposed sample process.  And once -- once we explain how the

21   cards are stored and then whatever protocol and the script, I

22   guess that will be the other pieces we would need to try to

23   keep putting these pieces together.

24           THE COURT:  I mean, there remains the problem that if

25   the Coalition wants particular machines a sample process might

1    not get to those particular machines.  So somebody has to --

2    that is -- just bear that in mind.  I mean, it is a little bit

3    like potentially -- do you know what counties -- does --

4    Mr. McGuire, do you know what counties they are from?

5           MR. McGUIRE:  Yes.  All the machines we have

6    identified by machine ID, which are the ones we don't -- we

7    need to certainly find the actual device.  The ones we have

8    identified by machine ID, we know the election, we know the

9    precinct, and we know the county.

10          THE COURT:  Okay.

11          MR. McGUIRE:  And we know the machine ID.

12          THE COURT:  Okay.  All right.  Well, anyway, that

13   would have to be a supplement to whatever the sample is.  But I

14   don't think that they can do a sample without knowing what

15   you -- basically how they are kept and all of that.

16          MR. TYSON:  Yes.

17          THE COURT:  All right.

18          MR. McGUIRE:  This is Robert McGuire.  Just from my

19   understanding to make sure I'm clear on what is happening,

20   we're only talking about a sample for purposes of determining

21   if the memory card to serial number process works?  That is

22   what I think; right?

23          MR. TYSON:  That is my understanding -- this is Bryan

24   Tyson -- of what the goal would be to determine if it works,

25   understanding that, you know, it may work in the sample and may

1  not work for all, you know, the universe of units we're looking

2  at.  But yes.

3         THE COURT:  It is to identify a set of cards to be

4  examined for the machines, if I understand, because you only

5  have partial information.  You can't find the machines based on

6  the information you have available.

7         MR. TYSON:  Correct.

8         THE COURT:  Okay.

9         MR. McGUIRE:  This is Rob McGuire.  That is slightly

10 different than I understood.  I thought we were just trying to

11 confirm that we can find the serial number from the machine ID

12 and we were doing a random search to make sure that that

13 process works at large.

14        THE COURT:  I don't see a -- I don't see a difference

15 with what we said.  But maybe -- maybe I didn't say it

16 properly.

17        MR. McGUIRE:  I probably misheard.  I didn't

18 understand it.  Thank you.

19        THE COURT:  You are trying to find out -- you want --

20 you basically want to know does the script work and is the data

21 collected consistently enough so that you could actually --

22 this process that he has proposed would work so that he could

23 have a -- from that he could identify -- once you had a -- you

24 have a large enough sample of cards that provide information as

25 to both the machine number and what you would call the VIN

1  number that you are able to -- you are able to use it as -- as

2  the data foundation for figuring out a smaller sample.

3          Is that what you said, or am I misunderstanding it?

4          MR. McGUIRE:  This is Rob McGuire.  I may be

5  misunderstanding.  But I thought it is exactly what Your Honor

6  said.  Use the sample to determine if the script will produce

7  the serial numbers for the data at large.

8          Again, the followup step after that would be to use

9  the script on the data at large to get the machines we have

10 identified specifically and to get the Curling sample from the

11 entire universe.  That was what I thought would be the followup

12 step from this process.

13         MR. TYSON:  Your Honor, this is Bryan Tyson.  I agree

14 with what Mr. McGuire is saying.  I think that if

15 Dr. Halderman's process works, it would provide us a

16 reconciliation of machine ID to serial number for each

17 election.

18         And so then the Coalition plaintiffs could take their

19 specific machines IDs and make a list of serial numbers off

20 that.  So I think that -- I think that is the end goal.

21         THE COURT:  All right.  All right.  So -- all right.

22 Well, why don't you-all try to check in with each other by

23 1:00 tomorrow.  I have a change of plea at 2:30 and a

24 proceeding at 10:30.  And if there is a problem, please

25 communicate with Mr. Martin and I'll talk with you-all in

```
1    between that.
2              All right?
3              MR. TYSON:  Thank you, Your Honor.
4              MR. CROSS:  Thank you.
5              THE COURT:  All right.  Hopefully you won't need
6    that.  But if you do, let's just do that.
7              Thank you very much.
8              MR. CROSS:  Thank you.
9              MR. TYSON:  Thank you, Judge.
10                  (The proceedings were thereby concluded at 5:54
11                  P.M.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

the United States District Court, for the Northern District of

Georgia, Atlanta Division, do hereby certify that the foregoing

33 pages constitute a true transcript of proceedings had before

the said Court, held in the City of Atlanta, Georgia, in the

matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the

16th day of June, 2020.







                         _____
                         SHANNON R. WELCH, RMR, CRR
                         OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT