```
1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4    DONNA CURLING, ET AL.,            :
                                       :
5           PLAINTIFFS,                :
     vs.                               :  DOCKET NUMBER
6                                      :  1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,       :
7                                      :
            DEFENDANTS.                :
8

9

10          TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11             BEFORE THE HONORABLE AMY TOTENBERG

12               UNITED STATES DISTRICT JUDGE

13                      JUNE 17, 2020

14                       4:01 P.M.

15

16

17

18

19

20

21    MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                   TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:
 4

 5       DAVID D. CROSS
         MARY G. KAISER
 6       MORRISON & FOERSTER, LLP

 7       HALSEY G. KNAPP, JR.
         ADAM M. SPARKS
 8       KREVOLIN & HORST, LLC

 9

10   FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
     WILLIAM DIGGES, III, AND RICARDO DAVIS:
11

12       BRUCE BROWN
         BRUCE P. BROWN LAW
13

14   FOR THE STATE OF GEORGIA DEFENDANTS:

15

16       VINCENT ROBERT RUSSO, JR.
         CAREY A. MILLER
         JOSH BELINFANTE
17       ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

18

19       BRYAN P. TYSON
         BRYAN JACOUTOT
         LOREE ANNE PARADISE
20       TAYLOR ENGLISH DUMA

21

22   FOR THE FULTON COUNTY DEFENDANTS:

23       DAVID LOWMAN
         OFFICE OF THE FULTON COUNTY ATTORNEY
24

25
```

```
1              P R O C E E D I N G S

2     (Atlanta, Fulton County, Georgia; June 17, 2020.)

3              COURTROOM DEPUTY CLERK:  Okay.  Good afternoon,

4     everyone.  We're here for the teleconference in the case of

5     Curling vs. Raffensperger, Civil Action Number 17-CV-2989.

6              I have representing the State of Georgia Vincent

7     Russo, Carey Miller, Bryan Tyson, Bryan Jacoutot, and Josh

8     Belinfante.

9              Representing the Curling plaintiffs, David Cross,

10    Wesley {sic} Knapp, Adam Sparks, Mary Kaiser.

11             Representing the Coalition, Bruce Brown.

12             Representing Fulton County, David Lowman.

13             And did I miss anybody?

14             COURT REPORTER:  Loree Anne Paradise for the State of

15    Georgia, Mr. Martin.

16             COURTROOM DEPUTY CLERK:  I'm sorry.  Ms. Paradise for

17    the State of Georgia.

18             Judge?

19             THE COURT:  Is Mr. McGuire with us today also or not?

20             COURTROOM DEPUTY CLERK:  I haven't heard from him.

21             THE COURT:  Okay.  That's fine.

22             MR. BROWN:  Judge, this is Bruce Brown.  Mr. McGuire

23    had a conflict.

24             THE COURT:  That is fine.  That is fine.  I was

25    just -- I know that you weren't able to be with us on Monday
```

1    and he was.  And so I was just trying to go with continuity.

2          All right.  Well, I guess the best laid plans of mice

3    and men and some women too look like they have gone astray.  I

4    know that, Mr. Cross, you indicated you had some questions that

5    you might want to pursue in connection with the information

6    that Mr. Tyson provided.

7          And I didn't mean to foreclose that.  But because I

8    just -- time seemed to be of importance, I didn't want you-all

9    to go in circles.

10         So were there particular questions that you were

11   looking to pursue that you thought would be helpful?

12         MR. CROSS:  Your Honor, this is David Cross.  Thank

13   you.

14         There were a couple of questions we had posed that

15   would be helpful just to understand.  One is, as I understand

16   it, they have got 48 trailers' worth of equipment.  Three of

17   those have been unloaded.  We are trying to understand where

18   those three trailers were unloaded, what counties they include,

19   just so we can understand what would be involved in accessing

20   the memory cards in the machines for those three trailers.

21         Like if they are sitting inside a warehouse together,

22   maybe it is easier to get access to that than what is sitting

23   on the trailers.

24         And the other question we have is whether the

25   trailers and this other facility are air-conditioned.  Because

1   one concern we have and we are trying to understand -- when we

2   were looking for alternative storage, which we have been

3   exploring since they had suggested that we may pick up the cost

4   of storage, we were trying to understand that cost -- we were

5   looking at air-conditioned storage.  Because our understanding

6   is you don't want these electronics to get access to high heat

7   or moisture.  And so we are trying to understand that as well.

8         MR. TYSON:  Your Honor, this is --

9         THE COURT:  Go ahead.

10        MR. TYSON:  I'm sorry, Your Honor.  This is Bryan

11   Tyson.  I think I can go ahead and answer those questions.

12        Our immediate concern obviously was the -- was just

13   the practicality of the memory card piece.  But to Mr. Cross'

14   questions, the three semi-trailers that had been unloaded was

15   just due to an inability to park those in the storage facility

16   yard that was there.

17        Those have been placed in an air-conditioned

18   warehouse that is also on the same site as most of the

19   semi-trailers.  Again, there are two sites where those are

20   currently stored.

21        The vendor that is storing those, just so everyone

22   has an understanding here, is a vendor that handles surplus

23   equipment for Fortune 500 companies.  This is a

24   well-established vendor that is used to handling a lot of

25   equipment of these types of things.

```
 1            So three counties' worth of equipment is in -- I'm
 2   sorry.  Three trailers' worth of equipment is in the warehouse
 3   that is air-conditioned there.  I don't believe -- I believe
 4   Evans County is one of them.  But I don't believe that we have
 5   the other county names.  Mr. Miller may correct me on that.
 6            But as to the trailers themselves, they are not
 7   air-conditioned.  Air-conditioning and a temperature control
 8   had not been an original concern when storing them just because
 9   of the nature of what the goal was of disposal.  Given the
10   situation we are in, obviously that is going to add to the cost
11   of storage at this point, which may exacerbate kind where we
12   are.
13            But those are the answers to Mr. Cross' questions.
14            THE COURT:  Mr. Miller, if you are there, could you
15   respond as to if he knows what other counties are -- materials
16   are in the warehouse?
17            MR. MILLER:  Yes, Your Honor.  To be clear as to the
18   three trailers, you know, most of the trailers are set up with
19   the intention to try and make a county whole within a single
20   trailer.  Of course, the nature of the beast is that doesn't
21   always work out in terms of space.
22            So to my understanding, Evans is one of those
23   counties that is in the warehouse.  Just briefly reviewing
24   these, it looks as though Candler County, Emanuel County,
25   Madison County, Pulaski County, Washington County, and White
```

1    County are within the warehouse area.

2            THE COURT:  Do plaintiffs' counsel have other

3    questions?

4            MR. CROSS:  Not at the moment, Your Honor.

5            THE COURT:  Mr. Brown, did you have any?

6            MR. BROWN:  No, Your Honor.

7            MR. TYSON:  Your Honor, this is Bryan Tyson.  I did

8    have one other piece of information that we learned late this

9    afternoon --

10           THE COURT:  All right.

11           MR. TYSON:  -- that I think is relevant.  And that is

12   that the Secretary's office kind of in light of where we are

13   with the machines is planning to move them to a storage

14   facility for the Port -- that the Port Authority has in

15   Savannah.

16           I think as we have indicated previously, the cost of

17   moving them is about three months' worth of storage expenses.

