IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,      :
                     :

    Plaintiffs,      :
                     :

v.                   :      CIVIL ACTION NO.
                     :      1:17-cv-2989-AT

BRAD RAFFENSPERGER, *et al.*,  :
                     :

    Defendants.      :

## **ORDER**

During the pendency of this lawsuit and following the 2018 gubernatorial general election, the Georgia Legislature enacted legislation requiring the Secretary of State to implement a new voting system that includes a voter-verifiable paper record.  In addition to their original claims aimed at the State's former electronic voting machines, Plaintiffs' newly amended claims challenge the ballot marking device system chosen by the Secretary of State which tabulates votes using an encrypted 2D barcode that Plaintiffs allege cannot be voter-verified. The State Defendants' Motion to Dismiss Curling Plaintiffs' Third Amended Complaint and Coalition Plaintiffs' First Supplemental Complaint [Doc. 645] is now pending before the Court.[1]

---

[1] After the Court granted Plaintiffs leave to file amended complaints, both  the Coalition's First Supplemental Complaint (Doc. 628) and the Curling Plaintiffs' Third Amended Complaint (Doc. 627) were filed on October 15, 2019.

## I.   BACKGROUND AND FACTUAL ALLEGATIONS

### A.   Georgia Enacts New Election Code and Adopts New Ballot Marking Device Voting System

Effective April 2, 2019, the Georgia legislature passed H.B. 316 and S.B. 34, mandating a new uniform statewide voting system that provides for:

> the use of scanning ballots marked by electronic ballot markers and tabulated by using ballot scanners for voting at the polls and for absentee ballots cast in person, unless otherwise authorized by law; provided, however, that such electronic ballot markers shall produce paper ballots which are marked with the elector's choices in a format readable by the elector.

O.C.G.A. § 21–2–300(a)(2).  (Coalition Pls.' Compl. ¶ 3.)  Georgia's new election code defines "electronic ballot marker"– also referred to as a ballot marking device or BMD – to mean:

> an electronic device that does not compute or retain votes; may integrate components such as a ballot scanner, printer, touch screen monitor, audio output, and a navigational keypad; and uses electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, communicate such interpretation for elector verification, and print an elector verifiable paper ballot.

O.C.G.A. § 21–2–2(7.1). (Coalition Pls.' Compl. ¶ 20; Curling Pls.' Compl. ¶ 136.) The law also requires that the "equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county of this state and shall be ***provided to each county by the state, as determined by the Secretary of State***." O.C.G.A. § 21–2–300(a)(1) (emphasis added).

The election code requires the Secretary of State to certify that the new BMD voting system is "safe and practicable for use" in all state, federal, and county

elections in the State and complies with the Georgia Election Code, the Rules of the Georgia State Election Board, and the Rules of the Secretary of State. O.C.G.A. § 21–2–300(a)(2); Ga. Comp. R. & Reg. r. 590–8–1–.01(d).  To comply with the rules governing certification, the voting system must meet qualification testing performed by an Independent Test Agency (ITA) certified by the Election Assistance Commission (EAC) or a Georgia Certification Agent designated by the Secretary of State. Ga. Comp. R. & Reg. r. 590–8–1–.01(d).

On July 29, 2019, the Secretary of State announced his intent to award the contract for this new system to Dominion Voting Systems, Inc. (Doc. 552; *see also* Curling Pls.' Compl. ¶ 70; Coalition Pls.' Compl. ¶ 5.)[2]  The Secretary of State engaged Pro V&V to conduct certification testing of the system.  (Coalition Pls.' Compl. ¶ 89.)  According to the Coalition Plaintiffs' Complaint, Pro V&V's certificate of accreditation by the EAC as a voting system test laboratory expired on February 24, 2017. (*Id.* ¶ 90.) On August 7, 2019, Pro V&V signed a Test Report stating that the requirements set forth for voting systems by the EAC 2005 Voluntary Voting System Guidelines ("VVSG") and the State of Georgia were satisfied.  (*Id.* ¶ 90; *see also* Pro V&V Test Report at 18, Doc. 61-7.) Two days later, on August 9, 2019 the Secretary of State certified the Dominion BMD system as compliant with the election code.  (Doc. 575 at 7; *see also* Coalition Pls.' Compl. ¶ 92.)

---

[2] On August 9, 2029, after no protests were made to the award, the Secretary of State issued its Final Notice of Award.  (Doc. 575.)

The Dominion voting system includes an election management system ("EMS"), ePollbook electronic voter check-in pollpads and software, electronic BMDs, and ballot scanners.  (Coalition Pls.' Compl. ¶¶ 67, 70.)  Below are photos of the ePollbook, BMD, and ballot scanner certified for use by the Secretary of State:

 

(Pro V&V Test Report, Dominion Voting Systems D-Suite 5.5A Voting System, Georgia State Certification Testing at 13-14.)

Pollworkers use the ePollbook to confirm a voter is in the correct polling place and eligible to vote and then to encode and issue a voter access card. (Coalition Pls.' Compl. ¶¶ 70-71.)  The voter inserts the access card into the BMD which pulls up the ballot style assigned to the voter encoded on the access card and displays voting options on the BMD touchscreen.   (Coalition Pls.' Compl. ¶¶ 72-73.)  After the voter makes her selections on the touchscreen, the BMD prints a

paper "ballot" containing a 2D barcode encoded with the selections and a human readable text summary of the voter's selections as shown in the example image below:



(Doc. 555 at 13.)  The voter is expected to review the human readable summary on the paper ballot printout to confirm that it correctly reflects the choices made on the touchscreen before casting her ballot by inserting it into a separate ballot scanner. (Coalition Pls.' Compl. ¶¶ 82-83.)  The summary indicates the candidates for whom a vote was cast, but not the other candidates identified in each race.

The ballot scanners do not tabulate votes from the written text summary of the voter's selections generated by the BMD. (Curling Pls.' Compl. ¶ 71.)  Instead, the ballot scanners tabulate votes by interpreting the encoded information about the voter's choices generated by the BMD in computer-readable form in the 2D barcode.  (Coalition Pls.' Compl. ¶ 79; Curling Pls.' Compl. ¶¶ 71, 73.)  The scanner saves this information, referred to as the cast vote record, to removable flash cards for use by county election officials for final tabulation along with hand-marked absentee and provisional ballots.  (Coalition Pls.' Compl. ¶¶ 84-86.)

The paper ballot printouts are also retained by county election officials and can be used for audit or recount purposes.  (Coalition Pls.' Compl. ¶¶ 87-88.)  The election code provides that "[t]he paper ballot marked and printed by the electronic ballot marker shall constitute the official ballot and shall be used for, and govern the result in, any recount conducted pursuant to Code Section 21-2-495 and any audit conducted pursuant to Code Section 21-2-498." O.C.G.A. § 21–2–379.23(d).

Georgia's Election Code contains new audit provisions.  *See* O.C.G.A. § 21-2-498.  First, beginning with the November 2020 general election, local election superintendents will be required to conduct "precertification tabulation audits" for any federal or state general election in accordance with rules promulgated by the State Election Board.[3] O.C.G.A. § 21-2-498(b). Second, after successfully

---

[3] O.C.G.A. § 21-2-498(c) provides that "[i]n conducting each audit, the local election superintendents shall:
  (1) Complete the audit prior to final certification of the contest;

completing a risk-limiting audit pilot program, the Secretary of State will be required to implement risk-limiting auditing for all statewide elections "beginning not later than November 1, 2024."[4] O.C.G.A. § 21-2-498(e). Finally, the code provides that "[t]he procedures prescribed by the State Election Board shall include security procedures to ensure that collection of validly cast ballots is complete, accurate, and trustworthy throughout the audit."   O.C.G.A. § 21-2-498(d).

## B.    Procedural Posture

On August 16, 2019, the day after this Court entered an Order partially granting the Plaintiffs' motions to preliminarily enjoin Georgia's use of DREs for future elections past 2019, the Curling Plaintiffs moved to amend their Complaint to include claims challenging the incoming BMDs.   The Coalition Plaintiffs followed suit three weeks later, filing their own separate motion to amend on September 6, 2019.  The Court granted the Plaintiffs' motions on October 15, 2019, based on Defendants' written indication of their consent on the condition that they

---

(2) Ensure that all types of ballots are included in the audit, whether cast in person, by absentee ballot, advance voting, provisional ballot, or otherwise;
(3) Provide a report of the unofficial final tabulated vote results for the contest to the public prior to conducting the audit;
(4) Complete the audit in public view; and
(5) Provide details of the audit to the public within 48 hours of completion."
[4] The Secretary shall (i) conduct a risk-limiting audit pilot program with a risk limit of not greater than 10 percent in one or more counties by December 31, 2021; and (ii) review the results of the pilot program and provide the members of the General Assembly with a comprehensive report, including a plan on how to implement risk-limiting audits state wide, within 90 days following the election in which such pilot program is used.  O.C.G.A. § 21-2-498(e).  The code provides that if the "risk-limiting audit is successful in achieving the specified confidence level within five business days following the election for which it was conducted, then all audits performed pursuant to this Code section shall be similarly conducted." *Id.*

retained their right to "to file motions to dismiss on the merits of the new claims," and that discovery would be stayed pending a ruling on the motions. The State Defendants moved to dismiss the amended complaints on October 25, 2019, but as discussed below they did not confine their motion to the new claims as represented.

## C.   New Allegations Challenging BMDs

The Curling and Coalition Plaintiffs allege that Defendants have failed to implement a constitutionally acceptable election system by requiring all in-person voters to use ballot-marking devices ("BMDs") which suffer from the same vulnerabilities as Defendants' flawed DRE Voting System. (Curling Pls.' Compl. ¶¶ 11, 75-76; Coalition Pls.' Compl. ¶¶ 6-7.) The basis for their claims fall into three main criticisms[5]: (1) the barcode-based BMD voting system will not be substantially safer than the DREs because BMDs are also susceptible to cybersecurity risks and manipulation, (2) the barcode-based BMD voting system does not produce a voter-verifiable paper record, and (3) the barcode-based BMD voting system is incapable of being meaningfully audited.

Plaintiffs allege that the Secretary of State adopted the Dominion barcode-based BMDs against the recommendation of cybersecurity experts and despite the fact that such voting systems have some of the same demonstrated security vulnerabilities as DREs. (Curling Pls.' Compl. ¶¶ 75-76; Coalition Pls.' Compl. ¶¶

---

[5] As discussed below, the Coalition Plaintiffs assert additional allegations about the security, reliability, and lawfulness of BMDs. (*See, e.g.*, Coalition Pls.' Compl. ¶ 93.)

132-136, 168-169.)   Their Complaints identify several alleged vulnerabilities identified with Dominion's election software and hardware.   First, they allege that Dominion's election system was certified under a 14-year old standard VVSG 1.0 rather than the more recent VVSG 1.1 or VVSG 2.0 standards.[6] (Curling Pls.' Compl. ¶ 79; Coalition Pls.' Compl. ¶¶ 149-154.)   Second, they allege that BMDs rely on software released in February 2015, which has not received security updates since March 2018.   (Curling Pls.' Compl. ¶ 82.)   Third, they contend that in February 2019, Texas voting systems examiners refused to certify Dominion's election management system based upon several problems with the software that did not appear to have ready-made or simple solutions, including that: (1) Dominion's hardware could be connected to and infected by the internet; (2) the audit trail stored voter selections in sequential order, which would permit the secrecy of the ballot box to be compromised; and (3) the paths for import of election data into the election management program revealed multiple opportunities for mistakes, requiring three separate restarts of the adjudication process during testing. (Curling Pls.' Compl. ¶ 80.)   Fourth, Plaintiffs allege that hackers at the 2019 DEFCON Voting Village identified twenty vulnerabilities in Dominion's precinct scanners.   (Curling Pls.' Compl. ¶ 81; Coalition Pls.' Compl. ¶ 173.)   These vulnerabilities included the ability of remote attackers to implement a Domain Name System ("DNS") attack and the existence of an exposed flash card containing

---

[6] The Coalition Plaintiffs further allege that the Secretary has failed to satisfy Georgia's certification requirement for the Dominion system. (Coalition Pls.' Compl. ¶¶ 154-162, 170-172.)

an .xml file that, if manipulated, would allow for scanned votes to be redirected to a different candidate. (*Id.*)

Finally, the Coalition Plaintiffs allege that there is a risk that malware-infected components of the compromised DRE/GEMS system can be transmitted to the new Dominion BMD System if the two systems interface either by direct or indirect physical and networked interaction between any pieces of the old system and any pieces of the new system at any point in time, including by shared interfacing with intermediary equipment. (Coalition Pls.' Compl. ¶ 176.) The Coalition Plaintiffs allege that despite the State Defendants' denial that any electronic data from the existing GEMS server and database will be imported for use with the new Dominion BMD System, (Doc. 556), the Dominion BMD System will be exposed at least indirectly to compromised components of the old system as the result of each system's separate interfacing with the Secretary's IT infrastructure which is compromised because of the history of security breaches already documented and proven in this litigation. (*Id.* ¶¶ 177-180.) According to Coalition Plaintiffs, "the DRE voting system and its components, including existing files, data sets, and auxiliary programs, can pass malware to the 'new' servers and working files of the Dominion BMD System. As legacy GEMS files are converted or transferred to work with the new Dominion BMD System, they will carry with them undetected malware or erroneous coding that will compromise the new system." (*Id.* ¶ 181.)

Plaintiffs' second major criticism of the Dominion BMD system is their assertion that it lacks a voter-verifiable paper record.  As a result of the alleged vulnerabilities outlined in their new Complaints, Plaintiffs contend that there is the potential that the BMD could generate barcodes that contain information regarding a voter's choices that do not match what the voter entered (as reflected in the written text summary), or could cause a precinct scanner to improperly tabulate votes.  (Curling Pls.' Compl. ¶¶ 83-84; *see also* Coalition Pls.' Compl. ¶¶ 167-174.) Plaintiffs allege that the human readable text generated by the BMD is irrelevant to the vote tabulation by the ballot scanners which read only the undecipherable barcodes.  (Curling Pls.' Compl. ¶ 73; Coalition Pls.' Compl. ¶ 64.) Therefore, voters will be unable to conduct any verification of the information encoded in the non-human readable barcode, will have no way of knowing what votes they are actually casting, and will instead be forced to trust that the barcode accurately conveys their intended selections. (Curling Pls.' Compl. ¶ 74; Coalition Pls.' Compl. ¶ 66, 79, 82, 104.)  Plaintiffs claim this fundamental characteristic of the BMD voting system, even if operated as designed, fails to provide voters with a verifiable auditable voting record in violation of their Constitutional right to a "transparent, fair, accurate, and verifiable election process" and to "cast an accountable vote." (Coalition Pls.' Compl. ¶¶ 1, 64-66, 105, 107; *see also* Curling Pls.' Compl. ¶¶ 74, 90, 116-119.)

Additionally, even if the barcode is identical to the text summary, Plaintiffs allege that the text summary does not redeem the system because: (1) research has

demonstrated that most voters are unlikely to review these summaries even when specifically directed to do so; (2) polling place exit interviews of voters who do choose to review a text summary of their vote reveal that some are unable to recall details of the ballots they cast and that voters fail to recognize errors in ballots presented to them for verification, or fail to recognize that the ballots presented to them for verification were not the ones they actually cast; and (3) on those occasions where a voter does notice a discrepancy on their ballot, research suggests that they are far more likely to attribute the discrepancy to their own mistake and are therefore "unlikely to raise concerns about a systemic attack on an election." (Curling Pls.' Compl. ¶¶ 85-87; *see also* Coalition Pls.' Compl. ¶ 110-120.)  This is allegedly also a function of the length and complexity of ballots, because the BMD generated printed paper ballot contains only a paraphrased summary of the voter's choices, and because voters may assume that the barcode contains accurate and complete information, even if the printout appears to be incomplete.  (Coalition Pls.' Compl. ¶¶ 114-115, 117.)  The voter must rely exclusively upon her memory to review the text summary and confirm that it is complete and correct despite agreement by auditing and voting system experts that "in most elections, many, if not most, voters will be unable, from memory, without the benefit of any visual cues or context, to reliably, accurately, and completely verify the completeness and correctness of a paraphrased textual summary of the selections they previously made on the touchscreen over the course of potentially 5 or 10 minutes" and "are unlikely to detect if a low-profile down-ballot race or ballot question is left off the

paper printout, or to notice if their votes were switched between 'Yes' and 'No' on a particular question." (*Id.* ¶ 115.)

The third major critique shared by the Curling and Coalition Plaintiffs is that, in light of these identified problems, Georgia's new barcode-based BMD system does not allow for a meaningful audit to guarantee that votes are accurately recorded and tabulated. (Curling Pls.' Compl. ¶¶ 72, 90; Coalition Pls.' Compl. ¶¶ 130-136, 142-147.) According to the Curling Plaintiffs, this alleged flaw is exacerbated by Georgia's failure to implement risk-limiting audits for all of its elections, including the November 2020 Presidential election. (Curling Pls.' Compl. ¶ 89.) The Coalition Plaintiffs rely on the opinions of experts, including Dr. Phillip Stark, the creator of risk-limiting audits, and the National Academy of Sciences as a basis for their contention that it is impossible to conduct a valid audit of BMDs that use barcodes to tabulate votes. (Coalition Pls.' Compl. ¶¶ 132-135.)

The Coalition Plaintiffs also raise three separate factual challenges to the implementation of the Dominion BMD system: (1) that the ballots cast on the Dominion BMDs are not secret ballots, (*id.* ¶¶ 121-129); (2) that the Dominion system is illegal to use because the Secretary of States' improper certification of the system is void, (*id.* ¶¶ 148-163); and (3) that proper implementation of the BMD system in time to conduct the upcoming elections is impractical and will expose voters to an electoral disaster, (*id.* ¶¶ 187-199).

In addition to their original claims challenging the DRE/GEMS voting system, Curling Plaintiffs bring three new causes of action regarding BMDs: (1)

Count III asserts that the BMD voting system will result in a violation of the Fourteenth Amendment's guarantee of substantive due process, based on the substantial burden placed on Plaintiffs fundamental right to vote; (2) Count IV asserts that the BMD voting system will result in a violation of the Fourteenth Amendment's guarantee of equal protection as a result of the unequal treatment between votes cast on BMDs and votes cast by absentee paper ballot; and (3) Count V asserts a claim for declaratory judgment that the Dominion BMD voting system selected by the Secretary of State violates the provisions of Act. No. 24/H.B. 316 that require an "elector verifiable paper ballot."  The Coalition Plaintiffs assert similar claims for substantive due process and equal protection violations related to the new BMDs in Counts I and II of their First Supplemental Complaint.  They also assert a procedural due process claim in Count III.[7]

## II.  DISCUSSION

The State Defendants filed a Motion to Dismiss Plaintiffs' amended/supplemental complaints on nearly identical grounds as their prior motions, which include: lack of standing, Eleventh Amendment immunity, failure

---

[7] According to the Coalition Plaintiffs' First Supplemental Complaint "Pursuant to Rule 15(d) of the Federal Rules of Civil Procedure, the Coalition Plaintiffs, in this supplemental complaint, hereby set out the following transactions, occurrences, and events that happened after the relation-back date of the Coalition Plaintiffs' Third Amended Complaint (the "TAC," Doc. 226). *The allegations and claims stated by this supplemental complaint are additional to, and do not supersede or replace, the allegations and claims stated in the TAC*. (at page 6.)"  (Coalition Pls.' First Supp. Compl. at 6, Doc. 628.)  Despite stating that the allegations and claims are additional to, but do not supersede or replace those in the Third Amended Complaint, the Coalition's First Supplemental Complaint does not pick up where the TAC left off.  Instead, the factual allegations begin with paragraph 1, and the claims are enumerated as Counts I, II, and III.  As a result, the Coalition Plaintiffs now confusingly have two different claims cast as "Count I" and two different claims cast as "Count II."

to state a claim, and the additional ground that Plaintiffs' remedy violates the Americans With Disabilities Act.[8]  But Defendants also seek to dismiss Plaintiffs' original claims regarding the DREs, arguing that: (1) the claims are moot because the DREs have been decertified by the Secretary of State and will no longer be used in Georgia elections; and (2) Defendants are entitled to Eleventh Amendment immunity because Plaintiffs' claim for declaratory relief regarding the DRE system as a whole seeks redress of past harms.

As an initial matter, the Court notes that in an October 23, 2019 Order, the Court advised Defendants that:

> The Court has entered two prior orders addressing motions to dismiss Plaintiffs' claims regarding DREs and will not entertain further arguments regarding the dismissal of those claims which now form the basis of the Court's August 15, 2019 preliminary injunction order. Defendants should focus their arguments entirely on the new claims related to the BMDs.

(Doc. 638.)  The State Defendants ignored this Court's directives and move to dismiss Plaintiffs' existing claims seeking relief as to the DRE voting system in addition to the Plaintiffs' newly added BMD claims.

## A.   Plaintiffs' Claims Challenging the DRE/GEMS Voting System and Associated Software Systems Are Not Entirely Moot

In response to Plaintiffs amending their Complaints to assert new claims challenging the replacement of DREs with BMDs, State Defendants assert that

---

[8] This last argument was previously raised by the State Defendants in connection with the prior round of preliminary injunction motions.

Plaintiffs' continued challenges to the DRE system are moot[9] because of: (a) the change in Georgia's election law with the passage of HB 316; and (b) the State's voluntary transition from DREs to BMDs. As a result, the State Defendants contend that the State's "voluntarily cessation" of the "the allegedly wrongful behavior" precludes further relief by the court warranting the dismissal of the claims as moot. *See United States v. Georgia*, 778 F.3d 1202, 1205 (11th Cir. 2015) (finding that in light of the passage of "comprehensive election reforms," the court could not "conclude that the Georgia Legislature would go back to the old electoral system if [the case] were dismissed as moot"); *Atheists of Fla. Inc. v. City of Lakeland*, 713 F.3d 577, 594 (11th Cir. 2013) (reasoning that the "voluntary cessation by a government actor gives rise to a rebuttable presumption that the objectionable behavior will not recur").

A case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. *Atheists of Florida, Inc.*, 713 F.3d 577, 593-94 (11th Cir. 2013); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Mootness can occur due to a change in circumstances or a change in the law. *Coral Springs Street Systems, Inc. v. City of Sunrise*, 371 F.3d 1328 (11th Cir. 2004). However, if the plaintiff's injury is likely to reoccur, despite events that occur

---

[9] Defendants assert that Plaintiffs cannot have it both ways – they cannot proceed on their "DRE claims" if their "BMD claims" are ripe.  The Court asked the parties to address the issue of ripeness in supplemental briefing.  The parties are in agreement that Plaintiffs' claims challenging the BMDs are ripe.  State Defendants contend, instead, that Plaintiffs lack standing to pursue claims challenging the BMDs.  While the concepts of standing, ripeness, and mootness are related, they are each subject to a distinct body of case law. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000).

subsequent to the filing of a lawsuit, then the court can still provide injunctive relief, and the claim is not moot. *See Knox v. Service Employees*, 567 U.S. 298, 307 (2012) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."); *Friends of the Earth*, 528 U.S. at 193;  *De La Teja v. United States*, 321 F.3d 1357, 1362 (11th Cir. 2003).

An "event" that may moot a claim can occur when the defendant ceases the behavior on which a claim is based. But, a defendant's "voluntary cessation" of a challenged practice does not necessarily "deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (2007); *Troiano*, 382 F.3d at 1282.   The standard for determining whether a case has been mooted by the defendant's voluntary conduct "is stringent: A case *might* become moot if subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189 (emphasis added); *Coral Springs Street Systems, Inc.*, 371 F.3d at 1328 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[T]o say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.")).

A defendant claiming that its voluntary compliance moots a case bears a "formidable" burden of persuading the court that the challenged conduct cannot

reasonably be expected to start up again. *Laidlaw*, 528 U.S. at 190, 189; *Sheely*, 505 F.3d at 1184.  A defendant's assertion that it has no intention of reinstating the challenged practice "does not suffice to make a case moot" and is but "one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts." *Id.* (quoting *W.T. Grant,* 345 U.S. at 633); *see also Hall v. Bd. of Sch. Comm'rs of Conecuh Cty*, 656 F.2d 999, 1001 (5th Cir. 1981) ("To defeat jurisdiction ..., defendants must offer more than their mere profession that the conduct has ceased and will not be revived.").  "The defendant's burden to show that a plaintiff is not facing future injury (and, therefore, is not in need of court-ordered relief) is heavier than the plaintiff's burden of demonstrating the possibility of future injury when establishing standing. *Fair Fight Action Inc. v. Raffensperger*, Civil Action 1:18-cv-5391-SCJ, Order, Doc. 68 at 25 (citing *Friends of the Earth*, 528 U.S. at 190).

When the defendant is a government actor, "there is a rebuttable presumption that the objectionable behavior will *not* recur."  *Troiano*, 382 F.3d at 1282-83 (emphasis in original) (citing *Coral Springs St. Sys., Inc.*, 371 F.3d at 1328–29.  Governmental entities and officials "have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities." *Coral Springs*, 371 F.3d at 1328–29; *Troiano*, 382 F.3d at 1283 (courts are "more apt to trust public officials than private defendants to desist from future violations").

The enactment of a superseding statute or regulation moots a case "only to the extent that it removes challenged features of the prior law." *Coral Springs*, 371 F.3d at 1329 (quoting *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1310 (11th Cir. 2000)). "To the extent that those features remain in place, and changes in the law have not so fundamentally altered the statutory framework as to render the original controversy a mere abstraction, the case is not moot." *Coal. for the Abolition of Marijuana Prohibition*, 219 F.3d at 1310. For example, in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, Fla.*, the Supreme Court declined to find moot a challenge to a minority set-aside program even though the challenged law had been repealed, because it had been replaced with a law that, although somewhat narrower, still had the potential to disadvantage the plaintiff: "There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so." 508 U.S. 656, 662 (1993). Thus, claims based on provisions of the law that continue after the enactment of a superseding law are not moot. *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) ("Where a superseding statute leaves objectionable features of the prior law substantially undisturbed, the case is not moot.").

The State Defendants seek dismissal of Plaintiffs' claims relating to DREs as now being moot because: (1) the State has voluntarily moved from the use of DRE voting to BMDs as a result of the passage of HB 316; (2) the State has purchased and is employing BMDs statewide in time for statewide use in the 2020 primary

and general elections; (3) the Court also has prohibited the State's use of "the GEMS/DRE system in conducting elections after 2019;" and (4) the State has decertified the DREs and has collected and stored them in a suitable facility in a fiscally prudent manner for testing of a sample and future disposal per the parties' agreement and the Court's approval.[10] (*See* Consent Order on Storage of DREs, Doc. 745) (addressing storage, testing of DRE memory cards and/or DRE Recap Sheets for purposes of identifying a sample of DRE machines to evaluate for assessment of electronic hacking/access issues in dispute).

Defendants are correct that all of this precludes the possibility of the DRE machines being used again in Georgia elections.[11] And the Court has indicated that it does not intend to grant any further relief relating to the use of the old DRE voting machines. But Plaintiffs' original claims challenged elements of the voting system beyond the DRE voting machines themselves. As highlighted extensively in this Court's prior orders, Plaintiffs' claims encompassed the security of the Secretary of State's election technology infrastructure and the actual breach of the Center for Election Systems ("CES") servers, computer networks, and data and the State's electronic voter registration system and database.[12] These concerns were at

---

[10] The Court recognizes that at the time this Order is being issued, both the 2020 Presidential Preference Primary and Georgia's Statewide Primary elections (pre-runoffs) have been conducted on the BMD system and DREs are no longer being used for any elections.

[11] At the time when Plaintiffs' amended complaints were filed and these motions were being briefed in 2019, DREs were still being used to conduct a small number of local elections and runoffs.

[12] Given the State's strong desire to protect the total confidentiality of its central GEMS server, the Court has authorized discovery of a sample of DRE voting machines, pursuant to Consent Order, to allow Plaintiffs' access to potentially relevant evidence in connection with these security, breach, and data integrity claims.

the center of the Court's consideration in ordering relief in August 2019 and remain a focus of this case even as the State implements the BMDs in connection with multiple other components and the State's main election system server. Plaintiffs allege in their amended/supplemental complaints that elements of the former system, including the voter registration database, will carry over into the new election system. And as this Court noted in its August 15, 2019 Order:

> The voter registration database, containing millions of Georgia voters' personal identifying information, plays a vital role in the proper functioning of the voting system. Yet it has been open to access, alteration, and likely some degree of virus and malware infection for years, whether in connection with: CES/KSU's handling of the system and data and failure to address these circumstances upon transfer of CES's functions back to the SOS; failure to remediate the database, software and data system flaws and deficiencies; or exposure of the widespread access to passwords to the voter registration data system throughout the SOS, CES/KSU, the 159 counties, or the public via the virtual open portal maintained at CES/KSU. Most significantly, the programming and use of ballots in both the DRE and future Dominion BMD system is tied to the accuracy of voter precinct and address information. Inaccuracy in this voter information thus triggers obstacles in the voting process. New Dominion express poll machines bought as part of the new contract with Dominion cannot alone cleanse the voter database to be transferred and relied upon.

(August 15, 2019 Order, Doc. 579 at 88-89.)

Defendants admit that the voter registration database (ENET), which is used by county registrars to maintain and update voter registration records is not being replaced and that information from this system will be loaded into the new electronic pollbooks for each election. (Defs.' Mot. at 11, n. 14; *see also* Dec. 6, 2019 Tr. at 11) (explaining that the ENET system "used to program ExpressPoll check-in units for the GEMS/DRE system" is "not being replaced" and that "[t]he same

database and same data, a flat text file, will be used to populate the Poll Pads"). They contend that the information is not electronically transmitted, and therefore cannot corrupt the new pollbook system, because only a flat text file from ENET (that will be run through a security scan) will be loaded into the pollpads for use during elections. Defendants offer nothing, however, to show that any action has been taken in response to issues experienced by voters in November 2018 (and prior elections or allegedly, during more recent elections) to ensure that the information from ENET is reliable, accurate, and updated. Due to the volume of evidence of voter issues at the polls detailed in the Court's August 2019 Order, Plaintiffs' allegations that errors and deficiencies in the voter registration system and database are likely to carry over into the new system and cause another round of voter disenfranchisement are plausible and remain a material concern. And of course, Defendants' motion is not being decided in a vacuum. As the Court is aware from the evidence presented in the context of the Plaintiffs' prior preliminary injunction motions, Defendants' contentions that the other two voter registration systems, the My Voter Page (MVP) and the Online Voter Registration system, do not interface with ENET are challenged by Plaintiffs. Plaintiffs have offered testimony of cybersecurity experts to rebut the State's assertions.[13]   Clearly, to the

---

[13] Plaintiffs presented evidence that the State's technology failures (whether caused by malicious interference, out of date software, or even human error by county registrars in failing to update voter registration information) have resulted in voter disruption and have potentially been left unremediated. Numerous declarations from voters highlighted instances where a voter's registration status on MVP, the "outward-facing system used to provide information to voters" did not match the voter registration status in the electronic pollbooks used to check in voters at the voting polls. At the December 6, 2019 hearing, counsel for the State explained it this way: "The My Voter page is a snapshot of the ENet database at a particular point in time. So it is a read only.

extent that the Court views the MVP system as part of the Plaintiffs' continuing challenge, the State's position on the MVP interface issue conflicts with this evidence provided to date.

Although O.C.G.A. § 21-2-221.2 (f) requires that "the Secretary of State shall employ security measures to ensure the accuracy and integrity of voter registration applications submitted electronically," the Plaintiffs have demonstrated a detailed account of the Secretary of State's deficient security practices in Georgia's pre-2020 elections. The Court therefore required the State Defendants to develop procedures and take other actions to address the significant deficiencies in the voter registration database and the implementation of the ExpressPoll system.

It is unclear what actions, if any, the State has undertaken to address these deficiencies in the electronic pollbooks and MVP voter registration interface or new versions of such in advance of June 2020 elections or the elections to be held in August and November 2020. While the Court at this juncture has only preliminary evidence in the record before it that addresses these claims in their current form, the Court notes that alleged significant problems relating to the express pollbooks were reported by the media during the June 2020 election cycle. The Court makes no findings whatsoever based on this reporting, but simply finds

---

A voter can look up their information. But if they click to say I want to change something, they are taken to the online voter registration system. That system will then send information to the county registrars that they are then able to say we're not going to put this in or will put this in. So it is not like a voter is able to actively edit the ENet database themselves. They have to do that – all of those systems will remain in place, the ENet system, the My Voter page, the online voter registration. None of those systems are changing with the adoption of the new voting system for the election process." (December 6, 2019 Tr., Doc. 679 at 12-13.)

that given the body of evidence originally presented and presented in connection with Plaintiffs' newest amended complaints, the Plaintiffs' claims relating to continuing, critical deficiencies in the MVP and voter registration system and electronic pollbooks are, at very least, plausible and not moot. Similarly, in the absence of evidence of the Secretary of State's progress or timeline for enactment or measures to address Plaintiffs' claims for relief regarding the deficiencies in the voter registration database relied on as the foundation of the voting system, the Court cannot find that these registration related claims are moot. *See Fanin v. United States Department of Veterans Affairs*, 572 F.3d 868, 876 (11th Cir. 2009) (finding that the plaintiff's case was not moot because there was "a wide gulf between the [defendant] being 'in the process' of implementing new procedures and it having those new procedures fully in place"). Thus, the Court cannot say that Plaintiffs' allegations have an insufficient basis or are sheerly speculative given this record.

Accordingly, although the portion of Plaintiffs' claims challenging the DRE voting machines themselves may for all practical purposes be moot because the DREs have been barred from use past 2019 as explained above, these other aspects of Plaintiffs' claims are not.[14] Nor would Plaintiffs' claims relating to the handing

---

[14] This Court has twice indicated its view that Plaintiffs' original claims challenging the constitutionality of the DRE/GEMS voting system were not moot as a result of the passage of Act No. 24/H.B. 316. First, in April 2019 (and before the DREs were enjoined for use past 2019), the Court noted that because the DREs were still being used for elections in 2019, the claims were still very much alive at that time. Indeed, the Court ordered substantive preliminary injunctive relief on those claims in its August 2019 Order. Second, the Court noted in November 2019 that "[w]hile the Court finds that discovery relating to the DREs and GEMS systems is not necessary to the Court's resolution of the Plaintiffs' claims based on the current posture of the case, the Court does

of security of the current voting system be moot to the extent that evidence is introduced linking this to prior security issues and breaches.

### B.    Plaintiffs' Claims Are Not Barred by Eleventh Amendment Immunity

State Defendants have renewed their argument that Plaintiffs' claims are barred by the Eleventh Amendment.  Implicitly recognizing the failure of their first attempt at an Eleventh Amendment defense, Defendants assert that "Plaintiffs' Complaints raise different Eleventh Amendment questions than those the Court previously addressed."  (Mot., Doc. 645-1 at 15.) They argue that the Eleventh Amendment bars claims in the amended/supplemental complaints because Plaintiffs' requested relief: (1) seeks redress of *past* harm; (2) is drastically different and more comprehensive than before; and (3) impermissibly seeks removal of the State's constitutional authority to oversee the details of elections. These are the exact arguments previously raised by the State in connection with Plaintiffs' claims challenging the DREs and rejected by both this Court and the Eleventh Circuit on appeal.

---

not agree with the State Defendants' characterization of Plaintiffs' claims as being entirely moot. The State has declined to concede that it will not seek to appeal the Court's August 15, 2019 injunction order upon entry of a judgment in the case. The State has further declined to agree to stipulate to the conversion of the Court's order as a permanent injunction. As such, Plaintiffs' claims challenging the DRE/GEMS election system are not legally moot." (November 22, 2019 Ord., Doc. 668 at 2-3.)

### (i) Curling Plaintiffs' claim for declaratory relief regarding DREs

State Defendants assert that "in Counts I and II of their Amended Complaint, Curling Plaintiffs *still* seek *retrospective* declaratory relief regarding use of the 'DRE Voting System' in the 'Relevant Previous Elections,'" and that the Eleventh Amendment bars such claims for retrospective relief. (Mot., Doc. 645-1 at 16) (citing Pls.' Third Am. Compl., Doc. 627 ¶¶ 98(a), 110, 112(a)). Defendants' argument is misplaced, mischaracterizes Plaintiffs' allegations in Counts I and II, is contrary to the Eleventh Circuit's decision on appeal, and ignores the aspects of Plaintiffs' claims that challenge elements of the voting system that persist despite the passage of HB 316 as discussed above.

First, the Curling Plaintiffs are not *reasserting* claims challenging the DREs. Rather, the Curling Plaintiffs filed a Third Amended Complaint to add claims challenging the BMDs to their existing claims from the Second Amended Complaint.[15] While Plaintiffs have not omitted their prior allegations and claims regarding the DREs, the Court does not view the Curling Plaintiffs' retention of these allegations that form the basis of relief already granted as seeking any new or additional relief regarding the defunct DRE voting machines.

Second, Defendants mischaracterize Plaintiffs' allegations as seeking relief related to past elections. When the Third Amended Complaint was filed, and when

---

[15] Rather, the purpose of the amended complaint was to "adds claims related to GA SOS's proposed implementation of a voting system relying on ballot-marking devices ("BMDs") that produce a 2D barcode scanned for tabulation, along with a written summary of a voter's selections," and to "update[] the named defendants based on resignations and subsequent elections, and updates the factual assertions to reflect the passage of time." (Pls.' Mot. for Leave, Doc. 581 at 2.)

Defendants filed their Motion to Dismiss, elections were still being conducted on DREs, including a runoff in December 2019. Although the complaint details deficiencies in the State's DRE/GEMS voting system in prior elections that resulted in alleged denial of the Plaintiffs' constitutional rights that form the basis of the claims, the complaint further alleges continuing violations as a result of the State's choice to continue using DREs in elections through the end of 2019 until such time as the BMDs are fully implemented. Therefore, at the time it was filed the Curling Plaintiffs' claims in Counts I and II sought relief for future elections in 2019.

Third, the State's recycled arguments were already rejected by the Eleventh Circuit in its decision on the State Defendants' appeal of the denial of their earlier motion to dismiss. The Eleventh Circuit held that Plaintiffs' claims fell squarely within the *Ex parte Young* exception to Eleventh Amendment immunity because Plaintiffs alleged ongoing violations of federal law against the State Defendants in their official capacities and sought only declaratory relief and an injunction against enforcing the election system in future elections and that the State's arguments to the contrary ran "counter to the complaints' allegations and settled precedent." *Curling v. Secretary of Georgia*, 761 F. App'x 927, 932 (11th Cir. 2019) ("Here, there is no question that, like the plaintiffs in *Grizzle*, Plaintiffs seek only an injunction barring the State Defendants from enforcing election rules that allegedly violate Plaintiffs' constitutional rights. Since they allege those rules will violate their constitutional rights in the future, they have satisfied *Ex parte Young's*

exception.") (citing *Grizzle v. Kemp*, 634 F.3d 1314, 1317–19 (11th Cir. 2011) (holding that claims of plaintiffs challenging constitutionality of a Georgia election law by seeking to enjoin the Secretary of State and members of the State Election Board from enforcing the law in upcoming elections the way they had in past elections sought "prospective injunctive relief" and fell within the *Ex parte Young* exception to Eleventh Amendment immunity).

Most important, the Court has already granted the relief requested in the form of a preliminary injunction and found that Plaintiffs had shown a substantial likelihood of success on the merits of their claims that the State's DRE/GEMS voting system violated the constitutional rights of Plaintiffs and other Georgia voters and has enjoined the use of DREs in elections after 2019. The State is not immune from those claims just because they are based on evidence of past wrongdoing and harm. The Eleventh Circuit rejected the State's argument that Plaintiffs only sought relief for past harms because "Plaintiffs seek to succeed in showing the unreliability (and thus unconstitutionality) of the DRE machines in past elections), explaining "Plaintiffs use these allegations only to show that past is prologue to their future injuries caused by the same election system." *Id.* (citing *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) ("Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction.")).

Defendants rely on *Green v. Mansour* to support their argument that they are immune because that the State's statutory changes have eliminated any alleged

ongoing violation of constitutional rights based on the DRE System. *Green v. Mansour,* 474 U.S. 64, 68 (1985).[16]  As explained above, because Plaintiffs' claims challenge as unconstitutional other aspects of the voting system (apart from the DREs machines) that will allegedly continue and seek prospective relief in future elections from such harm, these claims *still* fall within the *Ex parte Young* exception.  Therefore, *Green* is inapplicable.[17]

---

[16] In *Green*, the plaintiffs conceded on appeal that any claim they might have had for the specific type of injunctive relief approved in *Ex parte Young* was rendered moot by the amendments to the program under which plaintiffs sought benefits. They nevertheless sought "notice relief" and and a declaration that the defendant's prior conduct violated federal law, arguing that notice is an independent form of prospective relief protected against the Eleventh Amendment bar by *Ex parte Young*. 474 U.S. at 68.  The Supreme Court held that "[b]ecause 'notice relief' is not the type of remedy designed to prevent ongoing violations of federal law, the Eleventh Amendment limitation on the Art. III power of federal courts prevents them from ordering it as an independent form of relief." *Id.* at 71.  Therefore, "a request for a limited notice order will escape the Eleventh Amendment bar if the notice is ancillary to the grant of some other appropriate relief that can be 'noticed.' Because there is no continuing violation of federal law to enjoin in this case, an injunction is not available. Therefore, notice cannot be justified as a mere case-management device that is ancillary to a judgment awarding valid prospective relief." *Id.* at 72.

[17] Defendants also incorrectly assert that Plaintiffs are seeking relief that would only indirectly encourage compliance with federal law through deterrence which is "insufficient to overcome the dictates of the Eleventh Amendment," citing *Fla. Ass'n of Rehabilitation Facilities, Inc. v. State of Fla. Dep't of Health and Rehabilitative Svcs.*, 225 F.3d 1208, 1219 (11th Cir. 2000). (*See* Defs.' Mot. at 16). In that case, the Eleventh Circuit explained that "Plaintiffs' suit originally fell within the *Ex parte Young* exception. Their suit was directed against state officials in their official capacities and asked for prospective injunctive relief to halt continuing violations of federal law. Plaintiffs are not barred by the Eleventh Amendment from seeking enforcement, in a federal court, of a federal statute which state agents have violated. Defendants, in fact, do not argue that Plaintiffs' suit was barred from the outset. Instead, they make a more focused argument that much of the relief ordered by the district court is retrospective rather than prospective. They assert that, to the extent the district court directed them to make changes to the State's Boren-era reimbursement plan retroactive to September 4, 1991, it essentially required them to redress inequities in their past reimbursement payments from 1991 to the date of final judgment (April 1999), and potentially to reimburse Plaintiffs for those past deficiencies. We reluctantly agree." *Id.* at 1220.  The Eleventh Circuit held that the Defendants were entitled to immunity because although "the Eleventh Amendment does not generally prohibit suits against state officials in federal court seeking only prospective injunctive or declaratory relief, but bars suits seeking retrospective relief such as restitution or damages" and if "the prospective relief sought is 'measured in terms of a monetary loss resulting from a past breach of a legal duty,' it is the functional equivalent of money damages and *Ex parte Young* does not apply." *Id.*  Plaintiffs' claims here challenging the constitutionality of the State's election system have nothing to do with reimbursement or restitution for monetary damages.  And Plaintiffs do not simply seek indirect

Accordingly, the Court denies Defendants' motion to dismiss Counts I and II of the Curling Plaintiffs' Third Amended Complaint as barred by the Eleventh Amendment.

### (ii)   Coalition Plaintiffs' Claims for Relief Regarding BMD claims

The State Defendants next assert that the Coalition Plaintiffs' Supplemental Complaint *now* requests "relief beyond the scope of that permitted by *Ex Parte Young*, implicating special state sovereignty interests."[18] (Defs.' Mot. at 16.) Specifically, the State asserts that because "Coalition Plaintiffs seek a mandatory injunction to 'employ a properly certified system using hand marked paper ballots as the standard method of voting' with specific 'post-election, precertification audits' and tabulation of all votes using optical scanners," the relief they seek "implicates special sovereignty interests of the State by seeking judicial legislation in an area specifically reserved to the states by the Constitution." (*Id.*) The State

---

compliance with the law.    Therefore, Defendants' reliance on *Fla. Ass'n of Rehabilitation Facilities, Inc.*  is off base.

[18] Strangely, State Defendants have not moved to dismiss the identical claims of the Curling Plaintiffs on this basis.  State Defendants do seek dismissal of Count V of Curling Plaintiffs' Third Amended Complaint requesting a declaration that the Dominion BMD system violates the provisions of H.B. 316 because the BMDs do not print an "elector verifiable paper ballot." Defendants assert that Count V should be dismissed because: (i) it is premised on an alleged violation of state, not federal, law and does not fall within the *Ex parte Young* exception to Eleventh Amendment immunity; (ii) it is barred on state sovereign immunity grounds because Georgia has not abrogated or waived its immunity with respect to this claim; and (iii) the proper forum for the claim is in a Georgia state court.  In response, Curling Plaintiffs indicate they "do not oppose dismissal of Count V, which resolves State Defendants' state-law arguments." (Curling Pls.' Resp., Doc. 651 at 29.)  Despite referring to various provisions of H.B. 316 in the complaint for context, the Curling Plaintiffs do not assert any other state law claims.  Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss [Doc. 641] Count V of the Curling Plaintiffs' Third Amended Complaint.  As the Court has not ruled on the merits of the claim in light of the Curling Plaintiffs' concession, Count V is **DISMISSED WITHOUT PREJUDICE**.

Defendants again cite the Supreme Court's decision in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281–288 (1997), though without any substantive discussion or argument as to its application this second time around.[19]

While the Court recognizes that the Coalition Plaintiffs seek significant relief with respect to the State's implementation of a new voting system, Defendant's contention that the Coalition Plaintiffs' newly supplemented claims seek relief that is drastically different from that which they sought related to DREs rings hollow. As this Court previously stated in its September 17, 2018 Order on Plaintiffs' first motion for preliminary injunction and Defendants' earlier motion to dismiss in addressing the State's prior Eleventh Amendment immunity arguments:

> the requested relief does not implicate special state sovereignty interests by essentially usurping the State's role in regulating elections. Plaintiffs are not asking the Court to direct how the State counts ballots. They are asking the Court to bar the use of DREs based on the specific circumstances, history, and data security issues presented in this case and where the State has alternative options of using optical scanners and hand counting ballots. And they seek to require the State to implement a fully auditable ballot system designed to ensure the accuracy and reliability of the voting process

---

[19] Defendants also cite *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008). That case, however, has nothing to do with Eleventh Amendment immunity principles and in fact recognizes that a state's broad control over the election process "is not absolute, but is 'subject to the limitation that [it] may not be exercised in a way that violates … specific provisions of the Constitution.' In particular, the State has the 'responsibility to observe the limits established by the First Amendment rights of the State's citizens,' including the freedom of political association. *Id.* at 451-52 (internal citations omitted). The *Washington State* case also acknowledges the *Anderson-Burdick* balancing test is applicable to cases that challenge as unconstitutional a state's election regulations and practices. *Id.* (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 438 (1992) ("Election regulations that impose a severe burden on associational rights are subject to strict scrutiny, and we uphold them only if they are narrowly tailored to serve a compelling state interest. If a statute imposes only modest burdens, however, then the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions on election procedures. Accordingly, we have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls.)) (internal citations and quotations omitted).

in this challenging era when data system vulnerabilities pose a serious risk of opening election data, processes, and results to cyber manipulation and attack. Thus, pursuant to *Ex Parte Young*, the Court finds that the Eleventh Amendment does not bar Plaintiffs' federal claims.

(September 2018 Order, Doc. 309 at 30.)  Plaintiffs seek identical relief with respect to the state's newly adopted BMD voting system.

On appeal, the Eleventh Circuit also rejected the State's argument that Plaintiffs' claims implicate "special sovereignty interests," by seeking to interfere with how Georgia operates its elections. *Curling v. Secretary of Georgia*, 761 F. App'x at 933.  The Eleventh Circuit found that Plaintiffs' claims requesting "enjoining Georgia's use of DRE machines do[] not impermissibly violate Georgia's special sovereignty interests." *Id.* The *Coeur d'Alene Tribe* decision (the premise for Defendant's argument), the Eleventh Circuit explained, was "an unusual case" that presented an exception to the *Ex parte Young* doctrine because ruling in the tribe's favor would "extinguish" the state's ownership over "a vast reach of lands and waters long deemed by the State to be an integral part of its territory." *Id.* (quoting *Coeur d'Alene Tribe*, 521 U.S. at 282).  But, the Eleventh Circuit concluded that there was "nothing unusual about Plaintiffs' case" and that "[u]ndoubtedly, *Ex parte Young* suits are permitted when the plaintiff alleges that state election officials are conducting elections in a manner that does not comport with the Constitution." *Curling*, 761 F. App'x at 934 (citing *Grizzle*, 634 F.3d at 1316 (permitting the plaintiffs to challenge the constitutionality of a Georgia election law)).

Defendants contend that because *now* "Plaintiffs seek relief that reaches far deeper into the sovereignty interests of the state to the point of choosing one auditable paper-ballot system over another," their requested relief is impermissible.  Again, in their prior motion to dismiss, Defendants argued that "[o]verriding a constitutional statute and mandating by injunction a reversion to using and counting paper ballots by hand for a statewide election implicates exactly the 'special sovereignty interest' that makes an exception under *Ex parte Young* infirm."  (Defs.' Mot. to Dismiss Coalition Plaintiffs' Third Am. Compl., Doc. 234-1 at 46.)  Plaintiffs have been requesting that this Court order the State of Georgia to conduct elections using hand-marked paper ballots from the inception of this case.  The only difference now is that they seek to enjoin BMDs rather than DREs.  Plaintiffs' supplemental complaint does not raise different Eleventh Amendment questions than those previously rejected.

Nonetheless, the Court is cognizant that it must guide its consideration of both the claims raised and relief requested by balancing the State's interests in the administration of its elections with the burden on the rights of the State's voters, and has endeavored to give proper deference to the State's legislative and administrative determinations as set forth in the law and in this Court's prior orders.

### C.     Plaintiffs' Allegations Are Sufficient to Establish Standing to Assert Claims Challenging Constitutionality of BMDs

As they did with the DREs, Defendants argue that Plaintiffs lack standing to bring their BMD claims in federal court.  Defendants' motion asserts first that Plaintiffs have failed to allege harm from the BMD voting system that affects them in "a personal and individual way," and instead allege threatened injuries that are purely theoretical and speculative. Second, Defendants argue that the alleged injuries are not fairly traceable to State Defendants or to the challenged conduct of the State but are instead attributable to third-party nefarious actors. And third, Defendants assert that the BMD-related injuries alleged by Plaintiffs are not redressable because Plaintiffs' requested relief of hand-marked paper ballots suffer from the same potential harms as those associated with the BMDs.   These arguments are largely the same as those raised by Defendants in the prior motion to dismiss Plaintiffs' claims challenging DREs.

Standing is a "threshold question in every federal case, determining the power of the court to entertain suit.'" *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009) (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005)).  Standing has three elements:

> a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable

> to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180–181 (2000). The requirement that a plaintiff demonstrate standing "assures that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Id.* (internal citations omitted).

"Foremost among these requirements is injury in fact – a plaintiff's pleading and proof that he has suffered the invasion of a legally protected interest that is concrete and particularized, i.e., which affects the plaintiff in a personal and individual way." *Gill v. Whitford*, --- U.S. ----, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, and n. 1 (1992)) (internal quotation marks omitted). The Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.'" *Gill*, 138 S. Ct. at 1929 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)). The Eleventh Circuit recently held in *Jacobson v. Florida Sec'y of State* that although "voters have no judicially enforceable interest in the *outcome* of an election," they do "have an interest in their ability to vote and in their vote being given the same weight as any other." 957 F.3d 1193, 1202 (11th Cir. 2020) (emphasis in original). "A plaintiff need not have the franchise wholly denied to

suffer injury. Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009).

At the pleading stage, the plaintiff is only required to provide "general factual allegations of injury." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[H]owever, those allegations must nevertheless contain sufficient detail for the Court to determine that plaintiffs 'have made factual averments sufficient, if true, to demonstrate injury in fact.'" *Summers*, 555 U.S. at 493 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) ("extreme generality" of allegations insufficient to demonstrate standing)). In a case like this one, where a plaintiff seeks declaratory or injunctive relief, as opposed to damages for injuries already suffered, "the injury-in-fact requirement insists that a plaintiff 'allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future.'" *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014) (quoting *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999)). In ruling on a motion to dismiss for lack of standing, the court must accept as true all material allegations of the complaint and construe them in the Plaintiffs' favor. *Warth v. Seldin*, 422 U.S. 501-02 (citations omitted). At the same time, it is within the court's power to consider by affidavits further particularized allegations of fact deemed supportive of plaintiff's standing to determine whether the plaintiff's standing adequately appears from all materials of record. *Id.* Here, the Court is able to refer both to the Amended Complaints and a host of expert and other

36

affidavits in connection with Plaintiffs' Motions for Preliminary Injunction relating to the additional claims asserted in their Amended Complaints.  The Court also can draw on its knowledge of the record in the case as context.  The question of whether the Plaintiffs ultimately will prevail on the merits of their asserted claims is not the question before the Court in assessing standing.

As to injury in fact, Defendants contend that Plaintiffs are attempting to bootstrap their way into standing for their BMD allegations by relying on their previous claims about DREs.  Defendants also contend that Plaintiffs have not sufficiently alleged a concrete "injury in fact" because they "fail to allege that they are under threat of suffering a prospective injury that is '<u>real</u> and <u>immediate</u>' regarding Georgia's new BMD voting system." (Mot. at 25) (emphasis in original). Specifically, Defendants assert that Plaintiffs' allegations of generalized fear that malicious activity might occur is insufficient to confer standing:

> Plaintiffs allege that that the BMDs "remain susceptible to manipulation," are "vulnerable to intentional [and] unintentional forms of manipulation," and that these vulnerabilities "could cause" BMDs to malfunction or improperly tabulate votes. *Id.* In sum, Plaintiffs' injury allegations are that: (1) a malicious hacker *might* hack BMDs; (2) voters *might* not review the ballot; (3) the optical-scan unit *might* incorrectly count votes; (4) post-election audits of the ballot or an election challenge *might* not catch any errors.

(*Id.* at 26.)  Defendants also argue that "Plaintiffs have complete control over whether they are 'injured' because they can review their selections on their BMD-marked paper ballot."  (*Id.*)

37

These arguments mischaracterize the alleged injury. While voting security issues obviously form an important context surrounding the operation of elections and vote counts, the injury Plaintiffs allege is that they will be required to cast a ballot that cannot be read or verified as reflecting their actual choices because the votes are tabulated solely from an encrypted barcode that is not human readable. This injury is not speculative; it is "certainly impending," since Plaintiffs intend to vote in person in each upcoming election in Georgia. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Contrary to Defendants' characterizations, Plaintiffs' allegations are not *solely* premised on a theoretical and hypothetical possibility that the new BMD voting system might be hacked or improperly accessed and manipulated.[20] Defendants' motion focuses exclusively on allegations about security vulnerabilities and the potential for hacking, which they claim only implicates injuries that will be legally caused by nefarious third parties, instead of by the State. The State does not address Plaintiffs' other allegations, which assert that the operation of the Dominion BMD System *as designed* will injure in-person voters by depriving them of their fundamental right to cast a verifiable vote and have *that* vote counted, and their right to be treated equally with similarly situated absentee

---

[20] According to the Curling Plaintiffs, the BMD claims are legally identical to the DRE-related claims that this Court previously ruled Plaintiffs have standing to pursue, and no new facts should materially alter the Court's standing analysis here. (Curling Pls.' Resp., Doc. 651 at 18.) To be sure though, the posture of Plaintiffs' BMD claims is markedly different from the claims regarding DREs.

voters.[21]  (Coalition Pls.' Compl. ¶¶ 99–120, 129; Curling Pls.' Compl. ¶¶ 70-90.)[22]

Defendants ignore the fundamental basis of Plaintiffs' claims – the allegation that

the Dominion system ballot scanner only tabulates votes from the encrypted

barcode that is indecipherable to the human eye.

Plaintiffs allege that the BMD system's reliance on a BMD generated

condensed summary of voter electoral choices in tandem with ballot counting

based on an unverified barcode does not provide a means by which completed

ballots can be accurately counted, tested, or verified, thereby depriving or

---

[21] Plaintiffs each also assert equal protection violations based on allegations that by planning to allow electors to vote using two different methods, the unverifiable BMD system and paper ballots available to provisional and absentee voters that are verifiable and recountable, they are being subject to unequal treatment.  (Doc. 627 ¶¶ 124, 129) ("The voters of the respective ballots have not been treated equally in that the votes of those who will vote using the Proposed Election System cannot be meaningfully recounted, reviewed against an independent record to verify, or have discrepancies detected and corrected. These votes are unequally weighted, with greater weight given to those who vote by absentee paper ballot, whose votes can be verified as to voter intent, can be accurately recounted, and can have processing errors identified and corrected, while votes cast under the Proposed Election System, whose votes do not share those essential advantages."); (Doc. 628 ¶ 145) ("The Dominion BMD System deprives in-person voters of the right to have their official votes audited that other voters enjoy."); (*Id.* ¶ 231) ("Voters who are similarly situated in all respects but who instead cast their votes on mailed paper ballots in the same election will be treated differently and will suffer none of the foregoing burdens, risks, and harms, including the inability to read and verify the votes they cast.")  The fact that an individual Plaintiff could choose to vote by absentee ballot rather than voting in person using a BMD in order to cast a ballot that is verifiable and auditable does not diminish standing to assert an equal protection claim here. As Plaintiffs have alleged, voting by absentee ballot carries its own burdens, ranging from the minimal cost of postage (without consideration of pandemic conditions) to severe (the risk that a ballot is rejected for signature mismatch or is lost in the mail and never received for counting by the elections office).  Because Plaintiffs may have a preference for one alternative method of voting over another does not destroy their standing to bring a claim challenging the Defendants' failure to provide uniform procedures for recounts and audits to both in person and absentee voting. This Court recognized previously that "[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *See Bush v. Gore*, 531 U.S. 98, 105 (2000) (finding that application of different standards to determine voter intent in conducting a recount led to the unequal evaluation of ballots).

[22] Coalition Plaintiffs also separately allege that BMDs infringe their right to vote using a secret ballot. (Coalition Pls.' Compl. ¶¶ 39–41, 121–28.)

burdening their voting franchise rights.  (Curling Pls.' Compl. ¶¶ 71-75, 89-90, 116, 125; Coalition Pls.' Compl. ¶¶ 63, 66, 80, 82, 87, 88, 100, 103, 106, 203, 223; Affidavit of Plaintiffs' Expert Dr. Philip B. Stark at Doc. 680-1[23]).  And because the State has yet to adopt and implement a post-election audit procedure to verify that the barcode tabulations match the human-readable voter selections, voters cannot verify that the votes they cast were the votes that were counted. (Coaltion Pls.' Compl. ¶¶ 130-36, 142-47; Curling Pls.' Compl. ¶¶ 89-90.)

Plaintiffs separately allege, as they did with DREs, that their votes will "likely be improperly counted" under the BMDs system due to security vulnerabilities that have already been identified in the Dominion system and because of the Secretary of State's failure to act to address voting systemic vulnerabilities in its existing IT infrastructure.  Plaintiffs challenge the State Defendants' implementation of a barcode-based system with known and demonstrated vulnerabilities contrary to the recommendations of voting system experts that is incapable of being properly audited.  These include: (i) the State of Texas's refusal in February 2019 to certify Dominion's election management system based upon several problems with the software, (ii) the 2019 DEFCON Voting Village Report that found twenty vulnerabilities in a Dominion BMD system similar to the one being employed in Georgia, (iii) the National Academy of Sciences warning that BMDs that print only

---

[23]  Dr. Stark's affidavit discusses, among other things, the various reasons why "there is no way to establish that the BMD printout is a trustworthy record of what the BMD displayed to the voter or what the voter expressed to the BMD."  (Doc. 680-1 at 4.)  His affidavit addresses in turn why this makes a trustworthy, accurate full recount or audit of VMD votes cast not possible.

selections with abbreviated names/descriptions of the contests are virtually unusable for verifying voter intent, (iv) the opinion of the State's own retained expert, Dr. Shamos, that if a BMD is going to be used, the more reliable approach is to use a BMD that produces a ballot readable by a human voter, rather than a barcode, and (v) the Secretary of State's failure to remedy compromises in its current voter registration and internal IT systems. (Curling Pls.' Compl. ¶¶ 75-88; *see also* Coalition Pls.' Compl. ¶¶ 135, 176-186.)  In sum, Plaintiffs allege that despite the fact that cybersecurity experts and government officials recommended a voting system that included a voter-verified paper trail, Georgia's BMD System will rely on a non-voter-verified barcode as the elector's actual vote.[24] (Curling Pls. Compl. ¶¶ 74-75; *see also* Coalition Pls.' Compl. ¶¶ 164-175.)

Accordingly, the Court finds that Plaintiffs' allegations of the threat of imminent harm are sufficient at this stage of the proceedings to establish injury to their constitutional rights and demonstrate standing to proceed on their asserted claims.

Turning to the second standing element, "to satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Florida Sec'y of State*, 957 F.3d

---

[24] Although Plaintiffs' Complaints can be read as a criticism of the State of Georgia's selection of the BMD voting system over a hand-marked paper ballot system, the Court does not view Plaintiffs' claims as challenging the legislature's passage of HB 316 itself as unconstitutional. Rather, the Court views Plaintiffs as challenging the Secretary of State's implementation of a barcode-based BMD system for the reasons discussed herein.

1193, 1207 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560 (alterations adopted)). Defendants assert that to the extent any injuries arise, they are the result of third-party actions, not the actions of the State Defendants because "[t]he theoretical hacking, potential auditing issues, and hypothetical bar-code problems could be traced either to illegal hacking by third parties; improper conduct by election officials; or voters' failures to verify their paper ballots – not the State of Georgia's implementation of BMDs." (Mot. at 27-28.)  Defendants have essentially recycled the same argument (with the exception of blaming the voters themselves) previously raised in connection with Plaintiffs' DRE claims.  The same reasoning applies to reject this argument now.

Again, Plaintiffs' injury stems from Defendants' implementation of an alleged unconstitutional voting system that is subject to the same demonstrated vulnerabilities as the DREs and that is not a voter-verifiable and auditable paper ballot system.  Pursuant to H.B. 316 mandating the statewide use of "electronic ballot markers [that] shall produce paper ballots which are marked with the elector's choices in a format readable by the elector," Georgia's new Election Code placed the responsibility of selecting the equipment for the new voting system with the Secretary of State.  *See* O.C.G.A. § 21–2–300(a).  The law expressly requires that the "equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county of this state and shall be ***provided to each county by the state, as determined by the Secretary of State***." O.C.G.A. § 21–2–300(a)(1) (emphasis added).  The Election Code

further requires the Secretary of State to certify the new BMD voting system as "safe and practicable for use" in compliance with the Rules of the Georgia State Election Board prior to authorizing its implementation in state, federal, and county elections in the State. O.C.G.A. § 21–2–300(a)(2); *see also* Ga. Comp. R. & Reg. r. 590–8–1–.01(d). The Election Code also tasks the Georgia State Election Board with promulgating rules and regulations governing audit procedures and requires that "[t]he procedures prescribed by the State Election Board shall include security procedures to ensure that collection of validly cast ballots is complete, accurate, and trustworthy throughout the audit." O.C.G.A. § 21-2-498(b)&(d).

Plaintiffs challenge the actions of the Secretary of State and the State Election Board, not some potential absent third party hackers. Plaintiffs allege that State Defendants ignored the recommendations of election security experts to ensure that a proper audit regime was in place to verify the State's voting machine election results. And Plaintiffs allege that in implementing a mandatory statewide electronic barcode-based voting system without current or sufficient audit protocols in place in upcoming elections, Defendants are requiring Plaintiffs to exercise their right to vote using a system incapable of producing verifiable results. (*See, e.g.,* Curling Pls.' Compl. ¶¶ 89-90, 117; Coalition Pls.' Compl. ¶¶ 130, 135, 137, 145-47.) They also allege that the Secretary of State's failure to act to address the security and reliability vulnerabilities in its voting data systems and infrastructure over a sustained period of time continues to pose threats in implementation of the new BMD system. (Curling Pls.' Compl. ¶¶ 34-90; Coalition

Pls.' Compl. ¶¶ 176-186.)  The Coalition Plaintiffs further allege that the Secretary of State failed to properly certify the new BMD machines as required under HB 316 prior to their use in Georgia elections, and failed to test "whether the operation of the system would permit valid auditing of the results."  (Coalition Pls.' Compl. ¶¶ 155-63.)  At the motion to dismiss stage, these allegations are sufficient to show a causal connection, even if arguably indirectly, between Defendants' implementation of the BMD system and the injury to Plaintiffs' constitutional rights.  *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action . . . ."); *Lewis v. Governor of Alab*ama, 944 F.3d 1287, 1301 (11th Cir. 2019) ("it must be the effect of the court's judgment on the defendant" – not an absent third party – "that redresses the plaintiff's injury, whether directly or indirectly").

Finally, State Defendants argue that "Plaintiffs also cannot show redressability, because the same concerns allegedly associated with BMDs (lack of audits, hacking, and interference from election officials) are present in Plaintiffs' requested relief" of hand marked paper ballots. (Mot. at 37).  As this Court previously indicated in its September 15, 2019 Order rejecting Defendants' argument that Plaintiffs' claims are not redressable because "no election system is flawless," this is not the standard for redressability.  *Curling*, 334 F. Supp. 3d at 1318. Plaintiffs are seeking relief to address a particular voting system which they allege, as designed *or as implemented by Defendants*, burdens Plaintiffs' capacity

44

to cast votes that are actually properly counted and fails to produce a voter-verifiable auditable paper trail that is recognized as essential on a national level by election security experts. "Plaintiffs are not asking for a system impervious to all flaws or glitches." *Id.* They are seeking to vindicate their right to effectively and reliably cast a verifiable vote reflective of their ballot choices.

In sum, the Court finds that Plaintiffs have sufficiently alleged standing to bring their claims at this juncture.

### D. Coalition Plaintiffs Have Failed to State a Claim for Procedural Due Process Regarding the BMD Voting System

Defendants moved to dismiss Count III of Coalition Plaintiffs' First Supplemental Complaint[25] because: (i) Coalition Plaintiffs have failed to sufficiently allege the deprivation of a constitutionally protected liberty or property interest, (ii) the complaint does not allege that Plaintiffs have been subjected to inadequate process; and (iii) the availability of a state remedy necessarily prevents Plaintiffs from maintaining a procedural due process claim as a matter of law. Alternatively, Defendants also argue that "even assuming a liberty or property interest existed for a preferred voting system, there is no deprivation of that interest, given the State's no-excuse absentee voting system by hand-marked paper ballots."[26] (Defs.' Mot., Doc. 645 at 21.)

---

[25] The Curling Plaintiffs do not assert a procedural due process claim. (Curling Resp., Doc. 651 at 29.)

[26] The Court rejected this argument raised in connection with Plaintiffs' substantive due process claims raised in the Defendants' prior motion to dismiss. The Court found that the "choice" between undergoing additional burdens on their right to vote by absentee ballot to avoid having to use unsecure voting machines was itself a burden that Plaintiffs had plausibly alleged subjected

In Count Three of the First Supplemental Complaint, Coalition Plaintiffs allege that by implementing the Dominion BMD voting system, Defendants will violate their procedural due process rights because it will "severely restrict and/or arbitrarily and capriciously deprive" the Coalition Plaintiffs of the following "state-created liberty and property interests" without proper notice:

- The right of voters under Georgia statutes to have their official votes counted in an initial count.
- The right of voters under Georgia statutes to have their initial votes recounted in a recount or examined in an audit.
- The right of voters under Georgia statutes to cast their votes using a voting system that has been properly certified as safe for use.
- The right of voters under Georgia statutes to cast their votes on a voting system that is fundamentally compliant with Georgia law.
- The state statutory and state constitutional rights of voters to vote by secret ballot.

(Doc. 628 ¶ 240.)  Plaintiffs allege generally that "Defendants' threatened conduct will violate the procedural requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (*Id*. ¶ 242.)

A violation of procedural due process occurs where the state fails to provide due process in the deprivation of a protected property or liberty interest. *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (en banc). "A procedural due process

---

them to unequal treatment. The Court further found that the additional burdens and inconveniences associated with voting by absentee paper ballot were not mere trivial concerns and noted that "[a]s evidenced by the most recent election, absentee voting is not without its constitutional problems.  *See Martin v. Kemp*, 341 F.Supp.3d 1326 (N.D. Ga. 2018) (concluding that specific additional burdens and procedures imposed on absentee voters there were violative of due process guarantee of Fourteenth Amendment); *see also Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312 (finding that plaintiffs had established a likelihood of success on constitutional challenge to Florida's signature-match requirement for vote-by-mail paper ballots)." (May 21, 2019 Order, Doc. 375 at 47-48.)

claim has three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) a constitutionally-inadequate process." *Doe v. Fla. Bar*, 630 F.3d 1336, 1342 (11th Cir. 2011). It is not the deprivation of a protected interest that causes a violation, but rather, "[i]t is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim." *Id.* Accordingly, only when the state refuses to provide a process sufficient to remedy the procedural deprivation does an actionable constitutional violation arise. *Id.* Therefore, Plaintiffs carry the burden of "alleging that, as a result of some state action, the plaintiff was deprived of a constitutionally protected interest, and the state did not afford the plaintiff adequate process to challenge the deprivation." *Searcy v. Prison Rehab Industries & Ent, Inc.*, 746 F. App'x. 790, 795 (11th Cir. 2018).

As to the first element of the procedural due process claim, Defendants contend that there is no state-created liberty or property interest in a preferred choice of voting systems, citing the Georgia Supreme Court's decision in *Favorito*, 285 Ga. at 797–798. Plaintiffs' allegations in Count III are not based on a preference of one voting system over another. Rather, the Coalition Plaintiffs allege that Defendants' failure to comply with certain provisions and requirements of Georgia law deprives them of their constitutional rights, including the right to have their votes accurately counted, the right to a properly certified voting system,

the right to an auditable voting system, and the right to a secret ballot as guaranteed by the Georgia constitution.

Because the Court finds that Plaintiffs have failed to sufficiently allege the third element of a procedural due process claim – a constitutionally inadequate process – the Court assumes without deciding that Plaintiffs' allegations adequately establish the alleged deprivation of their constitutionally protected voting interests.  As this Court has recognized, once a state creates a statutory voting regime, the state "must administer it in accordance with the Constitution." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Georgia*, 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018).  The Supreme Court has long held that state-created statutory entitlements can trigger due process. *See Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *Paul v. Davis*, 424 U.S. 693, 710-12 (1976).

Coalition Plaintiffs, however, have failed to allege, except in the most general and conclusory fashion, that the State Defendants have failed to provide adequate procedures to remedy the alleged harms.[27]  "The law is well established that the

---

[27] Plaintiffs' allegations in their supplemental complaint are distinguishable from those in which courts have recognized a claim based on inadequate procedures in the context of voting.  For example, in *Georgia Muslim Voter Project v. Kemp*, (consolidated with *Martin v. Kemp*) the plaintiffs alleged that under Georgia law, county elections officials were required to reject all absentee ballots whose signature "does not appear to be valid" because the signature does not match the signature on file. *See* 1:18-cv-4789, Compl. ¶¶ 1, 30 (citing O.C.G.A. § 21-2-386(a)(1)(C)). Plaintiffs there further alleged: This determination is made by election officials who are not required to receive training on handwriting analysis or signature comparison and no statute or regulation provides standards to make such determinations or distinguish natural variations in a person's handwriting or to consider extrinsic evidence that might confirm the identify of the voter. *Id.* ¶¶ 5-6, 36.  When these rejections occur, voters are not provided any pre-rejection notice or an opportunity to be heard or to otherwise ensure that their absentee ballot

mere failure to follow state procedures does not necessarily rise to the level of a violation of federal procedural due process rights." *Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1345 (N.D. Ga. 2018) (finding that plaintiffs had not established substantial likelihood of success on claim of a lack of adequate process to remedy the rejection of mail-in ballots because the challenge "of failure to follow state procedures" did not establish a federal denial of due process); *Maddox v. Stephens*, 727 F.3d 1109, 1124 (11th Cir. 2013) ("[W]e emphasize that the violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution. If otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes."); *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1528 n.15 (11th Cir. 1987) (holding that although plaintiff had a state given property interest of continuing employment in the absence of just cause for termination, he received what was due under the Constitution, and declining to

---

will be counted. *Id.* ¶1. The elections officials' determination is final without any review or appeal. *Id.* ¶¶ 1, 31 (citing O.C.G.A. § 21-2-386(a)(1)(B)-(C)). The same process applies to the absentee ballot application process. *Id.* ¶¶ 19-24 (citing O.C.G.A. § 21-2-381(b)(1)-(3)). With respect to the applications, while there is no procedure by which an elector can contest the registrar's decision, the statutes do not prevent an elector whose application is rejected from applying a second time or voting in person. Plaintiffs alleged, however, that there is no reason to believe that the same signature will not be rejected again, and that a second application would not be futile. *Id.* ¶ 24. The district court found that these claims had merit and granted a preliminary injunction requiring the Secretary of State to instruct county election officials to cease rejecting absentee ballots and applications based on perceived signature mismatch and requiring them to provide pre-rejection notice and an opportunity to resolve the alleged signature discrepancy to the absentee voter and ordered that absentee voters shall have the right to appeal any absentee ballot rejection following the outcome of the court-ordered process. 341 F. Supp. 3d 1326, 1341-42 (N.D. Ga. 2018).

address whether the plaintiff had a cause of action in the state courts for failure of the board of education to strictly comply with the state's notice statute).

Coalition Plaintiffs' allegation that "there is no adequate legal remedy" for the alleged deprivations is likewise couched in entirely conclusory terms. (Coalition Pls.' Compl. ¶ 245.) Fellow District Court Judge Steve Jones recently addressed a similar constitutional challenge to the Secretary of State's compliance with provisions of H.B. 316 in *Fair Fight v. Raffensperger*, Civil Action No. 1:18-cv-5391-SCJ.  In denying the plaintiffs' request for a preliminary injunction that would have required an interpretation of the new state election law for the first time by a federal court, Judge Jones noted that "Plaintiffs also have an additional remedy in the form of seeking a mandamus in the state courts."  December 27, 2019 Order, Doc. 188 at 18-20) (citing inter alia, *Roe v. State of Ala.*, 43 F.3d 574, 582 (11th Cir. 1995).[28]

Accordingly, the Court finds that Coalition Plaintiffs have failed to sufficiently allege a claim for procedural due process and **GRANTS** Defendants' Motion to Dismiss Count III of their First Supplemental Complaint.  As Plaintiffs

---

[28] A plaintiff cannot rely on the failure of the state to provide her due process where adequate state remedies are available.  As the Eleventh Circuit has explained, if the state courts generally would provide an adequate remedy for the procedural deprivation the plaintiff claims to have suffered, there is no federal due process violation regardless of whether the plaintiff has taken advantage of the state remedy or attempted to do so.  *Horton v. Bd. of County Comm'rs of Flagler County*, 202 F.3d 1297, 1300 (11th Cir. 2000). Thus, if Georgia law provides an adequate means to remedy the alleged procedural deprivation, Plaintiff's procedural due process claim fails.  In applying Georgia law, the Eleventh Circuit has previously held that the writ of mandamus can be an adequate state remedy to ensure a party was not deprived of her due process rights. *See Cotton v. Jackson*, 216 F.3d 1328, 1332 (11th Cir. 2000); *A.A.A. Always Open Bail Bonds, Inc. v. DeKalb County, Ga.*, 129 F. App'x. 522, 525 (11th Cir. 2005).

are not foreclosed from pursuing their state remedies, Count III is **DISMISSED WITHOUT PREJUDICE**.

### E. Defendants' Contentions That Plaintiffs' Requested Remedy Violates the ADA is not an Appropriate Basis on Which to Dismiss the Claims

In their final argument for dismissal, State Defendants contend that Plaintiffs' proposed remedy of using hand-marked paper ballots for the majority of voters and to reserve the use of BMDs solely for disabled voters would require the State to provide disabled individuals with a voting system that is not equal as that provided to others, in violation of the Americans with Disabilities Act and the Rehabilitation Act. Despite the potential merits of their position, Defendants' motion does not explain the legal authority that would require the Court to accept Defendants' argument over the Plaintiffs' allegations and therefore that would support the dismissal of Plaintiffs' claims. Plaintiffs are correct that Defendants' arguments regarding the propriety of the relief Plaintiffs seek in their motion for preliminary injunction have no bearing on the sufficiency of the allegations of their complaints under Rule 12.[29] While the Court may ultimately be required to weigh the interests of the impact of any proposed remedy on disabled voters in fashioning any potential relief on Plaintiffs' claims, Defendants have failed to demonstrate that Plaintiffs' Complaints require dismissal at this stage on this basis.

---

[29] As Curling Plaintiffs note in their Response in opposition to Defendants' Motion to Dismiss, they do not request that disabled voters be forced to use the Dominion BMD system. Rather, they request only that Defendants "make available at each polling place at least one electronic or mechanical BMD that is in compliance with the Americans with Disabilities Act and Help America Vote Act." (Doc. 619 at 2.)

### III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss the Curling Plaintiffs' Third Amended Complaint and the Coalition Plaintiffs' First Supplemental Complaint [Doc. 645]. The Motion to Dismiss is **GRANTED** as to Count V of the Curling Plaintiffs' Third Amended Complaint and Count III of the Coalition Plaintiffs' First Supplemental Complaint and those claims are **DISMISSED WITHOUT PREJUDICE**.  The motion is **DENIED** in all other respects.

The Court **AUTHORIZES** discovery on these claims to begin immediately upon entry of this Order.  Finally, the Court **DIRECTS** Defendants to file a response to Plaintiff's proposal on the scope and schedule for expedited discovery on Monday, August 3, 2020.

**IT IS SO ORDERED** this 30th day of July, 2020.


**Amy Totenberg**
**United States District Judge**