## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,** | |
| **Plaintiffs,** | |
| | |
| **v.** | **Civil Action No. 1:17-CV-2989-AT** |
| | |
| **BRAD RAFFENSPERGER, ET AL.,** | |
| | |
| **Defendants.** | |

### COALITION PLAINTIFFS' INDEX TO DECLARATIONS
### RELATING TO PAPER POLLBOOK BACKUP RELIEF

The following evidence is being filed in support of Coalition Plaintiffs'

Notice of Filing Evidence and Request for Relief on Paper Pollbook Backups, to

be filed by August 3, 2020:

| | |
|---|---|
| EXHIBIT 1 | Marilyn Marks |
| EXHIBIT 2 | B. Joy Wasson |
| EXHIBIT 3 | Elizabeth Throop |
| EXHIBIT 4 | Aileen Nakamura |
| EXHIBIT 5 | Samantha Whitley |
| EXHIBIT 6 | Beatrice Brown |
| EXHIBIT 7 | Angela Stone |
| EXHIBIT 8 | Lynn H. Palazzo |
| EXHIBIT 9 | Bruce P. Brown |

Respectfully submitted this 2nd day of August, 2020.

/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

Counsel for Coalition Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CERTIFICATE OF COMPLIANCE AND SERVICE

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.  I further certify that on August 2, 2020, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Bruce P. Brown*
Bruce P. Brown

EXHIBIT

1

## DECLARATION OF MARILYN MARKS

MARILYN MARKS hereby declares under penalty of perjury, pursuant to 28 U.S.C. (s) 1746, that the following is true and correct:

1.     My name is Marilyn Marks.  I am the Executive Director of Coalition for Good Governance ("Coalition"). I have personal knowledge of all facts stated in this declaration, and if called to testify, I would testify competently thereto.

2.     This declaration concerns the need for paper backups of electronic pollbooks on Election Day containing the same data as the electronic pollbooks, that is, updated voters' information who have been issued a mail ballot or have voted early, so that officials may issue ballots to permit voting to continue when the electronic pollbooks fail or otherwise create bottlenecks.

3.     To illustrate an updated paper pollbook, I have attached as Exhibit A a true and correct copy of sample pages of a paper pollbook used on Election Day in my home county of Mecklenburg County, North Carolina. I obtained these sample pages from Mecklenburg County election officials.  Mecklenburg County has approximately 760,000 registered voters, which is similar in size to Fulton County, which has approximately 770,000 registered voters.

4.     As stated in the officer's email in Exhibit A, Mecklenburg prints 3 copies of the pollbooks for each precinct on the Saturday night prior to Tuesday

elections. The paper  pollbook and paper pollbook backup show whether a voter has already voted by absentee or mail ballot.

5.      Mecklenburg County uses paper pollbooks as the primary and back up pollbooks, and uses electronic pollbooks to facilitate exceptions as stated in the email in Exhibit A. The concept of an updated paper pollbook and a paper backup prepared after early voting ends on the Saturday before Election Day is illustrated in Exhibit A.

Coalition's Petitions for Paper Pollbook Backups

6.      After the widespread failures of the electronic pollbooks during the November 2019 Dominion system pilots, Coalition and other interested parties began directly petitioning the State Election Board for the adoption of paper pollbook backups for Election Day balloting.

7.      Attached as Exhibit B is a true and correct copy of a November 22, 2019 petition submitted on behalf of Coalition by Jeanne Dufort to Secretary of State Brad Raffensperger proposing a rule requiring the use of updated paper pollbook backups.  The proposed rule, repeatedly submitted since November 2019, has been rejected by the State Election Board each time.

8.      Coalition representatives spoke during public comment period of December 17, 2019, January 22, 2020 and July 2, 2020 State Election Board meetings, in each instance advocating for the use of updated paper pollbook

backups to reduce polling place lines and the excessive number of provisional ballots.

9.   Most recently, after the well-publicized long lines caused by e-pollbook failures in the June 9 election, Coalition resubmitted the proposed rule on June 30, 2020.  At its July 2 meeting, the State Election Board again rejected the proposal to supply the polling places with a paper back up to permit voting to continue when electronic pollbooks fail.

10.   In the July 2, 2020 meeting, for the first time a rationale was offered for rejecting the paper back-up proposal. Kevin Rayburn, of the Secretary of State's office, stated that the Secretary's office already supplies a paper back up "list of voters in the precinct" to each polling place.

11.   Mr. Rayburn's comments reflect a potential misunderstanding.  A "list of voters" is not a useful paper record of the pollbook for purposes of having voting continue with touchscreens or emergency ballots when problems with electronic pollbooks arise, because any list of voters used to issue ballots must be updated to reflect information from early voting or mail ballot voting.

12.   Attached as Exhibit C is a true and correct copy of a March 23, 2020 letter from me to Secretary Raffensperger and the State Election Board with suggestions for conducting the statewide primary during the pandemic with public health concerns as a priority, including the need for paper pollbook backups to

reduce polling place lines and bottle-neck-creating provisional ballot use.  I

received no response to Coalition's letter.

13.     In summary, Coalition has initiated numerous communications to

Defendants directly and through counsel attempting to persuade them that a simple

and inexpensive paper printout of the electronic pollbook's updated pollbook

content would save thousands of hours of voter waiting time, permit more people

to vote who cannot wait in long lines, and allow more timely polling place

operations.  Coalition has not received a substantive response from Defendants.

Poll Observations—June 9, 2020

14.     During the June 9, 2020 primary, approximately 10 individuals acted

as public observers or pollwatchers in the polling places on behalf of Coalition,

along with the political party or candidate directly appointing them as poll

watchers.

15.     I was an authorized poll watcher for the June 9, 2020 election for

some locations in Fulton and DeKalb counties, and also acted as a public observer

in other locations in those two counties.

16.      I arrived at Peachtree Christian Church polling place in Atlanta at

approximately 6:30 am. The long line began to form well before the 7am opening.

17.     Unlike many other precincts across the state with widely reported

problems in the poll opening, based on my observations, Peachtree Christian

appeared to have operational electronic pollbooks. Voting moved along at a steady pace during the time I was there.

18.     Based on my observations since November 2019 of numerous polling places in Georgia elections using the Dominion BMD system, I have frequently seen conditions or documentation of voting stopped or slowed to a trickle because of problem PollPads, (electronic poll books), and the resulting long lines of voters.

19.     I have witnessed long slow lines of voters at polling places where it was clear that the bottleneck creating the long lines was at the voter check-in station where there were too few working PollPads and no backup method of continuing the voting in those circumstances. The bottleneck was obvious in these circumstances because I could see that there were available touchscreen machines in the polling place while lines were deep at the check-in stations.

20.     The multiple steps in the check in process is depicted in the first 50 seconds of the Secretary of State's voter education video, (https://securevotega.com/how-to-vote/). It can be seen that there are numerous points of potential failure in the computerized operation.

21.     When voters attempt to check in at malfunctioning PollPad stations, depending on the malfunction, the pollworker may not be able to determine whether the voter is eligible to vote in the precinct, or may not be able to generate a voter access card to operate the touchscreen. This causes lines to form when the

pollworkers have no working pollbook (electronic or paper) to determine whether a ballot should be issued to the waiting voter. My observation is that typically in Georgia a provisional ballot is issued in such cases. The issuance of a provisional ballot requires a number of steps by the pollworker including an attempt to look up the voter in the paper list of registered voters—which has not been updated for early voting. The multiple steps for provisional ballot issuance are detailed on page 51, and pages 71-73 of the Poll Worker Manual, copied at this link:

https://georgiapollworkers.sos.ga.gov/Shared%20Documents/Georgia%20Poll%20Worker%20Training%20Manual.pdf.  Pictures of the required paperwork related to the provisional ballot issuance are at page 50, and include a manual voter certificate, an official ballot envelope to be completed, an inner envelope, and a listing of the provisional ballots issued.  The additional time necessary to complete provisional ballots creates the bottle-neck that causes long lines that result in the disenfranchisement of voters.

22.    As explained in the detailed provisions of the Election Code that are quoted on pages 52-70 of the Poll Worker Manual related to the handling of provisional ballots, the provisional ballots are placed inside sealed provisional ballot envelopes in the polling place and then – at the Elections Office after the polls have closed --  evaluated for eligibility.

6

23.     In contrast, if the touchscreen machine is malfunctioning or if lines are over 30 minutes, an emergency ballot may be issued to a voter whose name appears as eligible in the pollbook. (Ga. Comp. R. & Regs. 183-1-12-.11-2(c) and (d), and  O.C.G.A. § 21-2-418(h)) The emergency ballot does not require the paperwork and analysis for eligibility that a provisional ballot does, and is therefore considerably faster to issue, and for the voter to complete. While the same ballot form is used for emergency ballots and provisional ballots, emergency ballots may be cast in the scanner by the voter without any other paperwork or further eligibility checks, making it considerably faster to process the voter in the polling place. Further, the voter gains confidence that their ballot was cast and counted, which is not the case with provisional ballots.

24.     Also on June 9, I visited the Fulton County Central Park Recreation Center.  I was present during the filming of various parts of the PBS NewsHour story ("PBS Video") which can be viewed at this link: https://www.pbs.org/newshour/show/in-georgia-primary-election-chaos-highlights-a-voting-system-deeply-flawed.  The depiction of the lines at timestamp 0:49 and the depiction of the problems and lack of voting activity in the Central Park Recreation polling place (timestamp 1:38) are accurate based on my observation.

25.     Based on my discussions with a number of voters in line, the length of the line stretching as far as I could see, and my observation of the stalled activity in

the polling place, my estimate is that the wait to vote at 10am was at least four hours.

26.    During the time I was inside the polling place, voting was almost at a complete standstill.  I could see from my position that the pollbooks were not working and that this was causing the delay as pollworkers were issuing provisional ballots, which took the workers and voters a long time to complete, with only one provisional voting station available to mark ballots.

27.    There were some unoccupied touchscreen machine stations even though the line to vote was hours long. This indicated that the problem was at the voter check-in. During much of my time inside the polling place, the pollpad check in station was not even occupied by workers, presumably because workers had abandoned their attempts to make the Pollpads work, and were issuing provisional ballots instead.

28.    The delays caused by the problems with the electronic pollbooks at Central Park Recreation were not mitigated by the use of the precinct's registered voters list.  Since the precinct's registered voters list supplied by the Secretary of State does not show the current status of who voted in early voting or by mail, it is not a substitute for the electronic pollbooks. I observed no pollworkers actually using the precinct's registered voters in place of electronic pollbooks to issue

emergency ballots or electronic touchscreen ballots at Central Park Recreation (or, in fact, in any of the other voting locations that I visited).

29.     However, had this polling place been supplied with an updated paper pollbook backup, as Coalition has repeatedly urged, the lines would have been reduced substantially, as emergency ballots could have been quickly issued and voted and scanned by voters, or alternatively or concurrently, touchscreen access codes could be keyed into the BMDs for activation by the pollworkers to permit voting on the touchscreen machines without the PollPad encoded voter access card.

30.     I stayed at the Central Park Recreation Center for approximately two hours, spending a significant amount of that time outside the polling place talking with voters to understand their experience. The line of voters was around the block farther than I could see when I arrived and when I left. A simple updated paper pollbook of the contents of the electronic pollbook would have permitted voting to take place at a rapid place with the touchscreens and with emergency ballots which are supplied to all polling places in significant amounts.  The long lines and delayed start at Central Park Recreation Center attracted national attention.[1]

31.     Also on June 9, I visited the parking lot of the Fulton County Park Tavern polling location to monitor the voting lines. I observed the lines depicted in

---

[1] *'I Refuse Not to Be Heard': Georgia in Uproar Over Voting Meltdown*
**https://www.nytimes.com/2020/06/09/us/politics/atlanta-voting-georgia-primary.html**

the PBS Video at timestamps 0:33 and 6:48 and can confirm that the PBS Video shows an accurate depiction of the conditions that existed at this polling place. Park Tavern polling place was also mentioned in news stories about the long lines.[2]

32.     Based on the length of the line I saw at Park Tavern and its slow pace, my estimate of the voter wait time at 11:30 am was over 3 hours.

33.     Based on my personal observations, and the information that I received from Coalition interns who visited the Park Tavern polling location the day before Election Day, one cause of the long lines was that the polling location did not have near enough voting machines for the number of voters assigned to that polling location.  However, had the Park Tavern polling place been equipped with paper pollbooks backups and emergency ballots, the long lines would have been avoided: voting on hand marked emergency ballots, which is faster than voting on BMDs anyway, would have kept the lines moving throughout the day.

34.     On Election Day June 9, I also observed the Miller Grove Middle School polling place in DeKalb County. The line of voters at about 2:15 pm snaked down the corridor of the school (PBS Video, timestamp 7:42) and into the gymnasium where it snaked around the walls of the gymnasium. Based on my

---

[2] 'It Was Very Chaotic': Long Lines, Voting Machine Issues Plague Georgia Primary. **https://www.npr.org/2020/06/09/873054620/long-lines-voting-machine-issues-plague-georgia-primary;** Long lines blamed on technical problems, poor poll worker training; https://georgiarecorder.com/2020/06/09/long-lines-reported-across-metro-atlanta-as-voters-head-to-the-polls/

discussions with voters and the slow pace of the check in, I estimated the wait time to exceed 2.5 hours.

35.    I could see that the line was moving slowly because voter check in was taking so long.  During the time that I was observing the polling place intermittently between 2:15 and approximately 3:15 there were numerous touchscreen machines unused and available for voting. Additional check-in stations could have been easily and immediately established with an updated paper pollbook backup. The voting line could have been reduced by simply having the paper pollbook that contained the same information as the electronic pollbook.

My Voter Page Problems

36.    While observing the opening and the lines forming at the start of the voting day on June 9, I began to get messages from Coalition members that they could not check their voter registration or polling place assignment on the My Voter Page on the Secretary of State's website because it was not working. I then tested the MVP pages of some of our members who had given me their birthdates. I knew them to be frequent voters in Fulton County.  In each case the message appeared that their registration information could not be found. The MVP system failure shows again how important it is to have redundant systems and resilient back up records to keep voting continuing in the event of electronic system failures.

Other

37. The transcript of the latter portion of the June 19, 2020 Cobb County Board of
    Elections and Registration including the comments of Elections Director,
    Janine Eveler was prepared under my supervision by Coalition intern Beatrice
    Brown who prepared an audio recording it as she observed the meeting to
    inform me of the proceedings. The transcript is attached at Exhibit D. It is a
    true and correct transcript of the discussions during the latter portion of the
    meeting.

38. According to the Dominion/knowInk documents in Georgia's Request for
    Proposal eRFP: 47800-SOS0000037 Attachment D, File 0-3, the KnowInk
    ePulse application can print voter rolls for the pollbook (Exhibit E, page 7),
    and "update voter rolls minutes before an election." (Exhibit E, page 3).
    Exhibit E is a true and correct copy of this section of the RFP as posted on the
    Secretary of State's website.


     Executed August 2, 2020

     _Marilyn Marks_

     Marilyn Marks

EXHIBIT

A

**From:** "Mavromatis, Kristin W." <Kristin.Mavromatis@mecklenburgcountync.gov>
**Date:** Tuesday, July 14, 2020 at 3:18 PM
**To:** Marilyn Marks <Marilyn@USCGG.org>
**Cc:** "Dickerson, Michael" <Michael.Dickerson@mecklenburgcountync.gov>
**Subject:** RE: [External]Public records request---paper poll book example.

Ms. Marks,

Thanks for your email and inquiry into our pollbooks on election day.

Attached are actual copies of our actual pollbooks.

We use the first page you see for all standard voters – it is a peel-off label.  If someone has voted early or by mail, an "A"  is preprinted in the box and indicates the voters has already voted in the current election and would not be permitted to vote on election day.  We print our pollbooks Saturday evening after the close of early voting.  Labels are divided into binders by precinct and then alphabetical.

The second page is an additional backup we send of the entire pollbook for a precinct.  It is an additional copy of the entire precinct, just in case something/anything happens.

We use an electronic pollbook for all "nonstandard" issues – address changes, name change, wrong precinct….

At each precinct – there are 3 complete copies of registered voters.

000099875527    **REP**    219
**BROWN, JOAN PARSONS**
8125 WILLHILL RD 28227
**STYLE R0013**

000099875527    **REP**    219
**BROWN, JOAN PARSONS**
8125 WILLHILL RD 28227
PO BOX 23090
Gender: F    Race: W    Age: 77    AUTH# _____
**STYLE R0013**

001000544248    **REP**    219
**BROWN, LAILANIE DUMAROAG**
7613 MONOGRAMM LN 28227
**STYLE R0013**

001000544248    **REP**    219
**BROWN, LAILANIE DUMAROAG**
7613 MONOGRAMM LN 28227
**STYLE R0013**

001000544248    **REP**    219
**BROWN, LAILANIE DUMAROAG**
7613 MONOGRAMM LN 28227

Gender: F    Race: A    Age: 30    AUTH# _____
**STYLE R0013**

001000504391    **DEM**    219
**BROWN, MAURICE LASHAWN**
9701 BLACKBIRD HILL LN 28227
**STYLE D0005**

001000504391    **DEM**    219
**BROWN, MAURICE LASHAWN**
9701 BLACKBIRD HILL LN 28227
**STYLE D0005**

001000504391    **DEM**    219
**BROWN, MAURICE LASHAWN**
9701 BLACKBIRD HILL LN 28227
Gender: M    Race: B    Age: 18    AUTH# _____
**STYLE D0005**

000000344629    **DEM**    219
**BROWN, ROVINA M**
10820 REID ALEXANDER LN 28227
**STYLE D0005**

000000344629    **DEM**    219
**BROWN, ROVINA M**
10820 REID ALEXANDER LN 28227
**STYLE D0005**

000000344629    **DEM**    219
**BROWN, ROVINA M**
10820 REID ALEXANDER LN 28227
Gender: F    Race: B    Age: 64    AUTH# _____
**STYLE D0005**

000000496333    **UNA**    219
**BROWN, TERRY L**
9900 EDWARD'S PL 28227
**STYLE D0005/R0013/L0012**

000000496333    **UNA**    219
**BROWN, TERRY L**
9900 EDWARD'S PL 28227
**STYLE D0005/R0013/L0012**

000000496333    **UNA**    219
**BROWN, TERRY L**
9900 EDWARD'S PL 28227
Gender: M    Race: W    Age: 72    AUTH# _____
**STYLE D0005/R0013/L0012**

001000249808    **UNA**    219
**BROWNE, PASSION MARIE**
8105 PINE HILL RD 28227
**STYLE D0005/R0013/L0012**

001000249808    **UNA**    219
**BROWNE, PASSION MARIE**
8105 PINE HILL RD 28227
**STYLE D0005/R0013/L0012**

001000249808    **UNA**    219
**BROWNE, PASSION MARIE**
8105 PINE HILL RD 28227
Gender: F    Race: B    Age: 22    AUTH# _____
**STYLE D0005/R0013/L0012**

000000695324    **REP**    219
**BROWNE, SHARON RUSSELL**
8929 BLAIR RD 28227
**STYLE R0013**

000000695324    **REP**    219
**BROWNE, SHARON RUSSELL**
8929 BLAIR RD 28227
Gender: F    Race: W    Age: 62    AUTH# _____
**STYLE R0013**

001000521266    **DEM**    219
**BROWN-JORDAN, STACEY**
8436 WILLHILL RD 28227
**STYLE D0005**

001000521266    **DEM**    219
**BROWN-JORDAN, STACEY**
8436 WILLHILL RD 28227
**STYLE D0005**

001000521266    **DEM**    219
**BROWN-JORDAN, STACEY**
8436 WILLHILL RD 28227
Gender: F    Race: B    Age: 58    AUTH# _____
**STYLE D0005**

000000566014    **DEM**    219
**BROWN-PURDIE, GAIL**
4504 BAINVIEW DR 28227
**STYLE D0005**

000000566014    **DEM**    219
**BROWN-PURDIE, GAIL**
4504 BAINVIEW DR 28227
**STYLE D0005**

000000566014    **DEM**    219
**BROWN-PURDIE, GAIL**
4504 BAINVIEW DR 28227
Gender: F    Race: B    Age: 60    AUTH# _____
**STYLE D0005**

MECKLENBURG COUNTY BOARD OF ELECTION
VOTER INFORMATION FILE LIST
BY PRECINCT / STATUS / NAME / ADDRESS

Page: 23
ELECTION DATE: 03/03/2020
PRINT DATE: 02/29/2020

REGION: 15   PRECINCT: 243
STATUS: ACTIVE

| NAME | ADDRESS | GENDER | RACE | AGE | VOTER REG NUMBER | PTY | BALLOT STYLE | VOTING BOX | VOTER SPECIFIC MESSAGE |
|---|---|---|---|---|---|---|---|---|---|
| ENRIQUEZ, DANIA EMELINA | AUTUMN BLAZE DR | F | O | 39 | 000001307791 | DEM | D0005 | | |
| EPHRIAM, JASMINE RENEE | WINTER HAZEL RD #205 | F | B | 26 | 001000052154 | DEM | D0005 | | |
| EPPS, JAMES ISSAC | FIRENZA CIR #303 | M | B | 18 | 001000555039 | DEM | D0005 | | |
| ERNST, DEBORAH ELIZABETH | STEELECROFT PKWY #206 | F | W | 56 | 001000494388 | DEM | D0005 | A | |
| ERVIN, EMILY DIONE | LAKEPOINT FOREST DR | F | B | 17 | 001000560036 | DEM | D0005 | | Need to show ID: |
| ERVIN, LOIS P | SKYMASTER CT | F | B | 67 | 001000494963 | DEM | D0005 | | |
| ERVIN, TAMMIE C | SKYMASTER CT | F | B | 49 | 000000581034 | DEM | D0005 | A | |
| ESCALERA ARRIBA, REBECCA ANTONIA | UMBRELLA LN #203 | F | O | 85 | 001000236050 | DEM | D0005 | A | |
| ESPINALES, MARGARITA | WINGET POND RD | F | O | 60 | 001000045231 | DEM | D0005 | | |
| ESPINOSA-JARAMILLO, LAURA XIMENA | KINSTON RIDGE PL | F | U | 35 | 001000177454 | DEM | D0005 | | |
| ESSILFIE, DIANA KARLEY | TOSCANA WAY #108 | F | B | 41 | 001000302207 | DEM | D0005 | | |
| ESTERS, LINDA LOOPER | WITHER STEELE CT | F | B | 67 | 000999987540 | DEM | D0005 | | |
| ESTERS, TIAH TENNILLE | RAGAN ELIZABETH CT | F | B | 43 | 000999984283 | DEM | D0005 | | |
| ESTRELLA NUNEZ, JOELVYN JOSE | ALYSSA FAITH CT | M | B | 31 | 001000438090 | DEM | D0005 | A | |
| EVANKO, LINDA ANN | ELKHORN DR | F | W | 62 | 001000023903 | DEM | D0005 | | |
| EVANS, BEVERLY RENEE | PERUGIA WAY #302 | F | B | 52 | 001000472169 | DEM | D0005 | | |
| EVANS, JAMES | MICHAEL LYNN RD | M | B | 71 | 000000488872 | DEM | D0005 | | |
| EVANS, KINETH BRANDON | BEDDINGFIELD DR | M | B | 25 | 001000072656 | DEM | D0005 | | |
| EVANS, SANDRA E | MICHAEL LYNN RD | F | B | 70 | 000000488871 | DEM | D0005 | | |
| EVANS, TANEY CHEVON | HONEYFUR CT | F | B | 49 | 001000452473 | DEM | D0005 | A | |
| EVANS-PHILLIPI, DAWN MARIE | PLANTERS ESTATES DR | F | W | 50 | 000001137604 | DEM | D0005 | | |
| EWEKA, ELIAHU OSAS | HORNED LARK DR | M | B | 51 | 001000563563 | DEM | D0005 | | |
| FAINES, JOHN MICHAEL JR | PEDLAR MILLS RD | M | B | 36 | 000999842002 | DEM | D0005 | | |
| FAINES, PAUL PRINCETON | PEDLAR MILLS RD | M | B | 35 | 000001233880 | DEM | D0005 | | |
| FAIRBROTHER, SAPNA KORI | CAMDEN MEADOW DR | F | O | 34 | 001000373651 | DEM | D0005 | | |
| FAIRCHILD, HEATHER TARYN SPURGEON | SILVER DART PL | F | W | 36 | 001000335877 | DEM | D0005 | A | |
| FALKENBERG, KADY LEVONNE | SILVAIRE FARM RD | F | W | 30 | 001000428046 | DEM | D0005 | | |
| FANG, LINDA SARAH | LIMEHURST PL | F | A | 24 | 001000173317 | DEM | D0005 | | |
| FARMER, BRANDI LAKASHA | WINTER HAZEL RD #208 | F | B | 34 | 001000349840 | DEM | D0005 | | |
| FARMER, SABRINA | WINTER HAZEL RD #206 | F | I | 30 | 001000429107 | DEM | D0005 | | |
| FARR, XAVIER PRESTON | PERUGIA WAY #106 | M | B | 26 | 001000627216 | DEM | D0005 | | |
| FAULKNER, CHELA JUILLE | HUNTINGTON MEADOW LN | F | B | 27 | 001000035125 | DEM | D0005 | | |
| FAULKNER, CHRISTIAN ELIJAH | HUNTINGTON MEADOW LN | M | B | 21 | 001000239930 | DEM | D0005 | | |
| FAULKNER, MERALYN DELORES | HUNTINGTON MEADOW LN | F | B | 71 | 001000124382 | DEM | D0005 | | |
| FAULKNER, PAUL FRANKLIN JR | HUNTINGTON MEADOW LN | M | B | 73 | 001000066333 | DEM | D0005 | | |
| FAUST, ALISON MACHAN | FIRENZA CIR #204 | F | B | 49 | 000001017588 | DEM | D0005 | | |
| FAUST, DUUNA YOLANDA | ARMOUR RIDGE DR | F | B | 49 | 001000133326 | DEM | D0005 | | |
| FIELDS, KAI JOVAN | LAWRENCE FARM LN | M | B | 17 | 001000559162 | DEM | D0005 | | |
| FELDER, URSULA D | PEDLAR MILLS RD | F | B | 46 | 000001010445 | DEM | D0005 | A | |
| FELTER, JESSICA LIPSKY | CRANE CREEK DR | F | W | 37 | 001000318342 | DEM | D0005 | | |
| FERDINAND, ERIC A | STONES LANDING ST | M | B | 53 | 001000024311 | DEM | D0005 | | |
| FERGUSON, JOYCE | LAKEPOINT FOREST DR | F | B | 64 | 001000567605 | DEM | D0005 | | |
| FERGUSON, LAKAISHA EVETTE | CEDAR FARM RD #102 | F | B | 47 | 000999962547 | DEM | D0005 | | |
| FIDELIA, CHAEYONNA MONAE | BLACK BRANT LN | F | B | 19 | 001000434993 | DEM | D0005 | | |
| FIELDS, BETTYE JOYCE | SINGLELEAF LN | F | B | 48 | 001000144308 | DEM | D0005 | | |
| FIELDS, DERRICK MITCHELL JR | KENDRICK CROSS RD | M | B | 19 | 001000501910 | DEM | D0005 | | |
| FIELDS, KELLY LORRAINE | LAWRENCE FARM LN | F | B | 43 | 001000279102 | DEM | D0005 | | |
| FIGUEROA LOPEZ, ALEX ARIEL | PARASOL TREE PL #105 | M | W | 18 | 001000536691 | DEM | D0005 | | |
| FIGUEROA, ANA PATRICIA | ORCHARD GRASS CT | F | W | 54 | 000999915372 | DEM | D0005 | | |

E
X
H
I
B
I
T

B

November 22, 2019

The Honorable Brad Raffensperger
Chairperson, State Election Board
2 Martin Luther King, Jr Drive, S.E.
Suite 1104, West Tower
Atlanta, Georgia 30334-9000
(certified mail, copy via email to R. Germany rgermany@sos.ga.gov )

Re: Petition for Rule-Making

Dear Chairman Raffensperger:

Please find attached three proposed election rules for the consideration of the State Election Board under the provisions of Ga Comp. R. & Regs. 183-1-1-.01. The three draft rules submitted on a stand-alone basis are:

Proposed Rule 1 – Mail Ballot Drop-off at Polling Place (Exhibit 1)

Proposed Rule 2—Protecting Ballot Secrecy (Exhibit 2)

Proposed Rule 3—Paper pollbook backups (Exhibit 3)

We offer these proposed rule drafts to suggest practical and efficient improvements in the election administration process that will improve the voting experience for voters and streamline certain procedures and reduce cost. At the heart of our proposals is the protection of the constitutional right to vote and to have that vote protected by an absolutely secret ballot.

This verified petition is being submitted by Coalition for Good Governance[1] and Morgan County Democratic Committee[2] as stated on Exhibit 4. Coalition for Good Governance is a non-profit non-partisan membership organization with interest in each of its Georgia-based members' voting rights, and the advancement of its

---

[1] Official contact information for Coalition for Good Governance is: Ms. Mary Eberle, Board Secretary, 1520 Cress Court, Boulder, CO 80304, or Marilyn Marks, Marilyn@USCGG.org 704 292 9802

[2] Official contact information for Morgan County Democratic Committee is Ms. Jeanne Dufort, Vice-Chair, 1360 Apalachee River Road, Madison, Georgia 3065, Jdufort@aol.com 770 330 9040

organizational mission of election security and voter privacy. Morgan County Democratic Committee has interest in the election of Democratic Party candidates and protecting and advancing the voting rights of all eligible voters. Its interests in these rule changes are to provide more voters with timely and secure access to exercise their right to vote.

We encourage you to contact us if you have any questions about our proposed rules.

Your primary contact for this matter should be Jeanne Dufort, whose contact details are below.

Thank you for your consideration of these important improvements for the voting process in Georgia.

Respectfully submitted,

Jeanne Dufort
1360 Apalachee River Road
Madison, Georgia 30650
Jdufort@aol.com
770 330 9040

**Exhibit 3**

**Rule 3 --Paper Pollbook Back-ups (Printed Electors' List)**

> *In every election, after the close of advance in-person voting, the election superintendent shall print a paper copy of the poll book for every polling place, updated for advance in-person voting, and such copy shall be available in each polling place on Election Day in accordance with the provisions of O.C.G.A. 21-2-401(b). The printed poll book (printed electors' list) information shall be deemed the official voter information in the event of discrepancies in the electronic pollbook, and used for adjudication of disputes that arise from discrepancies or malfunctions of the electronic pollbook.*

Note: The adoption of the above proposed rule requires the **repeal** of obsolete Rule 183-1-12.07 (1) which provides:

> *Beginning July 1, 2006, counties shall use ExpressPoll units at precincts within the county during primaries, elections, and runoffs. The ExpressPoll units shall be utilized in lieu of the printed electors list and ballot encoders in each precinct where in use.*

Reason for the proposed rule:

Electronic poll books offer many advantages, including ease of use and fast updating of records. However, numerous reports from cyber-experts have warned of the potential for malicious attacks that could render the devices unusable or inaccurate. Observers during the recent pilot elections have observed an alarming number of discrepancies and malfunctions, including persistent reports where voters residing at the same address are unable to be processed simultaneously. In many counties, voting is a family affair – this type of malfunction presents an inconvenience to voters, and puts a severe strain on voter processing. For example, in the November 5, 2019 Valdosta municipal election, the electronic pollbooks malfunctioned and voters were turned away from the polling place while the pollbooks were not working. They were not offered provisional ballots. Hundreds of such incidents were documented in the November 2018 mid term elections.

Having an official paper poll book on site is a low cost and efficient way to protect against both malfeasance and malfunction, as well as mitigate emergencies like power outages.

Use of the paper pollbook back-ups should reduce the number of provisional ballots required that now result from electronic pollbook discrepancies.

Current statute (O.C.G.A. 21-2-401(b) requires the printing of the electors' list. However, it is not currently being used to resolve discrepancies or supply a back-up pollbook record. As a result, eligible voters are frequently forced to vote by provisional ballot or turned away from the polling place, or sent to the incorrect polling place.

EXHIBIT

C

# Coalition for Good Governance

March 23, 2020

The Honorable Brad Raffensperger
Georgia Secretary of State
214 State Capitol
Atlanta, Georgia 30334

Via email Brad@sos.ga.gov

Re: **Recommendations for 2020 Elections**

Dear Secretary Raffensperger:

The Coalition for Good Governance (CGG) proposes the following urgent actions that you and the Georgia State Election Board ("SEB") can take to ensure the security and integrity of, and broad voter participation in, the 2020 elections in view of the coronavirus threat. Though CGG is an adversary to your office and the SEB in litigation challenging the constitutionality of Georgia's Dominion Voting System, *Curling v. Raffensperger*, No. 1:17-cv-02989-AT (N.D. Ga. filed Aug. 8, 2017), we submit the following requests and recommendations to you not as litigation adversaries, but as interested members of the voting public. We hope that you and the SEB will consider these suggestions with open minds in order to serve our shared interest of protecting millions of Georgians.

We are happy to discuss any of these requests and recommendations at your convenience.

## A. Count All March 24 Mail Ballots

We understand that counties have been instructed not to count March 24 election mail ballots received after March 24, although the official election date has been moved to May 19. Voters may not desire to request another ballot to vote in the more complex May 19 primary. For example, a DeKalb County voter may wish to vote only on the March 24/May 19 sheriff's race and now may still have an unvoted mail ballot. The voter should not be required to apply for a new ballot when he or she has an unvoted ballot for the sheriff's race that is now moved to May 19. Please reconsider the decision not to count such ballots that arrive after March 24 and, instead, count all ballots arriving on or before May 19, the new official Election Day to avoid voter confusion, disenfranchisement and excessive paperwork for administrators.

**B. BMDs—An Unsafe System for the Foreseeable Future**

The Dominion Ballot Marking Device system is unsafe from a public health perspective while the coronavirus threat continues to ravage Georgia communities.

Georgia statutes require that a voting system be "safe and practicable" ***prior to deployment.*** O.C.G.A. § 21-2-300(a)(2). The Secretary of State is required to make a determination of whether the voting system can be used "safely and accurately." O.C.G.A. § 21-2-379.24(b). Upon re-examination, the Secretary's determination can change as to its ability to be used in safe operation by electors. O.C.G.A. § 21-2-379.24(c).

The Dominion BMD system cannot be used safely during the COVID-19 pandemic. The system requires intense and labor-intensive Logic & Accuracy Testing in the election office, followed by the labor-intensive steps of transporting system components to polling places. The systems then must be installed in the polling places, which also involves concentrated team contact, considerable equipment handling, and extensive staff presence in the polling places. The system's components (including touchscreens, PollPads, styluses, and smart cards) all require significant and repeated physical touching and handling by both voters and workers, as well as considerable team interaction (for operation, instruction, and assistance) between poll workers and voters. All supplies and components of the system must be cleaned to the CDC's exacting specification after every individual voter's use in the current environment. This health and safety requirement cannot be met given the delays that such steps would impose on voters in the polling places and the widespread labor and cleaning supply shortages. Further, Dominion recommends that the touchscreens be powered down for cleaning, which would cause a long delay for rebooting after every voter and massively increase the risk of system failure.

A far simpler, more health-conscious solution would be to replace the BMDs with hand marked paper ballots, which could be delivered in a single box to each polling place. Disposable pens or golf pencils (for 2020 only) could be used to mark ballots. Minimal handling of equipment would occur if officials were to use "central count" options for hand marked paper ballots as referenced by O.C.G.A § 21-2-485, a process in which voters could cast their paper ballots into a "dumb" precinct ballot box for centralized scanning at the elections office. This alternative would involve fewer personnel and less handling, as well as permitting voters to spend less time in the polling place.

Many thousands of labor hours would be saved by using hand marked paper ballots instead of BMDs, which would relieve pressure to staff the large number of posts currently anticipated to be necessary at a time when labor will be difficult to find.

**For the foregoing reasons, we urge you to decertify the BMD components of the Dominion Voting System for use in the immediately upcoming 2020 elections because the system is *unsafe* under the circumstances that will likely prevail at the time these elections are conducted.**

We believe that combined with flexible mail ballot and early voting options permitted by state law, hand marked paper ballots can provide the basis for an orderly and safe election in May, July, and November if diligent hygiene is maintained with lean crews. We offer a number of suggestions below that would facilitate the use of hand marked paper ballots to conduct these and any other elections that will be held during the remainder of the current national public health emergency.

1.  If officials are concerned about the accuracy of hand marked ballot style issuance in early voting because of the number of potential ballot styles, they should conduct a simple manual check with a sign-off by the poll worker "checker." This simple manual effort would save hundreds of hours and avoid the risks that will otherwise be imposed by the need to set up and use BMDs for automated ballot issuance.

2.  Voters should not be required either to sign or to use styluses to touch PollPads. (Nor should voters including voters with disabilities requiring assistive BMD technology be required to handle smart cards.) Either signatures should be waived this year, or else paper pollbooks should be used, since these can be signed with disposable golf pencils or disposable pens.

3.  Voters should be permitted (but not required) to bring their own printed-at-home, signed polling place applications to vote, thereby reducing human interactions and time spent in the polling place.

4.  Given the potential for disruptions of online services and the foreseeable difficulties of locating technical help promptly in such an event, the SEB should require election superintendents to use a paper pollbook backup of elector information that has been updated to reflect all early voting (i.e., the "certified electors list" in O.C.G.A. § 21-2-401(b)). The paper backup should be used to adjudicate discrepancies, and voters eligible to vote according to the paper backup list should not be forced to vote a provisional ballot.

## C. Voting Method Expansion and Alternatives

1.  Permit acceptance of mail ballots at early voting locations and home precinct on election day. The State Election Board ("SEB") is aware of CGG's proposals (in partnership with the Georgia Libertarian Party and Georgia Constitution Party as well as others) submitted November 22, 2019, for voters to be permitted to drop off mail ballots to be ***accepted*** for later counting after showing identification in

the polling places in order to avoid subjecting themselves to mailing and signature-rejection risks. These proposals should be adopted.

Additionally, for ballots received without identification (such as when a person delivers a family member's ballot), polling locations could be used as drop-off (not approval/verification) locations. We urge the SEB to quickly adopt a mandatory rule consistent with current law permitting the appointment of absentee ballot at expanded locations. *See* O.C.G.A. § 21-2-382.

Accept completed mail ballots at curbside. Early voting centers, precinct polling places, central offices, and temporary pop-up drive-through locations should be established to ***accept and approve*** mail ballots. A drive-through drop-off could be set up in each polling place's parking lot and could be staffed until late evening. Poll workers could use iPad-like tablets with absentee ballot lists to check off ballots as returned after reviewing the photo identifications of the voters. Absentee ballot clerks should be appointed at each of these stations under O.C.G.A. § 21-2-382.

2. Curbside voting. Many states effectively use curbside voting, which permits eligible voters to receive paper ballots in their cars, vote on a clipboard, and return the ballot in a secrecy sleeve to the poll worker. Georgia should make use of similar methods. Disposable cardboard sheets could be used instead of clipboards. Sleeved ballots could be dropped into a locked ballot box without poll workers handling the ballots.

3. Drive-through window voting at banks. Banks should be asked to participate by permitting their drive-through windows to be used as ballot acceptance stations on election day. Ballots can be issued to or collected from such facilities if proper controls are put into place.

4. Early voting hours. In Georgia's generous three-week period of early voting, differing hours (not necessarily more hours) should be offered, with at least some locations offering hours that extend until late evening on certain days, in order to help reduce the sizes and densities of polling place crowds during the day.

5. Polling place locations. For purposes of the May and July elections, polling places should be temporarily moved to nearby (closed) schools so that large gymnasiums and cafeterias can be used for in-person voting. Larger spaces mean more room to spread out equipment, voting stations, poll workers, and voters—all of which help people comply with the CDC's social distancing recommendations.

6. Facilitating mail balloting.

   a. The SEB should require all counties to accept online email or faxed absentee ballot applications, with a required short issuance period.

b. All voters should have the option to submit a one-time request for mail ballots that would cover all 2020 elections and related 2021 runoffs.

c. Current mail ballot application forms should be updated and simplified to explain methods of submitting the applications and clarify which voters are eligible to apply for multiple elections in one request.

d. Federal Write-In Absentee Ballots should be accepted as a fail-safe voting method if the voter has not obtained a mail ballot in time for mailing or casting (for 2020 only).

e. Establish pop-up absentee ballot clerk locations (i.e., "additional sites" under O.C.G.A. § 21-2-382) in precinct polling places and government buildings in order to *issue mail ballots in person*. Ballots could be taken home to be completed and subsequently returned by mail or in-person delivery.

f. Announce that there will be no enforcement of prohibition of voting mail absentee ballot on election day. (O.C.G.A. §21-2-385(a)) Many voters like to vote on election day and personally deliver their mail ballots. Some counties are recently warning voters not to vote their mail ballots on election day.

7. Mail Ballot Processing.

Certain changes to mail ballot processing will be warranted to effectuate the above proposals while also preserving secrecy of the ballot and minimizing any risks of voter disfranchisement.

a. Clear instructions must be printed on mail ballot inside secrecy envelopes to explain the purpose of the envelope, its mandatory use, and requirement of ballot secrecy.

b. Your office should emphasize that county election officials must comply strictly with mail ballot protocols for secrecy. CGG's poll watchers have observed voter privacy being compromised by election officials in small communities during the opening and processing of mail ballots.

c. Voters should be permitted to enclose a black and white *copy* of their photo identification to substitute for signature verification checks and thereby to avoid the rejection-and-cure process. (Enclosing identification must be accomplished in a manner that protects ballot secrecy and provides for redaction of personally identifying information afterward.)

d. Mail ballot acceptances and rejections should be required to be posted by all counties daily, as most counties do routinely. Third parties require this information to help voters track ballots and cure discrepancies.

## D. Mail Ballot Security

Certain additional security measures will be required in order to effectuate the above proposals. We recommend the following steps.

1.  Create strict prohibitions against ballot harvesting. Mail ballot coercion, fraud, and vote buying are all exacerbated if community groups, labor unions, religious organizations, etc., are permitted to collect ballots. The SEB should enact clear rules prohibiting such harvesting, including punitive fines.

2.  Adopt strict and transparent chain of custody documentation. In order to have public confidence in the election, the poll workers, poll watchers, and the parties they represent must be able to verify the chain of custody of mail ballots and their supporting documents. Clear rules should be promulgated by the SEB to ensure that such documents are mandatory, that there is certainty of compliance, and that poll watchers are afforded the ability to independently verify chain of custody for mail ballots and accompanying documentation.

## E. Transparency

Given the massive changes to voting methods that will be required in order to avoid exacerbating the public health threat posed by SARS-Cov-2 and COVID-19 (whether or not you and the SEB adopt any of the above recommendations), increased transparency measures—especially in mail balloting—are going to be essential to preempt doubts about the integrity of the upcoming elections. Accordingly, we offer the following additional suggestions that are aimed at ensuring voter confidence in this difficult period.

1.  Poll watcher access to mail ballot operations. County officials should be instructed that all operations and processes of mail ballot issuance, acceptance, rejection, scanning, and tabulation should be open to visual access and verification by authorized poll watchers. An appropriate number of poll watchers should be permitted, in order to allow for rotation of poll watchers over the expanse of days and hours in which election operations occur.

2.  Poll watcher review of ballot issuance or voter rejection. State law and ballot issuance practices should be amended to permit authorized poll watchers to verify the accuracy of ballot styles issued to the voter to reduce errors in ballot issuance or the rejection of the voter from voting in the polling location. Verification of accuracy can be conducted with reference to an electronic record in the possession of the poll watcher, such as via an iPad. Permitting poll watchers to conduct such a check should not impede the voting process in any way. Conducting such checks is a routine function of poll watchers in other jurisdictions. These checks help to minimize, if not avoid, instances of

unintentional disfranchisement of voters, inappropriate provisional balloting, and inaccurate ballot style issuance.

3. <u>Political Parties/Bodies Working Group</u>. We recommend that all political parties and registered political bodies be asked to join a working group to meet weekly (by virtual means) with you, preferably in a publicly broadcast meeting, to facilitate the exchange of information and ideas through the conclusion of the 2020 elections and runoffs in January 2021. This mechanism would provide a transparent vehicle for you to use to ensure that you may conduct any necessary ongoing problem-solving with the input of civic entities capable of speaking for a broad and hopefully representative cross-section of all Georgia voters. The political parties, in particular, could play a helpful public role, if they were involved in such a working group, by facilitating the widespread communication to the public and candidates of accurate information about ongoing decision making.

The above suggestions are a partial list of changes that we urge all Georgia officials to consider, given the grave public health risk facing Georgia at this moment and given the ever-present need to facilitate safe and secure voting. The Dominion BMD Voting System is particularly ill-suited to the current situation because it adds unnecessary risks and financial costs to a fragile election environment. Given Dominion's failures to comply with the terms of the contract with respect to compliance with federal and state election laws, including secret ballot laws, we urge you to consider requiring that Dominion refund the cost of the BMD touchscreen components, which would likely generate a refund to the State of $65 to $75 Million.

We are happy to discuss this with you at your earliest convenience.

Respectfully,

Marilyn Marks
Executive Director
Coalition for Good Governance
Marilyn@USCGG.org
704 292 9802

cc:
State Election Board Members
Vice-Chair Rebecca Sullivan Rebecca.sullivan@doas.ga.gov
Ahn Le ale@lelawllc.com
David Worley david@ewlllc.com
Matthew Mashburn mmashburn@georgia-elections.com

Staff:
Germany, Ryan rgermany@sos.ga.gov
GA Secretary of State Elections Division jshannon@sos.ga.gov

EXHIBIT

D

1    Cobb County Election Board Meeting Transcript

2    Fri, 6/19

3

4    **Janine Eveler**  00:00

5    For a turnout of 36.25%. The provisional ballots that were issued, totaled 2098, of which 1293 were

6    counted. The absentee mail and advanced voting, we had a total of 146,719 ballots issued both in

7    person and through the mail. And we received back 107,000 absentee mail 66 electronically issued

8    ballots, and we had 11,649 that voted in person for a total in these categories of 118,753. We have

9    recieved 24 ballots after election day from military and overseas citizens and so those were added to

10   the total as well. So those are the numbers. Now I'd just like to talk about some things that we

11   experienced here that resulted in some of the issues that we, that we- the public has talked about. As

12   far as the absentee ballots that were issued. We did, I think, a great job on that. It was recognized by

13   one of the speakers. We put a great number of loaned employees from other departments, and we got

14   the Jim Miller Park Event Center for- to have space to spread people out. And right away, we knew we

15   needed to take extraordinary measures to get all those ballots issued. And I believe we, in Cobb,

16   issued more ballots than any of the other counties. Maybe Fulton had a few more, but right up there.

17

18   And then as you all know, the voters on the Election Day did sometimes come back with- they had

19   been issued an absentee ballot but they wanted to vote in person. So talk a little bit about what we saw

20   at the polls. We had a little over 3500 voters that had to complete the affidavit at the polls, and that is,

21   what is the process when they don't bring in their ballot and they want to vote in person. And of those

22   3,572 affidavits only 788 said that they did not receive their ballot. And that was the reason that they

23   wanted to vote in person. Most of the affidavits that we received, indicated that they did receive their

24   ballot, they just changed their mind on how they wanted to vote. We also had five cardboard boxes that

25   were filled with ballots that were surrendered at the poll. So there were a great number of voters that

26   decided they wanted to vote in person rather than the absentee method which was issued at first. One

27   of the things that we did, I think we made a good decision on, we sent quite a number of those affidavits

28   to the polls, and then also gave the poll managers an extra packet of those so that they would have

29   enough. We anticipated that that would be something that we would see at polling places. Some of

30   them did run out even then, but were able to make some copies at the facilities that they were at.

31

32   As far as advanced voting, we did try a new system to try and distance people who were checking in,

33   rather than have a socially distance line down the down the sidewalk around the building. And graphs

34   have people in a dangerous situation. We allowed them to check in and get a group number, and then

35   go wait in their cars. And at some point, the poll workers felt that it would be advantageous to also take

36   a text- a phone number to text people. That was not our intention. And when that started to happen, a

37   lot of people either didn't get a text, or they left and came back. And so the line grew to several hours,

38   five, six hours on the last day because people are just continually checking in with no real

39   understanding of what the wait time was. So that is probably not something that we will continue to do.

40   It was an attempt to get a socially distanced line.

41

42   One of the challenges we also had on that last Friday of advanced voting was we were again working

43   through a six hour line and the state system went down for regular maintenance at 11pm. So everybody

1    that was in line from 11pm till 1:30 that morning, the next morning was voting on from a static list. So
2    there were some people that were complaining about getting the wrong ballot because they didn't we
3    didn't have an accurate list of whether they had voted already in the March election. So we had some
4    issues with that. And that was related to the system going down for regular maintenance on an
5    important voting day.
6
7    One of the other things that we did, I think, well, compared to some of the other counties that lost 10s
8    of- 45, 30, 45 polling places, we lost only two polling places. We have a pretty good contract with our
9    polling facilities. So we had several that were nervous about having people in there and the voters in
10   there but we were able to point to the contract and hold them to their commitment. So in that way, we
11   were lucky that we only had two do that we had to move to another location and double up there. One
12   of our biggest issues was poll worker retention. And I think that was true everywhere. We lost
13   significant numbers of our experienced workers and ended up in most polls with between four and eight
14   poll workers, which is not nearly enough to adequately complete the steps that are necessary with the
15   new equipment and to man the station. And I'm not surprised that poll workers did not work the line and
16   communicate better because they couldn't leave their station. We heard stories of poll workers, you
17   know, not eating all day, you know, very seldom being able to go to the restroom not wanting to drink
18   so that they couldn't, because they couldn't leave. So I was it was not a good day. We do give the same
19   resources to all polling places, but we don't know where we're going to have attrition. And when that
20   happens, it sometimes happens in a significant area. What we had tried to hire was 1,440 poll workers
21   and we ended up with a little over 1,100. And we were hiring hundreds of people in the last two weeks.
22   We ended up asking county employees to help fill some of our gaps, and we do get a good response.
23   We also had many employees out at the Jim Miller Park helping us with the absentee mail operation,
24   mainly from the library and parks departments. We also had staffing shortages in poll managers and
25   area supervisor positions. And we filled those with sometimes county employees or people who are
26   working elections for the very first time. We had our office workers filling in at area supervisors and poll
27   managers, which meant that we didn't have enough people here at the office to answer phone calls on
28   election day. But we had to man the polls and we had to have a poll manager in every poll.
29
30   So the other areas of shortages is we had one technician from the vendor that was assigned to us. And
31   he was overwhelmed with questions. We also were able to hire 12 of our own technicians to have a
32   route of polls that they were covering. Some of them were assigned up to 19 polls, which is impossible
33   to cover. We usually have 20 people or more as our troubleshooters, three of the 12 that we had were
34   brand new and not familiar with the equipment and had to be assisted by phone to complete their tasks.
35   Going forward, I understand the Secretary of State is saying that we will try to put a technician in every
36   poll, probably November is what the target is. I would appreciate that very much. If we could have
37   somebody technically trained in each poll that would have made a big difference. I believe though that
38   the Secretary is asking us to hire those people. So I'm not confident on that.
39
40   Regarding training for poll workers, the challenges that we had in that area were significant. When the
41   pandemic hit and we had people working from home, we also had our training supervisor resign. And
42   so a lot of collaboration that's needed to develop training was not as possible as it was before. The
43   state did supply some videos and some setup instructions, but there was no coordinated poll worker
44   training for the state. So we had to develop our own online training. We did not spend enough time to

Transcribed by https://otter.ai

1   discuss with the poll workers in our training about emergency procedures. So as also was pointed out
2   by one of the speakers, many people may poll managers reacted with different procedures when they
3   were faced with emergencies. Oh, as far as the system training, we had only 350 people left on our
4   rules that had gone to equipment training. So some polls had no one that had ever been trained or
5   worked with the equipment in a hands-on way. We did conduct training back before the first
6   postponement of the March election. But of course, that was in the far distant past for many people.
7   The online training that we were able to produce was a narrated PowerPoint and the state issued
8   videos and provided step by step instructions. But of course, those are difficult to go through under
9   pressure, which the poll workers were under a lot of pressure. It is a complicated multi component
10  system. The other thing is that during the February and March training that we did provide to the poll
11  workers in an in-person way, the state forms and instructions were still under development. So by the
12  time we had the final documents, we were no longer able to hold in-person classes. And that was a
13  huge challenge to educate the poll workers on what they needed to do.
14
15  Another challenge that we had was the time that we spent to acquire the PPE that was necessary the
16  personal protective equipment for the poll workers, the cleaning and sanitizing supplies, we were told
17  by the state that we should just try and acquire our own supplies since they didn't know if they could get
18  anything for us. In the last two weeks before the election, we were told that they had sufficient supplies
19  for us, but by then we had spent a lot of time trying to secure our own, which we could have spent in
20  better ways.
21
22  I'm sorry, this is a long but I'm gonna give you everything. One of the other issues that we had was with
23  the poll pad system, the check-in products. The poll pads have to be updated with the voter list the
24  weekend prior to the election. So the file that we were trying to update, we tried from Friday evening
25  through Sunday and we're not successful in uploading the voter file to the poll pad- to all the poll pads.
26  Apparently there was a minimum bandwidth required, and we were never told what that was. And we
27  did not have sufficient infrastructure to complete that task in the time that we were given. So out of 144
28  precincts 55 were not updated in time for the whole managers to pick up their poll pads. We stayed up
29  again all night Sunday, and the vendor assisted us by taking 200 of our poll pads to another location so
30  that they could be updated. So we had that whole weekend where we were trying to get- create the poll
31  pads so that the check-in would be successful. We finally did at 3am. We received those systems back
32  on Monday. And we were able to package them for the poll workers and had to get them to all the polls-
33  the poll managers. So we were able to distribute those to the area supervisors, who then had to get
34  them to the polls as they set up on Monday. Again, we were never told there was any minimum
35  bandwidth required, and we did not have sufficient infrastructure. The previous system, that task was
36  mainly just uploading the absentee voters so that we would have an accurate list of who was- who had
37  voted during the early voting. So it has to wait until Friday, early voting completes, and then we would
38  upload just the absentee file on the weekend. With this new system, it was the entire voter file with 7
39  million records. So it did take longer than we had been anticipating.
40
41  One of the other issues that we had was the delivery of the equipment to the polls. This new system
42  has four times the number of components as the previous system. We added an extra day and some
43  extra routes to our delivery schedule. But we were continually having to load fewer precincts into the
44  trucks because they wouldn't fit and missing deliveries throughout the week and rescheduling them

Transcribed by https://otter.ai

1   until the Monday delivery, the Monday prior to the election, was completely untenable and we could not
2   really complete that in a timely way. We had four truck drivers that quit on Sunday night, Sunday
3   afternoon. So we were scrambling to get new drivers and a county employee actually ended up driving
4   a truck our our agency director Mr. Tanks drove a truck that day. We had a truck also break down on
5   the Monday route. So by the time the last poll got their delivery, and set up, it was a after one o'clock in
6   the morning, Tuesday morning, and they had to be there at six in the morning.
7
8   The set up on Monday. The previous system allowed us to set up the units on Monday, and because
9   they had a sealed hard case and they had their own legs and they can be set up and left overnight.
10   This new system allows only a minimal amount can be set up so most of the work has to be done on
11   Tuesday morning. The units can't be set up and left overnight, because they have to be- stay sealed in
12   their cases overnight for security. The poll workers were instructed to get at least one voting unit
13   working by 7am, and to setup more as soon as possible, so that they could open their poll on time. But
14   many polls were still setting up units after the poll opened, causing the slope of the flow at the
15   beginning.
16
17   We set the number of voting enclosures that are required by law for one voting unit for every 250 voters
18   in the poll. However, they couldn't set up all those units because of the social distancing that was
19   required due to the pandemic. They had those available and sometimes in some polls that have long
20   lines, we were calling them and saying just put them closer together, add a few more, do what you can
21   to get people through the line. And so, you know, I understand from comments that people are more
22   concerned about the fact that they get through the line quicker than the fact that there is a risk of
23   COVID-19. So we'll take that in mind for the future.
24
25   On election day, many polls reported that their poll pads were not syncing, or that they could not
26   encode cards and they couldn't log in because it gave unexpected messages. We were given no
27   instructions on how to resolve these syncing issues. And so we couldn't really helped the poll workers.
28   Several polls reported issues that the vendor was contacted and said, the only way to fix that is for you
29   to take down a secure Wi Fi device called cradle point to that location. And so we can log in and fix
30   those poll pads. We did not have the resources to deliver that device to multiple polls with with issues.
31   The state provided no troubleshooting guides, and so perhaps some simple fixes, like perhaps the
32   syncing issue could have been done by the poll workers. That it didn't require a call to the office or
33   technician, but without that kind of a guide, the poll workers were just trying to call us and our phone
34   lines were jammed, because again, we did not have the staff to man the phones appropriately. They
35   were out in the field working.
36
37   Another thing that the poll workers were doing that caused a problem, and this was probably a training
38   issue, on the screen when they encode the card, it gives two checkboxes one for an audio ballot and
39   one for a provisional ballot. They knew they weren't supposed to be choosing provisional so they, they
40   chose the audio-visual option, which created an issue on the ballot marking device when they should
41   have been leaving both checkboxes blank. But human nature is when you have two checkboxes, you
42   figure you have to make a choice of one or the other. So that was not clear in the instructions that were
43   given. We will work on that as a training issue.
44

Transcribed by https://otter.ai

1    Again, the system that we have, and that I assume we will be keeping for a while, has many component
2    connections, each with a possibility of failure. Some of the problems with the printer was not being
3    recognized by the touchscreen. Others had issues with the universal power supply not functioning so
4    that no power was supplied to the touchscreen and the printer. The poll pad has a very small
5    connection point for the encoder that failed in many polls and cards were not able to be properly
6    encoded. One of the things that we will concentrate on going forward is so that when these issues do
7    occur, that the poll workers have a better emergency plan and that they all know what actions to take.
8    Lastly, the adjudication program that we did not use. The reason we did not use it is that we were given
9    a training webinar on May 29. So that was not enough time, in our view to learn a new module and to
10   be able to implement that in time. We've received many different training items and training webinars
11   and instructions from the state throughout this whole period of the postponement, and they were just
12   making changes to instructions and issuing new instructions throughout this period. And so this is
13   basically what I wanted to present. There were significant... there were things that we could have done
14   better. But there were things that are inherent in this system that are going to take us a while to make
15   sure that the poll workers completely understand it. Back to you
16
17   **Phil Daniell** 20:56
18   Appreciate you. I think this time, we'll be moving to the certification process, and I hereby like a motion
19   that we certify the results of the June 9, 2020 primary and election as presented. Do we have a
20   second?
21
22   21:13
23   Second
24
25   **Phil Daniell** 21:15
26   We have a motion and a second. We have any discussion by Board Members, any questions or
27   comments by them before voting? All right, I'll ask for everyone's vote. And since we all have visual, if
28   you will raise your hand if you approve this, thank you. And if ... happens to be on the phone if he could
29   give us a ... that would be good. All right, that passes by what we can see is four to- four to zero on
30   that. So we're hereby certified and next step would be our approval of the minutes. And we have our
31   minutes here. ...minutes of June the 9 which is election night, at that time we have three of our board
32   members which forms quorum which ... at the office on Whitlock at the office and then our other board
33   members are at the warehouse, and we opened up our meeting and then basically we recessed the
34   meeting in case there's anything that comes up that we need to deal with. And then whenever we get to
35   the last of the reports in, then we adjourn for the night. And so our meeting minutes are here. I make a
36   move that we approve these minutes, do we have a second?
37
38   **Neera Bahl** 22:42
39   Second.
40
41   **Phil Daniell** 22:49
42   All right, Neera seconds. Do we have any questions or comments about the minutes? I hear none. I'll
43   ask for everyone who approves to raise their hand, please. Alright, four votes for that. All right, so those

1 are approved. Thank you very much. And then we go into regular business now and I'll turn it back over
2 to Janeane, if she has further comments.
3
4 **Janine Eveler** 23:14
5 No, sir. I think I'm done.
6
7 **Phil Daniell** 23:21
8 Ok I appreciate all that. I know it was lengthy, but I appreciate you doing it. I know some of us have
9 communicated with Janine during this process of sourcing. And concern some of the things cause the
10 question comes to a lot of us about what what went wrong what could we do? We do have- had long
11 lines in a lot of cases, most cases, I guess you'd say and what can we do to correct it? And our next
12 thing is we have Do we have any other business? All right, no other business we have time here for
13 board members' comments. If I may take mine, I'll go ahead and make my comments if someone else
14 has some they want to make.
15
16 I started a little early with it just a moment ago, really. But we've been looking at these problems we had
17 and of course, we'll be discussing them more, because you may be aware or maybe not. Since the
18 election night, there has been activity going on about going over all these absentee ballots, they have
19 to be processed. Those ballots are run through scanners, if the ballots are in good condition and so
20 forth, they can be put in high speed scanners which helps us out, but even high speed is not all that
21 fast. And that means you have those that are rejected and cannot- they have to be done by hand and
22 there have to be a duplicate ballots made in order to be sure that vote is counted as it was intended to
23 be and take care of that. And that was not all completed until last night, or early this morning. I don't
24 know which one it was. But we've looked at all of that and I appreciate all the work Janine has done on
25 this. I know it's been very stressful on her and all the staff and all the poll workers. And I appreciate all
26 the poll workers that we have that were able to attend.
27
28 There are those that I know due to age or, or their health conditions, did not feel safe in being poll
29 workers in this dam, and some of them could not decide that until later in time to see how things were
30 going with this virus to be able to make that decision. And we've worked, I think, as well as we could at
31 that time, and we'll see what we can do to improve our next event will be of course, August 11. And
32 that's the runoff. And when you go with these results from the election that we have here, you'll see that
33 there are going to be some run offs and races, but of course not as many races and not any of the
34 presidential or some of those races. So there wouldn't be as many people turning that over to vote but
35 we still want to be prepared to handle that. Do any other board members have comments they'd like to
36 make?
37
38 **Fred Aiken** 26:04
39 I'd like to thank Jeanine for the excellent job she did in explaining what went wrong. And she also
40 commented about, you know, making plans for the day of the election took place. There were so many
41 unknown factors involved on election day that there was no way that you could make the advanced
42 plans, you had to just kind of try to solve the problems as they existed. But now that we know what
43 some of the problems were, hopefully we can remedy those problems and have a much smoother
44 election. But I would like to comment on one thing that you know, there were some comments about,

Transcribed by https://otter.ai

1    you know, that accused us of shenanigans, voter suppression and chaos by design. That's about as far
2    from what occurred as I can imagine. And I really personally resist that comment.
3
4    27:02
5    And can I can I comment on that that, I agree with Fred 100%. Because it's personally it's offensive to
6    all the people who are serving with the- there's no bias of any kind. We work together to see the
7    process is smooth. Everything else is in- it's not in our hands what happens and definitely pandemic
8    was not something that we any one of us forsaw. And like you said that most poll workers are older,
9    and they obviously last minute did not want to show up for health reason or didn't feel comfortable.
10   Well, we can hold it against Janine or anybody else for that matter. So I think, Fred, I really hundred
11   percent agree with your comments.
12
13   27:45
14   Um, ladies and gentlemen, I'd like to say first, that I don't take any personal offense to anything that any
15   of our voters validly say concerning their perceptions. I do not have any particular comments. I, I did
16   want to thank everyone who I think we've had more than 40 participants. I would like to thank everyone
17   who chose on this Juneteenth day to attend our meeting- our certification meeting. I would like to say I
18   also thank those who were sharing data, as well as their organizational and their personal perspectives
19   on what was going wrong. A lot went wrong. And we need to be very clear that the responsibility for the
20   problems began at the top. The state. I think that's been clear from Janine's comments. I think that, as I
21   have already expressed to other board members informally We had a lot of problems that occurred at
22   the local level. Certainly, to remedy some of the issues that we've had. We'll need resources we need,
23   we will need financial resources, because we have to foot the bill for those technicians. That's going to
24   be a tremendous expense. We already know that the Secretary of State will not be sending at least has
25   been said that he will not be sending out absentee ballot applications this time. So we have those
26   things to consider. We need human resources as well as other resources to resolve this but we are
27   here to serve our public and whether we call it voter suppression or not. It is voter suppression. It does
28   suppress the vote, whether it's intentional or whether it's unintentional. As I said, I didn't really plan on
29   making any, any form- spending a lot of time making formal comments. We all know that we are
30   experiencing a tremendous social, political, economic upheaval. But our challenge is to do better. With
31   all that we can in every way that we can and not blame our voters for many things that are also beyond
32   their control. So that's my statement for now.
33
34
35   **Phil Daniell** 30:39
36   Thank you very much. I'd like to make a couple other quick comments and that's concerning. These the
37   people who are on or still listening or watching may be well aware of this, but perhaps not. And I hope
38   you'll help spread the word that we do have this August the 11th will be a run off that you have
39   available. If you go to cobbelections.org our website, which is part of Cobb County elections, Cobb
40   county.org, that you will be able to see a lot of information there, about precincts, precinct maps,
41   elections that are coming up, meetings, minutes of meetings, a lot of other information, that could be
42   very useful to you. You have to kind of do some searching through some of it to find it, or go through
43   different parts of it, but I think you'd find it very rewarding. Also, I like to comment if you're not familiar
44   with it, about my voter page, my voter page, sometimes referred to as MVP, and this is provided by the

Transcribed by https://otter.ai

1   Secretary of State's office, and when you go there you can put in your personal information name,
2   birthdate, county and it will pull up your voting information as to where you go to vote. Get directions to
3   your precinct. You can pull up your sample ballot when those are ready close to an election. If you get
4   an absentee ballot application, sent in that will show when that when it's received. When they send out
5   your ballot, that'll show. Whenever it is received, that'll show. So that's good information to have to be
6   aware that you are well, first of all registered to vote and where you're supposed to be. And thank you
7   very much. And our next scheduled board meeting will be July 13 2020, at 4pm. That's our regular
8   meeting. Do we have a motion to adjourn.
9
10  32:34
11  So moved.
12
13  **Phil Daniell** 32:35
14  All right. I have a motion. I'll second that. And all in favor, please raise your hand. All right. 4-0. Thank
15  you very much. And we thank everyone for participating.
16
17  32:49
18  Thank you.
19
20  32:57
21  Thank you Janine. I still say you did a wonderful job under the circumstances.

Transcribed by https://otter.ai

EXHIBIT

E

**Attachment D – Mandatory Questions**

**File 0-3 Proposed SVS**

**3      State Level and EPoll Dataset-Building and Reporting**

**Supplier must propose a SVS solution that includes:**
**- State level ballot building (EMS)**
**- EPoll data set building and reporting (EPDMS),**
**- Electronic Poll Books (EPoll),**
**- Ballot Marking Devices (BMD),**
**- Polling Place Scanners (PPS),**
**- Central Scanning Devices (CSD),**
**- Consumables,**
**- and Peripherals**

**Provide the name and configuration of the product(s), product descriptions, and quantity proposed to be provided in the SVS (do not include cost).**

Yes. The proposed solution from Dominion and KNOWiNK includes all of the noted solution requirements. Below we provide a high-level response detailing the name and configuration of the products as well as the proposed quantity when available:

 

## - State level ballot building (EMS)

Ballot building is conducted using the Election Event Designer module of Democracy Suite, version 5.5A. Dominion is proposing 175 licensed copies of the Democracy Suite set of Products including 183 licenses of Adjudication, 175 licenses of Automated Test Decks, and 175 licenses of UOCAVA modules. The increased number of Adjudication Modules is due to select counties having more than one of each due to volume of absentee ballots printed and cast in major elections.



At the heart of our complete voting system solution is Democracy Suite, a robust and tested Election Management System that drives all voting channels out of a single comprehensive database; mail-in ballots, in person voting, accessible voting, and Uniformed Overseas Citizens Absentee Voting Act (UOCAVA)/Remote Accessible Vote by Mail(RAVBM).  All pre-election and post-election tasks utilize the same database.  From ballot layout to results reporting on Election Night, Democracy Suite is a complete, end-to-end elections solution that provides a single, powerful and versatile platform for election management.

Existing functionality and ongoing development of Democracy Suite centers around providing free and fair elections while considering the needs of our customers for easy to use and intuitive products, efficient processes, and accurate and transparent results for all ballots cast.

Democracy Suite is comprised of two modules: Election Event Designer and Results, Tally and Reporting.

 

# - EPoll data set building and reporting (EPDMS)

*ePulse is a secure web-based back-end election management system for use at the state and county level.*

ePulse is an all-inclusive election management suite designed to give administrators real-time access to monitor their election as a whole. All Poll Pads can connect to this central hub where voter check-in data is securely transferred via WiFi or cellular networks in near real time. This tool allows for administrators to oversee the operation of individual precincts and Poll Pads including battery life of the device, average check-in times, number of ballots issued or spoiled and more; all the while ensuring the election authority can directly contact poll workers via video or text message for speedy trouble resolution.

**ePulse Capabilities**

- Customizable real-time and
- election night reporting
- Ballot tracking
- Inventory tracking
- Election Day issue tracking
- Poll worker time-tracking
- Video communications from
- Poll Pads to ePulse
- Run concurrent elections
- Update voter rolls minutes before an election



*ePulse election monitoring dashboard. ePulse aims to be as intuitive and user-friendly as the Poll Pads themselves. These simple-to view dashboards give the user an overview of election data essentials which can be easily digested and exported into customizable*

# Data Set Building with ePulse




The Poll Pad and ePulse are designed to require minimal development to easily integrate with Georgia's select voting system. Once integration is established, the voter data is imported into ePulse, our election management software, and distributed to the Poll Pads. The following images show the steps to build an election.







*Election Details.* The ePulse user enters in the election details, including election type, date, and poll open and closing times. Supplemental changes can be applied in mass via a batch update shortly before Election Day in ePulse. Individual records can be updated in ePulse. If connectivity is available, the application will automatically pull in any relevant supplemental changes once connected to the network. Absent the availability of network connectivity, jurisdictions can deploy an iSync drive or use Poll Pad's barcode scanner to update the appropriate voter status.





The third step is reviewing the imported list of polling places. The user can customize the configuration for each Polling Place and precinct. Various combinations of polling locations can be manually added or imported in bulk into ePulse for use during an election. Vote centers, early absentee locations, or precinct specific locations are the most common types, but we are also able to work with the State to set up a unique offering at your request.



*Final Configuration.* ePulse begins indexing the voters and links voter records to the correct polling places. ePulse allows the upload of supplemental data and rosters from the State Voter Registration in accordance with Georgia law. Once loaded, the changes enacted by the supplemental file are then disseminated to the Poll Pad application via wireless hotspot connectivity, or barcode scanning, for near real-time updating of voter records.

*Figures D-31 and D-32. Setting up an election in ePulse.*

 



*Election Setup Confirmation. The Confirmation page provides a summary report of the new election details. The user reviews: then clicks Confirm.*

# Reporting with ePulse

ePulse has numerous modules that give each County a complete view to manage elections. The following pages highlight the major Poll Pad features and ePulse modules that come with the Poll Pad solution.

## ePulse Module: Reporting

Reports can be run in ePulse at any point during and after the election. Our standard reports are listed below. The State and its jurisdictions can apply filters to customize the standard reports and they may be exported and printed.

- Voter Check-in Details with Signatures
- Suspense/Inactive Voters who Voted
- Voter Turnout by Precinct
- Poll Worker Sign Ins
- Voter Turnout
- Provisional Voter Report
- Canceled Voter Check Ins
- Voter Rolls by Polling Place

 

- Ballot Styles
- Voter Turnout by Polling Place

ePulse can sort, filter, and search through check-in data in the post-election discovery process, making it easy to hone in on the exact information that is needed at any time.

The Poll Pad system can report on any data collected by the auditing system, including but not limited to: transaction types; transaction times; transactions by poll official; and number of searches per transaction. Transaction types and transaction times are easily viewable on the Election Day dashboard and updated in real time throughout the day with the use of an internet connection.

*Sample ePulse reports are provided on the following pages and include both the web browser screenshots and exported reports.*















**Sample PDF Report Downloaded from ePulse**



If deployed with connectivity, ePulse and Poll Pad can communicate in near real-time during elections. These communications can be used for the following modules:

## ePulse Module and Mobile Application: iTrack Issue Tracking

ePulse provides a method to assign election incident reports to help desk technicians and track their resolution. iTrack is a module built into ePulse and is divided into incident tracking and incident viewing/reporting. Reporting an incident allows the user to assign incidents to specific technicians, as well as detail what devices were affected by the incident, in which polling location or vote center, and whether the incident is open, pending, or closed. Issue creation, updates, and close are all timestamped, and the user that performed each event is logged in the system. iTrack allows for a method to track technicians and their GPS coordinates via a smartphone application that runs on iOS and Android operating systems.

KNOWiNK provides in-depth training and troubleshooting guides for in-office tech support and on-site personnel. Tech support personnel in the election office access the iTrack Issue Tracking system to log issues, assign them to devices and poll workers, and deploy techs out to the field to resolve incidents on-site. Using iTrack, Tech Support can communicate with poll workers via text messaging and video chat to get a first-hand



understanding of what the poll worker is encountering. iTrack is available in ePulse on a web browser and as a mobile application.



*iTrack module in ePulse.*





*iTrack Mobile Application Screenshots.*

"The Poll Pad solution and KNOWiNK customer service consistently meet Denton County's unique needs. ePulse allows us to change a voter from one ballot style to another, a feature we could not do with our previous system. We highly recommend KNOWiNK's Poll Pad solution."

– Frank Phillips, Election Administrator, Denton County, Texas



# ePulse Module & Mobile Application: iTrack Assets

This tool allows the user to create a comprehensive inventory database of their election-related equipment for assigning and tracking. Users can set up item names, serial numbers, and other pertinent data. Users can assign inventory items to individual polling location destinations.



iTrack Assets is also a mobile application that can be used on any iOS device. Using iTrack, tech support can communicate with poll workers via text messaging and video chat to get a first-hand look at what the poll worker is encountering. It uses data from the client's ePulse database. Users can select a polling place from the ePulse database and scan the barcode to check devices into or out of the polling place inventory. This information is communicated in real time, which allows viewers the ability to check on the status of inventory items at each polling place through ePulse. Election officials can set alerts for missing or low inventory, and log device incidents in the iTrack application and ePulse module for expedited issue tracking and resolution.

With iTrack Assets users can
- Scan any barcode
- Track inventory
- Set alerts
- Print labels
- Log incidents

# ePulse Module: Video and Text Messaging

ePulse provides election authorities with a powerful and complete communications tool between polling places and the elections office. Customizable and pre-written messages can be sent between the Poll Pads and ePulse to communicate questions and answers. KNOWiNK's innovative video chat is embedded directly into the Poll Pad application and is an election industry first. It revolutionizes how poll workers communicate issues to the election authority by giving them a first-hand look at the polling place.





## ePulse Module: Poll Worker Time Tracking

Poll Pad checks in poll workers, logging the timestamp and signature for each event. ePulse allows election officials to assign roles and pay rates to poll workers and provides reports on payroll, attendance and election day performance. Poll worker attendance is automatically managed on the Poll Pad. Using ePulse, election authorities may export a report of poll worker attendance and time for easy reporting and payment.





## - Electronic Poll Books (EPoll)

## The Poll Pad® – KNOWiNK's Electronic Poll Book

*Poll Pad is a secure electronic voter check-in tool used by election authorities across North America.*

The Poll Pad solution provides a seamless electronic voter check-in and verification process for election authorities across North America. Poll Pad is a secure Apple iPad application requiring no appendages for operation.

- Process voters in approximately 30 to 45 seconds; mitigate long lines with fast and secure voter look-up.
- Built-in election management and reporting tools; elections can be finalized and submitted within hours of election close.
- Efficiencies translate into reduced polling place staffing; jurisdictions can realize Election Day staffing reductions up to 50%.
- Customizable workflow presents required steps according to each
- jurisdiction's requirements and preferences.
- Improved accuracy and reduced preparation time and storage requirements with the elimination of paper logs.
- Poll workers or voters cannot leave the application without a password, preventing user error, a line slow-down, or creating a
- potential security issue.

"Poll workers and voters **especially appreciated** how easy the Poll Pads are to use...it's really **a wow factor**."





"Poll Pad was a big improvement over the legacy system it replaced in 2016, both in the Primary and General Elections. The District aggressively rolled out new voting equipment and pollbook system concurrently in June. Poll Pad's intuitive setup and operation, safeguards against error, top tier customer support and user-friendliness for the poll workers were all big contributors to the successful 2016 rollout."
–District of Columbia Board of Elections

## Integration with Voting Systems and Voter Registration Systems

The Poll Pad integrates with voting systems and voter registration systems (VRS), including Dominion's Image Cast. Our development team continuously incorporates customer feedback to add new features and process improvements.

 

# - Ballot Marking Devices (BMD)

The proposed Ballot Marking Device is the ImageCast X Prime as certified under Democracy Suite 5.5A.

| ImageCast Prime X – Ballot Marking Device | |
|---|---|
|  | |
| **ImageCast X Prime 21" Tablet Specifications** | **Ballot Marking Device Printer Unit Specs** |
| Manufacturer: Avalue<br>Model: HID-21V<br>OS: Android 5.1.1.<br>Processor: Intel Celeron J1900<br>Power: DC 19V input<br>Weight: 19.5 lbs (including battery)<br>Dimensions: H 22" x W 13.5" x D 2.9"<br>Battery Backup Life: 2 hour minimum | Model: M402dn<br>Power: DC 19V input<br>Weight: 19 lbs<br>Dimensions: 8.5" H x 15" W x 14" D |

**Quantity -  ImageCast X Prime BMD's is 30,050 as per Attachment O.  Dominion is proposing 30,050 Standard ICX Voting Booths.**



# - Polling Place Scanners (PPS)

The proposed Polling Place Scanner is the ImageCast Precinct as certified under Democracy Suite 5.5A.

| ImageCast Precinct |
|---|
|  |
| **Model number:** PCOS-330A 16V AC<br>**OS:** Linux<br>**Processor:** NXP ARM Cortex-A9 Dual Core 1GHz<br>**Memory:** 2GB<br>**Modem:** External Multi-Tech HSPA USB Modem<br>**Weight:** 14 lbs.<br>**Dimensions**: 17" x 13" x 3.5" |

 

**ImageCast Precinct Ballot Box**



The ImageCast Precinct includes a plastic ballot box to receive cast ballots directly from the ImageCast precinct tabulator. The ballot box contains several key elements such as multiple storage compartments (main, diverted, auxiliary), multiple locks and doors, and access control monitoring. The ImageCast Precinct and attached ballot box are integrated components of the voting system, and it includes security arrangements to prevent unauthorized access to the tabulation component and a locking access door for all ballot locations.

The capacity of the ballot box exceeded 1,500 sheets for 11-inch, 14-inch, 17-inch, and 22-inch ballots with 65lb, 80lb, and 100lb paper weights.

The overall size of the ballot box with the lid on is 25" (W) by 38" (D) by 44" (H) and the weight is 85 pounds.

**Quantity – Dominion is proposing 3,500 ICP Precinct Scanners in accordance to Attachment O. Each scanner comes with a Ballot Box, 3,500 Ballot Boxes.**

 

# - Central Scanning Devices (CSD)

The proposed central scanning device is the ImageCast Central as certified under Democracy Suite 5.5A. The ImageCast Central can be paired with two scanners including the high Speed Canon G1130 and, for smaller counties with limited scanning needs, the Canon M160ii.

| ImageCast Central |
|---|
|  |
| Includes Canon DR-G1130 scanner, Dell OptiPlex 7440 AIO computer, one 8GB flash memory card, one i-Button (black), one i-Button Programmer with USB Adapter, patch cable 25', Lexar LRW400CRBNA reader.<br><br>Dell OptiPlex 7440 AIO Computer Specs:<br><br>**Processor**: Intel® Core™ i3-6100 Processor (Dual Core, 3MB, 4T, 3.7GHz, 65W) ...<br><br>**Operating System:** (Dell recommends Windows 10 Pro.)<br><br>**Monitor:** 23.8" WLED Full-HD AIO Non-Touch Display.<br><br>**Memory:** 1 4GB2 DDR4 at 2133MHz. ...<br><br>**Hard Drive:** 2.5 inch 500GB 7200rpm Hard Disk Drive<br><br>**Approximate weight:** 15.9 lbs<br><br>**Approximate Dimensions:** 15.5"x22.6"x2.5"<br><br><br>**Scanner:** Canon Model DR-G1130 Specs |

 

**Feeder Capacity:** 48 mm stack or 500 sheets of 80 g/m² (20 lb bond)

**Scanning Resolution:** 150 x 150 dpi, 200 x 200 dpi, 240 x 240 dpi, 300 x 300 dpi, 400 x 400 dpi, 600 x 600 dpi

**Scanning Speed**:  B&W 100 ppm Portrait/130 ppm Landscape

**Power:** AC 100V (50/60Hz), AC 120V (60Hz), AC220-240V (50/60Hz)

**Approximate weight:** 50.3 lbs

**Approximate dimensions:** 18.9"x21.1"x12.4"



**Scanner:** Canon M160ii

**Feeder Capacity:** 60 sheets 21 lbs. bond

**Scanning Resolution:** 150 x 150 dpi, 200 x 200 dpi, 240 x 240 dpi, 300 x 300 dpi, 400 x 400 dpi, 600 x 600 dpi

**Scanning Speed**:  B&W 60 ppm

**Power:** DC24V 1.0A

**Approximate weight:** 7 lbs

**Approximate dimensions:** 11"x 10" x 9"



**Quantity – Dominion is proposing 165 ICC Central Scanners.  20 model G1130 and 145 Model M160ii.**



# - Consumables

| Consumable Item | Dominion Part | Model/Specifications | Timeline for Replacement | Quantities - Barry |
|---|---|---|---|---|
| ICP Cleaning Sheet | 141-000008 | Cleaning sheets | Dispose of sheets after each use and cleaning. | Each County to receive 5 sheets per Device. |
| ICP Lithium Battery | 117-000512 | Backup batteries | Four months before recharge. Capacity diminishes after 500 charge cycles. | Batteries have a 5-year life. Year 6 should replace all IC batteries. |
| ICX Lithium Battery | 117-000531 | Backup batteries | Four months before recharge. Capacity diminishes after 500 charge cycles. | Batteries have a 5-year life. Year 6 should replace all batteries. |
| ICP Paper Roll (96 foot) | 123-000229 | Archival thermal paper roll. | 7 year retention with proper storage. | 14,000 rolls have been proposed |
| Ballot Marking Device Printer toner | 123-000340 | Replacement toner | ~Every 3,100 pages | Toner will last for 3,100 images per BMD. Toner should last for 15 to 20 elections. |
| Ballot Marking Device Paper | 144-000018 | 3rd party paper stock 11", 14", 17", 19", 22" as applicable | As needed on a per election basis | Based on per election needs |
| Ballot Box Storage Boxes | 125-000074 | Cardboard ballot boxes for ballot transportation and storage. | As needed on a per election basis | 25 boxes per carton |



It is Dominion's policy to keep replacement parts and consumables on hand to meet the needs of our customers.



## - Peripherals

The proposed system includes various peripheral items including:

| Product | Description | Quantity |
|---|---|---|
| Server Kit | Includes PowerEdge R630 rack server, 24 port switch, 24" monitor, keyboard/mouse, patch cable, Cepstral, Avast. | 4 |
| EMS Workstation | Includes Dell T3420, 24" monitor, iButton programmer, high speed media reader, patch cable, smart card reader/writer. | 171 |
| Adjudication Workstation | Includes Dell T3420, 24" monitor, SQL Server 2016 CAL, cables, Windows 10 Pro. | 183 |



| | | |
|---|---|---|
| |  | |
| Voter Activation Cards | Smart Card to activate voting session on the ImageCast X Prime. | 3 per unit |
| Uninterruptible Power Supply | Backup power supply for precinct locations. | 2,913 |



| Audio Tactile Interface | Accessibility units for ImageCast X includes ATI unit, headphones and connection cord. | 2,754 |
|---|---|---|
| **Hardware and peripherals for electronic poll books** | | |
| iPad tablet | The iPad has a touchscreen/keyboard and a shockproof clear case. The iPad has a battery life of approx. 10 hours. Make: Apple \| Model: MP2FLL/A | 8,000 |
| Encoder/iOS Reader | The Mfi certified lightning port contact card reader connects securely to the iPad lightning port and include a micro USB cable.  Make: FEITAN Technologies \| Model: iR301 | 8,000 |
| iSync Drive | KNOWiNK's secure proprietary removable memory device, the iSync flash drives. Make: KNOWINK \| Model: iSD-110 | 2,800* |
| Stand for iPad | The iPad stand is durable and user friendly. Make: AI Data \| Model: i360 | 8,000 |
| Scanning tray | KNOWINK'S patented scanning trade scans barcodes on voter ID cards or state identification cards. Make: KNOWiNK \| Model: ISP103b-KN2-1 | 8,000 |
| Styluses | Poll workers and voters may use the styluses or their finger for the iPad's capacitive touch screen. Make: AI Daata \| Model: ISP-1010-KNO | 16,000 |
| Carrying case | Shockproof weatherproof foam-fitted case. Make: Nanuk \| Model: 910 | 8,000 |
| Thermal printer (optional) | The Star Micronics printer is the original printer used with KNOWiNK's system. This printer requires AC power. Make: Star Micronics \| Model: TSP650ii | (Optional. The printer pairs with one Poll Pad.) |



EXHIBIT

2

## DECLARATION OF B. JOY WASSON

1. My name is B. Joy Wasson.

2. I am over the age of 18 and competent to testify if called on to do so.  I have personal knowledge of the facts reported herein.

3. I am a registered voter in DeKalb County, Georgia.

Long Lines for Voting

4. On June 5th, the last day of early voting for the June 9, 2020 election, I took my voted absentee ballot to drop it off at Bessie Branham Recreation Center. The very long line stretched from the main building, winding down the stairs/ramp, down the sidewalk and into farthest corner and even past that onto the sidewalk. There were at least 200 people in line. Some voters had been waiting a couple of hours and still had a good distance to go. (See photo at Exhibit A)

5. Because I was just dropping off my voted absentee ballot, I didn't have to wait. I was escorted through the small voting room which was very crowded. I saw three Poll Pads, five ballot marking devices (BMDs) and two scanners.

6. I know from my extensive experience as a poll watcher since initial use of the Dominion Voting System in special elections and early 2020 elections that the voter check-in can sometimes be a slow process because of the frequent problems with the operation of the Poll Pads as a card encoder, necessary for the operation of the BMD. Three Poll Pads seems inadequate for an early voting site of this size.

7. Having observed voters using the new system, I think it's necessary to allow a voting time of about 10 to 12 minutes on the touchscreen and printer given the lengthy June 9th ballot. This 10 to 12 minutes wouldn't include the nearly 5 minutes a voter would need to

review their ballot for accuracy before scanning. Five BMDs was inadequate for a reasonably paced voting process at this location.

8. I was told to insert my ballot in a metal ballot box. The slot on the top was too small for my ballot so I was instructed to slip it in the crack between the lid and box.

Secretary of State's Voter Information Page Malfunction

9. On Election Day, June 9th after 7 am, I tried unsuccessfully to log onto the Secretary of State's My Voter Page on my laptop (https://www.mvp.sos.ga.gov/MVP/mvp.do ). I tried to log on with my iPhone around 7:16 am, but received the message "Your registration information was not located." (see Exhibit B;) Friends confirmed that they also received such messages as they tried to check their information.

10. I was distressed thinking how that message would be received by registered voters on the morning of the election if they were trying to confirm their polling place, and I worried that it might disenfranchise voters who would mistakenly think they weren't registered or wouldn't know where to vote.

Electronic Pollbook failures and lack of effective backup

11. On June 9th I arrived at the South Hairston DeKalb County precinct to poll watch at Antioch A.M.E. Church, 765 S. Hairston Rd, Stone Mountain, shortly before 7:45 am and saw at least 50 voters in line. A poll worker told me the two Poll Pads weren't working, and said "It's been called in." "Nothing is working," she said. I heard voters complaining, discouraged. They had been waiting an hour or more and no one had voted.

12. I saw later that Sam Tillman, Chair of DeKalb Board of Registration and Elections, issued a statement that morning that said in part, "DeKalb County Voter Registration and Elections Office is experiencing technical issues with the new state-issued voting machines. (See Exhibit C)

13. At 8:16 am a poll worker came outside to say they would offer provisional ballots. Voters had waited more than an hour after the polls opened before being able to begin voting. A bit later a poll worker rushed over to me and asked if I had a pen. I asked "for marking ballots?" She nodded and said "they didn't give us any," so I gave her one.

14. A poll worker told me when I asked for clarification, that they would code the ballots as "emergency" ballots, but I do not know what actually happened.  Voters were using two ballot envelopes including the salmon one used for provisional ballots. There would be no need for an envelope for an emergency ballot, which is issued to voters who can be determined to be eligible to vote and have not voted in early or absentee voting. I do not know the purpose of the two colors of envelopes.

15.  Technicians from DeKalb County came at 8:33 am, but left without being able to get the Poll Pads working. The technicians returned at 9:41 with two replacement Poll Pads. I had to leave around then, but I later looked at data (Exhibit D) provided to GPB reporter Stephen Fowler by the Secretary of State that indicated the first voter checked in at Antioch A.M.E. at 9:51 am. This indicates there was a delay of close to 3 hours from when polls opened until voters were checked in.

16. When I see the "voting should never stop" message from the Secretary of State materials, it pains me. I do not know why the Antioch A.M.E. location had more than an hour of no voting, and 1-1/2 hours of provisional voting. The poll workers had called in the issue

with the Poll Pads, but were apparently not given the instructions to use the back-up electors list and emergency ballots.

17. I surmise, based on my discussions and experience at the polls, that the back-up list was likely not current, therefore not permitting issuance of emergency ballots that can be cast and counted at the polling place.

18. Voters had been severely inconvenienced and surely some had left. If the polling place had used a paper copy of the certified electors list (pollbook), updated to show who had voted during early voting, they could have checked voters in and used emergency rather than provisional ballots. It would have saved time and prevented disenfranchisement of voters. Voters using emergency ballots would have been able to scan their ballots at the precinct. Scanning at the precinct would be preferable since the voter could be there to make any needed adjustments if their ballot had overvotes or other issues that the machine could flag. Also, no further eligibility paperwork would be required as provisional ballots require, which can result in error.


Pollworkers' training for non-standard ballot issuance

19. As an authorized poll watcher for the August 11 runoff, I need to be aware of the procedures for issuing ballots when there are problems with the electronic poll books.  I reviewed the poll worker training materials. On July 22, I looked at the Poll Worker Manual 2020 Edition (updated April 2020) on the Secretary of State's website: https://georgiapollworkers.sos.ga.gov/Shared%20Documents/Georgia%20Poll%20Worker%20Training%20Manual.pdf

Page 107 of the manual says there are three separate lists of voters at each location and lists the third as: "*Paper Back Up List - The paper back up list is a list of all the electors in your precinct. If your polling place loses power or your Poll Pads stop working for some reason, you do not have to stop processing voters. This is what the paper list is for*." The manual cites Georgia code regarding emergency situations:

> O.C.G.A. § 21-2-418
> (h) Notwithstanding any other provision of this chapter to the contrary, in the event that the voting machines or DRE units at a polling place malfunction and cannot be used to cast ballots or *some other emergency situation exists which prevents the use of such equipment to cast votes, provisional ballots may be used by the electors at the polling place to cast their ballots. In such event, the ballots cast by electors whose names appear on the electors list for such polling place shall not be considered provisional ballots and shall not require verification as provided by Code Section 21-2-419*; provided, however, that persons whose names do not appear on the electors list for such polling place shall vote provisional ballots which shall be subject to verification under Code Section 21-2-419.

20. The training video Emergency Prep mentions "voting should never stop." That video does not explain the difference between provisional and emergency ballots, although emergency ballots don't require curing, and can be scanned at the precinct if scanners are operable. At timestamp 1:23 (https://player.vimeo.com/video/391040185?autoplay=1&title ), regarding an emergency in the polling place, the narrator says to "locate a safe place to set up outside the building and, *using the paper back up electors list*, start issuing provisional ballots."

21. At another point in the video when discussing equipment failures the narrator says voters may be issued "hand marked paper ballots" which may be put into the scanner. Neither the video nor the Georgia poll worker manual explains how to issue, tabulate, or store

emergency ballots at the polling place, nor the difference between emergency ballots and provisional ballots.

22. The Georgia poll worker training video from the Secretary of State on provisional ballots also seems inadequate to explain the use of back up pollbook lists. The video https://player.vimeo.com/video/391053063?autoplay=1&title (timestamp :50) instructs the poll worker, if she has not found the voter information in the Poll Pad, to check the supplemental list, then look at the Poll Pad again before offering a provisional ballot. The training video fails to instruct poll workers to check the back-up paper electors list to prevent having to issue a provisional ballot. The narrator says to mark the correct code on the envelope and explains the six different codes and circumstances. None of the six apply to emergency ballots, as emergency ballots do not require envelopes and are cast in the scanners or dropped in a special bag for scanning later without requiring further proof of eligibility of the voter.

23. As a poll watcher trying to educate myself on the back-up ballot issuance procedure, I found the training materials so unclear and conflicting that I could not understand what the proper procedure is intended to be to keep voting continuing when pollbooks are unavailable or malfunctioning. There seems to be no clear guidance on using an updated back up list in order to issue regular or emergency ballots.

Unreconciled voter counts

24. I went back the day after the election to Antioch A.M.E. Church and photographed the poll tape which said 440 voters had cast ballots, and that the polls closed at 21:36:54. The paperwork was taped up inside the building in such a way that it was impossible to

see all the details and the regular recap sheet was not visible, only the provisional recap sheet showing 40 provisional voters.

25. I do not understand why the poll tape for Antioch shows 440 voters, but the dataset from Stephen Fowler (provided by the Secretary of State) shows 453 voter check-ins. The 13 voter difference doesn't match the additional 40 provisional voters, but could be supplemental voters (voters whose names appear on the supplemental list because they became eligible after the Poll Pad has been updated). Unfortunately, I do not know what the Poll Pad Recap Sheet said since it was not visible for me to photograph. The state poll worker training manual shows a Poll Pad Recap Sheet that has a place to list supplemental list voters, so I do not know how emergency voters are to be checked in or accounted for. No instructions seem to be given.

26. Mail Ballot Vote Tabulation Problem

27. I am an authorized poll watcher for the August 11 election and expect to observe the scanning and tabulation of mail ballots. In that regard, and because of my interest as a DeKalb voter, I am trying to educate myself on the reported issues with the tabulation software for mail ballots.

28. I have followed the Dominion Voting scanning and tabulation software issues that DeKalb and other counties have had with absentee ballots and legitimate votes not being counted as reported by the Associated Press.

https://apnews.com/66c2b4b36609d83aa5c08235f947ea59 , and the New York Times. (https://www.nytimes.com/2020/07/25/us/politics/georgia-election-voting-problems.html) Votes that were not flagged for adjudication, but were noticed by chance

by vote review panel members, were looked at by the reviewers who then determined voter intent and counted what they considered to be valid votes.

29. As a DeKalb voter and poll watcher I was frustrated when I raised this issue with State Elections Director Chris Harvey in the DeKalb Voter Experience Forum held via Zoom on June15, 2020. Mr. Harvey said the scanner setting's default is what was used for voting system certification and that the State Election Board is contemplating a rule that might prohibit counties from changing the setting. A true and correct transcript of this portion of the meeting is attached at Exhibit E.

30. I would like all counties to have uniform settings, and want every voters' vote to count in every county on a uniform basis. Given that the current default setting is not counting legitimate votes and is causing far too many ballots to need individual adjudication then I do not want the state to mandate using that faulty setting. This is a very serious issue which needs addressing.


Ballot secrecy


31. On July 20, 2020, the first day of early voting for the August Run Off, I arrived at 8:15am at the DeKalb Registration and Elections Office on Memorial Drive to obtain my poll watcher credentials. There were many poll workers and much equipment, but very few voters. There were two voting areas in the building— one for voters with disabilities near the building's accessible entrance and a main voting room.

32. I stepped into the main voting room and started to count the machines. A poll worker counted them and confirmed there were 34 BMDs. The BMDs were in four rows with each machine separated by a blue privacy screen, but the BMD voting stations were all

right next to each other. There was no social distancing consideration with the set up and no privacy at all. Screens were visible from outside in the hallway, where members of the public could watch people voting, and voters would have no secret ballot with other voters in the room passing by them.

33. The ADA voting room seemed very cramped. The 14 BMDs were not set up for social distancing and not set up to allow for voter privacy.

34. The ballot secrecy problems were consistent with the problems I have observed in more than a half dozen polling places since January 2020 where I could see voters' touchscreen choices which could also be observed by other voters, poll workers and poll watchers.

35. I submitted an affidavit for the Coalition for Good Governance's HAVA ballot secrecy complaint regarding some of my observations of officials' failure to provide ballot secrecy at elections earlier in the year. My affidavit is attached as Exhibit F.

36. I had submitted the same affidavit at Exhibit F for the Coalition for Good Governance's petition against Sumter County.

37. If pandemic conditions did not exist, my strong preference would be to vote in my neighborhood polling place with the most current information on Election Day on a hand marked secret ballot, with scanning in the precinct for assurance my votes had been counted. I would enjoy the communal experience of voting and the message it sends of community engagement.

38. However, I am voting during 2020 by mail ballot, despite the disadvantages of doing so. One of the reasons I choose to tolerate the risks of voting by mail ballot is because of the lack of ballot secrecy. I value the privacy of my decisions on some of the races and do not want every choice of candidate to be public.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this date, July 30, 2020.

B. Joy Wasson

EXHIBIT

A



EXHIBIT

B



mvp.sos.ga.gov



Corporations  Elections  News Room

**Your registration information was not located.**

**An exact match may have not been located by the Poll Lo**

**the following reasons:**

EXHIBIT

C



**DeKalb County, GA** ✔
@ItsInDeKalb

Statement Issued by Chair of Board Elections, Samuel Tillman

"DeKalb County Voter Registration and Elections Office is experiencing technical issues with the new state-issued voting machines. These issues are being seen statewide and are not isolated to DeKalb County. (1/3)

11:09 AM · Jun 9, 2020 · TweetDeck

**49** Retweets and comments   **14** Likes

**DeKalb County, GA** ✔ @ItsInDeKalb · Jun 9
Replying to @ItsInDeKalb
"Any voter who has been turned away without casting a ballot should go to any precinct in DeKalb County and ask for a provisional paper ballot. (2/3)

♡ 5      ⟲ 35      ♡ 17

**DeKalb County, GA** ✔ @ItsInDeKalb · Jun 9
"Voters experiencing issues should call the DeKalb County Board of Voter Registration and Elections at 404-298-4020." (3/3)

♡ 3      ⟲ 20      ♡ 7

EXHIBIT

D

## 6/9 Georgia Polling Place Data

| County | Polling Place | First Check-In | Last Check-In ↓≡ | Voters/Hour | Total Election Day Check-Ins ≡ | In-Person Early Votes |
|---|---|---|---|---|---|---|
| | RECOVERY VOL FIRE DEPT | 09:30:00 | 18:34:00 | 9 | 83 | 12 |
| | WEST BAINBRIDGE | 07:05:00 | 18:57:00 | 21 | 246 | 101 |
| DEKALB | ALL SAINTS CATHOLIC CHURCH | 07:04:00 | 19:01:00 | 33 | 396 | 104 |
| | ALLGOOD ELEMENTARY SCHOOL | 07:18:00 | 20:23:00 | 33 | 435 | 132 |
| | ANTIOCH A. M. E. CHURCH | 09:51:00 | 20:08:00 | 44 | 453 | 175 |
| | ASHFORD PARK ELEMENTARY SCHOOL | 07:02:00 | 19:02:00 | 48 | 581 | 91 |
| | | 08:05:00 | 18:59:00 | 33 | 361 | 34 |
| | ATLANTA METROPOLITAN CHURCH | 07:03:00 | 18:58:00 | 38 | 451 | 69 |
| | AVONDALE CITY HALL | 07:04:00 | 19:00:00 | 45 | 531 | 112 |
| | AVONDALE HIGH SCHOOL | 07:04:00 | 19:34:00 | 35 | 440 | 127 |
| | AVONDALE PATTILLO UMC | 07:06:00 | 19:08:00 | 25 | 297 | 96 |

EXHIBIT

E

**From Transcript of DeKalb Voter Experience Forum July 15, 2020**

Video (published July 16) available: https://video.ibm.com/recorded/127291399

**Joy Wasson:** Hi, I'm Joy Wasson. I voted absentee in DeKalb in June, and I thank the commissioners for having this forum. Thank you, Mr. Harvey, for being here. And I have a couple of questions for you, Mr. Harvey. I'm concerned that settings on Dominion's dual threshold scanning tabulation software can be a problem in DeKalb because the software doesn't count all valid votes. When absentee or other hand marked paper ballots are scanned at the elections office, the software detects valid votes and it flags marks that it's not sure are votes. The ambiguous marks must be decided by a vote review panel. At some settings the software is failing to recognize some clear and unambiguous votes and doesn't even flag them for the vote review panel. Our county was lucky because we had a very conscientious vote review panel in this past election that spent very long hours to count every vote they found. But there's a problem that the Dominion software settings are customer configurable. The state provided the software but doesn't ensure that votes in each precinct and each county are counted in a uniform manner. How can voters have faith in elections if the county can change the threshold settings to count more or fewer votes? Another problem with the Dominion scanning software at its default setting is that it flags far too many votes as ambiguous. Other states using hand marked paper ballots do not have these same issues. Election workers in Georgia are manually duplicating thousands of ballots in a less than ideal process, or time is wasted as vote review panels adjudicate too many ballots on screen. Sometimes with no paper audit trail of vote changes. Light marks, check marks and X's must count per Georgia rule and statute, although I've heard that that may not be the state's position, please explain the Secretary of State's position on this matter of light marks,

checkmarks, and Xs, and where they will or will not be counted, and is the Secretary of State's position that counties can set the standard threshold to their own preference? Thank you.

**Chris Harvey:** Okay, I'll do my best to answer most of those questions. First of all, the settings that are used are the settings that were used for certification when the Dominion voting system was certified by the Election Assistance Commission. The when, when it scans the ballot —and it's really only an issue with the ballots that are marked by hand, whether they're absentee ballots or emergency ballots, or provisional ballots. The ballot marking, that's one of the beauties of the ballot marking devices, is that they make very clear marks that are easily read by the scanner. But for those circumstances where the scanner does detect an ambiguous mark, the Georgia law requires that any, any overvote that's detected has to be reviewed by by a vote review committee. The law for optical scan ballots is that the ballot has to be marked by darkening the oval. Somebody making an extraneous mark outside of that area will not necessarily be picked up by the scanner and maybe evident if somebody is otherwise reviewing a ballot. But if somebody, for example, somebody were to make an X to the right of the voter's name, so you've got the bubble on the left and you got the candidate's name, and if somebody were to make a checkmark or an X to the right of the name, completely out of the target zone of the bubble, that wouldn't be detected at all by the by the scanner and frankly wouldn't constitute a valid vote for the optical scan system the way the the law is written for optical scan ballots. Now, the, for paper ballots, which are a separate legal entity, and which are only allowed to be used by municipalities in Georgia now, an X or a check mark could be an issue. So there is a fine distinction of law regarding what constitutes a mark on a ballot. The State Election Board is actually now contemplating a rule for setting some type of standard for, or a prohibition against counties

changing the setting. So that's something that we're currently looking at. But there are some

there's some legal distinctions there that need to be recognized. Thank you for your question.

EXHIBIT

F

## AFFIDAVIT OF B. JOY WASSON

1.      My name is B. Joy Wasson.  I am over the age of 18 and competent to testify if called on to do so.  This affidavit is based on my personal knowledge.

2.      I am a registered voter in DeKalb County, Georgia.

3.      I have spent approximately 4 hours as a poll watcher in the special election for Georgia House District 171 in southwest Georgia on January 28, 2020.

4.      On that day I observed elections in the following Mitchell County polling locations: Pelham, Camilla North, Hopeful, Branchville. I also was briefly in the Baconton polling location while the poll workers were shutting down equipment after the polls closed.

5.      I have observed in my capacity as a member of the public and as an authorized poll watcher.

6.      In the Pelham, Camilla North, and Branchville locations the curtained voting booths matched the type I have seen online: "MXB Dual Station Voting Booth with ICX Printer Shelves." The stations hold two BMDs back-to-back and they had curtains hanging from the top that completely obscured the equipment. This can be seen in the photograph that I took that appears in Exhibit A at page 21.

7.      From a distance, no one could see what was happening behind the curtain which I understand is problematic in that it could include tampering or unintentional interference with the equipment. It was also problematic for some

voters. I recall hearing a voter saying she couldn't see. Voters had trouble finding the output from the printer without a pollworker to guide them, which would have been aided by visual access by the poll workers.

8.     The Hopeful precinct has very limited floor space.  The voting machines were sitting on tables in plain view of all the people entering and in the room.  I sat in the farthest corner of the room but still had to avert my eyes from voters or else I could see their touchscreens. In that rural precinct it was obvious from conversations between voters and poll workers that most people knew each other and that voters could be intimidated since other people in their community could see how they were voting.

9.     At the end of the day I was in the Baconton polling place to pick up another poll watcher and I stood in the small voting room while the workers were closing down the equipment. I was nearer to the curtained booth than I had been earlier in the day and realized that depending on the lighting, the bright touchscreen was actually visible through the curtain.

10.     I was so concerned about the lack of privacy that on December 27, 2019, having learned that Lee County had ordered ICX privacy shields from electionsource.com ("Privacy Shield for Dominion ImageCastX Prime"), I ordered one of the shields to see if it would solve this problem of secrecy.  The photo in

Exhibit A at page 15 shows the Dominion privacy shield.  The sides of the shields are so short they do not prevent people behind the voter from seeing their screens.

11.     I have attended several demonstrations with the new Dominion ballot marking devices and can see that anyone in the vicinity can determine how someone is voting — particularly if they look at the screen while someone touches their choice since a very wide bar turns dark as the selection is made. I have attended DeKalb County election board meetings where the privacy concern has been raised in public comments. On November 15, 2019, I held up a prop that was an accurately scaled replica of the screen at the DeKalb Board of Registrations and Elections meeting so that the board members would understand how others could see my selection from a distance. I and other concerned citizens have been urging our elections officials at the State and in the counties to  find a method of protecting  voters' rights to a secret ballot in the 2020 elections.

12.     I took a video of a voter selecting a vote during a voting machine demonstration. My spouse helped me make a three-panel photo from the video source (Exhibit A at page 9).  These photos show how the screen is highlighted when the voter selects ballot choices.

There are candidates on the Sumter County March 24, 2020 ballot and others on the May 19, 2020 primary ballot that I support.

I plan to act as an authorized poll watcher in Sumter County as well as other Senate District 13 counties during the March 3, 2020 runoff.

I declare under penalty of perjury that the foregoing is true and correct.


Further affiant sayeth not.

This is the 22 day of February 2020.

B. Joy Wasson

Sworn to and subscribed before me this 22 day of February, 2020.

Notary Public

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 188647
EDGAR DOUGLASS WATTS
Commission Expires
Jan. 29, 2024
WASHINGTON COUNTY

EXHIBIT

3

## DECLARATION OF ELIZABETH THROOP

1. **Elizabeth Throop** declares, under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct:

2. My name is Elizabeth Throop.

3. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

4. I am a registered voter in DeKalb County. I am a supporter of Coalition for Good Governance and an active volunteer in supporting its voter education and election security efforts.

5. On Tuesday June 9th, Election Day, I was a poll watcher at Miller Grove (Relocated to Miller Grove Middle School) in DeKalb County. There were about 60 voters in line when I arrived at 7:30am. People in the front of the line had already been waiting over one hour. The line got shorter in late morning, but when I left at 1:30pm, voters were again waiting 1 ½ hours to vote. Despite the long lines, I never saw more than half of the 12 BMD touchscreen voting machines at the polling place in use at any one time.

6. During my visit, the two Poll Pad check-in stations were always the bottleneck preventing faster throughput. Some voter check-ins took under two minutes, but many took four minutes or longer. Many times a poll worker would try to scan a driver's license, but then have to take it out of the

tray and read the front of it to hand enter the driver's license data into the Poll Pad. The poll worker would then ask the voter to inspect each field to be sure she had gotten all the info typed correctly before finalizing. At times I saw Poll Pad workers looking up names on a paper list, though I wasn't close enough to really tell how they were using it.

7.  I wondered if poll workers had been trained about a weird feature of Poll Pads. The KnowInk Poll Pad manual says, "If the camera is unable to scan the voter's photo ID or if the ID is not placed onto the holder within five seconds, the Poll Pad will revert to the Voter Lookup screen. If this occurs, find the voter using the manual search method."

8.  I also never saw these workers attempt to adjust the light shining on the drivers' licenses, although per the KnowInk manual, glare or shadows on the driver's license can hinder the Poll Pad's scanning ability.

9.  Whatever the problems were with the Poll Pads, they slowed down the whole process and it seems likely some people had to leave without casting votes because of the long lines.

10. Another problem with the delays is that people were waiting in a gym with about 40 other people. It's possible that some voters were exposed to or contracted COVID19 because of their waiting in a room with infected people.

11. I was so concerned about Poll Pads causing voting delays that on June 23rd I sent a letter to the House Governmental Affairs Committee describing the problems with the Poll Pads I witnessed on June 9th Election Day. (Attached as Exhibit A)

12. Additionally, I observed problems with Poll Pads on five other occasions.

13. I was an observer at Carrollton Government Center, Carroll County on 10/22/2019, an Early Voting site for the pilots. While voting was very light, and problems with equipment didn't significantly affect voters, the Poll Pads were not being used in the way KnowInk says they are to be used. Workers had to collect signed certificates from voters on paper, look up the voter's name and address on a conventional computer, and make a notation before Poll Pad operators could encode the voter's access card. I was told by a poll worker that this setup was due to a problem with the Poll Pads. The Poll Pads are promoted as being capable of signature collection, voter data lookup based on driver's license scanning, voter status updating, and ballot access card encoding.

14. In my declaration of 12/16/2019 (Doc. 680-1 at 82) I described observing at Powell Park Recreation Center on 10/30/2019, an Early Voting site for the pilot elections. Check in was very slow, and the Dominion Voting

representative seemed to bring in a Wi-Fi signal booster to get the check-in equipment to work.

15. Also described in my declaration of 12/16/2019, I observed at Lakeshore Recreation Center for the Pilot. When I arrived on 11/5, 2019 Election Day about 7:45am, Poll Pads weren't working and neither the poll manager nor the Dominion Voting representative could fix the problem. Voters had to wait while the poll supervisor used his access card and passwords to give them access to an onscreen ballot.

16. A later report from the Secretary of State said that the Poll Pads had been mis-programmed, a fix had been executed via Wi-Fi, and that Poll Pads were functioning properly by 8:20am.

17. In fact, based on my personal observations, Poll Pads at Lakeshore were not functioning properly until after 10am when a Poll Pad representative came in person and seemed to reprogram them. That fix seemed to be temporary. The Secretary of State report did not list any problems at Lakeshore Rec Center in Carroll County on that day.

18. I was an observer at Camilla Resource Center South, Mitchell County, on1/28/2020 for the Special Election. Around 11:15, a woman couldn't be checked in because the Poll Pad indicated her having voted previously. The Poll Manager called the county election office, was told that the woman had

not already voted, and gave the voter an access card to vote. Afterward, the voter told me, "Maybe [the poll worker] left my driver's license in the tray too long, and that's why it said I had already voted."

19. Soon, the poll manager became concerned because her Poll Pad was losing charge, even though plugged in. She said that it was explained to her by phone that the relevant surge protector had been switched to OFF. She said she hadn't understood that the Poll Pad recharged via the Poll Pad's encoder.

20. Soon afterward, the poll manager's encoder wouldn't format ballot access cards. She again called technical support, and a Dominion Voting representative eventually came in person and discovered the encoder was upside down. He fixed it by rotating the encoder 180º. Later, I noticed that somebody had put green paper dots on the fronts of the encoders on both Poll Pads, probably trying to prevent someone from inserting them upside down as the manager had done. Unfortunately, the manager had not understood the significance of the green paper dots, and Dominion Voting had not designed the product to make the orientation evident. Turnout was light that day, and there was an additional Poll Pad check-in station, so few voters were inconvenienced by this machine being out of service for more than an hour. However, a paper pollbook back up would have permitted continued check-in and voting by the poll manager.

21. At the June 23, 2020, Georgia General Assembly House Governmental Affairs Committee hearing on problems with the June 9th election, Gabriel Sterling of Secretary of State's office tried to reassure the committee his office had plans to address the issue of upside-down encoders, although the problem had been the subject of a tech support call from Camilla Resource Center back in January. Sterling said "We've already figured out a few things that we can do to make things easier for those poll workers when they get in there. One of the main issues we saw as a reported issue was people putting the encoders on the Poll Pads upside down and it's the first thing it says on the checklist we sent out is, 'If it's not functioning, flip it over.' So we're doing, we're going to put a sticker on that says THIS SIDE UP."

22. At the hearing, there was no discussion of using a backup paper pollbook to rely on when human error or machine failure shut down or slowed voter check in on the Poll Pads.

23. On 7/22/2020 I was a poll watcher for early voting at South DeKalb Mall in DeKalb County. The Poll Pads did not have trays for driver's licenses attached. Instead, each voter handed the poll worker their driver's license and signed certificate, and the poll worker typed the voter's information into the Poll Pad. I'm not sure why the poll workers couldn't use the Poll Pad

feature that scans driver's license barcodes, but this slowed down the check-in process.

24. KnowInk Poll Pads perform many critical functions in elections, but I have seen them fail to read driver's license barcodes, not be used to collect voter signatures; fail to accurately report if a voter has voted or not; and fail to encode ballot access cards. I have seen voters wait for hours to vote because Poll Pads didn't work correctly, or didn't work quickly enough.

25. During my numerous observations of failures or bottlenecks of Poll Pads, I have not observed the use of back-up paper pollbooks to aid check-in and voting, although such back-ups are frequently recommended by experts across the nation as a basic security protection, such as in the attached Brennan Center report. (Attachment B)

Executed on this date, July 23, 2020

Elizabeth Throop

EXHIBIT

A

Tue 6/23/2020 1:58 PM

**Thank you for this opportunity to relate my experience. I was a poll watcher on June 9th at**
Miller Grove Middle School in DeKalb County.

Due to Covid19, it's understandable that poll workers were hired at the last minute and were
not able to train in person. Covid19 also meant some workers were trained before the March
election, but not given a chance to apply that knowledge for months. So it's impressive that
MGMS did open on time and process voters continuously, although slowly. When I arrived at
7:20am, the people had already been in line an hour or more and that line continued until I left
around  1:30pm.  Slow check-in at the two Poll Pad seemed especially critical in causing these
long waits.

This bottleneck meant that half or more of the voting machines were never in use. A poll
worker would try to scan a voter's driver's license – but about a third of the time, she would
have to take the license out of its tray and type in the data by hand. Then the voter would have
to inspect every field the poll worker had typed to be sure she had typed it right before she
would submit the data. Over and over, a process that should have taken 90 seconds would
stretch to 5 minutes or more. The poll workers at the check in stations stayed extremely busy,
but often had to stop to consult with the poll manager.

I wondered if poll workers had been trained about a weird feature of Poll Pads. Per the manual,
"If the camera is unable to scan the voter's photo ID or if the ID is not placed onto the holder
within five seconds, the Poll Pad will revert to the Voter Lookup screen. If this occurs, find the
voter using the manual search method."

Another problem with Poll Pads is lighting, which would have been very hard to adjust in that
room. I never saw these workers attempt to control the light shining on the drivers licenses,
although per their manual, glare or shadows on the driver's license can hinder the Poll Pad's
scanning ability.

Additionally, I talked to people in line who had brought their absentee ballots with them and
wanted to drop them off. One man told me it wasn't possible for him to go to a dropbox or
county office that day, and he just wanted to drop off his completed absentee. Instead, he had
to wait in line, then go through a ten- or fifteen-minute procedure to surrender his absentee
and vote on a machine. DeKalb allows completed absentee drop-offs at polling places during
early voting, but not on Election Day. Supposedly it's a rule that all absentees are required to be
at county elections office by 7pm on Election Day, and it's impractical to deliver them that day.
A change in this rule would make voting procedures more understandable,  more convenient,
and speed check-ins.

While I can only speculate about why voters were held up at check-in stations, I think the
limited number of Poll Pads, lack of training, and the overall complexity and delicacy of the

KnowInk equipment play a big part. Some of this may be under county control, but the state's demand that everyone use the system during the pandemic seems key.

Sincerely
Liz Throop
612 Clifton Rd., NE
Atlanta, GA 30307

EXHIBIT

B

Tell Congress: Protect the 2020 Election from Covid-19   **SIGN THE PETITION**



**Issues**   **Our Work**   **Experts**   **Get Involved**   **About**      Library   Press

Home // Our Work // Analysis & Opinion // Want a Simple Way to Increase Election Security? Use Paper

**ANALYSIS**

# Want a Simple Way to Increase Election Security? Use Paper

Electronic pollbooks are an overlooked vulnerability in election systems. The way to recover from electronic pollbook malfunctions is to have paper backups ready.





**Andrea Córdova McCadney**   |   October 8, 2018

Despite all the talk about the threat of cyberattacks against U.S. elections, one area has largely been overlooked: electronic pollbooks. Before electronic pollbooks, a voter would show up at the polls and an election worker would search through a paper book that contained the names of all the voters in her precinct. Once located, the voter would sign in, receive a piece of paper from the poll worker, show that paper to another worker controlling access to a voting machine, and then cast a ballot.

Today, 34 states use electronic pollbooks in at least some polling places, and six states — Colorado, Georgia, Maryland, Michigan, Rhode Island, and Utah — use them statewide. As electronic versions of voter registration lists — typically on a laptop computer or tablet — electronic pollbooks allow poll workers to find voters' names more quickly **and determine** if the voter is at the proper polling place or if the voter has already cast a ballot. This last function is particularly useful in states with early voting and **vote centers**, which can permit people to vote at one of a number of polling places, regardless of their residential address.

To function, many electronic pollbooks need to update information across numerous devices and locations. In many systems, this requires the ability to connect via wireless communication. Yet, integrating electronic

pollbooks into wireless networks can add security risks. In a worst-case scenario, hackers **could access these networks and alter or delete voter registration data,** even causing voters to appear as if they have voted when they have not. Electronic pollbooks that require access to the Internet can also pose problems in rural counties that lack reliable connectivity. All officials using these devices must prepare for the possibility of system malfunction.

The solution to these challenges is relatively simple. All polling places using electronic pollbooks should have paper pollbooks ready in case of system malfunction. In case backup paper pollbooks are unavailable or are found to contain errors, polling places should have an adequate number of "provisional ballots" (which can be counted after a voter's registration information is confirmed). Unfortunately, the Brennan Center found that of the 34 states that use electronic pollbooks, only half require paper backups to be present in every polling place at the time voting begins.

For instance, during the 2015 municipal primaries in Porter County, Indiana, a northern county east of Gary that borders Lake Michigan, electronic pollbooks **in at least 30** of the county's 136 polling places weren't operating when they opened at 7:00 a.m. Last year, there were problems in **a handful of polling places in Minneapolis** when poll workers used iPads for the first time to check in voters. During the 2016 presidential election, dozens of voters in Durham, North Carolina, were turned away in part because electronic pollbooks incorrectly showed that they had voted. Voting was **delayed** in some precincts for up to an hour and a half, as poll workers waited for new supplies to replace the faulty electronic pollbooks.

None of these problems are believed to have been the work of a malicious actor. But someone with malevolent intent could cause substantial delay, confusion, and damage in electronic pollbook jurisdictions. It is critical that election administrators using electronic pollbooks adopt robust contingency plans.

**States That Use E-pollbooks**



*In Colorado, the vast majority of voters vote by mail and state law requires that any voter voting in person receive a provisional ballot in the event of e-pollbook failure.

Legend:
- Gray: States That Do Not Use
- Light red: States That Use EPBs In Some Jurisdictions
- Red: States That Use EPBs Statewide

Any effective contingency plan for electronic pollbooks should include *both* of the following elements:

1. All polling places using electronic pollbooks should have backup paper systems on hand to use in case of electronic pollbook failure.

1. All polling places, especially those using electronic pollbooks, should have enough provisional ballots to cover three hours of peak voting activity in case any pollbook problems result in voting delays.

**The Importance of Paper Backup of E-Pollbooks**

Although electronic pollbooks have become the norm, sometimes there is no substitute for paper. In the August Arizona primary, **government contractors** were supposed to set up electronic pollbooks in Maricopa County's (Phoenix) more than 500 polling places. By 6:00 a.m. on Election Day, word came that set-up had not been finished in 62 of them. Although everything was finished by 11:30 a.m., for some voters that was too late. In addition, even in those precincts where the electronic pollbooks had been set up, there still were glitches, **with some voters being redirected to other locations.**

All this confusion could have been minimized if each polling location had backup paper pollbooks to check in voters.



All this confusion could have been minimized if each polling location had backup paper pollbooks to check in voters.

**The Importance of Provisional Ballots**

In June, South Dakota held a primary to determine nominees for one of the state's two U.S. Senate seats, its sole House seat, and the members of its state Legislature. Yet, in Pennington County (Rapid City), all 44 of its electronic pollbooks **failed to connect to the Internet.** In 16 precincts, voting was halted until backup paper pollbooks could be delivered, leading some voters to **leave** without casting a ballot. Julie Pearson, the

auditor and top election official in Pennington County, said no directive was issued to offer provisional ballots to inconvenienced voters. The vendor for the state's electronic pollbooks partly blamed the problems on **faulty Wi-Fi connectivity** in many counties aside from Pennington, including Hughes, Brown, Brookings, Yankton, Sully, Hyde, and Potter.

Most states that use electronic pollbooks do not set a mandatory minimum of provisional paper ballots that precincts should have on hand if electronic pollbooks fail. For federal elections, Connecticut requires that each polling place have paper ballots equaling at least 1 percent of the eligible voters in the district or an amount set by local election officials. In Ohio, the secretary of state requires that each precinct have at least 5 percent more provisional ballots than were cast at that location in a similar election.

In 32 of the 34 states using electronic pollbooks, the Brennan Center found no requirements in state law or regulation mandating a minimum number of provisional ballots (although several of these states — including Colorado, Connecticut, Idaho, Illinois, Iowa, Minnesota, North Dakota, and Wyoming — may need fewer provisional ballots because they either do not register voters or have Election Day registration).

**States That Do Not Require A Minimum Number of Provisional Ballots**



BRENNAN
CENTER
FOR JUSTICE

*Wisconsin has Election Day registration and does not issue provisional ballots. A voter without acceptable photo ID votes provisionally using a regular ballot, which is counted if the voter returns to the polling place or the clerk's office with an acceptable photo ID.

N/A
States With Minimum Provisional Ballot Requirement
States w/o Minimum Provisional Ballot Requirement

In the days leading up to the election, it is critical that election officials are adequately prepared to effectively recover from system malfunctions and cyberattacks. Electronic pollbooks are an overlooked, yet vulnerable, element in the election system. Low-tech, common-sense solutions like having paper backups and enough provisional ballots to cope with three hours of peak voting can greatly diminish the risk that problems with these systems will prevent people from voting.

(Photo: Shutterstock.com; maps: BCJ)

**RELATED ISSUES:**      **Defend Our Elections**

Election Security

EXHIBIT

4

**SUPPLEMENTAL DECLARATION OF AILEEN NAKAMURA**

**AILEEN NAKAMURA** declares, under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct:

1. My name is Aileen Nakamura.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. This declaration supplements my Declaration of February 21, 2020.

4. I am a registered voter residing in Sandy Springs in Fulton County, Georgia.

5. I am an active volunteer for the Coalition for Good Governance ("CGG").

6. On June 9th, 2020, at 7:18 a.m., I received a cell phone text from a long-time friend, Lynn Palazzo, who texted that she was waiting in line to vote at her polling place, Legacy Church, in Cobb County.

7. Lynn's text stated "Major problems with the voting system" at her polling place, and that the poll manager had stated that "none of them are working."

8. I had not spoken to Lynn for some time, but I knew she must have contacted me because I had posted a PSA from CGG on Facebook earlier in the week so that voters would know about Emergency Paper Ballots, which, under a new Election Rule, can be used in polling locations if the County Elections

Superintendent deems that the machines cannot be used, or lines are longer than 30 minutes.

9. I took Lynn's text to mean that the touchscreen BMD machines were down, so I told her that the poll manager should contact the Cobb Election Board so the polling place could use Emergency Paper Ballots. Lynn said it appeared that the poll manager knew nothing of this law and asked for the citation, so I texted her that it was Georgia Election Code 183-1-12.11, parts (c) and (d).

10. Around 7:50 a.m. Lynn texted that the poll manager told them they were "going to paper ballots even though we got no instruction on that."

11. Lynn Palazzo later texted me that she had arrived at her polling place at 6:45 a.m., and she did not finish voting until 8:45 a.m.

12. Around 7:30 a.m., while Lynn said that she was waiting for her poll manager to connect with Cobb Elections, I was scrolling through Facebook and saw that another long-time friend of mine, Angela Stone, had posted that she was also stuck in line at a different polling place in Cobb County – Sope Creek Elementary School.

13. I texted Angela to see what was going on at her location, and she said that she had been in line there since 6:50 a.m.

14. I let Angela know about the Emergency Paper Ballot rule, and sent her the relevant information so she could pass it on to the poll manager (if she could speak with him/her), or so she could make some calls herself.

15. It is my understanding that Ms. Stone has submitted a declaration to detail her experience that day in voting, giving the details that she shared with me. I was very frustrated hearing her experience, knowing that unnecessary lines were forming and discouraging people from voting when the new emergency ballot rule should permit voting to begin and continue even if the poll pads were not functioning.

16. Angela texted me that she finally voted at 9:03 a.m. She stated she had been only the 20th person to vote after the polling place had been open for 2 hours.

17. It is clear to me from the Election Day voting experiences as communicated to me by Lynn Palazzo and Angela Stone, and also the press reports I read that many poll workers in Cobb County were not trained for nor prepared for emergency situations such as poll pads being down. But it is unclear to me what they could have done without an updated paper pollbook backup, which was likely lacking, although a registered voter list (without the updates) was reportedly available.

18. One simple thing that I believe could have easily prevented the

situations at both Legacy Church and Sope Creek Elementary School would be to have updated paper poll-book backups for the precinct, at each polling place.

19. Had a paper pollbook backup been available with poll workers trained on how to use them, most polling places would not have had to stop checking voters in even when the poll pads were completely inoperable, and voters would not have had to wait for hours to vote, in my opinion.

20. Furthermore, I believe in cases like Legacy Church and Sope Creek where one or more poll pads may be functional but lines are getting longer because of a bottleneck at check-in, paper back-up pollbooks should always be used as a backup system to add at least one additional check-in station, so lines can keep moving and voters do not get disenfranchised.

21. The lack of paper back up pollbooks at polling places is especially frustrating to me as a very active citizen in election security and voting rights, because I have made public comments and sent emails to both the Fulton County Board of Registrations and Elections ("Fulton BRE") and the State Election Board ("SEB") about this very issue on multiple occasions.

22. On January 21st, 2020, I, along with two other members of CGG, Jeanne

Dufort and Shea Roberts, visited SEB member David Worley at his office to talk to him about new rules that CGG was proposing at the SEB meeting the next day. We explained why having a paper pollbook backup was crucial as an emergency contingency, but on January 22nd at the SEB meeting, Mr. Worley said that he did not see the need for that particular rule.

23. After the June 9th election where so many machines were inoperable, I have made public comments to the Fulton BRE and sent emails on the need for the paper pollbook backup on July 9th and July 19th, 2020. Other members of CGG have made public comments along with me to the SEB on numerous occasions about the necessity of paper poll book backups, but our words seem to fall repeatedly on deaf ears, which is truly frustrating and unfortunate in my opinion.

Executed on this date, July 29th, 2020.

Aileen Nakamura

EXHIBIT

5

## DECLARATION OF SAMANTHA WHITLEY

SAMANTHA WHITLEY, hereby declares under penalty of perjury, pursuant to 28 U.S.C. (s) 1746,

that the following is true and correct:

1. My name is Samantha Whitley.

2. I am over the age of 18 and competent to testify if called on to do so. I have personal knowledge of the facts reported herein.

3. I am an analyst for the Coalition for Good Governance.

4. On June 9th, 2020 I was an authorized poll watcher for the Constitution Party and observer at multiple polling locations in Fulton, Dekalb, Gwinnett, and Athens Clarke counties with Grace Guynn, a DeKalb County voter.

5. I first observed at Dunwoody Library in Dekalb County around 8:15 am. Upon arrival, multiple voters were leaving the polling location. One stopped us as we walked in and warned us that if we were voting, we should check our My Voter Page because his polling location had suddenly changed, even though he checked over the weekend and it had said Dunwoody Library.

6. In line, voters told us they had been waiting over an hour, some since opening, and very few people had voted. Grace's father had been waiting since opening.

7. Inside the polling location room, no BMD was in use, despite the over an hour long wait line. It appeared that voters were not being checked in and not issued paper emergency ballots. It appeared that there was no back up pollbook available to permit ballot issuance with the PollPad equipment down.

8. As we were leaving, one poll worker told everyone in the stalled line to check their My Voter Page to make sure Dunwoody library was their polling location. I let an elderly man use my

phone to pull up his My Voter Page. His polling location was still Dunwoody Library, but the woman behind him said that her polling location had suddenly changed. She said she had voted at Dunwoody library for the past few years. We left the polling location at 8:30.

9.  At 9:15 we arrived at the Gwinnett County Water Department Polling Location. The line was over 2 hours long. A voter from the precinct named Stephen Mitchell talked to us in the parking lot, he arrived at the polling location before 7:00 and he had just now finished voting at 9:15. I took a picture of the line outside and inside (Exhibit A).

10. In the polling room, there was voting equipment all in the back, not set up. A Democratic Party of Georgia Poll Watcher, Belinda Miller, stated that she had been at the location since polls opened at 7 am. She told us that the machines arrived at 8:30. She also told us the first person voted at 7:51am with a provisional ballot. She said the poll workers were not properly trained on how to use a provisional ballot.

11.  During provisional voting, there were two voter lists divided alphabetically used to check in. The voters were given a provisional ballot in order to vote. When they were done voting, they put the provisional ballot in a white envelope and then into a purple bag labeled "provisional ballots."

12. Belinda Miller explain to us that these votes were not able to be properly secured in a bag until 8:30 am, because they did not have the proper secured bag at the time of opening.

13. Because emergency ballots were not issued and there was apparently no back up pollbook from which emergency ballots could be issued, voters had to vote provisionally. This is a much longer process and clearly stalled the line.

14. At 9:15 am the BMD voting machines were being set up.

15. At 9:45 the back up batteries for the BMD units were delivered, but the poll manager and county officials indicated that they did not know what they were and that the machines had already been set up, so they were not used.

16. It is my understanding that back up batteries are required by law to be installed during voting to protect the vote records in the event of a power failure.

17. At 10:10 the first voters checked in with the poll pads. At 10:15 am the first voter voted on a BMD.

18. The poll workers appeared to be unfamiliar with the equipment and only the poll manager and a state representative were able to help voters with equipment or scanner problems.

19. The machines were set up along the back and side wall of the room, with the screens facing the center. I as well as everyone in the room could see the faces of the voting screens. It was impossible for most voters to shield their votes from public view.

20. I sat in the designated poll watcher area a little more than six feet away from the voters and could see clearly how people were voting. I had to purposefully not look at the machines to give voters privacy. Any poll worker or voter waiting in line could see how people were voting.

21. We left at 10:45, and the line was over 2 hours long.

22. We arrived to JC07 in Fulton County at 3:55 pm. The line was approximately an hour long.

23. The poll manager explained to me that voters had to vote provisionally until 10:30 am because the BMDs would not work. He explained that, first, he did not have the right code to work the BMDs. Then when the code worked and he could start up the machines, he claimed that they just wouldn't act right. He was an older gentleman without much technical

experience so could not exactly tell me what the problem was. Just that the machines started working around 10:30 am.

24. Provisional ballots, which are a very slow methods of voting, were used for voting until the machines were operational. Emergency ballots were not issued based on a paper pollbook to speed up the lines.

25. A police officer was one of the poll workers. He was dressed in his uniform and was the poll worker assisting voters with the scanner.

26. He stood a few feet back from the scanner and directed voters on how to put their ballot into the scanner. I never saw him touch a voter's ballot or look at it, but nonetheless it is concerning to me to have a police officer dressed in uniform working in the polling place. I believe that some voters would be intimidated by police presence in the polling place.

27. When I asked about how he was a poll worker, he did not tell me that he went through the poll worker training. Only that he was a police officer helping.

28. We arrived at Cross Keys School polling location in Dekalb County around 5:00pm.

29. There were at least 200 people cramped into the hallways, waiting to vote in the library. The line was longer than 2 hours to vote. There were no social distancing procedures implemented and no poll worker was in the hallway providing information or line control for voters.  I took pictures of these conditions. (Exhibit B)

30. One voter told me that she waited the whole time (over two hours) with an absentee ballot, only to get to the door with her absentee ballot to be told that they did not accept absentee ballots and she should go to a dropbox to drop it off. Because there were no poll workers in the hallways, she did not know this nor did she have anyone to ask.

31. The poll manager explained to me that the BMDs did not work until 11:00 because the code he was given for the BMDs was incorrect.  The poll manager told me that it took over three hours for a technician to come. He also said that eight poll workers he had assigned to him did not show up.

32. There were six BMDs in the polling location and two electronic poll books. The electronic poll books were causing the longest delay, because there were usually touchscreen voting machines free while they were checking people in.  The pollworkers did not attempt to use a paper back up of the pollbook to check in voters or issue emergency ballots.

Executed July 28, 2020

Samantha Whitley

EXHIBIT

A

Exhibit A.







EXHIBIT

B

Exhibit B





EXHIBIT

6

## <u>DECLARATION OF BEATRICE BROWN</u>

BEATRICE BROWN hereby declares under penalty of perjury, pursuant to 28 U.S.C. (s) 1746, that the following is true and correct:

1. My name is Beatrice Brown.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. I am a summer intern with the Coalition for Good Governance from May to August 2020. I am also a registered voter in Fulton County.

4. My polling place observations occurred during early voting leading up to the June 9, 2020 Election Day. I voted in person on June 9 but did not act as a poll watcher on that Election Day, other than in my own home precinct.

5. It is my understanding that check in and creation of voter access cards for activating the touchscreen machines are generated in two different ways depending on whether the voting is taking place in early voting or Election Day voting. It is my understanding that the laptops function as the pollbooks for checking in voters during early voting, and during early voting the PollPads are primarily used for encoding the voter access card after the voter has checked in.

6. Therefore, the check-in operations in the early voting polling places I visited were not reliant on the full PollPad operations as Election Day check-in operations are.

7. I observed voting at the Cobb County elections office as a public observer on May 18, 2020. When I arrived at 4:30 there were approximately 3 people waiting in line outside. The time between voters being allowed to enter the building to vote was between 10 and 15 minutes. I asked repeatedly if I could be let inside to observe but was told that due to

social distancing requirements, they could not let an additional person in the polling place. I was told by a poll worker who was managing the line that no emergency paper ballots had been issued despite the wait times having reached an hour during parts of the day.

8. I observed early voting at the South Fulton Service Center on May 19, 2020 as a public observer. There was approximately 60 people in line when I arrived at 11:00. I was told the wait time was two to three hours. I was not allowed into the polling place as a public observer, despite my showing the poll managers copies of the Georgia statutes that permit public observation of voting.

9. I observed early voting at the C. T. Martin Natatorium and Recreation Center in Fulton County on May 19, 2020 as a public observer. I timed two voters from check-in through touchscreen operation and until they scanned their ballots. It took an average of 15 minutes to complete the voting process. A woman waiting outside said she had already been in line for 45 minutes.

10. I observed voting at South Dekalb Mall in Dekalb County on May 19, 2020 as a public observer. I was not allowed inside the polling place but was told to observe from outside the building through the window, although I understand that public observation of voting in the polling place is authorized by Georgia statute. From what I could observe the precinct had between two and four poll pads. There was no line of voters during the time that I was observing from 2:30 to 3:00.

11. I observed early voting at Dekalb Elections Office as a public observer on May 19, 2020. I observed one voter who took seven minutes to complete the entire voting

process. The voter did not review the ballot for accuracy of the machine marking before scanning the ballot.

12. I observed early voting at Dunwoody Library on May 19, 2020 as a public observer. There was no line or wait time while I was there from 4:00 to 4:15. A poll worker said they had not had any long lines or too long of a wait that day. The location had two to four poll pads.

13. I was an observer at the Henry County Main Office on May 20, 2020 as a public observer. There was no line or wait time to vote. A poll worker said there had been some short lines during the morning. The precinct had two poll pads. I was there from around 2:00 to 2:30. I timed two voters who took an average of 11 minutes to vote on the touchscreen machines. Both voters did not spend more than a minute at the poll pad station.

14. I observed early voting at the Merle Manders Conference Center in Henry County on May 20, 2020 as a public observer. The precinct had two poll pads. I observed two voters complete the voting process in an average of 15 minutes. There was no line or wait time while I was there from around 2:45 to 3:20. One voter was told by a poll worker at a poll pad that she would have to cancel her absentee ballot. The voter said she had not requested an absentee ballot, but they went ahead with the cancelation process. The poll manager called to cancel the ballot and the voter was allowed to vote on a BMD. This indicated to me an error in the PollPad information.

15. I observed early voting at the Carl Rhodenheizer Recreation Center in Clayton County on May 20, 2020 as a public observer. The precinct had two poll pads. There was no line or wait time while I was there from around 3:35 to 4:05. I observed two voters

completing the entire voting process which took an average of 23 minutes. Both voters were at the poll book station for roughly two minutes. The voters did not review the printout of their ballot before scanning it.

16. I observed early voting at the Gwinnett Voter Registration Office on May 21, 2020 as a public observer. There were three poll pads at the precinct. Two voters were observed going through the entire voting process which took an average of ten minutes. Both voters spend six minutes at a poll book station.

17. I observed early voting at the Athens Clark County Board of Elections Office on May 21, 2020 as a public observer. The poll pad stations were behind a counter but from what I observed there seemed to be two poll pads at the precinct. There was not line or wait time while I was there from around 1:15 to 1:30.

18. I observed early voting at the Gwinnett County Fairgrounds on May 21, 2020 as a public observer. Despite the provisions of state law which state that the public can observe the voting, I was not allowed to observe from inside the polling place but was told by a poll worker that there were 12 poll books. I was able to look through the window to confirm this number. There was no line or wait time at this location. One voter was seen entering and exiting the building from which I estimated that it took him 16 minutes to vote.

19. I observed early voting at Alpharetta Library in Fulton County on May 21, 2020 as a public observer. I was not allowed into the polling place and was unable to see or get an answer from a poll worker on the number of poll pads at the precinct. There were around 10 voters in line, and I was told by a poll worker that the wait was between 45 minutes to an hour. It took three voters an average of 11 minutes to vote based on when voters entered and exited the voting room.

20. I observed early voting at the West Cobb Senior Center on June 1, 2020 as a public observer. There were approximately 15 voters in line. I was told I could not come inside the polling place and was forbidden from speaking to voters outside the building, although I was there simply as a member of the public. I was unable to determine how many poll pads the precinct had or how long voters had been standing in line for.

21. I observed early voting at the Riverside Epicenter in Cobb County on June 1, 2020 as a public observer. I was not allowed to enter the polling place as public observer but there appeared to be three poll pads at the precinct from what I could see. The line was only two to three people long while I was there between 1:30 and 2:00.

22. I observed early voting at the Douglas County Court House on June 1, 2020 as a public observer. From what I observed, the location had no poll pads. Only one to two voters were waiting to vote while I was there. I do not know how proper voter access cards were encoded for BMD voters without PollPads set up.

23. I observed the set-up of the Fulton County Buckhead Library precinct on July 14, 2020 as a public observer. The poll manager told me the poll pads were locked inside the carriers by employees at the warehouse. They stated that the carriers would not be opened until the first day of voting and the poll pads would not be plugged in or powered on until then. The poll manager and the IT team went back and forth on the set up of the elections equipment because there were so few power outlets in the room to power the poll pads along with all of the other equipment.

24. I observed early voting at Fulton County State Farm Arena on July 20, 2020 as a poll watcher with the Constitution Party. The precinct had nine poll pads. While I was at the precinct from 1:20 to 2:00 less the five total voters arrived. The ballot was very short with only 5 as the maximum number of contests. I timed one voter who took less than five minutes to vote and spent less than a minute at the poll pad station.

25. I observed early voting at Fulton County Buckhead branch library on July 20, 2020 as a poll watcher with the Constitution Party. The precinct had three poll pads. There was no wait time while I was there between 4:20 and 5:00. I timed three voters who took an average of seven minutes to complete the voting process, as this was a short ballot. No voter spent more the one minute at the poll pad station.

26. I observed early voting at Fulton County Ponce de Leon Library branch on July 21, 2020 as a poll watcher with the Constitution Party. The precinct had three poll pads. There was no line or wait time while I was there between 1:35 and 1:50. I timed three voters who took an average of four minutes to complete the voting process. No voter spent more than two minutes at the poll pad station.

27. I observed early voting at the Fulton County Northwest Branch at Scotts Crossing Library on July 21, 2020 as a poll watcher with the Constitution Party. The precinct at two poll pads. There was no line or wait time while I was there between 2:20 and 2:45. I timed three voters and they took an average of seven minutes to complete the voting process, because of the short ballot. None of the voters spent more than two minutes at the poll pad station. One voter had trouble with the voter card while at the BMD but a poll worker was quickly able to solve the issue.

28. I observed early voting at the Fulton County C. T. Martin Natatorium and Recreation Center on July 21, 2020 as a poll watcher with the Constitution Party. The precinct had three polls pads. There was no line or wait time while I was there between 3:10 and 3:35. I timed three voters who took an average of five minutes to complete the entire voting process. None of the voters spent more than two minutes at the poll pad station.

Executed on July 29, 2020

*Beatrice Brown*

Beatrice Brown

EXHIBIT

7

DECLARATION OF ANGELA STONE

ANGELA STONE, hereby declares under penalty of perjury, pursuant to 28 U.S.C. (s) 1746,

that the following is true and correct:

1. My name is Angela Stone.

2. I am over the age of 18 and competent to testify if called on to do so. I have personal
   knowledge of the facts reported herein.

3. I am a registered voter in Cobb County and my polling location is Sope Creek
   Elementary.

4. I arrived at my polling location, Sope Creek Elementary, at 6:50am on Election Day June
   9, 2020. While waiting, I visited the My Voter Page to access my sample ballot and
   remind myself of the candidates I wished to vote for. When entering my information, a
   message appeared that my voter registration "was not located" and I could not access My
   Voter Page at all. I worried that my name might not appear in the electronic pollbook at
   the check in table.

5. Around 7:30am, a woman near the front of the line was returning to her car and let us
   know that no one had voted yet and they were "having problems with the system." She
   passed along the message that they weren't sure how long it would take to fix the
   situation or when voting could begin. A few people left the line with her.

6. At 7:35am, I called the Secretary of State office (404-656-2881) to explain the situation.
   The woman I spoke with (I did not get her name) asked for my county, but was unable to
   directly help. She recommended I called my county election's office.

7. I inquired about the availability of emergency ballots or provisional paper. She said she
   wasn't aware of that being available and that she would "need to check on that" and put

me on hold. She wasn't able to locate any information on emergency paper ballots but said that I should call the election liaison and let her know about the issue at my location. She provided the name and number for Leigh Combs (470-312-2741).

8. At 7:43am I called Leigh Combs and explained the situation again. She shared that I was the second report of problems within Cobb County. I inquired about emergency paper ballots. She said "yes, they should be offering them" and that she would get in touch with someone at our location to identify the problems.

9. At 7:47am, I called the Cobb County Director of Elections office (770-528-2581) and was on hold 4 minutes before hanging up. At this time, a poll worker came through the line to let us know that the "systems were down" and that they were working on it as quickly as they could. I inquired again about the provision of emergency paper ballots and he replied "I just heard them talking about that now." A few more people left the line at this point.

10. A few minutes after 8:00am, a poll worker came back through the lines to provide us with Voter's Certificates and pens. We were told that the process would be explained once we got inside the building.

11. Inside the building, I could see that there were 4 poll pads set up but only one was in use. I could see 5 or 6 touchscreen voting machines but only 2 being used and a poll worker having to escort voters to each station and enter information to begin the voting process. At the check in desk, I overheard one poll worker say that "registration is working just fine but we can't validate the voter cards."

12. We did not receive the green voter cards that you typically insert into the machine. We were directed to wait for another poll worker to escort us to a machine and help us get started.

13. While waiting (this is now around 8:40-8:45am), I saw another worker approach the registration table with a large ream of paper, saying "I finally found it." The stack of paper said "back up copy" at the bottom and appeared to be a list of voters in the precinct.

14. After the registration work flipped through the first few pages, I overhead workers say that this method of checking in voters would "take too long" and they would continue to use the one poll pad for check in. At this point, another poll worker received a phone call and began describing the problems they were having with the pads. I heard him say several times "we tried that" and then finally "ok, I can try that." He unplugged one poll pad connection, flipped the wire/chip upside down, and plugged it in again.

15. The poll worker stated that they had determined that the poll pads had simply been plugged in incorrectly the whole time. At this point, they were able to begin processing registration as usual and issuing the green plastic voter cards. Those of us who were already checked in did not receive one.

16. When I approached the voting machine, a poll worker accompanied me to the screen and entered an admin ID or PIN. She then instructed me to choose a 4-digit ballot number from the printed paper she held. Two different numbers were provided for each party ballot you were requesting. So, for my democrat ballot, I was told I could enter one of two numbers and "it didn't matter which one." I do not know the significance of those numbers.

17. Once the ballot number was entered and she verified that my ballot was pulled up, the poll worker stepped away for privacy and went on to help the next voter. Unfortunately, the level of involvement from the poll workers meant that social distancing was impossible even though they were clearly trying their best throughout the situation.

18. Assuming the counter at the bottom of the scanner was counting total ballots cast, I was voter number 20 for voters casting a scanned ballot. I returned to my car at 9:03am after arriving to vote at 6:50am. During this process many people left the line without voting.

19. Water and a chair were requested for a gentleman who was "collapsing from overheating." When I returned to the parking lot, I saw that emergency responders were tending to him and loading him into the ambulance. Sadly, he was not able to cast his vote this morning.

20. Despite all of the confusion, I am grateful that I was finally able to vote. I commend the poll workers for trying as best they could in a situation for which they were not prepared or technologically savvy enough to remedy. The system appears to me to be complex with many integrated parts that I expect to continue to cause training difficulties and technical glitches.

21. It was beyond frustrating for all and several people in line expressed a lack of confidence that their votes would be counted.


Executed July 29, 2020


_____

Angela Stone

EXHIBIT

8

## DECLARATION OF LYNN H. PALAZZO

**LYNN H. PALAZZO** declares, under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct:

1. My name is Lynn H. Palazzo.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. I am a registered voter in Cobb County, Georgia, and my polling place is Legacy Church.

4. I applied for an Absentee Mail Ballot for the June 9th, 2020 election after I received the application in the mail.

5. I received a ballot, but because the election date on the ballot was May 19th, I threw it away. It was only later that I found out the ballot indicating May 19th was indeed the correct ballot for the June 9th election, and am still perplexed as to why there was nothing included with the ballot to let voters know that the May 19th ballot should be used for the June 9th election.

6. Even though I did not want to vote in person during the pandemic, because I had no way to vote by absentee ballot after I had discarded mine in confusion, I decided to go early to vote in person on Election Day.

7. On June 9th, I arrived at my polling place, Legacy Church, at 6:45 a.m. There were already 10-12 people in line when I arrived.

8. When the polls opened at 7 a.m., the line moved slowly at first, but within 5-10 minutes, the line stopped moving altogether. After 10 minutes, a poll official came to tell voters that if anyone had to be at work soon but could come back later in the day, that doing so might be better because the poll pads were down. There were two handicapped voters (an elderly man on oxygen with a cane and a gentleman in a wheelchair) who were in the increasingly longer line. They were not using the handicap entrance/check-in located indoors. I asked the poll worker if accommodations could be made for them in the air conditioning. She tried to assist, but this caused a discussion among the voters in line about what was happening inside. She said that the poll pads were completely down and that, "No one knows what the heck they're doing because we weren't allowed to open these ahead of time."

9. The assistant poll manager responsible for cancelling my absentee ballot, which normally would take a quick call to the election board, could not make the call because apparently machines were down all over Cobb County and the Elections Board support line had a 30-40 minute wait time. At one point he discouraged me from waiting, saying, "It's gonna take a long time. You sure you're up for this?" I said, "I'll wait, thank you." I was determined to stay until I could vote.

10. I had recently seen a post on Facebook from the Coalition for Good Governance ("CGG") that had mentioned that all polling locations should have Emergency Paper Ballots to use if the machines were down or if people had to wait in line for more than 30 minutes, so I asked the poll manager about using paper ballots, and his reply was, "That takes twice as long." I then informed fellow voters behind me in line about the election code and switching to paper ballots. The handicapped gentleman said that he didn't believe paper ballots were safe, and he and his companion began to leave.

11. Shortly after, I texted my friend Aileen Nakamura, who volunteers with CGG, to let her know that there were major problems at my polling place and that all the machines were down. She confirmed that the polling place should be switching to Emergency Paper Ballots based on the fact that the wait was over 30 minutes, and gave me the citation to the Election Code to give the poll manager, who did not seem to be aware that there was a statute for using paper ballots in such a situation.

12. The poll workers tried "rebooting the whole system", but the machines were still inoperable after the reboot.

13. At this point, the poll manager and I were both on hold with the Cobb Elections Board. I could hear him mumbling about paper ballots and he mumbled to me about "making it worse."

14. When I told him that I was trying to call Cobb County Election Director Janine Eveler to ask her to determine that my polling place needed to use paper ballots because people were being turned away, the poll manager clarified and said that "he had asked people to come back after work so that they wouldn't be late to work." The handicapped gentleman left and 3 others, two women and one man, left at the announcement of coming back later to avoid being late for work. I fear that people may have been discouraged and failed to come back or failed to attempt to vote at all given such conditions.

15. I feel very fortunate that I had the good health and flexibility to wait in frustrating conditions to vote. Certainly not all voters are so lucky and can easily be disenfranchised in such conditions, particularly during the pandemic.

16. At this point, I had been in line for almost an hour, and only two people had been able to vote. Since I was outside the voting area, and nothing was happening other than the poll manager talking on the phone about paper ballots, I decided to take a video the line of voters and the poll workers

sitting around with nothing to do. (Video is linked here.)

https://coaltionforgoodgovernance.sharefile.com/d-s071acb73aa24452a

Audio can be heard of poll workers "still on hold" with Cobb County at 7:40 a.m.

17. Around 7:50 a.m., the poll manager announced that they would be "going to paper ballots even though we got no instruction on that." He also stated that, "We're the ones standing here looking stupid."

18. One person finally voted using a provisional ballot.

19. Then around 8 a.m., they finally got one poll pad to work. But for what looked like a first time voter (who was one of the first three people in line with her parents,) it took her an hour to vote.

20. When it was finally my turn, I first needed to have my absentee ballot cancelled, because I had thrown it away due to the wrong date. The assistant poll manager who handled that function and who was supposed to maintain a record of it, suddenly rooted around to find a miscellaneous notebook to write down my cancelled ballot number. It was so unofficial that I realized very quickly that he was not prepared to do this nor was he even expecting to, so I made sure he had my name, my voter ID card, etc.

21. After I was checked in using the poll pad, I was finally able to cast my vote on a voting machine, which printed a paper copy of my choices that I then

cast into a scanner. I had arrived to my polling place at 6:45 a.m., and left at 8:45 a.m.

22. This was the worst voting experience I have ever had, as it was a total fiasco. It was clear that there was not enough training, especially for emergency situations, and that communications between the poll workers and the county was extremely poorly managed. Given that the pandemic does not seem to be going away any time soon, I fear that November 3rd will be another fiasco unless some serious thought and action is put into Georgia elections.

Executed on this date, July 29th, 2020.

Lynn H. Palazzo

EXHIBIT

9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **DONNA CURLING, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION** |
| **vs.** | ) | |
| | ) | **FILE NO. 1:17-cv-2989-AT** |
| **BRAD RAFFENSPERGER,** | ) | |
| **ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF BRUCE P. BROWN

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

1.     My name is Bruce P. Brown.  I am over the age of 18 and competent to testify.  I have personal knowledge of the facts stated in this declaration.  I represent the Coalition Plaintiffs in this case.

2.     Attached as Exhibit A is a true and correct copy of the following three emails: my email dated December 20, 2019 to Defendants' counsel, and co-counsel Cary Ichter's emails to Defendants' counsel dated December 26 and December 30, 2019.

3.     Attached as Exhibit B is a true and correct copy of an email that I sent to Defendants' counsel on July 20, 2020.

4.     On or shortly after July 20, 2020, counsel for the State Defendants agreed to have a conference call on the issue of the paper pollbook backups, which call took place on July 23, 2020. It was a lengthy and substantive call that led to subsequent emails relating to specific questions, but no agreement on the paper pollbook backups has been reached.

5.     Attached as Exhibit C is a true and correct copy of an email that I sent to counsel for the Fulton County defendants on July 28, 2020. In the email, I stated: "I have not received any response from Fulton County on the issue of backup paper pollbooks. Not having a back up for the pollbooks was one of the causes of the horrific delays in Fulton County during the last election." Counsel for the Fulton County Defendants have not responded to my July 20 or July 28, 2020, emails.

FURTHER DECLARANT SAYETH NOT.

This 31st day of July, 2020.

Bruce P. Brown

2

E
X
H
I
B
I
T


A

**Subject:** RE: March 2020 Primaries
**Date:**      Monday, December 30, 2019 at 11:29:52 AM Eastern Standard Time
**From:**      Cary Ichter
**To:**         Bryan Tyson, jbelinfante@robbinsfirm.com, Burwell, Kaye, Cheryl Ringer, Vincent Russo
**CC:**         Bruce Brown, Cross, David D., Robert McGuire, John Powers, Marilyn Marks

Counsel:  While I understand that some of you have taken some time off for the holidays, the scheduled elections have not, and Coalition Plaintiffs are quite concerned about the State and counties' readiness to conduct a fair and successful election without disenfranchisement, ballot secrecy violations, and significant inconvenience of voters. As such, we have been working over the holidays to attempt to evaluate our next steps, and after 10 days and repeated requests, we have not received so much as the courtesy of a response from any of you, much less the information we have requested in the emails below. The information we have requested should be readily available and easy to forward.

Absent a substantive response, Coalition will be forced to seek the Court's intervention to order the delivery of the information to Plaintiffs.  Please let us hear from you.

Cary Ichter

---

**From:** Cary Ichter
**Sent:** Thursday, December 26, 2019 2:45 PM
**To:** Bryan Tyson <btyson@taylorenglish.com>; jbelinfante@robbinsfirm.com; Burwell, Kaye <Kaye.Burwell@fultoncountyga.gov>; Cheryl Ringer <Cheryl.ringer@fultoncountyga.gov>; Vincent Russo <vrusso@robbinsfirm.com>
**Cc:** Bruce Perrin Brown Esq. (bbrown@brucepbrownlaw.com) <bbrown@brucepbrownlaw.com>; Cross, David D. <DCross@mofo.com>; Robert McGuire <ram@lawram.com>; John Powers <jpowers@lawyerscommittee.org>; Marilyn Marks <marilyn@aspenoffice.com>
**Subject:** RE: March 2020 Primaries


Counsel:

I'm writing to follow up on Bruce Brown's email of last week below, as he is out of the country. As best I can tell, no one responded in any substantive way (or any other way) to Bruce's email. If that is incorrect, I would appreciate it if you would send a copy of the response to me.

I would appreciate it if you would forward available responsive information Bruce requested available and follow up with us when the remaining requested information becomes available. The plans ordered by the Court should be readily available for distribution to us.  From personal experience, it is pretty clear that when the Defendants are playing "hide the ball," they simply ignore and shut down communications.  That will not work, and I seriously suspect that the Court will not be pleased with these tactics of evasion and concealment.

As Bruce wrote, the Coalition Plaintiffs are quite concerned about the potential for serious implementation problems prior to the March 24 primary, particularly because of the continuing significant delays in the equipment delivery and deployment. It is our understanding that little more than 10% of the equipment had been delivered as of about a week ago, while UOCAVA ballots are required to be mailed by February 8.

The sad news last weekend of Senator Kirk's death means a vacancy election in nine counties will have to be held, likely in February, and the HD 171 vacancy election in three counties in

January obviously add considerable stress to the already extremely challenging schedule. Given the challenges added by the latest developments, we would like to encourage the State Defendants to voluntarily reconsider the implementation schedule. We are happy to talk with you about some suggestions we have that would avoid seeking the Court's intervention.

We believe that the most important near-term actions to safeguard the upcoming vacancy elections and the March 24, 2020 elections would be the following:

1. Delay the deployment of the BMD units themselves (80,000 pieces of equipment) and conduct the March primary on hand marked paper ballots given the simplicity of the ballots with uniform ballot styles across the state. This would solve substantial portions of the logistical challenges of delivery, testing, debugging, programming the units prior to the end of February.

2. Use updated paper pollbooks to serve as active back up records to adjudicate discrepancies and serve as the working pollbook if PollPads are not functioning properly.

3. Permit counties to choose whether to run the March primary as hand marked paper ballot elections with Dominion or Diebold optical scanners and EMS systems and related E-Pollbooks, to avoid rushed conversions and permit counties to use equipment with which they are familiar. [This would require Court approval.]

Additionally, such an approach avoids the apparently difficult to solve problem of BMD screen ballot secrecy prior to the upcoming elections.

We are happy to talk with you about these or other options. Ideally, we could present a joint motion to the Court presenting these changes and an amended Order that incorporates these modifications. Obviously, we believe that these issues need to be addressed immediately and feel that absent agreement from the State Defendants, that Coalition Plaintiffs must seek Court intervention to address these issues.

Cary Ichter, Partner
Ichter Davis, LLC
Ste 1530
3340 Peachtree Road, NE
Atlanta, GA 30326-1084
(404) 869-7600
(404) 869-5243/DID
(404) 869-7610/Fax
(404) 769-1353/Cell
cichter@ichterdavis.com
www.ichterdavis.com

---

**From:** Bruce Brown <bbrown@brucepbrownlaw.com>
**Sent:** Friday, December 20, 2019 9:38 AM
**To:** Bryan Tyson <btyson@taylorenglish.com>; jbelinfante@robbinsfirm.com; Burwell, Kaye <Kaye.Burwell@fultoncountyga.gov>; Cheryl Ringer <Cheryl.ringer@fultoncountyga.gov>; Vincent Russo

<vrusso@robbinsfirm.com>
**Cc:** Cross, David D. <DCross@mofo.com>; Robert McGuire <ram@lawram.com>; Cary Ichter <CIchter@IchterDavis.com>; John Powers <jpowers@lawyerscommittee.org>
**Subject:** March 2020 Primaries


Counsel,

As you are aware from the content of the recently filed reply brief, Coalition Plaintiffs are gravely concerned about the lack of preparedness for the rapidly approaching March primary.  As we all know, this is the largest voting system implementation in U.S. history and, by the Secretary's staff own admission, the schedule to begin with was tight, even if everything went right.

By all reports, everything has not gone right and the State is far behind schedule. Tuesday's State Election Board meeting was particularly discouraging, with the Board rejecting a number of rules which, if implemented, would have reduced implementation risks and improved the security of the system and the integrity of the upcoming vote.

As you know, Judge Totenberg has repeatedly urged the parties to exchange information voluntarily and make every effort to work together to find solutions.  In that spirit, we make the following urgent requests:

1. Please provide Plaintiffs with the current implementation schedule for the Dominion system and all information that you can provide comparing that schedule to the initial implementation schedule.

2. Please provide Plaintiffs immediately with a copy of the Secretary's hand marked paper ballot plan referenced by the Court on page 148 of her Order (Doc. 579) (ordering the State to "develop a default plan for use in the 2020 elections that addresses the contingency that the new BMD system enacted by the State Legislature may not be completely rolled out and ready for operation in time for the March 2020 Presidential Primary elections").  Given that the hand marked paper ballot pilots were a portion of that back up plan, *id.,* the plan should have been fully developed by the November 2019 elections.  We therefore anticipate production of the plan ("the Hand Marked Paper Ballot Default Plan") immediately.

3. Please provide Plaintiffs with a report on the actions that the State has taken to implement the Hand Marked Paper Ballot Default Plan.  If the Hand Marked Paper Ballot Default Plan is not fully ready to be deployed for the March 2020 Presidential Primary elections, what specific actions does the State need to take and when will those actions be completed?

4. On the subject of the paper copies of the pollbooks, the State's position at the Status Conference and in response to the Motion for Preliminary Injunction on the BMDs is that the State is already doing what CGG is asking the Court to order the State to do.  It is very clear, however, that this is not the case.  Specifically, the State Election Board this week rejected a proposed rule that would have provided the relief that CGG seeks: that is, the requirement that a paper copy of the pollbooks, *updated to reflect early and absentee voting,* be made available in every polling place, and used as the official record to adjudicate discrepancies. This is exactly what O.C.G.A. §21-2-401(b) requires.  Instead of enacting a rule consistent with the law, the State Election Board is recommending a rule that would only require a voter registration list simply be kept at the polling place. Such a list will serve little value in resolving the ongoing disenfranchisement of voters when the electronic pollbooks malfunction, as was repeatedly the case in the pilot elections.

The Secretary has never articulated any reason to *not* provide a paper copy of the pollbooks, updated to reflect early and absentee voting.  Please reconsider the State's position on this issue so that CGG, if necessary, can get relief from the Court on this issue.

5. Please provide a copy of the plan that the Court on page 147 of its Order (Doc. 579) ordered the State *to be implemented* by January 3, 2020 addressing  "the procedures to be undertaken by election officials to address errors and discrepancies in the voter registration database."

6. To the State: In light of the size of the BMD screens, what action does that State plan to take to protect voters' right to case a secret ballot?  Does the State take the position that its vendor, Dominion, is HAVA complaint in this respect as the contract requires?

7. To Fulton County: In light of the size of the BMD screens, what actions does the County plan to take to protect voters' right to cast a secret ballot?

8. To Fulton County: please provide Plaintiffs with any copies of plans or reports of or by the State Defendants referenced above that you have received.  In addition, from the perspective of Fulton County: If neither the Dominion Voting System implementation plan nor the Hand Marked Paper Ballot Default Plan is fully ready to be deployed for the March 2020 Presidential Primary elections in Fulton County, what specific actions does the State or Fulton County need to take and when will those actions be completed?

Many thanks and please let us know if you have any questions.

Bruce Brown

EXHIBIT

B

**Subject:** Curling v. Raffensperger - Paper Pollbook Backups

**Date:** Monday, July 20, 2020 at 8:44:50 AM Eastern Daylight Time

**From:** Bruce Brown

**To:** cheryl.ringer@fultoncountyga.gov, vrusso@robbinsfirm.com

**CC:** Cary Ichter, Alexander Denton, Bryan Jacoutot, Brian Lake, Carey Miller, dbrody@lawyerscommittee.org, erosenberg@lawyerscommittee.org, hknapp@khlawfirm.com, Josh Belinfante, jpowers@lawyerscommittee.org, kaye.burwell@fultoncountyga.gov, sparks@khlawfirm.com, Cate Berenato, Loree Anne Paradise, Melanie Johnson, Bryan Tyson, Kaiser, Mary, Robert McGuire, Cross, David D., david.lowman@fultoncountyga.gov

Counsel:

In her October 23, 2019 Order granting in part Coalition Plaintiffs' Rule 59(e) Motion, Judge Totenberg denied Coalition Plaintiffs' requested relief related to paper pollbook backups "at this time," but stated that the Court "is potentially willing to consider this request for subsequent election cycles but only after hearing more concretely from the State regarding pragmatic implementation issues at a short conference or hearing." (Doc. 637 at 2-3). The purpose of this email is to suggest a "meet and confer" on the issue of paper pollbook backup at each precinct, an issue that we have never resolved and that Judge Totenberg, in the December 11, 2019 hearing, encouraged counsel to address. (Doc. 679 at 72-73). We would like to have this discussion in the next couple of days so that if we cannot work something out we can go to the Court for a short conference or hearing on the issue for relief in time for the August 11 election. Please let me know if there are times counsel for the Secretary and Fulton County would be available to speak about this tomorrow or Wednesday.

To back up a step, one problem that we have had with resolving this issue is the nomenclature. As Plaintiffs (and others) use the term, a "paper pollbook backup" is *not* the same as a print-out of the voter registration database, which is apparently currently used in the precincts. A "paper pollbook backup" means a list of eligible voters that is updated after early voting to reflect who has already voted and who has submitted mail ballot applications or mail ballots. The voter registration database as printed for the polling places does not have current information on who has voted and who has not voted. In addition, and a practical concern, the bulky voter registration database has a substantial amount of information that the paper pollbook backup does not have and does not need, such as registration history and related information. Instead, as its name suggest, the paper pollbook backup should have the same *updated* information as the electronic pollbook, nothing more and nothing less. In the past, confusion over this terminology has resulted in the Secretary, in defense of our claims for injunctive relief, taking the position that the state already provides a paper pollbook backup in each precinct (e.g., Doc. 679 at 72), which, according to Plaintiffs' definition, is not the case. Similar comments have been made at recent State Election Board meetings by Board Members to the effect that counties are sent paper pollbook backups, but that is not the case.

The currently created printouts of the voter registration database do not "backup" the electronic pollbook because they do not show who has voted absentee (either absentee in person (i.e., early) or by mail) in the election that is underway. This is contrary to Georgia law. The regulations provide:

> Electronic poll books shall be the primary method for checking in voters and creating voter access cards, **but the superintendent shall cause every polling place to be equipped with a paper backup list of every registered voter assigned to that polling place**. The paper backup list shall be used in case the electronic poll books do not properly function. The superintendent shall cause poll workers to be adequately trained in checking in voters on

both electronic poll books and paper backup list.

Ga. Comp. R. & Regs. 183-1-12-.19 (adopted February 12, 2020).  For the paper backup list to "be used in case the electronic poll books do not properly function," they need to be updated with the most recent voting information – information that the paper copies of the voter registration database does not provide.

In addition, as this regulation states, it is vitally important for "poll workers to be adequately trained in checking in voters on both electronic poll books and paper backup list."  As we have previously documented in numerous declarations, this is clearly not the case – if the electronic poll books are not working, pollworkers do not use any paper back up to adjudicate voter eligibility, primarily because the voter lists are not updated for use as back up pollbooks.

Actual paper pollbook backups, used by trained pollworkers to adjudicate voter eligibility, is therefore required by Georgia law.  But it also is a very smart, practical and easy way to mitigate the risks associated with electronic pollbooks.  Currently, if the electronic pollbooks are not working, the only option pollworkers take is to give voters a provisional ballot, an option that experience has shown brings voting in a precinct to an absolute standstill.  Even worse, a more systemic general problem with electronic pollbooks could bring the entire election to a standstill.

I hope we can come to an agreement this week so that pollworkers can be trained and paper pollbook backups can be used on Election Day, August 11.  There are a number of other serious risks associated with these elections during the pandemic that are very difficult to anticipate or mitigate, but not this one.  And we have a number of disagreements in this litigation that we have struggled with.  It would be great if we could tell Judge Totenberg that we have solved this problem – it will do a lot of good and potentially avert catastrophe.

So please let me know if you have time to talk about this tomorrow or Wednesday. Thanks again and I hope everyone is doing ok.

Bruce

Bruce P. Brown Law LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306

EXHIBIT

C

**Subject:** FW: Curling v. Raffensperger - Paper Pollbook Backups
**Date:** Tuesday, July 28, 2020 at 8:34:06 AM Eastern Daylight Time
**From:** Bruce Brown
**To:** Cheryl Ringer, Burwell, Kaye

Cheryl and Kaye –

I have not received any response from Fulton County on the issue of backup paper pollbooks.  Not having a back up for the pollbooks was one of the causes of the  horrific delays in Fulton County during the last election.   This is a very easy solution, and it is required by SEB regulations quoted below.

I am going to have to represent to the Court the parties positions after the meet and confer referenced below.
May I say that Fulton County supports (or does not oppose) the relief sought?

---

**From:** Bruce Brown <bbrown@brucepbrownlaw.com>
**Date:** Monday, July 20, 2020 at 8:44 AM
**To:** Cheryl Ringer <cheryl.ringer@fultoncountyga.gov>, "vrusso@robbinsfirm.com" <vrusso@robbinsfirm.com>
**Cc:** Cary Ichter <CIchter@ichterdavis.com>, Alexander Denton <Alexander.Denton@robbinsfirm.com>, Bryan Jacoutot <bjacoutot@taylorenglish.com>, Brian Lake <Brian.Lake@robbinsfirm.com>, Carey Miller <carey.miller@robbinsfirm.com>, "dbrody@lawyerscommittee.org" <dbrody@lawyerscommittee.org>, "erosenberg@lawyerscommittee.org" <erosenberg@lawyerscommittee.org>, "hknapp@khlawfirm.com" <hknapp@khlawfirm.com>, Josh Belinfante <Josh.Belinfante@robbinsfirm.com>, John Powers <jpowers@lawyerscommittee.org>, "kaye.burwell@fultoncountyga.gov" <kaye.burwell@fultoncountyga.gov>, "sparks@khlawfirm.com" <sparks@khlawfirm.com>, Cate Berenato <Cate.Berenato@robbinsfirm.com>, Loree Anne Paradise <lparadise@taylorenglish.com>, Melanie Johnson <melanie.johnson@robbinsfirm.com>, Bryan Tyson <btyson@taylorenglish.com>, "Kaiser, Mary" <MKaiser@mofo.com>, Robert McGuire <ram@lawram.com>, "Cross, David D." <DCross@mofo.com>, "david.lowman@fultoncountyga.gov" <david.lowman@fultoncountyga.gov>
**Subject:** Curling v. Raffensperger - Paper Pollbook Backups

Counsel:

In her October 23, 2019 Order granting in part Coalition Plaintiffs' Rule 59(e) Motion, Judge Totenberg denied Coalition Plaintiffs' requested relief related to paper pollbook backups "at this time," but stated that the Court "is potentially willing to consider this request for subsequent election cycles but only after hearing more concretely from the State regarding pragmatic implementation issues at a short conference or hearing." (Doc. 637 at 2-3).  The purpose of this email is to suggest a "meet and confer" on the issue of paper pollbook backup at each precinct, an issue that we have never resolved and that Judge Totenberg, in the December 11, 2019 hearing, encouraged counsel to address.  (Doc. 679 at 72-73).   We would like to have this discussion in the next couple of days so that if we cannot work something out we can go to the Court for a short conference or hearing on the issue for relief in time for the August 11 election.  Please let me know if there are times counsel for the Secretary and Fulton County would be available to speak about this tomorrow or Wednesday.

To back up a step, one problem that we have had with resolving this issue is the nomenclature.  As Plaintiffs (and others) use the term, a "paper pollbook backup" is *not* the same as a print-out of the voter registration database, which is apparently currently used in the precincts.  A "paper pollbook backup" means a list of eligible voters that is updated after early voting to reflect who has already voted and who has submitted mail ballot applications or mail ballots.  The voter registration database as printed for the polling places does not have current information on who has voted and who has not voted.  In addition, and a practical concern, the bulky voter registration database has a substantial amount of information that the paper pollbook backup does not have and does not need, such as registration history and related information.  Instead, as its name suggest, the paper pollbook backup should have the same *updated* information as the electronic pollbook, nothing more and nothing less. In the past, confusion over this terminology has resulted in the Secretary, in defense of our claims for injunctive relief, taking the position that the state already provides a paper pollbook backup in each precinct (e.g., Doc. 679 at 72), which, according to Plaintiffs' definition, is not the case. Similar comments have been made at recent State Election Board meetings by Board Members to the effect that counties are sent paper pollbook backups, but that is not the case.

The currently created printouts of the voter registration database do not "backup" the electronic pollbook because they do not show who has voted absentee (either absentee in person (i.e., early) or by mail) in the election that is underway.  This is contrary to Georgia law.   The regulations provide:

> Electronic poll books shall be the primary method for checking in voters and creating voter access cards, ***but the superintendent shall cause every polling place to be equipped with a paper backup list of every registered voter assigned to that polling place***. The paper backup list shall be used in case the electronic poll books do not properly function. The superintendent shall cause poll workers to be adequately trained in checking in voters on both electronic poll books and paper backup list.

Ga. Comp. R. & Regs. 183-1-12-.19 (adopted February 12, 2020).  For the paper backup list to "be used in case the electronic poll books do not properly function," they need to be updated with the most recent voting information – information that the paper copies of the voter registration database does not provide.

In addition, as this regulation states, it is vitally important for "poll workers to be adequately trained in checking in voters on both electronic poll books and paper backup list."  As we have previously documented in numerous declarations, this is clearly not the case – if the electronic poll books are not working, pollworkers do not use any paper back up to adjudicate voter eligibility, primarily because the voter lists are not updated for use as back up pollbooks.

Actual paper pollbook backups, used by trained pollworkers to adjudicate voter eligibility, is therefore required by Georgia law.  But it also is a very smart, practical and easy way to mitigate the risks associated with electronic pollbooks.  Currently, if the electronic pollbooks are not working, the only option pollworkers take is to give voters a provisional ballot, an option that experience has shown brings voting in a precinct to an absolute standstill.  Even worse, a more systemic general problem with electronic pollbooks could bring the entire election to a standstill.

I hope we can come to an agreement this week so that pollworkers can be trained and paper pollbook backups can be used on Election Day, August 11.  There are a number of other serious risks associated with these elections during the pandemic that are very difficult to anticipate or mitigate, but not this one.  And we have a number of disagreements in this litigation that we have struggled with.  It would be great if we could

tell Judge Totenberg that we have solved this problem – it will do a lot of good and potentially avert catastrophe.


So please let me know if you have time to talk about this tomorrow or Wednesday. Thanks again and I hope everyone is doing ok.

Bruce

Bruce P. Brown Law LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306