1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

4    DONNA CURLING, ET AL.,            :
                                       :
5            PLAINTIFFS,               :
     vs.                               :   DOCKET NUMBER
6                                      :   1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,       :
7                                      :
             DEFENDANTS.               :
8

9

10        **TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

11          **BEFORE THE HONORABLE AMY TOTENBERG**

12            **UNITED STATES DISTRICT JUDGE**

13                  **AUGUST 5, 2020**

14                   **1:20 P.M.**

15

16

17

18

19

20

21   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22              *TRANSCRIPT PRODUCED BY:*

23

     *OFFICIAL COURT REPORTER:*        *SHANNON R. WELCH, RMR, CRR*
24                                     *2394 UNITED STATES COURTHOUSE*
                                       *75 TED TURNER DRIVE, SOUTHWEST*
25                                     *ATLANTA, GEORGIA  30303*
                                       *(404) 215-1383*

# A P P E A R A N C E S   O F   C O U N S E L

**FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY SCHOENBERG:**

    DAVID D. CROSS
    MORRISON & FOERSTER, LLP

    HALSEY G. KNAPP, JR.
    ADAM M. SPARKS
    KREVOLIN & HORST, LLC

**FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES, WILLIAM DIGGES, III, AND RICARDO DAVIS:**

    BRUCE BROWN
    BRUCE P. BROWN LAW

    ROBERT ALEXANDER McGUIRE, III
    ROBERT McGUIRE LAW FIRM

**FOR THE STATE OF GEORGIA DEFENDANTS:**

    VINCENT ROBERT RUSSO, JR.
    CAREY A. MILLER
    JOSH BELINFANTE
    ALEXANDER DENTON
    ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

    BRYAN P. TYSON
    BRYAN JACOUTOT
    LOREE ANNE PARADISE
    DIANE LaROSS
    TAYLOR ENGLISH DUMA

(...CONT'D....)

1   (...CONT'D....)

2

**FOR THE FULTON COUNTY DEFENDANTS:**

3

4        DAVID LOWMAN
         CHERYL RINGER
         OFFICE OF THE FULTON COUNTY ATTORNEY

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2    (Atlanta, Fulton County, Georgia; August 5, 2020.)

 3              THE COURT:  Good afternoon.  This is Judge Totenberg.

 4              COURTROOM DEPUTY CLERK:  Good afternoon, Judge.  I

 5    think we have everybody represented.

 6              Would you like me to call the case?

 7              THE COURT:  Yes.

 8              COURTROOM DEPUTY CLERK:  Okay.  Good afternoon,

 9    everyone.  We are here for the teleconference in the case of

10    Curling vs. Raffensperger, Civil Action Number 17-CV-2989.

11              For the State of Georgia, I have Vincent Russo, Carey

12    Miller, Bryan Tyson, Alexander Denton, Bryan Jacoutot, and Josh

13    Belinfante present.

14              Did I miss anybody?

15              COURT REPORTER:  Loree Anne Paradise.

16              MS. LAROSS:  Diane LaRoss is also present.

17              COURTROOM DEPUTY CLERK:  I'm sorry.  Say that name

18    again.  Diane?

19              MS. LAROSS:  LaRoss.

20              MS. PARADISE:  Loree Anne Paradise.

21              COURTROOM DEPUTY CLERK:  Loree Anne Paradise.  Thank

22    you.

23              For Curling, I have David Cross, Adam Sparks, Halsey

24    Knapp.

25              Did I miss anybody for Curling?
```

```
 1                MR. CROSS:  No, sir.

 2                COURTROOM DEPUTY CLERK:  For the Coalition, I have

 3   Robert McGuire and Bruce Brown.

 4                Did I miss anybody for the Coalition?

 5                MR. BROWN:  I think that is it.  Ms. Marks is also on

 6   the line.

 7                COURTROOM DEPUTY CLERK:  And for Fulton County, I

 8   have David Lowman and Cheryl Ringer.

 9                Did I get everybody for Fulton County?

10                MS. RINGER:  Yes.  That is correct.

11                THE COURT:  All right.  First of all, good afternoon.

12   And I hope everyone and your families are okay.  I appreciate

13   your making yourselves available on such short notice.

14                I have to say I was speed reading the revised version

15   of what the plaintiffs sent in -- and I'm sure defense counsel

16   were as well -- to try to really understand it and to

17   understand what were the differences from beforehand.

18                And I can't say that I completely necessarily

19   understand or have -- understand -- I understand the summary

20   and the plaintiffs saying that they are doing less and

21   describing it somewhat generically of what they are doing --

22   what you are doing less.

23                But when I read it, what you provided, I can't say

24   that it reads that way.  And I don't think it will be

25   productive for me to go through every single item and try to
```

1    understand them.

2          But I would -- there are a few that would be helpful

3    just to talk on this level and to understand what happened

4    relative to the plaintiffs' efforts to previously observe the

5    logic and accuracy noticed testing and plaintiffs said you were

6    not able to do what -- even though publicly -- that there was a

7    public notice of it.

8          Is that your representation to the Court?

9          MR. BROWN:  Yes, Your Honor.  This is Bruce Brown for

10   the Coalition plaintiffs.

11         The experience that we have had with public

12   observation has not been good.  We have made efforts to both

13   observe logic and accuracy testing and other operations that we

14   believe the law requires public access to.  And that has

15   increased the need to seek some of this informal discovery

16   through the notice to Fulton County.

17         That having been said, we do not -- we do not have a

18   bad working relationship with Fulton County elections and would

19   expect to be able to cooperate with Mr. Barron and the other

20   officials there so that we can stay out of their way and -- but

21   still observe what we need to observe in a meaningful manner

22   and always respectful of not only their operational needs but,

23   of course, you know, without any impact upon any voting.

24         In that respect, some of -- one of the requests at

25   least or some of the request is not even -- would not even

1    be -- would be outside of their operations; instead would be

2    the examination to be conducted at an office or a lab that

3    Mr. Barron would specify -- would cooperate with.

4         So that is the general -- general character of the

5    request.  And I'm referring to -- and just to be more specific,

6    I'm referring to the notice of Rule 34 request to Fulton County

7    that was attached --

8         THE COURT:  Right.  That is what I'm looking at.

9         MR. BROWN:  -- most recently.  Okay.  Thanks.

10        THE COURT:  Well, is there a need -- when I go and

11   look at everyone's notices around the State, just trying to get

12   a sense of this, many of the districts have already conducted

13   their logic and accuracy testing.  Now, maybe there is another

14   round they are going to do.

15        But what is the -- what is left?  You have a bunch of

16   things for August.  So what is actually left to be done from

17   Fulton County's perspective for the --

18        MR. BROWN:  Well, the logic and accuracy testing is

19   one piece of it.  But the other pieces would include, as we say

20   in the Rule 34 request, to observe the operations comprising

21   mail ballot scanning and processing activities, which like the

22   others is public observation or at a minimum would be available

23   for poll workers, and also access to the documents, which are

24   as a matter of Georgia law public records.  And we have been

25   blocked at every juncture, whether it is Open Records Act,

1   requests through the statutory provisions relating to --

2   specifically to elections, and also to physical observation of

3   voting activities to the point where our interns go down to a

4   voting location and basically have to come back because they

5   are not getting any meaningful access, can't see anything well

6   beyond the barrier that would be set up for public access.  So

7   that is part of our -- part of our need here.

8           MS. RINGER:  This is Cheryl Ringer on behalf of

9   Fulton County.  I cannot speak to the logic and accuracy

10  testing.  What I have learned from our staff is that there were

11  some issues with interns.  But I do believe our logic and

12  accuracy testing has been completed at this point.

13          With respect to Open Records Act requests, that is

14  something that is handled by a different person in our office.

15  But I do know that there has been some issues in being able to

16  compile the information in the time period that the requestors

17  want it.

18          All that is required is that a notice is given with

19  respect to when the information would be available and how much

20  it is going to cost, if it is going to cost, within three days.

21  You do not have to provide and compile that information within

22  three days.

23          What has been the problem is we do have very limited

24  permanent staff.  And their time is being taken with preparing

25  for elections.  So Ms. Marks and individuals associated with

1    her would submit Open Records Act requests but were not able to

2    get responses in the time that they thought they needed.

3           But, again, as we all know, Fulton County has been on

4    the front lines of the newspaper.  And we're very much

5    concerned about conducting a good election.  And so we have

6    provided some time periods when some information would be made

7    available.  And I think that is not acceptable to them.

8           But there is also another process for going forward

9    if there is an Open Records Act dispute.  I don't think it is

10   proper in this instance to come before the Court here.

11          THE COURT:  All right.  I'm just -- obviously I'm not

12   trying to deal with the Open Records Act requests.  I'm really

13   trying to deal with whether it is done in 30 days or it is done

14   in some other period of time -- the inspection request and what

15   their scope is and trying to understand if there are some of

16   these processes are open -- are public.

17          Is there -- I don't know -- I'm very clear that the

18   logic and accuracy ones are.  I don't know about some of the

19   other ones that they are -- that the plaintiffs maintain are

20   also handled on a public basis.  And that's really what I was,

21   first of all, trying to get at, not -- and being an inspection

22   request.  Because obviously it is so time-sensitive.  It is

23   related to the August elections.  So that is next week.

24          So that is what I was trying to understand.  So there

25   is no more logic and accuracy testing, first of all, as I

```
 1   understand, Ms. Burwell, what you are stating?  That you have

 2   completed it?

 3           MS. RINGER:  Correct.

 4           THE COURT:  Okay.  And then in terms of what happens

 5   either on election day or beforehand or in the day afterwards

 6   or all of those days, is -- is there, in fact, the adjudication

 7   software accuracy and the team that determines how the

 8   adjudication -- is that a public process?

 9           MR. BROWN:  Your Honor, this is Bruce Brown.  Under

10   OCGA 21-2-483, it is very point-blank.  It says all proceedings

11   at the tabulating center and precinct shall be open to the view

12   of the public.

13           THE COURT:  And does the -- does your client maintain

14   that you -- that this was not available to you in June?

15           MR. BROWN:  Yes.

16           THE COURT:  All right.  And that you attempted to

17   observe and you were not -- and representatives were not

18   allowed to observe?

19           MR. BROWN:  That is my understanding, Your Honor.

20           THE COURT:  I'm sorry.  You said OCGA 21-2-43 or --

21           MR. BROWN:  I'm sorry.  Yeah.  You missed a digit or

22   I did.  21-2-483(b).

23           THE COURT:  483.  Okay.

24           MR. BROWN:  And then there is another provision about

25   polling places.
```

1          MS. RINGER:  One second.  For clarification, in June

2     I don't believe that we used the adjudication software.  And

3     I'm not even clear if that is going to be done this time.  So

4     just clarification there.  We could not have allowed you to see

5     something that did not occur in Fulton County.

6          MR. BROWN:  I stand corrected if that is the case.

7     In terms of the -- I mean, our understanding is they did use

8     it.  But the -- let me give you that citation -- those

9     citations again first, 21-2-483.

10          THE COURT:  (b).  Yeah, I have that.  I'm looking at

11     it.

12          MR. BROWN:  And then there is another one.  That is

13     21-2-267, which has to do with polling places themselves.

14          MS. RINGER:  First, to clarify, at the warehouse the

15     election -- what is it? -- the EPC, there is an area for the

16     public to be and observe.

17          Are you saying that your client was not allowed to be

18     in that area?

19          THE COURT:  Are you talking -- chatting with your

20     client to be able to respond?

21          MR. BROWN:  Yeah.  I am trying to -- I had to move to

22     my cell phone, Your Honor.

23          THE COURT:  That is fine.

24          MR. BROWN:  A couple of things.  On the logic and

25     accuracy testing, it is going to be repeated for the upcoming

1   September elections when those start.  That is the special

2   election for John Lewis' seat.  So that will be repeated.  And

3   we would expect to have the appropriate access to the logic and

4   accuracy testing there.

5           And then with the August 11 election, the ones

6   upcoming, there will be the election day observations that we

7   are requesting but also the post-election work that is done

8   with the mail ballot processing and things like that.

9           THE COURT:  Well, that is what Ms. Burwell was asking

10  was she was saying there is a public viewing area.  Now, I

11  don't know that -- she -- she maintained that there has been no

12  use of the scanners and adjudication software accuracy.  And I

13  don't understand that.  But that will need to be explained

14  more.

15          But -- all right.  Was there -- was your client

16  blocked from being in the public access area and what were --

17  or were they there and they were not allowed to see?  They were

18  restricted in what they could see?  I don't know which it is.

19          MR. BROWN:  The typical scenario is that they are

20  not, you know, excluded from the building.  But they are in a

21  room that is separate from, for example, the logic and accuracy

22  testing.  And so we might get close, but you can't see

23  anything.  And so it is a worthless enterprise.

24          And so that is what the situation was with the logic

25  and accuracy testing for the August elections.  And, frankly,

1    what we did see gave us grave certain that it was by action not

2    being conducted and not being conducted properly.  And it was

3    being conducted at a speed that was impossible if it were

4    sufficient under -- in any sort of general standards.  And so

5    it sort of increases our legitimate need for observation as to

6    that.

7         And -- but I still want to emphasize that the last

8    thing that we think will happen or that we want to do is to get

9    in the way of anything.  And that is why I think it is

10   consistent with common sense and with the law just to simply

11   allow meaningful public access but meaningful access by us so

12   that we can inspect these operations as they are going on.

13        So it is authorized under Rule 34 clearly, which

14   gives litigants broad powers.  It is also authorized --

15   required by Georgia law.  And then we will work, as we have in

16   the past, with the elections people to make sure that they are

17   comfortable with any aspect of this -- of these proceedings.

18        And, you know, typically when we have worked with

19   them, they had a lot of success and we would expect that to

20   continue.  But it is not --

21        THE COURT:  For instance, what I'm trying to

22   understand is I don't -- is that you have this whole portion of

23   the inspection which related to testing of mail ballot scanner

24   and adjudication of software accuracy by plaintiffs'

25   representative.

1        I mean -- this is a separate question of whether you
2   are going to be able to test it yourself.  But there is a whole
3   inspection part of it and observation.  And then Ms. Barwell --
4   Burwell -- excuse me -- says that they hadn't done any of this
5   yet.  And so I'm just trying to understand factually is -- and
6   maybe the State's representative can say.
7        Is everyone, in fact, using this adjudication
8   software, and is everyone using a mail ballot scanner at this
9   point?
10       MR. TYSON:  Your Honor, this is Bryan Tyson.
11  Ms. Ringer may have some better understanding of the specific
12  situation in Fulton.  But I believe that it is kind of county
13  by county on the adjudication software.
14       Generally speaking, elections offices will have areas
15  for public viewing.  I represent Gwinnett in some other cases,
16  and there is a designated area for the public to view the
17  process.
18       I know in the past Ms. Marks has expressed
19  disappointment with her ability to -- feeling that that is not
20  sufficient.  But, generally speaking, elections offices are
21  aware of and have places for the public to observe.  In
22  addition, there are other things that poll watchers are able to
23  observe either at the tabulation center or at -- being within
24  the enclosed space of a precinct.
25       So I don't know if that necessarily gets to what you

1    are asking.  But that is just a little more context that I have

2    on that point for you.

3            THE COURT:  Well, has the State rolled out

4    adjudication software or not?  I mean, my -- I mean, I hate to

5    rely on public media reports itself.  So I'm just asking.  Has

6    it made it available so that if they -- if there is a

7    disagreement as to -- or it is not -- there is some question

8    about how a ballot has been marked is there some sort of

9    adjudication software, or is this being done basically by hand

10   by the judgment of the individual members of the -- staff

11   members of the election board?

12           I had the sense that there was some sort of -- a

13   question of the adjudication software and how it was set.  But,

14   again, that is more based on my reference to public materials.

15   So I can't say one way or the other that that is totally true.

16           MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.  I

17   may be able to clarify some of those points.  So I think there

18   is a couple of different things we're talking about here.  And,

19   again, Ms. Ringer may have some additional context.

20           First of all, as to ballots that are marked by hand,

21   which is generally your absentee by mail ballots, there are

22   settings on the scanning units about the sensitivity of what

23   they count as a vote.  And that is something that the EAC

24   utilizes when they certify the machines.  It is a setting that

25   can be changed.  It is a setting on there that as far as we

1    understand it is consistent across the State.

2           If there is a question about a voter intent after the

3    scanner goes through it -- so it is not read by the scanner for

4    some reason -- then there is a statutory process with the vote

5    review panel that makes the determination.

6           My understanding of what Fulton had been discussing

7    is possibly getting software that would additionally be able to

8    assist in that initial vote review panel process versus the

9    process of the -- versus the process of the initial scanning of

10   the ballots.  Those, I believe, are two different processes

11   that we're talking about, as I understand them.

12          THE COURT:  So the panel in Fulton would look at it

13   before it was run through the machine?  Is that what your

14   understanding was?

15          MR. TYSON:  Ms. Ringer, could you maybe clarify that

16   point?

17          MS. RINGER:  Yes.  This is Ms. Ringer.  I'm sorry.  I

18   do not know the specifics of the software that they are looking

19   at.

20          Mr. Lowman, do you?

21          MR. LOWMAN:  I do not.

22          MS. RINGER:  I would have to defer to what Mr. Tyson

23   has stated, Your Honor.

24          THE COURT:  Okay.

25          MR. TYSON:  Your Honor, I'm being advised by text

1   message that most of the counties are using some sort of

2   adjudication software.  So a lot of counties are using that.

3           THE COURT:  So is the -- is there anticipation about

4   where the -- where will the vote review panel be meeting to

5   deal with adjudication and remaking of the ballots in Fulton

6   County on August 10 or through August 12 or whatever date it is

7   completed?

8           MR. BROWN:  Was that a question to Ms. Ringer or --

9           THE COURT:  That really was a question to Ms. Burwell

10  or whoever else is there with her who might be able to answer

11  it.

12          Ms. Burwell, were you able to hear me?

13          MR. LOWMAN:  Ms. Ringer just indicated to me that she

14  dropped off and is trying to get back into the call.

15          COURT REPORTER:  Who was just speaking?

16          MR. LOWMAN:  This is David Lowman.

17          COURT REPORTER:  Thank you, Mr. Lowman.

18          MR. TYSON:  Your Honor, this is Bryan Tyson.  I

19  believe under 21-2-483 the vote review panel process takes

20  place at the tabulation center, which includes the area that we

21  discussed with an open view for the public.  So under 483 -- I

22  was looking through my code on that.  I think that -- I believe

23  that is where that process takes place.

24          MS. RINGER:  Hello.  I'm sorry.  This is Ms. Ringer.

25          THE COURT:  That's all right.

1      MS. RINGER:  My call had dropped.  So I didn't know

2  if the Court had addressed anything to me.  I just called back

3  in.

4      THE COURT:  Thank you.  I was asking you basically:

5  Would the vote review panel in its review of remaking of

6  ballots and adjudication issues, ballot marking be happening at

7  the tabulation center next week or is it going to be someplace

8  else.

9      MS. RINGER:  So my understanding is that normally

10 occurs at the -- at the warehouse.  I would have to actually

11 probably get more information on this.  Because I believe that

12 occurs at the warehouse.  But this year, they are looking at

13 using State Farm Arena for the tabulation center because of the

14 space and the ability to social distance.  So I -- I will have

15 to get more information.  I'll try and reach out to my client

16 right now.

17     THE COURT:  Okay.  So what happened in June on this?

18 I mean, I'm just still trying to understand was -- you are

19 saying there was not any use of the software at that point?

20     MS. RINGER:  There was not.

21     THE COURT:  And there wasn't --

22     MS. RINGER:  That's correct.  Fulton County did not

23 use the adjudication software in June.  But we always have a

24 vote review panel.  And so I was not clear if the plaintiffs

25 were saying that they attempted to view the vote review panel

1    and were not able to do that.

2              THE COURT:  Mr. Brown, what is the response to that?

3              MR. BROWN:  I actually do not know the answer to

4    that.  I know that they are using the software -- that they did

5    not use the adjudication software in June but they are using it

6    in August.

7              THE COURT:  And what -- remind me what it means when

8    it says Auditmark ballot images with color overlay.  This is in

9    Item 4 of your request for inspection.

10             MR. BROWN:  Your Honor, this is Bruce Brown.  Rob

11   McGuire is on the line.  He's going to address the adjudicated

12   ballot image issue, which you also referenced in Paragraph 2 of

13   your order.  And I also sent around -- although it was right as

14   we were all getting on the phone -- a couple of images to

15   everyone just to sort of help guide that discussion.

16             So Rob?

17             MR. McGUIRE:  Yes.  Hello.

18             THE COURT:  Hi.

19             MR. McGUIRE:  Hi.  Your Honor, good morning.  Good

20   afternoon, I guess, there.

21             THE COURT:  That is fine.  I know it is morning

22   there.

23             MR. McGUIRE:  So Bruce had emailed -- I'm not sure if

24   it has been filed on the docket yet.  But he had emailed two

25   exhibits on the Auditmark and the overlays.

```
 1              If you can -- if you have that, Exhibit 1 has an

 2     image on it which shows --

 3              THE COURT:  I don't know where -- you sent me a lot

 4     of materials.  Where -- does it have a document number?

 5              MR. McGUIRE:  Bruce, did it get filed?

 6              MR. BROWN:  Yeah.  It is getting filed now.  It was

 7     sent at one point to you, and I'm about to file it.

 8              THE COURT:  Okay.  We haven't gotten an email.  So --

 9              MR. BROWN:  We sent it a little earlier, but you

10     would have been getting on the phone.

11              MR. McGUIRE:  Well, I can explain it.  A picture is

12     worth a thousand words.  When it comes in, it will be clearer

13     maybe.  But, hopefully, I can articulate it.

14              So the Auditmark is appended to the image of the

15     scanned ballot.  So when the scanned ballot comes in, you get

16     an electronic image of the ballot.  Then at the bottom, it

17     appends something which says which votes were recorded.  And to

18     the extent there has been adjudication through the software, it

19     appends as well what votes were adjudicated for who.

20              So you have on top the actual image that was scanned

21     of the ballot.  And below it you have like a textual -- a text

22     listing of what votes were recorded.

23              And the way -- that is going to be in Exhibit 1 when

24     Bruce's filing comes through.  It is just a picture of the

25     Dominion manual guide, which has an image of that.
```

1          On Page -- on Exhibit 2, there is a scan or a

2    photograph from the New York Times article, which looks at an

3    actual on-screen capture of the adjudication software in

4    operation.  And what it shows is it shows a portion of the

5    scanned ballot with several races on it where the person who is

6    voting it has -- rather than done the right thing and filled in

7    the bubble carefully like we are all taught to do, the person

8    has actually done checkmarks.

9          And what that does is it doesn't fill in a high

10   enough percentage of the bubble for the scanning software to be

11   certain that there is a vote.  So the scanning software

12   registers above a certain threshold of marking within the

13   circle as being a possible vote.  And it flags -- in this

14   picture, there are two races that have yellow highlight of a

15   candidate selected by checkmark.  And there is a third race

16   where there is no highlighting in yellow of the candidate

17   selected by checkmark.

18          And the difference between those two situations is

19   where there is no yellow highlighting there isn't enough of the

20   checkmark in the circle for the software to even perceive an

21   ambiguous vote.  And where there is yellow highlighting, it

22   means that the software has perceived there might be a vote.

23   And the yellow highlighted overlay is put on to the -- the

24   scanned image.  And it demonstrates where the software has

25   found ambiguity.

1          Then there's an additional overlay, which is a red

2     square, which is around the selections which have been

3     identified as being ambiguous but are then resolved by the vote

4     review panel.  So if the vote review panel looks at the

5     ambiguous votes the software has identified and resolves them,

6     there is a red square around that race as an additional

7     overlay.

8          So what this image shows when you are able to look at

9     it is that there are three equally obvious to the human eye

10    votes by checkmarks for candidates.  And the adjudication

11    software has only identified two of them as being ambiguous,

12    and it has completely disregarded the third.

13         And then the review board has adjudicated the two

14    ambiguous votes, which any human looking at it would know they

15    are definitely votes and would adjudicate them as votes.  But

16    what the adjudication software and the scanning software has

17    done is they have missed a vote, which is to a human eye

18    equally obvious that it is a vote.

19         And I think that is why this image made it into the

20    New York Times article because it illustrates the problem with

21    the adjudication software.

22         To Your Honor's point in your order that we address

23    why we wanted to look at adjudicated ballot images for certain

24    counties, we want to do that discovery.  It is very easy for

25    these counties to produce to us -- to ascertain the extent of

1    this problem of the adjudication software causing votes that

2    are apparent to the naked eye to not be counted.  And that --

3    those results will be recorded in the part of the Auditmark

4    that is appended to each scanned ballot image.

5            And so because this is going to affect all the mail

6    ballots that are scanned and it deals directly with votes not

7    being counted that are required to be counted, we think it is

8    very close to the heart of our claims.  And the discovery is

9    not burdensome for the counties that would be called upon to

10   produce these records.  And so that is why we included it in

11   our list.

12           THE COURT:  Well, I think it is straightforward.  But

13   I just sort of -- if you are talking about what the largest

14   issues are for you -- I mean, I don't know that that is.  I

15   don't know that ever was identified in your complaint.

16           I'm not saying just because, you know, the entire --

17   I mean, you had a very broad enough complaint.  But I'm just

18   trying to -- I was trying to understand in the inspection what

19   you had in mind.  Because you also have all sorts of things --

20   I mean, just using this prototypically is that you want to be

21   able not just to observe it but you want to be able to

22   basically use the machine yourself and test it, if I understand

23   it.

24           And I'm really -- I don't want to become fixated on

25   this except for the fact that it is sort of an easier thing to

1    be talking about. I mean, similarly, you want to be able to

2    use a certain number of the ballot-marking devices and scanners

3    and test them. And I don't -- you know, I don't know what that

4    number is. I can't remember and if you identified it.

5           And I don't know what it means when you want to

6    inspect and observe operations comprising the startup and

7    operation of ballot-marking devices in particular precincts,

8    including the inspection of all on-screen messages and

9    displays.

10          Now, if that is something that's generally made

11   public, that is one thing. You say you want to do this when no

12   voter is using the specific ballot-marking device. So you mean

13   when they are just setting up, or do you mean in the middle of

14   the day? What do you mean?

15          I'm just trying to understand the intrusiveness of

16   this as a whole and this notion also at points that testing is

17   essentially that you are going to get -- have the machines

18   yourself -- have access to them, they're being lent to you. I

19   don't know what you have in mind.

20          MR. BROWN: Your Honor, this is Bruce Brown. What we

21   are requesting is to be able to test the ballot scanner and the

22   adjudication software because of the way it is not counting

23   votes.

24          THE COURT: Well, here is the thing. When we had the

25   first preliminary injunction hearing all that period back,

```
 1   Dr. Halderman had a machine, his own equipment, that he
 2   testified about.  And there were also other experts who had
 3   worked with -- who have given affidavits about their use and
 4   testing of particular equipment and technology.
 5            So here though what you want is to take Fulton
 6   County's or some other county's -- because there is one other
 7   county that is mentioned.  I don't know what particularly is
 8   going on with that -- that one.  I can't remember.  It was some
 9   county I hadn't -- there must have been something going on
10   with.
11            But you want to take their equipment and do testing
12   with their equipment.  And it is not like it is after the
13   election.  It is during -- basically in and about an election
14   or between the August and November election obviously as soon
15   as possible.
16            But, in fact -- because I really -- because of the
17   expedited nature of your request, it sounds like it is within
18   the next ten days virtually that you want to do it in terms of
19   looking at these machines or perhaps before this election.  I
20   really don't know.
21            But that seems to me very challenging from the
22   perspective of just, you know, both thinking about how to
23   reasonably manage this and -- and also reasonably manage the
24   election.
25            It is one thing for you to want to inspect and
```

1  observe operations.  And it may be that there is nothing that

2  really should prohibit you from -- your folks if they are --

3  you have one representative and you are actually totally not in

4  the way.  And that doesn't mean necessarily you just have to be

5  confined to the public area.  But that is very different than

6  saying I want you to provide us with the same equipment or a

7  sample of that same equipment on a time-sensitive basis.

8         Here I have -- even on the logic and accuracy

9  testing, I understand why you want to inspect and copy the

10  materials created when used in logic and accuracy testing for

11  the August 11th election.  And I assume that that is already

12  available.  But --

13         MR. BROWN:  Your Honor?

14         THE COURT:  Yes.

15         MR. BROWN:  One thing is that the -- the type of

16  examination that we ask for would be our access to equipment

17  they are not using.  It should not be burdensome, Number 1.

18  Number 2 --

19         THE COURT:  How do we know there is excess equipment?

20         MR. BROWN:  That is our understanding.  Well, that is

21  our understanding.  I don't know for a fact.

22         But the other thing is this could be very helpful to

23  Fulton County also.  I mean, we are in the context of an

24  adversarial proceeding.  But I mean, the counties need to have

25  some expertise looking at some of these software issues also

```
 1    and would benefit from it.  And they may not really oppose it,

 2    to tell you the truth.

 3              THE COURT:  Well -- and, you know, if they don't

 4    oppose it, that is fine and it can be informally worked out.

 5    But that is -- that is not what is in front of me at this

 6    point.

 7              I mean, I understand that you could work out anything

 8    you wanted with them or they can work out anything with

 9    you-all.  That is always an option available to the entities

10    and to work with you and to get the benefit of some expertise

11    that you may bring to it.

12              MS. RINGER:  Your Honor, this is Cheryl Ringer for

13    Fulton County.  We do object with respect to the timing.

14    Again, we not only have this election; we have the

15    September 29th election -- special election, and then the

16    November election.

17              So the thought that we have the time to assist

18    plaintiffs and, you know, stand by them and hold their hands as

19    they do whatever testing -- one, we would object to testing

20    because we don't know what that means.  And that would possibly

21    take machines that we need for our elections out of commission.

22    And that is -- we don't have excess machines.  Actually with

23    the September election, we have had to order new machines

24    because there is a limitation on ability to use machines within

25    a 30-day period of time.  And so I want to disabuse you of the
```

1   notion that we just have excess machines that plaintiffs can

2   just have at.

3           MR. RUSSO:  Your Honor, this is Vincent Russo.  And

4   although this request wasn't directed to the State, we would

5   also object that it is not relevant to the claims or defenses

6   in this case.

7           THE COURT:  So the functioning of the standard is

8   that at minimum -- the functioning indeed is -- I mean, some of

9   this is.  It is just simply that it is just very hard at the

10  moment to see how some of this can happen.  I mean, the

11  observation of operations I can understand.

12          MR. TYSON:  Your Honor, this is --

13          THE COURT:  Go ahead.

14          MR. RUSSO:  I'm sorry, Your Honor.

15          MR. TYSON:  Go ahead, Vincent.

16          MR. RUSSO:  Just respectfully, Your Honor, the claims

17  in the Coalition plaintiffs' complaint are not that individuals

18  who are voting by hand-marked paper ballots are having their

19  fundamental right to vote burdened.  It is that individuals who

20  vote on the Dominion BMD system are having their fundamental

21  right to vote burdened.

22          So this is almost the reverse of their claims.  And

23  their claims don't go to the standards.  They go to the BMDs

24  and whether the BMDs and the QR codes are burdening the right

25  to vote of the voters.

1          THE COURT:  What do the plaintiffs have to say about

2     that?

3          MR. McGUIRE:  Your Honor, this is Robert McGuire.  I

4     respectfully disagree with that because our complaint goes to

5     whether -- certainly whether the BMDs, you know, violate the

6     right to vote.  But the State has all along asserted that the

7     alternative to using a BMD, which makes them constitutional, is

8     that people can vote by mail.

9          And to the extent that voting by mail exposes you to

10    a differential risk that your vote is not going to be counted,

11    this is squarely within the scope of our attack on BMDs.  And

12    we also -- we also are addressing in our first supplemental

13    complaint for the Coalition plaintiffs to the Dominion voting

14    system.

15         The BMDs are one of the most objectionable

16    components.  But the attack is on the whole system.  And so if

17    the scanners don't count votes, that is -- that is at the heart

18    of our claims.

19         MR. RUSSO:  Your Honor, I would just, you know,

20    direct you to their -- their equal protection claim in

21    Paragraphs 229 through 237 that that claim is clearly not what

22    Mr. McGuire thinks it is.

23         The -- I realize we are talking about the Coalition

24    plaintiffs and not the Curling plaintiffs.  But I would note

25    that the Curling plaintiffs wanted to use these scanners at one

point.  I don't know if that is still their position or not.
But I know currently the fundamental right to vote claim in
Count 1 starting at Paragraph 221 of the complaint and the
equal protection claim is all that is left after Your Honor's
order last week.

And a reading of that does not indicate that this is
about something larger than the BMD -- than the BMDs.  And it
is surely not about whether a hand-marked paper ballot is going
to be treated worse than a BMD-voted paper ballot.

THE COURT:  Well, you know, I don't know that I
completely agree with either of your descriptions.  But I
understand the point.  And I don't want to get lost on the
question of the absentee ballot.

I would like to instead just focus in on the
inspection and observation.  Inspection and observation is one
thing.  Testing is another.  And I just don't -- I think that
the county could make accommodations for negotiating with the
plaintiffs regarding actual inspection and observation because
it is one whole -- there is a sort of seamless process in this.

But it is a different thing -- different thing to be
talking about -- and I don't mean just as to the absentee
ballot or the adjudicated.  But it is a different thing for
them to be asking to produce the machines for the plaintiffs to
test.  And that is sort of a theme about the inspection issues,
whether -- I mean, I think the Poll Pads remain an issue.  I

1    think that certainly was clearly identified as an issue.

2           And, you know, watching the operation of that is one

3    thing again.  But I'm not sure, for instance, in Paragraph 8 of

4    this inspection report -- what it means.  Inspect and observe

5    operations comprising precinct opening and closing, including

6    the production of all electronic or paper reports -- all

7    right -- and inspection and copying of all precinct recap and

8    Poll Pad reports as soon as they are available.

9           But is that really an inspection of the report, or

10   are you -- is this just simply actually a request for the recap

11   and Poll Pad report?

12          MR. BROWN:  It could be viewed as either, Your Honor.

13   I mean, certainly the reports could be subject to a document

14   request as well.

15          THE COURT:  So it seemed to me that a lot of what

16   we -- there is a whole dimension of this inspection request

17   under Rule 34 as -- really, it tucks in all sorts of actual

18   requests for production.  It is not just a -- it is not one --

19   just one thing.  I want to inspect it, but then I want you to

20   produce the reports.

21          And I'm not sure in all of these that you -- you say

22   in Number 11 inspect and observe operations comprising ePulse

23   (dashboard) election day reporting and monitoring function of

24   the countywide deployed KnowInk Poll Pads -- Poll Pads at the

25   Fulton County office where the monitoring software is installed

1    and digital printouts of all logs uploaded on election day.

2            Well, obviously the digital printout, are you looking

3    for those beforehand?  Are you looking for those afterwards?

4    And what are you actually inspecting and observing in Number 11

5    that you actually want to stand by and watch?

6            MR. BROWN:  Your Honor, would it be helpful for us

7    to -- this is Bruce Brown again for the Coalition.  Would it be

8    helpful for us in light of your observations about how this

9    particular Rule 34 request (inaudible) some aspects of

10   inspection under Rule 34 with documents under Rule 34(a), I

11   guess, to streamline that and confer with Fulton County to see

12   what we can agree on and what we can in light of your

13   observations back off of or narrow?  And then -- and then bring

14   it back to you with a more streamlined and from your aspect

15   more manageable sort of question?

16           THE COURT:  Well, I mean, I would say that about

17   everything.  And that is what I was trying -- I realize I

18   didn't give you a lot of time.  But to me is -- I understand

19   you want some amount of discovery so that you can go to a

20   hearing and be productive.  And I don't accept what the

21   defendants are maintaining that you basically are not entitled

22   to anything at all.

23           On the other hand, you know, you can serve whatever

24   you want right now to get things moving.  And I don't -- you

25   know, I don't know whether -- but we're really talking about

1    what is expedited so that if you want to go to a hearing that

2    you have something that you don't have right now.

3         And I just -- the variety of requests to basically

4    produce the machines and the software and that you should --

5    and let your folks test it, you know, we went through a long --

6    obviously you still have the DRE information.  And I think

7    there is an agreement for identifying those machines.  But

8    that's not helpful right now to you because it is in the

9    injunction, I gather, from what you think.  Maybe it would be.

10        But I've got so much in front of me -- and I just

11   used this as an example because it was more -- not because I

12   thought it was necessarily the most salient issue.  But this is

13   so -- if I were running the election myself, which thank God

14   I'm not, you know, it would be overwhelming.

15        The plaintiffs have a very legitimate interest in

16   being able to vindicate the interest that they are seeking to

17   vindicate in this matter.  And I'm aware of that obviously.

18        But I can't basically say that this is giving me a

19   roadmap for saying, all right, these are the five, ten things

20   that have to happen so that you can at least productively

21   proceed to a hearing.  But instead what happened when I asked

22   this question was I got more.  I got so much detail.  And I

23   appreciate maybe you were trying to clarify what you were

24   looking at.  But it would -- it is overwhelming.

25        And yes, the plaintiffs are correct that you don't

1   really get meaningful relief if all this comes with an

2   election -- with a challenge in January and that you are

3   pragmatically oriented in affecting ultimately the November

4   election and that there would be integrity of the election

5   process.  But all the more important to be able to focus on

6   what are the biggest issues that you have that also relate to

7   the complaint.

8          And I don't think that is what I have in front of me.

9   I remain -- you know, I think it would be more important,

10  frankly, for you to serve your actual -- your discovery right

11  now, just to begin the time frame, and then actually identify

12  again something that is more straightforward and narrow as to

13  what are the essential things that you need right now.

14         But when you -- even you are wanting to take even the

15  depositions requested, even though you have narrowed it, they

16  are pretty exhaustive.  And they also come with all sorts of

17  document requests or information associated with them.

18         And it is true, of course, that lots of information

19  was collected over the litigation through Open Records Act

20  requests over time.  And you probably have been unable to get

21  as much productive responses because of the state of the COVID

22  world.  And I recognize that.  But that is where we're at.

23         So the bottom line is that I'm not averse to

24  approving something that was narrowly tailored and important

25  for purposes of proceeding here so that you can go to a hearing

1    and I could schedule one and I would understand that this is a

2    productive encounter, if I need to have a hearing.

3            But I don't -- what I have in front of me would sink

4    a ship at this point.  It doesn't necessarily sink a ship at

5    all for purposes of long-term discovery.  But it would for

6    having to be turned around in the time frames that we have got

7    here.

8            So I would basically go back to where I was when I

9    issued the order earlier this morning.  I think if the

10   plaintiffs come up with something that is closer to what I

11   could approve, even if I were not to exactly approve it as

12   submitted, then that is one thing.

13           But I can't even parse it.  I just can't parse it at

14   this point.  I spent a lot of time on it last night at midnight

15   and this morning.  And I just can't -- normally I can say, oh,

16   this and this and this, how about that?  But I can't even do

17   that now.

18           MR. CROSS:  Your Honor, this is David Cross.  Could I

19   just jump in for a moment?

20           THE COURT:  Yes.

21           MR. CROSS:  Just so I understand Your Honor's

22   position, we served on Monday eight document requests that we

23   did try to keep narrowly tailored.

24           Did you look at those and you feel that those were

25   too broad as well?

```
 1              THE COURT:  Yes.

 2              MR. CROSS:  Okay.

 3              THE COURT:  Well, you know, perhaps not necessarily.

 4    I didn't even try to look at it from this perspective for

 5    long -- for the -- you know, if you were doing discovery over a

 6    longer period of time.

 7              But the notion of expedited discovery in this context

 8    when the defendants also have to manage the election has to be

 9    more streamlined than that.  And yes, I spent time on that and

10    then I spent time on this second round.

11              MR. CROSS:  Okay.  We will certainly take another

12    crack at that.

13              One other specific question:  One of the things that

14    we would like to begin right away is forensic examination of

15    the memory cards that we received from the three counties.

16    Since Dr. Halderman already has those, there is no burden or

17    expense to the State for that.

18              But I am aware that when they were produced I think

19    the order said that they were produced solely for the sampling.

20    Is that something that we could get permission to proceed with

21    now?

22              THE COURT:  So what you want to do is now get those

23    particular machines?  Is that what you are saying?

24              MR. CROSS:  No, Your Honor.  It is two different

25    steps.  He has -- I'm sorry.  I wasn't clear.
```

1          He has memory cards from Fulton, Cobb, and Dekalb.

2     The only thing he has done with those cards so far was just to

3     test to see whether he could match up machines with elections

4     because that was the limited purpose for which he got those.

5          What he hasn't done and what we would like to do is a

6     full forensic examination of the memory cards because the

7     memory cards themselves can be contaminated such as by hacking

8     software.  And since he has those, we would like for him to --

9     and discovery is open, we would like for him to just be able to

10    go ahead and do a full forensic examination of those memory

11    cards.  That is the ask.

12         Separate and apart from that, we would like to do a

13    forensic examination of certain machines.  But that is a

14    separate issue.  The only thing I'm asking at the moment is

15    whether he can begin a full analysis of the memory cards he

16    already has.

17         MR. TYSON:  Your Honor, this is Bryan Tyson.  I think

18    this is an illustration of exactly the point.  I don't think we

19    are averse to a forensic examination of the memory cards and

20    the DREs.  But this needs to be served as a request.

21         The whole point of the memory cards initially was for

22    preservation purposes only.  And if we're going to be going

23    into the forensic analysis of things, we need to have experts

24    agree to a testing protocol, we need to have a way to work

25    through this.

1          And I think we can do that on a normal discovery

2     track as opposed to immediately beginning a forensic --

3     forensic process on memory cards before we have had a chance to

4     work through any kind of the pieces.  I know Your Honor's order

5     previously had required us to have a new 26(f) conference

6     within ten days after the denial of the motions to dismiss.

7     The plaintiffs have offered tomorrow and Monday.  Monday is our

8     tenth day -- or I guess the tenth day is on Sunday -- the 11th

9     day.

10          So, again, I think this just emphasizes where we can

11    just begin the normal discovery process here as opposed to just

12    throwing open the door to full forensic examinations right off

13    the bat.

14          MR. CROSS:  Your Honor, this is David Cross.  If I

15    could just briefly.  I guess I'm not sure I understand the

16    objection.  The cards are no longer used.  They are for

17    machines that are no longer used.

18          My understanding is that they are set to be destroyed

19    at some point.  They are already in our possession.  I'm not

20    sure I follow the idea that we have to have a testing protocol.

21    The parties routinely produce data and other things in cases to

22    experts.  And the experts are free to do their analysis.  In

23    fact, their analysis is privileged.  It is not discoverable

24    under the Federal Rules under Rule 26, except at the end of the

25    day where they reach conclusions and they disclose what they

1    relied on.

2         So the cards are there.  I don't understand why we

3    wouldn't be able to proceed with a forensic analysis and at

4    some point prepare a report.  This seems perfect for expedited

5    discovery.

6         MR. TYSON:  Your Honor, this is Bryan Tyson.

7         MR. CROSS:  What Mr. Tyson is proposing actually adds

8    a lot of cost and delay.  What we're saying is let's just get

9    off to the races with no imposition on them at all.

10        MR. TYSON:  Your Honor, this is Bryan Tyson again on

11   that point.  I think that it is important to remember that the

12   point of the memory cards was to try to identify the sample for

13   preservation.  And there were a number of provisions in that

14   order regarding use of a write blocker and our ability to

15   observe the process and those other things that occurred

16   related to preservation only.

17        If we're going to have now a full forensic

18   analysis -- I believe the order requires the cards to be

19   returned to the counties as soon as Dr. Halderman had finished

20   his analysis.  But if we're going to do this, that is fine.  We

21   can get to a point where we do that.  But we need to have some

22   sort of agreement about how we're going to go about testing

23   equipment that belongs to the State when -- before we are just

24   giving Dr. Halderman unfettered access.

25        I expect we will be at a point where we are going to

1    conduct a full forensic analysis of DREs and memory cards.

2    But, again, that is just a process we need to work through.

3    And that is better in the course of normal discovery than it is

4    in the -- in an expedited context when there is no kind of --

5    and I understand Mr. Cross believes it is narrowly tailored.

6    But throwing the doors wide open without any sort of process or

7    structure around it we don't believe is the right way to

8    approach it.

9         Serve the discovery request.  We'll work through it

10   and go from there.

11        THE COURT:  Well, tell me this, Mr. Cross:  How are

12   you thinking you are going to use this for purposes of a

13   preliminary injunction hearing?  Let's say it shows something

14   that is adverse to the State.  This is just an assumption.

15   Something that looks like it -- that would be consistent with

16   your -- the finding -- the contentions earlier that there had

17   been an intrusion into the system and that there was a virus

18   into the system or something like that or that that data had

19   been manipulated in some form.

20        How do you -- what is your thought at this juncture

21   of how all that would relate to the preliminary injunction

22   hearing in particular?

23        And I know that is just theoretical at this point.

24   But how would you imagine the forensic evaluation of the cards

25   will end up relating to the preliminary injunction hearing to

 1    the extent that -- assuming I have one?

 2          MR. CROSS:  Yes, Your Honor.  This is David Cross.  I

 3    mean, let's imagine a scenario where Dr. Halderman finds some

 4    indications that there was hacking on these memory cards,

 5    something to suggest that somehow they were contaminated

 6    through each of the vulnerabilities that Logan Lamb found or

 7    some other way.  We think that would be critically important to

 8    bring to the Court's attention with respect to the relief we're

 9    seeking before the election, in part because what we are also

10    trying to investigate on an expedited basis and then long term

11    is the degree to which contamination from the prior system may

12    have spilled over to the new system.  And there's --

13          THE COURT:  I understand.  So how would it -- what do

14    you think -- I guess my question is -- and I always have

15    understood that.

16          But how would the memory cards in particular reflect

17    that?

18          MR. CROSS:  Oh, my understanding from Dr. Halderman

19    is the memory cards are one potential penetration point.  They

20    are also a transmission point.  And so -- I think you said a

21    hypothetical.  Let's take a hypothetical.

22          Let's say that someone was able to infect the

23    election system through the vulnerability that Logan Lamb found

24    and it made its way to a GEMS server.  If that contamination is

25    sitting on the GEMS server at the time that they program the

1  memory cards, which are then used to make the ballot

2  definitions -- there can be other things on the DREs -- then

3  that contamination can get out to some, many, or all of the

4  DREs.  And Dr. Halderman thinks that it may be possible to see

5  that on the memory cards.

6          Now, admittedly it may not.  Dr. Halderman has always

7  been the first to emphasize that oftentimes hacking of this

8  sophistication may not leave a trail.  But the memory cards

9  would be a starting place to at least look as to whether there

10  may be some indications of contamination in the system.  That

11  is the idea.

12          THE COURT:  All right.  Well, why don't you do this.

13  Why don't you go ahead --

14          MR. CROSS:  We have --

15          THE COURT:  Yes.  Go ahead.

16          MR. CROSS:  We have served a request on this.  It is

17  in the requests we served on August 3rd.  It is the request for

18  inspection Number 1.  So they have it.

19          MR. RUSSO:  Your Honor, this is Vincent Russo.  I

20  would just point out that Dr. Coomer testified at the last

21  hearing and talked about the new Dominion system and all the

22  new components.

23          And plaintiffs' counsel had questions and asked

24  questions of Dr. Coomer at that time that established that

25  nothing from the old system has gone over into the new system.

```
1    In fact, even the ballot-building was done by hand at this
2    time.
3              So to the extent there was ever any -- any malware
4    that could have been on a memory card, at this juncture
5    there's -- there would have been no way for it to have gotten
6    on the new system, to begin with, which is what Dr. Coomer has
7    already testified to.
8              THE COURT:  I can't remember what Dr. Coomer's
9    position was.
10             MR. RUSSO:  He was -- he was with Dominion or is with
11   Dominion.  And Dr. Coomer indicated that everything that was
12   done had been -- there is air gapping.  There was no new or no
13   old -- excuse me -- memory cards from the old system used in
14   the new system.  The flash cards are all -- are all brand-new
15   and had been cleaned.
16             And the real piece was with the ballot-building
17   because there was this thought that, I believe, Dr. Halderman
18   had mentioned at one point that maybe through GEMS and through
19   that ballot-building process the old ballot styles would
20   somehow be used and that file would carry over from GEMS into
21   the new system.  And that was the -- that was the big link.
22             But as Dr. Coomer testified to at the hearing, all
23   the ballot-building process was done by hand.  So there
24   actually were no files that were transferred.
25             MR. CROSS:  Your Honor, this is David Cross.  Just
```

1    two quick responses.  One, we didn't actually get a chance to

2    cross-examine Dr. Coomer.  That was a point that the other side

3    emphasized throughout.

4         More importantly to the second point, recall that we

5    heard for two years in this case that the original system was

6    air gapped.  That proved to be untrue.  Recall that we heard

7    for two years that there were no vulnerabilities found in this

8    system.  The Fortalice reports revealed that to be untrue.

9    There was testimony from Mr. Beaver that proved to be

10   misleading at best.

11        So I am not saying this to cast dispersions.  It is

12   to justify the discovery.  While I appreciate that Mr. Russo

13   certainly believes what he is saying, discovery is needed to

14   figure out whether the representations that have been made are,

15   in fact, accurate and reliable.  And I think there is a --

16        THE COURT:  And I understand that.  But I'm just

17   trying to link up how will the cards -- I mean, if you are --

18   if you are trying to -- you have a certain number of jelly

19   beans here for expedited discovery.  How are the cards going to

20   get you to that, I mean, in terms of you want that -- to be

21   able to do that on an expedited basis?  I'm not clear about

22   that.

23        If that is what you want to pursue and you think it

24   will and there is a direct line -- but if this -- I think you

25   have to basically sort of think about it.  You have got a

1    certain amount of -- I'm saying I will on a narrow basis -- on

2    some sort of tailored basis allow something to be expedited.

3           Is this what you are really going to want to use your

4    chips for though?

5           MR. CROSS:  Your Honor, I guess the way I think about

6    it is:  The issue that we have addressed with expedited

7    discovery is the burden on defendants, which we completely

8    appreciate.  And that is why we'll go back and narrow down the

9    document requests that we sent because that imposes a burden

10   and expense on defendants.

11          The one thing we're talking about now, these memory

12   cards, does not impose a burden on them.  Dr. Halderman has

13   them.  It will not take any of their time or money to let him

14   do what routinely happens in cases, to simply take what he has

15   got and to analyze them.

16          And I do think it is one of the richest sets of

17   discovery essentially, depending on what he can find.  And it

18   would also, Your Honor, again position us to a point you have

19   made before that we don't want to have to have them preserve

20   more DREs and other things than we need.  We don't want a

21   bigger sample than we need.

22          Being able to do a forensic analysis of the memory

23   cards -- if he finds, for example, indications of concern on

24   particular memory cards, we now know that he can link those

25   cards to specific machines and specific elections.  And so then

1    a sample becomes very focused and targeted.

2            So it is a perfect initial step to let us further

3    narrow and focus discovery later.  And, again, it is only on

4    us.

5            MR. RUSSO:  Your Honor --

6            THE COURT:  All right.  Well, you-all -- you-all

7    have -- you can all have a normal discovery conference about

8    it.  It is something I'm willing to consider.  It is a burden

9    on the State.  I understand it wasn't the original purpose.  If

10   that is something -- I realize though everything that takes

11   time, even though you don't think this will take their time --

12   if there is some protocol that they are going to want you to

13   consider, then you have got to talk about it.

14           But it is not why -- I understand both perspectives.

15   I don't think it is a burden.  But I -- I'm not prepared today

16   to go through all of this.  I would say that you need to

17   have -- you really need to sit down and talk.

18           And I realize you won't be sitting down together

19   except electronically.  But you need to talk about it and do

20   that in the next two days or on Monday and just tee it up so

21   that I can actually make a proper decision.  Okay?

22           Because I'm not -- I mean, your going back and forth

23   now is not going to add anything.  I understand the points made

24   by Mr. Cross.  I understand some of the points made by

25   Mr. Russo.  And -- but it doesn't seem to me unbridgeable.

1    Some of the other things seem much more challenging than that.

2         And the other thing I would say is if, in fact, the

3    plaintiffs have some capacity to actually communicate

4    effectively with Fulton County about some of these observation

5    issues, that is something -- rather than just sending this

6    onward, if it is something you-all can agree upon as to closer

7    observation of some matters that is not disruptive and that you

8    are not -- I mean, I don't know who are the interns.  But, you

9    know, you are using somebody who has some -- some amount of

10   judgment in the way that they are handling whatever the

11   observation duties.  That is something reasonable to manage.

12        If you can't actually wherever your position see

13   anything -- I mean, the observation -- but the requests go

14   beyond observation.  If the plaintiffs believe that the

15   software is inherently -- there is an inherent problem, I mean,

16   you are capable obviously of getting your hands on some of this

17   equipment independently.  So I mean, that is what has been done

18   in the past.

19        So -- and I encourage you-all to have another -- even

20   as frustrating as it is, if the plaintiffs have another -- a

21   very streamlined version of what you want in expedited

22   discovery, then I would encourage you to talk about it.

23        If you can't get anywhere, then, of course, I'm going

24   to decide it.  But no, I didn't see -- I wasn't -- the world

25   didn't get illuminated between the first version and what was

 1    said to me later.

 2              MR. CROSS:  Your Honor, this is David Cross.  We

 3    certainly apologize for that.

 4              One procedural question.  As I read the defendants'

 5    response last Friday, they want to respond to requests in the

 6    ordinary course of 30 days.  I guess the question is:  What

 7    should be the procedure for us to try to narrow this down?

 8    Because we can get out refined discovery requests, I think, by

 9    tomorrow to them narrowed from what we sent earlier.  We maybe

10    can get them out tonight.

11              But if they are not going to respond for 30 days, I'm

12    not sure how we tee this up for Your Honor to figure out what

13    is expedited discovery if we can't agree ourselves.

14              How should we deal with that?

15              THE COURT:  You basically need to have your 26(f)

16    conference about it right away.  And I will decide if you can't

17    agree on what is to be expedited and what is going to be in the

18    normal schedule.  It may be a 25-day schedule or a 20-day

19    schedule.  Or it will be a 30-day schedule.

20              It just simply -- I'm just looking for something that

21    would be -- that -- I mean, I'm not going to wait for their

22    response 30 days later just to determine that something should

23    be expedited.  But I can't --

24              MR. CROSS:  Thank you, Your Honor.

25              THE COURT:  -- predict this.  So --

```
1                   MR. CROSS:  Okay.

2                   THE COURT:  That is the issue.  And I certainly don't

3     want too much time to go by either.  If you are going to be

4     able to get it out tomorrow, then hopefully you can basically

5     present the issue to me at least by Friday so I can make a

6     decision and get something out to you by Monday.

7                   MR. CROSS:  Understood.  Thank you, Your Honor.

8                   THE COURT:  That is if you can't agree.

9                   All right.  I mean, just returning to the observation

10    and production issues with Fulton County, I mean, it may be

11    useful to actually discuss what they can -- with Fulton

12    County's counsel what is really doable and what is not -- doing

13    it separately not just having a general conversation between

14    all defense counsel and plaintiffs.

15                  And what was the story with the other county that you

16    asked for information about?  What was that -- what county was

17    that?

18                  MR. BROWN:  Your Honor, we served a -- well, we are

19    serving a subpoena on Athens-Clarke County.

20                  THE COURT:  Yeah.  Not that one.  That was a

21    different county that you -- Lanier -- I'm just looking for --

22    it was the last item in the request at some point.  I don't

23    know.  It wasn't Athens-Clarke County though.

24                  MR. TYSON:  Your Honor, this is Bryan Tyson.  I think

25    you are referring to 752, Page 5, Irwin County.  There was a
```

1  list, among other counties, that the plaintiffs had

2  originally -- and I think in their revised version they said

3  they will plan to serve on some nonparty counties.  They didn't

4  specify particular ones in the revised one, unless I missed it.

5        THE COURT:  Okay.  All right.  I'll look to hear

6  whether anything gets resolved or not and urge you-all to talk

7  some more too.  Very good.

8        MR. BROWN:  Thank you, Your Honor.

9        THE COURT:  Thank you.

10        MR. CROSS:  Thank you.

11        MR. TYSON:  Thank you, Your Honor.

12        THE COURT:  Thank you.

13            **(The proceedings were thereby concluded at 2:41**

14            **P.M.)**

15

16

17

18

19

20

21

22

23

24

25

```
 1                   C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   50 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   7th day of August, 2020.

14

15

16

17                        _____
                          SHANNON R. WELCH, RMR, CRR
18                        OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```