**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,** **Plaintiffs,** **v.** **BRAD RAFFENSPERGER, ET AL.,** **Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

**COALITION PLAINTIFFS' BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION ON
PAPER POLLBOOK BACKUPS**

Coalition Plaintiffs submit this Brief in Support of their Motion for

Preliminary Injunction Relating to Paper Pollbook Backups.

**Preliminary Procedural Statement**

The relief sought in this Motion is substantially the same as the relief

relating to paper pollbook backups sought in the Coalition Plaintiffs' October 23,

2019 Motion for Preliminary Injunction (Doc. 640), which this Court dismissed

without prejudice on  August 7, 2020 (Doc. 768), and is the same relief that is

addressed in Coalition Plaintiffs' August 2, 2020 Motion of Coalition Plaintiffs to

File Notice of Filing Evidence and Request for Immediate Injunctive Relief on

Paper Pollbook Backups (Doc. 756).[1]  The Coalition Plaintiffs are seeking this

relief in a separate motion because (a) it concerns a narrow issue that is unrelated

to the ballot marking devices, (b) the merits of this Motion have been thoroughly

briefed by both parties in prior filings,[2] and (c) the relief is vitally necessary for the

upcoming September 29, 2020 special election and the November 2020 general

election and related runoffs and may easily be implemented without any *Purcell*

issues whatsoever.[3]

## Introduction and Summary

The continuing failure of the Defendants to have a workable paper backup to

the electronic pollbooks contributed significantly to massive failures of the June 9,

2020 statewide Primary.  In its July 30, 2020 Order, the Court stated:

> It is unclear what actions, if any, the State has undertaken to address these
> deficiencies in the electronic pollbooks and MVP voter registration
> interface or new versions of such in advance of June 2020 elections or the
> elections to be held in August and November 2020. While the Court at this
> juncture has only preliminary evidence in the record before it that addresses
> these claims in their current form, the Court notes that alleged significant

---

[1] Coalition Plaintiffs incorporate by reference the arguments and evidence previously submitted, including Doc. 640-1, 680, 680-1, 755 and 756.

[2] *E.g.,* Coalition Plaintiffs' Brief in Support of Motion for Preliminary Injunction (Doc. 640-1 at 32-33), State Defendants' Response (Doc. 658 at 54), and Coalition Plaintiffs' Reply (Doc. 680 at 29-32); *see also* Coalition Plaintiffs' Notice of Filing (Docs. 765 and 766), State Defendants Response to Notice of Filing (Docs. 757), and Coalition Plaintiffs' Reply (Doc. 758).

[3] Parts A and B of this Brief are very similar to Parts A and B of Coalition Plaintiffs' August 2, 2020 Notice of Filing Evidence (Doc. 756).

> problems relating to the express pollbooks were reported by the media
> during the June 2020 election cycle.

(Doc. 751 at 23).  Though complex issues relating to the security and reliability of

the voter registration and electronic pollbook operations will remain, a simple step

that can be taken now to reduce the most debilitating impact of a repeated system

failure is to provide each precinct with an *updated* paper pollbook that can be used

when the electronics malfunction.  This simple solution will keep people voting on

emergency paper ballots (in accordance with State Election Board regulations[4])

when the electronic pollbooks malfunction, whether because of technical problems,

poor pollworker training, equipment shortages,  lines exceeding 30 minutes, or

malicious attack.  Without this relief, another "meltdown" is almost inevitable, but

this time with much more serious consequences: turnout for the upcoming

elections will be  far higher than the record turnout in the June 9 primaries,

managing the lines and the voting process generally will remain extremely

challenging during this ongoing pandemic, and few of the technical or

administrative failures that caused the June 9 meltdown have been addressed.

In this Brief, Coalition Plaintiffs will in Part A summarize the procedural

history of Coalition Plaintiffs' claims relating to paper pollbook backups and the

mountains of evidence already on file demonstrating the longstanding serious

---

[4] Rule 1-183-12-.11.2(c)-(d).

deficiencies in Georgia's registration and pollbook systems. Coalition Plaintiffs

will also summarize the extensive and recent efforts that the Coalition and its

counsel have undertaken to resolve this issue without court intervention. In Part B,

Coalition Plaintiffs will summarize the evidence from the June 9 election (pre-filed

at Doc. 755) showing that the extensive voting delays and chaos were a direct

result of the ongoing failure of the State Defendants to provide the precincts with

useful paper pollbook backups. Part C address evidence from the August 11, 2020

runoffs demonstrating that the underlying deficiencies have not been remedied.

Part D addresses new evidence showing the stunning vulnerability of the electronic

pollbooks.   In Part E, Coalition Plaintiffs will explain the relief sought, and Part F

responds to arguments raised in the State Defendants' August 2, 2020 Response

(Doc. 757) to Coalition's Plaintiffs' August 2 Notice of Filing (Doc. 756).

### A.     Procedural and Factual Background

In their June 21, 2019 Motion for Preliminary Injunction, the Coalition

Plaintiffs moved for injunctive relief requiring the Secretary to direct the use of "an

updated paper back-up of the pollbook in the polling places for adjudicating voter

eligibility and precinct assignment problems." (Doc. 419 at 4).[5]  In its August 15,

2019 Order granting in part Plaintiffs' Motion, this Court found substantial

_____

[5] This requested relief was renewed in the Coalition Plaintiffs' October 23, 2019 Motion. (Doc.
640-2 at 4-5).

evidence of voters being disenfranchised because of electronic pollbook problems.[6] Based on these findings, the Court granted injunctive relief, referencing the recommendation of the National Academies of Sciences, that "all jurisdictions using electronic pollbooks 'should have backup plans in place to provide access to *current* voter registration lists in the event of any disruption.'" (Doc. 579 at 148 n. 101) (emphasis added).  The Court ordered:  "The State Defendants should require all County Election Offices to furnish each precinct location with at least one printout of the voter registration list for that precinct."  (Doc. 579 at 150).  The Court concluded:

> Finally, the Court views the significant voter registration database and related ExpressPoll deficiencies and vulnerabilities demonstrated in this case as a major concern both relative to burdening or depriving voters' ability to actually cast ballots.  The Court therefore requires the State Defendants to develop procedures and take other actions to address the significant deficiencies in the voter registration database and the implementation of the ExpressPoll system.

(Doc. 579 at 152-153).

On September 12, 2019, the Coalition Plaintiffs filed a Rule 59(e) motion requesting, among other relief, that the Court modify its directive to require the use of an *updated* paper pollbook backup at each precinct, rather than the voter

---

[6] "Forty-six individual voters described issues with the electronic pollbook, including voters not being listed as registered, wrong addresses listed for the voters, incorrect polling places, and listing voters have already voted."  (Doc. 579 at 98).  The Court also summarized the evidence submitted by Coalition Plaintiffs relating to problems in the preceding November 6, 2018 general election.  (Doc. 579 at 106 - 111, citing Doc. 258-1 at 62 *et seq*.)

registration list (Doc. 605 at 5).  The paper print out of the voter registration list, as currently provided in the polling places, is not updated to reflect all early or absentee mail ballot voting and therefore cannot be used as a backup to malfunctioning electronic pollbooks to issue regular or emergency ballots.  As the Coalition Plaintiffs explained, the clarification was necessary to assure "that the paper backup would be current (*after updating for early voting*)."  (Doc. 621 at 17) (emphasis in original).  In its October 23, 2019, Order Granting in Part and Denying In Part the Rule 59(e) Motion, the Court stated:

> The Court recognizes the Coalition Plaintiffs' motion was timely filed, however, a number of pragmatic considerations make the Court hesitant to modify this provision of the Order now that early voting has begun for the November 2019 election cycle.  The Court potentially willing to consider this request for subsequent election cycles but only after hearing more concretely from the State regarding pragmatic implementation issues at a short conference or hearing. Therefore, the Coalition Plaintiffs' request that the Court modify directive 2 on page 150 of the preliminary injunction Order to require the use of a paper pollbook backup is DENIED at this time.

(Doc. 637 at 2-3).  The Court further reiterated its "expectation that the parties would use good judgment and their knowledge of the Court's Order of August 15th as a whole in proceeding."  (Doc. 637 at 2).

In their October 23, 2019 Motion for Preliminary Injunction that seeks injunctive relief relating to the BMDs and other components of the State's new Dominion Election System, the Coalition Plaintiffs moved again for an order

directing the Secretary to require paper pollbook backups. (Doc. 640 at 32). Coalition Plaintiffs explained: "There is no reason to believe that the systemic problems with epollbooks will disappear with the transition to a new electronic pollbook component system. If anything, the rapid transition to a new epollbook system and the integration challenges will make these problems more severe." (Doc. 640 at 34). In response, the State Defendants argued that it already provides a paper copy of the registered voters. (Doc. 658 at 54). As Coalition Plaintiffs explained in their Reply, "what is needed is not the 'paper copy of the registered voters for each precinct,' as the State recites, but the *updated* copy of the pollbook." (Doc. 680 at 30).[7]

Meanwhile, the quality and reliability of the new "KnowInk" Pollpads were tested in several counties' municipal and county elections in November 2019, the December runoffs, and the first quarter 2020 special elections in State House District 171 and Senate District 13. Multiple PollPad problems were observed by Coalition's members in numerous different polling locations in each of the

---

[7] The briefing on the paper pollbook backup also contains discussion of State Election Board regulations. (*See* Doc. 658 at 54; Doc. 680 at 30). As discussed below, new regulations were promulgated in February 2020. The new regulations, though incomplete and not being followed by the Defendants, are not inconsistent with the relief that is sought by Coalition Plaintiffs. *See infra* Part E.

elections.[8]  Observer Elizabeth Throop spent 34 hours observing early, Election Day and run-off voting in 11 polling places in Paulding, Carroll, and Lowndes counites in the November pilot.  (Doc. 680-1 at 83-91).  Ms. Throop made the following prescient observations:

> Based on my observations on the polling places it is my strong opinion that the risks of pollbook failure, malfunction, "bugs," and insufficient poll worker training mandate the need for a back-up default paper pollbook that can be used as the official reference if the Poll Pad information is not available. . . . This over-reliance on electronic records seems to create an unacceptable risk for 2020 high turnout elections.

(Doc. 680-1 at 83-89).[9] The Secretary's own Executive Summary of the Pilots disclosed numerous issues with the PollPads and the failure to timely open the polls. (Doc. 680-1 at 101)

The issue of the paper pollbook backup arose again in the December 6, 2019 status conference.  Coalition Plaintiffs' counsel referenced the PollPad problems encountered in the November pilots, noting that requiring a paper pollbook backup would be an effective safeguard that would not be burdensome to Defendants.

---

[8] *See also* GEORGIA RECORDER, link at Doc. 680-1 at 150 ("Voters in five counties experienced problems with new check-in devices, called "poll pads," caused by a programming error that prevented them from using electronic ballot-marking devices.").

[9] *See also* Declaration of R. Martin, Doc. 680-1 at 76 (Reporting on the November 2019 pilot testing: "It was clear to me that despite three weeks of early voting, PollPad pollbook procedures were still buggy on Election Day, underscoring my fears of the impracticability of statement system conversion by the beginning of Presidential Primary Early Voting on March 2, 2020.").

(Doc. 679 at 69-70).  The Court then asked counsel for Defendants: "why wouldn't the state just do that?"  (Doc. 679 at 71).  In response, counsel for the State Defendants stated: "the state already provides a paper pollbook backup in each precinct," but then clarified that it was the voter registration list that the state provided, something that counsel may have believed (incorrectly) was the same thing as a current paper pollbook backup.  (*Id.* at 72).  At this point, the Court stated: "I encourage you-all to talk about it. . . . Because there is a lot of frustration obviously in the check-in process.  And it could only benefit the State in my mind."  (*Id.* at 74).

From the December 6, 2019 Status Conference to the weeks immediately prior to the August 2, 2020 filing, the Coalition Plaintiffs made a number of efforts to resolve this issue outside the litigation with repeated petitions to the State Election Board and overtures to opposing counsel, all unsuccessful.  (*See* Doc. 756 at 13-14 (detailing efforts)).

### B.   Electronic Pollpad Problems Cause Extreme Delays in June 9, 2020 Election

As the Court noted in its July 30, 2020 Order, "alleged significant problems relating to the express pollbooks were reported by the media during the June 2020 election cycle."  (Doc. 571 at 23).  It cannot be overstated that the evidence establishes that the primary cause of the "meltdown" was the failure of the Defendants to simply print and use inexpensive paper pollbook backups and to

issue emergency paper ballots to eligible voters. The Defendants' recklessness in refusing to print current paper pollbooks is indefensible, particularly given that this Court ordered the State Defendants "to develop procedures and take other actions to address the significant deficiencies in the voter registration database and the implementation of the ExpressPoll system." (Doc. 579 at 152-153).

The chaos caused by the PollPads is shown in the official election records (Ballot Recap Sheets) from the Election Day polling places themselves. Standard ballot accounting of course calls for the number of voters checking in to reconcile to the number of ballots cast, accounting for spoiled ballots or other limited exceptions. But as a review of the public records show, material differences exist between the number of ballots cast and the number of voters recorded in the PollPads as checking in at many Fulton County precincts' Ballot Recap Sheets, (See Marks Declaration, Ex. 1, ¶ 23-24).

Coalition Plaintiffs have filed eye-witness accounts of the significant problems caused by the failure of the Defendants to have any paper backup for the electronic pollbooks, (Doc. 755), which can be counted on to fail. For example, in a report to the Cobb County Board of Registration and Elections on June 19, 2020, Cobb County Election Director Janine Eveler gave a damning report of the June 9 polling place problems, including numerous problems with the KnowInk electronic PollPads. (Doc. 755 at 36-40). Director Eveler told Board Members of the

extensive difficulties her department had through the weekend prior to Election Day attempting to upload the information into the PollPads. (*Id.* at 38 line 31). She reported the complexity of setting up polling places the morning of Election Day because of the difficulties in securing the equipment, with the goal of getting "at least one voting unit working by 7am." (*Id.* at 39 line 12). Many polls were still being set up after the polls opened, causing longer lines to form. (*Id.,* line 14-15). "On election day, many polls reported that their poll pads were not syncing, or that they could not encode cards." (*Id.,* line 25-26). "We were given no instructions on how to resolve these syncing issues." (*Id.,* line 26-27).

Malfunctioning electronic pollbooks were the bottlenecks creating the long lines throughout the metro-Atlanta area. Coalition Plaintiffs have filed eye-witness accounts of voters having to wait in line for hours during the pandemic because electronic pollbooks were not working. *E.g.* Doc. 755 at 11-12 (at Central Park Recreation, Fulton County, a four hour wait); *id.* at 74-74 (at Antioch A.M.E., DeKalb County, three and one-half hour wait before first voter could vote); *id.* at 14 (at Park Tavern, Fulton County, a three hour wait); *id.* at 15 (at Miller Grove, DeKalb County, over two and one-half hour wait); *id.* at 148 (at Sope Creek, Cobb County, over a two hour wait)[10]; *id.* at 128 (Cross Keys, DeKalb County, over two

---

[10] A voter at Sope Creek recounted: "Water and a chair were requested for a gentleman who was 'collapsing from overheating.' When I returned to the parking

hour wait, with 200 people crammed into hallways with no social distancing procedures); *id.* at 154 (Legacy Church, Cobb County, two hour wait); *id.* at 125 (at Water Department, Gwinnett County, a two hour wait); *id.* at 124 (at Dunwoody Library, DeKalb County, no voting until 8:15).

When the Pollpads malfunctioned, "voting was almost to a complete standstill" because pollworkers were forced to use provisional ballots (Doc. 755 at 12; *see also id.* at 74-75, 127, 128, 154). Crucially, there is no doubt that the failure to have a paper backup to the malfunctioning electronic pollbooks was *the* cause of these long lines: as voters waited in line to check-in, no one was voting on the BMDs. (Doc. 755 at 12; *see also id.* at 15, 101, 127). A Cobb County voter states: "This was the worst voting experience I have ever had, as it was a total fiasco." (*Id.* at 155).

Though the State Defendants have blamed Defendant Fulton County for the meltdown, the long lines were experienced throughout Metro Atlanta and were caused by the State Defendants' failure to provide the counties with a useable paper backup for the malfunctioning electronic pollbooks (which the State Defendants purchased and supplied).

---

lot, I was that emergency responders were tending to him and loading him into the ambulance. Sadly, he was not able to cast his vote this morning." (*Id.* at 148).

C.    **The August 11 Runoffs**

There is no evidence that Defendants have even acknowledged, much less

solved, any of the electronic pollbook problems that plagued the June 9 elections.

In the August 11, 2020 runoffs, even though turnout out was very low,

malfunctioning electronic pollbooks caused long waits for some voters as

pollworkers tried to check-in voters. Two witnesses describe the failures at the

Fanplex polling location on Henry Aaron Drive in Fulton County.  At Fanplex, the

Pollpads initially would not recognize voters from Precinct 01F, even though

Precinct 01F had been assigned to Fanplex.  "Every voter we observed from

precinct 01F was unable to check in."  (Whitley Declaration (Ex. 5) ¶ 13; *see also*

Stippich Decl. (Ex. 4) ¶ 6).   The poll manager called county officials and were

overheard discussing how to "override" the PollPad system.  Thereafter, the

PollPads apparently recognized that Precinct 01F voters were in the right polling

locations, but showed that each of them had received absentee ballots, which was

uniformly incorrect.  After further delays, one voter left and the others filled out

provisional ballots.  At 10:00, the poll manager announced that all Precinct 01F

voters would be checked in using the polling place's June 9, 2020 registered

voters' list and given emergency ballots.  One observer found it "very problematic"

that the poll manager was using an out-of-date voters list to give voters emergency

ballots because "a list dated in early June would not account for newly registered

voters or show whether a voter had already voted in early voting or mail ballot voting."  (Whitley Decl. (Ex.5)  ¶¶ 17-18, 20).   Michael Stippich, who waited in line for three hours at Fanplex to vote on June 9, had to wait in line for over an hour on August 11, even though there were only a handful of voters trying to vote. (Stippich Decl. (Ex. 4) ¶ 14).  Other problems with the Pollpads during the August 11 election are addressed in Part D.

### D.    New Evidence of Electronic Pollpad Vulnerability

Additional evidence obtained in the investigation of the August 11 election confirms that the PollPads as deployed by the Defendants are extremely vulnerable to malicious attack or innocent malfunction.   First, the PollPads permit the issuance of multiple encoding cards to a single voter.  According to Cherokee County Voting Systems Manager Johnathan Densmore: "the poll pads can issue an unlimited number of voter access cards to same voter, with no override pass-code or anything required from the Election Office."  (Exhibit C to Marks Declaration (Ex. 1)).

Second, the electronic pollbooks contain extremely important information, obviously, controlling who can and who cannot vote in person.  For this reason, electronic pollbooks must be password protected and, for the June 9 election,

electronic pollbooks in Georgia were password-protected.[11]  During the June 9 elections, Defendants had multiple problems with the PollPad passwords.  So, starting with the August 11 runoffs, KnowInk, the PollPad manufacturer, made the determination that in Georgia passwords would no longer be required on PollPads because they were a "' redundant security measure.'"[12]  Therefore, any person who has physical access to an electronic pollbook has the power to disenfranchise every voter – or a selection of voters – on election day.

Worse, as Harri Hursti explains in his Declaration (Exhibit 1), even password-protected electronic pollbooks "present a compelling attack surface for any domestic or foreign adversarial actor who considers disrupting or sowing discord."  *Id.* ¶ 5 (b).  "Measures like removing passwords, and therefore weakening the security should never be a workaround for reliability issues."  *Id.* ¶ 12.  This security failure must be addressed regardless of the disposition of this Motion, but, even if it is addressed, this lapse demonstrates how little Defendants

---

[11] KnowInk, the manufacturer of the electronic pollbooks, used the clever password "1 2 3 4" to protect their Pollpads.  (Doc. 680-1 at 50).

[12] Hurst Declaration (Ex. 1) at ¶ 10; Marks Declaration (Ex. 2) at ¶¶ 6-7; Patterson Declaration (Ex. 3) at ¶ 21 ("The start up of the Pollpads does not require a password, which is concerning to me given the important of the data in the Pollpads, and the user's ability to impact which voters are shown as eligible for voting."

can be trusted to deploy this complex equipment responsibly and how necessary it is to have back-up systems in place in the event the equipment continues to fail.

Mr. Hursti further confirmed the technical difficulties that pollworkers were having in Fulton County using the PollPads on August 11, 2020, witnessing numerous problems with synchronizing the units and, at Fanplex, incorrectly showing that all voters had voted by mail.  "These are prime examples," Mr. Hursti concludes, "of the need for an updated back up paper pollbook so that such discrepancies can be handled in the polling place permitting voting to continue." *Id.* at 19.

### E.    Effective Relief Can be Granted Immediately

The problem and the solution are well understood.  The Court has previously found that a backup to the PollPads is necessary to protect the right to vote: "If voters' capacity to cast votes are thwarted through an inaccurate express pollbook voting check-in or voter website, this burdens their right to cast votes, scrambles election day voting procedures, and ultimately, in turn affects voting results." (Doc. 579 at 89-90).  The Defendants have never articulated a coherent reason for not providing paper pollbook backups and their failure to do so led directly to the

"Complete Meltdown"[13] on June 9, 2020.  There is no reason to believe that,

without these changes, the same problems will not plague the upcoming elections.

Coalition Plaintiffs note that the State Election Board revised its regulations

on paper pollbook backups in February 2020 to make it clear that such backups

may be used in place of the electronic pollbooks:

> Electronic poll books shall be the primary method for checking in
> voters and creating voter access cards, but the superintendent shall
> cause every polling place to be equipped with a paper backup list that
> of every registered voter assigned to that polling place.  The paper
> backup list shall be used in case the electronic poll books do not
> properly function.  The superintendent shall cause poll workers to be
> adequately trained in checking in voters on both electronic poll books
> and paper backup list.

Ga. Comp. R. & Regs. 183-1-12-.19 (adopted February 12, 2020).  The passage of

this regulations does not obviate the need for injunction relief, however, for three

reasons.  First, though the regulation says to use the paper backup list "in case the

electronic poll books do not properly function," the regulation does not explicitly

require that the paper pollbooks be updated after early voting. If the pollbook is not

current, pollworkers cannot reasonably issue ballots, other than provisional ballots.

Second, based on the eye-witness accounts of the June 9, 2020 election, there is no

evidence that this regulation is effective to cure the problems associated with

---

[13] https://coaltionforgoodgovernance.sharefile.com/d-s8b9d3ca459e42638

electronic pollbook malfunctions.  Third, and closely related, the regulation does not explicitly require the counties to give voters whose eligibility is established by reference to the paper backup an emergency ballot, and instead could be read to allow pollworkers to continue to undertake the time-consuming, frustrating and potentially disenfranchising process of giving such voters provisional ballots. Thus, the injunctive relief requested – which is not inconsistent with the new Board rule – is necessary to prevent the long lines and disenfranchisement caused by the present system.[14]

To make compliance by the Defendants easier and most effective, and to reduce the potential for the scope or purpose of the relief to be misunderstood, Coalition Plaintiffs are seeking relief that is modified from the relief sought in the October 23, 2019 Motion (Doc. 640-2 at 4-5) in two respects.  First, since the purpose of the relief is to allow election officials to adjudicate the eligibility of voters on Election Day so that they may cast a ballot (and not have to complete a provisional ballot), the amended proposed order makes this intent express by adding the clause "to allow voters who are shown to be eligible electors on the

---

[14] In addition, compliance with an appropriate order is even easier now for the State Defendants that it would have been with the old Diebold System.  A stated feature of the KnowInk (PollPad) system is its ability to print up-to-the minute pollbooks at the Secretary of State's offices or at central county offices.  (Doc. 755 at 16).

paper pollbook backups to cast an emergency ballot that is not to be treated as a provisional ballot."

Second, through the course of collecting evidence on the new systems, Coalition Plaintiffs have discovered that the training that the State currently offers to pollworkers on the issuance of emergency ballots (including the source of pollbook information) is not only insufficient but affirmatively misleads and confuses pollworkers, and as a result will continue to disenfranchise voters.[15] The State must immediately clarify its instructions to pollworkers for issuing emergency ballots before the September 29 special election, whether or not the requested relief is granted. Hence, the amended proposed order adds a clause stating: "to take every reasonable measure to ensure that county election officials and pollworkers are trained as to how to generate and use paper pollbook backups and emergency ballots in conformity with this Order."[16]

### F.     State Defendants' Response is Meritless

---

[15] *See* Doc. 755 at 76-79 (with links to SOS "Poll Worker Manual" and SOS Pollworker Training Video).  The cited declaration also describes the mistakes in the training instructions.

[16] In their August 2, 2020 Response Brief, the State Defendants' quibble with this aspect of the Motion,  stating that the Secretary is not "responsible for training poll workers."  (Doc. 757 at 3). But the Secretary in April published the "Poll Worker Training Manual" and the "Poll Worker Training Video" (referenced in the preceding footnote), that purport to train poll workers on exactly this topic: what to do when the Pollpads malfunction.

In response to the Coalition Plaintiffs' August 2, 2020 Notice of Filing (Doc. 755) and Motion (Doc. 756) relating to Immediate Injunctive Relief on Paper Pollbook Backups, the State Defendants' filed a Response (Doc. 757).  The State Defendants' Response confirms that injunctive relief can and should be granted.

Initially, the State Defendants do not explain *why,* as a practical or legal matter, this commonsense relief (of providing each polling place with an updated paper back-up copy of the pollbook) should not be granted, and they never have: they did not explain why in their *one-page* response to Plaintiffs' Motion for Preliminary Injunction (Doc. 658 at 54); nor in open court in response to the Court's questions (Doc. 679, Tr. at 71); nor in their Response Brief. (Doc. 757). The State Defendants do not dispute—and thus concede—that the lack of paper pollbook backups materially contributed to the "Complete Meltdown" that the Defendants oversaw on June 9, 2020.  Instead of responding on these core issues, the State Defendants raise several meritless arguments:

1. *Motion should be considered only after "normal discovery track"*

The State Defendants argue that "this case should proceed on a normal discovery track instead of on an emergency basis."  (Doc. 757 at 1).[17]   Yet the

---

[17] The Coalition Plaintiffs in this Motion are not seeking expedited discovery and, even if they were, this Court rejected the premise of the State Defendants' argument in its August 11, 2020 Order (Doc. 775 at 1-2): "Defendants' wholesale objection to expedited discovery in its Response brief (Doc. 772) and arguments that there is 'no emergency' and 'no need for

issue before the Court concerns a Motion for a *Preliminary* Injunction.  (Doc. 640).

If the need for a "normal discovery track" were sufficient to defeat a motion for

preliminary injunction, then no preliminary injunction would ever be granted.  But

that is not the law.  "[A] preliminary injunction is customarily granted on the basis

of procedures that are less formal and evidence that is less complete than in a trial

on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Similarly, the State Defendants argue that this relief should not be

considered on an "emergency basis."  (Doc. 757 at 1).  There is nothing rushed

about the consideration of this relief.  It has been a continual subject of Coalition

Plaintiffs' motions since at least June, 2019 (Docs. 419, 605, 640), and this Court's

Orders and conferences since August, 2019 (Docs. 579, 679 at Tr. 69-72).

For months, the State Defendants have had the opportunity to muster

evidence (all of which is within their own possession or control) disputing the

factual basis of Coalition Plaintiffs' claim.  But they have come up with nothing

and instead insist upon a "normal discovery track" for the transparent purpose of

running out the clock on any possibility for timely relief.

---

expedited discovery' because there is 'no pending preliminary injunction' ignore this Court's
assessment of the case posture and directives communicated to counsel."

2.     *Reliance on Hearsay and Policy Statements*

The State Defendants complain that the Coalition Plaintiffs' Motion relies

on hearsay.  (Doc. 757 at 1).  That is not a valid objection to evidence filed in

support of a motion for preliminary injunction.  *Levi Strauss & Co. v. Sunrise Int'l*

*Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (at the "preliminary injunction

stage, a district court may rely on affidavits and hearsay materials which would not

be admissible evidence for a permanent injunction").  The State Defendants also

criticize the Coalition Plaintiffs for filing policy statements that the Coalition

submitted to the State Election Board as "personal opinions."   (Doc. 757 at 2).

The submissions to the State Election Board speak for themselves: they do not

contain "personal opinions," but instead are fact-based, well-reasoned submissions

showing how the Coalition Plaintiffs have scrupulously followed this Court's

directives to make every effort to resolve this issue outside of litigation, including

by (fruitlessly) petitioning the State Election Board for relief.

3.     *It is "too late to make these changes." (Doc. 757 at 3).*

The State Defendants do not support this conclusory statement with any

citation to the record or with any analysis or evidence.  The reason why is because

the requested relief is trivially easy for the State to implement: printing a paper

backup of the electronic pollbooks in each polling place involves minimal skill,

time and cost.  The ease and simplicity of the requested relief are why paper

pollbook backups are not just considered a best practice, but a necessary procedure by the National Academy of Sciences (*see* Doc. 579 at 148 n. 101) and by the Brennan Center for Justice (*see* Doc. 755 at 112).

## Conclusion

The Defendants' collective unwillingness to attend to this issue contributed directly and significantly to the "Complete Meltdown" for which Defendants were, collectively, responsible.  Unless this injunctive relief is granted, there is a virtual certainty that it will happen again.

Respectfully submitted this 21[th] day of August, 2020.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III
Admitted Pro Hac Vice
 (ECF No. 125)
ROBERT MCGUIRE LAW FIRM
113 Cherry St. #86685
Seattle, Washington 98104-2205
(253) 267-8530

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,*
*Ricardo Davis & Megan Missett*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has

been prepared in accordance with the font type and margin requirements of LR 5.1,

using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER , ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2020, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Bruce P. Brown*
Bruce P. Brown