## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## COALITION PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION RELATING TO BMDS, SCANNING AND <u>TABULATING, AND AUDITING</u>

August 24, 2020

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................... i

TABLE OF AUTHORITIES ............................................................ iv

I.      INTRODUCTION ...................................................................... 1

II.     NECESSITY FOR, OVERVIEW OF, AND FEASIBILITY OF RELIEF
        SOUGHT ...................................................................................... 4

        A.      A Constitutional Voting System Provides "Transparent,
                Fair, Accurate, and Verifiable Election Processes That
                Guarantee Each Citizen's Fundamental Right To Cast An
                Accountable Vote." .......................................................... 4

        B.      The Entire Record Shows That Georgia's
                Implementation of The Dominion Voting System Fails
                To Meet This Standard And Violates Voters'
                Constitutional Rights ...................................................... 5

                1.      Evidence Previously Submitted Into The Record ...................... 5

                2.      New Evidence ........................................................ 5

                        a)      Voting System Servers Are Not Hardened And Not "Air-
                                Gapped" As Claimed ...................................... 6

                        b)      Scanner And Tabulation Software Is Not Counting All
                                Valid Voter Marks .......................................... 7

                        c)      Pre-Election Logic And Accuracy Testing Of BMDs Is
                                Materially Deficient ........................................ 8

                        d)      Post-Election Audit Failures And Non-Compliance ..... 10

                        e)      Ongoing Ballot Secrecy Violations ................................ 13

    f)  Ballot Accounting Discrepancies Are Common ........... 14

    g)  Malfunctions Reported .................................................. 15

   3.  More Evidence Will Be Forthcoming From Discovery.......... 16

  C.  Requested Relief—Description And Feasibility ............................... 16

   1.  Hand Marked Paper Ballots Instead Of BMDs........................ 16

   2.  Scanning Fixes For Mailed/Hand Marked Ballots.................. 17

   3.  Effective Audits For Mailed/Hand Marked Ballot Tabulations................................................................................ 18

III. LEGAL FRAMEWORK GOVERNING THIS MOTION ......................... 18

  A.  Overview ........................................................................................... 18

  B.  Substantive Law Governing The Underlying Merits ......................... 19

   1.  Fundamental Right To Vote..................................................... 19

   2.  Equal Protection....................................................................... 19

   3.  Unconstitutional Conditions Doctrine ..................................... 20

IV. STANDING OF COALITION PLAINTIFFS............................................. 21

V. COALITION PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BY SHOWING THAT GEORGIA'S REQUIREMENT FOR VOTERS TO USE BMDs IS UNCONSTITUTIONAL ............................. 21

  A.  Georgia's BMDs Unconstitutionally Infringe Upon The Fundamental Right To Vote By Producing Unaccountable Results That Are Impossible To Audit And Verify ......................................................................................... 21

B.    Georgia's BMDs Unconstitutionally Burden The Right To Vote And Treat Similarly Situated Voters Unequally By Depriving In-Person Voters Of Ballot Secrecy ............................ 24

C.    Georgia's Implementation Of The Dominion Voting System Is Unconstitutionally Insecure ................................................ 28

D.    Georgia's Testing Of The Dominion Voting System Is Unconstitutionally Deficient ................................................. 29

VI.    COALITION PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BY SHOWING THAT SCANNERS MAY NOT BE PROGRAMMED TO IGNORE VOTER MARKS ARBITRARILY .......... 30

VII.    ALL REMAINING ELEMENTS REQUIRED TO JUSTIFY AN AWARD OF INJUNCTIVE RELIEF ARE ALSO PRESENT ................................... 33

A.    Coalition Plaintiffs Are Likely To Suffer Irreparable Harm ................................................................................ 33

B.    The Balance Of Equities Favors The Coalition Plaintiffs ................. 33

C.    An Injunction Is In The Public Interest ............................................. 34

VIII.    CONCLUSION ......................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ........................................................................ 19, 20, 21, 30

*Bourgeois v. Peters,*
387 F.3d 1303 (11th Cir. 2004) .................................................................... 20, 27

*Burdick v. Takushi,*
504 U.S. 428 (1992) ........................................................................ 19, 20, 21, 30

*Bush v. Gore,*
531 U.S. 98 (2000) .......................................................................................... 27

*Casarez v. Val Verde Cty.,*
957 F. Supp. 847 (W.D. Tex. 1997) .................................................................. 35

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ......................................................................................... 19

*Columbia Gas Transmission, LLC v. 84.53 Acres of Land, More or Less,*
310 F. Supp. 3d 685 (N.D. W.Va. 2018) ........................................................... 34

*Crawford v. Marion County Election Bd.,*
553 U.S. 181 (2008) ................................................................................. *passim*

*Curling v. Kemp,*
334 F. Supp. 3d 1303 (N.D. Ga. Sep. 17, 2018) ...................................... *passim*

*Jones v. Governor of Fla.,*
950 F.3d 795 (11th Cir. 2020) ......................................................................... 33

*Koontz v. St. Johns River Water Mgmt. Dist.,*
570 U.S. 595 (2013) ......................................................................................... 20

*Reynolds v. Sims*,
377 U.S. 533 (1964) ................................................................. 33

*Tashjian v. Republican Party*,
479 U.S. 208, 218 (1986) ..................................................... 26, 34

*United States v. Saylor*,
322 U.S. 385 (1944) ................................................................. 32

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ................................................................. 18

*Wesberry v. Sanders*,
376 U.S. 1 (1964) .................................................................... 33

*Wexler v. Anderson*,
452 F.3d 1226 (11th Cir. 2006) ............................................. 20

*Winter v. NRDC*,
555 U.S. 7 (2008) ........................................................ 18, 33, 34

**Statutes**

O.C.G.A. § 21–2–300(a)(2) ..................................................... 16

O.C.G.A. § 21–2–379.25(a) ..................................................... 29

O.C.G.A. § 21–2–379.25(a), (c) .............................................. 29

O.C.G.A. § 21–2–379.25(c) ....................................................... 8

O.C.G.A. § 21–2–383(c) ........................................................... 16

O.C.G.A. § 21–2–483(g) ........................................................... 32

O.C.G.A. § 21–2–70(13) ........................................................... 27

O.C.G.A. § 21-2-322 ............................................................... 27

O.C.G.A. § 21-2-365 ............................................................... 27

O.C.G.A. § 21-2-373 ............................................................... 27

O.C.G.A. § 21-2-379.1 ................................................................. 27

O.C.G.A. § 21-2-386(5) ............................................................... 27

**Other Authorities**

Fed. R. Evid. 1006 ........................................................................ 5

Ga. Const. art. II, § 1, ¶ I ........................................................... 27

State Election Bd. Rule 183–1–12–.11.2(d) ................................ 4

State Election Bd. Rule 183–1–15–.04 (proposed) ................... 18

State Election Bd. Rule 183-1-15-.02(2)(k) (proposed) ........... 31

State Election Bd. Rule 183-1-15-.02 (proposed) .................... 17

U.S. Const. Amend I .................................................................. 34

U.S. Const. Amend XIV ............................................................ 19

U.S. Const. Amend XIV, § 1 (Equal Protection Clause)........... 19

The Coalition Plaintiffs[1] respectfully file this Brief In Support Of Motion For Preliminary Injunction Relating To BMDs, Scanning And Tabulating, And Auditing.

## I.    INTRODUCTION

In the current political environment, which combines escalating cybersecurity threats from foreign attackers with a public health crisis that is changing how most people will vote, it is especially critical for the State of Georgia to conduct a defensible, evidence-based election. Now, more than in any other election in modern history, Georgia is in a national and international spotlight as a result of its repeated election failures. If the State again forces voters to use its unaccountable, unverifiable Dominion voting system this November, the result will be a colossal train wreck for democracy, which will leave counties and the State utterly unable to defend their election results against charges of fraud and error. Georgia's Dominion voting system, like the unconstitutional DRE system that it replaced, produces unaccountable, inherently evidence-free election outcomes by its very design. While a switch to using hand marked paper ballots may superficially appear to be an administrative inconvenience, such a change would

---

[1] "Coalition Plaintiffs" are Coalition for Good Governance ("Coalition"), Laura Digges, William Digges III, Megan Missett, and Ricardo Davis.

actually greatly relieve the burden on counties while instituting the only viable method of conducting a defensible, auditable election.

The Coalition Plaintiffs' First Supplemental Complaint (the "FSC," Doc. 628) mounts an "as-applied" challenge to Georgia's implementation of the "Dominion BMD System." The FSC defines the "Dominion BMD System" as the EAC-certified system selected for Georgia's current voting system, which the FSC expressly alleges to consist of components that include the election management software, adjudication software, ballot marking devices and firmware, precinct scanners and firmware, and central-count scanners and firmware. (Id. at 8, ¶ 5; 23, ¶ 67.)[2] The voting system that is being challenged in this case is the entire Dominion BMD System, i.e., the certified combination of Dominion components that Georgia has implemented, including the Dominion-supplied KnowInk PollPads. The Coalition Plaintiffs' FSC explicitly attacks the "Dominion BMD System" as a whole, not just the BMD component standing in isolation.

The FSC alleges that the State Defendants' intended use of the "Dominion BMD System" in upcoming elections will cause imminent violations of the

---

[2] The proposed FSC was filed on September 6, 2019. (Doc. 600.) Afterward, the State itself expanded its own definition and certification of the Dominion voting system to include the new electronic pollbooks component. (Doc. 640, at 2 n.1.)

fundamental right to vote, (Count I, Doc. 628, at 67–69), and of the Fourteenth Amendment's guarantee of equal protection, (Count II, id. at 70–72.)[3]

In this Motion, Coalition Plaintiffs seek preliminary injunctive relief from these imminently threatened constitutional violations in time for the November 2020 election. Specifically, Coalition Plaintiffs ask the Court to enter a preliminary injunction that requires the State Defendants: (1) to refrain from forcing in-person voters to use BMDs and instead cause voters to use hand marked paper ballots as the standard method for in-person voting; (2) to adopt scanning threshold settings for the Dominion scanners and vote review procedures that will ensure all voter marks on mailed and hand marked paper ballots are counted; and (3) to require superintendents to conduct meaningful, effective pre-certification audits of scanned hand marked paper ballots to ensure the correctness of election outcomes.

The portion of the requested relief that would prohibit the use of BMDs and instead cause the use of hand marked paper ballots for in-person voters is eminently feasible because in-person voting on hand marked paper ballots is *already* the default method that the State Defendants themselves have adopted and currently require every polling place in Georgia to be ready to switch to on a

---

[3] Coalition Plaintiffs also allege that the Dominion BMD System violates the right to procedural due process, (Count III, Doc. 628, at 72–74), but this Court dismissed Count III without prejudice. (Doc. 751, at 45–51.)

moment's notice, in the event that BMDs fail (e.g., due to loss of power), voting wait times grow to be longer than thirty minutes, or some other emergency arises. State Election Bd. Rule 183–1–12–.11.2(d). The requested relief related to scanning and audit fixes is feasible because both of these proposed fixes are easily implemented, would require only modest, workable changes to counties' election administration, sharply lessening their administrative burden and cost. The impact on voters of hand marking their ballots will be to greatly simplify the voting process and reduce voting lines at the polls. The relief requested by Coalition Plaintiffs is not only feasible to implement, but it is *easy* to implement—and the relief is necessary to make Georgia's 2020 general election safe for democracy.

● ● ●

This Brief focuses on new evidence that conclusively shows why the Coalition Plaintiffs should be found likely to prevail on the merits and should be awarded the injunctive relief they seek.

## II.   NECESSITY FOR, OVERVIEW OF, AND FEASIBILITY OF RELIEF SOUGHT

### A.   A Constitutional Voting System Provides "Transparent, Fair, Accurate, and Verifiable Election Processes That Guarantee Each Citizen's Fundamental Right To Cast An Accountable Vote."

This Court held on September 17, 2018, that, "If a new balloting system is to be launched in Georgia in an effective manner, it should address democracy's

4

critical need for transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1328 (N.D. Ga. Sep. 17, 2018) (Doc. 309, at 46). All evidence shows that the State's BMD system satisfies none of these requirements.

**B.    The Entire Record Shows That Georgia's Implementation of The Dominion Voting System Fails To Meet This Standard And Violates Voters' Constitutional Rights**

Georgia began piloting its Dominion BMD System in November 2019. Experience in every election from November 2019 through the present demonstrates conclusively that Georgia's BMD-based voting system is irredeemably flawed and unconstitutional.

### 1.    Evidence Previously Submitted Into The Record

Previously filed evidence gathered in elections from November 2019 to March 2020 is listed and summarized in **Exhibit 15**. *See* Fed. R. Evid. 1006.  The prior-filed evidence set out in Exhibit 15 is incorporated here by reference.

### 2.    New Evidence

New evidence from Georgia's elections held on June 9, 2020 (Presidential Preference Primary and general election primary), and on August 11, 2020 (related runoffs) shows that the defects of the BMD system that were first identified in

October 2019 remain critical and unresolved. The new evidence of the system's constitutional deficiencies falls into the seven broad categories discussed next:

### a) Voting System Servers Are Not Hardened And Not "Air-Gapped" As Claimed

State Defendant's claims of air-gapped secure servers that are free of hacking or attack risk are simply unfounded, and cannot be considered an effective measure to protect an unaccountable BMD ballot system.

On August 11, Coalition's election security expert, Harri Hursti, observed Fulton County's election night operations and concluded based on the available applications displayed that the Dominion system as installed was not properly hardened for voting system use, indicating increased security risk. **Exhibit 2**, ¶ 17 (Hursti Decl.). Further, Mr. Hursti observed that remote wireless access could be occurring, which will be investigated with pending discovery from Fulton County. *Id*. at ¶¶ 44–45. The lack of basic chain of custody and security controls surrounding the handling of memory cards carrying the electronic voted ballots further exacerbates the security design flaws in the Dominion system.

Counties report receiving no instruction from the Secretary of State to maintain tight controls when using removable media with the new Dominion servers. **Exhibit 4**, ¶ 18 (Marks Decl.) & Ex. 4 thereto ¶¶ 10–11. Based on discussions with various counties and Coalition's election night observations in

others, it is not uncommon for counties to move data between the Dominion server and their Internet-enabled e-mail servers and election night reporting servers, even using USB devices that were used with the old GEMS server.  Doc. 723 at 15 (Throop Decl.); Doc. 723 at 26 (Marks Decl.); Ex. 4, ¶ 16 (Marks Decl.)

    **b)**  **Scanner And Tabulation Software Is Not Counting All Valid Voter Marks**

  As described by Vote Review Panel members Jeanne Dufort, **Exhibit 5** (Dufort Decl.) (Morgan County), and Adam Shirley, **Exhibit 6** (Shirley Decl.) (Athens-Clarke County), the Dominion scanner and tabulation software is failing to count all legal votes, treating some marks as "ambiguous" requiring human review and not counting some marks at all. Coalition's representative Rhonda Martin observed how the Fulton County adjudication process dealt with these uncounted votes for a portion of the ballots flagged for review. **Exhibit 3** (Martin Decl.)

  Without legal authority, some county superintendents are refusing to permit the Voter Review Panels to review all ballots for uncounted votes, despite the likelihood of some clear votes being rejected by the software. Ex. 5 (Dufort Decl.); Ex. 6 (Shirley Decl.) An illustration of an uncounted vote prior to adjudication can be seen at Ex. 3 attached to Marilyn Marks's Declaration (Ex. 4).  In addition, Coalition's ballot scanning expert, Harri Hursti, has explained how Dominion's

low-quality scanned images cause further degradation to the ballot counting

process and escalate the risk that valid votes will not be counted. Ex. 2, at ¶ 70

(Hursti Decl.)

While the State Election Board has proposed a new rule to establish fixed

settings for the first time, there has been insufficient testing to identify a setting

that will not have the widespread effect of discarding at least some valid votes.

Ex. 2, at ¶ 77  (Hursti Decl.)  The State Defendants' policy of denying voters

human review before arbitrarily discarding perceptible vote marks is

unconstitutional and violates Georgia law requiring votes to be counted if the

intent behind a voter's mark can be ascertained upon review.

### c) Pre-Election Logic And Accuracy Testing Of BMDs Is Materially Deficient

Pre-election Logic and Accuracy Testing ("LAT") is standard testing of

voting system components prior to deployment. Georgia's law for electronic ballot

marking devices provides that,  the "superintendent shall have *each* electronic

ballot marker tested to ascertain that it will correctly record the votes cast for all

offices and on all questions and produce a ballot reflecting such choices of the

elector…" O.C.G.A. § 21–2–379.25(c) (emphasis added).

In an apparent effort to evade the significant (but necessary) burden of this

testing, the Secretary slashed the testing requirements in his procedure manual to

permit testing as few as one machine in the polling place for any particular candidate's target area, with no requirement to test all ballot styles. Ex. 2, at Ex. L thereto (Hursti Decl.); Ex. 4, ¶¶ 5–14 (Marks Decl.)

Based on evidence of the test ballots obtained from Fayette and Paulding counties, the State's BMD LAT procedures are materially deficient and non-compliant with the requirements of Georgia law. Limited testing in three counties shows that the minimum LAT requirements for BMDs are not being met. Ex. 4, at ¶ 5-14 (Marks Decl.) Additionally Elizabeth Throop observed LAT in DeKalb County, on August 24, 2020, and discovered the same testing deficiency there as well. **Exhibit 7**, ¶¶ 5–6 (Throop Decl.) Mr. Hursti addresses the seriousness of deficient LAT procedures in his Declaration. Ex. 2, at ¶ 79 (Hursti Decl.)

The Secretary has ignored warnings about the complexity of performing even the most basic LAT testing of 33,000 touchscreens and their 33,000 associated printers.  Now simply complying with the most basic essential testing requirements in advance of the November election is an unrealistic aspiration, especially given the volunteer labor shortage caused by the pandemic. Without testing, the Dominion BMD system simply cannot be trusted and is unconstitutional to use.

#### d)       Post-Election Audit Failures And Non-Compliance

Like the LAT exercises conducted *before* an election, audits conducted *after*

an election are essential to ensure the proper functioning and integrity of any

computerized voting system.  Unfortunately, new evidence conclusively supports

the continuing need for Coalition Plaintiffs' first and third requests for relief,

namely, replacement of the BMDs because they are unauditable and adoption of

more robust election audit procedures based on generally accepted audit principles.

*Lack of BMD Auditability*.  The State Defendants' position that the BMDs

are auditable rests entirely upon the assumption that voters can and will check the

accuracy of the ballot summary cards.  New evidence confirms, again, that voters

do not review the ballot summaries.  For example, in a day of working at the polls,

a Dominion temporary technician "never saw anyone carefully reviewing their

choices on their [ballot] printout."  (Doc. 800-4, at 7 ¶ 30.)  A poll watcher stated:

"While observing for over four hours, I observed that very few voters made the

effort to look at their print ballot before scanning it into the scanner.  I did not hear

or observe poll workers advising voters to review their ballot." (Doc. 800-6 at 4 ¶

25 (Whitley Decl.); see also id. at 5 ¶ 26 (on June 9, at four different polling

locations, observed less than 5% of voters reviewing their ballots before casting it

into the scanner.)  Mr. Hursti reports on how voters were obviously not reviewing

their ballots because they were trying to scan "test ballots" that the BMDs incorrectly printed.   Ex. 2, at ¶ 16 (Hursti Decl.); *id.* at 3, ¶ 5(c) ("voters are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail").

   *Need for Effective Post-Election, Pre-Certification Audits*.   The Secretary told the press that his "pilot post-election audit" in June 2020 confirmed the outcome of the presidential preference primaries in Fulton County and demonstrated "once again the validity of the results produced by Georgia's new secure paper-ballot system."  The Secretary further stated that the audit "was a risk-limiting audit."  In his declaration, however, Dr. Philip Stark, who invented the risk-limiting audit, explains that the Secretary's description of the pilot audit was "false and misleading." Ex. 1, at 3 (Stark Decl.). Dr. Stark describes in painful detail the many ways in which the Secretary's Fulton pilot audit was deficient.  It was not a risk limiting audit of the outcome because, among other reasons, it relied on the BMD printout: "Errors in the BMD printout would not be detected by this audit and cannot be detected by *any* audit." **Exhibit 1**, at 6 (Stark Decl.) The audit did *not* follow "established procedures agreed upon by national voting-integrity experts" in *ten* material ways, as Dr. Stark describes on pages 4 through 8 of his declaration. Ex. 1, at 4 (Stark Decl.)

11

Coalition Board member Rhonda Martin attended the Fulton Pilot Audit and describes the superficiality of the procedures that, plainly, could not have verified the validity of the result or even confirmed the outcome, as the Secretary had proclaimed because, among other reasons, trusted source documents were not used and the software-based auditing tool was used when "the basic assumptions of the underlying statistics" were violated.  Ex. 3, at ¶ 31 (Martin Decl.).

In his declaration, Professor Stark goes on to address the State Election Board's Proposed Rule (set out in Exhibit 13) relating to audits. Ex. 1, ¶¶ 18 *et seq.* (Stark Decl.)  Professor Stark describes the Proposed Rule as "grossly deficient" because, among other reasons, it allows the Secretary to select the contests for audit, requires audits only once every two years (when every contest should be subject to some scrutiny), does not provide for a "compliance audit" to establish whether the audit trail is trustworthy, and many other deficiencies.  *Id.* at ¶ 24.  The proposed audit rules, Dr. Stark concludes, are "'security theater' unable to catch even serious, outcome-altering problems," including the tabulation of votes.  *Id.* at ¶ 28.  In sum, the State's existing and proposed audit procedures are wholly incapable of providing any meaningful assurance that the outcomes produced by Georgia's BMD voting system are correct.

### e)      Ongoing Ballot Secrecy Violations

Ballot secrecy violations resulting from oversized touchscreens continue to plague Georgia voters, and the State appears to have no plan to do anything at all to provide a remedy. On March 31, 2020, the Secretary acknowledged in his ruling against a HAVA complaint filed by Coalition that:

> [P]olling places layouts developed by local election officials must be done in a manner that ensures voter privacy, including obscuring the sightlines of observers, poll watchers, and the public such that they cannot view a BMD screen.

(**Exhibit 14**, at Page 6 of 7.)

Yet, despite this acknowledgment, the Secretary did nothing in the June and August 2020 elections and instead continued to require in-person voters to use non-compliant BMDs with touchscreens that violated ballot secrecy. The evidence of secrecy violations caused by the touchscreens is overwhelming.  (*See generally* Doc. 755, at 80-81 (Wasson Decl.) (during July 20 early voting in DeKalb County, the BMD screens "were visible from outside the hallway, where members of the public could watch people voting"); Doc. 755, at 126 (Whitley Decl.) (June 9 poll watcher in Gwinnett states that she "could easily see how people were voting"). ) At the Peachtree Christian polling place on August 11, 2020, the positioning of the equipment allowed the public to see how voters were voting from over thirty feet

13

away.  (Doc. 802, at 19  ¶ 14 (Marks Decl.).)  At Southeast Library, "any poll worker could easily see how people vote due to the large screens" in the small room.  (Doc. 800-6 at 5 ¶ 28 (Whitley Decl.); *see also* **Exhibit 10**, ¶ 23 (Dowswell Decl.) (voters could see how others were voting);  **Exhibit 11**, ¶ 21 (Akkouris Decl.) (at St. James United, "all the BMDs were facing the entrance to the precinct and people's privacy was not being respected while they were voting"); **Exhibit 12**, ¶ 6 (Stamey Decl.); Ex. 2, ¶ 6 (Hursti Decl.) ("Voter's selections could be effortlessly seen from over 50 feet away").)  In sum, the State Defendants fully intend to continue burdening the right to vote by depriving in-person voters of ballot secrecy, despite being fully aware of the obligation to do otherwise.  (*See* Doc. 723 (fifteen declarations about continuing pervasive ballot secrecy violations in elections prior to June 2020).)

### f)    Ballot Accounting Discrepancies Are Common

Standard ballot accounting of course calls for the number of voters checking in to reconcile to the number of ballots cast, accounting for spoiled ballots or other limited exceptions. But as a review of the public records show, material differences exist between the number of ballots cast and the number of voters recorded in the PollPads as checking in at many Fulton County precincts' Ballot Recap Sheets. (*See* Doc. 802 at 22 (Marks Decl.)).  Based on reports to Coalition, similar material

unreconciled differences are anticipated to be documented in responses to counties' third parties' subpoenas, implying system malfunction or significant user errors.  Discovery on this critical issue is ongoing.

### g) Malfunctions Reported

Widespread national and local media reports captured the chaotic experience of the partial deployment of the BMD system on June 9. There is no doubt about the BMD system's failure, and hundreds of pages of detailed evidence could be gathered from multiple counties to document the "complete meltdown" that happened on June 9, 2020. Documentation of machine malfunctions and system operating issues is being gathered in formal discovery and through open records reports.  Coalition's volunteers also observed these problems at the June 9 and August 11 elections.  For example, on August 11 at the FanPlex polling place in Atlanta, Mr. Hursti observed a BMD generating multiple test ballots to voters in addition to standard ballots. Ex. 2 (Hursti Decl.); Doc. 800-6 (Whitley Decl.); *see also* **Exhibit 8** (Halley Decl.), **Exhibit 9** (Elander Decl.) (voters report BMD ballot content errors during BMD voting in the June 9 election); *and* Doc. 800-4 (Peterson Decl.); Exs. 10 & 11 (Dowswell & Akkouris Decls.) (pollworkers experienced failing machines, untrained staff, and difficult remedies). The

existence of so many malfunctions means that the Dominion BMD System deprives voters of their right to cast an accountable vote.

### 3.    More Evidence Will Be Forthcoming From Discovery

Further evidence bearing on the foregoing constitutional deficiencies will be forthcoming as Defendants' and third parties' responses to pending discovery are received.[4]  Before the hearing on this Motion, Coalition Plaintiffs expect to conduct ballot scanning and tabulation testing on a county scanner tabulator; to obtain evidence concerning the presence of insecure commercial "freeware" installed on Fulton County's Dominion Server; to obtain additional ballot images from county boards of election; and to receive substantial additional documentary evidence from thirteen subpoenas and numerous open records requests.

### C.    Requested Relief—Description And Feasibility

Coalition Plaintiffs seek three items of relief as set out in the Proposed Order.[5]  The requested relief can feasibly be implemented before November.

### 1.    Hand Marked Paper Ballots Instead Of BMDs

First, the Court should prohibit the State Defendants from enforcing O.C.G.A. § 21–2–300(a)(2), O.C.G.A. § 21–2–383(c), or any requirement that in-

---

[4] This Court lifted the stay of discovery 24 days ago, on July 30, 2020. (Doc. 751.)
[5] Coalition Plaintiffs have separately moved to require updated paper pollbook backups at each polling location in case e-pollbooks have problems. (Doc. 800.)

person voters must vote on unauditable, secrecy-compromising, insecure, and deficiently tested marking devices (BMDs). Defendants should instead be required to make hand marked paper ballots the standard method for in-person voting.

This relief is eminently feasible for the State to implement before November. The Defendants' *own* election rules already require polling places to be prepared to immediately change from voting on BMDs to voting by hand marked paper ballots whenever in-person voting wait times grow to be longer than thirty minutes or unexpected emergency conditions arise. If every polling place in the State must already be prepared to make this switch "on the fly" on Election Day, while acting under the pressure of an unexpected crowd of waiting voters, machine malfunctions, or power outages, then it is plainly feasible for such a switch to be made in a deliberate, planned way over two months prior to Election Day.

### 2. Scanning Fixes For Mailed/Hand Marked Ballots

Second, the Court should command the State Defendants to amend their proposed State Election Board Rule 183-1-15-.02 to require scanner sensitivity settings that will not reject any perceptible voter markings on any hand marked paper ballots. This rule change is feasible because the proposed amendment to State Election Board Rule 183-1-15-.02 is still pending, and a revised version can easily be adopted in the time that remains before the November election.

17

### 3.   Effective Audits For Mailed/Hand Marked Ballot Tabulations

Third, the Court should command the State Defendants to require meaningful pre-certification audits of election results, focusing on contested candidate races and ballot questions, applying well-accepted audit principles, in order to ensure, to a scientifically appropriate level of confidence, that incorrect outcomes will be detected prior to any certification of election results. It is feasible for the State Defendants to adopt better audit procedures since they are currently amending their proposed audit rule anyway. (**Exhibit 13**, at 11–12 (proposed Rule 183–1–15–.04)).

## III.   LEGAL FRAMEWORK GOVERNING THIS MOTION

### A.   Overview

To obtain a preliminary injunction, a plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

The Court is permitted to rely upon hearsay and affidavits in lieu of live testimony in the context of an injunction motion. *See Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981).

**B.     Substantive Law Governing The Underlying Merits**

The following constitutional law has been well covered in prior briefings.

### 1.     Fundamental Right To Vote

Burdens on voting short of outright disenfranchisement are unconstitutional if they are not outweighed by a legitimate government interest. "[A] court evaluating a constitutional challenge to an election regulation weigh[s] the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 190 (2008); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "However slight that burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191.

### 2.     Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Differences between voting methods give rise to equal protection issues "of

constitutional dimension" where they lead voters who use one method to be "less likely to cast an effective vote than voters" who use a different method. *Wexler v. Anderson*, 452 F.3d 1226, 1231 (11th Cir. 2006). To evaluate an equal protection claim that arises in the voting context, courts apply the *Crawford* / *Burdick* / *Anderson* balancing test. *Crawford*, 553 U.S. at 190

### 3.   Unconstitutional Conditions Doctrine

The unconstitutional conditions doctrine[6] prohibits States from "condition[ing] receipt of a benefit or privilege on the relinquishment of a constitutional right." *Bourgeois v. Peters*, 387 F.3d 1303, 1324 (11th Cir. 2004); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). "[A]n especially malignant unconstitutional condition" exists where citizens are "required to surrender a constitutional right … not merely to receive a discretionary benefit but to exercise [] other fundamental rights." *Id*. The ability to avoid a constitutional violation by choosing a different way to exercise the violated right "does not alleviate the constitutional infirmity" of an unconstitutional condition. *Id.* at 1324–25.

---

[6] The FSC invokes this doctrine in connection with both the right to vote, (Count I, Doc. 628, at 69, ¶ 226) and the right to equal protection (Count II, id. at 72, ¶ 235).

## IV.   STANDING OF COALITION PLAINTIFFS

Coalition Plaintiffs previously presented evidence of their standing to bring the claims raised by the FSC. (Doc. 640-1, at 68 ¶ 3 (Marks Decl. addressing organizational and associational standing); *id.* at 163 ¶¶ 6–12 (L. Digges Decl.); *id.* at 167 ¶¶ 6–12 (W. Digges III Decl.); *id.* at 156 ¶¶ 6–13 (Davis. Decl.); *id.* at 149 ¶¶ 5–13 (Missett Decl.).) The same reasoning that led the Court to find standing to challenge the DRE system, *Curling,* 334 F. Supp. 3d at 1314–20 (Doc. 309, at 16–29), also warrants a finding that Coalition Plaintiffs have standing to challenge the BMD system. (Doc. 640-1, at 11–14 (analysis).)

## V.   COALITION PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BY SHOWING THAT GEORGIA'S REQUIREMENT FOR VOTERS TO USE BMDs IS UNCONSTITUTIONAL

Coalition Plaintiffs are likely to prevail on the merits of their right-to-vote and equal-protection claims under the *Crawford / Burdick / Anderson* balancing test.

### A.   Georgia's BMDs Unconstitutionally Infringe Upon The Fundamental Right To Vote By Producing Unaccountable Results That Are Impossible To Audit And Verify

A voting system that cannot be audited to confirm that the outcome it produces is correct fails, by definition, to protect the right of each voter to enjoy "transparent, fair, accurate, and verifiable election processes that guarantee each

citizen's fundamental right to cast an accountable vote." *Curling*, 334 F. Supp. 3d at 1328 (Doc. 309, at 46).  Because Georgia's BMD voting system simply cannot be audited, as Professor Stark has demonstrated, the required use of BMDs should be enjoined, and hand marked paper ballots should instead be made the standard method for in-person voting.

Any computer-based voting system computer can be misprogrammed or hacked. As a consequence, a computer voting system like Georgia's must be auditable to provide credible election results. Post-election, pre-certification audits are the only way to assure that the results reported are credible and accurate.

As the Court is by now well aware, an effective post-election audit cannot be performed on BMD-generated results because the only records of voters' choices in such a system (the computer-generated barcodes and printed ballot summaries on the ballot card printouts) are not records of voter intent that were created independently of the electronic voting system software.  Because the ballot cards are produced by the BMD itself, they simply cannot serve as a reliable source record for an audit. Instead, the ballot cards are essentially nothing more than unverified secondary records generated by the very computers that are meant to be verified by the audit process in the first place. BMDs lack any truly auditable

record of the original vote cast.  The system is inherently incapable of being audited.

Defendants' position is that individual voters will have the opportunity to review the computer-generated paper record of their purported choices to confirm the machine's recording accuracy. But this will not create an *auditable* record unless (a) every voter does in fact review their choices for accuracy (and the evidence is that almost no one does so) and (b) there is a feedback mechanism in the event a voter reports that the computer-generated paper record is inaccurate (and there is none and, as a practical matter, cannot be any).

As to whether voters actually review the ballot summaries for accuracy, research shows that voluntary voter verification of computer-generated paper ballots is notoriously sporadic, unreliable and inaccurate and will not result in an adequately voter-verified record of the original transaction that can form the basis for a post-election audit. Auditing and voting systems experts conclude that most voters do not reliably, accurately, or completely check the printed ballot summaries. In addition, all the evidence from Georgia's recent elections on BMDs that is discussed above confirm that voters, even when prompted to do so, generally do not review their ballot summaries.  And most voters could not review their ballot cards accurately if they tried—the National Academy of Sciences has

warned: "Unless a voter takes notes while voting, BMDs that print only selections with abbreviated names/ descriptions of the contests are virtually unusable for verifying voter intent."[7]

Since the ballot summaries are not reviewed by voters, any audit of the BMD system is fatally flawed for it assumes, without any evidence, what the audit is supposed to be testing: that the output of the BMD—the English language ballot summary and, more important, the inscrutable QR code—is an accurate report of the voters' choices.  At the end of the day, the most a BMD audit can say is that, *assuming that the BMD has accurately captured voter intent*, the rest of the system has accurately counted and tabulated the votes.  That assurance does not make for the kind of accountable voting system that this Court has already said the Constitution requires.

**B. Georgia's BMDs Unconstitutionally Burden The Right To Vote And Treat Similarly Situated Voters Unequally By Depriving In-Person Voters Of Ballot Secrecy**

The BMDs used by Georgia severely burden the fundamental right to vote by depriving voters of secrecy of the ballot. This deprivation of ballot secrecy occurs in two distinct ways. First, the touchscreens are so large that any person in

---

[7] Securing the Vote: Protecting American Democracy, at 79, https://www.nap.edu/login.php?record_id=2512o&page=https%3A%2F%2Fwww. nap.edu%2Fdownload%2F25120 (last visited Aug. 21, 2020).

the polling place can see how a voter is voting in real time.[8] Second, the Dominion precinct scanners record timestamp information directly onto the digital cast vote record that is created when a ballot is scanned, with the result that a voted BMD ballot card can easily be connected afterward with the individual voter who cast that ballot by simply comparing the scanned cast vote records (ordered by timestamps) with the order in which voters are observed going through the voting

_____

[8] The secrecy-jeopardizing size of the BMD touchscreens was only discovered by Plaintiffs when the actual hardware for the new system was rolled out for the first time in Georgia during the November 2019 pilot elections, an event that occurred well after the FSC was filed on September 6, 2019. (Doc. 600.) While the State may argue the touchscreens are not within the scope of the case as a result, that argument is wrong. The Dominion BMD System's failure to preserve ballot secrecy was squarely placed at issue by the FSC's allegations (1) that Georgia's HB 316 required BMD voting systems to "[p]ermit voting in absolute secrecy so that no person can see or know any other elector's votes" (Doc. 628, at 17, ¶ 46), and (2) that the Dominion BMD System "will deprive Georgia voters of their state constitutional right to a secret ballot," including through the system's timestamping of scanned BMD ballot cards (Doc. 628 at 31, ¶ 93; 40–41, ¶¶ 126–27.) All that has happened since is that Plaintiffs discovered (immediately upon system deployment in the 2019 pilots) a new mechanism through which even more egregious direct violations will occur, which will be remedied by the relief already being sought. Discovery often produces new evidence that supports claims already at issue—that is the purpose of discovery under the federal rules. Accordingly, there is no good reason why Plaintiffs' post-pleading discovery that the oversized BMD touchscreens violate ballot secrecy just as the timestamps do should be considered outside the scope of the existing claims. Plaintiffs seek to remedy constitutional violations arising from the Dominion system's lack of ballot secrecy whether the deprivation is caused by timestamping, touchscreen size, or something else. Evidence that the touchscreens destroy ballot secrecy should be received just like any other new evidence that bears directly on an existing claim.

process. The large BMD touchscreens and the timestamping of scanned BMD

ballot cards are separate problems that both independently violate in-person voters'

fundamental right to vote (Count I of the FSC) and right to equal protection

(Count II of the FSC).

*Right to Vote*

It is undisputed that free exercise of the right to vote requires ballot secrecy.

The State Defendants have themselves argued as much in this very case, saying:

> The United States Supreme Court has also recognized the
> necessity of the secret ballot to prevent electoral abuses
> and its prevalence in all 50 states. *Burson v. Freeman,*
> 504 U.S. 191, 206-07 (1992). Indeed, "[s]ociety has a
> strong interest in encouraging all individuals, even the
> most timid, to vote." *In re Dinnan,* 661 F.2d 426, 432
> (5th Cir. Unit B 1981). State Defendants therefore object
> to this request for protected information on the basis that
> disclosure of cast vote images would destroy the secrecy
> of the ballot maintained by the Constitution of Georgia
> and recognized by the Supreme Court.

(Doc. 369, at 22 (State's motion to quash a subpoena for cast vote records).

To justify the burden that depriving voters of absolute secrecy imposes upon

the right to vote under *Crawford / Burdick / Anderson*, the State must articulate the

"precise interests" that justify limiting ballot secrecy. *Crawford*, 553 U.S. at 191.

Not only must those interests be "sufficiently weighty to justify the limitation," *id.*,

but they may not be mere "administrative and financial considerations." *Tashjian*

*v. Republican Party*, 479 U.S. 208, 218 (1986). The State lacks any interest

sufficient to prevail.

> ### *Equal Protection*

BMDs deprive in-person voters of the same ballot secrecy that absentee

voters in the same election enjoy. This differential treatment violates the Equal

Protection Clause. Under Georgia law, all voters enjoy a state constitutional right

to a secret ballot. Ga. Const. art. II, § 1, ¶ I ("Elections by the people shall be by

secret ballot and shall be conducted in accordance with procedures provided by

law."). Several state statutes codify this state constitutional right in a statutory

guarantee of "absolute" secrecy. *See* O.C.G.A. § 21–2–70(13); § 21–2–322; § 21–

2–365; § 21–2–379.1; § 21–2–373; § 21–2–386(5). Having conferred a right to

absolute ballot secrecy upon all voters, the State of Georgia may not now eliminate

that right only for those voters who vote in-person. *Bush v. Gore*, 531 U.S. 98,

104–05 (2000).

Nor may the State argue that voters who do not wish to suffer constitutional

violations by voting in person can avoid by simply voting absentee. This erroneous

argument is barred by the unconstitutional conditions doctrine and amounts itself

to an independent constitutional violation. *See Bourgeois* 387 F.3d at 1324.

C.     **Georgia's Implementation Of The Dominion Voting System Is Unconstitutionally Insecure**

Georgia's touchscreen BMDs share the same security issues and operate similarly to touchscreen DREs, except that the BMD interprets the voter's screen input onto a printed paper vote record, while the paperless DRE records the screen input directly into electronic memory. In both cases, a computer is between the voter and the ballot, which introduces the potential for errors or malicious programming to prevent the voter's selection from being correctly recorded.  This problem of a computer intermediary is especially critical with a BMD system that uses a QR code to encrypt the voter's choices, since the voter cannot verify that the machine has accurately recorded his or her vote at all.

Under these circumstances, a pervasively lax approach to computer security deprives voters of their right to "transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." *Curling*, 334 F. Supp. 3d at 1328 (Doc. 309, at 46).  Yet all the evidence shows that a complete lack of security characterizes Georgia's BMD System. Pollbooks are replete with apparent errors and malfunctions that allow unlimited ballots to be issued, multiple ballots can be printed from BMDs during the same voter session, physical security of voting system components in polling places is woefully lacking, USB sticks are used in the machines and "air gaps" are not

maintained, off-the-shelf consumer-grade computers are used to run election servers without first having been cleaned of pre-installed games and privacy-threatening "bloatware," and numerous other expert observations all combine to demonstrate conclusively that Georgia's BMD System is simply not trustworthy enough to use to safely conduct a constitutional election.

### D. Georgia's Testing Of The Dominion Voting System Is Unconstitutionally Deficient

Georgia law, consistent with typical Logic and Accuracy testing (LAT) goals in many states, requires the testing of *all* questions and *all* offices on *each* BMD. O.C.G.A. § 21–2–379.25(a), (c).  The LAT procedures that have been implemented fail require testing that satisfies these requirements.  *See* Ex.3, at 20–30 (Martin Decl. Ex. 1) (Secretary's LAT Procedures (Jan. 2020)). When a BMD ballot could involve over a dozen contests across dozens of ballot styles in the primary or general election, there is simply no way to ensure that the "device is properly recording votes and producing proper ballots," O.C.G.A. § 21–2–379.25(a), without testing every contest in every ballot style in every machine. Not only does thorough testing or all combinations of races on each machine make sense, such thorough testing is also consistent with (and required by) the statute. Given the evidence of BMD equipment failures and known system security vulnerabilities, going through the statutory minimum procedures during pre-

election LAT processes is even more critical.  Since the State Defendants do not require counties to perform LAT procedures consistently with even the basic statutory requirements, the BMD System is incapable of satisfying this Court's standard that constitutional elections require "transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." *Curling*, 334 F. Supp. 3d at 1328 (Doc. 309, at 46).

## VI.   COALITION PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BY SHOWING THAT SCANNERS MAY NOT BE PROGRAMMED TO IGNORE VOTER MARKS ARBITRARILY

Under the *Crawford / Burdick / Anderson* balancing test, Coalition Plaintiffs are likely to show that the State Defendants' interest in proposed scanning sensitivity thresholds that will discard some votes is outweighed by the imminent threat of severe injury to Plaintiffs' constitutional rights.[9]

Scanners detect votes by reading what is known as a "target area" inside an oval next to a voter's choice. If a certain percentage of the target area is filled in, that marking is interpreted as a vote. If the marking fills in a lower percentage, then

---

[9] This Court properly concluded that, "The functionality and reliability of the scanners is relevant to both the Plaintiffs' requested relief in connection with their First Supplemental Complaint and related Equal Protection claims." (Doc. 799, at 2.)

it  is not interpreted as a vote. Anything between the two thresholds is flagged for review by a bipartisan panel.

For the June primary, Georgia's system was set to factory settings, which counted marks that filled in 35% or more of the target area as a vote, did not count anything below 12% as a vote, and sent anything between those two to a review panel.  The State Defendants have proposed to amend State Election Board rule 183-1-15-.02(2)(k) to lower both thresholds.  (Ex.13, p.5 of 13 (proposed rules).)

Under the proposed amended rule, any marks that fill in more than 20% of the target area will be considered a vote, but anything below 10% will not be considered a vote. Marks falling between 10% and 20% will go to a vote review panel for adjudication. (Id.) In sum, the proposed sensitivity threshold will still inevitably cause some light but perceptible voter marks not to be counted without the exercise of any human judgment or review.

It is unconstitutional to allow a Dominion computer software application to discard voter markings that are below an arbitrary threshold of completeness.   The differences between a computer's perception and human perception of voter intent are clear from examples of ballots that show different results reached by human and computer readers.  Votes which are obvious to a human eye can often be discounted and rejected as non-votes by a computer program.

31

The proposed scanner sensitivity settings will control the counting of votes on all hand marked paper ballots , which means all absentee, provisional, and emergency ballots. The potential is obvious for the Dominion system to discard a large number of markings that human tabulators would perceive as being expressions of voter intent to cast a vote.  Adopting setting that allow scanners to automatically reject voter marks that are perceptible at any level is plainly a violation of the fundamental right of each voter to have his or her vote accurately recorded and counted, as well as the right of every voter to have *all* votes counted correctly. *United States v. Saylor,* 322 U.S. 385, 386 (1944).  It is also a violation of equal protection because in-person voters who use BMDs are not subject to having their votes rejected by a scanner due to faint marks (of course, BMD voters face serious problems of their own, as has already been shown.)

The Secretary's proposed rule must be enjoined, and the Secretary must instead be ordered to require sensitivity settings that count any perceptible voter mark as a vote. If this produces an overvote, then the ballot will be flagged for manual adjudication of voter intent by a vote review panel pursuant to O.C.G.A. § 21–2–483(g)—using *human* eyes and judgment, not a computer's arbitrary perception.  No voter markings on any ballot should ever be allowed to be automatically rejected by a computer without some level of human review.

32

## VII.   ALL REMAINING ELEMENTS REQUIRED TO JUSTIFY AN AWARD OF INJUNCTIVE RELIEF ARE ALSO PRESENT

Coalition Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in their favor, and an injunction is in the public interest. *Winter*, 555 U.S. at 20.

### A.   Coalition Plaintiffs Are Likely To Suffer Irreparable Harm

Because Defendants' threatened conduct will infringe upon the Plaintiffs' fundamental right to vote and right to equal protection in the exercise of the franchise, Plaintiffs have clearly shown irreparable harm. *See Reynolds v. Sims,* 377 U.S. 533, 555 (1964). *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020).

### B.   The Balance Of Equities Favors The Coalition Plaintiffs

The weight of Plaintiffs' interest is self-evident, for "*No right is more precious* in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964) (emphasis added).

The interest of the State in avoiding an injunction is comparatively insubstantial. The State has an interest in utilizing its preferred method to conduct

elections, but no valid reason to favor that method over using hand marked paper ballots, which is the State's own legally authorized alternative voting method.

The administrative burdens on the State of switching to hand marked paper ballots for in-person voting, fixing scanning thresholds, and requiring effective pre-certification audits are minimal as a matter of fact and irrelevant as a matter of law. *See Tashjian*, 479 U.S. at 218 ("the possibility of future increases in the cost of administering the election system is not a sufficient basis here for infringing appellees' First Amendment rights").

### C.     An Injunction Is In The Public Interest

For the same reason that the equities favor the Coalition Plaintiffs, so too does the public interest likewise favor the granting of an injunction. In cases involving significant public interest, courts "consider the balance of the equities and the public interest factors together." *Columbia Gas Transmission, LLC v. 84.53 Acres of Land, More or Less,* 310 F. Supp. 3d 685, 695 (N.D. W.Va. 2018); *see also Winter,* 555 U.S. at 26 (considering balance of the equities and public interest together).

Granting the relief that the Coalition Plaintiffs seek will serve the public interest. Public confidence in the integrity of Georgia's election systems is vital.

The 2020 presidential election is widely expected to produce disputed election-night results in Georgia and elsewhere. In these fraught circumstances,

> The public must have confidence that the election process is fair . . . . Those who have studied history and have observed the fragility of democratic institutions in our own time realize that one of our country's most precious possessions is . . . the widespread acceptance of election results. Repeated abuse . . . can chip away at public respect for our legal institutions and undermine the willingness of losing candidates to accept the results.

*Casarez v. Val Verde Cty.*, 957 F. Supp. 847, 865 (W.D. Tex. 1997).

The relief requested by Coalition Plaintiffs will let all voters have confidence in the correctness and verifiability of Georgia's election outcomes by requiring "transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." *Curling*, 334 F. Supp. 3d at 1328 (Doc. 309, at 46). For this reason alone, if no other, an order granting the requested relief will manifestly be in the public interest.

## VIII. CONCLUSION

For the foregoing reasons, this Motion should be granted.

Respectfully submitted this 24th day of August, 2020.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Robert A. McGuire, III* |
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Admitted Pro Hac Vice |
| BRUCE P. BROWN LAW LLC | (ECF No. 125) |
| 1123 Zonolite Rd. NE | ROBERT MCGUIRE LAW FIRM |
| Suite 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 881-0700 | (253) 267-8530 |

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,*
*Ricardo Davis & Megan Missett*

36

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown

37

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER , ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2020, a copy of the foregoing was

electronically filed with the Clerk of Court using the CM/ECF system, which will

automatically send notification of such filing to all attorneys of record.

*/s/ Bruce P. Brown*
Bruce P. Brown