E
X
H
I
B
I
T

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **DONNA CURLING, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION** |
| **vs.** | ) | |
| | ) | **FILE NO. 1:17-cv-2989-AT** |
| **BRAD RAFFENSPERGER,** | ) | |
| **ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>DECLARATION OF HARRI HURSTI</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

1.     My name is Harri Hursti.  I am over the age of 21 and competent to give this testimony.  The facts stated in this declaration are based on my personal knowledge, unless stated otherwise.

2.     My background and qualifications in voting system cybersecurity are set forth in my December 16, 2019 declaration.  (Doc. 680-1, pages 37 *et seq*).  I stand by everything in that declaration and in my August 21, 2020 declaration. (Doc. 800-2).

3.      I am also an expert in ballot scanning because of extensive background in digital imaging prior by work researching election systems. In addition, in 2005 I started an open source project for scanning and auditing paper ballots from images. As a result, I am familiar with different scanner types, how scanner settings and image processing features change the images, and how file format choices affect the quality and accuracy of the ballots.

4.      I am engaged as an expert in this case by Coalition for Good Governance.

5.      In developing this declaration and opinion, I visited Atlanta to observe certain operations of the June 9, 2020 statewide primary, and the August 11 runoff. During the June 9 election, I was an authorized poll watcher in some locations and was a public observer in others.  On August 11, I was authorized as an expert inspecting and observing under the Coalition for Good Governance's Rule 34 Inspection request in certain polling places and the Fulton County Election Preparation Center. As I will explain below in this declaration, my extensive experience in the area of voting system security and my observations of these elections lead to additional conclusions beyond those in my December 16, 2019 declaration.  Specifically:

a) the scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes not to be counted;

b) the voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level; and

c) voters are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail.

**Polling Place Observations**

6.      <u>Election observation on Peachtree Christian Church.</u> The ballot marking devices were installed so that 4 out of 8 touchscreen devices were clearly visible from the pollbook check in desk.  Voter's selections could be effortlessly seen from over 50 ft away.

7.      Over period of about 45 minutes, I only observed one voter who appeared to be studying the ballot after picking it up from the printer before casting it in the scanner. When voters do not fully verify their ballot prior to casting, the ballots cannot be considered a reliable auditable record.

8.      The scanner would reject some ballots and then accept them after they were rotated to a different orientation. I noted that the scanner would vary in the amount of time that it took to accept or reject a ballot.   The delay varied between 3

3

and 5 seconds from the moment the scanner takes the ballot until the scanner either accepts the ballot or rejects it. This kind of behavior is normal on general purpose operating systems multitasking between multiple applications, but a voting system component should be running only a single application without outside dependencies causing variable execution times.

9.      Further research is necessary to determine the cause of the unexpected scanning delays.   A system that is dedicated to performing one task repeatedly should not have unexplained variation in processing time.  As security researcher, we are always suspicious about any unexpected variable delays, as those are common telltale signs of many issues, including a possibility of unauthorized code being executed. So, in my opinion changes of behaviors between supposedly identical machines performing identical tasks should always be investigated.

When ballots are the same and are produced by a ballot marking device, there should be no time difference whatsoever in processing the bar codes. Variations in time can be the result of many things - one of them is that the scanner encounters an error reading the bar code and needs to utilize error correcting algorithms to recover from that error.   Further investigation is

necessary to determine the root cause of these delays, the potential impact of the error correcting algorithms if those are found to be the cause, and whether the delay has any impact upon the vote.

10.     <u>Election observation in Central Park Recreation Center.</u> The Poll place manager told me that no Dominion trained technician had reported on location to help them that morning.

11.     The ballot marking devices were originally installed in a way that voter privacy was not protected, as anyone could observe across the room how people are voting on about 2/3 devices.

12.     The ballot scanner took between 4 and 6 seconds to accept the ballot. I observed only one ballot being rejected.

13.     Generally, voters did not inspect the ballots after taking it from the printer and casting it into the scanner.

14.     <u>Election observation in Fanplex location</u>. Samantha Whitley and Harrison Thweatt were poll watchers at the Fanplex polling location.  They contacted me at approximately 9:10am about problems they were observing with the operation of the BMDs and Poll Pads and asked me to come to help them

understand the anomalies they were observing.  I arrived at FanPlex at approximately 9:30am.

15.    I observed that the ballot scanner located by a glass wall whereby standing outside of the building observe the scanning, would take between 6 and 7 seconds to either accept or reject the ballot.

16.    For reasons unknown, on multiple machines, while voters were attempting to vote, the ballot marking devices sometimes printed "test" ballots.  I was not able to take a picture of the ballot from the designated observation area, but I overheard the poll worker by the scanner explaining the issue to a voter which was sent back to the Ballot-Marking Device to pick up another ballot from the printer tray. Test ballots are intended to be used to test the system but without being counted by the system during an election. The ballot scanner in election settings rejects test ballots, as the scanners at FanPlex did. This caused confusion as the voters needed to return to the ballot-marking device to retrieve the actual ballot. Some voters returned the test ballot into the printer tray, potentially confusing the next voter.  Had voters been reviewing the ballots at all before taking them to the scanner, they would have noticed the "Test Ballot" text on the ballot.  I observed no voter really questioning a poll worker why a "Test" ballot was printed in the first place.

6

17.    Obviously, during the election day, the ballot marking device should not be processing or printing any ballot other than the one the voter is voting. While the cause of the improper printing of ballots should be examined, the fact that this was happening at all is likely indicative of a wrong configuration given to the BMD, which in my professional opinion raises another question: Why didn't the device print only test ballots? And how can the device change its behavior in the middle of the election day? Is the incorrect configuration originating from the Electronic Pollbook System? What are the implications for the reliability of the printed ballot and the QR code being counted?

18.    <u>Election observation Park Tavern.</u> The scanner acceptance delay did not vary as it had in previous locations and was consistently about 5 seconds from the moment the scanner takes the ballot, to the moment the scanner either accepts the ballot or rejects it. The variation between scanners at different locations is concerning because these are identical physical devices and should not behave differently while performing the identical task of scanning a ballot.

19.    The vast majority of voters at Park Tavern did not inspect the ballots after taking them from the printer and before casting them in the scanner.

**Fulton Tabulation Center Operation-Election Night, August 11, 2020**

20.   In Fulton County Election Preparation Center ("EPC") on election night I reviewed certain operations as authorized by Rule 34 inspection.

21.   I was permitted to view the operations of the upload of the memory devices coming in from the precincts to the Dominion Election Management System ("EMS") server. The agreement with Fulton County was that I could review only for a limited period of time; therefore, I did not review the entire evening's process. Also, Dominion employees asked me to move away from the monitors containing the information and messages from the upload process and error messages, limiting my ability to give a more detailed report with documentation and photographs of the screens.  However, my vantage point was more than adequate to observe that system problems were recurring and the Dominion technicians operating the system were struggling with the upload process.

22.   It is my understanding the same EMS equipment and software had been used in Fulton County's June 9, 2020 primary election.

23.   It is my understanding that the Dominion technician ("Dominic") charged with operating the EMS server for Fulton County had been performing

these duties at Fulton County for several months, including during the June 9 primary.

24.     During my August 11 visit, and a follow-up visit on August 17, I observed that the EMS server was operated almost exclusively by Dominion personnel, with little interaction with EPC management, even when problems were encountered. In my conversations with Derrick Gilstrap and other Fulton County Elections Department EPC personnel, they professed to have limited knowledge of or control over the EMS server and its operations.

25.     Outsourcing the operation of the voting system components directly to the voting system vendors' personnel is highly unusual in my experience and of grave concern from a security and conflict of interest perspective. Voting system vendors' personnel have a conflict of interest because they are not inclined to report on, or address, defects in the voting systems.   The dangers this poses is aggravated by the absence of any trained County personnel to oversee and supervise the process.

26.     In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system.

27.     Based on my observations on August 11 and August 17, Dell computers running the EMS that is used to process Fulton county votes appeared not to have been hardened.

28.     In essence, hardening is the process of securing a system by reducing its surface of vulnerability, which is larger when a system performs more functions; in principle it is to the reduce the general purpose system into a single-function system which is more secure than a multipurpose one. Reducing available ways of attack typically includes changing default passwords, the removal of unnecessary software, unnecessary usernames or logins, grant accounts and programs with the minimum level of privileges needed for the tasks and create separate accounts for privileged operations as needed, and the disabling or removal of unnecessary services.

29.     Computers performing any sensitive and mission critical tasks such as elections should unquestionably be hardened. Voting system are designated by the Department of Homeland Security as part of the critical infrastructure and certainly fall into the category of devices which should be hardened as the most fundamental security measure. In my experience, it is unusual, and I find it unacceptable for an EMS server not to have been hardened prior to installation.

10

30.    The Operating System version in the Dominion Election Management computer, which is positioned into the rack and by usage pattern appears to be the main computer, is Windows 10 Pro 10.0.14393.  This version is also known as the Anniversary Update version 1607 and it was released August 2, 2016.  Exhibit A is a true and correct copy of a photograph that I took of this computer.

31.    When a voting system is certified by the EAC, the Operating System is specifically defined, as Windows 10 Pro was for the Dominion 5.5-A system. Unlike consumer computers, voting systems do not and should not receive automatic "upgrades" to newer versions of the Operating System. without undergoing tests for conflicts with the new operating system software.

32.    That computer and other computers used in Georgia's system for vote processing appear to have home/small business companion software packages included.  Exhibits B and C are true and correct copies of photographs that I took of the computer located in the rack and the computer located closest to the rack on the table to the right. The Start Menu shows a large number of game and entertainment software icons.   As stated before, one of the first procedures of hardening is removal of all unwanted software, and removal of those game icons and the associated games and installers  alongside with all other software which is not absolutely needed in the computer for election processing purposes would be

11

one of the first and most basic steps in the hardening process. In my professional opinion, independent inquiry should be promptly made of all 159 counties to determine if the Dominion systems statewide share this major deficiency.

33.    Furthermore, when I asked the Dominion employee Dominic assigned to the Fulton County election server operation about the origin of the Windows operating system, he answered that he believed that "it has been provided by the State."

34.    Since Georgia's Dominion system is new, it is a reasonable assumption that all machines in the Fulton County election network had the same version of Windows installed. However, not only the two computers displayed different entertainment software icons, but additionally one of the machines in Fulton's group of election servers had an icon of computer game called "*Homescapes*" which is made by Playrix Holding Ltd., founded by Dmitry and Igor Bukham in Vologda, Russia.  Attached as Exhibit C is a true and correct copy of a photograph that I took of the Fulton voting system computer" Client 02".  The icon for Homescapes is shown by the arrow on Exhibit C.

35.    The *Homescapes* game was released in August 2017, one year after Fulton County's operating system release.  If the *Homescapes* game came with the operating system it would be unusual, because at the time of the release of

Homescapes, Microsoft had already released 3 major Microsoft Windows 10

update releases after build 14393 and before the release of that game. This calls

into question whether all Georgia Dominion system computers have the same

operating system version, or how the game has come to be having a presence in

Fulton's Dominion voting system.

36.    Although this Dominion voting system is new to Georgia, the

Windows 10 operating system of at least the 'main' computer in the rack has not

been updated for 4 years and carries a wide range of well-known and publicly

disclosed vulnerabilities. At the time of this writing, The National Vulnerability

Database maintained by National Institute of Standards and Technology lists 3,177

vulnerabilities mentioning "Windows 10 Pro" and 203 vulnerabilities are

specifically mentioning "Windows 10 Pro 1607" which is the specific version

number of the build 14393 that Dominion uses.

37.    Even without internet connectivity, unhardened computers are at risk

when those are used to process removable media. It was clear that when Compact

Flash storage media containing the ballot images, audit logs and results from the

precinct scanners were connected to the server, the media was automounted by the

operating system. When the operating system is automounting a storage media, the

operating system starts automatically to interact with the device. The zero-day

vulnerabilities exploiting this process has been recurringly discovered from all operating systems, including Windows. Presence of automount calls also into question presence of another setting which is always disabled in hardening process. It is autorun, which automatically executes some content on the removable media. While this is convenient for consumers, it poses extreme security risk.

38.     Based on my experience and mental impression observing the Dominion technician's activities, Fulton County's EMS server management seems to be an *ad hoc* operation with no formalized process. This was especially clear on the manual processing of the memory cards storage devices coming in from the precincts on election night and the repeated access of the operating system to directly access filesystem, format USB devices, etc. This kind of operation in naturally prone to human errors. I observed personnel calling on the floor asking if all vote carrying compact flash cards had been delivered from the early voting machines for processing, followed by later finding additional cards which had been overlooked in apparent human error. Later, I heard again one technician calling on the floor asking if all vote carrying compact flashes had been delivered. This clearly demonstrates lack of inventory management which should be in place to ensure, among other things, that no rogue storage devices would be inserted into the computer.  In response, 3 more compact flash cards were hand-delivered. Less

than 5 minutes later, I heard one of the county workers say that additional card was found and was delivered for processing. All these devices were trusted by printed label only and no comparison to an inventory list of any kind was performed.

39.     In addition, operations were repeatedly performed directly on the operating system. Election software has no visibility into the operations performed directly on the operating system, and therefore those are not included in election system event logging. Those activities can only be partially reconstructed from operating system logs – and as these activities included copying election data files, election software log may create false impression that the software is accessing the same file over a period of time, while in reality the file could had been replaced with another file with the same name by activities commanded to the operating system. Therefore, any attempt to audit the election system operated in this manner must include through analysis of all operating system logs, which complicates the auditing process.  Unless the system is configured properly to collect file system auditing data is not complete. As the system appears not to be hardened, it is unlikely that the operating system has been configured to collect auditing data.

40.     A human error when operating live election system from the operating system can result in a catastrophic event destroying election data or even rendering the system unusable.  Human error is likely given the time pressure involved and,

at least in Fulton County, no formal check lists or operating procedures were followed to mitigate the human error risk. The best practice is to automate trivial tasks to reduce risk of human error, increase the quality assurance of overall operations and provide auditability and transparency by logging.

41.     Uploading of memory cards had already started before I arrived at EPC. While one person was operating the upload process, the two other Dominion employees were troubleshooting issues which seemed to be related to ballot images uploads. I repeatedly observed error messages appearing on the screen of the EMS server. I was not able to get picture of the errors on August 11th, I believe the error was the same or similar that errors recurring August 17th as shown on Exhibit D and discussed later in this declaration.  Dominion employees were troubleshooting the issue with 'trial-and-error' approach.  As part of this effort they accessed "Computer Management" application of Windows 10 and experimented with trouble shooting the user account management feature. This demonstrates that they had complete access to the computer.  This means there are no meaningful access separation and privileges and roles controls protecting the county's primary election servers. This also greatly amplifies the risk of catastrophic human error and malicious program execution.

42.    I overheard the Dominion technician's conversation that they had issues with file system structure and "need 5 files out of EMS server and paste. Delete everything out of there and put it there."  To communicate the gravity of the situation to each other they added "Troubleshooting in the live environment". These conversations increased the mental image that they were not familiar the issue they were troubleshooting.

43.    After about 45 minutes of trying to solve the issue by instructions received over the phone, the two Dominion employees' (who had been troubleshooting) behavior changed. The Dominion staff member walked behind the server rack and made manual manipulations which could not be observed from my vantage point. After that they moved with their personal laptops to a table physically farther away from the election system and stopped trying different ways to work around the issue in front of the server, and no longer talked continuously with their remote help over phone.

44.    In the follow-up-calls I overheard them ask people on the other end of the call to check different things, and they only went to a computer and appeared to test something and subsequently take a picture of the computer screen with a mobile phone and apparently send it to a remote location.

45.     Based on my extensive experience, this all created a strong mental impression that the troubleshooting effort was being done remotely over remote access to key parts of the system. Additionally, new wireless access point with a hidden SSID access point name appeared in the active Wi-Fi stations list that I was monitoring, but it may have been co-incidental. Hidden SSIDs are used to obscure presence of wireless networking from casual observers, although they do not provide any real additional security.

46.     If in fact remote access was arranged and granted to the server, this has gravely serious implications for the security of the new Dominion system. Remote access, regardless how it is protected and organized is always a security risk, but furthermore it is transfer of control out of the physical perimeters and deny any ability to observe the activities.

47.     I also observed USB drives marked with the Centon DataStick Pro Logo with no visible inventory control numbering system being taken repeatedly from the EMS server rack to the Fulton managers' offices and back.  The Dominion employee told me that the USB drives were being taken to the Election Night Reporting Computer in another office.  This action was repeated several times during the time of my observation. Carrying generic unmarked and therefore unidentifiable media out-of-view and back is a security risk – especially when the

exact same type of devices was piled on the desk near the computer. During the election night, the Dominion employees reached to storage box and introduced more unmarked storage devices into the ongoing election process. I saw no effort made to maintain a memory card inventory control document or chain of custody accounting for memory cards from the precincts.

48.    I also visited the EPC on August 17.  During that visit, the staff working on uploading ballots for adjudication experienced an error which appeared similar to the one on election night. This error was repeated with multitude of ballots and at the time we left the location, the error appeared to be ignored, rather that resolved. (EXHIBIT D - the error message and partial explanation of the error being read by the operator.).

49.    The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access, are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system.

50.    Such a risk could be overcome if the election were conducted using hand marked paper ballots, with proper chain of custody controls.  For elections conducted with hand marked paper ballots, any malware or human error involved

in the server security deficiencies or malfunctions could be overcome with a robust audit of the hand marked paper ballots and in case of irregularities detected, remedied by a recount. However, given that BMD ballots are computer marked, and the ballots therefore unauditable for determining the result, no recovery from system security lapses is possible for providing any confidence in the reported outcomes.

**Ballot Scanning and Tabulation of Vote Marks**

51.     I have been asked to evaluate the performance and reliability of Georgia's Dominion precinct and central count scanners in the counting of votes on hand marked paper ballots.

52.     On or about June 10th, Jeanne Dufort and Marilyn Marks called me to seek my perspective on what Ms. Dufort said she observed while serving as a Vote Review Panel member in Morgan County.  Ms. Dufort told me that she observed votes that were not counted as votes nor flagged by the Dominion adjudication software.

53.     Because of the ongoing questions this raised related to the reliability of the Dominion system tabulation of hand marked ballots, I was asked by Coalition Plaintiffs to conduct technical analysis of the scanner and tabulation accuracy. That analysis is still in its early stages.

54.     Before addressing the particulars of my findings and research into the accuracy of Dominion's scanning and tabulation, I will address the basic process by which an image on a voted hand marked paper ballot is processed by scanner and tabulation software generally. It is important to understand that the Dominion scanners are Canon off the shelf scanners and their embedded software were designed for different applications than ballot scanning which is best conducted with scanners specifically designed for detecting hand markings on paper ballots.

55.     Contrary of public belief, the scanner is not taking a picture of the paper.  The scanner is illuminating the paper with a number of narrow spectrum color lights, typically 3, and then using software to produce an approximation what the human eye would be likely to see if there would had been a single white wide-spectrum light source. This process takes place in partially within the scanner and embedded software in the (commercial off the shelf) scanner and partially in the driver software in the host computer. It is guided by number of settings and configurations, some of which are stored in the scanner and some in the driver software. The scanner sensors gather more information than will be saved into the resulting file and another set of settings and configurations are used to drive that part of the process. The scanners also produce anomalies which are automatically removed from the images by the software. All these activities are performed

outside of the Dominion election software, which is relying on the end product of this process as the input.

56.    I began reviewing Dominion user manuals in the public domain to further investigate the Dominion process.

57.    On August 14, I received 2 sample Fulton County August 11 ballots of high-speed scanned ballot from Rhonda Martin, who stated that she obtained them from Fulton County during Coalition Plaintiff's discovery. The image characteristics matched the file details I had seen on the screen in EPC. The image is TIFF format, about 1700 by 2200 pixels with 1-bit color depth (= strictly black or white pixels only) with 200 by 200 dots per square inch ("dpi") resolution resulting in files that are typically about 64 or 73 kilo bytes in size for August 11 ballots. With this resolution, the outer dimension of the oval voting target is about 30 by 25 pixels.  The oval itself (that is, the oval line that encircles the voting target) is about 2 pixels wide.  The target area is about 450 pixels; the area of the target a tight bounding box would be 750 pixels and the oval line encircling the target is 165 pixels. In these images, the oval itself represented about 22% value in the bounding box around the vote target oval.

58.    Important image processing decisions are done in scanner software and before election software threshold values are applied to the image.  These

scanner settings are discussed in an excerpt Dominion's manual for ICC operations

My understanding is that the excerpt of the Manual was received from Marilyn

Marks who stated that she obtained it from a Georgia election official in response

to an Open Records request. Attached as Exhibit E is page 9 of the manual.  Box

number 2 on Exhibit E shows that the settings used are not neutral factory default

settings.

59.    Each pixel of the voters' marks on a hand marked paper ballot will be

either in color or gray when the scanner originally measures the markings.  The

scanner settings affect how image processing turns each pixel from color or gray to

either black or white in the image the voting software will later process. This

processing step is responsible for major image manipulation and information

reduction before the election software threshold values are calculated. This process

has a high risk of having an impact upon how a voter mark is interpreted by the

tabulation software when the information reduction erases markings from the

scanned image before the election software processes it.

60.    In my professional opinion, any decision by Georgia's election

officials about adopting or changing election software threshold values is

premature before the scanner settings are thoroughly tested, optimized and locked.

61.     The impact of the scanner settings is minimal for markings made with a black felt pen but can be great for markings made with any color ballpoint pens. To illustrate this, I have used standard color scanning settings and applied then standard conversion from a scanned ballot vote target with widely used free and open source image processing software "GNU Image Manipulation Program version 2.10.18" EXHIBIT G shows the color image being converted with the software's default settings from color image to Black-and-White only. The red color does not meet the internal conversion algorithm criteria for black, therefore it gets erased to white instead.

62.     Dominion manual for ICC operations clearly show that the scanner settings are changed from neutral factory default settings. EXHIBIT H shows how these settings applied different ways alter how a blue marking is converted into Black-and-White only image.

63.     The optimal scanner settings are different for each model of scanner and each type of paper used to print ballots. Furthermore, because scanners are inherently different, the manufacturers use hidden settings and algorithms to cause neutral factory settings to produce similar baseline results across different makes and models. This is well-studied topic; academic and image processing studies published as early as 1979 discuss the brittleness of black-or-white images in

24

conversion. Subsequently, significance for ballot counting has been discussed in academic USENIX conference peer-reviewed papers.

64.     On the August 17th at Fulton County Election Preparation Center Professor Richard DeMillo and I participated in a scan test of August 11 test ballots using a Fulton County owned Dominion precinct scanner. Two different ballot styles were tested, one with 4 races and one with 5 races. Attached as Exhibits I and J show a sample ballots with test marks.

65.     A batch of 50 test ballots had been marked by Rhonda Martin with varying types of marks and varying types of writing instruments that a voter might use at home to mark an absentee ballot. Professor DeMillo and I participated in marking a handful of ballots.

66.     Everything said here concerning the August 17 test is based on a very preliminary analysis. The scanner took about 6 seconds to reject the ballots, and one ballot was only acceptable "headfirst" while another ballot only "tail first." Ballot scanners are designed to read ballots "headfirst" or "tail first," and front side and backside and therefore there should not be ballots which are accepted only in one orientation. I observed the ballots to make sure that both ballots had been cleanly separated from the stub and I could not identify any defects of any kind on the ballots.

67.   There was a 15 second cycle from the time the precinct scanner accepted a ballot to the time it was ready for the next ballot.  Therefore, the maximum theoretical capacity with the simple 5 race ballot is about 4 ballots per minute if the next ballot is ready to be fed into the scanner as soon as the scanner was ready to take it.  In a real-world voting environment, it takes considerably longer because voters move away from the scanner, the next voter must move in and subsequently figure where to insert the ballot. The Dominion precinct scanner that I observed was considerably slower than the ballot scanners I have tested over the last 15 years. This was done with a simple ballot, and we did not test how increase of the number of races or vote targets on the ballot would affect the scanning speed and performance.

68.   Though my analysis is preliminary, this test reveals that a significant percentage of filled ovals that would to a human clearly show voter's intent failed to register as a vote on the precinct count scanner.

69.   The necessary testing effort has barely begun at the time of this writing, as only limited access to equipment has been made available. I have not had access to the high-volume mail ballot scanner that is expected to process millions of mail ballots in Georgia's upcoming elections. However, initial results suggest that significant revisions must be made in the scanning settings to avoid a

widespread failure to count certain valid votes that are not marked as filled in ovals. Without testing, it is impossible to know, if setting changes alone are sufficient to cure the issue.

**Scanned Ballot Tabulation Software Threshold Settings**

70.     Georgia is employing a Dominion tabulation software tool called "Dual Threshold Technology" for "marginal marks." (See Exhibit M) The intent of the tool is to detect voter marks that could be misinterpreted by the software and flag them for review. While the goal is admirable, the method of achieving this goal is quite flawed.

71.     While it is compelling from development cost point of view to use commercial off the shelf COTS scanners and software, it requires additional steps to ensure that the integration of the information flow is flawless. In this case, the software provided by the scanner manufacturer and with settings and configurations have great impact in how the images are created and what information is removed from the images before the election software processes it. In recent years, many defective scanner software packages have been found. These software flaws include 'image enhancement' features which have remained enabled even when the feature has been chosen to be disabled from the scanner software provided by the manufacturer. An example of dangerous feature to keep

enabled is 'Punch Hole Removal', intended to make images of documents removed from notebook binders to look more aesthetically pleasing.  The software can and in many cases will misinterpret a voted oval as a punch hole and erase the vote from the image file and to make this worse, the punch holes are expected to be found only in certain places near the edge of the paper, and therefore it will erase only votes from candidates whose targets are in those target zones.

72.    Decades ago, when computing and storage capacity were expensive black-and-white image commonly meant 1-bit black-or-white pixel images like used by Dominion system. As computer got faster and storage space cheaper during the last 2-3 decades black-and-white image has become by default meaning 255 shades of gray grayscale images. For the purposes of reliable digitalization of physical documents, grayscale image carries more information from the original document for reliable processing and especially when colored markings are being processed. With today's technology, the difference in processing time and storage prices between grayscale and 1-bit images has become completely meaningless, and the benefits gained in accuracy are undeniable.

73.    I am aware that the Georgia Secretary of State's office has stated that Georgia threshold settings are national industry standards for ballot scanners (Exhibit K). This is simply untrue. If, there were an industry standard for that, it

28

would be part of EAC certification. There is no EAC standard for such threshold settings. As mentioned before, the optimal settings are products of many elements. The type of the scanner used, the scanner settings and configuration, the type of the paper used, the type of the ink printer has used in printing the ballots, color dropout settings, just to name few. Older scanner models, which were optical mark recognitions scanners, used to be calibrated using calibration sheet – similar process is needed to be established for digital imaging scanners used this way as the ballot scanners.

74.    Furthermore, the software settings in Exhibit E box 2 show that the software is instructed to ignore all markings in red color ("Color drop-out: Red"), This clearly indicates that the software was expecting the oval to be printed in Red and therefore it will be automatically removed from the calculation. The software does not anticipate printed black ovals as used in Fulton County. Voters have likely not been properly warned that any pen they use which ink contains high concentration of red pigment particles is at risk of not counting, even if to the human eye the ink looks very dark.

75.    I listened to the August 10 meeting of the State Board of Elections as they approved a draft rule related to what constitutes a vote, incorporating the following language:

*Ballot scanners that are used to tabulate optical scan ballots marked by hand shall be set so that:*

*1. Detection of 20% or more fill-in of the target area surrounded by the oval shall be considered a vote for the selection;*

*2. Detection of less than 10% fill-in of the target area surrounded by the oval shall not be considered a vote for that selection;*

*3. Detection of at least 10% but less than 20% fill-in of the target area surrounded by the oval shall flag the ballot for adjudication by a vote review panel as set forth in O.C.G.A. 21-2-483(g). In reviewing any ballot flagged for adjudication, the votes shall be counted if, in the opinion of the vote review panel, the voter has clearly and without question indicated the candidate or candidates and answers to questions for which such voter desires to vote.*

76.     The settings discussed in the rule are completely subject to the scanner settings. How the physical marking is translated into the digital image is determined by those values and therefore setting the threshold values without at the same time setting the scanner settings carries no value or meaning. If the ballots will be continuing to be printed with black only, there is no logic in having any drop-out colors.

77.     Before the State sets threshold standards for the Dominion system, extensive testing is needed to establish optimal configuration and settings for each step of the process. Also, the scanners are likely to have settings additional configuration and settings which are not visible menus shown in the manual excerpt. All those should be evaluated and tested for all types of scanners approved for use in Georgia, including the precinct scanners

78.     As temporary solution, after initial testing, the scanner settings and configuration should be locked and then a low threshold values should be chosen. All drop-out colors should be disabled. This will increase the number of ballots chosen for human review and reduce the number of valid votes not being counted as cast.

**Logic and Accuracy Testing**

79.     Ballot-Marking Device systems inherits the same well-documented systemic security issues embedded in direct-recording electronic (DRE) voting machine design. Such design flaws eventually are causing the demise of DRE voting system across the country as it did in Georgia. In essence the Ballot Marking Device is a general-purpose computer running a general-purpose operating system with touchscreen that is utilized as a platform to run a software, very similar to DRE by displaying a ballot to the voter and recording the voter's intents. The main difference is that instead of recording those internally digitally, it prints out a ballot summary card of voter's choices.

80.     Security properties of this approach would be positively different from DREs if the ballot contained only human-readable information and all voters are required to and were capable of verifying their choices from the paper ballot summary. That of course is unrealistic.

31

81.     When voter fails to inspect the paper ballot and significant portion of the information is not in human readable from as a QR barcode, Ballot-Marking Device based voting effectively inherits most of the negative and undesirable security and reliability properties directly from DRE paradigm, and therefore should be subject to the same testing requirements and mitigation strategies as DREs.

82.     In response to repeating myriad of issues with DREs, which have been attributed to causes from screen calibration issues to failures in ballot definition configuration distribution, a robust Logic & Accuracy testing regulation have been established. These root causes are present in BMDs and therefore should be evaluated in the same way as DREs have been.

I received the Georgia Secretary of State's manual "Logic and Accuracy Procedures "Version 1.0 January 2020 from Rhonda Martin. Procedure described in section D "Testing the BMD and Printer" is taking significant shortcuts, presumably to cut the labor work required. (Section D is attached as Exhibit L) These shortcuts significantly weaken the security and reliability posture of the system and protections against already known systemic pitfalls, usability predicaments and security inadequacies.

**CONCLUSIONS**

83.     The scanner software and tabulation software settings and configurations being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes not to be counted as cast.

84.     The method of using 1-bit images and calculated relative darkness values from such pre-reduced information to determine voter marks on ballots is severely outdated and obsolete. It artificially and unnecessarily increases the failure rates to recognize votes on hand-marked paper ballots. As a temporary mitigation, optimal configurations and settings for all steps of the process should be established after robust independent testing to mitigate the design flaw and augment it with human assisted processes, but that will not cure the root cause of the software deficiency which needs to be addressed.

85.     The voting system is being deployed, configured and operated in Fulton County in a manner that escalates the security risk to an extreme level and calls into question the accuracy of the election results. The lack of well-defined process and compliance testing should be addressed immediately using independent experts. The use and the supervision of the Dominion personnel operating Fulton County's Dominion Voting System should be evaluated.

86.     Voters are not reviewing their BMD printed ballots before scanning and casting them, which causes BMD-generated results to be un-auditable due to the untrustworthy audit trail. Furthermore, because BMDs are inheriting known fundamental architectural deficiencies from DREs, no mitigation and assurance measures can be weakened, including but not limited to Logic and Accuracy Testing procedures.

This 24th day of August 2020.

Harri Hursti

EXHIBIT A:



EXHIBIT B:



EXHIBIT C:



EXHIBIT D:



EXHIBIT E:



EXHIBIT F:



EXHIBIT G:



EXHIBIT H:



EXHIBIT I:



43

EXHIBIT J:



EXHIBIT K:



**Gabriel Sterling**
@GabrielSterling

Replying to @MarilynRMarks1 @rahulbali and 9 others

Again, all Central scanners were set at the industry standard 0-13% is not a mark (the oval is 5%) 14-28% is the ambiguous level to be checked by review panels, 29%+ is a mark. You ar pointing out the inherent issues with HMPBs that we don't see with BMD marked ballots.

8:02 PM · Jun 13, 2020 from Georgia, USA · Twitter for iPhone

45

EXHIBIT L:



- Create a voter card from Poll Pad for each unique ballot style within the designated Polling Location
  - Recommend labels be placed on card identifying what ballot style will be displayed by BMD once card is inserted
  - BMD removes the activation code from the Voter Card once used, therefore create the card again from Poll Pad after each use by a BMD

### D.  Testing the BMD and Printer

Use a combination of Poll Worker Card with Ballot Activation Codes for the polling location, and Voter Cards created from a Poll Pad loaded with the LA/Advance Voting dataset to bring up ballots on the BMD

- Produce at least one printed ballot from each BMD assigned to the polling location
- Produce a test deck from the BMDs assigned to the polling location for each unique ballot style within the polling location.  The test deck must contain at least one vote for each candidate listed in each race within the unique ballot style
  - **Example**:  Ballot from BMD 1 contains a vote for only the first candidate in each race listed on Ballot Style 1, Ballot from BMD 2 contains a vote only for the second candidate in each race on Ballot Style 1, and continue through the line of devices until all candidates in all races within the unique ballot style have received a single vote
  - **If Number of BMDs outnumber the number of vote positions on the unique ballot style**, start the vote pattern over until all BMDs have produced one printed ballot
  - **If Number of unique ballot styles in the polling place is greater than 1**, once the vote pattern is complete for a unique ballot style, proceed to the next BMD in line to start the review of the next unique Ballot Style
  - **All unique ballot styles do not have to be tested on each BMD**
- Review BMD-generated Test Deck and confirm the vote content before placing in the designated Polling Place Scanner

### E.  Testing the Polling Place Scanner

- Scan the BMD-generated Test Deck into the Polling Place Scanner
- Scan one blank optical scan ballot style(s) associated to the Polling Place to verify the Polling Place Scanner will recognize the ballot style in case of emergency
- Verify Scanner(s) shows a number of Ballot Cast equal to the number of ballots in the BMD-generated test deck plus the scanned blank Optical Scan ballot styles
- Firmly place the Security Key Tab in the Security Key Slot
- Touch Close Polls
- Enter the passcode
- Touch Enter
- Touch Yes
- Touch No for additional tapes (Scanner will automatically produce 3 copies of the closing tape)

EXHIBIT M:



## DUAL THRESHOLD TECHNOLOGY (MARGINAL MARKS)

From its early beginnings, Dominion Voting has emphasized the use of digital scanning, and continues to set the standard in digital image acquisition and analysis in the tabulation of digitally scanned ballots. When a ballot is fed into an ImageCast® tabulator – at the precinct level or centrally - a complete duplex image is created and then analyzed for tabulation by evaluating the pixel count of a voter mark. The pixel count of each mark is compared with two thresholds (which can be defined through the Election Management System) to determine what constitutes a vote. If a mark falls above the upper threshold, it's a valid vote. If a mark falls below the lower threshold, it will not be counted as a vote.

However, if a mark falls between the two thresholds (known as the "ambiguous zone"), it will be deemed as a marginal mark and the ballot will be returned to the voter for corrective action (please see diagram below). With this feature, the voter is given the ability to determine his or her intent, not an inspection or recount board after the fact, when it is too late. The chart below illustrates the Marginal Mark threshold interpretation.





DUAL THRESHOLD TECHNOLOGY