EXHIBIT

6

# DECLARATION OF ADAM SHIRLEY

ADAM SHIRLEY hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

2. I am a registered voter in Clarke County and a member of the Clarke County Democratic Party.

3. I served on behalf of the Clarke County Democratic Party on the Clarke County Vote Review Panel for the Presidential Preference Primary - General Primary - Nonpartisan General Election on June 9, 2020.

4. The Vote Review Panel was further composed of a member of the Clarke County Republican Party, a person designated by the Clarke County Board of Elections, and two persons designated by a Clarke County Superior Court judge.

5. After hand-marked absentee mail ballots were scanned, the Vote Review Panel reviewed ballots the software had flagged for adjudication. Out of approximately 15,000 scanned absentee ballots, approximately 350 had been flagged for adjudication.

6. I have attached sample screen shots from Fulton County and Clarke County to illustrate what I am describing at Exhibits 1, 2, and 3. The screen shots for

Exhibits 1 and 2 were provided to me by Rhonda Martin and Samantha Whitley of the Coalition for Good Governance. The screen shot for Exhibit 3 came from the July *New York Times* article about Georgia's primary election, and was taken in Clarke County by an observer during the adjudication of a partial recount of the June primary.

7. Exhibit 1 shows the scanned image of a marked ballot, with the software's highlighting hidden.

8. When adjudicating a ballot, a scanned image of the complete ballot was displayed. The software indicated the flagged contest(s) for human review by outlining them in red. The software used highlighting to indicate how it had interpreted the voter's mark. This highlighting was used for the entire ballot -- not only for the contests that were flagged for adjudication. On-screen green highlighting with a check-mark overlay indicated that the software was recognizing the mark as a vote, and counting it unless it was also flagged as an overvote.

9. Yellow highlighting indicated a mark the software categorized as ambiguous, and we were informed by officials that no vote highlighted in yellow was counted until there was Vote review Panel adjudication. Exhibit 2 shows examples of the yellow highlighting.

10. I was told by election officials and Dominion Voting Systems staff that the "ambiguous" marks were those with 12% to 33% of the oval darkened. I have no way of knowing whether those numbers are accurate or meaningful, given the complexities of scanning software, varying ink colors, and multiple types of paper stock on which Clarke County ballots were printed.

11. One reason for adjudication was an overvote. When more than one option in a contest was darkened, the software classified this as an overvote, highlighted both darkened ovals in green, outlined the contest in red, and sent the entire ballot to an adjudication queue. We adjudicated these overvotes pursuant to O.C.G.A. § 21-2-483.

12. Another reason for adjudication was for marginal marks that the Dominion system referred to as "ambiguous marks." When at least one oval in a contest was darkened sufficiently to be categorized as "ambiguous," the software highlighted the ambiguous option(s) in yellow, outlined the contest in red, and sent the entire ballot to an adjudication queue. Exhibit 2 is an example illustrative of the adjudication screen.

13. We adjudicated vote marks categorized as "ambiguous" to count votes that were clear as to voter intent despite my being unclear on what Georgia law says about whether the software is supposed to reject these vote marks and whether the Vote Review Panel is authorized to count such marks. Our panel

took the approach that for any votes flagged for adjudication, the vote should be counted if voter intent was clear from the on screen image.

14. When adjudicating, the vote review panel attempted to answer two questions. First: could the voter's intent be discerned? Second: what was that intent? For both overvotes and ambiguous votes, we reviewed the rest of the flagged ballot and how it was marked. This provided us with context and an understanding of the voter's style of marking their intent.

15. Though technically requiring only a simple majority of the panel, in practice the vote review panel's decision on each ballot image was unanimous: Republican, Democrat, and nonpartisan appointees alike agreed on each adjudication.

16. The most common reason for ballots to be flagged as ambiguous was the voter having marked their intent with check marks or X marks.

17. In the course of reviewing the rest of a ballot to inform our adjudication of flagged contests, we discovered clear ballot markings made by the voter that had not been highlighted by the software for adjudication. They were not counted as a vote and highlighted green; they were not counted as ambiguous and highlighted yellow.

18. Exhibit 3 shows the scanned image of one such marked ballot. The top and middle contests bear the red box flagging them for adjudication, and contain

yellow highlighting showing marks the software has classified as ambiguous. The bottom contest, though clearly marked by the voter, bears no red box or highlighting of any kind. This shows the software did not count that vote, and was programmed not to send a ballot to adjudication for containing a contest with such a vote. The system seemed to simply ignore such votes.

19. The county election staff assisting us with adjudication agreed with our assessment that the software had not counted these as votes.

20. In every instance we encountered, the vote review panel agreed without question that the voter had made their intent clear in these votes that had not been counted according to the AuditMark. The panel therefore instructed the software to count the previously-ignored votes on the ballots flagged for adjudication of other votes on the ballot as an ambiguous mark or overvote, although the software had not flagged these particular votes.

21. Because the Vote Review Panel was only permitted (by the software parameters set by elections staff or Dominion Voting Systems or Secretary of State staff) to adjudicate ballots that had been flagged, and because the software only flagged contests that were overvotes or ambiguous, it was possible there were ballots with uncounted votes that would never be

corrected by human review because no other marks on those ballots triggered flagging.

22. For example, if a voter marked one or two ovals adequate for detection, but marked the rest of the ovals with light X's or checkmarks that fell below the threshold, those lightly marked votes would not flagged for adjudication and not be counted.

23. The vote review panel expressed these concerns to elections staff and Charlotte Sosebee, Election Director, and the Board of Elections. In response to these and other concerns, the Board of Elections ordered a pre-certification partial recount of only the absentee ballots for 5 of Clarke County's 24 precincts. The partial recount took place on Wednesday, June 17.

24. Per the recommendation of election staff and the county attorney, the Election Board was not authorized by statute or by rule to conduct a recount using any method other than exactly what had been used for the first count.

25. Present for the recount were election staff, the five-person board of elections who function as superintendent, an investigator from the Secretary of State's office, three technicians from Dominion Voting Systems, candidates on the ballot, and members of the public.

26. 2,665 absentee ballots were re-scanned.  76 were flagged for adjudication, purportedly using the same threshold settings and criteria as used in the first tabulation.  On those 76 ballots, the Vote Review Panel unanimously agreed that 35 individual votes had not been counted by the software.  Those votes were spread across 12 separate ballots.

27. A Dominion Voting System technician confirmed the software was programmed to classify marks in one of three ways:  a normal vote (which it highlighted in green), an ambiguous mark (which it highlighted in yellow), and an uncounted vote (which it recognized, quantified -- but was programmed not to count, and not to be flagged for review).

28. As a voter, I find such a high rate of missed votes -- nearly sixteen percent of the adjudicated ballots -- to be alarming.  I am disappointed that neither local nor state elections officials have shown any interest to my knowledge in discovering exactly how many votes were missed.  I am deeply concerned that we as voters will not be able to trust the integrity of our election if as many as sixteen percent of cast mail ballots contain one or more votes that are deliberately ignored by scanning software.

29. As a voter and a member of the Vote Review Panel I am further concerned that votes are being classified as "ambiguous."  Given my Vote Review Panel responsibilities representing the Athens-Clarke Democratic

Committee, I wanted to be clear on what Georgia law is regarding how votes are to be interpreted when software is used to read ballots. I undertook my own search of the law, although I am not a lawyer, and nowhere in the Georgia Constitution, in state law, or in Secretary of State rules and regulations did I find provisions that authorize this classification of ambiguous votes or votes that fall below a threshold that should not be counted. Instead, I found assurances (O.C.G.A. § 21-2-438(c)) that our vote shall be counted when our intention can clearly be determined.

30. I recognized the seriousness of my responsibilities and the impact of our Vote Review Panel's activities in actually changing vote tallies in the database. We did so with no paper audit trail and without verifying the record of the changes we were making to the vote tallies. Nor did we reference the original ballot to determine if the low quality image was an accurate depiction of the voter-marked ballot before we changed the tally. I am uncomfortable with the process that we followed and fear that the system is leaving votes uncounted and preventing human intervention to recover and count those votes.

31. I am also uncomfortable that we kept no records of the changes we made to the tallies. The Vote Review Panel did not attempt to reconcile the votes we added to the vote tally before and after the adjudication process, leaving the

opportunity for unauthorized changes to the tallies by others with access to the system.

32. On July 1, 2020, I expressed my concern about the uncounted votes during public comment at a State Election Board meeting. When I asked them to require the scanning software to send all partially-darkened ovals to humans for review, Secretary of State General Counsel Kevin Rayburn responded, "[W]hile there is a statute that talks about marking a paper ballot and mentioning X or check mark, that does not apply to our current statewide method of voting. That is a very old statute that only some municipalities can use, and it does not refer to optical scan ballots. It refers to old ballots that have a box next to candidates and those are hand-counted. So, while there is a statute out there, it does not apply to our current system. Our current system's law and rule requires for optical scan ballots that the voter fill in the oval." I can find no such constraints and qualifications in either statutes or rules, which I have attempted to examine to be fully informed as to my duties on Vote Review Panels.

Executed this 23rd day of August, 2020



Adam Shirley



**EXHIBIT 1**



**EXHIBIT 2**

