```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3

 4   DONNA CURLING, ET AL.,           :
                                      :
 5           PLAINTIFFS,              :
     vs.                              :  DOCKET NUMBER
 6                                    :  1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,      :
 7                                    :
             DEFENDANTS.              :
 8

 9

10        TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11           BEFORE THE HONORABLE AMY TOTENBERG

12             UNITED STATES DISTRICT JUDGE

13                    AUGUST 21, 2020

14                      10:17 A.M.

15

16

17

18

19

20

21   MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                  TRANSCRIPT PRODUCED BY:

23
     OFFICIAL COURT REPORTER:          SHANNON R. WELCH, RMR, CRR
24                                     2394 UNITED STATES COURTHOUSE
                                       75 TED TURNER DRIVE, SOUTHWEST
25                                     ATLANTA, GEORGIA  30303
                                       (404) 215-1383
```

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
      SCHOENBERG:

 4

 5         DAVID D. CROSS
           LYLE HEDGECOCK
 6         MORRISON & FOERSTER, LLP

 7         HALSEY G. KNAPP, JR.
           KREVOLIN & HORST, LLC

 8

 9
      FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
10    WILLIAM DIGGES, III, AND RICARDO DAVIS:

11
           BRUCE BROWN
12         BRUCE P. BROWN LAW

13

14    FOR THE STATE OF GEORGIA DEFENDANTS:

15
           CAREY A. MILLER
16         JOSH BELINFANTE
           ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
17

18         BRYAN P. TYSON
           TAYLOR ENGLISH DUMA
19

20
      FOR THE FULTON COUNTY DEFENDANTS:
21

22         CHERYL RINGER
           OFFICE OF THE FULTON COUNTY ATTORNEY
23

24

25
```

UNITED STATES DISTRICT COURT
CERTIFIED OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **(Atlanta, Fulton County, Georgia; August 21, 2020.)** |
| 3 | THE COURT:  Good morning. |
| 4 | COURTROOM DEPUTY CLERK:  I believe we have got |
| 5 | everybody represented.  Would you like me to call the case? |
| 6 | THE COURT:  Sure.  Thank you. |
| 7 | COURTROOM DEPUTY CLERK:  Good morning, everyone. |
| 8 | We're here for the teleconference in the case of Curling vs. |
| 9 | Raffensperger, Civil Action Number 17-CV-2989. |
| 10 | Judge, this morning representing the State of |
| 11 | Georgia, I have Mr. Carey Miller, Mr. Bryan Tyson, and Mr. Josh |
| 12 | Belinfante. |
| 13 | For the Curling plaintiffs, I have Mr. David Cross, |
| 14 | Mr. Halsey Knapp, and Mr. Lyle Hedgecock.  I did not include |
| 15 | him on the sheet that I sent you this morning. |
| 16 | THE COURT:  Okay. |
| 17 | COURTROOM DEPUTY CLERK:  Representing Fulton County, |
| 18 | we have Ms. Cheryl Ringer. |
| 19 | THE COURT:  Yes. |
| 20 | COURTROOM DEPUTY CLERK:  And representing the |
| 21 | Coalition, Mr. Bruce Brown. |
| 22 | Have I missed anybody? |
| 23 | Okay.  Judge? |
| 24 | THE COURT:  Good morning. |
| 25 | MR. CROSS:  Good morning, Judge. |

```
 1              MR. TYSON:  Morning, Judge.

 2              THE COURT:  Maybe just because things were moving so

 3    quickly, really when I set the briefing schedule, I didn't

 4    realize, having not read the plaintiffs' brief in full -- the

 5    Curling plaintiffs' brief in full, the extent to which there

 6    had been no further evidence produced so that I -- you know,

 7    that was the height -- I have a concern, of course.  And

 8    you-all have requested now a discovery conference.

 9              But I also just had concern a little bit about

10    without having much additional discovery or any that -- about

11    the utility of the briefing and the functionality of the

12    schedule.  So just sort of that is an overriding concern that I

13    have.

14              Let me -- so not knowing and not having checked the

15    specific hour at which the joint discovery statement was filed

16    yesterday -- when was it filed?  I didn't go and check.

17              MR. CROSS:  It was around 5:30, Your Honor.  This is

18    David Cross.

19              THE COURT:  Let me ask the State this.  I mean, I can

20    go through the objections and the approach.  And I will

21    ultimately likely have to do that.  But I can't tell from your

22    preserved objections what has been done at all, what is out

23    there.

24              I mean, I did not expect wholesale objections like

25    this.  And so, you know, it is -- I don't think it is a proper
```

1  objection simply at this juncture to say, well, you are not

2  going to win essentially and there must be injunctive relief or

3  to the extent it has been said there is no -- there is no

4  pending motion.

5       And I don't really want to get into all of the

6  details of what happened in terms of the communications.  I can

7  see -- knowing that the case in front of Judge Ross is very

8  substantial, I do understand that State counsel were certainly

9  consumed on the day of the hearing, which was, I believe,

10 Wednesday.

11      But my greater concern is really that we have -- is

12 the nature of objections here that give basically one no idea

13 about what is being produced -- is likely to be produced.  And

14 that is -- I mean, the whole point of having the objections be

15 done earlier is so that we could sort through that.  And I

16 don't think there is anything that said basically my standing

17 order doesn't apply.

18      I do understand you might not know all of the

19 documents you might find.  But you know the nature of the

20 documents and if you are going to assert some specific

21 privilege.

22      So that I just -- the nature of the wholesale

23 objections is not right.  And now I don't even know anything

24 about whatever is going to be produced, and the briefing ends

25 up being sort of basically of so much less utility.

1           Now, it is certainly conceivable that between the
2   time the last briefing is heard or the last motion and now I
3   understand that the plaintiffs may have gathered some other
4   evidence on their own but some of the critical evidence they
5   likely will not have and it really -- because it is associated
6   with actually the whole functioning of the election system.
7           So I would like State counsel to just -- at this
8   moment where are you at and what is it that you -- what is the
9   nature of the objections that actually you are asserting?
10  Because these are not helpful.  These don't advance -- I mean,
11  I could say all objections were waived.  But that is not -- you
12  know, that is not my want to do.  But these are wholly
13  unhelpful.
14          MR. TYSON:  Your Honor, this is Bryan Tyson.  Maybe I
15  can kind of start -- I'll give you kind of our sequencing and
16  then where we are in terms of the search and what the
17  Secretary's office is planning to do or is already doing and
18  kind of what is underway.
19          So in terms of time lines, we had read the order on
20  the motion for expedited discovery saying that we had to do
21  objections to the request in seven days.  And we just wanted to
22  preserve those.  We didn't read it as requiring full responses
23  within the seven days.
24          But we wanted to go ahead and notify the plaintiffs
25  that we are planning to produce documents for every category

1    that -- of the request, which was our intention here.  And we

2    apologize for misunderstanding obviously what you were looking

3    for on that.

4           We didn't want to waive obviously any objections we

5    might have to the scope and the definitions and other issues

6    that are involved.  But where we are in terms of the search and

7    the documents as we indicated in the response, Dr. Halderman

8    was able to immediately begin his analysis of the memory cards

9    under the protocol that we had proposed and you had ordered,

10   that we also were able to agree without the Court's

11   intervention to a protocol with the Coalition plaintiffs for

12   the imaging of the DREs.  And they have now spent two full days

13   engaging in that process and have gained data off of the

14   forensic imaging of the DRE.  That has been underway.

15          The Secretary's office is in the midst of assembling

16   the documents that we are working with them on.  Given the

17   nature of the request, what the Secretary's office has done is

18   pull the county liaison -- so there are four regions of the

19   state for interface between the Secretary's office and the

20   county election officials.

21          They have removed the four county liaisons from their

22   typical role at this point of helping assist with certification

23   and helping check in with counties on preparations for November

24   to begin assembling the documents.  We expect to be able to

25   produce documents in response to every category here.  But we

1   are not -- the search is still not complete, and so we don't

2   know for certain, you know, what all the various -- we know

3   some general categories.  We don't know specifically if there

4   is going to be responsive documents that are privileged or that

5   are -- they need a protective order and just all the various

6   pieces that are there.

7        So I don't know what is most helpful for you.  If you

8   want to walk through the specific requests and I can kind of

9   talk to you about what documents we're expecting or --

10        THE COURT:  Okay.

11        MR. TYSON:  -- or what else is helpful.

12        THE COURT:  I think that would probably be helpful.

13   But let me find out from -- from plaintiffs' counsel.

14        Do you think that is a constructive way of

15   proceeding, or do you have some other alternate suggestion?

16        MR. CROSS:  Your Honor, this is David Cross.  I think

17   that could be useful.  I think there is a threshold question

18   that may help even expedite this, which was the question we

19   asked yesterday.

20        And that is:  Understanding they don't know the

21   specific documents that they will ultimately collect and

22   produce, what we were trying to understand is are there any

23   objections being asserted that they are going to stand on.

24   Because if there are not, if what Mr. Tyson is saying is they

25   are going to produce whatever documents they find that are

1    responsive to these requests and they are not standing on the

2    objections apart from, say, privilege, which, of course, we

3    don't expect them to waive, then I think this gets easier.

4    Because then we at least have comfort that whatever we have

5    asked for they are looking for and they are going to produce it

6    as opposed to holding something back that is within the scope

7    that they are objecting to some -- a part of it.

8           For example, the objection that, you know, there is

9    no pending -- I can't remember.  I don't have the language in

10   front of me -- but there is no need for this because we're not

11   going to win the case essentially, that is an objection

12   yesterday basically they couldn't answer as to whether they

13   would stand on that.

14          So I think if we can answer that threshold question,

15   it will help frame this because maybe we can take that off the

16   table, if I'm understanding Mr. Tyson correctly.  And then we

17   can go through them and get a better sense of what they expect

18   to produce.

19          THE COURT:  Mr. Tyson, can you respond?

20          MR. TYSON:  Yes, Your Honor.  So I think it is

21   important to note for us that there weren't any preliminary

22   injunction motions pending at the time.  So that obviously was

23   the reason for some of these objections.

24          But I can say to the Court and to the plaintiffs that

25   we are definitely searching for all responsive documents for

1    the requests.  We're absolutely doing that.  We're not not

2    engaging in that process.

3            But we don't know specifically at this moment what

4    documents we're going to find that are responsive that may

5    require us to stand on one of these objections.  That is -- I

6    think the awkward place we are in is I understand the idea

7    would be just identify which objections you will or won't stand

8    on.  Since we have not been able to review all of the documents

9    yet, I don't think we are in a position to say exactly which

10   objections.

11           Our plan was to notify the plaintiffs when we produce

12   all the documents if we were holding any documents subject to

13   an objection but with the goal of producing responsive

14   documents for every single request.

15           MR. BROWN:  Your Honor, this is Bruce Brown.

16           MR. CROSS:  Your Honor, this is David Cross.

17           Sorry, Bruce.  If I could just real quick.

18           I think that is the challenge of this that I'm not

19   understanding.  If you look at their responses, they have

20   essentially two buckets of objections.  One is confidentiality.

21   There is a protective order in place.  So we're assuming they

22   are not going to withhold documents on that basis.

23           The other bucket comes at the end of this long

24   paragraph, which says requires an extensive search for

25   documents.  That is not an objection that would apply once they

1   have located a responsive document.

2          So the only thing that is left is this argument there

3   is no pending preliminary injunction motion.  That is now off

4   the table.  So what we only get to is this objection that it is

5   too late for any relief to be ordered or they argue that the

6   documents are not related to the claims and defenses.

7          Once they have found a responsive document, unless

8   that document is privileged, I don't -- I don't see any basis

9   to withhold that in any of these objections.  And that's our

10  fear is they are keeping that open.  And so we -- we won't know

11  until August 26th whether there are really important documents

12  that they have taken the position they are responsive to our

13  request but they are not going to produce it based on some

14  objection in here as opposed to privilege.

15         And that is what we need to resolve today is:  If

16  they are committing that whatever documents they are locating,

17  if they are responsive to our requests as framed and we will

18  get them unless they are privileged, then I'm pretty

19  comfortable with that.

20         But we are hearing the opposite.  So I'm not sure how

21  this plays out.  I don't see anything here that would be an

22  appropriate basis to withhold responsive documents apart from

23  privilege.

24         THE COURT:  I'm trying to print a few things here so

25  I'm not making noise.

1      MR. TYSON:  This is Bryan Tyson.  I apologize.  I

2  think there is one other piece that is relevant here.

3      I'm looking at now the exhibit that was attached to

4  the joint discovery statement, which only includes the response

5  to Request 9.  There are some other bases as far as

6  definitional response to objections to some of these other

7  requests.  So it is not like this is -- and this is in a lot of

8  these.  But there are some other bases for objection with some

9  other requests.  So I just wanted the Court to be aware it is

10  not like Paragraph 9 is the same for every response.

11      THE COURT:  All right.  But that is fine.  But why

12  don't you still respond to the query posed by Mr. Cross.

13      MR. TYSON:  Your Honor, we understand that you -- I

14  guess the position we're in is I think we have a duty to our

15  clients to preserve the objections.  We understand that you are

16  likely to find or have found that it is not too late.

17      But the difficult place we're in is if we say right

18  here right now we're not going to stand on any objection except

19  for privilege and there is another basis or we're being accused

20  later on of not being fully responsive, I feel like we're in a

21  very awkward position being asked to waive an objection for our

22  client when we still haven't reviewed all of the documents.

23      MR. CROSS:  Your Honor, David Cross.  Just to be

24  clear, no one is asking for a waiver of objections.  Their

25  objections are preserved.  I mean, they objected to this

1    discovery initially.  That is preserved.

2          All we're saying is we understand you've preserved

3    the objection in writing.  The question now, as what Your

4    Honor's standing order gets to, is:  Are you going to stand on

5    those objections?  They are preserved.  But are you going to

6    stand on those as a basis to withhold documents that you

7    identify as responsive to the requests?

8          If the answer is no, any documents we find that are

9    responsive to your request, you will have them and mark them

10   privileged, then for my clients I'm comfortable with that.

11         What I keep hearing is:  We may find documents that

12   are responsive, but we may then decide we're not going to

13   produce them because we think it is too late for your relief or

14   we think this request doesn't relate to your claims, which is

15   an issue we should resolve today.  Or they are going to say we

16   don't understand terms like sufficient to show.  And that is

17   something we should resolve today.

18         So it is not waiver.  It is just getting clearance on

19   are they going to use an objection to withhold documents that

20   are responsive but not privileged.

21         THE COURT:  All right.  I'm going to go offline for a

22   second so I can get the document number or something from

23   Ms. Cole.  So just hold.  I'm going to go on the other line.

24         All right?

25              **(There was a brief pause in the proceedings.)**

```
 1              THE COURT:  Can you hear me now?
 2              COURT REPORTER:  Yes, ma'am.
 3              MR. BROWN:  Yes, Judge.
 4              MR. CROSS:  Yes.
 5              THE COURT:  All right.  Why don't we just -- I mean,
 6    it is hard to say as a theoretical matter that we are all on
 7    the same page.  I think that, Mr. Tyson, you have explained the
 8    position.  So I have a better sense of what you are saying that
 9    you will do.  But I am -- the potential for miscommunication is
10    great here.
11              Let's just make this easier -- I'm looking at which
12    one is the easiest one.  Let's just take something that looks
13    straightforward to me, which is Number 16 which was in the --
14    approved, which was reports of ballots inaccurately reflecting
15    voters' touchscreen entries in the June 9th, 2020, election.
16    That was identified -- I think it originally is Request
17    Number 20.
18              MR. TYSON:  I'm sorry, Your Honor.  Request Number 20
19    or Request Number 16?
20              THE COURT:  I'm just -- I'm sorry.  16.
21              MR. TYSON:  16.  Okay.  Yes.  So for 16 -- this is
22    Bryan Tyson -- we are pulling the complaint period -- like we
23    discussed with the plaintiffs, the complaint email boxes that
24    would have come to the Secretary to search for any reports of
25    inaccurate BMD ballots, if there were any reports of that
```

1    from -- I believe we had talked to the plaintiffs originally

2    about a period from the beginning of early voting for the

3    June 9th election through certification of the June 9th

4    election.

5            So those are the documents that we're pulling for

6    that.  Those will likely include some -- if there are any, they

7    will include some personal identifying information of voters.

8    But that is what we're doing for that request specifically.

9            THE COURT:  So what would any of the more generic

10   objections -- and I don't have your answers to 16.  I don't

11   know whether -- since I only have them as to the one that they

12   attached, what would you anticipate would be the objection --

13   the objections or documents withheld or portions of documents

14   withheld?

15           MR. TYSON:  So, Your Honor, I think for this

16   particular one I can't think of something there.  I mean, I

17   think, again, the issue is scope.  And we have not obviously

18   gone and searched for documents that may have come in by

19   letter, documents that may be in a file somewhere.

20           I mean, we are starting with the email boxes because

21   these were the quickest and easiest to get under the exigent

22   circumstances of trying to run an election.  So I don't want to

23   say for sure that -- I mean, again, this is where I'm

24   struggling a little bit in terms of what our search is.

25           Our search is based on our ability to search for

documents under the circumstances we're in.  I think we're

being compliant with the scope we had discussed with the

plaintiffs about this request.  But I can't think of a more

specific objection that would frame the basis for withholding

those documents after we get those beyond redacting personal

identifying information from voters.

THE COURT:  All right.

MR. CROSS:  Your Honor, this is David Cross.  If I

could just briefly.  Just so you know, the response to 16 is

identical to the response to 9.  This highlights why this is

really about the discussion that I wish we could have had

yesterday.

If their response in compliance with your standing

order had said what Mr. Tyson just said, I don't think we would

be here.  And so I do think it would be useful to walk through

each of these --

THE COURT:  Yeah.  I'm going to do that.

**(Unintelligible cross-talk)**

MR. CROSS:  Okay.

THE COURT:  I just wanted to do something that would

be easy first.  So apparently it wasn't so easy for me to find.

All right.  So let's go back.  And number -- the

original Number 9 was any reports, studies, findings, audits,

evaluations, and/or assessments of actual or potential security

breaches or vulnerabilities associated with the election system

1   since August 1st, 2019, including but not limited to new,

2   updated, or supplemental reports prepared by Fortalice

3   Solutions or similar consultants.  Then they gave -- then there

4   are examples of reports in preceding periods of Fortalice or

5   Payton.

6           Is there -- I mean, other than wanting -- potentially

7   wanting some sort of confidentiality agreement regarding this,

8   do you anticipate any actual withholding production in response

9   to Number 9?

10          MR. TYSON:  Your Honor, I think the short answer is

11  no in light of -- we're kind of in the same boat as in 16.  We

12  know kind of quickly some of the Fortalice reports that we're

13  able to get.  And we're able to get some of those.

14          But we're also -- I mean, there could be -- we don't

15  want to say for certain that these are all reports, studies,

16  findings, audits, evaluations, or assessments because there may

17  be some other documents in other places.

18          So we -- again, that goes to our ability to search

19  under the circumstances.  But at the very least, we can pull

20  the audits and reports from Fortalice that we know about.  And

21  that is what we are pulling for those.

22          THE COURT:  All right.  And I think that is what I

23  want to know.  Okay.

24          So you are going to do that first and produce those,

25  and then -- and then you'll continue then looking for anything

1    else?

2            MR. TYSON:  Yes, Your Honor.  And I guess that is the

3    thing.  That goes to our kind of under the circumstances under

4    which we're conducting the search that is our main concern with

5    several of these.  We're going to be producing documents that

6    are readily identifiable.  But if there is some email where

7    somebody did an assessment at some point, we may not capture

8    that initially here.

9            THE COURT:  All right.  I understand Number 10 to be

10   basically directed towards what was done in response to the

11   directive of the Court on August 19 in its order granting a

12   preliminary injunction, which among other things it directed

13   that the Secretary of State's office should work with its

14   consulting cybersecurity firm to conduct an in-depth review and

15   formal assessment of the issues relating to exposure and

16   accuracy of the voter registration database discussed here,

17   which was in that order, as well as those related issues that

18   will migrate over to the State's database or its new vendor's

19   handling of the e-poll voter database and function, including

20   documents sufficient to show any remedial measures taken or

21   planned as part of that effort.

22           So I mean, basically obviously this seeks information

23   or documentation that would reflect what efforts were, in

24   fact -- and what reviews were done.  It may have some overlap

25   with Number 9, I assume.  But there may be others -- it would

1  seem like there would be other issues, too, or other documents.

2          So it is the same question.  Are you -- are you -- is

3  there -- when you look at that and you know what the order

4  directed and some of the measures taken hopefully, are you

5  anticipating that there is anything that you are not going to

6  be able to produce at this juncture?

7          MR. TYSON:  So, Your Honor, for Number 10 -- this is

8  Bryan Tyson -- we have a further objection in our responses

9  that this is a request not relevant to the issues in the

10  plaintiffs' complaint as it appears to be aimed more towards a

11  motion for contempt, which has not been filed.

12          So to the extent that something is not responsive to

13  9 that may be responsive to 10, it is our intention to stand on

14  our objection that this is for a -- this is for a contempt

15  motion, not discovery on issues related to the complaint.

16          MR. CROSS:  Your Honor, this is David Cross.  If you

17  want me to respond to that.  They raised this during the Rule

18  26(f) conference that it has to do with a contempt motion.  As

19  I told them then, I honestly don't know what that means.

20          Part of what underlies our current claims, as the

21  original claims, is the overall security of the system.  And

22  we're just trying to find out what they have done to address

23  the security vulnerability that Your Honor ordered that they

24  take certain steps to address.

25          It is hard to understand why this is controversial.

1    It is certainly part of the existing case and has nothing to do

2    with contempt.  It is just trying to figure out for preliminary

3    injunctive relief is there a hole that is still in the system

4    at least as we believe there is a hole or have they plugged it

5    in some way.

6              MR. TYSON:  Your Honor, Bryan Tyson again.  I think

7    it is also relevant.  We have responded at this point on

8    several points back at the beginning of last year.  We gave a

9    status report -- I believe it was in the early 700s.  I'm

10   trying to find it right now -- regarding the -- what we were

11   doing in compliance with that order.  Here it is, Number 713.

12   And we have talked through that process already and referenced

13   that to the Court.  If they want to file a contempt and claim

14   that we're not doing it, then they can do that, I guess.

15             MR. CROSS:  Your Honor, this is David Cross.  I was

16   --

17             THE COURT:  I'm just looking -- I'm sorry.  I'm

18   looking at 713.

19             Well, I'm just trying to cut to the quick.  First of

20   all, it would seem -- I mean, the whole question of the

21   integrity of the vote and the voting process and being able to

22   be sure that, in fact, your vote -- that it translates

23   correctly and -- but the data hasn't been -- isn't subject to

24   manipulation or alteration where the voter -- including the

25   voter's database seems squarely there.

1    So I'm not seeing that.  I mean, I know that 713 is a

2  general description.  And I'm expecting that probably some of

3  the Payton/Fortalice studies or reviews will be helpful in

4  responding to both 9 and 10.  But -- and I don't know really,

5  of course, what Augusta University School of Computer and Cyber

6  Sciences Center, which is also working with the State is -- you

7  know, whether there is documentation.  And some of it, you

8  know, conceivably might not be relevant.  But I could imagine

9  that a lot of it is.  I could imagine you saying you want a

10  strong confidentiality agreement about it.

11    But I don't -- I don't view it as just a contempt.  I

12  mean, it goes to the actual issues here.  So I can't quite go

13  there with you, Mr. Tyson.

14    There might be something narrow that you want to sort

15  of basically say this is not relevant and -- at all because it

16  has -- because of some particular reason.  Then, you know, if I

17  have to look at this on an in camera review basis, I would.

18    But when I look at 713, I mean, it still seems that

19  10 is relevant.  And part of the -- I mean, the ongoing

20  issues -- and I have identified that in not dismissing the

21  claims -- related still to the underlying is the e-pollbook

22  picking up the data.  I mean, people -- and correctly and has

23  it been manipulated, is it infected.

24    I know that you've had your position about it that

25  you presented in the March hearing.  And at least at that point

1   prior to any elections, it seemed, you know, enough so that I

2   was not going to be issuing a preliminary injunction.  But that

3   doesn't take it off the plate as being relevant.

4          So I can't -- I can't agree with you about that.  I

5   mean, you can preserve it.  But I'm just telling you I don't

6   agree with you at this juncture.  And if there is some -- some

7   data that you think is absolutely beyond the pale, then you can

8   identify or you can just submit it for in camera review.

9          I realize you don't know all of this.  But I think

10  the approach that this is all outside the bailiwick of what is

11  appropriate discovery is incorrect.

12         Let me move on to Number 11.  County data and State

13  data collected, is it from --

14         MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.

15  For Number 11, we have some log sheets that are pieces.  The

16  issue -- part of the issue here is a lot of the data processing

17  happens in a software tool called Arlo that is within that

18  software.

19         So I think, of course, we're going to have whatever

20  we have there.  Our concern with this one is the is it

21  sufficient to show.  The plaintiffs have obviously used

22  discovery responses as documents -- tried to use them as

23  admissions against the State in the past.

24         So the term sufficient to show -- we're going to turn

25  over the data that we have that reflects the logs and what

```
 1    occurred as part of the pilot audit.  But as far as the scope

 2    goes of what is sufficient to show what, then that, I think,

 3    would be the only thing.  There may be something else that is

 4    sufficient to show that.  But we definitely will be turning

 5    over the data.

 6              THE COURT:  All right.  Mr. Cross, what is an

 7    alternate word to the phrase "sufficient to show" that you can

 8    say what do you mean by sufficient to show?

 9              MR. CROSS:  I'm thinking about that.  Sufficient to

10    show is such a routine discovery device to limit scope.  I'm

11    trying to think.  I mean, I guess I could explain it.

12              The idea -- right? -- is instead of telling -- saying

13    give us an expansive set of documents that relates to a

14    topic -- the idea was what we want to know is what were the

15    steps taken in the audit in the -- as part of Fulton County's

16    audit.  And if those steps differ from future audits, how do

17    they differ?  That is what we want to know.

18              Instead of saying give us all documents that relate

19    to that topic, just give us the documents that let us identify,

20    A, the steps taken and, B, any differences with respect to

21    planned procedures.  And so that is why we thought there might

22    be a single document that says this is how we're conducting the

23    audit in Fulton, for example.  And that would be fine if it is

24    just one document.  I don't know.  But that is the idea.

25              THE COURT:  All right.  Mr. Tyson, does that help
```

```
 1    you?
 2              MR. TYSON:  That helps some, Your Honor.  I think
 3    part of the challenge is -- I mean, in a lot of ways, that's
 4    more kind of like an interrogatory, what is changing from here
 5    to here.  If it is not a document that reflects this, there is
 6    obviously an SEB rule now about statewide risk-limiting audits
 7    that is out for public comment.  So that is going to be a
 8    response.  But I guess we'll see if there is a document that
 9    describes that.
10              But I'm sure there are conversations and, you know,
11    processes around what that is going to look like that may or
12    may not be reflected in a document.  But we'll see if we can
13    find one.
14              THE COURT:  Well, there was -- there was an audit
15    conducted in Fulton County; right --
16              MR. TYSON:  Correct.
17              THE COURT:  -- Number 1?  Is that correct?
18              MR. TYSON:  That is correct, Your Honor.
19              THE COURT:  All right.  So obviously whatever the
20    documentation is that would help you -- them understand -- I
21    mean, it may not be -- they are saying I don't need to have
22    every iteration.  We need to know what is in summary or what
23    was the final -- what was the final version of what the steps
24    were done for an audit in Fulton County's June 9th election.
25              And, you know, probably -- I mean, I realize you
```

1    have -- you have something out for comment about this point

2    about the audit process?

3              MR. TYSON:  Yes, Your Honor, we do.

4              THE COURT:  Okay.  And maybe there is I would think

5    in that connection though some learning from June 9th, 2020.

6    So there may be a document that -- that was distributed

7    among -- within staff or to the board or otherwise that

8    describes the evolution.  I don't know.  But I guess that is

9    what I assume that is getting at.

10             To the extent -- I mean, I find -- I agree that it is

11   very hard and I try to follow what is on record from the

12   board's postings.  But they are -- it is not easy to get --

13   necessarily for me to track what is being posted and sent out.

14   It gets belatedly posted.

15             So, in fact, if you have this when you -- I would

16   appreciate just simply to -- I have been wondering about what

17   the procedure is.  So I would, Mr. Tyson, be grateful if you

18   would send me out what the -- if you can file what the proposed

19   procedure is that is now being circulated, that would be

20   helpful.

21             MR. TYSON:  Yes, Your Honor.  We'll be happy to do

22   that after we finish up here.

23             THE COURT:  All right.  Thank you.

24             Is -- by the way, do you -- is the -- this is just a

25   personal sort of point of just clarification.  The new website

```
 1  where you can -- for absentee ballot applications, that is
 2  supposed to be out -- be posted, is that going up next week?
 3          MR. TYSON:  Your Honor, as I understand it -- my
 4  co-counsel may have better information than I do.  But as I
 5  understand it right now, it is supposed to be live by the end
 6  of the month.  And so I assume that would be either a week from
 7  today or early the following week.
 8          But yeah, that is the -- it is supposed to be
 9  imminent.
10          THE COURT:  All right.  Let's look at Number 13,
11  documents sufficient to show any plans to ensure that each
12  barcode or QR code printed with a Dominion ballot-marketing --
13  but I think it means marking -- device during a Georgia
14  election accurately reflects the selections intended by the
15  voter who cast the ballot bearing that barcode, including
16  showing the specific steps to be taken as part of any such
17  plans.
18          I think it is -- I mean, I think this is clear now
19  that I wholly understand sufficient to show.  It is sort of not
20  every -- Mr. Cross, are you asking for every iteration of the
21  plan or what the last plan is?
22          MR. CROSS:  The last plan, the plan that is
23  actually -- whatever they have that is implemented --
24          THE COURT:  What they are going to be using?
25          MR. CROSS:  Right.
```

        1          THE COURT:  Is there an actual objection to this

        2    substantively?

        3          MR. TYSON:  Your Honor, I believe in looking at our

        4    objection here it was sufficient to show the specific steps in

        5    terms of what was happening there.  So I think we have

        6    addressed those with Mr. Cross' definition.  I think we might

        7    have skipped over 12, not to take us back.

        8          THE COURT:  All right.  Well, let's just finish this

        9    one.  All right?

       10          So do you have clarity on Number 13, Mr. Tyson?

       11          MR. TYSON:  Yes, Your Honor.  And we will -- we were

       12    planning to produce documents on this subject to -- like I

       13    said, our concern on this one related to sufficient to show the

       14    specific steps.  I think we have addressed those.

       15          THE COURT:  All right.  For some reason, I don't have

       16    the language of 12 in front of me.  Do you have it in front of

       17    you?

       18          MR. TYSON:  I do, Your Honor.  It is documents

       19    sufficient to show any plans to remedy or avoid failures or

       20    glitches with any Dominion or KNOWiNK equipment used in Georgia

       21    elections since and including the June 2020 primary election,

       22    including showing the specific steps to be taken as part of any

       23    such plans.

       24          MR. CROSS:  Your Honor, this is David Cross.  I was

       25    just going to say:  If it helps Your Honor, attached to --

1    maybe Ms. Cole can pull this or we can forward it.  Attached to

2    our preliminary injunction motion is their complete responses

3    to this second set of requests.

4              THE COURT:  What exhibit number?

5              MR. CROSS:  That is a good question.

6              Lyle, do you know the answer to that or Jenna?  I

7    think Jenna may be on.

8              MR. TYSON:  It is the last one.  It is 786-1,

9    Exhibit 1 to Mr. Cross' affidavit.

10             MR. CROSS:  Thanks, Bryan.

11             I'm sorry, Your Honor.  We did the excerpt for the

12   discovery statement pursuant to your protocols.

13             THE COURT:  That's all right.  I'm just -- I'm not in

14   the office.  Everything is -- what can I say?  Normally I might

15   have assembled everything together in a notebook and been able

16   to flip.  So it is a little harder.

17             All right.  Mr. Tyson?

18             MR. TYSON:  Yes, Your Honor.  So for this one, there

19   are a couple of issues that I would say we have sufficient to

20   show the specific steps, also the definition of failure or

21   glitches.

22             But I think this is the first one that implicates a

23   larger concern on our part.  We understand the Dominion

24   equipment is before the Court as part of the complaint.  But

25   none of the operative complaints -- and we raised this to the

1    plaintiffs, I believe, in the 26(f) conference regarding the

2    KNOWiNK -- the Poll Pad equipment is not part of any of the

3    operative complaints in this case.  So we have a scope

4    objection here on this one.

5          THE COURT:  Well, I understood you even have

6    objections to the scanners, the scanners which are counting the

7    votes.  I mean, I'm going to deal with the KNOWiNK -- the

8    pollbook.  But let me just get through the scanners because I

9    thought I had seen something about the scanners were -- that

10   you thought were outside the scope as well.

11         MR. TYSON:  Yes, Your Honor.  And if you look at the

12   operative complaints, there is no challenge to the optical

13   scanners.  In fact, both sets of plaintiffs urged the State to

14   keep -- or wanted the State to keep using the optical scanners.

15         So we don't see that there is a challenge to the

16   optical scanners or to the Poll Pads in either of the operative

17   complaints at this point in the case.

18         THE COURT:  The entire -- the scanners -- the

19   scanners are what count the vote.  I mean, that is the thing.

20   I mean, that is being beyond literal.

21         MR. TYSON:  I think the -- I'm sorry.

22         THE COURT:  I mean, it is not that this is just

23   information on the -- coded in the barcode that you can't see.

24   It is that they don't think it is actually necessarily a

25   reliable vote and that you can't -- that you can't see what it

```
 1    is, that it is going to be counted by the scanners.
 2            So I'm -- that is -- that is kind of extraordinary to
 3    me, frankly.  I mean, that is just slicing and dicing in a way
 4    that makes no sense in terms of the essence of the claim.
 5            MR. TYSON:  And, Your Honor, our issue is that the
 6    scanners are used to scan both hand-marked paper ballots and
 7    the ballot-marking device ballots.  And the remedy that the
 8    plaintiffs are seeking is for us to remove one component of the
 9    election system, which is the Dominion BMDs, and continue to
10    use the Dominion optical scanners to scan hand-marked paper
11    ballots.
12            So as we read the complaint, we don't see that there
13    is a challenge to the use of the optical scanners or that
14    component of the election system.  It is a challenge to the
15    Dominion BMDs and the output of those.
16            MR. CROSS:  Your Honor, this is David Cross.  I can
17    address that if you need.  But I think you have hit the nail on
18    the head already.
19            THE COURT:  Yes.  Go ahead.
20            MR. CROSS:  The short of it is, the concern, as Your
21    Honor has noted, is the scanners are part of this.  And so the
22    system can get hacked or can fail in multiple ways.  One is the
23    BMDs or one of the scanners by virtue of the barcodes, for
24    example.
25            And so yeah.  In a world with hand-marked paper
```

1    ballots, those reviews with the scanners but we don't have to

2    worry about whether the scanner is failing to read the barcode

3    correctly but whether it has been manipulated to read the

4    barcode correctly.  So it is certainly part of the claims.

5              MR. BROWN:  And also -- Your Honor, also, according

6    to the hand-marked paper ballots --

7              THE COURT:  I'm sorry.  Who is speaking?

8              MR. BROWN:  I'm sorry.  This is Bruce Brown, Your

9    Honor.  The whole point is:  As you know, with the hand-marked

10   paper ballots, hand-marked paper ballots do not assume that

11   there will not ever be a hack.  It is actually the opposite.

12   And that is that it recognizes the vulnerability of electronic

13   machines.  And that is why you need a stable, fixed,

14   unchangeable voter record.

15             And so you did hit the nail on the head.  This is

16   about the system and whether it provides a verifiable and

17   accurate reporting of the vote.

18             In addition, to the extent that there are scanning

19   issues that might be embedded in our relief, in other words, if

20   our relief seeks to use these scanners even apart from the

21   entire system issue that you raised and that Mr. Cross raised,

22   knowing whether and how these scanners count is extremely

23   relevant to the relief that we're seeking and to make the

24   relief effective.  And we, of course, want the relief to be

25   effective in that it is -- that the scanners are working right.

```
 1          THE COURT:  All right.  Well, I'm going to overrule
 2   the objection of the State.  I think that is -- as I said, I
 3   think that is an artificial narrowing of the claim and it
 4   makes -- really would make it nonsense essentially.  So I can't
 5   construe the complaint in that way.  And I think that the
 6   objection is not warranted.
 7          MR. TYSON:  Your Honor, is that for both the optical
 8   scanners and for the KNOWiNK Poll Pads?
 9          THE COURT:  The KNOWiNK -- I mean, I think that it is
10   basically a seemless objection.  And I think that they have
11   preserved their claims relative to the way that the system
12   worked.  I think if they had completely not -- if they had not
13   continued with the claims -- and we discussed this at great
14   length in the motion to dismiss -- it would be something else
15   perhaps as to KNOWiNK.
16          But I think those were firmly maintained and there
17   were concerns about the voter -- the whole entry into the
18   system of the -- of the voter at the polling location and the
19   data system issues that start right at that point in terms of
20   the integrity of the voting process.  So yes, it is.
21          MR. TYSON:  So would Number 14 be next, Your Honor?
22          THE COURT:  Yes.  The forensic examination?
23          MR. TYSON:  Yes.
24          MR. CROSS:  Your Honor, this is David Cross.
25          MR. TYSON:  I'm sorry.  Go ahead, David.
```

```
 1              MR. CROSS:  I may be able to help with this.  On 14
 2    as they --
 3              THE COURT:  Is this Mr. Brown?  Just identify
 4    yourself.
 5              MR. CROSS:  This is David Cross.  Sorry, Your Honor.
 6    This is David Cross.
 7              They -- we have already started the memory card
 8    analysis.  So they are right.  That piece is proceeding.  On
 9    the first part, they have asked for a sample.  And I think that
10    is a fair request.  And some of the DRE analysis has already
11    begun.
12              So unless Mr. Brown disagrees, I think this is one we
13    can park and we are making some progress on.
14              MR. BROWN:  That's correct, Your Honor.  This is
15    Bruce Brown.
16              MR. TYSON:  Your Honor, this is Bryan Tyson.  Just so
17    we're clear on this, we had asserted an objection regarding the
18    optical scanners and the Poll Pads for this one as well and
19    would have an objection to the extent that there is going to be
20    an attempt to review equipment that is currently in use in the
21    runoff and in the November general election.
22              So as I understand, we're underway on DREs and
23    ballots and -- sorry -- the memory cards.  But for Dominion
24    equipment or equipment that is being used in the election,
25    we'll have an objection to that, even if that is included in
```

1    the sample that they are providing.

2          THE COURT:  Mr. Brown and Mr. Cross, how do you

3    expect --

4          MR. CROSS:  This is David Cross.  Yeah.  This is

5    David Cross.  I think we -- if we can't come to an agreement on

6    that, we can come back to Your Honor.  I don't -- from my

7    clients, I don't anticipate asking to examine Dominion

8    equipment that is going to be used in any of the elections

9    because I don't think that is going to be an issue.

10         But once we get a sample together, I think we can

11   figure out whether there is a disagreement and come back to you

12   if we need to.

13         And I will say we do appreciate their cooperation on

14   this.  The memory cards begun.  We have been able to do some

15   DRE analysis.  I have to give credit to Mr. Brown and to

16   Marilyn.  They have been able to begin that process with some

17   of the stuff.  So I think we're on the right trajectory.

18         But in fairness, it lies with us to get them a

19   sample.  And we'll work with them on that.

20         THE COURT:  All right.

21         MR. BROWN:  Your Honor, this is Bruce Brown.  This

22   overlaps a little bit with our request to Fulton County.  But

23   we have been trying to -- through our request for inspection to

24   inspect how the scanners work.  And we anticipate having

25   another meeting with Fulton County today and to do that in a

1 way that doesn't disturb any existing use of a scanner.  But

2 that inspection --

3                    **(Unintelligible cross-talk)**

4          THE COURT:  Well, anything you can work out is great.

5 So obviously everyone is conscious of these issues about not

6 interfering with the election either.

7          All right.  Number 16 is the next one -- is that

8 right? -- that we need to discuss?

9          MR. TYSON:  I believe Number 15 is next, Your Honor.

10          THE COURT:  Oh, my gosh.  All right.  Sorry.

11 Apparently I can't count.

12          15 was in-person inspection of the State's copies of

13 the polling place recap reports, Poll Pad recap reports for the

14 June 9th, 2020, election, and any related reports concerning

15 the counties' failure to reconcile the number of ballots

16 counted to the number of voters checked in on the Poll Pads.

17          MR. TYSON:  Your Honor, this is -- I'm sorry.

18          THE COURT:  Could plaintiffs' counsel just break this

19 down to me?  And, again, I mean, I understood this before.  But

20 tell me precisely what you are looking for here.

21          MR. BROWN:  This is Bruce Brown, Your Honor.  We're

22 going to be presenting some illustrative evidence with our

23 motion today.  Although it really relates to all of the

24 motions.  And that is that the ballot recap sheets are done in

25 a precinct, and they are taken from the count that is in the

1   Poll Pad of the number of people that voted and compare it to,

2   I believe, the counts on the BMDs and then maybe another

3   metric.  And they compare those to see if they all tally up.

4         And they are not -- our evidence is they are not

5   tallying up.  And exactly where the problem is, whether it is

6   with the Poll Pads or BMDs or if it is administrative, we're

7   trying to get to the bottom of because it just looks really

8   fishy right now.  So that is the general subject matter.

9         And these are -- the recap sheets are just -- if I'm

10  on the right track here, they are hard copies.  They are public

11  records.  But we need information about what the problem is.

12        THE COURT:  These are the ones that you introduced in

13  your -- your prior motion that -- basically the end of the

14  recap -- what they -- in the end that the polls -- the chief

15  poll person at the precinct fills out?

16        MR. BROWN:  Right.  It is supposed to be -- you know,

17  it is one plus -- it is supposed to compare three, and it is

18  supposed to be the same.  And if it is not, then they need to

19  figure out why.  They need to reconcile it right there, if it

20  is spoiled or what the story is.

21        THE COURT:  All right.  What is your problem there,

22  Mr. Tyson?

23        MR. TYSON:  Your Honor, our objection there was,

24  first of all, clarifying what failure to reconcile the number

25  of ballots counted to the number of voters checked in.  I think

1    Mr. Brown has explained that issue.

2         And then the other -- the other is an objection

3    related to the scope that the Poll Pads were not part of the

4    case.  So I'm assuming we'll add this to the list, which I

5    think I have 12, 14, and 15 on the scope.  Which I think it

6    might also help just for the record's sake if we have an order

7    clarifying that or we can draft something up or whatever makes

8    the most sense.

9         THE COURT:  All right.  But what I understand

10   Mr. Brown to say though was the number of ballots are coming --

11   that is -- the number of ballots as counted by which of the

12   machines?  The scanner, the BMD, or what?

13        I mean, we know how many people are in the polls --

14   are being counted on Poll Pad.  That is going to be reflected.

15   And then what else?  I want to make 100 percent sure, Mr.

16   Brown.

17        MR. BROWN:  I'm sorry.  I wasn't sure if you were

18   directing that to Mr. Tyson.

19        THE COURT:  No.  I was directing it to you since you

20   were explaining what --

21        MR. BROWN:  I'm pulling up that exhibit to be able to

22   give you a precise answer.  It asks for three things.  It asks

23   for the ballot recap sheet.  It asks for the number of ballots

24   printed by the ballot-marking devices, the ballots -- that is

25   one category.  And then another category is the scanner --

1    ballot scanner.

2              THE COURT:  Yeah.

3              MR. BROWN:  And then the third, Section C, is grand

4    total summary of persons voting.  Another one is Poll Pad

5    check-in and supplemental voters.  So it is just a form that

6    they all fill out.

7              THE COURT:  Yeah.  All right.  I've got it.

8              And then all of that seems very relevant in case they

9    are different because of -- it really does because are they

10   counting right, are the machines counting right, do we have the

11   right number.

12             I want to just say just in the interest of candor

13   about this that I had one -- and I know that Judge Ross

14   mentioned her own personal thing that she's not saying is in

15   the record but is an observation.  And I'm sure that all of you

16   and people of the State know as well and Fulton County that I

17   had two different daughters who saw people thinking that --

18   poll workers believing that the printout was a receipt and just

19   told people to go leave the polls.  I mean, it never got

20   scanned.

21             Now, there may be other sorts of issues as well of

22   why the numbers don't reconcile.  But I just -- I'm saying

23   that:  To the extent it is proved, it just seems obviously a

24   true -- something that you would -- in the interest of all of

25   us having an accurate and functional election I hope that it

1    can be addressed in training.

2           MR. TYSON:  Thank you, Your Honor.  If that is --

3    this is Bryan Tyson.  If that is the case, the poll official is

4    acting contrary to 183-1-12.11(8) about the staffing of the

5    polling place.  There is required by State Election Board rules

6    somebody stationed by the scanner to give verbal instructions

7    to review the ballot if it had a scan.  So they would not be

8    complying with that rule if that was going on in precincts.

9           THE COURT:  Well, you know, of course, we can have an

10   errant person.  But it was just more than one.  And, you know,

11   some of that has to do probably also with people getting lost,

12   where am I going from here to there.  I don't know how they

13   have reorganized precincts, et cetera.

14          But it is just -- I would feel -- I wanted to

15   disclose that to you.  I'm not verifying it, as Judge Ross

16   couldn't say anything either.  But it was apparently at least

17   sometimes -- in a few -- in these errant places at least that

18   happened to be observed by members of my family who were voting

19   an issue.

20          All right.  That was 15.  16 --

21          MR. TYSON:  Again, I believe we have covered it.

22   This is Bryan Tyson.

23          THE COURT:  Number 16 was reports of inaccurate BMD

24   ballot issued to voters.  This is one we already did?

25          MR. TYSON:  Yes, Your Honor.  I believe this was the

1    first one that we did, the email complaint box.

2            THE COURT:  All right.  Okay.

3            Number 17 was a request for production of documents

4    sufficient to show procedures, including but not limited to

5    instructions to the counties regarding maintaining secure

6    operations of the Dominion election system, including but not

7    limited to, procedures for transfer of data through removable

8    media and for air gapping State and county election servers.

9            Are there any --

10           MR. TYSON:  Your Honor -- I'm sorry.

11           THE COURT:  Go ahead.

12           MR. TYSON:  Your Honor, our objection to this one was

13   the sufficient to show language that we have discussed already.

14   And we are planning to produce documents in response to this

15   request.

16           THE COURT:  All right.  Good.  Okay.  So that is all

17   the requests for production.

18           MR. BROWN:  Your Honor, this is Bruce Brown.  We also

19   had our -- Coalition plaintiffs also had three that were

20   objected to.

21           THE COURT:  Tell me -- I'm -- yeah.  I only had these

22   that were attached to the Curling -- was there different ones

23   than theirs?

24           MR. BROWN:  They are different ones, and I don't

25   believe those are in front of you physically -- their

1    objections to these.

2            THE COURT:  All right.  Mr. Brown, could you just

3    get -- if you could for ease here, do you have your three in

4    front of you?

5            MR. BROWN:  I do.

6            THE COURT:  All right.  Do you want to read them?  Do

7    you want to just go --

8            MR. BROWN:  Sure.

9            THE COURT:  -- go through yours?  All right.

10           MR. BROWN:  Sure.  The first one is Request for

11   Production Number 1.  And just for the record, it is within our

12   fourth request for production of documents.  And Request

13   Number 1 is all documents relating to software updates or

14   changes to the election system during 2020, including but not

15   limited to documents reflecting system or component

16   certification, testing reports, studies, findings, evaluations,

17   or system documentation.

18           The State defendants objected to that on grounds of

19   confidentiality, trade secrets, overly broad, and that -- then

20   they made their three general objections, which is overly

21   broad, Purcell, and then --

22           THE COURT:  Tell me where it is.  Do you have a

23   document number that -- since it is long enough there in the

24   record?

25           MR. BROWN:  No, Your Honor.  This has not been filed.

```
 1              THE COURT:  Okay.
 2              MR. CROSS:  Your Honor, I just sent -- I'm sorry.
 3   This is David Cross.  I just sent a copy to Ms. Cole so she can
 4   forward it on to you.
 5              LAW CLERK COLE:  This is Ms. Cole.  I'm in the car
 6   driving.  I'm unable to forward it.
 7              Can you please email it to Mr. Martin so he can
 8   forward it to her?
 9              MR. CROSS:  On it right now.
10              MR. BELINFANTE:  Just so I can pull it up easier --
11   this is Josh Belinfante -- can you CC me as well at least?
12              MR. CROSS:  Sure.
13              MR. BELINFANTE:  Thanks.
14              THE COURT:  Let's just wait until we all have it in
15   front of us.  Ms. Cole will have to do what she is doing.  She
16   is doing a -- doing a chore for the family that is essential.
17              Mr. Martin, have you seen it?
18              COURTROOM DEPUTY CLERK:  Yes, ma'am.  I just
19   forwarded it to you.
20              THE COURT:  Okay.  Thank you very much.
21              Mr. Belinfante, have you gotten it?
22              MR. BELINFANTE:  I have it, Your Honor.
23              THE COURT:  Very good.
24              Mr. Brown, what specifically did you anticipate here?
25              MR. BROWN:  Yes, Your Honor.  The Dominion system
```

1    itself or most of it was certified.  As you may recall with the

2    DREs, the State took the position with respect to the

3    engineering of the system and specifically the GEMS database,

4    as you might recall Mr. Beaver's testimony, that Georgia had

5    some special sauce in their system that was not the

6    off-the-shelf Diebold application.  And so we want to know if

7    that is the case with the Dominion system.  And that is what

8    this request targets.

9            THE COURT:  Whether there was something additional

10   that was -- I don't really --

11                    **(Unintelligible cross-talk)**

12           THE COURT:  As much as I remember a lot about the

13   DREs, I don't remember any special sauce.  But anyway --

14           MR. BROWN:  Well, what I -- I should remember more

15   about it too, Your Honor.  But the allegation with respect --

16   we had a big fight over -- and it led to our motion for

17   sanctions -- a big fight over whether we could discover

18   Georgia's GEMS database.

19           And one of the reasons why we said it wasn't private

20   or confidential was that you could pull the GEMS database off

21   the internet from Oregon and I believe from Nevada.  In

22   response to that, the State said no, no, no, Georgia's is

23   different.  There is --

24           THE COURT:  Right.  Okay.  I've got it.  I remember

25   all of that.  I remember all of that.

1          MR. BROWN:  So we're trying to anticipate that here

2     is there some special sauce that's for Georgia voters only with

3     the Dominion system that we need to know about.

4          THE COURT:  Well, just in terms of the objections

5     here, why couldn't they just simply answer that question before

6     we got into all of this -- get into all of this -- the --

7          MR. BROWN:  Your Honor, this is Mr. Brown again.

8     The -- I guess I could refer to myself as Bruce Brown, not

9     Mr. Brown.

10          But with a lot of our requests -- with a lot of our

11    requests, it could be no documents exist.  And that -- in

12    discovery, half of our job is determining that we're not

13    missing something.  And so that could -- if there have been no

14    changes, then the answer is there's nothing there to produce.

15          It also seems like something that you would have in

16    one -- in all honesty in one file, in one place, and that it

17    would not be difficult to produce, and that the people who are

18    in charge of the system, in other words, Gabe Sterling or

19    another State official, would have that right at his

20    fingertips.

21          THE COURT:  Well, I guess the thing about it is that

22    you could read the request -- I understand what you are asking

23    for now and that -- you know, if you are saying is it a

24    different system in some respects than what you tested and

25    approved in the -- in the summer of 2019.

```
1              But I guess the way I read at least part of the

2     defendants' objection is that -- that you are actually asking

3     for documentation regarding whatever the software updates.  You

4     know, all of us download software updates all the time on

5     our -- standard Microsoft upgrades or viral updates.

6              And so that is my -- are you looking -- I mean, this

7     could be construed to include anything like that.  Of course,

8     they weren't doing any updates to the DREs.  But here they

9     might be doing updates and you are -- are you asking for any

10    updates in the system that gets sent out at all even if it is

11    not a substantive one?  Or why couldn't you get -- why wouldn't

12    there be a document that is just simply summarizing whatever

13    the update was for the purpose of?

14              MR. BROWN:  That would be -- that would be a start,

15    Your Honor, and certainly important for discovery.  And our

16    understanding of the EAC standard is that unlike for consumer

17    software that we get updates all the time, these systems are

18    not updated like that, like just general updates that, you

19    know, come in over the wire.

20              THE COURT:  Well, what does the EAC -- what do they

21    require in terms of there being -- information maintained about

22    updates?

23              MR. BROWN:  I don't know what sort of information the

24    EAC requires.  What I was referring to is that the EAC

25    certifies the system application at a certain point in time.
```

1              THE COURT:  I've got it.

2              MR. BROWN:  Yeah.

3              THE COURT:  Well, let me turn to Mr. Tyson.  I would

4     assume that there is some sort of summary of what updates may

5     have been done and the purpose for the update --

6              MR. TYSON:  Yes, Your Honor.

7              THE COURT:  -- to answer all the questions of

8     confidential -- basically providing the software or the trade

9     secrets about the nature of it but one that actually described

10    what is the purpose, what has it done, or just as kind of an

11    initial matter.

12             What would be the problem with producing that?

13             MR. TYSON:  Your Honor, our concern on the objections

14    here was not about that.  I think the certification paperwork

15    will be clear for the Dominion system.

16             As you will see in the bottom of that, our objection

17    here related to the scope and the election system as defined as

18    including the Poll Pads.  There have been based on the initial

19    experience that we have done, I think, one update to the Poll

20    Pads during 2020.  But that was our objection was a scope

21    objection, which I think we have dealt with.

22             THE COURT:  All right.  All right.  I read it --

23    because of the breadth in the beginning, I read it as larger.

24    Okay.  All right.

25             Well, why don't you let me know what the Poll Pads

1   update was.  And if there are no other updates, let them know

2   that as well so we're not just having it hanging.

3           MR. TYSON:  Yes, Your Honor.

4           MR. BROWN:  Thank you, Your Honor.  Thank you.

5           THE COURT:  Request for Production Number 2 was all

6   documents relating to Dominion Voting System vote mark

7   threshold setting standards adopted by any other state or

8   adopted or recommended by any government agency constituting or

9   reflecting communications about said threshold setting with

10  county officials in Athens-Clarke, Morgan, or Fulton Counties

11  or Dominion Voting Systems.

12          Do you want, Mr. Brown, to reduce that into --

13          MR. BROWN:  Sure.

14          THE COURT:  -- easier language?

15          MR. BROWN:  The vote mark threshold setting standards

16  are with the scanner/tabulation system.  And those determine

17  what votes get counted when the hand-marked paper ballot is

18  scanned.  And we have very strong evidence that hand-marked

19  ballots from absentee ballots or in person -- if you looked at

20  them, you would say that is clearly a vote for John Smith and

21  the Dominion system is not counting it.

22          The response to that is no -- and this is in -- this

23  has been in the press.  And then what the Secretary of State

24  says is no, we use standard threshold settings that are well

25  recognized.  And it is between -- this is getting into the

1    weeds a little bit.  But you can see where we are going -- is
2    that the amount of ink that is near the oval has to fill it in
3    by 12 or 13 percent or 15 percent.  And if it misses that, then
4    it is not going to be counted.
5         And our position is that the settings that the State
6    is using is massively not sensitive enough.  And sensitivity is
7    not technically the right word.  But on a nontechnical basis,
8    it is recognizing these marks but it is not counting them and
9    that the -- and it is not counting them in a way -- and even
10   worse than that, it is not even picking them out for even
11   review, as you would typically do if there is a -- if there is
12   an ambiguous mark.
13        And so what we are saying is, okay, if you are saying
14   your standards are normal, are these adopted by any other state
15   or recommended by any federal agency.  And the second part of
16   this request is we have -- there's inconsistency reports and
17   maybe emails.  I'm not sure.  Anyway, there is inconsistent
18   information about whether the Secretary of State is pushing
19   these standards to the counties or leaving it to the counties
20   to set it themselves.
21        And both of those possibilities have a lot of
22   different sort of scary ramifications as to the consistent
23   standards, inconsistent standards, whichever they are.  And so
24   this is an important but also an extremely discrete set of
25   documents that will be in somebody's file or somebody's -- it

1    should be in somebody's file.  How do you -- you know, how do

2    we set the standards, what do we tell the counties about those

3    standards, and where do we get those standards from.

4            Thank you.

5            MR. TYSON:  Your Honor, this is -- I'm sorry.  Are

6    you finished, Bruce?

7            MR. BROWN:  Yes.  I'm sorry.  Go ahead.

8            MR. TYSON:  Your Honor, this is Bryan Tyson.  This

9    is, again, an issue that is far afield from the scope of the

10   complaint.  Your Honor dismissed Count 3 of the Coalition

11   plaintiffs' supplemental complaint in your order.  And this is

12   an issue that relates solely to the standing of hand-marked

13   paper ballots.  It has nothing to do with ballot-marking

14   devices.

15           Mr. Brown has also sent out subpoenas to, I think, 13

16   at least counties seeking a lot of documents related to these

17   issues and the communications.  So we have a burden concern in

18   terms of the searching for these communications and a major

19   scope issue in that this has nothing to do with the complaint

20   because it has nothing to do with BMD-marked paper ballots.

21           THE COURT:  Do you want to respond, Mr. Brown?

22           MR. BROWN:  Yes, Your Honor.  As to, you know,

23   whether or not the Dominion system is counting the votes

24   correctly, we think that Your Honor has already hit the nail on

25   the head that this is clearly part of the system that both sets

1      of plaintiffs are challenging.

2              In addition, the effectiveness of any relief is in

3      question because obviously what we're saying is yeah, these are

4      the scanners but make them work right and make them work in a

5      way that people's votes are counted.

6              THE COURT:  Well, is it your anticipation -- have you

7      received any responses to your subpoenas?

8              MR. BROWN:  We have, Your Honor.  I'm trying to

9      think -- I have not seen the communications between the

10     Secretary of State and the county.  The counties -- for

11     example, Cobb County, we had a response from them yesterday

12     that gave us stiff arm saying you can get this from the State.

13     So we're getting a little bit from that side.

14             Obviously getting it from the State is a much more

15     efficient place to go because that is one repository and they

16     will have one memo there from -- I don't know -- Gabe Sterling

17     to every county election director that says -- that is entitled

18     Dominion Voting Systems vote mark threshold setting standards

19     and dated whatever.  Here is what you do.

20             And we may be able to get those from the counties.

21     We hope so.  But we're also entitled to get them from the

22     Secretary of State.

23             THE COURT:  All right.  I'm going to need a moment

24     here.  If you need to do anything yourself, let me take a look

25     at my notes about this.  All right?

| 1 | **(A brief break was taken.)** |

2       THE COURT:  All right.  I'm going to have to get back

3   to you about this one.

4       MR. BROWN:  Thank you, Your Honor.  I have sent to

5   Mr. Martin just for illustrative purposes because it is hard to

6   describe over the phone or at least it is hard for me the --

7   the practicality -- the practical aspects of what we're talking

8   about.

9       And what I have sent to him is a ballot image and a

10  cast vote record that is real that illustrates -- it first has

11  what was actually scanned by the State.  And what you will see

12  is a very clear vote for Fani Willis that is counted and then

13  an equally clear vote for Sheriff Jackson which was not

14  counted.  You can tell if they are counted or not by the second

15  page of the exhibit that I sent around.

16      And, you know, to us, it is just stunning that the

17  system would not be counting that vote for Mr. Jackson.  And

18  the problem is that what people do, if you look at the

19  Secretary of State's advertisements and if you look at

20  anything -- you know, Secure the Vote is his logo.  And right

21  next to the Secure the Vote logo, there is a little box and

22  there is a checkmark by it.

23      And the reason why that is a clever logo is that that

24  is what people do.  And if they haven't taken an SAT test

25  recently, they check the box.  They don't color it in like they

1    are supposed to.  They check it.  And under Georgia law,

2    Georgia law is, yeah, you have got to fill it in.  But Georgia

3    law is explicit that if a -- if you can tell clearly what the

4    voter intended to do, then you have got to count it, whether it

5    is filling in the oval or not.

6           And so this new, you know, BMD system -- they are

7    still working the kinks out because our view is they have

8    rushed this massive implementation out to the field without

9    doing so many things correctly.  This is one illustration of

10   it.  And it is not ready, and they need to fix this portion of

11   it.

12          And so you will see from this example that this is

13   something we could get discovery on and get to present it and

14   something we're entitled to relief is our position.

15          MR. TYSON:  Your Honor, this is Bryan Tyson again.  I

16   think this is exactly why you dismissed Count 3 of the

17   supplemental complaint.  And this is a question of state law to

18   what a vote is.  It has literally nothing to do with

19   ballot-marking devices.  It is all about hand-marked ballots.

20   And the State Election Board in its last meeting has put out a

21   comment -- I mean, a proposed rule for public comment that

22   specifically addresses the threshold settings that should be

23   used.

24          So I mean, at this point, now we're exploring an area

25   asking for a federal court to interpret state law, which the

1    Eleventh Amendment doesn't allow.  So, again, we just would

2    object to doing --

3            THE COURT:  All right.  Let me just -- send me

4    also -- would you also file that proposed rule and -- and,

5    Mr. Brown, I don't know whether you -- whether this document

6    you just sent to Mr. Martin has been filed.  I just want --

7    have you filed this document before someplace?  I can't

8    remember.

9            MR. BROWN:  No.  No, Your Honor.

10           THE COURT:  Well, you can go ahead and file whatever

11   you want to.  I mean, just in terms of everyone sitting on the

12   phone call, I think it -- and my going and reading again the

13   discussion of Count 3 and the dismissal, I will kind of -- it

14   will be more productive for us to move on.

15           I mean, I understand exactly what the State is

16   arguing.  The only -- the problem becomes only if you -- if the

17   BMDs are not working and more people are using -- are -- votes

18   are then channeled into the absentee process.  I think that is

19   also another way of looking at it.

20           But I feel like I need to just spend a little more

21   time and not be running around looking at two things on my

22   computer and anything else adding on productively.  Okay?

23           MR. BROWN:  Our last request -- thank you, Your

24   Honor.  Our last request for production is Number 3.

25           THE COURT:  Okay.

 1            MR. BROWN:  And -- and this relates to our ballot

 2    secrecy and voter privacy claim, which is clearly in the case.

 3    And the State's response to our argument on ballot secrecy and

 4    voter privacy is that they can configure these strains and the

 5    counties can figure these -- can configure these strains in a

 6    way that protects ballot privacy.  And we just want to know

 7    what they have told the counties about that.

 8            THE COURT:  All right.  Because now I have ten things

 9    up on my --

10            MR. BROWN:  Excuse me, Your Honor.

11            THE COURT:  I'm looking for your requests.  Can you

12    read exactly what it says?

13            MR. BROWN:  Yes.  Of course.  This is Request for

14    Production Number 3.  And we ask for communications with county

15    election officials and vendors concerning how the Dominion

16    Voting System can or should be used to protect ballot secrecy

17    and voter privacy.

18            And the objections to it are -- I won't even

19    characterize it -- but they are remarkably similar to the

20    previous objections.  In addition, he says that --

21            THE COURT:  Well, let him just explain what his

22    objections are.

23            And will you be sure to file in the record so that we

24    can refer to it these three requests for production?

25            MR. BROWN:  Yes.  I will do that in the same

1  document -- I will submit their objections as one document with

2  both.

3         MR. TYSON:  Your Honor, this is Bryan Tyson.  Our

4  objection here is we have a definitional objection but

5  primarily an objection again on the same issue that this

6  relates to the claims and defenses in Count 3 that was

7  dismissed.

8         In the Court's order on the motion to dismiss at

9  Page 46, you referenced that the issues in Count 3 were about

10 the statutory and constitutional rights of voters to vote by

11 secret ballot.  And this is, again, in trying to enforce an

12 issue with state law in federal court related to ballot

13 secrecy.  And the proper venue for that is not a federal court,

14 it is a superior court, if Mr. Brown's clients would like to

15 seek relief there.  So that's our objection.  It is basically

16 the same as with Number 2.

17        THE COURT:  All right.  All right.  Well, I will take

18 that -- when I have everything in front of me and going back

19 and being able to read -- we'll get all of this together.  I

20 will -- we'll take care of both of these today.

21        MR. BROWN:  I will file those papers right now.

22        THE COURT:  All right.

23        MR. BROWN:  So you have that.

24        THE COURT:  All right.  So here is my question in

25 light of all of this.  Obviously, Mr. Tyson, you are planning

1    to produce this in the next days?  These documents?  I mean, on

2    an ongoing basis?

3              MR. TYSON:  Yes, Your Honor, as soon as we can but

4    definitely everything by the 26th.  We don't anticipate needing

5    the extension that you mentioned in the order at this time.

6              THE COURT:  Okay.  Great.  So the question I have --

7    and I know that -- is then this -- and this is to plaintiffs'

8    counsel.  I set a schedule that was based on basically what you

9    indicated were your schedule for filing various motions.

10             But if all your motions are going to end up having to

11   be substantively supplemented by reference to the evidence that

12   you sought here and we just end up having a constant

13   supplementing on both sides, how is it clearly -- is that going

14   to be a productive use of everyone's energies and especially

15   when we are functioning on an expedited basis?

16             MR. CROSS:  Your Honor, this is David Cross.  Our

17   plan was not to supplement -- not to put anything in other than

18   what you have authorized, which for us, I think, is one more

19   brief or reply brief.

20             I think to make it work, as reluctant as I am to move

21   us any closer to the election, it may make sense to push the

22   dates back just a little bit.  Because if we're not going to

23   have their document production completed until the 26th,

24   putting together a reply brief in two days is -- I don't

25   know -- we can do it.  It may not be the best brief, Your

1 | Honor.

2 |      So getting a little more time on that, I think, would

3 | be useful.  And if that means pushing the hearing back a little

4 | bit, we're okay with that.  But we're obviously very sensitive

5 | to the timing issues here.

6 |      THE COURT:  Well, the question is in part:  If you

7 | are not raising anything that much in terms of the evidence

8 | that is new in your current motion, why is it productive for

9 | the Court to be reviewing the same type of response from the

10 | State because you are not adding discussion of any other

11 | evidence?

12 |      Why -- I mean, that is my concern is -- and I realize

13 | that would push you even further back.  But it is -- and I

14 | don't want to push you further back.  But -- and maybe the

15 | Coalition has more -- I mean, more evidence.  But that is -- I

16 | mean, you basically have a placeholder with this new motion.

17 | But it is not like how much additional evidence you think you

18 | have actually referenced in it.  I just looked at it very

19 | quickly.  So --

20 |      MR. CROSS:  Yeah.  Your Honor, David Cross again.  It

21 | is a fair question.  We have pulled together what we could from

22 | public sources.  So there is certainly a lot of new public

23 | citations in there for what actually transpired in the summer

24 | elections in June.  But I mean, we haven't received discovery

25 | from the State.  So we haven't been able to put that in.

1          I guess I'm trying to figure out the timing of -- if
2   we were to file -- if we were to start the briefing after the
3   26th, I'm not sure how that works.  And with all due respect to
4   the State, I mean, we are where we are because of the approach
5   they have taken to discovery.

6          And so what I don't want to have happen is we just
7   end up running out of time to get relief, which would reward a
8   particular strategy I think they have taken to discovery.  So I
9   think they will respond with their opposition, and we'll put in
10  our reply.

11         And also they have the evidence.  Right?  I mean,
12  they know what they are collecting.  Their brief, I think, is
13  due on the 26th, if I remember right.  So they will know the
14  day their opposition goes in exactly what they are giving us
15  and they can address it in their brief, and we will respond.
16  So I think it works out if we could just get a little more time
17  on the reply.

18         MR. BELINFANTE:  Your Honor, this is Josh Belinfante.
19  Let me say at the outset the implication that there has been a
20  strategy involved in discovery to put plaintiffs in this
21  position is simply false.

22         They requested information.  There was then a denial
23  of the preliminary injunction, and we were left with a
24  complaint and a normal discovery period.  Apparently based on
25  the Court's previous order or more recent order since the

1    denial, we misread that.  But this is not -- to imply that

2    there has been some kind of bad faith involved is just false.

3          The second issue, as the Court takes up this kind of

4    larger one, is we're going to have discovery requests of our

5    own.  And we need to see, you know, what that looks like.

6    Because as the Court knows, the preliminary injunction motion

7    was filed at, I think, 11:57 P.M. on Wednesday night.

8          And so we are going to want to test the theories

9    there, and there is going to be discovery coming from us as

10   well.  So as we talk about that, I did want to raise that as we

11   plan timing.

12         MR. BROWN:  Your Honor, this is Bruce Brown.

13   Mr. Cross and I spoke about this before the hearing this

14   morning.  And there is some balancing of the needs here.  There

15   is sort of an absolute deadline to have a hearing that is not

16   too late should we prevail to grant effective relief in time

17   for the defendants to do something about it.  That is obviously

18   the most important constraint.

19         Within that, the other interest is in making sure

20   Your Honor has the evidence that we have in time to be able to

21   consider that and that to the extent it needs to the State has

22   an opportunity to respond to any submission of evidence that we

23   have.

24         For the Coalition plaintiffs, we will be submitting a

25   brief on Monday that not only has evidentiary support for

1    ballot secrecy and for -- and for auditing and for tabulation

2    but also some additional evidence on the insecurity in the

3    system.  However, we will be supplementing that with the

4    evidence we get from the State and the counties hopefully on

5    the 26th.  And we don't know exactly the best way to supplement

6    that.

7            We thought, like Mr. Cross, that it would be with a

8    reply brief.  If the State needs time to, you know, reply, they

9    can have a sur-reply or we can have hearing briefs that address

10   the new evidence.  But we wouldn't be opposed to, you know, a

11   short pushing of the hearing to the next week.  But I'm not

12   sure we could go -- I'm not sure Your Honor --

13           THE COURT:  I don't think we can.  Yeah.  Yeah.

14           MR. TYSON:  Your Honor, this is Bryan Tyson.  One

15   other thing we'll throw out in terms of thinking through this

16   is I don't know if Your Honor was anticipating the hearing

17   being with witnesses, those kind of things too, or just

18   argument only.  I think that also is relevant as we think

19   about --

20           THE COURT:  I agree.  I agree.  So what were the

21   plaintiffs anticipating?  And do you need -- I mean, I'm happy

22   to break for five minutes if you want so that you can -- or

23   not.  But it may be you already have discussed it.

24           MR. CROSS:  Yeah.  This is David Cross.  I know

25   Mr. Brown and I have talked about this.  And we have weighed

1    this out a little bit in one of the filings.  But I'm sure he

2    will jump in if I get something wrong.  There are certain

3    witnesses that we do want Your Honor to hear from.  We can do

4    it by deposition or we can do it live at the hearing.  My

5    preference is always just to have people on the stand.

6              THE COURT:  Sorry.  I couldn't hear you.

7              MR. CROSS:  I'm sorry.  Can you hear me now, Your

8    Honor?

9              THE COURT:  There are some witnesses that you wanted

10   me to hear from.  Go ahead.

11             MR. CROSS:  Yes.  And my preference would be to just

12   put those people on the stand live as we have in the past.  And

13   it would include Mr. Barron, a 30(b)(6) witness, a corporate

14   deponent, for Dominion.  And there are a couple of others that

15   I know we had talked about that I think we hadn't reached a

16   decision on.  But it would be some of basically the same people

17   you have heard from in the past.

18             THE COURT:  So how much time are you anticipating?

19             MR. CROSS:  Certainly far less than -- yeah.  I think

20   we can certainly get it done in a day.  And I know Your Honor,

21   I think if I remember the schedule, had maybe a few hours.

22   We'll fit in whatever we need to fit in.  We certainly don't

23   anticipate taking as much time as we have in the past.

24             THE COURT:  When you say live, did you mean by Zoom

25   or did you mean really live?

```
 1              MR. CROSS:  Yes.  By Zoom would be fine.  We

 2    understand most courts aren't doing in courtroom.  So Dominion,

 3    we think, is a really important one.  We would want Your Honor

 4    to have an opportunity to question Mr. Barron and then maybe a

 5    couple of others -- key witnesses that play a role in the

 6    election security issues.

 7              THE COURT:  Okay.  So back to what you were also

 8    saying in terms of you would need more than two days if you

 9    just got the evidence, what are you thinking that you would

10    need?

11              I don't mean that critically because I thought

12    obviously when I heard the schedule I thought you would have

13    the evidence.

14              But, anyway, what day are you thinking?  I think I

15    made it due on the 28th?  Is that what I did?

16              MR. CROSS:  Right.  If we pushed it to the 31st, that

17    gives us the weekend, which is useful.  But I don't want to jam

18    Your Honor up.  If we are keeping the hearing on the 2nd, that

19    only gives you two days.  And I don't think that is -- I'm not

20    sure that is enough for you.

21              THE COURT:  All right.  Well, it depends on when you

22    get it to me on the 31st.  Are we talking about 11:00 P.M?

23              MR. CROSS:  That's fair.

24              THE COURT:  Or are we talking about 1:00 in the

25    afternoon --
```

```
 1          MR. CROSS:  What if we said --

 2          THE COURT:  -- or 9:00 in the morning?  And then also

 3   are you talking about not just -- because of the evidence -- if

 4   you are going to be submitting it, are you talking about giving

 5   me a notebook or are you giving me -- just asking me to

 6   download all those -- those exhibits and lose them in the

 7   process?

 8          MR. CROSS:  What if we said 10:00 A.M. on the morning

 9   of the 31st so Your Honor would have all day the 31st to begin?

10   Would that work?

11          MR. BROWN:  And that is for -- I'm trying to keep

12   track.  I'm looking at -- I'm trying to find my schedule here.

13   Are you talking about -- I'm sorry.  This is Bruce Brown.

14          Mr. Cross, you are talking about the deadlines for

15   what on the morning of the 31st?

16          MR. CROSS:  So you and I have two replies due on the

17   28th.

18          MR. BROWN:  Right.

19          MR. CROSS:  So it would be those two replies.  So a

20   reply on our one preliminary injunction motion.  Your reply --

21   I mean, I think we could just make everything due that day.

22          Your latest reply -- I'm sorry.  Your latest reply,

23   Bruce, is already due on the 31st.  So if we just said all of

24   the replies were due by 10:00 A.M. on the morning of the 31st,

25   unless you need that full day, Bruce, for the second reply.
```

1          MR. BROWN:  That will be fine.

2          MR. CROSS:  Okay.

3          MR. TYSON:  Your Honor, this is Bryan Tyson.

4   Again -- and then would the State -- I mean, if all the

5   evidence for the PI motions essentially comes in by 10:00 A.M.

6   on the 31st, would we have an opportunity to respond before the

7   hearing?  Because, otherwise, we're not going to see any

8   evidence that anyone is relying on for their PI.

9          THE COURT:  Well, I mean, either we're going to do it

10  on the -- I mean, the thing is:  Let's say even if you have

11  your response to us by the 2nd, it is sort of hard for me to be

12  prepared for the 3rd because it is the same issue still.  So

13  whatever -- you know, whatever we juggle from them, it sort of

14  makes me go up to the next week.

15         I can't do it on Tuesday.  And if I do it on

16  Wednesday, I have just to approve a settlement -- class action

17  settlement at 10:30 in the morning.  It may not take that long.

18  We could begin early and then break.  I'm just trying to buy

19  any time I can have.

20         So -- we have to be prepared -- if there was a

21  substantive amount of information afterwards, we would have to

22  be prepared to go over to the next day.

23         MR. BELINFANTE:  Your Honor may have already decided

24  the issue.  But this is Josh Belinfante.  The State would be

25  fine and, frankly, prefer that it be like the other preliminary

1    injunction motions we've had in front of Judge Batten, in front

2    of Judge Ross yesterday where it is on the pleadings and on the

3    record.

4            Our folks, as we have talked about, are busy

5    implementing the current election.  Mr. Barron is going to be

6    doing the same.  Although I'll let Fulton County speak for him.

7    And it is certainly possible to do what we have done in other

8    cases.  That would help the scheduling side, and it would also

9    certainly allow the State to continue to focus on, you know,

10   the point of all this litigation to begin with, which is

11   implementing elections.

12           THE COURT:  All right.  Well, frankly, it is a little

13   bit hard for me to know without knowing what is in the

14   evidence.  And that makes it particularly challenging.  And I

15   don't know, of course, what the plaintiffs are anticipating

16   that you are going to be able to bring out from the testimony

17   that wouldn't be otherwise available to me.

18           Now, I understand if you are calling someone on cross

19   and you don't have them otherwise it could be -- and you can't

20   ask them to do an affidavit.  That is the challenge.  So -- but

21   I don't know what you are anticipating that you are going to

22   cover with them either.

23           MR. CROSS:  Your Honor --

24           THE COURT:  Go ahead.

25           MR. CROSS:  -- this is David Cross.  We certainly

 1    think it is valuable for Your Honor to have some of the key

 2    witnesses on the stand.  And I think if we look at past

 3    hearings some of the most important information that has come

 4    to light for Your Honor's opinions has come out under

 5    cross-examination.  I think in fairness, both sides could

 6    probably say that.

 7          So we do think it is important -- and we have been

 8    able to do this twice, including in the same time frame in

 9    2018.  So I think we can do it without interfering in any kind

10    of election.

11          MR. BELINFANTE:  This is Josh Belinfante, if I could

12    respond briefly.

13          In 2018, the Court denied the preliminary injunction

14    on the grounds that it was too close to the election.  Since

15    then, the Supreme Court has repeatedly done so as recently as

16    last week.

17          I mean, we are just getting to a point that the

18    courts are recognizing that State officials, particularly in a

19    pandemic, are having to organize elections in a way that they

20    have not in the past.  And that requires extra focus.  I'm not

21    sure why this case is any different from even the Black Voters

22    Matter where there was a limited -- very limited discovery in

23    the hearing itself and no discovery and we went forward on that

24    case.  And that was decided or heard months ago.

25          So, again, we're just -- you know, we're putting --

1  combining and looking at all we have ordered the State to do or

2  that the State is going to do just from this hearing alone, the

3  status conference or whatever this is, and then combining that

4  with having these folks prepare for testimony in court -- it

5  really starts to interfere with the election.  And other courts

6  and other cases we have done it on the record.  And I just

7  don't see a reason why this one is any different, particularly

8  when we don't even know what the evidence is and what the

9  claims are.

10         MR. BROWN:  Your Honor, this is Bruce Brown.  There

11  is obviously a balance here.  On one end, there is the State's

12  position.  And that is that within 90 days of a national

13  election for the President of the United States that state

14  actors have open season on voters' rights that are immune from

15  judicial scrutiny.  That is one extreme.  That is the

16  defendants' position in this case.  We don't think that is the

17  law.

18         On the other hand, there is the Purcell in other

19  cases that says, look, in balancing the interest -- public

20  interest in making changes, you have got to be very careful

21  with the public interest in making changes very close to the

22  election.  That is on the other extreme.

23         And we don't think it is any different than any other

24  balancing of the equities except that the Supreme Court has

25  reminded everybody to common sense that Your Honor didn't need

1    the instruction of.  You -- in the denial of our first motion,

2    you took that into account.  And the granting of the second one

3    you did as well.

4           So I don't think there is anything special.  But we

5    would reject the idea that the State has that they are immune

6    from discovery and that they have open season on voters because

7    a national election for the next President for the United

8    States is 90 days away, that they can do anything they want

9    without any sort of judicial oversight.

10          And they are going to say you are -- we are

11   overstating their position.  But we're not.  That is what they

12   are claiming.  And we don't think that is the law.  And we

13   think we're entitled to a hearing to balance these equities out

14   and to see if the State has an answer for our claims.

15          The idea that they don't know what our claims are

16   also is -- it cannot be the case.  Because we are raising

17   substantially the same motion that we did about six months ago.

18   With respect to our Poll Pad relief, we have raised that over

19   and again.  And they know what that claim is.

20          So the idea that we are springing something on them

21   is absolutely false.  Now, they could say that, you know, we

22   haven't proven it or that the equities go the other way.  But

23   they don't have open season on voters, and our claims are not

24   new.

25          MR. BELINFANTE:  Your Honor, this is Josh Belinfante.

1    I will be brief, and I will stop.  But I can't allow an

2    accusation that the State is taking open season on the voters

3    to go unanswered.  That is not what we are saying.  Mr. Brown

4    is correct.  I am going to say he has mischaracterized our

5    analysis.

6              There are cases out there that seek to change

7    discrete aspects of voting.  This case is not that.  They are

8    asking you to replace an entire voting system when early voting

9    starts next month or -- I'm sorry -- on October 12th or 13th.

10   It is the relief they seek that heightens under any balancing

11   test the Purcell analysis.

12             If they were seeking for you to do a lot of what we

13   saw post-election 2018, this would be a different argument.

14   This isn't that.  They know it.  And we can't trace anything

15   back to Mr. Brown's complaint, which is why they have even

16   considered filing yet another amended complaint in the 26(f)

17   conference.

18             So this is just a unique case, and it is the reason

19   that this case should proceed under normal rules, under normal

20   discovery, and have what we had in Fair Fight in front of Judge

21   Jones where we can test these theories.

22             As I indicated, the defendants are going to want

23   discovery in this case for a preliminary injunction hearing.

24   And we are going to get that out probably today.  We were

25   waiting for this to call to see if there was a resolution for

1    that to begin.  And we'll do so.

2            But I had to answer at least some of those issues.

3            MR. BROWN:  Your Honor, I have to -- I have to change

4    what I said to add one more point.  And that is, the relief

5    that we're seeking is to make everything easier on the State by

6    replacing these BMDs, which are terrifically different, with

7    hand-marked paper ballots which they already have.  That is the

8    first point.

9            THE COURT:  Well, let me just say this.

10           MR. BELINFANTE:  Your Honor, I represent the State.

11   And it is not easier on the State.

12           THE COURT:  All right.  All right.  Let me just say

13   this.  I know that there was this discussion in front of

14   Judge -- in Judge Ross' hearing about when is a good time, when

15   is the perfect time to bring -- ask for relief that is not too

16   soon and not too late and all of that.

17           But, you know, even -- the thing that I am facing

18   here is something -- a whole other variation of this in my

19   mind.  And that it is perfectly possible that -- you know, it

20   is possible that some relief would be granted that is not the

21   wholesale relief that the plaintiffs are looking for in terms

22   of at this point going to paper ballots and being ordered in

23   September before a November presidential election.

24           But -- because you raised a lot of different things.

25   And part of my concern is:  Even if I were to say yes, this is

1    becoming almost like a bright-line rule on the Supreme Court

2    that, you know, basically we'll stay relief -- even if I were

3    to grant it that they would stay relief, the issue is -- and

4    everyone recognizes it -- is that it still may be an issue come

5    the Wednesday after the election.

6            And I don't want to be beginning at the Wednesday

7    after the election either.  And I say that to the State as well

8    as to the -- what I -- this comment is directed to both sides.

9            So, you know, BMDs is not working and there is chaos

10   with that or that there is significant challenges to the

11   integrity of the vote -- that this is sort of the predecessor

12   of it and yet they are not challenging it in November and the

13   only time they are challenging it virtually is the Wednesday

14   after the election or Thursday after the election, you know, it

15   is -- it makes all of what happens now very important and also

16   before the -- everyone is doing early voting.

17           So those are some of the factors I'm thinking about.

18   And it is really hard to -- and I at the same time say this to

19   the plaintiffs -- it is pretty hard still to imagine my

20   ordering wholesale substitution of the system at this point.

21           And, you know, whatever the responsibilities the

22   Court has for not having processed this faster, all right, I

23   take this.  But, you know, we've had -- these have been unusual

24   times too.  But in any event, I mean, I think there is a real

25   reason to get to the heart of it and to be -- and there might

```
1    be some things that the Court could grant relief that would not

2    be in the thicket of causing problems and confusion.  But

3    wholesale changes might be.  But at the same time it is all

4    relevant to what happens in the election and whether -- you

5    know, I'm going to end up having to see people after the

6    election.  So -- and I don't want to be just flatfooted at that

7    point either.

8            So I hear all parties about this.  Let me just ask

9    you this -- I mean, I think I've got to sort of mull this over.

10   I don't have any idea what you are really thinking these

11   individuals would testify about.  I understand why you want

12   them.

13           Are you able at this juncture -- I'm directing this

14   to plaintiffs' counsel -- to provide a brief summary of what

15   you are anticipating you would be pursuing or not in their

16   testimony?

17           MR. CROSS:  Your Honor, this is David Cross.  You

18   mean on this call like walk through each of the people?

19           THE COURT:  No.  I mean --

20           MR. CROSS:  You mean file something?

21           THE COURT:  Like the way you would almost in a

22   scheduling order.  Yeah.

23           MR. CROSS:  Sure.  We could file something on Monday

24   if that would be useful to Your Honor.

25           One brief point, Your Honor:  What you just said
```

1   comes as no surprise to us.  Candidly, we talked to our

2   clients.  Our hope -- our sincere hope is that we will convince

3   you that the full relief we are asking for is more than

4   feasible.  But we also understand Your Honor may be looking for

5   ways that are short of that to make sure that there is a

6   reliable and secure election this year.

7         And I do think that plays into why it is important to

8   get live testimony.  And just to take as an example, the first

9   time we ever learned that there was ballot building with

10  independent contractors in their homes was in a hearing in

11  front of Your Honor.  So that type of cross-examination, I

12  think, is critically important because that is the type of

13  discrete thing that we can learn that Your Honor could address,

14  if it is that type of issue, like if there is -- if the system

15  is not truly air gapped, which also came up in live testimony.

16        So just to get back to that point, I think getting

17  that live testimony is helpful to figuring out what relief Your

18  Honor can grant if you conclude it is not the full scope of

19  what we're asking for.

20        But to your question, we can file something on Monday

21  that puts some more teeth on that, assuming Bruce agrees.

22        MR. BROWN:  That is fine.  Absolutely.  And Monday --

23  we would do it Monday morning.

24        THE COURT:  Yeah.

25        MS. RINGER:  Your Honor, this is Cheryl Ringer.  Can

1    you hear me?

2            THE COURT:  Yes, I can.  I want to make sure that the

3    court reporter can hear you.

4            COURT REPORTER:  Yes, ma'am.

5            MS. RINGER:  I wanted to point out that Fulton County

6    has an additional election they will be carrying out on

7    September 29th with early voting on (unintelligible) --

8            THE COURT:  Right.

9            MS. RINGER:  -- the vacant seat of Congressman John

10   Lewis.

11           COURT REPORTER:  I'm sorry, Ms. Ringer.  You are

12   breaking up.  Could you start over.  I'm not sure what the

13   connection problem is.

14           MS. RINGER:  Is this any better?

15           COURT REPORTER:  That sentence was.

16           THE COURT:  I can hear you.

17           MS. RINGER:  Okay.  I just wanted to point out that

18   Fulton County Department of Registrations and Elections will be

19   conducting an additional election on September 29th for the

20   vacant seat of Congressional District Five for former

21   Congressman John Lewis' seat, as we're looking at, you know,

22   moving down something.

23           THE COURT:  Right.  So I think what they are saying

24   though is if they file their briefs on the 31st -- on the

25   morning of the 31st, the question is could I have a response by

1    12:00 -- could I have the response of the defendants by

2    Thursday.  And this is really a -- this is giving them --

3    you-all an opportunity for a second brief, I want to point out.

4    So it is not like you haven't had any -- you wouldn't have had

5    a brief.  So that is the issue.  Because I am basically leaving

6    town on Thursday, the 3rd.

7          I have not been with my grandchildren since March.

8    So I have tried to arrange for something where we could be

9    safely together.  Their parents are all in the medical world

10   treating COVID patients.  So it has been a challenge.

11         I need to leave essentially on Thursday by 12:00 or

12   1:00.  And I need to have your materials -- everyone's

13   responses.  So if I were to have -- so that I could be prepared

14   to have a hearing on -- one way or the other on the

15   Wednesday -- Wednesday the 9th or the Thursday or half of each

16   day, which might be what it really ends up being.

17         Is there any -- I have heard the issues about the --

18   that the State has.  I think I need to see what the plaintiffs

19   file on Monday morning about the testimony they are looking to

20   explore.  And then I'll make a -- make a decision.

21         But I just want to make sure that those -- putting

22   aside the concerns about a live hearing, are those dates -- in

23   terms of the time -- additional time frames for any responses,

24   can you-all live with those?

25         MR. BELINFANTE:  Your Honor, this is Josh Belinfante.

1    I am not listed as lead counsel in this case, so I have not

2    filed a leave.  But you may have seen from the Black Voters

3    Matter case -- although I don't expect you to read everything

4    on the docket as it comes in -- I'm actually having surgery on

5    September 9.

6             The State has apt counsel.  But if I am not here,

7    that is why.  I would like to participate, if possible.  But I

8    certainly just wanted to let the Court know that.

9             THE COURT:  All right.  I'm sorry about the surgery.

10            MR. BELINFANTE:  It is 2020.

11            THE COURT:  Yeah.  I know.  It is exactly the way

12   things -- the bad news rolls out in 2020.

13            MR. BELINFANTE:  Right.

14            THE COURT:  It seemed like a good number.

15            MR. BELINFANTE:  That's right.  That's right.

16            THE COURT:  It seemed like a good number, but we

17   didn't know.

18            All right.  Well, you have got some terrific

19   co-counsel.  You have got a great team.  But I understand that.

20            Let me see what you-all -- I mean, the point is that

21   we would be leaving the same dates in place and then there

22   would be a -- I mean, that is the way -- what the plaintiffs

23   are saying is that you are going to give the defendants two

24   responses?  The response brief and an opportunity for a reply

25   brief?

```
 1              Just in terms of the hustle for everybody, I'm just
 2     trying to understand that.  Does that --
 3              MR. BROWN:  Well, I think --
 4              MR. CROSS:  Yes, Your Honor.  This is David Cross.
 5              MR. BROWN:  Go ahead.
 6              MR. CROSS:  Sorry, Bruce.  I think the idea was we
 7     would get our reply -- plaintiffs would get all their replies
 8     in by the morning of the 31st.  And then the defendants would
 9     get a sur-reply at some point in that week with enough advance
10     notice for Your Honor to be ready.  It sounds like they have to
11     get it in before the 2nd or the 3rd.
12              THE COURT:  All right.  First of all, do this as you
13     suggested.  And I don't have a per se problem.  But it is
14     recognizing that the reply brief actually will be having new
15     evidence submitted.
16              MR. BROWN:  That's correct.
17              THE COURT:  The claims are the same.  But it will be
18     new evidence.
19              MR. BROWN:  That's correct.
20              MR. CROSS:  Right.
21              THE COURT:  All right.  Okay.  Well, I think that
22     probably will work.  But I would have -- I really actually have
23     to have from the State on the Thursday before I leave really
24     the notebooks in hand by like -- I'm telling you by 12:00.
25              I have to talk with my husband, and I'll let you
```

```
 1   know.  But I think the fact -- it is true that as you are
 2   assembling the documents you will have -- it is not like you
 3   won't have ever seen these documents before.
 4            All right.  I'm going to look at Monday -- you are
 5   going to file by what time on Monday the summaries that we
 6   talked about?
 7            MR. CROSS:  I was -- 10:00 A.M.  Does that work?
 8            THE COURT:  That is fine.  That is fine.
 9            MR. BROWN:  Sure.
10            MR. CROSS:  Could I clarify one other thing?
11            On the discovery responses, the defendants have a
12   confidentiality objection in each of the responses.  I just
13   want to clarify if there is something more they are looking for
14   in a protective order so we can deal with that or if they are
15   comfortable with the existing protective order and they are not
16   going to withhold documents on that basis.
17            MR. TYSON:  Your Honor, this is Bryan Tyson.  I
18   don't -- I think anything we have we can produce pursuant to
19   the protective order.  I think it covers it.  I can't think of
20   an issue where it would need further protection beyond what we
21   have in the protective order.  So we were planning to produce
22   it pursuant to the existing protective order.
23            MR. CROSS:  Thank you, Bryan.
24            THE COURT:  Okay.  All right.
25            MR. BELINFANTE:  One last question, Your Honor,
```

 1   before we head out.  This is Josh Belinfante.

 2          As I indicated, we were -- we are going to seek

 3   discovery as well.  Do we -- is it the Court's preference that

 4   we file that as -- in a motion for expedited discovery or just

 5   that it will be treated in the same time frames as the

 6   plaintiffs or -- excuse me -- that the defendants are operating

 7   under now?

 8          THE COURT:  Well, the thing is that -- you know, I

 9   finally had to -- if you remember, we went through multiple

10   rounds of getting them down to a level that I thought were

11   acceptable.  So what I think --

12          MR. BELINFANTE:  Sure.

13          THE COURT:  I mean, I'm happy to have you have some

14   expedited discovery and then have other stuff that is not

15   expedited.  But I think you-all should try to figure out what

16   you wanted in expedited to see if you can come to an agreement

17   first on that.

18          MR. BELINFANTE:  Okay.  Sounds good.

19          THE COURT:  And I would appreciate your all saving

20   the 9th and 10th for now because I don't know whether I would

21   have to roll over.

22          MR. BROWN:  Thank you, ma'am.

23          THE COURT:  And sort of pencil in the schedule we

24   talked about.  And on Monday, I'll finalize it.

25          MR. TYSON:  Thank you, Your Honor.  This is Bryan

1    Tyson.  I do have a hearing in superior court that is set for

2    the morning of the 10th.  But it shouldn't be that long.  We'll

3    figure it out though.

4            THE COURT:  That is fine.  I have a plea also from

5    that morning.  Okay.  Would you let -- do you know what time

6    your hearing is?

7            MR. TYSON:  Yes.  It is a 10:00 hearing on -- I don't

8    anticipate it taking longer than an hour and a half.

9            THE COURT:  So we would begin more like you are

10   saying at 1:00?

11           MR. TYSON:  Yes, Your Honor.  Around noon or

12   something like that.

13           THE COURT:  Or noon.  Okay.  Noon would be fine.

14           All right.  That is fine.  Very good.  Thank you-all

15   for the productive work today.

16           MR. BROWN:  Thank you, Your Honor.

17           MR. CROSS:  Thank you for taking the time, Your

18   Honor.

19           MR. TYSON:  Thank you, Your Honor.

20           THE COURT:  Thank you.  Bye-bye.

21               **(The proceedings were thereby concluded at**

22               **12:33 P.M.)**

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3    UNITED STATES OF AMERICA

 4    NORTHERN DISTRICT OF GEORGIA

 5

 6         I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7    the United States District Court, for the Northern District of

 8    Georgia, Atlanta Division, do hereby certify that the foregoing

 9    80 pages constitute a true transcript of proceedings had before

10    the said Court, held in the City of Atlanta, Georgia, in the

11    matter therein stated.

12         In testimony whereof, I hereunto set my hand on this, the

13    24th day of August, 2020.

14

15

16

17                         _____
                           SHANNON R. WELCH, RMR, CRR
18                         OFFICIAL COURT REPORTER
                           UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```