IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## STATE DEFENDANTS' RESPONSE IN OPPOSITION TO COALITION PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ON PAPER POLLBOOK BACKUPS

Defendants Secretary of State Brad Raffensperger, the State Election Board, and the State Election Board Members (collectively, "State Defendants") submit this response in opposition to the Coalition Plaintiffs' Motion for Preliminary Injunction on Paper Pollbook Backups (the "Pollbook PI Motion"). [Doc. 800].

## INTRODUCTION

Coalition Plaintiffs latest attempt at a judicial end-run fails again. Besides repeating what it already said time and time again to no avail, Coalition Plaintiffs cite no authority to support their position, literally none. Worse yet, Coalition Plaintiffs' claim exceeds even the most generous reading

1

of their latest "Supplemental" Complaint. They readily admit that the Pollbook PI Motion "concerns a narrow issue that is unrelated to the ballot marking devices." [Doc. 800-1, at p. 2][1]. Indeed, Coalition Plaintiffs allege that "[i]t cannot be overstated that the evidence establishes that the primary cause of the 'meltdown' was the failure of the Defendants to simply print and use inexpensive paper pollbook backups and to issue emergency paper ballots to eligible voters." [Doc. 800-1 at pp. 9-10]. The injuries Coalition Plaintiffs complain of in the Pollbook PI Motion are entirely unrelated to the claims and relief sought in the complaint. A preliminary injunction is not appropriate when it would grant relief of a different nature as that to be finally granted. *See De Beers Consol. Mines v. U.S.*, 325 U.S. 212, 220 (1945).

The Coalition Plaintiffs' First Supplemental Complaint ("FSC") [Doc. 628] contains an array of vague, conclusory, and untested allegations about the ballot marking devices ("BMDs") purchased by the State of Georgia. *See generally* [Doc. 628]. The relief that Coalition Plaintiffs seek in the FSC pertains to the Dominion BMD System,[2] hand-marked-paper-ballots, audits,

---

[1] All pinpoint citations for documents filed on the record are to the ECF page numbers at the top of each page.
[2] According to the Coalition Complaint, the Dominion BMD System is the "Dominion Voting System (EAC Certification Number DVS-DemSuite 5.5-A)." [Doc. 628 at ¶ 5].

and prohibiting Defendants from enforcing either O.C.G.A. § 21-2-300(a)(2) or O.C.G.A. § 21-2-383(c). *See* [Doc. 628 at pp. 74-76] (Ad Damnum Clause). None of the immediate relief sought in the Pollbook PI Motion is of the same character as that in the FSC. *Compare* [Doc. 628] *with* [Doc. 800-7].

Coalition Plaintiffs have failed to present new evidence supporting the asserted injuries in the Pollbook PI Motion. Because Coalition Plaintiffs cannot establish a relationship between the injury claimed and the conduct asserted in the FSC, the Pollbook PI Motion should be denied. *See Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997) (citing *De Beers Consol. Mines*, 325 U.S. 212, 220 (1945)) ("A district court should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit."). This should end any further consideration of the Pollbook PI Motion.

## PROCEDURAL BACKGROUND

On October 15, 2019, Coalition Plaintiffs' filed the FSC alleging that State Defendants have failed to implement a constitutionally acceptable voting system by requiring all in-person voters to use the Dominion BMD System. [Doc. 628 at ¶¶ 6-7]. The FSC raises three new claims challenging the Dominion BMD System: (1) Count I asserts that the Dominion BMD System violates the fundamental right to vote; (2) Count II asserts that the

Dominion BMD System violates the Equal Protection Clause of the Fourteenth Amendment; and (3) Count III contained a Procedural Due Process claim related to the use of the Dominion BMD System, which this Court dismissed on July 30. [Doc. 628 at ¶¶ 222-245]; [Doc. 751]. As defined by the Coalition Plaintiffs, the Dominion BMD System does not encompass the KnowInk PollPads.[3] [Doc. 628, ¶¶ 5, 67]; *see also* [Doc. 800-1, at p. 2].

The Coalition Plaintiffs filed their third preliminary injunction motion on October 2, 2019. [Doc. 640]. The Coalition Plaintiffs sought a preliminary injunction "[d]irecting Defendant Secretary of State to direct every county election superintendent (a) to provide at each polling place a paper back-up of the pollbook, which paper back-up shall be updated after early voting and (b) to use the paper back-up of the pollbook to adjudicate voter eligibility and precinct assignment problems." [Doc. 640 at ¶ 9].

Then, on August 7, 2020, this Court denied Coalition Plaintiffs' third Motion for Preliminary Injunction without prejudice, finding that there was

---

[3] Coalition Plaintiffs most recent motion for preliminary injunction [Doc. 809] further confirms that the KnowInk pollbooks are outside the scope of the FSC. Coalition Plaintiffs state that the "Dominion BMD System" is defined as "the EAC-certified system selected for Georgia's current voting system, which the FSC expressly alleges to consist of components that include the election management software, adjudication software, ballot marking devices and firmware, precinct scanners and firmware, and central-count scanners and firmware," although Defendants also dispute this definition. [809-1 at p. 9].

not a sufficient record to find that Georgia's Dominion voting system was facially unconstitutional. [Doc. 768, pp. 10-11]. The Court also found that, to the extent Plaintiffs intended to present an "as applied" challenge, the record was insufficient for this challenge as well, expecting more information based on "actual election based evidence." *Id.*

Less than two weeks after this Court denied Coalition Plaintiffs' preliminary injunction motion seeking paper pollbook backups at each polling place, Coalition Plaintiffs have filed yet another motion for preliminary injunction seeking the same relief. [Doc. 800]. Similar to Coalition Plaintiffs' prior motion, Coalition Plaintiffs again fail to address the requirements for a preliminary injunction. [Doc. 800-1]. Instead, they provide purported observations of their representatives about KnowInk PollPads during the recent elections and claim that State Defendants cannot articulate a coherent reason for not providing paper pollbook backups, despite their recognition that paper backups are already provided. [Doc. 800-1, pp. 14-18].

## RESPONSE TO STATEMENT OF FACTS

Coalition Plaintiffs once again ask the Court to enter a mandatory injunction that requires State Defendants to expend resources to provide a paper pollbook backup that reconciles early and absentee voting prior to election day. [Doc. 800]. Coalition Plaintiffs largely rely on documents

previously submitted in support of their third motion for preliminary injunction, which this Court denied. *See* [Doc. 755]; *see also* [Doc. 768]. New declarations provided by Coalition Plaintiffs in support of the Pollbook PI Motion once again do not demonstrate that the KnowInk PollPads violate either the fundamental right to vote or the Equal Protection Clause.

## I.   Coalition Plaintiffs do not offer sufficient evidence that KnowInk PollPads unconstitutionally burden voters.

Coalition Plaintiffs assert that evidence from the June 9 election shows "that extensive voting delays and chaos were a direct result of the ongoing failure of the State Defendants to provide precincts with useful paper pollbook backups." [Doc. 800-1 at p. 4]. Coalition Plaintiffs rely on a previously submitted transcript, which is unverified and incomplete, purporting to be from a Cobb County Board of Registration and Elections meeting on June 19, 2020. [Doc. 755 at p. 36-43]; *see also* [Doc. 800-1 at pp. 10-11]. However, that transcript, even if accurate, does not demonstrate that the KnowInk PollPads are unconstitutional. As indicated in that transcript, training poll workers was a significant challenge "when the pandemic hit and [Cobb County] had people working from home." [Doc. 755 at p. 37]. Janine Eveler noted that the pollbooks took more time to update because the size of the files are larger than those used in the prior epollbooks, but there is no

6

mention of delays or an impact on voting due to the additional time to upload the files. [Doc. 755 at p. 38]. Ms. Eveler also reported issues that "poll pads were not syncing, or that they could not encode cards," on election day, but the vendor fixed those issues. [Doc. 755 at p. 39]. Ultimately, none of the reported instances here are within the scope of the challenged conduct alleged in the FSC.

Coalition Plaintiffs also rely on declarations from three individuals who testify to their experiences in the August 11 runoff election. [Docs. 800-4; 800-5; 800-6]. Michael Peterson states that he was a "field support technician" for Dominion stationed at a polling place in Cobb County. [Doc. 800-4, at ¶¶ 4, 17]. Mr. Peterson helped set up the KnowInk PollPads, but he did not testify to any malfunctioning pollbooks or other issues related to the PollPads that burden the right to vote of any voter. [Doc. 800-4, ¶ 20]. In fact, Mr. Peterson stated that there were eighty-four voters at the polling place on election day, and there "was no wait all day." [Doc. 800-4, ¶ 31].

Two other declarants, Michael Stippich [Doc. 800-5] and Samantha Whitley [Doc. 800-6], testify that the PollPads at the Fanplex polling place initially indicated that voters in precinct 01F in Fulton County were assigned to a different polling location. [Docs. 800-5, ¶ 6; 800-6, ¶¶ 6-7]. According to Mr. Stippich, additional precincts were added to the Fanplex polling location.

7

[Doc. 800-5, ¶¶ 3-4]. Ms. Whitley, who works for the Coalition of Good Governance, testified that the PollPad listed the 01F precinct as "out of precinct" at the Fanplex polling location. [Doc. 800-6; ¶¶ 6-7]. Ms. Whitley did not understand the actions taken to correct this issue, but after 10:00 AM, voters assigned to 01F precinct were able to vote. [Doc. 800-6, ¶¶ 14, 21].

Coalition Plaintiffs also rely on the declaration of their expert, Harri Hursti. [Doc. 800-2]. Mr. Hursti noted that at the Peachtree Christian Church polling place, the paper voter list was the same list prepared for the June 9 election, believing this to be a problem. [Doc. 800-2, ¶ 8]. It is unclear if Mr. Hursti knows whether new voters can register to vote in a runoff where no federal election is on the ballot. Mr. Hursti also observed KnowInk PollPads not syncing immediately or allegedly not connecting to the wireless network.[4] [Doc. 800-2, ¶¶ 16-20]. Mr. Hursti's observations, however, do not include evidence of any unconstitutional burdens on voting.

Finally, the new declaration of Marilyn Marks, Executive Director of the Coalition for Good Governance, is equally unavailing. Ms. Marks asserts that handwritten Ballot Recap Sheets from seven precincts in Fulton County

---

[4] Mr. Hursti is admittedly not an election-administration expert and thus his opinions about the use of passwords for equipment that is kept locked when not in use by poll officials is irrelevant.

show material differences, but goes on to state that she would need additional information from Fulton County to confirm any material differences in the Ballot Recap Sheets. [Doc. 800-3, ¶ 23-24]. Ms. Marks' remaining observations are the same as those of other declarants, including Mr. Hursti, who she accompanied during the August 11 election. [Doc. 800-3, ¶¶ 4-19].

The new declarations do not identify systemic issues or evidence of unconstitutional burdens on voting. Moreover, Coalition Plaintiffs maintain that "there is no doubt that the failure to have a paper backup to the malfunctioning electronic pollbooks was *the* cause of these long lines: as voters waiting in line to check-in, no one was voting on the BMDs." [Doc. 800-1 at p.12] (emphasis in original).

## II.    Paper copies of the official electors list currently provided to the counties.

The Secretary of State's Office provides each county with a paper copy of the official electors list by precinct, which is mandated by state law. (Harvey Decl. at ¶ 3).[5] The paper copy of the official electors list includes the name, address, date of birth, and district combination information for each voter assigned to a precinct. (*Id.*) The paper copy of the electors list also includes information regarding whether a voter has requested and returned a

---

[5] The declaration of Chris Harvey is attached hereto as Exhibit 1.

mail-in absentee ballot or voted absentee at the time the paper copy of the electors list is generate. (*Id.*)

In addition to providing counties with a paper printout of the official electors list by precinct, the Secretary also generates a "supplemental list" on the Friday prior to the date of the election, which is distributed to the county elections officials. (*Id.* at ¶ 5). The supplemental list contains the list of voters added to ENET between the time when the electors list is downloaded for printing and the Friday before the election, and the counties are able to print and distribute those lists to the polling places. (*Id.*) Printing the electors list by precinct is a time-consuming process, as it requires not only printing but distributing the lists to the counties. (*Id.* at ¶ 6). The printed electors list for a single precinct may consist of multiple boxes of paper printouts. (*Id.*) The electors lists are ordered by the liaison to the county, and the process generally begins the Friday after the voter registration deadline, although larger counties are typically printed last—sometimes not until a week prior to the election so that larger counties have as much time as possible to enter any remaining voter registrations for eligible voters. (*Id.* at ¶ 4).

Absentee ballots are continuously being returned to county election officials before and during election day. (*Id.* at ¶10). County elections officials review a voter's information on the absentee ballot envelope when an

absentee ballot is returned and update the voter's record in ENET after accepting the absentee ballot. (*Id.* at ¶ 11). When a voter requests an absentee ballot but then appears at the polls on Election Day without their ballot in hand, the poll official should check with the registrar to ensure that no absentee ballot has been accepted for that voter prior to having the voter execute a cancellation affidavit and then vote using the BMD, regardless of whether the voter is checked in using a PollPad or a paper list. (*Id.* at ¶ 13). Even if the Secretary of State's Office could print and distribute an updated list of electors after the end of early voting, a paper printout could not capture voters who return absentee ballots before the start of voting on election day but after the printout of the updated electors list. (*Id.* at ¶ 15).

In addition to the paper copy of the electors list provided by the Secretary, county registrars are required to provide poll managers in each precinct with a copy of the electors list for such precinct prior to the opening of the polls on election day, which include the name of voters who have been mailed or delivered an absentee ballot. O.C.G.A. § 21-2-401(b). The electors lists provided by county registrars to the poll managers in each precinct are the electronic pollbooks. (*Id.* at ¶ 9). The electronic pollbook files are updated after the close of early voting to indicate those voters who voted in early

voting. (*Id.*) Additionally, the updated pollbook files indicate whether a voter requested a mail-in absentee ballot or voted absentee. (*Id.*)

ARGUMENT AND CITATION OF AUTHORITY

## I.  Standard of review.

This Court has found no less than three times before that Plaintiffs failed to meet the extraordinary burden precedent imposes on those seeking preliminary (and mandatory) injunctions.  This is for good reason.  A district court may grant the "extraordinary remedy" of a preliminary injunction only if the movant establishes that:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). The movant must successfully establish all four factors as "[f]ailure to show any of the four factors is fatal." *Id.*

Additionally, the immediate relief sought in a preliminary injunction must be of "the same character as that which may be granted finally." *Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997). Thus, "[a] district court should not issue an injunction when the injunction in question

is not of the same character, and deals with a matter lying wholly outside the issues in the suit." *Id.*; *see also Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir.1994) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.").

Preliminary injunctions are never granted as of right, even if a plaintiff can show a likelihood of success on the merits. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). "Mandatory preliminary injunctive relief, which goes well beyond simply maintaining the status quo" as Plaintiffs' requested relief does here, "is particularly disfavored and should not be issued unless the facts and law clearly favor the moving party." *Powers v. Sec'y, Fla. Dep't of Corrections*, 691 F. App'x 581, 583 (11th Cir. 2017) (quoting *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976)). While a preliminary injunction is already a form of extraordinary relief, that relief is an even-more-heightened form of extraordinary relief in the context of elections, because of the public interest in orderly elections and the integrity of the election process. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).

## II.   Coalition Plaintiffs are not likely to succeed on the merits.

Coalition Plaintiffs have two counts remaining in the FSC; however, Coalition Plaintiffs have failed to articulate any cause of action related to the

claims in the Pollbook PI Motion. Under either a fundamental right to vote claim or an Equal Protection claim, Coalition Plaintiffs have not made a sufficient showing that either the KnowInk PollPads or Georgia law regarding paper pollbook backups are unconstitutional, facially or as applied.

A. *Coalition Plaintiffs' claims are barred by the Eleventh Amendment.*

The Eleventh Amendment generally bars state officials from being sued in federal court. But "a suit against state officials on the basis of state law contravenes the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). This is because, the *Ex Parte Young* exception "'rests on the need to promote the vindication of federal rights,' but in a case alleging that a state official has violated state law, this federal interest 'disappears.'" *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015) (citations omitted).

Coalition Plaintiffs readily admit that the key issue in their motion is the interpretation of a state regulation on paper pollbook backups—State Election Board Rule 183-1-12-.19. [Doc. 800-1, pp. 16-17]. And that is where Coalition Plaintiffs' proposed relief runs headlong into *Pennhurst*. When the "claims necessarily rely on a determination that a state official has not complied with state law, [then] a determination that is barred by sovereign

immunity." *Fair Fight Action v. Raffensperger*, Case No. 1:18-cv-05391-SCJ, slip op. at 15 (December 27, 2019) (denying preliminary injunction).

Coalition Plaintiffs cannot succeed because their relief is barred by the Eleventh Amendment or, at the very least, should be certified to the Georgia Supreme Court as a question of state law. *See Gonzales v. Governor of Georgia*, Appeal No. 20-12649 (11th Cir. Aug. 11, 2020).

   B.   *There is no burden on the right to vote caused by the use of electronic pollbooks in administering elections.*

Coalition Plaintiffs generally claim that the mere use of electronic pollbooks burdens voters. *See generally* [Doc. 800-1]. Despite their voluminous historical pleadings on the issue, it still remains unclear what precise burden is actually *caused* by electronic pollbooks. Indeed, Coalition Plaintiffs devoted less than two pages in their third motion for preliminary injunction to their paper pollbook backups argument. *See* [Doc. 640-1, pp. 32-33]. Coalition Plaintiffs now claim that the injuries to voters are the result of not printing paper pollbook backups for each precinct after the close of early voting. [Doc. 800-1, pp. 9-10]. This Court already found that Plaintiffs' evidence "has been insufficient" to grant an injunction. [Doc. 768, pp. 10-11]. Coalition Plaintiffs have once again claimed a litany of "deficiencies" with the

electronic pollbooks, but they have failed to show an unconstitutional burden on voting due to the electronic pollbooks.

"The Supreme Court has rejected a 'litmus-paper test' for '[c]onstitutional challenges to specific provisions of a State's election laws' and instead has applied a 'flexible standard.'" *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). The *Anderson-Burdick* test requires a court to balance the burden of a regulation upon voters against the interests of the state served by the regulation. "Reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters are generally justified by "the State's important regulatory interests." *Burdick*, 504 U.S. at 434. "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). In challenges to a state's electronic-voting method, the lower-scrutiny *Burdick* test is applied. *See Wexler v. Anderson*, 452 F.3d

1226, 1232 (11th Cir. 2006) (applying *Burdick* to challenge to touchscreen voting procedure); *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003).

Coalition Plaintiffs cannot demonstrate that electronic pollbooks place a burden, much less a severe burden, on the right to vote. Coalition Plaintiffs do not cite to any cases finding an unconstitutional burden from electronic pollbooks. Coalition Plaintiffs instead rely on observations of representatives of the Coalition for Good Governance during the August runoff election, but at most, their observations point to technical issues and poll worker training in a limited number of polling places. *See, e.g.,* [Doc. 800-2 at ¶¶16, 18, 20]; [Doc. 800-3 at ¶¶ 6, 17]; [Doc. 800-6 at ¶¶ 6, 12-17]. Coalition Plaintiffs also submitted the declaration of Mr. Stippich, a voter who waited to vote for forty-five-minutes at the Fanplex polling location because his precinct had been added to the Fanplex location[6] but that location was showing as out of precinct. [Doc. 800-5 at ¶¶ 4-6, 9]. According to Mr. Hursti, who was an

---

[6] Coalition Plaintiffs simply do not address the impact of the COVID-19 pandemic on the elections, especially the number of locations that refused to serve as polling places, choosing to focus their efforts on their policy preferences. It is telling that when they attempted to litigate issues about the pandemic, Judge Batten quickly recognized that the issues they complain of—potential lines and reduced voting sites—are caused by the virus and not the State. *Coalition for Good Governance v. Raffensperger*, 1:20-CV-1677-TCB, 2020 WL 2509092 (N.D. Ga. May 14, 2020). The same is doubtlessly true in this case.

observer at the Fanplex polling location, voters belonging to a new precinct were included in the Fanplex polling place, which caused the technical issue. [Doc. 800-2 at ¶ 18]. Regardless, the poll workers spoke with the election office and those voters were located in the PollPad. [Doc. 800-2 at ¶ 18].

Coalition Plaintiffs reliance on the declaration of John Peterson, a field technician in the August election, is also misguided. [Doc. 800-4]. Mr. Peterson stated that he had to help poll workers set up the KnowInk pollpads because none of the poll workers "seemed familiar with setting up the Poll Pads." [Doc. 800-4 at ¶ 20]. However, Mr. Peterson did not testify to witnessing any malfunctioning PollPads or technical problems with the KnowInk PollPads on election day, and there were no lines at his polling place. *See generally* [Doc. 800-4].

States must "weigh the pros and cons of various balloting systems" to make state policy and "[s]o long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Weber*, 347 F.3d at 1107; *see also McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 808-09 (1969) (noting that "a legislature need not run the risk of losing an entire remedial [electoral] scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked."). "[T]he mere possibility of error" is not enough to bar the use of a particular

voting system, especially given the state interest in the orderly conduct of elections. *Banfield v. Cortés*, 631 Pa. 229, 260 (2015).

Coalition Plaintiffs have identified a variety of disconnected issues related to the KnowInk PollPads, namely technical issues and training of poll workers, but they have not provided evidence of systemic problems with the electronic pollbooks resulting in disenfranchisement of voters. Put simply, Coalition Plaintiffs' facial challenges to the KnowInk PollPads fail because there is no burden. Coalition Plaintiffs may not prefer electronic pollbooks, but this is merely a policy disagreement and Georgia's decision to use electronic pollbooks is entitled to significant deference. *Weber*, 347 F.3d at 1107. Accordingly, the Pollbook PI Motion should be denied.

> **B.**  *The State's interests in using electronic pollbooks exceeds any burden on the right to vote.*

State Defendants have considerable interests in using electronic pollbooks with the current paper backup of the electors list. Georgia law requires that "[t]he official list of electors eligible to vote in any primary or election shall be prepared and completed at least five calendar days prior to the date of the primary or election in which the list is to be used." O.C.G.A. § 21-2-224(f). County registrars are required to provide poll managers in each precinct with a copy of the electors list for such precinct prior to the opening

of the polls on election day, which identifies voters who have been mailed or voted an absentee ballot. O.C.G.A. § 21-2-401(b). The State Election Board rules also provide that "[e]lectronic poll books shall be the primary method for checking in voters and creating voter access cards, but the superintendent shall cause every polling place to be equipped with a paper backup list of every registered voter assigned to that polling place." Ga. Comp. R. & Regs. 183-1-12-.19(1). The county registrars provide the electronic pollbook for each polling place before the polls open, while the Secretary provides each county with a paper copy of the electors list by precinct. (Harvey Decl. at ¶¶ 3, 9).

If a voter is not located in the PollPad or an electronic pollbook is malfunctioning for any reason, the paper copy of the official electors list can be used to determine whether a voter is assigned to the precinct and polling location. (Harvey Decl. at ¶ 7). The paper backup of the official electors list also includes information regarding whether a voter has requested or returned an absentee ballot at the time the electors list is printed. (*Id.* at ¶ 3).

State Defendants have an interest in timely and accurate administration of elections. (Harvey Decl. at ¶ 16). Electronic pollbooks also allow poll workers to have timely information since the electors list can be updated closer to real-time than a paper printout. (*Id.*) Additionally, aside from providing a paper backup of the voters assigned to each precinct, the

counties are provided a supplemental electors list before the election containing updated voter information, which the counties can also print and supply to each polling location. (*Id.* at ¶ 5).

Absent a burden that cannot be justified through government interests, the State is charged with making reasonable policy decisions to effectuate orderly elections. *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970). The Secretary is required by law to provide a paper copy of the electors list to the counties, and counties are required to provide the electronic pollbook to each poll manager prior to the opening of the polls. *See* O.C.G.A. §§ 21-2-224(f), 21-2-401(b). No injunctive relief is required to generate the required lists. *Elend v. Basham*, 471 F.3d 1199, 1209 (2006) (noting "obey the law" injunctions are unavailable in the 11th Circuit). Given the lack of evidence demonstrating a burden on the right to vote, the interests of the State far outweigh any burden put forth by the Coalition Plaintiffs. Thus, the Pollbook PI Motion should be denied.

## III.   Coalition Plaintiffs will not suffer irreparable injury absent a preliminary injunction.

A plaintiff seeking preliminary injunctive relief must demonstrate that irreparable harm is likely in the absence of the requested injunction. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). As discussed above, Coalition

Plaintiffs have not shown that they will suffer any injury at all, and thus have not shown that they will suffer irreparable harm without an injunction. As a result, the absence of irreparable injury must end the Court's inquiry and would make preliminary injunctive relief improper. *See Lyons*, 461 U.S. at 111–12 (1983); s*ee also Snook v. Trust Co. of G. Bank of Savannah*, N.A., 909 F.2d 480, 486 (11th Cir. 1990) (affirming denial of preliminary injunction because plaintiff failed to meet burden of proving irreparable injury).

The asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *NE Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). As the Supreme Court has explained, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Here, Coalition Plaintiffs here cannot make a clear showing that they are entitled to the relief sought in the Pollbook PI Motion.

The Secretary already provides a paper backup of the electors list for use in each precinct. *See* O.C.G.A. § 21-2-224(f). The paper backup of the electors list includes precinct assignment, which is in part what Coalition

22

Plaintiffs seek in the Pollbook PI Motion. *See* [Doc. 800 at ¶ 2]. Additionally, updated voter information is included in the pollbooks after early voting. *See* O.C.G.A. § 21-2-401(b). Moreover, Coalition Plaintiffs cannot state with certainty that the relief they seek will redress the harm they have alleged. As has been discussed, county election officials receive mail-in absentee ballots from voters after the close of early voting, and a paper printout could not capture voters who return absentee ballots after printing the paper pollbook backup requested by Coalition Plaintiffs, ignoring the costs and logistical improbabilities to doing so. *See* (Harvey Decl. at ¶¶ 10, 15). Because Coalition Plaintiffs cannot demonstrate irreparable harm from the use of KnowInk PollPads, injunctive relief should be denied.

## IV.   The equities do not favor Coalition Plaintiffs and the public interest weighs in favor of State Defendants.

The remaining elements to not support granting the Pollbook PI Motion. The purpose of a preliminary injunction is to preserve the status quo only when the balance of equities so heavily favors the movant that justice requires the court to intervene pending judgment. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). The Court must consider the balance of the equities carefully; cursory analysis is insufficient. *See Winter*, 555 U.S. at 26. Indeed, the "balance of equities and consideration of the

public interest . . . are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Id*. at 32.

Coalition Plaintiffs' suggestion that the relief they seek is a "simple solution" fails to look at reality. [Doc. 800-1 at 3]. There are 3,116 precincts across the state of Georgia. (Harvey Decl. at ¶ 14). The Secretary of State's Office relies on an outside vendor to print the paper backup of the electors list currently due to the volume of paper and size of the project. (*Id*. at ¶ 4). The process for printing the electors list by precinct is a time-consuming process, and requires not only printing but distributing the lists to the counties. (*Id*. at ¶ 6). As a practical matter, even if an updated electors list could be printed by precinct and delivered to the counties in the three days between the end of early voting and election day, a paper printout of the updated electors list would not account for every voter's status, as absentee ballots are continuously being returned. (*Id*. at ¶ 15). As such, an updated electors list could not adjudicate voter eligibility in all situations. Further, county election officials would be required to train poll workers on an entirely new protocol with only weeks to go before the election.  (*Id*. at ¶ 17).

A preliminary injunction would harm the public interest by causing confusion in adjudicating voter eligibility and risk undermining election administration by changing the rules of the election, including the special

election in Congressional District 5 scheduled in September. The Supreme Court "has repeatedly emphasized that lower federal courts should not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020), citing *Purcell v. Gonzalez*, 549 U. S. 1 (2006) (per curiam). Court orders implementing new rules "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). Accordingly, when balancing the equities, there is no question that this balance tips in State Defendants' favor.

## CONCLUSION

Coalition Plaintiffs have not provided this Court with sufficient evidence or other relevant evidence that supports their request for injunctive relief. As it did just weeks ago with Coalition Plaintiffs' last motion for preliminary injunction, this Court should deny the Pollbook PI Motion.

Respectfully submitted this 25th day of August, 2020.

/s/ *Vincent R. Russo*
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240

cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250


Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for State Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing **STATE DEFENDANTS' RESPONSE IN OPPOSITION TO COALITION PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ON PAPER POLLBOOK BACKUPS** has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Vincent R. Russo*
Vincent R. Russo