## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, *et al.* | |
| *Plaintiffs*, | |
| v. | CIVIL ACTION |
| | FILE NO. 1:17-cv-2989-AT |
| BRAD RAFFENSPERGER, *et al.*, | |
| *Defendants*. | |

## STATE DEFENDANTS' RESPONSE IN OPPOSITION TO CURLING PLAINTIFFS' FOURTH MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Curling Plaintiffs' position in their fourth preliminary-injunction motion remains breathtaking—that the U.S. Constitution prohibits the use of an electronic voting system used throughout the country and, even more so, that the Constitution *mandates* their preferred method of voting, hand-marked paper ballots. Curling Plaintiffs ask this Court to throw out a system recommended by the National Academy of Sciences and the U.S. Intelligence Committee, certified by the U.S. Election Assistance Commission, and selected by election experts and the Georgia General Assembly. They invite chaos in the November elections in the process based on a record this Court

already found insufficient and which may or may not be further supplemented.

Curling Plaintiffs have had access to components of the prior DRE/GEMS system—including the Kennesaw State University server image—for months and do not present this Court with a shred of evidence of any actual compromise of that system. But even if they found something in that system, their experts offer nothing to connect the DRE/GEMS system to the Dominion system beyond rank speculation. Their experts have never examined the Dominion system and are unaware of how it functions. More than three years into this case, Curling Plaintiffs still have nothing but speculation and innuendo to offer this Court.

Worse yet, Curling Plaintiffs seem blind to the fact that on September 17, 2018 (about six days after their requested hearing this year is scheduled to end), this Court found that imposing an "eleventh-hour" injunction would not benefit the public. *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018), *aff'd in part, appeal dismissed in part sub nom. Curling v. Sec'y of Georgia*, 761 Fed. Appx. 927 (11th Cir. 2019). That conclusion remains even more true now; the U.S. Supreme Court has been more clear in its insistence that states—particularly in light of the COVID-19 pandemic and all of its

disruptions—be able to administer elections without massive, judicially-mandated overhauls like those sought by Curling Plaintiffs.

Curling Plaintiffs cannot satisfy any of the prongs for injunctive relief and their fourth attempt to change Georgia's voting system must be denied. At the very least, based on the timing from 2018, this Court has already concluded that they cannot show a public interest in obtaining relief now.[1]

## PROCEDURAL BACKGROUND

In July 2017, Plaintiffs filed this case in the Superior Court of Fulton County. *Curling, et. al. v. Kemp, et. al.*, CAFN 2017CV292233. The primary basis for the action was an election contest to the results of the 2017 Special Election Runoff between Jon Ossoff and Karen Handel for Georgia's Sixth Congressional District. Three years later, the case has yet to advance beyond its posture at the time it was removed to this Court—presenting new amended complaints and motions for preliminary injunctive relief. Indeed, since this case's removal, the Court has held three different hearings on multiple preliminary-injunction motions. *See* [Doc. 298] (September 12, 2018), [Docs. 550, 551] (July 25–26, 2019), [Doc. 721] (March 6, 2020).

---

[1] This fact demonstrates why this case should proceed, more than three years after its initiation, under the normal course of discovery applying the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

On August 7, 2020, this Court denied Curling Plaintiffs' third Motion for Preliminary Injunction without prejudice, finding that there was not a sufficient record to determine that Georgia's Dominion voting system was facially unconstitutional. [Doc. 768, pp. 10-11[2]]. The Court also found that, to the extent Plaintiffs intended to present an "as applied" challenge, the record was insufficient for this challenge as well, expecting more information based on "actual election based evidence." *Id.*

Twelve days later, Curling Plaintiffs filed essentially the same motion that this Court previously denied, adding a single declaration covering one voter's experience in the June 9, 2020 primary election (which covered none of the issues in the Curling Plaintiffs' latest amended complaint). [Doc. 785-6]. Aside from the citation of several hearsay news stories and the addition of arguments about State Defendants' notice of supplemental authority, the argument section of the brief in support of the motion is nearly identical.[3] Curling Plaintiffs admit that they currently lack evidence they say they

---

[2] All pinpoint citations for documents filed on the record are to the ECF page numbers at the top of each page.

[3] State Defendants recognize that hearsay evidence is admissible in the context of a preliminary injunction. It should matter, though, that Plaintiffs' "evidence" has never been subject to the scrutiny of the Federal Rules of Evidence or full-blown discovery despite more than three years of history.

need—and plan to include further evidence with their reply brief. [Doc. 785-1, p. 7]. This Court should again deny their relief.

## RESPONSE TO STATEMENT OF FACTS

Because the facts and issues remain largely unchanged, State Defendants adopt and incorporate their Statement of Facts and arguments included in their response to Plaintiffs' third motion for preliminary injunction [Doc. 658].[4] For the ease of the Court, State Defendants will reference the relevant new facts raised by Curling Plaintiffs in this most recent filing in this section and reference previously briefed facts where applicable in the argument section.

Initially, it is important to remember that Curling Plaintiffs are advocates for a policy of exclusive use of hand-marked paper ballots. Both Donna Curling and Donna Price are on the staff of Georgians for Verified Voting [Docs. 785-3 at ¶ 5, 785-4 at ¶5], which advocates for a hand-marked paper ballot election system and against BMDs. *See* Georgians for Verified Voting, Take Action page.[5] Jeffrey Schoenberg likewise personally disagrees with Georgia's decision to purchase BMDs. [Doc. 785-5 at ¶¶ 7-9]. Despite the

---

[4] The declarations attached to [Doc. 658] that are referenced in this brief are also attached as exhibits here for the convenience of the Court.

[5] Available at http://gaverifiedvoting.org/action.html (last accessed August 21, 2020).

State Defendants' continued challenge to their standing, no Plaintiff has ever testified or sat for a deposition in this case and Plaintiffs' experts have never been deposed in this case.

## I.   There are almost no new allegations about June 2020.

As far as new factual allegations, Curling Plaintiffs continue their oddly personal invective against State Defendants, this time (1) claiming that State Defendants never adopted or implemented a contingency plan in case the rollout of BMDs was not completed in time; and (2) making unsupported charges that State Defendants are not complying with the Open Records Act (which, of course, Plaintiffs could seek relief for only in the Superior Court of Fulton County). [Doc. 785-1, pp. 8-9, 11]. As the Court is aware, the BMD rollout is complete and thus there is no longer a need for a contingency plan, [Doc. 768, pp. 8-9, n.6], and Curling Plaintiffs later rely on existing State Election Board rules about the use of paper ballots in polling places as a reason why their relief can be implemented. [Doc. 785-1, p. 32].

Curling Plaintiffs next attack State Defendants on topics completely unrelated to the issues in their Complaint—an alleged lack of paper ballots, poll workers, and training for the June 9 election, which was conducted in the midst of a pandemic of unprecedented proportions. [Doc. 785-1, p. 9]. Curling Plaintiffs' discussion of the June 9 election without ever mentioning the

pandemic or citing any newspaper articles that specifically identify problems with BMDs (as opposed to other components of the election system) is telling and is an approach that has been rejected by other courts in this District. *See Coalition for Good Governance v. Raffensperger*, 1:20-CV-1677-TCB, 2020 WL 2509092, at *3 (N.D. Ga. May 14, 2020). And Mr. Franzoni's unsupported speculation and disagreement with the new system indicates no failures of anything, offering nothing of value. [Doc. 785-6, pp. 2-3].

## II.   There are no new allegations about security risks.

Curling Plaintiffs do not point to any new identified, active security risk or hacking potential the use of BMDs poses, and for their argument on security, continue to rely exclusively on prior security allegations regarding DREs as justification to challenge the new system. [Doc. 785-2, ¶ 11]. But even this reliance is stunning at this point: Curling Plaintiffs' experts gained access to the image of the Kennesaw State University server in December 2019. [Doc. 692-3, ¶ 4]; [Doc. 699-10, ¶ 8]. Their experts received 743 GEMS Databases in January 2020. [Docs. 735, p. 6; 735-2]. Dr. Halderman began his forensic analysis of the hundreds of memory cards from Cobb, DeKalb, and Fulton counties on August 13. [Doc. 791, p. 4]. Despite all of this opportunity

to analyze the prior system, Curling Plaintiffs offer no support that any actual hack or compromise of DRE/GEMS system ever occurred.[6]

And even if they were able to do more than speculate, the evidence demonstrates that Georgia's new BMD system is completely separate from the DRE/GEMS systems, down to hand-entry from original source documents so there "was no data extracted or reused from the prior system." Dr. Eric Coomer, Tr. of March 6, 2020 Hearing at 67:18-25; *see also* Declaration of Dr. Eric Coomer, attached as Ex. A ("Coomer Dec.") at ¶ 7; Declaration of Juan E. Gilbert, Ph.D., attached as Ex. B ("Gilbert Dec.") at ¶ 43.

## III. Curling Plaintiffs' attacks on the Dominion system are incorrect and remain about the optical scanners.

Curling Plaintiffs rely on the same attacks from Dr. Halderman on the Dominion system as before, focusing on the Texas denial of certification of Dominion's system and a single DEF CON report.[7] [Doc. 785-1, pp. 15-16].

---

[6] State Defendants also separately filed today the Declaration of David Hamilton under seal [Doc. 819], outlining the specific steps taken by the Secretary's office regarding past vulnerabilities that have been mitigated.

[7] This line of attack still does not make sense, because all the alleged vulnerabilities they identify apply equally to the hand-marked paper ballot system they seek to have this Court order. The alleged deficiencies identified by Texas examiners primarily relate to the optical scanners (ICP units), not the BMDs, which Curling Plaintiffs advocate the State continue using. [Docs. 785-1, p. 32; 785-2 at ¶¶ 4, 48]; Coomer Dec. at ¶¶ 6, 9. Likewise, the DEF CON voting village activists manipulated—*after unfettered and untimed access* which could not happen in an actual election—a Dominion optical

Dr. Halderman continues to criticize the optical scanners that would be used even in Curling Plaintiffs' proposed system as open to hacking, [Docs. 619-2 at ¶ 5, 785-2 at ¶ 29], and while he previously criticized the Dominion ICP units for lacking a memory-management unit, he does not repeat that allegation now, [Doc. 619-2 at ¶ 21].

Dr. Halderman admitted in his deposition in *Fair Fight Action* that he had never personally examined the Dominion voting system. Deposition of J. Alex Halderman, Ph.D., attached as Ex. C ("Halderman Dep.") 100:25-101:25, 136:04-136:11, 146:25-147:03. He also admitted to never seeing malware that would alter a ballot on the Dominion voting system in ways that he says "could" happen. Halderman Dep. at 126:01-09. All of his speculative opinions about the Dominion system are based only on his experience "with other electronic voting systems," *id.* at 101:19, his review of the Dominion documentation, *id.* at 101:20, and tests that authorities conducted in other states, *id.* at 101:21.

After reviewing Dr. Halderman's speculation about the Dominion system, an expert from an Accredited Voting System Test Laboratory

---

scanner (ICP unit), *not a BMD* or any other component of Georgia's election system. [Doc. 786-3 at 19-20]. And, regardless, those activists' work is wholly irrelevant: they didn't even "hack" the type of optical scanner that will be used in Georgia. Gilbert Dec. at ¶¶ 70-71; Coomer Dec. at ¶ 13.

concluded that Dr. Halderman "clearly does not understand the specific setup and nature of the Dominion system or its security features." Declaration of Jack Cobb, attached as Ex. D ("Cobb Dec.") at ¶ 9. Georgia checked the hash value[8] of each BMD at the time of acceptance to ensure the software had not been compromised, *id.* at ¶ 8, and the Dominion BMDs have a feature that generates a hash value in real time to determine if the software has been altered, *id.* at ¶ 7. The Dominion system has been the subject of penetration testing and requires encrypted digital signatures so that it would reject any ballots with altered QR codes or attempts to upload malware into the Dominion election-management system. *Id.* at ¶¶ 5-11. In sharp contrast to the extensive testing already conducted, Curling Plaintiffs have provided nothing beyond speculation about the security of the Dominion system.

## IV. Curling Plaintiffs do not offer new or sufficient evidence that voters do not review their ballots.

Curling Plaintiffs also rely on Dr. Halderman for the proposition that few unprompted voters review their ballots.[9] [Doc. 785-1, p. 17-18]. But the

---

[8] Dr. Halderman earlier agreed that hash value comparisons can be important tools for verifying files have not been changed. [Doc. 571 at 116:10-117:9].

[9] Dr. Halderman in turn relies on a peer-reviewed article by Matthew Bernhard, [Doc. 785-2, p. 21 n.40], but fails to mention that Mr. Bernhard, who previously served as an expert for Coalition Plaintiffs, cautioned individuals not to rely too heavily on the study for the conclusions which Dr.

science is not yet settled on the conclusions Curling Plaintiffs wish this Court

to reach. As Dr. Gilbert notes in his supplemental declaration, there is other

research indicating that voters can detect manipulation of ballots. Supp.

Declaration of Juan Gilbert, attached as Ex. E ("Gilbert Supp. Dec.") at ¶ 9.

Other research, including the paper cited by Dr. Halderman, supports the

idea that reminders to review ballots, such as Georgia requires, improve the

rate of review. *Id*. at ¶¶ 8-11; Ga. Comp. R. & Regs. r. 183-1-12-.11(8) ("The

poll officer stationed at the ballot scanner shall offer each voter specific

verbal instruction to review their printed paper ballot prior to scanning it.").

## ARGUMENT AND CITATION OF AUTHORITY

### I.   Standard of review.

Because temporary restraining orders and preliminary injunctions are

such extraordinary and drastic remedies, courts may not grant this type of

relief "unless the movant *clearly established* the 'burden of persuasion' as to

---

Halderman draws and notes that hand-marked paper ballots have not been
empirically shown to provide a verifiable paper trail. *See* @umbernhard,
twitter.com (January 10, 2020 4:49 PM ("I know I'm sounding kind of
defeatist of my own work, but anyone who tells you they know anything for
sure based on one scientific study is either suffering from confirmation bias
or selling snake oil."); @umbernhard, twitter.com (January 10, 2020 5:04 PM)
https://twitter.com/umbernhard/status/1215756381304840193 ("So when you
hear that BMDs are unverifiable, please understand that it does not mean
that hand-marked paper *is* verifiable. It probably is, but we haven't
established that.").

the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (emphasis added) quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989). Moreover, "[m]andatory preliminary injunctive relief, which goes well beyond simply maintaining the status quo" as Curling Plaintiffs' requested relief does here, "is particularly disfavored and should not be issued unless the facts and law clearly favor the moving party." *Powers v. Sec'y, Fla. Dep't of Corrections*, 691 F. App'x 581, 583 (11th Cir. 2017) (quoting *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976)). Plaintiffs therefore must *clearly* show that: (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) the balance of equities tips in Plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). While a preliminary injunction is already extraordinary relief, that relief is an even-more-heightened form of extraordinary relief in the context of elections, because of the public interest in orderly elections and the integrity of the election process. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).

Particularly important here is the U.S. Supreme Court's recognition that when "an impending election is imminent and a State's election machinery is already in progress," equitable considerations justify a court

12

denying an attempt to gain immediate relief—even if an elections practice was found unconstitutional. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). This is because parties must show they exercised reasonable diligence, especially in the context of elections. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018).

Finally, Curling Plaintiffs' sole basis for an injunction is under an *Anderson-Burdick* fundamental-right-to-vote analysis, [Doc. 785-1, pp. 25 n. 34], which "does not require any evidentiary showing or burden of proof to be satisfied by the state government." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009).

## II. Plaintiffs are not likely to succeed on the merits.

Curling Plaintiffs offer three lines of attack on Georgia's BMD system. Two are facial: (1) that BMDs unconstitutionally burden the right to vote because they are "susceptible to viruses and other malicious code and produce results that cannot be effectively audited" and (2) that BMDs that use barcodes unconstitutionally burden the right to vote because "the voter cannot verify accurately his or her choices." [Doc. 785-1, p. 26]. The third ground for attack is an as-applied challenge, claiming that the history of Georgia's election system creates "vehicles for malicious code." *Id.*

As this Court is aware, the evaluation of voting regulations under a fundamental-right-to-vote claim takes place under a sliding scale, which considers the alleged burden on the right to vote against the interest of government. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). In particular, where a plaintiff challenges a state's electronic-voting method, the lower-scrutiny *Burdick* test is applied. *See Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006) (applying *Burdick* to challenge to touchscreen voting procedure); *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003). As discussed below, Curling Plaintiffs have not shown any basis to determine that Georgia's current voting system is unconstitutional either facially or as applied.

A.    *Plaintiffs' facial claims fail because BMDs are a constitutionally permissible election method.*

Curling Plaintiffs ask this Court to be the first in the country to decide that the U.S. Constitution prohibits electronic voting and mandates votes by

14

hand-marked paper ballots. This Court already found that Plaintiffs' evidence "has been insufficient" to grant an injunction on a "quasi-facial challenge to the legality of the BMD system." [Doc. 768, pp. 10-11]. Curling Plaintiffs have added nothing that supports their general attacks on BMDs to change that conclusion. Nor have Curling Plaintiffs cited any controlling or even on-point authority to support their sweeping legal theory.

      1.    <u>There is no burden on the right to vote caused by the general use of technology in voting.</u>

Curling Plaintiffs' claim that BMDs are always unconstitutional fails in light of the U.S. Constitution and the statutory structure around the implementation and use of voting machines. Congress has the authority to impose regulations and laws regarding elections—which it did when it passed HAVA in 2002, for example—but it has yet to mandate that states employ particular voting equipment or methods for elections and anticipates that states will use a variety of technology in their individual voting systems. *See* U.S. CONST. Art. I § 4, Cl.1; 52 U.S.C. § 21081(a) (providing for lever voting systems, optical scanning voting systems, direct recording electronic systems, and paper ballot voting systems[10]). Instead, HAVA provides general

---

[10] Curling Plaintiffs' position must also be that Congress was mistaken when it passed HAVA, because it allowed states to select from a variety of voting methods Curling Plaintiffs believe are unconstitutional.

requirements for a voting system, including the ability to conduct an audit and accessibility for those with disabilities. 52 U.S.C. § 21081(a)(1)-(3).

Unlike some states, Georgia requires its election machines to be certified by the U.S. Election Assistance Commission. O.C.G.A. § 21-2-300(a)(3). State Defendants previously explained the certification process and will not repeat that process here, and instead rely on [Doc. 658, pp. 25-27] and Cobb Dec. at ¶¶ 3-4.

States must "weigh the pros and cons of various balloting systems" to make state policy and "[s]o long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Weber*, 347 F.3d at 1107; *see also McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 808-09 (1969); *Green Party of N.Y. v. Weiner*, 216 F.Supp.2d 176, 190–91 (S.D.N.Y. 2002). "[T]he mere possibility of error" is not enough to bar the use of a particular voting system, especially given the state interest in the orderly conduct of elections. *Banfield v. Cortés*, 631 Pa. 229, 260 (2015); *see also Stein v. Cortés*, 223 F. Supp. 3d 423, 441-42 (E.D. Pa. 2016).

Curling Plaintiffs' rely solely on Dr. Halderman's opinions that, because BMDs are susceptible to hacking, their use *always* results in an

16

unconstitutional burden on the right to vote.[11] But Dr. Halderman's opinions are based on his personal beliefs that hand-marked paper ballots are a superior election system. He simply decided, as a policy matter, that the only acceptable election system is hand-marked paper ballots and reasons backward from that conclusion.[12] *See, e.g.*, Halderman Dep. at 76:06-76:09 (best system would be hand-marked paper ballots), 55:01-56:17 & Ex. 10 (recommending federal policy). Dr. Halderman does not believe *any* ballot-marking device is sufficiently secure. *Id.* at 145:15-145:24.

Curling Plaintiffs have not shown that a voting system recommended by experts (of which Dr. Halderman is an extreme outlier in opposing) is always an unconstitutional method of election. Ultimately, Curling Plaintiffs' facial challenge to technology is just a policy disagreement and Georgia's selection is entitled to significant deference. *Weber*, 347 F.3d at 1107.

---

[11] This, of course, avoids the obvious response that all forms of voting have their drawbacks. Hand-marked paper ballots are susceptible to manipulation, miscounting, or the nightmarish elections that continue to emanate from Florida. Gilbert Supp. Dec. at ¶¶ 12-14. The "unfortunate reality is that the possibility of electoral fraud can never be completely eliminated, no matter which type of ballot is used." *Weber*, 347 F.3d at 1106.

[12] Indeed, another district court rejected Dr. Halderman's testimony because he advocated for his preferred policy: "Dr. Halderman's testimony was neither credible nor helpful. Throughout, he acted more as an advocate than an 'expert.' . . . Indeed, Halderman's 'advocacy' was so vigorous, I was compelled to caution him (to no avail)." *Stein v. Bockvar*, No. 16-6287, 2020 U.S. Dist. LEXIS 75476 at *33 (E.D. Pa., April 29, 2020).

2.      <u>There is no burden on the right to vote caused by barcodes.</u>

Curling Plaintiffs' next argument is that, even if the majority of the country is right and BMDs are generally acceptable, BMDs that use barcodes are not. [Doc. 785-1, p. 28]. Curling Plaintiffs rely solely on Dr. Halderman for this proposition as well, *id.*, but fail to meaningfully address: (1) that Dr. Halderman does not base his opinion on any actual examination or understanding of the Dominion voting system; (2) that the manner in which an optical scanner reads a barcode is the same as the way it reads a hand-marked ballot; and (3) Georgia's implementation of risk-limiting audits.

Dr. Halderman theorizes about what "might" happen, but he has never seen malware that would alter a ballot on the Dominion voting system in ways that he says "could" happen, possibly because of the digital-signature requirements of the system. Halderman Dep. at 126:01-09; Cobb Dec. at ¶¶ 10-11. He has never personally examined the Dominion voting system and does not understand its security features. Halderman Dep. at 100:25-101:25, 136:04-136:11, 146:25-147:03; Cobb Dec. at ¶¶ 7, 9-11. Curling Plaintiffs' claims are based on nothing more than Dr. Halderman's speculation of mere possibilities of errors deriving from his belief that states should not use BMDs. Halderman Dep. at 76:06-76:09; 55:01-56:17 & Ex. 10.

The opinion further ignores the actual technology and its implementation. An optical scanner does not read the text portion of either a BMD-marked ballot or a hand-marked ballot, because it reads information at coordinates, regardless of whether the information is created by a BMD or by hand. Coomer Dec. at ¶ 9. BMDs that print barcodes are widely used—including in six of the ten largest counties in the country, including Los Angeles, California; Cook County/City of Chicago; Maricopa, Arizona; San Diego, California; Dallas, Texas; and Riverside, California. Coomer Dec. at ¶ 5. Of those six counties, five are using Dominion BMDs.[13] *Id.*

Because Georgia's new voting system produces paper ballots that clearly indicate voters' selections, they can also be audited. While Dr. Halderman previously agreed that a sufficient audit of a BMD-generated ballot can "detect and correct" the kinds of hypothetical hacking attacks about which he warns, [Doc. 619-2 at ¶¶ 6-7], he now says that no audit of any BMD system would ever be enough to satisfy him, [Doc. 785-2 at ¶ 51]. Curling Plaintiffs do not explain Dr. Halderman's change on this point.

After gaining information from the pilot audits during and after the November 2019 election, the State Election Board proposed a rule for public

---

[13] Dr. Halderman acknowledges that Dominion does not currently have an EAC-certified non-barcode BMD system. [Doc. 785-2 at ¶ 38].

comment governing the auditing process beginning with the November 2020 election. Ga. Comp. R. & Regs. r. 183-1-15-.04 (published for comment). The audit is to be a statewide risk-limiting audit "with a risk limit of not greater than 10 percent." *Id*. at (1). When BMD-marked ballots are reviewed, the audit must also rely "on the printed text on the ballot to determine the voter's selection." *Id*. at (2)(4). Dr. Halderman's belief that this regulation is insufficient, [Doc. 785-2 at ¶ 54], is not surprising, because he now believes that no audit of any BMD-marked ballots would *ever* be sufficient. *Id*. at ¶ 55. Georgia is at the cutting edge of election practices by using statewide risk-limiting audits—only a handful of states even use risk-limiting audits.[14]

Curling Plaintiffs cannot demonstrate that all BMDs with barcodes—especially when used with audits—place any burden on the right to vote. Absent proof of a burden, Curling Plaintiffs' facial attacks on BMDs fail.

> **B.**   *Curling Plaintiffs' as-applied claims fail because there is no current burden on the right to vote based on Georgia's history.*

Faced with the lack of evidence supporting their facial attacks, Curling Plaintiffs argue that State Defendants' "neglectful attitude toward security

---

[14] *See* National Conference of State Legislatures, *Checking the Election: Risk-Limiting Audits* (July 2019), available at https://www.ncsl.org/research/elections-and-campaigns/checking-the-election-risk-limiting-audits.aspx

and evasive conduct" place a burden on their right to vote. [Doc. 785-1, p. 27].

But again, despite significant access to possible evidence, they present

absolutely nothing new.

Curling Plaintiffs present no evidence from their analysis of the

Kennesaw State University server, the hundreds of GEMS Databases they

have, or from Dr. Halderman's forensic analysis of memory cards. [Doc. 692-

3, ¶ 4]; [Doc. 699-10, ¶ 8]; [Docs. 735, p. 6; 735-2]; [Doc. 791, p. 4]. Despite all

of this evidence that could potentially support their claim that there was a

compromise of the DRE/GEMS system, Curling Plaintiffs present nothing for

this Court to determine that the GEMS/DRE system was *actually*

compromised, let alone any evidence that an actual compromise could be

carried forward into the new system—they are still left arguing that it *might*

happen. Further, the actual evidence in this case demonstrates that the

Dominion system did not import any data from the GEMS/DRE system and

did not utilize any components of the prior system. March 6, 2020 Hearing

Tr. at 67:18-25; Coomer Dec. at ¶ 7; Gilbert Dec. at ¶ 43. The Dominion

system has been subjected to significant testing, including penetration and

accuracy testing, and each BMD was verified as it was accepted. Cobb Dec. at

¶¶ 4-6, 8.

At the end of the day, Curling Plaintiffs have put forward no evidence that the state's general security environment around the DRE/GEMS system has any relationship to the Dominion system, let alone an actual burden on the right to vote. Given the level of access Curling Plaintiffs now have to the DRE/GEMS system, their inability to even find a dot from the old system to try to connect with the Dominion system demonstrates that there is no burden on the right to vote as a result of general security concerns.

C.   *The State's interests in maintaining its election system far exceeds any theoretical burden on the right to vote.*

In sharp contrast to the lack of burden on Curling Plaintiffs, State Defendants have extremely significant interests in using BMDs. Even if this Court finds a burden on the right to vote, it must still balance the State's interests in using the election system. *Timmons*, 520 U.S. at 358.

1.   BMDs provide clear voter intent, unlike hand-marked ballots.

The State has an important interest in the integrity of elections and maintaining voter confidence.[15] *Common Cause/Georgia*, 554 F.3d at 1353.

---

[15] On the latter point, it is notable that Georgia's officials who have to be elected using a voting system voted to use electronic ballot markers, 101-72 in the House (Georgia House Vote #78 (February 26, 2019)) and 35-21 in the Senate (Georgia Senate Vote #183 (March 13, 2019)).

BMD-marked paper ballots provide clear voter intent, unlike hand-marked ballots. *See generally* [Doc. 658, pp. 19-20].

> 2. BMDs are accessible for disabled voters.

HAVA and the Americans with Disabilities Act also provide the State with a powerful interest in helping the disabled during the election process. Hand-marked paper ballots are not an option for many voters with disabilities—a fact that Curling Plaintiffs consistently ignore.[16] Gilbert Dec. at ¶ 40(A); [Doc. 658, pp. 30-32].

Utilizing a single, accessible voting system—*i.e.*, BMDs—bypasses the legal and practical issues that may arise when a State employs a default system of hand-marked ballots with a separate system for voters with disabilities. A separate system for voters with disabilities results in two systems that are inherently "separate and unequal." Declaration of M. Riccobono, attached as Ex. F ("Riccobono Dec.") at ¶¶ 8, 13. Having only voters with disabilities vote on BMDs can result in the loss of the right to vote by secret ballot. *Id*. at ¶ 9. Using BMDs only for voters with disabilities can create also a greater risk to election security. *Id*. at ¶ 11.

---

[16] The only mention of disabled voters anywhere in Curling Plaintiffs' recent round of filings is a brief reference in the proposed order, [Doc. 785-7, p. 2], and two passing references from Dr. Halderman, [Doc. 785-2 at ¶¶ 47, 50].

These are not isolated concerns. *See* [Doc. 658, pp. 30-32]. In fact, an exclusively hand-marked system (except for one BMD at each precinct, as in Curling Plaintiffs' proposed order), would likely subject Georgia to additional litigation from voters with disabilities based on Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. *See* Riccobono Dec. at ¶ 12; *Nat'l Fed'n of the Blind, Inc. v. Lamone*, 438 F. Supp. 3d 510, 526 (D. Md. 2020) (plaintiffs plausibly alleged violations of federal law in challenge to hand-marked system with BMDs for disabled voters).

      3.    <u>Cost</u>.

Plaintiffs have provided no evidence regarding the cost of a switch to hand-marked paper ballots. This Court has twice—in this case and in another—noted that imposing additional costs on the State now is not wise and is an interest that outweighs other constitutional claims. [Doc. 733, pp. 6-7]; *Black Voters Matter Fund v. Raffensperger*, 1:20-CV-01489-AT, 2020 WL 4597053, at *35 (N.D. Ga. Aug. 11, 2020).

      4.    <u>Other interests.</u>

BMDs provide clear voter intent, are easier to administer and count than hand-marked paper ballots, and are harder to manipulate after the election. The State of Georgia has used electronic voting for almost two decades, so Georgia voters are already familiar with an electronic in-person

voting experience. Further, BMDs avoid the negative impact of hand-marked paper ballots on minority communities. [Doc. 307 at 283:20-285:16].

The interests of the State of Georgia far outweigh any burden on the right to vote based on the evidence presented to this Court and any problems with the election system can be resolved through the Election Code. *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970); *see also* O.C.G.A. § 21-2-520 *et seq*. Curling Plaintiffs have failed to show likelihood of success on the merits and this Court should deny their fourth preliminary-injunction motion.

## III.   Curling Plaintiffs will not suffer irreparable injury absent a preliminary injunction.

Significantly, even if Curling Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury makes preliminary injunctive relief improper. *See Snook v. Trust Co. of G. Bank of Savannah*, N.A., 909 F.2d 480, 486 (11th Cir. 1990). As the Eleventh Circuit has emphasized, the asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *NE Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).

Here, Curling Plaintiffs' fundamental right to vote will not be irreparably harmed absent injunctive relief for several reasons. Plaintiffs can

vote absentee and utilize the United States mail, SEB-approved drop boxes, or delivery to county election offices to cast hand-marked paper ballots. *See* O.C.G.A. § 21-2-380, *et seq*; Ga. Comp. R. & Regs. r. 183-1-14-0.6-.14. Second, paper audit trails resolve any non-speculative harm. Ga. Comp. R. & Regs. r. 183-1-15-.04 (published for comment). Third, after over three years of litigation, there is no evidence of any actual tampering of equipment in use in elections; instead Curling Plaintiffs continue to impermissibly try to flip the burden and make State Defendants disprove a negative.

## IV.    The balance of the equities does not favor Curling Plaintiffs and the public interest weighs in favor of State Defendants.

Once again, the interests of equity and the public favor denying Curling Plaintiffs' requests for injunctive relief. When considering whether to grant a preliminary injunction, the Court must consider the balance of the equities carefully; cursory analysis is insufficient. *See Winter*, 555 U.S. at 26. Indeed, the "balance of equities and consideration of the public interest . . . are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Id*. at 32.

The balance of the equities and public interest weigh heavily in favor of State Defendants, not Curling Plaintiffs. Today is August 26, 2020. Databases for the November election will be built in the next week.

Supplemental Declaration of Chris Harvey, attached as Ex. G ("Harvey Supp. Dec.") at ¶¶ 3-6. Absentee ballots for the November 2020 election begin going out to voters in 20 days. *Id*. at ¶ 4. Early voting for the November 2020 election begins on BMDs in 48 days. *Id*. at ¶ 7. County election officials have spent months training pollworkers to use the Dominion system. *Id*. at ¶ 8. In a pandemic, the training process for pollworkers has been challenging and in-person training opportunities have been limited. *Id*. After the experiences of the June 9 primary, county and state election officials have worked to update processes and training to ensure that the November election runs as smoothly as possible. *Id*. at ¶ 9.

Further, as was clear last year, county election officials were unanimous that it was incredibly difficult and costly in *July* of 2019 to make changes for the November 2019 election. [Doc. 472-6, ¶¶ 10, 14] (Chatham); [Doc. 472-9 at 37:8-38:4, 84:3-9] (Gwinnett); [Doc. 472-8 at 32:10-16] (Morgan). That is even more true in *September* 2020, to make changes for the November election, Supp. Harvey Dec. at ¶¶ 10-11, as this Court has previously recognized. *Curling*, 334 F. Supp. 3d at 1326.

Curling Plaintiffs' suggestion that entirely changing Georgia's election system would "require some minor additional training" ignores reality. [Doc. 785-1, p. 31]. Curling Plaintiffs completely ignore the existing training for

27

election officials, the difficulty of recruiting pollworkers, and the efforts to update practices following June 9. Supp. Harvey Dec. at ¶¶ 12-13. Further, printing millions of paper ballots is not as simple as going to Kinko's—ballots must be printed by one of the small handful of ballot printers nationwide. Cobb Dec. at ¶ 12; Supp. Harvey Dec. at ¶ 14. Those printers are already dedicated for the November 2020 election and are unlikely to have capacity to begin printing a significant number of paper ballots for Georgia. Supp. Harvey Dec. at ¶¶ 14-15. In spite of these significant burdens given the current timing, Curling Plaintiffs do not attach or cite a single declaration from an election official that supports their allegation that State Defendants could change the election system on the timeline they demand.

Even if there was some theoretical way to implement Curling Plaintiffs' proposed system, the November election is practically already underway. This Court is well aware of the U.S. Supreme Court's direction about making changes to elections: "This Court has repeatedly emphasized that lower federal courts should not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020), citing *Purcell v. Gonzalez*, 549 U. S. 1 (2006) (per curiam). Except for a single case where the state consented to relief, every single change made by a district court for the 2020 elections has been stayed by the Supreme Court.

28

*See* [Doc. 766] (collecting cases). Georgia is more than on the eve of an election—the November 2020 election is underway for all practical purposes.

Given all of this reality, requiring State Defendants to change the entire election system in a matter of days—as Curling Plaintiffs request—is a recipe for disaster. Balancing the State of Georgia's substantial resource expenditures and timing of the November election against Curling Plaintiffs' non-existent burden arising solely from mere possibilities of error, it is clear that any burden on Curling Plaintiffs pales in comparison, and Curling Plaintiffs' arguments to the contrary miss the mark. Curling Plaintiffs brazenly maintain that the Court has already concluded there is a "threat of real harms" to the constitutional interest at stake in this case. [Doc. 785-1, p. 31]. But this Court's preliminary conclusion on those threats, based on a limited record, applied only to *DRE voting systems* and recognized the danger of upsetting the orderly conduct of elections. [Doc. 309 at 41]. The Court did not—and could not—make that determination regarding BMDs. *See* [Doc. 579 at 137].

Finally, Curling Plaintiffs' burden, if any, is minimal. As has been shown above, Curling Plaintiffs do not have a constitutional right to their

preferred balloting system,[17] and, therefore, their "burden" in using the Dominion BMD system is negligible. Further, even if Curling Plaintiffs had a constitutional right to a specific balloting system (which they do not), Georgia's no-excuse absentee ballot system—especially when combined with the drop boxes available in November 2020—allows Curling Plaintiffs to use their preferred version of paper ballots to exercise their voting rights, minimizing any alleged burden. Accordingly, when balancing the equities— which the Court is required to do before issuing any injunctive relief—there is no question that this balance tips in State Defendants' favor. *See Winter*, 555 U.S. at 26. The Court should deny Curling Plaintiffs' request for injunctive relief.

## **CONCLUSION**

Curling Plaintiffs have not provided this Court with actual election-based evidence, auditing developments, or other relevant evidence that supports their request for injunctive relief. As it did with their third motion, this Court should deny the fourth motion in this case.

---

[17] "Although the right to vote is fundamental, '[i]t does not follow, however, that the right to vote in any manner . . . [is] absolute." *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registrations & Elections,* 2020 U.S. Dist. LEXIS 36702 *14–15 (March 3, 2020) quoting *Burdick*, 504 U.S. at 433.

Respectfully submitted this 26th day of August, 2020.

Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Jonathan D. Crumly
Georgia Bar No. 199466
jcrumly@taylorenglish.com
James A. Balli
Georgia Bar No. 035828
jballi@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202

lparadise@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for State Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing **STATE DEFENDANTS' RESPONSE IN OPPOSITION TO CURLING PLAINTIFFS' FOURTH MOTION FOR PRELIMINARY INJUNCTION** has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson
