# EXHIBIT C
# Part 1 of 3



Deposition of:
## J. Alex Halderman , Ph.D.

*February 25, 2020*

In the Matter of:

## Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 3 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 1

1                  IN THE UNITED STATES DISTRICT COURT

2                 FOR THE NORTHERN DISTRICT OF GEORGIA

3                          ATLANTA DIVISION

4

5        FAIR FIGHT ACTION, et al.,

6                         Plaintiffs,

7            -vs-                   Case No. 1:18-cv-05391-SCJ

8        BRAD RAFFENSPERGER, in his

9        official capacity as Secretary

10       of State of the State of

11       Georgia, et al.,

12                         Defendants.

13       _____/

14

15

16

17            THE DEPOSITION OF J. ALEX HALDERMAN, Ph.D.

18            Taken at 31500 Wick Road

19            Romulus, Michigan

20            Commencing at 9:27 a.m.

21            Tuesday, February 25, 2020

22            Before Trisha Cameron, RDR, RMR, CRR, RPR, CSR

23

24

25

Page 2

1        APPEARANCES:

2        MR. ANDREW D. HERMAN

3        Miller & Chevalier

4        900 16th Street NW

5        Washington, D.C.   20006

6        (202) 626-5869

7        aherman@milchev.com

8             Appearing on behalf of the plaintiffs.

9

10       MR. BRYAN P. TYSON

11       Taylor English Duma, LLP

12       1600 Parkwood Circle, Suite 200

13       Atlanta, Georgia   30339

14       (678) 336-7249

15       btyson@taylorenglish.com

16            Appearing on behalf of the defendants.

17

18

19

20

21

22

23

24

25

Page 3

1                    INDEX TO EXAMINATIONS

2

3        WITNESS                                            PAGE

4        J. ALEX HALDERMAN, Ph.D.

5         EXAMINATION BY MR. TYSON                            6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                        EXHIBITS

2      DEPOSITION EXHIBIT                              PAGE

3        Exhibit 1    Notice of Deposition              9

4        Exhibit 2    Expert Report                    10

5        Exhibit 3    Supplement to Expert Report      10

6        Exhibit 4    EVN Website                      25

7        Exhibit 5    EVN Website -                    27

8                     Affiliated Organizations

9        Exhibit 6    Dr. Halderman's written          29

10                    statement to House

11                    Appropriations Subcommittee

12                    on Financial Service and

13                    General Government in 2019

14       Exhibit 7    Dr. Halderman's written          37

15                    statement to US Senate

16                    Select Committee on

17                    Intelligence

18       Exhibit 8    Report of the Select             43

19                    Committee on Intelligence

20       Exhibit 9    New York Times story, I          52

21                    Hacked an Election.  So Can

22                    the Russians

23

24

25

Page 5

| | | | |
|---|---|---|---|
| 1 | Exhibit 10 | The Washington Post article, | 55 |
| 2 | | Here's How to Keep Russian | |
| 3 | | Hackers From Attacking the | |
| 4 | | 2018 Elections. | |
| 5 | Exhibit 11 | Medium article, Want to Know | 56 |
| 6 | | if the Election was Hacked? | |
| 7 | | Look at the Ballots | |
| 8 | Exhibit 12 | Michigan Alumnus article, | 60 |
| 9 | | Hacking the Vote:  It's | |
| 10 | | Easier than you Think | |
| 11 | Exhibit 13 | Patent 8,033,463 B2 | 69 |
| 12 | Exhibit 14 | Verified Voting Foundation: | 97 |
| 13 | | Principles for New Voting | |
| 14 | | Systems | |
| 15 | Exhibit 15 | Study by University of | 182 |
| 16 | | Michigan, Can Voters Detect | |
| 17 | | Malicious Manipulation of | |
| 18 | | Ballot Marking Devices? | |

19

20          (Exhibits attached.)

21

22

23

24

25

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 6

1          Romulus, Michigan

2          Tuesday, February 25, 2020

3          About 9:27 a.m.

4                           *   *   *

5                     J. ALEX HALDERMAN, Ph.D.,

6                     having been first duly sworn,

7                 was examined and testified as follows:

8                           *   *   *

9               MR. TYSON:  This will be the

10             deposition of Dr. Alex Halderman taken by

11             Defendant Secretary of State Brad

12             Raffensperger for the purpose of discovery

13             and all purposes allowed under the Federal

14             Rules of Civil Procedure.  And we'll

15             reserve all objections except form and

16             privilege and responsiveness until trial

17             or first use, if that's acceptable.

18                  MR. HERMAN:  That's acceptable.

19                           EXAMINATION

20      BY MR. TYSON:

21      Q.   All right.  Well, good morning, Dr. Halderman.

22      A.   Good morning.

23      Q.   Brian Tyson.  We met before.  It's good to see you

24           again.

25      A.   Good to see you again too.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 7

1    Q.   So I want to go over a couple ground rules just as we

2         get started today.  Have you had a chance to have

3         your deposition taken before?

4    A.   I have.

5    Q.   Okay.  And so you're going to be familiar with this.

6         For our court reporter's sake, it's best that we

7         don't talk over each other.  In conversations,

8         sometimes that's easy to do.  Sometimes you will know

9         where I'm going with a question before I get to the

10        question mark.  It's best for everybody if you can

11        wait until I get to the question mark, then answer.

12             It's best also for a yes and no, instead of

13        uh-huh and huh-uh, just because that makes for a

14        clearer better transcript.

15             And we can take breaks whenever you want to

16        along the way.  My only request is that you would

17        answer the last question I asked prior to taking a

18        break.

19             And there have been times, and it happens

20        in every deposition, where we get to the question

21        mark of a sentence, I don't know what I'm asking, you

22        don't know what I'm asking, no one is -- it's totally

23        confusing.  Let me know if that happens, and I'll

24        rephrase the question.  So will that work for you?

25   A.   Yes, I understand.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 8

1    Q.   Perfect.  All right.  So what I want to do is first

2         talk through some pieces of kind of how you got ready

3         for today.  Then we'll move into your background and

4         experience and then get to the report.  That's kind

5         of the general flow we'll be working with for the

6         day.

7              So what did you do to get ready for your

8         deposition today?

9    A.   So for the deposition today, I reviewed -- I reviewed

10        material that was produced by Dominion to the

11        plaintiffs that the plaintiffs provided to me that

12        was about -- that was several thousand pages of

13        documentation.  And I'm also familiar with the

14        contours of Georgia's system more generally from work

15        that I've done in the past.

16   Q.   So in terms of documents you reviewed, documents from

17        Dominion, did you review any other documents to get

18        ready for today?

19   A.   Other documents beyond what I'm generally familiar

20        with.  Let me see.  I went back and looked at

21        documentation prepared in testing the Dominion

22        equipment in California, as well as the Poll Pads in

23        California.  I reviewed certifications from

24        Pennsylvania regarding the Poll Pads and the Dominion

25        equipment, I think documentation from Texas, and a

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 11 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 9

1        number of other resources that are cited in my

2        report.

3   Q.   Did you review any documents that are not cited in

4        your report to get ready for your deposition today?

5   A.   I don't believe so.  Not specifically for the

6        deposition today.  Perhaps the order from the Curling

7        case.  I reviewed that.

8   Q.   And that would be the 2019 order?

9   A.   Judge Totenberg's order in 2019.  That's correct.

10  Q.   Got it.  And did you talk with anybody about your

11       deposition today?

12  A.   I spoke to -- I spoke to Andrew and to Kurt, the

13       attorneys for the plaintiffs.

14  Q.   Anybody at the university who's not an attorney that

15       you spoke to?

16  A.   No.

17  Q.   Anyone else who's not one of the attorneys that you

18       talked to about your deposition today?

19  A.   No.  No.

20                  (Exhibit No. 1 marked.)

21  BY MR. TYSON:

22  Q.   Okay.  I'm going to hand you what we've marked as

23       Exhibit 1, the Notice of deposition.  I'm assuming

24       you've seen that document before.

25  A.   Yes, I have.

Page 10

1    Q.    Okay.  That's just your notice.  Then what I'm going

2          to do is go ahead and mark your reports.  That way we

3          can refer to it as we're going through the

4          biographical details.  That will be easy enough on

5          that.  So I'll hand you what we've marked as Exhibit

6          2.

7                        (Exhibit No. 2 marked.)

8    BY MR. TYSON:

9    Q.    I'll ask if that's the report that you filed in this

10         case.

11   A.    Yes.

12                  MR. HERMAN:  Can I just note for one

13             second, this is the unsigned version.

14                  MR. TYSON:  Right.  I'm going to hand

15             him --

16                        (Exhibit No. 3 marked.)

17   BY MR. TYSON:

18   Q.    So I'll hand you, make it complete, what I've marked

19         as Exhibit 3.

20   A.    Yes.

21   Q.    Is that the signature page for the report that is

22         Exhibit 2?

23   A.    Yes.

24   Q.    Okay.  Wonderful.

25                  MR. HERMAN:  I underestimated you.

Page 11

1          I'm sorry.

2              MR. TYSON:   Totally fine.

3    BY MR. TYSON:

4    Q.   All right.  So, Dr. Halderman, in paragraph 13 of

5         your report, you indicate that you're being

6         compensated at a rate of $750 an hour for your work

7         on this case, correct?

8    A.   That's correct.

9    Q.   And is that -- you indicate that's your customary

10        rate.  Do you provide discounts for your expert

11        services in other cases, or is that what you charge

12        for all services?

13   A.   I generally don't provide discounts.

14   Q.   And when you say you generally don't, are there

15        specific situations where you have?

16   A.   There's -- I can think of one other situation I have

17        where work involved -- work involved a large amount

18        of rote technical work that I could do on an

19        arbitrary timeline, in which case I have.

20   Q.   And is the rate of $750 an hour generally what you

21        charge when you're working on a technical review for

22        a state or other sorts of work like that?

23   A.   Well, it depends on the circumstances.  The work that

24        I would do for a state might be anywhere from pro

25        bono to the $750 rate.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 12

1   Q.   Do you know approximately how much time you spent

2        preparing your report?

3   A.   I don't recall exactly how much time.

4   Q.   And have you sent a bill in this case?

5   A.   I haven't yet.

6   Q.   Okay.  And you plan to?

7   A.   I plan to.

8   Q.   Okay.  And you don't have a current estimate of what

9        that amount will be?

10  A.   No, I haven't prepared the bill yet.

11  Q.   All right.  So let's talk a little bit about how you

12       got involved in this lawsuit.  Did someone contact

13       you about providing a report in this litigation, or

14       how did you get started being an expert in this case?

15  A.   I was contacted by Plaintiffs' Attorneys I suppose

16       approximately a year ago.  I'd have to go back and

17       check.

18  Q.   And when you were contacted, did anyone give you

19       direction about what you were supposed to examine

20       beyond what you've described in your report?

21  A.   No, I don't believe so.

22  Q.   Did Plaintiffs' Counsel provide you with any data or

23       documents for purposes of this report?

24  A.   Yes.  They provided me with material that they --

25       that was the result of a subpoena to Dominion.

Page 13

1   Q.   And I should have asked.  Beyond the Dominion

2        subpoena documents, did Plaintiffs' Counsel provide

3        you any other data or documents that you relied on?

4   A.   Nothing beyond what's in the docket.

5   Q.   And did Plaintiffs' Counsel ask you to make any

6        assumptions about facts in this case for your report?

7   A.   No, they didn't.

8   Q.   Have you read the amended complaint in this case?

9   A.   Yes, I have.

10  Q.   Have you read any of the depositions that were taken

11       in this case?

12  A.   I don't believe so.

13  Q.   You indicated some docket information.  Have you read

14       any of the briefs that were filed in this case?

15  A.   I have -- I've skimmed through the docket, and I've

16       read some of the materials.  I'm not sure I've read

17       any of the briefs in full.

18  Q.   I'm not asking for your legal opinion here.  But in

19       your own words, do you have a description of what you

20       believe this case is about?

21  A.   So this case is broadly about whether election

22       practices in the state of Georgia have violated the

23       rights of Georgia voters or had discriminatory

24       effects.

25  Q.   And for your report and your work in this case,

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 14

1       you're not alleging any racial component to any of

2       the problems that you've identified in your report,

3       correct?

4   A.  Well, the problems that I have discussed in my report

5       certainly could have a racial effect, especially if

6       an attacker seeking to so discord or alter the

7       outcome of an election targeted specific candidates

8       or racial groups for that effect.

9   Q.  For purposes of this report, though, you have not

10      examined any racial impacts that -- you can speculate

11      about there might be one.  But for purposes of your

12      report here, you're not alleging there are any racial

13      impacts, correct?

14  A.  I haven't gone back to examine racial data.

15  Q.  Okay.

16  A.  But certainly one of the risks, the problems that I

17      identify in this report could have is racially

18      disparate impacts.

19  Q.  And the opinions that you've authored in this report

20      in Exhibit 2 do not address the potential racial

21      impact, correct?  You're not analyzing -- let me

22      start over again.

23              The opinions you're expressing in Exhibit 2

24      are not an analysis of any racial effect of

25      particular methods of attack.  Is that a fair

Page 15

 1       statement?

 2   A.  Well, they raise the possibility that -- and describe

 3       methods by which an attack could occur that I think

 4       it's clear could have a racial impact.  Do I analyze

 5       exactly what that impact would be?  I think that

 6       depends on what the attacker is hoping to achieve.

 7   Q.  Maybe I can put a finer point on this.  In the

 8       opinions you're expressing in your report, you're not

 9       alleging that Georgia has selected particular voting

10       machines or voting practices to have a racially

11       disparate impact, are you?

12   A.  I'm not alleging intention.

13   Q.  And you're not expressing any opinion about

14       intention; is that correct?

15   A.  No, I don't go to intention.

16   Q.  As part of your work on your report, have you spoken

17       to anyone in Georgia to obtain any information that

18       you later used in your report beyond Plaintiffs'

19       Counsel?

20   A.  I have had past conversations with people in Georgia

21       that have informed my -- that have informed my

22       overall knowledge about Georgia election systems.

23   Q.  And who would those individuals be?

24   A.  I've spoken to Dr. Richard DeMillo at Georgia Tech

25       and Dr. Wenke Lee at Georgia Tech.  That's just two

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 18 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

1      individuals.  And I have -- those would be probably

2      the two primary people who have informed my -- helped

3      inform my general knowledge about Georgia elections.

4   Q.  Have you spoken to any county election officials in

5      Georgia?

6   A.  No, I don't believe so.

7   Q.  Have you spoken with anyone in the Secretary of

8      State's office that resulted in information that was

9      included in your report?

10  A.  No.  But I'm generally familiar with their testimony

11     and the Curling matter and earlier litigation.

12  Q.  And when you refer to earlier litigation, beyond

13     Curling, what are you referring to there?

14  A.  Boy, all of this litigation has been going on for a

15     while, hasn't it?  I think there was -- am I correct

16     there was a state matter that -- before the Curling

17     federal matter in which there was additional

18     testimony?

19  Q.  Does Favirito versus Handel as a state court matter

20     ring a bell?  If not, that's fine.  I just thought I

21     could help identify it for you.  But if not, that's

22     fine.

23  A.  I'm sorry.

24  Q.  No problem.  Let's talk a little bit about your kind

25     of journey to here, starting with your undergraduate

J. Alex Halderman , Ph.D.                                        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 17

1              work at Princeton.  I know that you had your CV

2              attached to your report.  So I just want to walk

3              through a few questions on that.

4                       Your thesis for undergraduate work you

5              indicate was titled Investigating Security Failures

6              and Their Causes, An Analytic Approach to Computer

7              Security.

8                       Can you tell me a little bit about how you

9              arrived at that topic?  I'm sorry.  That was your

10             Ph.D. thesis.  I misspoke on that.

11      A.     How I arrived at that topic?  Can you -- what do you

12             want to know?

13      Q.     Sure.  So you focus obviously on computer security

14             and those types of issues.  How is it that you

15             arrived at wanting to study or studying this

16             particular area, cybersecurity?

17      A.     I see.  I started working on studying security

18             questions even when I was an undergrad at Princeton.

19             So you'd have to go back even farther.  But I suppose

20             what interested me most about security was that it

21             bridged both technical problems that were of

22             significant technical interest and problems involving

23             human beings and their lives, and there was an

24             opportunity in security to -- there was an

25             opportunity in security to bridge both the technical

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 20 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 18

1        and the human elements.

2   Q.   And I know from a timing perspective we're looking at

3        kind of post-2000 election.  I'm assuming that the

4        rise in electronic voting around the same time

5        period, was that also a factor, seeing the changes in

6        the growth there?

7   A.   I'm not sure that that is what initially attracted me

8        to the security field.  I had already been working in

9        the area, but the rise of electronic voting at the

10       time was certainly one of the challenging new

11       research problems that was exciting.

12  Q.   I see you finished up in Princeton in 2009.  And then

13       where did you go from there before arriving at the

14       University of Michigan?

15  A.   I came directly to the University of Michigan.

16  Q.   Oh, I see.  I'm sorry.  I was looking at the top line

17       there.  As an assistant professor?

18  A.   That's right.

19  Q.   And so are you currently tenured at the University of

20       Michigan?

21  A.   I am.

22  Q.   And your entire academic career as a professor has

23       been at the University of Michigan, correct?

24  A.   That's correct.

25  Q.   And was there a particular item or issue that led you

Page 19

1          from Princeton to Michigan?

2    A.    Not really.  Michigan -- Michigan has a very

3          well-ranked computer science department and has one

4          of the best computing systems groups in the country,

5          which is the broader area in which most security

6          research lies.

7    Q.    And so in terms of courses that you are teaching, you

8          list some of those on there.  You've taught courses

9          on election, cybersecurity.  It's fair to say that

10         your focus really has been on cybersecurity in the

11         election context; is that a fair statement?

12   A.    That has been one of the large focuses of my work.

13         But my work is about computer security and

14         cybersecurity broadly, also work about encryption

15         technology, about securing devices attached to the

16         internet, and so on.

17   Q.    And based on the courses you have in your CV, ethics

18         is also a part of the questions you have to deal

19         with; is that correct?

20   A.    Yes.  That's correct.

21   Q.    And so in terms of kind of general principles of

22         ethical implications involved with cybersecurity

23         work, what are some topics that you cover with your

24         students on those areas?

25   A.    Questions like responsible disclosure, that is

Page 20

```
 1          informing manufacturers of vulnerabilities in a way

 2          that helps get the vulnerabilities fixed.  Questions

 3          about when is it right or lawful or not to conduct an

 4          assessment of a particular system, etcetera.

 5     Q.   And when you say when it's right or lawful to conduct

 6          an assessment of a particular system, can you

 7          elaborate on that for me real quick?

 8     A.   Well, there are sometimes when there are some

 9          vulnerabilities in systems that are too dangerous to

10          investigate without the cooperation of the people

11          running a system because by virtue of investigating

12          them, you might disrupt the system in a way that

13          causes broader damage.  For instance, trying to

14          without permission demonstrate ways that you could

15          hack into a hospital, which might have the effect of

16          causing people to die.  That's probably not an

17          ethical exercise in hacking.  If there are safer

18          alternatives, it would be preferred to attempt those

19          safer alternatives.

20     Q.   And then do you do any consulting or offer services

21          to companies that want you to investigate potential

22          vulnerabilities that they have?

23     A.   I have a startup company that I founded that is in

24          the business of helping companies understand the

25          vulnerabilities in their internet-facing systems.
```

J. Alex Halderman , Ph.D.                          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 21

1    Q.   And so I'm assuming the business model is a company

2         would retain your services through your

3         corporation -- through your company to help them

4         evaluate that?

5    A.   No.  It's not so much about retaining my services.

6         But we produce application software that helps

7         companies understand their exposure.

8    Q.   And what is the name of your company?

9    A.   It's called Censys, C-e-n-s-y-s.

10   Q.   And do you sell the software that helps companies

11        understand their exposure?

12   A.   It's kind of an annual license model.

13   Q.   And then after a company understands its exposure,

14        does Censys offer services to help it mitigate those

15        risks?

16   A.   Yes, essentially.

17   Q.   And is that more on a consulting basis as opposed to

18        the annual license model?

19   A.   No.  It's not really a consulting model.  We help to

20        point out what the vulnerabilities are and help you

21        understand which ones are important to mitigate.

22   Q.   And I'm assuming in your work with Censys and then

23        your work at the University of Michigan you never

24        encountered a system with zero vulnerabilities.  Is

25        that safe to say?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 22

1   A.   Yes.  I think that's probably safe to say, that
2        computing systems in general of more than trivial
3        complexity as a rule have vulnerabilities.
4   Q.   And in your work with Censys, are there situations
5        where a company is not able to mitigate all the
6        vulnerabilities you identify?
7   A.   Well, not able is a bit of a tricky statement.  So I
8        think it's a question of -- all of the
9        vulnerabilities that we identify are things that can
10       be mitigated.
11  Q.   And then it's up to the company to choose whether or
12       not they want to mitigate those vulnerabilities,
13       right?
14  A.   That's right.  Nobody forces anyone to mitigate
15       vulnerabilities in general.
16  Q.   And so ultimately, I guess maybe this is too general
17       of a statement, but there are companies that choose
18       to encounter a level of risk for some reason known to
19       them?
20  A.   Well, that's right.  And sometimes -- sometimes
21       that's clearly irresponsible.
22  Q.   Can you tell me about ISRG and what that is.
23  A.   Sure.  ISRG, the Internet Security Research Group, is
24       a not-for-profit company that I co-founded.
25  Q.   And what type of work does ISRG do?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 23

1   A.   So ISRG runs some of the critical security

2        infrastructure for the internet.  It runs a service

3        called Let's Encrypt, which is a certificate

4        authority.  That means that it vouches for the

5        identity of websites.  So if you connect to a website

6        that has https, one of the crucial steps that's going

7        on behind the scenes before you make that connection

8        is that some trusted authority has vouched for the

9        identity of the site so that your computer knows it's

10       talking to the real website and not to an attacker.

11       So ISRG and Let's Encrypt are the worlds largest

12       certificate authority.  They've issued a billion

13       certificates as of this week for several hundreds of

14       millions of websites.

15  Q.   Have you ever seen a situation where an attacker

16       attempted to appear to be a certificate authority to

17       gain access to a system.

18  A.   Yes.

19  Q.   Is that a fairly typical method of trying to attack

20       or hack a system?

21  A.   To pretend to be a certificate authority?  It's one

22       of the attacks that we as a security community spend

23       a lot of time trying to make sure it doesn't happen.

24  Q.   But it is a potential risk --

25  A.   Yes.

Page 24

1    Q.   -- correct?  Are you paid for your services with

2         ISRG?

3    A.   No.  I only receive compensation for my travel.

4    Q.   And I'm assuming you are paid for the services Censys

5         provides, correct?

6    A.   Yes, I am.

7    Q.   So you benefit when there is a -- having visibility

8         about exposing vulnerabilities is a benefit to you as

9         advertising for Censys.  Is that fair to say?

10   A.   I suppose.  It depends on what the context of that

11        vulnerability is.

12   Q.   You indicate in your CV that in 2011 you received the

13        Election Verification Network's John Gideon Memorial

14        Award.  Do you recall that?

15   A.   Yes.

16   Q.   And what is the Election Verification Network?

17   A.   The Election Verification Network is a -- is a group

18        of election technology experts and election officials

19        and -- who are -- who work in the topic area of

20        increasing the security of elections.

21   Q.   And I'm assuming you've participated in EVN

22        conferences in the past?

23   A.   I have, yes.

24   Q.   And what does the John Gideon Memorial Award

25        recognize?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 25

1   A.   I think it's scoped as recognizing contributions to

2        election integrity.

3                (Exhibit No. 4 marked.)

4   BY MR. TYSON:

5   Q.   Dr. Halderman, I'm going to hand you what we've

6        marked as Exhibit 4.  And this is the -- appears to

7        be -- well, it's from the website of EVN for the 2019

8        conference.  And if you could turn over to the third

9        physical page.

10  A.   Page 3?

11  Q.   Yes.

12  A.   All right.

13  Q.   There's a 1:45 p.m. session on usability and voter

14       verification.  Are you with me on that?

15  A.   Yes.

16  Q.   And was this one of the panels for EVN on which you

17       appeared?

18  A.   I don't believe I appeared on that panel, no.

19  Q.   Okay.

20  A.   But I'm not listed as a panelist, and I don't recall

21       being on that panel.

22  Q.   At the -- I see your name right there.  I see Josh

23       Benaloh from Microsoft, Michelle Bishop, and then J.

24       Alex Halderman.

25  A.   Excuse me.  I was looking at the 11:45.  You mean the

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 26

1          1:45 panel?

2    Q.    Got it.  My apologies.

3    A.    Yes.  That panel I did speak on.

4    Q.    And can you tell me a little bit about what usability

5          and voter verification, what topics this panel

6          covered?

7    A.    Yes.  So this panel was about -- this panel was in

8          part about ballot marking devices and the issues of

9          usability and accessibility connected to them.  It

10         was also in part about what are called end-to-end

11         verifiable voting protocols and accessibility and

12         usability attributes connected to them.

13   Q.    And maybe I can get some definitions of terms.  So

14         when you say the usability attributes of a system,

15         what is that referring to?

16   A.    It refers to -- it refers to how humans interact with

17         the technology and whether they're able to use it

18         correctly and securely.

19   Q.    And accessibility as a topic, what does that cover?

20   A.    Potential -- primarily that covers problems that may

21         involve voters or other users who have certain

22         disabilities, such as physical disabilities, and

23         their ability to use the technology.

24   Q.    And when you refer to end-to-end encryption, can you

25         describe that a little bit, please.

Page 27

1    A.   So end-to-end verifiable voting protocols are a

2         family of technologies that use advanced encryption

3         methods to provide assurance that the election

4         results were correct essentially.

5    Q.   And that's an area that's still being researched, or

6         are there products available today that provide that?

7    A.   There are products available today that provide that.

8         But it certainly is still actively being researched,

9         and there were some significant limitations to the

10        products that provide it today.

11   Q.   Let me hand you next what will be marked as Exhibit

12        5.

13                  (Exhibit No. 5 marked.)

14   BY MR. TYSON:

15   Q.   And this is from the EVN website affiliated

16        organizations.  Are you aware of affiliated

17        participating organizations within EVN?

18   A.   I'm aware of some organizations that are affiliated

19        or participating, but I'm not sure that I've seen

20        this list before.

21   Q.   Okay.  And my main question, I see organizations like

22        the South Carolina Progressive Network, Common Cause,

23        the Brennan Center, the Advancement Project.  And

24        I -- my question is just going to be, do you know if

25        there are any conservative lean organizations

J. Alex Halderman , Ph.D.                                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 28

1          affiliated with EVN?  If you don't, that's fine.

2    A.    I don't know the politics of each of these

3          organizations.  I'm sorry.

4    Q.    Easy enough.  So let's talk a little bit about the

5          expertise here.  You're an expert in cybersecurity.

6          You focused on elections, as we've talked about.

7                    Do you consider yourself an expert in

8          election administration?

9    A.    In election administration?  The subset of election

10         administration that concerns securing elections I do

11         consider myself an expert.

12   Q.    Okay.  But not in election administration broadly?

13   A.    Not in all aspects of election administration.

14   Q.    And so one of those areas within election

15         administration where you would not be an expert is

16         on, for example, best practices on chain of custody

17         for paper ballots; is that true?

18   A.    That concerns security.  So I do think I have some

19         expertise there.

20   Q.    Okay.  Which components of election administration do

21         not involve security that you would not consider

22         yourself an expert in?

23   A.    Well, I suppose not being an expert, I can't identify

24         all of the expert -- the areas that I lack expertise

25         in.

J. Alex Halderman , Ph.D.                                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 29

1    Q.   Well, and the reason why I ask is in terms of

2         designing an election system, ultimately every piece

3         of design of an election system has to touch on

4         security in one way or another.  Is that fair to say?

5    A.   Probably significant amounts of the design of an

6         election system do.  I wouldn't say that every part

7         does.

8    Q.   And we have stories of, I'm sure you've heard, of

9         paper ballots being thrown into rivers, being

10        transported various methods between polling places

11        and central offices.  Do you consider yourself an

12        expert on the design of those components of handling

13        paper ballots?

14   A.   Yes, I do have expertise that's in that area.

15   Q.   And do you consider yourself an expert in the design

16        of auditing practices for elections?

17   A.   Yes.  Yes, I do.

18   Q.   Let's talk next about your testimony to congress.

19        I'll start with your most recent testimony.  You

20        testified to the House Appropriations Subcommittee on

21        Financial Service and General Government in 2019.  Do

22        you recall that testimony?

23   A.   Yes, I do.

24                  (Exhibit No. 6 marked.)

25

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 30

1  BY MR. TYSON:

2  Q.  I'll hand you what we've marked as Exhibit 6.  I'll

3      ask if this is your written testimony for that

4      committee.

5  A.  Yes, it appears to be.

6  Q.  And almost a year ago almost to the day, not quite.

7      So --

8  A.  Has it really been only a year?

9  Q.  2019 was a long year.

10              MR. HERMAN:  Wait until 2020.

11 BY MR. TYSON:

12 Q.  All right.  So in the second paragraph beginning

13     three years ago, you reference hackers penetrating or

14     manipulating efforts and targeting election

15     infrastructure, including voter registration systems

16     in at least 18 states.  Was Georgia one of those 18

17     states?

18 A.  Yes, it was.

19 Q.  Okay.  And so it's your testimony that hackers

20     targeted Georgia's voter registration system?

21 A.  So it's my testimony that subsequent to what I -- to

22     my written testimony from a year ago, the Senate

23     Intelligence Committee investigation has concluded

24     that the Russian -- the scope of the Russian attacks

25     was likely all 50 states, which would include

Page 31

1        Georgia.

2    Q.  And it's your testimony that that included Russian

3        attacks on Georgia's voter registration system, not

4        just on other components of the election system?

5    A.  I think that it's a fair inference from the findings

6        of the Senate Intelligence Committee that parts of

7        the system that are exposed to the internet like the

8        registration system were among those that the

9        Russians were targeting.

10   Q.  And when you say a system was targeted, you're not

11       necessarily saying it was accessed, correct?

12   A.  Not necessarily.

13   Q.  And not necessarily that it was manipulated in any

14       way, correct?

15   A.  Certainly not that -- you certainly can't conclude

16       from that that it was successfully manipulated.  No.

17   Q.  In the next paragraph, the end of that paragraph you

18       say, we were spared such a blow to the foundations of

19       American democracy only because Russia chose not to

20       pull the trigger.

21   A.  That's right.

22   Q.  And so would that be consistent with targeting but

23       not manipulating, that those are two different

24       things?

25   A.  So what we know is also, again, this is from the

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 32

1       bipartisan findings of the Senate Intelligence

2       Committee, is that in one or more states, Russia had

3       the technical ability to manipulate or destroy voter

4       registration data.

5   Q.  But it's not your testimony that Russia had that

6       ability as to Georgia's voter registration system; is

7       that correct?

8   A.  Well, so it's not my testimony that the Senate

9       Intelligence Committee has concluded that Russia had

10      that ability in Georgia.  Could Russia have done that

11      in Georgia?  I think it's very likely.

12  Q.  Okay.  But you don't have any personal knowledge or

13      anything that would indicate to you that Georgia's

14      voter registration system was accessed or could have

15      been accessed by the Russians?

16  A.  Could have been accessed by the Russians?  I think

17      based on what I know about the security posture of

18      the Georgia voter registration system and about the

19      capabilities of the Russian attackers, I do think

20      it's likely that they could have accessed it.

21  Q.  Okay.  But you don't have any personal knowledge that

22      it was, in fact, accessed?

23  A.  No, I don't.

24  Q.  On the second --

25  A.  When do you think your section will be done just

Page 33

1       so -- I think we're getting kind of closer to an

2       hour.

3   Q.  Sure.  Maybe five, ten minutes.  Do you want to take

4       a break now?

5   A.  All right.  We'll take a break after that.  Let me

6       stretch.

7   Q.  Sure.  We can finish this document, we can do that.

8   A.  Of course.

9   Q.  So on the second physical page, you identify three

10      essential measures to protect and defend our election

11      infrastructure.  And the first you indicate is to

12      replace obsolete and vulnerable voting systems, such

13      as paperless systems with optical scanners and paper

14      ballots.

15              Are you including ballot marking device

16      systems in that as an option that we should look to

17      move to or exclusively hand-marked paper ballots?

18  A.  Ballot marking devices are important in any system

19      that uses paper ballots in order to provide an

20      independent accessible voting option for voters with

21      disabilities.  But crucially, the risk of using

22      ballot marking devices becomes very substantial when

23      they're used for all voters, as Georgia does, as

24      opposed to just for voters who request them, for

25      instance, a smaller fraction of voters.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 34

1   Q.   Would you say it's better from a security standpoint

2        for a state to replace a paperless system with a

3        system that involves at least some paper?

4   A.   Depends what they do with that paper.  If they don't

5        look at that paper or they're not looking at enough

6        of that paper, then the paper isn't serving the

7        purpose.

8   Q.   And that's true of a hand-marked paper ballot system

9        or a ballot marking device system, correct?

10  A.   If they don't look at it, that's right.  It's that

11       the paper isn't serving a purpose.

12  Q.   And which leads us to the second piece there,

13       advocating looking at the paper.  And you advocate

14       what's best -- what's known as a risk-limiting audit;

15       is that correct?

16  A.   Yes.  I recommend RLAs.

17  Q.   So an RLA, you recommend that whether a state is

18       using hand-marked ballots or ballot marking device

19       ballots, correct?

20  A.   Yes, I do.

21  Q.   On the next page, page 3, you point out that paper

22       ballots, manual audits, and security best practices

23       are endorsed by a lot of folks, including the

24       National Academies of Science, Engineering, and

25       Medicine.  I know we had this discussion previously.

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 37 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 35

1         But you disagree with the National Academy of

2         Sciences as to ballot marking devices; is that right?

3    A.   No, I wouldn't say that I disagree.  The National

4         Academies' report called specifically for further

5         research.  And to the question of validation on voter

6         verification of ballot marking devices and ballots

7         that they produce, substantial subsequent research,

8         including research that my own group has conducted,

9         has led to further understanding of the security

10        risks of ballot marking devices.

11   Q.   At this point, the National Academy of Sciences has

12        not changed its recommendation recommending that

13        states use either hand-marked paper ballots or ballot

14        marking devices, correct?

15   A.   I believe they'd have to go through a new consensus

16        report process in order to change what they've

17        written, and that's a process that hasn't happened

18        yet.

19   Q.   So that's a no, they haven't changed their

20        recommendation yet?

21   A.   They have not changed the published report.  They

22        haven't released the new recommendation.

23   Q.   Down at the bottom of page 3, you indicate that many

24        states would like to replace vulnerable and obsolete

25        equipment, but they are struggling to figure out how

Page 36

1      to pay for it.  So you would agree with me that there

2      are a lot of considerations for states in looking at

3      replacing voting equipment, including financial,

4      correct?

5   A.  Yes.

6   Q.  Then on the bottom of page 4, you refer to

7      voter-verifiable paper audit trails, VVPATs.

8   A.  Yes.

9   Q.  And you indicate those are badly inferior to paper

10      ballots.  Are they inferior to ballot marking device

11      paper ballots as well?

12   A.  Let me see what I've written here.  Excuse me just a

13      minute.

14   Q.  Take your time.

15   A.  So VVPATs are inferior to certain kinds of ballot

16      marking device ballots, but they do share some of the

17      problems of ballot marking device ballots.

18   Q.  I'm assuming that VVPATs and ballot marking device

19      ballots, they are both superior to paperless DREs?

20   A.  When combined with rigorous audits, they're both an

21      improvement.  The limitation is -- one of the key

22      limitations has to do with particularly close

23      elections and whether the verifiable paper trail in

24      either case accurately reflects voters' intentions.

25   Q.  Okay.  All right.  That's all I have for that

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 39 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 37

1    exhibit.  So we can go ahead and take a break for a

2    few minutes.

3  A.   Okay.

4            (Recess taken.)

5  BY MR. TYSON:

6  Q.   Dr. Halderman, next I want us to talk about your

7    testimony to the Senate Intelligence Committee in

8    2017.  How were you invited to attend the US Senate

9    Intelligence Committee, if you recall?

10  A.   How was I invited?  One of the -- one of the

11    committee staffers e-mailed me and invited me to

12    testify.

13            (Exhibit No. 7 marked.)

14  BY MR. TYSON:

15  Q.   I'm going to hand you what we've marked as Exhibit 7.

16    Is that your statement to the Senate Select Committee

17    on Intelligence?

18  A.   This is my written statement.

19  Q.   If you could turn with me to page 2.  You talk about

20    in the second paragraph that optical scanners and DRE

21    voting machines are computers.  Then the third

22    sentence you say, fundamentally, they suffer from

23    security weaknesses similar to those of other

24    computer devices.

25            You'd agree that anything that is a

Page 38

1          computer has possible security vulnerabilities?

2     A.   Yes, in general.

3     Q.   And I think, as we talked about earlier, that's true

4          of any computer.  There's going to be some

5          vulnerability that a dedicated researcher could find.

6          Fair to say?

7     A.   Yes, that's fair to say.  That's why there's some

8          applications in which we shouldn't blindly trust

9          computers to function correctly.

10    Q.   And you mention optical scanners in this group.  Is

11         that why you advocate for audits even for hand-marked

12         paper ballots counted by optical scanners?

13    A.   Yes.  Essentially that because optical scanners can

14         be hacked so that they count incorrectly, it's

15         important to verify that the election outcome is

16         correct through physical inspection of the records

17         that match the voters' intent.

18    Q.   On the third page, first full paragraph, you mention

19         that vulnerabilities are endemic throughout our

20         election system.

21              If a jurisdiction was using exclusively

22         DREs and then moved to a hand-marked paper ballot

23         system counted by optical scanners but did not

24         utilize any audits whatsoever, would you consider

25         that more or less secure as an environment?

Page 39

1   A.   But did not utilize any audits.  I would characterize

2        it as a small improvement, although still a

3        significant security risk, such as such a system

4        could withstand, for instance, the total sabotage of

5        the optical scanners and still produce an election

6        result.

7   Q.   But it could not withstand a hacking of the optical

8        scanners that was never discovered because there were

9        no audits, correct?

10  A.   That's correct.

11  Q.   If you could turn with me to page 5.  The very top of

12       page 5 and then the first full paragraph on page 5

13       discuss the Russians being in a position to sabotage

14       equipment causing the failure of voting machines,

15       resulting in long lines, and then putting the

16       Russians in a position to spread an attack and

17       potentially steal votes.

18            Is there any evidence that the scenarios

19       outlined in those first two paragraphs on page 5

20       occurred in an election?

21  A.   There is evidence that Russia did attack one or more

22       vendors of election technology and attempt to spread

23       from there to the systems of municipalities.  There

24       is -- I think it's a remaining question whether they

25       got any farther than that.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 40

1    Q.   And so is there any evidence that the Russians have
2         sabotaged equipment on election day?
3    A.   So there are failures of equipment on election day
4         that there is I think it's fair to say substantial
5         question whether that failure is the result of an
6         attack or just of other forms of human error.
7    Q.   But sitting here today, you don't have any evidence
8         that equipment failure on election day was caused by
9         a Russian attack, correct?
10   A.   How would we have evidence one way or another?
11        most -- there have been few or no examinations of
12        polling place equipment since 2016 that would reveal
13        one way or another conclusively whether attacks had
14        been successful.
15   Q.   So let me ask again.  So sitting here today, you
16        don't have any evidence that any failure of equipment
17        on election day was caused by Russians, correct?
18   A.   No.  I cannot say that with high certainty that
19        failures were caused by Russia.
20   Q.   And you're not testifying to the Senate Intelligence
21        Committee or in your report here that -- I should
22        strike that.  Let me go to the next one.
23             And you don't have any evidence sitting
24        here today that the Russians have stolen votes as a
25        result of an attack on voting machines, correct?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 41

1    A.   No, there is no evidence to my knowledge that that

2         did take place.  It's -- the problem is that there

3         was nothing technical stopping that from taking place

4         in certain jurisdictions.

5    Q.   But as we discussed in your prior testimony, just

6         because you have the ability to aim the gun doesn't

7         mean you're going to pull the trigger, correct?

8    A.   No, that's right.  As I say, Vladimir Putin

9         apparently decided not to pull the trigger, and

10        that's what stopped massive chaos in 2016.

11   Q.   And in the third full paragraph on page 5 you say you

12        don't know how far the Russians got in their effort

13        to penetrate our election infrastructure, nor whether

14        they interfered with equipment on election day.  And

15        sitting here today, you still don't know how far they

16        got, correct?

17   A.   Unfortunately, that is correct.  There are still

18        large areas of election infrastructure that have not

19        been -- that have not been analyzed since 2016 in a

20        way that would allow us to know.  We may never know

21        how far the Russians got.

22   Q.   On page 6 you're reiterating the points of what you

23        recommend for safeguarding elections, and this

24        testimony obviously is in 2017.  So in the first

25        bullet when you advocate optical scanners and paper

Page 42

1       ballots, at this time in 2017, were you also

2       including ballot marking devices for all voters or

3       only for those with disabilities?

4    A.  I don't say one way or another in this testimony.

5       And I think that at that time, I still would have

6       said the safer thing to do is to limit the use of

7       ballot marking devices to less than all voters.

8    Q.  Have you had a change of your view of ballot marking

9       devices between 2016 and today based on the research

10      you've conducted, or have you always taken the

11      position that ballot marking devices for less than

12      all voters is the best system?

13   A.  I think that my view has gone from one of the

14      conservative positions that ballot marking devices

15      are less safe than hand-marking to one that is the

16      strong research supported conclusion is that ballot

17      marking devices are far less safe.  But I think -- I

18      think at the time that this was written back in 2017,

19      I would have acknowledged that we don't yet have

20      enough evidence to conclude strongly one way or the

21      other about ballot marking devices.

22   Q.  In your CV, you also reference five congressional

23      briefings between May 2017 and September 2019.  What

24      did those briefings involve?

25   A.  Those briefings involved generally public meetings on

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 43

1              Capital Hill somewhere in which I tried to educate

2              members of congress and their staff about some of the

3              security risks involved in elections.

4    Q.   And were those briefings focused on the

5              vulnerabilities inherent in DREs, or did you discuss

6              other topics related to election security?

7    A.   I discussed other topics too.

8    Q.   And do you recall what those other topics would have

9              been?

10   A.   Well, in general, the threats of -- threats of

11             tampering with other kinds of voting machines, like

12             optical scanners or ballot marking devices.  They

13             would have covered risks in other components of the

14             election infrastructure like registration or

15             reporting.

16   Q.   Have you reviewed the Senate Intelligence Committee's

17             report on Russia specifically involving the efforts

18             to interfere with election infrastructure?

19   A.   Yes.

20   Q.   I'm going to hand you what we've marked as Exhibit 8.

21                   (Exhibit No. 8 marked.)

22   BY MR. TYSON:

23   Q.   And I'll ask is this a report from the Senate

24             Intelligence Committee that you have reviewed

25             previously?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 44

1    A.   Yes, I have reviewed this.

2    Q.   I just want to ask a few questions, kind of walk

3         through this.  If you could turn first to page 3.

4         Under the heading that indicates findings, the first

5         paragraph obviously redacted on a number of points.

6         Then the unredacted last sentence, the committee has

7         seen no evidence that any votes were changed or that

8         any voting machines were manipulated.

9              You'd agree that the committee had access

10        to more information than you had access to in terms

11        of Russia's activities, right?

12   A.   I would.  Although, I would note that this is

13        carefully phrased, that they've seen no evidence.  So

14        it's, again, acknowledging the limits of the

15        capabilities of the intelligence community to acquire

16        such evidence, especially from systems that just

17        don't generate that kind of evidence.

18   Q.   And it's not your testimony that votes were changed

19        in any election, right?

20   A.   No, it's not.

21   Q.   And it's not your testimony that any voting machine

22        used in an election was manipulated, correct?

23   A.   No, it's not my testimony that any voting machine was

24        manipulated.  It's my testimony that the possibility

25        was there and that in significant cases if it had

Page 45

1          occurred, we might not know it.

2     Q.   If you could turn next to page 11.  Are you familiar

3          with Dr. Liles who testified to the committee?

4     A.   I'm sorry.  Where are you referring to?

5     Q.   Page 11.

6                    MR. HERMAN:  At the top.

7                    THE WITNESS:  Oh, I see.  I see.

8     BY MR. TYSON:

9     Q.   First bullet at the top.  Do you know who Dr. Liles

10         is?

11    A.   I don't recall who Dr. Liles is actually.

12    Q.   Okay.  Let me ask about the quote that's there.

13         Scanning for vulnerabilities, quoted in the report,

14         is analogous to someone walking down the street and

15         looking to see if you are home.  A small number of

16         systems were unsuccessfully exploited as though

17         someone had rattled the doorknob but wasn't able to

18         get in.  However, a small number of the networks were

19         successfully exploited.  They made it through the

20         door.

21                   Do you agree with that quote that's there

22         in terms of the activities that you're aware of in

23         the 2016 election?

24    A.   With regard to the voter registration system

25         activities, I do agree with that characterization.

Page 46

1    Q.   Do you agree with -- would you use this description

2         for any other systems beyond the voter registration

3         systems?

4    A.   I'm not sure I would use this description for other

5         systems beyond voter registration.

6    Q.   And why is that?

7    A.   Because the pattern of activities that involved

8         attempts to infiltrate vendor systems and then spread

9         to municipalities, those don't have this form of just

10        rattling the door.  Those were -- those were a

11        different shape of attack.

12   Q.   Okay.  Let's go next to the next page, page 12.

13        Right before the extensive series of redactions,

14        there's a statement that intelligence developed later

15        in 2018 bolstered Mr. Daniel's assessment that all 50

16        states were targeted.

17              Is that consistent with your understanding

18        of Russia's activities in the 2016 election?

19   A.   Yes, it is.

20   Q.   And as we've discussed, targeting is not necessarily

21        the same as manipulating or accessing.

22   A.   That's right.  It's probably step one.

23   Q.   Let's go now to towards the very end, page 59.

24   A.   Oh, 59.

25   Q.   Yeah.  Way towards the back.  So the page immediately

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 49 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 47

| | | |
|---|---|---|
| 1 | | prior, just for context, the recommendations of the |
| 2 | | committee to secure the vote itself.  The first |
| 3 | | bullet there recommends the purchase of more secure |
| 4 | | voting machines and recommends that any machine going |
| 5 | | forward should have a voter-verified paper trail and |
| 6 | | remove or render inert any wireless networking |
| 7 | | capability.  Do you agree with that recommendation? |
| 8 | A. | You're talking about the first bullet here? |
| 9 | Q. | Yes. |
| 10 | A. | On page 59.  I'm just making sure I'm looking at the |
| 11 | | right -- I would go farther than that recommendation, |
| 12 | | but I think that -- but I don't disagree with that as |
| 13 | | it stands. |
| 14 | Q. | And as I understand your testimony so far, you would |
| 15 | | say that this recommendation is not true of Georgia's |
| 16 | | new voting system; is that correct?  Or is it true of |
| 17 | | Georgia's new voting system? |
| 18 | A. | So I think this does apply to Georgia's new voting |
| 19 | | system.  But as I said, I think just this |
| 20 | | recommendation by itself is not enough to render the |
| 21 | | voting system secure, and I would certainly go |
| 22 | | farther. |
| 23 | Q. | So to make sure I have that right, you believe |
| 24 | | Georgia's system complies with the recommendation of |
| 25 | | this first bullet of the committee's recommendations, |

Page 48

1        but you would go further than the committee, correct?

2   A.   Yes.  Based on the science that's happened since 2017

3        or since -- since the committee received its

4        testimony that's the basis of this.  Yes.

5   Q.   And the second bullet on that page indicates that

6        states should require that machines purchased from

7        this point forward are either EAC certified or comply

8        with the VVSG standards.  That's true of Georgia's

9        new system as well, correct?

10  A.   Yes.  I believe that is true of Georgia's system.

11  Q.   The third bullet recommends that --

12  A.   Although, actually, pardon me, I'm not sure about the

13       remainder of that bullet, whether Georgia's

14       contracting satisfies that.  So if you're talking

15       about the whole recommendation, my answer is I don't

16       know.

17  Q.   Got it.  So as to the first sentence, yes.  As to the

18       second sentence, you don't have enough information to

19       know.

20  A.   Not at this -- at this time.

21  Q.   The third bullet there indicates an effort to secure

22       the chain of custody for paper ballots, and there's a

23       recommendation related to time stamping when ballots

24       are scanned.  Do you see that recommendation?

25  A.   Yes.

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 51 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 49

1    Q.   And do you know if Georgia's new system includes any
2         safeguards against the insertion of fraudulent paper
3         ballots?
4    A.   Any safeguards against the insertion of fraudulent
5         paper ballots?  I think there are some safeguards.
6    Q.   The fourth bullet recommends audits, as we've
7         discussed a little bit already.  And there's an
8         indication that as of August 2018, five states
9         conducted no post-election audit and fourteen do not
10        do a complete post-election audit.  Do you see that
11        statement?
12   A.   Yes, I do.
13   Q.   And in terms of the adoption of risk limiting audits
14        on a statewide level, do you know how many states
15        currently do a statewide risk-limiting audit?
16   A.   It's a small number.  It depends how you want to
17        define it exactly.  But perhaps two or three require
18        one at this point.
19   Q.   And when you say it depends on how you want to define
20        it, are there different definitions of risk limiting
21        audits?
22   A.   There are -- there are several complexities to RLA
23        legislation.  The question is also about when the
24        audit is required to be performed.
25   Q.   So some of the factors would be whether the audit is

Page 50

1        pre-certification or post-certification, correct?

2    A.  Yes.

3    Q.  And some of the factors would be what level of risk

4        limit is set for the audit?

5    A.  Yes.

6    Q.  And so those variabilities affect how robust the

7        audit is.  Is that a fair way to characterize that?

8    A.  Those are among the factors that affect whether it's

9        likely to discover an attack, if one occurs.

10   Q.  And are you aware of Georgia's statutory requirements

11       related to risk limiting audits?

12   A.  Yes, I am.

13   Q.  And what do you -- I'm sorry.  You're aware that that

14       requires a pilot risk-limiting audit, correct?

15   A.  I'm aware that it does require a pilot by 2021, I

16       believe.

17   Q.  Are you aware whether Georgia has already conducted a

18       pilot risk-limiting audit of any kind?

19   A.  Yes.  On the county level.

20   Q.  And you're aware of the Georgia statutory requirement

21       that an audit be performed of the November 2020

22       election, correct?

23   A.  Yes.  Though, not a risk-limiting audit.  So there is

24       potential arbitrary risk that the audit could fail to

25       detect outcome changing fraud.

J. Alex Halderman , Ph.D.                        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 51

 1   Q.   But it is possible that Georgia may choose to conduct

 2        a risk-limiting audit in November 2020, correct?

 3   A.   I suppose it's possible that Georgia could make

 4        whatever changes it wants to its election system

 5        between now and November.

 6   Q.   The reason I ask is -- and, again, I'm not asking for

 7        your legal opinion on this.  But is it consistent

 8        with your understanding that the requirement for

 9        November 2020 is there must be an audit but not

10        requirements beyond that?

11   A.   That's consistent with my understanding.

12   Q.   If you could turn to page 61 of the recommendations.

13        The first bullet there indicates that states -- well,

14        I guess it's recommendations about grant funds.  But

15        it recommends improvements in cybersecurity like

16        hiring additional IT staff, updating software,

17        contracting with vendors to provide cybersecurity

18        services.  Is it your understanding those things are

19        happening in the State of Georgia related to

20        elections, or do you know?

21   A.   It's my understanding that those are happening to

22        some extent.  But you can tell from the way that this

23        is written that it's not simply a box to be checked.

24        These words mean -- these words imply a large range

25        of activities that if done with sufficient diligence

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 52

1       will help, but it's more than simply having hired

2       someone.

3   Q.  All right.  So next I want to move to some of the

4       work that you've done in the public space.  I'm using

5       this next exhibit as a placeholder to talk about the

6       New York Times video.

7                   (Exhibit No. 9 marked.)

8   BY MR. TYSON:

9   Q.  So let me hand you what we've marked as No. 9.  And

10      this is a printout of New York Times story titled I

11      Hacked an Election.  So Can the Russians.  A video of

12      a part of a series on voting in America.  Do you

13      recall participating in this video series for the New

14      York Times?

15  A.  Yes, I do.

16  Q.  And can you describe generally what the videos in

17      this series involved?

18  A.  I actually haven't seen the other videos in the

19      series.  So I can only tell you about the video that

20      I participated in.

21  Q.  We'll start with yours then.  Why don't you tell us

22      about that video that you participated in?

23  A.  Right.  So that video was about risks to election

24      security that involve attacks on voting machines and

25      the potential for malicious software on voting

Page 53

1          machines to change the way votes are counted.

2     Q.   And were you approached by the New York Times, or did

3          you approach them to create this video?

4     A.   I was approached by them.

5     Q.   Okay.  And it's fair to say that the focus of the

6          video you participated in was to bring attention to

7          your area of research, correct?

8     A.   Was to bring attention to the risks to elections that

9          my research touches on.  Yes.

10    Q.   And ultimately bringing attention to that was part of

11         the goal to influence policymakers to abandon

12         electronic voting systems?

13    A.   Well, to influence general improvements to election

14         security.  That's right.

15    Q.   And one of those improvements to election security

16         would be abandoning electronic voting machines

17         without a paper trail, correct?

18    A.   Well, would be -- would be adopting machines that are

19         able to generate evidence where that evidence is

20         actually reviewed sufficiently in order for risks of

21         the equipment being hacked no longer to be a concern.

22    Q.   We talked earlier about the ethical implications of

23         certain types of hacking, hospitals and those kinds

24         of things.  Have you done any research or published

25         any research or given thought to the ethical

Page 54

1         implications of saying elections could be hacked and

2         what that may mean for our system of government?

3    A.   Yes, I have given attention to that.

4    Q.   Have you published any papers on that topic?

5    A.   Yes, I have.

6    Q.   And could you point me to those in your CV?

7    A.   There's a paper entitled ethical implications of

8         electronic voting research or something like that,

9         which if you'll give me a copy of my CV, I can point

10        you to.

11   Q.   It's actually Exhibit 2.

12   A.   Thank you.  Oh, is that attachment to Exhibit 2 here.

13   Q.   Yes.

14   A.   Oh, where is that?  It would be reference 82 on page

15        57 of this document, page 13 of the CV.

16   Q.   And I'm assuming in that paper you've concluded that

17        it is ethical to discuss the security of election

18        systems, correct?

19   A.   It's a long discussion of various scenarios, but we

20        do touch on that topic, I believe.  It's been a long

21        time.

22   Q.   Now, in addition to your New York Times video, you've

23        also written an editorial in The Washington Post

24        about election security, correct?

25   A.   That's right.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 55

1    Q.   I'm going to hand you what we've marked as Exhibit

2         10.

3              (Exhibit No. 10 marked.)

4    BY MR. TYSON:

5    Q.   And I'll ask if that's your Washington Post

6         editorial.

7    A.   Yes.

8    Q.   And if you could turn with me to the fourth page

9         there.  The top of that page begins one simple answer

10        is that lawmakers need a straightforward policy

11        agenda to fix the system.

12             So you were offering up a policy solution

13        that was recommended by your research; is that fair

14        to say?

15   A.   Well, so my research coupled with the political and

16        legislative dynamics.

17   Q.   And what political and legislative dynamics are you

18        referring to?

19   A.   Well, so this is recommending federal policy, and

20        there are certain questions about what's the

21        strongest level of security recommendation, for

22        instance, that would be likely to be passed by the

23        congress and signed by the president.  So it's

24        possible that the political compromises involved

25        there will result in a solution that's less than

Page 56

1         perfectly effective.

2    Q.   So you were advocating against or kind of in favor of

3         more secure voting systems and made these

4         recommendations based on what you thought was a

5         reasonable path forward politically; is that fair to

6         say?

7    A.   Or a plausible path forward politically in part.

8    Q.   Okay.  And so those recommendations include the

9         second paragraph there, replacing paperless voting

10        machines with systems that include a good old

11        fashioned paper ballot.

12   A.   Indeed.

13   Q.   And you personally believe that the best system would

14        replace paperless DRE machines and be a good old

15        fashioned paper ballot, correct?

16   A.   I do, in the sense of a ballot that is hand-marked by

17        those who are able to.

18   Q.   And you also wrote an article on the online platform

19        Medium about hacked elections in 2016.  Do you recall

20        that article?

21   A.   I do.

22                  (Exhibit No. 11 marked.)

23   BY MR. TYSON:

24   Q.   So first of all, the reason for the article indicates

25        you wanted to set the record straight about

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 57

1           something.  Let me hand you what we've marked as

2           Exhibit 11.  I'll ask you first is that the article

3           that you wrote on Medium?

4    A.     Yes.

5    Q.     Okay.  So on the first page there, you indicate that

6           you wanted to set the record straight about what you

7           had been saying to the Clinton campaign and everyone

8           else who's willing to listen; is that right?

9    A.     That's right.

10   Q.     And so what record needed to be set straight?

11   A.     Right.  So there had been an article in New York

12          magazine that incorrectly attributed to me -- and

13          this is in the immediate aftermath of the 2016

14          election -- the view that I suppose that I thought

15          that the election had been -- result had been changed

16          my hacking.

17   Q.     Okay.  So on the second page then, underneath the

18          map, if you want to turn to that second page, there's

19          a statement in that paragraph right under the map,

20          were these year's deviations from pre-election polls

21          the result of a cyberattack?  Probably not.  I

22          believe the most likely explanation is that the polls

23          were systematically wrong, rather than that the

24          election was hacked.

25   A.     That's right.  At the time I think I would have said

Page 58

1       I think there's only, say, a 20 percent chance that

2       the result had been changed due to hacking of

3       election systems and an 80 percent chance that it was

4       due to the polling differences, but the implication

5       is a 20 percent chance is still pretty high and

6       someone probably ought to check.

7   Q.  And today do you still believe that kind of 80/20

8       possibilities of what resulted in the 2016 election

9       results?

10  A.  No.  I think that there was substantial more evidence

11      in favor of the election result being correct that

12      was gained because of the recounts that were

13      partially completed in Wisconsin and Michigan.

14  Q.  So if you could turn over to page 4.  The bottom of

15      that second paragraph before the headline in the next

16      section you say that many states continue to use

17      machines that are known to be insecure, sometimes

18      with software that is a decade or more out of date,

19      because they simply don't have the money to replace

20      those machines.  So would you take the position that

21      a state that did not replace its machines was

22      intentionally trying to make its elections

23      vulnerable?

24  A.  Well, it depends on -- it depends on the

25      circumstances.  And I think here and in other places

Page 59

1        where I am writing about states needing to replace

2        their machines, one thing that you'll see I keep

3        doing is mentioning that states need more funding,

4        and that is one of the policy goals that I've

5        consistently supported helping to make sure that

6        states like Georgia were getting additional funding.

7    Q.  So this was part of the effort -- the overall

8        advocacy effort to move away from more insecure

9        machines, get federal funding, help states see the

10       need.  Fair to say?

11   A.  I think my policy recommendations in those terms have

12       been consistent.

13   Q.  And then in the next -- the third paragraph under the

14       headline, you mention that we use two main kinds of

15       paper systems in the US.  And you reference first a

16       hand-marked paper ballot and second, a system that

17       prints a record on a piece of paper.  And so that

18       would refer to -- I'm sorry.  And then at the end of

19       the paragraph, you indicate that there's a record

20       that can't later be modified.  So at this time, were

21       you still advocating for ballot marking devices, or

22       was this still just only a subset for disabled

23       voters?

24   A.  I certainly wasn't advocating for ballot marking

25       devices.  But I think the keyword in that assessment

Page 60

1         is can't later be modified and the risk with many

2         ballot marking devices is that the record might be

3         modified before it gets printed and not noticed by

4         the voter.  And it's the same with VVPAT systems.

5                   (Recess taken.)

6    BY MR. TYSON:

7    Q.   All right.  Dr. Halderman, I'm going to hand you what

8         we've marked as Exhibit 12.

9                   (Exhibit No. 12 marked.)

10   BY MR. TYSON:

11   Q.   And this is a profile in apparently Michigan Alumnus

12        magazine.

13   A.   Oh, yes.

14   Q.   Have you seen this before?

15   A.   I have, yes.

16   Q.   So I'm assuming you were interviewed for this

17        publication.

18   A.   I was.

19   Q.   So if you could look with me at the first -- I'm

20        sorry, the second page titled Hacking the Vote, It's

21        Easier Than You Think.

22   A.   Yes.

23   Q.   Then the subhead line indicates that professor

24        J. Alex Halderman has made a career studying

25        electronic voting security.  His research has changed

Page 61

1          the concept of stolen elections from theory to

2          reality.  Would you agree with that assessment that

3          elections have actually been stolen?

4    A.    Well, of course elections have been stolen.

5    Q.    Through hacking electronic voting machines?

6    A.    I think it's probably true that there have been

7          elections that have been altered as a result of a

8          cyberattack.  I can't point to one that successfully

9          was because if it was successfully altered, we

10         probably wouldn't know about it.

11   Q.    Okay.  Can you point to an unsuccessful example?

12   A.    Yes.

13   Q.    What is that?

14   A.    Well, one example is the 1994 election of Nelson

15         Mandela in South Africa where votes were tabulated by

16         electronic means.  And according to the UN and other

17         officials who were there at the time, somebody

18         successfully hacked into the computer network where

19         voters -- votes were being counted and attempted to

20         disadvantage Mandela's party, and that was detected.

21         But the interesting thing is the election officials

22         swore everyone to secrecy, and it wasn't until around

23         the time of Mandela's death that some of the

24         international officials involved started writing

25         about it in their memoirs.

Page 62

1              Another example would be the 2014 election

2        in Ukraine where attackers linked to Russia

3        reportedly attempted to -- reportedly did compromise

4        the election reporting system and rigged it to report

5        the wrong outcome, and that was apparently only

6        detected in the nick of time.

7    Q.  So let me rephrase my question then.  Are you saying

8        that any election in the United States has ever been

9        stolen through a hack of an electronic voting

10       machine?

11   A.  I can't point to a specific one.  But again, I think

12       there's substantial risk that one has that we don't

13       know about.

14   Q.  But sitting here today, you can't identify a single

15       election in the US that has had the result changed

16       through a hack of electronic voting systems?

17   A.  No.  Although, as I say, we probably wouldn't know.

18       That's one of the problems with electronic voting

19       systems.

20   Q.  If you could turn to page 9 of this profile.  And

21       that first full paragraph begins with -- let me just

22       read it.  The only reason there's no evidence of

23       whether voting machines or vote tabulating equipment

24       was hacked in the 2016 presidential election,

25       Halderman insists, is because nobody allowed him or

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 63

1       anyone else to check.  And that's consistent with

2       what you've described earlier in terms of not being

3       able to do full recounts or analysis of electronic

4       voting machines after the 2016 election?

5    A.  Well, it's also referring to forensics on voting

6       systems and so forth.  Yes.

7    Q.  And so is it your testimony that there is evidence

8       that machines were hacked, and that if you looked,

9       you would find that, or you just don't know?

10   A.  If machines were hacked, there's a possibility that

11      evidence could be found by doing forensics of

12      individual machines.  That's my testimony.

13   Q.  Okay.  And the next sentence begins, this is the core

14      of his advocacy regarding electronic voting machines

15      and vote tabulators.  Would you agree with that

16      description of you as an advocate regarding

17      electronic voting machines and vote tabulators?

18   A.  I suppose it depends what you mean.  I certainly do

19      recommend specific policy measures that are necessary

20      to secure election systems.

21   Q.  The next page over, one, two, third full paragraph,

22      it talks about your preparation process for

23      testifying to the US senate committee with a murder

24      board.  Always a delightfully-named function.

25   A.  Indeed.  I'm not seeing where you mean.

J. Alex Halderman , Ph.D.                           February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 64

1    Q.    Right about in the middle of the page, third full
2          paragraph.
3    A.    It begins it was remarkable?
4    Q.    Yes.
5    A.    I see.  Yes.
6    Q.    And the last sentence of that paragraph says, the aim
7          was for Halderman to avoid seeming partisan.  Is
8          there a concern that election security issues are a
9          partisan issue at this point?
10   A.    They're certainly a non-partisan issue at this point,
11         as I think you can see by the broad bipartisan
12         support in congress for things like the Secure
13         Elections Act and the bill that Mark Meadows
14         introduced to adopt very similar protections.  But
15         there's always a risk in discussion of elections that
16         partisan politics will come into play.
17   Q.    But at this point, you are not aware of partisan
18         politics around the adoption of hand-marked paper
19         ballots?
20   A.    I was aware that -- I was aware, and I believe there
21         still is a risk that partisan politics will -- will
22         override the very real technical issues and make it
23         difficult to have strong security legislation.
24   Q.    Are you aware of the partisan breakdown of votes in
25         the Georgia General Assembly about hand-marked paper

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 67 of 243
J. Alex Halderman , Ph.D.                              February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 65

1       ballots versus ballot marking devices as an election

2       system?

3   A.  No, I'm not aware.

4   Q.  Would it surprise you if those were partisan votes?

5   A.  I think most votes are pretty partisan.

6   Q.  So it wouldn't surprise you?

7   A.  So it wouldn't surprise me.  Although, I'm not sure

8       which way the partisan politics would work out in

9       this particular issue in Georgia.

10  Q.  Going up that page just a little bit.  We talked

11      about your Medium essay, and this is a portion

12      discussing that.  You indicated that after you wrote

13      your Medium essay, you had come to a point of greater

14      confidence that the polling information was wrong

15      versus the election was hacked based on the partial

16      recounts that were conducted.  On that third

17      paragraph there, it indicates that the effort to

18      conduct recounts didn't succeed, and recounts were

19      only conducted in Wisconsin with minimal changes and

20      nobody was able to inspect any of the equipment.

21              What is it about the recount process that

22      changed your view from your Medium essay to now about

23      the 2016 election?

24  A.  That the recount involved in large parts of Wisconsin

25      and in parts of Michigan involved manual inspection

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 68 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 66

1      of ballots that had been marked by hand served to

2      provide additional evidence for the correctness of

3      the election results and that those manual

4      inspections of hand-marked records didn't reveal a

5      systematic deviation from the reported results.

6   Q. There's also a reference in that paragraph that on

7      cable news and social media, you were dubbed a Stein

8      puppeteer trying to steal the election for Hillary

9      Clinton.  Is that an example of the partisan politics

10     that you discussed that could enter into those

11     questions?

12  A. Yes.  I think that -- that experts being labeled

13     partisans merely because their views are inconvenient

14     for the views of a political group is a substantial

15     part of the risk.

16  Q. There's also a great account in this article about

17     you meeting a man in a trench coat to obtain a

18     contraband voting machine.  Do you recall that event?

19  A. I do.

20  Q. And do you recall what kind of voting machine that

21     was?

22  A. It was an AccuVote TS DRE.

23  Q. That's the kind used in the State of Georgia up until

24     the end of 2019, right?

25  A. That's correct.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 67

 1   Q.   And on page 5 is where I am.  It's not necessarily

 2        relevant.  It just mentions that you posted a video

 3        about -- of the machine being hacked in a mock

 4        election between Benedict Arnold and George

 5        Washington.  Is that the same hacking demonstration

 6        you performed for Judge Totenberg in 2018?

 7   A.   I performed a similar demonstration.

 8   Q.   But it wasn't the same type of hack demonstration?

 9   A.   No.  Actually, it was using a different but also

10        effective way of hacking the AccuVote TS and TSX.

11   Q.   Okay.  And the demonstration that you did in the

12        YouTube video, would that have been untraceable to

13        someone looking at the voting machine?  Just in terms

14        of the main files, if they didn't dig into the system

15        architecture and just reviewed the reported files,

16        would that have been detectable in any way?

17   A.   No, it wouldn't have been detectable.

18   Q.   And just to stick with the 2016 recount piece for a

19        moment --

20   A.   You mean the Michigan Alumnus piece?

21   Q.   I'm sorry.  No.  Just the concept of doing recounts

22        following the 2016 election.  Not the exhibit.  We're

23        finished with the exhibit.

24             You assisted with the efforts to obtain

25        recounts in Michigan, Wisconsin, and Pennsylvania in

Page 68

1        2016; is that right?

2    A.  Yes.

3    Q.  And were you retained by the Stein campaign or the

4        Clinton campaign?

5    A.  I was retained by the Stein campaign.

6    Q.  And did you assist with recounts in any other states

7        in 2016?

8    A.  No, just those three.

9    Q.  And all three of those states were won by President

10       Trump in 2016, correct?

11   A.  Yes.  That's correct.

12   Q.  And were these efforts you undertook pro bono, or

13       were you being paid by the campaign?

14   A.  I was being paid.

15   Q.  Have you ever worked as a staffer on any political

16       campaign?

17   A.  No, I haven't.

18   Q.  Have you ever been retained by political campaigns

19       beside the Stein campaign?

20   A.  No.  Oh, actually, strike that.  Yes, I have.  I have

21       on one other occasion.

22   Q.  And what campaign was that?

23   A.  That's the current political campaign for the

24       presidency of the Dominican Republic.

25   Q.  So I can clarify that quickly.  In the United States,

J. Alex Halderman , Ph.D.                          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 69

1       you've not been retained by any other candidate or

2       campaign?

3   A.  No.

4   Q.  Okay.  Now, you hold at least one patent; is that

5       correct?

6   A.  Yes, that's correct.

7   Q.  I want to hand you what we've marked as Exhibit 13.

8               (Exhibit No. 13 marked.)

9   BY MR. TYSON:

10  Q.  I'll ask if this is a patent that you hold as an

11      inventor.

12  A.  Yes, it is.

13  Q.  And what does this patent involve?

14  A.  This is a system for efficiently auditing elections

15      by using a high-speed scanner to review

16      electronically paper ballots and then using

17      statistical sampling similar to an RLA to confirm the

18      results.

19  Q.  Now, do you retain any financial interest in the use

20      of this patent going forward?

21  A.  No.  In fact, Princeton has dedicated it to the

22      public domain at my request.

23  Q.  If you could turn to the -- I guess it's the one,

24      two, three, fourth, fifth physical page.  The top

25      begins System and Method For Machine-Assisted

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 70

1       Electronic Auditing.

2   A.   I'm sorry.  Can you repeat the page?

3   Q.   Sure.  The fifth physical page.

4   A.   The fifth -- the marked column 5 here?

5                MR. HERMAN:  The actual.

6   BY MR. TYSON:

7   Q.   Yeah.  The actual fifth page.

8   A.   The pages I don't think are numbered.

9   Q.   Oh, I see.  The columns are numbered.  My apologies.

10       I'm not a patent lawyer.  If you could look at column

11       2, down where line 25 is.

12  A.   Yes.

13  Q.   There's an indication that the primary weakness of a

14       particular method you're referring to and discussing

15       is establishing a link between electronic and paper

16       ballots at the time votes are cast.  Is this issue of

17       voter privacy, that if we kind of sequentially number

18       every ballot as it's collected and could tie that

19       back to voters that are voting at particular times a

20       common issue you encounter in the design of audits

21       for election systems?

22  A.   Excuse me.  Let me just review those two paragraphs.

23  Q.   Certainly.  Yes.

24  A.   Yes.  Sequential numbering of ballots is a common

25       issue in audits and in the design of voting systems

Page 71

1        more generally and creates privacy risks.

2   Q.   The way I've thought about it is I've tried to think

3        about it in the past.  If we could maintain the link

4        between the person and the ballot, auditing would

5        probably be pretty simple I'm guessing at that point.

6        We could use some sort of log method for that.  But

7        the importance of the secret ballot that we have to

8        separate those two pieces of information, is it

9        correct to say that's what leads to a lot of the

10       challenges around how we handle ballots and how we do

11       audits?

12  A.   I would say that, more broadly than that, that the

13       need for a secret ballot complicates much of election

14       security.

15  Q.   Okay.

16  A.   If we could just print everyone's name and vote in

17       the newspaper, it would be much easier.

18  Q.   From a security standpoint, but not from a

19       constitutional or administrative standpoint, correct?

20  A.   In fact, it would be bad from a security standpoint

21       too because the secret ballot is an important defense

22       against certain attacks.

23  Q.   So printing everybody's votes in the newspaper would

24       help with some attacks but would lead to other

25       possible attacks.  Is that what you're saying?

Page 72

1    A.    That's right.

2    Q.    So in the election field, do you consistently find

3          these kinds of trade-offs, that doing one thing may

4          solve one problem but create a host of other

5          problems?

6    A.    That's right.  That's why we need to be -- that's why

7          only certain technological approaches achieve a high

8          level of security all around.

9    Q.    But you'd agree with me that if, for example, the

10         United States of America decided that the secret

11         ballot was no longer an important consideration as

12         just a policy matter, that would change the mix of

13         technology in what we used going forward, right?  I

14         know that's a wild hypothetical.

15   A.    That's a wild hypothetical.  If it was actually true,

16         contrary to reality, that the secret ballot wasn't

17         important, it would be easier to design secure

18         election systems.

19   Q.    Just out of curiosity, I'm sure you followed what's

20         happened with the Iowa caucuses.

21   A.    I have.

22   Q.    Is it possible there's some kind of hacking for that

23         system, or do you have -- have you done any research

24         or have any opinions about that system?

25   A.    On the Iowa caucus system?  What part of it do you

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 75 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 73

1      mean?

2   Q.   I'm only going on news accounts that there have been

3        problems with the tabulation and an app that was

4        being used.

5   A.   Right.  Do you have a specific question?

6   Q.   It was just my own personal curiosity.  We can move

7        on.  Sorry.

8   A.   What a mess.  Let me just say what a mess.

9   Q.   All right.  So it's fair to say that you believe

10       electronic voting brings a host of problems to the

11       election system; is that fair to say?

12  A.   Yes.  It exposes the election system to several

13       different kinds of attacks.

14  Q.   Is there any circumstance besides disabled voters

15       where you would support the use of electronic

16       machines over hand-marked paper ballots?

17  A.   You mean ballot marking devices over hand-marked

18       paper ballots?

19  Q.   Any type of electronic ballot marker, whether done

20       through a DRE, through a ballot marking device, any

21       scenario.

22  A.   I see.  Is there any scenario?  In general, no.

23  Q.   So are you thinking of something besides disabled

24       voters where you might be willing to support

25       electronic voting?

J. Alex Halderman , Ph.D.                         February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 74

```
 1    A.    Well, I'm thinking, for instance, in some extreme

 2          emergency, would it be -- would I be -- would I say I

 3          would support it?  Well, it's hard to say.  It really

 4          depends on the facts of the situation.

 5    Q.    And it's fair to say that setting aside disabled

 6          voters, you believe that hand-marked paper ballots

 7          that are fully audited is the best method of

 8          administering elections, right?

 9    A.    I think from a security perspective, that's correct.

10    Q.    From an administerability standpoint, do you not

11          think that's correct, or is there a perspective where

12          you would disagree with that?  The reason why I

13          ask -- I can clarify.  I know you're trying to figure

14          out what I asked.

15                You clarified your answer with that you

16          believe from a security perspective that hand-marked

17          paper ballots with full audit to be the best method

18          of administering elections.  So my question is why

19          only from that perspective.

20    A.    Oh, I see what you mean.  There are -- there may be

21          administrative reasons to prefer other systems in

22          certain circumstances.  Although, I think the

23          alternatives do create a large and uncovered risk of

24          attacks to the election system.

25    Q.    So there may be policy reasons for using some
```

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 75

1           electronic components, is that what you're saying,

2           but it creates a security risk in the process?

3   A.   Yes.

4   Q.   I'm assuming that you don't believe that hand

5           counting all ballots is the best possible system.

6   A.   That's correct.

7   Q.   And why is that?

8   A.   Because hand counting all ballots -- hand counting

9           all ballots would take a very long time.  Hand

10          counting we know also creates its own set of security

11          risks.

12               My perspective is that the best way to

13          administer and secure elections is to count ballots

14          electronically, but to confirm the results of the

15          electronic counting through manual follow-up.

16  Q.   So if we had a system that involved hand-marked

17          ballots that were hand counted, would you still think

18          audits were required in that scenario?

19  A.   Some kind of audit I would say would still be

20          required.  But it wouldn't be the same kind of audit

21          that would be an RLA, for instance, designed to

22          specifically detect errors in a machine count because

23          you wouldn't have a machine count.

24  Q.   And when you mentioned that hand counting can bring

25          other challenges, would that include election

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 76

1       officials overvoting a ballot, for example, during a

2       hand count?

3   A.  That's a potential risk.  If the election officials

4       are dishonest, they could potentially make changes to

5       the ballots during counting.  That's right.

6   Q.  And you think it would be best for the State of

7       Georgia to have a system of hand-marked paper ballots

8       as the primary means of voting, right?

9   A.  Yes, I do.

10  Q.  I'm going to change direction a little bit.  Are you

11      good to keep ongoing?

12  A.  Yeah.  Let's keep on going a little bit.  I assume

13      we're thinking of lunch at some point.

14  Q.  Eventually, yes.  Probably have a good stopping point

15      here in a little bit.

16          I want to talk about some general things

17      about your report, Exhibit 2.  If you want to get

18      that in front of you.  Talk about some high level

19      pieces to it first, and then move through some of the

20      specifics.

21          All right.  So through your report, is

22      there a particular section of your report that

23      summarizes the opinions that you offer in it?

24  A.  I'm not sure there's a particular section that does.

25  Q.  If you could go with me to paragraph 20.  When I was

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 79 of 243
J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 77

1        looking for it, it seems paragraphs 20 and 23 seems

2        to summarize things well.  If you want to get there,

3        it's on page 6 on the bottom, 7 on the top.

4   A.   Okay.

5   Q.   So in this -- in paragraph 20 to start with, you

6        identify your opinion about a variety of scenarios of

7        what could happen based on Georgia's election system

8        facing a high risk of being targeted.  Is that a fair

9        statement?

10  A.   Yes.

11  Q.   So you say, first sentence, that there's a high risk

12       of being targeted by sophisticated adversaries.

13       Second, those adversaries could attempt to hack the

14       election system.  Third, they could sabotage BMDs or

15       optical scanners.  Fourth, they could infiltrate BMDs

16       and optical scanners.  And fifth, those attacks could

17       succeed despite efforts that Georgia has put in

18       place.

19              Is that a fair list of things that you

20       think are the main problems from Georgia's

21       perspective?

22  A.   With the new system, I think it's fair to say that's

23       a good summary of much of what's in my opinion --

24  Q.   Okay.

25  A.   -- in my report.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 78

1   Q.   And you're not saying that these scenarios definitely

2        will happen or have happened.  You're just saying

3        they might happen, correct?

4   A.   I'm not saying they definitely will happen.  I'm

5        saying that there's a high risk that they might

6        happen.

7   Q.   You'd agree with me that every election system used

8        by every state is subject to the potential targeting

9        by sophisticated adversaries, right?

10  A.   Yes.  That's why in every election system in every

11       state things like hand-marked paper ballots and risk

12       limiting audits are an important defense.

13  Q.   And you'd agree with me that every election system

14       used by every state has the potential to be hacked,

15       right?

16  A.   Indeed.  Again, that's why these protections are so

17       essential.

18  Q.   And you'd agree with me that attackers could sabotage

19       components of the election system used in every

20       state, right?

21  A.   That's right.  Again, why these defenses are so

22       important.

23  Q.   And you'd agree with me that attackers could place

24       malicious software on BMDs or optical scanners in the

25       election system of every state, right?

Page 79

 1   A.   Where those components are used, that's right.  Very

 2        few states use BMDs for all voters.

 3   Q.   But all states use optical scanners, right?

 4   A.   At least somewhere.  Not in all jurisdictions in all

 5        states unfortunately.  There are still some paperless

 6        jurisdictions.

 7   Q.   And you'd agree with me that the kind of attacks that

 8        we've outlined here could also succeed in other

 9        states too, right?

10   A.   Yes.

11   Q.   So in approaching your opinion about Georgia's

12        election system, what kind of specialized knowledge

13        are you using to come up with these potential

14        scenarios if they could apply to every states'

15        election system?

16   A.   What do you mean by specialized knowledge?

17   Q.   Does it require any special training or experience to

18        be able to outline the scenarios you've outlined in

19        paragraph 20?

20   A.   Yes.  Yes, it does.

21   Q.   And what -- I'm sorry.  Finish.

22   A.   Yes, it does.  So I've been studying security risks

23        to electronic voting systems for getting close to 20

24        years now.  And so I think that kind of specialized

25        knowledge is important in assessing both the threat

Page 80

```
 1          and the level of risk.

 2    Q.    And so you do have specialized knowledge about kind

 3          of the potential vectors of attack, I think as we

 4          refer to them, on computers that are used in the

 5          election system.  Fair to say?

 6    A.    Yes.

 7    Q.    And your focus has been primarily on the cyber

 8          vulnerabilities of an election system, the computers

 9          that are involved, not on the potential manipulation

10          of paper ballots through kind of old school methods.

11          We've referred to overvoting a ballot, for example.

12          Your research is focused primarily on the cyber

13          risks, right?

14    A.    I would say primarily.  But it also considers those

15          other risks, and I teach about them.  And auditing or

16          other defensive methods that I talk about are

17          designed with those risks in mind too.

18    Q.    So in reaching your opinions about Georgia's election

19          system, you are evaluating all the potential risks,

20          not only the cyber risks but also other possible

21          security risks?

22    A.    Well, I have thought about other potential security

23          risks, but the opinion here is primarily about the

24          risks of cyber attacks.

25    Q.    And in reaching your conclusion about Georgia's
```

Page 81

1     election system facing a high risk, is that including

2     the other security risks beyond cyber, or is that

3     limited to a cyber risk for the State of Georgia?

4  A.  Here I'm talking about the risks of attack by

5     sophisticated adversaries like hostile governments in

6     the context of attacks on computer system.

7  Q.  Okay.  And so in reaching your opinions in your

8     report, you've obviously used your specialized

9     knowledge to come up with a series of scenarios of

10    things that could happen.  And then you're assessing

11    how likely or unlikely those scenarios are to happen,

12    or are you just identifying these are possible

13    attacks?

14 A.  I'm also assessing the level of risk.

15 Q.  Okay.  And have you ever evaluated comparative risks

16    of an entirely paper ballot election system versus a

17    system that uses some electronic components?

18 A.  Of an entirely -- you mean a hypothetical?

19 Q.  Excepting disabled voters.  A hand-marked paper

20    ballot system for the comparative risk of that system

21    versus a system that uses electronic components.

22 A.  I have evaluated the risks in hand-marked paper

23    ballot systems, including for the Secretary of State

24    of Michigan.  So yes.

25 Q.  And what is the method you've used to evaluate the

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 82

1      comparative risks of those types of systems?  If

2      you're trying to compare one system's risks with

3      another, what is the method you'd used to evaluate

4      that comparative risk?

5   A.  So the method is basically what are -- examining the

6      differences between those voting systems and which

7      new attack vectors they make possible and how likely

8      are those vectors to be exploited.

9   Q.  So you essentially say okay, for system one, let's

10     say hand-marked paper ballot system with ballot

11     marking devices for disabled voters, electronically

12     tabulated using optical scanners, here's the list of

13     possible risks we face with that system?

14  A.  Of cybersecurity risks and which ones are enabled by

15     this change of technology.

16  Q.  And then we look at a system, ballot marking device

17     system for all voters, what are the risks with that

18     system.  So my question is, how do you then decide

19     which system is more or less secure based on that

20     list of risks?  Is there a specific method you use

21     for that?

22  A.  Sure.  So, for instance, in the ballot marking device

23     study that I published in January, we have a

24     quantitative method.  There was an equation in there

25     that will tell you based on the proportion of voters

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 85 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 83

1        who are using a ballot marking device versus a

2        hand-marked system, what is the additional risk

3        that's created by -- that outcome changing fraud will

4        go undetected.

5   Q.   And that's specifically related to voters verifying

6        their paper ballots, right?

7   A.   Right.  Which is one of the very significant defenses

8        in an election system is voter verification.  That's

9        the premise of BMD security, that voters will

10       successfully verify.

11  Q.   And it's not your testimony that there exists one

12       perfectly secure voting system, right?

13  A.   There are voting systems that have greater or lesser

14       risk for certain important categories of attacks and

15       ones that have no risk of certain categories of

16       attacks.  So I think the -- which is more secure or

17       not is pretty clear.

18  Q.   You say which is more secure or not is pretty clear.

19       Would that be as to overall policy reasons for one

20       system or another, or which one is more or less

21       secure from a cybersecurity standpoint?

22  A.   Well, I'm speaking specifically from a cybersecurity

23       standpoint.

24  Q.   And as we covered earlier, there are scenarios where

25       policymakers may have interest beyond cybersecurity

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 84

1            in selecting a particular election system, correct?

2    A.    There are other interests that come to play.  I

3          believe that there -- but I don't think that the

4          other interests, as they are practically manifested,

5          outweigh the cybersecurity advantages or

6          disadvantages that are part of that equation.

7    Q.    And you've gotten where I was trying to get to

8          earlier.  So then what is the way that you determine

9          whether the other policy reasons outweigh the

10         cybersecurity risks?

11   A.    Well, we could talk about that in the context of

12         specific policy questions that are coming to bear.

13         The question is to me the methodology that I would

14         apply is what are the alternative ways of achieving

15         this policy goal and are there practical

16         cybersecurity techniques that we could use to achieve

17         security under those circumstances.  And when the

18         outcome turns out to be no, we either have a system

19         that is at high risk of attack or not, I think that

20         the policy -- the policy balance outcome is pretty

21         clear.

22   Q.    And, again, the methods you're using to make that

23         policy balance outcome that you see is so clear is

24         you are looking at possibly alternative policies that

25         could have less cyber risk; is that a fair way to say

Page 85

1          that?

2    A.    Well, possible -- can you repeat the question?

3    Q.    Sure.  I'm just trying to understand how you weigh

4          the policy options of the other policy reasons why a

5          jurisdiction may have for other systems versus the

6          cyber basis.  And particularly I'm looking for what

7          method are you using to conclude that hand-marked

8          paper ballots are the right election system to be

9          used.  You're reaching a conclusion they are.

10   A.    I see.

11   Q.    That's what I'm trying to understand.  What method

12         are you using for that evaluation?

13   A.    There's a very stark cybersecurity difference between

14         the hand-marked system and/or hypothetical or not

15         hypothetical BMD for all system.  And so given the

16         sort of starkness of that contrast, the question is

17         can you achieve those same -- the question to me is

18         can you achieve the same policy objectives well with

19         the hand-marked system.  Right?  And if you can

20         achieve those policy objectives well with the system

21         that is significantly more secure, then I believe on

22         the basis of that reasoning it's the -- it's the

23         superior choice.

24   Q.    And it's a policy interest of a state, is it not, to

25         have voter intent be clear?  Could that be a policy

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 86

1              interest for a state?

2    A.   That could be a policy interest.

3    Q.   And in that policy interest, you'd agree with me that

4              ballot marking devices are superior to hand-marked

5              paper ballots, right?

6    A.   Not necessarily.  So hand-marked paper ballots.  You

7              can also have the optical scanner reject ballots that

8              the scanner determines are not clearly marked, and

9              that's a feature of the Dominion system, in fact.

10   Q.   And in those scenarios, have you ever talked to

11             election officials about what voter behavior happens

12             when a scanner rejects an improperly marked hand

13             paper ballot?

14   A.   I have talked to election officials about that, yes.

15   Q.   What have they told you?

16   A.   Some election officials have told me, in fact, that

17             when -- some election officials have told me that

18             they worry about delay that's caused by that

19             scenario.  But other election officials have told me

20             that they already have their scanners programmed to

21             work in that way and it's fine.

22   Q.   And election officials may have concerns about voters

23             becoming frustrated in the process.  Have you heard

24             that from election officials?

25   A.   I've heard that about BMD-based elections as well as

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 87

1   hand-marked elections.  So that is a concern either

2   way.

3   Q.  And those would be other policy interests that might

4       underlie the selection of one system over another

5       unrelated to cybersecurity, correct?

6   A.  There are other important considerations.

7   Q.  So you'd agree with me that it's not possible to

8       eliminate every attack vector against an election

9       system, right?

10  A.  Not every attack vector.  I mean, someone could cut

11      the power to the entire state somehow and just render

12      absolute chaos.  But in terms of attack vectors that

13      involve -- that involve hacking the computer systems

14      that are used to administer the election or that are

15      in the polling place, it's possible to reduce the

16      risks to a minimal level.

17  Q.  And when you say reduce the risks to a minimum level,

18      how are you categorizing minimal risk versus other

19      types of risk?  What method are you using to arrive

20      at this is a minimal risk system?

21  A.  Well, let me be more clear than that.  It's possible

22      to eliminate the risk that hacking polling place

23      equipment is going to be able to change the election

24      outcome or cause significant disruption through a

25      well-designed system.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 88

1   Q.   But it's not possible to eliminate all the risks.  I

2        think we talked about earlier every election system

3        is subject to being targeted by sophisticated

4        adversaries.  Every election system could have some

5        components of it hacked.  Every election system could

6        have software put on optical scanners.  So I guess

7        I'm trying to understand where you're concluding

8        there's minimal risk if there's always going to be

9        these vulnerabilities for any election system.

10  A.   Well, at the point where we can have a high and

11       quantifiable statistical probability of detecting and

12       correcting attacks of that form, I would say the risk

13       has been well constrained.

14  Q.   And ultimately, though, isn't that a policy decision

15       of what level of risk someone is willing to

16       encounter?

17  A.   Well, it's a policy decision -- is it a policy

18       decision?  Can you repeat the question?

19  Q.   So we're talking about all these different interests

20       that go into elections.  You can reduce it to a

21       statistically quantifiable number that we can have

22       confidence in a particular outcome.  But maybe in the

23       process, we're going to create long lines to do that.

24       There's all these competing policy interests in the

25       space of the design of an election system.  So what

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 89

1        I'm trying to get to is at what point is it a policy

2        decision and at what point is it a scientific process

3        you're using to arrive at your conclusions in this

4        report.

5    A.  Well, I reject the notion that it's actually a

6        trade-off between long lines and good security.  But,

7        I mean, if there's a policy decision that we would

8        like the election system to be at high risk of attack

9        by foreign governments, I suppose that is a policy

10       decision too, but I don't think it's a policy

11       decision that I as someone who is an expert in

12       election cybersecurity would get behind.

13   Q.  Do you use online banking?

14   A.  I do.

15   Q.  And I'm sure -- I do too.  And there are risks, of

16       course, that online banking is subject to

17       manipulation, hacking, targeted by foreign powers,

18       right?

19   A.  Yes.  And, in fact, there are billions of dollars of

20       fraud every year reportedly in the financial sector

21       due to hacking.

22   Q.  But obviously you've chosen, I've chosen to use a

23       system that has some risk for the sake of

24       convenience; is that fair to say?

25   A.  Well, I think the risks in online banking are fairly

Case 1:17-cv-02989-AT    Document 821-3    Filed 08/26/20    Page 92 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 90

```
 1        well constrained for consumers because of things like

 2        FDIC protection, and most fundamentally, because if

 3        the money is gone, we're going few notice.  The same

 4        can't be said unfortunately of election systems.  If

 5        the result is wrong, it's not necessarily going to be

 6        apparent to anyone.

 7   Q.   And I believe I saw you have a cellphone.

 8   A.   I do.  It's right here.

 9   Q.   I do too.  And cellphones are subject to

10        manipulation, hacking, targeting by foreign powers,

11        right?

12   A.   Potentially.

13   Q.   And yet, we use those because we've chosen to

14        encounter a degree of risk for the sake of

15        convenience, right?

16   A.   Well, so, again, if my cellphone is hacked, we

17        won't -- that will not end up causing something like

18        a national election outcome to be wrong, I hope.  But

19        there are good reasons, including the vulnerability

20        of cellphones, that we don't, for instance, let you

21        vote using an app on your cellphone in elections in

22        Georgia.  That's because the risks are substantial.

23   Q.   So I guess thinking about those examples, is your

24        ultimate opinion in your report that Georgia

25        policymakers have chosen to take too great a risk by
```

J. Alex Halderman , Ph.D.                      February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 91

1        using an all ballot marking device system election
2        system?
3    A.  So my opinion is that it's a very, very substantial
4        risk.  And if -- and yes, I would say that the
5        process in Georgia that has led to this risk has
6        resulted in an undesirable outcome from the
7        perspective of protecting the votes of the people of
8        Georgia.
9    Q.  So it's your opinion that Georgia policymakers have
10       chosen a path with too much risk to use for
11       elections, right?
12   A.  Yes, I think it's too risky a path.
13   Q.  And that opinion lines up with your personal views on
14       election administration, right?
15   A.  With my personal views?  How do you distinguish from
16       my professional views in this case?
17   Q.  I believe you said earlier that you believe the best
18       system for administering elections is a hand-marked
19       paper ballot system with ballot marking devices for
20       disabled voters.
21   A.  I see.  Yes, I think it's consistent with that.  It's
22       totally consistent with that, yes.
23   Q.  And so what scientific method are you using to
24       determine that Georgia policymakers have taken a path
25       with too great a risk?  There's obviously a point

Page 92

1     that you cross over a threshold.   What method do you

2     use scientifically to determine where that tipping

3     point is?

4  A. Where that tipping point is?  Oh, I see.  Well, I

5     think the -- I think the tipping point -- that

6     question, it comes down to a -- it comes down to

7     applying the expertise that I have from evaluating

8     voting systems to ask the question, is this system

9     actually going to provide a strong defense or not.

10    And so there's -- it's a matter of -- it's a matter

11    of comparatively assessing those risks.

12 Q. Are there published studies about evaluating

13    acceptable degrees of risk in the election context?

14 A. Probably there are.  So if you look at, for instance,

15    the California top-to-bottom review studies that were

16    commissioned in 2007, those studies technically are

17    focused on vulnerabilities in specific pieces of

18    election equipment but come out with the policy

19    recommendation that they not be used because the risk

20    is unacceptable.

21 Q. And that was a policy recommendation as the result of

22    that analysis, correct?

23 A. That's right.

24 Q. So you have the California top-to-bottom review.

25    Have you ever published papers on determining what

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 93

1         the acceptable degree of risk in election systems is?

2    A.   Acceptable degree of risk.

3    Q.   And the reason why I ask is, again, you're saying

4         that Georgia policymakers have taken too much risk.

5         So how -- have you ever published a paper evaluating

6         the acceptable degree of risk?

7    A.   So the ballot marking device paper that I published

8         in January tries to assess some of that in part by

9         trying to quantify whether -- whether in a given

10        system attacks are going to be detected or not,

11        what's the probability that an attack would be

12        detected.  If the system is achieving an acceptable

13        degree of risk, that probability is going to be high

14        for plausible attacks.  If it's not, it's going to be

15        low.  You can indeed quantify some of these things.

16   Q.   Did you determine the exact percentage at which you

17        cross that threshold in your study of ballot marking

18        devices?

19   A.   No.  But it's quite often the case in science that

20        rather than a clean threshold, you just have a

21        breakdown between scenarios that result in a low

22        output value and a high output value.

23   Q.   And so beyond the BMD paper, you can't think of any

24        other papers you've published looking at the

25        acceptable degree of risk in an election system?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 94

1    A.    I think that's the most quantitative one.

2    Q.    But you can't think of any others?

3    A.    Not off the top of my head.  But I have published a

4          lot of papers in this area, so it's quite possible.

5    Q.    Sure.  Is the field of determining an acceptable

6          degree of risk in non-election context, are you aware

7          of that being a discipline that people study what --

8          when people encounter certain degrees of risk?

9    A.    That's quite often a question that comes up in

10         matters of public policy and science.

11   Q.    But you didn't rely on any papers outside the

12         election context about assessing acceptable degrees

13         of risks in forming your opinions in this report,

14         right?

15   A.    No, I didn't.

16   Q.    A couple other global questions, and I think we'll

17         probably be at a good stopping point for lunch.

18         We'll dig into the details of the report after that.

19               Kind of globally throughout the report

20         there's terms potentially, possibly, could happen.

21         There's a lot of scenarios of what might happen along

22         the way.  And I believe we covered this already.  But

23         you are not aware of anyone who's ever documented an

24         actual compromise of an election system using

25         electronic voting equipment in an actual US election,

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 95

1        correct?  And I know I added a bunch of qualifiers on

2        there.

3    A.  You mean a hostile compromise?

4    Q.  Any compromise --

5    A.  Any compromise?

6    Q.  -- in a US election system of an electronic voting

7        machine.

8    A.  Sure.  There are plenty of voting machines in US

9        elections used in US elections that have been

10        actually demonstratively compromised.

11   Q.  And what are some examples of those?

12   A.  The previous voting machines used in Georgia, the TS

13        and TSX that I personally compromised, those kinds of

14        machines.

15   Q.  My question was that were being used in an actual

16        election.

17   A.  Those machines were used in actual elections in

18        Georgia from 2002 until 2019.

19   Q.  What I'm trying to get to is not a machine generally,

20        a model type that is being used in an election, but

21        an actual machine in a precinct on election day in a

22        US election.

23   A.  I see.

24   Q.  Has anyone ever documented a case of one of those

25        machines ever being compromised?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 96

1   A.   I don't believe so.

2                MR. HERMAN:  Okay.  Off the record

3           for a second.

4                (Recess taken.)

5                MR. TYSON:  Back on the record.

6   BY MR. TYSON:

7   Q.   All right.  Dr. Halderman, before lunch, I said we

8        were going to turn to your report.  I apologize.  I

9        do have one more thing I wanted to ask before we go

10       there.

11  A.   Yes.

12  Q.   You're on the board of advisors for the Verified

13       Voting Foundation; is that right?

14  A.   I am.

15  Q.   And can you briefly describe what the Verified Voting

16       Foundation is.

17  A.   The Verified Voting -- the Verified Voting Foundation

18       is a group that advocates for stronger election

19       security.

20  Q.   And when you say stronger election security, is it

21       primarily the cybersecurity component that you -- the

22       field that you work in?

23  A.   Yes.  Primarily.  It's a group that was founded

24       originally by computer scientists, and that's the

25       focus of their activity.

J. Alex Halderman , Ph.D.                     February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 97

1    Q.   Got it.  Were you involved in developing the

2         principles for new voting systems from the Verified

3         Voting Foundation?

4    A.   I don't think so.  No.

5    Q.   Okay.  I'm going to hand you what I've marked as

6         Exhibit 14.

7                  (Exhibit No. 14 marked.)

8    BY MR. TYSON:

9    Q.   Have you seen this document before?

10   A.   Yes.  Well, actually, wait.  No.  There's a new set

11        of principles since -- since 2015, I believe.

12   Q.   Okay.

13   A.   Or a new set of positions that I have seen, but I

14        don't think I've seen this version.

15   Q.   And this is the one I got off the website.  So I

16        might have gotten the wrong one.

17                  I wanted to ask about a couple of these

18        principles.  So No. 1, the system should use human

19        readable marks on paper as the official record of

20        voter preferences and as the official medium to store

21        votes.  Does the Verified Voting Foundation, to your

22        knowledge, accept ballot marking device ballots as a

23        valid way of voting, or is it only hand-marked

24        ballots?

25   A.   I believe that their current set of -- their current

Page 98

1        set of positions on these issues point to elevated
2        risk with ballot marking devices.
3    Q.  Let me ask about No. 7.  One of the other principles
4        is to use commercial off-the-shelf hardware and
5        open-source software.  Do you agree with that
6        principle of security in voting systems?
7    A.  Yes, I think all else being equal, that's probably
8        something that is at least somewhat preferred,
9        although commercial off-the-shelf hardware and
10       open-source software can also still have significant
11       security risks.
12   Q.  Okay.  Is there a reason just from a cybersecurity
13       perspective to prefer commercial off-the-shelf
14       hardware versus custom-built hardware?
15   A.  There is a reason to prefer it.  Again, all else
16       being equal, in general, developing hardware is
17       difficult and off-the-shelf hardware is more likely
18       to have been well tested than hardware that is
19       proprietary.  But it really depends on the specific
20       case whether it actually achieves security benefits
21       or not.
22   Q.  And does the same set of principles apply to
23       open-source software versus I'm assuming
24       custom-designed software?
25   A.  Yes.  Although, open-source software has the

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 101 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 99

1    additional benefit of making the code available to

2    others to review, which carries with it additional

3    security benefits since it's open to broader scrutiny

4    for problems.

5  Q.  And so since it's open to broader scrutiny, people

6    could find vulnerabilities and notify whoever they

7    need to to repair them; is that the general

8    principle?

9  A.  Well, that's right.  And so it's -- in addition, it

10   makes it easier to I think credibly assess the likely

11   level of security of the piece of software.  When

12   it's closed, it can be more challenging.

13  Q.  What is the role of kind of trade secret in voting

14   software particularly versus an open-source approach?

15   Are there pros and cons security-wise to each, or is

16   one always preferred over the other?

17  A.  I would say there are pros and cons.

18  Q.  And can you give me some examples of what the pros of

19   trade secret and what the pros of open source would

20   be?

21  A.  Well, the broader principle is that in a system that

22   is important for security, the parts that need to

23   remain secret for security should be well defined.

24   This is called Kerckhoffs' principle.  It's sort of a

25   foundation principle in security.  And it's easier to

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 102 of 243
J.  Alex Halderman , Ph.D.                              February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 100

1        achieve that in an open-source system than a

2        closed-source sytem because in the closed-source

3        sytem, everything is being kept secret.  You might

4        not be able to compartmentalize the pieces that need

5        to be kept secret.  But yes, there's a need to keep

6        some secrets secret in basically any secure system.

7        But they should be limited to things like

8        cryptographic keys that are well defined and narrow.

9        That's the principle.

10   Q.   All right.  Well, let's go ahead and turn to your

11        report.  And the good news, we can skip ahead to

12        paragraph 14.  So we'll start on page 3.  What I

13        wanted to do primarily, just kind of walk through the

14        report and ask about some of the conclusions you've

15        reached and some of the decisions or the opinions

16        that you've offered in this case.

17              So first of all, you indicate in paragraph

18        14 that you were asked to opine on the security of

19        Georgia's election system following the

20        implementation of the new system.  Is it your

21        understanding that the Dominion voting system and the

22        KnowInk system is at issue in this case?

23   A.   Yes, it's my understanding that it's at issue in this

24        case.

25   Q.   And you walk through the various components of that,

Page 101

1          the ballot marking devices, the ICX component, the

2          ICP precinct scanners, the ICC central-count

3          scanners.  Have you personally observed and tested an

4          ICX ballot marking device?

5     A.   No, I have not.

6     Q.   Have you personally observed and tested an ICP

7          precinct-count scanner?

8     A.   No, I have not.

9     Q.   Have you personally observed and tested an ICC

10         central-count scanner?

11    A.   No, I have not.

12    Q.   Have you personally observed and tested the Democracy

13         Suite election management system?

14    A.   No, I have not.

15    Q.   And have you personally examined and tested any Poll

16         Pad electronic poll books?

17    A.   No, I haven't.  My views on the systems are based on

18         the experience that I've had over the last nearly 20

19         years with other electronic voting systems and the

20         design of the systems as documented by Dominion and

21         the tests that have been conducted in other states.

22    Q.   Okay.  So it's not based on any personal evaluation.

23         It's based on your knowledge, tests of others, and

24         understanding of the system from Dominion itself?

25    A.   That's right.

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 104 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 102

```
1    Q.   Okay.  And I believe in 15 we've already covered that
2         you reviewed the documents the plaintiffs provided to
3         you from Dominion.  Let's go to paragraph 16 about
4         the eNet software.
5    A.   Yes.
6    Q.   And eNet is Georgia's voter registration database,
7         correct?
8    A.   That's correct.  It's the software that runs the
9         voter registration database and some associated
10        administrative functions.
11   Q.   Do you know approximately how many states use eNet?
12        Is it a widely-used piece of software?
13   A.   There are versions of eNet used in other states.  I
14        know that.
15   Q.   Are there other voter registration database software
16        that is more widely used than eNet, or is eNet kind
17        of one of the main players in this space?
18   A.   It certainly is a player in this space.  But there
19        are different versions of the software that are used
20        in other states, some of which are relatively better
21        protected.
22   Q.   Okay.  And have you evaluated the protection of
23        Georgia's version of eNet versus the versions in
24        other states?
25   A.   So I am familiar with the -- I have personally
```

Page 103

```
 1         evaluated vulnerabilities in the MVP and OVR system
 2         compared to other states as a component of the
 3         broader eNet platform.
 4    Q.   Is it your testimony that MVP and OVR are part of the
 5         eNet system?
 6    A.   Are interfaced with it.  That's right.
 7    Q.   And when you say interfaced with it, what do you mean
 8         interfaced with it?
 9    A.   I mean that data from those systems feeds into the
10         overall voter registration system and vice versa.
11    Q.   And does that happen without human intervention, or
12         is there a human intervention component for either of
13         those MVP and OVR systems to alter the voter
14         registration database?
15    A.   There may be a human component for the -- some of the
16         data that's fed back in.  I think the data that comes
17         out is read out by a computer process.
18    Q.   You say in paragraph 16 -- actually, before we go to
19         that, you said you evaluated the MVP and OVR
20         components.  Have you evaluated the eNet version used
21         by Georgia versus the eNet versions used by other
22         states?  For eNet specifically, not for other
23         associated applications.
24    A.   No, I have not.
25    Q.   You say in the second sentence of paragraph 16 that
```

Page 104

1    election officials use eNet to manage voter

2    registration data.  Which election officials use eNet

3    to manage voter registration data in Georgia?

4  A.  I'm not sure in Georgia's practice.

5  Q.  And do you know which election officials export eNet

6    data to electronic poll books?

7  A.  I don't know.  I think that happens at the Secretary

8    of State's office.  That's my understanding, but I --

9    but I'm willing to be corrected.

10  Q.  In the next sentence you talk about interface of MVP

11    and OVR and say that those systems allow voters to

12    view and update their voter registration data.  Can

13    you explain to me how those systems update voters'

14    voter registration data in eNet?

15  A.  So the voter can fill in updated information through

16    the voter -- or an updated -- or fill out a voter

17    registration -- a voter registration form on those

18    systems.  It gets uploaded to the server.  And then

19    through back-end processes, which may or may not

20    require human intervention, I'm not sure, the data is

21    updated in the voter registration database.

22  Q.  So you don't know if a voter registrar is required to

23    review information and changes to voter registration

24    data before those changes are made in eNet?

25  A.  You know, I'm not sure that it makes a significant

Case 1:17-cv-02989-AT    Document 821-3    Filed 08/26/20    Page 107 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 105

1      difference to the security of the system overall.

2      Even attacks that could affect -- attacks could

3      affect voter registration in plausible ways that a

4      registrar would approve.

5   Q. So it's your testimony that there's really no

6      security difference whether the input of a registrar

7      is required before changes are made?

8   A. It matters to some kinds of attacks, but I don't

9      think to plausible attacks that could affect -- to

10     certain plausible attacks that could affect the --

11     could affect the ability of Georgia voters to cast

12     their votes on an election day.

13  Q. And then we'll come back around to that in a little

14     bit more later on.  In paragraph 17, the bottom of

15     that page 4 you indicate absentee voters will not use

16     BMDs.  That is for people who vote absentee by mail;

17     is that right?

18  A. That's my understanding.

19  Q. And voters who vote absentee in person, do you have

20     an understanding of whether they will use BMDs or

21     not?

22  A. I think absentee in person is a BMD process.  Yes.

23  Q. In paragraph 18, you indicate in the second sentence

24     that the Secretary of State will transmit the

25     election programming files to county officials.  Do

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 108 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 106

1          you know how that transmission is made?

2     A.   I'm not sure whether the process has been changed

3          from the process that was used prior to the

4          introduction of the Dominion system or not.  But the

5          process prior to the transmission via CD ROM has

6          significant security downsides.

7     Q.   Okay.  But you don't know the current setup that's

8          being used, correct?

9     A.   I'm not sure that it makes a difference for the kinds

10         of attacks that I'm worried about.  But I don't know

11         for sure the current process.  I'm not sure that

12         that's been documented publicly yet.

13    Q.   So it's your testimony that the method of

14         transmission doesn't really matter to the types of

15         attacks you're concerned about?

16    A.   To some of the attacks I'm concerned about.  That's

17         correct.

18    Q.   But it does matter to other types of attacks you're

19         concerned about?

20    A.   That's right.  There can be attacks that depend on

21         the specific method of transmission, and there are

22         other attacks that only depend on the fact of

23         transmission.

24    Q.   So in evaluating the relative risks to Georgia's

25         election system, you didn't consider the method of

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 109 of 243
J. Alex Halderman , Ph.D.                 February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 107

1          transmission as informing that part of risk

2          assessment, correct?

3    A.    I think the method of transmission -- excuse me.

4                (Discussion off the record.)

5    BY MR. TYSON:

6    Q.    So in reaching your conclusions about the risks faced

7          by Georgia's election system, you did not -- since

8          you did not know the method of transmission, you

9          didn't take the method of transmission into account

10         in making that assessment; is that right?

11   A.    Well, I think that's right.  The method of

12         transmission might change the level of risk around

13         the edges, but it's not likely to be a night and day

14         difference.

15   Q.    So it's not important to your overall conclusions; is

16         that right?

17   A.    No, I don't think it affects the overall conclusion.

18   Q.    Okay.  At the bottom of 18 you indicate that election

19         workers will install a memory card or USB stick into

20         each BMD and ICP scanner prior to the start of

21         voting.  Do you know which election officials or

22         workers will do that?

23   A.    My understanding is that in Georgia that usually

24         happens at the county, but I'm not completely sure.

25   Q.    Okay.  And then the removal in paragraph 19 of the

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 110 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 108

1        memory cards for return, do you know which election

2        workers those would be?

3   A.   I think that happens at the polling place in Georgia,

4        but I'm not entirely sure.

5   Q.   And you don't mention what happens to the paper

6        ballots after an election.  Is that -- I'm assuming

7        that's not relevant to your analysis either.

8   A.   Well, not primarily to the cyber -- well, actually,

9        that is something that is relevant to the analysis.

10       I just don't mention it here.

11  Q.   So what is the method that the paper ballots are

12       returned back to a county official?

13  A.   I don't know.  But I'm assuming for purposes of this

14       analysis that the paper ballots are going to be

15       returned through an adequate chain of custody because

16       otherwise the security situation is even worse.

17  Q.   Okay.  So then you're assuming that paper ballots are

18       returned through an adequate chain of custody as part

19       of reaching your conclusions about the relative risks

20       of Georgia's system, right?

21  A.   Well, that's right, because those risks are even

22       worse if the chain of custody is not adequate.

23  Q.   And since you don't know exactly who's installing

24       memory cards, who's removing memory cards, I'm

25       assuming that's not part of your analysis either as

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 111 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 109

1          far as reaching your conclusions about relative risk.

2    A.    I tried to make generous assumptions about those

3          risks where I don't know the answer, ones that the

4          level of risk doesn't depend on it being the worst

5          possible way it could be done.

6    Q.    Again, so likely paper ballot transmission, you

7          assumed then that qualified election workers are

8          going to handle memory cards at all stages with the

9          proper chain of custody; is that fair to say?

10   A.    That's right.  Even though there are still

11         limitations to effectively what you can achieve with

12         that kind of chain of custody.

13   Q.    And --

14   A.    And also, I do -- okay.  That's fine.

15   Q.    We've already covered paragraph 20 I think pretty

16         thoroughly.  I just wanted to ask, on this point, the

17         high risk of attack that you're concerned about for

18         Georgia elections, would you say that Georgia's new

19         election system faces the same level of risk as the

20         DREs, a greater level of risk, or less risk?

21   A.    I think for very important -- for probably the most

22         important category of risk, which is the risk of

23         nation state attacks against close elections, the

24         risk is not substantially reduced.  I think for other

25         scenarios, there are some benefits to security from

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 112 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 110

1       the change.  But sort of the thing that we all should

2       be most worried about, the security of the new system

3       is not -- is not such that those attacks are strongly

4       prevented.

5   Q.  So it's your testimony that Georgia faces basically

6       the same amount of risk from a nation state attacker

7       with its new voting system as it faced with the DRE

8       system; is that right?

9   A.  Unfortunately largely because of the lack of strong

10      auditing and the difficulty of verifying -- of voters

11      actually verifying their ballots well.

12  Q.  If Georgia implemented proper, as you would

13      categorize them, robust auditing procedures, would

14      the security situation from a nation state attacker

15      be improved over the DREs?

16  A.  Well, the problems are both the lack of robust

17      auditing and the lack of -- and the lack of a

18      strongly voter-verified paper record.  If both of

19      those things were corrected, then I think the

20      relative risk would be lower than in the DRE system.

21  Q.  And you used a distinction there that I want to hone

22      in on for a minute.  You refer to a voter-verified

23      paper record.  Can you describe the difference in a

24      voter-verifiable paper record and a voter-verified

25      paper record?

Page 111

1    A.    Sure.  So with the caveat that those terms are often

2          not used precisely in the literature and people for

3          years kind of use them interchangeably but without

4          really addressing the question of whether things that

5          were verifiable would be verified.  But a

6          voter-verifiable record is one that in principle the

7          voter could verify.  A voter-verified record is one

8          the voter actually has verified and ensured is

9          correct.

10   Q.    And so in recommendations, there has been a lot of

11         terminology thrown around of voter-verifiable paper

12         records.  Voters have the option of verifying their

13         records in that situation, which distinguishes it

14         from a DRE where there would be no record; is that

15         correct?

16   A.    From a paperless DRE where there would be no record.

17   Q.    Yes.  I'm sorry.  Good clarification.  When I think

18         of DRE, I've only ever voted on a paperless DRE in

19         Georgia.  So thank you for that.

20               In paragraph 21, you say that there is no

21         doubt that Russia and other adversaries will strike

22         again.  On what basis are you saying that there is

23         absolutely no doubt they will strike again?  I'm

24         assuming you've not talked to President Putin or Vigo

25         Carpathian or somebody about this, right?

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 114 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 112

1    A.   No.   But I follow very closely the assessments of the

2         intelligence community and DHS and the federal

3         government on these questions.   And there's every

4         indication that Russia continues at this very minute

5         to be attempting to interfere in the election.

6    Q.   And election interference we can draw as a distinct

7         concept from vote manipulation.   Wouldn't you agree

8         those are distinct concepts?   Maybe one includes the

9         other?

10   A.   Yeah, maybe one includes the other.

11   Q.   So election interference could include manipulating

12        votes.   But merely interfering could be spreading

13        false messages on social media, visiting websites of

14        county boards, scanning for vulnerabilities in a

15        system.   Would that be a fair distinction to draw?

16   A.   I think that's fair.

17   Q.   And so in terms of, you know, no doubt that Russia

18        will strike again, I think we covered earlier we

19        don't have any evidence that Russia manipulated votes

20        in any election in the US, correct?

21   A.   That's right.   Even though there were significant

22        gaps in the visibility that would make that evidence

23        available.

24   Q.   Over on the next page, page 7, you indicate that the

25        report found that these foreign agents were

Page 113

1       successful in attacking at least one state.  Was that

2       one state Georgia?

3   A.  No.  Not the state that is referred to in the report.

4   Q.  In the last paragraph you indicate that Georgia was

5       among the states Russia targeted.  And as we

6       discussed earlier, targeting doesn't necessarily mean

7       manipulation or compromise, right?

8   A.  No.  It's just the first step, but it does -- it does

9       speak to -- towards the intent.

10  Q.  And like the Senate Intelligence Committee, the

11      special counsel never found any votes were actually

12      compromised, right?

13  A.  That's right.  But again, there were very serious

14      limitations to the available evidence that would, if

15      the votes were compromised, allow us to reach that

16      conclusion.  So the best I think that they could say

17      is well, essentially there's no evidence votes have

18      been compromised.

19  Q.  Is it your personal belief that Russia has

20      compromised votes in elections in the US?

21  A.  I don't know.

22  Q.  In paragraph 22, you talk about some examples.  I

23      believe we discussed earlier the Ukrainian

24      presidential election.  And Ukrain's vote counting

25      infrastructure that you reference there, that was a

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 114

1          system directly connected to the internet; isn't that

2          right?

3    A.    Yes, it was.

4    Q.    At the end of paragraph 22 you say, other adversarial

5          governments and various things might target future

6          Georgia elections.  And sitting here, you don't have

7          any evidence that other adversarial governments

8          absolutely will target Georgia elections, do you?

9    A.    No.  But there's no reason to doubt that other

10         governments have something at stake in the outcome of

11         future US elections and have the cybersecurity

12         offensive capabilities that they would need in order

13         to -- in order to do that.

14   Q.    But as we talked about, there's a difference in

15         aiming a gun and pulling the trigger, correct?

16   A.    That's correct.

17   Q.    And so you don't have any evidence they will

18         definitely pull the trigger to attack Georgia

19         elections?

20   A.    No, I can't speak to that.

21   Q.    To paragraph 23.  This is another kind of summary

22         opinion piece.  It's your opinion that Georgia's new

23         voting technology does not achieve the level of

24         security necessary to withstand an attack by a

25         sophisticated adversary, such as a hostile foreign

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 117 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 115

```
 1          government.  Isn't that statement true of every
 2          states' voting technology?
 3     A.   So no, I don't think that it is true of every -- of
 4          every states' voting technology, at least not in the
 5          same sense, because in states that really do have a
 6          hand-marked ballot and are or are intending to audit
 7          the paper trail rigorously, the attacks that I'm most
 8          concerned about, ones that would actually change the
 9          election outcome, would not be likely to succeed.
10     Q.   So in your opinion, the necessary preconditions to
11          have the level of security necessary to withstand an
12          attack by a foreign government are hand-marked paper
13          ballots and robust audits; is that fair to say?
14     A.   Those are two of the most important, and there are
15          other components of resiliency that are important
16          too.
17     Q.   So do you have an estimate on what percentage of
18          jurisdictions currently have sufficiently robust
19          audits and hand-marked paper ballots to withstand
20          that kind of attack?
21     A.   It's just a few percent of jurisdictions
22          unfortunately.  There's still a lot of work to do
23          nationally.  But there are degrees.
24     Q.   So would it be fair to say then that 90 percent of
25          jurisdictions don't have the level of security
```

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 118 of 243
J. Alex Halderman , Ph.D.               February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 116

1      necessary to withstand an attack by a hostile foreign

2      government?

3   A.  I'm not sure about 90 percent, but it is a high

4      percentage.

5   Q.  Higher than 80?

6   A.  Probably.

7   Q.  Okay.  Now, you have a lab where you do work related

8      to election technology and cyber vulnerabilities,

9      right?

10  A.  I do.

11  Q.  And do you believe your lab has the level of security

12      necessary to withstand an attack by a sophisticated

13      adversary such as a hostile foreign government?

14  A.  No, absolutely not.  We are -- we are definitely not,

15      however, running an election system for any state out

16      of our lab.

17  Q.  You do have technology in your lab that could be used

18      to compromise voting systems that are currently in

19      use, though, right?

20  A.  Yes, we do.  We try to take the best steps that we

21      can to prevent that.  But unfortunately, the reality

22      is that sophisticated nation states have -- hostile

23      nation states have extremely sophisticated cyber

24      offensive capabilities.  And the question is more a

25      question of do they really want to attack us, than

Page 117

 1            can we withstand the determined attack.

 2      Q.    So then in the subparagraphs under 23, you provide

 3            some scenarios under which attackers could

 4            potentially subvert the election technology.  And the

 5            first is infiltration of the voter registration

 6            database to extract, change, or erase records.  Do

 7            you see that?

 8      A.    Yes.

 9      Q.    Do you have any evidence that that has ever happened

10            to the State of Georgia's voter registration

11            database?

12      A.    No, I don't.

13      Q.    And it's true that attackers could infiltrate the

14            voter registration database of any state if they were

15            a sophisticated hostile foreign government, right?

16      A.    That's probably true.  Although, Georgia's system has

17            specific technical risks that lead me to believe that

18            the risk is higher in the State of Georgia than in

19            other states.

20      Q.    And how many other states' voter registration

21            databases have you studied for potential risks?

22      A.    How many?  That's a good question.  A handful of

23            other states.  Certainly Michigan in great detail.

24      Q.    And when you say a handful, less than five?

25      A.    Probably less than five in detail.

Page 118

1    Q.    So you've evaluated five states or less of the voter

2          registration databases.  And of those, your

3          conclusion is that Georgia is the most vulnerable of

4          those five?

5    A.    I'm not sure that I've specifically ranked or

6          quantified, but I would say Georgia is significantly

7          more vulnerable than it needs to be.

8    Q.    As compared to those five other states?

9    A.    And as compared to some other states that I've

10         studied.  It's certainly more vulnerable that

11         Michigan's.

12   Q.    And what other states have you studied?

13   A.    Where else have I studied?  I've looked at the voter

14         registration technology in Pennsylvania and in

15         California to some degree.  I would have to go back

16         and check.

17   Q.    Okay.  And your analysis of the relative risk level

18         is based on -- what kind of factors are you reviewing

19         when you're evaluating the risk to the voter

20         registration databases?

21   A.    Some of the most important factors are things like

22         the age and brittleness of the software involved, who

23         is maintaining it, and what the results of security

24         assessments have been and whether the problems found

25         in those assessments have been completely mitigated.

Page 119

1    Q.   And have Michigan, Pennsylvania, California conducted
2         sophisticated threat assessments by cybersecurity
3         vendors of their voter registration databases?
4    A.   Michigan has.  I don't know about the other states.
5    Q.   And did those -- for Michigan, did they find any
6         potential vulnerabilities in the database?
7    A.   They did.
8    Q.   And did Michigan then mitigate those and correct
9         those?
10   A.   They did.
11   Q.   And did they correct all of them?
12   A.   To my knowledge, they did, yes.  In fact, they
13        replaced the entire software system as a result of
14        those analyses.
15   Q.   What software system does Michigan use today?
16   A.   The Michigan software system is one that is called
17        the -- give me just a second.  Changing states.  It's
18        called the Qualified Voter File database or QVF.
19   Q.   And is QVF a vendor in this space?
20   A.   No.  QVF is custom software for the state.
21   Q.   So Michigan decided to build its own software for
22        voter registration database?
23   A.   That's right.
24   Q.   You indicate that the attacks could cause voters to
25        receive the wrong ballot or be prevented from casting

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 122 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 120

1        a regular ballot.  Are you familiar with the

2        provisional balloting process?

3    A.   I am.

4    Q.   And if there was an attack like the attack you're

5        describing in 23(a), you'd expect to see an increase

6        in provisional ballots for people who weren't in the

7        registration database, right?

8    A.   That's probably right.

9    Q.   Are you aware if there's been such an increase in

10       Georgia from 2016 to 2018?

11   A.   I don't know.

12   Q.   You indicate that they could also be used to steal

13       information that could be used to impersonate voters.

14       You're aware that Georgia has a photo ID requirement

15       for voting?

16   A.   I am.  But that doesn't apply to absentee by mail.

17   Q.   So your reference to voter impersonation here refers

18       to absentee by mail impersonation, not in-person

19       impersonation?

20   A.   Not in-person impersonation.

21   Q.   Which is much more of a tongue twister than I

22       realized it was going to be.

23   A.   That's right.  Absentee by mail or to access voter

24       registration records.

25   Q.   The second type of attack that you propose, attackers

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 123 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 121

1         could sabotage polling place equipment and prevent

2         them from functioning on election day.  Do you have

3         any evidence that any sabotage of polling place

4         equipment that kept it from functioning has happened

5         in Georgia?

6    A.   No.  Although, the new equipment has only been in use

7         for a very short period of time.

8    Q.   Do you have any knowledge of the physical security

9         requirements for state election board rules

10        surrounding the new system?

11   A.   I haven't reviewed them in detail.

12   Q.   And I'm assuming you haven't visited any counties to

13        review their inspection of how they're maintaining

14        the election equipment.

15   A.   No.  Although, I have -- I'm familiar with reports

16        from others who have visited Georgia counties in the

17        past and have seen some of the physical security

18        mechanisms in place.

19   Q.   And was that before or after the purchase of the new

20        system?

21   A.   That was before the purchase of the new system.

22   Q.   So today you don't know what physical security

23        requirements might be available to mitigate an attack

24        outlined in 23(b); is that right?

25   A.   23(b) is referring not specifically to attacks that

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 124 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 122

| | | |
|---|---|---|
| 1 | | require physical security compromise, but ones that |
| 2 | | involve compromise of the software and data running |
| 3 | | in the system by any means, including by remote |
| 4 | | cyberattack. |
| 5 | Q. | Okay.  So it's your testimony that the Dominion |
| 6 | | system is subject to remote cyberattack that could |
| 7 | | compromise its functioning? |
| 8 | A. | Potentially, yes. |
| 9 | Q. | You say at the end of that that the attacker could |
| 10 | | target such sabotage at jurisdictions that strongly |
| 11 | | favor a particular candidate and cause a partisan |
| 12 | | shift.  You don't have any evidence that that's ever |
| 13 | | happened in Georgia, do you? |
| 14 | A. | No, I don't.  Though, again, the system has only been |
| 15 | | in use a few weeks. |
| 16 | Q. | 23(c), you talk about the manipulation of optical |
| 17 | | scanners or EMS systems to report fraudulent |
| 18 | | outcomes.  Do you have any evidence that's ever |
| 19 | | happened in an election in Georgia on the new system |
| 20 | | or any system? |
| 21 | A. | No, I don't.  Although, the new system is new.  And |
| 22 | | the old system, I don't think anyone has ever done |
| 23 | | the kind of analysis of the optical scanners and EMS |
| 24 | | servers that would be required in order to make a |
| 25 | | strong statement about whether it had happened. |

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 125 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 123

1    Q.   You reviewed the GEMS databases for the state's old

2         system, though, correct?

3    A.   Yes, I have.

4    Q.   Have you discovered any malware compromise in that

5         review?

6    A.   No.   But the GEMS databases themselves are no

7         substitute for reviewing the actual software running

8         and installed on the servers.

9    Q.   But you don't know if anybody has undertaken that

10        kind of review in the last six months, say?

11   A.   No, I don't think so.

12   Q.   You indicate that at 23(c), attack could alter all

13        digital records of the election results.  And that's

14        where, again, you're coming back to the rigorous

15        manual audit or a recount of the paper ballots.  Then

16        you say, Georgia law doesn't currently require that.

17        What is your understanding of what Georgia law does

18        require?

19   A.   So my understanding of what Georgia law requires is

20        that it requires an audit this year but not a risk

21        limiting one.  It requires an audit pilot by the end

22        of 2021.  And that after that, the requirement

23        depends on the outcome of the pilot.

24   Q.   And you don't know what Georgia's current plans are

25        related to auditing of ballots going forward on the

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 124

1         new system, correct?

2    A.   Auditing ballots on the new system.  My understanding

3         is that Georgia does not require -- does not

4         currently plan to require a rigorous audit.

5    Q.   Have you reviewed any state election board rules

6         related to audits in Georgia?

7    A.   I have reviewed some state board election rules

8         related to audits in Georgia, but I can't -- I'm not

9         prepared to tell you exactly what the -- which set of

10        rules those were.  I just don't remember.

11   Q.   Are you aware that Georgia is working with Verified

12        Voting on the development of its audit processes?

13   A.   I'm aware that they were -- that they have been

14        working together in the past.

15   Q.   And do you support that kind of collaborative effort

16        to develop audits for jurisdictions?

17   A.   Well, look, I support work to implement robust

18        audits, but you have to actually get there in order

19        to have the benefit.

20   Q.   Do you based on your expertise in the design of

21        audits believe that piloting audits is a helpful

22        practice before you implement a full audit procedure

23        in a jurisdiction?

24   A.   Yes, I do.  But you have to actually implement the

25        full audit procedure in the jurisdiction.

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 127 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 125

1   Q.   And the type of attack you outline in 23(c) is also

2        true of a hand-marked paper ballot system; is that

3        correct?

4   A.   Yes, that's correct.

5   Q.   In 23(d) you talk about an infiltration to sometimes

6        print ballots differing from a voter's onscreen

7        selections.  And it's basically (d) and (e), the way

8        I read them, are two types of attack, one that

9        changes only the bar code, one that changes the bar

10       code and the human readable text.  Again, you

11       indicate that a 23(d) attack must be rigorously

12       audited or else it could go undetected.  Is that a

13       fair statement?

14   A.   That's right.

15   Q.   And so it's your testimony that a sufficient audit

16       would mitigate against the 23(d) style of attack,

17       right?

18   A.   That's right.  But it would have to be an audit that

19       was more rigorous than any audit that I understand to

20       be planned in Georgia.

21   Q.   But you don't currently know what's being planned in

22       Georgia; is that right?

23   A.   Well, I know what's being -- what's been publicly

24       talked about in Georgia, and I told you what my

25       understanding of the legal requirement is.

Page 126

1    Q.    Have you ever seen a, and this is going to be in any
2          context, lab or otherwise, a virus or malware that
3          would alter only the ballot bar code on a Dominion
4          system?
5    A.    On a Dominion system, no, I have not.
6    Q.    Have you ever seen in the lab or otherwise a piece of
7          malware or virus that would alter both the bar code
8          and the human readable text on a Dominion system?
9    A.    No.  Although, on other systems I have.
10   Q.    In 23(e) when you say research shows that few voters
11         carefully review their printed ballots, you're
12         referring to the two studies you cite later in your
13         report; is that right?
14   A.    Yes, I am.
15   Q.    And no other studies beyond those?
16   A.    I'm referring to those two studies.
17   Q.    And you say that the fraud sufficient to change the
18         winner of a close race might go undetected.  One
19         thing I've always wondered about these kind of
20         possible scenarios is how would an attacker know what
21         will be a close race?
22   A.    Right.  So usually by pre-election polling is one way
23         that an attacker can potentially conclude that a race
24         is likely to be close.
25   Q.    And in races where there's not regular polling, for

Page 127

1          example, smaller races, are there other methods

2          someone could try to use to determine what they would

3          need to alter?

4     A.   I'm sorry.  Can I actually turn this off?

5     Q.   Sure.

6                    (Recess taken.)

7                    THE WITNESS:  I'm sorry.  Can you

8               repeat your question, please.

9     BY MR. TYSON:

10    Q.   Sure.  So in a race that is a smaller jurisdiction

11         where there's not regular polling, for example, of a

12         race, state house race, county commission race, how

13         would an attacker go about determining what would be

14         a close race that they could try to throw in that

15         context?

16    A.   Well, they could cheat anyway just in case it's

17         close, right?  So they don't necessarily need to know

18         for sure that it's going to be close in order to

19         attempt an attack and succeed if it is, in fact,

20         close.

21    Q.   And then in 23(e) you indicate that no audit or

22         recount could detect that kind of attack because the

23         digital and paper records would be wrong.  And the

24         only way -- now this is me.  Is it correct that the

25         only way a 23(e) attack would be detected is if a

Page 128

1     sufficient number of voters carefully reviewed their

2     printed ballots?

3   A.   That's the only surefire way that such an attack

4        would be detected, and then also assuming that there

5        was a careful audit of the paper trail.

6   Q.   So the way I read this, the attacks you outline in

7        (c), (d), and (e) could be mitigated or detected by

8        sufficiently rigorous audits with voters carefully

9        reviewing their printed ballots in a sufficient

10       number.  Is that fair to say?

11  A.   I think that's fair to say.

12  Q.   And the attack outlined in (a) would be mitigated by

13       the use of provisional ballots, right, and possibly

14       detected through a spike in provisional ballots

15       there?

16  A.   Well, all right, wait a minute because it's -- it

17       matters a lot what we mean by mitigated.  That attack

18       in (a) would at least be detected as a result of a

19       spike in ballots.  But if it's already caused there

20       to be long lines or other chaos at the polling place,

21       there's no way that you can go back and fix it.

22  Q.   Okay.

23  A.   These other attacks in I think you said (c), (d), and

24       (e) were mitigated by a combination of voters

25       robustly verifying -- or rigorously verifying their

Page 129

1       ballots and a sufficiently robust audit.  Although
2       that's true, I don't think that there is any -- that
3       there is sufficient evidence to conclude that it's
4       possible to induce voters to rigorously verify their
5       ballots to the necessary level in an all BMD context.
6   Q.  And you made an important distinction.  So there are
7       methods by which (a), (c), (d), and (e) can be
8       detected, and then there will be at least some basis
9       to go and investigate further what actually happened.
10      Is that fair to say?
11  A.  So we have to -- we should probably make a diagram
12      about that or something like that to distinguish
13      exactly which circumstance detection versus
14      correction is possible.
15  Q.  Why don't we try it this way?  Under (a), you can
16      detect an attack outlined in 23(a) by a spike in the
17      provisional ballots for individuals not in the voter
18      registration database.
19  A.  Depending on which variation of this attack.  But for
20      plausible variations, I would agree with you.
21  Q.  And then for (b), I'm assuming that would be
22      relatively obvious because things are not working.
23      So that would be a very detectable type of attack?
24  A.  Yes.  Hard to recover from, but one that you know
25      chaos is happening.

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 132 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 130

1    Q.   And (c) can be detected through a sufficiently robust

2         audit or a recount, correct?

3    A.   Yes.

4    Q.   And (d) can be detected through a sufficiently

5         rigorous audit.

6    A.   Yes.

7    Q.   And then (e) can be detected --

8    A.   Although, (d) cannot necessarily be corrected by a

9         sufficiently rigorous audit.

10   Q.   That's why I'm asking specifically just the detection

11        question for each of these.

12   A.   Yes.  Okay.

13   Q.   And then for (e), it can be detected through

14        sufficient number of voters carefully reviewing their

15        printed ballot and sufficiently rigorous audits.

16   A.   Yes.

17   Q.   Okay.  And in each of those scenarios, there would

18        then be a basis to conduct a further investigation to

19        find evidence of the types of attacks that have been

20        outlined, right?

21   A.   Well, it depends.  So in some of those scenarios,

22        it's too late.  The election has already been

23        disrupted.  In other cases, in other cases, if you

24        detect that something is wrong, you don't have any

25        information available by which to go back and correct

Page 131

1           the changes that have happened.

2     Q.    You're familiar, I'm assuming, with the process of an

3           election contest?

4     A.    Yes.

5     Q.    And so there already exists provisions in Georgia law

6           and I'm sure other states as well that if, for

7           example, people who were ineligible incorrectly vote,

8           there's a provision to handle that through an

9           election contest.  Are you aware of that?

10    A.    Yes.

11    Q.    And so you said it's too late in terms of, you know,

12          once we detect it.  But if we detect it and an

13          election contest is filed, the election can be

14          re-run, just like it would be if ineligible people

15          were voting, right?

16    A.    That's true.  I would hate it -- I would hate to be

17          Georgia if we have to re-run the 2020 presidential

18          election because of Georgia's voting system.

19    Q.    And it's your testimony that you don't have any

20          evidence that any of the attacks in (a) through (e)

21          have ever occurred in an actual election in the

22          United States, right?

23    A.    No.  But election systems in many jurisdictions in

24          the United States don't produce the kind of evidence

25          that we'd need in order to know that these attacks

Page 132

1         have happened.

2    Q.   In paragraph 24, you begin discussing malware,

3         malicious software that could be introduced into the

4         election equipment.  You don't have any evidence that

5         malware has been introduced into election equipment

6         in use in elections in Georgia, do you?

7    A.   No, I don't.  Although, to my knowledge, no one has

8         done the kind of forensics to any piece of election

9         equipment in Georgia that would be the most probable

10        way to detect such malware intrusion if it occurred.

11   Q.   And the list of introduction of methods of malware

12        introduction in 24, that's true in every state,

13        correct?  You could introduce malware if you had

14        these types of things into optical scanners, for

15        example, in every state system or election management

16        system?

17   A.   Yes.  That is true.

18   Q.   In paragraph 25, you begin with a little bit more

19        detailed discussion of the pieces connected to the

20        internet.

21   A.   Could we maybe take a break at some point soon?

22   Q.   Certainly.  I'm fine to take a break now, if you'd

23        like to.

24   A.   All right.  If we could.

25   Q.   Absolutely.  Thank you.

Page 133

1              (Recess taken.)

2    BY MR. TYSON:

3    Q.   So turning to paragraph 25, we talk about some

4         components oven the system that are directly

5         connected to the internet.

6    A.   That's right.

7    Q.   Now, we've discussed a little bit the MVP and OVR

8         systems.  What is your understanding of how the MVP

9         system is connected to the eNet database?

10   A.   Well, let me see if I can remember for this

11        specifically for the MVP.  The MVP -- the MVP I know

12        receives information from the eNet database and I

13        believe contains a way to update that information.

14        But that may be in the OVR system.  It's been a while

15        since I've looked at them independently.

16   Q.   And so the OVR system, do you understand how that is

17        connected with the election system?

18   A.   Well, it generates voter registration requests that I

19        understand have to be reviewed by a person, but that

20        data then is fed into the database.

21   Q.   And are you recommending that no voter registration

22        information be put online for security purposes?

23   A.   No.  But what I'm recommending is that especially

24        heightened security precautions should be taken for

25        the components that are online because they create a

Case 1:17-cv-02989-AT  Document 821-3  Filed 08/26/20  Page 136 of 243
J. Alex Halderman , Ph.D.                      February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 134

 1          path by which an attacker could potentially come from
 2          anywhere in the world and access the system.
 3     Q.   In the third sentence of paragraph 25, though, the
 4          criticism seems to be just that they are connected to
 5          the internet.
 6     A.   This isn't a criticism.  This is an expression of --
 7          an expression of the nature of the risk.
 8     Q.   And so this is a risk that there's at least a good
 9          policy reason to encounter because we want voters to
10          have information about their voting information?
11     A.   Perhaps.  And it's a risk that -- but it's also a
12          risk that is especially heightened in Georgia due to
13          the nature of the problems that have already been
14          detected in the eNet system and the reviews that have
15          happened so far.
16     Q.   You don't have any evidence that Georgia's eNet
17          system has been directly targeted by malicious
18          actors, do you?
19     A.   Just the broad conclusion of the Mueller
20          investigation and the Senate Intelligence Committee
21          that Georgia was among the states whose systems were
22          targeted by Russia in 2016.  And I think it's a
23          inference that the online components of the
24          registration system were among those targeted.
25     Q.   Do you know how Georgia maintains backups of its eNet

Page 135

1         registration system or if it does?

2    A.   I believe it does, but I don't know the specifics

3         about how those backups are maintained.  And it's a

4         good thing that it does.

5    Q.   In paragraph 26, you talk about components that are

6         not connected to the internet that could be targeted.

7         And one of the ways is removable media.  And you cite

8         the Stuxnet computer virus.  Are you with me on that?

9    A.   Yes.

10   Q.   And it's your testimony that that was attacked

11        through removable media and not through programming

12        at the manufacturer?

13   A.   Stuxnet was designed to, among other things, spread

14        through removable media.

15   Q.   Did the initial infection of Stuxnet come through

16        removable media?

17   A.   I think I've seen conflicting reports and conclusions

18        about that, but the way that the Stuxnet malware was

19        designed was able to spread to disconnected systems

20        by a removable media.

21   Q.   And in the next sentence you say that attackers could

22        employ this method to infect state or county EMS and

23        spread from there to scanners and BMDs when workers

24        program them for the next election.  Do you have any

25        evidence that this has ever happened to a Dominion

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 138 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 136

1        system?

2    A.  No, I do not.  Although, the Dominion system is very

3        new.

4    Q.  So let's talk about the Dominion system.  That leads

5        up to paragraph 27.  And your opinions in this

6        section about the Dominion components, I think we've

7        discussed, came from your review of the technical

8        documentation, the California and other evaluations

9        of it, not from your personal review, correct?

10   A.  That's correct.  They're based on my experience with

11       other similarly designed voting systems as well.

12   Q.  Now, you in paragraph 27 say, Dominion does not

13       dispute that its devices can be hacked by

14       sufficiently sophisticated adversaries.  And that's

15       not really that remarkable of a statement, is it?  I

16       mean, can't any computer, we've already discussed, be

17       hacked by sufficiently sophisticated adversaries?

18   A.  I think that's actually a critically important point

19       because this is the entire reason that we need the

20       paper trail, the paper trail to reflect accurately

21       voters' intentions and the paper trail to be

22       rigorously audited.

23   Q.  So you would agree that that's not really a

24       remarkable statement, though, because it's a computer

25       that can be hacked, which is basically every

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 139 of 243
J. Alex Halderman , Ph.D.                        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 137

1          computer?

2    A.    I agree that it's basically every computer that can

3          be attacked.  But again, that's really a core part of

4          why Georgia even has a new voting system right now,

5          that all computer systems can be hacked, and we need

6          to be very, very careful to make sure that, you know,

7          voting system context, the correct outcome is going

8          to be determined even if the systems are successfully

9          attacked.

10   Q.    The first reason you cite, you say one reason why

11         this is true.  So you're going to give, I guess, a

12         couple of reasons why it can be hacked.  I guess

13         isn't the first reason why it's true is because it's

14         a computer?

15   A.    I suppose so.

16   Q.    Okay.  You first cite the complexity of the software,

17         though.  Have you compared Dominion's software with

18         the number of source code lines in other BMD systems?

19   A.    In other voting systems.  Not -- I'm not sure it's

20         specifically in other BMD systems.

21   Q.    And is it your testimony that the number of lines of

22         code is higher in the Dominion system than other

23         voting systems?

24   A.    It's ten times as much code as Georgia's previous

25         voting system.

J. Alex Halderman , Ph.D.                          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 138

1    Q.   And compared to other ballot marking device systems?

2    A.   I don't know.  It's probably similar, but I can't --

3         I can't estimate exactly how much.  Probably -- yeah.

4         I can't estimate how much.

5    Q.   The ICP scanner you indicate has 475,000 lines of

6         source code.  The ICP scanner is the optical scanner,

7         right?

8    A.   The precinct-based optical scanner as opposed to the

9         central count.

10   Q.   And is that similar to the number of lines of code

11        for other precinct-based scanners you've evaluated?

12   A.   It's more code than for other precinct-based scanners

13        that I've evaluated by something like a factor of

14        three or four.

15   Q.   And you indicate that the software is written in

16        C/C++, and you say that that programming language is

17        particularly susceptible.  Is that true of all

18        software written in C/C++, that it's more vulnerable

19        than other software?

20   A.   It's extremely difficult to write software in C and

21        C++ that is even reasonably secure to the point that

22        I'm advocating that my department stop teaching those

23        programming languages to undergrads.

24   Q.   Are those programing languages used in commercial

25        applications today?

Page 139

1    A.    They are.  Although, decreasingly so because of the

2          security risks.

3    Q.    And the security risks on the C, C++ front on the

4          precinct scanner are there for hand-marked paper

5          ballot systems too, correct?

6    A.    Yes.  That's part of the reason that the system needs

7          to be audited.

8    Q.    You say in paragraph 29 that software the size and

9          complexity of Dominion code inevitably has

10         exploitable vulnerabilities.  So is it true then that

11         just having a large number of lines of code always

12         leads to exploitable vulnerabilities?

13   A.    In practice, yes.

14   Q.    The quote at the end of 29 from the California study,

15         if the system were secure, it would be the first

16         computing system of this complexity that is fully

17         secure.  Would you ever categorize any computing

18         system as fully secure?

19   A.    There are some simple computer systems for which you

20         could plausibly make such a statement, but they're

21         very simple computing systems.

22   Q.    Like an Atari-level computing system?

23   A.    Probably not even that.

24   Q.    And so when you reference nation state attackers in

25         29 discovering and exploiting novel vulnerabilities

Case 1:17-cv-02989-AT  Document 821-3  Filed 08/26/20  Page 142 of 243
J. Alex Halderman , Ph.D.              February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 140

1          in complex software, that basically is pretty much

2          every piece of software has exploitable

3          vulnerabilities, right?

4     A.   That's right.  It's another way of saying that if the

5          Russian government decides to target Georgia's

6          elections in 2020, they're likely to succeed.

7     Q.   And ultimately, that's not a function of a Dominion

8          system, a function of the lines of code.  It's just a

9          function of it being a computer that's programmed by

10         software, isn't it?

11    A.   And a function of the lack of things like a

12         strongly -- a paper trail that voters -- a paper

13         trail that we can be sure reflects voter intent even

14         in the face of attack and a question of whether there

15         is a rigorous enough audit.

16    Q.   And so essentially it's your testimony that there is

17         no way we can ever secure any computerized voting

18         system adequately, which is why you advocate for a

19         hand-marked system primarily?

20    A.   I'm not opposed to the use of technology in voting in

21         general, but that technology has to be used in ways

22         where we don't have to trust that the technology is

23         functioning correctly in order to be sure the

24         election outcome is right.

25    Q.   But you would never place a piece of technology

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 143 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 141

1      between a nondisabled voter and the ballot?

2   A. I think it's unwise to do that if there were

3      alternatives, and hand-marked paper ballots are such

4      an alternative.

5   Q. In paragraph 30, you talk about using outdated

6      off-the-shelf software modules. Isn't that a

7      relatively common practice when designing software?

8   A. It's actually not a common practice among

9      well-written software. Well-written software today

10     tends to use automated methods to make sure that the

11     dependencies are up to date.

12  Q. And so when we discussed earlier the use of

13     open-source software and off-the-shelf hardware,

14     you're saying it's not a good idea to use

15     off-the-shelf software; is that fair?

16  A. I'm saying if you're going to use off-the-shelf

17     software, you have to make sure that it's up to date

18     every time that you're shipping a new version of your

19     product and you have to ship a new version of your

20     product every time there's security updates to those

21     downstream dependencies. That's a critical part of

22     the modern software development, of modern software

23     development practices that isn't reflected in the

24     Dominion system.

25  Q. And every EAC-certified system has to have its

Page 142

```
1        software certified and maintained by the EAC; is that
2        correct?
3   A.   Tautologically every EAC-certified system has to have
4        its software certified.  That's right.
5   Q.   And the certification process includes the EAC
6        maintaining a gold disc of that version of the
7        software that is the certified version; is that
8        correct?
9   A.   That -- essentially, yes.
10  Q.   And so any time a software manufacturer wishes to
11       make any change, including a security update, they'd
12       have to get their software recertified by the EAC,
13       right?
14  A.   That's part of the problem with the Georgia voting
15       system, that, in fact, its software is out of date
16       because a new version -- if there were security
17       updates needed, they're likely going to have to go
18       through further certification before they can be
19       used.
20  Q.   So that's a yes, it has to be recertified if there's
21       changes for security?
22  A.   It depends on quite what the changes are.  But
23       sometimes it has to go through a complete
24       recertification.
25  Q.   In paragraph 31 you say, outdated software components
```

Page 143

1       are a security risk because they have these

2       documented vulnerabilities, and you cite, for

3       example, a list of 254 known vulnerabilities.  Is a

4       vulnerability always an exploitable vulnerability?

5       How are you using the term vulnerability in this

6       paragraph?

7    A.  Whether it's exploitable or not in this context

8       depends on what the -- depends on the specifics of

9       the particular problem and what the attacker is

10       trying to do.

11    Q.  So the fact that an Android operating system has 254

12       known vulnerabilities is just like saying it's a

13       piece of software, right, because every software has

14       vulnerabilities?

15    A.  Well, no, not exactly.  The problem is that it's a

16       much stronger statement than simply it's a piece of

17       software.  This is a piece of software that's already

18       been analyzed, people understand where many of the

19       vulnerabilities are, and I can provide a recipe to

20       make it even easier for an attacker to get in or to

21       allow less sophisticated attackers to successfully

22       compromise the system that don't have the resources

23       of a nation state.

24    Q.  So the fact that there are 254, does that tell you

25       anything about the relative risks of the use of this

Page 144

1          particular version of Android?

2     A.   As compared to --

3     Q.   In the election contest, I should say.

4     A.   As compared to newer versions of Android?

5     Q.   As compared to anything.  Does the fact of the number

6          of known vulnerabilities tell you how vulnerable a

7          piece of software actually is?

8     A.   It's a good indicator.  It's certainly an indicator

9          of the level of vulnerability.  And 254 unpatched

10         vulnerabilities is a very bad situation to be in.

11    Q.   And is that number higher or lower than the number of

12         known vulnerabilities in other BMD systems?

13    A.   I don't know the number of known vulnerabilities in

14         other specific BMD systems off the top of my head,

15         but I can tell you that in absolute terms that's

16         pretty high.

17    Q.   Your next paragraph, 32, talks about a cheap security

18         officer position that was vacant.  How is this

19         paragraph 32 informing your analysis of the relative

20         risk faced by Georgia?  And the reason why I ask that

21         is, from our discussions so far, it sounds like it's

22         a piece of software, it's a computer, it's going to

23         be vulnerable.  How is the existence or not of a

24         chief security officer informing your analysis?

25    A.   Well, this is informing whether Dominion is following

Page 145

```
 1        best practices in its security and its software

 2        development and maintenance.  And not having a chief

 3        security officer in place, I think is a sign of a

 4        general -- is a sign of a general perhaps difficulty

 5        in achieving security best practice.

 6    Q.  So are you opining that Dominion does not take

 7        security seriously?

 8    A.  That the position is still vacant does not speak

 9        highly of Dominion's security posture.  I'm opining

10        that there is -- that this is -- that this is a sign

11        of lax security practice.

12    Q.  And it's your testimony that the Dominion software is

13        not secure software, right?

14    A.  Yes.

15    Q.  And it's also your testimony that every ballot

16        marking device software is not secure software,

17        right?

18    A.  It is my testimony that no ballot marking device is

19        likely to be able to withstand a sophisticated nation

20        state attack, and that's why it's so important that

21        we have -- that all jurisdictions practice -- that

22        all jurisdictions -- that's why it's so important

23        that ballot marking devices be -- that the scope of

24        use of ballot marking devices be limited.

25    Q.  And you haven't done a full comparison of every
```

J. Alex Halderman , Ph.D.                           February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 146

1          ballot marking device that's currently available,

2          right?

3    A.    That's right.

4    Q.    And you haven't asked Dominion who has responsibility

5          for security development and implementation of

6          security in Georgia?

7    A.    No, I haven't.  It's unclear who, if anyone.

8    Q.    In paragraph 33 you say, Georgia certified the system

9          without performing its own security testing or source

10         code review.  The system Georgia used is certified by

11         the EAC, right?

12   A.    Yes.  So were versions of Georgia's old system.

13   Q.    And part of the EAC's review for certification

14         involves security, correct?

15   A.    A very limited kind of security testing

16         unfortunately.  It's not rigorous.

17   Q.    So it's your testimony a state can never rely on EAC

18         certification for cybersecurity issues?

19   A.    I think it would be very foolish to rely only on the

20         EAC certification for security.  That's right.

21   Q.    In beginning of paragraph 34 we begin a walk through

22         the California test, which is a different version

23         than the version used in Georgia, right?

24   A.    It's a more recent version.

25   Q.    And I believe we've already covered this.  But you

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 149 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 147

1          weren't involved in any of the California review of

2          the Dominion system, right?

3   A.    No, I was not.

4   Q.    You say in paragraph 35 that, like all security

5          testing, California's tests were necessarily limited

6          and could not be expected to find all exploitable

7          vulnerabilities.  Can you tell me about what you mean

8          by that sentence?

9   A.    Right.  So security testing -- security testing can

10         expose the existence of vulnerabilities.  It can't in

11         general prove that systems have no vulnerabilities.

12  Q.    So you can't prove a negative basically.  I can't

13         prove there are no vulnerabilities?

14  A.    Not with the normal means of security testing.

15  Q.    And is that why the security testing is necessarily

16         limited in scope, because it's just not possible to

17         find everything?

18  A.    Well, in part.  And there's also a question of the

19         rigor involved.  For instance, the California

20         top-to-bottom review of the -- in 2007 of the

21         equipment that Georgia has just gotten rid of spent

22         something like a man year of effort per system doing

23         code review, right, a very high level, an intensive

24         level of review.  Security testing of the kind I

25         understand that California does now, it's a much more

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 150 of 243
J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 148

1           limited time and scale.  There's a quantifiable --

2           there's sort of a quantifiable difference as well.

3    Q.     So ultimately it's a policy decision how much effort

4           a state wants to put into its security testing.  Is

5           that fair to say?  California chose at one point to

6           do a massive amount of it.  Now it chooses to do

7           something less.

8    A.     I suppose you could characterize that as a policy

9           decision.

10   Q.     Would you characterize it as something different?

11   A.     No.  Again, I suppose you could characterize it as a

12          policy distinction.  I'm not sure I would

13          characterize it differently.

14   Q.     So in paragraph 35 you kind of distinguish the two

15          versions to say more recent versions of software tend

16          to contain fewer security vulnerabilities.  But you

17          haven't done any comparison, and to your knowledge no

18          one has, to know if that's the case, right, if

19          there's more or less vulnerabilities?

20   A.     Right.  Unfortunately, Georgia didn't do its own

21          security testing of a similar kind to California.  So

22          we don't have a direct comparison.

23   Q.     And you haven't -- I'm sorry.

24   A.     But in general, it's true that as software evolves,

25          vulnerabilities are corrected at a higher rate than

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 151 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 149

1          they're introduced.

2    Q.    And you have not done any security assessment of

3          vulnerabilities in Georgia's Dominion system, right?

4    A.    No.  I haven't had the access to do that.

5    Q.    The next paragraph talks about the installation --

6          software installation files and a belief that it was

7          possible to inject things into the system.  And you

8          say, this implies that attackers could modify

9          Dominion installation files.  But I'm assuming you've

10         never tried to do that, right?

11   A.    No.  I have not had the access to try to do that

12         myself.  This is based on what California's testers

13         found.

14   Q.    And California's testers, again, looked at the

15         antivirus available.  Do you know if that same

16         antivirus is used in Georgia's system, or not?

17   A.    Yes, it is.

18   Q.    And you reference that the ballot marking device and

19         the precinct optical scanners have no antivirus

20         software at all.  Would you expect to find antivirus

21         software on a precinct scanner?

22   A.    Some precinct scanners can have antivirus software.

23         It depends -- it depends on the specific scanner.

24   Q.    And so are there particular manufacturers that

25         install antivirus software on precinct scanners?

Page 150

1   A.   Yes.  So let me see.  No.  I can't -- I can't recall

2        off the top of my head.  But yes.

3   Q.   And so then the end of paragraph 37 you're saying,

4        malware that infected the Dominion components could

5        evade antivirus protection.  Again, that's possible,

6        but you don't know for sure, right?

7   A.   Well, with California's -- what California's test

8        found was, in fact, they tried to see if the

9        antivirus would detect malware samples, and in some

10       cases it failed to do that.  So that's the basis for

11       that conclusion.

12  Q.   And that was just specifically for the EMS server and

13       not for -- California didn't run those tests on the

14       BMD or the optical scanners, right?

15  A.   Well, the BMDs and optical scanners don't have

16       antiviruses.  So tautologically malware could evade

17       antivirus detection in those components.

18  Q.   And are you aware whether Georgia requires any other

19       components on the EMS server that would address

20       malware antivirus software different than California?

21  A.   I'm not.  But it would invalidate the EAC

22       certification for them to install such components.

23  Q.   So the EAC certification extends to the antivirus

24       components of the EMS server?

25  A.   Yes.

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 153 of 243
J. Alex Halderman , Ph.D.                        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 151

1    Q.   Paragraph 38 there's a discussion of physical access

2         to a USB port.  And you say, this implies that no

3         secret passwords or keys would be needed to exploit

4         the problem, given physical access.  Isn't that a

5         huge given under the circumstances that you don't

6         know what physical access requirements exist for

7         Georgia BMDs?

8    A.   It's very difficult to have a physical access regime

9         that would prevent any physical access under any

10        circumstances by an attacker.  So I think it's quite

11        significant that someone with physical access could

12        potentially alter the software running on these

13        devices.

14   Q.   If I gave you an unencrypted computer, physical

15        access to an unencrypted computer, no matter what

16        security measures I had on there, you could hack that

17        computer, right?

18   A.   Oh, definitely.

19   Q.   So doesn't physical access matter a lot then, the

20        protocols around physical access?

21   A.   The protocols around physical access are important.

22        But there's the question of, for instance, is the

23        computer actually encrypted.  If it is encrypted,

24        it's going to be more difficult to do something

25        hopefully for someone with physical access.

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 154 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 152

1    Q.   But ultimately since you were not aware of Georgia's

2         physical access and physical security requirements,

3         the statement in paragraph 38 doesn't really add much

4         to your analysis because we don't know what type of

5         physical access or what would be involved in someone

6         gaining physical access in Georgia, right?

7    A.   I'm not sure that I would agree with that.  I think

8         whatever the level of physical access protection that

9         Georgia has, the fact that given physical access

10        without any kind of secret information someone could

11        exploit the problem that the California reviewers

12        found creates significantly greater risks than if the

13        system had been designed without that problem.

14   Q.   So you say at the end of 39, these problems indicate

15        that the Dominion system was designed without

16        sufficient attention to security.  And so that's, I

17        guess, consistent with what you said previously.  You

18        don't believe there was any attention given to

19        secure -- sufficient attention given to security.

20        But ultimately, isn't it true that you find these

21        kind of vulnerabilities or problems with every

22        computer?  I guess what I'm trying to understand is,

23        you're opining about Georgia's Dominion system, but

24        really you're opining about ballot marking devices

25        generally.  I'm at a loss to see if you can never

Case 1:17-cv-02989-AT  Document 821-3  Filed 08/26/20  Page 155 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 153

1      sufficiently secure these systems, why is Dominion's

2      system any different than any other ballot marking

3      device being used today?

4  A.  So there are things that are true about all software

5      and all ballot marking devices, and there's further

6      evidence that these things are true about Georgia's

7      system specifically.  And, in fact, some of this is

8      what California's finding helps to suggest even more

9      specific recipes by which an attacker could strike

10     the Georgia Dominion system.  And this all gets back

11     to, once again, why the lack of sufficiently robust

12     audits and the universal use of BMDs for in-person

13     voters lead to such significantly heightened risks.

14 Q.  And that's true whether it's a Dominion system or any

15     other system if you're using BMDs for all voters,

16     right?

17 A.  Many of the same problems would in here.

18 Q.  And going to paragraph 40, ultimately California

19     chose to certify the Dominion system, right?

20 A.  They did.

21 Q.  And you know that they imposed much more stringent

22     security conditions than those in Georgia.  How do

23     you know that Georgia didn't adopt or utilize any of

24     the security conditions that California recommended?

25 A.  Based on -- based on my knowledge to date about what

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 156 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 154

1      procedures, publically available procedures Georgia

2      has promulgated.

3   Q.  So the statement that California imposed

4      certification or more stringent security conditions

5      than those in Georgia is based on the Dominion

6      documentation you reviewed?

7   A.  Yes, in part.  In part on the California

8      documentation I reviewed, and in part on the overall

9      security posture of the Dominion system as used in

10      Georgia.

11   Q.  And you disagree with California's decision to

12      certify the Dominion system, right?

13   A.  In part.

14   Q.  What do you mean in part?

15   A.  In part.  I think the -- so the -- California,

16      because it has more stringent auditing requirements

17      than Georgia, faces somewhat less risk.  And

18      California does not -- most California jurisdictions

19      don't use the BMDs for all voters.  And in those

20      cases, they don't suffer from the same risks from

21      BMD-based attacks.  So I think the risk is less in

22      California than in Georgia.  I still think that

23      there's a risk in some California jurisdictions if

24      they're going to use BMDs for all voters.  But I

25      think the way that the system is used in most of

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 157 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 155

1        California is less risky than Georgia.

2   Q.   Is it your opinion that a California county that uses

3        BMDs for all voters with these more stringent

4        security conditions has an acceptable level of risk?

5   A.   No.

6   Q.   So ultimately, even if Georgia agreed to every

7        security condition in California and imposed that for

8        all its BMDs, the fact that it's using BMDs for all

9        voters would be the thing that would -- that you

10        would say that's the security risk; is that right?

11  A.   Yes.  I think the BMDs for all voters, coupled --

12        they would need both the BMDs -- they would need both

13        sufficiently rigorous audits and not -- and to be

14        using BMDs for only a smaller fraction of voters in

15        order for the Dominion system with any set of

16        security precautions to be adequately safe.

17  Q.   So there is no situation where BMDs are used for all

18        voters, based on your current understanding of the

19        landscape, that you would say that was an appropriate

20        level of risk in an election system.  Is that right?

21  A.   I think that's probably safe to say.  Though, there

22        are matters of degree within that level of risk.

23  Q.   Which gets back to, I guess, our earlier discussion

24        about acceptable levels of risk.  Sitting here, do

25        you have a way by which you would determine the

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 158 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 156

1        acceptable level of risk for a BMD-for-all system?

2    A.  Yes.  So in part, this is based on empirical

3        observations about voters' likelihood of catching

4        errors as in our January study, right?  And you can

5        use that to estimate for a given BMD deployment and

6        what fraction of voters are using it what -- how much

7        evidence you would have of systemic error for a

8        particular closeness of an election result.  That's

9        one way of evaluating in a very quantifiable way the

10       relative risk.

11   Q.  And I apologize if I'm just not grasping the concept.

12       This is probably me, not you, so don't take this the

13       wrong way.

14   A.  It's probably me.

15   Q.  I just am trying to understand.  Ballot marking

16       devices for all voters is a scenario that you say

17       imposes a high risk such that it's too much risk.

18       You can point to the voters verifying at a level.

19       And so is it that if voters verified 90 percent of

20       their ballots, you would then say that's an

21       acceptable degree of risk for a BMD-for-all system?

22   A.  So the analysis is basically of the form, given this

23       fraction of voters using the system, is there -- is

24       it -- is it at all likely that election officials are

25       going to notice systematic fraud sufficient to change

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 159 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 157

1       the outcome of a close election if attackers are able

2       to compromise the machines.  And if the answer is

3       yes, it's very likely, then that's probably an

4       acceptable risk.  If the answer is no, it's quite

5       unlikely, then that's an unacceptable risk.  So

6       there's some gray area in between, but we're not in

7       that gray area with Georgia's machines.

8   Q.  And when you say we're not in that gray area with

9       Georgia's machines, I know we're not for the voter

10      certification.  Are you saying the security

11      vulnerabilities alone take us out of the voter

12      verification question?

13  A.  No.  The overall posture of deployment takes us out

14      of the -- out of the gray area there.  That they are

15      used by all -- that they are used by all voters

16      unfortunately takes us out of that gray area.

17  Q.  So it is correct then that if BMDs are used for all,

18      we're out of the range of acceptable risk under any

19      construct?

20  A.  At least for BMDs that are available today.  It's

21      possible that future BMDs, some very different design

22      might result in different verifiability properties,

23      that voters would have a much easier time verifying

24      them.  Or perhaps someone will discover eventually a

25      way to get voters to reliably verify everything on

Page 158

1         the ballot, but it seems extremely unlikely to me at

2         this point.

3    Q.   So let's move to voter registration database.   And

4         you talk about a cyber risk assessment of eNet from

5         two years ago.   Is that correct?

6    A.   That's right.

7    Q.   And I'm assuming you are relying on the publically

8         available information from the Curling case for

9         paragraph 41 and 42.

10   A.   Yes.

11   Q.   Okay.   You say that the PCC assessment or the

12        assessment of PCC software was limited in scope.   But

13        didn't we just say in 35 that all security testing is

14        limited in scope?

15   A.   This was particularly limited in scope.

16   Q.   Okay.   So too limited?

17   A.   It was particularly limited in scope.   The 2018

18        assessment, if I'm recalling correctly, was basically

19        just a functional assessment and didn't even get into

20        the inner workings of the code.

21   Q.   And you've not personally examined Georgia's security

22        environment for eNet or the software that Georgia --

23        or the eNet software itself in Georgia, correct?

24   A.   No.   Although, I'm familiar with the risk assessments

25        that Georgia commissioned in that environment.

Page 159

1   Q.   In paragraph 42, you state that transferring the

2        operations does not mitigate the full range of

3        issues, and then you say the state has -- there's no

4        evidence the state has taken other steps to address

5        them.  What is your basis for that knowledge today?

6        This is -- you know, we're what, eight months past

7        the hearing where these issues were discussed.  Is it

8        your understanding that Georgia still has not

9        mitigated these?

10  A.   I'm aware of a -- I'm aware today of a very recent

11       status update in the Curling case where Georgia

12       asserts that it has taken some steps.  Although, I'll

13       note that update is devoid of sufficient technical

14       detail to have -- to conclude that the progress is

15       substantial.  It just says that some things have been

16       mitigated and others are still in process, which

17       based on previous testimony in the Curling case about

18       vulnerabilities that would have led someone to

19       believe that vulnerabilities were corrected in these

20       systems when they had not been corrected, I think

21       leaves me with significant reason for doubt.

22  Q.   You don't know sitting here today whether Georgia has

23       contracted with any cybersecurity vendor for any of

24       the more detailed security assessments that you

25       recommend, right?

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 162 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 160

1    A.   I'm not sure.

2    Q.   And you don't know if Georgia's review of its

3         mitigation steps for the security assessment that

4         were outlined has been reviewed by its outside

5         cybersecurity vendors, do you?

6    A.   No, I don't.

7    Q.   And if all of those -- the full range of issues had

8         been fully mitigated, as recommended by the

9         cybersecurity vendor, would you have greater

10        confidence in the secure of Georgia's voter

11        registration database?

12   A.   I think it would also require further assessment and

13        source code review and mitigation of the things found

14        as a result of that before I would say I had further

15        confidence.  And the level of further confidence

16        would depend on the details of those analyses.

17   Q.   And those types of analyses cost money, don't they?

18   A.   Yes, they do.

19   Q.   In paragraph 43 you talk about attempts to infiltrate

20        the voter registration system.  And we've

21        discussed -- I think we discussed that piece already

22        about the internet connection.  But you say serious

23        vulnerabilities in the MVP website were discovered on

24        the eve of the November 2018 election.  What were

25        those serious vulnerabilities?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 161

1   A.   Yes.  So there were vulnerabilities in the websites
2        that would have allowed an attacker to access the
3        voter registration data of many individuals without
4        their cooperation or knowledge and that would have
5        allowed an attacker to access system files on the
6        server that were not intended to be exposed,
7        potentially critical components of the inner working
8        of the services.
9   Q.   Georgia's voter registration information about
10       identifying information on voters is public record,
11       isn't it?
12  A.   I don't believe that everything in the file is a
13       public record.
14  Q.   And you say in the next sentence, unauthorized
15       parties could have exploited these vulnerabilities to
16       access sensitive system configuration files and voter
17       registration data.  What's the basis for the
18       statement that they could have accessed -- I'm sorry.
19       I meant to ask about the next sentence.
20                 This information would have allowed
21       attackers to fraudulently change voter registrations
22       through the OVR system.  What is the basis for that
23       statement?
24  A.   That the information contained in the My Voter Page
25       was sufficient to authenticate as a voter to the --

Page 162

1          to the service that allows you to update your voter

2          information, like where you live.  And so it would be

3          possible for an attacker to use that information to

4          change the records of voters and cause them to be

5          registered in the wrong jurisdiction, for instance.

6     Q.   Is it your testimony that this type of attack could

7          have immediately updated the eNet system without

8          going through a registrar?

9     A.   No.  Although, I'm not sure that there is evidence

10         either that registrars would have spotted this attack

11         had it taken place.

12    Q.   And there's no evidence that this type of attack

13         occurred and that any registrations were ever

14         changed, correct?

15    A.   That's correct.  But I think it speaks to the level

16         of security preparedness of the voter registration

17         system.

18    Q.   Is it your understanding that the voter registration

19         system is at issue in this case?

20    A.   These are components of the voter registration system

21         by the definition used in basically every state.

22    Q.   And my question was, is it your understanding that

23         the voter registration system is at issue in the Fair

24         Fight Action case?

25    A.   Yes, I do understand that it is at issue.

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 165 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 163

1   Q.   Next we move to the electronic poll books in

2        paragraph 44.  And we covered you have not personally

3        reviewed the Poll Pad e-poll book, correct?

4   A.   That's correct.  I'm relying on the information

5        provided by Dominion, which included technical

6        documentation for the Poll Pad and on the analyses

7        done in other states and my expertise.

8   Q.   Are you aware whether Georgia requires the wireless

9        and internet capabilities of Poll Pads to be

10       disabled?

11  A.   I understand that it requires that during the process

12       of voting while polls are open, but that's -- that

13       the WiFi be disabled.  But I don't believe that it

14       requires that to be disabled at other points.

15  Q.   Do you know if Georgia has taken any steps to

16       permanently disable that access on Poll Pads?

17  A.   I don't know.

18  Q.   In paragraph 45, you discuss an attack to alter voter

19       registration data in the Poll Pads.  Are you aware

20       that Georgia requires paper records of all registered

21       voters in a precinct at each precinct?

22  A.   Yes, I suppose I do know that.

23  Q.   So if an attacker altered voter registration data or

24       disabled the Poll Pads, Georgia election officials

25       would have a way for voting to continue, correct?

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 166 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 164

1    A.    To continue, although possibly at a much slower rate,
2          which could cause chaos on the ground.
3    Q.    But you haven't assessed what the rate of check-in
4          would be with a paper list versus an electronic list?
5    A.    I haven't.  But it's fairly easy to -- I think it's a
6          reasonable conclusion that it would be slower without
7          the use of the technology.
8    Q.    And so ultimately it was a policy decision Georgia
9          made to include technology for this purpose possibly
10         to speed up the check-in process?
11   A.    Or to decrease the cost of the check-in process.
12   Q.    You say in paragraph 46 that Georgia -- to your
13         knowledge, Georgia has not performed any security
14         testing of the Poll Pads.  It's possible they
15         performed that and you don't know, right?
16   A.    I suppose it's possible that they performed their own
17         testing and didn't tell anyone about it.  But that
18         would seem -- but I've been following the case with
19         the Georgia system carefully, and to my knowledge,
20         they have not.
21   Q.    Do you know if Georgia relied on the California
22         review when it made the selection or decided to go
23         with the Poll Pads?
24   A.    I don't know.
25   Q.    And in 47 you indicate that California conditionally

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 167 of 243
J. Alex Halderman , Ph.D.                        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 165

1       certified the Poll Pads subject to 19 terms and

2       limitations.  Do you know if Georgia adopted any of

3       those terms and limitations?

4   A.  I don't know.  But one of the most important ones was

5       that the Poll Pad not be used to program or encode

6       smart cards that would interface with the BMDs, and

7       it's my understanding that Georgia has not adopted

8       that one.

9   Q.  And Pennsylvania also conditionally certified the

10      Poll Pad, right?

11  A.  That's right.

12  Q.  And they had some additional conditions and security

13      recommendations.  And you don't know if Georgia has

14      adopted those at any point in its implementation of

15      the Poll Pad, right?

16  A.  I don't -- I don't know.  Although, again, one of the

17      most important ones in Pennsylvania was the

18      prohibition on encoding smart cards from the Poll Pad

19      because that creates a path from the Poll Pad system

20      to the BMDs.  And Georgia does encode voter access

21      cards from the Poll Pad is my understanding.

22  Q.  If Georgia adopted all of the terms, limitations, and

23      security recommendations imposed by California and

24      Pennsylvania, would you still recommend against the

25      use of the Poll Pad?

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 168 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 166

1    A.   It would certainly further reduce the risk.

2    Q.   Would it reduce it to an acceptable level?

3    A.   Perhaps.  It's subject to -- subject to other

4         security conditions as well.  So that alone would not

5         necessarily be enough.

6    Q.   So when you say subject to other security conditions,

7         what other security conditions would it be subject

8         to?

9    A.   Well, I think it would take some time to do a full

10        analysis of that question.

11   Q.   And what process are you using to determine the

12        relative level of risk of the Poll Pads with and

13        without the California and Pennsylvania conditions,

14        or are you using one?

15   A.   So this is -- to determine the relative risk in that

16        case, this is what would -- what I'm doing to

17        determine that is modeling the different paths by

18        which an attacker might attempt to spread

19        infiltration through the voting system.  And so one

20        of the critical differences between the Georgia and

21        California and Pennsylvania models of using the Poll

22        Pad is the existence or not of this path from the

23        Poll Pads to the ballot marking devices.

24   Q.   In my hypothetical I asked you to assume that we

25        adopted all the Pennsylvania and California

Case 1:17-cv-02989-AT  Document 821-3  Filed 08/26/20  Page 169 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 167

1    conditions, which would include the prohibition on

2    that path.

3  A.  That's right.

4  Q.  How would you evaluate the level of acceptable risk

5    given the adoption of all those conditions?

6  A.  Well, I think it would involve a security analysis of

7    what the remaining modes of infiltration were and

8    what the -- what the full set of protection measures

9    allowed for or required in terms of a fail-safe.

10  Q.  And you haven't conducted that kind of analysis here,

11    right?

12  A.  Not in your hypothetical, no.

13  Q.  And you haven't conducted it as part of your report,

14    correct?

15  A.  I don't really need to in terms of this report

16    because the significant risk of the infection

17    spreading from Poll Pads to the BMD systems is

18    itself -- is itself the focus of my analysis here.

19  Q.  So the fact that items are being taken from the Poll

20    Pad to the BMD is a sufficient basis to determine

21    that is an unacceptable level of risk to encounter in

22    an election system, correct?

23  A.  That was sufficient to convince California and

24    Pennsylvania to prohibit that functionality entirely.

25  Q.  I'm --

Page 168

1   A.   I agree with that prohibition.

2   Q.   I just want to make sure I'm clear because you're

3        here opining that Georgia is taking an unacceptable

4        level of risk with its Poll Pads as well as part of

5        the structure of the election system.  Am I correct

6        about that?

7   A.   Yes.

8   Q.   And so what is the determination?  Is it the fact

9        that there's a card moving from the Poll Pad to the

10       BMD that makes it an unacceptable level of risk and

11       that distinguishes California and Pennsylvania, or is

12       there something else on which you're basing your

13       analysis that this degree of risk in using the Poll

14       Pads is unacceptable?

15  A.   So I'm basing that -- I'm basing that opinion on the

16       overall vulnerability of the Poll Pads and that

17       additional link between the Poll Pads and the BMDs,

18       and those are the primary -- that's the primary basis

19       for that assessment.

20  Q.   Okay.  And sitting here today, you can't say whether

21       or not California and Pennsylvania's use of the Poll

22       Pads is an acceptable or unacceptable level of risk;

23       is that correct?

24  A.   That's right.  I can't say that.  I haven't fully

25       evaluated that.

Page 169

1    Q.    Let's move next to supply chain threats.  You don't

2          have any evidence in paragraph 50 that attackers have

3          infiltrated the software development process of

4          Dominion KnowInk, PCC, or their suppliers, right?

5    A.    No.  I'm talking about the risk that that could

6          happen.

7    Q.    Right.  But you don't have any evidence it has

8          happened?

9    A.    I don't.  And I'm not sure that there would be such

10         evidence available if it had happened successfully.

11   Q.    And then in paragraph 51, you talk about the design

12         of several components overseas.  Is it your testimony

13         that Serbian programmers, that automatically means

14         that this is going to be accessed by the Russians or

15         influenced by the Russians in some way?

16   A.    No.  Not that it will automatically be, just that the

17         risk is even higher than if the software were

18         developed domestically in a facility that was not in

19         a location of a government closely aligned with

20         Russia.

21   Q.    And the EMS runs an antivirus software made by a

22         Czech company, you say, which earlier we said was the

23         Avast Antivirus file shield system; is that right?

24   A.    Avast, like a pirate.

25   Q.    And is Avast a widely-used antivirus software?

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 172 of 243
J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 170

1   A.   It is.

2   Q.   Why mention that it's a Czech company in that

3        scenario?  Does that increase the risk if it's a

4        widely-used piece of software?

5   A.   It creates further risks because the -- although a

6        widely-used piece of software -- although it is a

7        widely used piece of software, it's still true that

8        if attackers were to infiltrate that company, they

9        could spread -- spread malicious functionality into

10       the election management system.

11  Q.   And so it's your testimony that the antivirus is both

12       a terrible system because it doesn't track stuff and

13       it grants this Czech company access to the server?

14  A.   It can be simultaneously true that it introduces new

15       risks and doesn't adequately mitigate other risks.

16  Q.   And your reliance for this section of your report is

17       from this Computer World article, right?

18  A.   I'm sorry.

19  Q.   I'm sorry.  Let me rephrase that.  In paragraph 51

20       the statement about Dominion using Serbian

21       programmers is based on this Computer World article,

22       correct?

23  A.   Yes.  Although, I'm aware that that has been reported

24       elsewhere.  I'm not sure where.

25  Q.   And this is a system that has been certified by the

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 173 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 171

1      EAC since 2016, right?

2  A.  Yes.  Although, again, the EAC certification process

3      is not a -- it has significant limitations to its

4      security review.  It's not a rigorous security

5      review.

6  Q.  And your statement that a hostile government might

7      attempt to plant an agent at any of these companies,

8      black male honest employees, or hack into the

9      software development environments, that's true of

10     every election system and even ballot printing

11     services, right?

12 A.  I think it's an increased risk in foreign

13     jurisdictions, especially jurisdictions that are

14     aligned with potentially hostile governments.

15 Q.  So it's a true statement.  But you think that

16     Georgia's selection of Dominion led to an increased

17     risk of the -- of that sentence happening; is that a

18     fair statement?

19 A.  Yes.

20 Q.  And how are you evaluating the increased risk by

21     using foreign contractors versus domestic

22     contractors?

23 A.  This is -- well, it's just -- it's well known that --

24     it's well known among the -- among the -- in the --

25     it's well known in the study of supply chain risk

Case 1:17-cv-02989-AT  Document 821-3  Filed 08/26/20  Page 174 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 172

1      that extra jurisdictional supply chains create

2      additional risks that are not -- that are more

3      greater in kind than the risks of domestically

4      produced and domestically sourced equipment.

5   Q.  So there's not a kind of scientific evaluation of

6       that.  It's just it is what it is, right?

7   A.  It's not quantified.  It's very difficult to

8       quantify.

9   Q.  Got it.  Paragraph 52, you say that the measures

10      being taken to safeguard are not sufficient, and then

11      you go through kind of some of these examples.  First

12      of all, the AuditMark process.  Have you ever done

13      research about how the AuditMark process works

14      specifically in Dominion software?

15  A.  I've reviewed Dominion's technical documentation

16      about it.

17  Q.  And in paragraph 54 you indicate that you have

18      designed malware that runs on an optical scanner that

19      can manipulate digital ballot images.  And that's

20      true of a hand-marked system or a ballot marking

21      device system, right?

22  A.  That's right.

23  Q.  And that was not in the Dominion system.  That was on

24      a different manufacturer; is that right?

25  A.  It works against Dominion-style ballots, among

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 175 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 173

1          others.

2     Q.   Have you tested it on Dominion's ICP and ICC

3          scanners?

4     A.   No.  But based on the way that the malware works, I

5          have no reason to doubt that it would function on

6          those scanners.

7     Q.   Would it take physical access to install the malware

8          on the scanners?

9     A.   No.

10    Q.   In paragraph 56 you indicate that the tampering

11         wouldn't be detected by the election software.  And

12         I'm assuming since that's not unique to BMDs.  This

13         is another reason why you urge audits because it

14         would be found in an audit, correct?

15    A.   It would be found in an audit that reviewed the

16         physical paper ballots as opposed to the digital

17         ballots, ballot images.

18    Q.   Do you know which method Georgia is going to use,

19         paper or digital images?

20    A.   So, again, this is talking specifically about

21         AuditMark itself as a mitigation, like the AuditMark

22         mitigation is insufficient -- sufficiently robust

23         audits, and I do believe that Georgia intends to do

24         its audits by going back to physical paper ballots,

25         could detect an attack like this.  The question is

Case 1:17-cv-02989-AT    Document 821-3    Filed 08/26/20    Page 176 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 174

 1          whether those audits are going to be sufficiently

 2          robust.

 3     Q.   And then the next section discusses hash comparisons,

 4          and you say that Georgia may employ a method of hash

 5          comparisons.  Do you know for sure whether or not it

 6          will or not?

 7     A.   I don't know for sure whether it will or not.

 8     Q.   And hashing a value of a software versus a known good

 9          hash value is used in a lot of computer security

10          contexts, correct?

11     A.   Yes.

12     Q.   And at the end of paragraph 60 you say that a

13          sophisticated attacker could conceal the presence of

14          malware even if officials practiced hash comparisons

15          according to Dominion's instructions.  Would a better

16          hash compare process be a more secure process?

17     A.   Potentially, yes.

18     Q.   Okay.

19     A.   Can we take a break sometime soon?

20     Q.   Sure.  Yeah.  We can go ahead and take a break now,

21          if you'd like to.

22     A.   Okay.

23               (Recess taken.)

24     BY MR. TYSON:

25     Q.   All right.  Dr. Halderman, you mention in paragraph

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 177 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 175

1       61 -- I think we've already covered antivirus

2       software and end-point protection software provides

3       only a limited defense.  So it's your testimony no

4       matter what antivirus or end-point protection a BMD

5       or a precinct scanner had on it, that's not going to

6       protect them against a sophisticated nation state

7       attack, right?

8   A.  Yes.

9   Q.  In paragraph 62 you talk about one safeguard used in

10      Georgia is tamper-evident seals.  Are you aware of

11      those used on the new ballot marking devices?

12  A.  No, I'm not.  But I'm aware of fairly extensive

13      research on many different tamper-evident seals used

14      in different kinds of election systems, and none of

15      them offer strong security.

16  Q.  And so for physical security, your testimony is that

17      a tamper-evident seal is not going to provide any

18      real physical security; is that fair to say?

19  A.  No.  Not against a remotely capable adversary.

20  Q.  Would it provide some security against a locally

21      working adversary?

22  A.  Maybe against an adversary who didn't Google for how

23      to break the seals.

24  Q.  And so is there any value then to using seals on

25      voting equipment?

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 178 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 176

1    A.    I don't say that there is no value to using seals,
2          but they don't protect against the kinds of attackers
3          that are at issue in -- in my report, which are ones
4          who are sophisticated hostile adversaries.
5    Q.    So there may be good reasons to use seals for just
6          kind of administration or documenting purposes, but
7          not to rely on those seals for purposes of protecting
8          against sophisticated attacks; is that a fair
9          statement?
10   A.    Yes.
11   Q.    And you have not reviewed the rules generally on
12         physical security or on the use of seals in Georgia
13         going forward, right?
14   A.    I have not seen those rules.
15   Q.    Okay.
16   A.    But this is generally true of seals used in voting.
17   Q.    Uh-huh.  And in considering other elements of
18         physical security, you didn't consider other elements
19         of physical security for Georgia ballot marking
20         devices, only seals in reaching your conclusions for
21         this report, right?
22   A.    I've considered what I've known about Georgia
23         physical security procedures in the past.  But if
24         they have been changed, then I'm unaware of what
25         other protections are in place.

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 179 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 177

1    Q.   Next we call logic and accuracy testing.  Are you

2         aware what the logic and accuracy protocols are for

3         Georgia's new ballot marking devices?

4    A.   I'm not, but it doesn't matter.  No logic and

5         accuracy testing protocol is going to provide strong

6         protection against the kinds of attacks that I'm

7         discussing.

8    Q.   And you're not aware of any research that shows how a

9         piece of software could distinguish between a test

10        voter and an actual voter based on, for example, the

11        rate at which people vote; is that correct?

12   A.   It's certainly possible, and I've written malware

13        that attempts to do that.  And, in fact, our ballot

14        marking device study published in January discusses

15        some ways that malware could use different features

16        to try to distinguish between different categories of

17        voters, which I think touches on the subject of test

18        votes versus non.

19   Q.   And for parallel testing in paragraph 65, are you

20        aware of what Georgia's protocols are going to be for

21        parallel testing with the new ballot marking devices?

22   A.   I don't believe Georgia has made those public.  I'm

23        not aware.  But in general, it's impossible for

24        parallel testing to definitively or even reliably

25        detect misbehavior by a ballot marking device.

Page 178

1    Q.   And that's true even if at a random point in the

2         middle of the day every county went to every ballot

3         marking device and generated a certain number of

4         ballots?

5    A.   Yes.  Unfortunately it is true in that case.  And the

6         mathematical derivation is in the paper I cite.

7    Q.   You say at the end of paragraph 67, to your

8         knowledge, the state does not maintain sufficient

9         quantities of pre-printed ballots to allow voting to

10        continue under such a circumstance when the BMDs

11        fail.  Have you reviewed the state election board

12        rules regarding back-up ballots and what's required?

13   A.   I haven't reviewed them, but that's my understanding

14        from evidence that's come to light in the Curling

15        case about Georgia's current plans.

16   Q.   And do those include the changes that were made last

17        month to Georgia's rules regarding the number of

18        paper ballots?

19   A.   I don't know.  I don't know the timing.

20   Q.   So it's possible then that the state is now going to

21        require counties to maintain sufficient quantities to

22        allow voting to continue if the BMDs go out, and you

23        just don't know if that's the case, right?

24   A.   My understanding is that the -- the state plans to

25        have a very limited number of ballots available and

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 181 of 243
J. Alex Halderman , Ph.D.                                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 179

1           to print more on demand, if necessary.  But the

2           problem is if all of the BMDs across a large region

3           were to be sabotaged, as is possible by a malicious

4           software spreading from say a county election

5           management system, then you'd have a simultaneous

6           failure and require a very large number of ballots

7           sufficient for all voters, which would be impossible

8           to produce on -- and distribute in time.

9      Q.   You say in the post-election audit portion that

10          officials could potentially detect certain kinds of

11          attacks by a rigorous audit of paper ballots.

12          Actually, before I get to that, that footnote at the

13          bottom of page 28, the Philip Stark paper.

14     A.   Yes.

15     Q.   Is that a peer-reviewed paper?

16     A.   I don't know whether he's had the paper since

17          peer-reviewed.  I have independently -- I have

18          assessed myself the correctness of the -- of Stark's

19          result, but I don't know if it's gone through formal

20          peer review or not.

21     Q.   So next we have sufficient audits.  And I think we've

22          talked through the various categories of how audits

23          can detect things already.  The good thing is we've

24          covered a lot of this, so I can move through here.

25                    All right.  So let's skip ahead to

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 182 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 180

1        paragraph 72.  You say that the ballot marking

2        devices are computers, run outdated and vulnerable

3        software, must be programmed using the election

4        management system before every election.  This is --

5        kind of unlike DREs, this is an election system,

6        recommended by the National Academy of Sciences.  I

7        know that DREs were certified by the EAC -- certified

8        by the US Election Assistance Commission.  Why are

9        you taking the position that these are -- should

10       never be used by all voters in an election?

11   A.  Right.  So I'm taking that position based on

12       subsequent research that was called for by the

13       national academies in their study that has -- that

14       has established that the rate at which voters review

15       and catch errors in BMD-printed ballots is very low

16       and is, in fact, likely to be so low that an attack

17       on the BMDs in a close election wouldn't be detected

18       by election officials.

19   Q.  And so the subsequent research you're relying on are

20       the two studies about the rate of voter verification

21       of BMD ballots, right?

22   A.  That's right.  Although, there is previous work on

23       VVPATs systems that was highly suggestive that there

24       might well be a problem with BMDs.  So these new

25       results confirm and extend the problems with VVPATs

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 183 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 181

1              to BMD-based systems.

2    Q.    And those prior studies with VVPATs were prior to the

3          National Academy of Science's recommendation, right?

4    A.    That's right.  But there was still at least some

5          substantial question about whether the findings would

6          apply with equal certainty or equal force to BMD

7          systems, but now there's now strong evidence that the

8          same problems occur.

9    Q.    All right.  So let's get to those two studies.  If

10         you want to jump ahead with me to paragraph 81.  So

11         the first study that you cite about the rate at which

12         voters verify or look at their ballot marking device

13         printed ballots was a study by Dr. DeMillo,

14         Robert Kadel, and Marilyn Marks; is that right?

15   A.    That's correct.

16   Q.    And you'd agree with me that Ms. Marks is an activist

17         for hand-marked paper ballots; is that a fair

18         assessment of her?

19   A.    Well, I'd agree that she's an election integrity

20         activist.

21   Q.    And she opposes electronic voting as a policy matter,

22         right?

23   A.    I'm not sure she opposes all electronic voting, but

24         she opposes paperless electronic voting.

25   Q.    Does she -- do you know, she opposes ballot marking

Page 182

1          devices for all people?

2     A.   I believe she does, yes.

3     Q.   And this study has not been peer-reviewed, has it?

4     A.   No, that study has not.

5     Q.   And when voters in the study spent only four seconds

6          reviewing their ballots, how many races were they

7          looking at, do you know?

8     A.   I don't know.  I don't know off the top of my head.

9     Q.   And do you know if that study evaluated the use of

10         signs or verbal cues or other things to ask voters to

11         verify their ballots?

12    A.   No.  That we evaluate -- that my research group

13         evaluated in the other study I cite.

14    Q.   So let's go to that one.  Paragraph 82 you have a

15         realistic simulated election.  Were the candidate

16         names in the election something that individuals

17         would recognize?

18    A.   Yes.

19    Q.   And what were the candidate names?

20    A.   The candidate names were the names of the candidates

21         from the most recent Michigan midterm.

22    Q.   Let me hand you what we've marked as 15.

23                  (Exhibit No. 15 marked.)

24    BY MR. TYSON:

25    Q.   And is this your study with Mr. Bernard?

Page 183

1    A.   Yes.  And five other authors.

2    Q.   And Mr. Bernard is a student of yours, correct?

3    A.   Yes.  He's a Ph.D. student.

4    Q.   And have you found him to be reliable and a good

5         student?

6    A.   Yes.

7    Q.   Now, in the various scenarios that are outlined here,

8         you found that verbal prompting increased the number

9         of voters who were reviewing their ballots, correct?

10   A.   I did.

11   Q.   And you found that verbal prompting accompanied by

12        kind of identification of candidates on a slate

13        significantly increased the number of voters who

14        reviewed their ballots, right?

15   A.   Yes, it did.

16   Q.   And so in terms of a policy recommendation going

17        forward, is it your position that there is no way a

18        state can increase the number of voters verifying

19        their ballot marked device ballots based on your

20        research?

21   A.   The question is whether the increase is likely to be

22        significant enough that the state will have a high

23        chance of detecting attacks against a close election.

24        And the problem is that the magnitude of increase

25        that we found even with the best verbal prompts was

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 186 of 243
J. Alex Halderman , Ph.D.                        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 184

```
 1        relatively small.  And the magnitude, though, larger

 2        that we found with the use of slates only applies to

 3        the subset of voters who actually use slates.  So

 4        unless use of slates can be the vast majority of

 5        voters, even under the best of conditions, that

 6        mitigation would not result in a high probability of

 7        detecting attacks on close elections.

 8   Q.   And this is the first peer-reviewed study of its

 9        kind, studying this specific question of voter

10        verification and ballot marking devices, right?

11   A.   Yes.  Though I understand there are others now under

12        review that will be published soon.

13   Q.   And are you aware whether Georgia requires poll

14        workers to give verbal prompts to voters?

15   A.   I know that Georgia law requires signs, which we find

16        are not effective.  There may -- I don't know if

17        there are recently issued rules that also require a

18        verbal prompt.

19   Q.   So if the state election board issued rules requiring

20        a verbal prompt, that would at least move up the

21        chain a little bit in terms of verification, right?

22   A.   It would likely move it up.  But again, the rate

23        that -- the rate that would be required in order to

24        cause a significant -- excuse me.  In order to have a

25        high likelihood of detecting fraud even in close
```

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 187 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 185

1        elections is something like ten times the improvement

2        that we measured in the study from verbal prompts

3        alone.  So there's a lot more work that would need to

4        be done or a lot more increase that would be needed

5        in addition to verbal prompts.

6    Q.  But ultimately it's fair to say that the study found

7        that a well-designed procedure can have a significant

8        impact on the rates of voters checking their ballots,

9        right?

10   A.  Significant in the sense of statistically significant

11       or reliably measurable, but not necessarily in terms

12       of adequate.

13   Q.  And the paper also concludes that more research is

14       needed in this area.  Do you agree with that, right?

15   A.  I do.

16   Q.  And you welcome additional research on this topic?

17   A.  I do.

18   Q.  And if you -- if that later research demonstrates

19       that voters check their ballots at a high enough

20       rate, as you've outlined in this paper from a

21       mathematical perspective, would that change your view

22       of the use of ballot marking devices?

23   A.  Yes.

24   Q.  You opine in paragraph 87 that election officials are

25       unlikely to take disruptive actions unless there's a

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 188 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 186

1          certain or a fraction of BMD voters that are

2          reporting problems.  What are you basing the fact

3          that election officials are unlikely to take

4          disruptive actions on?

5     A.   In part the fact that there are a certain number of

6          reports of problems and inconsistencies in every

7          election.  And so election officials don't as a

8          general rule say we're going to have to take all of

9          our machines aside and study them just because there

10         was some sporadic reports of problems that could be

11         explained away by other things.  The rate would have

12         to be elevated in a way that stood out and was

13         unmistakable in order to take drastic action.

14    Q.   And your issue focused particularly on the margin of

15         victory being relevant to this consideration, right?

16         The analysis, the mathematical analysis.

17    A.   I'm sorry.

18    Q.   Let me rephrase that question.  In determining the

19         mathematical analysis you outline in this report, the

20         margin of victory was significant, right?

21    A.   Yes.

22    Q.   And so in a larger margin of victory, would that mean

23         fewer voters would have to report a problem?  Where

24         does the scale go in terms of larger margin of

25         victory versus smaller margin of victory?

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 189 of 243
J. Alex Halderman , Ph.D.                     February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 187

1    A.    I see.  If the margin of victory is smaller, then

2          it's easier to attack the system, if that's the --

3          the question you're asking.

4    Q.    Yeah.  Thank you.

5    A.    It takes us back to the election official's prayer,

6          please let it not be close.

7    Q.    That's right.  And the election lawyer's prayer

8          usually as well.

9    A.    And the election security researcher's prayer.

10   Q.    Okay.  Paragraph 88.  Now we get to the question of

11         the DREs.

12   A.    I'm sorry.  Paragraph --

13   Q.    We can put aside the exhibit.  Yeah.  Exhibit 15 is

14         finished.  So paragraph 88 of your report.

15   A.    Okay.

16   Q.    We move to the DRE machines, correct?

17   A.    Yes.  Okay.

18   Q.    And you're aware DREs are never going to be used in

19         Georgia again, right?

20   A.    Yes.  Thank goodness.

21   Q.    And those were decertified by the Secretary of State

22         at the end of 2019?

23   A.    That's right, as my research suggested in 2006.

24   Q.    And you state at the bottom of 88 that the DRE system

25         was highly susceptible to cyber attacks.  But as

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 190 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 188

1        we've discussed, there's no evidence that any of the

2        DREs in Georgia were ever actually compromised,

3        right?

4    A.  That's right.  But again, I don't think anyone has

5        ever actually inspected the software running in any

6        of those DREs.

7    Q.  And you cite the broad scientific consensus about

8        DREs not providing adequate security and you cite to

9        the Securing the Vote from the National Academy of

10       Science's report, right?

11   A.  Yes.

12   Q.  But you don't rely on that report for its

13       recommendations about ballot marking devices because

14       of the subsequent reports we've discussed, right?

15   A.  That's right.  The science about ballot marking

16       devices has moved.  There has not been any movement

17       in the scientific consensus of -- regarding DREs.

18   Q.  And the virus that you reference and discuss kind of

19       from 90 to 93, you've never tested that virus on the

20       version of software used in Georgia on the DREs,

21       right?

22   A.  No.  But actually, that's a good question.  It would

23       be -- so I have tested viral software on the previous

24       version and the subsequent version of the firmware

25       used in the DREs but not on the firmware version used

Page 189

```
 1        in Georgia because that was not available to me until
 2        recently.
 3   Q.   But it is available to you now?
 4   A.   In the Curling matter.
 5   Q.   And you have not yet made any analysis of that at
 6        this point?
 7   A.   It didn't occur to me until you asked the question
 8        that that would be possible to do.
 9   Q.   And how did you obtain access to that version of the
10        software in the Curling matter?
11   A.   It is in the -- it's contained in the FBI image from
12        Kennesaw State University Center For Election
13        Systems.  At least I believe that's correct.  I -- I
14        may be mistaken about that, but I do believe that the
15        firmware is there.  If my recollection is correct --
16   Q.   Got it.
17   A.   -- that analysis is not complete.
18   Q.   In paragraph 95 you reference the GEMS and
19        vulnerabilities in GEMS and BallotStation.  And I
20        know we talked about the election management servers
21        before.  But you've looked at the GEMS databases for
22        Georgia and have not found any infiltration or any
23        sort of manipulation of those databases, right?
24   A.   Yes.  The data -- the databases themselves is
25        distinct from the full contents of the server
```

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 192 of 243
J. Alex Halderman , Ph.D.                              February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 190

1              computers, which are -- which would be the -- the

2              more complete way to -- a more reliable way to look

3              for an infiltration.

4    Q.    And in 99 you say, in your opinion, an attacker who

5              infiltrated the SOS GEMS system could have spread

6              malware to the county GEMS servers be infecting the

7              CDs used to distribute the files.  And you have not

8              in your review of those CDs or any of the GEMS

9              databases found where that has occurred, right?

10   A.    I haven't had -- I don't have access to the CDs that

11             were distributed, only to the GEMS databases.  So I

12             can't assess whether the CDs actually did contain

13             malware, just that that is a viable threat factor.

14   Q.    And at the end of paragraph 100 when you say that

15             Georgia's election security countermeasures were

16             inadequate to doing these various things, the last

17             one is altering election outcomes.  It's not your

18             testimony that Georgia election outcomes have been

19             altered, is it?

20   A.    It's my testimony that we don't know and that the

21             election system did not generate adequate evidence,

22             at least any evidence that has been reviewed to date

23             to conclude that past election results were, in fact,

24             accurate.

25   Q.    Is it your testimony that we should doubt the results

Page 191

1        of the November 2018 election in Georgia?

2    A.  I wouldn't go that far.  I don't want to -- I don't

3        want to go that far.  But I do think that there is --

4        I think all of the ingredients were there for an

5        attacker to access the voting machines in polling

6        places and change the results.  The question is did

7        anyone actually do that or not.  And we wouldn't be

8        able to tell the difference from the evidence that is

9        outwardly visible one way or the other.  That's an

10       unfortunate consequence of the way the election

11       system was designed and operated.

12   Q.  So then why not doubt the November 2018 election

13       results.

14   A.  Because the election has been decided and history has

15       moved on.

16   Q.  So in your opinion, there's no value to go back and

17       try to do forensic analyses and dig up whether we

18       should rely on those results or not?

19   A.  Actually, I think that is very valuable because that

20       will teach us more about how Georgia needs to secure

21       the 2020 election.

22   Q.  How would it help with that question if it's

23       analyzing a system that's never going to be used

24       again?

25   A.  Because not all components of the system are being

Page 192

1        replaced.

2   Q.   Which components of the system are not being

3        replaced?

4   A.   The eNet system, the general network infrastructure

5        and computing infrastructure at the Secretary of

6        State, other infrastructure at the county level that

7        is used by election administrators.

8   Q.   So if history needs to move on and the election has

9        been decided, why not just do forensic analyses of

10       eNet, the network infrastructure of the Secretary of

11       State, the network infrastructure of county offices?

12  A.   That's going to be a less reliable way and much more

13       complicated way of trying to answer some of the

14       similar questions.

15  Q.   And you referenced the design of Georgia's election

16       system.  You're not testifying that anyone

17       intentionally designed a system that would be

18       vulnerable to hacking, are you?

19  A.   Intentionally designed, no.  Negligently maintained?

20       In my opinion, yes.

21              MR. TYSON:  Off the record for just a

22          minute.

23              (Recess taken.)

24              MR. TYSON:  All right.  Back on.

25

Page 193

1    BY MR. TYSON:

2    Q.    Dr. Halderman, thank you for your time today.  I

3          don't have any further questions.

4    A.    Thank you.

5                     MR. HERMAN:  All right.

6                     (Deposition concluded at 3:37 p.m.)

7                                *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 194

1                    CERTIFICATE OF NOTARY PUBLIC

2        STATE OF MICHIGAN )

3                         )

4        COUNTY OF LENAWEE )

5             I, Trisha Cameron, Certified Shorthand Reporter

6        and Notary Public in and for the State of Michigan, do

7        hereby certify that the witness whose attached

8        deposition was taken before me in the above cause was

9        first duly sworn or affirmed to testify to the truth,

10       the whole truth, and nothing but the truth; that the

11       testimony contained herein was by me reduced to writing

12       in the presence of the witness by means of Stenography;

13       afterwards transcribed by means of computer-aided

14       transcription; and that the deposition is a true and

15       complete transcript of the testimony given by the

16       witness to the best of my ability.  I further certify I

17       am not connected by blood or marriage with any of the

18       parties, their attorneys or agents; that I am not an

19       employee of either of them; and that I am not

20       interested directly, indirectly, or financially in the

21       matter of controversy.

22

23                    _Trisha Cameron_

24              Trisha Cameron, RDR, RMR, CRR, RPR, CSR

                Notary Public, Lenawee County, Michigan

25              My Commission Expires 5-24-24

J.  Alex Halderman , Ph.D.                              February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[& - 82]**                                                      Page 1

| & | 200   2:12 | 24   132:2,12 | 475,000   138:5 |
|---|---|---|---|
| **&**   2:3 | **2000**   18:3 | **25**   1:21 4:6 6:2 | **5** |
| **0** | **20006**   2:5 | 70:11 132:18 | **5**   4:7 27:12,13 |
| **05391**   1:7 | **2002**   95:18 | 133:3 134:3 | 39:11,12,12,19 |
|  | **2006**   187:23 | **254**   143:3,11,24 | 41:11 67:1 70:4 |
| **1** | **2007**   92:16 147:20 | 144:9 | **5-24-24**   194:25 |
| **1**   4:3 9:20,23 | **2009**   18:12 | **26**   135:5 | **50**   30:25 46:15 |
| 97:18 | **2011**   24:12 | **27**   4:7 136:5,12 | 169:2 |
| **10**   4:4,5 5:1 55:2,3 | **2014**   62:1 | **28**   179:13 | **51**   169:11 170:19 |
| **100**   190:14 | **2015**   97:11 | **29**   4:9 139:8,14,25 | **52**   4:20 172:9 |
| **11**   5:5 45:2,5 | **2016**   40:12 41:10 |  | **54**   172:17 |
| 56:22 57:2 | 41:19 42:9 45:23 | **3** | **55**   5:1 |
| **11:45**   25:25 | 46:18 56:19 57:13 | **3**   4:5 10:16,19 | **56**   5:5 173:10 |
| **12**   5:8 46:12 60:8 | 58:8 62:24 63:4 | 25:10 34:21 35:23 | **57**   54:15 |
| 60:9 | 65:23 67:18,22 | 44:3 100:12 | **59**   46:23,24 47:10 |
| **13**   5:11 11:4 54:15 | 68:1,7,10 120:10 | **30**   141:5 | **6** |
| 69:7,8 | 134:22 171:1 | **30339**   2:13 | **6**   3:5 4:9 29:24 |
| **14**   5:12 97:6,7 | **2017**   37:8 41:24 | **31**   142:25 | 30:2 41:22 77:3 |
| 100:12,18 | 42:1,18,23 48:2 | **31500**   1:18 | **60**   5:8 174:12 |
| **15**   5:15 102:1 | **2018**   5:4 46:15 | **32**   144:17,19 | **61**   51:12 175:1 |
| 182:22,23 187:13 | 49:8 67:6 120:10 | **33**   146:8 194:23 | **62**   175:9 |
| **16**   102:3 103:18,25 | 158:17 160:24 | **336-7249**   2:14 | **626-5869**   2:6 |
| **1600**   2:12 | 191:1,12 | **34**   146:21 | **65**   177:19 |
| **16th**   2:4 | **2019**   4:13 9:8,9 | **35**   147:4 148:14 | **67**   178:7 |
| **17**   105:14 | 25:7 29:21 30:9 | 158:13 | **678**   2:14 |
| **18**   30:16,16 105:23 | 42:23 66:24 95:18 | **37**   4:14 150:3 | **69**   5:11 |
| 107:18 | 187:22 | **38**   151:1 152:3 | **7** |
| **182**   5:15 | **202**   2:6 | **39**   152:14 | **7**   4:14 37:13,15 |
| **19**   107:25 165:1 | **2020**   1:21 6:2 | **3:37**   193:6 | 77:3 98:3 112:24 |
| **1994**   61:14 | 30:10 50:21 51:2 | **4** | **72**   180:1 |
| **1:18**   1:7 | 51:9 131:17 140:6 | **4**   4:6 25:3,6 36:6 | **750**   11:6,20,25 |
| **1:45**   25:13 26:1 | 191:21 | 58:14 105:15 | **8** |
| **2** | **2021**   50:15 123:22 | **40**   153:18 | **8**   4:18 43:20,21 |
| **2**   4:4 10:6,7,22 | **21**   111:20 | **41**   158:9 | **8,033,463**   5:11 |
| 14:20,23 37:19 | **22**   113:22 114:4 | **42**   158:9 159:1 | **80**   58:3 116:5 |
| 54:11,12 70:11 | **23**   77:1 114:21 | **43**   4:18 160:19 | **80/20**   58:7 |
| 76:17 | 117:2 120:5 | **44**   163:2 | **81**   181:10 |
| **20**   58:1,5 76:25 | 121:24,25 122:16 | **45**   163:18 | **82**   54:14 182:14 |
| 77:1,5 79:19,23 | 123:12 125:1,5,11 | **46**   164:12 |  |
| 101:18 109:15 | 125:16 126:10 | **47**   164:25 |  |
|  | 127:21,25 129:16 |  |  |

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 198 of 243

J. Alex Halderman , Ph.D. February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[87 - advocate] Page 2

| | | | |
|---|---|---|---|
| **87** 185:24 | **accept** 97:22 | **achieves** 98:20 | **administer** 75:13 |
| **88** 187:10,14,24 | **acceptable** 6:17,18 | **achieving** 84:14 | 87:14 |
| **9** | 92:13 93:1,2,6,12 | 93:12 145:5 | **administerability** |
| | 93:25 94:5,12 | **acknowledged** | 74:10 |
| **9** 4:3,20 52:7,9 | 155:4,24 156:1,21 | 42:19 | **administering** |
| 62:20 | 157:4,18 166:2 | **acknowledging** | 74:8,18 91:18 |
| **90** 115:24 116:3 | 167:4 168:22 | 44:14 | **administration** |
| 156:19 188:19 | **access** 23:17 44:9 | **acquire** 44:15 | 28:8,9,10,12,13,15 |
| **900** 2:4 | 44:10 120:23 | **act** 64:13 | 28:20 91:14 176:6 |
| **93** 188:19 | 134:2 149:4,11 | **action** 1:5 162:24 | **administrative** |
| **95** 189:18 | 151:1,4,6,8,9,11 | 186:13 | 71:19 74:21 |
| **97** 5:12 | 151:15,19,20,21 | **actions** 185:25 | 102:10 |
| **99** 190:4 | 151:25 152:2,5,6,8 | 186:4 | **administrators** |
| **9:27** 1:20 6:3 | 152:9 161:2,5,16 | **actively** 27:8 | 192:7 |
| **a** | 163:16 165:20 | **activist** 181:16,20 | **adopt** 64:14 |
| | 170:13 173:7 | **activities** 44:11 | 153:23 |
| **a.m.** 1:20 6:3 | 189:9 190:10 | 45:22,25 46:7,18 | **adopted** 165:2,7 |
| **abandon** 53:11 | 191:5 | 51:25 | 165:14,22 166:25 |
| **abandoning** 53:16 | **accessed** 31:11 | **activity** 96:25 | **adopting** 53:18 |
| **ability** 26:23 32:3 | 32:14,15,16,20,22 | **actors** 134:18 | **adoption** 49:13 |
| 32:6,10 41:6 | 161:18 169:14 | **actual** 70:5,7 | 64:18 167:5 |
| 105:11 194:16 | **accessibility** 26:9 | 94:24,25 95:15,17 | **advanced** 27:2 |
| **able** 22:5,7 26:17 | 26:11,19 | 95:21 123:7 | **advancement** |
| 45:17 53:19 56:17 | **accessible** 33:20 | 131:21 177:10 | 27:23 |
| 63:3 65:20 79:18 | **accessing** 46:21 | **add** 152:3 | **advantages** 84:5 |
| 87:23 100:4 | **accompanied** | **added** 95:1 | **adversarial** 114:4 |
| 135:19 145:19 | 183:11 | **addition** 54:22 | 114:7 |
| 157:1 191:8 | **account** 66:16 | 99:9 185:5 | **adversaries** 77:12 |
| **absentee** 105:15 | 107:9 | **additional** 16:17 | 77:13 78:9 81:5 |
| 105:16,19,22 | **accounts** 73:2 | 51:16 59:6 66:2 | 88:4 111:21 |
| 120:16,18,23 | **accuracy** 177:1,2 | 83:2 99:1,2 | 136:14,17 176:4 |
| **absolute** 87:12 | 177:5 | 165:12 168:17 | **adversary** 114:25 |
| 144:15 | **accurate** 190:24 | 172:2 185:16 | 116:13 175:19,21 |
| **absolutely** 111:23 | **accurately** 36:24 | **address** 14:20 | 175:22 |
| 114:8 116:14 | 136:20 | 150:19 159:4 | **advertising** 24:9 |
| 132:25 | **accuvote** 66:22 | **addressing** 111:4 | **advisors** 96:12 |
| **academic** 18:22 | 67:10 | **adequate** 108:15 | **advocacy** 59:8 |
| **academies** 34:24 | **achieve** 15:6 72:7 | 108:18,22 185:12 | 63:14 |
| 35:4 180:13 | 84:16 85:17,18,20 | 188:8 190:21 | **advocate** 34:13 |
| **academy** 35:1,11 | 100:1 109:11 | **adequately** 140:18 | 38:11 41:25 63:16 |
| 180:6 181:3 188:9 | 114:23 | 155:16 170:15 | 140:18 |

advocates  96:18
advocating  34:13
  56:2 59:21,24
  138:22
affect  50:6,8 105:2
  105:3,9,10,11
affiliated  4:8
  27:15,16,18 28:1
affirmed  194:9
africa  61:15
aftermath  57:13
age  118:22
agenda  55:11
agent  171:7
agents  112:25
  194:18
ago  12:16 30:6,13
  30:22 158:5
agree  36:1 37:25
  44:9 45:21,25
  46:1 47:7 61:2
  63:15 72:9 78:7
  78:13,18,23 79:7
  86:3 87:7 98:5
  112:7 129:20
  136:23 137:2
  152:7 168:1
  181:16,19 185:14
agreed  155:6
ahead  10:2 37:1
  100:10,11 174:20
  179:25 181:10
aherman  2:7
aided  194:13
aim  41:6 64:6
aiming  114:15
al  1:5,11
alex  1:17 3:4 6:5
  6:10 25:24 60:24
aligned  169:19
  171:14

alleging  14:1,12
  15:9,12
allow  41:20
  104:11 113:15
  143:21 178:9,22
allowed  6:13
  62:25 161:2,5,20
  167:9
allows  162:1
alter  14:6 103:13
  123:12 126:3,7
  127:3 151:12
  163:18
altered  61:7,9
  163:23 190:19
altering  190:17
alternative  84:14
  84:24 141:4
alternatives  20:18
  20:19 74:23 141:3
alumnus  5:8 60:11
  67:20
amended  13:8
america  52:12
  72:10
american  31:19
amount  11:17
  12:9 110:6 148:6
amounts  29:5
analogous  45:14
analyses  119:14
  160:16,17 163:6
  191:17 192:9
analysis  14:24
  63:3 92:22 108:7
  108:9,14,25
  118:17 122:23
  144:19,24 152:4
  156:22 166:10
  167:6,10,18
  168:13 186:16,16

186:19 189:5,17
analytic  17:6
analyze  15:4
analyzed  41:19
  143:18
analyzing  14:21
  191:23
andrew  2:2 9:12
android  143:11
  144:1,4
annual  21:12,18
answer  7:11,17
  48:15 55:9 74:15
  109:3 157:2,4
  192:13
antivirus  149:15
  149:16,19,20,22
  149:25 150:5,9,17
  150:20,23 169:21
  169:23,25 170:11
  175:1,4
antiviruses  150:16
anybody  9:10,14
  123:9
anyway  127:16
apologies  26:2
  70:9
apologize  96:8
  156:11
app  73:3 90:21
apparent  90:6
apparently  41:9
  60:11 62:5
appear  23:16
appearances  2:1
appeared  25:17,18
appearing  2:8,16
appears  25:6 30:5
application  21:6
applications  38:8
  103:23 138:25

applies  184:2
apply  47:18 79:14
  84:14 98:22
  120:16 181:6
applying  92:7
approach  17:6
  53:3 99:14
approached  53:2
  53:4
approaches  72:7
approaching
  79:11
appropriate
  155:19
appropriations
  4:11 29:20
approve  105:4
approximately
  12:1,16 102:11
arbitrary  11:19
  50:24
architecture  67:15
area  17:16 18:9
  19:5 24:19 27:5
  29:14 53:7 94:4
  157:6,7,8,14,16
  185:14
areas  19:24 28:14
  28:24 41:18
arnold  67:4
arrive  87:19 89:3
arrived  17:9,11,15
arriving  18:13
article  5:1,5,8
  56:18,20,24 57:2
  57:11 66:16
  170:17,21
aside  74:5 186:9
  187:13
asked  7:17 13:1
  74:14 100:18

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 200 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[asked - audits] Page 4

146:4 166:24
189:7
**asking** 7:21,22
13:18 51:6 130:10
187:3
**aspects** 28:13
**assembly** 64:25
**asserts** 159:12
**assess** 93:8 99:10
190:12
**assessed** 164:3
179:18
**assessing** 79:25
81:10,14 92:11
94:12
**assessment** 20:4,6
46:15 59:25 61:2
107:2,10 149:2
158:4,11,12,18,19
160:3,12 168:19
181:18
**assessments** 112:1
118:24,25 119:2
158:24 159:24
**assist** 68:6
**assistance** 180:8
**assistant** 18:17
**assisted** 67:24
69:25
**associated** 102:9
103:23
**assume** 76:12
166:24
**assumed** 109:7
**assuming** 9:23
18:3 21:1,22 24:4
24:21 36:18 54:16
60:16 75:4 98:23
108:6,13,17,25
111:24 121:12
128:4 129:21

131:2 149:9 158:7
173:12
**assumptions** 13:6
109:2
**assurance** 27:3
**atari** 139:22
**atlanta** 1:3 2:13
**attached** 5:20 17:2
19:15 194:7
**attachment** 54:12
**attack** 14:25 15:3
23:19 39:16,21
40:6,9,25 46:11
50:9 80:3 81:4
82:7 84:19 87:8
87:10,12 89:8
93:11 109:17
114:18,24 115:12
115:20 116:1,12
116:25 117:1
120:4,4,25 121:23
123:12 125:1,8,11
125:16 127:19,22
127:25 128:3,12
128:17 129:16,19
129:23 140:14
145:20 162:6,10
162:12 163:18
173:25 175:7
180:16 187:2
**attacked** 135:10
137:3,9
**attacker** 14:6 15:6
23:10,15 110:6,14
122:9 126:20,23
127:13 134:1
143:9,20 151:10
153:9 161:2,5
162:3 163:23
166:18 174:13
190:4 191:5

**attackers** 32:19
62:2 78:18,23
117:3,13 120:25
135:21 139:24
143:21 149:8
157:1 161:21
169:2 170:8 176:2
**attacking** 5:3
113:1
**attacks** 23:22
30:24 31:3 40:13
52:24 71:22,24,25
73:13 74:24 77:16
79:7 80:24 81:6
81:13 83:14,16
88:12 93:10,14
105:2,2,8,9,10
106:10,15,16,18
106:20,22 109:23
110:3 115:7
119:24 121:25
128:6,23 130:19
131:20,25 154:21
176:8 177:6
179:11 183:23
184:7 187:25
**attempt** 20:18
39:22 77:13
127:19 166:18
171:7
**attempted** 23:16
61:19 62:3
**attempting** 112:5
**attempts** 46:8
160:19 177:13
**attend** 37:8
**attention** 53:6,8
53:10 54:3 152:16
152:18,19
**attorney** 9:14

**attorneys** 9:13,17
12:15 194:18
**attracted** 18:7
**attributed** 57:12
**attributes** 26:12
26:14
**audit** 34:14 36:7
49:9,10,15,24,25
50:4,7,14,18,21,23
50:24 51:2,9
74:17 75:19,20
115:6 123:15,20
123:21 124:4,12
124:22,25 125:15
125:18,19 127:21
128:5 129:1 130:2
130:5,9 140:15
173:14,15 179:9
179:11
**audited** 74:7
125:12 136:22
139:7
**auditing** 29:16
69:14 70:1 71:4
80:15 110:10,13
110:17 123:25
124:2 154:16
**auditmark** 172:12
172:13 173:21,21
**audits** 34:22 36:20
38:11,24 39:1,9
49:6,13,21 50:11
70:20,25 71:11
75:18 78:12
115:13,19 124:6,8
124:16,18,21,21
128:8 130:15
153:12 155:13
173:13,23,24
174:1 179:21,22

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 201 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[august - believe] Page 5

**august** 49:8
**authenticate**
161:25
**authored** 14:19
**authority** 23:4,8
23:12,16,21
**authors** 183:1
**automated** 141:10
**automatically**
169:13,16
**available** 27:6,7
99:1 112:23
113:14 121:23
130:25 146:1
149:15 154:1
157:20 158:8
169:10 178:25
189:1,3
**avast** 169:23,24,25
**avoid** 64:7
**award** 24:14,24
**aware** 27:16,18
45:22 50:10,13,15
50:17,20 64:17,20
64:20,24 65:3
94:6,23 120:9,14
124:11,13 131:9
150:18 152:1
159:10,10 163:8
163:19 170:23
175:10,12 177:2,8
177:20,23 184:13
187:18

**b**

**b** 121:24,25
129:21
**b2** 5:11
**back** 8:20 12:16
14:14 17:19 42:18
46:25 70:19 96:5
103:16 104:19

105:13 108:12
118:15 123:14
128:21 130:25
153:10 155:23
173:24 178:12
187:5 191:16
192:24
**background** 8:3
**backups** 134:25
135:3
**bad** 71:20 144:10
**badly** 36:9
**balance** 84:20,23
**ballot** 5:18 26:8
33:15,18,22 34:8,9
34:18 35:2,6,10,13
36:10,15,17,18
38:22 42:2,7,8,11
42:14,16,21 43:12
56:11,15,16 59:16
59:21,24 60:2
65:1 70:18 71:4,7
71:13,21 72:11,16
73:17,19,20 76:1
80:11 81:16,20,23
82:10,10,16,22
83:1 86:4,13 91:1
91:19,19 93:7,17
97:22 98:2 101:1
101:4 109:6 115:6
119:25 120:1
125:2 126:3
130:15 138:1
139:5 141:1
145:15,18,23,24
146:1 149:18
152:24 153:2,5
156:15 158:1
166:23 171:10
172:19,20 173:17
175:11 176:19

177:3,13,21,25
178:2 180:1
181:12,25 183:19
184:10 185:22
188:13,15
**balloting** 120:2
**ballots** 5:7 28:17
29:9,13 33:14,17
33:19 34:18,19,22
35:6,13 36:10,11
36:16,17,19 38:12
42:1 48:22,23
49:3,5 64:19 65:1
66:1 69:16 70:16
70:24 71:10 73:16
73:18 74:6,17
75:5,8,9,13,17
76:5,7 78:11
80:10 83:6 85:8
86:5,6,7 97:22,24
108:6,11,14,17
110:11 115:13,19
120:6 123:15,25
124:2 125:6
126:11 128:2,9,13
128:14,19 129:1,5
129:17 141:3
156:20 172:25
173:16,17,24
178:4,9,12,18,25
179:6,11 180:15
180:21 181:13,17
182:6,11 183:9,14
183:19 185:8,19
**ballotstation**
189:19
**banking** 89:13,16
89:25
**bar** 125:9,9 126:3
126:7

**based** 19:17 32:17
42:9 48:2 56:4
65:15 77:7 82:19
82:25 86:25
101:17,22,23
118:18 124:20
136:10 138:8,11
138:12 149:12
153:25,25 154:5
154:21 155:18
156:2 159:17
170:21 173:4
177:10 180:11
181:1 183:19
**basically** 82:5
100:6 110:5 125:7
136:25 137:2
140:1 147:12
156:22 158:18
162:21
**basing** 168:12,15
168:15 186:2
**basis** 21:17 48:4
85:6,22 111:22
129:8 130:18
150:10 159:5
161:17,22 167:20
168:18
**bear** 84:12
**becoming** 86:23
**beginning** 30:12
146:21
**begins** 55:9 62:21
63:13 64:3 69:25
**behalf** 2:8,16
**behavior** 86:11
**beings** 17:23
**belief** 113:19
149:6
**believe** 9:5 12:21
13:12,20 16:6

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 202 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[believe - cameron] Page 6

25:18 35:15 47:23
48:10 50:16 54:20
56:13 57:22 58:7
64:20 73:9 74:6
74:16 75:4 84:3
85:21 90:7 91:17
91:17 94:22 96:1
97:11,25 102:1
113:23 116:11
117:17 124:21
133:13 135:2
146:25 152:18
159:19 161:12
163:13 173:23
177:22 182:2
189:13,14
**bell** 16:20
**benaloh** 25:23
**benedict** 67:4
**benefit** 24:7,8 99:1
124:19
**benefits** 98:20
99:3 109:25
**bernard** 182:25
183:2
**best** 7:6,10,12 19:4
28:16 34:14,22
42:12 56:13 74:7
74:17 75:5,12
76:6 91:17 113:16
116:20 145:1,5
183:25 184:5
194:16
**better** 7:14 34:1
102:20 174:15
**beyond** 8:19 12:20
13:1,4 15:18
16:12 46:2,5
51:10 81:2 83:25
93:23 126:15

**bill** 12:4,10 64:13
**billion** 23:12
**billions** 89:19
**biographical** 10:4
**bipartisan** 32:1
64:11
**bishop** 25:23
**bit** 12:11 16:24
17:8 22:7 26:4,25
28:4 49:7 65:10
76:10,12,15
105:14 132:18
133:7 184:21
**black** 171:8
**blindly** 38:8
**blood** 194:17
**blow** 31:18
**bmd** 83:9 85:15
86:25 93:23
105:22 107:20
129:5 137:18,20
144:12,14 150:14
154:21 156:1,5,21
167:17,20 168:10
175:4 180:15,21
181:1,6 186:1
**bmds** 77:14,15
78:24 79:2 105:16
105:20 135:23
150:15 151:7
153:12,15 154:19
154:24 155:3,8,8
155:11,12,14,17
157:17,20,21
165:6,20 168:17
173:12 178:10,22
179:2 180:17,24
**board** 63:24 96:12
121:9 124:5,7
178:11 184:19

**boards** 112:14
**bolstered** 46:15
**bono** 11:25 68:12
**book** 163:3
**books** 101:16
104:6 163:1
**bottom** 35:23 36:6
58:14 77:3 92:15
92:24 105:14
107:18 147:20
179:13 187:24
**box** 51:23
**boy** 16:14
**brad** 1:8 6:11
**break** 7:18 33:4,5
37:1 132:21,22
174:19,20 175:23
**breakdown** 64:24
93:21
**breaks** 7:15
**brennan** 27:23
**brian** 6:23
**bridge** 17:25
**bridged** 17:21
**briefings** 42:23,24
42:25 43:4
**briefly** 96:15
**briefs** 13:14,17
**bring** 53:6,8 75:24
**bringing** 53:10
**brings** 73:10
**brittleness** 118:22
**broad** 64:11
134:19 188:7
**broader** 19:5
20:13 99:3,5,21
103:3
**broadly** 13:21
19:14 28:12 71:12
**bryan** 2:10

**btyson** 2:15
**build** 119:21
**built** 98:14
**bullet** 41:25 45:9
47:3,8,25 48:5,11
48:13,21 49:6
51:13
**bunch** 95:1
**business** 20:24
21:1

**c**

**c** 21:9 122:16
123:12 125:1
128:7,23 129:7
130:1 138:16,16
138:18,18,20,21
139:3,3
**cable** 66:7
**california** 8:22,23
92:15,24 118:15
119:1 136:8
139:14 146:22
147:1,19,25 148:5
148:21 150:13,20
152:11 153:18,24
154:3,7,15,18,18
154:22,23 155:1,2
155:7 164:21,25
165:23 166:13,21
166:25 167:23
168:11,21
**california's** 147:5
149:12,14 150:7,7
153:8 154:11
**call** 177:1
**called** 21:9 23:3
26:10 35:4 99:24
119:16,18 180:12
**cameron** 1:22
194:5,24

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 203 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[campaign - chose] Page 7

campaign 57:7
68:3,4,5,13,16,19
68:22,23 69:2
campaigns 68:18
candidate 69:1
122:11 182:15,19
182:20
candidates 14:7
182:20 183:12
capabilities 32:19
44:15 114:12
116:24 163:9
capability 47:7
capable 175:19
capacity 1:9
capital 43:1
card 107:19 168:9
cards 108:1,24,24
109:8 165:6,18,21
career 18:22 60:24
careful 128:5
137:6
carefully 44:13
126:11 128:1,8
130:14 164:19
carolina 27:22
carpathian 111:25
carries 99:2
case 1:7 9:7 10:10
11:7,19 12:4,14
13:6,8,11,14,20,21
13:25 36:24 91:16
93:19 95:24 98:20
100:16,22,24
127:16 148:18
158:8 159:11,17
162:19,24 164:18
166:16 178:5,15
178:23
cases 11:11 44:25
130:23,23 150:10

154:20
cast 70:16 105:11
casting 119:25
catch 180:15
catching 156:3
categories 83:14
83:15 177:16
179:22
categorize 110:13
139:17
categorizing 87:18
category 109:22
caucus 72:25
caucuses 72:20
cause 27:22 87:24
119:24 122:11
162:4 164:2
184:24 194:8
caused 40:8,17,19
86:18 128:19
causes 17:6 20:13
causing 20:16
39:14 90:17
caveat 111:1
cd 106:5
cds 190:7,8,10,12
cellphone 90:7,16
90:21
cellphones 90:9,20
censys 21:9,14,22
22:4 24:4,9
center 27:23
189:12
central 29:11
101:2,10 138:9
certain 26:21
36:15 41:4 53:23
55:20 71:22 72:7
74:22 83:14,15
94:8 105:10 178:3
179:10 186:1,5

certainly 14:5,16
18:10 27:8 31:15
31:15 47:21 59:24
63:18 64:10 70:23
102:18 117:23
118:10 132:22
144:8 166:1
177:12
certainty 40:18
181:6
certificate 23:3,12
23:16,21 194:1
certificates 23:13
certification 50:1
50:1 142:5,18
146:13,18,20
150:22,23 154:4
157:10 171:2
certifications 8:23
certified 48:7
141:25 142:1,3,4,7
146:8,10 165:1,9
170:25 180:7,7
194:5
certify 153:19
154:12 194:7,16
chain 28:16 48:22
108:15,18,22
109:9,12 169:1
171:25 184:21
chains 172:1
challenges 71:10
75:25
challenging 18:10
99:12
chance 7:2 58:1,3
58:5 183:23
change 35:16 42:8
53:1 72:12 76:10
82:15 87:23
107:12 110:1

115:8 117:6
126:17 142:11
156:25 161:21
162:4 185:21
191:6
changed 35:12,19
35:21 44:7,18
57:15 58:2 60:25
62:15 65:22 106:2
162:14 176:24
changes 18:5 51:4
65:19 76:4 104:23
104:24 105:7
125:9,9 131:1
142:21,22 178:16
changing 50:25
83:3 119:17
chaos 41:10 87:12
128:20 129:25
164:2
characterization
45:25
characterize 39:1
50:7 148:8,10,11
148:13
charge 11:11,21
cheap 144:17
cheat 127:16
check 12:17 58:6
63:1 118:16 164:3
164:10,11 185:19
checked 51:23
checking 185:8
chevalier 2:3
chief 144:24 145:2
choice 85:23
choose 22:11,17
51:1
chooses 148:6
chose 31:19 148:5
153:19

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 204 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[chosen - computer]                                           Page 8

**chosen** 89:22,22
90:13,25 91:10
**circle** 2:12
**circumstance**
73:14 129:13
178:10
**circumstances**
11:23 58:25 74:22
84:17 151:5,10
**cite** 126:12 135:7
137:10,16 143:2
178:6 181:11
182:13 188:7,8
**cited** 9:1,3
**civil** 6:14
**clarification**
111:17
**clarified** 74:15
**clarify** 68:25
74:13
**clean** 93:20
**clear** 15:4 83:17
83:18 84:21,23
85:25 87:21 168:2
**clearer** 7:14
**clearly** 22:21 86:8
**clinton** 57:7 66:9
68:4
**close** 36:22 79:23
109:23 126:18,21
126:24 127:14,17
127:18,20 157:1
180:17 183:23
184:7,25 187:6
**closed** 99:12 100:2
100:2
**closely** 112:1
169:19
**closeness** 156:8
**closer** 33:1

**coat** 66:17
**code** 99:1 125:9,10
126:3,7 137:18,22
137:24 138:6,10
138:12 139:9,11
140:8 146:10
147:23 158:20
160:13
**collaborative**
124:15
**collected** 70:18
**column** 70:4,10
**columns** 70:9
**combination**
128:24
**combined** 36:20
**come** 64:16 65:13
79:13 81:9 84:2
92:18 105:13
134:1 135:15
178:14
**comes** 92:6,6 94:9
103:16
**coming** 84:12
123:14
**commencing** 1:20
**commercial** 98:4,9
98:13 138:24
**commission**
127:12 180:8
194:25
**commissioned**
92:16 158:25
**committee** 4:16,19
30:4,23 31:6 32:2
32:9 37:7,9,11,16
40:21 43:24 44:6
44:9 45:3 47:2
48:1,3 63:23
113:10 134:20

**committee's** 43:16
47:25
**common** 27:22
70:20,24 141:7,8
**community** 23:22
44:15 112:2
**companies** 20:21
20:24 21:7,10
22:17 171:7
**company** 20:23
21:1,3,8,13 22:5
22:11,24 169:22
170:2,8,13
**comparative**
81:15,20 82:1,4
**comparatively**
92:11
**compare** 82:2
174:16
**compared** 103:2
118:8,9 137:17
138:1 144:2,4,5
**comparison**
145:25 148:17,22
**comparisons**
174:3,5,14
**compartmentalize**
100:4
**compensated** 11:6
**compensation**
24:3
**competing** 88:24
**complaint** 13:8
**complete** 10:18
49:10 142:23
189:17 190:2
194:15
**completed** 58:13
**completely** 107:24
118:25

**complex** 140:1
**complexities** 49:22
**complexity** 22:3
137:16 139:9,16
**complicated**
192:13
**complicates** 71:13
**complies** 47:24
**comply** 48:7
**component** 14:1
96:21 101:1 103:2
103:12,15
**components** 28:20
29:12 31:4 43:13
75:1 78:19 79:1
81:17,21 88:5
100:25 103:20
115:15 133:4,25
134:23 135:5
136:6 142:25
150:4,17,19,22,24
161:7 162:20
169:12 191:25
192:2
**compromise** 62:3
94:24 95:3,4,5
113:7 116:18
122:1,2,7 123:4
143:22 157:2
**compromised**
95:10,13,25
113:12,15,18,20
188:2
**compromises**
55:24
**computer** 17:6,13
19:3,13 23:9
37:24 38:1,4
61:18 81:6 87:13
96:24 103:17
135:8 136:16,24

Case 1:17-cv-02989-AT  Document 821-3  Filed 08/26/20  Page 205 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[computer - correct]                                             Page 9

137:1,2,5,14
139:19 140:9
144:22 151:14,15
151:17,23 152:22
170:17,21 174:9
194:13
computerized
140:17
computers 37:21
38:9 80:4,8 180:2
190:1
computing 19:4
22:2 139:16,17,21
139:22 192:5
conceal 174:13
concept 61:1
67:21 112:7
156:11
concepts 112:8
concern 53:21
64:8 87:1
concerned 106:15
106:16,19 109:17
115:8
concerns 28:10,18
86:22
conclude 31:15
42:20 85:7 126:23
129:3 159:14
190:23
concluded 30:23
32:9 54:16 193:6
concludes 185:13
concluding 88:7
conclusion 42:16
80:25 85:9 107:17
113:16 118:3
134:19 150:11
164:6
conclusions 89:3
100:14 107:6,15

108:19 109:1
135:17 176:20
conclusively 40:13
condition 155:7
conditionally
164:25 165:9
conditions 153:22
153:24 154:4
155:4 165:12
166:4,6,7,13 167:1
167:5 184:5
conduct 20:3,5
51:1 65:18 130:18
conducted 35:8
42:10 49:9 50:17
65:16,19 101:21
119:1 167:10,13
conference 25:8
conferences 24:22
confidence 65:14
88:22 160:10,15
160:15
configuration
161:16
confirm 69:17
75:14 180:25
conflicting 135:17
confusing 7:23
congress 29:18
43:2 55:23 64:12
congressional
42:22
connect 23:5
connected 26:9,12
114:1 132:19
133:5,9,17 134:4
135:6 194:17
connection 23:7
160:22
cons 99:15,17

consensus 35:15
188:7,17
consequence
191:10
conservative
27:25 42:14
consider 28:7,11
28:21 29:11,15
38:24 106:25
176:18
consideration
72:11 186:15
considerations
36:2 87:6
considered 176:22
considering
176:17
considers 80:14
consistent 31:22
46:17 51:7,11
59:12 63:1 91:21
91:22 152:17
consistently 59:5
72:2
constitutional
71:19
constrained 88:13
90:1
construct 157:19
consulting 20:20
21:17,19
consumers 90:1
contact 12:12
contacted 12:15
12:18
contain 148:16
190:12
contained 161:24
189:11 194:11
contains 133:13

contents 189:25
contest 131:3,9,13
144:3
context 19:11
24:10 47:1 81:6
84:11 92:13 94:6
94:12 126:2
127:15 129:5
137:7 143:7
contexts 174:10
continue 58:16
163:25 164:1
178:10,22
continues 112:4
contours 8:14
contraband 66:18
contracted 159:23
contracting 48:14
51:17
contractors
171:21,22
contrary 72:16
contrast 85:16
contributions 25:1
controversy
194:21
convenience 89:24
90:15
conversations 7:7
15:20
convince 167:23
cooperation 20:10
161:4
copy 54:9
core 63:13 137:3
corporation 21:3
correct 9:9 11:7,8
14:3,13,21 15:14
16:15 18:23,24
19:19,20 24:1,5
27:4 31:11,14

[correct - database]                                                    Page 10

| | | | |
|---|---|---|---|
| 32:7 34:9,15,19 | counsel 12:22 13:2 | 133:25 172:1 | cut 87:10 |
| 35:14 36:4 38:16 | 13:5 15:19 113:11 | created 83:3 | cv 1:7 17:1 19:17 |
| 39:9,10 40:9,17,25 | count 38:14 75:13 | creates 71:1 75:2 | 24:12 42:22 54:6 |
| 41:7,16,17 44:22 | 75:22,23 76:2 | 75:10 152:12 | 54:9,15 |
| 47:16 48:1,9 50:1 | 101:2,7,10 138:9 | 165:19 170:5 | cyber 80:7,12,20 |
| 50:14,22 51:2 | counted 38:12,23 | credibly 99:10 | 80:24 81:2,3 |
| 53:7,17 54:18,24 | 53:1 61:19 75:17 | critical 23:1 | 84:25 85:6 108:8 |
| 56:15 58:11 66:25 | countermeasures | 141:21 161:7 | 116:8,23 158:4 |
| 68:10,11 69:5,6 | 190:15 | 166:20 | 187:25 |
| 71:9,19 74:9,11 | counties 121:12,16 | critically 136:18 | cyberattack 57:21 |
| 75:6 78:3 84:1 | 178:21 | criticism 134:4,6 | 61:8 122:4,6 |
| 87:5 92:22 95:1 | counting 75:5,8,8 | cross 92:1 93:17 | cybersecurity |
| 102:7,8 106:8,17 | 75:10,15,24 76:5 | crr 1:22 194:24 | 17:16 19:9,10,14 |
| 107:2 111:9,15 | 113:24 | crucial 23:6 | 19:22 28:5 51:15 |
| 112:20 114:15,16 | country 19:4 | crucially 33:21 | 51:17 82:14 83:21 |
| 119:8,11 123:2 | county 16:4 50:19 | cryptographic | 83:22,25 84:5,10 |
| 124:1 125:3,4 | 105:25 107:24 | 100:8 | 84:16 85:13 87:5 |
| 127:24 130:2,25 | 108:12 112:14 | csr 1:22 194:24 | 89:12 96:21 98:12 |
| 132:13 136:9,10 | 127:12 135:22 | cues 182:10 | 114:11 119:2 |
| 137:7 139:5 142:2 | 155:2 178:2 179:4 | curiosity 72:19 | 146:18 159:23 |
| 142:8 146:14 | 190:6 192:6,11 | 73:6 | 160:5,9 |
| 157:17 158:5,23 | 194:4,24 | curling 9:6 16:11 | czech 169:22 |
| 162:14,15 163:3,4 | couple 7:1 94:16 | 16:13,16 158:8 | 170:2,13 |
| 163:25 167:14,22 | 97:17 137:12 | 159:11,17 178:14 | **d** |
| 168:5,23 170:22 | coupled 55:15 | 189:4,10 | |
| 173:14 174:10 | 155:11 | current 12:8 68:23 | d 2:2 125:5,7,11 |
| 177:11 181:15 | course 33:8 61:4 | 97:25,25 106:7,11 | 125:16 128:7,23 |
| 183:2,9 187:16 | 89:16 | 123:24 155:18 | 129:7 130:4,8 |
| 189:13,15 | courses 19:7,8,17 | 178:15 | d.c. 2:5 |
| corrected 104:9 | court 1:1 7:6 | currently 18:19 | damage 20:13 |
| 110:19 130:8 | 16:19 | 49:15 115:18 | dangerous 20:9 |
| 148:25 159:19,20 | cover 19:23 26:19 | 116:18 123:16 | daniel's 46:15 |
| correcting 88:12 | covered 26:6 | 124:4 125:21 | data 12:22 13:3 |
| correction 129:14 | 43:13 83:24 94:22 | 146:1 | 14:14 32:4 103:9 |
| correctly 26:18 | 102:1 109:15 | custody 28:16 | 103:16,16 104:2,3 |
| 38:9 140:23 | 112:18 146:25 | 48:22 108:15,18 | 104:6,12,14,20,24 |
| 158:18 | 163:2 175:1 | 108:22 109:9,12 | 122:2 133:20 |
| correctness 66:2 | 179:24 | custom 98:14,24 | 161:3,17 163:19 |
| 179:18 | covers 26:20 | 119:20 | 163:23 189:24 |
| cost 160:17 164:11 | create 53:3 72:4 | customary 11:9 | database 102:6,9 |
| | 74:23 88:23 | | 102:15 103:14 |
| | | | 104:21 117:6,11 |

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 207 of 243
J. Alex Halderman , Ph.D.
February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[database - determining]
Page 11

117:14 119:6,18
119:22 120:7
129:18 133:9,12
133:20 158:3
160:11
**databases** 117:21
118:2,20 119:3
123:1,6 189:21,23
189:24 190:9,11
**date** 58:18 141:11
141:17 142:15
153:25 190:22
**day** 8:6 30:6 40:2
40:3,8,17 41:14
95:21 105:12
107:13 121:2
178:2
**deal** 19:18
**death** 61:23
**decade** 58:18
**decertified** 187:21
**decide** 82:18
**decided** 41:9
72:10 119:21
164:22 191:14
192:9
**decides** 140:5
**decision** 88:14,17
88:18 89:2,7,10,11
148:3,9 154:11
164:8
**decisions** 100:15
**decrease** 164:11
**decreasingly**
139:1
**dedicated** 38:5
69:21
**defend** 33:10
**defendant** 6:11
**defendants** 1:12
2:16

**defense** 71:21
78:12 92:9 175:3
**defenses** 78:21
83:7
**defensive** 80:16
**define** 49:17,19
**defined** 99:23
100:8
**definitely** 78:1,4
114:18 116:14
151:18
**definition** 162:21
**definitions** 26:13
49:20
**definitively**
177:24
**degree** 90:14 93:1
93:2,6,13,25 94:6
118:15 155:22
156:21 168:13
**degrees** 92:13 94:8
94:12 115:23
**delay** 86:18
**delightfully** 63:24
**demand** 179:1
**demillo** 15:24
181:13
**democracy** 31:19
101:12
**demonstrate**
20:14
**demonstrates**
185:18
**demonstration**
67:5,7,8,11
**demonstratively**
95:10
**department** 19:3
138:22
**depend** 106:20,22
109:4 160:16

**dependencies**
141:11,21
**depending** 129:19
**depends** 11:23
15:6 24:10 34:4
49:16,19 58:24,24
63:18 74:4 98:19
123:23 130:21
142:22 143:8,8
149:23,23
**deployment** 156:5
157:13
**deposition** 1:17
4:2,3 6:10 7:3,20
8:8,9 9:4,6,11,18
9:23 193:6 194:8
194:14
**depositions** 13:10
**derivation** 178:6
**describe** 15:2
26:25 52:16 96:15
110:23
**described** 12:20
63:2
**describing** 120:5
**description** 13:19
46:1,4 63:16
**design** 29:3,5,12
29:15 70:20,25
72:17 88:25
101:20 124:20
157:21 169:11
192:15
**designed** 75:21
80:17 87:25 98:24
135:13,19 136:11
152:13,15 172:18
185:7 191:11
192:17,19
**designing** 29:2
141:7

**despite** 77:17
**destroy** 32:3
**detail** 117:23,25
121:11 159:14
**detailed** 132:19
159:24
**details** 10:4 94:18
160:16
**detect** 5:16 50:25
75:22 127:22
129:16 130:24
131:12,12 132:10
150:9 173:25
177:25 179:10,23
**detectable** 67:16
67:17 129:23
**detected** 61:20
62:6 93:10,12
127:25 128:4,7,14
128:18 129:8
130:1,4,7,13
134:14 173:11
180:17
**detecting** 88:11
183:23 184:7,25
**detection** 129:13
130:10 150:17
**determination**
168:8
**determine** 84:8
91:24 92:2 93:16
127:2 155:25
166:11,15,17
167:20
**determined** 117:1
137:8
**determines** 86:8
**determining** 92:25
94:5 127:13
186:18

**[develop - documents]**                    Page 12

develop 124:16
developed 46:14
169:18
developing 97:1
98:16
development
124:12 141:22,23
145:2 146:5 169:3
171:9
deviation 66:5
deviations 57:20
device 33:15 34:9
34:18 36:10,16,17
36:18 73:20 82:16
82:22 83:1 91:1
93:7 97:22 101:4
138:1 145:16,18
146:1 149:18
153:3 172:21
177:14,25 178:3
181:12 183:19
devices 5:18 19:15
26:8 33:18,22
35:2,6,10,14 37:24
42:2,7,9,11,14,17
42:21 43:12 59:21
59:25 60:2 65:1
73:17 82:11 86:4
91:19 93:18 98:2
101:1 136:13
145:23,24 151:13
152:24 153:5
156:16 166:23
175:11 176:20
177:3,21 180:2
182:1 184:10
185:22 188:13,16
devoid 159:13
dhs 112:2
diagram 129:11

die 20:16
difference 85:13
105:1,6 106:9
107:14 110:23
114:14 148:2
191:8
differences 58:4
82:6 166:20
different 31:23
46:11 49:20 67:9
73:13 88:19
102:19 146:22
148:10 150:20
153:2 157:21,22
166:17 172:24
175:13,14 177:15
177:16
differently 148:13
differing 125:6
difficult 64:23
98:17 138:20
151:8,24 172:7
difficulty 110:10
145:4
dig 67:14 94:18
191:17
digital 123:13
127:23 172:19
173:16,19
diligence 51:25
direct 148:22
direction 12:19
76:10
directly 18:15
114:1 133:4
134:17 194:20
disabilities 26:22
26:22 33:21 42:3
disable 163:16
disabled 59:22
73:14,23 74:5

81:19 82:11 91:20
163:10,13,14,24
disadvantage
61:20
disadvantages
84:6
disagree 35:1,3
47:12 74:12
154:11
disc 142:6
discipline 94:7
disclosure 19:25
disconnected
135:19
discord 14:6
discounts 11:10,13
discover 50:9
157:24
discovered 39:8
123:4 160:23
discovering
139:25
discovery 6:12
discriminatory
13:23
discuss 39:13 43:5
54:17 163:18
188:18
discussed 14:4
41:5 43:7 46:20
49:7 66:10 113:6
113:23 133:7
136:7,16 141:12
159:7 160:21,21
188:1,14
discusses 174:3
177:14
discussing 65:12
70:14 132:2 177:7
discussion 34:25
54:19 64:15 107:4

132:19 151:1
155:23
discussions 144:21
dishonest 76:4
disparate 14:18
15:11
dispute 136:13
disrupt 20:12
disrupted 130:23
disruption 87:24
disruptive 185:25
186:4
distinct 112:6,8
189:25
distinction 110:21
112:15 129:6
148:12
distinguish 91:15
129:12 148:14
177:9,16
distinguishes
111:13 168:11
distribute 179:8
190:7
distributed 190:11
district 1:1,2
division 1:3
docket 13:4,13,15
document 9:24
33:7 54:15 97:9
documentation
8:13,21,25 136:8
154:6,8 163:6
172:15
documented 94:23
95:24 101:20
106:12 143:2
documenting
176:6
documents 8:16
8:16,17,19 9:3

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 209 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[documents - election]                                          Page 13

12:23 13:2,3
102:2
**doing**   59:3 63:11
  67:21 72:3 147:22
  166:16 190:16
**dollars**   89:19
**domain**   69:22
**domestic**   171:21
**domestically**
  169:18 172:3,4
**dominican**   68:24
**dominion**   8:10,17
  8:21,24 12:25
  13:1 86:9 100:21
  101:20,24 102:3
  106:4 122:5 126:3
  126:5,8 135:25
  136:2,4,6,12
  137:22 139:9
  140:7 141:24
  144:25 145:6,12
  146:4 147:2 149:3
  149:9 150:4
  152:15,23 153:10
  153:14,19 154:5,9
  154:12 155:15
  163:5 169:4
  170:20 171:16
  172:14,23,25
**dominion's**   137:17
  145:9 153:1
  172:15 173:2
  174:15
**door**   45:20 46:10
**doorknob**   45:17
**doubt**   111:21,23
  112:17 114:9
  159:21 173:5
  190:25 191:12
**downsides**   106:6

**downstream**
  141:21
**dr**   4:9,14 6:10,21
  11:4 15:24,25
  25:5 37:6 45:3,9
  45:11 60:7 96:7
  174:25 181:13
  193:2
**drastic**   186:13
**draw**   112:6,15
**dre**   37:20 56:14
  66:22 73:20 110:7
  110:20 111:14,16
  111:18,18 187:16
  187:24
**dres**   36:19 38:22
  43:5 109:20
  110:15 180:5,7
  187:11,18 188:2,6
  188:8,17,20,25
**dubbed**   66:7
**due**   58:2,4 89:21
  134:12
**duly**   6:6 194:9
**duma**   2:11
**dynamics**   55:16
  55:17

## e

**e**   21:9 37:11 125:7
  126:10 127:21,25
  128:7,24 129:7
  130:7,13 131:20
  163:3
**eac**   48:7 141:25
  142:1,3,5,12
  146:11,17,20
  150:21,23 171:1,2
  180:7
**eac's**   146:13
**earlier**   16:11,12
  38:3 53:22 63:2

83:24 84:8 88:2
  91:17 112:18
  113:6,23 141:12
  155:23 169:22
**easier**   5:10 60:21
  71:17 72:17 99:10
  99:25 143:20
  157:23 187:2
**easy**   7:8 10:4 28:4
  164:5
**edges**   107:13
**editorial**   54:23
  55:6
**educate**   43:1
**effect**   14:5,8,24
  20:15
**effective**   56:1
  67:10 184:16
**effectively**   109:11
**effects**   13:24
**efficiently**   69:14
**effort**   41:12 48:21
  59:7,8 65:17
  124:15 147:22
  148:3
**efforts**   30:14
  43:17 67:24 68:12
  77:17
**eight**   159:6
**either**   35:13 36:24
  48:7 84:18 87:1
  103:12 108:7,25
  162:10 194:19
**elaborate**   20:7
**election**   4:21 5:6
  13:21 14:7 15:22
  16:4 18:3 19:9,11
  24:13,16,17,18,18
  25:2 27:3 28:8,9,9
  28:12,13,14,20
  29:2,3,6 30:14

31:4 33:10 38:15
  38:20 39:5,20,22
  40:2,3,8,17 41:13
  41:14,18 43:6,14
  43:18 44:19,22
  45:23 46:18 49:9
  49:10 50:22 51:4
  52:11,23 53:13,15
  54:17,24 57:14,15
  57:20,24 58:3,8,11
  61:14,21 62:1,4,8
  62:15,24 63:4,20
  64:8 65:1,15,23
  66:3,8 67:4,22
  70:21 71:13 72:2
  72:18 73:11,12
  74:24 75:25 76:3
  77:7,14 78:7,10,13
  78:19,25 79:12,15
  80:5,8,18 81:1,16
  83:8 84:1 85:8
  86:11,14,16,17,19
  86:22,24 87:8,14
  87:23 88:2,4,5,9
  88:25 89:8,12
  90:4,18 91:1,14
  92:13,18 93:1,25
  94:6,12,24,25 95:6
  95:16,20,21,22
  96:18,20 100:19
  101:13 104:1,2,5
  105:12,25 106:25
  107:7,18,21 108:1
  108:6 109:7,19
  112:5,6,11,20
  113:24 115:9
  116:8,15 117:4
  121:2,9,14 122:19
  123:13 124:5,7
  126:22 130:22
  131:3,9,13,13,18

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 210 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[election - evidence]                                          Page 14

131:21,23 132:4,5
132:8,15 133:17
135:24 140:24
144:3 155:20
156:8,24 157:1
160:24 163:24
167:22 168:5
170:10 171:10
173:11 175:14
178:11 179:4,9
180:3,4,5,8,10,17
180:18 181:19
182:15,16 183:23
184:19 185:24
186:3,7,7 187:5,7
187:9 189:12,20
190:15,17,18,21
190:23 191:1,10
191:12,14,21
192:7,8,15
**elections** 5:4 16:3
24:20 28:6,10
29:16 36:23 41:23
43:3 51:20 53:8
54:1 56:19 58:22
61:1,3,4,7 64:13
64:15 69:14 74:8
74:18 75:13 86:25
87:1 88:20 90:21
91:11,18 95:9,9,17
109:18,23 113:20
114:6,8,11,19
132:6 140:6 184:7
185:1
**electronic** 18:4,9
53:12,16 54:8
60:25 61:5,16
62:9,16,18 63:3,14
63:17 70:1,15
73:10,15,19,25
75:1,15 79:23

81:17,21 94:25
95:6 101:16,19
104:6 163:1 164:4
181:21,23,24
**electronically**
69:16 75:14 82:11
**elements** 18:1
176:17,18
**elevated** 98:1
186:12
**eliminate** 87:8,22
88:1
**emergency** 74:2
**empirical** 156:2
**employ** 135:22
174:4
**employee** 194:19
**employees** 171:8
**ems** 122:17,23
135:22 150:12,19
150:24 169:21
**enabled** 82:14
**encode** 165:5,20
**encoding** 165:18
**encounter** 22:18
70:20 88:16 90:14
94:8 134:9 167:21
**encountered** 21:24
**encrypt** 23:3,11
**encrypted** 151:23
151:23
**encryption** 19:14
26:24 27:2
**endemic** 38:19
**endorsed** 34:23
**enet** 102:4,6,11,13
102:16,16,23
103:3,5,20,21,22
104:1,2,5,14,24
133:9,12 134:14
134:16,25 158:4

158:22,23 162:7
192:4,10
**engineering** 34:24
**english** 2:11
**ensured** 111:8
**enter** 66:10
**entire** 18:22 87:11
119:13 136:19
**entirely** 81:16,18
108:4 167:24
**entitled** 54:7
**environment**
38:25 158:22,25
**environments**
171:9
**equal** 98:7,16
181:6,6
**equation** 82:24
84:6
**equipment** 8:22
8:25 35:25 36:3
39:14 40:2,3,8,12
40:16 41:14 53:21
62:23 65:20 87:23
92:18 94:25 121:1
121:4,6,14 132:4,5
132:9 147:21
172:4 175:25
**erase** 117:6
**error** 40:6 156:7
**errors** 75:22 156:4
180:15
**especially** 14:5
44:16 133:23
134:12 171:13
**essay** 65:11,13,22
**essential** 33:10
78:17
**essentially** 21:16
27:4 38:13 82:9
113:17 140:16

142:9
**established** 180:14
**establishing** 70:15
**estimate** 12:8
115:17 138:3,4
156:5
**et** 1:5,11
**etcetera** 20:4
**ethical** 19:22
20:17 53:22,25
54:7,17
**ethics** 19:17
**evade** 150:5,16
**evaluate** 21:4
81:25 82:3 167:4
182:12
**evaluated** 81:15
81:22 102:22
103:1,19,20 118:1
138:11,13 168:25
182:9,13
**evaluating** 80:19
92:7,12 93:5
106:24 118:19
156:9 171:20
**evaluation** 85:12
101:22 172:5
**evaluations** 136:8
**eve** 160:24
**event** 66:18
**eventually** 76:14
157:24
**everybody** 7:10
**everybody's** 71:23
**everyone's** 71:16
**evidence** 39:18,21
40:1,7,10,16,23
41:1 42:20 44:7
44:13,16,17 53:19
53:19 58:10 62:22
63:7,11 66:2

[evidence - fair] Page 15

112:19,22 113:14
113:17 114:7,17
117:9 121:3
122:12,18 129:3
130:19 131:20,24
132:4 134:16
135:25 153:6
156:7 159:4 162:9
162:12 169:2,7,10
178:14 181:7
188:1 190:21,22
191:8
**evident** 175:10,13
175:17
**evn** 4:6,7 24:21
25:7,16 27:15,17
28:1
**evolves** 148:24
**exact** 93:16
**exactly** 12:3 15:5
49:17 108:23
124:9 129:13
138:3 143:15
**examination** 3:5
6:19
**examinations** 3:1
40:11
**examine** 12:19
14:14
**examined** 6:7
14:10 101:15
158:21
**examining** 82:5
**example** 28:16
61:11,14 62:1
66:9 72:9 76:1
80:11 127:1,11
131:7 132:15
143:3 177:10
**examples** 90:23
95:11 99:18

113:22 172:11
**excepting** 81:19
**exciting** 18:11
**exclusively** 33:17
38:21
**excuse** 25:25
36:12 70:22 107:3
184:24
**exercise** 20:17
**exhibit** 4:2,3,4,5,6
4:7,9,14,18,20 5:1
5:5,8,11,12,15
9:20,23 10:5,7,16
10:19,22 14:20,23
25:3,6 27:11,13
29:24 30:2 37:1
37:13,15 43:20,21
52:5,7 54:11,12
55:1,3 56:22 57:2
60:8,9 67:22,23
69:7,8 76:17 97:6
97:7 182:23
187:13,13
**exhibits** 4:1 5:20
**exist** 151:6
**existence** 144:23
147:10 166:22
**exists** 83:11 131:5
**expect** 120:5
149:20
**expected** 147:6
**experience** 8:4
79:17 101:18
136:10
**expert** 4:4,5 11:10
12:14 28:5,7,11,15
28:22,23,24 29:12
29:15 89:11
**expertise** 28:5,19
28:24 29:14 92:7
124:20 163:7

**experts** 24:18
66:12
**expires** 194:25
**explain** 104:13
**explained** 186:11
**explanation** 57:22
**exploit** 151:3
152:11
**exploitable** 139:10
139:12 140:2
143:4,7 147:6
**exploited** 45:16,19
82:8 161:15
**exploiting** 139:25
**export** 104:5
**expose** 147:10
**exposed** 31:7
161:6
**exposes** 73:12
**exposing** 24:8
**exposure** 21:7,11
21:13
**expressing** 14:23
15:8,13
**expression** 134:6,7
**extend** 180:25
**extends** 150:23
**extensive** 46:13
175:12
**extent** 51:22
**extra** 172:1
**extract** 117:6
**extreme** 74:1
**extremely** 116:23
138:20 158:1

**f**

**face** 82:13 140:14
**faced** 107:6 110:7
144:20
**faces** 109:19 110:5
154:17

**facility** 169:18
**facing** 20:25 77:8
81:1
**fact** 32:22 69:21
71:20 86:9,16
89:19 106:22
119:12 127:19
142:15 143:11,24
144:5 150:8 152:9
153:7 155:8
167:19 168:8
177:13 180:16
186:2,5 190:23
**factor** 18:5 138:13
190:13
**factors** 49:25 50:3
50:8 118:18,21
**facts** 13:6 74:4
**fail** 50:24 167:9
178:11
**failed** 150:10
**failure** 39:14 40:5
40:8,16 179:6
**failures** 17:5 40:3
40:19
**fair** 1:5 14:25 19:9
19:11 24:9 29:4
31:5 38:6,7 40:4
50:7 53:5 55:13
56:5 59:10 73:9
73:11 74:5 77:8
77:19,22 80:5
84:25 89:24 109:9
112:15,16 115:13
115:24 125:13
128:10,11 129:10
141:15 148:5
162:23 171:18
175:18 176:8
181:17 185:6

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 212 of 243
J. Alex Halderman , Ph.D.                          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[fairly - fully]                                                    Page 16

**fairly**  23:19 89:25
  164:5 175:12
**false**  112:13
**familiar**  7:5 8:13
  8:19 16:10 45:2
  102:25 120:1
  121:15 131:2
  158:24
**family**  27:2
**far**  41:12,15,21
  42:17 47:14 109:1
  134:15 144:21
  191:2,3
**farther**  17:19
  39:25 47:11,22
**fashioned**  56:11
  56:15
**favirito**  16:19
**favor**  56:2 58:11
  122:11
**fbi**  189:11
**fdic**  90:2
**feature**  86:9
**features**  177:15
**february**  1:21 6:2
**fed**  103:16 133:20
**federal**  6:13 16:17
  55:19 59:9 112:2
**feeds**  103:9
**fewer**  148:16
  186:23
**field**  18:8 72:2
  94:5 96:22
**fifth**  69:24 70:3,4
  70:7 77:16
**fight**  1:5 162:24
**figure**  35:25 74:13
**file**  119:18 161:12
  169:23
**filed**  10:9 13:14
  131:13

**files**  67:14,15
  105:25 149:6,9
  161:5,16 190:7
**fill**  104:15,16
**financial**  4:12
  29:21 36:3 69:19
  89:20
**financially**  194:20
**find**  38:5 63:9 72:2
  99:6 119:5 130:19
  147:6,17 149:20
  152:20 184:15
**finding**  153:8
**findings**  31:5 32:1
  44:4 181:5
**fine**  11:2 16:20,22
  28:1 86:21 109:14
  132:22
**finer**  15:7
**finish**  33:7 79:21
**finished**  18:12
  67:23 187:14
**firmware**  188:24
  188:25 189:15
**first**  6:6,17 8:1
  33:11 38:18 39:12
  39:19 41:24 44:3
  44:4 45:9 47:2,8
  47:25 48:17 51:13
  56:24 57:2,5
  59:15 60:19 62:21
  76:19 77:11
  100:17 113:8
  117:5 137:10,13
  137:16 139:15
  172:11 181:11
  184:8 194:9
**five**  33:3 42:22
  49:8 117:24,25
  118:1,4,8 183:1

**fix**  55:11 128:21
**fixed**  20:2
**flow**  8:5
**focus**  17:13 19:10
  53:5 80:7 96:25
  167:18
**focused**  28:6 43:4
  80:12 92:17
  186:14
**focuses**  19:12
**folks**  34:23
**follow**  75:15 112:1
**followed**  72:19
**following**  67:22
  100:19 144:25
  164:18
**follows**  6:7
**foolish**  146:19
**footnote**  179:12
**force**  181:6
**forces**  22:14
**foreign**  89:9,17
  90:10 112:25
  114:25 115:12
  116:1,13 117:15
  171:12,21
**forensic**  191:17
  192:9
**forensics**  63:5,11
  132:8
**form**  6:15 46:9
  88:12 104:17
  156:22
**formal**  179:19
**forming**  94:13
**forms**  40:6
**forth**  63:6
**forward**  47:5 48:7
  56:5,7 69:20
  72:13 123:25
  176:13 183:17

**found**  63:11
  112:25 113:11
  118:24 149:13
  150:8 152:12
  160:13 173:14,15
  183:4,8,11,25
  184:2 185:6
  189:22 190:9
**foundation**  5:12
  96:13,16,17 97:3
  97:21 99:25
**foundations**  31:18
**founded**  20:23
  22:24 96:23
**four**  138:14 182:5
**fourteen**  49:9
**fourth**  49:6 55:8
  69:24 77:15
**fraction**  33:25
  155:14 156:6,23
  186:1
**fraud**  50:25 83:3
  89:20 126:17
  156:25 184:25
**fraudulent**  49:2,4
  122:17
**fraudulently**
  161:21
**front**  76:18 139:3
**frustrated**  86:23
**full**  13:17 38:18
  39:12 41:11 62:21
  63:3,21 64:1
  74:17 124:22,25
  145:25 159:2
  160:7 166:9 167:8
  189:25
**fully**  74:7 139:16
  139:18 160:8
  168:24

**[function - going]**                                                    Page 17

function  38:9
63:24 140:7,8,9,11
173:5
functional  158:19
functionality
167:24 170:9
functioning  121:2
121:4 122:7
140:23
functions  102:10
fundamentally
37:22 90:2
funding  59:3,6,9
funds  51:14
further  35:4,9
48:1 129:9 130:18
142:18 153:5
160:12,14,15
166:1 170:5 193:3
194:16
future  114:5,11
157:21

g

gain  23:17
gained  58:12
gaining  152:6
gaps  112:22
gems  123:1,6
189:18,19,21
190:5,6,8,11
general  4:13 8:5
16:3 19:21 22:2
22:15,16 29:21
38:2 43:10 53:13
64:25 73:22 76:16
98:16 99:7 140:21
145:4,4 147:11
148:24 177:23
186:8 192:4
generally  8:14,19
11:13,14,20 16:10

42:25 52:16 71:1
95:19 152:25
176:11,16
generate  44:17
53:19 190:21
generated  178:3
generates  133:18
generous  109:2
george  67:4
georgia  1:2,11
2:13 13:22,23
15:9,17,20,22,24
15:25 16:3,5
30:16 31:1 32:10
32:11,18 33:23
50:17,20 51:1,3,19
59:6 64:25 65:9
66:23 76:7 77:17
81:3 90:22,24
91:5,8,9,24 93:4
95:12,18 103:21
104:3 105:11
107:23 108:3
109:18 110:5,12
111:19 113:2,4
114:6,8,18 117:18
118:3,6 120:10,14
121:5,16 122:13
122:19 123:16,17
123:19 124:3,6,8
124:11 125:20,22
125:24 131:5,17
132:6,9 134:12,21
134:25 137:4
142:14 144:20
146:6,8,10,23
147:21 148:20
150:18 151:7
152:6,9 153:10,22
153:23 154:1,5,10
154:17,22 155:1,6

158:22,23,25
159:8,11,22 163:8
163:15,20,24
164:8,12,13,19,21
165:2,7,13,20,22
166:20 168:3
173:18,23 174:4
175:10 176:12,19
176:22 177:22
184:13,15 187:19
188:2,20 189:1,22
190:18 191:1,20
georgia's  8:14
30:20 31:3 32:6
32:13 47:15,17,18
47:24 48:8,10,13
49:1 50:10 77:7
77:20 79:11 80:18
80:25 100:19
102:6,23 104:4
106:24 107:7
108:20 109:18
114:22 117:10,16
123:24 131:18
134:16 137:24
140:5 146:12
149:3,16 152:1,23
153:6 157:7,9
158:21 160:2,10
161:9 171:16
177:3,20 178:15
178:17 190:15
192:15
getting  33:1 59:6
79:23
gideon  24:13,24
give  12:18 54:9
99:18 119:17
137:11 184:14
given  53:25 54:3
85:15 93:9 151:4

151:5 152:9,18,19
156:5,22 167:5
194:15
global  94:16
globally  94:19
go  7:1 10:2 12:16
15:15 17:19 18:13
35:15 37:1 40:22
46:12,23 47:11,21
48:1 76:25 83:4
88:20 96:9 100:10
102:3 103:18
118:15 125:12
126:18 127:13
128:21 129:9
130:25 142:17,23
164:22 172:11
174:20 178:22
182:14 186:24
191:2,3,16
goal  53:11 84:15
goals  59:4
going  7:5,9 9:22
10:1,3,14 16:14
23:6 25:5 27:24
37:15 38:4 41:7
43:20 47:4 55:1
60:7 65:10 69:20
72:13 73:2 76:10
76:12 87:23 88:8
88:23 90:3,5 92:9
93:10,13,14 96:8
97:5 108:14 109:8
120:22 123:25
126:1 127:18
137:7,11 141:16
142:17 144:22
151:24 153:18
154:24 156:25
162:8 169:14
173:18,24 174:1

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 214 of 243

J. Alex Halderman , Ph.D.
February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[going - higher]
Page 18

175:5,17 176:13
177:5,20 178:20
183:16 186:8
187:18 191:23
192:12
**gold** 142:6
**good** 6:21,22,23
6:25 56:10,14
76:11,14 77:23
89:6 90:19 94:17
100:11 111:17
117:22 134:8
135:4 141:14
144:8 174:8 176:5
179:23 183:4
188:22
**goodness** 187:20
**google** 175:22
**gotten** 84:7 97:16
147:21
**government** 4:13
29:21 54:2 112:3
115:1,12 116:2,13
117:15 140:5
169:19 171:6
**governments** 81:5
89:9 114:5,7,10
171:14
**grant** 51:14
**grants** 170:13
**grasping** 156:11
**gray** 157:6,7,8,14
157:16
**great** 66:16 90:25
91:25 117:23
**greater** 65:13
83:13 109:20
152:12 160:9
172:3
**ground** 7:1 164:2

**group** 22:23 24:17
35:8 38:10 66:14
96:18,23 182:12
**groups** 14:8 19:4
**growth** 18:6
**guess** 22:16 51:14
69:23 88:6 90:23
137:11,12 152:17
152:22 155:23
**guessing** 71:5
**gun** 41:6 114:15

**h**

**hack** 20:15 23:20
62:9,16 67:8
77:13 151:16
171:8
**hacked** 4:21 5:6
38:14 52:11 53:21
54:1 56:19 57:24
61:18 62:24 63:8
63:10 65:15 67:3
78:14 88:5 90:16
136:13,17,25
137:5,12
**hackers** 5:3 30:13
30:19
**hacking** 5:9 20:17
39:7 53:23 57:16
58:2 60:20 61:5
67:5,10 72:22
87:13,22 89:17,21
90:10 192:18
**halderman** 1:17
3:4 6:5,10,21 11:4
25:5,24 37:6 60:7
60:24 62:25 64:7
96:7 174:25 193:2
**halderman's** 4:9
4:14
**hand** 9:22 10:5,14
10:18 25:5 27:11

30:2 33:17 34:8
34:18 35:13 37:15
38:11,22 42:15
43:20 52:9 55:1
56:16 57:1 59:16
60:7 64:18,25
66:1,4 69:7 73:16
73:17 74:6,16
75:4,8,8,9,16,17
75:24 76:2,7
78:11 81:19,22
82:10 83:2 85:7
85:14,19 86:4,6,12
87:1 91:18 97:5
97:23 115:6,12,19
125:2 139:4
140:19 141:3
172:20 181:17
182:22
**handel** 16:19
**handful** 117:22,24
**handle** 71:10
109:8 131:8
**handling** 29:12
**happen** 23:23 77:7
78:2,3,4,6 81:10
81:11 94:20,21
103:11 169:6
**happened** 35:17
48:2 72:20 78:2
117:9 121:4
122:13,19,25
129:9 131:1 132:1
134:15 135:25
169:8,10
**happening** 51:19
51:21 129:25
171:17
**happens** 7:19,23
86:11 104:7
107:24 108:3,5

**hard** 74:3 129:24
**hardware** 98:4,9
98:14,14,16,17,18
141:13
**hash** 174:3,4,9,14
174:16
**hashing** 174:8
**hate** 131:16,16
**head** 94:3 144:14
150:2 182:8
**heading** 44:4
**headline** 58:15
59:14
**heard** 29:8 86:23
86:25
**hearing** 159:7
**heightened** 133:24
134:12 153:13
**help** 16:21 21:3,14
21:19,20 52:1
59:9 71:24 191:22
**helped** 16:2
**helpful** 124:21
**helping** 20:24 59:5
**helps** 20:2 21:6,10
153:8
**herman** 2:2 6:18
10:12,25 30:10
45:6 70:5 96:2
193:5
**high** 40:18 58:5
69:15 72:7 76:18
77:8,11 78:5 81:1
84:19 88:10 89:8
93:13,22 109:17
116:3 144:16
147:23 156:17
183:22 184:6,25
185:19
**higher** 116:5
117:18 137:22

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 215 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[higher - individuals] Page 19

144:11 148:25
169:17
highly 145:9
180:23 187:25
hill 43:1
hillary 66:8
hired 52:1
hiring 51:16
history 191:14
192:8
hold 69:4,10
home 45:15
hone 110:21
honest 171:8
hope 90:18
hopefully 151:25
hoping 15:6
hospital 20:15
hospitals 53:23
host 72:4 73:10
hostile 81:5 95:3
114:25 116:1,13
116:22 117:15
171:6,14 176:4
hour 11:6,20 33:2
house 4:10 29:20
127:12
https 23:6
huge 151:5
huh 7:13,13
176:17
human 17:23 18:1
40:6 97:18 103:11
103:12,15 104:20
125:10 126:8
humans 26:16
hundreds 23:13
hypothetical
72:14,15 81:18
85:14,15 166:24
167:12

**i**

icc 101:2,9 173:2
icp 101:2,6 107:20
138:5,6 173:2
icx 101:1,4
idea 141:14
identification
183:12
identified 14:2
identify 14:17
16:21 22:6,9
28:23 33:9 62:14
77:6
identifying 81:12
161:10
identity 23:5,9
image 189:11
images 172:19
173:17,19
immediate 57:13
immediately 46:25
162:7
impact 14:21 15:4
15:5,11 185:8
impacts 14:10,13
14:18
impersonate
120:13
impersonation
120:17,18,19,20
implement 124:17
124:22,24
implementation
100:20 146:5
165:14
implemented
110:12
implication 58:4
implications 19:22
53:22 54:1,7

implies 149:8
151:2
imply 51:24
importance 71:7
important 21:21
33:18 38:15 71:21
72:11,17 78:12,22
79:25 83:14 87:6
99:22 107:15
109:21,22 115:14
115:15 118:21
129:6 136:18
145:20,22 151:21
165:4,17
imposed 153:21
154:3 155:7
165:23
imposes 156:17
impossible 177:23
179:7
improperly 86:12
improved 110:15
improvement
36:21 39:2 185:1
improvements
51:15 53:13,15
inadequate 190:16
include 30:25 56:8
56:10 75:25
112:11 164:9
167:1 178:16
included 16:9 31:2
163:5
includes 49:1
112:8,10 142:5
including 30:15
33:15 34:23 35:8
36:3 42:2 81:1,23
90:19 122:3
142:11

inconsistencies
186:6
inconvenient
66:13
incorrectly 38:14
57:12 131:7
increase 120:5,9
170:3 183:18,21
183:24 185:4
increased 171:12
171:16,20 183:8
183:13
increasing 24:20
independent 33:20
independently
133:15 179:17
index 3:1
indicate 11:5,9
17:5 24:12 32:13
33:11 35:23 36:9
57:5 59:19 100:17
105:15,23 107:18
112:24 113:4
119:24 120:12
123:12 125:11
127:21 138:5,15
152:14 164:25
172:17 173:10
indicated 13:13
65:12
indicates 44:4
48:5,21 51:13
56:24 60:23 65:17
indication 49:8
70:13 112:4
indicator 144:8,8
indirectly 194:20
individual 63:12
individuals 15:23
16:1 129:17 161:3
182:16

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 216 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[induce - isrg] Page 20

induce 129:4
ineligible 131:7,14
inert 47:6
inevitably 139:9
infect 135:22
infected 150:4
infecting 190:6
infection 135:15
167:16
inference 31:5
134:23
inferior 36:9,10,15
infiltrate 46:8
77:15 117:13
160:19 170:8
infiltrated 169:3
190:5
infiltration 117:5
125:5 166:19
167:7 189:22
190:3
influence 53:11,13
influenced 169:15
inform 16:3
information 13:13
15:17 16:8 44:10
48:18 65:14 71:8
104:15,23 120:13
130:25 133:12,13
133:22 134:10,10
152:10 158:8
161:9,10,20,24
162:2,3 163:4
informed 15:21,21
16:2
informing 20:1
107:1 144:19,24
144:25
infrastructure
23:2 30:15 33:11
41:13,18 43:14,18

113:25 192:4,5,6
192:10,11
ingredients 191:4
inherent 43:5
initial 135:15
initially 18:7
inject 149:7
inner 158:20
161:7
input 105:6
insecure 58:17
59:8
insertion 49:2,4
insists 62:25
inspect 65:20
inspected 188:5
inspection 38:16
65:25 121:13
inspections 66:4
install 107:19
149:25 150:22
173:7
installation 149:5
149:6,9
installed 123:8
installing 108:23
instance 20:13
33:25 39:4 55:22
74:1 75:21 82:22
90:20 92:14
147:19 151:22
162:5
instructions
174:15
insufficient 173:22
integrity 25:2
181:19
intelligence 4:17
4:19 30:23 31:6
32:1,9 37:7,9,17
40:20 43:16,24

44:15 46:14 112:2
113:10 134:20
intended 161:6
intending 115:6
intends 173:23
intensive 147:23
intent 38:17 85:25
113:9 140:13
intention 15:12,14
15:15
intentionally
58:22 192:17,19
intentions 36:24
136:21
interact 26:16
interchangeably
111:3
interest 17:22
69:19 83:25 85:24
86:1,2,3
interested 17:20
194:20
interesting 61:21
interests 84:2,4
87:3 88:19,24
interface 104:10
165:6
interfaced 103:6,7
103:8
interfere 43:18
112:5
interfered 41:14
interference 112:6
112:11
interfering 112:12
international
61:24
internet 19:16
20:25 22:23 23:2
31:7 114:1 132:20
133:5 134:5 135:6

160:22 163:9
intervention
103:11,12 104:20
interviewed 60:16
introduce 132:13
introduced 64:14
132:3,5 149:1
introduces 170:14
introduction
106:4 132:11,12
intrusion 132:10
invalidate 150:21
inventor 69:11
investigate 20:10
20:21 129:9
investigating 17:5
20:11
investigation
30:23 130:18
134:20
invited 37:8,10,11
involve 26:21
28:21 42:24 52:24
69:13 87:13,13
122:2 167:6
involved 11:17,17
12:12 19:22 42:25
43:3 46:7 52:17
55:24 61:24 65:24
65:25 75:16 80:9
97:1 118:22 147:1
147:19 152:5
involves 34:3
146:14
involving 17:22
43:17
iowa 72:20,25
irresponsible
22:21
isrg 22:22,23,25
23:1,11 24:2

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 217 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[issue - leaves]                                              Page 21

**issue** 18:25 64:9
64:10 65:9 70:16
70:20,25 100:22
100:23 162:19,23
162:25 176:3
186:14
**issued** 23:12
184:17,19
**issues** 17:14 26:8
64:8,22 98:1
146:18 159:3,7
160:7
**item** 18:25
**items** 167:19

**j**

**j** 1:17 3:4 6:5
25:23 60:24
**january** 82:23
93:8 156:4 177:14
**john** 24:13,24
**josh** 25:22
**journey** 16:25
**judge** 9:9 67:6
**jump** 181:10
**jurisdiction** 38:21
85:5 124:23,25
127:10 162:5
**jurisdictional**
172:1
**jurisdictions** 41:4
79:4,6 115:18,21
115:25 122:10
124:16 131:23
145:21,22 154:18
154:23 171:13,13

**k**

**kadel** 181:14
**keep** 5:2 59:2
76:11,12 100:5

**kennesaw** 189:12
**kept** 100:3,5 121:4
**kerckhoffs** 99:24
**key** 36:21
**keys** 100:8 151:3
**keyword** 59:25
**kind** 8:2,4 16:24
18:3 19:21 21:12
33:1 44:2,17
50:18 56:2 58:7
66:20,23 70:17
72:22 75:19,20
79:7,12,24 80:2,10
94:19 99:13
100:13 102:16
109:12 111:3
114:21 115:20
118:18 122:23
123:10 124:15
126:19 127:22
131:24 132:8
146:15 147:24
148:14,21 152:10
152:21 167:10
172:3,5,11 176:6
180:5 183:12
184:9 188:18
**kinds** 36:15 43:11
53:23 59:14 72:3
73:13 95:13 105:8
106:9 175:14
176:2 177:6
179:10
**know** 5:5 7:8,21
7:22,23 12:1 17:1
17:12 18:2 27:24
28:2 31:25 32:17
34:25 41:12,15,20
41:20 45:1,9
48:16,19 49:1,14
51:20 61:10 62:13

62:17 63:9 72:14
74:13 75:10 95:1
102:11,14 104:5,7
104:22,25 106:1,7
106:10 107:8,21
108:1,13,23 109:3
112:17 113:21
119:4 120:11
121:22 123:9,24
125:21,23 126:20
127:17 129:24
131:11,25 133:11
134:25 135:2
137:6 138:2
144:13 148:18
149:15 150:6
151:6 152:4
153:21,23 157:9
159:6,22 160:2
163:15,17,22
164:15,21,24
165:2,4,13,16
173:18 174:5,7
178:19,19,23
179:16,19 180:7
181:25 182:7,8,8,9
184:15,16 189:20
190:20
**knowink** 100:22
169:4
**knowledge** 15:22
16:3 32:12,21
41:1 79:12,16,25
80:2 81:9 97:22
101:23 119:12
121:8 132:7
148:17 153:25
159:5 161:4
164:13,19 178:8
**known** 22:18
34:14 58:17 143:3

143:12 144:6,12
144:13 171:23,24
171:25 174:8
176:22
**knows** 23:9
**kurt** 9:12

**l**

**lab** 116:7,11,16,17
126:2,6
**labeled** 66:12
**lack** 28:24 110:9
110:16,17,17
140:11 153:11
**landscape** 155:19
**language** 138:16
**languages** 138:23
138:24
**large** 11:17 19:12
41:18 51:24 65:24
74:23 139:11
179:2,6
**largely** 110:9
**larger** 184:1
186:22,24
**largest** 23:11
**late** 130:22 131:11
**law** 123:16,17,19
131:5 184:15
**lawful** 20:3,5
**lawmakers** 55:10
**lawsuit** 12:12
**lawyer** 70:10
**lawyer's** 187:7
**lax** 145:11
**lead** 71:24 117:17
153:13
**leads** 34:12 71:9
136:4 139:12
**lean** 27:25
**leaves** 159:21

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 218 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[led - malware] Page 22

**led** 18:25 35:9
91:5 159:18
171:16
**lee** 15:25
**legal** 13:18 51:7
125:25
**legislation** 49:23
64:23
**legislative** 55:16
55:17
**lenawee** 194:4,24
**lesser** 83:13
**level** 22:18 49:14
50:3,19 55:21
72:8 76:18 80:1
81:14 87:16,17
88:15 99:11
107:12 109:4,19
109:20 114:23
115:11,25 116:11
118:17 129:5
139:22 144:9
147:23,24 152:8
155:4,20,22 156:1
156:18 160:15
162:15 166:2,12
167:4,21 168:4,10
168:22 192:6
**levels** 155:24
**license** 21:12,18
**lies** 19:6
**light** 178:14
**likelihood** 156:3
184:25
**liles** 45:3,9,11
**limit** 42:6 50:4
**limitation** 36:21
**limitations** 27:9
36:22 109:11
113:14 165:2,3,22
171:3

**limited** 81:3 100:7
145:24 146:15
147:5,16 148:1
158:12,14,15,16
158:17 175:3
178:25
**limiting** 34:14
49:13,15,20 50:11
50:14,18,23 51:2
78:12 123:21
**limits** 44:14
**line** 18:16 60:23
70:11
**lines** 39:15 88:23
89:6 91:13 128:20
137:18,21 138:5
138:10 139:11
140:8
**link** 70:15 71:3
168:17
**linked** 62:2
**list** 19:8 27:20
77:19 82:12,20
132:11 143:3
164:4,4
**listed** 25:20
**listen** 57:8
**literature** 111:2
**litigation** 12:13
16:11,12,14
**little** 12:11 16:24
17:8 26:4,25 28:4
49:7 65:10 76:10
76:12,15 105:13
132:18 133:7
184:21
**live** 162:2
**lives** 17:23
**llp** 2:11
**locally** 175:20

**location** 169:19
**log** 71:6
**logic** 177:1,2,4
**long** 30:9 39:15
54:19,20 75:9
88:23 89:6 128:20
**longer** 53:21 72:11
**look** 5:7 33:16
34:5,10 60:19
70:10 82:16 92:14
124:17 181:12
190:2
**looked** 8:20 63:8
118:13 133:15
149:14 189:21
**looking** 18:2,16
25:25 34:5,13
36:2 45:15 47:10
67:13 77:1 84:24
85:6 93:24 182:7
**loss** 152:25
**lot** 23:23 34:23
36:2 71:9 94:4,21
111:10 115:22
128:17 151:19
174:9 179:24
185:3,4
**low** 93:15,21
180:15,16
**lower** 110:20
144:11
**lunch** 76:13 94:17
96:7

**m**

**machine** 44:21,23
47:4 62:10 66:18
66:20 67:3,13
69:25 75:22,23
95:7,19,21
**machines** 15:10
37:21 39:14 40:25

43:11 44:8 47:4
48:6 52:24 53:1
53:16,18 56:10,14
58:17,20,21 59:2,9
61:5 62:23 63:4,8
63:10,12,14,17
73:16 95:8,12,14
95:17,25 157:2,7,9
186:9 187:16
191:5
**magazine** 57:12
60:12
**magnitude** 183:24
184:1
**mail** 105:16
120:16,18,23
**mailed** 37:11
**main** 27:21 59:14
67:14 77:20
102:17
**maintain** 71:3
178:8,21
**maintained** 135:3
142:1 192:19
**maintaining**
118:23 121:13
142:6
**maintains** 134:25
**maintenance**
145:2
**majority** 184:4
**making** 47:10 99:1
107:10
**male** 171:8
**malicious** 5:17
52:25 78:24 132:3
134:17 170:9
179:3
**malware** 123:4
126:2,7 132:2,5,10
132:11,13 135:18

150:4,9,16,20
172:18 173:4,7
174:14 177:12,15
190:6,13
**man** 66:17 147:22
**manage** 104:1,3
**management**
101:13 132:15
170:10 179:5
180:4 189:20
**mandela** 61:15
**mandela's** 61:20
61:23
**manifested** 84:4
**manipulate** 32:3
172:19
**manipulated**
31:13,16 44:8,22
44:24 112:19
**manipulating**
30:14 31:23 46:21
112:11
**manipulation** 5:17
80:9 89:17 90:10
112:7 113:7
122:16 189:23
**manual** 34:22
65:25 66:3 75:15
123:15
**manufacturer**
135:12 142:10
172:24
**manufacturers**
20:1 149:24
**map** 57:18,19
**margin** 186:14,20
186:22,24,25
187:1
**marilyn** 181:14
**mark** 7:10,11,21
10:2 64:13

**marked** 9:20,22
10:5,7,16,18 25:3
25:6 27:11,13
29:24 30:2 33:17
34:8,18 35:13
37:13,15 38:11,22
43:20,21 52:7,9
55:1,3 56:16,22
57:1 59:16 60:8,9
64:18,25 66:1,4
69:7,8 70:4 73:16
73:17 74:6,16
75:16 76:7 78:11
81:19,22 82:10
83:2 85:7,14,19
86:4,6,8,12 87:1
91:18 97:5,7,23
115:6,12,19 125:2
139:4 140:19
141:3 172:20
181:17 182:22,23
183:19
**marker** 73:19
**marking** 5:18 26:8
33:15,18,22 34:9
34:18 35:2,6,10,14
36:10,16,17,18
42:2,7,8,11,14,15
42:17,21 43:12
59:21,24 60:2
65:1 73:17,20
82:11,16,22 83:1
86:4 91:1,19 93:7
93:17 97:22 98:2
101:1,4 138:1
145:16,18,23,24
146:1 149:18
152:24 153:2,5
156:15 166:23
172:20 175:11
176:19 177:3,14

177:21,25 178:3
180:1 181:12,25
184:10 185:22
188:13,15
**marks** 97:19
181:14,16
**marriage** 194:17
**massive** 41:10
148:6
**match** 38:17
**material** 8:10
12:24
**materials** 13:16
**mathematical**
178:6 185:21
186:16,19
**matter** 16:11,16
16:17,19 72:12
92:10,10 106:14
106:18 151:15,19
175:4 177:4
181:21 189:4,10
194:21
**matters** 94:10
105:8 128:17
155:22
**meadows** 64:13
**mean** 25:25 41:7
51:24 54:2 63:18
63:25 67:20 73:1
73:17 74:20 79:16
81:18 87:10 89:7
95:3 103:7,9
113:6 128:17
136:16 147:7
154:14 186:22
**means** 23:4 61:16
76:8 122:3 147:14
169:13 194:12,13
**meant** 161:19

**measurable**
185:11
**measured** 185:2
**measures** 33:10
63:19 151:16
167:8 172:9
**mechanisms**
121:18
**media** 66:7 112:13
135:7,11,14,16,20
**medicine** 34:25
**medium** 5:5 56:19
57:3 65:11,13,22
97:20
**meeting** 66:17
**meetings** 42:25
**members** 43:2
**memoirs** 61:25
**memorial** 24:13
24:24
**memory** 107:19
108:1,24,24 109:8
**mention** 38:10,18
59:14 108:5,10
170:2 174:25
**mentioned** 75:24
**mentioning** 59:3
**mentions** 67:2
**merely** 66:13
112:12
**mess** 73:8,8
**messages** 112:13
**met** 6:23
**method** 23:19
69:25 70:14 71:6
74:7,17 81:25
82:3,5,20,24 85:7
85:11 87:19 91:23
92:1 106:13,21,25
107:3,8,9,11
108:11 135:22

Case 1:17-cv-02989-AT  Document 821-3  Filed 08/26/20  Page 220 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[method - newspaper]                                        Page 24

173:18 174:4
**methodology**
84:13
**methods** 14:25
15:3 27:3 29:10
80:10,16 84:22
127:1 129:7
132:11 141:10
**michelle** 25:23
**michigan** 1:19 5:8
5:16 6:1 18:14,15
18:20,23 19:1,2,2
21:23 58:13 60:11
65:25 67:20,25
81:24 117:23
119:1,4,5,8,15,16
119:21 182:21
194:2,6,24
**michigan's** 118:11
**microsoft** 25:23
**middle** 64:1 178:2
**midterm** 182:21
**milchev.com** 2:7
**miller** 2:3
**millions** 23:14
**mind** 80:17
**minimal** 65:19
87:16,18,20 88:8
**minimum** 87:17
**minute** 36:13
110:22 112:4
128:16 192:22
**minutes** 33:3 37:2
**misbehavior**
177:25
**misspoke** 17:10
**mistaken** 189:14
**mitigate** 21:14,21
22:5,12,14 119:8
121:23 125:16
159:2 170:15

**mitigated** 22:10
118:25 128:7,12
128:17,24 159:9
159:16 160:8
**mitigation** 160:3
160:13 173:21,22
184:6
**mix** 72:12
**mock** 67:3
**model** 21:1,12,18
21:19 95:20
**modeling** 166:17
**models** 166:21
**modern** 141:22,22
**modes** 167:7
**modified** 59:20
60:1,3
**modify** 149:8
**modules** 141:6
**moment** 67:19
**money** 58:19 90:3
160:17
**month** 178:17
**months** 123:10
159:6
**morning** 6:21,22
**move** 8:3 33:17
52:3 59:8 73:6
76:19 158:3 163:1
169:1 179:24
184:20,22 187:16
192:8
**moved** 38:22
188:16 191:15
**movement** 188:16
**moving** 168:9
**mueller** 134:19
**municipalities**
39:23 46:9
**murder** 63:23

**mvp** 103:1,4,13,19
104:10 133:7,8,11
133:11,11 160:23

**n**

**n** 21:9
**name** 21:8 25:22
71:16
**named** 63:24
**names** 182:16,19
182:20,20
**narrow** 100:8
**nation** 109:23
110:6,14 116:22
116:23 139:24
143:23 145:19
175:6
**national** 34:24
35:1,3,11 90:18
180:6,13 181:3
188:9
**nationally** 115:23
**nature** 134:7,13
**nearly** 101:18
**necessarily** 31:11
31:12,13 46:20
67:1 86:6 90:5
113:6 127:17
130:8 147:5,15
166:5 185:11
**necessary** 63:19
114:24 115:10,11
116:1,12 129:5
179:1
**need** 55:10 59:3,10
71:13 72:6 99:7
99:22 100:4,5
114:12 127:3,17
131:25 136:19
137:5 155:12,12
167:15 185:3

**needed** 57:10
142:17 151:3
185:4,14
**needing** 59:1
**needs** 118:7 139:6
191:20 192:8
**negative** 147:12
**negligently** 192:19
**nelson** 61:14
**network** 24:16,17
27:22 61:18 192:4
192:10,11
**network's** 24:13
**networking** 47:6
**networks** 45:18
**never** 21:23 39:8
41:20 113:11
140:25 146:17
149:10 152:25
180:10 187:18
188:19 191:23
**new** 4:20 5:13
18:10 35:15,22
47:16,17,18 48:9
49:1 52:6,10,13
53:2 54:22 57:11
77:22 82:7 97:2
97:10,13 100:20
109:18 110:2,7
114:22 121:6,10
121:19,21 122:19
122:21,21 124:1,2
136:3 137:4
141:18,19 142:16
170:14 175:11
177:3,21 180:24
**newer** 144:4
**news** 66:7 73:2
100:11
**newspaper** 71:17
71:23

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 221 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[nick - order]                                                      Page 25

nick 62:6
night 107:13
non 64:10 94:6
    177:18
nondisabled 141:1
normal 147:14
northern 1:2
notary 194:1,6,24
note 10:12 44:12
    159:13
notice 4:3 9:23
    10:1 90:3 156:25
noticed 60:3
notify 99:6
notion 89:5
novel 139:25
november 50:21
    51:2,5,9 160:24
    191:1,12
number 9:1 44:5
    45:15,18 49:16
    70:17 88:21 128:1
    128:10 130:14
    137:18,21 138:10
    139:11 144:5,11
    144:11,13 178:3
    178:17,25 179:6
    183:8,13,18 186:5
numbered 70:8,9
numbering 70:24
nw 2:4

**o**

objections 6:15
objectives 85:18
    85:20
observations
    156:3
observed 101:3,6
    101:9,12
obsolete 33:12
    35:24

obtain 15:17 66:17
    67:24 189:9
obvious 129:22
obviously 17:13
    41:24 44:5 81:8
    89:22 91:25
occasion 68:21
occur 15:3 181:8
    189:7
occurred 39:20
    45:1 131:21
    132:10 162:13
    190:9
occurs 50:9
offensive 114:12
    116:24
offer 20:20 21:14
    76:23 175:15
offered 100:16
offering 55:12
office 16:8 104:8
officer 144:18,24
    145:3
offices 29:11
    192:11
official 1:9 97:19
    97:20 108:12
official's 187:5
officials 16:4
    24:18 61:17,21,24
    76:1,3 86:11,14,16
    86:17,19,22,24
    104:1,2,5 105:25
    107:21 156:24
    163:24 174:14
    179:10 180:18
    185:24 186:3,7
offs 72:3
oh 18:16 45:7
    46:24 54:12,14
    60:13 68:20 70:9

74:20 92:4 151:18
okay 7:5 9:22 10:1
    10:24 12:6,8
    14:15 25:19 27:21
    28:12,20 30:19
    32:12,21 36:25
    37:3 45:12 46:12
    53:5 56:8 57:5,17
    61:11 63:13 67:11
    69:4 71:15 77:4
    77:24 81:7,15
    82:9 96:2 97:5,12
    98:12 101:22
    102:1,22 106:7
    107:18,25 108:17
    109:14 116:7
    118:17 122:5
    128:22 130:12,17
    137:16 158:11,16
    168:20 174:18,22
    176:15 187:10,15
    187:17
old 56:10,14 80:10
    122:22 123:1
    146:12
once 131:12
    153:11
ones 21:21 82:14
    83:15 109:3 115:8
    122:1 165:4,17
    176:3
ongoing 76:11
online 56:18 89:13
    89:16,25 133:22
    133:25 134:23
onscreen 125:6
open 98:5,10,23
    98:25 99:3,5,14,19
    100:1 141:13
    163:12

operated 191:11
operating 143:11
operations 159:2
opine 100:18
    185:24
opining 145:6,9
    152:23,24 168:3
opinion 13:18
    15:13 51:7 77:6
    77:23 79:11 80:23
    90:24 91:3,9,13
    114:22,22 115:10
    155:2 168:15
    190:4 191:16
    192:20
opinions 14:19,23
    15:8 72:24 76:23
    80:18 81:7 94:13
    100:15 136:5
opportunity 17:24
    17:25
opposed 21:17
    33:24 138:8
    140:20 173:16
opposes 181:21,23
    181:24,25
optical 33:13
    37:20 38:10,12,13
    38:23 39:5,7
    41:25 43:12 77:15
    77:16 78:24 79:3
    82:12 86:7 88:6
    122:16,23 132:14
    138:6,8 149:19
    150:14,15 172:18
option 33:16,20
    111:12
options 85:4
order 9:6,8,9
    33:19 35:16 53:20
    114:12,13 122:24

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 222 of 243
J. Alex Halderman , Ph.D.      February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[order - part]                                                          Page 26

124:18 127:18
131:25 140:23
155:15 184:23,24
186:13
**organizations** 4:8
27:16,17,18,21,25
28:3
**originally** 96:24
**ought** 58:6
**outcome** 14:7
38:15 50:25 62:5
83:3 84:18,20,23
87:24 88:22 90:18
91:6 114:10 115:9
123:23 137:7
140:24 157:1
**outcomes** 122:18
190:17,18
**outdated** 141:5
142:25 180:2
**outline** 79:18
125:1 128:6
186:19
**outlined** 39:19
79:8,18 121:24
128:12 129:16
130:20 160:4
183:7 185:20
**output** 93:22,22
**outside** 94:11
160:4
**outwardly** 191:9
**outweigh** 84:5,9
**oven** 133:4
**overall** 15:22 59:7
83:19 103:10
105:1 107:15,17
154:8 157:13
168:16
**override** 64:22

**overseas** 169:12
**overvoting** 76:1
80:11
**ovr** 103:1,4,13,19
104:11 133:7,14
133:16 161:22

**P**

**p** 2:10
**p.m.** 25:13 193:6
**pad** 101:16 163:3
163:6 165:5,10,15
165:18,19,21,25
166:22 167:20
168:9
**pads** 8:22,24 163:9
163:16,19,24
164:14,23 165:1
166:12,23 167:17
168:4,14,16,17,22
**page** 3:3 4:2 10:21
25:9,10 33:9
34:21,21 35:23
36:6 37:19 38:18
39:11,12,12,19
41:11,22 44:3
45:2,5 46:12,12,23
46:25 47:10 48:5
51:12 54:14,15
55:8,9 57:5,17,18
58:14 60:20 62:20
63:21 64:1 65:10
67:1 69:24 70:2,3
70:7 77:3 100:12
105:15 112:24,24
161:24 179:13
**pages** 8:12 70:8
**paid** 24:1,4 68:13
68:14
**panel** 25:18,21
26:1,3,5,7,7

**panelist** 25:20
**panels** 25:16
**paper** 28:17 29:9
29:13 33:13,17,19
34:3,4,5,6,6,8,11
34:13,21 35:13
36:7,9,11,23 38:12
38:22 41:25 47:5
48:22 49:2,5
53:17 54:7,16
56:11,15 59:15,16
59:17 64:18,25
69:16 70:15 73:16
73:18 74:6,17
76:7 78:11 80:10
81:16,19,22 82:10
83:6 85:8 86:5,6
86:13 91:19 93:5
93:7,23 97:19
108:5,11,14,17
109:6 110:18,23
110:24,25 111:11
115:7,12,19
123:15 125:2
127:23 128:5
136:20,20,21
139:4 140:12,12
141:3 163:20
164:4 173:16,19
173:24 178:6,18
179:11,13,15,16
181:17 185:13,20
**paperless** 33:13
34:2 36:19 56:9
56:14 79:5 111:16
111:18 181:24
**papers** 54:4 92:25
93:24 94:4,11
**paragraph** 11:4
30:12 31:17,17
37:20 38:18 39:12

41:11 44:5 56:9
57:19 58:15 59:13
59:19 62:21 63:21
64:2,6 65:17 66:6
76:25 77:5 79:19
100:12,17 102:3
103:18,25 105:14
105:23 107:25
109:15 111:20
113:4,22 114:4,21
132:2,18 133:3
134:3 135:5 136:5
136:12 139:8
141:5 142:25
143:6 144:17,19
146:8,21 147:4
148:14 149:5
150:3 151:1 152:3
153:18 158:9
159:1 160:19
163:2,18 164:12
169:2,11 170:19
172:9,17 173:10
174:12,25 175:9
177:19 178:7
180:1 181:10
182:14 185:24
187:10,12,14
189:18 190:14
**paragraphs** 39:19
70:22 77:1
**parallel** 177:19,21
177:24
**pardon** 48:12
**parkwood** 2:12
**part** 15:16 19:18
26:8,10 29:6
52:12 53:10 56:7
59:7 66:15 72:25
84:6 93:8 103:4
107:1 108:18,25

Case 1:17-cv-02989-AT    Document 821-3    Filed 08/26/20    Page 223 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[part - point]                                                                Page 27

137:3 139:6
141:21 142:14
146:13 147:18
154:7,7,8,13,14,15
156:2 167:13
168:4 186:5
**partial** 65:15
**partially** 58:13
**participated** 24:21
52:20,22 53:6
**participating**
27:17,19 52:13
**particular** 14:25
15:9 17:16 18:25
20:4,6 65:9 70:14
70:19 76:22,24
84:1 88:22 122:11
143:9 144:1
149:24 156:8
**particularly** 36:22
85:6 99:14 138:17
158:15,17 186:14
**parties** 161:15
194:18
**partisan** 64:7,9,10
64:16,17,21,24
65:4,5,8 66:9
122:11
**partisans** 66:13
**parts** 31:6 65:24
65:25 99:22
**party** 61:20
**passed** 55:22
**passwords** 151:3
**patent** 5:11 69:4
69:10,13,20 70:10
**path** 56:5,7 91:10
91:12,24 134:1
165:19 166:22
167:2

**paths** 166:17
**pattern** 46:7
**pay** 36:1
**pcc** 158:11,12
169:4
**peer** 179:15,17,20
182:3 184:8
**penetrate** 41:13
**penetrating** 30:13
**pennsylvania** 8:24
67:25 118:14
119:1 165:9,17,24
166:13,21,25
167:24 168:11
**pennsylvania's**
168:21
**people** 15:20 16:2
20:10,16 91:7
94:7,8 99:5
105:16 111:2
120:6 131:7,14
143:18 177:11
182:1
**percent** 58:1,3,5
115:21,24 116:3
156:19
**percentage** 93:16
115:17 116:4
**perfect** 8:1
**perfectly** 56:1
83:12
**performed** 49:24
50:21 67:6,7
164:13,15,16
**performing** 146:9
**period** 18:5 121:7
**permanently**
163:16
**permission** 20:14
**person** 71:4
105:19,22 120:18

120:20 133:19
153:12
**personal** 32:12,21
73:6 91:13,15
101:22 113:19
136:9
**personally** 56:13
95:13 101:3,6,9,12
101:15 102:25
158:21 163:2
**perspective** 18:2
74:9,11,16,19
75:12 77:21 91:7
98:13 185:21
**ph.d.** 1:17 3:4 6:5
17:10 183:3
**philip** 179:13
**photo** 120:14
**phrased** 44:13
**physical** 25:9
26:22 33:9 38:16
69:24 70:3 121:8
121:17,22 122:1
151:1,4,6,8,9,11
151:14,19,20,21
151:25 152:2,2,5,6
152:8,9 173:7,16
173:24 175:16,18
176:12,18,19,23
**piece** 29:2 34:12
59:17 67:18,20
99:11 102:12
114:22 126:6
132:8 140:2,25
143:13,16,17
144:7,22 160:21
170:4,6,7 177:9
**pieces** 8:2 71:8
76:19 92:17 100:4
132:19

**pilot** 50:14,15,18
123:21,23
**piloting** 124:21
**pirate** 169:24
**place** 40:12 41:2,3
77:18 78:23 87:15
87:22 108:3 121:1
121:3,18 128:20
140:25 145:3
162:11 176:25
**placeholder** 52:5
**places** 29:10 58:25
191:6
**plaintiffs** 1:6 2:8
8:11,11 9:13
12:15,22 13:2,5
15:18 102:2
**plan** 12:6,7 124:4
**planned** 125:20,21
**plans** 123:24
178:15,24
**plant** 171:7
**platform** 56:18
103:3
**plausible** 56:7
93:14 105:3,9,10
129:20
**plausibly** 139:20
**play** 64:16 84:2
**player** 102:18
**players** 102:17
**please** 26:25 127:8
187:6
**plenty** 95:8
**point** 15:7 21:20
34:21 35:11 48:7
49:18 54:6,9 61:8
61:11 62:11 64:9
64:10,17 65:13
71:5 76:13,14
88:10 89:1,2

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 224 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[point - primarily]                                                    Page 28

91:25 92:3,4,5
94:17 98:1 109:16
132:21 136:18
138:21 148:5
156:18 158:2
165:14 175:2,4
178:1 189:6
**points** 41:22 44:5
163:14
**policies** 84:24
**policy** 55:10,12,19
59:4,11 63:19
72:12 74:25 83:19
84:9,12,15,20,20
84:23 85:4,4,18,20
85:24,25 86:2,3
87:3 88:14,17,17
88:24 89:1,7,9,10
92:18,21 94:10
134:9 148:3,8,12
164:8 181:21
183:16
**policymakers**
53:11 83:25 90:25
91:9,24 93:4
**political** 55:15,17
55:24 66:14 68:15
68:18,23
**politically** 56:5,7
**politics** 28:2 64:16
64:18,21 65:8
66:9
**poll** 8:22,24
101:15,16 104:6
163:1,3,3,6,9,16
163:19,24 164:14
164:23 165:1,5,10
165:15,18,19,21
165:25 166:12,21
166:23 167:17,19
168:4,9,13,16,17

168:21 184:13
**polling** 29:10
40:12 58:4 65:14
87:15,22 108:3
121:1,3 126:22,25
127:11 128:20
191:5
**polls** 57:20,22
163:12
**port** 151:2
**portion** 65:11
179:9
**position** 39:13,16
42:11 58:20
144:18 145:8
180:9,11 183:17
**positions** 42:14
97:13 98:1
**possibilities** 58:8
**possibility** 15:2
44:24 63:10
**possible** 38:1 51:1
51:3 55:24 71:25
72:22 75:5 80:20
81:12 82:7,13
85:2 87:7,15,21
88:1 94:4 109:5
126:20 129:4,14
147:16 149:7
150:5 157:21
162:3 164:14,16
177:12 178:20
179:3 189:8
**possibly** 84:24
94:20 128:13
164:1,9
**post** 5:1 18:3 49:9
49:10 50:1 54:23
55:5 179:9
**posted** 67:2

**posture** 32:17
145:9 154:9
157:13
**potential** 14:20
20:21 23:24 26:20
50:24 52:25 76:3
78:8,14 79:13
80:3,9,19,22
117:21 119:6
**potentially** 39:17
76:4 90:12 94:20
117:4 122:8
126:23 134:1
151:12 161:7
171:14 174:17
179:10
**power** 87:11
**powers** 89:17
90:10
**practical** 84:15
**practically** 84:4
**practice** 104:4
124:22 139:13
141:7,8 145:5,11
145:21
**practiced** 174:14
**practices** 13:22
15:10 28:16 29:16
34:22 141:23
145:1
**prayer** 187:5,7,9
**pre** 50:1 57:20
126:22 178:9
**precautions**
133:24 155:16
**precinct** 95:21
101:2,7 138:8,11
138:12 139:4
149:19,21,22,25
163:21,21 175:5

**precisely** 111:2
**preconditions**
115:10
**prefer** 74:21 98:13
98:15
**preferences** 97:20
**preferred** 20:18
98:8 99:16
**premise** 83:9
**preparation** 63:22
**prepared** 8:21
12:10 124:9
**preparedness**
162:16
**preparing** 12:2
**presence** 174:13
194:12
**presidency** 68:24
**president** 55:23
68:9 111:24
**presidential** 62:24
113:24 131:17
**pretend** 23:21
**pretty** 58:5 65:5
71:5 83:17,18
84:20 109:15
140:1 144:16
**prevent** 116:21
121:1 151:9
**prevented** 110:4
119:25
**previous** 95:12
137:24 159:17
180:22 188:23
**previously** 34:25
43:25 152:17
**primarily** 26:20
80:7,12,14,23
96:21,23 100:13
108:8 140:19

**[primary - publicly]** Page 29

| | | | |
|---|---|---|---|
| **primary** 16:2 | **problem** 16:24 | **professor** 18:17,22 | **protected** 102:21 |
| 70:13 76:8 168:18 | 41:2 72:4 142:14 | 60:23 | **protecting** 91:7 |
| 168:18 | 143:9,15 151:4 | **profile** 60:11 | 176:7 |
| **princeton** 17:1,18 | 152:11,13 179:2 | 62:20 | **protection** 90:2 |
| 18:12 19:1 69:21 | 180:24 183:24 | **profit** 22:24 | 102:22 150:5 |
| **principle** 98:6 | 186:23 | **program** 135:24 | 152:8 167:8 175:2 |
| 99:8,21,24,25 | **problems** 14:2,4 | 165:5 | 175:4 177:6 |
| 100:9 111:6 | 14:16 17:21,22 | **programing** | **protections** 64:14 |
| **principles** 5:13 | 18:11 26:20 36:17 | 138:24 | 78:16 176:25 |
| 19:21 97:2,11,18 | 62:18 72:5 73:3 | **programmed** | **protocol** 177:5 |
| 98:3,22 | 73:10 77:20 99:4 | 86:20 140:9 180:3 | **protocols** 26:11 |
| **print** 71:16 125:6 | 110:16 118:24 | **programmers** | 27:1 151:20,21 |
| 179:1 | 134:13 152:14,21 | 169:13 170:21 | 177:2,20 |
| **printed** 60:3 | 153:17 180:25 | **programming** | **prove** 147:11,12 |
| 126:11 128:2,9 | 181:8 186:2,6,10 | 105:25 135:11 | 147:13 |
| 130:15 178:9 | **procedure** 6:14 | 138:16,23 | **provide** 11:10,13 |
| 180:15 181:13 | 124:22,25 185:7 | **progress** 159:14 | 12:22 13:2 27:3,6 |
| **printing** 71:23 | **procedures** 110:13 | **progressive** 27:22 | 27:7,10 33:19 |
| 171:10 | 154:1,1 176:23 | **prohibit** 167:24 | 51:17 66:2 92:9 |
| **printout** 52:10 | **process** 35:16,17 | **prohibition** | 117:2 143:19 |
| **prints** 59:17 | 63:22 65:21 75:2 | 165:18 167:1 | 175:17,20 177:5 |
| **prior** 7:17 41:5 | 86:23 88:23 89:2 | 168:1 | **provided** 8:11 |
| 47:1 106:3,5 | 91:5 103:17 | **project** 27:23 | 12:24 102:2 163:5 |
| 107:20 181:2,2 | 105:22 106:2,3,5 | **prompt** 184:18,20 | **provides** 24:5 |
| **privacy** 70:17 71:1 | 106:11 120:2 | **prompting** 183:8 | 175:2 |
| **privilege** 6:16 | 131:2 142:5 | 183:11 | **providing** 12:13 |
| **pro** 11:24 68:12 | 159:16 163:11 | **prompts** 183:25 | 188:8 |
| **probability** 88:11 | 164:10,11 166:11 | 184:14 185:2,5 | **provision** 131:8 |
| 93:11,13 184:6 | 169:3 171:2 | **promulgated** | **provisional** 120:2 |
| **probable** 132:9 | 172:12,13 174:16 | 154:2 | 120:6 128:13,14 |
| **probably** 16:1 | 174:16 | **proper** 109:9 | 129:17 |
| 20:16 22:1 29:5 | **processes** 104:19 | 110:12 | **provisions** 131:5 |
| 46:22 57:21 58:6 | 124:12 | **properties** 157:22 | **public** 42:25 52:4 |
| 61:6,10 62:17 | **produce** 21:6 35:7 | **proportion** 82:25 | 69:22 94:10 |
| 71:5 76:14 92:14 | 39:5 131:24 179:8 | **propose** 120:25 | 161:10,13 177:22 |
| 94:17 98:7 109:21 | **produced** 8:10 | **proprietary** 98:19 | 194:1,6,24 |
| 116:6 117:16,25 | 172:4 | **pros** 99:15,17,18 | **publically** 154:1 |
| 120:8 129:11 | **product** 141:19,20 | 99:19 | 158:7 |
| 138:2,3 139:23 | **products** 27:6,7,10 | **protect** 33:10 | **publication** 60:17 |
| 155:21 156:12,14 | **professional** 91:16 | 175:6 176:2 | **publicly** 106:12 |
| 157:3 | | | 125:23 |

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 226 of 243
J. Alex Halderman , Ph.D.     February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[published - recognize]                                          Page 30

published 35:21
53:24 54:4 82:23
92:12,25 93:5,7,24
94:3 177:14
184:12
pull 31:20 41:7,9
114:18
pulling 114:15
puppeteer 66:8
purchase 47:3
121:19,21
purchased 48:6
purpose 6:12 34:7
34:11 164:9
purposes 6:13
12:23 14:9,11
108:13 133:22
176:6,7
put 15:7 77:17
88:6 133:22 148:4
187:13
putin 41:8 111:24
putting 39:15

**q**

qualified 109:7
119:18
qualifiers 95:1
quantifiable 88:11
88:21 148:1,2
156:9
quantified 118:6
172:7
quantify 93:9,15
172:8
quantitative 82:24
94:1
quantities 178:9
178:21
question 7:9,10,11
7:17,20,24 22:8
27:21,24 35:5

39:24 40:5 49:23
62:7 73:5 74:18
82:18 84:13 85:2
85:16,17 88:18
92:6,8 94:9 95:15
111:4 116:24,25
117:22 127:8
130:11 140:14
147:18 151:22
157:12 162:22
166:10 173:25
181:5 183:21
184:9 186:18
187:3,10 188:22
189:7 191:6,22
questions 17:3,18
19:18,25 20:2
44:2 55:20 66:11
84:12 94:16 112:3
192:14 193:3
quick 20:7
quickly 68:25
quite 30:6 93:19
94:4,9 142:22
151:10 157:4
quote 45:12,21
139:14
quoted 45:13
qvf 119:18,19,20

**r**

race 126:18,21,23
127:10,12,12,12
127:14
races 126:25 127:1
182:6
racial 14:1,5,8,10
14:12,14,20,24
15:4
racially 14:17
15:10

raffensperger 1:8
6:12
raise 15:2
random 178:1
range 51:24
157:18 159:2
160:7
ranked 19:3 118:5
rate 11:6,10,20,25
148:25 164:1,3
177:11 180:14,20
181:11 184:22,23
185:20 186:11
rates 185:8
rattled 45:17
rattling 46:10
rdr 1:22 194:24
reach 113:15
reached 100:15
reaching 80:18,25
81:7 85:9 107:6
108:19 109:1
176:20
read 13:8,10,13,16
13:16 62:22
103:17 125:8
128:6
readable 97:19
125:10 126:8
ready 8:2,7,18 9:4
real 20:7 23:10
64:22 175:18
realistic 182:15
reality 61:2 72:16
116:21
realized 120:22
really 19:2,10
21:19 30:8 74:3
98:19 105:5
106:14 111:4
115:5 116:25

136:15,23 137:3
152:3,24 167:15
reason 22:18 29:1
51:6 56:24 62:22
74:12 93:3 98:12
98:15 114:9 134:9
136:19 137:10,10
137:13 139:6
144:20 159:21
173:5,13
reasonable 56:5
164:6
reasonably 138:21
reasoning 85:22
reasons 74:21,25
83:19 84:9 85:4
90:19 137:12
176:5
recall 12:3 24:14
25:20 29:22 37:9
43:8 45:11 52:13
56:19 66:18,20
150:1
recalling 158:18
receive 24:3
119:25
received 24:12
48:3
receives 133:12
recertification
142:24
recertified 142:12
142:20
recess 37:4 60:5
96:4 127:6 133:1
174:23 192:23
recipe 143:19
recipes 153:9
recognize 24:25
182:17

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 227 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[recognizing - replaced] Page 31

recognizing 25:1
recollection
189:15
recommend 34:16
34:17 41:23 63:19
159:25 165:24
recommendation
35:12,20,22 47:7
47:11,15,20,24
48:15,23,24 55:21
92:19,21 181:3
183:16
recommendations
47:1,25 51:12,14
56:4,8 59:11
111:10 165:13,23
188:13
recommended
55:13 153:24
160:8 180:6
recommending
35:12 55:19
133:21,23
recommends 47:3
47:4 48:11 49:6
51:15
record 56:25 57:6
57:10 59:17,19
60:2 96:2,5 97:19
107:4 110:18,23
110:24,25 111:6,7
111:14,16 161:10
161:13 192:21
records 38:16 66:4
111:12,13 117:6
120:24 123:13
127:23 162:4
163:20
recount 65:21,24
67:18 123:15
127:22 130:2

recounts 58:12
63:3 65:16,18,18
67:21,25 68:6
recover 129:24
redacted 44:5
redactions 46:13
reduce 87:15,17
88:20 166:1,2
reduced 109:24
194:11
refer 10:3 16:12
26:24 36:6 59:18
80:4 110:22
reference 30:13
42:22 54:14 59:15
66:6 113:25
120:17 139:24
149:18 188:18
189:18
referenced 192:15
referred 80:11
113:3
referring 16:13
26:15 45:4 55:18
63:5 70:14 121:25
126:12,16
refers 26:16,16
120:17
reflect 136:20
reflected 141:23
reflects 36:24
140:13
regard 45:24
regarding 8:24
63:14,16 178:12
178:17 188:17
regime 151:8
region 179:2
registered 162:5
163:20

registrar 104:22
105:4,6 162:8
registrars 162:10
registration 30:15
30:20 31:3,8 32:4
32:6,14,18 43:14
45:24 46:2,5
102:6,9,15 103:10
103:14 104:2,3,12
104:14,17,17,21
104:23 105:3
117:5,10,14,20
118:2,14,20 119:3
119:22 120:7,24
129:18 133:18,21
134:24 135:1
158:3 160:11,20
161:3,9,17 162:16
162:18,20,23
163:19,23
registrations
161:21 162:13
regular 120:1
126:25 127:11
reiterating 41:22
reject 86:7 89:5
rejects 86:12
related 43:6 48:23
50:11 51:19 83:5
116:7 123:25
124:6,8
relative 106:24
108:19 109:1
110:20 118:17
143:25 144:19
156:10 166:12,15
relatively 102:20
129:22 141:7
184:1
released 35:22

relevant 67:2
108:7,9 186:15
reliable 183:4
190:2 192:12
reliably 157:25
177:24 185:11
reliance 170:16
relied 13:3 164:21
rely 94:11 146:17
146:19 176:7
188:12 191:18
relying 158:7
163:4 180:19
remain 99:23
remainder 48:13
remaining 39:24
167:7
remarkable 64:3
136:15,24
remember 124:10
133:10
remote 122:3,6
remotely 175:19
removable 135:7
135:11,14,16,20
removal 107:25
remove 47:6
removing 108:24
render 47:6,20
87:11
repair 99:7
repeat 70:2 85:2
88:18 127:8
rephrase 7:24
62:7 170:19
186:18
replace 33:12 34:2
35:24 56:14 58:19
58:21 59:1
replaced 119:13
192:1,3

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 228 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[replacing - right]                                         Page 32

replacing 36:3
56:9
report 4:4,5,18 8:4
9:2,4 10:9,21 11:5
12:2,13,20,23 13:6
13:25 14:2,4,9,12
14:17,19 15:8,16
15:18 16:9 17:2
35:4,16,21 40:21
43:17,23 45:13
62:4 76:17,21,22
77:25 81:8 89:4
90:24 94:13,18,19
96:8 100:11,14
112:25 113:3
122:17 126:13
167:13,15 170:16
176:3,21 186:19
186:23 187:14
188:10,12
reported 66:5
67:15 170:23
reportedly 62:3,3
89:20
reporter 194:5
reporter's 7:6
reporting 43:15
62:4 186:2
reports 10:2
121:15 135:17
186:6,10 188:14
republic 68:24
request 7:16 33:24
69:22
requests 133:18
require 48:6 49:17
50:15 79:17
104:20 122:1
123:16,18 124:3,4
160:12 178:21
179:6 184:17

required 49:24
75:18,20 104:22
105:7 122:24
167:9 178:12
184:23
requirement
50:20 51:8 120:14
123:22 125:25
requirements
50:10 51:10 121:9
121:23 151:6
152:2 154:16
requires 50:14
123:19,20,21
150:18 163:8,11
163:14,20 184:13
184:15
requiring 184:19
research 18:11
19:6 22:23 35:5,7
35:8 42:9,16 53:7
53:9,24,25 54:8
55:13,15 60:25
72:23 80:12
126:10 172:13
175:13 177:8
180:12,19 182:12
183:20 185:13,16
185:18 187:23
researched 27:5,8
researcher 38:5
researcher's 187:9
reserve 6:15
resiliency 115:15
resources 9:1
143:22
responsibility
146:4
responsible 19:25
responsiveness
6:16

result 12:25 39:6
40:5,25 55:25
57:15,21 58:2,11
61:7 62:15 90:5
92:21 93:21
119:13 128:18
156:8 157:22
160:14 179:19
184:6
resulted 16:8 58:8
91:6
resulting 39:15
results 27:4 58:9
66:3,5 69:18
75:14 118:23
123:13 180:25
190:23,25 191:6
191:13,18
retain 21:2 69:19
retained 68:3,5,18
69:1
retaining 21:5
return 108:1
returned 108:12
108:15,18
reveal 40:12 66:4
review 8:17 9:3
11:21 69:15 70:22
92:15,24 99:2
104:23 121:13
123:5,10 126:11
136:7,9 146:10,13
147:1,20,23,24
160:2,13 164:22
171:4,5 179:20
180:14 184:12
190:8
reviewed 8:9,9,16
8:23 9:7 43:16,24
44:1 53:20 67:15
102:2 121:11

123:1 124:5,7
128:1 133:19
154:6,8 160:4
163:3 172:15
173:15 176:11
178:11,13 179:15
179:17 182:3
183:14 184:8
190:22
reviewers 152:11
reviewing 118:18
123:7 128:9
130:14 182:6
183:9
reviews 134:14
richard 15:24
rid 147:21
rigged 62:4
right 6:21 8:1
10:14 11:4 12:11
18:18 20:3,5
22:13,14,20 25:12
25:22 30:12 31:21
33:5 34:10 35:2
36:25 41:8 44:11
44:19 46:13,22
47:11,23 52:3,23
53:14 54:25 57:8
57:9,11,19,25 60:7
64:1 66:24 68:1
72:1,6,13 73:5,9
74:8 76:5,8,21
78:9,15,20,21,25
79:1,3,9 80:13
83:6,7,12 85:8,19
86:5 87:9 89:18
90:8,11,15 91:11
91:14 92:23 94:14
96:7,13 99:9
100:10 101:25
103:6 105:17

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 229 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[right - sabotaged] Page 33

| | | | |
|---|---|---|---|
| 106:20 107:10,11 | **rights** 13:23 | 158:24 166:1,12 | **rom** 106:5 |
| 107:16 108:20,21 | **rigor** 147:19 | 166:15 167:4,16 | **romulus** 1:19 6:1 |
| 109:10 110:8 | **rigorous** 36:20 | 167:21 168:4,10 | **rote** 11:18 |
| 111:25 112:21 | 123:14 124:4 | 168:13,22 169:5 | **rpr** 1:22 194:24 |
| 113:7,12,13 114:2 | 125:19 128:8 | 169:17 170:3 | **rule** 22:3 186:8 |
| 116:9,19 117:15 | 130:5,9,15 140:15 | 171:12,17,20,25 | **rules** 6:14 7:1 |
| 119:23 120:7,8,23 | 146:16 155:13 | **risks** 14:16 21:15 | 121:9 124:5,7,10 |
| 121:24 125:14,17 | 171:4 179:11 | 35:10 43:3,13 | 176:11,14 178:12 |
| 125:18,22 126:13 | **rigorously** 115:7 | 52:23 53:8,20 | 178:17 184:17,19 |
| 126:22 127:17 | 125:11 128:25 | 71:1 75:11 79:22 | **run** 131:14,17 |
| 128:13,16 130:20 | 129:4 136:22 | 80:13,15,17,19,20 | 150:13 180:2 |
| 131:15,22 132:24 | **ring** 16:20 | 80:21,23,24 81:2,4 | **running** 20:11 |
| 133:6 137:4 138:7 | **rise** 18:4,9 | 81:15,22 82:1,2,13 | 116:15 122:2 |
| 140:3,4,24 142:4 | **risk** 22:18 23:24 | 82:14,17,20 84:10 | 123:7 151:12 |
| 142:13 143:13 | 33:21 34:14 39:3 | 87:16,17 88:1 | 188:5 |
| 145:13,17 146:2,3 | 49:13,15,20 50:3 | 89:15,25 90:22 | **runs** 23:1,2 102:8 |
| 146:11,20,23 | 50:11,14,18,23,24 | 92:11 94:13 98:11 | 169:21 172:18 |
| 147:2,9,23 148:18 | 51:2 60:1 62:12 | 106:24 107:6 | **russia** 31:19 32:2 |
| 148:20 149:3,10 | 64:15,21 66:15 | 108:19,21 109:3 | 32:5,9,10 39:21 |
| 150:6,14 151:17 | 74:23 75:2 76:3 | 117:17,21 139:2,3 | 40:19 43:17 62:2 |
| 152:6 153:16,19 | 77:8,11 78:5,11 | 143:25 152:12 | 111:21 112:4,17 |
| 154:12 155:10,20 | 80:1 81:1,3,14,20 | 153:13 154:20 | 112:19 113:5,19 |
| 156:4 158:6 | 82:4 83:2,14,15 | 170:5,15,15 172:2 | 134:22 169:20 |
| 159:25 164:15 | 84:19,25 87:18,19 | 172:3 | **russia's** 44:11 |
| 165:10,11,15 | 87:20,22 88:8,12 | **risky** 91:12 155:1 | 46:18 |
| 167:3,11 168:24 | 88:15 89:8,23 | **rivers** 29:9 | **russian** 5:2 30:24 |
| 169:4,7,23 170:17 | 90:14,25 91:4,5,10 | **rla** 34:17 49:22 | 30:24 31:2 32:19 |
| 171:1,11 172:6,21 | 91:25 92:13,19 | 69:17 75:21 | 40:9 140:5 |
| 172:22,24 174:25 | 93:1,2,4,6,13,25 | **rlas** 34:16 | **russians** 4:22 31:9 |
| 175:7 176:13,21 | 94:6,8 98:2 107:1 | **rmr** 1:22 194:24 | 32:15,16 39:13,16 |
| 178:23 179:25 | 107:12 109:1,4,17 | **road** 1:18 | 40:1,17,24 41:12 |
| 180:11,21,22 | 109:19,20,20,22 | **robert** 181:14 | 41:21 52:11 |
| 181:3,4,9,14,22 | 109:22,24 110:6 | **robust** 50:6 | 169:14,15 |
| 183:14 184:10,21 | 110:20 117:18 | 110:13,16 115:13 | |
| 185:9,14 186:15 | 118:17,19 123:20 | 115:18 124:17 | **s** |
| 186:20 187:7,19 | 134:7,8,11,12 | 129:1 130:1 | **s** 21:9,9 |
| 187:23 188:3,4,10 | 143:1 144:20 | 153:11 173:22 | **sabotage** 39:4,13 |
| 188:14,15,21 | 154:17,21,23 | 174:2 | 77:14 78:18 121:1 |
| 189:23 190:9 | 155:4,10,20,22,24 | **robustly** 128:25 | 121:3 122:10 |
| 192:24 193:5 | 156:1,10,17,17,21 | **role** 99:13 | **sabotaged** 40:2 |
| | 157:4,5,18 158:4 | | 179:3 |

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 230 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[safe - see] Page 34

**safe** 21:25 22:1
42:15,17 155:16
155:21 167:9
**safeguard** 172:10
175:9
**safeguarding**
41:23
**safeguards** 49:2,4
49:5
**safer** 20:17,19
42:6
**sake** 7:6 89:23
90:14
**samples** 150:9
**sampling** 69:17
**satisfies** 48:14
**saw** 90:7
**saying** 31:11 54:1
57:7 62:7 71:25
75:1 78:1,2,4,5
93:3 111:22 140:4
141:14,16 143:12
150:3 157:10
**says** 64:6 159:15
**scale** 148:1 186:24
**scanned** 48:24
**scanner** 69:15
86:7,8,12 101:7,10
107:20 138:5,6,6,8
139:4 149:21,23
172:18 175:5
**scanners** 33:13
37:20 38:10,12,13
38:23 39:5,8
41:25 43:12 77:15
77:16 78:24 79:3
82:12 86:20 88:6
101:2,3 122:17,23
132:14 135:23
138:11,12 149:19
149:22,25 150:14

150:15 173:3,6,8
**scanning** 45:13
112:14
**scenario** 73:21,22
75:18 86:19
156:16 170:3
**scenarios** 39:18
54:19 77:6 78:1
79:14,18 81:9,11
83:24 86:10 93:21
94:21 109:25
117:3 126:20
130:17,21 183:7
**scenes** 23:7
**school** 80:10
**science** 19:3 34:24
48:2 93:19 94:10
188:15
**science's** 181:3
188:10
**sciences** 35:2,11
180:6
**scientific** 89:2
91:23 172:5 188:7
188:17
**scientifically** 92:2
**scientists** 96:24
**scj** 1:7
**scope** 30:24
145:23 147:16
158:12,14,15,17
**scoped** 25:1
**scrutiny** 99:3,5
**seal** 175:17
**seals** 175:10,13,23
175:24 176:1,5,7
176:12,16,20
**second** 10:13
30:12 32:24 33:9
34:12 37:20 48:5
48:18 56:9 57:17

57:18 58:15 59:16
60:20 77:13 96:3
103:25 105:23
119:17 120:25
**seconds** 182:5
**secrecy** 61:22
**secret** 71:7,13,21
72:10,16 99:13,19
99:23 100:3,5,6
151:3 152:10
**secretary** 1:9 6:11
16:7 81:23 104:7
105:24 187:21
192:5,10
**secrets** 100:6
**section** 32:25
58:16 76:22,24
136:6 170:16
174:3
**sector** 89:20
**secure** 38:25 47:2
47:3,21 48:21
56:3 63:20 64:12
72:17 75:13 82:19
83:12,16,18,21
85:21 100:6
138:21 139:15,17
139:18 140:17
145:13,16 152:19
153:1 160:10
174:16 191:20
**securely** 26:18
**securing** 19:15
28:10 188:9
**security** 17:5,7,13
17:17,20,24,25
18:8 19:5,13
22:23 23:1,22
24:20 28:18,21
29:4 32:17 34:1
34:22 35:9 37:23

38:1 39:3 43:3,6
52:24 53:14,15
54:17,24 55:21
60:25 64:8,23
71:14,18,20 72:8
74:9,16 75:2,10
79:22 80:21,22
81:2 83:9 84:17
89:6 96:19,20
98:6,11,20 99:3,11
99:15,22,23,25
100:18 105:1,6
106:6 108:16
109:25 110:2,14
114:24 115:11,25
116:11 118:23
121:8,17,22 122:1
133:22,24 139:2,3
141:20 142:11,16
142:21 143:1
144:17,24 145:1,3
145:5,7,9,11 146:5
146:6,9,14,15,20
147:4,9,9,14,15,24
148:4,16,21 149:2
151:16 152:2,16
152:19 153:22,24
154:4,9 155:4,7,10
155:16 157:10
158:13,21 159:24
160:3 162:16
164:13 165:12,23
166:4,6,7 167:6
171:4,4 174:9
175:15,16,18,20
176:12,18,19,23
187:9 188:8
190:15
**see** 6:23,25 8:20
17:17 18:12,16
25:22,22 27:21

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 231 of 243
J. Alex Halderman , Ph.D.                        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[see - software]                                                    Page 35

36:12 45:7,7,15
48:24 49:10 59:2
59:9 64:5,11 70:9
73:22 74:20 84:23
85:10 91:21 92:4
95:23 117:7 120:5
133:10 150:1,8
152:25 187:1
**seeing**  18:5 63:25
**seeking**  14:6
**seen**  9:24 23:15
27:19 44:7,13
52:18 60:14 97:9
97:13,14 121:17
126:1,6 135:17
176:14
**select**  4:16,18
37:16
**selected**  15:9
**selecting**  84:1
**selection**  87:4
164:22 171:16
**selections**  125:7
**sell**  21:10
**senate**  4:15 30:22
31:6 32:1,8 37:7,8
37:16 40:20 43:16
43:23 63:23
113:10 134:20
**sense**  56:16 115:5
185:10
**sensitive**  161:16
**sent**  12:4
**sentence**  7:21
37:22 44:6 48:17
48:18 63:13 64:6
77:11 103:25
104:10 105:23
134:3 135:21
147:8 161:14,19
171:17

**separate**  71:8
**september**  42:23
**sequential**  70:24
**sequentially**  70:17
**serbian**  169:13
170:20
**series**  46:13 52:12
52:13,17,19 81:9
**serious**  113:13
160:22,25
**seriously**  145:7
**served**  66:1
**server**  104:18
150:12,19,24
161:6 170:13
189:25
**servers**  122:24
123:8 189:20
190:6
**service**  4:12 23:2
29:21 162:1
**services**  11:11,12
20:20 21:2,5,14
24:1,4 51:18
161:8 171:11
**serving**  34:6,11
**session**  25:13
**set**  50:4 56:25 57:6
57:10 75:10 97:10
97:13,25 98:1,22
124:9 155:15
167:8
**setting**  74:5
**setup**  106:7
**shape**  46:11
**share**  36:16
**shelf**  98:4,9,13,17
141:6,13,15,16
**shield**  169:23
**shift**  122:12

**ship**  141:19
**shipping**  141:18
**short**  121:7
**shorthand**  194:5
**shows**  126:10
177:8
**sign**  145:3,4,10
**signature**  10:21
194:23
**signed**  55:23
**significant**  17:22
27:9 29:5 39:3
44:25 83:7 87:24
98:10 104:25
106:6 112:21
151:11 159:21
167:16 171:3
183:22 184:24
185:7,10,10
186:20
**significantly**  85:21
118:6 152:12
153:13 183:13
**signs**  182:10
184:15
**similar**  37:23
64:14 67:7 69:17
138:2,10 148:21
192:14
**similarly**  136:11
**simple**  55:9 71:5
139:19,21
**simply**  51:23 52:1
58:19 143:16
**simulated**  182:15
**simultaneous**
179:5
**simultaneously**
170:14
**single**  62:14

**site**  23:9
**sitting**  40:7,15,23
41:15 62:14 114:6
155:24 159:22
168:20
**situation**  11:16
23:15 74:4 108:16
110:14 111:13
144:10 155:17
**situations**  11:15
22:4
**six**  123:10
**size**  139:8
**skimmed**  13:15
**skip**  100:11
179:25
**slate**  183:12
**slates**  184:2,3,4
**slower**  164:1,6
**small**  39:2 45:15
45:18 49:16 184:1
**smaller**  33:25
127:1,10 155:14
186:25 187:1
**smart**  165:6,18
**social**  66:7 112:13
**software**  21:6,10
51:16 52:25 58:18
78:24 88:6 98:5
98:10,23,24,25
99:11,14 102:4,8
102:12,15,19
118:22 119:13,15
119:16,20,21
122:2 123:7 132:3
137:16,17 138:15
138:18,19,20
139:8 140:1,2,10
141:6,7,9,9,13,15
141:17,22,22
142:1,4,7,10,12,15

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 232 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[software - states] Page 36

142:25 143:13,13
143:17,17 144:7
144:22 145:1,12
145:13,16,16
148:15,24 149:6
149:20,21,22,25
150:20 151:12
153:4 158:12,22
158:23 169:3,17
169:21,25 170:4,6
170:7 171:9
172:14 173:11
174:8 175:2,2
177:9 179:4 180:3
188:5,20,23
189:10
**solution** 55:12,25
**solve** 72:4
**somebody** 61:17
111:25
**somewhat** 98:8
154:17
**soon** 132:21
174:19 184:12
**sophisticated**
77:12 78:9 81:5
88:3 114:25
116:12,22,23
117:15 119:2
136:14,17 143:21
145:19 174:13
175:6 176:4,8
**sorry** 11:1 16:23
17:9 18:16 28:3
45:4 50:13 59:18
60:20 67:21 70:2
73:7 79:21 111:17
127:4,7 148:23
161:18 170:18,19
186:17 187:12

**sort** 71:6 85:16
99:24 110:1 148:2
189:23
**sorts** 11:22
**sos** 190:5
**sounds** 144:21
**source** 98:5,10,23
98:25 99:14,19
100:1,2,2 137:18
138:6 141:13
146:9 160:13
**sourced** 172:4
**south** 27:22 61:15
**space** 52:4 88:25
102:17,18 119:19
**spared** 31:18
**speak** 26:3 113:9
114:20 145:8
**speaking** 83:22
**speaks** 162:15
**special** 79:17
113:11
**specialized** 79:12
79:16,24 80:2
81:8
**specific** 11:15 14:7
62:11 63:19 73:5
82:20 84:12 92:17
98:19 106:21
117:17 144:14
149:23 153:9
184:9
**specifically** 9:5
35:4 43:17 75:22
83:5,22 103:22
118:5 121:25
130:10 133:11
137:20 150:12
153:7 172:14
173:20

**specifics** 76:20
135:2 143:8
**speculate** 14:10
**speed** 69:15
164:10
**spend** 23:22
**spent** 12:1 147:21
182:5
**spike** 128:14,19
129:16
**spoke** 9:12,12,15
**spoken** 15:16,24
16:4,7
**sporadic** 186:10
**spotted** 162:10
**spread** 39:16,22
46:8 135:13,19,23
166:18 170:9,9
190:5
**spreading** 112:12
167:17 179:4
**staff** 43:2 51:16
**staffer** 68:15
**staffers** 37:11
**stages** 109:8
**stake** 114:10
**stamping** 48:23
**standards** 48:8
**standpoint** 34:1
71:18,19,20 74:10
83:21,23
**stands** 47:13
**stark** 85:13 179:13
**stark's** 179:18
**starkness** 85:16
**start** 14:22 29:19
52:21 77:5 100:12
107:20
**started** 7:2 12:14
17:17 61:24

**starting** 16:25
**startup** 20:23
**state** 1:10,10 6:11
11:22,24 13:22
16:16,19 34:2,17
51:19 58:21 66:23
76:6 78:8,11,14,20
78:25 81:3,23
85:24 86:1 87:11
105:24 109:23
110:6,14 113:1,2,3
116:15 117:10,14
117:18 119:20
121:9 124:5,7
127:12 132:12,15
135:22 139:24
143:23 145:20
146:17 148:4
159:1,3,4 162:21
175:6 178:8,11,20
178:24 183:18,22
184:19 187:21,24
189:12 192:6,11
194:2,6
**state's** 16:8 104:8
123:1
**statement** 4:10,15
15:1 19:11 22:7
22:17 37:16,18
46:14 49:11 57:19
77:9 115:1 122:25
125:13 136:15,24
139:20 143:16
152:3 154:3
161:18,23 170:20
171:6,15,18 176:9
**states** 1:1 30:16,17
30:25 32:2 35:13
35:24 36:2 46:16
48:6 49:8,14
51:13 58:16 59:1

**[states - supposed]** Page 37

59:3,6,9 62:8 68:6
68:9,25 72:10
79:2,3,5,9,14
101:21 102:11,13
102:20,24 103:2
103:22 113:5
115:2,4,5 116:22
116:23 117:19,20
117:23 118:1,8,9
118:12 119:4,17
131:6,22,24
134:21 163:7
**statewide** 49:14,15
**statistical** 69:17
88:11
**statistically** 88:21
185:10
**status** 159:11
**statutory** 50:10,20
**steal** 39:17 66:8
120:12
**stein** 66:7 68:3,5
68:19
**stenography**
194:12
**step** 46:22 113:8
**steps** 23:6 116:20
159:4,12 160:3
163:15
**stick** 67:18 107:19
**stolen** 40:24 61:1,3
61:4 62:9
**stood** 186:12
**stop** 138:22
**stopped** 41:10
**stopping** 41:3
76:14 94:17
**store** 97:20
**stories** 29:8
**story** 4:20 52:10

**straight** 56:25
57:6,10
**straightforward**
55:10
**street** 2:4 45:14
**stretch** 33:6
**strike** 40:22 68:20
111:21,23 112:18
153:9
**stringent** 153:21
154:4,16 155:3
**strong** 42:16 64:23
92:9 110:9 122:25
175:15 177:5
181:7
**stronger** 96:18,20
143:16
**strongest** 55:21
**strongly** 42:20
110:3,18 122:10
140:12
**structure** 168:5
**struggling** 35:25
**student** 183:2,3,5
**students** 19:24
**studied** 117:21
118:10,12,13
**studies** 92:12,15
92:16 126:12,15
126:16 180:20
181:2,9
**study** 5:15 17:15
82:23 93:17 94:7
139:14 156:4
171:25 177:14
180:13 181:11,13
182:3,4,5,9,13,25
184:8 185:2,6
186:9
**studying** 17:15,17
60:24 79:22 184:9

**stuff** 170:12
**stuxnet** 135:8,13
135:15,18
**style** 125:16
172:25
**subcommittee**
4:11 29:20
**subhead** 60:23
**subject** 78:8 88:3
89:16 90:9 122:6
165:1 166:3,3,6,7
177:17
**subparagraphs**
117:2
**subpoena** 12:25
13:2
**subsequent** 30:21
35:7 180:12,19
188:14,24
**subset** 28:9 59:22
184:3
**substantial** 33:22
35:7 40:4 58:10
62:12 66:14 90:22
91:3 159:15 181:5
**substantially**
109:24
**substitute** 123:7
**subvert** 117:4
**succeed** 65:18
77:17 79:8 115:9
127:19 140:6
**successful** 40:14
113:1
**successfully** 31:16
45:19 61:8,9,18
83:10 137:8
143:21 169:10
**suffer** 37:22
154:20

**sufficient** 51:25
125:15 126:17
128:1,9 129:3
130:14 152:16,19
156:25 159:13
161:25 167:20,23
172:10 178:8,21
179:7,21
**sufficiently** 53:20
115:18 128:8
129:1 130:1,4,9,15
136:14,17 153:1
153:11 155:13
173:22 174:1
**suggest** 153:8
**suggested** 187:23
**suggestive** 180:23
**suite** 2:12 101:13
**summarize** 77:2
**summarizes** 76:23
**summary** 77:23
114:21
**superior** 36:19
85:23 86:4
**supplement** 4:5
**suppliers** 169:4
**supply** 169:1
171:25 172:1
**support** 64:12
73:15,24 74:3
124:15,17
**supported** 42:16
59:5
**suppose** 12:15
17:19 24:10 28:23
51:3 57:14 63:18
89:9 137:15 148:8
148:11 163:22
164:16
**supposed** 12:19

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 234 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[sure - takes] Page 38

**sure** 13:16 17:13
18:7 22:23 23:23
27:19 29:8 33:3,7
46:4 47:10,23
48:12 59:5 65:7
70:3 72:19 76:24
82:22 85:3 89:15
94:5 95:8 104:4
104:20,25 106:2,9
106:11,11 107:24
108:4 111:1 116:3
118:5 127:5,10,18
131:6 137:6,19
140:13,23 141:10
141:17 148:12
150:6 152:7 160:1
162:9 168:2 169:9
170:24 174:5,7,20
181:23
**surefire** 128:3
**surprise** 65:4,6,7
**surrounding**
121:10
**susceptible** 138:17
187:25
**swore** 61:22
**sworn** 6:6 194:9
**system** 8:14 20:4,6
20:11,12 21:24
23:17,20 26:14
29:2,3,6 30:20
31:3,4,7,8,10 32:6
32:14,18 33:18
34:2,3,8,9 38:20
38:23 39:3 42:12
45:24 47:16,17,19
47:21,24 48:9,10
49:1 51:4 54:2
55:11 56:13 59:16
62:4 65:2 67:14
69:14,25 72:23,24

72:25 73:11,12
74:24 75:5,16
76:7 77:7,14,22
78:7,10,13,19,25
79:12,15 80:5,8,19
81:1,6,16,17,20,20
81:21 82:9,10,13
82:16,17,18,19
83:2,8,12,20 84:1
84:18 85:8,14,15
85:19,20 86:9
87:4,9,20,25 88:2
88:4,5,9,25 89:8
89:23 91:1,2,18,19
92:8 93:10,12,25
94:24 95:6 97:18
99:21 100:1,6,19
100:20,21,22
101:13,24 103:1,5
103:10 105:1
106:4,25 107:7
108:20 109:19
110:2,7,8,20
112:15 114:1
116:15 117:16
119:13,15,16
121:10,20,21
122:3,6,14,19,20
122:21,22 123:2
124:1,2 125:2
126:4,5,8 131:18
132:15,16 133:4,9
133:14,16,17
134:2,14,17,24
135:1 136:1,2,4
137:4,7,22,25
139:6,15,16,18,22
140:8,18,19
141:24,25 142:3
142:15 143:11,22
146:8,10,12 147:2

147:22 149:3,7,16
152:13,15,23
153:2,7,10,14,15
153:19 154:9,12
154:25 155:15,20
156:1,21,23
160:20 161:5,16
161:22 162:7,17
162:19,20,23
164:19 165:19
166:19 167:22
168:5 169:23
170:10,12,25
171:10 172:20,21
172:23 179:5
180:4,5 187:2,24
190:5,21 191:11
191:23,25 192:2,4
192:16,17
**system's** 82:2
**systematic** 66:5
156:25
**systematically**
57:23
**systemic** 156:7
**systems** 5:14
15:22 19:4 20:9
20:25 22:2 30:15
33:12,13,16 39:23
44:16 45:16 46:2
46:3,5,8 53:12
54:18 56:3,10
58:3 59:15 60:4
62:16,19 63:6,20
70:21,25 72:18
74:21 79:23 81:23
82:1,6 83:13 85:5
87:13 90:4 92:8
93:1 97:2 98:6
101:17,19,20
103:9,13 104:11

104:13,18 116:18
122:17 126:9
131:23 133:8
134:21 135:19
136:11 137:5,8,18
137:19,20,23
138:1 139:5,19,21
144:12,14 147:11
153:1 159:20
167:17 175:14
180:23 181:1,7
189:13
**sytem** 100:2,3

**t**

**tabulated** 61:15
82:12
**tabulating** 62:23
**tabulation** 73:3
**tabulators** 63:15
63:17
**take** 7:15 33:3,5
36:14 37:1 41:2
58:20 75:9 90:25
107:9 116:20
132:21,22 145:6
156:12 157:11
166:9 173:7
174:19,20 185:25
186:3,8,13
**taken** 1:18 6:10
7:3 13:10 37:4
42:10 60:5 91:24
93:4 96:4 127:6
133:1,24 159:4,12
162:11 163:15
167:19 172:10
174:23 192:23
194:8
**takes** 157:13,16
187:5

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 235 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[talk - think] Page 39

**talk** 7:7 8:2 9:10
12:11 16:24 28:4
29:18 37:6,19
52:5 76:16,18
80:16 84:11
104:10 113:22
122:16 125:5
133:3 135:5 136:4
141:5 158:4
160:19 169:11
175:9
**talked** 9:18 28:6
38:3 53:22 65:10
86:10,14 88:2
111:24 114:14
125:24 179:22
189:20
**talking** 23:10 47:8
48:14 81:4 88:19
169:5 173:20
**talks** 63:22 144:17
149:5
**tamper** 175:10,13
175:17
**tampering** 43:11
173:10
**target** 114:5,8
122:10 140:5
**targeted** 14:7
30:20 31:10 46:16
77:8,12 88:3
89:17 113:5
134:17,22,24
135:6
**targeting** 30:14
31:9,22 46:20
78:8 90:10 113:6
**taught** 19:8
**tautologically**
142:3 150:16

**taylor** 2:11
**taylorenglish.com**
2:15
**teach** 80:15
191:20
**teaching** 19:7
138:22
**tech** 15:24,25
**technical** 11:18,21
17:21,22,25 32:3
41:3 64:22 117:17
136:7 159:13
163:5 172:15
**technically** 92:16
**techniques** 84:16
**technological** 72:7
**technologies** 27:2
**technology** 19:15
24:18 26:17,23
39:22 72:13 82:15
114:23 115:2,4
116:8,17 117:4
118:14 140:20,21
140:22,25 164:7,9
**tell** 17:8 22:22
26:4 51:22 52:19
52:21 82:25 124:9
143:24 144:6,15
147:7 164:17
191:8
**ten** 33:3 137:24
185:1
**tend** 148:15
**tends** 141:10
**tenured** 18:19
**term** 143:5
**terminology**
111:11
**terms** 8:16 19:7,21
26:13 29:1 44:10
45:22 49:13 59:11

63:2 67:13 87:12
94:20 111:1
112:17 131:11
144:15 165:1,3,22
167:9,15 183:16
184:21 185:11
186:24
**terrible** 170:12
**test** 146:22 150:7
177:9,17
**tested** 98:18 101:3
101:6,9,12,15
173:2 188:19,23
**testers** 149:12,14
**testified** 6:7 29:20
45:3
**testify** 37:12 194:9
**testifying** 40:20
63:23 192:16
**testimony** 16:10
16:18 29:18,19,22
30:3,19,21,22 31:2
32:5,8 37:7 41:5
41:24 42:4 44:18
44:21,23,24 47:14
48:4 63:7,12
83:11 103:4 105:5
106:13 110:5
122:5 125:15
131:19 135:10
137:21 140:16
145:12,15,18
146:17 159:17
162:6 169:12
170:11 175:3,16
190:18,20,25
194:11,15
**testing** 8:21 146:9
146:15 147:5,9,9
147:14,15,24
148:4,21 158:13

164:14,17 177:1,5
177:19,21,24
**tests** 101:21,23
147:5 150:13
**texas** 8:25
**text** 125:10 126:8
**thank** 54:12
111:19 132:25
187:4,20 193:2,4
**theory** 61:1
**thesis** 17:4,10
**thing** 42:6 59:2
61:21 72:3 96:9
110:1 126:19
135:4 155:9
179:23
**things** 22:9 31:24
51:18 53:24 64:12
76:16 77:2,19
78:11 81:10 90:1
93:15 100:7
110:19 111:4
114:5 118:21
129:22 132:14
135:13 140:11
149:7 153:4,6
159:15 160:13
179:23 182:10
186:11 190:16
**think** 5:10 8:25
11:16 15:3,5
16:15 22:1,8 25:1
28:18 31:5 32:11
32:16,19,25 33:1
38:3 39:24 40:4
42:5,13,17,18
47:12,18,19 49:5
57:25 58:1,10,25
59:11,25 60:21
61:6 62:11 64:11
65:5 66:12 70:8

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 236 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[think - trying] Page 40

71:2 74:9,11,22
75:17 76:6 77:20
77:22 79:24 80:3
83:16 84:3,19
88:2 89:10,25
91:12,21 92:5,5
93:23 94:1,2,16
97:4,14 98:7
99:10 103:16
104:7 105:9,22
107:3,11,17 108:3
109:15,21,24
110:19 111:17
112:16,18 113:16
115:3 122:22
123:11 128:11,23
129:2 134:22
135:17 136:6,18
141:2 145:3
146:19 151:10
152:7 154:15,21
154:22,25 155:11
155:21 159:20
160:12,21 162:15
164:5 166:9 167:6
171:12,15 175:1
177:17 179:21
188:4 191:3,4,19
**thinking** 73:23
74:1 76:13 90:23
**third** 25:8 37:21
38:18 41:11 48:11
48:21 59:13 63:21
64:1 65:16 77:14
134:3
**thoroughly** 109:16
**thought** 16:20
53:25 56:4 57:14
71:2 80:22
**thousand** 8:12

**threat** 79:25 119:2
190:13
**threats** 43:10,10
169:1
**three** 30:13 33:9
49:17 68:8,9
69:24 138:14
**threshold** 92:1
93:17,20
**throw** 127:14
**thrown** 29:9
111:11
**tie** 70:18
**time** 12:1,3 18:4
18:10 23:23 36:14
42:1,5,18 48:20,23
54:21 57:25 59:20
61:17,23 62:6
70:16 75:9 121:7
141:18,20 142:10
148:1 157:23
166:9 179:8 193:2
**timeline** 11:19
**times** 4:20 7:19
52:6,10,14 53:2
54:22 70:19
137:24 185:1
**timing** 18:2
178:19
**tipping** 92:2,4,5
**titled** 17:5 52:10
60:20
**today** 7:2 8:3,8,9
8:18 9:4,6,11,18
27:6,7,10 40:7,15
40:24 41:15 42:9
58:7 62:14 119:15
121:22 138:25
141:9 153:3
157:20 159:5,10
159:22 168:20

193:2
**told** 86:15,16,17
86:19 125:24
**tongue** 120:21
**top** 18:16 39:11
45:6,9 55:9 69:24
77:3 92:15,24
94:3 144:14
147:20 150:2
182:8
**topic** 17:9,11
24:19 26:19 54:4
54:20 185:16
**topics** 19:23 26:5
43:6,7,8
**total** 39:4
**totally** 7:22 11:2
91:22
**totenberg** 67:6
**totenberg's** 9:9
**touch** 29:3 54:20
**touches** 53:9
177:17
**track** 170:12
**trade** 72:3 89:6
99:13,19
**trail** 36:23 47:5
53:17 115:7 128:5
136:20,20,21
140:12,13
**trails** 36:7
**training** 79:17
**transcribed**
194:13
**transcript** 7:14
194:15
**transcription**
194:14
**transferring** 159:1
**transmission**
106:1,5,14,21,23

107:1,3,8,9,12
109:6
**transmit** 105:24
**transported** 29:10
**travel** 24:3
**trench** 66:17
**trial** 6:16
**tricky** 22:7
**tried** 43:1 71:2
109:2 149:10
150:8
**tries** 93:8
**trigger** 31:20 41:7
41:9 114:15,18
**trisha** 1:22 194:5
194:24
**trivial** 22:2
**true** 28:17 34:8
38:3 47:15,16
48:8,10 61:6
72:15 115:1,3
117:13,16 125:2
129:2 131:16
132:12,17 137:11
137:13 138:17
139:10 148:24
152:20 153:4,6,14
170:7,14 171:9,15
172:20 176:16
178:1,5 194:14
**trump** 68:10
**trust** 38:8 140:22
**trusted** 23:8
**truth** 194:9,10,10
**try** 116:20 127:2
127:14 129:15
149:11 177:16
191:17
**trying** 20:13 23:19
23:23 58:22 66:8
74:13 82:2 84:7

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 237 of 243
J. Alex Halderman , Ph.D.                          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[trying - use]                                                      Page 41

85:3,11 88:7 89:1
93:9 95:19 143:10
152:22 156:15
192:13
**ts** 66:22 67:10
95:12
**tsx** 67:10 95:13
**tuesday** 1:21 6:2
**turn** 25:8 37:19
39:11 44:3 45:2
51:12 55:8 57:18
58:14 62:20 69:23
96:8 100:10 127:4
**turning** 133:3
**turns** 84:18
**twister** 120:21
**two** 15:25 16:2
31:23 39:19 49:17
59:14 63:21 69:24
70:22 71:8 115:14
125:8 126:12,16
148:14 158:5
180:20 181:9
**type** 22:25 67:8
73:19 95:20
120:25 125:1
129:23 152:4
162:6,12
**types** 17:14 53:23
82:1 87:19 106:14
106:18 125:8
130:19 132:14
160:17
**typical** 23:19
**tyson** 2:10 3:5 6:9
6:20,23 9:21 10:8
10:14,17 11:2,3
25:4 27:14 30:1
30:11 37:5,14
43:22 45:8 52:8
55:4 56:23 60:6

60:10 69:9 70:6
96:5,6 97:8 107:5
127:9 133:2
174:24 182:24
192:21,24 193:1

**u**

**uh** 7:13,13 176:17
**ukrain's** 113:24
**ukraine** 62:2
**ukrainian** 113:23
**ultimate** 90:24
**ultimately** 22:16
29:2 53:10 88:14
140:7 148:3 152:1
152:20 153:18
155:6 164:8 185:6
**un** 61:16
**unacceptable**
92:20 157:5
167:21 168:3,10
168:14,22
**unauthorized**
161:14
**unaware** 176:24
**unclear** 146:7
**uncovered** 74:23
**underestimated**
10:25
**undergrad** 17:18
**undergrads**
138:23
**undergraduate**
16:25 17:4
**underlie** 87:4
**underneath** 57:17
**understand** 7:25
20:24 21:7,11,21
47:14 85:3,11
88:7 125:19
133:16,19 143:18
147:25 152:22

156:15 162:25
163:11 184:11
**understanding**
35:9 46:17 51:8
51:11,18,21
100:21,23 101:24
104:8 105:18,20
107:23 123:17,19
124:2 125:25
133:8 155:18
159:8 162:18,22
165:7,21 178:13
178:24
**understands** 21:13
**undertaken** 123:9
**undertook** 68:12
**undesirable** 91:6
**undetected** 83:4
125:12 126:18
**unencrypted**
151:14,15
**unfortunate**
191:10
**unfortunately**
41:17 79:5 90:4
110:9 115:22
116:21 146:16
148:20 157:16
178:5
**unique** 173:12
**united** 1:1 62:8
68:25 72:10
131:22,24
**universal** 153:12
**university** 5:15
9:14 18:14,15,19
18:23 21:23
189:12
**unmistakable**
186:13

**unpatched** 144:9
**unredacted** 44:6
**unrelated** 87:5
**unsigned** 10:13
**unsuccessful**
61:11
**unsuccessfully**
45:16
**untraceable** 67:12
**unwise** 141:2
**update** 104:12,13
133:13 142:11
159:11,13 162:1
**updated** 104:15,16
104:21 162:7
**updates** 141:20
142:17
**updating** 51:16
**uploaded** 104:18
**urge** 173:13
**usability** 25:13
26:4,9,12,14
**usb** 107:19 151:2
**use** 6:17 26:17,23
27:2 35:13 42:6
46:1,4 58:16
59:14 69:19 71:6
73:15 79:2,3
82:20 84:16 89:13
89:22 90:13 91:10
92:2 97:18 98:4
102:11 104:1,2
105:15,20 111:3
116:19 119:15
121:6 122:15
127:2 128:13
132:6 140:20
141:10,12,14,16
143:25 145:24
153:12 154:19,24
156:5 162:3 164:7

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 238 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[use - voters] Page 42

165:25 168:21
173:18 176:5,12
177:15 182:9
184:2,3,4 185:22
**users** 26:21
**uses** 33:19 81:17
81:21 155:2
**usually** 107:23
126:22 187:8
**utilize** 38:24 39:1
153:23

**v**

**vacant** 144:18
145:8
**valid** 97:23
**validation** 35:5
**valuable** 191:19
**value** 93:22,22
174:8,9 175:24
176:1 191:16
**variabilities** 50:6
**variation** 129:19
**variations** 129:20
**variety** 77:6
**various** 29:10
54:19 100:25
114:5 179:22
183:7 190:16
**vast** 184:4
**vector** 87:8,10
**vectors** 80:3 82:7
82:8 87:12
**vendor** 46:8
119:19 159:23
160:9
**vendors** 39:22
51:17 119:3 160:5
**verbal** 182:10
183:8,11,25
184:14,18,20
185:2,5

**verifiability**
157:22
**verifiable** 26:11
27:1 36:7,23
110:24 111:5,6,11
**verification** 24:13
24:16,17 25:14
26:5 35:6 83:8
157:12 180:20
184:10,21
**verified** 5:12 47:5
96:12,15,17,17
97:2,21 110:18,22
110:24 111:5,7,8
124:11 156:19
**verify** 38:15 83:10
111:7 129:4
157:25 181:12
182:11
**verifying** 83:5
110:10,11 111:12
128:25,25 156:18
157:23 183:18
**versa** 103:10
**version** 10:13
97:14 102:23
103:20 141:18,19
142:6,7,16 144:1
146:22,23,24
188:20,24,24,25
189:9
**versions** 102:13,19
102:23 103:21
144:4 146:12
148:15,15
**versus** 16:19 65:1
65:15 81:16,21
83:1 85:5 87:18
98:14,23 99:14
102:23 103:21
129:13 164:4

171:21 174:8
177:18 186:25
**viable** 190:13
**vice** 103:10
**victory** 186:15,20
186:22,25,25
187:1
**video** 52:6,11,13
52:19,22,23 53:3,6
54:22 67:2,12
**videos** 52:16,18
**view** 42:8,13 57:14
65:22 104:12
185:21
**views** 66:13,14
91:13,15,16
101:17
**vigo** 111:24
**violated** 13:22
**viral** 188:23
**virtue** 20:11
**virus** 126:2,7
135:8 188:18,19
**visibility** 24:7
112:22
**visible** 191:9
**visited** 121:12,16
**visiting** 112:13
**vladimir** 41:8
**vote** 5:9 47:2
60:20 62:23 63:15
63:17 71:16 90:21
105:16,19 112:7
113:24 131:7
177:11 188:9
**voted** 111:18
**voter** 25:13 26:5
30:15,20 31:3
32:3,6,14,18 35:5
36:7 45:24 46:2,5
47:5 60:4 70:17

83:8 85:25 86:11
97:20 102:6,9,15
103:10,13 104:1,3
104:12,14,15,16
104:16,17,21,22
104:23 105:3
110:18,22,24,24
111:6,7,7,8,11
117:5,10,14,20
118:1,13,19 119:3
119:18,22 120:17
120:23 129:17
133:18,21 140:13
141:1 157:9,11
158:3 160:10,20
161:3,9,16,21,24
161:25 162:1,16
162:18,20,23
163:18,23 165:20
177:10,10 180:20
184:9
**voter's** 125:6
**voters** 5:16 13:23
26:21 33:20,23,24
33:25 36:24 38:17
42:2,7,12 59:23
61:19 70:19 73:14
73:24 74:6 79:2
81:19 82:11,17,25
83:5,9 86:22
91:20 104:11,13
105:11,15,19
110:10 111:12
119:24 120:13
126:10 128:1,8,24
129:4 130:14
134:9 136:21
140:12 153:13,15
154:19,24 155:3,9
155:11,14,18
156:3,6,16,18,19

Case 1:17-cv-02989-AT Document 821-3 Filed 08/26/20 Page 239 of 243
J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[voters - wireless] Page 43

156:23 157:15,23
157:25 161:10
162:4 163:21
177:17 179:7
180:10,14 181:12
182:5,10 183:9,13
183:18 184:3,5,14
185:8,19 186:1,23
**votes** 39:17 40:24
44:7,18 53:1
61:15,19 64:24
65:4,5 70:16
71:23 91:7 97:21
105:12 112:12,19
113:11,15,17,20
177:18
**voting** 5:12,13
15:9,10 18:4,9
26:11 27:1 33:12
33:20 36:3 37:21
39:14 40:25 43:11
44:8,21,23 47:4,16
47:17,18,21 52:12
52:24,25 53:12,16
54:8 56:3,9 60:25
61:5 62:9,16,18,23
63:4,5,14,17 66:18
66:20 67:13 70:19
70:25 73:10,25
76:8 79:23 82:6
83:12,13 92:8
94:25 95:6,8,12
96:13,15,17,17
97:2,3,21,23 98:6
99:13 100:21
101:19 107:21
110:7 114:23
115:2,4 116:18
120:15 124:12
131:15,18 134:10
136:11 137:4,7,19

137:23,25 140:17
140:20 142:14
163:12,25 166:19
175:25 176:16
178:9,22 181:21
181:23,24 191:5
**vouched** 23:8
**vouches** 23:4
**vs** 1:7
**vulnerabilities**
20:1,2,9,22,25
21:20,24 22:3,6,9
22:12,15 24:8
38:1,19 43:5
45:13 80:8 88:9
92:17 99:6 103:1
112:14 116:8
119:6 139:10,12
139:25 140:3
143:2,3,12,14,19
144:6,10,12,13
147:7,10,11,13
148:16,19,25
149:3 152:21
157:11 159:18,19
160:23,25 161:1
161:15 189:19
**vulnerability**
24:11 38:5 90:19
143:4,4,5 144:9
168:16
**vulnerable** 33:12
35:24 58:23 118:3
118:7,10 138:18
144:6,23 180:2
192:18
**vvpat** 60:4
**vvpats** 36:7,15,18
180:23,25 181:2
**vvsg** 48:8

**W**

**wait** 7:11 30:10
97:10 128:16
**walk** 17:2 44:2
100:13,25 146:21
**walking** 45:14
**want** 5:5 7:1,15
8:1 17:2,12 20:21
22:12 33:3 37:6
44:2 49:16,19
52:3 57:18 69:7
76:16,17 77:2
110:21 116:25
134:9 168:2
181:10 191:2,3
**wanted** 56:25 57:6
96:9 97:17 100:13
109:16
**wanting** 17:15
**wants** 51:4 148:4
**washington** 2:5
5:1 54:23 55:5
67:5
**way** 7:16 10:2
20:1,12 29:4
31:14 40:10,13
41:20 42:4,20
46:25 50:7 51:22
53:1 65:8 67:10
67:16 71:2 75:12
84:8,25 86:21
87:2 94:22 97:23
109:5 125:7
126:22 127:24,25
128:3,6,21 129:15
132:10 133:13
135:18 140:4,17
154:25 155:25
156:9,9,13 157:25
163:25 169:15
173:4 183:17

186:12 190:2,2
191:9,10 192:12
192:13
**ways** 20:14 84:14
105:3 135:7
140:21 177:15
**we've** 9:22 10:5
25:5 28:6 30:2
37:15 43:20 46:20
49:6 52:9 55:1
57:1 60:8 69:7
79:8 80:11 90:13
102:1 109:15
133:7 136:6,16
146:25 160:20
175:1 179:21,23
182:22 188:1,14
**weakness** 70:13
**weaknesses** 37:23
**website** 4:6,7 23:5
23:10 25:7 27:15
97:15 160:23
**websites** 23:5,14
112:13 161:1
**week** 23:13
**weeks** 122:15
**weigh** 85:3
**welcome** 185:16
**wenke** 15:25
**went** 8:20 178:2
**whatsoever** 38:24
**wick** 1:18
**widely** 102:12,16
169:25 170:4,6,7
**wifi** 163:13
**wild** 72:14,15
**willing** 57:8 73:24
88:15 104:9
**winner** 126:18
**wireless** 47:6
163:8

Case 1:17-cv-02989-AT   Document 821-3   Filed 08/26/20   Page 240 of 243
J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[wisconsin - zero]                                                        Page 44

wisconsin  58:13
  65:19,24 67:25
wise  99:15
wishes  142:10
withstand  39:4,7
  114:24 115:11,19
  116:1,12 117:1
  145:19
witness  3:3 45:7
  127:7 194:7,12,16
won  68:9
wondered  126:19
wonderful  10:24
words  13:19 51:24
  51:24
work  7:24 8:14
  11:6,17,17,18,22
  11:23 13:25 15:16
  17:1,4 19:12,13,14
  19:23 21:22,23
  22:4,25 24:19
  52:4 65:8 86:21
  96:22 115:22
  116:7 124:17
  180:22 185:3
worked  68:15
workers  107:19,22
  108:2 109:7
  135:23 184:14
working  8:5 11:21
  17:17 18:8 124:11
  124:14 129:22
  161:7 175:21
workings  158:20
works  172:13,25
  173:4
world  134:2
  170:17,21
worlds  23:11
worried  106:10
  110:2

worry  86:18
worse  108:16,22
worst  109:4
write  138:20
writing  59:1 61:24
  194:11
written  4:9,14
  30:3,22 35:17
  36:12 37:18 42:18
  51:23 54:23
  138:15,18 141:9,9
  177:12
wrong  57:23 62:5
  65:14 90:5,18
  97:16 119:25
  127:23 130:24
  156:13 162:5
wrote  56:18 57:3
  65:12

## y

y  21:9
yeah  46:25 70:7
  76:12 112:10
  138:3 174:20
  187:4,13
year  12:16 30:6,8
  30:9,22 89:20
  123:20 147:22
year's  57:20
years  30:13 79:24
  101:19 111:3
  158:5
york  4:20 52:6,10
  52:14 53:2 54:22
  57:11
youtube  67:12

## z

zero  21:24

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.

If requested by the deponent or a party before

completion of the deposition, the deponent shall

have 30 days after being notified by the officer

that the transcript or recording is available in

which to review the transcript or recording and, if

there are changes in form or substance, to sign a

statement reciting such changes and the reasons

given by the deponent for making them. The officer

shall indicate in the certificate prescribed by

paragraph (1) of subsection (f) of this Code

section whether any review was requested and, if

so, shall append any changes made by the deponent

during the period allowed. If the deposition is not

reviewed and signed by the witness within 30 days

of its submission to him or her, the officer shall

sign it and state on the record that the deposition

was not reviewed and signed by the deponent within

30 days. The deposition may then be used as fully

as though signed unless, on a motion to suppress

under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.