**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

DONNA CURLING, *et al.*

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## STATE DEFENDANTS' RESPONSE IN OPPOSITION TO COALITION PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RELATING TO BMDS, SCANNING AND TABULATING, AND AUDITING

### INTRODUCTION

In the fourth round of preliminary-injunction filings in this case, Coalition Plaintiffs again ask this Court to do something it cannot do. In order to grant almost all of the relief sought in the latest motion, this Court must endorse Coalition Plaintiffs' interpretation of state law and state regulations on (1) ballot secrecy, (2) testing of voting equipment, and (3) scanner thresholds, and then find that state officials are in violation of those laws and regulations—which this Court is prohibited from doing by the Eleventh Amendment.

Further, Coalition Plaintiffs' proposed order, [Doc. 809-17, pp. 2-3], would have this Court not just enjoin particular statutes, but commandeer the State Election Board and require it to promulgate a variety of rules—a remedy the Eleventh Circuit has noted would "raise serious federalism concerns, and it is doubtful that a federal court would have authority to order it." *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1212 (11th Cir. 2020).

State Defendants are already implementing a robust audit regime with assistance of VotingWorks, an organization specializing in the development of risk-limiting audits. In 2020, Georgia is set to be one of a handful of states to conduct a statewide risk-limiting audit. Coalition Plaintiffs have shown no basis why this Court should intervene in or change a process that has taken more than a year to develop.

Not only do Coalition Plaintiffs urge this Court to exceed its constitutional jurisdiction but they also have not carried their burden of proof as to any of the four requisites. This Court should deny their latest effort to change Georgia election laws.

## RESPONSE TO STATEMENT OF FACTS

### I.   Scope of claims in First Supplemental Complaint.

Coalition Plaintiffs begin by acknowledging that the definition of the "Dominion BMD System" in their First Supplemental Complaint, [Doc. 628],

does not include PollPads.[1] *Id.* at ¶ 67. Despite Coalition Plaintiffs' claims

that their Supplemental Complaint includes the optical scanners, Counts I

and II focus on issues unrelated to the operation of the scanners, *id.* at ¶¶

222-223, 230-231, and their relief seeks to have State Defendants continue

using the Dominion scanners, *id.* at p. 76. Coalition Plaintiffs' preliminary-

injunction motion likewise only seeks to enjoin the use of BMDs, with the use

of scanners continuing (albeit with modified settings). [Doc. 809-17]. State

Defendants recognize that this Court has determined that scanners are

included in the scope of the Supplemental Complaint. [Doc. 799].

## II.    Coalition Plaintiffs' previously filed evidence remains insufficient.

Coalition Plaintiffs next incorporate "previously filed evidence" into

their brief. The exhibit outlining their prior-filed evidence includes hundreds

(if not thousands) of pages covering their October 23, 2019 motion, a variety

of documents Coalition Plaintiffs dropped into the record at various points, 16

declarations, and a collection of news clippings.[2] [Doc. 809-16].

_____

[1] The word "PollPad" never appears in the First Supplemental Complaint and the only mentions of any "ePollbook" system are part of a general description of how cards are encoded. *Id.* at ¶ 70-71.

[2] While State Defendants recognize this Court may consider hearsay as part of a preliminary-injunction motion, in a case that is now more than three years old, this Court should consider the admissibility under the Federal

This Court already denied Plaintiffs' third set of Motions for Preliminary Injunction without prejudice, finding that there was not a sufficient record to find that Georgia's Dominion voting system was facially unconstitutional, which included all of Coalition Plaintiffs' previously filed evidence. [Doc. 768, pp. 10-11[3]]. The Court also found that, to the extent Plaintiffs intended to present an "as applied" challenge, the record was insufficient for this challenge as well, expecting more information based on "actual election based evidence." *Id*.

## III.   Coalition Plaintiffs new evidence is similarly lacking.

Recognizing that their prior-filed "evidence" was insufficient, Coalition Plaintiffs next turn to a series of declarations describing their view of various election processes and opining on the potential security risks. The additional filings do not assist the Court with weighing the issues presented in the motion nor do they support an as-applied challenge to the Dominion BMDs.

### A.   *Declaration of Harri Hursti.*

Coalition Plaintiffs first offer the declaration of Mr. Hursti, which is based primarily on his observations of the August 11 runoff, but it offers

---

Rules of Evidence of the documents that have not been tested through the adversarial process.

[3] All pinpoint citations for documents filed on the record are to the ECF page numbers at the top of each page.

little, if any, value to the Court. Like Dr. Halderman, Mr. Hursti personally believes that hand-marked paper ballots are a superior voting system. [Doc. 680-1, p. 43]. While Mr. Hursti has experience in cybersecurity, he never alleges anywhere in his declaration that he has experience with Georgia's Dominion voting system and only speculates about possible issues and references analyses that are in their "early stages." *See* [Doc. 680-1, pp. 42-43] (has never studied Dominion ImageCastX system and recommends a security evaluation because he cannot enumerate possible attack vectors); [Doc. 809-3], ¶ 9 (recommending further research and saying that he cannot determine potential impacts), ¶ 17 (raising questions, recommending examination be conducted, and speculating about possible causes); ¶ 21 (incomplete review, but speculating about system problems); ¶ 25 (guessing about use of vendor personnel versus county personnel); ¶ 27 (guessing that computers "appear not to have been hardened"); ¶ 34 (attempting to draw "reasonable assumption" about configurations); ¶ 38 (relying on mental impressions about process used by Fulton County); ¶ 39 (speculating about proper configuration of file system auditing data); ¶ 42 (speculating about whether techs were troubleshooting "in the live environment"); ¶ 45 (unsure whether new Wi-Fi access point was coincidental); ¶ 46 (speculating about whether remote access was granted); ¶ 53 (acknowledging any analysis is "in

5

its early stages"); ¶ 82 (drawing conclusions based on review of single document and opining that a regulation should have been adopted); ¶ 83 (system "likely" causing counting problems); ¶ 85 (calling for further evaluation). This series of speculations stands in sharp contrast to the evidence presented by State Defendants—that the BMD system is hardened, has been subjected to extensive testing, and has a variety of security features built in. [Doc. 821-6] ("Cobb Dec.") at ¶¶ 4-6.

Based on his unsupported theories about the Dominion system and his limited observations, Mr. Hursti asserts that Georgians should have no confidence in the votes cast on August 11—a shocking charge that not even Dr. Halderman was willing to make about the DRE system. *Compare* [Doc. 809-3, ¶¶ 49, 85] *with* [Doc. 821-3] ("Halderman Dep.") at 190:25-191:15.

Like Dr. Halderman, Mr. Hursti does not understand the actual operations of the Dominion system. The scanner threshold settings are set by the election database, not by users.[4] *Compare* [Doc. 809-3, ¶¶ 59-62] *with*

---

[4] Further, Voluntary Voting System Guidelines 1.1 require the consideration of "marginal marks" by certified scanners. A marginal mark is defined as "a mark within a voting target that does not conform to vendor specifications for a reliably detectable vote." *See* U.S. Election Assistance Commission, VVSG 1.1, available at
https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf

Supplemental Declaration of Dr. Eric Coomer, attached as Ex. A ("Supp. Coomer Dec.") at ¶ 4.

Even though the speculative nature of Mr. Hursti's declaration significantly limits its utility to the Court, this Court should also not consider Mr. Hursti's opinions as part of this case, because his testimony is like the expert testimony excluded in *Summit at Paces, LLC v. RBC Bank*, Civil Action No. 1:09-cv-03504-SCJ, 2012 WL 13076793 (N.D. Ga. May 22, 2012). In that case, the purported expert witness had a degree in financial management and had general knowledge of the banking industry, but was unable to link his experience to the issues in the case. *Id.* at *2. Given Mr. Hursti's inability to link his general experience in cybersecurity to the specific issues involving the operation of the Dominion system, this Court should not consider his opinions. This is even more true considering the degree of speculation in which he engages.

B.   *Declaration of Marilyn Marks.*

Coalition Plaintiffs also rely on a declaration from Ms. Marks that offers little utility to the Court. Ms. Marks explains her interpretation of state statutes based on her "personal experience." [Doc. 809-5, ¶¶ 5-14]. She offers a hearsay statement that a single individual in Cherokee County uses a memory stick he used previously. *Id.* at ¶ 16. And she seeks to use a single

county's response to a subpoena as an admission that there are no state procedures. *Id.* at ¶ 18.

Like Mr. Hursti, Ms. Marks cannot connect her personal experience to the issues in her declaration to provide opinion testimony. *Summit at Paces, LLC*, 2012 WL 13076793 at *2. Similarly, Ms. Marks is not a lawyer and her opinions on the law are the proper province of this Court, not a purported expert. *Birnholz v. 44 Wall St. Fund, Inc.*, 880 F.2d 335, 341 n.8 (11th Cir. 1989) ("the interpretation of a statute is a question of law for the court to decide"); *see also Plantation Pipe Line Co. v. Associated Elec. & Gas Ins. Servs. Ltd.*, No. 1:09-CV-1260-SCJ, 2011 WL 13143563, at *4 (N.D. Ga. Dec. 2, 2011) (quoting *Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007).

C.     *Declarations of Vote Review Panel members.*

Coalition Plaintiffs offer two Vote Review Panel members who are also members of the advocacy organization Coalition for Good Governance and who share its concerns about the operations of the scanners.[5] But these declarants offer no basis beyond their personal opinions. [Doc. 809-6, ¶¶ 18-19] (claiming votes were "clearly marked" but providing no support for what kind of marks that were made); [Doc. 809-7, ¶¶ 17-18] (saying "clear ballot

---

[5] Both are also members of their local Democratic parties. [Doc. 809-6, ¶¶ 4-5], [Doc. 809-7, ¶ 2].

8

markings" were not highlighted by the software and providing only one example). Further, as Coalition Plaintiffs acknowledge, the State Election Board has proposed a new rule to establish fixed threshold settings, but they now complain that more testing is needed first, ignoring the extensive accuracy testing that was part of Georgia's certification of the system. [Doc. 809-1, p. 15]; Cobb Dec. at ¶¶ 4-6. The allegation that State Defendants have a "policy of denying voters human review" is not supported by the citation to any evidence and is a statement regarding Georgia law. *Id*.

> D.     *Logic and accuracy testing.*

In addition to their continued reliance on Mr. Hursti and Ms. Marks, Coalition Plaintiffs also attempt to introduce evidence of alleged pre-election testing deficiencies through Ms. Throop. Ms. Throop does not allege she has any qualifications or experience with elections beyond her support of the Coalition for Good Governance and admits she has to guess about whether the testing process she observed was complete. [Doc. 809-8, p. 3]. Thus, her declaration offers nothing useful to the Court. Coalition Plaintiffs also make further allegations against the Secretary, claiming he ignored warnings, but again cite no evidence supporting that proposition.

E.   *Audits.*

Coalition Plaintiffs next attack State Defendants' audit processes, but their core arguments are not new. Coalition Plaintiffs add nothing to the earlier information from Curling Plaintiffs regarding voters verifying their ballots, except for a handful of declarations that do not address the Georgia regulation that requires voters to be reminded to check their ballots. [Doc. 800-4, 800-6].

Dr. Stark spends much of his latest declaration criticizing a press release while also acknowledging that the "Fulton County pilot audit was worth doing." [Doc. 809-2, ¶ 17]. But the root of Dr. Stark's declaration is abundantly clear—no audit of any barcode-based BMD would ever satisfy him.[6] [Doc. 809-2, ¶ 6c]. Dr. Stark opines at length about Georgia's rule on audits that he (unsurprisingly, given his opposition to all barcode-based BMDs) finds insufficient. And most of Dr. Stark's criticisms of the regulation are just that the proposed regulation on audits is not sufficiently detailed for his liking. [Doc. 809-2, ¶¶ 23-26].

---

[6] Coalition Plaintiffs also previously attacked barcode-based BMDs as unauditable using Dr. Stark's testimony. [Doc. 680-1, p. 3]; [Doc. 640-1, p. 41].

In sharp contrast to Dr. Stark's criticism, VotingWorks, an organization with considerable experience designing and assisting jurisdictions in the implementation of risk-limiting audits ("RLA"), has been assisting Georgia in the development of its risk-limiting audit ("RLA") processes. Declaration of Dr. Benjamin Adida, attached as Ex. B ("Adida Dec.") at ¶¶ 3-4. Developing RLAs for states is a challenging process, requiring extensive pilots prior to implementation. *Id*. at ¶ 10. For example, it took almost 10 years from the invention of RLAs to the first statewide RLA in Colorado in 2017.[7] *Id*. at ¶ 7. VotingWorks has assisted eight states besides Georgia in the design of pilot RLAs and RLAs. *Id*. at ¶ 9.

RLA pilots are necessary and operate with some known concessions in order to troubleshoot and improve ballot custody and reconciliation processes. *Id*. at ¶ 10. For states that have recently moved to using paper ballots, the design of ballot custody and reconciliation procedures is new and often difficult. *Id*. at ¶ 8. In fact, implementing RLAs without extensive preparation and piloting can cause unwarranted mistrust in the election outcome. *Id*. at ¶ 10. VotingWorks assisted in the development of the proposed State Election Board rule requiring a statewide risk-limiting audit

---

[7] Colorado also was uniquely equipped for faster deployment of RLAs because it has a fully centralized ballot-tabulation system, unlike most states. *Id*.

in Georgia. *Id*. at ¶ 11. Georgia's rule was modeled off of the Rhode Island
RLA process. *Id*.

One of the strengths of an effective RLA is that it protects against the
malfunctioning or hacking of a QR code generated by a BMD. *Id*. at ¶ 12.
RLAs using the human-readable portion of a BMD-generated ballot (like
Georgia's) are able to capture potential QR code mismatches, just like any
other tabulation mistake. *Id*. Every RLA that VotingWorks has helped
conduct use the human-readable text, protecting against any potential QR-
code mishaps. *Id*. at ¶ 13.

Georgia will be one of only a handful of states that will run risk-
limiting audits for the 2020 general election. *Id*. at ¶ 14.

F.    *Other factual allegations.*

Coalition Plaintiffs' remaining factual allegations are not part of this
case or not helpful to the Court. First, Coalition Plaintiffs discuss alleged
violations of ballot secrecy based on the layout of precincts. [Doc. 799, p. 4
n.1, pp. 20-21]. This Court has already determined that is outside the scope of
this case.

Second, Coalition Plaintiffs claim there was improper reporting of
information from poll officials in seven precincts in Fulton County. [Doc. 809-
1, pp. 21-22]. But Coalition Plaintiffs offer nothing substantive on this point

and do not explain how it relates to the relief they seek (especially because no relief on PollPads is sought in this motion), simply noting that discovery is "ongoing."

Finally, Coalition Plaintiffs make several arguments without citation to evidence about timestamps on Dominion precinct scanners. [Doc. 809-1, pp. 32-33]. As State Defendants and Dominion explained last year, there are no timestamps on any scanned ballots. [Doc. 658-2, ¶ 10] (Coomer Declaration explaining AuditMark process). Coalition Plaintiffs cite nothing new or existing in the record to contradict this clear statement by Dominion.

## ARGUMENT AND CITATION OF AUTHORITY

### I.   Standard of review.

Because temporary restraining orders and preliminary injunctions are such extraordinary and drastic remedies, courts may not grant this type of relief "unless the movant *clearly established* the 'burden of persuasion' as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (emphasis added) quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989). Moreover, "[m]andatory preliminary injunctive relief, which goes well beyond simply maintaining the status quo" as Plaintiffs' requested relief does here, "is particularly disfavored and should not be issued unless the facts and law

13

clearly favor the moving party." *Powers v. Sec'y, Fla. Dep't of Corrections*, 691 F. App'x 581, 583 (11th Cir. 2017) (quoting *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976)). Plaintiffs therefore must *clearly* show that: (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) the balance of equities tips in Plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008).

As this Court knows well from the history of this case, preliminary injunctions are never granted as of right, even if a plaintiff can show a likelihood of success on the merits. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). While a preliminary injunction is already a form of extraordinary relief, that relief is an even-more-heightened form of extraordinary relief in the context of elections, because of the public interest in orderly elections and the integrity of the election process. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S. Ct. 5 (2006).

Particularly important here is the U.S. Supreme Court's recognition that when "an impending election is imminent and a State's election machinery is already in progress," equitable considerations justify a court denying an attempt to gain immediate relief—even if an elections practice

14

was found unconstitutional. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). This is because parties must show they exercised reasonable diligence, especially in the context of elections. *Benisek*, 138 S. Ct. at 1944.

Finally, Coalition Plaintiffs' sole basis for an injunction is under an *Anderson-Burdick* fundamental-right-to-vote analysis, [Doc. 785-1, pp. 25 n. 34], which "does not require any evidentiary showing or burden of proof to be satisfied by the state government." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009).

## II.   Coalition Plaintiffs are not likely to succeed on the merits.

As this Court is aware, the evaluation of voting regulations under a fundamental-right-to-vote claim or an Equal-Protection claim takes place under a sliding scale, which considers the alleged burden on the right to vote against the interest of government.[8] *Anderson v. Celebrezze*, 460 U.S. 780,

---

[8] Coalition Plaintiffs also raise the unconstitutional-conditions doctrine as a possible basis for relief, [Doc. 809-1, p. 27], but only reference that doctrine once later in the brief, *id*. at 34, and do not cite any court that ever applied the doctrine to absentee ballots. Coalition Plaintiffs do not have the "the right to vote in any manner," *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*, Civil Action No. 1:20-cv-00912-SDG, 2020 U.S. Dist. LEXIS 36702, at *14 (N.D. Ga. Mar. 3, 2020) quoting *Burdick*, 504 U.S. at 433, and thus fail to identify the right they are allegedly giving up if they vote absentee. *Dolan v. City of Tigard*, 512 U.S. 374, 385, 114 S. Ct. 2309, 2317 (1994). *See also Democracy N.C. v. N.C. State Bd. of Elections*, No.

789 (1983). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). In particular, where a plaintiff challenges a state's electronic-voting method and requests the use of paper ballots, the lower-scrutiny *Burdick* test is applied. *See Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006) (applying *Burdick* to challenge to touchscreen voting procedure); *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003). As discussed below, Coalition Plaintiffs have not shown any basis to determine that Georgia's current voting system is unconstitutional.

> A.    *Most of Coalition Plaintiffs' relief is barred by the Eleventh Amendment.*

Coalition Plaintiffs are not likely to succeed on their claims because they request relief that this Court cannot order. The Eleventh Amendment generally bars claims against the State Defendants in their official capacities.

---

1:20CV457, 2020 U.S. Dist. LEXIS 138492, at *138 (M.D.N.C. Aug. 4, 2020) (finding no likelihood of success on unconstitutional-conditions doctrine claim when right allegedly surrendered was bodily integrity in COVID voting case).

16

*See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). While *Ex Parte Young*, 209 U.S. 123 (1908), provides an exception to Eleventh-Amendment immunity, it does so only for prospective injunctive relief grounded in a violation of federal law. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 105–106 (1984). This is because the *Ex Parte Young* exception "'rests on the need to promote the vindication of federal rights,' but in a case alleging that a state official has violated state law, this federal interest 'disappears.'" *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015) (citations omitted).

   While *Brown v. Georgia Department of Revenue*, 881 F.2d 1018, 1023-24 (11th Cir. 1989), allowed relief for a violation of state law when it was grounded in federal constitutional rights, Coalition Plaintiffs' proposed relief is exclusively grounded in the interpretation of state statutes and state regulations. When the "claims necessarily rely on a determination that a state official has not complied with state law, [then] a determination . . . is barred by sovereign immunity." *Fair Fight Action v. Raffensperger*, Case No. 1:18-cv-05391-SCJ (Doc. 188), slip op. at 15 (December 27, 2019) (denying motion for preliminary injunction).

   A significant portion of Coalition Plaintiffs' alleged relief turns on the interpretation and application of state law against state officials. They seek

an order finding (1) that BMDs violate Georgia law related to ballot secrecy, [Doc. 809-1, p. 33-34]; and (2) that the current logic and accuracy testing process is inconsistent with the requirements of Georgia law, *id.* at 36. This relief is plainly barred by the Eleventh Amendment, because the sole claim is that a *state* official has violated *state* law.[9] *Alabama*, 801 F.3d at 1290.

Coalition Plaintiffs' proposed relief on scanner thresholds and audits also violates the Eleventh Amendment. Coalition Plaintiffs seek an order requiring the State Election Board to make changes to its rules regarding threshold settings for scanners and auditing procedures. [Doc. 809-1, pp. 24-25]. But the *Ex Parte Young* exception to the Eleventh Amendment only exists when a court commands "a state official to do nothing more than refrain from violating federal law, [because] he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255, 131 S. Ct. 1632, 1638 (2011). Congress is not allowed to "commandeer the legislative processes of the States" by requiring passage of particular laws. *New York v. United States*, 505 U.S. 144, 161 (1992) quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

---

[9] Coalition Plaintiffs know how to seek relief in Superior Court and sought to do so earlier this year on the same issues on ballot secrecy they raise here. *See Coalition for Good Governance v. Gaston*, Case No. 20CV00077(S) (Sumter County Superior Court).

Because even Congress cannot commandeer the legislative process, a federal-court order requiring state officials to promulgate a regulation raises "serious federalism concerns," *Jacobson*, 957 F.3d at 1212, in large part because federal judges can "enjoin executive officials from taking steps to enforce a statute" but not to erase it from the statute books. *Id.* at 1209 quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 936 (2018).

This Court should decline Plaintiffs' invitation to adjudicate these state-law claims or, at the very least, they should be certified to the Georgia Supreme Court as questions of state law. *See Gonzales v. Governor of Georgia*, Appeal No. 20-12649 (11th Cir. Aug. 11, 2020).

> B.    *Coalition Plaintiffs are not likely to succeed on their claims that BMDs cannot be audited.*

Like Curling Plaintiffs, Coalition Plaintiffs argue that a barcode-based BMD system cannot be audited. [Doc. 809-1, pp. 22-23]. But the mere use of barcodes does not provide a sufficient basis to find the system is inherently unauditable and Coalition Plaintiffs cite nothing beyond Dr. Stark's beliefs on this point.

The proposed audit rules from the State Election Board, designed with the assistance of VotingWorks, clearly indicate that audits are to rely on "the

printed text on the ballot to determine the voter's selection" when auditing. Ga. Comp. R. & Regs. r. 183-1-15-.04(2)(4) (proposed rule); Adida Dec. at ¶¶ 4-5, 12. This process is consistent with recommendations of the National Academies of Science. [Doc. 821-7] ("Gilbert Supp. Dec.") at ¶ 7(C) n.2. Audits protect against potential malfunctions or hacks of QR codes on BMD-marked ballots. Adida Dec. at ¶ 12.

Coalition Plaintiffs also do not offer anything beyond what Curling Plaintiffs offered on voters verifying their ballots, instead resorting to the concept that no auditing record is sufficient unless every voter reviews every choice and there is a feedback mechanism for dealing with reports of inaccuracies. [Doc. 809-1, p. 30]. Coalition Plaintiffs rely on an extremely limited review of voter behavior during an election held in a pandemic and do not address the studies reviewing interventions and voters' abilities to find manipulations. Gilbert Supp. Dec. at ¶¶ 8-11. Moreover, the citation to the National Academy of Sciences report does not accurately reflect the ballots printed by Dominion BMDs in Georgia, because they do not use "abbreviated names/descriptions." [Doc. 809-1, p. 31].

C.   *Coalition Plaintiffs are not likely to succeed on their ballot-secrecy claim.*

Coalition Plaintiffs identify two alleged violations of ballot secrecy: (1) the size of the touchscreens and (2) the alleged timestamp on a digital cast-vote record. They fail to show any burden on the right to vote from either alleged issue.

First, this Court has already determined that claims related to the size and visibility of the touch screens are not part of this case. [Doc. 799, p. 4 n.1]. Even if they were, State Election Board rules already require[10] that each polling place "shall be arranged in such a manner as to provide for the privacy of the elector while voting." Ga. Comp. R. & Regs r. 183-1-12-.11(4). Further, the Secretary of State's office has provided guidance to county election officials about the setup of precincts that avoids having screens visible when voters are voting. Supplemental Declaration of Chris Harvey, attached as Ex. C ("Supp. Harvey Dec.") at ¶ 3 and Ex. 1. Coalition Plaintiffs point to no evidence that the BMDs cannot be deployed in a manner to

---

[10] If Coalition Plaintiffs allege that counties or State Defendants are not following State Election Board rules due to these alleged privacy issues, the same Eleventh-Amendment problems emerge here as well because the claim is that state officials are violating state regulations.

protect ballot secrecy as required by State Election Board rules, even if this claim was before the Court.

Second, Coalition Plaintiffs claim that the scanners places a timestamp on the cast-vote record but point to nothing in the record that supports this claim. As was explained last year, each AuditMark includes only (1) what tabulating unit scanned the ballot and (2) a randomized sequence number. . [Doc. 658-2, ¶ 10]. There is no way to correlate the sequence number to an individual voter or any point in time that the ballot was cast. *Id*. The optical scanner does not store any date or time-stamp information with the ballot image. *Id*. In short, it is impossible to re-recreate the sequence of the order in which the ballots were cast—meaning it is impossible to determine how someone voted. *Id*. Coalition Plaintiffs have no evidence to the contrary to support this claim.

Because Coalition Plaintiffs have not presented any evidence of a violation of the right to secret ballot, they have not shown there is any burden on the right to vote for in-person voters. As a result, they cannot show a likelihood of success on the merits of this claim.

D. *Coalition Plaintiffs' are not likely to succeed on their as-applied challenges to BMDs.*

Like Curling Plaintiffs, Coalition Plaintiffs rely on an alleged "complete lack of security" around Georgia's voting system as a basis for relief. [Doc. 809-1, pp. 35-36]. Their sole basis for this statement is Mr. Hursti's limited review of and admittedly incomplete opinions about elections in August along with a few other scattered reports, but this is hardly a foundation on which to find a burden on the right to vote. *Id*. Unlike Curling Plaintiffs, Coalition Plaintiffs do not rely on information carrying over from the DRE/GEMS system, but continue their general opposition to any technology coming between the voter and the ballot. *Id*. While this is a policy argument they have made to the General Assembly and other policy-making bodies, it is not a basis on which to conclude there is a burden on the right to vote.

Coalition Plaintiffs attack the current Logic and Accuracy Testing process as inconsistent with Georgia statutes. [Doc. 809-1, p. 36-37]. Even if not barred by the Eleventh Amendment, these claims simply do not make sense. The statute specifically requires the superintendent to test the ballot markers "in a manner that the State Election Board shall prescribe by rule or regulation." O.C.G.A. § 21-2-379.25(c). It did so in Ga. Comp. R. & Regs r. 183-1-12-.08. And the cited procedures requires test ballots to be created so

that for "all candidates in all races within the unique ballot style have received a single vote" that are then placed in the scanner. [Doc. 809-4, p. 25]. Coalition Plaintiffs offer no evidence that "testing every contest in every ballot style in every machine" is a workable or recommended practice—just their speculation that it should be required (or possibly already is required) by the statute. [Doc. 809-1, p. 36]. Again, without more, this is no basis to conclude that there is a burden on the right to vote from the method of testing Georgia's voting machines, especially with no evidence of any issues with the counting of ballots from those machines.

> E.   *Coalition Plaintiffs are not likely to succeed on their claims about scanners.*

For the final part of their search for a burden on the right to vote, Coalition Plaintiffs claim that it is unconstitutional for marks below a 10% threshold on an optical scanner to not be reviewed by humans. [Doc. 809-1, pp. 37-39]. Initially, this claim appears to be designed to force Georgia to not only use hand-marked ballots, but *hand-counted* ballots.

Coalition Plaintiffs ignore the extensive accuracy testing that took place as part of the EAC Certification process for the Dominion System. Cobb

Dec. at ¶¶ 4-6. And they cite only a handful of examples from supporters of the Coalition as a basis for their claims.[11]

The only possible burden on a voter arising from the scanner-threshold settings is if the voter disregards the instructions that come with the ballot. Supp. Harvey Dec. at ¶¶ 4-5. That is not a burden on the right to vote—it is a voter choosing to not follow the required regulatory structure of the state. If a voter shows up on the Wednesday after the election to vote in person, that voters has not been disenfranchised—they have failed to follow the necessary regulations to vote. *See, e.g., Stewart v. Marion Cty.*, No. 1:08-cv-586-LJM-TAB, 2010 U.S. Dist. LEXIS 38096, at *14 (S.D. Ind. Apr. 16, 2010) (no burden on the right to vote when voter had photo identification and ability to present it). But the proposed state regulations are even more generous and allow for a voter to fill in as little as 10% of the target area and still have their vote adjudicated by a Vote Review Panel.[12] Ga. Comp. R. & Regs. r. 183-

---

[11] Coalition Plaintiffs cite *United States v. Saylor*, 322 U.S. 385, 386 (1944), a criminal case involving voter fraud, as the sole authority in this section of their brief but it does not support the proposition for which it is cited.

[12] In an argument oddly similar to the "pregnant chad" discussion during the 2000 presidential election in Florida, Coalition Plaintiffs want *any* "perceptible voter mark" counted as a vote, but fail to define what standard should be used to determine whether a mark is "perceptible." [Doc. 809-1, p. 39].

1-15-.02(2)(k). If that is a burden at all, it is a "reasonable, nondiscriminatory restriction." *Timmons*, 520 U.S. at 358.

> F.   *The State's interests in maintaining an orderly election system far exceed any theoretical burden on the right to vote.*

Coalition Plaintiffs have shown no burden on the right to vote. But even if they had, the state has important regulatory interests that justify each of the alleged burdens and this Court must balance those interests against the vanishingly small burdens. *Timmons*, 520 U.S. at 358.

State Defendants will not repeat the state interests in maintaining the BMD system already outlined in response to Curling Plaintiffs, instead incorporating the sections of that brief covering voter intent, disabled voters, cost, and security at [Doc. 821, pp. 22-25]. State Defendants provide several additional discrete interests related to Coalition Plaintiffs' claims.

First, the State has an interest in the integrity of its election process. *Purcell*, 549 U.S. at 4. The tabulation of votes with clear voter intent saves time for election officials and allows the faster counting of ballots. Supp. Harvey Dec. at ¶ 5.

Second, the use of technology "between the voter and the ballot" allows the state to assist disabled voters and to avoid questions of voter intent in the administration of the election.

26

Third, the scope of the logic and accuracy testing sought by Coalition Plaintiffs would be extremely burdensome and is unnecessary. Supp. Harvey Dec. at ¶ 6. The Secretary of State's office designed the logic and accuracy testing procedures in consultation with Dominion and based on best practices. *Id.* at ¶¶ 7-8. Coalition Plaintiffs' proposal would add hours (if not days) of effort for local officials that are unnecessary. *Id.* at ¶¶ 9-10.

Finally, the State Election Board carefully considered the views of the Coalition for Good Governance, county election officials, and Dominion when designing the rule on the definition of a vote. Supp. Harvey Dec. at ¶ 8. The 10% threshold was chosen to minimize the burden on election officials while still ensuring that questionable marks were reviewed. *Id.* at ¶ 9. Requiring a manual review of every stray mark that happens to be in a target area would require significant time by county officials and would result in delays in certification. *Id.* at ¶ 10.

The interests of the State of Georgia far outweigh any burden on the right to vote based on the evidence presented to this Court and any problems with the election system can be resolved through the Election Code. *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970).  O.C.G.A. § 21-2-520 *et seq*. Coalition Plaintiffs have failed show likelihood of success on the merits and this Court should deny their latest preliminary-injunction motion.

### III.  Coalition Plaintiffs will not suffer irreparable injury absent a preliminary injunction.

Even if Coalition Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury makes preliminary injunctive relief improper. *See Snook v. Trust Co. of G. Bank of Savannah*, N.A., 909 F.2d 480, 486 (11th Cir. 1990). As the Eleventh Circuit has emphasized, the asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *NE Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).

Coalition Plaintiffs rely solely on the fact that their claims involve voting as the basis they will suffer irreparable harm. But unlike the plaintiffs in *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020), who would have been actually prevented from voting by the challenged law, Coalition Plaintiffs have a variety of methods of voting in upcoming elections using their preferred method of voting.

Coalition Plaintiffs can vote absentee on a hand-marked paper ballot and utilize the United States mail, SEB-approved drop boxes, or delivery to county election offices to cast their votes. *See* O.C.G.A. § 21-2-380, *et seq*; Ga. Comp. R. & Regs. r. 183-1-14-0.6-.14. Second, paper audit trails resolve any

non-speculative harm. Ga. Comp. R. & Regs. r. 183-1-15-.04 (published for comment). Third, after over three years of litigation, there is no evidence of actual tampering of equipment in use in elections; instead Coalition Plaintiffs continue to impermissibly try to flip the burden and make State Defendants disprove a negative.

## IV.   The balance of the equities does not favor Coalition Plaintiffs and the public interest weighs in favor of State Defendants.

Once again, the interests of equity and the public favor denying Coalition Plaintiffs' requests for injunctive relief. When considering whether to grant a preliminary injunction, the Court must consider the balance of the equities carefully; cursory analysis is insufficient. *See Winter*, 555 U.S. at 26. Indeed, the "balance of equities and consideration of the public interest . . . are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Id*. at 32.

In the interests of avoiding duplication, State Defendants incorporate the discussion of election timing outlined in their brief in response to the Curling Plaintiffs' motion. [Doc. 821, pp. 26-30]. In addition, there are only 34 qualified ballot printers for use with the Dominion Democracy Suite and only one of those is located in the State of Georgia, making Coalition Plaintiffs'

proposed switch to hand-marked ballots even more difficult. Supp. Coomer Dec. at ¶ 5.

Coalition Plaintiffs breezily assert that State Defendants "have no valid reason to favor" one method of voting over another, [Doc. 809-1, p. 41], ignoring the state's statutes that require the use of electronic ballot markers as the default method of election. O.C.G.A. § 21-2-300(a). Coalition Plaintiffs also gloss over the extreme difficulty of changing election systems on the timelines they propose—and offer no support from any experts that such a change is even possible. In fact, Coalition Plaintiffs earlier questioned whether State Defendants would be able to roll out the Dominion system on a much longer timeline. [Doc. 640-1, p. 4] (questioning whether rollout of statewide system could be complete in six months).

Coalition Plaintiffs' argument that the public interest favors relief because voters need to have confidence in the election system is stunning in light of the fact that *their own expert* is telling Georgians they should have no confidence in the August 11 election results. [Doc. 809-3, ¶¶ 49, 85]. Coalition Plaintiffs appear to be the ones working to undermine confidence in the election system. As State Defendants earlier explained, changing an election system on the timeline proposed would be disastrous for the November

elections, especially in comparison with the lack of burden on Coalition Plaintiffs.

Georgia has worked extensively over the past year to become one of the few states planning to conduct a statewide risk-limiting audit. Adida Dec. at ¶ 14. Clear voter intent from BMDs, combined with RLAs, will produce strong evidence that election outcome is correct. *Id*. at ¶¶ 5, 12-14. Georgians can have confidence in their election system due to years of work of election officials and Coalition Plaintiffs again offer only speculation to the contrary.

## CONCLUSION

Coalition Plaintiffs ask this Court to be the first court in the country to declare BMDs unconstitutional. They also seek changes to scanner programming and audit rules, all within days before the November election is underway. Coalition Plaintiffs have provided no evidence that varies this Court's decision about their third round of preliminary-injunction motions and this Court should deny their latest motion as well.

Respectfully submitted this 28th day of August, 2020.

Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com

Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

*/s/Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Jonathan D. Crumly
Georgia Bar No. 199466
jcrumly@taylorenglish.com
James A. Balli
Georgia Bar No. 035828
jballi@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for State Defendants*

32

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing **STATE DEFENDANTS' RESPONSE IN OPPOSITION TO COALITION PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RELATING TO BMDS, SCANNING AND TABULATING, AND AUDITING** has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson