# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## COALITION PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION RELATING TO BMDS, SCANNING AND TABULATING, AND AUDITING

September 1, 2020

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................i

TABLE OF AUTHORITIES ....................................................................iv

I.    INTRODUCTION ..........................................................................1

II.   DEFENDANTS' RESPONSES FAIL TO REBUT COALITION
      PLAINTIFFS' INITIAL SHOWING ON THE MERITS..........................2

      A.    Defendants' Legal Arguments Are Wrong ...........................2

            1.    The State's Arguments In Response ..........................2

                  a)    Applicable Standard ....................................2

                  b)    Eleventh Amendment Immunity ......................3

                  c)    Auditability (Doc 834, at 19–20)....................5

                  d)    Ballot secrecy (Doc 834, at 21–22) ...............5

                  e)    Security and Testing (Doc 834, at 23–24)........6

                  f)    Scanner Settings (Doc 834, at 24–26) ............6

                  g)    Weight of State's Interest (Doc 834, at 26–27)...............7

            2.    The Fulton Defendants' Arguments In Response....................8

      B.    The State's Evidence Fails To Rebut Coalition Plaintiffs'
            Proof ........................................................................8

            1.    Dr. Eric D. Coomer (Doc. 834-1) ............................8

            2.    Dr. Benjamin Adida (Doc. 834-2) ...........................10

            3.    Chris Harvey (Doc. 834-3) ...................................11

       4.      Jack Cobb (Doc. 821-6) ...........................................................11

       5.      Dr. Juan Gilbert (Doc. 821-7) ..................................................12

III.    NEW EVIDENCE BOLSTERS COALITION PLAINTIFFS'
       LIKELIHOOD OF PREVAILING ON THE MERITS ...............................12

    A.    Reply Declarations ..........................................................................13

    B.    New Evidence Shows Constitutional Violations Have
         Occurred And Are Imminently Threatened To Recur ......................16

       1.      EAC-Certification Status Of Georgia's Voting Software .......16

       2.      Disenfranchising Scanner Settings And Feature
           Configurations.........................................................................16

       3.      BMD And Scanner Secrecy Violations ...................................18

       4.      Inability To Audit And Verify Outcomes................................19

       5.      Cybersecurity Deficiencies ....................................................20

       6.      Testing Deficiencies...............................................................21

IV.    PLAINTIFFS' SHOWING OF ALL REMAINING ELEMENTS
       REQUIRED FOR INJUNCTIVE RELIEF IS UNREBUTTED..................21

    A.    Coalition Plaintiffs Are Likely To Suffer Irreparable
         Harm .................................................................................................22

    B.    The Balance Of Equities Favors The Coalition Plaintiffs
         And An Injunction Is In The Public Interest......................................22

V.     FEASIBILITY AND *PURCELL* ....................................................................23

    A.    Hand Marked Paper Ballots Instead Of BMDs..................................24

    B.    Scanning Sensitivity Settings and Audits ..........................................25

VI.   CONCLUSION..............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burdick v. Takushi*,
504 U.S. 428 (1992)....................................................................................2

*Bush v. Gore*,
531 U.S. 98 (2000)..............................................................................4, 17

*Crawford v. Marion County Election Bd.*,
553 U.S. 181 (2008)...........................................................................3, 4

*Curling v. Kemp*,
334 F. Supp. 3d 1303 (N.D. Ga. Sep. 17, 2018)................................2, 14, 16, 19

*Innovative Health Sys. v. City of White Plains*,
117 F.3d 37 (2d Cir. 1997) ...................................................................4

*Jacobson v. Fla. Sec'y of State*,
957 F.3d 1193 (11th Cir. 2020) ...........................................................4

*Jones v. Governor of Fla.*,
950 F.3d 795 (11th Cir. 2020) ............................................................22

*Lynch v. Baxley*,
744 F.2d 1452 (11th Cir. 1984) ...........................................................8

*Purcell v. Gonzales*,
549 U.S. 1 (2006)...........................................................................23, 24

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
140 S. Ct. 1205 (2020)..................................................................23, 24

*Tashjian v. Republican Party*,
479 U.S. 208 (1986)........................................................................3, 22

*United States v. Saylor*,
322 U.S. 385 (1944).......................................................................18, 21

*Ex Parte Young*,
  209 U.S. 123 (1908) ...................................................................................3

**Statutes**

28 U.S.C. § 1746 .........................................................................................15

O.C.G.A. § 21–2–300(a)(2) ........................................................................24

O.C.G.A. § 21–2–379.25(a) & (c) .........................................................11, 21

O.C.G.A. § 21–2–379.25(c) ......................................................................6, 7

O.C.G.A. § 21–2–383(c) .............................................................................24

O.C.G.A. § 21–2–438(c) ..........................................................................7, 17

**Other Authorities**

Eleventh Amendment ....................................................................................3

Ga. Comp. R. & Regs. 183–1–12–.11(2)(c) ...............................................23

Georgia Const. ...............................................................................................4

State Election Bd. Rule 183–1–15–.04 (proposed) ....................................25

State Election Bd. Rule 183-1-15-.02 (proposed) .....................................25

U.S. Const. Amend XI ...................................................................................3

The Coalition Plaintiffs respectfully file this Reply Brief In Support Of Motion For Preliminary Injunction Relating To BMDs, Scanning And Tabulating, And Auditing.

## I.   INTRODUCTION

The State Defendants' opposition to the Motion relies almost entirely upon legal arguments.  It makes only a token effort, if that, to present actual *evidence* that might contradict the Coalition Plaintiffs' overwhelming showing of massive constitutional deficiencies in the Dominion BMD System.  Instead, Defendants confine their case to arguing that this Court lacks power to make Defendants respect constitutional rights, and they limit their evidence mostly to proffered testimony that the State cannot feasibly stop violating the Constitution.

Plaintiffs have demonstrated that the State's voting system is unauditable, that its BMD ballot cards are neither checked nor verifiable by voters, that the BMDs violates ballot secrecy with their giant touchscreens, that the BMD scanners violate ballot secrecy by timestamping ballot images when ballot cards are cast into scanners, that the entire system is pervasively insecure and vulnerable to malicious attack, that the basic system testing is deficient, that the scanner settings cause outright disenfranchisement of many absentee voters by discarding valid votes, and more.  The evidence before this Court shows that the Dominion BMD

System, as it has been implemented in Georgia, violates the fundamental right to vote and the right to equal protection.  It fails to meet the standard this Court told the State it would have to meet almost two years ago—"If a new balloting system is to be launched in Georgia in an effective manner, it should address democracy's critical need for transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1328 (N.D. Ga. Sep. 17, 2018) (Doc. 309, at 46). The relief requested by the Coalition Plaintiffs should be granted.

## II.   DEFENDANTS' RESPONSES FAIL TO REBUT COALITION PLAINTIFFS' INITIAL SHOWING ON THE MERITS

The Defendants have failed—on both the law and the evidence—to refute the Coalition Plaintiffs' likelihood of prevailing on the merits.

### A.   Defendants' Legal Arguments Are Wrong

The Defendants' legal arguments (Doc. 834; Doc. 821; Doc. 833) lack merit.

#### 1.   The State's Arguments In Response

##### a)   Applicable Standard

Under *Anderson / Burdick / Crawford*, "a court evaluating a constitutional challenge to an election regulation [must] weigh the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.'"  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

"However slight that burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008).

The State claims that the *Anderson / Burdick / Crawford* framework does not require the State to produce evidence to prove its interest in a challenged election regulation, citing *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009). (Doc. 834, at 15.) While it is true that a State need not offer evidence of its interest, the asserted interest still must be "relevant and legitimate," *Crawford*, 553 U.S. at 191, and it may not consist of mere "financial and administrative considerations," *Tashjian v. Republican Party*, 479 U.S. 208, 218 (1986). And no case says the State's ability to assert a valid interest without evidence means that the State can dispute a plaintiff's evidence (of burdens on constitutional rights) without having to present contrary proof of its own. States have no such privilege.

### b)   Eleventh Amendment Immunity

Defendants stubbornly recycle Eleventh Amendment arguments that have consistently been rejected by this Court and the Eleventh Circuit. (Doc 834, at 16–19.)  By now it is well-established as law of the case that Coalition Plaintiffs' claims for prospective injunctive relief fall within the exception to Eleventh Amendment immunity recognized by *Ex Parte Young*, 209 U.S. 123 (1908).

3

The State argues for a different result here because, it says, the claims on ballot secrecy, testing, and scanner thresholds are "exclusively grounded in the interpretation of state statutes and regulations."  (Doc. 834, at 17.) The State also argues that *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1212 (11th Cir. 2020), prohibits relief that compels the State to do something, rather than refrain from doing something.  These arguments are wrong.

First, Coalition Plaintiffs do not seek relief "exclusively grounded" in violations of state law. Violations of ballot secrecy *do* violate Georgia law, but they *also* burden the (federal) fundamental right to vote without a "sufficiently weighty" justification. *Crawford*, 553 U.S. at 191. Depriving in-person voters of ballot secrecy *does* violate the Georgia Constitution, but it *also* violates the (federal) right to equal protection. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). The same reasoning applies to testing, auditability, verifiability, security, and scanning.

Second, the State's characterization of the requested scanner and audit relief as mandatory rather than prohibitory is based on semantics. The Coalition Plaintiffs' proposed relief can just as easily be framed in prohibitory terms with no substantive difference. Where, as here, "the distinction between mandatory and prohibitory injunctions is often 'more semantical than substantive,'" *Innovative*

*Health Sys. v. City of White Plains*, 117 F.3d 37, 43 (2d Cir. 1997), the Court should look to substance. The State does not have immunity.

### c)      Auditability (Doc 834, at 19–20)

Defendants are cavalier about the lack of any auditable record of voter intent.  The State simply waves away the record evidence that shows most voters do not check their BMD ballot cards and few voters are able to accurately verify their ballots even when they do check. The State offers almost no defense on audits.

### d)      Ballot secrecy (Doc 834, at 21–22)

Defendants dispute that BMD touchscreens are part of this case, which is wrong (Doc. 809, at 32 n.8). They argue that their guidance on setting up precincts will protect voter privacy, which is also wrong. The February 2020 guidance referenced (Doc. 834-3 at 7) simply does not work to prevent voters having sightlines to other voters' touchscreen ballots in an actual polling place as well documented in the many declarations filed by Coalition's election observers  for multiple elections in multiple counties since the guidance was issued. Finally, they dispute that timestamping of scanned BMD ballots even occurs. (Doc. 834, at 13 (citing Doc. 658-2).)  This last argument flies in the face of Dominion's documentation  (Doc. 640-1, at 81) and of ballot images that clearly show

timestamping. (Ex. 19-D (Marks Decl.) (AuditMark appended to every image shows scanning timestamp).) Timestamps record the order in which BMD ballots are cast into scanner, which makes it easy to identify an in-person voter's ballot.  If the State does not even know how its own voting system works, then its claims that secrecy is preserved plainly deserve no credence.

### e)      Security and Testing (Doc 834, at 23–24)

Defendants confine their defense of the system's security to the argument that proper security standard merely amounts to a policy dispute.  They defend Georgia's lax Logic and Accuracy Testing (LAT) on grounds that testing every contest in every ballot style on every machine is neither workable nor recommended—despite this exact process being expressly required by O.C.G.A. § 21–2–379.25(c). These threadbare arguments totally ignore the substance of the security and testing deficiencies that have been identified by Coalition Plaintiffs.

### f)      Scanner Settings (Doc 834, at 24–26)

Defendants make the astonishing argument that scanner settings which automatically discard perceptible voter markings create no burden on the right to vote. The State says this is true because voters have instructions for marking ballots, and scanners were tested when the Dominion system was certified by the EAC. Incredibly, this argument is the State's entire defense on the issue of scanner

6

threshold settings; there is nothing more.  Further, the new 5.5-A(GA) software is not certified by the EAC. The State makes no attempt to explain how an arbitrary threshold for discarding voter markings can be reconciled with O.C.G.A. § 21–2–438(c), which requires that all markings on a paper ballot that clearly indicate a voter's intent *must* be counted as votes, even if the voter does *not* mark the ballot as the law requires.  The State's position is indefensible.

### g)    Weight of State's Interest (Doc 834, at 26–27)

Finally, the State identifies its interests (to be weighed against the burdens on Coalition Plaintiffs' rights, under *Anderson / Burdick / Crawford*) as interests in election integrity, assisting disabled voters, avoiding questions of voter intent, and avoiding the burdens of LAT procedures. The last two items do not count as "legitimate" interests because the State can have no legitimate interest in violating laws.  See O.C.G.A. § 21–2–438(c) (marks that show voter intent must count) or O.C.G.A. § 21–2–379.25(c) (providing required LAT procedures). The interest in election integrity will be promoted by the requested relief, not diminished.  Finally, restraining the State from requiring all in-person voters to use BMDs will not adversely impact disabled voters in any way.

### 2.    The Fulton Defendants' Arguments In Response

Fulton County's response (Doc. 833, at 2) basically reiterates the State's arguments.  Fulton addresses literally none of the evidence presented by Coalition Plaintiffs, and Fulton introduces no rebuttal evidence of its own.  Fulton County's legal arguments should be rejected for the same reasons as the State's.

### B.    The State's Evidence Fails To Rebut Coalition Plaintiffs' Proof

The State Defendants offer very thin evidence that fails to meet, much less contradict, most of the Coalition Plaintiffs' showing on the merits.(Doc. 834, at 4–13.) To the extent that the State does attempt to present contrary evidence on the merits, the State's proffered testimony is completely unpersuasive.[1]

### 1.    Dr. Eric D. Coomer (Doc. 834-1)

In their Response (Doc. 834, at 20), the State Defendants proffer testimony from Dr. Eric D. Coomer on three very specific points.  Dr. Coomer's testimony on all three points is either irrelevant or demonstrably wrong.

---

[1] In addition, the State Defendants erroneously discount the Coalition Plaintiffs' "prior-filed" evidence as "not a sufficient record" to find the Dominion system unconstitutional. (Doc. 834, at 3–4.)  Defendants ignore (1) that the Court only denied the previous motion in the interest of having a refreshed record and (2) that previously submitted evidence shows past wrongs, which still support injunctive relief now.  *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) ("Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction.").

First, on scanner sensitivity, Dr. Coomer says, "scanner threshold settings are set by the election database, not by users" and cannot be changed by users "without being trained to do so, and with the appropriate application access privileges." (Docs. 834, at 7; 834-1, at 3, ¶ 4.)  Even if true, these statements are irrelevant. The State is *already* proposing to change these setting through a new rule. (Doc. 809-14, at 6.)  Changing the settings to a *different* level entails no additional user training or access beyond what is already pending.

Second, to rebut Plaintiffs' showing that ballot secrecy is threatened by timestamps on scanned ballots, Dr. Coomer says, "[T]here are no timestamps on any scanned ballots." (Doc. 834, at 13 (citing previous Coomer Decl., Doc. 658-2).)  This statement is demonstrably false.  Dominion's documentation *shows* the timestamps. (Doc. 640-1, at 81.) So do numerous ballot images from an actual recent election. (Ex. 19 (Marks Decl. Ex 19-D).)

Third, on feasibility, Dr. Coomer says that switching to hand marked paper ballots would be "difficult" because only one (out of 34) qualified ballot printers is located in Georgia. (Doc. 834, at 29–30; 834-1, at 3, ¶ 5.) This is pure misdirection, given the well-publicized fact that Georgia's primary ballot printer is located in Arizona. The physical location of a single printer says nothing about

whether it is feasible to print enough ballots to make the switch. (It is eminently feasible.)

### 2.  Dr. Benjamin Adida (Doc. 834-2)

The State submits a declaration by Dr. Benjamin Adida that proffers testimony about post-election risk-limiting audits (RLAs). It is notable that Dr. Adida does not say that the State has actually conducted an RLA. Nor does he comment on the State's near-term ability to realistically conduct a meaningful audit. Significantly, he does not bless BMDs as auditable. Nor does he opine that valid audits are possible without voter-verified ballots serving as the underlying auditable record.  Instead, Dr. Adida carefully premises his opinions on his *assumption* that every voter has actually verified the correctness of his or her ballot. (Doc. 834-2 at 7, ¶ 12) ("As long as voters verify the text, and as long as RLAs are conducted on the basis of the same ballot text (such as is required by Georgia's proposed rule), the potential QR code mismatches are caught just like any other tabulation mistake might be caught."). Dr. Adida does not explain why this assumption is valid, given Coalition Plaintiffs' evidence that voters do not, in fact, verify their BMD ballot cards. Dr. Adida does not address the reality of human behavior in the polling place, which conflicts with the behavior that is required for BMD elections to be auditable.

### 3. Chris Harvey (Doc. 834-3)

The State Defendants submit a declaration by Chris Harvey, in which he acknowledges that the Georgia's large BMD touchscreens create "voter privacy" problems that have required official guidance about how to set up precincts to avoid the screens being visible.  (Doc. 834-3, ¶ 3 & at 7 (Ex.1).)  Mr. Harvey does not address previously filed evidence that shows the ineffectiveness of the State's guidance. Mr. Harvey also states that testing all candidates and races on each BMD "is overly burdensome and unnecessary," (id. at 4, ¶¶ 6–7), yet he neglects to explain how O.C.G.A. § 21–2–379.25(a) & (c), which require testing of *all* questions and offices on *each* BMD, are not essential to test machine accuracy and can be lawfully disregarded. Finally, he justifies a scanner sensitivity threshold that automatically discards some voter marks because it "minimizes the burden on election officials" and avoids time-consuming manual reviews of "every stray mark that happens to be in a target area.". (Id. at 4–5, ¶¶ 9–10.)

### 4. Jack Cobb (Doc. 821-6)

The State incorporates a declaration by Jack Cobb (Doc. 834, at 6; Doc. 821-6), that was originally filed in opposition to the Curling Motion (Doc. 785). The State presents Mr. Cobb's declaration as evidence that, "the BMD system is hardened, has been subjected to extensive testing, and has a variety of security

features built in." (Doc. 834, at 6.) But Mr. Cobb's opinion of the system's security is circular insofar as it is *based upon trusting the system to report its own health accurately to begin with*. For example, Mr. Cobb trusts BMD software to report its own true hash value as a way to detect whether the software has been altered. (Doc. 821-6, ¶ 7.) He also trusts each BMD to determine whether it is infected by comparing the digital signatures on access cards "against the digital signature on the system." (Id. at ¶ 10.) Trusting any software to verify its own integrity in this manner is not a defensible approach to security.

### 5.   Dr. Juan Gilbert (Doc. 821-7)

Finally, the State incorporates a declaration by Juan E. Gilbert, Ph.D. (Doc. 834, at 20; Doc. 821-7.) Dr. Gilbert discusses various studies on voter verification without connecting their conclusions to any actual observations of voter behavior in real Georgia elections. Dr. Gilbert asserts that one study shows voters are "quite good" at verifying BMD ballots, but he concedes that "many voters in the study chose not to examine their ballots." (Doc. 821-7, ¶ 9.) In sum, Dr. Gilbert's declaration is an academic exercise that fails to address real evidence of *actual* deficiencies plaguing Georgia's voting system in practice.

## III.   NEW EVIDENCE BOLSTERS COALITION PLAINTIFFS' LIKELIHOOD OF PREVAILING ON THE MERITS

Coalition Plaintiffs submit additional declarations and evidence with this

Reply.  These submissions are summarized in the following sections.

## A.     Reply Declarations

Coalition Plaintiffs submit several additional exhibits with this Reply Brief.

**Exhibit 20** is the declaration of Kevin Skoglund.  Because this declaration is at least partly based upon Mr. Skoglund's review of restricted material that the Defendants have recently produced, it will be separately filed under seal.

Mr. Skoglund's declaration provides his opinions on whether Georgia is actually running the same version of election software that the U.S. Election Assistance Commission has certified, and discusses the implications of his conclusions. Obviously if Georgia is not running the EAC-certified version of Dominion's software, then the imprimatur of system security that the EAC's certification provides, which the State Defendants rely so heavily upon, would be destroyed.[2]

**Exhibit 16** is the Sixth Declaration of Philip B. Stark. In his declaration, Dr. Stark rebuts Dr. Gilbert's theories about auditability and voter verification by demonstrating how unrealistic assumptions of voter verification undercut the theory that BMD verification rates can be improved "enough," even with

---

[2] Plaintiffs have objected to the Defendants' overly broad designation of materials as "confidential" and "Attorney Eyes Only" in the recent productions.  The parties were still attempting to confer at the time of this filing.

instructions and reminders, to make BMD ballots a reliable source record for audits.  To illustrate this point, Dr. Stark gives an example that shows how easily an election outcome can be manipulated without detection, given typical rates of non-verification of ballots by voters and typical voter inability to conduct accurate verifications. (Ex. 16, ¶¶ 7–12.) He also discusses the inadequacy of instructions and reminders for improving voter behavior. (Id. at ¶ 13.) Finally, Dr. Stark explains why BMDs are not contestable, even if voters who do their verifications should notice errors. (Id. ¶¶ 14–15.) These findings lead to the inevitable conclusion that BMD elections satisfy the fundamental constitutional requirement, articulated by this Court, for "verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." *Curling*, 334 F. Supp. 3d at 1328  (Doc. 309, at 46).

    **Exhibit 17** is the declaration of Harri Hursti**.**  While Defendants claim that the "BMD system is hardened, has been subjected to extensive testing, and has a variety of security features built in," (Doc. 834, at 6), Mr. Hursti provides alarming expert rebuttal testimony based on his multiple visits to Fulton County Elections Preparation Center ("EPC") where he observed remote access to the EMS server and saw numerous indications of a system that has not, in fact, been hardened. Mr. Hursti's review of server Windows logs and his observations of a Dominion

14

employee's operation of the server reveal a complete absence of meaningful security. Mr. Hursti reiterates his opinion that there can be no confidence in the reported outcome of the election given the collapse of security of the central election server. Mr. Hursti also attaches a number of ballot images from a recent Fulton County election that clearly show the Dominion scanner sensitivity threshold settings are causing obvious votes to be discarded

**Exhibit 18** is a certified transcript, with its own Exhibit 1, of a sworn statement given by Jesse Evans in interview format, the Chair of the Athens-Clarke County Board of Elections, which is submitted pursuant to 28 U.S.C. § 1746.  (Ex. 18, at 2: 15–:23.) In his statement, Mr. Evans attests that Athens-Clarke County converted from BMD to hand marked paper ballots overnight to solve ballot secrecy problems (id. at 22–25), and then converted back to BMDs again overnight after being subject to an enforcement action and being fined by the State Election Board, (id. at 28–30.)

**Exhibit 19** is the declaration of Marilyn Marks, which authenticates seventeen voter complaints filed with the State Election Board, which have been designated "confidential" by the Defendants and thus are being filed separately under seal as **Exhibit 19-C**.  Ms. Marks also authenticates an email from an

election official related to Acceptance Testing, and the source of certain ballot images produced in discovery.

### B. New Evidence Shows Constitutional Violations Have Occurred And Are Imminently Threatened To Recur

Additional evidence submitted with this Reply strengthens the Coalition Plaintiffs' showing that the Dominion BMD System, as implemented in Georgia, fails to "address democracy's critical need for transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." *Curling*, 334 F. Supp. 3d at 1328 (Doc. 309, at 46).

#### 1. EAC-Certification Status Of Georgia's Voting Software

Discussion of certification status of Georgia's voting system software is discussed in a separate filing (**Exhibit 21**), which includes review of the declaration of Kevin Skoglund (Ex. 20.)  The separate filing will be filed under seal pursuant to the requirements of this Court's protective order governing "confidential" and "Attorney Eyes Only" material. (Doc. 477, at 8, 11.)

#### 2. Disenfranchising Scanner Settings And Feature Configurations

Harri Hursti's declaration explains how the Dominion scanner sensitivity threshold settings work and why the State's preferred settings will result in valid votes being discarded.  Ballot images from Fulton County, including a number of

images that show the AuditMark has recorded "blank contest" for races in which the human eye can clearly tell the voter meant to cast a vote. (Ex. 19, at 27–4 (Marks Decl. Ex. 19-D).) These images show that the pre-printed ovals are washed out, (e.g., id. at 41, 43, 45), which means the scanner's dynamic contrast adjustment is unevenly reducing the amount of information available on the ballot images for the threshold settings to be applied to in the first place.

The images submitted with Mr. Hursti's declaration are evidence of outright voter disenfranchisement. These ballots are evidence of per se violations of the fundamental right to vote. They are also evidence of violations of equal protection because in-person voters who use BMDs are not subject to having their votes rejected by a scanner in this manner. These ballots show that the State's scanner settings violate state law—and thus equal protection under *Bush v Gore*, 531 U.S. at 104–05—by allowing a Dominion computer software application simply to discard (only) in-person voter markings that are below some arbitrary threshold of completeness even where those marks are obvious votes to a human eye and must be counted. O.C.G.A. § 21–2–438(c). This is not a small problem. (See Ex. 19-D.)

As Mr. Hursti discusses, this problem can be solved by restraining the State from requiring scanner settings that automatically discard any degree of perceptible voter markings, but it will not be solved by the State's proposed rule.

Scanner sensitivity settings control the counting of votes on all hand marked paper ballots , which means all absentee, provisional, and emergency ballots. Adopting setting that allow scanners to automatically reject voter marks that are perceptible at any level is plainly a violation of the fundamental right of each voter to have his or her vote accurately recorded and counted, as well as the right of every voter to have *all* votes counted correctly. *United States v. Saylor,* 322 U.S. 385, 386 (1944). No voter markings on any ballot should ever be allowed to be automatically rejected by a computer without some level of human review.

### 3.    BMD And Scanner Secrecy Violations

The State's argument that guidance for setting up polling places is sufficient to mitigate the secrecy violations caused by oversized BMD touchscreens ignores all the evidence Coalition Plaintiffs have already placed in the record about the failure of the State's guidance to solve this problem. The issuance of guidance amounts to an admission that the problem exists.  But the State has no other argument, evidence, or solution to offer.  The Court should grant relief from BMDs on this ground alone.

As for the timestamps, it is shocking that the State can argue timestamping does not occur when Dominion's own documentation shows that AuditMark does timestamp the images of scanned BMD ballot card, and when the Fulton County

ballot images attached to Marilyn Marks's declaration plainly contain timestamps that prove that the Dominion documentation is correct. (Ex. 19-D.)

Timestamping on scanned ballot images makes it possible to associate BMD ballot images with the in-person voters who cast the corresponding ballots into the scanner. If an observer records the time that a person scans their ballot, anyone with access to the EMS data can tell how that person voted.  For prominent people like government official, journalists, and politicians who vote in person, there is no secret ballot in Georgia.  Appropriate relief is to restrain the State from requiring in-person voters to use BMDs or, if it is possible, to require State to disable timestamping on scanners.

### 4.    Inability To Audit And Verify Outcomes

All the evidence shows that elections conducted on BMDs are not auditable and thus deprive voters of "verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." *Curling*, 334 F. Supp. 3d at 1328 (Doc. 309, at 46).  Philip Stark has explained that voters cannot accurately verify whether their own choices are summarized correctly on lengthy ballots, which are typical in modern elections, and the record is replete with evidence that most in-person voters do not check their BMD ballots for correctness in any event.. Even if they did check and found a problem, Dr. Stark explains that nothing can be

done about it because there is no practical way to verify or diagnose a

malfunctioning BMD.  The State's answer is to rely upon the false security of post-

election audits that are conducted on the back of voter records that have to be

*assumed* to be accurate reflections of voter intent. Such audit theater does not give

voters the kind of "verifiable election process" that this Court has already said the

Constitution requires, but provides only false comfort.

### 5.   Cybersecurity Deficiencies

The evidence shows that the security of the Dominion BMD System is

constitutionally deficient.  Kevin Skoglund's sealed deposition discusses the issue

of whether Georgia is using an EAC-certified version of its voting system

software. To the extent that Georgia is using uncertified software, any assurances

of security that rest on the EAC certification may not be credited.

The Dominion BMD System is replete with security deficiencies.  Harri

Hursti's declaration identifies numerous problems that cannot be ignored in

determining the constitutionality of the system.  Mr. Hursti, Alex Halderman, and

others have described how the system suffers from logging accountability and

audit trail problems, the presence of insecure commercial "freeware" on servers,

apparent remote accessibility of the servers over the Internet, the ability to print

multiple ballots can be printed from BMDs during the same voter session, use of

USB sticks with potential to inject malware, failure to maintain "air gaps," and more.  The system suffers from pervasively lax security and is therefore an incredibly inviting target that is profoundly vulnerable to malicious attack.

*United States v. Saylor* recognizes voters' right "to have their expressions of choice given full value and effect by not having their votes impaired, lessened, diminished, diluted and destroyed by fictitious ballots fraudulently cast and counted, recorded, returned, and certified." 322 U.S. at 386.  This right cannot be guaranteed by a voting system as insecure and Georgia's system.

### 6.    Testing Deficiencies

Georgia law, consistent with typical Logic and Accuracy testing (LAT) goals in many states, requires the testing of *all* questions and *all* offices on *each* BMD. O.C.G.A. § 21–2–379.25(a), (c).  But the LAT procedures that have been implemented fail to require testing that satisfies these requirements.  Chris Harvey's declaration admits this. Inadequately tested machines cannot be trusted, especially when lack of testing meets a profound lack of security.  Relief is needed.

## IV.    PLAINTIFFS' SHOWING OF ALL REMAINING ELEMENTS REQUIRED FOR INJUNCTIVE RELIEF IS UNREBUTTED

The Defendants also dispute the remaining elements required for injunctive relief.  Their arguments are wrong as a matter of law and should be rejected.

### A.   Coalition Plaintiffs Are Likely To Suffer Irreparable Harm

State Defendants dispute the presence of irreparable harm by suggesting, among other things, that no voters will be "actually prevented from voting." (Doc. 834, at 28–29.)  But voters whose votes are discarded by scanners are prevented from voting.  "The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm" *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020).

### B.   The Balance Of Equities Favors The Coalition Plaintiffs And An Injunction Is In The Public Interest

State Defendants offer the avoidance of administrative inconvenience and cost as their chief equities, (Doc 834, at 29–31), even though the Supreme Court excludes these kinds of considerations from ever being relevant and legitimate state interests that could be used to justify the violation of constitutional rights. *Tashjian*, 479 U.S. at 218. The State dismisses the Coalition Plaintiffs' invocation of public confidence in elections as favoring relief, and instead engage in gaslighting by suggesting that public confidence has actually been damaged by voters' temerity in seeking to vindicate their constitutional rights.  When Defendants argue that making a switch from BMDs to paper ballot in a considered way months in advance of an election "would be disastrous" (Doc 834, at 30), they ignore that their own election rules already call for such a switch to be made "on-

22

the-fly" during emergencies or when wait times get long, *see* Ga. Comp. R. &

Regs. 183–1–12–.11(2)(c) & (d) (State Election Bd. Rules), Dissimulation of this

sort should be rejected; the equities and public interest clearly favor granting relief.

## V.   FEASIBILITY AND *PURCELL*

Defendants dispute the feasibility of Coalition Plaintiffs requested relief and

invoke *Purcell v. Gonzales,* 549 U.S. 1, 4–5 (2006), and *Republican Nat'l Comm.*

*v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020), to argue that no relief

may equitably be granted, even against admittedly unconstitutional practices, two

months before an election. (Doc. 834, at 14–15.)  Defendants are wrong.

*Purcell* involved a factual challenge to a voter identification requirement in

which the district court denied an injunction without making factual findings, and

the appeals court subsequently granted an injunction pending appeal four weeks

prior to the election without benefit of any factual findings.  The Supreme Court,

concerned that the appeals court had acted without having any facts to review,

vacated the injunction "[g]iven the imminence of the election and the inadequate

time to resolve the  factual disputes." *Id*. at 5–6.

In *Republican Nat'l Comm.*, the Supreme Court vacated a district court's

injunction—granted just five days before the election—that permitted absentee

ballots mailed after election day to be counted as long as they were received by an

extended mail-ballot receipt deadline. The district court's error lay in "changing the election rules so close to the election date and by affording relief that the plaintiffs themselves did not ask for in their preliminary injunction motions." *Republican Nat'l Comm.*, 140 S. Ct. at 1207.

Neither of these cases, nor any other, bars Coalition Plaintiffs' requested relief. Here the Court will be issuing relief that the Coalition Plaintiffs have requested (since October 2019), and will be doing so almost two months in advance of the November 2020 election. This timing is permissible under *Purcell*.

### A. Hand Marked Paper Ballots Instead Of BMDs

There is nothing disruptive about preventing the State from enforcing O.C.G.A. § 21–2–300(a)(2), O.C.G.A. § 21–2–383(c), and instead requiring the State to utilize a voting system (hand marked paper ballots) that is already its emergency backup plan. Moving deliberately to the default plan for running an election two months before the election is not only feasible, but prudent.

The State offers no evidence for its conclusory assertions that there is not enough printing capacity to use paper ballots for a statewide election. (Doc. 834-1, at 3, ¶ 5 (Coomer Decl.) (irrelevant point that just a single printer is located in Georgia); Doc. 821-6, at 9, ¶ 12 (Cobb Decl.) (conclusory assertion without evidence that Georgia does not have enough paper ballots); Doc. 821-9, at 5, ¶ 14

(Harvey Decl.) (speculating without evidence that there is insufficient printing capacity nationwide to print enough ballots for 2020).)

Common sense suggests it is eminently feasible to run a statewide election using hand marked paper ballots.  Georgia expects five million voters, about half of whom will use mailed ballots.  Georgia thus needs only 2.5 million paper ballots for polling places.  Roughly 750,000 will already be printed as emergency and provisional ballots. That leaves only 1.750 million paper ballots to be printed.  That figure does not make for a terribly big printing order when it is just *extending print runs* (i.e., production does not entail printing of any new ballot styles).  And, if worse came to worse, the BMD heavy stock ballot paper can be used in the Ballot On Demand printers to print any locally necessary remainder. The requested relief of hand marked paper ballots is feasible.

### B. Scanning Sensitivity Settings and Audits

The State is already in the process of adopting new scanner settings, (Doc. 809-14, at 4–7 (proposed Rule 183–1–15–.02)), and a new audit rule, (Doc. 809-14, at 7–8 (proposed Rule 183–1–15–.04).) Accordingly, Defendants only oppose the requested scanner and audit relief on the merits, not on grounds of feasibility.

## VI.  CONCLUSION

Coalition Plaintiffs' Motion should be granted.

Respectfully submitted this 1st day of September, 2020.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Robert A. McGuire, III* |
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Admitted Pro Hac Vice |
| BRUCE P. BROWN LAW LLC | (ECF No. 125) |
| 1123 Zonolite Rd. NE | ROBERT MCGUIRE LAW FIRM |
| Suite 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 881-0700 | (253) 267-8530 |

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,*
*Ricardo Davis & Megan Missett*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been

prepared in accordance with the font type and margin requirements of LR 5.1, using

font type of Times New Roman and a point size of 14.

*/s/ Robert A, McGuire, III*
Robert A. McGuire, III

27

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER , ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2020, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Robert A, McGuire, III*
Robert A. McGuire, III

28