EXHIBIT

18

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING,      et al.,      )
     Plaintiffs,                  )
                              )      CIVIL ACTION FILE
v.                                )
                              )      NO. 1:17-cv-02989-AT
BRAD RAFFENSPERGER, et al.,       )
     Defendants.                  )
_____

STATEMENT UNDER OATH
JESSE EVANS

August 16, 2020



APG USA, INC.
www.APGreporting.com
(770) 827-1223

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


DONNA CURLING, et al.,          )
                                )
      Plaintiffs,               )
                                )      CIVIL FILE ACTION
vs.                             )
                                )      NO. 1:17-cv-02989-AT
                                )
BRAD RAFFENSPERGER, et al.,     )
                                )
      Defendants.               )
_____


STATEMENT UNDER OATH

JESSE EVANS

August 16, 2020

2:15 p.m.


Via Zoom Videoconferencing



Reported by:  Marsi Koehl, CCR-B-2424





APG USA, INC.
www.APGreporting.com
(770) 827-1223

Curling v.                  Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

```
 1                   C O N T E N T S

 2               E X A M I N A T I O N

 3

 4                                              Page

 5   Examination by Mr. Brown.........................4

 6

 7

 8                   E X H I B I T S

 9
     Exhibit No.         Description              Page
10

11   Exhibit 1           Polling Location Setup    33
                         Resolution Policy
12

13
     (Original exhibit attached to original transcript.)
14

15

16

17

18

19

20

21

22

23

24

25
```

***** C E R T I F I E D *****

Curling v.                    Statement Under Oath
Raffensperger                  JESSE EVANS                8/16/2020

```
 1   APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiffs:

 3        BRUCE P. BROWN
          Attorney at Law
 4        BRUCE P. BROWN LAW, LLC
          1123 Zonolite Road
 5        Suite 6
          Atlanta, Georgia  30306
 6        (404) 881-0700
          bbrown@brucepbrownlaw.com
 7

 8

 9   Also present:

10        Marilyn Marks, Coalition for Good Governance
          Jeanne Dufort, Coalition for Good Governance
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Curling v.                Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

```
 1              P R O C E E D I N G S
 2                   JESSE EVANS,
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5                   EXAMINATION
 6   BY MR. BROWN:
 7        Q.  Please state your name for the record.
 8        A.  Jesse Evans.
 9        Q.  Mr. Evans, this is -- (audio faded).
10        A.  You're cutting in and out, Bruce.
11        Q.  Yeah, that static is not from me.
12        A.  It's gone now.
13        Q.  Jesse, can you hear me now?
14        A.  Sure.
15             MR. BROWN:  This will be a sworn
16        statement pursuant to 28 USC § 1746.
17   BY MR. BROWN:
18        Q.  Mr. Evans, although we're not in court and
19   this is not a formal deposition with the opposing
20   parties and other lawyers, you understand that you
21   are sworn to tell the truth, the whole truth and
22   nothing but the truth; correct?
23        A.  Yes.
24        Q.  And that the -- if you don't tell the truth,
25   you're subject to perjury.  Do you understand that?
```

Curling v.                Statement Under Oath
Raffensperger            JESSE EVANS                    8/16/2020

```
 1        A.   Sure.   Yeah.
 2        Q.   I'm going to be -- this is awkward doing
 3   this by video.   I'm going to do the best I can to ask
 4   questions that are clear.   It's particularly
 5   important especially since there's no other party
 6   represented that your answers -- that you understand
 7   the question before answering, that you don't
 8   speculate, don't guess.
 9             You can -- you can tell me you don't know it
10   and tell me why you don't know it.   It's just
11   important that you're very comfortable with the
12   accuracy of your testimony.   And if you don't
13   understand my question, please just have me reframe
14   it.   Okay?
15        A.   Sure.
16        Q.   What's your current position with elections?
17        A.   Say it again.
18        Q.   Are you involved in Athens-Clarke County
19   elections?
20        A.   Yes.
21        Q.   What is your role?
22        A.   I'm currently the chair of the County Board
23   of Elections.   Having said that, I'm not here
24   representing the Board in any way, shape or form.
25   I'm here representing myself as an individual.
```

***** C E R T I F I E D *****

1      Q.   As an individual, can you just tell me a
2   little bit about yourself, your background and what
3   you do?
4      A.   You mean apart from the Board of Elections?
5      Q.   That's correct.
6      A.   I'm in my eighth year of teaching American
7   government and civics in a local Title I public high
8   school.  I'm also the chair of, you know, a committee
9   with GAE.  I'm also chair of a local nonprofit that's
10  focused on economic justice and voter registration
11  and, you know, "get out the vote" efforts and
12  elections integrity.
13     Q.   What high school is it that you teach at?
14     A.   Cedar Shoals High School.
15     Q.   And where did you get your degree?
16     A.   My undergraduate degree, two majors and
17  three minors, at the University of Louisville.  The
18  majors were philosophy and psychology.  The minors,
19  political science, history and Latin-American
20  studies.
21          My graduate degree and my teaching
22  certification comes from the University of Georgia.
23  I received by Masters of Art in teaching with a
24  concentration in social studies education, 6th
25  through 12th, specializing in political science.

Curling v.                Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

```
 1         I also earned my reading endorsement while I
 2   was earning my certificate in teaching.
 3        Q.  And you have a newborn baby, I understand
 4   also?
 5        A.  I do.  He's seven months, a little over.
 6        Q.  I congratulate you.
 7        A.  Thank you.
 8        Q.  How long have you been on the board of --
 9   Athens-Clarke County Board of Elections?
10        A.  I was sworn in, in -- well, January of 2017,
11   I believe.  My term started January 2017.
12        Q.  When you started, were you chairman?
13        A.  No, no, no, no.  Definitely not.
14        Q.  When did you become chairman?
15        A.  I became chairman like the beginning of my
16   fourth year.  My colleagues selected me to serve
17   as -- the majority of my colleagues selected me to
18   serve as chair in late January 2020 when the vote
19   took place.  And my first session as chair was in
20   February of 2020.
21        Q.  How are board members -- how do you get
22   appointed to be a board member?
23        A.  Well, there are five positions on the board.
24   Three are nonpartisan positions and they are
25   appointed by a local commission.
```

Curling v.                   Statement Under Oath
Raffensperger               JESSE EVANS                    8/16/2020

```
 1              Two of the positions are partisan.  And the
 2    statute says -- the policy says something about, you
 3    know, whichever two -- yeah, whichever two parties
 4    has the majority of votes in a particular election
 5    cycle, that's who would determine -- you know, we're
 6    a two-party system in the United States.  So that
 7    leaves the Republican and Democratic party as
 8    dominant -- the dominant party in the community right
 9    now.
10              So the local Republican party appointed one
11    person and the local Democratic party appointed the
12    other.  And I'm not in a political party.
13         Q.  So you're one of the nonpartisan appointees;
14    is that correct?
15         A.  That's correct.  The mayor and commission
16    had me go through an interview process and -- you
17    know, with others.  And they made the decision in
18    late -- late 2016 and my term began January 2017.
19         Q.  About how much time do you spend with your
20    Board of Elections work just per month roughly?
21         A.  Per month?  That just depends on the month.
22    I mean, if it's an election month, you know, there
23    are several meetings around the time of the election,
24    but also we -- you know, I've done like in June, I
25    coordinated -- I designed, planned and coordinated
```

1  like the delivery of all election equipment for

2  Clarke County for that election.  So that was a lot

3  more time than I normally devote to the job.

4          I also, you know, do a lot of research with

5  issues -- ongoing issues and speak to stakeholders

6  between meetings and E-mail.  And, you know, honestly

7  it would be really hard for me to say, you know, a

8  firm estimate.

9          I know our meetings tend to go -- usually

10 our regular meetings go something like two or three

11 hours.  And, you know, sometimes we have a special

12 meeting and it'll been a 30-minute meeting to an

13 hour.

14          But I don't really -- I'd have to sit down

15 and do the math to give you a firm estimate of

16 something like that.

17     Q.  It's a major commitment of time, obviously.

18     A.  It definitely is a lot of time.

19     Q.  Let me drill down a little bit on what you

20 said.  You were describing your work with the board.

21 And you said that you were responsible for the

22 delivery and the installation of all equipment or

23 something to that effect.

24          Can you explain that in a little bit greater

25 detail?

Curling v.                Statement Under Oath
Raffensperger            JESSE EVANS                    8/16/2020

```
 1        A.  Sure.  When I was appointed or selected to
 2   be chair of the board, I was told by staff that the
 3   chairperson usually historically has had a huge -- a
 4   big role in ensuring that equipment is delivered to
 5   all the polling locations.  So they were requesting
 6   my service for that.
 7             And, you know, I said that's fine.  And this
 8   particular year was more challenging than past years
 9   because this is the first year we've had our Dominion
10   system, which is a lot more equipment.  And we have
11   24 polling locations.
12             And, basically, I created a tentative, sort
13   of a living document, a standard operating
14   procedure -- excuse me -- procedure for loading the
15   truck to ensure we can get to at least three
16   different precincts -- I'm sorry.  We use 24-foot, I
17   believe -- 24-foot moving trucks and a trail vehicle
18   if we need to, like a moving van actually is what we
19   used this past go-around as a trail vehicle.
20             And so I basically had to design -- I
21   designed the layout.  I loaded it with a -- another
22   person, like I did like a practice run of loading the
23   truck and getting it -- as much equipment on there as
24   possible in a way that's like stable and safe and
25   effective for loading -- for moving the equipment to
```

1  each polling location.  So I've got an SOP for that;

2  I developed that.

3         And on the day I also coordinated with --

4  over the phone and via phone calls, text and E-mail

5  with like people who would be our point of contact at

6  each location just to give them a heads-up that we're

7  coming and to check in with them as a reminder and

8  kind of get details about where our delivery

9  personnel should go and, you know, what time of day

10 and stuff like that.

11        And I also on the day -- so on the day of

12 the moving -- the equipment moving, the load-out and

13 getting it to the locations -- and, again, I

14 coordinated the election day locations.  I didn't

15 coordinate advance voting.  That's a less demanding

16 task.  There's less equipment for that and it's

17 not -- because we delivered to all 24 polling

18 locations in one day.

19        So on the day of moving we -- I sort of

20 do -- I did a briefing in the morning with -- we've

21 been using staff members from Athens-Clarke County

22 Unified Government personnel, basically, for that.

23 And I briefed them on routes.

24        I did a lot of planning and preparation for

25 the routes.  There were four different trucks,

```
 1  24-foot moving trucks and I coordinated routes for

 2  that.  And I trained personnel on those routes.

 3         I had maps prepared for them, myself and --

 4  with directions and everything.  And I also had

 5  created a slide deck with aerial views of the

 6  locations, so they would be more familiar with where

 7  they were going and also had point of contact

 8  information for those people -- for the driving crew,

 9  the moving crew to use.  And I had a communication

10  protocol that I -- that I provided to them.

11         And then, you know, they used my SOP, my

12  diagram and the pictures and stuff I took of the

13  fully-loaded truck that I did with the practice run

14  to help them deliver.  Oh, and I also created --

15  used -- created an inventory sheet with pictures of

16  each thing, so people could know -- our personnel

17  could know what they were looking at and how many

18  they needed and stuff like that.

19         So we reviewed all that.  And then during

20  the day when they were loading out and leaving and

21  stuff, they would text me that they were leaving.

22  And they got -- one of the roles that I had assigned

23  that they chose, they -- each team had a person that

24  was supposed to be communicating with me throughout.

25         And so they would tell me when they were
```

Curling v.                Statement Under Oath
Raffensperger            JESSE EVANS                    8/16/2020

1  leaving, when they arrived.  And I would give, you

2  know -- I was basically communicating with delivery

3  teams and with the point of contact at each location

4  to let them -- give them a heads-up that the delivery

5  team was on way.  And I was also relaying information

6  to staff, ACC Board of Elections staff, about

7  progress.

8          You know, we had four different area

9  managers and I was, you know -- and also there's one

10  person, a staff person over the entire like

11  facilities side of things, the elections side of

12  things, the equipment side of things.  So I was

13  coordinating with her and the managers as well

14  throughout that process just to make sure that

15  everything went smoothly.

16          And everything did go smoothly.  I was

17  commended by staff.  They had never seen anybody do

18  it the way I did it.  But it was very well-organized

19  they said and it was very effective and they liked

20  what I did.

21      Q.  What election was that for?

22      A.  June 2020.

23      Q.  Do you have like a logistics background

24  training?

25      A.  I was a commissioned officer in the U.S.

Curling v.                   Statement Under Oath
Raffensperger                JESSE EVANS                    8/16/2020

1  Army National Guard.  Part of my training -- part of
2  my role -- well, I mean, your job as an officer is to
3  plan missions and to supervise and command those
4  missions.  And, you know, there's a lot that goes
5  into it, the research and the reconnaissance and
6  coordination and delegation of tasks.
7         But, yes, so I have -- I've planned and
8  coordinated large movements of very expensive
9  equipment, very sensitive equipment in the past.
10     Q.  What were the dates of your service in the
11 National Guard?
12     A.  I honestly don't have that off the top of my
13 head, but it was back in -- so it was 2011 to 2015,
14 but I don't have the exact dates off the top of my
15 head.
16     Q.  I want to shift gears a little bit and turn
17 your attention to ballot secrecy and the challenges
18 of protecting ballot secrecy using the ballot marking
19 device.
20         Are you with me, just the general topic?
21     A.  Ballot secrecy?
22     Q.  Yes.  Did that issue come up in Athens
23 during your tenure in the past -- in the past year?
24     A.  It actually came up -- well, when you say in
25 the "past year," do you mean this current calendar

***** C E R T I F I E D *****
APG USA INC.                                    (888) 542-5598

Curling v.                  Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

```
 1  year or do you mean a year from now, like back.

 2        Q.  Back.  Yes, this calendar year.

 3        A.  So just 2020 or 2020 all the way back to

 4  August 2019?

 5        Q.  When did it come up?

 6        A.  Late 2019.

 7        Q.  How did it come up?

 8        A.  People in the community reaching out about

 9  it.  And there was concern already about -- from

10  staff -- this is well before we had any equipment --

11  that, you know, there was a lot more equipment.  It

12  was larger.  And, you know, there was concern about,

13  you know, storing it and also concern about fitting

14  it all into the polling locations.

15           So we knew there was going to be -- it was

16  going to be a challenge to get all this new equipment

17  set up and then -- period, but also in a way that --

18  well, ballot secrecy, there were people that reached

19  out to us concerned about ballot secrecy.  And I read

20  in the media as well there were concerns about ballot

21  secrecy in Georgia.  And that kind of came from

22  concerned community members and it came from the news

23  media, really.

24        Q.  How did the board approach the issue or how

25  did you approach the issue?  What did you do about it
```

1  or not do about it?

2      A.  And the issue you're saying is ballot

3  secrecy -- maintaining ballot secrecy when utilizing

4  the Dominion system?

5      Q.  Exactly.

6      A.  So after receiving information from, you

7  know, community members and seeing it in the paper

8  and also receiving information from, I believe, a

9  nonprofit organization that's dedicated to elections

10 integrity, we -- we ended up as a board adopting a

11 back-up plan just in case we couldn't -- and the

12 back-up plan wasn't just about ballot secrecy.  It

13 was about whether or not we'd be able to utilize the

14 Dominion system, the new system coming in, like in a

15 way that meets our legal obligations and serves --

16 that would allow us to -- but also like practically

17 speaking, physically speaking, could we use all the

18 equipment that we've been asked to use?

19          So we need a plan B, what happens if there's

20 something that goes wrong or we're not able to --

21 because it took a long time for us to get our

22 equipment.  We didn't even get our equipment until --

23 I believe it was February of 2020 when we got our

24 equipment --

25     Q.  Right.

Curling v.                 Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

1    A.  -- and we had a March primary coming up.

2    Q.  Right.

3    A.  So we adopted -- we actually adopted as our

4    back-up plan -- we just, you know, did some research.

5    And, again, there was media coverage of this.

6        We adopted Cobb County's pilot program that

7    they utilized for hand-marked paper ballots.  There

8    was media coverage of that, like pilot success.  And

9    we wanted to have a back-up plan in place that would

10   allow us to seamlessly transition to a back-up plan,

11   something that was going to work and if for some

12   reason we couldn't utilize the new electronic

13   equipment that was coming in.  So we adopted the Cobb

14   County pilot program as our plan B.

15   Q.  And then you adopted the Cobb County pilot

16   plan as plan B.  That was before you actually started

17   installing the new equipment; is that right?

18   A.  Oh, absolutely.  We were -- there was a lot

19   of uncertainty about the new equipment.  We actually

20   had just been told -- I believe it was at the same

21   meeting, I believe.  We were given an electrical

22   survey, estimate or something.  I forgot what they

23   call it.

24       Basically, it was looking at our polling

25   locations and looking at the demands that we had for

Curling v.                Statement Under Oath
Raffensperger              JESSE EVANS                8/16/2020

1   electricity for this new system, like number of

2   circuits and things of that nature and the number of

3   machines that are required per polling locations,

4   meeting the one-per-250 rule.

5          And we were told at that meeting, I

6   believe -- I want to say it was late January at a

7   special-called meeting that the -- 18 out of

8   20 polling locations in Clarke County -- because we

9   only had 20 at the time because we had some merge for

10  construction reasons and other reasons.

11         But 18 out of the 20 at the time, we

12  didn't -- did not have -- either didn't have current

13  electrical capacity needed or they were unsure about

14  it basically.  So only two out of 20 election polling

15  locations had been checked out and confirmed that

16  they had electrical -- they met the electrical

17  requirements of the new system.  So that was a

18  concern.

19         But also, you know, there had been

20  complaints of -- in the media regarding ballot

21  secrecy and complaints from community members who had

22  seen the machines and had been concerned about the

23  size of the screen and the angle of the screen and

24  the size of the print and the lighting on the screen,

25  basically, permitting people who were in the area --

1  for many people to see somebody else's voting

2  selections, which was a violation of ballot secrecy.

3          It was before we installed any equipment --

4  and, actually, that led to us requesting -- you know,

5  these concerns led to us requesting that our staff,

6  our elections staff create at floor plan -- to-scale

7  floor plan of each polling location that showed where

8  each machine would go, meeting the one-per-250 rule

9  but also the orientation of the machines as well.  So

10  we could have the -- the Board of Elections could

11  have confidence that this is possible -- you know,

12  that this was a possibility to set up all the

13  equipment in ways that did not violate ballot

14  secrecy.

15      Q.  And so in coming up with the back-up plan in

16  late January, after doing that planning, then what

17  happened?

18      A.  It was -- during the meeting when we adopted

19  the plan -- the back-up plan, we received pushback

20  from our director of elections, you know, for

21  getting -- basically, it was clear that she didn't

22  think that we should adopt it.  She kept saying, We

23  don't need to.

24          And the majority of the board didn't feel

25  comfortable with what she was saying and given the

Curling v.          Statement Under Oath
Raffensperger          JESSE EVANS                    8/16/2020

1  facts that we knew at the time.  And then actually

2  after that, I followed up to ensure that we -- I

3  needed to know how much -- like what equipment would

4  be needed to implement plan B and how much of that

5  equipment we had -- or materials we had on hand but

6  also what we were lacking and when the purchase dates

7  were.

8          And so I E-mailed our director of elections

9  about that, cc'ing the board.  And we ended up

10  getting an estimate eventually regarding printing of

11  ballots.  And our elections director attempted to

12  call a special meeting.  Like normally -- so our

13  bylaws say that the chair could call a special

14  meeting as long as there's concurrence of two other

15  board members, so we needed a quorum to do that.

16          But our director of elections actually tried

17  to initiate her own special-called meeting.  And in

18  order to do that, she needed four members to vote yes

19  to that.

20          And she was attempting to have us meet again

21  and like it would seem it was to reconsider plan B

22  that she had initially opposed to begin with.  And

23  the reason she said was because there's an estimate

24  of money to be considered for printing the ballots

25  and -- or the paper ballots.

***** C E R T I F I E D *****

Curling v.                Statement Under Oath
Raffensperger            JESSE EVANS                    8/16/2020

1          And there was frustration expressed by board
2   members about this because the board had made a
3   decision and it seemed as though the director of
4   elections in Clarke County was persisting in trying
5   to dissuade the board -- basically, persuade the
6   board not to have a plan B in place and,
7   specifically, not to use the Cobb County pilot
8   program as plan B.
9          But after conferring with board members, it
10  was -- we were under the impression that, you know,
11  we don't really need another special meeting -- a
12  special-called meeting for that.  We voted to have a
13  plan B in place and that's what we wanted.
14         And, you know, there were election expenses
15  every election cycle that were never -- the director
16  of elections had never requested that we approve, you
17  know, a certain dollar amount for anything like that,
18  to my knowledge and to other board members'
19  knowledge.  So it was pretty obvious she was
20  insisting upon a special meeting then.
21         So I actually spoke with assistant manager
22  Deborah Lonon who is the direct supervisor of
23  Director of Elections Charlotte Sosebee, Clarke
24  County and clarified the board's position on not
25  needing another like meeting for this, that we had

***** C E R T I F I E D *****

1  already made our decision.

2         This was after, you know, E-mail

3  correspondence regarding this, after the board member

4  who had proposed -- Mokah Johnson, after she had

5  replied with -- to Director Sosebee's E-mail about

6  this stuff and was expressing her frustration with

7  Director Sosebee's sort of pushing back on the board

8  and resisting doing what the board had decided to do.

9         And so, anyway, we spoke to Assistant

10 Manager Deborah Lonon about it.  And then it was made

11 clear that we don't -- you know, so first of all,

12 four members didn't vote for -- like to confirm the

13 special meeting, but also there was E-mail

14 communication about there not being any need for

15 another meeting about that.  And that was issued by

16 Deborah Lonon, assistant manager.

17    Q.  So plan B then was not at that point

18 reconsidered by the board; is that right?

19    A.  No.  Because we had already made the

20 decision that we needed a back-up plan.  We had never

21 used this equipment.  There were plenty of concerns:

22 electrical concerns, space concerns, secrecy

23 concerns.  You know, so we wanted to have a back-up

24 plan to be sure that we could do our elections in

25 Clarke County we had coming up.

1       Q.   And this was for the then-March primaries;

2    correct?

3       A.   Correct.

4       Q.   And if my recollection is correct, the

5    voting actually began on the March primaries before

6    the pandemic suspended them; correct?

7       A.   Could you restate that?

8       Q.   The voting started in March on the March

9    primaries; right?

10      A.   We had advance voting.

11      Q.   How many weeks of advance voting did you

12   have?

13      A.   Oh, gosh, this is why I needed to be able to

14   look at my phone and get exact days.  I want to say

15   it was three, but I'd have to double check --

16      Q.   Days or weeks?

17      A.   Weeks.

18      Q.   But how many actually -- how many days of

19   voting occurred, just roughly, before the primary was

20   postponed?

21      A.   Well, that's, again, a good question because

22   I'd have to check those dates as well.  I can tell

23   you that the week of the first Tuesday in March, so I

24   guess March 3rd, I think, is when it was.

25           Can I look at my phone real quick --

***** C E R T I F I E D *****

Curling v.                 Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

```
 1        Q.  Sure, sure.

 2        A.  -- and confirm these dates?

 3             MR. BROWN:  Sure.

 4             (Brief pause.)

 5             THE WITNESS:  Yeah.  So March 3rd was

 6        the day we had a regular meeting for Board

 7        of Elections.  And the day prior to that was

 8        the first day of early voting.

 9             So, you know -- and then I went to the

10        Board of Elections' office, which was --

11        that was the first day of early voting and

12        that was the only site that was set up at

13        that time for that week -- and just doing

14        the normal Board of Elections stuff,

15        checking out polling locations and saying

16        "hi" to people, checking on the progress,

17        the first time we'd used the Dominion

18        system.

19             We had concerns about --

20   BY MR. BROWN:

21        Q.  Let me interrupt you right there.  I'm going

22   to focus on some things.

23             So early voting started at one location on

24   March 2nd; correct?

25        A.  Yeah.  At the downtown Board of Elections
```

***** C E R T I F I E D *****

APG USA INC.                                    (888) 542-5598

Curling v.              Statement Under Oath
Raffensperger           JESSE EVANS                    8/16/2020

```
 1  office.
 2      Q.  Were you using BMDs or did you invoke your
 3  back-up plan?
 4      A.  No.  We tried to use the BMDs.  We tried to
 5  use the electronic system.  We received assurances
 6  from Director Sosebee that -- you know, multiple
 7  times.  We would ask for like a diagram or a plan or
 8  something to show that the machines could be set --
 9  this new equipment could be set up in a way that
10  would protect ballot secrecy and, you know, meet the
11  one-per-250 rule and all that.
12          She had to -- like she said that we didn't
13  need to have any sort of to-scale floor plans for
14  early voting, that there would be no problems with
15  that.  She agreed, I want to say at the February
16  meeting -- the February regular meeting -- she'd
17  provide us --
18          (Reporter requests witness slow down.)
19  BY MR. BROWN:
20      Q.  Let me ask you just -- if you could focus on
21  my questions...(audio fades).
22      A.  I can't hear you, Bruce.
23      Q.  What I need to get from you, if you'll just
24  sort of follow along, is just some of the structure
25  of this.  And if I want more detail, I'll ask you.
```

Curling v.                  Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

1          Early voting started on March 2nd; correct?

2     A.   Yes.

3     Q.   You were using BMDs on March 2nd; right?

4     A.   Yes.

5     Q.   And, at some point, did you need to invoke

6  plan B, in other words, using hand-marked ballots?

7     A.   Yes.  On March 3rd we did that.

8     Q.   And then why did you do that on March 3rd?

9     A.   Because -- well, for multiple reasons, one

10  of which was when I visited the early voting location

11  at the downtown office on March 2nd, I went and I was

12  speaking with staff in the area where staff works

13  behind the partition between public and staff.

14          And when I was talking to staff, one of the

15  voting -- the BMD screens actually caught my eye on

16  the right of me.  You could see through the -- at the

17  looking glass -- at the set partition glass that

18  separates staff from public and you could see the

19  screen, the BMD screen.  And that's a violation of

20  ballot secrecy.

21          And another reason was that on March 3rd

22  when we met, we had been previously -- we had been

23  promised in February, we were told by Director

24  Sosebee that she would provide to us, have staff

25  provide to us to-scale floor plans for all election

***** C E R T I F I E D *****

APG USA INC.                                    (888) 542-5598

Curling v.                Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

```
 1   day voting locations and that would actually be
 2   provided prior to March 3rd and that was never done.
 3            And on March 3rd when we showed up, they
 4   didn't have to-scale floor plans showing that we
 5   could execute that election with all the equipment
 6   required meeting the one-per-250 rule and utilizing
 7   all the equipment while maintaining ballot secrecy.
 8   They just didn't, staff didn't provide that for the
 9   board.
10            And the board had lost confidence because we
11   had been reassured repeatedly that we could do that.
12   Specifically, we were told that they could accomplish
13   that with advance voting at the downtown office.  And
14   then in the one instance where we -- the equipment
15   had been set up and they said it was not a worry, not
16   an issue, it was going to be protected -- ballot
17   secrecy was going to be protected, it like didn't --
18   it wasn't protected.  It was violated.  Well, the
19   setup was violating ballot secrecy.  People could
20   just see the screen of the BMD.
21            Also that wasn't the only concern.  The BMDs
22   at the advance voting location, they had been set up
23   side by side next to each other.  And in order to get
24   to the BMD that was furthest away, voters had to walk
25   past the closest BMD to get to the next BMD.  And you
```

Curling v.                  Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

```
 1  could see the screen as they were -- they could see
 2  the other voters' voting screens as they were walking
 3  past to get to their BMD.  So the setup was not
 4  protecting ballot secrecy in that way either.
 5      Q.  So when you invoked plan B with respect to
 6  the early voting location, did you stop using the
 7  BMDs that were there and started using hand-marked
 8  paper ballots?
 9      A.  To my knowledge, at least one BMD was
10  maintained like in use.  But, yeah, they had switched
11  over to -- to the paper ballots.
12      Q.  How did the switchover to paper ballots go?
13  Was that relatively easy?
14      A.  To my knowledge, yes.  I didn't hear
15  complaints from the public about it as far as, you
16  know, like them not liking using paper ballots.  I
17  didn't hear a lot of complaints about that.
18          I think that there was definitely, you know,
19  concerns expressed from some members of the public
20  prior to -- when the decision-making was being done
21  at the March 3rd meeting, but that was not about the
22  process of transitioning.  That was just some people
23  basically bothered about the board's decision.
24          There were some people speaking in favor of
25  the board making the decision to switch to plan B and
```

Curling v.                  Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

1   some people speaking against the decision to switch

2   to plan B.  But as far as executing plan B, I didn't

3   hear really many complaints.  The only complaint I

4   heard was that sometimes staff or poll workers

5   would -- when a voter would go in to turn in their --

6   to scan their BMD -- or their ballot -- and this was

7   happening with the BMDs, too, some poll workers

8   were -- for some reason I was told some poll workers

9   were asking voters to put it in face up instead of

10  face down.

11        But that was a concern.  We discussed the

12  concern about that, the board members and I did.  And

13  to my knowledge, they stopped doing that at that

14  location.

15     Q.  Let me back up a little bit just to make

16  sure that the record is clear.

17        You mentioned the one-to-250 rule a couple

18  of times.  You said one to 250.  Is that the rule

19  that requires at least one ballot station for every

20  250 voters in particular precincts?  Is that what

21  you're referring to?

22     A.  Yes.  And that applies to election day not

23  advance voting.

24     Q.  Thank you.  Okay.  So moving forward a

25  little bit, the voting for the March primary at some

1  point then was suspended and the election day for the

2  primary day was moved off a couple of times,

3  actually; correct?

4          A.  Yes.

5          Q.  And then -- so you stopped the early voting

6  in Athens.  Then what happened with respect to the

7  plan B?

8          A.  I don't remember.  Actually, it was prior to

9  the -- prior to the voting for the March primary

10 being pushed back but put on pause and pushed back

11 due to the pandemic, we were actually -- the Georgia

12 State Elections Board called an emergency hearing

13 regarding our decision to utilize plan B for our

14 community.

15         Q.  The Board of Elections was challenging that

16 decision; correct?

17         A.  The State Elections Board did challenge our

18 decision.  They wanted -- they had a hearing.  And

19 the hearing was to -- it was regarding the decision.

20 And all indications were that they were in

21 opposition.

22         Q.  Let me try to get back on track here then.

23         So the sequence was that the secretary of

24 state weighed in while the primary was still going

25 on; correct?

Curling v.                 Statement Under Oath
Raffensperger             JESSE EVANS              8/16/2020

```
 1        A.  Yeah.

 2        Q.  And then what did you do?  Did you change

 3   the way the voting was going on prior to the hearing

 4   or did you wait for the hearing or what did you do?

 5        A.  We relayed to them what we were doing and we

 6   wanted the State Elections Board to hear the

 7   reasoning and to hear from our attorneys that we

 8   hired regarding the practicability of utilizing the

 9   voting machines, the voting system to meet this

10   one-per-250 rule and also meet the statutes -- the

11   constitutional requirement and the federal and state

12   requirements, statutory requirements that we protect

13   absolute ballot secrecy; and also the requirement

14   that the equipment -- voting equipment should be able

15   to be monitored at all times, monitored by staff,

16   poll workers at all times while in use.

17            So we -- you know, the three of us, the

18   majority of us who voted on March 3rd for a plan B

19   also, you know, wanted to make sure that our concerns

20   and our case and our perspective was put forth with

21   the elections board.  And so we definitely didn't

22   change like our decision prior to the hearing and we

23   only did after the hearing because we were under

24   threat of fines.

25            The hear -- the board -- the State Elections
```

Curling v.                 Statement Under Oath
Raffensperger             JESSE EVANS                    8/16/2020

```
 1   Board decided against our decision to enact plan B
 2   and to utilize plan B.  And they, you know, issued
 3   a -- I want to say it was a $2,500 fine, but also
 4   they issued their -- in their decision they said that
 5   it would be even more costly for us if we continued
 6   to utilize absentee ballots -- or, excuse me, the
 7   hand-marked paper ballots.  So that very next day
 8   after that emergency hearing, the voters in our
 9   county were back to using the electronic ballot
10   marking devices.
11        Q.  And then did the Athens-Clarke County Board
12   come up with a resolution or something as to how it
13   was going to conduct the elections going forward
14   after the Board of Elections hearing?
15        A.  Yes.  So during the process of preparation
16   for the hearing, our attorneys received a concession
17   from the secretary of state office's attorney.  It
18   was an interpretation of the one-per-250 rule that we
19   had not been provided up to that point and,
20   basically, saying that it was one voting booth per
21   250 people rather than one ballot marking device for
22   250 people.
23             So that was factored into a new board policy
24   but also other things like best practices that had
25   been observed in other counties, one incorporated
```

Curling v.                Statement Under Oath
Raffensperger            JESSE EVANS                    8/16/2020

```
 1  into the new policies.  And the policy was drafted by
 2  our attorneys who had represented us in this SEB
 3  emergency hearing and it was approved by the board on
 4  April 1st, 2020.
 5            (Exhibit 1 marked for identification.)
 6  BY MR. BROWN:
 7      Q.  Let me -- if you would look at what we have
 8  marked as Evans Exhibit 1, which is -- I'll represent
 9  to you is the document that you E-mailed to us
10  shortly before your statement today.
11            Do you see that on the screen?
12      A.  I do.
13      Q.  This particular copy is not signed, but it
14  was -- your recollection is that this was document
15  that was signed by the board on or about April 1st,
16  2020?
17      A.  Yes.  The only difference is that there was
18  a typo on the top of page 3 that's no longer there.
19  There was a typo on that day that we signed.
20      Q.  And but the board should have the actual
21  signed resolution; correct?
22      A.  Yes.
23      Q.  But just going through the substance of this
24  resolution, let me sort of work backwards on this.
25            Is this the current up-to-date resolution
```

Curling v.                 Statement Under Oath
Raffensperger              JESSE EVANS              8/16/2020

```
 1  that would govern the subject matter or has this in
 2  turn been revised?
 3        A.   There's been no revision.
 4        Q.   Did Athens-Clarke County when it set up for
 5  the June 11th and for the -- wait, the June 9th
 6  primary and then for the August 11 run-offs follow,
 7  basically, the procedures and policy that's set forth
 8  in Evans Exhibit 1?
 9        A.   I'm going to turn off my camera and pull up
10  the document on my phone, so I can go down through it
11  with you.  Okay?
12        Q.   Okay.
13        A.   So staff training -- or poll worker training
14  was provided leading up to the June 9th, 2020
15  election.  And I took part in one of those and I also
16  sat in on another, like virtually.
17             And staff was actually -- they like
18  mentioned the policy, but they didn't actually go
19  through it line by line, you know.  And they just
20  said, We've provided this to you.  And they sort
21  of -- it was presented as an option, as a guide, not
22  as "this is what should be done."
23             And I'll also say that, you know, throughout
24  this whole process, there had been pushback from
25  staff regarding the board taking action to ensure
```

1  ballot secrecy like, for example, with the floor

2  plans.  I, you know, personally -- well, actually,

3  during the SEB hearing, staff promised -- because

4  during that SEB emergency hearing staff had still not

5  provided us -- the board directly those -- the

6  to-scale drawings.  And the ones that they provided

7  to our attorneys for the purposes of the hearing were

8  like not sufficient.  They did not show that one for

9  250 and ballot secrecy rules were being met.

10         But it was said under sworn statement --

11  sworn testimony by a staff member from ACC Board of

12  Elections that they would have that to the board the

13  following week and that never happened.

14         So there's been like a resistance to -- from

15  staff on following through and doing what the board

16  has asked staff to do regarding preservation of

17  ballot secrecy.

18         I actually met with -- like staff asked me

19  to meet with staff to help them like with the

20  to-scale floor plans and with understanding what

21  they should be -- people should be doing -- like poll

22  workers should be doing to implement the policy that

23  the board had adopted on April 1st.

24     Q.  Let me interrupt you there just to sort of

25  cut to the chase.

1    On the June 9th election, did Athens-Clarke

2   County have enough BMDs in the polling locations to

3   meet the one-to-250 requirement?

4       A.   I guess that depends on what you mean by did

5   they have them in the polling locations.  I

6   personally observed in one of the polling locations

7   that while the equipment had been dropped off, that

8   there were actually fewer -- like some of the

9   equipment was never taken out the case and it wasn't

10  set up to be utilized by voters.

11       And also they didn't -- that poll manager

12  hadn't put up any tables and voting booths for

13  hand-marked paper ballots to make up the difference

14  between the number of BMDs that were set up and the

15  required number of voting booths for that station --

16  polling location.

17       Q.   Okay.  So at least you can say that

18  certainly not all of the polling locations had BMDs

19  or ballot stations deployed sufficient to meet the

20  one-to-250 requirement; correct?

21       A.   That's correct.  Only after I called

22  Director Sosebee and spoke to her about it later that

23  day -- after witnessing this, I called our director

24  of elections and spoke to her about it.  And I came

25  back later that day and there were tables set up, you

Curling v.                     Statement Under Oath
Raffensperger                    JESSE EVANS                    8/16/2020

1   know, like -- basically, there were tables set up

2   just to meet the one-to-250 rule, but they weren't

3   being utilized.  And they were like not in the voting

4   area where voters were actually -- I mean, they were

5   in the voting area, but they weren't -- it was clear

6   they weren't actually intended to be used.  It was

7   just to meet the one-to-250 rule.

8       Q.  If they had been used, it would have been

9   for hand-marked paper ballots; right?

10      A.  Correct.

11      Q.  Now, in the polling locations was ballot

12  secrecy preserved by the positioning of the ballot

13  marking devices in an effective way?

14      A.  Again, we had the problem where people were

15  walking -- like people would walk behind voters in

16  the voting booths to get to their voting booth and

17  they could see the screen that way.

18          Also our policy that the board adopted said

19  if there are polling machines side by side, they

20  should have extended dividers to protect -- you know,

21  to prevent people from being able to see the BMDs

22  screens of other voters.  And those were not put in

23  place to protect ballot secrecy.

24      Q.  We're talking about the June election right

25  now, but I can probably expand it to other elections.

Curling v.                    Statement Under Oath
Raffensperger                 JESSE EVANS                    8/16/2020

```
 1              In terms of based upon your experience --
 2    and you've had a lot of hands-on experience both as
 3    the chairman but also your experience of unloading
 4    this equipment and planning all the logistics -- is
 5    it feasible for Athens-Clarke County, given the
 6    polling locations that it has available, to both meet
 7    the one-and-250 requirement and use only BMDs
 8    throughout?
 9         A.   Umm...
10         Q.   You mentioned some things that sound like
11    problems in execution, right, like if you did it
12    better, you might be able to do it.  Okay?
13              But even if you did a good job with the
14    screen separators, with the floor plans, if you did
15    that, could you preserve ballot secrecy and match one
16    BMD for every 250 electors into your existing polling
17    locations?
18         A.   From what I've seen, it would not -- like
19    that would not be the case for all polling locations.
20    And also I'd have to say like to this date -- to this
21    date right now, when we're speaking right now, we
22    have not -- the board has still not received like
23    to-scale floor plans, like a finalized draft to show
24    that we can do this.  And staff has said --
25    communicated that it's really hard to fit this many
```

***** C E R T I F I E D *****

Curling v.                Statement Under Oath
Raffensperger            JESSE EVANS                    8/16/2020

1  machines in there to begin with but also to do it

2  while protecting ballot secrecy.

3        So we still don't have -- you know, months

4  and months later -- what is it, six months later?  Or

5  five months later?  Yeah, five months later.  We

6  still -- the board still has not been presented with

7  a finalized copy of to-scale floor plans for all

8  24 polling locations that show we can do one per 250

9  with BMDs -- with all BMDs.

10       Q.  Based upon your knowledge of the polling

11  locations, is the problem that the staff is just not

12  doing their homework or the homework cannot be done,

13  if you know what I'm saying?

14       A.  Honestly, it could be both.  I know there

15  definitely has been resistance from staff on just

16  implementing this.  But also like a poll manager had

17  seen a draft of the floor plan and when I had shown

18  up -- this is same poll manager, the same location,

19  the one that had a lot of machines still in the

20  suitcases, again, the carrying cases.  That poll

21  manager expressed to me like they did not feel like

22  they could actually set up all that equipment

23  according to that floor plan.  They couldn't actually

24  set it all up that way.

25       Q.  Going back a little bit to just a broader

Curling v.                 Statement Under Oath
Raffensperger            JESSE EVANS                    8/16/2020

1   question.  Based upon your hands-on experience of

2   loading the equipment, all the logistics involved in

3   setting up the equipment, your efforts in trying to

4   have your staff develop floor plans that attempted to

5   protect privacy but also meet the numerosity

6   requirement, the one-and-250 requirement -- based

7   upon all that experience, what would -- why wouldn't

8   you switch to hand-marked paper ballots?

9        A.  I mean, at this point it's -- it's basically

10   a result of the DEB hearing -- emergency hearing.

11   Like we thought we were doing the right thing.  We

12   still felt we were doing the right thing back in

13   March when we were attempting to protect ballot

14   secrecy by using our back-up plan, but then -- and

15   our attorney presented very compelling evidence.  Our

16   attorneys did a great job, made it very clear with

17   photographic evidence, with like witness testimony,

18   with -- you know, even with their way -- they did

19   cross-examination of state's witnesses.

20            And at the end of the day, it didn't matter.

21   It did not matter.  The SEB was like -- they found

22   against it.  They said that we -- they didn't agree

23   with the decision.  And they issued a fine and it

24   would be an even harsher fine or an even harsher

25   penalty if we didn't switch over immediately back

Curling v.                 Statement Under Oath
Raffensperger             JESSE EVANS                    8/16/2020

```
 1   to --
 2        Q.  Let me do this and I'm -- the purpose of the
 3   question wasn't to assign blame for you not walking
 4   into a bunch of fines.  That's not -- that wasn't the
 5   thrust of it.
 6            But what I want to do is separate -- there
 7   are bureaucratic and legalistic reasons why you would
 8   not want to go directly to hand-marked paper ballots,
 9   specifically the Board of Elections is going to get
10   punished by the State Elections Board.  Are you with
11   me?
12        A.  Yes.
13        Q.  I'm going to call those bureaucratic and
14   punitive reasons for not switching from ballot
15   marking devices to hand-marked paper ballots.
16            Are you with me?
17        A.  Yes.
18        Q.  Apart from those concerns, could the Board
19   of Elections -- could Athens deploy hand-marked paper
20   ballots and protect voter privacy, meet the
21   logistical requirements of getting prepared to vote
22   with hand-marked paper ballots?
23        A.  So I asked a similar question of the staff,
24   like I sent an E-mail requesting information about,
25   you know, what if, you know, the secretary of
```

Curling v.                Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

1  state -- what if they decide that everyone's going to
2  hand-marked paper ballots, could we handle that?
3  Could we do that?
4          And the staff's response was, We'll do
5  whatever is required of us to do.  We'll figure out
6  how to do it.  Basically, it was yes.  If that's what
7  we were told to do, we would do it and we would
8  manage it.
9      Q.  Based upon your experience and your sort of
10 working knowledge of the various ways of voting,
11 would you have any particular concerns about
12 switching to hand-marked paper ballots?
13     A.  I mean, the only things -- for one, it would
14 be a longer time to process the elections.  That's
15 not necessarily a reason not to do it.  That's just
16 an effect of switching over.  Right?
17     Q.  Right.
18     A.  It would take longer to process those -- you
19 know, that many paper ballots.
20          And, two, back in June we had about 16,000
21 absentee -- paper absentee ballots sent in like by
22 voters in our county.  And one issue that came up was
23 that our voter review panel actually discovered that
24 there were marks being made by voters on these paper
25 ballots but that the Dominion scanner -- or the

***** C E R T I F I E D *****

Curling v.                 Statement Under Oath
Raffensperger             JESSE EVANS                    8/16/2020

1   scanner being used by the Dominion system that we

2   were using to scan the ballots and the software we

3   were using for adjudication -- the software we were

4   using for adjudication wasn't counting marks that

5   are to the human eye, to the voter review panel's

6   eyes, were clearly votes cast -- like they meant to

7   be cast.

8          They weren't counting all those if they were

9   below a certain like bubble coverage threshold.  The

10  settings I believe were anything less than 12

11  percent, it would not be counted as ambiguous.  So it

12  wouldn't be flagged to be seen by a voter review

13  panel.  But like it would just never be -- you know,

14  it would just never have human eyes on it, basically,

15  to see that it was a vote.

16     Q.  Mr. Evans, I'm going to address that

17  separate.  Okay?  That's another issue on the

18  scanning thing that I want to talk to you about.

19          But just in terms of setting up the -- your

20  polling places for election day, your staff said,

21  Sure, you can switch to hand-marked paper ballots.

22  It may take a little bit longer to process the

23  hand-marked paper ballots.

24          And why is that?  Don't the voters scan

25  those just like they scan their BMD-generated

Curling v.                Statement Under Oath
Raffensperger              JESSE EVANS                8/16/2020

```
 1  ballots?
 2       A.  They -- so in my experience with the
 3  hand-marked paper ballots -- or you're saying like at
 4  the actual -- you're saying on the election day
 5  itself not using -- because I was referring to the
 6  processing of absentee by mail.
 7       Q.  No, no.  I meant -- I'm talking about
 8  election day -- election day.  And let's say for some
 9  reason you can't use BMDs.  Are you with me?
10       A.  Yeah.
11       Q.  Would deploying hand-marked paper ballots
12  instead of BMDs be relatively easy?
13       A.  Yeah.  I don't see why it wouldn't be.
14           "Yes" is the answer.  I don't see why.  We
15  were doing it back in March and it was fine.  So I
16  don't know why it would be any different in November.
17       Q.  And we talked about ballot secrecy and about
18  one to 250 and about the power requirements and many
19  people hiding behind the booth, all the different
20  constraints that you have.
21           How does the need to socially distance
22  voters and poll workers have an impact upon the
23  feasibility of using the ballot marking devices?
24       A.  You can only have a certain number of people
25  in the room.  There's a maximum of, I believe,
```

***** C E R T I F I E D *****

Curling v.                 Statement Under Oath
Raffensperger              JESSE EVANS                   8/16/2020

1   10 people in the room and that's including poll

2   workers.

3        So I think it was -- basically at the

4   polling locations it was you're only allowed to have

5   three or four voters come through at a time.  And

6   they are coming in in waves or in shifts or whatever.

7   And they'd have to be spread out throughout the room

8   as well.

9        And, you know, there's the sanitizing of the

10  equipment before voters get in there.  There's the

11  sanitizing of the equipment after voters have used it

12  between each wave of voters -- of three or four

13  voters coming through.  So it slows things down

14  dramatically and it would lead to -- I mean, like in

15  June it wasn't -- we didn't see long lines in June.

16  But in November if this is still going on, it's going

17  to be a much higher turnout.  June was primaries

18  mostly, but -- with some local stuff here, too.  But,

19  you know, in November it's going to be a much higher

20  turnout.

21        So it would affect voting lines.  It would

22  affect how long people have to wait and how many

23  votes are being done in one polling location at the

24  time or in a day.

25        Q.  Right.  And would it speed things up to have

***** C E R T I F I E D *****

```
 1   hand-marked paper ballots?
 2        A.  Well, yeah, because you wouldn't have to
 3   sanitize the equipment.
 4        Q.  Right.
 5        A.  Also some counties -- I've heard of some
 6   places using like drive-through or drive-up voting
 7   like outdoor voting.  We had a voter recently in
 8   Clarke County send me an E-mail asking me about are
 9   we going to be able to do -- could we possibly do
10   voting outside in a covered space or something.  But
11   if we're using BMDs, like we'd have to have
12   electrical capacity, electrical set-up.  We'd have to
13   have it done in a way that's going to protect the
14   machines from the elements.
15        Q.  Right.
16        A.  But, you know, with paper ballots you don't
17   run into that.  You just have tables set up outside
18   in a covered area and people would come and vote.
19   You don't have all the electrical requirements.
20            So, yeah, you wouldn't have -- it's also new
21   equipment.  People have to get the card at the poll
22   pad and then go use the card at the machine and
23   scroll through and then print it out -- like once
24   their done, hit "submit," print it out and then go
25   over to the scanner and scan it in after --
```

1   hopefully, after they've confirmed.  Gone to our

2   station where people can use magnifying glasses and

3   confirm that what's on the paper is what selected in

4   the machine.

5         So it's going to be fewer steps in the

6   process and we have more options when it comes to

7   voting outside and stuff if we went to paper as well.

8   It would be faster, I think.

9         Q.  Let me switch gears -- thank you for that.

10         Let me switch gears a little bit to just a

11   very few questions on one issue.

12         And that is for absentee -- completed

13   absentee ballots, somebody has completed their

14   absentee ballot, doesn't want to put in the United

15   States Postal Service for obvious reasons.

16         In Athens-Clarke County, where can they come

17   drop it off if they don't want to use the mail?

18         A.  We have five -- currently, we have five

19   absentee ballot drop boxes that have been

20   strategically set throughout our community -- set up

21   throughout our community for ease of access.  We

22   dispersed them in various parts of town that we know

23   that people have access to and they know where it is

24   and it's, you know, closer -- we don't have it all

25   centralized.  It's all spread out so people can have

Curling v.                   Statement Under Oath
Raffensperger               JESSE EVANS                      8/16/2020

1 access to it and it's closer to their home.

2      Q.  Will you allow them to drop it off at

3 polling locations --

4      A.  No.  No.  That's -- we were told -- we've

5 been told by staff that that's not something that

6 we're doing.  We're not -- and I'm not sure if

7 that's -- I think -- I want to say it was the -- it's

8 definitely the director saying this.  It's on our

9 website.  Right now you can go check it out and see

10 on our website that absentee ballots cannot be turned

11 in at polling locations.

12         So we're not offering that right now.  And,

13 again, that was at the insistence of our elections

14 director.

15      Q.  Let me direct your attention to the scanning

16 issue, the sensitivity of the scanning.  You actually

17 mentioned it when we were talking about the ballots.

18         Were you on the vote review board for this

19 last election?

20      A.  The August election?

21      Q.  Yes.

22      A.  Yes.  I was.

23      Q.  What is the vote review board just in

24 general?

25      A.  The vote review panel, it's a group of

Curling v.              Statement Under Oath
Raffensperger          JESSE EVANS                  8/16/2020

1  community members and -- that were, you know, either
2  appointed by the board or, you know, there are some
3  that are appointed by both local parties, the
4  Republican Party and the Democratic Party locally.
5  There's a couple that are appointed by a judge.
6  However, this last time around it was just me
7  representing the board and then a Democratic Party
8  appointee and a Republican Party appointee.  There
9  were only three of us there.
10        And -- and the job is -- consists basically
11  of, you know, if there's a ballot that's been
12  duplicated, one piece of the job is to look at the
13  duplications and make sure that the duplicate matches
14  the intent of the voter on the original ballot.  So
15  that's part of it.
16        But the other piece of it is adjudicating
17  ballots, you know, making sure that if the voter has
18  made a mark on the ballot that -- and that mark can
19  be, you know -- the vote review panel determines that
20  that mark is actually an intentional attempt at
21  voting and the intent of the voter is clear, it can
22  be discerned by the vote review panel, then than mark
23  is accepted as a vote by that voter.
24      Q.  Let me back up just a little bit.
25          (Audio fades) -- ballots duplicated?

***** C E R T I F I E D *****
APG USA INC.                              (888) 542-5598

Curling v.                    Statement Under Oath
Raffensperger                    JESSE EVANS                    8/16/2020

```
 1        A.  Sometimes there's damage to the ballot, the
 2   paper ballot.  Sometimes it's, you know, because the
 3   way the voter marked the ballot like --
 4        Q.  Spilt coffee --
 5        A.  Say again?
 6        Q.  Somebody spilled coffee on it and it won't
 7   go through the scanner; that kind of thing?
 8        A.  Yeah.  Basically, if it's going to be an
 9   issue with the scanner.
10        Q.  Let me move into the adjudication of
11   ballots.
12            Now, who or what, I should say probably,
13   decides what ballots are supposed to be adjudicated
14   or need to be adjudicated?
15        A.  Well, now under this new system it's a
16   software that determines which ballots are to be
17   adjudicated.
18        Q.  And so it will give -- the software then
19   will give who the vote -- or separate for the
20   voter review panel to review a set of ballots that
21   needs to be adjudicated; is that right?
22        A.  Yeah.  There are certain parameters that
23   are -- like certain settings for the software, the
24   adjudication software for this new system.  And if
25   there's -- I think there's seven or eight different
```

Curling v.                  Statement Under Oath
Raffensperger               JESSE EVANS                      8/16/2020

1   criteria that could be checked, you know, could be

2   implemented to kick ballots back to the vote review

3   panel for adjudication.  The state, apparently, I'm

4   told by staff, only trained people to use four of

5   those options even though it's possible to use the

6   others.

7           And also it has to do with the amount of ink

8   or the amount of coverage of the bubble.  You know,

9   if it's above -- if it was below -- if it's between

10  12 percent and I want to say like 32 or 34, I forget

11  the exact number -- maybe 30.  Yeah, I forget.  But

12  it's 12 and 30 something percent -- that that would

13  be counted not as a vote but as an ambiguous mark.

14  If anything's over that upper limit of that ambiguous

15  mark range, that would be counted as a vote.

16  Anything less than that lower limit, the threshold,

17  that would not be counted as a vote and would not be

18  counted as ambiguous needing to be reviewed by the

19  vote review panel.  And also, basically, nobody -- no

20  human eyes would ever necessarily be on that.

21      Q.  If it's below, say, 12 percent, it gets

22  rejected without any human intervention; correct?

23      A.  It -- yeah.  There's -- it's not counted as

24  a vote.  And there's no -- and it's not presented to

25  human eyes, you know, to identify the intent -- to

***** C E R T I F I E D *****
APG USA INC.                                    (888) 542-5598

 1  try to identify the intent of the voter.

 2      Q.  When a ballot gets into the -- I'll just say

 3  the adjudication queue, the batch that needs to be

 4  reviewed by the vote review panel.

 5          The ballot will have many different races on

 6  it; correct?

 7      A.  It depends on the election but, yes.  In

 8  June it did.

 9      Q.  And so --

10      A.  In August it did not.  It was a runoff.

11      Q.  So if there's a single ambiguous vote on

12  there, it would kicked out for adjudication, correct,

13  or put aside for adjudication; right?

14      A.  Ambiguous is one of the settings, yeah.

15  Ambiguous and overvote.

16      Q.  And overvote, right.

17      A.  And there were two more settings that I can

18  find and tell you what they, if you'd like.

19          MR. BROWN:  Yeah.  If you could do that

20      quickly, that's be great.

21          THE REPORTER:  Hey, Bruce, can we take a

22      quick bathroom break?

23          MR. BROWN:  Let's take a break right

24      now.

25          (Recess from 3:31 p.m. to 3:43 p.m.)

1  BY MR. BROWN:

2       Q.  Mr. Evans, we're back on the record.

3           Have you seen floor plans that give you

4  confidence that in light of the other constraints,

5  including the requirement of one BMD for every

6  250 voters or one ballot station for every 250

7  voters, that voter privacy, that ballot secrecy can

8  be protected without using hand-marked paper ballots

9  at some or all of your polling locations?

10      A.  I have not seen floor plans like you've just

11 described.

12      Q.  Thank you.  Let's move on to -- go back to

13 the vote review panel, which we were talking about

14 right before we broke.  And to get us back on track,

15 you were describing four different -- you had said

16 before that there were seven or eight criteria that

17 could be used by the software -- the adjudication

18 software, that the state uses four options and that

19 two of the options were ambiguous votes, which were

20 votes which were cast -- which votes had some -- I'm

21 sorry, ballots that had some votes that were between

22 12 percent and 33 percent.  That's one category.

23          And then overvotes.  We know what overvotes

24 are.  That's when someone votes for more than one

25 person for the same race; correct?

Curling v.                    Statement Under Oath
Raffensperger               JESSE EVANS                      8/16/2020

```
 1          A.   Yes.  It's overvote and ambiguous mark.

 2          Q.   Okay.

 3          A.   And also the other two that were utilized in

 4   June and also in August in our county was the blank

 5   ballot and the write-in.  Those four settings were

 6   utilized with the software.

 7               The ones we did not use were blank contest,

 8   undervote and write-in for qualified candidates.

 9          Q.   What's write-in for qualified candidates?

10          A.   Great question.  That was never explained to

11   us.  It was just -- we were just told it was a

12   write-in.  "Qualified" was in parenthesis.  But like

13   we didn't use those.

14               Actually, in Georgia, blank contest and

15   undervote are going to be actually the same.  Like

16   it's going to pull up the same contest because we

17   don't have ranked voting in this state.

18          Q.   So if somebody doesn't vote on a race, it

19   just counts what it counts and you never see it?

20          A.   To be more precise, if the software doesn't

21   recognize a mark as a vote and the software doesn't

22   recognize a mark as an ambiguous mark, then the vote

23   review panel -- it's not flagged for adjudication by

24   the vote review panel.

25               However, our vote review panel back in June
```

***** C E R T I F I E D *****

1    when looking at the ballots that were -- did have at

2    least one contest flagged for adjudication noticed

3    that there were other contests that were not flagged

4    for adjudication but also had marks that were not

5    counted as votes, but there was a mark there and it

6    was -- the voter's intent was clear.  And had they --

7    you know, had they not seen that ballot due to the

8    contest that was flagged for adjudication, then that

9    would have never been seen.

10        Q.  When you were doing the vote review panel

11   work, did you see ballots that featured that

12   combination of -- like one ambiguous vote that kicked

13   it into ballot review board review but then also

14   other marks that didn't counted at all?

15        A.  So I -- so in August, there was only one

16   race on the ballot.

17        Q.  Okay.

18        A.  So the answer would have to be no on that.

19             In June, members of the public could

20   actually -- we had a glass window where people could

21   actually look into the room -- the secured room where

22   the voter review panel was doing adjudication.  And I

23   did see in June, you know, several -- you know,

24   many -- like there were many ballots in which one

25   contest on the ballot was flagged for adjudication,

Curling v.                 Statement Under Oath
Raffensperger            JESSE EVANS                   8/16/2020

1  but there were other contests on the ballot that were

2  not flagged for adjudication but also the mark that

3  had been made on that was not counted as a vote and

4  like -- but to the human eye, the voter's intent was

5  very clear.

6         And, actually, our vote review panel then

7  that I was not a part of back in June, they did

8  account those marks as votes.

9      Q.  Was any effort in June made to go back and

10  review ballots that may have had some races that were

11  not counted but that were not adjudicated because

12  they did not trigger any of the software criteria for

13  adjudication?

14      A.  Yeah.  Actually, members of the board that

15  I'm on, the Board of Elections, we were thinking if

16  we were missing anything less than 12 -- like marks

17  less than 12 percent that were not on a ballot where

18  anything was flagged for adjudication, if we're

19  missing those marks and we have technological

20  capability to change the settings on the software,

21  the adjudication software to count undervotes and

22  blank contests, then -- if we want to capture, if we

23  want to know and go see and try to identify and

24  hopefully count as a vote, if we're legally permitted

25  to do, a mark on the ballot that wasn't picked up --

***** C E R T I F I E D *****

Curling v.              Statement Under Oath
Raffensperger           JESSE EVANS                    8/16/2020

1  marked as an ambiguous mark by the software and

2  wasn't flagged -- or marked as a -- or counted as a

3  vote, we could do it that way.

4        But when we asked our staff -- our director

5  of elections if we could do that and we asked our

6  attorney if we could do that, we were told by both

7  that we were not allowed to do that, that we were not

8  allowed to change the settings on the adjudication

9  software to hopefully -- you know, and that way to

10  find the votes that were not counted and not shown to

11  the vote review panel.

12     Q.  Has that issue been pursued further by the

13  board or by the lawyers, if you know?

14     A.  Yeah.  Like interestingly and frustrating

15  enough, we were advised -- we were told that earlier

16  in -- so in June, that the week after the elections

17  when we were coming in for -- like to do special

18  called meetings and try to handle this issue, we were

19  told early in the week that we couldn't do it.  But

20  then we find out later in the week that the county

21  next door actually did do that.

22        And then on -- on the day that we were to

23  certify the election -- scheduled to certify the

24  election in June, one of our attorneys -- apparently

25  the attorney that spoke to the secretary of state's

1  office and spoke to their attorney then tells us, Oh,

2  well, actually, by the way, yes, I did tell you this

3  earlier this week, but, you know, between then and

4  now I've spoken with them again and now they've

5  backed off that statement saying that -- you know,

6  like the idea that we're not permitted to change the

7  settings on the adjudication software.

8       Q.  So what's the current -- what's true now?

9  Are you able --

10      A.  That's a good question.  We have asked -- so

11  we asked again.  We were going to try to include

12  those things in August.  We were going to try to

13  include those settings to avoid that issue, just make

14  sure we're not leaving -- like if a voter casts a

15  vote in Clarke County, you know, it's cast.  We can

16  count it.

17          And we were told again by our attorney

18  that -- by one of our attorneys that we can't do

19  that, it would be in violation of, you know, laws

20  and -- certain laws.

21      Q.  At the county level, the county does not

22  have the discretion to change either the criteria for

23  either ballot review panel -- vote review, panel

24  review or the percentages that were deemed to be an

25  ambiguous vote; is that right?

1      A.  Yeah.  We've been told that we can't do

2   either of those things.  And then when I asked, Like

3   would you show me -- and actually another board

4   member asked, Would you show me where it's written

5   that we can't do this?

6           The attorneys said, Well, I can't show you

7   in statute because it's not written in statute.  But

8   I can say that, you know, the way laws are

9   interpreted, you know, that were written -- this is

10  implied, basically, is what the attorney said.

11          And then, you know, they said -- the

12  attorneys told us that if we decided to do this, it

13  would probably be challenged.  We're setting

14  ourselves up for another challenge from the State

15  Elections Board.

16      Q.  If they fine again --

17      A.  Say it again.  I'm sorry.

18      Q.  With the threat that you'll get fined again.

19      A.  Yeah, yeah, yeah.  But also like, you know,

20  we were told, Well -- you know, because after I

21  pushed back and said, Didn't you tell us that you

22  called back and they said that they backed off that?

23          And she said, Yes, you're right, I did say

24  that.  And then they said, Well, until we receive

25  very clear directive and guidance from the State

Curling v.                  Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

1  Elections Board that we can do this, I'm advising you
2  not to do this.  This was in a regular public meeting
3  that they said this.
4      Q.  So the default then is that you can't change
5  either the criteria or the settings unless you're
6  given affirmative authority to do so from the State
7  Elections Board; correct?
8      A.  That's what we're being advised by both our
9  attorney and also by our director of elections.
10         And even further I would like to -- I want
11  to know like if we can actually like -- okay, we
12  can't go back and do this with VRP, right, voter
13  review panel, but what we could do is create a new
14  project in Dominion, right, and like set the settings
15  to only like over -- sorry, undervote and blank
16  contest.  Right?  And these are the settings that we
17  didn't use last time, you know.  And then we can have
18  the adjudication software -- set those ballots from
19  the previous election aside.  Right?  And we could go
20  through visually.
21         And even though it's already done, we can at
22  least have an idea of -- the election's already done,
23  we can at least have an idea of what are we missing
24  with this software?  What -- how many votes -- marks
25  that would have been votes, that should have been

Curling v.              Statement Under Oath
Raffensperger           JESSE EVANS                    8/16/2020

1   votes, how many are we actually missing?

2           So I brought that idea to my elections

3   director and she said it would be illegal for us to

4   do that.  We don't have permission to do that.

5       Q.  Not even to do like a mock run of it?

6       A.  Yeah.  Just to go back after the fact and

7   look at the -- you know, what the software would give

8   us even if it's not a part of the official

9   adjudication process or it's not part of the official

10  certification of elections process, we still -- like

11  she said we can't do it period.

12          She hasn't pointed to any statute or rule

13  that says that, but that's what she said to us --

14  like to me we can't -- like that would be in

15  violation of the law if we were to do that.

16      Q.  I don't want to get into the sort of

17  personal dynamics between the board and the elections

18  director.

19          But let me just ask this.  Can the board

20  just say, Tough, do it?

21      A.  Sure.  We could.  We could like make a

22  decision and say, yes, we're going to do this.  But

23  with the way things have gone earlier this year

24  with -- when we tried to protect the ballot secrecy

25  by switching to plan B and the way the SEB handled it

1  and the way our elections staff and our attorney here

2  locally handled it, it doesn't -- you know, it's not

3  likely to happen --

4       Q.  So I take it --

5       A.  -- as far as votes go.  I don't know that

6  we'd have -- I don't think we'd have the number of

7  votes needed to do something like that.

8       Q.  Is it fair to say that there's not a whole

9  lot of curiosity from either your director of

10  elections or the state board or the lawyers as to the

11  impact these settings might have upon actually

12  disenfranchising voters?

13      A.  I've not seen -- like I've not seen evidence

14  of that sort of curiosity from any of those parties.

15  And I've seen our board try to figure this out and

16  then I've seen our board get pushback from our local

17  attorney and our local elections director.

18      Q.  Does it seem like your local attorney and

19  your elections director are sort of a proxy for the

20  State Elections Board?

21      A.  You know, honestly, I don't -- I couldn't

22  say that about my local attorney, but there are times

23  that I do wonder that about our elections director.

24  She's employed by our local government, but many

25  times throughout my tenure on the board, it seemed

Curling v.                Statement Under Oath
Raffensperger               JESSE EVANS                  8/16/2020

```
 1  that --
 2      Q.  Let me move on to another somewhat related
 3  topic.
 4          Now, the public is able to see the decisions
 5  that the review panel is making while they're making
 6  it?  Are they like looking over your shoulder or
 7  looking across the room?  How does that work?
 8      A.  The room that they're in are two entrances
 9  and one of those entrances opens up into a hallway.
10  The other entrance opened up into our facility where
11  we store machines and equipment and stuff.
12          But the hallway side, like the public can
13  come down that hallway and there's actually like
14  large glass window.  And they can -- the public can
15  view that through the glass.
16      Q.  The policy of sort of the -- the policy and
17  the culture is that's a good thing; right?  They
18  ought to be able to see what you're doing.  Is that
19  fair to say?
20      A.  I'll say that the board is of that -- you
21  know, the board -- like from what I've seen, the
22  majority of the board is very much in favor of that.
23          And I can say -- I don't think that -- like
24  there's been -- I haven't seen staff make an effort
25  to obstruct that window or anything like that.
```

Curling v.                  Statement Under Oath
Raffensperger               JESSE EVANS                  8/16/2020

```
 1         Q.  Let me take you back to the actual work that
 2   the voter review panel does.
 3              It's sort of mechanically looking on a
 4   computer screen at different images of ballots that
 5   have been put in by the computer for the panel's
 6   review; correct?  You're looking at a screen; right?
 7         A.  Yes.  That's correct.
 8         Q.  And the three of you are looking at it and
 9   there's an ambiguous vote.  Let's just say all three
10   of you go, Oh, yeah, that clearly is a vote for
11   Smith; right?
12         A.  Mm-hmm.
13         Q.  Then what happens?
14         A.  Then the person -- the way it's worked so
15   far is that we have a Dominion tech, like a person
16   assigned to us to help us with this machinery and
17   stuff.  And so far it's been that that person clicks
18   you know, the option in the -- the option in the
19   computer system in the software to change that --
20   like to make that ambiguous mark a vote that's
21   counted.
22         Q.  And that's it; right?  That's a vote that's
23   counted; right?
24         A.  Yeah.  And there's a second -- so every --
25   every ballot that's scanned through has at the bottom
```

***** C E R T I F I E D *****

Curling v.                  Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

```
 1   there's an audit mark, which is like a summary of
 2   what the computer system sort of recognized and did
 3   with each race, each contest.  And whenever the voter
 4   review panel, if they discover that there's a mark
 5   made on the ballot that wasn't counted as a vote but
 6   that should be counted as a vote, once they make that
 7   change, a second audit mark is added to the bottom of
 8   the ballot record.
 9        Q.  At the end of the day is there a paper trail
10   to be able to determine what decisions and on what
11   ballots the voter review panel made?
12        A.  You mean like a report or something that can
13   be generated?
14        Q.  Yeah, or some audit trail.
15        A.  So that's a good question.  I -- in my
16   experience when I've asked questions about, Can we
17   pull up the ballots that were audited -- or, I'm
18   sorry, that were adjudicated and changes made to them
19   and stuff, I've been told by staff, no, that can't
20   happen.  Like we can look at the -- go back and
21   manually review, right, and you can look at the audit
22   marks.  And if there's two audit marks, they were
23   changed by the vote review panel, like the vote
24   review panel made a change as far as how the system
25   counted the vote or didn't count the vote.
```

```
 1           But, to my knowledge, there's not like a
 2   running log of the ballot at this precinct for this
 3   election.  This was adjudicated by VRP.
 4       Q.  Hang on one second.
 5       A.  Now, they have the batches, like they have
 6   the queue and the system that they utilized.  But as
 7   far as like saving that list somewhere, I don't know
 8   that that's -- I don't know.
 9       Q.  Has -- let me change topics entirely.
10           For both the June and the August elections,
11   I believe you said -- I don't know if this was on the
12   record -- but that you went to a number of different
13   polling locations just to see how things were going.
14       A.  For June I did.  In August, we only had
15   three polling locations.
16       Q.  Were you able to assess the effectiveness of
17   the electronic poll pads for their intended purpose
18   just in general?
19       A.  When I was visiting?
20       Q.  Yes.
21       A.  No.
22       Q.  Have you had any -- have you observed
23   problems with them or -- either firsthand or reports
24   of problems?
25       A.  Yes.
```

1      Q.  And what problems did you either see or were
2    reported to you?
3      A.  One person sent a message, an E-mail, I
4    believe, recently in August saying that they had had
5    issues with it, with the poll panel -- or the poll
6    pad.  And I can pull up the E-mail if you would like
7    to recap what they said.
8      Q.  That's all right.  Just the gist of it.
9      A.  Basically, the sensitivity of the signature,
10   like tools -- you know, when they have to sign off on
11   it.  And also they said that the components, like the
12   wiring, the ports and stuff were not optimal as far
13   as, you know, maintaining the structural integrity of
14   those things over time and preventing them from
15   disconnected and things of that nature.
16     Q.  In general, did it seem like they basically
17   were working okay?
18     A.  I didn't see -- I've not seen lot of
19   complaints about our poll pads in Clarke County.
20     Q.  Do you have any paper backup for the poll
21   pads that you use, that the polling locations use?
22     A.  To my knowledge, yes, they have paper backup
23   but also there's a -- you know, if there's -- if the
24   poll worker has a problem at the poll pad as far as
25   like a voter not showing up on their poll pad but

***** C E R T I F I E D *****

1  also not on their back-up list on paper, then they

2  just call the Board of Elections office and have

3  staff there look up the person in the system.

4      Q.  And what system would they look -- what

5  system would the Board of Elections person look into?

6      A.  The system that has our official voter

7  rolls.

8      Q.  Are you familiar with the concern about the

9  DREs -- I'm moving on to a different topic here --

10  the DREs that were used in the Winterville polling

11  location for the mid-term elections in 2018?

12      A.  Say again.  I'm sorry.

13      Q.  Moving on to DREs -- and I'm referring to

14  the 2018 election, the midterms.  Are you aware of

15  any concerns about the DREs that were used in the

16  Winterville precinct?

17      A.  Yes.

18      Q.  What did you learn about that, those issues?

19      A.  So I've seen media coverage of concerns

20  about these machines at the Winterville train depot

21  polling location in 2018 of the voting data on them

22  being statistically anomalous in a way that is very,

23  very unlikely statistically speaking.

24      Q.  What, if anything, did you or the board do

25  to secure the particular DREs that were used?

Curling v.                    Statement Under Oath
Raffensperger                 JESSE EVANS                    8/16/2020

```
 1        A.  We were -- when we found out about it, we
 2   put it on our next agenda.  And we wanted to find out
 3   what was going on about it and actually like get to
 4   the bottom of this.
 5             And we had been told that those machines
 6   were to be placed in quarantine and held.  And we
 7   were basically given a directive -- like our staff
 8   was given a directive by the state -- secretary of
 9   state's office to put those machines aside.
10        Q.  As far as you know, were those machines set
11   aside?
12        A.  I recently discovered that not all those
13   machines were set aside.  That was recently found out
14   that not all of those machines were set out.
15        Q.  How do you know?  What did you -- how did
16   you find --
17        A.  There was a report that was created by staff
18   that someone shared with me that said that two of
19   them -- two of the machines, I believe, were actually
20   like put in an area of our facility that's for
21   equipment that needs to be repaired.  And then they
22   weren't actually stored with the quarantined
23   machines; and also that those machines have -- when
24   we sent -- when the state came and picked up all the
25   DREs and stuff for the switchover to Dominion BMDs,
```

Curling v.                Statement Under Oath
Raffensperger            JESSE EVANS                    8/16/2020

```
 1  that those machines, I believe, were collected and
 2  taken by the state.
 3          And I'm told that it was an accident, you
 4  know, made by staff; that it wasn't -- you know, that
 5  the -- the paper that I saw said that it was the --
 6  the machines were set over there in that area of our
 7  facility -- storage facility for repair and that,
 8  basically, it was like an oversight, I believe, is
 9  what was claimed on the document.
10          Q.  Let me just -- you're referencing a report
11  by staff.  That's the elections staff in Athens?
12          A.  Yes.  By one member of the elections staff.
13          Q.  Who wrote the report?
14          A.  Lisa McGlaum's name is on the report, I
15  believe.
16          Q.  Spell that name for me.
17          A.  Lisa, L-I-S-A.
18          Q.  Got that.
19          A.  McGlaum, M-C-G-L-A-U-M.
20          Q.  When was that report written?
21          A.  I don't know, actually.  I can look at the
22  report and tell you.
23          Q.  Sure.
24          A.  Is that all right?
25          Q.  Yeah.  Or you can just send it to me.
```

***** C E R T I F I E D *****

```
 1        A.  I've got it right here, but, I mean, I can
 2   share it with you, too, if that's something you would
 3   like.
 4        Q.  Why don't you just E-mail it to me?
 5        A.  Okay.
 6        Q.  So just to make sure I've got the overview
 7   here, there were a total of eight machines -- or
 8   seven or eight machines that were actually used in
 9   Winterville; is that right?
10        A.  Yes.
11        Q.  And two of the ones that were actually used
12   in Winterville got accidentally joined with other
13   DREs in the repair -- (audio fades) -- and then taken
14   by the state when they did their big sweep; correct?
15        A.  That's my understanding.
16        Q.  Did that leave -- how many?
17        A.  Just a second.  I don't have like a PDF of
18   that report, photos of that report that somebody sent
19   me.
20        Q.  Don't worry about that.
21        A.  But I can tell you the date that's on the
22   report, if you'd like, for when it was prepared.
23        Q.  What's the date?
24        A.  August 13th, 2020.
25        Q.  With the exception of the two machines that
```

Curling v.                  Statement Under Oath
Raffensperger              JESSE EVANS                  8/16/2020

1   were put in the wrong place, are you aware of any

2   other security issues relating to the Winterville

3   machines?

4        A.  I'm sorry.  Just a moment.  I was reviewing

5   the document just now to make sure that I've been

6   clear on what it says.

7              MR. BROWN:  Okay.

8              (Witness reviewing document.)

9              THE WITNESS:  Yeah.  Apparently, it was

10             one machine, according to this report, one

11             DRE that was not used.  It was assigned to

12             Winterville, but it wasn't used in November

13             of 2018.  And it was put in the hospital

14             area of the warehouse, quote, unquote, where

15             they set them up for equipment in need of

16             repair.  And then the other one was machine

17             number two that was used on November 2018.

18  BY MR. BROWN:

19       Q.  Okay.  And then apart from that issue, were

20  there any other security or custody issues relating

21  to the other machines that were used in Winterville?

22       A.  Could you clarify your question?

23       Q.  I'm just trying to sort of wrap-up.

24             You mentioned that -- the problem with the

25  two.  Were there any other problems?  Like were five

***** C E R T I F I E D *****

Curling v.                Statement Under Oath
Raffensperger              JESSE EVANS                    8/16/2020

1  of them hacked, for example?  I just want to make

2  sure I got the whole story.

3        A.  To my knowledge, there -- there were eight.

4        Q.  I just need to sort of finish up and make

5  sure --

6        A.  There were eight machines that I've seen

7  personally that were in quarantine in the office --

8  like in what used to be called the EMS room.  I'm not

9  sure what they call it now, now that we switched

10 over.  It's a secured room, but it's also in the

11 office of Lisa McGlaum.

12        MR. BROWN:  Let me do this.  Let me talk

13     with my clients for a couple of minutes.

14     And let's take a five-minute break and then

15     we'll wind up with just a few questions.

16     Okay?

17        THE WITNESS:  Okay.

18        MR. BROWN:  Great.  Thanks.

19        (Recess from 4:15 p.m. to 4:30 p.m.)

20 BY MR. BROWN:

21        Q.  Mr. Evans, I want to go back to the topic of

22 the -- (audio fades) -- software and the ballot

23 review panel.

24        One issue --

25        A.  Will you represent that?  I'm sorry.

***** C E R T I F I E D *****

Curling v.                Statement Under Oath
Raffensperger             JESSE EVANS                8/16/2020

1        Q.   Go back to -- make sure I have the word

2   right.

3             What is the panel called that reviews the

4   ambiguous votes?

5        A.   The vote review panel.

6        Q.   The vote review panel, when it was doing its

7   work, it was looking at the images on a computer

8   screen; correct?

9        A.   Yes.

10       Q.   So when you were looking at voter intent,

11  you weren't looking at an actual physical ballot that

12  was cast; were you?

13       A.   Correct.  We were not.  The vote review

14  panel was not looking at a physical like paper

15  ballot.  That's the one that was actually physically

16  marked on.  It was looking at scanned images.

17       Q.   Let me direct your attention to the issue we

18  talked about some and that was the concern about

19  votes that weren't counted.

20            I believe it was your testimony that you had

21  concerns about the ballots that weren't flagged by

22  the adjudication software that might have on them

23  what you saw were uncounted votes on ballots that the

24  adjudication software didn't flag for other reasons.

25            Do you follow me?

Curling v.              Statement Under Oath
Raffensperger           JESSE EVANS                    8/16/2020

```
 1        A.  Correct.
 2        Q.  Did you actually see on those ballots that
 3   were sent to you to adjudicate votes that should have
 4   been counted?
 5        A.  If you're referring to the August election,
 6   there was an ambiguous -- there was one ambiguous
 7   ballot that was adjudicated by the vote review panel
 8   in August.  And that did have a mark on it that
 9   needed to be adjudicated and that was a vote.  The
10   vote review panel determined that that was actually a
11   vote and counted it as a vote and --
12        Q.  That was all --
13        A.  I'm sorry?
14        Q.  August was just one race, so you didn't have
15   the -- that fact pattern come up; right?
16        A.  Right.  But in June I was able to observe --
17   I was not on the vote review panel in June.  We had a
18   different person doing that on behalf of the board.
19   It was a different board member.
20             However, I was able to observe through the
21   looking glass -- the window.  And I saw many ballots
22   that were like that, that were -- the adjudication
23   software had flagged it, the ballot for the VRP to
24   look at based upon the parameters that were in place
25   for at least one contest.
```

***** C E R T I F I E D *****

Curling v.              Statement Under Oath
Raffensperger           JESSE EVANS                    8/16/2020

```
 1          However, there were other contests that were
 2   not flagged for adjudication but the vote review
 3   panel like was doing due diligence and looking at the
 4   entire ballot front and back.  And it noticed that
 5   there were voter marks that were not counted as a
 6   vote but also were not flagged for adjudication.
 7          Q.  That must have meant that they fell beneath
 8   the 12 percent threshold?
 9          A.  Yes.  Assuming that the software did what it
10   was programmed to do.
11          Q.  If the software did what it was programmed
12   to do, at 12 percent the software is not catching
13   what were clearly intended to be votes for particular
14   races; correct?
15          A.  Well, anything below the lower threshold,
16   they are not catching those.
17          Q.  Right.  But what I'm saying is you saw
18   markings that were clearly votes --
19          A.  Yes.
20          Q.  -- and it was not catching at 12 percent;
21   correct?
22          A.  Yes.  Yes.  And that had not been counted as
23   votes.  And that happened many times.
24              MR. BROWN:  Okay.  I think that's all I
25          have.
```

***** C E R T I F I E D *****

Curling v.                Statement Under Oath
Raffensperger             JESSE EVANS                    8/16/2020

```
 1          So did you want to add anything or -- I
 2      appreciate you extra time today.  I really
 3      do on a Sunday.
 4          THE WITNESS:  No.  I don't think I have
 5      anything else to add.
 6          MR. BROWN:  Let's go off the record
 7      then.
 8          (Proceeding concluded at 4:35 p.m.)
 9          (Signature reserved.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

***** C E R T I F I E D *****

Curling v.                  Statement Under Oath
Raffensperger               JESSE EVANS                8/16/2020

```
 1                         CERTIFICATE

 2

 3  STATE OF GEORGIA:

 4  COUNTY OF FULTON:

 5

 6          I hereby certify that the foregoing

 7  transcript was taken down, as stated in the caption,

 8  and the colloquies, questions, and answers were

 9  reduced to typewriting under my direction; that the

10  transcript is a true and correct record of the

11  evidence given upon said proceeding.

12          I further certify that I am not a relative

13  or employee or attorney of any party, nor am I

14  financially interested in the outcome of this action.

15          This the 31st day of August, 2020.

16

17

18

19  _____

20          Marsi Koehl, CCR-B-2424

21

22

23

24

25
```

***** C E R T I F I E D *****

APG USA INC.                              (888) 542-5598

Curling v.                Statement Under Oath
Raffensperger            JESSE EVANS                  8/16/2020

```
 1              UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3

 4   DONNA CURLING, et al.,        )
                                   )
 5        Plaintiffs,              )
                                   )    CIVIL FILE ACTION
 6   vs.                           )
                                   )    NO. 1:17-cv-02989-AT
 7                                 )
     BRAD RAFFENSPERGER, et al.,   )
 8        Defendants.              )
                                   )
 9

10

11

12        The preceding statement under oath taken in the

13   matter, on the date, and at the time and place set out

14   on the title page hereof.

15

16        It was requested that the statement under oath be

17   taken by the reporter and that same be reduced to

18   typewritten form.

19

20        It was agreed by and between counsel and the

21   parties that the Witness will read and sign the

22   transcript of said statement under oath.

23

24

25
```

***** C E R T I F I E D *****
APG USA INC.                                    (888) 542-5598

Curling v.                  Statement Under Oath
Raffensperger                  JESSE EVANS                    8/16/2020

```
 1                        CERTIFICATE

 2   STATE OF
     COUNTY/CITY OF
 3

 4       Before me, this day, personally appeared, JESSE
     EVANS, who, being duly sworn, states that the
 5   foregoing transcript of his statement under oath,
     taken in the matter, on the date, and at the time and
 6   place set out on the title page hereof, constitutes a
     true and accurate transcript of said statement under
 7   oath.

 8

 9                   _____

10                          JESSE EVANS

11

12

13   SUBSCRIBED and SWORN to before me this

14   _____day of _____, 2020 in the

15   jurisdiction aforesaid.

16

17   _____

18   My Commission Expires        Notary Public

19

20

21    []   No changes made to the Errata Sheet; therefore, I

22   am returning only this signed notarized certificate.

23

24    []   I am returning this signed, notarized certificate

25   and Errata Sheet with changes noted.
```

Curling v.                  Statement Under Oath
Raffensperger                    JESSE EVANS                    8/16/2020

```
 1   STATEMENT UNDER OATH ERRATA SHEET

 2   Deponent:  JESSE EVANS

 3   Date:  August 16, 2020

 4   To Reporter:

 5   I request that the following changes be entered upon

 6   the record for the reasons indicated.  I have signed

 7   my name to the Errata Sheet and appropriate

 8   Certificate and authorize you to attach both to the

 9   original transcript.

10

11   Page No.        Line No.

12   Change to:

13   Reason for Change:

14

15   Page No.        Line No.

16   Change to:

17   Reason for Change:

18

19   Page No.        Line No.

20   Change to:

21   Reason for Change:

22

23

24   Signature:                          Date:

25               JESSE EVANS
```

***** C E R T I F I E D *****

**NOW THEREFORE BE IT RESOLVED**, that the Athens-Clarke County Director of Elections and Voter Registration, the full-time staff and other employees and volunteers should to the maximum extent practicable implement the following policy regarding precinct layout:

1.     Under O.C.G.A. § 21-2-367, the number of "voting booths or enclosures" required in each precinct on election day is to be computed as follows:

- Divide the number of active voters in that precinct as of the close of the registration period (usually 30 days before election day) by 250
- Round the result up to the nearest whole number

So, for example, a precinct with 251 active voters would require 2 voting booths.

2.     The required number of "voting booths or enclosures" in a precinct can be satisfied by a combination of ballot-marking devices (BMDs) and voting booths or enclosures suitable for voting by paper ballot.

So, for example, a precinct that requires 10 "voting booths or enclosures" could have 4 BMDs and 6 places suitable for marking paper ballots.

3.     A precinct should have no more BMDs than can be arranged in a manner that is consistent with the Secretary of State's guidance on ensuring voter privacy (a copy of which is attached).  If that number is less than the number of "voting booths or enclosures" required by law in that precinct, the remaining number should consist of paper-ballot voting booths.

4.     In order to remain consistent with the Secretary of State's guidance on ensuring voter privacy, BMDs should be arranged in accordance with the following principles.

a.     Voters who are checking in, waiting in line, or using a magnifying station should not be able to see the screen of any BMD.

b.     Poll workers should not be able to see the screen of any BMD except when necessary to assist a voter.

c.     BMD screens should face the wall and should preferably be positioned back to back rather than side by side.

d.     If BMDs are positioned side by side, there should be an extended privacy screen between them, as illustrated by the attached photo.

**EXHIBIT**

**1**

    e.        BMDs should be arranged so that no voter has to walk behind any other voter in order to get to a machine. Aisles of BMDs (see attached photo) are therefore strongly discouraged.

    f.        There should be no more than two BMDs on any banquet table.

5.       A paper-ballot voting booth could be a table or a part of a table if appropriate screening is used to ensure voter privacy. See the attached photo. A provisional voting station counts as a "voting booth or enclosure" as long as it meets this guideline.

6.       Paper ballots—and paper-ballot voting booths—should only be used in cases of emergency. Under the Georgia Administrative Code, examples of emergencies justifying the use of paper ballots include "power outages, malfunctions causing a sufficient number of electronic ballot markers to be unavailable for use, *or waiting times longer than 30 minutes*." Ga. R. & R. 183-1-12-.11(2)(d).

All poll managers should be trained on the use of paper ballots in the case of an emergency and should be instructed to monitor the length of the lines. If, in the poll manager's judgment, waiting times are longer than 30 minutes, paper ballots should be used (in addition to BMDs) until the emergency is resolved.

7.       No number of voting booths is required during the early voting period. Accordingly, guidelines 1 and 2, above, do not apply. However, early voting locations should be arranged in a manner that is consistent with guidelines 3 and 4.

***AND BE IT FURTHER RESOLVED,*** that the foregoing shall become and is the policy of the Athens-Clarke County Board of Elections and Registrations.

SO RESOLVED this 1st day of April, 2020.


_____          _____
Jesse Evans, Chairperson                       Charles Knapper, Vice Chairperson


_____          _____
Willa J. Fambrough, Secretary                 Patricia A. Till, Member


_____
Rocky Raffle, Member