IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, *et al.* <br><br> *Plaintiffs,* <br><br> v. <br><br> BRAD RAFFENSPERGER, *et al.*, <br><br> *Defendants.* | CIVIL ACTION <br><br> FILE NO. 1:17-cv-2989-AT |

**STATE DEFENDANTS' SURREPLY IN OPPOSITION TO CURLING PLAINTIFFS' FOURTH PRELIMINARY INJUNCTION MOTION**

## INTRODUCTION

What is most remarkable about Curling Plaintiffs' reply [Doc. 855] is what is not included. Curling Plaintiffs cite almost nothing that was not already available to them for months. And they cite no evidence:

- That the DRE system was ever actually compromised (now even suggesting that Dr. Halderman's ongoing detailed forensic examination "may find nothing" and that still will not satisfy them because it will not prove anything);

- That the Dominion BMD system has ever been compromised;

- That any election official believes that the relief they propose is reasonable, possible, or feasible for the November 2020 elections.

After pushing past the bluster, the unsupported allegations of spoliation and discovery violations, and the policy arguments, Curling

Plaintiffs are left arguing for a position that is contrary to the law—that, merely because Curling Plaintiffs like a hand-marked paper ballot system better, the burden is on State Defendants to prove that the State of Georgia's chosen paper-ballot system is "secure." But even Dr. Halderman has previously testified that there is no such thing as an election system without at least some vulnerabilities, including a hand-marked ballot system.

The burden of proof remains firmly on Curling Plaintiffs and the small pieces of additional evidence they offer do not support the massive relief they seek, especially on such an expedited timeline.

## FACTUAL ISSUES

### I. Curling Plaintiffs offer no new evidence about the security of the Dominion system.

Despite receiving expedited discovery about the Dominion system, Curling Plaintiffs do not submit any new information from that discovery with the exception of a preliminary analysis of memory cards from DREs [Doc. 855-1, pp. 12-20] and hearsay in the form of a handful of voter complaints [Doc. 855-4, pp. 9-90]. Curling Plaintiffs also begin their attack by claiming there is no basis on which to conclude that "Georgia's election system is secure." [Doc. 855, p. 10]. But this asks the wrong question. As Dr. Halderman agreed last year, there is no such thing as "absolute security"

because every election system (including a hand-marked paper ballot system) has vulnerabilities. The proper usage is a system that is "more secure" or "less secure." *See* July 25, 2019 Hearing Tr. at 109:5-110:1. Curling Plaintiffs' evidence does not show that Georgia's paper-ballot system is *unconstitutionally* insecure.

    *A.*    *There is no evidence of any DRE compromise.*

Because Curling Plaintiffs cannot present any evidence of any actual compromise of the GEMS/DRE system, they now move the goalposts again—arguing that a forensic examination that finds nothing was actually compromised does not eliminate the "possibility of malware in the system." [Doc. 855, p. 22]. Curling Plaintiffs have argued for years that if they could just get a forensic examination, they could prove their case. Now that the evidence is (thus far) non-existent, they must again rely on vulnerabilities.[1]

In order for Plaintiffs' theory about vulnerabilities in the Dominion system *caused* by the GEMS/DRE system (described at [Doc. 751, pp. 8-10]) to be true, this Court must find (1) there was an actual compromise of the

---

[1] Curling Plaintiffs' continuing unsupported attacks on State Defendants for obstruction, delay, and spoliation are unnecessary and improper. If Curling Plaintiffs wish to move for sanctions, they should do so and be required to put forward evidence instead of taking shots in their briefs. [Doc. 855, p. 22].

GEMS/DRE system,[2] that (2) is invisible to a forensic examination, which then (3) carried over into the new system, and (4) can be detected at some point. There is simply no evidence to support any of these inferences, much less in support of their argument that the U.S. Constitution *mandates* a wholesale change in Georgia's election system.

Curling Plaintiffs also offer absolutely nothing that this Court has not already considered about the voter-registration database or existing hardware, despite identifying it as the only possible vector of attack from the GEMS/DRE system into the Dominion system—if there ever was an actual compromise of that system. [Doc. 855, p. 21].

> B.   *There is nothing except speculation regarding the Declaration of Jack Cobb.*

Curling Plaintiffs attack the declaration of Jack Cobb, who operates a U.S. Election Assistance Commission-certified Voting System Test Laboratory, as not understanding a system on which he has conducted extensive testing—an attack made by individuals who have not yet analyzed

---

[2] Right now, Dr. Halderman can only "confirm the *vulnerability* of the DRE system and reveal additional ways that malware *could* have spread through it." [Doc. 855-1, ¶ 35] (emphasis added). After three years of litigation and several years of research, Dr. Halderman is still unable to point to the actual existence of malware on Georgia's old DRE system, which was decommissioned in December 2019.

or examined the Dominion system. But even these attacks are not correct. As Mr. Cobb explains, Mr. Liu does not understand the design of the encryption keys for the system. Supplemental Declaration of Jack Cobb, attached as Ex. A ("Supp. Cobb Dec.") at ¶¶ 13-14.[3] Further, contrary to Dr. Halderman's representations, Pro V&V has performed penetration testing and other security testing on versions of Dominion Democracy Suite systems. *Id.* at ¶ 15. And the California study Dr. Halderman relies on to say that serious vulnerabilities exist actually found no source code vulnerabilities and approved the Dominion system for operation in the state. *Id.* at ¶¶ 16-19.

    C.    *The State has taken steps forward on its cybersecurity.*

In their efforts to tar the Secretary of State, Curling Plaintiffs confess shock and horror about the status of the voter-registration infrastructure. But State Defendants have been forthcoming to the Court and the parties regarding the status of the new datacenter, most recently in February 2020. *See* [Doc. 713, p. 3]. The Secretary's office has been abundantly clear that they are working with their cybersecurity vendor weekly and the vendors would conduct "further threat assessments" when "the new datacenter buildout is complete." *Id.* The Declaration of David Hamilton provides an

---

[3] Mr. Cobb also clarifies the terminology used regarding digital signatures and encryption. *Id.* at ¶ 21.

update for the Court on the status of the identified vulnerabilities from past Fortalice reports and shows that, as State Defendants explained in February, each of the risks has been fully remediated or is in the process of being remediated. *Id.* at pp. 2-3; [Doc. 819-1]. As Mr. Hamilton explains in his Supplemental Declaration, the change in operational control of the voter-registration database already took place and he further explains the status of the datacenter. [Doc. 862-1]. His Supplemental Declaration also responds to several allegations from Dr. Halderman.[4] *Id.*

Curling Plaintiffs also ignore the changes in cybersecurity about which they have been informed in this litigation. In August 2019, a new regulation about the security of the voter-registration database became effective, setting out 27 distinct security standards with which the Secretary of State is complying. Ga. Comp. R. & Regs. r. 590-8-3-.01.

Finally, Curling Plaintiffs rely on Harri Hursti's declaration, which is full of speculation and multiple instances where Mr. Hursti *thinks* he is observing something, but is not sure. *See* [Doc. 834, pp. 4-6]. Other issues all

---

[4] The types of issues addressed in Mr. Hamilton's Supplemental Declaration responding to Dr. Halderman could easily be sorted out in depositions and normal discovery instead of the continuing back-and-forth by declaration that requires this Court's time and effort to sort through basic factual issues in this case.

relate to the November 2019 pilots, about which the Secretary has been more than forthcoming, as evidenced by Curling Plaintiffs' citation to the Secretary's own report on those pilots. [Doc. 855, p. 16 n.13, p. 17 n.14].

## II.   Curling Plaintiffs' reliance on voter complaints is unavailing.

Despite the effort required of State Defendants to respond to the expedited discovery this Court granted after Plaintiffs' demands, the *only* documents relied on by Curling Plaintiffs are a handful of voter complaints about the June 9, 2020 elections. [Doc. 855, pp. 13-16]. Moreover, Curling Plaintiffs' reliance on this hearsay is telling.[5] Apparently seeing little opportunity to advance their claims with admissible evidence rather than conjecture, Curling Plaintiffs are now pursuing their *fourth* motion for preliminary injunction in this case. In any event, these complaints from an election held during a pandemic do not assist Curling Plaintiffs' claims.

The June 9 primary was a merger of both the Presidential Preference Primary (PPP) and the General Primary. Supplemental Declaration of Chris Harvey, attached as Ex. B ("Supp. Harvey Dec.") at ¶ 3. Voters who voted in

---

[5] While the Court may consider hearsay at the preliminary-injunction stage, that ability is not without limits. Its use must be "appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc*, 51 F.3d 982, 986 (11th Cir. 1995) (citations and internal quotation marks omitted).

the PPP before it was delayed did not have the presidential race displayed on their ballots, while voters who had not voted in the PPP had the presidential candidates displayed on their ballots. *Id.* at ¶¶ 4-5. Thus, the various complaints about the presidential race not appearing are apparently from voters who had already voted in the PPP.[6] [Doc. 855-4, pp. 10, 18, 29, 31, 53, 72, 76, 90].

The only other complaints about "missing races and missing or incorrect candidate names" are from voters who received nonpartisan ballots as opposed to partisan ballots, [Doc. 855-4, p. 41, 82]; were surprised that a nonpartisan ballot did not include partisan races, [Doc. 855-4, pp. 20, 68, 80]; who expected to see races that are not being held until November, *compare* [Doc. 855-4, pp. 27, 35] (expecting to see Sen. Isakson's seat that is set for November) *with* Supp. Harvey Dec. at ¶ 6; or who make general allegations without more specificity about which candidates they expected to see [Doc. 855-4, p. 43]. None of these complaints indicate any systemic issue with the display of candidates on the BMDs.

The other complaints are equally unavailing. Curling Plaintiffs cite a single voter who said the BMD did not work properly, but who also indicated

---

[6] In contrast, at least one voter complained that more than 10 Democratic candidates for president were listed, [Doc. 855-4, p. 51].

that they were able to use the machine successfully. [Doc. 855-4, p. 12]. Curling Plaintiffs also assume that every "voting machine malfunction" refers to the BMDs (as opposed to other components) and cite only to examples from Fulton County for these issues except for one instance in DeKalb. [Doc. 855-4, pp. 14, 33, 39, 45, 47, 55, 57, 62, 64, 70, 74 (DeKalb), 88].

One voter reported a printer jam that was fixed by a poll worker and who apparently did not understand that, in a primary, candidate affiliations are not shown for each individual candidate. [Doc. 855-4, p. 22]; Supp. Harvey Dec. at ¶ 7. Other voters just reported long waits [Doc. 855-4, p. 16], did not ask for assistance when they ran into claimed issues with a machine [Doc. 855-4, p. 78], had general complaints about the process [Doc. 855-4, pp. 24-25], or expressed a preference for the DREs over the BMDs [Doc. 855-4, p. 86].[7] Other voters either used emergency or provisional ballots when needed or refused to do so. [Doc. 855-4, pp. 37, 49, 59-60, 66, 72].

The Secretary of State and county officials have spent months working on plans to address the issues in the June 9 primary, as has been widely reported. Supp. Harvey Dec. at ¶ 8; Mark Niesse, *Runoffs bring changes to*

---

[7] Curling Plaintiffs also rely on a complaint from a voter who lives in Michigan and apparently did not vote in Georgia for support of their statement that improper instructions were issued and/or equipment malfunctioned. *See* [Doc. 855-4, p. 84] and [Doc. 855, p. 15 n. 10 & 11].

*Georgia elections after primary problems*, A.J.C. (August 5, 2020) available at https://www.ajc.com/politics/runoffs-bring-changes-to-georgia-elections-after-primary-problems/6EJKTGSYUFETZGXTBNCXHWOBPU/  Curling Plaintiffs' citation of this limited number of complaints does nothing to advance their claims about BMDs.

**III.    Curling Plaintiffs ignore the design of Georgia's audit process.**

Curling Plaintiffs completely ignore the declaration of Dr. Ben Adida of VotingWorks, which specializes in the design of risk-limiting audits. Instead, Curling Plaintiffs simply argue that the mere presence of a bar code is sufficient to eliminate any possibility of auditing. [Doc. 855, p. 20-21].

In the world Curling Plaintiffs imagine, if every voter does not verify his or her ballot, then no audit of a barcode BMD system is ever good enough. But this misses an important distinction from the prior world of DREs. In a DRE-based system, the only precondition to a possible cybersecurity problem in an election was a singular: adding malware to DREs. However hard that may be in reality given the physical security available, it was still the only precondition because voters could not verify what was recorded in the DREs.

But with BMDs, there are now *two* preconditions—someone still has to get malware onto a BMD by bypassing any number of physical and cyber security components, but voters now have the ability to verify the output of

the BMD. Auditing the human-readable portion of ballots using RLAs "protect[s] against any malfunction or hack of the QR code on ballots produced by ballot-marking devices." [Doc. 864-2, ¶ 12]. Dr. Adida's team helped design the Georgia process and explained the value of pilots, which are conducted with some concessions, as part of that process. *Id*. at ¶¶ 9-14.

So ultimately even if voters choose not to verify their ballots, they have the opportunity to do so, which is an important distinction between the DRE system and the BMD system which Curling Plaintiffs ignore. While they disagree as a matter of policy, they ultimately offer nothing beyond their disagreements in response to the auditing process designed for Georgia.

## ARGUMENT AND CITATION OF AUTHORITY

### I.   Curling Plaintiffs are not likely to succeed on the merits.

Curling Plaintiffs ultimately offer this Court nothing to demonstrate they will likely succeed on the merits of either a facial or as-applied claim. Beyond general attacks on barcodes and continuing claims of vulnerabilities, they can offer only what was before this Court when it denied their third round of preliminary-injunction motions. Curling Plaintiffs have not "clearly established" that they are likely to succeed on the merits. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). If anything, the evidence before this Court only demonstrates that there are policy disagreements in

the election community about the use of barcode BMDs and the scope and use of risk-limiting audits. That is not nearly enough support on which to build a mandatory injunction based on a violation of the U.S. Constitution.

Curling Plaintiffs merely assume that the use of BMDs places a serious burden on the right to vote. [Doc. 855, pp. 29-30]. But they cite no authority for this proposition or any court that has ever concluded that the use of *BMDs* causes a severe burden.

## II. There is no irreparable harm.

Curling Plaintiffs rely on this Court's prior rulings about the threatened harm from the GEMS/DRE system as a basis for irreparable harm here. *Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1402 (N.D. Ga. 2019). But the Court relied on other evidence, including the issues with Kennesaw State, in reaching that conclusion. *Curling*, 334 F. Supp. 3d at 1325.

Each Curling Plaintiff has the right to vote on a hand-marked paper ballot that is delivered in a dropbox on Election Day—which, under their own theory, is fully auditable and will be counted. Further, "[v]oters have no judicially enforceable interest in the outcome of an election. . . . Instead, they have an interest in their ability to vote and in their vote being given the same

weight as any other." *Jacobson v. Florida Sec'y of State*, No. 19-14552, 2020 U.S. App. LEXIS 28078, at *17 (11th Cir. Sep. 3, 2020).

### III. The equities and public interest do not favor Curling Plaintiffs.

In order to argue that the equities and public interest favor their proposed relief, Curling Plaintiffs pretend that massive changes to election systems are simple and easy. But they offer nothing to rebut the evidence presented by State Defendants that the changes they seek are impossible with 32 days between the September 11 hearing date and the beginning of early voting on October 13 (to say nothing of the four days between the current hearing dates and the start of mailing absentee ballots).

#### A. *This Court has already determined it is too late to order relief.*

This Court has already determined in this case that an "eleventh-hour" injunction would not benefit the public. *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018). The Supreme Court has even held—in a case cited by State Defendants that Curling Plaintiffs simply ignore—that there are circumstances "where an impending election is imminent and a State's election machinery is already in progress, [when] equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid." *Reynolds v. Sims*, 377 U.S. 533,

585 (1964). Contrary to Curling Plaintiffs' position, State Defendants do not advocate for violating Georgia voter's rights—they simply cite binding precedent that "lower federal courts should not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020).

      B.    *Curling Plaintiffs mask the significance of their changes.*

Contrary to claims that the "framework" for hand-marked paper ballots is already in place, [Doc. 855, pp. 24-25], the evidence before the Court indicates that it is impossible to print a sufficient number of ballots or train poll workers in time for the November election. [Doc. 821, pp. 26-28]. Curling Plaintiffs' only response to three witnesses identifying significant problems with obtaining enough paper ballots is to say that it is speculation—while they offer nothing in response.[8] [Doc. 855, p. 26].

Curling Plaintiffs are correct that Georgia provides for the use of hand-marked ballots in limited circumstances during machine outages. Ga. Comp. R. & Regs r. 183-1-12-.11. But that does not automatically mean that there is a roadmap for how to conduct an *entire election* on hand-marked ballots. As

---

[8] State Defendants do not understand the claim that they have "refused to provide any discovery on the costs of obtaining sufficient paper and other equipment." [Doc. 855, p. 26].

Mr. Harvey explained, additional training for poll workers would be required and there is simply no time for that. [Doc. 821-7, ¶¶ 12-13]. Curling Plaintiffs offer nothing to address the significant issue of required training and processes and completely ignore the fact that their proposed relief would still require the setup of at least one BMD per precinct, with the attendant equipment about which they complain.

## CONCLUSION

The State of Georgia has taken significant steps to hold reliable and verifiable elections using its new voting system and upcoming risk-limiting audits. Curling Plaintiffs have a policy disagreement with the state—they want a different method of voting and adjustments to the auditing procedures—but they have not shown any burden on their right to vote. Even if they had, the state's significant interests are more than sufficient to overcome any minimal burden. Curling Plaintiffs have not shown irreparable harm and have provided this Court with absolutely no evidence that their proposed relief is feasible, possible, or even affordable. This Court should deny their latest motion.

Respectfully submitted this 4th day of September, 2020.

Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com

Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381

*/s/Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Jonathan D. Crumly
Georgia Bar No. 199466
jcrumly@taylorenglish.com
James A. Balli
Georgia Bar No. 035828
jballi@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing **STATE DEFENDANTS' SURREPLY IN OPPOSITION TO CURLING PLAINTIFFS' FOURTH PRELIMINARY INJUNCTION MOTION** has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

                                                 */s/ Bryan P. Tyson*
                                                 Bryan P. Tyson