```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION

 3

 4   DONNA CURLING, ET AL.,          :
                                     :
 5          PLAINTIFFS,              :
     vs.                             :   DOCKET NUMBER
 6                                   :   1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,     :
 7                                   :
            DEFENDANTS.              :
 8

 9

10         TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11            BEFORE THE HONORABLE AMY TOTENBERG

12              UNITED STATES DISTRICT JUDGE

13                   AUGUST 31, 2020

14                      2:51 P.M.

15

16

17

18

19

20

21   MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22              TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
      SCHOENBERG:
 4

 5        DAVID D. CROSS
          LYLE HEDGECOCK
 6        MORRISON & FOERSTER, LLP

 7        ADAM SPARKS
          KREVOLIN & HORST, LLC
 8

 9
      FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
10    WILLIAM DIGGES, III, AND RICARDO DAVIS:

11
          BRUCE BROWN
12        BRUCE P. BROWN LAW

13

14    FOR THE STATE OF GEORGIA DEFENDANTS:

15
          VINCENT RUSSO
16        CAREY A. MILLER
          JOSH BELINFANTE
17        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

18
          BRYAN P. TYSON
19        LOREE ANNE PARADISE
          BRYAN JACOUTOT
20        TAYLOR ENGLISH DUMA

21

22    FOR THE FULTON COUNTY DEFENDANTS:

23
          CHERYL RINGER
24        DAVID LOWMAN
          OFFICE OF THE FULTON COUNTY ATTORNEY
25
                                        (...CONT'D....)
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
1    (...CONT'D....)

2

3    FOR THE THIRD PARTY, DOMINION VOTING SYSTEMS:

4

5        J. MATTHEW MAGUIRE, JR.
         PARKS CHESIN & WALBERT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; August 31, 2020.)**

THE COURT:  Good afternoon.  This is Judge Totenberg.

COURTROOM DEPUTY CLERK:  Good afternoon, Judge.  We have everyone represented.  Would you like me to call the case?

THE COURT:  Sure.

COURTROOM DEPUTY CLERK:  Good afternoon, everyone. We're here for the telephone conference in the case of Curling v. Raffensperger, Civil Action Number 17-CV-2989.

Judge, today representing the State of Georgia, we have Mr. Russo, Mr. Miller, Mr. Tyson, Mr. Jacoutot. Mr. Belinfante is on the line, and Ms. Paradise is on the line.

Representing the Curling plaintiffs, we have Mr. David Cross, Mr. Adam Sparks, Mr. Lyle Hedgecock.

Representing the Coalition, we have Bruce Brown.

Representing Fulton County, we have David Lowman and Cheryl Ringer.

And Mr. Maguire representing Dominion is on the line as well.

THE COURT:  Okay.  Well, first of all, I want to say that I only myself just realized that this joint discovery dispute from the Coalition plaintiffs and Fulton County defendants was just submitted.  And I realized it was filed when we looked at it at noon but did not see it and wasn't -- didn't realize that this was going to be filed.

```
 1              And I understand the reason for filing it.  But I
 2    just would say in the future it would be helpful if you -- if
 3    you are expecting me to deal with something immediately because
 4    we already had a hearing on that date or a phone conference for
 5    that day it would be helpful if you would send a note to
 6    Mr. Martin as well as to Ms. Cole in the event that they are
 7    just being pulled in different directions.  Because I have not
 8    read the entire -- I have not read all of it.  I understand the
 9    general subject matter, but I have not read all of it.
10              MR. BROWN:  Thank you, Your Honor.  We didn't want to
11    be presumptuous so --
12              THE COURT:  That's all right.  And I'm not saying I
13    would have dealt with it.  I just didn't know -- I mean, I
14    literally pulled it up 20 minutes ago.
15              So -- so I have -- but I have reviewed, on the other
16    hand, the submission on behalf of the Secretary of State.  And
17    I know that the plaintiffs wanted to respond and had -- were
18    going to do that orally because of the time frame.
19              Mr. Cross, are both you and -- I know you wanted to
20    respond.  I don't know whether you are just handling that for
21    the plaintiffs altogether or whether Mr. Brown or somebody from
22    his team also will be doing so.
23              MR. CROSS:  Your Honor, this is David Cross.  I can
24    probably handle the bulk of it, and Mr. Brown can add on at the
25    end if there is something I miss.  But we had agreed that I
```

1     would take the lead on this.

2              THE COURT:  All right.  Go ahead.

3              MR. CROSS:  Okay.  So I guess to start with, as we

4     all know, it is the State defendants' burden to prove

5     privilege.  And what they submitted I think, Your Honor, not

6     only falls short of that but it actually confirms that the

7     privilege does not apply.  Or even if it did, the substantial

8     need test for work product would be easily satisfied.

9              And just to be clear, they point to the documents

10    labeled attorney-client privilege.  But they have not asserted

11    that privilege.  It is only work product that has been asserted

12    here.  So that is the only thing we're talking about.

13             So just a few points on that.  One, they still don't

14    provide essential details.  One of the things courts routinely

15    looked at is who received the document.  This is something we

16    specifically asked them to tell us.  Because if it has gone to

17    third parties -- for example, even if it has gone to lower

18    level employees like lower level staff, they may not be within

19    the scope of privilege.  And they just outright refused to tell

20    us who received this.

21             We don't know who prepared it.  We know generally

22    Fortalice.  An important point on this is there is no

23    representation from Mr. Germany or anyone else that counsel

24    actually was involved in preparing the report or drafting it.

25    In fact, what Mr. Germany says is he handed this off to staff.

1          The only role that counsel had according to what they

2     have put in with the Court is that outside counsel requested it

3     be done.  Mr. Germany then asked his staff to engage Fortalice.

4     And then the staff apparently were -- some staff.  We don't

5     know who they are.  We don't know what their role is.  There is

6     no indication that they are even lawyers -- but that some staff

7     worked with Fortalice and Fortalice itself prepared a report,

8     much like it has in the past.

9          So if this is clearly just fact information contained

10    in a report -- and courts have been clear that merely having

11    counsel request that is not a sufficient basis to have it

12    privileged.

13          And it is important to look at the purpose.  In this

14    circuit, the courts that we have looked at, particularly in the

15    Northern District of Georgia -- recent cases tend to apply what

16    is called the "because of" test.  That is, the overwhelming

17    majority of circuits apply that test.

18          And what it says is -- it sort of has been construed

19    by courts as a "but for" test, which is you did this -- think

20    of it this way.  You would not have prepared this report but

21    for the litigation, which is another way of saying you did it

22    because of the litigation.

23          And the facts just don't support what the defendants

24    would have the Court believe, that this was done simply for the

25    litigation.  One, essentially, it is the same purpose.

 1    Fortalice has done assessments of the election security system

 2    for years.  We have seen those reports.  This is just a similar

 3    report of a similar analysis from what we have been able to

 4    tell looking at some of the new system.  Courts have held --

 5    and I can give Your Honor case law if you want it.  But there

 6    are courts that have held in this particular context we are

 7    looking at, consulting reports, security reports, that if it is

 8    the same sort of thing that your consultant does in the

 9    ordinary course, you don't get to shield it from discovery by

10    just having your litigation counsel or your in-house counsel

11    ask for it.  Because then it is not really done because of

12    litigation.

13          And I think that is a point we should pause on, Your

14    Honor, because it is really a stunning claim for the State to

15    come in and say to the Court that the only reason they have

16    this report is because our clients brought a lawsuit on BMDs.

17          What we learned last Friday for the first time is

18    that this is the only assessment -- the only security

19    assessment anyone has done of any aspect of the new election

20    system.

21          That in and of itself is troubling because Your Honor

22    had an order telling them to go do this in 2019.  But now they

23    are saying they wouldn't even have done that if our clients had

24    not brought BMD claims.  That is just not at all consistent

25    with the history of Fortalice doing these regular, periodic

1   assessments of aspects of the election network and preparing

2   those reports in the ordinary course.

3           And, again, the courts are very clear, if it is

4   consistent with ordinary coursework, it is not privileged

5   simply by virtue of having your litigation counsel ask for it.

6   It is hard to believe the State really wants to tell the public

7   that our clients are the reason they did any assessment at all.

8   It is not consistent with any position they have ever taken in

9   this case about how they worked to secure the system, ensure it

10   is secure, and that we are just a nuisance.

11           And just briefly on the need point, Your Honor,

12   again, I don't think the privilege is met for the reasons I

13   gave.  But I don't think the need can really be disputed here

14   for the same reason I just noted.

15           This is it.  The only assessments that they have told

16   us exist anywhere in the world about security of this current

17   system that voters are relying on, that our clients are relying

18   on, is this one report from Fortalice.  So it is not like their

19   cases.  They cited cases that are inapposite, things dealing

20   with crime-fraud exception, for example.

21           But even the cases where they didn't order discovery

22   was because, for example, you could go to other witnesses in

23   the case to get those facts.  There is no other avenue for us

24   to get the underlying facts.  And that is what we're talking

25   about, facts of what Fortalice did and what it found and what

1    it may have recommended with respect to the current system.

2    This report is it.

3            They are not offering any other means.  And the

4    report is certainly the best means for doing that.  So there is

5    no ambiguity or dispute about what they actually meant.

6            So I think no matter where the Court goes, you can

7    find it is privileged.  We think that is not right.  But it

8    still would easily meet the substantial need test for attorney

9    work product.

10           Thank you, Your Honor.

11           THE COURT:  Okay.  Does counsel wish to respond?

12           MR. MILLER:  Sure, Your Honor.  This is Carey Miller.

13   I was unclear if the Coalition plaintiffs intended to make an

14   argument as well.  I may have --

15           THE COURT:  Mr. Brown, do you want to add anything or

16   any of your co-counsel?

17           MR. BROWN:  No, I do not.  Thank you, Your Honor.

18           Go ahead, Mr. Miller.

19           MR. MILLER:  Thank you, Your Honor.  You know,

20   frankly, Your Honor, I think addressing some of the points

21   Mr. Cross made kind of puts the determination here as to what

22   is work product backwards.

23           As the Court is well aware, there are two general

24   elements to a work product claim.  It must be the work of an

25   attorney or his or her agent and must be created in

1    anticipation of litigation or prepared for trial.  Both of

2    those aspects are met here.

3           You know, Mr. Cross discussed the concept of, you

4    know, the Secretary's in-house counsel working with other staff

5    in terms of tasking Fortalice with the report.  But that is

6    irrelevant, Your Honor.  The aspect of why the report was

7    created and why it was started was specifically to prepare for

8    litigation in this case.

9           And I would also point out that the report that is at

10   issue is simply fundamentally different than the former

11   Fortalice reports.  As Your Honor is aware, those former

12   reports are generally reviews of the Secretary's IT

13   infrastructure as applies to many other divisions of the

14   office.

15          What the Court now has in its hands and has reviewed

16   in camera I think is a very specific document which explicitly

17   recommends no particular policy choice and instead is geared

18   toward preparation for this very litigation.

19          And, Your Honor, the plaintiffs may have waited until

20   shortly after this Court's ruling last year to amend their

21   complaint.  We have known for some time now plaintiffs intend

22   to challenge the BMD systems.

23          Frankly, the Court may recall on April 9 of last year

24   the Court held a scheduling conference in this case.  And at

25   that time, the issue or at least ostensibly the issue was

1    regarding the DRE GEMS-based system.  And as I'm sure the Court

2    will recall and defendants certainly recall, at that point,

3    Mr. Cross waved a ballot with a barcode on it asking if we

4    could read it.  That has been the direction plaintiffs have

5    intended to go throughout the course of this case.

6           And, frankly, to suggest that the State cannot use

7    experts, cannot use those qualified in the field to evaluate

8    the claims that plaintiffs were making and had already

9    indicated they intended to make puts the State at an incredible

10   disadvantage.

11          Your Honor, the reality is that this report was

12   specifically prepared for that purpose.  Fortalice would not

13   have undertaken a study of the particular BMD system and

14   evaluated it had the State not directed it to do so because of

15   this litigation.

16          And, now, Mr. Cross made the point that, you know,

17   the State can't or doesn't want to be in the position to tell

18   the citizens of this State that a report was created solely for

19   that purpose and that is the only report.

20          So that gets the law and the facts wrong on two

21   different points.  First of all, as a matter of law, that is

22   completely irrelevant.  And if Mr. Cross or his clients or

23   whoever want to berate the Secretary and the public's fear,

24   then they are certainly welcome to do it.  That is Politics

25   101.

1              However, as to the actual factual matter that we are

2    dealing with here, there have been many other documents

3    produced that were responsive to Request 9.  What Mr. Cross

4    seems to be conflating is the difference between what that

5    request language says versus what that -- versus whether there

6    is a specific Fortalice assessment that is similar in like kind

7    to the previous ones that this Court has seen.

8              The answer to the latter question is no.  The answer

9    to the former question is that the State has produced thousands

10   of documents.  At this point, plaintiffs have in their

11   possession in excess of 25,000 documents confirming hash

12   testing and verification on the equipment, confirming various

13   other aspects, and compliance with certification.

14             All of these were created for the purpose of ensuring

15   compliance and ensuring security.  The defendants don't claim

16   that those items are work product.  This Fortalice report,

17   however, specifically was prepared so that the State defendants

18   could be prepared to respond to plaintiffs' allegations in this

19   case.

20             And, Your Honor, the documents that defendants have

21   produced in this claim is also relevant and for the specific

22   need.  We are headed headlong into a quickly put-together

23   preliminary injunction hearing on a matter that is certainly of

24   importance.  And at this juncture, the State defendants are

25   working to prepare for that.  Their clients are working to

```
1    administer litigation -- or excuse me -- our clients are

2    working to administer litigation -- or elections.

3            And at this juncture, Your Honor, plaintiffs have

4    what they need and have had for some time to make claims

5    regarding purported vulnerabilities.  They did so in their own

6    complaint.

7            So to say that the plaintiffs have a specific need to

8    this document is hard to find.  And, frankly, I don't believe

9    that the plaintiffs have made that showing.  Defendants have

10   made a sufficient showing to show this Court that the document

11   was both produced as product of an attorney or his agent and

12   also was created in the anticipation of litigation for trial.

13           And at this point, the heavy burden of showing that

14   the plaintiffs must or have a right to discover litigation

15   counsel's directed study is astounding.

16           Your Honor, for these reasons and for those stated in

17   our response to the Court, we respectfully request that the

18   Court prevent disclosure of this document and otherwise so that

19   we can move forward in this litigation.

20           THE COURT:  All right.

21           MR. CROSS:  Your Honor, could I respond to a couple

22   of points?

23           THE COURT:  Yes.

24           MR. CROSS:  I'm sorry.  This is David Cross.

25           Just quickly, the notion that we bear a heavy burden
```

```
 1    is just not accurate.  The burden is theirs to establish the
 2    privilege.  And the standard, again, is whether they would have
 3    done this in the absence of our lawsuit.  It is because of.
 4    That is the language.
 5           And Mr. Miller just said the State would not have
 6    prepared this report if we hadn't filed these claims.  But that
 7    is not supported by the facts.  There is no evidence.
 8    Mr. Germany says only litigation counsel requested it.  There
 9    is nothing in his declaration that says we would not have done
10    this otherwise, that we would have departed from our years'
11    long practice of relying on Fortalice to test the security
12    system, and the only reason we did this is for the litigation.
13    He does not say that.
14           In fact, Mr. Hamilton in sworn testimony belies that
15    very claim.  He points out that one of the ways they remediated
16    a serious vulnerability with the election network was by
17    engaging Fortalice on an even deeper basis apparently than they
18    had them already.  Rather than just having them do periodic
19    reports, Mr. Hamilton suggests Fortalice is now completely in
20    the tent and they are the go-to provider to assess --
21           THE COURT:  Where is that?  Where is Mr. Hamilton's
22    affidavit?
23           MR. CROSS:  I was just trying to pull it up.  Give me
24    a second, Your Honor.
25           MR. TYSON:  Your Honor, this is Bryan Tyson.  It is
```

```
 1    Document 819-1 is the declaration of Mr. Hamilton that is
 2    sealed --
 3              THE COURT:  Okay.  Got it.
 4              MR. TYSON:  -- filed under seal.
 5              MR. CROSS:  There is a reference --
 6              THE COURT:  Thank you.
 7              MR. CROSS:  I was about to pull it up.
 8                    (There was a brief pause in the proceedings.)
 9              THE COURT:  Just one second.  All right.  I know you
10    are looking.  But I'm also trying to pull it up.
11              MR. CROSS:  It is Paragraph 13, Your Honor.
12              THE COURT:  Why don't you continue because I'm just
13    having some trouble with the sealed status.  Holly is going to
14    send it to me again.  It is somehow closing.
15              MR. CROSS:  Do you want me to read it, Your Honor?
16    It is a short paragraph.
17              THE COURT:  Yes.
18              MR. CROSS:  So Your Honor may recall -- I don't know
19    how much time you've had to spend with this.  But
20    Mr. Hamilton -- what he does in his declaration is he goes
21    through each of the vulnerabilities Fortalice had previously
22    identified in its prior reports Your Honor has seen.  He puts
23    the status of remediation.
24              Number 13 is the █████████████████████████████████
25    █████████████████.  And he writes, ████████████████████████████
```

```
1   ████████████████████████████████████████████████████
2   ███████████████████████████████████████████████
3   █████████████████████████ And he writes, ████████████████
4   ███████████████████████████████████████████████
5   ████████████████████████████████████████████████████
6   ████████████████████████████████████████████████
7   ████████████████████████████████████████████████████
```

8          And so what this -- what they rely on in their brief,

9    Your Honor, is to say, don't worry, we're fixing these

10   problems.  And one of them is Fortalice is now fully retained

11   to do the ongoing security assessments and the forensic

12   analysis and all of that that we have talked about on an

13   ongoing basis.

14          So you can't have it both ways.  They can't say we've

15   remediated the major vulnerability by pulling Fortalice in on

16   an even broader basis than they were before with their periodic

17   reports and then turning around and saying to Your Honor, again

18   with no factual support, just state as lawyers, we never would

19   have had them create this report to do the only assessment that

20   Fortalice has done on this system if it weren't for the

21   litigation.

22          Those are irreconcilable factual positions.  One is

23   in sworn testimony, which we take as fact, which is what

24   Fortalice has really been engaged to do, which is generate

25   reports like this in the ordinary course.  And the other is a

1    litigation position.  It doesn't have factual support from

2    Mr. Hamilton or Mr. Germany.

3           And the only other point, Your Honor, they talk about

4    the Request 9 that this is responsive to.  Just two brief

5    responses.

6           One, Your Honor will recall I asked specifically on

7    the Friday call if there were any security assessments of the

8    system apart from this Fortalice report.  Mr. Tyson was

9    unequivocal, no, there are none.  Fortalice has not done

10   anything and no other third party has done anything or anyone

11   that we know has done anything since the last Fortalice report

12   in 2019, I think -- early 2019 predating the system.  So this

13   is the one and only assessment.

14          The thousands of documents they point to, that's a

15   fight for another day.  I will just tell you for now they

16   dumped thousands of wholly irrelevant documents.  Literally,

17   they power on the BMDs.  They turn it on.  And they go, oh, it

18   looks right, it came on, it worked.  Then they shut it down.

19   That is what these reports look to be.

20          Some of them -- many of them indicate problems with

21   the BMDs, including with the hash values.  But there is nothing

22   in there that comes anywhere close to saying, here is what we

23   have done to assess the overall system.  And if they are saying

24   they are relying on these documents, these power on-and-off

25   things -- reports, the security is even worse than we had

1    thought.  I'll just leave it at that on that.

2         MR. MILLER:  Your Honor, this is Carey Miller.  If I

3    can just address just a couple of quick points there.

4         First of all, this is a declaration of Mr. Hamilton.

5    And specifically at Paragraph 13, what he is referring to there

6    are reports that are similar to those that were presented to

7    this Court back last year.  Those reports are fundamentally

8    different than the report at issue right now, which is

9    specifically addressed to the BMD system.

10        Those reports previously covered every aspect of the

11   Secretary's kind of internet presence and IT security presence.

12   So yes, the fact that Fortalice has continued to engage in

13   terms of that bigger picture issue -- it just does not have

14   relevance as to the work product as to this document.  There is

15   a fundamental difference between the two documents.

16        And, Your Honor, there is a point that Mr. Cross

17   stated that Mr. Germany's declaration says nothing about why it

18   was undertaken.  Specifically in Paragraph 7 of the Germany

19   declaration, Mr. Germany specifically speaks to why the report

20   was undertaken.  And he says, Fortalice does not generally

21   provide reports on hardware for SOS.  This report was different

22   and was undertaken for the purpose of litigation that we knew

23   was coming.

24        Your Honor, the logical conclusion of what plaintiffs

25   are asserting here is that any work that we had Fortalice do in

1    preparation for last year's hearing over the DREs, in

2    evaluating Dr. Halderman's purported malware, and evaluating

3    what the next trick that would be up the sleeve in terms of

4    machines and demonstrations -- the logical conclusion was that

5    it would be that all of that would be subject to discovery.

6    And that is simply not what the work product doctrine says.

7            And, Your Honor, as to the point of burden, the issue

8    here is not to say that plaintiffs bear the initial burden.  We

9    bear the initial burden to show that it was work product in the

10   sense that it was created because of litigation and that it was

11   created at the direction of counsel.

12           We have done that.  We have made that evidentiary

13   showing.  Plaintiffs have not said anything to the contrary

14   that there is no evidentiary showing.  That is all that is in

15   the docket right now.

16           And at that juncture, the burden then switches to

17   plaintiffs.  And, indeed, that is a heavy burden in showing the

18   substantial need and undue hardship, as this Court recognized

19   in the *Bibby* case.  And that would be the *United States ex rel.*

20   *Bibby v. Wells Fargo* that is cited in our brief.

21           Your Honor, without belaboring the point, the issue

22   is there is a fundamental difference between the general

23   matters in which Fortalice engages on IT security as a bigger

24   picture and particularly the fact that they work in concert

25   with other divisions irrelevant to elections, like professional

1   licensing boards and corporations and securities, all those

2   aspects attached to the Secretary's office.

3          And what the reports that we put at issue previously

4   actually ended up doing, frankly, in trying to show Your Honor

5   the work that the State was doing is that it allowed plaintiffs

6   in opening to take a completely irrelevant document and then

7   assert that it was somehow this damning piece of evidence.

8          And, Your Honor, at the end of the day, that is not

9   at issue here.  We're not here to discuss those other matters.

10  But the difference between the two documents -- the fundamental

11  nature of the two documents matters in this context.

12         MR. TYSON:  Your Honor, this is Bryan Tyson.  I

13  wanted to clarify one piece for Ms. Welch.  The quote that

14  Mr. Cross read was from a document filed under seal.  And I

15  believe that there are more than just individuals -- counsel of

16  record on the call.  So I just wanted to bring that to the

17  Court's attention and also ensure for transcript purposes the

18  recognition is that quote is from a sealed document.

19         THE COURT:  Okay.  And how do you want that dealt

20  with?  Are you requesting --

21         MR. TYSON:  I suppose we can redact the quote since

22  counsel of record have access to that.

23         THE COURT:  Why don't you -- she can do two versions.

24  She can do one with redacted and one that is under seal where

25  it is not.

1          MR. TYSON:  Thank you, Your Honor.  I just wanted to

2    make sure we had that clear.  Thank you.

3          MR. CROSS:  Your Honor, this is David Cross.  I'm not

4    going to respond to Mr. Miller.  I think Your Honor has heard

5    enough argument.

6          I will just put on the record an objection to sealing

7    that portion.  There is nothing confidential about what was

8    just discussed.

9          THE COURT:  Well, I don't really know what it came

10   from.

11         MR. CROSS:  I understand.

12         THE COURT:  So I'm just --

13         MR. CROSS:  I understand, Your Honor.  I just didn't

14   want it to seem like we were agreeing to the confidentiality.

15         THE COURT:  I understand.  I mean, I think Mr. Tyson

16   can send me a reference from where it is so that I can be sure

17   before -- if I want to modify what I have just directed, I will

18   modify it.

19         But I would like -- I mean, it is the obvious way to

20   handle it.  I'm sure Mr. Tyson can send me -- send the Court

21   something that would indicate where it came from exactly again

22   and where it was sealed -- okay? -- in terms of the records on

23   the docket.

24         Let me ask you this other question and it in someway

25   relates to substantial need.  But it also just makes -- deals

1    with the entire posture of the case at the moment.

2         My understanding from my incredibly brief look at

3    the -- what the Coalition filed as the joint discovery

4    statement was that there developed some sort of problem when

5    Fulton County was cooperating with the plaintiffs in allowing

6    them to see the operation of the BMD or the printer that -- I

7    guess it would be the printer because it was the images -- that

8    the State indicated that they -- that there is a state rule

9    that prohibits them from providing a copy of the image.  And I

10   was wondering what that state rule was.

11        MR. TYSON:  Your Honor, this is Bryan Tyson.  It is a

12   state statute under 21-2-300.  If I recall the reference

13   correctly, ballot images are part of a document that are sealed

14   at the Clerk of Superior Court following an election.  And so

15   under that statute, a court order is required to release ballot

16   images.  I'm assuming that is what the dispute was about.  I

17   was not aware there was a dispute between Fulton County and the

18   Coalition on this point.

19        THE COURT:  I don't know that it is between them.  It

20   is sort of that they couldn't get authorization.  And as I

21   said, I haven't read it thoroughly enough to not say it wasn't

22   something else.

23        But is that an issue, Mr. Brown and counsel for

24   Fulton County?  Was the county advised by the State you

25   couldn't -- you couldn't distribute -- disclose it?  Because

1  we're not talking about an image that was done from the

2  election itself.  We were talking about a trial run.

3  　　　　MS. RINGER:  Your Honor, this is Cheryl Ringer for

4  Fulton County.  It is actually both.  Actually, it is both.

5  　　　　I think when we were initially -- Fulton County staff

6  spoke to the vendor and I believe someone at the Secretary of

7  State's office with regards to the test deck that was created

8  by plaintiffs.  I believe they should be able to have those

9  actual documents.  The issue came with our staff not being able

10 to run images off of the machine.

11 　　　　The second issue with respect to the adjudication

12 that was done or the rerun of adjudication were actually voted

13 ballot images.  And that we have a bigger problem with.

14 　　　　THE COURT:  Okay.  Let's talk about the first one.

15 All right?

16 　　　　The first one was -- again, Counsel, would you just

17 again tell me -- and Mr. Brown then can sort of correct you.

18 Describe again what precisely was the first one.

19 　　　　I understand the adjudication one was a real ballot.

20 Was the first one a real ballot, or is it one that was used as

21 sort of a test process?

22 　　　　MR. BROWN:  Cheryl, I'll go ahead and jump in.  This

23 is Bruce Brown.

24 　　　　MS. RINGER:  I thought she was asking you to explain.

25 Go ahead.

1          MR. BROWN:  The first one was a test deck of 15

2     marked ballots that were scanned.  But then in terms of getting

3     the result of that scan, my client was prevented from doing so

4     because Fulton County needed some instructions from Dominion

5     and Dominion didn't authorize it.  That is the first one.

6          THE COURT:  All right.  Let's just deal with one at a

7     time.

8          So was -- was Dominion's action based on instructions

9     from the State or a state rule or what -- what was the basis of

10    it?

11         MS. RINGER:  I was advised that it was based on

12    instruction from the State.  I did not have an opportunity to

13    talk to Mr. Germany about it.  But I believe it was not

14    thoroughly explained to them that the ballot images were of a

15    test deck.  I think if they just asked could they provide

16    ballot images, the response would have been no.

17         THE COURT:  But these weren't actual ballots --

18         MS. RINGER:  Correct.

19         THE COURT:  -- of individual voters?  So --

20         MS. RINGER:  So for my client it was that they could

21    not download the images and get them out of the machine.  What

22    they were getting was encrypted, and they needed assistance.

23    That is when they contacted the vendor.

24         THE COURT:  I see.  And then the vendor said they

25    couldn't help?

```
 1              MS. RINGER:  Correct.

 2              THE COURT:  And so is the vendor -- was the vendor

 3    instructed not to under state law, or what is the story?

 4              I don't want to really put the vendor on the spot.

 5    But I'm --

 6              MS. RINGER:  I don't know if Mr. Maguire would know.

 7    It is my understanding from my client that yes, that they were

 8    told that they should not assist in providing assistance with

 9    that as we could face charges from the Attorney General.

10              As I stated, I believe they didn't explain that these

11    were of the test deck that plaintiffs had created.

12              Bruce, did you want to add anything?

13              MR. BROWN:  Yes.  Two things.  One is that the test

14    deck, obviously we should be able to get information about that

15    back.

16              In terms of the bigger issue about whether ballot

17    images should be produced, I believe the cite is 21-2-500,

18    Bryan.

19              MR. TYSON:  I may have gotten it wrong.  I'm sorry.

20              MR. BROWN:  And my understanding of that statute says

21    that the counties must keep a copy of the ballot images and

22    file those ballot images at some point with the superior court

23    for safekeeping.

24              And what the Secretary of State is sort of waving

25    that around and threatening or there is some suggestion that
```

```
1    there is threatening -- I don't know if it is really

2    happening -- is that if the counties then in response to a

3    subpoena or something else divulges the ballot images to the

4    public or to a litigant it was somehow violating the law.

5              These ballot images, there is -- I don't believe the

6    Secretary is taking the position that there is anything on the

7    ballot images that discloses the voter identity.  If there is,

8    then there is a whole different kind of secrecy problem because

9    they are all over the place.

10             As Your Honor knows, we have filed ballot images --

11   adjudicating ballot images with the Court.  They are a public

12   document.  And there is no -- there is no other information on

13   them.

14             Instead, what they show is the vote image and how the

15   computer adjudicated it, whether the computer decided on --

16   instead of a human, for example, whether a checkmark was a vote

17   or not.  And in the ones that we have tendered, it said no.

18   But with any human looking at it, it would say, of course, that

19   is a vote.

20             And to deny that is a patent violation of Georgia

21   law.  And it is not just saying Georgia law.  It would be very

22   clear just taking away people's vote.  And that is what we can

23   show is that these machines look at a vote, log them, say it is

24   not a vote.  People get disenfranchised just hand over fist.

25             So we need that discovery.  It is coming up -- this
```

1    is all very recent.  And -- but it is coming up with these

2    other counties.  For example, Cherokee County, we have a

3    subpoena to them.  They are taking the same position.  And they

4    all say, absent a court order to produce -- well, make the

5    production under seal.  Well, there's two things wrong with

6    that.

7              THE COURT:  All right.  But you are dealing -- the

8    thing is I was really asking you about the deck.  And maybe

9    they are all taking the same position about the deck.

10             I realize you have the adjudication ones.  I'm

11   really -- the ones that actually were cast.  I'm not past that.

12   But I'm trying to understand what happened in terms of why --

13   why you were blocked from seeing an image created by the deck

14   and maybe the State -- and why would it be appropriate under

15   the statute if that is what the State is maintaining.

16             And, candidly, I mean, it really relates to the --

17   the first dispute as well.  So that is what -- I'm trying to

18   understand substantial need.  I'm trying to understand what the

19   status of this -- you know, this effort has been to try to --

20   on the part of the plaintiffs to use alternative means for

21   assessing the functionality of the equipment.

22             MS. RINGER:  Your Honor?

23             THE COURT:  Yes.

24             MS. RINGER:  So from Fulton County's standpoint, we

25   do not object to them having a copy of the test deck.  The

1    issue for us was we were unable to provide it.  And then our

2    vendor was not able to assist because they were concerned that

3    it would be a violation of state law.  So if it is not a

4    violation of state law, then we will work with the vendor to

5    provide the copy.

6            THE COURT:  And I think you were very clear, and I

7    appreciate that.  So I'm really at this point trying to

8    understand what -- I mean, the State's position as to this.

9            Why would they -- what state law would have

10   prohibited Fulton County from going ahead and providing the

11   images?

12           MR. TYSON:  Your Honor, this is Bryan Tyson for the

13   State.  I can -- I can maybe short circuit this because I can't

14   think of a reason why a test deck would be protected under any

15   provision of Georgia law or why it would not be disclosed.

16           The first notice we had of this dispute is when it

17   was filed on the docket.  The Secretary's office has taken a

18   consistent position that ballot images as part of 21-2-500, the

19   election records that are held under seal, can be released but

20   can only be released with an order of a court since they are

21   held under seal by the superior court.  But that is the actual

22   ballots, not a test deck.

23           So I can't think of a reason why a test deck would be

24   protected from disclosure.  Like I said, we weren't aware of

25   this -- of the dispute until we saw it filed on the docket.

1        THE COURT:  So what happened in your discussions

2    about getting a -- allowing the plaintiff simply to purchase

3    a -- the necessary equipment and to provide it to Fulton County

4    as a swap-out so that they would be able to run the test

5    themselves on one computer and whatever peripherals there are?

6    I assume that the scanner is an off-the-shelf scanner and is

7    available.

8        MR. TYSON:  Your Honor, this is Bryan Tyson.  I can

9    just go ahead and begin with kind of where we are at the

10   moment.  In our call with the Court -- and originally in the

11   joint discovery request, the request was for a ballot-marking

12   device, a scanner, and an EMS system.

13       In the reply on the joint notice, it was kind of down

14   to one BMD, it seemed like, was the request.  We had a call

15   together with the plaintiffs on Friday after our call with Your

16   Honor.  And the request is back to kind of a BMD, a scanner,

17   and at least an image of an EMS server so you could try to do

18   some tabulations.

19       In the course of that conversation, it became clear

20   that we needed some clarification around what was the scope of

21   the equipment that the plaintiffs were wanting to test and what

22   was the scope of testing they wanted to conduct.  Because if

23   we're talking about, you know, opening up the BMD and

24   installing other stuff on it, taking chips in and out, kind of

25   the process that we are doing right now with the DREs, that is

```
1    one thing.  If we're talking about running test decks and
2    creating test decks in BMDs and tabulating, that is something
3    different.
4            So plaintiffs had agreed we were going to look at the
5    -- we were going to look at the contracts with Dominion for the
6    State, what the limitations were for us.  The plaintiffs were
7    going to get back to us on those points.
8            We didn't get anything Friday.  We asked on Saturday
9    morning where are we on scope.  We didn't hear back again
10   until -- until 11:00 -- almost 11:00 P.M. last night from the
11   plaintiffs.
12           And the current scope now has added Poll Pads, has
13   added the central count scanners, backend system and related
14   software, along with additional kind of -- ballot paper and all
15   these kind of pieces that they need for -- immediately for an
16   analysis.
17           Then there is kind of track two that is a
18   ballot-marking device and scanner that is a little bit more
19   localized.  But they want these to both run in tandem.
20           We responded this morning on that point with our
21   concerns about the contracts from Dominion.  We -- under the
22   contracts -- Mr. Maguire may have more on this point.  But we
23   only have a license for the software.  We can only purchase on
24   behalf of the State or other State entities.  There is not an
25   opportunity to resell because of the protections of the
```

1   confidential information and the ownership of the contracted

2   product in the contract.

3          And those provisions are there because -- and part of

4   the security is that not just anyone can get their hands on to

5   the system.  So we asked some additional questions of the

6   plaintiffs about, you know, what are we talking about in terms

7   of are you opening the units, are we -- you know, how are we

8   going to make sure that these are able to be used again, or are

9   our experts going to be there, what is the process by which

10   this will happen.

11          And we have gotten some partial answers to that.

12   We're still waiting on some additional answers from Mr. Cross

13   on some other questions about the scope of the testing.

14          But I guess maybe taking it in pieces:  From an

15   equipment perspective, Number 1, I think we need to understand

16   is the challenge to the whole system or not and what is the

17   definition of whole system.  Because Ms. Kaiser back in, I

18   believe it was, December or sometime last year said that there

19   was not a challenge to the whole system.  But if it is the

20   whole system, are we also -- do they need access to eNet?  Are

21   they wanting access to the online voter registration system, to

22   My Voter page, to Firefly?  Are they planning to subpoena Apple

23   for the source code to the iPad because the Poll Pads run on an

24   iPad platform?

25          I think we need to clarify what equipment are we

```
 1   talking about, what kind of testing are we talking about, and
 2   that is -- we are still in the dark, Your Honor, in terms of
 3   what the plaintiffs are looking to do on that front.
 4            MR. CROSS:  Your Honor, this is David Cross.
 5            THE COURT:  Okay.
 6            MR. CROSS:  I'm trying to figure out where to start
 7   here.  That is not quite right.  Let me just take a step back
 8   and break down where we actually are.
 9            As Mr. Tyson just indicated, we proposed two phases.
10   And they would move in parallel.  One is focused on the
11   immediate need for the preliminary injunction.  One is a
12   longer-term phase, which we all recognize will take more time
13   and resources.
14            The short-term is this -- it is the same as we said
15   last week.  We understand Fulton County is willing to loan us a
16   BMD.  My understanding is that BMD, I think, has already been
17   used in elections.  So it is fully configured for the State.
18   So there is no dispute over whether it is a BMD that is used in
19   Georgia elections.
20            We can get access to that as quickly as Fulton County
21   can make it available.  From my understanding, I think they can
22   do it fast.  The only other thing we would need in the
23   short-term is access to a scanner, you know, maybe some voter
24   registration -- I'm sorry -- voter cards that are used to
25   activate the BMD and a little bit of ballot paper so we can
```

1    print.

2          Because all we're looking to do is to get a BMD to

3    our experts, let them examine it, run some testing on it, do

4    the sort of software analysis that we would expect them to do,

5    probably quite similar to something that Fortalice has done

6    maybe.  And then they just need to hook that up to a scanner

7    and to -- I'm sorry -- hook that up to a printer, which we

8    have -- we have the printer -- print the ballot --

9          THE COURT:  You have the printer?

10          MR. CROSS:  We do.  All printers are off the shelf.

11    The scanners are not.  The BMDs are not.  So we would only take

12    on loan the BMD.  So it is the only piece of equipment we would

13    take on loan.

14          We would then -- when we are finished with the

15    testing, we would print some ballots from it using our printer,

16    the same printer that they use in elections.  We would need

17    help from, say, Fulton County to just run those --

18          THE COURT:  But you need the scanner, don't you?

19          MR. CROSS:  Correct.  That is what I'm saying.  The

20    next step would be come back to Fulton County and borrow a

21    scanner maybe for a few hours before the hearing.  We would

22    figure that out.  But it would be an in-precinct scanner type,

23    not one of the big central scanners but a scanner where we

24    could run it through, and then show how the ballots tabulate.

25    You just do that by printing the poll tape, which shows the --

1   the tabulations and how they compare to ballots.

2          It is very little equipment.  It is very simple.  And

3   my understanding is Fulton has agreed at least with the BMD

4   part to let us do that.  And I think there are discussions on

5   the scanner.

6          And obviously if Your Honor would order that, I'm

7   sure they would comply.  That is a small thing that we can get

8   done in short order.  And our position has been consistent on

9   that.

10         What Mr. Tyson was talking about is an ongoing

11  discussion that is broader.  We do -- we do, as Your Honor has

12  pointed out, have issues with broader aspects of this system,

13  like EMS, for example.  So we do ultimately need to get an

14  image of the EMS.  We think there are counties that could do

15  that.  Fulton County might be able to do that.  Cherokee

16  County, other counties.  I don't know.

17         We think we should be able to cooperate with the

18  county.  If they are willing to image the EMS for us, we should

19  be able to do that.  There is no reason for the State to stand

20  in the way of that.  And then we'll go from there.

21         That is a longer term thing.  We would like to start

22  that now because we think -- if we could, for example, get an

23  image of the EMS this week, there is analysis that our experts

24  could do that could help inform Your Honor for the preliminary

25  injunction hearing, even though that is going to be a broader

1    ongoing analysis that will take months to conclude because it

2    is just more broad.

3            I just want to be clear.  It is two things.  It is

4    one that is very simple.  The State should not be constructing

5    our ability to get the equipment we need from Fulton and just

6    move forward with that.  We would ask they work with us or at

7    least not get in the way of our ability to work with counties

8    on getting things like an EMS image.

9            The only other thing is he is talking about the whole

10   system, eNet, Apple source code.  We have never asked for any

11   of that.  We have an email that's very specific on what we're

12   asking for.  It doesn't include that.  So I'm not sure where

13   that is coming from.  But that is where we actually are.

14           Oh, Your Honor, the last point.  I'm sorry.  They

15   have mentioned several times about contract provisions.  We

16   have asked them to identify these provisions and to give us

17   whatever contracts they are relying on.  They haven't.  So I

18   can't really respond to that.

19           I don't know what they are relying on.  But I will

20   point out contract provisions have never been a bar to

21   discovery in federal court in my experience.  People have

22   confidentiality provisions.  I have done IP cases where there

23   are licensing right limitations.  Your Honor has broad

24   discretion to order discovery irrespective of what contract

25   rights are.

1      So that -- that really is an irrelevant consideration

2  at this point for discovery purposes.

3      MR. TYSON:  Your Honor, this is Bryan Tyson.  On the

4  contract point, Mr. Cross when they filed their last motion --

5  third round of preliminary injunction motions filed the master

6  solution purchase and services agreement.  It is on the docket

7  at 619-8.  In that document, the provisions about the State has

8  a license is 3.1.1, Section 1.4.  It indicates that we can only

9  purchase on behalf of the State or other State entities, not

10 for third parties.

11     Section 11 is a detailed section about the

12 confidentiality and the trade secrets software that we have

13 access to.  12.1 relates to the ownership of contracted

14 product.  So these -- the contract that we have -- those are

15 specific issues that are there.

16     The other thing that I guess I'm a little confused

17 from what Mr. Cross just said is the email we received on

18 Sunday night at 11:00, which I'm happy to forward to Mr. Martin

19 and Ms. Cole, indicates they would need one unit -- just

20 reading the email -- of each piece of equipment used in

21 Georgia, an ICP scanner, an ICX BMD, computers configured in

22 the State's standard configuration for the counties' EMS

23 servers and ICC scanner, KNOWiNK pollbooks, backend system and

24 related system software, as well as any accessories used to

25 administer the system or conduct test elections such as voter

1   cards, keys, USB sticks, memory cards, smart cards, and a small

2   supply of ballot paper.  And at the end of the email, Mr. Cross

3   indicates they need that equipment and software for analysis by

4   Wednesday, by the day after tomorrow.

5          So the idea that this is just a simple -- there is

6   Phase 1 and Phase 2, the way this has been proposed is two

7   simultaneous processes running at the same time while the State

8   and the counties are trying to prepare for the November general

9   election.

10         And it also includes provisions of -- they are

11  planning to open up the BMDs, to open up -- this is a very

12  extensive analysis.  If it was just running a test deck of

13  things like Mr. Cross described, I think right now that is of a

14  different process than the answers we have gotten so far.  And

15  like I said, we're still waiting for answers about several of

16  our questions about how they are going to ensure that the BMDs

17  are still in working order and counting accurately when they

18  are returned as part of their proposal and whether they are

19  going to be installing software on to the BMDs themselves or

20  any other component of the system.

21         THE COURT:  Well, first of all, so I don't lose the

22  thread of what you just said, Mr. Tyson, would you mind just

23  filing a document with the references that you have just given,

24  the contract document numbers and sections.

25         MR. TYSON:  Yes, Your Honor, we can.

1          Do you want me to include the email from Mr. Cross of

2     the proposal as well just so it is all in one place?

3          THE COURT:  That is fine.

4          MR. TYSON:  Okay.

5          THE COURT:  Mr. Cross, what is your response to what

6     Mr. Tyson said?  Are you looking for everything at once to be

7     produced on Wednesday?

8          MR. CROSS:  What he was reading from was the longer

9     term.  It is actually literally called in the email longer term

10    component of the proposal.

11         What we had hoped to do was to begin that.  So, for

12    example, getting an image of the EMS from a cooperating county,

13    we would like to do that this week.  We understand there are

14    components of that broader system that are going to take longer

15    to pull together.  But the immediate need would be keep a

16    shorter term component which --

17         THE COURT:  What is the shorter term?

18              **(Unintelligible cross-talk)**

19         MR. CROSS:  Right.  The shorter term again is --

20         THE COURT:  Did you attach that so that that should

21    also be attached by Mr. Tyson?

22         MR. CROSS:  Yeah.  It is all in the same email.  So

23    if he attaches it, you will see it.

24         But, again, what we had already worked out with

25    Fulton largely is get on loan a BMD.  We should be able to do

1    that right away.  Then we will need access to a scanner to be

2    able to -- once we print the ballots to be able to run them

3    through a scanner.

4           Again, I think there are some other pieces in that,

5    like a voter card because you need that to actually activate

6    the BMD.  All we're really trying to do is just to say we want

7    to be able to analyze a BMD and then be able to print ballots

8    and scan them on the same scanners so that Your Honor can see

9    whether the ballots as they are scanned are wrong or not,

10   whether there is way to manipulate the system.

11          THE COURT:  I'm sorry.  All right.  So I want to make

12   sure.

13          Is that separate and apart from the test deck that

14   Mr. Brown was talking about?

15          MS. RINGER:  Yes, Your Honor.

16          MR. CROSS:  Can you answer that, Bruce?

17          I'm sorry, Cheryl.  Go ahead.

18          MS. RINGER:  Yes.  That is separate.

19          MR. BROWN:  I'm sorry.  I was on mute.  That's

20   correct.  This is Bruce Brown.

21          THE COURT:  All right.  Just going back to the test

22   deck, so is everyone agreed that the county can print the

23   images then -- download the images and make those available to

24   the plaintiffs?  I thought I heard that but --

25          MR. TYSON:  Your Honor, for the State, we don't

1    have -- I'm sorry.  Go ahead, Bruce.

2        MR. BROWN:  Go ahead, Bryan.  Go ahead, Bryan.

3        MR. TYSON:  Your Honor, for the State, we don't have

4    any problem with the test deck images being provided to the

5    plaintiffs.  I think it is important to note that test deck is

6    a hand-marked ballot.  That test deck is not a BMD-marked

7    ballot.  But we have no problem with those being provided

8    because they are not actual ballots.

9        THE COURT:  And if they were ballots, if they were

10   running a pseudo-mock election, you would have troubles with

11   them doing it?

12       MR. TYSON:  No, Your Honor.  No, Your Honor.  The

13   ballots that were used in an actual election would be covered

14   by 21-2-500.

15       THE COURT:  I understand that.  I'm talking about a

16   mock election where people could vote for any of the same

17   candidates but it is just a mock election.

18       MR. TYSON:  Correct.  They wouldn't be subject to any

19   protections that I'm aware of.  But they wouldn't be ballots

20   used in an election.

21       THE COURT:  Well, we have this sort of unique

22   situation right now with Fulton County that Fulton County while

23   it is having an election for runoff the end of September, not

24   all of the precincts are involved and they apparently do have

25   some equipment available and they are willing to cooperate.

1           So I really think that everything possible should be

2     done to facilitate that.  And I'm thinking about the equipment.

3     And that is why I'm just trying to get some clarity, which I

4     would say I have only a partial clarity about what the staged

5     request is from the plaintiffs.

6           But I mean, I view it as part -- in connection with

7     the Fortalice situation.  I think that -- this is part of the

8     heart of it, the issue in terms of substantial need and to

9     absolutely block the plaintiff from obtaining in one way or

10    another an access to equipment -- and I'm not talking about

11    multiple BMDs -- one BMD and the peripherals to be able to

12    actually understand the most core issue to this case, which has

13    to do still with the barcode.

14          I mean, there are other issues and for sure -- you

15    know, there are issues even in the relief order that might

16    relate to -- potentially to the Fortalice report.  But this --

17    you know, in terms of the course of substantial need, not to

18    sort of say we're not going to provide this and we looked at

19    this issue -- all right -- and we are claiming attorney -- that

20    this is work product and at the same time say we're not going

21    to -- there is no substantial need and we're going to also

22    block you from actually looking at and working with one of

23    these machines so we can get to the core issues seems to me a

24    problem.

25          I think that one -- so that I'm looking at both

1    issues together.  That is why I really asked about where are we

2    on this because that would seem the most obvious thing for me

3    to do is to say, all right, maybe -- I mean, this is one way of

4    my addressing the substantial need.

5         Now, I realize it could say substantial need means I

6    need to have this document or you could say I need to be able

7    to at least have the -- the same underlying -- underlying

8    equipment that they evaluated because they have their own

9    experts.  They can come to whatever conclusions they want to

10   come to.  And the State can decide whether you are going to use

11   Fortalice or not or somebody else.

12        So I mean, that is what I -- I'm just letting you

13   know that is what I'm thinking about.  Now, I don't know all

14   of -- all of the ins and outs of the contract or whether -- I'm

15   sure there are ways of doing this.  I'm sure there are ways of

16   also assuring confidentiality in terms of release of

17   contractually-protected software, that no one it is going out

18   to sell it, no one else is distributing the software.  But -- I

19   mean, this is the most straightforward way in my mind.

20        Now, I will say one other thing about this is that,

21   you know, I'm looking at that.  And, you know, I'm hopeful we

22   can get the deck right away, that whatever was dealing with

23   that -- the decks and also perhaps the deck that is actually

24   run through the BMD and scanner -- printed and scanned on the

25   regular BMD, not just simply a handwritten ballot.  Because I

1    think that would advance things as well.  And if it is not a

2    real ballot, it shouldn't be -- run into collision with the

3    State confidentiality statute.

4          It is very ambitious on the part of the plaintiffs to

5    think that you can put on a full enough case -- and we touched

6    on this earlier -- a whole -- but a large and compelling enough

7    case that we -- that would get to the ballots at this point.

8          I mean, I have allowed you to begin.  And if

9    something is absolutely -- you know, absolutely jumps out or at

10   least is a protection that needs to be thought about for the

11   future or it could be relevant on the day after the election,

12   that is one thing.

13         But, you know, I can't be doing this on a daily

14   basis.  I just -- you know, it is not -- in terms of judicial

15   resources and likelihood of prevailing right now before the

16   election on foreclosing use of the BMDs, it is a tall order.

17         It is one thing for you to basically be in process

18   now so that you are not -- because you have such grave concerns

19   and I'll allow you to do this and that there is something that

20   can possibly be done, as I have told you before, that is more

21   minor, that is more regulatory might if all hell breaks loose

22   be something that is relevant on Wednesday after the election.

23         But, you know, I am trying to be measured about this

24   in understanding the posture of where we are at and at the same

25   time the importance of the issues raised.  So, you know, it is

1   one of those --

2           MR. CROSS:  Your Honor, this is David Cross.

3           THE COURT:  Yes.

4           MR. CROSS:  I was just going to say:  That point,

5   Your Honor, we have heard loud and clear.  And, again, it is

6   why this -- you know, at least getting access to the BMDs and

7   what we need to run a mock election, as Your Honor put it,

8   which is really the right way to think about it -- is analyzing

9   the BMD, assessing vulnerabilities, and then running a mock

10  election so we can print the ballots and scan them and identify

11  and confirm vulnerabilities.

12          It is important I think because, while I still hope

13  we'll convince you of the full relief and we will show you it

14  is nowhere near the heavy lift the State would have you believe

15  it is -- but putting that to the side -- that type of analysis

16  is going to be critically important for identifying things like

17  specific security measures that may be able to at least help.

18  We think they would show what is needed.

19          But it is why we have been working so hard to try to

20  get that so at least Dr. Halderman or Harri Hursti can come

21  before Your Honor and say, if you don't do anything else -- we

22  hope this is not where you end up -- but if you don't do

23  anything else, here are a handful of sort of stopgap security

24  measures that are important that we can show with this

25  equipment.

1            The only thing I just wanted to say, Your Honor, is I

2      understand how you are thinking about the substantial need

3      point.  But I do think it is worth noting that our experts

4      getting access and doing analysis is different.  It is not --

5      in my mind, it is not a substitute for the Fortalice report

6      because whatever our experts do, as we have seen in the past,

7      the State is going to dispute that.  It is very different to

8      get their own experts' analysis of the system and what they

9      found.

10           And if I could just quickly, I'll just give you three

11     cases Your Honor may find useful.  We actually --

12           THE COURT:  Why don't you send them to me.  I don't

13     want to be --

14           MR. CROSS:  I'll do that.  But what I would say is

15     none of the cases the State cites deal with cybersecurity

16     reports that we saw.  We did a quick lock.  All the ones we

17     found -- we found three recent ones, 2020, 2019, 2017.  They

18     all ordered the reports produced for the same sort of reasons

19     that we are arguing here.  And what they all do is reject

20     Mr. Miller's argument that the only thing you have to do is

21     come forward and say we anticipated litigation and we prepared

22     this for litigation.

23           The courts routinely say that is not enough.  Because

24     if that were enough, as one of the courts points out, it

25     becomes really easy to shield highly relevant information from

1   discovery by just saying, well, we did it at the direction of

2   counsel.

3          And so we'll send this on.  Your Honor can take a

4   look.  But I just wanted to make the point that I see where

5   Your Honor is going and I understand the reasoning.  But I

6   don't think they are substitutable because, unless they are

7   going to come in and say that their own consultant, Fortalice,

8   was unreliable, getting Fortalice's assessment -- and for

9   better or worse -- it may come in and say the system is great

10  in all sorts of ways.  And I think Your Honor should consider

11  that.  Regardless of which way it cuts, I think that is

12  important for the Court to have rather than just hearing from

13  our experts and they will say our experts are wrong.

14         MR. MILLER:  Respectfully, Your Honor -- and this is

15  Carey Miller.  I apologize for jumping in.  I thought we were

16  past the discussion over the work product issue.  But just --

17         THE COURT:  No.  I had to look at other issues that

18  related to it.  Thank you.

19         MR. MILLER:  And, Your Honor, I do just want to say,

20  you know, that the State defendants are not resting on the

21  concept that because an attorney directs somebody to do

22  something it is automatically per se not discoverable.  I don't

23  think our brief says that.  I don't think anything I stated

24  says that.

25         Instead, what the case law says is that once you have

1    established the prima facie case of the work product then the

2    burden then shifts to the plaintiffs.  And I believe in the

3    context of what that report actually is, which Your Honor has

4    already conducted an in camera review of it -- and Your Honor

5    can see the fundamental difference between the previous reports

6    that plaintiffs are trying to tie this to and the actual claim

7    as to the work product.

8           And, Your Honor, as to the point on the need to

9    cross-examine a witness on something, you know, frankly, that

10   is also irrelevant.  But, you know, respectfully, if Ms. Payton

11   produced a new report and relied on this Fortalice assessment,

12   then we would be in a different situation.  But that is not the

13   case here.

14          And, Your Honor, the last thing I will say is it is

15   somewhat difficult in terms of the State being able to respond

16   to these arguments in that we are attempting in a good faith

17   effort to produce discovery after the Court had overruled our

18   objections on an expedited basis.

19          We have made plaintiffs aware early because we

20   didn't, frankly, want to be told that the State defendants were

21   hiding the ball as to documents being withheld and have not

22   even gotten to the point of producing a privilege log, much

23   less to the extent that, you know, Mr. Cross' email, I guess,

24   counts as a motion to compel.

25          Your Honor, I think all of those things are relevant

```
 1    in terms of the posture as to where we are right now.
 2             THE COURT:  Well, two things.  One, Mr. Cross, would
 3    you file whatever you are going to file on the docket?
 4             MR. CROSS:  Yes, Your Honor.
 5             THE COURT:  And are we in a position to at least
 6    resolve at this moment the question of Fulton County's being
 7    able to run images for both an absentee ballot -- mock absentee
 8    ballot and a set of -- a deck of cards that would be just
 9    simply as if somebody had filled them out on the BMDs?
10             MR. TYSON:  Your Honor, for the State defendants --
11             MR. BROWN:  Of course --
12             MR. TYSON:  -- this is Bryan Tyson.  I think that we
13    are in a position to resolve that.  I don't think there is any
14    basis to withhold those if they are not part of an actual
15    election.
16             THE COURT:  All right.  I realize now that the BMD
17    ballots would have to be filled out.  But I assume that that is
18    feasible.
19             MS. RINGER:  I'm sorry, Your Honor.  This is Cheryl
20    ringer.  What was that last statement?
21             THE COURT:  I just said because I gather that the
22    sample deck was one that was done based on absentee ballots?
23             MS. RINGER:  Yes.
24             THE COURT:  All right.  So I said that --
25                      (Electronic interference)
```

```
 1            THE COURT:  Well, let me call back.  Hang on just a

 2   minute.  Let me call back and I'll try again.

 3                  (There was a brief pause in the proceedings.)

 4            THE COURT:  Ms. Welch, is that any clearer?

 5            COURT REPORTER:  Yes, ma'am.

 6            THE COURT:  Okay.  So what I was saying was I

 7   understood that the first sample deck that was -- that Fulton

 8   County was attempting to run for the plaintiffs was an

 9   absentee -- set of absentee ballots and that there was no

10   objection from the State for running that and so that the

11   problem of being caught in between that I think that Dominion

12   had should be resolved.

13            And I was just saying also that if Fulton County

14   would run a set of -- a sample BMD ballot being also -- not

15   absentee ballots that was again not a real election that the

16   mock -- that if somebody has done mock voting on we can all

17   discuss how you are going to do that together.  Then those

18   could also be run on the scanner.

19            MS. RINGER:  At this juncture, Your Honor, no one --

20   I am sorry.  This is Ms. Ringer.  At this juncture, no one has

21   done the test deck for the BMD.

22            THE COURT:  Right.  I understand that.  But I think

23   they need some cards to do that.  I was throwing that out to

24   you that they would need -- someone would need to come in and

25   do a sample deck of cards.
```

1        MS. RINGER:  Well, if they are going to have the BMD

2   from the county, they would not need us to be involved at that

3   juncture.

4        THE COURT:  Right.  Right.  Well, that is what the

5   last part of this is really about.  But I was just trying to

6   expedite things.  But -- all right.

7        MR. TYSON:  Your Honor, this is Bryan Tyson.  Maybe I

8   could help with that one point.  In terms of generating a set

9   of BMD ballots, I mean, that is relatively standard as a

10  testing protocol where you video -- you have a script of the

11  votes in order, then video votes going in, generate the test

12  BMDs, and then they are run through the scanner.  I don't think

13  anyone would have a problem with that happening immediately.  I

14  mean, I think that is a very reasonable testing process that

15  could be accomplished pretty quickly without having to figure

16  out all the ins and outs of the security needs.

17        I don't know.  Mr. Maguire may be okay with that from

18  a Dominion perspective.  But I think we would be fine with that

19  from our perspective.

20        MR. MAGUIRE:  Your Honor, this is Matt Maguire.  May

21  I jump in?

22        THE COURT:  Of course.

23        MR. MAGUIRE:  So as Your Honor recognized a few

24  minutes ago, we clearly have intellectual property concerns in

25  connection with the equipment.  And what I would propose is

1    that Mr. Cross and I try to hammer out a nondisclosure

2    agreement.  We have done that in other jurisdictions.  And if

3    we are unable to reach terms, then we could just put it before

4    Your Honor.  And hopefully you could -- you could help us get

5    across the finish line.

6              But we have got -- we have got significant concerns.

7    There are several provisions in the contract that speak to the

8    confidentiality of the components.  And we just want to make

9    sure that that is -- that there is proper restraints in place

10   to protect them outside of the context of this litigation.

11             THE COURT:  Okay.  I mean, ultimately I think --

12             MR. CROSS:  Your Honor --

13             THE COURT:  Go ahead.

14             MR. CROSS:  I was just going to say -- this is David

15   Cross.  I guess I'm not sure what more is needed.  There is a

16   protective order in place that limits far more than an NDA

17   would.  Us and our experts would be also -- litigation counsel

18   and experts are the only ones who would have access.  You can't

19   do anything with it other than the analysis --

20             THE COURT:  Well, I'm not in a position -- I think

21   that you-all should talk about that.  I mean, I'm not in a

22   position to say -- if you can't come to an agreement about it,

23   that is something different.  But I'm not going to try to --

24             MR. CROSS:  The challenge is each time we talk -- and

25   I understand Your Honor's -- it is just lost time, to be

1    candid, Your Honor.  We never get anywhere close to an

2    agreement.  I mean, as I said before, we offer a narrow phase,

3    let us just cooperate with Fulton -- get out of the way, let us

4    cooperate with Fulton, let them give us what they are willing

5    to give us to run a mock election.  It is all subject to a

6    protective order.  And every response we hear is, well, we may

7    have contract provision terms.  We never get a provision until

8    today.  They have IT terms.  So I'm worried that we are

9    running --

10          THE COURT:  But I just said -- wait a second.  I just

11   said that you -- and I didn't hear any objection from the State

12   about your running a mock election on both the BMD and the --

13   with the -- a stack of cards from the BMD.  You don't have

14   access at that point to the machine.  They are running it for

15   you, and you are seeing the images.

16          MR. CROSS:  Your Honor, that is --

17          THE COURT:  I know you want -- I know you want to be

18   able to evaluate the equipment.

19          MR. CROSS:  Right.  I'm not --

20          THE COURT:  And I'm -- just wait a second.

21          MR. CROSS:  I'm sorry.  I'm sorry.

22          THE COURT:  I know you want one of everything or at

23   least the three main pieces here.  And I understand the desire

24   for the polling -- whatever it is called now -- when you come

25   in that is going to communicate.  I understand that.

1            But I'm just trying to start with this.  And I'm just

2   asking you as to this other part because if you think it is --

3   if you think it is worthless to run a mock election, fine.  You

4   don't have to do it.  I'm trying to give you something for

5   tomorrow.

6            MR. CROSS:  Yeah.  I agree, Your Honor.  To be clear,

7   we're not saying it is worthless to run a mock election.

8            What we think is important for Your Honor is what we

9   did with the DRE, which is run a mock election after our

10  experts had at least a little bit of time to see if he can

11  manipulate the election in the way that we believe he can.

12           And so if they are just running a mock election with

13  test ballots in the ordinary course, that is fine.  But that is

14  not going to tell Your Honor whether there are vulnerabilities

15  in the system.

16           THE COURT:  All right.  Then why don't we cancel the

17  preliminary injunction hearing and just go through discovery

18  and have a proper hearing the day after the election, if you

19  want?  I mean, really this is -- this is not -- what you-all

20  are doing is not a -- I understand completely, and I think we

21  can have expedited discovery, get yourselves ready.

22           But, you know, the thing about it is I can't say that

23  it is per se unreasonable for Dominion or the State to say we

24  want to work our way through the whole process of the IP.  And

25  then I'll be happy to resolve it.  But I can't say it is

1   just -- I should rule today that it should happen.  I think it

2   is all connected.

3          I'm happy to move on a very expedited basis.  But,

4   you know, we're talking about a hearing that is so close that I

5   don't know why you think that you're going to be able to or

6   that I'm going to be able to digest that and that you're going

7   to have the evidence that you are talking about by then.

8          MR. CROSS:  Well, Your Honor --

9          THE COURT:  I'm sorry.  I mean, if I thought that

10  the -- it was -- we were in a different posture and that it was

11  likely that I could do more in terms of relief, if I found

12  there were merits, it would be one thing.  But it is hard for

13  me to turn over heaven and earth I think about this report

14  basically a week and a half from now under these circumstances.

15  It is still heaven and earth to move it quickly so that you

16  could be able to be in a position -- in a different position at

17  the point of election.

18         But, you know, I'm going to rule on each of these

19  things.  I'm going to keep on treating it as an expedited -- on

20  an expedited basis.  But you have to step back and say at some

21  point does this truly make sense.  Because if I order tomorrow

22  for you to be able to have access -- to be able to have this

23  arrangement and get a computer on loan and you just basically

24  replace it altogether -- and really to me it may make complete

25  sense -- it still is not going -- knowing the ways of the

1    world, it is not going to happen in one hour from the point I

2    issue the order.

3            MR. CROSS:  Your Honor, I understand that.  I guess I

4    will say if I may it feels honestly a little unfair that we

5    would be criticized when I think we have tried to do what Your

6    Honor has often emphasized, which is to cooperate.  And Bruce

7    Brown and his whole team, they cooperated extensively in

8    coordination with us, with Fulton County and --

9            THE COURT:  And they have done a great job.  I

10   appreciate it.

11           MR. CROSS:  But it -- but it -- it is hard -- I

12   understand we're asking Your Honor to make big decisions on a

13   fast basis.  I get that.  But I just -- it is important to me

14   that there not be a wrong impression that we are really trying

15   hard to cooperate, to ask for narrow things like this simple

16   BMD thing where Fulton said, let's do it.  And we lose days or

17   weeks because at every turn the State jumps in and says no.

18   And they won't let their own experts look at it.  When they do,

19   they won't let us know what their experts found.

20           So it is -- Mr. Belinfante is going to yell at me.

21   But it is hard to imagine a case with more obstruction than we

22   have dealt with.  So it hurts a little bit.

23           THE COURT:  All right.  You know --

24           MR. CROSS:  We are doing what we can.

25           THE COURT:  I understand that.  And I'm not saying

1    that you have delayed, that you have done anything.  I'm not --

2    I'm not pointing fingers.  I'm just simply saying it is -- you

3    are in a very difficult posture.  But I'm just trying to say it

4    is not -- I'm looking at the time frame and the considerations

5    here.

6           And when you say I don't want to talk with

7    Mr. Maguire at this point, you just should make the decision --

8    and I haven't been involved at all, I haven't looked at their

9    contract at all, I haven't looked at it in the sense of

10   entering an order that says yes, this can easily be done just

11   under the protective order -- you say I can.  You may be

12   100 percent right.

13          MR. CROSS:  Your Honor, to be clear, I'm not saying I

14   don't want to talk to Mr. Maguire.  We spoke last week, and I

15   asked him to give me proposed measures.  We never heard from

16   them.  So that is my fear is it is just we go to talk and

17   nothing happens on the other side.  We're talking, and we just

18   don't get anywhere.  So I don't -- it is not -- I'm happy to

19   talk to him, Your Honor.

20          THE COURT:  Well, why don't --

21          MR. MAGUIRE:  Your Honor, this is Matt Maguire.  The

22   reason why we didn't respond to him is because we never found

23   out what kind of test he wanted to perform until 11:00 last

24   night.

25          I have worked on a confidentiality order today.  I

1    was able to get a copy to Bryan Tyson just before the hearing.

2    I don't know that he's had a chance to review it yet.  But as

3    soon as he blesses it, I'm happy to send that to Mr. Cross and

4    we can start talking about it.

5            THE COURT:  Great.  All right.  Mr. Tyson, can that

6    be accomplished?

7            MR. TYSON:  Yes, Your Honor.  I have reviewed it, and

8    we don't have any objection to it.  So I'm fine with that

9    proceeding.

10           And I also want it to be clear that we have worked

11   very hard to cooperate with the plaintiff as well.  We have

12   worked with the Coalition plaintiffs to immediately begin

13   imaging DREs.  We agreed to a protocol on memory cards.

14           We have to run elections.  And we're trying to

15   balance the state laws, the implementation of an election, and

16   the needs of this case.  We produced a significant amount of

17   documents on an expedited basis.  We are trying to work

18   cooperatively as well.

19           But I think Your Honor is right in terms of what is

20   practical and what we can accomplish on the time line that

21   we're on right now.

22           THE COURT:  All right.  Well, why don't y'all send

23   the confidentiality -- proposed confidentiality agreement to

24   plaintiffs' counsel and see where you are at.  And you can -- I

25   don't know what the next steps are after that.

```
 1              If it is a confidentiality agreement that the
 2   plaintiffs can agree on, what happens next at that juncture
 3   from your perspective, Mr. Cross?
 4              MR. CROSS:  If we all agree on confidentiality, I
 5   would hope that we could go forward with Fulton County getting
 6   the BMD on loan and access to what we need for a mock election.
 7              Can we all agree on that?
 8              THE COURT:  All right.
 9                   (Unintelligible cross-talk)
10              MS. RINGER:  I can agree with regards to the BMD.
11   But the other things that you say you need I'm not sure Fulton
12   County can provide.  We do have an election coming up.  I would
13   ask that you would get the image from someone else because they
14   are doing the DREs this week, as well as providing the BMD.
15   And I need my staff to be able to prepare for the election on
16   September 29.
17              THE COURT:  Ms. Ringer, you are saying you can
18   provide the BMD but you can't provide a scanner?
19              MS. RINGER:  I have not asked my client about that.
20   I can't say for sure that we can.  I know he's concerned about
21   the election for September 29.  I know that they were focused
22   with trying to get additional scanners.  So I would have to
23   verify.
24              THE COURT:  Well, can you do that?
25              MS. RINGER:  I will.  I will send a message right
```

1    now.

2            THE COURT:  All right.  Why don't you-all let me know

3    whether you have been able to figure this out by 9:30 tomorrow

4    morning and whether -- I mean, if you want, we can get off the

5    phone and get back on the phone.  But I hate to -- I mean,

6    either -- I don't know how long the confidentiality order is or

7    agreement is.

8            How long is the proposed one, Mr. Maguire?

9            MR. MAGUIRE:  It is double-spaced about six pages.

10   Let's see.  About six pages.

11           THE COURT:  Okay.  Then why don't we get off the

12   phone and why don't you send it over to plaintiffs' counsel.

13   And we'll get back on the phone at 4:30.  And I'll just be told

14   at that point if you have -- if there is an issue or not.  All

15   right?

16           Maybe Ms. Ringer will have heard from her client too.

17   It will give her a chance to call somebody.  Okay?

18           Just use the same number, and I'll talk to you at

19   4:30.

20           MR. TYSON:  Thank you.

21           MR. CROSS:  Thank you, Your Honor.

22           **(A brief break was taken at 4:19 P.M.)**

23           THE COURT:  Hello.  This is Judge Totenberg.

24           MR. TYSON:  Good afternoon, Judge.  Bryan Tyson for

25   the State defendants is here.

```
 1              MR. MILLER:  Your Honor, this is Carey Miller here as
 2    well for the State defendants.
 3              THE COURT:  Great.
 4              MR. MAGUIRE:  Matt Maguire just joined.
 5              MR. BROWN:  Bruce Brown just joined, Mr. Martin.
 6              MS. PARADISE:  Loree Paradise is here as well.
 7              MR. BROWN:  Mr. Martin, Ms. Marks is also on the
 8    line.
 9              COURTROOM DEPUTY CLERK:  Thank you.
10              MR. CROSS:  This is David Cross.
11              THE COURT:  Hello.  We have at least lead counsel
12    from every party here.  So why don't we begin?
13              Did you get an opportunity to review what draft
14    agreement was sent to you?
15              MR. CROSS:  I did.  I am loathe to say this.  But I
16    don't think it is going to work.
17              One threshold question and I'll talk to the
18    specifics.  It is -- what Mr. Maguire explained is that they
19    don't just offer protocol from Wisconsin source code review.
20    So that is a very different thing.
21              One threshold question I had that Mr. Maguire
22    indicated he doesn't know the answer to -- I don't know if
23    Mr. Tyson can answer this -- what was the protocol for
24    Fortalice for the examination they did?
25              Because it may be that whatever Dominion and the
```

1   State were comfortable when Fortalice did their assessment for

2   the report that would work for us.  But I'm guessing it is not

3   what they sent us because there is no way Fortalice could have

4   done an assessment with what is sent to us.

5        MR. TYSON:  Your Honor, this is Bryan Tyson.  I

6   honestly don't know.  I believe that is something Mr. Germany

7   took care of.  So I'm not sure what the process or protocol

8   would have been for that.  I believe that is something in his

9   declaration.  I don't know the answer to that.

10        MR. MAGUIRE:  Your Honor, this is Matt Maguire.  I

11   don't know the answer either.  I'm trying to get the answer

12   from Dominion's counsel -- in-house counsel.

13        THE COURT:  Okay.  All right.

14        MR. CROSS:  So that --

15        THE COURT:  Go ahead.

16        MR. CROSS:  I'm sorry.  I was just saying:  The

17   problems that come up with this are things like, just to give

18   you some examples, the review by our experts has to take place

19   at a secure location that the State has.  Two days before any

20   review, we have to get a detailed written examination of

21   exactly what we're going to do.  Dominion is present at all

22   times.  There could be no copying -- or copying probably isn't

23   an issue -- that we can't connect anything to it like a USB

24   device or anything.  Each piece of equipment has been to be in

25   its own separate room.  I'm not sure how that will work.

1          So it is -- it is just very draconian limits that

2    wouldn't be in our -- Dr. Halderman wouldn't really be able to

3    do anything.  And it really with respect to the State flies in

4    the face of the position they are taking on Fortalice to say

5    that they had access, that it is all work product, and yet for

6    us to do a similar analysis would be entirely discoverable and

7    severely limited.

8          So, again, I asked Mr. Tyson.  Hopefully he can find

9    out from his client what the terms were for Fortalice.  And

10   maybe we can all agree on those, depending on what they look

11   like.

12         I'll also just note the fact that litigation counsel

13   doesn't know what those are seems to undermine their position

14   about work product.  But --

15         MR. MILLER:  Your Honor, this is Carey Miller.  At

16   this point, we're just getting way off the track of what we

17   were talking about here, which was the proposal from Dominion

18   in good faith and, of course, there will be give and take on.

19         THE COURT:  All right.

20         MR. MAGUIRE:  Without a formal discovery request or a

21   subpoena.  This is literally volunteering on the part of

22   Dominion.

23         THE COURT:  All right.  Well, what I -- what I would

24   suggest, first of all, since this has been -- I don't know if

25   we're going to make progress.  I think that the defendants

1    should make available whatever the agreement was with Fortalice

2    about how the materials were to be protected.

3          I think -- I'm authorizing the plaintiff to make a

4    specific request, I mean, because this has been an issue that I

5    keep on hearing arising.  I think that they thought they could

6    be able to buy it off the shelf and they weren't in this

7    situation.  And I think that there is sufficient cause to

8    warrant their making the request.

9          You know, whether I can -- you know, how it is going

10   to end up working out -- but I do need a specific actual

11   request on the record in allowing the defendants to make an

12   objection.  So then file the request.  It is basically -- we

13   are doing -- you know, I thought we were going to be able to

14   resolve on Friday and come to an easy resolution of.

15         But if I'm going to end up having to order anything,

16   I need an official request on the record.

17         And I don't understand, just while I'm trying to

18   clean up the record in this regard, what the State's objection

19   was to my putting down in a minute order -- in the minutes

20   basically a record of how I proceeded in terms of the in camera

21   review of the documents.

22         In terms of the filing that was provided to the Court

23   today, I have -- I have to say I'm befuddled what the objection

24   was, that I should have issued an order in a different way when

25   I made clear in any case what the directive was.  And it is

```
 1    such a standard way of dealing with claims of work product that
 2    I don't know that the State was in any way injured in terms of
 3    making its objections, filing a document, and having the
 4    objections be properly considered.  All of which has occurred.
 5            I mean, this is just simply some of the problems of
 6    moving on an expedited basis.  But I think I have completely
 7    respected the fact that the State was asserting objections and
 8    dealt with them and was attempting to make sure the record
 9    reflected that you had made them.  I'm befuddled, but it is
10    water over the dam.
11            And the plaintiff may file this.  If you want to file
12    anything further in terms of a response to the defendants'
13    brief, you are welcome to do that.  You can just file, on the
14    other hand, the authority that you mentioned.  But everything
15    should be filed tonight.  And I'll proceed from there.
16            If anyone can -- I would -- I think we have at least
17    the deck that was the absentee ballot.  We have some agreement.
18    If you want to go further also with a set of cards, even though
19    you don't think -- apparently the plaintiffs don't think it is
20    very valuable, clearly there is -- it is possible and could be
21    done.
22            I haven't heard yet from Ms. Ringer about whether she
23    can free up a scanner.  But I can't imagine, given the short
24    period of time, that it can't be done.
25            MS. RINGER:  Your Honor, yes.  This is Ms. Ringer.  I
```

```
 1    have not been able to reach out to catch my client.  I have

 2    left voice mails, and I expect to get something tonight.

 3              THE COURT:  Okay.  I appreciate your cooperation and

 4    assistance.

 5              That is where we're at.  If anyone has something

 6    else -- I had one other question that was completely different,

 7    which was tell me -- remind me what was the different --

 8    material or not material between the machine in Texas and the

 9    BMD system in Texas versus the testing done for purposes of

10    could it be certified or not versus the equipment here.

11              MR. TYSON:  Your Honor, this is Bryan Tyson.  If you

12    could give me just a moment to locate my notes on that.

13              THE COURT:  If it is hard for you to find, you can

14    just -- you can file a one-pager.  That is fine.

15              MR. TYSON:  Certainly, Your Honor.

16              THE COURT:  It doesn't have to be pretty, or you

17    could -- it doesn't have to be pretty.

18              MR. TYSON:  Very well.

19              I remember the Texas issues in particular had to do

20    with the precinct scanners as opposed to the ballot-marking

21    devices primarily.  But I do not recall off the top of my mind

22    if it was a different software version.  So I will locate that

23    and file something on the record for the Court.

24              THE COURT:  Okay.  And if you would -- be sure you

25    don't have -- you can file under seal whatever the
```

1    confidentiality agreement was with Fortalice.

2            MR. BROWN:  Your Honor, this is Bruce Brown.  I don't

3    want to interrupt anything.  But before we leave, I have one

4    very easy and short request.

5            THE COURT:  Sure.  Go for it.

6            I just want to be sure that the State -- the State is

7    going to be able to -- is the State going to be able to do that

8    today, or are you going to do it first thing in the morning

9    or --

10           MR. TYSON:  In terms of the Fortalice --

11           THE COURT:  Uh-huh (affirmative).

12           MR. TYSON:  -- agreement?  We'll need to get in touch

13   with Mr. Germany as soon as we finish this call and see if he

14   can locate it.

15           THE COURT:  If you can't find it tonight, file it

16   first thing in the morning.

17           Then, Mr. Brown, you can -- since I don't even know

18   everything that you cover in your motion, you -- probably

19   whatever else you wanted to add, you have to tell me the

20   general areas that you were trying to deal with in that so I

21   know what is next.

22           MR. BROWN:  Yes, Your Honor.

23           This is with respect to Document 839, which is the

24   joint discovery dispute.  And the only reason why I'm

25   mentioning it now is that in your standing orders you

1   anticipate situations in which your hearing on it is

2   unnecessary because it is plain and this one falls under that

3   category.

4          If you view it, it is one where Fulton County is

5   simply asking for the Court to direct it to comply with our

6   discovery request to give it some connection.  But it is all

7   proper documents.  It is document requests and responses.

8          THE COURT:  Okay.  Well, I will -- we'll look at it

9   this evening.

10         MR. BROWN:  Thank you so much.

11         MS. RINGER:  Your Honor, this is Ms. Ringer.  I did

12  get a response from our client.  They are able to provide a

13  precinct scanner.

14         Do we know how long plaintiffs would need the

15  scanner?

16         MR. BROWN:  Mr. Cross?

17         MR. CROSS:  Yeah.  I was just thinking about that.

18  Sorry.

19         Is it okay if I get back to you, Cheryl?  I mean,

20  we'll work within your framework.  But would a few days be

21  workable?  You can tell me.

22         THE COURT:  Why don't you-all talk about that

23  offline?

24         MR. CROSS:  Sure.

25         MS. RINGER:  Thank you.

1          MR. CROSS:  Thank you, Cheryl, for doing that so

2     quickly.

3          THE COURT:  Okay.  All right.  Well, I'll look at all

4     your filings that are either coming tonight or -- you know,

5     Mr. Cross, if you -- you know, if you can't do something quick

6     on the -- just as long as I have something by -- by 9:00 in the

7     morning.  The sooner I get your stuff the better I can digest

8     it.  But just everyone not -- let me say 9:30 in the morning

9     since I don't know where Mr. Germany is at this point.  So --

10    anyway -- okay.

11         MR. CROSS:  It is coming in the next 15 minutes, Your

12    Honor.  It is only going to be three cases.

13         THE COURT:  Okay.  If I could get -- if you get ahold

14    of Mr. Germany, I would like the stuff tonight.  Otherwise, no

15    later than 9:30.

16         Okay?

17         MR. TYSON:  Yes, Your Honor.

18         THE COURT:  And also, Mr. Tyson, you know, I assume

19    you will file whatever you have.  It may already be on the file

20    in the record.  But I just don't remember about the Texas

21    stuff.

22         MR. TYSON:  Yes, Your Honor.  I have located it.  I

23    will file it so it is clear for everybody.

24         THE COURT:  All right.  All right.  Fine.

25         Just one other thing is that I don't think that the

1    defendants have to refile as a response to the set of

2    objections.  We'll have something in the record that absolutely

3    indicates that you can stand on whatever objections you already

4    filed -- on the motion that you have already filed in response

5    to the formal filing of the discovery request.  Okay?

6              MR. TYSON:  Thank you, Your Honor.

7              Your Honor, also one other issue for the Court.  I

8    know we're discussing about whether we're going to continue

9    towards the hearing.  There has been a number of subpoenas for

10   depositions of county officials over the next remainder of this

11   week from the Coalition plaintiffs.

12             And I don't know in terms of kind of where we are

13   at -- I know you said you would continue moving expedited.  But

14   I just wanted to make you aware of that, that that is also an

15   outstanding issue, depending on what we are looking at before

16   the hearing.  Those are after the replies for the plaintiffs

17   are due that would include their evidence but prior to the

18   currently scheduled date for the hearing.

19             THE COURT:  Well, I'm not stopping anyone.  I'm

20   not -- I'm not going to -- I'm not canceling the hearing at

21   this point.  But I'm not -- they have a right to a hearing.

22   How long I'll make for the hearing depends on really what there

23   is actually.  And I'm just really not at the point of making

24   that decision, and I would like to see progress here.  Because

25   it is not going to get easier the closer we are to October or

November too.

MR. CROSS:  Your Honor, this is David Cross.  Could I ask one clarifying question?

THE COURT:  Yes.

MR. CROSS:  I just want to make sure I understand what you are looking for from us.  We are going to file as soon as my paralegal can file it just a list of those three cases that I said on that point.

THE COURT:  Right.

MR. CROSS:  Is there something else you are looking for from us?  You mentioned -- I mean, are you looking for us to file a formal --

THE COURT:  Well, you have to have something that you had -- you got permission for the discovery request you made -- remember, the limited group.  I said you had permission now to go ahead and request what we've been dealing with since Friday, which is --

MR. CROSS:  I see.  I see.  Okay.

THE COURT:  The fact that you did not have one because you thought you were going to be able to purchase the equipment and the software or have something that was very closely analogous to it, whether from one -- from one study or another -- but that Dr. Halderman will get from a colleague.  And apparently that was not true.

But you had other people who had studied it.  So you

1    relied on that.  You obviously relied on the Texas study.  You

2    have done other sorts of things in terms of thinking about your

3    experts looking at the question of the barcode.

4          But if you are anticipating that you are going to

5    actually need the equipment that you have not been able to get,

6    then you still have to basically formally request it.  I said I

7    would approve it.  But I don't have the actual request in front

8    of me and --

9          MR. CROSS:  I understand.

10         THE COURT:  And we have now had all of this

11    discussion without the formal request in front of me.  I mean,

12    I understood it.  And really ultimately what I said on Friday

13    was BMD, the scanner, and the printer.  And if you don't need

14    the printer, that is fine because using different printers is

15    fine.  I haven't said anything about the Poll Pads because the

16    Poll Pads is a different set of -- my understanding was

17    produced by a different company.

18          And that is not -- even though I do understand the

19    Poll Pad to be an issue and have consistently said so and also

20    in everything that I have written, that is not what is in front

21    of me right now that we have been dealing with.  You may have

22    wanted the Poll Pad a long time -- and I would encourage you if

23    that is something you want to go ahead and indicate that.  But

24    for right now, for the purposes of the expedited discovery, I'm

25    not dealing with it for this limited round.

1          That is -- so get it -- if that is something that you

2     are going to want, get it out so that you can actually longer

3     term deal with that.

4          MR. CROSS:  So, Your Honor, you are looking for us to

5     put a formal request in that is for everything we wanted over

6     the course of discovery, not just the expedited?  I just want

7     to make sure things don't get confusing.

8          THE COURT:  No.  I'm just saying -- this is the

9     issue.  I mean, I said you could go forward with discovery.  So

10    you are going to be -- all that is going to keep on moving

11    forward.  So don't wait for -- I don't want to be dealing with

12    equipment issues on November 1st when you-all can't agree.

13         MR. CROSS:  All right.

14         THE COURT:  And this was -- I mean, this was -- this

15    was difficult enough because I -- frankly, the way it ended up

16    arising.  I'm just giving you -- I'm just telling you that is

17    what I perceived on Friday when I was dealing with this.  I

18    talked about the three pieces of equipment.  And I know there

19    was some confusion about what it was and that Mr. Tyson

20    mentioned it.  Was it everything?  Was it just the BMD, et

21    cetera?  And that is what I said I thought we were dealing

22    with, the three items.  But the printer may not be necessary.

23    But that is up to you.

24         But you at least have to have it formally part of the

25    record.  You are making it orally part of the record.  There

1  was email about it.  There was all of this.  But I mean, I have

2  to have -- there has to be something I'm actually approving.

3  And I don't -- you know, for all I know, you'll add something

4  else that I don't know about.

5        MR. CROSS:  Understood.  Okay.  I understand, Your

6  Honor.  We'll get something.

7        THE COURT:  I mean, I assume you need some cards or

8  something like that you said.  But like I said, that is the

9  point.  I don't know what that is.  And I just need -- I can't

10  be flying around like this.  And I hope -- meanwhile, I hope

11  that you-all can -- you'll get back with Ms. Ringer.  Okay?

12        MR. CROSS:  Thank you, Your Honor.

13        THE COURT:  All right.  Thanks very much.

14        MR. BROWN:  Thank you, Your Honor.

15            **(The proceedings were thereby concluded at 4:52**

16            **P.M.)**

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   74 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   1st day of September, 2020.

14

15

16

17                           _____
                             SHANNON R. WELCH, RMR, CRR
18                           OFFICIAL COURT REPORTER
                             UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```