```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3

 4    DONNA CURLING, ET AL.,          :
                                      :
 5            PLAINTIFFS,             :
      vs.                             :  DOCKET NUMBER
 6                                    :  1:17-CV-2989-AT
      BRAD RAFFENSPERGER, ET AL.,     :
 7                                    :
              DEFENDANTS.             :
 8

 9

10      TRANSCRIPT OF HEARING ON PRELIMINARY INJUNCTION VIA ZOOM

11                           PROCEEDINGS

12             BEFORE THE HONORABLE AMY TOTENBERG

13                UNITED STATES DISTRICT JUDGE

14                     SEPTEMBER 10, 2020

15                          1:00 P.M.

16                          VOLUME 1

17                          REDACTED

18

19

20

21     MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                    TRANSCRIPT PRODUCED BY:

23
      OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                    2394 UNITED STATES COURTHOUSE
                                      75 TED TURNER DRIVE, SOUTHWEST
25                                    ATLANTA, GEORGIA  30303
                                      (404) 215-1383
```

**A P P E A R A N C E S   O F   C O U N S E L**

**FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY**
**SCHOENBERG:**

    DAVID D. CROSS
    VERONICA ASCARRUNZ
    EILEEN BROGAN
    MORRISON & FOERSTER, LLP

    HALSEY G. KNAPP, JR.
    ADAM M. SPARKS
    KREVOLIN & HORST, LLC

**FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,**
**WILLIAM DIGGES, III, AND RICARDO DAVIS:**

    BRUCE BROWN
    BRUCE P. BROWN LAW

    ROBERT ALEXANDER McGUIRE, III (VIA VIDEO CONFERENCE)
    ROBERT McGUIRE LAW FIRM

**FOR THE STATE OF GEORGIA DEFENDANTS:**

    VINCENT ROBERT RUSSO, JR.
    CAREY A. MILLER
    ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

    BRYAN P. TYSON
    BRYAN JACATOUT
    DIANE LAROSS
    LOREE ANNE PARADISE
    TAYLOR ENGLISH DUMA

(...cont'd....)

1    (...cont'd....)

2

**FOR THE FULTON COUNTY DEFENDANTS:**

3
        CHERYL RINGER
4       KAYE BURWELL
        OFFICE OF THE FULTON COUNTY ATTORNEY
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                 I N D E X   T O   P R O C E E D I N G S

2
                                                              PAGE
3
    OPENING STATEMENT
4
        by Mr. Cross                                           22
5       by Mr. Brown                                           27
        by Mr. Tyson                                           30
6
        WITNESS                                                PAGE
7
    PHILIP B. STARK, Ph.D.
8
        Direct Examination
9         By Mr. Brown                                         40
        Cross-Examination
10        By Mr. Miller                                        56
        Redirect Examination
11        By Mr. Brown                                         81
        Examination
12        By The Court                                         82

13  J. ALEX HALDERMAN, Ph.D.

14      Direct Examination
          By Ms. Ascarrunz                                     86
15
    HARRI HURSTI
16
        Direct Examination
17        By Mr. McGuire                                       117
        Cross-Examination
18        By Mr. Tyson                                         144
        Redirect Examination
19        By Mr. McGuire                                       162
        Recross-Examination
20        By Mr. Tyson                                         165
        Examination
21        By The Court                                         166
        Redirect Examination (Further)
22        By Mr. McGuire                                       168
        Recross-Examination (Further)
23        By Mr. Tyson                                         169

24  JEANNE DUFORT

25      Direct Examination
          By Mr. Brown                                         170
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1    (...cont'd...)

2    **WITNESS**                                    **PAGE**

3    Cross-Examination
        By Mr. Russo                                  185
4    Examination
        By The Court                                  189
5    Redirect Examination
        By Mr. Brown                                  191
6
                                    *   *   *
7
     CERTIFICATE                                      209
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        P R O C E E D I N G S

 2    (Atlanta, Fulton County, Georgia; September 10, 2020.)

 3              COURTROOM DEPUTY CLERK:  Okay.  Good afternoon,

 4    everyone.  We are here for the evidentiary hearing in Curling

 5    vs. Raffensperger, Civil Action Number 17-CV-2989.

 6              Beginning with Curling plaintiffs, would counsel make

 7    your appearance for the record.

 8              COURT REPORTER:  You are muted, Mr. Cross.

 9              COURTROOM DEPUTY CLERK:  Yeah.  It is on his side,

10    too.

11              (There was a brief pause in the proceedings.)

12              MR. CROSS:  Your Honor, can you hear me now?

13              THE COURT:  Yes, I can.  Thank you.

14              MR. CROSS:  Sorry about that.  We'll try this again.

15              David Cross on behalf of Curling plaintiffs.

16              THE COURT:  Okay.

17              COURTROOM DEPUTY CLERK:  Anyone else?

18              MR. KNAPP:  Your Honor, Halsey Knapp and Adam Sparks

19    also on behalf of Curling plaintiffs.

20              COURTROOM DEPUTY CLERK:  Thank you, sir.

21              Coalition?

22              MR. BROWN:  Bruce Brown for the Coalition plaintiffs

23    and Robert McGuire also for the Coalition.

24              COURTROOM DEPUTY CLERK:  Thank you, sir.

25              State of Georgia?
```

1          MR. TYSON:  Your Honor, Bryan Tyson, Bryan Jacoutot,

2    Loree Anne Paradise, and I believe Diane LaRoss are all here

3    for State defendants from Taylor English.

4          COURTROOM DEPUTY CLERK:  Thank you, Mr. Tyson.

5          Fulton County?

6          Okay.  We're ready, Judge.  Thank you.

7          MS. RINGER:  Cheryl Ringer and Kaye Burwell here for

8    Fulton County.

9          THE COURT:  Thank you very much.

10         MR. CROSS:  Your Honor, I should have introduced two

11   other colleagues who are going to participate, Veronica

12   Ascarrunz and Eileen Brogan.  We are spread out in the room.

13   So they won't be on the video.  But they are here.

14         THE COURT:  All right.  Very good.  And I guess we

15   have pictures of some other people.  But that is fine.  That

16   doesn't interfere with anything else.  And cartoon images of

17   some people.  But that is great.

18         So good afternoon, everybody.  Before we really begin

19   this in earnest, I know there was some email exchanges late

20   this morning about timing and schedules.  And I tried to just

21   sort of cut to the quick of it by having Ms. Cole write you

22   about, you know, basically pick a number of hours that you are

23   basically thinking you can get your case put in, let's monitor

24   that.  Because the defendants never agreed to basically a shock

25   top per witness.  And I didn't pursue that further at that

1   juncture because we had a lot on our hands.

2          But having a time frame for each side allows us to at

3   least determine how you are doing and having the totality of

4   the time be counted so that we can get this done in a

5   reasonable way this afternoon and starting tomorrow.

6          First of all, did you agree on a time to begin that

7   will accommodate whatever -- whoever's witness was providing

8   some problems in the morning as to schedule?

9          MR. RUSSO:  Mr. Miller can speak to that.

10         MR. MILLER:  Morning, Your Honor.  I apologize.

11  We're having a little logistical difficulties here with our

12  Zoom technology.

13         THE COURT:  All right.  So this is Mr. Miller

14  speaking for the record, even though it says Vincent Russo, for

15  Ms. Welch's behalf.  So if you-all are jumping sides, maybe

16  each time you converse, say your name for the purposes of the

17  record so we make sure that -- Ms. Welch is handling a lot.

18  All right?

19         MR. MILLER:  Yes, Your Honor.  We'll -- assuming we

20  can get my laptop working, I'll join separately as well.  But I

21  didn't want to delay anything right now.

22         THE COURT:  Sure.  Thank you.

23         MR. MILLER:  Your Honor, I think in terms of

24  schedule, yeah, I think we're largely on the same page.  There

25  are a couple of outstanding questions from our perspective on

```
 1   schedule as far as, Number 1, Mr. Liu's testimony, who we
 2   understand the plaintiffs intend to call but, to my knowledge,
 3   has not been noticed as a witness to the Court and,
 4   secondarily, with respect to Dr. Coomer, who the State
 5   defendants intend to call and for whom there is no effective
 6   subpoena sitting right now for his testimony otherwise.
 7            So with that respect, our proposal was -- and some of
 8   this depends a little bit on -- and Mr. Cross can speak to this
 9   as far as Mr. Liu's availability.  But looking at it the way we
10   just kind of framed out, assuming an hour per witness in total,
11   not intending that necessarily to be binding but trying to
12   sketch this out so we can inform our witnesses, it appears to
13   make sense, if Mr. Liu is available and plaintiffs intend to
14   call him, if he could be called this afternoon.
15            Other than that, the kind of witness availability
16   time frames I think are consistent with the proposed schedule.
17   And to the extent Mr. Liu is not available today and the Court
18   is inclined to hear his testimony, then perhaps he could go in
19   the morning alongside Dr. Gilbert.
20            Those are kind of the two availability issues as far
21   as witness scheduling.
22            THE COURT:  All right.  Does -- Mr. Cross, does
23   Mr. Liu have any limitations as to his availability?
24            MR. CROSS:  He does, Your Honor.  Unfortunately, he
25   is not available today.  He is available tomorrow morning.  He
```

1        is in California.  So he will start early tomorrow.

2                THE COURT:  All right.

3                MR. CROSS:  Our thought was get him up tomorrow

4        morning after Dr. Gilbert.  Because I understand Dr. Gilbert

5        has a window of time tomorrow morning before 11:00.  So if he

6        goes first, we'll finish him.  We'll get to Mr. Liu.  He will

7        be very short, ten minutes.

8                With respect to Mr. Coomer, we have confirmed with

9        Dominion's counsel he is available today.  I'm not quite sure

10       the point about an effective subpoena.  I think what Mr. Miller

11       is getting at is in fairness to them we did neglect to send

12       them a copy of a notice of his subpoena.

13               But we originally subpoenaed a 30(b)(6) witness from

14       Dominion.  They objected to that.  And so we said, well, can we

15       just sub out Mr. Coomer for that?  They agreed, and they agreed

16       to accept service, which I know Mr. Miller was aware that we

17       were withdrawing the 30(b)(6) subpoena.

18               So I don't think there is prejudice to them.

19       Mr. Coomer is obviously a big part of the case.  We want to

20       examine him.  He is available today.

21               The last point, Your Honor, is it is just a matter of

22       timing.  If we don't put Mr. Coomer on today, tomorrow is going

23       to get tight.  Mr. Coomer is a much more substantive

24       examination than Mr. Liu.  We're just going to run out of

25       witnesses today based on availability, particularly because

```
 1   we're leaving a lot of our witnesses until their case, like
 2   Mr. Harvey and others who work for the State.  And so I think
 3   to get it done we need to get Mr. Coomer on today.
 4              THE COURT:  All right.
 5              MR. MILLER:  Your Honor, I apologize.  I didn't mean
 6   to interrupt.
 7              THE COURT:  That's all right.
 8              MR. MILLER:  I think in terms of, you know, tomorrow
 9   being crammed, I frankly think Mr. Cross is exactly right.  We
10   have in front of us a witness list that exceeds what we did
11   last year.  And, frankly, you know, to the extent that the
12   parties are aware of concepts, we certainly understand that.
13   But the focus of the Court and having a witness list was so
14   that we could have some form of preparation and logistical
15   scheduling, I would assume, in terms of approach today.
16              We kind of are truthfully a little curious as to what
17   relevance Mr. Liu's testimony is going to have at all.
18   Obviously, the plaintiffs can, you know, call witnesses they
19   believe are going to put on their case.  But it seems to me his
20   testimony may just be superfluous in general.
21              At the end of the day Your Honor, the concept on --
22   and I do want to clarify a couple of things as far as -- and I
23   don't believe Mr. Cross is trying to mislead.  But in terms of
24   they, the way it was used in the sense of accepting service,
25   that was not the State.  That was Dominion.
```

1          THE COURT:  Yeah.  I understood that.

2          MR. MILLER:  So I did want to clarify that.  And the

3    reality is a rule does require prior notice of a subpoena.  And

4    if the plaintiffs want to have Dr. Coomer to testify, you know,

5    we certainly understand it.  He is already being called as a

6    State's witness.  The plaintiffs will have an opportunity to

7    cross-examine him.

8          And I think in terms of practicality, it makes a lot

9    of sense to move forward in the proposed schedule that we sent

10   the Court, which we believe is eminently reasonable in light of

11   the condensed nature of this hearing.

12         THE COURT:  Well, I don't really have a schedule,

13   frankly, from you that is in order that I considered reliable.

14   I just had witnesses originally.  So I never treated it as if

15   what you sent me was a -- because you-all were having such

16   difficulties in agreeing on things and agreeing also about the

17   most -- you know, the beginning fundamental issue that the

18   plaintiffs' counsel wanted to be able to go beyond the scope of

19   cross so that they wouldn't have to call a witness twice so

20   that I just, you know -- I figured you basically did not have

21   an agreement, that they were calling your witnesses and you

22   were going to then just reserve your examination until later.

23         MR. MILLER:  And, Your Honor, I apologize.  In terms

24   of the proposed schedule, I'm referring to the Word document I

25   sent Ms. Cole and Mr. Martin this morning and not to the

1    parties' separate witness list.

2         That proposed schedule, I think, takes into account

3    the availability and the witnesses that were called.  And Your

4    Honor is correct that our position is, frankly, that

5    cross-examination should be subject to the scope of the direct;

6    alternatively, if cross-examination is subject and direct is

7    subject to the scope of the declarations, which is how we

8    proceeded last year in this case, such that essentially expert

9    declarations were treated as their report.

10        THE COURT:  Well, sort of.  Yeah.  I wouldn't -- I

11   wouldn't say it was that limited though, frankly.  But I'm --

12        MR. CROSS:  Your Honor, I may be able to help.  I

13   think the only real issues on the table are when does

14   Mr. Coomer get called.  As a practical matter, he is available

15   today.  They are going to examine him.  They have always been

16   prepared to examine him.

17        So I'm not sure -- there is no prejudice from us

18   deciding to examine him as well, even though we didn't serve

19   the notice of subpoena.  And I apologize for that.  But there

20   is no prejudice because they were always calling him.

21        As a practical matter, let's put him up today, free

22   the man up to get back to his life.  I have not heard any

23   argument as to why that has prejudiced anyone.

24        As to Mr. Liu, we may end up not needing to call him.

25   We are going to see how Dr. Halderman goes and the other

1    experts.  We're going to see what Dr. Gilbert has to say, and

2    maybe we won't call him.  But he is ten minutes.  So I think we

3    can --

4              THE COURT:  All right.  Well, you can reserve the

5    time for him.  I know that the highest -- the State, I assume,

6    they just want to make sure they have enough time for their

7    witnesses.  So I don't have any problem with allowing it a

8    little bit of out of order.

9              But if the State would prefer to have you finish your

10   witness first, that is okay also.  But I know that the State

11   has the 11:00 hard and fast time line.  So that is really --

12   one or the other is fine with me.  We can get them both done by

13   11:00.  And we'll begin as we need to in order to do that.  And

14   I'm happy to accommodate the State tomorrow morning in either

15   order.

16             MR. MILLER:  Thank you, Your Honor.  And just in

17   terms of the substantive aspects of Dr. Coomer -- Mr. Cross'

18   statement may get rid of the issue.  But in terms of what

19   Mr. Liu is intending to testify about, those may be some items

20   that, frankly, we'll want to direct Dr. Coomer in terms of

21   response.  I truly don't know as far as Mr. Liu.  But that is

22   sort of the issue as to why we reserved it.  But thank you.

23             THE COURT:  As to Dr. Coomer, the State has him up at

24   December -- September 11, even though it says December.  And I

25   was looking at that.  Thank God, you have got me here forever.

1    But you have him at 2:00.

2            But my understanding was that they wanted to limit

3    Mr. Coomer -- Dr. Coomer in terms of the cross-examination.

4    And if that is the State's position, then we just have to -- he

5    will just have to come and testify twice.  So it is one or the

6    other.

7            MR. MILLER:  Okay.  I think I understand Your Honor's

8    point there.  And if it is a matter of Dr. Coomer testifying

9    tomorrow and having a scope difference as to Dr. Coomer, then I

10   think that is suitable.

11           THE COURT:  Is that acceptable, Mr. Cross?

12           MR. CROSS:  I don't want to be difficult, but I'm

13   worried about time, Your Honor, because --

14           THE COURT:  Because you are so backed up?

15           MR. CROSS:  Yeah.  I mean, like -- as Mr. Miller has

16   pointed out, they won't start most of their witnesses until

17   probably late tomorrow morning.  Dr. Gilbert will go early.

18   We're taking him out of order.

19           THE COURT:  All right.  Well, why don't you do this.

20   Why don't we do this then.  I want -- you know, it would be

21   very different if we were in person.  But I assume that

22   Dr. Coomer is testifying from wherever he is located.

23           So we are in a situation where it probably doesn't

24   make that much difference.  He will have to testify twice.  We

25   will get it done, and we won't be frozen.  And it is my

1  accommodation to you and yet getting also -- I think people

2  will really need the time tomorrow.

3          So I can't tell you we'll end up having an hour break

4  if we're -- either.  So all right.  So you can call Coomer

5  today.  And I guess the extent -- I just will say to you though

6  then don't go over the same subject matter again and again

7  tomorrow.  I'm going to hold you to that.

8          MR. MILLER:  Sure.  Yes, Your Honor.  It may well be

9  the case that --

10          THE COURT:  I meant Mr. Cross.  Maybe you'll have

11  something you want to do and you will say we can get rid of the

12  whole thing yourself today, Mr. Miller.  If that is -- you can,

13  that is great too.

14          MR. MILLER:  Okay.  Thank you.

15          THE COURT:  But if you can't, I realize it is your --

16  he is your witness too.  And you can reserve it until the next

17  day.

18          MR. MILLER:  Thank you, Your Honor.

19          THE COURT:  All right.

20          COURTROOM DEPUTY CLERK:  Mr. Osophski (phonetic) and

21  Mr. Strickland, please turn your video off.

22          THE COURT:  You can still see us by video.  We're

23  just trying not to get distracted by seeing you.  Thank you

24  very much.

25          COURT REPORTER:  Judge, one second.

1          Mr. Cross, could I get you to speak up.

2          MR. MILLER:  Your Honor, if I may, I think just in

3    terms of logistics before we kick off with opening statements,

4    there were a couple of additional things in the proposed

5    schedule that I don't know that we necessarily -- we have a

6    time issue that we have all recognized.

7          Our suggestion was to limit direct examination to not

8    exceed 30 minutes.  And that was based off of the anticipated

9    time for testimony from the final witness lists that were

10   provided to the Court and then, secondarily, that the time

11   period for cross-examination would not exceed whatever time

12   period for direct, consistent with the Court's docket entry

13   order from late August.

14         You know, frankly, those matters were in the Court's

15   purview.  From the defendants' perspective, we thought they

16   made sense in trying to efficiently get through this hearing.

17   But I wanted to raise those two issues.

18         THE COURT:  Mr. Cross, do you agree with that?

19         MR. CROSS:  No, Your Honor.  On the 30 minutes, I

20   don't think there is any witness we anticipate to go beyond 30

21   minutes -- not by much.  So I think as an aspiration that is

22   fine.  I just don't want to be in a position where we are cut

23   off.  But I think all of our witnesses will be around there or

24   less.

25         The second point is really unworkable because, again,

1    we have agreed to forgo witnesses we would affirmatively call

2    to their case, like Mr. Harvey, Mr. Cobb.  And so if our cross

3    is limited to the scope of their direct and in limited time, it

4    puts them in a position to do a five-minute direct and we can't

5    do what we would do if we were calling them ourselves.

6           So we are either in one of two worlds.  Either their

7    witnesses testify twice, we do an unbounded adverse examination

8    in our case, or they testify once -- which we're comfortable

9    with.  That is the most efficient -- and our cross is not bound

10   by the time that they take.  That would seem to be the most

11   prudent course.

12          THE COURT:  So did you-all come -- when Mr. Miller

13   sent this proposed schedule, had you agreed that -- for

14   instance, for Mr. Harvey that you would be able to exceed the

15   scope of the direct?

16          MR. CROSS:  Candidly, Your Honor, I thought we had

17   worked that out yesterday.  I misunderstood because we got

18   Mr. Miller's email and he indicated this was still their

19   position.

20          But we have agreed for several days that we would

21   forgo State employees, people they were calling, like their

22   experts -- we would forgo them until their case.  And so I just

23   don't think you can reconcile that with the position that we

24   are then bound by the time they use on their direct for our

25   cross.  It lets them game that.  They can put on whatever

```
 1   testimony --
 2           THE COURT:  Maybe -- maybe Mr. Miller doesn't mean
 3   that.
 4           MR. MILLER:  In fairness --
 5           MR. CROSS:  Fair enough.  But the bottom point --
 6   gaming is not the word.  The point is:  If they decide they
 7   only need five minutes with their witness, then we only get
 8   five minutes.
 9           THE COURT:  I understand the point.  I'm just trying
10   to find out what Mr. Miller and Mr. Tyson had in mind because
11   you-all have said now very different things.  I tried to broker
12   this, you know, more than a week ago.  And I keep on getting
13   different versions of things from you-all now.
14           MR. MILLER:  Your Honor, I think in terms of marrying
15   the two together, the time period on direct versus cross, I
16   would suggest that perhaps that is just a default rule of
17   proceeding.  And, of course, Your Honor can adjust that on an
18   ad hoc basis as things move forward.
19           Kind of separate issue -- and frankly, Your Honor, in
20   terms of the proposal, we're intending to reflect what we
21   understood the Court anticipated.  If that is not what the
22   Court anticipated, then ultimately it is Your Honor's decision.
23           The secondary issue in terms of scope -- we
24   understand that, you know, the limitations we have on trying to
25   put together this quick hearing.  I guess the State's concern
```

1    is that, frankly, we are putting up witnesses on

2    cross-examination on matters that we have no concept as to

3    where the plaintiffs are headed.  If they want to take them on

4    direct, that is fine.  But there is a high likelihood, it seems

5    to us, that there will be questions that probably are outside

6    of the witnesses' competence.

7         So the suggestion would be that the scope aspect be

8    tied either to the declaration or to the direct.  And to

9    Mr. Cross' point, you know, to the extent we have a short

10   direct examination, we certainly would not intend to hold

11   Mr. Cross to a five-minute cross-examination because we are

12   trying to game the system on a five-minute direct.

13        That is not our intent.  And I believe Your Honor

14   would call us on that fairly quickly.  And Mr. Cross would as

15   well.

16        THE COURT:  All right.  This is what I'm going to do.

17   You-all wanted to have opening remarks.  You can go ahead.  I

18   think that originally the plaintiffs wanted to call some of the

19   State employees as witnesses as part of their case and said it

20   would be more efficient that way.  You wanted -- then basically

21   you wanted to do it instead.

22        I'm not going to limit them since they said right

23   from the start they wanted to call them as part of their case.

24   If you-all want to change your mind about that, we can take a

25   break and talk about it.  Then the plaintiffs can go, and you

```
 1   can call them again.
 2            This is what we did before.  And I'm just sort of --
 3   that was -- so that is how we're going to proceed at this
 4   juncture.  If it ends up -- I would say when we take a break
 5   you-all should chat about it some more.  Otherwise, I'll just
 6   let the plaintiffs go beyond the scope of the direct.  Because
 7   I mean, that is what their original intent was to call these
 8   folks.  I don't think that they are going to be wide-ranging.
 9            We are going -- I know we have down here a time of
10   6:00 P.M. for still calling a witness on tomorrow.  So it is
11   important that we go as much as possible -- if we run out of
12   witnesses today and we have plenty of time, which would be
13   remarkable, then I'm going to ask them if there is really no
14   reason for the plaintiff not to perhaps call someone like
15   Mr. Harvey who is -- who is pretty straightforwardly factual in
16   my experience with him.
17            But -- but if the defendants object, we'll start
18   earlier on tomorrow.  That's all.
19            All right.  You-all wanted to make some remarks
20   first.  So let's go ahead and do that.
21            MR. CROSS:  Thank you, Your Honor.
22            THE COURT:  And I will indicate it is essentially
23   1:30, 1:29.  So ten minutes of remarks from each side.
24            And I understood that the plaintiffs were going to
25   divide their time or else allocate it to one counsel or
```

```
 1    another.

 2              MR. BROWN:  That's correct.

 3              MR. CROSS:  Yes, Your Honor.  I'm going to go first

 4    and then hand it off.

 5              COURTROOM DEPUTY CLERK:  Please turn your video off

 6    unless you are counsel of record, please.  Thank you.

 7              MR. CROSS:  Ready, Your Honor?

 8              THE COURT:  I think we just have -- is it Sue

 9    Ellen -- yes -- and Shelley.  I guess some of these -- it is

10    hard to tell who is counsel of record and who is here.  Some of

11    these people -- that is fine.  It is fine.

12              Go ahead.  But, please, if you are not counsel of

13    record, be sure to just be appearing as a name and if you want

14    a picture.  But that is it.

15              Go ahead.

16                           OPENING STATEMENT

17              MR. CROSS:  Thank you, Your Honor.  I'm going to just

18    briefly touch on three key points to frame the hearing for Your

19    Honor and what I think is the focus as we go through the next

20    couple of days.

21              Let me start with the law because there is a

22    fundamental disagreement in this case about the legal standard

23    Your Honor is to apply.  Our position is that unconstitutional

24    elections are never permissible ever.  The State fundamentally

25    disagrees.
```

1          In their papers, they say that an unconstitutional

2     election can be permitted if it is simply inconvenient, too

3     burdensome, or too late to remedy that.  We think that is

4     wrong.  The Supreme Court has never held that in any case.  And

5     we can't imagine it ever would.  But the Supreme Court has

6     repeatedly emphasized that the Constitution protects not just

7     the right to vote but to have their votes counted.  And that is

8     the issue that we're focused on in this case.

9          It has also emphasized that other rights, even though

10    it is basic, are illusory if the right to vote is undermined.

11    Not eliminated.  Not abolished.  Simply undermined.  And we're

12    going to show you in this hearing that the right to vote in

13    Georgia and to have it counted is undermined.

14         Let me just focus on two quick points, Your Honor.

15    Feasibility -- and I'll start there.

16         Can we get the first slide up?

17         So let me pause for a moment, Your Honor.  The State

18    would have Your Honor believe that what we're asking for is a

19    whole new system -- fundamental change in the election system.

20    That is very, very far from reality.

21         What you are looking at here is a picture of the

22    equipment we got from Fulton County.  So this is actual Georgia

23    election equipment.  And there are three basic components to

24    the BMD system.  There is the BMD that you can see, the

25    touchscreen.  There is the printer, which is off the shelf.

1   And there is a scanner.

2           What are we asking Your Honor to order?  Look, that

3   is it.  Eliminate two pieces of equipment.  And I'm going to

4   explain this.  That is all we're asking.  Take the tens of

5   thousands of BMDs which are unreliable, that are vulnerable in

6   ways we will show, glitchy in the printers, and just leave them

7   where they are but keep the rest of the system.  Keep the

8   scanners.  Keep the EMS.  Keep the poll workers who are trained

9   on paper ballots, so on and so forth.

10          How do we know that you can do this with the existing

11  system?  Let me be clear.  This isn't 2018 where we were

12  changing the GEMS system.  This isn't 2019 when they were first

13  rolling out the BMDs.  This is take the existing system and the

14  training and use hand-marked paper ballots.

15          Here is how we know that they can do it.  Next slide.

16  This is the emergency paper ballot plan that the State has sent

17  out.  And I'm going to focus you quickly on a couple of

18  provisions.  So let me blow up the first one.

19          What this provides is that under a variety of

20  circumstances the State is supposed to use or the counties are

21  supposed to used hand-marked paper ballots.  And that can be if

22  there are too few machines, the machines don't work, wait times

23  are too long, longer than 30 minutes.

24          Think about June.  These circumstances happened all

25  across the counties in ways even worse than we first imagined

 1   based on the discovery we have gotten.  And we'll show you

 2   this.

 3            And we know that it is going to be worse in November

 4   with a much bigger turnout.  So they are going to have to have

 5   lots and lots of hand-marked paper ballots, paper ballots to be

 6   marked by hand.

 7            How do those get tabulated?  Exactly like the BMD

 8   ballots.  This is the key.  The first bullet, we're talking

 9   about marking ballots by pen at the polls.  What happens?

10   Those get scanned in to the same Dominion scanners right there

11   in the precinct exactly in the same manner as the BMD

12   ballots -- in the same manner.

13            So the only change we're talking about is when the

14   voter walks in, instead of having them deal with a bunch of

15   equipment, instead of having the counties set up a bunch of

16   equipment, simply hand the voter a paper ballot and a pen.  And

17   from there, everything happens the same.

18            Let me just briefly finish on security, Your Honor,

19   because what we're going to show you is the reason this simple

20   solution is necessary is because we have got a voting system

21   that's fundamentally unsecure.

22            Next slide.  First, Your Honor, they have not offered

23   a single election security expert to endorse Georgia's BMD

24   system.  They could not find one.  They haven't even allowed

25   their experts to examine that system.  Dr. Gilbert has never

1    used it.

2           Next, Your Honor, we're going to show you that the

3    BMD system is readily hackable in similar, if not worse, ways

4    than the DRE system Your Honor already found unconstitutional.

5    Dr. Halderman and others are going to show that to you

6    firsthand.

7           We also know next that of the many security

8    vulnerabilities that Fortalice found years ago most of those

9    are still out there in the system unremediated.  And despite

10   Your Honor's directive for them to work with their consultant

11   on that, they have done nothing in two years.

12          We also now know -- next point -- evidence confirms

13   that we now have there is, in fact, connectivity between the

14   old system and the new that allows the spread of malware.

15          Lastly, Your Honor, they are going to say audits.

16   They are going to tell you that audits are the superman of

17   election integrity to save the day.  Not in Georgia.

18          First of all, Your Honor, Dr. Gilbert himself is

19   going to admit -- he was forced to admit in his declaration --

20   that very few voters, a study he himself cites Your Honor to --

21   very few voters even examine their ballots.  And among those

22   who do, they routinely do not miss errors and anomalies.

23          And, in fact, although Dr. Gilbert spent a lot of his

24   declaration a year ago talking about audit procedures and how

25   he thought that they would work out well in Georgia, his latest

1    declaration says he is offering no opinions on the audit

2    procedures in Georgia.  The man wouldn't even address it for

3    Your Honor this time around now that we have some proposed

4    rules.  And it is no surprise because Georgia has no reliable

5    RLA procedures, which he says are critical.

6            In fact, what they have proposed, at least the latest

7    proposal we have seen, is a single RLA for a single election

8    picked by the Secretary of State every other year.  Not even

9    close to what Dr. Gilbert says is needed, which is RLAs across

10   the state for every race.

11           So I'm going to hand it off to Mr. Brown, I believe,

12   Your Honor, with this.  The solution we are proposing is very

13   simple.  It takes the existing infrastructure.  It uses that

14   infrastructure and provides constitutional elections for our

15   clients and for voters across the state.  And it is not ever

16   permissible to allow an unconstitutional election, and that is

17   what will happen if there is no relief.

18           Thank you, Your Honor.

19                       OPENING STATEMENT

20           MR. BROWN:  Thank you, Your Honor.  Bruce Brown for

21   the Coalition plaintiffs.  The upcoming election will be one of

22   the most controversial and chaotic in the nation's history.

23   The question today is whether in the midst of this chaos

24   Georgia will be able to say at the end of the day that it knows

25   who won the election.  And this it cannot do with the existing

1    equipment.

2         We will put up Dr. Philip Stark, who is the

3    preeminent expert on election auditing.  And he will testify

4    that no quality of audit, no matter how good the audit is, with

5    the existing equipment, Georgia will not have an auditable or

6    accountable election.

7         Your Honor held in 2018 before the State purchased

8    the system that if a new balloting system is to be launched in

9    Georgia it must -- it should address democracy's critical need

10   for transparent, fair, accurate, and verifiable election

11   processes that guarantee each citizen's fundamental right to an

12   accountable vote.

13        And, Your Honor, the question -- the defendants will

14   say there is a lot of -- lot of dispute, that there's facts on

15   both sides, that there is an academic dispute.  There is not.

16   Every time you hear the phrase it is just policy preference or

17   there is a factual dispute or all elections are insecure to

18   some degree, that is code for we don't have any evidence to

19   support our position.  Because they don't.

20        The evidence and the science and the law is

21   undisputed.  All that remains is the noise that you will hear

22   from the defendants, which you will not hear witnesses as

23   Mr. Cross -- you will not hear experts as Mr. Cross explained.

24        You will also hear from Harri Hursti, internationally

25   recognized cybersecurity expert and ethical hacker, who will

1    explain his own observations and his own expertise about in an

2    alarming detail as to the complete absence of the security

3    infrastructure protecting Georgia's election system from either

4    a malicious attack or an innocent programmer.

5         I, of course, would echo Mr. Cross' statements about

6    the simplicity of his solution.  But I would also say that what

7    is crippling Georgia now is the complexity of the system.  So

8    the proposed solution does two things.  It provides an

9    accountable election, which the Constitution guarantees to its

10   citizens.  But it also dramatically decreases the complexity

11   that is crippling Georgia right now.  And it is unable to show

12   again that not only is it putting forward a vulnerable system

13   but it is institutionally incapable of protecting it in a way

14   that is acceptable to the community.

15        Your Honor, we have two other issues that I will

16   address very quickly.  One -- and these are independent of the

17   switch from hand-marked paper ballots.  And we'll address this

18   further in the hearing.

19        One is to the extent -- the first is the paper

20   pollbook backups.  Separate issues in a separate motion.  We

21   believe that is fully briefed and that there are undisputed

22   facts on that.  And the State has no good reason for not at

23   this point -- that remedy would have fixed the meltdown in

24   June.  And if it is not fixed, we'll have another meltdown in

25   November.  As the lines get longer and longer, here is what

1    happens now, Your Honor --

2           THE COURT:  Why don't you move on because I certainly

3    read all about this.  And I understand.  And you-all are at ten

4    minutes.  So wrap it up.

5           Is there something else -- do you want to flag the

6    other things?

7           MR. BROWN:  The other things is on the scanning, Your

8    Honor.  The scanning -- you will hear evidence on that.

9           So thank you very much for your time.

10          THE COURT:  You are very welcome.

11          MR. TYSON:  Your Honor, I'll be proceeding for the

12   State when you are ready.

13          THE COURT:  I'm ready.

14                          OPENING STATEMENT

15          MR. TYSON:  Thank you, Your Honor.  Bryan Tyson for

16   the State defendants.  One thing we all agree on is this is a

17   critically important case.

18          The plaintiffs are asking this Court to be the first

19   court in the country to find that a paper ballot election

20   system using ballots marked by ballot-marking devices violates

21   the United States Constitution.  And after the plaintiffs ask

22   you to reach that question, they are also asking for relief on

23   any variety of other components in the system, including Poll

24   Pads, scanner thresholds, and audits.  But this Court should

25   not grant any relief in its attempt to undermine the public

1    confidence in the legitimacy of Georgia's elections.

2         When this Court denied a third round of preliminary

3    injunction motions last month, it found that the evidence

4    presented was insufficient as a matter of law to determine that

5    the Dominion BMD system was facially unconstitutional.  And you

6    left open the question of whether further evidence would

7    support an as-applied challenge.  And the Court relied heavily

8    on the intent of the plaintiffs to significantly supplement

9    their evidence.

10        What we're going to see over the next few days is not

11   a significant amount of new evidence.  What we're going to see

12   is a series of recycled theories and conjecture using this

13   court as a platform.

14        Indeed, in response to the State defendants'

15   expedited discovery seeking evidence of malware that could

16   alter election outcomes or any evidence of any actual

17   compromise of the prior voting system in Georgia, Curling

18   plaintiffs' entire document production in response was one

19   email from almost a year ago just speculating about a variety

20   of attacks on a system they had not examined.

21        Further, as the briefing demonstrated, the Coalition

22   plaintiffs thought they had uncovered a major problem with the

23   timestamps but instead simply misread the Dominion manuals and

24   didn't understand how Georgia's system actually worked.

25        There simply is not a significant amount of new

1   evidence.  Or if there is, the plaintiffs are not letting it be

2   tested through the adversarial process.  But I want to begin

3   where the Court must, with the law.

4        For the first prong of a preliminary injunction in

5   this case, under the Anderson-Burdick balancing test, this

6   Court must first find a burden on the right to vote created by

7   the use of Georgia's new electronic voting machine, then

8   categorize the burden from mild to severe if it finds one

9   exists, and then balance the State's interests.  The evidence

10  is going to show there is not a burden on the right to vote.

11       The plaintiffs offer a series of theories that are

12  still not backed up by any evidence of any compromise of a

13  component of any part of the system.  The plaintiffs are unable

14  to connect any of those dots they are putting on the page.  And

15  everything they offer is speculation.  But even if they could

16  connect the dots to an actual compromise somewhere, any burden

17  is extremely slight on voters because, unlike the DRE system,

18  voters have the opportunity to verify the ballots that are

19  counted by the scanners and then audited using a risk-limiting

20  audit that Dr. Adida has testified addresses potential QR code

21  errors.

22       And so taking that vanishingly small burden and

23  weighing it against the State interests and clear voter intent

24  and access for disabled voters in the orderly administration of

25  elections, and a timely processing of returns, all those things

1  counsel in favor of finding that the State's interests

2  dramatically outweigh any minute burden on the right to vote if

3  it is even there through the use of BMDs.  This Court cannot

4  get to a question of remedy unless the plaintiffs get past that

5  first hurdle, which they cannot.

6          And then moving to the second prong of a preliminary

7  injunction, there is no irreparable harm here.  Plaintiffs can

8  go vote a paper ballot marked by hand and deposit it in a

9  dropbox.  They cannot have an injury based on the outcome of an

10 election, as the Eleventh Circuit made clear in *Jacobson*, only

11 their own votes being counted.

12         Ultimately, plaintiffs want to vote using a different

13 system in their precinct.  That is a policy position they

14 advocated for in the Georgia General Assembly and lost.  And

15 now they ask this Court to impose what they could not persuade

16 policymakers was a better system.

17         And then the third and fourth prongs on equities and

18 public interest also favor in denying relief.  In this act of

19 this case, the plaintiffs have put forward no evidence from

20 anyone with statewide experience that the remedies they seek

21 are even feasible on the time line that we are on.

22         We have discussed we have more witnesses scheduled

23 for this hearing than any of our prior hearings.  But the Court

24 has already found in 2018 that September was too late to make a

25 change.  And nothing has changed from that decision.  Absentee

1     ballots for November go out next week.  Early voting starts

2     October 13.  We are on the eve of a November election.  We are

3     in the election.

4            Where are the election administrators who said last

5     year that plaintiffs' proposed relief was feasible?  They

6     aren't here and for good reason.  Because the kinds of relief

7     they are proposing cannot be implemented before or after the

8     November elections.

9            So let's talk a little bit about that relief.

10    Eliminating BMDs for the November election, Mr. Cross says it

11    is very simple, it is very easy, you just take two components

12    out.  The Court has already noted that it seems like it is

13    unlikely at this juncture in the case.  But during our

14    conversation yesterday, the Court noted the plaintiffs were

15    still sorting through their own issues.

16           And the so far undisputed evidence is there is not

17    enough capacity to preprint and handle millions of additional

18    paper ballots for the November election, let alone deploy all

19    of those ballots and ballot combinations, possibly thousands in

20    some counties, to every early voting site when early voting

21    begins in a little over 30 days.

22           An emergency ballot provision that is for a limited

23    purpose on election day is not a framework under which the

24    State can conduct an election under an entirely hand-marked

25    paper ballot system.

1          The other relief that plaintiffs seek ask the Court

2     to involve itself in the administrative details of an election,

3     which the Eleventh Circuit has said federal courts may not do.

4     Mr. Brown talked about paper pollbook backups.  The State

5     already does this.  The undisputed evidence is that it is a

6     burden -- a severe burden to print them as requested by the

7     Coalition plaintiffs.  There is nothing in response to that in

8     evidence.

9          Scanner thresholds.  Even if it was jurisdictionally

10    appropriate for this Court to weigh in, the State considered a

11    variety of options regarding scanners and set rules for the

12    thresholds through regulation.  And, again, the undisputed

13    evidence showed that having a human check every stray mark made

14    by a voter who disregards the instructions to fill out their

15    hand-marked ballot properly will lead to delays in

16    certification.  And that is a huge issue in a presidential

17    election year.

18         Mr. Cross and Mr. Brown say audits are worthless.

19    The State worked with the national organization, VotingWorks,

20    to design a risk-limiting audit based on models used in other

21    states.  Georgia is going to be one of only a handful of states

22    conducting a precertification statewide risk-limiting audit in

23    November 2020.

24         There is absolutely no basis for this Court to order

25    a different process than the one that took almost a year to

1   design.  And there is no reason for this Court to intervene in

2   what is ultimately an academic debate about the role and scale

3   of audits, especially to say the U.S. Constitution mandates a

4   particular audit process when it leaves the administration of

5   elections to states.

6           Your Honor, this case is about Georgia's BMDs.  This

7   case is about Georgia's scanners.  The people of the State of

8   Georgia can and should have confidence in their election

9   system, and this Court should not find otherwise.

10          We can verify our ballots.  Georgia will utilize a

11  risk-limiting audit before certifying.  This Court should deny

12  plaintiffs' attempts to undermine the legitimacy of Georgia

13  elections by their attacks on election technology,

14  especially -- especially in an emergency motion context.

15          And I want to be very clear about this.  The

16  plaintiffs are going to have the chance to make their case.

17  That is how litigation works.  But that should not take place

18  on a lower standard rushed schedule like is happening right

19  now.

20          This case has been going on for three years.  It

21  started as an election contest in the Karen Handel/John Ossoff

22  race in 2017.  Then it was a case challenging DREs.  Then it

23  was a case challenging BMDs.  And now it is a case challenging

24  BMDs, scanners, and any other piece of election technology

25  plaintiffs can think of.

1          The adversarial process exists for a reason.  And

2    this Court should deny plaintiffs' attempt to seek massive

3    changes to Georgia's election system on incomplete, rushed, and

4    untested evidence.

5          Because of the significance of this case, the

6    plaintiffs' claims should be put to that test with experts for

7    each side evaluating what they are saying, not conducting a

8    trial by ambush.  After discovery and fair testing, the Court

9    can then rule on their claims at that time.

10          But in the meantime, Your Honor, the Court should

11    deny act four of the preliminary injunction motions and let

12    this case proceed to act five where it can be resolved through

13    the application of the Federal Rules of Evidence and the

14    Federal Rules of Civil Procedure by this Court.

15          Thank you.

16          THE COURT:  Thank you.

17          I just want to remind everybody attending the hearing

18    that if you are not counsel of record please eliminate your --

19    the imaging for yourself.  You can still watch the video

20    without my seeing you and being distracted or counsel seeing

21    you and being distracted.

22          So there are several people who are right now

23    appearing visually.  And I'm trying not to call people out.  I

24    don't know all the people who virtually are here present.  But

25    I can see that there are many people who are still not

```
1     controlling your video so that you are not appearing.
2            So all you have to do is cross your -- basically put
3     a strike through the video so you are not appearing.  You will
4     still be able to see everything.
5            COURTROOM DEPUTY CLERK:  Thank you, Mr. Strickland.
6            Amy C., are you able to disable your video please?
7     Amy C., please turn your video off.
8            THE COURT:  You are waving at us now, Amy.  So I'm
9     not --
10           UNIDENTIFIED SPEAKER:  Maybe they don't know how.
11    Maybe you should instruct --
12           COURTROOM DEPUTY CLERK:  I'm going to remove her from
13    the hearing and she can call back in using the audio only line.
14           Okay.  It looks like she was able to turn it off.
15           THE COURT:  All right.  Very good.  All right.
16           Thank you for your remarks.  A fair amount of heat
17    for opening remarks, let me just say, from all sides.  And I
18    know that everyone feels very strongly about this.
19           I want to say one thing though.  Having heard this
20    case for some time, I do not think it is an accurate
21    description of the third -- the Court's ruling in the summer
22    not granting the relief on the facial basis to say that we went
23    through a full preliminary injunction hearing.
24           The reality is there was a motion to dismiss, there
25    was a motion for preliminary injunction, there was a facial
```

1    challenge.  I had a hearing, which I basically was asking

2    questions because there were issues I wanted to understand.

3    And it wasn't an independent opportunity for the plaintiffs to

4    present and even at points cross-examine witnesses.  And I

5    asked the State to explain to me some issues that I was not

6    clear about from their presentation and from the plaintiffs'

7    presentation.  And that was the essence of what occurred.

8            So I want to be clear that I do not -- I do not view

9    that as an evidentiary hearing.  I denied it as a facial

10   challenge after looking at it with the additional information

11   made available.

12           Unfortunately because of the pandemic, I felt myself

13   was not able to turn right back to writing about it.  And I

14   apologize to you-all for that.  And the schedule as it was --

15   that basically got moved later than I would have preferred

16   because of the challenges that we have had this spring.

17           That hearing was held approximately, I think, a week

18   or so before the Court basically stopped -- it continued to

19   hear -- have cases.  But it was not able to have hearings.  And

20   everyone understands what happened at that juncture.

21           So in my view, that is how -- just in terms of the

22   schedule, a fuller description of what has happened in the last

23   half year and how we got here at this date.

24           All right.  It is now 1:55.  Do plaintiffs want to

25   call your first witness?

1           MR. BROWN:  Thank you, Your Honor.  The Coalition

2   plaintiffs will call Dr. Philip Stark.

3           COURTROOM DEPUTY CLERK:  If you would, please raise

4   your right hand.

5                       **(Witness sworn)**

6           COURTROOM DEPUTY CLERK:  All right.  Please, sir, if

7   you would state your name and spell your last name for the

8   record.

9           THE WITNESS:  Philip Bradford Stark, S-T-A-R-K.

10      Whereupon,

11                       PHILIP B. STARK, PH.D.,

12      after having been first duly sworn, testified as follows:

13                       DIRECT EXAMINATION

14  BY MR. BROWN:

15  **Q.**   Thank you, Dr. Stark.  Dr. Stark, this is Bruce Brown

16  representing the Coalition plaintiffs.

17      Can you hear me okay?

18  **A.**   Yes, sir.

19  **Q.**   Dr. Stark, by whom are you currently employed?

20  **A.**   University of California at Berkeley.

21  **Q.**   And what do you teach?

22  **A.**   I teach statistics.

23  **Q.**   And you have submitted a number of declarations in this

24  case; correct?

25  **A.**   Yes, sir.

1   **Q.**   I believe in your first one, you included a copy of your

2   CV; correct?

3   **A.**   Yes, sir.

4         MR. BROWN:  And just for the record, that is with

5   Document 296, Your Honor.

6   **Q.**   **(BY MR. BROWN)**  And, Dr. Stark, did you invent the

7   risk-limiting audit?

8   **A.**   Yes, I did.

9   **Q.**   Have you testified in court and Government entities about

10   election auditing and election security?

11   **A.**   Yes, sir.  On a number of occasions.

12   **Q.**   Now, beyond your expertise in election auditing, I would

13   like to focus your attention on your experience in election

14   security.

15       What experience or expertise do you have with election

16   security?

17   **A.**   Well, I'm on the cybersecurity subcommittee of the

18   Advisory Board of U.S. Election Assistance Commission.  I have

19   been on the program committee of two election security

20   conferences for about six years now.

21       I have published 17 or 18 peer-reviewed publications in

22   election security journals and conference proceedings.  I have

23   testified to the California Little Hoover Commission about

24   election security.

25       I have advised Secretaries of State in Colorado and

1   California on matters related to election security, as well as

2   the election commissions of Nigeria, Mongolia, and Denmark.

3       I was asked to co-author a manual or report on election

4   forensics for the Venice Commission of the Council of Europe.

5   A number of other things.

6   **Q.**   Thank you.

7           MR. BROWN:  Your Honor, I would tender Dr. Philip

8   Stark as an expert in the fields of election auditing and

9   election security.

10          THE COURT:  Any objection?  Is there any objection?

11          MR. MILLER:  I apologize.  This is Carey Miller.  We

12   were unmuting.  We are readjusting for our Zoom issues.

13          I -- the State defendants would assert an objection

14   to the extent that the expertise of Dr. Stark is being offered

15   for.  It goes beyond the concept of auditing.

16          And if Your Honor would prefer, we can conduct a voir

17   dire at this point or subsequent in our cross-examination.

18   That is perfectly fine too.

19          THE COURT:  You can do it later.

20          MR. MILLER:  Thank you.

21   **Q.   (BY MR. BROWN)**  Dr. Stark, have you developed an opinion

22   on whether BMDs, like the BMDs used in Georgia, guarantee a

23   transparent, fair, accurate, and verifiable election?

24   **A.**   Yes.  They do not.

25   **Q.**   And in general terms, why don't they?

**A.**   Introducing electronics between the voter and the paper
record in effect makes the paper record hackable.  The machines
themselves are vulnerable to misconfiguration, software bugs,
and hacking.

Evidence is that the vast majority of voters do not notice
errors in the BMD printout.  Those who do have no mechanism by
which they can cry foul and prove to a poll worker or election
official or anybody else that there was, in fact, a
malfunction, that the ballot-marking device didn't do what it
was supposed to do.

There is essentially no practical way to detect hacking of
ballot-marking devices.  And as a result, the paper record
produced by ballot-marking devices is not a trustworthy record
of voter intent.

**Q.**   Dr. Stark, you may have heard in the opening that counsel
for the State asserted that Georgia was going to do a
risk-limiting audit of these elections.

And I want to ask you:  Would a risk-limiting audit of
these elections be effective and, if they are effective, what
would they show or not show?

**A.**   If they were to conduct a genuine risk-limiting audit
including a compliance audit to ensure that the chain of
custody of the paper hadn't been broken, that the paper trail
is as it was when it was cast by the voters, all that a
risk-limiting audit could accomplish is to confirm that the

 1    whole manual tabulation of the paper record would give the same

 2    winner or winners as the electronic tabulation of that paper

 3    record did.  It would do nothing to detect or correct any

 4    problems in the generation of that paper record by the

 5    ballot-marking devices.

 6        To the extent that ballot-marking devices misprinted

 7    voters' intentions, there is nothing that a risk-limiting audit

 8    could do to detect that or recover from it.

 9    **Q.**   Dr. Stark, you mentioned vulnerability.  Does your opinion

10    about the efficacy of a risk-limiting audit depend upon the

11    degree of vulnerability that the Court might find that the

12    Georgia system is subjected to?

13    **A.**   Unless there were a way to guarantee that every single BMD

14    printout was correct, that it correctly reflected what was

15    shown to the voter on the screen or spoken into the voter over

16    the audio interface, then there is a problem that cannot be

17    rectified by any kind of auditing.

18        So provided they are not perfect, this problem exists.

19    The materiality of the problem is going to depend on the number

20    of voters who vote using ballot-marking devices.

21    **Q.**   Dr. Stark, the evidence will show that there is some --

22    there's studies that have been conducted that show that some

23    voters do, in fact, verify their ballots.

24        Why isn't that enough to either be a random kind of

25    sampling or enough to alert officials there might be a problem?

**A.**   There are several questions wrapped up in that.  I'll try
to untangle it.

So first of all, some voters noticing that there was an
error in the printout and requesting a fresh opportunity to
mark a ballot does nothing for the voters who didn't check or
didn't request a fresh opportunity.  So it only corrects those
votes where the errors were caught.

Secondly, the number of voters who would request a fresh
opportunity to mark a ballot may be very, very small.
Certainly not enough to arouse suspicion.

Conversely, if election officials were willing to take
voters' assertions that the device misbehaved as proof that the
device misbehaved, the only recourse would be to hold a new
election.  There is no way to go back and figure out which
votes were affected, how many votes were affected, and what the
correct outcome of the contest should have been.

**Q.**   Dr. Stark, is there some kind of pre-election testing
though that the State could conduct that would ensure that the
BMDs don't misbehave in such a manner?

**A.**   There is pre-election testing that the State should
conduct routinely, logic and accuracy testing.  But that
testing can generally only detect gross misprogramming errors,
gross configuration errors.

There is no way that it can suffice to show that on
election day the devices do not alter enough votes to change

1    the electoral outcome of one or more contests.

2    **Q.**   I also heard the assertion that, you know, a BMD printout

3    is in English, the voter is free to verify it.

4         How can there be question of voter intent if the voter has

5    that opportunity?

6    **A.**   Well, again, there's several issues there.  BMD, kind of

7    by its nature, erases all direct evidence of voter intent.

8    There's no way to tell from a BMD printout what the voter

9    actually saw on the screen, what the voter did with the device,

10   what the voter heard through the audio interface.  So it really

11   becomes trusting the computer at that point.

12        Yes, the ballots are printed in English.  Ballots in

13   Georgia, ballots in California are quite long.  They typically

14   vote on very many things.  I understand that in the primary

15   this summer there were something like 29 issues to vote on in

16   Fulton County, if I'm recalling correctly.

17        The evidence is that most voters don't check, that those

18   who do check often miss problems that are actually there.  And

19   I personally would not be able to recall how I voted on 29

20   different things without using a sample ballot or some kind of

21   paper record of what -- how I intended to vote.

22   **Q.**   I want to focus your attention on:  Of the few voters who

23   might check their ballot and the fewer still who might check --

24   detect an error, if they go to a poll worker, what are the poll

25   workers' options?

**A.**   Well, in most states -- and I assume in Georgia as well --
the poll worker should give the voter a fresh, unmarked ballot
to have a do-over, to mark the ballot again, or mark a fresh
piece of paper.

The -- the poll worker or the election official is really
in a bind because there is no way for an election official to
tell whether when a voter requests a new opportunity to vote it
is because the voter made a mistake, the machine malfunctioned,
or the voter is just crying wolf and trying to cast out on the
outcome of the election.

The fundamental problem with ballot marking or a
fundamental problem with ballot-marking devices is that they
make voters responsible for the security of the system but
don't provide the voters with evidence that the voters can then
show anyone else to demonstrate that this was a problem.

**Q.**   Dr. Stark, have you looked at the issue of how many hacks
would be necessary to go detected or undetected in an actual
election given some assumptions about the number of voters who
might detect that problem?

**A.**   Yes, sir.  I prepared a demonstrative exhibit using as an
example the Attorney General's conference -- I'm sorry --
contest in Georgia in 2018.

MR. BROWN:  And at this point, Your Honor, I would
like to ask that Dr. Stark's Demonstrative Exhibit Number 1 be
shared on the screen.

```
1              THE COURT:  All right.  Have you shared it with the

2    defense counsel?

3              MR. BROWN:  No, I have not, Your Honor.

4              THE COURT:  All right.  Well, I'll let you show it.

5    But please have everything else -- anything else that you-all

6    can share in advance, I would appreciate your doing that.

7              MR. BROWN:  Thank you, Your Honor.

8              THE COURT:  Both sides.

9              MR. BROWN:  Can everybody see this exhibit, Your

10   Honor?  Can you see that?

11             THE COURT:  I am just looking at whether I can get it

12   up larger.  That is all.  It is all my eyesight.

13             MR. BROWN:  Mine too.

14             THE COURT:  All right.  That is better.  Thank you.

15             THE WITNESS:  It helps me too.

16   Q.   (BY MR. BROWN)  Dr. Stark, can you tell the Court what

17   Stark Demonstrative Exhibit Number 1 is -- what it shows?

18   A.   The official results for the Georgia Attorney General

19   contest in 2018, Chris Carr beat Charlie Bailey 51.3 percent to

20   48.7 percent.

21        That margin, the way it is expressed here, is about

22   2.6 percent, which is not especially small as margins go.

23   There were a total of just shy of 4 million ballots cast in all

24   of Georgia of which a little more than ten percent were cast in

25   Fulton County.
```

1         The table shows various hypothetical situations.  In the

2    left column, the left column indicates what fraction of voters

3    cast their mark of their votes using a ballot-marking device.

4    The first three rows are for every voter using a BMD.  The next

5    three rows are for half the voters using BMDs.  The last three

6    rows are what happens if only five percent of voters use BMDs.

7         Then the next column is the rate at which voters noticed

8    errors and requests a fresh opportunity to mark a ballot.  The

9    6.6 percent figure comes from experiments done, a study by

10   Matthew Bernard, Alex Halderman, and others from the University

11   of Michigan.  That was the rate that they found which voters

12   would notice errors in their ballots without any prompting.

13        20 percent is an optimistic number.  That was a number

14   that that study found through the rate of detection with

15   appropriate verbal prompting of voters to review their ballots

16   just before the voters scanned the printout.

17        And 76 percent is an even more optimistic figure.  It

18   comes from a study by Kortum, et al., at Rice University where

19   they found among voters who did review their ballots on average

20   across the experimental conditions that they used 76 percent

21   noticed errors.  Though, if you could get every voter to review

22   his or her ballot, the BMD output, then perhaps one might

23   attain a 76 percent rate of noticing errors in the output.

24        The third column is the rate at which votes would need to

25   be altered in order to alter the outcome of that Attorney

```
 1    General contest.  So, for example, in the first row, by

 2    altering 1.4 percent of BMD printouts, you could change the

 3    outcome of that contest.

 4        The fourth column is the rate at which voters who used

 5    ballot-marking devices would request a new opportunity to mark

 6    a ballot on the assumption that they have that detection rate

 7    and that hacking rate, that rate of altered votes.

 8        And the final column is, if this alteration of votes were

 9    uniform across the entire State of Georgia, the number of

10    voters in Fulton County who would request a new opportunity to

11    mark a ballot.

12    Q.   Dr. Stark, just in your -- the hack rate would be the

13    number of votes that needed to be changed, say, from Bailey to

14    Carr or from Carr to Bailey; correct?

15    A.   Yes, sir.  But only -- I'm assuming that the only votes

16    that get altered are votes that are cast using ballot-marking

17    devices.

18    Q.   And does your -- do your numbers assume that the voters

19    who cast this mistake -- their votes are switched to be

20    correct?

21    A.   Yes.  I'm assuming that if they catch an error and request

22    a fresh opportunity to vote that second marking of a ballot is

23    not altered.

24    Q.   So even if the diligent voters who catch this mistake get

25    that fixed, a relatively tiny hack rate could still change the
```

1    election; correct?

2    **A.**    Yes, sir.  A relatively low rate of errors in the

3    printout.  And that would generate an even lower rate of

4    do-over requests in the polling places.

5    **Q.**    I want to focus your attention and on the rows as you go

6    down -- not the columns but the rows.

7        And what do you see as you decrease the percentage of

8    voting systems that are BMDs?

9    **A.**    In order to alter the outcome of the contest would then

10   require altering a larger and larger percentage of the

11   BMD-marked paper printouts.

12       So starting -- if everyone votes on a BMD and let's take

13   20 percent as a relatively optimistic figure, which would

14   require specific interventions to attain -- particular ways of

15   reminding voters -- so if everyone voted on a BMD, the do-over

16   rate would be on the order of three voters in a thousand,

17   .3 percent, .003.  If only half of the voters voted on BMDs,

18   that would double.  It would still be less than a percent.  It

19   would be six voters in a thousand.

20       But if you restricted the use of BMDs to a much smaller

21   set of voters, voters who particularly benefit from the

22   accessibility advantages such as AR BMDs, then that do-over

23   rate would rise to 6.4 percent, .64 out of a thousand, among

24   those voters who marked their ballots using ballot-marking

25   devices.

1          MR. MILLER:  If I may, I apologize.  This is Carey

2    Miller.  I'm trying not to interrupt and realizing that we are

3    on a Zoom hearing here.  But I don't want to waive any

4    objections.

5          It seems at this point that the demonstrative has

6    gone a little beyond just a demonstrative and is what appears

7    to be an attempt at substantive evidence.  They are welcome to

8    bring in Dr. Starks' declaration for which there is no,

9    frankly, discovery as to the basis of the opinion.

10         I understand if Your Honor wants to proceed as a

11   matter of efficiency, but I just wanted to ensure we weren't

12   waiving anything with this being the first witness today.

13         THE COURT:  All right.  Your objection is noted.

14         MR. BROWN:  Thank you, Your Honor.

15         And if we can take this demonstrative exhibit down

16   for now.  And we can pull it up on cross if the State has some

17   questions about it.

18         THE WITNESS:  I'm sorry.

19   **Q.   (BY MR. BROWN)**  Dr. Stark, I wanted to change gears a bit.

20   **A.**   May I make a clarifying comment?

21   **Q.**   Sure.  Sorry.

22   **A.**   There are calculations of this form in one of my

23   declarations.  These specific numbers aren't there.  But

24   calculations of the same form are.

25   **Q.**   And I believe they are also in the article that you cite

1   in one of your declarations as well?

2   **A.**    Yes.

3   **Q.**    Now, I want to switch gears.  The State will contend that

4   the audit that is being done by the VotingWorks I believe is

5   the name of the application or the company, which Dr. Adida is

6   associated with, will be sufficient to show that the results

7   are verifiable.

8        Now, have you reviewed Dr. Adida's declaration?

9   **A.**    Yes, sir.

10  **Q.**    And do you believe that Dr. Adida says that, or, if he

11  did, if that were consistent with your opinion?

12  **A.**    No, sir, he didn't say that.

13  **Q.**    And why -- what do you mean?

14  **A.**    What Dr. Adida said was if every voter checks the human

15  readable portion of the ballot and -- and confirms that it

16  correctly reflects that voter's intention and a risk-limiting

17  audit uses the human readable portion of the ballot as the

18  basis for the audit, then errors in the QR code, where the QR

19  code doesn't represent what the human readable portion is,

20  could be detected by an audit.

21  **Q.**    And in your view, does the RLA that would be conducted by

22  Mr. Adida's firm verify the election -- Georgia's election

23  results in any meaningful way?

24  **A.**    No, sir.

25           MR. MILLER:  Your Honor, just in terms of where we

1    are characterizing testimony, I object to the compounding and,

2    frankly, leading questions.  Again, I am not trying to make a

3    Zoom hearing more difficult than it already is.  But I want to

4    raise that.

5           COURT REPORTER:  Mr. Miller, I'm going to have to be

6    able to see you.  I cannot hear and I cannot see him.

7           MR. MILLER:  I'm sorry.

8           THE COURT:  Ms. Cole said she was having trouble

9    hearing you too.  You are a little bit remote.  I'm able to.

10   But I'm not having to transcribe it.

11          MR. MILLER:  Thank you.  We'll work on our

12   microphones.

13          THE COURT:  All right.  Your objection is noted.  I

14   think for efficiency purposes though since we are not on

15   rebuttal and like a whole set of witnesses after your -- after

16   Mr. Adida is now scheduled to testify in your case at 5:00 P.M.

17   tomorrow, there is no choice but to allow Mr. Stark to comment

18   on what he perceived as Mr. Adida's actual testimony based on

19   his affidavit.

20          I do want to say though that it is 2:20, basically

21   2:19.  So we are kind of at 25 minutes into Mr. Stark's

22   testimony.

23          MR. BROWN:  Your Honor --

24          THE COURT:  Y'all projected about an hour including

25   cross-examination, I think.

```
1              MR. BROWN:  Your Honor, unless you have some

2     questions for Dr. Stark, at this point, we will reserve any

3     further questions for redirect.

4              THE COURT:  All right.  Well, I think I will wait

5     until State's counsel has an opportunity to examine Mr. Stark.

6     Thank you.

7              MR. BROWN:  Thank you, Doctor.

8              MR. MILLER:  Thank you, Your Honor.

9              (There was a brief pause in the proceedings.)

10             COURT REPORTER:  I am not going to be able to take

11    him down, Judge, if he doesn't get on the screen.  I cannot

12    hear him.

13             THE COURT:  All right.  Ms. Welch, are you able to

14    see him?  Have you looked at -- and you are looking at gallery

15    view?

16             COURT REPORTER:  Yes.  One of my boxes is being taken

17    up by Emily Levy.  Otherwise, it is counsel of record.

18             THE COURT:  Mr. Martin, are we able to move people in

19    terms of the sequence?

20             COURTROOM DEPUTY CLERK:  No, ma'am.  I'm not capable

21    of that.  The only active videos are on the front screen.

22             COURT REPORTER:  I can see Mr. Miller now.  I can see

23    Mr. Miller now.  He has popped up.  But he is way away from the

24    mic.  I can try.

25             MR. MILLER:  Apologies for that, Your Honor, and
```

1   Ms. Welch.

2           THE COURT:  No problem.

3                   **(There was a brief pause in the proceedings.)**

4                       CROSS-EXAMINATION

5   BY MR. MILLER:

6   **Q.**   Good afternoon, Dr. Stark.  How are you?

7   **A.**   Good afternoon.  Fine, aside from the fact that it looks

8   like Armageddon out the window.

9   **Q.**   It is hard to separate the reality of the COVID outside

10  from the Zoom on the inside.

11          Dr. Stark, I am going to ask you just a few questions to

12  be able to go over your testimony here and your prior

13  declarations.

14          As you heard earlier with respect to your qualifications,

15  as to election security, you spoke to your experience with the

16  Election Assistance Commission; correct?

17  **A.**   Yes, sir.

18  **Q.**   And election security conference; correct?

19  **A.**   Two conferences for roughly six years, yes, sir.

20  **Q.**   And you spoke to advising Secretaries of State as well; is

21  that correct?

22  **A.**   Yes, sir.

23  **Q.**   Now, how much of that advising and participation was

24  rooted in risk-limiting audits as opposed to cybersecurity and

25  mechanics of actual machines?

**A.**   Things are blended together to some extent because the way to attain an evidence-based election, despite whatever cyber vulnerabilities the system might have, necessarily involve paper.

I'm a coauthor on a number of papers on end-to-end cryptographically verifiable voting systems, including being on the development team for the STAR-Vote system for Travis County, Texas.

I have advised on issues related to paper flow issues related to cross-checking electronic results against other systems of record, including voter registration databases and ballot tracking systems.

So it is a mix of a bunch of things.  But issues around cybersecurity, paper, and auditing are all commingled.

**Q.**   And they all refer back to your expertise of risk-limiting audits; correct?

**A.**   That is not the foundation of it.  It is through the development of risk-limiting audits and the work that I have done initially for the California Secretary of State, but I became familiar with the underlying issues and gained exposure to larger issues around the conduct of elections through working closely with state and local election officials, including lots of time on the ground looking at paper flow and procedures and security procedures including physical security procedures in election offices.

**Q.**   And you believe that experience qualifies you to the
fields of human behavioral factors and human memory and
attention?

**A.**   My experience around human and behavioral factors
experience and attention is partly through participating in the
design of the STAR-Vote system working closely with two human
factors experts.

**Q.**   You yourself are not a human factors expert; correct?

**A.**   I am not a human factors expert.

**Q.**   You relied on the expertise of other people with the
expertise in that field; correct?

**A.**   For what purpose?  I'm sorry.  I don't understand the
question.

**Q.**   Well, to the extent that the human factors molded into the
concept of the STAR-Vote system, you were not the human factors
expert?  You were relying on the opinions of others I believe
is what you just said; right?

**A.**   I was not the human factors expert for the development of
the STAR-Vote system.  That is correct.

**Q.**   Okay.  And so when you testify about voters review their
ballots, those are based on what, I think you will agree with
me, to be human factor-related observation; right?

**A.**   I am relying -- for the numbers that I quoted, I'm relying
on two articles, one of which was by actually some human
factors experts I worked with on the STAR-Vote system, the team

```
 1   from Rice, and the other by Alex Halderman, Matt Bernard, and
 2   others from the University of Michigan.
 3                  (Unintelligible cross-talk)
 4          MR. BROWN:  I object.  Please let him finish.
 5   A.   With regard to issues around human memory, attention, and
 6   the ability to remember long lists of things, I'm relying in
 7   part on my experience teaching undergraduate and graduate
 8   students for more than three decades now and what I have seen
 9   in testing and the work that I have done developing
10   graphical-user interfaces and online systems for online
11   education.
12   Q.   (BY MR. MILLER)  But you didn't conduct those studies
13   yourself; right?
14   A.   I did not conduct those two studies.  That is correct.
15   Q.   And the team at Rice you are referring to, would that
16   include Dr. Byrne?
17   A.   Yes, sir.
18   Q.   Michael Byrne?
19   A.   Yes.
20   Q.   Okay.  With respect to hand-marked paper ballots, have you
21   conducted any research as to the rate at which voters verify
22   hand-marked paper ballots?
23   A.   I have not.
24   Q.   Okay.  And why is that?
25   A.   Again, the human factors is not my particular area of
```

```
 1    study.  I'm not aware of any studies on the rate at which
 2    voters do verify hand-marked paper ballots.
 3         The issue here I believe is not the rate at which voters
 4    either make mistakes or correct their own mistakes.  The issue
 5    is the distinction between a voter being responsible for his or
 6    her own work and a voter being responsible for errors
 7    introduced by the electronic technology.
 8              MR. MILLER:  If I can, I'll pull up what will be a
 9    defense exhibit.
10              And, Your Honor, just because of the quick time line,
11    we have not shared this as well.  But we can quickly email it.
12              THE COURT:  If plaintiffs would also email your
13    documents -- your demonstrative to the defendants.
14              MR. BROWN:  Yes, Your Honor.
15              THE COURT:  Just remember I don't have it.  We'll
16    deal with all what I don't have later.
17    Q.   (BY MR. MILLER)  Dr. Stark, can you see your screen now?
18    A.   Yes, sir.
19    Q.   Okay.  Can you read that?
20    A.   The New York Times, Florida Recount Senate Votes Yet Again
21    and Nelson's Chances Dwindle.
22    Q.   Okay.
23    A.   Shall I go ahead and read the article?
24    Q.   No.  I apologize.  I, frankly, meant in terms of can you
25    read the text on the screen.  But that is all fine as well.
```

**A.**    It is not an eye test.

**Q.**    Sure.

So, Dr. Stark, I believe you just mentioned a minute ago that you hadn't found the voter's intent relevant to a hand-marked paper ballot but instead were concerned that it reflect the voter's vote or mark.

Is that approximately correct?

THE COURT:  I'm sorry.  I'm sorry.  Mr. Miller, you are getting more remote again.

MR. MILLER:  I apologize.  Can you hear me now, Your Honor?

THE COURT:  I'm having trouble seeing you.  I guess the --

MR. MILLER:  Your Honor, I think right now --

THE COURT:  Right now you are there.

MR. MILLER:  Can you hear me now?

THE COURT:  Yes.  And I can see you now.

MR. MILLER:  Okay.  Thank you.

THE COURT:  Though I see Ms. Welch, but I'm not sure --

MR. MILLER:  I'm sorry, Ms. Welch.  I don't intend to leave it up for too long.  I apologize.

**Q.    (BY MR. MILLER)**  So, Dr. Stark, to go back to my prior question there, I believe you were just testifying to the extent that for a hand-marked paper ballot voter verifiability

1    is less of a concern because you are talking about whether the

2    voter properly marked it; is that right?

3    **A.**   No, sir.  That isn't an accurate reflection of my -- at

4    least what I intended to say.

5    **Q.**   Please correct me.

6    **A.**   Whether a voter verifies his or her hand-marked paper

7    ballot is up to the voter.  And if a voter makes a mistake and

8    doesn't correct that mistake, that is on the voter on some

9    level.

10        In contrast, a voter can check a review screen on a

11   ballot-marking device or listen to the audio output of a

12   ballot-marking device.  And yet what gets printed on the

13   printout isn't necessarily what the voter saw, what the voter

14   heard, or what the voter did.  What is on a hand-marked paper

15   ballot is necessarily what the voter did.

16   **Q.**   Okay.  And I believe I understand your --

17            THE COURT:  Could you just take down the Florida

18   recount because it is not helping our -- what we're trying to

19   see here.

20            MR. MILLER:  Your Honor, if I could have the witness

21   read one sentence off of this.

22            THE COURT:  You just read it.  Read it aloud what you

23   -- there is no point in --

24            MR. MILLER:  Okay.

25            THE COURT:  Read what you want to ask him about.

1          MR. MILLER:  Yes, Your Honor.  I understand.

2     **Q.    (BY MR. MILLER)**  So, Dr. Stark, for that purpose, as to

3     the first contention, are you aware of the senate race in

4     Florida between Bill Nelson and Rick Scott?

5     **A.**    Yes.

6     **Q.**    And in that contest, do you understand the concern around

7     ballot design and a voter's vote on those ballots?  Are you

8     aware of that?

9     **A.**    I'm aware generally that ballot design, whether it is a

10    printed ballot or a ballot-marking device screen layout, can

11    greatly affect the rate at which voters make errors.

12    **Q.**    And so specific to this instance here from this article --

13    and I'll read it to you -- Broward County was unusual in that

14    it had reported more than 30,400 of undercount ballots.  They

15    were not miscounted -- excuse me -- if they were not

16    miscounted, then the most likely explanation was that they

17    were, in fact, left blank, possibly because of the way the

18    ballot was designed.

19         Do you understand that?

20    **A.**    I heard what you said.  Yes, sir.

21    **Q.**    And do you believe this has any effect on your contention

22    that hand-marked paper ballots are essentially without fault in

23    the risk-limiting audit concept?

24    **A.**    I'm sorry.  I don't understand the question.  Voters can

25    make mistakes whether they are using a hand-marked paper ballot

1    or a ballot-marking device.  Poorly designed ballot layouts,

2    whether they are on screen or on paper, can increase the rate

3    at which voters make mistakes in marking their ballots.

4        But the difference is that if a voter left a contest blank

5    on a hand-marked paper ballot we know that the voter actually

6    left the contest blank on the hand-marked paper ballot, whether

7    it was deliberate or not.  Whereas for a ballot-marking device

8    printout, if the contest is blank, we don't know whether that

9    is because of malware, voter error, or design or something

10    else.

11    **Q.**   Well, I guess the question really boils down to your

12    concept of the voter's intent in leaving the ballot blank.  So

13    it is your contention that a poorly designed ballot which

14    results in an undercount -- that a voter in that situation

15    should have no recourse?  Should be upset only at themselves?

16    **A.**   I'm sorry.  If a ballot is poorly designed, that is a

17    problem.  Ballot design should be reviewed before the election

18    to be checked for usability.

19        There are good guidelines on how to design hand-marked

20    paper ballots and on-screen ballots as well.  I'm not sure what

21    you are getting at.

22        The risk-limiting audit can't get at what is in the

23    voter's mind.  All it can look at is what the voter did if it

24    is a hand-marked paper ballot or what the machine did if it is

25    a ballot-marking device printout.

1  Q.   That is precisely what I was getting at, Dr. Stark.  Thank

2  you.

3       And, secondarily, in terms of audits generally, you stated

4  in your declaration that you had invented the risk-limiting

5  audit; correct?

6  A.   Yes, sir.

7  Q.   Am I correct in that being in the beginning of 2007?

8  A.   Yes, sir.

9  Q.   Okay.  And following that invention, you agree that the

10 Election Assistance Commission extensively piloted this

11 concept; right?

12 A.   The Election Assistance Commission provided support to the

13 States of California and Colorado for those states to conduct

14 pilots.  Some pilots were conducted without funding from the

15 EAC.  Some were conducted with money from the EAC.

16 Q.   And in terms of piloting an audit, no audit just flips on

17 at the flick of a switch; correct?

18 A.   I don't understand your question.  But, first, the

19 number --

20 Q.   Let me rephrase that.  So in terms of the question is:

21 When you implement a risk-limiting audit, would it be your

22 opinion that you flip it on at the turn of a switch without

23 piloting and testing the proper processes and procedures?

24 A.   Again, I don't understand the question.  If the question

25 is whether the audits that were conducted that I'm calling

1    pilot audits genuinely fulfilled all the criteria of being

2    risk-limiting, I can speak to that.  If there is an issue --

3                    **(Unintelligible cross-talk)**

4    **Q.   (BY MR. MILLER)**  Dr. Stark, when you move forward to

5    implement a risk-limiting audit, say, in Colorado, for

6    example -- okay? -- would you suggest the State of Colorado

7    wholesale implement a risk-limiting audit without ever having

8    done it before and without piloting the concept?

9    **A.**    There are a lot of moving pieces to conducting a statewide

10   risk-limiting audit.  Conducting a jurisdictionwide

11   risk-limiting audit is a lot simpler.  And many of the audits

12   that I'm calling pilot audits were genuine risk-limiting

13   audits.

14        Working out the regulatory framework and the legislative

15   framework for conducting binding risk-limiting audits clearly

16   takes some time.  There are logistical aspects of how each

17   jurisdiction handles its paper, keep tracks of its paper,

18   organizes its paper, deals with chain of custody, and so forth

19   that need to be addressed.  Those are not simple questions.

20        It is certainly a great way to get one's feet wet to

21   conduct pilots that are not binding, that are not under as much

22   pressure as a risk-limiting audit that has the legal

23   possibility of changing the outcome of an election would

24   require.

25        So I think pilots are terrific.  I also think that with

1    good planning and help a jurisdiction could immediately move --

2    could move to conducting risk-limiting audits in one or more

3    contests either within jurisdictions or statewide on a couple

4    of months' notice.

5    Q.    And did you think that the State of Colorado had that kind

6    of help when they were implementing the audit regime?

7    A.    The State of Colorado had help from me, help from a number

8    of other election integrity advocates, help from, I think,

9    Colorado League of Women Voters.

10        Initially, there was no legal mandates to risk-limiting

11   audits.  So things could only be done on a pilot basis.  I'm

12   not sure how to answer your question.

13   Q.    And, of course, the statewide risk-limiting audit as a

14   binding matter didn't come to fruition until 2017; is that

15   correct?

16   A.    That's correct.

17   Q.    And you are also aware that Colorado utilizes central

18   tabulation for their ballots; right?

19   A.    Yes, sir.

20   Q.    And so that all ballots are scanned through the central

21   count scanner, not through precinct scanners in various

22   counties?

23   A.    There may be still some legacy systems that differ from

24   that.  But I believe that their now uniform voting system

25   generally is central count optical scanner, that they are

1   largely a vote-by-mail state.

2   **Q.**   Do you believe an RLA is effective on central scanning?

3           COURT REPORTER:  I'm sorry.  Can you repeat that?

4   **Q.   (BY MR. MILLER)**  Do you believe a risk-limiting audit is

5   effective in a central scanning jurisdiction?

6   **A.**   Again, it depends on how it is conducted.  I'm not sure

7   what you mean by effective.  If the underlying paper trail is

8   trustworthy, if there has been a compliance audit to confirm

9   that the underlying paper trail was trustworthy, then a

10  risk-limiting audit, you know, will have a known minimum

11  probability of catching and correcting outcome-changing errors.

12  **Q.**   And so I believe you mentioned earlier that you did not

13  believe that an audit -- a risk-limiting audit could ever be

14  effective on a ballot-marking device system; is that correct?

15  **A.**   There is no audit procedure that can be conducted on the

16  output of ballot-marking devices to confirm that the outcome of

17  a contest is correct in the sense that it reflects what the

18  voters actually did on the BMD or saw on the screen or heard

19  through the audio.

20          The sense in which a risk-limiting audit may still be

21  worth doing is that it can catch -- it can detect whether

22  errors in the tabulation of a particular pile of ballots was

23  large enough to alter the reported outcome of one or more

24  contests.

25          But what it can't do is determine whether that particular

1   pile of paper is a trustworthy representation of what voters

2   did, saw, or heard.

3   **Q.**   And do you believe a risk-limiting audit could be

4   conducted on, say, a DRE machine?

5   **A.**   No -- well, again, a paperless DRE, absolutely not.  A DRE

6   that prints a VVPAT, you could use the VVPAT as the basis for

7   an audit.  It would have the same faults of using a BMD

8   printout as the basis for an audit would have.  Namely, there

9   is little reason to believe that what is printed by the device

10  reflects what the voter did.

11  **Q.**   And, of course, you engaged in an audit of that nature;

12  correct?

13  **A.**   I have done a pilot audit that used the printout from --

14  the DRE printout in Orange County, yes, sir.

15  **Q.**   And you did that in India as well; correct?

16  **A.**   No, sir.

17  **Q.**   Explain -- well, I apologize.  In terms of the election

18  machine -- the electronic voting machine, are those similar to

19  a DRE that is used in India?

20  **A.**   Yes.  They have a -- they have a simple -- I actually

21  haven't seen one.  I recall seeing photos of them.  But they

22  have some kind of simple interface, and they print -- they

23  print a record.  I think a single candidate or a single party.

24  **Q.**   And so on that machine the vote is recorded inside the

25  machine; right?

**A.**   Yes, sir.

**Q.**   Okay.  And the paper is not recorded --

**(Unintelligible colloquy)**

THE COURT:  Whoever is speaking has to remember that you are going to be sharing your voice and your remarks with everybody else in the court.  Thank you.  Be careful.

Go ahead.

**Q.**   **(BY MR. MILLER)**  And so, Dr. Stark, in those instances, the what you referred to as a VVPAT, which I take to mean a voter verifiable paper audit trail, that was not a vote of record; correct?

**A.**   I'm sorry.  That was not a --

**Q.**   In the context of India, the printout that came on with the EVMs was not a vote of record; correct?

**A.**   I don't know Indian electoral law well enough to know whether they considered the printout to be the vote of record or the electronic record to be the vote of record.

**Q.**   Let me put it this way:  When tabulating, the machine is tabulating the vote in the machine and it is not tabulating anything on paper; correct?

**A.**   That is correct.

**Q.**   Okay.  So you conducted an audit on these machines in India; right?

**A.**   No, sir, I did not.

**Q.**   You wrote a paper on it?

**A.**    I wrote a paper about a method for auditing electoral

systems like that used in India.  I did not conduct any audit

in India.  I have not been involved in the conduct of any audit

in India.

**Q.**    And so do you believe this audit in India was a --

THE COURT:  All right.  I think -- I'm sorry.  We are

really going far afield.  If he was not, in fact, conducting

the audit in India, I mean --

MR. MILLER:  Your Honor, we are trying to share a

screen here to see if this is referring to some published work

of Dr. Stark.

**A.**    There has been no audit in India.

**Q.**    **(BY MR. MILLER)**  There has been no audit in India?  Did I

hear that correctly?

**A.**    Yes, sir.

**Q.**    And you wrote this paper about concepts of auditing then;

is that right?

**A.**    Yes, sir.

**Q.**    Okay.  So I believe you used the term security theater

before when you --

**(Unintelligible cross-talk)**

THE COURT:  All right.  I would like you to remove

the document.  The thing about -- the reason why I'm trying to

get you to remove documents -- anyone, not you personally

necessarily -- is that unless the person -- we have to have our

1    attention drawn to it, then I can't -- then I can't see you and

2    I can't hear as well.

3              MR. MILLER:  Yes, Your Honor.  I understand.  I

4    wanted to make sure that Dr. Stark and I were on the same page

5    as the study we're talking about.

6    **Q.   (BY MR. MILLER)**  But you are familiar with that study

7    we're referencing, Dr. Stark; correct?

8    **A.**   I'm not sure I would call it a study.  It is a research

9    paper.  It introduces a mathematical method for auditing a

10   different electoral system from that that we use in the United

11   States.

12       I do believe that if an audit were based on, in essence,

13   the VVPAT output, it would have the same problems that it would

14   in the United States.  Perhaps not quite as bad for a number of

15   reasons.  The primary one being that what is reflected on the

16   paper printout is basically a single candidate or party, if I

17   understand correctly.  It is not like checking a list of 29 or

18   30 different selections in different contests.  It is a single

19   item being printed.

20       I think the cognitive load involvement verifying that is

21   much smaller.  However, I don't know what procedures are in

22   India and how they vary from jurisdiction to jurisdiction

23   within India regarding what happens if a voter contests that

24   the printout doesn't match the button that the voter pushed on

25   the screen.

1    Q.    And you're not aware of those procedures in Georgia

2    either, are you?

3    A.    Excuse me?

4    Q.    You are not aware of those procedures in Georgia either,

5    are you?

6    A.    No, sir.  I understand informally that if a voter requests

7    another opportunity to mark a ballot the voter is legally

8    entitled to.  But I'm not even sure that that is correct in

9    Georgia.

10   Q.    Okay.  And you talked about hypothetical voters who might

11   have an issue and raise it and be ignored; is that right?

12   A.    No, sir.  I said that the poll worker or election official

13   would be in a bind if a voter raises an issue because the

14   options that are available to the election official or poll

15   worker are very limited, aside from allowing the voter an

16   opportunity to mark a new vote.

17        If you take a voter's claim that the machine misbehaved at

18   face value, you are faced with -- the only option is to do the

19   election over again.  And if you don't give it any credence,

20   well, then an election could be -- the election result could be

21   incorrect because of malfunctions of the equipment.

22   Q.    But you have --

23                    **(Unintelligible cross-talk)**

24   A.    There is no good option.

25   Q.    -- to voter.

1          MR. BROWN:  Objection, Your Honor.  He was not

2     finished with his answer.  Again, we have --

3          MR. MILLER:  Your Honor, I'm not trying to cut off

4     the witness.  But at some point this is a cross-examination

5     with yes-or-no questions and not (unintelligible).  I realize

6     we are on Zoom, and I'm not trying to be difficult.

7          THE COURT:  Let Professor Stark finish the answer if

8     he hasn't.

9          THE WITNESS:  Thank you, Your Honor.  I actually

10    don't remember what I was going to say.

11         THE COURT:  All right.  Go ahead, Mr. Miller.

12    **Q.   (BY MR. MILLER)**  On the exhibit you discussed in your

13    direct testimony, you referred to a hack rate; correct?

14    **A.**   Yes, sir.

15    **Q.**   And just to be clear, that document was not produced in

16    discovery; right?

17    **A.**   That's correct.

18    **Q.**   Was that document cited and included in your declaration?

19    **A.**   No, sir.

20    **Q.**   And so on those hack rates, you mentioned earlier you are

21    unaware of any study as to hand-marked paper ballot

22    verifiability.

23         How did you determine the hack rate relative to, say,

24    50 percent of hand-marked paper ballots in your hypothetical?

25    **A.**   In the hypothetical involving 50 percent hand-marked paper

1   ballots, the only votes that were changed were votes that were

2   printed using ballot-marking devices.  And I assume that there

3   was no change to votes made on hand-marked ballots.

4   Q.   So you just assumed that there was no issue with a

5   hand-marked paper ballot; right?

6   A.   No, sir.  I assumed that electronic hacking can't change a

7   hand-marked paper ballot.

8   Q.   And would you agree with me that a hack with a pencil or

9   pen could change a hand-marked paper ballot?

10  A.   If there isn't a good chain of custody of ballots, if

11  insiders can alter marks on ballots, then there is a problem,

12  whether it is hand-marked paper ballot or ballot-marking device

13  output.

14  Q.   And that chain of custody becomes even more difficult when

15  there is central tabulating scanners; correct?

16          THE COURT:  When they are essential what?

17          MR. MILLER:  I'm sorry.  Central tabulating scanners.

18  Central count scanners, for example, in Colorado.

19  A.   I don't see why that would be the case.

20  Q.   (BY MR. MILLER)  And when the voter is not him or herself

21  inserting the ballot into the scanner?

22  A.   I don't think that that cuts one way rather than the

23  other.  The chain of custody of the ballots matters regardless

24  of where the ballots are collected.

25  Q.   And you have a couple of comments in the -- in your

1    declaration regarding the Fulton County pilot audit.

2         And just real briefly, you do understand that is a pilot;

3    correct?

4    **A.**   It clearly was a pilot, but it was not represented as a

5    pilot by the Secretary of State's office.

6    **Q.**   Would you agree with me that a press release is not the

7    equivalent of binding state policy?

8    **A.**   Sir, obviously, it is not binding state policy.  But it

9    was completely misleading.  It said that it was a risk-limiting

10   audit.  It said that it could catch and correct errors.  It

11   said it validated the results.  It said it followed best

12   practices established by experts in election integrity.  And it

13   was none of those things.

14   **Q.**   It was an example of trying to learn and work out the

15   kinks of implementing best practices?  Would you agree with me

16   on that?

17             THE COURT:  I really don't think this is helpful.  I

18   mean, you are arguing with the witness about an article -- an

19   article about, I guess, the Secretary of State's office --

20             MR. MILLER:  Your Honor, if I may, this is contained

21   in his declaration.

22             THE COURT:  I understand that.  But I don't think it

23   is going to materially make a difference to me.  That is what

24   I'm trying to tell you.

25             MR. MILLER:  Your Honor, one last subject matter here

1    and I'll be done.

2    **Q.   (BY MR. MILLER)**  And I would ask that we put the screen

3    share back on briefly.

4        Dr. Stark, can you see this on your screen?

5    **A.**   Yes, sir.

6    **Q.**   Okay.  And do you see your name there at the top in the CC

7    line?

8    **A.**   I do.

9    **Q.**   Okay.  I just want to ask you just a few general

10   questions.

11       Who is David Dill?

12   **A.**   David Dill is a computer scientist formerly at Stanford

13   University.  He has gone to Facebook from Stanford.  He was the

14   founder of Verified Voting Foundation.

15   **Q.**   And am I correct in assuming the other individuals on the

16   email are associated with Verified Voting?

17   **A.**   That would not be correct.  It is true of some of them but

18   not all of them.

19   **Q.**   I understand.  And so you yourself, Dr. Stark, are you

20   affiliated with Verified Voting?

21   **A.**   No longer.  I was on the advisory board for some years,

22   and I was on the board of directors for some years, and I

23   resigned last year.

24   **Q.**   And how about Barbara Simmons?  Do you know if she is

25   affiliated with Verified Voting?

**A.**    Yes.  Dr. Simons is the chair of the board of Verified

Voting.

**Q.**    I apologize.  Thank you for correcting me on her name.

Mr. Favorito, is he affiliated with Verified Voting?

**A.**    Not to the best of my knowledge.

THE COURT:  Tell me where you are going, Mr. Miller,

because right now you have gone longer than Mr. Brown.  So just

tell me where you are going with this and how much longer are

you going to be.

MR. MILLER:  Your Honor, the point as to this

exhibit, which is the only piece of evidence that was produced

in discovery, is that it demonstrates a disagreement, frankly,

within the organization as to what a risk-limiting audit is.

And it includes plaintiffs in this case.

THE COURT:  Ask him a point-blank question rather

than -- why are we going through each of the individuals.  If

you want to ask him, let him read the document and ask him a

question about it or else --

MR. MILLER:  Yes, Your Honor.  I guess the basis is

to form the foundation on the individuals listed here.  I will

just ask him about two other individuals on this email chain if

that is okay.

THE COURT:  Two.  I mean, I just don't really see the

point.  But that is -- I'm not going to restrict you.  But I'm

telling you at this point, you know, you have one minute to

```
 1   wrap up.
 2              MR. MILLER:  Yes, Your Honor.
 3   Q.   (BY MR. MILLER)  Dr. Stark, Ms. Donna Curling is on this
 4   email chain too; correct?
 5   A.   Yes, sir.
 6   Q.   And Ms. Marilyn Marks is on this email chain too; correct?
 7   A.   Yes -- yes, sir.
 8   Q.   Okay.  And so if I could point you here to the email from
 9   Ms. Simons to Ms. Marks.  And we'll scroll down here to Curling
10   1000 -- excuse me -- 10019.
11        Do you recognize these emails from around Christmas of
12   last year?
13   A.   Give me a moment to orient myself.
14                 (There was a brief pause in the proceedings.)
15   A.   Yes.  I have read it now.
16   Q.   (BY MR. MILLER)  And do you recall this conversation?
17   A.   Yes.
18   Q.   And would you agree with my assessment that this is an
19   internal discussion and dispute as to whether RLAs are, in
20   fact, RLAs on a ballot-marking device?
21   A.   Internal to what?
22   Q.   To Verified Voting or I should say just interested
23   parties.
24   A.   It is not internal to Verified Voting.  There are a number
25   of parties who are not affiliated with Verified Voting,
```

1    including by that time me.

2        I mean, the president of Verified Voting, Marian

3    Schneider, had made some public comments which actually

4    triggered my resignation.  And this enunciated position is

5    still not consistent with what I intend risk-limiting audit to

6    mean and what it is supposed to accomplish.

7        I think that this is part of the reason that Verified

8    Voting and I parted ways.  Although they have come closer to my

9    position since I left.

10   **Q.**   I'm sorry.  And I take that to mean they still don't agree

11   with your position now?

12   **A.**   There are still some published materials that contradict

13   my position.  Although I understand from Dr. Simons that that

14   was not their intent.

15   **Q.**   And would you agree that Verified Voting is generally a

16   specialized group focusing on as aspects like RLAs and voting

17   machines; right?

18   **A.**   Verified Voting originally was primarily concerned with

19   internet voting and then electronic voting more generally.

20       In the last few years, they have been focusing primarily

21   on risk-limiting audits.  Yes.

22   **Q.**   And would you agree with me that reasonable people can

23   disagree and reasonable experts in the field can disagree as to

24   what constitutes effective RLAs?

25   **A.**   No, sir.  I think that anyone who disagrees with me on

1    this point is unreasonable.

2    **Q.**   So any other individual that disagrees with you is

3    unreasonable?  But you have the exact testimony; right?

4    **A.**   Well, on this particular issue, I did come up with the

5    idea.  The whole principle that it is supposed to fulfill, the

6    whole point of the audit is that it has a large chance of

7    correcting the reported outcome if the reported outcome is

8    wrong.  And everything flows from that.

9        So some people are trying to redefine it so that it only

10   corrects some kinds of errors, so that it is fine to do it even

11   on an untrustworthy paper trail.  I don't think that that is

12   the spirit of it.  That is certainly not what I intended it to

13   be.  That is not what the papers say.

14           MR. MILLER:  Thank you, Your Honor.  No further

15   questions.

16           THE COURT:  Mr. Brown, do you have anything more?

17           MR. BROWN:  I have one follow-up question.

18                   REDIRECT EXAMINATION

19   BY MR. BROWN:

20   **Q.**   Dr. Stark, putting aside your risk-limiting audit for the

21   moment, do you know of any audit no matter how well conducted

22   that could confirm this upcoming election in Georgia is

23   accurate if Georgia does not replace the BMDs?

24   **A.**   No, sir.  There is no pre-election, during the election,

25   or post-election process that can check whether BMDs altered

```
 1    votes -- enough votes to change the outcome of the contest,
 2    even if the resulting paper were tabulated perfectly.
 3              MR. BROWN:  Thank you, sir.
 4              THE COURT:  All right.  Let me just ask you one
 5    question, Dr. Stark.
 6                              EXAMINATION
 7    BY THE COURT:
 8    Q.   When you were responding to the last questions that
 9    Mr. Miller was making about whether you found it -- whether you
10    were right, whether they were right, I want to make sure I
11    understand this.  I mean, you had -- when you developed the
12    concepts and principles of a risk-limiting audit, you indicated
13    that this was a -- basically a whole paradigm development and
14    construct of how it was done and you did this sort of as a
15    mathematician and as a scientist, if I understand your prior
16    affidavits and your resumes?  Is that basically a fair summary,
17    or am I missing something?
18    A.   I apologize, Your Honor.  But I didn't quite understand
19    the question.
20    Q.   All right.  Well, my understanding -- I'm just looking --
21    was that you are an expert on statistics, on mathematics, and
22    you developed -- and that you developed the whole concept of
23    principles around risk-limiting audits.
24         And is that correct?
25    A.   Yes, Your Honor.
```

**Q.**   All right.  And so when you were responding to Mr. Miller,
if I understand what your testimony was, is that from your
perspective as the kind of creator and author of risk-limiting
audits that you -- that paradigm that you don't find that these
are acceptable modifications?  Is that a fair summary?

**A.**   Yes, Your Honor.  That the weakening of the concept
destroys the fundamental property that the audit has the -- has
a large chance of correcting the outcome if the outcome is
wrong.

     I should say that I didn't develop this in a vacuum.  This
started with work I did for the California Secretary of State
then Debra Bowen, who as part of her platform promised to
review the voting systems that had been deployed in California
and see whether they should be recertified or decertified.

     She also pulled together a working group for post-election
audit standards.  I was named to be on that working group.  And
it was after reviewing what California and other states were
actually doing, reviewing the academic literature on auditing
that I was left dissatisfied with the state of the art and
spent some months trying to figure out what might work better.

     And so it is from that practical application within the
context of an assignment from the California Secretary of State
that I developed risk-limiting audits.

**Q.**   If I understand correctly, your focus is developing a
methodology that would allow you to catch systemic errors

84

1   that -- so that you could validate the election results

2   ultimately and correct processes that were lending themselves

3   to lack of integrity in the data?

4   **A.**   Your Honor, I apologize for talking on top of you.  The --

5   this flows from the fundamental question of what would we like

6   an audit to be able to do or what would we like auditing to

7   accomplish.  And it seemed like at a bare minimum we would like

8   an audit -- we would like to know that when we are done with

9   the audit we have high confidence that the reported winners

10  really won.  And so everything flows from that.

11       We are never going to get tallies exactly right.  But in

12  contrast to financial matters, when it comes to elections,

13  there is a nice bright line for materiality.  I decided to

14  treat an error as material if it changed the electoral outcome,

15  if it changed who won.

16       So instead of worrying about every last vote, this is kind

17  of a minimum standard to say we should at least ensure that

18  everything that happened was accurate enough to determine who

19  won.  And so this is a procedure that relies on a trustworthy

20  paper trail -- and there are separate ways of establishing

21  whether the paper trail is trustworthy -- and uses that paper

22  trail to ensure that if the reported winner did not really win

23  there is a large chance of catching that incorrect ending.

24            THE COURT:  All right.  Thank you very much.  We're

25  going to take -- it is 3:04.  I have been keeping everyone's

```
 1    time.  And I took the last five minutes.  The State, as I said,

 2    took more than the plaintiffs.  Just watch it because I'm -- I

 3    am watching the time myself.  We're going to take a five-minute

 4    break and then resume.

 5            Thank you very much.  It is now 3:05.  We will resume

 6    at 3:10.

 7                 (A brief break was taken at 3:05 P.M.)

 8            THE COURT:  Plaintiffs' counsel, when we sometimes

 9    have an echo, it is helpful to separately just turn off the

10    audio and to be speaking into the phone if I remember correctly

11    from that one evidentiary hearing we had with all the people at

12    different sites.

13            MS. ASCARRUNZ:  Is this any better?

14            THE COURT:  That's better.  All right.

15            MS. ASCARRUNZ:  I apologize.

16            THE COURT:  All right.  That is fine.

17            So you are calling Dr. Halderman next.  All right.

18            COURTROOM DEPUTY CLERK:  Dr. Halderman, if you would

19    please raise your right hand.

20                         (Witness sworn)

21            COURTROOM DEPUTY CLERK:  Thank you.  Please state

22    your name and spell your last name for the record.

23            THE WITNESS:  My name is Alex Halderman.  That is

24    H-A-L-D-E-R-M-A-N.

25            Can you hear me all right?
```

1              THE COURT:  Yes.

2              THE WITNESS:  Thank you, Your Honor.

3         Whereupon,

4                   J. ALEX HALDERMAN, PH.D.,

5         after having been first duly sworn, testified as follows:

6                        DIRECT EXAMINATION

7    BY MS. ASCARRUNZ:

8    **Q.**   Perfect.  Good afternoon, Dr. Halderman.  Given that the

9    Court is familiar with your credentials and has previously

10   accepted you as an expert in computer science specializing in

11   election security, I won't go through your entire credentials

12   and we can jump right into it unless the Court has any

13   questions.

14             THE COURT:  Go ahead.

15   **Q.   (BY MS. ASCARRUNZ)**  Dr. Halderman, you testified last year

16   regarding the State's DRE and EMS system.

17        What did you do for purposes of the hearing today?

18   **A.**   Well, we have been busy.  I have been conducting forensic

19   reviews of the FBI's image of the Center for Election Systems

20   server at Kennesaw State.  I have been examining DRE system

21   memory cards and internal memory images from a set of DREs that

22   have been provided to us.

23        I have -- as of last Friday, we got access to equipment

24   from the new system.  And so I have been analyzing the BMD and

25   optical scanner system as well.

1    **Q.**   And we can hear you, but it is a little bit soft.  If you

2    can speak up or move closer to the mic, that would be helpful.

3    **A.**   Is this any better?

4              THE COURT:  Well, it is good.  It is now loud for me.

5    But that is okay.

6              THE WITNESS:  I'm sorry.

7              THE COURT:  No.  That is all right.  Everyone else

8    needs to hear.

9    **Q.   (BY MS. ASCARRUNZ)**  Okay.  So, Dr. Halderman, you said

10   that this weekend you started to do some work on analyzing as

11   well.

12        Could you explain what you did in that regard.

13             MR. TYSON:  Your Honor, excuse me.  Pardon me.  I'll

14   just object here.  The information for Dr. Halderman's analysis

15   of the Dominion system under this Court's order -- any

16   information he gained from it was protected by the protective

17   order in this case.

18             So I believe that we would need to close the

19   courtroom to hear the results of his analysis from that given

20   the issues raised in Dominion in this Court's order.

21             THE COURT:  Well, this was precisely what I tried to

22   raise with you-all yesterday and everyone said we can handle

23   it.  So I'm kind of -- no one said, oh, we're going to have to

24   have a separate proceeding.

25             MS. ASCARRUNZ:  Your Honor, from our perspective, the

1    analysis that Dr. Halderman did was of material that is

2    publicly obviously visible and available to voters and others

3    during an election cycle.  This particular set was given to

4    him -- access was given to him obviously in the context of this

5    case.

6              So we don't -- you know, the analysis that he did was

7    not particularly privy to any source code material or anything

8    along those lines or that nature.

9              THE COURT:  All right.  Well, I'm going to allow him

10   to begin.  Mr. Tyson, you can renew your objection.  I'll be

11   very sensitive to it.  And I know that we did discuss this

12   issue so that if we -- if plaintiffs' counsel think we are

13   suddenly also -- that you are in a bad spot I would prefer to

14   have Mr. -- Dr. Halderman then speak at the end of the hearing

15   because then at least we can do anything else that is a public

16   matter then and then we could have a separate -- we can adjourn

17   and I can basically then hear his testimony towards the end.

18             MS. ASCARRUNZ:  Thank you, Your Honor.

19             THE WITNESS:  I will endeavor not to reveal technical

20   details that would (unintelligible) --

21             COURT REPORTER:  There is some sort of -- I'm having

22   trouble understanding Dr. Halderman.

23             THE WITNESS:  I hear a hum in the background.

24             THE COURT:  I do too.  What happens when you speak

25   again?

```
1              THE WITNESS:  Let me try it.  Can you hear me now?

2              THE COURT:  Yes.

3    Q.   (BY MS. ASCARRUNZ)  Dr. Halderman, I think we were

4    discussing --

5              THE COURT:  I really think that it is coming from

6    counsel's office because when you speak then we get that hum

7    again.

8              MS. ASCARRUNZ:  I'll make sure to mute it when

9    Dr. Halderman is speaking.  That may help.

10             THE COURT:  All right.

11   Q.   (BY MS. ASCARRUNZ)  Dr. Halderman, with respect to the

12   analysis of the BMD materials and the equipment, what did you

13   analyze?

14   A.   I analyzed the ballot-marking device itself and the

15   accompanying optical scanner that was provided from Fulton

16   County.  Of course, this is just the beginning of the analysis.

17   We have only had the equipment since Friday afternoon.

18   Q.   And were there any particular issues you are trying to

19   resolve or questions that you wanted answered?

20   A.   Yes.

21        So the hum is back.  I'm sorry.

22             THE COURT:  Counsel, are you calling from your

23   Washington office or some -- a different office?  Are you

24   with --

25             MS. ASCARRUNZ:  Yes.
```

```
 1              THE COURT:  Surely there is somebody there who can
 2    try to deal with the hums in there.  It is like we have this
 3    constant -- it is not more than a hum.  It is higher.
 4              Can you hear it yourself?
 5              MS. ASCARRUNZ:  We don't hear it here.  We are
 6    working on it to try to resolve it as we go through.  It seemed
 7    fine a little while ago.
 8              THE WITNESS:  Perhaps if counsel could mute the
 9    microphone in Zoom while I'm giving my answer.
10              THE COURT:  Can you do that?
11              MS. ASCARRUNZ:  I have been doing that when
12    Dr. Halderman is speaking.
13              COURT REPORTER:  Now she is muted.
14              THE COURT:  I can't hear you now.
15              MS. ASCARRUNZ:  I'm sorry about that.  I was saying
16    we have been muting it over here on this end when Dr. Halderman
17    is speaking.  But the hum is still going across on the end.
18              Can you hear me?
19              THE COURT:  Yeah.  Just proceed for now.
20              Are you able to hear the question, Dr. Halderman?
21              THE WITNESS:  Could you repeat the question, please.
22    Q.   (BY MS. ASCARRUNZ)  I have lost track of it.  But I think
23    the question was:  What specific questions or issues were you
24    trying to resolve in your review of the system?
25    A.   Well, so the initial review I have been doing has been a
```

form of penetration testing.  I'm looking for attacks that

could be executed against the system, ways that attackers could

get information out of it, even simple things that an adversary

could do to try to forge votes.

**Q.**   And what were you able to find?

**A.**   Quite a lot actually, given the amount of time.  We were

able to construct -- we were able to construct an end-to end

demonstration of one particular attack.  And it was able to

find, quote, a number of different -- a number of different

avenues that an attacker could use to do even more damage.

     Overall, the analysis so far has further confirmed my

existing impression based on studies performed in other states

that there is significant vulnerabilities in the Dominion

system.

**Q.**   Let's get down to specifics.  You mentioned an end-to-end

demonstration of an attack.  What is that?

          MR. TYSON:  Your Honor, at this point, I'll renew my

objection in terms of whatever Dr. Halderman is about to speak

to.  It is going to be from the information he learned in this

process of his review that the Court allowed.

          His demonstration is to discuss something that has

not been tested by both experts, that has not -- is subject to

the protective order.  So we will renew our objection to this

being done in open court.

          THE COURT:  What does plaintiffs' counsel have to

1    say?

2           MS. ASCARRUNZ:  Your Honor, we believe, as I said

3    before, that this was information gleaned from equipment that

4    is visible to the public and available to the public.

5           Dr. Halderman did not review or look at any

6    proprietary information that was produced by the defendant.

7    That being the case, there is some material within his

8    testimony that we can cover that is not arguably within the

9    scope of any protective order.  And I think Dr. Halderman

10   already committed to not revealing any technologically, you

11   know, sensitive information.

12          THE COURT:  All right.  What I think we should do is

13   -- unless Dr. Halderman is about to leave -- needs to leave for

14   some urgent appointment we should defer him -- his testimony to

15   a little later in the afternoon.  And then he can -- you can

16   begin in the public while we have a public connection.  And he

17   can testify about anything that is safely not confidential.

18   And then we can go off and resume ourselves privately.

19          MS. ASCARRUNZ:  That is fine.  Thank you, Your Honor.

20          THE COURT:  All right.

21          MS. ASCARRUNZ:  Dr. Halderman --

22          THE COURT:  Go ahead.

23   Q.   (BY MS. ASCARRUNZ)  Dr. Halderman, we will set aside for

24   now the analysis that you did over the weekend and go through

25   some of the other issues that you had analyzed in this case.

1           Did you review --

2                THE COURT:  Let me ask you this:  What I was trying

3      to say is -- I mean, is he your last witness for the day?

4                MS. ASCARRUNZ:  No, he is not, Your Honor.

5                THE COURT:  So what I'm saying that would make better

6      sense, unless there is some foundation -- existential

7      foundation, why can't we just wait and let Dr. Halderman

8      talk -- begin his testimony later?  And we'll have a continuity

9      rather than having him come and then somebody else and then him

10     coming back.

11               MR. CROSS:  Sorry, Your Honor.  This is David Cross.

12     The next witnesses, I think, are going to run into the same

13     issue, Mr. Hursti, maybe Ms. Dufort.  So I don't know if --

14     from our perspective, this is the same as the hack that he did

15     to the DRE in the courtroom, which was public.  It is the same

16     style of presentation.

17               He is not going to get into the specifics of how it

18     is done other than at a high level.  So nothing technical.

19     There was no objection when we did that before, and that was

20     the system used.

21               So it is the same approach.  But we are going to have

22     the same issue because the next two witnesses are going to talk

23     about the same equipment.

24               MR. TYSON:  Your Honor, from the State defendants'

25     perspective, I mean, obviously the plaintiffs would not have

1    had access to this equipment without the Court's order allowing

2    it.  It is not something that has been shared with us so that

3    we know what is going to be done here.

4         But to have someone who -- like Dr. Halderman who has

5    been found by the court in Pennsylvania in *Stein vs. Boockvar*

6    that he acted more as an advocate than an expert to demonstrate

7    something that may or may not be what it appears to be and for

8    which we have had no opportunity to test or see if it is what

9    it says it is, especially in the current environment regarding

10   the legitimacy of elections, this is definitely at least

11   information related to the security of voting systems covered

12   under the protective order.

13        I just -- I don't see that there is a reason why this

14   needs to be carried out in open court, given the issues and

15   given the stage of this case where we have had no opportunity

16   to test or even address whatever it is Dr. Halderman is about

17   to show.  I don't know what that is because I haven't seen it

18   and it has not been shared with us.

19        THE COURT:  I'm just trying to understand to move

20   forward because I'm -- A, I really think you should avoid the

21   attacks on any witness at this juncture.  Secondly, I'm willing

22   to consider that if that is his testimony.  But I was trying to

23   get to issues that were with him basically testifying in a way

24   that it would be more seemless.  So really basically plaintiffs

25   just -- you picked up -- somehow you didn't hear what I was

1    saying.

2           But you are telling me that Dr. Hursti has the same

3    issue?  That he was also looking at the documents at the -- all

4    right.  Well, then what --

5           MR. CROSS:  Well, Your Honor --

6           THE COURT:  What we need to do then -- I'm sorry.

7           MR. CROSS:  I understand.  I'm sorry.

8           THE COURT:  What we need to do is take a five -- a

9    ten-minute recess then again and let me talk to you-all on the

10   phone because I can't -- first of all, there is this hum

11   that -- Mr. Cross, that somebody has to deal with in the firm.

12   And because it is just -- it is going to drive us crazy.

13          And, secondly, I would like to understand what is

14   coming up next in the testimony and presentation.  Of course,

15   there is a strong degree of interest in elections.  I

16   understand the State's interest in basically not -- in having

17   the electorate feel confident about the electoral processes.

18          But there is also strong interest in openness about

19   this.  So this is -- but I don't know what is coming up.  So it

20   is really very difficult for me to manage from afar.  So I

21   think just -- I'm very sorry to the public that we are jumping

22   up and down and we are having these problems.  And it is

23   obviously to some extent a function of Zoom and some of the

24   sensitivity of the subject matter and my allowing this matter

25   to proceed at this -- at this time, which I think I also had an

```
1   obligation to do.

2          But, anyway, it is 3:30, and we'll -- we have the

3   telephone number we have been using to have phone conferences,

4   Counsel?

5          MR. TYSON:  Yes, Your Honor.

6          MR. CROSS:  Yes, Your Honor.

7          THE COURT:  All right.  Mr. Brown, do you have it

8   too?

9          MR. BROWN:  I'll get it, Your Honor.  Thank you.

10         THE COURT:  All right.

11         All right.  Mr. Martin, could you just establish that

12  line?  And we'll all get on that -- anyone who is counsel.

13         COURTROOM DEPUTY CLERK:  I'm going to put this on

14  hold, and I will open that right now.

15         THE COURT:  Thank you very much.  I appreciate it and

16  anyone who is -- anyone who is on this Zoom line, please mute

17  yourself and we will get back to you shortly.

18                 (Whereupon, the transcript continues with the

19                  parties, counsel, and the Court speaking on a

20                  telephone conference, as follows:)

21         THE COURT:  ███████████████████████████████████████

22  ███████████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████

25  ████████████████████████
```



1     MR. CROSS:



UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

MR. TYSON:



UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT





UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
 1
 2        MR. MILLER:
 3
 4
 5
 6
 7
 8
 9
10        THE COURT:
11
12        MR. CROSS:
13        THE COURT:
14        MR. TYSON:
15        THE COURT:
16
17
18        MR. CROSS:
19
20
21
22
23        THE COURT:
24
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT





1    MR. BROWN:

2        MR. McGUIRE:

3

4

5        MR. TYSON:

6

7        MR. McGUIRE:

8

9

10

11

12        MR. TYSON:

13

14

15

16        MR. McGUIRE:

17

18

19

20

21    THE COURT:

22

23        MR. McGUIRE:

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
 1
 2
 3
 4
 5          MR. TYSON:
 6
 7
 8
 9
10          MR. McGUIRE:
11
12
13
14
15          MR. TYSON:
16          MR. McGUIRE:
17          MR. CROSS:
18
19          THE COURT:
20          MR. CROSS:
21
22
23
24
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



1

2

3

4

5

6

7    THE COURT:

8

9

10   MR. CROSS:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT





UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

113



UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
 1
 2
 3
 4           MR. CROSS:
 5
 6
 7           THE COURT:
 8
 9
10
11
12     COURTROOM DEPUTY CLERK:
13
14           THE COURT:
15
16     COURTROOM DEPUTY CLERK:
17
18           THE COURT:
19
20
21
22     COURTROOM DEPUTY CLERK:
23           THE COURT:
24
25     COURTROOM DEPUTY CLERK:
```

```
 1            MR. TYSON:  ██████████████████████████

 2            MR. CROSS:  ████████████████

 3                 (The telephone conference proceedings were

 4                 thereby concluded at 4:05 P.M. and all parties

 5                 returned back to the Zoom conference.)

 6            THE COURT:  Are we ready to switch out witnesses?

 7  And I will explain to those who are present what is going on.

 8            MR. BROWN:  Yes, Your Honor.

 9            THE COURT:  Is Mr. Hursti around?

10            MR. McGUIRE:  He looks like he is on Page 2 of 5 as

11  far as the pictures.

12            THE COURT:  Oh, hi.  And do any of the geniuses here

13  have a way of getting him to be on Page 1?

14            COURT REPORTER:  Maybe if he speaks, Judge.

15            COURTROOM DEPUTY CLERK:  If he turns on his video, he

16  will appear.

17            THE COURT:  So is everyone ready to begin at this

18  point?

19            MR. BROWN:  Yes, Your Honor.

20            MR. CROSS:  Yes, Your Honor.

21            THE COURT:  Okay.  Ladies and gentlemen who are

22  listening in as members of the public, I determined that -- at

23  least initially that I should hear Dr. Halderman's testimony in

24  a sealed proceeding basically in a -- at the conclusion of the

25  testimony today.  And then I will determine whether or not any
```

1    portions of it can be released on the transcript and any of the

2    exhibits.

3          I will explain that the Court authorized plaintiffs

4    with their expert to examine the sample BMD and associated

5    equipment.  And they had purchased also a printer as the one

6    that was being used in any voting site.  But part of the

7    ability to do that was an agreement to keep information

8    regarding the operation of the BMD confidential and the

9    internal operation.

10         And the question really is whether the testimony is

11   going to be interfaced in such a way that that would make it

12   difficult.  The plaintiff attempted to purchase a BMD on the

13   market but would not be sold one.  So that was how we ended

14   up -- or they ended up in this position and I had to address on

15   one hand their access to the information and on the other hand

16   the State's interest in protecting confidentiality of the

17   internal processes for other security reasons.

18         And there were other issues as well.  So not knowing

19   how the testimony is going to end up exactly and knowing that I

20   have still the option of making it available otherwise and not

21   wanting to hold this hearing up further, we discussed the other

22   witnesses' testimony.  I think it was advisable that we start

23   other witnesses scheduled for today.

24         So is Dr. Hursti the next witness?

25         MR. McGUIRE:  Yes, Your Honor.  Mr. Hursti is ready

```
 1    to be called.
 2            THE COURT:  All right.  I see him now that he is
 3    there.  Thank you very much.
 4            Mr. Hursti, thank you.  You may go ahead.  Just one
 5    second.
 6            Go ahead, Mr. Martin.
 7            COURTROOM DEPUTY CLERK:  Mr. Hursti, if you would
 8    raise your right hand, please.
 9            (Witness sworn)
10            COURTROOM DEPUTY CLERK:  Thank you very much.  If you
11    would please state your name and spell your last name for the
12    record.
13            THE WITNESS:  Harri Hursti, H-U-R-S-T-I.
14            COURTROOM DEPUTY CLERK:  Thank you.
15       Whereupon,
16                         HARRI HURSTI,
17       after having been first duly sworn, testified as follows:
18                       DIRECT EXAMINATION
19    BY MR. MCGUIRE:
20    Q.   Mr. Hursti, just as the outset, have you had any access to
21    Fulton County election equipment that was produced on
22    September 4 pursuant to the Court's order and subject to the
23    confidentiality or the protective order?
24    A.   I have not.
25    Q.   Okay.  Have you had access to any other discovery material
```

1    that has been produced in this case under a designation of

2    confidential or attorneys' eyes only?

3    **A.**    I have not had access.

4    **Q.**    Okay.  Mr. Hursti, Mr. Halderman began to testify about

5    security of distributed components of the voting system.  I

6    want to ask you about the security of the central components,

7    the system core, the EMS.  I also want to ask you about how the

8    system records and tabulates votes.

9        I'm going to begin with your background.  You have -- you

10   were -- the Court noted in August 2019 that you are a

11   nationally-recognized cyber expert.  I would like to just talk

12   about your expertise in two different areas, voting system

13   security and ballot scanning.

14       First of all, on voting system security, can you tell us a

15   little bit about how you -- about your background in that area?

16   **A.**    I was invited by election supervisor Ion Sancho back in

17   2005 to --

18            THE COURT:  Speak a little more slowly -- all

19   right -- so that --

20            THE WITNESS:  I'm sorry.  English is my second

21   language.

22            THE COURT:  No.  That is quite all right.  I have a

23   member of my family or did who had many different accents as

24   well.  I understand.  But I am trying to deal with a court

25   reporter who is trying to get everything down that you said.

A.    So I was voluntarily invited by the election supervisor

Ion Sancho of Tallahassee, Florida, to examine the vote --

          COURT REPORTER:  Slow down, please.

          THE COURT:  You were invited by someone in

Tallahassee?

          THE WITNESS:  Yes.  Tallahassee, Florida, by the

election supervisor Ion Sancho to examine --

          THE COURT:  We'll get the name later.  The election

supervisor there in Tallahassee -- we'll get the name at the

conclusion.  All right.

A.    I will take the microphone here, so it is better

hopefully.

      -- so to examine the system he was using.  And

subsequently I have been part of a number of studies, most

notably a study commissioned by Secretary of State Ohio

Jennifer Brunner called EVEREST, which examined every single

voting system used in the State of Ohio.

      That was one of the many studies.  So I have been spending

15 years both in United States and overseas examining the

security properties of voting systems.

Q.    (BY MR. McGUIRE)  Thank you.  Have you given testimony as

well before any presidential commissions?

A.    Correct.  I was invited by the Presidential Advisory

Commission on Election Integrity also called Pence-Kobach

Commission to testify about election security properties.

**Q.**   And are you involved in any -- in any professional or interest group conferences related to security?

**A.**   Yes.  I am a cofounder and co-organizer of the Voting Machine Hacking Village at DEF CON.  DEF CON is one of the oldest and largest security community and hacker conferences in the world, which attracted in 2019 when we were last time in person 30,000 people to be present in Las Vegas.

**Q.**   And in the course of your DEF CON conference, have you ever looked at or examined BMD-type devices?

**A.**   Yes, I have.  We have been looking on eBay and government surplus stores and bought everything what we find.  So yes, we have had BMD-type of devices, the first device being AutoMARK Device.

COURT REPORTER:  A what kind of device?

THE WITNESS:  AutoMARK.  It is a brand name.

THE COURT:  AutoMARK, could you spell it for us.

THE WITNESS:  A-U-T-O-M-A-R-K.

THE COURT:  Thank you.

**Q.   (BY MR. McGUIRE)**  I would also like -- I also understand you have an expertise in ballot scanning.

Can you talk about your background in that?

**A.**   Back in 2005 when I started, one of the first things I realized is that I need to build an open source software to examine ballots.  So I started both building a system how to scan ballots and then process images.  Eventually that system

1    has been used to process images, which I have not produced

2    myself.

3         So I have an expertise both how to examine images and also

4    how to examine images produced by others.  Also I have a

5    background in computer graphics as well.  So I have been

6    leveraging my knowledge about digital imaging technologies in

7    order to have a quick start in ballot images.

8    **Q.**   And have you participated in any audits that deal with

9    ballot scanning software?

10   **A.**   One of the public pilots we did was Arapahoe County which

11   is outside of Denver, Colorado, where we conducted multiple

12   different ways of risk-limiting audits.  One of those involved

13   reimaging the images.  That was a republican primary of summer

14   of 2014.

15            MR. McGUIRE:  Your Honor, I would like to -- I can go

16   into more detail.  But in the interest of time, I would like to

17   tender Mr. Hursti as an expert in two things, voting system

18   cybersecurity and ballot scanning, and then ask him some

19   questions about that in those areas.

20            MR. TYSON:  Your Honor, we would have no objection to

21   the ballot scanning part of Mr. Hursti's expertise.  I will

22   want to ask him some more questions about the cybersecurity

23   issues, specifically related to Dominion.  We would object to

24   that, but I understand I can cover that in cross.

25            THE COURT:  All right.  That is fine.  I think that

1    is certainly enough of a showing that he could proceed.

2              MR. McGUIRE:   Thank you.

3    **Q.   (BY MR. McGUIRE)**  So, Mr. Hursti, you have given four

4    declarations in this case; correct?

5    **A.**   Correct.

6    **Q.**   Okay.  I want to talk about the ones that you gave in late

7    August and September of this year.  Specifically in your

8    declaration of August 24, which was Document 809-3 on the

9    docket, you talked about two investigations you had conducted.

10   One is June 9 where you were a poll watcher.  The other is

11   August 11 when you did a Rule 34 inspection in Fulton County.

12   I want to cover those.

13             First of all, June 9.  What did you do on June 9?

14   **A.**   On June 9, we traveled across different precincts on

15   election day.  The day before election day, I went to the

16   Atlanta Congress Center, whatever was that where the absentee

17   ballot, mail-in ballot process was, observing the equipment

18   from across from the room of what equipment they had, how they

19   processed, how the processes worked.  And then after the

20   election day, observing the precincts, I went to English Street

21   to observe from the observation area how the election night

22   tallying and the information acquisition started.

23   **Q.**   Okay.  Thank you.  And so in the course of your June 9

24   observations, you saw test ballots being printed; is that

25   right?

**A.**   So in that area in one of the locations, the ballot
marking -- I arrived to the location because there was a report
that there was irregularities in the ballot-marking device
operations.  I was told that the ballot-marking device produces
test ballots.

       And while I was observing, I saw a voter who went to scan
their ballot.  The poll worker -- after the machine rejected
multiple times, the poll -- he sent the -- told that this is a
test ballot.  The voter went back with the test ballot and
picked up the real ballot and returned the test ballot into the
tray.  So I observed that, and I didn't see the ballot, but I
believe that the poll worker when -- when the poll worker said
that this is a test ballot.

**Q.**   So you detailed that in other observations in your
declaration; correct?

**A.**   Correct.

**Q.**   Okay.  As far as your August 11 visit to Fulton County
election center, are your observations in your declaration --
does that substantially capture what you saw that day as well?

**A.**   Correct.

**Q.**   Okay.  So, Mr. Hursti, I want to ask you:  Based on your
expertise and based on what you observed, the things that you
have detailed in your declarations, do you have an opinion
about whether the Dominion voting system using BMDs is capable
of producing an accountable election result?

**A.**    Taking into account that I, as I detailed in the
declarations, saw multiple different kinds of irregularities
and an unexplained behavior, there is a serious doubt that the
system was operating correctly.  And in a theoretical level, as
detailed already by Professor Stark, when you don't have an
end-to-end chain of the voter's intent, when there is a system
which can either maliciously or by honest error reproduce wrong
kind of evidence, you don't have a capability of auditing.

**Q.**    Okay.  So without a capability of auditing, can you trust
the election results coming -- and without the chain of custody
and other issues you have described, you know, can you trust
the results coming out of the Dominion voting system?

**A.**    I personally would say I cannot trust it.  And also this
is not an election-specific issue.  Any other industry, any
other system with similar faults in those same areas would be
equally untrustworthy.

**Q.**    Okay.  In your opinion, specifically looking at this as an
election system, as a voting system, is there a solution to the
problem of the system's untrustworthiness?

**A.**    Yes, I believe there are.  Based on the fact -- fact and
observations and what I have gathered, the solution would be
two-fold:  First, moving to the hand-marked paper ballots.  And
in the case of a precinct in-person voting, the deficences of
that scanner can be overcome by instructing voter carefully to
vote and providing a pen, which will be known to be recorded

1   well by the scanner, what would be a black felt pen so that it

2   gives no reflection.  And at the same time, in home voting and

3   email voting -- home voting and mail-in voting, the solution

4   would be to use already existing scanners with more efficient

5   way producing a higher quality, more information, retaining

6   files to be used.

7   **Q.**   Okay.  So let me just break that down.  Are you suggesting

8   the continued use of the BMDs?

9   **A.**   I am not suggesting the continued use of BMDs.  I am

10   strongly recommending to go to the hand-marked paper ballots

11   for the reasons being that when the system in between cannot be

12   trusted the chain of custody is broken.

13   **Q.**   Okay.  Let me ask you a question about scanners.  Do you

14   have an opinion whether the Dominion system's precinct and high

15   volume scanners, the two different kinds of scanners, can be

16   relied upon to accurately count all the votes?

17   **A.**   Not at this current type of settings and the way they

18   operate.

19   **Q.**   Is that no, you don't have an opinion or no, they can't be

20   trusted?

21   **A.**   No, they can't be trusted under the current configuration

22   and how they are currently being used.

23   **Q.**   Okay.  So is there a solution to that problem for the

24   precinct scanners?

25   **A.**   Yes, there is a solution.  As I stated before, my opinion,

1    the relief for the deficiencies of the system would be

2    carefully instructing voters how to fill the oval and enforce

3    use of a proper marking device, so using a black felt pen,

4    which that scanner seems to be very much liking and recognizing

5    more accurately than other kinds of pens.

6    **Q.**    Okay.  And as far as the high volume scanners that are

7    used to scan all the mail ballots, is there a solution to their

8    unreliability at counting votes?

9    **A.**    Yes, I believe there is.  That scanner is far more capable

10   than the precinct scanner.  So that device can be configured to

11   capture higher quality and more information retaining images.

12   So instead of using a bilevel black or white capture images

13   which contain more information, for example, color or gray

14   scale images.  And also that scanner is natively having higher

15   resolution than what is used to capture today.

16   **Q.**    Okay.  So I'm going to try and cover all that in the time

17   we have left.  Let me just jump quickly to the security issue,

18   which dealt with whether the system can be trusted.

19        In your declaration, you talked about the system -- the

20   central system not being hardened.  What do you mean by

21   hardening a system?

22   **A.**    Hardening is the standard basic security practice under

23   the well-accepted principle that a general purpose device when

24   used with a lot of software for different purposes is more

25   vulnerable than a limited system which has all the minimum

1    necessary to accomplish the task.  So it is just really using a

2    general purpose machine via single purpose machine.  This is by

3    eliminating and removing all unnecessary software, removing all

4    unnecessary services, and removing all unnecessary drivers to

5    make it the bare bone minimum needed for the task.  And that is

6    by reducing using the attack surface making it inherently more

7    secure.

8    **Q.**   And based on what you have seen in your observations, has

9    the attack surface on the Fulton and other county servers been

10   reduced?

11   **A.**   It has not been reduced.  It is visibly obvious just

12   seeing in the start menus the icons of software which

13   absolutely doesn't have any role in election system.  But also

14   in the examination of or inspection of the system in Cherokee

15   County and the information they produced show that to be the

16   case beyond any kind of question because they produced

17   information of all programs running, all services running, all

18   drivers running, and software installed.  And that list is

19   comprehensively proving that the system has been not hardened.

20        Also the manager of election system there -- I'm sorry.

21   I'm dyslexic.  He also outright stated to me that he -- his

22   understanding also is that system has not been hardened.

23   **Q.**   Okay.  I would like to show you what is marked as P --

24   Exhibit PX 4, if they can pull that up on the screen.  If not,

25   I'll share my screen.  Let me see if we have got anyone able to

1   do that.  So can we widen that so the focus is on the screen?

2       So, Mr. Hursti, you said visibly -- you said the lack of

3   hardening was visible.  Is this an example of that?

4   **A.**   This is very much example of that.  It is very much

5   visible that there are a number of computer game symbols on the

6   screen, and it is irrelevant whether those are installers or

7   can be highjacked the game itself.  And any hardening would

8   remove all of this to be visible and remove all remains of that

9   from the system.

10  **Q.**   So -- and I'm sorry.  You said those were computer games?

11  **A.**   That is correct.  Some of those games are very much

12  recognizable, especially the bald gentleman on the bottom left

13  corner.  That game is Homescapes from a Russian gaming company

14  where that Russian gaming company has been over times -- a

15  number of times under scrutiny about their business practices

16  and also the companion software and so-to-speak alleged spyware

17  that is spread with their games --

18  **Q.**   And what election server is this we're looking at here?

19  **A.**   This is a -- it is labeled underneath the monitor.  This

20  is in Fulton County on the right-hand side of the central

21  tabulator rack.  This is one of the client computers which this

22  part of the computer was used to upload the early voting vote

23  at the time when I arrived to the polling location on the

24  election night.

25  **Q.**   Okay.  I would like to pull up next Exhibit PX 5.  And if

1    you can enlarge that as well, if possible.

2        Mr. Hursti, is this -- is this a similar example or

3    something different?

4    **A.**    This is a similar example.  This is from Cherokee County.

5    And this is a Windows integral interface, which they also

6    produced showing that Microsoft probably used Xbox gaming

7    console accompanying software is installed.  Definitely not

8    something that you need in an election system.  And if

9    especially this is a companion software, which is intended to

10   be communicating, this is opening attack surfaces -- vulnerable

11   attack surfaces.

12   **Q.**    Do you mean attack surfaces?

13   **A.**    Yeah.  Attack surfaces.

14            THE COURT:  Surfaces, Ms. Welch.

15   **Q.    (BY MR. McGUIRE)**  So in addition to what is installed on

16   the server, have you taken a look at any logs to try and find

17   out if these vulnerabilities have been exploited?

18   **A.**    So we were provided by Fulton County a series of logs.

19   And one of the observations immediately was that from the

20   election night the security log is only 29 minutes long.  It is

21   covering only a very short period of time, about 5:00 P.M.

22   to --

23   **Q.**    Let me stop you there.  Let me stop you there, and I'll

24   ask the technician to remove the exhibit.  Can we replace that

25   exhibit with Exhibit 6 -- PX 6?  I'm sorry.  And can you widen

1    that, please?

2         So, Mr. Hursti, what are we looking at in PX 6?

3    **A.**   We are looking at a Microsoft event viewer, which is

4    standard software to view all the logs of the system, viewing

5    application log, which was from Fulton County, provided when

6    Fulton County was asked to provide a log of the server.  This

7    is the application log of that server in the viewer.

8    **Q.**   Okay.  And that blue line there, is that -- what is that

9    highlighting?

10   **A.**   This is highlighting the fact that in this log, which is

11   application log, there is a significant gap of time from

12   6:59:34 A.M. to 3:52:31 P.M. where no log entries were present.

13   This is significant because if you see the previous days where

14   no election was conducted you had a previous day, which is

15   Monday 1561 log entries and on Sunday 1661 entries --

16            THE COURT:  Slow down because if I'm having trouble

17   the court reporter is.  So we have -- we are going to go over

18   this again.  We have this day, which is I guess --

19            THE WITNESS:  This is a log provided by Fulton

20   County.

21            THE COURT:  Right.  And what is the date?  It is

22   6:59 A.M. in the morning?  Is that what you are saying?

23            THE WITNESS:  6:59:34 in the morning on the 11th of

24   August --

25            THE COURT:  All right.

1        THE WITNESS:  -- which is the election day.  So log

2   stops -- the application log stops at that point of time in the

3   morning of the election day, and it continues 3:52:31 P.M.

4   There are no log entries in between those.

5        THE COURT:  All right.  Go ahead.

6   **Q.   (BY MR. McGUIRE)**  Mr. Hursti, what would you have expected

7   to see on election day in a log of an election server in a

8   county that was conducting an election?

9   **A.**   So, first of all, I compared this same period of time for

10  the day before and the day before that, so Sunday and Monday.

11  And I found that even when the election was not going on there

12  was 1561 log entries on the day before and 1661 log entries on

13  the same period of time on Sunday, which means that even if the

14  system is not used it will produce log entries.

15       Also, accompanied with this was a system log which shows

16  20 entries in this period of time spread over the whole period

17  of time showing that the system was up and running at the time.

18  So because of the election, I definitely would at least expect

19  to see the same amount of entries than what is the amount of

20  entries in the day when the election is not going, especially

21  because after the 3:00 P.M. when the log resumes on the gap

22  there is extremely -- there is a heightened amount of entries

23  from that period of time.  So this gap -- it cannot be

24  explained.

25  **Q.**   Okay.  So, Mr. Hursti, we can go on and on like this.  But

```
 1    just in the interest of getting to the scanning portion, I just
 2    want to ask you real quick just a single question.
 3         In addition to hardening, is physical security something
 4    that you have observed being a problem?
 5    A.   Physical security has been very much part of the problem.
 6    In both locations, it is not because of any malicious.  It is
 7    just probably not training and instructing how physical
 8    security should be conducted.
 9    Q.   So -- and that would include things like accessibility to
10    the equipment from unauthorized persons?
11    A.   Correct.  One of the very basic practices is that in order
12    for a system to be hardened physically all ports which are not
13    used in the computers are physically blocked or temporarily
14    blocked because the only thing -- this is an attack computer
15    made in U.S. costing $99.  You can take this and plug it in for
16    30 seconds to 60 seconds.  That is all it takes to take over a
17    system.  So --
18    Q.   Let me stop you there.  So you are holding up a USB stick;
19    is that right?
20    A.   This looks like USB.  It is a USB stick.  But this is an
21    attack computer of its own freely available in the market, made
22    in America, designed in America.
23    Q.   You just have to put that into an open port, and you can
24    take over a computer?
25    A.   This can be programmed to carry out ultimate attacks.
```

1    There have been a number of times using this particular device

2    and assisted in the demonstration of how vulnerable systems are

3    if they are not physically protected.

4        The general purpose computer like what is used here is

5    consumer grade computer, cannot defend itself if physical

6    access is granted.  And it is so quick -- the time period you

7    need to carry out, so on and so on.

8    **Q.**   If there were an attack, would you expect to see evidence

9    in a log file?

10   **A.**   If there would be attack, there should be some kind of

11   evidence there.  Or the attack is sophisticated enough to

12   remove all evidence.

13   **Q.**   So you would have missing log entries?

14   **A.**   Missing log entires is a culprit of sophisticated attack.

15   **Q.**   I would like to jump to scanning next.  Now, there are two

16   types of scanners.  There are central count scanners, and there

17   are precinct scanners, and I want to talk to you about both.

18       First, let's talk about the central count scanners.  Tell

19   me -- tell me what your concerns are with the central count

20   scanners.

21   **A.**   So the central count scanner -- the whole import of the

22   general purpose computers, general purpose scanner, cheap, low

23   quality, if you may, but no quality -- not that much quality is

24   needed in consumer product.  So that is one part.

25       But second part is the way it is used because this is

134

```
 1    really for the central count scanner it is like driving a

 2    Porsche with the first gear blocked.

 3         Sorry.

 4              COURT REPORTER:  Slow down, please.  I am not

 5    following you.

 6    A.   So the way the scanner is used in this environment is like

 7    driving your sports car locked on the first gear.  The scanner

 8    itself is capable of producing a lot higher orders of magnitude

 9    higher images than what it is currently doing.

10    Q.   (BY MR. McGUIRE)  So let me -- so let me see if I

11    understand.

12         What you are saying is that scanner is recording a lower

13    quality image than it is capable of?

14    A.   That's correct.

15    Q.   Okay.  Why is it doing that?

16    A.   The computers are doing exactly what they are asked to do.

17    So as part of the configuration, that scanner is instructed to

18    produce low quality images with a reduced amount of

19    information.

20    Q.   Okay.  I would like to show you Exhibit PX 7.  I would

21    like to go to the second page and blow it up.

22         You know what?  Hold on just a minute.  So actually I'm

23    sorry.  I mistook that.  Let's look at the first page, but

24    let's blow it up.  If we can scroll down to show the three

25    races that are on there.
```

1          So, Mr. Hursti, this is PX -- Exhibit PX 7.  And are you

2     familiar with this -- what this is showing?

3     **A.**   Yes, I am familiar with what this is showing.

4     **Q.**   Can you tell the Court what we're looking at?

5     **A.**   We are looking for a ballot image, which has reduced the

6     only white and black, no gray scales, and the ballot markings,

7     which the voter has conducted in the marking of this ballot.

8     **Q.**   So these are real -- this is a real ballot that was

9     scanned in the central count scanner?

10    **A.**   Correct.

11    **Q.**   And these -- this is the image that the scanner recorded?

12    **A.**   Correct.

13    **Q.**   Okay.  And you are saying that this is a lower quality

14    image than the scanner could have recorded?

15    **A.**   Correct.  Because this image is only 200 DPI, which is a

16    fraction of what the scanner is capable.  Also, this scanner --

17    this image has been reduced to have only black or white pixels

18    based on algorithms and so-called business logic and the

19    scanner itself is capable of producing color images and gray

20    scale images.

21    **Q.**   Okay.  So now --

22              THE COURT:  The scanner itself is capable of

23    producing what?

24              THE WITNESS:  Color images and gray scale images.

25              THE COURT:  Gray scale.  All right.  And you were --

```
 1   the initials you used before, just so that the court reporter

 2   gets it, was DBI or --

 3              THE WITNESS:  DPI, dots per inch.

 4              THE COURT:  Dots per inch.  Okay.  Thank you.

 5   Q.   (BY MR. McGUIRE)  Mr. Hursti, that first race that says

 6   district attorney of the Atlanta Judicial Circuit, do you see

 7   that?

 8   A.   I do see that.

 9   Q.   And do you see the mark next to Fani Willis?

10   A.   Yes, I do see that.

11   Q.   Would you expect a scanner to be able to count that mark?

12   A.   Certainly I would.

13   Q.   Okay.  Let's go to Page 2.

14        So, Mr. Hursti, what does Page 2 show?

15   A.   Page 2 shows the software interpretation of what it saw on

16   the ballot.

17   Q.   And so this is the Dominion's central count scanner's

18   interpretation of how to count the ballot we just saw?

19   A.   Correct.

20   Q.   And under that first race for district attorney of the

21   Atlanta Judicial Circuit, it says Fani Willis.  That is what

22   you would have expected; correct?

23   A.   Correct.

24   Q.   And so let's go back to the previous page one more time

25   and scroll down to the race for sheriff.
```

1        And you see that very similar mark there, do you not?

2    **A.**    Yes, I do see it.

3    **Q.**    And that is a vote for Theodore Jackson?

4    **A.**    I would say it is a vote.

5    **Q.**    Let's go to Page 2.  Now, under -- on that record there

6    where it says sheriff, it says blank contest.  What does that

7    mean?

8    **A.**    It means that the voting system did not record any vote

9    being cast by the voter.

10   **Q.**    Is this expected behavior for a central count tabulator?

11   **A.**    This is not expected behavior.

12   **Q.**    Okay.  How can you explain what we are seeing here?

13   **A.**    What we are seeing here is that the scanner is reducing

14   all information to either black or white and that

15   predetermination tells what the image is recording.

16       And after that, a mathematical algorithm is applied which

17   is only blindly counting how many black and white pixels it

18   sees and based on that make a determination if there is a vote

19   or not.

20       So based on that reduced information, the system didn't

21   cross the threshold to see that as a vote or even as ambiguous

22   mark.

23            THE COURT:  By ambiguous mark, you mean it didn't

24   reflect either an ambiguous mark or --

25            THE WITNESS:  Or as a vote cast.

1    Q.    **(BY MR. McGUIRE)**  Just to drive home that, what would have

2    happened if it had been marked as an ambiguous?

3    A.    Well, that would have meaning that the system sees

4    something, which it says that it is not clear whether it is

5    mark or not.  And that would have then gone to the human

6    process.  But in this case, the system didn't even see that

7    there would be a mark of requiring a human observation.

8    Q.    I would like to take down this exhibit and put up Exhibit

9    PX 7-1 -- 7.1.  So let's go to Page 2 of this one.

10        So, Mr. Hursti, do you recognize this exhibit?

11   A.    Yes, I do recognize this exhibit.

12   Q.    So what are we looking at in this one that is different

13   from the other exhibit?

14   A.    So these are not ballots which have been marked by a real

15   voter.  These are test ballots, which we marked with various

16   type of colors of pens and various of ways to see what the

17   scanner is recognizing as a vote and what it is not recognizing

18   as a vote.

19   Q.    And this was done not on a central count scanner but on a

20   precinct scanner; correct?

21   A.    That is correct.

22   Q.    Okay.  Why do we see two different ballots?

23   A.    Well, we see two different ballots because they are

24   produced by two different resolutions and qualities, which is

25   obvious from two different things.  First of all, on the

1    right-hand side, you don't see any of the ovals even.  So

2    even --

3               THE COURT:  Ovals?  You don't see any of the ovals

4    that you would circle in?  Is that what you are saying?

5               THE WITNESS:  Correct.  The vote targets which are

6    signified as an oval -- this is on the left side -- have

7    disappeared on the right-hand side.  The barcode on top

8    right-hand corner is a blur to the extent that most of these

9    barcodes can't be any more recognized and interpreted because

10   of the low quality.

11              And also more -- very importantly, if you observe the

12   text under the date, you see that the text is not evenly

13   recognized from left to right.  Instead, it is disappearing on

14   the right-hand side.  All of these are hallmarks of bad quality

15   scanning and bad quality technology.

16   **Q.    (BY MR. McGUIRE)**  Okay.  And let's go to the next page.

17   And here you have a colored mark.

18        Is this showing the same thing?

19   **A.**   Again --

20              THE COURT:  When you say the next page, which page

21   are you talking about?

22              MR. McGUIRE:  I believe we should be on Page 3, Your

23   Honor?

24              THE COURT:  Okay.  Thank you.

25   **A.**   So this is underlining the fact why a scanning or either

1    in color or a gray scale is required because the business logic

2    of converting -- the scanner itself is seeing everything in

3    color.  And then there is a business logic in removing the

4    color to make it black and white.

5        So when the red marking is not meeting that threshold

6    value and in this case of the IPC scanner, there are other

7    things which are typical in nature, meaning the color of the

8    light that is used to illuminate the ballot, it doesn't capture

9    those marks at all.

10   **Q.   (BY MR. McGUIRE)**  So if a voter -- the voter would vote on

11   the image on the far left, and the scanner ultimately winds up

12   tabulating the image that is on the right; is that correct?

13   **A.**   Correct.

14            THE COURT:  This is the top right here?  Because I

15   have got two ballots.

16            MR. McGUIRE:  And then the smaller --

17            THE COURT:  I just want to make sure I'm looking at

18   the right thing.  You are examining --

19            MR. McGUIRE:  Yes, Your Honor.  There is a ballot on

20   the left and a ballot in the middle.  And then on the right,

21   the top right, there is an interpretation.

22            THE COURT:  Okay.

23            THE WITNESS:  So those are two images of the same

24   physical piece of paper.  It is a common misconception that the

25   scanner is taking picture of the paper.  Scanner is not a

1   camera.  Scanner is analyzing the paper and producing an image

2   what the scanner software thinks the human wants to see.

3           It is very different than trying to be accurate

4   representation of the original piece of paper.

5   **Q.   (BY MR. McGUIRE)**  Okay.  And so this is the precinct

6   scanner, not the central count scanner; correct?

7   **A.**   On the right-hand side, that is the precinct scanner.

8   **Q.**   Okay.  So is there a solution to this problem with the

9   precinct scanners?

10  **A.**   So for a precinct scanner, as it is very clear here, it is

11  not as sensitive as the left-hand side scanner.  The solution

12  is to use -- instruct the voters carefully to fill the whole

13  oval and provide them a pen -- black pen which is not

14  reflecting because the precinct scanner is more sensitive to

15  that color and that combination than anything else.  So it is

16  more likely that the voter intent is accurately recorded.

17          THE COURT:  I just want to -- for the record want to

18  make sure that we're talking about the same document.  This is

19  a -- this is a provisional ballot that -- absentee/provisional

20  ballot or emergency ballot that a voter filled out at the

21  precinct because I gather there was some reason they couldn't

22  vote on the machine at that point?

23          THE WITNESS:  This is a test ballot, which we filled

24  in order to both find out what are the limitations of the

25  scanner and also in this case demonstrate what are the

1    deficiencies.  Because we filled 28 ballots, which were

2    accepted by the scanner with a significantly high error margin

3    of votes not being recorded from the ballots by the precinct

4    scanner.

5    **Q.   (BY MR. McGUIRE)**  So just to narrow that down, Mr. Hursti,

6    this is not a ballot that was used in an actual election;

7    correct?

8    **A.**   Correct.

9    **Q.**   This is a ballot that you filled out to test the

10   scanner -- the precinct scanner?

11   **A.**   This is -- yeah.  This is a ballot -- which this

12   particular ballot was not filled by me.  But the sole purpose

13   of filling this out was to test what are the limitation of the

14   scanner.  This is not a real vote from real election.

15   **Q.**   Okay.  And have you had an opportunity to look at actual

16   ballot images from a precinct scanner?

17   **A.**   So we have been trying to get the actual images, but we

18   have been not getting the real images.  And that is why the

19   only thing we can show in the precinct scanners are the test

20   images we made -- the test ballots which we created ourselves

21   that were run through the scanner.

22   **Q.**   Finally, just to wrap this up, as between the precinct

23   scanner and the central count scanner, I understand that you

24   are proposing a different solution for the central count

25   scanners; is that right?

1    **A.**    That is right.

2    **Q.**    Okay.  What is that solution?

3    **A.**    The solution for a central count scanner is to allow that

4    scanner to capture the images with a higher resolution and

5    higher amount of information, meaning either color or gray

6    scale images.  And since the standard of that kind of scanner

7    in office use is 300 DPI, which is obviously higher than 200

8    DPI here, just letting the current minimum standard of office

9    technology to be used.

10   **Q.**    Okay.  We can take the exhibit down.

11       So my last question for you, Mr. Hursti, is:  Given what

12   you have seen of these scanners, in your opinion, are all votes

13   being counted by the current Dominion system?

14   **A.**    We have been looking into different examples and

15   examinations.  I don't believe all of the votes are being

16   counted.

17          MR. McGUIRE:  Okay.  Thank you.  I have no further

18   questions except on maybe redirect, Your Honor.

19          THE COURT:  Are you offering these exhibits into

20   evidence?

21          MR. McGUIRE:  Yes.  Yes.  We would like to offer all

22   of these exhibits, 4, 5, 6, 7, and 7.1.

23          MR. TYSON:  And we have no objection, Your Honor.

24          THE COURT:  Okay.  Later on, we should go back and

25   make sure if there are exhibits that were introduced in any of

1    the other witnesses that we address them.  They are admitted.

2          MR. McGUIRE:  Thank you.

3          MR. TYSON:  Your Honor, are you ready for me to

4    proceed with cross?

5          THE COURT:  Yes, I am.

6                        CROSS-EXAMINATION

7    BY MR. TYSON:

8    **Q.**   Mr. Hursti, good to see you again.  I am Bryan Tyson.  I

9    represent the State defendants.  We met in Athens a few weeks

10   ago.

11       I just have some questions for you to walk through this.

12   But I want to start with:  You personally believe that

13   hand-marked paper ballots is the best way to conduct an

14   election; correct?

15   **A.**   Correct.

16   **Q.**   And you personally believe that having paper pollbook

17   backups is the only or is the best way to conduct an election;

18   correct?

19   **A.**   Correct.  Because the current pollbook systems have been

20   demonstrably error-prone and they are not ready for prime time.

21   **Q.**   You have stated that in your declarations, but that is not

22   based on any review you have undertaken of the Poll Pads?  That

23   is based only on your observations from a public vantage point;

24   correct?

25   **A.**   I am involved -- the Secretary of State of New Hampshire

1    examined these very same pollbooks.  So yes, it is observation

2    but also in my other work for Secretary of State New Hampshire.

3    **Q.**   Mr. Hursti, you don't have any specialized training or

4    experience in the administration of elections; correct?

5    **A.**   Correct.

6    **Q.**   And your training and experience, I believe, as we

7    discussed is focused on cybersecurity; right?

8    **A.**   Cybersecurity and election security.  Yes.

9    **Q.**   And so when did you first personally examine a Dominion

10   BMD, or have you examined a Dominion BMD personally?

11   **A.**   I acquired a -- the BMD ICP hybrid machine, which is a

12   ballot-marking device, different model from the Dominion than

13   that one, in 2017.  And so I have been 2017 starting to examine

14   that ballot-marking device from Dominion.

15   **Q.**   But you have not personally examined any of the Dominion

16   system that is currently used in Georgia except for the ICP; is

17   that correct?

18   **A.**   I have not examined even the ICP used in Georgia.  Not

19   ballot-marking device.  Not the ICP.

20   **Q.**   You mentioned earlier that you were involved in the

21   creation of the DEF CON Voting Village.  Do you recall that?

22   **A.**   I am a cofounder and co-organizer, correct.

23   **Q.**   And are you aware of the criticism of the Voting Village

24   by the Department of Homeland Security because it gives access

25   that is not real world conditions for researchers?

**A.**    I am not aware of the Department of Homeland Security --
the Department of Homeland Security giving that kind of
criticism.  I am aware of general criticism from other sources
than the Department of Homeland Security.

**Q.**    And you are being paid as an expert for the Coalition for
Good Governance; is that correct?

**A.**    Correct.

**Q.**    In your review and preparation of your declarations, did
you ever review Georgia State Election Board rules regarding
the storage of and access to components of the voting system?

**A.**    I have cursory reviewed that.  But I'm not certain how
accurate are the ones which are posted to the wall of the
Fulton County Election Preparation Center.  So I have been only
examining the ones which are posted on the wall there.

**Q.**    And so do you know for sure whether Georgia has specific
rules about the EMS and other components of the system being
connected to the internet?

**A.**    I am not a law expert.  I'm not a lawyer.  I don't declare
to be that.  So I'm not aware of the specific rules and
regulations in that area.

**Q.**    And you concluded in, I believe, your December 2019
declaration that it was probable that a system like Georgia's
Dominion system would be targeted.

       Do you recall that testimony?

**A.**    Yes, I recall the testimony.  And in the time of -- the

```
 1   term where we are, all election systems are likely to be
 2   targeted.
 3   Q.   And you are basing that probable statement not based on
 4   actual knowledge of any hacking equipment that was actually
 5   used in an election?  You are basing it based on your
 6   cybersecurity background; correct?
 7   A.   Cybersecurity background and also already published
 8   studies, including the study which was published in DEF CON
 9   Voting Village this summer which countries are targeting which
10   kind of systems and all.  But it is not specific to any
11   specific location.
12   Q.   But you are not aware of any hacking of voting equipment
13   that was actually used in an election -- correct? -- in
14   election conditions?
15   A.   There are -- there is only anecdotal evidence of that.
16   And the reason is that all of the voting systems which have
17   been observed today in independent studies have one thing in
18   common.  They don't record, preserve forensic evidence.
19           THE COURT:  They don't preserve forensic evidence?
20   Is that what you said?
21           THE WITNESS:  Yeah.  Correct.  The logs are not
22   protected, and they are very relaxed of capturing information
23   which would be required for forensic studies.
24   Q.   (BY MR. TYSON)  And it is your testimony that that is true
25   of all ballot-marking device systems?
```

**A.**   I'm not making statement about ballot-marking devices.

I'm making statement about voting systems in general.  And I'm

not making this statement specifically about Dominion.  As I

say, all the systems have been independently studied.  Dominion

system has not been independently studied because it has never

been submitted as a whole system to any independent studies.

THE COURT:  I'm sorry.  Just to make sure, it has

never submitted itself to an independent study?

THE WITNESS:  No Secretary of State has so far

conducted the studies like the Secretary of State Ohio and

Secretary of State California where Dominion system would have

been part of the study.

**Q.   (BY MR. TYSON)**  And so, Mr. Hursti, just so I understand,

it is your testimony that the California system that reviewed

another version of the Dominion system -- your criticism is it

didn't review the version in use in Georgia; is that correct?

**A.**   So my criticism here is that the last California conducted

independent study was conducted in 2007, which is called

California Top-to-Bottom Review.  And no Dominion system was

part of that study.

**Q.**   And Dr. Halderman in his declarations relies on SLI study

of Dominion BMD's system more recently in California.

Are you aware of that study?

**A.**   I have browsed through a SLI study, which is posted in the

EAC website.  I'm not aware of exactly the study, but I have

1   browsed through the study which is in the website.  There is

2   actually multiple studies for different versions of the

3   Dominion Suite -- Democracy Suite software package.

4   **Q.**   And are you aware of the study of the Democracy Suite 5.5

5   conducted in Pennsylvania by SLI and another study by Pro V&V

6   as well on security?

7   **A.**   I have not read the study provided to Secretary of State

8   Pennsylvania.  And also SLI is not independent study.  It is a

9   volunteer guideline study based on -- paid by the vendor.  So

10  that's not conducting an independent study as independent

11  studies are generally recognized in the security community.

12  **Q.**   So it is your testimony that an EAC certified voting

13  system test lab, when it is conducting a security study, is not

14  an independent study of a voting system?

15  **A.**   Independent study means that it is independent from the

16  voting system vendor.  If the laboratory is paid by the vendor,

17  it is not independent study by the very definition.

18  **Q.**   So just to clarify my question then, you would say if a

19  voting system vendor paid an EAC certified voting system test

20  laboratory for a security study you would not consider that an

21  independent study; correct?

22  **A.**   Independent study is independent financially and by

23  control from the vendor.  That is not independent study under

24  that definition.

25      I also would like to add that if you examine the Voluntary

1    Voting System Guidelines, it is very silent about security

2    properties.  So, hence, that EAC study has very little -- very

3    little mandates with a real hardcore security study.

4              THE COURT:  Hardcore what?  I'm missing words.  It

5    has little to do with a hardcore what type of study?

6              THE WITNESS:  Security study.  So the reason why

7    Secretaries of State like Jennifer Brunner of Ohio back then

8    and Debra Bowen of California back then -- why they wanted to

9    conduct independent studies is exactly to get rid of and to

10   have a study which is not by the current regulation paradigm.

11   **Q.   (BY MR. TYSON)**  Mr. Hursti, when you testified earlier

12   that you had examined the Fulton and Cherokee County EMS server

13   setups, are those the only two county EMS servers you

14   personally observed?

15   **A.**   Yes.  I have not touched them.  I have been only observing

16   them.  In the case of Cherokee, I was able to construct a

17   number of lines which the manager typed in.  So I didn't touch

18   the machine.

19   **Q.**   When Mr. McGuire was asking you about Plaintiffs'

20   Exhibit 4, you pointed out some various programs and icons that

21   were located on an EMS server.

22       Do you recall that testimony?

23   **A.**   Correct.

24   **Q.**   And do you know if the hardening process utilized by

25   Dominion removes the programs and the icons or just the

programs and leaves the icons in place?

**A.**    So, first of all, if you are doing a hardening, you remove both.  And at the same time, based on the list of the output of everything what we were able to get from Cherokee, that shows that a lot of the programs are still there, a lot of the icons are still there, and a lot of the services are still there, things which would have been removed if the hardening had been conducted.

**Q.**    But you have not personally examined the EMS server to conclude that all those are there?  You are basing that on the information you were able to gain from those reports and from looking at those screens; correct?

**A.**    Correct.

**Q.**    You also testified that physical security was not followed.

    Was that in the Fulton County location or Cherokee or somewhere else?

**A.**    Both locations.  Both in Fulton and in Cherokee.

**Q.**    And I believe you testified already that you are not aware of State Election Board regulations that mandate physical security for certain components of the voting system; correct?

**A.**    Correct.

**Q.**    Was your visit to polling places on June 9 the first time you had seen the Dominion system in use?

**A.**    No.  I have seen that multiple times in use in other

1  states.

2  **Q.**   Was June 9th the first time you observed the voting

3  process in Georgia?

4  **A.**   With this system, correct.  I used to live in Georgia.

5  **Q.**   I'm sorry.  I'll let you finish.

6  **A.**   No.  I used to live in Georgia.

7  **Q.**   Very well.

8       You would agree with me that physical security measures

9  can be used to mitigate cyber vulnerabilities; right?

10 **A.**   Cyber defense requires physical because especially when a

11 general purpose consumer grade equipment are used that is a

12 fundamental requirement to achieve cybersecurity.  It is not

13 mitigation.  It is a fundamental requirement.

14 **Q.**   And so when you testified in your declaration that not

15 having a password on the Poll Pad is an unacceptable practice,

16 you are basing that statement not based on Georgia's physical

17 security rules from the State Election Board?  You are basing

18 that on your cybersecurity experience; correct?

19 **A.**   That is correct.  If you look in the Federal Information

20 Processing Standards, which are for everything -- which are

21 used in the private industry context, you see that passwords

22 are fundamental requirement.

23 **Q.**   And in your declarations, you obviously identify a lot of

24 issues.  But you would agree that they require more

25 investigation to determine what is actually going on; is that

1    fair to say?

2    **A.**    Yes.  Since the declarations I submitted, more information

3    has become available.  So a lot of things which I have state to

4    be appearing, that is because of the amount of information I

5    had been able to obtain at that point in time.  And later I

6    have learned more and got more evidence.

7         So that is why the -- certainly the level is limited

8    because I'm a very cautious man who wants to be certain that

9    what I have said is accurate.

10   **Q.**    Very well.

11        One of the issues you identify in your declarations is

12   scanners taking differing amounts of time to accept or reject

13   the ballot.

14        Do you recall that testimony?

15   **A.**    Yes, I do.

16   **Q.**    And in reaching your conclusions or opining about that,

17   were you aware that there were five different ballot styles of

18   varying length in use in the June 9th primary in Georgia?

19   **A.**    Yes, I was aware.  And I was trying to observe to see if

20   the ballot style is giving a different time because you can

21   recognize the different ballots very easily from a distance.

22   **Q.**    And you would agree with me though that different length

23   ballots could be a reason for a variation in a scanner's

24   processing time; correct?

25   **A.**    When the ballot's QR code -- the amount of votes in that

1    shouldn't change the QR code interpretation time.  So I cannot

2    conclusively say that it wouldn't.  But it would defy the logic

3    of using QR codes.

4    **Q.**   And, Mr. Hursti, did you examine any documents produced by

5    the State defendants in this case?

6    **A.**   Only the documents which are not confidential or in any

7    way restricted.

8    **Q.**   And are you -- you in your declarations have called for

9    additional testing for scanner thresholds.

10       Do you recall that testimony?

11   **A.**   Yes, I recall.  My statement here is that there are two

12   sets of parameters for scanner.  The one parameter, which is in

13   the election software, and the other one is directly for the

14   scanner itself and the scanner driver.  Those both need to be

15   in parallel locked into place to have any kind of meaningful

16   remedy into the problems observed right now.

17   **Q.**   And are you aware that the State defendants produced a

18   document or did you review a document outlining the testing

19   process conducted by the Secretary's Center for Election

20   Services in studying ambiguously marked ballot samples?

21   **A.**   I'm not certain I know which document you are referring

22   to.

23   **Q.**   I'm going to share my screen here.  I'm trying to make

24   this zoom in a little bit for you.  It is kind of an executive

25   summary.

1      And down here at the bottom, you can see that it is

2  numbered State Defendants 0023540.

3      Do you recall ever seeing a document that looked like

4  this?

5  **A.**   No, I actually don't.  I have seen so many documents.  But

6  I don't recall this document.

7  **Q.**   Okay.

8          THE COURT:  What number is it?  Has it been submitted

9  to the Court?

10          MR. TYSON:  I can submit it, Your Honor.  I don't

11  believe it has been.  I'll send it right now.

12          Just to Ms. Cole?

13          THE COURT:  That is fine.

14          Are you offering it as an exhibit?

15          MR. TYSON:  I am, Your Honor.

16          THE COURT:  All right.  Why don't you formally do so.

17  Then it is not just to Ms. Cole, but then you will deal with it

18  after you deal with the submission properly later.

19          MR. TYSON:  Very well.  So, Your Honor, we'll mark

20  this as Defendants' Exhibit -- and I believe we are on

21  Number 3.  If not, Mr. Miller can correct me on that.

22          THE COURT:  Just be careful when you email Ms. Cole

23  that you don't do it on the public -- I saw for a moment your

24  email to her and it was going to --

25          MR. TYSON:  Oh, very well.  Yes, ma'am.

1  **Q.   (BY MR. TYSON)**  Mr. Hursti, just to clarify then, you have

2  not looked at this document or were aware that the State had

3  conducted any kind of study like this?

4  **A.**   I have -- I have seen the Dominion marketing material

5  discussing about the same topic.  This is -- it has the same

6  discussion topic.  But it doesn't look like this.  So I can't

7  recall ever seeing this particular document.

8  **Q.**   Very well.

9            THE COURT:  What is the date of the document?  Who is

10  it from?  What is it that they are seeking to admit?

11            MR. TYSON:  Certainly.

12            THE COURT:  I need to know what it is.

13            MR. TYSON:  Certainly.  And I wanted to mark it just

14  so we had it for the record.

15            This is a report prepared by Michael Barnes at Center

16  for Election Services in July.  It is part of the preparation

17  for the -- impartial preparation for the State Election Board

18  rule that was adopted today that relates to scanner thresholds.

19            MR. McGUIRE:  Your Honor, I would just object to the

20  extent that Mr. Tyson is representing this as a report that was

21  prepared.  But it is clearly marked draft.  So it is unclear if

22  this is a final version of anything.

23            So I would object on the basis that it doesn't appear

24  to be what it is being represented to be on the face.

25            THE COURT:  All right.  Well, why don't you take a

      1    look at it.  And I'm not going to admit it at this point.  But

      2    he can -- you can ask him -- I mean, I don't think it is fair

      3    to examine something -- him examine something that was a draft

      4    because it probably wasn't distributed before as a public

      5    document.

      6              Was it distributed as a public document?

      7              MR. TYSON:  I don't know, Your Honor.  I believe we

      8    were going to have Mr. Harvey talk about kind of the process of

      9    the rule that involves this analysis.  Obviously, again, kind

     10    of being out of sequence, I know it is a little bit difficult.

     11    I just wanted to confirm Mr. Hursti has not seen this document.

     12              THE COURT:  He is indicating he has seen some

     13    materials.  I don't know whether it is from Dominion.  I don't

     14    know whether this is a Dominion -- all Mr. Barnes or whether

     15    Mr. Barnes absorbed some of the information that was provided

     16    by Dominion or what.

     17              But -- so I think that in terms of -- you ought to --

     18    if you want to question about anything, at least give him an

     19    opportunity to look at it and read it.

     20              MR. TYSON:  Yes, Your Honor.

     21              THE COURT:  I don't know that he would have seen a

     22    draft.

     23              When did you provide it to the plaintiffs?

     24              MR. TYSON:  This was part of the group of documents

     25    provided with the expedited discovery, Your Honor, related to

UNITED STATES DISTRICT COURT
                    OFFICIAL CERTIFIED TRANSCRIPT

1       the --

2               THE COURT:  So sometime in the last ten days or so?

3               MR. TYSON:  Yes, Your Honor, I believe so.  The 31st

4       or somewhere around there.

5               THE COURT:  Okay.  Well, I think his affidavit is

6       around there.  The one before then and maybe there was one

7       September 1st.  So I don't know.

8               Go ahead.

9               MR. McGUIRE:  Your Honor, I have no objection to him

10      examining Mr. Hursti about anything that is in the document as

11      long he is not examining him based on him having familiarity

12      with the actual document, which he hasn't seen and obviously on

13      Zoom can't see.

14              MR. TYSON:  Your Honor, again, I wasn't intending to

15      go line-by-line in this document.  My intent was just

16      Mr. Hursti called for more research.

17              Was he aware that there was at least some research

18      that had been performed?  That is the limitation.  That is as

19      far as I was going to go.

20              THE COURT:  All right.

21              MR. TYSON:  So if we could -- Mr. McGuire, if we

22      could have Plaintiffs' Exhibit 7 put back up on the screen.

23              MR. McGUIRE:  Sure.

24              MR. TYSON:  I'll ask Mr. Hursti a setup question

25      here.

1   **Q.    (BY MR. TYSON)**   Mr. Hursti, you testified towards the end

2   of your testimony that voters should be instructed to fill in

3   the oval on a paper ballot.

4        Do you recall that testimony?

5   **A.**   Correct.

6   **Q.**   And have you reviewed the instructions that are on the

7   absentee provisional emergency ballot -- paper ballots that --

8   **A.**   I have.

9   **Q.**   And so you are aware looking at Plaintiffs' Exhibit 7 on

10  Page 1 that those instructions tell voters to fill in the

11  bubble; correct?

12  **A.**   Correct.  And many of the voters haven't been following

13  that which means that the instructions have not been effective.

14  **Q.**   And you also see there on Page 1 of Plaintiffs' Exhibit 7

15  that only blue or black pen or pencils are to be used?  Do you

16  see that?

17  **A.**   Correct.  And in the testing, it was found that inks which

18  are visible to human eye blue if they contact red pigment which

19  human eye cannot see the scanner is not very effective to

20  detect those markings.  So the blue markings themselves are not

21  effective with the scanner.

22  **Q.**   Very well.

23       Are you aware that the SEB -- the State Election Board

24  adopted rules relating to scanner thresholds at their meeting

25  today?

1   **A.**   I was listening over one state of board elections thing.

2   I was on the audio only.  I didn't see any documents.  I heard

3   the conversation then and the ruling.  But I did not know it

4   became effective today.

5   **Q.**   And if we could go to the second page of Plaintiffs'

6   Exhibit 7.

7       Mr. Hursti, you earlier testified that the AuditMark would

8   contain ambiguous vote information and that it was marked

9   information.

10      Do you recall that?

11  **A.**   Yes.

12  **Q.**   Are you -- are you certain of that, or is it possible that

13  the ambiguous voter information is located somewhere other than

14  the AuditMark on the Dominion system?

15  **A.**   So the ambiguous mark reading comes to the screen of the

16  voting machine.  And with the logic unclear to me, sometimes it

17  overrides, sometimes not.  I haven't been able to witness

18  enough other people doing -- operating the machine to

19  understand what the logic is.

20  **Q.**   So you are not certain that the AuditMark would contain

21  ambiguous marked information?  You are just assuming that?

22  **A.**   I have seen an AuditMark -- AuditMark logs which have

23  entries indicating there has been ambiguous marks.  Those have

24  been provided by the counties which are providing information.

25      So I am not -- I have not witnessed a number, under which

1    conditions the AuditMark is having that information log, but it

2    can be logged.

3           MR. TYSON:  And we can stop the screen share now.

4    Thank you, Mr. McGuire.

5           MR. McGUIRE:  Thank you.

6    **Q.    (BY MR. TYSON)**  Mr. Hursti, you would agree with me that

7    hand-marked paper ballots also have vulnerabilities to

8    manipulation by bad actors; correct?

9           COURT REPORTER:  Manipulation by what?

10          MR. TYSON:  I'm sorry.  I'll just ask it again.

11   **Q.    (BY MR. TYSON)**  You would agree with me that the

12   hand-marked paper ballots also have vulnerabilities to

13   manipulation by bad actors; correct?

14   **A.**   There is no such thing as perfect system.

15   **Q.**   So is that yes?

16   **A.**   Yes.  Everything can be -- everything can be -- with

17   enough resources and motivation can be turned.  So hand-marked

18   paper ballots is the best we have.  Nothing is ever

19   100 percent.

20   **Q.**   And it is your testimony that Georgia should not use its

21   Dominion optical scanners in the November 2020 election without

22   adjusting or making changes to the software that is utilized;

23   is that correct?

24   **A.**   Yes.  As a stop-gap measurement and mitigation, the way it

25   is operating and the way the configuration is set up should be

1    examined and changed to ensure that every vote counts.

2    **Q.**   And, Mr. Hursti, my last question:  Is it your testimony

3    that Georgia voters can have no confidence in the voting system

4    that we use in our elections?

5    **A.**   In the situation where logs cannot be produced, when basic

6    security principles cannot be verified, I think it is very

7    prudent to say you couldn't trust something you cannot verify.

8    Even Ronald Reagan mentioned that, trust but verify.  There is

9    no way to verify right now.

10             MR. TYSON:  Okay.  Thank you, Mr. Hursti.  I don't

11   have any further questions.

12             MR. McGUIRE:  Your Honor, I just have a couple of

13   clarifying things on redirect very short, if I may.

14             THE COURT:  Yes.

15                      REDIRECT EXAMINATION

16   BY MR. MCGUIRE:

17   **Q.**   Mr. Hursti, Mr. Tyson asked you if the precinct scanner

18   that you looked at was the one used in Georgia, and you said it

19   was not the one used in Georgia.

20        Can you explain why that is -- what the difference is

21   between the precinct scanner you examined and the precinct

22   scanners that are used in Georgia?

23   **A.**   I don't believe there is any difference.  It is a

24   physically different device because the device I bought was

25   used in New York.  I don't believe there is meaningful

1    difference.

2    **Q.**   So as far as actually reviewing a scanner that is used --

3    that has been used in Georgia, have you had any opportunity to

4    do that?

5    **A.**   I have not been able to do anything else and observe when

6    other people are using the scanner.

7    **Q.**   Okay.  Second, Mr. Tyson asked you about the State

8    Election Board's rules governing storage and access to a voting

9    system and if you were aware of those rules.

10        Let's assume that those rules exist, and let's assume that

11   what you have observed is consistent with those rules.

12        Are the rules adequate to protect Georgia's elections?

13   **A.**   I would say that if those are the rules then the rules are

14   not adequate and looking to other states, which kind of rules

15   they have enacted, and maybe get some best practices from other

16   states.

17   **Q.**   Finally, you talked about the certification laboratories

18   that test voting systems for EAC certification.  My

19   understanding is you don't believe those are independent

20   because they are paid by the vendor; correct?

21   **A.**   In every industry, it is the same.  Independent means that

22   you are independent from the vendor you are inspecting.  And

23   receiving payments itself is a threat to that independence.

24   **Q.**   And so do those labs test for -- is there distinctions

25   between testing for security and testing for functionality?

1    **A.**   There is a humongous distinction between that.  Security

2    is very much inconvenience in a lot of things because people

3    want to do things the easy way.  Functionality is something

4    else again.  So there is a humongous difference between testing

5    usability, testing physical shocking and writing, functionality

6    and security.  They are all distinguishable different

7    disciplines.

8    **Q.**   Based on what you know of how the certification labs test

9    voting systems for certification by the EAC, do they test both

10   functionality and security to the appropriate standard?

11   **A.**   We have been conducting -- I have personally been involved

12   in EVEREST study.  All those systems have passed the EAC

13   certification testing.  And yet we found and reported 380 pages

14   of vulnerabilities even in the redacted version.

15            MR. McGUIRE:  Thank you.  I have no further --

16            THE COURT:  Redacted version?  Is that what you said?

17   Even in the redacted version?

18            THE WITNESS:  Yes.  Redacted version was 380, top of

19   my head, plus or minus one page, if my memory is incorrect.

20            THE COURT:  And this -- your report was independently

21   published, or was it submitted to EAC or some other entity?

22            THE WITNESS:  So that study was commissioned by

23   Secretary of State Ohio.  The study was conducted by Penn State

24   University -- team under Penn State University.  So it was

25   independent.  There was a university in between.  And there was

```
 1   the Secretary of State office in between.  There was no direct

 2   connection of money or otherwise with the vendor.

 3            And this is really how independent studies should be

 4   conducted.  The team was conducting the study are not bound and

 5   cannot be in any shape or form influenced by the people they

 6   are examining and the system they are examining.

 7            MR. TYSON:  Just one brief follow-up question.

 8                         RECROSS-EXAMINATION

 9   BY MR. TYSON:

10   Q.   Mr. Hursti referenced a report from the Secretary of State

11   of Ohio.  It is your testimony that all of the machines that

12   were examined in that report were EAC certified?

13   A.   I believe that the system -- because they were in use.

14   Top of my head -- the report speaks for itself.  Everything

15   what is there is listed.

16        But since Ohio requires certification, I believe they

17   were.  But don't get -- look at the report.  If there is

18   something, the report is correct and I'm wrong.

19   Q.   And, Mr. Hursti, on that point, was any Dominion system

20   used -- the Dominion system used in Georgia part of that study

21   in Ohio?

22   A.   Dominion has later acquired system different vendor.  So

23   they were -- they are systems which are now under Dominion.

24   But none of the systems which is currently used here, the

25   precinct scanner, was not part of that study.
```

1          MR. TYSON:  Thank you.  I don't have any further

2    questions.

3          THE COURT:  So let me ask this question, Mr. Hursti.

4                         EXAMINATION

5    BY THE COURT:

6    Q.    You recommended that the -- that the -- the scanners be

7    adjusted, they be higher basically -- higher digital quality --

8    A.    Correct.

9    Q.    -- or resolution.  Can you articulate why anyone -- why

10   the State wouldn't do this?  I'm trying to understand that as

11   well as what your response would be.

12   A.    So I can only speculate why a choice has been made in

13   Dominion to artificially create images, which haven't been

14   accepted even for tax purposes for decades.  Maybe it is to

15   have the same quality of images coming from the precinct

16   scanner or high speed scanner.

17         But I don't see any reason why -- why would you -- why

18   wouldn't you use the equipment you already have in hand the

19   best possible way as long as it doesn't lower any performance,

20   et cetera and since 300 DPI, which is obviously a little higher

21   than 200 DPI, and a higher information density is the office

22   standard -- office industry standard.  I don't understand why

23   wouldn't you use what is standard for any general purpose

24   office.

25   Q.    And is it your testimony that using the 300 DPI would

1    capture some of these marks that are now not evident?

2    **A.**   The 300 DPI accompanied with changing it from solely black

3    or white to be either gray scale or color is critical to

4    capture that additional information.  Because right now the

5    settings of the scanners are reducing the amount of

6    information.  They are removing marks which the scanner saw,

7    and the marks are never translated to the files which are going

8    to the election system based on threshold values which happen

9    before the election software even sees that image.

10       So it is not only the resolution.  It is the amount of

11   information which at the minimum have to be gray scale,

12   preferably color.  That captures then what is the true look of

13   the ballot, how the voter saw it and marked.

14   **Q.**   So just taking that last step there, you were saying it is

15   not just simply that it removes it but it basically -- when it

16   feeds it into the vote, it is not being counted, I assume, is

17   what you are saying?

18   **A.**   So if, for example, the voter is using a pen, which is not

19   completely black, the scanner can remove that mark from the

20   image if it doesn't meet the scanner's internal threshold in

21   the translation of the sensor to the black and white.  And that

22   is why it is paramount importance to capture more information

23   to the image itself so that the voting software has more to

24   analyze and can be more accurate.

25            THE COURT:  Are there any questions in light of mine?

```
 1              MR. McGUIRE:  Just to clarify -- yes, Your Honor, if
 2    I may.
 3                    REDIRECT EXAMINATION (Further)
 4    BY MR. MCGUIRE:
 5    Q.   Mr. Hursti, how difficult is that step of reconfiguring
 6    the scanner to read that additional information, whether it is
 7    the precinct scanner or the central count scanner?
 8    A.   The precinct scanner might be impossible because of the
 9    hardware limitation of that.  In the high speed scanner,
10    because that is a standard commercial off-the-shelf Canon
11    scanner, it is natively lots better images.  That shouldn't be
12    troublesome at all.
13    Q.   So that is a setting that is accessible to whoever has
14    access to the scanner?
15    A.   Correct.
16              MR. TYSON:  Your Honor --
17              THE COURT:  Are either or all -- I just want to make
18    sure that -- I'm sorry.
19              These then would be the absentee ballots that are
20    coming into the central office essentially that are being -- if
21    they were not able to scan provisional ballots or they would
22    send -- the precincts would send them as well as far as you
23    know?
24              THE WITNESS:  Yeah.  And the real problem is the
25    people who are voting at home, they use whatever pen they have
```

```
 1    and might be rushed to go to school or whatever.  It is very
 2    hard to enforce them to use proper pen.  In-person voting even
 3    when the scanner -- the precinct scanner is inferior, it is
 4    easier to enforce good behavior from the voter than in-home
 5    voting where people are going to do whatever they do anyway.
 6              THE COURT:  It sounds like a discussion about
 7    instruction.
 8              MR. McGUIRE:  And I think the answer to your
 9    question, Your Honor, was that the central scanner does scan
10    the mail ballots, the absentee ballots.
11              THE COURT:  All right.
12              MR. TYSON:  Your Honor, I just had one additional
13    question.
14                     RECROSS-EXAMINATION (Further)
15    BY MR. TYSON:
16    Q.   Mr. Hursti, is it your testimony that a change in the
17    scanner threshold settings does not require new EAC
18    certification of software, or do you know?
19    A.   I don't know.
20              MR. TYSON:  Thank you.
21              THE COURT:  All right.  Thank you very much.  I
22    appreciate it.
23              THE WITNESS:  Thank you, Your Honor.
24              THE COURT:  How long is Ms. Dufort's testimony?
25              MR. BROWN:  Your Honor, her testimony will be around
```

```
 1   ten minutes.
 2             THE COURT:  All right.  Well, it seems like a good
 3   thing to do right now.
 4             MR. BROWN:  Plaintiffs would call Jeanne Dufort.
 5             COURTROOM DEPUTY CLERK:  Ms. Dufort, if you would
 6   please raise your right hand.
 7                     (Witness sworn)
 8             COURTROOM DEPUTY CLERK:  Thank you, ma'am.  If you
 9   would, please state your name and spell your last name for the
10   record.
11             THE WITNESS:  My name is Jeanne Dufort, D-U-F-O-R-T.
12        Whereupon,
13                        JEANNE DUFORT,
14        after having been first duly sworn, testified as follows:
15                        DIRECT EXAMINATION
16   BY MR. BROWN:
17   Q.   Ms. Dufort, by whom are you currently employed?
18   A.   I am self-employed.  I'm a realtor.
19   Q.   And briefly what is your background?
20   A.   I have a business background in international sourcing and
21   manufacturing and resell.  Wholesale supply chain.
22   Q.   And where are you from?
23   A.   I live in Madison, Georgia.
24   Q.   Are you a member of the Coalition for Good Governance?
25   A.   I am.
```

1    **Q.**    Now, you're in Morgan County; is that right?

2    **A.**    That is right.  It is a beautiful place.

3    **Q.**    And are you involved in any way in elections in Morgan

4    County?

5    **A.**    I am.  I am very interested in election integrity.  So I

6    regularly attend the board of elections meetings.  I have

7    routinely been a poll watcher.  For this past June election, I

8    was both a poll watcher, I was a vote review panelist for the

9    democratic party.  And I got drafted on election night for

10   three or four hours to open up mail ballots because we had 3000

11   of them, and it took some time.

12   **Q.**    What does the vote review panel do?

13   **A.**    So the vote review panel makes up for the limits of

14   technology.  We take ballots that can't be scanned or ballots

15   that have marks that the scanner can't interpret, and we put

16   human eyes on them.

17        So I like to think of us as backstop to make sure that

18   every vote that can where voter intent is clear gets counted.

19   **Q.**    And then how physically or mechanically does the vote

20   review panel make its decisions on votes?

21   **A.**    Under the new system, for this election, we used the

22   adjudication software.  So that meant we were reviewing

23   software on a -- we were reviewing ballots on a screen cued up

24   by the software.

25   **Q.**    And in your -- that is what you did for the -- what is

1    it? -- the June election; is that right?

2    **A.**    That is right.

3    **Q.**    And in your review of the ballots in the adjudication of

4    those ballots, did you notice any anomalies in the way the

5    adjudication software was recording or indicating the results

6    of particular votes?

7    **A.**    We did.  Of course, it was our first time using the system

8    for all of us.  So the whole thing was new.  But the system was

9    that a ballot would be cued up that needed review.  And if a

10   ballot was considered valid by the system, it was marked

11   highlighted with an overmark of green.  If it was considered

12   ambiguous, it was highlighted with an overmark of yellow.  And

13   anything that needed our attention, whether it was an overvote

14   or ambiguous, was boxed in with red.  And so we were to spend

15   our attention on those.  And that is what we were doing.

16   **Q.**    In the process of reviewing what had been highlighted by

17   the system in those various colors, did you notice any

18   anomalies?

19   **A.**    We did.  We came across a ballot that had some green

20   marks, had some yellow marks, and a red box.  But it also had

21   some clear voter marks that were not flagged in any way by the

22   software.

23        So I asked the Dominion tech, who was with us -- the vote

24   review panel is bipartisan.  It is a democrat, a republican,

25   and somebody from the election board.  So the three of us were

1    there with a Dominion rep.

2         And I asked him what about that vote, you know, did it

3    count.  And he said, well, of course, it counted.  And the rest

4    of us looked at it and said, well, good, because it should

5    count, it is a vote.  And we went on, kept going.

6         The second time we found the same situation of a clear

7    vote with no adjudication marks on it at all.  No green, no

8    yellow.  I asked the tech, can you show me what the system

9    thought about that vote?  He said, sure.  There is AuditMark.

10   I can show you the AuditMark.  That is the record of what is

11   counted for this ballot.  And that is where it got interesting.

12   **Q.**   What did you do next?

13   **A.**   We looked at -- the tech brought up the AuditMark for that

14   particular race.  And to all of our surprise, it told us that

15   there wasn't a vote there.

16   **Q.**   And did you notice this anomaly on other votes that were

17   within the voter review panel there in Morgan County?

18   **A.**   Yeah.  As we went through our batch -- I think we had to

19   review about 150 ballots out of the 3000 roughly mail

20   ballots -- we found probably as many as ten different ballots

21   that had -- no, a little more than -- that had votes that

22   hadn't been counted.  We said close to 20.  We weren't keeping

23   a log.  At the time, it was so fresh and so new and, frankly,

24   so shocking that we were just trying to make sure we focused on

25   making sure every vote counted.

1    **Q.**   And did you take any -- did you take photographs of what

2    you were seeing?

3    **A.**   No.  That is not allowed.

4    **Q.**   Okay.  And have you seen any illustrations that would be

5    helpful for you in describing what you saw?

6    **A.**   Yeah.  The New York Times did an article shortly after

7    this came out, and they included an image that they represented

8    as coming from a county, and it looked an awfully lot like what

9    I saw while I was doing that work.

10   **Q.**   Excuse me.  Could I have Number 13 up on the screen,

11   please.

12        Is Plaintiffs' Exhibit 13 an illustration that you saw in

13   the New York Times that resembles what you saw?

14   **A.**   It is.

15   **Q.**   Describe for the Court what this shows.

16   **A.**   So the Justice of Supreme Court with Beth Beskin and

17   Charlie Bethel has a red box around it and a yellow highlight

18   over that vote.  That is telling us, vote review panel, do your

19   thing, decide if this is a vote.

20        But the race below it was with Hal Moroz and Sarah Warren.

21   It doesn't really have an outline.  You have to look carefully

22   to be sure of that, but look to the right.  The red box doesn't

23   continue down.

24        So that is an example of a ballot that would have -- or

25   vote that is just not being counted.  It is being seen by the

1    system.  But the system is saying this is not a vote.

2    **Q.**    Now, was this the first that you had heard of this -- when

3    you were doing your vote review panel the first that you had

4    heard of this problem?

5    **A.**    Absolutely.

6    **Q.**    And then did you subsequent to that hear that from other

7    jurisdictions?

8    **A.**    Yes.  And I reached out to some of my friends who were on

9    vote review panels for other counties and asked if they had

10   come across this.  And, in fact, other counties had also seen

11   it.

12   **Q.**    And in skipping ahead --

13          THE COURT:  Could you -- so you are saying that this

14   vote for Sarah Warren -- Justin Warren would be recorded as a

15   blank?

16          THE WITNESS:  That's right.

17          MR. BROWN:  If you could take that exhibit down now

18   off screen share.

19          THE COURT:  Are you tendering this?

20          MR. BROWN:  Yes, we are tendering that as Exhibit --

21   the premarked number is 13.

22          THE COURT:  All right.  Just stay with that for now.

23   **Q.    (BY MR. BROWN)**   Then, Ms. Dufort, have you recently had

24   the opportunity to test precinct scanners supplied by Fulton

25   County?

1   **A.**   Yes.

2        MR. BROWN:  And, Your Honor, this is -- this is the

3   equipment that was supplied by Fulton County pursuant to your

4   order.  I have distributed to the defendants what I'm going to

5   have her identify, which are some photographs of the testing

6   that she conducted.

7        And I am just alerting everybody to this in light of

8   the previous discussion about Dr. Halderman's testimony.  Our

9   position is there is nothing even close to confidential or

10  sensitive.  But I'm just alerting the parties to that.

11  **Q.   (BY MR. BROWN)**  Ms. Dufort, let me put up on the screen

12  Exhibit 17 if we could.

13       Just while that is happening, let me set this up.  You

14  were reviewing -- you had access to a scanner that had been

15  supplied by Fulton County; correct?

16  **A.**   Yes.

17  **Q.**   What is Exhibit 17?

18  **A.**   Exhibit 17 is a hand-marked ballot.  We can see three

19  races on the front side, and there were two races on the

20  backside of this ballot.

21  **Q.**   Okay.  And what does this particular exhibit show?

22  **A.**   It shows votes -- five votes for all five races.  This

23  particular voter used an X to mark their ballot.

24  **Q.**   And is this a test ballot that you used?

25  **A.**   It is.

1    **Q.**    I notice it says Anywhere County; right?

2    **A.**    Right.

3    **Q.**    What was -- I don't want to say what was the result that

4    the scanner told you.  But what was the scanner's reaction, I

5    guess?  What did you see from the scanner when this was used?

6    **A.**    When the scanner saw these marks, it decided that they

7    were not votes and it reported it as a blank ballot.

8    **Q.**    And so -- and this was -- this was a ballot that you fed

9    into the --

10   **A.**    I personally fed it through multiple times because it

11   seemed so surprising.

12   **Q.**    And did you have the opportunity to feed in other ballots

13   to test the effectiveness of the system?

14   **A.**    I did.

15   **Q.**    And I know you have a video of this.  But I'm going to

16   show -- did you take a video of that?

17   **A.**    Yes.

18   **Q.**    And did you take that video and then make some still

19   photographs out of that?

20   **A.**    I was the one feeding into the scanner, so I didn't

21   personally shoot the video.  But yes.

22   **Q.**    Okay.  Let's look at Exhibit 12 --

23            MR. BROWN:  We would like to introduce 17 into the

24   record, Your Honor -- Plaintiffs' Exhibit 17.

25            THE COURT:  Any objection?  Are there any objections?

1           MR. RUSSO:  No, Your Honor.

2           THE COURT:  And were there any objections to 13?

3           MR. RUSSO:  No, Your Honor.

4           THE COURT:  Okay.  They are both admitted.

5           MR. BROWN:  We would like to pull up on the screen

6    Number 12.

7    **Q.   (BY MR. BROWN)**  And while that is coming up, Ms. Dufort,

8    can you tell the Court what your methodology was in feeding the

9    same ballot in over and over again and why you did it that way?

10   **A.**   Sure.  The purpose of this was to try as best we could

11   replicate how human beings do things.  And that is to say never

12   the same way twice.

13        So we took many of these sample ballots and put them

14   through the scanner in each of the possible ways the voter

15   might see this through, top side up, top first and then bottom

16   first, and bottom side up, top first, and then bottom first to

17   see if it made any difference in how the scanner saw the vote.

18   **Q.**   I believe I may have the wrong exhibit number.  Can you

19   pull up please the -- the exhibit with the number of different

20   ballots in it?  I thought it was 13, 17, or 12.  But I must

21   have the wrong number.

22          MR. BROWN:  Excuse me, Your Honor, while we do that.

23               **(There was a brief pause in the proceedings.)**

24   **Q.   (BY MR. BROWN)**  While we're looking for the exhibit that

25   has the number of photographs that you took from the video,

1    could you simply describe narratively for us what you did and

2    what results you received from the scanner.

3    **A.**    Sure.  So the ballot had five contests on it.  Three were

4    races, and two were questions.  When I put it through, the

5    first thing I did was put it through each of the four possible

6    ways to feed it.  And each time, I got a different message from

7    the scanner.  It would return it with an error saying there

8    were ambiguous marks, but it never pointed out the same

9    ambiguous marks.

10        I'm going to look at my notes here in absence of the

11   image.  So the first time when we put it in face up like you

12   see first, it told us that one SPLOST race, one of the contests

13   on the backside, was ambiguous.

14        The second time when I put it in bottom first, it told me

15   that the liquor sale vote was what was ambiguous and it didn't

16   tell me anything about the SPLOST.

17        The third time when I turned it over and put it backside

18   facing up top end, it told me the SPLOST and one of the judge

19   races was ambiguous.

20        Then the fourth time when I put it backside bottom in, it

21   told me the SPLOST and the liquor sales was in there.  So four

22   different times feeding and four different error messages.

23        The important thing to understand about how this was

24   working -- the precinct scanner is designed to help a voter

25   catch their own mistakes or at least the things that the

1    scanner doesn't understand about their vote.  It doesn't tell

2    you affirmatively what it is accepting for a vote.  So you will

3    not hear if it is deciding it is a no vote.  You will only hear

4    if it thinks it is ambiguous.

5        And it might tell you if the vote cast, but it won't tell

6    you if it counted all five.  So I would call that a bit lacking

7    in terms of voter prompts because I may be told I have one race

8    that is ambiguous and I fix that.  As a voter, I am going to

9    assume that all of the others were good.  But that may not be

10   true, and you are not told by the scanner.

11   **Q.**   Ms. Dufort, we now have the exhibit on the screen.

12        MR. BROWN:  And for the record, this is an exhibit

13   number that I will be told momentarily and put in the record.

14   **Q.**   **(BY MR. BROWN)**   But for now, does this show the stills of

15   the video that you took of what you were doing?

16   **A.**   It does.  And this is the ballot I was describing.

17   **Q.**   Okay.  And so what you did is you just fed it different

18   ways repeatedly, and you got different results from the scanner

19   almost every time; is that right?

20   **A.**   Yes.  And there is more.

21   **Q.**   Please tell us.

22   **A.**   After getting four different results feeding it four

23   different directions, I decided to see if I set it the same

24   direction five straight times would I get the same answer five

25   straight times.

1   **Q.**   What happened?

2   **A.**   I never got the same answer five straight times, no matter

3   which direction I fed it in.

4   **Q.**   Would you expect a computer that is just a computer to

5   give you different results based upon the exact same input five

6   different times?

7   **A.**   I would not.  All my life training says reports out of

8   computers are consistent.  It is people who aren't.  But this

9   is the opposite.

10          MR. BROWN:  I do not have any further questions at

11   this time.  And we would introduce this exhibit into evidence.

12          MR. RUSSO:  I'm sorry.  Is it -- Bruce, I'm sorry.

13   Is it just this one page?  I think you had originally sent us a

14   compilation of photos.

15          MR. BROWN:  It is the compilation I sent you that we

16   would like introduced, and I will perfect the record later.

17          MR. RUSSO:  To the extent that they have not been

18   authenticated, because I think they are photos that Ms. Dufort

19   took, we would say that they are not admissible yet.  But

20   Mr. Brown can lay that foundation if he needs to.

21          THE COURT:  Well, go ahead and do the foundation.  I

22   mean, she took -- she has been talking about this very

23   document.

24          MR. RUSSO:  And this first page is fine.  I think it

25   is a document that has -- it is Page 1 of 27 at the bottom.

1    That is all.  I have no objection to this first document.

2              THE COURT:  Are you trying to introduce 26 other

3    pages?

4              MR. BROWN:  I am, Your Honor.

5              THE COURT:  All right.  Well, then have her identify

6    what the rest of it is then.

7              MR. BROWN:  If we could -- if we could scroll through

8    a couple of seconds at a time each of those pages.

9              THE COURT:  Watch out.  Somebody is typing while you

10   are speaking.

11   **Q.   (BY MR. BROWN)**  Ms. Dufort, would you describe what we are

12   doing just generally?

13   **A.**   Sure.  These first few are just giving you better images

14   of how the voter -- how the vote was marked.

15   **Q.**   And this is taken of the test ballots that you ran on the

16   Fulton County machine last week?

17   **A.**   That is right.  This is one ballot we're looking at.  All

18   27 photos are of this ballot and what happened as we put it

19   through the scanner.

20       So this is going through the scanner for the first time,

21   and this is the first result -- the error message that we got,

22   ambiguous for one vote.

23   **Q.**   And I believe you testified that error message is supposed

24   to prompt the voter who is feeding the ballot into the scanner

25   to correct something; correct?

**A.**     That is right.  So as a voter, I would look at this and I would probably strengthen my markings around the SPLOST education vote and put it back through.

**Q.**     If you could keep scrolling will be fine.  Thank you.

**A.**     And that is showing what that mark was.  You can see what the voter mark was.  Now I am feeding it through bottom -- face up but bottom side.  Same ballot.

**Q.**     And the scanner is supposed to take it any of those four ways; correct?

**A.**     That is right.  All the training in the poll worker training says they can feed it any way.  This time, we have a note of an ambiguous mark, but it is the Sunday liquor sales. It is a different contest.  And there is that voter mark.

Now we flipped it over, and we're feeding the top side of the back in first.  I am.  This time it sees two ambiguous marks, that SPLOST and now we have added the judge of the probate court.

Now I am feeding it backside bottom, SPLOST for education and Sunday liquor sales.  Again -- so this is -- you have now gone through four possible ways to feed it, and you have gotten four different ambiguous messages.

**Q.**     And do the rest of the photos similarly detect different combinations?

**A.**     That is right.  And so we have, you know, 20 different times I put that one ballot through, five times each for each

1    of the possible ways to feed it.  And I could never get the

2    same answer between the different ways to feed it, and I could

3    never get five same answers for any one direction.

4    **Q.**   And did you sort of deliberately use a checkmark on those?

5    They are checked?  You didn't fill in the ovals; is that right?

6    **A.**   They are.  We tested other types.  Voters -- my

7    understanding -- I'm not a lawyer.  But my understanding as a

8    vote review person for many years is if voter intent can be

9    discerned you count the vote.

10   **Q.**   And that is what you do?  Both parties and the third party

11   would count a vote when it is clear what the voter intended?

12   **A.**   Yeah.  I can't imagine anyone sitting on a vote review

13   panel that would challenge any of these votes except the one on

14   the left of the first page.

15        You don't have it in front of me right now on that side.

16   But that one is marked kind of funny.  Right?  Right over

17   there, bottom left.  That is a funny write-in.  So probably my

18   vote review panel would actually have not even known what that

19   vote was for, and we would not have counted that vote.  But we

20   would have counted all the others because they were clear.

21             MR. BROWN:  Thank you very much, Ms. Dufort.  I have

22   no further questions.  But I would like to go ahead and admit

23   Plaintiffs' Exhibit Number 12.

24             MR. RUSSO:  No objection.

25             THE COURT:  It is admitted.

```
1              MR. RUSSO:  Yes, ma'am.  No objection.

2              Your Honor, could I proceed?

3              THE COURT:  Yes.

4                         CROSS-EXAMINATION

5    BY MR. RUSSO:

6    Q.   Ms. Dufort, my name is Vincent Russo, and I represent the

7    State defendants in this case.  It is a pleasure to meet you

8    over Zoom.

9    A.   Thank you.

10   Q.   I have a few questions for you quickly.  Now, when did you

11   conduct your review of these -- these ballots in Fulton County

12   that you just discussed?

13   A.   Tuesday of this week.

14   Q.   And where did you conduct that review?

15   A.   Downtown Atlanta in a law office.

16   Q.   Now, the ballot photos identify a county that is called

17   Anywhere County.  How did you obtain those ballots?

18   A.   I don't know.  I wasn't part of the process of getting the

19   equipment there or getting the ballots.  It was done by

20   direction of the Court, and it was outside my purview.

21   Q.   Okay.  I wasn't sure if this was -- I must have misheard

22   you earlier.  I didn't realize this was the Court-ordered

23   inspection.  I thought this might be a different one.

24        Now, prior to conducting the test, did you conduct any

25   testing on the scanner?
```

1    **A.**    No.

2    **Q.**    And did you check any of the scanner settings?

3    **A.**    No.

4    **Q.**    Do you know what the scanner settings were at at the time

5    of the test?

6    **A.**    No idea.

7    **Q.**    Do you have any -- any special education in election

8    systems?

9    **A.**    No.  I'm a citizen volunteer.

10   **Q.**    And you are not being offered as an expert in this -- in

11   this case; right?

12   **A.**    I am being offered because I served on a vote review panel

13   and had an experience that was useful.

14   **Q.**    And you would agree with me that voters are instructed to

15   fill in the ovals next to the candidate that they are

16   selecting; right?

17   **A.**    Yes.

18   **Q.**    You have -- at least you state so much in your

19   declaration; correct?

20   **A.**    Yes.

21   **Q.**    And you would agree with me also that marks that do not

22   register on the scanner is because the ovals that were supposed

23   to be filled in were instead marked with checks in this case?

24   **A.**    You are going further than something I can agree with.

25            THE COURT:  Mr. Russo, I don't think this is useful.

1          MR. RUSSO:  I'll move on, Your Honor.

2     **Q.   (BY MR. RUSSO)**  The scanners -- now, you are aware of the

3     State Election Board rule that was passed today setting the

4     scanner threshold at 10 percent and a 20 percent threshold?

5     **A.**   I was watching this hearing at the time that vote was

6     taken, but I was at that meeting earlier this morning and made

7     remarks to that State Election Board telling them that in my

8     opinion that ten percent threshold will result in votes not

9     being cast.  And I believe the report that was proffered for

10    Harri that was marked draft confirms that.

11    **Q.**   I'm sorry?

12    **A.**   The report that was proffered for Harri to look at, the

13    one that was marked draft that CES did, confirms that seven

14    votes will not be cast as the result of the setting of 10 to

15    20 percent.  It is in the report.

16    **Q.**   And you believe that the controlled scanner setting should

17    be lower than ten percent?

18    **A.**   I believe that a computer should never be allowed to

19    discard a vote without human review.  We have a vote review

20    panel process.  It works.

21         I think the setting -- whatever setting is necessary to

22    kick these things out to let humans look at them is what works

23    for voters.

24    **Q.**   So you would -- you do think it should be a lower

25    threshold than ten percent?

1    **A.**    I do.

2    **Q.**    And according to your declaration, you state that in the

3    June primary there was about five percent of the ballots that

4    had to be reviewed by the vote review panel?

5    **A.**    In my county, yes.

6    **Q.**    In your county.  And would you agree that a lower scanner

7    threshold setting would require more time and ballots to be

8    reviewed?

9    **A.**    Well, there is good news.  That same rule that they

10   apparently passed today, according to you, dropped the upper

11   threshold from 35 to 20.  And that will result in close to a

12   40 percent reduction, according to that same CES report.

13        So we're going to free up some time on the top end that

14   was wasted and spend some very valuable time making sure every

15   vote gets counted as cast.

16   **Q.**    And do you have any idea if the move to an all hand-marked

17   paper ballot system what five percent of the total vote being

18   reviewed would look like?

19   **A.**    I haven't done the math.  I could do it.

20            MR. RUSSO:  Okay.  Thanks.

21            No more questions, Your Honor.

22            THE COURT:  Let me just ask -- did you have some

23   follow-up, Mr. Brown?  I'm sorry.  You have the --

24            MR. BROWN:  I'm sorry, Your Honor.  I don't have any

25   more questions.

```
 1                        EXAMINATION
 2   BY THE COURT:
 3   Q.   All right.  I just wanted to get some clarity since you
 4   had spent a lot of time at the polls at this juncture, more
 5   than I have.
 6        When you say when the voter puts the -- this is like for a
 7   provisional ballot that would be doing this -- right? --
 8   because --
 9   A.   If you were in a precinct, you would not be putting it
10   through the scanner for provisional.  If you were in a
11   precinct, you would be putting it through if you were voting
12   under the emergency ballot rule.
13   Q.   Okay.  If you were putting it in -- all right.
14        And when you were adjudicating ballots for Morgan County,
15   were you looking at both?  The central office and the precinct
16   level?
17   A.   We do -- the vote review panel winds up looking at all
18   accepted provisional ballots.  So some did come in from the
19   precinct level.  But we were primarily looking at the mail-in
20   absentee ballots.
21           THE COURT:  And we were talking about the
22   ten percent.  I'm going to assume, Mr. Russo, you are not
23   saying that is the same as what Mr. Hursti is saying?  I mean,
24   that's a different number.  Are we having -- I just want to
25   make sure that we are having clear communication.
```

1      MR. RUSSO:  The ten percent is the threshold under

2  the SEB Rule, Your Honor.

3      THE COURT:  Right.  But that is different than doing

4  what Mr. Hursti was recommending, which is adjusting the

5  measure -- the DPI level on the scanner -- right? -- unless you

6  are saying something different?

7      MR. TYSON:  Your Honor --

8      MR. RUSSO:  Yeah.  Go ahead, Bryan.

9      MR. TYSON:  I think I can clarify this, Your Honor.

10  Bryan Tyson.  Mr. Hursti was talking about the dots per inch.

11  This is the percentage of the oval that is filled.

12      THE COURT:  Right.  So there are two different ways

13  of getting at this issue.

14  Q.   **(BY THE COURT)**  But with the ten percent, your concern,

15  Ms. Dufort, is that you still will have ballots you don't get

16  to look at?

17  **A.**   So here -- you need to think about what are the things

18  that go into that judgment of ten percent -- okay? -- when the

19  scanner is reporting.  You have the scanned image.  That is

20  what Harri was talking about, the DPI, high quality image.

21  Then you have the software looking and interpreting that image.

22  Okay?

23      But what goes into what the scanner sees depends on a lot

24  of things, including, you know, humidity, including how much

25  of -- how dark the oval mark is.  You saw some very light oval

1   marks and some darker oval marks.  It matters what color ink

2   you have used.

3       So there are a number of different things that go into

4   that judgment.  So I am just here to say very simply I have

5   seen enough votes go uncounted to be very uncomfortable with

6   the very idea.  And I have seen a report from the State that

7   affirms that at ten percent votes will not be counted.  They

8   will be definitively discounted and not even shown to vote

9   review panel people.  And I think that is crazy.

10              THE COURT:  All right.

11              MR. BROWN:  Your Honor, I have a follow-up questions

12  about emergency ballots and provisional ballots, if I might.

13              THE COURT:  Okay.

14                      REDIRECT EXAMINATION

15  BY MR. BROWN:

16  **Q.**   Ms. Dufort, are you familiar with all of the precinct

17  scanner -- what you were looking at were not black ovals that

18  would have been put in by -- with a black ballot pen --

19  correct? -- the ones that you were testing?

20  **A.**   That is right.

21  **Q.**   And so the test that you were doing was designed to

22  determine how generally one of these scanners might read

23  mail-in ballots; correct?

24  **A.**   That is right.

25  **Q.**   And might it be different for -- like, say, the switch was

1   made to hand-marked paper ballots, for example.  What would

2   based upon your observations you expect the scanner to behave

3   or not behave with respect to those kinds of ballots?

4   **A.**   Well, Harri, who spoke earlier, is the most knowledgeable

5   person I personally know about scanners.  But I have also

6   reviewed some of the Dominion manuals that we have acquired

7   through Open Records.

8        And it appears to be true that there is a best practices

9   in the world of what pen you should use to mark ballots.  You

10  can't control that with ballots marked from home.  But you

11  certainly can control it in a precinct.

12            MR. BROWN:  Thank you very much.

13            THE COURT:  Thank you.  Are there any -- did we take

14  care of all the exhibits, Mr. Brown?

15            MR. BROWN:  Yes.  We would make sure.  It is 12, 13,

16  17.  I think they are all admitted.

17            THE COURT:  All right.  Very good.

18            All right.  Well, my suggestion at this point is that

19  counsel look at those -- be given an opportunity to look at the

20  movie that we -- the five-minute movie and we adjourn the

21  public proceeding and that we at least discuss the movie and

22  how we are proceeding for tomorrow.  All right?

23            And we're going to adjourn the public portion of

24  this, and I think we'll just -- we'll take care of that

25  business and how we're going to handle tomorrow so that we are

```
1    proceeding tomorrow.
2              MR. RUSSO:  Your Honor, could we take a quick
3    five-minute restroom break?
4              THE COURT:  Absolutely.  It is 6:08.  We're going to
5    call it 6:10.
6              Shall we resume at 6:25?  Will that --
7              MR. RUSSO:  That is plenty of time for me.
8              THE COURT:  Right.  Holly, you have the movie?
9              LAW CLERK COLE:  I do.  And I have forwarded it to
10   you as well.
11             THE COURT:  Okay.  All right.
12             MR. CROSS:  Your Honor, just to clarify, we're going
13   to come back in here?  We're not going on a phone call?
14             THE COURT:  Well, we can -- you know, we can go
15   back -- let's go back on a phone call.  We can always go back
16   on this, and you can look at something together.
17             I don't really want to be on a space that I can't
18   assure right now the privacy of.
19             MR. CROSS:  All right.  Very good.
20             THE COURT:  So we'll go back on the telephone at
21   6:25.  Thank you, everybody.
22                      (A brief break was taken at 6:09 P.M., and the
23                      parties resumed with a telephone conference, as
24                      follows:)
25             COURTROOM DEPUTY CLERK:  ███████████████
```



THE COURT:

MR. CROSS:


UNITED STATES DISTRICT COURT





UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT





UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
 1          MR. MILLER:  ███████████████████████
 2    ████████████████████████████████████████████████
 3    ████████████████████████████████████████████████
 4    ██████████████████████████
 5          THE COURT:  ████████████████████████
 6    ████████████████████████████████████████████████
 7    ████████████████████████████████████████████████
 8    █████████
 9              ████████████████████████████████████
10          MR. BROWN:  █████████████████████
11    ████████████████████████████████
12          MR. MILLER:  ████████████████████████
13    ████████████████████████████████████
14    ████████████████████
15          THE COURT:  ██████████████████████████
16    ████████
17          MR. CROSS:  ██████████████████████████
18    ████████████████████████████████████████████████
19    ████████████████████████████████████████████████
20    ████████████████████████████████████████████████
21    ██████████████████
22          THE COURT:  ████████████████████████
23    █████████
24          MR. CROSS:  █████████████████████████
25    ████████████████████
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
 1          MR. MILLER:
 2          MR. TYSON:
 3
 4          MR. BROWN:
 5          MR. CROSS:
 6          THE COURT:
 7
 8
 9
10          LAW CLERK COLE:
11
12
13
14
15
16          THE COURT:
17          MR. CROSS:
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



THE COURT:

MR. CROSS:

THE COURT:

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



MR. CROSS:

DR. HALDERMAN:

THE COURT:

LAW CLERK COLE:

MR. CROSS:

LAW CLERK COLE:

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
1         MR. CROSS:
2         THE COURT:
3
4
5         MR. CROSS:
6
7
8
9
10
11
12    COURTROOM DEPUTY CLERK:
13
14
15
16
17    LAW CLERK COLE:
18    COURTROOM DEPUTY CLERK:
19
20
21         THE COURT:
22         MR. CROSS:
23         THE COURT:
24
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
 1
 2
 3
 4
 5
 6
 7        MR. BROWN:
 8        THE COURT:
 9
10
11
12        MR. MILLER:
13
14
15
16
17        THE COURT:
18        MR. MILLER:
19        THE COURT:
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT





[redacted]

COURT REPORTER: [redacted]

THE COURT: [redacted]

THE COURT: [redacted]

MR. CROSS: [redacted]

THE COURT: [redacted]

MR. McGUIRE: [redacted]

THE COURT: [redacted]

MR. McGUIRE: [redacted]

THE COURT: [redacted]

MR. McGUIRE: [redacted]

MR. TYSON: [redacted]

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
 1
 2          COURTROOM DEPUTY CLERK:
 3
 4
 5        THE COURT:
 6
 7
 8          COURTROOM DEPUTY CLERK:
 9
10
11
12        THE COURT:
13
14
15
16        MR. BROWN:
17        THE COURT:
18
19        MR. MILLER:
20        THE COURT:
21
22          COURTROOM DEPUTY CLERK:
23        THE COURT:
24
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1          **(The proceedings were thereby adjourned at 6:54**

2          **P.M.)**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of
the United States District Court, for the Northern District of
Georgia, Atlanta Division, do hereby certify that the foregoing
208 pages constitute a true transcript of proceedings had
before the said Court, held in the City of Atlanta, Georgia, in
the matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the
12th day of September, 2020.




                         _____
                         SHANNON R. WELCH, RMR, CRR
                         OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT