1        IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF GEORGIA
2              ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,            :
                                      :
5            PLAINTIFFS,              :
    vs.                               :  DOCKET NUMBER
6                                     :  1:17-CV-2989-AT
    BRAD RAFFENSPERGER, ET AL.,       :
7                                     :
             DEFENDANTS.              :
8

9

10    TRANSCRIPT OF HEARING ON PRELIMINARY INJUNCTION VIA ZOOM

11                     PROCEEDINGS

12         BEFORE THE HONORABLE AMY TOTENBERG

13           UNITED STATES DISTRICT JUDGE

14               SEPTEMBER 14, 2020

15                    9:32 A.M.

16                    VOLUME 3

17                    REDACTED

18

19

20

21    *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22             *TRANSCRIPT PRODUCED BY:*

23

*OFFICIAL COURT REPORTER:*        *SHANNON R. WELCH, RMR, CRR*
24                                *2394 UNITED STATES COURTHOUSE*
                                  *75 TED TURNER DRIVE, SOUTHWEST*
25                                *ATLANTA, GEORGIA  30303*
                                  *(404) 215-1383*

**A P P E A R A N C E S   O F   C O U N S E L**

**FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY SCHOENBERG:**

    DAVID D. CROSS
    VERONICA ASCARRUNZ
    EILEEN BROGAN
    MORRISON & FOERSTER, LLP

    HALSEY G. KNAPP, JR.
    ADAM M. SPARKS
    KREVOLIN & HORST, LLC

**FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES, WILLIAM DIGGES, III, AND RICARDO DAVIS:**

    BRUCE BROWN
    BRUCE P. BROWN LAW

    ROBERT ALEXANDER McGUIRE, III (VIA VIDEO CONFERENCE)
    ROBERT McGUIRE LAW FIRM

**FOR THE STATE OF GEORGIA DEFENDANTS:**

    VINCENT ROBERT RUSSO, JR.
    CAREY A. MILLER
    ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

    BRYAN P. TYSON
    BRYAN JACATOUT
    DIANE LAROSS
    LOREE ANNE PARADISE
    TAYLOR ENGLISH DUMA

(...cont'd....)

1    (...cont'd....)

2

**FOR THE FULTON COUNTY DEFENDANTS:**

3
         CHERYL RINGER
4        KAYE BURWELL
         OFFICE OF THE FULTON COUNTY ATTORNEY
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **I N D E X   T O   P R O C E E D I N G S**

2

           **WITNESS**                                    **PAGE**
3
   J. ALEX HALDERMAN, Ph.D.
4
           Direct Examination (Continued)
5            By Ms. Ascarrunz                                22
           Cross-Examination
6            By Mr. Tyson                                    50
           Examination
7            By The Court                                    77

8   KEVIN SKOGLUND

9          Direct Examination (Continued)
             By Mr. McGuire                                  84
10         Cross-Examination
             By Mr. Tyson                                    92
11         Direct Examination (Continued)
             By Mr. McGuire                                  100
12         Cross-Examination
             By Mr. Tyson                                    123
13         Examination
             By The Court                                    127
14         Redirect Examination
             By Mr. McGuire                                  133
15         Recross-Examination
             By Mr. Tyson                                    134
16                              *  *  *

17

18  CLOSING ARGUMENT

19         by Mr. McGuire                                    136
           by Mr. Tyson                                      147
           by Mr. Cross                                      171
20
    CERTIFICATE                                              199
21

22

23

24

25

                    UNITED STATES DISTRICT COURT
                    OFFICIAL CERTIFIED TRANSCRIPT



```
 1              P R O C E E D I N G S
 2    (Atlanta, Fulton County, Georgia; September 14, 2020.)
 3                    (The following proceedings were held in a
 4              private Zoom call with only authorized
 5              participants, as follows:)
 6         THE COURT:  █████████████████████████████████
 7    ███████████████████████████████████████████████
 8    ████████████████████████████████████████████████
 9    ████████████████████████████████████████████████
10       ████████████████████████████████████████
11    ████████████████████████████████████████████████
12    ██████████████████████████████████████████████
13    ██████████████████████████████████████████████
14       ████████████████████████████████████
15         MR. CROSS:  ███████████████████████████
16    ████████████████████
17         THE COURT:  ████████████████████████
18    ██████████████████████████████████████████████
19    ████████████████████████████████████████████
20    █████████████████████████████████████████████████
21    ████████████████████████████████████████████
22    ███████████████████████████████████████████
23    ██████████████████
24         MR. BROWN:  █████████████████████████████
25    ████████████████████████████████████
```



1        THE COURT:

2        MR. BROWN:

3

4        THE COURT:

5

6

7

8

9        MR. CROSS:

10

11        THE COURT:

12        MR. MILLER:

13

14        THE COURT:

15        MR. CROSS:

16        THE COURT:

17

18        MR. TYSON:

19

20

21        THE COURT:

22

23

24

25        MR. MILLER:

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



1       THE COURT:

2           MR. TYSON:

3

4

5           THE COURT:

6

7           MR. TYSON:

8           THE COURT:

9           MR. JACOUTOT:

10

11          THE COURT:

12

13          MR. SPARKS:

14

15

16

17          THE COURT:

18          MR. TYSON:

19

20

21          THE COURT:

22

23

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



1
2
3            MR. MAGUIRE:
4
5            THE COURT:
6
7
8
9            MR. CROSS:
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



MR. TYSON:



```
 1
 2
 3
 4
 5
 6
 7
 8        MR. CROSS:
 9
10        THE COURT:
11
12
13
14        MR. TYSON:
15
16        THE COURT:
17
18
19
20
21
22
23        MR. TYSON:
24
25
```

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          MR. McGUIRE:

19

20

21

22

23

24

25

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT





THE COURT:

THE COURT:

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT





MR. TYSON:



```
 1
 2
 3          MR. CROSS:
 4          THE COURT:
 5          MR. CROSS:
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22          THE COURT:
23
24
25
```

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT









```
 1          DR. HALDERMAN:
 2          THE COURT:
 3          MR. CROSS:

 4
 5
 6
 7          THE COURT:
 8
 9
10
11          MR. MILLER:
12
13
14
15
16
17
18
19
20
21
22
23
24
25          THE COURT:
```



1

2

3

4

5

6

7

8

9

10

11

12

13     MR. MILLER:

14

15

16

17

18

19

20

21     THE COURT:

22

23

24     MS. ASCARRUNZ:

25     THE COURT:

22



BY MS. ASCARRUNZ:

**Q.**

**A.**

**Q.**

    MS. ASCARRUNZ:

**Q.   (BY MS. ASCARRUNZ)**

**A.**

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT





1

2

3

4  Q.

5

6

7  A.

8

9

10

11

12

13  Q.

14

15  A.

16

17  Q.

18

19  A.

20

21

22

23

24

25





1   **A.** 
2
3
4
5   **Q.**
6
7   **A.**
8
9
10
11
12
13
14
15   **Q.**
16        MS. ASCARRUNZ:
17
18
19
20        MR. TYSON:
21
22
23
24
25



1       THE COURT:

3   Q.    (BY MS. ASCARRUNZ)

7   A.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



1
2
3 **Q.**
4 **A.**
5      THE COURT:
6 **Q.   (BY MS. ASCARRUNZ)**
7
8
9 **A.**
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24 **Q.**
25





Q.   (BY MS. ASCARRUNZ)

        THE COURT:

        THE WITNESS:



1      THE COURT:

5      COURT REPORTER:

7      THE COURT:

14     THE WITNESS:

24     THE COURT:

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



1
2   THE WITNESS:
3   THE COURT:
4   THE WITNESS:
5
6
7
8
9
10
11
12   THE COURT:
13   **Q.   (BY MS. ASCARRUNZ)**
14
15
16   **A.**
17
18
19   **Q.**
20
21   **A.**
22
23
24
25

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT







1    **A.**

2    **Q.**

3    **A.**

4

5

6

7

8

9

10

11   **Q.**

12

13        THE COURT:

14

15

16

17        THE WITNESS:

18        THE COURT:

19        THE WITNESS:

20

21

22

23

24

25



1

2

3

4    THE COURT:

5

6

7

8

9

10    THE WITNESS:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1  ████████████████████████████████████

 2         THE COURT:  ██████████

 3  Q.   (BY MS. ASCARRUNZ) █████████████████

 4  ████████████████████████████████████████████

 5  ██████████████████████████████████████████

 6  ████████████████████████████████████████

 7  ███████████████████████████████████████████

 8  ██████████████████████████████████████████████

 9  ████

10      ████████████████████████████████████

11  A.  ██████████████████████████████████████

12  ███████████████████████████████████████████

13  ██████████████████████████████████████

14  ████████████████████████████████████████████

15  ███████████████████████████████████████████████

16  ██████████

17     ███████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████

20  ██████████████████████████████████████████████

21  ███████████████████████████████████████

22  ████████████████████████████████████████████████

23  ██████████████████████████

24     █████████████████████████████████████

25  ████████████████████████████████████████████████
```

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT





1

2

3

4          THE COURT:

5

6

7

8

9

10

11

12          THE WITNESS:

13

14

15

16

17

18

19

20

21

22

23

24

25





1

2

3   **A.**

4   **Q.**

5

6   **A.**

7           MS. ASCARRUNZ:

8

9

10

11

12

13

14

15

16           THE COURT:

17

18

19           MS. ASCARRUNZ:

20

21

22

23           THE COURT:

24           MR. TYSON:

25           THE COURT:



1   MR. TYSON:

2

3

4

5

6   MS. ASCARRUNZ:

7

8

9   MR. TYSON:

10

11

12   MS. ASCARRUNZ:

13   MR. TYSON:

14   MS. ASCARRUNZ:

15

16

17   THE COURT:

18

19

20

21   THE COURT:

22

23   MS. ASCARRUNZ:

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

44



```
 1
 2
 3
 4          THE COURT:
 5
 6
 7          MR. TYSON:
 8
 9
10
11          THE COURT:
12
13
14          MS. ASCARRUNZ:
15    Q.    (BY MS. ASCARRUNZ)
16
17
18
19
20
21    A.
22    Q.
23
24
25
```

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT















52



UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

























MR. TYSON:

Q.    (BY MR. TYSON)

A.

Q.

A.











Exception level?



Q.   (BY MR. TYSON)

A.

Q.

A.

Q.

A.

Q.

Q.

A.

Q.

Q.













```
 1   Q.
 2
 3   A.
 4
 5   Q.
 6
 7   A.
 8
 9   Q.
10
11
12   A.
13
14
15
16            MR. TYSON:
17
18            MR. TYSON:
19
20            MR. CROSS:
21            THE COURT:
22
23   BY THE COURT:
24   Q.
25
```

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT











1
2   Q.
3
4
5   A.
6
7
8          THE COURT:
9          THE WITNESS:
10         THE COURT:
11
12
13         MS. ASCARRUNZ:
14
15         THE COURT:
16         MS. ASCARRUNZ:
17
18         THE WITNESS:
19         MR. McGUIRE:
20
21         THE COURT:
22
23
24
25



BY MR. MCGUIRE:

**Q.**

**A.**

**Q.**

    THE COURT:

    MR. TYSON:

    THE COURT:

    MR. TYSON:

    DR. COOMER:

    THE COURT:

**Q.   (BY MR. McGUIRE)**



1

2

3

4

5

6       THE COURT:

7       MR. McGUIRE:

8

9       THE COURT:

10

11      LAW CLERK COLE:

12

13

14      MR. McGUIRE:

15      LAW CLERK COLE:

16

17

18

19      MR. McGUIRE:

20      LAW CLERK COLE:

21      MR. McGUIRE:

22

23      **Q.   (BY MR. McGUIRE)**

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT









```
 1          MR. McGUIRE:
 2
 3          THE WITNESS:
 4
 5
 6     Q.   (BY MR. McGUIRE)
 7
 8
 9
10     A.
11     Q.
12
13
14     A.
15
16
17     Q.
18
19     A.
20
21     Q.
22
23
24
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT













1
2
3
4  Q.
5
6  A.
7
8       MR. TYSON:
9
10      THE COURT:
11
12
13
14
15      THE WITNESS:
16
17      THE COURT:
18      THE WITNESS:
19
20
21
22
23
24      THE COURT:
25



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11        MR. TYSON:
12
13
14
15
16        THE COURT:
17
18
19
20
21
22
23
24
25
```

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



98



Line 5: LAW CLERK COLE:
Line 6: THE COURT:
Line 7: LAW CLERK COLE:
Line 8: THE COURT:

9    **(The private Zoom proceedings were thereby**
10   **concluded at 12:34 P.M., and the Zoom meeting**
11   **open to the public continued, as follows:)**

12   THE COURT:  Is Mr. Skoglund still -- are we going to
13   continue with his testimony?

14   MR. McGUIRE:  Yes, Your Honor.  We do have a few
15   exhibits for him.

16   THE COURT:  All right.  How many more, Ms. Cole, do
17   you have to admit?

18   LAW CLERK COLE:  I just have four people in the
19   waiting room right now.

20   THE COURT:  All right.  Well, go ahead and admit them
21   or whatever you are going to do.  And then we will begin and
22   get the exhibits up.

23   LAW CLERK COLE:  Mr. McGuire, what are the pictures
24   you are going to use?

25   MR. McGUIRE:  It will be PD 20, PD 19, and then



UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

 1    potentially -- well, that will be it for Mr. Skoglund.

 2              THE COURT:  Who is Diabolic Empress?  Okay.  Thank

 3    you.  I don't want to have another experience here.

 4              I think we have everyone here -- counsel and the

 5    witness.

 6              And is Mr. Skoglund going to continue his testimony

 7    now that is the public portion of his testimony?

 8              MR. McGUIRE:  Yes, Your Honor.

 9              Mr. Bruce Brown had a motion I believe he wanted to

10    make.  I think he is muted.

11              THE COURT:  Mr. Brown -- let's see.  Ms. Cole, did

12    you de-mute?

13              MR. BROWN:  Thank you, Your Honor.  Thank you,

14    Ms. Cole.

15              The Coalition plaintiffs at the appropriate time will

16    be filing a motion to unseal the portion of the sealed

17    testimony that is not confidential.  We will also be taking the

18    position that the demonstration of Dr. Halderman also should be

19    unsealed.  We completely understand the logistical imperatives

20    that Your Honor has been grappling with.  And I believe that a

21    motion would be the best vehicle for allowing the parties,

22    including the State, to present the arguments and to be very

23    specific of what portions of the testimony should be unsealed

24    and for Your Honor to consider those in due course.

25              Thank you.

```
 1              THE COURT:  That is fine.  Thank you.
 2              MR. McGUIRE:  Mr. Skoglund, I believe you are muted,
 3    and I don't see your video.
 4              LAW CLERK COLE:  It is taking a moment for --
 5              COURT REPORTER:  I believe we have some members of
 6    the public with video up.  If counsel of record could just have
 7    video up.
 8              THE COURT:  I think we're okay.  We have pictures
 9    but --
10              All right.  Great.  We have our witness back.  Hello,
11    Mr. Skoglund.
12              MR. McGUIRE:  May I proceed?
13              THE COURT:  Yes.
14                   DIRECT EXAMINATION (Continued)
15    BY MR. MCGUIRE:
16    Q.   Mr. Skoglund, I would like to ask you about logic and
17    accuracy.
18              MR. McGUIRE:  And so I would like to ask Holly --
19              THE COURT:  Would you just -- for purposes of the
20    public, let's just go ahead and just have the witness identify
21    again.
22              You are still under oath, Mr. Skoglund.  Would you
23    just go ahead again and identify yourself, where you are
24    located, and what your -- basically what the scope of your
25    expertise and position are.
```

1          THE WITNESS:  Yes.  My name is Kevin Skoglund,

2     S-K-O-G-L-U-N-D.  I reside in Wynnewood, Pennsylvania, just

3     outside of Philadelphia, which is where I'm calling from today.

4     I'm testifying as a cybersecurity and electronic voting expert

5     in this case.

6          THE COURT:  And what is the nature of your business

7     and background, just as background?

8          THE WITNESS:  Yes.  My background is diverse.  It

9     includes programming, teaching, cybersecurity consulting, and

10    advising on election technology.

11         THE COURT:  Thank you.

12    **Q.   (BY MR. McGUIRE)**  So thank you, Mr. Skoglund.

13    You are familiar with logic and accuracy?

14    **A.**   Yes, I am.

15    **Q.**   What is the purpose of pre-election logic and accuracy

16    testing?

17    **A.**   The purpose of any testing is to try and answer a

18    question, to try and, you know, find out if something is true

19    or not.

20         And so for logic and accuracy testing, different counties

21    perform it different ways, different states perform it

22    different ways depending on what question they want to answer.

23    So it really depends on what the scope of what you want to look

24    at.

25         If you look at a single contest, then you verify that that

1    single contest is working correctly.  If you look at a single

2    piece of equipment and test that, then you verify that that

3    single piece of equipment is working correctly.  If you test --

4    if you test everything that is on a ballot, then you can test

5    that the ballot is working correctly.

6    Q.   And do you have a view of what constitutes adequate logic

7    and accuracy of equipment such as a ballot-marking device?

8            MR. TYSON:  Your Honor, I'll object here that we

9    haven't admitted Mr. Skoglund as an expert on election

10   administration to have an opinion on what is adequate.  I think

11   Mr. McGuire can lay the foundation for that.  I don't think it

12   has been laid so far.

13           MR. McGUIRE:  Your Honor, we have already tendered

14   him as an expert in voting -- electronic voting security.  And

15   logic and accuracy testing is an inherent part of voting

16   security.

17           We can certainly lay more foundation if the State

18   wants, but I think he is already qualified.

19           THE COURT:  All right.  Why don't you just briefly do

20   so.  I think he is.  But go ahead basically to do so.

21   Q.   (BY MR. McGUIRE)  So, Mr. Skoglund, let's go back.  I

22   think some of the ground that we covered yesterday might be

23   informative here.

24       Can you tell the Court more about your experience in

25   regard to voting technology?

**A.**    So I have advised a number of different groups about their voting technology and the selections that they are making, including states and counties, the City of New York.  And I have made -- I have done studies, analysis of the voting purchases that different counties make and comparing the features of those systems.

I'm not sure if there is something more specific you want me to go into.  It is a long list.

THE COURT:  And is logic and accuracy a capacity of the systems and how it functions in the logic and accuracy part of that?

THE WITNESS:  Logic and accuracy -- I think the State is right.  It is a point where election administration interfaces with election technology.  But there definitely are things that I can speak to about the election technology side of that, you know, what is required to make sure that the technology is functioning correctly.

THE COURT:  Okay.

MR. McGUIRE:  Your Honor, do I need to go further or can I ask --

THE COURT:  No.  If there is something you want to wrap up, that is fine but --

MR. McGUIRE:  Yeah.

**Q.   (BY MR. McGUIRE)**  So I just wanted to talk to you, Mr. Skoglund, about -- I would like to put up Exhibit PD 20.

1      Mr. Skoglund, I'm going to represent to you that this is

2  the Georgia statute that pertains to testing pre-election

3  testing and voting equipment.

4      And if we could please scroll down to the highlighted

5  portion in Subsection C.

6      Mr. Skoglund, it says there on or before the third day

7  preceding a primary or election, including special primaries,

8  special elections, and referendum elections, the superintendent

9  shall have each electronic ballot marker tested to ascertain

10  that it will correctly record the votes cast for all offices on

11  all questions and produce a ballot reflecting such choices of

12  the elector in a manner that the State Election Board shall

13  prescribe by rule or regulation.

14      Did I read that correctly?

15  **A.**   Yes, you did.

16  **Q.**   What does that mean to you as a cyber -- as a security

17  person?

18  **A.**   This is essentially the description of what the logic and

19  accuracy test ought to be to ensure that the technology is

20  functioning correctly.

21  **Q.**   And so when you say this is what it should be, what

22  particular aspects of this are you focused on to arrive at that

23  conclusion?

24          MR. TYSON:  I'll object to the extent this calls for

25  a legal conclusion.  But I believe Mr. Skoglund can answer

1    based on his personal understanding of it.

2            MR. McGUIRE:  I'm just asking, Your Honor, as a

3    security person what does he -- which aspects of this does he

4    feel are sufficient because he just said it was sufficient.

5            THE COURT:  Okay.  Proceed.

6    **A.**   The keywords that jump out to me there are the -- in the

7    second line of it where it says each electronic ballot marker

8    and then in the following line when it says record the cast

9    votes for all offices and all questions.  To me, that is a good

10   comprehensive way to define the scope of what we're testing,

11   the question that we're asking when we perform logic and

12   accuracy testing.

13       We're going to be testing every BMD for every office and

14   every question that is tested will correctly record the votes

15   and produce the ballot.

16            MR. McGUIRE:  Thank you.

17            And we can take that exhibit down.  If we could put

18   up PD 19, please.

19   **Q.   (BY MR. McGUIRE)**  Now, Mr. Skoglund, I'm showing you PD

20   19, which is the document that is already in the record.  It is

21   Document 809-4, Page 25.  If we could scroll down so that

22   Section D is visible in the frame.

23       Mr. Skoglund, have you seen this document before?

24   **A.**   I have.

25   **Q.**   What is your -- what is this document?

1  A.   This document is what I believe is the guidance from the

2  State of Georgia or from the State Election Board to how the

3  BMDs and printers should have their logic and accuracy testing

4  performed.

5  Q.   And this Section D deals specifically with the BMD and

6  printer.  Can you take a quick look at that and tell us in your

7  view is that equally adequate as the statute that we just

8  looked at?

9  A.   No, I don't think that it is adequate.

10  Q.   Why not?

11  A.   Because it doesn't test -- it doesn't follow what was just

12  in the previous statute that we looked at.  It is not testing

13  every machine and every what we call ballot position.  Instead,

14  it says that it is acceptable to just test some of those on

15  some of the BMDs and not other ones on other BMDs.

16      And it notes there at the very bottom all unique ballot

17  styles do not have to be tested on each of the BMDs, which I

18  think is not correct.

19  Q.   Okay.  When you say not --

20      THE COURT:  Go ahead.

21      MR. McGUIRE:  I'm sorry, Your Honor.

22  Q.   **(BY MR. McGUIRE)**  When you say not correct, what do you

23  mean exactly?  Do you mean not consistent with the law, or do

24  you mean it is not adequate?  What do you mean?

25  A.   Both actually.  I should clarify.  Yes, it is both.  I

1    think it doesn't -- it does not match my understanding of what

2    the statute was that we just looked at.  And it also is, again,

3    defining the scope of testing such that we are not asking all

4    the questions to all the machines all the time.

5    **Q.**   And if this is the -- if this is the procedure which BMDs

6    and their printers are actually tested under, do you have an

7    opinion on the significance of the difference between this

8    procedure and what the statute requires for purposes of the

9    security of the system?

10           MR. TYSON:  I'll object to the extent this assumes

11   that there is a distinction between those two, but I understand

12   Mr. McGuire's question.

13           THE COURT:  Go ahead and proceed.

14   **A.**   I'm sorry.  Could you ask the question again.

15   **Q.   (BY MR. McGUIRE)**  Yeah.  I may not be able to ask it in

16   exactly the same words.  But, you know, to the extent that you

17   understand this procedure that we're looking at, this D,

18   testing of the BMD and printer, do you have an opinion on the

19   significance of the departure between this document, these

20   procedures, and what you understood the statute to require?

21   Does it matter?

22           MR. TYSON:  (Unintelligible).  Sorry.

23   **A.**   Yes, I think it does matter.  Not just in a legal sense.

24   But in a technical sense, I think it matters.  And there is a

25   good recent example of that.  In Northhampton County,

1    Pennsylvania, where I reside -- in the state I reside, in

2    November of last year, there was some poor configuration of the

3    ballot-marking devices that is a ballot marker and tabulator

4    all in one.  And the configuration problem -- the systems were

5    not adequately logic and accuracy tested.  So those

6    configuration problems weren't caught.  And the result is that

7    there were some contests on election night that had correct

8    tallies and other contests where the candidate that was

9    eventually the winner got zero votes.

10       And so not only was it, you know, a big fiasco to sort of

11   sort out, but the public's trust in the election was really

12   damaged.  Thankfully this failure was on a machine with paper

13   and the error was on the side of the tabulation of that paper.

14   So the paper could be rescanned.

15       But if the error had been in the ballot-printing portion,

16   as Dr. Stark has testified about is a concern, it would not

17   have been able to correct those results.

18   **Q.   (BY MR. McGUIRE)**  And by that, you mean using this

19   procedure versus the one in the statute?

20   **A.**   That's right.  If you don't catch the problems in the BMD

21   and ask yourself if every BMD is operating properly, then you

22   open yourself up to having results that you can't detect are

23   wrong.

24   **Q.**   The example you just gave in Northhampton, Pennsylvania,

25   was of a misconfiguration of the BMDs.  Would your conclusion

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1    hold true in the event of intentional malware attack that had

2    altered the functioning of one or more BMDs?

3    **A.**   Yes, it would.   There is no real distinction between

4    manipulation, you know, or malfunction.   There is an intention

5    is the difference.   But the machine is not acting according to

6    its specifications.   It is not doing what it is supposed to,

7    which is what logic and accuracy testing is designed to test.

8    **Q.**   Okay.   So I asked you about the changes to central count

9    scanner settings that the plaintiffs have proposed.

10        You heard Dr. Coomer and Mr. Harvey suggest on Friday that

11   changing scanner settings might implicate EAC certification,

12   did you?

13   **A.**   I heard them say that.

14   **Q.**   Okay.   Do you agree with their testimony on that point?

15   **A.**   No, I do not.

16   **Q.**   Why not?

17   **A.**   The EAC certification doesn't reference specific settings,

18   such as color and gray scale and dots per inch.   So when

19   Democracy Suite 5.5-A is certified, it is certified for all

20   available settings.   And the scanner documentation shows that

21   these settings are available.

22   **Q.**   So the EAC certification does not specify the DPI setting

23   required for central count scanners?

24   **A.**   It does not.

25   **Q.**   Okay.   And are you aware -- and it doesn't specify that

1  central count scanners have to be set to scan only in black and

2  white?

3  **A.**    That is correct.  On the dots per inch, I would also add

4  my understanding from the previous testimony is that it is

5  actually different on different machines, the central count

6  scanner and the precinct scanners.  So it is already different.

7  **Q.**    Are you aware of anything in the EAC test plan or the

8  certifications or approvals of 5.5-A or to the extent you know

9  5.5-A (GA) that would preclude Georgia from adjusting the

10  settings of the Dominion central count scanners?

11  **A.**    I do not.

12  **Q.**    In your opinion, would an order from this Court that

13  requires changes to those scanner settings void or violate any

14  current certification or approval from the EAC?

15  **A.**    No, I don't think it would.

16  **Q.**    Okay.  Finally, I want to switch gears and ask you about

17  the plaintiffs' request for BMDs not to be used and instead for

18  paper ballots to be used for in-person voting.

19      I understand from your declaration in October of 2019 in

20  this case that you are a judge of election in Montgomery

21  County, Pennsylvania, and that the polling place you oversee

22  uses a voting system manufactured by Dominion and configured

23  for hand-marked paper ballots; is that true?

24  **A.**    That is correct.  We use Democracy Suite 5.5-A, the same

25  system.

1    Q.   So, first of all, what is a judge of elections in

2    Pennsylvania?

3    A.   I'm not sure what the term is in Georgia.  It is the head

4    poll worker, the person who runs the poll placing and performs

5    sort of the highest level tasks in the polling place.

6    Q.   So the hardware and software that you use in Pennsylvania,

7    how similar is it to what the plaintiffs are proposing should

8    be used here in Georgia?

9    A.   It is the same suite of software.  We use the -- what I

10   understand to be the same hardware as well.  We have the

11   ImageCast X BMD with the external printer, as you have seen

12   before, and the ImageCast precinct scanner.

13        The difference is in the way that we deploy those.  We

14   only deploy one scanner and one ballot-marking device per

15   polling place rather than many of the ballot-marking devices.

16   Q.   And the rest of the voters vote how?

17   A.   They vote -- the voters who don't use the ImageCast X BMD

18   vote by hand-marked paper ballot.  That is the majority of

19   voters.  In fact, in the last two elections, I think it has

20   been all but one voter who voted by hand-marking a ballot.

21   Q.   And you heard Mr. Barron's testimony that using

22   hand-marked paper ballots on election day would not -- would be

23   possible for Fulton County?

24   A.   Yes, I did.

25   Q.   Does your experience in Pennsylvania support that

1  conclusion by him?

2  **A.**   Absolutely.  It works very well for us.  We have been very

3  happy with the system.

4  **Q.**   Now, you also heard him testify that early voting might be

5  a concern for Fulton County, did you not?

6  **A.**   I did.

7  **Q.**   Do you have any reason -- well, first of all, do you have

8  early voting in Pennsylvania?

9  **A.**   We don't have early voting in Pennsylvania.

10  **Q.**   Okay.  So do you have reason to disagree with Mr. Barron's

11  apprehension about conducting early voting without BMDs?

12  **A.**   No.  I think that it is very feasible.  I mentioned before

13  that I have provided some testimony to the New York City

14  council.  That was actually specifically on this question.

15      New York City had implemented early voting, and they were

16  trying to figure out how they were going to do that

17  logistically and from a technology perspective.  So I was

18  invited to speak and to talk about my recommendations to the

19  city council.

20      And I recommended to them -- they were trying to decide

21  between rolling out ballot-marking devices for everyone, which

22  is what some people were pushing for, versus other solutions.

23  I recommended other solutions being a ballot-on-demand

24  printing.  That is ultimately what New York City ended up

25  adopting.  And my understanding is that worked very

1    successfully and they are going to continue using it.

2        The idea is just that at each early voting location you

3    have a printer that can print a ballot on demand.  And the

4    solution that they went with is one made by KNOWiNK, the

5    pollbook company that, I believe, Georgia uses as well.  And it

6    is called Poll Print.  It directly interfaces with the pollbook

7    so that when the voter checks in their ballot style is pulled

8    up by the pollbook and the ballot instantly prints and it is

9    handed to the voter for them to go then take and hand-mark.  So

10   it is sort of a just-in-time printing.

11   **Q.**   So in that situation as I understand it, you are saying

12   that the early vote center would stockpile some ballots but it

13   would print most of them?

14   **A.**   I think that their solution is to print them all

15   immediately.  I'm not positive on that.  But I had actually

16   recommended to them that they didn't have to do immediate

17   printing, that they also could stockpile a sort of reservoir of

18   each ballot style.  So maybe 20 to 50 ballots of each style and

19   then you pull the appropriate, you know, ballot style for each

20   voter.  Then you can use a ballot-on-demand printer to

21   replenish those reservoirs of ballots as they were given out.

22   **Q.**   Okay.  So in your supplemental declaration, which for the

23   record is Document 680-1 at Page 29 -- I'm going to point

24   specifically to Paragraph 11 -- you said that hand-marked paper

25   ballot systems have shorter lines due to the rate in which a

1    series of voters can move through the polling place.

2         Have you observed this to be true in jurisdictions you are

3    familiar with?

4    **A.**    Yes.  I think I have seen in my experience and I have read

5    studies that show that it is true.  The reason why -- in my

6    county before we switched systems, we had DREs.  And my polling

7    place had two DREs, which meant that two voters could vote at a

8    time.  And that was the total throughput of the polling place.

9    Only two voters could cast their vote at any time.

10        And if you had a particularly long ballot, it would take a

11   long time for voters to make up their mind in the booth.  But

12   under the new system, when voters come into the poll, then we

13   give them their ballot.  They go to privacy stations to do the

14   time-consuming part, to mark their ballot.  In my polling

15   place, we have seven to eight places for them to do that that

16   are designated already.  It is a combination of standup

17   cardboard lecterns that people can mark their ballot at and

18   also some tabletop privacy screens that are just very

19   inexpensive plastic dividers.

20        And there's actually a couple of others that are in supply

21   that we can set up if we need more and they provide clipboards

22   if we needed any more.  So that means that the throughput in

23   our system now is much larger.  It gives you potentially seven

24   or eight voters who can vote at any one time instead of two.

25   And that is the time-consuming part.

1   The process of scanning on the ImageCast precinct is very

2   quick.  So you can just feed your ballot in and then go on

3   your --

4   Q.  So from the voter's perspective in your experience, what

5   is -- is there a benefit to using hand-marked paper ballots

6   versus BMDs?

7   A.  Definitely.  There are a lot of -- a lot of them.  One of

8   them comes from that long line thing.  I always have really

9   liked the fact that voters who may need more time with their

10  ballots, either to make decisions or maybe they have literacy

11  challenges or language challenges -- they can take their time

12  and not feel the pressure of a line building behind them.

13  Where with the old system, you know, those voters had people

14  behind them, you know, waiting and wanting them to hurry up,

15  you know, visibly agitated.  Whereas, now you can sit and take

16  your time.  And a slow voter and a fast voter can be voting

17  side by side.  Several fast voters can move through the process

18  without the slow voter holding things up.

19  Q.  Are you aware of any research that bears on this question

20  of voter delay when using paper ballots versus electronic

21  voting?

22  A.  I am.  There's two papers that come to mind.  One is there

23  is a paper that is coauthored by Charles Stewart from MIT.  He

24  is someone who I really admire.  He takes a very data-driven

25  approach to looking at election problems.  And he looked at

1    this issue and found that waiting times are uneven across the

2    country, found that a lot of the problems are in sort of the

3    southeastern states with long lines, and concludes that those

4    lines have an effect on voter trust of the system.

5        He determined that if you wait in line you are more likely

6    to not trust your election and also that you are not as likely

7    to trust the elections of other people in other places as well.

8    So it has an overall diminishing effect on voter trust.

9    **Q.**   And you said that was one of the studies.  Was there

10   another?

11   **A.**   Yes.  The other study is looking at Maryland elections and

12   using data and computer simulations to compare the wait times

13   between touch screen DREs and hand-marked paper ballots.  And I

14   found that the DREs are a limiting resource in the way that I

15   just described, that they provide a bottleneck, especially if

16   the ballot is really long.

17       They actually come up with a formula for determining, you

18   know, how many screens you would need to handle the capacity

19   and conclude that the hand-marked paper ballots are a better

20   solution because they have more, you know, throughput capacity.

21   **Q.**   Okay.  I would like to show you PX 61 and then PX 62 and

22   have you confirm whether those are the studies you are talking

23   about.

24       This one would be PX 61, I believe.  And that is -- is

25   that one of the studies you were talking about?  Or maybe you

1   could scroll down.  It says waiting to vote there.

2   **A.**   Can you scroll down -- is that possible? -- to the next

3   page?  Sorry.  Yes, that is the one.

4   **Q.**   This is the Stewart paper you referred to?

5   **A.**   That's correct.

6         MR. McGUIRE:  Okay.  Great.  I would move to admit

7   this one, Your Honor, PX 61, and I would like to show you PX 62

8   next.

9         MR. TYSON:  Your Honor, we'll object as hearsay.

10  Mr. Skoglund hasn't been participating in the study.  He read

11  the study, and he liked it.  That is the whole basis of it

12  coming in.  I don't see that there is any relevance here.

13  There is no policy discussion, not what different things can be

14  done.  But it is not relevant to the claims before the Court.

15        MR. McGUIRE:  Perhaps I could ask another question or

16  two then of Mr. Skoglund.

17  **Q.**   **(BY MR. McGUIRE)**  Mr. Skoglund, are these studies the

18  kinds of things that you would rely upon to form your opinions

19  as an expert?

20  **A.**   I would rely upon it.  I have relied upon them.

21  **Q.**   So in terms of the opinions you are expressing here today,

22  are these two studies -- these underlie those opinions?

23  **A.**   Yes, they do.

24        MR. McGUIRE:  Okay.  Based on that, Your Honor, I

25  mean, he has already testified to the underlying stuff.  I

1　don't know why it would be objectionable to admit it as

2　foundation for what his opinions were.

3　　　　　MR. TYSON:  Again, Your Honor --

4　　　　　THE COURT:  Fine.  I'll just take it under

5　advisement.

6　　　　　Thank you.  Go ahead.

7　**Q.　(BY MR. McGUIRE)**  The other one is PX 62.  Is that the

8　other study you were referring to?

9　**A.**　Yes, it is.

10　　　　　MR. McGUIRE:  And similarly I would move for that one

11　to be admitted as well.

12　　　　　MR. TYSON:  Same objection, Your Honor.

13　　　　　THE COURT:  All right.

14　**Q.　(BY MR. McGUIRE)**  Mr. Skoglund, just to wrap up this

15　section, so in your opinion do you have an opinion --

16　　　　　THE COURT:  I'm sorry.  Would you just mind reading

17　into the record the name of each study and the authors and

18　their affiliation.

19　　　　　MR. McGUIRE:  Certainly, Your Honor.  I can do that.

20　P -- I'm sorry.  Let me pull it up.  62 -- PX 61, the authors

21　are Charles Stewart and Stephen Ansolabehere, and the title is

22　Waiting to Vote.  It is from the Election Law Journal:  Rules,

23　Politics, and Policy dated 2015.

24　　　　　THE COURT:  Its affiliation?

25　　　　　MR. McGUIRE:  I'm sorry.  It is -- I'm sorry.  It was

1      from MIT open access articles.  It is from the MIT faculty.

2              THE COURT:  Okay.

3              MR. McGUIRE:  The second article, PX 62, is from

4      proceedings of the 2010 electronic voting technology workshop,

5      the workshop on trustworthy elections in Washington, D.C. on

6      August 9 and 10, 2010.  The title is, Queuing and Elections:

7      Long Lines, DREs, Paper Ballots.  That is by William Edelstein

8      and Arthur Edelstein.

9              THE COURT:  And that's Johns Hopkins University and

10     the Mr. Edelstein from the University of California in San

11     Francisco.

12             I just want in the record for it to be properly

13     referenced.  Before I let them in, I'll have to take a look.

14     **Q.   (BY MR. McGUIRE)**  Mr. Skoglund, just to clarify one point,

15     that one article in its title referred to DREs.  And we have

16     been talking about BMDs today.

17         Does that make a difference?

18     **A.**   No.  Because the key point of those is about providing a

19     voting resource.  Right?  So each one is still a resource.  If

20     you have two or three or four in a polling place, that is the

21     limit of that resource.

22         And if anything, ballot-marking devices take more time

23     because there is that extra process of printing a piece of

24     paper, which hopefully voters are going to spend time looking

25     at, even if the evidence is thin that they do.

**Q.**   So, Mr. Skoglund, based on your own experience and based on what you have observed in the New York City council, do you have an opinion on whether a large Georgia county like Fulton could feasibly implement hand-marked paper ballot voting during early voting and on election day in the time left between now and when voting starts?

**A.**   Absolutely.  I mean, for hand-marked voting, that is done in large cities and large counties across the nation, so, you know, Boston and New York City as we mentioned.  Same for early voting.

In my personal county, we have about 75 percent, I think, the size of Fulton County.  I'm sort of doing rough math there.  But I think that is about right.  We had no problems moving to it.

**Q.**   So to wrap all this up, in your expert opinion, is Georgia's voting system secure?

**A.**   You know, this question has come up a couple of times from other experts as well.  And in my line of work, we don't think of it as being secure or insecure.  And we don't try to measure the distance the system is from either one of those and that is because we can't predict the future.

Vincent Liu when he testified talked about some of the engagements he's been on where they didn't find anything.  But he could have been an hour and a few key strokes away from finding a big problem.  Instead, because we can't predict the

1    future, instead we engage in something called threat modeling

2    where we try to look at the potential problems that could

3    happen and then measure the risks of those problems.

4         And the way we measure risks is with two things:  The

5    likelihood of something happening and the impact if it does

6    happen.  And looking at those and measuring those allows us to

7    then weigh our need to do something versus the risk involved

8    with it, to weigh competing options, and also to prioritize,

9    you know, where our biggest concerns are so that we can add

10   mitigation, which is a word just for -- you know, for lessening

11   the risks.

12        When you go on vacation, you -- you lock yours doors and

13   leave on some lights and hold the mail.  Those are just

14   mitigations for you not being robbed.  It doesn't mean you

15   won't be robbed while you are away.  But they make the

16   likelihood less.

17        And we look for ways to build in resilience to a system.

18   A good example of that is like a power generator.  If the power

19   in your house goes out, you can lessen the impact of it by

20   having a backup generator.

21   Q.   And how would you regard Georgia's current BMD voting

22   system using the methodology you just described?

23             MR. TYSON:  Your Honor, I'll object to this line of

24   questioning as beyond the scope of Mr. Skoglund's expertise.

25   This is now about threat modeling, risk assessments.  I don't

```
 1   think we have had any indications of the expertise of

 2   Mr. Skoglund in those areas.

 3           MR. McGUIRE:  Your Honor, he has been all but

 4   qualified as an expert in cybersecurity.  And this is right

 5   down the middle of that.

 6           THE COURT:  I'll permit it.

 7   Q.   (BY MR. McGUIRE)  Again, my question, Mr. Skoglund, is:

 8   How would you regard Georgia's current BMD voting system using

 9   the methodology that you just described?

10   A.   The methodology said that we would first look at the

11   threats.  And those threats are not just threats of hacking by

12   foreign actors.  But it is everything from machine failures to

13   long lines to running out of emergency paper ballots, power

14   outages, pandemics as we have now seen.

15       So as I understand the plaintiffs' concerns in this case,

16   a lot of those are the risks that they see in the voting

17   system, the risk of not counting votes, returning outcomes that

18   don't reflect what the voters intended, long lines, Poll Pad

19   failures.  Those are what I see as the risks.

20       And we can't predict whether any of those will happen or

21   not because we can't see the future.  But we can measure the

22   likelihood and the impact if they do.  That is what

23   cybersecurity would do is look at the likelihood and the

24   impact.

25       And I think there has been evidence that the risks have a
```

1    high likelihood and a significant impact.  So we would then

2    seek to mitigate those risks to try and prioritize them and,

3    you know, to lessen the impact of them by either, you know,

4    putting new measures in place or adding resilience to the

5    system so that we could recover from problems if they did

6    happen.

7         So to answer your question, I think that the current risk

8    level in Georgia's voting system is high.  And I think that

9    mitigations are warranted.

10             MR. McGUIRE:  Thank you.  I have nothing further on

11   direct, Your Honor.

12             THE COURT:  Thank you.  Does the State wish to pursue

13   any questions?

14             MR. TYSON:  Yes, Your Honor.  Just a few.

15                       CROSS-EXAMINATION

16   BY MR. TYSON:

17   **Q.**   Yes.  Good afternoon again, Mr. Skoglund.

18        Mr. Skoglund, I want to ask first:  If nothing changes in

19   Georgia's election system, can Georgians have confidence in the

20   outcome of the 2020 elections?

21   **A.**   It goes back to what I just answered in my last question.

22   It is not a yes-or-no answer.  I think that we can't predict

23   the future in the same way you can't predict if your house is

24   going to be robbed.  All we can do is lessen the risk.

25        So, you know, I can't predict what will happen and no one

else can.  I think that we have seen that the threats are very high and very prevalent.  I think there is plenty of evidence of that, plenty of reason to be concerned, and therefore reason to take steps to mitigate that.

But I don't think we can form an opinion about it is secure or is it not secure.  I just don't think that is a useful question.

**Q.**   Have you ever designed a logic and accuracy testing process for any voting system?

**A.**   I have not designed one.  I have made recommendations about how they should be designed.

**Q.**   Have you ever conducted a logic and accuracy testing regime for any election system?

**A.**   I have never held that position, no.

**Q.**   And when you mentioned BMDs in Pennsylvania that had the configuration errors, those were not Dominion BMDs; correct?

**A.**   They were not.

**Q.**   You mentioned that you testified to New York City regarding the implementation of early voting.

Do you recall that testimony?

**A.**   That's correct.

**Q.**   What time line was New York City able to utilize to implement early voting?

**A.**   I don't know the exact time line.  I know that in 2018, I believe, is when the legislation was passed to permit it.  I

1    spoke in April of 2019, and they had not made a decision and,

2    you know, did not make one, I know, for a couple of months at

3    least afterwards.  I don't know exactly when.

4         But they did end up making a decision between the time

5    that I testified and November.  I don't know the exact dates.

6    **Q.**   And is it your testimony that there is sufficient time in

7    Georgia to design a complete paper ballot early voting system

8    in the 28 days between today and when early voting begins?

9    **A.**   I'm not an expert on election administration.  So I

10   wouldn't want to try to characterize that.  But I know that --

11   yeah.  I'll leave it at that.

12   **Q.**   And you indicated that a solution can be printing ballots

13   at an early voting site on the spot; correct?

14   **A.**   Correct.  That is what my understanding is New York City

15   is doing with the KNOWiNK Poll Print.

16   **Q.**   Do you recall Mr. Harvey's testimony that there is one,

17   maybe a couple of more ballot printing -- ballot-on-demand

18   printers in each county?

19   **A.**   You mean that the counties already own one in their

20   offices?

21   **Q.**   Yeah.

22   **A.**   That is correct.  That is very common for many election

23   offices that they have one, you know, in the office that they

24   can use to print ballots in a pinch.

25   **Q.**   And you heard Mr. Barron's testimony that there will be at

1    least, I believe it was, 33 early voting sites in Fulton

2    County?

3    **A.**    Yes, I did.

4    **Q.**    And so that would require a significant number of

5    purchases in addition to the setup to even think about that

6    kind of operation; right?

7    **A.**    It would require new purchases.  Yeah.  In New York City,

8    I think they had 60, 65, somewhere in that range early voting

9    sites.  So yes, you would need to make new purchases.

10   **Q.**    And you testified about line length, and you said that the

11   number of stations or the equipment was relevant to that?

12   **A.**    Correct.

13   **Q.**    And do you know what the allocation of BMDs per voter for

14   each precinct in Georgia is?

15   **A.**    I heard it at one point.  If you were to tell it to me, I

16   could refresh my memory.  I want to say it was in the 300s.

17   But I don't recall.

18   **Q.**    Well, what I really want to ask is:  You didn't take that

19   into account in forming opinions about the -- you didn't take

20   into account Georgia's allocation of resources when forming

21   your opinions about the number of voting stations and

22   line length in Georgia; correct?

23   **A.**    No.  My testimony was about generally a comparison between

24   the two.  And the study, you know, that I cited was about

25   looking specifically at Maryland.

1  **Q.**  And you agree that the throughput, as you referred to it,

2  is based on the allocation of equipment; correct?

3  **A.**  Correct.  That is the limiting constraint resource.  You

4  can only have that many voters voting at that -- at that time.

5  If a machine goes down for any reason or if the activation

6  cards stops working, then that number gets reduced.

7          MR. TYSON:  Thank you, Mr. Skoglund.  I don't have

8  any further questions.

9          THE COURT:  Anything occasioned by that?

10          MR. McGUIRE:  I'm sorry?

11          THE COURT:  This is just -- Mr. McGuire, did you have

12  anything else?

13          MR. McGUIRE:  No, nothing on redirect.  No, Your

14  Honor.

15          THE COURT:  All right.  Would you wait a minute and

16  let me just see whether I have any questions.

17          THE WITNESS:  Absolutely.  Thank you.

18          THE COURT:  Could you bring up the logic and accuracy

19  testing document again?  I don't know what that document is.

20          MR. McGUIRE:  PD 19.

21                          EXAMINATION

22  BY THE COURT:

23  **Q.**  Mr. Skoglund, what is the -- based on your own programming

24  and experience in cybersecurity, what is the role of logic and

25  accuracy testing just looking at the big picture?

**A.**    I mean, what you ultimately are trying to find out is do
we have belief that every piece of equipment is going to
operate properly and record votes properly on election day.
And so we're crafting a set of questions to ask in advance to
try and ascertain if that is true.

So I would say you would want to test every machine
because you want them all to work properly.  You want to test
every ballot style because you want every ballot style to work
properly.  And you want to check every contest.  At a minimum,
you want to make sure that every candidate is able to receive a
vote; that if you were to put a vote -- let's say a contest
between George Washington and Thomas Jefferson -- a vote for
George Washington should be able to be marked and observed to
be correct and it should be able to go through the tabulator
when you do the logic and accuracy testing on the tabulator to
show that it did, in fact, record a vote for George Washington.
And you should do the same for Thomas Jefferson to make sure
that his -- a vote for him would work all the way through to
the tabulation.

But you also have to make sure that the -- that the votes
aren't being swapped, that they are not crisscrossing.  Right?
If you just vote one vote for George and one vote for Thomas,
you won't necessarily know that they -- that the correct winner
is going to be indicated.  So I think you have to check a
number of things.

1        And I actually recommend usually that we go a step further

2   even than the statute does and test the audio ballot that is

3   used by voters who are blind to ensure that there is no errors

4   there because you wouldn't want those to be crisscrossed.  And

5   the same for language -- for ballot marking in other languages.

6   There is a lot of testing that goes into these ballot-marking

7   devices to make sure that the technology is going to behave

8   correctly on election day.

9   **Q.**   So when you say crisscross, you mean that I voted for

10  George Washington but it is recorded as Thomas Jefferson?

11  **A.**   Correct.  Let's say that I followed a logic and accuracy

12  procedure.  So I cast one vote for George Washington, and I

13  printed on the ballot-marking device, and I run it through the

14  tabulator.  Then I do another one for Thomas Jefferson and do

15  the same thing.

16       Now I have one vote for each.  So when I look at the final

17  results, I expect to see one vote for each.  But how do I know

18  that they didn't get swapped?  How do I know that it correctly

19  attributed them?

20       So usually what you would do is give two votes for George

21  Washington and one vote for Thomas Jefferson.  That way in the

22  end results you can see each candidate was capable of receiving

23  a vote and they were correctly attributed.

24  **Q.**   What, if any, issues do you see if you are only testing

25  for one candidate's race per machine?

1    **A.**   Then if you are thoroughly testing that candidate's race,

2    then you can feel good that that candidate's race is not going

3    to have problems.  You cannot make any assertions about any

4    other race on the ballot.

5        It is similar to the problems with the risk-limiting

6    audits that we talked about.  If you are only auditing one

7    race, you are only going to detect problems in one race.

8        Once you test, the scope of your testing determines

9    whether you will find the problems.  If you don't look, you

10   can't find them.

11   **Q.**   Well, if I -- I mean, this is structured right now so that

12   I have, let's say, five machines.  I test machine Number 1 on

13   the presidential race and the next one, machine Number 2, on

14   senate race number A or letter number A.

15       Does the fact that I've been able to test the presidential

16   race on the first machine tell me anything about the

17   functioning and -- internal functioning and accuracy of machine

18   number B that I'm testing for the senate race?

19   **A.**   It does not.  It does not.  And you can make -- you can

20   make an assumption or use that to think that maybe it should be

21   right.  But you have not tested it.  So you don't know.

22   **Q.**   And I mean, each of these are independent basically

23   computers; is that right?

24   **A.**   That's correct.

25   **Q.**   All right.  And with respect to the unique ballot style,

1   what is the issue in your mind specifically about why each

2   ballot style should be tested on each BMD?  I know it provides

3   that they don't have to be.  But why in your view --

4   **A.**   Ballot style is a separate discrete unit.  So an example

5   is in a primary you might have a ballot style for the

6   republicans and a ballot style for the democrats.  Those are

7   two separate styles.

8        In some -- some polling places, you may have, you know,

9   school board elections that are different on one ballot and not

10   on the other.  Whereas, everything else on the ballot is

11   potentially the same.

12       I think you need to check both of those because the ballot

13   itself is not just the change to the bottom of it.  There's all

14   sorts of other information that is there as well.

15  **Q.**   You mean the races.  But does it also affect in terms of

16  what is being tested on a logic and accuracy how it -- how the

17  computer computes and how it records the information?

18  **A.**   I'm sorry.  Could you ask that one more time.

19  **Q.**   I'm just trying to understand.  Is the logic and accuracy

20  testing regarding how the computer computes that particular

21  race and also where it locates the information?

22  **A.**   Yes.  So on the ballot-marking device, you are testing

23  that it marks a ballot correctly; that whatever you do on the

24  screen is reflected in what is output on paper at the end.

25       On a tabulator, you're validating that when you take the

1   input of the ballot into the tabulator that the totals that

2   come out at the end match correctly.  In both cases, you are

3   looking to see if what goes in gives you what you expect to

4   come out on the other side.

5   **Q.**   And I guess from your perspective -- and I know I have

6   asked this in different ways.  But I want to just make sure.

7        What you perceive as the problem about just testing one

8   race is it doesn't yield information about how the computer

9   handles the full range of the ballot?

10  **A.**   That is correct.  It is not testing that each of these

11  machines is behaving properly on all of these contests.  So if

12  you -- if we sort of give a hypothetical example, let's say

13  that there was a contest where we found that one ballot

14  style -- the school board race at the bottom was computed

15  correctly but on another ballot style it wasn't.  And we asked

16  ourselves afterwards, well, why didn't we detect that?  Why

17  didn't we find that there was this problem in this one race?

18  And it is not just hypothetical.  That is actually what

19  happened in the example I gave in Northhampton County.

20       There was some races that worked perfectly fine.  Their

21  totals were exactly right.  If you had looked at that race,

22  there was no problem.  But then there were other contests where

23  something that was a little bit different about those contests

24  and the way that it was set up caused a problem so that some

25  candidates got zero votes -- where winning candidates got zero

```
1   votes.
2             MR. McGUIRE:  Your Honor, if I may, just a couple of
3   questions inspired by your own.
4                        REDIRECT EXAMINATION
5   BY MR. MCGUIRE:
6   Q.   Mr. Skoglund, is it fair to say that logic and accuracy
7   testing is a functional test or is it a security test?
8   A.   It is both.  I mean, it is the way that you make sure that
9   it is -- that it is working properly.  And that is in the realm
10  of security.  I mean, like I said, the threats to security are
11  not just from foreign nation states or from insiders who may be
12  trying to manipulate the election and have access to the
13  files -- right? -- and know what you are going to test where.
14       It is also, you know, for more common type problems as
15  well.  In the case of Northhampton County, it was a common type
16  mistake in the configuration.
17       So it is both.  It is a functional test that is an
18  important part of security.
19  Q.   Would you expect conducting a logic and accuracy test to
20  necessarily reveal the existence of malware on a system, for
21  example?
22  A.   No, it would not reveal that.  I mean, it could reveal
23  that.  If there was, let's say, clumsy malware, it might reveal
24  that at that point.  But the famous case is Volkswagen's test
25  of their emissions.  You know, they gamed the system so that,
```

1    you know, when they were testing it, like during logic and

2    accuracy essentially for the cars, they would pass their test.

3    But then in the real world, you know, they were failing the

4    test.

5         And the same thing is here.  You could easily have malware

6    that was set to not operate before a certain date or to wait

7    until, let's say, 53 ballots were cast before it kicks in.  So

8    there are all sorts of ways malware could evade these tests.

9              MR. McGUIRE:  Thank you.  Nothing further.

10                        RECROSS-EXAMINATION

11   BY MR. TYSON:

12   **Q.**   Mr. Skoglund, just one brief question.  You have never

13   seen actual malware in an actual election affect the

14   ballot-marking device; correct?

15   **A.**   I'm sorry.  When you say have I seen, what do you --

16   **Q.**   Do you know of any instance in the United States where

17   malware has been put on a ballot-marking device in an actual

18   election?

19   **A.**   No, I don't.  Ballot-marking devices are very new to the

20   market.  They really just started being sold as systems for all

21   voters to use in the last four years or so.

22        Before that, they were much simpler.  They were really

23   just filling in the ovals on regular ballots.

24              MR. TYSON:  That's all I have, Your Honor.

25              THE COURT:  Thank you very much, sir.

1              Are we through with the presentation of evidence,

2     Counsel?

3              MR. TYSON:  For the State defendants, yes, Your

4     Honor.

5              MR. CROSS:  Yes, for Curling plaintiffs.

6              MR. McGUIRE:  For Coalition as well.

7              THE COURT:  All right.  Are there any -- if there are

8     any exhibit issues or any evidentiary issues, why don't we take

9     them up afterwards and just making sure we have the exhibits in

10    order or that I have ruled on everything -- whatever is

11    outstanding or that I will in that event.

12             We're about to -- for those who are participating --

13    everyone is participating remotely -- but listening in, we are

14    going to have closing argument.

15             I have allocated 20 minutes.  The plaintiffs have two

16    sets of counsel.  Fulton County and the State represent the

17    defendants, and it will be the same thing.

18             So if the State defendants haven't determined how you

19    are dividing it, please do.  I could slow things up because I

20    have my own questions as you have all seen and have some more

21    questions about the audit issues.

22             I will not -- any time I spend on my questions -- you

23    responding to my questions I won't count against you.  I'm

24    going to allow everyone to take a restroom break, and we'll --

25    it is 1:47.  We should come back immediately.  When we see

```
 1    everyone here, we will start then.  Otherwise, I will assume we
 2    will be starting within five minutes.
 3              MR. TYSON:  Thank you, Your Honor.
 4              MR. CROSS:  Thank you.
 5                  (A brief break was taken at 1:47 P.M.)
 6              THE COURT:  All right.  Are we ready to begin?
 7              MR. BROWN:  Yes, Your Honor.
 8              MR. TYSON:  Yes, Your Honor.
 9              THE COURT:  All right.  Who for plaintiffs is
10    proceeding?
11              MR. McGUIRE:  Yes, Your Honor.  We were planning to
12    spend ten minutes for -- I would go for ten minutes and then
13    Mr. Cross would spend ten minutes on rebuttal.
14              THE COURT:  All right.
15              MR. McGUIRE:  Shall I begin?
16              THE COURT:  Yes.
17                         CLOSING ARGUMENT
18              MR. McGUIRE:  Thank you, Your Honor.  I'm Robert
19    McGuire.  And I'm counsel for the Coalition plaintiffs in this
20    case.
21              In the course of bringing this request for relief,
22    we, the plaintiffs, have been guided by this Court's previous
23    holding from September of 2018 when the Court ruled that if a
24    new ballot system is to be launched in Georgia in an effective
25    manner it should address democracy's critical need for, quote,
```

1  transparent, fair, accurate, and verifiable election processes

2  that guarantee each citizen's fundamental right to cast an

3  accountable vote.

4          Now, all of the evidence that is in front of the

5  Court, whether in the papers or through this three-day hearing,

6  shows that the State's BMD system satisfies none of these

7  requirements.  As the Supreme Court held in *Wesberry vs.*

8  *Sanders* in 1964, the right to vote is one of our most precious

9  rights.  Other rights, even the most basic, are illusory if the

10 right to vote is undermined.  And that is exactly what has

11 happened or will happen if the changes that the plaintiffs are

12 requesting are not made for the upcoming November election.

13         Mr. Tyson said in his opening that ultimately the

14 plaintiffs want to vote using a different system in their

15 precinct.  He calls this a policy dispute that the plaintiffs

16 lost in policymaking bodies and they are trying to enforce in

17 court.

18         Nothing could be further from the truth.  The

19 plaintiffs here are not asking for a whole new voting system.

20 They are not asking for a different voting system than the

21 voting system that has been put in place.  What we are asking

22 for are four constitutionally required improvements to the

23 existing voting system.  And each of these four improvements

24 that we are asking the Court to order will either remove

25 complexity and risk or they will add much needed redundancy.

1  So I'm going to go through each of those four items of relief

2  very briefly.

3            Improvement one is to require the State to provide

4  updated paper pollbook backups in the polling places to ensure

5  that there is no disenfranchisement of in-person voters as we

6  have seen in past elections.

7            Improvement two is going to remove the BMD touch

8  screen printer combo and instead have in-person voters use

9  hand-marked paper ballots as the default voting method.

10           Improvement three has to do with scanning.  For

11 central scanning, the Secretary should change the sensitivity

12 settings on the scanners so that any perceptible voter mark is

13 either counted or reviewed by a vote review panel.  For the

14 precinct scanners, voters should be provided black pens that

15 they can use to mark emergency ballots.

16           Fourth and finally, we have improvements that we are

17 asking the Court to order in respect to auditing.  So I'm going

18 to briefly touch on each of these four.

19           With respect to updated paper pollbooks -- updated

20 paper pollbook backups, the State defendants have never denied

21 that their malfunctioning electronic pollbooks led directly to

22 long lines and resulting disenfranchisement during the June

23 primaries here in Georgia.

24           Mr. Barron confirmed that he and the other metro

25 counties are still experiencing serious problems with the Poll

1    Pads in that September election.  We are still experiencing

2    them in the September election.  He also confirmed that having

3    updated paper Poll Pad -- pollbook backups would help.  This

4    Court has been asking the State defendants since at least the

5    December 6th, 2019, status conference, which is discussed in

6    our brief for the Poll Pad motion at 800-1 at Pages 8 and 9 --

7    the Court has been asking the State defendants since at least

8    December 2019 why updated paper pollbook backups should not be

9    granted.  And at this hearing when asked what the burden would

10   be upon the State to provide this easy and effective remedy,

11   Mr. Harvey still had no answer.

12        In our brief, 800-1, on the pollbook issue, Coalition

13   plaintiffs described in exhaustive detail our efforts to try to

14   convince the defendants to make this change outside of

15   litigation.  It is an easy change to make.

16        It is clear the State defendants are not going to do

17   anything unless they are ordered to do so.  And this is the

18   opportunity for that improvement to be made.

19        The second improvement that we are requesting is to

20   remove BMD touch screen and printer combos and use hand-marked

21   paper ballots instead.  The *United States vs. Saylor* case from

22   the Supreme Court in 1944 recognized that voters have a right,

23   quote, to have their expressions of choice given full value and

24   effect by not having their votes impaired, lessened,

25   diminished, diluted, and destroyed by fictitious ballots

1   fraudulently cast and counted, recorded, returned, and

2   certified.  That is a right that is 70 years old in the Supreme

3   Court's eyes, and it cannot be guaranteed by Georgia's current

4   voting system because the lack of security makes it impossible.

5          Harri Hursti's testimony showed that the BMDs are

6   insecure and simply cannot be secured.  He showed that the

7   system hasn't been hardened, that the BMDs have a huge attack

8   surface.  He showed that Xbox console and Russian games are

9   installed on the EMS servers in multiple counties.  Physical

10  security of the EMS server is all but nonexistent.  He showed

11  that multiple ballots can be printed and cast by a voter.

12         The State's defense that the system is certified by

13  the EAC provides no comfort for the reasons that Mr. Skoglund

14  testified about under seal.  As Harri Hursti explained, voting

15  system testing focuses on functionality, not security.

16  Penetration testing by voting system labs is very limited.

17         Dr. Halderman's testimony showed that the BMD system

18  is vulnerable to undetectable manipulation.  The very same kind

19  of evidence underlay this Court's decision to find the DREs

20  unconstitutional.  The same kind of reasoning justifies finding

21  the BMDs unconstitutional now.

22         This insecurity cannot and is not being remedied.

23  The LAT procedures, which aren't even capable of catching

24  sophisticated malware, as Mr. Skoglund testified just moments

25  ago -- they are not even being run in their most bare bones

1    basic fashion that State law requires.  Each machine is being

2    tested on one contest, not even on multiple ballot styles.  And

3    that is the State's official guidelines.  The State just

4    doesn't do the testing that even State law requires.

5            You have heard from Professor Stark, Dr. Stark that

6    BMDs are not auditable.  There are multiple reasons for it.

7    But people don't look -- they don't look at their ballots.

8    They don't review whether the ballot card that is coming out of

9    the printer matches what they did on the machine.  And because

10   of that, the BMD ballot cards cannot be meaningfully audited.

11   They are not what the voter did.  They are what the machine

12   did.  And the machine can be manipulated to do things that the

13   voter did not do.

14           Finally, on this point, BMDs violate ballot secrecy.

15   The touch screens violate ballot secrecy because they are so

16   large that anyone within a line of sight to a person's BMD

17   screen can see how that voter is voting.  There is a mountain

18   of evidence in the record on this issue.  It is completely

19   uncontroverted.

20           The only thing that the State says that even comes

21   close to trying to controvert it is Mr. Harvey saying that they

22   tried to develop sketches of how to set up a polling place so

23   that it wouldn't happen.  But all of the evidence or most of

24   the evidence that has been introduced came in after those

25   sketches were implemented.  They don't work.  The State has not

1    been able to fix this problem.  They are aware of the problem,

2    which is why they are trying to solve it with sketches.  But

3    they are unable to solve it.

4         As a result, rights are being violated.  And the

5    right to vote is being burdened -- severely burdened because

6    the secret ballot is fundamental to the right to vote.  And

7    when the secret ballot is denied, the right to vote is burdened

8    because voters are unable to freely cast the votes that they

9    want.

10        It is more than feasible for this second change to be

11   implemented.  It is already the emergency plan on election day.

12   Rick Barron testified that Fulton County could do it on

13   election day.  You have got testimony -- you have got evidence

14   in the record that Athens-Clarke County was able to do it

15   overnight.  Kevin Skoglund's testimony showed that New York

16   City was able to do it.  Mr. Barron, in fact, said that not

17   only could it be implemented for election day but he testified

18   that it would actually wind up giving him more time because it

19   would take less time to deploy hand-marked paper ballots than

20   to set up all of the BMDs.

21        Although the State defendants have made the argument,

22   there is no evidence that there is not enough printing capacity

23   to make this solution possible.  And there is evidence that

24   special paper isn't required for the ballots to be scanned into

25   the tabulators.  So there is really no reason not to replace

1     the BMDs.  There is no good reason.

2          So what about early voting?  Kevin Skoglund explained

3     how that works in places that have lots of early voting

4     centers, like New York City.  Ballots can be stockpiled in

5     early voting centers, especially the ones that are most likely

6     to be used in particular locations.  And they can be

7     replenished every night using the ballot-on-demand printers,

8     just like New York City does.  It is simply not an argument

9     that it is not possible to replace the BMDs with paper ballots.

10    It is more than possible.

11          In the 1950s and the 1960s, federal courts

12    transformed society in order to ensure that there was equal

13    treatment under the law.  The interests that are at stake in

14    this case are similarly weighty, and they are no less

15    fundamental.

16          The right to vote is ultimately the right that

17    guarantees all of our other rights.  That is why the Supreme

18    Court said in *Wesberry vs. Sanders* that no right is more

19    precious in a free country than the right of having a voice in

20    the election of those who make the laws under which as good

21    citizens we must live.

22          This case is about the right to vote, and it is about

23    equal protection.  And it is emphatically a role of the federal

24    courts to protect those rights when they are deemed violated.

25    And the fact that there is inconvenience does not justify

```
 1    violation of those rights.  And as we have shown in the
 2    evidence, any inconvenience that the State argues is overblown
 3    anyway.
 4             Improvement Number 3 has to do with scanning.  We are
 5    asking the Court to order that the scanner settings on the
 6    central scanners be adjusted so that every vote counts.  And
 7    that is a simple -- simple procedure that can be done.
 8             The Court saw the ballots where people plainly to the
 9    human eye marked a vote that was then not counted.  The State,
10    the defendants, Dr. Coomer -- they approached this in a way
11    which is disturbing because their answer is votes are being
12    discarded, they are just not being counted.  And that is an
13    outrageous -- outrageous defense to take when people are
14    actually losing their voice in elections.
15             And we have got evidence.  They can't refute it.
16    There is no evidence on the other side.  I mean, we have shown
17    the Court ballots that have had votes discarded.  Those people
18    have lost the right to vote on those races.  They are
19    disenfranchised.
20             And the scanner settings, as Mr. Hursti explained,
21    can be adjusted in a way that makes it -- that catches those
22    votes.  You just -- he suggested that you scan in gray scale or
23    color.  He suggested that you scan in the higher dots per inch
24    setting, and he suggested that if that happens then you are
25    going to be able to avoid getting rid of those votes.
```

1          The State has adopted a new scanner rule that they

2     claim, without any evidence, will solve this problem.  The only

3     evidence they have given you is Exhibit DX 4, which is the

4     Michael Barnes document.  DX 4 is a long draft analysis of

5     the -- of the various scanner threshold settings.  But the most

6     important part is at the very end on Page 7 in the second to

7     last paragraph.  Even using the settings that they just

8     adopted, which set between 10 and 20 percent as the range for

9     the perceiving ambiguous votes, seven ballots out of their test

10    deck were read as completely blank.  Those are ballots that a

11    human would have perceived as votes.

12          Under Georgia law, if you can perceive voter intent

13    from a ballot mark, you have to count that vote.  Those seven

14    votes would be people who under their current settings that

15    they just adopted, would be disenfranchised.  The answer is to

16    adopt scanner settings that look at any human mark below the

17    definite vote threshold as requiring review by a vote review

18    panel so that a human can look at the ballot and determine

19    whether there is actually a vote there.  A machine should never

20    discard a human marking.  That is arbitrary.  It is

21    unconstitutional.

22          MR. CROSS:  Your Honor, I'm sorry to interrupt.  We

23    are going to have a time issue here.

24          MR. McGUIRE:  And you know what?  My timer isn't

25    running.  So I'm very sorry.  I don't want to eat up Mr. Cross'

 1    time.  Let me just say the final point that I have on the

 2    merits here.

 3              Improvement four is auditing.  A voting system that

 4    cannot be audited to confirm the outcome it produces is correct

 5    fails by definition to protect the right of each voter to enjoy

 6    transparent, fair, accurate, and verifiable election processes

 7    that guarantee each citizen's fundamental right to cast an

 8    accountable vote.

 9              Dr. Stark addressed this.  If we keep the BMDs, they

10    can't be audited.  They are not auditable because you are not

11    auditing what the voter did.  You are auditing what the machine

12    said the voter did.  And that is not an auditable record.

13              So, Your Honor, we would claim that there should be

14    some auditing improvements.  But they really need the BMDs to

15    be removed and replaced with hand-marked paper ballots.

16              And on that, I'll rest.

17              THE COURT:  Yes.  I would like to ask you one

18    question that I'm not counting against your time.  I don't have

19    right now Mr. Barnes' analysis in DX 4 in front of me.  And I

20    will pull it up.

21              But are the -- when you talked about the seven

22    ballots that came up as blank but, in fact, are markings, is

23    that referenced in his analysis?

24              MR. McGUIRE:  It is, Your Honor.  It is the second to

25    the last paragraph on Page 7 of Doc. 887-4.

```
 1              THE COURT:  Eight -- I'm sorry?

 2              MR. McGUIRE:  It is Document 887-4 at Page 7.  It is

 3     also Exhibit DX 4.

 4                   (There was a brief pause in the proceedings.)

 5              THE COURT:  All right.  Thank you very much.  I was

 6     looking at the document.  Thank you.

 7              MR. McGUIRE:  Thank you, Your Honor.

 8              THE COURT:  That was 7 ballots out of 29 needing

 9     physical review.  All right.  Thank you.

10              MR. TYSON:  Your Honor, I have talked to the Fulton

11     defendants, and they will not be closing separately, so we will

12     end up closing for all of the defendants.

13              THE COURT:  All right.  Very good.

14                              CLOSING ARGUMENT

15              MR. TYSON:  Your Honor, it has been said that

16     nostalgia is an incredibly powerful force.  And in this case,

17     the plaintiffs are nostalgic for the day that they filed this

18     case more than three years ago.  They continue to pretend like

19     nothing has changed.

20              But I think it is important for us to talk about what

21     has changed since 2017 when this case began.  The Georgia

22     General Assembly and Governor endorsed sweeping update to the

23     election infrastructure in this state after the 2018 election.

24              Those updates included robust protections for absent

25     provisional ballots, updates to statutes about absentee
```

1    ballots, requirements to harden the voter registration

2    database.   The General Assembly appropriated more than

3    $100 million to upgrade Georgia's voting system to a paper

4    ballot system endorsed by the panel of experts on the SAFE

5    Commission.

6            And Georgia became one of only a handful of states

7    that developed statewide risk-limiting audits for use in the

8    November 2020 election working with VotingWorks.   And as you

9    heard, that is the same organization trusted by the Department

10   of Homeland Security to develop and implement auditing tools

11   for elections.

12           Georgia has continued to remediate the risks

13   associated with its computer systems.   And Georgia now has

14   record high voter registration, an online absentee ballot

15   request portal, and state of the art technology.

16           Plaintiffs pretend like none of this ever happened.

17   When we began on Thursday, I said you were going to hear a lot

18   of recycled theories and speculation.   And that is just where

19   we have ended up.   And those recycled theories and speculations

20   are insufficient to carry the plaintiffs' heavy burden to

21   clearly establish the preliminary injunction requisites for an

22   election that is underway with absentee ballots going out this

23   week and early voting beginning in 28 days.

24           First, the plaintiffs have not shown any likelihood

25   of success on the merits.   They haven't shown any burden on the

1    right to vote.  This is a case about ballot-marking devices

2    principally.  And there has been no testimony that a Dominion

3    BMD system has ever been actually hacked in an election.

4         The plaintiffs have not been able to connect any

5    identified vulnerabilities from the old system to anything

6    related to the ballot-marking devices.  The most they have to

7    hang their hat on after three days of this Court's time and

8    after obtaining thousands of documents in expedited discovery

9    is a single email about a USB drive that doesn't say for sure

10   what happened.

11        So apparently now their theory is that maybe -- just

12   maybe a single USB drive in one county somewhere in the state

13   has some sort of malware on it and it somehow works on both

14   DREs and BMDs, can adept to each election prior to knowing the

15   candidates or the races, and has remained hidden from Dr.

16   Halderman's forensic analysis of both the GEMS databases and

17   actual DREs.

18        THE COURT:  I think you have to slow up, or else

19   Ms. Welch is not going to be able to get your argument.  I know

20   you want to get a lot in.  But you have --

21        MR. TYSON:  I apologize, Ms. Welch.

22        The preliminary injunction standard of clear

23   entitlement is nowhere to be found in the evidence.  Further,

24   the plaintiffs have shown at most exactly the kind of thing

25   that we can easily work through in discovery to figure out what

1   happened.  And you heard extensive testimony about the

2   functioning and the hardening of the system.

3          For paper backups, we have dealt with that issue

4   extensively in the briefing.  Mr. Harvey testified as to the

5   burden on the State.  The printing cost is significant.  The

6   Coalition plaintiffs haven't put forward contrary evidence at

7   this point.

8          On scanners, the evidence shows that reasonable

9   protocols, which are consistent with the instructions on the

10  ballot and further the State's interest in the efficient and

11  equitable administration of elections.  The plaintiffs' expert,

12  Mr. Hursti, did not testify to proper settings or offer any

13  standard in the professional community.  Instead, he only

14  offered that the State should evaluate and study the proper

15  settings.  Well, the evidence shows that the State did so and

16  Mr. Hursti chose not to review that.

17         And even still the evidence shows that --

18         THE COURT:  That is not quite right.  That is not

19  quite right.  I mean, basically he had one particular

20  recommendation, and there is no indication as to the DPI that

21  you looked at that at all.

22         I mean, there was a different suggestion that you

23  made I realize in terms of basically the way you assess it.

24  But there was a very concrete recommendation that there was no

25  indication that you-all looked at.

1          MR. TYSON:  Your Honor, I think this gets us back

2     to -- as Dr. Coomer explained, the way that the plaintiffs have

3     framed up their threshold setting issue would require every

4     single hand-marked ballot to be reviewed if there was no vote

5     found because part of the oval would form part of the

6     percentage.

7          And so I think we're, again, at a point where if

8     we're down to -- if the State's current threshold settings and

9     the DPI settings violate the U.S. Constitution, the -- that is

10    a significant step forward, Number 1.  But, Number 2, given

11    dramatic increase in mail-in voting, Mr. Harvey's testimony is

12    that having to do a personal review of every single hand-marked

13    ballot that has zero percent threshold, any stray mark

14    anywhere, would delay certification of an election at a time of

15    heightened political intensity.  And that is only after the

16    voter has disregarded all the instructions of how to fill out

17    the ballot.

18         THE COURT:  I don't think you really responded to my

19    question.  Did anyone look at the 300 DPI?  And I don't have

20    any basis from the testimony really for determining that that

21    would mean every single ballot had to be examined.

22         MR. TYSON:  Your Honor, I believe Dr. Coomer went

23    into detail about the 300 versus 200 DPI, and the software is

24    built around interpreting the percentage fills based on what it

25    reads.

1          So, again, if we're at a point where we're ordered to
2    go to 300 DPI, I don't think there is any testimony that that
3    is feasible or possible under the current system, as I
4    understand it.
5          THE COURT:  Okay.  Go ahead and continue.
6          MR. TYSON:  Thank you.  The timely certification of
7    this year's election is of critical State interest that
8    outweighs even the slightest burden on the right to vote
9    relating to scanners.
10          On auditing, the evidence shows that Georgia's
11    process is even more robust than almost every other state.  And
12    while plaintiff disagrees that BMD ballots can be audited at
13    all, that position is hardly uniform across the field.  And a
14    reasonable policy disagreement among experts does not amount to
15    a violation of the United States Constitution.
16          Dr. Adida made clear that the process used in Georgia
17    has been carefully piloted.  It is a necessary step for its
18    proper implementation, as the National Academy recommends and
19    similar to other states that have been early adopters of
20    statewide audits.
21          I know the Court had some concern earlier.  The
22    audits, as Dr. Adida testified, will involve a review of
23    (unintelligible) individuals of the ballots.  We are not
24    relying -- this is a ballot pulling audit.  But it is not going
25    to be a situation where no one is ever looking at the actual

```
1    ballot to determine what the auditing process should be.
2            THE COURT:  Is it correct what he said -- when I
3    asked him about that, he said, yes, we are going to look at the
4    ballot.  But what he is going to do then is he is never going
5    to compare that ballot to any electronic record for that ballot
6    as to the vote actually counted.
7            So I mean, why is it meaningful?  He did not -- he
8    did not respond to that question at all.
9            MR. TYSON:  And I believe as you will recall, Mr.
10   Rayburn spoke back in March to the process by how they were
11   doing this, that as the auditors are looking at each ballot you
12   are looking at the ballot and the audit mark.  So you are
13   looking at what did the machine interpret, what did the vote --
14   what is on the ballot, and then you are comparing that.  And,
15   again, as Dr. Stark said, the purpose of a risk-limiting audit
16   is to determine did the right person win the race.  It is not
17   to ensure that every single individual vote is being assigned
18   individually, but you are still looking at those issues.
19           THE COURT:  I'll let you go on.  We'll discuss this
20   more at the end.  All right?
21           MR. TYSON:  And considering, Your Honor, that the
22   vast majority of states are not going to conduct a
23   risk-limiting audit of any kind in the 2020 election, the
24   plaintiffs haven't shown that the particular auditing method
25   Georgia is using places a burden on the right to vote or is in
```

1    any way violative of the U.S. Constitution.

2         THE COURT:  But no other state virtually has done a

3    statewide BMD system.  That is the reality.  You are an unusual

4    situation.  There are jurisdictions -- smaller jurisdictions,

5    cities that have done BMDs.  But this is basically the entire

6    state.  And so it is -- it does put the State in a much more

7    challenging position.

8         MR. TYSON:  Your Honor, again, I think that it is

9    important to remember that, yes, while the number of states

10   that currently use a statewide implementation of BMDs is a

11   growing number but a small number right now, very large

12   jurisdictions from Cook County to Los Angeles to other places

13   around the country are using BMDs for all of their in-person

14   voters as well.

15        So this is not a situation with the DREs where we're

16   at the tail end of a system.  This is a situation where Georgia

17   is taking a significant step forward in this process in a lot

18   of areas.

19        And so I think at the end, the burden -- the failure

20   of the plaintiffs to identify a burden on the right to vote --

21   that should be the end of the preliminary injunction quest in

22   this case.

23        But it is incredible to me that despite the lack of

24   evidence of where we are on this and based solely on

25   speculation, at least one of plaintiffs' experts, Mr. Hursti,

1    told Georgians they should have no confidence in our election

2    system, a shocking allegation that to me undermines the very

3    legitimacy of the elections the plaintiffs claim that they seek

4    and is necessary for us to have a functioning democracy.

5         At the best reading, the plaintiffs at this point

6    have shown maybe three things.  One, there is a disagreement in

7    the election community about the scope and the use of audits.

8    Two, the rather unremarkable fact that people with unrestricted

9    access can do what they want with computers, as Mr. Hursti

10   testified.  And, three, that voters who disregard instructions

11   for filling out hand-marked paper ballots may have challenges

12   with the scanners under the thresholds that were in existence

13   before.

14        And none of these issues are sufficient for this

15   Court to find a likelihood of success on the merits for any of

16   the issues that are actually alleged in the plaintiffs'

17   complaints.  And without the likelihood of success, there is

18   nothing this Court can do and there is no basis for a

19   preliminary injunction.

20        But, second, the plaintiffs have also presented no

21   evidence of any irreparable harm.  They just assume irreparable

22   harm for purposes of this motion.  They have nothing to say on

23   the issue about the fact that this case is ultimately about the

24   outcome of an election or the possible outcome of an election,

25   not the individual right to vote, which means the case is

1    foreclosed according to *Jacobson*.

2          In order for there to be any injury to any plaintiff,

3    a bad actor would have to design and build malware that is then

4    placed in the BMDs that are right now being programmed for the

5    November election that somehow can alter enough votes to make a

6    difference but not enough for voters to actually notice.

7          It is not a manipulation that is discovered while

8    conducting a risk-limiting audit and that actually affects the

9    outcome of an election.  And compared with the plaintiffs'

10   claims in *Clapper*, that is a far more attenuated chain of

11   possibilities than in that case.

12         And so the only thing that each plaintiff has to do

13   to avoid that possible imagined theoretical scenario is to

14   request a hand-marked ballot, fill it out by hand, and then

15   return it in a dropbox by election day.

16         There is no irreparable harm here.  And even if the

17   individual plaintiffs can fix their injury this way, the

18   evidence that we submitted on the Coalition for Good

19   Governance's 9940 for 2018 indicates that 98 percent of their

20   organizational budget is being spent on litigation.  There is

21   no diversion of resources.

22         Your Honor, on the third and fourth prongs, again,

23   the plaintiffs' lack of evidence is staggering.  They offer no

24   evidence that their preferred method of voting would remedy

25   their purported election security injury, rather than open

1    vulnerabilities for less sophisticated mechanisms of hacking.

2            They still offered nothing to explain why the system

3    they dislike is unconstitutional for them but perfectly

4    acceptable for disabled voters.  They have presented absolutely

5    no evidence from anyone with statewide election experience that

6    what they propose is actually feasible.

7            They didn't give you anyone who opined that what they

8    propose can be done in the 28 days between today and the start

9    of early voting on BMDs.  No one has designed a process to

10   deploy paper ballots to every county's early voting site that

11   includes every possible ballot combination.  As you heard,

12   Fulton County alone would have to plan and deploy more than 700

13   different ballot instances at all 33 early voting sites in the

14   next 28 days.

15           Election day and early voting are two completely

16   different things.  Absentee-by-mail processing and in-person

17   hand-marked paper ballots on election day are two different

18   things.  And the plaintiffs continue to conflate them,

19   demonstrating their lack of understanding of the actual

20   administration of elections.

21           Where is the training and logistical support for that

22   system?  Where are the election administration experts who

23   endorse this plan to change Georgia's election system in a

24   matter of weeks?

25           They say just turn off the BMDs and have the system

1    function properly.  But there is no opportunity and they have

2    shown nothing that this is feasible or possible on the time

3    line that they have given this Court.

4         So I want to be absolutely clear the plaintiffs have

5    shown no reason why any Georgia voter should doubt Georgia's

6    election system.  The plaintiffs have not shown -- I want to be

7    so clear about this -- any reason why any Georgia voter should

8    doubt Georgia's election system.

9         And, further, it makes no logical sense to exchange a

10   suspected hypothetical security risk, which has never been

11   shown in an actual election across -- for a well-known,

12   well-documented, constant, easily accessible, and universal set

13   of security risks associated with hand-marked paper ballots,

14   especially making that change in a matter of days.  It doesn't

15   take sophistication to hack those.  Only a Sharpie.

16        I want to remind everyone as we are wrapping up here

17   where we are in this case after more than three years.  We

18   haven't yet had full discovery on these claims about BMDs and

19   the Dominion system.  We haven't had expert reports.  We

20   haven't had expert depositions.  We haven't had summary

21   judgment briefing.

22        This is a hearing held on a reduced evidentiary

23   standard weeks before an election without the benefit of the

24   adversarial process to test the documents and the testimony

25   that plaintiffs have continued to add to the record in this

1    case.  And without the Court being given the benefit of that

2    process to sort through the very complicated election

3    administration issues in this case and election administration

4    is complicated.

5           Plaintiffs are seeking these sweeping changes.  They

6    are ultimately asking this Court to completely rewrite the

7    State's election code and draft detailed election

8    administration policies to supplant those that are authored and

9    enacted by the General Assembly and the State Election Board.

10          Your Honor, as someone who represents election

11   officials, I also want to be clear about this:  This is already

12   an extremely high degree of difficulty election.  It is a

13   presidential year.  There is going to be record turnout.  All

14   of us can recognize that we are operating in the midst of a

15   divisive political environment.  And we are still in the middle

16   of a pandemic that has upended almost everything about our

17   lives.

18          Making further changes or adjustments to the election

19   system like the plaintiffs propose at a large level like the

20   BMDs or at a more administrative level like these pollbook

21   changes, audits, scanners -- making those changes now is a

22   recipe for disaster in an already challenging election year.

23          This Court should deny all the plaintiffs' motions,

24   allow Georgia to go forward on the system chosen by its

25   policymakers and designed by its election officials, and allow

1    this case to hear the rest of plaintiffs' claims on a normal

2    discovery track and a normal litigation track going forward.

3            Georgians can and should have confidence in their

4    elections running the Dominion voting system for the 2020

5    election.

6            Thank you, Your Honor.

7            THE COURT:  All right.  Let me just ask you a

8    question or two.  Is there a contradiction between your

9    position that, on one hand, Georgians can rely on the absentee

10   ballot process but you cast doubt on the reliability of a hand

11   ballot process?

12           MR. TYSON:  Your Honor, there are two -- there is not

13   a contradiction there because the chain of custody and the

14   statutory and administrative structures around absentee ballots

15   have been in place for a long time.  They are well established.

16   They are well understood.

17           Having lots of additional live ballots beyond just

18   the emergency ballots that are in a polling place on election

19   day, that would be a completely new thing for Georgia to

20   implement.  And that is a different setup than dealing with the

21   verifiable process you can use in the absentee ballot

22   situation.

23           THE COURT:  With regard to -- again, this is not

24   against your time in any way.

25           But with respect to the experience of voters,

 1    including members of these organizations and the individual

 2    plaintiffs in coming in and having -- basically facing

 3    challenges because they are either waiting in lines or there is

 4    a major -- major obviously change in the introduction of a new

 5    system -- and there were substantial issues in the June

 6    election, and there are continuing problems.  And I'm not

 7    saying that they are going to continue.  I know the State is

 8    trying to address these.  But they were enormous and enormous

 9    in particular communities.

10            Why wouldn't the State under these circumstances --

11    when it has a provision under its own rules for emergency

12    ballots, why wouldn't the State truly make an arrangement for

13    that that makes it real so that we actually on election day --

14    we're not talking about before election day.  But on election

15    day that if these sorts of lines develop and that are a

16    function also of not just, oh, we have got so many people

17    coming -- because that is what we anticipate, that is what we

18    want in a presidential election, and it is what we -- the State

19    has a reason to expect -- that we -- that the emergency ballot

20    process is used and that you are equipped to use it also or the

21    precincts are equipped to use it because they also are able --

22    quickly to be able to consult with a full printout and

23    up-to-date printout of who has cast votes so that they only

24    have to call about a limited number of ballots to the county

25    office.

1          Why wouldn't that be an appropriate remedy in this

2     case given the introductions of a lot of new machinery that at

3     least as of this point has been shown from the last election --

4     serious election here in June have had a truly detrimental

5     impact on people being able to easily exercise their vote at

6     least in a number of population centers?

7          MR. TYSON:  Your Honor, I think what you have

8     outlined is essentially what the State Election Board rules

9     require to happen.  And I know for June 9, as an example -- I

10    represent Gwinnett County.  And in the Gwinnett elections, they

11    were able to use all their emergency ballot supplies to open

12    precincts when there was late delivery of equipment.

13         So I think what you find is maybe a training issue

14    for poll workers, which I know that recruitment of poll workers

15    has been a very high priority for the Secretary and for county

16    election officials.  I know there has been and there is

17    evidence in the record from Mr. Harvey about the extensive

18    updates to training of officials and poll workers on these

19    various points.

20         And since the State Election Board rules require

21    there be a paper backup, people can immediately begin checking

22    in.  That is what is supposed to happen.  That is what the

23    State Election Board rules require if the Poll Pads are not

24    working and if the BMDs are not working they should go right to

25    the emergency ballots or if the line is longer than 30 minutes.

1          Those are the existing regulatory structure that

2    needs to be implemented.  And I know that there has been a very

3    conscious focus of state and county officials to make sure that

4    poll workers are ready and are trained on all of those points,

5    including those items.

6          THE COURT:  Well, how are they checking people in if

7    they -- if the Poll Pads are not working --

8          MR. TYSON:  Your Honor, they would --

9          THE COURT:  -- under the State's rules?  Because I

10   didn't hear that ever addressed other than what the plaintiffs

11   have suggested.

12         MR. TYSON:  Yes, Your Honor.  So the way the State

13   rule would work is you would immediately begin checking in

14   voters and the voters would be voters who were on the

15   precinct's list.  There would be an indication on the list if

16   they have made an absentee ballot request up to the time that

17   the list is prepared.

18         But one of the challenges -- and I have never heard

19   the plaintiffs give a good answer to this question is -- if,

20   for example, the Poll Pads go down at noon and a voter who

21   voted at 8:00 A.M. comes back, the paper list is not going to

22   be updated for that fact.

23         So the remedy is you check everybody in and any sort

24   of alleged double voting that would take place can be handled

25   after the election through an election contest or some other

1    procedure.  But that would be the way you would handle it.

2         And trying to -- the burden on the State that

3    Mr. Harvey talked about for doing this updated printing, it

4    really doesn't address the plaintiffs' concerns except if the

5    Poll Pads don't work right at opening.

6         THE COURT:  Well, I think that there was the

7    alternative that he himself identified, which was not that the

8    State would print it but they would simply send basically an

9    electronic -- they would send it electronically to the county

10   for printing on that Saturday before the election.  And he

11   seemed to think that was viable in my understanding of his

12   testimony.

13        MR. TYSON:  And, Your Honor, I believe Mr. Harvey was

14   checking to see if that was technologically feasible using the

15   eNet system.  I have not gotten an answer back on that point

16   yet.  But that, I believe, was what he said, that it sounded

17   logical but he wasn't sure if it was an existing report that

18   was already created or we would have to get additional

19   programming done to generate that.

20        THE COURT:  Okay.  Well, I assume that there is a

21   straightforward answer then that you will be able to provide

22   today.  I know you have been here with me.  But I would like to

23   get the answer.

24        MR. TYSON:  We'll do our best on that, Your Honor.

25        THE COURT:  All right.  And because, really, that

1    whole question of the -- what type of information is available

2    at the local polls, I think the plaintiffs are correct that we

3    have been discussing that really even from before December of

4    2019.  And I have asked repeatedly, why is it not possible?

5    Can't you-all discuss it together?  And it seemed like such an

6    important pragmatic step forward for dealing with -- we're

7    going to experience one of the largest crunches.  And also

8    there is -- I mean, if you talk about confidence in the

9    election, clearly having a capacity to address such a crunch on

10   such a -- especially during a pandemic or really any time is an

11   important issue.  And it is important for us to know if they

12   are capable of resolving it and that they don't care about my

13   ruling and want me not to be here.

14          Then I had a question about the State audit rule.  I

15   understand the position of the State regarding, well, we are

16   doing something and this is a step forward and this is -- we're

17   using the State's position that there are disagreements in the

18   field as to how the audit should be done.

19          What I don't just factually understand is one of the

20   things that Dr. Adida says is basically if we -- if there seems

21   to be something funky about the data essentially, he says, and

22   it points to perhaps it not being reliable, well, we'll just

23   take some more -- we'll just keep on -- we'll get another batch

24   of ballots to look at until we can actually confirm.

25          Well, that is really part of what I was asking about

1   is the confirmation.  Is this really simply going to be we're

2   going to get another group until we can say yes, it is.

3   Basically it is never, oh, there is a problem.  It is always

4   we're going to get the amount until we can actually confirm

5   yes, the way I heard his testimony.

6           And I wanted to understand that.  I wanted to

7   understand what the 90 percent confidence level was in this --

8   I think that is what is used in the rule.  I don't have a

9   searchable copy of the rule.

10          So I can't -- I read it.  Let's see.  It is a

11  non-searchable version.

12          Anyway, do you want to respond?  You probably know

13  what the confidence value is.

14          MR. TYSON:  Yes, Your Honor.  I'm trying to pull it

15  up myself as well here.

16          I think, Your Honor, one of the things that might be

17  helpful on this point -- I mean, the nature of a risk-limiting

18  audit is that the review of the ballot -- the paper ballot

19  continues to grow if you are not able to determine whether the

20  risk limit has been met all the way up to a full hand recount,

21  if necessary.  I mean, that is kind of the way this ends is a

22  truly enforceable risk-limiting audit can get that far where we

23  have to go back and check every single -- every single

24  component.

25          And I believe our brief on the audit issue walked

1    through these issues in kind of great detail.  So I would point

2    Your Honor --

3              THE COURT:  All right.

4              MR. TYSON:  -- to our brief on that point.  But it is

5    because the nature of what ballot pulling risk-limiting audits

6    such that you are looking to see whatever that risk limit is

7    set at if you can achieve it based on the review of the paper

8    ballots that you have.  If the answer is no, then you continue

9    counting -- hand counting up until a full manual recount of the

10   entire state, if necessary.

11             THE COURT:  Well, as soon as you hit -- let's say it

12   is 90 percent, which is what I believed it was.  As soon as you

13   hit 90, you stop?  Or -- because it might be that at that point

14   if you added another 5000 you are back at 85 percent.

15             MR. TYSON:  Yes, Your Honor.  This is -- I found the

16   rule.  It is ten percent.  A risk limit of not greater than

17   ten percent.

18             And the way -- this, again, gets into statistics that

19   are far beyond my ability to comprehend them.  And the Arlo

20   software that the Department of Homeland Security worked with

21   VotingWorks on in development does this kind of background

22   processing so you can determine based on the random sampling

23   that you have done whether or not you have reached that risk

24   limit or not.

25             And as Dr. Adida explained and actually I believe

1    Dr. Stark explained too in his supplemental declaration, you

2    recognize that that initial sample may not be quite right.  But

3    like with pulling or other statistical processes, you can reach

4    a very high confidence level based on a subset of the entirety

5    of the ballots.  And if you can't reach that, that is where you

6    continue growing your sample size as needed all the way.

7           THE COURT:  Is there a reason why -- and I discussed

8    this particularly with Dr. Adida -- you never actually compare

9    the mark -- the barcode on a particular ballot with the

10   selections?  You know, if there is a chance as we -- as we have

11   discussed before that the barcode mark is, in fact, imparting a

12   different number than the actual selections and that that is

13   one variation of malware that could occur or perhaps a

14   function, why wouldn't something as fundamental as that be

15   looked at on an individual ballot?  Because we're not -- as he

16   testified, that is not part of the process.

17          MR. TYSON:  And, Your Honor, I may be misremembering

18   Dr. Adida's testimony, but I thought that was part of the

19   process.  Because when Mr. Rayburn explained the process in

20   March that the State was using, there was a pulling up of the

21   ballot.  You were looking at both the audit mark, the human

22   readable portion.  So the audit mark is the machine's

23   interpretation of what the QR code would be.  And you were

24   determining from that if -- what is the human readable portion.

25   Are we counting that?

1        So I may be misrecalling the testimony on that point.
2   But that is my recollection on that, that that is part of the
3   review.
4        THE COURT:  Well, I asked him specifically did he --
5   would you review the QR code again and see if it -- if it had
6   imparted other information.  And he said no.
7        But we can all look at the transcript.  I understand
8   what you are saying -- what Mr. Rayburn is saying.  But that
9   was at -- it is a variation on this in light of also the work
10  that Dr. Halderman was doing to see with the QR codes.
11       MR. TYSON:  Yes, Your Honor.  I think they are not
12  going to rescan the ballots and see what the QR reading is.
13  That -- I mean, that may be what Dr. Adida is referring to.
14  But, anyway, I --
15       THE COURT:  Well, he said he just -- we didn't need
16  to go back and look at that on an individual ballot basis.  Of
17  course, he wasn't going to -- so that is what I'm getting at.
18  All right.  Because that was specifically what I was asking
19  about is are you going to check the actual selections on
20  this -- on this ballot versus the QR code.  And he said no.
21  And that was confounding to me as a matter of even for security
22  for -- I mean, people's sense of confidence.  But maybe there
23  is some other explanation.
24       MR. TYSON:  And, Your Honor, I know you had a
25  question earlier as well about tracking people who bring their

 1  ballot back to the ballot marking devices to say that something

 2  is not right about them.  We were able to confirm with the

 3  Secretary's office there is a spoiled and unaccompanied ballot

 4  recap sheet that is collected with the information from

 5  counties.

 6          They don't report by machine, but they do report by

 7  precinct and by ballot combination.  So if you saw a particular

 8  precinct and ballot combination where there was an extensive

 9  number of errors, you could go back and work through and get

10  down to at least a grouping of machines from there.

11          THE COURT:  Okay.  Thank you.  All right.  Thank you

12  very much.

13          MR. TYSON:  Thank you, Your Honor.

14          THE COURT:  Mr. Cross?

15          MR. CROSS:  Your Honor, yes.  Before I start,

16  Ms. Cole, if she could pull up some slides that I'll reference.

17          If Your Honor wouldn't mind, I would appreciate a

18  little latitude on the time because there was a lot covered

19  there.

20          Ms. Cole, is it possible to go to slide view?

21          THE COURT:  Is there something other than this first

22  screen?

23          MR. CROSS:  This will work.

24          Ready, Your Honor?

25          THE COURT:  Yes.

```
 1                         CLOSING ARGUMENT
 2              MR. CROSS:  Your Honor, the closing that Mr. Tyson
 3     gave is so far removed from the facts of this case it is hard
 4     to know where to begin.  But let me just start with this notion
 5     that we only offer recycled theories and speculation.
 6              We are the only ones who have examined the new BMD
 7     system who have knowledge it exists, that it is new, it is
 8     different, and it needs to be inspected.  Only us.  Not one
 9     election security expert has ever examined this system for the
10     State.  Not one endorses it.  They could not find one to
11     endorse this system.
12              On this issue of voter confidence, I will say this,
13     Your Honor.  For Mr. Tyson to say in the public portion of this
14     hearing that we have shown no reason to doubt Georgia's system,
15     when he knows what the State has concealed during the course of
16     this hearing by their confidentiality objections, which we
17     think are totally unmerited -- to say that to the people is at
18     best misleading.  And I will leave it at that.
19              The first slide, Your Honor, the entire defense that
20     the State has offered collapses.  They have said that there is
21     no burden or only a slight burden on voters and they say for
22     two reasons.  This is in the opening.  Voters have the
23     opportunity to verify their ballots that are counted by the
24     scanners.  That is simply not true.  It is not even disputed
25     that that is untrue.  You can't verify QR codes.  And the
```

1  research their own expert put into the record showed that

2  voters are not adept at verifying ballots.

3          The second fact that they rely on or allegation is

4  that the ballots are then audited using a risk-limiting audit.

5  It is not disputed that that also is untrue.  There is a single

6  audit for a single statewide election every other year.

7          So by their own argument, Your Honor, there is a

8  heavy burden on voters in this state.

9          Next slide.  Ms. Cole, can you go to the next slide?

10 Sorry.

11         Just briefly on this, Your Honor, we started here.

12 They did not ask a single witness if this was true, that all

13 we're really asking for is to remove two pieces of equipment.

14 The most that we heard from any of their witnesses, Your Honor,

15 was, well, it may also involve some additional training.  But

16 we know that is not accurate because they are already trained

17 on emergency paper ballots.  It uses the same scanner.

18 Everything is the same from the moment they get the ballot.

19         And I'm going to jump ahead for time, Ms. Cole.  If

20 you would just jump to slide three, if you would.

21         While she pulls that up, it is important to keep in

22 mind, Your Honor, that what we learned in the June 9 elections

23 is hand-marked paper ballots were used as emergency ballots

24 across the State.

25         The next slide, Ms. Cole.  Sorry.

1          Cobb County, one of the biggest counties -- this is

2    one of the things we brought out during the course of the

3    hearing, Your Honor -- they had to use hand-marked paper

4    ballots across many precincts.  This is from Ms. Eveler in an

5    email that we put into the record.

6          Your Honor is to think that the June 9 primary was

7    not a bigger disaster than it was because you had the foresight

8    a year ago to require an emergency backup plan.  Without that,

9    the election on June 9 would have come to a halt at precinct

10   after precinct.  Fortunately, the infrastructure is now there,

11   the people are trained, the paper ballots are there.  All we're

12   asking for is just more ballots.

13         And, Your Honor -- Ms. Cole, if you would jump to

14   slide five.  Next slide.

15         Mr. Barron himself took the stand and acknowledged

16   that at least as to election day having hand-marked paper

17   ballots would be simpler and easier.  He practically asked Your

18   Honor to order it because the State won't allow him to do it.

19   And as the election director for the biggest county, if Fulton

20   can do this, there is no question that all the other counties

21   in the state, which deal with far fewer voters, can do it, Your

22   Honor, at least on election day.

23         Next slide.

24         And what did Mr. Harvey say about this?  He said the

25   only thing he could come up with that would be tricky or

1   difficult is you would have to have a few stacks of paper

2   bigger than you normally have.  Because instead of bringing out

3   paper ballots of ten percent of the anticipated vote, you would

4   have to have more.  That is it.  That is the only thing they

5   could come up with that they would have to do beyond what they

6   already do.

7           Next slide.

8           Their only other argument on this is to say, well,

9   maybe, kind of sort of we think we might not get enough

10  ballots.  But we never asked anyone because we are really

11  scared that, of course, every ballot company in the dozens of

12  them across the country would, of course, commit to printing

13  these ballots.  They don't ask the question because they know

14  the answer, Your Honor.  There is no evidence of a ballot

15  shortage.

16          Next slide.

17          And they didn't tell Your Honor that the counties can

18  print the ballots themselves.  Every county has at least one

19  printer.  And some of them have many more, 200 to 250 ballot

20  printers on demand across the State that can print any ballot

21  style that they need.

22          So the point of feasibility, Your Honor -- their

23  entire argument is not supported by the facts, which is why

24  Mr. Tyson just does not address the facts in his closing.

25          Let me turn briefly to security, Your Honor.

1        Next slide.

2        Contrary to what Mr. Tyson said, there is, in fact,

3   an established, recognized standard in the election security

4   field for election technology like the system here.

5   Dr. Gilbert acknowledged it.  It is called software

6   independence.  You have to be able to determine whether your

7   system has been compromised in some way or simply isn't

8   operating right.  If you cannot do that in a reliable way, then

9   it is not software independent.

10       Every expert who has examined this system -- our

11  experts -- said it is not software independent.  Not one expert

12  from the defense said it is.  Dr. Gilbert said it might be if

13  we assume that it is air gapped.  And we're going to see that

14  it is not.

15       So here you have the State central defense that we

16  have heard time and time again.  There is no evidence that the

17  old system was affected by -- infiltrates the new.

18       Next slide.

19       They even represented to Your Honor before that it

20  was air gapped.  They were very precise about that.  This is

21  State's defense counsel.  But Dr. Coomer never said that or

22  anything close to air gapped.  We now know --

23       Next slide.

24       -- that it is not even close to air gapped.  This is

25  the same problem that we dealt with two years ago when

1    Mr. Barnes disclosed in a hearing that he was plugging a USB

2    drive into his internet-facing computer and then plugging it in

3    to the GEMS system.

4           Now they are telling people across the State --

5    Mr. Tyson did not characterize this email accurately.  He said,

6    well, maybe it is one USB in one county.  Look at what is being

7    asked for.  The counties across the state, what are they

8    supposed to do for USB drives?  Not just for L&A exports but

9    for election day exports.  Just use the ones from the previous

10   system.  They say, well, we don't really know what he means by

11   previous system.  There is only one prior election system in

12   the state.  And if Mr. Barnes had another explanation, we would

13   have seen an 11th hour declaration on that this morning too.

14   But we didn't.  Everyone knows what this is about.

15          And it shows this system is just as compromised and

16   just as infected as the last one.  And they like to tell Your

17   Honor there is no evidence of any hack on the old system.  That

18   is just not true.  Logan Lamb hacked it multiple times.  Who

19   knows what else -- what anyone else was able to do with

20   nefarious intent.

21          The election director, Mr. Harvey, didn't even

22   mention any examination of this system.  And the only thing

23   I'll say on this, Your Honor, because I haven't touched on it

24   is, Mr. Tyson asked Dr. Halderman if he agrees that well-run

25   organizations should constantly adjust to security threats.

```
 1              Yes.  That is the point of our case.  What we have

 2    learned is that in two years they have not done that at all.

 3    Your Honor directed them last year to do that.  They have not

 4    done a single security assessment of this case, apart from one

 5    they have withheld, which they said was only created for this

 6    case.  We have never seen it.  No regular periodic -- not a

 7    single assessment of this case in two years.  And by

 8    Mr. Tyson's own argument, that does not meet any kind of

 9    professional standard for security.

10              THE COURT:  You don't mean of this case?  You mean of

11    the BMD system or the revision?

12              MR. CROSS:  Yes.  Thank you.

13              Next slide.

14              Just briefly, Your Honor, the only person they offer

15    who has actually looked at any part of this system is Mr. Cobb.

16    He is not an election security expert.  He is not a security

17    expert at all.  And every single thing he offered in his

18    original declaration to say the system is secure -- every

19    single allegation proved to be wrong, and he had to abandon

20    them.

21              He said you can rely on hash values.  That was wrong.

22    Completely abandoned in his next declaration.  He said keys

23    are -- barcodes are encrypted.  Absolutely wrong.  And

24    ultimately he was forced to admit in the last bit of testimony

25    here, Your Honor, that the time an election is happening when
```

1   we're underway the BMD system has everything it needs to
2   generate fake QR codes that no voter can detect.  And then
3   nothing they have offered is going to detect when you have got
4   one audit for one election every other year.
5        Next slide.
6        Mr. Cobb also confirmed the simple attack that
7   someone can walk out with their ballot, as voters often do
8   because they are confused when the language says cast ballot
9   instead of print ballot -- but a nefarious actor could walk out
10  with it making many, many photocopies and distribute those
11  among people who have not yet come in to vote.  And just
12  because the system will tabulate anything that is run through
13  it that has the QR code, it is easy to hack.  This is stuffing
14  the ballot box.
15       Note the contradiction in their defense.  They say,
16  well, you can't use hand-marked paper ballots because
17  someone -- insider they like to say -- so they are talking
18  about an election worker or someone at the state or county will
19  manipulate those.
20       Well, that same argument is why you can't rely on the
21  BMD system that they have offered up, Your Honor.  The same
22  thing can happen.  And the only defense they offer -- security
23  they offer for the equipment is to say, well, don't worry, we
24  have locked it down.  Someone would have to come in and embed
25  malware.  Someone would have to come in and embed the small

1      computer that Dr. Halderman developed.

2              But they are the ones that keep telling you you can't

3      trust insiders, that there can always be an insider that will

4      do that with hand-marked paper ballots.

5              And changing individual hand-marked paper ballots one

6      at a time, like they say, with a Sharpie, that is going to take

7      a whole lot more time than simply embedding a small computer in

8      a printer that no one sees or plugging a USB stick into a BMD

9      or an EMS server that then propagates across the system.

10             Next slide.

11             And we know that the system is not hardened.  They

12     have no response as to why election computers and servers are

13     loaded up with video games that don't come standard that

14     someone decided to put on there.  We are very far from a world

15     where this system is in any way secure.

16             Let me just close with audits, Your Honor.  I think

17     Your Honor sees where we are going.

18             Next slide.

19             I think Your Honor hit the nail on the head on this.

20     This is from Mr. Tyson's opening statement.  Mr. Tyson from the

21     start of this case acknowledged that audits are absolutely

22     irrelevant to the question that is before Your Honor right now.

23     They are not meaningful at all, which is the word Your Honor

24     used.

25             This is what he said, talking about the plaintiffs,

1   we cannot have an injury based on the outcome of an election,

2   as the Eleventh Circuit made clear in *Jacobson*, only their own

3   votes being counted.  And why does that render RLAs entirely

4   irrelevant?  Because every expert in this case agrees,

5   including Dr. Adida, that RLAs serve a singular purpose --

6           Next slide.

7           -- to validate election outcomes.  That is it.  That

8   is undisputed.  So even if they had a robust RLA process across

9   the state -- and they don't.  What they have -- it would be

10  laughable if we weren't talking about elections.  All they can

11  do is tell you that the election outcome might be right.  It

12  does not ever validate a vote.  So they have nothing to offer

13  this Court in a network, an environment that is incredibly

14  compromised that is easy to hack and manipulate.

15          They have nothing to offer Your Honor to say we can

16  validate any individual vote.  And Mr. Tyson was right from the

17  start of the trial.  That is what this case is about.  Not

18  election outcomes.  So obviously if we can validate every

19  counted vote, then the election outcome flows from that.  But

20  the injury that we're after is the one that Mr. Tyson

21  identified, election outcome -- RLAs are irrelevant to that.

22          I will just touch briefly on them because we spent so

23  much time.

24          Ms. Cole, if you would just jump to slide 19, the

25  second to last slide.

1          The two points on this, Your Honor.  It is worth

2     noting --

3          Next slide.

4          -- none of their experts are willing to endorse or

5     even comment on the RLA process that has been adopted.  They

6     told Your Honor in their brief that Dr. Adida's team helped

7     design the Georgia process.  But when he was asked just a

8     singular question about that process, he said, I don't know

9     enough about the details of those plans to even comment on

10    them.  The man who has supposedly designed it has so little

11    understanding of it he couldn't even comment on them.

12         Dr. Gilbert, whose original declaration last year

13    went on for pages about RLAs, now says I'm not going to offer

14    any opinions on RLAs in Georgia.  Because what they have

15    adopted is so absurd that no self-respecting expert will even

16    go near it.  That is where they have left themselves.  No one

17    endorses this, just like the system.

18         Lastly, Your Honor, it cannot be overstated --

19         Next slide, Ms. Cole, if you would.

20         It cannot be overstated why RLAs, even in a reliable

21    system, simply cannot work with a BMD.  This is Dr. Gilbert.

22    This is the Rice study that Dr. Gilbert himself offered up to

23    the Court from his own declaration.  He represented to the

24    Court that the ability of voters to actually detect

25    manipulation of the voter choice is quite good.  That is when

1  he said it is okay to rely on BMDs because they are good at

2  verifying their ballots.  And he cites this Rice study in that

3  discussion in his declaration.

4         But what he did not tell Your Honor is that the 25

5  people that he references there were out of 108.  He just

6  didn't disclose to the Court that the very study he cited is

7  contrary to what he represented.  That what it showed was only

8  23 percent of voters were able to -- even made an attempt to

9  verify the ballots.

10        So in the world of BMDs, you are talking a very small

11 percentage of voters who can even try.  And then among that

12 small quarter, a substantial portion of them were not good at

13 even detecting errors at all or maybe they detected one.  In

14 fact, once we brought this out and he was asked about this

15 particular study, he said, I don't even want to be associated

16 with this study because it is not my work.  This is the study

17 he directed Your Honor to in his written testimony in this

18 case.

19        Let me close with this, Your Honor.  In 1954 in *Brown*

20 *vs. Board of Education*, the Court said, you cannot segregate

21 schools.  A year later, states were back before the Supreme

22 Court saying this is really hard, dragging their feet, and

23 delaying the desegregation.  The Supreme Court was quite clear.

24 This is a fundamental right.  Do it with all deliberate speed.

25 That is what the Supreme Court said.  Get it done with all

1   deliberate speed.

2         And they also said if you are going to come in

3   arguing that this is burdensome or difficult then the burden is

4   on you as the State.  Because if you are going to tread on a

5   fundamental right like this or you are going to make

6   allegations of burden, then it is on you to prove those up.

7         And the same logic holds here, Your Honor.  We

8   embrace our burden.  But our burden -- our evidence cannot be

9   rebutted by simply Mr. Tyson or the other lawyers just making

10  claims, allegations for which they have no evidence, things

11  like, well, maybe we can't get printers or we can't get

12  ballots.  Everything that they offer has no substantial

13  evidence behind it or any evidence.

14        And what we are asking Your Honor is as fundamental

15  as the right to education.  It is more so.  Because every right

16  starts with the right to vote, as the Supreme Court has

17  indicated.

18        So what we are asking for, Your Honor, is a system

19  that is the only system known today, particularly in the

20  environment in which the Georgia elections operate, in which

21  voters can have confidence.  It is simple.  It takes the

22  existing infrastructure, the existing training, and simply

23  rolls it out as they already are.  They just need more ballots.

24  That is it.

25        Thank you.

1      THE COURT:  Thank you.  Well, let me ask you one or

2 two questions.

3      MR. CROSS:  Yes.

4      THE COURT:  Mr. Tyson accurately points out though at

5 a preliminary injunction hearing the plaintiffs bear a very

6 high substantial burden of proof and in this context to show

7 that their right to cast a vote has been burdened.  And it is

8 not as you all say -- everyone says here it is not about

9 necessarily election outcome but about the burdening of the

10 vote and the exercise of it.

11      And it is also about in that connection that your

12 vote counts in the same way that anyone else's counts, that it

13 is -- that that is part of the equation.  I might think that

14 some of the policies or regulations for handling of the

15 election processes by the State are inadequate in some way.

16 Some of them are perhaps very inadequate.  Some of them

17 basically are still reflecting change that was -- never had

18 occurred before.

19      But -- and I might, you know, have a different policy

20 choice on all sorts of things.  But why should I say at this

21 juncture -- what do you think is the most compelling point you

22 have that the plaintiffs have presented that the right to have

23 a vote cast and equally counted -- that individual voter has

24 been burdened impermissibly, with this high standard in mind?

25      MR. CROSS:  To that I would say, Your Honor, that the

1    Supreme Court has been clear that burdening the vote unlawfully

2    includes eroding voter confidence.  If voters cannot have

3    confidence in their vote, then that is a constitutional

4    deprivation.

5         With that standard in mind, I would say, Your Honor,

6    what we have presented is an environment specific to Georgia --

7    and let me be clear.  Mr. Tyson has said before we're asking

8    Your Honor to invalidate BMDs across the country.  Not so.  Our

9    case is about Georgia.  It is specific to the environment here.

10   We have --

11        THE COURT:  What are you pointing to when you say

12   that it is enough to have invalidated confidence -- I mean, it

13   is certainly something -- all everyone here has been aware of

14   and concerned about perhaps, frankly, for everybody who cares

15   about our society and its health and well-being and future.

16        But tell me what case you are pointing to when you

17   say it is sufficient that they -- the way that they have

18   managed things have undermined voter confidence when they all

19   look to you and your clients as having undermined confidence --

20   voter confidence.

21        MR. CROSS:  Let me make sure I understand Your

22   Honor's question.

23        THE COURT:  Well, you, first of all, have said the

24   most important thing is that the State has -- in this

25   Georgia -- particular Georgia environment the State has

1    affected the right to vote because it has undermined voter

2    confidence because of the way they have handled the election

3    system.  And I'm asking you what case do you rely on for that

4    proposition.

5              MR. CROSS:  Oh, what case we rely on?

6              THE COURT:  Yes.

7              MR. CROSS:  I'm just going to pull that up, Your

8    Honor.  It is the Supreme Court case that I referenced in my

9    opening.

10             MR. BROWN:  That is *Saylor*.

11             MR. CROSS:  Yes.  Thank you.

12             I guess to get to your initial question, Your Honor,

13   that what is the most compelling evidence or fact, I would say,

14   one, you have Dr. Halderman's demonstration and then you have

15   that within an environment that has two pieces to it.

16             One, the recognized advanced persistent threats from

17   sophisticated nation states like Russia.  So there is no

18   question that they are trying to get in.  We now understand

19   they actually did get in in Florida, embed malware.

20             Then you have got the specific environment in Georgia

21   where they have not done any assessment -- any security

22   assessment in the state in two years, including with a

23   brand-new system.

24             And it is difficult to comprehend how you can roll

25   out a new system that has never been used on this -- on this

1    scale in any other state before and not bother to have a single

2    election security firm or expert come in and say, well, let us

3    just look at it, even on a cursory level, to see does it work

4    as it is supposed to.  Is it hardened in the way that it needs

5    to be?

6              There is nothing I can imagine we would ever agree.

7    You wouldn't allow people to put vehicles on the road without

8    getting some sort of safety testing.  We don't allow the state

9    to build bridges without some sort of safety testing.  There is

10   nothing that we allow a government or private company to do

11   that has this kind of risk without not some basic safety and

12   security testing.

13             And they are asking voters to go to the polls without

14   ever having anyone look at it.  And I said this before, but

15   there are only two possible explanations that I can come up

16   with.  One is:  They are as terrified as we are of what they

17   will find, which means they also don't have confidence in the

18   system as they claim, or they know how bad it is and they are

19   just turning -- they are keeping their heads in the sand, as

20   Your Honor told them two years ago not to do.

21             But that for me is the most powerful point, Your

22   Honor.  We are beyond the dispute that the system is relatively

23   easy to compromise for the ones who are trying to compromise

24   it, very sophisticated actors.  And no one has said -- no

25   one -- this system works and it is reliable.

1          I can't think of any other situation where we would

2     take something as fundamental as elections and say it is okay

3     to go forward under those circumstances.  Just don't test it.

4     Nothing comes to mind.

5               THE COURT:  Okay.

6               MR. BROWN:  Your Honor, this is Bruce Brown.  If I

7     may add one thought.

8               The confidence that we are looking for is not a false

9     confidence.  It is not the confidence that will paper overrule

10    underlying deficiencies.  It is true confidence.  And today if

11    a voter votes on a BMD and then asks the State will you count

12    this correctly, if the State answered honestly, they would have

13    to say we have no idea.  We will never be able to tell you if

14    we did or not.  That is the --

15              THE COURT:  Well, I'm sure Mr. Tyson would disagree.

16              MR. TYSON:  Yes.

17              THE COURT:  But thank you.

18              All right.  Thank you, Counsel.

19              MR. CROSS:  Thank you, Your Honor.

20              THE COURT:  All right.  Do we have your exhibits?  We

21    don't have to do all of this publicly.  Are there exhibits

22    that -- we don't have Mr. Martin here taking down if exhibits

23    have been admitted or not.  And Ms. Cole has a job -- many

24    different roles.

25              But you haven't identified which exhibits have not

1    gotten in that you were trying to get in that I had a hold on.

2         MR. CROSS:  Yes, Your Honor.  I think there are a

3    few.  We filed something last night.  Let me just look at what

4    may still be outstanding.

5         THE COURT:  Ladies and gentlemen, while counsel are

6    looking at this, I don't think we have any further substantive

7    proceedings here in terms of your observation.  You are welcome

8    to stay while we are talking about exhibits.  But no one will

9    be offended if you leave here.

10        I'm just trying to be -- and I appreciate that

11   everyone has been so engaged and interested.  And I'll not be

12   announcing the decision today.  These are challenging issues,

13   and they are challenging issues also in the context of under

14   governing law when there is an election so soon at this time.

15        But the reason I had this hearing is because I think

16   it is important that all circumstances be aired, whatever the

17   decision is, and -- and I'm -- frequently a federal district

18   court trial judge is not the final word on anything.

19        But I appreciate that there has been so much interest

20   in this.  It is probably one of the more vital manifestations

21   of people engaged in democracy -- in the practice of it.

22        Thank you very much for attending and for your

23   interest.  We're sorry again about the Zoom blast that happened

24   on Friday.  And it is sort of the byproduct of still trying to

25   maintain an open society that things can go wrong like this.

```
 1      And hopefully one day again we'll get to see you in open court.
 2              Thank you.
 3              MR. CROSS:  Should we quickly touch on the exhibits,
 4      Your Honor?
 5              THE COURT:  Yes.
 6              MR. CROSS:  The ones that I think that are not yet
 7      moved or not yet admitted are PX 1, which is a Fayette County
 8      ballot.  I think, Bruce or Rob, that was one of you guys --
 9              MR. BROWN:  That was with -- with Mr. Gilbert as just
10      an example of a Fayette County ballot.  I don't think there was
11      an objection to it.
12              MR. TYSON:  No objection, Your Honor.
13              THE COURT:  All right.  It is admitted.
14              MR. CROSS:  Then PX 9, this was the overview from
15      Dominion that Mr. Cobb quoted in his declaration for the QR
16      codes being encrypted.  We only pulled up the cover publicly
17      because it is designated confidential.  But we would move the
18      entire document in so Your Honor has it.
19              MR. McGUIRE:  This is one that Mr. Skoglund talked
20      about as well.
21              MR. TYSON:  No objection as long as the document
22      itself stays under seal.  The cover page is fine.
23              MR. CROSS:  Then the last two, Your Honor,
24      Plaintiffs' Exhibit --
25              THE COURT:  All right.
```

1              MR. CROSS:  I'm sorry.

2              THE COURT:  What is being admitted on PX 9 -- I'm

3      sorry -- that you-all agree on?

4              MR. CROSS:  The cover page can be made publicly

5      available.  But the State wants the rest under seal.

6              THE COURT:  All right.

7              MR. CROSS:  The last two, PX 53, that was an

8      emergency ballot with some hand-marking.  I think, Bruce or

9      Rob, one of you guys put that up.

10             THE COURT:  Any objection?

11             MR. TYSON:  No objection, Your Honor.  I think that

12     is the ballot procedure from that Secure the Vote document.

13     But that is fine.  No objection.

14             MR. CROSS:  Thank you, Bryan.  I think that is right.

15             THE COURT:  Right.  It is admitted.

16             MR. CROSS:  Last one, PX 56, this is another Dominion

17     document where again we only put up the cover.  Rob, I think

18     you had this one.

19             MR. McGUIRE:  56?

20             MR. CROSS:  There were two Dominion documents that we

21     put the cover up on.  One was the overview Mr. Cobb quoted, and

22     then there was another one.

23             MR. McGUIRE:  I don't -- Bruce, I don't know if you

24     used 56.  I don't think 56 was one of mine.  We used 54.

25             THE COURT:  Was 54 admitted?

```
 1              MR. McGUIRE:  I believe it was.

 2              MR. CROSS:  Yes, 54 was admitted.

 3              THE COURT:  Well, like, for instance, 53 is admitted

 4    or the cover page in PX 9 -- you are going to have the rest of

 5    it be under seal?

 6              MR. TYSON:  Yes, Your Honor.

 7              THE COURT:  All right.  Okay.  Fine.

 8              All right.  Well, if you figure out about 56, you can

 9    let us know.

10              Mr. Tyson, (unintelligible) --

11              MR. TYSON:  I'm sorry, Your Honor.  You broke up.

12              THE COURT:  Are there any of the defendants' exhibits

13    that need to still be admitted?

14              MR. TYSON:  I believe we had Exhibit 11, which was

15    the hand recount story, and there was an Exhibit 12 that was

16    the stills from the video that we'll file under seal.

17              THE COURT:  Right.  What is the hand recount story?

18              MR. TYSON:  From Savannah where the state house -- I

19    talked to Dr. Halderman about it.  The hand recount of the

20    state house election.

21              THE COURT:  I have to review that before I let it in.

22    It is a newspaper article.  After all, you were objecting to

23    also even just actual academic studies coming in.  You can

24    examine somebody without having an article come in itself.

25              So I'm not inclined to.  But I will look at it if you
```

```
 1   want.
 2              Holly, do you know which one that is?
 3              What was the exhibit again, Mr. Tyson?  And I will
 4   look at it.
 5              MR. TYSON:  It is filed at 893-2.
 6              THE COURT:  All right.  I'll look at it afterwards,
 7   and I will let you-all know.  But I'm not inclined to admit it.
 8              MR. McGUIRE:  Your Honor, we used DX 4.  I'm not sure
 9   if that was admitted or not.  But we would --
10              THE COURT:  What was DX 4?
11              MR. McGUIRE:  It was the -- Michael Barnes' draft
12   document on scanner settings.
13              THE COURT:  Are you seeking to admit it?
14              MR. McGUIRE:  If it isn't already admitted, we would
15   seek to admit it, yes.
16              MR. TYSON:  We don't have an objection to that, Your
17   Honor.
18              THE COURT:  All right.  Admitted.
19              MR. McGUIRE:  We had also submitted 61 -- PX 61 and
20   PX 62.  Those are the articles that Mr. Tyson was just
21   referring to, I believe.
22              THE COURT:  All right.  I'll look at those.  The one
23   I was referring to?
24              MR. McGUIRE:  Yes, ma'am, you were referring to.
25              THE COURT:  Well, I'll look at all three articles,
```

1    and I'll let you-all know.

2            MR. TYSON:  Then, Your Honor, also those stills from

3    the inspection video under seal but --

4            THE COURT:  All right.  You were going to get back to

5    me this afternoon about the question I posed to you; right?

6            MR. TYSON:  Your Honor, I have already sent it to the

7    Secretary's office.  So they are working on it right now.

8            THE COURT:  All right.  Thank you very much.  I know

9    it has been a lot of work for you-all.  I appreciate the

10   excellent really work you have done and your advocacy and the

11   strength of your beliefs on all sides and commitment to your

12   clients.

13           And if we have any questions, I will let you know.

14   It has been a challenging thing to do this by Zoom.  And I very

15   much appreciate everyone's professionalism as we have tried to

16   navigate together over the last period of time, in the

17   particular last few days.

18           Is there anything else we should address at this

19   time?

20           MR. CROSS:  Your Honor, I think we may have figured

21   out the exhibit, just while we have got you.  So Exhibit 56 --

22   I think I have it confused.  My apologies.

23           Exhibit 56 is the November 2019 Democracy Suite

24   system overview.  I think that is the one we used and the one

25   that Mr. Cobb quoted from.  Exhibit 9 is -- let me pull it up

1    now.  That is the Windows build document.

2              MR. McGUIRE:  That one is admitted, I think.

3              MR. CROSS:  Right.  That was the one that --

4              THE COURT:  You are looking to admit the

5    November 2nd, 2016, documentation that Mr. Cobb relied on?

6              MR. CROSS:  Yes.  It is 2019.  But that is right.

7    Again, it would only be the cover page because it is designated

8    confidential.  So Exhibit 56, the cover page could be public

9    but the rest would be under seal, according to the State.

10             THE COURT:  So let me ask you this just in terms of

11   the -- did you give them to us as two separate documents all

12   the times that you are saying just the cover page or are we

13   supposed to be scanning it ourselves to make these?  How do you

14   perceive this happening pragmatically.

15             MR. CROSS:  We, I think, have publicly filed all of

16   the exhibits.  And for Exhibit 9 and 56, we filed just the

17   cover sheet.

18             THE COURT:  All right.

19             MR. CROSS:  I'll confirm that.

20             THE COURT:  Everything else under seal?

21             MR. CROSS:  Then the rest would be under seal with

22   the Clerk.

23             THE COURT:  All right.  Were they filed under seal

24   before?

25             MR. CROSS:  No.  We will put in a sealed filing for

```
 1    those.  I don't think we have done that yet.
 2            THE COURT:  Is that okay with you, Mr. Tyson, and is
 3    there anything that you were submitting that was sealed?
 4            MR. TYSON:  That is fine with us, Your Honor.  I
 5    think the one we have under seal is the Exhibit 12.  So I will
 6    file that under seal here shortly.
 7            THE COURT:  All right.  Ms. Cole, is there anything
 8    else that you can spot or think of?
 9            LAW CLERK COLE:  No.
10            MR. CROSS:  Your Honor, I guess one other question.
11    To Mr. Brown's point at the start of the day that the
12    plaintiffs will move to unseal this, we don't want to distract
13    from the far more pressing point that Your Honor needs to make
14    a decision on the motion.
15            What is your preference of timing and how we would do
16    that?  We do think it is --
17            Go ahead.
18            THE COURT:  I don't have a preference.  I have to
19    deal with what you-all have put in front of me.
20            MR. CROSS:  Right.
21            THE COURT:  And I have -- you know as with -- well, I
22    don't know.  I think Mr. Tyson must be dealing with elections
23    full time and nothing else and his colleagues.  But I do have
24    plenty of work that is not elections that I have got to get to.
25            So, you know, I realize on a time-sensitive basis you
```

1    want me to rule on that.  So, you know, you just will have

2    to -- obviously proceed as soon as you can.  But I can't tell

3    you that I'm going to be able to rule on it that much faster.

4    I mean, I'm happy to give you-all a shorter period of time

5    because you want to deal with it.  But I can't predict exactly

6    when I will be able to turn it around.

7                 MR. CROSS:  Understood.

8                 MR. BROWN:  Thank you, Your Honor.

9                 THE COURT:  Yes?  Mr. Brown, were you saying

10   something?

11                MR. BROWN:  No.  I just said thanks.

12                THE COURT:  I think that is probably -- there is a

13   lot that the State has to deal with -- State counsel.  So I

14   think the better thing is to file it ASAP and then I just won't

15   grant an extension and they can have their 14 days.  That seems

16   to me the more sensible way of proceeding, since everyone is

17   under enormous pressure just to get this hearing happening.

18                MR. CROSS:  Thank you, Your Honor.

19                MR. TYSON:  Your Honor, also we just want to say on

20   behalf of all of us on both sides thank you to Ms. Welch and

21   Ms. Cole for heroic work in this.  Thank you.

22                THE COURT:  They were terrific.

23                All right.  If I have any other questions, I will let

24   you-all know.  Thank you also.  Be well.

25                MR. CROSS:  Thank you, Your Honor.

1          MR. TYSON:  Thank you, Your Honor.

2          MR. BROWN:  Thank you.

3          THE COURT:  All right.  Take care.  Bye-bye.

4               **(The proceedings were thereby concluded at 3:25**

5          **P.M.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNTED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
1                    C E R T I F I C A T E

2


3   UNITED STATES OF AMERICA

4   NORTHERN DISTRICT OF GEORGIA

5

6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

7   the United States District Court, for the Northern District of

8   Georgia, Atlanta Division, do hereby certify that the foregoing

9   198 pages constitute a true transcript of proceedings had

10  before the said Court, held in the City of Atlanta, Georgia, in

11  the matter therein stated.

12       In testimony whereof, I hereunto set my hand on this, the

13  15th day of September, 2020.

14

15

16

17            _____
              SHANNON R. WELCH, RMR, CRR
18            OFFICIAL COURT REPORTER
              UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```