IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, ET AL., :
:
PLAINTIFFS, :
vs. : DOCKET NUMBER
: 1:17-CV-2989-AT
BRAD RAFFENSPERGER, ET AL., :
:
DEFENDANTS. :

**TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

**BEFORE THE HONORABLE AMY TOTENBERG**

**UNITED STATES DISTRICT JUDGE**

**SEPTEMBER 8, 2020**

**6:01 P.M.**

***MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED***

***TRANSCRIPT PRODUCED BY:***

***OFFICIAL COURT REPORTER:*** ***SHANNON R. WELCH, RMR, CRR***
***2394 UNITED STATES COURTHOUSE***
***75 TED TURNER DRIVE, SOUTHWEST***
***ATLANTA, GEORGIA 30303***
***(404) 215-1383***

**A P P E A R A N C E S O F C O U N S E L**

**(SPEAKING ONLY)**

**FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY SCHOENBERG:**

DAVID D. CROSS
MORRISON & FOERSTER, LLP

**FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES, WILLIAM DIGGES, III, AND RICARDO DAVIS:**

BRUCE BROWN
BRUCE P. BROWN LAW

ROBERT ALEXANDER McGUIRE, III
ROBERT McGUIRE LAW FIRM

**FOR THE STATE OF GEORGIA DEFENDANTS:**

CAREY A. MILLER
ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

BRYAN P. TYSON
TAYLOR ENGLISH DUMA

***There were many other counsel present on the phone call but not listed on this appearance page.

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; September 8, 2020.)**

THE COURT: All right. The most time-pressing matter to deal with -- that is why I proceeded this evening -- has to do with the attorneys' eyes only issue. And I read the Coalition's response to the defendants' submission. And I'm actually not 100 percent sure that I understand what the Coalition is doing or arguing.

Is it, Mr. -- let me just ask everyone just who is actually going to be speaking today just say -- identify yourselves so I know who is here, first of all. I'm not going to go through all 20 people the phone system just identified.

MR. BROWN: Thank you, Judge. This is Bruce Brown. I'll be speaking on behalf of Coalition plaintiffs.

MR. McGUIRE: Robert McGuire as well is here for Coalition.

THE COURT: Very good.

MR. CROSS: David Cross, Your Honor, for Curling plaintiffs. And I'm the only one that will speak for our group.

MR. TYSON: And, Your Honor, Bryan Tyson for State defendants. Mr. Miller may have a few things to add, but I'll probably do most of the speaking this evening.

THE COURT: All right. So, Mr. Brown or Mr. McGuire, when I read your last submission, I got a somewhat different

impression than I got from some of the earlier communications.

In the last communication I thought you perhaps were saying that the sole responsibility of the three-client-affiliated individuals who certainly played a large part in this litigation in terms of just support as plaintiffs and gathering information is that they were going to -- what they were doing was because of the massive amount of materials submitted and the fact that the attorneys' eyes only information wasn't segregated that they were looking at this material. So I got the notion they might be looking at it solely to segregate the attorneys' eyes only information.

On the other hand, in some of the earlier communications, I got a sense that they might be looking at the materials more broadly. And that's what your declaration or your filing indicated when you were identifying them as consultants but they were going to be used for actually substantive review of these documents.

So I wanted some clarification as to what is going on.

MR. BROWN: Your Honor, I think I can -- let me speak to that. And I can see why the way I drafted -- wrote that is misleading in this realm. The direct answer is that your first impression is correct. We are designating them as consultants so they can have a full substantive review of attorneys' eyes only material.

The confusion results from our rebuttal of the State defendants -- it is not really an argument -- just sort of a comment that they made that another team of people that we have who are reviewing as our representatives -- just our team of people who are reviewing who have also signed the protective order and -- but are -- just our -- just our team of volunteers who are reviewing it.

They do not -- we're not seeking any sort of broad authorization for those people to review attorneys' eyes only material. Instead, that came up just because the State defendants said, oh, they have some people who are -- who are reviewing attorneys' eyes only material. We turned around and said, no, they are not. It is just that the State didn't label these documents in such a way that we can tell they are attorneys' eyes only material until you look at them.

So for those people, they are under very careful instructions that if you see anything that is marked attorneys' eyes only don't look at it, put it aside, skip it. And that's -- I mean, it is awkward. But there is no other better way to do it. And the State defendants haven't suggested a better way of doing it. And they haven't volunteered to segregate the attorneys' eyes only material either. And I'm not suggesting that each time they can do that.

So, Your Honor, our -- our ask and our notice relates to three individuals, Rhonda Martin, Susan Greenhalgh, and

Marilyn Marks. The protective order says attorneys' eyes only. And it includes experts and consultants. It is not limited to experts. It is not limited to attorneys either. It is attorneys, staff, people working for the attorneys, et cetera. And so --

THE COURT: They are not really working for you though. I mean, you are working for them. I mean, they are obviously working -- you are all working, as you said, as a team, which is not unusual in this sort of litigation. But they are not really your consultant either.

MR. BROWN: Well, they are --

THE COURT: Go ahead.

MR. BROWN: Yes, Your Honor. I mean, they are not -- I would have to say they are not paid consultants. I think that the connection could be made -- I mean, Ms. Marks is the executive director of the Coalition. But she is acting to assist in the litigation -- assist counsel in the litigation as she has done for years now in this case.

THE COURT: Yeah. And I -- you know, I understand your desire because they are very knowledgeable. But what -- you know, you have represented lots of corporate entities. And obviously this is often so in a corporate context also where you have attorneys' eyes only items. And sometimes the people who know best the subject matter expertise are the opposite of the corporation.

But that is the entire purpose of this, attorneys' eyes only, to have that sort of insulation even though it is challenging. Sometimes people obviously negotiate with in-house counsel and do what -- arrange for in-house counsel. But I mean, it is -- it is a --

MR. BROWN: The only thing I would say --

THE COURT: Go ahead.

MR. BROWN: The only thing I would say to that -- and I have been in the situation -- you know, it was even formalized more defense-oriented but also serving -- and I know Mr. Cross has experienced it in intellectual property cases.

And in those cases, the attorneys' eyes only designation is reserved for information that loses its value once the party knows it. Not that the party would thereafter disclose it. That simply disclosing it to the party means that the value evaporates, like a trade secret or something like that.

So that is why the attorneys' eyes only information is used typically. So this is different. This is a different situation. The parties are different. The nature of the information is different. It doesn't mean that the information is not substantive or that it would not damage the defendants in some instances if it is disclosed to the public.

But it is not information that would damage the defendants if it is disclosed to these consultants, and there

has been no suggestion that it would be.

THE COURT: Well, you know, I appreciate that there is a distinction -- the distinction that you draw. And I don't know in the short time that this has materialized at least for me as an issue that we have done any genuine substantive research about this in this context.

But -- and, you know, I understand that you have addressed the concerns that the defendants articulated about Ms. Marks because of her active advocacy and that -- and active use of social media for being able to do that. And there is nothing wrong with that. And I think you've properly pointed out that why -- that she was publicizing not a private document but, in fact, a public document, public contract.

But it still is problematic because, you know, it puts you in the position of having also to monitor your clients. There are potentially -- I don't know all the information that is being provided. But some of it undoubtedly is sensitive.

And what is sensitive to them or to you that you know as an automatic reflex does not mean that it is sensitive to them. And it is not to be in any way critical because they -- they have their -- have a very important role here and have obviously done a lot of significant investigation themselves.

But -- but -- and it is also to recognize that you have the need for being able to consult them about a huge range

of information potentially.

But I'm just struggling to call the individuals who are basically the most active leaders of this organization -- of the organization and the research as just -- as your consultants. It kind of converts all the roles.

And I could imagine other people who work with you being more likely in that capacity or people who are graduate students or otherwise with some of your -- the experts that have worked with plaintiffs being in that role far easier in terms of just simply their obligations of confidentiality and somebody -- actually their job depends on basically conforming to the protocols of confidentiality that you specify.

So, you know, I'm just -- I can't quite see it. And that's why I -- I have other things I did want to talk about if we can today. I understand right now that Mr. Cross has to get off or has a hard deadline of 6:30.

But unless there is something else you have to say, I don't really -- I see it. I can see your being able to identify somebody else and they don't -- the State doesn't have a per se right to control who you -- who is identified as a consultant.

But this was not necessarily completely unpredictable that they would in this context say this is a -- that they think it is not a genuine -- a genuine consultant or arm of your -- or paralegal.

MR. BROWN: Your Honor --

MR. CROSS: Your Honor, this is David Cross. Your Honor, this is David Cross. Could I just add one thing? Because I think this may help.

THE COURT: Yes.

MR. CROSS: I will say from our perspective Ms. Marks very much does operate as a consultant in this case. She's not our client. She has an enormous wealth of background and information that I will honestly tell the Court we have come to rely on ourselves. And so I get the relationship Your Honor is addressing with Mr. Brown and the client.

But I do feel an obligation to tell the Court that in the months, particularly leading up in the last few weeks and we have been in a really expedited crunch Ms. Marks has played a very valuable role. And I would say consultant captures it perfectly.

I don't think we have to reach the issue of whether she is an expert. That is for another day. But I do -- I haven't joined this motion because it is Mr. Brown's client. But I am concerned about our ability to continue to rely on her in that role if she can't get access to certain things.

And I understand Your Honor's concern. But at the end of the day, it is the State's burden to show harm. I read the papers. I don't see any articulation of harm in disclosure to her at all other than this risk that she will disclose it

publicly. But there is no evidence that she's ever not complied with the protective order. And that's really speculative and seems unfair.

THE COURT: Let me just cut to the quick. All right? And I appreciate what you are saying, that you have great need and Ms. Marks is extremely knowledgeable. All of that which I well understand.

What -- what I wanted to know still though -- and I do agree that I would like -- I understand from the State more about what the nature of the documents are. And I don't mean for you to have to reveal at this point with 14 people on the phone call who I don't know who is on the phone the very -- the details of them.

But I don't know whether it is an overbroad definition, whether it is just, you know -- basically people can designate anything. And there is certainly a certain presumption here that everyone is functioning with the State, especially under this time line.

But if it is -- if it is so broad that it is basically invoked in a way that is not in good faith, then it basically cuts off the other side from consulting with their most knowledgeable client. So it is an important issue.

And were there approximately 700 documents that were identified as attorneys' eyes only, or have I got that wrong? Because I'm reading fast myself.

MR. TYSON: Your Honor, this is Bryan Tyson. From our looking at our system, we see only 65 documents in our three productions that were designated as AEO. As we had advised the plaintiffs, this was a situation where obviously we moved quickly to make sure they got these documents. There may be some situations where we inadvertently marked something confidential that really wasn't. We were trying to be careful with the information.

But if the Coalition plaintiffs have some documents they think are improperly marked AEO, we'll be happy to take a look at that. But as to our count, it is only 65 documents.

MR. McGUIRE: Your Honor, this is Robert McGuire. We understood it is approximately 700 pages. And we have instances where documents that are marked attorneys' eyes only in this production by the State have been produced without any confidentiality designation by Dominion or are available publicly on the EAC website for download by anybody, just to give you two examples.

We believe it has been wildly overdesignated. And we think the resistance to Ms. Marks is intended at least in part to hobble us because everyone recognizes her role and how valuable she is to our side.

MR. BROWN: Your Honor, this --

THE COURT: Well, if there are 65 documents, I mean, I can well believe that there are 700 pages. But if there are

65 documents, wouldn't counsel be able to identify this and basically -- and schedule a phone conference for tomorrow morning to immediately identify those so that you can get those freed up?

MR. McGUIRE: On that note, we've asked the State to tell us what pages and documents are designated AEO so that we -- I mean, he seems to know -- Mr. Tyson seems to know. But we haven't had it pointed out to us.

The only way we can do it is to go through this 100,000-page or whatever that we have gotten between the State and Dominion and look on a page-by-page basis.

So as far as rushing to get ready for a hearing, we don't have the attorney capacity on our side to do that kind of review, to identify page-by-page which documents are -- which collection of images are a document.

THE COURT: Well, Mr. Tyson, you must have a listing.

MR. TYSON: Your Honor, it is all in the Relativity eDiscovery platform, as I understand it. Mr. Miller is much more conversant in that than I am.

I think one of the issues is Curling plaintiffs and us are using an eDiscovery platform for document review. And the productions are being produced for that platform. But I don't believe the Coalition plaintiffs have a similar platform, which is why they are having this manual process.

So I don't know if we can generate something or not.

But I mean, if there is something specific, we're more than happy to take a look at it. I just don't know if there is a report that can generate that kind of information quickly and easily. But I know the Curling plaintiffs, I believe, have the same platform we are using in Relativity.

MR. BROWN: This is Bruce Brown. I mean, I think if they know it is 65 documents, they know the 65 documents that we're talking about and can tell us. And that would help. Because, for example, Ms. Marks cannot read even Curling's reply brief in this case. Because -- and so we are trying to prepare for trial. And one of the main briefs, which is Curling's reply brief I have, of course, read, but can't talk about it to my client because it is filed under seal.

The same thing, one of our own experts, Kevin Skoglund, we had to file that under seal. And it is what we are relying on. We didn't file a sealed brief. Instead what we did is we carved out the discussion that was sealed and filed that carved-out discussion under seal. So we are doing everything we can to work around this. If we can get the list of 65 documents, that would help.

And the other thing, Your Honor, is that the -- I do appreciate the distinction between the consultant and the client, who is working for who.

But I would add that Susan Greenhalgh does not work for the Coalition. She's a very well-known and respected

elections expert who works for Free Speech for People in Amityville, New York, and has agreed to help.

And then Ronnie Martin, although she is a director of the Coalition -- and we have seen her declarations throughout. She's very well-qualified also. But she also is not an employee. She is an independent person. And they would be distinctive in their capacity and relationship to the overall team, if that makes any sense.

THE COURT: Do you want to send me -- I'm not going to go look at it. If Ms. Greenhalgh has a bio, she can send that -- you can file it and let me look at it.

MR. BROWN: Sure.

THE COURT: I mean, none of this is to in any way diminish the significant qualifications of your clients. There is a reason that they are involved is that they are -- you know, they have qualifications. And these are issues of great import to them professionally and personally. So it is really not that. It is the question of their client status.

But I don't know about Susan. So I can't -- I can't speak to that.

Well, I would like to -- Mr. Cross, I know you have six minutes and you offered an opinion on this. So you are using the same platform as the State.

Are you able to identify -- can you tell me anything from your perspective about the capacity to identify the

attorneys' eyes only documents?

MR. CROSS: Your Honor, you anticipated what I have been trying to do. I sent an email to the team, and I don't have an answer yet. So as soon as we get an answer, I can get back to you on it. I don't know myself unfortunately.

THE COURT: And, Mr. Tyson, do you want to hand it over to your colleague to respond to the same question?

MR. TYSON: Yes, Your Honor. I'll let Mr. Miller take that. I mean, I think it is also significant that they have had these documents for two weeks now. I understand that it is a process. But we are on the eve -- we are all on the eve of a hearing right now.

But I can let Mr. Miller walk through what -- if he is aware of what we can do or how that platform would function.

MR. MILLER: Sure. Your Honor, this is Carey Miller. And, you know, respectfully to that point, frankly, Mr. Tyson took the words out of my mouth a little bit. The documents have been sitting with them for a few weeks.

And, frankly, I spent today trying to handle whether we would consent to various subpoenas being served. And it turns out they were served anyway during our conversation.

But all that aside, in terms of identifying the documents, I'm sure it is something that we can have our vendor run a script and pull. I can pull the totals from our production output file.

But in terms of just readily available, frankly, we're scrambling a little bit to adapt to the hearing right now. And we are a little caught offguard by this issue being raised on the eve of the hearing rather than several weeks ago.

THE COURT: Well --

MR. BROWN: Your Honor --

THE COURT: It has been percolating obviously. I am looking at the time, which is -- I know that Mr. Cross has to leave. So I want to just, first of all, figure out the time to continue -- yes, I would like the State to go ahead and identify -- have your contractor, whoever is working on this, run a script and identify which of the attorneys' eyes only documents so they can go and sort for that.

And, secondly, I would like to continue the discussion about the hearing and logistics and witnesses and time tomorrow as soon as possible. I know that Mr. McGuire is three hours likely apart. So that is not going to happen. But he may not be able to participate.

But are you -- is everyone else available at like 8:30 in the morning so I'm not running into whatever else you have planned for the day?

MR. CROSS: I'm sorry, Your Honor. What time did you say?

THE COURT: 8:30 in the morning. I'm just trying to find a time that I am not negotiating with everyone.

MR. BROWN: Your Honor, this is Bruce Brown. That is fine with the Coalition plaintiffs, as long as you don't require Mr. McGuire to get up at 5:30.

THE COURT: No, I'm not going to require that.

MR. McGUIRE: I'll be on there. I'll be on there, Your Honor. We don't need to worry about that. I'm used to adjusting for this when I need to.

THE COURT: Well, what about the State's counsel?

MR. TYSON: Your Honor, this is Bryan Tyson. 8:30 will be fine for us as well.

THE COURT: All right. We'll continue this then at 8:30 in the morning. And Mr. Miller is going to send out an email to whoever asking -- to try to arrange this script to be written right away so that we can identify the documents hopefully by noon.

That would be enormously helpful. And, Mr. Brown, you can file whatever you have for -- I'm sorry -- it is Greenhalgh? -- Susan Greenhalgh?

MR. BROWN: Greenhalgh, yes. G-R-E-E-N-H-A-L-G-H.

THE COURT: Yeah. You can do that as well. And we'll just continue the rest of the discussion about the other pending matters tomorrow morning at 8:30. All right?

MR. BROWN: Great. Thank you, Your Honor.

MR. CROSS: Your Honor, before we leave, this is David Cross.

I was just going to ask Bryan: Are you guys -- does it make sense for all of us to talk later tonight? I'm just asking while we are all on. Given the call early -- do you want to get back to us on that?

MR. TYSON: About? I'm sorry. Which topic, David? I'm sorry.

MR. CROSS: About logistics. I know it might help if we get on the call with the Judge early tomorrow if you guys are around later tonight.

MR. MILLER: I may be confused. But I thought I recalled you were unavailable until 9:00 this evening.

MR. CROSS: Yeah. So if you guys want to talk at 9:00, we can do that.

MR. MILLER: I tend to try not to schedule work calls at 9:00 P.M. in the evening.

THE COURT: Well, you are welcome to start at 8:00 without me. I'm not going to say I'm going to be available to you at 8:00. As you know, I'm a late owl.

So I would encourage you to figure out whether you could do it at 8:00 in the morning beforehand. I think it will be a lot more productive.

MR. CROSS: That works for Curling.

MR. BROWN: That works for us.

MR. TYSON: I think we could make that work, Your Honor, for the State.

THE COURT: Great. If somehow everything vanishes, let me know.

MR. MILLER: Thank you, Your Honor. Will do.

MR. TYSON: Thank you, Your Honor.

THE COURT: And, the State, use the same number to get in.

**(The proceedings were thereby concluded at 6:30 P.M.)**

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 20 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

In testimony whereof, I hereunto set my hand on this, the 9th day of September, 2020.

Shannon R. Welch

SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT