# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, et al.<br><br>Plaintiff,<br><br>vs.<br><br>BRAD RAFFENSPERGER, et al.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION FILE NO.: 1:17-<br>)  cv-2989-AT<br>)<br>)<br>)<br>)<br>)<br>) |

## SUPPLEMENTAL DECLARATION OF KEVIN SKOGLUND

**KEVIN SKOGLUND** declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

2. I attended the court's audio hearing on September 28, 2020 to review the State's plans to make software changes to the ImageCast X ("ICX").

3. Mr. Tyson and Dr. Coomer explained that logic and accuracy ("L&A") testing had revealed a problem: the current ICX software is unable to reliably render the screen for a contest with 30 candidates in two columns of 15.

4. This revelation highlights the importance of robust L&A testing. The State described a rendering problem which manifests under some circumstances and not others. Georgia's voters are lucky it was caught this time. Performing less than the comprehensive testing prescribed in Georgia statue could have allowed this problem to slip through undetected.

5. Dominion has proposed changing the ICX software so that the desired two-column layout will render reliably. Dominion submitted the change to the ICX software to Pro V&V for review. I heard Dr. Coomer express optimism that Pro V&V will endorse the change as "de minimis" later this week.

6. It concerns me that a significant software change is happening at this late date and that pressure to prepare over 30,000 ballot marking devices for this election may result in less thorough review and testing of the proposed change.

7. I have not heard Dominion or the State say that the change to the ICX software has been submitted to the U.S. Election Assistance Commission ("EAC"), or that the EAC had been contacted about the change. It is not uncommon to engage a Voting System Test Lab ("VSTL") to review a change before notifying the EAC. However, the VSTL review is only the

first step in the approval process. Since time is of the essence, I expected the EAC would be included at the earliest stages.

8. The EAC's Testing and Certification Program Manual describes the procedure for a de minimis change. It introduces them with: "A proposed de minimis change may not be implemented as such until it has been approved in writing by the EAC."[1]

9. After a VSTL reviews the proposed change, "[t]he EAC will review all proposed de minimis changes endorsed by a VSTL. The EAC has sole authority to determine whether any VSTL endorsed change constitutes a de minimis change under this section. The EAC will inform the Manufacturer and VSTL of its determination in writing."[2]

10. The federal certification of a voting system is voided if the software is modified prior to the EAC's written determination. ("Any modification to the system not authorized by the EAC will void the certificate."[3])

11. The certification guidelines are strict in order to safeguard the integrity of the voting system.

12. It is not certain if the EAC will approve the proposed change to the ICX software as a de minimis change.

---

[1] "Testing and Certification Program Manual," Section 3.4.3, available at: https://www.eac.gov/sites/default/files/eac_assets/1/6/Cert_Manual_7_8_15_FINAL.pdf

[2] "Testing and Certification Program Manual," Section 3.4.3

[3] "Testing and Certification Program Manual," Section 5.11

13. The EAC only began allowing *any* software changes to be considered de minimis on November 15, 2019.[4] Prior to that date, software changes which required a new build of the software and VSTL testing were classified as "system modifications" and subjected to more thorough testing.

14. I have heard EAC staff say the reason for the previous prohibition was the recognition that even a small software change can create unintended consequences that alter the system's reliability, functionality, capability, or operation.

15. I described in my testimony a real-world example which illustrates the wisdom of this approach. It bears striking similarities to the current situation.

16. In November 2019, Northampton County, Pennsylvania wanted to change how candidates were displayed on the touchscreen (of a different brand of voting system) in order to reduce voter confusion. They added some text in the square to the right of some candidates: "Straight Party Vote will light up to the left for this candidate." It seems like a harmless change, but it had a nasty side effect on election day. The votes cast for some candidates stopped being recorded altogether. It was perplexing

---

[4] "Notice of Clarification 19-01: Software De Minimis Changes," available at: https://www.eac.gov/sites/default/files/voting_equipment/NOC19.01_SoftwareDeMinimisChanges_11-15-2019.pdf

because the affected candidates were not necessarily near any added text and other voting machines used the same data without incident.[5]

17. Small changes can cause large, unintended consequences. Their impact is easy to underestimate.

18. Today, I was surprised to hear Mr. Tyson express the opinion that Georgia law ceases to require federal certification after procuring a new voting system.

19. If the federal certification can in fact be voided on the day after purchase, it undermines all of the excellent reasons to require it in the first place.

20. I am alarmed that any state would contemplate abandoning compliance with the federal standards. I view it as irresponsible and counterproductive. It would put Georgia far outside the norm.

21. The federal standards are a *minimum* set of requirements for any voting system. They are the *starting point* for providing reliable, secure elections. Many states—notably California, Colorado, New York, and Pennsylvania—have rigorous state requirements for security and usability in addition to the baseline federal certification.

22. Voiding the federal certification would void the guarantees that a voting system will meet established minimum standards set by experts for

---

[5] "A Pennsylvania County's Election Day Nightmare Underscores Voting Machine Concerns," *The New York Times*, November 30, 2019, available at: https://www.nytimes.com/2019/11/30/us/politics/pennsylvania-voting-machines.html

security, accessibility, usability, reliability, and accuracy. Instead, the voting systems's "guarantees" would be based on an ephemeral, patchwork, of subjective processes that reduce trust.

23. Without the nominal standard, Georgia's new voting system can only be as secure and reliable as the less rigorous standard that takes its place.

24. I fear that if the State is motivated to abandon the minimum standards by time pressure or by inconvenience, then the stresses of future elections will motivate the State to cut additional corners.

25. The federal certification of the voting system and its requirements for managing changes provide essential guardrails. They reduce the risks of significant, unexpected problems on election day. It is important to preserve and follow them.

26. My previous declaration and testimony (under seal) underscores my current concerns.

Executed on this date, September 29, 2020.

Kevin Skoglund