1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,                    :
                                              :
5           PLAINTIFFS,                       :
    vs.                                       :   DOCKET NUMBER
6                                             :   1:17-CV-2989-AT
    BRAD RAFFENSPERGER, ET AL.,               :
7                                             :
            DEFENDANTS.                       :
8

9

10          **TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

11             **BEFORE THE HONORABLE AMY TOTENBERG**

12                **UNITED STATES DISTRICT JUDGE**

13                    **SEPTEMBER 28, 2020**

14                        **11:04 A.M.**

15                         **REDACTED**

16

17

18

19

20

21     *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22                  *TRANSCRIPT PRODUCED BY:*

23

    *OFFICIAL COURT REPORTER:*          *SHANNON R. WELCH, RMR, CRR*
24                                       *2394 UNITED STATES COURTHOUSE*
                                         *75 TED TURNER DRIVE, SOUTHWEST*
25                                       *ATLANTA, GEORGIA  30303*
                                         *(404) 215-1383*

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
      SCHOENBERG:

 4

 5         DAVID D. CROSS
           LYLE HEDGECOCK
 6         MORRISON & FOERSTER, LLP

 7         ADAM M. SPARKS
           KREVOLIN & HORST, LLC

 8

 9

10    FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
      WILLIAM DIGGES, III, AND RICARDO DAVIS:

11

12         BRUCE BROWN
           BRUCE P. BROWN LAW

13         ROBERT ALEXANDER McGUIRE, III (VIA VIDEO CONFERENCE)
           ROBERT McGUIRE LAW FIRM

14

15         CARY ICHTER
           ICHTER DAVIS, LLC

16

17    FOR THE STATE OF GEORGIA DEFENDANTS:

18

19         VINCENT ROBERT RUSSO, JR.
           CAREY A. MILLER
           ALEXANDER DENTON
20         ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

21

22         BRYAN P. TYSON
           BRYAN JACATOUT
           JONATHAN D. CRUMLY, SR.
23         TAYLOR ENGLISH DUMA

24

25
                                          (...cont'd....)
```

```
1   (...cont'd....)

2
    FOR THE FULTON COUNTY DEFENDANTS:
3
        CHERYL RINGER
4       OFFICE OF THE FULTON COUNTY ATTORNEY

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; September 28, 2020.)**

COURTROOM DEPUTY CLERK:  Morning, Judge.

THE COURT:  How are you?  I had a little trouble getting in.  I'm sorry.

COURTROOM DEPUTY CLERK:  No problem.

I think we have representatives for everybody here, if you would like me to call the case.

THE COURT:  Sure.  Thank you very much.

COURTROOM DEPUTY CLERK:  All right.  Morning, everyone.  We are here for the telephone conference in the case of Curling vs. Raffensperger, Civil Action Number 17-CV-2989.

Judge, this morning representing the State of Georgia, we have Mr. Russo, Mr. Miller, Mr. Tyson, Mr. Denton, and Mr. Jacoutot.

For the Curling plaintiffs, we have Mr. David Cross.

For the Coalition, we have Mr. Cary Ichter, Mr. Bruce Brown, and Mr. Robert McGuire.

And for Fulton County, we have Ms. Cheryl Ringer on the line.

THE COURT:  Thank you very much.  Morning, Counsel. Thank you for making --

MR. MILLER:  Morning, Judge.

THE COURT:  Good morning.  Thank you for making yourselves so quickly available.  I am most appreciative.

1          You know, obviously I didn't know until I read the

2     note -- the notice filed on -- on the docket about some of the

3     issues that had arisen, I gather, by Friday but maybe

4     beforehand as to the logic and accuracy testing of the ballot.

5     And, frankly, because I have been working on the order, I

6     didn't see it until Sunday morning.

7          So I had some follow-up questions because this

8     information in some ways even just in terms of whatever the

9     accuracy of what I'm saying or considering here has been

10    impacted.  And I just didn't feel that it was appropriate for

11    me to issue something until I understood what was -- where we

12    were at and also because of some of it potentially -- the

13    potential issues I'm looking at or the issues that I am looking

14    at.

15         So I asked whether Mr. Coomer could be available on

16    the phone.  Is Mr. Coomer available?

17         I don't mean to directly question him this second,

18    but I just want to know whether he is present.

19         DR. COOMER:  This is Dr. Coomer, and I am present.

20         THE COURT:  I'm sorry.  Thank you, Doctor.

21         So just so that I know what we're talking about is

22    that the open election that has 20 candidates for a Senate --

23    United States Senate position is there is some sort of ballot

24    configuration issue that was affecting the ballots statewide --

25    design statewide.

```
 1                 Is that a correct statement?
 2                 MR. TYSON:  Your Honor, this is Bryan Tyson.  Yes,
 3       that is a correct statement.
 4                 What we want to discuss this morning is this is
 5       ultimately a very minor issue that has been kind of blown up
 6       based on plaintiffs' counsel's assumptions about this.
 7                 THE COURT:  All right.
 8                 MR. TYSON:  This is a -- so I'm sorry.  I don't mean
 9       to -- I didn't know how you wanted to proceed, but I'm prepared
10       to discuss --
11                 THE COURT:  Well, you can go ahead and present it as
12       you -- you know, describe it as you see fit.  And then we can
13       ask questions.  That is why I said I wasn't going to plunge
14       into asking questions because I wanted just to -- I wanted you
15       to summarize and tell me what is going on from your
16       perspective.  And then I could --
17                 MR. TYSON:  Thank you, Your Honor.
18                 THE COURT:  And if it is easier at some point for
19       Dr. Coomer to present that, then that is fine too.
20                 MR. TYSON:  Yes, Your Honor.  I think it might make
21       sense.  I can kind of explain the initial issues.  And then we
22       can -- Dr. Coomer can answer some more technical questions.
23                 And, obviously, given the openings we are hearing, if
24       we get too technical, there may be some intellectual property
25       issues or State election process issues that are arising.
```

```
 1            THE COURT:  All right.

 2            MR. TYSON:  Where we are --

 3            THE COURT:  Let me just say if there are we'll just

 4    leave those until the end.  And while I had not initially

 5    anticipated we would be in a public hearing and just scheduled

 6    it to get myself up to date, I really didn't have any choice in

 7    terms of that.

 8            I mean, it is still a public matter.  That is where

 9    we are.  But if it is something that is covered by intellectual

10    property or otherwise it is so confidential that we need to

11    deal with it in private, then we'll deal with it at the end of

12    the meeting.  Okay?

13            MR. TYSON:  Thank you, Your Honor.  That sounds

14    great.

15            All right.  So, Your Honor, where we are is, I think,

16    again a situation where the Coalition plaintiffs have jumped to

17    conclusions not fully understanding what is happening and they

18    are trying to make a mountain out of what really is a mole hill

19    that is not merely as big a deal as they are alleging.

20            And, initially, just for the purposes of the record

21    to preserve objections, we don't believe this evidence is

22    relevant to the issues in the complaint or this should be

23    addressed or needs to be addressed through a hearing.  But we

24    want to be responsive to the Court's request.

25            So everything we're talking about today stems from a
```

basic decision of election administration made by the
Secretary's office.  As you referenced already, the U.S. Senate
special election has 20 candidates in it.  And so in terms of
ballot design, we all know ballot design impacts voter
behavior.  And so we had for the Votomatic the butterfly ballot
in Palm Beach County in 2000 and we had a U.S. Senate race in
Florida in 2018 on a hand-marked ballot where ballot design led
to some undervotes.

        And so given the nature of the BMDs, they primarily
display candidates in a single column list.  If we use that
single column list to display candidate names, then a number of
candidates would not appear -- if we had to do multiple pages
or scrolling down, they wouldn't appear on the first page.  And
the candidates who would not appear on the first page, if we
had a scroll or a second page of candidates, include Mr.
Lieberman, Senator Loeffler, Mr. Tarver, and Reverend Warnock.
So a number of significant candidates would not be listed on
the front page.

        So in order to accommodate the candidates and
administer the election, the Secretary's office decided to
ensure that all the candidate names appeared on the first kind
of single screen for the ballot-marking devices.  That required
two columns to be displayed, which is not a typical setup.
And, again, this is not a typical election because there are so
many candidates.

1          So everything that we're going to discuss today stems

2    from that decision.  And if there was not a scrolling down or a

3    paging over, there would not be a question.

4          Dominion assisted in the programming of the databases

5    so they could be displayed in two columns.  And so when

6    counties began their logic and accuracy testing, logic and

7    accuracy testing did what it was supposed to do.  It discovered

8    this very minor issue for a very limited subset of voters based

9    on particular behavior that one time would keep the second

10   column of candidates from showing up.

11          And so I want to let Dr. Coomer kind of talk through

12   some more of the details there.  But there is no impact on

13   absentee ballots, to be abundantly clear.  The databases

14   correctly include all candidates.  There is no issues there.

15   This has nothing to do with the scanners.  And there is time to

16   address this before logic and accuracy is complete.

17          There's two stages to logic and accuracy testing.

18   There is a limited subgroup for the early voting machines that

19   have to be deployed by October 12th.  And then the logic and

20   accuracy and programming for election day machines can continue

21   after that.

22          THE COURT:  I'm sorry.  Just a second.  Just go back

23   a second.  Go through your calendar again.  I realize that the

24   absentee ballots were not affected.  But you were going through

25   the calendar, and I missed something.

1          MR. TYSON:  Certainly, Your Honor.  So the counties

2    had -- most of the counties who would be doing logic and

3    accuracy have started this week.  This was an issue that was

4    discovered on Thursday.  So it is a relatively new thing.

5    Again, a minor issue in two counties that it was discovered.

6          Early voting begins on October 12th.  And so the

7    logic and accuracy testing and programming for the machines

8    that will be used in early voting -- we still have two weeks to

9    complete that process.  So there's time to address that.

10         The election day machines can continue to be

11   programmed after early voting begins.  And so that process can

12   continue up until it is time for equipment deployment when we

13   get to the weekend before the election.  So there's still time

14   for us to address and take care of the display issue going

15   forward.

16         But I think it is also important to remember kind of

17   again where we are.  The plaintiffs are flagging this as kind

18   of some apocalyptic scenario on social media, and it is not.

19   This is a very minor issue.  And this is an issue with the

20   display of the 20-candidate race, and that is it.  This is not

21   anything bigger than that.

22         And to have the plaintiffs continue to jump in based

23   on assumptions, file this at 11:00 P.M. on a Friday night,

24   make a number of allegations in front of you on Monday, Your

25   Honor, this is -- we have -- their experts have already said

1    that Georgians should not have confidence in the elections.

2    And this is an example where this is a minor issue being blown

3    up to something major.  And we would just urge the Court that

4    this is not the right time or place to be dealing with, again,

5    kind of more ambush evidence being brought in.

6              But that being said, Your Honor, Dr. Coomer can --

7              THE COURT:  I'm sorry?  Hello.

8              MR. TYSON:  I'm sorry, Your Honor.  I believe I was

9    muted accidentally.

10              THE COURT:  Okay.

11              MR. TYSON:  So that covers my kind of introduction,

12    Your Honor.  So I think maybe Dr. Coomer can cover some of the

13    specifics on what has been done and what is being done as we

14    work to address this minor issue.

15              THE COURT:  All right.  So let me ask one more

16    question before you turn it over to Dr. Coomer.  All right?

17    And it may be that he is better to answer this.

18              But the ballot styles that are getting transferred

19    and checked, are they -- basically when we talked about

20    replacement of ballots -- the whole ballot had to be rebuilt

21    and replaced, I'm just trying to understand where and when is

22    that occurring.

23              MR. TYSON:  Yes, Your Honor.  Dr. Coomer can cover

24    that.  This was first discovered -- the initial issue was we

25    believed that a database fix was necessary.  I believe we have

1    now determined that there is a simpler solution than that and

2    no databases need to be changed or affected.

3           But I'll let Dr. Coomer speak to that.  All the

4    machines need to be touched anyway during logic and accuracy.

5    So they are already going to be touched anyway in terms of the

6    normal programming process.

7           THE COURT:  Okay.  Go ahead, Dr. Coomer.

8           DR. COOMER:  Thank you, Your Honor.

9           Just to reiterate what Mr. Tyson just covered, so

10   during the logic and accuracy testing, a very specific pattern

11   was identified.  It is a very rare occurrence.  But as

12   described under a certain pattern in a certain circumstance,

13   that second column of candidates in this two-column contest

14   will fail to display on the first viewing.

15          Once the voter views other parts of the ballot and

16   comes back to that contest, those candidates will reappear on

17   the screen.  This happens only once for one voter during a

18   complete machine cycle.  So it is not a systemic issue.  It is

19   a very specific pattern that leads to this.

20          You know, we did some analysis on the election

21   project itself to see if we could address the issue through a

22   new database project.  What we discovered is that the

23   underlying issue is the way that the ICX is communicating with

24   the underlying Android operating system.

25          And then we had to identify a de minimus software

1   change that addresses this issue.  We have made that change

2   internally.  We have tested that change.  We believe it is a de

3   minimis change, and we have submitted that de minimis change

4   under the certification process to the voting system test

5   laboratory, Pro V&V, for verification and validation.

6          THE COURT:  So is that what you normally do?  That

7   you -- when you have a ballot prepared that you are -- or

8   because you've had to change the software that you are saying

9   that you are submitting it to Pro V&V?

10         DR. COOMER:  Yeah.  Because it is a de minimis

11  software, under the certification guidelines, this is the

12  process to accomplish that.

13         THE COURT:  So the software change -- without getting

14  into all the details -- probably you're going to have to repeat

15  something again -- you made a software change that would allow

16  the -- there was some sort of problem in the software

17  beforehand that was basically making some ballots disappear --

18  the second page?

19         DR. COOMER:  Yes.  And it is not disappear.  They

20  failed to render in very certain rare circumstances.  And this

21  change fully mitigates that across the entire project, without

22  any changes necessary to the project itself.  So that, you

23  know, guarantees that there is, you know, no related issues for

24  any of the absentee ballots that have already been sent out.

25         This change -- again, this de minimis change if

1    applied to the ICX would then allow in any instance for the

2    complete rendering of that contest in the two-column format,

3    which then preserves, you know, the voter use and not have to

4    have the voter scroll or go to a second page to view all of the

5    candidates.

6              THE COURT:  So let me just kind of roll back to the

7    most basic of questions.  All right?  And my apologies.  But

8    right now, I mean, this still was -- this is going to render a

9    change in the ballot style or not, or does this just make it

10   more reliable?

11             DR. COOMER:  Yeah.  It doesn't make any changes to

12   the ballot style or the underlying election definition.  It is

13   simply to address the rendering issue where under certain

14   circumstance the second column would not appear on the first

15   view.

16             THE COURT:  And just to make sure that I haven't

17   misunderstood something, are ballot styles -- all ballot styles

18   for a county basically put -- I'm just trying to understand

19   because you can end up having -- swapping out machines.

20             Is this -- what are we talking about in terms of the

21   ballot styles only being in -- located in one precinct or is it

22   in the county when you are doing the testing?

23             I'm really just trying to understand to make sure I'm

24   concretely getting it.

25             DR. COOMER:  Yeah.  So the --

1    THE COURT:  The testing -- where is the software --

2    when we get a card out of the check-in -- check-in at the polls

3    and it creates a card for you, then you are going to go over

4    and cast your vote on the ballot-marking device.  Is it that

5    the software is in the cards you are bringing over?  Is it the

6    software that is triggering the BMD to generate it and then in

7    turn going over to the scanner?

8    Just walk me through that so I make sure I haven't

9    misunderstood anything.

10   DR. COOMER:  Yes.  So the entire election definition

11   resides on the ICX itself.  The only information that comes

12   through the voter activation card is essentially a ballot style

13   ID.  So the machine knows what ballot to present to the viewer.

14   And then there are a couple of related security elements to

15   protect that data in transit.

16   THE COURT:  Then what about the scanner -- the

17   scanner tabulator?

18   DR. COOMER:  The scanner itself -- and, again, this

19   issue does not affect the scanner tabulators whatsoever.  Those

20   definitions -- because, again, it is simply a display issue on

21   the ICX.  It is not any of the underlying election definition.

22   The scanner tabulator has a full definition of the

23   ballots that are either in that precinct or in the early vote

24   for the whole county so that it knows how to process each

25   individual ballot style that is scanned.

1          THE COURT:  Okay.  But in terms of the L&A testing,

2     aren't you testing the correspondence at each stage of the

3     election?  I mean, basically --

4          DR. COOMER:  Yes.  L&A is conducted on all pieces of

5     the equipment.  So it is including the ICX, which is how this

6     issue was discovered and the scanner tabulators, whether they

7     are the precinct-based or the central count scanners.

8          THE COURT:  All right.  So what is the time frame

9     that you are anticipating on the review at the laboratory?

10          DR. COOMER:  I don't have a definitive time line.

11     But due to, you know, the de minimis nature of this change, you

12     know, we would expect that to be conducted and finalized, you

13     know, today or tomorrow, I believe.

14          THE COURT:  So --

15          MR. TYSON:  Your Honor, I'm sorry.  This is Bryan

16     Tyson.  We have Mr. Sterling from the Secretary's office on the

17     line as well who may be able to offer some insight on timing,

18     if that is what you are looking to dig into.

19          THE COURT:  Well, very briefly, yes.  Go ahead.

20          MR. TYSON:  Mr. Sterling, are you able to unmute

21     yourself?

22          MR. STERLING:  Now I think I'm unmuted.  Can y'all

23     hear me okay?

24          THE COURT:  Yes.

25          MR. STERLING:  Okay.  Good.

1        I'm sorry, Judge.  If you could repeat your question,

2   I can try to give you as definitive an answer as possible given

3   the moving nature of this.

4        THE COURT:  Okay.  Go ahead.

5        MR. STERLING:  No.  Could you repeat your question.

6   I apologize.  I just want to make sure --

7        THE COURT:  I'm sorry.  I was asking:  What is the

8   time frame -- assuming the P&V {sic} lab is through with this

9   and says this is fine and it has done it by Wednesday, what is

10  the time frame?

11       MR. STERLING:  As soon as it gets done, we will get

12  the secure media to all the counties to then begin the process

13  of loading on to the BMDs.

14       What essentially we're doing is we're making it a

15  part of the L&A process.  They will load this de minimis change

16  on to the ITXs directly and then load the database after they

17  test through that in a normal L&A process.  So we are actually

18  just inserting one additional step --

19       THE COURT:  Wait, wait, wait.  You have got to --

20  Wait.  Stop.  Stop.  We have a court reporter present.

21       MR. STERLING:  Sorry.

22       THE COURT:  So you are going to have to start again.

23  I'm sorry.

24       MR. STERLING:  That's okay.  I will talk slower.  I

25  have a bad habit of doing that.

1          All right.  So what we're going to do is once the Pro

2   V&V gets us the tested software done, we will take that secured

3   media and take it to each one of the counties individually.

4          Now, in normal L&A testing, they are going to have to

5   touch every ICX anyway.  So the plan is to insert this as an

6   additional step at the front end for the ICX/BMD, where they

7   will take the media, load the de minimis software change on to

8   the BMD, and then cycle it through and load the database on,

9   and then do their normal L&A testing.

10         So essentially we're adding an additional step at the

11  front end of the L&A process for the BMDs.  So this is a normal

12  process anyway.  And Dominion is looking at sending some

13  additional staff to those counties that had already begun to

14  get them back closer to their original time line.

15         THE COURT:  And how is it loaded?  How --

16         MR. STERLING:  Oh, it is a secure thumb drive that we

17  physically get overnighted to us from the laboratory, and then

18  we duplicate and then send out either by Sneakernet or

19  overnight delivery service to the counties.

20         THE COURT:  And that is how also the database is --

21         MR. STERLING:  Correct.  They already have the

22  databases because there is no change to the database.  So that

23  is already there.

24         THE COURT:  Right.  No.  But I'm just asking:  Is

25  that how you -- the ballot --

```
 1              MR. STERLING:  Yes.

 2              THE COURT:  -- the ballot design and the database

 3     that you transfer to -- you sent that by the same way?

 4              MR. STERLING:  Yes, Your Honor.

 5              THE COURT:  And do all of the counties have that at

 6     this juncture or only some -- they only have it for some of

 7     them?

 8              MR. STERLING:  All of the counties have a database.

 9              THE COURT:  All right.  And they have the county --

10     the database for just their county or for the State?

11              MR. STERLING:  This is a little more technical.  As I

12     understand it, they have their county style and everything

13     because each BMD will carry all the ballot styles for that

14     county.

15              MR. TYSON:  Your Honor, this is Bryan Tyson.  I think

16     that if you'll recall the databases that include all of the

17     statewide elections obviously are customized for each county

18     and then each ballot style for each county is in the county

19     database.

20              So those -- that is what we covered, I believe, in

21     the hearing a couple of weeks ago in terms of that process.

22     And the programming process for the BMDs is again, I think,

23     what we -- what Mr. Sterling has outlined.

24              THE COURT:  All right.  I mean, I'm just trying to

25     make sure I understand in the context of what we are doing here
```

1    where everything is at.  That is fine.

2         So has -- has the software modification already been

3    sent to P&V {sic}?

4         MR. STERLING:  Yes, Your Honor.

5         THE COURT:  When was that sent?

6         MR. STERLING:  I believe it was sent on Sunday,

7    yesterday.

8         THE COURT:  So -- I'm sorry.  Dr. Coomer, was it sent

9    from -- was the modification sent from Dominion's office in

10   Colorado, or was it sent from Georgia?

11        DR. COOMER:  That was sent -- sorry.  This is

12   Dr. Coomer.  That was sent from the Dominion offices.

13        THE COURT:  All right.  And you have a laboratory who

14   had -- that had completely tested it at this point?

15        DR. COOMER:  Yes.  So this is -- this is Dr. Coomer

16   again.  This is the same laboratory that did the initial

17   certification.  So all we had to do was send them the de

18   minimis change.  They have applied that to the certified copy

19   that they already have.

20        I did just confirm that they just did the trusted

21   build this morning.  And part of that process is their review

22   of the de minimis nature.  And they should have that validated,

23   again as I said, today or tomorrow at the latest.

24        THE COURT:  So in terms of the logic and accuracy

25   testing, are you anticipating doing a separate test on this

1    particular functionality?

2            MR. STERLING:  This is Mr. Sterling.

3            THE COURT:  No.  Let me ask Dr. Coomer first.

4            Is that what you are anticipating?

5            DR. COOMER:  Yes.  This is Dr. Coomer.  Absolutely.

6    And that is actually part of the certification process because

7    they need to validate the de minimis change and the affected

8    issue.  So that is part of their test plan.  And I can let

9    Mr. Sterling discuss anything that the State wants to.

10           THE COURT:  Go ahead, Mr. Sterling.

11           MR. STERLING:  Thank you, Your Honor.  As part of

12   L&A, the new software will be on there and it will be tested

13   just like the database and software were tested where this

14   issue was found and addressed so quickly.  That is why we do

15   L&A testing.  This is how the system is supposed to work.

16           So yes.  When we add the new software, small de

17   minimis change, it will be part of the overall L&A testing of

18   each individual BMD that is deployed.

19           THE COURT:  Well, the testimony -- and I don't mean

20   to in any way examine -- go beyond the scope of this.  But the

21   testimony indicated that the normal standard is to test one or

22   two or three races on each of the BMDs rather than the entire

23   ballot.

24           So that is why I'm asking you about how this will

25   be -- how will this one be -- this particular software issue be

1    changed?  Is it going to be the same sort of system that you

2    already are using -- that you only do some tests?  I mean, if

3    you only are going to vote on -- test the Senate race on, let's

4    say, you know a fraction of the BMDs, how do you know that you

5    are -- that you caught the whole thing?

6             MR. TYSON:  Your Honor, this is Bryan Tyson.  I think

7    the testimony and the evidence from the hearing related to --

8    that kind of laid out the exact process for testing.  And I

9    think as Dr. Coomer explained already, this is an extremely

10   rare situation to start with.

11            And so obviously the logic and accuracy testing was

12   robust enough to capture it.  We expect it will be robust

13   enough to capture any other issues that would be identified as

14   we follow the process that was outlined.

15            MR. BROWN:  Your Honor, this is Bruce Brown.  If I

16   may respond to some of this if you --

17            THE COURT:  Well, let's just make sure, Mr. Brown,

18   that they feel they have had an opportunity to present

19   everything that has happened.  And then you can ask any

20   questions or address any problems.

21            MR. BROWN:  Of course.

22            THE COURT:  Counsel, is there more that you would

23   like to present to any of the issues raised?

24            MR. TYSON:  Your Honor, this is Bryan Tyson.  I don't

25   believe so.  I think, again, this is -- this is just a

1    demonstration that logic and accuracy testing was robust enough

2    and caught this issue.  It has been resolved, as you heard, on

3    a very, very quick time line.  It is going to be resolved in

4    time to complete the process for the November election.

5         And there is no basis for us to have to change course

6    or do anything different based on this one minor issue in this

7    process.  So I think that is what -- we have covered what we

8    would like to cover with you.

9         THE COURT:  All right.  I had one final question

10   before Mr. Brown raises anything else.

11        What then -- where was this identified in terms of

12   the L&A testing?  Because you said it was some particular types

13   of ICXs where this was reflected.  I don't know whether it was

14   a particular county or was it a particular precinct or what was

15   the story.

16        MR. TYSON:  So, Your Honor, this is Bryan Tyson

17   again.  Dr. Coomer may be able to speak more specifically.  But

18   I believe what happened is there had to be a particular set of

19   voter behavior in terms of flipping back and forth through

20   races to cause the display issue to occur.

21        So it was identified in I know at least two counties.

22   But it was based on a specific kind of sequence of events you

23   had to complete.  In every other situation, the Senate race

24   displayed properly.

25        Dr. Coomer may have more on that.

1      DR. COOMER:  Your Honor, this is Dr. Coomer.

2 Mr. Tyson summarized that completely.  I don't have any more to

3 add.

4      THE COURT:  So you were seeing -- the voter was going

5 back and forth on the ballot trying to determine what he or she

6 wanted to do or consider his options?

7      DR. COOMER:  Yeah.  Again, it is a pattern of how the

8 ballot is displayed.  And it is not -- it is not, you know,

9 just a specific model or just a specific county.  It is any

10 time this double column contest is viewed in a particular

11 pattern only once through the whole machine cycle can lead to

12 this issue.

13      THE COURT:  I'm sorry.  Only -- what is only once?

14      DR. COOMER:  That this behavior happens.  So it is

15 not that -- you know, if it happened for one voter and then the

16 next voter did the exact same pattern, it wouldn't happen for

17 them.  It has to do with sort of the lifetime of the machine

18 you are on.  There is one particular pattern.  And once that

19 happens, it fails to display properly.  But then from that

20 point on, it will always display properly.

21      So that is why it is such a rare occurrence is

22 because you have to have this perfect pattern and it is only

23 once.

24      THE COURT:  All right.  I have a host of questions

25 about that.  But I'm not going to -- I'm sure.  Obviously there

1   are other different scenarios once the testing is looked at in

2   that connection.  But I'm not going to -- I'm not going to go

3   there at this moment.

4           Mr. Brown, what did you want to say?

5           MR. BROWN:  Yes, Your Honor.  Yes, Your Honor.  I

6   have a couple of things to say about this.

7           First, with respect to the screen flipping column

8   problem that the State defendants have described, that --

9   first, that is only one of three problems that we have

10  information about.  So the Secretary -- so there's one problem

11  that the Secretary is disclosing.  And there are two

12  undisclosed problems, even though we notified them about them

13  over the weekend.  And I'll explain.

14          But, first, on the problem that they did explain,

15  Mr. Tyson's explanation for the robustness of the logic and

16  accuracy is a mammoth non sequitur.  What he is saying is that,

17  because we slipped and fell and found one needle in the

18  haystack, therefore we know where all the other needles reside.

19          They have described a freakish discovery, and we

20  still don't know who found it, whether it was found by a county

21  or it was found by Dominion in their offices in Colorado or

22  Canada or wherever they are doing this, or it was found by a

23  county.  You asked, but they did not disclose that.

24          But, first, the idea that the logic and accuracy

25  testing was robust is just flatly wrong.  They are violating

1    state law --

2         THE COURT:  All right.  I mean, I understand what the

3    evidence is on that.

4         MR. BROWN:  Okay.

5         THE COURT:  But you said there were two other things

6    you brought to their attention.

7         MR. BROWN:  Yes, Your Honor.

8              **(Unintelligible cross-talk)**

9         MR. BROWN:  When we filed our notice on Friday

10   evening, we did not even know about what they are talking about

11   today.  Instead, what we learned from Cherokee County is that

12   the -- when they started their logic and accuracy testing, the

13   tabulation of mail -- of hand-marked mail ballots did not work

14   at all.  They would feed it in, and they would get zero votes.

15        They reported that to the Secretary of State.  Hours

16   later, the Secretary sends a notice to all 159 counties saying

17   that the database was defective.

18        Then with the notice that the database was defective,

19   Your Honor, we thought it was appropriate to make the Court

20   aware of that.  This is the database that is driving the

21   election -- the general election in November 3, 2020, for the

22   entire State of Georgia was defective.  That was the

23   information that the Secretary of State circulated.

24        Then on Saturday morning, we alerted Mr. Tyson as to

25   the nature of the problems that the scanner was not tabulating

1    correctly.  He did not respond to that.  That was Mr. Cross'

2    email attached to our submission.

3         Then Mr. Cross emailed him again asking for a

4    response.  Then I emailed last night another question saying

5    that the problem that we discovered is different than the

6    problem that you reported to the press.  What is the nature of

7    it?

8         So we have given them, in addition to our filing with

9    the Court, three separate opportunities to inform the

10   plaintiffs as to the nature of these problems.  We are not

11   making a mountain out of a mole hill.  There are three

12   mountains out there.

13        They described one very inadequately, and there are

14   two other problems.  The third problem we found out from one of

15   the counties, Irwin County, in response to our Open Records Act

16   request.  Said no, no, it is not a big deal.  It wasn't either

17   one of the problems that we knew about.  It is, in fact, a

18   third problem.  And that was with write-in candidates wasn't

19   working.

20        And so what we have is we have three problems.  One

21   they have disclosed.  Now -- and it is not de minimis.  If it

22   is de minimis, it still needs to get certified.  The EAC still

23   needs to bless it as a de minimis change.  It is highly unusual

24   to have a software change on the eve of an election.

25        But, moreover, we have no explanation, despite giving

1  the Secretary the opportunity over the entire weekend, to come

2  up with some response to our questions.  What is going on with

3  these -- with the scanner not reading at all for the November 3

4  election?  Just to be clear, you feed a November 3 ballot into

5  the scanner and it doesn't read it using the current database.

6          Given that information and given --

7          THE COURT:  And which one is this?  Of the

8  submissions you-all sent in, which one?  Because you have A

9  through G, I think.

10          MR. BROWN:  That is described in -- in my email,

11  which is B, and then also in Mr. Cross' email, which is, I

12  think, D.

13          MR. TYSON:  Your Honor, this is Bryan Tyson.  I would

14  like to respond obviously when Mr. Brown is finished.

15          MR. BROWN:  And so we have been -- Your Honor, we

16  have done what we could to try to get some answers prior to

17  this.  And they have no answers even though they have had since

18  Saturday.  And in addition, the counties themselves that

19  experienced these problems each notified the Secretary.

20          This isn't the ballot-flipping-two-column problem

21  that they told the press and they have been talking about this

22  morning.  These are separate problems with the database.

23          THE COURT:  Where does this -- where was the scanner

24  problem when you say --

25          MR. BROWN:  It was in Cherokee County.  It was in

1    Cherokee County, Your Honor.  We discovered it, Your Honor,

2    because we have an incomplete discovery request to Cherokee

3    County to inspect their scanner.

4          And so we were -- Mr. Ichter was trying to make the

5    arrangements for us to go up there on Tuesday to inspect the

6    scanner.  Counsel for Cherokee County has confirmed multiple

7    times that, okay, you can come on out on Tuesday, but the

8    database doesn't work, it won't read the ballots.

9          So when we learned that on Friday, we were, of

10   course, alarmed.  And then almost immediately, we got Chris

11   Harvey's email to all 159 counties saying that the database

12   wasn't working.

13         So we asked Bryan Tyson, what is up with this, and

14   got no response and then get blasted this morning for making a

15   mountain out of a mole hill.

16         MR. CROSS:  Your Honor, this is David Cross.  If I

17   could further respond with two quick points.  One, just picking

18   up on the last piece about Irwin County, part of the concern

19   here is there looks to be a dramatic disconnect between what

20   the State is telling us and what is being conveyed to the

21   county.  So this is Exhibit E where --

22         THE COURT:  What did you say?  D or E?

23         MR. CROSS:  E.  E as in echo.

24         THE COURT:  All right.

25         MR. CROSS:  So if you have that, Your Honor, it is a

1  short email from Irwin County -- Ken Collins from Irwin County

2  elections.  And the Coalition had folks reach out to counties

3  to figure out what we could about this since we couldn't get a

4  response from the State.

5          And here you have Irwin County taking a very

6  different position than you have heard from the State where

7  Irwin County says the very issue that was the subject of the

8  filing, Mr. Harvey's email -- they are saying this is the third

9  flaw that Mr. Brown noted where they are saying they are the

10  ones who have identified it as just a minor glitch.  They

11  caught it in their L&A testing.  It has to do with the write-in

12  candidate.

13          So this raises a serious concern of what the counties

14  even understand is the problem and what they are supposed to

15  do.  You will see in two of the other exhibits that we filed at

16  least one or maybe two of the counties have indicated they are

17  moving forward with L&A testing even on the current database

18  and equipment.

19          And so it is -- I'll get to the second point in a

20  moment.  It is -- but I just want to say it is frustrating to

21  get blasted, as Mr. Brown put it, on this call, that we have

22  tried our best to get to the bottom of this and there is a lot

23  of different information coming out from counties versus the

24  State.

25          So it does not look to be de minimis at all as the

1    way Mr. Tyson began.  And that gets to the second point.  What

2    we just heard is that they are making a software change to the

3    BMDs.  That is what was represented to this Court.  That is not

4    at all a de minimus change.

5           Remember what Mr. Tyson said during the hearing?

6    These were his words.  The election is already underway.  That

7    was a key theme for them.  Not we are on the cusp of it.  It is

8    underway.

9           They are telling Your Honor that in the midst of an

10   election they are changing the software to the BMD.  That is an

11   enormous -- just put aside for the moment the vector that

12   creates as a penetration point for malware.

13          But where is the EAC certification for that?  What is

14   the extent of that change?  How do we know what security

15   measures have been taken?  They are apparently going to ship

16   USB drives to 159 counties coming from we don't even know.  It

17   sounds like maybe Dominion.  What security measures are on

18   those?  Are those just going through UPS or FedEx?

19          I mean, this -- this is -- this is a mountain.  It is

20   not a mole hill.  And what we have heard this morning is only

21   making it a greater concern.

22          MR. TYSON:  Your Honor, this is Bryan Tyson.  What we

23   have just heard is a disinformation campaign about Georgia

24   elections.  Let me walk through these issues here one at a

25   time.

```
 1              THE COURT:  All right.

 2              MR. CROSS:  Your Honor, I'm sorry.  That is just --

 3    that is totally inappropriate.

 4              THE COURT:  All right.  All right.

 5                   (Unintelligible cross-talk)

 6              MR. CROSS:  I'm sorry.  I need to respond to that.

 7    That is inappropriate.  These are the facts.  No one on our

 8    side is (unintelligible).

 9              MR. BROWN:  Your Honor, we have taken enough of this.

10    We have been called Luddites for two years now.  And --

11              THE COURT:  All right.  I understand.  There is

12    hot -- there is a great deal of concern on all parties', all

13    counsel's part.  And I don't think it is helpful to -- at this

14    point to make this more vitriolic or electric than it needs to

15    be.

16              That is what I was trying to say before, Mr. Tyson,

17    you basically plunged in is that I think I need to read the

18    correspondence that was sent.  It is all very short.  But I'm

19    going to have to take two or three minutes to read what was

20    sent back and forth.

21              And I do want to know though what was -- you know,

22    was there -- again, trying to wrap up the one matter we were

23    discussing, where was it identified in L&A testing?  What

24    county, or was it in the lab, or where was it?

25              MR. TYSON:  Your Honor, it was -- this is Bryan
```

1   Tyson.  It was Richmond -- or Douglas County and Richmond

2   County.  And the county L&A testing is where it was identified.

3            THE COURT:  Thank you.  All right.  I'm going to --

4   I'm just going to go on mute while I read this.  All right.

5   And I will be back.

6            And I would appreciate if people didn't talk during

7   that period of time.  Thank you.

8            **(A brief break was taken at 11:49 A.M)**

9            THE COURT:  All right.  I'm ready to reconnect.

10           Just before you plow in, Mr. Tyson, Mr. Harvey's --

11   can you hear me, first of all?

12           MR. TYSON:  Yes.  Yes, Your Honor, we can.  And I

13   believe --

14           THE COURT:  All right.  Mr. Harvey's email to the

15   election offices around the State indicated that the database

16   would have to be rebuilt.

17           So what was that in response to then?

18           MR. TYSON:  Your Honor, this is Bryan Tyson.  And I

19   believe Dr. Coomer and Mr. Sterling -- I thought they had

20   covered this.  They may not have.

21           But the original thought was that a change to the

22   database would be required.  And then we were able to locate a

23   better fix, which was a simpler fix that would not require

24   rebuilding the database.

25           And so that is why the original email indicated that

1    was the approach they were thinking of taking.  We have found a

2    better way to do it and are taking that measure instead.

3             THE COURT:  When did you first have notice of it?  I

4    mean, you may have covered this.  But I'm just trying to figure

5    out why at 4:10 this occurred.

6             And was it directly to you, or was it -- I assume

7    that the department contacted Dr. Coomer.

8             MR. TYSON:  Your Honor, the counties first notified

9    the Secretary's office on Thursday evening, I believe, and the

10   work began on Friday.

11            The thinking behind Mr. Harvey's email was we didn't

12   want to have counties working unnecessarily on logic and

13   accuracy testing if they would have to just redo it again.  And

14   so thus the reason for the pause and then picking it back up

15   hopefully this week to make that process move forward.

16            The Secretary's office handled the interactions with

17   Dominion.  Counsel was -- we were made aware of it on, I guess,

18   Saturday when we discussed it with the Secretary's office.

19            MR. STERLING:  I can speak -- this is Gabriel again.

20   I can speak to one slight difference.  We got informed at the

21   Secretary's office, I think, around lunchtime or so, if memory

22   serves, on Thursday.  And Thursday night, Dominion called me

23   and said that they had discovered what the actual problem was.

24            And on Friday, we were talking about what to do.  And

25   we said why let the counties spend time, money, and effort on

1     doing L&A if we're going to have to do it again.  At the time
2     we thought we were still going to be doing a database rebuild.

3             I believe on Saturday we were offered a couple of
4     options.  One was a database rebuild, but we would not have
5     been able to do the two columns, which was the decision on the
6     ballot style, that we would have to do a single column with
7     pagination or scrolling.

8             And the other one was the fix that we are going with
9     that will allow both columns to appear so it is fairer to the
10    candidates and easier for the voters.  So that is why that
11    decision was made.

12            THE COURT:  All right.  Mr. Tyson, you wanted to
13    respond?

14            MR. TYSON:  Yes, Your Honor.  I just wanted to cover
15    the other issues Mr. Brown raised.

16            He mentioned a problem with the central count
17    scanners from Cherokee County.  The issues that have been
18    raised by Cherokee County relate to what we discussed
19    extensively during the hearing that the AuditMark does not
20    contain whether or not the vote was flagged as ambiguous for
21    those stray marks on ballots.

22            The Cherokee County folks apparently misunderstood
23    that and believed that the AuditMark -- when it said no vote
24    was recorded, that was the end of the story.  Where in reality
25    the only issue there was they did not look at the adjudication

1    software to see whether it was flagged as ambiguous.

2         So there are no issues for scanning on anything else

3    there.  That is the sole issue that we covered extensively at

4    the hearing.

5         The Ben Hill issue or the Irwin County issue on

6    write-ins apparently has to do with a candidate -- presidential

7    write-in candidate who has a number in his name.  And the BMD

8    has a -- just only letters on the keyboard.  So that is not a

9    defect or a fault.  That is just, you know, you don't -- you

10   enter information about the write-in so that the election

11   officials can determine what that is.

12        So, again, that is the entirety of these issues.  And

13   when we are getting the emails over the weekend from

14   plaintiffs' counsel, it is responding to a filing that includes

15   -- said that we likely intentionally were sitting on this

16   information.  But also we were in a scenario where we by Sunday

17   had a call scheduled with the Court.

18        We were trying to determine what was actually

19   happening, discovered these are really nonissues at all or

20   easily fixed, and did not see any basis to conduct discovery by

21   email, especially considering with this case we have a history

22   of emails between counsel being waved around as admissions and

23   various other things.

24        We can deal with this in the normal course of

25   discovery, and these are not issues that require any sort of

1    emergency resolution or change to our status.  The BMDs are

2    working.  We have identified the issues through normal testing.

3    We are -- the issue is being addressed through a very simple

4    change.  It will allow voters to see all Senate candidates on a

5    single screen, which is best for everyone.  And we can proceed

6    with the November election.

7          And the last point I'll make is:  Mr. Cross

8    referenced the issue we raised about the election is underway.

9    That is correct.  The absentee portion of the election is well

10   underway.  Over a million people have already had absentee

11   ballots go out from the State and counties to them.

12         The election is underway.  The poll worker training

13   is underway.  But election operations for the BMDs

14   themselves -- this is a process that we have to go through.

15   The issues with the election being underway relate to absentee

16   processing, printing, poll worker training, all those issues.

17         The programming of the BMDs can continue on its

18   course, as Mr. Sterling discussed, even with this minor change

19   that addresses the underlying issues.  So the election is

20   absolutely underway.  But there is also time to continue the

21   programming of the ballot-marking devices and make this

22   November election a success that all Georgians could have

23   confidence in when we finish counting the votes.

24         MR. CROSS:  Your Honor, this is David Cross to

25   respond to a couple of points.  One, we still haven't gotten an

1    answer on what exactly they are doing.  They have said they are

2    reprogramming the BMDs.  They are making a change to the

3    software.  There is no indication as to what that is exactly or

4    whether the EAC has approved it, whether they have gone before

5    the EAC.

6             THE COURT:  Well, they haven't had -- they have

7    said -- I mean, I'm going to follow up and find out what

8    happens after the independent laboratory reviews this and where

9    it goes then.

10            But they have said what they are doing.  They

11   submitted -- they are submitting it to the lab or they did it

12   last night, and they are expecting something -- basically a --

13   that they will be conducting a laboratory test and making --

14   that is the question.

15            What happens at that point?  But they were

16   anticipating approval by Wednesday.

17            MR. CROSS:  Is that approval from -- sorry, Your

18   Honor -- approval from the EAC or from the independent lab from

19   Pro V&V?  Because that is --

20                  **(Unintelligible cross-talk)**

21            THE COURT:  Let's just deal with -- Dr. Coomer, what

22   was the anticipation so that I'm not just jumping to

23   conclusions?

24            DR. COOMER:  Yes, Your Honor.  This is Dr. Coomer.

25   So the testing lab has already deemed the change de minimis.

1    So I have to -- I have to be careful here because, you know, I

2    don't have the exact statute and regs at my fingertips.

3            But there is a process within the EAC for rapid

4    approval of de minimis software changes.  So that is the

5    framework on which we are operating.  And it is my

6    understanding that that approval can be granted as quickly as,

7    you know, the next day or two.

8            THE COURT:  So when did the testing occur even if

9    they viewed it as de minimis?  They are just viewing it as --

10   the lab, Pro V& -- and whatever the last -- other initial is --

11   they are viewing it as de minimis, but they already did testing

12   on it?

13           DR. COOMER:  Your Honor, this is Dr. Coomer again.

14   So the first step is they analyze the code change to determine

15   whether it is de minimis or not.  And then that -- then if it

16   is de minimis, then they follow the testing steps around that

17   process.

18           THE COURT:  And they told you that --

19           DR. COOMER:  I'm sorry.  That is what they are doing

20   today.

21           THE COURT:  That is what they are doing today.  All

22   right.

23           DR. COOMER:  Yes.

24           MR. TYSON:  Your Honor, this is Bryan Tyson.  One

25   other point I think is relevant here is that while the statute

1   requires Georgia to procure a system that is EAC certified,

2   which they did, the statute does not specifically require that

3   Georgia's system has to -- we can only use an EAC certified

4   system.  So if necessary, the Secretary can certify the system

5   and we can proceed with its use even if we're still waiting on

6   the EAC certification because the system was EAC certified when

7   we obtained it.

8            MR. CROSS:  Your Honor, this is David Cross.  That is

9   a troubling position to take.  For the purpose --

10           THE COURT:  All right.  I understand what your

11  position would be.  I don't mean to --

12           I'm sorry.  Something is going wrong with the audio.

13           **(There was a brief pause in the proceedings.)**

14           THE COURT:  I'm sorry.  You went -- whoever was

15  speaking went on to some peculiar channel of audio.  We could

16  not hear it clearly.

17           MR. ICHTER:  Your Honor, this is Cary Ichter.  May I

18  make a comment, please?

19           THE COURT:  Well, was somebody speaking just now?

20  Because I couldn't understand a word of it if they were.

21           MR. ICHTER:  Your Honor, this is Cary Ichter.  I just

22  asked if I could make a comment.

23           THE COURT:  Yes, you can make a comment.  I'm just

24  saying before you just said, could I make a comment,

25  Mr. Ichter, somebody was speaking.

1          Who was speaking before you?

2          MR. ICHTER:  I'm not sure.

3          COURTROOM DEPUTY CLERK:  Judge, that was someone

4    identified as Sara Nelson on the thing.  So I muted them.

5          THE COURT:  Okay.  Thank you very much for the

6    clarification.

7          MR. ICHTER:  Your Honor, as Mr. Brown mentioned, this

8    all began Friday late evening as a consequence of a

9    conversation I was having with counsel for Cherokee County

10   where we found out about the notice from the Secretary's office

11   about the defect in the database.  And as a consequence of

12   that, the papers that we filed got filed.

13          That conversation I was having with counsel was a

14   consequence of the subpoena that we had issued to go out and

15   observe the logic and accuracy testing, which was supposed to

16   occur on this Tuesday.

17          And since that was being suspended and we were told

18   that we were no longer going to go out and observe that, we

19   asked that we be allowed to come out and take a look at what

20   was going on with the scanners, which was the second problem

21   that Mr. Brown identified that the State's counsel didn't

22   mention during the course of his argument.

23          And we intend to do that tomorrow with the

24   cooperation of counsel for Cherokee County.  And that is

25   scheduled for tomorrow.  And if Cherokee County is having

1    problems with the scanner and it has been explained to them

2    what the problem is and how they resolve it and it is

3    purportedly not a problem, then they don't seem to appreciate

4    that.  Because when I spoke to counsel for Cherokee County this

5    morning, I was advised that when we come out there to look at

6    the scanner and see how it is operating tomorrow, we would

7    learn that it is not operating in the manner in which it is

8    supposed to.

9         And what I would propose is that we do that

10   tomorrow -- I believe it is at 10:00 A.M. -- and that we circle

11   back to the Court and report to the Court on our findings with

12   respect to what is happening in Cherokee County.

13        MR. TYSON:  Your Honor, this is --

14        THE COURT:  Wait.  Is the scanner at all connected to

15   this presidential candidate who -- this candidate who has an

16   actual number in his name or her name?

17        MR. ICHTER:  No, not as far as I am aware, Your

18   Honor.  I'm sorry.  That was Cary Ichter.

19        THE COURT:  So the problem with the scanner is

20   precisely what that you have reported?

21        MR. ICHTER:  As it has been described to us -- and we

22   have not personally observed it.  But as it has been described

23   to us is that when the ballots are scanned in they are

24   tabulating nothing.

25        MR. TYSON:  Your Honor, this is Bryan Tyson.  I

1    believe I covered this, that the issue from Cherokee County is

2    stray marks that are showing as no vote on the AuditMark but

3    were not viewed using the adjudication software.

4          Again, we're kind of -- now we have hearsay within

5    hearsay from Mr. Ichter about what somebody told him about what

6    they thought was happening.  I'm kind of at a loss as to what

7    we are doing.

8          MR. ICHTER:  I guess, Mr. Tyson, my question would

9    be:  What is the source of your information that that is

10   Cherokee County's problem?

11         MR. TYSON:  This is Bryan Tyson.  Cherokee County had

12   sent some information to the Secretary's office.  And only

13   since ballots with audit marks questioning why certain stray

14   marks were showing as no vote on the AuditMark -- that is the

15   exact issue we discussed with Dr. Coomer during the hearing,

16   that there is metadata that those could be flagged as ambiguous

17   or not or they could be outside the target area.

18         That doesn't mean that the scanner is not working

19   properly or has a defect, as Mr. Ichter has said, which there

20   is no evidence of a defect.  We have already discussed at

21   length the issue with the display.

22         MR. BROWN:  This is Bruce Brown.  I just want to

23   focus in on one thing.  And that is that the Secretary of State

24   is basing its diagnosis of the problems in Cherokee upon what

25   Cherokee sent to the Secretary of State and not upon any other

initiative that it has taken to determine what the problems

with Cherokee -- that Cherokee is having.

Is that correct, Mr. Tyson?

MR. TYSON:  I'm at a loss, Bruce.  I'm sorry.  The

ballots that were filled out properly the votes show as clearly

counted.  The stray marks show there was nothing there.

MR. BROWN:  Are you talking about the votes from

Cherokee -- are you talking about -- are you talking about just

sort of in the abstract or the information that you received

from Cherokee County?

MR. TYSON:  The information the Secretary's office

received from Cherokee County, which beyond Mr. Ichter's

statement in the hearing right now, is the only information we

have about any alleged issues with Cherokee County.

THE COURT:  All right.  The only thing -- Counsel, I

mean, I can understand what the dispute is.  But I want to just

know one thing, which is if this -- are we talking about

something that has arisen in connection with logic and accuracy

testing there?  I mean, is that of the absentee ballot then

we're talking about?  Because we're talking about stray

ballots -- stray marks.  Or are we talking about --

MR. BROWN:  Yes, Your Honor.

THE COURT:  -- on the BMD itself?

MR. BROWN:  What my understanding is -- and

Mr. Ichter can weigh in if this is wrong.  My understanding is

```
1    that in anticipation of the Coalition plaintiffs' visit to
2    Cherokee County scheduled for Tuesday, still scheduled for
3    tomorrow, Cherokee County tested their -- started their own
4    logic and accuracy testing so that they could assure themselves
5    that what they were setting up for the Rule 34 inspection would
6    work.  They did so, and it didn't work.
7             And the description that Mr. Tyson gives sort of as
8    an abstract matter relating back to the hearing is totally
9    different from what we received from Cherokee.
10            And the Cherokee people are very good.  They know
11   what they are doing.  And they spotted this problem and could
12   not get it to work.  And then we alerted Mr. Tyson of this
13   problem.
14            THE COURT:  All right.
15            MR. BROWN:  And there was crickets all weekend.
16            THE COURT:  Well, you know, it is also the weekend.
17   But -- all right.  I think I understand.  Of course, I don't
18   know what really is happening in Cherokee County myself.  And
19   I'm not going to be able to get to the bottom of that now.
20            But -- and the only thing about it is that to the
21   extent that they are testing -- which I gather absentee ballots
22   on the -- that might -- or paper ballots that have been scanned
23   on the -- and tabulated and these are paper ballots that
24   individuals filled with their own handwriting -- that is a
25   question I did want to follow up on separately.
```

1        But I'm not going to even get to that until I let

2   Mr. Tyson say what he wanted to say.  I mean, he was telling me

3   at the point that everyone jumped that it was -- basically that

4   the State didn't need certification of the EAC in order to

5   proceed as long as the machine has been -- the whole package

6   had already been certified before and it was only a

7   modification.

8        I understood as a matter perhaps of law that that is

9   something else.  And people -- I mean, I think at that point

10  also Mr. Cross had started saying it is very troubling, it is

11  very significant.  I understood that point too.

12       But I don't think there is more to be said about that

13  other than really, you know, yes, the EAC can take more time

14  and maybe it won't (unintelligible) exactly that way.

15       But I'm going to presume that there is going to be

16  more testing of it in other counties again with the same issue.

17  At this juncture, though, as I understand it, just in terms of

18  the facts in front of the Court, is that there -- that the

19  State is not at this juncture contemplating rebuilding the

20  databases or is it?

21       MR. TYSON:  Your Honor, this is Bryan Tyson.  That's

22  correct.  The State is not rebuilding the databases.  We are

23  making the de minimis software change that Dr. Coomer has

24  outlined.  And that addresses the entirety of the issues with

25  the display of the two columns in the U.S. Senate race.

```
1              THE COURT:  Now, if, in fact, there is an issue, for

2    instance, out of Cherokee or another county with the tabulator,

3    you would have to -- that would be something else; right?  That

4    would go -- that would have to be promptly reported; right?

5              MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson

6    again.  That is correct.

7              And if there was some widespread issue, we would

8    expect to see it in a number of counties.  No other county has

9    reported similar questions around the scanners as to what

10   Cherokee has.  And that is why, again, we believe it is just

11   the issue of the AuditMark versus the adjudication as opposed

12   to -- and the stray marks.

13             And, again, as you correctly identified, it only

14   relates to hand-marked absentee ballots -- the scanner issues

15   Mr. Brown was discussing.  It has nothing to do with BMD-marked

16   ballots.  And that is to the extent it is even an actual issue,

17   which we don't at this point believe it is.  But we will always

18   investigate if the county brings something to us.

19             THE COURT:  Well, if absentee ballots are those

20   classified as that because -- or provisional ballots or

21   emergency ballots that are hand done; right?

22             MR. TYSON:  Yes, Your Honor, except that the -- yes,

23   except that the emergency or provisional ballots -- the

24   provisional ballots would be counted on a central scanner.  But

25   the emergency ballots would be counted on a precinct scanner,
```

1    not on a central count scanner.

2            And, again, all of the bubbles that were filled in

3    properly for Cherokee correctly registered on what

4    (unintelligible).

5            THE COURT:  All that is assuming that the scanner

6    tabulator is working in a precinct but -- and that there is not

7    a power failure or anything else in terms of the emergency

8    ballot.

9            Let me ask you this because this is really something

10   that was a hanging chad from the last hearing -- and this is

11   really directed as much to Dr. Coomer as I don't -- I

12   understand that you indicated that the software -- in your

13   testing the software for the scanner would have to be modified

14   in order to have better resolution of the scanned image for

15   ballots that have to be adjudicated or being flagged for

16   adjudication.

17           And so if you had -- when you were at the point of

18   having to build -- potentially to rebuild the database, then

19   you would do it then?  Or are you just talking -- why wouldn't

20   this be a minor adjustment -- just that type of adjustment be a

21   minor adjustment just -- you are saying this current one that

22   you are submitting at this moment is?

23           DR. COOMER:  Your Honor, this is Dr. Coomer.  So I

24   did cover this in my initial testimony.  And we have to be very

25   clear here.  There are two issues when people talk about

```
 1   scanner resolution.

 2          The first is the sensitivity settings for whether

 3   what we call an ambiguous mark is ambiguous or we determine to

 4   be a mark or not a mark.  That requires no software change.

 5   And those limits were changed by the State.  And that required

 6   no software change.

 7          There were statements made about accuracy being

 8   affected by the scanner resolution itself, the DPI, which there

 9   is absolutely no basis for that statement.  Whether a mark is

10   counted as ambiguous or not is wholly independent of the DPI

11   resolution.

12          THE COURT:  I don't want to get into a debate, having

13   read your testimony about five times now about this.  But you

14   indicated that anything that was done about this in order to

15   increase clarity would have to be done on the software and

16   therefore you couldn't do it.

17          DR. COOMER:  For the DPI resolution, that is correct.

18   For the sensitivity threshold settings, that is -- that is

19   supported through the existing software.  And those limits were

20   changed for this election.

21          THE COURT:  And you could change them again?

22          DR. COOMER:  Yes.

23          THE COURT:  But --

24          DR. COOMER:  But that would require a whole new

25   database.
```

```
 1              THE COURT:  A whole new database just to change the
 2   -- you just said you could -- in order to change the -- you
 3   went down from 12 to 10.  You are saying it would have to --
 4   you would have to have a whole -- use a whole new database just
 5   so you could change --
 6              DR. COOMER:  Sorry if I wasn't clear.  We didn't need
 7   to change software.  But those settings are part of the machine
 8   files that are created during database setup.  So it would
 9   require all new database to change those limits.
10              THE COURT:  So when you were changing -- I mean, you
11   had an emergency rule that was passed two weeks ago, I think
12   while we were having the hearing.  And you are saying you did
13   it right then, or you did it beforehand?
14              DR. COOMER:  No.  We did it when that rule -- I
15   believe we did it when that rule came in.  We might have done
16   it prior to that in anticipation.  I would have to verify on
17   the exact date we made that change.  But it was before the
18   database was finalized and delivered to all of the counties.
19              THE COURT:  So when was it, Mr. Sterling, finalized
20   and -- when did you distribute the database to the county?
21              MR. STERLING:  Off the top of my head, I don't know.
22   I'll get that answer to you.
23              THE COURT:  How many counties have actually done --
24   the logic and accuracy testing has been completed?
25              MR. STERLING:  Before this -- well, nobody has now
```

1   because, as we said, with this new software change, they are

2   going to have to start over again.  We had 77 counties, I

3   believe, that had begun the process of doing L&A testing.

4          THE COURT:  All right.  All right.  I'm going to take

5   a break and just see whether I have any other questions.  And

6   it will be about two minutes.  All right?

7          MR. CROSS:  Your Honor, this is David Cross.  Could I

8   ask one clarifying question?

9          THE COURT:  Yes.  Go ahead.

10          MR. CROSS:  Just -- all right.  So do I understand

11   correctly that the software change that is proposed for the BMD

12   will not require a new database?  So that software could be

13   changed, but they won't require a new database for the

14   counties?

15          MR. TYSON:  Your Honor, this is Bryan Tyson.

16          THE COURT:  Let Dr. Coomer respond at this point.

17   All right?

18          DR. COOMER:  Yeah.  This is Dr. Coomer.  That is

19   correct.  This de minimis software change does not require any

20   database change in project settings.

21          MR. CROSS:  Thanks, Doctor.

22          THE COURT:  All right.  I'm going to take a few

23   minutes.  I think it is 12:22.  Let's try to pick up at 12:25.

24   Thank you.

25               **(A brief break was taken at 12:22 P.M.)**

1          THE COURT:  Okay.  Dr. Coomer, let me just make sure

2    I understand one of the things you said is that, all right, you

3    have to have the new -- you have to basically build the new

4    database, which is all the instructions relating to the ballot

5    and the completion of the ballot, I assume, and other -- and

6    the coordinates and how to -- the adjudication software, what

7    it is recognizing and what the thresholds are.

8          But all of that is loaded into what you call the

9    database and is loaded into the ICX and then separately into

10   the scanner or not?

11         DR. COOMER:  Yes.  This is Dr. Coomer.  Yes.  Each

12   device has its own set of election files.  So, for instance,

13   the ICX, because it is a ballot-marking device and it is not

14   scanning anything, knows nothing about threshold settings on

15   the tabulator.

16         The tabulator as it is scanning ballots needs to

17   understand what those threshold limits are.  So that

18   information is included in those files.  All of the files come

19   from a single database.

20         THE COURT:  And when you send the database, are you

21   sending -- I'm just trying to make sure I understand.  You are

22   putting that on a thumb drive.  You did this earlier.  You are

23   putting it on a thumb drive.

24         And it is just one that you are putting on the same

25   thumb drive that you are basically going to use for each of the

1   devices, or do you have a different one for each of the

2   devices?

3          DR. COOMER:  So for the main back-end system, which

4   is the election database and that is used for defining all of

5   the machines and all of the election content, that is a single

6   file that is, you know -- that resides on the county's

7   equipment.  From there, you create individual machine files

8   that then you use to program all of the different machines.

9          Is that clear?

10          THE COURT:  I'm sorry.  You provided one to the

11   county elections office as a whole and from there -- you broke

12   up in part.

13          DR. COOMER:  Yeah.  From there, the counties then

14   create individual election files for each of the devices and

15   use their process for loading those on to machines.

16          THE COURT:  All right.  And their process would

17   include -- is that an internet context?

18          DR. COOMER:  No.  Everything is loaded on through,

19   you know, secure removable media, whether it is a USB or a

20   compact flash, depending on the device.

21          THE COURT:  All right.  Thank you very much.

22          DR. COOMER:  You are welcome.

23          THE COURT:  And to your knowledge, that has already

24   been done?

25          DR. COOMER:  That's correct.  That's correct.  And,

1  again, the State can provide a little more detail on that.

2          MR. STERLING:  Judge Totenberg, this is Gabriel

3  Sterling again.  We finalized that process a couple of weeks

4  ago.  The last database files were sent out on 9/16.  I just

5  got that confirmed while you were on your break.

6          THE COURT:  Are there any other questions at this

7  juncture from defense counsel that are questions?

8          MR. TYSON:  Not for the State defendants, Your Honor.

9  This is Bryan Tyson.

10          MR. CROSS:  Your Honor, this is David Cross.  I did

11  have a question if I could.

12          The new software that is going out and the USB drives

13  that will carry it, is there any security testing undertaken

14  for that software and for the drives?

15          THE COURT:  Is that for Mr. Sterling?

16          MR. CROSS:  This is for Mr. Sterling or Dr. Coomer,

17  whoever might know the answer.

18          MR. TYSON:  Your Honor, Bryan Tyson for the

19  defendants.  I just object on the basis we're not

20  cross-examining the witnesses.  But I understand you would like

21  to know the answer.  So --

22          MR. STERLING:  This is Mr. Sterling.  These are done

23  with fresh drives, as we have done databases under the

24  protocols we followed for several years.  That is how it is

25  done.  That is how we'll continue to do it.

```
 1              THE COURT:  Mr. Sterling, you are saying that they
 2    are fresh drives?
 3              MR. STERLING:  Yes, Your Honor.  Yes, Your Honor.
 4              THE COURT:  There is some evidence inconsistent with
 5    that.  But I'm glad -- that is the objective, in your mind?
 6              MR. STERLING:  Yes, Your Honor.
 7              MR. CROSS:  Your Honor, just back to my question, is
 8    there security testing of the software and the drives, or is it
 9    just aiming to get --
10              MR. STERLING:  There is security testing on the
11    software, yes.
12              MR. CROSS:  If we could get an explanation for what
13    that is and who is doing it.
14              MR. TYSON:  Your Honor, this is Bryan Tyson.  Again,
15    I'll object.  We are way far afield.  But --
16              THE COURT:  I think, you know -- I'm not sure it is
17    going to be helpful at this point.  I mean, I'm just trying to,
18    frankly, reconcile this with the document that was put out by
19    the CES division saying that they could use any -- they could
20    use their own thumb drives in order to update something.  That
21    is what --
22              MR. STERLING:  Judge, I was referring to the drives
23    that the State sends out for them to load to their EMSs.  I was
24    asked how the State was done, and that is what I am answering.
25              MR. CROSS:  Your Honor, if I may, this is David
```

1    Cross.  The reason why, just as a factual matter, the security

2    is important and why we did want to understand a little better

3    is it sounds like the only one that has done any testing is Pro

4    V&V.  And you'll recall that as Mr. Cobb pointed out they don't

5    do security testing.  And, in fact, they have never tested the

6    existing software that is used in Georgia.  They tested a

7    different version.

8            And so we just have -- it is a factual concern of

9    when they say Pro V&V has done -- this is a de minimis change.

10   You are looking at a lab that has never actually tested the

11   software that is used in Georgia to make that determination.

12   And then they are not doing security testing.

13           And so among all the things we have heard, the

14   software change is the most concerning.  It is not what we

15   actually felt was happening coming in today.  We thought it was

16   a database change, which had its own concerns.  But this is far

17   bigger than we originally thought.

18           So I just want to make sure we are all clear on the

19   facts.  Because it sounds like there are going to be 159 or so

20   USB drives with new software for BMDs shipped across the state

21   by some means, some unspecified security testing -- we don't

22   know who that is or what that is.  But it can't be Pro V&V

23   because that is not what they do -- just a few weeks before a

24   presidential election.

25           THE COURT:  All right.

| | |
|---|---|
| 1 | MR. CROSS:  It is hard to imagine a more concerning |
| 2 | scenario.  That is it.  That is all I have, Your Honor. |
| 3 | THE COURT:  Mr. Sterling, go ahead and respond to the |
| 4 | question if you -- |
| 5 | MR. STERLING:  I'm frankly confused as to what the |
| 6 | question actually is.  Pro V&V does some security testing.  The |
| 7 | individual, who I believe was testifying before, Jack -- I |
| 8 | can't remember his last name -- does not do security testing. |
| 9 | But, again, we feel comfortable and confident in our systems. |
| 10 | THE COURT:  All right. |
| 11 | MR. TYSON:  Your Honor, this is -- |
| 12 | THE COURT:  Yes.  Go ahead. |
| 13 | MR. TYSON:  I'm sorry, Your Honor.  This is Bryan |
| 14 | Tyson.  I just wanted to be clear that what Mr. Cobb -- as |
| 15 | Mr. Sterling said, Mr. Cobb's testimony was he did not |
| 16 | personally do security testing.  He does have someone who does. |
| 17 | So I don't want that to be left with the impression that Pro |
| 18 | V&V does not do security testing because they do. |
| 19 | MR. CROSS:  That is actually not what he said |
| 20 | originally, Your Honor.  But you have it.  Pro V&V has never |
| 21 | done security testing on the election systems.  That is in his |
| 22 | sworn declaration. |
| 23 | Again, I don't want to get bogged down.  The only |
| 24 | point was there is new software coming out.  We don't really |
| 25 | understand -- there does not seem to be security testing by any |

```
 1   independent security testers or what that looks like, just so
 2   we're clear on that.
 3             THE COURT:  All right.  If I understand, I'm --
 4   really at this juncture why I just turned to Mr. Sterling is
 5   you are relying on that Pro V&V is doing the testing?
 6             MR. STERLING:  Again, I'm loathe to answer this right
 7   now and talk about security in a public forum about how we do
 8   and what we do.
 9             So I feel confident in our systems.  They will be
10   secure.
11             THE COURT:  All right.  We'll just --
12             MR. BROWN:  Your Honor --
13             THE COURT:  Let's do this not in the public section
14   of this.  And I mean, I'm not going to go into this in great
15   detail.  But I don't want to sort of put Mr. Sterling in a
16   difficult position either.
17             And I'll deal with all follow-up we have, if we have
18   anything else that is hanging, in a private session.  I just
19   would like to get some clarification.
20             But I am confident that if there is something that is
21   an issue on the Cherokee or the other county that it will be
22   raised.  So I don't know that I need to create a feature for
23   that other than I would like not to have emergency hearings, if
24   at all possible.
25             And I do want to say that I had planned to issue a --
```

1   just for anyone who is present who is not going to obviously be

2   present in the next -- I had planned to issue sort of an

3   omnibus order today before all this arose.  In order to get the

4   order out that has -- that is time-sensitive -- more

5   time-sensitive relating to the pollbooks, I basically took

6   what -- last night when it became clear what was going on, I

7   divided the order and assembled it so that the part of the

8   order that deals with provisions as to the pollbook and getting

9   it out are -- will be issued separately and will also be issued

10  ultimately as part of the order issued on the rest of the

11  order.

12          But I didn't want to wait any longer.  And it was --

13  the order as a whole was a significant undertaking.  So I know

14  that Ms. Cole has a conflict at the moment.  So when she

15  returns to her home, we'll be able to get out the order.  But

16  we will get it out this afternoon in order not to hold up the

17  relief any further or your being able to know where I'm at on

18  that.  Everything is a narrow issue -- very narrow issue that

19  it addresses.

20          And I just wanted to make that clear.  And it is just

21  sort of a change in course in the way we are dealing with it

22  that was just a function of the circumstances.

23          Mr. Martin, should we generate a different number to

24  call back in so that you don't have to -- don't have to deal

25  with anybody not understanding and getting on the phone?

```
 1                COURTROOM DEPUTY CLERK:  Are you talking about going
 2      private with attorneys only?
 3                THE COURT:  That is right.
 4                COURTROOM DEPUTY CLERK:  Yeah.  I guess we could use
 5      the number that we've used before.
 6                THE COURT:  All right.  Do you want to just send that
 7      to everybody?
 8                COURTROOM DEPUTY CLERK:  Yes, ma'am, I will.
 9                THE COURT:  The only thing is that -- yes.  Anyone
10      who is -- I guess Dr. Coomer should just -- should dial in as
11      well though.  But they know how to get to whoever they need.
12                All right.  Thank you.  Then we're going to adjourn
13      the public proceeding.  Thank you very much, everyone.
14                          (The public proceedings were thereby concluded
15                           at 12:39 P.M., and all authorized parties
16                           continued with a private telephone conference,
17                           as follows:)
18                THE COURT:  ██████████████████████████████
19      ██████████████████████████████
20                DR. HALDERMAN:  ████████████████████████
21      ███████████████
22                THE COURT:  ██████████████████████████
23      ████████████████████████████████████████████
24      █████████████
25               ████████████████████████████████████
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
 1
 2        MR. CROSS:
 3
 4
 5
 6        THE COURT:
 7        MS. RINGER:
 8        THE COURT:
 9        MS. RINGER:
10
11        THE COURT:
12
13
14        MR. BROWN:
15
16
17        THE COURT:
18
19        MR. BROWN:
20        THE COURT:
21        MR. BROWN:
22
23
24        MR. CROSS:
25        MR. BROWN:
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

62



```
1     MR. CROSS:
2     THE COURT:
3     MR. BROWN:
4     THE COURT:
5
6
7     MR. TYSON:
8
9
10
11
12    THE COURT:
13    MR. TYSON:
14
15
16
17    THE COURT:
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



1
2
3
4
5    MR. TYSON:
6
7
8
9
10
11    DR. COOMER:
12
13
14
15
16
17
18
19
20
21
22
23
24
25    THE COURT:

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
 1  ████████████████████████████████████████████
 2  ████████████████████████████████████████████
 3  ██████████████████████████████████████
 4       DR. COOMER:  ███████████████████████
 5  ████████████████████████████████████████
 6  ████
 7       THE COURT:  ██████████████████████████
 8       DR. COOMER:  ████████
 9       THE COURT:  ██████████████████████████
10  ███████████████████████████████████
11  ████████████████████████████████████
12  ███████████████████████████████████████
13  █████████████████████████████
14       DR. COOMER:  ███████████████████████
15  ███████████████████████████████████████████
16  ████████████████████████████
17       THE COURT:  █████████
18         ██████████████████████████████
19  ██████████████████████████████████████
20  █████████████████████
21       MR. STERLING:  ███████████████
22  ████████████████████████████████████████
23  ████████████████████████████████████
24  ████████████████████████████████████
25         ████████████████████████████
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



1

2

3

4

5    THE COURT:

6

7

8    MR. STERLING:

9

10

11    THE COURT:

12

13    MR. STERLING:

14

15    THE COURT:

16

17    MR. STERLING:

18    THE COURT:

19

20

21

22

23    MR. TYSON:

24

25    THE COURT:

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
 1        MR. TYSON:
 2        DR. COOMER:
 3
 4
 5
 6
 7
 8
 9        THE COURT:
10
11
12
13
14
15
16
17        DR. COOMER:
18
19
20
21
22
23        THE COURT:
24
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



MR. STERLING:

THE COURT:

MR. CROSS:

MR. RUSSO:

MR. STERLING:

THE COURT:





```
 1
 2
 3
 4
 5
 6
 7        MR. RUSSO:
 8
 9
10
11
12        THE COURT:
13
14
15
16
17
18
19        DR. COOMER:
20
21        THE COURT:
22
23
24        MR. RUSSO:
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

70



UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT



```
1
2
3
4
5        MR. CROSS:
6        THE COURT:
7              (The proceedings were thereby concluded at 1:01
8        P.M.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 71 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

In testimony whereof, I hereunto set my hand on this, the 28th day of September, 2020.




_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT