# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## BRIEF IN SUPPORT OF [CORRECTED] COALITION PLAINTIFFS' RULE 59(E) MOTION TO ALTER OR AMEND THE COURT'S OPINION AND ORDER  [DOC. 918] REQUIRING PAPER POLLBOOK BACKUPS

October 9, 2020

**TABLE OF CONTENTS**

TABLE OF CONTENTS...........................................................i

INTRODUCTION ...............................................................1

I.    Procedural Framework...................................................2

II.   The Court Should Amend The Order To Narrow The Information Required To Be Included In The Updated Electors List For Printing ...........................3

III.  The Court Should Amend The Order To Clarify That The Procedure In O.C.G.A. § 21–2–388(2) Is Not Enjoined .......................................5

IV.  The Court Should Amend The Order To Specify The Minimum Number Of Emergency Paper Ballots That Are Necessary To Prevent Likely Harm To In-Person Voters ...........................................................9

V.   The Court Should Amend The Order To Clarify That The Findings And Relief Apply To Elections After November 2020........................................12

CONCLUSION ................................................................16

The Coalition Plaintiffs[1] respectfully file this Brief In Support Of Coalition

Plaintiffs' Rule 59(E) Motion To Alter Or Amend The Court's Opinion And Order

(Doc. 918) Requiring Paper Pollbook Backups.

## INTRODUCTION

Coalition Plaintiffs file this Rule 59 Motion because certain aspects of the

Court's Opinion and Order (Doc. 918, the "Order") require minor clarifications in

the form of relatively straightforward but important amendments to the Court's

Order.  The purpose of these clarifications are (1) to ensure that the Order is

narrowly tailored to effectuate the intended relief; (2) to clarify that the Order does

not enjoin operation of O.C.G.A. § 21–2–388(2); (3) to specify the minimum

number of emergency paper ballots that the Secretary should require country

superintendents to have on hand in each polling place on Election Day; and (4) to

clarify that both the Court's findings of imminent harm to voters and the injunctive

relief granted apply not just to the November 2020 general election, but also to

elections in December 2020, January 2021, and thereafter.

---

[1] "Coalition Plaintiffs" are Coalition for Good Governance ("Coalition"), Laura
Digges, William Digges III, Megan Missett, and Ricardo Davis.

## I.     Procedural Framework

Rule 59(e) states: "A motion to alter or amend the judgment must be filed no later than 28 days after the entry of the judgment." The word "judgment" as used in the Federal Rules of Civil Procedure is defined in Rule 54(a) and "includes a decree or any order from which an appeal lies." *Id.* Thus, the word "judgment" encompasses final judgments and appealable interlocutory orders, such as the Court's Order here. *Alabama v. U.S. Army Corps of Engineers,* 424 F.3d 117, 1129–30 (11th Cir. 2005) (preliminary injunction is an appealable order). This Motion is filed no later than 28 days after the entry of this Court's September 28, 2020 Opinion and Order, as required by Rule 59(e).

Rule 59(e) is the appropriate procedural mechanism for prevailing parties like Coalition Plaintiffs to seek alterations to the relief granted, such as making the relief granted more explicit. *See Herzog Contracting Corp. v. McGowen Corp.,* 976 F.2d 1062, 1065 (7th Cir. 1992) (Posner, J.) (prevailing plaintiff's motion to make relief granted in judgment more explicit was proper motion to alter or amend the judgment under Rule 59(e), tolling the time for appeal). Rule 59(e) is also the appropriate vehicle for obtaining major or minor clarifications of the Court's ruling. *Barry v. Bowen,* 825 F.2d 1324, 1328 n.1 (9th Cir. 1987) ("Although the precise contours of this relief [under Rule 59(e)] have never been authoritatively

defined, a motion seeking minor alterations in the judgment is properly one under Rule 59(e).")

This Motion does not "present new arguments or evidence that should have been raised earlier, introduce novel legal theories, or repackage familiar argument to test whether the Court will change its mind." *Perdum v. Wells Fargo Bank, N.A.,* 2014 WL 12703276 (July 17, 2014) (citations omitted). Instead, this Motion seeks only to make the relief granted by the Order itself more likely to be effective in view of the State Defendants' evident determination to misconstrue potential ambiguities in the Order. To eliminate these potential ambiguities and ensure that the Order is narrowly tailored to effectuate its intended relief, Coalition Plaintiffs seek amendments to the Order as set out herein.  These proposed amendments will make the injunctive relief granted more explicit, *see Herzog, supra,* and less susceptible to misinterpretation, *Barry, supra.*

## II.   The Court Should Amend The Order To Narrow The Information Required To Be Included In The Updated Electors List For Printing

The Order requires the Secretary to generate and transmit "an updated electors list in a format capable of printing by [each] election superintendent that includes all the information located in the electronic pollbooks."  (Doc. 918, at 64.) This direction is not unduly burdensome, but may require more printing than is actually necessary. The new electronic pollbooks that are delivered to each

precinct now include information on all 7 million voters in Georgia.  Workers at any given polling place only need a small subset of this information to check in the voters assigned to their polling place.  Accordingly, the Secretary should be ordered instead just to provide an updated electors list capable of printing by the counties that contains only "the information located in the electronic pollbook that is necessary to print precinct-level information required in each polling place to check in voters and issue ballots to eligible voters."  The Order should also clarify that the Secretary may assume responsibility for the printing and delivery of these lists for each polling place and, in any event, the Secretary shall be responsible for the cost of printing and delivery of lists to polling places.

Coalition Plaintiffs' Motion, therefore, seeks to make the following changes to the current language on Page 64 of the Order:

> Effective immediately, the Secretary of State shall generate and transmit to each county election superintendent at the close of absentee in-person early voting an updated electors list in a format capable of printing by the election superintendent that includes all of the information located in the electronic pollbook **necessary for printing precinct-level information**

> **required in each polling place to check in voters and**
>
> **issue ballots to eligible voters**. [FN 26] **Alternatively,**
>
> **the Secretary may assume responsibility for the**
>
> **printing and delivery function. In either case, the**
>
> **Secretary of State shall be responsible for the cost of**
>
> **printing and delivery.** . . . .

(Doc. 918, at 64 (proposed additions shown in bolded underlining, and proposed deletions shown in bolded strike-outs).)

## III.   The Court Should Amend The Order To Clarify That The Procedure In O.C.G.A. § 21–2–388(2) Is Not Enjoined

Coalition Plaintiffs also request clarification and modification of Page 65, first subsection (4), of the Court's Order, as explained in this Section.

Initially, as the Court held, the purpose of the paper pollbook backup remedy is to ensure that, when the electronic PollPads are not operational for whatever reason, the polling place workers will still have the same information available for checking in voters that would be available if the electronic PollPads were accurate and operational.  Thus, if the electronic PollPads fail or malfunction, the polling place workers will still have the information necessary to make a determination that the voter is eligible (as will be the case for the vast majority of voters who show up to vote in person on Election Day), that the voter has not been sent an

absentee ballot, and that the voter is therefore entitled to cast an in-person ballot. The ability to make this determination when the electronic PollPads are not operational (and they have malfunctioned in each and every election) will save the counties from experiencing another "complete meltdown" as occurred during the Primaries.  This portion of the Court's remedy is provided in subsections (1) through (3) which require no change or clarification.

The first subsection (4) on Page 65 of the Order reflects the Court's recognition that, whether or not the electronic PollPads are operational, there will be a subset of would-be in-person voters who are eligible to vote, but who are shown by the PollPads, or listed on the paper pollbook backups, as having been sent an absentee mail ballot.  (*See* Doc. 918, at 57).  For these voters, as the Court rightly recognizes in its current footnote 28, Georgia law (specifically O.C.G.A. § 21–2–388(2)) already details the process required to be undertaken to cancel the absentee ballot.  Following current practice, for this small subset of voters in the updated pollbooks, poll managers simply call the County Elections Office to confirm voting status.

Unlike the State Defendants, (Doc. 951, at 14, 18–19, 27), the Coalition Plaintiffs do not read the current language of the first subsection (4) on Page 65 of

6

the Order as superseding the provisions of O.C.G.A. § 21–2–388. To the contrary, the current language expressly cites to this statute in footnote 28.

In addition, the Court's current language should obviously be read together with what the Court specifically said earlier in the Order about the need for the O.C.G.A. § 21–2–388 procedure to be followed whenever an updated paper pollbook backup could not provide conclusive verification of a voter's status:

> As further justification for opposing relief, Defendants assert that "a paper printout of the updated electors list would not account for every voter's status, as absentee ballots are continuously being returned" and therefore "an updated electors list could not adjudicate voter eligibility in all situations." But this assertion acknowledges that an updated list can be used to properly adjudicate voter eligibility for some voters and therefore does not justify denying relief merely because an updated list might not capture every voter. (*A poll manager, consistent with current practice, would simply then call the County Elections Office to confirm the voting status* for a much smaller, select number of voters.).

(Doc. 918, at 57 (emphasis added).)

Despite the foregoing points, the Defendants are evidently determined to misinterpret the first subsection (4) on Page 65 of the Court's Order as ordering the Secretary to require county officials to ignore or violate the provisions of O.C.G.A. § 21–2–388, rather than follow those provisions. (See Doc. 951, at 14, 18–19, 27). Coalition Plaintiffs disagree with Defendants' strained interpretation of the current

language, but clarifying or modifying the Order to remove any arguable ambiguity
would eliminate the issue and assist county superintendents with implementation
without having any adverse impact upon the effectiveness of the remedy.

Coalition Plaintiffs' Motion, therefore, seeks to make the following changes
to the first Subsection (4) of the Court's Order:

> . . . (4) to allow voters who are shown to be eligible
> electors on the paper pollbook backups**,** but who are
> shown on the **paper pollbook backups** ~~updated list~~ as
> having requested an absentee mail-in ballot**,** to ~~have
> their absentee ballot canceled [FN 28] and to~~ cast a
> regular or emergency ballot that is not to be treated as a
> provisional ballot, provided that **such voter's absentee
> ballot is cancelled in accordance with O.C.G.A. § 21-
> 2-388** ~~such voter either surrenders the absentee ballot
> to the poll manager of the precinct or in the case of a
> voter who has requested but not yet received their
> absentee ballot completes an elector's oath [FN 29]
> affirming the voter has not marked or mailed an~~

8

**absentee ballot for voting in such primary or election**.

. . . .

(Doc. 918, at 65 (proposed additions shown in bolded underlining, and proposed deletions shown in bolded strike-outs).)

In addition, to correct a typographical duplication in the numbering of the Court's fourth and fifth subparagraphs on Page 65 of the Order, the following changes should be made:

- the current second subparagraph (4) on Page 65 of the Order should be newly renumbered as subparagraph (5), and

- the current subparagraph (5) on Page 66 of the Order should be newly renumbered as subparagraph (6).  (Amendments proposed to the substance of this subparagraph (6) are addressed in the next section of this Brief.)

## IV.  The Court Should Amend The Order To Specify The Minimum Number Of Emergency Paper Ballots That Are Necessary To Prevent Likely Harm To In-Person Voters

The Court should amend the Order to clarify the minimum number of emergency paper ballots that polling places should have on hand at the beginning of operations on Election Day.  Currently, the Order requires maintenance of "a

sufficient stock of emergency paper ballots," (Doc. 918, at 66), but does not specify what number of ballots constitutes a "sufficient stock."

The Brief of Amicus Curiae Common Cause – Georgia (Doc. 931-1), which is incorporated by reference here, explains how having a sufficient number of emergency ballots on hand will help prevent voting delays.  As the Court rightly notes in the Order, (Doc. 918, at 66 n.30), the Secretary's regulations currently require superintendents to cause polling places to maintain a "sufficient amount" of emergency ballots to ensure uninterrupted voting, and the regulations define a "sufficient amount" of ballots to be "at least 10% of the number of registered voters [assigned] to a polling place."  Ga. Comp. R. & Regs. 183-1-12-.11(2)(c).

But given evidence of the expected high turnout in upcoming elections, evidence that shows repeated BMD and electronic pollbook malfunctions, and evidence of the ongoing unmitigated cybersecurity risks created by the State's conduct, a higher number of emergency ballots should be required than the minimum amount called for in the State's existing regulation.  The Court has already ordered that a "sufficient stock" of emergency ballots should be maintained.  Clarification of what amount constitutes a "sufficient stock" is necessary given the likelihood of harm to voters that will occur if enough emergency ballots are not available on Election Day.

Coalition Plaintiffs respectfully request that the Order be amended to specify that a "sufficient stock" means a starting supply of emergency ballots in each polling place on Election Day that is equal to at least forty percent of the number of registered voters in that polling place, and to specify that emergency ballots must thereafter be resupplied to ensure that the maintained stock is never allowed to drop below the 10% minimum required by Ga. Comp. R. & Regs. 183-1-12-.11(2)(c) (10% minimum) and Ga. Comp. R. & Regs 183-1-12-.01 ("The election superintendent shall also be prepared to resupply polling places with emergency paper ballots in needed ballot styles in a timely manner while voting is occurring so that polling places do not run out of emergency paper ballots.").

Without the foregoing explicit clarification of the Order's requirements, there is a risk that the relief ordered by the Court will be less effective because the State has pre-determined by regulation that a "sufficient amount" of emergency ballots means a number of ballots that is equal to only 10% of the number of registered voters in a polling place—an initial stock level that the evidence shows is likely to be insufficient to avoid the established likelihood of injury to in-person voters in upcoming elections. In addition, the Order should clarify that any marginal costs of obtaining additional emergency ballots as required by the Order is to be borne by the Secretary of State.

Coalition Plaintiffs' Motion, therefore, seeks to make the following changes to newly renumbered subparagraph (6) (formerly subparagraph (5)) on Page 66 of the Court's Order:

> . . . and **(6)** ~~**(5)**~~ **begin polling place operations on Election Day with at least 40% of the number of registered voters to a polling place and at all times thereafter** maintain a sufficient stock of emergency paper ballots **in compliance with Ga. Comp. R. & Regs. 183-1-12-.11(2)(c) and 183-1-12-.01**. [FN 30].  **The cost of obtaining the initial stock of emergency paper ballots above the requirements of Ga. Comp. R. & Regs. 183-1-12-.11(2)(c) shall be borne by the Secretary of State**.

(Doc. 918, at 66 (proposed additions shown in bolded underlining, and proposed deletions shown in bolded strike-outs).)

## V.   The Court Should Amend The Order To Clarify That The Findings And Relief Apply To Elections After November 2020

The Court should amend the Order to expressly state that its findings of imminent harm apply with respect to all upcoming elections, not just the November 2020 election, and to explicitly award relief not just for the November 2020 election, but also for the elections following after November.

This should already be clear from the terms of the Order, which expressly apply "UNTIL FURTHER ORDER OF THIS COURT." (Doc. 918 at 64 (capitalization by the Court). The State Defendants, however, read the Order as making changes "on the eve of an election." (Doc. 951, at 29.) They appear set on challenging the Order based on Supreme Court cases, such as *Purcell v. Gonzalez,* 549 U.S. 1 (2006), that Defendants read as cautioning courts not to make changes to election procedures "too close to the election itself." (Id.) In other words, it is apparent that the Defendants have misapprehended the Court's injunction as applying only to the upcoming November 2020 election, not to any other elections.

Plaintiffs do not agree with Defendants' determination that the Order is limited only to the November 2020 election, but the Defendants can point to some language in the Order that provides weak support for this view. For example, on Page 64, the Order notes that Coalition Plaintiffs' evidence demonstrates systemwide problems that "resulted in voter disenfranchisement and that is likely to continue *in the upcoming Federal Presidential election*." (emphasis added.) Because this passage, on its face, omits to address the identical likely injury to voters that will also occur in the elections following after the November election, in the absence of relief, the Defendants may attempt to assert in any appeal that the

Order's necessary findings of imminent harm render the Order limited just to the "upcoming Federal Presidential election."

It is obvious that the Court did not intend to so limit its findings of imminent harm.  For one thing, nothing in the evidence in the record distinguishes the kind of imminent harm that is likely to occur in November 2020 from the same harm that will occur in *any* Upcoming Election, in the absence of the pollbook relief ordered by the Court. For another thing, the Order itself expressly states its intention to protect voters' constitutional rights "on this coming November 3rd general election day *and thereafter*." (Doc. 918, at 67 (emphasis added).)

November 2020 is a critical election, but the pollbook relief granted by the Order was sought for—and should apply to—*all* upcoming elections.  Additional elections that are set to follow the November election include elections in December 2020 (runoffs) and in January 2021.  All of these elections are included within the term "Upcoming BMD Elections," which defines the scope of elections for which relief is sought from the constitutional deficiencies of the "Dominion BMD System" by the Coalition Plaintiff's operative First Supplemental Complaint. (Doc. 628, at 32, ¶ 97 (defining 'Upcoming BMD Elections'); at 67–68, ¶ 222 (Count I); at 70, ¶ 230 (Count II).)

It is entirely appropriate for the Court to grant relief now for the December 2020 and January 2021 Upcoming BMD Elections, which are just two and three months away, respectively. Both the December and January elections are significantly more imminent right now than the November 2020 election was a year ago, when the Coalition Plaintiffs sought (for a second time) the pollbook relief that how now been granted by the Order. (Doc. 640-1 (brief), at 8, 32–33; Doc. 640-2 (proposed order), at 5–6, ¶¶ 9–10.)

The Order should be clarified to state that its relief is being granted not just for the November 2020 election, but also for the December 2020, January 2021, and other subsequent elections.  If the Defendants intend to challenge the Order on the grounds that its relief is coming "on the eve of an election," (Doc. 951, at 29), and thereby avoid having to prevail on the merits, then their objection, as meritless as it is, applies—at most—to the next upcoming election.  The Court should amend its Order to state that the findings of imminent harm to voters apply with respect to all Upcoming BMD Elections, not just the November 2020 presidential election. Such a finding will support the Court's already evident intention to award pollbook relief for all Upcoming BMD Elections.

Coalition Plaintiffs must emphasize that nothing in *Purcell* or any other authority precludes this Court from granting this relief for the November 2020

presidential election.  There is no possibility that this Court's remedy will confuse

voters, and preventing the "complete meltdown" from happening again will only

enhance, not diminish, the orderliness and voters' confidence in the integrity of the

November election.

## CONCLUSION

For the foregoing reasons, the Coalition Plaintiffs' Rule 59 Motion should

be granted.

Respectfully submitted this 9th day of October, 2020.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Robert A. McGuire, III* |
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Admitted Pro Hac Vice |
| BRUCE P. BROWN LAW LLC | (ECF No. 125) |
| 1123 Zonolite Rd. NE | ROBERT MCGUIRE LAW FIRM |
| Suite 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 881-0700 | (253) 267-8530 |

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,Ricardo Davis & Megan Missett*

16

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER , ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 9, 2020, a copy of the foregoing was

electronically filed with the Clerk of Court using the CM/ECF system, which will

automatically send notification of such filing to all attorneys of record.

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III

18