IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,          :
                                  :
        Plaintiffs,               :
                                  :
v.                                :        CIVIL ACTION NO.
                                  :        1:17-cv-2989-AT
BRAD RAFFENSPERGER, *et al.*,     :
                                  :
        Defendants.               :

## ORDER

On September 28, 2020, this Court entered an Order granting the Coalition Plaintiffs' motion for a preliminary injunction regarding paper pollbook backups. (Order, Doc. 918.)  Four days later, the State Defendants filed a Notice of Appeal to the Eleventh Circuit Court of Appeals, and on October 6, 2020 they filed a Motion to Stay the Court's Order pending the appeal (Doc. 951).

The Coalition Plaintiffs have moved under Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend this Court's Opinion and Order of September 28, 2020 which granted their motion for a preliminary injunction regarding paper pollbook backups [Doc. 958][1].  For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

---

[1] Plaintiffs filed their original motion on October 8, 2020 at Doc. 956.  The next day, Plaintiffs filed a Corrected Motion at Doc. 958.  As the Corrected Motion (Doc. 958) is the operative motion, the Clerk is **DIRECTED** to terminate the original motion at Doc. 956.

## I.   DISCUSSION

In light of arguments made by State Defendants in connection with their Motion to Stay the Order pending appeal, Coalition Plaintiffs assert that "certain aspects of the Court's Opinion and Order require minor clarifications in the form of relatively straightforward but important amendments to the Court's Order." Specifically, they seek modification of the Order to (1) ensure that the Order is narrowly tailored to effectuate the intended relief; (2) clarify that the Order does not enjoin operation of O.C.G.A. § 21–2–388(2); and (3) clarify that both the Court's findings of imminent harm to voters and the injunctive relief granted apply not just to the November 2020 general election, but also to elections in December 2020, January 2021, and thereafter.   In addition, Plaintiffs seek to modify the Order to (1) require the Secretary of State to be responsible for the cost of printing and delivery of the paper pollbook backup; and (2) specify that the Secretary should require county superintendents to have enough emergency paper ballots on hand for at least 40% of the number of registered voters at each polling place as the minimum number of emergency paper ballots for election day.

According to Plaintiffs, the Motion seeks only to make the relief granted by the Order itself more likely to be effective in view of the State Defendants' "evident determination to misconstrue potential ambiguities in the Order" and the proposed amendments will "make the injunctive relief granted more explicit . . . and less susceptible to misinterpretation."

### A.     The Information Required To Be Included In The Updated Electors List For Printing

In their opposition to Plaintiffs' request for paper pollbook backups, the State Defendants asserted the relief was unnecessary because Georgia law already requires the provision of a paper copy of the supplemental voter lists.  However, as Plaintiffs presented in their motion, the supplemental lists currently provided in paper do not show voting status (as should be reflected in the updated information in the electronic pollbooks) and so they cannot be used in the same way for check-in and issuance of access cards to the voting machines when the electronic pollbooks experience outages or malfunctions.  In fashioning relief, the Court endeavored to make clear that the paper pollbook backup must be updated at the conclusion of absentee and in-person early voting to include all information necessary to determine a voter's eligibility on election day, which would necessarily include the same information provided by the electronic pollbooks.  Therefore, the Court ordered that "the Secretary of State shall generate and transmit to each county election superintendent at the close of absentee in-person early voting an updated electors list in a format capable of printing by the election superintendent that includes all of the information located in the electronic pollbook" and "direct every county election superintendent (1) to print and provide at each polling place at least one paper back-up of the pollbook for use on Election Day, which paper back-up shall be updated after the close of absentee in-person voting (early voting) [and] (2) to use the paper back-up of the pollbook in the polling place to attempt

to adjudicate voter eligibility and precinct assignment in the event of equipment malfunction or an emergency as defined by Ga. R. & R. 183-1-12.11(2)(d)." (Order, Doc. 918 at 64-65.)  The Court noted that, like the information in the electronic pollbooks, the list must include *accurate* information regarding all persons who have been issued or cast absentee ballots during the advanced/early voting period prior to election day. (Order at 64, *id.* at 64 n. 26) (quoting O.C.G.A. § 21-2-224(b) ("The registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. The list shall indicate the name of any elector who has been mailed or delivered an absentee ballot.").)

Plaintiffs now assert, that by requiring an updated paper list that "includes all the information located in the electronic pollbooks," the Court's Order, though "not unduly burdensome [] may require more printing than is actually necessary" because the new electronic pollbooks that are delivered to each precinct now include information on all 7 million registered voters in Georgia.  However, because poll "workers at any given polling place only need a small subset of this information to check in the voters assigned to their polling place," Plaintiffs assert that the Court should clarify that the Secretary is ordered to provide "an updated electors list in a format capable of printing by the election superintendent that includes all of the information located in the electronic pollbook *necessary for printing precinct-level information required in each polling place* to check in

4

voters and issue ballots to eligible voters." (Pls.' Mot., Doc. 958-1 at 3-5) (emphasis added).

This is precisely what the Court intended by its reference to O.C.G.A. § 21-2-224(b). *See* O.C.G.A. § 21-2-224(b) ("The registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct *one copy of the certified electors list for such precinct*, *such list to contain all the information required by law*. The list shall indicate the name of any elector who has been mailed or delivered an absentee ballot.") (emphasis added). Accordingly, to the extent modification of the Order is needed to clarify that the paper pollbook to be used as an emergency backup contains updated precinct-level information required in each polling place, the Plaintiffs' Motion is **GRANTED**.

Plaintiffs also seek modification of the Order to indicate that "the Secretary may assume responsibility for the printing and delivery of these lists for each polling place" and to require that the Secretary is "responsible for the cost of printing and delivery of lists to polling places." Of course, the Secretary of State may opt to provide printed lists at its own cost. The Court will not, however, modify the terms of the Order to require the Secretary to absorb the cost for providing paper pollbook backups for each polling location in all of Georgia's 159 counties absent evidence from Plaintiffs regarding such costs in the context of a permanent injunction. Accordingly, the Court **DENIES** Plaintiffs' request for modification of the preliminary injunction on these grounds at this time.

### B. Amendment of the Order to Clarify the Procedure In O.C.G.A. § 21–2–388(2) is Not Enjoined

In their opposition to Plaintiffs' request for updated paper pollbook backups for use in the event of problems with the electronic pollbooks on election day, the State Defendants asserted that "[e]ven if an updated electors list could be printed by precinct and delivered to the counties in three days between the end of early voting and election day, a paper printout of the updated electors list would not account for every voter's status, as absentee ballots are continuously being returned" therefore "an updated electors list could not adjudicate voter eligibility in all situations." (Resp. at 24.) State Defendants further argued that use of a paper pollbook to determine voter eligibility would insert an entirely new protocol just weeks prior to the election.

But as the Court explained in its September 28th Opinion and Order, the paper pollbook backup ordered by the Court would provide the same information contained in the electronic pollbook as required by state law and therefore could be used in the same manner as the electronic pollbook to determine voter eligibility (as necessary in the event of emergencies, electronic outages, or disruptions). (*See* Order at 12-13) (quoting O.C.G.A. § 21-2-401(b) requiring that "[t]he registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. *The list shall indicate the name of any elector who has been mailed or delivered an absentee*

*ballot*") (emphasis added); (*see also* Order at 17-19) (summarizing testimony of Elections Director, Chris Harvey, that, "[w]hen a voter requests an absentee ballot but then appears at the polls on Election Day without their ballot in hand, the poll official should check with the registrar to ensure that no absentee ballot has been accepted for that voter prior to having the voter execute a cancellation affidavit and then vote using the BMD" and "[t]hat process applies whether the voter is checked in using the PollPad or a paper list"); (*see also* Order at 56-57) (explaining that under the Secretary of State's own training manual, poll workers are currently trained to use a paper list of electors in the precinct and are directed to refer to the paper list to keep processing voters if the polling place loses power or the PollPads stop working and that the only change would be that the paper backup copy Plaintiffs request would be more complete and accurate than the current paper lists and would mirror the information in the e-pollbook).)

The Court recognized Defendants' concern that "a paper printout of the updated electors list would not account for every voter's status, as absentee ballots are continuously being returned" and therefore "an updated electors list could not adjudicate voter eligibility in all situations." But the Court found that this concern did not justify denying relief where an updated list can be used to properly adjudicate voter eligibility for some voters and for others would require the poll workers to follow their existing protocol of contacting the county elections offices to confirm voter eligibility. (*See* Order at 57) ("A poll manager, consistent with

current practice, would simply then call the County Elections Office to confirm the voting status for a much smaller, select number of voters.").

Plaintiffs' proposed order, however, did not expressly account for the situation described by Defendants, and instead asked the Court to require county election superintendents to "to use the paper back-up of the pollbook in the polling place to attempt to adjudicate voter eligibility and precinct assignment" and "to allow voters who are shown to be eligible electors on the paper pollbook backups to cast an emergency ballot that is not to be treated as a provisional ballot." Therefore, the Court included provisions in its relief intended to address this gap and to indicate that the State's existing procedures for handling such voter eligibility issues would still apply.  Specifically, the Court ordered the Secretary of State to direct every county election superintendent to "allow voters who are shown to be eligible electors on the paper pollbook backups who are not shown on the updated list as having requested an absentee mail-in ballot to cast a regular [or] emergency ballot that is not to be treated as a provisional ballot" and "allow voters who are shown to be eligible electors on the paper pollbook backups but who are shown on the updated list as having requested an absentee mail-in ballot to have their absentee ballot canceled[2] and to cast a regular or emergency ballot that is not to be treated as a provisional ballot, provided that such voter either surrenders the absentee ballot to the poll manager of the precinct or in the case of a voter who has

---

[2] See O.C.G.A. § 21-2-388 (providing for cancellation of absentee ballots and permitting voters to cast votes in person upon cancellation); see also Ga. Comp. R. & Regs. 183-1-14-.06 (regarding procedures for spoiled absentee ballots).

requested but not yet received their absentee ballot completes an elector's oath[3] affirming the voter has not marked or mailed an absentee ballot for voting in such primary or election." (Order at 65.) The Court expressly referred to the procedures outlined in O.C.G.A. § 21-2-388, providing for cancellation of absentee ballots and permitting voters to cast votes in person upon cancellation. (*See id.* at 65, n. 28.)

State Defendants argue in their Motion to Stay the Order pending their appeal that the Order alters the State's procedure and effectively excises the requirement in O.C.G.A. § 21-2-388(2) that registrars "confirm[] that the elector's absentee ballot has not yet been received by the board of registrars" prior to allowing a voter to vote in the precinct on Election Day "because the Court orders the Secretary to direct every superintendent that no such additional check is required before voters who are shown as 'having requested an absentee mail-in ballot' are allowed to vote on the BMDs." (Mot. at 14.)   This is a glaring mischaracterization and an entirely inaccurate interpretation of the Court's ordered relief.

As the Court indicated repeatedly in its Order, the relief is narrowly tailored and manageable within the framework of the current statutory and regulator system without any major changes required of the Secretary of State or local election superintendents.  The remedy's conformity with the overall regulatory scheme imposed no changes to Georgia's statutory procedures relating to voters who requested absentee ballots, but who instead decide to vote in-person.

---

[3] *See* O.C.G.A. § 21-2-384.

Nonetheless, because the State Defendants are laboring under a flawed misinterpretation, the Court **GRANTS** Plaintiffs' Motion as necessary to clarify that voter eligibility shall be determined in accordance with O.C.G.A. § 21-2-388 and the existing practices as described by Mr. Harvey.

### C.   The Court's Findings and Relief Apply to Elections After November 2020

According to Plaintiffs' motion, "it is apparent that the Defendants have misapprehended the Court's injunction as applying only to the upcoming November 2020 election, not to any other elections." Although Plaintiffs believe it is already clear from the terms of the Order which expressly apply "UNTIL FURTHER ORDER OF THIS COURT," Plaintiffs request that the Court amend the Order to expressly state that "its findings of imminent harm apply with respect to all upcoming elections, not just the November 2020 election, and to explicitly award relief not just for the November 2020 election, but also for the elections following after November."

Accordingly, to the extent it is necessary to expressly clarify that its findings apply to all elections until further order of this Court, Plaintiffs' Motion is **GRANTED**.

### D.   Request for Modification of Order to Specify the Minimum Number of Emergency Paper Ballots Per Precinct Polling Place

At the conclusion of the injunction hearing on September 13, 2020, and again in a subsequent order entered on September 15, 2020, the Court asked the

parties to address whether and why relief tailored to facilitating the uniform implementation of the State's established emergency ballot process would be a feasible alternative to Plaintiffs' request for a wholesale switch to hand-marked paper ballots. Thereafter, on September 28, 2020, the Court entered an Order requiring the Secretary of State to (1) take every reasonable measure to ensure that county election officials and poll workers are trained as to how to generate and use paper pollbook backups and emergency ballots and handle the casting and counting of emergency votes in conformity with this Order directly as emergency ballots, if necessary; and (2) maintain a sufficient stock of emergency paper ballots. The Court noted this relief is consistent with State Election Board Rule 183-1-12-.11(2)(c) that requires that election superintendents "shall cause each polling place to have a sufficient amount of emergency paper ballots so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable. For any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be *at least* 10% of the number of registered voters to a polling place." (emphasis added).

At no time prior to the entry of the Order did either group of Plaintiffs offer any evidence or make any specific request regarding what would be a sufficient amount of emergency paper ballots for use in the November 3, 2020 election, despite presenting evidence of the scope of the malfunctions of the BMD voting system equipment in the pilot and primary elections. Days after the entry of the

Court's Order, non-party Common Cause Georgia filed an amicus brief asserting that according to its research, the minimum threshold provided in Georgia's regulations – an amount equivalent to at least 10% of registered voters in a polling place – is "nowhere near 'sufficient' to meet the demands that Georgia polling places are projected to see on Election Day." (Doc. 931 at 1-2.)  Rather, according to its "data-based analysis," the appropriate number of emergency and provisional ballots would be equal to 40% of registered voters assigned to a polling place.

Based on this information, which was not timely provided to the Court in connection with the preliminary injunction motions, Plaintiffs now seek a modification of the September 28, 2020 Order to require that each polling place open with an initial stock of emergency paper ballots totaling at least 40% of the number of registered voters to a polling place and that the cost of obtaining this initial stock be borne by the Secretary of State's Office.

The Court **DENIES** this request as it invites the Court to plunge into the task of advising election officials on precise details of election administration, a function that is vested in the State Defendants' and local election superintendents' discretion.  Contrary to Plaintiffs' contention, SEB Rule 183-1-12-.11(2)(c) does not pre-determine that a sufficient amount of emergency ballots is equal to only 10% of the number of registered voters in a polling place.  Instead, the Rule provides that election superintendents shall determine what is a sufficient amount of emergency paper ballots "so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable" and

provides that for "any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be *at least* 10% of the number of registered voters to a polling place." *Id.* (emphasis added). As the evidence and reports of the voting conditions during the primary reflected, some polling places experienced significant disruption and long lines, while others were not impacted or backed up at all. Thus, it is likely that the number of emergency paper ballots necessary to facilitate voting – in the event such measures are necessary – may vary wildly from polling place to polling place.

## II.  CONCLUSION

Accordingly, the Court **GRANTS IN PART** the Coalition Plaintiffs' Motion [Doc. 958] and will enter a separate Amended Order as follows:

UNTIL FURTHER ORDER OF THIS COURT:

Effective immediately for each scheduled primary, general, and runoff election, the Secretary of State **IS ORDERED** generate and transmit to each county election superintendent at the close of absentee in-person early voting an updated electors list in a format capable of printing by the election superintendent that includes all of the information located in the electronic pollbook necessary for printing precinct-level information required in each polling place to check in voters and issue ballots to eligible voters (referred to as the "updated paper pollbook backup").[4]  The Secretary of State shall further direct every county election

---

[4] Consistent with O.C.G.A. § 21-2-224(b) and State Election Board Rule 183-1-12-.19(8), this list must include *accurate* information regarding all persons who have been issued or cast absentee ballots during the advanced/early voting period prior to election day. *See* O.C.G.A. § 21-2-224(b)

superintendent (1) to print and provide at each polling place at least one paper backup of the pollbook for use on Election Day, which paper backup shall be updated after the close of absentee in-person voting (early voting); (2) to use the updated paper pollbook backup in the polling place to attempt to adjudicate voter eligibility and precinct assignment in the event of equipment malfunction or an emergency as defined by Ga. R. & R. 183-1-12.11(2)(d);[5] (3) to allow voters who are shown to be eligible electors on the paper pollbook backup who are not shown as having requested an absentee mail-in ballot to cast a regular or emergency ballot that is not to be treated as a provisional ballot; (4) to allow voters who are shown to be eligible electors on the paper pollbook backup but who are shown as having requested an absentee mail-in ballot to have their absentee ballot canceled and to cast a regular or emergency ballot that is not to be treated as a provisional ballot, provided that such voter's eligibility is confirmed by the county registrar's office and the voter's absentee ballot is canceled in accordance with the provisions of

---

("The registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. The list shall indicate the name of any elector who has been mailed or delivered an absentee ballot."); Ga. Comp. R. & Regs. 183-1-12-.19(8) ("Prior to delivery to a polling place, the election superintendent or registrars shall cause the electronic poll books to accurately mark all persons who have been issued or cast absentee ballots in the election."). The Secretary may generate this information directly from the PollPads or from ENET and the Absentee Voter Report referenced in their filing at Doc. 895. Alternatively, the Secretary may assume responsibility at its discretion for the printing and delivery of the updated paper pollbook to county election superintendents.

[5] The State Election Board's Emergency Rule, Ga. R. & R. 183-1-12.11(2)(d), defines the types of events that may be considered emergencies as "power outages, malfunctions causing a sufficient number of electronic ballot markers to be unavailable for use, or waiting times longer than 30 minutes."

O.C.G.A. § 21-2-388;[6] (5) to take every reasonable measure to ensure that county election officials and poll workers are trained as to how to generate and use paper pollbook backups and emergency ballots and handle the casting and counting of emergency votes in conformity with this Order directly as emergency ballots, if necessary; and (6) maintain a sufficient stock of emergency paper ballots in compliance with Ga. Comp. R. & Regs. 183-1-12-.11(2)(c) and 183-1-12-.01.[7]

While the Court has ordered that a minimum of one paper pollbook backup should be made available for each polling place, it is likely that more than one copy would be needed in large precincts per the testimony of Fulton County's Director of County Registration and Elections.  As precincts vary in size enormously across the counties and the State, the Court **FURTHER ORDERS** that the Secretary of State direct all local election superintendents to evaluate the need for issuance of additional copies of the  pollbook backup printouts as back-up tools for precincts

---

[6] *See* O.C.G.A. § 21-2-388 (providing for cancellation of absentee ballots and permitting voters to cast votes in person upon cancellation by either surrendering their absentee ballot to the poll manager of the precinct or in the case of a voter who has requested but not yet received their absentee ballot by completing an elector's oath affirming the voter has not marked or mailed an absentee ballot for voting in such primary or election); *See* O.C.G.A. § 21-2-384 (regarding elector's oath); *see also* Ga. Comp. R. & Regs. 183-1-14-.06 (regarding procedures for spoiled absentee ballots).

[7] This relief is consistent with State Election Board Rule 183-1-12-.19(1) that requires that election superintendents equip each polling place with the electronic pollbooks, a paper backup list, and ensure that "poll workers [] be adequately trained in checking in voters on both electronic poll books and paper backup list." Ga. Comp. R. & Regs. 183-1-12-.19(1); *see also* Ga. Comp. R. & Regs. 183-1-12-.11(2)(c) (providing that the "election superintendent shall cause each polling place to have a sufficient amount of emergency paper ballots so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable. For any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be at least 10% of the number of registered voters to a polling place").  County election superintendents shall determine what is a "sufficient number" of emergency paper ballots necessary at individual polling locations, which number may exceed 10% of the number of registered voters at the polling place as needed.

based on the number of registered voters in each county precinct or polling location and to promptly advise the County Registrar's Office of the number of such additional copies needed.

**IT IS SO ORDERED** this 12th day of October, 2020.

**Amy Totenberg**
**United States District Judge**