IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, et al., | ) |
| Plaintiffs, | ) |
| | ) CIVIL ACTION |
| v. | ) File No. 1:17-cv-2989-AT |
| | ) |
| BRAD RAFFENSPERGER, et al., | ) |
| | ) |
| Defendants. | ) |

## COALITION PLAINTIFFS' EMERGENCY MOTION
## FOR EXPEDITED DISCOVERY
## AND IMMEDIATE INJUNCTIVE RELIEF

This Court has long been aware of and concerned by Defendants' failure to properly secure and debug its E-Net system. Those concerns have proven prescient in the November 3, 2020 election, which saw widespread increased failures of the E-Net voter database system, creating a significant number of voting delays, pollbook inaccuracies, discrepancies in voters' voting records, inaccurate voting information presented to voters, and disenfranchisement in some cases. This motion seeks expedited discovery meant to identify a subset of voters who were wrongly required to cast a provisional ballot while there is still time to validate and count their provisional ballots, prior to final election results

certification and allow them to participate in the 2020 Presidential Election and to require the Secretary to direct county superintendents to process, automatically cure, and count the eligible votes in all provisional ballots affected and provide clear instructions for how to segregate and cure the same in a timely and transparent manner that can be verified by authorized monitors and poll watchers.

## I. Current Flaws In the Voter Check-In System at Polling Precincts

The Help America Vote Act requires states to implement a single centralized, computerized, statewide voter registration list containing the name and registration information of every legally registered voter in the State. 52 U.S.C. § 21083(a)(1)(A).  As this Court explained in its Order on Paper Pollbook Backups, in Georgia this is the ENET database system, which is maintained by Secretary of State and is supposed to be regularly updated to reflect voting status for use in electronic pollbooks that poll workers then access to verify voters' registration and voting status and to generate a voter access card that activates the specific electronic ballot linked to the voter's residence address. (Doc. 918 at 4-5). Georgia uses the E-Net system on internet-connected laptops as early voting electronic pollbooks and the new KnowInk PollPads as the electronic pollbooks on Election Day.  The E-Net  system provides the data for the PollPads as well as the absentee mail balloting applications.

## II.     Prior Proceedings Before This Court Concerning Systemic Flaws

On August 21, 2020, Plaintiffs filed a Motion for a Preliminary Injunction on Paper Pollbook Backups, [Doc. 800], which this Court granted on September 28, 2020 [Doc. 918]. In that motion, Plaintiff asks the Defendant to require "a paper backup of the electronic pollbook at each polling precinct location which is updated after the close of absentee in-person voting to facilitate the issuance of regular or emergency ballot on election day." [*Id.* at 3]. The Order noted that this was not the first time, Plaintiffs had sought—or the Court had granted—relief to address "critical deficiencies and vulnerabilities that impacted the reliability and integrity of the State's election technology infrastructure." [*Id.* at 8, 21].

The Order noted that:

> numerous declarations from voters highlighted instances where a voter's registration status on MVP, the "outwardfacing system used to provide information to voters" did not match the voter registration status in the electronic pollbooks used to check in voters at the voting polls. . . And . . . individual voters described issues with the electronic pollbook, including . . . listing voters as having already voted.

(*Id.* at 24 (citing Doc. 579 at 98-111), 30 (citing Doc. 755 at 104-05), 32 (citing Doc. 755 at 37-40)). It also noted that Plaintiffs presented evidence that the State had failed to not only adequately address issues with the E-Net system itself, but

also to provide pollworkers and counties with training or guides to ameliorate these issues.  (*Id.* at 30 (citing Doc. 755 at 10-141), 32-33 (citing Doc. 755 at 37-40)).  The Order found that "Defendants have offered nothing to indicate concretely any action taken in response to issues experienced by voters in November 2018 and more recent elections to ensure that the information from ENET and the operation of the electronic pollbooks is reliable, accurate, and updated."  (*Id.* at 23).  Ultimately the Court granted Plaintiff's Motion because the evidence "Plaintiffs provided in support of their motion demonstrates a system wide problem of malfunctioning electronic PollPads beginning with the November 2019 pilot elections, again in the June 2020 primary election, and most recently in the August 2020 runoff elections in tandem with wholly inadequate backup plans and *voter registration data deficiencies* that resulted in voter disenfranchisement and that is likely to continue in the upcoming Federal Presidential election."  (*Id.* at 63 (emphasis added).

State Defendants were ordered to immediately "generate and transmit to each county election superintendent at the close of absentee in-person early voting an updated electors list in a format capable of printing by the election superintendent that includes all of the information located in the electronic pollbook." [*Id.* at 64].  Rather than comply with the Order, Defendants

immediately appealed it and the Eleventh Circuit, without opinion, granted a stay. State Defendants' choice to avoid supplying accurate paper pollbook backups indeed resulted in voting being shut down in Spalding County when PollPads failed. The PollPads also failed in all locations in Morgan County.

### III.  Facts Establishing Immediate and Irreparable Injuries That Prior Order Sought to Prevent

Once again, the combination of unremedied E-Net and PollPad failures, coupled with poor training, lack of guidance about amelioration techniques, and failure to provide emergency ballots, prevented voters from casting regular and, in some cases, provisional ballots on November 3, 2020.  On Election Day, November 3, 2020, poll workers—supplied with incorrect information—told numerous Georgia voters that the voter records indicated that the voters had already voted in the November 2020 election, and therefore were ineligible to vote. Other voters who had voted in early voting wre told that there is no record of their having voted.  (Affidavits to be provided, if necessary).  Specifically, Coalition Plaintiffs believe that information in the E-Net system was not accurately updated to the PollPads used by multiple precincts in multiple counties. The outdated paper electors lists distributed to the precincts of course cannot provide current information for pollworkers' decision making for issuing a ballot.  Based on

reports from voters, poll workers, and poll watchers on Election Day, Plaintiffs believe that these errors spread across numerous counties and affected thousands of voters, but caused numerous voters to be required to vote provisional ballots requiring additional steps by the voter. Thousands of voters were required to vote on provisional ballots because of the Spalding County electronic pollbook failure. Voters forced to vote provisionally did not have their vote accepted at the polling places, are left to wonder whether their ballot will be accepted, and are at risk of having their votes not count due to Defendants own failure to abide by the Court's previous order.  A few examples follow simply to demonstrate the types of issues encountered by many more voters across the State (additional evidence will be filed as it become available, if necessary):

   One newly registered voter in Fulton County who registered in October was told by poll workers, when he went to check-in on Election Day at his assigned polling place, that he had already voted by absentee ballot when he had not. *See* Aff. Spencer Kurtti, attached hereto as Exhibit 4, at ¶¶ 2-4, 9.  He was told poll workers that he had to vote provisionally which he did. *Id.* at ¶ 6.

   Another, first-time Georgia voter in DeKalb County who was registered in 2018 was told by poll workers, when she went to check-in on Election Day at her assigned polling place, that she had already voted early and in person when she had

not.  *See* Aff. Kristen Watt, attached hereto as Exhibit 6,  at ¶¶ 2-4, 9, 12.  She, too, was told by poll workers she had to vote provisionally, which she did.  *Id.* at ¶ 7.  Poll workers gave her a number (1-866-335-8683) to call and check the status of her ballot, which she called on Election Day but her calls went unanswered.  *Id.* at ¶ 8.  Yet another registered DeKalb County voter was told by poll workers, when she went to check-in on Election Day at her assigned polling place, that she had already voted by absentee ballot when she had not.  *See* Aff. Laura Singley, attached hereto as Exhibit 5.  She, requested to vote provisionally, and then did.  *See id.*

Another registered DeKalb County voter who went to check-in on Election Day at her assigned polling place, was told by poll workers that she had already received the absentee ballot she requested by mail on or around October 18 and returned it on or around October 22, when she had not.  *See* Aff. Sarah Caroline Blount Taylor, attached hereto as Exhibit 3, at ¶¶ 2-6.  She, too, was told by poll workers to vote provisionally which she did.  *Id.* at ¶ 7.  Poll workers also told her that her vote would be counted by November 15, 2020.  *Id.* at ¶ 8.

Yet another registered DeKalb County voter was told by poll workers, when he went to check-in on Election Day at his assigned polling place, that he had already voted by early and in person when he had not.  *See* Aff. Jordan Truesdale,

7

attached hereto as Exhibit 2.  The poll worker also told Mr. Truesdale that his information stated that Mr. Truesdale was at the wrong polling place.  *See id.*  After concluding a phone call regarding Mr. Truesdale, the poll worker was able to bypass or clear the message in the system that indicated that Mr. Truesdale voted early in person, and Mr. Truesdale was able to vote using the touchscreen machine.  *See id.*

Another voter who has voted several times in Fayette County without incident prior to thus most recent election, attempted to vote in person at her assigned polling place on Election Day and, when she went to check-in, the poll worker looked her name up in what appeared to be a paper pollbook and informed her that she had already voted in person, when she had not.  *See* Aff. Judith Hull, attached hereto as Exhibit 7, at ¶¶ 2-4, 12 .  She, too, was told she had to vote provisionally, which she did.  She, too, received a phone number (1-833-547-8683), from poll workers who told her that other voters at this precinct has experienced the same issue and that she could call the number to see if her vote was counted.  *Id.* at ¶¶ 5-6.  When she called this number later on Election Day, she spoke to a man who told her that there was a "computer glitch from the Secretary of State's office[,]" that this happened to "a lot of" other people, and that he could not guarantee her vote would be counted.  *Id.* at ¶ 7.

Plaintiffs are continuing to collect evidence on the wide-ranging scope of these problems, but are aware of a significant number of voters reportedly impacted. Because Plaintiffs likely have learned of only a small fraction of cases statewide, the number of impacted voters could be far higher than they know. Nevertheless, the fact that all of the aforementioned voters have different voting registration histories, polling precincts, and were given differing information about these issues and how they would be resolved, but all experienced the same issue and, in some cases, were told these issues were widespread and directly attributable to the State Defendants, suggests that this is not an isolated incident that can be blamed on counties or individual polling places.  It is precisely the type of system-wide failure that the concerned the Court and Coalition Plaintiffs in the weeks leading up the Election Day—and it is precisely the type of issue State Defendants deliberately avoided remediating by filing their interlocutory appeal. The difference is that, this time, Coalition Plaintiffs and voters are about to suffer an irreparable injury that only immediate injunctive relief can prevent.

## IV.    **Argument and Citations to Authority**

This Motion seeks information through expedited discovery, which this Court has the discretion to grant, and specific injunctive relief based on the information disclosed, which the Court may grant under the familiar tests.  *See*

*McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). At the preliminary injunction stage, a district court "need not find that the evidence positively guarantees a final verdict in plaintiff's favor," and may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is "appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co., v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) (quoting *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).  Federal courts "possess broad discretion to fashion an equitable remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable relief, and, if granted, what form it shall take, lies in the discretion of the district court."). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam); *Kansas v. Nebraska*, 574 U.S. 445, 456 (2015) (noting that a court of equity may "'mold each decree to the necessities of the particular case' and 'accordfull justice' to all parties"). Here, Plaintiffs meet all criteria.

First, substantial state law establishes that Defendants had a duty to provide accurate information to polling precincts. In addition, the State Election Board's regulations require that "[p]rior to delivery to a polling place, the election superintendent or registrars shall cause the electronic poll books to *accurately* mark all persons who have been issued or cast absentee ballots in the election." Ga. Comp. R. & Regs. 183-1-12-.19(8) (emphasis added). They further require that

> every polling place to be equipped with a paper backup list of every registered voter assigned to that polling place. The paper backup list shall be used in case the electronic poll books do not properly function. The superintendent shall cause poll workers to be adequately trained in checking in voters on both electronic poll books and paper backup list.

Ga. Comp. R. & Regs. 183-1-12-.19(1). They also require that "[f]or electors whose names are added to the voter registration rolls after the preparation of the electronic poll books, the registrars shall provide a printed supplemental list for use at the affected polling places." Ga. Comp. R. & Regs. 183-1-12-.19(10) (emphasis added). Defendants refusal to abide by the Court's previous Order and the ensuing and utterly predictable disenfranchisement of voters across multiple counties and precincts violates these laws and regulations. Indeed, had Defendants simply abided by the Court's previous Order, many of these problems may have been ameliorated, if not entirely prevented.

Moreover, the Georgia Election Code, which includes provisions to fulfill the state's obligations under HAVA, provides that individuals whose names do not appear on the list of registered electors should be allowed to cast provisional ballots and have their votes counted if they later prove their eligibility. O.C.G.A. §§ 21-2-418, 419.  In this case, allowing the relief Coalition Plaintiffs seek, that is, information concerning the voters who were forced to cast a provisional ballot due to E-Net, electronic pollbook, and PollPad errors, should facilitate proof of their eligibility to vote.

Second, Coalition Plaintiffs and Georgia voters will suffer substantial immediate and irreparable harm if the Defendants do not promptly identify all Georgia voters affected by these ENET defects.  As this Court is aware, Georgia law provides only a limited period to cure and process provisional ballots before an election is certified.  Unless the State Defendants diagnose the problem, identify affected voters, and instruct counties to count provisional ballots cast by those voters by November 6, the voters will be disenfranchised through a predictable failure on State Defendants' part.  Finally, the requested relief would cause no harm to any State Defendant other than the incidental cost of fixing a problem that never should have existed.  This cost is amply outweighed by the harms suffered by Plaintiffs if eligible votes are not counted.  As a result, the balance of the

equities favors granting Plaintiff's the immediate and injunctive relief requested herein.

## V. Relief Requested

Coalition Plaintiffs will be seeking additional relief relating to the issues raised in this Motion, but given the time-sensitivity of this request, is limiting the relief sought to the following:

To ensure that this recurring and completely foreseeable voter disenfranchisement issue does not continue in the upcoming runoff elections and all future Georgia elections, Plaintiffs request that Defendant immediately and in no event later than 4:00 p.m. on November 5, 2020.

1) Provide a complete explanation of the problems that caused discrepancies in voter information in E-Net, electronic pollbooks, and PollPads including when it first became aware of this discrepancy or any technology issue that could cause the same;

2) Provide the number of voters who experienced issues of missing or inaccurate voter records resulting in requiring provisional ballots or complete disenfranchisement;

3)       Provide Coalition Plaintiff with the names and contact information of voters required to cast provisional ballots in each county as a result of inaccurate voter records in the State's system;

4)       Issue an immediate Official Election Bulletin and publish the information it contains on Firefly and The Buzz for all election officials, which explain any system errors that affected the pollbooks;

5)       Direct Superintendents to process, automatically cure, and count the votes in all eligible provisional ballots affected and provide clear instructions for how to segregate and cure the same in a timely manner and, in any event, before county certification of results; and

6)       Provide Plaintiffs with full database access on an ongoing basis to the logs and error codes attributable to this coding error or discrepancy, including specifically logs and error codes associated with the specific voters identified in this motion, and the current status of each provisional ballot.

Plaintiffs further request that the Court order Defendants to:

7) Explain, in detail, the interactions Defendants have had with Dominion Voting System, KnowInk, Civix or other vendors to ameliorate this issue;

8) Provide the instructions, guidance and explanations, given to counties since October 12 regarding the problem; and

9) To provide such other and further relief as necessary.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court enter an order, effective immediately, awarding it the above requested expedited discovery and immediate injunctive relief. A proposed order is attached.

Respectfully submitted this 5th day of November, 2020.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>v.<br>E<br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | Civil Action No. 1:17-CV-2989-AT |

**CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, ET AL., <br> Plaintiffs, <br><br> v. <br><br> BRAD RAFFENSPERGER , ET AL., <br> Defendants. | Civil Action No. 1:17-CV-2989-AT |

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2020, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Bruce P. Brown*
Bruce P. Brown