## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, et al., ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION FILE |
| ) | |
| vs. ) | NO. 1:17-cv-2989-AT |
| ) | |
| BRAD RAFFENSPERGER, et ) | |
| al., ) | |
| ) | |
| Defendant. ) | |

## STATE DEFENDANTS' CONSOLIDATED RESPONSE IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR ATTORNEYS' FEES AND EXPENSES

Defendants Brad Raffensperger, David J. Worley, Rebecca N. Sullivan, Anh Le, and Matthew Mashburn (collectively, the "State Defendants"), oppose Coalition Plaintiffs' Renewal of Motion for Attorney's Fees and Expenses [Doc. 967] and Curling Plaintiffs' Renewed Motion for Attorneys' Fees and Expenses [Doc. 998] for the reasons outlined in this brief.

## INTRODUCTION

In their original Special Motions for Attorney Fees [Doc. 595, 596] ("Plaintiffs' Special Motions") Plaintiffs, collectively, sought in excess of $6,000,000 in attorneys' fees and expenses. To justify this award of attorney fees, they claimed to be prevailing parties "…based on this Court's August 15,

2019 Order" (the "Order") which granted, in part, and denied, in part, their Motion for a Preliminary Injunction. [Doc. 595 at 3]. To reach the $6,000,000 figure, the Coalition Plaintiffs included their "fees and expenses <u>incurred to date</u> in this matter." [Doc. 595 at 2] (emphasis added).[1] Given those descriptions, it is no surprise that this $6,000,000 figure included the fees and expenses incurred by Plaintiffs' counsel beginning in 2017 when this case started as an election contest between Jon Ossoff and Karen Handel to and through October 2019 when they submitted their Bill of Costs for the work they claim was performed in connection with the Order. The fees and expenses sought in Plaintiffs' Special Motions were included without regard to whether the work performed bore any relation to the limited relief obtained in the Order or whether the work actually resulted in any affirmative relief at all. In short, their initial fee applications reflected essentially a blanket request for the fees and expenses Plaintiffs had incurred litigating the case for almost two years.

In their Consolidated Response to Plaintiffs' Special Motions, State Defendants demonstrated why the Plaintiffs' Special Motions should be denied. Plaintiffs were not the prevailing party, much of the work for which recovery was sought was unrelated to the relief obtained, the number of hours

---

[1] Curling Plaintiffs sought their "attorney fees and expenses incurred in litigating this matter." [Doc. 596 at 2].

expended on the matter was not reasonable, the hourly rates were not reasonable, the expenses were excessive, etc. Rather than repeat those arguments here, State Defendants incorporate by reference their Consolidated Response. [Doc. 660, 660(1)–(7)].

In their recently filed Renewed Motions for Attorneys' Fees [Doc. 967, 998], both sets of Plaintiffs seek the same $6,000,000 in fees and expenses based on the same supporting documentation. But they now claim, for the first time, that the $6,000,000 is for work that is sufficiently "discrete" from the remaining issues to be litigated in the case so as to support an "interim" award for fees and expenses. They also contend that the State's financial condition has improved sufficiently so as to support an interim award of this magnitude, and that any continued involvement in the litigation will create a financial burden for Plaintiffs' counsel.[2] As demonstrated below, Plaintiffs are wrong.

---

[2] Maintaining their consistent attacks on opposing counsel, Curling Plaintiffs also claim that the "dilatory tactics" by State Defendants and the "prolonged nature of the litigation" also justify their interim fee application. Never mind that it is Plaintiffs who have demonstrated no interest in litigating this suit to final adjudication on the merits, opting instead to pursue nine distinct motions for preliminary injunction in three years' time.

## ARGUMENT AND CITATION OF AUTHORITY

### I.    The State's financial condition is still unsettled.

In its May 26, 2020 Order deferring consideration of Plaintiffs' original Motion for Attorney's Fees until a final resolution of this case, the Court recognized "the immediate pressing needs and deficits the State must address due to the current public health crisis and the reverberating fallout from the COVID-19 pandemic." [Doc. 733 at 4]. As support, the Court pointed to the

> expenditure of over $3,000,000 to expand Georgia voters' access to the absentee ballot voting process to assist voters in avoiding the risk of exposure by in-person voting during the imminent federal and statewide primary and general elections.

*Id*. The Court further recognized that that "the 2020 election cycle under the pandemic circumstances may well demand State expenditures beyond the norm." *Id*.

The Court's concerns about the financial impact of conducting a general election with an unprecedented volume of absentee ballots during a pandemic proved well-founded. The statewide post-election audit (which included a hand recount of the Presidential election), a statutory post-election recount of that same race, and the looming runoffs for one Georgia office and two U. S. Senate seats have not been inexpensive, to say the least.

4

To justify an award at this juncture, Plaintiffs point to increased tax revenues by the State of Georgia in July and August 2020. But they make no mention of the unprecedented costs already incurred and to be incurred in this election cycle, nor do they mention the continued impact of the COVID-19 pandemic as cases increase across the nation and reports of a nationwide lockdown pervade the news cycle. As health officials continually remind Americans, nothing has really changed and vigilance is still warranted. It is certainly encouraging that the State's financial condition appears to be improving slightly, but the state remains under a heavy financial burden and significant uncertainty about future revenues. The ongoing pandemic only makes Georgia's financial condition more precarious and its ability to pay an award of the magnitude sought less likely. This is particularly true where, as here, the award sought exceeds $6,000,000.

## II. Plaintiffs have not met the criteria for an interim award of attorney fees.

*Walters v. City of Atlanta*, 652 F. Supp. 755 (N.D. Ga. 1985) sets out the criteria for an award of interim attorney fees: (1) whether the grounds for the interim award are sufficiently discrete from the matters remaining to be litigated; (2) whether the moving party will be unable to continue litigating the case absent an interim award; (3) whether the party opposing the motion has

5

been guilty of dilatory tactics; and (4) whether the action has been or is likely to be protracted. *Id.* As demonstrated below, Plaintiffs cannot satisfy any of these criteria.

A. <u>The alleged grounds for the interim award are not sufficiently discrete from the matters remaining to be litigated in this case.</u>

> *1. Plaintiffs have admitted that the grounds for the interim award are not sufficiently discrete from the remaining matters to be litigated in this case.*

In their Renewed Requests for Attorneys' Fees, Plaintiffs suggest for the first time that the claims addressed in the Order are "sufficiently discrete from the matters remaining to be litigated" to support an award of attorney fees at this juncture. [Doc. 998 at 7; Doc. 967 at 11]. To support that assertion, Curling Plaintiffs claim that "the requested award is grounded in the relief this Court ordered with respect to the State's previous DRE/GEMS voting system" and that "the fact that the State Defendants have now implemented the new BMD system in a manner that makes it susceptible to many of the same vulnerabilities as the DRE/GEMS system takes nothing away from Plaintiffs' success in challenging the DRE/GEMS system." [Doc. 998 at 7]. The Coalition Plaintiffs likewise claim the Court may award fees because "continuing litigation over the BMDs will [not] have any impact upon the Plaintiffs' entitlement to fees for the work on the DRE motions…" [Doc. 967 at 12].

But when Plaintiffs sought leave to amend their respective complaints the day after entry of the Order to assert claims against the new BMD system, they took the opposite position. Curling Plaintiffs argued that their Third Amended Complaint "involve[d] overlapping issues and facts and parties." [Doc. 581 at 3]. They emphasized the fact that they could "rely in part on overlapping discovery" and claimed that the "resolution of these claims will rely on testimony and evidence similar to that already presented to this court." *Id*. They even represented that the Court was "intimately familiar with these issues," and that it would "be far more efficient to resolve these claims in this case, rather than requiring the Curling Plaintiffs to open a new case." *Id*. And most importantly, they candidly admitted that "the relief sought with respect to the new BMD claims *is intimately tied to the relief already requested and partially granted*, by this Court." *Id*. (emphasis added).

Coalition Plaintiffs have likewise acknowledged that the issues addressed in the Order are not discrete from the issues remaining to be litigated in this matter. For example, in their Special Motion for Attorneys' Fees, they included an entire section entitled "Clarification of Additional Relief and Implementation" which details their belief in the inexorable overlap of the issues addressed in the Order and those remaining in the case. It reads in part:

>As the court suggested in the August 27, 2019 Conference call, there are detailed aspects of the exhaustive injunctive relief that will require the Parties to work together to fashion appropriate relief given the changing circumstances. In addition, the Coalition Plaintiffs will be conferring with the Parties with respect to particular clarifications relating to errors and discrepancies in electronic pollbooks and its software, the need for updated paper back-ups of the electronic pollbooks in polling places, the implementation of robust post-election audit procedures, the use of the GEMS for election management software in 2020 and other issues.

[Doc. 595 at 13]. In other words, according to Coalition Plaintiffs, the relief granted in the Order was far from discrete from the remaining issues in the case. To the contrary, they candidly admitted that the relief granted in the Order involved a mere subset of the claims raised by Plaintiffs initially and many, if not most of those original claims, remain to be litigated in the case.

In summary, when Plaintiffs wanted to challenge Georgia's new BMD voting system, they convinced the Court that the issues and facts supporting their challenge to the new BMD voting system overlapped with those raised in their challenge to the old DRE/GEMS system, so much so that much of the discovery that would be necessary in connection with their new BMD claims had already been completed, and that it was "far more efficient" to proceed in that way. But now when they collectively seek over $6,000,000 in fees and expenses—a sum that exceeds the budget of the Elections Division of the State of Georgia for an entire year, H.B. 31, Act 319, Line 305.100—Plaintiffs claim

that the issues involving the DRE/GEMS voting system have somehow magically become "discrete" enough from those new BMD claims to support an interim award of attorney fees and expenses. Simply put, Plaintiffs cannot have it both ways.

> *2. The Court recognized that the grounds for any interim award are not sufficiently discrete from the issues remaining to be litigated in the case.*

Plaintiffs are not alone in their beliefs about the interrelationship of the issues addressed in the Order and the issues remaining to be litigated in this case. The Court's Order granting Plaintiffs leave to amend makes that clear. [Doc. 751]. There, the Court plainly stated that the "Plaintiffs' original claims challenged elements of the voting system beyond the DRE voting machines themselves." [Doc. 751 at 20]. According to the Court, those elements included "the security of the Secretary of State's election technology infrastructure and the actual breach of the Center for Election Systems ("CES") servers, computer networks and data and the State's electronic voter registration system and database." *Id.* The Court said that the Plaintiffs'

> …concerns were at the center of the Court's consideration in ordering relief in August 2019 and remain a focus of the case even as the State implements the BMDs in connection with multiple other components of the State's main election system server.

*Id.*

Moreover, in its Order denying without prejudice the Plaintiffs' Special Motions for Attorneys' Fees, the Court acknowledged the tension between the Plaintiffs' ongoing struggles against themselves. "[T]he Court notes (without commenting on the merits of such argument) that Plaintiffs themselves argue that their original claims challenging Georgia's former DRE voting system which has been discontinued are fundamentally the same in their objective as their newly asserted claims challenging Georgia's BMD voting system." [Doc. 733 at 4]. Nothing in the Plaintiffs' subsequent briefing on the issue is sufficient to establish that their once interconnected claims are suddenly discrete at the exact moment when it serves their financial interest.[3]

In short, the Court saw that Plaintiffs' claims with regard to the DRE/GEMS voting system were a small subset of their original claims and the relief they seek that Georgia be required to use hand-marked paper ballots.

---

[3] The Court has recognized that Plaintiffs' DRE claims are not discrete from the claims remaining to be litigated in the case on at least two other occasions. First, it did so when it ordered that all GEMS software, DREs, and memory cards to be preserved in connection with potential future discovery disputes—an order that was extended by consent less than six months ago. [Docs. 668, 745]. Then, in its Order denying State Defendants' Motions to Dismiss the Curling Plaintiffs' Third Amended Complaint and the Coalition Plaintiffs' First Supplemental Complaint, the Court spent ten pages explaining why the Plaintiffs' claims challenging the DRE/GEMS voting system and associated software were not "entirely moot." [Doc. 751 at 15-25].

Stated differently, those claims were not "discrete" from the remaining matters to be litigated in the case. Either the claims are connected or they are not, but this Court has already recognized a connection between the two.

> ### 3. State Defendants' decision not to appeal the Order does not make the DRE/GEMS issues sufficiently discrete from the remaining matters to be litigated in the case.

Plaintiffs contend that State Defendants' decision not to appeal the Order somehow proves that the DRE/GEMS issues are sufficiently discrete to make a $6,000,000 fee award appropriate now. [Doc. 967 at 3; Doc. 998 at 6]. This is wrong for several reasons. First, it ignores Plaintiffs' own admissions and this Court's prior determination that the remaining matters to litigate in the case are intimately involved with the DRE/GEMS system at issue during the first two preliminary-injunction stages. Second, it ignores the fact that in its Order, the Court actually denied almost all of the relief sought by Plaintiffs—most notably their primary objective of having the Court require that hand-marked ballots be used for all Georgia elections. And, as demonstrated in detail in State Defendants' Consolidated Response to Plaintiffs' Original Motions, it ignores the fact that Plaintiffs' fee applications seek compensation for work entirely unrelated to the relief granted in the Order. For example, it includes work for time in connection with Plaintiffs' failed attempt to get a preliminary injunction in August 2018 and work

11

incurred in connection with an appeal to the Eleventh Circuit—fees which are not recoverable.[4]

>    *4.* Common Cause/Ga. *does not require a different result.*

In *Common Cause/Ga. v Billups*, 554 F.3d 1340 (11th Cir. 2009), the Eleventh Circuit affirmed the grant of an interim attorney fees award for work performed in obtaining a preliminary injunction against Georgia's voter-identification law. At the time the district court entered the injunction in *Billups*, the challenged law was in effect. But *subsequent* to the entry of the injunction, the challenged law was repealed. On appeal, the defendants argued that the subsequent voluntary repeal of the statute in question proved that the Plaintiffs' had not succeeded on the merits. The Eleventh Circuit rejected that argument, concluding that Plaintiffs had materially altered the relationship with state election officials because the injunction prevented them from enforcing the voter-identification law.

In *McGuire v. Murphy,* 285 F. Supp. 3d 1272, (M.D. Ala. 2018), a case relied upon by the Coalition Plaintiffs and cited by this Court in its May Order, the defendants found themselves in a similar timeline as those in *Billups*. Indeed, as Coalition Plaintiffs concede in their brief, the change in the

---

[4] Additional examples are included in State Defendants' Consolidated Response [Doc 660].

challenged law by the state of Alabama occurred only *after* the court enjoined the defendants and purportedly materially altered the legal relationship of the parties. *See, e.g.* [Doc. 967 at 9 n.6] ("The district court entered an order in 2015 holding that certain provisions of [the challenged law] were unconstitutional, but only granting in part plaintiff's request for relief. The plaintiff moved for an award of attorney's fees… ***A week later,*** Alabama passed a new law repealing the provisions that the district court had enjoined." (Emphasis added) (internal citations omitted).

This case presents a very different set of facts. Here, the Georgia General Assembly passed HB 316, which effectively jettisoned the DRG/GEMS voting system, in the spring of 2019 and that bill was signed into law before the Order was entered the following August. [Doc. 579]. In other words, the injunction in this case did not prevent the state officials from enforcing any law. To the contrary, they had already decided to stop using the DRE/GEMS system by the time the Order was entered. Moreover, even during the balance of 2019, State Defendants were not enjoined from using the DRE/GEMS system—the Court only prohibited "use of the DRE/GEMS system *after 2019.*" *Id.* at 152. Simply put, the Order in this case did not materially alter the relationship between Plaintiffs and State Defendants. Rather, it merely added the Court's approval of a legal relationship that already existed at the time the Order took effect.

B. Plaintiffs' own conduct demonstrates no financial burden.

The second criteria that Plaintiffs must satisfy to justify an interim award of attorneys' fees is to show that they will be unable to continue litigating the case absent an interim award. Neither the Curling Plaintiffs nor the Coalition Plaintiffs have actually taken that position.[5] Instead, the Curling Plaintiffs say that financial investment in this case has been "larger than expected" and claim, without any substantiation, that this case has "consumed resources that otherwise could, and would, be allocated for Curling Plaintiff attorneys to represent other prospective clients in important civil rights cases." [Doc. 998, p. 12].

Publicly available information tells a different story. Curling Plaintiffs are represented by the international law firm Morrison & Foerster, LLP ("MoFo") which is headquartered in San Francisco, California. MoFo has 17 offices around the world, between 750-1,000 attorneys and boasted $1.15 billion in revenue in 2019,[6] making its requested fee award in this case 0.3% of its revenue.

---

[5] One simple indicator that Plaintiffs are not unable to continue litigating this case is that there have been over 400 entries on the docket since the Order was entered.

[6] Law.com Law Firm Profile, https://www.law.com/law-firm-profile/?id=216&name=Morrison-%26-Foerster-LLP

More importantly, MoFo touts, as it should, its long and deep history of providing pro bono services to clients around the world. For example, in the Fall of 2019, it published a twenty-one page glossy brochure entitled "MOPROBONO" in which it described the Firm's global pro bono efforts, all of which appear to have continued while this case has been pending.[7] Under these circumstances, it appears that pro bono work is part of the culture at MoFo for which financial remuneration is not a goal or even a concern. But even if finances were an issue, the financial burden the Curling Plaintiffs' attorneys allude to in their papers is actually a tiny fraction of MoFo's overall financial performance and clearly has not impeded their ability to litigate this case.

Coalition Plaintiffs cannot satisfy this criteria for a different reason: they have been using this litigation to fundraise for their own purposes. These efforts were described in Exhibits A and B to State Defendants' Consolidated Response to Plaintiffs' Original Motion. And those efforts appear to have intensified. The Home page of the Coalition for Good Governance, https://coalitionforgoodgovernance.org/, includes a detailed description of this case with two separate "Donate" links. The Donate page even asks for contributions "to help with attorney fees and expert work." In other words,

---

[7] The brochure also describes MoFo's efforts in this case. A copy of MOPROBONO is attached as Exhibit A.

Coalition Plaintiffs have solicited and continue to solicit funds to pay the very fees and expenses they seek in this application. They should not be permitted a double recovery.

C. There is no basis for finding dilatory tactics.

Next, the Curling Plaintiffs say that an interim award is necessary due to the dilatory tactics of the State Defendants. [Doc. 998 at 13]. As support, they point to the Motion for Sanctions they filed in 2019 to which State Defendants filed a lengthy reply rebutting Plaintiffs' claims. Significantly, the Court deferred any ruling on that matter until the end of the case and this Court is well aware of the intensity with which this case has been litigated by Plaintiffs.

D. The protracted nature of this case is due primarily to Plaintiffs' actions.

Finally, Curling Plaintiffs suggest that an interim award is necessary because of the protracted nature of the litigation pointing to the fact that the case has been pending for three years and there remains much to be done. What they fail to recognize is that this case started in 2017 as an election contest between Jon Ossoff and Karen Handel, pivoted to a claim targeting the DRE voting system and alleged security flaws in the GEMS software, became bogged down by disagreement amongst the Plaintiffs and their counsel, then

later morphed in 2019 to a request via a Third Amended Complaint to enjoin the use of Georgia's new voting system involving Ballot Marking Devices ("BMDs"). In other words, the only reason the case is still pending is Plaintiffs' penchant for raising new claims and filing amended complaints.

Most telling in this regard, however, is Plaintiffs' refusal to proceed to final adjudication of this claim on the merits. Indeed, this Court is well-aware of Plaintiffs' history in this regard, having entertained nine different motions for preliminary injunction in this case. And Plaintiffs have shown no sign of altering that strategy—Curling Plaintiffs filed their most-recent such motion (the seventh in this case) less than two weeks after their identical prior motion was denied. State Defendants are ready to proceed with discovery and final resolution of this case; it is Plaintiffs' decision to eschew any semblance of traditional litigation which has caused this case to languish and remain no closer to final adjudication, procedurally, than at the time of removal to this Court—notwithstanding the more than one thousand docket entries in the case.

## CONCLUSION

Plaintiffs have shown no basis for an interim fee award. This Court denied the award previously and Plaintiffs still have not obtained the relief their case seeks—hand-marked paper ballots. The Court should deny this

motion and move this case forward in discovery, setting clear expert deadlines and a timeline for summary judgment, so that this case can move to its final resolution before this Court.

Respectfully submitted this 2nd day of December, 2020.

Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

*/s/ R. Dal Burton*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Jonathan D. Crumly
Georgia Bar No. 199466
jcrumly@taylorenglish.com
R. Dal Burton
Georgia Bar No. 097890
dburton@taylorenglish.com
James A. Balli
Georgia Bar No. 035828
jballi@taylorenglish.com

Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for State Defendants*

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Response has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).  Specifically, this Motion has been prepared using 13-pt Century Schoolbook font.

*/s/ R. Dal Burton*
R. Dal Burton