# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRIAN KEMP, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## COALITION PLAINTIFFS' REPLY BRIEF IN SUPPORT OF RENEWAL OF MOTION FOR ATTORNEY'S FEES AND EXPENSES

### Preliminary

On August 29, 2019, the Coalition Plaintiffs filed a timely Motion for Attorney's Fees and Expenses (Doc. 595) ("Motion for Fees") as "prevailing parties" under 42 U.S.C. § 1988 based on this Court's August 15, 2019 Order (Doc. 579) granting in part Coalition Plaintiffs' Motion for Preliminary Injunction (Doc. 419). The Coalition Plaintiffs' entitlement to, and the reasonable amount of, their fees and costs have been fully briefed since January 21, 2020. *See* Coalition's Motion (Doc. 595), Detailed Specification (Doc. 630), State Defendants' Response (Doc. 660), Fulton Defendants' Response (Doc. 661), Coalition's Reply (Doc. 705). Coalition Plaintiffs claim $1,483,422 in attorney's fees and $415,959 in expenses, for a total award of $1,899,381 (Doc. 705 at 42).

On May 26, 2020, this Court denied without prejudice Coalition Plaintiffs' Motion for Fees, stating that "Plaintiffs may renew their request once a final judgment has been entered on their claims or if circumstances change that would support an interim award." (Doc. 733 at 7).[1]  On October 13, 2020, having determined after the passage of almost five months that changed circumstances do exist, specifically the improvement in the State's finances, Coalition Plaintiffs renewed their fee request.  (Doc. 967).  On October 19, 2020, this Court granted Defendants a six-week extension of time to respond (Doc. 979), at the end of which the Defendants submitted responses (Doc. 1022 (State), Doc. 1023 (Fulton)).

## Summary

Defendants offer three unpersuasive reasons for denying an interim award: First, Defendants say an award is premature because of the continuing litigation; second, Defendants say the State's financial condition continues to warrant postponement of an award; and third, Defendants say Plaintiffs' counsel have not demonstrated the need for an award in order to be able to continue representing

---

[1] Separately, on October 11, 2019, Plaintiffs filed a Joint Motion for Sanctions (Doc. 623) seeking monetary sanctions of $297,368.49 against Defendants based on their obstructive discovery tactics in connection with the GEMS database.  On August 10, 2020, this Court denied the Joint Motion for Sanctions without prejudice, stating that it would "take up the issue of imposing purely monetary sanctions for alleged past discovery abuses at the conclusion of this case along with other fee issues, as appropriate." (Doc. 771). The sanctions issue is separate and discrete from the present issue, which concerns an award of prevailing-party fees and costs.

Coalition Plaintiffs in this litigation.  Only the first consideration is even relevant, but none of the three factors warrants further delay.

## I.    DOMINION VOTING SYSTEM LITIGATION WILL HAVE NO IMPACT ON PLAINTIFFS' ENTITLEMENT TO FEES

The Defendants now appear to oppose any consideration of an interim award of fees to Plaintiffs.  But, in their original responses in opposition to Plaintiffs' Motions for Fees submitted a year ago, no Defendant even suggested that the fee applications were premature or that an award should await final judgment. (Doc. 660; Doc. 661).  Instead, implicitly acknowledging that the fee applications were ripe, the State Defendants squarely addressed the merits, inaccurately arguing that Plaintiffs were not prevailing parties because the Court did nothing more than "approv[e]" "the State's predetermined course of action regarding the 2020 elections."  (Doc. 660 at 2).  The Fulton County Defendants similarly incorrectly argued that they were not liable for fees because Defendants' decision to scrap the DREs was "voluntary."  (Doc. 661 at 6).  Both sets of Defendants also launched detailed (but erroneous) attacks on Plaintiffs' claimed rates and the number of hours spent.  These responses were, and continue to be, meritless.

Crucially, no Defendant previously suggested that the Plaintiffs' interim fee applications were premature, or that the awards had to wait on final judgment, or that Defendants did not have sufficient funds to pay appropriate awards, or that the Court should defer ruling on the issue for any reason whatsoever.  (Doc. 660

*passim;* Doc. 661 *passim*).  Given that a full year ago neither Defendant even

suggested deferring an interim award, but instead focused solely on the merits of

the applications themselves, there is absolutely no reason why consideration of the

merits of an interim award on the DRE claims should be deferred until after entry

of a judgment on the Dominion Voting System claims.

As Coalition Plaintiffs explained in the Motion to Renew, with exhaustive

citations to controlling authority, the only arguable justification for delaying

consideration of the fee application until entry of final judgment would be if

something in the ongoing litigation over the Dominion Voting System might divest

Plaintiffs of their victory on the DREs.  Significantly, in their Responses to the

Motion to Renew, Defendants do not distinguish any of the law cited by Coalition

Plaintiffs, so it is worth emphasizing the relevant points from these controlling

authorities once again.

In its Order denying Plaintiffs' Motion for Fees without prejudice, this Court

cited *Walters v. City of Atlanta*, 652 F. Supp. 755 (N.D. Ga. 1985), which listed

four factors to be considered by a court evaluating whether to make an interim

award of fees.  These four factors are: (1) whether the grounds for an interim

award are sufficiently discrete from matters remaining to be litigated, (2) whether

the moving party will be unable to continue litigating the case absent an interim

award, (3) whether the party opposing the interim award has been guilty of dilatory tactics, and (4) whether the action has been or is likely to be unduly protracted.  *Id.*

In the thirty-five years since *Walters* was decided, the four-factor test recited in *Walters* does not appear to have been followed by any other court.  Notably, *Walters* was cited, but not followed, by the much more recent decision,  *McGuire v. Murphy,* 285 F. Supp. 3d 1272, 1284 (M. D. Ala. 2018), also cited by this Court in its Order.  In *McGuire,* the district court granted the plaintiff's motion for an interim award of fees while the defendants' appeal was pending and ordered the defendant to pay the fees within thirty days.[2]  The district court recited the four-factor test from *Walters,* but it granted relief on the basis of finding that the plaintiff had satisfied only the first factor – that the "grounds for an interim award are sufficiently discrete from the matters remaining to be litigated."  In its decision, the *McGuire* court emphasized that the defendant's pending appeal of the

---

[2]The procedural history of the *McGuire* case is complex, but instructive given the procedural posture of this case.  The district court had three years earlier, in 2015, entered an order holding that certain provisions of the Alabama Sex Offender Registration and Community Notification Act were unconstitutional, but only granted in part the plaintiff's requested relief.  285 F. Supp. at 1277.  The plaintiff promptly moved for an award of attorney's fees. Before the briefing on the motion for attorney's fees was completed, the plaintiff also appealed the underlying order, and the defendants timely cross appealed.  With an appeal of its injunction order pending, the district court denied plaintiff's motion for fees without prejudice and granted plaintiff leave to re-file the fees motion after the conclusion of the appeals.  A week later, Alabama passed a law repealing the provisions of the Sex Offender law that was the subject of the district court's injunction. Three years later, with the appeal still undecided, the plaintiff moved for reconsideration of the plaintiff's motion for fees.  In the resulting decision, the *McGuire* court granted the motion for reconsideration, granted the motion for fees, and ordered the defendants to actually pay the fees within thirty days.  *Id.* at 1289.

underlying injunction on the merits had been rendered moot by legislation. *See* 285 F. Supp. at 1279-1280; *id.* at 1284-84. Because the plaintiff had obtained substantial relief that was "'not defeasible by further proceedings,'" the *McGuire* court held, the plaintiff was entitled to an award of fees, and there was no reason to postpone ordering the defendant to pay them. *Id.* (quoting *Richardson v. Penfold*, 900 F.2d 116, 119 (7th Cir. 1990) (Posner, J.) ("Once a plaintiff obtains substantial relief that is not defeasible by further proceedings, he can seek interim fees and the district court has the power to award them.")).

    *McGuire* recognized that the first *Walters* factor by itself warrants an interim fee award, where an injunction giving rise to a prevailing-party fee entitlement is no longer capable of being undone in further litigation, such as when an appeal has become moot. *McGuire*'s focus on the first factor, rather than *Walters*' consideration of all four factors together, is also more consistent with the treatment of interim awards in U.S. Supreme Court precedents. In *Hanrahan v. Hampton*, 446 U.S. 754, 757–58 (1980),[3] and in *Texas State Teachers Ass'n v. Garland*

---

[3] In *Hanrahan,* the Supreme Court held that Congress "contemplated the award of fees *pendente lite*" "to a party who has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal." The Court in *Hanrahan* did not suggest that a party who has established his entitlement to some relief on the merits had to go further and demonstrate that, for example, counsel could not continue representing the plaintiff without an interim payment of fees. Moreover, the power to *award* fees before the entry of final judgment recognized by the Court in *Hanrahan* carries with it the power to order *payment* of the fees in advance of the final judgment. *See Palmer v. City of Chicago*, 806 F.2d 1316, 1320 (7th Cir. 1986).

*Indep. Sch. Dist.,* 489 U.S. 782, 791 (1989),[4] the Supreme Court acknowledged that successful plaintiffs were entitled to an award of fees *pendente lite*, and in neither case did the Supreme Court suggest that the plaintiffs' entitlement to fees was contingent upon factors other than success on the merits.

The question, then, to use Judge Posner's formulation, is whether Plaintiffs have obtained "substantial relief that is not defeasible by further proceedings." *Penfold,* 900 F.2d at 119.  As applied here, the question becomes: Will the continuing litigation over the constitutionality of the Dominion Voting System have any impact upon Plaintiffs' entitlement to fees for previously showing the unconstitutionality of DREs.  (Doc. 1022).   *Defendants pose, but never answer, this question.*   (Doc. 1022 at 6-7).  State Defendants offer only a discussion about how the ongoing case about the Dominion Voting System involves some similar facts and issues.  (Doc. 1022 at 7-8).  But such similarities are not relevant: The facts underlying the Dominion Voting System claims may be related to the now

---

[4] In *Texas State Teachers*, the Supreme Court considered whether a plaintiff could be considered the "prevailing party" for purposes of Section 1988 if it succeeded on some claims but did not achieve, or had not yet achieved, the so-called "central purpose" of the litigation.  Noting that it had already held in *Hanrahan* that plaintiffs were entitled to an award of fees *pendente lite* upon the achievement of "some success on the merits," the Supreme Court concluded that achieving some discrete success, rather than the "central purpose" of the litigation at the conclusion of a case, was the touchstone for an entitlement to fees under Section 1988: "Congress cannot have meant 'prevailing party' status to depend entirely on the timing of a request for fees: A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation." 489 U.S. at 791.  Nothing in *Texas State Teachers* suggests that a plaintiff's entitlement to fees *pendente lite* should be conditioned upon anything other than success on the merits of some discrete issue.

concluded DRE claims, but the dispositive reality is that if Coalition Plaintiffs lose on their Dominion Voting System claims, they still will be prevailing parties with respect to the DRE claims. The ongoing litigation over the Dominion system provides no basis – in the law or in common sense – to postpone an award of fees for Plaintiffs' unquestioned (and indefeasible) success in enjoining the use of DREs.

The State Defendants also attack the *merits* of Plaintiffs' fee request, (Doc. 1022 at 11 to 13), arguing that "the Order in this case did not materially alter the relationship between the Plaintiffs and State Defendants." (*Id.* at 13). Plaintiffs thoroughly refuted this argument when the fees motion was fully briefed last year. Further rehashing the merits of the fees motion is unnecessary and inappropriate at this stage, because the only issue before this Court now is whether the (already briefed) fees motion should be decided or should continue to be postponed.

The relevant inquiry is quite simple:

Is there a ruling by this Court, in the Dominion Voting System litigation, that could plausibly cause the Coalition Plaintiffs to be divested of their status as prevailing parties with respect to the already-decided Motion for Preliminary Injunction entered against GEMS/DREs in 2019?

Coalition Plaintiffs respectfully submit that there is no such possible ruling. *However this Court resolves the issues relating to the BMDs*, the issue of Plaintiffs' entitlement to fees on their success relating to the DREs, and the amount

of fees to be awarded, *will be exactly the same* as it has been since the issues were fully briefed by the parties a full year ago.  The only difference will be that the briefs and supporting material that the Court will be referencing in making its final decision will be months or years older. Delaying consideration of the issue and an award, therefore – apart from any consideration of fairness to Plaintiffs,  Plaintiffs' counsel, or the purposes behind Section 1988 – will add time and expense to the process for all concerned and frustrate the efficient resolution of this controversy.

## II.   THE STATE'S FINANCES ARE NO REASON FOR DELAY

The State's financial condition provides no factual or legal justification for delaying an interim award of fees:

### A.   There Is No Evidence of Defendants' Inability to Pay

In their Response, the State Defendants do not submit or point to any evidence relating to the State's financial condition.  (Doc. 1022 at 4-5).  Instead, they simply assert, without any substantiation: "[t]he ongoing pandemic only makes Georgia's financial condition more precarious and its ability to pay an award of the magnitude sought less likely." (Doc. 1022 at 5).  The State Defendants concede the Coalition Plaintiffs' factual showing that the State's revenue for the first quarter of fiscal year 2021 was recently projected to be $365 million *greater* than the State's pre-pandemic Q1-2020 revenue.  (Doc. 967 at 7). The State Defendants' only attempt to harmonize reality with their discordant

assertion of penury is to protest that budget figures cited by the Coalition Plaintiffs do not account for unidentified "unprecedented costs." (Doc. 1022 at 5). But the State Defendants are not correct. The Governor's quoted press release says: "The State anticipates being able to fund its $26 billion budget for fiscal year 2021, which began July 1." (Doc. 967 at 7). Updated disclosures from the Secretary's office reflect a strong financial position.[5] These admissions confirm that the State expects to weather the pandemic and meet its financial commitments, and fund discretionary projects – and Defendants do not directly or expressly contend otherwise. Their bare assertion that the State's current financial condition warrants postponement of an award of fees, therefore, lacks any factual substantiation.

### B.   No Legal Authority Permits Consideration of the State's Financial Condition, In Any Event

As the Coalition Plaintiffs explained in detail in their Renewal Brief, there is simply no authority for the proposition that a governmental defendant's financial condition is relevant to the entitlement, timing, or amount of any fee award under

---

[5] On December 14, 2020, Defendant Secretary Raffensperger's spokesman, Gabriel Sterling, touted the State's financial capacity to spend money on a discretionary signature verification audit, saying: "Money always helps with these things. The Governor and the Speaker have indicated that they would have the resources to do that. **And since we're about $519 million over and above what we had brought into the coffers this time in fiscal 2020**, we think there's some money there to be had to help do this process to help put faith back into people's – give people faith in the election because of the sheer volume of disinformation, misinformation, flat out lies so far." Secretary of State office holds a briefing (11 Alive), available at https://youtu.be/KOCzKwfUbj8 (last visited Dec. 14, 2020) (timestamp 12:45) (emphasis added).

Section 1988.  (Doc. 967 at 5-6).[6]  Neither Defendant addresses this argument, tacitly conceding the point.

Giving consideration to the State's finances also raises other issues, which further confirm that its financial condition cannot be a relevant consideration.  For example: What metrics could this Court use to determine if the State has enough money?  Is the State's financial condition sufficiently robust if (as is true here) the State raises enough revenue *every hour* to pay the Coalition Plaintiffs' entire fee request?  How should the Court review the State's finances to determine whether it does indeed have the funds available? Should the Court consider whether it is fair for the State to pay *other* Section 1988 plaintiffs notwithstanding its (completely unsupported claim of) financial hardship, but not Plaintiffs in this case?  Does the State's consent to pay fee awards to some prevailing opponents under Section 1988 while deferring payment to others raise Equal Protection concerns?  What is the

---

[6] In enacting Section 1988, Congress could have conditioned the award of fees on a defendants' financial condition or explained that a defendant's financial condition should be taken into account, but Congress did not do so.  In addition, the federal common law that preceded the enactment of Section 1988, which is referenced in the legislative history, did not include a defendant's financial condition as a factor to be considered in determining whether or when an award should be made, or whether there should be an upward or downward adjustment to the lodestar.  *See e.g., Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974) (twelve factors do not include reference to defendant's financial condition); *see also Hensley v. Eckerhart,* 461 U.S. 424, 429–30 (1983) (noting that the House Report on Section 1988 cites the twelve factors set forth in *Johnson*).  *See also Lee v. Randolph Cty. Bd. of Educ.*, 885 F. Supp. 1526, 1532 (M.D. Ala. 1995) ("The school board argues that the court should consider the precarious financial condition of the school district. Even assuming that this factor is proper for the court's consideration, the court is not convinced that, in this case, this concern overrides the directive of 42 U.S.C.A. § 1988 to award attorney's fees to successful civil rights plaintiffs.").

legal or equitable basis for considering the financial impact of the pandemic upon the State Defendants and not the impact of the pandemic upon Plaintiffs and their lawyers?  These and other intractable questions inevitably arise once a governmental defendant's financial condition is invoked as a reason to postpone payment of a fee award to which a plaintiff is entitled.

In sum, even if there were legal authority for postponing consideration of the fee application because of the State's financial condition, there is no evidence that the State's financial condition will have any impact on its ability to pay the fees and meet its other commitments.

## III.   COUNSEL'S ABILITY TO CONTINUE, ABSENT A FEE AWARD, SHOULD NOT BE A CONSIDERATION

In Coalition Plaintiffs' Motion to Renew, the Coalition Plaintiffs explained that it would be highly prejudicial to require Plaintiffs' lawyers to make a showing that they will be unable to continue representing Plaintiffs unless they are awarded fees.  "For example, to make such a showing, counsel would have to represent to the Court that they will be forced to withdraw from the case unless the Court" ordered the Defendants to pay the fee award instanter.  "Requiring counsel to commit publicly to withdrawing in such a manner would prejudice the client and create a clear conflict of interest."  (Doc. 967 at 15-16).

The State Defendants do not respond to this argument.  Instead, the State Defendants praise counsel for the Curling Plaintiffs, Morrison & Foerster, for their

substantial commitment to pro bono work while noting that the Coalition for Good Governance, a nonprofit, references this case in its litigation fundraising efforts. Of course such fund-raising efforts are essential in partially funding the ongoing litigation costs, as Coalition Plaintiffs' counsel cannot fully carry the long-term financial burden of this public interest litigation. Plaintiffs' methods of supporting this litigation is not an argument for deferring a fee award.

There is nothing in Section 1988, or in the legislative history of Section 1988, or in any Supreme Court case addressing Section 1988, that suggests the individual financial condition of counsel or client should be a factor in determining entitlement to or the timing of an award.  To the contrary, as the district court in *McGuire* held, the issue is not whether plaintiffs' counsel *in particular* have the financial wherewithal to continue in the litigation, but whether "an interim fee award is needed [to] give effect to the underlying purpose of § 1988, which is to ensure that civil rights plaintiffs *in general* can continue to obtain representation." 285 F. Supp. at 1285 (emphasis in the original).

> Allowing an interim award will encourage other members of the bar to accept civil rights cases by reassuring them that the likelihood of a protracted appeal in a complicated case will not financially cripple their firms.

285 F. Supp. at 1285.

It is ironic that the State Defendants appeal to their own financial status as a justification to avoid paying a well-earned fee award to Plaintiffs' counsel,

especially when an explicit purpose of Section 1988 is to ensure that meritorious
civil rights litigation is not suffocated in the cradle by the inability of would-be
clients to find private lawyers willing and able to litigate such cases without the
assurance of regular, ongoing fee payments.  Section 1988 was adopted to assure
that the rights of *ordinary* people are protected as vigorously as the rights of the
rich and powerful.  To the extent any financial consideration is ever proper in this
context, it must be the consideration that Coalition Plaintiffs are here represented
by a small number of very small law firms that have collectively litigated this case
for years now—successfully—against massive legal teams that are regularly and
reliably paid out of public funds on an hourly basis by the State and by Fulton
County.  Coalition's  small firms have achieved enormous victories for their clients
and for the public.  If financial considerations ever matter, then here they must
weigh decisively in favor of granting an immediate award to the Coalition
Plaintiffs so that the Plaintiffs' small law firms can survive and be rewarded for the
success that they and their clients have achieved in this litigation.  By the same
token, the Coalition itself is a small public-interest entity whose ability to raise
funds and devote resources is limited. If Defendants can prevail by weaponizing
delay, they will accept that victory as readily as they would accept a victory on the
merits.  Since the merits do not favor the Defendants, delay is the best outcome the
Defendants can hope for.  Delay is not consistent with the letter or spirit of Section

1988, however, and Coalition Plaintiffs' motion for fees should be reconsidered and decided now, rather than postponed any longer.

For the foregoing reasons, the Coalition Plaintiffs respectfully request that the Court consider their Motion for Fees at this time, that it award the Coalition Plaintiffs reasonable compensation for their successful efforts in achieving the 2019 injunctive relief, and that it direct the Defendants to pay the awarded fees and expenses within a reasonable time.

Respectfully submitted this this 15th day of December, 2020.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III
Admitted Pro Hac Vice
 (ECF No. 125)
ROBERT MCGUIRE LAW FIRM
113 Cherry St. #86685
Seattle, Washington 98104-2205
(253) 267-8530

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,*
*Ricardo Davis & Megan Missett*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that on December 15, 2020, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.  In addition, pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown