1               IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

4  DONNA CURLING, ET AL.,         :
                             :
5        PLAINTIFFS,        :
  vs.                       :  DOCKET NUMBER
6                          :  1:17-CV-2989-AT
  BRAD RAFFENSPERGER, ET AL.,   :
7                          :
        DEFENDANTS.        :
8

9

10     **TRANSCRIPT OF STATUS CONFERENCE VIA ZOOM PROCEEDINGS**

11        **BEFORE THE HONORABLE AMY TOTENBERG**

12          **UNITED STATES DISTRICT JUDGE**

13             **FEBRUARY 2, 2021**

14              **11:01 A.M.**

15

16

17

18

19

20

21   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22            *TRANSCRIPT PRODUCED BY:*

23

   *OFFICIAL COURT REPORTER:*     *SHANNON R. WELCH, RMR, CRR*
24                        *2394 UNITED STATES COURTHOUSE*
                            *75 TED TURNER DRIVE, SOUTHWEST*
25                        *ATLANTA, GEORGIA  30303*
                           *(404) 215-1383*

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:

 4

 5        DAVID D. CROSS
          LYLE F. HEDGECOCK
 6        MORRISON & FOERSTER, LLP

 7        HALSEY G. KNAPP, JR.
          ADAM SPARKS
 8        KREVOLIN & HORST, LLC

 9

10   FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
     WILLIAM DIGGES, III, AND RICARDO DAVIS:

11

12        BRUCE BROWN
          BRUCE P. BROWN LAW
13
          ROBERT ALEXANDER McGUIRE, III
14        ROBERT McGUIRE LAW FIRM

15

16   FOR THE STATE OF GEORGIA DEFENDANTS:

17

18        VINCENT ROBERT RUSSO, JR.
          CAREY A. MILLER
          JOSHUA B. BELINFANTE
19        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

20        BRYAN TYSON
          JONATHAN D. CRUMLY, SR.
21        ROBERT DALRYMPLE BURTON
          TAYLOR ENGLISH DUMA

22   FOR THE FULTON COUNTY DEFENDANTS:

23

24        NO APPEARANCE

25
```

```
 1              P R O C E E D I N G S

 2    (Atlanta, Fulton County, Georgia; February 2, 2021.)

 3              THE COURT:  All right.  Morning, all.

 4              All right.  Harry, do you want to call the case?

 5              COURTROOM DEPUTY CLERK:  Yes, ma'am.  We're here for

 6    the status conference in the case of Curling vs. Raffensperger,

 7    Civil Action Number 17-CV-2989.

 8              Since we do have quite a few people on here, if just

 9    the primary speaker for the Curling plaintiffs would identify

10    yourself for the record.

11              MR. CROSS:  Morning, Your Honor.  This is David

12    Cross.

13              COURTROOM DEPUTY CLERK:  Thank you.

14              Coalition?

15              MR. BROWN:  Bruce Brown.

16              COURTROOM DEPUTY CLERK:  Thank you, sir.

17              State of Georgia?

18              MR. TYSON:  Yes.  Good morning.  Bryan Tyson.

19              COURTROOM DEPUTY CLERK:  Okay.  Thank you, sir.

20              Fulton County?

21              Okay.  Who else is on that I missed?

22              MR. MILLER:  Your Honor, Carey Miller, Vincent Russo,

23    Josh Belinfante.  Mr. Tyson will be handling this for the State

24    defendants.

25              COURTROOM DEPUTY CLERK:  Thank you very much.
```

```
1              Judge?

2              THE COURT:  Thank you.

3              All right.  So this is sort of a Shakespearean play

4    within the play.  I realize in sending you the order and asking

5    you about the hearing that at this juncture I don't necessarily

6    have a credibility dispute.  So I want to make sure that you

7    understand that I perceive that.  But, you know, we may have

8    disputes.  We really just dealt with affidavits in the past

9    regarding -- regarding the named plaintiffs.

10             So I guess the overall thrust of what I was trying to

11   communicate in the order was there is a way at very minimum to

12   address the plaintiffs' concern expressed in the submission

13   that certifying the order from the motion to dismiss is

14   truncated and doesn't really reflect the state of the record.

15             That doesn't -- you know, for me to do this pause in

16   this way doesn't necessarily obviously address the plaintiffs'

17   concern that they want to get on with things.

18             On the other hand, you know, it does allow me to

19   address potentially the state of the record now.  Whether I

20   certify a different order that I issue now or not is a whole

21   other matter.  But that -- and I didn't know necessarily what

22   evidence might be introduced as to standing at this juncture.

23             But just reviewing the cases, it just seemed we're

24   not -- it is true that we're not at this point at the -- in

25   reality solely in terms of the record at the point of a motion
```

1  to dismiss.

2       So that is what it was focused on.  So with that in

3  mind, maybe I could hear first from plaintiffs who are the most

4  vigorous about saying this is not necessary.  But on the other

5  hand, we have some other views in light of what I have said.

6       MR. BROWN:  Your Honor, this is Bruce Brown.  The

7  Curling and Coalition teams have discussed this matter together

8  and, frankly, are trying to address the Court's concerns and

9  also looking towards a trial on the merits.

10      Based upon what we know and the research that we have

11 conducted on the cases, including the most recent cases, our

12 position is that the standing issues need not and should not be

13 severed from the trial on the merits and that the certification

14 of the motion to dismiss also would not be effective.

15      And I think our general approach is that we fully

16 understand that if the standing issue was adjudicated in a way

17 that allowed for appellate review prior to the trial on the

18 merits that there would potentially be some savings.  But we do

19 not believe that at the end of the day that that will really

20 work.

21      And the reason for that, just to explain in a little

22 bit greater detail, is that the -- the motion to dismiss, as we

23 explained in our papers, treats the standing issue on the

24 pleadings frozen in time quite awhile ago.  Since then, a lot

25 has happened.  So it doesn't provide a very good avenue for

1    either appellate review or certainty if we go forward from that

2    that a trial on the merits would have -- would have all the

3    certainty that we would like.

4          The current appeals that are before the Eleventh

5    Circuit also will address standing.  But they will deal with --

6    but standing is claim specific.  And the current appeals only

7    deal with two -- the current appeal -- excuse me -- only deal

8    with two issues that seek to -- on the Coalition's claims.

9    They don't address any of the Curling's claims.  And it doesn't

10   address the broader BMD issue of whether or not the BMDs are a

11   violation of the Fourteenth Amendment.  And so that is also not

12   going to tell us too much about standing, as it were.

13         The third option is the option suggested by Your

14   Honor in your order.  And that is to in a sense have a pretrial

15   or to sever the standing issue in a separate, full evidentiary

16   hearing.  That would have the advantage over certifying the

17   motion to dismiss, that it would be both horizontally -- and

18   the appeal because it would be horizontally broad enough to

19   cover all of the issues in the case and it would not face sort

20   of the anachronisms that you would have with the record frozen

21   in time with the other appeals.

22         However, although those are advantages, we pretty

23   strongly believe that that is not -- that will not be effective

24   or practical.  There's two reasons for that.  One is that --

25   and I think David Cross can explain this better than I can.

```
1              But the issues -- the standing issues in our case are
2    intertwined with the facts on the merits a way that makes
3    pretrying that problematic.  And the case that you cited, Your
4    Honor, the 2000 case from the Eleventh Circuit quoted another
5    case, which is called Barrett Computer Services, a Fifth
6    Circuit case from 1989.  And Barrett goes into why you don't
7    want to sever or explains how you don't want to sever standing
8    when it is intertwined with the merits.  And it in turn quotes
9    Supreme Court cases Gwaltney and SCRAP and Wright Miller &
10   Cooper to this effect -- and it says, because it would be
11   impossible to prove the injuries alleged for purposes of
12   establishing standing without also addressing the merits, a
13   preliminary hearing of the type available in disposing of a
14   motion to dismiss would not offer an appropriate forum for
15   evaluating the issues.  In fact, this type of intertwining of
16   the merits and the jurisdictional issues has led some
17   commentators to, quote, conclude there is little to be gained
18   by preliminary factual inquiry to some issues of standing.
19             And we think -- we think that is this kind of case.
20             THE COURT:  Why would that be so when I have -- in
21   this type of case where I've had, I guess all told, at least
22   two and a half days of an evidentiary hearing, which in some
23   circumstances might be a full trial?  But -- and those issues
24   deeply went into -- address the -- both the BMD issues, even
25   though there was more to be done, and obviously some of the
```

1    issues surrounding absentee ballot, scanners, et cetera?

2         What would you -- you know, under the best of

3    circumstances I guess is what I'm saying, just sort of almost

4    looking at it from the perspective almost of the summary

5    judgment, you know, standard where I consider all of the

6    evidence that has been provided and that might be provided in

7    the future in the light most favorable to the plaintiffs, tell

8    me -- but I also -- which I might or might not.  But, you

9    know -- and obviously I already have made some findings on the

10   current record.

11        Tell me how that would translate into particularized

12   harm and how will it help me in that regard.  I mean, I have

13   just basically proceeded based on the premises found -- and the

14   legal analysis found in the motion -- the order on the motion

15   to dismiss.

16        But I'm not clear why would it not allow me to --

17   that while you couldn't establish enough so that I can feel

18   some comfort level that I really actually before we do

19   something that has great public import and have also enormous

20   amount of resources that we're not just simply chasing after

21   something that is not just -- may not materialize or likely is

22   not going to materialize.

23        MR. BROWN:  The plaintiffs are very comfortable with

24   the record on standing, both the pleadings -- both at the

25   pleading stage and at the preliminary injunction stage.  And we

 1   have looked at these current -- the more recent Eleventh

 2   Circuit cases, and we don't see anything in the Eleventh

 3   Circuit cases that would cause a reevaluation of your own

 4   analysis of standing in your most recent order on the

 5   preliminary injunction.  We don't see it.

 6           And the Eleventh Circuit cases that did balance Lin

 7   Wood's cases on standing and the others, they don't weigh any

 8   of the Eleventh Circuit cases or establish standing doctrine of

 9   Anderson-Burdick in a way that we're -- we are concerned enough

10   about standing such that we would not want to go ahead and

11   proceed to trial.

12           Our view is that interrupting the course of the

13   litigation to take up standing separately has enormous cost not

14   only to time but also to effort.  And it is unlikely for a

15   number of different reasons to yield that much more certainty

16   because a separate proceeding on standing, even if it were

17   certified by the Court, may not be taken by the Eleventh

18   Circuit.

19           If it goes up before a trial on the merits, there

20   will be arguments both ways that the factual record is

21   insufficient for either from the defendants' standpoint or the

22   plaintiffs' standpoint.  And so we may not even have the

23   standing issue even if it were pretried presented in such a way

24   that it could get a clear answer.

25           And further proceedings on standing likely would be,

1    Your Honor, just as long as a trial on the merits.  And our

2    strong preference would be to go with one of the two schedules

3    or some blend of the two schedules that were presented to the

4    Court and march through to a trial on the merits.

5           The effort involved both from the plaintiffs'

6    perspective and from our clients' perspective is that anything

7    that can -- anything that will prolong the case is at risk.

8    There is a run rate of effort.  And so it is not just trying a

9    case.  It is month after month after month.

10          And this case, if and when we win, Your Honor -- we

11   would like to be optimistic.  But if we do win, it will be

12   appealed -- the standing issues and everything else.  That is

13   going to be slow and costly enough.

14          And for the plaintiffs and their organizations to be

15   able to sustain this level of litigation, as hard as it is

16   already, quite frankly, would be more difficult if we have to

17   before trying the case go up and down on appeal.

18          So that is sort of our deal.

19          David, you might have more particular examples of

20   some of the more complex issues.

21          MR. CROSS:  Your Honor, to your question what would

22   be the particularized harm if the facts were sort of looked at

23   under a summary judgment standard, I'll give you one example.

24   A primary point that they make -- the defendants make in their

25   briefing on the motion to dismiss -- and we see this at the

1  appellate level too.  But a primary argument they make is that

2  there is no harm to our clients because our clients can verify

3  their ballot.  They can go into the BMD.  They can look.  They

4  can make their selections, print the ballot, and review the

5  ballot.  Even if we put aside all the science on the degree to

6  which voters can actually do that, particularly with these

7  really long, complex ballots, it ignores the reality that in

8  Georgia there are QR codes.  And the QR codes are what gets

9  scanned.

10      So it cannot be that any voter, our clients included,

11  can actually verify their ballot.  The moment at which they

12  cast it they have no idea what is actually going to get counted

13  for their ballot.

14      Now, the State's response to that is that, oh, but

15  we're going to come in and we're going to do an audit.  And Mr.

16  Russo mentioned this last time, that they would want to talk

17  about the audit on an appeal on standing.

18      Well, now we're getting deeper into the facts.  And

19  we would want to show that the audit can't save them because,

20  first of all, as Mr. Tyson himself readily pointed out in the

21  September hearing, our right to vote is not a right to an

22  election outcome.  Our right to vote is to have our vote

23  counted.

24      An audit is only on election outcomes.  It has no

25  bearing and cannot determine whether any vote is counted,

1   particularly our clients'.  And so that is another thing that

2   we would want to develop, that the audit can't save them there.

3   And even if the audit somehow could do something of relevance,

4   we would want to point out that the audit here is not robust,

5   it is not reliable, it is not a risk-limiting audit, for

6   example.  And those are disputed facts.

7        The other way that this gets all bound up together is

8   another primary argument they make is they say, well, we can't

9   rely on anything with the DRE system for standing.  Right?  We

10   can't rely on the fact that the DRE system was hacked twice by

11   Logan Lamb.  We can't rely on any of the vulnerabilities.  We

12   can't rely on the fact that the State itself acknowledged that

13   the DRE system needed to be scrapped as a basis for our

14   standing argument because they say they are two fundamentally

15   different systems.

16        Well, Your Honor may recall that Dominion produced an

17   email that came to light where Michael Barnes told the counties

18   to use the USB drives they had used with the DRE system with

19   the new BMD system.  The State disputes whether that actually

20   happened.

21        Again, we need discovery to figure out what actually

22   has happened on that.  We would want to develop a record to

23   show that the vulnerabilities and the hacking that occurred

24   with the original system -- that does have a spillover effect.

25   And we think there are other ways that that happens.

 1          Ultimately their argument to us is our injury is

 2     entirely speculative because we just imagine that there are

 3     vulnerabilities with this system that can affect our clients in

 4     some way.

 5          And, you know, we're in a public hearing, so I'm not

 6     going to get into specifics.  But as Your Honor knows, we have

 7     looked at this in detail with an expert.  That analysis is

 8     ongoing, and we are -- we will be prepared at the end of

 9     discovery to give Your Honor a presentation that shows that our

10     case is very far from speculative, that there are very real

11     issues with this system that present real and imminent harm

12     anytime our clients have to use it.

13          The last point to make on this is:  Their other

14     argument is to say, well, there is no harm to you from the BMD

15     system because you have the option to vote by absentee ballot.

16     Well, first of all, the law is well established that the

17     opportunity to turn to absentee ballot doesn't vitiate

18     standing.

19          But even if we were to just assume that for the sake

20     of argument, Your Honor may recall that Donna Curling, my

21     client, tried to do that with the old DRE system.  She tried to

22     vote by absentee ballot years ago.  She didn't know until we

23     got into this lawsuit -- filing this lawsuit is the way that

24     she learned that she had been disenfranchised in that election

25     because the State came along and said, well, Donna Curling

1    didn't even vote in that particular election.  That was the

2    first that she had ever heard.  And were it not for this

3    lawsuit, she never would have learned that she had been

4    disenfranchised in that because her absentee ballot for some

5    reason just wasn't processed.

6           We know in the current climate that was a big problem

7    in the last election because of mail issues and the volume of

8    absentee ballots that were submitted.

9           So the bottom line point here is:  All of the

10   arguments the State wants to make on why we don't have

11   standing -- they all go to the very core of our claims.  It is

12   all bound up together.  And so there is really no way to sever

13   it.

14          The last thing, Your Honor, is:  I just direct your

15   attention to the recent Rose vs. Raffensperger decision from

16   Judge Grimberg.  And I think Judge Grimberg really interprets

17   *Jacobson* exactly right.  The State argued the same thing there,

18   that there was no standing and the case should be dismissed on

19   the motion to dismiss stage because there is no standing.  And

20   they cited *Jacobson*.  And Judge Grimberg says, no, no, no, you

21   are reading *Jacobson* way too broadly.  Because in *Jacobson*,

22   that went to a trial on the merits.  There was a bench trial.

23   There was a complete evidentiary showing.

24          And what the Eleventh Circuit found was at trial

25   after full discovery the plaintiffs failed to prove up their

1  allegations that they were relying on for standing.  So it

2  wasn't simply the Court of Appeals saying we have looked at

3  this and this should have died on the vine at this motion to

4  dismiss stage because the allegations were never sufficient.

5         The Eleventh Circuit said you had an opportunity to

6  prove those up and you didn't, you did not come forward with

7  evidence.  And that is -- so Judge Grimberg concludes and what

8  *Jacobson* actually says is you are going to have an opportunity

9  to prove up standing through discovery and, if you don't prove

10 up your allegations, then you lose.

11        And so there's just -- I like Mr. Brown's point.

12 There is just no basis to carve off standing and particularly

13 in the way that the defendants want to litigate it and present

14 that on some sort of truncated record.

15        It will be prejudicial, and we don't think it is --

16        THE COURT:  Well, I guess my question is a little

17 different.  Or maybe it is not.  But -- because I know that the

18 State has a host of different levels of defense on standing.

19 And obviously I have addressed them before.

20        My concern has to do more with what makes your

21 clients different and specifically injured as opposed to the

22 general public and that aren't they just basically prototypical

23 voters.  And if this -- I mean, everything that you have put

24 forth might be 100 percent true.

25        But then is it an injury -- a legal injury for

1   purposes of litigation, or is it one that is something that

2   ought to be presented to the legislature?  Because it is not a

3   classic sort of -- they are not injured in a way that is

4   different.

5          That was what I was trying to get at and why I

6   offered to have a hearing if you had some -- something in

7   particular that I should be considering so that I would feel

8   comfortable about proceeding.

9          I'm happy you are comfortable about proceeding with

10  things.  But it is a lot of work on the Court's part.  It is a

11  lot of public resources.  And if we're just going to end up at

12  the Eleventh Circuit saying this is no -- this is no different

13  than any other voter and that there is no particularized harm

14  to these specific voters -- and I'm just trying to get a notion

15  of what that is more specifically at this point.

16         I don't have any, you know, doubt that people -- that

17  it impacts the right to vote.  But I guess the thing is that

18  there are a variety of First Amendment cases that also, you

19  know, obviously impact other voters that somebody is standing

20  in place and they are having their -- and in some ways, it is

21  impacting their right to get on the ballot or to pick the

22  person they want on the ballot or the *Anderson* case but -- and

23  arrays of that.

24         And I think, you know, there are ways in which *Bush*

25  *vs. Gore*, even though the court said it wasn't precedential,

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1   the Supreme Court simply created some of this -- may itself

2   have created confusion with this because, you know -- because

3   they did intervene.

4           But, anyway, that is what I'm asking you about.

5           MR. BROWN:  Your Honor, our position is that the --

6   initially we as a legal matter don't accept the general

7   proposition that if the state disenfranchises everybody it

8   doesn't disenfranchise anybody.  And we think that all that is

9   often repeated, that sort of dictum.  We think that is the

10  political question doctrine law leading --

11          THE COURT:  The political?

12          MR. BROWN:  The political question cases sort of

13  bleeding into the actual injury question in a way that if you

14  really look at the case are unsustainable.

15          All of the -- even the one man, one vote cases go all

16  the way back to *Baker vs. Carr*.  Depending on how you

17  characterize the plaintiffs' injury could be characterized in

18  such a way that affects a broad amount of people.  And the

19  argument could be it is so many people let the legislature

20  decide, an argument that was rejected in the bill of rights in

21  *Marbury vs. Madison*.

22          So our position is that the -- that our case that is

23  in our causes of action straight into Anderson-Burdick, Common

24  Cause -- the Common Cause case that was cited with approval on

25  all of these Eleventh Circuit cases and fits also within Judge

```
 1    Pryor's decision in Jacobson where he specifically cites --
 2    string cites cases, Anderson-Burdick cases just like ours, in
 3    which he says, of course, none of those cases are a problem
 4    from a political question standpoint or from an injury
 5    standpoint, from a standing standpoint.
 6              And so we -- now, getting back to the practical
 7    question, Judge, although we think there is also established
 8    factually individual injury, whether it is because of the
 9    screens or because of privacy violations or because of
10    organizational standing -- and we only need one plaintiff to
11    have standing -- we think that it may be most efficient to
12    address that particular issue in further briefing rather than
13    having an additional evidentiary proceeding on that issue, if
14    that makes any sense.
15              THE COURT:  And how would you -- what are you
16    suggesting?  I'm sorry.
17              MR. BROWN:  Well, Your Honor -- well, it seemed like
18    from your order on Thursday the one option would be to brief
19    the additional issues rather than having an evidentiary
20    hearing, and that might be the best option.
21              THE COURT:  Well, if you are saying there is one or
22    there is two versus ten who have standing, then wouldn't I need
23    to know what distinguishes these individuals and is it in the
24    record?
25              MR. CROSS:  I'm sorry.  What was your question?  I
```

1  apologize.  It froze for me for a second.

2        THE COURT:  If Mr. Brown is saying you can proceed

3  even if you just have one plaintiff who has standing or perhaps

4  one for each side, wouldn't I have to know something about that

5  individual or else you would have to point out in the record

6  what distinguishes their experiences?

7        MR. BROWN:  You might, Your Honor.  The various types

8  of injury that we have in the record already range from people

9  that are trying to vote absentee to people with concerns about

10 ballot privacy to a more general -- I wouldn't say generalized

11 but a more general fear -- more than just fear that the vote is

12 not going to be counted in much the same way that these other

13 cases have adjudicated those.

14       We -- in terms of pointing to evidence, we don't --

15 we don't see it as being necessary to have a full-blown

16 evidentiary hearing.  And I would note, Your Honor, that the

17 cases that you cited and that -- well, what is the name of the

18 one?  The 2000 case.  *Bischoff* and the cases that it cited

19 procedurally were sort of the reverse.  Those were cases where

20 the trial court reached out and dismissed cases on the

21 standing.

22       THE COURT:  Right.

23       MR. BROWN:  And so we don't -- we don't want you to

24 do that, of course.  But I don't think that compels you to make

25 factual findings now, in addition to what we have already put

1    forward.

2            And that under the cases cited by *Bischoff* that we

3    need to put it altogether into one -- you know, they are all

4    intertwined.  And it is more efficient to try it all at once.

5    And there is no requirement that you decide standing in

6    advance.  There is, of course -- once we try it, you'll have to

7    make findings of fact that establish our right to permanent

8    relief.

9            MR. CROSS:  Okay.  Your Honor, the one thing I would

10   add is -- I agree with Mr. Brown.  I don't -- I think too much

11   is getting read into these recent election cases, which were

12   post-election election outcome cases and this idea that if the

13   harm could be the same to more than one voter no voter has

14   constitutional standing to bring a case.

15           I just -- that is not and has never been the law in

16   voting rights cases nor could it be.  I mean, it is not hard to

17   imagine a lot of different ways in which -- I mean, if you had

18   an election system, for example, that actually did have some

19   sort of algorithm that rigged the result, it affects everyone

20   the same way but there is no way anyone would ever say that

21   that is a constitutional system and your only avenue to

22   challenge it would be to convince the legislature, particularly

23   if that system adopted by a legislature and the algorithm

24   favors the party in power.  You would just be stuck.  And that

25   cannot be the law.

1           And when you look at the voting rights cases, many of

2     the cases we look at over time, multiple voters are impacted in

3     the same way.  The question is whether the voter has a

4     particularized harm.  In these recent cases, there were people

5     coming forward and they just didn't like the outcome of the

6     election.  And that is what their cases were about.  And they

7     were arguing things -- they would say we have a collective

8     harm.

9           I mean, literally I think in the Lin Wood case -- in

10    one or more of those cases, the argument was collective harm.

11    That is not our case.  We're not arguing that.

12          Donna Curling, again, will give the perfect example,

13    I think, as someone who tried to avoid the system because of

14    the lack of confidence she has -- and, again, the Supreme

15    Court -- I think it has always been known.  Even undermining

16    voter confidence can be sufficient for standing.  But she tried

17    to avoid it and found out she had been disenfranchised.  So

18    that is a very particularized harm.

19          And, you know, also the vulnerabilities we're talking

20    about, we don't know exactly how they will play out in any

21    given situation.  We want to make a presentation to Your Honor

22    for Dr. Halderman to talk you through that so you understand

23    how the harm actually can affect individual voters and in

24    particular our clients.  We have to complete discovery on that.

25          Your Honor, the last point I was going to make before

1   I forget, I do -- you know, I'm not an appellate lawyer.  I

2   talked to our appellate team about this.  For what it is worth,

3   there is significant skepticism that even if Your Honor were to

4   certify this for an interlocutory appeal that the Eleventh

5   Circuit would take it.

6          So part of the concern we have is we could spend a

7   lot of time and money on a standing-focused proceeding and then

8   you certify it and then the Eleventh Circuit, consistent with

9   what we think they intended in *Jacobson*, just as Judge Grimberg

10   interprets that decision, will send it back and say it is just

11   too soon.

12          And there are a lot of reasons for that.  In our

13   particular case, again, you know, respectfully, Your Honor, if

14   that happened, we would have to make the argument to the

15   Eleventh Circuit that it is procedurally defective, that we

16   should get an opportunity to do this altogether.  And so then

17   it goes up on appeal with that procedural argument.

18          The Eleventh Circuit we think will likely look at

19   that and say this should be presented at the end in a trial.

20   But also we think the Eleventh Circuit may not want to open the

21   door to courts sending up standing issues at the early stage.

22   They may not want to set that precedent because it is extremely

23   unusual to do that.

24          THE COURT:  Well, that assumes I rule for you.  I

25   mean, the thing is I could rule against you.  And then it is --

```
1   and then it is the end of the case.

2           I mean, basically, the Court always reserves the

3   right to reconsider its ruling.  So then it is the end of the

4   case, and you appeal, and they send it back to me.  Then I'm

5   wrong.  But that is --

6           MR. CROSS:  Right.  That is true.  Obviously if we

7   lose, then we would be the appealing one and then they may send

8   it back to you.

9           We think at that point they would send it back and

10  say that the decision was premature because we should get to

11  present everything.  Obviously understood.

12          But if Your Honor finds that there is standing and it

13  certifies that for appeal, we just -- we don't think we will

14  have really gained anything.  Frankly, even if the Court of

15  Appeals looks at it and affirms the ruling, all the Eleventh

16  Circuit is saying is we are affirming as of the record right

17  now.

18          The defendants will still -- I mean, I hate to admit

19  it.  But the defendants will still have their standing

20  arguments because the case will then go to a full trial on the

21  merits.

22          We certainly will argue that standing should be a

23  resolved issue to us at that point.  There should be at least

24  some sort of collateral estoppel on that.  I don't know whether

25  that is right because we haven't seen a case that deals with
```

1  this yet.  And it is hard to know how the Eleventh Circuit will

2  write their decision.

3        Our fear is what the Eleventh Circuit would likely

4  say at most is we'll affirm it now but there is still --

5  standing is a live issue, as Your Honor points out, at any

6  point in time.

7        And so I'm not sure we're buying any kind of

8  certainty even if it were to play out in that way.  Because

9  certainly the defendants are not going to waive the standing

10  arguments and you'll have to address it again at trial.

11        MR. McGUIRE:  Your Honor, may I also attempt to

12  address -- earlier you asked what makes our clients different.

13        THE COURT:  Right.

14        MR. McGUIRE:  You know, I think the Eleventh Circuit

15  has used this generalized grievance phrase as a way of tossing

16  some of these cases.  But there is a difference between an

17  undifferentiated generalized grievance and injury for purposes

18  of standing that actually affects clients in a particularized

19  way.

20        And the fact that an injury might be individually

21  experienced by a large number of people does not -- does not

22  mean that any one person is not injured for purposes of

23  standing.

24        And I think the Eleventh Circuit -- to the extent

25  that their holdings point in that direction, I think it is

1    contrary to what the Supreme Court itself has directly said on

2    this.   In *Spokeo vs. Robins* in Footnote 7, the court said, the

3    fact that an injury may be suffered by a large number of people

4    does not of itself make that injury a non-justiciable

5    generalized grievance.   And here -- and that kind of makes a

6    lot of sense because if the State just does something that is

7    wildly unconstitutional it would create a dynamic where the

8    more people they affect the less -- the fewer people have

9    standing to challenge to the court, which would be backwards

10   from what would make sense in a justice system.

11           So we believe the record has established at least

12   prima facie evidence that there is a -- that there are

13   particularized injuries to both the Coalition as an

14   organization and to each of the individual plaintiffs.

15           And as you said, there hasn't yet been any

16   credibility challenge that would call into question those sworn

17   affidavits.   So we believe the record as it currently stands,

18   you know, combined with the way the Supreme Court has addressed

19   this issue of the generalized grievance -- we believe standing

20   is pretty solid at the moment.

21           And we certainly could take the time to elaborate on

22   it.   But we believe the Court already has what it needs to show

23   that the individual and organizational plaintiffs have

24   particularized injuries, albeit wildly shared, no doubt.   But

25   that doesn't deprive us of an injury for purposes of standing.

```
 1                THE COURT:  Okay.  I assume somebody from the State
 2    wishes to speak?
 3                MR. TYSON:  Yes, Your Honor.  Good morning.  Bryan
 4    Tyson for the State.
 5                I think -- I don't have a whole lot to add.  But I
 6    think initially I can just say I think we found at least a
 7    point of agreement here.  The State doesn't believe an
 8    additional evidentiary hearing on the issue of standing is
 9    going to be helpful.  And apparently from what I have heard
10    this morning, the plaintiffs are in agreement with that.
11                I think the key issue is what Your Honor has
12    identified.  Like the plaintiffs in this case, Mr. Wood and
13    Ms. Powell in their -- the complaints were claims they were
14    packing of the system.  And the court dismissed those claims
15    because they were the same as every other voter in Georgia.
16                And to the point that there are no other remedies,
17    well, there are a whole host of remedies available in superior
18    court related to election.  The question here is particularly
19    is there a federal claim on this.
20                And to Mr. Cross' point about Jacobson and trying to
21    say, well, we have to have a trial to get there, there were
22    many bases on which the Jacobson plaintiffs didn't have
23    actionable claims.  But there was several that had nothing to
24    do with the evidence.  It was the nature of the complaint.
25    There is no interest in the outcome of an election.
```

So *Rose* and the voting rights cases that have been
discussed were specific vote dilution claims based on the
configuration of districts.  And there was a very
well-developed precedent on that but even a case like *Gill vs.*
*Whitford,* to get all the way to the U.S. Supreme Court and say,
you know, there is not standing because there is not any issues
here.  I think, again, we're back to they have to have a
particularized injury that is not just a generalized grievance.

So from our perspective, since we are still waiting
on the Eleventh Circuit to issue its decision on the
jurisdictional question on the appeals of what all it is going
to take, it seems to make sense to us that we're going to
address standing in the context of those appeals if they -- if
they take both of them.

And from a conservation of resources standpoint, if
they are going to hear those issues, it doesn't make a whole
lot of sense in our minds to continue to conduct discovery,
kind of continue litigating these issues here if they are going
to resolve that question.

We want this case to get to trial so we can dispel
the cloud over Georgia's elections.  So I want to be very clear
about that.  But if the Eleventh Circuit is already going to be
ruling on these same issues, I think we need to consider that
in terms of the ultimate resources.

Because I think if we want to get to an evidentiary

1    question, there is a -- there is a whole host of issues we

2    would have to deal with in terms of the discovery we serve that

3    has not been responded to.  And, as Mr. Cross and Mr. Brown

4    both discussed, they really from their perspective have to get

5    into the merits of their claims of the hacking of Georgia's

6    election system to show that they have or believe to show they

7    have an injury that is still -- even if they get through all

8    the processes, which we don't believe they will be able to,

9    that alleged injury is not concrete and particularized because

10   it is shared by all Georgia voters.  And that is ultimately the

11   question here.

12           And I think then maybe -- as Mr. Brown alluded to,

13   maybe there is a question about the Coalition diverting

14   resources.  We submit that even if that is the case they are

15   still -- we are still in *Clapper* land at that point.  If a

16   diversion -- I mean, clearly the plaintiffs in *Clapper* were

17   diverting resources.  But it was only because of the

18   speculative chain of possibilities.  So we're, again, not at a

19   point where we can have and deal with those types of questions.

20           So ultimately, Your Honor, we think that the most

21   logical thing is to let the Eleventh Circuit deal with this

22   question.  But barring that, I think your suggestion of -- even

23   considering that there is a record and entering a new order

24   that can then be certified is probably our best way to get to

25   an appeal and have the Eleventh Circuit hear that because

1  ultimately this is the problem.  There is not the concrete and

2  particularized injury as to the claims, not just as to the

3  evidence.

4          So I am happy to answer any other questions, Your

5  Honor, but I think we have kind of hit the nail on the head in

6  all the discussions so far.

7          THE COURT:  It didn't look like you-all had -- that

8  there was -- is there a time frame for briefing at this point

9  in your -- because I know obviously that there was about the

10  question of taking the interlocutory appeal.

11         But has there actually been full briefing on the --

12         MR. BROWN:  No, Your Honor.  What it looks like right

13  now is the court in the Eleventh Circuit asked a jurisdictional

14  question about the appealability of Your Honor's ruling on the

15  scanners because your ruling on the scanners that had been

16  appealed looked like there was something more coming and, in

17  fact, there is or might be.

18         And so what the Eleventh Circuit said is, in light of

19  the -- what looks like an incomplete ruling on the scanners, do

20  we now have jurisdiction?  So we went in -- I can't remember

21  what the State said -- we said no, you don't, because there may

22  be another ruling coming from the trial court.  And that

23  decision would be appealable.

24         Separately, they have consolidated that case with the

25  Poll Pad case.  Consolidation doesn't change any of these

1    issues that much.  It will just be the same panel.  There is no

2    jurisdictional challenge to your order on the Poll Pads.

3            So in any event, they will -- it is not clear -- no

4    offense, Your Honor.  It is not clear who is waiting on who

5    with the Eleventh Circuit.  I'm not -- I don't know what they

6    are waiting on.  Of course, you know, they don't tell us what

7    they are thinking and certainly haven't told us in this case

8    what they are thinking, including their reversal of your

9    67-page opinion on the Poll Pads.

10           So we don't know what they are thinking on that.  But

11   we do know if they do decide standing it will not even reach

12   the BMD claims.  And that is -- I mean, we think all of the

13   claims are important, of course, Poll Pads, scanners.

14           But the BMD issue is if not the major a major appeal.

15   If we should establish standing on appeal, the first thing the

16   State defendants will say when it comes back down is, yeah, it

17   doesn't tell us anything, Judge, because they didn't address

18   standing of the main BMD claims.

19           So there is no point in waiting on the Eleventh

20   Circuit.  Who knows what they are going to do or when.  But we

21   do know that when they do issue a ruling it will not address

22   the main standing in this case.

23           And so we think that it is not going to be helpful to

24   certify the motion to dismiss for the reasons I said.  No point

25   in waiting on the Eleventh Circuit for the reasons I have done.

1   And that I think we agree that having a separate trial on a

2   severed standing issue is incomplete.

3          The other thing that -- I mean, the *Jacobson* case

4   clearly distinguishes our case and Anderson-Burdick cases in a

5   long citation of cases.  And we may -- I'm not -- I'm not

6   asking for an additional brief to have to file.  But if there

7   is something that we do -- we can brief, we'll be happy to do

8   so.  But the *Jacobson* case is actually very good authority for

9   us proceeding right now to trial on the merits.

10          MR. TYSON:  Your Honor, I'll just add:  In terms of

11   once the Eleventh Circuit answers the jurisdictional question,

12   that will then determine where we go.

13          We did raise standing issues in the Poll Pad appeal

14   as well.  So that is also before the Eleventh Circuit.  I'm

15   assuming the arguments will be basically identical in terms of

16   the concrete and particularized injuries.  We will get that

17   ruling eventually.  I don't know when we will get that from the

18   Eleventh Circuit.  When they rule, that will set the schedule

19   for briefing.

20          THE COURT:  All right.  Why don't we just take a

21   pause for a few minutes.  I'm going to talk to Ms. Cole off

22   the -- offline.

23          Ms. Cole, I'll give you a call on the other -- on my

24   phone.  All right?

25          MR. CROSS:  Your Honor, could I -- just quickly

before we pause, I did want to echo Mr. McGuire's point because

I will say that Mr. Tyson did not respond to that.  And I just

don't see how anyone could make the argument that Mr. Tyson is

making about this generalized grievance in light of Footnote 7

in the *Spokeo* Supreme Court decision.

And, again, we think the Eleventh Circuit case law is

being misinterpreted here.  But even if it is being -- even if

it is right, it is directly at odds -- I mean, completely at

odds with what the Supreme Court said in *Spokeo*.

The fact that an injury may be suffered by a large

number of people does not of itself make that injury a

non-justiciable generalized grievance.  It even gives the

example of mass torts.

Particularized injury, the Supreme Court says, all

that is required is it is personal -- it is the experience of a

person in an individual way.  Lots of people can have that.

THE COURT:  And what about *Gill*?

MR. CROSS:  I'm sorry.  What about *Gill*?

THE COURT:  Yes.  Just raising the issue of simply is

it, I guess, ultimately a political question in this context.

Yes.

MR. CROSS:  I guess I don't see that there is a

political question for us in the way that we're presenting our

particularized harm here, Your Honor.  It is based on

particular facts about the system.  It is not a political

1    issue.

2         MR. BROWN:  And the other political question issue is

3    whether or not there is manageable judicial standards.  And

4    that was the problem in *Rucho* or *Rucho* (different

5    pronunciation), the political gerrymandering case.  And that

6    both *Jacobson* and *Rucho* dealt with entirely different issues.

7    *Jacobson*, of course, is the order that candidates appear on the

8    ballot.  And *Rucho* was political gerrymandering.

9         Judge Pryor in the *Jacobson* case said we're not

10   talking about Anderson-Burdick cases in terms of political

11   question.  Because in Anderson-Burdick cases, the plaintiffs

12   have identified a burden, a discrete burden, which if removed

13   will address their constitutional grievance, a feature that is

14   not found in the political gerrymandering cases or the ballot

15   sequence cases.

16        Here we have identified particular burdens.  Screens

17   are too big.  The BMD is not reliable.  It is vulnerable.  It

18   is not verifiable.  The scanners don't count votes.  And in

19   *Jacobson*, here Judge Pryor says -- in distinguishing the

20   Anderson-Burdick cases comes down and says, and to state the

21   obvious, the statute, that is, the statute involved in

22   *Jacobson*, certainly does not create the risk that some votes

23   will go uncounted or be improperly counted.

24        So this is just William Pryor saying if you have a

25   case in which there is a state law or state practice that

1    creates the risk that some votes will go uncounted or not be

2    properly counted you have standing and there is no political

3    question.  And that is precisely Your Honor's analysis not only

4    in the most recent -- in the order on the BMDs but your order

5    on the DREs.  That is exactly the way Your Honor analyzed it.

6    And that law has not changed since you ruled in either of your

7    prior decisions.

8         And so if a particular -- if a plaintiff -- if an

9    individual plaintiff -- if it was Donna Curling or any of our

10   clients, if there was a risk that their vote would go

11   uncounted, that is a risk that every voter shares because you

12   don't know if you're going to be the one that is not counted.

13        And so the defendants' argument would apply exactly

14   to the situation that Judge Pryor has said is not a political

15   question.  And it turns exactly on the misreading of the

16   generalized grievance that is decimated by Footnote 7 in

17   *Spokeo*.

18        MR. TYSON:  Your Honor, just on that very briefly, I

19   think the key point is a lot of people is different than

20   everybody, Number 1.

21        Number 2, I think the Eleventh Circuit in *Gardner vs.*

22   *Mutz* also discusses this issue at length in terms of

23   generalized grievances as opposed to concrete and

24   particularized injury.

25        So I believe the point -- I think you have got the

1    area of law well.  But I just wanted to make those points as

2    well.

3              THE COURT:  Okay.  All right.  All right.  Well, I'm

4    going to take a few minutes, as I said, and talk with Ms. Cole.

5    I'll get back to you.

6              So just hold on.  And you can mute yourself so you

7    can talk among yourselves as you see fit.  And we'll come back

8    shortly.  Okay?

9              **(There was a brief break in the proceedings.)**

10             THE COURT:  I'm just going to talk so maybe we will

11   see that we are here.  Mr. Cross is there, Mr. McGuire,

12   Mr. Tyson.

13             Are you ready to begin?

14             Okay.  I think we have -- you have done a lot of

15   briefing before on standing many times over.  And so I'm not

16   looking just for a rehash of everything in the past.  But I do

17   think this whole issue of is it just a generalized concern, is

18   there a particularized injury, is -- or is there a

19   particularized injury and is it just so general to all voters

20   that it -- can it or can it not basically be a basis of

21   standing is something that was not specifically really zoned in

22   on in some of the other briefing.

23             I mean, there is certainly -- I'm not saying it

24   wasn't mentioned at all but it was -- and particularized injury

25   was but not sort of in this context that has sort of become --

1    because of all the litigation over the 2020 election, it became

2    so dominant not just in our circuit but elsewhere as well.

3              So I think it would be helpful for the Court to get

4    briefs from the parties that specifically focus on that

5    question that we have been addressing today and that has given

6    the Court obvious thoughts.

7              Because you have heard each other's arguments, I

8    don't know that we need to go back and forth.  I think that

9    just needlessly delays the process.  You know what -- obviously

10   the plaintiff has talked a lot more than the defendants.  But

11   Mr. Tyson still has laid out his legal theory.

12             And if there is -- so if I find that there is

13   something I still think is confusing to me or that I would like

14   a response on, I can ask you for it.  But it seems to me to

15   make more sense to have the parties submit a brief in ten days

16   and let me see what you've got and see whether it is going to

17   address -- how it addresses my concerns and focusing on the

18   issues that I have tried to focus on as a -- specifically in

19   this hearing.

20             And I think that would be helpful.  This has been

21   helpful too.  But I think it would be better to just simply at

22   this juncture for me to get a brief with citations to some of

23   the cases you have been talking about and let me put this

24   together into the context of whatever we have done before.

25             But don't rehash everything you have ever done.  All

1   right?  That is not going to be helpful.  It is kind of -- it

2   should be to all of you also having either been involved in the

3   litigation over this cycle or watched it closely what the

4   concerns of the Court are.

5           MR. BROWN:  Thank you, Your Honor.

6           MR. CROSS:  Your Honor, I just want to make sure I

7   understand what you are looking for.  Are you looking for

8   briefing just on a pure legal question regarding sort of what

9   case law means on this issue of generalized grievance?

10          THE COURT:  I'm asking you this in the context of the

11  allegations in this case and the evidence in this case.

12          MR. CROSS:  Right.  Right.  So you are asking --

13  essentially what you are asking us is to brief if we have

14  standing under this generalized grievance standard and so we

15  should put in evidence on that; right?

16          THE COURT:  You can do that.  That is one way of

17  doing it.  I mean, you are going to -- obviously you told me

18  you are going to be talking about *Spokeo* and the footnote.  And

19  you'll probably do some -- just tell me to rely on *Spokeo* and

20  the footnote.

21          But I guess it is -- obviously it is the meshing of

22  it all because it is not just a theoretical principle and how

23  you want me to apply it here.  I mean, we do have a real record

24  in this case.

25          MR. TYSON:  Your Honor, if Mr. Cross is planning --

```
 1        I'm sorry.
 2                 THE COURT:  Yeah.
 3                 MR. TYSON:  I was going to say:  If Mr. Cross is
 4        planning to put in evidence, I think maybe we would need some
 5        way to respond to that.
 6                 Obviously, we haven't taken the depositions of the
 7        plaintiffs yet.  We were trying to get documents first.  We
 8        weren't able to cross-examine them in the hearing.
 9                 So if there is going to be an evidentiary component,
10        we might need to have something that is not just simultaneous
11        briefing just so we have the ability to respond.
12                 But I think, like he said though, I don't see the
13        evidence is going to make a difference because it is the nature
14        of the injury.  But just not knowing what they maybe wanted to
15        put in, we may need some ability to respond to that.
16                 MR. BROWN:  Your Honor, if I may, what we were
17        planning in response to the issues was a briefing on the law on
18        that point that you identified as applied to the current record
19        in the case and that we anticipate being able to show based on
20        the affidavits and the other evidence that we meet the
21        standards and to not open it up into some prolonged evidentiary
22        back-and-forth and that we could probably do that if each -- we
23        would write separately.  So maybe 15 pages per plaintiff group.
24                 Would that be in line with what you were
25        anticipating?
```

```
1              THE COURT:  That's fine.  That's fine.

2              MR. BROWN:  Okay.

3              THE COURT:  Why don't we do that.  Then let me just

4    say automatically everybody -- any party can write a five-page

5    response.  But you -- but the five-page response has to be

6    submitted in five days.  And consecutive days, not -- so --

7    so -- because, you know, the rules do something different often

8    when it is less than ten.  But, anyway, five pages, less

9    than -- and five days from the date of the submission.  And

10   then anyone can do that.

11             MR. BROWN:  Okay.  Thank you, Your Honor.

12             MR. TYSON:  Your Honor, one other issue -- thank you

13   for that.  I think that works.

14             I know that we also are in a situation where we have

15   pending discovery with the plaintiffs, they have pending

16   discovery with us.

17             Do you want us to continue -- it doesn't seem like it

18   is worth continuing back and forth on meeting and conferring on

19   discovery.  But I wanted to clarify kind of what you would like

20   us to do that on since we have all the pending items out there.

21             THE COURT:  How much do you have?

22             MR. TYSON:  I mean, we have served a relatively

23   significant number of document requests that have been objected

24   to and interrogatories and requests for admission.  And I know

25   Mr. Cross and the Coalition folks have quite a bit that they
```

```
1    have served on us that we -- that are going to require a lot of
2    work on the Secretary's office.  And we have been trying to get
3    through the election obviously before beginning that process of
4    assembling the search terms and things like that.
5            So I just -- I just wanted to clarify:  Do we need to
6    have our clients work on that?  Or, you know, what should we do
7    in the meantime?  Because we both have, like, pending items
8    with the other that we would have to meet and confer about and
9    then bring discovery statements to you.
10           THE COURT:  Why don't -- why don't you do that --
11   begin to talk after all of the -- after the 15-day period is
12   over.
13           MR. TYSON:  Okay.  Thank you, Your Honor.  That will
14   work.
15           THE COURT:  Yeah.  Why don't you just start doing it
16   that way.
17           MR. McGUIRE:  Your Honor, I think we had some audio
18   issues on our end judging by what I'm hearing.
19           So just to reiterate, our brief -- our plaintiffs'
20   brief would be due in ten days, which is Friday the 12th, 15
21   pages per group and then within five -- and the State's brief
22   on the same day.  But then within five days later, not skipping
23   weekend days, max five-page response?
24           THE COURT:  Right.
25           MR. McGUIRE:  Thank you.
```

1          MR. BROWN:  Thank you, Your Honor.

2          MR. CROSS:  Your Honor, two quick things.  I did want

3  to clarify one thing.  Mr. Tyson mentioned earlier he thought

4  we were in agreement on not having an evidentiary hearing on

5  standing.

6          Our position was and is we just don't think there

7  should be a standing-only proceeding.  But I did want to

8  reserve, once we see the briefing, if we think an evidentiary

9  hearing is helpful for the Court, we may come back on that.

10  But maybe it won't be needed with the further briefing.

11          THE COURT:  You can notify us of that once you get --

12  see what they submitted also.

13          MR. CROSS:  That was the idea, Your Honor.  I just

14  didn't want to leave the impression that we were waiving that.

15          The last thing, Your Honor, is:  Given the pace at

16  which we are moving on the BMD stuff and the possibility we may

17  be dealing with an interlocutory appeal, we would appreciate

18  Your Honor's attention to the fee request at the Court's

19  earliest convenience.

20          It is a substantial sum, and I won't go into the

21  merits here.  But it looks like we're going to be a long time

22  before we get to a resolution on the BMD claims.  So if we

23  could address that, we would appreciate it.

24          THE COURT:  Okay.  All right.  Can you remind me

25  whether the last time your clients provided affidavits in

1  connection with the DRE claims and not -- or were there

2  affidavits also in connection with the -- with the BMD amended

3  claims?

4       MR. CROSS:  There were new declarations supplied

5  regarding the BMD system.

6       THE COURT:  All right.

7       Okay.  Anything else for the good of the order?

8       Okay.  All right.  We'll look for the submissions.

9  If we need to talk to you, then we'll let you know.

10      Okay.  Thank you very much.  I hope everyone is well

11 and your families are well.  I neglected to start that way.  I

12 always am concerned about everybody and how each of your teams

13 are.  I know it has been a very challenging time.

14      And, Mr. Tyson, are things at all calming down at the

15 State?

16      MR. CROSS:  You are muted, Bryan.

17      THE COURT:  You are muted.  Mr. Tyson, you are muted.

18 I can't hear you.

19      MR. TYSON:  I apologize, Your Honor.  I think my

20 phone cut out.

21      There is plenty to do.  It is a little bit slower.

22 But as soon as the legislature acts, I am sure we will have

23 plenty more to do as well.  So we will see.

24      THE COURT:  Well, it certainly seemed like Georgia

25 was the center of the world for a while.  That's a little

```
 1    exaggeration, but it did certainly -- there was a lot going on.

 2           MR. BROWN:  We have always believed that Georgia is

 3    the center of the world, Your Honor.

 4           MR. CROSS:  Now everybody knows.

 5                   (Unintelligible cross-talk)

 6           MR. CROSS:  Everybody knows where the Big Chicken is

 7    now.

 8           THE COURT:  For sure.

 9           Very good.  All right.  Good to see you-all.  Take

10    care.

11           MR. CROSS:  Thanks, Judge.

12           MR. TYSON:  Thank you, Your Honor.

13                   (The proceedings were thereby concluded at

14                   12:13 P.M.)

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


     I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

the United States District Court, for the Northern District of

Georgia, Atlanta Division, do hereby certify that the foregoing

43 pages constitute a true transcript of proceedings had before

the said Court, held in the City of Atlanta, Georgia, in the

matter therein stated.

     In testimony whereof, I hereunto set my hand on this, the

2nd day of February, 2021.




_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT