# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF GEORGIA
                          AUGUSTA DIVISION

The Twelfth Congressional     )
District Republican Committee,)
et al,                        )
                              )
          Plaintiff,          )
                              )
     vs.                      )      Case No. 1:20CV180
                              )
Bradford J. Raffensperger, et )
al,                           )
                              )
          Defendant.          )
_____)

                       MOTIONS HEARING
             BEFORE THE HONORABLE J. RANDAL HALL
             CHIEF UNITED STATES DISTRICT COURT JUDGE
              THURSDAY, DECEMBER 17, 2020; 10:07 a.m.


FOR THE PLAINTIFFS THE TWELFTH CONGRESSIONAL DISTRICT
REPUBLICAN COMMITTEE, BRIAN W. TUCKER, CATHY A. LATHAM, AND
EDWARD METZ:

     Christopher I. Kachouroff, Esquire
     Patrick M. McSweeney, Esquire
     Robert J. Cynkar, Esquire
     McSweeney, Cynkar & Kachouroff, PLLC
     13649 Office Place, Suite 101
     Woodbridge, Virginia 22192
     (703)365-9900

     John Emmett Clyde Vines, Esquire
     Post Office Box 1422
     Metter, Georgia 30439
     (912)243-0519

FOR THE DEFENDANTS BRADFORD J. RAFFENSPERGER, REBECCA N.
SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, AND ANH LE:

     Russell D. Willard, Esquire
     OFFICE OF THE ATTORNEY GENERAL-ATLANTA
     40 Capitol Square, SW
     Atlanta, Georgia 30334
     (404)656-7298
```

FOR DEFENDANTS TIM MCFALLS, MARCIA BROWN, SHERRY T. BARNES, TERENCE DICKS, AND BOB FINNEGAN:

    Bryan F. Jacoutot, Esquire
    Bryan P. Tyson, Esquire
    Diane F. LaRoss, Esquire
    Taylor English Duma, LLP
    1600 Parkwood Circle, Suite 400
    Atlanta, Georgia 30339
    (770)434-6868

FOR THE INTERVENOR DEFENDANTS DEMOCRATIC PARTY OF GEORGIA, INC., AND DSCC,

    Amanda R. Callais, Esquire
    John Geise, Esquire
    Perkins Coie, LLP
    700 13th Street NW, Suite 800
    Washington, DC 20005
    (202)654-2000

    Joyce Gist Lewis, Esquire
    Krevolin & Horst, LLC
    1201 Peachtree Street, NW
    One Atlantic Center, Suite 3250
    Atlanta, Georgia 30309
    (404)888-9700

FOR THE INTERVENOR DEFENDANTS GEORGIA STATE CONFERENCE OF THE NAACP, GEORGIA COALITION FOR THE PEOPLES AGENDA, INC., AND HELEN BUTLER,

    Julie M. Houk, Esquire
    Lawyers' Committee for Civil Rights Under Law
    1500 K Street, NW, Suite 900
    Washington, DC 20005
    (202)662-8391

    John P. Batson, Esquire
    Post Office Box 3248
    Augusta, Georgia 30914-3248
    (706)737-4040

OFFICIAL COURT REPORTER:

    Lisa H. Davenport, RPR, FCRR
    Post Office Box 5485
    Aiken, South Carolina 29804
    (706)823-6468

1          (Call to Order at 10:07 a.m.)

2          THE CLERK:  The court calls case CV120-180.  The

3   Twelfth Congressional District Republican Committee, et al,

4   versus Bradford J. Raffensperger, et al.  Here for a Complaint

5   and Emergency Motion for Temporary Restraining Order and

6   Preliminary Injunction hearing by video teleconference.

7   Present for Plaintiffs The Twelfth Congressional District

8   Republican Committee, Brian W. Tucker, Cathy A. Latham, and

9   Edward Metz are Christopher Kachouroff, Johnny Emmett Vines,

10  Patrick McSweeney, Robert Cynkar.  Present for Defendants

11  Bradford Raffensperger, Rebecca Sullivan, David Worley, Matthew

12  Mashburn and Anh Le is Russell David Willard.  Present for

13  Defendants Tim McFalls, Marcia Brown, Sherry T. Barnes, Terence

14  Dicks, Bob Finnegan are Bryan Jacoutot, Bryan Tyson, and Diane

15  LaRoss.  Present for Intervenor Defendants Democratic Party of

16  Georgia, Inc., and DSCC are Amanda Callais, John Geise and

17  Joyce Lewis.  Present for Intervenor Defendants Georgia State

18  Conference of the NAACP, the Georgia Coalition for the Peoples

19  Agenda, Inc., and Helen Butler are Julie Houk, John Batson.

20  Also present is Halsey Knapp.

21          THE COURT:  Thank you, Mrs. Capps.

22          Good morning, everyone.  Due to the continuing surge

23  of the Corona Virus we are conducting this hearing today by

24  video with nationwide audio streaming.  I know Mrs. Capps has

25  given you some direction, but I remind all video participants

1    that your mic should be muted until you are called upon to

2    speak this morning.  I also stress that federal court rules

3    strictly prohibit recording by anyone whether you're

4    participating by video conference or audio stream of recording

5    any part of this hearing today.

6            Now on December 9th the Plaintiffs in this case

7    filed a Complaint and Emergency Motion for TRO and Preliminary

8    Injunction asking this court to essentially declare two rules

9    now in effect in an ongoing election to be in violation of

10   Georgia law.  At issue are the rules for receipt and processing

11   of absentee ballots including the use of drop boxes and

12   Plaintiffs seek to halt the use of those rules in the now

13   ongoing United States Senate run-off elections.

14           Defendants and Intervening Defendants have responded

15   in opposition to the motion for TRO and also seek dismissal of

16   Plaintiffs' Complaint.  The Court does note that statewide

17   voting has already begun in this run-off election and election

18   offices are now receiving absentee ballots.  I also note that

19   under Rule 65 the Court has consolidated the consideration of

20   the equitable motion and Complaint.

21           Now I intend to conduct this hearing in two parts this

22   morning.  First, I have what I call two threshold issues that I

23   believe have to be resolved before I can even consider the

24   merits of the Complaint and the injunction request.  What I am

25   going to do is I am going to address my complaint -- my

1    questions, rather -- and concerns over these two issues to the

2    Plaintiffs and then I will allow the Plaintiffs to respond to

3    my questions.  After hearing from the Plaintiffs, then my plan

4    is to seek responses if any want to be made from the Defendants

5    and from the Intervening Defendants.  If the Plaintiffs

6    successfully overcome what I consider these two critical

7    issues, then we will move into argument on the merits of the

8    Complaint and motion.

9            As I said there are two threshold issues that I find

10   to be very critical in this case.  In fact, I see these as

11   significant obstacles that the Plaintiffs today are going to

12   have to overcome.  It is a fairly heavy lift in the Court's

13   view.  The first is the issue of standing.  In looking at the

14   record -- and I have reviewed the record very carefully in this

15   case -- what I see is as to these Plaintiffs a failure to,

16   first and foremost, prove the critical element of standing and

17   that is an injury in fact, a particularized actual and imminent

18   injury.

19           As to the standing for the individual Plaintiff voters

20   the Court has looked at not only the general case law in this

21   area, but, more importantly, the *Wood versus Raffensperger* case

22   that has recently come through the Northern District of Georgia

23   and the Eleventh Circuit and the finding there is that the

24   claims by in that case Mr. Lin Wood, the Plaintiff and a

25   Georgia voter, was nothing more than a general grievance, was

1   not particularized, and standing was found not to exist.

2          On the issue of the party the Twelfth Congressional

3   District Republican Committee, the Plaintiffs in this case in

4   the response filed yesterday to the various motions to dismiss

5   argued that the diversion of resources was sufficient to

6   establish standing for that organization.  However, I am still

7   not convinced today that that meets the requirement.  As I see

8   it their claim is based upon speculation about actions or

9   conduct of independent bad actors that may or may not exist and

10  may or may not act during the course of this run-off election.

11  Spending money or directing resources based on a fear of

12  speculative harm does not in this Court's mind establish a

13  concrete injury.

14         As to the additional assertion of standing on behalf

15  of two of the Plaintiffs -- those being the presidential

16  elector and the member of the Libertarian party -- again,

17  looking beyond the general grievance issue, I believe that

18  their claims like the organization's claims are based upon

19  speculation about actions or conduct of independent bad actors

20  and simply they see ghosts behind a door but I don't see any

21  evidence of ghosts, at least at this point, and there is just

22  no particularized actual impending harm facing those parties

23  that would be sufficient to establish standing in a case like

24  this.

25         So that's the first obstacle that I see the Plaintiffs

1    have to try to overcome this morning and the second is kind of

2    a 10,000-foot issue and that's the issue abstention and the

3    Supreme Court and the Eleventh Circuit have already made very

4    clear in recent rulings that it is not the place of a federal

5    court or certainly is a place that should be only entered in

6    extreme caution to step into the middle of an election.

7         Now in most of the cases that have been decided

8    recently it was either post-election or on the eve of election,

9    but in this case we are now in the midst of an election, and so

10   as I look at the *Purcell* -- what I would call the *Purcell* case

11   and the line of cases that have been decided under that *Purcell*

12   doctrine -- I have real concerns about whether this court

13   should if standing is met even entertain this action at this

14   point and I say that because not only following the direction

15   of the Supreme Court and the Eleventh Circuit as to exercising

16   extreme caution or taking such a drastic action, but I look at

17   this case and as I previously mentioned on standing the fraud

18   concerns at this stage are all highly speculative.

19        I note there is a delay in filing of this case.  So

20   the issue of whether the Plaintiffs exercised reasonable

21   diligence I think is a significant factor to consider.  These

22   rules that are now the subject of this Complaint have been in

23   effect for months.  They applied during the November 5th

24   election.  The fact is the case was not filed immediately after

25   the November 5th election and I say that because there was in

some of the responses or in the response the Plaintiffs filed in this case there was some indication that not until the November election did they realize the potential harm of these rules.  I'm not sure I am buying that argument.  I think the fact is that these rules have been in effect.  I think there's been a lot of discussion in the political and legal world about these rules and the effect upon the elections.  Those concerns, if they are legitimate, existed prior to the November election and certainly existed immediately after the November election, but yet I have a lawsuit that wasn't filed until December 9th after absentee ballots were, in fact, printed and mailed.

I also note that this action is asking -- this is all part of what I call the mix that goes into this abstention cake -- but asking this Court to direct state and local officials to comply with state law I think is a factor that runs or counters the court taking this case.  Clearly, a federalism issue exists.  *Pullman* issues exist in this case.  *Colorado River* issues exist in this case.  Ultimately, this case seems to me to be a classic case that has been identified by the Supreme Court and the Georgia court of -- and the Eleventh Circuit Court of Appeals.

I failed to mention as I talked about *Pullman* and *Colorado River*, I mean clearly there are state courts that are entertaining these complaints with these rules.  It just seems to me to be as I said the classic case for why the Supreme

1    Court said the federal courts should abstain from intervening
2    in elections, particularly one that is now well underway.
3         So I say that because I now think the Plaintiffs need
4    to address my concerns -- these what I think are significant
5    obstacles to this case moving forward.  It is a heavy lift,
6    but, nevertheless, a lift that they have an opportunity to now
7    try to make.  So, again, what I'll do is ask the Plaintiffs to
8    address my concerns over these two obstacles and assuming that
9    -- and then once they're finished I'll call upon the Defendants
10   and the Intervening Defendants who wish to offer any comment or
11   argument in response to their comments.  So with that I'll now
12   look to the Plaintiffs to respond to my concerns.
13        MR. MCSWEENEY:  Your Honor, this is Patrick McSweeney
14   for the Plaintiffs.  Let me address the standing of the lead
15   Plaintiff, the Twelfth District Committee.  We have two
16   essential constitutional claims.  One is equal protection and
17   the other is freedom of association, both of which have been
18   violated by the Defendants' actions.  The first -- equal
19   protection -- is violated because the party -- in fact, all of
20   the Plaintiffs -- are in a class that each one of which has a
21   right to challenge the irrational classification, the class
22   being those that are not accorded drop boxes and those that
23   are.  The state has decided to spend money to subsidize and
24   locate drop boxes only in areas where there are clearly
25   overwhelming Democratic voters.

1    THE COURT:  Let me ask you -- before you move on, you

2  say the state has done that.  As I understand the decision as

3  to whether to use drop boxes and where to place them is a local

4  decision made by each local Board of Elections.  Is that not

5  correct?

6    MR. MCSWEENEY:  That is correct, Your Honor.  However,

7  the Drop Box Rule enables this classification.  Obviously,

8  Republican areas, as the evidence in other cases and this case

9  establish, are areas in which in-person voting is clearly

10  preferred.  The overwhelming amount of ballots, absentee

11  ballots, mail-in and drop-off ballots are in Democratic areas.

12  So it's the action of the State Election Board members that

13  produce this classification.

14    THE COURT:  But are Republican voters prohibited from

15  accessing the drop boxes?

16    MR. MCSWEENEY:  They are not prohibited from accessing

17  unless the county does not have those boxes.  There are no

18  boxes in those Republican districts.

19    THE COURT:  But in those counties there are postal

20  mailboxes, aren't there, where they can be dropped off for

21  mailing in if that voter should decide they're uncomfortable

22  with in-person voting?

23    MR. MCSWEENEY:  That's exactly what the general

24  assembly anticipated -- only two methods: in-person or mail-in.

25  Not drop box.

1          THE COURT:  Okay.

2          MR. MCSWEENEY:  Clearly, there is no drop box option

3     accorded by the general assembly statutes which were enacted or

4     revised as late as 2019.

5          THE COURT:  All right.  Well, I led us into merits.

6     Let's go ahead and hear about standing.

7          MR. MCSWEENEY:  The law of standing allows challenge

8     to a classification by the members who are affected within

9     those classifications.  The second claim which is the

10    infringement of the right of freedom of association is affected

11    whenever a party or any organization engaged in political

12    activity is forced by a rule to respond by diverting resources.

13    In this case virtually all of our resources are being diverted

14    to responding to two major problems we identified in our

15    Complaint:  The first is the lack of verification of the

16    voter's identification, the signature match and the second is

17    the drop box presence, the use of drop boxes.  That has clearly

18    given rise to our exercise of our right to raise the diversion

19    of resources claim which is well identified in more than a

20    dozen cases which I cited in our reply.

21          The harm comes not from -- not simply because they're

22    bad actors.  The general assembly dealt with the problem of bad

23    actors when it revised the election code and it did so in order

24    to limit, minimize or to the extent it could preclude ballot

25    harvesting and that's something that's done by bad actors.  The

1    code specifically addresses those abuses.  To waive that off as

2    simply a complaint about the action of private,

3    non-governmental entities or individuals misleads and ignores

4    the fact the general assembly set up this system to minimize

5    ballot harvesting.

6           Our argument that the absence of effective voter

7    signature identification and matching and drop boxes

8    facilitates ballot harvesting.  It allows far more of

9    interaction by third-party activists with voters, either

10   through intimidation, bribery or whatever illicit means, it is

11   the means established by the rule we've challenged -- the rules

12   we've challenged that facilitate and enable that.  That is the

13   essence of our challenge, not the action of bad actors.

14          That is the problem which the general assembly

15   addressed when it came up with this version of the code.

16   That's what we're seeking to enforce.  We're only asking that

17   the code as enacted by the general assembly be enforced.

18   Clearly, we have -- the Twelfth District Committee clearly has

19   standing based upon its diversion of virtually all of its focus

20   of energy and resources to these problems presented by the

21   rules changes that we have attacked.

22          Now if you want, Your Honor, I can move to your

23   abstention concerns --

24          THE COURT:  Yes.

25          MR. MCSWEENEY:  -- which I have addressed in a reply

1  brief.

2        THE COURT:  Yes.

3        MR. MCSWEENEY:  Let me go first with *Purcell*.  *Purcell*

4  does not lay down black-letter prohibition.  It does not lay

5  down a universal rule that cases that are brought at this

6  juncture in an election cycle are to be precluded.  Its concern

7  was the confusion that would be created by the introduction of

8  this litigation close to an election.  The problem that we have

9  and has not been countered by the Defendants or intervenors is

10 that there is now widespread confusion among the voters, even

11 the county election officials -- considerable confusion brought

12 about by the actions of these Defendants.  What relief we seek

13 would eliminate or minimize that confusion if the Defendants

14 are simply required to conform their actions to what the

15 general assembly prescribed.  So this is the reverse of the

16 concern that *Purcell* addresses.

17       We're attempting to provide a way to eliminate that

18 confusion which we've established in these declarations as

19 widespread, not just among voters, but among the county

20 officials as well.  We're not sure -- I'm not sure we

21 identified any effort to eliminate that confusion on the part

22 of the Defendants.  Only this court can do that by eliminating

23 the two rules which were unauthorized and in direct conflict

24 with the election code that the general assembly established

25 just a year ago.  The ---

1          THE COURT:  And you don't think that me entering an

2     order enjoining the use of the boxes and the processes that

3     were used for absentee ballots during the November election --

4     you don't think that would cause confusion statewide?

5          MR. MCSWEENEY:  Not undue confusion, no, Your Honor.

6     You made the point earlier.  Every voter -- every absentee

7     voter -- has the option of using the U.S. mail which is the

8     second alternative the general assembly provided for submitting

9     an absentee ballot.  They are the only two ways:  In person or

10    by mail.  They still have that option of using the mail which

11    is left to everybody else in the state who does not have a drop

12    box.

13         If there is any impact, it's only the impact that

14    comes from conforming to the laws that the general assembly

15    enacted.  I cannot see how that could be an actionable

16    confusion.  The confusion is caused by the change in the rules

17    that the general assembly established.  All we're asking is

18    that you require the enforcement of the laws as enacted by the

19    general assembly.

20         The *Colorado River* case -- I have run into this

21    countless times in recent years.  The essential requirement is

22    that there has to be a parallel court action in state court.

23    There is no such parallel state action.  In fact, none include

24    the claims that we assert in our Complaint.  The *Pullman* issue

25    I think I've dealt with in the response and now reply.  *Pullman*

1   applies only when there is some ambiguity in the law.  There is
2   no ambiguity in the state law.  The plain language of the
3   statutes that are involved here, particularly the code sections
4   21-2-381, -382, -385, and -386 are plain on their faces.  There
5   is nothing ambiguous and Defendants haven't pointed to any
6   ambiguity that needs to be resolved by a state court or any
7   other court.  It is plain on its face.  Now that is the
8   distinguishing feature in this case -- the feature that
9   distinguishes this case from the *Pullman* case.  So I think we
10  dealt with both *Pullman* and *Colorado River* and I think *Purcell*
11  in our reply.

12          Again, going back to *Purcell*, we're trying to
13  eliminate confusion -- certainly, to minimize it.  There is no
14  confusion if drop boxes are eliminated as the law requires.  It
15  simply means the voter has to use the other option which is
16  allowed by the code and which is to use the mailbox.

17          Your Honor, you did -- you did move into an area that
18  you didn't identify such as the question of Laches.  If you
19  want to address that now I will.

20          THE COURT:  Yes, let's do.  I think that's a critical
21  issue.

22          MR. MCSWEENEY:  No one knew whether there would be a
23  run-off until after the election -- in fact, until sometime
24  after the general election.  The rules that we challenged are
25  rules that we adopted because the old rules were going to

1    expire.  Now we do -- it says quite candidly that we didn't

2    appreciate the problem of lack of verification and the problem

3    posed by these drop boxes until after the general election

4    cycle.

5            I think that's a critical fact.  There is ample time

6    to deal with this confusion before the election.  Simply

7    eliminate that unauthorized use of drop boxes and require that

8    the provisions of the law, particularly Section 386 which the

9    Defendant says it intends to abide by and is instructing county

10   officials to implement, would not be changed.  That's what they

11   say they want to do and we will point out that there are some

12   discrepancies between that general representation the

13   Defendants make and what's actually happening, but there can be

14   no concern about what would happen now in anticipation of the

15   vote in January.

16           The key difference is here that we acted upon

17   realizing the concern about drop boxes and the lack of

18   verification which was not something that was reasonably

19   available to these people before they occurred in the general

20   election.  Those new rules were extended, readopted on

21   November 23rd.  Otherwise, they would have expired before the

22   run-off.  So we acted promptly after learning of the

23   reactivation, the extension of those rules which we consider

24   unauthorized and illegal because they're in direct conflict

25   with state law as soon as we realized that they were going to

1   be reauthorized and not expire by their own terms as originally

2   adopted.

3          THE COURT:  Okay.  Thank you for that response.  I'll

4   now hear -- I want to hear first from the state Defendants.

5          Is that you, Mr. Willard, or whoever is on the call

6   representing the state Defendants?

7          MR. WILLIARD:  Your Honor, yes, I am the only one here

8   today representing the state.  You'll have to pick on me to the

9   extent that you want to.  I appreciate the opportunity to deal

10  with these two critical issues that are fatal to Plaintiffs'

11  claim for relief.  They still haven't really addressed your

12  standing concerns.  They throw up a lot of chatter.  They talk

13  about their equal protection claims, but as the Court pointed

14  out their equal protection claims, to the extent that they are

15  even arguably valid, there is only traceability to non-named

16  county defendants.  Their complaint is really against the

17  counties that decided not to establish secure drop boxes if

18  there is any disparate treatment between voters from county to

19  county and that disparate treatment if it, in fact, exists is

20  not to an individual class or readily identifiable class of

21  voters.

22         As Your Honor is aware there is no party registration

23  in Georgia.  You have voters who may cast ballots for a

24  particular partisan candidate, but we don't have Republican

25  voters registered in the state.  We don't have Libertarian

1    voters.  We don't have the Democratic party voters.  So you

2    have an issue where there is not a readily identifiable class

3    that is being -- is suffering disparate treatment.

4         They talk about -- they said that the only ways to

5    vote are in person and mail.  That's just flat out not true.

6    There is delivery of ballots to local election officials.  That

7    is permitted under the statute and what the State Election

8    Board did in the light of the fact that we're in the midst of

9    not only a global pandemic but a still-in-existence

10   state-declared public health emergency, they adopted a rule

11   that said that delivery to local election officials is

12   accommodated both by handing it across a counter to a live

13   person or utilizing one of these secure drop boxes and here are

14   the crits that counties need to adopt if they erect one of

15   these secure drop boxes.

16        You've got to remember we're not dealing with just

17   voters and election officials and a lot of these counties, you

18   know, the local election office is behind the tax office,

19   countless myriad county workers, and what the state was trying

20   to do was allow the counties to avoid exposing county workers

21   to folks constantly coming in and bringing and dropping off

22   absentee ballots.  So it developed a common sense solution that

23   Judge Grimberg found in the *Wood* case that is completely in

24   compliance with the state law in permitting this sort of

25   absentee ballot scheme where they could securely drop off and

1    deliver those ballots to the election officials via the secure

2    drop box which is clearly authorized by state law.

3           The freedom of association claims and their argument

4    about diversion of resources is likewise unavailing here.  They

5    talk about the lack of signature verification, but they really

6    have no evidence showing that any ballots are being accepted

7    with insufficient signature verification.  They complain again

8    about the use of drop boxes and how that discriminates against

9    Republican voters and Libertarian voters.  Once again, we don't

10   have those in Georgia.  We have voters.  And they have to

11   identify a readily discernable class of voters that are being

12   treated disparately by the state Defendant in order to have

13   traceability back to the Defendants for Article Three standing

14   and they have yet to articulate that.

15          Their complaint is, as the Court acknowledged, is

16   really against ghost or I would argue fictional and imagined

17   potential bad actors out there who could abuse the secure drop

18   box.  By that same logic they can just as easily go out and,

19   quote, abuse the U.S. Postal Services mail drop boxes which are

20   not under 24-hour video surveillance and have none of the

21   safeguards that have been built into the system by the State

22   Election Board and their promulgated rules.

23          Despite the fact that they have failed to articulate

24   standing, even if the Court were somehow to decide that they

25   have established standing to proceed on their claims, they just

1  flat out cannot get around *Purcell*.  *Purcell* has laid down --
2  they say it's not a bright line rule; it's not concrete; it's
3  not a bar to these type of claims.  The Eleventh Circuit as
4  recently as two months ago pretty much put that to lie in the
5  *New Georgia Project* case.  We have had a Northern District
6  decision come out against us that had put in place some rules
7  for the then ongoing general election and Judge Grant writing
8  for the Eleventh Circuit said, sorry, we're not even in the
9  *Purcell* eve of the election; we're in the midst of the election
10  and it is a disservice to the public writ large local election
11  officials and the countless election volunteers that our system
12  depends on to change the rules midstream.  We're not at the
13  11th hour.  The clock is striking midnight on this election
14  cycle and all of a sudden Plaintiffs want to come in and change
15  the rules.  The Supreme Court and the Eleventh Circuit have
16  said, no, you cannot do that.

17       In effect, the Plaintiffs have a two-prong delay
18  problem.  They waited too long to bring their claims after the
19  alleged injury occurred which is a Laches problem for them and
20  then they waited too close to the election to try to get relief
21  from this court which is a *Purcell* problem.  Both of those bar
22  any claim for relief that Plaintiffs can try to get from this
23  court.

24       In terms of their argument and they have Eleventh
25  Amendment and *Pennhurst* problems for trying to get this court

1   to say that we should step in or you should step in and say

2   that there is a problem with a promulgated state regulation and

3   it violates state law, not only do you have *Pennhurst* problems,

4   but you have factual problems in terms of they claim that the

5   general assembly had forbidden this in its legislative

6   framework.  If the general assembly had a problem with any of

7   these promulgated rules, they had ample opportunity to exercise

8   their legislative veto.

9        Your Honor has been around probably as long as I have

10  and you may recall Georgia used to have a speaker of the house

11  who his goal was to get the general assembly to adjourn by

12  St. Patrick's Day every year so he could get down for the

13  St. Patrick's Day parade and then go down to the Atlanta Braves

14  spring training.  Well, in the midst of a global pandemic the

15  general assembly didn't get out of town until the end of

16  summer.  They came back in after these rules were promulgated

17  and there was not a chirp of legislative dissonance and

18  disagreement for what the State Election Board had done in

19  enacting common sense and completely-authorized regulations to

20  address the concerns of the public and local election officials

21  during the midst of a global pandemic and a

22  gubernatorially-declared public health emergency which is also

23  still ongoing and that is also fatal to Plaintiffs' Complaint.

24       The State Election Board out of an abundance of

25  caution reauthorized these emergency rules for the

1   January 5th runoff.  They were not required to do that.  When

2   you look at the expiration under the Georgia code of

3   promulgated emergency rules they last either from 120 days

4   after their adoption or the end of the publicly-declared health

5   emergency.  That has not happened.  Governor Kemp continues to

6   recognize that there is an ongoing public health emergency in

7   the state of Georgia and so these rules would have been in

8   effect even absent any intervening intervention from the State

9   Election Board, and yet Plaintiffs sat on their hands.

10          This is a classic case as the Fifth Circuit before the

11   split off from the Eleventh Circuit -- so this case is binding

12   on the court as well and the *Tony* decision from 1973.  Either

13   Plaintiffs are now manufacturing a constitutional violation

14   that didn't exist or as the *Tony* court said they recognized

15   that there was a potential constitutional violation and they

16   sat on their hands and they waited until after the election

17   took place because they wanted to benefit from the alleged

18   constitutional violation.  Either way, it is insufficient for

19   them now to come to this court and improper for them to ask

20   this court to grant relief.

21          Your Honor, I think I have addressed the points.  I've

22   got additional arguments that I am going to make if we get to

23   the merits of the case, but Plaintiffs clearly lack Article

24   Three standing.  There is no either actual harm or certainly

25   impending harm as the Eleventh Circuit has decreed is an

1   absolute must to establish Article Three standing.  There is no

2   traceability for many of these fictional and imagined causes of

3   action and claims of injury that are traceable to the state

4   Defendants, nor as the Eleventh Circuit held in *Jacobson* is it

5   likely that a federal court has jurisdiction to order the State

6   Election Board to promulgate regulations that would bind

7   non-party defendants.  For all of those reasons, Your Honor, we

8   ask that you end this farce and dismiss Plaintiffs' claims.

9             THE COURT:  Thank you, Mr. Willard.

10            We'll now move to the local Defendants.  I believe,

11   Mr. Tyson, is that you?

12            MR. TYSON:  Yes, Your Honor.  Good morning.

13            THE COURT:  Good morning.

14            MR. TYSON:  Bryan Tyson for the members of the

15   Richmond Board of Elections.  We appreciate your time and

16   appreciate you hearing these issues quickly.  Obviously,

17   elections are critically important and as Director Bailey's

18   declaration indicates the Richmond Board is working very, very

19   hard to get this right and follow the law and follow the

20   processes to ensure that every voter can vote.

21            I don't want to repeat what Mr. Willard has already

22   argued.  We're in large -- at large agreement with the position

23   of the state Defendants in this matter.  In terms of

24   traceability and redressibility, obviously, there is a little

25   bit more of a connection for us just because the Richmond Board

1    made the decisions to implement what the State Election Board

2    allowed, but we still have the issue of third-party action to

3    have any harm as alleged here.  So I won't belabor the point on

4    standing.

5         I'll just move into the *Purcell* pieces and the

6    Eleventh Amendment issues.  So first as Mr. Willard mentioned

7    the point -- one of the big points of drop boxes as Your Honor,

8    I'm sure, is aware, the Board of Elections office is on the

9    fifth floor of the Augusta Municipal Building and if a voter

10   wishes to drop off his or her ballot and the statute in 385(a)

11   literally allows them to personally deliver that absentee

12   ballot to the board registrars.  If they can't use a drop box

13   outside, they have to go into the building, go up to the fifth

14   floor, reach the office and deliver that way.

15        As Ms. Bailey also had in her declaration one of --

16   there is a burden on election officials if the pole -- if the

17   drop boxes were not available because she would have to keep

18   her folks in the office, keep the office open longer to receive

19   ballots after business hours -- those kind of things -- to help

20   the voters along the way.  So in terms of the delivery piece,

21   that's an important point that voters have options under the

22   statute more than that, but I think it's also important to

23   recognize that there is a very severe burden on voters.

24        When Justice Kavanaugh concurred in one of the many

25   election cases that went up to the Supreme Court this last year

in *Democratic National Committee versus Wisconsin Legislature*,
he said, "When an election is close at hand the rules of the
road should be clear and settled. That's because running a
statewide election is a complicated endeavor and at every step
state and local officials must communicate to voters how, when,
and where they may cast their ballots, your in-person voting on
election day, absentee voting or early voting."  And as he
defended the *Purcell* principle here about not making these kind
of last minute changes, that's the problem we have for voters
in Richmond County.

          The location of the drop boxes has been publicized for
this election.  They've been used throughout the 2020 cycle.
Thousands of Richmond County voters have requested absentee
ballots with the understanding that these drop boxes are
available.  They've been open and voters have been depositing
absentee ballots in them in Richmond County since Monday of
this week, and if the court was to now take away that
opportunity for voters, there is going to be a significant
issue in terms of communicating that change to the voters of
Richmond County.

          Obviously, they've been able to use these drop boxes
for the entirety of 2020 election cycle and the beginning here
of the January run-off and to take them away while that is
underway is again significant change and is, again, why we
don't alter the rules on the eve of election.  As Mr. Willard

1   referenced this is not an election we're on the eve of.  This
2   is an election we're in the middle of.  The absentee ballots
3   have been printed.  Voters have been already been delivering
4   absentee ballots to these drop boxes along the way.  So there
5   is no basis for the Court to now intervene and change that
6   process.

7          In terms of the Eleventh Amendment and the *Pennhurst*
8   problems that the Plaintiffs have as well, I think you heard
9   Mr. McSweeney say pretty clearly that this is an issue.  He
10  said they're asking for the Georgia code to be enforced.
11  They're asking the Court to conform the Richmond Defendants
12  conduct to what the general assembly provided, that the
13  regulations are in direct conflict with state law.  Well, all
14  of those determinations require this court to determine that
15  state officials are violating state law and that county
16  officials enforcing state regulations are violating state law
17  which leads to a significant problem with *Pennhurst*.

18         You have to reach into these questions of state law
19  there and while the Plaintiffs say there is no ambiguity, we
20  would agree there is no ambiguity.  These regulations are
21  absolutely allowed by the statutes that are here.  The
22  regulation on delivery interpreted what personal delivery to
23  the registrars means.  The process for the scanning of absentee
24  ballots as Director Bailey testified in her declaration are
25  critical to timely processing of absentee ballots and as the

1  Court is aware we've had a massive amount of increase of

2  absentee ballots this cycle.

3          So, obviously, I, as Mr. Willard, have additional

4  arguments if we reach the merits, but in terms of the standing

5  piece and particularly the Eleventh Amendment components and

6  the *Purcell* issues in this case, we don't believe this Court

7  should exercise jurisdiction.

8          THE COURT:  Thank you, Mr. Tyson.

9          All right.  I'll now hear from the Democratic Party of

10  Georgia, the DSCC.  Who would like to speak on their behalf?

11          MS. CALLAIS:  Good morning, Your Honor.  Amanda

12  Callais on behalf of the Democratic Party of Georgia --

13          THE COURT:  Yes, ma'am.

14          MS. CALLAIS:  -- and the DSCC and I won't belabor the

15  points that Mr. Willard and Mr. Tyson have already made, but I

16  would just like to note Your Honor is exactly right when it

17  expresses that the two threshold concerns standing and, quite

18  frankly, abstention, both on *Purcell* grounds and sovereign

19  immunity, are issues that must be overcome to move forward.

20  When I was listening to the Plaintiff counsel's answer on this

21  I was looking for an answer to this question that the Court

22  raised about speculation and there was none.  Essentially, all

23  Plaintiffs' counsel said was that they are harmed if third

24  parties are harvesting ballots as a result of these rules.

25  That is quintessential speculative conduct of a third party and

1  it's just simply not enough to get over the bar of standing.

2         What one would have anticipated happening in answer is

3  them saying, of course, Your Honor, there is fraud.  There are

4  things that we are seeing happening out there.  We know that

5  these actions are taking place.  This is not speculative.  This

6  is concrete and our voters are being harmed.  But that's not

7  the answer that Plaintiffs' counsel gave and it's not the

8  answer that he can give in this instance because there has been

9  no evidence even at the minimal level required for standing at

10 this point that there is any actual, quote, unquote, ballot

11 harvesting or voter fraud taking place as a result of these

12 rules.

13        I think what's important is that in their reply a

14 number of the cases that Plaintiffs looked at to set up their

15 diversion of resources theories such as *Crawford v Marion*

16 *County* or the *Democratic National Committee v Hobbs*, those are

17 what I would call quintessential voting rights cases where

18 there is an imminent possibility of the deprivation of a right

19 to a voter and that an organization has to respond to.  That's

20 where a diversion of resources standing really comes in --

21 where there is an imminent possibility of harm and an

22 organization is responding to that.

23        Here what Plaintiffs have expressed in their brief and

24 what they expressed in their very scant evidence is not an

25 imminent possibility.  It is an if.  It is a maybe.  It is a

1    perhaps, but it is certainly not imminent and it is definitely

2    not concrete.  I think what's also problematic is that in order

3    to create or sort of pull together concrete standing what

4    Plaintiffs' counsel said in response to this Court's question

5    was that, well, it's not that they're worried about the harm or

6    the speculative harm of voter fraud. It's that they're worried

7    that these laws do not comply with the laws set by the general

8    assembly and they're only, quote, asking that the code that the

9    general assembly set be followed.  So if that's the harm

10   here -- if that's the concrete harm, then that places

11   Plaintiffs in sort of second bucket of threshold issues that

12   this Court identified as problematic.  It places them squarely

13   within *Pennhurst* where they're asking this court, a federal

14   court, to tell state officials to follow state law.

15            So either, Your Honor, on one hand the harm that

16   they're citing is speculative and it's based on actions by a

17   third party that have not or may not take place or it's placing

18   them squarely within the *Pennhurst* doctrine, and it's simply

19   relief that this Court can't grant because it's really not

20   appropriate for a federal court to order state officials to

21   follow state law.  So for both of these reasons this Court

22   really can't move forward with the discussion of the merits on

23   this issue.

24            So, in addition to, I think, the *Purcell* issues that

25   the Court has focused on that Mr. Tyson and Mr. Willard

1  explained very well -- the fact that this is in an ongoing

2  election -- the Plaintiffs' answer to this Court's question

3  have really placed them in a double problem.  It is either

4  speculative or it is a *Pennhurst* problem and there is really no

5  way that they can get around that at this point.

6          THE COURT:  Thank you, Ms. Callais.

7          Is there anyone else that wanted to speak on behalf of

8  the Democratic Party of Georgia or DSCC?  All right.  Hearing

9  none, I'll now call upon the Georgia State Conference of the

10  NAACP, the Georgia Coalition for the Peoples Agenda, Inc., and

11  Helen Butler.  Who would like to speak on behalf of those

12  Intervenor Defendants?

13          MS. HOUK:  Good morning, Your Honor.  This is Julie

14  Houk.  I am with the Lawyers Committee for Civil Rights under

15  Law.  We represent the Georgia State Conference of the NAACP,

16  the Georgia Coalition for the Peoples Agenda, and Helen Butler

17  as Defendant Intervenors.  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MS. HOUK:  As the other counsel have already stated,

20  these two threshold issues are determinative in this case.

21  First off the Plaintiffs have failed to completely establish

22  that they have standing.  The *Wood versus Raffensperger* case is

23  very instructive in this case and it dealt with very same

24  issues just weeks ago and the Eleventh Circuit affirmed Judge

25  Grimberg's decision in that case on standing.

1          The Defendants -- the Plaintiffs have failed to

2    establish their equal protection claim.  As Mr. Willard pointed

3    out, it's up to the counties to establish drop boxes, not the

4    state.  The rule that was adopted by the State Election Board

5    offered that same opportunity to every 159 counties in the

6    state to establish drop boxes and some chose not to and that's

7    an issue they should take up with those counties if they feel

8    that they should have enacted the drop boxes.

9          Secondly, with respect to the diversion of resources,

10   the evidence they presented on that is almost zero unlike the

11   Georgia NAACP and the Georgia Peoples Agenda who have spent

12   hours in resources of educating voters across the state about

13   the use of drop boxes, how to use them, the restrictions on the

14   use of drop boxes and voters who relied on the use of drop

15   boxes for the June 9th primary, the August 11th primary

16   run-offs, and the general election on the 3rd of November

17   without any complaint by the Plaintiffs.  So you've got

18   reliance by voters such as our clients and their members on the

19   drop box offered through the counties and the state and to take

20   that away now is unconscionable.

21         We also don't have any strong argument by the

22   Plaintiffs on abstention.  As counsel have all stated there is

23   virtually no evidence that this Court should interject itself

24   in determining issues of state law that are perfectly

25   resolvable in state courts and the federal courts have clearly

1    stated that federal court should not micromanage elections in

2    this way and direct states to comply with state law.  For those

3    reasons we agree that the Court should not allow this case to

4    go forward beyond these particularly pertinent threshold

5    issues.  Thank you.

6         THE COURT:  Thank you, Ms. Houk.

7         I want to give any other lawyer that is on the video

8    call who wishes to speak to address the standing and the

9    abstention issue, I want to give you the opportunity to speak

10   now if you'd like.

11        All right.  Hearing none, Mr. McSweeney and

12   Mr. Kachouroff, you've heard those arguments.  I'll give you

13   the last word before I address my concerns.

14        MR. MCSWEENEY:  Briefly, Your Honor.  The position of

15   each of these opposing parties would mean that we could never

16   sue for a violation of a federal constitutional right in this

17   context.  If we do it before the process, it's speculative.  If

18   we do it once we begin to see the abuses during the process, it

19   is too late.  What they're saying is the Constitution is waived

20   or suspended in these situations which cannot be the law.

21        Addressing the state's argument that the general

22   assembly was in session last this summer, the state Defendants

23   could have gone to the general assembly to get the modification

24   of state law that they have affected illegally with these

25   rules, but they didn't do it.  If the question is whether we

1   have only speculative concerns, that was clearly resolved when

2   we demonstrated that through the admission of one of the county

3   officials that 500 ballots -- applications -- were submitted

4   and apparently have been accepted in one batch -- just dumped

5   on the county officials.  The abuses are already occurring and

6   they're occurring throughout the district, not just in Richmond

7   County.

8           Moving to the question of equal protection -- the

9   state's role -- the state Defendants had to approve each of

10  these drop boxes.  They had to approve each of these.  Not only

11  that, they funded these drop boxes.  They facilitated the

12  process by creating this illegal category.  These drop boxes

13  clearly offend the explicit language of the statute.

14          Now the argument -- the *Pennhurst* argument is very

15  simple.  If the question is if there is a state law violation

16  there can be no federal litigation, then *Bush v Gore* would

17  never have been resolved.  Just because you are to contemplate

18  and review a state law provision does not mean there cannot be

19  a federal constitutional claim.  That is the difference.  If

20  the violation of state law produces a violation of either the

21  equal protection clause or the First Amendment association of

22  rights, clearly we have standing.  The standing question is

23  simply as a matter of fact not involved.  Clearly, diversion of

24  resources -- and we've established we've spent countless hours

25  and we have disputed the conclusive statement of Ms. Bailey and

1   her declaration that there is verification.  We have shown that
2   there are already violations.  There are abuses.  There is no
3   *Pennhurst* problem.  There is no Colorado state problem and
4   there is no *Purcell* problem because what they do not address in
5   their responses is that they have created the confusion.  The
6   Defendants have created the confusion.

7            This case is different because it doesn't create
8   confusion.  It eliminates it by a ruling that you cannot pursue
9   these illicit rules and instructions that are contrary to the
10  existing law which, by the way, is a requirement of federal
11  law.  These are federal elections.  These are not state
12  elections.  These are federal elections to federal office which
13  the Constitution of the United States allows the states to
14  conduct.  So this is a federal enterprise and that is exactly
15  at the heart of *Bush v Gore* and the state law there was,
16  obviously, under consideration.  You cannot waive off a claim
17  like this simply because there is a state law issue involved.
18  There really is no issue because the law is plain.  If they
19  wanted to change it, they should have gone to the general
20  assembly this summer to do so.

21           THE COURT:  All right.  Thank you.  Okay.  The Court
22  has now heard from the parties on the two threshold issues that
23  the Court raised; that being Article Three standing by the
24  Plaintiffs in this case and the issue of abstention, *Purcell*.
25  On the issue of Article Three standing, the Court finds that

1   the Plaintiffs in this case have failed to establish the first

2   and most important element of standing; that is, an injury in

3   fact.  As the Court previously mentioned in its earlier

4   comments, the individual voters' claims represent nothing more

5   than a general grievance, not particularized in any fashion.

6   As to the claims by the committee and the two voters asserting

7   First Amendment claims, the Court finds that those claims are

8   simply based upon speculation, highly speculative -- highly

9   speculative issues in some cases -- many cases -- involving

10  potential actions of conduct of independent actors.  The Court

11  has noted that spending money or directed resources based on

12  some fear of a speculative harm simply does not establish the

13  concrete injury required for standing.  Nothing in this record

14  suggests to this Court that any of the Plaintiffs in this case

15  have met the important requirement of establishing an injury in

16  fact that is particularized and actual or imminent.

17          The Court also finds that had standing been

18  established that, as the Court previously mentioned, this case

19  appears to be a classic case contemplated by *Purcell* and as

20  addressed in the *New Georgia Project* case recently in the

21  Eleventh Circuit.  We are not on the eve of an election.  We

22  are -- as it relates to this particular election, we are

23  closing in on halftime.  Absentee ballots have already been

24  printed and mailed and in some cases are now being returned.

25  That seems to me to be exactly what the Supreme Court has

1  contemplated by cautioning federal courts about intervening in

2  ongoing elections and establishing new rules.

3         The Court's findings are bolstered by, again, the

4  highly speculative basis upon which the Plaintiffs' concerns at

5  this stage are based.  The delay in filing appears to the Court

6  the Plaintiffs did not exercise reasonable diligence in

7  challenging these rules, again, which have been in effect for

8  months, have already applied to prior elections.  The Court is

9  also concerned about the *Pennhurst* issues, the *Pullman* issues.

10 The Plaintiffs have admitted that they wish this Court to

11 direct state officials to comply with state law.  That is a

12 problem.

13        When you take all of these issues as a whole this is a

14 classic *Purcell* case.  These Plaintiffs are asking me to do

15 what our Supreme Court and our Eleventh Circuit simply have

16 cautioned against.  I am not willing to go there.  Based upon

17 the lack of standing and the Court's findings on the issue of

18 abstention, the Defendants' motions to dismiss are granted.

19 The Plaintiffs' Emergency Motion for Temporary Restraining

20 Order and Preliminary Injunction is denied as moot and the case

21 is dismissed.

22        This hearing is now completed and is adjourned.  Thank

23 you all very much about participating today and your interest

24 in this case, but we are adjourned.  Thank you.

25     (The hearing is concluded.)

1              CERTIFICATE OF REPORTER

2

3

4

5       I, Lisa H. Davenport, Federal Official Reporter, in and

6   for the United States District Court for the Southern District

7   of Georgia, do hereby certify that pursuant to Section 753,

8   Title 28, United States Code that the foregoing is a true and

9   correct transcript of the stenographically-reported proceedings

10  held and that the transcript page format is in conformance with

11  the regulations of the Judicial Conference of the United

12  States.

13

14  _____

Digitally signed by Lisa
Davenport
Date: 2020.12.31
19:21:41 -05'00'

15         Lisa H Davenport, RPR, FCRR

16         Federal Official Reporter

17

18

19

20

21

22

23

24

25