# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**FAIR FIGHT ACTION, INC., et al.,**

    **Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, et al.,**

    **Defendants.**

**CIVIL ACTION FILE NO.**

**1:18-CV-5391-SCJ**

## ORDER

This matter appears before the Court on Defendants' Motion for Summary Judgment concerning the substantive merits of the case. Doc. No. [450].[1]

## I.    BACKGROUND[2]

Plaintiffs Fair Fight Action, Inc. ("Fair Fight"); Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District,

---

[1] On June 10, 2020, upon Defendants' request, the Court informed the parties that they would be allowed to file two separate summary judgment motions for purposes of addressing jurisdictional and substantive/merits issues. Doc. No. [379]. The Court ruled on the jurisdictional motion on February 16, 2021. Doc. No. [612].

[2] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

Inc. (collectively, "Plaintiffs") first filed this lawsuit on November 27, 2018. Doc. No. [1]. Since then, Plaintiffs have twice amended their Complaint, Doc. Nos. [41]; [582], and the Court dismissed several of Plaintiffs' original claims. Doc. No. [68]. Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief brings certain claims against Defendants Brad Raffensperger (in his official capacity as Secretary of State of the State of Georgia (the "SOS" or the "Secretary") and as Chair of the State Election Board of Georgia), Members of the State Election Board in their official capacities (Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le), and the State Election Board ("SEB") (collectively, "Defendants"). Doc. No. [582].

In their Second Amended Complaint, Plaintiffs allege that in the 2018 General Election, Defendants "enforced unconstitutional and otherwise unlawful legislation, created and enforced unconstitutional and otherwise unlawful policies, and engaged in gross mismanagement that resulted in an election that deprived Georgia citizens, and particularly citizens of color, of their fundamental right to vote." Id. ¶ 2. Plaintiffs assert that Defendants' actions violated the First,

Fourteenth, and Fifteenth Amendments to the United States Constitution, as well as Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301. Id. ¶ 3.[3]

On June 29, 2020, Defendants filed their Motion for Summary Judgment on Jurisdiction. Doc. No. [441]. On February 16, 2021, the Court granted in part and denied in part the jurisdictional motion. Doc. No. [612]. The motion was granted in part for lack of standing as to Plaintiffs' polling place claims and for mootness as to Plaintiffs' voter list security claim and absentee ballot claims (based on dating and notification issues). The motion was denied as to the remaining asserted grounds concerning standing, mootness, and the political-question doctrine. The Court also recognized that certain claims had been abandoned

_____

[3] Specifically, Plaintiffs' five causes of action are as follows: (1) violation of the fundamental right to vote (First and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count I); (2) violation of the ban on racial discrimination in voting (Fifteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count II); (3) violation of Equal Protection (Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count III); (4) violation of Procedural Due Process (Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count IV); (5) violation of Section 2 of the Voting Rights Act of 1965 (Count V). Doc. No. [582], ¶¶ 150–222. Despite the recent amendment of the Complaint, the Court is of the opinion that its prior Eleventh Amendment immunity ruling as to the SEB (as a state agency) controls. Doc. No. [68], pp. 43–52, 85. Accordingly, only Count V (which pertains to Section 2 of the Voting Rights Act of 1965) remains pending against the SEB. The immunity ruling does not apply to the official capacity causes of actions asserted against the individual members of the SEB.

through Plaintiffs' filing of a Second Amended Complaint. Thus, for purposes of perfecting the record, the Court provided the following full list of allegations/claims that are no longer in this case: Help America Vote Act ("HAVA"); Voting Machines; Voter List Security; Use of Election Technology that is Vulnerable to Hacking and Manipulation; Absentee Ballots (dating and notification issues); Promotion of Moving and Closing Precincts and Polling Places; and Failure to Provide Adequate Resources to Polling Places.

On June 29, 2020, Defendants filed their Motion for Summary Judgment on the Merits, Doc. No. [450], arguing that Plaintiffs have failed to identify evidence sufficient to show that a reasonable jury could conclude Defendants violated any voters' rights arising under (1) the First and Fourteenth Amendments of the U.S. Constitution (Count I); (2) the Fifteenth Amendment of the U.S. Constitution (Count II); (3) the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution (Count III); (4) the Fourteenth Amendment of the U.S. Constitution's Procedural Due Process Clause (Count IV); and (5) Section 2 of the Voting Rights Act of 1965 (Count V). See Doc. No. [450], pp. 1–2. Plaintiffs have

responded in opposition, Doc. No. [490], and Defendants replied, Doc. No. [535].[4]

The Court held a hearing on the pending motion on January 12, 2021. Doc. No.

[602]. After consideration of the arguments and the parties' presentations of

material facts,[5] this matter is now ripe for review.

### A.  <u>Preliminary Procedural Issues</u>

Turning now to the facts of this case, the Court makes the following

findings of fact for the purpose of resolving the pending motion for summary

judgment. In doing so, the Court derives the facts from the admitted portions of

the parties' statements of material facts and the Court's own review of the record.

Doc. Nos. [451] (Defendants' Statement of Material Facts) ("DSMF"); [506]; [604]

(Plaintiffs' Corrected and Abbreviated Statements of Additional Material Facts)

("PSMF").

---

[4]  Additional supplemental filings are at Doc. Nos. [546]; [553]; [564]; [566]; [594].

[5]  Plaintiffs and Defendants have both filed various iterations and updates of statements of material facts, as well as responses and objections thereto. <u>See, e.g.</u>, Doc. Nos. [451]; [458]; [491]; [492]; [506]; [532]; [534]; [550]; [604]; [610]. The Court recognizes that Defendants have filed a global objection to Plaintiffs' Corrected and Abbreviated Statements of Additional Material Facts (Doc. Nos. [534]; [610]). The Court has resolved Defendants' global objection by separate order. Doc. No. [616]. To the extent that any party has filed specific objections to the facts cited in this Order, the Court has overruled said objection by the inclusion of said fact in this Order (or otherwise specified the purpose for which the Court considered the fact).

The Court resolved the parties' objections to each other's facts as it reviewed the record. If a party admitted a fact in part, the Court includes the substance of the undisputed part. If a party denied a fact in whole or in part, the Court reviewed the record to determine if a dispute exists and if it is material. The Court excludes facts, or parts of facts, that are legal conclusions, immaterial, inadmissible at trial, or not supported by citation to record evidence. See LR 56.1(B)(2)(a)(2), NDGa. With that in mind, the undisputed material facts for purposes of summary judgment are as follows.

### B. Statement of Facts[6]

As indicated above, Plaintiffs assert five constitutional and statutory challenges based upon factually distinct "theories of voter suppression" arising from certain policies and actions of Defendants concerning training, list accuracy, list maintenance (also referred to as "Use it or Lose it" and "voter purge"), and voter registration (also referred to as the "Exact Match Policy"). Doc. No. [543], p. 6.

---

[6] Additional facts will be set forth as they become necessary for discussion of Plaintiffs' claims and the issues presented in Defendants' Motion for Summary Judgment.

6

## 1.  The Secretary's Election Training Program

State law requires that the Secretary "conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections." O.C.G.A. § 21-2-50(a)(11). County election superintendents and registrars are required to be certified by the Secretary. Doc. No. [507-1], p. 954, Tr. 175:8–176:5. The SOS provides training materials and requires that each superintendent and registrar take a quiz based on those materials to become certified. Id. Tr. 31:24–32:3. Currently, the Secretary's office conducts its annual training courses in conjunction with the Georgia Association of Voter Registration and Election Officials. DSMF ¶ 76. Superintendents and registrars must also maintain their certification by completing at least 12 hours of training annually. DSMF ¶ 77; Doc. No. [451], p. 22, ¶ 77. Plaintiffs dispute that the SOS enforces this certification requirement. Plaintiffs' Response to DSMF ¶ 77.

The Secretary's office disseminates "Election Updates," "Election Nuggets," and monthly webinars ("3T's") to provide additional guidance to superintendents and registrars in the form of webinars and bulletins. DSMF ¶ 78.

7

Plaintiffs do not dispute that the SOS disseminates these materials, but they argue the "SOS does not require anyone to view these 'guidance' documents and does not know who read, watched or understood the training materials." Plaintiffs' Response to DSMF ¶ 78 (citing Doc. No. [507-1], p. 902 (Pl. Exh. 23), Aug. 16, 2019 SOS 30(b)(6) Dep. Tr. 96:5–97:3 ("Q: Do you have any, any way to make sure that local officials review stuff that you put out? A: I think the answer to that is no. We can't assure that they do it. No, we don't have a way to do that.")). To facilitate the "prompt and efficient" distribution of these materials, the Secretary utilizes "Firefly," a digital repository for training materials and election information. DSMF ¶ 79.

Each county is assigned a liaison within the Secretary's office who distributes materials directly to their assigned counties and is a central point of contact between a county and the Secretary's office. DSMF ¶ 80. Plaintiffs do not dispute this but argue these liaisons do not "provide meaningful or effective training and oversight on the issues Plaintiffs' claims address." Plaintiffs' Response to DSMF ¶ 80. While Defendants maintain they are not responsible for training poll workers or lower-level county election personnel, the SOS "does prepare materials county officials may (but are not required) to use in training

8

their poll workers." DSMF ¶ 81. However, the SOS "encourages counties to use the poll worker training materials prepared by the Secretary of State's office and is unaware of any counties that do not use them." DSMF ¶ 89. These materials include, but are not limited to, videos, webinars, power points and other documents. DSMF ¶ 86. Additionally, the SOS publishes a public-facing webpage containing a poll worker manual, various Election Day tips, and videos regarding certain common issues. DSMF ¶ 88.

### 2. *List Accuracy*

State law explicitly assigns responsibility for maintenance of the official list of registered voters to the Secretary. See O.C.G.A. § 21-2-50(a)(14) (requiring the Secretary to "maintain the official list of registered voters for this state and the list of inactive voters required by this chapter"); O.C.G.A. § 21-2-50.2(a) (indicating that the Secretary shall be responsible for coordinating the obligations of the state under HAVA); see also 52 U.S.C. § 21083(a)(1), (4) (setting forth each state's duties under HAVA; stating that each state "shall implement . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter

9

in the State"; and stating that "[t]he State election system shall include provisions to ensure that voter registration records in the State are accurate and updated regularly").

### 3.    List Maintenance/"Use it or Lose it"

Georgia maintains a voter-list-maintenance process by which inactive voters are moved to canceled status in the voter rolls upon the occurrence of certain triggering events. See O.C.G.A. §§ 21-2-233 to -235; DSMF ¶ 110. If a voter has no contact with the elections or voter registration system for five calendar years, the voter will be sent a confirmation notice by their county registrar to confirm whether the voter wishes to remain on the voting rolls. DSMF ¶ 111. A similar confirmation notice is also sent to voters whom the State has determined may have changed residences. See O.C.G.A. § 21-2-233. If the voter returns such a confirmation notice and indicates eligibility to vote, he or she remains in active status; failure to return the notice results in the voter being moved to inactive status. See DSMF ¶ 112. The SOS may move a voter in inactive status back to active status if the voter contacts the State in one of several ways contemplated under Georgia law. See id. ¶¶ 113–115. Failure to make contact or, in the case of voters who potentially changed residences, confirm eligibility to vote results in

10

the voter's registration being changed to canceled status, at which point the individual is unable to vote without re-registering. Id. at 30–31, ¶¶ 116, 121; O.C.G.A. §§ 21-2-233 to -235.

### 4.    *"Exact Match" of Voter Registration Data*[7]

For purposes of this lawsuit, the term "Exact Match" means the voter verification program for voter registration application data, including citizenship status, used by the State of Georgia. Doc. No. [510-14], p. 143 (Pl. Exh. 1007). The parties dispute whether "Exact Match" is codified law in the State of Georgia. Doc. No. [532], ¶ 426. While the record shows that two Georgia statutes, O.C.G.A. §§ 21-2-216(g) and -220.1, concern voter registration documentation requirements and required evidence of citizenship to register to vote, Plaintiffs assert that the matching process to verify the identity of the applicant (utilizing data from the Georgia Department of Driver Services and Social Security Administration) is actually an internal procedure of the Secretary of State's Office. There is conflicting evidence as to how the procedure actually works. Doc. No.

---

[7]  For purposes of this Order, the Court will utilize the term "Exact Match." However, the Court recognizes that the same practice is sometimes referred to as "HAVA Match" by Defendants in reference to the Help America Vote Act, 52 U.S.C. § 21083(a)(5) identification requirements. Plaintiffs do not agree that HAVA requires the "Exact Match" procedures in use by the State of Georgia. See Doc. No. [492], p. 31.

[532], ¶ 415 (citing Doc. No. [238], p. 10); <u>but see</u> DSMF 140 (indicating that "[t]here is an overnight electronic process whereby the following fields from paper [voter registration] applications are checked against DDS' database: first name, last name, date of birth, driver's license number, and social security number.").

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,

12

323 (1986)). The moving party's burden is discharged merely by "showing—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325 (internal quotations omitted).

In determining whether the movant has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1090 (11th Cir. 1996). "In doing so, the district court may not weigh the evidence or find facts. Nor may the court make credibility determinations of its own." <u>Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs</u>, 775 F.3d 1336, 1343 (11th Cir. 2015) (internal quotations and citations omitted). Further, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." <u>Ellis v. England</u>, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citation omitted); <u>Jefferson v. Sewon Am., Inc.</u>, 891 F.3d 911, 924–25 (11th Cir. 2018) (holding that "conclusory allegations without specific supporting facts have no probative value").

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by

13

coming forward with specific facts showing a genuine dispute. <u>Matsushita Elec.
Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Celotex Corp.</u>, 477 U.S.
at 324 (requiring the nonmoving party to "go beyond the pleadings" to establish
that there is a "genuine issue for trial"). All reasonable doubts should be resolved
in the favor of the nonmovant. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115
(11th Cir. 1993). When the record as a whole could not lead a rational trier of fact
to find for the nonmoving party, there is no "genuine [dispute] for trial." <u>Id.</u>
(citations omitted).

The Court approaches this case "with caution, bearing in mind that these
circumstances involve 'one of the most fundamental rights of . . . citizens: the
right to vote.'" <u>Ga. State Conf. of NAACP</u>, 775 F.3d at 1345 (citations omitted).
The Court also recognizes that "summary judgment is not often granted in voter
denial lawsuits." <u>Greater Birmingham Ministries v. Sec'y of State for Ala.</u>, 966
F.3d 1202, 1221 (11th Cir. 2020). However, "[i]t is irrefutable that a motion for
summary judgment can—and should—be granted when the conditions of Rule
56 are met." <u>Id.</u>; <u>cf. Greater Birmingham Ministries</u>, 966 F.3d at 1245 (Gayles, J.,
dissenting) ("Summary judgment is generally inappropriate in intentional

14

discrimination cases because the 'legislature's motivation is itself a factual question.'") (quoting <u>Hunt v. Cromartie</u>, 526 U.S. 541, 549 (1999)).

## III.   ANALYSIS

### A.   <u>Count I: Fundamental Right to Vote Claim</u>[8]

Count I of Plaintiffs' Second Amended Complaint brings voting rights claims under the First and Fourteenth Amendments. Doc. No. [582], p. 69. Count I claims Defendants' following conduct imposed severe burdens on the right to vote: (a) failing to furnish counties and precincts with sufficient tools for voting; (b) failing to train adequately county elections officials on laws governing elections; (c) failing to maintain an accurate and secure voter registration list; and (d) removing and preventing voter registrations under the "use it or lose it" statutes and "exact match" policy. <u>Id.</u> at 70, ¶ 155. They argue that, due to Defendants' misconduct, "voters in Georgia have suffered and will continue to suffer irreparable harm—including disenfranchisement and severe burdens on

---

[8] "Plaintiffs filed suit under 42 U.S.C. § 1983, which provides them with a federal 'cause of action for constitutional violations committed under color of state law. To prevail, plaintiffs must demonstrate both that the defendants deprived them of a right secured under the Constitution or federal law and that the deprivation occurred under color of state law.'" <u>Greater Birmingham Ministries</u>, 966 F.3d at 1221–22 (citations omitted). Because the Georgia laws and practices at issue fall squarely under color of state law, the Court need only address the constitutionality of the law. <u>Id.</u>

15

the right to vote in any and all elections and disenfranchisement." Id. at 72, ¶ 157.

In moving for summary judgment on this Count, Defendants argue that "virtually all of the activity Plaintiffs complain of [in Count I] is decided and administered by counties, not State actors." Doc. No. [450-1], p. 7. They also argue Plaintiffs' claims, which they contend "largely challenge alleged *non-action*," are ill-suited for application of traditional First and Fourteenth Amendment voting rights precedent. Id. at 25 (emphasis in original). This, they argue, "leaves Plaintiffs, for the most part, in search of a court order to 'do more,' which is not obtainable relief in federal court." Id. (citation omitted).

"The Supreme Court has rejected a litmus-paper test for constitutional challenges to specific provisions of a State's election laws and instead has applied a flexible standard." Common Cause/Georgia v. Billups, 554 F.3d 1340, 1351 (11th Cir. 2009) (internal quotation marks omitted). Thus, a reviewing court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." Anderson v. Celebrezze, 460 U.S. 780, 789 (1983). The court must then "identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule." Id. The Court must consider both the

"legitimacy and strength of each of [the state] interests" and "the extent to which those interests make it necessary to burden the plaintiff's rights." Id. "Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." Id.; see also Burdick v. Takushi, 504 U.S. 428, 434 (1992).

"Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe." Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 205 (2008) (Scalia, J., concurring) (quotation omitted). However, burdens "are severe if they go beyond the merely inconvenient." Id. If a State's election law imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. Burdick, 504 U.S. at 434 (citing Anderson, 460 U.S. at 788). But if a State's election law imposes a "severe" burden, it must be "narrowly drawn to advance a state interest of compelling importance." Id. (citing Norman v. Reed, 502 U.S. 279, 289 (1992)). In other words, "lesser burdens . . . trigger less exacting review." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997). Importantly, "[t]o establish an undue burden on the right to vote under the Anderson-Burdick test, Plaintiffs

17

need not demonstrate discriminatory intent behind the" challenged practice. Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1319 (11th Cir. 2019).[9]

Using this framework, the Court addresses each alleged violation of the right to vote in turn.

### 1.    *Resources for Polling Places*

In their merits motion for summary judgment, Defendants move for summary judgment on the ground that Plaintiffs failed to set forth evidence to support their claim that Defendants caused a systemic, unconstitutional burden by failing to provide sufficient "tools for voting." Doc. No. [450-1]. This portion of Defendants' motion is moot, as the Court has previously determined that Plaintiffs lack standing to bring polling places claims. Doc. No. [612], pp. 44–49.

### 2.    *Training*

Plaintiffs bring two types of training claims. The first alleges failures to train poll workers on election laws generally, Doc. No. [582], p. 70, ¶ 155, and on

---

[9] While this Court recognizes that stay-panel opinions are "tentative," "preliminary [in] nature," and are "not a final adjudication of the merits of the appeal," this Court accepts the stay-panel's opinion in Lee as persuasive authority. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm., 950 F.3d 790, 795 (11th Cir. 2020); cf. E. Bay Sanctuary Covenant v. Trump, 950 F.3d 1242, 1265 (9th Cir. 2020) (treating the motions panel's decision as persuasive, but not binding authority).

the use of absentee ballots and provisional ballots specifically, id., ¶ 156. The second category of allegations involve failure to train superintendents on issues that they decide directly, including providing an insufficient number of provisional ballots to precincts, creating conditions that produced unreasonably and avoidably long waits to vote at polling places, providing an insufficient number of voting machines to polling places, and failing to provide an adequate number of paper ballots to polling places. Id. The Court finds the second category is moot, as the Court has previously determined that Plaintiffs lack standing to bring polling places claims. Doc. No. [612], pp. 36–42, 44–49.[10] Thus, it addresses only the first category.

Defendants argue they are entitled to summary judgment on Plaintiffs' training claims because Plaintiffs have failed to show an unconstitutional burden on voting. Doc. No. [450-1], p. 27. They also argue the poll worker training claims fail because Defendants are not directly responsible for training poll workers. Id. at 29. Plaintiffs respond that "at a minimum, genuine issues of material fact" exist as to whether they have identified unconstitutional burdens caused by

---

[10] Superintendent training is still relevant, however, to the extent it affects poll worker training through Georgia's "Train the Trainer" method.

inadequate training. Doc. No. [490], p. 25. Plaintiffs also argue that under § 1983, liability attaches regardless of whether Defendants themselves carried out the challenged practices because § 1983 applies where the defendant "subjects, or *causes to be subjected*, any . . . person" to a constitutional deprivation. Id. at 26 (emphasis in original) (citing 42 U.S.C. § 1983; Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978)).

The Court must first resolve a dispute between the parties as to what standard applies to Plaintiffs' training-related claims. Defendants argue the governing standard is 42 U.S.C. § 1983 liability for failure to train, as enunciated in City of Canton v. Harris, 489 U.S. 378 (1989). Doc. No. [450-1], p. 28. That case recognized municipal liability where an employee was inadequately trained, and that the failure to train caused a constitutional wrong. Id. at 387. To be "inadequate" for purposes of § 1983 liability, the training must "amount[] to deliberate indifference to the rights of persons with whom the [employees] come into contact." Id. at 389. In response, Plaintiffs argue deliberate indifference is not required, as the Eleventh Circuit has never applied a deliberate-indifference standard in the context of voting rights. Doc. No. [490], p. 27. They argue Anderson-Burdick is the governing standard. Id. Defendants agree that the

Eleventh Circuit has not applied failure to train and failure to supervise theories in the context of elections. Doc. No. [450-1], p. 28.

The Court agrees with Plaintiffs. While the Court recognizes the Eleventh Circuit has required deliberate indifference in other § 1983 failure-to-train contexts, the Supreme Court has made clear that the <u>Anderson-Burdick</u> framework is the proper standard for analyzing voting rights claims under the First and Fourteenth Amendments. Indeed, the Eleventh Circuit recently noted that, when considering a "generalized burden on the fundamental right to vote," the <u>Anderson-Burdick</u> balancing test, rather than a "traditional equal-protection inquiry" applies. <u>Lee</u>, 915 F.3d at 1319 (citation omitted).[11] This was an important distinction because, "[u]nder <u>Anderson-Burdick</u>, it is not necessary for a plaintiff to show discriminatory intent to make out a claim that the state has unconstitutionally burdened the right to vote." <u>Id.</u> at 1319 n.9. The <u>Lee</u> court noted, however, that "a traditional Equal Protection Clause claim is cognizable

_____

[11]  A central issue in <u>Lee</u> was whether the defendants, the Florida Secretary of State and Attorney General, had "enacted uniform standards for matching signatures" or "created qualifications or training for those who engage in the job." 915 F.3d at 1319–20. Here, a central issue is whether Defendants engaged in sufficient training and oversight to ensure uniformity in election practices such as provisional ballot availability and absentee ballot acceptance. Thus, the Court finds <u>Anderson-Burdick</u> applies, as it did in <u>Lee</u>.

in the voting context if the plaintiff alleges that discriminatory animus motivated the legislature to enact a voting law." Id. Similarly, this Court finds that a traditional § 1983 failure-to-train claim is cognizable in the voting context where a plaintiff alleges deliberate indifference. However, where, as here, the plaintiff's claims are constitutional challenges alleging a generalized burden on the right to vote, Anderson-Burdick squarely applies.[12] See Democratic Nat'l Comm. v. Wis. State Legislature, ___ U.S. ___, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurring) (noting the "Anderson-Burdick balancing test" is the "ordinary" test "for analyzing state election rules").

The Court agrees with Defendants that "[t]he law does not impose constitutional liability for governments because they do not *exceed* their statutory obligations." Doc. No. [450-1], p. 29 (emphasis in original). However, as the Court noted in its jurisdictional summary judgment order, State law requires that the Secretary "conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections." Doc. No. [612], p. 49 (quoting O.C.G.A. § 21-2-50(a)(11)). Given the

───────────────

[12] To the extent the Court's jurisdictional summary judgment order (Doc. No. [612]) implied otherwise, it is **AMENDED** herein to conform with the above-stated analysis.

22

evidence that Georgia uses a "Train The Trainer" method, wherein the SOS trains superintendents who in turn train lower-level county officials, including poll workers, Plaintiffs survived jurisdictional summary judgment (i.e., traceability) on their poll worker training claims. Id. at 54. The question that the Court left open for this Order is whether, based on Anderson-Burdick, Defendants' inadequate training of superintendents and registrars caused an unconstitutional burden on Georgians' right to vote. Id. at 54–55.

First, the Court addresses whether Defendants' allegedly inadequate training has created a burden on voting within the meaning of Anderson-Burdick. Then, it applies the appropriate level of scrutiny. Because Plaintiffs' training claims deal mostly with absentee ballots and provisional ballots, the Court divides this analysis into those subcategories.

### i.     Absentee ballots

Defendants argue the Court should grant summary judgment because (1) "Defendants are not responsible for training poll workers—superintendents are," Doc. No. [450-1], p. 29, and (2) regardless, there exist no "widespread or systemic constitutional violations" regarding absentee ballots, id. at 32. Plaintiffs argue "[g]enuinely disputed issues of fact exist as to both" issues. Doc. No. [490], p. 36.

23

Plaintiffs argue the SOS and SEB are "aware county-administered training is often insufficient," and yet "the SEB has promulgated no regulations pertaining to training and the SOS deems poll worker training 'adequate' as long as counties simply claim they have provided training." Doc. No. [490], p. 22. Plaintiffs also argue that "Defendants fail to oversee, train, and advise counties about the proper handling of absentee ballots," which resulted in failure to timely mail absentee ballots to voters; improper rejection of some absentee ballots; failure to timely notify some voters that their absentee ballots had been rejected, preventing a timely remedy; and refusal to allow some voters to cancel absentee ballots in-person, which the law explicitly permits. Doc. No. [582], ¶¶ 133–142; O.C.G.A. § 21-2-388.

First, the Court finds that Plaintiffs have failed to connect their allegations related to mailing and rejection of absentee ballots to training. Plaintiffs' facts regarding incorrect or untimely mailing do not mention training at all. PSMF ¶¶ 823–831, 833–836. Nor do they connect their facts regarding absentee ballot rejection rates to training in any way. Id. at ¶¶ 837–838. Thus, Plaintiffs have not

shown that these injuries are "fairly traceable" to Defendants' training.[13] See Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1256 (11th Cir. 2020). Further, the Court has already concluded that Plaintiffs' claims concerning rejection notifications and rejection for lack of date of birth are moot. Doc. No. [612], pp. 62–64. Thus, the Court addresses only their allegations regarding refusal to allow some voters to cancel absentee ballots in-person.

The Court finds Plaintiffs are correct that they need not show a burden is "widespread and systemic" to be severe. Hearing Tr., 134: 1–10. Nothing in Anderson-Burdick requires the Court to determine whether a burden is "widespread and systemic"—rather, the analysis is focused on the "character and magnitude" of the alleged burden on voters' First and Fourteenth Amendment rights. Anderson, 460 U.S. at 789; Burdick, 504 U.S. at 434. However, there still

---

[13] While Plaintiffs do state that "SOS training materials have . . . explicitly advised counties to reject absentee ballots that provide . . . the voter's mailing address instead of the voter's residence," PSMF ¶ 845, this fact cites to a ninety-seven-page document which is divided into five different attachments. Plaintiffs provide no page number, paragraph number, or even bates number to support their allegation. While the Court has been lenient where the citation allows it to locate Plaintiffs' cited evidence, it is not responsible for parsing through almost 100 pages and five attachments in search of the referenced evidence. See LR 56.1(B)(1) ("The Court will not consider any fact: (a) not supported by a citation to evidence (including page or paragraph number) . . . ."); Thus, Defendants' objection to this fact is **SUSTAINED**. See id.; Defendants' Response to PSMF ¶ 845.

25

needs to be evidence that the challenged practice "unreasonably interfere[s] with the right[s] of voters." Id.

Before delving into Plaintiffs' voter declaration and complaint evidence, the Court resolves a large number of Defendants' objections. See Doc. No. [532]. Federal Rule of Civil Procedure 56(c)(4) provides:

> An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Id. The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999). Defendants use this general rule to object to virtually **all** of Plaintiffs' voter declaration and voter complaint evidence. See, e.g., Doc. No. [532], ¶¶ 286, 287, 315, 352, 455, 526, 527, 528, 529, 530, 531, 532, 533, 555, 559, 562, 563, 564, 565, 566, 567, 569, 570, 571, 573, 574, 575, 576, 579, 580, 581, 582, 589, 708, 729, 735, 738, 741, 743, 746, 747, 765, 781, 784, 785, 787, 803, 808, 809, 810, 811, 814, 841, 868, 870, 877, 878, 879, 884, 909, 914, 915, 916, 917, 918, 924, 932, 936, 937, 938, 942, 943, 944, 1025, 1027, 1067, 1085, 1096, 1110. However, Defendants completely ignore the *next paragraph* of the case they cite for these objections: the equally well-established

26

rule that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'" <u>Macuba</u>, 193 F.3d at 1323 (quoting <u>Wright v. Southland Corp.</u>, 187 F.3d 1287, 1304 n.21 (11th Cir. 1999)) (citations omitted); <u>see also</u> <u>Cooper v. S. Co.</u>, 260 F. Supp. 2d 1258, 1272 n.7 (N.D. Ga. 2003) ("[T]here is no requirement that evidence be presented in admissible form as long as the evidence would be admissible at trial. The evidence at issue would likely be admissible at trial."). The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial. <u>See</u> <u>Pritchard v. S. Co. Servs.</u>, 92 F.3d 1130, 1135 (11th Cir. 1996) (noting that an affidavit "can be reduced to admissible form at trial" by calling the affiant as a witness). Further, 28 U.S.C. § 1746 specifically authorizes a written "unsworn declaration, certificate, verification, or statement" signed by the person under penalty of perjury to substitute for an affidavit. 10A Fed. Prac. & Proc. Civ. § 2722 (4th ed.) (citing 28 U.S.C. § 1746).[14] Thus, the Court

---

[14] Plaintiffs' declarations are signed and state: "Declaration Under Penalty of Perjury Pursuant to 28 U.S.C. § 1746."

considers any declaration or document that can be reduced to admissible form at trial.[15]

Even assuming Plaintiffs' declarations and complaints can be reduced to admissible form for trial, however, some evidence cited to support their claims related to absentee ballot cancelation are inadmissible pursuant to this Court's Order. Doc. No. [255] (ordering Plaintiffs "to identify and produce a final list" of declarants that Plaintiffs intended to use to support their claims on Friday,

_____

[15]  This conclusion also applies to Defendants' objections to emails as unauthenticated or hearsay. See, e.g., Doc. No. [532], ¶¶ 444, 445, 460, 461, 463, 471, 472, 483, 484, 485, 489, 490, 493, 494, 500, 501, 502, 503, 504, 505, 506, 507, 509, 511, 525, 557, 646, 696, 705, 711, 834, 928, 939, 991, 1001, 1004, 1006, 1014, 1082, 1088. So long as the document can be authenticated at trial and is not otherwise inadmissible, the Court can consider its contents at summary judgment. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1296 (11th Cir. 2012) (email could be considered at summary judgment if it could be reduced to an admissible form at trial); AGSouth Genetics, LLC v. Cunningham, No. CA 09-745-C, 2011 WL 1833016, at *4 (S.D. Ala. May 13, 2011) (unauthenticated transcripts could be considered at summary judgment because they could be authenticated at trial and were otherwise admissible). Furthermore, circumstantial evidence can be relied upon to show the authenticity of a document, "including the document's own distinctive characteristics and the circumstances surrounding its discovery." U.S. v. Smith, 918 F.2d 1501, 1510 (11th Cir. 1990). Finally, the Court notes that most of these emails were sent to or by employees of Defendants—making them business records or statements of party opponents. Itel Capital Corp. v. Cups Coal Co., Inc., 707 F.2d 1253, 1259 (11th Cir. 1983) (noting under Federal Rule of Evidence 803(6), documents made and kept in the ordinary course of business are admitted as an exception to the hearsay rule); Fed. R. Civ. P. 801(d)(2) (a statement is not hearsay when it is being offered against an opposing party and "was made by a person whom the party authorized to make a statement on the subject [or] . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed").

February 14, 2020). Plaintiffs argue that when "voters attempt[ed] to vote in person, having never received their ballots or unsure if their completed absentee ballots were ever received by the counties," they were "informed they cannot vote, must vote provisionally, or must travel to a centralized office first to formally cancel their ballot." Doc. No. [490], p. 36 (citing PSMF ¶¶ 868–895). Of those cited declarations, many of the ones pertinent to lack of training deal with the June 2020 primary and were thus taken and produced after February 14, 2020. See PSMF ¶¶ 893–895 (citing declarations regarding the June 2020 primary election). The Court does not consider these declarations.

There are other admissible exhibits that deal with 2018 elections for the Court to consider.[16] First, there is evidence that SEB member David Worley notified Elections Director Chris Harvey that voters in Cobb County seeking to cancel absentee ballots were not being offered provisional ballots, and in some cases, were refused provisional ballots even after asking for them. Doc. No. [510-1], p. 231 (Pl. Exh. 499). Worley warned Harvey that, because every precinct in

---

[16] Because Defendants objected to nearly every paragraph of Plaintiffs' Statement of Additional Material Facts, the Court will not follow its usual practice of addressing individual objections for each piece of material evidence. If Defendants objected on hearsay grounds and the Court cites to the exhibit in this Order, it is because the Court has concluded the evidence can be reduced to admissible form at trial.

the County had a manual with "wrong" instructions, the problems would "reoccur the rest of the day" absent a "clarification to every precinct." Doc. No. [510-2], p. 15 (Pl. Exh. 508).

There is also declaration evidence that voters attempting to cancel absentee ballots in person were treated differently in different counties. One voter in Atkinson County stated that he went to vote in person on Election Day, but because he had requested an absentee ballot, he had to argue with elections officials just to receive a provisional ballot. Doc. No. [510-13], p. 98 (Pl. Exh. 939).[17] Another voter in Gwinnett County who had requested an absentee ballot was originally not permitted to vote, was then offered a provisional ballot, and finally was permitted to vote after "being insistent." Doc. No. [510-4], p. 10 (Pl. Exh. 584). One Gwinnett County voter was permitted to vote by machine. Doc. No. [507-8], p. 39 (Pl. Exh. 66). Seven Cobb County voters were not allowed to vote by machine but were allowed to vote by provisional ballot. Doc. Nos. [508-3], p. 98 (Pl. Exh. 293); [508-2], p. 210 (Pl. Exh. 267); [508-6], p. 50 (Pl. Exh. 396); [508-3], p.

_____

[17] Plaintiffs cite to their Exhibit 847 for a similar complaint, but that exhibit is not included in their corrected filing. See Doc. No. [510-11], pp. 81–83 (skipping from Exhibit 846 to 848).

56 (Pl. Exh. 283); [508-3], p. 23 (Pl. Exh. 275); [508-4], p. 27 (Pl. Exh. 306); [508-4], p. 201 (Pl. Exh. 340). Some voters (in DeKalb County and Fulton County) were not permitted to vote at all. Doc. Nos. [508-3], pp. 62–64 (Pl. Exh. 285); [508-4], p. 164 (Pl. Exh. 335). One Gwinnett County precinct Assistant Manager stated that during the 2018 general election, there was a "unilateral change in the middle of the day" requiring voters to turn in their absentee ballots to the county elections office before returning to their polling location to vote. Doc. No. [508-4], p. 204 (Pl. Exh. 341).

There is evidence that Defendants' training materials include incorrect information on how poll workers should handle absentee ballot cancellation requests. For example, prior to the passage of HB 316,[18] Defendants state that voters who requested absentee ballots and decided not to use them were eligible to vote in person by provisional ballot. DSMF ¶ 22 n.3. Yet, the 2018 version of the SOS's Poll Worker Manual states nothing about this provisional ballot eligibility. Doc. No. [507-3], p. 109 (Pl. Exh. 34). In fact, if the voter has the

_____

[18]  HB 316 was enacted by the Georgia General Assembly "on or about April 2, 2019" after this lawsuit was filed and changed certain election laws. Doc. No. [492], ¶ 29. The parties dispute whether the legislation was actually an "overhaul" of Georgia's election laws. Id.

absentee ballot, it instructs poll workers to write "CANCELLED" on the envelope and allow the voter to "go through the normal procedures of voting." Id. If the voter does not have the absentee ballot in hand, it instructs poll workers to send the voter to the county registrar's office to request to have the ballot canceled and receive written authorization to vote in person, "which the voter must bring back to the poll." Id.

Post-HB 316, and thus currently, if a voter applies for an absentee ballot but later decides to vote in person, State law permits them to cancel their absentee ballot request. O.C.G.A. § 21-2-388. If the ballot has been received, the voter can surrender and cancel it in person. O.C.G.A. § 21-2-388(1). "If the elector has not received the ballot, has not yet returned the ballot, or if the elector has returned the ballot but the registrars have not received the ballot," the voter can still cancel the ballot in person by appearing before the managers of the elector's precinct, the registrars, or the absentee ballot clerk. O.C.G.A. § 21-2-388(2). Despite the change in the law, the version of the SOS's 2020 Poll Worker Manual produced in this litigation in March 2020 has the same "Troubleshooting" section as the 2018 version. Doc. No. [507-4], p. 106 (Pl. Exh. 35). If the voter does not have the absentee ballot in hand, it instructs poll workers to send the voter to the county

32

registrar's office to request to have the ballot canceled and receive written authorization to vote in person, "which the voter must bring back to the poll." Id. Further, the updated version of the manual, released in April 2020, *entirely* deleted instructions about how poll workers should handle in-person voters who had previously requested absentee ballots. PSMF ¶ 363; Doc. No. [507-13], p. 117 (Pl. Exh. 208). Thus, the April 2020 update includes no instructions on absentee ballot cancellation.

The Court concludes that Plaintiffs have created a genuine issue of material fact, putting forth evidence that disparate and unpredictable absentee ballot cancellation requirements cause more than an ordinary burden on voters' First and Fourteenth Amendment rights. "Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe." Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 205 (2008) (Scalia, J., concurring) (quotation omitted). And it is not requisite that voters actually be precluded from voting to have experienced a severe burden—a burden is "severe if [it goes] beyond the merely inconvenient." Id. Plaintiffs have put forth evidence that voters attempting to cancel absentee ballot requests in person must frequently deal with more than the "ordinary" burden of going through the statutory process outlined

33

in O.C.G.A. § 21-2-388. There is evidence that voters are subjected to unpredictable requirements, which vary from voting provisionally to traveling to the county office and then back to one's precinct. There is also evidence that these requirements differ based on county and precinct, and even the time of day. Finally, there is evidence that Defendants were aware of these issues and of voters being subjected to differing requirements in different counties.

The Court now turns to the State's "interest" in the challenged practice. Defendants' brief does not squarely address their interest in maintaining the existing training program. However, Defendants do argue they are not responsible for training poll workers and other lower-level county elections personnel, and "[e]vidence is lacking to suggest that Georgia's training of superintendents and registrars on absentee ballots is constitutionally deficient." Doc. No. [450-1], p. 14. The Court finds this argument unavailing for two reasons.

First, as this Court discussed at length in its previous summary judgment order on jurisdiction, Defendants are statutorily responsible for ensuring uniformity in Georgia's election administration. See Doc. No. [612]; O.C.G.A. § 21-2-50(b) (naming the SOS as the "state's chief election official"); Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("[I]it is clear that under both the Constitution

34

and the laws of the State the Secretary is the state official with the power, duty, and authority to manage the state's electoral system . . . ."); O.C.G.A. § 21-2-31(1) (requiring the SEB to "promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials"); see also Curling v. Raffensperger, 397 F. Supp. 3d 1334, 1345 (N.D. Ga. 2019) ("The Secretary of State and State Election Board also have significant statutory oversight authority to train local elections officials, set election standards, and investigate failures of local elections officials."). O.C.G.A. § 21-2-50(a) requires the SOS to "conduct training sessions . . . for the training of registrars and superintendents of elections." And as SOS representative and Elections Director Chris Harvey stated in his deposition, if the superintendents' training is insufficient or inaccurate, they lack the knowledge base to be able to train their personnel, including poll workers. Doc. No. [507-1], p. 760, Tr. 178:4–10 ("Q: If the superintendents and the registrars aren't well-trained in election laws and practices, they don't really have the knowledge base to be able to train their people; correct? A: Right . . . . If they're going to provide the training, they have to understand it.").

Defendants have not pointed to any record evidence that they attempted to remedy known burdens caused by the differing and largely incorrect absentee ballot cancellation procedures being used by various counties. Certainly, they have not asserted a state interest for failure to do so. Defendants do not claim that they updated training materials for superintendents and registrars on absentee ballots, increased the frequency of training for superintendents and registrars, or even made superintendents and registrars explicitly aware of the absentee ballot issue, to ensure that information would be passed along to lower-level workers. Plaintiffs have created a genuine issue of material fact as to whether Defendants' inadequate or inaccurate training of superintendents and registrars caused impermissible burdens on voters seeking to cancel absentee ballots in person.

Second, Defendants *do in fact* provide a Poll Worker Manual that is used to train poll workers and lower-level county elections workers. The Court sees no state interest in providing incomplete or incorrect training materials. For these reasons, Plaintiffs' Count I claim, as it relates to training on absentee ballot cancellation, survives summary judgment.

### ii.     Provisional ballots

Plaintiffs' Second Amended Complaint states that, due to inadequate or inaccurate training, county elections officials gave incorrect information on how provisional ballots would be handled; gave incorrect instructions to voters who showed up at the wrong polling place and failed to offer them a provisional ballot; and applied inconsistent and incorrect rules when handling provisional ballots. Doc. No. [582], ¶¶ 127–131. Again, Defendants argue summary judgment is warranted because (1) "Defendants are not responsible for training poll workers—superintendents are," Doc. No. [450-1], p. 29, and (2) regardless, there exist no "widespread or systemic constitutional violations" regarding provisional ballots, id. at 32. Plaintiffs argue that, "[a]t a minimum, genuine issues of material fact exist on both issues." Doc. No. [490], p. 40.

O.C.G.A. § 21-2-418 states:

> If a person presents himself or herself at a polling place, absentee polling place, or registration office in his or her county of residence in this state for the purpose of casting a ballot in a primary or election stating a good faith belief that he or she has timely registered to vote in such county of residence in such primary or election and the person's name does not appear on the list of registered electors, the person shall be entitled to cast a

37

provisional ballot in his or her county of residence in
this state as provided in this Code section.

O.C.G.A. § 21-2-418(a). Subsection (c) states that when the person has provided

the information above, the person "*shall* be issued a provisional ballot and

allowed to cast such ballot as any other duly registered elector subject to the

provisions of Code Section 21-2-419." O.C.G.A. § 21-2-418(c) (emphasis added).

Section 21-2-419 states that a person "shall cast a provisional ballot on the same

type of ballot that is utilized by the county or municipality." O.C.G.A. § 21-2-419.

Plaintiffs cite several poll watcher and voter declarations[19] to support their

assertion that "[p]oll workers consistently fail to offer provisional ballots to

voters, resulting in voters leaving polling places without being able to vote."

PSMF ¶ 909. One Gwinnett County poll watcher stated that voters were turned

---

[19] The Court addressed Defendants' objections regarding voter declarations supra. For
the same reasons, the Court cites here only to poll watcher declarations that can be
reduced to admissible form at trial. While declarations recounting conversations had by
others is hearsay, poll watchers' testimony about their own observations is not. See, e.g.,
Brown v. Univ. of Ill., No. 10 C 06104, 2015 WL 6756266, at *4 (N.D. Ill. Nov. 5, 2015),
aff'd sub nom. Brown v. Bd. of Trs. of The Univ. of Ill., 673 F. App'x 550 (7th Cir. 2016)
(holding a witness' written statement included hearsay and "could not itself be offered
as evidence at trial," but the witness' testimony at trial about her observations of
interactions between third parties "would, of course, not be hearsay"). The Court can
still consider the declarations for purposes of summary judgment. See id. (holding the
witness' written statement was "still an acceptable means of proffering the availability
of evidence for trial in opposition to a motion for summary judgment").

away if poll workers could not locate their registration and were not given a provisional ballot unless they asked for one. Doc. No. [508-5], p. 143 (Pl. Exh. 377). A second Gwinnett County poll watcher witnessed multiple voters sent away to different Gwinnett precincts without being offered provisional ballots. Doc. No. [507-13], p. 118 (Pl. Exh. 196). A Clayton County poll worker also witnessed voters being sent to other locations without being offered a provisional ballot. Doc. No. [508-3], p. 36 (Pl. Exh. 278). A Muscogee County poll watcher said at both precincts he observed, poll watchers did not offer provisional ballots to voters who were in the wrong precinct. Doc. No. [508-6], p. 46 (Pl. Exh. 395). An attorney and statewide poll watcher who observed precincts in Sumter and Dougherty Counties observed poll workers "variously, without apparent consistency" turning voters away without offering a provisional ballot. Doc. No. [508-6], pp. 23–24 (Pl. Exh. 389). A Newton County poll watcher witnessed people turned away without being offered a provisional ballot after their names were not found in the system. Doc. No. [508-7], p. 44 (Pl. Exh. 420).

Defendants argue "[t]he few [voter] declarations that do address the issue are equally inconclusive" as to whether voters were entitled to provisional ballots in the first place. Doc. No. [450-1], p. 16. However, Defendants address but three

declarations. Id. They do not address the following: Ms. Powers, a Cherokee County voter who was not offered a provisional ballot after allegedly showing up to vote at the wrong precinct[20] and had to drive to another precinct to vote, Doc. No. [507-12], pp. 485–86 (Pl. Exh. 166); Mr. Baiye, a Gwinnett County voter whose registration could not be found despite having voted in both 2012 and 2016 and was not offered a provisional ballot, Doc. No. [507-12], p. 488 (Pl. Exh. 167); Ms. Platt, a Chatham County voter who showed up to vote at the precinct where she "always" voted, was told she was at the wrong precinct, showed up to the second precinct, and was told that was also the wrong precinct, and was never offered a provisional ballot, Doc. No. [507-13], p. 4 (Pl. Exh. 168); Ms. Holt, a Webster County resident who showed up to a Webster County precinct, was told she needed to vote in "Muskogee County," [sic][21] despite never having lived in "Muskogee County," [sic] and was not offered a provisional ballot, Doc. No. [508-4], p. 160 (Pl. Exh. 334); or Ms. Terry, a Henry County voter who showed up

---

[20]  The voter disputes that she was at the wrong precinct. Her husband, who resides at the same address, was permitted to vote at the first precinct. Doc. No. [507-12], p. 485 (Pl. Exh. 166).

[21]  While the declaration refers to "Muskogee County," the Court assumes the declarant was referring to Muscogee County.

to the precinct where she had voted in the 2016 general election, was told her name was not in the registration database, and was not offered a provisional ballot, Doc. No. [508-6], p. 127 (Pl. Exh. 408). There is also evidence of voter complaints, SOS investigation reports, and SEB meeting transcripts to show that the SOS was aware of these issues. PSMF ¶¶ 910, 911, 913.

However, even assuming this evidence creates a genuine issue of material fact on the burden factor, Plaintiffs have not shown it is factually traceable to Defendants' training. This is because Defendants' training materials address provisional ballots in much greater detail than absentee ballot cancellations—and Plaintiffs have not claimed that information is incorrect.[22] The 2018 version of the Poll Worker Manual includes nineteen pages of instructions on provisional ballots, including the relevant statues[23] and SEB rules. Doc. No. [507-3], pp. 55–74 (Pl. Exh. 34). The March 2020 Poll Worker Manual included largely the same

_____

[22] Plaintiffs do claim that the 2020 Poll Worker Manual exhibits defects, including quoting an outdated SEB regulation on provisional ballots. Plaintiffs' Response to DSMF ¶ 192. However, there is no allegation that an SEB regulation caused confusion as to when or how to give out provisional ballots.

[23] Plaintiffs claim that Defendants' training materials are inadequate because they do not "provide clear instructions on an affirmative obligation to offer provisional ballots." Plaintiffs' Response to DSMF ¶ 193. However, all Poll Worker Manuals in the record include the relevant law on provisional ballots.

information. Doc. No. [507-4], pp. 54–70 (Pl. Exh. 35). Both listed the eight different kinds of voters who were eligible to vote by provisional ballot. Id. at 64–65; Doc. No. [507-3], pp. 67–68. And both include a flowchart on how to process a provisional ballot. Doc. Nos. [507-4], pp. 68--69; [507-3], pp. 71–72. Defendants also point out that the SOS's public-facing poll worker webpage instructs: "please, do not discourage a person eligible to cast a provisional ballot from casting it, ALWAYS OFFER A PROVISIONAL BALLOT! A good rule to remember is: when in doubt, give it out." DSMF ¶ 193. Unlike the evidence on absentee ballot training, Plaintiffs have not created a genuine issue of material fact that Defendants' training on provisional ballots caused the burdens complained of. For this reason, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiffs' Count I claim on provisional ballot training.

### iii.     Eleventh Amendment

Defendants argue Plaintiffs' Count I training claims are barred by the Eleventh Amendment. Doc. No. [450-1], p. 30. The Court reserved this argument to be addressed in this Order. Doc. No. [612], p. 63, n.29. Plaintiffs argue their training claims are not barred, as "Plaintiffs argue Defendants have violated the *federal* Constitution, *not* state law, and the measure of relief sought is that which

the federal Constitution requires." Doc. No. [490], p. 44 (emphasis in original). The Court agrees with Plaintiffs.

As this Court has previously noted, the United States Supreme Court has held that "a suit against state officials on the basis of state law contravenes the Eleventh Amendment." Doc. No. [188], p. 13 (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984)). In Brown v. Georgia Department of Revenue, 881 F.2d 1018 (11th Cir. 1989), the Eleventh Circuit held that the Supreme Court's decision in Pennhurst does not apply when a plaintiff alleges a violation of the federal Constitution. Id. at 1023. The Eleventh Amendment applies when the obligation allegedly violated by a state official "comes from state law" and the measure of relief "is determined by state law." S & M Brands, Inc. v. Georgia ex rel. Carr, 925 F.3d 1198, 1205 (11th Cir. 2019). Clearly, a district court "cannot enjoin [a state] to follow the district court's interpretation of [the state's] own constitution." Hand v. Scott, 888 F.3d 1206, 1213–14 (11th Cir. 2018). However, that is not what Plaintiffs' Count I training claims ask of this Court.

This Court must examine the SOS and SEB's statutory obligations to determine whether the challenged practices are traceable to and redressable by Defendants. See Jacobson, 974 F.3d at 1254 (analyzing Florida law to determine

43

whether relief against the Florida Secretary of State would redress injury caused by challenged practice). That is not to say, however, that determination of their liability will rise or fall on an interpretation of state law. As Plaintiffs point out, in § 1983 cases, courts routinely examine state statutes to determine whether a defendant is responsible for the allegedly unconstitutional practices. Doc. No. [490], pp. 44–45 (collecting cases). For example, to establish § 1983 municipal liability, a plaintiff "must show that the local government entity . . . has authority and responsibility over the governmental function at issue." Teagan v. City of McDonough, 949 F.3d 670, 675 (11th Cir. 2020). Thus, such cases pose "federal questions" that "depend[] on an analysis of state law." McMillian v. Monroe Cnty., 520 U.S. 781, 786 (1997) (citing Regents of Univ. of Cal. v. Doe, 519 U.S. 425, 429 n.5 (1997)). This does not pose an Eleventh Amendment issue.

Similarly, here, state law is relevant to Defendants' responsibility for the challenged practice and ability to redress any constitutional violations. However, Defendants' liability under Count I, if any, will be determined pursuant to the federal Anderson-Burdick framework, as evidenced by this Court's discussion supra.

### 3.    List Accuracy

Plaintiffs' Second Amended Complaint alleges that Georgia's voter registration rolls, which are maintained by the SOS, "are inaccurate, often foreclosing voters from exercising their right to vote." Doc. No. [582], ¶ 104. They claim that "[m]any Georgians who register to vote arrive at the polls and are told they are not on the list of registered voters." Id. Plaintiffs claim Defendants' failure to maintain an accurate voter registration list violates voters' First and Fourteenth Amendment rights. Id. ¶ 155. However, Defendants' Motion for Summary Judgment and accompanying brief do not address this claim. See Doc. No. [450-1], pp. 29–35 (discussing training and "list maintenance," or "Use it or Lose it").

At summary judgment, the movant's initial burden consists of a "responsibility to inform the . . . court of the basis for its motion" and to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting Cleotex, 477 U.S. 323). Further, absent notice and time to respond, the Court cannot grant summary

45

judgment on a claim not moved upon. Fed. R. Civ. P. 56(f)(2). Thus, despite Defendants' statement that they seek summary judgment on "all of Plaintiffs' claims," Doc. No. [450], p. 2, the Court concludes Defendants have not properly moved for summary judgment on Plaintiffs' Count I list accuracy claim.

### 4. *List Maintenance/Use it or Lose it*

Plaintiffs' Second Amended Complaint alleges that Georgia's voter-list-maintenance process, which the SOS oversees, erroneously cancels eligible voters from the voter rolls. See Doc. No. [582], ¶¶ 71–72. Plaintiffs contend that many individuals erroneously removed from the voter rolls do not learn that they have been removed until they attempt to vote on Election Day, at which point they cannot vote because it is too late to re-register. Id. ¶¶ 73–74. Plaintiffs also allege that the voter-list-maintenance process disproportionately affects the "young, poor, and people of color." Id. ¶¶ 75–76. They further contend that the process "unlawfully disenfranchises voters or severely burdens their right to vote" and that Georgia has "no compelling or substantial governmental interest" in the process. Id. ¶¶ 77, 79.

Defendants argue they are entitled to summary judgment on this claim "because Plaintiffs have not provided evidence of a constitutional burden." Doc.

No. [450-1], p. 35. Alternatively, Defendants argue that their list maintenance activities create only a minimal burden on the right to vote, and that burden is outweighed by three important state interests: "(1) maintaining a reliable list of electors; (2) applying the law as written; and (3) eliminating voter confusion and improving Election Day operations." Id.

Plaintiffs respond that Defendants' enumerated state interests do not outweigh the above burden on voters. Id. at 34–35. They contend that the alleged state interest in maintaining a "reliable list of electors" is not served by canceling voters whom Defendants can readily determine are in fact eligible to vote. See id. Plaintiffs also contend that Defendants cannot legitimately assert an interest in "applying the law as written" if they are "applying an unconstitutional law." Id. at 35. Finally, Plaintiffs argue that Defendants cannot claim an interest in "eliminating voter confusion and improving Election Day operations" because their list maintenance activities have in fact fomented voter confusion and worsened Election Day operations. See id.

Determining whether Defendants' voter-list-maintenance process has burdened voters' rights requires a brief review of the federal and state law

47

guiding that process. The National Voter Registration Act ("NVRA")[24] "requires state election officials to make a reasonable effort to remove certain ineligible registrants from the voter rolls." Bellitto v. Snipes, 935 F.3d 1192, 1194 (11th Cir. 2019); see also 52 U.S.C. § 20507(a)(4)(B). Under the NVRA, "the states . . . are required to conduct a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible on account of death or change of residence, and only on those two accounts." Id. at 1195; see also 52 U.S.C. § 20507(a)(4) ("[E]ach State shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of--(A) the death of the registrant; or (B) a change in the residence of the registrant."). Under § 20507(d)(1):

> A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—
>
> A. confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

---

[24]  The purpose of the NVRA is to "increase the number of eligible citizens who register to vote in elections for Federal office," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b).

B. (i) has failed to respond to a [prepaid, preaddressed notice]; and (ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

Id.

The Georgia Code directs the SOS to adhere to the process outlined in the NVRA. See O.C.G.A. §§ 21-2-233 to -235; Doc. No. [451], pp. 29–31, ¶¶ 110–122. In Georgia, a voter's registration status can be changed to canceled for change of address in one of two ways: (1) where their name appears on the United States Postal Service's change of address database, O.C.G.A. § 21-2-233; or (2) for "no contact" in five calendar years,[25] O.C.G.A. § 21-2-234(a), which is a proxy for change of address. Only the latter is referred to as "use it or lose it," but both are relevant to analyzing Plaintiffs' claims.

---

[25] "[T]he term 'no contact' shall mean that the elector has not filed an updated voter registration card, has not filed a change of name or address, has not signed a petition which is required by law to be verified by the election superintendent of a county or municipality or the Secretary of State, has not signed a voter's certificate, has not submitted an absentee ballot application or voted an absentee ballot, and has not confirmed the elector's continuation at the same address during the preceding **five calendar years**." O.C.G.A. § 21-2-234(a)(1) (emphasis added). However, at the time of the filing of this lawsuit, the "no contact" period was three calendar years.

"If it appears from the change of address information supplied by the licensees of the United States Postal Service" that an elector has moved, "the elector shall be sent a notice of the change by forwardable mail at the elector's old address with a postage prepaid, preaddressed return form by which the elector may verify or correct the address information." O.C.G.A. § 21-2-233(c). If the notice is not returned in thirty days, the voters' registration status is changed to inactive.[26] If a voter identified for "no contact" does not respond within thirty days to a prepaid, preaddressed notice to confirm they have not in fact moved, that voter's registration status is changed to canceled. O.C.G.A. § 21-2-234(c).

First, this Court notes that the NVRA does not shield Defendants from all of Plaintiffs' list maintenance allegations. As this Court has previously recognized, the list maintenance scheme Georgia uses is explicitly permitted by the NVRA. Black Voters Matter Fund v. Raffensperger, No. 1:20-CV-04869-SCJ, 2020 WL 7394457, at *11 n.24 (N.D. Ga. Dec. 16, 2020) (citing 52 U.S.C. § 20507(b)(2)); see also Husted v. Randolph Inst., ___ U.S. ___, 138 S. Ct. 1833,

---

[26] "An elector placed on the inactive list of electors shall remain on such list until the day after the second November general election held after the elector is placed on the inactive list of electors." O.C.G.A. § 21-2-235(b). If the elector makes "no contact" during that period, "the elector shall be removed from the inactive list of electors." Id.

1843 (2018) (upholding Ohio's list maintenance process—which is almost identical to Georgia's—as compliant with the NVRA's requirements). However, the NVRA safe harbor does not dictate the *entire* process.[27] This means it is possible that a State may unconstitutionally burden voters' rights in executing the parts of its voter-list-maintenance process on which the NVRA is silent. Therefore, the inquiry does not end at the text of the NVRA, and the Court will apply the <u>Anderson-Burdick</u> framework.

The Court now turns to the alleged burden. Plaintiffs urge the Court to consider that this burden differs from the minimal burden identified at the preliminary injunction stage, which was the SOS simply requiring voters flagged by the process to return a prepaid, preaddressed confirmation notice or re-register to vote. Doc. No. [490], p. 33. At this stage, Plaintiffs have presented voter declarations which state the declarants were canceled without having received

---

[27] For example, the NVRA permits a state to begin the notice/no contact process when it appears from information provided by the Postal Service that "a registrant has moved to a different residence address." 52 U.S.C. § 20507(c)(1). However, here, there is evidence that at one point, the SOS relied on data concerning changed *P.O. Box* addresses reflected in the National Change of Address System, even though such a change may not necessarily reflect a change in one's residential address. <u>See</u> Doc. Nos. [510-8], p. 54 (Pl. Exh. 654); [510-9], pp. 188–90 (Pl. Exh. 767). The NVRA does not address P.O. Box addresses.

the confirmation notice postcards.[28] However, after reviewing this evidence, the Court concludes Plaintiffs have not created a genuine issue of material fact that the burden on voters is more than ordinary.

First, the Court finds Plaintiffs have not created a genuine issue of material fact on the burden imposed because their voter complaints and declarations do not address the central issue: whether those voters were eligible to be canceled, either because they appeared on the Postal Service database or made "no contact." Most of the declarations state that the voter did not receive the confirmation notice. However, these voters do not allege that their names did not appear on the Postal Service database or that they made "contact" within the meaning of the statute. See Doc. Nos. [507-9], p. 147 (Pl. Exh. 88) (voter email to SOS after not being permitted to vote; email from Kevin Rayburn in response states that the voter was canceled after there being no contact for two federal elections); [507-9], p. 149 (Pl. Exh. 89) (voter complaint stating voter was not permitted to vote as his

---

[28] "The common law has long recognized a rebuttable presumption than an item properly mailed was received by the addressee." Chung v. JPMorgan Case Bank, N.A., 975 F. Supp. 2d 1333, 1348 (N.D. Ga. 2013) (quoting In re Farris, 365 F. App'x 198, 199 (11th Cir. 2010)). Thus, a voter's declaration that he or she did not receive the confirmation notice, standing alone, "is insufficient to rebut the presumption." In re Farris, 365 F. App'x at 200 ("The mere denial of receipt, without more, is insufficient to rebut the presumption.").

registration was canceled due to no contact; voter states he is a lifelong Georgia resident and received no notice but does not state he voted in the last two federal election cycles); [507-9], p. 151 (Pl. Exh. 90) (voter complaint stating voter's registration was canceled without notice but admitting voter "had not voted in some time"); [507-9], p. 153 (Pl. Exh. 91) (voter complaint stating voter's registration was canceled despite voter voting every election cycle since 1980 but not addressing whether voter had moved); [507-9], p. 155 (Pl. Exh. 92) (voter complaint stating voter showed up to polls and was told she had been canceled for no contact in two election cycles but not contesting she had not voted); [507-9], p. 159 (Pl. Exh. 94) (voter declaration stating voter had not moved in thirty years, received no notice of potential cancelation from the SOS, and was notified by Fair Fight he was on the list of voters to be canceled, but also admitting he "can't remember the last time" he voted); [507-9], pp. 162–63 (Pl. Exh. 95) (voter declaration stating voter had not moved, received no notice of potential cancellation from the SOS, and was notified by Fair Fight he was on the list of voters to be canceled, but also stating he had not voted since 2008).[29]

--------------------

[29] One voter declaration states the voter attempted to verify her polling place and realized registration had been canceled and states she had not moved and had voted in

53

Second, the Court finds that the burden is no more than ordinary because even canceled voters can re-register to vote. As the Court noted in December of 2019, re-registering to vote after being removed from the voter rolls for "no contact" "is no different from registering to vote in the first instance. A voter can re-register to vote by going online to use the Online Vote Registration system or renewing one's driver's license or identification car with the Department of Driver Services." DSMF ¶ 133; Doc. No. [188], pp. 26–27. Indeed, some of Plaintiffs' evidence shows voters re-registered after being unable to locate their registration information online or were directed to do so by the SOS. Doc. Nos. [507-9], p. 141 (Pl. Exh. 85) (reply email to voter complaint confirming that the voter had been canceled but also confirming that her online re-registration was successful); [507-9], p. 143 (Pl. Exh. 86) (reply email to voter complaint confirming that the voter had been canceled but also confirming that his online re-registration application had been received and would be processed in time for the next election); [507-9], p. 145 (Pl. Exh. 87) (confirming voter's registration had

---

November 2017 "without issue." [510-11], p. 20 (Pl. Exh. 809). However, that voter does not state whether she was precluded from voting, and it is unclear whether she was able to re-register upon learning of the cancellation. Id. One such declaration, however, is not enough to establish a severe burden.

54

been canceled and directing her to re-register online); [510-13], p. 58 (Pl. Exh. 923) (voter email asking when post-cancellation re-registration would be processed).

Third, the Court finds Plaintiffs have not shown that the process is applied differently to any class of voters. See Black Voters Matter Fund, 2020 WL 7394457, at *11. There is no evidence that the list maintenance process is not uniformly applied to registrants whose names appear on the NCOA database. Contra Bush v. Gore, 531 U.S. 98, 106 (2000) (finding there was evidence the "standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another").

The Court agrees that Plaintiffs' evidence shows that "no contact" flags voters who may not have actually changed their residential address. However, the Supreme Court has held that "Congress clearly did not think that the failure to send back a return card was of no evidentiary value because Congress made that conduct one of the two requirements for removal" under 52 U.S.C. § 20507(d). Husted, 138 S. Ct. at 1845–46. Further, Plaintiffs are not challenging the constitutionality of the NVRA itself. For these reasons, the Court concludes that the burden imposed by Georgia's list maintenance process is not severe. Burdick,

504 U.S. at 434 (holding "reasonable, nondiscriminatory restrictions" are not severe) (quoting Anderson, 460 U.S. at 788).

On the other side of the balancing analysis is the State's purported interests in enforcing its list maintenance process. Because the burden is ordinary, the state interest need not be "compelling . . . to tip the constitutional scales in its direction." Id. at 439. Rather, "the State's important regulatory interests are generally sufficient to justify" the restrictions. Id. at 434. In December 2019, this Court found that the regulatory interests of the State in (1) maintaining a reliable list of electors, (2) applying election laws as written, and (3) eliminating voter confusion and improving election-day operations were sufficient to satisfy the lower-end of Anderson-Burdick's flexible standard. Doc. No. [188], pp. 28–29. Because Plaintiffs have not shown the burden is severe, the Court reaches the same conclusion at this stage. Thus, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiffs' Count I "Use It or Lose It" claims.

### 5. Voter Registration/Exact Match

Plaintiffs' Second Amended Complaint alleges that, shortly before the 2018 election, Georgia's "Exact Match" policy "prevented 53,000 Georgians from having their registrations accepted." Doc. No. [582], ¶ 86. Plaintiffs argue

removing and preventing voter registrations under the "Exact Match" policy violates voters' First and Fourteenth Amendment rights. Id. ¶ 155. However, Defendants' Motion for Summary Judgment and accompanying brief do not address this claim. See Doc. No. [450-1], pp. 29–35 (discussing training and "list maintenance," or "Use it or Lose it"). For the same reasons as those discussed supra, see Section I.A.3, the Court concludes Defendants have not properly moved for summary judgment on Plaintiffs' Count I "Exact Match" claim.

### B.     Count II: Fifteenth Amendment

In Count II of their Second Amended Complaint, Plaintiffs allege that "[a]cting under color of state law, Defendants deprived Georgians of the right to vote—as secured by the Fifteenth Amendment—by administering an election plagued with irregularities that disproportionally affected voters of color." Doc. No. [582], pp. 73–74.

The Fifteenth Amendment provides in relevant part that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV. "The Amendment bans racial discrimination in voting by both state and nation. It thus establishes a national policy . . . not to be

discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local." <u>Terry v. Adams</u>, 345 U.S. 461, 467 (1953). "The design of the Amendment is to reaffirm the equality of races at the most basic level of the democratic process, the exercise of the voting franchise." <u>Rice v. Cayetano</u>, 528 U.S. 495, 512 (2000).

"The Supreme Court has long recognized that evidence of a racially discriminatory motivation is required for Plaintiffs to prevail on a Fifteenth Amendment claim. Put simply, 'racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation.'" <u>Greater Birmingham Ministries</u>, 966 F.3d at 1224–25 (citing <u>City of Mobile v. Bolden</u>, 446 U.S. 55, 62 (1980), <u>superseded by statute on other grounds as stated</u> in <u>Thornburg v. Gingles</u>, 478 U.S. 30, 35 (1986)). More specifically, there are two prongs to an abridgment analysis under the Fifteenth Amendment. <u>Greater Birmingham Ministries</u>, 966 F.3d at 1225 (citations omitted). "Plaintiffs must first show that the State's 'decision or act had a discriminatory purpose and effect.'" <u>Id.</u> (citing <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1188–89 (11th Cir. 1999)).[30] "If Plaintiffs are

---

[30] The Supreme Court has explained that "'[d]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the

58

unable to establish both intent [or purpose] and effect, their constitutional claims fail." Id. (citing Burton, 178 F.3d at 1195). "Once discriminatory intent [or purpose] and effect are established, the second prong provides that 'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor.'" Id. (citing Hunter v. Underwood, 471 U.S. 222, 228 (1985); Johnson v. Governor of Fla., 405 F.3d 1214, 1223 (11th Cir. 2005)).

As Plaintiffs acknowledged at oral argument, the remaining challenged practices for the Fifteenth Amendment claims are: "Exact Match" of voter

---

decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1349 (11th Cir. 2005) (citing Hernandez v. New York, 500 U.S. 352, 360 (1991)). This Court recognizes that Holton was a Fourteenth Amendment/Equal Protection case; however, the Eleventh Circuit has indicated that the standard is the same for Fifteenth Amendment and Equal Protection/Fourteenth Amendment claims in the voting rights context. See Greater Birmingham Ministries, 966 F.3d at 1231 ("[I]n order 'to establish a violation of either the Equal Protection Clause of the Fourteenth Amendment or the Fifteenth Amendment, [plaintiffs] must show that [the state's] decision or act had a discriminatory purpose and effect.") (citations omitted). To this regard, the Court will utilize both Fifteenth Amendment and Equal Protection precedent in this section of the Order.

registration application data and absentee ballot rejections.[31] Doc. No. [607], Tr. 144: 6–8.[32]

In their briefing, Defendants acknowledge that Plaintiffs provided evidence of "alleged disparate racial impact" as to these two claims, but they argue there is no evidence showing a racially discriminatory purpose chargeable to the State because Plaintiffs have not shown evidence that Defendants knew of racial disparities and chose to ignore them. Doc. No. [450-1], p. 36. In opposition, Plaintiffs assert that Defendants have not set forth the correct standard. Doc. No. [490], p. 59. After review, it appears that there is merit to each side's position concerning the applicable standard, as the Eleventh Circuit has recently noted that "knowledge of [discriminatory] impact" is a supplemental factor to the

---

[31] The parties also presented oral argument concerning disparate impact and poll closure claims; however, as discussed <u>supra</u>, poll closures are no longer a part of this case, based on the Court's jurisdictional ruling finding that Plaintiffs lack standing to bring poll closure claims. <u>See</u> Doc. No. [612], pp. 37–38 ("The Court finds that Plaintiffs lack standing to pursue their claims related to the moving and closing of precincts and polling places because those claims are neither traceable to nor redressable by Defendants. State law explicitly assigns responsibility for determining and changing precincts and polling places to the county superintendents.").

[32] The other practices (listed in the Second Amended Complaint) for which there is no evidence of disparate impact do not survive summary judgment. Summary judgment is therefore granted for the following claims (under Counts II and III) not previously dismissed for lack of standing: (1) failure to train on election laws and (2) the voter registration list allegations (that do not concern "Exact Match").

traditional non-exhaustive list of evidentiary factors that the Supreme Court has set forth to determine whether "racially discriminatory intent existed" in the State's decision or act. Greater Birmingham Ministries, 966 F.3d at 1225. However, the Supreme Court has also held that "[d]iscriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Hernandez v. New York, 500 U.S. 352, 360 (1991).

More specifically, the Eleventh Circuit has held that "the fluid concept of discriminatory intent is sometimes subtle and difficult to apply." Dowdell v. City of Apopka, 698 F.2d 1181, 1185 (11th Cir. 1983). The Court must "evaluate all available direct and circumstantial evidence of intent in determining whether a discriminatory purpose was a motivating factor in a particular decision." Burton, 178 F.3d at 1189. In addition, in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977), the Supreme Court suggested that relevant evidentiary factors include: (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary

61

statements and actions of key legislators.[33] <u>Greater Birmingham Ministries</u>, 966 F.3d at 1225 (citing <u>Arlington Heights</u>, 429 U.S. at 267–68). The Eleventh Circuit has supplemented the <u>Arlington Heights</u> list to include the following additional factors: (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives. <u>Id.</u> (citing <u>Jean v. Nelson</u>, 711 F.2d 1455, 1485–86 (11th Cir. 1983), <u>on reh'g</u>, 727 F.2d 957 (11th Cir. 1984), <u>aff'd on other grounds</u>, 472 U.S. 846 (1985)). The Eleventh Circuit has "repeatedly recognized that evidence of [t]he historical background of the decision is relevant to the issue of discriminatory intent." <u>Burton</u>, 178 F.3d at 1189 (citing <u>Williams v. City of Dothan</u>, 745 F.2d 1406, 1415 (11th Cir. 1984) (quoting <u>Arlington Heights</u>, 429 U.S. at 267) (internal quotations omitted). "Indeed, all 'actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.'" <u>Burton</u>, 178 F.3d at 1189 (citing <u>Columbus Bd. of Educ. v. Penick</u>, 443 U.S. 449, 464 (1979)).

------

[33] As indicated above, the parties dispute whether Georgia's "Exact Match" process is codified in Georgia's statutory scheme or policy of the Secretary of State's Office. To this regard, in considering the contemporary statements factor and viewing factual inferences in the light most favorable to the non-moving party, here Plaintiffs (in accordance with the above-stated summary judgment standard), the Court will consider this factor as including the contemporary statements and actions of key policymakers (as opposed to only "key legislators").

Thus, the focus of summary judgment in the case *sub judice* is discriminatory purpose. The Court notes that it has been held that when relying on the Arlington Heights factors, a plaintiff need only provide "very little . . . evidence" that an action was motivated by discriminatory purpose "to raise a genuine issue of fact" to survive summary judgment and have the question "resolved by a fact-finder." Arce v. Douglas, 793 F.3d 968, 977–78 (9th Cir. 2015). The Court must now undertake a sensitive inquiry and determine whether Plaintiffs have met this burden. See Arlington Heights, 429 U.S. at 266 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.").[34]

### 1. Exact Match of Voter Registration Application Data

The Court considers the Arlington Heights factors and evidence presented as to Plaintiffs' claims concerning "Exact Match," which, as stated above, is the

---

[34] The Court's ruling, supra, concerning hearsay objections to Plaintiffs' Statement of Additional Material Facts carries forward to this section of its Order. Furthermore, Defendants' additional objections to consideration of evidence through Plaintiffs' experts, Dr. McCrary, Dr. Smith, and Dr. Mayer, based on their prior motions to exclude the expert testimony are overruled for the reasons stated in the Court's orders denying said motions. Doc. Nos. [561]; [580]; [585].

voter verification program for voter registration application data, including citizenship status used by the State of Georgia. Doc. No. [510-14], p. 143 (Pl. Exh. 1007).

The parties dispute whether the State's "Exact Match" process is codified law in the State of Georgia. Doc. No. [532], ¶ 426; see also Doc. No. [492], ¶ 40. While the record shows that two Georgia statutes, O.C.G.A. §§ 21-2-216(g) and 21-2-220.1 concern voter registration documentation requirements and required evidence of citizenship to register to vote, Plaintiffs assert that "Exact Match" is actually an internal procedure of the Secretary of State's Office for which various staff members gave conflicting testimony about how the matching process works. See O.C.G.A. § 21-2-216(g)(7) ("The Secretary of State shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship."); Doc. No. [492], p. 112; PSMF ¶ 415 (citing Doc. No. [238], p. 10 ("[O]ne official said that a mismatched space character between [Department of Driver Services, "DDS"] and voter registration records

64

would trigger a non-match. Another said he was not sure. The General Counsel did not know whether a hyphen in one data set but not the other would result in a verification failure. The Director of Elections testified that matching is done on 'last name, first name, date of birth, and last four of social,' but the General Counsel testified that the match is only done on the first letter of the first name (and that some counties were using the entire first name[.]")); but see DSMF 140 (indicating that "[t]here is an overnight electronic process whereby the following fields from paper [voter registration] applications are checked against DDS' database: first name, last name, date of birth, driver's license number, and social security number.").

According to Plaintiffs' expert, Dr. Kenneth Mayer, individuals can be flagged for a verification failure even if the failure results from:

> a minor mistake on a registration form, such as a one-character difference in spelling or spacing in a name, an apostrophe, a misplaced hyphen or a typographical error; errors made by Georgia election officials manually entering information from paper registration forms; incorrect data in the verification files, such as outdated citizenship or name data in Georgia DDS or [Social Security Administration] files; [or] differences in data for the same individual in voter registration, DDS, or Social Security Administration files.

PSMF ¶ 418 (citing Expert Report of K. Mayer, Doc. No. [238], p. 6).

In regard to the above-stated eight relevant/non-exhaustive evidentiary factors, the parties focus their evidence and briefing on disparate impact, knowledge of the impact, historical background and events leading up to the "Exact Match" policy, and contemporary statements. The Court proceeds likewise and begins with disparate impact.[35]

As indicated above, Defendants acknowledge that Plaintiffs provided evidence of "alleged disparate impact" for their "Exact Match" claims. Doc. No. [450-1], p. 36. The record also bears this out as undisputed. See DSMF ¶ 168 ("Dr. Mayer, Plaintiffs' proffered expert regarding voter-verification, identified particular processes that he said 'produce higher verification failure rates and noncitizenship flags for minority registrants compared to non-Hispanic White registrants.'") (citations omitted); see also PSMF ¶ 610 (indicating that out of 46,946 records pending for "exact match," 69.96% were African American).

Next, the Court considers knowledge of the impact. Plaintiffs assert that Defendants have had knowledge of the disparate impact for roughly a decade,

---

[35] The Court models its approach after the Eleventh Circuit's approach in Elston v. Talladega County Board of Education, 997 F.2d 1394, 1408 n.15 (11th Cir. 1993) ("For the sake of clarity, our . . . analysis of each decision focuses on the factors plaintiffs have specifically emphasized. However, we have considered all the relevant evidence of discrimination with respect to each decision.").

beginning with a 2009 denial of preclearance from the Department of Justice ("DOJ").[36] More specifically, in 2009, the DOJ denied preclearance for Georgia's "Exact Match" program. PSMF ¶ 406; see also Doc. No. [510-14], pp. 143–47 (Pl. Exh. 1007). The DOJ explained that the program "does not produce accurate and reliable information" and cited testimony "that an error as simple as transposition of one digit of a driver license number can lead to an erroneous notation of a non-match across all compared fields." Id. In denying preclearance, the DOJ noted that "[t]he impact of these errors falls disproportionately on minority voters." Id.

Next, the Court considers the historical background and events leading up to the "Exact Match" policy as it exists today. Plaintiffs' evidence shows that in 2010, Georgia again sought preclearance of its "Exact Match" procedures based upon a revised verification process that called for daily monitoring of the voter verification process and prompt notice to applicants who could not be verified. PSMF ¶¶ 409–410. The DOJ indicated that it did not intend to object to Georgia's

_____

[36] Prior to 2013 and the United States Supreme Court's decision in Shelby County v. Holder, 570 U.S. 529 (2013), certain states, including Georgia, needed to seek preclearance from the DOJ for new voting changes.

implementation of the revised verification process. Id. (citing Georgia v. Holder, 748 F. Supp. 2d 16, 18 (D.D.C. 2010) ("On August 16, 2010, [Georgia] amended its complaint to reflect that it had revised its proposed Verification Process. That same day, [the United States Attorney General] notified the Court that after having 'conferred extensively with Plaintiff State of Georgia concerning this matter since the fall of 2008,' and having reviewed the revised proposed verification process, it no longer opposed preclearance by the Court. Then, on August 18, 2010, the United States Department of Justice informed [Georgia] that it did not intend to object to implementation of the revised Verification Process.") (citations omitted)).

Despite the DOJ's non-objection to a revised verification process, since 2010, there have been additional legislative enactments pertaining to voter registration, HB 268 and HB 316, a 2018 notice of disproportionate impact letter from the NAACP to the State of Georgia, and two voting rights lawsuits challenging Georgia's "Exact Match policy"—one of the lawsuits resulted in a settlement and the second resulted in a preliminary injunction and remains pending. See NAACP v. Kemp, No. 2:16-cv-00219-WCO (N.D. Ga. 2017); Ga. Coal. for People's Agenda, Inc. v. Kemp, 347 F. Supp. 3d 1251, 1258 (N.D. Ga. 2018)

(referencing the settlement agreement in the 2016 case and issuing a preliminary injunction by stating "[p]laintiffs have shown a substantial likelihood of success on the merits of their claim that Defendant [then-Secretary of State, Brian Kemp] is violating the right to vote, as guaranteed by the First and Fourteenth Amendments to the United States Constitution, for individuals Defendant has flagged and placed into pending status due to citizenship. The election scheme here places a severe burden on these individuals.");[37] see also PSMF ¶¶ 430, 433, 609; see generally Doc. Nos. [339], Expert Report of P. McCrary; [510-8], pp. 7–19 (Pl. Exh. 644; p. 22); [510-8], p. 22 (Pl. Exh. 645).

Prior to April 2019, voters' registrations were rejected after twenty-six months in "pending" status pursuant to Georgia's voter-verification law. Doc. No. [492], ¶ 151. Since April 2, 2019 and the passage of HB 316, registrants who fail the verification process are either placed on the active rolls with an "MIDR" notation (for "Missing ID Required"), or placed in pending status and not added to the voter rolls if they are flagged as potential non-citizens. PSMF ¶ 436; see

---

[37] As both lawsuits were filed in the Northern District of Georgia, the Court takes judicial notice of these filings pursuant to Federal Rule of Evidence 201. See United States v. Rey, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records and the records of inferior courts.").

also Doc. No. [507-1], pp. 994, 1192. According to Plaintiffs, the fundamental problem with the "Exact Match" process (left unchanged by the recent HB 316 legislation) is that the DDS erroneously flags naturalized citizens as non-matches for citizenship. Doc. No. [490], p. 14. Plaintiffs' expert also stated in his report that of the nearly 460,000 voting-age naturalized citizens in Georgia in 2017, "over 80% were members of minority groups." PSMF ¶ 439; see also Doc. No. [238], pp. 5, 23.[38]

Next, the Court considers the State of Georgia's history of discriminatory official actions. Defendants "do not contest that prior to the 1990s, Georgia had a long and sad history of racist policies in a number of areas including voting."

---

[38] Plaintiffs' expert offered the following explanation for why this is occurring:

> [N]on-U.S. citizens are eligible for a Georgia driver's license or state ID card if they are legally present in the country . . . . If a noncitizen obtains a license or ID, their noncitizenship status at that time is recorded in DDS files. If that person later naturalizes, they are not required to update their information with DDS, but will continue to be flagged as noncitizens by the DDS verification process if they register to vote unless they present naturalization documents at the time they register.

Doc. No. [238], p. 5.

Doc. No. [450-1], p. 50 n.38.[39] Defendants also indicate that the Court can take judicial notice of such fact, which the Court does now for purposes of perfecting the record. Id.; see also Wright v. Sumter Cnty. Bd. of Elections & Registration, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018), aff'd, 979 F.3d 1282 (11th Cir. 2020) (noting that "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.") (citations omitted).[40]

Lastly, the Court considers evidence of contemporary statements. Here, Plaintiffs cite a 2014 statement by then-Secretary of State of Georgia, Brian Kemp (who is now the Governor of Georgia). See Doc. No. [481-1], p. 204. The statement was made at a Gwinnett County Republican Party meeting. Doc. No. [154], p. 13; see also Doc. No. [481-1], Tr. 87:14–17. The relevant excerpt of then-Secretary Kemp's statement is as follows:

---

[39] This statement was found in the Section 2/Voting Rights Act section of Defendants' brief at Doc. No. [450-1], but it applies equally to the Arlington Heights discriminatory purpose consideration.

[40] In considering this factor, the Court notes that the Eleventh Circuit has been "mindful of the danger of allowing the old, outdated intentions of previous generations to taint [a state's] legislative action forevermore on certain topics." Greater Birmingham Ministries, 966 F.3d at 1228.

> In closing, I just wanted to tell you real quick, after we get through this runoff, you know the Democrats are working hard, and all these stories about them, you know, registering all these minority voters that are out there and others that are sitting on the sidelines, if they can do that they can win this November. But we've got to do the exact same thing.

Id.; see also Doc. No. [481-1], p. 204. He then went on to describe how event attendees could help register more Republican voters. Id.

Plaintiffs assert that then-Secretary Kemp's statement "confirmed the motivation to discriminate against voters of color that is behind Exact Match." Doc. No. [490], p. 60. Defendants, on the other hand, make a number of arguments that the July 12, 2014 statement was mere campaign,[41] unofficial speech and is problematic to use to prove government motive, as it "raises serious First Amendment concerns and requires engaging in disfavored 'judicial psychoanalysis.'" Doc. No. [450-1], p. 37 (citing Washington v. Trump, 858 F.3d 1168, 1173-74 (9th Cir. 2017) (Kozinski, J., dissenting) and Trump v. Hawaii, ___ U.S. ___, 138 S. Ct. 2392, 2418–20 (2018) (considering campaign speech as extrinsic evidence that was not determinative of the Court's final ruling when analyzing

---

[41]  At his deposition, Governor Kemp testified that he "was certainly speaking these words at a political function in my individual status as a candidate for office." Doc. No. [481-1], Tr. 87:23–25.

whether a policy "address[es] a matter within the core of executive responsibility" and when applying rational basis review to determine whether a policy "can reasonably be understood to result from a justification independent of unconstitutional grounds")).

    There does not appear to be a case on point that addresses the exact context that is presented in the case *sub judice*, as the cases cited by Defendants were not Fifteenth Amendment cases and the cited dissenting opinion is not binding authority. The Court also recognizes that in the non-voting rights class of cases/discrimination context, the Supreme Court has noted disagreement among the Justices as to whether statements made by lawmakers may properly be taken into account in determining whether a law intentionally discriminates on the basis of religion. See Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n, ___ U.S. ___, 138 S. Ct. 1719, 1730 (2018) (considering religious discrimination).[42]

---

[42] There is some Eleventh Circuit precedent on discriminatory statements in the Fifteenth Amendment context; however, the speech at issue in those cases was not campaign speech. See, e.g., Greater Birmingham Ministries, 966 F.3d at 1227 (indicating that the racist comments of the lawmaker, while not condoned under any circumstances, need to be "made about the law at issue in this case" to evidence discriminatory intent behind the law); NAACP v. Stallings, 829 F.2d 1547, 1552 (11th Cir. 1987) (concluding that the speech made by the sponsor of legislation during legislative session "was evidence of an intent to discriminate against black voters in any voting legislation before the General Assembly during that session, and that a finder of fact might well infer that

In reviewing Defendants' citation of non-binding authority concerning campaign speech and the Supreme Court Justices' noted disagreements concerning lawmaker statements in the <u>Masterpiece Cakeshop</u> case, the Court perceives that the law is unsettled on consideration of statements, such as the one at issue involving campaign speech. Nevertheless, the Court does not deem it proper to disregard the 2014 statement at the summary judgment stage of the case, which involves consideration of all available potentially direct and circumstantial evidence of intent.

To this regard, considering that the Court cannot make credibility determinations (or weigh the evidence) at the summary judgment stage of the case,[43] as well as the low burden of "very little evidence" that Plaintiffs must meet to establish a genuine issue of fact to defeat summary judgment on their Fifteenth Amendment claim, the Court finds that Plaintiffs have met their burden (through the evidence presented showing disparate impact, knowledge of the disparate

---

such intent continued until 1951 when the bill was re-introduced under the same sponsorship").

[43] As noted above, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact-finder] functions, not those of a judge [when] ruling on a motion for summary judgment." <u>Anderson</u>, 477 U.S. at 255.

impact, history of discrimination, and the statement of a policymaker) and summary judgment is not warranted on the "Exact Match" claim. See Arce, 793 F.3d at 977–78 ("[W]hen relying on Arlington Heights to demonstrate that an action was motivated by a discriminatory purpose, a plaintiff need provide 'very little such evidence to raise a genuine issue of fact; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder.'") (citations omitted).[44]

### 2. *Absentee Ballot Rejection Rates*[45]

In their Second Amended Complaint, Plaintiffs allege that Defendants deprived voters of color of their fundamental right to vote through "misconduct in overseeing and training of county election officials" of "failing to count absentee ballots cast in accordance with applicable law." Doc. No. [582], ¶ 168. More specifically, Plaintiffs allege that in 2018, Defendants' misconduct in

---

[44] Recent Eleventh Circuit authority indicates that to grant summary judgment in favor of Defendants, the Court would have to find that "[n]o reasonable fact-finder could find a discriminatory intent or purpose underlying [the law] from the statements identified by Plaintiffs." Greater Birmingham Ministries, 966 F.3d at 1228.

[45] All absentee ballot claims concerning prompt notification and date of birth rejections are no longer a part of this case, per the Court's ruling on mootness in the context of Defendants' jurisdictional motion for summary judgment and statutory as well as rule changes by the SEB. Doc. No. [612], pp. 62–63.

overseeing and training of county elections officials led to "elections officials . . .

reject[ing] absentee ballots for improper reasons," such as "irrelevant mistakes."

Id. ¶ 136.[46]

As counties are statutorily responsible for counting the absentee ballots

(see O.C.G.A. §§ 21-2-381, 386), Plaintiffs' "misconduct in overseeing" the

rejection of the absentee ballots claims are subject to dismissal for lack of standing

in light of the Eleventh Circuit's recent holding in Jacobson, 974 F.3d 1256.[47] Cf.

Georgia Republican Party, Inc. v. Sec'y of State for Ga., No. 20-14741-RR, 2020

WL 7488181, at *1 (11th Cir. Dec. 21, 2020) (applying Jacobson to conclude that

the plaintiffs failed to demonstrate that any alleged injury was traceable to and

redressable by the Georgia Secretary of State where Georgia law gave authority

---

[46] The Court recognizes that some of the mistakes included missing birthdates, which was subject to the jurisdictional motion for summary judgment and deemed moot. Doc. No. [612], p. 71.

[47] As stated in the Court's jurisdictional order, in Jacobson, the Eleventh Circuit considered a constitutional challenge to the order in which the names of candidates appeared on the Florida election ballot. 974 F.3d at 1263. The Eleventh Circuit concluded that the asserted injury was not redressable by judgment against the Florida Secretary of State "because she [did] not enforce the challenged law. Instead, the [county] [s]upervisors . . . officials independent of the Secretary—[were] responsible for placing candidates on the ballot in the order the law prescribe[d]." Id. The court's conclusion rested on the reality that the county election supervisors were independent officials under Florida law who were not subject to the secretary's control. Id. at 1253.

76

to conduct the absentee ballot signature-verification process to local county supervisors); see also Doc. No. [612], pp. 49–55.

Plaintiffs' absentee ballot rejection claim is therefore limited to the Secretary's duty to train superintendents and registrars on how to reject absentee ballots. O.C.G.A. § 21-2-50(a)(11). However, as indicated above in the Count I section of this Order, Plaintiffs do not connect their facts regarding absentee ballot rejection rates to training in any way, which leads to a conclusion that Plaintiffs have not shown that their injuries pertaining to absentee ballot rejections are "fairly traceable" to Defendants. Further, the Court has already concluded that Plaintiffs' claims concerning rejection notifications and rejection for lack of date of birth are moot. Doc. No. [612], pp. 62–64.

In sum, Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART** as to Count II, Fifteenth Amendment. The motion is granted as to the following claims under Count II that have not been previously dismissed for lack of standing: failure to train on election laws, the voter registration list claims, and absentee ballot rejection claims. The motion is denied as to the "Exact Match" claim.

### C.     <u>Count III: Equal Protection</u>

In their Complaint, Plaintiffs raise two different equal protection claims. The first claim challenges the same procedures as Counts I and II of their Second Amended Complaint. More specifically, Plaintiffs allege that "[a]cting under color of state law, Defendants deprived Georgians of the right to vote on an equal basis, as secured by the Equal Protection Clause, by administering an election plagued with irregularities that disproportionately affected voters of color." <u>Id.</u> ¶¶ 181–182. Plaintiffs' second equal protection challenge concerns uniformity and residency (or "geography," as both terms are used by the parties in the briefing). More specifically, Plaintiffs allege that "Georgia's voting system . . . violates Equal Protection because voters are subject to arbitrary and inconsistent differences in rules, processes, and burdens depending on where voters happen to reside"—resulting in "different elections systems in different counties in Georgia." <u>Id.</u> ¶¶ 186–187. Plaintiffs further allege that "Defendants have allowed the voting processes in the 159 counties in Georgia to devolve into an arbitrary and inconsistent web of actual laws, erroneous interpretations of laws, and local rules that are often unannounced until applied to a voter." <u>Id.</u> ¶ 188.

The Fourteenth Amendment provides in relevant part that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "[T]he Equal Protection Clause confers a substantive right to participate in elections on an equal basis with other qualified voters." Bolden, 446 U.S. at 62.

"A successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." Greater Birmingham Ministries, 966 F.3d at 1224 (citing Davis v. Bandemer, 478 U.S. 109, 127 (1986). "Once discriminatory intent and effect are established, the second prong provides that "'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor.'" Id. at 1225 (citations omitted).

### 1.    *Procedures*

Plaintiffs' equal protection claim concerning the procedures challenged in Count II of the Second Amended Complaint is subsumed in the same analysis that the Court applied to the Fifteenth Amendment claim pertaining to Count II of this Order. Cf. NAACP v. Austin, 857 F. Supp. 560, 572 (E.D. Mich. 1994) ("[W]e believe that the Fifteenth Amendment's prohibition against purposeful

discriminatory denial or abridgement by government of the freedom to vote on account of race, color, or previous condition of servitude is subsumed in the analysis required under the Fourteenth Amendment's equal protection clause." (internal quotations omitted)); see also Thompson v. Merrill, No. 2:16-CV-783-ECM, 2020 WL 7080308, at *9 (M.D. Ala. Dec. 3, 2020) ("Both a Fourteenth Amendment Equal Protection Clause claim and a Fifteenth Amendment discrimination claim require proof of intent to discriminate. Therefore, the Court applies the same analysis to both claims."). Accordingly, for the reasons set forth in the Court's analysis concerning Count II, summary judgment is not warranted as to Plaintiffs' Count III equal protection claim concerning voting procedures (specifically, "Exact Match"). Summary judgment is warranted as to absentee ballot rejection claims.

### 2. Uniformity and Residency/Geography

As indicated above, Plaintiffs allege that "Georgia's voting system . . . violates Equal Protection because voters are subject to arbitrary and inconsistent differences in rules, processes, and burdens depending on where voters happen to reside," resulting in "different elections systems in different counties in Georgia." Doc. No. [582], ¶¶ 186–187. Plaintiffs further allege that "Defendants

have allowed the voting processes in the 159 counties in Georgia to devolve into an arbitrary and inconsistent web of actual laws, erroneous interpretations of laws, and local rules that are often unannounced until applied to a voter." Id. ¶ 188.

There does not appear to be binding Supreme Court or Eleventh Circuit precedent that provides an applicable standard; however, the Sixth Circuit has held that "[a] plaintiff may state an equal-protection claim by alleging that lack of statewide standards results in a system that deprives citizens of the right to vote based on where they live." Husted, 837 F.3d at 635;[48] see also Bush, 531 U.S. at 104–05 ("The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").[49]

---

[48] The briefing also focuses on the standard, as enunciated by the Sixth Circuit. See, e.g., Doc. Nos. [490], p. 62; [535], p. 33.

[49] The Court recognizes that the Third Circuit has recently stated that Bush v. Gore is a limited holding as it "does not federalize every jot and tittle of state election law," but focused on the "lack of any standards" that empowered officials to treat ballots "arbitrarily, violating equal protection." Donald J. Trump for President, Inc. v. Sec'y of Pa., 830 F. App'x 377, 388 (3d Cir. 2020). By contrast, where the State's election code provides counties with specific guidelines, "[r]easonable county-to-county variation is not discrimination." Id.

The central question in a lack-of-uniform standards claim appears to be whether the state lacks "adequate statewide standards" in the right to vote context at issue. Cf. Husted, 837 F.3d at 635–36 (citations omitted).

In their Motion for Summary Judgment, Defendants assert that Plaintiffs' claims regarding uniformity fail for three reasons: (1) Plaintiffs have offered no concrete allegation of varying practices among counties, much less any concrete evidence that varying practices amount to valuing the vote of one over another; (2) Plaintiffs articulated no injury that flows from the alleged differing practices in Georgia counties, particularly since the enactment of HB 316; and (3) Plaintiffs have not shown erroneously different applications of law, nor have they shown that Defendants caused differing policies to apply across the State. Doc. No. [450-1], p. 38.

In response to Defendants' first argument, Plaintiffs assert "Exact Match," absentee ballot, and provisional ballots as varying practices among the counties. Doc. No. [490], pp. 64–66.[50] Plaintiffs assert that Defendants' second argument

---

[50] Plaintiffs also assert arguments concerning polling place changes. However, as stated above, polling place changes are no longer a part of this case based on the Court's jurisdictional ruling finding that Plaintiffs lacked standing to bring such claims. Doc. No. [612], p. 71.

(concerning absence of "injury" due to the passage of HB 316) is essentially a repeat of their jurisdictional mootness argument and that HB 316 provides no "uniform standard for training." Id. at p. 67. As for Defendants' third argument, Plaintiffs assert that it is wrong because "Defendants have an affirmative obligation to obtain uniformity in counties' election practices that they have not fulfilled." Id. (citing PSMF ¶¶ 331–402).

After review, the Court agrees that Plaintiffs have shown evidence to defeat summary judgment as to their "Exact Match" equal protection claims as there is evidence that the county officials are not guided by clear rules. For example, the record contains testimony concerning "Exact Match" from Ryan Germany, General Counsel for the Secretary of State's Office, in which he "acknowledged that it was possible that voters in different counties may be treated differently and that 'processes in different counties are going to be different based on . . . a host of different reasons.'" PSMF ¶ 619 (citing Doc. No. [507-1], Pl. Ex. 26, R. Germany Dep. 130:15–25). Plaintiffs' expert also stated that "the rates at which registrants are placed in [Missing ID Required, "MIDR"] and pending status vary widely by county, suggesting county officials handling

registrations have adopted different practices for identifying and correcting typographical errors in applications." PSMF ¶ 620.

Further, as indicated in the above sections of this Order concerning Count II (the Fifteenth Amendment), Plaintiffs have presented evidence that shows a genuine dispute of material fact as to a lack of specific state guidelines for the "Exact Match" process. As indicated in Count I (First and Fourteenth Amendment), Plaintiffs have presented evidence that shows a genuine dispute of material fact as to a lack of specific state guidelines for cancellation of absentee ballots in-person.

Lastly, the Court finds that summary judgment is warranted as to the provisional ballots and absentee ballot rejection uniformity claims, based on the Court's ruling, <u>supra</u>, concerning Count I and the Secretary's training on provisional ballots. In essence, it appears to the Court that Plaintiffs' uniformity arguments are linked to their inadequate training arguments in Count I. <u>See, e.g.</u>, Doc. No. [490], p. 65. However, as stated in the Court's analysis of Count I, Plaintiffs have not shown that the problems with the provisional ballots are factually traceable to Defendants' training (which contains uniform statewide standards that apply equally to all voters). In addition, as stated in <u>Husted</u>,

"[a]rguable differences in how elections boards apply uniform statewide standards to the innumerable permutations of ballot irregularities, although perhaps unfortunate, are to be expected, just as judges in sentencing-guidelines cases apply uniform standards with arguably different results." 837 F.3d at 635–36. Similarly, for the reasons stated in Count I, Plaintiffs do not meet their burden of showing how their alleged absentee ballot rejection rate injuries are traceable or otherwise caused by Defendants. Further, there is evidence in the record of a uniform statewide standard. See PSMF ¶ 842 ("In 2012, the Georgia Attorney General issued guidance stating that under a Georgia Supreme Court decision, 'an election official does not violate O.C.G.A. § 21-1-386(a)(1)(C) when they accept an absentee ballot despite the omission of a day and month of birth and/or an address, if the election official can determine the identity of the voter with the voter's signature and whatever other information is provided.'").

In sum, summary judgment is **DENIED** as to claims regarding "Exact Match" of voter registration application data and cancellation of absentee ballots in-person and **GRANTED** as to Plaintiffs' provisional ballot and absentee ballot rejection claims.

### D.   Count IV: Procedural Due Process

In Count IV of their Second Amended Complaint, Plaintiffs allege that Georgia's voter-list-maintenance process violates Georgia voters' rights to procedural due process under the First and Fourteenth Amendments of the United States Constitution. Doc. No. [582], ¶¶ 69–81, 197.[51] Plaintiffs further allege that "[t]he 'use it or lose it' statute, as well as its enforcement by Defendants, unlawfully disenfranchises voters or severely burden their right to vote by penalizing voters based on their voting choices, providing voters inadequate notice, and failing to ameliorate the [registration cancellations] by offering same-day registration." Id. ¶ 77.

In their summary judgment briefing, the parties utilized the procedural due process standard enunciated in Mathews v. Eldridge, 424 U.S. 319 (1976); however, after the close of the briefing, a stay-panel of the Eleventh Circuit Court of Appeals issued a published opinion in New Georgia Project v. Raffensperger,

---

[51]   "The right to vote derives from the right of individuals to associate for the advancement of political beliefs that is at the core of the First Amendment and is protected from state infringement by the Fourteenth Amendment." Curling v. Raffensperger, No. 1:17-CV-2989-AT, 2020 WL 5994029, at *34 (N.D. Ga. Oct. 11, 2020); see also U.S. Const. amend. XIV (prohibiting states from "depriv[ing] any person of life, liberty, or property, without due process of law").

86

976 F.3d 1278 (11th Cir. 2020), in which the Court cited its earlier opinion in Jacobson, 974 F.3d 1236, and indicated that the applicable standard for evaluating laws that burden voting rights is the Anderson-Burdick approach. Id. at 1282. The stay-panel also noted that the district court (subject to their stay review) "cited no binding cases from any court" that applied the Mathews generalized due process test to "a State's election procedures." Id. The stay-panel further stated that even in looking at the generalized due process approach "in the most charitable light possible, it is conceptually duplicative of the specific test [courts] have been instructed to apply under Anderson and Burdick." Id. While this Court recognizes that stay-panel opinions are "tentative," "preliminary [in] nature," and are "not a final adjudication of the merits of the appeal," this Court accepts the stay-panel's opinion in New Georgia Project as persuasive authority. Democratic Exec. Comm. of Fla., 950 F.3d at 795 (11th Cir. 2020); cf. E. Bay Sanctuary Covenant, 950 F.3d at 1265 (treating the motions panel's decision as persuasive, but not binding authority).

Accordingly, absent binding authority compelling this Court to apply the Mathews generalized due process test to Georgia's election procedures, and given the recent guidance of the New Georgia Project opinion, this Court holds

87

that its above-stated <u>Anderson-Burdick</u> analysis (concerning Count I and the "Use it or Lose it"/voter purge claims) controls as to Plaintiffs' procedural due process claims pertaining to Georgia's "Use it or Lose it" list maintenance process.[52]

---

[52] The Court recognizes that in 2019, another stay-panel of the Eleventh Circuit applied <u>Mathews</u> in the context of a voting rights in the case of <u>Georgia Muslim Voter Project v. Kemp</u>, 918 F.3d 1262, 1268 (11th Cir. 2019) concerning absentee ballot signature mismatches. Without more, that stay-panel opinion does not change this Court's adherence to the <u>New Georgia Project</u> published opinion because the <u>Georgia Muslim Voter Project</u> panel did not specifically discuss adjudicative versus legislative actions. More specifically, in a more recent published opinion, the Eleventh Circuit held in the context of a felon voting rights case that "[t]o avail themselves of the <u>Mathews v. Eldridge</u> framework, the felons were obliged to prove a deprivation of liberty based on adjudicative action," as opposed to a legislative action. <u>Jones v. Governor of Fla.</u>, 975 F.3d 1016, 1049 (11th Cir. 2020); <u>see also</u> <u>75 Acres, LLC v. Miami-Dade Cnty., Fla.</u>, 338 F.3d 1288, 1294 (11th Cir. 2003) (explaining the difference between legislative and adjudicative action as "[w]hen the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process. The challenges to such laws must be based on their substantive compatibility with constitutional guarantees. By contrast, if government conduct is viewed as adjudicative in nature, property owners may be entitled to procedural due process above and beyond that which already has been provided by the legislative process.") (citations and quotations omitted). The Court further notes that in the case *sub judice*, Plaintiffs do not discuss the adjudicative obligation requirement in any of their briefing/argument or otherwise present evidence to this regard.

### E. Count V: Section 2 of the Voting Rights Act

Plaintiffs raise a vote-denial claim in Count V of their Second Amended Complaint concerning Section 2 of the Voting Rights Act. Doc. No. [582], ¶ 204.[53] The circuits are split as to the proper standard for reviewing a vote-denial claim under Section 2.[54]

The United States Supreme Court is currently considering the issue in the case of Arizona Republican Party v. Democratic National Committee, 141 S. Ct. 221 (Mem.) (2020) (No. 19-1258). The Eleventh Circuit has held that a district court has good reason, "if not an excellent one" to stay a case "to await a federal appellate decision that is likely to have a substantial or controlling effect on the claims and issues in the stayed case." Miccosukee Tribe of Indians of Fla. v. S. Fla. Water Mgmt. Dist., 559 F.3d 1191, 1198 (11th Cir. 2009); see also Clinton v. Jones,

_____

[53] "Vote denial occurs when a state, or here a municipality, employs a 'standard, practice, or procedure' that results in the denial of the right to vote on account of race." Burton v. City of Belle Glade, 178 F.3d 1175, 1197–98 (11th Cir. 1999) (citing 42 U.S.C. § 1973(a)).

[54] "In short, the Ninth Circuit treats disparate rates of utilization [of a voting procedure] as a 'disparate burden' cognizable under § 2, whereas the Fourth, Sixth, Seventh, and now Eleventh Circuits look to disparate opportunities [to vote]. And that major difference controls whether neutral 'time, place, and manner' regulations that impose only the ordinary burdens of voting run afoul of § 2" of the Voting Rights Act. See Brief for Petitioner at 9, Ariz. Republican Party v. Democratic Nat'l Comm., 141 S. Ct. 221 (Mem.) (No. 19-1258), 2020 WL 4455276, at *9.

520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."). The Supreme Court heard oral argument for the <u>Arizona Republican Party</u> case on March 2, 2021. Accordingly, a stay of the case *sub judice* until the Supreme Court issues its opinion (likely later this year) will be of definite duration and will provide clarity on the question of the proper standard for consideration of the Section 2 challenge presented in Plaintiffs' Second Amended Complaint. A temporary stay of this Court's ruling on the Voting Rights Act claim to await this clarity from the Supreme Court is in the interest of judicial economy, and nothing in the record indicates that a stay will prejudice either party. Accordingly, the Court exercises its discretion to stay consideration of the Section 2 Voting Rights Act claim.

### F.    Injunctive Relief

At the conclusion of Plaintiffs' Second Amended Complaint, they seek injunctive relief to permanently enjoin Defendants to "oversee adequately elections by enforcing uniform standards and processes . . . consistent with Georgia and federal law governing voter registration" and "ensure each county conducts efficient, just, and fair elections." Doc. No. [582], pp. 91–97.

90

In their Motion for Summary Judgment, Defendants assert that Plaintiffs seek an impermissible "obey the law" injunction. Doc. No. [450-1], p. 51. "As the name implies, an obey-the-law injunction does little more than order the defendant to obey the law. [The Eleventh Circuit has] repeatedly questioned the enforceability of obey-the-law injunctions" because they are broad, non-specific, and do not give the restrained party fair notice of what conduct will risk contempt. SEC v. Goble, 682 F.3d 934, 949 (11th Cir. 2012); see also Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1531 n.12 (11th Cir. 1996) ("A person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing.").

In response, Plaintiffs claim that they do not seek a prohibited "obey the law" injunction. Doc. No. [490], p. 13. Rather, Plaintiffs contend that the Court "can grant specific and tailored injunctive relief [that] Plaintiffs request." Id. Plaintiffs also suggest that this issue remains premature because if this case proceeds to trial and Plaintiffs prevail, proper remedies can be addressed at a separate remedial proceeding with supplemental briefing (and possibly additional expert witness testimony). Doc. No. [607], Tr. 117:14–20; 118:3–22.

91

Precedent supports Plaintiffs' position. In <u>Terry v. Adams</u>, 345 U.S. 461 (1953), the Supreme Court affirmed the district court holding that election machinery had deprived petitioners of their right to vote on account of their race and color and remanded the case to the district court "to enter such orders and decrees as are necessary and proper under the jurisdiction it has retained under" the Declaratory Judgment Act, 28 U.S.C. § 2202. 345 U.S. at 470. The Court further stated that "[i]n exercising this jurisdiction, the [district court] is left free to hold hearings to consider and determine what provisions are essential to afford [the petitioners] full protection from future discriminatory . . . election practices which deprive citizens of voting rights because of their color." <u>Id.</u>; <u>see also</u> <u>Morris v. Travisono</u>, 509 F.2d 1358, 1362 (1st Cir. 1975) (holding that the "district court acted within its power and did not err in concluding that injunctive relief was necessary and proper to enforce its declaratory judgment").

Like the <u>Terry</u> case, the case *sub judice* is being brought under the Declaratory Judgment Act for alleged deprivations of the right to vote on the account of race or color, as noted in paragraph 7 of the Second Amended Complaint. Doc. No. [582], ¶ 7. In light of the holding in <u>Terry</u>, this Court adheres to its prior ruling (in the context of Defendants' Motion to Dismiss) that it is

92

premature (at the current stage of the case) to review the precise nature of any type of injunction. In the event that Plaintiffs prevail at trial, it remains possible during the remedial stage of the case that Plaintiffs will seek injunctive relief that is "specific and narrow enough that" Defendants "would be afforded sufficient warning to conform their conduct." Doc. No. [68], p. 53 (citing <u>SEC v. Graham</u>, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016)); <u>cf.</u> <u>Holt Civic Club v. City of Tuscaloosa</u>, 439 U.S. 60, 65–66 (1978) ("[A] federal court should not dismiss a meritorious constitutional claim because the complaint seeks one remedy rather than another plainly appropriate one. Under the Federal Rules of Civil Procedure [54(c)] 'every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.' Thus, although the prayer for relief may be looked to for illumination when there is doubt as to the substantive theory under which a plaintiff is proceeding, its omissions are not in and of themselves a barrier to redress of a meritorious claim.") (citations omitted). Thus, without more, summary judgment is not warranted as to Defendants' arguments concerning injunctive relief.[55]

---

[55] This portion of the Court's ruling is subject to reconsideration, depending on the standard enunciated by the Supreme Court in the <u>Arizona Republican Party</u> case for

## IV.    CONCLUSION

Defendants' Motion for Summary Judgment (Doc. No. [450]) is **GRANTED IN PART, DENIED IN PART, STAYED IN PART, and MOOT IN PART.**

More specifically, as to Count I (Fundamental Right to Vote), the motion is **GRANTED** as to Plaintiffs' training claims concerning provisional ballots, absentee ballot rejections, and Plaintiffs' list maintenance/"Use it or Lose it" claim. The motion is **DENIED** as to Plaintiffs' training claims concerning in-person absentee ballots cancellations, as well as Plaintiffs' claims concerning list accuracy and "Exact Match" of voter registration application data.

As to Count II (Fifteenth Amendment), the motion is **GRANTED** as to the failure to train on election laws claims, the voter registration list claims (that do not concern "Exact Match" of voter registration application data), and absentee

---

Section 2 Voting Rights litigation. Also, in the event of a remedial stage of trial, the attorneys of record should be prepared to discuss Judge Gerald B. Tjoflat's dissenting opinion in the case of <u>Democratic Executive Committee of Florida v. Lee</u>, 915 F.3d 1312, 1331 (11th Cir. 2019). While not binding, the opinion does provide an overview (and a number of scholarly citations) concerning district court remedial powers in constitutional litigation.

ballot rejection claims. The motion is **DENIED** as to "Exact Match" of voter registration application data.

As to Count III (Equal Protection), the motion is **DENIED** as to "Exact Match" of voter registration application data claims and **GRANTED** as to absentee ballot rejection claims. As to Count III (Geographic/Residential Equal Protection), the motion is **GRANTED** as to provisional ballot and absentee ballot rejection claims and **DENIED** as to "Exact Match" of voter registration application data and in-person absentee ballot cancellation claims.

As to Count IV (Procedural Due Process), the motion is **GRANTED**.

As to Count V (Section 2 of the Voting Rights Act), the Court **STAYS** its consideration until the United States Supreme Court issues its decision in Arizona Republican Party v. Democratic National Committee, 141 S. Ct. 221 (Mem.) (2020) (No. 19-1258). Thereafter, Defendants may file a renewed partial motion for summary judgment as to the Voting Rights Act claim. Said motion shall be filed within **TWENTY DAYS** of the issuance date of the Arizona Republican Party opinion.[56]

---

[56] The time for filing a consolidated pretrial order pursuant to Local Rule 16.4(A), NDGa. is also stayed.

95

The motion is **DENIED** as to the injunctive relief grounds.

The motion is **MOOT** as to all claims for which summary judgment was previously granted in Defendants' favor in the context of the Court's ruling on Defendants' jurisdictional summary judgment motion. Doc. No. [612].

For purposes of perfecting the record, the Court notes that it is aware that on March 25, 2021, the Georgia General Assembly passed and the Governor signed SB 202, which substantially changed numerous Georgia election laws. This Order addresses Georgia law as it existed for purposes of the 2018 General Election challenged in this lawsuit and HB 316, which was enacted immediately after this lawsuit was filed and in effect at the time the parties completed briefing on Defendants' Motion for Summary Judgment. In the absence of the opportunity for full briefing by the parties on the newly enacted legislation, the Court does not address SB 202 herein.

The Clerk is **DIRECTED** to term the pendency of the motion at Doc. No. [450].

**IT IS SO ORDERED** this  31st  day of March, 2021.

 s/Steve C. Jones
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

96