# Exhibit F

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) ) | |
| | | C.A. No. N21C-03-257 EMD |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| FOX NEWS NETWORK, LLC, | ) ) | |
| Defendant. | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS RULE 12(b)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

OF COUNSEL:

Charles L. Babcock
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, TX 77010
(713) 752-4210

Scott A. Keller
LEHOTSKY KELLER LLP
200 Massachusetts Avenue NW
Washington, D.C. 20001
(512) 693-8350

Dated: May 18, 2021

Blake Rohrbacher (#4750)
Katharine L. Mowery (#5629)
Valerie A. Caras (#6608)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for Defendant Fox News Network, LLC*

# TABLE OF CONTENTS

# TABLE OF AUTHORITIES

## PRELIMINARY STATEMENT

A free press must be able to report both sides of a story involving claims striking at the core of our democracy—especially when those claims prompt numerous lawsuits, government investigations, and election recounts. When a sitting President of the United States and his legal team challenge a presidential election in litigation throughout the nation, the media can truthfully report and comment on those allegations under the First Amendment without fear of liability. Plaintiffs' defamation lawsuit against Fox News threatens to stifle the media's free-speech right to inform the public about newsworthy allegations of paramount public concern.

Fox hosts did not create allegations against Dominion, which predate the November 2020 election. In 2019 legal claims (Ex.A1) still pending, Georgia voters alleged that Dominion's "unaccountable, unverifiable" voting system "will be a colossal train wreck for democracy," because it "produces unaccountable, inherently evidence-free election outcomes by its very design." Ex.A2. In October 2020, federal Judge Totenberg credited testimony in that case from an "array of experts and subject matter specialists [that] provided a huge volume of significant evidence regarding the security risks and deficits in the [Dominion] system." *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1278 (N.D. Ga. 2020).  The court warned that Dominion's technology "presents serious system security vulnerability and operational issues" caused by "fundamental deficits and exposure"—risks the court

found "neither hypothetical nor remote." *Id.* at 1340-41. During a subsequent PBS interview, one of the challengers' experts "worried" that Dominion's system "is the technical equivalent" to an airplane crash. Ex.A3.

A week later, Fox called Arizona before any other network, and Fox then called the election for now-President Biden the same day as other media. That call was disputed: President Trump and his legal team quickly challenged the election results in lawsuits across the country. Instead of shying away from reporting these controversies, Fox fairly and extensively covered them just as it had reported the election results. As responsible journalists, Fox covered both sides. The American people deserved to know why President Trump refused to concede despite his apparent loss.

The news media has the right in a democracy to inform citizens by reporting and commenting on a President's allegations challenging the security of our elections. The President and his legal team filed multiple lawsuits alleging, like the 2019 *Curling* claims, that voting systems like Dominion's could be manipulated to alter votes. Many doubted these allegations. Others, like the *Curling* challengers, continue to express concerns. Fox and other media throughout the world truthfully reported the newsworthy claims by President Trump and his legal team. Fox hosts responsibly covered the controversy, repeatedly pressing the President's attorneys, Rudy Giuliani and Sidney Powell, for evidence substantiating their allegations.

Dominion accepted Fox's offer to appear on air, vigorously disputing the claims. Hosts reminded viewers of Dominion's denials. And some shared opinions about the allegations.

That is natural under the First Amendment, which protects news reporting essential for "uninhibited, robust, and wide-open" debate. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Fox had a free-speech right to interview the President's lawyers and surrogates even if their claims eventually turned out to be unsubstantiated. Dominion's complaint challenging the deeply enshrined protections for the free press thus should be dismissed—for two primary reasons.

*First*, Dominion has alleged no actionable defamation by Fox. A series of First Amendment and New York free-speech doctrines each independently protect media reporting and commentary on newsworthy allegations of public concern made by the President and his legal team. It was a newsworthy "fact" that the sitting President simply made allegations challenging the presidential election. Dominion confuses the obligation to truthfully report allegations with a purported requirement that the media rebut their underlying falsity. No such duty exists under the First Amendment or New York law. The press can safely cover both sides and interview newsmakers without endorsing everything they say. The freedoms of speech and press would be illusory if the prevailing party could obtain billions of dollars from the press for providing the losing side a forum.

Well-established doctrine protects the media's ability to report and comment specifically on government proceedings like election recounts and lawsuits. The President and his legal team waged a national litigation battle challenging the 2020 election results, while making the same allegations Dominion complains of in this suit. When a sitting President and aligned lawyers challenge an election through litigation, the public has a right to know those allegations and what evidence supports them. Fox therefore had a broad free-speech right to interview the President's lawyers and surrogates, regardless of whether they could substantiate their claims.

*Second*, Dominion fails to plead facts alleging that Fox published the challenged speech with actual malice—that is, with knowledge or reckless disregard of its falsity and that the person responsible for telecasting the speech in fact entertained serious doubts about its truth. At most, Dominion alleges that Fox negligently failed to investigate the President's lawyers' speech in advance and refused to stop reporting after Dominion denied their allegations. The U.S. Supreme Court has already rejected these theories of actual malice.

There are two sides to every story. The press must remain free to cover both sides, or there will be a free press no more. Dominion's $1.6 billion suit against Fox for covering both sides of this vigorous election dispute should be dismissed.

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs filed their complaint on March 26, 2021. D.I.1 ("Compl.¶__"). On March 30, this Court extended Fox's time to respond to the Complaint until May 18. D.I.26. Defendant moves to dismiss under Rule 12(b)(6) and N.Y. C.P.L.R. §3211(g)(1).

## BACKGROUND

### A.    Overview of Dominion.

Founded in 2002 in Canada, Plaintiffs (collectively, "Dominion") supply voting machines and software in 28 States, including Georgia, Michigan, Arizona, and Wisconsin. Compl.¶¶5, 20, 25; Compl.Ex.5; Ex.B1, B5.

Dominion acquired Sequoia Voting Systems, a U.S.-based company operating in numerous states. *Gusciora v. Christie*, 2013 WL 5015499, at *2 n.3 (N.J. Super. Ct. App. Div.) ("Dominion Voting Systems is the successor to Sequoia."). Sequoia was previously owned by Smartmatic, another electronic-voting company founded in 1997 by Venezuelan entrepreneurs in Venezuela. Ex.B2.[1] "Hugo Chavez's elections" in Venezuela were "handled" by "Smartmatic." Compl.¶186. Smartmatic

---

[1] New York's anti-SLAPP pleading standard applies to this lawsuit for the reasons explained in Fox's prior motion (D.I.38), which is incorporated here by reference. This requires consideration of "affidavits" at the pleading stage. N.Y. C.P.L.R. §3211(g)(2).

sold Sequoia because foreign ties raised national-security and election-integrity concerns. Ex.B2-B4.

**B.      Security concerns about Dominion's voting systems arose in government proceedings before the November 2020 presidential election.**

In January 2020, after a two-day examination by six experts, Texas refused to certify Dominion's system, questioning whether it "is safe from fraudulent or unauthorized manipulation."[2] Ex.B6.

In 2019, Georgia enacted legislation to adopt and purchase new voting systems. 2019 Georgia Laws Act 24 (H.B. 316) §18 (codified at Ga. Code §21-2-300(a)). Democrats, led by defeated gubernatorial candidate Stacey Abrams, opposed the legislation for security reasons, and Abrams' voting-rights group argued this legislation wasted money on "hackable voting machines." Ex.A4. In July 2019, Georgia awarded Dominion this contract for nearly $107 million. Ex.A5.

Later in 2019, Georgia voters and the Coalition for Good Governance challenged the Dominion system in federal litigation as insufficiently secure. That

---

[2] At the pleading stage, the court "may properly consider" a fact subject to judicial notice, particularly "where a plaintiff has no good faith basis for challenging [its] authenticity or legitimacy." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 172 (Del. 2006). Judicial notice is proper for all "public documents . . . filed with government officials," *Doppelt v. Windstream Holdings, Inc.*, 2016 WL 612929, at *5 n.57 (Del. Ch.)—and "statements and releases" by government "official representatives," *Jimenez v. Palacios*, 2019 WL 3526479, at *2 n.3 (Del. Ch.), *aff'd*, 237 A.3d 68, 2020 WL 4207625 (Del. 2020) (TABLE).

court recognized "[t]he contract was entered at a time when the cybersecurity risks and vulnerabilities of digital election systems had emerged as a major concern." *Curling*, 493 F. Supp. 3d at 1274.

Three weeks before the November 2020 presidential election, Judge Totenberg credited significant expert testimony raising security concerns with Dominion's system, writing that an "array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the [Dominion] system." *Id.* at 1278. One cybersecurity expert testified that Dominion's system remained vulnerable to a "cyber attack . . . causing the swapping or deletion of specific votes cast." *Id.* at 1279. Another testified that Dominion had "'not permitted[] independent research'" into its system, expressing "serious doubt that [it] was operating correctly." *Id.* at 1288-89.

The court refused to order any major changes so close to Election Day. *See id.* at 1307-12. But it warned that "Dominion's" system posed "substantial risks and long-run threats," and "[t]hese risks are neither hypothetical nor remote"—including vulnerability to "stealth vote alteration . . . by malware that can be effectively invisible to detection." *Id.* at 1312, 1341. The court concluded that "national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?'—but 'when it will happen.'" *Id.* at 1342.

Media widely covered the *Curling* litigation and its allegations against Dominion. For example, *USA Today* reported that Dominion's system "had been rejected by Texas and is the subject of a court battle over accuracy." Ex.A6. According to the *Washington Post*, "election integrity activists say the new [Dominion] voting machines are unaccountable and unverifiable and have many of the same security vulnerabilities as the old ones." Ex.A7. The *Associated Press* explained that plaintiffs argue that "voters cannot be confident their votes are accurately counted." Ex.A8. The *New York Times* reported that Dominion's system was a "Rube Goldbergian assemblage of interrelated components" and an "expert witness for the plaintiffs in the [*Curling*] lawsuit" saw "the multitude of components as more vulnerable to attack. Ex. H1. The *Atlanta Journal-Constitution* stated that Dominion's system "is vulnerable to cyberattacks that could undermine public confidence, create chaos at the polls or even manipulate the results on Election Day." Ex.A9.

### C.    Election lawsuit allegations about Dominion.

Before the 2020 election, President Trump expressed concern about election integrity and promised to challenge the results if he suspected election-integrity problems. Ex.C1. At a November 5, 2020, press conference, he announced plans to bring "a lot of litigation" challenging the election results. Ex.D1; *see* D2-D7.

As promised, the sitting President and aligned lawyers filed multiple lawsuits raising vote-fraud allegations about Dominion's systems. A chart summarizing these lawsuits is attached as Exhibit E. At least one of these lawsuits was pending between November 2020 and April 2021—the entire timeframe covering Fox's speech challenged by Dominion in this lawsuit.

In a November 7 lawsuit, the Trump campaign claimed that Dominion machines in Maricopa County, Arizona, improperly rejected thousands of ballots. Ex.E1. On November 11, the campaign filed a lawsuit in Michigan, alleging that "[t]he Dominion Voting Systems election management system and voting machines (tabulators) . . . were at fault" for miscounting votes. Ex.E2.

On November 13, aligned lawyers seeking President Trump's reelection filed a lawsuit challenging Georgia's election results based on fraud. Ex.E3. On November 17, the plaintiff filed a supporting affidavit claiming that Dominion's software is "a descendant of" Smartmatic's, which was allegedly designed to rig Venezuelan elections. Ex.E4. The affiant expressed "alarm[]" because the "circumstances and events" surrounding the presidential election allegedly resembled "what happened with Smartmatic software electronically changing votes" in Venezuela. *Id.*

On November 25, Sidney Powell filed lawsuits in Georgia and Michigan accusing Dominion of election fraud. Ex.E5, E6. According to the Georgia complaint:

- Dominion's system "carr[ied] out massive voter manipulation" by switching votes from President Trump to Joe Biden. Ex.E5 ¶18; *see id.* ¶¶15, 102, 163, 190.

- Dominion's software "is designed to facilitate vulnerability," allowing users "to arbitrarily add, modify or remove" votes without detection. *Id.* ¶¶8, 103.

- Exploiting this vulnerability, foreign agents hacked the software "in order to monitor and manipulate elections, including the most recent US general election in 2020." *Id.* ¶14; *see id.* ¶¶111, 130, 185.

- Dominion was "founded by foreign oligarchs and dictators" to manipulate votes and ensure that "Venezuelan dictator Hugo Chavez never lost another election." *Id.* ¶5.

- Dominion's systems were "rushed into use" by Georgia election officials, who "disregarded" security concerns and committed "corruption" by spending millions of dollars on "hackable voting machines." *Id.* ¶¶4, 12-13, 31, 97.

The Michigan complaint (Ex.E6) contained similar allegations.

Powell filed more lawsuits in Arizona and Wisconsin. Ex.E7, E8. These repeated allegations about Dominion and added new ones:

- Dominion had a "clear motive . . . to rig the election in favor of Biden," who "received a statistically significant Advantage, based on fraud, from the use of Dominion Machines." Ex.E7 ¶¶19, 101; *see id.* ¶117.

- Purported "glitches" in Dominion's system "ha[d] the uniform effect of hurting Trump and helping Biden." *Id.* ¶¶86, 91, 101.

- Dominion sent ballots "offshore" for "algorithmic vote manipulation." *Id.* ¶¶65, 133.

- Dominion's machines had "intentional[] security flaws" that "facilitated foreign interference in the 2020 General Election." *Id.* ¶13.

*See* Ex.E8 ¶¶6-11, 16, 52-62, 70-89, 116, 118, 130 (similar allegations).

The last of these cases did not conclude until April 13, 2021. Ex.E9.

### D.    Government investigations into electronic-vote fraud.

Government proceedings besides litigation also examined allegations of electronic-vote fraud in the 2020 presidential election.

Federal investigations were already underway before November 9, 2020. On November 9, the U.S. Attorney General authorized all U.S. Attorneys and the FBI "to pursue substantial allegations of voting and vote tabulation irregularities," as he had "*already done* in specific instances." Ex.F1 (emphasis added). On November 12, the Cybersecurity & Infrastructure Security Agency explained that it too had investigated "voting system[s]." Compl.¶64. On December 1, the U.S. Attorney General clarified that DHS and DOJ "have looked into" claims "that machines were programmed essentially to skew the election results," and "*so far*, we haven't seen anything to substantiate that." Compl.¶102 (emphasis added).

State officials also investigated possible electronic-vote fraud—including Dominion systems specifically. Antrim County, Michigan, "initially reported incorrect unofficial results" due to software and human-error issues on some

Dominion voting machines. Ex.F2; Compl.¶65. On November 7, Michigan's Secretary of State announced that the State's Bureau of Elections had conducted a "preliminary review of the issue." Ex.F3. She further explained that any similar errors "occur[ring] elsewhere in the state" would be "caught and identified during the county canvass" process, which was "ongoing" and lasting two weeks. *Id.*; *see* Mich. Comp. Laws §168.822(1). Moreover, responding to allegations that this error "was part of a larger conspiracy," the Secretary ordered a hand audit of all Antrim County ballots to confirm "that the Dominion machines had counted correctly." Ex.F2.

The Georgia Secretary of State announced on November 17 that "last week"—the week of November 9—he had ordered "an audit of a random sample of [Dominion] machines to confirm no hack or tamper." Ex.F4. Georgia also conducted a hand audit recount of all ballots to confirm the electronic tally. Compl.¶84.

### E.   Fox's coverage of the 2020 U.S. presidential election and this lawsuit.

All the speech Dominion alleges as defamation occurred amid pending litigation and other governmental investigations implicating Dominion. Along with virtually every U.S. media outlet, Fox covered the President's vote-fraud allegations and associated lawsuits brought by the President and his supporters. Fox hosts—including Maria Bartiromo, Lou Dobbs, and Jeanine Pirro—went straight to the newsmakers connected to those lawsuits. They interviewed the President's lawyers,

-12-

Rudy Giuliani and Sidney Powell, about their vote-fraud allegations concerning Dominion. Compl.¶¶17-18, 91, 179.[3] During the interviews, Giuliani and Powell made several allegations against Dominion matching claims asserted in court: "(1) Dominion committed election fraud by rigging the 2020 Presidential Election; (2) Dominion's software and algorithms manipulated vote counts in the 2020 Presidential Election; (3) Dominion is owned by a company founded in Venezuela to rig elections for the dictator Hugo Chávez; and (4) Dominion paid kickbacks to government officials who used its machines in the 2020 Presidential Election." Compl.¶2; *see* Compl.¶179(a)-(s).

Fox also covered the other side of this story. The chart attached as Exhibit G shows Fox's coverage of the election-fraud allegations was often quite skeptical. *See* Ex.G1-G35. Fox hosts regularly and accurately introduced Giuliani and Powell as members of the President's legal team, Compl.¶¶179(a), (c), (h), (j); Ex.I2, I7-I9; pressed them for supporting evidence, Compl.¶¶179(e), (g), (q); Ex.I3, I4, I13; informed viewers of Dominion's denials, Compl.¶¶179(c), (e), (j); Ex.I4, I7, I9; and called for deeper investigation by authorities, Compl.¶¶179(b), (e), (h), (l), (m), (q); Ex.I4, I6, I8, I10, I11, I13. Dominion concedes that Fox hosts like Laura Ingraham and Tucker Carlson expressed skepticism about the allegations against Dominion,

---

[3] As Dominion concedes, even after Powell left the Trump legal team on November 22, she continued pursuing aligned "litigation challenging the 2020 Presidential Election." Compl.¶¶17, 91, 93.

highlighting the lack of supporting evidence. Compl.¶¶68, 136, 181. Dominion itself appeared on Fox to offer its side: Fox anchor Eric Shawn interviewed on air Dominion spokesperson Michael Steel, who addressed and denied President Trump's allegations. Ex.I1(transcript); Ex.J1(video).

## ARGUMENT

The parties agree that New York substantive law applies, D.I.40, because New York has the "most significant relationship" to this "defamation" lawsuit, *Stephen G. Perlman, Rearden LLC v. Vox Media, Inc.*, 2015 WL 5724838, at *10 (Del. Ch.). Every challenged telecast came from Fox's headquarters in New York, where Dominion also conducts "significant operations" and serves its second-largest customer. Compl.¶¶11-16, 23.

Plaintiffs fail to state a claim under any applicable pleading standard. Under Delaware's standard, Dominion cannot recover "under any reasonably conceivable set of circumstances" because it failed to plead actionable defamation made with actual malice. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 536 (Del. 2011). So *a fortiori*, Dominion cannot satisfy the New York anti-SLAPP law's "heightened standard" for pleading claims addressing statements regarding matters of public concern. *Nat'l Fuel Gas Distribution Corp. v. PUSH Buffalo*, 104 A.D.3d 1307, 1309 (N.Y. App. Div. 2013). Under New York law, Dominion's defamation claim "shall" be dismissed because it lacks a "substantial

basis in law." N.Y. C.P.L.R. §3211(g)(1). New York's anti-SLAPP pleading standard applies here for reasons described in Fox's prior motion (D.I.38), which is incorporated here by reference.

## I. Dominion's defamation claim against Fox challenges media speech broadly protected under multiple constitutional doctrines.

Several constitutional doctrines under the First Amendment and New York law all lead to the same conclusion: Fox's reporting and commentary on newsworthy allegations of public concern by the sitting President and his legal team are not actionable defamation.

### A. Multiple free-speech doctrines protect Fox's reporting and commentary.

At least three separate free-speech doctrines protect Fox's challenged speech. *First*, truthfully reporting newsworthy allegations made by a President and his legal team on matters of public concern is not actionable. *Second*, the media has complete protection to report and comment about allegations made in government proceedings. *Third*, opinion and hyperbolic rhetoric about newsworthy allegations are constitutionally protected.

#### 1. Truthfully reporting newsworthy allegations made by a sitting President and his legal team on matters of public concern is not actionable.

Dominion's defamation suit fails because Fox truthfully reported a public official's newsworthy allegations. Falsity is an essential element of a defamation

claim: Both New York law and the First Amendment require a provably false statement that can "reasonably be interpreted as stating actual facts about" the plaintiff. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990); *see Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995). "Mere allegations, rather than objective statements of fact, are not actionable." *Boulos v. Newman*, 302 A.D.2d 932, 933 (N.Y. App. Div. 2003); *accord GS Plasticos Limitada v. Bureau Veritas*, 39 Misc. 3d 1206(A) (N.Y. Sup. Ct. 2010), *aff'd*, 84 A.D.3d 518 (N.Y. App. Div. 2011).

Reporting that properly attributes allegations of "public concern" made by a President and his legal team is not "reasonably susceptible" of defamatory meaning when the report does not "represent these quotations as the true facts." *Orr v. Lynch*, 60 A.D.2d 949, 950 (N.Y. App. Div.), *aff'd*, 383 N.E.2d 562 (N.Y. 1978); *see, e.g.*, *Glob. Relief Found., Inc. v. N.Y. Times Co.*, 390 F.3d 973, 986-88 (7th Cir. 2004); *Lambert v. Providence Journal Co.*, 508 F.2d 656, 658 (1st Cir. 1975). Indeed, "a vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody said rather than of what anybody did." *Time, Inc. v. Pape*, 401 U.S. 279, 285 (1971).

Consequently, the press may report "serious charges" by public officials on matters of public concern "regardless of the reporter's private views regarding their validity." *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 120 (2d Cir. 1977).

If "[w]hat is newsworthy about such accusations is that they were made," truthfully reporting them is not actionable. *Id.*; *see Greenbelt Co-op. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 12-14 (1970). To fulfill its journalistic mission, the media can report newsworthy allegations of public concern by and about public figures that the media even knows are "likely false." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 104-05 & n.11 (2d Cir. 2000). Thus, "in reporting a newsworthy event, the belief or doubt of the reporter is not important since he is reporting the news event, not assuming responsibility for the veracity of the quoted remarks." *Orr*, 60 A.D.2d at 950; *see Campo Lindo for Dogs, Inc. v. N.Y. Post Corp.*, 65 A.D.2d 650, 650 (N.Y. App. Div. 1978); *DeLuca v. N.Y. News Inc.*, 109 Misc. 2d 341, 346 (N.Y. Sup. Ct. 1981).

Dominion mainly complains that Fox "intentionally provid[ed] a platform" for the President's lawyers to present *their own* newsworthy election-fraud allegations. Compl.¶179. That is not actionable defamation by Fox. Fox had a constitutional right to inform the public of the newsworthy allegations made by the President and his legal team—which were "newsworthy" by the mere fact "that they were made." *Edwards*, 556 F.2d at 120; *accord Croce v. N.Y. Times Co.*, 930 F.3d 787, 793 (6th Cir. 2019). Virtually every major U.S. news outlet—and many international ones—also reported those allegations. If Fox were liable for

defamation, media across the world would be too—and that absurd conclusion cannot follow in a country that protects freedom of the press.

Dominion considers Fox's coverage too negative. But *even one-sided reporting* of newsworthy allegations of public concern made by a President and his legal team is protected. *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1434 (8th Cir. 1989). Regardless, Fox fairly covered both sides of the controversy. Fox gave Dominion the on-air opportunity to rebut the allegations. And as Dominion concedes, Fox informed viewers that Dominion denied them and pressed Giuliani and Powell for supporting evidence. *Supra* p.12-14.

Dominion claims that Powell and Giuliani were so "facially unreliable" that Fox never should have invited them on to explain their election-fraud allegations. Compl.¶¶4, 59, 63, 113, 191, 195. Dominion's position would unconstitutionally punish the press for interviewing the sources of these newsworthy allegations. The press need not "suppress newsworthy statements merely because it has serious doubts regarding their truth. Nor must the press take up cudgels against dubious charges in order to publish them without fear of liability for defamation." *Edwards*, 556 F.2d at 120. The media's right to report newsworthy allegations made by a President and his legal team does not turn on the "trustworthiness or credibility" of the allegations' source, given "the public interest in being fully informed about

-18-

public controversies." *Barry v. Time, Inc.*, 584 F. Supp. 1110, 1126 (N.D. Cal. 1984);

*accord In re United Press Int'l*, 106 B.R. 323, 329 (D.D.C. 1989).

### 2. The media has complete protection to report and comment on allegations made in government proceedings.

Fox's challenged speech is also absolutely protected as reporting and commenting on allegations made in government proceedings. The press may report attorney comments about litigation and allegations prompting government investigations. During their Fox interviews, Powell and Giuliani repeated, elaborated, and previewed allegations made in litigation. *Supra* p.12-14. And government authorities were already investigating the allegations, including through state election recounts and audits. *Supra* p.11-12.

**a.** Every challenged Fox interview of Powell and Giuliani reported on judicial proceedings. In fact, election-fraud allegations against Dominion remained pending in litigation until *last month*, long after the last allegedly defamatory statement mentioned in Dominion's complaint.

The First Amendment completely shields "accurate reports of judicial proceedings" and other government investigations—whether public or confidential. *Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976); *see Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838-39 (1978) (confidential administrative investigation); *Greenbelt*, 398 U.S. at 12-14 (city council hearing). New York law likewise prohibits civil liability "for the publication of a fair and true report of any judicial

proceeding, legislative proceeding or other official proceeding." N.Y. Civ. Rights Law §74. This protection "is absolute, and is not defeated by the presence of malice or bad faith." *Glendora v. Gannett Suburban Newspapers*, 201 A.D.2d 620, 620 (N.Y. App. Div. 1994).

This doctrine requires "a liberal interpretation . . . so as to provide *broad protection to news accounts* of judicial or other official proceedings." *Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (N.Y. App. Div. 2009) (emphasis added). To qualify as a protected "fair and true" report, an account of an official proceeding "must be only 'substantially accurate.'" *Lacher v. Engel*, 33 A.D.3d 10, 17 (N.Y. App. Div. 2006). In other words, this doctrine protects news statements fairly describing "allegation[s] in the complaint"—whether or not those allegations are true. *Id.* This test "admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated." *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979).

Protection for reporting on government proceedings extends far beyond parroting court documents. Protected reports include "*comments made by attorneys to the press* in connection with the representation of their clients." *McNally v. Yarnall*, 764 F. Supp. 853, 856 (S.D.N.Y. 1991) (emphasis added) (citing *Branca v. Mayesh*, 101 A.D.2d 872 (N.Y. App. Div. 1984); *Ford v. Levinson*, 90 A.D.2d 464, 465 (N.Y. App. Div. 1982)). The doctrine also covers "the release of background

material with regard to the case," particularly "where the description of the case is offered by a party's legal counsel." *Fishof v. Abady*, 280 A.D.2d 417, 417-18 (N.Y. App. Div. 2001). Even "reports that bear a more attenuated relationship to a proceeding have been deemed sufficiently connected." *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 217 (N.D.N.Y. 2014) (collecting cases).

Fox's coverage is protected because pending or planned litigation "form[s] the basis" for the allegations Powell and Giuliani made during Fox's interviews. *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 217-18 (E.D.N.Y. 2012). On November 5, 2020, President Trump promised "a lot of litigation" challenging the election results, and this litigation commenced on November 7. *Supra* p.8-10. Before formally presenting arguments or adding details in later complaints, the President's legal team remained "free and safe to announce its position . . . in a forum other than court." *Hudson v. Goldman Sachs & Co.*, 304 A.D.2d 315, 316 (N.Y. App. Div. 2003).

As that forum, Fox and the rest of the media cannot be sued for accurately reporting the attorneys' arguments. The press may report "background facts" and arguments planned for "*anticipated* judicial proceedings," including future lawsuits not yet filed. *Dimond v. Time Warner, Inc.*, 119 A.D.3d 1331, 1333 (N.Y. App. Div. 2014) (emphasis added); *see Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York*, 101 A.D.2d 175, 182 (N.Y. App. Div. 1984) (protecting

report of proceeding before it formally began). Such protection covers positions that a party "*might* assert in litigation." *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 95 (2d Cir. 2017) (emphasis added); *see McNally*, 764 F. Supp. at 856.

Powell previewed litigation against Dominion in her November 8 Fox interview. Compl.¶179(a). During subsequent interviews, the President's legal team explained their background facts, litigation strategy, and forthcoming arguments concerning Dominion. Compl.¶¶179(b)-(c), (e), (g)-(j), (l)-(o), (q), (s). Several interviews discussed supporting "evidence" and "witnesses." Compl.¶¶179(c), (f)-(h), (j), (l), (q). Some explicitly mention affidavits submitted in litigation. Compl.¶¶179(g)-(j). And just as they previewed on Fox, attorneys added more detailed allegations to suits filed later in November and December. In interviews before and after these filings, Powell's and Giuliani's statements closely track these complaints. *Compare supra* p.12-13, *with* Compl.¶¶2, 179(a)-(t).

The media may report attorney statements that "essentially summarize or restate the allegations of [the] pleading[s]." *Lacher*, 33 A.D.3d at 17 (citing *Ford*, 90 A.D.2d at 465); *see McRedmond v. Sutton Place Rest. & Bar, Inc.*, 48 A.D.3d 258, 259 (N.Y. App. Div. 2008). The same goes for the contents of affidavits. *See Russian Am. Found., Inc. v. Daily News, L.P.*, 109 A.D.3d 410, 413 (N.Y. App. Div. 2013). While the Trump campaign's initial complaints did not include all the details, providing "background to the misconduct attributed . . . in the complaint" is

protected even if it "does not clearly and directly fall within any of the allegations of the complaint." *Ford*, 90 A.D.2d at 465; *accord El Greco Leather Prods. Co. v. Shoe World, Inc.*, 623 F. Supp. 1038, 1043 (E.D.N.Y. 1985), *aff'd*, 806 F.2d 392 (2d Cir. 1986). And the complaints filed in the ensuing weeks included those details, *supra* p.9-11, contemporaneously with Fox's interviews.

**b.** Beyond all the litigation, Fox's challenged coverage is further protected as reporting on allegations considered in government investigations, including state election recounts and audits. *E.g.*, *Landmark*, 435 U.S. at 838-39.

Reporting is protected when it "concerns activities which are within the prescribed duties of a public body." *Freeze Right*, 101 A.D.2d at 182. Reporting on state election-certification proceedings like recounts and audits easily qualifies. So does reporting about FBI and Justice Department investigations. *Id.*; *Fine*, 11 F. Supp. 3d at 214; *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1315 (S.D. Fla. 2018) (applying New York law). Even "reports on allegations that *lead* to a government investigation are fully protected." *SentosaCare LLC v. Lehman*, 58 Misc. 3d 1216(A) (N.Y. Sup. Ct. 2018) (emphasis added).

Before the challenged statements, authorities were already investigating possible electronic-vote fraud regarding Dominion's systems. By November 7, Michigan had already reviewed Dominion software and announced an ongoing audit. *Supra* p.12. The U.S. Attorney General acknowledged federal investigations

already had begun before November 9. *Supra* p.11. Georgia audited its Dominion machines during the week of November 9. *Supra* p.12. CISA confirmed on November 12 that it had already investigated. *Supra* p.11.

It makes no difference that only "certain parts" of the reported allegations may have been "subject to official action." *Gubarev*, 340 F. Supp. 3d at 1316. "[I]t would undermine the privilege to require that one who reports on official action tie every specific allegation in the report to a specific instance of official action." *Id.* at 1314. For example, New York law protected BuzzFeed's publication of the *entire* Steele Dossier, even though the Justice Department and FBI only investigated some of its allegations. *Id.* at 1315. The press need not "investigate extensively the allegations . . . to determine whether the government was investigating each separate allegation." *Id.* at 1317. The same goes here: Because the electronic-vote fraud allegations by the President and his surrogates prompted government investigations and state recounts, Fox could report those allegations without fear of liability.

Dominion complains that Fox "deliberately omitted" certain facts during interviews that would have undermined Powell's fraud claims. Compl.¶63. But "it is well settled that there is no requirement that the publication report the plaintiff's side of the controversy." *Curto v. N.Y. Law Journal*, 144 A.D.3d 1543, 1544 (N.Y. App. Div. 2016); *accord Cholowsky*, 69 A.D.3d at 115. Regardless, Fox *did* report

Dominion's denials and had a Dominion spokesperson on to report its side of the story. *Supra* p.12-14.

Nor does it matter that Fox hosts occasionally offered opinions based on the allegations in government proceedings. Reporting on government proceedings remains protected "even though the [publication] may have been embellished 'with the fair and expectant comment of the story teller, who adds to the recital a little touch of his piquant pen.'" *Josephs v. News Syndicate Co.*, 5 Misc. 2d 184, 184 (N.Y. Sup. Ct. 1957) (quoting *Briarcliff Lodge Hotel v. Citizen-Sentinel Publishers*, 183 N.E. 193 (N.Y. 1932)).

### 3. Fox hosts' opinions about newsworthy allegations of public concern are constitutionally protected.

"[O]pinion relating to matters of public concern"—including "loose, figurative" language and "rhetorical hyperbole"—"receive[s] full constitutional protection." *Milkovich*, 497 U.S. at 20-21. Indeed, the New York Constitution provides "broader protection" for opinion than the First Amendment. *600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930, 934 (N.Y. 1992); *see Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1277 (N.Y. 1991). In context, even "statements which might otherwise be viewed as assertions of fact may take on an entirely different character" as protected opinion. *Brian*, 660 N.E.2d at 1130. Commentators may thus repeat others' allegations when opining that the "charges" warrant further "investigation" because otherwise their opinion would "ma[ke] no sense." *Id.* at

1131. Reasonable viewers "would understand the statements . . . as mere *allegations* to be investigated rather than as *facts*." *Id.*

In full context, reasonable viewers would understand many of the Fox hosts' statements in interviews with the President's surrogates as constitutionally protected opinion calling for further investigation and greater transparency—not endorsements stating defamatory facts. Identifying opinion heavily depends on the broad "over-all context": Instead of "isolating and identifying assertions of fact," the Court must consider Fox's coverage "as a whole"—including "its tone and apparent purpose," "the nature of the particular forum," and the "broader social setting." *Id.* at 1129-30.

Fox hosts went straight to the allegations' source, "an accepted approach" that allows each viewer "to form his or her own conclusions." *Themed Restaurants, Inc. v. Zagat Survey, LLC*, 4 Misc. 3d 974, 978 (N.Y. Sup. Ct. 2004), *aff'd*, 21 A.D.3d 826 (N.Y. App. Div. 2005). The hosts repeatedly introduced Giuliani and Powell as members of the President's legal team and informed viewers that Dominion denied their allegations. *Supra* p.12-13. These surrounding statements make clear that host commentary reflects their own preliminary opinions based on the allegations, not factual statements endorsing them. "The preliminary nature of [the] reported information" provides further context showing "that the statements are ones of opinion." *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 379 (S.D.N.Y. 1998).

Reasonable viewers also understand many of Fox's shows as editorial forums like a newspaper's op-ed page. They expect hosts to share their personal views "on matters of public concern," sometimes using "fiery rhetoric," "hyperbole," and "speculation." *Brian*, 660 N.E.2d at 1130; *see Von Gutfeld*, 603 N.E.2d at 936 ("impromptu comments" amid "heated" discussion convey opinion). On cable news, "pundits debat[e] the latest political controversies" and provide "pitched commentary," which is nonactionable opinion rather than "factual representations." *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 184 (S.D.N.Y. 2020) (Tucker Carlson Tonight); *see Herring Networks, Inc. v. Maddow*, 445 F. Supp. 3d 1042, 1050 (S.D. Cal. 2020) (The Rachel Maddow Show). Hosts are "widely known" for offering "unrehearsed and unscripted" opinions addressing "controversial current topics of public interest and debate." *Behr v. Weber*, 172 A.D.2d 441, 443 (N.Y. App. Div 1991); *see Huggins v. NBC*, 1996 WL 763337, at *3 (N.Y. Sup. Ct.) ("unscripted, unrehearsed" comments delivered in a "conversational tone" signal opinion).

Fox hosts did just that, urging the President's surrogates to keep "pursuing . . . the truth," "straighten[] out" the allegations, and "get[] to the bottom" of them. Compl.¶¶179(b), (c), (e); Ex.I4:21, I6:31, I7:18. While they expressed concern about the allegations, the hosts repeatedly called for greater transparency and further investigation. Compl.¶¶179(b), (e), (h), (l), (m), (q); Ex.I4, I6, I8, I10, I11, I13.

Interviews expressly addressed whether there was sufficient evidence to warrant deeper investigation. Compl.¶¶179(g), (h); Ex.I3, I8. And hosts repeatedly asked Giuliani and Powell for that evidence. Compl.¶¶79(e), (g), (q); Ex.I3, I4, I13. Such "interrogative language" weighs heavily "on the opinion side of the scale"—to "provide greater leeway to journalists and other writers and commentators in bringing issues of public importance to the public's attention and scrutiny." *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984) (en banc) (plurality op.); *see Steinhilber v. Alphonse*, 501 N.E.2d 550, 554 (N.Y. 1986) (endorsing *Ollman* plurality).

Fox hosts' calls for truth-seeking are opinion protected by the First Amendment and New York law. *Brian*, 660 N.E.2d at 1131. Those calls would make little sense without discussing the allegations to be investigated. In context of the editorial forum and the surrounding commentary, reasonable viewers would understand these interviews as truthfully presenting "mere *allegations* to be investigated rather than as *facts*" about Dominion. *Id.*; *see Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 36 Misc 3d 1231(A), at *11, *13 (N.Y. Sup. Ct. 2012) (calls for investigation "signal to the reasonable reader that the statements are non-actionable opinion").

Raising "pointed[]" questions about allegations without "ultimately adopt[ing] any particular answer" does not qualify as defamation, "however embarrassing or unpleasant to its subject." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d

1087, 1094, 1098 (4th Cir. 1993); *accord Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union*, 39 F.3d 191, 195 (8th Cir. 1994). Because Fox hosts' statements reveal their "lack of definitive knowledge about" the allegations against Dominion, Fox's interviews discussing the allegations are not actionable. *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015); *see Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 145 (D.D.C. 2017).

Dominion incorrectly alleges that Fox hosts' remarks are actionable "mixed opinion." Compl.¶202. Mixed opinion "implies that it is based upon facts which justify the opinion *but are unknown to those reading or hearing it*." *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014) (emphasis added). By contrast, Fox hosts engaged in protected "pure opinion" because their commentary reacted live to allegations *just made in interviews with the President's lawyers* and was thus "accompanied by a recitation of the facts upon which it is based." *Id.* Armed with those facts, viewers could "assess the basis upon which the opinion was reached in order to draw [their] own conclusions concerning its validity." *Id.*

**B.** **None of the challenged individual statements identifies actionable defamation against Fox.**

The previously discussed doctrines protect all Fox's challenged speech. To make that clear, this section individually examines each allegedly defamatory statement.[4]

**1.** <u>Bartiromo, Pirro, and Dobbs statements (Fox hosts who interviewed Giuliani and Powell)</u>. Most of the Fox hosts' statements that Dominion challenges are just accurate summaries of newsworthy allegations made by the President and his legal team. At times, these hosts also provided their own opinions about the claims, which the First Amendment fully protects. *Supra* p.25-29.

Fox had the right to interview Giuliani and Powell about their inherently newsworthy election-fraud allegations pressed in litigation, and no reasonable viewer would understand their statements as Fox's own speech. *Supra* pp.15-19, 27-28. For some challenged telecasts, Dominion does not even challenge speech by any Fox host. Compl.¶179(n), (s).

Furthermore, many of the alleged defamatory statements concern Dominion's *product* rather than Dominion itself. For example, Powell and Giuliani claimed that Dominion's system was developed and used in Venezuela, incorporates Smartmatic

---

[4] Judicial notice is proper for the challenged telecasts' video and audio of each entire program because they are "integral to a plaintiff's claim and incorporated into the complaint." *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996). *See* Exs. I1-I18 (transcripts); J1-J18 (videos).

software, counts votes overseas, is vulnerable to hacking, and was hacked by foreign powers. *Supra* p.13. Under New York law, a claim for defamation of a "product" requires the "manufacturer" to allege "special damages," an essential element of this claim. *Drug Research Corp. v. Curtis Publ'g Co.*, 166 N.E.2d 319, 322 (N.Y. 1960); *see Kirby v. Wildenstein*, 784 F. Supp. 1112, 1115 (S.D.N.Y. 1992). Plaintiffs' nonspecific conclusory allegations do not meet the stringent requirements for pleading special damages: "[R]ound figures" or a generic allegation of dollar amounts do not suffice. *Drug Research*, 166 N.E.2d at 322.

    a. <u>Bartiromo</u>.

**¶*179(a)***. Maria Bartiromo's November 8, 2020 program opened by explaining that the President and his legal team were "readying new lawsuits," and Rudy Giuliani and Sidney Powell would "make the President's case." Ex.I2:12, J2.1:10. Each was introduced as part of the President's legal team. I2:3, J2.2:19. Bartiromo began with Giuliani, asking "what is the evidence" showing fraud? I2:3, J2.2:34.

Bartiromo later asked Powell to explain the facts "as you see it." I2:32, J2.35:47. Powell alleged that "an algorithm" and "computers" were used to "flip" votes "from Trump to Biden." I2:34-35, J2.36:36. Bartiromo began to ask about that claim, but broke for a commercial before Powell could respond. I2:34-35, J2.38:37. Upon returning, Bartiromo picked up where she left off: "Sidney, we talked about the Dominion software. I know that there were voting irregularities. Tell me about

that." I2:35, J2.39:00.. In context, Bartiromo simply summarized what Powell alleged before the break. Powell then expanded on her prior allegations. I2:35, J2.39:09.

Bartiromo responded, "I have never seen voting machines stop in the middle of an election, stop down, and assess the situation." I2:36, J2.40:00 This statement does not mention Dominion or endorse Powell's allegations. It just explains Bartiromo's own observations about other voting machines.

*¶179(f)-(g)*. Bartiromo interviewed Giuliani and Powell again on November 15, Compl.¶179(f)-(g)—to get an update on their investigation, Ex.I3, J3. Dominion misleadingly suggests that Bartiromo was breaking news about voting-machine software. Dominion's complaint omits the portion of her statement clarifying that he *"is breaking* so much news"—referring to "Rudy [Giuliani]." I3:15, J3.13:14 (emphasis added). Bartiromo then summarized Giuliani's allegations that Dominion was connected to Smartmatic and Venezuela, inviting viewers later to assess those claims for themselves. I3:16, J3; *see* Compl.¶179(f).

Bartiromo announced at the outset that "President Trump's legal team" would discuss "new evidence . . . on voting machines, ballot tampering, and election interference," and "new affidavits and lawsuits charging fraud." Ex.I3:3, J3.00:17. Throughout this program, Giuliani and Powell mentioned "Dominion" ten times, "Smartmatic" ten times, and "Venezuela" four times. I3, J3. While Giuliani recited

allegations, Bartiromo showed and explained an accurate graphic of six states that used Dominion voting machines. I3:10, J3.9:10 *see* Compl.¶179(g). Bartiromo then inquired about allegations that Smartmatic's software had a "backdoor," asking Giuliani whether the President was claiming that "states that used that software did that." Ex.I3:11, J3.9:39. Giuliani maintained he could "prove it with witnesses." I3:11, J3.9:39.

Turning to Powell, Bartiromo noted that Powell "says she has enough evidence of fraud to launch a massive criminal investigation." I3:17, J3.14:36. Bartiromo then pressed Powell, asking if she would "be able to prove" this in court. I3:18, J3.16:13; *see* Compl.¶179(g). Powell responded, "I never say anything I can't prove," and mentioned "evidence of some kickbacks, essentially."[5] Ex.I3:19, J3.16:51. Powell claimed the evidence came "from various whistleblowers." I3:20, J3.18:38. When Bartiromo asked who received kickbacks, Powell reiterated "[w]e're still collecting the evidence on that." I3:21, J3.18:40. Noting that Powell claimed to "have an affidavit" showing fraud, Bartiromo again pressed Powell if she "can prove

---

[5] Although the election-challenge complaints do not use the exact word "kickbacks," Bartiromo's discussion is protected reporting of anticipated legal claims. Powell's statement previewed later-pleaded claims that state officials committed "corruption" by overspending on Dominion's allegedly insecure voting machines. *See* Ex.E5 ¶¶4, 12-13, 31, 97. Courts should not scrutinize reports of government proceedings with "a lexicographer's precision," especially for legal terms of art. *Holy Spirit*, 399 N.E.2d at 1187; *see Gurda v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 436 N.E.2d 1326 (N.Y. 1982).

this in court." I3:23-24, J3.23:46. Powell responded, "Yes," that she had a "sworn statement from a witness." I3:24, J3.23:58.

In context, no reasonable viewer would understand any of this as Bartiromo making provably false statements of fact. Rather, Bartiromo questioned the President's lawyers about their newsworthy allegations.

**b.** Pirro.

Likewise, Judge Jeanine Pirro made no actionable statements. Pirro is a well-recognized "hard-hitting" opinion commentator. *McKesson v. Pirro*, 2019 WL 1330910, at *12 (N.Y. Sup. Ct.); *supra* p.27-28.

*¶179(e)*. Pirro interviewed Powell on November 14. Compl.¶179(e). But first, Pirro explained that she was discussing legal "complaints, now in the form of affidavits and lawsuits." Ex.I4:4, J4. Pirro displayed the cover page of the *Wood* complaint (Ex.E3), showing viewers (Ex.J4.7:13) that she was discussing pending litigation:



Pirro accurately stated "the basis of many complaints around the country, now a part of official lawsuits"—including that "[t]he Dominion Software system has been tagged as one, allegedly, capable of flipping votes." Ex.I4:4-5, J4.2:45. Pirro's next sentence explained that Powell would discuss these allegations: "Now, you'll hear from Sidney Powell in a few minutes, who will explain what she has unearthed in the creation of Dominion." I4:5, J4.3:58.

When Powell alleged "system-wide election fraud" including "manipulating the Dominion and Smartmatic software," Pirro asked, "[W]hat evidence do you have to prove this?" I4:23, J4.25:53. Pirro asserted that Powell was the one "say[ing] you have evidence," and Pirro again asked how Powell would "prove that they [votes]

were flipped?" I4:24, J4.26:41. This context confirms Pirro was asking questions while interviewing the President's lawyer about her allegations.

Pirro ended by calling for further investigation—"hopefully" by "the Department of Justice"—and she wished Powell "good luck on your—on your mission." I4:26-27, J4.29:27. Pirro's call for further investigation is protected opinion, as are her well wishes to Powell. Especially for a pundit opinion commentator like Pirro, a "reasonable" viewer would expect that statement "represent[s] the viewpoints of their authors and, as such, contain[s] considerable hyperbole, speculation, diversified forms of expression and opinion." *Brian*, 660 N.E.2d at 1130; *supra* pp.25-29.

**¶*179(k)***. On November 21, Pirro accurately reported that "[t]he President's lawyers" alleged "Dominion" and "Smartmatic software" had "a backdoor [that] is capable of flipping votes." Ex.34; *see* Compl.¶179(k). She reiterated allegations made by "the President's lawyers," explaining that "the President's lawyers offered evidence by way of affidavits." Ex.I5:4-5, J5.3:17. Pirro showed viewers (Ex.J5.4:56) that court-filed affidavit:



Separately, Pirro questioned, "Why was there an overnight popping of the vote tabulation that cannot be explained for Biden?" Ex.I5:8, J5.8:44. This expressed Pirro's opinion about whether an explanation existed. It does not even mention Dominion. At most, a reasonable viewer would interpret this pundit commentator's question as hyperbole speculating about an explanation.

**c.** <u>Dobbs</u>. Lou Dobbs is another Fox primetime veteran pundit long known for his fiery rhetoric since before joining Fox, which is crucial context for evaluating his speech. *Supra* p.27-29. Dobbs has been commenting on election-security issues for years. Ex.B4.

**¶*179(b)***. On November 12, Dobbs interviewed Giuliani, introducing him as "President Trump's personal attorney." Ex.I6:24, J6.26:12. Dobbs asked Giuliani for "an update on Dominion." Compl.¶179(b).

Giuliani alleged ties between Dominion, Smartmatic, and Venezuelans "very close" to Venezuelan leaders Hugo Chávez and Nicolás Maduro. *Id.* Giuliani alleged that Dominion voting machines "can be hacked" and "can change votes." Ex.I6:24-26, J6.26:40.

Dobbs reacted with opinion calling for further investigation "to find out whether they did." I6:26, J.28:75. As support for this opinion, Dobbs (accurately) explained that "five of the top voting companies . . . comprise 90 percent of all the election voting market in this country. It's stunning." I6:26, J.29:15. Omitting this context, Dominion's complaint misleadingly suggests that Dobbs described Giuliani's Venezuela allegations as "stunning." I6:26, J6.29:31. Dobbs then accurately noted these are "private firms," opining that "very little is known about their ownership, beyond what you're saying about Dominion" so "[i]t's very difficult to get a handle on just who owns what and how they're being operated." I6:26, J6.29:33. In context, a reasonable viewer would understand this as Dobbs offering his opinion after summarizing Giuliani's allegations—not Dobbs making factual assertions.

Dobbs next shared his opinion that the President's claims might be difficult to prove because "the state, as you [Giuliani] well know now, they have no ability to audit meaningfully the votes that are cast because the servers are somewhere else." I6:26, J6.29:47. Given those challenges, Dobbs asked: "how do you proceed now?"

I6:26-27, J6.30:06. Dominion's complaint omits this important context, which further confirms that a reasonable viewer would have understood Dobbs as repeating Giuliani's allegations to offer Dobbs' own opinions and asking Giuliani about his next steps. This is not defamation. *Brian*, 660 N.E.2d at 1131.

Reacting to Giuliani's claim that "[t]his was a stolen election," Dobbs later opined that "this looks to me like it may be—and I say may be—I'm not suggesting it is." Ex.I6:29, J6.32:24. Dobbs added hyperbolic rhetoric, further asserting his opinion connected to the earlier "special counsel investigation" and "impeachment process": "This looks to me like . . . the endgame to a four-and-a-half year long effort to overthrow the President of the United States." I6:29, J6.32:41. Dobbs ended the segment with more opinion noting the election's many "firsts" and calling for investigation urging Giuliani to keep "pursuing what is the truth." I6:31, J6.34:28. Reasonable viewers would understand these statements as Dobbs' opinion reacting to Giuliani's allegations rather than factual assertions.

**¶*179(c)***. Dobbs led his November 13 program by covering Dominion's denial: "Dominion Voting Systems say they categorically deny any and all of President's Trump's claims that their voting machines caused any voter fraud in key swing states or electoral fraud, but reports contradict that claim." Ex.I7:12, J7.12:49.

Dobbs then interviewed Powell, introducing her as "a member of President Trump's legal team," and immediately asking her to respond to Dominion's "straight

out disavowal of any claim of fraud." I7:13-14, J7.14:18. Powell made various allegations about "all the evidence we have collected on Dominion" including ties to "Venezuela" and "Hugo Chavez," as well as "evidence on the financial interests of some of the governors and Secretaries of State who actually bought into the Dominion Systems." I7:14, J7.14:48. These allegations match those made in contemporaneous lawsuits filed by President Trump's attorneys. Dobbs reacted to Powell's financial allegations by stating: "Well, that's straightforward. It may take— you're going to have to be quick to go through and to produce that investigation and the results of it." I7:15, J7.16:13. Dobbs expressed opinion reacting to Powell's allegations, calling for further investigation. No reasonable viewer would understand this as Dobbs making demonstrably provable factual assertions or endorsing the allegations Powell had just made.

After Powell made further assertions about Dominion, Dobbs reiterated his opinion reacting to Powell's allegations: "this is the culmination of what has been over a four-year effort to overthrow this president," and "[t]his looks like the effort to carry out an endgame in the effort against [President Trump]." I7:17, J7.19:28. This is hyperbolic opinion expressing concern that Powell's allegations, if true, would be a momentous affront to our democracy.

¶*179(d)*. On November 14, Dobbs tweeted: "Read all about Dominion and Smartmatic voting companies and you'll soon understand how pervasive this

Democrat electoral fraud is, and why there's no way in the world the 2020 Presidential election was free or fair." Compl.¶179(d). This tweet features "loose, figurative, or hyperbolic language" that "negate[s] the impression" Dobbs is stating defamatory facts. *Milkovich*, 497 U.S. at 21. Dobbs used "colloquial and loose" language, *Von Gutfeld*, 603 N.E.2d at 937, when saying "there is no way in the world" the election "was free or fair." Moreover, the tweet is "devoid of reference to" any "specific" facts about Dominion, *id.*, and it instead attributes "electoral fraud" to "Democrat[s]" generally. In short, the tweet conveys an "expression of outrage," not "an accusation of fact." *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002). This is not "the language of someone inviting reasonable persons" to "find specific factual allegations in his remarks," and this same reasoning has been rejected in other defamation suits involving allegations of "fraud." *Von Gutfeld*, 603 N.E.2d at 937.

The speech's forum—Twitter—reinforces that Dobbs was not stating defamatory facts. Courts have recognized that Twitter is not a forum where reasonable viewers would conclude they are seeing actual facts about the plaintiff. *Rapaport v. Barstool Sports, Inc.*, 2021 WL 1178240, at *19 (S.D.N.Y.); *see also Konig v. WordPress.com*, 112 A.D.3d 936, 937 (N.Y. App. Div. 2013) (reasonable reader would understand online allegations of "downright criminal actions" made during sharply contested election as opinion, "not a factual accusation of criminal

conduct"). Instead, the "common expectation" with Twitter is that such statements "will represent the viewpoints of their authors and, as such, contain considerable hyperbole, speculation, diversified forms of expression and opinion." *Brian*, 660 N.E.2d at 1130.

**¶*179(h)***. Dobbs began his November 16 telecast by attributing the allegations discussed to "President Trump's legal team." Compl.¶179(h). Dobbs accurately stated, "Dominion systems [are] used in more than two dozen states" and "Dominion [is] also one of three companies accounting for almost 90% of the voting equipment in the U.S. elections." *Id.*

Later, Dobbs interviewed Powell, introducing her as "a member of President Trump's legal team." Ex.I8:3, J8.15:04. Noting that Powell's "legal team" had a growing "interest" in Dominion, Dobbs asked her for "the latest." I8:3, J8.15:15. Powell discussed what she called "stunning evidence" from a witness "affidavit." I8:14, J8.15:28.

Dominion's complaint misleads by suggesting that Dobbs affirmed Powell's allegation that "Smartmatic owns Dominion." I8:16-17, 21, J8. The video and audio provide crucial context imperceptible from the transcript, as Dobbs and Powell were talking over each other. After Powell's lengthy discussion of "Smartmatic," Dobbs interjected to ask Powell to explain her allegations of how Smartmatic and Dominion were related. *See* I8:16-17, J8. (Dobbs: "And Smartmatic, the relation—"). At that

same time, Powell continued speaking while Dobbs interjected. *See id.* (Powell: "Smartmatic is—"). Following a two-second pause, both Dobbs and Powell started speaking again at the same time: Dobbs said, "Sidney, I—." I8:16-17, J8. Lost amid the "cross talk" noted on the transcript, Ex.I8, Powell simultaneously said "Smartmatic owns Dominion," Ex.J8.17:44. After another two-second pause, Dobbs interjected to get the interview moving, saying: "—yes. And Smartmatic, the—the chairman is Admiral Pete Neffenger, who is also on the President—the Vice President's transition team." I8:17, J8. In context, Dobbs was not affirming Powell's allegation because the two were talking over each other (and Powell's audio was muffled because she appeared by telephone). I8:17, J8.

Dobbs later expressed his opinion that the election had been "deeply troubling" and "the worst in this country's history," while the investigations were "slow to move" and "infuriating." I8:20, J8.22:07. Dobbs ended the interview with more opinion calling for further investigation "to find out exactly what's going on." I8:20-21, J8.22:58.

**¶179(i)**. On November 18, Dobbs read from the affidavit filed in Georgia federal court the day before. *Supra* p.9. Dominion's complaint omits that most of the long Dobbs quote in ¶179(i) is Dobbs accurately reading this affidavit. Compl.¶179(i) (Dobbs quoting affidavit—from "I am alarmed . . ." to ". . . the opposing candidate, Joe Biden.").

Dominion also complains that Dobbs said, "It's outrageous." Compl. ¶179(i). That is paradigmatic protected opinion as an "expression of outrage." *Horsley*, 292 F.3d at 702.

**¶*179(j)*.** On November 19, Dobbs discussed "today's news conference" at which Powell cited the publicly filed "affidavit," and Dobbs again quoted from it. Compl. ¶179(j). Dobbs then reported that "Smartmatic and Dominion deny those charges." *Id.*

Dobbs summarized Powell's allegations, noting that "[s]he will be providing more details." *Id.* Dobbs interviewed Powell, introducing her as "a member obviously of the president's legal team" and asking her to comment "as you and the legal team see it." Ex.I9:11, J9.11:54. Dobbs asked Powell whether Dominion was linked to Smartmatic, and whether the companies' servers record votes. I9:13-14, J9.11:54. These questions do not assert defamatory facts, and they addressed newsworthy allegations.

After describing the "legal grounds" for challenging "use of those [Dominion] machines," Powell promised "suits" seeking "to invalidate the results of the election." I9:13, J9. Dobbs pressed Powell for more evidence, asking "when do you believe you will be prepared to come forward with hard evidence establishing the basis for a court to overturn elections or at least results of those elections . . . ?" I9:14, J9.16:19. Dobbs opined that "our election is run by companies, the ownership

of which we don't know." I9:15, J9.17:39. This is opinion and hyperbole in context, not an assertion of defamatory fact.

**¶179(l)**. On November 24, Dobbs interviewed Powell about the litigation "in Georgia." Ex.I10:15-16, J10.17:48. Dobbs asked Powell, "Are you planning any other suits beyond Georgia?," and Powell answered, "Yes, we are." I10:16, J.10.17:48.

During this interview Dobbs expressed protected opinion: "*I think many Americans have given no thought* to electoral fraud that would be perpetrated through electronic voting; that is, these machines, these electronic voting companies, including Dominion, prominently Dominion, *at least in the suspicions of a lot of Americans*." I10:14, J10.15:07. (emphases added). A reasonable viewer would interpret this as Dobbs' opinion that, until recently, Americans had not given much consideration to possible electronic-vote fraud.

**¶179(m)**. On November 30, Dobbs interviewed Powell, again discussing the pending "case in the court in Georgia." Ex.I11:13, J11.15:36. Dobbs asked Powell about the request for "an injunction" regarding an election "server." I11:15, J11.17:20. Powell responded that amid litigation, someone "removed the server." I11:15, J11.18:00. That prompted hyperbolic opinion from Dobbs: "You know, people don't go to jail for their attitude, but in the case of the Secretary of State and the governor of Georgia right now, one would be tempted to prosecute, based on

their conduct so far. What is going on with those two individuals?" I11:15-16, J11.18:13. This is protected opinion discussing government officials, and it does not mention Dominion.

After Powell elaborated, Dobbs provided protected opinion with hyperbolic rhetoric expressing outrage: "you know, I just can't"; "I think most Americans right now cannot believe"; "no idea what's going on"; "the most ludicrous, irresponsible, and rancid system imaginable"; "complete nation of fools"; "Are you kidding me?" I11:17, J11.19:55.

Dobbs ended with opinion calling for the President to investigate further: "this President has to take, I believe, drastic action, dramatic action, to make certain that the integrity of this election is understood." I11:18, J11.22:10.

**¶179(o)**. On December 4, Dobbs interviewed retired Army Colonel Phil Waldron, who "testified in a number of battleground States before state legislatures about how our voting systems have been manipulated in this election." Ex.I12:12, J12.12:08. Dobbs' protected reporting addressed newsworthy allegations made in government proceedings. By this point, the President's allegations had been in the news and court proceedings for weeks, and Dobbs accurately summarized those newsworthy allegations when he asked Waldron: "At the center of it all, Dominion Voting Systems. Are they the culprit here? Not the only culprit, but are they the principal culprit?" I12:12, J12.12:38.

Dobbs also summarized Waldron's allegations from "battleground States, in which you've been testifying": "Dominion Voting Systems, *which you have described it* with algorithms . . . designed to be inaccurate rather than to be a secure system. Give us your sense of who is driving all this." I12:14, J12. (emphasis added). Media summaries of newsworthy allegations made in government proceedings are protected speech. Waldron then made various allegations about "Dominion" related to his testimony. I12:14, J12. Dobbs even pressed Waldron for "evidence of foreign involvement," explicitly leaving the issue "open." I12:18, J12. No reasonable viewer would attribute Waldron's speech to Fox or Dobbs.

***¶179(p)-(r)***. Dominion's complaint includes connected statements from both Dobbs' telecast and Twitter on December 10.

Dobbs' telecast reported on Powell's allegations: "She calls what happened on November 3rd now a 2020 Cyber Pearl Harbor." Ex.I13:3, J13. Dobbs accurately summarized that "she charges four individuals as authors of what she calls a Pearl Harbor-style cyber attack on the 2020 presidential election." I13:8, J13. Dobbs asked Powell, "You say these four individuals led the effort to rig this election. How did they do it?" I13:9, J13. Dobbs displayed (Ex.J13) their names "according to Sidney Powell":



Dobbs asked Powell, "what is the evidence" showing a "relationship among these four individuals?" Ex.I13:10, J13. Dobbs pressed again, "What is the evidence . . . ?" Ex.I13:11, J13. Dobbs clarified this information was an "element from—from your investigation." Ex.I13:14, J13. Against that backdrop, Dobbs reacted by summarizing Powell's allegations that would be explored more after commercial break: "We're going to examine in some detail the—the reason for what is apparently a broadly coordinated effort to—to actually bring down this President by ending his second term before it could begin." Ex.I13:13, J13.With this context, a reasonable viewer would interpret Dobbs as reporting on Powell's newsworthy allegations, not endorsing them.

Dobbs later provided protected opinion expressing "outrage[]" about certain federal officials—including the "Attorney General," "head of the cyber intelligence unit for the Department of Homeland Security," the "FBI director," and the "Homeland Security department." Ex.I13:15, J13. This is protected hyperbolic opinion in context, as Dobbs used figurative and loose language—such as "it was

-48-

nonsense"; "who has apparently lost both his nerve and his commitment to his oath of office, and to the country"; "seems to be as politically corrupt as anyone who preceded him"; "doesn't know what the hell it's talking about"; and "is spending more time playing politics." Ex.I13:15, J13.  Dobbs also made the following call for further investigation: "We will gladly put forward your evidence that supports your claim that this was a cyber Pearl Harbor. We have tremendous evidence already, of fraud in the election. But I will be glad to put forward on this broadcast whatever evidence you have, and we'll be glad to do it immediately. . . . We'll work overnight. We will—we will take up whatever air we're permitted beyond this broadcast, but we have to get to the bottom of this." Ex.I13:17, J13. In context, Dobbs offered to report on additional evidence from lawyers litigating pending cases, asserted his opinion about the evidence already presented, and called for further investigation. This is all protected speech.

Dobbs ended the interview with opinion criticizing Georgia government officials: "I mean the Governor and the state—Secretary of State have to find, if not the integrity, the—the primal fear of the voters in Georgia to stop what's going on and stop it now," either out of "integrity," or at least "the primal fear of the voters." Ex.I13:19, J13. This does not assert any facts, and the hyperbolic language ("primal fear") confirms it is opinion.

This same day that Dobbs interviewed Powell on his telecast to discuss her "cyber Pearl Harbor" allegations, Dobbs posted two connected related messages on Twitter. Compl.¶179(p), (r). In one tweet, Dobbs summarized Powell's allegations while attaching a video of her telecast interview: "Cyber Pearl Harbor: @SidneyPowell1 reveals groundbreaking new evidence indicating our Presidential election came under massive cyber-attack orchestrated with the help of Dominion, Smartmatic, and foreign adversaries." Compl.¶179(r). In another tweet, Dobbs previewed Powell's allegations by tweeting: "The 2020 Election is a cyber Pearl Harbor: The leftwing establishment have aligned their forces to overthrow the United States government." Compl.¶179(p).

These statements are accurate reports of Powell's newsworthy allegations, or at most hyperbolic opinions with figurative and loose language. Embedded in the tweet at ¶179(p) is a document that, in full context, a reasonable viewer would not ascribe to Dobbs. When the full context is considered, this document summarized *Powell*'s allegation—as it lists the "four names" Powell discussed on Dobbs' telecast, while using the phrase "cyber Pearl Harbor" that Dobbs attributed to Powell on the telecast. In all events, the speech's forum, Twitter, confirms that reasonable viewers would not conclude that they were seeing facts about Dominion— particularly in the context of a television pundit's tweets including an embedded

document with Powell's allegations discussed on that night's telecast. *See Brian*, 660 N.E.2d at 1130; *Rapaport*, 2021 WL 1178240, at \*19.

**2.** Carlson and Lindell statements. Tucker Carlson is another of Fox's well-known primetime "pundit" commentators, which is important context. *McDougal*, 489 F. Supp. 3d at 184 (discussing Tucker Carlson Tonight).

*¶179(t)*. On January 26, 2021, Carlson interviewed My Pillow CEO Mike Lindell on his program. Carlson did so because "Lindell ha[d] just been banned from Twitter" for expressing "different opinions." Ex.I14:15, J14.14:24. Carlson therefore "ha[d] Lindell on tonight *to give his perspective*." I14:16, J14.14:51. (emphasis added). No reasonable viewer would ascribe Lindell's speech to Fox or Carlson in this context.

Dominion's complaint includes Carlson's introduction of Lindell, which simply identifies Lindell and does not mention Dominion, voting, or the election. I14:16, J14. This is not actionable defamation.

Unprompted by Carlson, Lindell brought up Dominion. Lindell made various allegations—unconnected to the 2020 presidential election—about Dominion targeting Lindell through online speech. I14:18, J14.17:22. Lindell stated that if "[f]ake stories" online can target him, then "[t]hey can do it to anyone out there, but we're not—I'm not backing down. We can't back down not of fear this time. Nobody." I14:18, J14.17:42. To that opinion about not backing down when facing

contrary speech, Carlson said: "I totally agree." I14:18, J14.17:51. Carlson offered an opinion about the value of "not backing down," and argued throughout this segment that individuals should not self-censor their speech. *See* I14:20-21, J14.17:51. ("[Y]ou don't make people kind of calm down and get reasonable and moderate by censoring them"; "[C]ensorship of any person diminishes the rest of us and diminishes the country.").

Lindell later asserted, "I've been all in trying to find the machine fraud, and I—we found it. We have all the evidence." I14:19, J14.18:38. Lindell continued, "No. I have the evidence." I14:19, J14.18:56. He "dare[d] Dominion to sue me." *Id.* Lindell then asserted his opinion that "they don't want to talk about it." I14:19, J14.18:56. Carlson added his opinion: "No. They don't." I14:19, J14.18:56. This is protected speculative opinion because neither Lindell nor Carlson could know the mental state of Dominion—or Dominion's own opinions about what it did and did not want to talk about.

## II.   Dominion fails to allege actual malice as required under the First Amendment and New York law.

Not only have Plaintiffs failed to allege actionable speech, but they also have failed to plead facts that clearly and convincingly establish "actual malice," an essential element of their claim.

The First Amendment and New York law each requires actual malice here. Under New York's anti-SLAPP law, Dominion must prove "actual malice" with

"clear and convincing evidence" because Fox's challenged "public" speech about election fraud concerns an "issue of public interest." N.Y. Civ. Rights Law §76-a(1)(a). This is "substantive" New York law applicable here. D.I.38. Regardless, the First Amendment imposes the same requirement because Dominion is at least a limited-purpose "public figure" for its "election-related" activities. *Agar v. Judy*, 151 A.3d 456, 477 (Del. Ch. 2017). Public controversy over electronic voting and Dominion's system specifically long predates the November 2020 election. *Supra* p.6-8. By providing voting technology for the core government function of running elections "while knowing of the preexisting public controversy" over its technology, Dominion "assumed the risk" that it could become embroiled in further controversy over election security or results. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1280 (D.C. Cir. 2003); *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

Actual malice is a subjective standard requiring that the defendant "in fact" had a "high degree of awareness of probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Even at the pleading stage, a plaintiff is required "to allege facts sufficient to show actual malice with convincing clarity." *Jimenez v. United Fed'n of Teachers*, 239 A.D.2d 265, 266 (N.Y. App. Div. 1997). Dominion's allegations do not suffice.

Giuliani's and Powell's states of mind do not transfer to Fox. *Karaduman v. Newsday, Inc.*, 416 N.E.2d 557, 566 (N.Y. 1980); *see Weber v. Woods*, 334 N.E.2d

857, 863 (Ill. App. Ct. 1975) (rejecting liability for defamatory statement by guest on talk show because he "was in no sense an agent or employee of" TV network). Rather, the relevant inquiry addresses the *actual speaker's* state of mind—here, the Fox hosts alleged to have spoken defamatory statements, and not other Fox employees. *E.g.*, *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) ("When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice."). Actual malice is quite difficult to establish in the context of live-interview telecasts. *Pacella v. Milford Radio Corp.*, 462 N.E.2d 355, 360 (Mass. App. Ct. 1984), *aff'd*, 476 N.E.2d 595 (Mass. 1985); *Adams v. Frontier Broad. Co.*, 555 P.2d 556, 566-67 (Wyo. 1976).

Dominion's complaint affirmatively demonstrates that Fox *lacked* actual malice. As Dominion acknowledges, Fox hosts repeatedly pressed Powell and Giuliani for evidence backing up their claims, questioning how they planned to prove them in court. *Supra* p.13-14. While reacting to the President's surrogates' allegations, Fox's hosts often called for further investigation. *Id.* These hosts' calls for further factual development demonstrate their genuine lack of knowledge about the full scope of allegations pressed by lawyers in pending litigation, so this cannot reflect actual malice: "[T]here is a critical difference between not knowing whether

something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." *Liberman v. Gelstein*, 605 N.E.2d 344, 350 (N.Y. 1992).

Dominion claims that Fox knew or recklessly ignored that the vote-fraud allegations against Dominion were false because the network possessed two sources of information: (1) contrary reporting by Fox and other media outlets; and (2) denials that Dominion sent to Fox hosts and producers. Compl.¶¶66-69, 76-77, 79, 82, 85-86, 88, 94, 96, 99, 103, 113, 181, 199. Dominion also alleges Fox covered these allegations to increase ratings. Compl.¶¶1, 61, 74, 203. None of these claims adequately plead that Fox deliberately or recklessly published false election coverage about Dominion.

For starters, a "profit motive in publishing allegedly false and defamatory material does not suffice to prove actual malice." *Kipper v. NYP Holdings Co.*, 912 N.E.2d 26, 31 n.6 (N.Y. 2009).

Conflicting accounts also do not establish actual malice. *Freeman v. Johnston*, 637 N.E.2d 268, 271 (N.Y. 1994). Even contrary stories published by the defendant itself do not establish actual malice. *E.g.*, *Sullivan*, 376 U.S. at 287. Nor do conflicting stories create some duty for further investigation: "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would

have investigated before publishing." *St. Amant*, 390 U.S. at 731; *Kipper*, 912 N.E.2d at 30.

Dominion's denials cannot establish actual malice either. Actual malice "cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards*, 556 F.2d at 121; *see Coliniatis v. Dimas*, 965 F. Supp. 511, 519 (S.D.N.Y. 1997).

Dominion insists that the allegations "were ludicrous, inherently improbable, and technologically impossible." Compl.¶59, 194. But just weeks before the November 2020 election, Georgia federal Judge Totenberg credited the testimony of numerous cybersecurity experts who testified otherwise, specifically warning that Dominion's system remained vulnerable to vote-altering hacking. *Supra* p.7-8. As that still-pending Georgia litigation demonstrates, Dominion's systems have not "achieved such an impeccable reputation for truth and accuracy that any suggestion to the contrary must necessarily be of questionable validity." *Nader v. de Toledano*, 408 A.2d 31, 56 (D.C. 1979).

The allegations were serious enough, moreover, to prompt recounts and investigations by multiple government authorities. *Supra* p.11-12. Affidavits from purported witnesses also supported allegations made in litigation. *Supra* p.9. These

government proceedings remained pending throughout Fox's challenged coverage. Dominion cannot establish actual malice because that coverage concerns "matters about which there were investigations or which were supported directly by witnesses." *Wilsey v. Saratoga Harness Racing, Inc.*, 140 A.D.2d 857, 859 (N.Y. App. Div. 1988).

## CONCLUSION

The Court should grant defendant's Rule 12(b)(6) motion to dismiss for failure to state a claim.


OF COUNSEL:

Charles L. Babcock
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, TX 77010
(713) 752-4210

Scott A. Keller
LEHOTSKY KELLER LLP
200 Massachusetts Avenue NW
Washington, D.C. 20001
(512) 693-8350

Dated: May 18, 2021

*/s/ Blake Rohrbacher*
Blake Rohrbacher (#4750)
Katharine L. Mowery (#5629)
Valerie A. Caras (#6608)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for Defendant Fox News Network, LLC*