The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

1
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
2
ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,                    :
                                             :
5           PLAINTIFFS,                       :
    vs.                                       :   DOCKET NUMBER
6                                             :   1:17-CV-2989-AT
    BRAD RAFFENSPERGER, ET AL.,               :
7                                             :
            DEFENDANTS.                       :
8

9

10   **TRANSCRIPT OF DISCOVERY DISPUTE CONFERENCE VIA ZOOM PROCEEDINGS**

11                **BEFORE THE HONORABLE AMY TOTENBERG**

12                    **UNITED STATES DISTRICT JUDGE**

13                           **JUNE 2, 2021**

14                            **2:31 P.M.**

15

16

17

18

19

20

21      *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22                    *TRANSCRIPT PRODUCED BY:*

23

    *OFFICIAL COURT REPORTER:*          *SHANNON R. WELCH, RMR, CRR*
24                                      *2394 UNITED STATES COURTHOUSE*
                                        *75 TED TURNER DRIVE, SOUTHWEST*
25                                      *ATLANTA, GEORGIA  30303*
                                        *(404) 215-1383*

```
 1                A P P E A R A N C E S   O F   C O U N S E L

 2

 3      FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
        SCHOENBERG:

 4

 5           DAVID D. CROSS
             LYLE F. HEDGECOCK
 6           MARY G. KAISER
             EILEEN M. BROGAN
 7           MORRISON & FOERSTER, LLP

 8           ADAM SPARKS
             KREVOLIN & HORST, LLC
 9

10

        FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
11      WILLIAM DIGGES, III, AND RICARDO DAVIS:

12

             BRUCE BROWN
13           BRUCE P. BROWN LAW

14

15      FOR THE STATE OF GEORGIA DEFENDANTS:

16

             VINCENT ROBERT RUSSO, JR.
17           CAREY A. MILLER
             JOSHUA B. BELINFANTE
18           ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

19           BRYAN TYSON
             BRYAN JACATOUT
20           R. DAL BURTON
             TAYLOR ENGLISH DUMA
21

22      FOR THE FULTON COUNTY DEFENDANTS:

23

             NO APPEARANCE
24

25
```

```
 1              P R O C E E D I N G S
 2    (Atlanta, Fulton County, Georgia; June 2, 2021.)
 3              THE COURT:  Good afternoon.
 4              Is that everybody?  One of these days we will be in
 5    person.  But I didn't want to drag counsel from out of town
 6    here just for a discovery conference at this time frame.
 7              Mr. Martin, do you want to call the case and just
 8    confirm is everyone present?
 9              COURTROOM DEPUTY CLERK:  Yes, ma'am.
10              Good afternoon, everyone.  We are here for a
11    discovery hearing in the case of Curling vs. Raffensperger,
12    Civil Action Number 17-CV-2989.
13              Beginning with the Curling plaintiffs, would counsel
14    please make their appearance for the record.
15              MR. CROSS:  Good afternoon, Your Honor.  It is David
16    Cross on behalf of Curling plaintiffs.
17              COURTROOM DEPUTY CLERK:  Thank you, Mr. Cross.
18              Anyone else?
19              Okay.  Coalition for Good Governance?
20              MR. BROWN:  Mr. Martin, this is Bruce Brown.  And
21    with me is my client, Marilyn Marks.
22              COURTROOM DEPUTY CLERK:  Thank you, Mr. Brown.
23              Anyone else?
24              Okay.  State of Georgia?
25              MR. TYSON:  And good morning or good afternoon.
```

```
 1   Bryan Tyson for the State defendants.  And I'm joined by Carey

 2   Miller, Vincent Russo, Josh Belinfante, and Bryan Jacoutot.

 3             COURTROOM DEPUTY CLERK:  Thank you.

 4             Fulton County?

 5             Okay.  Judge, that is everybody.

 6             THE COURT:  All right.  So Fulton County is not

 7   represented here today?

 8             COURTROOM DEPUTY CLERK:  No, ma'am.

 9             THE COURT:  Okay.  Very good.

10             All right.  Well, I looked at your discovery

11   statement.  And I can't say I'm left with a very clear idea of

12   what is going on, other than the fact that everyone disagrees.

13             So obviously some of the objections that had to do

14   with the election being imminent and this being a distraction

15   are no longer relevant.  But on the other hand, I don't really

16   understand necessarily here the scope of what the plaintiffs

17   are seeking.

18             And so I mean, it appears at first glance to be very

19   broad.  But it may not be.  But I don't really know.  Although

20   I'm looking at the questions.

21             It seemed to me that some of them were intended to

22   obtain information on a statewide basis.  And it would -- and I

23   can go through some of this more particularly.  But I'm trying

24   to -- I mean, that was my greatest concern.

25             I'm trying to clarify what is it that the plaintiffs
```

1  are seeking exactly in common language without my going through

2  everything, which I have read.  But I'm just really trying to

3  get to the core of what plaintiffs are seeking here.

4         MR. CROSS:  Your Honor, this is David Cross.  In

5  simplest terms, we're trying to get access to equipment and

6  software that has been used in actual elections in the State of

7  Georgia, in particular in recent elections.  So the November

8  election and for the -- potentially -- particularly the

9  November election but also maybe the senate election, the

10  runoff in January.

11         And really what that comes down to is getting access

12  to a BMD and the corresponding components -- so the scanner,

13  the printer -- that were used in an election and that still

14  have the election data on them and as well as access to the

15  EMS -- Dominion EMS, again, where it has been used in an

16  election.

17         The equipment that we got from Fulton County has been

18  really helpful.  And Dr. Halderman will have a report obviously

19  coming out in the next month on that.  The challenge that we

20  have with that is as far as we can tell it looks like it may

21  have been wiped or altered in some way before it was produced

22  to us.  So it doesn't have a complete set of data or

23  potentially any data from the elections in which it was used.

24         And so the concern we have is the defense that we

25  keep hearing from the State in particular is that we have not

1    found evidence of a compromise.  We dispute that we have to

2    find evidence of a compromise.

3            But just parking that to the side, that has been a

4    central theme for them.  And so our position is:  As long as

5    they are going to continue to argue that that is our burden,

6    then we need to have access to equipment and to the EMS

7    software and the data used in actual elections so that we can

8    respond to that.

9            I don't think it is fair or appropriate for them to

10   say you haven't found evidence of a compromise but we haven't

11   received data or equipment where we could even begin to look

12   for that under the current system.  And that is what we're

13   trying to get to.

14           And we're prepared to narrow this down.  We were

15   prepared to narrow this down during negotiations.  But the

16   position that we got from the State was there was no

17   circumstances under which they would produce equipment or

18   software.  And so that's how we ended up here.

19           THE COURT:  Well, you know, I definitely had the

20   impression you were looking for information for all counties.

21           MR. CROSS:  Right.  That is how it is written.

22   Dr. Halderman is on, who can speak to it as well.  I don't

23   think we need it for all counties.  I think -- let me give you

24   a concrete example.  And I want to be a little careful because

25   we're in a public hearing.

1          Let's just say hypothetically that there were a way

2     to manipulate votes on the BMD.  We would want to be able to

3     test or perhaps confirm that that manipulation could be

4     implemented across the state through the EMS.  Meaning, if

5     someone had access, just like a voter, for example, to a single

6     BMD machine, such as through the USB port that is accessible to

7     voters when they are voting -- if you could upload a malware to

8     that, could you then populate that back through the EMS so that

9     it would affect BMDs across the state or scanners across the

10    state or printers across the state.

11         We need to have access to the EMS to do that.  So

12    that is the type of thing we're looking for.  Because, again,

13    when we point to certain vulnerabilities, as we have in the

14    past, the defense we always here is sort of two-fold.  One,

15    this is all hypothetical.  You are not using equipment that has

16    actually been used in a Georgia election.  You are not looking

17    at data from a Georgia election.  So we need to be able to

18    rebut that.

19         Second, well, even if you could do it, you would only

20    be affecting the one particular machine that you spend time

21    with.  And we need to be able to rebut that to say no, a

22    sophisticated person, even a voter just spending a few minutes

23    in a voting booth with access to a USB port on a single

24    machine, could populate a virus through the system back to the

25    EMS.  And there are ways to do that.

```
1              So that's what we are trying to get to.  I don't
2     think we need EMS from every county to do that.  I don't think
3     we need data from every county.  But we do need access to
4     Dominion EMS, and we need access to election equipment that has
5     been used in elections in the state.
6              And the last thing I'll just say is:  The only real
7     objection that the plaintiffs -- I'm sorry -- that the
8     defendants make to this is principally a confidentiality
9     objection.
10             The burden is nominal.  We have seen that with the
11    Fulton County equipment we have already got.  And Dr. Halderman
12    already has access to essentially the same equipment and
13    software and similar voting data from the work he did on behalf
14    of the Secretary of State in Michigan.
15             So our position would be:  If the Secretary of State
16    of Michigan trusts him to do this work -- and they had much
17    more data available in that case, as I understand it from
18    Dr. Halderman -- there would be no reason to think he can't be
19    trusted here.
20             And no one in this case on our side has violated a
21    protective order or come anywhere close to that.  So it is
22    really only a confidentiality objection.  I just don't think
23    there is any merit to that, given everyone has complied with
24    the protective order.  And we're talking about equipment and
25    software that he already has had access to in another state.
```

```
1              THE COURT:  Tell me what the context of the Michigan

2    case was that he was doing this on.

3              MR. CROSS:  Sure.  And he can get in more specifics

4    if you need.  But it is Antrim County.  You might recall that

5    during the election Antrim County, which has long been a

6    Republican stronghold -- surprisingly, the votes were coming

7    out heavily for Biden.

8              And so they went in -- they realized the error

9    quickly.  It had something to do with the way -- I think it had

10   something to do with the ballot.  Again, Dr. Halderman can give

11   you the specifics.

12             But they went in to see what was wrong.  This became

13   a big focus in these I will say rather bogus claims out of

14   certain plaintiffs, like Mr. Giuliani and Sidney Powell and

15   others, that Dominion and others are unfortunately dealing with

16   -- it became a big focus like here we go, this shows a rigged

17   election.

18             The Michigan Secretary of State brought in

19   Dr. Halderman to look at this issue.  Plaintiffs filed suit.

20   Part of that litigation, as I understand it, he was retained as

21   an expert on behalf of the state to look and see what happened.

22             It was a combination of manual error and I think some

23   computer error but nothing rigged.  And they were able to fix

24   it.  And they got to the right election results.

25             So it was similar in the sense here that he was
```

1  brought in to look at the equipment, look at the software, look

2  at the voting data, and figure out what went wrong and then be

3  able to offer up some fix.

4        And so he looked at, again, the same equipment, the

5  same basic EMS software, the same basic data.  Obviously, the

6  votes were a bit different.  But the same sort of voting data

7  that we're looking for here.  He was able to identify the

8  problem that occurred.

9        THE COURT:  So -- but this was in the context of the

10 state -- the Secretary of State's office in Michigan trying to

11 figure out why the results looked weird in some way and perhaps

12 just like up in north Georgia when there were 2000 votes

13 missing?  Maybe something was -- that he found that was

14 actually physically identified that was missing.

15       MR. CROSS:  Right.

16       THE COURT:  But we don't have that here.  I mean, I

17 guess I'm trying to -- I mean, to me -- I mean, this is some of

18 my concern at this juncture and why I have been, you know,

19 asking frankly, you know, trying to figure out the posture and

20 how to move the case forward to some form of resolution that

21 anyone can appeal.

22       But we don't have that posture here.  We have -- you

23 know, certainly arguably in the situation where you have had

24 a -- could show a breach in the original case, I thought, you

25 know, that really -- and what was the evidence that was shown,

1    I could understand exactly where we were going.

2         This is a little bit more challenging.  Not to say

3    that any -- you can't live right now in our society without

4    thinking about data vulnerability.  It is obviously an enormous

5    challenge.  Since we've had -- it is different.  The hacking

6    is.  But it is a different sort of situation.  But it is

7    obviously pervasive issues that have been arising whether in

8    pipelines or in health systems or other contexts.

9         But -- so I'm not trying to say it wouldn't happen or

10   it couldn't happen.  But I'm trying to understand relative to,

11   you know, if you had been hired -- if the plaintiffs' expert

12   had been hired by the Secretary of State's office to do this

13   and analyzing what had gone wrong or you were presenting

14   something that had gone wrong, it would be easier for me to

15   understand exactly what your need for it is.

16        But right now you are saying you have the need for

17   this, even if not for every county, but data that would help

18   you basically determine this with -- or computers that would

19   and equipment that would because you think that the Fulton

20   County equipment you had was not -- had some problems with it

21   in light of being cleansed.  It might have been.  I can't say

22   it wasn't one way or the other.  Though there was testimony

23   about that, about how it got to you and discussed as well --

24   that we had discussed, I believe, in my last order.

25        But, you know, I guess I'm trying to understand -- it

1    is an important investigation that you potentially want to

2    undertake.  But if you don't have anything that leads into this

3    at this juncture beyond the vulnerability -- and I know it is

4    sort of these are -- it is a difficult situation because it is

5    a chicken and egg problem.

6              But we've had an election.  Things have happened in

7    that election -- a lot.  And -- and where is it going to take

8    me?

9              I mean, my view in saying that we should go forward

10   with the summary judgment motions was trying to say sort of if

11   you had evidence and you had evidence upon which to base

12   further discovery so that you could -- basically that the harm

13   here is a particularized harm, it was -- it would -- then we

14   have a record.  Because you kept on saying, you know, you would

15   be stripped of being able to show the record otherwise if this

16   went up on standing without the record fully.

17             MR. CROSS:  I think the challenge we have, Your

18   Honor, is -- again, I don't want to get into the specifics in a

19   public hearing.  But Dr. Halderman is going to have a report

20   that is I think going to be eye-opening for everyone on the new

21   system.  And what we're really trying to get after is to head

22   off what is (Zoom interference) --

23             THE COURT:  Head off what?

24             MR. CROSS:  The defenses that we always face --

25   right -- which is that --

 1          THE COURT:  I understand the defenses.

 2          MR. CROSS:  But when Your Honor said that we're just

 3   talking about vulnerabilities, we're not talking about a

 4   problem like we saw in Antrim County, the vulnerabilities are

 5   obviously a core part of our case.  The vulnerabilities are not

 6   hypothetical.  They are quite specific.

 7          I think it is fair to say, which we have already said

 8   publicly, they are far worse with the public system -- with the

 9   current system than they were with the system that was already

10   found to be unconstitutional by Your Honor.  And as the State

11   has said, they themselves found it to be unreliable, which is

12   why they say they got rid of it.

13          So we are dealing with a far worse system than we

14   have before in terms of cybersecurity and reliability -- voter

15   verifiable reliability.  And we're prepared to make a showing

16   to the Court on that.

17          But we know the response we're going to get is you

18   are dealing with a single piece of equipment from Fulton, it

19   has never been used in an election, or, if it was, it no longer

20   looks like it looked in an election.  You can't show that

21   anything you are talking about is a vulnerability can reach any

22   other machine.  Meaning, we can't even -- they'll argue we

23   can't even show standing to our clients because our clients

24   didn't vote on this particular machine.

25          And so we've got to be able to respond to that.  If

1   they are going to come in and say we have to show an actual

2   compromise or we have to show a vulnerability to be manipulated

3   in such a way to affect our clients' votes being on different

4   machines in other counties, we have to be able to respond to

5   that.  It is just not fair for them to lay so much of their

6   defense on those allegations and we have no response because we

7   have never had access to the equipment needed to do that.

8          And they won't -- I think it is kind of telling.  But

9   -- so I mean, I guess I don't know a better way to explain it.

10  I understand Your Honor's concern that we are differently

11  situated than Antrim.

12         But their defense squarely puts at issue this

13  equipment and our ability to show what they are saying we can't

14  show and we think we will show if we get access to this.

15         Again, it is not every county.  I think if we got

16  just a single BMD, the components from a county that was used

17  in an election, it is still configured and set up just as it

18  was in the election, it still has the data, and we had a single

19  county EMS again as used in an election -- I think that is

20  enough.

21         And Dr. Halderman will jump in and yell at me if I am

22  wrong.  But I think that is enough.  I think it is a pretty

23  small ask in terms of what we need to be able to respond to

24  their --

25         THE COURT:  So a single -- I mean, the State says,

```
1   well, listen, the only defendant here who is obligated to do

2   this is Fulton.  And you have Fulton's.  And so --

3               MR. CROSS:  If we got access to the Fulton EMS --

4               THE COURT:  If you got access to what?

5               MR. CROSS:  The Fulton EMS, the election management

6   system.

7               THE COURT:  What was the system you were trying --

8   there was a lot written about that was -- that defendants said

9   they didn't know what you meant.  And I wasn't 100 percent sure

10  either.

11              MR. CROSS:  I'm not -- I don't remember them -- I'm

12  just looking back at the brief.  I didn't remember them saying

13  they were confused about something.

14              If Bryan wants to take that.  I'm not sure what you

15  are referencing, Your Honor.

16              THE COURT:  I'll tell you in a second.

17              MR. CROSS:  Okay.  Sorry.

18              THE COURT:  Fully-configured ICC.

19              MR. CROSS:  What was that, Your Honor?

20              THE COURT:  The ICC.

21              MR. CROSS:  Oh, the scanner.

22              THE COURT:  Yeah.  That is the scanner?

23              MR. CROSS:  That's the scanner.

24              THE COURT:  As I looked -- and there were a lot of

25  other things that are called ICC.
```

```
 1            MR. CROSS:  Yes.  The ICC is the scanner.  Dominion
 2   scanner.
 3            THE COURT:  Okay.
 4            MR. CROSS:  And we did have an agreement at least --
 5   and we put in email correspondence on this -- the EMS -- on the
 6   databases -- the Dominion databases.  Mr. Tyson (Zoom
 7   interference) those late last year.  And so we hoped at the
 8   very least we would get those.  But we need more than the
 9   databases.  We need the EMS system itself to be able to respond
10   to the notion that you could not populate an attack beyond an
11   individual machine.
12            THE COURT:  You are looking for the EMS system or
13   what?
14            MR. CROSS:  I think we --
15            THE COURT:  For the entire state or that would relate
16   to a particular county?
17            MR. CROSS:  I think -- again, Dr. Halderman, tell me
18   if I'm getting this wrong.  I think if we got a forensic image
19   of the EMS server used in Fulton County, that would probably be
20   enough.
21            Again, we would have -- we would have the equipment
22   that -- ideally we would get another set of equipment that
23   wasn't wiped in any way.  Right?  It is configured.  It has got
24   the election data.  It has got everything exactly as it was
25   from the November election of last year and an image from the
```

1    EMS from Fulton.

2          So we would have sort of a microcosm of the Georgia

3    election system where we could say here are the vulnerabilities

4    that we identify, here is how we can show that those

5    vulnerabilities could be exploited and then populated across

6    the state or to other counties through the EMS.

7          THE COURT:  What does that mean to be populated

8    across to other counties?

9          MR. CROSS:  Meaning, if someone were to upload

10   malware to an individual BMD -- right?  So, again, there is a

11   USB port that we know is accessible publicly.  If you were to

12   upload malware to that, you could then get that malware to

13   other BMDs across the state or across a county.

14         One way to do that would be to have the malware flow

15   back to the EMS, the election management system, server.

16   Because the election management server for an individual county

17   is used to manage all the BMDs across the county.  Right?

18         If you could get to the state level EMS, then you

19   have access to BMDs, scanners, and printers across the entire

20   state.  And because these things are not actually air-gapped,

21   because there are internet connections that come into play,

22   because there are thumb drives that move back and forth between

23   these systems, we think we can show that you could upload

24   malware to an individual BMD and then have that moved back to

25   either a county level EMS or state level EMS.  And data would

```
 1   get populated -- it would end up getting transferred to other
 2   BMDs in the county or across the state.
 3           That's how an attack would work.  And we are in a
 4   climate where unfortunately very sophisticated actors are
 5   trying to do that.
 6           THE COURT:  All right.  I mean, I know that there are
 7   other topics here as well.
 8           But, Mr. Tyson, are you going to be speaking on
 9   behalf of the State?
10           Mr. Brown, is there anything you wanted to add before
11   I turn to Mr. Tyson?  Yes?  No?
12           MR. BROWN:  No, Your Honor.
13           THE COURT:  Thank you.
14           MR. TYSON:  All right.  Thank you, Your Honor.
15           Yes.  I'll be -- Bryan Tyson.  I'll be speaking on
16   behalf of the State defendants.
17           I think you kind of identified, I think, the crux of
18   the issue here in terms of kind of where we are and what this
19   case is about.  We are in a situation where the plaintiff, as I
20   understand their claims at this point, are alleging
21   vulnerabilities.  They are not alleging an actual hack.
22           Earlier in the case, they said you have to assume it
23   was hacked basically it was so vulnerable.  Currently, I don't
24   believe they are alleging that anything was actually altered.
25           And if that is not an allegation that is in the
```

1    complaint, I think that to make this relevant to what they are

2    getting to -- they haven't even alleged that there was an

3    actual compromise of a voting system.

4          Now, if they want to make that allegation, I think

5    then we can talk about this.  But then we're also into the

6    realm of Arizona, we're into the realm of these other cases

7    that have been filed post 2020 that are alleging actual

8    compromises of the system and trying to dig into these issues.

9          The concern that we have is where we are in this case

10   today -- I know Your Honor knows this -- is if the sole claims

11   are the stacking up of vulnerabilities, then we are solely into

12   the Eleventh Circuit precedent in *Tsao* and in *Muransky*.  And we

13   have talked about that extensively, and I don't want to go back

14   over that.

15         But I think it is important that what Mr. Cross is

16   talking about is actual election equipment that was actually

17   used in an election.  And we filed the documents for you from

18   Dominion and from the U.S. Department of Justice and others

19   about handing over actual election equipment to third parties

20   that are not certified test labs and the concerns that that

21   involves.

22         But if they are still relying solely on

23   vulnerabilities, I don't think there is a basis to get access

24   to do this forensic-style audit they want to conduct like what

25   is happening in Arizona today.  And I think that especially

1    when they have had access to the KSU server image, they have

2    had access to DREs, they have had access to hundreds of GEMS

3    databases -- the BMD they have had in some cases -- some of

4    these pieces they have had in place for years.  And the whole

5    theory right now for them is that there is some magical malware

6    that has continued to live in the system and transfer.  And if

7    they can't come forward with any evidence of a compromise so

8    far, then what is the basis to then keep digging and keep

9    looking as we go there?

10           They have cited to Antrim County.  I know Antrim, as

11   you discussed with Mr. Cross, is a very different case.  In

12   that case, it was a voter who said my vote didn't count and

13   that is why I'm bringing this case.  So it is different from a

14   standing perspective.

15           And then there is an analysis that happened there

16   that this was -- I mean, Antrim was kind of the center of the

17   misinformation campaign about the 2020 election.  And

18   Dr. Halderman was brought in by the Secretary of State to say,

19   hey, the system worked, it did what it was supposed to do.

20           So I think that just counting all those pieces

21   together it doesn't make any sense to keep digging into the

22   election system and especially not to hand over actual election

23   equipment to the plaintiffs in this case.

24           And I know that Mr. Cross has raised the issue of

25   confidentiality and the protective order is enough.  I know

 1   Your Honor knows, we're in a place now where in September we

 2   had a confidential portion of that hearing that the plaintiffs

 3   said they were going to try to get made public after a

 4   production pursuant to a protective order.  And even if they

 5   don't seek -- plaintiffs don't seek that this time, we know

 6   there are people like Sidney Powell and Lin Wood who have

 7   various information that is not public -- they are probably

 8   going to be coming to you and asking for that information to be

 9   made public.  And I think we're going to see the same thing all

10   over again.

11           And so the fact that we are where we are with the

12   allegations in this case -- if the plaintiffs are going to

13   stand on the vulnerabilities and that is their claims, then I

14   think we're at a point where Your Honor can decide the legal

15   issues that are still pending here.

16           But if they believe they need or they are going to

17   allege that there is an actual compromise in an actual

18   election, then we can have that conversation.  But as of right

19   now, we haven't even gotten to that point, which leads us to

20   conclude that really we're just kind of on an Arizona style

21   fishing expedition here at this point and not digging into

22   actually trying to resolve the issues in this case.

23           We -- I talked to everyone before the election about

24   the importance of public confidence in elections and how that

25   matters.  And further sowing distrust in Georgia's election

1 | system is dangerous for everybody.  And we would just urge that
2 | there is no basis for us to get into this because it is not
3 | part of the allegations that are in the complaint in this case.
4 |         THE COURT:  Well, I guess the thing is -- Mr. Cross,
5 | is why wouldn't I wait in the event in terms of determining
6 | what you have until you produce whatever you say you have from
7 | Dr. Halderman?  Because I mean, it does seem like we're jumping
8 | into a whole new -- an expanded zone in order for you to find
9 | vulnerabilities or to prove the system is vulnerable, which I
10 | have already recognized that that is a possibility, which is
11 | not a news flash at this point, which is something that the
12 | State will have to deal with.
13 |         But by itself, unless it is sort of an imminent
14 | threat and there is some proof of -- I mean, I'm trying to
15 | figure out how you are -- you know, you still have to weave
16 | together a very challenging standing issue.  And, you know, you
17 | have done some over the course of time.
18 |         But I just -- it seems to me at this juncture you are
19 | asking for discovery so that you can obviously make your case.
20 | But if it is just going to basically mean that there is this
21 | vulnerability, I'm not sure just because of the changes or the
22 | developments in the law that have occurred since the beginning
23 | of the case that you are in the best of positions.
24 |         MR. CROSS:  I guess two initial thoughts, Your Honor.
25 | One, there's sort of two points on the table, I think.  One is

1   vulnerability, and one is compromise.  And we have heard both

2   from Mr. Tyson.  And this discovery goes to both.

3            And they have long kept us in a catch 22 in this

4   case, which is to say we can never show a compromise or a hack

5   of the system.  That wasn't true of the old system because of

6   what Logan Lamb was able to do publicly.  But they do have a

7   new system in place.  And I don't think it is appropriate at

8   all for them to continue to say we have never shown a

9   compromise in the system when we have never had any ability to

10  begin to look at that, other than what maybe Logan Lamb did.

11  And we're not going to do that in the context of litigation

12  where we're going to try to hack their system.

13           So we literally have no ability to do what they are

14  saying we have to do.  The only way to do that, to show that

15  there might have been a compromise of the system, is to

16  actually look at it.  And we have an expert that has been

17  trusted by a Secretary of State to do that.

18           And I just -- I don't see how -- to your question of

19  putting it off, we know that that is going to continue to be a

20  defense for that.  We're going to go through discovery.  We're

21  going to go through summary judgment briefing.  And I can

22  guarantee you the first paragraph of their summary judgment

23  brief is going to say there is no evidence of compromise.  And

24  that is -- it may be that system has never been compromised.

25  But they don't know any better than we do because they never

1    have let us look at it.

2           THE COURT:  Well, that may well be so.  But tell me

3    how -- knowing where the Eleventh Circuit is at in standing

4    issues on these election cases, because we've had a profusion

5    of them, I'm just -- I'm bewildered exactly how you can -- how

6    you are going to proceed without at least some more material

7    evidence of actual harm.

8           And maybe there is a way there.  But you're not

9    addressing that.  That is what I'm trying -- I mean, I'm trying

10   to because of the amount of resources that the plaintiffs have

11   in good faith put into this case in a way to basically identify

12   true issues with the system and that may have been enough to --

13   because of kind of all the different arms of the case be enough

14   to raise real issues about preliminary injunctive relief while

15   things were being implemented and implemented in very

16   challenging ways, let me just say, for purposes of -- in the

17   first year.

18          But I -- you know, I don't know what to tell you

19   because I'm not -- you know, I'm not your strategist.  But I'm

20   just trying to hear something that would address that concern

21   that if all I'm going to get -- I mean, is -- I mean, I haven't

22   appointed you as the -- and the plaintiffs to go and find -- to

23   do detective work on this.  That is not the point.

24          The point would be if you had had I guess in your

25   version of Antrim County something that really looked like it

```
 1    was off then, you know, maybe that is something different.

 2    And -- but I don't -- I don't know -- I realize that the system

 3    has some real challenges.  And people have talked about that.

 4    And, of course, standards are evolving as to what security

 5    means in this context.  And I guess our -- I mean, this case is

 6    a testament to that.

 7              But I still have to deal with the Eleventh Circuit

 8    standards, which are also the Supreme Court standards.

 9              MR. BROWN:  Your Honor, this is Bruce Brown.  If I

10    may address this last point.

11              Part of the frustration that we're having is that --

12    this doesn't sound quite the way I'm saying it.  But it is

13    almost like the Court is anticipating that we're going to lose

14    but we haven't lost yet so we're in this suspended sort of

15    period of not knowing whether to start or to stop because of

16    the standing issue.

17              It is true that there are a lot of extreme fact

18    patterns that met the Eleventh Circuit through this last

19    election.  But *Burdick* is still the law, Your Honor.

20    *Anderson-Burdick* is still the law.  *Spokeo* is still the law.

21              And under those cases, we win.  In fact, we came

22    extremely close to already winning the BMD case.  The only

23    reason why we didn't, according to your decision, was because

24    we were too close to the election.

25              THE COURT:  I don't think that is quite right.
```

1          MR. BROWN:  So that is the record as it stands right

2    now.  Until that is reversed under the normal course of

3    litigation, that is the law of the case.  We almost won as to

4    the law of the case, not that we were almost about to lose

5    because of we think aberrant decision on bad facts on standing.

6          And so the way the posture of the case is we almost

7    won a preliminary injunction, we were too close to the

8    election.  The election passes.  We pick it up again.  And

9    according to what Your Honor said in your order, which to us

10   makes perfect -- perfect sense actually, is let's try the case.

11   Quit doing the preliminary injunctions.  Let's go ahead and

12   gear up and try the dang thing and get it over with.

13          So that's what we're doing.  And to do that, we need

14   a little bit of discovery.  And the discovery that Mr. Cross

15   outlined is very limited.  The State is not objecting to it.

16   It has a feeble objection based on confidentiality,

17   anticipating that Giuliani will come in here and want copies

18   of, which I think is an extremely weak argument.

19          That is one argument they have is confidentiality.

20   They don't have an argument on burden.  The only argument they

21   have is that we're going to discover something, which is in my

22   view a very backwards way of looking at a discovery dispute.

23   Don't let them have discovery, Judge, because they might find

24   something, which we don't think is a valid objection.

25          And it is going to take longer to sort some of these

 1    things through Your Honor than it is just to go ahead and have

 2    Dr. Halderman look at this stuff.

 3          So I think we -- I think the concern about the

 4    Eleventh Circuit naturally we all share.  And we have briefed

 5    that ad nauseam.  And we are filing a brief today in the

 6    appeals of your two orders, which we won, by the way.  We

 7    didn't lose those.  We won those.  So we're on a winning

 8    streak.

 9          But every time we have a hearing, it is like we're

10    about to lose something so why are we doing discovery.  We have

11    put an enormous investment into this case, and we are paying

12    for it.  We have not been granted any fees.  We're making

13    decisions tactically.  This is discovery we think is

14    worthwhile.  And we can get it done.

15          And if there is logistical issues that we can make

16    easier on the State, we'll be happy to do so.  We have worked

17    through a lot of issues with Mr. Tyson and his team in the

18    past.  And we think we can do so here.

19          Thank you.

20          MR. CROSS:  Your Honor, the only other thing I'll add

21    to what Mr. Brown said is I do think it is worth noting that

22    Fulton County is not here objecting to this.  They did not join

23    the motion.  And Dominion is not here objecting to this.  And I

24    think that says a lot.

25          THE COURT:  Well, what do you say about what

1    Mr. Tyson has said about the Justice Department's concerns

2    about distribution of any equipment that has basically got

3    actual election data on it and the disclosure of confidential

4    information?

5              MR. CROSS:  So the -- it is absolutely a fair

6    concern.  Dr. Halderman himself I think has been vocal on this

7    when you look at some of the folks that have gotten access to

8    the stuff in other cases, for example, in Arizona, I will tell

9    you.

10             We and our experts do not take kindly to their

11   characterization of our folks as cyber ninjas.  Cyber Ninjas is

12   actually the name of a firm I think in Arizona, if I remember

13   right, that folks have raised I think concerns about their

14   having access to certain election data.

15             It seemed to me that that was a not so subtle effort

16   to suggest that Dr. Halderman is the same as those folks.  He

17   is not.  He is the leading expert in this area.  He has been

18   trusted, again, by a Secretary of State and by many others.  He

19   has testified before Congress.

20             We have gotten access to Fulton equipment already.

21   We have had the GEMS databases.  There has never been even the

22   remotest concern of us violating a protective order or leaking

23   anything out.

24             To Mr. Tyson's concern that we asked to make -- to

25   unseal some of his testimony in the fall, I would just point

1    out we never filed that motion, Your Honor.  We took Your

2    Honor's admonition.  We thought about it.  We decided that that

3    was not the right thing to do.

4         So I think we have shown exactly the sort of

5    restraint that is needed in a case like this for what we're

6    looking for.  And so the confidentiality issue just does not

7    have any merit here.

8              THE COURT:  All right.  Well --

9              MR. TYSON:  Your Honor --

10             THE COURT:  Yes.

11             MR. TYSON:  I'm sorry.  If I could clarify a couple

12   of quick points on this.

13        I don't want to let it go unsaid that when the

14   continuing allegation is that we have never looked to see if

15   our system works the State of Georgia conducted the largest

16   risk-limiting audit in the aftermath of the Presidential

17   election that confirmed that the system worked the way it was

18   supposed to.

19        So the continuing allegation from the plaintiffs that

20   we have never looked at the security or the functioning of our

21   system is just patently untrue.  We are still in a mode of if

22   the plaintiffs want to get into these kinds of issues then

23   allege a hack.  They know how to do that.

24        I believe the original 2017 election contest

25   complaint in this case made such an allegation.  There were

1    allegations -- Mr. Brown brought an election contest after the

2    2018 lieutenant governor race that made allegations like that.

3    Those allegations aren't here.

4            If the plaintiff wants to make those allegations of

5    an actual compromise, then we can come to that.  But right now

6    it is not -- all they have alleged is vulnerabilities at this

7    point.

8            And then to the continuing point about Dr. Halderman

9    has been trusted by all these people, I understand

10   Dr. Halderman has expertise in this area.  But he also referred

11   to the Georgia election system as the 737 MAX before the

12   November election, that we were headed for a plane crash of an

13   election system.  So I think we're well within our rights to

14   have some concerns about getting access in our equipment on

15   that.

16           I just wanted to raise those issues with you.

17           MR. CROSS:  Your Honor, just could I add two quick

18   points?

19           One, our concern -- I don't want to get into a debate

20   about whether there was an audit.  Our position is clear that

21   there was not a risk-limiting audit.  And I wasn't saying they

22   have not looked at their system in a broad sense.

23           My point is only they have never had an election

24   security expert come in and look if the system is compromised.

25   And that is what they need to do and we have to do.  That is my

1   only point.  I don't think there is any dispute that no one has

2   done that in the State of Georgia for whatever reason.

3            The last thing is:  It is not entirely accurate to

4   say our case is only compromise or a vulnerability.  Remember,

5   one of the things that we put into evidence before was an email

6   from Michael Barnes out to the counties telling them to use the

7   USB drives from the old GEMS DRE system with the new system.

8            We know that the old system was compromised on at

9   least two occasions by Logan Lamb.  We know that the

10  analysis -- the limited analysis we have been able to do on the

11  KSU drive, which they wiped three times -- they wiped it three

12  times.  Okay?  So we are doing the best we can with that.

13           We know that that had some indications, as Mr. Lamb

14  put into a declaration before for the Court -- there are some

15  indications that it was compromised by someone other than

16  himself.  We are still trying to do the best we can in

17  analyzing that.

18           So we have a system that we know was compromised on

19  multiple occasions that they then did not separate from the new

20  system, that they just said take the old USB drives from the

21  old system and put them into the new.  So we do have a

22  compromise that we can directly connect -- directly connect

23  across the state, across the counties through the USB drives.

24           And so, again, it is not fair to say that this is

25  only a vulnerability case.  It is really not.  And it is -- it

```
 1   is difficult for them to keep saying you have to show there is

 2   a compromise but we're not going to give you access to anything

 3   you need to see whether the compromise that we know happened

 4   with the old system very well could have made its way into the

 5   new system through USB drives used across the state.  That is

 6   just one avenue whether that happened.  And I think we're

 7   entitled to respond to that.

 8          THE COURT:  All right.  Well, just to summarize where

 9   you are at though, what you want -- what you are saying is that

10   it would be adequate if you had Fulton -- a new machine -- a

11   new Dominion ImageCast BMD from Fulton County?

12          MR. CROSS:  Yes.  The scanner, the BMD, the printer

13   since the printer became an issue last time at the hearing.

14   Again --

15          THE COURT:  Poll Pad?

16          MR. CROSS:  The Poll Pad.

17          THE COURT:  The technician card, the poll worker

18   card.  All of those different things you have on page -- listed

19   on Page 2 of your Document 1094-1.

20          MR. CROSS:  Right.  Again, not for every county.  We

21   can take it for Fulton County.

22          THE COURT:  But then tell me again with the -- when

23   you said you wanted the EMS system as a whole, then you were

24   going to -- with one that was actually used during the

25   election, you want to be able to test it and see whether it
```

```
 1   could infect that --
 2            MR. CROSS:  Yes.
 3            THE COURT:  -- is what you would do?
 4            MR. CROSS:  Yes.  Right.  Whether the compromise at
 5   the BMD level or the scanner or printer level can make its way
 6   back to the EMS.  Dr. Halderman tells me he feels confident it
 7   can.  But we want to be able to show that so that we're not
 8   being told (Zoom interference) --
 9            THE COURT:  Is that the only thing you want the EMS
10   system for?  Or are there other things you are planning to do
11   with it?
12            MR. CROSS:  I think that's it.  I mean, certainly we
13   would look at the election data.  Again, to their point that we
14   haven't shown a compromise, we would want to see since we have
15   one that is configured (Zoom interference) --
16            MR. BROWN:  Your Honor --
17            THE COURT:  You are breaking up a lot.  So I can't --
18   I really can't hear everything.
19            MR. CROSS:  I'm sorry, Your Honor.  I'm sorry.
20            Can you hear me now?  Is this better?
21            THE COURT:  Yeah.  You were breaking up about you
22   would still want to look at the EMS data since you would have
23   statewide data.
24            MR. CROSS:  It would be -- yeah, it wouldn't be -- if
25   it only came from Fulton County, it would be Fulton County
```

1    data.  We would not have statewide.  But we think it would be

2    sufficient as a proxy to look at that.

3           So we want to look at the election data.  To this

4    issue of Mr. Tyson saying that we have to show a compromise, we

5    would certainly look at that as well.

6           THE COURT:  Statewide or just for the county?  That

7    is what I'm trying to find out.

8           MR. CROSS:  Well, if it is only the Fulton County EMS

9    and their machine, we could only look at the Fulton County

10   level.  But we would take that as a proxy for the state since

11   it is the same EMS and the same system and software.

12          THE COURT:  All right.  So then what is -- what is

13   the nature of what you are looking for in terms of documents

14   from Pro V&V and Dominion's roles regarding Georgia's election

15   system?

16          MR. CROSS:  So there are a variety of requests on

17   that.

18          Principally, just to start with Pro V&V, Your Honor,

19   the focus there is on the audit that they did -- or I don't

20   know if you call it an audit -- but the work that they did in

21   the fall when the underlying software changed.  We just want

22   some limited discovery into their role into the testing that

23   they have done on this system.

24          My understanding -- and Mr. Tyson will tell me if I

25   have this wrong.  But my understanding of -- there are a

```
 1    variety of requests that go to certain documents from Dominion

 2    and Pro V&V.  The objection we are bringing to Your Honor

 3    today, because it seems to be the objection they are standing

 4    on -- it is kind of the way of us moving forward -- is that

 5    they just won't produce anything that relates to Dominion and

 6    Pro V&V under the same confidentiality issue.

 7              And so our position is that is not a proper basis to

 8    withhold this.  We think we have shown that it is relevant.  So

 9    we should be talking about producing these discrete categories

10    of documents.

11              With Dominion, it is things like emails, for example,

12    between the State and Dominion, which Dominion produced

13    themselves last time without objection.  And we can get some of

14    that from them.

15              So, again, they are not objecting on confidentiality

16    grounds themselves on that.  They have produced a large volume

17    of those emails.  In fact, the one that I mentioned from

18    Michael Barnes, I think that came from Dominion.  I think that

19    is how we got that.

20              And we just want comparable discovery from the State.

21              THE COURT:  Mr. Tyson, the State believes that

22    everything -- all communications with Pro V&V are confidential?

23              MR. TYSON:  No, Your Honor.  Our concern with this

24    is -- I don't think that we necessarily have the ability to

25    know which of our communications with Pro V&V and Dominion
```

1    involve things that are possibly trade secrets for them.  That

2    was our concern.

3           We know the plaintiffs have served third-party

4    discovery on Pro V&V.  I believe they have -- I don't know if

5    they served them on Dominion this time around or not.  That has

6    been our concern is trying to work through that.  And they know

7    -- Pro V&V and Dominion know what might be trade secrets.  But

8    we don't.

9           I mean, we will include -- we have already kind of

10   worked through with the plaintiffs on search terms and working

11   through.  And obviously if things are caught in there, that is

12   fine.

13          But that was our concern about trade secrets and

14   proprietary information.  And I don't have all of those

15   objections in front of me.  Because I don't believe they were

16   attached to the joint discovery statement.

17          But that was the main concern we had is that we don't

18   necessarily know what is proprietary and trade secret of those

19   two organizations.  Because they obviously operate in a

20   regulatory environment both as a certified voting system test

21   lab and as an election equipment manufacturer.

22          THE COURT:  And relative to the information as to

23   Dominion, they were served as third parties?

24          MR. TYSON:  I'm sorry, Your Honor.  I lost that a

25   little bit on the connection.

1          THE COURT:  The plaintiffs' joint RFP 25 through 28

2     and 32 through 39 seek certain documents involving Pro V&V's

3     and Dominion's roles regarding Georgia's election system.  And

4     basically the plaintiffs say that the State is withholding

5     responsive documents as trade secrets or proprietary

6     information of Pro V&V and Dominion.

7          And they basically are complaining about the alleged

8     blanket refusal to produce highly relevant documents relating

9     to the two third parties involved in the security and

10    administration of Georgia's election systems.

11         That's what I'm trying to get at.

12         MR. TYSON:  Yes, Your Honor.  I don't think we have

13    an objection to producing the relevant documents.  Our concern

14    again was just the scope was so broad that it was including

15    things that were potentially trade secret.

16         If they can get them from Pro V&V and Dominion,

17    that's fine.  We are pulling up our objections on there right

18    now to take a look at that.  But that was our only concern.

19    There is not an issue with just producing general

20    communications with those organizations.  It is which of those

21    are going to disclose trade secret/proprietary information,

22    which we can work through that.  I think that is something we

23    can figure out.

24         But our thought was Dominion and Pro V&V know that

25    much more easily.  And if the plaintiffs have already served

 1   discovery on them, that is a much easier way to sort through

 2   that.

 3          THE COURT:  Mr. Cross, where does that leave you?

 4   What is your reaction?

 5          MR. CROSS:  It sounds like progress.  Because, again,

 6   based on the meet-and-confer we had with them and their written

 7   responses, we understood they were not producing anything

 8   related to Dominion or Pro V&V.

 9          If Bryan is saying they will produce communications

10   with them, then it sounds like --

11          MR. TYSON:  Your Honor, Mr. Miller is handing me our

12   objections.  And response 25, subject to objections, we will

13   produce non-privileged documents from January 1 to the present

14   after the election cycle is concluded if we can work on search

15   terms, which we have been working on.  That is our response to

16   25.  26, same thing, we're going to produce documents.  27,

17   we're going to produce documents.  28, we're going to produce

18   documents.

19          Let me get down to 32.  This is all part of search

20   term process, which we have talked to Mr. Cross about.  Same

21   for 32, we're going to produce documents.  33, we're going to

22   produce documents.  34, we're going to produce documents.  35,

23   we're going to produce documents.

24          Yes.  So I don't see that we were standing on blanket

25   objections for any of these and now looking at these -- at our

 1   objections here.

 2             MR. CROSS:  The intro to that phrase is subject to

 3   objections, which Your Honor's standing order says you can't

 4   do.  We actually asked them to clarify what objection they were

 5   standing on.

 6             MR. TYSON:  David --

 7             MR. CROSS:  The response was -- you can read what we

 8   wrote, and so that is how we are here now.

 9             Again, it sounds like we have made progress.  I mean,

10   the parties put in a joint statement as well where we said this

11   is our understanding of their position and there was no

12   response in the brief that we had misunderstood their position.

13   So --

14             MR. TYSON:  Your Honor, just to clarify, we have

15   specifically that we will not withhold documents except for

16   ongoing investigative documents, privilege and trade secrets

17   and proprietary information.

18             So we complied with your standing order to clarify

19   which objections we were going to stand on.  And I was not part

20   of the meet-and-confer on Friday because I was out of town.

21   But my understanding is this wasn't an issue that was raised at

22   that meet-and-confer either.

23             So I apologize that we're doing this in front of you

24   this way.  But that is where we are with that.

25             THE COURT:  Okay.

```
1            MR. CROSS:  I think a lot of this could be avoided if
2     the responses were to comply with Your Honor's standing order.
3     Just the specificity as to what it is.
4            THE COURT:  All right.  Well, I think you can all get
5     this done.  I mean, if there is something that is highly
6     sensitive, that is one thing, that is a confidential trade
7     secret.  And then you can identify the nature of the trade
8     secret in some way so you can try to work out what that really
9     is.
10            But it is hard for me to resolve this without seeing
11    the type of documents at issue.  So if you-all can't -- I think
12    it sounds like you can resolve this.  But if you can't, then I
13    would need to look at some of the information -- you know, more
14    specific objections and some, you know, examples of the nature
15    of the documents that you are saying are protected material on
16    an in camera review basis.
17            MR. TYSON:  That will work, Your Honor.  Yesterday we
18    received the search terms back from Mr. Cross.  So we have been
19    negotiating back and forth on those.  I think we'll be in good
20    shape on that.  But we'll bring it back to you if that becomes
21    an issue.
22            THE COURT:  I don't know that there was another body
23    of information like -- those are the two bucket -- major
24    buckets.
25            Are there other buckets that I missed?
```

 1          MR. CROSS:  If we could get confirmation the State

 2   will produce the EMS (Zoom interference) --

 3          THE COURT:  I'm sorry.  You are breaking up again.

 4          MR. CROSS:  Sorry.  If we could get confirmation from

 5   the State that they will produce the EMS databases that

 6   Mr. Tyson agreed last fall, that would help us as well.  And

 7   those were for the statewide.

 8          MR. TYSON:  Yeah.  We have been working on that

 9   piece, Your Honor.  So the EMS databases -- we learned a few

10   things about this.

11          Similar to the GEMS databases, they are provided by

12   counties to the Center for Election Services after the

13   elections.  Unlike the databases that Dr. Halderman worked with

14   in Antrim, these include all the ballot images if the export is

15   done correctly by the county.

16          So in order to produce the databases in a JSON

17   format, which is kind of, as I understand, the normal way of

18   exchanging these documents or databases, the Center for

19   Election Services has to upload each individual database file

20   into the EMS, which then -- which is a kind of lengthy process

21   they have to go through.  It can take days per each database.

22          And then it is then able to be exported or created

23   from there.  So we are working through that process with the

24   folks.  And we have -- you know, we said we will produce these

25   databases.  We have no problem producing them.  It is just a

1  matter of logistically doing them for 159 counties is a massive

2  undertaking by the Secretary's office.  So we're trying to work

3  through the most efficient way to do that and seeing if there

4  is some alternative way to do it.

5          But we -- that is not an issue, I think, that we have

6  a pending discovery dispute because we said we will produce

7  those and it is just a matter of logistically getting that

8  done.

9          THE COURT:  So clarify for me:  The EMS that you are

10 talking about doing, is this the pre-election, post-election?

11 I'm trying to figure out what you are all talking about --

12         MR. CROSS:  Yes, Your Honor.

13         THE COURT:  -- so that I understand what you have

14 agreed to produce.

15         MR. TYSON:  Before each election, there is a database

16 that is a file that is used to program each EMS that then

17 programs all the BMDs and all the scanners.  So everything kind

18 of relates back to that database.

19         After the election is over, that election database is

20 then exported into a file that is supposed to be returned by

21 the counties to the Secretary's office.  So that is the process

22 that takes place after that.

23         Those are created into a kind of compacted file that

24 is then delivered to the Secretary's office.  That is not the

25 server itself.  It is the database file for that election.  And

1  each election file has a unique set of encryption keys that go

2  with it, which is why there is not nearly the same concerns

3  with having -- they change each election.  So there is not a

4  concern about somebody getting access to one database file and

5  having access to all of them.

6          And so those are the files that we're talking about.

7  And to get them into a format that can then be retransmitted to

8  somebody else, we basically have to onboard that database file

9  into an election management server and then create the exports

10  that would be needed to do that.

11          So that is the process that we are working -- trying

12  to work through with the Secretary's office to get that done.

13          THE COURT:  Mr. Cross, then it sounds really that

14  your main issue is that you want Fulton County.  Why have

15  you -- you can't resolve whatever your concerns are with Fulton

16  County?

17          MR. CROSS:  I'm not sure I understand that, Your

18  Honor.

19          THE COURT:  Well, the only thing that you want then

20  really is here that you haven't got because you say you are

21  willing to live with just having the Fulton County data is the

22  data -- you want a new -- you feel like your BMD was wiped and

23  therefore it wasn't -- which might be true.  As I have said, I

24  don't know.  Though that was denied by the representative who

25  prepared it from Fulton County.

```
 1              So you want a different Fulton -- you want all of the

 2   material -- and the objections are then identified -- well, you

 3   asked for in question -- Interrogatory 18 or request for

 4   production -- excuse me -- you wanted the BMD, the scanner, the

 5   Poll Pad, the technician card, lots of different technician

 6   cards, passcodes -- passcodes for those, security key tab code,

 7   polling place scanner, et cetera.

 8              So have you --

 9              MR. CROSS:  Yeah.

10              THE COURT:  Have you attempted to resolve that

11   request with Fulton County?  Have you sought it from Fulton

12   County, since obviously the State is not very happy about --

13   has never wanted to produce it themselves?

14              MR. CROSS:  So let me just be clear.  There are two

15   different things I want to make sure don't get confused.

16              THE COURT:  All right.

17              MR. CROSS:  So what Bryan was just talking about were

18   the EMS databases.  That is separate from the stuff we have

19   been talking about.  The State agreed to produce the databases

20   for the counties.  So I don't think we have a dispute on that.

21   It sounds like they are working to get us that.

22              We would like to have those in the native format that

23   they come from the counties.  I don't know if we have a

24   disagreement on that.  But maybe we can park that for a moment

25   and get back to Fulton County.
```

1          The challenge we have always had with Fulton County,

2   the same as last time, is they won't produce anything to us

3   without the State's permission.  And so when the State objects,

4   as they did here, we have to resolve it with Your Honor or the

5   State has to consent.

6          So my hope is if you order it, like we did last time,

7   over the State's objections or if the State were now willing to

8   consent, Fulton County will likely give it to us, we're hoping,

9   based on their cooperation last time.

10          But in fairness to them, they feel obliged to do what

11   the State tells them to do.  So when the State objects, there

12   is nothing they can do.

13          THE COURT:  Well, you have, other than the problems

14   with the scanner, all of this information right now?  You just

15   have -- don't you?

16          MR. CROSS:  We don't have the EMS, and we don't have

17   the (Zoom interference) --

18          THE COURT:  But you are going to get the EMS; right?

19          MR. CROSS:  No.  Sorry.  I'm sorry.  This is where it

20   gets confusing.  This is (Zoom interference).  There is the EMS

21   database.

22          THE COURT:  The EMS what?  I'm sorry.  You are

23   breaking up again.  Wait a second.  You are breaking up again.

24          Go back a minute.  There is the EMS --

25          MR. CROSS:  The EMS database, that is separate from

1    the EMS software that runs the system.  You might remember last

2    time when we went through this with GEMS we got the GEMS

3    databases.  We did not get the GEMS server software.  That's

4    separate.

5          What we're asking for now and what we discussed

6    earlier -- can you hear me okay now, Judge?

7          THE COURT:  A little.  But it is a little garbled,

8    let me just tell you.  This is an imperfect line relative to --

9    so everyone else is clear.

10         MR. CROSS:  I could dial in real quick if that is

11   easier, if Harry or someone could let me in, on the phone line.

12         THE COURT:  No.  That is all right.  Just stay where

13   you are.

14         MR. CROSS:  But yes.  So the EMS databases --

15   right? -- these are just files that contain a variety of

16   information.  That, the State is willing to give us, just like

17   the GEMS databases we got from them last time.

18         Separate and apart from that is the EMS software and

19   server that manages the election system -- right? -- for the

20   counties and for the state.  That, we need from Fulton County,

21   the image of their server -- their EMS server so we get the

22   software and the data sitting behind it.  And the State would

23   give us the databases, which are separate.

24         THE COURT:  Have you actually explored with Fulton

25   whether they would be willing to do this?  You just think --

```
 1    you are assuming it is going to be just like before?  That they
 2    would as long as the State didn't object or the State's
 3    objections were overruled?
 4              MR. CROSS:  That -- we have not because they have
 5    told us they can't do anything without the State's permission.
 6    So we needed to resolve the State's objection first.  But they
 7    have been cooperative with us.
 8              Again, they are not objecting here.  So I'm hoping
 9    that means that they will -- obviously if Your Honor orders it,
10    they will produce it.  I think we could do it the same as last
11    time where we worked out an order that laid out what they
12    produced.  We just have to resolve the State's objection.
13              THE COURT:  All right.  Well, I would like to take
14    about a five-minute break.
15              Is there anything else we need to address while --
16    before we take a five-minute break?
17              MR. TYSON:  Your Honor, I was just going to very
18    briefly say I think, again, we're kind of very far afield from
19    the allegations in terms of the alleged vulnerabilities versus
20    alleged hacking compromise.
21              Also, again, there are state laws and state
22    regulations that govern who has access to election equipment,
23    as the Department of Justice pointed out.  There's also federal
24    laws relevant to that.  I think all of that has to be addressed
25    in terms of Fulton and the State and all those pieces.
```

1          Other than that, I just wanted to make those points

2     as well.

3          THE COURT:  Well, do you want to address any of that

4     in terms of the state laws that would restrict it?

5          MR. TYSON:  Yes, Your Honor.  The State Election

6     Board regulations and state statutes require that the election

7     system components be kept in a secure environment.  There are

8     requirements on the SEB regs about who has access to it.  And

9     then if someone else who has not been given access historically

10    has access, there are then requirements for reacceptance

11    testing, recertification of those pieces of equipment to ensure

12    the chain of custody is clear.

13          So the access to the equipment is covered -- I'm sure

14    we briefed it at some point.  We can get it to you if you need

15    it -- on the State Election Board regs and the statutes.  And

16    those are designed to comply with federal law.  Because

17    obviously when federal elections are involved, there are a

18    number of requirements related to the maintenance of records

19    following those elections.

20          And the design is to ensure that the state and the

21    counties are in full compliance with those federal laws, that

22    chain of custody and maintenance of election records for

23    federal elections.  And I believe the federal statutes are

24    summarized in the DOJ letter that we filed.

25          THE COURT:  All right.

1          MR. TYSON:  Also, Your Honor, I have been reminded by

2     co-counsel that Dominion also has advised all of its customers

3     that if you're going to hand over equipment to somebody that is

4     not part of a certified voting system test lab they obviously

5     say that could void the certification from the EAC, could void

6     the ability to use the equipment in the future.  So that is

7     another -- another issue also with the licensing agreement with

8     Dominion.

9          So those are all factors that are involved in getting

10    access to the equipment itself.

11         THE COURT:  All right.  Well, let's take a

12    five-minute break or so.  And then we'll resume.  All right.

13                **(A brief break was taken at 3:38 P.M.)**

14         THE COURT:  I'm just waiting until Mr. Brown is back.

15         MR. BROWN:  I am back.  Thank you, Judge.

16         THE COURT:  Is there anyone else, Mr. Tyson, from

17    your team who you need back?

18         MR. TYSON:  We're all here, Your Honor.  So we're

19    good whenever you are.

20         THE COURT:  So, Mr. Cross, when is it you are

21    expecting this report from your expert, Mr. Halderman --

22    Dr. Halderman?

23         MR. CROSS:  I think the deadline Your Honor set was

24    July 1.

25         THE COURT:  To Mr. Brown's point, which is, of

```
 1   course, Mr. Cross' point too -- but Mr. Brown articulated it
 2   more -- all right -- you basically say -- well, both of you
 3   say, well, we almost won, we almost showed this.  And while I
 4   disagree with some of your characterizations of the last order,
 5   which I certainly identified many of the issues -- the issues
 6   that you raised -- but I think that is different than saying
 7   that you were only -- that the only thing that prevented you
 8   from getting an injunction was the time.  I don't think that --
 9   I mean, I have said that before.  But I don't think that is
10   what I was saying here solely.
11          And we were in a position also moving forward at a
12   time when there had been a great deal of problems with the Poll
13   Pads and the voting process that were very serious in the
14   Court's judgment.
15          Obviously I wouldn't have entered the injunction if
16   it weren't for the concerns for that and concerns about other
17   matters as well.  But what I really wanted to get back to is
18   what, you know, both of you -- both plaintiffs' counsel here
19   have said, you know, basically you told us that, you know, we
20   have done -- we put on a lot of proof and the only thing that
21   has changed is that we have these other wild cards and cases
22   and the fact that have -- they haven't -- you say they haven't
23   altered the landscape for you-all but -- and they haven't
24   altered really the law.  And so, you know, why are you putting
25   us through these hoops is partially the way I hear this.
```

 1           And, meanwhile, the State through Mr. Tyson argues

 2    look at *Muransky*, which is really just a data breach case, but,

 3    again, you know, is of the same vein he is arguing.  That

 4    *Muransky* is a data breach case but you haven't been harmed

 5    because you haven't actually lost anything.  You didn't

 6    actually have any expenses.  You just simply had your data

 7    turned upside down.

 8           Now, you know, arguably obviously voting is more

 9    fundamental to the democracy than having your financial

10    security at risk because of a data breach.  But it is obviously

11    what the State's arguing is of the same ilk.

12           So, you know, I didn't end up certifying the case

13    based on standing because I was convinced by plaintiffs that

14    you should -- that you deserve to have a record and whatever

15    happened, and maybe it would lead to a trial and maybe it

16    wouldn't lead to a trial.

17           If you think that I am handcuffing you in some way,

18    we can always -- I can change that.  I mean, this is a very --

19    we have an odd circumstance because we have a lot of record in

20    this case.

21           And -- but the law also has been moving on -- a good

22    deal for about a year, you know, on these issues and moving

23    even as to liability of the State in this context.  So at any

24    point if you think this is a waste of valuable resources, we

25    can put this in a posture that you can have an immediate

1   appeal.

2            I'm trying to figure out how to do this so that

3   everyone gets a fair shot and we get these issues aired and

4   looked at because they are serious issues.  But I am also bound

5   to look at what has happened in the evolution of the law in the

6   last year and a half.

7            And I mean, I think this case has some exceptional

8   circumstances from the start -- factual circumstances.  I

9   didn't quite anticipate we would be in this exact posture

10  though, I have to say.

11           MR. CROSS:  Nor did we, Your Honor.

12           THE COURT:  Yeah.  And, you know, if you told me that

13  Mr. -- that Dr. Halderman's report would be available in two

14  weeks, I would look at that and think about that.  But it is a

15  month, which is -- you know, we can move the briefing a month

16  forward.  But I don't know that it will make any difference to

17  me either.  So I don't want to sort of hold you up on all of

18  that.

19           But the bottom line here is I'm not prepared to rule

20  on the issue right now as to the EMS and the equipment.  And I

21  see the Justice Department's letter.  I don't know how that

22  fits with anything else.  You really haven't responded to that

23  fully.  So it might be, you know, helpful to know that.

24           But we are dealing with something different when we

25  are talking about the actual election software system that was

1    used, updated, et cetera.

2          But, you know, it is not that I distrust counsel or

3    their expert.  But I have to really think if this is really

4    just -- if what you're, in fact, ultimately attempting at this

5    juncture just simply to show is this vulnerability, which I

6    think the record is clear, then I might as well just simply

7    certify the record based on that theory.

8          I mean, it is (Zoom interference) vulnerability, and

9    the Court found that.  It is not hypothetical, as I have said

10   before.  But that's -- that's what I'm struggling over because

11   I don't want to waste all of your time and have you feel like,

12   oh, my God, we are just having to jump through hoops for the

13   Court for no purpose.

14         So that is why I asked about what Dr. Halderman would

15   say because I'm trying to understand how that fits in.  I mean,

16   I think that Mr. Tyson correctly stated that one of the things

17   about the original case as presented was that -- really that

18   obviously the equipment was so old, the software was so old, so

19   hackable -- not just hackable but everyone understood in the

20   software industry this was not acceptable, their own expert

21   who -- the State's own expert said I wouldn't want to use a

22   system like that and I wouldn't use a system like that.

23         So it was just -- it was completely out of there.

24   This originally comes to us in the sense of we can't verify how

25   our -- how our -- the encoded vote is being read and we don't

```
 1    feel comfortable -- we don't feel like we -- it is verifiable.

 2         And then it kind of moves on from there.  Of course,

 3    you know, if it is not verifiable, then, of course, it could be

 4    false.  And I understand that.

 5         But it is more complicated.  It is simply more

 6    complicated.  So I'm going to think about this some.  You can

 7    think about it some.  If there is something that you want to --

 8    I have an argument in a large case on Friday that I've got to

 9    prepare for.

10         If there is anything that you want to consider that

11    would move me off the dime and present whether on the record or

12    on the record but sealed, that is up to you.  But it also may

13    be you want to think about this in terms of resources and your

14    resources and if you would prefer to suggest that I certify

15    this for appeal based on an agreed record.

16         MR. CROSS:  Your Honor, just two quick points, if I

17    could.

18         One, we will think about that.  From a resource

19    standpoint and what matters most, the EMS system, the

20    software -- getting it from something like Fulton County really

21    is the most important part of this.  I don't think there is

22    really any burden involved in that.

23         The last thing I'll say is:  One of the things I have

24    learned in the context of this case is that there is a certain

25    irony when it comes to computer software cybersecurity.  So you
```

 1   made the point the old system was old.  The newer software --

 2   the problem -- what Dr. Halderman will lay out -- and he will

 3   get into the specifics.

 4          One of the reasons the new system is so much more

 5   vulnerable than the old is because it is newer software and it

 6   is off the shelf, like the printer.  And so I think the

 7   metaphor Dr. Halderman gave me once was, think about the

 8   nuclear missile system in the U.S.  One of the reasons why it

 9   is so hard to hack is it is a really old, antiquated system and

10   there are not a lot of people who understand it.

11          Dominion has put a system into the marketplace that

12   uses off-the-shelf software and off-the-shelf components.  So

13   you don't have to be that sophisticated to understand what the

14   vulnerabilities are in that system and to exploit them.

15          And you have now put that system in an environment

16   where those entrusted with administering the election are not

17   adhering to basic election security hack instances, like

18   reusing USB drives from the old system, not air-gapping it, all

19   of these sorts of thing.

20          THE COURT:  I got that originally.  I mean, when I

21   said old before, it was -- it wasn't that it was aged.  It was

22   that -- it was -- had been out -- was outdated because it was

23   so capable of being modified before and we had the software

24   industry saying this is not acceptable so that is -- and the

25   State's own experts saying that.

```
 1              So, really, I understand what you are arguing.  I
 2    understand that is the nature of the software.  And it makes --
 3    and the system and that, you know, it -- also that they are
 4    trying to find a financially viable one.  And I understood that
 5    is the theory of the case.  That is why I'm -- and I think we
 6    got the record in about that.
 7              So if you -- and it is a very challenging
 8    circumstance.  And it is a certainly very challenging public
 9    policy circumstance too.  But how much I can -- what I can do
10    as a matter of law is another matter.
11              And I'm just being straightforward about this because
12    if you -- you know, if -- I may be -- you know, maybe the trial
13    or summary judgment record is going to bring this to basically
14    a culminating sort of picture so that it is dealt with and
15    addressed whether in the courts or in other forums.
16              But I just don't want to -- you say you are
17    frustrated with me, and I understand that.  We do have a moving
18    target in terms of what the law -- how the law has been
19    articulated so -- and articulated as to standing in the sort of
20    data breach situations too.  So --
21              MR. BROWN:  Your Honor, if I could just say first
22    we're not frustrated with you, of course.  It is a difficult --
23    it is a difficult case.  And we're trying our best to move it
24    along, given the constraints and the uncertainties.
25              And we're also very mindful that you are mindful of
```

1    our own investment and how efficiently to get -- to not waste

2    resources, that those resources would end up being wasted.

3            Our legal position though I think, if you look at it

4    this way, is that we believe that it is not a stretch, even

5    given all of the Eleventh Circuit activity in the last year, to

6    posit that at some point the voting system becomes so

7    vulnerable that it is a violation of the right to vote.

8            Now, we may disagree on how vulnerable it is as a

9    matter of degree.  We don't think it is a stretch to say at

10   some point the vulnerability of the system that is counting the

11   votes without any reliable backup -- that vulnerability crosses

12   the line from being a -- sort of an everyday kind of election

13   issue that the State has the authority to deal with across the

14   Fourteenth Amendment.

15           And so we think that along that continuum we are

16   entitled to discovery on the scope that Mr. Cross has outlined.

17   And that if we get that, we'll put on our case with that

18   evidence so that the record is clear that, you know, it still

19   may be a legal issue that we haven't presented enough evidence

20   of vulnerable to show a Fourteenth Amendment violation but that

21   that is what we think we will be able to do.

22           In terms of -- Your Honor, of course, is correct that

23   your -- I oversimplified your holding in the -- in the

24   injunction.  And I didn't mean to do that.

25           THE COURT:  All right.

1          MR. BROWN:  But the effort -- what I was trying to

2     get across was that we are trying to follow what Your Honor has

3     outlined as the path toward resolution of the case, one way or

4     the other.  That is to get through discovery, to get these

5     bumps in the road in discovery done, and to get the case tried.

6          That is it.  Thank you.

7          MR. CROSS:  One just quick fact.

8          MR. TYSON:  Your Honor --

9          MR. CROSS:  Sorry, Bryan.  One quick fact for Your

10    Honor.  You mentioned one of considerations on the prior system

11    was that the State's own expert found it was unreliable.  It is

12    worth noting as we brought to Your Honor last fall he has

13    released his own BMD system that is intended to -- it is

14    premised on the unreliability of the system they have in

15    Georgia.

16         So it seems like Juan Gilbert -- and he has done a

17    panel recently where he acknowledged that the system used in

18    Georgia -- they are just not reliable.  Voters can't verify

19    their votes.

20         So we actually don't know of an election security

21    expert in the country that is still endorsing these systems.

22    We'll see what they come up with.

23         MR. TYSON:  Your Honor, I'll briefly tag on at the

24    end.  I think it is worth comparing the Lin Wood and Sidney

25    Powell cases allege that the voting system had been hacked by

1    Venezuela, by Russia, by Hugo Chavez.  And those were the kind

2    of allegations that were presumed to be true that were

3    generalized grievances not sufficient for standing.  I think we

4    are not nearly there.

5         But given the context of that, we have as the State

6    believe it to be far better use of everyone's resources for us

7    to get the standing issue resolved by the Eleventh Circuit

8    first and then go from there, just considering where we are on

9    all these different pieces.

10        THE COURT:  All right.  Well, I'm going to -- since I

11   asked for the time to think about it, you-all can have it too.

12   And if there is something also that in that connection --

13   anything such as what Mr. Cross mentioned that you wanted to do

14   to supplement the record also, if you decide that that is where

15   you want to go, let me know -- identify what you want.

16        MR. BROWN:  Thank you, Your Honor.

17        MR. CROSS:  Thank you, Your Honor.

18        THE COURT:  All right.  Very good.  So today is

19   Wednesday afternoon.  Is it reasonable to think that you would

20   be able to -- I don't know what your schedules are.  But if you

21   want to get back to me on sometime Monday?

22        MR. BROWN:  Yes, Your Honor.

23        MR. CROSS:  Yes, Your Honor.

24        MR. TYSON:  That is fine, Your Honor.

25        THE COURT:  You are welcome to opine on it yourself

```
 1    as well on behalf of the State.  I mean, if you point it out,

 2    it would be helpful to the Court but also represent the

 3    interest of your clients also obviously.

 4              Okay.  Thank you.

 5              MR. CROSS:  Thank you, Your Honor.

 6              MR. BROWN:  Thank you.

 7              THE COURT:  Would you please also proceed on all of

 8    these other fronts just so we're not dropping the ball on

 9    anything.  Just keep on working on everything else you have

10    agreed to work on.  Okay?

11              MR. CROSS:  Yes.

12              THE COURT:  Okay.  Thank you.

13              MR. CROSS:  Thank you, Your Honor.

14              THE COURT:  All right.  Bye-bye.

15                   (The proceedings were thereby concluded at 4:08

16                   P.M.)

17

18

19

20

21

22

23

24

25
```

```
 1                  C E R T I F I C A T E

 2

 3    UNITED STATES OF AMERICA

 4    NORTHERN DISTRICT OF GEORGIA

 5

 6         I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7    the United States District Court, for the Northern District of

 8    Georgia, Atlanta Division, do hereby certify that the foregoing

 9    60 pages constitute a true transcript of proceedings had before

10    the said Court, held in the City of Atlanta, Georgia, in the

11    matter therein stated.

12         In testimony whereof, I hereunto set my hand on this, the

13    3rd day of June, 2021.

14

15

16

17                     _____
                       SHANNON R. WELCH, RMR, CRR
18                     OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```