**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br> **Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

**PLAINTIFFS' JOINT SUPPLEMENTAL BRIEF
IN SUPPORT OF NARROW DISCOVERY REQUEST**

Plaintiffs seek critical, narrow discovery that State Defendants have put squarely at issue in this case with their central defense.  They repeatedly claim that Plaintiffs have failed to show that Georgia's new BMD system has been "compromised".  But they refuse to allow Plaintiffs (or any of their own election security experts) to examine *any* equipment *actually used* in any Georgia election.  This violates fundamental discovery principles and the truth-seeking function of judicial actions such as this.  State Defendants' claim also is misleading given the proven connections of the BMD system to voter databases and other elements of the GEMS/DRE system, which this Court found so flawed as to be unconstitutional and which already were publicly accessed on multiple occasions.

1

In addition, the State's framing of the issue – whether the State's systems have been "compromised" – is not accurate.  Instead, as the Court has held, the issue is whether the system is compromised or is  unreliable (Dkt. 964 at 59 (emphasis added).)  Contrary to State Defendants' contention—and as this Court already has found—Plaintiffs have gone well beyond alleging merely hypothetical security vulnerabilities in the new BMD system.  Instead, they have shown specific errors and deficiencies that came to light in recent Georgia elections that show its unreliability.   And Dr. Halderman's continued analyses of the Fulton County equipment—which State Defendants conveniently argue is not representative of the equipment *actually used* in Georgia elections—has further revealed the disturbing unreliability of Georgia's new BMD system.  Thus, Plaintiffs have readily satisfied their nominal burden for the narrow discovery they seek.

State Defendants, however, fall far short of the hefty burden they bear in opposing this discovery.  They offer only vague, conclusory, and ultimately meritless claims of burden and "sensitivity".  Tellingly, neither Fulton County nor Dominion is opposing this discovery.  Further, State Defendants' own expert, Juan Gilbert, now acknowledges the unreliability of BMD systems like that used in Georgia and is even working to replace such BMDs with new voting machines, while the Secretary's own political party—which controls Georgia's legislature—just adopted a resolution

ny-2123855

demanding abandonment of the BMD system as unreliable, demanding hand marked paper ballot elections instead.  Thus, State Defendants stand alone in defending Georgia's BMD system and shielding it from scrutiny.  One wonders what they are so terrified an examination of that system will reveal.

The Court should order immediate production of (i) a forensic image of the Fulton County Election Management System ("EMS"); and (ii) a single BMD, scanner, and printer *actually used* in the November 2020 and January 2021 elections in Fulton County, in exactly the same state they were in at the close of the last election.

## I.  PLAINTIFFS SEEK *NARROW*, HIGHLY-RELEVANT DISCOVERY THAT IS PROPORTIONAL TO THE NEEDS OF THE CASE

### A.  *Plaintiffs Seek Nominal Election Equipment and Data*

Plaintiffs seek only: (1) a single scanner, BMD, printer, and necessary peripherals, such as access cards, that were used in the November 2020 and January 2021 elections; and (2) a forensic image of the EMS from Fulton County.

 With respect to the scanner, BMD, and printer, Plaintiffs are specifically requesting equipment that was *actually used* in the most recent elections.  These devices are necessary for multiple purposes.  While Fulton County provided an Image Cast Precinct (ICP) Scanner and Image Cast X (ICX) BMD in August 2020,

3

analysis indicated that the units had not been used in any prior Georgia election. (*See* Ex. A (Halderman Decl.) ¶ 3.)  In addition, State Defendants argued that Dr. Halderman's analysis of that equipment was unreliable because it might not have been configured identically to that used in Georgia elections.  (*See id.* ¶ 5.)  Plaintiffs, therefore, need to test Georgia's BMD voting equipment that has *actually been used* in Georgia elections—again, to rebut State Defendants' argument that Plaintiffs' experts' testing to date is not indicative of Georgia's actual voting equipment and the broader election system.  Further, Plaintiffs need to test Georgia's BMD equipment using the new software that Georgia installed to fix a glitch for the November 2020 election.  (Dkt. 964 at 48-51; *see also* Ex. A ¶ 6.)  Dominion developed this new software, Pro V&V approved it, and Georgia implemented it after Plaintiffs received the BMD equipment the Court required Fulton County to produce last September. *Id.*  Lastly, Plaintiffs need to test whether voting equipment that was used in elections in Georgia has been compromised or is otherwise unreliable.  (*See* Ex. A ¶¶ 3-4, 7.)  Plaintiffs need this critical discovery to respond to State Defendants' central defense in this case.

Similarly, a forensic image—*i.e.*, a *copy*—of the Fulton County EMS is essential for analyzing the integrity of Georgia's BMD system.  The Election Management System, or EMS, consists of a small number of servers and computers

that are used to operate the Dominion Democracy Suite software and to perform central tasks, such as preparing ballots for each election, importing results from the scanners, and counting votes.  (*See id*. ¶ 3.)  As Dr. Halderman has explained, the EMS is an ideal vantage point for an attacker seeking to compromise votes.  (*See id*. ¶ 8.)

A forensic image of the EMS will allow Dr. Haldeman to analyze, among other things: (1) whether there have been any attempted or successful attacks against the EMS; (2) whether the EMS components have been configured and operated in accordance with their design, with Georgia law and best practices; and (3) whether the Dominion software protects against attacks by actors with physical access to the EMS or other election equipment.  (*See id*. ¶ 12.)  As Dr. Halderman explains, analysis of a forensic image of the Fulton County EMS is "highly relevant for assessing whether the election system has already been or may imminently be compromised." (*Id*. ¶ 11.)  Such analyses would be impossible with only the limited election data that State Defendants have agreed to produce.  (*See id*. ¶ 11)

In short, Plaintiffs do not seek a massive, statewide release of information. State Defendants cannot credibly argue that such a narrow production, from Fulton County, threatens their ability to prepare for or administer elections, nor can they credibly argue that they lack time or resources to facilitate the discovery, which

would come from Fulton County (which is not opposing this discovery and has committed to producing the requested equipment and data if State Defendants allow it or the Court overrules State Defendants' objections (*see* Ex. B). State Defendants have devoted far more time and expense to fighting this discovery than if they had simply cooperated. They need do nothing here at all except drop their meritless objections and permit Fulton County to provide the requested equipment and data—which, again, it is not opposing here. In other words, State Defendants just need to get out of the way.

> B.   *Georgia's BMD System Interacts with Its Unconstitutional DRE/GEMS System, Rendering the BMD System Equally Vulnerable*

Plaintiffs have shown that Georgia's BMD system exists as part of a larger election system that is highly vulnerable and potentially already "compromised." That election system includes the prior DRE/GEMS system, components of which have been used with Georgia's new BMD system. As the Court is familiar, Logan Lamb on multiple occasions accessed (or in State Defendants' parlance, "compromised") components of the DRE/GEMS system, including confidential information available via a server maintained by the Center for Election Systems ("CES") previously hosted at Kennesaw State University (the "KSU server").[1] (Dkt.

---

[1] *See* Dkt. 699-10, *passim.*

6

964 at 14 n.9; *see also* Dkt. 548 at p.24-28.)   Plaintiffs have found evidence suggesting that *another unknown attacker* also accessed the KSU server.[2]  (Dkt. 699-10 at 3-4.)   Curiously, the Secretary of State's Office deliberately excluded the DRE/GEMS election system from the periodic cybersecurity assessments its consultant, Fortalice Solutions, conducted for it.  (Dkt. 862-1; *see also* Dkt. 510-5, -6, -7.)  In fact, State Defendants steadfastly refused to allow any of their election security experts to examine Georgia's DREs and GEMS servers for vulnerabilities and potential "compromise".  The same is true for the KSU server.  Thus, their claims that the prior system was secure and reliable are, at best, wishful thinking.

Defendants' adoption of the Dominion BMD system did not alleviate the crippling vulnerabilities and compromises of the prior system.  For example, the computer equipment used by officials to transmit election results is largely unchanged.  (Dkt. 682 ¶¶ 9-10; *see also* Ex. A ¶ 15.)  Georgia's voter registration database—which Fortalice found to be extremely vulnerable—also is largely

---

[2] The extraordinary lengths State Defendants took to wipe the KSU server after Plaintiffs filed this lawsuit have greatly impeded Plaintiffs' ability to analyze and recover data from the server (likely as intended by those who wiped it).  (Dkt. 564 at 8-9, 13; *see id.* at 13 ("Furthermore, the Director of CES, Michael Barnes, acknowledged that he received notice from counsel for KSU to preserve all documents before the servers were wiped. When asked whether he knew that the servers would be wiped, Barnes acknowledged that he knew that the servers might be "reused in some capacity.") (internal citations omitted).)

7

unchanged,[3] and ████████████████████████████████████████████

████████████████████████████. (Dkt. 855-1 ¶¶ 67-68; Dkt. 682 ¶ 9.)

State Defendants' oft-repeated-but-n'er-substantiated claim that the new BMD system is completely divorced from the prior DRE/GEMS system ultimately proved to be incorrect, as with many of their claims in this litigation.[4]  It came to light—through an email produced by Dominion, not State Defendants—that the state and counties have continued to use with the new BMD system the same USB drives previously used with the DRE/GEMS system.  (Dkt. 892-11.)  And why have they been doing something so obviously dangerous and unnecessary?  Because Michael Barnes, Director of Georgia's Center for Election Systems, told them to.  (*Id.*)

---

[3] *See* Dkt. No. 751 at 22 ("Due to the volume of evidence of voter issues at the polls detailed in the Court's August 2019 Order, Plaintiffs' allegations that errors and deficiencies in the voter registration system and database are likely to carry over into the new system and cause another round of voter disenfranchisement are plausible and remain a material concern.").

[4] There is a compelling basis to doubt State Defendants' claims about the system, not only because they have done nothing to test the system themselves, but also because they have made numerous claims in this case that proved to be false upon examination.  *See, e.g.*, Dkt. 579 at 83-84 (detailing how evidence long-withheld by State Defendants undermined the testimony of Merritt Beaver); *see also id*. at 61-62 (explaining how, after providing a declaration supporting Defendants' opposition to abandoning the DREs, Dr. Michael Shamos' deposition testimony "in many ways provide[d] further expert evidence in support of Plaintiffs' position").  The history of this case demonstrates the legitimate need to test State Defendants' allegations that go to the core of their defense.

8

Thus, Plaintiffs have established *specific* connections between the new BMD system and the prior system that was so vulnerable as to be unconstitutional, as well as shown the continued egregiously-poor mismanagement of Georgia's election system by those entrusted to maintain it. Examining a forensic copy of the Fulton County EMS will allow Plaintiffs to examine the extent of such connections to the old system and whether they have been successfully exploited or could be easily exploited in the future. (*See* Ex. A ¶ 15.) This alone readily supports the narrow discovery Plaintiffs seek here regarding the new BMD system.

C.     *Georgia's BMD System Is Less Secure than the DRE/GEMS System*

Dr. Halderman has amassed substantial evidence demonstrating that the vulnerabilities with Georgia's BMD system are even more severe than those that rendered the DRE/GEMS system unconstitutional. He will detail his findings in his forthcoming expert report, due July 1, 2021, but a high-level overview is attached here for the purpose of obtaining the critical discovery Plaintiffs seek. (*See* Ex. A.) Dr. Halderman's demonstration for the Court last September established how easily Georgia's BMD system can be "compromised." (Dkt. 964 at 25-27.) The extensive analyses he has conducted since then reveals a system that is secured by little more than hope and wishful thinking in an environment that demands much more.

9

D.     *Plaintiffs Have Identified Numerous Vote Tabulation Issues in Recent Georgia Elections that Remain Unexplained and Suggest Many Individual Votes Were Not Counted Correctly*

During the June 2, 2021 hearing, the Court seemed to indicate that Plaintiffs' entitlement to the requested discovery might be clearer if Plaintiffs could point to more than a "vulnerability" of the system, to something more akin to the vote tabulation errors that occurred in Antrim County, Michigan.  (Dkt. 1099 at 12:1-4.) Plaintiffs respectfully disagree that such a high showing is required for the narrow discovery sought (State Defendants bear the burden here, and as the Court noted, this presents a "chicken and egg" problem, *id.*), but nonetheless have presented hard evidence of specific system flaws that manifested themselves as apparent tabulation errors in the November 2020 election.   This evidence more than justifies the narrow discovery Plaintiffs seek, coupled with Plaintiffs' broader showing.

As documented in Marilyn Marks's February 12, 2021 Declaration, tabulation discrepancies across dozens of Georgia counties were reported in the November hand count "audit" of the original BMD count.  (Dkt. 1071-2 ¶¶ 27-31.)    For example, in Bibb County's audit, former President Trump netted 88 *more* votes with 24 *fewer* ballots counted overall.  In Cobb County's audit, President Biden netted a 315 *higher* vote margin on 301 *fewer* ballots counted overall.  In Clayton County, on 360 *fewer* ballots, former President Trump netted 145 *more* votes.  Rockdale

10

County counted 6 *fewer* ballots in the audit, but former President Trump netted 241 *more* votes. The table below shows offsetting discrepancies between the original machine count and the hand count, using five counties as examples (the Coalition for Good Governance ("CGG") has members in these counties):

**Comparison of Original Machine Tallies to "Audit" Vote Tallies**

|  | Bibb | Clayton | Cobb | DeKalb | Rockdale |
|---|---|---|---|---|---|
| Trump- In - Person | -15 | -103 | -420 | -249 | -5 |
| Trump- Absentee +Provisional | +47 | +4 | +75 | +318 | +122 |
| **Trump –Total** | **32** | **-99** | **-345** | **+69** | **+117** |
| Biden—In Person | -58 | -386 | +216 | -754 | -1 |
| Biden—Abs + Provisional | +2 | +142 | -246 | +1383 | -123 |
| **Biden- Total** | **-56** | **-244** | **-30** | **+629** | **-124** |
| Jorgenson- In-Person | +1 | -16 | -14 | -12 | +2 |
| Jorgenson- Abs.+ provisional | -1 | -1 | +88 | +46 | -1 |
| **Jorgenson Total** | 0 | -17 | +74 | +34 | +1 |
| **Net change in Trump/Biden Margin** | **+88 Trump** | **+145 Trump** | **-315 Biden** | **+560 Biden** | **+241 Trump** |

In addition, Rockdale County reported system problems in which batches of ballots initially were uncounted because of what appears to be a systemic batch management software problem. (Dkt. 1071-2 ¶¶ 28-29.) These serious tabulation

problems appear to be the same as experienced in Gwinnett County.  (Dkt. 1071-2 ¶¶ 12-19.)  Discrepancies between original machine vote tallies, hand count tallies, and machine recount tallies were shown as examples of count discrepancies in the Fulton County precincts of six CGG members.  (Dkt. 1071-2 at 24-30.)

Defendants have repeatedly minimized and dismissed the unresolved discrepancies, stating instead that the "audit" proved that the machines are counting accurately, (Dkt. 1071-2 ¶ 30), and stating in the June 2 hearing that the "audit" "confirmed that the system worked the way it was supposed to," (Dkt. 1099 at 29:17-18).[5]  But State Defendants misstate the import of the "audit", as these serious vote count discrepancies certainly merit an examination of the affected equipment and corresponding election data—just as in Antrim County, Michigan.  But unlike Michigan's Secretary of State, State Defendants are doing what this Court warned

---

[5] It also bears emphasizing, again, that audits—even when conducted properly—cannot validate individual voters' respective votes; they can only validate *election outcomes*.  (Dkt. 891 at 5-6, 9.)  As State Defendants acknowledged during the September 2020 hearing, Plaintiffs' claims are *not* about election outcomes, because voters have no constitutional right to a particular outcome.  (Dkt. 904 at 33:9-11.)  They are about ensuring that Plaintiffs' votes count as intended. Thousands of votes could be miscounted in any given election without affecting the outcome, and thus even the most robust audit would provide no relief for the many voters who were disenfranchised and provide no measure of confidence that each vote was counted as intended.  State Defendants' persistent reliance on "audits" as a validation of Georgia's election system and a refutation of Plaintiffs' claims is entirely misplaced and misleading.

them against years ago:  sticking their heads in the sand and ignoring indications of serious reliability problems with Georgia's BMD system.  (Dkt. 309 at 45.)

Based on information currently available to Plaintiffs, the tabulation discrepancies detailed above did not appear to affect the Presidential election outcome—*this time*—because the errors seemingly offset each other (miscounting votes for President Biden offset by miscounting votes for former President Trump). But the miscounts remain unexplained (and potentially uncorrected), and they are probative of the unreliability of the system that gives Plaintiffs a right to relief— and show a clear entitlement to the narrow discovery sought here.  As this Court held in its October 11, 2020 Order, while voters "do not have a First or Fourteenth Amendment constitutional right to perfect implementation of state statutory provisions guiding election preparations and operations," they do "have the right to cast a ballot vote that is properly counted on machinery that is not compromised *or that produces unreliable results.*" (Dkt. 964 at 59 (emphasis added).)  Plaintiffs seek narrow discovery needed to assess the capability of Georgia's election machinery to afford voters that constitutional right, in a system rife with vulnerabilities and discrepancies and an environment characterized by advance persistent threats from sophisticated hackers, such as Russia.

13

In sum, Plaintiffs have demonstrated to this Court that (i) Georgia's BMD system is more vulnerable than the prior system known to be unconstitutionally-vulnerable and can be "compromised" with modest effort; (ii) the BMD system interacts with the prior system, which was "compromised" multiple times; and (iii) numerous tabulation discrepancies have been documented with Georgia's BMD system across the state that remain unexplained.  Just one of these facts alone is more than sufficient for the narrow discovery Plaintiffs seek here.

## II.   DEFENDANTS ALONE BEAR THE BURDEN HERE—AND THEY FALL FAR SHORT OF MEETING IT

State Defendants bear a high burden here under Rule 26 as the party opposing discovery.  *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1558-59 (11th Cir. 1985) (reversing and remanding District Court's grant of summary judgement because it abused its discretion in denying discovery of relevant materials based on defendant's "conclusory" claims about expense and burden).  "The party resisting discovery bears the burden of showing '*specifically* how the objected-to request is unreasonable or otherwise unduly burdensome.'" *Rhodes v. JLG Indus. Inc.,* No. 1:13-cv-00872-TCB, 2015 WL 11199066, at *2 (N.D. Ga. Apr. 30, 2015) (in products liability action against manufacturer, granting discovery regarding failures of similar models that injured plaintiff where defendant failed to provide specific

14

facts supporting objections) (internal citations omitted) (emphasis added).

Given that relevance is not—and cannot be—disputed here, State Defendants must "overcome the *presumption* of discoverability by showing good cause for withholding the information." *Martin v. Ward*, No. 1:18-cv-4617-MLB, 2021 WL 1186749, at *6 (N.D. Ga. Mar. 30, 2021) (emphasis added). In *Martin*, a death row inmate brought a constitutional challenge to Georgia's death penalty protocol. *Id.* at *1. He sought discovery related to the drugs and other measures used, including deposing individuals involved in producing and procuring the drugs. *Id.* As it does here, the state objected that (i) its protocols and the involvement of third-party vendors were confidential; and (ii) the discovery would impose an undue burden on the state's ability to carry out its laws. *Id.* at *7. The court disagreed, granting the discovery and finding that a protective order was appropriate to protect any legitimate confidentiality concerns. *Id.* at *8-9. The Court should do the same here.

Recognizing they cannot meet their high burden, State Defendants improperly attempt to shift the burden to Plaintiffs to meet some unspecified standard to obtain the narrow discovery sought. This is improper—especially given State Defendants themselves put the requested discovery at issue with their central defense. And Defendants themselves have taken *no* steps to assess the security and integrity of the BMD equipment or EMS that they claim—*without evidence*—are secure.

15

### A.   State Defendants' Central Defense Puts the Requested Discovery Squarely at Issue, Necessitating Its Disclosure

Defendants' central defense is that Plaintiffs have not shown a "compromise" with Georgia's new BMD system.   This is misleading as explained above. Moreover, this defense puts the requested discovery squarely at issue in this litigation, which *requires* production of the equipment and data sought.  *See, e.g.*, *Arthrex, Inc. v. Parcus Med., LLC*, No. 2:11-cv-694-Ftm-29SPC, 2012 WL 5382050, at *4, *6 (M.D. Fla. Nov. 1, 2012) (requiring plaintiffs to produce documents concerning contracts and incentive programs that were relevant to defendants' counterclaims and issues "injected into the case" by plaintiffs); *see also Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 354 (1978) (discovery rules should be "construed broadly to encompass any matter that bears on *any issue* that is or may be in the case") (emphasis added).  If allowed by this Court, State Defendants will continue to claim that Plaintiffs cannot show the BMD system is unsecure, while withholding the very evidence that can dispose of that question. This is fundamentally unfair and inconsistent with basic discovery principles and the Court's truth-seeking function.

Plaintiffs are caught in a catch-22 they cannot escape, as State Defendants intend, without the requested discovery.  State Defendants know Dr. Halderman and

Plaintiffs' other experts cannot find evidence of an actual "compromise" or unreliable design of Georgia's BMD system without examining equipment *actually used in Georgia elections*—which State Defendants refuse to provide or to allow any Georgia county to provide.  Plaintiffs and their experts do not have the latitude of individuals like Logan Lamb to test the security of Georgia's election system on their own by attempting to access portions that should not be publicly accessible. No doubt State Defendants would cry foul and even pursue criminal charges were Plaintiffs or their experts to do that.[6]  This means Plaintiffs have no way of repeating the showing they were able to make based on Logan Lamb's work before without conducting the requisite examination of the system *in discovery*, which is exactly

---

[6] When a Georgia voter innocently stumbled upon a serious vulnerability with Georgia's election system and dutifully reported it shortly before the November 2018 elections, Georgia's Secretary of State's Office accused him—and the Democratic Party of Georgia—of trying to hack the election and prompted a criminal investigation.  The accusation proved false.  Ga. Sec'y of State, *After Failed Hacking Attempt, SOS Lauches Investigation into Georgia Democratic Party* (Nov. 5, 2018), https://sos.ga.gov/index.php/general/after_failed_hacking_attempt_sos_launches_investigation_into_georgia_democratic_party; Ga. Sec'y of State, *SOS Releases More Details Over Failed Cyberattack, Officially Requests FBI to Investigate* (Nov. 5, 2018), https://sos.ga.gov/index.php/general/sos_releases_more_details_over_failed_cyberattack_officially_requests_fbi_to_investigate; Mark Niesse, *Investigators find no evidence for Georgia Gov. Kemp's hacking claim*, Atlanta Journal-Constitution (Mar. 3, 2020), https://www.ajc.com/news/state--regional-govt--politics/case-closed-evidence-hacking-alleged-georgia-gov-kemp/JeTYlcx3I3Ssb4CiVtdgaO/.

17

what Plaintiffs are seeking—and entitled—to do.

B.     *State Defendants Dismiss Dr. Halderman's Analyses as Inapplicable to Equipment Actually Used in Georgia Elections, Necessitating Disclosure of that Equipment*

Defendants have attacked Dr. Halderman's analyses of the Fulton County equipment this Court ordered produced last September by arguing that he has not analyzed equipment actually used in Georgia's election system.  For example, ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ (Dkt. 904 at 99:7-13.)  They similarly argue that he has not shown that any vulnerability with Georgia's BMD system could be exploited to affect vote tabulation on a wide scale basis.  All these attacks on his findings necessitate disclosure of the very equipment that State Defendants' own arguments acknowledge is critical for discovery—namely, equipment actually used in Georgia elections.  This is all Plaintiffs seek.  Without it, Plaintiffs cannot respond to State Defendants' unfair attacks, as they intend.[7]

---

[7] For the same reasons Rule 56(f) prevents parties from moving for summary judgment when the opposing side has been denied the opportunity to discover information relevant to that merits determination, so too here Defendants should be precluded from asserting allegations and arguments for which they refuse to provide the discovery needed to test and rebut those allegations and arguments. *Cf. Jones v. City of Columbus, Ga.,* 120 F.3d 248, 253 (11th Cir. 1997); *Dean v.*

18

C.     *State Defendants' Own Expert and the Secretary's Own Party Now Acknowledge the Unreliability of Georgia's BMD System*

State Defendants are nearly alone at this point in defending Georgia's indefensible BMD system.  Their own prior supporters are abandoning them.

State Defendants previously touted Dr. Juan Gilbert as an expert on the security and reliability of BMDs—notwithstanding that he has never defended the BMD system used in Georgia since he has never seen it, much less examined it. (Dkt. 905 at 23:7-21.)  As has happened before in this case,[8] Dr. Gilbert now echoes Plaintiffs' concerns regarding the reliability of the BMD system used in Georgia and has even gone so far as to develop a *new type of BMD* specifically to address the unreliability of the BMDs used in Georgia.  Essentially a transparent voting touch screen with a printer behind it, Dr. Gilbert's new BMD is intended to help ensure that the printed paper ballot accurately reflects the voter's choices and requires voter confirmation to create the ballot printout.  According to Dr. Gilbert, unlike the Georgia BMDs, the scanned paper of the ballot generated by his new machine could not be altered without a high likelihood of detection.  Moreover, the paper ballots

---

*Barber,* 951 F.2d 1210, 1214 (11th Cir. 1992).  Either Defendants must produce the requested discovery or be precluded from defending the election system as secure and reliable and from attacking Plaintiffs' experts' analyses as inapplicable to equipment and data from actual Georgia elections.

[8] Dkt. 579 at 61-62.

are intended to create an auditable election system, which also does not currently exist in Georgia. Dr. Gilbert also admits "there are ways to intervene, possibly, and put software that is not the correct software" in machines and that such an invasion may not be detected, leaving voters disenfranchised when voting on such machines.[9]

On March 30, 2021, Dr. Gilbert presented a seminar with the following summary:

> Touch-screen ballot-marking devices (BMDs) produce paper ballots that are counted by optical-scan voting machines and can be recounted by hand. *If the BMD is hacked or misprogrammed so that it prints a different candidate selection than the voter indicated on the touchscreen, the voter is supposed to notice this; this is an essential protection against hacking and programming bugs. Recent studies have shown that, unfortunately, only a small fraction of voters read their paper ballot carefully enough to catch errors. That's a problem, because errors printing the paper ballots cannot be caught by recounts.* This talk will present a new design for ballot marking devices, the Transparent BMD, which uses a novel human-computer interaction (HCI) mode: it prints the ballot just where the voter is already looking–behind a transparent touchscreen–and deliberately directs the voter's attention to the paper printout in just the right place. User studies

---

[9] Ctr. for Info. Tech. Policy, *CITP Seminar: Juan Gilbert – Can Voters Detect Ballot Manipulations with a Transparent Voting Machine?*, Princeton Univ., at 36:18-36:48 (Apr. 1, 2021),
https://mediacentral.princeton.edu/media/CITP+SeminarA+Juan+Gilbert+%E2%80%93+Can+Voters+Detect+Ballot+Manipulations+with+a+Transparent+Voting+MachineF/1_67s0hsf9https://mediacentral.princeton.edu/media/CITP+SeminarA+Juan+Gilbert+%E2%80%93+Can+Voters+Detect+Ballot+Manipulations+with+a+Transparent+Voting+MachineF/1_67s0hsf9.

on the prototype show a dramatically higher rate for voter detection of errors.[10]

In other words, Dr. Gilbert—State Defendants' own expert—has now become so concerned about voters' well-documented inability to verify ballots generated by the BMDs used in Georgia that he devoted considerable time and effort to developing a whole new type of BMD to try to remedy that unreliability.  Dr. Gilbert need not be so concerned about voters verifying their ballots *unless* he also is concerned that the BMD system generating the ballots is so unreliable as not to capture their actual selections.  Thus, Dr. Gilbert evidently has reversed course, developing a prototype BMD designed to combat the specific concern of leading election security experts Dr. Halderman and Dr. Andrew Appel,[11] among others, that Georgia's BMDs are so unreliable as to require replacement with a new, more reliable system.

And what reliable election system should replace Georgia's BMD system? The Secretary's own party has the answer:  hand-marked paper ballots.  At its state-wide Convention, held June 4-5, the Georgia Republican Party overwhelmingly

---

[10] Princeton Univ., *CITP Seminar: Can Voters Detect Ballot Manipulations with a Transparent Voting Machine?* (Mar. 30, 2021), https://www.princeton.edu/events/2021/citp-seminar-can-voters-detect-ballot-manipulations-transparent-voting-machine.

[11] Dkt. 681-3 ¶ 32.  *See also* Andrew Appel, *Juan Gilbert's Transparent BMD*, Freedom to Tinker (Apr. 12, 2021), https://freedom-to-tinker.com/2021/04/12/juan-gilberts-transparent-bmd/.

ny-2123855

passed a resolution calling for, among other things, "[r]eplacing all Dominion voting systems with secure hand marked paper ballots which should be scanned and tabulated using a device that is not connected to the internet, and to do so with the passage of legislation for the governor to sign prior to the start of the candidate qualifying beginning March 7, 2022."[12]   (*See* Ex. C (Report of Resolutions Committee).)  Just as with the obviously-unconstitutional DRE/GEMS system, State Defendants again waste this Court's time and substantial taxpayer funds defending a system that is indefensible.  This no doubt explains their refusal to allow Plaintiffs or even State Defendants' own election security experts to examine that system, knowing full well this would lay bare the many vulnerabilities that render it even less reliable than the DRE/GEMS system—and possibly reveal that the new BMD system has in fact been "compromised" already.

### D.    State Defendants' Confidentiality Objection Is Meritless

This case has long been subject to a protective order that fully protects confidential information.  (Dkt. 477.)  State Defendants cannot show a single instance in which Plaintiffs have mishandled or released protected information to unauthorized individuals.   Unlike the "cyber ninjas" they mockingly decry,

---

[12] Beau Evans (@beauvans), Twitter (June 5, 2021), https://twitter.com/beauvans/status/1401273673290600451?s=21.

Plaintiffs' experts are among the most respected in the country. Michigan's Secretary of State recently entrusted Dr. Halderman in particular with far broader access to even more election data and essentially the same Dominion BMD equipment and EMS software for essentially the same purpose.[13] Tellingly, Dominion is not objecting to the narrow discovery Plaintiffs seek here—and State Defendants have no standing to presumptuously object on Dominion's behalf regarding *Dominion's* purported intellectual property or "sensitive" information, which is subject to a comprehensive and stringent protective order in this case.

### E.     *DOJ's Letter Does Not Preclude the Requested Discovery*

State Defendants rely heavily on the Department of Justice's ("DOJ's") May 5, 2021 letter. (Dkt. 1096-2.) But their reliance is misplaced, because that letter does not in any way preclude the discovery Plaintiffs seek here. (*See* Ex. A ¶ 17.) The letter merely notes that the election information has to be maintained under measures that protect its confidentiality and integrity, and that that do not threaten the anonymity of individual voters' ballot selections.[14]    The Court's existing

---

[13] J. Alex Halderman, Analysis of the Antrim County, Michigan November 2020 Election Incident (Mar. 26, 2021),
https://www.michigan.gov/documents/sos/Antrim_720623_7.pdf.
[14] The DOJ letter is motivated by two concerns, neither of which are applicable here: (1) the risk of loss to election records; and (2) voter intimidation. (*See id*. at 2-3.) State Defendants do not contend that either of these concerns is implicated

protective order satisfies the first requirement, and State Defendants do not even contend that the requested discovery contains voters' individual ballot selections (were they to claim that, they would have serious problem themselves since the BMD system is supposed to be designed to prevent that, as they have claimed).

State Defendants have failed to put forth—much less substantiate with facts and evidence—any compelling argument that the discovery sought is unreasonable or that the existing protective order is inadequate to protect the confidentiality of the information at issue.

## IV.   CONCLUSION

State Defendants alone object to this discovery, lacking support from both Dominion and Fulton County, which stands ready to produce the requested discovery upon State Defendants' permission or an order of this Court.   State Defendants fail to meet their high burden as the party opposing discovery, and their effort to shift the burden to Plaintiffs is improper.   State Defendants cannot be permitted to advance a central defense that they refuse to allow Plaintiffs to test or rebut with the requisite evidence exclusively in Defendants' control.   The Court's Protective Order

---

by the requested discovery.  State Defendants and Fulton County will maintain their own copy of all election records, and there is absolutely no issue of voter intimidation here.

24

more than adequately addresses any confidentiality concerns.  The Court should compel immediate production of (1) a single scanner, BMD, printer, and any associated peripherals, such as access cards, that were used in the November 2020 and January 2021 elections in Fulton County; and (2) a forensic image of the Election Management System (EMS) from Fulton County.

ny-2123855

Respectfully submitted this 9th day of June, 2021.

 */s/ David D. Cross*                        */s/ Halsey G. Knapp, Jr.*
David D. Cross (*pro hac vice*)        Halsey G. Knapp, Jr.
Veronica S. Ascarrunz (*pro hac vice*)   GA Bar No. 425320
Mary G. Kaiser (*pro hac vice*)        Adam M. Sparks
Eileen M. Brogan (*pro hac vice*)      GA Bar No. 341578
Lyle F. Hedgecock (*pro hac vice*)     KREVOLIN & HORST, LLC
MORRISON & FOERSTER LLP               1201 West Peachtree Street, NW
2100 L Street, NW                     Suite 3250
Suite 900                             Atlanta, GA 30309
Washington, DC 20037                  (404) 888-9700
(202) 887-1500

*Counsel for Plaintiffs Donna Curling, Donna Price & Jeffrey Schoenberg*

*/s/ Bruce P. Brown*                       */s/ Robert A. McGuire, III*
Bruce P. Brown                        Robert A. McGuire, III
Georgia Bar No. 064460                Admitted Pro Hac Vice
BRUCE P. BROWN LAW LLC                 (ECF No. 125)
1123 Zonolite Rd. NE                  ROBERT MCGUIRE LAW FIRM
Suite 6                               113 Cherry St. #86685
Atlanta, Georgia 30306                Seattle, Washington 98104-2205
(404) 881-0700                        (253) 267-8530

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,*
*Ricardo Davis & Megan Missett*

26

ny-2123855

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br> **Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

<u> /s/ David D. Cross </u>
David D. Cross

27

ny-2123855

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| |
|---|
| **DONNA CURLING, ET AL.,** **Plaintiffs,** **v.** **BRAD RAFFENSPERGER, ET AL.,** **Defendants.** |

Civil Action No. 1:17-CV-2989-AT

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 9, 2021, a copy of the foregoing **PLAINTIFFS'**

**JOINT SUPPLEMENTAL BRIEF IN SUPPORT OF NARROW**

**DISCOVERY REQUEST** was served on all counsel of record by electronic

delivery of a PDF version.

 */s/ David D. Cross*
David D. Cross

ny-2123855