The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
1                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                        ATLANTA DIVISION

3

4    DONNA CURLING, ET AL.,          :
                                     :
5            PLAINTIFFS,             :
     vs.                             :  DOCKET NUMBER
6                                    :  1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,     :
7                                    :
             DEFENDANTS.             :
8

9

10        TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11           BEFORE THE HONORABLE AMY TOTENBERG

12              UNITED STATES DISTRICT JUDGE

13                      JULY 26, 2021

14                       1:01 P.M.

15

16

17

18

19

20

21    MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                  TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
 1            A P P E A R A N C E S   O F   C O U N S E L

 2

 3     FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
       SCHOENBERG:
 4

 5          DAVID D. CROSS
            MARY G. KAISER
 6          MORRISON & FOERSTER, LLP

 7          HALSEY KNAPP
            KREVOLIN & HORST, LLC
 8

 9
       FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
10     WILLIAM DIGGES, III, AND RICARDO DAVIS:

11
            BRUCE BROWN
12          BRUCE P. BROWN LAW

13          ROBERT A. McGUIRE III
            ROBERT McGUIRE LAW FIRM
14

15     FOR THE STATE OF GEORGIA DEFENDANTS:

16
            VINCENT ROBERT RUSSO, JR.
17          CAREY A. MILLER
            JOSHUA B. BELINFANTE
18          ALEXANDER DENTON
            ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
19
            BRYAN TYSON
20          BRYAN JACATOUT
            R. DAL BURTON
21          JONATHAN D. CRUMLY SR.
            LOREE ANNE PARADISE
22          TAYLOR ENGLISH DUMA

23

24

25                              (...CONT'D....)
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
1    (...CONT'D....)

2

3    FOR THE FULTON COUNTY DEFENDANTS:

4
         DAVID R. LOWMAN
5        CHERYL RINGER
         OFFICE OF FULTON COUNTY ATTORNEY
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **(Atlanta, Fulton County, Georgia; July 26, 2021.)** |
| 3 | COURTROOM DEPUTY CLERK:  Okay.  Good afternoon, |
| 4 | everyone.  We're here for the teleconference in Curling vs. |
| 5 | Raffensperger, Civil Action Number 17-CV-2989. |
| 6 | Would counsel for Curling please introduce yourself |
| 7 | for the record. |
| 8 | MR. CROSS:  David Cross and Mary Kaiser for Curling |
| 9 | from MoFo. |
| 10 | MR. KNAPP:  Halsey Knapp with Krevolin & Horst for |
| 11 | Curling as well. |
| 12 | COURTROOM DEPUTY CLERK:  Thank you. |
| 13 | Coalition plaintiffs? |
| 14 | MR. BROWN:  Bruce Brown and Rob McGuire for the |
| 15 | Coalition plaintiffs. |
| 16 | COURTROOM DEPUTY CLERK:  Thank you. |
| 17 | State of Georgia? |
| 18 | MR. TYSON:  Good afternoon.  This is Bryan Tyson, |
| 19 | Bryan Jacoutot, Loree Anne Paradise, and Jonathan Crumly from |
| 20 | Taylor English. |
| 21 | And, Mr. Miller, do you have the other part of our |
| 22 | group? |
| 23 | MR. MILLER:  Yes. |
| 24 | Mr. Martin, this is Carey Miller.  Also with me here |
| 25 | are Josh Belinfante, Vincent Russo, and Alexander Denton. |

```
 1              COURTROOM DEPUTY CLERK:  Thank you, sir.

 2              Anyone here from Fulton County?

 3              MR. LOWMAN:  David Lowman for Fulton County, Your

 4    Honor.

 5              COURTROOM DEPUTY CLERK:  Thank you, Mr. Lowman.

 6              Judge, that will be it.

 7              THE COURT:  Okay.  Great.

 8              All right.  Well, good afternoon.  There is a lot of

 9    interlocking pieces of mess that you presented.  So I have a

10    few questions, and then we'll get some discussion.

11              I'm not clear what the scope of the information was

12    that is being sought in the documents that are now being

13    objected to production on a burdensome basis, though apparently

14    not originally objected to on that basis.  But I just want to

15    know what the nature of the documents that are outstanding are.

16              Is any work being done at this juncture at all on

17    basically securing them by the State?

18              MR. MILLER:  Your Honor, this is Carey Miller.  The

19    documents at issue that we're discussing here are only emails.

20    These are not --

21              THE COURT:  Right.

22              MR. MILLER:  -- you know, (unintelligible) and

23    records and things of that nature.  Those kind of items the

24    plaintiffs already have, frankly.

25              So the issue here are only transitory email records.
```

1    We have documents queued up that have hit on the search terms.

2    But, Your Honor, as we posited in the joint discovery

3    statement, the reality is they are well beyond the scope of

4    this case.  Many irrelevant documents.

5         And frankly, Your Honor, the standpoint for the State

6    defendants is trying to figure out, you know, what are we doing

7    here, what do these email documents go to, and, if we're still

8    only talking about vulnerabilities, where are we headed.  And

9    if that is the case, the extent to which plaintiffs already

10   possess the information that they need to make that showing as

11   far as vulnerabilities, setting aside the standing questions.

12        THE COURT:  Well, maybe plaintiffs' counsel will say.

13   What were you seeking in the -- what is the scope of the issues

14   that these emails would be addressing that you are asking for?

15        MS. KAISER:  Your Honor, Mary Kaiser.  We sought

16   documents that go beyond just emails.  I mean, we are looking

17   for documents that talk about known vulnerabilities in the BMD

18   system, problems with implementation in the BMD that will

19   allow --

20        THE COURT:  Talk a little slower -- all right? -- for

21   the court reporter and for me as well.

22        MS. KAISER:  So as I mentioned, vulnerabilities in

23   the BMD system -- were they known to the State.  Problems with

24   implementation and the rollout of the BMD system.  And, you

25   know, a range of issues around that.  The use of removable

```
 1   media devices.

 2          You know, we have a set of fairly extensive requests

 3   for production.  That said, we have tried to narrow that by

 4   negotiating a set of reasonable search terms and a set of

 5   reasonable custodians.  The State has agreed to that set of

 6   search terms twice and then came back and said, oh, no, never

 7   mind, we're not going to review the documents that hit upon the

 8   agreed-upon search terms.

 9          When they proposed revisions to the search terms, we

10   agreed to all of them.  And at this point, they have come to

11   the Court asking for relief.  We're not clear --

12                    (Electronic interference)

13          MS. KAISER:  Yes.  So as I was saying at this point,

14   the State defendants have come to the Court seeking relief in

15   terms of the document requests and search terms.  But we aren't

16   clear on what relief they are actually seeking because they

17   have not proposed any alternative search terms or revisions to

18   the search terms.  We, frankly, don't know what they are asking

19   for at this point.

20          MR. MILLER:  Your Honor, if I may, just briefly here,

21   you know, heard discussion of known vulnerabilities and

22   implementation problems and use of removable media devices.

23   Frankly, the plaintiffs already possess thousands of pages of

24   documents that go through instructions to counties as to what

25   they are supposed to do, Dominion operation manuals as to how
```

```
1    the equipment works, hash verification testing for each item of
2    equipment.  All these things the State defendants produced in
3    advance of the preliminary injunction hearing last September.
4           In terms of the narrowing of the search terms issue,
5    Your Honor, frankly each time we proposed narrowing, it becomes
6    a cat and mouse game.  As we expressed in our joint discovery
7    statement, you know, our attempts to try and quickly propose
8    revised search terms that we still felt were too broad and that
9    we offered explicitly acknowledging that further revisions
10   would be needed, we were met back with re-expanding the terms.
11          And each time the search term discussion has come up,
12   that is exactly how it is played out.  We offer something.  The
13   terms are proposed to be expanded by the plaintiffs.  Even if
14   you go as far back as December of last year, you know, the
15   initial set of terms that the plaintiffs provided to us is
16   nearly 100 terms and numerous custodians that we don't have
17   control over.
18          You know, Your Honor, that --
19          THE COURT:  But I -- the thing with it I don't
20   understand is I have read your correspondence -- the
21   correspondence in the past.  I mean, it is clear that Mr. Tyson
22   said we are going to need to narrow it and then the plaintiffs'
23   counsel then said -- Mr. Cross said, okay, it is agreeable.  I
24   mean, after a little bit of fussing words.  But, nevertheless,
25   he said that Mr. Tyson's proposal for a more limited -- for the
```

```
1    particularized limited search was acceptable.

2            So that is why I'm confused.  I don't -- I'm not

3    going to go back to what happened in December.  I mean, I'm

4    just looking at this correspondence.  And there did seem to be

5    an absolute agreement, frankly, Mr. Miller, until then you

6    piped in after Mr. Tyson's agreement was on behalf of the State

7    with plaintiffs' counsel and you said -- and then there is a

8    lot between you at that juncture.

9            But if there was -- I don't understand what -- why

10   that agreement didn't hold.  Now, it may have been that it was

11   going to take -- some of the fuss that happened then in the

12   conversation is how long it will be and the relationship of the

13   information to whatever was produced in Fair Fight, et cetera,

14   et cetera.

15           But I just -- but there was an agreement about search

16   terms.  So I don't know why I'm being asked to look at search

17   terms again since there was an agreement.

18           MR. MILLER:  Your Honor, I think the issue becomes

19   that -- and you touched on it there briefly -- is that in order

20   for us to get through, you know, what started at 300,000

21   potential emails, now down to 100,000 -- we're looking at the

22   extended discovery period that does not appear to be consistent

23   with the abbreviated discovery that you ordered, Your Honor.

24           And with respect to the timing, you know, frankly,

25   the email cache was so large that by the time we were able to
```

1    download it, put it back on to our E-discovery server

2    consistent with the metadata requirements that the plaintiffs

3    have insisted on before but not reflected in their most recent

4    production -- you know, by the time we got to that and then

5    looked at the documents and realized the breadth and the -- the

6    wholly unrelated emails that were being captured, we didn't

7    believe it was consistent with getting to summary judgment

8    quickly, not consistent with abbreviated discovery, and not

9    consistent with the needs of this case -- the status of this

10   case as it stands.

11          And, Your Honor, not to broaden the issue too much,

12   but frankly a decent portion of this kind of circles back to

13   our continued waiting game on receiving any document production

14   from the plaintiffs.

15          And, Your Honor, you did mention Fair Fight.  We have

16   produced -- after Mr. Cross asked for them, we queued up and

17   reviewed and produced documents that were identified as

18   relevant that were produced in Fair Fight.

19          MS. KAISER:  Your Honor, if I could make just a

20   couple of points.

21          THE COURT:  Uh-huh (affirmative).

22          MS. KAISER:  At this point, if we're down to 100,000

23   documents, that is something that the State could have reviewed

24   and produced at this point.  You know, we have been spending --

25   we have spent almost two months fighting over the search terms

1   at this point, unbeknownst to the Curling plaintiffs for large

2   portions of that time.  In two months, they could have reviewed

3   100,000 documents.

4           But at the end of the day, that is not that many

5   documents to get through with a reasonable team of contract

6   attorneys.  I think we have all been involved in discovery

7   projects that were much larger in scope than that.

8           The second point is that, you know, constant trying

9   to condition their production of any documents on our

10  production of documents is -- it is just -- it is

11  inappropriate.  And at this point, I mean, we're talking about

12  very differently situated parties here.  And frankly --

13          THE COURT:  All right.  I don't need to hear that.  I

14  mean, I'm going to hear it separately if there is a problem.

15  But I'm not going to go back and forth about what one party has

16  versus another.  But I mean, I will definitely hear it if there

17  is some problem that you have failed to produce.

18          But I want to sort of sort out what happened here

19  first before going further.  Because I mean, that is -- I mean,

20  it just muddies the water to try to combine them all.

21          MR. MILLER:  Sure.  Your Honor, I'll leave the

22  Curling plaintiff document production to the side for the

23  moment.  Although I do believe it is something that needs to be

24  addressed.

25          But just in terms of how this came to a head is

1   really a timing issue that, frankly, coincided with the first

2   meet-and-confer that we held on this topic.  It was the same

3   day that -- and during the conference was while the plaintiffs

4   moved to extend the schedule based on the defendants'

5   nonfeasance.

6           You know, frankly, in order to make this consistent

7   with what we believe Your Honor envisioned on abbreviated

8   discovery and approaching summary judgment quickly, we fail to

9   see how these 100,000 emails, many of which are just wholly

10  irrelevant, are going to advance the case or -- and certainly

11  not advance the case beyond discussion of vulnerabilities and

12  items which we maintain that do not confer standing to the

13  plaintiffs.

14          MR. CROSS:  Your Honor, this is David Cross.  If I

15  could add one thing just to respond to that point.

16          Mr. Miller is referring to about documents we already

17  have.  We have very, very few internal emails from the State.

18  So what he is talking about are, you know, policy documents or

19  guidelines or guidebooks for using the equipment.

20          And I'll give you one example of why the emails are

21  critically important.  You will recall that they took the

22  position that they had air gapped the new system, the BMD

23  system when they implemented it from the old system.  And they

24  took the position repeatedly that there was no crossover

25  contamination, no interaction of data or equipment between the

1    two systems.

2          We then received some emails from Dominion.  One of

3    those emails, as Your Honor might recall from the preliminary

4    injunction hearing last fall, was one from Michael Barnes to

5    the counties saying just continue to use the USB drives that

6    you have with the old GEMS system -- continue to use those with

7    the new BMD Dominion system.

8          That is not an email that we have ever received from

9    the State.  The only reason we have it is because Dominion

10   produced it.  And it is just an example of why the emails

11   themselves are critically important.  Because the State wants

12   to stand on practices and guidelines and policies.

13         But what is important is whether those practices,

14   policies, and guidelines are actually applied, whether they are

15   adhered to, and whether they are accurate in terms of the

16   day-to-day practice of the people who are managing the election

17   system.

18         And we have seen on a number of occasions that they

19   are not.  And so we need to get the emails that we have asked

20   for.  And so I'll just make that point on the relevance in

21   terms of what we're looking for and why it is important.

22         MR. MILLER:  Your Honor, if I may just briefly.

23         THE COURT:  Yes.  But you can also tell me --

24         MR. MILLER:  I apologize.

25         THE COURT:  -- how long it is going to take -- that's

1    all right.  But tell me also how long it is going to take for

2    these projected 100,000 documents --

3              MR. MILLER:  Your Honor --

4              THE COURT:  -- if you produce them on a rolling

5    basis.

6              MR. MILLER:  Right.  And certainly, Your Honor, we

7    could produce them on a rolling basis.

8              Based off of our estimation, five minutes of review

9    per document -- now, that also is including baked-in time for

10   quality control and preparing the production, et cetera -- we

11   anticipate we're looking at about 20 weeks with 10 attorneys

12   doing this 40 hours a week -- doing only this 40 hours a week

13   in terms of timeline.

14             And, Your Honor, I do want to just say briefly, you

15   know, as far as the email that Mr. Cross is referring to, first

16   of all, Your Honor may also recall that that is hearsay.

17   Nobody testified as to that document.  And a lot extrapolations

18   were made as to what that document said.  It was a one-sentence

19   email.  It wasn't, to put it generously, not as explicit as Mr.

20   Cross describes it.

21             Separately though, you know, even still -- we're

22   still back here talking about the vulnerabilities issue.  And I

23   recognize, you know, Your Honor, we don't want to continue to

24   beat a dead horse on the topic.  But when looking at the

25   discovery, which is consistent with Rule 26 and proportional to

1  the needs of the case, we're left at a point of trying to

2  figure out where exactly these proposed documents, you know,

3  get to.

4           THE COURT:  Well, I understand.  I understand

5  completely.  And that is the thing.  The whole point was to be

6  able to actually look at that on a summary judgment basis.  And

7  the thing about it is though it is -- some of the

8  State's arguments I understand about things you don't want to

9  do.  But this one, which seems, you know -- you are saying 40

10 weeks.  I mean, that is what you said for 300,000 documents.

11 So I don't understand it.

12          MR. MILLER:  20 weeks.

13          THE COURT:  20.  I'm sorry.  Then I misunderstood.

14 But 20 weeks is still -- I mean, these are not likely prolific

15 writers and lengthy.  It is not like we are dealing in a world

16 where people are writing multiple page memos to each other.

17          MR. MILLER:  But, Your Honor, I do -- I think that is

18 correct in terms of the kind of length of the emails.  But also

19 I do want to just reiterate:  A significant portion of these

20 documents are just entirely irrelevant.  So I mean, we're going

21 to be reviewing through them because they have been identified

22 by search terms.

23          But there's -- I can say confidently there are not

24 100,000 documents that are actually responsive or relevant to

25 the case.

```
1            THE COURT:  Right.  And, you know, you have another
2   alternative, which is simply produce things that are irrelevant
3   as well.  I mean, you know, basically say this is a data dump.
4   You want it.  So here it is.  You know, and just only be
5   looking for something that would suggest there was an
6   attorney-client privilege or work product.  I mean, that -- I
7   mean, that is the simplest way of proceeding at this point.
8            Because you may be right that they are completely
9   irrelevant.  But I have -- if it is going to take that much
10  longer and we're all trying to get this done, that was the --
11  that is the simplest way of dealing with that.
12           I mean, it is one thing for privilege.  But if it is
13  just irrelevant, all right, they are irrelevant.  And that
14  happens.  We all have seen discovery produced that basically is
15  not helpful to the other side.
16           You know, maybe it is tangential, it has some word
17  that that is what it is.  But I am not in a position to
18  second-guess it either way.  So -- but it did seem to me
19  originally that there was -- it wasn't a question of relevance.
20  It was the question of burdensomeness that you raised that was
21  not raised merely before, other than Mr. Tyson having first
22  agreed to it and then later on trying to cull it back and
23  then -- which Mr. Cross agreed to.
24           So then we get wave three after that, which is really
25  the genuine we're not doing it because it is burdensome, which
```

1    wasn't really being said before.  So I just -- this seems

2    solvable.  Just shift the burden to the plaintiff then.

3             MR. MILLER:  Your Honor, if that is how the Court

4    would like us to proceed, that is how we will proceed.  You

5    know, the one thing that I am going to note, without trying to

6    start a new argument, is that we certainly know that these fees

7    and expenses of the Curling plaintiffs will be presented in an

8    attorneys' fees bill later this year, you know, for a document

9    production.

10            But, Your Honor, if the Court would like us to

11   proceed, then so be it.

12            THE COURT:  Well, I'm just sort of suggesting that

13   that is one way of resolving the time issue.  I don't know

14   what -- I haven't heard from plaintiffs' counsel about that.

15   But --

16            MS. KAISER:  Your Honor, this is Mary Kaiser.  We're

17   fine with that, if they just want to review the documents for

18   privilege.  I think that would be an expeditious way to move

19   forward.

20            THE COURT:  Okay.

21            MR. MILLER:  Your Honor, one issue I do want to

22   flag -- and, frankly, this came about in the Fair Fight case as

23   well.  But I think the responsiveness of these is going to be

24   required to some extent for a couple of reasons.  The first of

25   which is, if we're deeming them all responsive, then we may end

1    up with wholly unrelated documents on a privilege log, which is

2    an issue we went through on Fair Fight where we took that

3    approach.  And then second is that one thing that will have to

4    be reviewed, particularly in light of this case, is designation

5    under the protective order, which, Your Honor, frankly the

6    State defendants have tried not to overdesignate.  But the

7    reality that is here and the nature of this case and the nature

8    of the cases that came out of the 2020 elections is certainly a

9    heightened concern of our client.

10            MS. KAISER:  Your Honor, we would be okay with them

11   producing everything as AEO under the protective order, and

12   then we could come back and look at a subset of documents from

13   the perspective of confidentiality after the fact.

14            THE COURT:  All right.

15            MR. McGUIRE:  Just on behalf of the Coalition

16   plaintiffs, I don't think we -- we would not consent to that

17   blanket designation as AEO.  We just don't have the legal team

18   to do that.  We need to be able to have, you know, staff and

19   folks look at things that are on a confidential basis, not AEO.

20            COURT REPORTER:  I'm sorry.  Was that Mr. McGuire?

21            MR. McGUIRE:  I'm sorry.  Yes, it was.  Apologies.

22            THE COURT:  Well, it is a time issue obviously.  I

23   mean, maybe there is some very -- a way of getting some of this

24   out now that the State feels comfortable after having done a

25   work product and attorney-client privilege review of saying,

1    all right, these -- we can just dump these now, and there is

2    not going to be a -- there is not a sensitivity issue here that

3    we need to assert.

4              But I don't -- otherwise you are just basically stuck

5    with their doing it and you are waiting a longer period of

6    time.

7              I think if we had a better sense -- if I had a better

8    sense of what the documents were, it would be easier in terms

9    of subject matter.  And, you know, I think that all of -- if

10   you could see the documents produced and maybe your

11   spreadsheet -- the spreadsheet the State has identifies that

12   and then you could be able to eyeball that, that would be one

13   way of proceeding.  But it is hard for me without knowing what

14   the documents are.

15             Has there been a production of what the documents are

16   that they came up with in the search?

17             MR. MILLER:  Your Honor, this is Carey Miller.  We

18   have not produced any documents out of this search while we

19   were awaiting resolution of the discovery dispute.  I have

20   reviewed sample sets of the documents.

21             You know, one thing the Court should be aware of is

22   the starting point where we were is there were certain

23   custodians whose 80 percent of their email inbox was captured

24   as responsive.

25             What we found in Fair Fight, which is the closest

1    analogy to this, is we were coming across documents that were

2    about candidate qualification, certificates for a certified

3    copy of legislation.  You know, all these kind of nonelection

4    items that come in and out of the Secretary's office just in

5    terms of a look at a sense of the documents.

6              As far as the substantive policies, you know, again

7    not to circle back entirely, but that is something that the

8    plaintiffs already possess.

9              THE COURT:  Well, I guess what I was asking about was

10   did your program identify what the documents were so that even

11   in eyeballing them we would be able to -- or did you have to

12   look at the documents to know what they were about?

13             I'm just trying to figure out what was loaded up and

14   what was identified --

15             MR. MILLER:  I see.

16             THE COURT:  -- so that you can get a sense of which

17   ones or what body of them were not going to raise sensitivity

18   issues so that you could deal with the Coalition concerns.

19             MR. MILLER:  And, Your Honor, we have -- in our

20   discovery platform, I can look at the email subject line, who

21   is on it, when it was sent, and then a title of documents that

22   are attached to it.

23             You know, in terms of looking at it for substance,

24   whether it is responsive and whether, say, the document

25   attached to it is one that will need to be designated, that is

1    not something we can necessarily see without looking at each

2    document.

3            The search terms kind of hit all over the place.

4    There are two in particular that are, you know, just on

5    multiple documents.  And there is little correlation between

6    what the search term was aimed to get at and what documents

7    have identified.

8            THE COURT:  Give me an example of that -- of a

9    word -- a search term that would produce basically nothing

10   helpful because it was so wide.

11           MR. MILLER:  Sure.  So, Your Honor, I don't have the

12   spreadsheet I sent earlier before.  But I would point to you

13   this -- any time these within or and is used rather than

14   within -- so, for instance, one of the terms includes election

15   or vote and review or analyze or examine or evaluate or study

16   or assess or test, you know -- and I should say vote is just

17   V-O-T with a root expander.  So anything that includes that

18   term in it and also includes something else is going to be

19   deemed as responsive.

20           You know, for instance, out of the Fair Fight

21   documents, some of the documents that hit on the terms from Mr.

22   Cross included personnel management forms that are routine

23   yearly reviews of individuals that are not substantive in terms

24   of, say, discussion of, you know, election day processes but

25   are, okay, an investigator from some other aspect of the

1   Secretary of State's office spent this many hours doing this,

2   the work product was okay, we recommend renewing for another

3   year term.

4           THE COURT:  Okay.  Well, I don't -- I don't really

5   know how to -- frankly for the Coalition how to address the

6   concerns you have.  I understand what they are.  But if we

7   really want to move with any speed, I -- it is still a lot of

8   documents.

9           If there was a way you could either suggest further

10  narrowing things or looking at their spreadsheets and saying,

11  well, maybe we can give up this -- otherwise it seems to me if

12  you want just simply the document dump basically free of the

13  privileged documents that -- I mean, that is the alternative.

14          MR. McGUIRE:  Your Honor, we --

15          THE COURT:  Or you could allocate that responsibility

16  to your co-counsel, and then -- and then you-all can sort it

17  out whether it really is privileged later.  But I mean, I can't

18  solve that.

19          MR. McGUIRE:  Apologies.  This is Robert McGuire.

20  Just on that note, I mean, part of what has hamstrung us on the

21  Coalition side is the fact that we have not been allowed to

22  select who we want to use as a sort of in-house expert.  That

23  is the executive director of the Coalition.  And she has been

24  excluded from -- Marilyn Marks has been excluded from

25  attorneys' eyes only designation.

1          So if we could have an exception to that, that would

2     permit us to deal with this in a way that we can't do it if it

3     is AEO because then we just -- we have two one-man law firms

4     that are lead counsel on our side.

5          THE COURT:  I understand.  And I understand the

6     executive director is highly knowledgeable.  But I mean, the

7     thing is I think the sense of -- the sensitivity to the

8     obligations of the Court are not there for somebody who is in

9     her capacity.  That is my concern.

10          I understand that is what you would like, and I

11     completely appreciate that.  There may be still -- all I'm

12     suggesting is that there may be a whole body of documents that

13     are not, in fact, legitimately -- should be attorneys' eyes

14     only or under some less than attorneys' eyes only standard of

15     review.

16          And the first pass of it could be done by the Curling

17     counsel team and whatever paralegals they have and then -- and

18     some of this could be worked out, or else you can ask the State

19     to do it and just look at more months.  I don't know how

20     valuable this stuff is.  I understand there is a thought that

21     it is valuable.

22          You know, here is the basic thing from my

23     perspective.  I felt like it was understandable that you wanted

24     to make the record that was more on the up-to-date record of

25     why you thought all these basically would -- likely that you

1   had a claim, that you could show injury, and that you have

2   standing, which is, of course, understandable at this juncture

3   because it has been the overall mantra of the State.  And I

4   would like to get that done sooner than later as well.

5           So I have allowed some -- you some -- that is why I

6   said I would allow expedited discovery.  But I think you're

7   going to have to go offline to consider my suggestions.  I

8   don't know.

9           The spreadsheet that is being discussed -- I don't

10  have that spreadsheet.  So if you-all have shared that

11  spreadsheet, maybe you can make more -- better use of it than I

12  can in trying to (unintelligible) of it.  But I can't do better

13  than that.

14          I think they can either give the stuff to you and

15  weed it out of privilege and you go forward and then try to as

16  a collective team decide how you are going to divide it and go

17  back to the protection issues.  But I -- or do something else

18  with the benefit of the spreadsheet.  But I can't weed that

19  out.

20          I have given you my suggestion.  I'm willing to give

21  some type of extension so you can look at the material.  I

22  don't know that it has anything fruitful or not.  It is hard

23  for me to know, to say the least.

24          MR. McGUIRE:  Your Honor, this is Rob McGuire.  I'm

25  sorry.  This is Rob McGuire.

1           From our perspective, we certainly appreciate that

2    you are giving us options that might be workable.  From our

3    perspective, we would prefer delay over being excluded from

4    being able to do our own review of the documents.

5           We have certainly been getting along with our

6    co-plaintiffs, the Curling group.  But it hasn't always been

7    the case in this case.  And we did retain separate approaches

8    to the litigation.  We're looking for separate things.  And so

9    what they might consider to be important is not necessarily

10   what we would consider to be important and vice versa.

11          So from our perspective, if the choices were to allow

12   Curling to certainly be the gatekeeper of the production before

13   we could have our team review it or delay, we would appreciate

14   an extension to allow us to do our own review of the documents.

15   That would be our position.

16               THE COURT:  Well, the thing is --

17               MR. MILLER:  Your Honor --

18               THE COURT:  -- 20 weeks is a lot.

19          Who is speaking now?

20               MR. MILLER:  I apologize.  This is Carey Miller.  I

21   don't want to interject.  But I did want to pose a question to

22   Rob on --

23          Rob, I understood from the last production you guys

24   are using an E-discovery platform now that should be capable of

25   identifying the designated documents or undesignated ones.

```
1              MR. BROWN:  Yeah.  This is Bruce Brown.  I have an
2      electronic discovery platform that we used to produce
3      documents.  I'm sure it is not as good as yours, Mr. Miller.
4      But it is not cheap.
5              I think where I was -- and this is still Mr. Brown --
6      where I was a little bit confused was:  On the data dump
7      alternative, was the thinking that the State would just
8      automatically designate all of those documents attorneys' eyes
9      only or was it maybe to do that to documents that really are,
10     you know, off the charts confidential but the rest of them --
11     most of them or nearly all of them would be confidential?
12             That makes a crucial difference for us in terms of
13     our ability to review them.
14             THE COURT:  Well, I'm going to let State's counsel
15     respond.
16             Mr. Miller?
17             MR. MILLER:  Your Honor, I think just in terms of the
18     process that you are discussing here in terms of just as
19     quickly as possible producing them that the State's position
20     would be a preference to producing them as attorneys' eyes
21     only.  And, of course, you know, if there are documents that
22     are not identified or, you know, alternatively we can identify
23     them as we go, it shouldn't -- I guess one thing that occurs to
24     me is I don't think designating under a confidentiality or
25     protective order of confidential or AEO is going to be what
```

 1  slows the process up, as much as it is just the size of the
 2  documents we're talking about here.
 3          And, Your Honor, I do want to point out, you know,
 4  there has been discussion previously in this case about, you
 5  know, whether the State has overdesignated.  Your Honor, I will
 6  say as an officer of the Court that has never been our
 7  intention.  We have always examined them with that intention.
 8  And whenever an issue was brought to us, we have always, you
 9  know, worked to redesignate it as we did in an expedited period
10  last year.
11          However, I also think it is relevant to point out
12  though that in the Curling plaintiffs' production that they did
13  last Friday there were 57 documents and about 50 of them were
14  designated as attorneys' eyes only and the remainder were all
15  designated confidential.
16          These are, again, emails.  Frankly, Your Honor, some
17  of the emails raised the specter of a sanctionable issue that
18  there is unknown reasons why they weren't produced to us last
19  year.  And they are responsive to the same single email chain
20  that was produced in advance of the PI hearing.
21          I don't want to get far astray from the topic here.
22  But in terms of -- when we are talking about the designation
23  issue, I do want to make sure the Court is fully aware as to
24  what is going on here.
25          MR. CROSS:  Your Honor, this is David Cross.  If the

```
 1   State has an issue with our production, they should raise it
 2   with us.  We'll meet and confer, and we'll resolve it.  This is
 3   not the time or place and certainly not -- it is not
 4   appropriate to keep going around sanctions.
 5          We did want to ask of you, Your Honor -- Ms. Kaiser
 6   was going to go back to the issue about a production deadline.
 7          MS. KAISER:  Your Honor, we think it is -- if the
 8   Court could set a 30-day deadline for the document production.
 9   At that point, the State could decide whether they want to
10   pursue a document dump or do a responsiveness review.
11          If we're really talking about 100,000 emails, we
12   think that is something the State could easily get through in
13   30 days.  The average takes a minute or less to review, not
14   five minutes that the State is suggesting.
15          So we think 30 days is enough time for them to get a
16   responsiveness review done if they would like to do that.
17   Otherwise, like we said, we're comfortable moving forward with
18   the review of just seeking privileged information and the
19   designation as AEO.  But the State has the choice.  But that
20   would allow us to move the case forward.
21          MR. MILLER:  Your Honor, in terms of time frame, I do
22   want to note that unlike before when we were discussing this,
23   we're not flying blind here.  We just produced 2500 or so
24   documents last week that were Fair Fight documents that had
25   already been produced and where the sole review was for purpose
```

1   of relevance to the claims and defenses at issue here.

2           That review took a team of -- I think we had about

3   eight to ten attorneys reviewing them.  It took us the entirety

4   of a week.

5           So I don't want Your Honor to think that I'm pulling

6   numbers out of thin air.  You know, this is something we just

7   did and, frankly, with a set of documents that are less

8   sensitive and quicker to work through.

9           THE COURT:  Okay.  Well, I can see what the issues

10  are.  And because I have a sentencing hearing at 2:30 and I'm

11  not -- not in the courthouse, I'm going to -- my sort of time

12  to terminate this will be at roughly 2:00.  So you-all, I

13  think, will end up having to resume as it is when I'm through

14  with the sentencing hearing.

15          So let's just move on.  And that will give all

16  counsel an opportunity -- plaintiffs' counsel to reach any

17  other resolution of this particular issue as well as State's

18  counsel to talk about your solidifying that.  Because I would

19  need to have an actual date.  And 20 weeks seems very long.

20          Or you may just decide that your position is you

21  would just likely shift it over -- do the one -- one review for

22  privilege issues and tell me how long that is going to take and

23  that that is your desire.  And that is perfectly satisfactory.

24  But then tell me what -- exactly how long that is going to

25  take.

1           But I'll give you -- you'll have -- when I'm in the

2      criminal sentencing, you can make your -- sort of look at that

3      issue together -- I mean, defense counsel by yourselves.  Of

4      course, you are welcome to call the other side as well.

5           So -- well, relative to document production in terms

6      of the State's production, is that all of -- does that

7      basically capture the issues?

8           MR. MILLER:  Your Honor --

9           THE COURT:  Is there something else I didn't -- is

10     there something else on production issues as to documents that

11     I haven't mentioned?

12          MS. KAISER:  Your Honor, this is Mary Kaiser.  One

13     thing that we are learning for the first time today is that

14     these are only emails that have been included in the search

15     term review.  We thought that the State was running our search

16     terms against all electronic documents, not just emails.

17          So if that is not the case, then we want to know why

18     they have not produced other types of electronic documents that

19     are not emails or if they are planning to run search terms

20     against other types of documents.

21          MR. MILLER:  Your Honor, that is correct.  These are

22     only emails, which I think we've mentioned multiple times on

23     conferences and in email.  If that is mistaken, I apologize.

24     But I know we have discussed this issue.

25          You know, in terms of documents that were to exist on

1    internal servers, we can certainly run the terms against them

2    but it will be another 100,000 documents at least.

3    Alternatively, we are searching for any documents that we need

4    to supplement our prior production from.

5           But as far as, you know, official policies and, you

6    know, official documents that exist within the Secretary of

7    State's servers, the plaintiffs have those.  Those were

8    produced in advance of the September preliminary injunction

9    hearing.

10          MR. McGUIRE:  Your Honor, this is Robert McGuire.

11   From our perspective -- Coalition perspective, there are some

12   other documents that are outstanding.  There are a number of

13   election project files from counties from the November and

14   January elections, which is -- election project files are the

15   new term for what used to be the GEMS database.  It has got all

16   the images and tabulation details for those elections.

17          And the counties are required to produce those to

18   the -- get those to the State.  The State hasn't produced them

19   I think in their recent productions to us.  So we are still

20   going through what they have produced.

21          But our understanding right now is that they are

22   incomplete.  So we haven't raised this issue, I don't believe,

23   yet.  But it is something I want to make you aware of so that

24   no one walks away thinking that the emails are the only thing

25   that we are waiting on in discovery.

1          MR. MILLER:  Your Honor, just briefly.  The project

2    packages first really came up in the midst of our prior

3    discovery conference on June the 2nd.  We immediately turned

4    around and produced all project packages that were in our

5    client's possession for the November '20 and January '21

6    elections within a week.  Those were produced on June 11.  It

7    is 564 gigabytes of the packages that we have.  Whatever the

8    Secretary of State possesses, it has been produced to the

9    plaintiffs.

10          MR. McGUIRE:  Your Honor, our understanding is that

11   possession, custody, and control is that it includes documents

12   that a party is legally entitled to obtain.  And these are --

13   these are documents that the State is actually required to be

14   provided by the counties.  The State certainly is entitled to

15   obtain them.

16          And if they didn't have them, then fair enough.  But

17   they are entitled to obtain them, and they should be produced

18   because they are responsive.  So that's one of the things that

19   we're still waiting on.

20          MR. MILLER:  I may be incorrect here, and I'll let

21   Mr. Tyson correct me if I am.  But I believe the main issue on

22   the missing packages was with Fulton, who is also a defendant

23   in this case.

24          I thought that it had been resolved.  But I may be --

25   I may have a misunderstanding there.  There has been a lot of

1    emails.

2            MR. TYSON:  Your Honor, this is Bryan Tyson.  Yes.

3    So we have produced -- I think we located the Fulton November

4    files, which were the ones that were -- the plaintiff had been

5    asking about.

6            And in terms of kind of the collection of these files

7    otherwise, I mean, if we're going to go to the counties and get

8    these -- and we did this last time with the GEMS databases as

9    the Court required us to do -- that required pulling Secretary

10   of State staff out to each of the counties to do this.  It is a

11   process we have to go through.  And the State would not

12   typically go back and recheck what the county sent.

13           So, historically, there has been kind of no reason

14   for them to go back and get it.  If the Court wants us to do

15   that, that is fine.  The plaintiff has known though for months

16   now that we were only going to produce what we had, that it was

17   going to be incomplete, and that they were free to go to the

18   counties directly to get this information.  And they have

19   chosen not to do that.  We advised them at the outset that

20   would be a more efficient process.

21           So they have chosen to pursue them this way.  And if

22   the Court wants us to work on that, we will.  But, again, we're

23   in the realm of vulnerabilities, not actual hacking.  And so we

24   can continue to produce hundreds more databases if we need to,

25   I guess.

```
1              THE COURT:  Does counsel want -- does plaintiffs'
2    counsel want to respond to that?
3              MR. McGUIRE:  Well, just, Your Honor, we --
4    vulnerabilities overlaps with people being deprived of their
5    votes obviously if we're looking at past elections.  If there
6    are irregularities in a precinct where we have a -- the
7    Coalition has a member, then that would be -- that makes
8    standing.  That would be supporting our standing.  So it would
9    be something we would -- certainly given that their main attack
10   is our standing, that is something that obviously would be
11   central to us being able to refute that.
12             And we have many counties that are missing.  We
13   can -- I guess we -- if the Court wants us to go to the
14   counties, we can do that.  Typically the way that happens is
15   then we have got a bunch of new parties coming in and
16   objecting.  And the Secretary behind the scenes has frequently
17   asked counties not to respond to us when we go to them.  We
18   have to go through Open Records.  We have to subpoena them.
19             And it seems pretty inefficient if we are all trying
20   to get this thing sort of moving forward efficiently for us to
21   have to go and do that in a decentralized way when the
22   Secretary is lawfully required to have those things from the
23   counties.  The counties are required to provide them.
24             So from our perspective --
25             THE COURT:  Well, let me ask you this.  I'm kind of
```

```
 1    confused.  I don't remember this issue being -- was this issue
 2    teed up for me before this conference?
 3              MR. McGUIRE:  No.
 4              MR. MILLER:  No, Your Honor.
 5              MR. McGUIRE:  No, I don't believe it has been.  In
 6    fact, the only reason I raised it, as I mentioned earlier, is I
 7    don't want to leave the misimpression that the only thing we
 8    are --
 9              THE COURT:  All right.  All right.  Well, I need
10    you-all to sort this out.  You have got so much -- you have so
11    much at this point that I can't -- I think I can only resolve
12    the immediate things that are in front of me, not something
13    that isn't yet there.
14              And I think anything I do resolve helps you think
15    about how better to do it for the future.  I mean, I understand
16    the problems about going to all the different counties.  But it
17    doesn't mean -- I mean, also on the other hand really not
18    making this -- if you are planning to go to the State at the
19    same time you want them to be looking at all these documents,
20    you need to prioritize it and decide which counties you really
21    want the data for.  Not everything.
22              So I don't -- but that is my thought.  But I -- you
23    know, I haven't been involved.  But to think about all of the
24    counties would be very difficult.
25              So let me just move on.  Another issue was I thought
```

36

1    the question of the State wanted to be able to share

2    Dr. Halderman's report with Dominion personnel.

3              Is that right?  Is that posed or not?

4              MR. MILLER:  That's correct, Your Honor.

5              THE COURT:  And the plaintiffs have objected and

6    point out that Dominion is not basically an expert witness

7    here.  But -- and that it -- I gather that you have viewed

8    everything they have produced as being attorneys' eyes only at

9    this point.

10             Since the State itself has at various times been very

11   concerned about producing information that was sensitive about

12   the election without it being cloaked as attorneys' eyes only

13   or highly confidential material, why wouldn't the concerns

14   raised by the plaintiffs be reasonable?

15             Because obviously, I mean, there are -- there might

16   be subject issues that you could discuss with them because of

17   what is being litigated without providing the actual memorandum

18   from Dr. Halderman.

19             MR. MILLER:  Your Honor, as a starting point, of

20   course, this is equipment that Dominion has manufactured, that

21   Dominion obtained certification from the EAC, that Dominion

22   produces, and that Dominion provides in the State pursuant to a

23   contract for the statewide voting system.  So we're in a bit of

24   a unique situation where Dominion is an agent of our client.

25             And then, of course, Dominion also possesses the

1   expertise to look at this.  You know, I think at the joint

2   discovery statement, the plaintiffs suggested that we wanted

3   carte blanche disclosure to everyone at Dominion, which is not

4   the case.  We intended to identify individuals.

5          However, we're in a bit of a bind because, frankly,

6   Dr. Coomer is not as willing to participate voluntarily in this

7   case as he was last year.  And so that is just an

8   identification of individuals at Dominion who would then be

9   even in a consulting expert type role or as an agent of our

10  client.

11         In that situation, you know, there is a statement

12  referred to in the Law Governing Lawyers explicitly provides

13  for confidential agent communications.  And the concept that we

14  would consent to a carte blanche waiver of anything regarding

15  the review of those documents at the front end is a little

16  jarring, to be honest.

17         Of course, we expect that at some point along the way

18  I'm sure plaintiffs would move to compel certain issues and

19  state that it is work product or fact work product that they

20  can overcome the burden for.

21         But at this point, the State is not in a position to

22  just carte blanche waive work product protection and privileged

23  communication protection at the front end.

24         THE COURT:  Well, I'm a little confused.  Waive it

25  for yourselves or waive it because they are the -- right now it

1    is the plaintiffs who are asserting work product?  So that is

2    what I'm trying to understand what you are --

3           MR. MILLER:  Your Honor, so the issue is whether

4    Dominion can review the expert report of Dr. Halderman --

5           THE COURT:  Right.

6           MR. MILLER:  -- and provide its opinions and

7    expertise in that realm.  We're in a unique situation because,

8    again, the attorneys' eyes only designation and where Dominion

9    is in a bit of a hybrid role as an expert in this case on

10   numerous occasions on different topics but also as an agent of

11   our client.

12          So the issue isn't discovering work product of

13   Dr. Halderman.  The issue is that:  In order for the plaintiff

14   to consent to our designation of Dominion under the AEO -- as

15   able to view attorneys' eyes only material, the plaintiffs

16   asked for basically waiver of any privilege over that review.

17          MR. CROSS:  Your Honor, this is David Cross.  That is

18   not quite right.

19          We're not asking for waiver.  There is no applicable

20   privilege.  Let's just be clear.  Dominion is a third party

21   here.  They have not -- no one from Dominion has been

22   designated as an expert by the State.  The deadline to do that

23   has long since passed.  They had an opportunity.

24          They previously relied on Dr. Coomer as an expert.

25   They chose not to designate an expert from Dominion.  It is too

1    late to do that now.

2          And they also -- the claim that Dominion is their

3    agent is a complete reversal of where they have been

4    historically in this case.  We first asked the State some time

5    ago to produce documents from Dominion, to coordinate with

6    Dominion to produce relevant documents in our case.  And their

7    position was Dominion is not their agent.  They have no control

8    over Dominion.  Dominion is an independent institute, a third

9    party.  And we had to serve a subpoena on them, which we did.

10   And they cooperated last year in producing a lot of documents,

11   including many emails that they had with the State that the

12   State has never produced.

13         So they have now done a reversal of course because

14   they now want to claim privilege over communications with

15   Dominion.  And what they are saying is that they don't have

16   anyone at the State on their staff or in their IT department or

17   among their experts, including Juan Gilbert, and telling this

18   Court that there is no one available to them within the scope

19   of privilege who can look at Dr. Halderman's report and respond

20   to the many serious vulnerabilities he has identified.

21         That is troubling in a variety of ways but also just

22   isn't accurate.  They have put Dr. Gilbert forth in this case

23   as an expert on the security of BMD systems.  He has addressed

24   it in live testimony and in his declarations.

25         They are simply choosing not to allow him to examine

```
 1    any equipment.  I don't know why.  But that has been their

 2    position throughout this case, as Your Honor will recall.  They

 3    have never allowed any of their experts to look at any of the

 4    equipment.

 5          That is their choice.  They are entitled to make that

 6    choice.  But they have to live with that.  They don't get to

 7    say, well, we're going to have a third party respond to

 8    Dr. Halderman's report, and we're going to keep our

 9    communications with that third party confidential so that we

10    can pick and choose what we share with plaintiffs and the

11    Court.

12          Because what that means is if Dominion says to the

13    State, Dr. Halderman is right about many of these

14    vulnerabilities and it is a serious problem, we will never hear

15    that, Your Honor.  It will be treated as privileged.  If they

16    say, well, there is one vulnerability and it is not a big deal

17    and we can fix it, you will hear that.

18          And that is not appropriate.  The Court should hear

19    and we should hear everything Dominion has to say about

20    Dr. Halderman's report, about the claims and defenses in this

21    case so that the Court has a complete and accurate record and

22    can make a decision that is right on the merits.

23          No one should be picking and choosing what Dominion

24    has to share with the Court or us.

25          MR. MILLER:  Your Honor, this gets back to the issue
```

1   of we're talking in hypotheticals here.  You know, the idea

2   that -- at no point were the State defendants anticipating

3   Dominion having a report or Dominion personnel having a report.

4   That is why they were not designated as a testifying expert.

5          That does not preclude anything regarding consulting

6   experts.  Never has.  And what confounds this issue is that

7   we're talking about hypothetically if Dominion were to say

8   this, that, or the other.  What occurs to me is it seems far

9   more workable that Dominion should be permitted to view AEO

10  material under the terms of the protective order.

11         It is arguable they can now because it is their

12  equipment and then evaluation of their equipment that is at

13  issue here.  And the discoverability of the issue is separate

14  and apart from that.

15         I'm sure at some point we will get a motion to compel

16  communications or subpoena for communications.  And at that

17  point, the Court can deal with the issue knowing what exactly

18  the communications are.

19         MR. CROSS:  Your Honor, I --

20         MR. McGUIRE:  Your Honor, this is Robert McGuire.

21         MR. CROSS:  I apologize.  But if I can just finish

22  real quick.

23         Your Honor, I agree with Mr. Miller that they're

24  separate issues.  He is right about that.  And I think it makes

25  sense to deal with this as separate issues.

1          So we should talk about whether there are terms in

2     which Dr. Halderman's report can go to Dominion.  Mr. McGuire

3     will obviously speak for his clients.  I think we are aligned

4     in the idea that it should go to Dominion and eventually should

5     be public.

6          Speaking for the Curling plaintiffs, we think that

7     there have to be specific parameters on that.  There are

8     specific ways to do that.  There is a short declaration from

9     Dr. Halderman we put in that talks about how these things are

10    typically handled.

11         The concern we have is Dominion has ongoing

12    litigation, including Mr. Coomer himself -- Dr. Coomer, I

13    should say, himself.  And there are folks on the other side of

14    that case who I think probably everybody on this call would

15    have concerns about Dr. Halderman's report reaching some of the

16    folks on the other side of that litigation.  And we have not

17    heard anything from the State as to how we could protect

18    against that.

19         Because as soon as Dr. Coomer receives it or anyone

20    at Dominion receives a copy of his report, it becomes

21    potentially discoverable in any litigation they have got.  And

22    certainly there are a few cases in front of some other judge.

23    So we have a --

24         MR. MILLER:  -- protected under the terms --

25              **(Unintelligible cross-talk)**

COURT REPORTER: I'm sorry. I can't take you both down at the same time.

MR. CROSS: And as to Your Honor's -- I guess to Mr. Miller's point, Your Honor's protective order is not going to be binding on a judge in another court, even a state court necessarily. Another judge can choose to do what they want regardless of the protective order Your Honor has entered here.

So we just -- we have serious concerns about the discoverability on that. We offered to work out parameters. I said to Mr. Tyson let's talk about parameters under which this report gets disclosed to Dominion. We can talk about who gets it, what the protections are in place, what are things we can do to prevent discovery in these other litigations, and let's talk about what sort of visibility this has into the communications.

And the response was absolutely not. We will not talk about it. We are entitled to disclose it to anyone we want at Dominion. We will choose who that is. We will not tell you who that is, and we will not share any communications with you. And that for us is a nonstarter.

THE COURT: All right.

MR. CROSS: And I guess just the last thing, Your Honor -- I'm sorry.

THE COURT: All right.

MR. CROSS: When Mr. Miller says they did not

1  anticipate needing anything from Dominion, that is hard to

2  understand.  They have known that Dr. Halderman was coming in

3  with a report.  Come and examined this equipment -- Dominion

4  equipment since last September.  We put in an overview -- a

5  high level summary declaration for Your Honor earlier.  Your

6  Honor set a deadline.

7         Everyone knew -- everyone knew what was coming from

8  Dr. Halderman.  And they chose not to get an expert from

9  Dominion.  It is too late to do that now.  We need to move

10  forward.

11         MR. MILLER:  Your Honor, this is Carey Miller.  Just

12  briefly.

13              **(Unintelligible cross-talk)**

14         MR. MILLER:  -- from Dominion.  We're not presenting

15  a report from Dominion.  They are not a testifying expert.  The

16  designation under the scheduling order is irrelevant.

17         MR. McGUIRE:  Your Honor, the Coalition -- this is

18  Robert McGuire.  The Coalition has its own position on this,

19  which is that the report ought to be minimally redacted and

20  made public.  And our concern with having it released to

21  Dominion even under the protective order is that there are

22  reporting obligations that Dominion as a manufacturer of voting

23  equipment is going to have once it becomes aware of a

24  vulnerability because this system is used in other states.  And

25  so once information is put in the hands of Dominion -- and, in

1    fact, I'm not sure if the Secretary of State doesn't have

2    obligations as well.  And from what we understand, this report

3    has not been shared with the client of opposing counsel.  The

4    Secretary of State's office doesn't know the details of it

5    either because it is AEO.

6            But once that -- once the report is handed outside of

7    attorneys to people who have reporting obligations, then the

8    Court's protective order is going to be at odds with those

9    lawful requirements that vulnerabilities be reported to, you

10   know, the EAC and probably authorities in other states where

11   the same equipment is being used.

12           So from our perspective, the best solution here would

13   be to have a minimally redacted version of the report filed and

14   the rest of it be made public so that certainly the Secretary

15   of State and his office can deal with the vulnerabilities

16   because they should not be kept in the dark about

17   vulnerabilities that are affecting elections going forward,

18   especially since there are major elections coming up I am

19   assuming with Fulton County.

20           So our position is that it should be made public with

21   minimal redactions, and that should be the solution to this.

22           THE COURT:  All right.  Well, we'll continue at 4:00

23   or 4:30.  Mr. Martin will send everybody a note when we can

24   envision getting close to finishing that hearing.  And we can

25   send you a note.

```
 1              All right.  We'll be on the same telephone line.
 2              MR. BROWN:  Thank you, Your Honor.
 3              THE COURT:  If there is something specifically that
 4    we haven't touched on from this, then I would appreciate -- I
 5    mean some major topic headings that we haven't addressed, it
 6    would be very helpful if you-all would just -- each side would
 7    simply put a bullet list of the items -- the major items --
 8    because I'm assuming there are lots of little items I'm not
 9    going to get to -- that we still need to discuss and send that
10    to Mr. Martin by 3:15.
11              All right?
12              MR. CROSS:  Thank you, Your Honor.
13              MR. TYSON:  Thank you, Your Honor.
14              THE COURT:  And please copy, as well, Ms. Cole.
15              Thank you.  All right.  Talk to you later.
16                   (The proceedings were thereby adjourned at 2:06
17                   P.M., and recommenced at 5:16 P.M., as
18                   follows:)
19              THE COURT:  Good afternoon once again.  This is Judge
20    Totenberg.
21              Harry, are you on the line?
22              COURTROOM DEPUTY CLERK:  Yes, ma'am.  I'm here.
23              THE COURT:  Okay.  Very good.  We had the collapse of
24    our conference phone call -- conference telephone.  That is
25    where we are now.
```

```
 1              Obviously our criminal proceeding went a lot longer
 2    than expected.  So my apologies to one and all.
 3              All right.  So clearly -- Mr. Martin, do you want to
 4    just check -- get a roll call so we can make sure everyone is
 5    here that needs to be and just wait until -- we keep on --
 6    since we keep on hearing more people calling in?
 7              COURTROOM DEPUTY CLERK:  All right.  Curling
 8    plaintiffs, who is on the line for -- representing the Curling
 9    plaintiffs?
10              MR. CROSS:  Hi, Mr. Martin.  This is David Cross at
11    Morrison & Foerster.
12              COURTROOM DEPUTY CLERK:  Anyone else?
13              MR. KNAPP:  Halsey Knapp at Krevolin Horst.
14              COURTROOM DEPUTY CLERK:  Thank you.
15              Coalition?
16              MR. McGUIRE:  Robert McGuire is on the line.  I
17    believe Bruce might be as well.
18              Bruce, are you here?
19              Okay.  He told me he was on.  I don't know if he is
20    on.  But I am on and available.
21              COURTROOM DEPUTY CLERK:  Okay.  Great.
22              State of Georgia?
23              MR. TYSON:  Good afternoon, Mr. --
24              MR. MILLER:  Good afternoon.
25              MR. TYSON:  I'm sorry, Carey.
```

```
 1            MR. MILLER:  We are at two different locations.  This
 2   is Carey Miller here with Vincent Russo, Josh Belinfante, and
 3   Alexander Denton.
 4            COURTROOM DEPUTY CLERK:  Thank you, sir.
 5            MR. TYSON:  And then Bryan Tyson with the Taylor
 6   English group.  I have Bryan Jacoutot, Dal Burton, and Jonathan
 7   Crumly with me.
 8            COURTROOM DEPUTY CLERK:  Thank you.
 9            Fulton County?  Mr. Lowman?
10            MS. RINGER:  No.  Mr. Lowman is not here.  This is
11   Cheryl Ringer here for Fulton County.
12            COURTROOM DEPUTY CLERK:  Okay.  Thank you,
13   Ms. Ringer.
14            Judge?
15            THE COURT:  So, Mr. Cross, is your colleague who was
16   speaking a good deal not participating on this portion of the
17   hearing?
18            MR. CROSS:  Yes, Your Honor.  Ms. Kaiser had a family
19   obligation.
20            THE COURT:  All right.
21            MR. BROWN:  And, Mr. Martin, this is Bruce Brown.  I
22   was trying to say hello, but my headphones weren't working.
23   I'm here for the Coalition plaintiffs.
24            COURTROOM DEPUTY CLERK:  All right.
25            THE COURT:  Thank you.
```

1          All right.  I have your bullet points.  Does the

2    State have any greater thought to the question of how -- about

3    the production of the emails?

4          MR. MILLER:  I apologize, Your Honor.  You were

5    breaking up a little bit there.

6          THE COURT:  Did the State give any further review

7    among yourselves to the question of the production of the

8    public official emails, what you are prepared to do, and what

9    time frame or whether you -- what -- you would prefer to do a

10   dump or what is going -- I just want to sort of wrap that up.

11   Or you don't have a position?

12         MR. MILLER:  I understand, Your Honor.

13         Your Honor, the State's position will be we'll comply

14   with Your Honor's order and direction here.  Prior to engaging

15   in the long process, we certainly wanted to receive that

16   direction from you.

17         But as it stands now, I took away from our call

18   that -- or our earlier portion of the call that we will begin

19   reviewing those 116,000 documents and start making rolling

20   productions.

21         One thing that gives me hesitance about a just total

22   dump would be -- and I alluded to this earlier with respect to

23   what we saw in the Fair Fight case.  And what I don't want to

24   have happen here is we'll end up in a privilege log dispute

25   likely.  And it will be based off of documents that aren't

```
 1   relevant.
 2            So I just wanted to caveat that.  But if Your Honor
 3   directs it, we'll review for responsiveness and begin a rolling
 4   production.
 5            THE COURT:  All right.  Will you be able to commence
 6   later this week?
 7            MR. MILLER:  Your Honor, we'll start immediately.
 8   You know, I do -- I'm not in a position to suggest that the
 9   estimated time is really any different until we kind of get
10   moving through things.  But we'll start immediately.
11            THE COURT:  All right.  Why don't you give us an
12   estimate after two weeks.  Can you do that?
13            MR. MILLER:  Sure.  Yes, Your Honor.
14            THE COURT:  All right.  So the last thing I was
15   hearing from plaintiffs' counsel though was a surprise that
16   this was confined to emails, that obviously the State had said
17   it has provided the policies.
18            Tell me what else you were thinking that they were
19   going to be giving you -- that they were going to be searching.
20            MR. CROSS:  Your Honor, this is David Cross.  I went
21   back and took a look.  I sent an email to Mr. Tyson on May 20th
22   asking them to confirm that the search terms would be applied
23   not just against emails but electronic documents and custodian
24   files because we agreed on specific custodians.
25            And Mr. Tyson confirmed that the Secretary of State
```

1    employees store all documents on a central shared server, so we

2    will separately search that server for responsive documents

3    since -- as we have in other election cases.

4         So today was the first we had heard that they were

5    only searching emails.  So we would like confirmation that they

6    are, in fact, searching this central shared server as well for

7    responsive documents, as agreed.

8         MR. MILLER:  I do think we can resolve that fairly

9    quickly and clarify that fairly quickly.  The 116,000 that

10   we're talking about, that is only emails.  We're certainly not

11   taking a position that emails are the only thing that will be

12   searched and produced in this case.  In fact, as we have

13   discussed already, quite the opposite.

14        The discussion about emails was to simply say that

15   the number that we're talking about here and the process we're

16   talking about just for this large number is only emails.

17        THE COURT:  All right.

18        MR. CROSS:  Could we get clarity -- Your Honor, this

19   is David Cross again -- on when the searches are happening for

20   the central repository?  Because the last email I had from

21   Mr. Miller was they were not conducting any searches or review

22   until the search term issue was resolved, which we took to mean

23   that everything was subject to that.  Because we had not

24   received any documents apart from the Fair Fight partial

25   production.  It is not clear to us when we're getting documents

1    from the repository.

2            MR. MILLER:  I guess to be clear, you have already

3    received documents from the repository.  You got those in

4    September of last year or actually, I guess it was, August of

5    last year.

6            But we're certainly complying with our duty to

7    supplement those to the extent additional ones are located.

8            MR. CROSS:  Is that using the search terms that were

9    agreed to?  When and how is that happening?

10           MR. MILLER:  I did not intend that we would apply

11   search terms to the server but locate responsive documents

12   manually.

13           If you would prefer us to apply search terms to the

14   server, I'll just go ahead and again posit that we'll be

15   talking about a significant number of documents again.

16           MR. CROSS:  That's what Bryan had agreed back on

17   May 20 because that was the question.

18           MR. TYSON:  David, this is Bryan Tyson.  Just to

19   clarify, the way we have always handled discovery in election

20   cases -- those things are stored on a central election server

21   by the Secretary's office.  They are stored by folders on

22   there.  They are not stored by kind of individual.

23           And so for individual requests, we haven't

24   historically used search terms on a server.  We have gone to

25   the folder that has the documents that would be responsive to

```
 1     that request and done it that way.  Because that is what Carey
 2     is referring to there in terms of how we are handling this.
 3              We didn't need to go through a custodian by custodian
 4     search.  That is why my email said we were going to search the
 5     central server the way we had done in all these other election
 6     cases.
 7              So maybe that clarifies the issue for you.  My email
 8     probably wasn't as artfully worded as it could have been to
 9     explain that.  But that is how we have handled this for all the
10     other cases.
11              MR. CROSS:  Okay.  All right.  I understand that.
12              Is that -- I guess I'm not clear on why that hasn't
13     happened if that is a separate issue from the search terms.
14              MR. MILLER:  David, it has already happened.  That is
15     what I'm explaining to you is that we produced all of those
16     relevant documents in August and continue to locate and produce
17     responsive documents that are on that folder.  So, for
18     example --
19              MR. CROSS:  That is a lot of documents --
20                   (Unintelligible cross-talk)
21              COURT REPORTER:  I'm sorry.  You guys are talking
22     over each other.  So I am getting no one.
23              MR. MILLER:  Sorry.
24              MR. CROSS:  Sorry.
25              I'm just trying to understand.  I understand
```

1    documents were produced last year.

2         The question is:  When are we getting a supplemental

3    production from that server for documents created within the

4    last 12 months?

5         MR. MILLER:  Well, David, we can certainly work to

6    get you a supplemental production.  I, frankly -- although you

7    dispute that it is relevant, I think it is particularly

8    relevant as to whether your production is complete or if we're

9    expecting a supplemental production.

10        MR. CROSS:  I don't understand your response.  Our

11   production is not an issue.  I'm happy to address that.

12        The question is:  When are we getting documents from

13   the repository that were created in the last 12 months since

14   the last production?

15        MR. MILLER:  As I just explained to the Court, we'll

16   begin immediately a rolling production.  And we'll also include

17   in there any additional documents that are located in the

18   server.

19        Does that answer your question?

20        MR. CROSS:  It does.  Thank you very much.  I

21   appreciate that.

22        THE COURT:  All right.  Since Mr. Miller has raised

23   it at various points, what is the status of the plaintiffs'

24   production of documents?

25        MR. CROSS:  Sure, Your Honor.  This is David Cross.

1    I can speak for my clients.

2            I believe our production is complete as of last week.

3    We're still looking at that and talking with the clients.  But

4    my understanding is subject to -- within the parameters that we

5    have negotiated with the defendants and discussed with the

6    defendants our production is complete.

7            MR. MILLER:  I'm sorry, Your Honor.  This is Carey

8    Miller.  I'm a little confused as to the parameters Mr. Cross

9    is referring to.

10           THE COURT:  Mr. Cross, what parameters are you

11   referring to?

12           Is there somebody driving, or is there just -- this

13   is just a bad line?  I feel like I am in a wind tunnel.

14           MR. CROSS:  It sounds like somebody might want to

15   mute.  It just got better for me.

16           THE COURT:  Yeah.  Thank you.

17           What particular parameters are you speaking of?

18           MR. CROSS:  Well, it depends on the request, Your

19   Honor.  We had negotiations with them over the course of --

20   over their individual document requests.  So I would have to go

21   back and look at each one in terms of the parameters that we

22   agreed to for those requests with our objections.  We had a

23   number of rounds of discussions, as I recall.

24           So what we agreed to produce is now out the door, as

25   I understand it.  Again, I want to confirm that with my team

1    and our clients.  But based on what we agreed to produce, it is

2    out the door.

3              THE COURT:  Well, do you want -- can you get back to

4    counsel for the State by Thursday about that?

5              MR. CROSS:  Sure.  Yeah.  Definitely, Your Honor.  I

6    mean, again, the State has all this because they have our

7    written responses.  We had raised specific objections, and we

8    had a number of meet-and-confers and correspondence.  So if

9    there are specific questions, I'm more than happy to talk that

10   through with them.  But I don't think there is any ambiguity

11   about what we agreed to produce.  Or if there is, I can clarify

12   it with them offline.

13             MR. MILLER:  So, David, if I may just in terms of,

14   you know, setting aside if there is some additional thing that

15   you have yet to locate through your clients, but your

16   production is complete right now; is that correct?

17             MR. CROSS:  That is my understanding, yeah.  And I

18   will let you know by Thursday, as the Judge suggested, if that

19   is not right.  But my understanding is that we are done.

20             MR. MILLER:  Your Honor, I'll defer to how you would

21   prefer us to proceed.  We can wait until Thursday and discuss

22   it and see if there is anything additional coming.

23             But, you know, as far as we stand right now, the

24   State just has a hard time believing things are complete at

25   this juncture.  But, of course, I don't want to jump the gun.

1          THE COURT:  All right.  Let me change that to say you

2    are going to talk on Wednesday, if you are going to need

3    something from me.  I have a jury selection in a criminal case

4    starting on Friday.  So I'm just trying to not have you wait on

5    me again if there is an issue.

6          So try to if -- Mr. Cross, if you can get back to

7    them by noon on Wednesday, then you can all talk about it and

8    submit something to us as appropriate.

9          All right?  So that if I need to talk to you on

10   Thursday that I can talk to you on Thursday.

11         MR. CROSS:  Yes, Your Honor.

12         THE COURT:  All right.

13         MR. McGUIRE:  Your Honor, this is Robert McGuire.

14   Not to go backwards at all.  But on the State production of

15   emails and documents, I heard that they were to begin reviewing

16   for responsiveness and do a rolling production.  I just didn't

17   want to leave unclear whether or not the idea of this blanket

18   AEO designation has been dispensed with and now they are going

19   to be doing that on a document by document basis, just to

20   preserve our objection.

21         THE COURT:  That is my understanding.  That is my

22   understanding.

23         MR. McGUIRE:  Thank you.

24         THE COURT:  And I see something from the Coalition

25   saying basically you want a 60-day extension running from the

1    date of the State's completion of production.  Really, while

2    I'm willing to give an extension to you, I just don't have

3    enough information at this juncture as to -- and I'm not sure

4    I'm willing to run it the way you are suggesting.

5          So when we hear from Mr. Miller at the very minimum

6    two weeks from now, then I'll look at the length of the

7    extension.  I think you can assume since they are saying it is

8    going to be some amount of time I'll certainly give a 60-day

9    extension.  Whether I will give more is another matter.  I want

10   to hear what the actual time length is.

11         I don't -- then there is something here about

12   Dr. Halderman's AEO expert report.  And I see the Coalition's

13   position being articulated.  I'm just -- I'm not prepared to

14   unseal it at this juncture.

15         You know, what -- we were, I thought, dealing with

16   questions around Dominion instead at the time that we closed

17   off and sharing that with Dominion.  And I'll just take that

18   under advisement unless there is something more.

19         I don't know how all of this also relates to Curling

20   plaintiffs or Coalition plaintiffs -- I don't remember which --

21   has -- you have a subpoena enforcement action in Colorado

22   going; is that right?

23         MR. CROSS:  Sorry, Your Honor.  This is David Cross.

24   We did move to compel a subpoena in Colorado.  The judge

25   ordered expedited briefing.  I don't recall the schedule off

1    the top of my head.  But we could figure that out and email it

2    to you.

3              THE COURT:  All right.

4              MR. CROSS:  I think the response is due this week,

5    but I don't recall.

6              THE COURT:  All right.  Well, then email me whatever

7    the schedule is.  But I'm not going to be acting on anything

8    related to confidentiality one way or the other.

9              But right now I'm viewing the Halderman report as

10   being attorneys' eyes only.

11             MR. CROSS:  Well, Your Honor, I do have the schedule.

12             MR. McGUIRE:  Oh --

13             MR. CROSS:  I'm sorry.  I'm sorry, Rob.

14             Just to give the Court the schedule, their response

15   is actually due today.  And we have a reply that is due within

16   five days.  So it will be fully briefed, it looks like, this

17   week in Colorado.  And we'll, of course, keep Your Honor

18   advised of how it is resolved.

19             THE COURT:  All right.  And I did hear argument

20   already from the State regarding Dominion being their agent and

21   therefore they would need to share the affidavit.

22             I would just say let's treat it as AEO at this point.

23   And I don't remember -- and you submitted a lot.  But I don't

24   remember exactly what argument you gave as to the -- how being

25   your agent was going to deal with the AEO issue but having been

1    shared on an AEO basis, I really -- and what protections would

2    be in place.

3            So I understand the desire to have an appropriate

4    person from Dominion be able to look at some of the issues.

5    And I'm not -- and I'm giving due attention to that.  But I

6    need to get some more information about both how they are your

7    agent, what would be the protections here, how does this relate

8    to any other litigation, and would it be subject to -- would it

9    be subject to disclosure in other litigation and how would that

10   work.

11           I mean, I just -- I would need some more information

12   from the State as to how you propose all of that.

13           MR. MILLER:  Your Honor, this is Carey Miller.  We

14   can certainly put together the information.  The agent comment

15   came up in response to the condition on production that all of

16   the basically review and discussion be discoverable.

17           As to protocols surrounding disclosure of the

18   document to Dominion, we would certainly identify the

19   individual, have them sign a protective order or the agreement

20   to be bound by the protective order, and treat it much the same

21   way as the proceedings were treated involving Dominion last

22   year with Dr. Coomer.

23           Of course, because of the fall-out from some of the

24   claims surrounding the 2020 election, Dr. Coomer is not quite

25   as willing to do these things.  And, frankly, I have not

61

```
1    (unintelligible) at the same point and 2020 election litigation
2    involving the same claims, which targeted Dr. Coomer.
3            So long story short, the thought would be we will
4    identify specific individuals with Dominion.  They will sign
5    the agreement to be bound by the protective order and all, you
6    know, review of the report would be restricted to that
7    individual and subject to the terms, just as a consulting
8    expert would do.
9            Outside of that, Your Honor, I think it is important
10   to note although the -- I understand the Court's concern about
11   separate, you know, outside litigation, these sort of 2020
12   fall-out claims and who could then access it in the defamation
13   suit or whatever the case may be, but that same logic, that
14   same argument is going to apply to whatever the Curling
15   plaintiffs are able to squeeze out of the district court in
16   Colorado, which is the same request that Your Honor considered
17   in the June 2 conference and did not order.  So I do --
18           THE COURT:  That's why I'm not doing anything until I
19   hear from the district court in Colorado.
20           MR. MILLER:  I understand.
21           MR. CROSS:  Your Honor, this is David Cross.  Just to
22   clarify, it is not the same request.  I'm not sure why
23   Mr. Miller is saying that.  It is different.  But I don't think
24   we need to get into that.  The district court in Colorado will
25   decide the issue that is before it, and we'll let Your Honor
```

1    know how that turns out.  But it is not the same request that

2    Your Honor had before you before.

3            It overlaps in some respects.  But it is -- we are

4    looking -- to the extent that he's talking about the election

5    equipment used in Georgia, that is a request that we have made

6    to the State.  They are the ones that have that equipment.  It

7    is their equipment.  So that is a separate issue that is still

8    pending before Your Honor.

9            MR. MILLER:  Your Honor, I didn't mean to indicate it

10   was word for word the exact same.  I think what Mr. Cross

11   stated there that there is significant overlap between the

12   issue that was before the Court and the issue that is before

13   the district court in Colorado is what I was referring to.

14           I am looking at the filing in Colorado.  They are

15   certainly seeking more than just what was before you.  Though

16   what was before you is included therein.

17           MR. CROSS:  Again, Your Honor, I'm not sure where

18   Mr. Miller is getting that.  I'm not aware of --

19           THE COURT:  We've got enough to cover.  We've got

20   enough to cover.  I'm just -- you know, when it becomes a

21   reality in some way, then I'll hear it.  I'm sure you'll all

22   make it abundantly clear.

23           MR. CROSS:  Yes, Your Honor.

24           And I did want to just clarify.  We are still hoping

25   to get a ruling from Your Honor when you can on the request for

```
 1    access to the election equipment in Georgia.  And I don't
 2    believe Dominion has any ability to give us that, which is why
 3    it is not before the district court in Colorado.
 4              THE COURT:  Well, that is the -- I mean, that is the
 5    State's objection is to what the -- the first set of objections
 6    that came in front of me that are regarding the production of
 7    the documents -- I mean, not the documents -- the equipment?
 8              MR. CROSS:  Yes, Your Honor.  In Mr. Tyson's email,
 9    he refers to Docket 1094.  And that is what that is, Docket
10    1094.  And as I recall, Your Honor had suggested wanting to
11    read Dr. Halderman's report.  And Your Honor has that now,
12    so --
13              THE COURT:  I read it.
14              MR. CROSS:  So if you are able --
15              THE COURT:  I read it.  But I -- I don't really --
16    I'm not sure that it helped me particularly in understanding
17    what you are seeking to do with all of this.  And I mean, it
18    sounded to me more like this -- frankly that this is more --
19    this confirmed more about vulnerability.  I don't -- I don't
20    really know what else he is expecting other than -- and then
21    there is the whole other business about his wanting to do this
22    on a state -- statewide -- something that would give him
23    information on a statewide -- I can't listen to this because
24    there is so much feedback.
25              Is there feedback for other people?  I can hear
```

1    myself for one second after I'm speaking.

2              COURT REPORTER:  There is for me.

3              MR. CROSS:  There is not for me, Your Honor.  It may

4    just be --

5              MR. MILLER:  There is on the State's end, Your Honor.

6    But it seemed to have stopped there towards the end of your

7    statement.

8              MR. McGUIRE:  Your Honor, this is Robert McGuire.  I

9    just want to make sure I understand what you have said earlier.

10             You said that for now you are going to continue

11   treating the report as AEO.  Does that mean until the State

12   gives you more information you are deferring that issue and

13   they are not to share the report with Dominion?

14             THE COURT:  Right.

15             MR. McGUIRE:  Okay.

16             THE COURT:  They are not to share it, and I'm not --

17   I'm treating it as a confidential document.

18             MR. MILLER:  Your Honor, this is Carey Miller, and

19   that is what we understood as well.

20             One thing I do want to raise for the Court is that,

21   in terms of identifying an individual at Dominion or getting

22   you additional information, we have not even discussed the

23   existence of this report with anyone at Dominion.

24             And so that would be one thing I would request that

25   in terms of us being able to identify someone or the Court may

1   tell me that is not what you need.  But that is one thing that

2   we would request to be able to just speak to its existence so

3   we could identify the right person.

4           THE COURT:  Are there any objections to that,

5   Counsel?

6           MR. CROSS:  Not from Curling, Your Honor.

7           MR. McGUIRE:  Not from the Coalition.  I mean, the

8   existence of the report is on the public docket.  So we don't

9   have any objection.

10          THE COURT:  All right.  That is fine.  I mean, I

11  would expect you would do it with discretion so that it is only

12  one or two people you are going to need to talk to.  But we'll

13  see.

14          MR. MILLER:  Thank you, Your Honor.

15          MR. McGUIRE:  Your Honor, the Coalition -- this is

16  Robert McGuire.  The Coalition -- you are obviously aware of

17  our position and we understand you are not going to rule on it

18  now and you are not going to release the report now.

19          Would you entertain a motion from us to unseal that

20  where we laid out our argumentation and supporting authority

21  because we believe --

22          THE COURT:  Not at this time.  Not at this time.  I

23  mean, I just -- you know, obviously if you file something like

24  that, then I'm not going to be able to deal with it and then

25  I'm going to -- right now because of the trial coming up that I

 1    have.

 2            And I am -- I'm concerned enough about the

 3    information contained in it and I attempted as best as feasible

 4    to manage this with discretion in the September hearings.  And

 5    I think that would -- I have seen how this can blow up.

 6            So I'm not -- not inclined to grant it -- certainly

 7    not at this moment.  So if you do file something, I would

 8    suggest you file it under seal.

 9            MR. McGUIRE:  File it under seal.  Thank you, Your

10    Honor.

11            And just so you know where we're coming from, our

12    concern is that there are upcoming elections in municipalities

13    which are not required to use the BMD system.  So they have the

14    option to choose to use a different method of voting and to be

15    aware as to the public interest of flaws in the system.

16    Without details of how to actually execute those flaws is

17    something we strongly think is in the public interest.

18            And so that is what is motivating this.  And we would

19    very much like to file it with discretion not under seal, if

20    Your Honor would accept it that way.

21            THE COURT:  The thing is -- no.  No, you cannot.  I

22    think that it just could end up being a go-around, even though

23    I trust counsel in this matter.  But it could be a go-around

24    about this.

25            As it is, I think that we're on very difficult

1   territory.  And I think that there are so many other ways to

2   educate the public besides trying to use this case.  And I am

3   just not -- I'm at the end of my rope about that.

4          MR. McGUIRE:  Understood.  Thank you, Your Honor.

5          THE COURT:  All right.  All right.  On Page 3 of

6   Document 1094-1, which is the discovery dispute as to the --

7   setting forth the defendants' objections to plaintiffs' third

8   joint request for production is essentially on, I guess it

9   is -- on the top of the CM/ECF document, it lists Page 4.  On

10  the bottom, of course, it lists the original page, Page 3.

11         So is the top objection as to inspection of items

12  that may contain confidential information, trade secrets,

13  sensitive election security information, or other state

14  secrets -- is this as to all of the physical items, machinery,

15  technology?

16         MR. TYSON:  Your Honor, this is Bryan Tyson.  Yes, as

17  to all the equipment.  So I think it is both a kind of state

18  secret objection like is outlined there and also -- I'm looking

19  back at that language now too -- but also a kind of scope of

20  discovery, given the vulnerability issues that are also raised

21  on that same page, along with the federal law requirements

22  about the retention and security of equipment actually used in

23  elections.

24         THE COURT:  And what are you saying as to the last

25  substantive paragraph?  The State defendants further object to

1    the request because it seeks inspection of voting equipment

2    which is outside the scope of discovery nor likely to lead to

3    the discovery of admissible evidence.  Tell me what you are

4    saying about it is outside the scope of discovery.

5            MR. TYSON:  I'm sorry, Your Honor.  I'm trying to

6    find that provision.  It is in our objections or --

7            THE COURT:  Objections 1094-1 at Page-- on CM/ECF

8    Page 4, paragraph that starts State defendants further object.

9            MR. TYSON:  There we go.  Thank you, Your Honor.

10   I've got it now.

11           Yes.  So there were -- this includes, you know, all

12   the different components of things.  And in terms of this --

13   I'm looking at their specific objection.

14           These are Dominion equipment pieces.  I know that

15   there was -- for the KNOWiNK and the other components, we

16   definitely note that those are not part of the case.  And then

17   in terms of the list of items here -- I'm sorry.  I'm looking

18   at this.

19           MR. MILLER:  Your Honor, I think a portion of this

20   may be back to the discussion we had on the prior discovery

21   dispute about there has been no alleged hack of the 2020

22   elections.  The interrogatories stated that we're not

23   contending that the 2020 elections were hacked.  And that goes

24   to the, you know, getting the 2020 election equipment versus

25   the equipment that they already have.

```
1              THE COURT:  Okay.  Tell me where it says the
2    plaintiffs have acknowledged that there is nothing been hacked
3    in 2020.
4              MR. MILLER:  Your Honor, I'm pulling back up the
5    other attachments to that joint discovery statement.  Actually
6    I now recall that was filed separately.  We attached
7    interrogatories and discovery responses.
8              Let's see.  Give me a second.
9              THE COURT:  While you're looking, could one of you
10   tell me about the -- I know the City of Atlanta is having an
11   election this fall.
12             And if we're just talking about Fulton County, maybe
13   Fulton County reps can tell me what their circumstances are for
14   this fall in terms of election equipment.
15             MS. RINGER:  I'm sorry, Your Honor.  This is Cheryl
16   Ringer for Fulton County.
17             What is the question?
18             THE COURT:  The question is:  I know that the City of
19   Atlanta is having its city elections this fall.  And is Fulton
20   County basically running the machines for that, and does Fulton
21   County have any elections other than the City of Atlanta's
22   election?
23             MS. RINGER:  Yes, we have other municipal elections.
24   I think there's only two cities within Fulton County that are
25   not having Fulton County run their municipal elections.  I
```

1    think that's Mountain Park and maybe Palmetto.  We also expect

2    to have -- there is a T-SPLOST and possibly an E-SPLOST.

3              I do know that they are also looking to get

4    additional equipment to make sure that we can comply with the

5    requirements of the number of voters per polling place.  We had

6    a few locations that exceeded now with the requirement under

7    Senate Bill 202.

8              MR. McGUIRE:  Your Honor, this is Robert McGuire.

9    While they are looking for what they claim is a concession by

10   us that there were no hacks in the 2020 election, which we did

11   not, I don't believe, make -- and if we did, on the record, I

12   would like to say we do not concede that -- what we have said

13   is that that is not necessarily part of our case.

14             And on the subject of this equipment, the word

15   vulnerability has kind of -- it seems like it has become a bit

16   of a dirty word.  Our need for this equipment is not

17   necessarily based on showing vulnerabilities, but we have need

18   for some of the equipment that is at issue in this -- in this

19   discovery dispute because it goes to the scanner issues.

20             COURT REPORTER:  I'm sorry.  It goes to what issues?

21   I'm having trouble understanding you, Mr. McGuire.

22             MR. McGUIRE:  I'm sorry.  Is this better?  Is this

23   better?

24             COURT REPORTER:  Yes.  It seems a little better.

25             MR. McGUIRE:  We have -- we need this equipment to

1   develop further evidence of the scanner problems that we showed

2   the Court in the preliminary injunction hearing in

3   September 2020.  We have asked for a central count scanner.  We

4   have asked for Poll Pad stuff, which will allow us to further

5   substantiate our Poll Pad-related claims.

6           So we're not just pursuing this from the perspective

7   of vulnerabilities.  We're pursuing it to show that the

8   equipment actually fails to operate and do what it is supposed

9   to do and the result is that votes don't count.

10          So we don't -- you know, we obviously do not concede

11  that vulnerabilities is a problem.  I mean, vulnerabilities, I

12  think, is an important part of our case.  But we are actually

13  looking at this equipment for additional reasons as well.  So

14  it is not just vulnerability-related.

15          MR. TYSON:  Your Honor, this is Bryan Tyson.  I have

16  located the responses I think we were discussing earlier.  I

17  don't see that these have been filed on the record.

18          But on January 27, there is a Coalition for Good

19  Governance response to Interrogatory Number 10, which began, if

20  you contend the election system was hacked in any way before or

21  during the election held on November 3rd, 2020 -- and it

22  requests some additional information.  The Coalition's response

23  is, Coalition is not contending that the November 2020 election

24  was hacked.  That is the Coalition response.

25          And then a January 14 response from the Curling

1  plaintiffs to Interrogatory Number 8, similar question about if

2  you contend the system was hacked.  The Curling plaintiffs

3  identified examples of breaches in their July 15, 2019,

4  response and then reserved the right to supplement as they

5  obtained additional discovery but didn't answer the question

6  directly on whether they were alleging the November election

7  was hacked.

8          MR. MILLER:  Your Honor, I did locate in the record

9  the -- just briefly, it is connected to the supplemental

10  briefing you ordered regarding the June 2, '21, conference.

11  And those are just excerpts.  It is Docket Number 1105, and the

12  attachments are 1105-2 and 1105-1.

13          THE COURT:  What was the document numbers that you

14  were reading -- or they weren't in the record -- the ones that

15  Mr. Tyson was reading from?

16          MR. MILLER:  Your Honor, I believe Mr. Tyson was

17  reading from the entirety of the interrogatories.  But I did

18  locate the excerpts in the record that are cited in 1105.  And

19  those are attached as 1105-1 and 1105-2.

20          THE COURT:  Okay.  That is fine.

21          MR. CROSS:  Your Honor, this is David Cross.  Just to

22  clarify, as Mr. Tyson just confirmed, our clients have not

23  acknowledged that there was no hack in the 2020 election, as it

24  sounds like the State represented.

25          We just haven't taken a position on that.  And what

```
 1    we said is we don't know.  We're not contending that.  But the

 2    honest answer to the question from our clients as three voters

 3    is they just have no way of knowing that one way or the other.

 4          That is the position that we have put into responses,

 5    as I recall, because it is the only position we could give.

 6          MR. McGUIRE:  And, Your Honor, from the Coalition's

 7    perspective, in Document 1105-1 on Page 4, we reserved the

 8    right to introduce evidence of malware identified in discovery.

 9    But part of the problem is we haven't received the equipment.

10    So we are still conducting discovery that would allow us to

11    prove what they are asking if we are trying to prove.

12          So it is not necessary for our case since our case is

13    based on prospective harm.  Past harm tends to show the

14    likelihood that future harm will occur.  But it is not an

15    essential component of our case.  And for them to -- what they

16    are trying to do is have us make a concession, which they

17    haven't given us the documents that we need and the equipment

18    that we need to be able to have a position on.

19          MR. MILLER:  Your Honor, just to clarify, the

20    discussion on June 2 and the supplemental briefing in 1105 was

21    focused on -- you know, it is not that the plaintiffs are under

22    some obligation to prove an allegation or to prove a hack.

23    However, they have not alleged it.  And this goes back to our

24    discussion in the conference, as you may recall, which was

25    focused on this vulnerability issue and the chicken and the egg
```

74

1   problem of at what point will plaintiffs allege it, do they

2   intend to allege it, and until they do we're still in the

3   vulnerability realm.

4          MR. CROSS:  Your Honor, it is David Cross.  I don't

5   want to retread ground Your Honor has heard before.  I will

6   just say the State keeps saying that.  And each time they say

7   it it is never right.

8          We have shown that the prior system was hacked on

9   multiple occasions, as Your Honor knows.  We have shown that

10  the prior system has been directly connected to the new system,

11  even with the limited discovery we have gotten.  And so we are

12  definitely beyond the world of vulnerability with the current

13  system.

14         And the reason we have asked for the equipment that

15  is actually used in the State elections is to rebut their

16  argument that there is no compromise on that.  We have to look.

17  But we have done -- we are way beyond the point of some sort of

18  speculation.  And it is just not accurate to keep saying that

19  we have not alleged any compromise of the system because we can

20  go back to the original system and the interactions between the

21  two.

22         I'll just leave it at that because we have been over

23  this ground before.

24         THE COURT:  All right.  Is there any other discovery

25  matters for me to address?

1          MR. TYSON:  Your Honor, this is Bryan Tyson.  I

2    believe the only other one we had referenced in our email to

3    Mr. Martin was Docket 1127 involving our discovery to the

4    Coalition plaintiffs about their communications with the public

5    and their communications to members of the press about their

6    claims.  That one is kind of fully on that discovery thing.

7          THE COURT:  Tell me why you think that is relevant.

8          MR. TYSON:  Yes, Your Honor.  So the Coalition has

9    obviously -- they said they have responsive documents.  They

10   made a number of statements in different parts of this case

11   about widespread issues.  They submitted a lot of declarants

12   saying there are widespread problems.

13         We believe these statements are relevant to the scope

14   of what they are -- what they have discovered in the process

15   and also relevant to their allegations of organizational harm

16   and their statements that they are educating members of the

17   voting public.

18         Obviously, the Coalition has chosen to litigate this

19   case in the press as well.  And so being able to understand

20   what kind of statements it has been making about the voting

21   system is going to be important to test their claims and

22   especially their diversion claims of what purposes they are

23   actually serving with their communications and their efforts.

24         MR. BROWN:  Your Honor, this is Bruce Brown.  Can you

25   hear me okay?

1       THE COURT:  Yes.

2       MR. BROWN:  If I may respond.  The issues, I think,

3   have been addressed pretty well in our briefing.  But I would

4   like to respond briefly to what Mr. Tyson said.

5       He didn't answer your question as to what the

6   documents were relevant to.  They are not relevant to any claim

7   because, of course, the Coalition is the plaintiff and we're

8   seeking prospective injunctive relief relating to the

9   defendants' election systems.  And therefore we wouldn't have

10  any evidence that is germane to that.

11      And if we -- if you look at -- the State says

12  repeatedly this line, the documents are relevant, and CGG

13  should be required to produce them.  They don't say what they

14  are relevant to.

15      The closest that they get to saying what they are

16  relevant to is two things:  One is that they claim repeatedly

17  that CGG has chosen to litigate the case in the press.  Your

18  Honor, I don't know what that means.  We have chosen to have

19  this case litigated in the United States District Court, not in

20  the press.  We don't know where that observation comes from.

21      And I'm sure Your Honor doesn't want to hear rebuttal

22  as to who has contacted the press about this case more, the

23  Secretary or CGG.  And -- but that -- the fact that that would

24  be a response to Your Honor's question I think illustrates how

25  far afield this is.

1          They are asking for documents reflecting CGG's

2     efforts to track voters actually affected by the election

3     system.  They don't need that information.  If we came into

4     court and said, Your Honor, we have a day's testimony and we

5     would like to prove our case by showing you all of our

6     communications with voters, you would say sit down and don't do

7     that because that is not relevant to any claim.  It is not.

8          The only thing -- after we made our point repeatedly

9     that they had failed to identify any claim that this relates

10    to -- I mean, first their response was you mentioned the

11    litigation.  Therefore it is relevant.  We have explained in

12    our briefing and over the phone that that just didn't make any

13    sense.

14         They finally came back and said, oh, it is relevant,

15    finding everything out about CGG, its communications with the

16    press, with other organizations, with the voters, with its

17    membership.  They couldn't explain any claim that that was

18    related to.  So they came back and said, oh, it is related to

19    standing.

20         And the relationship to standing is that there's --

21    the notion is that if you took all of our efforts together

22    there would not be a diversion of resources if you looked at

23    every single thing that you had done.  And, Your Honor, that is

24    just not the law.

25         Standing -- there is no notion of quantum of standing

1   or amount of standing.  It is not like CGG has, you know, four

2   units of standing and they need to get five.  You either have

3   it or you don't.  And it is a very low threshold to establish

4   injury for purposes of standing.  There's case after case about

5   that.

6         Moreover, if the defendants were really interested in

7   finding out information about standing, several things:  One,

8   they could ask that.  All of us have represented defendants.

9   And what you do in cases like this is to say a couple of

10  things.  You can say state every fact upon which you base your

11  contention that you are injured in this case.  And for every

12  fact, identify a witness who can identify your documents.  That

13  puts the burden on the responding party to come up with

14  evidence that can be tested on summary judgment.

15        But instead of doing that, they ask these broad --

16  they are as broad as you can imagine interrogatories and

17  document requests that aren't focused on that idea and don't

18  even capture this.

19        The other thing that the defendants could do would be

20  to take a 30(b)(6) deposition.  They haven't done that either.

21  That would be the other way you would get this information.  If

22  they really were interested or needed to rebut our assertions

23  of standing, that is what they have done.  But the very breadth

24  of these discovery requests indicate that that is not what they

25  are trying to do.  They are just trying to tie us up.

79

1              Imagine if this were a diversity case and we were the

2     plaintiffs and we contended that we were residents of Georgia

3     and the defendants were residents of -- or that we were

4     residents of North Carolina and the defendants were residents

5     of Georgia and we had diversity.  And the defendants wanted to

6     test that by capturing every document in our possession that

7     related to our citizenship in Georgia.  It would cover every

8     single document we had ever created, just like their

9     document requests do.

10             There is not a document that CGG has generated since

11    the beginning of this case that would not be responsive to

12    their request.  Because every document that CGG generates is

13    evidence of some effort, some resource diversion or commitment.

14             And so we don't know of any documents that are not

15    responsive.  We have explained this to the defendants.  And

16    they come back and say we are trying to try the case in the

17    press or it is just really, really relevant.  And so they do

18    not explain what claims it relates to.

19             The other problem apart from sort of the fundamental

20    problem with the concept of relevancy is proportionality.  And

21    they haven't addressed any of the rules under the discovery

22    rules relating to proportionality.

23             As Your Honor is well aware, the concept of

24    proportionality assumes that there is some scintilla of

25    relevant evidence.  Assumes that.  We don't concede that.  But

1    it assumes that there is some scintilla of relevant evidence.

2    But finding it this way is too burdensome.

3              And we think this is a perfect illustration of when

4    that should be invoked because there are so many other ways

5    that they can target the information that they seek and get it

6    through a 30(b)(6), which we're willing to have Ms. Marks sit

7    for -- would be the best.  And then they could follow up that

8    discovery with -- that with additional discovery.

9              I will also say that the Coalition has produced

10   documents that are highly -- which show diversion of resources,

11   including the filings that are required by the IRS to file that

12   show their budget and how they use it, along with four separate

13   folders of information showing how CGG's resources in four

14   other states have been diverted to work on this case and to

15   confront what the State is doing here.

16             So for those reasons, we think that both of these

17   discovery issues should be overruled in our favor.  Thank you.

18             THE COURT:  So let me just ask State's counsel:  Why

19   wouldn't you proceed with a 30(b)(6) deposition?

20             MR. TYSON:  Your Honor, this is Bryan Tyson.  We're

21   fine to proceed with a 30(b)(6).  That had been our plan once

22   we received the documents.  We wanted to get these documents to

23   examine those in the 30(b)(6).  But we definitely want to

24   proceed with a 30(b)(6) of the Coalition.  We were just waiting

25   for the ruling on these documents before proceeding with that.

1              THE COURT:  Well, the document request seems very

2     broad to me.  I mean, if there is something specific or

3     examples or something like that -- but they have also provided

4     you information from IRS filings that's obviously specific too.

5              But I don't know the relevance of their -- of your

6     getting every communication they have had with the press.  I

7     mean, virtually -- I mean, a lot of that is virtually -- you

8     could probably find anyway out there.

9              But I don't know what the relevance is, I mean, other

10    than they are going to turn that to say this is about public --

11    education around the election.  You are going to have it as a

12    different spin.

13             But it is just really (electronic interference) and

14    the same thing as -- you know, it is one thing to ask how do

15    you log your phone calls so that you are really giving voter

16    assistance.  And I think they view themselves as an advocacy

17    organization on voting issues.  But they may also be

18    representing people.  I don't know.

19             But those are all relevant ways you could pursue this

20    without this being -- just going into the weeds and turning the

21    organization inside out in order -- because I don't think you

22    need that in order to deal with addressing standing.

23             So that is my suggestion.  I mean, I can -- we will

24    summarize a few of -- the things we have been able to reach

25    we'll summarize very quickly in an order.  But -- and I'm

1   obviously still -- the thing that I'm troubled about is the

2   longer this goes the messier it is.

3          Obviously my vision was to try to do a -- to have a

4   more -- less robust evidence -- evidentiary development and

5   have enough so that I could have an updated record.  And

6   standing obviously is a major issue.  And that is primary on my

7   mind.

8          And we are in a certain amount of -- you know, of an

9   issue I realize -- that the plaintiffs say that vulnerability

10  is not a dirty word and that they have done a lot more than

11  vulnerability and the defendants say all they have shown is

12  potentially vulnerability and anyway it is a general interest

13  to all citizens.  And those are very different perspectives.

14         And I was trying to allow a somewhat more robust

15  record relative to this to be used and updated since the claims

16  were complaining about my -- any time the possibility of my

17  just staying the issue and letting it go up on interlocutory

18  appeal with a record that was pre the preliminary injunction

19  hearing.

20         But I don't think my perspective is shared by anyone

21  at this point as to being able to get out an order in a

22  reasonable time frame based on a truncated record but one that

23  was a little fuller than what we had.  And it is sort of

24  like -- as we have said before, we are in Groundhog Day at one

25  level on these disputes.

```
 1            So I'm listening carefully.  I'm thinking about this.
 2   And I would just ask you-all to think about this too.  Because
 3   it seems to me that -- I say this to the plaintiffs:  On one
 4   hand, you want a lot, and I understand why you do.  This is --
 5   but this could be converted into a monster, and therefore this
 6   issue won't be resolved.
 7            I can't believe, frankly, that we're not going to end
 8   up having to deal with standing in one way or the other or that
 9   it is not going to come back to us from the Eleventh Circuit,
10   whenever that might be.  And I realize there will be different
11   issues and not everything went up.
12            And that is why I have given -- you know, if we're
13   not going to take this opportunity to try to efficiently get
14   this done, it doesn't do good for anyone.  It just simply is a
15   lot of lawyers' time.
16            So I mean, I'll be -- be required to sort of do some
17   of the truncating for everybody that otherwise I wish you would
18   do and make some reasonable judgments about what you -- what is
19   essential for each side.
20            So, anyway, those are my thoughts.  We'll try to --
21   we'll issue an order on the things that we -- that are
22   outstanding that we have given a clear ruling on.  I think you
23   have got a sense of where I'm going though.  And I look forward
24   to hearing any updates on all the various things we have talked
25   about by the end of the week.
```

1          Anything else, Counsel?

2          MR. CROSS:  No, Your Honor.

3          MR. BROWN:  Nothing else, Your Honor.

4          THE COURT:  All right.  Very good.  Thank you.

5   Bye-bye.

6               **(The proceedings were thereby concluded at 6:17**

7               **P.M.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1                    C E R T I F I C A T E

 2

 3    UNITED STATES OF AMERICA

 4    NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7    the United States District Court, for the Northern District of

 8    Georgia, Atlanta Division, do hereby certify that the foregoing

 9    84 pages constitute a true transcript of proceedings had before

10    the said Court, held in the City of Atlanta, Georgia, in the

11    matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13    28th day of July, 2021.

14

15

16

17                    _____
                      SHANNON R. WELCH, RMR, CRR
18                    OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT