IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, ET AL.,<br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, ET AL.,<br>Defendants. | Civil Action No. 1:17-CV-2989-AT |

**CURLING PLAINTIFFS' RESPONSE TO STATE DEFENDANTS'
DISCOVERY STATUS REPORT**

**I.     State Defendants' Production**

*A.     The Production Rate Is Indefensible*

State Defendants' production is moving at a snail's pace—nowhere near what it should be moving according to well-accepted industry standards for document review. "The generally accepted rule is that associate-level document review can be effectively conducted at a rate of *fifty 10-page documents per hour*." *Oliva v. Infinite Energy, Inc.*, No. 1:11-cv-232-MP-GRJ, 2013 WL 6815989, at *8 (N.D. Fla. Dec. 24, 2013) (emphasis added).  Some practitioners have achieved review rates higher than 100 or even 300 documents per hour.[1]  State Defendants' review is moving at

---

[1] Bennett Borden, *The Demise of Linear Review*, Williams Mullen E-Discovery Alert (Oct. 2010), https://www.williamsmullen.com/sites/default/files/wm-url-files/E-Discovery_10-05-2010_Linear-Review2.pdf.

1

*a fraction* of well-recognized norms.

In their August 10, 2021 Status Report, State Defendants report they engaged 16 attorneys who reviewed approximately 8,000 documents in about a week as part of their so-called "expeditious[]" review. (Dkt. 1149 at 2.) This reflects a review rate of only 500 documents *per attorney* **per week**. A review rate of only 50 documents an hour represents about a single day's work spread over the course of an entire week. But State Defendants' actual review rate should be *much* higher. They omit that the average page length for their production is only about three pages per document.² This is only about a *third* of the page length justifying a review rate of 50 documents per hour, meaning State Defendants' rate should be about three times that rate. *Oliva*, 2013 WL 6815989, at *8. State Defendants also omit the hourly review rate for their production or the number of hours each reviewer spent on the review. Regardless, the rate is indefensible.

Whether this is just further deliberate delay from State Defendants—which this Court has lamented numerous times—or a lack of proper prioritization of resources to timely complete the production (e.g., reviewers are spending only a few

---

² The production is about 3.6 pages per document on average—but that average is inflated by the inclusion of three documents that alone account for over 1,900 pages (about 15% of the production). Without those three outliers, the production is only 3.1 pages per document on average.

hours each week on the review), the fact is that State Defendants' rate of production is directly contrary to this Court's directive for an abbreviated discovery period allowing for expeditious discovery.

The Court should set a production deadline for Defendants within 30 days, which is easily achievable at a review rate merely approaching well-recognized norms. Except for a handful of outliers, the documents—based on Curling Plaintiffs' review to date—do not look to be dense or difficult to review. Many are email messages with only a few lines of text that can be reviewed for relevance in mere seconds. Many other documents require no meaningful time at all to review for relevance, while significantly inflating the page count of State Defendants' production. For example, the two largest documents in the August 11 production are copies of the House and Senate versions of the "For the People Act," which is publicly available, and the third largest document is an XML format computer file.[3] The production also includes many blank pages.

Whether State Defendants deliberately include many publicly available documents in their productions to inflate the production size (they repeatedly trumpet the size of their production rather than its substance, which continues to be

---

[3] State Defendants' July 17 production included many public documents from the *Fair Fight* litigation against State Defendants, such as public court filings.

lacking), the fact is that such documents require no meaningful time to review. This makes State Defendants' extraordinarily-slow review rate even more unreasonable. A team of 16 reasonably-diligent reviewers should be able to review and produce tens of thousands of documents each week, many multiples of what State Defendants have been doing.[4] Given they have now engaged more than 16 reviewers and started with about 100,000 documents to review, their reviewers should easily complete the review within 30 days.[5] State Defendants' estimate of 15-17 weeks to complete their production is nonsensical.[6] Thirty days is more than sufficient to complete their

---

[4] State Defendants could add reviewers without meaningfully increasing their cost for the review, which is driven by the number of documents, not reviewers. Assuming a review rate of only 60 documents per hour (i.e., only one document per minute) and a total of 100,000 documents to review, it would take 100,000 minutes to complete the review. Whether that's one reviewer billing for 100,000 minutes, 20 reviewers billing for 5,000 minutes each, or 100 reviewers billing for 1,000 minutes each, the cost to complete the review is essentially the same: the hourly billing rate for the review applied to 100,000 minutes. All that is achieved by limiting the number of reviewers is increasing the time to complete production.

[5] State Defendants produced only 2,822 documents on August 13, continuing their snail-paced production. That production also was only three pages on average per document when not counting three outlier documents that alone account for over 2,500 pages (or about 23%) of the production. Those three documents could not have required meaningful time to review for production. For example, one is a 1,643-page audit log file, and another is the 520-page November 3, 2020 certification report.

[6] Plaintiffs sincerely hope State Defendants' counsel are not charging their clients—*and thus Georgia taxpayers*—for a review rate that's anywhere close to the five-minute per document rate State Defendants represented to this Court, which would be more than five times a normal review rate. Dkt. 1143 at 14:8-13 ("Based off of our estimation, five minutes of review per document . . . .").

production with what remains for review.

      B.     *The Completeness of State Defendants' Production Remains a Concern*

State Defendants claim that "[t]he number of documents remaining [] continues to expand" and that, "*[a]t the request of Plaintiffs' counsel*, State Defendants will be *adding* email documents of Mr. Gabriel Sterling for the time-period during which he was an independent contractor." (Dkt. 1149 at 3 (emphasis added).) That State Defendants are "adding" to their collection at this late date the specific email documents at issue for Mr. Sterling is deeply concerning and raises serious doubts about the adequacy of their search and collection efforts given the nature of the email account at issue—which State Defendants omit in their filing.

Plaintiffs merely asked State Defendants to confirm that their collection for Mr. Sterling includes his email address SterlingInnovative@gmail.com. This account should have been included already. State Defendants misleadingly refer to Mr. Sterling as a mere "independent contractor" during the time he used this email address. They omit that he was in that role in 2020 and that not only was he responsible—as an agent of Georgia's Secretary of State—for "the implementation of the Statewide Voting System for Georgia" that was purchased from Dominion, but that *he used his SterlingInnovative@gmail.com specifically for that very purpose*. (Ex. A.) Excluding this account from their searches was indefensible.

5

Another cause for concern about the sufficiency of State Defendants' production is that they still have not produced documents that Dominion produced last August, including emails that relevant employees of the Secretary's Office sent or received. Although Plaintiffs have those specific documents from Dominion, their omission from State Defendants' production indicates a serious failing in their search and collection efforts or in their preservation efforts—or perhaps both.

State Defendants offer no explanation for the exclusion Mr. Sterling's official Sterling Innovative email account from their search and collection efforts or for the omission of relevant documents Dominion previously produced. This raises serious concerns about other important sources of highly relevant documents they have ignored, overlooked, or otherwise omitted and about the sufficiency of their search and review efforts for those sources from which they have searched and collected documents. State Defendants, unfortunately, have been opaque about their efforts.

## II.   Curling Plaintiffs' Production

### 1.   *State Defendants' Arguments Are Not Properly before the Court*

Curling Plaintiffs object to State Defendants' inclusion in their Status Report of complaints about their document production. Not only did the Court not authorize them to include that in the Status Report it requested regarding their own long-overdue production, but they repeatedly declined to comply with this Court's

mandated dispute resolution procedures that require a joint discovery filing. They did not even meaningfully comply with the Court's meet-and-confer requirement.

Immediately before the parties were to confer regarding other issues, State Defendants' counsel insisted on addressing Curling Plaintiffs' production in that discussion. In an effort to cooperate, Curling Plaintiffs agreed to do so even though their lead counsel was unavailable due to a deposition, as had been made clear to State Defendants multiple times. That discussion occurred the Friday afternoon before State Defendants filed their August 10 Status Report, and it was the first time State Defendants articulated certain concerns (State Defendants' vague and improper claim at the prior conference with the Court that Curling Plaintiffs' production was somehow sanctionable was pure hyperbole and utterly baseless).

The Court should order State Defendants to comply with its mandated discovery dispute resolution procedures—both because they should adhere to the Court's rules and because a meaningful meet-and-confer between the parties may resolve whatever concerns State Defendants have. It is unclear what relief they are seeking and what is meant by the "requested direction from the Court." The Court's mandated procedures would at least narrow and crystalize any disputes for the Court.

### 2. *State Defendants' Recitation of the Facts Is Incorrect*

State Defendants' Status Report is wrong on several counts.

First, State Defendants claim that "all of the documents produced have apparently come from only one Plaintiff (Ms. Price)." (Dkt. 1149 at 5.) This is false. Ms. Curling has produced almost the same number of documents as Ms. Price.

Second, State Defendants claim that "the documents appear to have been gathered in advance of the September hearing on Plaintiffs' motions for preliminary injunction but for whatever reason were not produced until a few weeks ago." (*Id.*) This is misleading. State Defendants omit that they served specific document requests before the September 2020 hearing that the parties negotiated to a much narrower scope given the expedited nature of discovery then at that time (which was exacerbated by the late service of those requests by State Defendants). Curling Plaintiffs made a reasonably-diligent effort to search for documents within the scope of the requests *as agreed last August*, and their counsel made a reasonably-diligent effort to identify and produce documents within that scope. It comes as no surprise that there may be some documents previously collected that are responsive to the broader scope of discovery applicable today—a fact State Defendants ignore. And the omission of any document responsive to the prior, narrower scope that was not produced last August—assuming such a document exists—would be inadvertent.

Third, Curling Plaintiffs did not say that "more documents would be forthcoming" (apart from a few potentially-missing attachments, addressed below). (*Id*.) Instead, as stated in correspondence just prior to that meeting and verbally at the meeting, Curling Plaintiff's production is complete and has been complete for weeks.[7] State Defendants' persistent angst about this fact is difficult to understand or to reconcile with the fact that they want *another four months* to do the same.

Fourth, State Defendants' complain that "portions of the email chains [Curling Plaintiffs] did produce, and attachments thereto, are missing entirely from the production." (*Id.*) This is a significant overstatement about the production. Perhaps more importantly, though, State Defendants omit that Curling Plaintiffs agreed to investigate and produce the *six* missing attachments or email portions if located. As has been explained to State Defendants many times, Curling Plaintiffs are individuals, not a highly-resourced organization with IT staff and lots of other experienced personnel to conduct searches of emails and other files. Curling Plaintiffs' counsel, of course, have actively assisted with this process. But it would be no surprise that a small number of attachments were inadvertently not produced, which happens even with the most sophisticated organizations in discovery.

---

[7] State Defendants claim that Curling Plaintiffs' lead counsel informed them *after* the meet-and-confer that their production was complete. This is misleading. Another member of the team conveyed this to them before the meeting.

Fifth, State Defendants claim that "that no non-email documents had been produced whatsoever" by Curling Plaintiffs. This too looks to be untrue. A quick search of the file types Curling Plaintiffs produced indicates dozens of non-email messages in the production.

Ultimately, State Defendants' core concern seems to be based upon their belief that Curling Plaintiffs should have more responsive documents, especially non-email documents. But this is pure speculation—and it ignores the reality that Curling Plaintiffs are individual voters who are not responsible for Georgia's election system and thus who are unlikely to have many documents of relevance to the issues in this case. In fact, State Defendants have strained to attribute any relevance to Curling Plaintiffs' documents, resorting to the mantra that because they filed this case, their emails and other documents are obviously relevant. But that's not an argument based on facts, or frankly an argument at all—it's just an empty, conclusory claim. Moreover, given the well-established gaps in State Defendants' own production and their prior misstatements about their own documents, their speculative attacks on Curling Plaintiffs are ironic and not well taken.

    3.    *Personal Email and Social Media Should Be Subject to Mutually-Applicable Protocols*

The only specific issue State Defendants raise that is actually based in reality is that Curling Plaintiffs' personal emails were not recently produced. But this could

10

have come as no surprise—Curling Plaintiffs specifically confirmed this protocol with State Defendants for document productions by the parties in this case. Although State Defendants repeatedly resisted disclosing whether they were searching non-public social media accounts and personal emails for responsive documents, they finally admitted they were not. Curling Plaintiffs explained, during the tortuous dialogue, that they were trying to understand State Defendants' position on the issue to determine the search parameters for this case. Given State Defendants' position that those parameters should not include personal email and social media, Curling Plaintiffs applied those parameters to their own searches.

State Defendants now reverse course and suddenly argue that Curling Plaintiffs should be held to different parameters. This is unreasonable—and needlessly invasive of Curling Plaintiffs' privacy given State Defendants' past track record of publicly attacking Curling Plaintiffs and others they deem adversaries, including making false claims of criminal violations and launching bogus criminal investigations.[8] Curling Plaintiffs have legitimate concerns about State Defendants and their counsel needlessly delving into their personal emails and the like—and

---

[8] *See, e.g.,* Ben Nadler, *Report: No proof of Dem hacking claim by Georgia Gov. Kemp*, Associated Press (Mar. 3, 2020), https://apnews.com/article/us-news-elections-georgia-stacey-abrams-voter-registration-400f9c5e4add61c5fb30283d68945853.

11

doing so would be far from proportionate discovery in this case given the nominal, if any, relevance such documents have for any issue in this case.[9]

Moreover, personal emails and the like should be subject to mutually-applicable search protocols, if they are to be searched and produced at all. State Defendants admit they have declined to search "the personal email accounts of the Secretary's employees." (Dkt. 1149 at 5.) In typical fashion, it was like pulling teeth to get this admission out of them. They defend it by arguing that "the Secretary's Office does not conduct official business via personal email accounts." (*Id.*) This argument is misleading.

First, whether they "conduct official business via personal email accounts" is not the standard for discovery; if they sent or received emails that are relevant to this case and responsive to Plaintiffs' discovery requests, State Defendants are obligated to produce those. Second, multiple custodians have used personal social media accounts to communicate directly about this case. For example, Jordan Fuchs made false statements on social media attacking Plaintiffs and this Court.

---

[9] As State Defendants admit, Ms. Price did produce many emails, including attachments, from her email account that she uses with her voting rights organization, Georgians for Verified Voting. Although that organization is not a party to this case, given its nature and Ms. Price's use of that account for communicating from time to time about election-related issues, Ms. Price conducted a reasonable search of that account and produced responsive documents.

(Dkt. 1026.)[10]  Likewise, just this week, Gabriel Sterling attacked Dr. Alex Halderman (going so far as to overtly attack his honesty) on social media specifically regarding his work in this case and declined to answer whether he has seen Dr. Halderman's sealed report.[11]  Thus, it defies credulity that none of State Defendants' document custodians have communicated about this case, its participants, and the issues (and even the Court itself) in their personal email and social media accounts.  *Tellingly, State Defendants do not dispute this*, instead cleverly claiming only that employees do not use their personal email accounts to "conduct official business," which is beside the point.

Nevertheless, mindful of this Court's admonition about focused, abbreviated discovery, Plaintiffs did not object to this approach or intend to raise it with the Court.  They are comfortable with none of the parties searching personal email accounts and personal social media accounts for discovery here.  This is consistent with the abbreviated discovery schedule in this case and this Court's repeated admonition for the parties to narrow the scope of discovery, which State Defendants have resisted (except when it serves them).

---

[10] The Court has not yet resolved this discovery motion.
[11] Gabriel Sterling (@GabrielSterling), Twitter (Aug. 13, 2021 5:19 PM), *responding to* Edward Perez (@eddieperezTX), Twitter (Aug. 13, 2021 4:44 PM), https://twitter.com/eddieperezTX/status/1426283596621434884.

**III.    Access to Dr. Alex Halderman's Sealed Report Detailing Numerous Serious Flaws with Dominion's Voting Equipment**

Three concerns warrant this Court's attention regarding access to Dr. Halderman's sealed report.

First, Gabriel Sterling—Chief Operating Officer and Chief Financial Officer for Georgia's Secretary of State—recently publicly stated that Dr. Halderman's report is "a load of crap." This was in answer to a specific question about public Dr. Halderman's finding of serious vulnerabilities that could alter votes and election outcomes in Georgia. State Defendants have declined to explain the basis for Mr. Sterling's claim given he is not permitted access to the sealed report, per this Court's Protective Order, and given the vulnerabilities he has identified are disclosed only on that sealed report (not his public reply report, since State Defendants' experts did not address those vulnerabilities in their reports). State Defendants, to date, have declined even to clearly indicate whether they have asked him directly if he has had access to the sealed report or its substance. The Court should require them to immediately file a sworn statement explaining the basis for Mr. Sterling's claim and unequivocally stating whether he has had access to the report or learned anything about its substance.

Second, this Court directed State Defendants to discuss a protocol for

14

sharing Dr. Halderman's findings with appropriate individuals at Dominion with necessary and sufficient safeguards in place to protect against unwarranted disclosure to others. State Defendants have refused to provide any information about any such discussions with Dominion, including whether they have occurred at all. The Court should order them to immediately file a report detailing any communications they have had with Dominion about access to Dr. Halderman's sealed report or the substance thereof. As Curling Plaintiffs and Dr. Halderman have made clear, they are anxious to work out an appropriate protocol that enables Dominion to try to mitigate the serious vulnerabilities with their equipment given its continued used in Georgia and elsewhere.[12]

Third, Curling Plaintiffs invited State Defendants to propose a similar protocol for disclosure to necessary employees of the Secretary's Office, for the same purpose: to try to mitigate the serious vulnerabilities with the Dominion

---

[12] This is even more important and time sensitive in light of recent events regarding Dominion's election software. Just this past week, images of Dominion's election management system servers (which it claims are confidential) reportedly were publicly distributed. (Ex. B, Hursti Declaration.) These purport to be authentic copies from those with access to the necessary equipment, and thus — if true — could provide a road map to how similar EMS servers in Georgia are configured and operate, exacerbating already extreme vulnerabilities with Georgia's Dominion voting system. *See* AJ Vicens, *QAnon Hero Claims to Present Sensitive Election Files at MyPillow CEO Event*, MotherJones (Aug. 11, 2021), https://www.motherjones.com/politics/2021/08/qanon-hero-claims-topresent-sensitive-election-files-at-mypillow-ceo-event/.

equipment given its continued used in Georgia. They have declined this invitation to date, leaving Curling Plaintiffs susceptible to those vulnerabilities in elections. It is curious and unsettling that State Defendants are disinterested in devising a protocol for their own access beyond their outside counsel, and that their own experts still have not examined the Dominion equipment themselves (or otherwise addressed, much less disputed, the specific vulnerabilities Dr. Halderman has detailed with that equipment).

Dated: August 16, 2021

Respectfully submitted,

 */s/ David D. Cross*
David D. Cross (*pro hac vice*)
Veronica Ascarrunz (*pro hac vice*)
Mary G. Kaiser (*pro hac vice*)
MORRISON & FOERSTER LLP
2100 L Street, NW
Suite 900
Washington, DC 20037
Telephone: (202) 887-1500
DCross@mofo.com
VAscarrunz@mofo.com
MKaiser@mofo.com

Halsey G. Knapp, Jr.
GA Bar No. 425320
Adam M. Sparks
GA Bar No. 341578
KREVOLIN & HORST, LLC
1201 West Peachtree Street, NW
Suite 3250
Atlanta, GA 30309
HKnapp@khlawfirm.com

16

Sparks@khlawfirm.com

*Counsel for Plaintiffs Donna Curling, Donna Price & Jeffrey Schoenberg*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,** <br> **Plaintiffs,** <br><br> **v.** <br><br> **BRAD RAFFENSPERGER, ET AL.,** <br> **Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

                                                       */s/ David D. Cross*
                                                       David D. Cross

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,** Plaintiffs, <br><br> v. <br><br> **BRAD RAFFENSPERGER, ET AL.,** Defendants. | Civil Action No. 1:17-CV-2989-AT |

### CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2021, a copy of the foregoing **CURLING PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' DISCOVERY STATUS REPORT** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

                                                 */s/ David D. Cross*
                                                 David D. Cross