The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

1               IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA

2                  ATLANTA DIVISION

3

4  DONNA CURLING, ET AL.,         :
                       :

5        PLAINTIFFS,      :
  vs.                    :  DOCKET NUMBER

6                       :  1:17-CV-2989-AT
  BRAD RAFFENSPERGER, ET AL.,  :

7                       :
        DEFENDANTS.      :

8

9

10     **TRANSCRIPT OF STATUS CONFERENCE (VIA ZOOM) PROCEEDINGS**

11         **BEFORE THE HONORABLE AMY TOTENBERG**

12          **UNITED STATES DISTRICT JUDGE**

13            **AUGUST 19, 2021**

14              **1:41 P.M.**

15

16

17

18

19

20

21   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22            *TRANSCRIPT PRODUCED BY:*

23

*OFFICIAL COURT REPORTER:*      *SHANNON R. WELCH, RMR, CRR*

24                       *2394 UNITED STATES COURTHOUSE*
                         *75 TED TURNER DRIVE, SOUTHWEST*

25                         *ATLANTA, GEORGIA  30303*
                         *(404) 215-1383*

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:
 4

 5        DAVID D. CROSS
          MARY G. KAISER
 6        VERONICA ASCARRUNZ
          MORRISON & FOERSTER, LLP
 7
          HALSEY KNAPP
 8        ADAM SPARKS
          KREVOLIN & HORST, LLC
 9

10
     FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
11   WILLIAM DIGGES, III, AND RICARDO DAVIS:

12
          BRUCE BROWN
13        BRUCE P. BROWN LAW

14        ROBERT A. McGUIRE III
          ROBERT McGUIRE LAW FIRM
15

16   FOR THE STATE OF GEORGIA DEFENDANTS:

17
          VINCENT ROBERT RUSSO, JR.
18        CAREY A. MILLER
          ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
19
          BRYAN TYSON
20        JONATHAN D. CRUMLY SR.
          TAYLOR ENGLISH DUMA
21

22   FOR THE FULTON COUNTY DEFENDANTS:

23
          DAVID R. LOWMAN
24        CHERYL RINGER
          OFFICE OF FULTON COUNTY ATTORNEY
25
```

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; August 19, 2021.)**

1  THE COURT:  All right.  Very good.

2  Good afternoon, Counsel.  We're here for the

3  discovery conference in Donna Curling vs. Brad Raffensperger,

4  Civil Action Number 1:17-CV-2989.

5  I am in receipt of the materials that were sent this

6  morning by counsel.  I cannot profess to have studied any of

7  them in detail.  I have been in hearings in another matter the

8  better part of the morning, going into the early afternoon

9  so -- but I -- other than to surmise, per the norm here, that

10  there is a great deal of conflict.  But I have looked at it

11  briefly.

12  I don't know -- you know, obviously I sent out an

13  agenda for discussion.  And I'm certainly happy to have -- for

14  anyone to add things.  But I would like to at this juncture, in

15  order to avoid a free-for-all, basically keep with the schedule

16  identified on my order of August 17, 2021.

17  I realize there was the State's filing.  I think it

18  was intended to deal with that in part at least.  And I got as

19  far as in terms of detailed reviewing this at Page 6 with the

20  central repository.  I had questions about what I had seen in

21  the first part of it.  And counsel for the State had questions

22  about what did I mean about whether AI is being used to guide

23  refinement of the search production process.

```
1              And just further to fill in the gaps here, I did read

2    Mr. -- the section of Mr. Curling's letter as detailed -- that

3    addresses what Curling plaintiffs view as the

4    misrepresentations in defendants' submission as to the AI

5    review process.

6              I would like to avoid getting into all of the morass

7    of that.  But really again just try to understand just starting

8    with the AI question is that:  You can use artificial

9    intelligence in the way that people use Pandora to select --

10   for it to select music that you like based on music that you

11   like.

12             And I know that all of you are sophisticated complex

13   litigators.  So you know all about this.  But based on the

14   certain set of successful or unsuccessful choices in

15   identification of documents, it will take other ones and

16   discard other ones based on that learning experience.

17             And that is what I had in mind in asking about

18   whether you were using any form of AI for that purpose.

19             Is that correct for the State?

20             MR. MILLER:  Yes, Your Honor.  This is Carey Miller

21   on behalf of the State.

22             In terms of Your Honor's description of artificial

23   intelligence, we're not using a sort of program that identifies

24   documents on its own.  We can certainly explore that option.

25             As we have discussed in our filing though, each of
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1    these kind of tools, some of which we are using, comes at a

2    significant expense to the State.

3           And, Your Honor, the State defendants' position is

4    the direction from the teleconference on the 26th is that the

5    State should proceed producing documents on those search terms

6    that were discussed then.  And that is what we are doing.

7           THE COURT:  Right.  Well, what I understood -- I

8    understood that that is what you were doing.  It is just that I

9    heard in our last conference that you felt that you were --

10   that it was leading to a lot of dead ends and an enormous

11   amount of work and it was going to take more months because of

12   this.  And that is why I asked these questions.

13          MR. MILLER:  I understand.

14          THE COURT:  And I also understood from other

15   litigation experience that, you know, sometimes when you see

16   this that you can share reports regarding -- with the other

17   side about how much is being created that is responsive and

18   which is not being responsive to specific terms, all of the

19   things that I'm sure you all know better than me, in fact.

20          And so that if you looked at those reports together,

21   you might actually come into some consensus of a way to

22   streamline it.  That is what I was trying to get at.

23          MR. MILLER:  I understand, Your Honor.

24          Frankly, the State defendants walked away from the

25   prior conference sort of assuming that we were proceeding on

1    this path.  We'll certainly explore whatever options there may

2    be available and the cost of those options.

3         We are using Relativity, which is a pretty common

4    platform for review projects.  And Your Honor is correct.  The

5    search terms as they currently stand are pulling up a large

6    number of irrelevant documents, documents that have no relation

7    to this case.  And that is part of what is taking a significant

8    amount of time.

9         We will discuss the matter with our vendor and see

10   what options may be available to try and explore using AI or

11   trying to create search terms based off of those that have been

12   identified as responsive to this point.  We're certainly happy

13   to do that.

14        Frankly, I just don't want the Court to take the

15   impression that we were being ignorant of that option.  We

16   didn't understand that to be an option on the table at this

17   juncture.

18        THE COURT:  Well, after the first discovery

19   conference, I said go forward.  And that is -- and that is what

20   I meant.

21        But you basically -- then we got back to the

22   complaints -- the same round of complaints that everything is

23   going so slowly.  So that is why I asked whether you were

24   sharing reports and about what -- I don't know whether you

25   received any actual reports.  But it looked like you had from

1      the data that has been shared -- that the State has provided

2      about how many -- the percentage of nonresponsive documents or

3      that are irrelevant.

4              So that is why I thought perhaps if you had a

5      breakdown you might be able to share that with the plaintiffs'

6      counsel and things could be refined a little bit more.

7              MR. MILLER:  Yes, Your Honor.  And we don't have our

8      vendor right now creating kind of weekly reports.  Frankly, it

9      just adds another layer of cost to the State.  We can certainly

10     do that if it is going to get us to a situation where we can

11     narrow the overall scope and then reduce the overall cost.

12             I think that is certainly fruitful or worth trying.

13     And we will have our vendor work on that immediately and see

14     what we can come up with.

15             THE COURT:  So these are not contractors you

16     clarified in your submission?  These are lawyers who are

17     already on staff who are working on this?

18             MR. MILLER:  That's correct, Your Honor.  These are

19     attorneys that are at either law firms of Taylor English or at

20     my law firm, the Robbins Firm.

21             And we went about it that way for a few different

22     reasons.  First of all, State's counsel that is in the case is

23     most familiar with what the case is about, the concepts at

24     issue, the claims at issue.

25             Secondarily, of course, the State wants to have a

1    concept as to what it is producing in this rush to push out

2    documents.

3            And, third, just the timeline it takes to get

4    contract reviewers up to speed.

5            You know, frankly, Your Honor, at this point, while

6    we are headed in this direction, it seems likely the State will

7    need to end up engaging full-time reviewers.  But also just I

8    want the Court to be aware that the document review we're

9    looking at right now, setting aside further revision of the

10   search terms made possible by, you know, various tools and

11   Relativity, the discovery process and document review we're

12   looking at right now is one that is for a typical case headed

13   to full trial on the merits at minimum if not beyond the scope

14   of Rule 26 for such a case.

15           It is just simply not what we understood the Court

16   envisioned as an abbreviated discovery.

17           THE COURT:  All right.  And what was your -- just to

18   sort of continue to deal with these production issues, I did

19   not get to the point of looking at what you had indicated in

20   response to the issues about the repository.

21           MR. MILLER:  Your Honor, as to the State's shared

22   server drive, we expect we'll be able to produce those at the

23   latest by September 3.  So within two weeks.

24           We actually think we'll be able to do it quicker than

25   that.  But I don't want to make any false promises here.

```
1          THE COURT:  Who on behalf of plaintiff is going to be
2    speaking about the first two topics about the document
3    production?
4          MS. KAISER:  I am, Your Honor.  This is Mary Kaiser
5    on behalf of the Curling plaintiffs.
6          THE COURT:  All right.  Was there anything that you
7    wanted to add or point out that you think would actually assist
8    in facilitating this process?
9          MS. KAISER:  Your Honor, certainly if the State is
10   prepared to offer reasonable modifications to the search terms,
11   we will consider those.  That is not something that has
12   happened, you know, in the last several weeks.
13         From our perspective, a 40 percent responsiveness
14   rate is not abnormally low in a review such as this one.  It is
15   actually fairly good.
16         And really what concerns us is the fact that (Zoom
17   interference) to provide the Court some specifics.  You know, I
18   think the industry standard is that a contract reviewer should
19   be able to review something closer 50 to 65 documents per hour
20   unless the documents are substantially longer than the average
21   documents that we're seeing in the production.  We just don't
22   see why we can't get through this faster, Your Honor.
23         And if they have 16 reviewers reviewing these
24   documents, we believe they should be able to get through them
25   much -- no longer than 30 days, probably quicker than that.
```

```
 1    But --
 2                THE COURT:  Mr. Miller -- let me stop you for a
 3    second.  You were shaking your head about what she -- what
 4    Ms. Kaiser said about the industry standards.
 5                Do you have a basis for disagreeing?
 6                MR. MILLER:  Yes, Your Honor.
 7                So, first of all, I'll compare it to our production
 8    in the Fair Fight matter.  In that instance, we didn't reach --
 9    even approach 60 documents per hour.  You know, frankly -- and
10    I looked at the citation that the plaintiffs' counsel provided
11    in one of their filings which was actually to a motion for
12    attorneys' fees and what amount of attorneys' fees would be
13    recoverable on the basis of document review for attorneys who
14    were receiving the documents, not those who were producing
15    them.
16                But setting that aside, what the citation there said
17    was to this Sedona conference, the Sedona principles, the
18    eDiscovery conference.  The concept there was not that, you
19    know, 50- or 60,000 pages I think in the filing is necessarily
20    produced.  But the example they were discussing there would be
21    if you had 50 100-page documents.
22                And, Your Honor, this is way far into the weeds.  But
23    to give Your Honor a picture of the platform we're using, it is
24    essentially a program on your computer that shows an image of
25    each document.
```

1     So as each document is pulled up, it takes time to

2  pull it up.  You know, sometimes it is working properly and it

3  is only a matter of a couple of seconds.  Sometimes it is going

4  slowly.  But the reality is:  To do 60 of these documents in an

5  hour would be clicking through them without coding them as to

6  any responsiveness, really.

7     Now, one thing that we did note in our filing that we

8  are engaging in is an email threading process where all of the

9  emails will essentially be condensed down.  So it reduces the

10 number of documents.

11     What I found in the *Fair Fight* case is that the long

12 documents are not what takes time.  This is not something where

13 the defendants are necessarily looking through every single

14 line of the documents.  It is understanding what the document

15 is, understanding what needs to be applied in terms of the

16 protective order, which can often be done quickly.

17     But if there are multiple, tiny documents, they

18 actually end up taking longer than a few large documents.  I

19 know this is way far into the weeds.  But I did want to point

20 that out.

21     And, Your Honor, I did also want to note for the

22 Court actually just today we have added an additional five

23 reviewers to our process right now.  And combining that and the

24 email threading and our last production, I don't expect it to

25 be 8000 documents static per week reviewed.  It is continuing

```
 1   to ramp up a little bit.  But that is to be expected in a

 2   project of this nature.

 3              THE COURT:  And you are producing the documents --

 4   what? -- once a week or what?

 5              MR. MILLER:  Once a week, yes, Your Honor.

 6              THE COURT:  And that is on a Friday.  Or is that on a

 7   Monday after the week or --

 8              MR. MILLER:  It is on a Friday, Your Honor.

 9              THE COURT:  Well -- go ahead.

10              MR. MILLER:  Your Honor, I was just going to -- you

11   know, to the point of the overall process, we're adding these

12   additional reviewers.  And the plaintiffs have made a point a

13   few times that whether who is reviewing it it is the same cost.

14   And that is true.  But it ignores the issue that State

15   defendants understood as to whether this is the abbreviated

16   discovery the Court envisioned that is focused on plaintiffs'

17   standing.

18              Right now, you know, there is nothing in the State

19   defendants' possession that is going to go to defining a

20   particularized injury, that is going to go to defining the

21   concreteness of verifiability.  These are issues that are not

22   going to be resolved by document productions of the State.

23              MR. McGUIRE:  Your Honor, Robert McGuire for the

24   Coalition plaintiffs.

25              Just to follow on to that last comment, a bit of
```

1    response and also a bit of just inserting the additional thing

2    that isn't necessarily covered in these topics but -- wasn't

3    mentioned in the order but is still live.

4         The State has not produced the election project files

5    that we have asked for that we talked about on July 26.  So

6    that is one of the things that we believe does go to our

7    standing.  It does go to the burden on voting and whether votes

8    are being counted accurately.

9         And so in addition to the documents that are

10   outstanding, these election project files are documents that

11   the State has not produced yet, which we would also want them

12   to commit to producing.

13        MS. KAISER:  Your Honor --

14        THE COURT:  I think that is what I meant -- I think

15   that is what I meant to encompass within Item 6 where I said

16   plaintiffs' counsel are also directed how this request for the

17   election -- for the election equipment interfaces with their

18   request for the statewide election files.  I thought that is

19   what I was referring to.

20        MR. McGUIRE:  Okay.  We can hold off until we cover

21   6, of course.

22        THE COURT:  No.  We can just go ahead and discuss

23   that.  But I mean, I think that we might -- if you are saying

24   that that is what's critical, let's do that first.  And then

25   we'll go and talk about the other matters as to 5, for

1    instance, after that, which is 6 and 5 and skip 3 and 4 for

2    now.

3         MR. MILLER:  Your Honor, if I may -- I apologize.  If

4    I may briefly with respect to the comment of Mr. McGuire.

5         You know, as he stated about whether votes are being

6    counted accurately, that does nothing to further the

7    generalized nature of the plaintiffs' grievances here.  If

8    we're talking about all Georgia voters being similarly

9    situated, this is the same situation as the *Wood* case.

10        As to the production of the project files, I'll defer

11   to Mr. Tyson and let him explain what the State has produced.

12        THE COURT:  Okay.

13        MR. TYSON:  Thank you, Your Honor.

14        So in terms of the election project files, I think we

15   need to distinguish between the project files and the election

16   equipment that has been subpoenaed from Dominion and from

17   Fulton.  I think those are two separate pieces.

18        THE COURT:  All right.

19        MR. TYSON:  The project files are the pieces that are

20   extracted from the election management system at the conclusion

21   of each election.  Those are then supposed to be returned to

22   the State.

23        And what we have -- what we have produced to the

24   plaintiffs is all of the election project files or anything

25   else that we received from the counties that they generate from

 1    the system post-election.

 2           If the plaintiffs -- and we have said this

 3    repeatedly, and you have heard this repeatedly.  If they wish

 4    to go to the counties and get the election project files from

 5    them, they are free to do that.  They have subpoenaed plenty of

 6    counties in this case.

 7           But we as a State don't have them.  And we take the

 8    position that we have no -- it is not in our custody or control

 9    to go and try to get them and extract them from county election

10    management systems at this point.

11           We're not going to collect them.  We have given them

12    everything that we have on those election project files.

13           MR. McGUIRE:  Your Honor, we have discussed this with

14    Mr. Tyson over email.  I think it was about a week and a half

15    ago and kind of arrived at a stalemate.

16           Our understanding is that there is an election

17    bulletin for counties that say they must -- it uses the word

18    must -- return these election project files to the State.  And

19    so therefore things are constructively in the actual

20    possession, custody, and control of the State.  So the State

21    has the power and authority to obtain them unless the election

22    bulletins are not mandatory for counties to follow.

23           So in the course of my correspondence with Mr. Tyson,

24    I asked him, are you taking the position that your election

25    bulletins are not mandatory for counties to follow?  And he

1    would not answer that question.  He said that that was an

2    improper interrogatory to counsel and just basically left that

3    question outstanding.

4         My second question to him was, will you object or

5    instruct the counties to object to a subpoena, or will you not

6    oppose the subpoena?  And we got back after some back-and-forth

7    kind of a half answer that they won't object but they reserve

8    their rights to object.

9         So, you know, our options at this point are either

10   serve discovery on the counties, do it via subpoena, and

11   potentially have a variety of election -- of discovery disputes

12   that we would then have to bring to the Court or potentially

13   none or pursue a discovery dispute directly with the State

14   based on this position they have that even though they have

15   issued a bulletin that says something must be provided to them

16   they don't actually have authority to obtain it.

17        So we're willing to do whatever makes the most sense

18   and whatever would be the most efficient dealing with the

19   Court's resources.  But the way things have gone in this case,

20   we are anticipating that if we do what they say we're just

21   going to run into a different line of defense further down that

22   has us fighting with a bunch of counties over something that we

23   should be able to get directly from the State, according to

24   their own election bulletin.

25        So the bottom line is we need this information.

1    Mr. Miller says that it bears on all voters being similarly

2    situated, and therefore it doesn't really bear on the standing.

3    It doesn't really help us with the standing injury.

4            We disagree with that.  Obviously a burden on the

5    right to vote is a standing injury.  It is also evidence on the

6    merits.  But to the extent that it applies to all voters

7    generally, that is just not the case.

8            We're actually looking for the election project

9    files -- we have narrowed our list.  We're specifically looking

10   for the election project files that have to do with the

11   jurisdictions in which our individual plaintiffs and the

12   members of the Coalition for Good Governance actually vote.

13   Because if there is evidence in those project files, as we have

14   seen in the ones we have received, that votes are being

15   miscounted both in the original count, in the hand recount, and

16   in the machine recount -- they are all producing different

17   numbers -- that very directly bears on our plaintiffs'

18   standing.  Because these are the precincts -- the files cover

19   the precincts in which our plaintiffs are voting.  And that is

20   very --

21           THE COURT:  How many counties are those?

22           MR. McGUIRE:  I think it is six or seven.  We

23   narrowed it by email.  It is a list of six or seven counties.

24           THE COURT:  And do you remember what those are?

25           MR. McGUIRE:  They were the big ones.  I think it was

1    Cobb, Dekalb, I believe -- a couple of other ones.  I would

2    have to go back and dig up the email.  But they were the large

3    counties that hadn't produced these files to the State.

4         THE COURT:  Well, Mr. Tyson, I think that they are

5    entitled to at -- and the Court is entitled to know if they

6    subpoena these from the counties are you going to -- is the

7    State going to file objection?

8         MR. TYSON:  Your Honor, we don't plan to.  The only

9    reason -- in our email to Mr. McGuire, we just said we can't

10   waive necessarily -- we haven't seen the subpoenas to see all

11   that would be included.  If it is just for those project files,

12   we're not going to assert objections about those.

13        And in addition to the other point he was asking on

14   official election bulletins, we have been in this case a long

15   time.  Counties run elections.  Official election bulletins are

16   guidance from the State.  They are not binding on the counties.

17        And if they serve a subpoena and as long as it is for

18   those project files of the county, we're not going to object to

19   that.  We just didn't know what the terms of the subpoena would

20   be otherwise.  And that was what we stated in the email to

21   Mr. McGuire.

22        But I think, again, we're now kind of veering from

23   vulnerability into compromise of the election system, which is

24   not really -- it is -- as an aside on that, that is not an

25   issue in the case as we have discussed at length here.

```
 1              THE COURT:  All right.  Well, we'll discuss the next
 2    thing after that.  But it sounds to me at least -- it sounds to
 3    me though that the plaintiffs could pursue that subpoena --
 4    have a single subpoena for that at least so that it is an
 5    individual one that doesn't get into all sorts of other stuff
 6    so that it is more straightforward and that that would be
 7    worthwhile then.
 8              I mean, it is hard -- we're going to just go round
 9    and round if the State says they don't have authority and don't
10    exercise authority to demand it and then the reliance is on
11    this bulletin.  I think it makes it more complicated,
12    especially in the current legal context if they say they don't
13    have authority to mandate it.
14              MR. McGUIRE:  We are --
15              THE COURT:  Counsel, do you want to explain, even
16    Mr. McGuire and/or Curling counsel, what you are -- more about
17    how this particular discovery that we're having these debates
18    about and -- how it is going to be framed to provide an
19    evidentiary and legal basis for addressing the standing issues?
20              MR. McGUIRE:  Certainly.  Rob McGuire for the
21    Coalition plaintiffs.
22              Your Honor, we -- we have approached the case with
23    the idea that we have multiple grounds for standing.  And
24    obviously we have briefed it a number of times, including in
25    February of this year.
```

1          And I think what has happened is we have got the

2     other election cases.  We have the *Wood* case, the *Jacobson* case

3     that have sort of thrown a lot of dust in the air about whether

4     the standard for establishing standing has in some way changed.

5          Our -- our view on how all these cases have affected

6     standing -- and that bears on how we are conducting

7     discovery -- is that those cases have not, in fact, changed the

8     doctrine of standing in any way that bears on our standing in

9     the case.

10          So first and foremost, one of the things that has

11     been kicked around a lot is the *Wood* case and its standing and

12     whether all voters are affected.  And, you know, to back up

13     from that, we are -- we -- I, for example, represent the

14     Coalition for Good Governance, which is an entity.

15          And the Coalition for Good Governance does have its

16     own direct organizational standing to bring the claims that are

17     being brought by the Coalition plaintiffs in this case.  And if

18     you look at the Eleventh Circuit precedent, we only need one

19     plaintiff to have standing per claim.  And we have it through

20     the Coalition for Good Governance's organizational standing.

21          So obviously we're not doing any discovery of our own

22     on the issue of standing because we're in possession of all of

23     that information.  But what we have done is we have produced in

24     response to the State's discovery request materials that are

25     more than sufficient to establish that the Coalition for Good

1    Governance has organizational standing based on a diversion of

2    resources away from things that the Coalition would be doing in

3    the future.

4         And, of course, as this case has gotten -- has moved

5    along, the future has started as being things that are now in

6    the past and now we're proceeding into the future.  So standing

7    is constantly -- has to be maintained constantly.  And we are

8    constantly having to show that we had standing at the beginning

9    and we continue to have standing throughout the action.

10        And our diversion -- the Coalition's diversion of

11   resources began at the beginning and has continued and is

12   continuing in this -- continuing into the future.  We're

13   diverting resources away from projects that we would be doing

14   otherwise.  And we are diverting it to -- in opposition to the

15   State's enforcement conduct as challenged in this case.

16        And there's lots of evidence that we have given them

17   about that.  Presuming that that evidence is sufficient in the

18   Court's eyes, that solves the standing problem for --

19        THE COURT:  Well, the only thing it does -- I

20   understand the diversion theory.  But that goes to the

21   Coalition.  But the Coalition is still -- the harm that the

22   Coalition suffered still as a result of servicing its members

23   has become more complex or the burdening of their mission in

24   that connection.

25        So I mean, there is a degree to which obviously the

1    claims of the members is tied to the duality of the

2    organization to its harm.

3         So what do you -- are you looking for anything

4    specific at this juncture as to -- or what is the evidence that

5    you are thinking will prove that the members have suffered

6    individualized harm, particularized harm that is different than

7    the electorate at large?

8         MR. McGUIRE:  So --

9         THE COURT:  And I will just say -- comment one thing

10   about all of this.  When these cases were originally briefed

11   several years ago, we haven't -- having it all spin out in the

12   context of an election case is different than having it spin

13   out in the context of other cases.

14        And, you know, you may be right that it hasn't

15   changed anything.  But I think the way it has been applied and

16   the sorts of circumstances that has to be applied in the last

17   2020 election does give it a color and shape that might not

18   have been at least to all so evident that it was going to -- so

19   that is why I'm asking to be more particularized.

20        For instance, you-all were arguing both dilution

21   before, which I think really because you were -- and it was a

22   claim that had some similarities to the ones asserted by

23   Mr. Wood as to -- you can shake your head.  But it is related

24   to the use of absentee ballots -- being forced to use an

25   absentee ballot as opposed to -- because you don't trust the

```
 1    automated methodology, the in-person methodology.

 2            MR. McGUIRE:  Yes, Your Honor.

 3            THE COURT:  So I think there are some modifications.

 4    But I think that is -- I don't want to hear myself talking,

 5    frankly.

 6            So go ahead.

 7            MR. McGUIRE:  Your Honor, just to address that point,

 8    so organizational standing -- set it aside, our position is

 9    that if we have that everything is good.  If we're going to

10    look at non-organizational standing, the Coalition has

11    associational standing, which as you rightly point out derives

12    from the rights of the individual members of the organization

13    to sue on their own behalf and also we have individual

14    plaintiffs who are suing on their own behalf.

15            So if any one of these has standing in terms of an

16    injury that permits them to come in and make the merits

17    argument, then all of them have standing.

18            Now, our theory of individual standing therefore is

19    looking -- you have to look at two different things.  Because

20    if you read the Eleventh Circuit cases, which we very carefully

21    tried to follow, especially given the focus on standing that

22    has sort of emerged in the last, you know, year of this

23    litigation, there is -- it is important to recognize that there

24    is a distinction between standing -- the injury that gives you

25    standing and the burden that makes you win on the merits.
```

1          And so the injury that gives you standing might not

2    be enough to win on the merits.  The burden that lets you in on

3    the merits is an injury for standing purposes.  But you don't

4    have to -- it doesn't have to be one and the same.

5          We briefed all this in February in Document 1074 on

6    the docket.  But the distinction between the standing injury,

7    which in the words of all the courts that have looked at it can

8    be fairly trivial, it can be a minor inconvenience, it doesn't

9    have to be the thing that makes the conduct you are challenging

10   unlawful.

11         So all of these -- all of these objections to our

12   standing that are based on the fact that you are like all the

13   other voters in the world is ignoring the individualized

14   inconveniences that our particular plaintiffs have alleged as

15   standing injuries.

16         Now, we tried to -- because of the shift in focus of

17   standing, obviously we don't want to rest on injuries that we

18   think are sufficient.  If they are not compelling, they should

19   be sufficient legally to get us into the courthouse where we

20   can argue the merits.  But if they are not compelling on their

21   own, we wanted to bulk those up.

22         So we have been doing a lot of discovery that is more

23   focused on the merits and the burdens on the merits.  But it is

24   important -- it is important in this context to recognize that

25   once we're in the courthouse door because of the standing

1    injury the burden argument is not tied just to the standing

2    injury.  I mean, the burden argument on the merits can be much

3    broader.

4             So our discovery that is aimed at things like the

5    machines not counting votes, it goes both to the merits and to

6    the standing of our individual members who are casting the

7    votes that the machines aren't counting.

8             So the additional wrinkle is that we're seeking

9    prospective injunctive relief.  And so therefore by definition,

10   we're not allowed to sue for harms that have already occurred.

11   They have 11th amendment immunity for harms that have already

12   occurred.

13            But harms that have already occurred are recognized

14   as being evidence of likely future harm.  And the future harm

15   is what we have to show in order to have standing to get in the

16   courthouse and argue the merits.

17            And so if you look at the cases that have come out,

18   the *Wood* case involves -- I mean, it was decided in a way on

19   standing injury.  But that case involved past harms.  It

20   involved harms that have already occurred.  And the remedy that

21   was being sought was some kind of future remedy for harms that

22   had already occurred.

23            That is not like our case.  We are seeking to avoid

24   future harm to our voters, and there is past harm that has

25   occurred that tends to substantiate that our fears are

1    realistic that we're going to suffer these harms in the future

2    due to the -- due to the vulnerabilities and insecurities and

3    deficiencies in the voting systems and processes that we are

4    challenging.

5            So that's a long winded way of saying our discovery

6    is oriented towards standing.  And it is important to recognize

7    that to the extent that looks like we're getting into the

8    burdens on voting that might be more broadly applicable.  Those

9    are merit -- things to pursue on the merits.  And it is

10   legitimate merits discovery.

11           But to the extent that it applies to our specific

12   plaintiffs and it gives them a realistic chance of being

13   injured, that is also standing injury.  But it is not necessary

14   for us to show those burdens of the voting system in the

15   constitutional sense in order to be entitled to come into the

16   courthouse and make that argument.  We just have to show that

17   we had to pay for a postage stamp.  We have to show that it was

18   inconvenient, that we couldn't vote in our precinct.

19           These are all things that the Eleventh Circuit has

20   found permit standing.  These are standing injuries.  And they

21   are all different than the standing injuries that were rejected

22   in *Wood* and in the *Jacobson* case -- in both *Wood* cases and in

23   the *Jacobson* case because, you know, vote dilution was one of

24   the *Wood's* injuries and the general sensibility that the

25   election should be run with integrity was one of the *Wood's*

1    injuries.  And those are all very general.

2          The vote dilution injury is -- the defect there was

3    that he offered no comparison -- no comparison point.  Diluted

4    compared to what?

5          We're not making those same kinds of allegations.

6    We're making the allegations that are particularized to the

7    individuals that are our plaintiffs and the members of the

8    Coalition.

9          THE COURT:  All right.

10          MR. MILLER:  Your Honor --

11          MR. CROSS:  Your Honor, if we're into --

12          THE COURT:  Let me just hear from Mr. Cross first.

13          MR. CROSS:  Yes.  Since it looks like we're into the

14    question of standing.

15          I'm sorry, Your Honor.

16          THE COURT:  I can hear you.  I think your picture is

17    frozen, but I can hear you.  All right.

18          MR. CROSS:  So since we're on this issue, I just want

19    to be clear and pick up where Mr. McGuire was.  It is important

20    to keep in mind that under the Eleventh Circuit and the Supreme

21    Court standard, for standing, we only need to establish what

22    the Court has called a substantial risk that the harm we allege

23    will occur.

24          And here the defendants misstate the harm that we

25    allege.  They only focus on a part and they only focus on a

1    part of the right to vote.  They act as if our harm here is

2    premised only on an actual hack of the system that

3    disenfranchises the plaintiffs.  And that is part of the harm

4    we're concerned about, but it is not the only harm.  And what

5    they do is they focus only on the right to cast a ballot.  That

6    is all they ever address.  They say, look, we have given you a

7    system to cast a ballot, that is our only obligation.  Beyond

8    that, we are done.

9         But that is not the law.  Right?  In *Reynolds vs.*

10   *Sims*, the Supreme Court emphasized that it is also the right to

11   have your vote counted.  And that is what our case really

12   focuses on.  And why the vulnerabilities themselves are

13   sufficient to establish standing.  And ultimately they collapse

14   into the merits of our case, which is one of the things that

15   the courts have emphasized over the years that oftentimes the

16   standing analysis gets bound up in the merits.  And we submit

17   that is exactly what is going on here.

18        Our position is our clients have the right to leave

19   the voting booth reasonably confident that their vote will

20   count.  And the defendants do not ever address that part of the

21   constitutional right to vote.

22        And our position ultimately is that a system can

23   become so hopelessly vulnerable, particularly in an environment

24   where it is undisputed that there are sophisticated attacks on

25   that system all the time in every election, that it no longer

1    protects the right to vote.  And we don't mean just in the

2    sense that at some point they may have their votes stolen.

3    That is part of it.  But it is the loss of the right to walk

4    out of that voting booth with reasonable confidence that it

5    counts.  Because if all you have at the end of the day is a

6    system where the most you can do is just hope, hope that your

7    vote counted in some way, that you never know -- you will never

8    know whether it did, that doesn't meet the constitutional

9    standard to the right to vote.

10           And here Theresa Payton is quite helpful on this.

11   Theresa Payton testified in July 2019 under oath that the

12   question was:  In going into the midterm elections of last

13   year, you had great concerns about election interference;

14   correct?

15           Answer:  I did, yes.  Still do.

16           Question:  In fact, going into the midterms of last

17   year, you believed that one thing that we can be sure of is

18   that a U.S. election will be hacked?  No doubt about it; right?

19           Her answer was yes.

20           And so we find ourselves in a world, Your Honor, that

21   is far removed from *Clapper*, that is far removed from the case

22   they cite, the *Tsao* case -- the *Tsao* case -- I'm not exactly

23   sure how you say it -- and the *Wood* case.

24           *And, in fact, Clapper*, Your Honor, confirms that we

25   have standing here.  And in this particular -- in the course of

1   the discussion of the *Laidlaw* case, in *Clapper*, the plaintiffs

2   there tried to rely on the *Laidlaw* and other cases, *Monsanto*.

3          And the way the Court distinguishes *Laidlaw* confirms

4   we think beyond any reasonable dispute that we have standing.

5   Here is what it said.  It said that *Laidlaw* would resemble this

6   case, being the *Clapper* case, only if two things were present:

7   One, it were undisputed that the Government was using

8   Section 1881 a, authorized surveillance, to acquire

9   respondent's communication; and, two, the sole dispute

10  concerned the reasonableness of respondent's preventive

11  measures.  That is our case.

12         The problem in *Clapper* was they were speculating,

13  first, that their communications would be intercepted at all;

14  second, the communications would be intercepted under this

15  particular surveillance program.  And then speculation beyond

16  that.

17         Here, we meet that first point in distinguishing

18  *Laidlaw* because there is no speculation about our clients being

19  forced to vote in this system.  It is the only system available

20  to them.  If they want to cast a vote in person, as is their

21  right, they have to vote in this system.

22         And when you look at the new Georgia election law

23  that was passed recently that now makes it harder to get an

24  absentee ballot, their option is to vote in person.  And so

25  they are subjected to this guaranteed in a way that did not

1   happen in the *Clapper* case exactly as the Court acknowledged in

2   distinguishing *Laidlaw*, which means the sole dispute in this

3   case is exactly what the court said in *Clapper* about *Laidlaw*,

4   which is the reasonableness of the preventive measures that

5   have been asserted here to protect the right to vote.  And that

6   turns on how serious these vulnerabilities are, how easily they

7   can be exploited.

8           And on that, Your Honor, I point out the

9   vulnerabilities in Dr. Halderman's report -- I won't get into

10  the specifics in a public hearing.  Those vulnerabilities are

11  undisputed, Your Honor.  That is the critically important fact.

12  And it is different from everything they cite.  If you take the

13  *Tsao* case from the Eleventh Circuit -- I'll come back to that

14  in a moment.  It is just a little bit different -- they did not

15  have any of their experts look at any of the vulnerabilities in

16  the system.

17          So you have got one of the most respected election

18  integrity experts in the country testifying in front of

19  Congress, has been retained by two Secretary of States,

20  including Michigan just recently, for the very purpose of

21  examining the Dominion equipment.  And he has found serious

22  vulnerabilities that could be exploited in minutes by a voter

23  in the voting booth for just one of them.  And it is undisputed

24  that that is the system.

25          That is exactly what the Supreme Court is talking

1    about in discussing -- in distinguishing *Laidlaw* from *Clapper*,

2    on the measures that the State is going to say we can protect

3    against those vulnerabilities somehow.  They haven't identified

4    any measures.  They say only Dominion can even address those

5    measures, which is disturbing since the State is responsible

6    for the election system.

7            That is our case.  And we're entitled under the

8    reasoning in *Clapper* to prove that up, Your Honor.  And the

9    same is true on *Monsanto*.  I won't get into the specifics.  But

10   *Monsanto* we think is exactly on point the same way.

11           The one distinction I would draw again as we talk

12   about *Clapper* and *Monsanto*, Your Honor, is these are all cases

13   about future injury.  Future injury is part of it for us.  If

14   there is a hack and our votes are lost, that is an injury.  And

15   that is exactly what *Clapper* says that is what we get to

16   litigate.  Have they protected against that?

17           But we have an injury the moment our voters walk into

18   the booth, vote and walk out, and have no idea whether their

19   vote was counted.  Another important point on *Clapper*, Your

20   Honor, is one of the things that the court emphasized that gave

21   it comfort that it did not need to address these claims at that

22   point in time was that if the speculation came to fruition, if

23   the plaintiffs' communications were eventually subject to this

24   surveillance program, there were notification requirements.

25   The federal government would have to notify those people that

1    they had intercepted their communications.

2         And the Supreme Court said at that point you would

3    have standing to come in and pursue a claim.  There is no

4    back-end protection, there is no safety net here that ever

5    provides our clients any such notification.  They vote in the

6    system.  They leave.  And for the rest of their lives, they

7    will never ever know if their vote was counted in a system that

8    is hopelessly vulnerable.

9         So we are just nothing like *Clapper* except to the

10   extent that --

11        THE COURT:  If it is as you describe that we'll never

12   know who individually actually didn't get their vote cast and

13   the system is riddled with this, is a logical follow-up to that

14   though then, well, then it is a generalized injury, one that

15   the public at large needs to pursue, because it is not

16   susceptible to analysis on an individual voter harm basis?

17        MR. CROSS:  Good question, Your Honor.  I think --

18   well, I guess let me put it this way.  I think it is.  I think

19   two things.  I guess I would say those are not mutually

20   exclusive.  I think it is an issue that is susceptible to the

21   public at large needing to address this and do it through the

22   courts -- through the federal courts.

23        But I also think that our voters individually

24   protecting their own individual right to vote are well

25   positioned to come in and do that on their own behalf.  And

1    that is where *Wood* comes into play.  *Wood* is vastly different.

2    Right?  *Wood* was about election outcomes.  And that is what the

3    Eleventh Circuit repeatedly makes clear in its -- in both of

4    its decisions that what *Wood* was saying was, look, I don't like

5    the way this election ended, and so my relief is to redo the

6    election.  That was both of his cases.

7         Our cases are not about election outcomes.  We're not

8    asking to redo any election.  We're looking purely at the

9    future and we're looking only at our votes, which is another

10   big distinction with the way Wood presented his claims, Your

11   Honor.

12        There, the Eleventh Circuit pointed out that his

13   claims were generally about what he called -- what the court

14   refers to as the integrity of the election.  That is not us.

15   We're not challenging the integrity of any particular election

16   nor are we concerned about the votes cast by other -- by other

17   voters, which was again the focus of *Wood*.

18        Our concern is did our vote count.  Does Donna

19   Curling's vote count when she casts it and leaves?  And the

20   same for Donna Price and the same for Jeffrey Schoenberg?  And

21   that is an individualized claim that they are entitled to meet.

22        And *Wood*, actually, I think at least implicitly

23   acknowledges that, Your Honor.  One of the things that the

24   Eleventh Circuit points out is that Wood himself is not a

25   monitor of the recount.  And he was trying to stand in their

1    shoes and say, well, because monitors were not allowed to watch

2    the recount, I can bring a claim on their behalf.

3            Well, what the Eleventh Circuit said is, well, those

4    monitors actually -- they perhaps can bring a claim on their

5    own behalf.  And think about what that means.  If the State

6    were to adopt a rule or just violate its own rules and say

7    we're not going to allow any monitors to view the recount, the

8    Eleventh Circuit is saying those monitors would likely have

9    standing to come in and bring a claim.  But that would affect

10   every election monitor across the state.

11           And under the State's argument, it would affect every

12   election monitor the same.  They would all be prevented from

13   monitoring the recount.  And that alone, I would say, Your

14   Honor, is enough in the Eleventh Circuit's reasoning to say it

15   doesn't matter that the harm affects lots of different people,

16   even if its affects them the same way, which is also directly

17   consistent with *Spokeo* the way the Supreme Court says there

18   explicitly.  It is irrelevant whether it affects a lot of

19   people.

20           Otherwise, we would viciate standing in most tort

21   cases, as it notes.  But it goes further, Your Honor.  What is

22   also absent in the discussion of the Eleventh Circuit is the

23   Eleventh Circuit doesn't say those monitors would have standing

24   only if they showed there was an error in the recount.  Right?

25   It doesn't say they would also have to come in and show that

1   some votes weren't counted or there was a tabulation error.  It

2   is enough that their right to monitor is violated.

3          And that is our -- that we submit, Your Honor, is

4   closer to our case and at least -- at least refutes the

5   position of the State that if everyone did that, it is a lot of

6   people, that somehow no one has the right to sue.

7          MR. McGUIRE:  Your Honor --

8          MR. CROSS:  Also, Your Honor -- sorry.  Just one

9   more.

10          It is also important, I think, just to go back to

11  where we start, which is *Anderson*, Your Honor.  Under the

12  State's approach, *Anderson* would not come out the way it does.

13  You couldn't have it because it is the same thing there.  The

14  harm there affected voters -- a large swath of voters.  It

15  affected them all the same way.

16          And so what the State is trying to do is to take

17  these two cases from someone, Mr. Wood, who clearly had a very

18  partisan approach, who was explicit about coming after an

19  election outcome, and take those and turn them into this

20  expansive -- essentially an immunity for the State in any

21  legitimate election case.

22          And that is directly at odds with the reasoning in

23  *Clapper* and what the Supreme Court says there.  And it is

24  directly at odds with every voting rights case that has come

25  down in the history of the U.S. Supreme Court and every other

1    court in this country where it has sided with the voters

2    because in almost every one of those cases the harm affected a

3    lot of voters and it affected them in the same way.

4         It would -- not only would it violate the law, Your

5    Honor, we submit to find that we don't have standing but it

6    would take what is already a tragic situation with the last

7    election and compound the harm if we were allowed those bogus

8    lawsuits to suddenly prevent legitimate lawsuits, like ours,

9    where we have science establishing vulnerabilities that are

10   undisputed with this system.

11        It is our right under the reasoning of the Supreme

12   Court jurisprudence and the Eleventh Circuit to prove up those

13   vulnerabilities and to say they are so severe in an environment

14   where their own expert -- the State's own expert says it is a

15   certainty that there will be a hack -- it is our right to prove

16   up and say then you have not secured the right to vote and have

17   it counted in the State of Georgia.

18        We believe that is our claim on the merits, and we

19   would ask for an opportunity to do that.

20        MR. McGUIRE:  May I -- I just have one additional

21   point to make that is very directly to your question, Your

22   Honor, about someone leaving the voting booth that is concerned

23   about whether their vote counted.  And I would add the

24   Coalition plaintiffs have also asserted an injury that occurs

25   in the voting booth, which is the fear of voting a nonsecret

1    ballot, which is certainly an injury sufficient for standing.

2          But for the person who leaves the voting booth

3    concerned whether their particular vote counts, that is a

4    particularized injury to that individual that is widely shared.

5    And so that is not the kind of injury that is encompassed by

6    the phrase generalized grievance.  That phrase obscures the

7    total point, which is that the generalized grievance is not an

8    individual grievance that happens to be shared by many with

9    respect to themselves.

10          A generalized grievance is a grievance that is itself

11    general, like Wood's concerns that the election was not being

12    run with integrity.  That was a generalized concern because the

13    concern was about a generalized harm.

14          And I think the point is:  When you see the word

15    generalized used in that context of a generalized grievance, it

16    doesn't mean widely held or shared by many people.  It means

17    that the grievance itself is generalized harm.  And that is

18    what -- that is why the *Wood* case was rejected because his

19    grievance was that the election wasn't being run with

20    integrity.  That was a generalized grievance and rightly so.

21          But an individual voter's concern about whether or

22    not her vote is going to count when she walks out of the booth

23    is not a generalized grievance.  It is particularized to her,

24    even if millions of other voters have the same apprehension

25    about their own individual votes.

```
1              So that is an important fact.
2              THE COURT:  So back to the question of:  In what way
3    is the current discovery designed to provide an evidentiary
4    basis for that -- for those contentions?
5              MR. CROSS:  Your Honor --
6              THE COURT:  Go ahead.
7              MR. CROSS:  I'm sorry.  I was just going to answer
8    that question.  I realized at the end that I didn't.
9              The discovery that we have served and that we're
10   focused on is specific to focusing on vulnerabilities in the
11   system and whether there is any known compromise or hack of
12   that system.
13             And for the reasons I just articulated, we think that
14   goes to standing and also, of course, goes to the merits
15   because those two overlap.
16             But that is what we're focused on.  And it is
17   narrowed discovery.  And I understand the State likes to say
18   otherwise.  But I think one of the most compelling facts here,
19   Your Honor, is by their own count they are on track to -- the
20   document production is about 15 percent the size of what they
21   produced in the *Fair Fight* litigation.  And that is by design.
22             We are focused on exactly the issues that I have just
23   walked through from the standing perspective on whether --
24   whether the measures that they claim are sufficient to protect
25   the right to vote, meaning to have that vote counted, and to
```

```
 1   provide confidence to voters -- to our clients at will --
 2   whether those measures -- first, what are they?  We have not
 3   heard.  And, second, whether they are sufficient.  That is the
 4   focus.
 5             THE COURT:  You said -- I want to wind back a
 6   sentence.  Something about that is where we haven't gotten
 7   something.  You were talking about the document production, and
 8   then you slid into something.
 9             It just might be the afternoon, but I missed it.
10             MR. CROSS:  No.  I was saying we have not gotten any
11   discovery from the State on what measures, if any, they have in
12   place to cast votes in light of the vulnerabilities that are
13   established with this system.
14             In fact -- and, again, their response was to say we
15   as a state cannot actually address that, only Dominion can
16   address that.  We think that is a telling fact for the Court to
17   consider at some point on the merits.
18             But our point is our discovery directed at them and
19   to Dominion is focused on that standing issue, which again
20   relates to the merits about do you dispute these
21   vulnerabilities.  If you do, what is the basis?  And what
22   measures, if any, have you taken to address them?
23             And the first part of that is getting their own
24   internal communications so that we understand what is it they
25   know about this system, about its vulnerabilities, its
```

```
 1    reliability issues, and whether there has been any compromise.

 2    And we're contending it is fair because they won't let us have

 3    access to election equipment that has actually been used in a

 4    Georgia election.  Then they turn around and say, well, the

 5    equipment we have from Fulton County is irrelevant because it

 6    hasn't been used in a Georgia election.

 7            So we say we should get that equipment, but we also

 8    should get your own internal documents narrowly focused,

 9    whether emails or internal studies or reports, about the

10    vulnerabilities and the security of the system.  And that is

11    what we're looking for.

12            MR. MILLER:  Your Honor, if I may, there is a lot to

13    unpack here.

14            But starting with the question you posed beginning

15    with Mr. McGuire and then with Mr. Cross as to the plaintiffs'

16    standing here -- and I think it is important that we look back

17    at what has been pleaded in the complaint, what has been

18    alleged as an injury in the complaint.

19            Federal courts are not notice pleading jurisdictions.

20    *Twombly* and *Iqbal* demands more and requires a plaintiff to

21    plead what they proved in the complaint.  In that instance,

22    looking at it compared to what the Eleventh Circuit just said

23    was a generalized grievance is striking.

24            For example, the Coalition plaintiffs allege that

25    voters who vote on BMDs -- not the Coalition plaintiffs, not
```

1   the plaintiffs' votes on BMDs -- voters who vote on BMDs suffer

2   injury by not having a secret ballot.  First of all, at this

3   point, that is nearly abandoned.  There is just no substance to

4   it.

5          But setting that aside, that the ballot cannot be

6   read and verified.  That BMD voters suffer a greater risk of

7   casting a less effective vote than absentee voters.

8          Curling plaintiffs third amended complaint says the

9   BMD system allegedly fails to and incurs harm because BMD

10  voters are not sufficiently protected against unauthorized

11  intrusion or manipulation.  Protected against tampering.

12  Ensure that all properly cast votes are counted and improperly

13  cast votes are not counted.  That is precisely what the

14  Eleventh Circuit ruled on in *Wood*.

15         So, Your Honor, there are multiple aspects to the

16  injuring fact inquiry.  And it is important not to confuse them

17  across each other.  The injury must be particularized.  It must

18  be concrete.  And in this instance, it must be imminent and

19  separate from injury.  You must have traceability and

20  redressability.

21         So starting with the lack of particularized injury,

22  again, the plaintiffs don't allege that their votes are going

23  to be burdened by use of the BMD system.  In fact, they stated

24  on multiple occasions they don't vote on the BMD system.  But

25  to the extent the BMD voter is -- if we take the plaintiffs'

1  complaint as true that the BMD voter suffers a greater risk of

2  casting a less effective vote, that is not the plaintiffs.

3  That is a generalized grievance that is not to be placed in the

4  hands of concerned bystanders, in this instance, because they

5  will use it as a vehicle for the vindication of value

6  interests.  That comes from *Gardner vs. Mutz* in the Eleventh

7  Circuit, at 2020 case.

8        And there is no amount of discovery that can rectify

9  plaintiffs' generalized grievance.  Their alleged harms are

10 shared with all Georgia voters.  There is no particularized

11 nature to it.

12       On concreteness, you heard a lot about the burden of

13 verifiability.  Your Honor, that is an abstract injury that is

14 not de facto.  That is not concrete sufficient for purposes of

15 establishing an injury in fact.  Of course, an injury can be

16 either intangible or tangible.  But it cannot be abstract.  And

17 there is no amount of discovery that resolves the issue that

18 plaintiffs' alleged injury is too abstract and not sufficiently

19 concrete to confer standing.

20       On imminence, plaintiffs' hypothetical harm must be

21 either certainly impending or there must be a substantial risk

22 of such harm.  But the plaintiff cannot conjure standing by

23 inflicting some direct harm on itself to mitigate a perceived

24 risk.  That comes from *Tsao*.  And in *Tsao*, the Eleventh Circuit

25 says that vulnerabilities are insufficient to create this

1    certainly impending harm.

2           And when you couple that with the lack of

3    particularization, the chain of possibilities we're looking at

4    here are that one of these plaintiffs who refused to use the

5    BMD system are going to vote on the BMD system; that the system

6    is hacked; that it alters their vote; and at that point that is

7    how they are going to be injured.  That is way too far a chain

8    of speculation.  And that is including with me altering the

9    theory of their claim so that it is at least particularized

10   enough so that if it did happen it could confer standing.

11          And, Your Honor, I would point the Court to *Shelby*

12   *Advocates for Valid Elections vs. Hargett* out of the Sixth

13   Circuit.  It is a very similar case where, like here, an

14   advocacy group that was pursuing an injunction against

15   electronic voting systems in order to mandate hand-marked paper

16   ballots.  And there the Court held that even if plaintiffs had

17   adequately alleged past harm they have not plausibly alleged,

18   much less shown, that future malicious hacking is certainly

19   impending.

20          Your Honor, the imminence aspect is perhaps the only

21   aspect where discovery may go to anything.  But the problem

22   here is we're still talking about vulnerabilities.  So their

23   imminence -- even if you got every amount of discovery that

24   could possibly be had to prove up a vulnerability, *Tsao*,

25   *Muransky*, *Salcedo*, binding Eleventh Circuit precedent, tells us

 1    it is insufficient.

 2            And, Your Honor, as to the organizational standing,

 3    an organization can't have standing based on a diversion of

 4    resources.  That standing has to demonstrate what the

 5    organization has diverted resources from.  That does not come

 6    from discovery of the State defendants.  That is discovery of

 7    theirs.

 8            The Coalition for Good Governance tells us they have

 9    completed their document production.  If we're done with

10    discovery, then we can go ahead and move on because we have not

11    established an organizational standing based on a diversion of

12    resources theory.

13            Your Honor, as to a couple of the other examples --

14    for instance, Mr. Cross mentioned the concept of election

15    monitors having standing.  And that is what the Eleventh

16    Circuit told us out of the Republican 12th District Committee

17    case.  And in that case, the plaintiffs sued the Secretary of

18    State to mandate that they have access to view the process of

19    ballots, the recount process, and election day activities.

20            The Eleventh Circuit told us no, this is not an

21    injury that is traceable and redressability to the Secretary of

22    State because the Secretary of State is not in -- I think in

23    that case it was Columbia County.  The Secretary of State was

24    not preventing people in Columbia County from accessing the

25    area.  It was Columbia County that had allegedly committed a

1   problem.

2         And that leads on to the bigger issue on traceability

3   and redressability here at all.  Let's presume that plaintiffs

4   can establish their standing here.  At this point, not only

5   would the traceability be traced to whatever third-party hacker

6   has altered the system, but this Court cannot order what the

7   plaintiffs are asking.

8         If the plaintiffs prove every aspect of their case,

9   prove standing, this Court can enjoin the State from enforcing

10  the BMD requirement in Georgia law.  What this Court cannot do

11  is order 158 nonparty counties to adopt the system that the

12  plaintiffs prefer and cannot prevent these nonparty counties

13  from adopting the BMD system on their own or some other kind of

14  BMD system or moving back to DREs.

15        The Court has enjoined the State -- the State

16  defendants from enforcing the DRE aspect; could theoretically

17  enjoin the State defendants, if the case is proved up, from

18  enforcing the BMD aspect.  But none of this resolves

19  plaintiffs' complaint.

20        Your Honor, in conclusion, you know, I do want to

21  point out we have discussed a lot of this about where does this

22  discovery need to come from in order to get toward standing.

23  And that discovery comes from the plaintiffs.

24        For instance, not a single individual member

25  plaintiff of the Coalition has produced any document, anything

1    whatsoever that indicates they are individually harmed.  At

2    this juncture, the Court should just dismiss those individual

3    plaintiffs.

4            Likewise for the Curling plaintiffs, Ms. Price is the

5    only individual who has produced these documents.  And

6    Ms. Curling is included on some of the emails.  I have yet to

7    see anything from Mr. Schoenberg other than we reach a hearing

8    and out of the blue an affidavit comes.

9            Your Honor, these aspects -- if they are susceptible

10   to being proved through discovery at all, they are susceptible

11   to being proved by discovery that comes from the plaintiffs,

12   not from the State defendants.

13           But, Your Honor, the bigger picture -- the real issue

14   here is a pleading problem.  It is not a discovery problem.

15   These are the claims that the plaintiffs have created.  They

16   are the master of their complaint.  They chose not to act on

17   your directive to tailor their claims.

18           We are here.  We have expended significant sums of

19   resources from the State to engage in this discovery right now.

20   And this case is not anywhere closer to plaintiffs satisfying

21   their standing burden than it was eight months ago when this

22   Court suggested that perhaps we should address the standing

23   initially, perhaps plaintiffs should tailor their complaints.

24   That has not happened.

25           MR. CROSS:  Your Honor, if I could respond briefly.

```
1              THE COURT:  I'm going to let you respond.  Then we're
2    going to take a few minutes off.  Okay?  And I think that
3    Mr. Brown wants to also speak.
4              MR. CROSS:  Sure.  Your Honor, just briefly on a few
5    points.
6              One, what we were talking about on the monitors is
7    exactly what the Eleventh Circuit was saying in the Wood case
8    where monitors, even if they are in a large number across the
9    state prevented from monitoring the recount, would have
10   standing.  Mr. Miller doesn't have a response to that.
11             In fact, the one case he cited that involved
12   monitors, he acknowledges there could be standing against the
13   county.  So there is standing.  So we seem all agreed on that.
14             He also says plaintiffs alleged that they voted on
15   BMDs.  That is just absolutely false.  Jeffrey Schoenberg has a
16   sworn declaration describing his experience voting on a BMD in
17   one of the most recent elections.
18             Ultimately, Your Honor, what they really come back to
19   is an issue where they want to argue about the merits but say
20   it is about standing, which is they have this fundamental idea
21   as a defense that a voting system can never be challenged in
22   federal court, no matter how unreliable it is, because the
23   voters would be affected essentially the same across the state.
24   That is -- that is their defense.  Let's be clear.  That is
25   their defense.
```

1          So if the State comes in with an election system that

2     says, you know, we're going to put -- it is going to be like a

3     Catholic confession.  Put a man behind a curtain, whisper to

4     him, and you leave, and you just hope that he writes it down,

5     remembers it correctly, and it gets tabulated.

6          They would say you don't have any standing to

7     challenge that because every voter who walks into that voting

8     booth is impacted in the exact same way.  That is their

9     argument.

10          Now, if they say we're going to do that in one

11     precinct, we're going to eliminate a BMD and we're just going

12     to require some voters coming into the precinct to vote in that

13     way, certainly we would all agree, well, that is not

14     appropriate.  They would have standing to challenge that.

15          The fact that you then expand that statewide doesn't

16     mean that suddenly everybody loses standing.  And that is their

17     defense.

18          And *Tsao*, Your Honor, I think is helpful here because

19     they like to rely on *Tsao*, the data breach case.  But it is

20     important to remember in that case there was no alleged harm

21     from the data breach itself.  The only harm they alleged was

22     future possible misuse of the data.

23          That is not our case.  As Mr. McGuire and I have both

24     explained, our harm happens the moment we're forced to vote on

25     this system, which is the only option if you want to vote in

1    person as you are entitled.

2          Again, the new law makes it much harder to vote by

3    absentee.  So there is no guarantee that our clients can vote

4    by absentee at all.

5          These arguments ignore years of voting right

6    jurisprudence, Your Honor.  It doesn't address *Clapper* at all.

7    Ultimately, Your Honor, he has a devastating admission.  He

8    says absolutely this Court can order the State not to use BMDs.

9    We agree.  But he goes on and says, well, that is not enough

10   because we want a particular type of voting system.  It is true

11   we are hoping that our ideal voting system is hand-marked paper

12   ballots.  But that is only part of the relief that we're asking

13   for.

14         The fact that everyone in here is agreed that Your

15   Honor has authority to shut down the BMDs in the State, just as

16   you did on the DREs -- that establishes standing.  And we're

17   entitled to that relief.  Even if Your Honor says, I'm not

18   going to give you hand-marked ballots, which was your ruling

19   with the DRE system in 2019, that is a key part of the relief

20   that we're looking for.  And it is enough, Your Honor.

21         The last thing I'll say -- I don't know why we have

22   to keep saying this.  It just isn't true that Donna Price is

23   the only one that has produced documents.  Donna Curling has

24   produced about the same number.  I don't understand where that

25   is coming from.

1          But the core issue, Your Honor, is we are entitled to

2     prove up the vulnerabilities.  Our discovery is narrowly

3     tailored to that.  And we would ask for an opportunity to do

4     that.

5          THE COURT:  Okay.  Well, let's take a few minutes,

6     and we'll come back.  We'll start at 3:00.

7          **(A brief break was taken at 2:54 P.M.)**

8          THE COURT:  Okay.  I want to go back for a moment to

9     the question of the state election project files that are in

10    the possession of each of the counties.

11         Mr. Tyson, I was a little -- wasn't sure whether you

12    were dancing around with me about the question of whether the

13    State wouldn't object if they go ahead -- if the plaintiffs go

14    ahead and submit their requests for these project files to the

15    seven or eight counties that they believe are at issue.

16         Oh, I can't hear you.

17         MR. TYSON:  I'm sorry, Your Honor.

18         I wasn't dancing around on that point.  All I was

19    just saying is we won't object to the production of those

20    databases.  The only issue is we wanted the specific terms of

21    the subpoena.

22         I think what you suggested, a single item subpoena

23    that says this is what these are seeking, just the project

24    files, we won't have any objection to that.

25         THE COURT:  So I don't know who wants to speak on

```
 1    behalf of the plaintiffs.  Is there a problem with that just
 2    simply so we can zone in on that in that manner?  So if I'm
 3    resolving a motion to compel, I don't have anything else I have
 4    to --
 5              MR. BROWN:  No, Your Honor.  The Coalition plaintiffs
 6    (Zoom interference) individual counties with a single shot
 7    request that they produce the files.
 8              THE COURT:  All right.  Well, why don't you proceed
 9    in that fashion.
10              MR. BROWN:  Your Honor, this is Bruce Brown.  I had a
11    couple of statements due to Mr. Miller's --
12              COURT REPORTER:  Mr. Brown, can you start over?  You
13    completely broke out on me.  Can you hear me?
14              THE COURT:  About standing or about --
15              MR. BROWN:  About (Zoom interference).
16              THE COURT:  All right.  I mean, it seems -- I'm going
17    to give you that opportunity because you have had the least
18    amount of time to speak.  Although Mr. McGuire has had plenty
19    of time.
20              I understand Mr. Miller's arguments.  And I believe I
21    understand you-all's arguments.  I think I made a decision
22    obviously at some juncture here that the best way to resolve
23    this, because I had already addressed this in the -- in a
24    lengthy decision on standing and whether -- and on a lengthy
25    amended complaint, that it was enough allegations at least to
```

1    proceed so that I basically got to the point of saying I want

2    to see -- have an abbreviated summary judgment process so we

3    can -- and obviously standing was going to raise its head at

4    that point.  But it wouldn't all be based on allegations but

5    also be based on evidence.

6            We didn't want to deprive you of -- all the

7    plaintiffs of having an ability to show -- to show harm in the

8    way that is -- or impact as required.  And I just -- so it is

9    not that I in any way disagree that it is a significant issue.

10           But I just -- you know, this is the course I have

11   taken.  The parties have agreed upon a different course for

12   dealing with this by consent for resource purposes before.  I

13   might end up, of course, in the process of this -- because

14   everything is taking longer than I had hoped, I might get a

15   decision down from the Eleventh Circuit on the two cases in

16   which -- that have been joined for interlocutory appeal.  And

17   that may interfere with those plans.

18           But I don't have that.  And as far as I know, there

19   has been no scheduling of oral argument.  So I can't predict

20   the future.

21           I just would like to tighten the plan and have less

22   time spent on all of the disputes about discovery and get some

23   cooperation there so that we can actually have this happen,

24   have -- I mean, I told you-all because everyone is in agreement

25   I would grant the 60-day extension.  But I'm really loathe to

```
 1    do much more than that or else I'll be writing this at a time
 2    that is awfully late, even assuming that whatever I write will
 3    end up being appealed on an interlocutory basis.
 4            So -- and yes, I had asked plaintiffs to try to
 5    streamline themselves about focusing in on what you were
 6    getting at because I don't know -- obviously my questions here
 7    directed towards that.
 8            I really don't have anything more to say about that.
 9            Mr. Brown, go ahead.
10            MR. BROWN:  Thank you, Your Honor.  I don't want to
11    (Zoom interference) standing (Zoom interference).  Our approach
12    on the standing issue --
13            COURT REPORTER:  Mr. Brown -- Mr. Brown, this is
14    Shannon.  You are cutting out on me.  I am only able to get
15    like every other word.
16            Am I the only one?
17            MR. BROWN:  Well, you are one of the most important
18    people.  So I want to make sure that if the others can't hear
19    me you need to.
20            Can you hear me better, Shannon?
21            COURT REPORTER:  Yes.
22            THE COURT:  Just don't lean back.  Stay close.
23            MR. BROWN:  Thank you, Your Honor.
24            In terms of standing, we can look at it as of July
25    2020 when Your Honor received the briefs from the parties on
```

```
 1   specifically (Zoom interference) with respect to the
 2   Coalition's supplemental complaint and Curling's (Zoom
 3   interference).  Your Honor dealt with all the issues that
 4   Mr. Miller has raised.  All of them, redressability,
 5   traceability, and character of the injury.
 6              THE COURT:  All right.  We are losing you.
 7              MR. BROWN:  I'm sorry.
 8              THE COURT:  That's all right.
 9              MR. BROWN:  We dealt with all of the issues.  And the
10   only thing that has changed has been a couple of Eleventh
11   Circuit opinions that we think are distinguishable.  And so we
12   are ready to move on.
13              In terms of the discovery (Zoom interference) --
14              COURT REPORTER:  I'm still majorly struggling.
15              Judge, do you want to give me about two minutes to
16   get in the courtroom and see if we can make this -- finish it
17   in there?
18              I think it is the echo from the courtroom that is
19   cutting Mr. Brown out, if I am the only one having trouble.
20              THE COURT:  Okay.
21                  (There was a brief pause in the proceedings.)
22              MR. BROWN:  This is Bruce Brown.
23              THE COURT:  Okay.  Great.  Go ahead.
24              MR. BROWN:  Thank you.
25              THE COURT:  We're still not hearing you, Mr. Brown.
```

1    You are still being interrupted.

2            MR. BROWN:  Okay.  I don't want to take up any of the

3    Court's time because of the audio.

4            The only points that I will make I will -- I will

5    text it to Mr. McGuire and make sure that he makes them.

6            THE COURT:  All right.  Thank you.

7            MR. BROWN:  I'll do that.

8            There may a little delay if you want to go on to the

9    next topic.

10           THE COURT:  Mr. Brown, you can always telephone in

11   instead with your cell phone and that -- we can still see the

12   image of you, just to be reminded, as well.

13           All right.  So we dealt with the -- let me ask about

14   the election -- what did plaintiffs expect to get from the

15   election equipment as opposed to the review of the election

16   outcome in this case?  And are you just talking about, again,

17   the Fulton County election equipment, or are you looking for

18   other equipment?

19           MR. CROSS:  Is that question directed --

20           THE COURT:  Yes, it is directed towards the

21   plaintiffs.  I don't care who.

22           MR. CROSS:  So I'm sorry.  You were asking about

23   the --

24           THE COURT:  Well, we've already dealt with the

25   question of the project files.  So why do you need to have the

1    election equipment additionally?  And is that something from

2    the State or just the Fulton County equipment?

3              MR. CROSS:  Got it.

4              We could get it from the State or Fulton County.  The

5    last word we got from Fulton County was they will produce

6    whatever Your Honor orders, which is what they did before.

7              So I think what we were looking for was just

8    essentially the same equipment we got before but it hadn't been

9    used in an actual Georgia election -- so it would have the

10   configuration from the Georgia election; it would have data

11   from the Georgia election -- just to refute the argument that

12   the equipment we have is not representative of what is used in

13   Georgia elections.  So it would be the BMD, printer, the

14   scanner, and then just a few peripherals that come along with

15   that.  That is what we're looking for.

16             And the other piece that we were looking for was a

17   copy of the EMS server, which, again, we can get from Fulton

18   County.  Getting a copy of their EMS server would be

19   sufficient.

20             One thing that I'll just note -- Your Honor may have

21   seen reference in our response to the status reports that there

22   apparently now are images of Dominion's EMS software -- it

23   looks like from multiple locations that are publicly available

24   that have been leaked.

25             As far as we can tell, it looks like some clerks --

1    county clerks that had access allowed folks to come in and take

2    images of those.  And the Colorado Secretary of State has

3    opened an investigation in at least one instance.

4              So the confidentiality argument, we think, certainly

5    is not as strong as it once was because that is still out

6    there.  But the more important concern is:  To the extent those

7    images are generally consistent with the software configuration

8    in Georgia -- and we suspect they are much like we dealt with

9    on the GEMS when we confirmed that the GEMS configuration was

10   essentially the same in Georgia as in other states -- that

11   heightens the risk of these vulnerabilities being exploited.

12             So it is, we think, another fact that supports us

13   getting access to the equipment we have asked for.  To be

14   clear, we're not asking for anything statewide, we're not

15   asking for anything from multiple counties.  Just essentially

16   the same equipment we got from Fulton before but configured and

17   used in an election without any alteration and a copy of the

18   EMS server.

19             THE COURT:  Why would you need the EMS server though?

20   I haven't --

21             MR. CROSS:  Oh, yes.  So -- sorry, Your Honor.

22   Another argument we get from the State is that if Dr. Halderman

23   is right about the vulnerabilities with the BMDs that would

24   only affect those individual BMDs.  Right?  You wouldn't be

25   able to affect ones beyond that.

1          And we think to refute that we want to be able to

2     show that -- let's say a voter walked into the voting booth and

3     infected a particular BMD with malware.  We want to be able to

4     show that that could populate back across the state through the

5     EMS server because the voting data moves back and forth between

6     the BMDs and the EMS server -- the ballot definitions and the

7     things.

8          And so we want to be able to show that path so we can

9     refute the argument that whatever the harm is it would be

10    contained to a particular BMD and not affect others and they

11    would say it wouldn't affect our clients.  Our clients --

12         THE COURT:  Why couldn't you just basically address

13    that point through a deposition?  Do you think that somebody in

14    the State would deny that, that there was -- I understand that

15    it is conceivable someone might be able to contain it.  But I

16    also can understand your being able to ask the question without

17    having access to the EMS.

18         MR. CROSS:  So that is a great question and great

19    thought, Your Honor.  I guess I have two concerns.

20         One is:  No one from the State, other than obviously

21    counsel, has access to Dr. Halderman's report.  We have invited

22    them to make a proposal to work that out.  We haven't received

23    a proposal.

24         So right now anyone we would depose would not know

25    what those specific vulnerabilities are and how they would get

1    exploited.  That may be a bridge we can cross if we can -- if

2    we can get them to engage with us in trying to make the

3    disclosures to the right folks.

4         The other problem would be -- and I don't say this to

5    cast dispersions.  But there is a history in this case, Your

6    Honor, of sworn testimony from people at the level of the CIO

7    that was not accurate, representations about things being air

8    gapped, about --

9         THE COURT:  Okay.  All right.  I know where you are

10   going on that.  Okay.

11        MR. CROSS:  So perhaps we could start with a

12   deposition, Your Honor.

13        MR. McGUIRE:  Your Honor, Robert McGuire on behalf of

14   the Coalition plaintiffs.

15        I would like to add:  From our perspective, what we

16   expect to get from this request is a set of equipment from

17   Fulton that was used in the statewide election in the form that

18   it was used so with the actual election loaded on to it.  And

19   we were looking for basically the entire, you know, complement

20   of equipment.  So we wanted an ICC scanner, the central count

21   scanner.  We wanted a Poll Pad.  And we wanted the EMS, the

22   BMD, the printer, the precinct scanner.

23        And the reason we want -- we want the complete set of

24   equipment from an election that was actually used is because,

25   as I mentioned earlier, we have received the election project

1    files from a number of counties, although not all of them, as

2    you know -- but from a number of counties that show votes are

3    not being counted properly.  They weren't counted properly in

4    the original count, in the hand recount -- hand audit, or in

5    the machine recount.  They don't -- they don't match.

6              And so we need the equipment in order to be able to

7    understand whether the errors that we are seeing in the

8    election project files are -- you know, if they can be

9    explained by the way the machinery operates when it is working

10   together.

11             So we need to have that set of machinery to test that

12   so we can actually understand what we're seeing when we see

13   these errors in the election project files.  And, again, all

14   that ties to standing because we are looking for the project

15   files for the precincts where our people voted.  And so -- so

16   that is why we need that.

17             And we're happy just to take -- I think there is a

18   question in your order about whether we needed it for both

19   November and January.  We're happy just to take the equipment

20   as loaded for the November election.  That would be all we need

21   in order to do what the Coalition plaintiffs want to do with

22   the equipment.

23             THE COURT:  So you are saying it is solely for

24   understanding the -- what you perceive as errors in the count

25   for those precincts that your plaintiffs are residing in?

1          MR. McGUIRE:  That is -- that is the primary purpose.

2     We also have -- Your Honor has also heard testimony in this

3     case in September of 2020 from Dr. Coomer with Dominion that he

4     essentially shot down our -- our allegations about the precinct

5     scanner not recording the timestamps, which enable people to

6     discern who voted which ballot that is saved on the compact

7     flashcard in the -- in the scanner -- the precinct scanner.

8          We have reason to believe from the other evidence

9     that has been produced in the case that this testimony was

10    erroneous, if not outright false.  And the equipment that we

11    obtain will allow us to prove that.  That is another objective.

12         THE COURT:  Well, just explain this to me.  All

13    right.  Let's say you were in my precinct and you got the vote

14    from my precinct and you thought it was -- that the -- it

15    didn't count -- the count did not reflect 20 votes properly.

16         Tell me how you tie that down back to me.  I mean, I

17    understood the original claim as I can't verify my vote and, in

18    fact, it may have been cast incorrectly.  So -- but -- and

19    assuming that, in fact, you can't identify which is my vote,

20    what you've got then is that 20 people in that precinct somehow

21    had their votes erroneously counted.

22         Right?

23         MR. McGUIRE:  Yes.  So there are a host of Supreme

24    Court cases on right to vote, which have held -- and these go

25    way back to the 1940s -- which held that you are entitled to

1    have your vote counted correctly.  And that is a fundamental

2    element of the right to vote.  It is a part of the right to

3    vote.  It is the right to have your vote counted correctly.

4           And earlier in this case, Your Honor, and also your

5    opinion on the DREs held that we have a right to an accountable

6    vote that -- that all entails that the votes be counted

7    accurately.

8           And so if we have evidence that one of our plaintiffs

9    has voted in a precinct where votes have been counted

10   incorrectly and it is a result of the deficiencies in the

11   voting system that we're challenging, to us that seems like

12   that is a pretty good lock on standing at the very least and

13   very likely that entitles us to prevail on the merits.

14          THE COURT:  Are you saying that as to both the

15   absentee ballots and as to the absentee count because of

16   problems with the scanner?  Or are you saying -- and the BMD

17   system, which they weren't able to -- that there was something

18   wrong in the scanning in of the vote?

19          MR. McGUIRE:  Well, Your Honor, it depends on where

20   the problem arises.  But it could serve -- it could identify

21   problems with both modes of voting under the same system.

22          And Mr. Miller was incorrect earlier when he said --

23   he said that the allegations in our complaint are extremely

24   limited.  The only talk about BMD voters.

25          That is just not true.  Our first supplemental

1   complaint -- I believe it is Paragraphs 204 and 206 of Document

2   628 -- one of them talks about the injuries to voters who vote

3   on BMDs.  The other paragraph talks about injuries to voters

4   who vote by mail.

5           And there has been a lot of evidence in this case

6   showing that people who vote by mail frequently don't have

7   their votes counted correctly because of the scanner settings.

8           And so in Your Honor's earlier scanner order, one of

9   the things that you had asked us to do was submit a proposed

10  order.  And we did submit a proposed order but with the caveat

11  that we need this equipment in order to be able to provide the

12  Court with, you know, an answer as to what the proper relief

13  would be for the lack of votes being counted on the -- on the

14  central count scanners.

15          THE COURT:  Well, because they have appealed that

16  order and I know the issue of whether it was a final -- at

17  least final preliminary injunction is in front of the Court of

18  Appeals, I'm not aware of them having issued anything about

19  that.

20          Have they?

21          MR. McGUIRE:  No, Your Honor, they have not.

22          THE COURT:  So is it really -- is that claim really

23  squarely before me if it is up above on the injunction?

24          MR. McGUIRE:  Well, I think it is before you.  To the

25  extent that it bears on our standing, I think it is continually

1    before you to the extent proceedings are continuing in the case

2    below.

3           So even if we -- even if a particular issue has been

4    decided -- has been removed from the jurisdiction of the trial

5    court by virtue of an interlocutory appeal, since the rest of

6    the case is proceeding and standing has to be maintained

7    continuously -- you know, if we want to take one potential

8    injury off the table and say, well, you can't use that one to

9    rely upon for your standing, then that would be one thing.  But

10   for purposes of us demonstrating our standing to continue to

11   bring those claims, which has to be done continuously, I think

12   all of it is still in play here at the trial court.

13          And in any event, this evidence will eventually bear

14   on the merits.  And so therefore, you know, Your Honor, we

15   believe it would be appropriate for us to conduct that work.

16          It is not going to be any different than the work

17   we're going to be conducting on the other stuff that hasn't

18   been raised before the Court of Appeals.  So like, for example,

19   the Court of Appeals is looking at Poll Pads and scanners.  It

20   is not looking at anything related to the BMDs.

21          And, you know, getting the equipment all at once is

22   going to be a lot easier because it all works together.  Or it

23   is going to be difficult to meaningfully understand what the

24   election project files tell us unless we have the equipment we

25   need to test the entire system that together works to generate

1    those election project files in the EMS.

2            MR. MILLER:  Your Honor, if I may just briefly.  I

3    won't spend an inordinate amount of time on the standing issue.

4    But I do think this conversation kind of brings out a point of

5    the importance to address the standing of the plaintiffs on the

6    claims they have pleaded so that the parties and the Court are

7    clear as to what actually is before the Court right now.

8            In Paragraph 204 of the complaint, which Mr. McGuire

9    just cited, they state voters who avoid BMDs by choosing to

10   vote by mail will incur postage, will be deprived of

11   availability to vote in the neighborhood polling place, will

12   have to vote earlier than other similarly situated voters, and

13   incur the risk of having their ballot rejected without notice

14   for cure.

15           That is not the issue that was before the Court or

16   that the Court ordered with relation to the standing order.

17   And it goes back to plaintiffs set their goalposts by the

18   pleading in their complaint and they have to establish the

19   pleading within their complaint.

20           So setting aside the standing issue, what confines

21   the claims in the sense of that issue is what the plaintiffs

22   have actually pleaded.  And it has nothing to do with what we

23   originally thought were standard threshold settings in the

24   brightness and contrasting.

25           Setting that all aside, Your Honor, the specific

1    issue here as to this dispute -- you know, I don't want to

2    rehash all of the repeated arguments we've made here.  We have

3    a fully briefed joint discovery statement on the record before

4    you.  We have referenced the issues with custody of the

5    machines and control.  We have repeated -- we have repeated the

6    issue as to unfettered access to this equipment.

7             And what the plaintiffs are essentially asking for

8    here is to conduct their own audit -- conduct their own

9    forensic audit of the machine.  That is not what this complaint

10   is about.  They have not alleged how it affects them

11   personally.

12            But, again, setting the standing aspect aside, it

13   just does not go to what is actually pleaded in the complaint.

14   Perhaps it goes to some other, you know, issue they could raise

15   and wave around as a significant issue.  It could possibly --

16            THE COURT:  Well, listen, I -- all right.  I think

17   we're going backwards now.  I mean, obviously, they have -- a

18   central part of what they have pled is that -- on the BMDs that

19   they don't know -- they cannot know and verify that their vote

20   is being properly cast.

21            So yes, they are trying to verify that and raise the

22   inference that through that evidence that, in fact, their vote

23   may well have not been properly cast and counted.  That is as I

24   understand it.

25            I understand -- you are right.  I do understand

1    everyone's position.  I'm just trying to get us to the point

2    where I have a proper summary judgment briefing on an expedited

3    basis.  And the way we're going, it never will happen.

4         So I'll make a decision as to anything else that they

5    have out there that is -- and I understand the points of the

6    State.  And I would say I understand the plaintiffs' argument.

7    And also I have asked the plaintiffs to look at in a refined

8    basis what they at core need.

9         So I would suggest, first of all, in terms of once

10   you get another week of documents, that you share the reports

11   that you have about the documents with the plaintiffs, that you

12   can actually talk about whether there are some terms that need

13   to be modified, or what could -- what else could happen.

14        I'm glad that you are asking people to work full

15   time.  But I just -- this is sort of like we don't need to go

16   through a paper hunt that is not productive.  And I think part

17   of knowing whether it is productive is you share some

18   information with the plaintiffs' counsel to talk about that.

19        Now, the defendants are concerned that the

20   verification that plaintiffs' counsel have provided as to

21   completion of documents is -- I think at base is that you think

22   it is not true, it is not really done.

23        They have provided a verification at this juncture or

24   not?

25        MR. MILLER:  Yes, Your Honor, they have provided a

1    verification.  The issue really is:  I fail to understand how

2    that verification is accurate absent some misunderstanding as

3    to what the verification is.

4           So, in other words, you know, no documents have been

5    produced from at least five of the individual plaintiffs here.

6    If that is the case that they don't exist, then that is the

7    case.  But what the State defendants have never been clear on

8    is what exactly the process was to gather these documents, who

9    the documents came from.  And these are questions we

10   specifically asked of counsel.

11          I specifically stated in an email, you know, that all

12   of these documents based on an initial review of them seem to

13   have come from Donna Price, for example.  Please confirm

14   whether it is the case that all the other plaintiffs have

15   produced and searched their documents.

16          In the written response, I got no answer to that

17   question.  In our joint -- in our discovery conference, the

18   State defendants understood that the only documents that had

19   been searched were Donna Price's emails with an at Verified

20   Voting.com email domain.  That is what we understood.  If that

21   is incorrect, then that is incorrect.

22          But that is what we understood coming away from that

23   conversation and further understood that they were not going to

24   search any other plaintiffs' email accounts because they were

25   their personal emails.

1          But, Your Honor, Verified Voting is not a plaintiff

2    in this case.  But even if we accept that argument as typical

3    or as acceptable, then that would mean that Verified Voting

4    surely has other documents in their possession that are

5    responsive to the request, that they have non-hard copy emails,

6    they have responses that are not from Ms. Price.

7          I just fail to understand where --

8          THE COURT:  All right.  I've got what you fail to

9    understand.  I understand what you fail to understand.

10         So let me just ask the plaintiffs.  When I'm saying

11   it should not be personal email, it doesn't mean this is an

12   exemption from anyone looking at their personal email if that

13   is all they are using.

14         It means I'm not expecting them to be able -- to have

15   to be able to share documents that are personal in context.  If

16   plaintiff A is writing to her daughter about her feelings about

17   an election, I don't think that really is -- that is personal.

18         So if everyone is using personal email, then they

19   have to look at it for purposes of looking at their -- what

20   they did as to voting that might be relevant to establish --

21   that might be relevant to standing.  Now, that is really what

22   it is going to be or their harm or how they went and cast a

23   vote.

24         Now, I don't know what you have done to look.  So --

25   and so I need counsel -- plaintiffs' counsel to tell me:  Have

1    you, in fact, communicated with each of your clients and is, in

2    fact, essentially the sum total of what has been produced

3    Ms. Price's documents?

4           MS. ASCARRUNZ:  Your Honor, this is Veronica

5    Ascarrunz from Morrison Foerster.  I can speak on behalf of the

6    Curling plaintiffs.

7           Can you hear me okay?

8           THE COURT:  Yes.

9           MS. ASCARRUNZ:  So it is not accurate as to --

10          THE COURT:  All right.  Now you are fading in and

11   out, like Mr. Brown did.

12          MR. CROSS:  Your Honor, I think there may be an echo

13   that comes from the courtroom.  It might help if you mute.

14          THE COURT:  Okay.  I have to have --

15                **(There was a brief pause in the proceedings.)**

16          THE COURT:  This is what happens when you are not in

17   virtual reality any longer.

18          MS. ASCARRUNZ:  Okay.  So let me pick up with the

19   question of who has produced documents.  We have, in fact,

20   checked with all of our clients and produced documents from all

21   three, as Mr. Cross mentioned earlier today.  We have produced

22   documents from Donna Price, Donna Curling, and Jeffrey

23   Schoenberg.

24          In an earlier email that maybe Mr. Miller is not

25   aware of, Mr. Cross actually enumerated how many documents have

1    come from each of those clients.  So we have confirmed and

2    collected and produced documents from all three.

3            It is true that this latest batch of production was

4    only from Ms. Price.  And that was just because neither of the

5    other two clients had any responsive documents.  This last

6    batch of requests was primarily directed to correspondence that

7    you have had with the press, correspondence that you've had

8    with political parties, and things of that nature.  So it is

9    not -- you know, it is not surprising that our clients didn't

10   have that kind of documentation.

11           So we have now advised defendants in -- two weeks ago

12   as well as in an email from this morning that we have completed

13   our production.  That was subject to the Gmail discussion that

14   Your Honor is aware of.  And so we have not produced documents

15   from one of our clients' personal Gmail addresses.

16           So subject to Your Honor's guidance today, we can

17   look back and see if that impacts what we need to produce.  But

18   maybe some more clarification on that point on what is

19   responsive will be helpful.  Because, you know, again, these

20   emails are not of the nature that Your Honor described a moment

21   ago.  So they are not about, I went to the poll, and I had a

22   hard time, or anything along those lines.

23           They are essentially correspondence they had with

24   their personal acquaintances about, you know, their concerns

25   about the voting process.  And if those are responsive and that

1    should be collected and produced, then we will look to Your

2    Honor for guidance on that point.

3            But we have not produced personal Gmails of our

4    clients that are just generally discussions about the election

5    and things like that.

6            MR. MILLER:  Your Honor, I think that clarifies a

7    significant point.  Maybe it is just a lack of specificity in

8    my terminology.

9            What I'm referring to in terms of production is

10   production related to the request for documents, you know, in

11   this round of discovery.  And what we're looking at here and

12   what I heard is that that was correct that it was Ms. Price's

13   Verified Voting address.

14           You know, as to the examples of the responsiveness,

15   it is absolutely relevant to the claims and the defenses of

16   this case to the extent that any plaintiff is discussing the

17   litigation and their theories about the vulnerabilities.

18           For example, the plaintiffs keep telling us how

19   different they are from Lin Wood, how different they are from

20   the *Kraken* case.  I want to know how they discuss how they are

21   different, if they discuss it at all.  That is absolutely

22   relevant to the claims that are at issue here.

23           MR. BROWN:  Your Honor, this is Bruce Brown.  I hope

24   you can hear me better.

25           THE COURT:  I can.

1          MR. BROWN:  The issue that Mr. Miller just raised was

2     already raised and litigated to completion with the last

3     discovery dispute that the Coalition had with the plaintiffs

4     and with the defendants in which the defendants wanted all our

5     communications with the press, with other nonprofits, et

6     cetera.  And we explained convincingly that none of that was

7     relevant, that the plaintiffs do not have control over the

8     election equipment and are highly unlikely to have any evidence

9     that is germane and certainly wouldn't be found in

10    communications with the press or nonprofits.

11          Your Honor tentatively agreed and said to the State

12    why don't you try to get information through a 30(b)(6).  So

13    that is where we are on that.  The Coalition is done with our

14    part with document discovery.  And I just wanted to make sure

15    that it is clear that the Coalition plaintiffs are done.  We

16    will make our witnesses available for deposition.  And that was

17    the understanding as of the resolution of that dispute.  So we

18    can move on.

19          Before I had the communications from -- I did want to

20    correct also one thing that Mr. Miller said and that is that

21    the State can't control the counties over what election

22    equipment they use.

23          If that is the case, I don't understand the law

24    because 21-2-300 -- Georgia Code 21-2-300 says that the

25    equipment used for casting and counting votes in county, state,

1    and federal elections shall be the same in each county in this

2    state and shall be provided to each county by the state as

3    determined by the Secretary of State.

4         So that is what we're alleging on.  However, in terms

5    of traceability and redressability, Your Honor has already

6    covered that in your July 2020 order.  And nothing has changed

7    since then.

8         So we think that traceability and redressability

9    issues which they raise at every single lawsuit in which they

10   are sued and that every single time are unsuccessful in raising

11   it is also invalid in this case as well.

12        MR. MILLER:  Your Honor, I'll address that in reverse

13   order and address that issue very quickly because I think Your

14   Honor has moved on from it.  That statement was made in the

15   context of traceability and redressability if the plaintiffs

16   had proved their case, if they successfully showed their

17   standing, that this Court could enjoin us from enforcing that

18   exact Code Section 21-2-300.

19        What would then be left is every county's individual

20   responsibility to supply their own polling places.  Setting

21   that aside, you know, I understood the joint discovery

22   statement to be concerning the statements of the press.

23        If we have an issue where we have been overruled to

24   obtain relevant and responsive information that goes to their

25   claims and defenses with other individuals, that is a problem

1  that we need to address immediately and we will seek Your

2  Honor's reconsideration of it.  Because the fact of the matter

3  is right now we have got plaintiffs that are communicating, you

4  know, with other individuals, which is just absolutely their

5  right.  But what they say about their claims, what they say

6  about this case, what they say about the *Wood* litigation is

7  absolutely relevant to their claims and defenses at issue here.

8        And I would go further to say as to the separate

9  nonprofits -- you know, Your Honor may recall designating

10 Ms. Greenhalgh a consultant to the attorneys' eyes only

11 equipment.

12       At this point, it appears her employer, the Free

13 Speech for People, is actually litigating cases in Pennsylvania

14 and North Carolina or they were -- I think they have been

15 dismissed and upheld on appeal -- seeking to enforce the

16 hand-marked paper ballots.

17       And what was turned over to us in discovery from the

18 Curling plaintiffs, not Coalition plaintiffs -- from the

19 Curling plaintiffs shows that Ms. Greenhalgh was playing an

20 active role in publicizing the endeavors of the plaintiffs

21 here.

22       And separate from the Coalition issue, the second

23 issue with the Curling plaintiffs' document production is that

24 there are only four documents that post-date the September

25 hearing.  Four documents.  There is one during the hearing, two

1    in October, and one in November.

2         So even setting aside the rest of it, I do want to

3    raise for the Court that I'm astounded that more recent

4    responsive documents don't exist.  Perhaps that is the case,

5    that more recent responsive documents don't exist just for

6    Ms. Price, who is the only individual they produced documents

7    from.

8         But, Your Honor, at this point, we're (Zoom

9    interference).  Again, if the plaintiffs want to prove their

10   standing, if the plaintiffs want to demonstrate their standing,

11   it requires discovery not from the State, it requires the

12   discovery from the plaintiffs that they can then present to

13   Your Honor at summary judgment.

14         MR. BROWN:  Your Honor, here is the problem with what

15   he is saying.  As to the Coalition, the State defendants have

16   never asked us for our evidence relating to standing.  That is

17   the problem, and that is what I pointed out last time is that

18   he's -- Mr. Miller is acting like he asked an interrogatory

19   that said state every fact that supports the basis you have

20   standing and identify every witness, identify every document.

21   He never did that.  He never did that.

22         Instead he wants to know about the comments that we

23   have made to the press because we're trying the case in the

24   press as if we didn't file a lawsuit in federal court and are

25   trying the case.  Whereas apparently his clients are not doing

1    that, I guess.

2           None of that is relevant.  He has never been able to

3    explain how statements to other third parties are relevant just

4    because they mention the suit.  And if he is willing to

5    stipulate that we can enter all that evidence into the record

6    in the trial of this case, then that might be different.  But I

7    bet he will object then.  Because, of course, it is absolutely

8    irrelevant.

9           So -- but we're back to where we were.  He hasn't

10   asked for that.  He hasn't asked for the evidence he is

11   claiming that we haven't produced.  He can ask for it within

12   the time constraints.  And if it is relevant to a claim or

13   defense, we'll produce it.  But he hasn't done it.

14          Instead, it is this -- it is this harassing type of

15   discovery about our relationship with the press.  And so --

16          THE COURT:  All right.  Where do I find in the

17   record --

18                  **(Unintelligible cross-talk)**

19          MR. BROWN:  -- point to it.  He hasn't asked that

20   yet.  We pointed that out.  We are putting up our witnesses for

21   depositions.  He can ask them then if there are documents that

22   are germane they might be identified in those depositions.  And

23   we won't need to bother Your Honor any more.

24          MR. MILLER:  Your Honor, I'm not seeking to revisit

25   the statements with the press issue.  The Court has already

```
 1   ruled on that.
 2          If I serve Mr. Brown an interrogatory that says state
 3   every reason you have standing, he would, of course, object on
 4   overbreadth and you would, of course, sustain that objection.
 5   It is an absurd position to take.  If I ask for every document
 6   that goes to the standing and that is what the request said,
 7   that would be an overly broad question.
 8          Your Honor, if the plaintiffs don't feel like they
 9   are required to participate in discovery in this case, I fail
10   to see --
11          MR. CROSS:  Come on, Carey.
12              (Unintelligible cross-talk)
13          MR. MILLER:  -- producing such a volume of documents.
14          THE COURT:  All right.  Listen, this is not
15   productive.
16          Mr. Miller, if you could point to me -- and,
17   plaintiffs' counsel, if you can point to me where I can find
18   the actual discovery requests provided and the responses, I
19   will take a look at them and I will rule.
20          If they are not in the record or if they are buried
21   someplace, just agree on a submission with it all so we can
22   have it without looking -- spending our time looking all over
23   the place.
24          Okay?
25          MR. BROWN:  Yes, Your Honor.
```

```
 1              THE COURT:  So if you will do that within the next --
 2    give it -- if you can do that, I assume you can do that by
 3    tomorrow and that would be fine.  Just tell me -- or send it.
 4              MR. BROWN:  Yes, Your Honor.
 5              THE COURT:  In connection with the telling or
 6    whatever, I just want to say that the marvelous Ms. Cole's last
 7    day is tomorrow, which is extremely sad for me.  We have worked
 8    together for ten years and more.  And she's been an enormous
 9    asset to my chambers and has done a bullwork of work in this
10    case.  And she is going on to greener pastures literally.
11              And we are -- we are going to be dividing up some
12    responsibilities in the office.  So I will just say for now
13    write Mr. Martin.  And when we get settled in with the two
14    people who are taking over responsibility, who -- I don't know
15    whether they can get closer so that you can see them.
16              If they come up, I'm going to let them introduce
17    themselves.
18              LAW CLERK BRADLEY:  Hi, everyone.  My name is Amanda
19    Bradley.  Very excited to be working on your case.
20              LAW CLERK PALMER:  Hi, everyone.  I'm Gavin Palmer.
21              THE COURT:  Thank you.  But to prevent any confusion
22    for now, just send it to Mr. Martin and he will send it to all
23    of us.  All right?
24              And that doesn't mean we won't be bothering Holly for
25    something.  But don't send her any midnight emails.  All right?
```

1              So that is as far as I can go on that issue.  But

2    have you settled upon dates?  Have you given dates for the

3    depositions?

4              MR. CROSS:  Yes, Your Honor, we have.

5              MR. BROWN:  Yes, Your Honor.

6              THE COURT:  And when are those?  Have you-all

7    talked -- communicated about them?

8              MR. BROWN:  Yes, Your Honor.  This is Bruce Brown.

9    We have given a number of dates for our people over the next

10   four weeks or so.  We will agree to dates quickly.

11             THE COURT:  Have you made any progress in discussing

12   the confidential and attorneys' eyes only information and how

13   to handle it in terms of protocols?

14             MR. CROSS:  Your Honor, this is David Cross.  We have

15   not gotten any information from the State on where their

16   discussions are with Dominion.  We are eager, as Dr. Halderman

17   has explained, to share his findings with Dominion.  As we

18   discussed last time, we need a protocol for that.

19             So we would appreciate hearing from the State whether

20   they have had a conversation with Dominion, where that stands,

21   and how we can work out the disclosure.

22             THE COURT:  And are there any protocols relative to

23   the -- within the agency -- within the Secretary of State's

24   office for sharing how information is shared?

25             MR. CROSS:  We have invited that as well over the

1    last few weeks.  And nothing.  They just won't respond.

2                THE COURT:  Mr. Miller?

3                MR. MILLER:  Your Honor, as to the Secretary of

4    State's office, they are not viewing attorneys' eyes only, if

5    that is the question.

6                THE COURT:  Well, I guess they had -- the plaintiffs

7    had raised this question of Gabriel Sterling's access to the

8    information from Dr. Halderman.

9                MR. MILLER:  Your Honor, we received that email from

10   Mr. Cross one day.  And I implicitly told him for at least the

11   third time, including in this court before this Court, that our

12   clients have not viewed Dr. Halderman's report.

13               However, as I suspected at the time and what turned

14   out to be the case is that Mr. Sterling was discussing the

15   rebuttal report of Dr. Halderman's, which was not designated,

16   and which was blasted throughout the state by plaintiffs in

17   this case.  Sent to every county election official throughout

18   the state.

19               MR. CROSS:  That is the first time we have heard

20   that, Your Honor.  So we appreciate the confirmation.

21               THE COURT:  All right.

22               MR. MILLER:  It was attached to an email.

23               THE COURT:  It probably is something if you are going

24   to end up -- you may end up needing to talk about protocols.

25   Otherwise, you just are basically going to be confined about

1    who you get any information from and you will just be -- the

2    State can obviously designate somebody that they need to -- who

3    needs to be able to look at a document.  But then you have to

4    have some agreement about who that is.

5              MR. CROSS:  Your Honor, one thing that we were going

6    to raise on this subject is we would appreciate permission to

7    share Dr. Halderman's report with CISA.

8              THE COURT:  With who?

9              MR. CROSS:  CISA.  It is a department within DHS that

10   handles these precise types of cybersecurity issues.  Geoff

11   Hale, who is the head of CISA -- there's an email we can

12   provide to the Court -- has indicated they would be interested

13   in seeing this, if we can make it available to them.

14             And what they would be able to do is address the

15   vulnerabilities in the system with a company like Dominion, the

16   manufacturer, with states that are using this.  And they have

17   particular security protocols in place to make sure that the

18   findings are not shared with anyone who should not have access

19   to them.  But they are shared with those who need access

20   particularly.

21             Again, there is a particular program.  Dr. Halderman

22   is far more familiar with it than I am.  He is available to

23   discuss it.  But we would like permission to share the report

24   with CISA.

25             THE COURT:  Well, I would suggest you need to talk

```
 1   about this offline first unless you have already talked about
 2   it.
 3             MR. CROSS:  We have not, Your Honor.  This arose
 4   today.  I just wanted to make sure if Your Honor is comfortable
 5   with it then we can work it out with the State.  We'll work it
 6   out with the State.  I just want to make sure Your Honor did
 7   not have a concern about us doing that if we could arrange it
 8   with the State.
 9             MR. MILLER:  Your Honor, what does that have to do
10   with anything in this litigation?  How does that prove or
11   disprove any claim --
12             THE COURT:  I'm not going to have this argument in
13   front of me first.  I think you have -- I don't even know at
14   this juncture one way or the other.  But I think you ought to
15   be able to talk about it.  And I think --
16             Mr. Miller, I just would suggest having -- arguing
17   almost reflexively about it doesn't make sense.  It doesn't
18   help us in moving forward here.  Because soon this will be --
19   no one will be able to look at anything and be able to opine
20   about anything, other than Dr. Halderman, which is not an aid
21   to anyone here.  So that is --
22             MR. MILLER:  Your Honor --
23             THE COURT:  I'm going to leave it at that.  I suggest
24   you -- as I clearly indicated, I think you need to communicate
25   about it and you ought to be talking about it, not just
```

1   generally, but specifically, what individuals did you have in

2   mind.

3          We can't move forward with that.  If you-all want a

4   60-day extension, as I have indicated before, you can.  I'm not

5   going to go further than that.  You should draft -- have a

6   consent agreement for a 60-day discovery extension.

7          And next Friday, I would like to -- not this Friday,

8   but next Friday, I would like to get a copy of one of these

9   reports about how far we are on the document production.  And

10  remember that you are going to be sending me the -- this week

11  the references to the -- either the documents themselves or

12  the -- or the docket numbers for the discovery at issue that

13  you want me to look at.  I think I have the answers to

14  everything else.

15         When you communicate next Friday, let me know what

16  you -- what percentage of the discovery from the

17  State's perspective in terms of the documents that you've

18  reviewed and we'll be able -- and are producing.

19         I mean, I assume you are producing things every

20  Friday, from what you have said.

21         MR. MILLER:  Yes.  Yes, Judge.  Yes, Your Honor.

22         And to date, it has been about 40 percent responsive

23  or relevant to the case.  40 percent of the 116,000 some-odd

24  documents are relevant.

25         THE COURT:  I will give you some greater clarity

1    about the document production of the individuals once I get the

2    actual request.

3              All right?

4              MR. CROSS:  Your Honor, could I just ask:  For the

5    60-day extension to work -- and that is the extension that we

6    want because we want to move quickly -- could we get a 30-day

7    completion date for the State?

8              The reason I ask for that is they represented they

9    produced 280,000 email messages in three months.  That's 90,000

10   documents per month.  They have told us that they expect to

11   produce about 40- to 50,000 documents total.  That would be

12   half of what they produced in a month in *Fair Fight*.  We should

13   easily be able to get that done in the next 30 days.  I mean,

14   the math would say we could get it done in 15 days.

15             So I just worry if we don't have a production

16   deadline this is going to drag out until the end of discovery

17   and then we're probably beginning depositions.  So by their own

18   math, they should be able to finish this in two weeks and

19   certainly 30 days.

20             THE COURT:  All right.  Well --

21             MR. MILLER:  Your Honor, that is --

22             THE COURT:  Let me know next Friday what percentage

23   is done, and then we'll -- I'll look at it then.  All right?

24             MR. CROSS:  Thank you, Your Honor.

25             THE COURT:  All right.  Thank you, Counsel.

1          MR. BROWN:  Thank you, Judge.

2          THE COURT:  I think that concludes things.

3              **(The proceedings were thereby concluded at 4:14**

4              **P.M.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6       I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   87 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12       In testimony whereof, I hereunto set my hand on this, the

13   20th day of August, 2021.

14

15

16

17                    _____
                      SHANNON R. WELCH, RMR, CRR
18                    OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```