IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, ET AL.,
Plaintiffs,

v.

BRAD RAFFENSPERGER, ET AL.,

Defendants.

Civil Action No. 1:17-CV-2989-AT

## NOTICE OF ADDITIONAL AUTHORITY

The purpose of this filing is to give the Court notice of a recent decision by Judge Boulee, attached as Exhibit A, holding that the Coalition for Good Governance ("CGG") has organizational standing to challenge certain State election laws based on CGG's diversion of resources.

In *Coalition for Good Governance, et al., v. Raffensperger*, No. 21-cv-02070, CGG and thirteen other plaintiffs challenge Georgia's recently enacted election law, SB202, as violating free speech, procedural due process, substantive due process, equal protection, and the fundamental right to vote.  Plaintiffs filed a Motion for a Preliminary Injunction, seeking to enjoin the enforcement of four of SB202's criminal laws and a provision in SB202 that narrowed the window for applying for absentee ballots.  On August 20, 2021, Judge Boulee entered an Order

granting the Motion in part and denying it in, enjoining the State from enforcing

what is referred to as the "Photography Rule II."

In support of its standing to bring suit, CGG alleged and presented evidence

that it had diverted resources "to provide advice to its members regarding how to

navigate SB202's requirements."  (No. 21-cv-02070, Doc. 49 at 10).  The State

Defendants argued that this evidence was insufficient because CGG had not

diverted resources away from its core mission.  (*Id.,* Doc. 21 at 16) ("[CGG's]

claimed expenditures also constitute CGG's pursuit of its organizational purpose,

and it cannot claim standing 'based solely on the baseline work they are already

doing.'").  This is the same argument that they raise in this case.  (No. 17-cv-

02989, Doc. 1066 at 14 (CGG "cannot be diverting resources because it is doing

the very thing that it exists to do")).

Judge Boulee flatly rejected the State Defendants' argument, holding:

The Court is not persuaded by State Defendants' unsupported
assertion that CGG's diversion of resources further its organizational
purpose and therefore cannot constitute an injury for standing
purposes.

Based on these facts, the Court finds that GAPPAC's[1] and CGG's
diversion of resources to address SB 202's impact constitutes
sufficient injuries for standing purposes.

---

[1] GAPPAC is the acronym for the Georgia Advancing Progress Political Action Committee, a co-
plaintiff in the case.  GAPPAC presented similar evidence of a diversion of resources to "explain
the requirements of SB 202." (Doc. 49 at 10).

(Doc. 49 at 11).   Judge Boulee also ruled that, since at least one plaintiff had

satisfied the Article III standing requirements, it could reach the merits of the case.

(Doc. 49 at 14 & *id.* at n. 6).

Respectfully submitted this 24th day of August, 2021.

*/s/ Bruce P. Brown*                          */s/ Robert A. McGuire, III*
Bruce P. Brown                                Robert A. McGuire, III
Georgia Bar No. 064460                        Admitted Pro Hac Vice
BRUCE P. BROWN LAW LLC                          (ECF No. 125)
1123 Zonolite Rd. NE                          ROBERT MCGUIRE LAW FIRM
Suite 6                                       113 Cherry St. #86685
Atlanta, Georgia 30306                        Seattle, Washington 98104-2205
(404) 386-6856                                (253) 267-8530

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,*
*Ricardo Davis & Megan Missett*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2021, I served a copy of the foregoing upon

counsel for the Defendants and the Curling Plaintiffs via electronic mail.

*/s/ Bruce P. Brown*
Bruce P. Brown

EXHIBIT

A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COALITION FOR GOOD
GOVERNANCE et al.,

       Plaintiffs,

  v.

BRIAN KEMP et al.,

       Defendants.

CIVIL ACTION NO.
1:21-cv-02070-JPB

## ORDER

Before the Court is Plaintiffs Coalition for Good Governance, Adam Shirley,

Ernestine Thomas-Clark, Antwan Lang, Patricia Pullar, Judy McNichols, Jackson

County Democratic Committee, Georgia Advancing Progress Political Action

Committee, Ryan Graham, Rhonda Martin, Jeanne Dufort, Aileen Nakamura,

Elizabeth Throop and Bradley Friedman's (collectively "Plaintiffs") Motion for

Preliminary Injunction ("Motion").  ECF No. 15.  After due consideration of the

briefs, accompanying evidence and oral argument, the Court finds as follows:

## I.    BACKGROUND

Plaintiffs filed this action seeking a declaration that certain provisions of

Georgia Senate Bill 202 ("SB 202") violate the United States Constitution and/or

the Voting Rights Act.  Governor Brian Kemp signed SB 202 into law on March

25, 2021.

In the instant Motion, Plaintiffs ask the Court to issue a preliminary

injunction enjoining the implementation of the following sections of SB 202:

- **O.C.G.A. § 21-2-568.1 (the "Observation Rule")**

    The Observation Rule prohibits a person from "intentionally observ[ing]
    an elector while casting a ballot in a manner that would allow such
    person to see for whom or what the elector is voting."

- **O.C.G.A. § 21-2-568.2 (the "Photography Rules")**

    The Photography Rules proscribe the use of photographic or other
    electronic monitoring or recording devices to (i) "[p]hotograph or record
    the face of an electronic ballot marker while a ballot is being voted or
    while an elector's votes are displayed on such electronic ballot marker"
    ("Photography Rule I") or (ii) to "[p]hotograph or record a voted ballot"
    ("Photography Rule II").

- **O.C.G.A. § 21-2-386(a)(2)(B)(vii) (the "Communication Rule")**

    The Communication Rule precludes election "monitors" and "observers"
    from "[c]ommunicating any information that they see while monitoring
    the processing and scanning of the absentee ballots, whether intentionally
    or inadvertently, about any ballot, vote, or selection to anyone other than
    an election official who needs such information to lawfully carry out his
    or her official duties."  The rule's prefatory statement separately
    establishes that such communications are prohibited "[w]hile viewing or
    monitoring" the absentee ballot opening and scanning process.  *Id*. § 21-
    2-386(a)(2)(B).

- **O.C.G.A. §§ 21-2-386(a)(2)(A) and (a)(2)(B)(vi) (the "Tally Rules")**

    Section (a)(2)(A) ("Tally Rule I") prohibits any person from tallying,
    tabulating or estimating the absentee ballots cast, attempting to do so or

causing a ballot scanner or any other equipment to produce any such tally or estimate until polls close on the day of the primary, election or runoff.

Section (a)(2)(B)(vi) ("Tally Rule II") applies specifically to election "monitors" and "observers" and similarly prohibits them from tallying, tabulating or estimating the absentee ballots cast or attempting to do so. Tally Rule II's prohibitions are, however, in effect only "[w]hile viewing or monitoring" the absentee ballot opening and scanning process.

- **O.C.G.A. § 21-2-381(a)(1)(A) (the "Ballot Application Rule")**

  The Ballot Application Rule provides that an application for an absentee ballot must be submitted "not earlier than 78 days or less than 11 days prior to the date of the primary or election, or runoff of either, in which the elector desires to vote."

The Observation and Photography Rules became effective on March 25, 2021, and the remaining challenged rules became effective on July 1, 2021.

Plaintiffs oppose the specified rules on one or more of the following grounds: undue burden on the right to vote, abridgment of free speech and void for vagueness.[1] They contend that the rules violate their rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment.[2]

Defendants Brian Kemp, Brad Raffensperger, Rebecca N. Sullivan, Anh Le, Matthew Mashburn and Sara Ghazal (collectively "State Defendants") and Intervenor Defendants Republican National Committee, National Republican

---

[1] All rules, except the Ballot Application Rule, provide for criminal penalties ranging from a misdemeanor to a felony.

[2] Plaintiffs' Motion concerns only a subset of the claims alleged in the Complaint.

Senatorial Committee, National Republican Congressional Committee and Georgia Republican Party, Inc. (collectively "Intervenor Defendants") oppose the Motion on the merits. State Defendants also challenge Plaintiffs' standing to bring this suit.

## II.    DISCUSSION

The Court addresses State Defendants' standing argument first, given the Court's obligation "'to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based.'" *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1422-23 (11th Cir. 1995) (quoting *Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir. 1991)).

### A.    Standing

To satisfy standing requirements under Article III, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). These

requirements ensure federal courts adjudicate only actual "cases" and

"controversies." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925

F.3d 1205, 1210 (11th Cir. 2019).

### 1.    Injury

State Defendants challenge the standing of both the individual and

organization plaintiffs to bring this suit.

### a.    Individual Plaintiffs

"When an individual is subject to the threatened enforcement of a law, an

actual arrest, prosecution, or other enforcement action is not a prerequisite to

challenging the law." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1304

(11th Cir. 2017) (internal punctuation omitted) (quoting *Susan B. Anthony List v.*

*Driehaus*, 573 U.S. 149, 158 (2014)).  "The plaintiff's own action (or inaction) in

failing to violate [a] law eliminates the imminent threat of prosecution, but

nonetheless does not eliminate Article III jurisdiction." *MedImmune, Inc. v.*

*Genentech, Inc.*, 549 U.S. 118, 129 (2007).  Indeed, "[t]he dilemma posed by . . .

putting the challenger to the choice between abandoning his rights or risking

prosecution . . . is 'a dilemma that it was the very purpose of the Declaratory

Judgment Act to ameliorate.'" *Id*. at 129 (quoting *Abbott Lab'ys v. Gardner*, 387

U.S. 136, 152 (1967)).  Therefore, courts allow a plaintiff to bring a pre-

enforcement suit "when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Wollschlaeger*, 848 F.3d at 1304 (internal punctuation omitted).

In *Wollschlaeger*, the Eleventh Circuit Court of Appeals found that the plaintiff doctors had demonstrated an injury sufficient for the purposes of standing where they sought to challenge a new statute that prohibited them from discussing firearm safety with their patients, although they had ceased those discussions as a result of the statute's enactment. *Id*. The court explained that "[w]here the 'alleged danger' of legislation is 'one of self-censorship,' harm 'can be realized even without an actual prosecution.'" *Id*. at 1305 (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)).

However, the threat of prosecution must be credible. *See Am. Booksellers Ass'n*, 484 U.S. at 393 (stating that the court was "not troubled" by a pre-enforcement suit because the plaintiffs alleged "an actual and well-founded fear that the [respective] law [would] be enforced against them"). This requirement is also satisfied where the government has not disavowed prosecuting persons who violate the challenged legislation. *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010) (finding a credible threat of prosecution existed because the

government did not indicate it would forego prosecuting the plaintiffs if they violated the statute).

Here, the record shows that individual plaintiffs have changed or intend to change their behavior in response to SB 202. For example, Plaintiff Jeanne Dufort, a poll watcher, member of the Vote Review Panel of Morgan County and vocal critic of Georgia's election system, testified that she will not vote in person and may not serve as a poll watcher in future elections to avoid the possibility of prosecution under the Observation Rule. Dufort Decl. ¶¶ 21-22, ECF No. 15-4. Plaintiff Bradley Friedman, host of a nationally syndicated radio show that addresses election security, testified that SB 202's restrictions will limit his show's news reporting activities for upcoming elections. Friedman Decl. ¶ 8, ECF No. 15-5. As such, the alleged injury—self-censorship or forgoing participation in the election process—may have already occurred for those plaintiffs who indicated that they would change their behavior with respect to the July 13, 2021 runoff elections.[3]

With respect to the threat of prosecution under the challenged provisions, Plaintiffs submitted evidence of pending complaints against poll watchers for

---

[3] Since the parties completed briefing on this Motion prior to the July 13, 2021 runoff elections, the record does not reflect whether the respective plaintiffs did, in fact, change their behavior.

election monitoring activities that allegedly violated an election statute not at issue here.  Marks Decl. ¶ 11, ECF No. 15-3.  Notably, State Defendants did not refute— either in their papers or during oral argument—Plaintiffs' contention that any alleged violations of SB 202 will be "vigorously" prosecuted.  Pls.' Reply Br. 5, ECF No. 23.  Therefore, Plaintiffs have demonstrated a credible threat of prosecution.

State Defendants' reliance on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), to challenge Plaintiffs' standing is misplaced.  Unlike here, the plaintiffs in *Clapper* lacked knowledge of the government's enforcement practices and failed to provide a credible basis for their fear of prosecution.  *Id*. at 411.

Similarly, the opinions in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), and *Tsao v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d 1332 (11th Cir. 2021), which State Defendants cite as additional reasons to find Plaintiffs lack standing in this case, do not require a different result.  *Lyons* did not concern a pre-enforcement challenge to legislation and rather involved a lawsuit regarding a police restraint method that could be employed by officers at their discretion.  *See* 461 U.S. at 98.  *Tsao* involved an "insubstantial," "non-imminent" and general threat of identity theft as a result of a data breach.  986 F.3d at 1345.  These cases are thus quite different from the instant pre-enforcement challenge of SB 202.

In sum, the Court is satisfied that at least some individual plaintiffs have demonstrated an actual injury and a credible threat of prosecution for the purposes of standing to challenge the Observation, Communication, Photography and Tally Rules.[4]

### b.     Organization Plaintiffs

"'[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'"  *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)).  In *Common Cause*, the court found that the plaintiff had established an injury sufficient to challenge a Florida voting statute because the plaintiff planned to divert resources from its regular voter registration, mobilization and education activities to a campaign to educate and assist voters in complying with the new photo identification requirement under the challenged statute.  *See id; see also Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (stating that a sufficient injury is demonstrated even when the diversion of resources is only "reasonably

---

[4] As Plaintiffs' Complaint shows, these alleged injuries are "arguably affected" with First and Fourteenth Amendment interests.  *Wollschlaeger*, 848 F.3d at 1304.

anticipate[d]" (alteration in original)). The court reasoned that this diversion constituted an adequate injury because it would cause the organization's noneconomic goals to suffer. *See Common Cause*, 554 F.3d at 1350-51.

In this case, the Complaint alleges that Plaintiff Georgia Advancing Progress Political Action Committee ("GAPPAC") has diverted and will continue to divert resources away from key activities as a result of SB 202. Compl. ¶ 223, ECF No. 1. For example, GAPPAC asserts that SB 202 has forced it to divert resources from a core activity of translating voting materials into multiple languages for members of the public to now undertaking education campaigns to explain the requirements of SB 202. *Id*. ¶¶ 220, 224-25.

Plaintiff Coalition for Good Governance ("CGG") likewise testified that it is diverting resources to provide advice to its members regarding how to navigate SB 202's requirements. Marks Decl. ¶ 13, ECF No. 15-3. It also explained that the challenged provisions have diminished its core activities of monitoring absentee ballot processing because, among other things, it is now prohibited from reporting election integrity issues it uncovers. *Id*. ¶ 27. For example, Marilyn Marks, Executive Director of CGG, testified that she has recorded video and reported ballot tabulation issues in the past but intends to curtail her election monitoring activities in light of SB 202's provisions. *Id*. ¶¶ 27, 33.

The Court is not persuaded by State Defendants' unsupported assertion that CGG's diversion of resources furthers its organizational purpose and therefore cannot constitute an injury for standing purposes.

Based on these facts, the Court finds that GAPPAC's and CGG's diversion of resources to address SB 202's impact constitutes sufficient injuries for standing purposes.

## 2. Traceability and Redressability

It is well-settled that "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560). Additionally, "it must be *the effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (internal punctuation omitted) (quoting *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)). Therefore, the court must be satisfied that a decision in the plaintiff's favor would "significantly increase the likelihood that [the plaintiff] would obtain relief that directly redresses the injury that she claims to have suffered." *Id.* (internal

punctuation and alteration omitted) (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)).

In *Luckey v. Harris*, which involved a complaint against the governor of Georgia and others regarding the state's provision of legal services to indigent criminal defendants, the court explained that "[a]ll that is required [for injunctive relief against a state official] is that the official [sued] be responsible for the challenged action." 860 F.2d 1012, 1015 (11th Cir. 1988). Thus, "the state officer sued must, by virtue of his office, have some connection with the unconstitutional act or conduct complained of. Whether this connection arises out of general law, or is specially created by the act itself, is not material so long as it exists." *Id.* at 1015-16 (internal punctuation and alteration omitted). The court therefore concluded that prospective relief could be ordered against the state officers, including the governor of Georgia, who is generally responsible for enforcing the state's laws. *Id.* at 1016. Specifically, the court explained:

> According to the Georgia constitution, the governor is responsible for law enforcement in [the] state and is charged with executing the laws faithfully. Ga. Const. Art. 5, § 2, ¶ 2. The governor further has the residual power to commence criminal prosecutions, [O.C.G.A.] § 17-1-2 (1982), and has the final authority to direct the Attorney General to "institute and prosecute" on behalf of the state. *Id.* § 45-15-35. Defendants[, including the Governor,] are therefore appropriate parties against whom prospective relief could be ordered.

*Id.*

Relying on this "binding precedent" from *Luckey*, the Eleventh Circuit rejected the state officers' argument in *Georgia Latino Alliance* that the plaintiffs did not have standing to sue because the state officers, including the governor of Georgia, lacked enforcement authority over the challenged immigration statute. 691 F.3d at 1260 n.5. The court emphasized that it was "easily satisfied" that the plaintiffs met the traceability and redressability requirements to bring a pre-enforcement, constitutional challenge against the officers, where "[e]ach injury [was] directly traceable to the passage of [the challenged statute] and would be redressed by enjoining each provision." *Id*. at 1260.

Following this reasoning, the Court finds that the traceability and redressability requirements are satisfied in this case. The governor of Georgia is a defendant here, and the injuries alleged are directly traceable to SB 202, for which he has enforcement authority.[5]

---

[5] State Defendants concede that they have "authority with respect to civil enforcement proceedings" regarding the Observation, Communication, Photography and Tally Rules. Defs.' Br. 17, ECF No. 21. They do not dispute that they have general enforcement authority regarding the Ballot Application Rule and argue only that they play no role in the "processing of absentee ballots for purposes of the deadline." *Id*.

In all, the Court finds that the Article III standing requirements are satisfied by at least Plaintiffs Jeanne Dufort, Bradley Friedman, GAPPAC and CGG.[6] Accordingly, the Court will evaluate the merits of the Motion.

### B. Merits

A plaintiff seeking preliminary injunctive relief must show the following:

> (1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*Sofarelli v. Pinellas Cnty.*, 931 F.2d 718, 723-24 (11th Cir. 1991) (quoting *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir.1983)). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal punctuation omitted) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301,

---

[6] "'Where only injunctive relief is sought, only one plaintiff with standing is required.'" *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1118 (N.D. Ga. 2020) (quoting *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018)); *see also, e.g.*, *Glassroth v. Moore*, 335 F.3d 1282, 1293 (11th Cir. 2003) ("Having concluded that those two plaintiffs have standing, we are not required to decide whether the other plaintiff, the one who has not altered his behavior . . . , has standing.").

1306 (11th Cir.1998)).  Granting a preliminary injunction is thus the exception

rather than the rule.  *See id.*

### 1.    Likelihood of Success on the Merits

A plaintiff seeking preliminary injunctive relief must show a substantial

likelihood that he will ultimately prevail on the merits of his claim.  *Sofarelli*, 931

F.2d at 723.  This factor is generally considered the most important of the four

factors, *see Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986), and

failure to satisfy the burden here, as with any of the other prerequisites, is fatal to

the claim, *see Siegel*, 234 F.3d at 1176.  The Court addresses the merits of each

claim in turn.

### a.    First Amendment Claims

Plaintiffs argue that the Communication and Photography Rules result in

unconstitutional restrictions on their freedom of speech under the First

Amendment.

The First Amendment prohibits the enactment of laws that abridge the

freedom of speech.  *See* U.S. Const. amend. I.  Therefore, governments generally

"ha[ve] no power to restrict expression because of its message, its ideas, its subject

matter, or its content."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting

*Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)).  Regulation of speech

15

based on the topic discussed or the idea or message expressed is presumptively

unconstitutional and may be justified only if the government proves that the

regulation is narrowly tailored to serve compelling state interests.  *See id*. at 165

(stating that "[a] law that is content based on its face is subject to strict scrutiny

regardless of the government's benign motive, content-neutral justification, or lack

of 'animus toward the ideas contained' in the regulated speech" (quoting

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993))).

      However, the Supreme Court of the United States has "long recognized that

the government may impose some content-based restrictions on speech in

nonpublic forums, including restrictions that exclude political advocates and forms

of political advocacy."[7]  *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885-86

(2018).  Restrictions on speech in nonpublic forums are subjected to a more limited

review and are constitutional "as long as the regulation . . . is reasonable and not an

effort to suppress expression merely because public officials oppose the speaker's

view."  *Id*. at 1885 (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460

U.S. 37, 46 (1983)).  In other words, where the regulation of speech in a nonpublic

---

[7] A nonpublic forum is "a space that 'is not by tradition or designation a forum for
public communication.'"  *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885
(2018) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46
(1983)).

forum is content-based but neutral as to viewpoint, "there is no requirement of narrow tailoring." *Id*. at 1888. Instead, courts employ a lower standard of review, which requires only that the regulation be "'reasonable in light of the purpose served by the forum.'" *Id*. at 1886 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

With these principles in mind, the Court turns to Plaintiffs' First Amendment claims regarding the Communication and Photography Rules.

### i. The Communication Rule

State Defendants ask the Court to evaluate the Communication Rule under the *Anderson-Burdick* framework for determining the constitutionality of an election statute and not under the traditional First Amendment framework for speech restrictions. However, they do not offer any binding authority for this proposition, and the sole case they cite, *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 777 (M.D. Tenn. 2020), does not support their argument. In determining the appropriate inquiry in *Lichtenstein*, the court simply noted that the *Anderson-Burdick* framework would be applicable if the challenged provision restricted "expressive ***activity***" but did not restrict "core political speech." *Id*. (emphasis added). That is not the case here because the Communication Rule implicates speech, not merely expressive activity. As such, the Court will proceed with a

First Amendment analysis.

Under First Amendment jurisprudence, the Court must determine whether the Communication Rule is content-based and in which kind of forum the rule governs speech in order to select the appropriate level of review.

As described in section I, *supra*, the Communication Rule prohibits "monitors" and "observers" from "[c]ommunicating any information that they see while monitoring the processing and scanning of the absentee ballots, whether intentionally or inadvertently, about any ballot, vote, or selection to anyone other than an election official who needs such information to lawfully carry out his or her official duties." O.C.G.A. § 21-2-386(a)(2)(B)(vii). The prefatory statement to the rule separately establishes that the specified communications are prohibited "[w]hile viewing or monitoring" the absentee ballot opening and scanning process. *Id*. § 21-2-386(a)(2)(B).

By its terms, the Communication Rule restricts speech based on the subject matter. Monitors or observers are not permitted to disclose information regarding "any ballot, vote, or selection" that they obtain during the election viewing and monitoring process. *Id*. § 21-2-386(a)(2)(B)(vii). It is therefore content-based.

The operation of the rule is, however, limited in two important respects: (i) it applies only ***during*** the viewing or monitoring of the absentee ballot opening and

scanning process and (ii) it consequently applies only ***in the physical space*** where the ballot opening and scanning process is occurring (the "Ballot Processing Room").[8]  Since the Ballot Processing Room is set aside specifically for that purpose and is not traditionally or by designation a space for public communication, it is a nonpublic forum.  *Cf. Mansky*, 138 S. Ct. at 1886 (finding that a polling place qualifies as a nonpublic forum).  This means that a lower standard of review applies, and the Communication Rule need only be reasonable given the purpose of the forum.  *See id*.

In light of the confidential work that takes place in the Ballot Processing Room, the legitimate state goal of preserving the integrity of the electoral process[9] and the Communication Rule's narrow scope, the rule appears to be a reasonable

---

[8] State Defendants explained during oral argument that the process of opening and scanning absentee ballots historically has occurred in a designated room where participants are sequestered and are not permitted to communicate information regarding the process to outsiders while the process is ongoing.  Transcript of Oral Argument, July 1, 2021, 42:3-10.  SB 202 also refers to "the room" where the process takes place and specifies additional requirements for conduct in that room, including prohibiting the use of photographic or other recording devices therein.  O.C.G.A. § 21-2-386(a)(2)(B)(ii).

[9] *See Rosario v. Rockefeller*, 410 U.S. 752, 761 (1973) (stating that "[i]t is clear that preservation of the integrity of the electoral process is a legitimate and valid state goal"); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) (noting that a state "'indisputably has a compelling interest in preserving the integrity of its election process'" (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006))).

restriction of speech that is appropriate for the forum in which it applies.

State Defendants argue for an interpretation of the rule that would extend its reach outside the Ballot Processing Room and until the polls close on election day. Transcript of Oral Argument, July 1, 2021 ("Transcript"), 43:3-5, 44:1-4. They contend that the legislature was "trying" to implement a "process to ensure that vote counts would not be disclosed before the polls closed." *Id.*

Yet those provisions are not in the Communication Rule as drafted.[10] The Supreme Court has reiterated "time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). The Eleventh Circuit has also directed that "'courts should always begin the process of legislative interpretation . . . where they often should end it as well, which is with the words of the statutory provision.'" *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1088 (11th Cir. 2018) (quoting *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000)). Therefore, the Court is not at liberty to broaden the scope of the rule and insert additional language based on what State

---

[10] The Tally Rules, which prohibit the estimating of absentee ballots cast before the polls close on election day or while viewing or monitoring the absentee ballot opening and scanning process, *see* section II(B)(1)(c)(iii), *infra*, appear to address the concern regarding the premature disclosure of votes.

Defendants assert the Georgia legislature may have intended or hoped to achieve.

Based on the Court's reading of the Communication Rule, Plaintiffs have not demonstrated a substantial likelihood of success on the merits of their claim that the Communication Rule violates the First Amendment.

### ii.      The Photography Rules[11]

As described in section I, *supra*, the Photography Rules regulate what type of ballot information a person may record.  Therefore, both are content-based.  *See Reed*, 576 U.S. at 163.

However, Photography Rule I necessarily applies only to polling stations because it proscribes photographing or recording the face of an ***electronic ballot marker*** while a ballot is being voted or while an elector's votes are displayed on the screen.[12]  *See* O.C.G.A. § 21-2-568.2.  Since a polling station is a nonpublic forum, the lower reasonable standard of review applies to the Court's analysis of

---

[11] The Eleventh Circuit has recognized that the right to photograph or videotape is protected by the First Amendment. *See, e.g.*, *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (agreeing that the plaintiffs had a First Amendment right to photograph and videotape police conduct, subject to reasonable restrictions); *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (recognizing a First Amendment right to tape record a public meeting).

[12] Another statute, O.C.G.A. § 21-2-413(e) (not part of SB 202 and not at issue here), establishes a general ban on photography in a polling place while voting is taking place.  Therefore, Georgia law prohibits photography in a polling station of both electronic ballot markers and paper ballots.

Photography Rule I.

Under this standard, the state of Georgia's proffered interests in protecting the secrecy of the ballot at the polling place and preventing fraud, including vote payment schemes, provide a reasonable basis for the limited restriction on photography and other forms of recording in that specific space. Accordingly, Plaintiffs have not shown a substantial likelihood of success on the merits of their claim as to Photography Rule I.

Photography Rule II, on the other hand, is not limited in any way. Its broad sweep prohibits any photography or recording of any voted ballot in public and nonpublic forums alike. *Id*. State Defendants asserted during oral argument that Photography Rule II even prohibits recording voted ballots for personal use (*e.g.*, a voter photographing his own absentee ballot at home for his files). Therefore, the strict scrutiny level of review applies, and the government must show that Photography Rule II is narrowly tailored to serve a compelling state interest.

Even if the Court accepts State Defendants' argument that Photography Rule II serves the compelling interests of preserving ballot secrecy and preventing fraud, they have neither argued that it is narrowly tailored to serve those interests nor rebutted Plaintiffs' assertion that the rule is a blanket prohibition on recording any voted ballot under any circumstance.

By comparison, the Alabama election statute, which State Defendants offer as an analogous regulation, reflects tailoring that is not evident here. For example, that statute focuses on photography at a polling place and provides carveouts, including for photography of a voter's own ballot. *See* Ala. Code § 17-9-50.1.

Based on the foregoing analysis, the Court finds that Plaintiffs are not substantially likely to succeed on the merits of their First Amendment challenge to Photography Rule I but are substantially likely to succeed as to Photography Rule II.

### b. Undue Burden on the Right to Vote

Plaintiffs allege that the Ballot Application and Observation Rules impose an undue burden on their right to vote.

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). "But the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Id*. at 441. Thus, "'there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the

democratic processes.'" *Id*. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

In resolving a challenge to a state's election laws, the court must: (i) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate;" (ii) "identify and evaluate the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule;" (iii) "determine the legitimacy and strength of each of those interests;" and (iv) "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The analysis is not a "litmus-paper test" and instead requires a "flexible" approach. *Common Cause*, 554 F.3d at 1352. Any "[d]ecision . . . is very much a matter of degree, very much a matter of considering the facts and circumstances behind the law, the interests which the [s]tate claims to be protecting, and the interests of those who are disadvantaged by the classification." *Storer*, 415 U.S. at 730 (internal citations and punctuation omitted). Ultimately, "there is 'no substitute for the hard judgments that must be made.'" *Anderson*, 460 U.S. at 789-90 (quoting *Storer*, 415 U.S. at 730).

If the court finds that a plaintiff's voting rights "are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of

compelling importance.  But when [the law] imposes only reasonable, nondiscriminatory restrictions . . . , the [s]tate's important regulatory interests are generally sufficient to justify the restrictions."  *Burdick*, 504 U.S. at 434 (internal citation and punctuation omitted); *see also Common Cause*, 554 F.3d at 1354-55 (stating that where the burden is slight, "the state interest need not be 'compelling . . . to tip the constitutional scales in its direction'" (alteration in original) (quoting *Burdick*, 504 U.S. at 439)).

Nonetheless, even a slight burden "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'"  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).  Also, "a [s]tate may not choose means that unnecessarily restrict constitutionally protected liberty."  *Anderson*, 460 U.S. at 806 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973)).  "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."  *Id*.

The Court applies the reasoning of these cases to its analysis of whether the Ballot Application and Observation Rules impose an undue burden on Plaintiffs' right to vote.

### i.     The Ballot Application Rule

Voters have sixty-seven days to request an absentee ballot for a general election and seventeen days after a general election to request a runoff election absentee ballot.[13] While the Court recognizes that these application windows, especially for runoff elections, may inconvenience some voters who—for one reason or another—do not meet the deadline, those voters have other options, such as early in-person or election day in-person voting.  If they cannot use the alternate options, they can reasonably be expected to exercise diligence to request a ballot within the more than two-month window for general elections and the more than two-week window for runoff elections.[14]  *See New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281-82 (11th Cir. 2020) (describing—in the context of the absentee ballot return deadline—the "numerous avenues [available in Georgia] to mitigate chances that voters will be unable to cast their ballots" and stating that

---

[13] The Ballot Application Rule provides that an application for an absentee ballot must be made no earlier than seventy-eight days or later than eleven days prior to election day, O.C.G.A. § 21-2-381(a)(1)(A), so the absentee ballot application window for a general election is sixty-seven days.  Since a runoff election is scheduled twenty-eight days after the general election, *id.* § 21-2-499(b), and the absentee ballot must be requested no later than eleven days prior to the election, the application window for a runoff election is seventeen days.

[14] An elector confined in a hospital may also apply for an absentee ballot on the day of the election or during the ten-day period immediately preceding the election.  *See* O.C.G.A. § 21-2-384(a)(4).

26

voters must "take reasonable steps and exert some effort" to comply with the deadline). Therefore, Plaintiffs have not demonstrated that they are substantially likely to show that the allotted time to request an absentee ballot imposes a severe burden on the right to vote.[15]

State Defendants explained during oral argument that the Ballot Application Rule is necessary because the late issuance of absentee ballots poses administrative burdens on election officials, and the deadline addresses the legislature's concern that absentee ballots issued too close to election day may not allow sufficient time for their return by the deadline and may therefore prevent the respective votes from being counted. Transcript, 53:6-14. These appear to be strong, legitimate reasons that justify and outweigh whatever slight burden the application windows may impose on voters. It is not the role of the courts or Plaintiffs to dictate election

---

[15] Intervenor Defendants have not cited any binding authority for their position that the Supreme Court's opinion in *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 807-08 (1969), which states that there is no right to an absentee ballot, essentially requires the Court to summarily dispose of Plaintiffs' claims as to the Ballot Application Rule or to ignore the undue burden analysis the Supreme Court later developed in *Anderson* and *Burdick*. As set forth above, the *Anderson-Burdick* framework requires the Court to evaluate the type of burden imposed by the challenged provisions and apply the level of review that corresponds to that burden. *See Anderson*, 460 U.S. at 789 ("Only after weighing [the designated] factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.").

policy to legislatures,[16] and elected officials should be permitted leeway to address potential deficiencies in the electoral process, so long as the response is reasonable and does not impose a severe burden on constitutionally protected rights. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986).

Consequently, Plaintiffs have not shown a substantial likelihood of success on the merits of this claim.

### ii. The Observation Rule

The Observation Rule prohibits a person from "intentionally" observing an elector while that elector is casting a ballot "in a manner that would allow [the] person to see for whom or what the elector is voting." O.C.G.A. § 21-2-568.1. At the heart of Plaintiffs' challenge is a concern that voters may inadvertently violate, or would be improperly accused of violating, the rule given the normal layout of polling stations and the size and brightness of the voting touchscreens. Plaintiffs reach this conclusion because they read the Observation Rule's intent requirement as applicable only to the act of observing the elector and not to the manner in which the elector is observed.

By its plain words, however, the rule does not make such a distinction. The

---

[16] Plaintiffs contend that the application deadline should be only a "couple days" prior to election day. Transcript, 70:7-16

intent requirement naturally excludes inadvertent viewing and applies only if a person **intentionally** attempts to see for whom an elector is voting.  Plaintiffs' reading of the rule does not square with the text.

Because the Observation Rule does not extend to inadvertent actions, it is unlikely that Plaintiffs can show that it imposes a severe burden on their right to vote.  Therefore, the state's legitimate interests in protecting the secrecy of the balloting process and upholding the integrity of elections are likely sufficient to justify whatever slight burden may exist.  Plaintiffs thus have not carried their burden to show that they are substantially likely to prevail on their challenge to the Observation Rule.[17]

### c.    Void for Vagueness

Plaintiffs contend that the Observation, Communication and Tally Rules violate the due process requirements of the Fourteenth Amendment because they are impermissibly vague.

"Generally, the void for vagueness doctrine encompasses 'at least two connected but discrete due process concerns:  first, that regulated parties should know what is required of them so they may act accordingly; second, precision and

---

[17] Plaintiffs' argument regarding the potential for arbitrary enforcement of the rule or the improper use of the rule to target political opponents is addressed below in connection with their vagueness argument.  *See* section II(B)(1)(c)(i), *infra*.

guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.'" *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)); *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (stating that the vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement").

In *Kolender*, the Supreme Court found that a statute requiring citizens to submit "credible and reliable" identification that provided "reasonable assurance" of authenticity was impermissibly vague because it contained "no standard" regarding how it could be satisfied and rather "vest[ed] virtually complete discretion in the hands of the police to determine whether [the requirements were met.]" 461 U.S. at 358, 359.

The vagrancy statute in *Papachristou v. City of Jacksonville*, which, among other things, regulated when and under what conditions a person may stand or stroll on city streets, was similarly unconstitutional because it provided "no standards governing the exercise of the discretion [it] granted" and thereby "permit[ted] and encourage[d] an arbitrary and discriminatory enforcement of the

law." 405 U.S. 156, 170 (1972). The additional concern there was that the law "furnish[ed] a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.'" *Id*. (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940)).

Nevertheless, the Supreme Court has cautioned that "[t]he root of the vagueness doctrine is a rough idea of fairness." *Colten v. Kentucky*, 407 U.S. 104, 110 (1972). Therefore, "[i]t is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Id*.

These cases guide the Court's analysis of Plaintiffs' claims that the Observation, Communication and Tally Rules are impermissibly vague.

### i.      The Observation Rule

As the Court explained in section II(B)(1)(b)(ii), *supra*, the Observation Rule is clear in its prohibition of the intentional viewing of an elector in a manner that would allow the elector's votes to be seen. Thus, contrary to Plaintiffs' assertion, the rule's language provides fair warning as to what conduct is prohibited and therefore satisfies the first prong of the vagueness test.

The second prong of the analysis, which requires the rule to establish a clear

31

standard for enforcement, might be a closer question. The Observation Rule does vest discretion in polling station workers to determine when a person is intentionally viewing an elector in a manner that would cause the elector's vote to be seen. But while it is possible that such discretion could lead to arbitrary or discriminatory enforcement, the rule's intent requirement addresses those concerns. *See Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) (noting that where "intent . . . must be proved to impose liability," the "scienter requirements alleviate vagueness concerns"); *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972) (finding that a noise ordinance was not impermissibly vague, despite the discretion it afforded police officers, in part because the statute required that the prohibited acts be "'willfully' done"); *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995) ("'A statutory requirement that an act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.'" (quoting *United States v. Conner*, 752 F.2d 566, 574 (11th Cir. 1985))). Accordingly, the rule satisfies the second prong of the vagueness test.

For these reasons, Plaintiffs have not demonstrated a substantial likelihood of success on their argument that the Observation Rule is unconstitutionally vague.

32

### ii. The Communication Rule

Under the Communication Rule, disclosure of information "about any ballot, vote, or selection to anyone other than an election official who needs such information" is not permitted "[w]hile viewing or monitoring" the absentee ballot opening and scanning process. O.C.G.A. § 21-2-386(a)(2)(B)(vii). The Court also explained in section II(B)(1)(a)(i), *supra*, that the rule applies only in the Ballot Processing Room. Because the rule specifically describes what type of communication is prohibited as well as during what time and to whom such information may not be provided, it provides both fair warning regarding the proscribed conduct and clear guidance for enforcement purposes.

The Court is not persuaded by Plaintiffs' argument that the rule is vague simply because a "zealous State Election Board investigator or prosecutor" could interpret it to prohibit communications outside the Ballot Processing Room. Pls.' Br. 16, ECF No. 15-1. That interpretation would not pass muster because it is contrary to the plain words of the statute.

In sum, the Communication Rule is not the type of standard-less regulation that courts find to be impermissibly vague, and Plaintiffs therefore have not shown that they are substantially likely to succeed on the merits of this claim.

### iii.  The Tally Rules

The Tally Rules prohibit the tallying, tabulating or estimating of absentee ballots cast before the polls close on election day (Tally Rule I), O.C.G.A. § 21-2-386(a)(2)(A), or while viewing or monitoring the absentee ballot opening and scanning process (Tally Rule II), *id*. § 21-2-386(a)(2)(B)(vi).[18]

Here also, the language of the rules is direct in what conduct is proscribed: counting or estimating of absentee ballots cast prior to the closing of the polls on election day or during the absentee ballot viewing and monitoring process. Therefore, Plaintiffs are not substantially likely to show that the rules fail to provide fair warning regarding prohibited conduct.  Nor are they substantially likely to show that the rules encourage arbitrary enforcement.

The Court disagrees with Plaintiffs' argument that the Tally Rules punish "pure thought" and inherently lack any "observable or objective indicia of criminal conduct."  Pls.' Br. 17, 19, ECF No. 15-1.  To the contrary, writing down a tally or estimate of the number of ballots cast is an observable act that would violate the rules.[19]  And such objective conduct, rather than mere mental thought, would be

---

[18] Although similar in language, Tally Rule II applies specifically to election monitors or observers, whereas Tally Rule I encompasses all persons engaged in the absentee ballot opening and scanning process.

[19] Plaintiffs mentioned but did not develop an argument that prohibiting communications regarding ballot estimates would implicate the First Amendment,

necessary for enforcement. *See United States v. Oviedo*, 525 F.2d 881, 884 (5th Cir. 1976) (noting that our jurisprudence does not permit the punishment of a person's "thoughts, desires, or motives, through indirect evidence, without reference to any objective fact").[20]

For these reasons, Plaintiffs have not demonstrated that they are substantially likely to succeed on the merits of this claim.

### 2.    Irreparable Harm

The Court will address the irreparable injury, balance of the equities and public interest prongs only with respect to Photography Rule II because Plaintiffs have not shown that they are substantially likely to succeed on the merits of their challenge to the other provisions. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

"A showing of irreparable injury is the 'sine qua non of injunctive relief.'" *Id.* (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of*

---

so the Court does not address it. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (agreeing with the district court's conclusion that "when a party fails to respond to an argument or otherwise address a claim, the [c]ourt deems such argument or claim abandoned" (alteration in original) (quoting *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001))).

[20] "[D]ecisions of the United States Court of Appeals for the Fifth Circuit . . . handed down by that court prior to the close of business on [September 30, 1981], shall be binding as precedent in the Eleventh Circuit." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

*Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).  Even if a plaintiff can show a substantial likelihood of success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  *Id.*; *see also City of Jacksonville*, 896 F.2d at 1285 (declining to address all elements of the preliminary injunction test because "no showing of irreparable injury was made").

The irreparable injury sufficient to satisfy the burden "must be neither remote nor speculative, but actual and imminent."  *Siegel*, 234 F.3d at 1176 (quoting *City of Jacksonville*, 896 F.2d at 1285).  In the context of constitutional claims, it is well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also City of Jacksonville*, 896 F.2d at 1285-86 (noting that an ongoing violation of First Amendment rights constitutes irreparable injury).

The parties devoted little time in their briefs and during oral argument to the issue of irreparable harm.  Plaintiffs assert that this prong is satisfied because they have alleged constitutional harm, and State Defendants assert (without any authority) that no irreparable injury exists because they contend Plaintiffs have not alleged an intent to violate the challenged provisions.

36

Because Plaintiffs have shown a substantial likelihood of success on their claim that Photography Rule II violates their First Amendment rights, they have also carried their burden to show that they would suffer irreparable harm should an injunction not issue with respect to that rule. The second factor of the preliminary injunction test is therefore satisfied with respect to Photography Rule II.

### 3. Balance of the Equities and Public Interest

The Court combines its analysis of the final two factors—balance of the equities and the public interest—because "where the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

The parties' arguments under these prongs are similarly cursory. Plaintiffs argue that the balance of equities weighs strongly in their favor given the important First Amendment rights at stake. They also maintain that there is no public detriment to enjoining the challenged provisions since other adequate laws exist that would advance State Defendants' interests without impinging on Plaintiffs' constitutional rights.

State Defendants and Intervenor Defendants, on the other hand, focus solely on the timing of injunctive relief in light of upcoming elections and Plaintiffs' alleged lack of diligence in bringing their claims.

Since Plaintiffs have shown a substantial likelihood of success on the merits of their claim that Photography Rule II violates their First Amendment rights, the Court finds that the threatened injury to Plaintiffs outweighs any potential harm an injunction may cause to State Defendants.  This is particularly true where other election statutes, including O.C.G.A. § 21-2-579(1), which prohibits voters from allowing their ballot to be seen for fraudulent purposes, and O.C.G.A. § 21-2-413(e), which generally bans photography in a polling place, advance the interests underlying Photography Rule II.

Further, an injunction with respect to Photography Rule II would not be adverse to the public interest because it would simply enjoin the enforcement of a rule that is substantially likely to be found unconstitutional.

Although the Court's opinion denying injunctive relief regarding the July 13, 2021 runoff elections, ECF No. 37, cited the timing and diligence considerations set forth in *Purcell*, 549 U.S. at 5-6, those concerns are much less significant today and do not militate against an injunction.  The next scheduled elections are not until September 21, 2021, and early voting for those elections has not yet begun.

Finally, an injunction enjoining the enforcement of Photography Rule II is unlikely to affect the administration of the election or cause voter confusion at this time.

For all these reasons, the Court finds that the third and fourth prongs of the preliminary injunction test (balance of the equities and the public interest) are satisfied with respect to Photography Rule II.

### III.    CONCLUSION

Having reviewed and fully considered the papers and evidence submitted in connection with Plaintiffs' Motion for Preliminary Injunction (ECF No. 15), the Court **GRANTS** the Motion with respect to Photography Rule II only and **DENIES** it in all other respects.  State Defendants are hereby enjoined from enforcing Photography Rule II until further order of the Court.

The Court recognizes that a preliminary injunction is an extraordinary remedy that should be granted sparingly, especially when it enjoins enforcement of a statute, but finds it is appropriate here given the constitutional rights at stake and Plaintiffs' satisfaction of the requisite burden.

**SO ORDERED** this 20th day of August, 2021.

J. P. BOULEE
United States District Judge