The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                           ATLANTA DIVISION

 3

 4   DONNA CURLING, ET AL.,            :
                                       :
 5            PLAINTIFFS,              :
     vs.                               :   DOCKET NUMBER
 6                                     :   1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,       :
 7                                     :
              DEFENDANTS.              :
 8

 9

10          TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11             BEFORE THE HONORABLE AMY TOTENBERG

12               UNITED STATES DISTRICT JUDGE

13                       OCTOBER 7, 2021

14                         4:01 P.M.

15

16

17

18

19

20

21    MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                   TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

**A P P E A R A N C E S   O F   C O U N S E L**

**FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY SCHOENBERG:**

    DAVID D. CROSS
    MORRISON & FOERSTER, LLP

    HALSEY KNAPP
    KREVOLIN & HORST, LLC

**FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES, WILLIAM DIGGES, III, AND RICARDO DAVIS:**

    BRUCE BROWN
    BRUCE P. BROWN LAW

**FOR THE STATE OF GEORGIA DEFENDANTS:**

    VINCENT ROBERT RUSSO, JR.
    CAREY A. MILLER
    JOSHUA BELINFANTE
    MELANIE JOHNSON
    JAVIER PICO-PRATS
    ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

    BRYAN TYSON
    TAYLOR ENGLISH DUMA

**FOR THE FULTON COUNTY DEFENDANTS:**

    DAVID R. LOWMAN
    OFFICE OF FULTON COUNTY ATTORNEY

|  | **P R O C E E D I N G S** |
|---|---|
| 1 |  |
| 2 | **(Atlanta, Fulton County, Georgia; October 7, 2021.)** |

3     THE COURT:  Counsel, a number of reporters called the

4 office indicating their desire to listen in.  And as I -- this

5 is a -- I have not rendered this a confidential conference in

6 some way or made it sealed.  I'm going to proceed with the

7 reporters online.

8     And if we have to do this in the future if I get --

9 and I know that there is that much interest, I would simply

10 have it in the courtroom.  But for now that is where we're at.

11     We're here for -- Counsel, do you believe that all

12 the people who are associated with you are on the line?  We

13 keep on hearing more beeps.  So I don't know who else that is.

14 But it is all right as long as it is not -- you're not missing

15 somebody.

16     MR. CROSS:  This is David Cross, Your Honor.  We have

17 everyone for the Curling plaintiffs.

18     MR. BROWN:  This is Bruce Brown, Your Honor.  We have

19 everybody for the Coalition plaintiffs.

20     MR. RUSSO:  This is Vincent Russo.

21     THE COURT:  You feel like you have everyone,

22 Mr. Russo?

23     MR. RUSSO:  (Unintelligible).

24     THE COURT:  All right.  Mr. Russo, we hardly can hear

25 you.  Are you driving?

1    MR. RUSSO:  I am not, but I do hear background noise.

2  I don't know that it is necessarily our phone.  But I can move

3  closer to the phone if that would be helpful to Your Honor.

4    THE COURT:  All right.  So you are not in a car?  I'm

5  just trying to --

6    MR. RUSSO:  No, ma'am.  I'm in an office in the

7  conference room.

8    THE COURT:  Well, if anyone else is driving --

9  Mr. Belinfante, are you driving?

10    MR. BELINFANTE:  Your Honor, I'm in a car.  But I

11  have my phone on mute.

12    THE COURT:  Well, I don't know what is going on.  It

13  is just --

14    COURTROOM DEPUTY CLERK:  Everyone that is on the call

15  make sure that your phone is muted, please.  Make sure your

16  phone is muted.

17    THE COURT:  Oh, my gosh.  This feels like

18  magnificent.  It is such an improvement.

19    All right.  We're here for a discovery conference in

20  Curling vs. Raffensperger, Civil Action Number 1:17-CV-2989.

21  And the parties have multiple disputes regarding the Curling

22  plaintiffs' second set of interrogatories.

23    And let me just say here these are somewhat, like I

24  said -- as I said in a written order regarding the defendants'

25  lengthy request for interrogatories and other materials that it

1    would be simpler, it seemed to me, on most of these matters for

2    the parties to take depositions rather than to engage in this

3    jousting around interrogatories, given the scope of the issues

4    and the nature of the issues.

5              And have you sat down and talked about already what

6    depositions will be taken?

7              MR. CROSS:  Your Honor, this is David Cross.  The

8    depositions of our clients are scheduled.

9              THE COURT:  All right.  Now I'm talking about --

10   since you are the ones who are at this juncture seeking more

11   information through the second set of interrogatories, have you

12   sat down and talked with the defendants alternatively about

13   taking depositions that would provide at least some of this --

14   some information that would be responsive to these

15   interrogatories?

16             MR. CROSS:  Only with respect to a 30(b)(6), Your

17   Honor.  We've had extensive negotiations about that.  We were

18   waiting for the document production to be completed, which I

19   understand from the last report we saw from the State should be

20   completed sometime in the next week or two, I think.  And then

21   we wanted to get scheduled the 30(b)(6) deposition and then, of

22   course, some of the individual employees as well.  But we

23   wanted to make sure we had a complete set of folks that we

24   would want to depose based on what we see in the documents.

25             The interrogatories were intended to help us focus on

1    who we would want to depose as well.  But I understand Your

2    Honor's point that maybe the depositions can be, I guess,

3    another avenue to get that information.

4         THE COURT:  Well, what I'm concerned about is they

5    are broad.  And then to answer them would be -- many of the

6    questions would involve detailed answers, and that would

7    involve an enormous amount of work, and likely you would still

8    not get what you are actually anticipating you would want to

9    receive.

10        So I'm not -- and then you would all be back in front

11   of me again, which you may be anyway.  But it just seems like

12   that inevitably is going to end up in a lot of disputes and

13   still also a lot of frustration on all parties' part about

14   whether you've gotten an actual responsive and sufficiently

15   complete answer.  And --

16        MR. CROSS:  Your Honor, this is David -- I'm sorry.

17        THE COURT:  Yes.  Go ahead.

18        MR. CROSS:  I just was going to say I appreciate the

19   concern about the breadth.  We had hoped to negotiate down a

20   scope on this.  But the position we got from the State was they

21   have given us all they are going to give us.

22        And so just to take a concrete example, if you take

23   just the first interrogatory at issue, Number 15, all we're

24   really trying to find out, you know, is the State aware --

25   State defendants aware of any actual or suspected hack or

1    compromise of the election system.

2           And we don't have an answer at all, which is why I

3    say the breadth is not so much the challenge.  If we had a

4    substantive answer to that, it may be sufficient.  We don't

5    have a substantive answer at all other than pointing to things

6    that are publicly available.

7           And to give you the concrete example, you know, we

8    understand that Fortalice, for example, which Your Honor will

9    recall is their outside cybersecurity consultant, was engaged

10   on at least a couple of occasions, once in 2019 and once last

11   year in 2020, involving what we understand were at least

12   suspected and possibly actual compromises of components of the

13   election system.

14          We are on a public call.  So I'm not going to get

15   into specifics about that.  We would be able to do that.  But

16   that doesn't appear in their responses.  We know about that

17   only because of discovery from Fortalice.

18          And it is curious that we have not seen that in their

19   documents, including documents from Fortalice that are

20   exchanged with the State.  And it is not in their responses.

21          And so I just want to be clear it is not a situation

22   where we -- where we got substantive responses and we said it

23   is not enough.  They literally just declined to answer these

24   interrogatories at all, other than citing what they call

25   non-exhaustive examples of documents.  And that is not what

1    Rule 33(d) allows.

2         In taking Interrogatory 15, they don't even answer

3    whether there has ever been any compromise of the system at

4    all.  And we raised that specifically in the negotiations.

5    Could we just get an up or down yes or no to that?

6         The fact that they won't answer, I think, probably

7    tells us the answer.  But we need an answer of some measure,

8    other than just saying here are a handful of documents that

9    you've got from public sources.

10        That would be our position.

11        MR. RUSSO:  Your Honor, this is Vincent Russo.  You

12   know, regarding this interrogatory and all of them, Your Honor

13   is correct that they are extremely broad.  And if you couple

14   the interrogatory requests with the definitions that the

15   plaintiffs have used in their interrogatories, the requests

16   expand exponentially to the point that, Your Honor, I don't

17   think anyone could provide a complete answer.

18        Now, it sounds like Mr. Cross is referencing

19   documents that answer those questions.  If there are others --

20   we have produced thousands and thousands of documents.  We have

21   been going through this exercise for months.  And we are

22   hopefully at the tail end of it.

23        They have received, of course, Fortalice documents

24   from the State in the past related to Fortalice's work.  And,

25   Your Honor, I would suggest if you look at the definitions -- I

1    know that they weren't provided because the plaintiffs didn't

2    attach their actual requests to this joint discovery statement.

3    But they are extremely broad.  And, you know, to be able to

4    describe with specificity a suspected security vulnerability at

5    that time as defined, I don't think anybody could reasonably

6    provide a response to that.

7             THE COURT:  Well, I don't have the definitions in

8    front of me, unless one of you filed it.  I see the objections

9    to them.  But I don't see the -- I don't have a definitions

10   section here.

11            MR. RUSSO:  Mr. Miller will send those to Mr. Martin.

12            THE COURT:  Okay.

13            Well, let me -- just as to Number 15, did you-all

14   attempt to meet and confer regarding how to narrow what was

15   being sought in 15 if that is -- because obviously this is a

16   more concrete one in my -- actually, even though I know that

17   the State views it as particularly broad.  But I think it is

18   certainly susceptible to being narrowed.

19            MR. CROSS:  Yes, Your Honor.  David Cross.

20            We talked about that one specifically.  You know,

21   when we received the objections, we invited them to give us a

22   proposed narrowing of each of the requests.  The reaction we

23   got was no, that they would not do that.  So that is how we are

24   where we are.

25            You know, Mr. Russo's argument, I appreciate again

 1    the breadth.  But that would be a defense of an answer related

 2    to an interrogatory to say, well, we did our best.  We gave you

 3    a good faith response where we conducted due diligence,

 4    compiled an answer, and here it is.  And now they are asking

 5    for more.

 6            That is not where we are.  We don't have any answers

 7    to these interrogatories at all.  And we have not been able to

 8    get an engagement on narrowing it down to something that they

 9    would find agreeable.

10            MR. RUSSO:  Your Honor, we had a meet-and-confer with

11    Mr. Sparks.  I don't believe Mr. Cross was on that call.  And

12    if I recall, the narrowing of the request was simply to remove

13    the reference to the voter registration system as being part of

14    the current election system that is referenced in the request.

15            So, in other words, it was so broad previously that

16    it would have encompassed the voter registration system.  And

17    it was narrowed to remove that, and that was it.

18            THE COURT:  And what was plaintiffs' view as to why

19    you didn't want yourselves to propose a narrowing, having seen

20    the objections and having had that conversation?

21            MR. CROSS:  Your Honor, this is David Cross.  I think

22    the challenge we had, as we tried to explain in each of our

23    discovery disputes, is I'm not sure how we narrow it.  I mean,

24    the question for the State is what would you consider a

25    reasonable scope within the scope of the request.

```
 1              And that is how I have litigated my entire career.
 2    If somebody sends me a discovery request that I think is
 3    overbroad, I'm going to come back to them and say here is what
 4    I think is reasonable, this is what we're willing to answer.
 5    And then you negotiate from there.
 6              I'm just shooting in the dark, as Mr. Russo just
 7    pointed out.  Right?  One of the ways to narrow, as Mr. Sparks
 8    suggested, was, well, what if we pull out the registration
 9    database.  And that was not a sufficient narrowing.
10              And it is just not a useful -- it is not a good use
11    of time for us just to offer one proposal after another in the
12    dark.
13              What really should happen is they come back and say,
14    we read your request, we think it is too broad, but here is the
15    scope that we're willing to answer.
16              And we have never gotten that.  We have invited it
17    many times.  So we just find ourselves at impasse.
18              MR. RUSSO:  Your Honor, I think this somewhat goes
19    back to the issue of taking depositions and that they could
20    simply take a 30(b)(6) and have -- and question a witness over
21    this topic.
22              Now, alternatively, of course, the plaintiffs could
23    have narrowed it -- narrowed the request to say describe each
24    breach of the system or describe a hack of the system.  We
25    haven't seen any evidence so far in this case that demonstrates
```

1    that the system has been -- that the BMD system has been

2    hacked, so to speak, or changed anybody's votes.

3         But there are ways to narrow it without -- that they

4    could have done if they really wanted to have a precise

5    interrogatory that the State could have answered.  But to leave

6    it as each known or attempted or suspected security

7    vulnerability or security breach is literally impossible for

8    anyone to answer.

9         THE COURT:  Well, Interrogatory 19 says identify any

10   efforts made to ensure that any actual or potential hack or

11   compromise of Georgia's GEMS DRE election system could not and

12   did not affect the current election system.  Well, that is sort

13   of dealing with a hack.  And the same sort of general

14   objection.

15        And I think there was another one that dealt with

16   asking about specific -- other than the Number 15 where we

17   started.

18        MR. RUSSO:  Your Honor, this is Vince Russo.  I'll

19   try to address that Number 19 real quickly.  The request is

20   asking the State to go back many years, not just, you know, to

21   the start of when the BMD system was put in place is one issue.

22        However, they have also received Fortalice reports,

23   reports -- Pro V&V reports, documents regarding hash values,

24   and other documents.  So they have documents that would provide

25   the information they are looking for.

1          I'm not sure if they just don't want to go look for

2   it or they just want us to lay everything out for them.  But

3   the way this request is still framed is extremely broad.

4          MR. CROSS:  Your Honor, this is David Cross.  The

5   challenge that we have -- what Mr. Russo keeps pointing out is

6   we have documents from third parties.  That is not really the

7   way this is supposed to work.  I mean, we're not supposed to be

8   finding out that there has been a compromise of the election

9   system only because Fortalice produced something to us

10  indicating that.

11         The purpose of document requests to the State as a

12  party or to the State defendants as a party and the

13  interrogatories is to gather that information.  And we have

14  never heard an explanation for why we received these documents

15  only from third parties when they include emails with folks at

16  the State.

17         We've had the same issue with documents coming in

18  from Dominion.  And they just refuse to answer interrogatories.

19         And, again, you know, we can discuss the breadth.

20  But that doesn't justify no answer at all.

21         And so we're just -- I'm concerned about the idea

22  about going into depositions because an individual witness is

23  only required to know what they know.  And there is no

24  obligation to prepare them.

25         And so an individual witness could easily come in and

1    say, I don't know anything about what you are asking me about.

2    They may not know about a compromise.

3         The 30(b)(6) has been an extraordinary fight.  We

4    have been trying to negotiate that for months.  And so for

5    Mr. Russo to now say, well, we should just take a deposition on

6    this topic, well, we served the topic and we have narrowed it

7    multiple times and we haven't gotten anywhere.

8         So we just -- we keep finding ourselves running into

9    a wall in discovery from the State defendants.  And then their

10   answer is, well, don't worry, third parties are giving you a

11   smattering of documents that we should be getting from the

12   State.  And that is just not the way this process is supposed

13   to work.

14        And the end result is going to be are we really

15   learning what we need to learn.  And, again, it comes back to

16   why won't they just answer the question of has there been a

17   compromise to the system.

18        MR. RUSSO:  Your Honor, I don't necessarily think

19   that is entirely accurate.  The State has produced those

20   documents to them.  Fortalice documents -- the State has

21   produced Fortalice documents.  The State has produced documents

22   regarding hash values.  The State has produced several thousand

23   documents in this case.

24        And regarding the 30(b)(6), it has been -- if I

25   recall, it has been about two months or so since any discussion

1    about the 30(b)(6) has come up.  So, you know, to say that

2    we're conducting extensive negotiations, I don't think, you

3    know -- I didn't see anything.  And if I have been left off of

4    those emails, I apologize.  But I don't recall seeing anything

5    for a time.

6                    THE COURT:  So your document --

7                    MR. CROSS:  Your Honor?

8                    THE COURT:  Yes.  Go ahead.

9                    MR. CROSS:  I was just going to say just briefly on

10   the issue of the third-party documents, Mr. Russo is right.

11   There are some documents from them that include things like

12   Fortalice and Dominion.

13                    What is troubling is it doesn't include really key

14   documents.  Right?  For example, we learned only from Fortalice

15   that it was engaged in 2019 and 2020 for specific concerns

16   involving the system.

17                    And those documents indicate that there were also

18   going to be monthly reports as a part of those engagements.  We

19   have not seen those from the State.  And we don't have an

20   explanation on that.

21                    And, you know, again, fundamentally, I would invite

22   Mr. Russo to answer the question now.  Has there been any

23   compromise to the system, and have they investigated that in

24   response to any of our discovery requests?  We just have not

25   gotten an answer even at that threshold level.

1     MR. RUSSO:  And, Your Honor, I would say this is the

2 first time that this issue regarding a Fortalice document has

3 been raised.  It was not raised during the meet-and-confer.  It

4 hasn't been raised since.  I'm not entirely sure what document

5 he is referring to.

6     And it may be that we have produced other materials

7 that are -- that Mr. Cross is referencing.  I don't know if

8 they have looked.  But that is something that I would have to

9 look into here.  But this is a new issue that has been raised

10 now, which, you know, should have been raised pretty easily.

11     THE COURT:  So how many more documents do you have to

12 produce?  What is the estimate, Mr. Russo?

13     MR. RUSSO:  I'm going to turn that over to

14 Mr. Miller.  He is our eDiscovery expert over here.

15     MR. MILLER:  I'm unclear about the expert title, Your

16 Honor.

17     But with respect to our progress, we anticipate

18 making a production tomorrow.  That will in large part almost

19 completely finish our document production of the 100,000 or so

20 documents that we discussed at length.

21     After that, it will simply be just some quality

22 control maybe for a week at most just ensuring that we have

23 gotten everything out the door.

24     THE COURT:  So, Mr. Cross, have you-all digested what

25 has been provided to you on a rolling basis?

 1          MR. CROSS:  We have, Your Honor.  We have been

 2     keeping up with their production.

 3          THE COURT:  And I mean, I can't necessarily at this

 4     point really make heads or tails of what you -- the differences

 5     in what is being said, for instance, about the Fortalice

 6     documents.

 7          But wouldn't part of your remedy here be, in fact,

 8     just ensuring that you have received all the documents that you

 9     believe exist in connection with the search terms?

10          MR. CROSS:  Yes.  I was thinking about that.  I think

11     that is right.  I guess what I'm -- I guess on a 53, Your

12     Honor, is how we would ever confirm that.  We have assumed as

13     these productions roll in that we're getting all the documents

14     that are captured by the search terms and responsive.

15          But, again, then we get documents from third parties

16     that should also be coming in, and we don't understand why

17     we're not getting those.

18          And so -- and I will say in fairness to Mr. Russo I

19     had not raised with him the specific Fortalice documents.

20     Those only -- I think we only got them recently.  I only

21     learned about them myself recently.

22          But we have raised on a number of occasions things

23     including in filings that we've gotten documents from third

24     parties, in particular Dominion, that we have not gotten from

25     the State.  And we have requested explanations for that, and we

1    have never received it.  The Fortalice documents are new.

2           So I guess I'm not sure I answered your question only

3    because I want to assume we're getting everything.  But the

4    third-party productions indicate that we're not.  And I

5    don't -- I just don't know why that is.

6           THE COURT:  Well, wouldn't it --

7           MR. MILLER:  Your Honor --

8           THE COURT:  I'm sorry.  Who is speaking now?

9           MR. MILLER:  I apologize, Your Honor.  This is Carey

10   Miller.

11          THE COURT:  All right.

12          MR. MILLER:  I just want to briefly point out, you

13   know, I think actually the first -- perhaps I missed something.

14   But the first thing I noticed about it was in the footnote that

15   again this joint discovery statement regarding documents that

16   they are getting from third parties, you know.

17          At this juncture, the State has expended an enormous

18   amount of resources to produce discovery, which is sufficient

19   and which we maintain is beyond the scope of this case.  But

20   I've gotten through it and have produced what we have.

21          And to the extent they have obtained documents from a

22   third party that weren't captured by the search terms, you

23   know, I'm failing to see the prejudice at issue here.  That if

24   there is a speculation that documents exist that have not been

25   produced, you know, we are certainly happy to investigate that

1    and make sure everything has been captured.

2         But, Your Honor, I would just point out briefly -- I

3    don't want to get into (unintelligible) here.  But this kind of

4    goes back to this speculation of additional documents existing,

5    which frankly was the same boat we were in and that Mr. Cross,

6    you know, strenuously objected to document production on that

7    basis.

8         THE COURT:  Okay.  Well, I just think this is not

9    going to be a proposition in terms of the interrogatories that

10   I'm going to be able to very easily manage.  And given still

11   the scope of the interrogatories, it seems to me that if there

12   is something very specific that the plaintiffs want that is --

13   that can be -- in terms of information that is narrower, then

14   you should propose it.  And you should propose it as an

15   alternative.

16        And then I'm happy also to look at that.  You can

17   give it to the defendants, and we'll see whether we still have

18   objections.

19        And I'm not saying to go through all of these.  I

20   mean, I'm really -- very much as in the other discovery dispute

21   I most recently handled, I would like you to really zone in on

22   what you need.  And then if you think that you only have --

23   that you have gotten the documents in part from the State, in

24   part from a third party, and there is something missing that

25   is, in fact, in the State's possession that is going to help

1   you sort something out, then you need to identify that.

2          And they have to go back and look at the documents,

3   and that will be more productive than our basically having them

4   identify -- respond in a way that you find unsatisfactory to

5   the interrogatory.

6          Because inevitably so much of what -- it is not that

7   everything you have proposed here to ask is broad.  But because

8   of the -- it is sufficiently voluminous and at the same time

9   specific that I'm just not sure that it is going to -- you are

10  going to get what you want.  And we'll just be in this

11  conversation again.

12         But if there is something absolutely narrowly

13  tailored, then you are set up to be able to at least present

14  that to the Court.  And the defendants are going to have to be

15  very careful about just asserting a generalized objection at

16  that point.

17         So I guess I have two ways of looking at this.  One

18  is, again, you can do this a narrower -- narrowing of this and

19  get very specific as to what you are looking for and the time

20  frame.  And, secondly, that if you are -- when you are looking

21  over the documents that you can see clearly that something is

22  materially -- that is material to you is missing, then I

23  suggest that at that juncture you go back to the defendants and

24  they have -- so that they can produce the remaining documents

25  that are associated with what you -- what you believe exists

1    based on what has been delivered to you.

2            And then finally, which is the third thing, is:  I do

3    think a 30(b)(6) with follow-up individual depositions or the

4    opposite -- you know, you may want to do a few employees and

5    then -- and then go to the 30(b)(6) deposition based on that.

6            Yes, the employees can't bind the State.  But on the

7    other hand, if you do those first, you'll have more information

8    for the 30(b)(6).

9            But you know all of that.  And I understand

10   everyone's frustration with each other.  But I don't know that

11   I -- if I require the State to respond to these exactly, I fear

12   that there is a lot of work and you-all are just going to be

13   back here and writing more discovery memoranda.

14           So I'm not inclined to do that.  But I do want to

15   make clear also to the State that if -- if there is a narrower

16   set of interrogatories as an alternative, I expect you to look

17   at them and to act in good faith in discussing them and what

18   you think you can produce.  And if there is a discussion about

19   what -- what is encompassed in a term that you actually discuss

20   what that is, rather than just sending off a generic objection.

21           But I'm not looking for a huge volume of

22   interrogatories in that connection.  I think -- because I

23   think, in fact, anything you are going to get ultimately is

24   going to be coming from documents.  But there are some that I

25   can understand that you would like to ask.  But I think you

```
 1    need to just make it a little more concrete.

 2           And also now that you have the objections that go --

 3    basically construe anything as a potential statewide phenomena,

 4    county data, et cetera -- and if that is what you meant to

 5    include, that is one thing.  But if you didn't mean to include

 6    that, then let's get it narrowed so it is very clear what you

 7    are asking for.

 8           And then go through the process I discussed on the

 9    documents so that you really are sitting down and talking about

10    what is missing based on what you've looked at and having a

11    real conversation about that.

12           MR. CROSS:  Understood, Your Honor.  We'll do that.

13    This is David Cross.

14           THE COURT:  I know that there also was something

15    about -- in the -- in connection with the request as to

16    Dr. Halderman.

17           MR. CROSS:  Yes, Your Honor, regarding CISA.

18           THE COURT:  Yeah.  If CISA itself were to make the

19    request, I would consider it.  I think I need to -- I know

20    you've attached some correspondence.  But I would like to -- I

21    think it is a different thing -- there is a distinction between

22    the plaintiffs deciding they want to give this to CISA, and it

23    may not be a distinction that makes a difference.  But if CISA

24    itself is assuming responsibility for asking for it and

25    representing, of course, that they are going to be implementing
```

1    whatever their normal security protocols are and directly to

2    the Court, that makes a difference.

3          MR. CROSS:  Your Honor, this is David Cross.  I just

4    want to make sure I understand.

5          I guess we thought the email from Geoffrey Hale from

6    August 19 that is attached to Dr. Halderman's declaration did

7    that.  He indicates that CISA is looking to receive the report

8    and explains that it could go through the coordinated

9    vulnerability disclosure process.  And there is information on

10   why and that Dr. Halderman has described on how that process

11   works.

12         So they have indicated that they are prepared to have

13   it and that they want to work with Dr. Halderman in their

14   normal process to address the vulnerabilities or address the

15   report.

16         THE COURT:  I understand the letter.  I think you

17   probably actually understood what I was saying.  I mean, there

18   is -- I understand they are interested.  But they are

19   interested via Dr. Halderman reaching out to them.

20         And he is obviously in that community of security

21   data system experts as they are and particularly in the field

22   of elections.  But -- and I understood --

23         MR. CROSS:  Your Honor, I apologize.  I --

24         THE COURT:  Go ahead.

25         MR. CROSS:  I just -- and I apologize.  You just said

1   you want a formal request?

2        THE COURT:  I would like to see a formal request,

3   yes.

4        MR. CROSS:  Okay.  Okay.  I see.  Understood.

5        THE COURT:  And, you know, the formal request would

6   also assure the Court that any materials that might have been

7   provided to Dr. Halderman on a confidential basis through

8   this -- would be that -- of course, that those same protocols

9   would be observed.

10       I mean, I assume --

11       MR. CROSS:  Understood, Your Honor.

12       THE COURT:  -- that the agency has authority to work

13  with the State and to also reach out to the State.

14       So -- all right.  So just to confirm though, the

15  document discovery or the document production from the State

16  will be wrapped up by next -- the end of next week; is that

17  correct?

18       MR. MILLER:  Yes, Your Honor.  Our -- we intend to

19  make the -- what we think is a final production tomorrow.  But

20  we will do some just additional QC but not pulling kind of

21  additional new stuff.

22       THE COURT:  All right.

23       MR. MILLER:  I think we'll need a week or two at most

24  just to do that quality control.

25       THE COURT:  Okay.  I'm going to go offline for one

1  second.  I just want to check something, and then I will be

2  right back with you.

3                  **(A brief break was taken at 4:39 P.M.)**

4            THE COURT:  Okay.  All right.  And I will deal

5  with -- you know, deal with the severance motion that the

6  plaintiffs filed when I get obviously all of your briefs.  I'm

7  not going to address that today.

8            Is there anything else that needs to be addressed at

9  this time?

10            MR. CROSS:  Your Honor, this is David Cross.  Just a

11  view discrete issues while we have you.

12            THE COURT:  All right.

13            MR. CROSS:  One is:  We -- during the depositions

14  that have been taken of some of the Coalition plaintiffs, the

15  State has used reports that I think are from the eNet system,

16  if I understand right.  They are reports that show voting

17  history.

18            We have asked for copies of those for our clients.

19  And we have not gotten confirmation that we're going to get

20  those.  We would just like to get confirmation that we will get

21  those this week.

22            MR. RUSSO:  Your Honor -- sorry.

23            THE COURT:  Just tell me who is speaking.

24            MR. RUSSO:  Vincent Russo.

25            There are a few things here.  First, obviously the

1    State typically doesn't -- we don't typically pull those

2    reports until we have them right in front of us for the

3    deposition.  And they haven't been requested previously in a

4    document request.  We have gotten I believe over 50 or over 60

5    document requests in this case at least from one side.  And we

6    have not had that request.

7            So we are getting informal requests via email.  And,

8    you know, we don't -- we have concerns about having this

9    case -- our discovery being conducted informally over emails.

10   We see what is happening (unintelligible) with this case when

11   we conduct business informally.

12           So with that being said, of course, you know, the

13   reports are public records.  Any of these individual plaintiffs

14   could submit an Open Records request to get them, if they

15   wanted them, and (unintelligible) --

16           THE COURT:  And what?

17           Well, how many people have you not -- do you have

18   left to depose of the plaintiffs?

19           MR. RUSSO:  We have three plaintiffs left.

20           THE COURT:  All right.  Just do me a favor and go

21   ahead and produce their voting history reports and do so --

22   provide them electronically to the plaintiffs by -- by Tuesday.

23           When is the next deposition?

24           MR. RUSSO:  I believe the 19th is the next

25   deposition.  19th of October.

1          THE COURT:  All right.  So if you would provide that

2     by Tuesday, that should be sufficient.  It is just the voting

3     reports for three people.  Let's not go around the -- beat

4     around the bush in that way.

5          Okay.  What else?

6          MR. CROSS:  Your Honor, the other thing or the second

7     thing was we learned -- I learned today -- this is David Cross.

8          I learned today from Dr. Halderman that the State has

9     sent a FOIA request to the University of Michigan requesting

10    documents and materials related to his work that relates to his

11    work in this case on the Dominion system.

12         We were surprised by that because there are

13    particular rules on what is discoverable.  And so we wanted to

14    raise with the Court our concern that, one, this wasn't flagged

15    for us and, two, they have served document requests asking for

16    the same sort of thing, materials and analyses that he did not

17    rely on in this case and we have objected to that.  And this

18    looks to be an end run around that where the University would

19    be expected to produce that and we can't control what the

20    University produces.

21         So we need to make sure that everybody is complying

22    with the discovery rules and what is actually discoverable for

23    testifying experts.  And it would only be information and tests

24    and analyses that he is relying on and not going beyond that.

25         MR. MILLER:  Your Honor, this is Carey Miller.  Yeah.

1    I'm not entirely sure what the, I guess, objection there is.

2           But frankly, Your Honor, as far as a FOIA request

3    under Michigan law, we're entitled to that information, the

4    kind that is incumbent upon the University of Michigan to

5    provide.  I would presume that the University of Michigan will

6    be mindful of any Michigan statutory limitations as far as what

7    is subject to public records.

8           But respectfully, Your Honor, this is a bit beyond

9    the scope of the Court in this posture.

10          THE COURT:  Well, the thing is --

11          MR. CROSS:  Your Honor --

12          THE COURT:  -- the plaintiffs have very actively used

13   the Open Records Act for its case -- for building their cases

14   both for preliminary injunction hearings and otherwise.

15          I mean, there is a different point that you have

16   made, Mr. Cross, that he -- that Dr. Halderman may not, in

17   fact, have relied upon some of the documents that are being

18   secured under the Open Records Act.  But he can obviously state

19   that expressly, that that was not -- I didn't think it was

20   relevant and that is not what I -- and I was not relying on

21   this.

22          I don't -- I don't really -- you know, maybe there is

23   a different concern that it puts a burden on the University and

24   he doesn't want to be in that position that his -- that his

25   consulting and work here has put any type of burden on the

1   University.  I don't know what it is.

2          But -- and I can understand that personally.  But I'm

3   not sure it is -- unless y'all had some agreement that I'm not

4   aware of -- and maybe you do -- I don't understand what is

5   being -- why they wouldn't be able to use an Open Records Act

6   request.

7          MR. CROSS:  Yes, Your Honor.  This is David Cross.

8   It may be it just depends on what it captures.  We just learned

9   about it today.

10         I have had experts in many, many cases over the years

11  that work with universities.  I have never had anyone FOIA

12  their university.  And what we just want to make sure is that

13  this is not an end run around the limits on discovery.

14         For example, if there were drafts of reports that

15  were sitting on a university server, I don't see why they would

16  get that under a FOIA request when they are not entitled to it

17  under the rules in this case.  That would be an end run around

18  that protection that is built in to the Federal Rules of the

19  litigant in the case.

20         THE COURT:  Well, it doesn't mean that I would admit

21  it.  I mean, that is something different if it is a draft.  And

22  it doesn't mean I would admit it.

23         But there are -- it is -- definitely you were facing

24  yourselves a lot of roadblocks imposed by the State on

25  discovery and just ended up using FOIA in order to deal with

1     that.  And, of course, it is the State Open Records Act.

2         So I'm not saying it is admissible.  That is

3     something completely different.  But I'm not in a position to

4     basically tell them that they can't use FOIA, just as I won't

5     tell you that you can't use the State Open Records Act.

6         MR. CROSS:  Understood, Your Honor.  I would just say

7     the difference is when we submit Open Records Act we're sending

8     it to the State.  Right?  So the State's counsel -- in fact, I

9     think the State counsel has asked us to keep him informed of

10    that.  And at least for us, I think we have done that on every

11    occasion.  My group has not done many Open Records requests.

12        But in any event, they are in a position to control

13    what comes out.  Not surprisingly, we haven't gotten a lot of

14    response to those requests.

15        Here, it is third party.  I don't know that I have

16    any ability to protect my client's privilege.  And that is the

17    issue.  Right?  My client's expert -- the privilege belongs to

18    my client.

19        And so to serve a FOIA request that feels like an end

20    run around that is the concern.  Again, we can see how it plays

21    out.

22        I suppose we can do the same thing for Dr. Gilbert

23    that we serve through the public university in Florida.

24        THE COURT:  Yes.

25        MR. CROSS:  I have just never seen it before.  It

1  seems like an odd way to go about it.  But I supposed we could

2  -- both sides could --

3         THE COURT:  I would suggest that you-all talk about

4  it because it could be kind of ugly for both professors.

5         MR. CROSS:  Right.

6         THE COURT:  So I mean, having some understanding

7  would be appropriate.  I mean, otherwise, you are basically

8  having both professors having to deal with their university,

9  which is not a lot of fun.

10        But -- so, you know, if you had an agreed

11 understanding, I'm sure the University would be happy not to be

12 looking for rough drafts, whether it be the University of

13 Michigan or Florida.

14        MR. CROSS:  Right.  Okay.  Thank you, Your Honor.

15        THE COURT:  All right.

16        MR. CROSS:  The last thing is I think maybe the

17 easiest.  There has been some discussion about privilege logs.

18 And I think we were all just trying to figure out a date.

19        I figured while we were all here whether we could

20 agree that the privilege logs would be exchanged one week from

21 today, if that is a date that works for everyone.

22        THE COURT:  Mr. Russo, Mr. Miller?

23        MR. MILLER:  Your Honor, this is Carey Miller.  You

24 know, we'll produce a privilege log immediately when we are

25 done with the kind of quality control process.  Maybe two weeks

1    from today, if that would be acceptable, or two weeks from

2    tomorrow.

3            Frankly, Your Honor, our last discussion I believe I

4    got from another counsel of record of Mr. Cross' firm indicated

5    that plaintiffs didn't intend to produce a privilege log.  As

6    long as we're exchanging them, that is fine.

7            THE COURT:  Is two weeks satisfactory, Mr. Brown and

8    Mr. Cross?

9            MR. CROSS:  Sure.  Yes, Your Honor.  This is David

10   Cross.

11           THE COURT:  All right.  Friday -- two weeks from --

12   essentially two weeks from now, plus the day of Friday.  Very

13   good.  But I'm expecting them to be filed on or exchanged on

14   the Friday.  I don't need to have them filed with me.

15           MR. CROSS:  Thank you, Your Honor.

16           THE COURT:  All right.  Very good.  Thanks very much.

17           Is there anything else from any other counsel before

18   we conclude?

19           MR. RUSSO:  No, Your Honor, not for State defendants.

20   This is Vincent Russo.

21           MR. BROWN:  This is Bruce Brown.  Not for the

22   Coalition plaintiffs, Your Honor.

23           THE COURT:  All right.  Thank you.

24           All right.  That concludes this proceeding.  Bye-bye.

25           **(The proceedings were thereby concluded at 4:51**

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1        **P.M.)**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 32 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

In testimony whereof, I hereunto set my hand on this, the 7th day of October, 2021.

_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT