The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

4    DONNA CURLING, ET AL.,           :
                                      :
5           PLAINTIFFS,               :
     vs.                              :  DOCKET NUMBER
6                                     :  1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,      :
7                                     :
            DEFENDANTS.               :
8

9
```

**TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

**BEFORE THE HONORABLE AMY TOTENBERG**

**UNITED STATES DISTRICT JUDGE**

**OCTOBER 20, 2021**

**4:02 P.M.**

*MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

*TRANSCRIPT PRODUCED BY:*

*OFFICIAL COURT REPORTER:*          *SHANNON R. WELCH, RMR, CRR*
                                    *2394 UNITED STATES COURTHOUSE*
                                    *75 TED TURNER DRIVE, SOUTHWEST*
                                    *ATLANTA, GEORGIA  30303*
                                    *(404) 215-1383*

```
1              A P P E A R A N C E S   O F   C O U N S E L

2

3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:
4

5         DAVID D. CROSS
          HANNAH R. ELSON
6         MORRISON & FOERSTER, LLP

7

8
     FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
9    WILLIAM DIGGES, III, AND RICARDO DAVIS:

10
          NO APPEARANCE
11

12   FOR THE STATE OF GEORGIA DEFENDANTS:

13
          VINCENT ROBERT RUSSO, JR.
14        CAREY A. MILLER
          JOSHUA BELINFANTE
15        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

16
     FOR THE FULTON COUNTY DEFENDANTS:
17

18        NO APPEARANCE

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

|     |                                                                  |
| --- | ---------------------------------------------------------------- |
| 1   | **P R O C E E D I N G S**                                        |
| 2   | **(Atlanta, Fulton County, Georgia; October 20, 2021.)**         |
| 3   | THE COURT:  Okay.  This is Judge Totenberg.  Good                |
| 4   | afternoon.                                                        |
| 5   | MR. MILLER:  Good afternoon.                                     |
| 6   | THE COURT:  So the questions that were being posed to            |
| 7   | the witness, Mr. Schoenberg, regarding some sort of advocacy,    |
| 8   | what in particular were they -- what information -- excuse       |
| 9   | me -- were they seeking in particular?                           |
| 10  | MR. MILLER:  Your Honor, this is Carey Miller on                 |
| 11  | behalf of the State defendants.  I was taking the deposition     |
| 12  | there.                                                           |
| 13  | As far as information I was seeking in particular, I             |
| 14  | don't mean to argue with the question.  But it is a little       |
| 15  | difficult to state that precisely because the questioning never  |
| 16  | proceeded to that extent.                                        |
| 17  | But in terms of kind of the big picture and where it             |
| 18  | fits into this case, Your Honor, the intent here was to gauge,   |
| 19  | first of all, in terms of motivation of a plaintiff, whether     |
| 20  | that is motivated as far as the system itself or otherwise for   |
| 21  | other reasons for impeachment purposes.  But also more acutely   |
| 22  | relative to the position of the case right now is to explore     |
| 23  | this concept of generalized grievances and concerned bystanders  |
| 24  | that are seeking to impose value judgments -- using those as a   |
| 25  | vehicle.                                                         |

1          And, Your Honor, I understand you have a copy of the

2    deposition transcript with you.  If it would be appropriate, I

3    could point you to a couple of the initial questions on the

4    topic.  If you prefer otherwise, I'll --

5          THE COURT:  All I have is two pages.

6          MR. MILLER:  Okay.  Your Honor, I think --

7          THE COURT:  Was there more?

8          All right.  Could you tell us which pages you want

9    to -- or else you can read me -- read it to me.  Because it was

10   150 pages, and I have not looked at it in that context.

11         MR. MILLER:  Sure.  I understand that, Your Honor.

12         It was a text file.  It is a little difficult to

13   navigate.  But I will point you to starting at Page 26 in the

14   text file.  It is going to be difficult to find by pages of the

15   PDF.

16         THE COURT:  Well, why don't you tell me what you were

17   asking.  And then you can send us the page numbers when we're

18   through with this.

19         MR. MILLER:  Okay.  Yes, Your Honor.  So

20   Mr. Schoenberg testified regarding -- the question was

21   regarding informal political works that he mentioned engaging

22   in.  And I posed the question, can you describe that kind of

23   political work to me?

24         He went on to explain that I've been on campaigns,

25   two or three, informally as a consultant.  And that people,

1  friends of mine, positions of authority, will call me and ask

2  me my advice on things.

3        The follow-up to that statement -- the question

4  was -- and this is quoting from Page 27 of the rough -- now,

5  you mentioned earlier that friends of authority or in positions

6  of authority will call and ask you advice.  Have those calls

7  ever concerned elections in Georgia?

8        At that point, an objection was posed from Ms. Elson.

9  Quoting from the transcript, I'll jump in here.  I think you

10  are inquiring into matters the defendant agreed not to pursue.

11  You indicated we wouldn't be responding to correspondence.

12        I ask Ms. Elson to state the objection and we would

13  move along.  The next statement was Ms. Elson instructing the

14  witness not to answer questions about his legislative

15  activities.

16        THE COURT:  And were any of these questions about

17  advocacy as to the voting system, or was it about general

18  advocacy about anything -- anything at all that was --

19        MR. MILLER:  Your Honor, the questions posed were

20  regarding the elections and election administration.  I'll read

21  you the next question that follows what I just read to you.

22  And this is on Page 28, Line 3.

23        The question is:  Mr. Schoenberg, let me ask you this

24  way.  Those friends in positions of authority that you've

25  called and talked to have asked for your advice, did it ever

1    concern the administration of elections and election technology

2    in Georgia?

3              Again, there was an instruction not to answer.

4              THE COURT:  And so were any of the questions though

5    about the election -- election as a whole rather than election

6    administration?  Because you said elections and election

7    administration.

8              Elections are a much broader -- obviously a much more

9    broader politicized subject.

10             MR. MILLER:  That's correct, Your Honor.  And when I

11   was rephrasing that question there, the intent was to narrow it

12   there.  And in that question, it was concerning the

13   administration of elections and election technology in Georgia.

14             THE COURT:  Okay.  All right.  And who is going to be

15   speaking on behalf of plaintiffs?

16             MR. CROSS:  This is David Cross, Your Honor.

17             THE COURT:  All right.  I understood from the short

18   communication I received that your concern was that this wasn't

19   relevant because the standing of the Curling plaintiffs wasn't

20   resting upon the same organizational interest that the

21   Coalition's was.

22             But as you know, anything that could lead to

23   discoverable evidence, generally speaking, would be proper

24   subject absent a compelling First Amendment privacy concern.

25             So I'm trying -- what was the basis of the objection?

1          MR. CROSS:  Yes, Your Honor.  The objection -- and

2     this was a part when Mr. Miller was reading the transcript he

3     didn't read what Ms. Elson actually said.  She went on to say

4     that the basis for the instruction -- I'm just getting back to

5     it.  She said that would be an objection to relevancy and

6     protected speech.

7          So we are to go to two bases during the course of the

8     deposition.  The relevance, Your Honor, is we don't see it.

9     And I don't believe Mr. Miller has articulated it.

10          We actually have had a lot of meet-and-confers on

11     this particular issue in the context of discovery when they

12     sought documents -- and there may have been some

13     interrogatories.  But certainly there were document requests

14     that got to the same sort of thing.

15          And we have always maintained that this is

16     off-limits.  And when we have asked them to articulate the

17     relevance, we get what you got today, which is some vague

18     notion of motive.  I'm not sure how the motive here has any

19     bearing upon the constitutionality of this system or their

20     standing.  And their motive is not in question.

21          It is certainly public knowledge that our clients

22     have engaged in some legislative activities to remedy the

23     problems that they see with the election system.  One of the

24     ways they have sought to do that is trying to get hand-marked

25     paper ballots.  That motive is clear.  It is public record.

1    And we don't dispute that.

2         What they want to do with the questioning is to dig

3    into the specifics of those communications with members of the

4    legislature, with other activists, with members of the

5    executive branch.  And that concern, Your Honor -- it is not

6    only irrelevant, but it runs head-long into what we believe the

7    First Amendment privilege is intended to protect, which is to

8    avoid chilling that type of behavior.

9         If our clients as activists -- and unlike the State,

10   we don't think activist is a pejorative term.  If they have to

11   be concerned that any communications they have in exercising

12   their First Amendment rights are going to be the subject of

13   cross-examination by the current government, by an agent of the

14   State, then that is going to chill their activity.  It is going

15   to become concerning to them, and they are going to face

16   potentially retaliation.  And we have seen retaliation in the

17   context of this particular litigation.  So I think it is a

18   legitimate concern.

19        And I will say the standard, Your Honor, articulates,

20   you know, the reasonable -- the likelihood to lead to

21   reasonable evidence.  You know, Federal Rule 26, as Your

22   Honor -- I know you know this.  But it has been narrowed in the

23   scope of discovery and is really focused on, you know, what is

24   relevant to a claim or defense and more particularly what is

25   relevant to a fact of consequence.

1          This does not bear on any fact of consequence as to

2     whether this system is constitutional and whether our clients

3     are individually harmed by having to use this or use the

4     burdensome alternative of absentee ballots.

5          And we have not heard any relevance for it.  And I

6     would submit any relevance is so nominal it is drastically

7     outweighed by the potential harm of invading communications

8     that have been protected by the First Amendment.

9          THE COURT:  Well --

10         MR. CROSS:  One last thing on this, Your Honor, I

11    should point out.  We did allow -- if you go to Page -- I think

12    it is 37 -- let me just get there real quick.  I think this

13    gets to the question you were asking.

14         There was a question of -- and this is a rough.  So

15    I'm not sure -- the way the question is phrased is, have you

16    engaged with any advocacy can federal electronic voting system?

17    I don't know exactly -- since it is a rough, we don't have the

18    exact wording.

19         But the question as I recall as captured here was

20    whether Mr. Schoenberg engaged in advocacy specifically

21    regarding the federal electronic voting system.  And he

22    answered that no.

23         THE COURT:  I'm sorry.  I didn't understand what you

24    were saying.  The question was --

25         MR. CROSS:  I'm sorry.

1          THE COURT:  -- what again?

2          MR. CROSS:  He was -- yeah.  Sorry, Your Honor.  He

3    was asked a question about whether he engaged in political

4    advocacy regarding the federal electronic voting system.

5          I'm not sure exactly what -- my recollection of the

6    question that he was asked -- allowed to answer yes or no was

7    whether he engaged in political advocacy regarding the

8    electronic voting system specifically in some way.  He answered

9    that no.

10          Unfortunately, we don't have the precise wording

11    because it is a rough transcript.  So there was not an outright

12    instruction on every question.  And we think the record shows

13    that to the extent that he engaged in political advocacy, like

14    Ms. Curling and Ms. Price, it doesn't have anything to do with

15    the issues in this case and the constitutionality of the BMD

16    system that is in place and whether that harms our clients.

17          MR. MILLER:  Your Honor, if I may, I'm on the page

18    that Mr. Cross was referring to.  Just before then, the

19    question posed was, quote, have you engaged in any legislative

20    advocacy or advocacy with the executive branch of state

21    government regarding Georgia's electronic voting system?

22          The answer was yes.

23          The next question was, and can you describe that to

24    me?

25          The next interaction was an instruction not to

1  answer.

2       The subsequent question Mr. Cross is referring to --

3  and he is correct.  This is a rough.  I can inform the Court as

4  to what the question was aimed to get at was similar to the one

5  I just read, which is to say advocacy with a legislature,

6  executive branch of the federal Government.  I recognize with a

7  rough transcript we have got a few gaps here.  But that was the

8  intent at least.

9       So back to the central issue, Your Honor, they are

10  stating yes, we engaged in this advocacy.  But a simple

11  question of can you describe this to me, they are instructing

12  him not to answer.

13       And, Your Honor, I'll dispense with the relevance

14  issue here pretty quickly because I don't think that is

15  reasonably in dispute.  In their complaint, they allege at

16  various points dereliction of duty of office holders and office

17  holders' knowledge.  And, of course, that knowledge comes in

18  part at least from constituent service interactions and

19  certainly makes this relevant.

20       But setting all that aside, Your Honor, the

21  description of relevance that Mr. Cross just offered I think is

22  in contradiction to the descriptions that were offered when Mr.

23  Cross was seeking discovery from my clients.

24       I don't believe the relevance is reasonably in

25  dispute right now.  Instead, it is this instruction not to

1  answer on the issue entirely.

2        And, Your Honor, with respect to the type of things

3  we're asking about here, you know, frankly, I think it is

4  absolutely relevant when Mr. Cross referenced the co-plaintiffs

5  and their advocacy.  And it is absolutely relevant to know has

6  Mr. Schoenberg or other plaintiffs in this case engaged in that

7  advocacy with the state.  That question was answered.

8        What was the advocacy?  Were they seeking opposition

9  to House Bill 316?  I assume so.  I don't know that though

10 based off of the record for the Curling plaintiffs at least and

11 certainly for Mr. Schoenberg.

12       THE COURT:  I didn't understand --

13       MR. CROSS:  Your Honor --

14       THE COURT:  Just a second.

15       Mr. Miller, what were you saying about the

16 dereliction of duties?  I didn't understand what you were

17 trying to convey to me about the allegation of -- how the

18 allegation as to dereliction of duties relates to this.

19       MR. MILLER:  Your Honor, frankly, I'm speaking on my

20 recollection of the complaint right now.  I don't have the

21 exact -- notes exactly in front of me.  But throughout the

22 complaint, there are allegations made as to our clients'

23 awareness of this issue, their awareness that the BMDs could

24 never be secured, their awareness that a hack was imminent,

25 their awareness that, frankly, it is just a bad policy

1  decision.  And that is where the complaint kind of goes at

2  this.

3           But from a bigger picture perspective, Your Honor, it

4  simply gets back to the meat of the issue that I mentioned at

5  the outset of the call, which is a central portion of State

6  defendants' dispute regarding the plaintiffs' standing is that

7  what we're talking about here is a generalized grievance about

8  the conduct of the government being conducted according to law.

9           And this goes exactly to that nature.  If this can be

10 accomplished, you know, by legislative advocacy, that is

11 certainly relevant to that claim.

12          You know, I'm certain Mr. Cross will dispute its

13 weight; would dispute, you know, perhaps on other grounds

14 admission.

15          But as far as relevance in obtaining that information

16 in discovery, Your Honor, I respectfully submit I don't think

17 that is reasonably in dispute here.

18          THE COURT:  Okay.  I interrupted you, Mr. Cross.

19 What were you trying to say?

20          MR. CROSS:  Yes, Your Honor.  This is David Cross.  I

21 guess briefly on the relevance point, the new argument we're

22 hearing now, which is not an argument we have heard before, is

23 this goes to the knowledge of the state actors.  Because not

24 only is that an entirely new argument, but to say that now

25 their defense is that the State is relying on our clients to

1   inform them of whether the election system is secure strains

2   credulity.

3           And, again, since it has never been articulated

4   before, it seems clear that is not the motivation behind these

5   questions.  In any event, that seems an awfully thin read to

6   examine our clients on questions that go to the substantive --

7   their political activity.  And in particular these questions

8   are not just about communications with the Secretary of State's

9   office in this case.  But broadly about anyone in any position

10  of authority is the vague capture of the question.  And that

11  goes well beyond even what Mr. Miller is now arguing.

12          The last thing I will say is:  I cannot understand

13  this argument that this has anything to do with whether it is a

14  generalized grievance.  The fact that some of our clients or

15  all of our clients may be exercising their First Amendment

16  right to try to get change through the legislature that is

17  similar to the change they are trying to get in this court has

18  nothing to do with how the election system when they are

19  voting -- whether that has an impact on them and whether that

20  impact is particularized to them.

21          What I hear from Mr. Miller is what we here in all of

22  our discovery conferences, which is the conclusory argument,

23  well, of course, it is relevant, it is absolutely relevant.

24  But that is not an argument.  That is not an articulation of

25  fact.  It is not an identification of any fact of consequence

1    in this case.

2         And so this is not an issue we wanted to burden the

3    Court with.  But we are very concerned that we have clients who

4    are activists who regularly engage in exercising their First

5    Amendment rights and we have an agent of the State that wants

6    to explore deeply into those communications.

7         And we have not been able to work on any limit on

8    that in the prior meet-and-confers.  We are just told it is all

9    relevant, it is absolutely relevant, and we're entitled to know

10   who they are talking with, what they are saying, what they are

11   hearing, what their positions are, what their rationale is.

12        And that is an invasion that we think is not

13   warranted and, again, does not bear on any fact of consequence.

14        MR. MILLER:  Your Honor, if I may just pose one

15   additional thought here.  Mr. Cross just discussed kind of the

16   heart of this issue.

17        The plaintiffs are advocates for hand-marked paper

18   ballots.  And that is completely fine as a policy matter.  You

19   know, what they want to persuade their elected officials to do

20   is completely fine as a policy matter.

21        Of course, it is also relevant to the litigation they

22   brought as plaintiffs to seek to impose their policy -- their

23   preferred policy as a matter of constitutional law.

24        And, Your Honor, with respect to the, you know,

25   private meet-and-confers -- prior meet-and-confers, I can't say

1   I can speak with any specificity as to exactly which

2   meet-and-confer Mr. Cross was referring to.  But I will, of

3   course, remind -- Your Honor is, of course, aware of frankly

4   our disagreement in the discovery process.  And rather than

5   burden the Court with additional joint discovery statements and

6   demand answers to these -- or productions from these documents

7   that we're getting stonewall refusal on, we decided to explore

8   the topic in a deposition so that maybe the deposition could

9   inform a more narrowed discovery request.  And at this point,

10  we're unable to do it.

11          Your Honor, I would just revert back once more to

12  kind of the central issue here.  You know, as far as a

13  relevance objection, not only do I not think it is not

14  reasonably in dispute, but, of course, that is not a proper

15  instruction to give a witness not to answer a question.

16          Now, to the extent there is a privilege applicable

17  and the First Amendment privilege is what the plaintiffs are

18  seeking to use to protect this information, it is their duty to

19  make the prima facie showing that their associational rights

20  will be chilled.

21          Your Honor, I don't think we're there.  And if the

22  question is would we subject this portion of the deposition to

23  Your Honor's protective order, certainly.

24          You know, this is not -- I'll put it this way.  Mr.

25  Cross's argument may make -- may carry more water if we were

```
1    discussing a non-plaintiff member of the Coalition who we
2    subpoenaed for a deposition and sought to produce documents.
3              That is not what we're discussing here.  We're
4    discussing a plaintiff who brought this litigation who
5    presumably had a basis for doing so.  And we want to explore
6    his motive for doing so.
7              THE COURT:  So let me ask you this, Mr. Miller.  I'm
8    going to then revert to asking some questions of Mr. Cross.
9              Why is their motive for -- their motive I can see
10   would be relevant if they really were -- relative to I feel
11   impacted by this, I don't feel like I can properly cast a
12   ballot.
13             But presumably what you are trying to do at the
14   moment, I guess, is elicit answers that would indicate that
15   their true motive is change of the balloting system and that
16   everything else is false.
17             But the thing is:  It could be both true; right?
18   What does it matter?  What does it matter if it is a combined I
19   don't feel this -- that my vote is secure and at the same time
20   I would like to obtain -- I would like the State to adopt a
21   better or different balloting system?
22             MR. MILLER:  Sure.  Your Honor, so I will address
23   that.  I guess a couple of initial thoughts come to mind there.
24             First, Your Honor, you are exactly right.  It could
25   be a combination of the two motives.  And that is something
```

1    that I think is relevant to exploring, if not else, for

2    impeachment purposes.

3          Second, Your Honor, I would also point to

4    Mr. Schoenberg's, you know, testimony that he did offer about

5    his position with the Secretary of State candidate.  I do not

6    have the exact text in front of me.  But something along the

7    lines of one of the primary issues in that campaign was on

8    election systems, whether to move to hand-marked paper ballots

9    or not.  And that was offered.

10          He told us that was a central issue of the campaign

11    for which he served as a treasurer.  And to see if he pursued

12    that through other means, we're being carte blanche told we

13    can't by the defending counsel.

14          So in sum, Your Honor, I think the relevance comes

15    into play of first of all just general impeachment purposes.

16    Of course, we will want to cross-examine the witness if there

17    is some ulterior motive that goes to this issue rather than

18    actually securing the election.

19          But separate from that, Your Honor, it simply goes

20    to, frankly, this is a -- this is a political debate, not a

21    federal constitutional claim.

22          MR. CROSS:  Your Honor --

23          THE COURT:  Well, I guess I'm not -- if it is a

24    political debate, I'm not sure the fact that the plaintiff has

25    some views about this makes -- I don't understand why that

1    helps the State's defense of this.

2         I mean, I -- I thought you want to take these --

3    pursue this line of questioning to see or something -- some

4    line of questioning against these individual plaintiffs to

5    establish that they didn't have standing.

6         And I'm just -- I'm just not really clear how -- how

7    pursuing all of the different things that they may have done in

8    order to change or to improve the balloting system ultimately

9    addresses that since they are not -- they are not claiming

10   systemic organizational standing.

11        MR. MILLER:  Yes, Your Honor.  And that is right.

12   You know, we have been discussing largely the weight of

13   evidence in terms of the merits.

14        But with respect to standing, Your Honor, it goes to

15   the -- and I believe it was from the *Gardner vs. Mutz* case

16   about the -- it is also referenced in the *Lin Wood* case and in

17   *Bodnar* about simply converting your policy position into a

18   federal constitutional claim that is not a particularized

19   concrete injury.

20        Your Honor, of course, at succeeding stages of the

21   litigation, the plaintiffs have to prove up their standing at

22   each stage as is required.  So at the initial pleading stage,

23   of course, we could make these sort of assertions but wouldn't

24   be there.  But, Your Honor, at this point, we're in discovery.

25   We expect the plaintiffs will put up evidence -- I would

anticipate they would put up evidence to go to the particularized injury issue.  And we, likewise, feel entitled to obtain discovery on evidence that undercuts that or that supports our argument.

And, Your Honor, I guess as to the central issue, you know, there's the two-layer issue of the relevance, which is as it goes to the standing that I just discussed or to the weight that we discussed previously.  But even still, that relevance objection is not a proper basis on which to instruct a witness not to answer a question.

THE COURT:  I agree.  I agree with that.

MR. MILLER:  Okay.  And, Your Honor, the only proper basis then would be a privilege assertion.  And I have yet to hear the prima facie application of why it applies, why it would be reasonably likely to chill speech.

But even still, at least under the Ninth Circuit -- frankly, I have not come across an Eleventh Circuit case addressing it in this context as opposed to, for example, a reporter's confidential sources but, you know, a host of factors that can be considered and if there is a way to guard against, you know, chilling the First Amendment privilege.

And, Your Honor, I would respectfully submit that if we subject the portion of the deposition discussing this to Your Honor's protective order then that rids that issue.

THE COURT:  Well, I think -- let me just hear now

1    from Mr. Cross, and then I'll share some of my own thoughts

2    unless -- so let me hear from Mr. Cross.

3              What were you trying to say?

4              MR. CROSS:  Sure, Your Honor.  Thank you.  On the

5    issue of the instruction, the instruction was based on the

6    First Amendment privilege, which we think is a legitimate basis

7    to instruct.  That is a recognized privilege.  The courts have

8    recognized it is a privilege that is appropriate to decline

9    discovery.

10             THE COURT:  So you -- I understand that it is a

11   legitimate basis.

12             But you are asserting that the counsel did assert a

13   First Amendment privilege objection?

14             MR. CROSS:  Yes, explicitly.  And that is at -- let

15   me just come back to it.  I think it is Page 27.  It is the

16   portion --

17             MR. MILLER:  Your Honor, this is Carey Miller.  Mr.

18   Cross is referring to the portion he read earlier.  It is

19   shortly after what I read to you when we first got on the call.

20   And I state on Line 9 of Page 27, do you want to state your

21   objection?  We'll move along, rather than speaking objections.

22   Ms. Elson says, sure.  That would be an objection to relevancy

23   and just protected speech.  It is improper questioning.

24             THE COURT:  Okay.  All right.

25             MR. CROSS:  Right.  And that was articulating the

 1    First Amendment privilege is protected speech, Your Honor.  So

 2    both objections were asserted to preserve them.  The

 3    instruction was based on the privilege assertion.  And had the

 4    questioning persisted, we would have contacted the Court.  We

 5    didn't do that because Mr. Miller indicated he was going to do

 6    that.

 7          So that is how we ended up here.  I think the

 8    relevance argument is well within the Court's discretion since

 9    we are here now addressing this issue.

10          And on that, I will say that Mr. Miller keeps coming

11    back to impeachment.  I don't understand what he is talking

12    about because he's not offered what the impeachment is.  There

13    is no suggestion of inconsistent testimony or positions here.

14          In fact, what he seems to be saying is he wants to

15    show that our clients have been entirely consistent in always

16    seeking to remedy this -- the issues they see with the election

17    system, both the DREs and now the BMDs, and have exhausted

18    every means that they can think to do that from the legislature

19    to the courts.

20          So it is the opposite of impeachment.  If he wants to

21    say their motive is and has always been that they are not happy

22    with the election system because they find it unreliable and

23    that they want hand-marked paper ballots, that is not

24    impeachment.  It is the opposite.

25          So I honestly don't know what he is talking about.

1    And he has not identified any inconsistency that he can even

2    imagine.

3              And then I would say, Your Honor, they keep saying

4    that our lawsuit seeks hand-marked paper ballots.  And I guess

5    what he wants to say is the motivation of our clients is that

6    what they want in this lawsuit is hand-marked paper ballots.

7              And that is not what the lawsuit says on its face.

8    Hand-marked paper ballots are part of the relief that they

9    would like to have.  But as they have explained many times,

10   what they are ultimately after is a reliable election system

11   but more importantly eliminating the current system that is

12   unreliable.

13             Your Honor's injunction on the DREs our clients have

14   always considered a win, even though it didn't give them a new

15   system, because it gave them the fundamental relief that they

16   are seeking, which was to eliminate that system.  And that is

17   what they are seeking now.

18             Again, if Mr. Miller wants to establish that in their

19   ideal world they would also get hand-marked paper ballots,

20   well, that is not in dispute.  They will testify to that.  He

21   does not need to get into any communications with the

22   legislature or the executive office of the state to establish

23   that in their ideal world they would like that.

24             But that is not the only relief they are seeking.

25   So, again, there is no inconsistency or no impeachment.

1        And then the last thing I would say, Your Honor, this

2  notion of policy positions -- he says that that bears -- that

3  would be their defense to the facts that we would put on of an

4  individualized harm.  Again, I just don't know what that means.

5        If our clients can put forth facts that show that

6  they are harmed at a particularized level as required by the

7  law when they vote in this system, I don't honestly know what

8  he means when he says their motive or their policy position

9  would somehow refute that.

10        Regardless of what their motives are and regardless

11  of what their policy positions are, if the facts show that they

12  are harmed, then that is what they show.  And so it just --

13  this is all sort of a lot of handing-waving to invade protected

14  speech.

15        And I guess I don't know what else to say because I

16  really fundamentally don't understand Mr. Miller's argument.

17  It is just a complete disconnect between the notion that what

18  they have done in the legislative sphere somehow has bearing,

19  much less refutes factual determinations that will be decided

20  on their experience in voting in the system.

21        THE COURT:  Well, let me ask you this.

22        MR. MILLER:  Your Honor --

23        THE COURT:  Let me just ask Mr. Cross something now.

24        Just following the ruling of *NAACP vs. State of*

25  *Alabama* -- old case but still very valid case dating back to

1     1958.

2          Tell me:  Are you prepared to address in an

3     affidavit -- your clients to address in an affidavit that

4     compelled disclosure will chill their associational rights and

5     that there is an objective reasonable probability of that

6     occurring?

7          MR. CROSS:  Yes, Your Honor.  We absolutely can do

8     that.

9          THE COURT:  And not do this just simply on a

10    generalized basis?

11         MR. CROSS:  I'm sorry.  Can you -- I didn't

12    understand the question.

13         THE COURT:  And they would be prepared to do this not

14    just on a generalized basis but based on their own

15    individualized experience as well?

16         MR. CROSS:  Yes.  My understanding is yes, Your

17    Honor.

18         I mean, we have discussed this at length with them.

19    The concern that we hear from our clients is that because they

20    do remain active on issues regarding election security and

21    other things and issues beyond that, if the substance of their

22    communications with fellow activists, the legislature, and

23    others, as Mr. Miller put it, with people in positions of

24    authority suddenly become discoverable to the State, they are

25    not going to be able to work as activists.  No one is going to

1    associate with them on these issues.  Because as soon as it

2    becomes clear that all of these communications can potentially

3    become discoverable in this or related litigation, particularly

4    when they file litigation to pursue, you know, the same sort of

5    rights that they are seeking to protect in the legislative

6    sphere, then they are crippled.  That is exactly the sort of

7    First Amendment protection and chilling that I think the

8    privilege is intended to protect.  That they are just going to

9    be iced out.  They will be isolated.  That is what I hear from

10   my clients.

11        Because how can people feel comfortable emailing with

12   them, including them in meetings, having the sort of, you know,

13   deliberative process and advocacy they need to engage in if the

14   fear is that one of the people in that group, you know, decides

15   to file a lawsuit to pursue their rights and suddenly all of

16   those communications become discoverable to the State?

17        THE COURT:  Okay.  Well, you can point, Counsel, even

18   though it is not exactly, to say the least, on all fours -- but

19   it reviews this area of the law, *Flynn vs. Square One*

20   *Distribution*, 2016 Westlaw 2997673.  And this discussion occurs

21   at -- starting at Page 2 going through Page 3.

22        I know the depositions are supposed to continue

23   tomorrow.  And if they could continue -- I'm not going to rule

24   first thing at 9:00 in the morning for you.  So -- but you can

25   file the affidavits under seal.  They should address the sorts

1   of -- you know, with specificity what they're talking about to

2   properly assert the privilege.

3          And then the burden would shift to the opposing party

4   to demonstrate a compelling need for the requested information.

5          Now, I haven't really heard that compelling need,

6   frankly.  I think, you know, the more simple thing is

7   realistically that either -- that there is or is not standing

8   based on the harm that they actually are -- these individuals

9   are asserting and is it generalizable, as the State has

10  consistently said, and completely basically controlled by the

11  *Lin Wood* cases or not.

12         I don't think it will make a difference -- all this

13  other stuff.  But if the plaintiffs are going to assert the

14  privilege and they want to understand this -- the defendants

15  think that somehow it would be relevant to their defense, I'm

16  not going to -- I think I at least have to have a properly

17  asserted privilege in front of me so that I understand what

18  I've got here.

19         If you want to proceed with your depositions tomorrow

20  all but this area, then you may do so.  Just avoid discussing

21  this specific area.  And then you would resume on anything

22  else, if necessary.  And you could do that obviously by remote,

23  if necessary.

24         MR. CROSS:  Your Honor, this is David Cross.  Just to

25  clarify, are you giving us the option to proceed tomorrow or

```
1    you are telling us we need to proceed tomorrow regardless?

2              THE COURT:  Well, I think that is sort of the -- it

3    really kind of depends on your schedule.

4              I mean, let me just say this:  I have a trial that

5    begins on Friday.  We'll give it priority attention.  But even

6    if you filed it tonight, I don't think we would give you an

7    order tomorrow morning at 9:30 in the morning.  That is just

8    not what -- I just don't have that capacity.

9              MR. CROSS:  Right.

10             THE COURT:  So if y'all can find a different date

11   next week, sure.  That is a possibility.  But -- and I can

12   understand the utility of that.  But that is up to you-all to

13   decide.

14             And if you want to talk about it while I'm present,

15   I'm happy to do so.  Or if you want to go offline and talk

16   about it together, that is fine too.

17             Why don't you take five minutes to discuss it, and

18   we'll just be offline for five minutes.  Okay?

19             MR. CROSS:  Your Honor, this is David Cross.  We

20   should -- the parties should stay on this line and talk and

21   then you'll come back?

22             THE COURT:  In five minutes, yes.

23             MR. CROSS:  All right.

24             MR. MILLER:  Thank you, Your Honor.

25             THE COURT:  You're welcome.
```

```
 1              (There was a brief break in the proceedings.)

 2              THE COURT:  All right.  This is Judge Totenberg

 3    again.  Are y'all ready to talk?

 4              MR. CROSS:  Yes, Your Honor.  This is David Cross.

 5              We were not able to reach a compromise.  But we

 6    did -- Mr. Miller was on.  We did agree to postpone the

 7    depositions as long as we can get them back on the schedule in

 8    relatively short order so Your Honor can resolve this.

 9              THE COURT:  Okay.  Can you get -- use the time you

10    are here to draft an -- to work on the affidavits and get them

11    to us as soon as possible?

12              I just think my attention span for this is going to

13    disappear.  Jury selection starts on Friday.

14              MR. CROSS:  Yes.  Your Honor, could we have until --

15    I want to make sure we can realistically do this.  What is the

16    latest that we could get them to you tomorrow without putting

17    you in a bind?

18              THE COURT:  4:00.

19              MR. CROSS:  Oh, okay.  We'll shoot for the morning.

20              THE COURT:  Very good.  That is certainly better.

21              MR. CROSS:  We'll get them as early as possible.

22              THE COURT:  Yes.

23              MR. CROSS:  Could I raise one other issue while we

24    have you briefly?

25              THE COURT:  Yes.
```

```
 1              MR. MILLER:  Your Honor, before we change subjects,
 2    could I just address the filing issue?
 3              THE COURT:  Yes.
 4              MR. MILLER:  And my simple question here was:  I
 5    don't anticipate we're talking about extensive briefing or
 6    anything of that nature.
 7              THE COURT:  No.
 8              MR. MILLER:  But the State would like an opportunity
 9    to respond, you know, once the showing and articulation of the
10    privilege is made and, frankly, to respond as to the mitigating
11    factors and things we think can work around as to any potential
12    harm.
13              THE COURT:  All right.  Well, then let's say that --
14    let's do it this way.
15              Mr. Cross, you get your materials in by -- can you
16    get your materials in by 1:00 P.M.?
17              MR. CROSS:  Yes, Your Honor.
18              THE COURT:  Okay.  And then can the State get your
19    response in by noon the next day?
20              MR. MILLER:  Yes, Your Honor.  That will be fine.
21              THE COURT:  So you would need to address why you have
22    a compelling need for the requested information I have heard
23    you speak.  You don't need to go at length.  But if -- you have
24    to be specific as to that if you really are going to contend
25    that you have a compelling need for the requested information
```

1  and alternatively yes, you can address the other items that you

2  mentioned.

3          And, Mr. Cross, to the extent you have heard

4  Mr. Miller identify what he thinks are reasonable alternative

5  ways of addressing your concerns, you should probably address

6  that as well in your submission -- your -- do a cover

7  submission.  Okay?

8          MR. CROSS:  Yes, Your Honor.

9          THE COURT:  All right.  We'll look for that.  Thanks

10  very much.

11          We'll try to get you out something but I don't -- on

12  Friday, but it may be Monday.

13          MR. CROSS:  Your Honor, one other quick issue if I

14  may.

15          THE COURT:  Yes.

16          MR. CROSS:  The DRE issue that Mr. Miller raised in

17  his argument, we withdrew the instruction on that to avoid

18  burdening the Court with it.  But I did want to raise it

19  because we do have a concern that the bulk of yesterday's

20  deposition focused on examination about the DREs going back to

21  the original complaints and declarations predating even the

22  injunction.  And that was a heavy focus of -- I would say it

23  was more than half the day.

24          We are concerned -- given that the State has taken

25  the position that DREs are out of the case and have not

1    provided discovery on DREs, we don't think our clients should
2    have to sit through depositions that are spending literally
3    hours on questions about the DREs, their concerns about the
4    DREs, their motivation for bringing the DRE claims.
5         And we would like to work -- we had hoped to reach an
6    agreement.  We could not get an agreement from the State on
7    that.  So we would appreciate help from the Court to the extent
8    we can, given we have got two more depositions coming up.
9         We're spending a lot of time on that issue -- more
10   time on that than anything else.
11        MR. MILLER:  Your Honor, if I may just address that
12   briefly because I don't think it is an issue we need to burden
13   the Court with today.
14        But with respect to the amount of time spent in the
15   deposition discussing DREs, I would respectfully provide the
16   caveat that the deposition ended early when Mr. Schoenberg
17   informed us he needed to go pick up his daughter.
18        Just as a human matter, I was not seeking to frankly
19   torture Mr. Schoenberg to continue going on longer.  So
20   chronologically we worked through each complaint and, yes,
21   addressed the issue.
22        But as far as the relevance at this juncture, Mr.
23   Cross -- excuse me -- not Mr. Cross's complaint -- the Curling
24   plaintiffs' complaint has with it two counts regarding the DRE
25   systems, which Your Honor will recall we do believe is moot.

1    But, frankly, Your Honor, we lost that issue.

2              The second set of claims are regarding the BMD issue.

3    And so we also addressed those claims regarding the deposition

4    testimony.  And, frankly, with respect to both claims, they are

5    essentially the same claim.  The harm as alleged is largely the

6    same, the verifiability aspect, the risk.  All of these are the

7    same type of claims.  And, in fact, the language between the

8    two complaints hardly changes.

9              So with respect to this issue, Your Honor -- and I

10   would also note it was after the deposition concluded that we

11   received the notice from CM/ECF about Curling plaintiffs'

12   joinder in the severance issue.

13             And respectfully, Your Honor, if we want to address

14   the DRE topics, I would suggest, Your Honor, with the pending

15   severance motion from two different sets of plaintiffs, it may

16   be appropriate to have a status conference in terms of where

17   those claims are.  And we will, of course, respond to them.

18             And we anticipated discussing this with Mr. Cross

19   today.  But, you know, now that we have two different sets of

20   complaints both seeking severance, we have got some very thick

21   procedural and jurisdictional issues to work through with this.

22             And I hate to ask it, but we may need to ask for an

23   extension on the response so that we can adequately respond to

24   the motion as it pertains to both complaints.

25             THE COURT:  Okay.  Well, I don't think I'm in a

1   position to -- right now to direct any pulling back on the

2   questioning about the DREs.  I think any witness in this regard

3   is not deemed an expert witness.  They can express their

4   concerns.  And I don't know that it damages their credibility

5   because they are not Dr. Halderman.  I mean, this is -- it

6   is -- but on the other hand, it could be a waste of time.  And

7   I recognize that.

8           And -- but I think almost all of the plaintiffs sat

9   through a lot of these hearings and are relatively informed.

10  So I'm not sure it makes a difference one way or the other.

11  But it does seem like a waste of time potentially.

12          I would be happy to have a hearing once I'm through

13  with the -- with this trial.  The trial may last a week and two

14  days or so.  So it will go all -- supposedly according to the

15  Government it will go all next week into the following week.

16  But I don't know how long precisely.

17          If you -- and, of course, if the State needs an

18  extension, you just ask for a reasonable extension and it will

19  be granted.  You-all can speak today about what you think you

20  need and what sort of -- what sort of time, if any, that the

21  plaintiffs are going to need for a reply.  And there is no

22  point in my having the hearing until I have gotten the brief so

23  I understand what all the issues are.

24          MR. CROSS:  Thank you, Your Honor.

25          MR. MILLER:  Yes, Your Honor.  I understand that.  I

1    just wanted to essentially raise the issue for sure.

2         THE COURT:  But I would say, you know, I can't

3    conceive -- I have no idea whether half the -- if it was true

4    that it was half the deposition and he had to go pick up his

5    daughter and let's say that was 3:00, it still would be a good

6    number of hours.

7         So I'm not sure how much that really is helpful to

8    the defendants.  But, you know, it is your business in the end.

9         All right.  I'll look for your filings.  And we'll

10   hopefully get you something by Monday with any luck.  But the

11   beginning of the trial is always demanding.  So we'll see.

12        MR. CROSS:  Thank you, Your Honor.

13        THE COURT:  All right.  Very good.

14        MR. MILLER:  Thank you, Your Honor.

15        THE COURT:  Take care.  Bye-bye.

16             **(The proceedings were thereby concluded at 4:59**

17             **P.M.)**

18

19

20

21

22

23

24

25

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 35 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the 21st day of October, 2021.




_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT