# EXHIBIT 1

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-12388

_____

COMMON CAUSE GEORGIA,

Plaintiff-Appellee,

*versus*

SECRETARY, STATE OF GEORGIA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-05102-AT

_____

Before WILLIAM PRYOR, Chief Judge, LAGOA, Circuit Judge, and
SCHLESINGER,[*] District Judge.

SCHLESINGER, District Judge:

The recent Georgia elections garnered significant media at-
tention. Mark Leibovich, *A Political Hurricane Blew Through
Georgia. Now It's Bracing for More*, N.Y. TIMES (Mar. 25, 2021),
https://www.nytimes.com/2021/03/13/us/politics/georgia-re-
publicans-voting-rights.html. The results of the elections may have
been significant, but the question before us is simple—is Common
Cause Georgia a "prevailing party" entitled to attorneys' fees and
costs under 42 U.S.C. § 1988? We conclude that it is.

I.

The November 6, 2018, general election in Georgia was
hotly contested and an eagerly watched bellwether of the national
political mood. At the time, Georgia's state government hosted
voter-registration information on a website named "My Voter
Page." The website was used both by voters, who could check their
voter-registration status, and by election workers, who used the in-
formation to determine voter eligibility.

On November 5, 2018, Common Cause Georgia, a not-for-
profit organization dedicated to electoral reform and voter rights,
filed a Complaint against then-Georgia Secretary of State Brian

---

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle
District of Florida, sitting by designation.

Kemp alleging violations of the Fourteenth Amendment of the U.S. Constitution; the Help America Vote Act, 52 U.S.C. § 21082; Article II, Section 1 of the Georgia Constitution; and Georgia Code § 21-2-211.

Common Cause alleged Georgia's voter registration systems were vulnerable to serious security breaches, increasing the risk eligible voters would be wrongly removed from Georgia's election rolls or their registration information would be unlawfully manipulated to prevent eligible voters from casting a regular ballot. These allegations, if true, were not without effect. Under Georgia's then-existing provisional balloting scheme, voters whose names could not be found on the voter registration list could vote, but only by provisional ballot. But these ballots would be rejected if election officials could not find the voters' names on the voter registration server.

Common Cause also alleged the Secretary knew the security vulnerabilities of the voter registration system but failed to remedy the issues. Fears of registration tampering were amplified when the political parties, each pointing fingers at the other, publicly highlighted the vulnerabilities in the days leading to the election.

On November 7, 2018, one day after Election Day, Common Cause moved for expedited discovery and a temporary restraining order to enjoin the rejection of any provisional ballots cast due to the failure of the voter's name to appear on the voter registration list, while a decision on the permanent relief was pending. The Secretary urged the denial of Common Cause's motion,

arguing the relief requested was "extraordinary" and would create a "massive disruption to the state's election processes" by "go[ing] against well-established Georgia law regarding the processing of provisional ballots." The district court held a hearing on the motion the next day, November 8, 2018.

At that hearing, Common Cause stated that it was "specifically asking for a very, very narrow order preventing the final rejection of provisional ballots for the narrow class of persons who had registration problems" until there was confidence that "there was not widespread manipulation of the voter registration database." Common Cause contended that it was "not asking for a halting of the processing of provisional ballots[,] . . . not precluding defendants from accepting provisional ballots," and "not precluding defendants from rejecting provisional ballots for other reasons," such as failure to submit the appropriate identification. The district court noted that Common Cause's request at the hearing was "something different" from the broader relief it requested in its complaint. Common Cause replied that the two reliefs "peaceably coexist[ed]" and that the relief it proposed at the hearing was "to prevent [voters' provisional ballots] from being rejected" while it figured out whether possible manipulation of the voter registration database was "widespread." Additionally, the Secretary represented at the hearing that his office normally certified the election results the day following the certification of results by the counties, which, for the 2018 election, would be November 14, 2018.

The district court largely granted the motion for a temporary restraining order on November 12, 2018, finding, based on "the combination of the statistical evidence and witness declarations in the record," Common Cause was likely to succeed on the merits of its claim "that the Secretary's failure to properly maintain a reliable and secure voter registration system has [resulted in] and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted." The district court found other considerations, such as the risk of irreparable injury, the balance of harms, and the public interest, also supported granting the order.

But the district court determined the relief Common Cause requested was "not practically feasible" because it required an "alteration of the original deadline for local county election boards to certify their results to the Secretary of State," even though "a great number of counties ha[d] already completed their certifications." Instead, the district court directed the Secretary to take other steps to "ensur[e] the certification of correct and complete election results." For example, the district court enjoined the Secretary "from certifying the results of the election prior to" 5:00 p.m. on November 16, 2018, noting that the Secretary had represented he intended to certify the elections results on November 14, 2018—"the same day [his office] receive[d] the returns from the counties, rather than tak[e] any portion of the additional week provided under the law to fully discharge the Secretary's independent duty of review." The

Secretary complied and did not seek reconsideration of the temporary restraining order by the district court or review by this Court.

The parties began discovery. In 2019, two new voting laws were enacted in Georgia which affected the procedures surrounding handling provisional ballots and touched on issues and concerns about security that are directly relevant here. The parties agreed the passage of these provisions made further litigation unnecessary and stipulated to dismiss the action with prejudice. *See* Fed. R. Civ. P. 41(a)(1)(A).

Common Cause moved for attorneys' fees and litigation expenses incurred through the issuance of the temporary restraining order and in preparing the fee motion. Common Cause argued it was the prevailing party, as it achieved the relief it sought, and requested attorneys' fees of $179,105 for 433 hours spent and $4,527.59 in litigation costs and expenses.

The Secretary maintained that Common Cause deserved no fee award because it was not a prevailing party as that term is used in § 1988, and argued in the alternative that the award should be reduced to no more than $34,314.

On May 29, 2020, the district court granted the motion, holding Common Cause was a prevailing party entitled to fees under § 1988 because Common Cause, in obtaining the temporary restraining order, "succeeded on 'a significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit.'" And it determined the litigation was necessary "to alter the

legal relationship between the parties and to obtain an injunction providing significant relief to prevent the irreparable harm to the rights of Georgians who sought to cast their votes and have them counted." Common Cause was awarded $161,682.50 in attorneys' fees, and $4,527.59 in expenses for a total award of $166,210.09. The district court found much of the time billed was sensibly expended and the attorneys' rates were mostly reasonable.

The Secretary timely appealed. He disputes the district court's characterization of Common Cause as a "prevailing party" because he alleges nothing in the temporary restraining order "substantially modified" the Secretary's behavior or authority under the challenged statutes, and Common Cause achieved no significant goal of the lawsuit as alleged in the pleadings. Last, the Secretary argues even if Common Cause were entitled to fees, the award should be significantly reduced.

## II.

We review the award of attorneys' fees and costs for an abuse of discretion, with subsidiary factual findings reviewed for clear error and conclusions of law reviewed *de novo. Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009).

## III.

"For private actions brought under 42 U.S.C. § 1983 and other specified measures designed to secure civil rights," Congress enacted 42 U.S.C. § 1988, which "authorizes federal district courts, in their discretion, to 'allow the prevailing party . . . a reasonable

attorney's fee as part of the costs.'" *Sole v. Wyner*, 551 U.S. 74, 77 (2007) (quoting 42 U.S.C. § 1988(b)). A plaintiff qualifies as a prevailing party entitled to attorneys' fees under 42 U.S.C. § 1988 if there is a "material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Id.* (quoting *Tex. State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989)). We have "interpreted this language to require either '(1) a situation where a party has been awarded by the court at least some relief on the merits of his claim or (2) a judicial imprimatur on the change in the legal relationship between the parties.'" *Billups*, 554 F.3d at 1356 (quoting *Smalbein ex rel. Estate of Smalbein v. City of Daytona Beach*, 353 F.3d 901, 905 (11th Cir. 2003)).

The grant of the temporary restraining order constituted relief on the merits. The district court found Common Cause "ha[d] shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system ha[d] [resulted in] and [would] continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted." The district court also required changes to the Secretary's behavior that benefited Common Cause and its members.

The award of fees under § 1988 is not thwarted solely because it stemmed from a temporary restraining order. The Supreme Court teaches "prevailing party" status may be based on "succe[ss] on any significant claim affording [the litigant] some of

the relief sought, either *pendente lite* or at the conclusion of the litigation." *Garland*, 489 U.S. at 791. And under this Court's precedent "a preliminary injunction on the merits entitles one to prevailing party status and an award of attorney's fees." *Billups*, 554 F.3d at 1356 (alteration adopted) (internal quotation marks omitted).

We find no basis for distinguishing between preliminary injunctions—which may confer prevailing party status under our precedent—and the temporary restraining order here, which provided the Secretary "notice of the application for the temporary restraining order" and awarded merits-based relief. *United States v. Alabama*, 791 F.2d 1450, 1459 (11th Cir. 1986) (quoting *Dilworth v. Riner*, 343 F.2d 226, 229 (5th Cir. 1965)).

The district court's temporary restraining order materially altered the parties' legal relationship. The Secretary was directed to comply with the Help America Vote Act (and state law) by "immediately establish[ing] and publiciz[ing] on its website a secure and free-access hotline or website for provisional ballot voters to access to determine whether their provisional ballots were counted and if not, the reason why."

The district court also ordered State officials to supply voters with more information about their provisional ballots and registration status beyond the information within the My Voter Page database. This order prevented Common Cause from "having to further divert personnel and resources to resolving the problems of voters left off the registration rolls on election day."

Additionally, the district court enjoined the Secretary "from certifying the results of the election prior to . . . November 16," providing more time to verify the provisional ballots. The Secretary argues he had the discretion to certify the results on November 16 absent court intervention. But, before the district court, the Secretary revealed he intended to certify the election results on November 14, 2018. The temporary restraining order thus prevented the Secretary from exercising the discretion afforded in the statute to certify at an earlier date.

Finally, the court ordered the Secretary to "engage in an independent review" of provisional-voter eligibility using "all available registration documentation," or to direct county election officials to engage in a similar "good faith review." It ordered reviewers to consider "registration information made available by voters themselves" among the documents used to verify eligibility. And it prohibited the Secretary and local officials from "relying solely on the registration information" in the My Voter Page database.

The temporary restraining order marked a change in the legal relationship between the parties—it altered the Secretary's conduct and benefited Common Cause and its members. While the Secretary contends that Common Cause only received "highly limited" or "modest" relief from the temporary restraining order compared to the relief it originally sought in its complaint, "a party 'need not obtain relief identical to the relief [that it] specifically demanded, as long as the relief obtained is of the same general type.'" *Dillard v. City of Greensboro*, 213 F.3d 1347, 1354 (11th Cir. 2000)

(alteration in original) (quoting *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1583 (11th Cir. 1994)).  "Nor does the plaintiff need to obtain relief to the extent demanded; getting something suffices to authorize an award of fees." *Id.*; *see also Farrar v. Hobby*, 506 U.S. 103, 114 (1992) ("'[T]he *degree* of the plaintiff's success' does not affect 'eligibility for a fee award.'" (quoting *Garland*, 489 U.S. at 790)).

The district court correctly determined Common Cause was a "prevailing party" entitled to attorneys' fees under § 1988. 42 U.S.C. § 1988(b). The question then becomes: was the fee awarded reasonable?

IV.

The starting point for determining reasonableness is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). But district courts have wide latitude in determining the amount of a fee. *Brooks v. Ga. State Bd. of Elections*, 997 F.2d 857, 866 (11th Cir. 1993) (citing *Webb v. Bd. of Educ.*, 471 U.S. 234, 244 (1985)). The reason is simple—district courts have a "superior understanding of the litigation," and the parties have an interest in "avoiding frequent appellate review of what essentially are factual matters." *Hensley*, 461 U.S. at 437.

Additionally, "[t]here remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" *Id.* at 434.

12                    Opinion of the Court                    20-12388

In considering the "results obtained" factor, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at 435.

Upon our independent review, the district court properly considered the relevant factors in analyzing whether the attorneys' fees requested by Common Cause were reasonable and in setting the fee award, and its factual findings were not clearly erroneous. *See id.* at 436–37.

We **AFFIRM**.