# EXHIBIT 5

ROUGH DRAFT            1

```
1         ROUGH DRAFT - UNCERTIFIED

2

3    This transcript is an UNCERTIFIED ROUGH DRAFT

4    TRANSCRIPT.  It contains raw output from the court

5    reporter's stenotype machine translated into

6    English by the court reporter's computer, without

7    the benefit of proofreading. It will contain

8    untranslated steno outlines, mistranslations (wrong

9    words), and misspellings.  These and any other

10    errors will be corrected in the final transcript.

11    Since this rough draft transcript has not been

12    proofread, the court reporter cannot assume

13    responsibility for any errors therein.  This rough

14    draft transcript is intended to assist attorneys in

15    their case preparation and is not to be construed

16    as the final transcript.  It is not to be read by

17    the witness or quoted in any pleading or for any

18    other purpose and may not be filed with any court.

19

20

21

22
```

ROUGH DRAFT          18

1   this is the one and only aspect.  It's a trade-off

2   of multiple different considerations.  Security

3   is -- security is one of them.

4       Q.  Understood.

5          Would you support the use of an election

6   system that could be hacked in a few minutes by a

7   voter in the voting booth?

8       A.  I would not -- I would -- I would want to

9   see the data on -- on how that could be done, but

10   generally hacking is not a good idea.  It's

11   something that you'd like to -- like to oppose, but

12   I'd like -- I'd have to see the particular

13   circumstances.

14          If it could be hacked in a -- in a

15   courtroom under artificial circumstances, that's

16   very different than being hacked in the wild.

17       Q.  But from your answer is it -- am I

18   understanding correctly that you would not support

19   an election system that could be hacked in a few

20   minutes by a voter in the voting booth?

21          MS. JOHNSON:  Mr. Mashburn's opinion in

22   his personal capacity.  He's here in his capacity

ROUGH DRAFT          19

1   as a member of the State Board of Elections, but

2   you can answer.

3       A.  You would want to avoid a system that

4   could be hacked by a random person in the wild.

5       Q.  Are you familiar with BMD's?

6       A.  Sure.

7       Q.  Do you know how they work?

8       A.  Yes.  I just used one the other day.

9       Q.  What company manufacturers the BMD's?

10      A.  I don't know.

11      Q.  What company does the State of Georgia

12   have a contract with that provides the BMD's to the

13   State of Georgia?

14      A.  I don't know.

15      Q.  Are you familiar with Dominion?

16      A.  I've heard -- I've heard of them, yes.

17      Q.  Are you aware that the State of Georgia

18   has contracted with Dominion for Dominion to

19   provide BMD's to the State of Georgia?

20          MS. JOHNSON:  He stated he wasn't aware

21   who the State of Georgia had a contract with.  You

22   can answer.

ROUGH DRAFT          20

1    A. Yeah, I don't know who the contract's

2   with.

3    Q. Have you interacted at all with Dominion?

4    A. No.  Wait.  Scratch that.  We had a

5   representative of Dominion at a State Election

6   Board meeting to testify, and he answered some of

7   my questions.  So I guess that's an interaction,

8   but other than that, no.

9    Q. Have you inspected one of the BMD machines

10   before?

11    A. I've seen them and I've used them.

12    Q. Do you know how the BMD machines are

13   programmed?

14    A. No.

15    Q. That's not something that you discussed

16   with other State Election Board members?

17    A. We did have a question about adjusting

18   the -- how it reads a mark, but I didn't discuss

19   programming other than just the general idea of

20   that you want to have it read this much.  But how

21   you accomplish that through programming I have no

22   idea.

ROUGH DRAFT          23

1     Q.  Would you support the use of an election

2   equipment that could be hacked in such a way that

3   both the QR codes and the human readable text could

4   be altered?

5        MS. JOHNSON:  (Inaudible.)

6        THE REPORTER:  I'm sorry.  I couldn't hear

7   you, Melanie.

8        MS. JOHNSON:  Object to form and lack of

9   foundation.

10     A.  Well, spec- -- all right.  Ask me the

11   question again, please.  Just repeat the question.

12     Q.  Would you support the use of an election

13   equipment that could be hacked in such a way that

14   both the QR codes and the human readable text could

15   be altered?

16        MS. JOHNSON:  Objection.  You can answer.

17     A.  If it was a theor- -- if it was a

18   theoretical possibility, it would just depend on a

19   lot of other factors, but you have the voter who

20   checks it.  So it would be really strange to have a

21   system that alters it before the voter looks at it

22   and the voter doesn't know -- none of the voters

ROUGH DRAFT          24

1    that look at it notice.  That just would -- I just

2    can't -- I just can't anticipate that that could be

3    possible.

4        Q.  How about a system -- sorry.  Strike that.

5         So just going back on your previous

6    answer, you noted that you couldn't anticipate that

7    it would be possible, but regardless of whether you

8    can anticipate that it's possible, let's assume it

9    is possible.  Would you support the use of an

10   election equipment that could be hacked in such a

11   way that both QR codes and human readable text

12   could be altered?

13       MS. JOHNSON:  Object to form, misstates

14   his prior testimony, lack of foundation, and

15   relevance.

16       A.  Yeah.  I just -- I don't think it's

17   possible to have a system where you hack and none

18   of the voters who review their ballots don't catch

19   that it's -- that it's switched.  The voters are

20   too concerned about their votes.  We had so many

21   questions about calibrations on the DRE's, the

22   voters were all over it.  So I can't support or --

ROUGH DRAFT          25

1   or oppose a system that's just not possible.

2     Q.  Understood.

3        You testified a few minutes earlier that

4   you understood that only -- initially only the QR

5   codes are tabulated and not the human readable

6   text, correct?

7     A.  The scanner reads the QR codes, correct.

8     Q.  Okay.  So would you support the use of

9   election equipment that could be hacked in such a

10  way that only the QR codes are altered but the

11  human readable text shows the voter's intent?

12      MS. JOHNSON:  Same objection.

13    A.  If I knew -- if I knew that it was

14  possible -- if I knew it was happening -- scratch

15  that.

16      If I knew it was possible to do that, that

17  would not be a system that I support.  I would want

18  to know -- I would want to know more information as

19  to how somebody's marketing a system that that

20  could happen.  How did that -- how did that meet

21  the request -- how did that meet the proposal,

22  request for proposals.

ROUGH DRAFT          36

1   people's representatives in the General Assembly to

2   choose that as a method.  I don't object to it as a

3   method, but I would object strenuously to it being

4   as the sole method.

5       Q.  If you found out after an election that

6   your vote had not counted, would that concern you?

7       A.  Yeah.  I would want to know why.

8       Q.  What if you found out that your vote had

9   been counted for a different candidate, would that

10  concern you?

11      MS. JOHNSON:  Objection.  These questions

12  are outside of Mr. Mashburn's role as a State

13  Election Board member, but you can answer.

14      A.  Well, it's a secret ballot.  So I don't

15  know how -- I don't know how that -- I don't even

16  know how that would be discovered.  Would I

17  discover it or would they discover it?  Who would

18  discover it?

19      I'm not supposed to ask you question, I

20  realize.  I'm sorry.  I breached deposition

21  protocol.  I'm sorry.  I asked rhetorically.  I ask

22  rhetorically, not of you, but rhetorically how

ROUGH DRAFT          47

1   retained by both parties in this litigation?

2       A.  Yes.

3       Q.  Do you know who those experts are?

4       A.  No.

5       Q.  Have you discussed the retention of

6   experts in this litigation with members of the

7   State Election Board?

8       A.  Not to my knowledge.

9       Q.  So how did you become aware that experts

10  have been retained by both parties in this

11  litigation?

12      A.  I think I read it in an Atlanta Journal

13  article.

14      Q.  And so do you know who the experts are

15  that have been retained?

16      A.  No.

17      Q.  Are you familiar with Alex Halderman?

18      A.  No.

19       THE REPORTER:  What was the last name,

20  Tamara?

21       MS. WIESEBRON:  Halderman, H A L D E R M A

22  N.

ROUGH DRAFT          48

1          THE REPORTER:  Thank you.

2      Q.  And so you're not aware that he provided

3   an expert report in this litigation?

4      A.  No.  Sorry to have interrupted you.  I

5   apologize, but no.

6      Q.  All right.

7          And do -- so you're not aware that he is a

8   cybersecurity expert?

9      A.  I don't know him.

10      Q.  Okay.  And would you be interesting --

11   interested to find out what is in his expert

12   report?

13          MS. JOHNSON:  Object to form.  You can

14   answer.

15      A.  If I -- yeah.  If I knew who he was and I

16   knew if he had anything relevant, sure.  I'm always

17   up to reading anything that I can -- anything I can

18   read to educate myself.

19      Q.  And so you mentioned earlier that you're

20   not familiar with what this case is about?

21      A.  Not offhand, no.

22      Q.  And have you discussed this case with

ROUGH DRAFT            49

1   other State Election Board members?

2       A.  Not that I particularly recall this case.

3   We do have executive sessions where counsel comes

4   in and briefs the board on pending litigation, but

5   we've been sued a lot.  So this case doesn't stand

6   out in my mind.

7       Q.  Got it.

8          And have you personally discussed this

9   case with anyone?

10      A.  No particular conversations come -- come

11   to mind.  I suspect that if somebody came and said,

12   hey, I talked to you about this, I wouldn't have

13   any information to dispute them, but I don't recall

14   any particular conversations about this particular

15   case other than I talked to the lawyer yesterday or

16   the day before that I was having a deposition.

17      Q.  Do you know anything about the serious

18   vulnerabilities that Mr. Halderman found?

19         MS. JOHNSON:  Object to form.  You can

20   answer.

21      A.  I don't know anything about Halderman.

22      Q.  Would you be interested to know what those

ROUGH DRAFT        50

1   serious vulnerabilities are?

2        MS. JOHNSON:  Same objection.

3        A.  Sure.  If he's -- if he's -- if it's a

4   credible person who has relevant information, I

5   would be interested -- always interested to hear

6   it.  We get a lot of crack pots, but if he's -- if

7   he's -- if he's wise and has good data, I'm always

8   interested to hear it.

9        Q.  Do you know whether the State Election

10  Board or anyone from the Secretary of State's

11  office has done anything to remedy the

12  vulnerabilities pointed out by Mr. Halderman?

13        MS. JOHNSON:  Same objection.

14        A.  I wouldn't know.

15        Q.  Are you aware --

16        A.  I mean, if -- if I don't know about him, I

17  don't know about his recommendations, I wouldn't

18  know that I was instituting his recommendations,

19  but we might have instituted something of his

20  recommendations without me knowing it was

21  attributable to him.  So it's hard to -- hard to

22  know.  Or he might have had the same idea as

ROUGH DRAFT          65

1      Q.  Okay.  Do you know whether they compared

2   each single paper ballot to the machine recorded

3   ballot?

4        MS. JOHNSON:  Object to form.

5      A.  Yeah.  My recollection was they did them

6   in batches.

7      Q.  Okay.  So just to clarify, you did not

8   hear from the Secretary of State that they compared

9   every single paper ballot to that same single

10   machine recorded ballot, right?

11      A.  Yeah.  I would have -- I would have

12   thought that would have been a very time-consuming

13   waste of time to run each ballot individually

14   through the machine.  I would think that would take

15   forever.

16      Q.  Understood.

17        Let's see.  Okay.  Are you aware that

18   malware could be introduced to BMD machines through

19   USB sticks?

20        MS. JOHNSON:  Object to form.  You can

21   answer.

22      A.  In different contexts, in artificial