1
2
3
4
5
6
7
8
9
10   The following is the PDF of an official transcript.   Official
11   transcripts may be filed in CM/ECF only by the official Court
12   Reporter and will be restricted in CM/ECF for a period of 90
13   days. You may cite to a portion of the attached transcript by
14   the docket entry number, referencing page and line number,
15   only after the Court Reporter has filed the official
16   transcript; however, you are prohibited from attaching a full
17   or partial transcript to any document filed with the Court.
18
19
20
21
22
23
24
25

1

1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF GEORGIA
2                         ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,        )
              PLAINTIFFS,         )
5                                 )    DOCKET NUMBER
            ,                     )
6            -v-                  )    1:17-cv-2989-AT
                                  )
7   BRAD RAFFENSPERGER, ET AL     )
              DEFENDANTS.         )
8                                 )

9

10

11        TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

12           BEFORE THE HONORABLE AMY TOTENBERG,

13           UNITED STATES DISTRICT SENIOR JUDGE

14                   FEBRUARY 2nd, 2022

15                      11:30 a.m.

16

17

18

19

20          Proceedings recorded by mechanical stenography,

21   transcript produced by computer.

22

23            Melissa A. Brock, RPR, RMR,
              Federal Official Court Reporter
24          75 Ted Turner Drive, SW, Suite 1946
              Atlanta, Georgia 30303-3309

25

1                    APPEARANCES OF COUNSEL:

2

3   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
    SCHOENBERG:

4

5        DAVID D. CROSS
         MORRISON & FOERSTER, LLP

6

7        ADAM M. SPARKS
         KREVOLIN & HORST, LLC

8

9

10  FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA
    DIGGES, WILLIAM DIGGES, III, AND RICARDO DAVIS:

11       BRUCE BROWN
         BRUCE P. BROWN LAW

12

13       ROBERT ALEXANDER McGUIRE, III
         ROBERT McGUIRE LAW FIRM

14

15  FOR THE STATE OF GEORGIA DEFENDANTS:

16
         CAREY A. MILLER
17       ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

18

19  FOR THE FULTON COUNTY DEFENDANTS:

20       CHERYL RINGER

21

22

23

24

25

1       THE COURT:  Good morning.  This is Judge Totenberg on
2  the phone.
3       Mr. Martin, can you tell me whether counsel are
4  present.
5       COURTROOM DEPUTY:  All right.  Thank you, Judge.
6       Good morning, everyone.  We are here for the
7  teleconference in Curling v. Raffensberger, Civil Action No.
8  17-cv-2989.
9       Starting with the Curling plaintiffs, which counsel
10 do we have on the call?
11      MR. SPARKS:  This is Adam Sparks with Krevolin &
12 Horst.
13      COURTROOM DEPUTY:  Good morning, Mr. Sparks.
14      Who else do we have?
15      MR. SPARKS:  I believe we are expecting Mr. Cross as
16 well.  He may be wrapping up a deposition.
17      COURTROOM DEPUTY:  All right.  Coalition plaintiffs.
18      MR. BROWN:  Bruce Brown for the Coalition plaintiffs
19 along with Rob McGuire.
20      COURTROOM DEPUTY:  Okay.  Good morning, Mr. Brown.
21      MR. BROWN:  Good morning.
22      COURTROOM DEPUTY:  All right.  State of Georgia.
23      MR. MILLER:  This is Carey Miller here on behalf of
24 the State Senate.
25      COURTROOM DEPUTY:  Okay.  Who is with you this

1  morning, Mr. Miller?

2        MR. MILLER:  I am not sure I have got anybody else on

3  the line with me.

4        THE COURT:  Okay.  Great.  Thank you.

5        Fulton County?

6        MS. RINGER:  Cheryl Ringer on behalf of Fulton

7  County.

8        COURTROOM DEPUTY:  And is it just you, Ms. Ringer?

9        MS. RINGER:  I believe so.

10        COURTROOM DEPUTY:  Okay.  Great.

11        Judge, we've got everybody represented.

12        THE COURT:  All right.

13        MR. CROSS:  Your honor, this is Mr. Cross.  I think

14  I -- I was trying to announce myself.  I'm on the line, too.

15        THE COURT:  Great.  Thank you.

16        COURTROOM DEPUTY:  Thank you, Mr. Cross.

17        THE COURT:  Mr. Miller, do you want us to wait for

18  anyone else?  Any other counsel for the State?

19        MR. MILLER:  No, your Honor.  Unfortunately, we've

20  got -- being pulled in a few different directions today.

21        THE COURT:  Yeah.  I imagine.

22        MR. MILLER:  I've drawn the short straw.

23        THE COURT:  That's all right.  That's quite all

24  right.  So counsel, can you give me an update where you are

25  relative to communication with CISA or CISA?

1       MR. CROSS:  Your Honor, this is Mr. Cross.  We -- the

2 parties spoke yesterday after the conference, and folks will

3 correct me if I'm wrong, my understanding is that everybody

4 agrees that the full report should go out to CISA immediately.

5 So we are prepared to do that as soon we have your Honor's

6 permission.

7       And then beyond that, we can talk to, I guess, what

8 else happens to it, but we're all agreed on that, is my

9 understanding.

10       THE COURT:  All right.

11       MR. CROSS:  And that can happen.

12       THE COURT:  All right.  Well, that's fine.

13       And plaintiffs are authorized to immediately transmit

14 it, too, but I would like to know who else it's going to.

15       MR. CROSS:  Okay.  Your Honor, we will do that.  It

16 will go through the formal process that was laid out in that

17 letter.  I am not an expert on that, but we will confirm with

18 the Court and the parties once that's done and give you any

19 information we have on that.

20       THE COURT:  All right.  And so, you agree on that,

21 but what about this timeframe?  That was the issue that we --

22 that was sort of hanging and I thought you all were going to

23 try -- one, that you were going to try to negotiate some

24 process for how you were going to deal -- address that with

25 CISA.

1          MR. CROSS:  Yes, your Honor.  This is David Cross

2    again.  I think the plaintiffs are relying and I believe the

3    Coalition put something in shortly before this call to their

4    parties or to their clients.  Your Honor may not have had a

5    chance to look at it.

6          THE COURT:  I did look at it but, you know, they're

7    hot to trot so.

8          MR. CROSS:  Yes.

9          THE COURT:  So I want to understand.  Is this, in

10   fact, the timeframe that CISA can live with and -- or is this

11   just wishful thinking?

12         MR. CROSS:  My understanding, your Honor, is that

13   what CISA indicates -- and this is what Dr. Halderman has

14   informed me, CISA indicates that I think its normal process is

15   45 days or maybe that's -- I can't remember if that's the

16   minimum or the normal process for its disclosure.

17         And so they explained in that letter they do have

18   transparency obligations.  My understanding is that ultimately

19   CISA itself will have to make some or all of the report

20   public, and that typically would happen in about 45 days.

21         The reason we think 30 days is appropriate is because

22   normally in that situation, normally the way this works is

23   CISA will be getting a report and then CISA will be going to

24   the constituents like the voting manufacturer, the machine

25   manufacturer, in the first instance, and so Dominion would be

1  learning about this at the same time that CISA is.

2       And so then that needs time to play out.  Since

3  Dominion has had the redacted version of the report since, I

4  think, early December, our view is Dominion is certainly aware

5  of this.  They would be further along in their own internal

6  processes in dealing with it and so CISA will need less time

7  and we are only shaving off about 15 days.

8       THE COURT:  When did Dr. Halderman last speak with

9  anyone at CISA?

10      MR. CROSS:  When he and I spoke on Monday, I think he

11 said the last time he had a conversation with someone was

12 maybe a couple -- a week or two ago, but it was not a

13 substantive conversation.  I think it's been a while since

14 he's had a substantive communication and that was before the

15 letter that came in.  Sometime before that letter.  Weeks,

16 weeks actually before that letter came in.

17      MR. MILLER:  Your Honor, this is Carey Miller for the

18 State.

19      THE COURT:  Yes.

20      MR. MILLER:  I do want to make clear that for my

21 client's position, our -- as far as sharing the report with

22 CISA, there's no real concern there, but to the extent that

23 there is -- and I have not had time to really digest what the

24 Coalition plaintiffs filed shortly before we got on here, but

25 to the extent that is delaying the release of the report,

1   respectfully, your Honor, it just does not solve the problem

2   for my client, which is the innuendo surrounding the report.

3            MR. BROWN:  Your Honor, Bruce -- sorry.  Go ahead,

4   David.

5            MR. CROSS:  I was going to say, I guess two things.

6   One, I'm not clear what Mr. Miller means when he says

7   innuendo.  We heard that in the call last night, but we have

8   not gotten an explanation of that.

9            The public has been aware of the report at a general

10  level since, I think, August of last year since they,

11  themselves, have pointed out, because Mr. Hald --

12  Dr. Halderman's reply declaration was not sealed, which I

13  don't know what's changed suddenly that the State has done a

14  reversal and we've not gotten an explanation, but the 30 days

15  we do think is important.

16           The one thing I want to be clear if -- and I'm sorry,

17  your Honor.  The one point I do think --

18           THE COURT:  No, go ahead.

19           MR. CROSS:  What is really important to us to

20  Dr. Halderman because Dr. Halderman, his integrity and

21  credibility has been directly attacked publicly by the

22  Secretary's office.  And the only reason I bring that up is

23  because we agree with the State that the report does need to

24  be made public in relatively short order.  Because Dr.

25  Halderman needs to be a position to defend his work and defend

1  his professional integrity, and we fully anticipate the report

2  will do that.

3        The reason for the 30 days is we think CISA, as I

4  indicate, they usually want a period of about 45 days.  They

5  do need some time to be able to work with Dominion to

6  communicate with other Secretarys of State that have these

7  machines in limited use.  And so we think that period is

8  important.

9        But what I do not want to have happen is that they're

10  going to be statements from the Secretary saying that

11  Dr. Halderman or the Curling plaintiffs have retreated and

12  they're somehow now trying to hide this.  That is not at all

13  what's happening.  Frankly, we would defer to the Secretary,

14  if we thought he was making an election security decision on

15  this report rather than a political decision.

16        MR. MILLER:  Your Honor, I'm sorry.

17        THE COURT:  All right.  Let me stop everybody here.

18  All right.  Let me stop everybody.

19        I had a phone conference with you all on Monday.  On

20  Monday, everyone understood that -- the Court's concerns and

21  you seemed to agree with them, whether you want to both

22  maximize transparency and also maximize the security of the

23  election system, and that is Court's goal.  And it is a

24  difficult balancing act.  I believe that sending it to CISA

25  for this purpose so that they can basically make the

1  independent decision of what should be -- how to do that

2  balancing act is appropriate.

3  　　　　All I was asking about was, you know, who's been in

4  contact with them.  I had hoped that you might jointly do it,

5  but I -- that was apparently a false hope.  But it is -- I'm

6  not here to have everyone with -- sort of slugging it out

7  about this.  It's not helpful to resolve this specific issue.

8  　　　　Everyone agrees it should go to CISA.  I would like

9  some confirmation that CISA can do it in 30 days.  That's all.

10  I mean I'm not holding it back from going to CISA.  It should

11  proceed today, but I would like a representative from CISA

12  and/or counsel to basically -- and we -- and, of course, they

13  had filed a letter on the record indicating their willingness

14  to go ahead and review this material.

15  　　　　I don't know what they're going to do with it, but I

16  was hoping that they would identify in their judgment, what

17  was proper to be -- to be disclosed and what needed to be

18  redacted, at least their recommendations to the Court because

19  of security issues.

20  　　　　And, obviously, Dr. Halderman should -- his

21  recommendations should be provided to them, because they

22  should get the redacted and non-redacted copy so that they can

23  see it, but, I didn't think that was sufficient, so -- the

24  redactions proposed, for purposes of protecting the security

25  of the system.  And as I said to you then, I wanted the State

1  to actually look at it and propose something themselves.

2          I have lots of proposals -- you know, concerns about

3  normally expressed by the Secretary of State's Office

4  regarding security issues and protecting the security of the

5  system, so that's what I anticipated.  And the Secretary of

6  State's Office could communicate its concerns as well to CISA,

7  anything that they thought, and both parties will share it

8  with each other.

9          But that's, that's what I envisioned, and that's what

10 I'm going to require, and I will just ask -- since CISA has

11 appeared on the docket, and I didn't get you all to basically

12 communicate together with a representative of CISA, and I

13 can't just ask Dr. Halderman to be the Court's representative,

14 that's not proper, I will do something to that effect.

15         I don't think there's much more I can say at this

16 juncture and I can't, you know, in terms of everyone's own

17 concerns, whether it's reputational or political or -- which

18 is also representational, I -- you know, that's -- I can't

19 address that.

20         I think that the public's entitled to have a

21 understanding of the general matters covered in the report --

22 but, as I said before, but I'm not trying to go through all

23 the details of what exploit that for adverse manipulative

24 purposes, whether from a foreign state or in a bad act or in

25 the United States.  That's the sum total of it.

1          MR. MILLER:  Your Honor, this is Carey Miller.  I

2    apologize.  If I may?

3          THE COURT:  Yes.  Go ahead.

4          MR. MILLER:  Your Honor, the real difficulty here is

5    we understand your Honor's concern.  My client has the same

6    concern and we've been talking for a long time in this case

7    about confidence in the election system.  And the discussion

8    around this, you know, super secret report has escalated to

9    the point where it is undermining confidence and my client's

10   position is the only way to battle back about that is radical

11   transparency.

12          And, your Honor, to that end as well, and I know we

13   raised this in the last conference that we had, but I would

14   like to renew our oral motion that we unseal the hearing

15   testimony of Dr. Halderman from the September 2020 hearing.

16          THE COURT:  All right.  Well, I will go -- I don't --

17   I -- frankly, I didn't recall the oral motion on the September

18   28th hearing, but I will certainly go back and look at it and

19   that maybe --

20          MR. MILLER:  Thank you, your Honor.

21          THE COURT:  Maybe certainly work, but I have to go

22   read it again.  Believe it or not, it is not in my -- every

23   word of it is not in my memory at the moment.

24          MR. MILLER:  I understand, your Honor.

25          THE COURT:  And are you searching only for Dr.

1  Halderman's testimony to be unsealed or everyone's testimony
2  from the rest of the hearing to be unsealed?
3          MR. MILLER:  Your Honor, at this point, I think it's
4  prudent that we go ahead with the entire hearing.  If your
5  Honor would prefer, we can identify, you know, in a formal
6  filing, the specific line numbers.  I would have to refresh my
7  memory as to exactly which portions are sealed.
8          But, your Honor, my client's position is that a lot
9  of this has been taken out of context and that a selective
10 publication of something like the report should also be
11 accompanied by the full context of the prior testimony.
12         THE COURT:  Okay.  Well, why don't you make a formal
13 motion, and, I mean, if it's everything, it's everything.  I
14 will be able to find that out.  But if there is something that
15 you are saying not, then I'd like -- I want to make sure what
16 the contours are.
17         MR. MILLER:  We can do that, your Honor.
18         THE COURT:  And I'm happy to look at it as soon as
19 you file the motion.  It doesn't have to be long.  And I
20 assume --
21         MR. MILLER:  Yes, your Honor.
22         THE COURT:  -- plaintiffs are not going to object?
23         MR. CROSS:  Your Honor, this David Cross.  We do not
24 object to that.  We agree with that.
25         I do want to make sure that it's clear that the only

1  reason any of that is sealed is because the Secretary insisted

2  on it being sealed.

3       MR. MILLER:  That's correct, your Honor.  This is

4  Carey Miller and, you know, we acknowledge that.  The reality

5  is we respectfully didn't think a lot of this should have

6  gotten to the point that I did, but we are here now.  And as

7  we raised at the last conference, that, frankly, the benefit

8  of the seal has really been vitiated by the surrounding

9  conversation around it.

10       And with respect to the clarification on the

11  innuendo, what Mr. Cross mentioned is exactly our Exhibit A of

12  the innuendo where a rebuttal report summarizing the -- Dr.

13  Halderman's work and the underlying report was served and then

14  sent around to every elections director throughout the State

15  telling them that you can't use the system in an upcoming

16  municipal election.  So that's the type of issue that we are

17  talking about.

18       THE COURT:  Okay.

19       MR. CROSS:  And, Your honor, if I could -- this is

20  Mr. Cross.  In fairness to Mr. Miller, I want -- we did not

21  know that.  My client -- the first I learned of anything from

22  Dr. Halderman had gone to the counties was literally like two

23  days ago.  We didn't do that.  We didn't authorize that.  I

24  understand Mr. Miller's concern on that and I'll just leave it

25  at that.  We had nothing to do with that and had no idea it

1   happened.

2           THE COURT:  So somebody -- somebody other than the

3   Curling's plaintiff distributed it?

4           MR. CROSS:  Yes, your Honor.  Yes, that's correct.

5           MR. MILLER:  Your Honor --

6           MR. CROSS:  I'm sorry.  Go ahead, Carey.

7           MR. MILLER:  Your Honor, as I understand the fact

8   pattern so to speak, I don't doubt Mr. Cross that he wasn't

9   aware of it when it went out.  We had a conversation, you

10  know, amongst counsel over email where there was some

11  questions about some comments of Mr. Sterling that we pointed

12  it out to counsel for the Curling and Coalition plaintiffs

13  that the discussion he was referring to regarding

14  Dr. Halderman was the rebuttal report that was pushed out by

15  the Coalition for Good Governance to all the counties, and

16  it's still hosted on their website.  That's what I was

17  referring to.

18          MR. CROSS:  Yeah, I'm sorry, Carey.  I recall that

19  discussion.  We weren't aware that it went to the counties.  I

20  knew that Mr. Sterling had talked about the August reply but

21  it was not clear to us, certainly to me or my client, that it

22  had gone to the counties.  In any event, I understand your

23  concern about that, Carey.  We're not pushing back on that.

24          The two things I wanted to come back to, your Honor,

25  if we could, again it sounds like the parties are in agreement

1   on this, although it sounds like the State goes a little

2   further than we do.

3        All the parties agree that the report needs to come

4   out quickly.  The only distinction between us is Curling and

5   Coalition are suggesting a 30-day period versus -- and I

6   understand from Mr. Miller the State thinks it should come out

7   immediately.

8        We do think it's really important your Honor sets a

9   clock.  And the reason for that is CISA's process doesn't

10  work, I think, quite as your Honor envisions.

11       The report will go to them.  They are going to go

12  through their process.  It's not their process to put out a

13  formal report on that it will come back and report back in any

14  way.  Still work with whoever they work with as part of that

15  process and then they'll ultimately make a

16  determination themselves.

17       THE COURT:  They will ultimately make a what?

18       MR. CROSS:  So my understanding is they ultimately

19  will make some or all of the report transparent themselves.

20  But given all the parties agree here, including the Secretary

21  himself who we all acknowledge is the ultimate person

22  responsible for possessing election security in Georgia, given

23  we have an agreement at that high of a level that this report

24  should become public either immediately or within 30 days, we

25  do think it's very important your Honor sets a deadline.

1  Because what we don't want to have happen is this goes to

2  CISA, CISA, as agencies can do because they are quite busy and

3  certainly in the current environment I'm sure CISA is very

4  busy, we don't want this to sit for more than 30 days or for

5  months because you're waiting for something from CISA to

6  release the report, given everyone agrees it should come out

7  in no more than 30 days.  So we would ask that we set that

8  deadline.

9        THE COURT:  All right.  My question is this, though,

10  I understand everyone agrees on this except the State would be

11  ready for it to come out tomorrow.  Is -- what is CISA going

12  to do with it?

13        It seems -- this seems a little bit different than

14  what I heard on Monday.  So, when they -- if they are through

15  in 30 days or whatever it is, they will do what with the

16  report?  What is my understanding of -- your understanding of

17  the process?

18        MR. CROSS:  So what CISA will do is my understanding,

19  their job is to take this type of threat assessment with

20  election security and they will read the report and then

21  they'd go out to anyone who has some sort of interest in that.

22        So if Dominion, for example, is a manufacturer,

23  Secretarys of State would use these machines, and if they

24  determine that there are vulnerabilities that required

25  mitigation -- we expect they will -- it may be disagreement on

1  that, but if they conclude that, then they will work with

2  Dominion, Secretarys of State and anyone else who has, you

3  know, some responsibility for that equipment and election who

4  will work with them to mitigate those vulnerabilities and to

5  make sure that everyone who's involved in the elections

6  understands these vulnerabilities, understands what they

7  needs, understands the risk and then take mitigation measures.

8          That process may play out over a lot more than 45

9  days.  The transparency, as I understand it, typically comes

10 in around 45 days, but that transparency may come while the

11 mitigation measures are still underway.  That's my

12 understanding of it.  And so, again -- I'm sorry.  Go ahead.

13         THE COURT:  Well, my -- what you indicated before was

14 that they would take it upon themselves to make a part of at

15 least some portion of the report public, what they thought was

16 appropriate.  But I'm not hearing anything about that now.

17         MR. CROSS:  No, they will.  Sorry, they will.  They

18 will do that.  And, your Honor, I just got a question -- an

19 answer to a question you asked me a moment ago.

20         Mr. Halderman, Dr. Halderman tells me that he was

21 just emailing with Geoff Hale, who's the Head of CISA, and

22 CISA indicates that they will work around your Honor's

23 schedule constraints, if necessary.

24         THE COURT:  Excellent.

25         But, what is -- what can I expect at the end of this

1  in terms of the parties desires to make this report public or

2  some version of the report that is safe to make public, for

3  purposes of protecting the security of the election

4  infrastructure?

5         MR. CROSS:  So my understanding of sort of the steps

6  that I think we are all generally agreed on, your Honor, is it

7  goes to CISA today and Dr. Halderman can submit it through the

8  formal process that was laid out by CISA in the letter.  CISA

9  will then review it, digest it, meet with the stakeholders,

10 Dominion and others, and begin their process.  Sounds like

11 from Mr. Hale, they're prepared to move as quickly as they

12 can, understanding the time constraints with this case and

13 what the Secretary and others want.

14        And so -- and then at the same time, your Honor, we

15 would ask that no matter where CISA is in that process, in 30

16 days, the redacted version of report becomes public.  I

17 know -- it's not clear to me if Mr. Miller -- it's not clear

18 to me whether the Secretary is saying that the whole report

19 becomes public.  We do think the redactions are quite modest,

20 as your Honor saw.

21        THE COURT:  That's the whole point, is I'm trying to

22 figure out -- I thought you were -- you before were saying

23 that they would make a judgment also about whether those were

24 appropriate redactions, whether additional redactions were

25 necessary, what they would do in that regard.

1          So, I mean all I see is in their letter of January

2     20th, it says CISA has specific statutory authority to

3     receive, analyze, and disseminate information relating to

4     cyber security risk and function of the federal civilian

5     interface for the multi-directional and cross-sector sharing

6     of such information.

7          So, I'm just trying to figure out -- and then it goes

8     on about CISA's vulnerability disclosure process.  It's very

9     lengthy, but I'm -- so I'm not expecting you to go through all

10    that with me.  I'm just trying to determine based on

11    Dr. Halderman's experience, because I don't know that you know

12    exactly at this point, at the conclusion of their review on an

13    expedited basis, are we going to see -- are they are going to

14    issue their own version of what they believe is an appropriate

15    digestible, meaningful report with only those portions that

16    they believe are -- that need not to be disclosed because

17    they -- because malicious cyber actors may independently then

18    proceed to exploit any other vulnerabilities identified in the

19    system?  Are they going to do that?

20         MR. CROSS:  Sorry.  I was going to say, I realize

21    Dr. Halderman is actually on this call.  So instead of me

22    bumbling though this, I think I misunderstood when he was

23    saying about Geoff Hale.

24         Do you want to just let him answer that question?

25         THE COURT:  Sure.  Sure.

1          MR. CROSS:  Go ahead, Dr. Halderman.

2          DR. HALDERMAN:  Hi, your Honor.  Good morning.

3          THE COURT:  Good morning.

4          DR. HALDERMAN:  So, a coordinated vulnerability

5    disclosure process such as CISA is usually working with the

6    parties who are making the disclosure in order to honor their

7    desire that the information be used constructively and then

8    afterwards become public.  Typically, the parties making the

9    disclosure indicate a timeline and -- which could be shorter

10   or longer.  CISA will work with the manufacturer.  Will work

11   with effective jurisdictions to share information with them

12   and to receive information also about constraints surrounding

13   mitigation.  And that would be communicated back to the

14   reporters and other interested parties through the process.

15          CISA's description of their process, their

16   documentation says that they would typically share the

17   disclosed information publicly as soon as 45 days, and that's

18   their -- what they've documented.  My understanding is that

19   they can sometimes move even faster than that.

20          But, CISA's responsibility is about sharing

21   information and getting it to the people who need it.  I would

22   expect that their process would be one that could adapt to the

23   needs of the Court and that -- more process involving the

24   parties and their disclosure concerns could take place in

25   parallel.

1          I think they would be extremely -- in my experience

2    is that itself, usually an organization like that doesn't take

3    responsibility for releasing the full original report

4    themselves.  They would release information about its

5    findings.  And so the release of the full report would be the

6    responsibility of the parties and the Court apart from CISA's

7    process which is at some point publicly document the

8    vulnerability and the mitigation that have taken place.

9          THE COURT:  All right.  Dr. Halderman -- I mean I'm

10   delighted that CISA would be involved, but at the end of their

11   review or in the middle of it when they are -- are they going

12   to give me any or the parties, any assistance in identifying

13   the elements of your report that should, in its view, would

14   make -- would not be appropriate to be disclosed because it

15   would enable malicious actors to intervene in the system?

16         DR. HALDERMAN:  In my experience with coordinated

17   vulnerability disclosure, it's common if there are concerns

18   about harm from further disclosure that that would be

19   communicated back from the disclosing agency, that's CISA in

20   this case, to the people who reported the issues, and I would

21   be very happy to make any concerns, to bring any concerns that

22   CISA expresses to attention of the Court.  I understand that

23   CISA is -- appears to be hesitant to inject themselves into

24   the middle of this case, of course, because of the obvious

25   separation of powers concerns, but to the extent that they

1  communicate any hesitancy to me, I would be very happy to make

2  that, bring that to your Honor's attention.

3      THE COURT:  Well, I would think that the Secretary of

4  State's Office would also want to actively be a part of that

5  communication, and, obviously, separately likely because

6  that's the way things are in this case, but, I would hope that

7  that would be so, so we could get something productive.  It's

8  one thing to say we are going to wait 30 days or thereabouts

9  to get some information back about this but -- and I would

10 expect CISA would be working on things after that, but there

11 is the immediate issue of my trying to understand what they

12 believe beyond what you may believe, Dr. Halderman, what they

13 believe should be actually not disclosed for security reasons.

14     DR. HALDERMAN:  That makes sense, your Honor.  I'm

15 sure that CISA will -- would in their normal process,

16 communicate with Georgia election officials.

17     I do want to just correct for the record.  I think

18 Mr. Cross misunderstood my -- the context of my communication

19 with Geoff Hale.  CISA did not -- CISA did not themselves tell

20 me that they will work around our scheduling constraints, but

21 that's my experience from similar CBD programs in the past.

22     MR. MILLER:  Your Honor --

23     THE COURT:  I'm sorry.  Is that Mr. Miller who's

24 trying to talk or Mr. Cross?

25     MR. MILLER:  Yes, your Honor.  This is Carey Miller.

1  I don't want to interrupt but at the appropriate time.

2          THE COURT:  All right.  Are you through,

3  Mr. Halderman, Dr. Halderman?

4          DR. HALDERMAN:  I just wanted to say that based on my

5  experience in the past with such disclosures, probably the

6  most helpful thing would be for us to -- for your Honor to set

7  a tentative timeline on when you would like to see the

8  findings disclosed if -- unless there is a concern raised from

9  CISA, and that will help set their timeline and give it a

10  concrete -- a concrete sending point.

11          THE COURT:  All right.  Mr. Miller.

12          MR. MILLER:  Your Honor, I just want to clear up a

13  couple of points there.

14          First of all, Mr. Cross expressed some confusion as

15  to what the State was proposing for public release, and that

16  is the redacted version, as I understood it, Dr. Halderman had

17  determined was appropriate for public release.

18          The second -- and, your Honor, I will also say the

19  State has had some discussions with its vendor on a handful,

20  very minor redactions.  I think it's maybe totaling three

21  different pages, but nothing more significant than what's

22  already excluded.

23          Your Honor, as far as the, you know, process that

24  says, again, it simply just does not resolve my client's

25  position.  I think the Court understands that.  If this is the

1  process that the Court would prefer to go, we, of course,

2  would want to have that communication with CISA or Dominion.

3         However, it does occur to me that there's one group

4  of folks that's noticeably absent here, and that's CISA.  And,

5  your Honor, we went through the discussion last Fall.

6  Subsequent, they filed a letter that doesn't really take a

7  position on anything and doesn't really say a whole.  It just

8  says what the vulnerability disclosure is.  But it just occurs

9  to me, your Honor, that CISA is so longer -- remains not

10 before the Court.

11        THE COURT:  Right.  Well, that's what I had hoped

12 that you all were going to figure out, a way to get CISA

13 before me, frankly, when I asked to you all on Monday to use

14 Tuesday to try to deal with this between the Secretary of

15 State's Office and Dr. Halderman that there was going to be

16 some effort to try to do precisely that.  But, I would like to

17 see what the State -- the additional redactions that you are

18 proposing and I'm going to consider issuing an order asking

19 CISA -- I mean it's hard for me just to direct CISA to

20 complete something when they're not even before me, frankly.

21        So, even though they say they're willing to do this,

22 it is sort of like I'm sending this out into the wind, so it's

23 not that they have to be a party, but they -- this is -- it's

24 an odd posture that we're in.  So I'm going to have to think

25 about, since you all didn't resolve that for me, what I'm

1  going to do.  How about that?  All right.

2          So can you get me what Dominion is suggesting

3  either -- by tomorrow?

4          MR. MILLER:  Yes, your Honor.  We can cover that with

5  our client.

6          This is Carey Miller.  I do just want to raise one

7  initial thing.

8          THE COURT:  Okay.

9          MR. MILLER:  I think it was during the conference we

10  last had or a conference that we were on, the Court received

11  another Motion to Intervene from a hearing, I believe.

12          THE COURT:  Right.

13          MR. MILLER:  Your Honor, I would just raise that

14  while the Court is, you know, currently considering this, that

15  either to extend the time for a response or to abstain from

16  ruling on the intervention motion until we resolve this.

17          THE COURT:  I'm happy to do both.  I'm not going to

18  rule on -- rule on this until this is resolved.  But if you

19  need -- if you want to file something that -- on an extended

20  timeline, I'm happy to also accommodate that.  Just let me

21  know how many days.

22          MR. MILLER:  Yes, your Honor.  Yes, your Honor.  My

23  thought was an extension of time for the State's response

24  until this is resolved because we could be on a totally

25  different landscape at that point.  There may be no need for

1   it.

2           THE COURT:  All right.

3           MR. MILLER:  We can do that.

4           THE COURT:  All right.  Well, if you want to submit a

5   proposed order on that, I'm happy to look at it.

6           MR. MILLER:  Yes, your Honor.

7           THE COURT:  Okay.

8           MR. CROSS:  Your Honor, this is David Cross.  Two

9   quick things.  One, would it -- it sounds like there's

10  would --

11          THE COURT:  We didn't get what you said.

12          MR. CROSS:  Sorry.  Somebody needs to mute their

13  phone.

14          Would it be helpful to the Court if the parties try

15  to set up together a call with Geoff Hale or someone else in

16  CISA's office?

17          THE COURT:  Yes.  That's what I thought you were

18  going to do.

19          MR. CROSS:  I thought that's what you were suggesting

20  and I'm sorry that that was not clear.  We will coordinate

21  with the State and Coalition on that.

22          The other thing that I want to make sure that I think

23  we didn't get to yet is the report has been treated

24  as attorney eyes only.  Given --

25          THE COURT:  I'm sorry.  You are breaking up.  You are

1  breaking up.  Let me just finish this -- the phone call

2  business.

3         Mr. Miller, is the State willing to participate in

4  such a phone call?  So I don't want to sort of have any hope

5  that's going to happen if, in fact, the State is not willing

6  to do that.

7         MR. MILLER:  Yes, your Honor.  And I was having a bit

8  of difficulty following the discussion there, but just to

9  clarify, it was a phone call with CISA about what they are

10 going to do with the report.  Is that accurate?

11        THE COURT:  Well, what you are hoping and what --

12 basically to discuss the process and how fast they can move.

13        MR. MILLER:  Okay.

14        THE COURT:  And that's what I was hoping was going to

15 come out your conversation yesterday.  So if you could go

16 ahead and try to set that up, ASAP, that would be great.

17        MR. MILLER:  Yes, your Honor.  This is --

18        THE COURT:  Yes.

19        MR. MILLER:  Your Honor, this is Carey Miller again

20 and I think that would be fine by my client.  I haven't talked

21 to my client specifically about that.  However, it just --

22 again, and I know, your Honor, I think has moved past that but

23 it just does not resolve the issue that my client sees with

24 the way this report has taken a life of its own.

25        THE COURT:  And I understand, and -- but if you would

1  go ahead on that and you can file your motion and I don't know

2  what was distributed around the State but, if you want to also

3  bring that to my attention, you may do that.  But if you want

4  to just simply send, provide a copy to the Court, it doesn't

5  have to be filed, you can you just send it to my law clerk.

6  I'm just trying to follow the conversation, right.

7            MR. MILLER:  Yes, your Honor.

8            THE COURT:  Either way.

9            MR. CROSS:  Your Honor, this is David Cross.  The

10 other issue I was trying --

11           THE COURT:  Can I get counsel, though, to commit to

12 actually following up today and setting up the phone call by

13 tomorrow so that you can get back to me?

14           MR. CROSS:  Absolutely, your Honor.

15           MR. MILLER:  Yes, your Honor.

16           THE COURT:  All right.  Okay.

17           MR. CROSS:  The other issue, your Honor, is the

18 report has been treated as attorneys eyes only, which means

19 the only people who can read it are counsel and experts,

20 although, the State's client is now, I understand from the

21 last call, read it.  Dominion has it.

22           Given the State's position on this now, our clients

23 have not been able to read it in the past because of the

24 State's objection to that.  So we wanted to confirm that the

25 report now is, at most, reduced to the confidential

1  destination and so our clients can read it.  It certainly

2  helps us to be able to work with the State and work with your

3  Honor and CISA on a path forth.

4          THE COURT:  Is it going to end up being distributed

5  by them?

6          MR. CROSS:  Our client absolutely will not distribute

7  anything to anyone.  All we're asking is that it would be just

8  be my three clients would get to look at it, who have not yet

9  seen it and it will be treated as confidential under the

10  protective order until your Honor rules otherwise.

11          THE COURT:  What about the Coalition?

12          MR. CROSS:  Your Honor, we would share it with

13  Ms. Marks and that's it.

14          THE COURT:  All right.  Well, I need to see what has

15  been circulating around the state, frankly.  I want to

16  understand what I'm getting into with saying yes to that.  So,

17  I will take it under advisement.

18          MR. CROSS:  Thank you, your Honor.

19          MR. BROWN:  This is Bruce Brown.  Point of

20  clarification.  Counsel has agreed to engage with CISA as soon

21  as possible.  Would it be appropriate for Mr. Halderman to go

22  ahead right now and submit his two reports, one the redacted

23  report and the unredacted report to CISA to get that process

24  started?  Because I don't think that --

25          THE COURT:  That's fine.  That's fine.

1      MR. BROWN:  -- future process will change.  Thank
2  you.

3      THE COURT:  Do that.  You can go ahead and do that,
4  but I would like to -- you to as soon as you have made contact
5  with CISA and you have all talked, that you have -- I know
6  when you are going to be talking with them about this, so I
7  understand what's in front of us.  All right.

8      MR. McGUIRE:  Robert McGuire.  I know the Court said
9  you were taking under advisement the issue of sharing the
10  redacted report with principles of the parties.  And I
11  understand, you know, there's been a lot of talk about
12  innuendo on this call, and I just wanted to make it very clear
13  for the record that we have been -- we and our client have
14  been scrupulous about observing the protective order.  And so
15  nothing has been circulated that has not been made public, and
16  there is no allegation as far as I'm aware, that anyone,
17  especially on our side, has violated any provision of the
18  protective order related to matters are designated as
19  confidential or attorneys eyes only.

20      So I think if the Court is entertaining the
21  possibility of that having happened, I would ask that the
22  Court order people to put on the record what these allegations
23  are that the protective order has not been followed, because
24  we are not aware of any breach by our folks.

25      And, so, you know, we have been prejudiced

1   significantly by the protective order in our inability to

2   share designated material.  In a lot of cases, over-designated

3   material with our clients and chief officer.

4       So for us, you know, it's an important point that we

5   be able to involve our client in trial prep and in summary

6   judgment prep.  So we hope that, you know, if there is -- you

7   know, if the Court is considering the possibility that the

8   protective order has been violated, we should have an

9   opportunity to formally hear what those violations are so we

10  can respond and address them.  Thank you.

11      MR. MILLER:  Your Honor, this is Carey Miller.  To be

12  clear, I don't have any tangible evidence that the protective

13  order has been violated, but what I do know is my client is

14  fielding phone calls from members of the press that clearly

15  have had either access or a, you know, understanding that is

16  far beyond what is in the public rebuttal declaration.

17      How that came about, I do not know.  I cannot sit

18  here on this call as an officer of the court and make

19  accusations about that.  That's all I'm aware of.

20      THE COURT:  All right.  Well, I don't -- I don't know

21  what was being distributed that we talked about before in

22  terms of -- I'm assuming you are going to send it to my law

23  clerk and I will -- and I can't really -- this is always so

24  about what is shared with the media, but I don't know anything

25  about that, but I'm still taking it under advisement.  I'm

1  trying to act cautiously here, and I would like you to go

2  ahead and try to make your appointment for the phone call with

3  CISA to provide the information to the -- Dr. Halderman will

4  provide the information and then the State -- but we do need

5  to have Dominion's proposed redactions also, even if they are

6  very minor, so that can be sent over the CISA.  And please

7  copy each other when everything is sent.

8           I think it would be preferable if, frankly, if we

9  didn't end up putting Dr. Halderman exactly in this position

10 and instead counsel would send it on his behalf and

11 Dr. Halderman can just simply let his contact at CISA know

12 that it will be coming from -- who it's going to be coming

13 from, from counsel.

14          And, similarly, and everyone will copy each other and

15 similarly Mr. Miller, you'll share with them what your -- what

16 you all had thought was appropriate.  Okay.

17          And then, please, update the Court as to what your

18 timeframe is for talking with them, and we'll make up

19 another -- either a date for talking for Thursday or for

20 Friday ourselves again.  All right.

21          All right.  Thank you very much.

22

23   (Whereupon, the proceedings were concluded at 12:25 p.m.)

24

25

1

2

3

4

5

6

7

8

9

10  I do hereby certify that the foregoing pages are a true and

11  correct transcript of the proceedings taken down by me in the

12  case aforesaid.

13           This, the 4th day of February, 2022.

14

15

16                      /s/Melissa A. Brock
                        MELISSA BROCK, CCR, RMR, RPR
17                      OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25