# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CURLING PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS'
## MOTION FOR CLARIFICATION OR MODIFICATION
## OF THIS COURT'S ORDER, [DOC. 1348]

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

BACKGROUND ............................................................................................2

A. Dr. Halderman Demonstrated the Ease with which Georgia's BMD Voting Equipment Can Be Hacked ................................................2

B. Georgia's Secretary of State Misused a Report from Curling Plaintiffs' Counsel of a Potential Vulnerability involving Georgia's Election Systems to Wrongly Attack Political Rivals on the Eve of His Own Election ....................................................................................5

C. Some of State Defendants' Counsel in this Case Also Reportedly Represented the Trump Campaign in One or More Election Lawsuits involving the November 2020 Elections in Georgia .......................7

D. Curling Plaintiffs, Their Counsel, and Dr. Halderman Faced a Challenging Situation with How to Alert the Proper Authorities to Serious Vulnerabilities with Georgia's Voting Equipment Shortly Before the January 5, 2021 Senate Runoff Elections ..................................9

E. Curling Plaintiffs Promptly Contacted the Court, State Defendants, Coalition Plaintiffs, and Dominion for a Conference....................10

F. Curling Plaintiffs' Counsel Sent a Single Substantive Email to the Court's Former Clerk as the Clerk Directed and Expressly Indicated that the Email Could Be Shared with All Other Parties .......................13

G. State Defendants Raised No Concern and Requested No Information about this Issue During the Parties' Extensive Discovery Efforts in the First Half of 2021....................................................................20

H. State Defendants Raised No Concern and Requested No Information about this Issue Until August 16, 2021—the *Last Day* of Fact Discovery ....22

I. Curling Plaintiffs Fully and Timely Complied with the Court's Production Order ..........................................................................27

J. State Defendants Expressly Asked for More Discovery regarding this Issue, including Deposing the Court's Former Clerk....................29

ARGUMENT .................................................................................................34

CONCLUSION..............................................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Carranza v. Fraas*,
  763 F. Supp. 2d 113 (D.D.C. 2011) ............................................................ 38, 39

**Other Authorities**

Canon 3(A)(4) of the Code of Conduct for United States Judges ........ 34, 35, 36, 37

Introduction to the Code of Conduct for United States Judges ...................... 38 n.23

## INTRODUCTION

State Defendants' Motion is anything but a motion for clarification. It is a personal, public attack on the integrity of Curling Plaintiffs' counsel, this Court, and its former clerk, and it is premised on sanctionable misrepresentations. State Defendants brazenly ask this Court to enter *findings* that Curling Plaintiffs' counsel and this Court engaged in *ex parte* "communications [that] were improper both as a matter of procedure and substance" and that "State Defendants did not request this Court authorize a deposition of the Court's staff." The first defies the facts and the law, and the second is patently untrue. State Defendants also claim that the single substantive email with the Court's former clerk was "a personal and political attack on State Defendants and their counsel." This too is incorrect. Tellingly, State Defendants do not dispute anything in the substance of that email, all of which has long been public, known to State Defendants, and the subject of other filings.

This Motion is a frivolous distraction from the merits of this case and the overwhelming, undisputed facts of State Defendants' failure to take reasonable measures to secure the right to vote in Georgia, which will come to light when the parties finally address the merits of Plaintiffs' claims in this case (which State Defendants have delayed at every opportunity). Secretary Raffensperger and his

Office have engaged in a campaign of public attacks on Plaintiffs and this Court,[1] which his lawyers have effectuated in this case with tactics such as this. But there are no alternative facts in court—there is only one truth. This Court should reject State Defendants' effort to spin a new narrative at the expense of Curling Plaintiffs, this Court, and its former clerk.

## BACKGROUND

### A.   Dr. Halderman Demonstrated the Ease with which Georgia's BMD Voting Equipment Can Be Hacked

In the preliminary injunction hearing before this Court that occurred September 10-11 and 14, 2020, Dr. Halderman demonstrated a simple and effective way of hacking the Dominion BMD voting system Georgia implemented in 2019 after this Court enjoined the state from using its unconstitutional DRE

---

[1] *See*, *e.g.*, The John Fredericks Radio Show, *Broadcast Live from Georgia Secretary of State Brad Raffensperger Office* (Jan. 12, 2022), https://johnfredericksradio.libsyn.com/jfrs-daily-podcast-january-12-2022 ("But you have to understand that Judge Totenberg is a far-leftwing judge and she's taken senior status and won't be on the bench anymore, but, uh, she has morphed, allowed the *Curling* case to morph into the Dominion Voting Systems – we don't use the DRE machines anymore and somehow the Dominion machines got in there and it's just costing the Georgia taxpayers a lot of money."); Ga. Sec'y of State, *In High-Stakes Election, Atlanta's Newspaper Susceptible to Election Disinformation Campaigns* (Oct. 23, 2020), https://sos.ga.gov/news/high-stakes-election-atlantas-newspaper-susceptible-election-disinformation-campaigns ("Other federal judges have more accurately found that these same activists and 'experts' who are spreading disinformation in Georgia have zero credibility."). State Defendants identified no such judicial findings in discovery regarding Curling Plaintiffs.

system in 2020 and beyond.  (Dkt. 905 at 313:7-315:1.)  Dr. Halderman devised

and implemented that hack in the span of *only a few days*, immediately before that

hearing in which he testified.  So State Defendants knew as of September 2020 that

Georgia's BMD voting system was susceptible to a relatively simple hack that

could manipulate the QR codes on ballots used to tally votes cast by Plaintiffs and

other voters across the state.  (Dkt. 906 at 28:3-29:23.)  They also knew that voters

had no way of detecting that hack even by carefully reviewing their ballots because

it did not change the human-readable portion of the ballots, which is not used to

tabulate votes in Georgia.  (Dkt. 905 at 315:2-316:17; Dkt. 906 at 79:15-17.)  State

Defendants further knew that the audit procedures used in Georgia also likely

would not detect that hack since they do not compare the QR codes on the ballots

to the human-readable portions of those ballots and only a relatively small number

of ballots would need to be altered in a close, statewide race.  (Dkt. 906 at 65:8-25,

79:18-22.)  Dr. Halderman was clear in his September 2020 testimony that this one

vote-stealing vulnerability undoubtedly was just the tip of the iceberg, with many

more serious vulnerabilities yet to be uncovered.  (Dkt. 905 at 316:19-317:17,

320:24-322:11; Dkt. 906 at 31:12-18, 33:4-11, 47:7-16.)   He was tragically right.

Dr. Halderman continued his analysis of the Dominion voting equipment

used in Georgia's elections, as provided by Fulton County, into the fall of 2020.

By December 2020, it had become clear that the equipment is riddled with serious vulnerabilities that leave Plaintiffs and other Georgia voters susceptible to vote-stealing hacks by bad actors that almost certainly would go undetected in an actual election using the state's current voting systems.  Dr. Halderman would ultimately describe those and other serious vulnerabilities in a lengthy, detailed report provided to Defendants on July 1, 2021.

In the latter half of December 2020, Dr. Halderman alerted Curling Plaintiffs' counsel to this reality and expressed extreme concern about the intended use of that system in the then-approaching Senate runoff elections, which occurred on January 5, 2021.  Although the substance of his communications with Curling Plaintiffs' counsel are privileged, suffice to say that as a leading member of the elections integrity community, he felt a deep obligation to alert Dominion and the proper authorities to these vulnerabilities so that they could take measures that might help mitigate the risk to voters—measures Dr. Halderman was ready to help devise.  Curling Plaintiffs and their counsel, upon learning of Dr. Halderman's concern, shared that sense of obligation.  The question then became:  with whom can his findings be shared in a way that would prompt remedial measures and comply with the Court's Protective Orders?  Unfortunately, historical events—which State Defendants omit from their Motion—left that question with no clear

answer and instead presented significant challenges and concerns.

**B.     Georgia's Secretary of State Misused a Report from Curling Plaintiffs' Counsel of a Potential Vulnerability involving Georgia's Election Systems to Wrongly Attack Political Rivals on the Eve of His Own Election**

Just two days before the 2018 election for Georgia governor, then-Secretary of State Brian Kemp publicly accused the Democratic Party of Georgia of a "failed hacking attempt" of voter registration systems in the state.[2]  He even went so far as to use his powers as Secretary of State to open an investigation into the political party of his opponent in that election regarding the alleged "hacking attempt."  *Id.* The Georgia Bureau of Investigations would later find that there was no such "hacking attempt" and that then-Secretary Kemp's wrongful accusation was based on planned security tests by the U.S. Department of Homeland Security and— importantly for present purposes—information provided to his office about a potential security vulnerability that a Georgia voter had stumbled upon involving the state's voter registration systems.  *Id.*  How that information was provided to his office is important here, and missing from State Defendants' Motion.

Late on Friday, October 30, 2018, a Georgia voter alerted Curling Plaintiffs'

---

[2] Mark Niesse, *Case files discredit Kemp's accusation that Democrats tried to hack Georgia election*, Atlanta Journal-Constitution (May 29, 2020), https://www.ajc.com/news/state--regional-govt--politics/became-political-inside-kemp-false-election-hacking-allegations/xcMXfkgKGRsFxOeglGn57N/.

counsel to a potentially serious vulnerability with the state's voter registration systems, which he explained he had happened upon while reviewing his own registration information.  Curling Plaintiffs' counsel took immediate steps to assess whether the report seemed legitimate and promptly alerted the FBI.  The next morning, Saturday, October 31, 2018, the FBI advised Curling Plaintiffs' counsel to alert the Georgia Secretary of State's Office.  Curling Plaintiffs' lead counsel promptly did that the same day in a telephone conversation with State Defendants' then-counsel in this lawsuit, Mr. John Salter.  Neither Curling Plaintiffs nor their counsel conveyed that information to the press or anyone else outside this litigation.  They shared it with the proper federal and Georgia state authorities with the sole purpose of alerting those in a position to implement remedial measures as the November 2018 election fast approached.[3]

Unfortunately, based on that good-faith report from Curling Plaintiffs' counsel of a serious vulnerability with Georgia's voter registration systems, then-

---

[3] Curling Plaintiffs would later come to learn that the individual who reported the vulnerability to their counsel also shared it, on the morning of October 31, 2018, with someone associated with the Democratic Party of Georgia in a further effort to try to address the problem.  The information eventually reached the press, but not from Curling Plaintiffs or their counsel.  As with the vulnerabilities they sought to share via their December 23, 2020 conference request, their intention in October 2018 was only to help address the risk for Georgia voters and they worried that public disclosure of the vulnerability at that time would exacerbate the risk.

Secretary Kemp wrongfully accused his political opponent's party of an unlawful "hacking attempt" on the eve of his own election.  This is critically-important context for the situation Curling Plaintiffs, their counsel, and Dr. Halderman found themselves in with his findings of far more serious vulnerabilities with Georgia's voting equipment in late December 2020, shortly before another statewide election for both of Georgia's U.S. Senate seats.  But that's not all.

### C.   Some of State Defendants' Counsel in this Case Also Reportedly Represented the Trump Campaign in One or More Election Lawsuits involving the November 2020 Elections in Georgia

State Defendants omit another important piece of information that Curling Plaintiffs, their counsel, and Dr. Halderman confronted in late December 2020: some of State Defendants' own lead counsel *in this lawsuit* at that time also reportedly represented the Trump campaign in one or more election lawsuits in Georgia concerning the November 2020 elections.[4]  Clark Cunningham, an attorney and legal ethics professor at Georgia State University, reportedly questioned how that could not be a conflict of interest for State Defendants' counsel: "I am surprised and dismayed that senior lawyers at the Taylor English

---

[4] Mark Niesse, *Trump hires election lawyers who were supposed to defend Georgia*, Atlanta Journal-Constitution (Nov. 11, 2020), https://www.ajc.com/politics/trump-hires-election-lawyers-who-were-supposed-to-defend-georgia/WNCZZOIDZFEF3PYKEV3IROORRI/.

law firm agreed to advocate the interests of the Trump campaign, which is attacking the accuracy of the Nov. 3 vote count in Georgia, at the same time they were responsible for defending the secretary of state in pending federal litigation."[5]

Thus, in late December 2020, according to public information, the same counsel to whom Curling Plaintiffs ordinarily would alert Dr. Halderman's findings regarding Georgia's voting equipment included lawyers representing in one or more election lawsuits the same campaign that was falsely claiming the November 2020 election had been stolen—a narrative that ultimately would become known as the "Big Lie." Thus, sharing Dr. Halderman's findings with State Defendants' counsel also meant sharing them with *counsel for the Trump campaign* when that campaign was falsely attacking elections in Georgia and elsewhere, which in turn raised a concern about how that campaign might misuse Dr. Halderman's findings.

The Trump campaign and some of its supporters filed numerous lawsuits challenging the November 2020 election results, including in Georgia. Some of those lawsuits, including those filed by Lin Wood in Georgia, relied on some of Dr. Halderman's findings in this case to try to cast a veneer of legitimacy over otherwise bogus election fraud claims. (Motion at 8-9.) Thus, in December 2020,

---

[5] *Id.*

Curling Plaintiffs, their counsel, and Dr. Halderman had seen firsthand how the Trump campaign and some of its supporters were misusing Dr. Halderman's findings regarding Georgia's voting systems to try to bolster improper attacks on the November 2020 elections. And again, some of the same lead lawyers at Taylor English representing State Defendants in this lawsuit reportedly also represented the Trump campaign in election lawsuits in Georgia at that time.

**D.  Curling Plaintiffs, Their Counsel, and Dr. Halderman Faced a Challenging Situation with How to Alert the Proper Authorities to Serious Vulnerabilities with Georgia's Voting Equipment Shortly Before the January 5, 2021 Senate Runoff Elections**

In December 2020, Curling Plaintiffs, their counsel, and Dr. Halderman thus found themselves in a terribly difficult situation in light of the undisputed facts:

1) Georgia was about to conduct important, statewide runoff elections on January 5, 2021, to elect both of the state's two U.S. Senators;

2) Dr. Halderman had discovered serious vulnerabilities with Georgia's voting equipment that potentially could allow the injection and propagation of likely-undetectable vote-stealing and election-altering malware across the state's voting systems;

3) The last time Curling Plaintiffs' counsel alerted State Defendants' counsel to a potentially serious vulnerability with components of Georgia's voting systems, the then-Secretary of State used that information to wrongfully accuse his political rivals of a "hacking attempt" just days before his own election;

4) Some of State Defendants' lead counsel in this case reportedly were representing the Trump campaign in one or more election lawsuits in Georgia regarding the November 2020 elections; and

5) The Trump campaign and some of its supporters were falsely claiming that the November 2020 elections were stolen, and they were misusing some of Dr. Halderman's findings in this case regarding Georgia's voting systems and publicly attacking election officials in the state.

Curling Plaintiffs, their counsel, and Dr. Halderman carefully considered the circumstances and the need to act quickly with the Senate runoff elections fast approaching, as well as the holiday season. They could have done nothing given there was no requirement in this case to disclose Dr. Halderman's findings at that time. But as explained in the December 23, 2020 email to the Court's former clerk, they felt that was the wrong thing to do given the seriousness of his findings and the risk the vulnerabilities present to voters using that Dominion equipment, with the Senate runoff elections on the horizon; they believed Dominion and the proper authorities should be consulted on what to do with Dr. Halderman's findings with those elections approaching. So they concluded that the only path forward was to alert the Court to the issue and to do so in a manner that would protect against the sort of misuse of such information that occurred on the eve of Georgia's 2018 gubernatorial election and in bogus election fraud claims in 2020.

### E.   Curling Plaintiffs Promptly Contacted the Court, State Defendants, Coalition Plaintiffs, and Dominion for a Conference

On December 23, 2020, Curling Plaintiffs' counsel asked the Court for a brief emergency conference via email. (Dkt. 1106.) They explained that they were

not making the request on the public docket because of the sensitivity of the

information they sought to address with the Court.  (*Id.*)  That was *not* an *ex parte*

communication—it included counsel for all Plaintiffs and State Defendants plus

counsel for Dominion.  (*Id.*)  To address the serious concerns arising from the

unusual circumstances detailed above, Curling Plaintiffs requested some specific

protective parameters for the conference:[6]

1) That attendance at the conference be restricted to only essential outside
   litigation counsel for the parties, with no more than two lawyers per party
   group (i.e., two lawyers for each of the following groups: all State
   Defendants, all Fulton County Defendants, all Curling Plaintiffs, and all
   Coalition Plaintiffs);

2) That Dr. Halderman be allowed to participate;

3) That Dr. Eric Coomer and Mr. Matthew Maguire, Dominion's outside
   litigation counsel, be allowed to participate for Dominion;[7] and

---

[6] In a March 2, 2021 letter, in response to a concern from Plaintiffs about State
Defendants' over-designation of their September 2020 productions as Confidential
or Attorneys' Eyes Only, State Defendants' lead counsel, Mr. Bryan Tyson,
emphasized the importance of protecting information in this case from use by
litigants pursuing bogus election fraud claims and even admitted that State
Defendants had taken "a cautious approach" in designating documents they
produced in discovery as Confidential or Attorneys Eyes Only in part to protect
against that specific risk.  Thus, it should have come as no surprise to them that
Curling Plaintiffs sought to similarly protect Dr. Halderman's findings in
December 2020 when requesting a conference with the Court.

[7] Curling Plaintiffs' lead counsel who sent the email did not know at the time that
Dr. Coomer was on leave from Dominion due to threats arising from false election
fraud claims and bogus election lawsuits filed by the Trump campaign and some of
his supporters in Georgia and elsewhere.  Dr. Coomer has retained Dr. Halderman

    4)  That the conference be sealed and restricted to only essential outside litigation counsel unless and until the Court orders otherwise.

Thus, Curling Plaintiffs sought to share Dr. Halderman's findings with the Court and counsel for all the parties, plus Dominion's counsel and its former Director of Product Strategy and Security, Dr. Coomer, who had testified in this case. The timing of this request two days before Christmas obviously was unfortunate and not intentional. Curling Plaintiffs and their counsel acted promptly in contacting the Court once alerted to Dr. Halderman's findings and corresponding concerns.

The Court's former clerk responded that same day, writing: "The Court is closed tomorrow and all chambers staff are out for the holiday. I will follow up with you on Monday. In the meantime please provide some information on the nature of your request in a separate email to me." (Dkt. 1106.) Counsel for State Defendants and for Coalition Plaintiffs both asked to be included on any such email. (*Id.*) Neither the Court nor its former clerk responded to those communications to provide any different instructions from the earlier directive for Curling Plaintiffs' counsel to send "a separate email to" the clerk (nor was there any obligation to, as explained below, *see infra* at 36-37).

In short, at no point did Curling Plaintiffs request, propose, or suggest any *ex*

---

as an election security expert in his defamation litigation against those who made certain false claims of election fraud involving the November 2020 elections.

*parte* communication with the Court as State Defendants now claim.  Rather, the

Court's former clerk directed Curling Plaintiffs to send "a separate email" to the

clerk (as the applicable rules allow, *see infra* at 34-35).  State Defendants

misleadingly gloss over this critical fact in their recitation of the facts and their

request that this Court find that Curling Plaintiffs had improper *ex parte*

communications with this Court.  And importantly, Curling Plaintiffs at no point

asked anything of the Court other than exactly what was requested in the

December 23, 2020 email copying State Defendants' counsel—namely, that the

Court hold an emergency conference with appropriate protections in place for

Curling Plaintiffs' lead counsel and Dr. Halderman to share his findings with the

Court, the parties, and Dominion to determine what measures—*if any*—might be

taken before the January 2021 Senate runoff elections.  Curling Plaintiffs sought *no*

*other action* and they sought *no relief* from the Court in this case.

> **F.    Curling Plaintiffs' Counsel Sent a Single Substantive Email to the Court's Former Clerk as the Clerk Directed and Expressly Indicated that the Email Could Be Shared with All Other Parties**

As directed by the Court's former clerk, Curling Plaintiffs' lead counsel sent

a single, substantive email to the clerk on the evening of December 23, 2020.

(Dkt. 1328-1.)  State Defendants grossly mischaracterize the substance of that

email, which they have had for months.  That email contains two substantive

points—none of which State Defendants dispute and all of which has long been known to State Defendants and the public.[8]

*First*, the email provided only at a high, general level the reason for requesting the emergency conference—namely, that Dr. Halderman's continued analysis of the Fulton County Dominion election equipment confirmed the presence of serious vulnerabilities with the system, including that the system can be hacked by loading malware on a single BMD by a voter or others at a polling site that then likely could spread across Georgia's voting systems via the election management system.  (Dkt. 1328-1 at 2.)  State Defendants *admit* that this information has been known to them and *the public* since at least the September 2020 hearing.[9]  This information was further conveyed to them when Dr. Halderman described his findings in his July 1, 2021 Expert Report, which was filed with the Court on July 12, 2021 (Dkt. 1131), his August 2, 2021 rebuttal declaration, and his September 21, 2021 declaration which was filed publicly with

---

[8] Curling Plaintiffs have no objection to the Court withdrawing the confidentiality designation of this and the other emails with the former clerk.

[9] Motion 7-8 (characterizing this portion of the email as "nothing more than what Dr. Halderman has already speculated in open court (and others have alleged publicly): that malware could theoretically be implanted on a voting machine and somehow spread its way across thousands of others to alter election outcomes.").  To be clear, however, his findings are not "speculation".  They are based on a robust examination of the Dominion equipment provided by Fulton County.

the Court (Dkt. 1177-1).  Moreover, this information already should have been known to State Defendants even before the September 2020 hearing given they are responsible for securing that voting equipment in Georgia and have repeatedly represented to voters that it lacks such vulnerabilities.[10]  Lastly, the face of the email refutes State Defendants' claim here that it "provided very little, if any, 'additional information regarding the proposed subject matter of the requested hearing.'"  (Motion 2.)  And in any event, it captured the sum total of what was conveyed to the Court's former clerk about the requested conference.

*Second*, the email explained why Curling Plaintiffs were seeking to convey Dr. Halderman's findings to the parties and Dominion through a conference with the Court.  To that end, the email noted at a general level just two facts that were *publicly known* at that time:  (1) as the AJC had recently reported, the Secretary of State's Office made public statements on the eve of an election about the Democratic Party of Georgia regarding the vulnerability Curling Plaintiffs' counsel had conveyed to State Defendants' prior litigation counsel that were found to be inaccurate; and (2) as the AJC also had recently reported, some of State

---

[10] In recent conferences, State Defendants surprisingly have claimed that the vulnerabilities with Georgia's voting equipment are issues for Dominion, not State Defendants—as if the latter are not responsible for securing the state's voting systems.  This scapegoat argument misstates their duties to Georgia voters.

Defendants' counsel in this case were representing the Trump campaign in challenging recent election results in Georgia.  (Dkt. 1328-1; *see also* Mark Niesse, *supra* notes 1 & 2.)  The email explained that, given these circumstances, Curling Plaintiffs and Dr. Halderman were seeking the conference so the Court could devise appropriate protections for them to share his findings with the other parties and Dominion to try to address the vulnerabilities for the Senate runoff elections. (Dkt. 1328-1.)  The email also made clear that neither Curling Plaintiffs nor their experts had found evidence of widespread fraud in any Georgia elections.  And it noted that Dr. Halderman considered his findings so sensitive that they had been shared with *only two of Curling Plaintiffs' own lawyers*—namely, lead counsel at Morrison & Foerster LLP and at Krevolin Horst LLC.  (*Id.*)

The email concluded by expressly stating that Curling Plaintiffs did not object to the Court sharing the email with representatives of the other parties—a critical fact that State Defendants omit and that makes clear that the communication was not intended to be *ex parte* but instead shared with the other parties.  (*Id.*)  Curling Plaintiffs' lead counsel simply followed the directive given to him regarding sending the email separately to the former clerk.

Nothing in the December 23, 2020 email to the Court's former clerk in any way attacks—politically or otherwise—State Defendants or their counsel.

16

Tellingly, State Defendants identify no such attacks in their Motion and dispute *none* of the facts included in the email.  It merely noted *public* information as the basis for the requested conference.  (Dkt. 1328-1.)  Moreover, the email stated explicitly that Curling Plaintiffs were offering no views on those facts and were not suggesting any improper behavior by State Defendants or their counsel—a fact State Defendants omit.[11]  (*Id.*)  The email went further, expressing a concern that Dr. Halderman's findings in the hands of those wrongly attacking the November 2020 elections in Georgia could be used to fuel personal attacks and threats directed at election workers and officials in Georgia, "*including against State Defendants themselves*."  (*Id.* (emphasis added).)  Thus, contrary to attacking State Defendants in the email as they wrongly claim, Curling Plaintiffs' counsel expressed a concern that *State Defendants themselves* could be targeted for attacks by those who would misuse Dr. Halderman's latest findings.[12]

---

[11] Perhaps State Defendants take issue with a single reference in the email to recent inaccurate public statements about Curling Plaintiffs from the Secretary of State's Office.  (Dkt. 1328-1.)  But that information also already was known to the Court, State Defendants, and the public.  In fact, it was the subject of a discovery motion filed with the Court just a few weeks earlier.  (Dkt. 1026.)

[12] State Defendants omit that just a few weeks before this issue arose, on December 3, 2020, Curling Plaintiffs' lead counsel both emailed State Defendants' counsel to express their heartfelt concern about attacks and threats that State Defendants and other election officials and workers were suffering in Georgia due to the Trump campaign's false election fraud claims.  (Exhibit A.)  Curling Plaintiffs' lead counsel made clear that they did not support the misuse of filings in this case by

State Defendants vaguely speculate that "the substance of that communication was … a failed attempt to distinguish their extraordinary request from other cases pending in this District." (Motion 7.) They likewise claim, with reference to the 2020 *Wood v. Raffensperger* and *Pearson v. Kemp* election fraud cases: "The *ex parte* communications attempting to distinguish Plaintiffs' request from those cases was therefore indisputably substantive." (*Id.* at 9.) This claim is nonsensical and cannot be reconciled with the face of the December 23-24, 2020 emails with the Court's former clerk.

The substance of those emails sought no relief from the Court, had nothing to do with any other case in this District, and did not mention the *Wood* or *Pearson* (or any other) cases. And a request for a court conference is not "extraordinary." Moreover, the parties are in complete agreement that such cases as those brought by Lin Wood were meritless and fueled improper and dangerous attacks and threats against election officials and workers. In fact, State Defendants make much of the fact that on December 23, 2020, they were "moving to dismiss the second

---

those making those false claims and even offered to help State Defendants combat those falsehoods and attacks. *Id.* Unfortunately, rather than take Curling Plaintiffs' up on their offer to help, State Defendants' lead counsel subsequently— and repeatedly—has claimed that Plaintiffs themselves, their counsel, and their experts were personally responsible for those attacks, including death threats, on State Defendants and other election officials in Georgia in late 2020.

case of L. Lin Wood, Jr., and responding to his motion to enjoin use of Georgia's

Dominion Voting System for the runoff elections because he claimed it had been

hacked."[13] (*Id.* at 8.) That litigation illustrates the very concern that motivated

Curling Plaintiffs to request the conference in the non-public manner that they did

and to seek the protections they requested for that conference. And that request

was intended—just as the email states, which State Defendants omit—only to

establish a means by which Dr. Halderman could safely and properly disclose his

very serious findings to those who could take remedial steps before the Senate

runoff elections without inadvertently fueling false election fraud claims and

further attacks on election officials, including State Defendants themselves.

On the afternoon of December 24, 2020, the Court's former clerk emailed

Curling Plaintiffs' lead counsel requesting "a brief phone call" with the clerk that

day. (Dkt. 1328-2.) That call was so short and uneventful that Curling Plaintiffs'

lead counsel has little recollection of it except vaguely that the former clerk let him

know as a courtesy on the afternoon of Christmas Eve that an email would come

shortly informing the parties that the Court was declining the request for an

emergency conference. That email came shortly after the call; thus, the substance

---

[13] Curling Plaintiffs' lead counsel at Morrison & Foerster LLP was unaware of this
when he emailed the Court's former clerk on December 23-24, 2020.

of that brief call was immediately shared with State Defendants.  (Dkt. 1106.)

There were no further communications with the Court's former clerk, the Court, the other parties, or Dominion regarding this issue in December 2020 or any time in the weeks or months thereafter.

### G.     State Defendants Raised No Concern and Requested No Information about this Issue During the Parties' Extensive Discovery Efforts in the First Half of 2021

State Defendants claim they "disagree" with the Court's explanation "that neither counsel for State Defendants nor counsel for the Coalition Plaintiffs 'filed any letters or motions' immediately following the message to request a copy of it or to seek additional information, and that State Defendants have always been 'free to request information from Curling Plaintiffs' counsel' on the matter."  (Motion 3 (internal citations omitted).)  Tellingly, State Defendants cite no contrary facts. Instead, they baselessly claim in their Motion that they "sought to understand what happened" with Curling Plaintiffs' December 2020 conference request and that "this case was largely dormant for the first four months of 2021."  (*Id*. at 4.)  This is untrue.  The parties were *actively* engaged in discovery in that time period—e.g.:

- State Defendants served *eight* sets of document requests on Plaintiffs on December 23, 2020—the same day Curling Plaintiffs requested the emergency conference;

- State Defendants served *eight* sets of requests for admission on Plaintiffs on December 28, 2020, just five days later;

- State Defendants served *eight* sets of interrogatories on Plaintiffs on December 29, 2020;

- State Defendants served *eight more* sets of interrogatories on Plaintiffs on December 30, 2020;

- Curling Plaintiffs sent State Defendants a detailed letter regarding numerous discovery issues on December 29, 2020;

- State Defendants responded with their own lengthy letter on January 4, 2020;

- The parties met and conferred multiple times regarding discovery in the weeks following the December 23, 2020 conference request, continuing through the spring 2021;

- Coalition Plaintiffs served multiple subpoenas for production of documents to county election officials in January 2021;

- Between January 11-27, 2021, Plaintiffs served responses to State Defendants' voluminous discovery requests from December 2020;

- On January 27, 2021, the Coalition Plaintiffs filed a Joint Discovery Statement with Gwinnett County Board of Elections regarding production of scanned ballot images (Dkt. 1057);

- On March 2, 2021, State Defendants' lead counsel sent an *eight*-page letter regarding numerous discovery issues;

- The next day, on March 3, 2021, State Defendants' lead counsel sent two more letters, totaling nearly *ten* pages, specifically addressing numerous categories of discovery sought from Curling Plaintiffs;

- The parties met and conferred on March 3, 2021, regarding numerous discovery issues;

- Two days, on March 5, 2021, State Defendants' lead counsel sent three more letters, totaling nearly *20* pages, specifically addressing numerous

categories of discovery sought from Coalition Plaintiffs;

- On March 19, 2021, the Coalition Plaintiffs filed a Joint Discovery Statement with Bartow County regarding production of scanned ballot images (Dkt. 1080); and

- On April 22, 2021, Curling Plaintiffs sent a letter addressing numerous discovery issues.

These are just *some* of the many efforts the parties made after the December 23, 2020 conference request, into "the first four months of 2021" and beyond, on discovery in this case.[14]  Importantly, Curling Plaintiffs have not found—and do not recall—*any* instance of State Defendants raising the December 23, 2020 conference request in any of their *numerous* discovery requests (*served just days after that request*), correspondence, or meet-and-confers during the period when they now wrongly claim this case was "largely dormant".  Nor do State Defendants claim that they did or identify any discovery efforts before August 2021.

### H.    State Defendants Raised No Concern and Requested No Information about this Issue Until August 16, 2021—the *Last Day* of Fact Discovery

On May 20, 2021, the Court entered an Amended Scheduling Order that required fact discovery to be completed by August 16, 2021, and expert discovery

---

[14] Curling Plaintiffs have not attached these materials to avoid inundating the Court with lengthy discovery requests and correspondence, but Curling Plaintiffs will file them should State Defendants dispute their contents or the Court requests them.

by September 3, 2021.  (Dkt. 1093.)  The parties continued with discovery,

including addressing numerous issues through written correspondence, meet-and-

confers, and Court conferences.  Curling Plaintiffs have found no instance of State

Defendants seeking any information about the December 23, 2020 conference

request in any of the discovery they sought or the many discovery issues the parties

addressed after the Court set new discovery deadlines for 2021.  State Defendants

made only a passing reference to the request in a footnote in a June 9, 2021 filing:

> State Defendants (and apparently Coalition Plaintiffs) remain unaware
> as to the substance of the *ex parte* communication and "emergency
> conference" Curling Plaintiffs sought with the Court in December
> 2020. In any event, the Court was unpersuaded.

(Dkt. 1105 at 6 n.2.)  State Defendants filed the December 23-24, 2020 emails as

an exhibit to that filing.  (Dkt. 1106, Ex. D.)  Thus, six months after those emails,

State Defendants deliberately did not seek *any* information about them and instead

simply dismissed them with a brief mention in a footnote that emphasized that "the

Court was unpersuaded" by whatever was contained in the alleged "*ex parte*

communication."  Thus, contrary to the alarm State Defendants feign now, they

dismissed that correspondence as unpersuasive and sought no discovery about it.

Curling Plaintiffs served Dr. Halderman's Expert Report on July 1, 2021.

State Defendants sought no discovery for many months regarding his report or the

work described in it; nor did they seek any information regarding the December

23, 2020 conference request related to Dr. Halderman's work.  They also did not seek any extension or express any need for any additional time to respond to Dr. Halderman's report.  Their expert, Dr. Juan Gilbert, responded to Dr. Halderman's report on July 16, 2021.  He likewise expressed no need for any information from Dr. Halderman or Plaintiffs to evaluate and respond to Dr. Halderman's analyses and findings, which he did not refute.

State Defendants note that they "served formal discovery specifically targeted to this issue in August 2021," but they are coy about the exact timing of those discovery requests—because the deadline to serve them had already passed.  (Motion 5.)  They served those two requests on August 16, 2021, the deadline for fact discovery.  (Dkt. 1093.)  This Court's Standing Order expressly requires:  "All discovery must be served early enough so that the responses thereto are due on or before the last day of the discovery period." (Dkt. 11 at 13 (emphasis in original).)

By serving the requests at issue on the *last day* of fact discovery, State Defendants missed the deadline by *weeks*: 15 days for the interrogatory and 30 days for the document request.  Not only did this render the discovery requests improper, but the very-belated timing further refutes the alarm and importance State Defendants now attribute to the December 23, 2020 conference request.  Moreover, despite knowing those requests were untimely, State Defendants

24

opposed Plaintiffs' motion for an extension of discovery at that time and instead sought an extension only to allow depositions of Plaintiffs.  (Dkts. 1119 and 1152.) Had State Defendants prevailed, their untimely August 16 discovery requests would have been *moot*.  (Dkt. 11 at 13.)  State Defendants' actions over many months speak far louder than the empty words in their Motion do today.

Despite the untimeliness of the requests, Curling Plaintiffs responded in good faith in light of the extension of fact discovery that the Court granted.  By that time, Curling Plaintiffs' lead counsel at Morrison & Foerster LLP who had sent the emails to the Court's former clerk did not locate copies of them (unlike other correspondence in this case, those emails did not include and were not shared with other members of Curling Plaintiffs' legal team at Morrison & Foerster LLP). Curling Plaintiffs believed the requested discovery was unnecessary in any event since the substance of the correspondence at issue had been disclosed to State Defendants in Dr. Halderman's July 1, 2021 Expert Report[15] or was otherwise public information.  Curling Plaintiffs also did not—and do not—believe any of the emails with the Court's former clerk were improper *ex parte* communications as State Defendants claim.[16]  Thus, Curling Plaintiffs objected to the requests but

---

[15] Dr. Halderman confirmed this in his November 17, 2021 deposition.

[16] Lawyers often unilaterally contact judicial clerks in federal and state courts across the country regarding such topics as scheduling conferences or hearings in

repeatedly explained that they had located no responsive documents.  Again

contrary to the alarm and importance State Defendants now feign regarding this

issue, State Defendants admit that they did not pursue that discovery with the

Court until January 2022—well after the November 15, 2021 close of fact

discovery.  (Dkt. 1176.)

In an early January 2022 meet-and-confer, State Defendants' counsel asked

if Curling Plaintiffs had searched the emails of attorneys at Krevolin & Horst LLC

for responsive documents regarding this issue, which Curling Plaintiffs' counsel

acknowledged had not occurred to them to do (Curling Plaintiffs' counsel had not

recalled copying anyone on the email that the Court's former clerk had requested

he send over a year earlier).  They immediately did that and promptly informed

State Defendants *that same day* that they had located emails regarding the

December 23, 2020 conference request.  They also informed State Defendants that

they did not object to producing the substantive email sent to the clerk on

December 23, 2020.  But Curling Plaintiffs noted that they continued to believe it

was unnecessary and duplicative of information already known to them, and they

---

matters before those courts.  This includes numerous lawyers adverse to Curling
Plaintiffs' counsel in a wide array of cases over many years.  This is the first case
in which any lawyer has claimed that such routine communications are improper
*ex parte* communications with the court—a claim unsupported by the law.

26

did not feel comfortable producing it without the Court's permission given the former clerk's directive to send the email separately to the clerk.  Thus, State Defendants' claim that they were "stonewalled and misled entirely" by Curling Plaintiffs regarding this issue is absolutely untrue.  (Motion 2.)

As State Defendants admit, they waited until January 11, 2022 (Dkt. 1250)—over a year after Curling Plaintiffs made their December 23, 2020 request for an emergency conference—to seek information from the Court regarding that request.  (*Id.* at 5.)  Again, their conduct is inconsistent with any alarm, urgency, or importance regarding this frivolous issue.

## I.      Curling Plaintiffs Fully and Timely Complied with the Court's Production Order

On January 12, 2022, the Court ordered "Curling Plaintiffs to produce any document(s) or communication(s) responsive to the State Defendants' discovery request" regarding this issue.  (Dkt. 1252.)  State Defendants complain that Curling Plaintiffs produced a single email "[m]ore than two weeks later, on January 28, 2022," but they again omit critical context.  (Motion 5.)

*First*, State Defendants omit the fact that Curling Plaintiffs' counsel was busy preparing for and taking many depositions during those two weeks, including James Oliver (Jan. 17), David Hamilton (Jan. 18), Donna Curling (Jan. 19), Merritt Beaver (Jan. 20, later rescheduled to Feb. 2), Dominic Olomo (Jan. 21), Derrick

Gilstrap (Jan. 21), Gabriel Sterling (Jan. 25, later rescheduled to Feb. 24), Dr.
Andrew Appel (Jan. 27), and Chris Harvey (Jan. 28).  State Defendants asked
about this issue in a January 27, 2022 discovery conference (as Curling Plaintiffs'
lead counsel was traveling home from Dr. Appel's deposition), and the production
was made the very next day.

*Second*, based on the parties' prior meet-and-confers regarding this issue,
Curling Plaintiffs understood that the sole substantive email was the only one State
Defendants sought and thus the only one "responsive to the State Defendants'
discovery request," per the Court's Order.  That sole email had been their focus in
those discussions.  And it was—and remains—difficult to discern any relevance or
significance of the other short, entirely-non-substantive emails of which they now
make much ado.  Nevertheless, when State Defendants clarified weeks later in a
meet-and-confer (regarding other discovery issues) that they also were seeking
those other non-substantive emails, Curling Plaintiffs promptly produced those as
well on February 25, 2022, as State Defendants admit.

Tellingly, Curling Plaintiffs received no initial response from State
Defendants to their January 28, 2022 production of the one substantive email with
the former clerk.  They expressed none of the shock, alarm, or concern they now
feign in their Motion, nor did they request any further discovery until a month

28

later.  They also did not ask any Curling Plaintiff about these supposedly-important emails, including the brief call with the former clerk, in their depositions, one of which occurred after State Defendants received all the emails.  Curling Plaintiffs believed the issue was resolved as of February 2022 when they produced the one additional non-substantive email chain.  Unfortunately, it was not.

### J.      State Defendants Expressly Asked for More Discovery regarding this Issue, including Deposing the Court's Former Clerk

State Defendants claim they "have never requested discovery from the Court" regarding this issue beyond production of the December 23-24, 2020 emails.  (Motion 10.)  Not so.  *First*, State Defendants admit that, in their March 4, 2022 Motion to Stay, they told this Court that they "*required* 'further discovery to (1) confirm completion of the production; (2) confirm that no other *ex parte* communications have occurred; and (3) understand the nature of a telephone call referenced therein.'"  (Motion 10 (quoting Dkt. 1327 at 3-4) (emphasis added).) *Second*, State Defendants specifically requested in the parties' joint filing on March 11, 2022, regarding outstanding discovery disputes "a brief *deposition* (by oral or written questions), an affidavit under oath, or otherwise an explanation in open Court."  (Dkt. 1340 at 15-16 (emphasis added).)  Confronted with the obvious absurdity and impropriety of their request for a deposition, they now wrongly claim that they "never requested discovery from the Court" and specifically deny

29

requesting a deposition of the Court's former clerk.  But they cannot escape the facts and what they themselves said and wrote.

Although they now claim that "State Defendants intended to depose, obtain an affidavit, or obtain an explanation in open court from *counsel on the call*," that is not what they said or wrote *before* this Court issued its March 18, 2022 Order that they now seek to evade with a new narrative.  (Motion 12 (emphasis added).) They admit that during the parties' March 10 meet-and-confer they claimed a need "to understand what was discussed on that phone call and that, from the State's perspective, it would probably require *a deposition of **someone** who was on the call*."  (*Id.* at 11 (emphasis added).)  Not *counsel* on the call—"someone".  They knew when they made that request that the only two people on that very brief call were Curling Plaintiffs' lead counsel at Morrison & Foerster LLP and the Court's former clerk, because they had been told that already.  Thus, they knew that their request for "a deposition of ***someone*** who was on the call" would have to be one of those two individuals.  *And they did not specify either*.  They also persisted with this request after Curling Plaintiffs' counsel shared with them on that March 10 call everything there is to share about the December 23-24, 2020 communications

with the Court's former clerk and even offered to provide a sworn affidavit.[17]

Given the surprise of this extraordinary request on that call, Curling Plaintiffs' counsel specifically asked if they were seeking to depose *him*.  State Defendants were unequivocal in reiterating that they needed to depose "***someone** who was on the call*" and, *importantly*, that they were not specifically seeking to depose Curling Plaintiffs' counsel—*which of course left only the Court's former clerk*.  At that point, Coalition Plaintiffs' counsel spoke up to confirm that State Defendants were seeking to depose this Court's former clerk and advised that the parties move on from the topic since State Defendants would have to ask the Court for that deposition.[18]  *State Defendants did not disagree or withdraw their request*.

Based on that unambiguous discussion, Plaintiffs memorialized State Defendants' request to depose the Court's former clerk in their portion of the parties' joint filing on March 11, 2022.  (Dkt. 1340 at 8.)  State Defendants claim that they "did not have the opportunity to rebut or correct" this, but this is untrue.  (Motion 11.)

---

[17] State Defendants' wrongly claim that, during the March 10 discussion, their "counsel even suggested that Curling Plaintiffs' counsel on the call could provide an affidavit."  Curling Plaintiffs' counsel offered that, to no avail.  (Motion 11.)
[18] State Defendants' claim that "Coalition Plaintiffs' counsel [] jumped in to demand State Defendants seek a deposition of the clerk" is wildly untrue and nonsensical.  (Motion 11.)

*First*, they admit that they received Plaintiffs' portion of the joint filing a full hour before it was filed, which afforded all parties ample time to review the other parties' respective portions.  State Defendants expressed no concern about that language in Plaintiffs' portion of the filing before or after it was filed.

*Second*, State Defendants have not shied from making their own filings in this case.  They could—and no doubt would—have corrected something that important in their own short filing that day had it truly been incorrect.

*Third*, they participated in a lengthy teleconference with the Court that same day.  Although the Court indicated in that conference that it would address this particular discovery issue separately at another time, nothing prevented State Defendants from simply informing the Court that they were not seeking to depose its former clerk.  (Dkt. 1342 at 18:24-19:9.)  At no point did they say that, despite speaking at length during the conference on a variety of issues and despite the obvious importance of correcting that, if it actually had been incorrect.

And again—perhaps most damning of all—even in their own portion of the parties' March 11 joint filing, State Defendants did *not* limit their explicit request for a deposition to *counsel*, which they obviously would have done were that actually their request (especially after the shock Plaintiffs' counsel expressed during the March 10 discussion at their request to depose the clerk).  Moreover,

32

given State Defendants decided not to limit their deposition request to *counsel*

even in their own portion of the joint filing, they cannot fault this Court for

construing it as including its former clerk, which it obviously did.  More

importantly, there is no basis for this Court to reach a factual finding that their

request for a deposition did *not* include the clerk.[19]

---

[19] State Defendants' attempt to spin a new narrative only after this Court rightly
rejected their extraordinary request to depose its former clerk is consistent with the
casual approach they have exhibited toward the truth throughout this litigation
when confronted with unflattering facts, including a recitation of the history of this
case that was so inaccurate that the Court rightly likened it to an episode of *The
Twilight Zone*.  (Dkt. 969 at 1 ("This argument is a fallacy and simply removed
from the *actuality* of the content of the Court's Order."); *see also* Dkt. 957 at 2
(State Defendants opted for a "cat and mouse response over. . . ten days regarding
a time sensitive significant matter [] needlessly burden[ing] the Court as it
endeavored to issue a substantial and difficult order regarding the pending
preliminary injunction motions in this case."); *compare* Dkt. 416 at 4 ("The GEMS
Databases are protected and carefully guarded under state law and are unique to the
state of Georgia – which runs a version not used in any other state.") *with* Dkt. 571
at 89:15-23 ("contrary to the expressed position of the state that there was
something unique to Georgia about these databases . . . there is actually nothing
whatsoever unique about the structure of the Georgia GEMS databases.  It is
identical to the structure of databases in several other states, including databases
that are public on the internet."); *see also* Dkt. 623 at 3-9 (summary of State
Defendants' misconduct concerning discovery of the GEMS databases); Dkt. 579
at 70 ("Given the entire course of events described here, the Defendants'
contention that the servers were simply 'repurposed' and not intentionally
destroyed or wiped is flatly not credible."); Dkt. 579 at 71 ("Similarly, Defendants'
denial and dodging before the Court regarding the known veracity of Logan
Lamb's proactive alerts to CES/KSU as to the broadscale vulnerability of its
election servers, software, and databases both undermines the credibility of
Defendants' representations and signals the election system problems would
continue upon CES's transfer to the Secretary of State's Office."); Dkt. 579 at 78-

## ARGUMENT

The undisputed—and indisputable—facts resolve this Motion against State Defendants, but a bit needs to be said about the law, which they also misstate. They cite no cases supporting their argument that Curling Plaintiffs' counsel and this Court engaged in *ex parte* "communications [that] were improper both as a matter of procedure and substance." (Motion 13.)  They instead cite Canon 3(A)(4) of the Code of Conduct for United States Judges.  (*Id*. at 3.)[20]  But they offer no explanation for how anyone here violated that Canon—nor could they.

*First*, Canon 3(A)(4) explicitly provides that judges may "permit *ex parte* communication for scheduling, administrative, or emergency purposes."  The

---

79 ("Strangely, while SOS Chief Information Officer Beaver declared in his August 2018 and July 2019 affidavits in this case that penetration testing had been conducted as an apparent indication of SOS remedial measures, his declarations never even hinted that Fortalice had actually successfully penetrated a major SOS network and data system that would allow the 'attacker' access to information as to architecture of the entire system by obtaining control over the domain.  Nor did Mr. Beaver ever clarify, contrary to his representations in his 2018 affidavit, that the SOS had never requested or authorized focused penetration testing of the Election Division, the GEMS database and server system, the eNet or voter registration system, or the SOS election services vendors."); Dkt. 579 at 152 ("The Defendants have previously minimized, erased or dodged the issues underlying this case.  Thus the Court has made sure that the past is recounted frankly in this Order, to ensure transparency for the future.").

[20] State Defendants also cite ABA Model Code of Judicial Conduct, Canon 2, Rule 2.9(A).  (Motion 3.)  But this "Model Code" does not govern the federal courts and the cited provision is not materially different from Canon 3(A)(4) of the Code of Conduct for United States Judges in any event.

34

communications at issue here with the Court's former clerk were expressly for that very purpose: scheduling an emergency hearing. And contrary to State Defendants' argument (Motion 3), Canon 3(A)(4) does not require consent of the parties for such communications.

Further, as explained above, none of those communications "address[ed] substantive matters" in the case. State Defendants' only argument to the contrary is that some portion of one email somehow sought to distinguish this case from other election lawsuits pending at that time in this District. But again, that argument grossly misstates the stated intention and substance of that email, which did not mention any of the election lawsuits State Defendants discuss here (or any other cases for that matter). The email merely observed, at a general level, what was widely known then—and on which the parties agree, as State Defendants acknowledge in their Motion—that some litigants were citing filings from this case to support false claims of election fraud and fueling attacks on election officials. None of that addressed the *substantive matters at issue in this case*.

State Defendants also offer no basis for the Court to have believed that any party would "gain a procedural, substantive, or tactical advantage" from the emails or very brief call with its former clerk. *State Defendants do not claim any such advantage*, nor could they. Their sole mention of those emails months later in a

35

filing brushed them aside, emphasizing that "the Court was unpersuaded" by them. And they sought no discovery regarding those communications for *eight* months, waiting until well after the deadline to serve new discovery requests and even opposing an extension of discovery needed to breathe life into those untimely requests. This is not the conduct of one concerned that an opposing party may have achieved some advantage with the Court. These facts dispose of State Defendants' Motion and demonstrate its lack of merit and good faith.[21]

*Second*, State Defendants argue that "the communication should have been immediately disclosed," again claiming some violation of Canon 3(A)(4). (Motion 3.) But this argument also contravenes the facts. Canon 3(A)(4) provides: "If a judge receives an unauthorized *ex parte* communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested." There was no "unauthorized *ex parte* communication" here. The Court's former clerk explicitly directed Curling Plaintiffs' counsel—in a communication that

---

[21] State Defendants often emphasize that this Court has denied most of Plaintiffs' preliminary injunction motions, and the Court has granted numerous motions from State Defendants over Plaintiffs' objections since December 2020, including striking an entire expert report from Coalition Plaintiffs and just recently staying this case. Any notion of unfairness toward State Defendants in this case is belied by the record.

included State Defendants' counsel—to send the email at issue separately to the

clerk.  Moreover, the parties already were notified of "the subject matter of the

communication" via the initial email copying State Defendants' counsel requesting

the emergency conference.  Lastly, as this Court rightly found, State Defendants

*never requested* "an opportunity to respond" to the email that they knew the

Court's former clerk requested from Curling Plaintiffs' counsel.  (Dkt. 1348 at 4.)[22]

They merely objected to the email being sent and asked that they be copied.  (Dkt.

1106.)  But again, Canon 3(A)(4) does not require their consent for such a

communication with the Court's former clerk regarding scheduling an emergency

hearing.  And they chose to say nothing further on this issue for many months,

despite that the parties engaged in extensive discovery efforts and negotiations in

the days, weeks, and months immediately following the December 23, 2020

---

[22] This Court found:  "Neither counsel for Defendants nor counsel for the Coalition
Plaintiffs filed any letters or motions with the court in the days or immediate
months after the Court's action on December 24 (denying the Curling Plaintiffs'
request for a hearing) to request that the Court order Mr. Cross to provide a copy of
his follow-up letter explaining the grounds for his request for a hearing or to
provide more information regarding the alleged urgent matter he wished to have a
hearing on. Similarly, in the immediate weeks and months thereafter, defense
counsel did not request that the Court hold a conference regarding Plaintiffs' actual
grounds for the hearing request or the Court's denial of that hearing request, even
though the Court has per force scheduled an ongoing series of hearings and
conferences at short notice upon the request of all counsel throughout this
litigation." (Dkt. 1348 at 4.)  These findings accurately reflect the facts.  State
Defendants' claimed disagreement with them lacks support and good faith.

37

conference request.  Again, that period was not "largely dormant" as they now

wrongly claim—far from it.  *See supra*, Section G.  Once State Defendants finally

asked the Court for the emails at issue, over a year later, the Court ordered their

disclosure *the very next day*.  (Dkt. 1252.)  These facts also dispose of State

Defendants' Motion and further demonstrate its lack of merit and good faith.

*Third*, the Code of Conduct for United States Judges does not apply to

counsel.[23]  Thus, even if there were some violation of that Code—*and there was*

*not*—that still would provide no basis for finding that Curling Plaintiffs' counsel

engaged in any sort of unethical behavior.  This is especially true given he simply

did what the Court's former clerk directed him to do, which again State Defendants

ignore in their effort to besmirch his integrity here.

*Carranza v. Fraas*, 763 F. Supp. 2d 113 (D.D.C. 2011), highlights the

frivolousness of State Defendants' Motion.  In that case, "the court contacted the

defendant through one of the [] judge's law clerks and *requested that the defendant*

*file an opposition to the plaintiffs' motion* for relief upon reconsideration."  *Id.* at

120 (emphasis added).  The court conveyed this request *only to the defendant's*

---

[23] *See* Introduction to the Code of Conduct for United States Judges: "This Code
applies to United States circuit judges, district judges, Court of International Trade
judges, Court of Federal Claims judges, bankruptcy judges, and magistrate judges.
Certain provisions of this Code apply to special masters and commissioners as
indicated in the 'Compliance' section."

*counsel* and *after* "the defendant chose not to file an opposition" to that motion.

*Id.* The defendant filed the opposition as requested, which the court then granted.

*Id.* The court held that there was no impermissible *ex parte* communication

because (i) the substance of the case was not discussed, (ii) the plaintiffs were not

denied any relief to which they were otherwise entitled as a result of the telephone

call, and (iii) any potential prejudice was mitigated by the fact that they responded

to the defendant's opposition.  *Id*. at 120-21 (collecting cases).

The same reasoning holds here but with even greater force given State

Defendants' counsel were included on the communication requesting a separate

email from Curling Plaintiffs' counsel; neither the Court nor its former clerk asked

Curling Plaintiffs to take any action in the case; the communications did not

concern any relief requested by any other party; and the Court immediately denied

the only request Curling Plaintiffs made:  their request for an emergency

conference.  And like in *Carranza*, State Defendants have had ample opportunity

to address the substance of Curling Plaintiffs' December 23, 2020 email to the

former clerk, including in various filings, expert reports, depositions, discovery

requests, and ultimately at summary judgment if they so choose.

## CONCLUSION

State Defendants' Motion lacks support in the law, the facts, and any

39

semblance of good faith.  It distorts the facts as they too often have done in this

litigation and is yet another effort to publicly besmirch the integrity of Curling

Plaintiffs' counsel, the Court, and its former clerk.  Curling Plaintiffs have incurred

considerable expense going back through nearly a year and a half of

correspondence, case filings, and other materials to reconstruct the facts of what

actually occurred here in the face of knowing misrepresentations by State

Defendants.  This was wholly unnecessary and a colossal waste of already-highly-

constrained resources.  State Defendants cannot evade this Court's findings

regarding an extraordinary and inappropriate request for discovery from its former

clerk by weaving a new narrative and misstating the law.  The Court should deny

the Motion to reach new and different findings that would contradict reality and

impugn the integrity of Curling Plaintiffs' counsel and the Court's former clerk.

Dated:  April 11, 2022                         Respectfully submitted,

                                               _/s/ David D. Cross_____
                                               David D. Cross (*pro hac vice*)
                                               Mary G. Kaiser (*pro hac vice*)
                                               Veronica Ascarrunz (*pro hac vice*)
                                               Hannah R. Elson (*pro hac vice*)
                                               Zachary Fuchs (*pro hac vice*)
                                               MORRISON & FOERSTER LLP
                                               2100 L Street, NW
                                               Suite 900
                                               Washington, DC 20037
                                               Telephone: (202) 887-1500
                                               DCross@mofo.com

MKaiser@mofo.com
VAscarrunz@mofo.com
HElson@mofo.com
ZFuchs@mofo.com

Halsey G. Knapp, Jr.
GA Bar No. 425320
Adam M. Sparks
GA Bar No. 341578
KREVOLIN & HORST, LLC
1201 West Peachtree Street, NW
Suite 3250
Atlanta, GA 30309
HKnapp@khlawfirm.com
Sparks@khlawfirm.com

*Counsel for Plaintiffs Donna Curling,
Donna Price & Jeffrey Schoenberg*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

 */s/ David D. Cross*
David D. Cross

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2022, a copy of the foregoing **CURLING PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION FOR CLARIFICATION OR MODIFICATION OF THIS COURT'S ORDER, [DOC. 1348]** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

      */s/ David D. Cross*
      David D. Cross