18   And so I think we're at a point now where if it is going to

19   cost three months' worth of storage to get them to a cheaper

20   warehouse setup that maybe our initial plan to go back through

21   paper records is still the best one, even give that three-month

22   time line.

23           Since we have kind of our initial -- our initial

24   immediate need for relief, we're going to have to kind of go

25   through that anyway as it is.  I just wanted that to be -- you

```
 1    to be aware of that fact as well.

 2            THE COURT:  So what would be the cost in the Port

 3    Authority in Savannah?

 4            MR. TYSON:  I actually -- you know what?  I don't

 5    know a monthly cost for that.

 6            Mr. Belinfante, do you know -- is that a -- I know it

 7    is an 81,000-dollar cost to move them, which was roughly three

 8    months of storage.  But I don't know what the new monthly cost

 9    would be.

10            MR. BELINFANTE:  This is Josh Belinfante.  We were in

11    the same meeting late this afternoon.  And I think certainly

12    what I gathered is that it is less than we are paying now.  But

13    I think the details are being worked out.  But it is materially

14    less for sure.

15            THE COURT:  Well, is it the State's -- is the Port

16    Authority a State entity?

17            MR. BELINFANTE:  It is.  But -- and it is one of the

18    things candidly, Judge -- I'm sorry.  This is Josh Belinfante

19    again.  When we submitted the motion, our hope was that this

20    could be resolved before.  And then during the budget process

21    that is ongoing and it appeared that we were not going to be

22    able to get it resolved within three or four months, the Ports

23    Authority stepped up with some -- with this opportunity.

24            So not to get too much into the weeds, but it is an

25    interesting thing in state government where agencies pay the
```

1    Georgia Building Authority rent basically.  And so there is

2    probably still some cost associated with using the Ports

3    Authority building.  But it will be significantly less than

4    what we are paying now for the storage facility.

5         THE COURT:  Okay.  Well, I'm going to just be on the

6    micro level for a minute more, and then I would like to talk

7    about the mega picture.

8         But is there something that the plaintiffs in

9    particular thought that you were interested in doing?  I mean,

10   if, in fact, Mr. Miller has -- I realize you have some more

11   information.  I'm not saying you are hiding anything but that

12   you -- it appears based on just even knowing what counties have

13   their materials inside the warehouse -- that are in the

14   warehouse that there's some ability to identify which

15   counties -- and I'm sure Fulton has, for instance, a lot of

16   different -- their materials in a substantial number of these

17   trailers -- semi-trailers.  Or else they don't at all because

18   we have already identified what ones -- what was supposed to be

19   held otherwise.

20        So I'm not sure between that, whether -- in terms of

21   the three counties you were dealing with where their materials

22   are where you asked those to be segregated.

23        Do you know?

24        MR. MILLER:  Your Honor, this is Carey Miller.  And

25   just as a starting point to delineate these machines that were

1   picked up from the counties from those that were subject to

2   the, I guess, initial preservation order that was specific to

3   the counties -- but with respect to these machines what we have

4   is -- frankly, Your Honor, I spent this morning in Dawsonville.

5   Unfortunately, I didn't get to go visit the pool hall up there

6   for a burger.

7            But, nonetheless, the counties are set -- what we

8   have is knowledge of which county is within which trailer.  The

9   practical difficulty of the trailers is -- first of all, it is

10  an 18-wheeler semi-trailer.  So it is -- in some sense, calling

11  it a trailer is doing it a bit of an injustice.

12           But, for instance, this morning, you know, trying to

13  get up in it, basically the trailer is packed wall-to-wall with

14  those DREs, optical scanners, and various other equipment.  The

15  memory cards, from what we can deduce, of those that were

16  unloaded from trailers, because there was no space outside that

17  are within a trailer to continue storing them, is that the

18  memory cards are generally within boxes that contain various

19  other election equipment.

20           They may have extension cords that plug in to the

21  DREs.  They may have -- they have got voter access cards that

22  pull up the ballot combinations.  They have the encoders for

23  the voter access cards, supervisor cards.  Numerous other just

24  kind of miscellaneous equipment within various shrink-wrapped

25  circular containers.

1          So the real practical issue with that, in order for

2    us to get to -- you know, say if we wanted to get ten memory

3    cards for each county -- would be that we would have to unload

4    the entirety of the trailers to be able to physically access

5    them, unload the pallet that we presume contains the memory

6    cards, unload the materials in that pallet and the box on top

7    of that pallet to find the memory cards.  Because, frankly, the

8    memory cards are relatively small PCMCIA cards that plug into

9    the back of the DREs distinct from the voter access cards.

10          But in order to get to them, you have got to unpack

11   and pack it back up.  And then presumably subsequently there

12   would be a second unpacking for identifying the preserved DREs

13   to the extent that the memory card concepts actually work,

14   unlike the GEMS attempt.

15          So that is kind of the practical aspect of how that

16   is all set up.  We certainly have no intention of hiding the

17   ball.  But, frankly, because of the massive number of trailers

18   that are backed up, it is a little difficult to say with

19   specificity inside of each trailer.

20          Does that make sense?

21          THE COURT:  Yeah.  But I mean, I assume -- I guess

22   the thing is:  Obviously, it makes it very difficult to think

23   about the sheerly statistically randomized selection

24   methodology.

25          On the other hand, if you roughly knew that -- if you

1    have an idea of which ones are, generally speaking, Fulton,

2    Dekalb, Bibb County, Chatham County, for instance -- I mean,

3    some variety of that -- there would be -- since the plaintiff

4    has said they would deal with the cost of some of this, this is

5    probably a less invasive technique that is involved here.

6              But, you know, one alternative is for them simply to

7    basically take a crapshoot and pick five of Fulton County and

8    five of something else, five of something else, and say we're

9    going to pay for the unpacking of those.  And it is not going

10   to be ten for every single county.

11             That may not be what they want.  But I know -- and it

12   becomes even harder when you think about the way that the

13   Coalition wanted to get particular computers.  And so then it

14   becomes even more like you are looking for a needle in a

15   haystack.

16             But I mean, that would seem to me one option.  I

17   mean, the problem here is no matter what you are -- they are

18   going to have to -- you have to unload it in order to get the

19   DREs.  You have to unload it looking for the cards.  And so you

20   can't just -- I mean, obviously to unload everything is a

21   massive enterprise.  So --

22             MR. MILLER:  Yes, Your Honor.  I apologize.

23             THE COURT:  That is all right.  So I mean, I offer,

24   you know, one very rough approach.  And it kind of -- but the

25   other thing that it gets me to is just talking about what the

overall objective is.

When the request was initially made, we were still dealing with the last round of DRE elections.  So, you know, there was a question also of whether -- at that time whether the State would really still retain the -- for itself the option of using DREs in the future in some way if there was a problem with the new system.

Now, we're obviously not having DRE elections.  We may have other problems.  But that is another matter.

So in terms of -- it seemed to me -- but the plaintiffs are welcome to educate me as to what they are -- the variety of goals there were that would be relevant to weighing where we are going forward.

One was -- as I understood it was in the event the State was going to appeal that it wanted to have still -- since the State maintains that it was sheerly speculative that there had been a hacking -- and I'm not sure that that was essential to the claim.

But it certainly was a part of the claim in terms of having verifiable votes that also -- and voting machines that the plaintiffs wanted to be able to prove what -- if the State was going to challenge the Court's findings that it wanted to be able to present more evidence about how the machines actually operated and had been not allowed that discovery.

So that went to the question of simply obtaining the

1   permission on appeal on the underlying case.  And I certainly

2   recall that the Government -- the State has constantly argued

3   it is moot.

4           So I'm not -- I'm not addressing that at this moment.

5   But in terms of if it does go up on appeal and it is not deemed

6   moot, it could be, I guess, certainly arguably a problem here.

7           But what are the -- what were the other objectives

8   beyond what I have identified for the plaintiffs in securing

9   this evidence, given the fact that we do have -- the State is

10  operating on a new system?

11          MR. BROWN:  Your Honor, this is Bruce Brown.  And

12  Mr. Cross may be able to add to this.

13          But a couple of things.  One is that I believe there

14  is some evidence of migration of defects from the old system to

15  the new system.  I don't have that at my fingertips.  But that

16  has been one of the plaintiffs' concerns about preserving.

17          THE COURT:  I understand that.  And I'm prepared to

18  address that separately.  But I don't -- okay.  But I'm -- go

19  ahead.

20          MR. BROWN:  Yeah.  And that is the -- that is the

21  point that I wanted to make.

22          If we go back to the actual production issue, not the

23  current mootness of the request, just for a second -- and I

24  know that Mr. McGuire mentioned this in the last session.  But

25  the Coalition identified specific machines by machine number

1    and then others by ID number before they were shrink-wrapped

2    and buried in these trucks.

3            And it troubles us that that -- you know, as

4    taxpayers, that the State is going to have to spend money to

5    find those.  But, you know, as litigants, I think that is the

6    State's problem to address.

7            But Mr. Cross may be able to add more on the use of

8    these machines in the discovery context.

9            MR. CROSS:  Your Honor, this is David Cross.  I don't

10   know that I have much to add, other than what you have already

11   acknowledged and what Mr. Brown pointed out.

12           And we have somewhere in the record -- I don't have

13   it at my fingertips -- the declarations from Dr. Halderman on

14   the potential lingering effects.  And I know Your Honor knows

15   that.  So those are the two points that we think go to the

16   continued relevance.

17           The only other thing I'll say is I do think Mr. Brown

18   hit the nail on the head, which is we have been trying to work

19   out a sample with the State since the spring of 2018.  We did

20   it initially with three of the counties.  Cobb apparently is

21   still holding on to those DREs themselves at no cost.

22           And so I do think it is important to take a step back

23   for a moment, which is:  I feel quite confident that if I came

24   to the Court with a corporate client having done what the State

25   has done here saying we took a bunch of stuff we knew we had to

1    preserve and we shrink-wrapped it and sent it in some fashion

2    to Iron Mountain and buried it with a bunch of stuff and now it

3    is really expensive to go back and look at it I don't think I

4    would get a lot of sympathy from the Court nor should I.

5           And, you know, I guess there are taxpayers behind

6    this.  But the State is the one that did this without ever

7    communicating with anyone that this is happening.  I mean, at

8    the moment they were collecting the stuff, that would have been

9    an ideal point in time for us to work with them to figure out

10   which of the machines can we just go ahead and destroy right

11   now.  Let's work out the sample.  You have got the machines

12   with you.  You have got the memory cards.  They are organized

13   by county.

14          And they did this in the dark.  And now they are

15   coming and saying we should bear extraordinary expense.  I

16   mean, we have now looked really closely at doing the paper

17   recap sheet.  And it is a massive undertaking for the number of

18   elections and counties we're talking about.  Whereas, the

19   memory card piece would do this quickly and cost effectively by

20   just using computers.

21          And so I --

22          THE COURT:  But the memory card -- all right.  All

23   right.  Let me say I can -- I well understand your frustration.

24   And I don't know whether Fulton -- I'm assuming Cobb -- or else

25   you would have identified it -- is the only one that kept the

1    identified DREs and materials separately.

2           Is that what your understanding is?

3           MR. CROSS:  That is my understanding, Your Honor,

4    yes.

5           MR. TYSON:  Your Honor, this is Bryan Tyson.  Just to

6    correct that point, I know the State did not collect the

7    segregated machines from Cobb, Fulton, and Dekalb.

8           So our understanding is that those machines are still

9    being held by those counties.  I may not be right about that.

10   But they were not collecting those machines.

11          MR. CROSS:  Your Honor, this is David Cross.

12   Ms. Kaiser can tell me if I'm wrong.  I thought the response we

13   got from the ORR to Fulton is that all of the machines were

14   collected.

15          Is that right, Mary?

16          MS. KAISER:  We're still waiting on a substantive

17   response from Fulton County.

18          MR. CROSS:  Okay.

19          THE COURT:  Can Fulton County's representative

20   respond?

21          MR. LOWMAN:  Yes.  Fulton County does have the

22   machines, and they are still separated out, and they are being

23   stored at a separate facility.  So we still have those DRE

24   machines.

25          THE COURT:  All right.

```
 1              MS. KAISER:  We have not got a substantive response
 2   from Dekalb County either.  So I'm not sure about that.
 3              THE COURT:  All right.  Well, frankly, I mean, it is
 4   hard to know.  But if Fulton and Cobb held them, I have no
 5   reason to believe that Dekalb didn't likely hold them as well.
 6   But I'm sure that's something that if you are not getting a
 7   response right away that the State can get a response right
 8   away about it.  So --
 9              MR. MILLER:  Your Honor --
10              THE COURT:  Yes.
11              MR. MILLER:  -- if I may, just to address -- this is
12   Carey Miller.  But just to address one quick point that
13   Mr. Brown made regarding the machines that they have identified
14   by serial number, that is a distinct difference between the
15   concept of the memory cards pulled solely to identify machines
16   to then pull.
17              As for those machines, you know, maybe about half or
18   so that the Coalition plaintiffs did identify by the serial
19   number, that is not as much of an issue as the serial number is
20   on the side of the machine.  Those machines at one point, one
21   way or the other, are going to be removed from the trailers.
22              The question that we were addressing as to cost is
23   not whether, you know, the State is under an obligation to, you
24   know, pick out the ones that are identified is with respect to
25   unloading them solely for the purpose of discovering which ones
```

```
 1    they want later and then reloading them, unloading them again
 2    to grab those as we moved forward.  So I just wanted to clarify
 3    that distinction.
 4            THE COURT:  Well, it is one that I wondered about
 5    though because I -- if you ultimately have to pick out, let's
 6    say, from Bibb County 30 machines, you don't know where they
 7    are.  You are still going to have to drag them out.
 8            MR. MILLER:  Right, Your Honor.
 9            THE COURT:  Those 30.
10            MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.  I
11    think I can address that.  I think part of the discussion was
12    that you would be obviously getting them out to destroy them
13    and be disposing of them if we had the permission to do that
14    for basically all the machines except for the ones with these
15    serial numbers.
16            So you could examine the units at that time to
17    determine -- and also just directly to Mr. Cross' point about
18    us doing the collection in the dark, we filed multiple
19    documents with the Court in December, in January talking about
20    this process.
21            I don't know what he is saying that we weren't open
22    with the Court and the parties about the fact that we needed to
23    collect the DREs to get the ballot-marking devices rolled out.
24            MR. BROWN:  I think we just learned today that these
25    things are shrink-wrapped though.  This is Bruce Brown.  Sorry.
```

| | |
|---|---|
| 1 | MR. CROSS:  Your Honor, this is David Cross.  Maybe |
| 2 | the solution would be, just to focus on moving forward, they |
| 3 | are going to move these things to the Port Authority, it sounds |
| 4 | like.  So they are going to have to unload at some point there. |
| 5 | Why couldn't we at that point pull the memory cards |
| 6 | and do it then? |
| 7 | MR. TYSON:  This is Bryan Tyson.  I think unloading |
| 8 | them is a different kind of concept.  They are either going to |
| 9 | park the trailers there at, you know, the Port Authority |
| 10 | facility and not unload them.  Or they are just going to unload |
| 11 | hundreds and hundreds of pallets and not necessarily be opening |
| 12 | up each individual pallet.  I don't think we're going to take |
| 13 | them off the pallet. |
| 14 | So I think the process maybe gets a degree easier. |
| 15 | But you still have to go on a pallet-by-pallet search for |
| 16 | memory cards once you get them to a new facility, assuming they |
| 17 | come off the truck -- the trailer, which I don't know what the |
| 18 | plan is for that. |
| 19 | MR. BROWN:  But all of them -- this is Bruce Brown. |
| 20 | This is just a question, Your Honor. |
| 21 | All of them are going to be -- if you had your way, |
| 22 | you would be unpacking all of them and disposing of all of |
| 23 | them; right? |
| 24 | MR. TYSON:  Correct.  Yes.  That is correct. |
| 25 | MR. BROWN:  David, I think, is saying in the process |

1   of doing what you would ordinarily do anyway, unpack

2   everything, find the memory cards, put those in one stack, find

3   the Coalition machines, give those to us, use the memory cards

4   to determine the translation between the machine IDs and the

5   serial numbers, and then give us the rest.  And that might be

6   in a warehouse.  That might be in a gymnasium.  I don't know.

7   I know it is a lot of stuff.

8          But that way you just -- you know, with oversight

9   from the plaintiffs, you just do sort of the physical unloading

10  and triage all at once.  And we don't have to spend a bunch of

11  money storing State machines that nobody wants any more or

12  going through the gosh-awful process of looking for stuff and

13  then repacking it, on the one hand, or spending months in the

14  Georgia archives going through that paperwork.

15         MR. TYSON:  And, Bruce -- this is Bryan -- I don't

16  think we have looked at trying to secure a facility that would

17  allow us to do that process.  I mean, they are currently in a

18  storage facility, not in a facility with a large enough

19  warehouse to unpack, spread out, and do that kind of

20  assessment.  I just don't think anybody has looked at that or

21  contemplated that right now.  I imagine that is more expensive

22  than our current storage space though.

23         THE COURT:  Well, I guess what I'm wondering from the

24  Curling plaintiffs in particular -- but I mean, there is

25  another variety of this for the Coalition.  Why -- in the best

1    of all worlds, yes, you want a pure statistical sample.  But

2    discovery in any event is a question of a balancing of cost and

3    the values involved here.

4         And I appreciate the fact that the plaintiffs'

5    experts are trying to get you the very best result.  But I

6    think -- and I have said this before.  But I'm not -- you know,

7    at some -- you know, sometimes -- there are all sorts of cases

8    you end up being forced to use a smaller statistical sample.

9    You use different -- different analogies in light of that.  Or

10   the evidence is simply -- it is either compelling, or it is not

11   compelling.

12        It gives -- it raises an inference, or it doesn't

13   raise an inference.  It is one thing if you were relying solely

14   in this case on statistical evidence.  But you are not.  You

15   have tried to present an array of information, and I'm -- I

16   realize that you want to hold -- hold on to the findings made.

17        But I'm -- at some juncture here we're really chasing

18   our tail in terms of the actual objectives.  I mean, you are

19   doing all of this, and I -- and there was still not the

20   strongest evidence yet as to -- presented as to how this

21   information that you thought was going to infect the next

22   system.

23        I thought there was some information.  But, of

24   course, there was some information rebutting it as well.  It

25   really all related to the BMD part of the system but it had --

1   which I realize has its own connections.  But it had to do with

2   the voter check-in.  And there was evidence -- and the

3   defendants maintained that they used the flat file in order to

4   feed the information in.  And they couldn't have infected in

5   any way the way they fed it in.  And therefore it couldn't have

6   in turn infected anything else.  And I didn't hear much about

7   that from you-all.  I mean, I heard -- frankly.

8             So in terms of its long-term value, the merits of the

9   case that are really being actually -- supposed to be litigated

10  in front of me at this point -- the rest of the case I don't --

11  I'm having trouble.  It is all just about basically asserting

12  your prevailing party status before.  It is -- I realize it is

13  important.  But it is not -- it is not quite the same.

14            MR. CROSS:  Your Honor, this is David Cross.  I guess

15  a couple of thoughts on those points, if I can.

16            One, a key concern for us and for our experts

17  continues to be, particularly for Dr. Halderman, that whatever

18  infection may have existed in the original system spilled over

19  to the new system.

20            And I understand the State disputes that, and they

21  have made a number of representations on why that would not be

22  possible.  But it is also, I think, important to keep in the

23  broader context of the case, Your Honor, which is -- and to be

24  clear, I don't mean this to insult or cast dispersions.

25            But there is a fact in this case that they

1    represented for a long time that the original system was air

2    gapped.  Your Honor may recall.  And it wasn't until we finally

3    got some discovery that their own expert was forced to admit

4    that that was not true, that it was nowhere close to air

5    gapped.

6              And so they may genuinely believe that the measures

7    they have in place protect the new BMD system from infections

8    from the original GEMS system.  Their belief does not make it

9    fact.  And as we have seen in the facts -- in the past, it may

10   simply be not accurate.

11             So we are entitled, I believe, as a matter of

12   discovery under the original claims, which are still alive

13   because of the posture they have taken in the case, and under

14   the new claims with respect to BMDs to take some basic

15   discovery that analyzes whether the hacks that occurred in the

16   past and the suseptibility that was shown to the system whether

17   there could be an infection that spilled over to the new

18   system -- these machines enable us to do it.  They are the only

19   way.

20             THE COURT:  Well, they allow you to -- they allow you

21   to provide some other concrete information as to the hack of

22   the old system.  It doesn't -- I'm just pointing out I don't

23   think you have given me that much as to -- you have given me

24   some information and -- and I understand what your argument is,

25   that it is necessary information for purposes of showing

1    potential contamination in the new system.

2         But that has been, you know, under the circumstances

3    bare.  You are not really identifying it now other than that

4    Dr. Halderman believes and this is sort of the record as it has

5    been.

6         So -- and I realize you haven't had discovery.  But

7    this isn't focused on the new contamination.  This is focused

8    on the prior one; right?

9         MR. CROSS:  It is focused on -- it is focused -- this

10   is Davis Cross.  It is focused on the ability to infect the new

11   system through the old system.  So when you say it is not the

12   new contamination, our concern is that the new system suffers

13   from the original contamination of the old system, to the

14   extent there was one.  And that's what I think we're entitled

15   to check.

16        And the last point I'll make, Your Honor, is this,

17   which gets to your other point:  You are absolutely right that

18   there is a balancing that goes into these things.  But I have

19   never in all of my experience -- and I can't think of any

20   case -- where in analyzing the cost and benefit analysis in

21   preservation the court weighs burden and expense with a state

22   that a party took on to itself after its duty of preservation

23   arose.  Because that is what we're talking about.

24        If they had left these machines at the counties at no

25   cost, then there would not even be a discussion here.  They

```
 1    could sit where they were.  And at some point, we would figure

 2    out a way to deal with that.  Instead, every --

 3            THE COURT:  Well, it is a cost.  Wait a second.  It

 4    is a cost to them.  Not a financial way.  They are saying they

 5    are trying to implement a new system and they don't have any

 6    room.  So it is not like they are saying I can't just leave

 7    this in each county.

 8            Maybe I misunderstood.  But I mean, they have a duty

 9    to also administer the new system.

10            MR. CROSS:  Right.  Your Honor, there is no

11    evidence -- I mean, Cobb is a perfect example.  Cobb does not

12    seem to have any problem or Fulton, which we now know is

13    holding on to these other machines -- they don't seem to be

14    having any problems with administering elections or finding

15    space for those.

16            Again, the point I was going to get to was, you know,

17    Mr. Tyson says they filed some stuff saying they were going to

18    collect this stuff.  We never had visibility or were invited to

19    participate in that that we asked.  I don't say that just to

20    lodge criticism.  It is a substantive point.

21            If the parties had worked together at the time of

22    collection, it was the exact right opportunity to say, okay, we

23    know where the memory cards are, we know where the machines

24    are, they are in each county.  Here is our list.  Let's figure

25    out a way so that when you do the collection some small set
```

1    would be preserved and you can do it in the moment because you

2    are going to have all the stuff there by county.  And the rest

3    you can do whatever you want with.  You can destroy it.

4            But they chose to do it in a way that didn't include

5    anyone.  And now all of the cost that they are talking about,

6    all of the burden comes from decisions that they made.  Again,

7    I don't think that is the right balance to look at.

8            I'm not aware of any case where that has happened

9    where a party said we took very particular measures on

10   preservation that we didn't have to take in that way, we didn't

11   coordinate with anyone on it, and now that cost becomes the

12   balance against whatever benefit.

13           If that were the case, I mean, you would have clients

14   all the time that just make their preservation extremely

15   burdensome and costly.  You would incentivize that type of

16   conduct.

17           So I just don't think it is fair to look at that.

18   And suddenly also as we talk about shifting cost to us, this is

19   a situation they created.  To some extent, as Mr. Brown said,

20   they have got to own that.

21           THE COURT:  Well, I obviously don't see it quite that

22   way.  I don't see it quite the way the State sees it either.

23   But I just -- I can't really -- there has been sufficiently --

24   the charged and difficult relationships between counsel,

25   without allocating blame, is definitely negatively impacting

1    the resolution of this.  That is not a question in my mind.

2           But let me ask you this:  When we talked at some

3    length on Monday -- and maybe it was Friday at this point.  The

4    timing is getting blurred -- I thought that you -- that the --

5    very clearly that the plaintiffs understood what you were

6    taking on when you offered to do -- work with the -- with the

7    materials that now turn out to be in the archives and the stuff

8    there, that it is going to take a lot of work to get them out.

9           So today when you tell me that, well, we now know

10   that it is a lot more complicated -- but you were very

11   affirmative -- the plaintiffs were -- in offering this as an

12   alternative when we originally talked.

13          So tell me what happened.  Why would you have been so

14   affirmative that we can do it and we're -- we'll -- and we'll

15   be in there and we'll get it done?  Because I know at least the

16   Coalition folks are very deep into election documents.

17          MR. CROSS:  Your Honor, this is David Cross.  What I

18   articulated on that Friday -- and I can go back to the

19   transcript to look at this.  But what I tried to articulate was

20   we are willing to do that if that is the only course.  And what

21   I had tried to convey is that we should do these things in

22   parallel, which was let's figure out where the recap sheets

23   are, which the State has done thankfully, but at the same time

24   in parallel figure out whether we can do this with the memory

25   cards.

1          We know with a high level of confidence that we can

2     do this with the memory cards.  It is a fraction -- I mean, a

3     tiny, tiny fraction of the time and expense to do it with the

4     recap sheets.  So I'm not walking away from doing it with the

5     recap sheets.  It is just that takes a ton of burden and

6     expense to the State's own preservation duties and shifts it to

7     us because then we're absorbing all that time and expense to

8     review, do the data entry, match everything up, and come back

9     to them.

10         Whereas with the memory cards, we can run those

11    fairly quickly, pull the numbers.  And then it is a matter of

12    doing what they are going to have to do anyways under either

13    approach, which is then pull those machines out.

14         THE COURT:  What has happened here?  Just putting

15    aside the history of you -- we all understood there was a

16    problem about the memory cards.  You didn't know it was this on

17    Friday.  And you voluntarily at that point said that you didn't

18    realize the archives were going to be -- going to take months

19    upon months but yes, you would just roll up your sleeves and

20    get it done and take it on.

21         And, you know, as we know at this point, I think it

22    is just the 2018 elections that was available but not the

23    2000 -- but not necessarily the 2017 and '16.  Those are in the

24    archives, if I understand correctly.

25         So I mean, I guess a part of me says why aren't you

1    looking at the 2018 records now and using the DREs that are

2    available to you from these three major counties.

3            MR. CROSS:  We asked that, Your Honor.  I don't think

4    I ever got an answer to that.  One of the questions that we

5    posed to the State, unless I missed a response, was what would

6    the cost and time estimate be if we only looked at the 2018

7    elections.  I don't recall getting an answer to that.

8            MR. TYSON:  Your Honor, this is Bryan Tyson.  I think

9    the answer we gave to that was that assuming the 2018 elections

10   were all at the Secretary's office, which is what we believe to

11   be the case, that review could begin right away.

12           The larger concern that we raised regarding that was,

13   especially since the Coalition was seeking, you know, these

14   very specific numbers, that it wouldn't -- it wouldn't expedite

15   the process.  It would begin the process, but it wouldn't

16   expedite the conclusion of the process, that you would still

17   need to get the materials from the archives.

18           So, again, it is something that could begin right

19   away.  But it is still going to be that long process to get to

20   the end because we can't know all the serial numbers until we

21   know all the elections that the plaintiffs want to look at

22   based on the machine IDs.

23           THE COURT:  I think Mr. Cross was asking about the

24   cost.  But maybe he was also asking about the delay too.

25           MR. TYSON:  The cost -- well, I mean the documents

1  are already at the Secretary's office.  So I'm not sure there

2  would be a cost associated with that, beyond just the storage

3  cost of any paper storage.

4          THE COURT:  And then the -- just to make sure that

5  I'm sort of touching base, I know that the Coalition was more

6  interested in -- or at least had some gradient level of the

7  system in '16 and '17 elections.  So those would be more

8  delayed.  But you would still have access to the three

9  metropolitan counties' machines that you had segregated.

10          MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson

11  again.  I think that is correct.  But I think that the

12  challenge is we wouldn't know for sure which serial numbers

13  could be disposed of until after we completed the process of

14  all of the elections going back to 2016.  Because it is

15  possible that a serial number that wasn't used in 2018 for some

16  reason was used in the 2016 election and would still need to be

17  maintained.

18          So that, again, was a timing question.  And then the

19  sample -- the samples that are maintained by the counties are

20  still there.  I mean, those -- I think we proposed at one point

21  just using those as the samples and disposing of the remaining

22  machines.

23          So I think there are any number of things we can do.

24  We could do ten random machines out of each county and dispose

25  of the remainder from the ones the State is holding.  I think

1    there are some other options.  But they lack the kind of

2    statistical nature of what the plaintiffs sought.

3            THE COURT:  Well, what is the -- what is the

4    problem -- this is to plaintiffs' counsel -- with going forward

5    and at least testing the machines you have access to

6    immediately?

7            MR. CROSS:  Your Honor, this is David Cross.  Do you

8    mean the ones that are sequestered in the three counties?

9            THE COURT:  Uh-huh (affirmative).

10           MR. CROSS:  That would be fine.  I think that is a

11   great way to start.

12           THE COURT:  And you know -- and the thing about it

13   is -- I mean, it doesn't give you the 2016 information.  But

14   you could have a team still working on the 2018 status so you

15   get something there.  And at least that would allow you to -- I

16   mean, they are moving this stuff to the Port Authority, it

17   sounds like, no matter what since we don't have an agreement.

18           But at least we would be a little further ahead if

19   you did that all -- went forward immediately on those two

20   fronts.

21           I mean, I still urge you-all to think about something

22   other than a pure statistical sample.  Because I mean, I think

23   that if you have a large enough volume and you -- there is

24   either a point you are making or not -- that is going to flesh

25   out or not.  If you end up just with two counties of something

1    that looks suspicious and is crummy and that they are going to

2    come out and explain in a different way, as has happened at

3    points, that is -- you know, that is what happens.  But I

4    just --

5          MR. BROWN:  Your Honor, this is Bruce Brown.  The

6    Coalition's approach was to target areas that we were concerned

7    with and make specific requests.  That is why our number is so

8    low.  And also our statistical notion is that we don't -- this

9    type of sampling is -- we don't need to know like the average

10   weight of the DRE.  Right?  It is a different sort of way of

11   doing the statistics.

12         Instead, we want a sufficient number so that we can

13   say, if there is a defect, there is a 95 percent chance that

14   this subset of the universe will show it.  And so it is a

15   different -- it is a different logic to that.  And so that

16   is -- that is why we --

17         THE COURT:  Well, I understand the 95 percent, except

18   for the fact that you have -- the way it was described to me by

19   Mr. McGuire is that you are all looking particularly for

20   machines that have shown some peculiar behavior.

21         MR. BROWN:  Right.

22         THE COURT:  So I guess you are saying the subset is

23   those machines and we don't know what that number would be that

24   are showing that type of behavior.

25         MR. BROWN:  Well, what I'm trying to say is we really

1   have been -- made an effort, given that there is -- that the

2   discovery is so expensive for the taxpayers and for us, to

3   really fashion our request.  And we make it to them, and we

4   identify specific machines, and then they get shrink-wrapped.

5        And so it is very frustrating that we have

6   specifically identified 120 DREs that were identified that they

7   saw and looked at the serial number and put it deep in storage

8   and then shrink-wrapped it.

9        THE COURT:  When you gave them the numbers, when was

10  that?

11       MR. BROWN:  That was in February, I believe.

12       THE COURT:  And when were they shrink-wrapped?

13       MR. BROWN:  After February, I think.

14       MR. TYSON:  Your Honor, this is Bryan Tyson.  The

15  State had been collecting machines all through December,

16  January.  I think we would probably have to look at which

17  particular county was picked up at which time.

18       But the -- but by mid-January, just looking back at

19  our filing from the middle of January, it looks like that we

20  had, for example, 16 counties that were picked up on -- in the

21  middle -- of the week of January 16.  So the pickup process was

22  ongoing through December and January and probably February as

23  well towards that March date of rollout.  So --

24       THE COURT:  Well, it is not a great situation.  But

25  I'm also -- I'm trying -- I mean, I understand this is an

1    important issue.  And at the same time, you know, there is a --

2    it would be a lot -- it may be the State just has to send all

3    the equipment to the cheaper spot to the Port Authority and

4    you-all need to do something -- go forward with what you have

5    and have a team working on the 2018 materials.

6           You know -- and maybe there is a way that the

7    Coalition folks can modify this.  I don't know how you

8    determine what ones were going to be kept originally in Dekalb,

9    Fulton, and Cobb.  But I'm just -- and maybe it is more useful

10   at some point to say you look at a sample of what you are using

11   now.

12          But, you know, I guess the equitable argument about

13   why did they shrink it up and this was -- this was really

14   either obstructive or stupid.  I understand the argument.

15          But there is a lot going on here also in terms of

16   these folks trying to get an election in place and making

17   judgments and perhaps wrong judgments.  But, you know, not

18   wanting just to hold everything up and not being able to say at

19   this point, oh, because we don't know the numbers that I can

20   say to them, all right, only send half of them to the Port

21   Authority, which would be one easy way of doing it -- say send

22   half to the Port Authority.  And Mr. Miller presumably has

23   enough of a list that you could say you could send this half.

24          MR. CROSS:  Your Honor, this is David Cross.  I think

25   the idea that it sounds like you floated, if I understood

```
 1    right, was to get access to the samples of the memory cards

 2    that Cobb, Dekalb, and Fulton have for the sequestered

 3    machines.  I think that would be a great first step.  It sounds

 4    like we could probably do that in a matter of days.

 5            And then in parallel, since the State has the recap

 6    sheets for 2018 -- or it sounds like they may still have

 7    them -- maybe we could get access to those.  That would be a

 8    good step forward to try to resolve this.

 9            It is my understanding -- and Mr. Tyson can correct

10    me if I have this wrong.  But my -- or the Fulton County

11    counsel.  The machines that are sequestered with the three

12    counties I think have not been used in elections -- well, they

13    would have only been used in elections predating the 2018

14    midterms, if I remember right.

15            So they would -- they would give us some older

16    elections.  And then the recap sheets would have the more

17    recent.  So it sounds like that could work as an initial step.

18            THE COURT:  Does Fulton County counsel disagree?  I

19    mean, that is my recollection of when you had the agreement.

20            MR. LOWMAN:  Your Honor, this is David Lowman for

21    Fulton County.  That is correct.

22            MR. TYSON:  Your Honor, this is Bryan Tyson.  I just

23    want to clarify I guess what we're now discussing.  Are we now

24    discussing beginning discovery of these?

25            Because my understanding was Your Honor's last order
```

1    was denying the forensic examination of the DRE system.  And,

2    obviously, I mean, Cobb and Dekalb aren't parties any more, and

3    we don't have discovery open right now.  So I guess I just want

4    to understand the parameters of what we're discussing at this

5    point.

6              THE COURT:  Well, we're talking about those three

7    machines -- counties -- the machines from those counties to

8    give them more historical information and to look at the --

9    they wanted to -- everyone understood that the reason they

10   wanted the card was to be able to look at the machines I

11   thought.

12             MR. TYSON:  Your Honor, this is -- I'm sorry.

13             THE COURT:  Go ahead.

14             MR. TYSON:  I thought the reason for the cards was to

15   determine the sample of machines to be preserved in -- for

16   the -- for one day if the Court later ordered a forensic

17   examination we would have those machines available.  It related

18   to our preservation options or preservation duties, not to the

19   conduct of discovery, which isn't currently open in this case.

20             THE COURT:  Right.  But, you know, the thing is it is

21   not -- I'm going to decide on this soon enough.  So if I decide

22   on it -- I mean, I think that this was the best way I could

23   basically say -- be able to try to truly truncate what you are

24   going to have to preserve.

25             I mean, I think that really there is no reason in

1    reality why -- in the end why the plaintiffs can't decide if

2    Mr. Miller is able to give them a rough count of where the

3    counties are.  Because it is still going to be a terrific

4    amount of work to go and hunt and peck for each of these DREs

5    for preservation purposes.  I don't know why plaintiffs

6    couldn't go back and say, all right, we could live without them

7    from this number -- these particular counties.

8          MR. CROSS:  Your Honor, this is David Cross.  That is

9    something that we had discussed with our experts.  And I think

10    we are trying to put a proposal together on that.  So I think

11    that may be a way we could go as well.

12          I do think that -- I mean, if we could at least move

13    forward with the memory cards from the three counties, then

14    that would enable us to confirm that we can do this.  Again,

15    all indications are that we can because Dr. Halderman has

16    tested it.

17          And we understand from the State they have preserved

18    these memory cards and what was on them.  Mr. Tyson let us

19    know, I think, on the last call that nothing was getting

20    erased.  So we should be able to use the memory cards.  But

21    if --

22          THE COURT:  By the time we get the memory -- just to

23    be -- to Mr. Tyson, by the time we get the memory cards and

24    have to jump through the hoops of dealing with the counties and

25    identifying that the machines really are there, we will have an

1    order out on the motion to dismiss, one way or the other.  But

2    we will have moved forward.

3            MR. TYSON:  Yes, Your Honor.  Thank you.  And I think

4    we can definitely work towards that as far as memory cards.  I

5    still don't know exactly why we want to do the memory cards

6    because it is still going to be that difficult to locate.  But

7    that is fine for us to proceed.

8            THE COURT:  Well, it may be -- I mean, we're talking

9    about memory cards, first of all, in these places where they

10   have the memory cards and the DREs.  Right?  The three

11   counties, Number 1.

12           So that is -- and then basically just simply so I'm

13   trying -- I'm trying to act on your request to limit the number

14   of things moved as you sent -- if you were able to send us

15   the -- not me -- them -- the allocation of where these -- of

16   the counties by -- by car number, then they could just tell you

17   you don't have to preserve -- you don't have to move -- you

18   don't have to move whatever, Numbers 1 through 200.

19           MR. TYSON:  And maybe I'm not quite grasping it, Your

20   Honor.  Maybe I just don't -- but I thought our sequence of

21   events that we discussed previously was determine whether

22   Dr. Halderman's scripts would work as an initial step.

23           THE COURT:  Right.

24           MR. TYSON:  Step two would be that we would have to

25   then locate and hand -- and have Dr. Halderman analyze all

1   30,000-plus memory cards because every memory card contains a

2   machine ID to serial number reconciliation.  After we had then

3   analyzed all 30,000 memory cards, we would then be able to have

4   the list of the corresponding machine ID to serial number for a

5   particular election.  They would then allow us to identify

6   particular -- the sample to maintain.

7           I don't know that getting memory cards from the three

8   counties does anything beyond step one in that process because

9   it doesn't really advance us.  All it will tell us is the

10  serial numbers of the machines that are currently being

11  sequestered and maybe possibly another machine that was used in

12  the past.

13          But I guess I'm not seeing how that has any bearing

14  on what we have to move.  And it may be just I'm missing a stop

15  in the process.  So I apologize.

16          THE COURT:  No.  I can certainly be -- I was trying

17  to help you cut down your responsibilities -- that's all -- on

18  the numbers.  But my notion is --

19          MR. TYSON:  We appreciate that.

20          THE COURT:  -- they were trying to get -- they would

21  run -- they would get the cards for Fulton, Dekalb, and Cobb.

22  They would run them.  They would be able to see exactly what

23  they had.  They would see whether Dr. Halderman's process,

24  first of all, works with this particular set of cards.

25          So let me just stop there.  Is that a realistic

1   assessment, Mr. Cross, since you seem to be the one talking for

2   Dr. Halderman?

3           MR. CROSS:  I'm sorry, Your Honor.  Could you say

4   that again?  Was what a realistic --

5           THE COURT:  You have -- assuming you have all of the

6   cards from Fulton, Dekalb, and Cobb and Dr. Halderman runs

7   those, will he be able to assess whether his formula or his

8   process for identifying -- making sure that you can identify

9   the machines work or not from that?

10          MR. CROSS:  Yes.  Yes.

11          THE COURT:  All right.  So at that point, I mean, you

12  have already had to pick a subsample, whether you liked it or

13  not now.  But you do have a subsample.  And he would be able to

14  help you -- make sure that you have the machines you wanted

15  from those counties for the earlier elections; right?

16          MR. CROSS:  That's right, Your Honor.  Then as to

17  those sequestered machines, we could also let the counties know

18  they can release --

19          THE COURT:  -- the rest of those?

20          MR. CROSS:  Right.

21          THE COURT:  So, Mr. Tyson, so that was the notion

22  first about the three major counties, two of which have had

23  very significant -- have significant challenges in other

24  directions in terms of the current election.  So I thought it

25  would also be a relief to them.  But whatever.

1           MR. TYSON:  Understood, Your Honor.  That helps.

2     Thank you.

3           THE COURT:  All right.  So then in terms of -- you

4     were talking about -- we're going to send all of our shrink --

5     there are two senses here.  And presumably because of the

6     fiscal year, we're sending -- we're going to send all of these

7     shrink-wrapped vans back to the Port -- the State's Ports

8     Authority.  And so that is an expense itself.  It was $81,000

9     approximately.

10          I mean, you can spend $81,000.  All I was trying to

11    suggest, first of all, was if Mr. Miller or your office has, in

12    fact, a listing, more or less -- it is roughly correct as to

13    which -- which vans or trailers have which counties, maybe they

14    could determine they don't need certain things or that we only

15    need two or three from -- and I realize it is not -- the point

16    is it means everyone is giving up a certain amount of pristine

17    statistical quality here.

18          So the State would have to actually be on board for

19    that too.  You can't come back and say why didn't you do

20    better.  But it would just simply allow you not to even have to

21    transport some of them potentially.

22          MR. TYSON:  Yes, Your Honor, which would be -- I'm

23    sorry.

24          To the Port Authority?

25          THE COURT:  Yes.  Right.

1        MR. TYSON:  And we do have from the vendor a kind of

2   inventory of which county has how many pallets on which trailer

3   by a trailer ID.  So, for example, we have, you know, three --

4   four different trailers where there are Cobb County pallets

5   located.  And so we do have that reconciliation.

6        So if there was a -- we could release particular

7   counties, we would be able to identify at least which trailer

8   those were on, even if there are other machines in the mix

9   there.

10       THE COURT:  I mean, I don't -- I could conceptualize

11  any number of things.  I mean, there might be a Fulton County

12  2018 and they want every single one of them.  But Forsyth

13  County they don't -- they only say give us -- whatever Forsyth

14  County's are, make sure we have half of those.  They say keep

15  Trailers 5, 6, and 7.  I don't know.

16       It is something for them to talk about.  But the

17  point was:  If they had whatever the information -- the

18  inventory information you have, they could at least talk

19  with -- among themselves about could they cut it down so that

20  they would be -- in fact, when cars are identified that they

21  are -- that they are working with a smaller subset, not the

22  whole set, so that you could release, you know, from the

23  obligation both to preserve as well as to transport the entire

24  set of them.

25       And, meanwhile, they would proceed with looking at

what they have got, you know, on the 2018.  And, you know --
and I think that the sooner they start that the more they might
be more educated about what could be released.

When is the contract through?  Is it -- is it
June 30th?  The current one?

MR. TYSON:  Your Honor, this is Bryan Tyson.

THE COURT:  Or is it month to month?

MR. TYSON:  Yes, Your Honor.  It is my understanding
that it is month to month.  $36,000 for each month until such
time as we move them to Savannah, for example.

THE COURT:  Yeah.  And were you really thinking you
were going to be able to move them by the end of the month, or
was it really more likely a July move date?

MR. TYSON:  I honestly don't know a time line.  I had
not --

THE COURT:  I mean, nothing happens so quickly in
state government.  I don't mean that in a pejorative sense.
But it is hard.  I've worked with the government.  I have
been -- for the government.  So it is -- everything takes time.
It takes time in big business too.

MR. CROSS:  Your Honor, this is Davis Cross.  Could I
ask one quick question?

Bryan, are the trailers owned by the vendor?  So like
those will get left with the vendor and you will unload them at
the Port Authority?  Or is the expectation that they will stay

```
 1   on the trailers at the Port Authority?
 2           MR. TYSON:  And I honestly have no idea.  I really
 3   don't know the answer to that.
 4           MR. CROSS:  Okay.
 5           THE COURT:  All right.  Well, why don't you try -- I
 6   think that is an important question so -- because they would
 7   still have to be unloaded if they are going to -- they are
 8   not -- if they are not going to say -- if they are not going to
 9   all stay together.
10           Why don't you see if you can find that out in the
11   next -- by tomorrow and share that information?
12           And who is -- Mr. Tyson, is somebody on your team or
13   the State prepared to call up Dekalb County so that they can
14   make contact about -- that we have -- you have obviously
15   counsel for Fulton County here.  And you know -- and apparently
16   you have somebody in Cobb so that you know the cards are there.
17           Is there somebody who is in particular the State's
18   contact in Dekalb that you can --
19           MR. TYSON:  Your Honor, this is -- I don't know that
20   we have a particular contact.  But Shelley Momo is representing
21   Dekalb County in several other election-related cases.  So I
22   will probably reach out to her first.
23           THE COURT:  All right.  And then you can follow up
24   when these paper materials could be made available relating to
25   the 2018 election.  And the plaintiffs can work on that.
```

1          I mean, that is my proposal to you.  I mean, y'all

2    can litigate it forever.  But I'm just trying to resolve it and

3    move everyone forward.  And I would just encourage you to share

4    that information with the plaintiffs that -- and if you can

5    email the inventory information right away.  And plaintiffs'

6    counsel can talk with Fulton County's counsel -- I mean, he is

7    on the phone now.  So that is simple enough.  You can follow up

8    after the phone call.

9          Do you want me to -- today is -- I can't even

10   imagine.  It is Wednesday.  Do you want to check in again

11   tomorrow afternoon or Friday?

12         I have a phone conference in a large case, I think,

13   at 4:00 on Thursday.  So if you don't think you are going to

14   have made any progress by that point, then we'll try to set

15   something for Friday.

16         MR. CROSS:  Your Honor --

17         THE COURT:  Well, y'all -- yes?

18         MR. CROSS:  -- I think we would defer to the State on

19   what would work best with them.  We can have people ready to go

20   with the memory cards as soon as they are.

21         MR. TYSON:  Your Honor, I think Friday might make

22   more sense just because the election -- Friday is the election

23   deadline -- certification deadline.  So we have some of the

24   time lines in the state case into high gear next week for the

25   state certification the following Friday.  So in terms of

1    election staff, I think maybe giving us another day would be

2    helpful.

3              THE COURT:  All right.

4              So, Mr. Martin, are you there?

5              COURTROOM DEPUTY CLERK:  Yes, ma'am, I'm here.

6              THE COURT:  Do you have any idea how long that phone

7    conference about Mr. Pierce's case is going to take?  That is

8    just about a binding plea, isn't it?  That is what it says

9    anyway.

10             All right.  Let's just talk about 4:00 on Friday

11   then.  All right?

12             COURTROOM DEPUTY CLERK:  Okay.

13             THE COURT:  That gives everyone enough time to sort

14   some things out and try to talk to each of the counties.

15   Because, you know, if you can get the cards even for one

16   county -- if Fulton County is able to make the cards available,

17   presumably you could start -- be getting ready to run the cards

18   to see if the formula works at all.  Because that is what we

19   need to know, first of all -- first and foremost.  So you have

20   got to get somebody's cards.

21             MR. CROSS:  Right.  Right, Your Honor.

22             THE COURT:  Because, otherwise, we are chasing

23   something involving Savannah and these -- these materials that

24   could be irrelevant.  So let's just try to get hold of -- and I

25   just would ask the State and Fulton County to really help us --

```
 1    let's see if this methodology works at all.  Then, meanwhile,

 2    you can look at the schedule for looking at the 2018

 3    documentation.  All right?

 4              MR. CROSS:  Thank you, Your Honor.

 5              THE COURT:  Thank you.  Talk to you -- good luck.

 6    Talk to you Friday.

 7              MR. TYSON:  Thank you, Your Honor.

 8              MR. BROWN:  Thank you, Judge.

 9                   (The proceedings were thereby concluded at 5:14

10                   P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

the United States District Court, for the Northern District of

Georgia, Atlanta Division, do hereby certify that the foregoing

48 pages constitute a true transcript of proceedings had before

the said Court, held in the City of Atlanta, Georgia, in the

matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the

22nd day of June, 2020.




                          _____
                          SHANNON R. WELCH, RMR, CRR
                          OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT