IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, ET AL.,          )
                                )
     Plaintiffs,                )
                                )
vs.                             )     CIVIL ACTION NO.
                                )
BRAD RAFFENSPERGER, ET          )     1:17-CV-2989-AT
AL,                             )
                                )
     Defendants.                )

VIDEOTAPED 30(b)(6) DEPOSITION OF GABRIEL STERLING

(Taken by Plaintiffs)

February 24, 2022

9:07 a.m.

Reported by:   Debra M. Druzisky, CCR-B-1848

```
 1              APPEARANCES OF COUNSEL

 2   On behalf of the Curling Plaintiffs:

 3       DAVID D. CROSS, Esq.
         HANNAH ELSON, Esq.
 4       JENNA CONAWAY, Esq.
         LOGAN WREN, Esq.
 5       SONJA SWANBECK, Esq.
         REEMA SHOCAIR ALI, Esq.
 6       REILEY PORTER, Esq.
         Morrison & Foerster
 7       2100 L Street NW, Suite 900
         Washington, D.C.  20037
 8       (202) 887-8795
         dcross@mofo.com
 9

10   On behalf of the Coalition Plaintiffs:

11       JILL CONNORS, Esq.
         Ichter Davis
12       3340 Peachtree Road, Suite 1530
         Atlanta, Georgia  30326
13       jconnors@ichterdavis.com

14       -and-

15       BRUCE P. BROWN, Esq.
         Bruce P. Brown Law
16       1123 Zonolite Road, Suite 6
         Atlanta, Georgia  30306
17       (404) 881-0700
         bbrown@brucepbrownlaw
18
         -and-
19
         ROBERT A. MCGUIRE, III, Esq.
20       The Robert McGuire Law Firm
         113 Cherry Street, #86685
21       Seattle, Washington  98104
         (253) 267-8530
22       ram@lawram.com

23

24

25
```

1          APPEARANCES OF COUNSEL (Continued.)

2    On behalf of the Defendants Georgia Secretary of
     State and State Election Board:
3
         VINCENT R. RUSSO, Esq.
4        Robbins Ross Alloy Belinfante Littlefield
         500 14th Street
5        Atlanta, Georgia  30318
         (678) 701-9381
6        vrusso@robbinsfirm.com

7        -and-

8        DIANE F. LAROSS, Esq.
         Taylor English Duma
9        1600 Parkwood Circle, Suite 200
         Atlanta, Georgia 30339
10       (770) 434-6868
         dlaross@taylorenglish.com

11

12   On behalf of the Defendant Fulton County Voter
     Registration and Elections:
13
         DAVID LOWMAN, Esq.
14       Office of the Fulton County Attorney
         141 Pryor Street, Suite 4038
15       Atlanta, Georgia  30303
         (404) 612-4000
16       david.lowman@fultoncountyga.gov

17

     Also Present:
18
         Chris Bennett, videographer
19       Susan Greenhalgh
         Marilyn R. Marks
20       Duncan Buell
         Philip Stark
21
                         --oOo--
22

23

24

25

```
 1                    INDEX TO EXAMINATION

 2    Witness Name:                               Page

 3    GABRIEL STERLING

 4       By Mr. Cross                                8

 5       By Mr. McGuire                            245

 6       By Mr. Brown                              268

 7

 8

 9         INDEX TO CURLING PLAINTIFF'S EXHIBITS

10       No.               Description            Page

11    Exhibit 1    2-23-22, Curling Plaintiffs'     9
                   Fourth Amended Notice of
12                 Deposition of Office of the
                   Secretary of State re: The
13                 above-captioned action.

14    Exhibit 2    LinkedIn Web page print-out re:  13
                   Gabriel Sterling.
15
      Exhibit 3    Excerpted pages of "Integrity    76
16                 Counts" by Brad Raffensperger.

17    Exhibit 4    Video excerpt of speech by       151
                   Gabriel Sterling re: Universite
18                 de Geneve function.

19    Exhibit 5    7-15-19, State Defendants'       154
                   Objections and Responses to
20                 Curling Plaintiffs' First Set of
                   Interrogatories re: The
21                 above-captioned action.

22    Exhibit 6    8-23-21, State Defendants'       157
                   Responses and Objections to
23                 Curling Plaintiffs' Second Set
                   of Interrogatories re: The
24                 above-captioned action.

25
```

Page 5

1   INDEX TO CURLING PLAINTIFF'S EXHIBITS (Continued.)

2      No.                    Description                   Page

3   Exhibit 7    11-23-21, State Defendants'              179
               Responses to Curling Plaintiffs'
4               First Requests for Admission re:
               The above-captioned action.
5
   Exhibit 8    State Defendants 113751,                 223
6               12-29-20, E-mail string from
               Gabriel Sterling to Beau Roberts
7               re: GA AV 20201228.

8   Exhibit 9    State Defendants 172679 thru            230
               686, 3-1-21, E-mail string from
9               Blake Evans to Andrew Jackson
               re: 3 images forward.
10
   Exhibit 10   State Defendants 169353,                 233
11               10-26-20, E-mail string from
               Gabriel Sterling to Michael
12               Barnes re: BMDs and printers.

13   Exhibit 11   State Defendants 192602 thru            237
               603, 11-10-20, E-mail string
14               from John Poulos to Gabriel
               Sterling re: AP calling -
15               Dominion Voting and misinfo.

16                          - - -

17

18

19

20

21

22

23

24

25

                  INDEX TO CGG PLAINTIFF'S EXHIBITS

     No.                    Description                    Page

Exhibit 12    Audio recording of telephone         256
              call.

Exhibit 17    State-Defendants 11151729 thru       276
              781, 9-17-21, Carahsoft
              Statement of Work for Georgia
              Secretary of State.

Exhibit 18    Dominion Voting brochure re:         280
              Mobile ballot printing.

Exhibit 19    4-2-19, Georgia Code Annotated       284
              Section 21-2-498 re:
              Pre-Certification Tabulation
              Audits, Rules and Regulations,
              Risk-Limiting Audit Pilot
              Program.

Exhibit 20    Rule 183-1-15-.04 re: Audit.         295

Exhibit 21    Arlo document re: Ballot             299
              manifest.

Exhibit 22    11-19-20, Excel spreadsheet re:      304
              Arlo audit report.

Exhibit 23    11-17-21, State of Georgia           321
              letterhead from Brian Kemp to
              Members of the State Election
              Board re: 2020 election.

Exhibit 24    11-14-20, Audit Board Batch          312
              Sheet re: DeKalb Tucker Election
              Day.

Exhibit 25    11-14-20, Audit Board Batch          314
              Sheet re: DeKalb Tucker Library
              Advance.

Exhibit 26    (Exhibit not identified by
              counsel.)

Exhibit 27    Audit Board Batch Sheet re:          307
              DeKalb 2339 Absentee.

Page 7

1      INDEX TO CGG PLAINTIFF'S EXHIBITS (Continued.)

2      No.                Description                Page

3    Exhibit 28   Audit Board Batch Sheet re:         319
                  DeKalb 1956 Absentee.
4
     Exhibit 29   Audit Board Batch Sheet re:         320
5                 DeKalb 1836 Absentee.

6    Exhibit 30   1-24-22, The Georgia Assembly        365
                  letterhead from Senators Walker
7                 and Blackmon to Members of the
                  State Election Board re: 2020
8                 election.

9    Exhibit 31   (Exhibit not identified by
                  counsel.)
10
     Exhibit 32   11-4-20, Fox5Atlanta Web page        353
11                article by Brooke Zauner re:
                  Software glitch causes delay in
12                counting thousands of votes in
                  Gwinnett County.
13
     Exhibit 33   12-3-20, Whittier Daily News Web     366
14                page article by Conny McCormack
                  re: A behind the scenes look at
15                Georgia's vote counting.

16                          - - -

17

18

19

20

21

22

23

24

25

1           THE VIDEOGRAPHER:  All right.  This

2       will be the deposition of Gabriel Sterling

3       in the case of Curling versus

4       Raffensperger, File Number

5       1:17-CV-2989-AT.  Today's date is February

6       24th, 2022, and the time is 9:07 a.m.  And

7       we are on the record.

8           Would the court reporter please swear

9       in the witness?

10               GABRIEL STERLING,

11   having been first duly sworn, was examined and

12   testified as follows:

13                   EXAMINATION

14   BY MR. CROSS:

15     Q.   Good morning, Mr. Sterling.

16     A.   Good morning, Mr. Cross.

17         (Whereupon, a technical discussion

18          ensued off the record.)

19   BY MR. CROSS:

20     Q.   All right.  Mr. Sterling, I understand

21   you've been deposed before, I think relatively

22   recently, in fact, so this will be similar to your

23   prior experience.

24           You -- do you understand that you're here

25   to testify today on behalf of the Secretary of

```
 1    State's office on specific topics that they've

 2    designated you on?

 3         A.   Yes.

 4         Q.   Okay.  And do you have the Exhibit Share

 5    in front of you?

 6         A.   I do.

 7                        (Whereupon, Plaintiff's

 8                         Exhibit 1 was marked for

 9                         identification.)

10    BY MR. CROSS:

11         Q.   Okay.  Can you pull up Exhibit 1, please?

12         A.   Okay.

13         MR. RUSSO:  Hey, David, I don't mean

14    to interrupt, but I'm just going to raise

15    one quick issue here.  You guys are going

16    to split, I understand Bruce said you all

17    are splitting time today?

18         Okay.  So you guys figured that out.

19    I just wanted to make sure it was -- we

20    were clear that that was our understanding

21    also --

22         MR. CROSS:  Yeah.

23         MR. RUSSO:  -- before we got started.

24    Okay.

25         THE WITNESS:  I've got Exhibit 1
```

1        pulled up.

2    BY MR. CROSS:

3        Q.   Okay.  Have you seen Exhibit 1 before?

4        A.   I don't think I've seen this one, no.

5        Q.   Okay.  All right.

6        A.   Not that I recall.

7        Q.   Scroll down to -- what page is this, page

8    numbers.  It's Page 8 of the P.D.F.  The top of --

9    the top says Amended Topics.  Just tell me when

10   you've got that.

11       A.   I'm there.

12       Q.   Okay.  Have you seen this list of topics

13   before?

14       A.   Allow me a moment.

15       Q.   Sure.

16            (Whereupon, the document was

17         reviewed by the witness.)

18   BY MR. CROSS:

19       Q.   And I can make it easier on you.  There

20   are specific topics in here you've been designated

21   on.  And so if you want to --

22       A.   I know.  I'm just reading them to make

23   sure that they're all the ones I already saw.  So.

24       Q.   Okay.  Yeah.  Got it.  Got it.

25            (Whereupon, the document was

1          reviewed by the witness.)

2               THE WITNESS:  Yeah, this essentially

3          comports to the list I've -- I remember

4          looking over, so yes.

5     BY MR. CROSS:

6          Q.   Okay.  So just so we're on the same page,

7     if you look at topic one.

8          A.   Let me scroll back up to it.  Bear with

9     me.

10         Q.   Okay.

11         A.   The one listed as implementation and

12    operation of Georgia's yadda, yadda, yadda?

13         Q.   Yes, sir.

14         A.   Okay.

15         Q.   Look at that, you'll see topics A, B, C

16    and E, and H.  Are you prepared to testify on those

17    topics today?  So it's A, B, C, E and H.

18              (Whereupon, the document was

19           reviewed by the witness.)

20              THE WITNESS:  Yes.

21    BY MR. CROSS:

22         Q.   All right.  And then if you look at topic

23    two, are you prepared to testify on topic 2(c) to

24    that?

25              (Whereupon, the document was

1          reviewed by the witness.)

2               THE WITNESS:  Yes.

3     BY MR. CROSS:

4          Q.   And then are you prepared to testify on

5     all the other topics here except for 16?

6          A.   Yes.

7          Q.   Okay.  And on 16, are you prepared to

8     testify at least as to documents that you're

9     familiar with, such as E-mails you sent or

10    received?  Is that fair?

11         A.   Hold on a second.  I'm having a -- there.

12    I had to blow the screen back up.

13              Ask that question again.  I apologize.  I

14    was having a technical issue.

15         Q.   Sure.  On 16 it just involves documents

16    that were produced in discovery by the State

17    defendants, and they said it was a case-by-case

18    basis.

19              But I assume you're prepared today to

20    testify about documents that you're familiar with,

21    like E-mails that you sent or received.  Is that

22    fair?

23         A.   Yeah.  Sure.

24         Q.   Okay.  All right.  We'll come back to

25    this.

```
 1                      (Whereupon, Plaintiff's

 2                      Exhibit 2 was marked for

 3                      identification.)

 4   BY MR. CROSS:

 5       Q.   Grab the next exhibit, if you would,

 6   please.

 7            MR. RUSSO:  That's Exhibit 1, Gabe.

 8            THE WITNESS:  That's -- oh.  I'm

 9       looking at the wrong -- okay.  I see what

10       it is.  It builds up.

11   BY MR. CROSS:

12       Q.   Yeah.  Yeah, sometimes you have to

13   refresh.  Do you see Exhibit 2?

14       A.   Yeah.  But to me Number 2 should be the

15   next one down, not the first one in.  So now I've

16   figured that out.  I've got it opened.

17       Q.   All right.  And Exhibit 2, do you

18   recognize that as a copy of your LinkedIn profile?

19       A.   It looks like it, yes.

20       Q.   Okay.  And does the LinkedIn profile that

21   you have here in Exhibit 2, does that generally

22   capture your education and work experience?

23       A.   To a degree.

24       Q.   All right.  Is there anything -- oh, I'm

25   sorry.
```

```
 1      A.   It's obviously LinkedIn -- well, it's a
 2   LinkedIn, so it's intentionally short and punchy
 3   versus, you know, long answers on things.
 4      Q.   Right.  Is there anything important in
 5   your work experience or education that you'd want
 6   to add here today that you think is missing?
 7      A.   Well, one of the things that I would
 8   consider to be important on this one, if we go
 9   back, and you can talk about my Sterling Advisory
10   time or my time with Sandy Springs City Council,
11   where I did a lot of operational items and a lot of
12   bidding items around procurements and things like
13   that, as well as valuations and understanding
14   supply chains when we were valuing businesses and
15   working with businesses to maximize their
16   operational profits.
17           So those, those are some of the things
18   that aren't necessarily in there that I've kind of
19   alluded to that, if I was doing a job interview,
20   I'd get deeper into, obviously.
21      Q.   Okay.  Are there any professional
22   businesses or jobs that you've had that are not
23   reflected here that you would want to mention?
24      A.   No.  I think most of -- I mean, most of
25   the stuff's in there.  So.
```

1      Q.   Are there any formal education degrees

2    that you have that are not mentioned here?

3      A.   No.  Just my nice little U.G.A. bachelor

4    of science, political science degree.

5      Q.   Okay.  And a couple of questions about

6    this.  If you come down -- so your current position

7    is chief operating officer at the Secretary of

8    State's office; is that right?

9      A.   Yes.

10     Q.   And if you come down to the top half of

11   the second page, do you see where it says Voting

12   System Implementation Manager?

13     A.   Yeah.

14     Q.   And do I understand correctly that was

15   actually a contract position for the Secretary's

16   office, you were not an employee in that time?

17     A.   Correct.

18     Q.   Who made the decision for you to work as a

19   contractor rather than a state employee for that

20   role?

21     A.   It was an internal decision made by

22   essentially the leadership team between the

23   Secretary, the Deputy Secretary, myself, Ryan

24   Germany.

25          Because we were having a difficult time

1  finding anybody to do the actual implementation as

2  a project manager.  We had interviewed several

3  engineering firms and other people, and the sales

4  sides were very excited about doing it.  But once

5  it got to the law -- legal side, essentially they

6  said reputational risk and litigation potentials

7  were too high to take on the job.  We were talking

8  about paying a million dollars for some of those

9  things.

10          So actually, I believe it was Ryan Germany

11  who came up with the idea, it was like, we've been

12  trying to find somebody to do -- you've been

13  essentially running the project of getting it out

14  here, why don't we find somebody to do your C.O.O.

15  duties.

16          So we -- in order to do that, there was

17  two things we had to do.  In the project itself,

18  project management is nearly exclusively always

19  paid for out of the project budget.  Now, the

20  project budget could not be used to pay for state

21  employees.  That's against the rules is my

22  understanding.

23          So what we did was we -- and also, there's

24  only so much budget in the Secretary of State's

25  state dollars in that -- from that fund source for

1    administration.

2            So what we did was I left that position.

3    The money that I would have been paid if I had

4    stayed on as C.O.O. was then redirected to hiring a

5    contractor for a period of time who became an

6    employee as our C.F.O., our controller C.F.O., who

7    is a gentleman named Robert Orange, took over most

8    of the other duties that I had for the C.O.O. side,

9    and then I went over to the voting system

10   implementation manager side.

11           There is one thing in here that is not

12   exactly -- it says November '19 to December '20.

13   There was about a three-week period or a four-week

14   period, I believe, in the months of January and

15   February where I had to come back in for some

16   C.O.O. duties.

17           So I had to come off the contract for a

18   period of time, then come back to the Secretary of

19   State's office to deal with budget items and

20   testify to the State Senate and State House as to

21   constructing our budget, because I was pretty much

22   the only person who could speak to that, and I

23   couldn't do that while I was on the contract.  So I

24   had to come off the contract and then go back to

25   that.

1          And again, it was some -- I can't -- I

2    can't give you the exact frames, but it was in

3    January and February.  It was about three or four

4    weeks of that period of time.

5          But there was internally the side of that

6    because there's so only so much money for the

7    administration side, and the project management was

8    always going to be paid for out of the project

9    budget.  So the only way to do that was for me to

10   go and be a contractor on that front if we were

11   going to do that path.

12         And we essentially ran out of time.  It

13   came to about October, and we had to have

14   everything out with the new machines by the middle

15   of February.  We had sort of an internal deadline

16   in our head of February 14th or so, which we did

17   actually hit.

18         But it was decided, essentially, we don't

19   have time to train anybody up even if we get the

20   best project manager in the world.  We'd been doing

21   this now -- because I had led the team to build the

22   R.F.P.  I wasn't on the R.F.P. evaluation team, but

23   I was part of that process of getting it to that

24   point.

25         And Ryan Germany and I had been in the

Page 19

1  negotiations with the two final bidders, which were

2  ES&S and Dominion, so I kind of knew all the ins

3  and outs of the equipment better than anybody who

4  would run it from the outside.  So that's how the

5  decision was essentially made.

6      Q.   What were you compensated for that role?

7      A.   It was annualized at 200,000 dollars a

8  year.  Like I said, I was off for a period of time

9  in the middle of that.  So it was 8,333 dollars a

10 pay period.

11     Q.   How did that compare to your compensation

12 as C.O.O.?

13     A.   Well, it's kind of an apples and oranges

14 thing.  Because of the burden for State, who runs

15 that 61.73 percent for every dollar you spend for a

16 salary, it was about 185,000 dollars to employ me

17 for the State.  So it was about 200,000 dollars to

18 employ me this way.

19          Now, you realize that, when you're a

20 contractor, the State no longer picks up the other

21 half of social security and Medicare, which I had

22 to take personally.  The State's no longer getting

23 me subsidized health insurance, so I had to pick up

24 that side.

25          Essentially, we ran the math, and it was

1    maybe 500 to a thousand dollars more a month was

2    what I was actually going to be able to take home

3    based on all those things.

4        Q.   And when you came back as C.O.O., did you

5    come back to the salary you had when you left or

6    did you have a different salary?

7        A.   I think it was slightly higher, like 124

8    or something like that.

9        Q.   124,000?

10       A.   I believe so, yeah.  I can't recall right

11   now.  It's been over a year.

12       Q.   And so what was it before you became the

13   implementation manager?

14       A.   Again, I think it was, like, 115,

15   something like that.

16       Q.   All right.  Thank you.

17       A.   I could be off a little bit one way or the

18   other, but those basic numbers are probably right.

19       Q.   All right.  And just briefly on your

20   education, your degree is in political science, not

21   computer science; is that right?

22       A.   Yes.

23       Q.   Okay.  Do you have any formal education in

24   computer science?

25       A.   Formal education?  No, no formal education

1    other than the fact that I'm 51 years old and been

2    in and around computers since I was 12 years old,

3    you know, like anybody born in the early '70s who

4    came up at the time when we started doing those

5    things.

6        Q.   I see you worked on the Bush/Quayle

7    campaign in '92.

8        A.   Yes, I did.  I was 21 years old.

9        Q.   I worked on that campaign in South

10   Carolina.

11           All right.  You're familiar with an

12   election security expert named Alex Halderman;

13   right?

14       A.   I'm aware of him, yes.

15       Q.   And you're aware that Dr. Halderman

16   prepared a report that he produced on July 1 of

17   last year involving his assessment of Georgia

18   voting equipment that was provided by Fulton

19   County; is that right?

20       A.   I didn't know it was provided by Fulton

21   County.  I was aware that there was a report that

22   he did, and I did not know that it was July, but I

23   know that there's a report that was produced.

24           Bear with me a second, because I'm stuck

25   on this exhibit still.  I can't figure out how to

Page 22

1    get off of it.

2              MR. RUSSO:  If you just go back to,

3         if you just hit the Zoom -- yeah, there

4         you go.

5              THE WITNESS:  Okay.  There we go.

6         Sorry.  It was just disconcerting looking

7         at this.

8    BY MR. CROSS:

9         Q.   Yeah.  And so what was your understanding

10   of where he got the equipment that he examined?

11        A.   I had no understanding of it.  It didn't

12   matter to me.

13        Q.   Why didn't it matter where the equipment

14   came from?

15        A.   Because it just wasn't anything that I was

16   going to be directly concerned about at the time.

17   In fact, like I said, I don't think I was aware

18   that it was -- existed in July, so I'm not sure --

19   I might have known -- I might have been told it was

20   Fulton, but it just didn't register as something

21   that was necessarily important to know.

22        Q.   When did you first learn about

23   Dr. Halderman's July 2021 report?

24        A.   I don't know.  I knew it existed.  I

25   couldn't tell you when I -- when I discovered that.

1     Q.   Did you learn about it last year?

2     A.   Yes, it would have been last year.

3     Q.   Do you know if it was within a month?

4  Within a few months?  What's your best estimate of

5  when you learned about it?

6     A.   Within a few, more than likely.

7     Q.   And how did you learn about it?

8     A.   I think just discussions within the office

9  that this existed, or with the -- with the

10  attorneys.  I'm not positive.

11     Q.   Okay.  And have you discussed

12  Dr. Halderman's report with anyone other than

13  litigation counsel?

14     A.   Well, it's not a report I've read, so it

15  would be difficult to have a discussion about it.

16     Q.   So I was going to ask you that.  So still

17  today you've not read Dr. Halderman's report?

18     A.   That's correct.

19     Q.   Why is that?

20     A.   I think that it's lawyers' eyes only, as

21  far as I understand it.

22     Q.   It's your understanding that it's still

23  limited only to lawyers?

24     A.   I believe.  I, honestly, I just, I wait

25  for the lawyers to tell me these kind of things.

Page 24

1    So yeah, that's my -- last I heard it was lawyers'

2    eyes only.  I mean, I know that there was a lot of

3    stuff out in the press around it.  I remember being

4    somewhat irritated about that.

5          But yeah, I don't -- I've never seen it.

6    And you know, I mean, I believe Ryan Germany in our

7    office has read it.  I believe, you know, the

8    attorneys have read it.  But that's my -- that's my

9    understanding.

10     Q.    Have you ever asked for permission to read

11   it?

12     A.    No.

13     Q.    So as the State's implementation manager

14   of the Dominion system, you're not curious what a

15   leading election security expert found about

16   vulnerabilities with that system?

17     A.    That's not what I said.  What I said --

18   what you asked specifically was whether or not I

19   was going to read the report.  I wait for the

20   attorneys to tell me what's available and what's

21   the proper thing to do in these kind of situations

22   with litigation.  I lean on the attorneys for those

23   kind of things, not being --

24     Q.    Well --

25     A.    -- an attorney.

1      Q.   Right.  But why not ask them if you can

2   read it?

3      A.   Because, again, they basically said no

4   need to read it right now.  And here's the other

5   thing that I've -- I don't view -- there are many

6   experts out there in the field of security, and

7   they look at things in one particular way, and one

8   particular way only.

9           And I don't find a lot of the things that

10   they have said in the public arena about election

11   systems and vulnerabilities -- because every

12   election system ever devised by man, whether it be

13   electronic or manual, has vulnerabilities.

14           It's a question of how you mitigate those

15   vulnerabilities.  And I've seen for the most part

16   discussions around these kind of ignore mitigations

17   for the most part.

18           But that's -- again, I know our

19   mitigations that we use, both physical and just

20   process-wise on a lot of these things.  So.  And

21   I've heard other elections critics, I couldn't give

22   you names, to say similar things.  Because guess

23   what, these are all computers.

24           Any pro -- any computer could be

25   reprogrammed if you had a bad actor.  Any

1    hand-marked paper ballot could be double-marked if

2    you had a bad actor.

3              So most of these vulnerabilities I've

4    heard about, generally speaking.  I don't know if

5    that's what it says in this report, but as I said,

6    I've generally heard before, it requires bad actors

7    doing bad things.

8              So as long as you have the mitigation in

9    place, this may -- again, both process and

10   personnel-wise, you are -- you can mitigate most

11   vulnerabilities.  Because every system in the world

12   has vulnerabilities, especially ones that involve

13   human beings.  Because human beings are the

14   biggest, you know, failure point of any system.

15   Q.   So I gather no one has told you that Judge

16   Totenberg authorized the Secretary of State's

17   office to review Dr. Halderman's July report and

18   that she authorized that weeks or months ago;

19   nobody told you that?

20   A.   No.  I was aware that that happened and

21   that Ryan Germany in our office reviewed it.

22   Q.   But were -- you're not aware before now

23   that she has not restricted that report to

24   attorneys' access in the Secretary's office; is

25   that right?

1      A.   I don't believe I said that.  I said we
2  were aware that, you know, that Ryan Germany, he's
3  in our office and he reviewed it.
4      Q.   Well, Ryan Germany is a lawyer; right?
5      A.   But he's inside of our office.
6      Q.   Right.  But you testified earlier you had
7  not read it because you understood it was limited
8  to lawyers.
9      A.   Early on, yes.  Now, you asked me over the
10  whole period of time.  I'm not -- it's not relevant
11  to what I'm working on now.  I'm the C.O.O.  I'm
12  not the voting system implementation manager now.
13          But I also, as I said before, have a basic
14  belief and understanding of what I've seen from
15  most reports like these where, outside of the
16  specifics, that most of them have to involve around
17  bad actors doing bad things, and that's just, that
18  is not rocket science to figure out.  It's not any
19  major thing that I've seen.
20          And I'm sure that there are things in
21  every computer system that can be shored up in some
22  way, shape or form.  And I'm sure that Dominion,
23  who is the manufacturer of these things, is working
24  on those things.  I believe they have access to the
25  report as well now, too.

1      Q.   Okay.  So is it now your testimony you do

2    understand that the report is no longer limited to

3    lawyers for the Secretary of State's office; is

4    that right?

5      A.   That is correct.  I didn't say that I -- I

6    said -- I talk to my lawyers and say you need to

7    read it?  I'm not worried -- I wasn't really

8    worried about it yet, because it's nothing that I'm

9    directly working on right now in that particular

10   function.

11     Q.   Who at the Secretary's office has read the

12   report now?

13     A.   As far as I understand it, Ryan Germany.

14     Q.   So the Secretary himself has not read it?

15     A.   I don't know.

16     Q.   Well, you're testifying on behalf of the

17   Secretary's office today as a corporate

18   representative.  So I'm asking --

19     A.   Yes, I am.

20     Q.   I'm asking you as a corporate

21   representative, has the Secretary himself read this

22   report?

23     A.   And my answer remains the same, that I

24   don't know.

25     Q.   Okay.  And how would you find that out?

 1       A.   I guess I would probably have to call him

 2    and ask him.  It didn't occur to me to ask him

 3    beforehand.

 4       Q.   And has Jordan Fuchs read the report?

 5       A.   As I stated, the only person I'm aware of

 6    reading the report in our office is Ryan Germany.

 7       Q.   And so in preparation for today's

 8    deposition, you didn't ask anyone in the office

 9    other than Mr. Germany whether they had read this

10    report; is that right?

11       A.   I didn't ask Mr. Germany.  He informed me

12    a couple weeks ago when he read it, I believe.  So

13    it wasn't a question of me asking him if he had

14    done it.  He said, hey, I read it.  I said, oh,

15    okay.

16       Q.   So in preparation for today, you didn't

17    ask anyone at all whether they had read it?

18       A.   No.  I wasn't under the impression I would

19    need to.

20       Q.   Okay.  Don't you need to understand the

21    specific vulnerabilities identified in the report

22    to be sure that you mitigate them?

23       A.   Me personally?  I don't think that I would

24    need to, because that's not necessarily my role.

25    Dominion, who is our contractor, we have a contract

Page 30

1    list to keep up with security protocols, and it

2    calls for them to do those kind of things and

3    mitigate any things they become aware of.

4        Q.   Right.  Remember, you're testifying today

5    as the Secretary's office, and that includes on

6    election security.  So my question to you is --

7        A.   And again -- sorry.  Go ahead.

8        Q.   Yeah.  My question is, doesn't the

9    Secretary's office need to understand the specific

10   vulnerabilities in order to make sure they mitigate

11   those vulnerabilities?

12       A.   I think we would always look to mitigate

13   any vulnerabilities we become aware of.  But it's

14   also the responsibility of the person that we've

15   contracted with to inform us and to make those

16   mitigations necessary.  If there seems to be

17   process changes, then they would bring those to us

18   as well.

19            As you understand, this -- these are very

20   complicated things we have to do.  We have to go

21   through reprogramming potentially.  And if they do

22   have to do changes, it has to go through E.A.C.

23   certification.  And then we would probably have to

24   send it through our own certification again if

25   there was any changes that were done.

1          So if those become ripe to a point where

2   we need to do those things, then we would probably

3   become informed and aware of them.

4     Q.   And wouldn't it have been important to

5   begin that process in July of 2021 when your office

6   first received this report through its lawyers?

7     A.   I don't believe our office received this

8   report for our lawyers.  Because at that time, I

9   do -- it is my understanding that Judge Totenberg

10  put it at lawyers' eyes only.

11    Q.   So nobody ever told you that Judge

12  Totenberg and the plaintiffs repeatedly asked your

13  lawyers to provide the names of individuals at the

14  Secretary's office who could read this report; you

15  never heard of that before?

16    A.   Not that I can recall, no.

17    Q.   Does it surprise you that the Secretary's

18  office was in a position to read this report as

19  early as July of 2021 and never once made any

20  request to us or the Court to do so?

21        MR. RUSSO:  David, I'm just, I'm

22      going to object on the grounds that it

23      just assumes facts that aren't in the

24      record.

25  BY MR. CROSS:

1      Q.   Does that surprise you, sir?

2      A.   I don't -- again, I'm not sure that's the

3   case, so I -- I don't know.

4      Q.   Okay.  So as you sit here today testifying

5   on behalf of the Secretary's office, you can't say

6   one way or the other whether the specific

7   vulnerabilities in Dr. Halderman's report have been

8   mitigated in any way because you don't actually

9   know what they are; right?

10     A.   Yeah.  I don't know if they exist.

11          MR. BARGER:  And David, I mean, I --

12          what topic does that go to?  We're getting

13          somewhat outside the scope, I think, of

14          the 30(b)(6) topics.

15   BY MR. CROSS:

16     Q.   So Mr. Sterling, you said that bad actors

17   doing bad things.  I want to make sure I understand

18   that.  What do you mean, what relevance does that

19   have to Dr. Halderman's report?

20     A.   I was saying in general I've heard

21   election security experts, Halderman and others.

22   Nearly everything I've read or seen from anybody on

23   that front involves having a bad actor having

24   access to things they shouldn't legally or by rule

25   have access to to do things they shouldn't legally

 1    or be allowed to have act -- to do.

 2            Now, when you have -- when you have a,

 3    like, passwords, you know, pass codes, physical

 4    access for periods of time, all those kind of

 5    things, there's rules in the S.E.B. about how

 6    that's supposed to be handled.

 7            So for the most part, like I've seen, it

 8    requires people getting things they aren't legally

 9    supposed to have access to to begin with.  Now,

10    that's the whole point, criminals are criminals, so

11    they would violate the law.

12            But again, I've not seen anything that

13    makes me believe that there's a large path to do

14    some of these things, I mean, especially when it

15    comes to the current system of B.M.D.s given the

16    high volume of those, and the complexities around

17    those considering we have, in June of 2020 we had

18    over 36,000 ballot styles, I mean, it's just -- the

19    possibilities become mind-numbingly low of

20    vulnerabilities that can be hit across a wide array

21    of things to change big outcomes.

22            I mean, the majority of issues that I have

23    seen and understand over the years involve smaller

24    scale items, like ballot stuffing, and usually they

25    involve things like hand-marked paper ballots,

Page 34

1   which are much more easily reproducible than

2   something onsite of a B.M.D.  I know less about

3   D.R.E.s, honestly, but B.M.D.s is what I know more

4   about.

5        Q.   And when you say, you mentioned

6   hand-marked paper ballots are more reproducible,

7   what does that mean?

8        A.   I mean, if somebody wanted to do something

9   untoward, it would be easier to take a hand-marked

10  paper ballot, or a stack of them and -- or even

11  voted ones and double bubble things so that --

12  throws votes out.

13            That's a much easier thing to do if you

14  have somebody who is a bad actor again, who is

15  inside the -- who's inside the castle walls, for

16  lack of a better word.

17            So that's what I mean by that.  I mean,

18  there's vulnerabilities to every system, and

19  that's -- it's frankly easier in many ways to do

20  that with hand-marked paper ballots than it is on a

21  B.M.D. ballot.

22       Q.   But you understand that an insider who

23  alters hand-marked paper ballots, it would take

24  hours for them to alter any significant number of

25  hand-marked paper ballots if they wanted to alter,

1    say, thousands to swing an election; whereas, with

2    malware, they could get that on the election system

3    in a matter of minutes in the voting booth with a

4    U.S.B. stick and alter tens of thousands or

5    millions of votes, wouldn't they?

6         A.    I mean, that's --

7              MR. RUSSO:  Objection to form.

8              THE WITNESS:  No, I don't agree with

9         that, actually, honestly, because that's

10        not how the systems are set up.

11   BY MR. CROSS:

12        Q.    How so?

13        A.    The possibility of getting a single stick

14   into a single B.M.D. and affecting millions of

15   votes is physically impossible.

16        Q.    What's the basis for that understanding?

17        A.    Because a B.M.D. is a -- is simply a

18   printer.  That's all that it does.  And it's

19   applied to one printer at a time.  So it doesn't --

20   they don't talk to each other in the middle of

21   these things, I mean.

22              And then we have 159 different counties

23   with 30,000 different B.M.D.s.  It would require a

24   Herculean effort to go and do that.  That's my

25   point, is that it would be physically easier to

Page 36

1    alter hand-marked paper ballots in large numbers in

2    a back room somewhere than it ever would be to do

3    something to a B.M.D. from everything I've seen of

4    how these things would have to function, especially

5    considering the regulations and testing around

6    them.

7            I mean, you have L & A testing before each

8    and every one.  After the last election we had hash

9    testing of several -- in several different counties

10   to make sure there wasn't anything that had been

11   changed.

12           And in the L & A testing, we know we have

13   very robust L & A testing in the fact that it

14   caught a couple of issues in both Douglas and

15   Richmond County on the November election ballot

16   having to do with the United States Senate race.

17           So I do, I disagree vociferously with the

18   idea that somehow it is easier to do.  ███████

19   ████████████████████████████████████████████████

20   ████████████████████████████████████████

21   ██████████████████████████████████████████

22   ████████████

23       Q.  ███████████████████████████████████████

24   ██████████████████████████████████████

25   █████████

Page 37



1        Q.   Okay.  You mentioned L & A testing.  Are

2    you aware that multiple election security experts

3    have testified in this case that L & A testing

4    cannot detect malware?

5        A.   No.

6             MR. RUSSO:  Objection to form.

7             THE WITNESS:  No.

8    BY MR. CROSS:

9        Q.   You mentioned hash testing.  Are you aware

10   that multiple election security experts have

11   testified that hash testing cannot detect malware?

12       A.   No.  And I -- from what little I do know

13   about computer security from my learning over the

14   last few years, that would be very difficult unless

15   the people were -- it would take a her -- it would

16   take a large effort to do -- to get around hash

17   testing.

18            Because usually, if you change any

19   particular number or letter or anything in code, if

20   you use the proper third-party hash testers, you

21   should -- you should be able to get around them.

22   So I don't know that I agree with that even if your

23   experts say that, because I'm sure there are

24   experts that believe otherwise.

25       Q.   Is there any identi -- any cybersecurity

Page 39

1    expert you can identify today that says that hash

2    testing is a reliable way to determine whether a

3    software has been compromised with malware?

4         A.    No.  But again, it's not my role

5    necessarily to know that.

6         Q.    Okay.  Whose role is it at the Secretary

7    of State's office to know that?

8         A.    Nobody.  It's supposed to -- you're asking

9    me to prove a negative against something else

10   that's said.  So I'm not going to dual about that

11   right now.

12           It's, you know, security is always a --

13   one of the highest hallmarks we have right now, and

14   we discuss it weekly internally on how we're

15   dealing with things.  And most of that security

16   comes down to physical security, processes and

17   training.  So that's, that's how we focus on it.

18           The computer side of it is really going to

19   be our systems managers and then dealing with

20   Dominion.  Because again, under our State contract,

21   Dominion has the responsibility to keep their, we

22   called it future proofing when we were negotiating

23   the thing, to inform us of vulnerabilities and also

24   stay ahead of those vulnerabilities if they are

25   identified.

1       Q.   Well, throughout this case, including

2    yourself, the Secretary's office typically mentions

3    L & A testing and hash testing when we talk about

4    looking for malware on machines.

5            So my question to you is, who at the

6    Secretary's office is responsible for understanding

7    whether those tests can actually reliably identify

8    malware in voting equipment?  Who has that

9    responsibility?

10           MR. RUSSO:  Objection to form.

11           THE WITNESS:  Essentially, it's the

12       responsibility of the office and the

13       elections division and the people managing

14       the contract with Dominion.

15           We have contractors who have

16       responsibilities who are not necessarily

17       employees of the office for many things

18       across the agency.  We -- our C.I.O. is a

19       contractor.

20           We have some -- we have a -- right

21       now I believe it's one cybersecurity.  We

22       have an opening as well for another one

23       over our election system that's mainly for

24       our side.

25           We had to look over the voter

Page 41

```
 1        registration system, because that's

 2        something we directly control, versus

 3        right now Dominion, they own their

 4        software, they -- you know, and we own the

 5        equipment and everything, but it's their

 6        job to work with us in tandem, because

 7        that's what contractors do, to make those

 8        things work properly and as safely as

 9        possible.

10             (Whereupon, Ms. LaRoss joined the

11         deposition.)

12   BY MR. CROSS:

13        Q.   But the only --

14        A.   And one other thing I left out, let me

15   finish up the answer, another reason that we know

16   that there was no malware, at least in the 2020

17   election, was we did a hand tally that showed that

18   the machines counted the ballots as they were

19   presented.

20        Q.   We'll come back to that.

21             And just so I understand, you think the

22   hand tally that you did in 2020 shows that the

23   machines were not compromised in any way?

24        A.   Absolutely.

25        Q.   And what's the basis for that belief?
```

1      A.    Because we did a hand tally that showed

2    that the machine count matched the human count.  I

3    mean, we were off by point 1053 percent in the

4    overall totals and off by point 0099 percent in the

5    margin between those two things, which is well,

6    well, well below the normal amount of difference

7    you see in a hand count.

8             If I remember, there was a, I want to say

9    it was University of Wisconsin, but I can't recall

10   exactly right now, study that basically says, when

11   you do hand tallies of elections, you usually

12   expect there to be a 1 to 3 percent deviation just

13   because human beings are counting it versus

14   machines.

15            And in this particular case, too, you had

16   for all the hand-marked paper ballots, anything

17   that had questionable marks had to go through human

18   beings again, which they might come to a slightly

19   different conclusion than they did the first time

20   with those particular bipartisan review committees.

21   So that could move part of that as well.

22            But being that close point 1053 percent in

23   the total ballots cast and point 0099 percent in

24   the margin essentially shows me that the machines

25   counted exactly as they were marked and read by

1    those individuals.

2            Secondarily to that, and this will

3    probably go to one of your other questions here, we

4    did work with the Center for Innovation Election

5    Research and the University of Georgia to do

6    studies to look at reviews of ballots, and we saw

7    that, at a minimum, 24 or 25 percent of people were

8    actually taking time to review their ballots.

9            So if there had been anything in the

10   middle of the election, we would have had more

11   people going to their poll workers saying, there's

12   a problem here.  And we saw none of that anywhere

13   in the State of Georgia in any county at all.

14            (Whereupon, Mr. McGuire joined the

15       deposition.)

16   BY MR. CROSS:

17       Q.   The 24 to 25 percent of voters that are,

18   you said, taking time to review ballots, that was

19   as --

20       A.   Yes.

21       Q.   -- little as one second, wasn't it?

22       A.   Yes.

23       Q.   And you think that a voter can reliably

24   review a ballot in only one second?

25       A.   I think, if they review over it and

1    they -- I'm sure a lot of them did, they looked at

2    the president and said they were probably fine

3    after that.  So.  And I -- they have, don't forget,

4    they reviewed it on the screen as well.

5            And again, let's say, law of large

6    numbers, let's say 5 percent of them looked at it

7    for, you're saying some of them went for one

8    second, some of them were a couple of minutes.  So

9    if there was some widespread issue, it would have

10   been readily apparent.  We would have heard about

11   it.  It didn't exist.

12           It's similar to the same way I know we

13   didn't have a lot of people illegally voting for

14   people using their names without their knowledge

15   because -- or using absentee ballots, because we

16   didn't have tens of thousands of people going up

17   saying, I didn't vote, I need you to give me a

18   provisional vote.  That didn't happen either.

19           The fact those things didn't happen shows

20   us that the systems were not compromised.  That's

21   from -- from our point of view, we're watching

22   those kind of things.  Because when you have five

23   million people vote, if we had had 5,000, if we had

24   500, if we had had a hundred -- we had none that

25   I'm aware of where that happened.

Page 45

1          Q.   A voter has no way to know whether the

2     Q.R. code that gets tabulated accurately captures

3     the selections that they made on the B.M.D. or if

4     they're even reflected on the ballot; right?

5                MR. RUSSO:  Objection to form.

6                THE WITNESS:  They have no way of

7           knowing if the tick marks that they --

8           when they bubble in items is going to be

9           that way in the computer either.  I mean,

10          it's --

11    BY MR. CROSS:

12         Q.   But they can read --

13         A.   It's ridiculous -- it's a ridiculous

14    comparison, because the computer isn't reading

15    anything that's the human readable section of it.

16    The computer is simply reading the points on a page

17    to say X 37 and Y 18 equals this person in the

18    computer.  So technically, the voter has no way of

19    knowing that either.

20         Q.   Right.  But they can read the human

21    readable portion of their ballot and see whether it

22    corresponds to their selections to the extent they

23    recall their selections.  They cannot read what

24    actually gets tabulated in the Q.R. code.

25                We're agreed on that; right, sir?

Page 46

1        A.    We're agreed that they can't --

2              MR. RUSSO:   Objection to form.

3              THE WITNESS:   We agree that they

4        can't know what the tabulation is on a

5        hand-marked paper ballot either.

6   BY MR. CROSS:

7        Q.    Okay.  So it's your view that using a Q.R.

8   code is no different than voters using hand-marked

9   paper ballots for tabulation purposes?

10       A.    It's not no different, because it's

11  obviously physically different.  It also has a

12  situation where it is much more likely to have

13  something go wrong on a hand-marked paper ballot

14  where there might be stray marks and accidental

15  bubbling in on the same line.  We've seen in the

16  past over-votes and under-votes based on that.

17             So I believe it's actually riskier for

18  voters to use hand-marked paper ballots than it is

19  to use a B.M.D. ballot, yes.

20       Q.    Are you familiar with an election security

21  expert named Michael Shamos?

22       A.    No.

23       Q.    You're not aware the Secretary's office

24  hired him as an expert in this case, offered him up

25  as testimony as an election security expert?

1       A.   No.

2       Q.   No one ever told you that Michael Shamos

3   testified in the summer of 2019 before the

4   Secretary announced the B.M.D. system that you

5   should not use B.M.D.s with Q.R. codes?

6       A.   No.  And let's be aware of something here.

7   I mean, the Secretary didn't announce the B.M.D.

8   The State legislature after, you know, several

9   years of review after the S.A.F.E. Commission

10  passed legislation HB 316 to basically mandate the

11  use of a B.M.D.

12      Q.   But they did not mandate the use of Q.R.

13  codes, did they, sir?

14      A.   They did not.

15      Q.   That's a decision that the Secretary's

16  office made in choosing the Dominion system over

17  non-Q.R. code options; correct?

18      A.   As I understand it, the two final bidders

19  were both using Q.R. codes.  So we really didn't

20  have much of a decision on that.

21      Q.   Well, you narrowed down to the final

22  bidders, but there was a bid that came in from a

23  provider that did not use a Q.R. code; correct?

24      A.   That was under the Georgia procurement law

25  well out of bounds of an ability to be a person in

Page 48

1     the final two.

2          Q.   Would it have been helpful in making the

3     decision whether to adopt the Dominion system to

4     know that your own election security expert advised

5     against using Q.R. codes?

6               MR. RUSSO:  Objection.  Form.

7               THE WITNESS:  Again, that wouldn't --

8               given the state laws of Georgia, that

9               would not have been able to be a final

10              thing.  It wouldn't have been a

11              disqualifier under the way the bid was

12              written and the law was written at the

13              time.

14              ES&S and Dominion were the only two

15              qualified bidders at that point.  The

16              third bidder, which was Smartmatic and

17              Clear Ballot, I believe it was Clear

18              Ballot, doing a joint venture were well

19              out of the scope.

20              They had the lowest technicals by

21              far, and they had the highest price by

22              far.  So under Georgia procurement laws,

23              they weren't an available bidder anymore.

24              They were not qualified.

25     BY MR. CROSS:

1      Q.   So you're saying, even if you'd been aware

2    of Dr. Shamos's testimony, you would have adopted a

3    system that your own election security expert

4    advised against?

5      A.   Mr. Cross, I did not say that.  What I

6    said is the laws demanded that we have -- we're

7    down to the last two bidders, and the only two

8    bidders that were qualified had a Q.R. code in it.

9      Q.   But if you had known going into that

10   process that your own election security expert

11   advised against Q.R. code, then you could have made

12   a deliberate decision to seek bids only from

13   providers that had a non-Q.R. code option; right?

14          MR. RUSSO:  Objection to form.

15          THE WITNESS:  The decision of one

16       individual, whether they were our expert

17       or somebody else's expert, cannot outweigh

18       the myriad of decisions around how you

19       have to do -- implement a system this size

20       and scope and a unified system in the

21       State of Georgia.

22          It would have been potentially

23       something else to take into account.  You

24       could have maybe had some additional

25       points for that.  And in fact, for all I

1       know, the -- when they were reviewing it,

2       they might have gotten some additional

3       points for that.

4            But I'm not a -- I'm not aware of

5       that at the time.  I couldn't tell you,

6       because I wasn't on the selection

7       committee.

8            But they -- but that's not the only

9       thing that's involved.  If I remember

10      correctly, we had something like 30

11      questions with 260 sub-questions.  And the

12      way the procurement law of Georgia is

13      written, there is no, like -- you can't go

14      back.

15           You've written it, you've let it out

16      and this is what's going moving forward.

17      And that was written and dropped I want to

18      say in March of 2019 when the -- when the

19      final version of HB 316 passed the State

20      Senate even before the governor's

21      signature, because we were -- did not have

22      the time necessarily to wait any longer on

23      those items.

24           So Q.R. codes have been used in other

25      places.  I know they've been taken away in

1    other places.  But again, I do not see a

2    large vulnerability, especially

3    considering, like I said, huge percentages

4    of people, or large percentage -- large

5    enough to identify a problem were

6    reviewing their ballots.

7         We also under the S.E.B. rules have

8    an individual, a county employee or

9    temporary worker in front of every scanner

10   saying, have you reviewed your ballot?

11        You know, we cannot mandate human

12   behavior.  But having one in four at least

13   look at it, and like I said, even if we

14   took it down to two in a hundred, if there

15   was a widespread issue, it would have been

16   identified.  And we had nobody going to a

17   poll worker saying, this is doing the

18   wrong thing.

19        And I can't -- I can't overcome the

20   state law of Georgia on procurements.  The

21   law is the law.  So again, people have, I

22   think, mischaracterized that the Secretary

23   announced this and the Secretary did that.

24        The Georgia procurement law

25   essentially said, you've got the most

Page 52

1        points, Dominion, you win, you're getting

2        the contract.

3             And we did a best and final offer to

4        both of them.  And in that you cannot

5        change the technicals, as I understand it,

6        but you can only change the pricing.

7             And both of them came down on pricing

8        to try to get ahead of the other person,

9        or stay ahead of the other person, and

10        that's what -- that was worded into the

11        final contract costs.

12   BY MR. CROSS:

13        Q.   But the point allocations could have been

14   set up so that you did not award significant points

15   to a provider that offered a Q.R. code option in

16   light of your own election security expert's

17   testimony, you could have done that, you just

18   ignored it; right?

19        A.   And Mr. Cross, to answer my earlier

20   statement, one person's opinion does not drive

21   procurement laws or rules in the state.  There's

22   only 750 points to allocate, and we had many, many

23   different areas to cover.

24             So that could have been something that

25   would have -- again, there were two things that

Page 53

1   happened here.  ES&S was slightly ahead of Dominion

2   in the technicals.

3          The Smartmatic and Clear Ballot was, I

4   can't remember, but they were literally hundreds

5   of -- I think they were hundreds of points behind.

6   If we had added a hundred points to them for having

7   that, they probably wouldn't have made it,

8   honestly.

9          Because their technicals and their other

10  things, ease of set-up, reliability, many -- I

11  mean, there were so many things in the scope of

12  this, it was -- and Smartmatic and Clear Ballot

13  were just, they weren't -- they weren't in the

14  running.

15    Q.   All right.  Mr. Sterling, I need you to

16  answer the questions I ask you and try to avoid the

17  long speeches, if you would, because we're on a

18  clock.

19          MR. BARGER:  And David, I think these

20      are outside the scope of the topics to

21      begin with, so that might help move us

22      along.

23          MR. CROSS:  Okay.  Well, good luck

24      making that argument.

25  BY MR. CROSS:

Page 54

```
 1       Q.   Mr. Sterling, are you familiar with the
 2   S.A.F.E. Commission?
 3       A.   Yes.
 4       Q.   The S.A.F.E. Commission was set up by the
 5   Secretary's office to help make the decision on the
 6   next system that would replace the D.R.E.s; right?
 7       A.   Correct.  It was the previous
 8   administration under now-Governor Kemp,
 9   then-Secretary Kemp.
10       Q.   And the only cybersecurity expert who
11   served on that commission who was hand chosen by
12   then-Secretary Kemp was a man named Dr. Wenke Lee.
13   Are you familiar with that?
14       A.   Yes.
15       Q.   Are you aware that Dr. Lee very vocally
16   objected to using B.M.D.s as the new system?
17       A.   Yes.
18       Q.   So you keep saying there was -- one
19   person's opinion can't change the outcome of -- or
20   the decision-making or the process, but we're not
21   talking about one person.  There were two election
22   security experts the State brought in, one in the
23   S.A.F.E. Commission, one in this case.  Both
24   advised against the system you adopted, and yet you
25   adopted it anyway.
```

1          Those are the facts, are they not, sir?

2      A.    They are not.  I did not adopt it.  The

3  state legislature adopted it, Mr. Cross.  The

4  Secretary of State's office didn't adopt it.  We

5  supported it, but it was the state legislature who

6  adopted it.  And then, following Georgia

7  procurement law, we procured a system following the

8  law.

9      Q.    Are you familiar with an election security

10  expert named Dr. Juan Gilbert?

11      A.    The name, but I don't know much about him,

12  no.

13      Q.    Are you aware that he is another election

14  security expert the Secretary's office has brought

15  to testify into this case?

16      A.    That might be why I'm aware of his name.

17      Q.    Are you aware that Dr. Gilbert testified

18  under oath that he wanted -- if he wanted to have a

19  cybersecurity assessment done of voting

20  equipment --

21          MR. RUSSO:  Objection to form.

22  BY MR. CROSS:

23      Q.    -- Dr. Halderman and Dr. Andrew Appel are

24  the two experts he would ask to do that?  Have you

25  heard that before?

1      A.    I apologize.  My learned counsel objected

2   in the middle of your question.  Can you repeat the

3   question for me, please?

4      Q.    Sure.  Sorry.  Let me do that again.

5            Are you aware that Dr. Gilbert, the

6   elect -- the Secretary's own election security

7   expert testified that, if you wanted to have a

8   cybersecurity assessment done of voting equipment,

9   there are two experts he would ask to do that,

10  Dr. Alex Halderman and Dr. Andrew Appel?

11           Had you heard that before?

12     A.    No.  But I do want to ask a question.

13  When you say "voting equipment," to what is he

14  and/or you referring to?

15     Q.    Cybersecurity assessment of voting

16  equipment just like that used in Georgia.

17     A.    Well, when you say "equipment," there's

18  lots of different pieces.  Every single piece of

19  equipment we're talking about or, I mean, what

20  specifically was he referring to or do you know?

21     Q.    The voting machines, like, the B.M.D.s.

22     A.    Okay.  Then no, I'm still not aware of

23  that, no.

24     Q.    But you publicly said that Dr. Halderman's

25  report looking at the Fulton County equipment were,

1    in your words, a "load of crap."  Right?

2        A.    Yes.

3        Q.    And do you still believe that?

4        A.    From what I understand of it, again, I

5    haven't read the report, but what I've seen of

6    Dr. Halderman -- and this is the situation in many

7    people, and I said earlier on, if you're looking at

8    any system that has a computer in it from a solely

9    one position, not usability, not functionality, not

10   the ability to get the actual job done, but

11   security, security, security, we'd get the most

12   secure system in the world that no human being

13   could run or you could have the easiest system in

14   the world that was open to every cyber thing in the

15   world, it's always going to be a balancing act in

16   those things.

17           And I think it's important to have people

18   who are viewing it from one thing, and one thing

19   only, like the cybersecurity side.  But they are

20   not the controlling factor in all things.

21           The same way I wouldn't have, you know,

22   somebody who was a voting advocate say you can't

23   have voter registration, you can't have voter ID,

24   you can't have all those things, because that's

25   what they want to make it easy to vote.

1          So when you look at it from a single

2     prism, yes, there's -- you're going to -- you're

3     going to find more identifiable issues potentially

4     because it's what you are trained to go after.

5          But it all has to be balanced out to it be

6     usable, follow the law, and so have voters be able

7     to function in it and have counties and the county

8     workers be able to use it.

9     Q.   So what's the basis for your public claim

10    that Dr. Halderman's report is a load of crap when

11    you, yourself, have not read it and are not

12    familiar with it?

13    A.   Because what I said, as I've said

14    previously, I've seen the cyber experts before, and

15    they nearly always have to do with bad actors.  And

16    what I mean by "load of crap" is that the

17    vulnerabilities that exist potentially from

18    whatever report they do are the same for any system

19    in the world that uses a computer.

20          And therefore, if the -- if your way to

21    mitigate that is to stop using computers

22    altogether, it's not a reasonable thing to do.  If

23    the -- and it's the same way it's not reasonable to

24    say you can't have voter registration, you can't

25    have signature matching, you can't have voter ID on

1    the other side, you want to have security that way.

2            That's what I mean by it's a load of crap,

3    because it's not unique to any particular system.

4    It would be the same for nearly every system.

5    Would the vulnerabilities be slightly different

6    because of the configurations of any particular

7    system?  Of course they would.

8            But overall, we have mitigations, we have

9    policies and we have procedures that would mitigate

10   most things that I was already aware of.  And if

11   there's something else that has to happen, then

12   under a State contract Dominion would have to take

13   steps to mitigate many of these things.

14           And I've seen no real evidence yet of

15   anybody making a claim anything has actually

16   happened.  And there's always, like I said, in any

17   system there's going to be vulnerabilities, but you

18   have to have training and you have to have policies

19   and procedures and, you know, testing where you can

20   that can mitigate those items.

21           And I just -- I know you asked me not to

22   go into long speeches, but I'm trying to answer

23   your question as best I can.

24           I was asked that question in a public

25   forum by a Democrat from my home town, and at that

Page 60

1   point I was kind of irritated because I believe

2   some of these cyber experts, you know, yes, guess

3   what, there -- every computer in the world can be

4   reprogrammed to do something just about.  That's

5   what they're pro -- that's what they're there for.

6          I mean, the Dominion machines, the touch

7   screens started out life as a point of sale thing

8   inside restaurants.  That's what they started off

9   as.  A printer is just a printer.

10         I mean, so when I say it was a load of

11  crap, it was my fast and relatively punchy way of

12  answering it in a public forum.  If I was sitting

13  down doing a longer testimony talking about it, I

14  would give more context like I just have here.

15     Q.   Is it your view that the vulnerabilities

16  Dr. Halderman has identified are not a

17  significant -- are not a significant concern

18  because there are measures that prevent what you

19  call bad actors from doing bad things with the

20  system?

21     A.   I can't speak directly to the report or

22  the vulnerabilities because, again, as you pointed

23  out, I haven't read the report yet, as I said

24  earlier.  So I don't know honestly or not, or if

25  they're the same kind of things that were

Page 61

1    identified in the earlier review by the E.A.C.  I

2    mean, they could be similar.  I don't know.

3        Q.   But isn't it important for the Secretary's

4    office to figure that out, whether the

5    vulnerabilities Dr. Halderman has identified,

6    whether they can't -- cannot be exploited because

7    there are mechanisms in place to prevent that?

8             Shouldn't the Secretary's office know

9    that?

10       A.   At the end of the day, working with

11   Dominion I believe that we will.  Of course,

12   litigation tends to complicate things and make

13   things more difficult for us to actually do our

14   jobs in many ways.

15            And I would like to -- at the end of the

16   day, after all this is done, we always focus on

17   security.  We will always work with our partner to

18   be as secure as we can and have as an up-to-date a

19   system as we can.

20            But I can't speak directly to

21   Dr. Halderman's report as I have not read it yet.

22   And you pointed out, Mr. Germany in our office has,

23   but I'm not aware of anybody else that has yet.

24       Q.   You said litigation complicates things.

25   But the only reason that there is a forensic

Page 62

1    assessment of the Dominion voting equipment used in

2    Georgia is because of this lawsuit, because

3    Dr. Halderman did it; right?

4         A.   And I believe Dr. Halderman went to

5    Dominion and asked to be put on retainer to do

6    other things as well to get some more money into

7    his own pocket.  So I don't know what the driving

8    factor is behind some of these things.

9         Q.   Please tell me where in the world you

10   heard that.

11        A.   From Dominion's employees.

12        Q.   You -- you're sitting here telling me you

13   believe that Dominion -- sorry.  Let me -- let me

14   make sure I get this right.

15             You believe that Dr. Halderman went to

16   Dominion and asked to be put on retainer; is that

17   right?

18        A.   Or to review this thing directly at some

19   cost, yes, to pay -- to pay for the work that he

20   had already done, yes.

21        Q.   And tell me exactly who told you that.

22        A.   I believe it was John Poulos, the C.E.O.

23   of Dominion.

24        Q.   Okay.  Sir, you've been lied to.  And

25   there's documentation that'll show it.  And people

1    are going to be pretty embarrassed at the end of

2    the day on that.

3              When did that conversation take place?

4         A.   I don't know.  I really couldn't tell you.

5    Sometime in the last month or two.

6         Q.   So sometime in the last month or two, John

7    Poulos told you that Dr. Halderman came to him and

8    asked to be a retained expert?

9         A.   I didn't say that.  What I said was he

10   said that he asked to be paid --

11        Q.   (Inaudible due to cross-talk).

12        A.   -- something along -- based on this

13   report.  I didn't say retained.  If I said

14   retained, that was me using a colloquialism.

15        Q.   Okay.  All right.  Well, let's just make

16   sure.  You're saying that John Poulos told you

17   sometime in the last month or so that Dr. Halderman

18   came to Dominion and said he wanted to be paid for

19   work he had already done with respect to this

20   system; is that right?

21        A.   Something along those lines, yes.

22        Q.   Would it surprise you to learn that

23   Dominion actually reached out affirmatively on its

24   own and said that they wanted to hire Dr. Halderman

25   because they wanted to address the vulnerabilities

1    in his report?

2              MR. RUSSO:  Objection.  Form.

3              THE WITNESS:  No.  And it could have

4         been the way it was discussed that would

5         be my interpretation of it.  So no, it

6         wouldn't surprise me necessarily.  Because

7         like I said, it is Dominion's

8         responsibility under our state contract to

9         mitigate any potential via --

10        vulnerabilities.

11   BY MR. CROSS:

12        Q.   That's a very different set of

13   circumstances than Dr. Halderman coming to Dominion

14   and saying he wants to get paid for work he's

15   already done; right?

16        A.   It would be.  However, if he's saying get

17   paid for the work he did inside of a lawsuit coming

18   after us, you can see the level of frustration

19   potentially from everybody's side on this.

20             But I hear what you're saying.

21        Q.   Have you seen a draft engagement letter

22   between --

23        A.   No.

24        Q.   -- the two?

25        A.   No.

1      Q.    Maybe you should talk to Mr. Poulos about

2   that.

3           All right.  To come back to this issue of

4   bad actors, are you aware that one of the positions

5   that the State has taken in our case, including

6   through their experts, is that hand-marked paper

7   ballots present a serious security challenge

8   because of what the State calls insiders that can

9   manipulate those ballots?

10     A.    Not specifically.  But in general, I'm

11  aware of that, yes.

12     Q.    So doesn't the same concern apply to the

13  B.M.D.s, that if you cannot trust your election

14  workers and others who have access to the ballots,

15  don't you have the same concern for those same

16  people when they have access to B.M.D.s?

17     A.    I think the same concerns would go in all

18  directions.  And I think it's -- functionally

19  requires less technical know-how to spoil or do

20  multiple hand-marked paper ballots than it would to

21  work on a B.M.D., and essentially, especially since

22  B.M.D.s are used in two particular locations.

23          They are used for early voting in advance

24  and in-person voting where there would be a lot

25  more individuals around outside of the bad actors.

1    Hand-marked paper ballots taken into a back room

2    could be produced in a much more, you know, ready

3    way than what's done in a scanner on the day of.

4            So yeah, I see what you're saying.  But

5    again, it's sort of apples and oranges because of

6    the use and deployment of the two systems.

7        Q.   Are seals on the B.M.D.s, is that one of

8    the security measures that you have in mind to

9    prevent exploitation of vulnerabilities?

10       A.   Yes.

11       Q.   And --

12       A.   That's one of them.

13       Q.   Would it be appropriate to use B.M.D.s in

14   an election if the election workers, when they

15   pulled out the B.M.D.s to use them, say, found that

16   the seals were missing or broken?

17       A.   It depends, honestly.  If the way they

18   were stored they were broken sitting there because

19   of the way they stored them -- I'm not going to try

20   to answer a hypothetical like that because it's

21   just too broad.

22       Q.   Well, what is -- what is the -- well, I

23   guess I'll ask a different question.

24            Does the Secretary have guidance for the

25   counties, a written policy that says, if you

1    discover B.M.D.s that have broken or missing seals,

2    here are the specific steps you should take to

3    determine whether to use those in an election?

4    Does that exist?

5         A.   I don't know if it's a specific of if it's

6    broken do this, but I think that's to say you have

7    to record those seals on the -- those -- the

8    close-out forms that you have.  So I don't think

9    it's a specific thing other than I think -- and

10   again, this is me -- I don't want to speculate.

11             But in seeing some of the training,

12   basically, if you see something that's broken or

13   not correct or the numbers are off, you report it

14   to the higher-ups eventually.

15             And again, the counties are running these

16   elections.  They don't come back to the State and

17   do a lot of these things except on the final forms

18   they were turning in is my understanding.

19        Q.   You mentioned that the hand tally

20   validated that the machines were not compromised in

21   the 2020 election.  But the hand tally was only

22   done on the presidential election; right?

23        A.   That's correct.

24        Q.   So there's no hand tally that validates

25   that there was no compromise for down ballot

1    elections, like the Senate election; correct?

2         A.    That's correct.

3         Q.    Were you aware --

4         A.    At the same time, there's no evidence that

5    anything -- if you look at -- you saw my degree's

6    in political science.  Nothing that we saw looked

7    untoward or out of place and looked relatively

8    normal in the scheme of how the State has been

9    going for the last few years.

10             So I didn't -- there's no need -- belief

11   on my side that anything was compromised.  And

12   because the presidential race was the highest

13   profile one that was so close, I have no reason to

14   believe that the rest of the ballot wasn't correct.

15   But you're right, we have not done a hand tally on

16   every other thing as well.

17        Q.    Are you aware that, ███████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ██████████████████████████████████████████████████

21   █████████████████████████████████████████████

22   ██████████████████████████

23             Had you heard that before?

24        A.    The specifics of what you just laid out,

25   not exactly.  But I knew there was some period of

1    time he was able to do that, yes.

2       Q.   And did the Secretary's office take any

3    specific steps to protect against that

4    vulnerability in the 2020 or subsequent elections?

5       A.   Well, in September we were probably -- we

6    were getting ready for early voting.  We, again, we

7    did the L & A testing.

8            We can't go through, since I don't even

9    know if we were aware of what he's claiming to be

10   hacked or having done it -- because I don't know

11   that our side got to see what his full claim was or

12   even the path by which he did it.  I just, I'm not

13   aware if we have that information or not.  So it's

14   hard to mitigate against something if you don't

15   have the details of it, A.

16           And B, we have no reason to believe that

17   that occurred.  And having somebody have access for

18   three days would kind of be noticed in most

19   situations in most of our counties, especially as

20   we were doing the run-up to get to.  We were

21   already involved at that point in the absentee

22   ballot processing.  So it would -- we were in

23   election mode then.

24           So the -- we did not do anything specific

25   because there wasn't anything specific that we were

1    aware of that had been verified in any way, shape

2    or form to mitigate.

3         Q.   You said --

4         A.   Similar to when Jovan Pulitzer went on in

5    a State Senate thing and said he had hacked a poll

6    pad.  We had no evidence of that.  Well, what did

7    you do to fix this?  We have no evidence of it.

8         Q.   Well, there's a big difference here, which

9    is the Court required Dr. Halderman to have a video

10   recording of everything he did with the Fulton

11   County equipment, and your counsel received hours

12   and hours of video so they could see step by step

13   what he was doing.

14             Were you aware of that?

15        A.   I'm aware that they had access to

16   something along those lines, yes.  But again, as

17   you pointed out, it took him, a cybersecurity

18   expert, three days to do this.  And with the

19   handling of our equipment, they are locked -- in

20   most counties they are locked in a specific room.

21             And it's one B.M.D. you're talking about.

22   I mean, with the 18,000 ballot styles, you'd have

23   to go through and figure that out which ones you

24   were at -- or it's just, it's monumentally complex.

25             Doing it to one machine is one thing.

1    Doing it to 30 some odd thousand of them is

2    something different, especially considering you

3    have -- there's different paths and different

4    passwords and different pass codes for all of those

5    things.

6        Q.   So just so we're clear, there are no

7    specific steps that you can identify the

8    Secretary's office took to mitigate against the

9    hack that Dr. Halderman demonstrated in September

10   of 2020, there's nothing specific to that; right?

11       A.   Nothing specific to that because we

12   already have equipment handling rules around those

13   things that, if a B.M.D. went missing for three

14   days, it would normally, from my point of view,

15   have been noted by the elections director in

16   whatever county that occurred.

17       Q.   But again, but as you pointed out before,

18   we have to worry about insiders, degrees in the

19   State that said they don't want to use hand-marked

20   paper ballots as the primary means of voting.

21            You wouldn't notice if an insider who

22   already has authorized access to a B.M.D. did

23   something to it; right?

24       A.   I believe you're twisting my words.  My

25   point was, in any system an insider can cause

1    problems, period.  We have no reason to believe

2    that there are negative insiders that exist in any

3    of our counties right now.  But of course, if there

4    are bad guys, they may not want you to know that.

5           But again, we've seen no -- there's

6    nothing indicating that anywhere that we've seen in

7    my three years in the office.

8    Q.   So then we need not worry about insiders

9    engaging in bad acts as a reason not to adopt

10   hand-marked paper ballots, we're agreed on that;

11   right, sir?

12   A.   No.  What I said was it's easier if there

13   is somebody to do it that way than the other way.

14   I believe this is a safe -- is a high -- B.M.D.s

15   are safer and better for the voters and also have a

16   level -- added level of security that is more

17   difficult to do things along the lines of hacking

18   thousands and thousands of B.M.D.s versus having

19   stacks of ballots you go through and mark or you

20   have stacks of ballots that are voted and double --

21   basically cancelling out votes by putting multiple

22   marks into a single line.

23          All of them have vulnerabilities.  You

24   have to have systems in place to try to mitigate

25   them regardless.

Page 73

1          Q.   Were you aware that, up until last month,

2     the Secretary's office repeatedly had argued to the

3     Court that Dr. Halderman's July 2021 report should

4     be sealed?

5               MR. RUSSO:  Objection to form.

6               THE WITNESS:  I don't know if I would

7          characterize it quite that way.  What we

8          didn't necessarily want in a general rule

9          is, if there are vulnerabilities, we don't

10         want it out in the wild, basically.

11         Because you don't want anyone, like, hey,

12         everybody look at the potential

13         vulnerabilities here.

14              That was, from my point of view, kind

15         of the position that was being taken.  And

16         I know that we ended up changing -- or

17         saying, you know, this time release the

18         thing.  And I believe the Secretary did a

19         press release to that effect.

20    BY MR. CROSS:

21         Q.   Were you aware that we provided a redacted

22    version of Dr. Halderman's report in November of

23    last year?

24         A.   To whom?

25         Q.   To your lawyers.

1      A.    Yeah, I believe so.

2      Q.    And are you aware that, even after we

3   provided the redacted version of that report in

4   December at a hearing, your lawyers still argued

5   that even that version of the report should be

6   sealed; were you aware of that?

7            MR. RUSSO:   Objection to form.

8            THE WITNESS:   I believe so, yeah.   If

9        you state that, I believe that to be true.

10   BY MR. CROSS:

11      Q.    Why did the Secretary's office reverse

12   position, after arguing for many months that the

13   report should be sealed, suddenly last month demand

14   that the report become public?

15            MR. RUSSO:   Objection to form.

16            THE WITNESS:   I wasn't really in

17        those conversations.   I just knew that it

18        was decided that it was time.   We've

19        reached a point where it's probably -- you

20        know, I think part of it was there were so

21        many press reports around it based on, I

22        guess, the August summary that the having

23        it as lawyers' eyes only was essentially

24        moot almost at that point because there

25        was so much discussion around it based on

```
 1        what had been released in that other

 2        report, which I'm not sure ought to have

 3        been released either.

 4             But I think it reached that point it

 5        was like, well, we've got to be able to

 6        discuss this thing, so let's do it that

 7        way.  I believe that's kind of where they

 8        came -- the lawyers and our team came

 9        down.

10   BY MR. CROSS:

11        Q.   You did not participate in those

12   discussions; is that right?

13        A.   I was informed of them kind of after the

14   fact.  I wasn't -- I wasn't really much involved in

15   those discussions directly.

16        Q.   So if you wanted to know exactly what was

17   discussed and decided, who would you ask?

18        A.   Probably Ryan Germany.

19             Mr. Cross, can -- it's about 10:15.

20        Q.   Okay.

21        A.   Can we take a quick break?  I have to use

22   the head real quick.  I -- thank you.

23        Q.   Sure.

24             THE VIDEOGRAPHER:  Going off the

25        record 10:16.
```

Page 76

1           (Whereupon, a discussion ensued

2        off the record.)

3           (Whereupon, there was a brief

4        recess.)

5           THE VIDEOGRAPHER:  All right.  We're

6        back on the record at 10:24.

7                    (Whereupon, Plaintiff's

8                     Exhibit 3 was marked for

9                     identification.)

10   BY MR. CROSS:

11      Q.   Mr. Sterling, grab Exhibit 3, please, if

12   you would.

13      A.   Okay.  Which page would you like to focus

14   on?

15      Q.   Well, we're going to look at a number of

16   pages.  But do you have Exhibit 3 in front of you?

17      A.   Yes, I do.

18      Q.   And do you recognize this as portions of

19   Secretary Raffensperger's book called Integrity

20   Counts?

21      A.   I read it once a while back, so I'm a --

22   this looks like it, yes.

23      Q.   Did you assist at all in preparing this

24   book?

25      A.   In some specific parts, yeah.

1     Q.   How so?

2     A.   I was asked for specifics on certain -- I

3  couldn't tell you exactly.  I mean, what happened

4  on this date, I believe that kind of thing.  It was

5  sort of in a general way.

6     Q.   Did you write any portions of it or --

7     A.   No.

8     Q.   -- or edit?

9     A.   I'm not that good.  No, I did not write

10  any portion of it.

11     Q.   Okay.  But you read drafts of excerpts

12  before it went out, and your views were requested;

13  is that generally right?

14     A.   My views were not requested, no.  It was

15  more about specifics of, you know, act -- questions

16  of fact on those kind of things, making sure that

17  those were more properly vetted.

18     Q.   Okay.  All right.  So if you go down to

19  the bottom of each sort of P.D.F. page, you'll see

20  that there is a book page, we'll say, like, Page X

21  of 240.

22     A.   Uh-huh.

23     Q.   Scroll down to where it says Page 46 of

24  240, please.

25     A.   Okay.

1      Q.   Just let me know when you've got it.

2      A.   I'm there.

3      Q.   Okay.

4      A.   If you want me to read it real quick or...

5      Q.   Well, for -- I want to make sure to give

6  you context.  So if you start at Page 45 of 240 --

7      A.   Oh.  Okay.

8      Q.   -- look at the bottom of the left-hand

9  column.  Do you see that Mr. Raffensperger writes:

10          "Every politician has a stump

11       speech, and mine went something like

12       this"?

13          And then what follows in italics is --

14     A.   Yes.

15     Q.   -- the stump speech for Mr. Raffensperger?

16          If you come to the top of Page 46 of 240,

17  you see here he writes that in a stump speech he

18  said:

19          "As we change over to new voting

20       machines, Georgia has a once in a

21       lifetime opportunity to create a

22       process that is objectively fair and

23       yields an outcome that Georgians,

24       individually and as a whole,

25       subjectively trust."

Page 79

1           Do you see that?

2     A.    Yes.

3     Q.    And do you agree with that assessment?

4     A.    Yes.

5     Q.    And why is it important for Georgians

6     individually to subjectively trust the voting

7     machines and the election process in Georgia?

8     A.    It's important for Georgians and every

9     American to have an implicit trust in the election

10    system to pick our leaders.  If you erode that

11    trust, then the elections and the faith in

12    elections falls apart.

13    Q.    Why is that?

14    A.    If you can't trust the outcomes of

15    elections, then what's the point of elections?

16    Q.    All right.  Come down to the next page, 47

17    of 240.

18    A.    Uh-huh.

19    Q.    And do you see at the bottom of the

20    left-hand column he refers to an op ed that he

21    wrote?

22    A.    Yes.

23    Q.    And then portions of that op ed are in

24    italics on Page 47.  Do you see that?

25    A.    Yes, sir.

Page 80

```
 1        Q.   And if you come to the right-hand column,
 2   do you see the paragraph that begins:
 3             "It is through voting that we
 4        actually live the proposition that we
 5        are all equal"?
 6             Do you see that?
 7   A.   Yes.
 8        Q.   And here Secretary Raffensperger wrote:
 9             "Every registered voter gets one
10        vote.  Bill Gates gets one vote.  The
11        19-year-old college student gets one
12        vote.  And thus we reaffirm, as
13        regularly and as often as every
14        election season, the idea that makes
15        us one.  We are all equal before the
16        law.  We all count.  We all have a
17        voice."
18             Do you see that?
19   A.   Yes.
20        Q.   And do you agree with that assessment?
21   A.   Yes.
22        Q.   And what -- why is it important for an
23   individual voter's voice to be heard in an
24   election, as Secretary Raffensperger describes
25   here?
```

```
 1        A.   Because it's the foundational section of
 2   our democratic republic.
 3        Q.   Okay.  And then if you come to the next
 4   paragraph, he wrote:
 5             "My view is that this election is
 6         about using this unique and historic
 7         opportunity to create a voting system
 8         that is modern, efficient, accurate,
 9         secure, safe, verifiable, fair,
10         accessible and trustworthy."
11             Do you see that?
12        A.   Yes.
13        Q.   And do you agree with him on that?
14        A.   Yes.
15        Q.   Just to go back briefly to a subject we
16   talked about earlier, the hand tally that was done
17   with the presidential election in 2020, there was
18   no effort made to determine whether the Q.R. code
19   on any individual ballot actually corresponded to
20   the human readable portion of that ballot.
21             Do I understand that right?
22        A.   Restate the question for me, please.
23        Q.   Sure.  In the hand tally that you referred
24   to in November of 2020, there was no effort in that
25   hand tally to determine whether the Q.R. code on
```

1   any given ballot would be tabulated in the same way

2   as the human readable portion indicated the

3   selections were on that ballot; right?

4        A.   On individual ballots, no.  A whole point

5   of a hand tally in that posture is to get to an

6   aggregate to show that the machines counted them as

7   the ballots were marked.  And that's what that

8   tally showed.

9        Q.   Well, then let's be clear.  I want to make

10  sure we're talking about the same thing.  You

11  said --

12       A.   Okay.

13       Q.   -- that the hand tally showed that the

14  ballots were tabulated as they were marked, but

15  that's, I think you said that's at an aggregate

16  level; right?

17       A.   Yes.  It's not on individual ballots, no.

18  They did not go to say individual ballot 17A

19  matches up.  However, in hand counting five million

20  of them and coming at a point 1053 percent on the

21  totals and point 0099 percent on the margin showed

22  that there's no indication that a Q.R. code did not

23  match the human readable portion.

24       Q.   But you didn't test that?  No one at the

25  Secretary's office or the counties tested that;

1   right?

2       A.   Not to my knowledge.  Because in the

3   aggregate it showed what the outcome was.

4       Q.   Well, you understand that malware could

5   alter Q.R. codes so that they don't match the human

6   readable selection, that those could wash out in

7   opposite directions over the course of five million

8   votes; right?

9           MR. RUSSO:  Objection to form.

10          THE WITNESS:  I understand that

11       that's a claim that could be made, yes.

12  BY MR. CROSS:

13      Q.   And the individual voters who had their

14  ballots altered in that way, assuming that

15  happened, and I'm not suggesting it did, but just

16  so we understand the vulnerability, if something

17  like that were to happen, those individual voters

18  would have lost their vote even though the election

19  outcome might be right; right?

20          MR. RUSSO:  Objection.  Form.

21          THE WITNESS:  I'm -- you're -- this

22       is at a level of convoluted to where I'm

23       trying to follow it here.  Are you saying

24       the malware -- walk me through your logic

25       train on this, because I'm not quite

Page 84

1          following it.  I apologize.

2              (Whereupon, Mr. Stark entered the

3           deposition.)

4      BY MR. CROSS:

5          Q.   Yeah.  So let's say that you had a -- you

6      had a situation where malware changed the Q.R. code

7      on a ballot for some small number of ballots so

8      that the Q.R. code tabulated differently than the

9      human readable portion.

10             That's where we are so far.  Do you

11     understand that?

12         A.   I'm getting what you're saying on that.

13     But then you also said it did it the opposite side,

14     so it was a wash.  So again, the outcomes -- if the

15     outcomes remain the same, again, this is where I'm

16     kind of getting lost on --

17         Q.   Got it.

18         A.   -- the individual voter losing their vote,

19     because the outcome is the outcome.  Because if

20     they washed, it was evenly matched, that'd be some

21     super smart malware, because they don't talk to

22     each other and no one know how many people are

23     going to be voting on a B.M.D.

24             So the logic train on this requires a lot

25     of logical leaps to get to that point.  Could it

Page 85

1   happen in any -- in any kind of way?  I don't

2   believe it could.  But technically, I guess if you

3   somehow managed to do many, many things in the

4   smartest possible way and make it undetectable, I

5   suppose you could.

6          But again, the real world in which we

7   counted those ballots, the aggregate showed that it

8   was the same.  So I just can't accept the

9   supposition that somehow malware got in and did a

10  complete wash.  Because again, what would be the

11  point of it, then?

12     Q.   Yeah.  And just to be clear, I'm not -- we

13  are not suggesting in any way that there was

14  malware that manipulated the results in the

15  November 2020 presidential election.

16     A.   Okay.

17     Q.   I'm just, I'm talking about how

18  vulnerabilities could work.  And I want to make

19  sure we're -- we understand what we're talking

20  about.  So let me ask it this way.

21          Let's say hypothetically that there was

22  malware on a single B.M.D. that changed the Q.R.

23  code -- that changed the Q.R. code on only a

24  handful of ballots.

25          Okay?

Page 86

```
 1      A.    Okay.

 2      Q.    A small number, not enough to swing the

 3    election outcome, and not even enough to be

 4    captured in a -- in an audit.

 5            Would you agree with me that the

 6    individual voters who were affected by that on

 7    their ballots, even though the outcome is the same

 8    as it otherwise would be, if those individual

 9    voters did not have their votes counted as

10    intended, we're agreed on that count?

11            MR. RUSSO:  Objection to form.

12            THE WITNESS:  In this narrow

13         definition that you have laid out of

14         things that there is no proof of, again,

15         with what you have laid out, obviously

16         those individuals who were affected by

17         something like that that no one has seen

18         exist, yes, those votes or one of their

19         votes or some parts of their votes would

20         have been undercut.

21            By the same token, when somebody

22         double votes in a system when -- even

23         though we have guardrails up, that

24         undermines somebody's vote.  In every

25         election there's always going to be some
```

 1          issues around those kind of things where

 2          people have their votes, you know, hit

 3          unfortunately.  But you try to do

 4          everything you can to avoid that.

 5     BY MR. CROSS:

 6          Q.   And again, I'm not suggesting this has

 7     happened.  I'm talking about protecting against a

 8     vulnerability where something could happen in the

 9     future.

10          And what I'm trying to get at is, do you

11     agree that what matters to voters isn't just the

12     outcome of the election but also that their

13     individual vote counts, that what Secretary

14     Raffensperger refers to as their voice, their voice

15     is heard on their ballot?

16          A.   Both count.

17          Q.   All right.  Turn to -- all right.  Turn to

18     where it says Page 52 of 240.

19          A.   I'm there.

20          Q.   And if you come down to the bottom, do you

21     see here Secretary Raffensperger writes, at the

22     bottom of the left-hand column, he's referring to

23     the new system -- do you see where he refers to,

24     "however, a ballot marking device with a verifiable

25     paper ballot"?

Page 88

1              Do you see that?

2         A.   One moment.  "However" -- yeah, I'm there.

3    I got you.

4         Q.   Okay.  And then if you come down a little

5    further, I think it's six lines from the bottom,

6    you see the sentence that begins in the middle,

7    "the resulting printed paper ballot"?

8         A.   Yes.

9         Q.   And here Secretary Raffensperger wrote:

10             "The resulting printed paper

11         ballot is then counted using a digital

12         scanner and a tabulator.  This printed

13         paper ballot, which is the official

14         ballot, is then fed through a scanner

15         into a locked ballot box so that all

16         originals are saved for auditing and

17         recounts.

18             "Additionally, the voter has the

19         ability to proofread the ballot before

20         it is scanned and have it voided and

21         start over if there is an error."

22             Do you see that?

23         A.   Yes.

24         Q.   And on this last point, the only error

25    that a voter could catch on a ballot is in the

1    human readable portion of the ballot, not in the

2    Q.R. code; right?

3                  MR. RUSSO:  Objection to form.

4                  THE WITNESS:  Yes.  But it's the

5         same -- again, as I pointed out earlier,

6         the same could be said for a hand-marked

7         paper ballot, they have no way of

8         necessarily knowing that, how it's going

9         to be scanned, the same thing in the Q.R.

10        code.

11   BY MR. CROSS:

12        Q.    Right.  But they would know that, on a

13   hand-marked paper ballot, when they fill it out,

14   and if they review it after they do so, that at

15   least the paper ballot will accurately reflect

16   their vote selections; right?

17        A.    Well, Mr. Cross, the paper ballot

18   accurately revotes [sic] their vote selections on

19   the other.

20        Q.    But the tabulation --

21        A.    If they're reviewing it for a hand tally

22   or a recount, that's -- I mean, I'm sorry, not for

23   a recount, but for a hand count tally or auditing,

24   that would be the same.

25                  So on that front, they are fundamentally

1    the same because a human being can never know how a

2    computers been programmed to read either the tick

3    marks and the bubble-in sheets or the Q.R. code,

4    which is essentially just the tick marks that the

5    bubble is.

6        Q.   Is it your belief that voters would not

7    have more confidence in a ballot where what's

8    getting tabulated is what they can read as opposed

9    to a Q.R. code that they cannot read?  Do you --

10       A.   But again, Mr. Cross, your point is

11   you're -- I think you're avoiding the point that

12   they can't know any more on that than they can on a

13   Q.R. code if the computer being [sic] scanned and

14   doing the tabulation is reading it properly.

15       Q.   I understand that.  But I thought we

16   agreed that voter confidence is important.

17       A.   Well, if people are telling them that

18   it -- that, you know, it's not, that undermines

19   voter confidence even if it's not true.

20       Q.   All right.  But we agree that voter

21   confidence in the voting system is important;

22   right, Mr. --

23       A.   Yes --

24       Q.   -- Sterling?

25       A.   -- we are.

1    Q.    Okay.  And is it your belief that voters

2    do not have greater confidence in a ballot where

3    they can actually read what's being tabulated than

4    a Q.R. code?

5            Do you believe voters are just totally

6    indifferent to that?

7    A.    Mr. Cross, you've said they can read

8    what's being tabulated.  Neither one can they do

9    that.  That's my -- I'm not accepting the

10   underlying point of your question.

11   Q.    So let me ask it this way.  Is it your

12   belief that voters have just as much confidence in

13   a system that uses Q.R. codes as one that does not?

14   Is that your belief?

15   A.    I think "voters" is a very broad

16   statement, because we have, you know, seven million

17   registered in the state.  So I'm not going to

18   attempt to get in the mind of seven million

19   individuals.

20   Q.    Well, do you have any view, as the

21   individual at the Secretary of State's office who

22   was responsible for implementing this new system,

23   do you have any view or understanding as to whether

24   the majority of Georgia voters have an -- have

25   greater confidence in a system that does not use

1    Q.R. codes than one that does?

2         A.   I think that there has been so much

3    misinformation and disinformation put around Q.R.

4    codes that in some ways it probably has undermined

5    many people's belief in that.

6              But I think the most thing they looked at

7    is looking at the outcomes and then having three

8    counts in a row to show that the votes were cast in

9    the way that they were presented to the computers

10   should instill that confidence.

11             So I understand what you're trying to get

12   to.  You believe that a hand-marked paper ballot is

13   a better thing that instills more confidence.  I

14   don't necessarily agree with that or know that to

15   be the case.  I haven't looked at any polling.  I

16   don't know.

17             But again, it's -- we have a system that

18   we procured and put in place that follows the laws

19   of the State of Georgia right now.

20        Q.   And I wasn't mentioning hand-marked paper

21   ballots.  Again, you can have a B.M.D. ballot that

22   doesn't use a Q.R. code.  So all I'm asking --

23        A.   I see what you're saying.  Yeah.  Okay.

24        Q.   Right.  Do you have any, just based on

25   your experience in your role at the Secretary's

1  office, do you have any understanding one way or

2  the other as to whether most Georgians have greater

3  confidence in a system that does not use a Q.R.

4  code than one that -- than one that does, even if

5  it's still --

6      A.   I'm not -- sorry.  I'm not going to do --

7  I'm not going to speculate on "most Georgians."

8  That's kind of a -- not really my position.

9      Q.   So you just, you don't have a belief or an

10  understanding one way or the other on that; is that

11  fair?

12      A.   I'm not going to speculate on what seven

13  million individual Georgians think.

14      Q.   Well, I'm not asking you to speculate.

15  You spent over a year implementing this system.

16  You spent multiple years working with the

17  Secretary's office defending this system.

18          And my question is, based on that

19  experience and the knowledge that you have, do you

20  have some belief or understanding as to whether

21  Georgians generally have greater confidence in the

22  system without a Q.R. code than one with?

23          MR. BARGER:  And I'm going to just go

24      ahead and object to the form and also as

25      to any opinion testimony that you're

Page 94

1      seeking.

2           Go ahead.

3           THE WITNESS:  Okay.  Frankly, the

4      majority of undermining of the election's

5      integrity thought process for most people

6      are nearly 100 percent around hand-marked

7      paper ballots absentees.  That's the vast

8      majority of the claims we had to deal with

9      all the time and very little around the

10     B.M.D.s.

11          There is a small cadre of people who

12     are really upset about the Q.R. codes.

13     But the vast majority of the complaints

14     and problems that have been raised to our

15     office and have been brought to the S.E.B.

16     have to do with hand-marked absentee

17     ballots mailed in.

18          That is the vast majority of the

19     issue that I've seen from the majority of

20     people in Georgia who have a -- have a

21     concern about the last election.

22     BY MR. CROSS:

23     Q.   Mr. Sterling, hasn't the Trump campaign

24     and his supporters and those associated with him,

25     Lin Wood, Sidney Powell, Giuliani, wasn't a key

1    part of the lawsuits that they brought, the public

2    claims that they made about Georgia, specifically

3    about the Dominion machines and all sorts of

4    conspiracy theories about the reliability of those

5    machines?

6         MR. RUSSO:  Objection to form.

7         THE WITNESS:  Many parts of them

8         relied on previous cases, including this

9         one, yes, and -- but the majority, once we

10        did the hand tally, the majority of the

11        stuff we saw on the ground in Georgia, the

12        majority of the items that our office had

13        to deal with, the majority of the claims

14        about our investigations had to do with

15        absentee balloting, which is done by

16        hand-marked paper ballots.

17             That is the vast, and not by a little

18        bit, but by a huge amount the problems

19        that were viewed by people who have --

20        lack faith in the outcome of the last

21        election.

22             I would call it probably something

23        like 85/15 that people have problems with

24        the absentee balloting program over

25        anything having to do with the B.M.D.s.

1           Early on, the early days, yes, there

2      was a lot of questions about that.  It was

3      mainly misinformation, disinformation

4      around Dominion.  But the vast majority

5      once we did the hand tally came in from

6      the absentee ballot side, mainly focused

7      on Fulton County.

8  BY MR. CROSS:

9      Q.   Okay.  Is there any election security

10  cybersecurity expert you can identify who has done

11  a forensic assessment of the voting equipment,

12  meaning the B.M.D.s, the printers, the scanners,

13  the election management servers, of the ENet system

14  and the voter registration system, is there any

15  election security expert that you can identify

16  who's done a forensic examination of those

17  components to determine whether there's been any

18  compromise?

19      A.   I believe we have our outside third-party

20  group, Fortalice, who's done some assessments on

21  that.  I can't -- I'm juggling so many things right

22  now, I can't remember specifically on that, but

23  Fortalice is generally the people who we do some

24  kind of stuff with.

25           We were in the middle right now, once we

Page 97

```
 1    had our warehouse established, of getting some

 2    stuff over to the cybersecurity center in Augusta,

 3    but we have not been able to get that over to them

 4    yet.

 5         Q.   So there's no one -- no one other than

 6    Fortalice who you can point to right now that's

 7    done any assessment like that; is that right?

 8         A.   I don't believe so.  Now, I could be

 9    wrong, but I don't believe so.

10              (Whereupon, Ms. Elson entered the

11         deposition.)

12    BY MR. CROSS:

13         Q.   And you mentioned Augusta.  Are you

14    talking about the set-up with Dr. Alex Schwarzmann?

15         A.   Correct.  Yeah.

16         Q.   And this is -- this is the set-up at

17    Augusta University where you have a mirror set-up

18    of the voting system ranging from the E.M.S. server

19    to the printer to the scanner to the B.M.D. set up

20    at Augusta University; is that right?

21         A.   Again, I don't believe it's actually set

22    up yet.  We were in the middle of trying to do that

23    and COVID hit and we were -- and then we had stuff

24    to get deployed.  But it's -- that's -- our

25    intention is to get that stuff over to them, but
```

1    that has not been officially set up yet, Mr. Cross.

2        Q.    And I was going to ask about that.  So

3    while we're there, Dr. Schwarzmann talked about

4    this as early as February of 2020 in an interview,

5    and it looked like it had not been set up yet.

6            What's the reason for that?  Was it COVID?

7    Is that what you said?

8        A.    COVID was the biggest thing in the middle.

9    And then we had to -- we were on path.  COVID kind

10   of got in the way.  Then we had elections.  And as

11   is pretty well known, we've been very busy with

12   both false election claims and litigation and

13   regular work and staffing issues.

14           And as an example, there was -- to get

15   stuff off of trucks we had in storage to put into

16   the new warehouse, we had to wait for two months

17   for a plate to offload stuff.  I mean, it's those

18   kind of real world things kind of got in the way of

19   it.

20       Q.    And do you have an estimated time for

21   getting that set up?

22       A.    We were supposed to do an inventory and

23   get it off of that last week when I had my

24   emergency dental surgery.  So soon, but I don't

25   have an exact date right now for you.  I apologize.

1    Q.   What's the purpose of that set-up at

2  Augusta?

3    A.   As I understand it when we had the initial

4  discussions, and again, it's been a little while,

5  was to have that mirrored system, as you pointed

6  out, Mr. Cross.

7        And I think we were even talking about

8  maybe a dual mirrored system, one that's going to

9  be pristine and one that will be tested on to see

10 if they can replicate anything that is discovered

11 or any vulnerabilities or any claims to see if they

12 can be, you know, reproduced, and if they can be

13 reproduced, then possibly look into any mitigation

14 if necessary.  That's sort of the goal overall.

15   Q.   Who is responsible for that project, for

16 getting it set up and coordinating with Augusta?

17   A.   I guess, for lack of a better word, me.  I

18 mean, it would be me and Blake Evans from our

19 office.  And I think -- we had a warehouse manager

20 who accepted the deal and he would have been part

21 of that process, but he ended up taking another

22 job.  So we don't have a warehouse manager right

23 now to help coordinate some of that.

24   Q.   Given that you and others at the

25 Secretary's office have publicly defended the

1    reliability and security of this system, why do you

2    need Augusta to do this set-up to do further

3    security testing?

4         A.   Because we view, I'm sure this sounds

5    cliché, cybersecurity is a never-ending race.  You

6    can always be looking for new things.  You can

7    always be looking for new threats.  And mitigating

8    those threats, when you mitigate one, another one

9    may pop up.  So you can never, like, say, stop,

10   we're done.  So this is just an ongoing kind of

11   process.

12        Q.   Do you know whether Dr. Schwarzmann or

13   anyone in his department has read any of

14   Dr. Halderman's reports or testimony in this case?

15        A.   I do not.

16        Q.   Who would you ask if you wanted to know?

17        A.   I would probably call Dr. Schwarzmann.

18        Q.   Well, you -- I think you said you're one

19   of the primary people responsible for coordinating

20   with him.  Why not have him review Dr. Halderman's

21   report and do his own assessment of the election

22   equipment to determine whether he agrees or

23   disagrees with Dr. Halderman?

24        A.   We haven't gotten to that kind of point

25   yet.  Like I said, I'm just trying to get him the

1   equipment right now.

2       Q.   Okay.  Is that something you would

3   anticipate doing, or you just don't know one way or

4   the other as you sit here?

5       A.   I don't know one way or the other.  But

6   logically, it would probably make sense.  I mean,

7   again, Dominion is the person responsible for kind

8   of doing these mitigations.  But we want to have,

9   you know, our own other expert on that side be able

10  to look at some of those things potentially.

11          And we can't have perfect information

12  100 percent of the time and get everything executed

13  100 percent perfectly in the fastest possible way

14  because we have the real world we have to deal

15  with.  So I want to get the stuff over to them, and

16  we will do this in due course.

17      Q.   Are you aware that the Secretary's expert,

18  Dr. Juan Gilbert, testified at his deposition, I

19  went through and finding by finding in

20  Dr. Halderman's report, and he testified each time

21  he did not disagree with any of the findings?

22          Were you aware of that?

23      A.   No, I was not.

24      Q.   Does that affect your view on whether you

25  think that that report is a load of crap?

1       A.   No.  Because again, the underlying thing

2   of it, as I said, every system in the world has

3   vulnerabilities.  It's a question of what you do to

4   mitigate around them.

5            And I've seen for most people who are on

6   the cybersecurity side, they exclusively focus on

7   that, and only that, and kind of ignore mitigations

8   for the most part.

9       Q.   Are you aware of whether the Secretary's

10  office has had any cybersecurity experts or

11  election security experts review Dr. Halderman's

12  July of 2021 report other than Dr. Gilbert?

13      A.   I believe, like I said, I know Dominion

14  has it, and they are a contractor of the State.

15      Q.   Anyone else?

16      A.   Not off the top of my head, no.

17      Q.   If you wanted to know the answer to that,

18  who would you ask?

19      A.   I would assume Ryan Germany with my

20  office.

21      Q.   All right.  Look at Page 54 of 240, if you

22  would, please, in Exhibit 3.

23      A.   Okay.  I'm there.

24      Q.   If you come to the bottom of the

25  right-hand column here, the last full paragraph

Page 103

1    before the number seven paragraph.

2        A.   Uh-huh.

3        Q.   Do you see that?

4        A.   Uh-huh.

5        Q.   And just to give you some context so you

6    know what we're looking at, if you go back to Page

7    50, if you scroll up to Page 50 of 240 and look at

8    the --

9        A.   I'm there.

10       Q.   -- at the bottom right column, do you see

11   here what Secretary Raffensperger is writing about,

12   it's what the S.A.F.E. Commission recommended in

13   January of 2019, that's these numbered paragraphs?

14       A.   Yes.

15       Q.   And so then if you come back to Page 54

16   and you look just above their number seven

17   recommendation, the last thing there from the

18   S.A.F.E. Commission was:

19            "Additionally, Georgia law should

20        be updated to clarify that the human

21        readable component of the ballot is

22        the official vote record."

23            Do you see that?

24       A.   Yes.

25       Q.   That has not happened; right?

1    A.   I don't know that's the case.  I believe

2    that the paper ballot is viewed as the -- if there

3    is -- I'm not sure, honestly, about how the law

4    reads on that section of it.  I know that the paper

5    ballot is the official ballot.  And -- but I guess

6    recounts are done using the Q.R. codes.

7         So I can see where there could be -- that

8    may not have been on that depending on how it's

9    done.

10   Q.   Right.  The official vote tally in any

11   election using the current system comes from the

12   scan of the Q.R. codes; right?

13   A.   Correct.  Either it would be the first

14   count or any recounts.

15   Q.   And do you know whether the Secretary's

16   office disagrees with this recommendation from the

17   S.A.F.E. Commission that the human readable

18   component of the ballot should be the official vote

19   record?

20   A.   No, I don't -- I don't believe we would

21   agree with that, no.  But again, it's the

22   legislature's decision.

23   Q.   Has the Secretary's office taken any

24   efforts to advocate for that change with the

25   legislature in Georgia?

1      A.   I don't know at this point -- at this

2   point if the Secretary's office took any positions

3   that the legislature would be too inclined to

4   listen.  But not off the top of my head, no.

5      Q.   The legislation that was adopted that led

6   to the Dominion B.M.D. system, did you help write

7   that?

8      A.   Me personally?  Not specifically.  But I

9   was in the room sometimes with Mr. Germany and --

10   let's see.  I remember that Barry Fleming was the

11   key author on that.

12        So that was where a lot of that -- those

13   discussion points came up and to kind of get into

14   the specifics of it of how you put it from S.A.F.E.

15   Commission language to the law.  But yeah,

16   basically.

17        I was -- like I said, I'm not a lawyer,

18   but I was around those conversations about how this

19   ought to come together.

20      Q.   Okay.  How the legislation that came out

21   that led to the Dominion B.M.D.s, how that

22   developed coming out of the S.A.F.E. Commission

23   recommendations; is that what you're referring to?

24      A.   Yes.  HB 316, which was the final version

25   of a bill to move to a B.M.D. and to decommission

1    the D.R.E.s.

2        Q.   Okay.  And do you know at a high level or

3    just generally what the Secretary's office

4    involvement was in that?

5            You mentioned Mr. Germany.  So that just

6    so I understand it, did individuals at the

7    Secretary's office help prepare that legislation?

8        A.   Mr. Rayburn, Kevin Rayburn, who's left the

9    office and went on to be general counsel of the

10   E.A.C., was also pretty -- very involved in the

11   specifics of a lot of that.

12       Q.   All right.  Turn to the Page 68 of 240, if

13   you would, please.

14       A.   All right.  I'm there.

15       Q.   All right.  If you look at the top of the

16   second right -- or sorry, if you look at the top of

17   the column on the right, do you see that on Page

18   68?

19       A.   "They politely told us"?

20       Q.   Yes.

21       A.   Okay.

22       Q.   And then in the next sentence, Secretary

23   Raffensperger writes:

24            "Election integrity wasn't

25          something that Republicans, or by

Page 107

1          extension then-sitting president

2          Donald J. Trump, saw the value in

3          defending in the lead-up to the 2020

4          election."

5               Do you see that?

6     A.   Yes.

7     Q.   And do you agree with that assessment?

8     A.   Yes.

9     Q.   And do we agree that election integrity is

10    something that's important to Georgia voters

11    generally?

12    A.   Yes.  But now, the idea of what election

13    integrity is varies from person to person, but yes.

14    As a general thought, yes.

15    Q.   All right.  Come down, then, to Page 71.

16    It should be the next page in the exhibit.

17    A.   Yes, sir.  I'm there.

18    Q.   And if you look at the right column, do

19    you see the paragraph that begins, "I had been

20    elected Secretary of State"?

21    A.   Yes.

22    Q.   And then there Secretary Raffensperger

23    writes:

24          [As read]  "Georgia was one of

25          only five states using

Page 108

1          direct-recording electronic, or

2          D.R.E., voting machines.  And with

3          mounting concerns of potential foreign

4          and domestic attempts to hack and

5          alter the results of American

6          elections, Georgia moved toward

7          replacement in time for the March 2020

8          presidential primary."

9              Do you see that?

10     A.    Yes.

11     Q.    And the replacement he's referring to

12   there is what became the Dominion B.M.D. system

13   used today; right?

14     A.    Yes.

15     Q.    Why weren't the physical security measures

16   and other measures that were in place to protect

17   the D.R.E.s against the hacks and the alterations

18   that Secretary Raffensperger notes here, why

19   weren't those sufficient to protect the D.R.E.

20   system to continue using it?

21     A.    I don't --

22          MR. RUSSO:  Objection.  Object to the

23     form.

24          Go ahead.

25          THE WITNESS:  I don't know that they

1       weren't.  I do know that they were very

2       old.  And because of the way that the

3       physical hardware and the I.P. were split,

4       that we couldn't update them at all.  And

5       they were beginning to physically fall

6       apart.

7            So there were concerns around that,

8       and everybody -- I say "everybody."  Many

9       people were of the belief that having a

10      paper-based system was one of the better

11      guarantors of avoiding any kind of outside

12      attempts to do that.

13   BY MR. CROSS:

14      Q.   Did you say --

15      A.   I mean, to this point even today, there's

16   a belief that things were done that didn't actually

17   occur, and that's maybe to more what he's referring

18   here.  Like, people all hacking machines and

19   flipping votes from Hillary Clinton to Donald

20   Trump, that was -- that was sort of a belief out

21   there with many people.

22      Q.   All right.  Go to the next page, 72,

23   please.

24      A.   Okay.  I'm there.

25      Q.   And actually, sorry, just so you have

1    context, if you go back to 71, the bullet points

2    there that start on 71 and go to 72 --

3         A.   Uh-huh.

4         Q.   -- do you see here that what Secretary

5    Raffensperger is referring to is things that were

6    intended to come out of the draft legislation that

7    became House Bill 316?

8         A.   Yes.

9         Q.   And then if you come down to the next

10   page, one of the things that he includes there in

11   the second-to-last bullet -- or the second bullet

12   on the --

13        A.   On the next page or were we on 72 still?

14        Q.   72.  Go to 72.

15        A.   Okay.

16        Q.   See the three bullets on the top left?

17        A.   Uh-huh.

18        Q.   And then he writes one of the things that

19   was thought to come out of the legislation, the

20   draft legislation, was:

21             "Conduct an audit immediately

22          following each election to confirm

23          election equipment worked properly."

24             Do you see that?

25        A.   Yes.

Page 111

1       Q.   That's not done in Georgia; right?

2       A.   I disagree.   The -- we consider that the

3    audit that we did after the general election, the

4    Secretary gets to choose one, when you do that,

5    that shows that the machinery actually counted the

6    ballots as cast correctly.   That is the intent of

7    that, and that's what that's referring to.

8       Q.   Well, the -- that was -- that was a hand

9    tally or an audit, if you want to use that word, of

10   a single election contest in the November 2020

11   election; right?

12      A.   Yes.

13      Q.   And the law that was adopted in Georgia

14   only requires a single statewide audit every other

15   year.   Do you understand that?

16      A.   And they consider -- they consider that

17   particular thing to be met with that audit.

18      Q.   Okay.   But I just want to make sure,

19   what's written here is not a single statewide

20   election of a single contest every other year.

21   What's written here is, "conduct an audit

22   immediately following each election," not every

23   other year, not only statewide, "each election to

24   confirm election equipment worked properly."

25           That's what's written here; right?

1     A.   That's what's written there, yes.  But I

2   think they came to the point that doing it every

3   two years is what the -- met that point in their

4   outline of what they were trying to do.

5     Q.   All right.  Go to -- sorry.  Stay on this

6   page.

7     A.   Okay.

8     Q.   If you look at the top of the next column,

9   still on Page 72, here Secretary Raffensperger

10  wrote:

11           "In the meantime, Deputy Secretary

12        of State Jordan Fuchs was organizing a

13        multi-disciplinary evaluation team to

14        review the proposals."

15           Do you see that?

16    A.   Yes.

17    Q.   And these are the proposals that came in

18  in response to the R.F.P. for the new system in

19  2019; right?

20    A.   Correct.

21    Q.   And then Secretary Raffensperger goes on:

22        [As read]  "That group included,

23        among others, a cybersecurity expert,

24        an advocate for people with

25        disabilities, election directors from

1          large and small counties," and then in

2          parentheses, "(their needs are quite

3          different from each other), and an

4          attorney who is an expert in election

5          law."

6               Do you see that?

7     A.   Yes.

8     Q.   Did you work with this multi-disciplinary

9  evaluation team?

10    A.   I was brought in as a subject matter

11 expert when it came to there was a section of the

12 bid having to do with their individual businesses,

13 which the intent of that was to make sure they had

14 the capital available and the ability to actually

15 fulfill this very large order.

16               I was never actually -- the stuff was so

17 plain, I was never actually, I don't believe I was

18 asked any questions during the evaluation process.

19 I can't recall for certain.  I might have asked a

20 couple of individual ones.

21               But no, the individuals who did that were

22 off on their own doing their evaluations, and then

23 they came together I think three times all

24 together.  And one on the final they had to drop

25 off because his mom died, and so he couldn't make

Page 114

1    the final one.

2        Q.   Who was the cybersecurity expert on that

3    team?

4        A.   Steve -- crap.  He's the C -- he was the

5    C.I.O. for the Georgia Technology Authority who had

6    done hundreds of R.F.P.s for the State having to do

7    with information technology.  And I cannot remember

8    his last name now.  I apologize.

9        Q.   Okay.  Is he still the C.I.O. for the

10   Georgia Technology Authority?

11       A.   He is not.

12       Q.   Do you know where he is today?

13       A.   I do not.

14       Q.   Do you know when he left, roughly?

15       A.   The new one came in at some point last

16   year, but I don't know when.  And I don't know if

17   he had left prior to the new one being appointed or

18   not.  I hadn't dealt with him directly since 2019.

19       Q.   All right.  Were there any employees of

20   the Secretary's office on this team other than

21   Jordan Fuchs?

22       A.   Kevin Rayburn, who is the attorney who's

23   the expert on election law in that listing there.

24       Q.   Anyone else?

25       A.   No.

1      Q.   Okay.  If you wanted to know what this

2   team considered, what they discussed, who would you

3   ask?

4      A.   I would probably go to the bid documents

5   and re -- and look at what they reviewed there.  I

6   think some notes are -- I think the real time notes

7   are also part of that record, but I'm not positive.

8   But you can look at it.  I think it's a public

9   record.

10      Q.   The discussions and the notes, the files

11   for this committee?

12      A.   Yes.  That's my understanding.

13      Q.   And when you say "public record," do you

14   mean it's publicly available, like, I could find it

15   on-line, or just that you could get it through --

16      A.   You should be able -- I believe you can

17   find it on-line.  I don't think it's an O.R.R., an

18   open records request kind of thing.  I believe you

19   can find it on-line under the Department of

20   Administrative Services procurement tab and look

21   for, you know, statewide voting system solution.  I

22   believe that would have all those documents.

23      Q.   All right.  Go to Page 75, if you would,

24   please.  It's the beginning of Chapter 7, 2020.

25      A.   I've got it.

1      Q.   If you look at the right column and go --

2  the long paragraph that ends towards the bottom

3  half of the second -- of the right column, do you

4  see the sentence, the last sentence that begins

5  "with our outside counsel"?

6      A.   Yes.

7      Q.   And here the Secretary writes:

8           "With our outside counsel at the

9       attorney general's office, who brought

10      in Georgia's leading conservative

11      election lawyers, I was confident we

12      could successfully defend all of our

13      election integrity measures."

14          Do you see --

15     A.   Yes.

16     Q.   -- that?

17     A.   Yes.

18     Q.   Do you know why it was important for the

19 Secretary to bring in specifically conservative

20 election lawyers to defend the election integrity

21 in Georgia?

22     A.   Because I think liberal election lawyers

23 would probably, from our point of view, attack some

24 of the things we considered to be election

25 integrity measures.

1      Q.    And why would you assume that?

2      A.    Well, because Marc Elias, and then as

3   discussed in this particular page the Four Pillars

4   program, and they were doing things to attempt to

5   weaken identification of individuals, extend times

6   that ballots can be received, you know, even

7   outside of the normal what the law called for,

8   things along those lines.

9      Q.    Why not obtain -- retain non-partisan

10  counsel to defend the election integrity?

11     A.    Frankly, I couldn't tell you.  Because I

12  don't think the -- seemingly in election law, I'm

13  not sure that there's such a thing as a

14  non-partisan counsel.

15     Q.    All right.  Come to Page 88, please.

16     A.    Yes, sir.  All right.  I'm there.

17     Q.    If you look at the top of the right-hand

18  column and go to the second sentence that begins,

19  "I first explained," do you see that?

20     A.    Yes, sir.

21     Q.    And there Secretary Raffensperger writes:

22             "I first explained that 'counties

23          run elections.'  We have" --

24     A.    Yes.

25     Q.    "We have 159 counties, and more

1          than 150 of them did a great job."

2          Do you see that?

3     A.   Yes, sir.

4     Q.   Do you agree with Secretary Raffensperger

5     that counties run elections in Georgia?

6     A.   Yes, sir.

7     Q.   Who is responsible for securing elections,

8     from the voting equipment to the servers to

9     anything that touches the election system in

10    Georgia?

11    A.   The counties.  We are responsible for our

12    E.M.S. at our Center for Elections, but the

13    counties secure the voting equipment and secure

14    their E.M.S.s.

15    Q.   Does the Secretary's office have any

16    program or practice of doing -- sort of assessing

17    whether the counties are complying with the

18    security measures that need to be taken to secure

19    the election system?

20    A.   We've worked in the past with C.I.S.A.,

21    the -- I always get that acronym wrong, it's

22    C-I-S-A -- to do assessments of counties to make

23    sure they have physical -- they're following the

24    physical protocols necessary.

25          In fact, we just met with them I want to

1    say a month ago to request we do another round of

2    that again.  So we do have some of those things

3    where we work with the federal government to help

4    counties move along on that front.

5            We also in the 2020 election cycle set up

6    some grants for security as well to help them

7    mitigate some of the things with the new equipment

8    they had to do.

9            So there's several things along those

10   lines, but it's really fundamentally the counties'

11   responsibility.  I mean, our grants were relatively

12   small, and they're really held for the smaller

13   counties than the bigger counties.

14       Q.   And what have you done with C.I.S.A. to

15   check the security measures at the county level?

16       A.   They physically send inspectors out to

17   look and make sure a block's here, is there a date,

18   is there a file, those kind of items.  Like, the

19   physical security was the biggest front-line thing

20   to try to do with the counties.

21       Q.   How often is that done in Georgia?

22       A.   I don't know the answer to that question.

23   I mean, I know we did it once early on when I was

24   here, and we're talking about them going out and

25   doing it again, you know, in a relatively soon time

Page 120

 1    frame.

 2          Like I said, we met last month and had --

 3    started having some initial discussions about

 4    having that done again.

 5    Q.    Does that process generate a report?  Does

 6    C.I.S.A. say, here's what we did and here's what we

 7    found?

 8    A.    I don't know.

 9    Q.    How would you find that out?

10    A.    I guess I'd probably go and talk to either

11    our elections director or Ryan Germany.

12    Q.    And Blake Evans is the elections director

13    today.

14    A.    Correct.

15    Q.    Is that right?

16    A.    Yes, sir.

17    Q.    And would it be the responsibility of the

18    counties to address any concerns that come up in

19    those assessments?

20    A.    Yes.

21    Q.    All right.  If you go -- stay on Page 88.

22    A.    Okay.

23    Q.    Look at the middle of the right column.

24    Do you see the second full paragraph that begins,

25    "but the county"?

Page 121

1        A.   Yes, sir.

2        Q.   Here Secretary Raffensperger writes:

3             "But the county officials and

4         election boards select the voting

5         locations, train poll workers,

6         distribute voting machines, and manage

7         almost every Election Day decision."

8             Do you see that?

9        A.   Yes, sir.

10       Q.   Do you agree with that?

11       A.   Yes, sir.

12       Q.   All right.  Go to Page 92, please.  Should

13   be the next one.

14       A.   All right.  I'm there.

15       Q.   And if you look at the full paragraph at

16   the bottom of the left column beginning,

17   "traditionally," do you see that?

18       A.   Yes, sir.

19       Q.   And here Secretary Raffensperger writes:

20            "Traditionally, 'no excuse'

21        absentee ballots had been a Republican

22        strength in Georgia, not a weakness.

23        And they could have remained so in

24        2020."

25            Do you see that?

Page 122

1        A.    Yes.

2        Q.    And absentee ballots in Georgia are

3    hand-marked paper ballots; right?

4        A.    Correct.

5        Q.    And so is it fair to say that the

6    Secretary's office finds the hand-marked paper

7    ballots that are done through the absentee system

8    just as reliable as the electronic voting equipment

9    that's used?

10       A.    No.   We -- on the reliability side, you

11   are much more likely to have an over-vote or an

12   under-vote on a hand-marked paper ballot done at

13   home.   So on that front, they're not quite as

14   reliable, no.

15       Q.    So then why does the Secretary believe

16   that hand-marked paper ballots through the absentee

17   system historically was a strength for Republicans,

18   not a weakness, if they're less reliable than the

19   voting machines?

20            MR. RUSSO:   Objection to form.

21            THE WITNESS:   What he's referring to

22       there is in a political way.

23       Historically, up until the 20 -- I want to

24       say 2018 election -- every previous

25       election from 2006, which was after the

1    2005 passage of the law, up until 2016,

2    Republicans had generally done better on

3    absentees than Democrats.

4         But the previous two election cycles,

5    the Democrats worked very hard to set up

6    good systems for tracking and getting

7    absentee ballots out.  And they just,

8    frankly, did a better job of working the

9    system the way -- legally the way it was

10   constructed than Republicans had

11   previously.

12        And his point saying the Republicans

13   could have made them a strength in 2020

14   given COVID-19, I think that's more of an

15   allusion to the fact that there were

16   Republicans who were saying, don't trust

17   absentee ballots, like the president at

18   the time.

19   BY MR. CROSS:

20   Q.   You're not suggesting that the hand-marked

21   paper ballots that are used in Georgia's absentee

22   system are unreliable; right?

23   A.   No, I'm not suggesting they're unreliable.

24   I'm saying they are less reliable in terms of

25   avoiding over-votes and under-votes than a

Page 124

1    B.M.D.-marked ballot.

2       Q.   Is there any other way in which you

3    believe they're less reliable than a B.M.D. ballot?

4       A.   I believe they're more open to having

5    issues done with them after the fact.  However, in

6    our system, the current system much more so than

7    the previous system with absentees, where if there

8    was an adjudication, it was all done manually and

9    there was no log file that was done.

10         Now, in the current system, there is a log

11   file.  So I think on that front, the absentees

12   under the current system are better than the

13   absentees in the old system in terms of just the

14   way they're being processed, but not the physical,

15   you know, attributes of the absentee ballots

16   themselves.

17      Q.   Okay.  All right.  Turn to Page 98,

18   please.

19      A.   Okay.

20      Q.   Do you see here the second paragraph in

21   the left column where Secretary Raffensperger

22   writes:

23         "For 60 days from Election Day

24          until January 2nd when President Trump

25          called and asked me to 'find 11,780

1        votes,' we investigated all complaints

2        received and looked for any evidence

3        of widespread fraud"?

4            Do you see that?

5      A.   Yes, sir.

6      Q.   Who was responsible for that investigation

7   or those investigations on behalf of the

8   Secretary's office?

9      A.   For the largest part of that, it would

10   have been our investigations division, which was --

11   at that point had the director of Frances Watson.

12   She would be overseeing all of that.

13            There was one particular part of the

14   investigation where we partnered with the G.B.I. to

15   do a signature match in Cobb County where we

16   basically needed more people to deploy on that.

17            So that was the only time we used a lot of

18   other resources, which was for that ballot -- or

19   sorry, envelope review of about 15,000 and a

20   handful of extras of the -- of the absentee ballot

21   envelopes.

22      Q.   And the G.B.I. piece, that only concerned

23   absentee ballots; do I understand that right?

24      A.   Doing the -- making sure the signature

25   match was done properly, yes.  That was what the

Page 126

1    G.B.I. piece was.  So the vast majority of them

2    were directly under Frances Watson through our

3    investigations division.

4        Q.   All right.  And if you come down to this

5    paragraph, do you see that Secretary Raffensperger

6    reports with respect to these investigations, he

7    writes:

8            "We did not see any evidence of

9         widespread fraud."

10           Do you see that?

11   A.   Yes.

12       Q.   Was there any evidence of any fraud at all

13   in the November 2020 election found by the

14   Secretary's office?

15   A.   The --

16           MR. RUSSO:  Objection to form.

17           THE WITNESS:  The use of the term

18       "fraud" is kind of a large, fraught word.

19       We definitely found instances of what we

20       referred to as illegal voting, as there is

21       in every election.

22           At the time of this writing, there

23       were -- we knew there were two dead people

24       that had voted.  By -- at this point we

25       now know there were four.

1          We know that there was potentially 74

2      people who were felons that might have

3      voted, and we're still investigating those

4      and knocking those numbers down.

5          But there's always some level of

6      illegal voting, but no organized kind of

7      fraud if that's what you're more asking

8      the question of and what he could be

9      referring to here.

10 BY MR. CROSS:

11     Q.   Are there any other instances of fraud or

12 illegal voting that was found through these

13 investigations beyond what you just identified?

14     A.   Yes.  And I'd refer you to the outcomes

15 from the State Election Board meetings where these

16 were vetted out, again, in public, and it's all

17 available on-line through the transcripts there,

18 and the referrals that were done to the attorney

19 general's office.

20     Q.   All right.  So whatever findings there

21 were coming out of these investigations, you're

22 saying -- are you saying those are all public?

23     A.   Of the ones so far.  I believe there's

24 another 50 that are still open right now out of,

25 like, I'm spitballing this, about 300 total

1    invest -- different investigations --

2        Q.   Okay.

3        A.   -- that are still to be brought forward.

4    And I believe there is another S.E.B. meeting

5    come -- State Election Board meeting coming up

6    in -- on March 16th.

7        Q.   And are those --

8        A.   And I apologize if you're hearing anything

9    in the background.  There's somebody blowing leaves

10   at the window next to us.

11           MR. RUSSO:  Give me one second.  I'm

12       sorry.  Can we take just a quick two-,

13       three-minute break.  I just need to tell

14       the folks doing the cleaning outside the

15       office to cut off the blower here so we

16       can -- you can hear Gabe and I can hear

17       Gabe.

18           THE WITNESS:  Sorry, guys.

19           MR. CROSS:  Yeah, yeah.  Go ahead.

20           THE VIDEOGRAPHER:  Off the record,

21       11:19.

22           (Whereupon, a discussion ensued

23        off the record.)

24           (Whereupon, there was a brief

25        recess.)

```
 1              THE VIDEOGRAPHER:  Back on the record
 2         at 11:22.
 3    BY MR. CROSS:
 4         Q.   All right.  Go to Page 118.
 5         A.   Can you hold on one second for me?  I
 6    apologize.
 7              (Whereupon, a technical discussion
 8          ensued off the record.)
 9              THE WITNESS:  Okay.  Go ahead.
10    BY MR. CROSS:
11         Q.   All right.  Go to Page 118 of the
12    Secretary's book, please.
13         A.   Okay.  The one that says -- starts off,
14    "in every case"?
15         Q.   Yes.
16         A.   Okay.
17         Q.   And if you come down, do you see the
18    heading that says Forensic Audit of Dominion
19    Equipment?
20         A.   Yes.  I've got it.
21         Q.   And then at the bottom of that page,
22    there's a paragraph that reads:
23              "Pro V & V was not the first to
24          work with us to protect our election.
25          We also partnered with the Department
```

1          of Homeland Security, the Georgia

2          Cyber Center, Georgia Tech security

3          experts and other election security

4          experts."

5               Do you see that?

6     A.   Yes.

7     Q.   What Georgia Tech security experts did the

8     Secretary's office partner with to protect

9     elections in Georgia?

10    A.   What's his name?  I can't recall his name

11    right now.  He's bald.  He looked at a couple of

12    our cybersecurity forms that we had done that were

13    coordinated with the Center for Election Innovation

14    and Research.  He has a Greek last name, if memory

15    serves.  I just can't recall it right now.

16    Q.   Is it Angelos Keromytis?

17    A.   Ah.  There we go.  Yes.

18    Q.   And what work has Dr. Keromytis done with

19    respect to Georgia election security?

20    A.   Basic overviews and discussions.  There's

21    never been a -- there's been no reports or anything

22    issued.  I remember we were having some discussions

23    with him.

24               And again, some of this is pre-COVID.  So

25    COVID kind of shut some of these things down that

1    we were doing.  But I remember he had had some

2    discussions we -- with our side and with several

3    people we had in a room kind of discussing those

4    things who were other experts on cybersecurity and

5    elections.

6          But there's not, like, a report that was

7    done or anything, but they had come in to kind of

8    review and say, what are you doing and those kind

9    of items in a general kind of way.

10    Q.   When was Dr. Keromytis first engaged to

11    advise the State on election security?

12    A.   Likely -- again, I don't think he was

13    engaged so much as he was brought in by the Center

14    for Election Innovation and Research, or even if we

15    engaged him -- I think there was a discussion of

16    it, but then COVID hit.  So I can't recall exactly.

17    But I know he was in meetings starting in 2019, if

18    memory serves.

19    Q.   And do you know whether he was retained by

20    the Secretary's office or someone else on behalf of

21    the State, or was he brought in informally?

22    A.   I don't know for certain.  My best guess

23    is it was informally with the intention of doing it

24    more formally, but then COVID yet.

25    Q.   If you wanted to know whether there was an

1    actual retention, who would you ask?

2         A.   I would probably talk to either our

3    procurement side or to Ryan Germany.

4         Q.   How often has Dr. Keromytis met with

5    individuals on behalf of the Secretary's office

6    regarding election security?

7         A.   I don't know.

8         Q.   Who would you ask --

9         A.   Let me be --

10        Q.   -- if you wanted to know that?

11        A.   I know there was at least two times he

12   did.  I would have to ask individuals, mainly Ryan

13   Germany probably.

14        Q.   Did you participate --

15        A.   I re -- well, I remember I met with him in

16   a group setting at least twice -- at least twice.

17   Pardon me.

18        Q.   Okay.  And who all participated in those

19   group meetings?

20        A.   I would have to refresh my memory.  I

21   honestly can't recall.

22        Q.   What's your best recollection of who

23   participated, who was there?

24        A.   David Becker from the Center for Election

25   Innovation and Research; Ryan Germany; I believe at

1    the time probably Kevin Rayburn; Chris Harvey, the

2    elections director at the time.

3            And I want to say there was a couple --

4    there was some -- two other people had come in from

5    out of town that I can't recall right now, but we

6    could -- I would have to -- I would have to look it

7    up to honestly tell you for certain.

8        Q.   All right.  Where would you look to find

9    out?

10       A.   I'd probably go to our scheduling

11   calendars and look.

12       Q.   Do you recall whether Jordan Fuchs was in

13   any of those meetings?

14       A.   I think she might have been in parts of

15   them but maybe not for the whole thing.  I just

16   honestly don't recall.

17       Q.   And what about the Secretary?

18       A.   The Secretary was going to be there for

19   parts of the discussion.  But again, I do not

20   believe he was there for all of the discussions.

21       Q.   Okay.  And what was the purpose of those

22   meetings with Dr. Keromytis?

23       A.   Well, it wasn't just with Dr. Keromytis.

24   It was several different people, I believe, who

25   were basically, what are the threats you're seeing

1    out there, what kind of things should we be on the

2    lookout for, those kind of -- in a general kind of

3    way.  I couldn't give you specifics now, because it

4    has been a couple of years.

5        Q.   Were there other election security experts

6    in those meetings?

7        A.   I believe so.  I mean, I know I remember

8    we flew -- somebody flew in, but I can't recall who

9    they are.  I'd have to check.

10       Q.   Do you recall where they came from?

11       A.   Out of state.  That's the best I can give

12   you.

13       Q.   Okay.  You just don't recall anything

14   about that other individual?

15       A.   I think there was two.  I can remember

16   kind of what they looked like, but I can't remember

17   specifically.  But again, it's been a couple of

18   years.

19       Q.   Do you know whether there were any notes

20   or minutes from those meetings?

21       A.   I do not.

22       Q.   Were there any specific election security

23   concerns that were discussed in those meetings?

24       A.   Again, on specificity's side, I don't

25   think there was, like, there's this vulnerability,

1    there's this fix.  I think it was in a general way.

2           Because we were still coming off the 2018

3    claims of stuff, and we're looking at a new system

4    and kind of what do you look for as in a general

5    way what do you -- what should -- what boxes should

6    you check, that kind of thing.

7           But it wasn't, like, there's a report,

8    there's this or -- just a generalized sort of

9    discussion to kind of say what should you be

10   looking for.  That's my -- that's my recollection.

11       Q.   And what was discussed about what you

12   should be looking for with respect to election

13   security?

14       A.   I would have to -- I wouldn't attempt to

15   characterize it.  I'd have to go back and refresh

16   my memory.

17       Q.   Okay.

18       A.   I mean, because at the time we were

19   talking about foreign actors.  And I think one of

20   the big things we talked about, I do remember this,

21   was it was really more around the voter

22   registration system.

23           And I remember somebody said, basically,

24   if you really wanted to screw with something, you

25   know, you go into the voter registration system and

Page 136

1    flip all the voter ID numbers one day and basically

2    everything would go to crap.  I mean, I remember

3    that being one of the big fears.

4             And there were more fears around the voter

5    registration systems in terms of what could be done

6    to have chaos versus any individual either --

7    B.M.D.s at the time.

8             I remember that was kind of like the

9    threat level was higher on that side for a foreign

10   actor to do something than there is on B.M.D.s.  I

11   do remember that kind of being part of the

12   discussion at one point.

13       Q.   Do you recall other specific concerns

14   raised with the voter registration system?

15       A.   No.  I mean, that was -- I remember -- I

16   just remember that being one of my generalized

17   take-aways from that, or from those meetings.

18       Q.   And do I understand correctly the

19   Secretary's office has decided to replace ENet?

20       A.   Yes.

21       Q.   And have you been involved in that

22   decision at all?

23       A.   Yes.

24       Q.   Why has the Secretary's office decided to

25   replace ENet?

1        A.    That's -- it's reached the end of its

2    useful life.  And one of the issues that we ran

3    into was, with the passage of SB 202, there were

4    two specific items that the ENet simply -- it was

5    built, it could do what it could do what it was

6    built for originally, but now it's being asked to

7    do additional things that it couldn't do.

8             One specific one is, because of the

9    passage of SB 202, there are now dual voter

10   registration dates for federal run-offs.  Because

11   we had the federal run-off back to state law level,

12   which is four weeks out.

13            So if there's a state run-off and a

14   federal run-off on the same day, some people will

15   be eligible to vote for one but not for the other,

16   and ENet could not basically handle doing that.  So

17   that was -- that was one of the big reasons.

18            And then in the absentee ballot portal,

19   it's requiring now that you have to have a scanned

20   or a physical image or copy of the request be

21   attached to the request that is submitted via the

22   portal, and ENet was not capable of doing that with

23   its rather older hard coding that it was done.

24            Those are -- those are two of the big

25   reasons we're moving to a new system.  And just an

1    updating system.  And we'll be moving to the cloud,

2    which provides for an additional level of security

3    under the FedRAMP, the -- on the Salesforce FedRAMP

4    cloud.

5        Q.   So do I understand correctly that among

6    the reasons to move away from ENet were security

7    concerns about that system as well?

8        A.   No.  Not security concerns so much as you

9    can make things better.  We didn't have specific

10   things we were worried about on the security side

11   for that.  Although, I think having something on

12   the FedRAMP is some -- is probably better even when

13   you have lots of security around your own data

14   center, which we have.

15       Q.   So are there any other meetings or

16   communications that you're aware of with

17   Dr. Keromytis or these other two individuals at

18   these two meetings in 2019 that you thought might

19   be election security experts regarding election

20   security?

21       A.   There may be, you know, correspondence

22   with other individuals from the meetings that I'm

23   not aware of.  I imagine there probably is, but I'm

24   not a -- like I said, I'm not aware of them.

25       Q.   Who would you ask to find out -- to find

1    out?

2        A.   Well, I mean, if -- not knowing what the

3    discovery is in this case, I mean, if there were

4    cybersecurity in there, I'm assuming -- and there

5    were E-mails in the State, you probably have them

6    if they exist.

7        Q.   Does Dr. Keromytis work directly with

8    Jordan Fuchs on election security issues?

9        A.   I don't know.  I mean, Jordan doesn't

10   really, she's not operationally doing stuff inside

11   election things, so I wouldn't -- maybe as an "to

12   advise" thing.  But outside of that, I wouldn't

13   know anything, no.

14       Q.   Do you know why Dr. Keromytis would have

15   Jordan Fuchs's cell number?

16       A.   Probably because they were in the meeting

17   together and they probably shared information.

18       Q.   Do you know why Jordan Fuchs would ask

19   Dr. Keromytis to call her on her cell specifically

20   about an election security concern?

21           MR. RUSSO:  Objection to form.

22           THE WITNESS:  No.

23   BY MR. CROSS:

24       Q.   Who would you ask if you wanted to know?

25       A.   I would guess Dr. Keromytis or Jordan

Page 140

1    Fuchs.

2        Q.   If you look back at this language we just

3    read, I asked you about the Georgia Tech security

4    experts, it also indicates other election security

5    experts.

6             Are there any election security experts

7    the Secretary's office has worked with on the

8    security of Georgia elections beyond the ones we've

9    already talked about?

10       A.   I don't know who the Secretary might be

11   referring to specifically here.

12       Q.   So there's no one you're aware of beyond

13   Dr. Keromytis, the two individuals in this meeting

14   that you can't recall, and whatever you're trying

15   to set up with Dr. Schwarzmann; is that fair?

16       A.   Well, again, you're mainly focusing on the

17   cybersecurity side.  We also have other security

18   side.  Like we -- like I said, we meet with

19   C.I.S.A.  We do those things.  We work with Center

20   For Election Innovation and Research on what are

21   the best practices for securing elections.

22            We work, from our point of view, working

23   with the Center for Civic Design to make sure your

24   absentee ballots are -- and applications and -- are

25   done -- the instructions are done better.

1        All those from my point of view are about

2   the system working and making it secure.  Then if

3   you're talking about the narrow band of

4   cybersecurity, I think you -- we've gone over the

5   specific ones we've talked about there.

6        Q.   Why has the Secretary's office never

7   engaged an election security expert to do a

8   forensic assessment of voting equipment in the

9   state of Georgia?

10       A.   We rely on our partner through our

11  contracts to make sure our systems are secure.  And

12  like I said, we are working to try to get something

13  over to the cyber center so we have another set of

14  eyes in case a specific issue comes up.

15       Q.   And by "partner," do you mean Dominion?

16       A.   Yes.

17       Q.   And the cyber center, that's the

18  Dr. Schwarzmann --

19       A.   Correct.

20       Q.   Okay.

21       A.   Correct.  And Colonel Toler I believe is

22  the other person we met with over there.

23       Q.   And he works in Dr. Schwarzmann's

24  department?

25       A.   No.  Dr. Schwarzmann works beneath him.

Page 142

1    He's over the whole cyber center.

2         Q.   They're both --

3              (Whereupon, technical difficulty

4          caused Mr. Cross to disconnect from

5          the deposition.)

6              THE REPORTER:  Let's go off the

7          record.

8              (Whereupon, there was a brief

9          recess.)

10             THE VIDEOGRAPHER:  Back on the record

11         at 11:50.

12   BY MR. CROSS:

13        Q.   All right.  Sorry about that,

14   Mr. Sterling.

15        A.   Technology help -- don't help unless it

16   helps, I know.

17        Q.   That's right.

18             Okay.  So do you still have, I think it's

19   Exhibit 3 up?

20        A.   I'm on Page 118 if that's where you wanted

21   to be.

22        Q.   Okay.  All right.  Go to Page 142, please.

23        A.   Okay.  All right.  I'm there.  Which

24   column?

25        Q.   The right column.  Do you see the heading

1    that reads Courts: The Ultimate Fact Check?

2        A.   Yes.

3        Q.   And you see, if you go to the second

4    paragraph under that heading, do you see the

5    paragraph that begins, "in the weeks and months"?

6        A.   Yes, sir.

7        Q.   And then the second sentence in that

8    paragraph, Secretary Raffensperger writes:

9            "The ultimate fact check in the

10           United States, however, occurs in

11           courts of law where witnesses swear to

12           tell the truth or risk imprisonment

13           and where lawyers must also tell the

14           truth or risk disbarment.  If you want

15           to know the truth, watch what happens

16           in court."

17           Do you see that?

18       A.   Yes.

19       Q.   Do you agree with Secretary Raffensperger

20   on that?

21       A.   In a generalized statement, yes.

22       Q.   Secretary Raffensperger has repeatedly

23   referred to Judge Totenberg in our case as a

24   radical left wing activist judge.  Have you heard

25   those comments, including just recently on a -- on

Page 144

1    a radio show?

2         MR. RUSSO:  Objection to form.

3         THE WITNESS:  The general feeling and

4         tone of that, if not the exact verbiage.

5         But generally speaking, yes, I'm aware of

6         that.

7    BY MR. CROSS:

8         Q.   Is that -- do you share his view?

9         MR. RUSSO:  Objection to form.

10        Relevance.

11        THE WITNESS:  I don't know if I

12        would -- I don't have enough information

13        she's -- whether she's a radical leftist

14        or not.

15   BY MR. CROSS:

16        Q.   Do you know what the basis is for

17   Secretary Raffensperger to say that about Judge

18   Totenberg?

19        MR. RUSSO:  Objection to form again.

20        THE WITNESS:  I can't get into the

21        man's mind, sir.

22   BY MR. CROSS:

23        Q.   Well, if you wanted to know why he's

24   saying that or why he believes that, would you ask

25   him?

Page 145

1      A.   Generally speaking, if you want to know

2   what somebody thinks, you would generally ask them.

3      Q.   So as you sit here, you're -- you don't

4   have any understanding as to why he's saying that?

5      A.   Not specifically, no.  I know he has those

6   feelings.

7      Q.   Okay.  All right.  Turn to Page 160,

8   please.

9      A.   Okay.

10      Q.   And do you see the second-to-last

11   paragraph, the last full paragraph that begins with

12   "additionally" at the bottom of the right-hand

13   column?

14      A.   Yes, sir.

15      Q.   Here Secretary Raffensperger writes:

16          "Additionally, the touch screen

17       interfaces and attached printers are

18       never attached to the poll pads and

19       are air-gapped so they cannot connect

20       to the Internet."

21          Do you see that?

22      A.   Yes.

23      Q.   And do you believe that to be true?

24      A.   Using the general layman's terms of that,

25   yes.

1      Q.   And I was going to ask, what is your

2   understanding of what "air-gapped" means in this

3   context?

4      A.   In this context it basically means you're

5   not through Bluetooth or WiFi going to have the,

6   either the B.M.D., the printer or the scanner or

7   any of those items be attached to the Internet.

8      Q.   And would you consider voting equipment

9   air-gapped even if there are -- there's removal

10  media that is sometimes connected to components of

11  the election system that are also used with

12  Internet connected computers?

13     A.   I know that in the -- a term of art and

14  specificity in the cybersecurity world is that that

15  may not be considered air-gapped.  But for reg --

16  when we're having these discussions, when you're

17  talking to regular voters and regular citizens,

18  they're thinking about being connected directly to

19  the Internet in real time versus a removable media

20  item.

21          And that would be the sec -- I'm assuming

22  that's what the Secretary's referring to here.  But

23  you'd have to talk to him directly to know for

24  certain, because it's his -- it's his mindset.

25     Q.   All right.  Come down to Page 186, please.

Page 147

1        A.    All right.

2        Q.    And if you look at the bottom, do you see

3    here there is -- Secretary Raffensperger is

4    reporting on a conversation that he had with

5    President Trump in late 2020 about the November

6    election?

7        A.    Actually, this is in early 2021, and this

8    is a transcript of that call.

9        Q.    So -- okay.  So this call happened in

10   early 2021?

11       A.    If memory serves, it was January 2nd.

12       Q.    Okay.  Got it.

13             And if you look at the bottom of the left

14   column on 186, do you see where it indicates that

15   Secretary Raffensperger said:

16             "We believe that we do have an

17              accurate election."

18             Do you see that?

19       A.    Yes.

20       Q.    And then it goes on and President Trump

21   responds:

22             "No.  No, you don't.  No.  No, you

23              don't.  You don't have.  Not even

24              close.  You're off by hundreds of

25              thousands of votes."

1          And he goes on from there.  Do you see

2     that?

3          A.   Yes.

4          Q.   You and Secretary Raffensperger have both

5     publicly stated that you voted for Trump in the

6     2020 election; right?

7          A.   Yes.

8          Q.   Do you worry at all that it undermines

9     voter confidence in Georgia that the Secretary

10    himself, and the chief operating officer and the

11    person responsible for implementing the Dominion

12    system, voted for a president who you have publicly

13    acknowledged misrepresented the November 2020

14    election?

15         A.   Restate your question.

16         Q.   Do you think it affects voter confidence

17    in Georgia that the Secretary himself and the chief

18    operating officer for the Secretary's office have

19    publicly stated they voted for a president who you

20    acknowledge has misrepresented the election in

21    Georgia in 2020?

22              MR. RUSSO:  Objection to form.

23              THE WITNESS:  I don't know that the

24         statement of facts that the Secretary, a

25         Republican, and myself, a Republican,

1        voted for the Republican nominee before

2        any of these things happened would --

3        should undermine that, no, any more than

4        anybody voting for Stacey Abrams when

5        she's claimed she was cheated out of the

6        election either.

7             And in fact, stating that we voted

8        for him and stating that he lost I think

9        would probably increase people's, you

10       know, belief in the outcome of the

11       election.

12   BY MR. CROSS:

13       Q.   Do you agree with Secretary Raffensperger

14   that President Trump was attempting to overturn the

15   will of Georgia's voters?

16            MR. RUSSO:  Objection to form.  And

17       objection based on relevance.

18            THE WITNESS:  And what -- where is

19       he -- I need some context for where that

20       statement is specifically.

21   BY MR. CROSS:

22       Q.   Looks like for some reason that page is

23   not here.  It's in Chapter 10 of his book, The

24   Aftermath, Our Hope.  He writes:

25            "President Trump was attempting to

1          overturn the will of Georgia voters,

2          and my duty was to prevent that from

3          happening."

4               MR. RUSSO:  Same objection.

5     BY MR. CROSS:

6          Q.   Do you agree -- do you agree with that?

7          A.   I believe the Secretary views his role as

8     following the law and following the Constitution

9     and telling the truth.

10              MR. CROSS:  All right.  We can break

11         for lunch.

12              THE WITNESS:  Okay.

13              THE VIDEOGRAPHER:  Going off the

14         record at 11:59.

15              (Whereupon, a discussion ensued

16          off the record.)

17              (Whereupon, there was a luncheon

18          recess.)

19              THE VIDEOGRAPHER:  We are back on the

20         record at 12:36.

21    BY MR. CROSS:

22         Q.   All right.  Mr. Sterling, let me pull up

23    the next exhibit.

24         A.   So we're leaving the book and going to

25    another exhibit in the whatchamadigger?

Page 151

1       Q.   Yes.

2       A.   Okay.

3       Q.   And I forgot to ask you, Mr. Sterling.  I

4    know you had some, like, oral surgery or something

5    recently.  Are you on any medication or anything

6    today that would affect your ability to testify

7    truthfully and completely?

8       A.   No.  Antibiotics, that's about it, which

9    make me a little bit itchy.  But no, no pain meds

10   or anything.

11      Q.   Okay.

12      A.   Have you loaded the other one yet?

13   Because I'm not seeing it.

14      Q.   No, no.  Sorry.  It's coming up in just a

15   moment.

16                     (Whereupon, Plaintiff's

17                      Exhibit 4 was marked for

18                      identification.)

19   BY MR. CROSS:

20      Q.   All right.  See if you can pull it up now.

21      A.   Okay.  There we go.

22      Q.   So it's a video file.  It should play.  If

23   it doesn't play on your end, let me know.

24      A.   It gives me an option to say press play, a

25   video button.  Should I go ahead and do that?

Page 152

1          Q.    Go ahead and do that.

2          A.    58 seconds?

3               (Whereupon, a video recording was

4           played.)

5               THE WITNESS:   Okay.

6     BY MR. CROSS:

7          Q.    So Mr. Sterling, Exhibit 4 is a video

8     where you spoke at a -- some sort of event; is that

9     right?

10         A.    Yes.

11         Q.    And what was that event?

12         A.    Democracy Week in Geneva sponsored by the

13    University of Geneva and the Albert Hirschman

14    center for democracy [sic] at the University of

15    Geneva in the state of Geneva.

16         Q.    Okay.  And everything we just heard in

17    Exhibit 4 in the video, does that still represent

18    your view today?

19         A.    Yes.

20         Q.    And why is it historically important in

21    Georgia for Georgians to vote in person?  What is

22    it about the pageantry that's important?

23         A.    This is a personal opinion more than

24    anything.  It's -- I guess the best way to

25    characterize it is it's I am getting in my car, I

1    am going through the -- I guess "pageantry" is not

2    the right word.  I couldn't think of the right

3    word, so I used the best word I could think of in

4    the moment.

5         It's essentially, it's a cultural and

6    civic duty that you are now exercising in a very

7    public kind of way.  I mean, I was saying that

8    there's a difference in Georgia because

9    historically, like I said, 95 to 96 percent of --

10   or 97 percent of people vote in person, just either

11   advanced in person or at their polling location,

12   and that's just been historically how it's normally

13   been done.

14        Now, I don't know whether it's important

15   or not.  It just is.  I mean, it is a statement of

16   fact that that is what people do in this state.

17   Q.   And you mentioned M.L.K.  What was the

18   significance of M.L.K. and the point that you were

19   making about voting in person?

20   A.   The point about that is we have a large

21   population in the state that for many years was

22   denied the right to vote easily, and not just this

23   state, but this country.  And M.L.K. is from

24   Georgia.  That was the rationale behind making that

25   emotional connection in that particular part of the

Page 154

```
 1    talk.

 2         Q.   Okay.   Thank you.

 3                        (Whereupon, Plaintiff's

 4                         Exhibit 5 was marked for

 5                         identification.)

 6    BY MR. CROSS:

 7         Q.   All right.   Grab the next exhibit, please,

 8    if you would, Exhibit 5.

 9         A.   Bear with me.

10         UNIDENTIFIED SPEAKER:   It'd really

11         help if you were --

12         THE WITNESS:   Hold on.

13         UNIDENTIFIED SPEAKER:   -- managing

14         that.

15         THE WITNESS:   Oh, sorry.   Okay.   All

16         right.   I pulled it up.

17    BY MR. CROSS:

18         Q.   All right.   And you see that this is

19    entitled State Defendants' Objections and Responses

20    to Curling Plaintiffs' First Set of

21    Interrogatories?

22         A.   Yes.

23         Q.   And if you come down to the very last

24    page, you'll see that there's a verification of the

25    responses that you signed, looks like July of 2019.
```

1    Do you see that?

2        A.   I don't know if I signed it July -- on

3    July 19th, but -- July of '19, but I know I did

4    sign this.

5        Q.   Okay.  All right.  Come down to

6    interrogatory number seven, please, which is at the

7    bottom of --

8        A.   Do you know what page that's on to make it

9    a little easier?

10       Q.   Yeah.  It starts at the bottom of Page 9.

11       A.   Bear with me.  I'm not used to this

12   computer, so I'm having to navigate.

13       Q.   Okay.

14       A.   The one that says, "describe with

15   specificity each alternative system"?

16       Q.   You know what, I'm sorry.  I jumped too

17   far.  Go to interrogatory number two.

18       A.   Number two, okay.

19       Q.   Yeah.  It's at Page 3.  Just let me know

20   when you've got that part.

21            (Whereupon, the document was

22        reviewed by the witness.)

23            THE WITNESS:  I'm on the question

24       now.  I've read the question.

25   BY MR. CROSS:

Page 156

1      Q.   Okay.  So you see interrogatory number two

2    states:

3           "Describe with specificity each

4         known, attempted or suspected security

5         vulnerability or security breach

6         involving any part of the election

7         system since Georgia adopted and

8         implemented D.R.E.s..."

9           Do you see that?

10     A.   Yes.

11     Q.   And then if you come down to the response,

12   come down to the top of Page 4, you see the

13   paragraph that reads, "subject to and without

14   waiving the foregoing objection"?

15     A.   Yes.

16     Q.   And the response indicates:

17          [As read]  "State defendants state

18        that the incident involving Kennesaw

19        State University" or "(K.S.U.) Web

20        server and the hacking attempt by

21        Logan Lamb, information regarding both

22        of which is already well known to

23        Curling plaintiffs, are the only

24        incidents responsive to this

25        interrogatory."

Page 157

1          Do you see that?

2      A.   Yes.

3      Q.   What investigation was undertaken at the

4  Secretary's office to prepare that response to this

5  interrogatory?

6      A.   Specifically I'm a -- it's my dealing with

7  the -- our attorneys and then with relevant staff.

8      Q.   What staff?

9      A.   Mainly, in that particular case, and this

10  is D.R.E. time, it's really Michael Barnes would

11  have been the main person to deal with anything

12  around those.

13     Q.   Was there anything else done?  For

14  example, did you engage any cybersecurity experts

15  or other election security experts to do any

16  assessment of the election system to answer this

17  interrogatory?

18     A.   Not to my knowledge.

19     Q.   All right.  You can put that aside.

20          Sorry.  I'm just trying to get the next

21  one here.

22                    (Whereupon, Plaintiff's

23                     Exhibit 6 was marked for

24                     identification.)

25  BY MR. CROSS:

1      Q.   All right.  Grab Exhibit 6, if you would,

2   please.

3      A.   Okay.  All right.  I have it up.

4      Q.   And do you see that this is the State

5   Defendants' Responses and Objections to Curling

6   Plaintiffs' Second Set of Interrogatories?

7      A.   Yes, sir.

8      Q.   And if you come down to Page 24 of the

9   P.D.F., you'll see a verification that you signed

10  for this as well.

11     A.   Yeah.

12     Q.   And that one, do you see it's dated August

13  23rd, 2021?  Do you see that?

14     A.   Yes.

15     Q.   Okay.  And then if you come to the next,

16  Page 25 of the P.D.F., just beyond your

17  verification, do you see where it says

18  interrogatory number 15?

19     A.   One moment, please.  I'm sorry.  I was

20  going the other direction assuming that was the way

21  you were going, so let me --

22     Q.   Oh.

23     A.   -- scroll back down.

24     Q.   Sorry.

25     A.   That was my fault for making an

Page 159

1    assumption.  Okay.  So I'm on Page 24 of 32,

2    interrogatory number 15.

3         Q.   Yeah.  And do you see where it says --

4    right.  So you've got interrogatory number 15.  And

5    do you see that you've got requests for 15, 16, 19

6    and 20 and 21, 24, 25?

7              They continue for a few pages.  Do you see

8    that?

9         A.   Yeah.  I mean, I see it.  And I saw it

10   before.  But that's -- do you want me to read it

11   in -- for specificity in the case now or just

12   acknowledging that I've seeing this.

13        Q.   Just right now I'm just asking if you've

14   seen it.  And then if you come on beyond that,

15   you'll get to a heading that says Response to

16   Revised Interrogatory 15.

17             Do you see that?

18        A.   Yes.

19        Q.   And then you see that there are responses

20   from state defendants to those revised

21   interrogatories that go through the end of the

22   document.

23             Do you see that?

24        A.   All the way to the end?

25        Q.   Yeah.

Page 160

1        A.    Responses, yes, I see that.

2        Q.    Okay.  Have you seen these revised

3    interrogatories and the responses before now?

4        A.    Yeah.

5        Q.    When did you see them?

6        A.    I think in preparation for this

7    deposition, spitballing, two or three weeks ago

8    when I saw these revised ones again.  I might have

9    seen them before, but I remember going over them

10   again a couple weeks ago, two or three weeks ago.

11       Q.    Okay.  And let me just pause there for a

12   moment.  What did you do specifically to prepare to

13   be a corporate representative on the designated

14   topics today?

15       A.    Meeting with the attorneys and then

16   dealing with different staffers within the office,

17   specifically, you know, Merritt Beaver, Michael

18   Barnes, Ryan Germany on our side, to kind of go

19   over some of these things.

20            Occasionally, I think I might have had --

21   gone to Blake Evans for some stuff.  But in gen --

22   just basically talking to other staffers and

23   looking over what the questioning was going to be

24   around.

25       Q.    When did you start that process?

1     A.   To me it's kind of an ongoing process.

2   Because I'm dealing with them all the time on

3   different things that were tangential or con --

4   directly substantive to this.

5          But probably, you know, well over a month

6   ago, probably two months ago, if not even before

7   that to a degree.  Because we knew this was -- I

8   think at that point we'd -- I don't know if I was

9   "named" named as the 30(b)(6) for this, but we knew

10   it was a likelihood that I would be called for some

11   of these kind of things, so just kind of refreshing

12   my memory on some of the stuff we'd done previously

13   and then kind of going over some of the specifics.

14     Q.   Is there anyone you met with or spoke with

15   to prepare for your testimony today beyond

16   Mr. Beaver, Mr. Germany, Mr. Barnes, Mr. Evans or

17   counsel?

18     A.   Not specifically, no.  And to -- but I

19   could have met with people that some of their

20   information might feed some of the responses to

21   this, but it wasn't specifically for that purpose.

22     Q.   Okay.  And what did you discuss with

23   Mr. Beaver to prepare for today?

24     A.   If memory serves, we were really talking

25   about operating systems, you know, noting that the

Page 162

1    B.M.D. runs on an Android-based system, whereas our

2    old systems were Windows-based, things along those

3    lines with Mr. Beaver.

4        Q.    What did you discuss with Mr. Barnes to

5    prepare for today?

6        A.    Kind of some history on D.R.E.s, you know,

7    how we do ball -- the ballot building, the

8    transfers, and then how we get information back in

9    to then certify the elections, things along those

10   lines.

11       Q.    How long was your discussion with

12   Mr. Barnes --

13       A.    I couldn't --

14       Q.    -- approximately?

15       A.    -- tell you.  A couple hours maybe.  I

16   mean, it wasn't like we sat and talked for two

17   hours, but it was over a couple-of-hour period, you

18   know, I call and call back, that kind of thing.

19       Q.    I see.  And what about Mr. Beaver?

20       A.    You've met Mr. Beaver before.  His -- he

21   speaks nearly as fast as I do.  And a lot of it is

22   popping into the office, going over things and

23   going back out, following up.

24            So over a period of time, again, another

25   few hours off and on, but it was over a period of

1   time just because we both generally tend to be

2   staccato in our way of communicating with each

3   other.

4       Q.   Okay.  And what did you discuss with

5   Mr. Evans in preparation for today?

6       A.   In general, sort of like how is our

7   training looking right now or what are we doing on

8   those fronts.  And not directly involved in this,

9   but since training is about mitigation, you know,

10  he and I are dealing with we reorganized how we

11  have the elections division set up, we set up

12  another training center down in Macon, things along

13  those lines.

14      Q.   And what does training -- how does that

15  pertain to mitigation?

16           And when you say --

17      A.   How --

18      Q.   -- "mitigation," do you mean election

19  security?

20      A.   Election security and just overall good

21  processes and good handling.  And again, it's not

22  just cyber; it's everything.  It's -- because we

23  still have the issue of the -- one of the things we

24  saw coming out of 2020 was the first time in

25  literally 20 years that there were paper ballots.

1           And some counties were better than others

2     at handling -- at doing their reconciliations and

3     handling the paperwork and doing those things

4     properly.

5           And you know, some generalized discussions

6     around the audit slash hand tally.  And then what

7     would audits look like going forward and some other

8     discussions around those fronts.  There's other

9     things, too, but those are the ones that come top

10    of mind to answer your question.

11        Q.   Okay.  Is there anything else that comes

12    to mind that you recall discussing with Mr. Evans

13    for today?

14        A.   Not off the top of my head, no.  I'm

15    sorry.

16        Q.   And when did you talk with Mr. Evans for

17    today's deposition?

18        A.   Again, they sort of blend together.

19    There's regular work and there's also, hey, by the

20    way.  So it was off and on over the last three or

21    four weeks again, just, you know, hey, what about

22    this, and as I reviewed things in the middle.

23           Then it -- the time I normally spent on

24    preparing for this in a specific way was when I

25    would sit down with the attorneys.  We'd kind of go

1    through these things, we would occasionally then

2    call -- the biggest one was calling Michael Barnes.

3    That was one where we had a lot of the back and

4    forth.

5        Q.   So you had a call with Michael Barnes

6    while you were meeting with the lawyers to prepare

7    for today; is that right?

8        A.   I think it was multiples on the same day,

9    but yes.

10       Q.   Okay.  During any of your meetings with

11   the lawyers to prepare for your deposition today,

12   did you call anyone else?

13       A.   Not that I recall.

14       Q.   What did you discuss with Mr. Germany to

15   prepare -- to prepare for today?

16           MR. BARGER:  And just to the extent

17       it's something that's privileged, I'm

18       going to object.

19           THE WITNESS:  He kind of gave me the

20       rundown of what 30(b)(6) meant, because

21       I'm not an attorney, and the generalized

22       kind of these are the areas you're going

23       to be going over.

24           It was sort of a in a deposition,

25       this is how you do it.  Because in my last

1        deposition, I was doing it in my personal

2        capacity and it was a little bit

3        different, I think.  And just sort of

4        generalized kind of how do you -- how do

5        you approach these things.

6   BY MR. CROSS:

7        Q.   Okay.  Let me ask the question this way.

8   Is there any information you received from

9   Mr. Germany that you're relying on to testify about

10  on the topics that you were designated today?

11            And I don't mean, like, deposition

12  process.  I mean substantive facts that you're

13  providing on behalf of the office on those topics.

14       A.   I would have to -- depending on the

15  questions I get, nothing so far I've gone over.

16  But I think there was some of the things we went

17  over as far as how the laws were pulled together

18  and things we might be looking at on some of those

19  things.

20            Like, I didn't have -- it's hard to

21  separate general work product and general dealing

22  with our attorneys and then this.  They all kind of

23  blend together in certain parts of the role.

24       Q.   Okay.  What factual information did you

25  obtain from Mr. Germany in preparation for your

Page 167

1    deposition today pertaining to the topics, if any?

2        A.   I know I -- I know I've probably gotten

3    some.  But unless you ask me a specific question, I

4    probably couldn't point back to it.

5        Q.   Okay.  So there's nothing that immediately

6    comes to mind; is that fair?

7        A.   Correct.

8        Q.   Did you review any documents in

9    preparation for your testimony today as a corporate

10   representative?

11       A.   Yes.

12       Q.   What did you review?

13       A.   I remember there were some E-mails, some

14   of the earlier interrogatory answers.  Let's see.

15   Some other correspondence.  But this -- those

16   general things kind of related to the questioning

17   on some of the stuff we already produced that I

18   might not have seen in a while or not seen at all

19   before, those types of items.

20            But I would have to look at it to tell

21   you, yes, this was for that purpose.

22       Q.   Describe as specifically as you can the

23   documents.  Put aside the discovery responses, the

24   interrogatories, the E-mails and other things that

25   you reviewed for today.

1        A.    E-mails of correspondence.

2        Q.    Like, E-mails with whom, regarding what?

3        A.    I remember the -- the one that I hadn't

4    seen before was the one from -- a couple from

5    Michael Barnes.  I didn't see any of my own that I

6    recall seeing during the -- during the prep.  And I

7    think there might have been some O.E.B.s at some

8    point we looked at -- I'm sorry, Official Election

9    Bulletins, things like that.

10          But I, again, it's going -- been going on

11   over, like, a couple of months.  And then with the

12   attorneys, you know, specifically I -- if I didn't

13   understand something or didn't see something, I

14   would say, well, what is this, what are they

15   referring to here, and they would show me some

16   documents.

17          Again, I remember E-mails and a couple

18   other things, but there wasn't too much outside of

19   that.

20   Q.    So you can't recall, like, specifically

21   particular documents you looked at other than the

22   discovery -- the interrogatory responses and a

23   couple E-mails from Mr. Barnes; is that right?

24   A.    Yeah.  Off the top of my head, yeah.  I'm

25   sure there's a couple other things.  But I mean,

Page 169

1    those are the ones where I kind of had to re --

2    either refresh my memory or be shown them for the

3    first time.

4        Q.   What did the two E-mails with Mr. Barnes

5    concern?

6        A.   I remember one was specifically where

7    there was sort of an ambiguous E-mail from him

8    about use of, what do you call it, media that they

9    already had.  That was one that there was a

10   specific thing that -- and then there was another

11   one that I can't recall right now.  That one stuck

12   out in my mind.

13       Q.   Okay.  All right.  Take a look at, if you

14   still have the exhibit in front of you, the revised

15   interrogatory responses, and take a look at --

16       A.   Okay.

17       Q.   -- take a look at 15.  And if you come to

18   the second paragraph that begins "additionally," do

19   you see that?

20       A.   One moment, because I'm back in the

21   questions again.  So where am I looking?  I'm on

22   Page 29 of 32.  So where am I looking on this?

23       Q.   Do you see the heading Response to Revised

24   Interrogatory 15?

25       A.   Yes.

1     Q.   And then you'll see the second paragraph

2    that begins "additionally"?

3     A.   Yes.

4     Q.   And the last sentence there reads:

5          "You asked state defendants to

6          'describe with specificity each

7          successful or attempted instance of

8          unauthorized access to or copying or

9          alteration of' the following."

10         And then there's a list of various types

11   of computer equipment in the election system.  Do

12   you see that?

13    A.   Yes.

14    Q.   And then if you come down to the next page

15   at the end of the lettered bullets, do you see

16   the --

17    A.   Yes.

18    Q.   -- the paragraph that begins, "as you

19   know"?

20    A.   Yes.

21    Q.   And the last sentence in that paragraph

22   reads:

23         "To investigate each of these

24          interrogatories is extremely

25          burdensome and would require

1        significant time."

2            Do you see that?

3    A.    Yes.

4    Q.    Did I understand correctly that the state

5    defendants, including the Secretary's office, did

6    not undertake such an investigation for this

7    response?

8    A.    As we point out in the response itself,

9    these are in the possessions of the counties, and

10   there's over 30,000 of them.  So I think the

11   statement that it would be burdensome and require

12   significant time and resources still applies.

13           So we did not send anybody to go and look

14   at each individual B.M.D. or each individual E.M.S.

15   and printers and scanners, et cetera, that are

16   listed in the lettered items above, correct.

17   Q.    And then if you come to the very last

18   paragraph there, above the heading regarding

19   interrogatory 16, it reads:

20           "In an effort to provide

21       information responsive to this

22       request, state defendants respond that

23       they do not have knowledge of any

24       election equipment used with the

25       Dominion election system being hacked

1        in an election in Georgia."

2            Do you see that?

3    A.    Yes.

4    Q.    And do I understand correctly, there was

5    not a specific investigation undertaken for that

6    response; is that right?

7    A.    Well, I think the statement there kind of

8    stands on itself, that we were unaware of anything

9    that was reported or anything.  We have no evidence

10   of anything.  So that I think this, again, stands

11   on its own.

12   Q.    Right.  But you didn't undertake a

13   particular investigation or an inquiry to prepare

14   that response, you just relied on what you'd

15   already known or did not know as of that date;

16   right?

17   A.    We relied on the fact that there was no

18   reports of anything untoward along those lines.

19   And we had done a lot of the other things that we

20   mentioned earlier, which included the hand tally,

21   which included the L & A, which included the hash

22   testing and those kind of items.

23            So things were done, not necessarily at

24   the request of this specific interrogatory, that

25   could give us the ability to say we are not aware

1    of any issues regarding what's being alleged or

2    asked here.

3         Q.   So in preparing this response, for

4    example, you did not go, and before you verified

5    it, you didn't go and review investigative files or

6    speak with Frances Watson or others in the

7    investigative department; right?

8         A.   I personally didn't.  However, employees

9    together, staff, Mr. Germany, Blake, Frances at the

10   time, she's no longer with the office, obviously,

11   I'm sure they were all discussed with them, and it

12   was represented to me that we have no knowledge.

13        And I am still aware of no alleged actual

14   acts other than some of the claims made by the

15   President, some of their failed lawsuits.  So I

16   have no evidence of anything like that happening --

17   former president, pardon me.

18        Q.   But when you verified this, you relied on

19   the representations from counsel that this was

20   accurate; is that right?

21        A.   And staff.

22        Q.   What staff?

23        A.   State staff.

24        Q.   Sorry.  Who specifically?

25        A.   Mr. Germany.  I mean, everybody involved

Page 174

1    in pulling these together, which my assumptions

2    were would be our investigations division,

3    Mr. Germany working with our counsel and, you know,

4    working with our elections divisions.

5            Again, we've seen no evidence of that in

6    the state of Georgia.

7        Q.   I just want to make sure I understand that

8    you're assuming that people in the investigation

9    division or otherwise were consulted in preparing

10   this response, you did not personally confirm that;

11   right?

12       A.   I did not personally go to our acting

13   person and ask that question, no.

14       Q.   Okay.  And you did not personally confirm

15   with counsel, for example, that they or anyone else

16   had consulted the investigations division for this

17   answer; right?

18           MR. RUSSO:  And I'm just going to

19       object to the extent it calls for

20       attorney-client privileged communication.

21           THE WITNESS:  Again, it's sort of

22       like a dog that didn't bark.  It wouldn't

23       occur to me that anything would be

24       represented to me incorrectly.

25   BY MR. CROSS:

1      Q.   And I'm not suggesting that it's

2    incorrect.  I just want to understand what you're

3    relying on, Mr. Sterling, versus what you're

4    assuming.  That's all I'm trying to get at.

5      A.   Okay.

6      Q.   So for this response, you did not confirm

7    with counsel or others that, in preparing this

8    response, someone actually consulted the

9    investigations department.  That's something you're

10   assuming happened.  You don't know that it

11   happened.

12           Is that right?

13     A.   That is correct.  I am making an

14   assumption of that particular, very specific

15   statement, yes.

16     Q.   Okay.

17     A.   But also, outside of that I have my own

18   basic knowledge that I talked to the investigators

19   and the chief investigator and the acting chief

20   investigator.  And I'm making an assumption there

21   that if some -- if there was a claim of a hack or

22   there was evidence of it, it would have kind of

23   bubbled up to the top to begin with.  And I am not

24   aware of anything like that.  So it didn't occur to

25   me to say, are you sure?

 1      Q.   Yeah.  But the -- we've seen that

 2   information regarding the security of the election

 3   system does not always get shared with folks across

 4   the office, including yourself; right?

 5           MR. RUSSO:  Objection to form.

 6           THE WITNESS:  And again, in the

 7        investigation side, I don't have -- that

 8        statement is not the case.

 9   BY MR. CROSS:

10      Q.   So you're saying you have complete

11   visibility into everything that the investigations

12   department and the Secretary does, what they

13   investigate, how they investigate and what they

14   find with respect to election security?

15      A.   No.  What I said was, if something had

16   reached that level of what would be an accused

17   hacking or anything like that, again, in all

18   likelihood my assumption is it would have bundled

19   up -- bubbled up to the senior leadership, and that

20   did not happen.

21      Q.   And yet it did not bubble up to senior

22   leadership that Dr. Alex Halderman had created a

23   nearly hundred-page report identifying

24   vulnerabilities with the election system in July of

25   2021; right?

1          MR. RUSSO:  Objection.

2          THE WITNESS:  I believe -- I don't

3      believe I said that.  We were aware that

4      happened.  It's inside of a lawsuit, which

5      is litigation, which is a different animal

6      than the actual regular functioning of the

7      office.

8  BY MR. CROSS:

9      Q.   So information that's developed in a

10  lawsuit is treated differently than information

11  that arises in the ordinary course; is that right?

12     A.   I would say in a general statement that

13  that's correct, yes.

14     Q.   All right.  And the response here refers

15  to being "hacked in an election in Georgia."  Do

16  you see that?

17     A.   In the final sentence, yes.

18     Q.   Yeah.  If you come back to the request,

19  which is quoted in that second paragraph we read

20  earlier, "describe with specificity each successful

21  or attempted instance of unauthorized access to or

22  copying or alteration of" the following equipment,

23  I just want to make sure we're not missing each

24  other on terminology.

25          As a representative of the Secretary of

Page 178

1    State's office, as the individual who verified the

2    responses to these interrogatories, are you aware

3    of any successful instance of unauthorized access

4    to or copying or alteration of data or software on

5    any equipment used with the Georgia election

6    system?

7              MR. RUSSO:  Objection to form.

8              THE WITNESS:  I am not.

9    BY MR. CROSS:

10        Q.   Okay.  And would that include, for

11   example, like, the voter registration system?

12        A.   Yes.

13        Q.   Okay.  Are you aware of any attempted

14   instance of unauthorized access to or copying or

15   alteration of the election system in Georgia?

16             MR. RUSSO:  Objection to form.

17             THE WITNESS:  It depends on what

18        you're defining as the election system in

19        Georgia.  I mean, there was the Logan Lamb

20        issue.  There is, if I remember correctly,

21        around that that was really about an

22        F.T.P. site, not the actual registration

23        system itself.

24             So I want to be careful by answering

25        these things.  I'm unaware of anybody

```
 1        actually getting into the registration

 2        system itself or even attempting other

 3        than people -- oftentimes we see people go

 4        to SOS.GA.gov assuming they're finding a

 5        way to get there.

 6             And you know, we have thousands of,

 7        you know, I guess they call them hits,

 8        some people trying to do things on that

 9        front.  But that's not any good -- that's

10        no way to get to the actual ENet system.

11             So again, I'm not aware of anybody

12        getting to a point where we could say,

13        yes, that was an attempt to actually get

14        to the registration system itself.

15   BY MR. CROSS:

16        Q.   All right.  Let me pull the next exhibit.

17        A.   Let me know when it's there.

18        Q.   Okay.

19                       (Whereupon, Plaintiff's

20                        Exhibit 7 was marked for

21                        identification.)

22   BY MR. CROSS:

23        Q.   All right.  You should have Exhibit 7.

24        A.   First Requests for Admission?

25        Q.   Yes.
```

Page 180

1       A.   Okay.

2       Q.   Have you seen this document before?

3       A.   I don't know that I've seen this one

4    before.

5       Q.   Okay.  You can see this is State

6    Defendants' Responses to Curling Plaintiffs' First

7    Requests for Admission; right?

8       A.   Yes, I see that.

9       Q.   Okay.

10      A.   The problem I'm having now, I've seen so

11   many of these that kind of look alike, that naming

12   convention doesn't strike -- first requests for

13   admission, I don't recall seeing that, but I might

14   have seen this.

15      Q.   All right.  Take a look at -- if you come

16   to Page 2, you'll see where the requests and the

17   responses start, and you'll see number one there.

18   Do you see that?

19      A.   Under Objections and Responses to

20   Requests?

21      Q.   Yes.

22      A.   Yes, I've got it.

23      Q.   And you see the first one here reads:

24           [As read]  "Admit that Deputy

25        Secretary of State Jordan Fuchs was

1        not aware of any federal judge finding

2        that Curling plaintiffs have zero

3        credibility when she made the

4        following statement on October 2020,

5        'other federal judges have more

6        accurately found that these same

7        activists and experts who are'"

8        spending disin -- "'spreading

9        disinformation in Georgia have zero

10       credibility.'"

11            Do you see that?

12       A.   Yes.

13       Q.   And if you come down to the response,

14  you'll see at the end of the response paragraph at

15  the top of the next page the request is denied?

16       A.   I'm trying -- I see response, "state

17  defendants object to this request."  That's at the

18  end of Page 2.  And where are you telling me to

19  look?

20       Q.   Go to the top of Page 3.  The last

21  sentence of that paragraph before the second

22  request, do you see the end of that says "the

23  request is denied"?

24       A.   "Subject to and without waiving

25       the foregoing objections, the request

Page 182

1       is denied."

2            Yes.

3       Q.   Do you know what the basis is for that

4   denial?

5       A.   I do not.

6       Q.   As you sit here, are you aware of any

7   federal judges that have found that my clients,

8   Donna Curling, Donna Price, Jeffrey Schoenberg, or

9   any of their experts, Dr. Halderman, Dr. Andrew

10  Appel or others, have zero credibility?

11            MR. RUSSO:  Objection.  Form.

12            THE WITNESS:  I'm not personally

13       aware of that, no.

14  BY MR. CROSS:

15      Q.   And that's not something you discussed

16  with Jordan Fuchs?

17      A.   No.

18      Q.   All right.  Take a look at number eight,

19  which is on Page 7, please.  Just let me know when

20  you've got it.

21      A.   I'm there, yeah.

22      Q.   And number eight reads:

23            "Admit that the Secretary of

24        State's office did not work with a

25        consulting cybersecurity firm to

1        conduct an in-depth review and formal

2        assessment of the election system."

3            Do you see that?

4     A.   Yes.

5     Q.   And if you come down to under eight, you

6     see the last sentence for the response reads:

7            "Because the Secretary of State's

8        office worked with consultants that

9        reviewed and assessed the State's

10       election system, this request is

11       denied."

12           Do you see that?

13    A.   Yes.

14    Q.   What consultants are referred to here that

15    reviewed and assessed the State's election system?

16    A.   I don't know.  But we do have a contract

17    with Dominion voting systems that they -- we have

18    to work with them, and it's on their responsibility

19    to keep us up to the highest level of security

20    possible and make us aware of any issues that may

21    come forth.

22    Q.   Are there any vendors or consultants that

23    you can think of for this response apart from

24    Dominion?

25    A.   Perhaps Fortalice, but I don't know.

Page 184

1    Q.   You're not aware of any assessment like

2    that's called for in request eight by Fortalice; is

3    that right?

4    A.   I'm sorry.  You -- somebody was scraping

5    when you were talking.  I couldn't quite --

6    Q.   Oh, I'm sorry.

7    A.   -- hear you.

8    Q.   Yeah.  Sorry.  The cybersecurity

9    assessment that's referred to in request eight,

10   you're not aware of any assessment like that by

11   Fortalice, though; right?

12   A.   Specifically, no, I'm not.  I know that

13   they're -- they are our kind of go-to for those

14   things.  And then, of course, everything is

15   reviewed by Pro V & V as well for the certification

16   by the State.

17   Q.   All right.

18   A.   And with that, it's 1:12.  I apologize.  I

19   have to use the restroom real quick, so I'll be --

20   if we can do three minutes and be back at 1:15,

21   does that work?

22   Q.   That works.

23   A.   All right.  Thank you.  I apologize.

24   Q.   Sure.

25        THE VIDEOGRAPHER:  Off the record at

Page 185

1      1:12.

2              (Whereupon, a discussion ensued

3        off the record.)

4              (Whereupon, there was a brief

5        recess.)

6              (Whereupon, Ms. Connors joined the

7        deposition.)

8              THE VIDEOGRAPHER:  And we are back on

9        the record at 1:15.

10  BY MR. CROSS:

11      Q.   Okay.  Sticking with the R.F.A. responses

12  here, Mr. Sterling --

13      A.   And which number are we on?

14      Q.   Go to number 25 on Page 16.  I tell you

15  what, actually, just jump to number 27.

16      A.   Okay.

17      Q.   Start there.

18      A.   Okay.

19      Q.   Here it reads:

20              [As read]  "Admit that you did not

21        develop procedures -- did not develop

22        procedures or take other action to

23        address any of the deficiencies found

24        by the Court in its August 15, 2019

25        order concerning the voter

Page 186

1          registration database."

2               Do you see that?

3          A.   Yes.

4          Q.   And the response at the end indicates the

5     state defendants -- they object because "it

6     requires state defendants to admit or deny an issue

7     in dispute in this case in order to respond."

8               Do you see that?

9          A.   Yes, I do.

10         Q.   Do you know whether the Secretary's office

11    took -- developed any procedures or took other

12    actions that are described in request number 27?

13         A.   I do not know that -- I do not know.  From

14    reading the specific thing, other deficiencies

15    found by the Court in August 15, 2019, no, I do not

16    know one way or the other.

17         Q.   Come back up to 25, please.

18         A.   Okay.

19         Q.   25 reads:

20              "Admit that you did not develop

21         procedures or take other action to

22         address all the deficiencies found by

23         the Court in its August 15, 2019 order

24         concerning the election system."

25              And it's got a similar response which

Page 187

1    state the clients can't answer one way or the

2    other.  Do you know whether any such procedures or

3    actions were taken?

4              MR. RUSSO:  Objection to form.

5              THE WITNESS:  I know we're always

6         updating procedures and actions.  Whether

7         they were in response to the August 15,

8         2019 finding of the Court, I do not know

9         the answer to that.

10   BY MR. CROSS:

11        Q.   Okay.  All right.  Come to number 43,

12   please, on Page 26.

13        A.   I've got it.

14        Q.   And here it reads:

15             "Admit the D.R.E. system is

16         completely separate from the B.M.D.

17         system."

18             Do you see that?

19        A.   Yes.

20        Q.   And the response is:

21             "...state defendants admit that

22         the B.M.D. system is separate from the

23         D.R.E. system."

24             Do you see that?

25        A.   Yes.

1      Q.   And then in 44, which is the inverse of

2    43:

3           "Admit the D.R.E. system is not

4       completely separate from the B.M.D.

5       system."

6           Do you see that?

7    A.   Yes.

8    Q.   And there's the same response:

9           "...state defendants admit that

10      the B.M.D. system is separate from the

11      D.R.E. system."

12          Do you see that?

13   A.   Yes.

14   Q.   Why is the Secretary's office either

15   unwilling or unable to state whether the B.M.D.

16   system is completely separate from the D.R.E.

17   system?

18          MR. RUSSO:  Objection to form.

19          THE WITNESS:  I'm looking at the

20      response to 43 where it says:

21          "State defendants admit the B.M.D.

22       system is separate from the D.R.E.

23       system."

24          So I don't understand the basis of

25      your statement.

Page 189

1   BY MR. CROSS:

2        Q.   Well, the request is whether the B.M.D.

3   system is completely separate from the D.R.E.

4   system.  The response indicates it's separate; it

5   does not say "completely."

6             So I'm trying to understand, is that -- is

7   that a deliberate omission because there's some

8   concern about "completely"?

9             MR. RUSSO:  Objection to form again.

10            THE WITNESS:  I don't have an answer

11        as to why the word "completely" is not

12        there, because they are separate.  I mean,

13        they're completely different machinery,

14        different equipment, different operating

15        systems.  I mean, they are separate.  So I

16        don't know of any better way to state

17        that.

18   BY MR. CROSS:

19        Q.   Well, based on your experience

20   implementing the B.M.D. system, would it be fair to

21   say that the B.M.D. system and the D.R.E. system

22   are completely separate?

23            MR. RUSSO:  Again, objection to form.

24            THE WITNESS:  Again, I think separate

25        and completely separate is -- I don't know

Page 190

 1        what hair splitting that could be.  They

 2        are separate.

 3   BY MR. CROSS:

 4        Q.   So come to request 51.

 5        A.   Okay.

 6        Q.   And here it states:

 7             "Admit that the B.M.D. system is

 8         not completely separate from the ENet

 9         system."

10             Do you see that?

11        A.   Yes.

12        Q.   Here the response just unequivocally

13   denies that request.  Do you see that?

14        A.   I do.  I'm reading it real quick.  Bear

15   with me.

16             (Whereupon, the document was

17          reviewed by the witness.)

18             THE WITNESS:  Yes, I see that.

19   BY MR. CROSS:

20        Q.   So what I'm trying to understand is

21   whether something is intended with respect to these

22   three responses.  Because the State would not say

23   that the B.M.D. system is completely separate from

24   the D.R.E. system, but here it does say that the

25   B.M.D. system is completely separate from the ENet

Page 191

1    system.

2          So is there --

3          MR. RUSSO:  Objection --

4    BY MR. CROSS:

5      Q.   Is there some sort of connections or

6    overlap or integration or interaction between the

7    B.M.D. and the D.R.E. systems?

8      A.   No, there is not.

9      Q.   So do you know why they could -- why the

10   State can say the B.M.D. system is completely

11   separate from the ENet system but can't say the

12   same with respect to the old D.R.E. system?

13     A.   I'm not trying to be difficult, but I --

14   it seems to me they're admitting it but the word --

15   the lack of the word "completely," which doesn't

16   meet the level that you would like to be met is

17   essentially what I'm hearing.

18          Is that correct?  Am I stating that

19   properly?

20     Q.   I'm just trying to understand whether this

21   is -- whether this is indicative of something that

22   we're missing.  That's all I'm trying to get at.

23     A.   I don't think so.  I think this is just

24   lawyers and language and lawyers and language.

25   There's -- I don't think there's anything that's

Page 192

1    trying to be accomplished by the lack of that word,

2    no.

3         Q.   Okay.  Okay.  All right.  So you're not

4    aware of any interactions, connections or overlap

5    of -- between the data, the equipment or the

6    software from the old D.R.E. system and the new

7    B.M.D. system; is that fair?

8              MR. RUSSO:  Objection to form.

9              THE WITNESS:  Vince, I'm sorry --

10             MR. RUSSO:  I just said, "objection

11        to form."

12             THE WITNESS:  Okay.  That would be a

13        fair statement, yes.

14   BY MR. CROSS:

15        Q.   All right.  Come to 65, please.

16        A.   Okay.  Okay.

17        Q.   And you see 65 says:

18             "Admit that security deficiencies

19         or vulnerabilities identified by

20         Fortalice with the ENet system have

21         not been fully mitigated."

22             Do you see that?

23        A.   I do.  I'm reading it real quick.

24             (Whereupon, the document was

25         reviewed by the witness.)

1             THE WITNESS:   Okay.

2    BY MR. CROSS:

3        Q.   And you see the response, the State did

4    not answer this one way or the other.  They don't

5    admit or deny it.

6             Do you know whether security deficiencies

7    or vulnerabilities that Fortalice identified with

8    the ENet system, whether they have been fully

9    mitigated?

10       A.   I know with pretty -- with a lot of

11   certainty that, if not all, the vast majority have.

12   I remember we had a discussion with Merritt about

13   this, God, a while back.

14            And I can't speak to what specifically

15   they were at this point because it's been so long,

16   but I know there were several things that were done

17   on how we managed permissions and passwords and the

18   like.  And I remember there were some bad practices

19   at the county level in some cases where, like, they

20   would have multiple people on a single user ID and

21   password.  That's been stopped.

22            They -- now, if you don't log in for I

23   believe it's 30 days, those credentials are lost.

24   They have to be -- you have to be re-upped.

25   There's multi-factor authentication on all those

1    things.

2         So I do know the vast majority -- I can't

3    recall what they all were.  I do know that the vast

4    majority of those were addressed inside prior to

5    the 2020 election, if memory serves.

6         Q.   As you sit here, you're not aware of which

7    of those deficiencies remains outstanding today; is

8    that right?

9         A.   Or if any, honestly.

10        Q.   Okay.  All right.  Come to 74, please.

11        A.   Okay.

12        Q.   And here it states:

13             "Admit there was no systematic

14         method of tracking the number of

15         Georgia voters that complained that

16         the B.M.D. print-out for their

17         respective votes did not match the

18         selections they each made on the

19         corresponding B.M.D. in the November

20         2020 election."

21             Do you see that?

22        A.   Yes.

23        Q.   And if you come to the second-to-the-last

24    sentence under response, you're welcome to read the

25    whole thing, but that second-to-last sentence says:

1           "State defendants further deny

2            that it does not keep track of

3            complaints made to state defendants."

4           Do you see that?

5      A.   Yes.

6      Q.   Is there some sort of a systematic method

7  or process that the Secretary's office has to keep

8  track of instances where voters complained that

9  their B.M.D. print-out did not reflect the

10  selections they made on the B.M.D.?

11     A.   There are the -- they're supposed to --

12  for spoiled ballots, they are supposed to, the

13  counties are supposed to inside the poll locations

14  use the spoil ballot.  I think there's a form,

15  there's a recap form that's supposed to list out

16  what happened with these particular ones.

17          I will say that we didn't have very many

18  at all out of the five million, or I guess the

19  three million in per -- or sorry, 3.75 million

20  in-person votes that would have been done on a

21  B.M.D. that had those situations.

22          But the -- they're supposed to be using

23  the ballot recap forms to track spoiled ballots,

24  yes.

25     Q.   And what happens to a spoiled ballot?

1   Where does it go?

2        A.    It should be held with, as I understand

3   it, the other documentation and ballots for the

4   election with a kind of a recap form basically

5   saying this is what happened with these ballots.

6        Q.    Do the counties keep those?

7        A.    Yes.  And then if memory serves, this

8   would go along with the other things that are

9   transferred to the Superior Courts, and they hold

10  them for the 22 months after that.

11       Q.    But the only -- the only reporting that

12  the Secretary gets of this type of concern where a

13  voter says that the B.M.D. print-out doesn't

14  reflect their selections, you learn about that only

15  if the county conveys that to the Secretary; is

16  that right?

17       A.    Correct.

18       Q.    Okay.  But there's no systematic method or

19  requirement for counties to convey that?

20       A.    Again, they have the ballot recap forms.

21  And there may be something in the paperwork they

22  send up, but I don't recall one specifically, for

23  that very narrow purpose, no.

24       Q.    Okay.  One of -- one of the issues that

25  arose with the new system in 2020 elections was

1    that sometimes the printers would print two ballots

2    when the voter would vote.

3              Are you aware of that?

4        A.    Not two ballots.  What I was aware of is

5    that they would print one with, like, just a Q.R.

6    code and another one with the readable parts

7    together.  They would come out as two ballots.  So

8    I was aware that that happened in a very few

9    instances, yes.

10       Q.    And when that happened, was there any

11   investigation undertaken, like, a forensic

12   examination of the machines involved?

13       A.    I believe in a couple of those cases they

14   went and pulled the log files.  I'm not sure what

15   happened after that off the top of my head.

16       Q.    If you wanted to know, who would you ask?

17       A.    I would probably call Dominion, because I

18   think they were the ones that would have to pull

19   those log files.

20       Q.    So you're not aware of an examination of

21   the machines involved apart from the log files?

22       A.    Well, the log files would show you what

23   happened and why it happened.  So there wouldn't

24   need to be much beyond that, normally speaking, as

25   my understanding is.

1      Q.   And what's the basis for the understanding

2   that the log files would tell you why that

3   happened?

4      A.   Because the log files basically track

5   everything that happens inside the system, and you

6   can -- for smart people who understand those

7   things, they can kind of walk through and see what

8   happened as to -- to cause that kind of issue.

9      Q.   Was any of the equipment that that

10   happened with, do you know whether any of that

11   equipment was taken out of use in the elections?

12      A.   I believe that in real time when that

13   happened, I do -- I have a recollection of there

14   being at least one county that took one of those

15   machines and just put it off to the side and didn't

16   use it the rest of the day.  I cannot recall what

17   county that was off the top of my head right now.

18      Q.   But the other counties or the other

19   machines, they didn't take them off-line?

20      A.   I don't know.  I know specifically that

21   one did, but I cannot recall what the other ones

22   may or may not have done after that.

23      Q.   Okay.

24      A.   But again, I will say I didn't hear about

25   a machine doing it multiple times.  So I'm going to

Page 199

1    make somewhat of an assumption they probably took

2    some of those out of -- out of service just to

3    avoid that problem or they kept running it when the

4    problem didn't reappear.

5         Q.   And if you wanted to know whether machines

6    were taken out of service in an election, would

7    that be a question you ask the county or is there

8    someone else you could ask?

9         A.   You have to ask the county, because they

10   are in charge of running the polling locations and

11   the use of equipment.

12        Q.   Okay.  All right.  Take a look at 78,

13   please.

14        A.   Okay.

15        Q.   Here it states:

16             "Admit that the results of the

17        full hand recount of the human

18        readable text on B.M.D.-marked ballots

19        did not match the results of the Q.R.

20        code scanning for those ballots within

21        an expected margin of error."

22             Do you see that?

23        A.   Yes.

24        Q.   And do you know whether that's true or

25   not?

Page 200

1       A.    As I stated a couple of times in this

2    deposition so far, being a point 1053 percent off

3    in the total votes cast and point 0099 percent off

4    in the margin is well within an expected margin of

5    error.  So I can state that unequivocally.

6       Q.    So but and I had understood you to say

7    that earlier.  Do you know why, then, state

8    defendants declined to admit or deny this response?

9       A.    No.  I'm not a lawyer, so I don't know

10   what the rationale would necessarily have been.

11      Q.    If you wanted to know why they were

12   unwilling to deny this response, who would you ask?

13      A.    Probably my lawyers.

14      Q.    Okay.  All right.  Take a look at 80.

15      A.    Okay.

16      Q.    And just so we're clear, sorry, you don't

17   have any reluctance in denying 78; right?

18      A.    Let me go back and look at it again.

19      Q.    Yeah.

20      A.    I have zero reluctance denying that

21   statement, yes.

22      Q.    All right.  So take a look at 80.  80

23   states:

24           [As read]  "Admit that the full

25             hand recount performed in connection

1          with the November 2020 election did

2          not check whether the human readable

3          text on B.M.D.-marked ballots matched

4          the results of Q.R. code scanning."

5          Do you see that?

6     A.   Yes.

7     Q.   And is that statement, based on your

8  experience, true or false?

9     A.   Well, going back to the earlier question

10  you asked where we kind of had to go over some

11  definitional items, an individual ballot was not

12  checked to see if the B.M.D. -- if the Q.R. code

13  matched the human readable.

14          That stated, in the aggregate it showed

15  that the result of the election was essentially the

16  same when we had a hand count of those ballots

17  using the human readable portion.  So the logical

18  assumption is that the ballots were cast as

19  intended.

20     Q.   But you don't dispute that the hand

21  recount of the November 2020 election did not check

22  whether the human readable text on B.M.D.-marked

23  ballots matched the results of the Q.R. code

24  scanning for those ballots; right?  That's not

25  something --

Page 202

1      A.   I dis --

2      Q.   -- that you --

3      A.   I dispute that that's the intent of the --

4   of the hand tally that was done.  I do not dispute

5   that that wasn't done, because that wasn't the

6   intent for the hand tally.

7      Q.   Okay.  All right.  Take a look at 81,

8   please.

9      A.   Okay.

10      Q.   It reads:

11           "Admit that the full hand recount

12       performed in connection with the

13       November 2020 election did not check

14       whether the human readable text on

15       B.M.D.-marked ballots actually

16       reflected the selections each voter

17       intended for each of those ballots."

18           Do you see that?

19      A.   Yes.

20      Q.   And is that statement true or false, based

21   on your experience?

22      A.   Again, following the same logic train we

23   had in the last question, that wasn't the intent of

24   this.

25           However, when you have -- come to a point

Page 203

1    1053 percent on the total ballots cast and point

2    0099 percent on the margin, that the human readable

3    matched what was tallied even within the counties

4    and then statewide as well.

5         There is no evidence pointing to the fact

6    that the Q.R. code did not match the human readable

7    portion of the ballot.

8    Q.   But you didn't -- the State didn't

9    undertake any investigation to determine whether

10   the human readable portion of the ballots that were

11   hand tallied, whether that accurately reflected

12   what the voters selected on the B.M.D. screen;

13   right?

14   A.   That is correct.  Except for that the hand

15   tallied showed that the computers counted the way

16   the hands -- that they were marked by the -- by the

17   voter in the human readable portion.

18   Q.   Right.

19   A.   So knowing that, there's no reason to

20   believe that the Q.R. code does not match that, or

21   that in 25 percent of the ballots that the

22   hand-marked didn't match what they had chosen there

23   as well, the tick marks were somehow off in the

24   computers -- tally marks, pardon me.

25   Q.   Right.  But given that the study that the

1    Secretary's office commissioned in 2020 in actual

2    elections found that the majority of voters spend a

3    second or no time at all reviewing their ballots,

4    you can't be sure that the human readable portion

5    of every ballot is actually what the voter

6    intended; right?

7        A.   I do know that our studies show that one

8    in four did actually review, whether for a second

9    or two minutes.  And again, you can't take into

10   account human behavior, but I will say if one in

11   four are reviewing it, or even necessarily one in

12   ten or one in 20, if there was a systemic issue,

13   then that would have made -- would have made itself

14   known to the polling place managers, which would

15   have made it known to the State.

16            We did not see that here.  There is no

17   evidence that occurred.

18       Q.   Okay.  Is it your understanding or is it

19   your position that the error rate for the hand

20   tally in November 2020 was not substantially larger

21   for some sets of ballots versus others?

22       A.   In discussing this with VotingWorks, who

23   were the vendors we brought in to help do this,

24   you're going to see variabilities like that.

25   Especially there are some individuals who

Page 205

1    mistakenly believe that you're trying to re-create

2    the election as it was voted as opposed to looking

3    at it in the aggregate.

4          When you're doing this kind of hand tally,

5    you're looking at it in the aggregate.  So there is

6    going to be more human errors in some batches and

7    less human errors in other batches.

8    Q.   Right.  But the error rate for some sets

9    of ballots, for example, at a county level that

10   came out of the human tally, some of those error

11   rates were outside the margin of an expected error

12   rate; right?

13   A.   It depends on what you're referring to

14   specifically.  Because again, you're not going

15   precinct by precinct; you're trying to go batch by

16   batch.  But even some counties did not do their

17   batching properly and did not put it into the Arlo

18   system properly.  But in the aggregate, which is

19   what you're looking at here, both by the county and

20   by the state, you did not see that overall.

21         And as an example, there was one batch I

22   can remember in Fulton County of overseas votes

23   that was a batch that was something like, again, I

24   don't know, I'm spitballing, but this is as an

25   example, 500 for Biden and a hundred for Trump.

1          And instead of putting them together and

2     putting them in as a single batch, they did 500 for

3     Biden in a single batch and put that in the system,

4     then a hundred for Trump in a single batch and put

5     that in the system.  So again, you can't go by the

6     batch counts on those things being off, because

7     they don't necessarily align with precincts.

8          And that's one of the issues where people

9     having a lack of understanding what they're looking

10    at find those rates being very far off and not

11    understanding why that's occurring.

12    Q.   And you said something a moment ago, I

13    just want to make sure I understand --

14    A.   Uh-huh.

15    Q.   -- to the effect of, and if I'm getting

16    this wrong just tell me, but something to the

17    effect of that there's a misunderstanding about the

18    audit or the hand tally, that it's not intended to

19    confirm the election as it -- as it occurred, it's

20    meant to do it at an aggregate level.

21          What did you say and what did you mean?  I

22    just want to --

23    A.   What I mean is it's not intended to

24    re-create the ballots as they were cast

25    specifically, but on the aggregate you're supposed

Page 207

1      to look at how the system did it.

2               As an example, I live in precinct SS02B in

3      Fulton County.  There were four different kinds of

4      ballots that were cast out of SS02B: in-person

5      early, absentee by mail, in person and then

6      provisionals.  Those are the kind of votes that

7      would be there.

8               In the hand tally they're not going

9      through and saying in SS02B we had this in person,

10     this, you know, absentee, this provisional.  They

11     weren't done that way.  Especially, I unfortunately

12     live in Fulton County, and Fulton County had more

13     challenges than others just because of the sheer

14     size and some lack of managerial control inside of

15     that county.  But you were taking it in the

16     aggregate of all of it.

17              And then also there were some naming

18     convention issues occasionally and -- where they

19     would say RW02B when they were inputting it over

20     here and RW02B over here.  They shouldn't have done

21     that.  The rules are you're supposed to have one

22     person inputting these.  Fulton went to multiple

23     people doing it, so they had some other specific

24     issues.

25              You'll find that most counties lined them

1    up decently well.  This was the first time that

2    they'd ever to do ballot manifests, then you --

3    because we hadn't had ballots in 20 years.  And

4    that's -- some of the things you're going to see

5    come out of that, you're going to see down in

6    the -- in the minutia, there are going to be things

7    that are off.

8           But they're going to, to your point

9    earlier, potentially sort of balance out because

10   mistakes tend to happen on both sides of the ledger

11   of those things.  And that's why we saw statewide

12   the point 1053 on the total votes cast and the

13   point 0099 percent on the margin difference.

14        Q.   Is it --

15        A.   Whenever you have human beings involved,

16   your chances of human error increase tremendously.

17        Q.   Is it your position that all of the errors

18   that occurred with the human tally -- or the hand

19   tally, sorry, I should say, of the presidential

20   election of November 2020, that those errors

21   occurred only with the hand count, not with the

22   machines?

23        A.   No.  That is not my contention.  My

24   contention is everything that we have seen has all

25   been human error.  There were double scans that we

1   discovered from the initial count.  There were

2   human errors both tallying in the hand tally and

3   inputting them into the Arlo system, which is a

4   system used to track the hand tally.

5           And then there were, again, mainly in

6   Fulton, double scans.  And I believe there was one

7   batch that was scanned three times.  But you would

8   normally avoid those things if you were just using

9   B.M.D.s, because they don't have large batches of

10  things being scanned at one time.

11          The only things that are usually done this

12  large batch -- scans at one time are the

13  hand-marked paper ballots that were sent in by

14  mail.

15     Q.   Okay.  So you're not saying that the

16  errors that were reflected in the hand tally in

17  November 2020, that those errors came -- they were

18  produced only by the hand recount; is that right?

19     A.   The -- two things.  The hand recount and

20  then the anomalous inputting them improperly.  Two

21  different errors -- two human errors occurred there

22  to produce some of those issues.

23     Q.   And is it your position that all of the

24  errors that came to light were all human errors,

25  they were not machine errors?

Page 210

1      A.   Well, in a hand tally there are no machine

2   errors because there's no machines involved.  The

3   double scanning that occurred, both the general

4   election initial count and the double scanning

5   errors that occurred, those were all hand-marked

6   where they had those problems.

7           And the recount there, it appears there

8   were some B.M.D. ballots scanned multiple times.

9   But in a normal deployment, you wouldn't have that

10  happen because you're only scanning one at a time

11  for each individual voter as they place it into

12  the -- into the scanner, into the polling and then

13  the ballot box.

14     Q.   So I just want to make sure we're talking

15  about the same thing.  So in a given county, for

16  example, or a given precinct where the hand tally

17  came up with a different number, so maybe just a

18  slightly different number on the election results

19  than the -- than the scanner tabulation did, was

20  there any investigation undertaken to determine

21  whether that was truly the product of human error

22  in the hand tally versus the product of an error in

23  the electronic scanning or the use of the B.M.D.s?

24     A.   No, there wasn't.  Because there was

25  nothing pointing to the fact that there was any

1    systemic error on those things.

2              Again, you have to look at these precinct

3    by precinct.  And again, in my old life, political

4    consulting, no -- there was no precinct that

5    anybody looked at and said, wow, that's really

6    weird, that's really anomalous.

7              The things we saw with the hand tallies

8    were, again, essentially mainly attributable to

9    human error and mainly in Fulton County.  And

10   again, and Fulton County has a well documented past

11   of having bad management and some sloppy practices,

12   so that's not unheard of in those situations.

13        Q.   And you mentioned before you're familiar

14   with one of the experts in this case, Philip Stark;

15   right?

16        A.   Yes, I'm familiar with him.

17        Q.   Are you aware that he produced a report in

18   January of this year addressing, at least in part,

19   the human tally and the error rates that came to

20   light?

21        A.   No.

22        Q.   So that's not a report that you've ever

23   read or considered; right?

24        A.   I'm not aware of it, no.

25        Q.   Do you know whether anyone at the

1    Secretary of State's office has reviewed that

2    report?

3         A.   I do not.

4         Q.   If that report were to identify error

5    rates that would cause concern as to whether the

6    machines had operated accurately, is that something

7    you would want to see?

8         A.   That's a large supposition, and it would

9    depend on the level and the documentation behind

10   it.

11        Because again, you can only go with the

12   data that you're given, which in this case

13   oftentimes was done by human error into the Arlo

14   system and even human error on the tally sheets

15   themselves.  So we would have to compare some of

16   those items.

17        But I wouldn't have any objection to our

18   office looking at that, no.

19        Q.   Do you know why your office has not looked

20   at that yet?

21        A.   Frankly, I didn't know it existed.  So I

22   can't look at things I don't know exist.

23        Q.   Okay.  Are you aware that the Dominion

24   scanners will tabulate a photocopy of a B.M.D.

25   printed ballot in the same way they'll tabulate the

Page 213

1    original B.M.D. printed ballot?

2        A.    That depends on two things.  If it was a

3    central scanner ballot, yes, I know.  And it can

4    potentially do that on a polling place scanner

5    except for the fact that, if you turn on the

6    security paper setting, a regular paper wouldn't go

7    through without being identified.

8        Q.    And what's the basis for your

9    understanding that the precinct scanner has a

10   setting that can evaluate security paper from other

11   paper?

12       A.    The bid, our instructions, the existing --

13   I mean, discussions with Dominion.

14       Q.    And why does that security setting not

15   exist on the central scanners?

16       A.    It is a source of annoyance for me that it

17   doesn't.  I think that they had a different

18   programming set to the original polling place

19   scanners, and I don't know if it -- if they're

20   looking at making that an addition in any software

21   firmware upgrades for the upcoming central

22   scanners.

23            And until this -- until the passage of

24   SB 202, absentee ballots were not required to be on

25   security paper, so it didn't -- wouldn't have

Page 214

1    necessarily made sense to have it at the central

2    scanner at that time.

3         Q.   All right.  Come to 106, please, on Page

4    53?

5         A.   One moment.

6         Q.   Sure.

7         A.   I clicked out of that for a moment.  You

8    said 106; correct?

9         Q.   Yes, sir.

10        A.   Okay.

11        Q.   And so 106 says:

12             "Admit that no expert who has

13         testified on your behalf in this

14         litigation has, to your knowledge,

15         forensically examined each B.M.D. used

16         in any actual elections in Georgia to

17         determine whether malware was loaded

18         on to it at any point in time."

19             Do you see that?

20        A.   Yes.

21        Q.   And do you see the response, the state

22    defendants, including the Secretary's office,

23    declined to answer this as seeking privileged work

24    product?

25             Do you see that?

Page 215

1     A.   Yes.

2     Q.   Are you aware of any forensic examination

3     of each B.M.D. used in actual elections in Georgia

4     for the purpose of this case or any other purpose

5     by any expert who's testified for the State?

6     A.   When you're saying "each B.M.D.," you're

7     referring to all 30 some odd thousand that have

8     been used in elections?

9     Q.   Yes.

10    A.   Then no, I'm not aware of that.

11    Q.   What about of any B.M.D.s?

12    A.   After the November of 2020 election, there

13    were -- Pro V & V was sent to several counties to

14    look at random B.M.D.s and scanners to see if there

15    was any issues.  They did a hash test to look for

16    those kind of items.  That is the only thing I'm

17    aware of off the top of my head specifically kind

18    of speaking to 106.

19          But then again, between the November

20    election and the January election, L & A testing

21    was done again on all those machines, and they

22    checked the hashes in those then, so there were no

23    changes noted then.

24    Q.   Come to 173, please.  We're almost done

25    with this document.

Page 216

1      A.   Okay.  What page is 173 on?

2      Q.   84.

3      A.   84.  Okay.  Okay.

4      Q.   And here it states:

5           [As read]  "Admit that the testing

6           relating to the letter report prepared

7           by Pro V & V concerning version

8           5.5.10.32 of the Dominion B.M.D.

9           software," there's a court docket

10          number, "did not attempt to

11          independently verify the cause of the

12          ballot display problem."

13          Do you see that?

14     A.   Yes.

15     Q.   And do you recall in the September or

16  October 2020 time frame there was an issue that

17  came to light where the ballot -- certain ballots

18  on -- maybe it was one particular ballot on the

19  B.M.D.s didn't display properly and you had to make

20  a software change to address that?

21     A.   Yes.

22     Q.   And you understand this is the letter

23  report that we're referring to that Pro V & V

24  prepared regarding that software change?

25     A.   I had a chance to look at what you're

1    referring to.  Yes.

2         Q.   Okay.  Did you actually see that letter

3    report from Pro V & V yourself?

4         A.   I don't recall.  I might have, but I just

5    don't recall.

6         Q.   Okay.  So come to 175 on Page 85.  Let me

7    know --

8         A.   Okay.

9         Q.   So we're referring to the same letter

10   report, the software change in the September or

11   October 2020 time frame.  And here it states:

12              "Admit that the testing relating

13        to the letter report did not test

14        whether the changes created new

15        problems impacting the reliability,

16        accuracy or security of the B.M.D.

17        system."

18              Do you see that?

19        A.   Yes.

20        Q.   And then in the second sentence, state

21   defendants say that they "lack sufficient

22   information or knowledge to admit or deny this

23   request."

24              Do you see that?

25        A.   Yes.

1  Q. Do you know whether that statement in 175

2 is true or false?

3  A. As to whether Pro V & V did testing or not

4 or if Dominion and their engineers looked at it to

5 say this would work?  I mean, you're -- that's two

6 different questions to me.

7   So what specifically -- admit the testing

8 related to the letter report did not test -- so to

9 the letter report, that's specifically to Pro

10 V & V.  Is that the question?

11  Q. Well, that's part of it, and we can start

12 there.  Do you know whether the testing that Pro

13 V & V did that relates to the subject of the letter

14 report and the software change in the fall of 2020,

15 whether that created new problems impacting the

16 reliability, accuracy or security of the B.M.D.

17 system?

18   MR. RUSSO:  Objection to form.

19 BY MR. CROSS:

20  Q. Do you know it just one way or the other?

21  A. In the testing on the front end, I do not

22 know one way or the other.  However, I do know that

23 it was an important de minimis change that E.A.C.

24 approved, and we didn't have any subsequent issues

25 with the B.M.D.s, you know, working properly.

Page 219

 1          Because the issue was a display of two
 2   columns because of the sheer size of the particular
 3   Senate special election.  And we had, through our
 4   very robust logic and accuracy testing, Douglas
 5   County and Richmond County found the issue, and
 6   then Dominion found an engineering solution that
 7   allowed that -- both columns to be displayed in
 8   every circumstance and that we needed to have that
 9   change done and we did that prior as -- on the
10   front end to the L & A testing.
11          So we didn't see anything come out with
12   any accuracy issues or reliability or security that
13   we saw in the actual functioning, but I don't know
14   if Pro V & V did testing in and of itself for that
15   purpose when they went back to look at the
16   solution.
17     Q.   All right.  Take a look at 186, please, on
18   Page 90.
19     A.   Okay.  I'm there.
20     Q.   Here it reads:
21          [As read]  "Admit that you have no
22           evidence of any widespread voter fraud
23           in Georgia in connection with
24           elections held in Georgia on November
25           3rd, 2020 and January 5th, 2021."

Page 220

1          Do you see that?

2     A.   Yes.

3     Q.   Do you know whether that is a true or

4 false statement based on your experience in the

5 Secretary's office?

6     A.   From my position and what I said earlier

7 was the use of the term "widespread voter fraud" is

8 kind of a fraught emotional loaded kind of

9 statement.

10         We know that there was illegal voting.  We

11 know that that illegal voting only totalled in the

12 tens of votes, not the tens of thousands of votes.

13 So there was not enough illegal voting to affect

14 the outcome of any election that we are -- we've

15 seen or been aware of so far.

16    Q.   And we saw earlier that Secretary

17 Raffensperger in his book states unequivocally that

18 you found -- his office found no evidence of

19 widespread voter fraud in the 2020 or 2021

20 election; correct?

21    A.   That's right.

22    Q.   So do you know why the Secretary's office

23 and the other state defendants were unwilling to

24 admit or deny this request?

25    A.   No.

1    Q.   All right.  Take a look at 189.

2    A.   Okay.

3    Q.   Here it's:

4         "Admit that you have no evidence

5     that the election system counted any

6     illegal votes in the election held on

7     November 3rd, 2020."

8         Do you see that?

9    A.   Yes.

10   Q.   And if you look at the response, it says

11   at the end:

12        "State defendants admit they do

13    not have any evidence indicating the

14    election system failed to count any

15    votes as cast by the voter."

16        Do you see that?

17   A.   Yes.

18   Q.   That's not what it asks; right?

19        So I just want to make sure I understand.

20   I think you acknowledged earlier that there is

21   evidence that there were some illegal votes counted

22   in the November 3rd, 2020 election; right?

23   A.   Correct.

24   Q.   And do you, as you sit here, do you know

25   why state defendants were unwilling to admit or

1    deny that request 189?

2         A.    No.

3         Q.    All right.

4         A.    Other than I guess they say it's outside

5    of the scope of Curling plaintiffs' claims in this

6    case.

7         Q.    Oh, okay.  All right.

8              MR. CROSS:  Why don't we take a

9         five-, ten-minute break.  What works for

10        you, Mr. Sterling?

11             THE WITNESS:  Let's go for ten.

12             MR. CROSS:  Okay.

13             THE WITNESS:  I want to say split the

14        baby, but let's just go for ten.

15             MR. CROSS:  Okay.

16             THE VIDEOGRAPHER:  Off the record,

17        1:55.

18             (Whereupon, a discussion ensued

19         off the record.)

20             (Whereupon, there was a brief

21         recess.)

22    BY MR. CROSS:

23        Q.    All right.  Mr. Sterling, grab -- there

24    are a handful of documents that we'll jump through

25    quickly, and then -- and then I'll be done.

Page 223

1                    (Whereupon, Plaintiff's

2                    Exhibit 8 was marked for

3                    identification.)

4    BY MR. CROSS:

5        Q.   Grab Exhibit 8, if you would, please.

6             THE VIDEOGRAPHER:  Back on the record

7        at 2:03.

8             MR. CROSS:  Oh.  Sorry.

9             THE WITNESS:  Okay.  An E-mail from

10       me.  Okay.

11   BY MR. CROSS:

12       Q.   Yeah.  So if you look at Exhibit 8,

13   ████████████████████████████████████████████████

14   █████████████████████████████████████████████

15   ███████████████████████████████████████████████

16            Do you see that?

17       A.   Yeah.

18       Q.   Okay.  ███████████████████████████████

19   ████████████████████████████████████████████████

20   ██████████████████████   Do you see that?

21       A.   No.  It won't scroll.  I've got a single

22   page on mine.

23       Q.   It's --

24       A.   I'm sorry.  Yeah.  I got it.  I got it.

25   Yeah.

Page 224

```
 1      Q.    Sorry.  It's in the middle of that first
 2   page.
 3      A.    Yes.
 4      Q.    ████████████████████████████████████████
 5   ██████████████████████████████████████████████
 6   ██████████████       Do you see that?
 7      A.    Uh-huh.  Yes.
 8      Q.    And then you write back:
 9            ████████████████████████████████
10        ██████████████████████████
11            Do you see that?
12      A.    Yes.  Yes.
13      Q.    ██████████████████████████████████████
14   ██████████████████████████████████████████████████
15      A.    Yes.  That's what I was referring to.
16   Looking at this in context, that's what I would
17   have been referring to, yes.
18      Q.    ████████████████████████████████████
19   ██████████████████████████████████████████
20   ██████████████████████████████████████████
21   ████████
22      A.    Yes.
23      Q.    ████████████████████████████████████████████
24   █████████████████████
25            ██████████████████████████████████████
```

Page 225

1   ██████████████████████████████████████

2   ████████████████████████████

3       A.   Yes.

4       Q.   ████████████████████████

5   ████████████████████████████████████████

6   ██████████████████████████████████████

7   ████████████████

8       A.   █████████████████████████

9   ██████████████████████████████████████

10  ████████████████████████████████████

11  ████████████████████████████████████████

12  ██████████████████████████████████

13  █████████████████████████████████████

14  ████████████████████████████████████

15  ████████████████████████████████████████

16  ████████████

17       █████████████████████████████

18  █████████████████████████████████████

19  █████████████████████████████████████

20  ████████████████████████████████

21       Q.   ████████████████████████████

22  ████████████████████████████████████████

23  ███████████████████████████████████

24       A.   In the sit -- normally in that situation,

25  that's going to be at the county level with the not

Page 226

1    poll workers or poll managers, even it'd be -- it

2    would normally be county workers.

3    ████████████████████████████████████████

4    ████████████████████████████████████████

5    ████████    When they ran their absentee ballots

6    through the cutters, occasionally the cutting

7    machine would grab the ballot and slice it as well.

8    ████████████████████████████████████████

9    ████████████████████████████████████████

10   ████████████████████████████████████

11   ██████████████████████    Like, I saw Rick

12   Barron himself doing some of those.

13       Q.   Okay.  Are you aware of whether the

14   existing B.M.D.s in Dominion -- or sorry, in

15   Georgia can effectively be used as ballot-on-demand

16   printers at the polls meaning, rather than having

17   voters vote on the B.M.D., you check the voters in

18   on the poll pad and then you just use the B.M.D. to

19   print whatever ballot they're supposed to get, and

20   then they can mark it by hand and have it tabulated

21   by the scanner?

22           Are you aware of whether that's do-able

23   with this system?

24           MR. RUSSO:  Objection to form.

25           THE WITNESS:  The way you've outlined

1      it, not that I'm aware of, no.

2    BY MR. CROSS:

3      Q.   You say the way I --

4      A.   And I'm sure -- go ahead.

5      Q.   Well, I just -- you say the way I outlined

6    it.  Is there some version of that that you're

7    aware of that can be done?

8      A.   Not with this -- not with the current

9    software.

10     Q.   And what is it about the current software

11   that limits that?

12     A.   Well, it's not limiting.  The software is

13   not designed to do that.

14     Q.   Not designed to do what part of what I

15   just described?

16     A.   What you just said is to print out a

17   hand-marked paper ballot to fit that.  One of the

18   issues you have is, when you're doing a ballot,

19   okay, in the state right now there are several

20   different ballot sizes.  There's not a good way to

21   necessarily shrink it down to have the tick marks

22   line up properly inside the polling place scanner

23   and the B.M.D. as we have right now set on eight

24   and a half by 11 paper.

25            There's a lot of logistical issues around

1    that you'd have to fix first before moving to the

2    kind of system you're talking about.

3             What a more likely outcome would be was

4    that you do a ballot mark -- you do ballot marking

5    like we currently do where you make your selections

6    on the screen, and you could have a ballot on a

7    face that looks like a handwritten ballot but it's

8    actually printed by the B.M.D., and you could still

9    have the advantages of no over-votes, no

10   under-votes and they can look at it.

11            And again, you don't know how the scanner

12   is going to scan it if something's happened there.

13   But they could potentially do that.  But it's hard

14   right now because, take Fulton County, for

15   instance, when we have ballot questions, you're

16   having 21-inch ballots.  And that's just not

17   something that's do-able right now.

18       Q.   Okay.  Each precinct currently has a

19   Dominion mobile ballot printer; right?

20       A.   No.

21       Q.   Okay.  How many precincts have those?

22       A.   None that I'm aware of.

23       Q.   There are no Dominion --

24       A.   Mobile ballot printers are intended to be

25   used at the central location.  Every county was

1    given at least one.  I think the most any one

2    county got was five out of the initial distribution

3    of equipment.

4          And they're intended to be used for

5    emergency ballots, absentee ballots if they want to

6    run that way.  Only one county ran it as their main

7    absentee ballot process, and that was Camden or

8    Glynn down on the coast.  I can't remember which

9    one was which.

10   Q.   Okay.  And I may be conflating two things.

11   So there's the ballot-on-demand printer.  That's

12   what you're talking about; right?

13   A.   Not a ballot-on-demand printer, because

14   that's a trademark of ES&S, but a mobile ballot

15   printer that you could print ballots as you need

16   them with the correct ballot styles.

17   Q.   Okay.  Do you know whether Dominion has

18   mobile ballot printing software that you could use

19   to print ballots on demand at the precinct, so the

20   polling sites, once voters check in?

21   A.   I assume they probably do, because they

22   have mobile ballot printing software, yes.

23   Q.   So do you know whether the current system

24   could use that software to print ballots at the

25   polls to be marked by hand today?

Page 230

 1        A.   It would require massive changes in how

 2    the system's put together, additional equipment,

 3    different training.  Again, I don't see the

 4    advantage of going backwards in technology.

 5        Q.   But the technology could do it; right?

 6        A.   The technology can do it.  I mean, you

 7    could -- there's -- no question there's a

 8    technological way to do it.  It's a question of

 9    function of training, what are the up sides, what

10    are the down sides, what are the problems, again,

11    what are the logical issues.

12             There's varied and sundry questions that

13    could to be answered on the -- need to be answered

14    if you're going to go any of those kind of routes.

15                          (Whereupon, Plaintiff's

16                          Exhibit 9 was marked for

17                          identification.)

18    BY MR. CROSS:

19        Q.   All right.  Grab the next exhibit, please.

20    I think it's Exhibit 9.

21        A.   Yes.  ███████████████████████

22        Q.   Yeah.  █████████████████████████████

23    ███████████████████████████████████  Do

24    you see that?

25        A.   Yeah.

Page 231

1      Q.   And then if you come down, on Page 3 -- I

2   tell you, to make it easier, do you see at the

3   bottom right corner where it says ███████████████

4   ██████████████████████████████

5      A.   ██████████████

6      Q.   Yeah.

7      A.   ████████      Yeah.

8      Q.   Go to the one that ends in ████████

9      A.   Got it.

10     Q.   And you see at the very bottom of that

11  page there's an ████████████████████████████████

12  █████████████████

13     A.   Yes.

14     Q.   Who's -- ████████████████████████████████

15  ████████████████████   Do you see that?

16     A.   Yes.

17     Q.   And ██████████████████████████████

18  ████████████████████████████████████████

19  ████████████████████████████████████

20  ████████████████

21          Do you see that?

22     A.   Yes.

23     Q.   And do you recall this E-mail?

24     A.   Yes.

25     Q.   And if you come up to the first page, the

Page 232

1     ███████████████████████████████████

2     ████████████████████████████████████

3     Do you see that?

4          A.   At the very first page?  Yes.

5          Q.   And then you write in the second sentence:

6               ██████████████████████

7          ███████████████████  ████████████

8          █  ██████████████████████

9          ████████████████████████

10         ██████████

11              Do you see that?

12         A.   Yes.

13         Q.   What did you mean that ████████████████

14    ████████

15         A.   ██████████████████████

16    ████████████████████████████████████

17    ██████████████████████████████████

18    ███████████████████████████████████

19    ████████████████████████████████████

20    ████████████████████████████████████

21    ███████████████████████████████████

22    ████  █████████████████████████████████

23    ████████

24              ████████████████████████████

25    ███████████████████████████████████

Page 233

1 ███████████████████████████████████

2 ██████████████████████████████████

3      ██████████████████████████

4 ████   ████████████████████   ████████████

5 ██████████████████████   ████████████████

6 ████████████████████████████████████

7 ██████████████   ████████████████████

8 ████████████████████████

9      Q.   █████████████████████████████

10 ████████████████████████████████'s

11      A.   Yes.

12      Q.   Okay.

13                     (Whereupon, Plaintiff's

14                     Exhibit 10 was marked for

15                     identification.)

16 BY MR. CROSS:

17      Q.   All right.  Pull up Exhibit 10, please.

18      A.   I've got it up.

19      Q.   Okay.  And do you see Exhibit 10 █████

20 ████████████████████████████████████

21 ████████████████████████████████████

22 ████████████████████████████████

23      A.   Yes.

24      Q.   And if you come down to the bottom of the

25 first page, ████████████████████████████████

Page 234

1    ███████████████████████████████████████  Do

2    you see that?

3       A.   Yes.

4       Q.   ████████████████████

5    ███████████████████████████

6    ████████████████████████████

7    █████████

8    ████████████████████████████████████████

9    ██████

10   ████████████████████████████

11   ██████████████████████

12        Do you see that?

13   A.   Yes.

14   Q.   And then ██████████████████

15   ████████████████████████████

16   █████████████  ███████████████████

17   ████████████████

18        Do you see that?

19   A.   Yes.

20   Q.   And then ████████████████████████

21   ██████████████████████████

22   ████████████████████

23        Do you see that?

24   A.   Yes.  Uh-huh.

25   Q.   Do you recall this situation?

Page 235

1      A.   Yes.

2      Q.   ███████████████████████████

3   █████████████████████████████████████

4   █████████████████████████████████████

5      A.   ██████████████████████████

6   ███████████████████████████████

7   ██████████████

8         ███████████████████████████████

9   ███████████████████████████████████

10  █████████ ████████████████████████████

11  ████████████████████████████████████

12  ████████████████████████████████████

13  ███████████████

14     Q.   And are you sure that's what this is or

15  you're --

16     A.   I'm 99 percent sure.  I mean, I remember

17  this happening at the time, and that's what we

18  discussed.  ███████████████████████████████

19  ███████████████████████████████████

20  █████████████████████████████████████

21  ███████

22     Q.   Did this happen with any other counties?

23     A.   No.  Not that I recall.  ████████████

24  █████████████████████████████████████████

25  ██████████████████████████    ███████████████



Page 236

 1  ████████████████████████████████

 2  ████████████████████████████████████

 3  ████████████████████

 4  ████████████████████████████████

 5  ███████████████████████████████████

 6      Q.   Okay.  ████████████████████████

 7  ████████████████████████████████████

 8  █████████

 9      A.   Yes.

10      Q.   ████████████████████████

11  ██████████████████████████████████████████

12  ███

13      A.   Yes.

14      Q.   ████████████████████████████

15  ████████████████████████████████████

16  ████████████

17      A.   ████████████████████████

18      Q.   Okay.  Are you aware of any B.M.D.s having

19  been lost or misplaced that were intended to be

20  shipped to Georgia?

21      A.   Not that I'm aware of, no.

22      Q.   Is that something that has -- an

23  investigation has been undertaken at any point to

24  look into?

25      A.   I'm not sure of any claim of a lost one to

Page 237

1   investigate.  So no, no investigation has been done

2   for that.

3                           (Whereupon, Plaintiff's

4                           Exhibit 11 was marked for

5                           identification.)

6   BY MR. CROSS:

7        Q.   All right.  Almost done.  Grab the next

8   exhibit, if you would, please.

9        A.   Is that Exhibit 11?

10       Q.   Yes.

11       A.   Okay.  Okay.  Got it.

12       Q.   And do you see that this is ███████████

13   ████████████████████████████████████████████████

14   ████████████████████

15       A.   Yes.

16       Q.   ███████████████████████████████████████

17   ██████

18       A.   Yes.

19       Q.   And do you correspond with him regularly

20   as part of your job?

21       A.   Regularly is a little bit of a stretch.

22   But you know, we'll talk occasionally and do

23   E-mails, yes.

24       Q.   Okay.  If you look here, ████████████████

25   ███████████████████████████████████████

Page 238

1    

2        Do you see that?

3    A.   Yes.

4    Q.

5

6

7    A.

8

9

10   Q.

11

12

13

14

15

16

17

18

19   A.

20

21   Q.   Oh.  Thank you.

22   A.   Yes.

23   Q.

24

25



Page 239

1      ███████████████████

2          Do you see that in number one?

3      A.   Yes.

4      Q.   Number two, ███████████████████

5      ███████████████████████████████

6      ███████████████████████████

7      ███████████████████████████

8          Do you see that?

9      A.   Yes.

10         Q.   And then in number three, third paragraph

11     at the top of the next page, it's written here in

12     bold print:

13     ███████████████████████

14     ███████████████████████████████

15     ███████████████████████████████

16     ███████████████████████████

17     ██████████

18         Do you see that?

19     A.   Yes.

20     Q.   ███████████████████████

21     █████████████████████████████████████████

22     █████████████   █████████████████████████

23     ████████████████████████

24     A.   ███████████████████████

25     █████████████████████████████████████

Page 240



16    Q.   Okay.  I think that is all the time I

17  have.  Let me just look real quickly.

18         Oh, I think you mentioned before, unless I

19  misunderstood that -- did you say the current

20  C.I.O. is a contractor at the Secretary's office?

21    A.   Yes.

22    Q.   Who is that?

23    A.   Merritt Beaver.

24    Q.   Oh, Mr. Beaver is not an employee of the

25  Secretary's office?

Page 241

1      A.    That's correct.

2      Q.    Oh, when did -- when did he become a

3  contractor?

4      A.    He has always been a contractor.

5      Q.    Oh.  Why is that?

6      A.    That preceded my joining the

7  administration.

8      Q.    Does he have a written contract that lays

9  out his engagement?

10     A.    I believe so, yes.

11     Q.    Okay.

12         MR. CROSS:  Okay.  That's all I have,

13     Mr. Sterling.  Counsel for other

14     plaintiffs are going to ask you questions.

15         We will -- as Mr. Russo knows, we're

16     going to hold the deposition open, but I'm

17     not going to bother you with the legalese

18     on that.  We'll just reserve our rights.

19         THE WITNESS:  Well, thank you for

20     that, Mr. Cross.

21         MR. CROSS:  I can at least give you

22     that.  And I do appreciate your time

23     today.  Hopefully you're feeling better

24     after your surgery.

25         By the way, I do -- I do have one

Page 242

```
1       more question.  Do I understand right that
2       you think Peaky Blinders is the best show
3       ever made?
4            THE WITNESS:  Yes.
5            MR. CROSS:  Well, we're in violent
6       agreement on that, sir, so we can -- we
7       can end on that.
8            THE WITNESS:  I'm waiting for
9       February 27th when the next season
10      comes -- final season comes out.
11           MR. CROSS:  I've got to say, I didn't
12      know it was coming out until I saw your
13      tweet.  So your tweets are valuable.
14           THE WITNESS:  I'm glad I could be of
15      help to make your life better.
16           MR. CROSS:  Appreciate that.
17           All right.  Thank you.
18           THE WITNESS:  Thank you.
19           MR. MCGUIRE:  Hi.  This is Robert
20      McGuire for Coalition for Good Government.
21      Vincent, are we ready for me to go ahead?
22      Can I just, you know, get started, or do
23      you want to --
24           THE WITNESS:  Before we get rolling,
25      I'm going to hit the head real quick, if
```

1       that's okay with everybody, just for a

2       moment.  So.

3              MR. RUSSO:  Yeah.

4              (Whereupon, a discussion ensued

5        off the record.)

6              THE VIDEOGRAPHER:  Off the record,

7        2:25.

8              (Whereupon, a discussion ensued

9        off the record.)

10             (Whereupon, there was a brief

11        recess.)

12             THE VIDEOGRAPHER:  All right.  We're

13       back on the record at 2:28.

14     BY MR. CROSS:

15       Q.   Sorry.  Mr. Sterling, quickly, you

16     testified earlier that you'd gotten a call from

17     Dominion's C.E.O. at some point conveying to you

18     that Dr. Halderman had asked Dominion to engage him

19     to do work and to pay him for work that he'd

20     already done with respect to their equipment.

21             Do you recall that testimony?

22       A.   Yes.  And something along those lines in a

23     general way, yes.

24       Q.   Have you since learned during the course

25     of this deposition what the actual facts were

Page 244

1    regarding that possible engagement?

2        A.   Well, you stated it on the record earlier

3    where Dominion had reached out to him originally,

4    yes.

5        Q.   Well, I want to be clear that it's not

6    just me stating it.  Are you aware that Dominion's

7    counsel --

8        A.   Yes, I am aware of that now.

9        Q.   And you're aware that Dominion's counsel

10   had a conversation with your counsel, Mr. Germany,

11   today about this subject; right?

12       A.   Yes.

13       Q.   And we both understand that what actually

14   has occurred is that Dominion approached me about

15   engaging Dr. Halderman to work as an expert on

16   their behalf and they would pay him for that work

17   that he would do for them.

18            Do you understand that?

19       A.   I don't know the timing of it.  That's my

20   basic -- so I didn't know that you were involved in

21   it, no.

22       Q.   All right.

23       A.   That's new knowledge to me.

24       Q.   Okay.  Well, then I guess just to be

25   clear, do you understand now that Dominion reached

1    out to affirmatively engage Dr. Halderman, that

2    that was Dominion's outreach?

3         A.   It would -- I do understand that, but that

4    they sub -- eventually chose not to do that, if

5    memory -- if I'm correct.

6         Q.   All right.  Well, that would be news to me

7    if they chose not to do it.

8         A.   I mean, they haven't yet; correct?

9         Q.   Yeah.  There you go.

10        A.   Okay.

11             MR. CROSS:  All right.

12             THE WITNESS:  Okay.

13             MR. CROSS:  Thank you, Mr. Sterling.

14    I appreciate that.

15             THE WITNESS:  Thank you.

16                      EXAMINATION

17    BY MR. MCGUIRE:

18        Q.   Hello.  Mr. Sterling, can you hear me?

19        A.   Yes, Mr. McGuire.

20        Q.   Hi, there.

21             MR. BROWN:  And just -- and excuse

22        me, Rob, but just for the record, this is

23        Bruce Brown.  And Rob, I just wanted to

24        make this statement.

25             The reason why the C.G.G. plaintiffs

1      have two lawyers examining Mr. Sterling

2      today is, by pre-agreement with the

3      defendants' counsel, myself, Bruce Brown,

4      I have a potential conflict of interest

5      with one line of inquiry.  And therefore,

6      Mr. McGuire is going to take charge of

7      that line of inquiry, and then I'm going

8      to resume.

9           Thank you.

10          MR. BARGER:  And Bruce, what is this

11     potential conflict?

12          MR. BROWN:  That's all I can say.

13     Thanks.

14          MR. RUSSO:  So y'all are going to

15     both be taking the deposition due to

16     you -- because you have a potential

17     conflict?

18          MR. MCGUIRE:  I just have a brief

19     line of questioning that would cause a

20     problem --

21          MR. RUSSO:  I'm just --

22          MR. MCGUIRE:  -- for Mr. Brown.

23          MR. RUSSO:  -- trying to understand

24     what's going on.

25          MR. BROWN:  Yeah.

Page 247

```
 1            MR. RUSSO:  I'm just trying to
 2       understand what's going on.  If it will --
 3            MR. BROWN:  Rather than --
 4            MR. RUSSO:  (Inaudible due to
 5       cross-talk).
 6            MR. BROWN:  Rather than take up --
 7            MR. RUSSO:  -- if there's a potential
 8       conflict.
 9            MR. BROWN:  No.  Because I didn't
10       want to take up the time of Mr. Sterling
11       or everybody else on this phone call, I
12       cleared this with Carey Miller, your
13       partner, yesterday.
14            MR. RUSSO:  And you explained to him
15       the conflict?
16            MR. BROWN:  I explained what I could,
17       yes.  And he said that would be fine and
18       that he would tell you.
19            Thank you.
20            MR. RUSSO:  Okay.
21  BY MR. MCGUIRE:
22       Q.   Okay.  Mr. Sterling, as Bruce said, I'm
23  Robert McGuire.  I'm counsel for the Coalition for
24  Good Government, one of the counsel.  And I wanted
25  to ask you about the Secretary's publicly stated
```

1    position with respect to the vulnerabilities and

2    risks identified in Professor Halderman's sealed

3    expert report.

4         Now, you have not read the report;

5    correct?

6         A.    Correct.

7         Q.    And has Secretary Raffensperger read the

8    report?

9         A.    Not to my knowledge.

10        Q.    Okay.  So on February 11th, 2022, the

11   Atlanta Journal & Constitution reported that

12   Secretary Raffensperger had publicly said the

13   following, quote:

14        "Halderman is way off base.  I'm

15         sure that anyone who has that kind of

16         unlimited access could do something,

17         but it's not the real world," end

18         quote.

19        Are you aware of this statement?

20        A.    In general, yes.

21        Q.    Okay.  Does it continue to be the

22   Secretary's position today that any voting system

23   vulnerabilities and risks identified in the

24   Halderman report are not the real world?

25             MR. RUSSO:  Object to form.

1          THE WITNESS:  I'm not necessarily

2     going to say that -- not the real world.

3     Are there vulnerabilities that exist?  I'm

4     sure that there are.

5          Are they vulnerabilities that are

6     easily exploitable in an actual election

7     environment?  I do not know that.  And

8     neither does the Secretary.

9          And most of the time we've seen

10    vulnerabilities that are of a cyber

11    nature, or frankly any nature, there is

12    normally layers of processes and items

13    like testing around them that tend to

14    mitigate that possibility.

15          Secondarily, we rely on our

16    contractor, Dominion Voting Systems.

17    Inside that contract they are supposed to

18    keep security up there.  And if they learn

19    of a vulnerability, they're supposed to

20    identify it.

21          Or if they learn of a -- let me --

22    I'm trying to think back to the contract

23    language itself, so I apologize.  I'm not

24    a lawyer, so I don't necessarily say it

25    always correctly.

1          But in general, it's up to them to

2      keep the security up there.  But then we

3      have to deal with our counties to make

4      sure they keep these things secure and

5      away from things so there aren't people,

6      you know, monkeying around with them for

7      three days and a screwdriver, those kind

8      of things.

9  BY MR. MCGUIRE:

10     Q.   So it sounds like you're saying that

11  access is key to whether or not there are

12  vulnerabilities?

13          MR. RUSSO:  Let me --

14          THE WITNESS:  Not ex -- sorry.

15          MR. RUSSO:  Just objection to the

16      form of the question.

17          THE WITNESS:  Not necessarily.  That

18      is a major component.  Physical security

19      is the, obviously the front line of all

20      cybersecurity.  And that's one of our main

21      things we have to worry about at all

22      times.

23          That's why we work with the counties

24      to make sure they have these things under

25      lock and key.  Most counties have a

1        limited access log where you have to go

2        into where these things are.

3              And as I stated previously, in a

4        generalized way, every system in the

5        world, be it ES&S, Smartmatic, Clear

6        Ballot, anything that involves a computer

7        somewhere in the process, be it a scanner,

8        an E.M.S., a B.M.D., a D.R.E., any of

9        those things, they're computers.  Things

10       can be done to computers by very smart

11       people.

12             It depends on the access they get,

13       the time they have, the knowledge they

14       have.  So all those things, you know, can

15       happen, but you have to do what you can in

16       a real world environment, in an election

17       environment, in order to mitigate those

18       risks.

19   BY MR. MCGUIRE:

20       Q.   Is there some minimum amount of access

21   that your office believes a bad actor would need to

22   have in order to pose a risk to the system?

23       A.   That's too broad of a question to really

24   answer.  I mean, it depends on which kind of

25   vulnerability they're going to go after and also

1    what the risk is.

2            There's a much higher risk for somebody

3    if -- depending on what the goals are, too.  If

4    you're trying to flip votes, if you're trying to

5    cause chaos within the system, the voter

6    registration system, you know, if you wanted to go

7    after something, as I stated earlier, flipping the

8    voter identification numbers could cause chaos, but

9    it wouldn't necessarily hurt outcomes of votes.

10            It's too specific [sic] of a question to

11    give you a specific answer to.  I mean, you would

12    need to really narrow it down and say in this

13    instance here, in this instance here, in this

14    instance here, if that makes sense.

15    Q.   Sure.  The thrust of the Secretary's quote

16    that the Halderman report didn't reflect real

17    world, though, the presumption there, you would

18    agree with me, is that Halderman had more access

19    than other actors have to the voting system;

20    correct?

21    A.   More access and potentially even passwords

22    and things like that, as I understand it.  So yeah,

23    I think in general he would have more access.

24            Now, granted, as I stated earlier in the

25    other part of the deposition, bad actors can be bad

1    actors, whether that's with hand-marked paper

2    ballots or computers.  So you always have to be on

3    the lookout for that potentiality.

4          And you know, there's no way to ever know

5    for certain if there's not a bad actor somewhere.

6    But the vulnerabilities are across every kind of

7    voting system manufactured by every manufacturer

8    and every style.

9        Q.   Okay.  Besides government people, Dominion

10   folks and the experts in this case, including

11   Professor Halderman, are you aware of any

12   unauthorized person who has obtained long-term

13   access to Georgia's voting system, to any of the

14   components or to the software?

15         MR. RUSSO:  Objection to form.

16         THE WITNESS:  When you say "voting

17      system," are you referring to,

18      essentially, all the components of the

19      voting system, E.M.S.s, voter

20      registration, I mean, every part and

21      parcel?

22   BY MR. MCGUIRE:

23      Q.   Yeah.  That's what I'm --

24      A.   I am --

25      Q.   -- referring to.

1      A.   -- not aware -- I'm not aware of it, no,

2   other than what was, I think Halderman was given,

3   as I've learned from Fulton County.

4           There were claims of that in some specific

5   cases.  There was a claim that in Ware County

6   somebody -- an independent auditor got ahold of it.

7   But that turned out to be -- not to be true.  They

8   didn't misplace anything.  There wasn't anything

9   that was taken away.

10           But outside of that, no, I'm not aware of

11   anybody having inappropriate access, no.

12      Q.   So your office investigated the Ware

13   County incident and concluded that it was nothing?

14      A.   Yes.  Because there was -- there was no

15   incident.  It just didn't happen.  There was not a

16   Ware County B.M.D. taken out.  I mean, it just

17   didn't happen.

18      Q.   Okay.  And I assume your previous answer

19   encompassed this, but just for clarity let me ask.

20   Do you know of any unauthorized person who has

21   imaged any component of Georgia's voting system and

22   taken away copies with them?

23      A.   No.

24      Q.   Okay.  Do you agree with me that, if

25   someone had done that and thereby obtained

1    long-term access to the system, that that would

2    create a real world risk?

3         A.   Well, again, I don't know what you mean by

4    "long-term access."

5         Q.   Well, let's say someone had copied it and

6    they had a copy of it --

7         A.   What is --

8         Q.   -- on an ongoing basis.

9         A.   What is "it," Mr. McGuire?

10        Q.   Let's say someone had imaged all of the

11   software in the voting system, would that be --

12   would that create a risk to the voting -- the

13   security of the voting system?

14        A.   Well, there are several different pieces

15   and parts they would have to image from each

16   individual component necessarily.  And even if they

17   did, we have 159 counties with over 18,000

18   different ballot styles with different passwords

19   that are changing for each one, they change from

20   election to election.

21             That would be a risk and vulnerability

22   that we would probably have to figure out some way

23   to mitigate if that was the case.  We have no

24   evidence that that's the case.  And I'm not -- I am

25   not a cybersecurity expert, so I don't know what

1    the long-term possibilities of that is.

2              I do know that having 159 counties with

3    over 18,000 different ballot combinations, and

4    knowing that our voter registration system is

5    completely separated from the election machinery, I

6    mean, it'd be -- it would be very difficult to get

7    every thing imaged for every single individual one

8    and then go back and do things that became

9    undetectable, from my understanding of how these

10   systems all work, without triggering something

11   along the way or having something that would just

12   be, for lack of a better word, noticeable.

13                             (Whereupon, Plaintiff's

14                             Exhibit 12 was marked for

15                             identification.)

16   BY MR. MCGUIRE:

17        Q.   So I'm going to share with you an exhibit

18   which is in the form of a recording.  And I

19   don't -- I haven't done this before with the audio,

20   so I'm not quite sure whether it's shared.  I've

21   introduced it as an exhibit, and I'd like to see

22   if --

23        A.   Uh-huh.

24        Q.   -- you see it.

25        A.   Let me go look real quick.

Page 257

1        Q.   It's Exhibit 12.  Well, it's showing up as

2    Exhibit 2012, it looks like, but it should only be

3    12, but.  It's at the bottom.

4        A.   I've got it.  Exhibit 2012 is Exhibit 12,

5    CGG Recording?

6        Q.   Correct.

7        A.   Is that the one?

8        Q.   That's the one.

9        A.   Okay.

10       Q.   I'd like you to open that and play it.

11   It's two minutes and 35 seconds.

12       A.   Okay.

13            (Whereupon, an audio recording was

14        played.)

15            THE WITNESS:  All right.

16   BY MR. MCGUIRE:

17       Q.   So Mr. Sterling, were you able to hear the

18   whole recording?

19       A.   Yes.

20       Q.   And there are two voices on that call;

21   right?

22       A.   Apparently.  Sounds like it.

23       Q.   So I'm going to represent to you that the

24   female voice was that of my client, C.G.G.'s

25   executive director Marilyn Marks.

1        A.    I thought I recognized it.

2        Q.    Yeah.  Do you recognize the male voice on

3    the recording?

4        A.    I do not.

5        Q.    Okay.  Before this call, before you

6    listened to this recording, which is an excerpt,

7    has the Secretary's office been aware of the

8    alleged imaging that the male caller claims he did

9    in Coffee County?

10       A.    I don't think he's claiming he did it.  I

11   think he was claiming that somebody came down from

12   Michigan and did it.  I knew that there were claims

13   in and around Coffee County that were numerous,

14   voluminous.  And I know our investigations team

15   looked into it down there.  But I don't know the

16   specifics of the outcome of that or what came of

17   that.

18            And I believe Misty, the elections

19   director, officially lost her job because she was

20   falsifying timesheets, not anything to do with this

21   kind of item.

22       Q.    Okay.  So there has -- there has been an

23   investigation of the incident that was discussed in

24   that recording?

25       A.    Or something -- I mean, Coffee County was

Page 259

1    problematic.  I mean, she also did a video where

2    she -- I think she had her credentials up on the

3    screen.  But I mean, I'd have to go back and look

4    at the specifics of them.  I don't know what came

5    of it.

6         But here's the issue we had, Mr. McGuire,

7    is we had claims up and down the state like this in

8    Ware County, things like that, of those kind of

9    issues and people demanding forensic audits, not

10   understanding what a forensic audit was.

11        So I am not aware of the specifics of what

12   the outcome of that investigation was or if they

13   were specifically looking if somebody imaged those.

14   I know that they -- we sent investigators to Coffee

15   County for several different items.  I believe that

16   was one of the ones amongst them.

17   Q.   Okay.  But you're not aware of any

18   findings of -- in connection with whether the

19   equipment was all imaged?

20   A.   I'm not aware of it off the top of my

21   head.  I would have to go back and check with our

22   investigations team.

23   Q.   Okay.  Are you aware of any efforts

24   undertaken to mitigate potentially unauthorized

25   access to that equipment?

1     A.   Well, like I said, every county, we have

2   S.E.B. rules and laws that surround all these

3   things.  So if anybody said, hey, go ahead and copy

4   these things, they would have been in violation of

5   both the law and the S.E.B. rules.

6     Q.   Okay.  And I believe -- I believe you

7   answered this question, but was the male -- I

8   presume the male caller was not authorized by the

9   Secretary to do the imaging that he claims was done

10  in Coffee County?

11    A.   Again, it doesn't sound like he wasn't

12  claiming that did it from my listening to it.  He

13  claims somebody from Michigan had come down to do

14  it, it sounded like.  So no, that -- no one was

15  given authorization to go do imaging of equipment.

16    Q.   Okay.  Is it -- I'm going to represent to

17  you that this call took place in March of 2021.  So

18  it's been more than a year -- almost a year since

19  the re -- since the call took place.

20         And he was obviously referring to

21  something that had happened previously; correct?

22    A.   Yes.

23    Q.   So if the male caller was telling the

24  truth on that phone call about the imaging of this

25  system and components, whether it was by him or

1    somebody else, then you'd agree that he had longer

2    access at this point to whatever those images are

3    than Professor Halderman had access to the

4    equipment from Fulton County; right?

5            MR. RUSSO:  Robert, have you guys

6        produced this call in the case?

7            MR. MCGUIRE:  I don't -- I don't

8        know.  I don't believe it has been.  But

9        you certainly have it here as an exhibit.

10           MR. RUSSO:  Okay.  And just so

11       we're -- is this a -- is it a full

12       transcript or is this the whole thing

13       or --

14           MR. MCGUIRE:  You have what I have at

15       the moment.

16           MR. RUSSO:  Okay.  I just wanted to

17       make sure he understood the whole -- the

18       whole call.

19           MR. MCGUIRE:  Sure.

20           THE WITNESS:  So I'm sorry.  Can you

21       go back and ask that question again?

22   BY MR. MCGUIRE:

23       Q.   So --

24       A.   I apologize.

25       Q.   So sure.  Let's assume the male caller was

Page 262

1    telling the truth about the imaging happening.  If

2    that's true, then you would agree with me that he's

3    had access to that image, or whatever was taken, or

4    whoever took it had access to whatever was taken

5    for longer at this point than Professor Halderman

6    had access to the Fulton County equipment; correct?

7         A.   I'm not going to accept the fact this guy

8    was telling the truth, because I've had so many

9    people lying through their teeth around a lot of

10   these things.

11             However, you're saying he could have had

12   the image.  I believe that Professor Halderman had

13   the actual equipment itself, which would have given

14   you the ports and the other things you would need

15   in order to test and do some of these things to

16   attempt to do alterations of the software itself.

17             So I think it's an apples and oranges kind

18   of comparison.

19        Q.   Sure.  But you'd agree with me that he's

20   had that image for at least as long and probably

21   longer than Halderman had access to the equipment

22   in Fulton County?

23        A.   I don't agree with that, because I don't

24   accept the premise that he has it.

25        Q.   All right.

```
 1      A.    And if he did, if he is telling the truth

 2   and these magical technical people were -- got

 3   these images and walked away with them and nobody

 4   investigated to find out what they were, then he

 5   potentially could have the images longer.  But I

 6   don't know if that's enough in and of itself.

 7            So like I said, like an apple -- it's an

 8   apples and oranges comparison.

 9      Q.    Right.  And I understand you don't know

10   whether this person is telling the truth, so I want

11   you to assume for the purpose of my question that

12   he is.

13      A.    Okay.

14      Q.    Assuming he is telling the truth about

15   what he asserted in the call, would you agree with

16   me that he could have shared that with virtually

17   anybody by now?  Whatever he --

18      A.    Yes.

19      Q.    Whatever was taken away could have been

20   shared with anybody by now?

21      A.    Yes.

22      Q.    Okay.  So can you tell me, when was the

23   last time you were aware of any activity in the

24   investigation of Coffee County?

25      A.    Months ago.  I mean, 2021 at some point.
```

1    Q.   Is it -- is it an ongoing investigation or

2   is it -- is it -- has it reached a tentative

3   conclusion?

4    A.   I would have to check.  I don't want to

5   speculate.  I mean, we have 50 continuing open

6   investigations.  Coffee County doesn't strike me as

7   one that's still open, if memory serves.  But

8   again, I don't want to speculate.  It could be

9   open, but I believe it's not.  I believe it's all

10   closed down there.

11    Q.   Okay.  Have there been any other

12   investigations of any other counties for similar

13   kinds of things?

14    A.   Calling things similar in this situation,

15   we had Morgan County where there was an issue

16   around the poll pad usage.  We had Spalding County

17   with a similar situation.  I'm not aware -- and

18   then we had the Ware County claim.

19         But outside of that, I'm not aware of

20   anything.  It doesn't mean it doesn't exist.  It

21   doesn't mean there might have been a claim of such.

22   And it doesn't mean there may or may not have been

23   an investigation.

24         I'm not aware of anything that had bubbled

25   up to say, yes, this is a substantive issue; yes,

Page 265

1    this is a problem; yes, we need to do something

2    about this.  I'm not aware of any of that.  Nothing

3    has bubbled up from the investigations side to the

4    leadership of the Secretary of State's office.

5        Q.   And I think you said earlier that the

6    election director, Misty Martin, or Misty Hampton I

7    believe, she goes by both --

8        A.   She got married sometime in the middle, so

9    I'm not sure which name is her maiden name and

10   married.

11       Q.   But we know we're talking about the same

12   person; right?

13       A.   Correct.  Yes.

14       Q.   So are you -- are you telling me that her

15   termination had nothing to do with whatever the

16   allegations are that were in the call I just

17   played?

18       A.   It's my understanding she was terminated

19   for falsifying timesheets is what I -- if memory

20   serves what it was.

21       Q.   Okay.  And that's it?  Anything else?

22       A.   Not that I'm aware of.

23       Q.   How about Newton County, are you aware of

24   any allegations about images being made of

25   equipment and software in Newton County?

1      A.   No.

2      Q.   And you said there were no other counties

3  that where you were aware of that happening, other

4  than --

5      A.   Correct.

6      Q.   -- potentially Morgan, Ware, and I think

7  you said Spalding?

8      A.   Yeah.  But that was a different kind of

9  thing.  I was thinking about places around

10  equipment where there was an issue.  And those were

11  not anything having to do with people imaging

12  stuff.

13         I apologize if you took my answer to mean

14  that I was thinking anything equipment related.

15  And those were the, some of the ones I was thinking

16  about.

17      Q.   So you're not aware of anything related to

18  equipment copying or imaging of software,

19  imaging --

20      A.   Correct.

21      Q.   -- of devices?

22      A.   Correct.

23      Q.   Okay.  Are you aware of any counties

24  receiving requests after the 2020 election for

25  people to come and image their equipment and

Page 267

1    software?

2         A.   Yes.

3         Q.   And what counties are you aware that that

4    happened in?

5         A.   I'd hate to try to number them at this

6    point, because I'm sure that there were --

7    President Trump and the individuals around him

8    stirred up lots of emotions to follow conspiracy

9    theories and disinformation and misinformation

10   around Dominion Voting Systems.

11             I'm sure that there were E-mails received

12   by every single county to demand a forensic audit

13   and all the things that go with that, even though

14   people really couldn't define what a forensic audit

15   was.  So I would probably venture to guess that 159

16   counties received a call from somebody to do that.

17        Q.   And are you aware of any specifically

18   that, you know, passed those requests along to the

19   Secretary of State's office or got advice or

20   guidance from the Secretary's office?

21             MR. RUSSO:  Objection to form.

22             THE WITNESS:  No.  I mean, I think

23        just in general, for lack of a better

24        word, follow the rules, follow the law,

25        you know, keep the system cordoned off and

1    safe.

2         And that -- our elections directors

3    are a -- are for the most part a very

4    good, functional crew that defend the

5    integrity and the security of the systems.

6         MR. MCGUIRE:  Okay.  All right.

7    Well, that's really all I had.  And I'm

8    going to turn it over to Bruce now.  But I

9    appreciate your time.  Thank you.

10        THE WITNESS:  Thank you.

11                 EXAMINATION

12   BY MR. BROWN:

13   Q.   Good afternoon, Mr. Sterling.  My name is

14   Bruce Brown, and I represent the plaintiffs C.G.G.

15   in this case.

16        Could you -- I'm going to return to the

17   issue of the State's voter registration system that

18   you testified about a bit when Mr. Cross was

19   examining you.  Excuse me.

20        The -- when did the State begin to think

21   about procuring a new voter registration system?

22        MR. RUSSO:  And I'm going to object

23   as outside the scope of the 30(b)(6)

24   topics.  But while -- since we have

25   Mr. Sterling here, you can go ahead and

```
1       answer if you know the -- know it in your

2       personal capacity.

3            THE WITNESS:  Mr. Brown, you want to

4       repeat the question for me again one more

5       time?  I think it was -- I'll try to

6       restate it to you.  Tell me if it's

7       correct.

8            When did we start look at first

9       procuring a new voter registration system;

10       is that essentially --

11  BY MR. BROWN:

12       Q.   It is.  Thank you.

13       A.   Yes?

14       Q.   Yes.

15       A.   Okay.  With the passage of SB 202 in

16  April -- so it was signed in April of '21.  We

17  started looking at having -- what we were going to

18  have to do to run the upcoming municipals and

19  general elections for 2022 and using ENet to

20  fulfill some of the specific requirements based on

21  SB 202.

22            I mentioned two of them that were specific

23  that were proving to be problematic over time.  One

24  was the dual voter registration dates that we were

25  working with the incumbent provider Civix in ENet
```

1    to try to code it to handle doing two dates of

2    registration for allowing votes on Election Day.

3              They were having a problem with that and

4    then, secondarily, the absentee ballot portal

5    requiring an image, either a scan, P.D.F., or

6    J.P.E.G., T.I.F., those kind of things, of the

7    request form itself to go along with the on-line

8    request.

9              Both of those things, the incumbent

10   provider on the hard-coded ENet system were having

11   a difficult time trying to get code to work to make

12   those two specific things occur.

13             And at the same time, we were looking at

14   some issues around the incumbent provider itself.

15   Every person who had been there when the original

16   code was done was essentially gone.  It had been

17   bought since we came into office I think twice by

18   private equity and had to change from P.C.C. to

19   G.C.R. and then finally to Civix.

20             And we were looking at some other things.

21   And in the meantime, in a parallel way, I serve as

22   the interim director of our professional licensing

23   board, and I was looking for a solution for our

24   licensing issues on the older system there called

25   IMRON.

Page 271

1          And I was in discussions with Salesforce

2    and another integrator called MTX.  And knowing the

3    issues we were having with ENet trying to get done

4    what the law required, we basically started having

5    a conversation like, well, a database is a

6    database, maybe we can look at using that for this

7    as well.

8          And originally, it started off as this

9    will be sort of a back-up thing.  If we can't get

10   this stuff to work on ENet, we'll have this --

11   we'll have some functionality in that.  But then it

12   was decided it'd be better, the risks were lower

13   moving to this new system than trying to run

14   parallel systems or run piecemeal systems.

15          So I'm assume -- we signed the contract,

16   the original one, back in December.  We did a

17   change to the scope of work to move everything up

18   so we could have a launch date of mid-March.  And

19   that was done in, I think we signed it in January.

20          But the discussions had gone back to

21   September, October, somewhere in that time range,

22   sir.

23   Q.    Could you give a year on that?

24   A.    I'm sorry.  2021.

25   Q.    Okay.  So December 2021 and then mid-March

Page 272

1      of this year?

2          A.   Those were the two scope of work change --

3      there was an original scope of work and then I want

4      to say we signed the other scope of work with the

5      change order in late January.  And we did -- we had

6      the initial discussions talking about this and kind

7      of scoping everything out starting back in

8      September, I believe, of '21.

9          Q.   Now, I want to shift back a little bit.

10     You mentioned some issues with ENet.  And I'm not

11     suggesting that these are the exact same issues.

12     But with ENet back a couple years ago at least,

13     there was the problem that the voter registration

14     database might cause eligible voters to not appear

15     as eligible voters; right?

16              Do you recall --

17         A.   I'm not.

18         Q.   Go ahead.

19         A.   I'm not familiar with that specifically.

20     I'm not -- this is triggering some discussion I

21     think that was had, but I think -- I don't know if

22     that characterization is correct or eligible

23     voters -- make your statement again.  I'm trying to

24     dig deep in my --

25         Q.   Let me just -- I don't --

Page 273

```
 1      A.    -- memory.

 2      Q.    I'm not -- I'm not trying to be coy or

 3   anything, but in --

 4      A.    Yeah.

 5      Q.    -- in Judge Totenberg's order of August

 6   15, 2019, she -- and this is ordering the state

 7   defendants:

 8            [As read]  "...to develop a plan

 9         for implementation no later than

10         January 3, 2020 that addresses the

11         procedures to be undertaken by

12         election officials to address errors

13         and discrepancies in the voter

14         registration database that may cause

15         eligible voters to:

16            "One, not appear as eligible

17         voters in the electronic poll books;

18            "Two, receive the wrong ballot;

19            "Three, be assigned to the wrong

20         precinct in the electronic poll book;

21            "Or four, be prevented from

22         casting a regular ballot in their

23         properly assigned precinct."

24            Do you recall those problems with the

25   other system?
```

1          MR. RUSSO:  Objection to form.

2          THE WITNESS:  The only specific

3     problem I know having to do with that

4     wasn't a system problem, it was normally a

5     county input error that would have done

6     something along those lines.  So again,

7     training would do those things.

8          Again, there's no -- I'm trying to

9     answer your question as best I can.  I was

10    not really aware of the other specific --

11    specificity of that August order.  I

12    wasn't focused on that at the time,

13    because I was mainly focused on the

14    equipment side of that when we were trying

15    to work to get that procured.  So the

16    voter registration was kind of off to the

17    side on that end.

18         Everything I'm aware of now shows me

19    that, if there is an error, I've never

20    seen an error that the system itself

21    caused.  It was normally the county didn't

22    do something right, the county input

23    person didn't do something right.

24         So outside of that, I don't know what

25    level this kind of thing occurs on.  And

1      the inability to cast a ballot at your

2      polling location, I mean, we have a

3      process in place for provisional ballots

4      as it is in the law, so I'm not quite sure

5      how that fits.

6   BY MR. BROWN:

7      Q.   Did -- are you aware of any formal or even

8   informal plan that the Secretary undertook between

9   August of 2019 and the work that you're doing

10  procuring a new system to address errors and

11  discrepancies in the voter registration database?

12     A.   Well, one of the main things that we did

13  with the passage of HB 316, the Secretary insisted

14  we be allowed to join the Electronic Registration

15  Information Center, which would allow us to update

16  our voting rolls more specifically and more quickly

17  with better data.

18          We will have access to social security

19  death records, which we didn't have before.  We

20  will have consistent access to the National Change

21  of Address versus the one time every two years we

22  were doing it before.

23          But again, human beings being human

24  beings, you can only mitigate those kind of errors

25  up to people being trained and doing their jobs the

Page 276

1    way they are supposed to be doing their jobs.  And

2    obviously, in a county with many, many more people

3    with less strong management, say, for instance,

4    like a Fulton, we see more of those kind of issues.

5            Like, the data errors I've seen more and

6    those things is their failure to merge records

7    properly, they're not pulling dead people off the

8    rolls.  And that's just mainly -- that's a

9    managerial thing at the county level.  And that's

10   something that we can't go and handhold county

11   workers as they input data.

12           And the main data that they would be

13   inputting that wouldn't be coming directly over

14   from the Department of Driver Services, which is

15   obviously going to be a cleaner set of data because

16   they have to go through other checks and they have

17   the -- an A.P.I. they -- that lines up to say this

18   is a real address, is when they're inputting stuff

19   from paper registrations and there is a higher

20   likelihood of user error, human error putting them

21   into the system.

22                         (Whereupon, Plaintiff's

23                          Exhibit 17 was marked for

24                          identification.)

25   BY MR. BROWN:

Page 277

1      Q.   Can you access, I'm not sure if I'm doing

2   this right, but can you access Exhibit 17?

3      A.   Let me take a look.  Yes, I've got one

4   here that says Sterling Fulton Recount Results Tab.

5   Is that what that is?

6      Q.   No.  It should be Sterling S.O.S.

7   Carahsoft Agreement.  Do you see that?

8      A.   Ah.  It's way down here.  Yes, I've got

9   it.

10      Q.   Okay.  And what's the number of that that

11   you show?

12      A.   Well, there's two different exhibit names

13   on here.  They have -- there's something called CGG

14   17, which is Exhibit 35.  And I realize now Exhibit

15   17 and not the CGG 17 is what you're referring to,

16   so that's what I'm looking at.

17           MR. BROWN:  Let me take a quick

18        break, because I don't want the record

19        screwed up on the numbers here.  And I'll

20        just be back in a minute.  Okay?

21           THE WITNESS:  All right.

22           MR. BROWN:  Excuse me.  Let's go off

23        the record a second.

24           THE VIDEOGRAPHER:  We're off the

25        record at 3:03.

Page 278

1          (Whereupon, a discussion ensued

2      off the record.)

3          (Whereupon, there was a brief

4      recess.)

5   BY MR. BROWN:

6      Q.   Okay.  Back on the record.  What is

7   Exhibit 17?

8      A.   It's the original scope of work through

9   Carahsoft and the partnership with MTX for the

10  Salesforce implementation of a voter registration

11  system for Georgia.

12     Q.   And if you scroll down to Page 39 real

13  quickly you'll -- or you may not even need to, but

14  you're identified as the escalation contact?

15     A.   Yeah.

16     Q.   And what does that mean?

17     A.   If there's ever a question of scope or a

18  problem and the functioning level people can't come

19  to an agreement to move forward, it would -- it

20  gets escalated to me to make a decision one way or

21  the other on how to handle it moving forward.

22     Q.   And you testified earlier about

23  anticipated implementation.  If you would turn to

24  Page 19 of Exhibit 17, I'd like to just sort of

25  compare what you said, not in a critical way, I'm

1    just trying to get the information.

2         A.   Okay.

3         Q.   Look at Page 19 --

4         A.   19.

5         Q.   -- of Exhibit -- of Exhibit 17.  I want to

6    just sort of map what you said against what is in

7    the scope of work.

8         A.   Okay.  I've got Page 19 as the

9    classification level.  Is that what you're looking

10   at?

11             I'm sorry.  Page 19 numbered or Page 19 of

12   the P.D.F.?

13        Q.   Correct -- well, which is -- which is the

14   correct answer?

15        A.   I don't know.

16        Q.   Oh.

17        A.   Because Page 18 of the document is Page 19

18   of the P.D.F.

19        Q.   Look at -- look at the page that says

20   Project Plan.  It's Page 21.

21        A.   Yes.  Here we go.

22        Q.   You've got that?  21?  Okay.

23        A.   Yes.

24        Q.   And so looking at that, where are you in

25   the implementation of the new system, then?

Page 280

1        A.   Well, as I mentioned earlier, which may

2   have been missed, was we've done a subsequent scope

3   of work to escalate this to a faster pace.

4        Q.   Okay.

5        A.   We are in sprint -- to compare it to this,

6   we are in sprint -- we just completed sprint three

7   in the Agile process.

8        Q.   Were you -- were you involved in the

9   procurement of this contract -- again, you

10  testified that you were involved in figuring out

11  what sort of database you needed.

12           Were you involved in the procurement

13  process if there was one for this?

14       A.   For the procurement process, what we did

15  was we used -- there's an existing bid state

16  contract through Carahsoft for Salesforce.

17       Q.   Okay.

18       A.   So we used the existing state contract to

19  bring Salesforce in with their integrator, which is

20  MTX for this project.

21                        (Whereupon, Plaintiff's

22                         Exhibit 18 was marked for

23                         identification.)

24  BY MR. BROWN:

25       Q.   Let me direct your attention to the next

Page 281

1    exhibit, which should be Exhibit 18.

2         A.    The mobile ballot printing?

3         Q.    Right.

4         A.    Yeah.

5         Q.    And the mobile ballot printing is

6    Dominion's name for a ballot printer; is that

7    right?

8         A.    Uh-huh.  Yes, sir.

9         Q.    And this brochure is an example of how you

10   could purchase, I take it, from Dominion an

11   application that will allow for mobile ballot

12   printing; correct?

13        A.    Correct.

14        Q.    Are you familiar with the issue of -- in

15   early voting, a precinct will have to have an array

16   of ballot styles; correct?

17        A.    Yes.

18        Q.    I should say a voting -- a voting place

19   should have an array of ballot styles; correct?

20        A.    An early voting location, they don't need

21   to have a -- remember, right now in Georgia, we

22   early vote in person on B.M.D.s.  So they would

23   have all the ballot styles available through the

24   encoding on the cards for -- they were all loaded

25   into the B.M.D.s.

1       Q.   If you didn't have a B.M.D., you would

2   need to have an adequate stock of paper ballots for

3   the -- for the ballot styles that you anticipated;

4   correct?

5       A.   Correct.

6       Q.   And one way to achieve that if you didn't

7   have a B.M.D. machine would be to have a mobile

8   ballot printer; correct?

9       A.   Yes.

10      Q.   In addition to that, given just for

11  demographics for a particular early voting

12  location, a large percentage of the people could be

13  supplied with a smaller percentage of ballot

14  styles, correct, leaving, say, a certain number of

15  ballot styles for people who came from a further

16  distance away; correct?

17          MR. RUSSO:  Objection to form.

18          THE WITNESS:  I'll be honest, I'm not

19      quite following your question there --

20  BY MR. BROWN:

21      Q.   Well, have --

22      A.   -- Mr. Brown.

23      Q.   Has the Secretary looked at the

24  feasibility of using a mobile ballot printing if

25  you didn't have a B.M.D. for accommodating ballot

Page 283

1    styles?

2        A.    No.   Because the -- we vote on B.M.D.s.

3    So I wouldn't look at other options to that, other

4    than I believe we had to look at the possibility of

5    what we would have to do.   I think the judge

6    ordered to have some kind of look at that.

7              And while it'd be feasible, it still would

8    be logistically difficult in the current

9    configuration of the system.

10       Q.    Do you know how much the application costs

11   by any chance, the -- or --

12       A.    No, I don't.   I don't know off the top of

13   my head.

14       Q.    You spoke -- I'm going to change gears a

15   little bit.   You spoke at length about the hand

16   audit.   Are you with me?

17       A.    The tally, yes.

18       Q.    The -- and did you -- is it actually a

19   risk-limiting audit?   Was it actually a

20   risk-limiting audit?

21       A.    No.   Because I mean, again -- I'm not a

22   scientist on this front.   I will speak in common

23   sense terms.   It wasn't a risk-limiting audit in

24   terms of the election was so close -- and some of

25   the literature I've said says basically, once you

Page 284

1    get to a point where you're pulling 20 percent or

2    more of the ballots, you're just as well off to do

3    a complete hand re-tally.

4           And we were going to be well past that

5    given the closeness of the race being at, oh, gosh,

6    I can't remember the number now, but it was well

7    inside half a percent.  I think it was point

8    15 percent out of five million ballots that were

9    cast.

10          So the hand tally, while not being a

11   risk-limiting audit per se because of the rules

12   around risk-limiting audits, working were with

13   VotingWorks, this was the best option to reach

14   the -- what we were trying to achieve, which was to

15   show that the computers tallied the votes as they

16   were presented to the computers.

17                        (Whereupon, Plaintiff's

18                         Exhibit 19 was marked for

19                         identification.)

20   BY MR. BROWN:

21       Q.   If you would turn to Exhibit 19, which is

22   a statute, 21-2-498.

23       A.   Yes, I've got it.

24       Q.   The statute is entitled Pre-Certification

25   Tabulation Audits, Rules and Regulations,

Page 285

```
 1    Risk-Limiting Audit Pilot Program.  Do you see
 2    that?
 3         A.   Yes.
 4         Q.   If you would -- I just want to see where
 5    we are in terms of what the State has done on this
 6    to match it up with the actual activities on the
 7    ground.  If you'd look at Subsection B.
 8         A.   Okay.
 9         Q.   It says:
10              [As read]  "As soon as possible,
11          but no later than November 2020,
12          general election, the local election
13          superintendents shall conduct
14          pre-certification tabulation audits
15          for any federal or state general
16          election in accordance with
17          requirements set forth by rule or
18          regulation by the State Election
19          Board."
20              Do you see that?
21         A.   Yes.
22         Q.   Was that done?
23         A.   I would have to look at what the actual
24    audit rule says.  Because you've got to understand,
25    we were allowed to do -- we could define what a
```

Page 286

1    pre-certification tabulation audit was.  We chose

2    to where, if we could, do what would be called an

3    R.L.A., or risk-limiting audit.

4          But then with the closeness of this, we

5    had to go the next best route we could, because we

6    couldn't have not chosen the presidential election

7    to do the hand tally on.

8          And I don't want to get into the argument

9    of the head -- angels on the head of a pin about

10   the difference between an audit, a risk-limiting

11   audit or a hand tally.

12         The hand tally achieved the goal that was

13   intended by the law, which was to show that the

14   equipment tallied the votes as cast properly.  And

15   that's what was achieved through the hand tally

16   that was done in five days.

17   Q.   When you say "we chose," who's the "we"?

18   A.   The Secretary chose the race that would

19   be -- undergo the audit slash tally.

20   Q.   So you were a little bit ahead of me on

21   answering a question I didn't ask.  I appreciate

22   that.  But my question was relating to "the local

23   election superintendent shall conduct

24   pre-certification tabulation audits in

25   accordance" --

Page 287

1       A.   Yes.

2       Q.   -- "in accordance with the requirements

3   set forth by rule or regulation" by the State

4   Election Board.

5            Okay.  Are there rules set forth by the

6   State Election Board for -- that match up with

7   Subsection B?

8       A.   As I understand it, yes.

9       Q.   Okay.  And did, prior to or during the

10  November 2020 election, local election

11  superintendents conduct pre-certification

12  tabulation audits in accordance with that rule?

13           MR. RUSSO:  And objection to the

14       extent it calls for a legal conclusion.

15           THE WITNESS:  I would think that the

16       hand tally meets the goal and intent of

17       the law and the rule.

18  BY MR. BROWN:

19      Q.   So by doing the hand tally on the

20  presidential election, you're saying that the local

21  election superintendents complied with this law?

22           MR. RUSSO:  Same objection.

23           THE WITNESS:  Yes.  The Secretary,

24       who by the law or rule, I can't remember

25       which one, got to choose which election it

Page 288

1          was done on.  He chose the presidential.

2          That was done in all 159 counties by the

3          local election superintendent and their

4          designees through their audit teams.  So

5          yes.

6    BY MR. BROWN:

7          Q.   And was that audit done in public view?

8          A.   Yes.  I mean, I saw streaming.  I know the

9    public was allowed to see.  In some cases -- I know

10   in Fulton there were some arguments internally

11   about who was able to see what, and they put up

12   some barriers which I think were incorrectly done.

13              And I believe that there was a lawsuit at

14   the time where the attorney was Jason Thompson, and

15   he won and Fulton had to take down some of those

16   barriers.

17              So I believe that was around the hand

18   tally, but I honestly can't recall right now

19   because there were so many around that time.

20        Q.   Let me direct your attention to Subsection

21   E of the same law.

22        A.   Bear with me to -- while I scroll down.

23              (Whereupon, the document was

24          reviewed by the witness.)

25              THE WITNESS:  I see it.

Page 289

1    BY MR. BROWN:

2         Q.    And has the Secretary of State conducted

3    "a risk-limiting audit pilot program with a risk

4    limit of not greater than 10 percent in one or more

5    counties by December 31, 2021"?

6         A.    Again, from the Secretary's point of view,

7    and I believe from Mr. Germany and the State

8    Election Board, the hand tally met the obligation

9    under this code section.

10            But again, I'm not a lawyer, so I'm not

11   going to -- the real world is yes, it was done that

12   way.  And we've had other discussions about how do

13   we make these things better and how do we make sure

14   we have ballot manifests done properly.  So there's

15   always an ongoing discussion internally.

16        Q.    So it didn't really follow the law but

17   what the Secretary thought the law meant; is that

18   fair to say?

19        A.    No, I'm not saying that.

20            Oh, I'm sorry, Vincent.

21            MR. RUSSO:  I'm going to object to

22        form and also to the extent it's outside

23        the scope of the 30(b)(6) topics.

24            You can go ahead.

25            THE WITNESS:  And my previous answer,

Page 290

1        no, that's not what I said.

2    BY MR. BROWN:

3        Q.   The second sentence of Subsection E says:

4             [As read]  "The Secretary shall

5         review the results of the pilot

6         program..."

7             So you're calling the hand tally of the

8    presidential election the pilot program?

9             MR. RUSSO:  Objection.  Same as

10        before, calls for a legal conclusion.

11             THE WITNESS:  And frankly, with all

12        the stuff going around, I'm not sure

13        what -- how best to call it or define it.

14        I think that probably would've met the

15        qualification for that.

16             And I frankly don't know if we did --

17        I think that there was a report done, but

18        I honestly can't recall because there's

19        been several different reports especially

20        to the General Assembly on different items

21        around this.

22    BY MR. BROWN:

23        Q.   Judge --

24        A.   I mean, the elections in general.

25        Q.   Judge Totenberg in her August 15, 2019

Page 291

1    order ordered the State:

2              [As read]  "...to file with the

3         Court a copy of any proposed rules as

4         well as final rules adopted by the

5         Georgia Board of Elections for the

6         Office of Secretary of State relating

7         to protocols and provisions for

8         auditing of election results and

9         ballots as authorized or required by

10        O.C.G.A. 21-2-498 within two days of

11        their issuance."

12        Do you know if the Secretary has complied

13   with that order?

14        MR. RUSSO:  I'm going to interpose an

15        objection, outside the scope of the

16        deposition.

17             THE WITNESS:  I don't know.  You'd

18        have to check with Ryan Germany.

19   BY MR. BROWN:

20        Q.   Now, you mentioned that -- well, did the

21   hand tally seek to follow the regulations that are

22   in place for audits?

23             MR. RUSSO:  And objection.  Calls for

24        a legal conclusion.

25             THE WITNESS:  Mr. Brown, we were

1    doing -- we were under a complete time

2    strain under the President of the United

3    States's claim the Dominion machines were

4    flipping votes.  The best possible outcome

5    was to do the hand tally to prove and show

6    that they did [sic].

7         We brought in VotingWorks, who were

8    the people that I believe are seen as

9    experts in the United States for actually

10   implementing on the ground actual R.L.A.s

11   and other audits.

12        Again, I'm not in the best position

13   to argue over the angels on the head of a

14   pin.  The reality was they did the count.

15   It was well within what people consider

16   normal margin of error and even closer

17   than that.

18        I mean, point 1053 percent off in the

19   total votes and point 0099 percent off in

20   the margin showed that the machines

21   counted the ballots as presented to them

22   properly.

23        And that was one of the biggest

24   things we were trying to push back on

25   against Trump and, you know, people who

Page 293

1          were claiming that machines can be hacked

2          and Russians and whatever else you want to

3          call it, I mean.

4               So we did in the real world the --

5          doing the hand tally fully in my -- from

6          my point of view did more to prove than if

7          a, quote, unquote, risk-limiting audit

8          would be done on a limited number of

9          ballots.  Counting each one, it showed

10         that the machines did properly count the

11         votes.

12    BY MR. BROWN:

13         Q.   Let me be transparent in the thrust of my

14    questions.  So our lawsuit is not about the 2020

15    election or necessarily the decisions that you

16    made, you and the Secretary made with respect to

17    the 2020 election.  Our lawsuit is about the next

18    election and whether Georgia has a vulnerable or a

19    secure election system.

20              Are you with me?

21         A.   Well, when you filed, the election -- the

22    next election was the 2020 election.  So --

23         Q.   No.  It was the 20 --

24         A.   -- it's kind of hard for me to separate

25    the two.

Page 294

1     Q.   It was the 2018 election, actually, I

2     think.

3     A.   Okay.  Yeah.  So it's two elections ago.

4     Q.   Right.  We're seeking prospective

5     injunctive relief.

6     A.   Okay.

7     Q.   We're looking ahead, just as you are in

8     your work, we're looking ahead at the next

9     election.

10          Are you with me?

11    A.   Yes.

12    Q.   Okay.  And when we look at the security of

13    Georgia's system right now and your testimony today

14    and questions about whether and to what extent it's

15    vulnerable, you have repeatedly come back to this

16    hand audit that you did as showing that the system

17    is not vulnerable.

18          And so whether or not the hand audit was

19    sufficient for whatever purpose you used it for the

20    presidential contest is one issue.  I'm addressing

21    to whether and to what extent it's a reliable

22    measure for just how secure the underlying system

23    is.

24          Do you follow me?  They're totally

25    different --

Page 295

1      A.   I get to where you're trying to go.

2      Q.   Okay.  And when you did -- and so some of

3   these questions aren't picking at you for not

4   following the rules.  They're just designed to see

5   just how good that hand audit was as a measure of

6   the underlying vulnerability or not of the system.

7           Do you follow me?

8      A.   (Whereupon, there was no audible response

9   by the deponent.)

10     Q.   So in the --

11     A.   I follow you, but I also would not -- do

12  not accept the characterization that we didn't

13  follow the rules.

14     Q.   Okay.  Let's look at the rules, then.

15                  (Whereupon, Plaintiff's

16                   Exhibit 20 was marked for

17                   identification.)

18  BY MR. BROWN:

19     Q.   Let's look at Exhibit 20.  And for the

20  record, Exhibit 20 is Rule 183-1-15-.04 Audit.  Are

21  you with me?

22     A.   Yes.

23     Q.   And do you see where it says:

24          "Prior to county certification,

25       the election superintendent of each

Page 296

1          county shall prepare a ballot

2           manifest..."?

3               Do you see that?

4          A.   Yes.

5          Q.   Did election superintendents at each

6     county prepare ballot manifests prior to county

7     certification with respect to the audit?

8               MR. RUSSO:  Objection to the extent

9          it calls for a legal conclusion.

10              THE WITNESS:  Yes, it's my

11          understanding they did.  Because they

12          wouldn't have been able to put stuff into

13          Arlo.  And Arlo and this was all done

14          before certification -- well, that's for

15          State certification.

16              The ballot manifests, to do them, you

17          normally have to do them as you're going.

18          So as to the exact times, my assumption is

19          yes, they all did.  Is it possible some

20          may not have?  It's potentially possible,

21          but I'm not aware of it.

22     BY MR. BROWN:

23         Q.   So there is a separate document that, from

24     each county, that's a ballot manifest that gives an

25     inventory of the tally sheets that are going to be

Page 297

1   put into Arlo or that were put into Arlo; is that

2   your testimony?

3       A.   That's not exactly -- okay.  Let me see if

4   I can -- restate to me what you're trying to ask

5   here, because I now am a little lost.

6       Q.   I'll just be blunt.  I've looked at a lot

7   of files, and I haven't seen any ballot manifest

8   that matches what I understand a ballot manifest to

9   be.

10      A.   I've seen several that do.  I've seen some

11  where they've mismanaged some of the stuff on the

12  front end, and we know that.  And that's one of the

13  reasons that I -- we were talking about internally

14  in our office how do we do this to where the ballot

15  manifests just become a standard thing that they do

16  as they go.

17           Let's remember a few other things while we

18  keep this in perspective.  We were still in the

19  middle of a COVID crisis.  We were still in the

20  middle of a new voting system.  And then not long

21  after this, we were in the middle of large scale

22  misinformation, disinformation around the

23  elections.

24           So our county people did as best they

25  could for the first time doing it, and I think we

1   probably learned some items from that.  And our

2   elections directors -- and we have now, like I

3   said, reorganized parts of the office to help make

4   sure we have better relationships between our

5   liaisons and the counties as we move forward.

6          And we're trying to lean on the strong

7   counties to help the weak counties on the training

8   side of this, because we do understand that we need

9   to have good audits that people can have faith in

10  moving forward.

11     Q.   Right.  The point I'm getting at is that

12  you didn't have good audit for the 2022 [sic]

13  election.  And it might have been sufficient for

14  the presidential election, but it isn't sufficient

15  to determine whether or not the underlying system

16  has vulnerabilities.

17          That would have to be with other evidence;

18  correct?

19     A.   I think you meant the 2020 election.  You

20  said 2022 election.

21     Q.   Right.  You're --

22     A.   And frankly, no, I disagree with that

23  statement.  Again, I think it was adequate to show

24  that the machines counted things properly.

25                         (Whereupon, Plaintiff's

```
 1                      Exhibit 21 was marked for

 2                      identification.)

 3    BY MR. BROWN:

 4       Q.   Okay.  Turn to Exhibit 21.  And for the

 5    record, Exhibit 21 is a several-page document.  The

 6    first one is -- has the title Arlo Ballot Manifest.

 7       A.   Yes.

 8       Q.   Do you see that?

 9       A.   Yes.

10       Q.   And is it your testimony that counties

11    prepared a ballot manifest as described by Arlo in

12    this document?

13       A.   To the best --

14            MR. RUSSO:  Sorry.  Can you just read

15       the document first, please?

16            THE WITNESS:  Give me a moment,

17       because it's my first time seeing this --

18       I've seen this, but it's been a while.

19    BY MR. BROWN:

20       Q.   Okay.

21            (Whereupon, the document was

22        reviewed by the witness.)

23            THE WITNESS:  I've read it.  Now ask

24       your question again, Mr. Brown.

25    BY MR. BROWN:
```

1     Q.   Yeah.  Did the counties prepare ballot

2   manifests as described in this Arlo document?

3     A.   Perfectly as it described that?  I highly

4   doubt it.  I know that there was an attempt by

5   every county to do it the proper way, but they may

6   have come up short.  And some may have done it

7   perfectly.

8         I know that I -- like, I walked into

9   Fulton County and saw their batches with the names

10  on labeled boxes that matched up on some of these

11  things.  So I know that there was an attempt by all

12  the counties to do it properly.

13    Q.   Right.  But the whole purpose of the

14  ballot manifest is to give an external document to

15  the actual tally so you know whether or not

16  everything's been counted and accounted for;

17  correct?

18    A.   Yes.  That's correct.

19    Q.   Okay.  And instead what we have seen, and

20  just correct me when I'm wrong when we're looking

21  at this, is that -- let me walk through this to

22  make sure I've -- to genuinely make sure I'm

23  getting this correct.  This is not to try to trap

24  you, so correct me if I'm wrong.

25         Okay?

Page 301

1      A.    Okay.

2      Q.    My understanding is that -- is that the

3   Arlo system is an application that appears on a

4   computer screen.  And the poll workers or election

5   people will take a tally sheet, which is

6   handwritten, and then enter in the tally sheet into

7   the Arlo system on-line.

8           Correct?

9           MR. RUSSO:  And I'm going to object

10          to the form of the question, Bruce.

11          THE WITNESS:  Again, I'm not an

12          expert on how Arlo actually works.  My

13          understanding, essentially, is you do the

14          ballot manifest prior to the tallying

15          being done, the hand tallying being done.

16          You need to know the number of

17          ballots inside the batches, and the names

18          need to make sure they're separate, and

19          you don't want to necessarily have them

20          match up to the tabulator.

21          At -- you're not -- you're not trying

22          to achieve a goal of matching the thing.

23          That's one of the things it specifically

24          says on Page 3.  They would take those and

25          then input the things from the tally

```
 1        sheets once they have been counted into

 2        the Arlo system.

 3              Now, if memory serves on this one, I

 4        think you had to put the batches into Arlo

 5        first.  Because in a normal situation it

 6        would say there's 250 ballots in batch

 7        seven from precinct one.  And it varied

 8        out throughout whatever was in the county.

 9              Then you have the dice, the however

10        many dice they have to roll to get the

11        randomized number to start the process

12        from -- so you can randomly choose, go get

13        a ballot from batch B73, which is what you

14        normally would be trying to do in the

15        different counties and everything.

16              We couldn't have that match -- that

17        done here as clearly in large part because

18        of the fact we had to do a complete hand

19        re-tally.  We didn't have to do those

20        parts of it.

21              But you have to have the batches

22        lined up with the amounts in each one of

23        the batches beforehand so Arlo can then

24        tell you what you have to go pull for the

25        randomized samples.  And it depends if
```

1          you're doing a batch comparison or a

2          ballot comparison.  So there's two

3          different ways to do it.

4               And I think the intent when the

5          Secretary chose to do an R.L.A. originally

6          back in May was to do batch comparisons at

7          the beginning, if memory serves, but I --

8          I'm 99 percent sure on that.

9               Kevin Rayburn was one of our internal

10         audit experts before he left, and he was

11         the one that helped kind of construct a

12         lot of this stuff on the front end.

13    BY MR. BROWN:

14         Q.   Okay.  But then the county in the actual

15    hand audit that was done would take a handwritten

16    tally sheet and then enter that into the computer;

17    correct?

18         A.   Hopefully correctly, yes.

19         Q.   And then those numbers would populate a

20    central database at the Secretary of State's

21    office; correct?

22         A.   With VotingWorks, actually, but yes.

23         Q.   Okay.  And with VotingWorks sort of under

24    the Secretary of State's umbrella?

25         A.   We contracted with VotingWorks to run the

1   hand tally.  They originally contracted to do a

2   risk-limiting audit.

3        Q.   Okay.  Now, have you physically seen a

4   document that's a ballot manifest for the counties,

5   or does that reside somewhere in the Arlo

6   application?

7        A.   I think it -- I'm -- again, it's been over

8   a year since I've had to deal with any of this.  I

9   believe that there's, in most counties, there's

10  probably a hard copy of what they did, and then

11  there's the ballot manifests inside Arlo where it

12  should have been loaded at that time as well, it's

13  my understanding.

14                      (Whereupon, Plaintiff's

15                       Exhibit 22 was marked for

16                       identification.)

17  BY MR. BROWN:

18       Q.   Okay.  If you could turn to Exhibit 22,

19  Mr. Sterling.  And for the record, Exhibit 22 I'll

20  represent to you, and you don't have to believe it,

21  but for purposes of this questioning you might,

22  this is an extraction from the Secretary of State's

23  statewide listing of the tallies in each county.

24       A.   Okay.

25       Q.   This particular exhibit is just for DeKalb

Page 305

1    County.  Are you with me?

2        A.   Yes.

3        Q.   And --

4             MR. RUSSO:  Object.  Lacks

5        foundation.

6    BY MR. BROWN:

7        Q.   If you -- if you scroll down, you'll see

8    that there are a couple hundred rows with each row

9    being a batch of ballots, or tallies from a batch

10   of ballots.

11            Are you with me?

12       A.   Yes.  But I'm confused.  You're saying

13   this is an extraction, but I see the words "CGG

14   total" on here.  So does that mean that the

15   Coalition did some other work on this sheet?

16       Q.   Yes.  We -- just I'll show them to you.

17       A.   Okay.

18       Q.   That's a fair question.  I'm glad you

19   asked that.  I believe that C.G.G. did some totals

20   at the bottom row that would not -- was not in

21   the -- in the original spreadsheet.  Hang on just

22   one second.

23            If you'd look -- if you look at the Excel

24   row 280, do you see that?

25       A.   Yes.  Where it says "CGG total."

Page 306

1      Q.   Yeah.   That's what's been added to this.

2   And it's the total of votes for Joe Biden, Donald

3   Trump, and then Mr. [sic] Jorgensen.

4           Do you see that?

5      A.   Yes.   But it looks like it leaves out --

6   no.   I guess it's got invalid write-ins, valid

7   write-ins which are not included in the totals,

8   blank under-votes and over-votes.

9      Q.   That's right.   Those were not tallied.

10  You could if you wanted to, and that -- and we did

11  not do that in this particular exhibit.

12          And then do you see in Column B, and you

13  can scroll up and down if you want, there's various

14  descriptions of the different tallies?   Do you see

15  that?

16     A.   Column B says batch name in most -- for

17  most of mine.   Is that what you're referring to?

18     Q.   Right.

19     A.   Okay.   And batch type is at Column C.

20  That's the different type that it is.

21     Q.   That's right.   That's the mode of voting;

22  right?

23     A.   Yes.

24     Q.   And now, we have reviewed the batch sheets

25  for DeKalb, and we have some questions for you on

Page 307

1    that.  And I may need for you to go back and forth,

2    but let me do the best I can here.

3                        (Whereupon, Plaintiff's

4                        Exhibit 27 was marked for

5                        identification.)

6    BY MR. BROWN:

7        Q.   Let me jump down to Exhibit 27.

8        A.   Okay.

9        Q.   And this is -- this is an example of maybe

10   human error, maybe system.  I don't know.  But if

11   you look at this, it says batch name 2339.  Do you

12   see that?

13       A.   Yes.

14       Q.   Do you see where it shows that Biden got

15   1,825 votes?  Do you see that?

16       A.   Yes.

17       Q.   All right.  Just make a mental note of

18   batch 2339.

19            MR. RUSSO:  And Bruce, I don't know

20       where this document came from, so I'm just

21       going to object to the extent that it's --

22       lacks foundation.

23   BY MR. BROWN:

24       Q.   And then if you'd go back to Exhibit 22,

25   which is the list --

Page 308

1      A.   Yes.

2      Q.   -- and if you'd find batch 233 --

3      A.   It's line -- it's Line 127.

4      Q.   Thank you.  Do you see the number there?

5      A.   Yes.  It looks like they left off one for

6    1,825.

7      Q.   Is that a mistake that you caught before

8    or just seeing it here for the first time?

9           MR. RUSSO:  Objection to form.

10          THE WITNESS:  Again, we didn't look

11      for human input errors.  We were looking

12      in the aggregate.  So that's the first

13      time I'm seeing this specific one of batch

14      2339 for DeKalb County.

15          Were we aware that there were input

16      errors?  Yes.

17   BY MR. BROWN:

18      Q.   Let me get back to the ballot management

19   issue.  And is there anything on Exhibit 22, I'm

20   not suggesting that there should be, okay, but is

21   there anything on 22 that would tell somebody who

22   is looking at this how many batches DeKalb was

23   supposed to have?

24          MR. RUSSO:  Objection.  I think you

25      already told us, Bruce, that your --

1       Coalition created this document; right?

2  BY MR. BROWN:

3       Q.   With that -- with that prompting,

4  Mr. Sterling, can you answer the question?

5       A.   Well, let me look across the whole thing.

6  And again, "supposed to have," again, is a

7  subjective question.

8       Q.   Yeah.  It's a normative question.  Things

9  are done the right way or the wrong way.  And so

10  what I'm saying --

11      A.   Or you -- again, "supposed to have," it

12  depends on how they chose to break their batches

13  up.  Even in the description you gave me on Page 3,

14  it specifically contemplated and suggested, if

15  there is a batch -- if there is a delineation

16  within a batch itself, a batch should be noted as a

17  separate batch.

18           So if you're trying to say that there

19  ought to be a rule that says that there are three

20  different ballot -- or four different ways to vote

21  in a particular precinct, you make -- take the

22  number of precincts and multiply by four and that's

23  the number of batches you'd have, that is not the

24  case on the front end.

25           If you're saying the Arlo software ought

1   to have that, maybe it should, but that's not --

2   you know, they are viewed from every person I've

3   read and seen as the world leaders in the United

4   States of implementing these kind of risk-limiting

5   audits.

6           Now they're saying that their software

7   isn't adequate to the task.  I don't know who else

8   you would go to to create those kind of things

9   necessarily.  But again, "should" and "does" are

10  not -- those are subjective terms that I'm not

11  necessarily going to agree with your

12  characterization because of those rules and the way

13  they can be done.

14      Q.   I mean, is there an indication of the

15  number of ballots that should be counted to

16  determine whether there is a large number of human

17  error or some other problem?

18      A.   Well, I'm looking on page -- sorry, Line

19  8, Column E that says there's 5,023,000 there.

20  That's overall for the State.  And let's see.

21  Two -- and I'm looking, those are statewide

22  numbers.  And again, this was a statewide

23  risk-limiting audit.  It's a statewide system.  It

24  is not county by county.  You're not supposed to be

25  able to do that.

1           One of the advantages from my

2     understanding of this is, at the county level, you

3     don't want them to be putting in things trying to

4     target to reach what they met before.  They're

5     supposed to be putting in only what they see on the

6     tally sheets.

7           If they made a mistake, like you pointed

8     out 2339, obviously that's a problem.  But there's

9     going to be human error in every hand tally and

10    every risk-limiting audit.  There's going to be

11    human error.  There's going to be input error.

12          You're at a rule of law of large numbers

13    here where those errors are going to kind of

14    balance out, which they essentially did, it looks

15    like, over five million votes that were hand

16    tallied.

17          In a risk-limiting audit, those numbers

18    will be smaller.  And if you don't read -- meet the

19    risk limit, you go to the next round of ballots to

20    pull.  But again, that only works properly if you

21    have a proper ballot manifest done on the first --

22    in the -- in the front end, yes.

23    Q.   And the -- where do you think we could

24    find the ballot -- I mean, this is discovery;

25    right?  I want to find it, the ballot manifest for

Page 312

1    DeKalb.  Because it really would have helped us
2    review the accuracy of this sheet quicker if we had
3    one.
4             Where would -- would DeKalb County
5    supposed to have one?  Do you -- does it say --
6        A.   I do not know the answer to that.
7    Mr. Brown, I don't know the answer to that
8    question.  I would -- I would recommend you maybe
9    talk to VotingWorks, who are the ones who we're --
10   we leaned on their expertise on how to best run
11   this process.
12                      (Whereupon, Plaintiff's
13                       Exhibit 24 was marked for
14                       identification.)
15   BY MR. BROWN:
16       Q.   Okay.  Look at Exhibit 24.  And you see
17   that says Tucker?
18       A.   Yes.
19       Q.   And just remember 195 for Trump.  Okay?
20       A.   And either 420 or 120 for Biden depending
21   if you're looking really closely.
22       Q.   Yeah.  I think it's --
23       A.   It's 420, but it --
24       Q.   I think the Democrats say that's 420.
25   Don't you?

1       A.   I believe that's -- no pun intended.

2            So what was -- that was Tucker what?

3       Q.   Tucker.

4       A.   Library or Tucker --

5       Q.   No.  Just Tucker.

6       A.   Okay.

7       Q.   Tucker Election Day 195.

8       A.   Okay.

9       Q.   Do you -- do you see that on there?

10      A.   I'm looking.  There's a lot of Tucker on

11   here.  I see 395 and 811 for one Election Day for

12   Tucker, but I see a lot of different Tucker names

13   in here.  So which one -- which line are we saying

14   this is supposed to potentially correspond to?

15      Q.   Well, no idea, because it doesn't appear

16   on here.  We couldn't find it.

17           MR. RUSSO:  I'm going to object to

18       the form of the question.  It lacks

19       foundation anyway.

20   BY MR. BROWN:

21      Q.   I mean, I'm just telling you we couldn't

22   find it, and we don't see it anywhere.

23           MR. RUSSO:  Oh, I don't have the

24       exhibit.  Sorry.  I was referring to

25       Exhibit 24.  I think I've already checked

Page 314

1          into 22.  Lack of foundation.

2               THE WITNESS:  Oops.  Sorry.  I'm

3          looking at the wrong exhibit.

4     BY MR. BROWN:

5          Q.   Okay.  Let's move on.

6          A.   And I'm guessing it's probably going to --

7     it looks like it would match close -- the most

8     closely to -- no.  That's not right.

9               You're right, I don't see one that would

10    potentially even look like it was a typo

11    necessarily.  Just it didn't make it onto here or

12    they mixed it in with another batch on top of it.

13                         (Whereupon, Plaintiff's

14                          Exhibit 25 was marked for

15                          identification.)

16    BY MR. BROWN:

17         Q.   Okay.  Look at Exhibit 25.  And I'm not

18    going to trick you.  There's -- we've got two

19    Tucker libraries.  One was counted, one wasn't.

20    The one that was counted -- well, the one that was

21    uncounted is cleverly labeled Tucker library

22    uncounted.  That's Number 25.  And we couldn't find

23    that on there, but we could find a counted Tucker

24    library on there.

25               MR. RUSSO:  To the extent there's a

1       question on 25, I'll object to the form

2       and lack of foundation.

3  BY MR. BROWN:

4       Q.   Do you see where --

5       A.   So what --

6       Q.   Do you see where the audit board batch

7  sheet for DeKalb Tucker library with 400 votes for

8  Donald Trump appears on Exhibit 22?

9       A.    No.  But also it doesn't mean it wasn't

10 blended in with another one, either on purpose for

11 filing purposes or by accident.

12          Again, this is in the aggregate, and this

13 is over five million votes.  And we have -- I would

14 stipulate there is going to be miscounts, things

15 written wrong on tally sheets and things entered

16 incorrectly into Arlo.  All of those things are

17 likely true because we're dealing with hundreds, if

18 not thousands, of people doing these jobs.

19      Q.   Right.  And what I'm getting at is that,

20 our point is that, while that sort of accuracy is

21 good for the presidential election for hand

22 grenades and for horseshoes, is it good enough for

23 you to be able to say, I know that that system is

24 secure because we did the hand audit?

25          MR. RUSSO:  Is there a question?

```
 1              MR. BROWN:  Yes.  That was a
 2       question.
 3              MR. RUSSO:  Can you -- can you repeat
 4       it?  I didn't hear a question.  Or she can
 5       just read it back.
 6              MR. BROWN:  I'll just say it again.
 7  BY MR. BROWN:
 8       Q.  If that sort of accuracy is good enough
 9  for the presidential election hand grenades and
10  horseshoes, does that mean it's good enough to
11  be -- for you to be able to determine that the
12  underlying system is not vulnerable or it has
13  systematic errors?
14              MR. RUSSO:  Objection to form of the
15       question.
16              THE WITNESS:  Sir, this was done to
17       show that ballots were counted properly by
18       the machines.  I will say again, in human
19       tallying there's going to be a large swath
20       of difference that would generally wash
21       out of large numbers.
22              In a normal risk-limiting audit, you
23       wouldn't have five million of these things
24       counted by thousands of individuals
25       quickly in five days and input hopefully
```

1        by one person in the computers, what it's

2        intended to do which it looks like a

3        couple of counties may not have done.

4            But in the environment in which we

5        were in and the environment that we are

6        in, the law calls for this to be done.  We

7        feel like it was done.  It did show that

8        the system did work properly, especially

9        in the presidential race.

10           And there's no reason, none, to

11       believe that anything untoward in any

12       other elections.  And no one's made such a

13       claim or -- of that.  And as I said

14       before, there are vulnerabilities in every

15       system in existence for elections.

16           And I think we need to continue to

17       work on making audits better and doing

18       training and all those kind of things that

19       we were already doing and would have done

20       regardless of this lawsuit's existence.

21       That's the reality.

22           So yes, I'm going to answer you and

23       say this tally at this time proved the

24       system worked the way it was intended.

25       And we will continue to work on

1      strengthening audits and doing better --

2      and doing better training.

3           And even now I believe Arlo has made

4      a change to where you can't put in the

5      same, I believe they're working on this at

6      least, you can't put in the same, inside

7      the same county, the same naming

8      convention so you don't have double input

9      errors in some of these things.

10          So I mean, there's always room for

11     improvement in these areas.  And this is

12     not the only way we know something didn't

13     happen.

14          As I've said repeatedly, we did

15     acceptance testing on the machinery in the

16     beginning.  We did L & A, logic and

17     accuracy testing before each election.

18     There was Pro V & V review in several

19     counties on several machines to show the

20     hash values remain the same.  So it's not

21     one thing we're relying on.

22          This is a big one, there's no

23     question.  Because the biggest claim that

24     existed, I know you didn't want to talk

25     about the 2020 election, you want to talk

1          about future ones, but the biggest claim

2          that existed was Dominion voting machines

3          were doing fractional voting or flipping

4          votes.  This hand tally proved that didn't

5          happen.

6                          (Whereupon, Plaintiff's

7                          Exhibit 28 was marked for

8                          identification.)

9     BY MR. BROWN:

10         Q.   Let me direct your attention to Exhibit

11    28.  This is --

12              MR. RUSSO:  We can't hear you.

13    BY MR. BROWN:

14         Q.   -- further back.

15              MR. RUSSO:  Bruce, we can't hear you.

16              MR. BROWN:  Oh, I'm sorry.  Thank

17    you, Vince.

18    BY MR. BROWN:

19         Q.   So let me direct you to Exhibit 28.  And

20    this is for batch name 1956.  Do you see that?

21         A.   Yes.

22         Q.   And do you see where that entry on Exhibit

23    22 for 1956 does not match the batch sheet?

24         A.   Mr. --

25              MR. RUSSO:  I'm going to object to

Page 320

1        the lack of foundation.

2              THE WITNESS:  Mr. Brown, again, I

3        think I've said that I'm sure you have

4        things you have found that don't match.

5        And I'm not going to say yes, they do

6        match, because obviously on this sheet

7        that you have provided, they do not.

8    BY MR. BROWN:

9        Q.   Okay.

10                        (Whereupon, Plaintiff's

11                        Exhibit 29 was marked for

12                        identification.)

13   BY MR. BROWN:

14       Q.   Let me direct -- just for the record, look

15   at Exhibit 29.  This is another batch sheet which

16   we can't find being counted, DeKalb County number

17   1836, with over 1,600 votes on it that do not

18   appear on the -- Exhibit 22.

19              MR. RUSSO:  Objection to the form of

20        the question to the -- lacks foundation to

21        the exhibit.

22   BY MR. BROWN:

23       Q.   Okay.  Now, let me -- the problems that

24   I've been showing that you've been explaining and

25   about human error and difficulties with trying to

Page 321

1    match up the batch sheets to this sheet that the

2    Secretary of State has on-line, that all came out

3    of DeKalb County; right?  All the what I've been

4    talking about is DeKalb County; correct?

5         A.   So far, yes.

6         Q.   And you're aware of other counties having

7    difficulty with the same issues as DeKalb County;

8    correct?

9         A.   Mainly Fulton.

10        Q.   Okay.  But it's not just Fulton?

11        A.   I'm not aware of gigantic issues and other

12   things.  Like I said, in aggregate, which is what

13   you're going for even when you're doing a full hand

14   re-tally, if you're doing an R.L.A. on a small

15   number of ballots, these kind of issues would

16   become much more apparent, readily apparent more

17   easily than if you're having thousands of people

18   handle these things.

19             Again, I think you're comparing apples to

20   oranges in these situations.

21                       (Whereupon, Plaintiff's

22                        Exhibit 23 was marked for

23                        identification.)

24   BY MR. BROWN:

25        Q.   Okay.  Let me direct your attention to

1    Governor Kemp's letter, which is Exhibit 23.

2         A.   Let's see.  Sorry.  You skipped around on

3    me, Mr. Brown.

4         Q.   I did.  I did.

5         A.   Yes.

6         Q.   I had some challenges numbering these.  I

7    had excellent help.  All the mistakes were mine,

8    believe me.

9              You've seen this letter; right?

10        A.   Yes.

11        Q.   And you've, I take it, studied the

12   attachment to it; is that right?

13        A.   "Studied" would be a strong word.

14        Q.   What's a --

15        A.   I've looked at it.

16        Q.   What's a weaker -- or what's a weaker --

17        A.   I've looked at it.

18        Q.   -- expletive?  Okay.

19        A.   I've looked at it, yeah.

20        Q.   Okay.  Have you been involved in

21   investigating the inconsistencies noted by

22   Mr. Rossi in the attachment to the governor's

23   letter?

24        A.   No.

25        Q.   Who has?  Who with your office has been in

Page 323

1    charge of that?

2        A.   The investigations division, which right

3    now is under the Deputy Chief Callaway.

4        Q.   Can you say that again, the name?

5        A.   Callaway, James Callaway.

6        Q.   Okay.  And Mr. Callaway, at least

7    temporarily, has taken over for -- from Ms. Watson;

8    is that right?

9        A.   Correct.

10       Q.   Did she do some of the work before she

11   left, do you know?

12       A.   I don't think so.  I -- this letter from

13   Mr. Rossi came well after her exit.

14       Q.   Okay.  When did she -- when did she leave,

15   do you know, just roughly?

16       A.   No, I really don't.  I think it was

17   sometime in fall or early fall.

18       Q.   And this -- the -- Mr. Rossi's report, I

19   don't want to generalize too much, but it indicates

20   some of the same problems that we have noted in

21   DeKalb, correct, inconsistencies between the hard

22   copy of the tally sheet and what it was --

23       A.   And Fulton County, yes.

24       Q.   Right.  Okay.  Has this -- has the

25   Secretary, or to your knowledge the State Election

Page 324

1    Board, investigated the findings of Mr. Rossi and

2    reported back to anyone?

3        A.   Not yet.  I believe that there is a

4    planned report out from the investigations team to

5    the State Election Board at the upcoming March 16th

6    meeting.  I believe that's the plan right now.

7        Q.   Now, the Governor says on Page 2, it's the

8    fourth paragraph down:

9            "The data that exists in public

10           view on the Secretary of State's Web

11           site of the R.L.A. report does not

12           inspire confidence."

13           Do you see that?

14       A.   Yes.

15       Q.   And he goes on to say:

16           "It is sloppy, inconsistent and

17           presents questions about what

18           processes were used by Fulton County

19           to arrive at the result."

20           Do you see that?

21       A.   Yes.

22       Q.   Sort of picking on Fulton County there

23   when it appears to be, at least in DeKalb County,

24   probably other counties, there were the same

25   troubles; right?

1       A.   Similar.

2       Q.   Let me back -- change gears on you.  You

3   said something that was interesting in the first

4   part of your deposition, and I thought about it in

5   response to -- in your answer a couple of questions

6   ago.

7            You said something to this effect, is that

8   you identified problems in the system and working

9   to make it better with respect to the ballot

10  manifest, making sure the counties know how to do

11  it, do it correctly, and that whatever the

12  difficulties might have been with the 2020

13  election, you've got to do it better next time,

14  something to that effect; correct?

15      A.   I think you can always improve after every

16  election.  You always learn.

17      Q.   Why is it, then, when you're confronted

18  with an expert report by Professor Halderman do you

19  trash it as being a load of crap?

20           Why don't you take that just as seriously

21  as something like this and think, you know what, we

22  can make it better, we can make this more secure,

23  we want to look at it, we want to honor it, credit

24  it, have our own people look at it, rather than

25  just saying it's some hack, it's a load of crap?

Page 326

1           Why don't -- why isn't your attitude about
2      cybersecurity the same as you express it to be with
3      respect to this?
4           A.   Because it is -- I'm sorry.
5                MR. RUSSO:  Bruce, you've been
6           testifying most of the time, and now
7           you're arguing and being argumentative and
8           testifying.
9                MR. BROWN:  I'll take that as a
10          compliment.
11     BY MR. BROWN:
12          Q.   Can you answer the question?
13               MR. RUSSO:  So yeah, there are
14          certain topics here for the 30(b)(6) which
15          Mr. Sterling is here for.  This topic is
16          not.  But we would like to be able to move
17          forward and, if possible --
18               MR. BROWN:  I'll --
19               MR. RUSSO:  -- can we get it --
20               MR. BROWN:  Okay.
21     BY MR. BROWN:
22          Q.   Just answer the question.  You -- I'm not
23     going to pick on you, Mr. Sterling.  You did say
24     quite fairly that your description of
25     Dr. Halderman's report, which you still haven't

1    read, was "a load of crap" was a punchy line and it

2    was motivated by an understandable frustration with

3    criticism of a system because it's not absolutely

4    secure; correct?

5         A.   No.  I think it's because people are

6    trying to undermine everybody's -- you want to know

7    my underlying emotional thought on this, Mr. Brown?

8    Is that for several years now in this state many

9    people have made claims that I don't believe are

10   justifiably accurate.

11             And that started in 2018, started in 2017,

12   even 2016, when you had people claiming that people

13   were -- Russians were hacking machines and flipping

14   votes to Hillary Clinton.

15             I had a democrat state representative who

16   has been combative with me in the past ask a

17   question about the report in a way that was

18   intended to be political as a gotcha question.  So

19   you're right, my initial reaction was a punchy go

20   back right back at him because you can't take the

21   politics out of politics.

22             And this report was not presented in such

23   a way as to be, hey, here's a helpful situation.

24   It is underlying trying to undermine Georgians' and

25   Americans' faith in the overall system.  So yes, I

1    take everything with a grain of salt coming out

2    from that path.

3            But we do take cybersecurity and all

4    security seriously.  It's at the forefront of our

5    discussions every day when we talk about how we're

6    implementing the system and what we can do to make

7    it better.

8            And like I said, I now am aware, too, that

9    Dominion has this, and engineers are looking at it

10   and seeing if there are -- as with every

11   computerized system in the world with elections,

12   there's going to be some vulnerabilities.  You have

13   to do your best to mitigate them and get ahead of

14   them.

15           So if there is anything that comes out of

16   that, I know that Dominion will be happy to do

17   that.  And it's their responsibility to bring those

18   to the Secretary of State's office.  And if we

19   discover something independent of them, it's our

20   responsibility to take it to them.

21           And Debra, I apologize, and I realize I'm

22   talking really fast right now.  So.

23           So to that point, the "load of crap" thing

24   was an emotional quick punch, because every kind of

25   criticism like that I've seen is based on there are

1    bad actors.  If there's bad actors, nothing is

2    secure.  No system is secure.

3          And that's the -- and that's the

4    underlying issue when I say that that was what I

5    was -- my intention at the time.  If I learn more

6    after reading it or seeing it and people who are

7    frankly going to be smarter than me who understand

8    the specifics of it and might find a way to

9    mitigate these things or make them better, yes,

10   obviously Dominion will bring those to us and we

11   would work with them to see what we could make

12   happen.

13        Q.   The -- let me follow up.  There's a lot of

14   common ground here, believe it or not,

15   Mr. Sterling.  I think that we can agree that it's

16   important that a voting system actually has

17   integrity and security and that it's perceived by

18   voters to have integrity; correct?

19        A.   Yes.

20        Q.   Therefore, it is damaging and bad for

21   irresponsible and false claims of insecurity to be

22   advanced; correct?

23        A.   Or claims made with no evidence, yes.

24   Both of those things would be things that I think

25   would be damaging and unnecessary.

1      Q.   But it's also crucial to investigate fully

2    potentially meritorious claims about system

3    security and to mitigate any vulnerabilities found

4    if possible; right?

5      A.   State your question because I -- there's a

6    statement in there, but I don't think I disagree

7    with it.  But what are you trying to ask

8    specifically?

9      Q.   Well, it's crucial to election security to

10   take -- to take things like Dr. Halderman's report

11   seriously and to mitigate whatever vulnerabilities

12   are found if mitigation is possible; correct?

13     A.   I would lean on our contractors to look at

14   it and see if there is vulnerabilities there to

15   tell me whether or not something would be taken

16   seriously or not.

17     Q.   And what --

18     A.   I would take anything, anything that's --

19   has a found -- a substantive foundation that was

20   outside of the already existing grounds of

21   mitigation to see if any other mitigation might be

22   necessary or proper as long as it doesn't interfere

23   with the process of the elections themselves or the

24   ability of our county workers to run the election

25   or voters to vote in the election.

1    Q.    There might be some vulnerabilities just

2    in the abstract that would convince even you that

3    you can't use the system; correct?

4    A.    Not given the current situation, I

5    seriously doubt that.

6    Q.    So --

7    A.    Knowing the complexities of our system and

8    everything, I mean, I would be -- I would be -- it

9    would take a lot.

10         I'm sure that there is some level out

11   there in some world where, yes, this is so insecure

12   you can't use it.  I do not believe that to be this

13   system.  And if it was the case for this system, it

14   would be the case with any system using a computer.

15   Q.    Well, don't get me going there.  But we're

16   talking about this system, I would --

17   theoretically, I think there's a lot of people who

18   would agree with the latter statement that you

19   made, that anything that uses a computer will

20   remain vulnerable.  But we're talking about the

21   Dominion B.M.D. system.

22         And what evidence would it take for you to

23   decide, okay, I didn't know that, now I know that

24   and we can't use the system anymore?  Just give me

25   a --

1      A.   I don't want to engage in a hypothetical

2   with you, Mr. Brown, on that.  I'm just -- it's not

3   going to happen.

4      Q.   I mean, because we heard earlier in the

5   deposition that, yeah, a bad actor if they have

6   enough time can hack the system.  And now there's a

7   lot of evidence that there are people out there who

8   have plenty of time.

9           And that's not enough for you to worry

10   about the security of the system; right?

11      A.   Mr. Brown, I'm going to agree with your

12   statement there's a lot of evidence that people

13   have that.  There isn't such evidence.  There's

14   claims.  There is no evidence to that effect.

15           Secondarily, in order to go and hack

16   thirty some odd thousand B.M.D.s would require

17   getting through multiple layers of physical

18   security, getting past risk-limiting -- I mean,

19   sorry, logic and accuracy testing.

20           I mean, I just -- in the real world, it is

21   very difficult to do that.  If you're going to do

22   that, you would -- I think it would be easier to

23   target the scanners.  Or the tabulation machines

24   would be the easier thing to do than anything else

25   than trying to get to a B.M.D.

1       Q.    Well --

2       A.    And those would affect whether you did a

3   hand-marked ballot or not or B.M.D. ballots.

4       Q.    And part of that's based upon your

5   understanding that B.M.D.s can't talk to one

6   another; right?

7       A.    Well, they can't talk to one another, so

8   yes.

9       Q.    And that an infected B.M.D. is just an

10  isolated infected computer; correct?

11      A.    I've seen the claims by some that there

12  could be a self-propagating thing that can go from

13  B.M.D. to B.M.D. with nobody noticing it, nobody

14  picking up a hash change, nobody noticing ballots

15  changing, nobody -- it requires literally thousands

16  of people to ignore what they're looking at for the

17  claim that I'm understanding is being made about

18  some of the systems around the B.M.D.s.

19           And I simply have not seen evidence of

20  that.  And I think even by your own estimation

21  there have been no claims that that has happened,

22  but there may be vulnerabilities that could allow

23  for things like that to happen.

24           But I've not heard of anybody saying that

25  there is a virus, a malware that can jump from

Page 334

1    operating system to operating system and

2    self-propagate to achieve these goals, not knowing

3    what ballots are going to look like, not knowing

4    what the ballot formats are out of 18,000 in our

5    state.

6          The complexities alone make it highly

7    suspect that anything like that could actually

8    happen in the real world.

9    Q.   But if it could happen, even you would say

10   this system is too vulnerable to allow Georgians to

11   vote on it; correct?

12   A.   Mr. Brown, I've literally just said I

13   don't see a way it could happen.  Maybe there is

14   some fantastical world in which that could occur,

15   but I'm not going to speculate with you on the fact

16   that it could.

17         With that, it's 4:07, and I really have to

18   pee.  So if we could take a break for a moment.

19   Q.   Of course.  Thank you for your --

20   A.   Thank you.

21         THE VIDEOGRAPHER:  Okay.  Going off

22   the record at 4:07.

23         (Whereupon, a discussion ensued

24    off the record.)

25         (Whereupon, there was a brief

Page 335

```
 1        recess.)

 2            THE VIDEOGRAPHER:  Back on the record

 3        at 4:16.

 4   BY MR. BROWN:

 5        Q.   I wanted to go back to a statement that

 6   you'd make about Dr. Halderman's report.  And I

 7   believe you said something to the effect that his

 8   report was not presented in a way to be helpful to

 9   the situation, it was trying to undermine Georgia's

10   faith in the election system.

11            Did you mean that?

12            MR. RUSSO:  I'm -- do you know where

13        he said that?  Are you talking about

14        today?

15   BY MR. BROWN:

16        Q.   Did you say that?  Do you recall saying

17   that?

18        A.   Did I say that about five minutes ago,

19   something along those lines?

20        Q.   Yeah.

21        A.   Yeah, I remember saying something along

22   those lines.  And I meant we're in an adversarial

23   issue right now.  And I don't know, and this is why

24   I think I don't know, I don't know if it was

25   submitted to C.I.S.A. in the way you can do -- I
```

Page 336

 1    don't -- there's a name for it where you basically

 2    say I'm giving you a vulnerability and I want to be

 3    reported for it, here you go, that's more I'm

 4    saying it here's the problem.

 5            I did mean that in the context of which

 6    we're discussing it right now, yes.

 7        Q.   So you think that Dr. Halderman, the

 8    purpose of him doing that was to undermine faith in

 9    Georgia's election system, seriously?

10        A.   I think the purpose of this lawsuit is to

11    do things like that, yes, to force us to do a

12    change.

13        Q.   Okay.  That's different than undermine --

14    than the purpose being to undermine the people's

15    confidence in the system.

16        A.   I think it's the same.

17        Q.   Okay.  Let me take you back a couple of

18    years.  When we sued to have the D.R.E.s

19    disallowed, your people said the same thing.  And

20    that --

21            MR. RUSSO:  Objection to form.

22    BY MR. BROWN:

23        Q.   That is that our suits are lousy and all

24    we're trying to do is destroy the faith in the --

25    Georgia's election system.  That is what we heard

1    last time.

2         A.   Okay.

3         Q.   Aren't you fortunate that we won and you

4    didn't have to deal with the D.R.E.s that had no

5    paper record in this last 2020 election; right?

6              MR. RUSSO:  Objection to form again.

7              THE WITNESS:  To be fair, I do not

8         believe you did, because we were already

9         starting the process.  The Secretary was

10        already running on changing to B.M.D.s.

11             The first hearings were in the House

12        in 2016 to say change the election system.

13        And the law was passed in '19.  And I'm

14        not -- I believe there was an order saying

15        we couldn't use D.R.E.s until well after

16        that.

17             Our intention was to do that all the

18        way along.  So no, I do not view that as

19        having been applicable to that case.

20    BY MR. BROWN:

21        Q.   Yet the Secretary said he did it because a

22    federal judge, an activist federal judge made him.

23    Do you recall that?

24        A.   No.

25        Q.   Okay.

 1      A.   Because you've got to remember, he ran on

 2   moving to B.M.D.s, and that started in 2017.

 3      Q.   And do you recall that Dr. Halderman

 4   hacked the D.R.E.s in the courtroom?  Were you

 5   there?

 6      A.   No.

 7      Q.   Okay.  Before your time?

 8      A.   I would assume so.  I'm not aware of it.

 9      Q.   Okay.  And that when he did that, what the

10   state defendants argued in response was that all

11   the plaintiffs were trying to do is exactly the way

12   you described his testimony today, is to undermine

13   Georgians' faith in the election system.

14          Okay?

15          MR. RUSSO:  I'm going to object to

16      the form.

17          THE WITNESS:  Is there a question in

18      there, Mr. Brown?

19   BY MR. BROWN:

20      Q.   We have heard this before about our

21   evidence and about our motives.  And so it's

22   nothing new.  But in truth, if there is something

23   in Dr. Halderman's report, whatever its motivation,

24   that shows a vulnerability that needs to be

25   mitigated, you would mitigate it, wouldn't you, or

1   see that Dominion --

2        A.   If the -- I'm sorry.  Do you have another

3   question, or do you want me to answer the first

4   question you just asked?

5        Q.   The one you -- the one I just asked.

6        A.   Okay.  Let's do a series of suppositions

7   here.  If there is an actual vulnerability pointed

8   out in this, we would work with Dominion to try to

9   mitigate it if it was something that could be

10  mitigated.

11       Q.   And if it --

12       A.   Or if it was --

13       Q.   If it wasn't, what would you do?

14       A.   If it wasn't something that -- well, it

15  depends.  You said it wasn't -- could be mitigated

16  or if there was a cost to it.  I'm not going to

17  speculate on something I haven't read.  But if

18  there was something there, yes, we would work to

19  mitigate it.

20            My point is, bringing it up in this highly

21  adversarial situation that's been now going on

22  since 2017, as I understand it, and yes, this case

23  has un -- has helped to undermine people's faith in

24  the elections.

25            This case was cited by President Trump and

Page 340

1    Sidney Powell and Lin Wood.  So yes, all those

2    things are true.  It may not have been your intent.

3    And I'm not going to go to the intent.  I'm saying

4    about the -- I'm talking about some of the outcomes

5    here.

6        Q.   But you would agree that you're not trying

7    to promote a false sense of security in your system

8    by just completely rejecting any criticism of it;

9    right?  You're looking at those criticisms

10   seriously; right?

11       A.   It -- well, I will be honest.  It depends

12   on who -- from whom they are coming and their basis

13   of fact and where they are positioned in relation

14   to our office oftentimes, I mean.

15            But yes, just because somebody is your,

16   quote, unquote, opponent doesn't mean they could --

17   they're 100 percent wrong every time.

18       Q.   Particularly when your own --

19       A.   Do I take it with more of a grain of salt?

20   Yes.

21       Q.   But particularly when your own expert,

22   your own expert agrees with his findings; right?

23       A.   Again, I'm not privy other than you saying

24   that.  And again, it's in Dominion's hands right

25   now.  These things have to be vetted out and looked

Page 341

1    at and then can things be done either through

2    programming or physical mitigations.  I don't know.

3         But yes, if something was real, my

4    assumption is we would do things to mitigate it to

5    assure the continued security of our system, which

6    I think has been proved through this election so

7    far and every election we've run them in, starting

8    with the pilots in 2019, the presidential

9    preference primary, the joint primary in June, the

10   general election in November, the elections in

11   January and the municipals in 2021.

12   Q.   But the basis for your statement that he

13   prepared the report for the purpose of undermining

14   voter confidence is simply because he was engaged

15   as the plaintiffs' expert, is that it?  Or do you

16   have some other basis for such a serious charge to

17   make?

18   A.   Mr. Brown, we are in an adversarial

19   situation here.  He is an expert from the, quote,

20   unquote, the other side.  So yeah, that is the

21   outcome, the literal outcome of this.

22        And especially with the way it was

23   discussed in the press before -- when it was still

24   lawyers' eyes only was from my point of view, my

25   personal opinion, intended to undermine people's

1    faith in the elections in this state.

2        Q.   Did you know that the Secretary of State

3    objected to Mr. Hal -- Dr. Halderman submitting his

4    report to C.I.S.A.?

5        A.   I don't remember.  I remember at the time

6    something like that happened, but I can't remember

7    what the rationale was at -- was for it.

8        Q.   Are you aware of reports of the Dominion

9    software being copied out of Michigan and out of

10   Colorado?

11       A.   I'm aware that there was a claim of that

12   in Michigan.  I never saw evidence of that.  I

13   believe the claim in Colorado was more -- had more

14   substantive -- but I'm not sure which Democracy

15   Suite version it was.  I don't know if it was our

16   version or some other version.

17       Q.   And what difference does it -- and what

18   difference does -- might it make?

19       A.   If it's a different version, it could have

20   very different items to it and how it's supposed --

21   the work flows and things internal to the systems.

22   That would make a pretty sizable difference if

23   you're trying to, quote, unquote, hack a system.

24       Q.   And you don't know which is which, whether

25   either of those systems is the system that Georgia

Page 343

1   was using -- is using?

2        A.   I think Colorado is close to ours, but I

3   think they're on a different version.  I could be

4   wrong on that.

5        Q.   Okay.  Has the -- has the Secretary

6   investigated the significance from a security

7   standpoint of that software being released to the

8   public, either from --

9        A.   Is it --

10       Q.   -- Michigan or Colorado?

11       A.   Not specifically, no.

12       Q.   Generally?

13       A.   Not that I'm aware of.

14       Q.   Generally?

15       A.   Gen -- no.  Not that I'm aware of.

16       Q.   I mean, sitting here today shouldn't he do

17   so?

18       A.   I'm not going to speculate on that,

19   Mr. Brown, because you're giving me stuff that I

20   don't necessarily know to be true.  Like I said, in

21   Michigan I'm not sure it was actually copied.

22            In Colorado there was a claim of that, but

23   I'm not sure if it was actually, it mirrored and

24   sent to somebody else.  I have no specific

25   knowledge to that front.  You may have more

1    information than me on the front.

2        Q.   Well, who in your office is looking at

3    that, if anybody?

4        A.   Well, I and Ryan Germany talked to

5    Dominion about some of these items.  And I'm not

6    aware of anything right now where a major concern

7    has been raised because of that.

8        Q.   Okay.  Your big defense to the relevancy

9    of Dr. Halderman's report is that he had all the

10   time in the world to hack it, so what.  And yet now

11   we know that potentially a lot of people could have

12   at least very similar software, and you and the

13   lawyer, Ryan Germany, are just sort of talking

14   about it at the water cooler and not doing anything

15   about it?

16            MR. RUSSO:  Objection.  Bruce, I

17       mean, stop arguing with the witness and

18       ask your questions.

19            MR. BROWN:  I did.

20            MR. RUSSO:  No, you didn't.

21            THE WITNESS:  Mr. Brown, can you

22       ask -- can you state your question?

23   BY MR. BROWN:

24       Q.   Is that -- so you're really not doing a --

25   I mean, I'm sort of aghast.

Page 345

1      A.   No, what you're claim -- what you're

2   sitting here claiming is that there's an imaged --

3   potential image which we don't even know exists is

4   out there, according to you.  And my point was,

5   having a physical piece of hardware is different

6   than just having the software on some of those

7   things.

8           And again, I will go back, and my big

9   defense isn't because he had all the time in the

10  world, he was able to do physical -- have physical

11  access to a -- one piece of equipment, and we're

12  talking about 30 -- over 30,000 pieces of equipment

13  when you're just talking about the B.M.D.s

14  themselves.

15          Secondarily to that, the complexity of the

16  ballot builds in our state are so broad as to make

17  it next to impossible if you do one that you

18  suddenly have the ability to do all of them.  We

19  have mitigation around passwords for both

20  technicians and county workers.

21          I mean, you're basically ignoring the fact

22  that there's over 18,000 different ballot styles,

23  and if you're trying to do something to switch

24  votes, you have to know what is the exact

25  coordinate for the exact name for this ballot style

1    on this B.M.D. in this polling location.

2         I mean, it's ignoring the complexity of

3    the system overall thinking that, if one thing can

4    happen, then it can just cascade everywhere.  And

5    there's been no evidence, no one has shown evidence

6    of that being a possibility that I'm aware of.

7    There's been speculation, but speculation is not

8    something that you can mitigate against.

9         Q.   I understand.  But you would think that

10   the Secretary of State -- well, does any state

11   have -- use Dominion more than Georgia or more --

12        A.   Different --

13        Q.   -- more people voting on it?

14        A.   In Pennsylvania about 53 percent of the

15   counties have it but not the large ones.  I mean,

16   Louisiana they're 100 percent Dominion.  Colorado I

17   believe is 80 percent Dominion.  I know they're in

18   California.  I'm not sure the extent of it.  New

19   York state is very Dominion.

20        And it depends on, you said, talking about

21   the number of people voting on it, it depends on

22   how many elections you have, too.  We have lots of

23   elections in this state.  Other people have lots of

24   elections, too.

25        So we are the largest single deployment of

Page 347

1    the election equipment in the country for a single

2    state.  But Michigan had has a high percentage of

3    it.  Like I said, Pennsylvania does.  New York

4    does.  Colorado does.  Louisiana, like I said, is

5    100 percent.

6           But again, you know, we are the -- we are

7    the tenth largest state in the country, and we are

8    a unified system, so you -- that statement is

9    probably correct.

10    Q.   Okay.  So given that fact, I take it the

11    Secretary of State office itself has taken no

12    actions to investigate the significance, if any, of

13    the potential release of the software in Michigan

14    or Colorado; correct --

15           MR. RUSSO:  Objection to form.

16    BY MR. BROWN:

17    Q.   -- if any, if it happened?

18    A.   I know that at some level we've had

19    conversations with -- I know Ryan Germany and Mike

20    Frontier (Phonetically) have had conversations.  I

21    don't know specifically to that, but it's around

22    security and what we're doing in those situations.

23           I, again, I have no evidence to show that

24    that's happened, so I don't usually chase things I

25    don't have evidence for of actually occurring.  And

Page 348

1   the problem is we exist in a situation right now

2   where there are lots and lots of claims, and it's

3   impossible to investigate every single claim unless

4   we have -- find specific evidence.

5           I'll give an example.  Signature matching

6   not happening in Fulton, lots of claims about that,

7   no evidence of it.  We had a specific claim from an

8   inside worker in Cobb County, so we did an

9   investigation there.

10          Because a claim is made doesn't mean it's

11  a real thing.  And you can't expend your resources

12  on things that may not be real.  So we rely on our

13  partner, Dominion, to keep up with the security of

14  the system and then our own internal training.

15          And like I said, the complexity of our

16  systems alone make it difficult to do the kind of

17  things that are being alleged as far as those

18  vulnerabilities go, as I understand it.

19  Q.   What are the -- I'll change gears a little

20  bit.  What are the protocols for access to servers

21  in the counties, B.M.D.s -- into E.M.S. servers in

22  the counties, like, what --

23  A.   It depends on what you -- it depends on

24  what you're being asked to do.  Obviously, the

25  election administrator for that county has

1     administrative access.

2             For all human beings in every county, if

3     you're given any level of access, you have to go

4     through some cybersecurity training at the front

5     end.  You then have to be assigned an

6     individualized password -- sign-in and

7     individualized password.  You have to go through a

8     multi-factor identification.  And then you're given

9     permissions depending on what you're doing at the

10    administrative level.

11            Like I said, the elections directors are

12    given administrative level, so they can do

13    basically everything within their county.  Then

14    you'd have, like, essentially, for lack of a better

15    word, a managerial level which would have access to

16    more functions but maybe specifically in the arenas

17    in which they are in charge.

18            And then the largest single group of

19    people who are given access who have to go through

20    the cyber -- through all the same stuff everybody

21    else does is the around 2,500 or so county either

22    temporaries or employees who are doing check-ins on

23    early voting.  That's the single largest group of

24    people who would ever have access to the E.M.S.

25            And their functions are literally they can

1   give credit for voting, and I believe that's about

2   it.  They can check them in, give credit for

3   voting, look at their ballot style, and then they

4   even encode the cards separately on those -- on

5   those sides.

6          The second largest group would be people

7   who are processing absentee ballots and doing --

8   and doing that kind of processing and giving credit

9   for voting and showing when it was mailed.

10      Q.   Does anybody have, in a county have

11   administrative access other than the election

12   director?

13      A.   Not generally speaking.  But there may be

14   some deputies who have that kind of access, but I

15   don't know off the top of my head.

16      Q.   What about if Dominion technicians were

17   on-site, would they be given administrative access?

18      A.   There's two different kinds of

19   technicians.  There's the field technicians, which

20   we had deployed on election days throughout, and

21   they were really just there for the equipment.

22          Then you had technicians who were deployed

23   into the counties to help them learn about this.

24   They may have in some cases had that.  I honestly

25   don't know off the top of my head right now.  I'd

1   have to go back and check.  Because they would have

2   to be able to show, yes, county administrator, this

3   is how you do this.

4        But I'm not -- I don't believe that that

5   was a generalized kind of thing.  There were some

6   cases where small counties or smallish counties

7   didn't have staff, and they -- and Dominion might

8   have supplemented some of those roles.

9   Q.   I may have misspoke on a question.  I want

10   to make sure your answer was clear, or that I

11   understand your answer.

12        In terms of the administrative access, I

13   was asking about the E.M.S. servers, not the voter

14   registration.

15   A.   Oh.  Then I was totally misunderstanding

16   your question.

17   Q.   Okay.  So who -- thank you.  And I'm sure

18   I misspoke.

19   A.   The E.M.S., the administrative side for

20   that is really only going to be the elections

21   director and maybe one of or two of their designees

22   to be signed in to go into the E.M.S. itself.

23   Q.   Okay.  And then -- and they would have

24   administrative access to that, but no one else

25   would be able to get into it at all; is that right?

Page 352

1       A.   Inside their county, yes.

2       Q.   Okay.

3       A.   Now, it doesn't go from county to county,

4    because the E.M.S. is obviously subject to that

5    county.  The ballot builds are done for that.  They

6    don't have access to other counties and stuff.

7    Because they're not talking to each other.  They're

8    air-gapped.

9       Q.   So in terms of, like, doing things like

10   deleting activity logs or permanent deletion of

11   records, it would only be someone with

12   administrative access to the E.M.S. that would be

13   able to do that; right?

14      A.   If I understand your question correctly,

15   yeah.  You can't just randomly go do that.  And

16   even then there would be a log of what happened and

17   who did it with sign-ins.

18      Q.   Does -- are there written protocols for

19   this, of what we've just been talking about, in

20   terms of within a county who was supposed to have

21   access like that?

22      A.   I think there are.  And Michael Barnes

23   leads the training on that.  And we have training

24   manuals around that.  So I believe there are.

25   Basically, you want to limit it.

Page 353

1         And like I said, in most counties their --

2    the E.M.S. is lock -- is oftentimes locked away.

3    You have to sign in.  Some counties are smaller and

4    they're not going to be in that same way, but you

5    still have to have access and codes to get into it.

6                        (Whereupon, Plaintiff's

7                        Exhibit 32 was marked for

8                        identification.)

9    BY MR. BROWN:

10      Q.   Let me direct your attention to exhibit --

11   I'm going to skip up a little bit -- Exhibit 21

12   [sic].

13      A.   The Exhibit 21 is the Arlo ballot

14   manifest.  Is that what you meant to talk about?

15      Q.   It is not.

16      A.   Or is it Exhibit 32, which is CGG 21?

17      Q.   Exhibit 32 is the correct number.  Thank

18   you very much.

19      A.   Okay.

20      Q.   Sorry.  I had a wrong -- I had an old

21   screen up.  And can you -- do you see, it should be

22   an article about a software glitch?

23      A.   Yes.

24      Q.   Do you recall a software glitch causing

25   delay in thousands of votes in Gwinnett County?

Page 354

1       A.   I remember it being called a software

2   glitch, which again is just a colloquial term about

3   these kind of things.  If I remember correctly,

4   this had to do with running multiple adjudication

5   modules at the same time, if this is what -- this

6   is what I'm thinking about, but I can't remember

7   exact -- the exact technical rationale.  But it had

8   to do with running multiple adjudication modules at

9   the same time, if memory serves.

10      Q.   What does that mean?

11      A.   They had two different adjudication

12  servers.  And for some reason, for lack of a better

13  word, it's kind of like if you turn something off

14  and on too quickly, it opens back up and it doesn't

15  recognize part of what happened previously.

16           And they had to go back and re-scan a lot

17  of these things because they weren't communicating

18  properly.  You're supposed to be able to run

19  multiple teams at one time.

20           And they didn't close one of them

21  properly, if memory serves.  And they reopened it,

22  and then they were kind of off on where they should

23  have been so that they wouldn't -- they could be

24  going through and doing it at the same time,

25  because they were running through the E.M.S.

1    together.

2          And that was the issue that came up from

3    that.  Again, I'm not a technical person.  That's

4    the way it was sort of explained to me.

5    Q.   And has that issue been addressed so that

6    it won't happen again?

7    A.   Well, again, it's addressed because

8    somebody closed down one of the other adjudication

9    modules incorrectly the day previously.

10         So they did something they weren't

11   supposed to do.  It's kind of like when you turn

12   off your machine and you remove media and it says

13   you did that wrong, that kind of thing.  So it's

14   not something you can really -- if somebody does it

15   wrong, they do it wrong.  I don't know if there's a

16   way to software fix that or not.

17         But again, this was the first time many of

18   these people were using this software, so you're

19   going to expect some of those kind of things in the

20   initial implementation.

21   Q.   You mentioned in your testimony, and we

22   have examples of it here, although it's harder to

23   tell with the exhibits, but of the same ballot

24   being counted more than once.

25   A.   Yes.

Page 356

1      Q.   And that happened, I'm not going to get

2   into quantifying that, but it happened more than

3   once, certainly; right?

4      A.   Yes.  Yes.

5      Q.   And tell me about what you found and what,

6   if anything, can be done about it, or could be done

7   about it?

8      A.   Well, there are two different things

9   happening on those fronts.  In the initial November

10  election, 100 percent of those that were double

11  counted were the hand-marked paper ballots with

12  some mismanagement on the scanning of them.

13         You can -- you can recognize it pretty

14  easily because, essentially, you would see the

15  results -- you could see the scanned ballots and it

16  was, like, a hundred this way and then it was back

17  a hundred -- it goes from one to a hundred, then

18  back from a hundred to one where they basically

19  picked up a batch and put it back through again.

20         And there's two ways that could have

21  happened.  They didn't properly clear a bad batch.

22  Because the normal process you do when you're doing

23  that is, if you're going through and there's a

24  problem scanning one of the ballots, because it's

25  going so fast two or three or four will get

Page 357

1    through.  You grab that full batch.

2           You're supposed to delete the batch and

3    then run the batch again.  They may not have done

4    that properly.  That's one thing that could happen.

5    Or they just stacked them incorrectly and then ran

6    them again.

7           But again, those are on absentee

8    hand-marked ballots.  You really didn't see that in

9    the B.M.D. ballots either in the advanced or the

10   in-person voting on Election Day.

11          The second one we saw was in the recount

12   where B.M.D. ballots and absentee ballots were all

13   run through central scanners.  Again, it's a ballot

14   handling situation where people double scanned

15   things, thought they'd already -- they had --

16   didn't realize -- they either thought they hadn't

17   scanned it --

18       Q.   You're talking about --

19       A.   -- they got the wrong stack and --

20       Q.   You're talking about the machine recount?

21       A.   Yes.  This is the machine recount.

22       Q.   Keep going.

23       A.   Because we were -- they were 100 percent

24   done on the central scanners.  So again, there was

25   a mishandling of things.  I think there was one, if

 1    memory serves, there was one batch that was counted

 2    three times.

 3            And again, from everything we've seen from

 4    our own investigations, it appears it was just

 5    ballot mishandling done on a recount, which then

 6    becomes the certified final results.

 7            But the -- but in the -- in the real world

 8    where most things of these happened, it's on the

 9    hand-marked paper ballots that are mailed in,

10    because they're done in large stacks at a time.

11    Q.   If on the recount there was the problem

12    with the same ballot being scanned twice, how did

13    the recount come -- all total up come out to match

14    so closely the original count?

15    A.   Because there were, if you remember

16    correctly, there were counts that were not in the

17    original certified things by a few thousand.

18    Fayette, I think it was Fayette.  Floyd had the

19    2,600 ballots that they had forgot to count.  It

20    looks like Fulton double counts in the first round

21    about 900 votes they didn't count the second round.

22            Again, the law of large numbers, the

23    mistakes happened on both sides and were basically

24    kind of a wash on that front.  But it was down

25    between -- a memory card was found in Walton.

1    Fayette had a small amount of ballots that hadn't

2    been counted.  And then Floyd had their 2,600

3    ballots.

4         So again, the final outcome wasn't moved.

5    Because you remember, the original ballot

6    difference was around 14,000, and the final was

7    11 -- rather famously now, 11,779.

8         Q.   You mentioned two causes of double and

9    triple counting.  And I got that.  Were there any

10   other causes that you detected of double and triple

11   counting of the ballot?

12        A.   It looks like it was 100 percent human

13   error and mishandling of ballots.

14        Q.   Is there any -- are you aware of any

15   software or operational change that could be made

16   that would reduce the likelihood of the first human

17   error, and that is, where they didn't clear the bad

18   patch and they did it again, or it was counted

19   twice?

20        A.   I would say that's a possibility.  We

21   don't know for sure that's what happened.  It's a

22   possibility of what happened.

23        Essentially, the human being has to do

24   things the way they've been trained to do them.

25   But when you have thousands of individuals doing

1    stuff, invariably a couple are going to make

2    mistakes, and this is one of those kind of things.

3            And I don't know -- you can't -- I'm not

4    aware of any software mitigation that could avoid

5    that, because we're -- because what you don't want

6    to do is have software making decisions that ought

7    to be made by human beings.

8            Software, you don't want them deleting a

9    batch on its own and then sending it back through.

10   You want that to be left to the human being to make

11   that decision.

12   Q.   You -- in response to my question, it was

13   clear that you've looked at it and you had

14   evaluated potential causes.

15   A.   Yes.

16   Q.   Tell me how you went about that

17   investigation or people under your -- under your

18   direction went about that.

19   A.   I can't speak to the investigative

20   procedures of our investigators.  But between

21   talking to the investigators, talking to our

22   elections director, talking to their elections

23   directors and then talking to Dominion, yeah, the

24   question was, how does this kind of thing happen?

25           They said, well, this will happen if these

Page 361

1   happen.  And they said, this happened?  They're

2   like, well, we didn't mean for it to, but there's a

3   possibility that happened, yes.

4          That's kind of the process by which you do

5   that.  You're having discussions and then trying to

6   highlight where this could have occurred.

7      Q.   Did that result in any meeting or

8   write-up, E-mails or memo or anything?

9      A.   We had discussions.  I would -- like, a

10  specific meeting about the double counting or

11  something like that, I mean, because it was a --

12  anytime you have double voting, it undermines -- it

13  dilutes everybody else's votes.

14         We understand that.  That's why it's

15  important you avoid those things, which is why we

16  really try to focus on be careful when you're

17  handling ballots.

18         And again, for the first time in 20 years,

19  we had ballots, whether they were hand-marked paper

20  ballots of the absentees, they were -- you know,

21  they had a record level of 1.25 million, or the

22  3.75 million B.M.D. ballots.

23         Like I said, the majority of human errors

24  come out of handling large batches of hand-marked

25  absentee ballots.  And you've just got to work on

Page 362

1    your training and work on your people to make sure

2    they don't make those kind of errors.

3        Q.   Let me get back.  If I wanted to find out

4    more about the investigation and the possible

5    causes, is there -- are there any documents that

6    would sort of help?

7              Like, you said that, you know, there were

8    how -- you know, in terms of how many ballots were

9    duplicated or what counties or what types of

10   ballots --

11       A.   Not really.  That's --

12       Q.   (Inaudible due to cross-talk).

13       A.   Again, not what we've seen.  I mean, I

14   don't have, like, a written report on this is how

15   this all happened from anybody.

16             Again, you're trying to operate and learn

17   from those things and go forward and talk to

18   Dominion about -- because they know the software

19   and these systems better than we do, because

20   they've been do -- they've had them for years now,

21   and they were Sequoia before that, on many of these

22   things.  So we lean on them and we lean on the

23   elections directors, and oftentimes they know where

24   the issues come up.

25             And like I said, the reality is this

Page 363

1   happens mainly in the large counties with not the

2   strongest management in the world, which is why in

3   SB 202, it didn't go the way I would have written

4   it, but there's an accountability measure for

5   counties that consistently seem to have errors like

6   this and screw up and mistreat voters either

7   because of mismanagement or poor planning or poor

8   execution.

9        Q.   Who was involved in looking at and

10  discussing and investigating the double counting

11  that you're aware of?

12       A.   I'm sure some of our investigators, but

13  Blake Evans, at the time Chris Harvey when he was

14  there, Ryan Germany, those kind of people.  And

15  then we had discussions with Dominion, obviously.

16            And myself, I even -- I remember I -- you

17  know, the leading way to get an investigations was

18  somebody posted some potential double counting on

19  Twitter, and I sent it to Dominion, the project

20  manager over there, Nicole Nollette, and said

21  what -- is this double counting from your

22  perspective?  And their engineer looks and says,

23  this looks like this was likely double counting.

24            So we get information and we pass it off

25  to investigators and people who understand these

1    internal systems and what to look for on those

2    fronts.  But yes, that's -- there's not, like, a

3    giant single report that has everything boiled down

4    to it --

5        Q.   Okay.

6        A.   -- if that's what you're asking about,

7    Mr. Brown.

8        Q.   And who was it at Dominion again, could

9    you just repeat the name, Nicole?

10       A.   Nollette.  She is the project manager on

11   the Dominion side.

12       Q.   And so Dominion did some investigation

13   also about possible causes and then sort of

14   evaluating what it looked like happened?

15       A.   Yes.  And again, I think some log files

16   were pulled along the way.  I just, I can't recall,

17   because there's been so many of these things over

18   the last two years.

19       Q.   The way you described the potential causes

20   to me just from a layperson's standpoint did

21   describe a double counting.  What about the triple

22   counting, did that --

23       A.   It would be the same thing.  They put the

24   same batch back, like, they stacked it there and

25   they thought, is this the "to scan" file -- "to be

Page 365

1    scanned" file or the "scanned" pile.  I mean,

2    that's kind of where we saw that happen.

3            MR. BROWN:  Okay.  I'm going to take

4        about a five-minute break, which actually

5        will speed things up, get me organized to

6        finish up.  So we'll be back in five

7        minutes.

8            THE WITNESS:  All right.  Thank you.

9            THE VIDEOGRAPHER:  Off the record,

10       4:48.

11           (Whereupon, a discussion ensued

12        off the record.)

13           (Whereupon, there was a brief

14        recess.)

15   BY MR. BROWN:

16       Q.  Okay, Mr. Sterling, we've got about a

17   couple dozen questions.  It'll be quick.  Thank you

18   for your patience.

19                       (Whereupon, Plaintiff's

20                        Exhibit 30 was marked for

21                        identification.)

22   BY MR. BROWN:

23       Q.  Could you pull up Exhibit 30, please?

24       A.  Is that the Georgia Assembly?

25       Q.  Right.  The letter from Walker.

Page 366

1       A.   And Blackmon?

2       Q.   That's correct.

3            Has the --

4       A.   Yes?

5       Q.   Has the Secretary responded to that

6   letter?

7       A.   I don't believe so.  I think we are -- the

8   intent, as I stated earlier, is that the

9   investigative outcome will be reported to the State

10  Election Board at the March 16th meeting is my

11  understanding.

12                        (Whereupon, Plaintiff's

13                         Exhibit 33 was marked for

14                         identification.)

15  BY MR. BROWN:

16      Q.   Okay.  Now, changing gears a little bit,

17  if you could access Exhibit 33, please.

18      A.   The Conny McCormack opinion editorial?

19      Q.   That's correct.  Have you seen this

20  before?

21      A.   No.

22      Q.   Hang on just one second.  I'm looking for

23  the passage that I need to ask you about.  She says

24  that:

25              [As read]  "The Secretary of State

1          has confirmed that the 100 percent

2          manual tally verified that their

3          voting system accurately counted the

4          votes and he has certified the

5          official election results."

6               Did it accurately -- did it verify -- it's

7     one thing to verify the result as being fair.

8     Another is to verify that the voting system

9     accurately counted the votes.

10               Did it do that?

11     A.    Yes.

12     Q.    Did it also in -- determine that the

13     voting system double counted the votes in some

14     instances?

15     A.    Not from the hand tally, which is what

16     she's talking about.  And the certification was

17     not -- was done -- because you have to do the audit

18     tally prior to state certification.  But state law

19     still stipulates you have to certify the election

20     results within ten days of the election.

21     Q.    Okay.  Do you see -- you see the problem,

22     is that the hand count either correctly -- or

23     confirmed a miscount or it incorrectly missed the

24     first one.

25               Which is it?

Page 368

1      A.   No, Mr. Brown, I'm not going to give in to

2      the characterization of your -- of your statement.

3      If there's --

4      Q.   Well, let me ask you this --

5      A.   -- five million votes cast, if the -- you

6      get to the point where it's point 1053 percent off

7      in terms of the number of ballots that were in the

8      original vote count and point 0099 percent off in

9      the margin, that shows that in the aggregate the

10     system correctly tallied the votes.

11     Q.   Now, is that percentage that you're using,

12     is that taking into account the double counting and

13     triple counting or not?

14     A.   Mr. Brown, again, inside that, inside that

15     point 1053 percent, and then with the human error

16     of which all of that is a part, and the discovery

17     of several thousand ballots because of the audit,

18     that is what showed that the machines accurately

19     reflect the ballots they were put through.

20          Was it probably double counted by a human

21     being in one place and then not double counted

22     another time to make it get closer in the wash, I

23     mean, law of large numbers?  Yes.

24          So again, I'm going to state for the

25     umpteenth time in this deposition and in, you know,

Page 369

1   press conferences and the like that the hand tally

2   showed that the machines counted properly the

3   ballots presented to them.

4          And if ballots were presented to it twice,

5   it counted twice.  And that is a human error that

6   is going to happen in every election in the world,

7   unfortunately, because there's human beings

8   involved.

9          And the intent of a hand tally is not to

10  replicate the exact outcome.  And so yes, when you

11  look at this with that close of a percentage, it

12  essentially shows it was dead on accurate in terms

13  of the way the ballots presented and the ballots

14  counted.

15     Q.   Did you or your office detect the

16  duplicate and triplicate counting before or after

17  the hand tally?

18     A.   I believe it would have been after.  We

19  became aware of it in many of those cases, yes.

20  Because at the time I didn't believe that there was

21  any until I was -- it was discovered after this, I

22  believe, that there had been some especially only

23  in the hand-marked paper absentee ballots in the

24  initial count, and then at sometime after that,

25  after the recount, that there had been batches of

Page 370

1    the B.M.D. ballots, which in the normal regular

2    world would not have occurred because you wouldn't

3    have run them through a central scanner.

4         Q.   How did you quantify the number of

5    duplicate and triplicate counting?

6         A.   I'm only aware of a couple of hundred

7    overall.  But the office is aware of it, and that's

8    the numbers that we have to work with right now.

9         Q.   What I'm getting at is someone found, oh,

10   here's a hundred that were done twice, to use

11   your --

12        A.   Something along those lines, yes.

13        Q.   Right.  What did they do, did they keep on

14   looking to see if there was another hundred in

15   another county?

16        A.   I don't know.

17        Q.   So they found thousands of duplicate or

18   triplicate and stopped looking?

19        A.   No, I don't believe that's the case, sir.

20        Q.   Okay.  How many were -- well, what was the

21   quantity?  How many do you -- how many were

22   duplicate ballots in your view?

23        A.   As I understand it, we're -- it was in the

24   hundreds tops.  That's as it was left in my last

25   having any discussions about this.  It's now been

Page 371

1    probably a year or so since I've had a discussion

2    about double scanning of ballots, it may be a

3    little bit less than that, but sometime back in

4    2021.

5        Q.   Now, Secretary Raffensperger said in a

6    radio interview a couple of days ago that there

7    were thousands of duplicate ballots and focused on

8    Fulton.

9             If I'm recalling his testimony correctly,

10   that is an overstatement in your --

11       A.   I wouldn't call it his testimony.  He was

12   on a political radio show.  And I don't believe he

13   said --

14       Q.   I --

15       A.   -- there was thousands of double cast --

16       Q.   Let me take that --

17       A.   -- ballots.

18       Q.   Let me just strike that.  That was an

19   unfair question.  His statement on the radio show.

20   Do you --

21       A.   I don't believe he said that.  I was

22   listening to the radio show as well.  I believe

23   that the radio host might have said there were

24   thousands.  I don't believe the Secretary said

25   there was, because there, as far as we are aware,

1    there were not.

2        Q.   Okay.  Well, just help me out, though.  I

3    know that you found hundreds of duplicates or

4    triplicates.  What did you or people under your

5    direction do to make sure there weren't more?

6            I mean, how do you do that?

7        A.   I can't answer that question because,

8    again, people are looking at it and bringing them

9    to us, we don't have a habit of going and looking

10   over people's shoulders over and over again to see

11   this.

12           Because again, we had an initial count, a

13   hand tally and a recount that were all pretty close

14   to each other.  And again, the things we found,

15   that there was more missing ballots because of the

16   Floyd County event than there were of anything of

17   kind of duplicate ballots that we were aware of at

18   any time.

19       Q.   So a longer but maybe more correct

20   statement would be that you have found hundreds,

21   not thousands, of duplicates and triplicates

22   correct, you don't really know how many there are?

23       A.   Let me say this.  On the triplicates there

24   was one batch, and I think it was less than a

25   hundred.  And the other ones were in the hundred or

Page 373

1  so range, if memory serves.  And again, I can think

2  of maybe four occurrences where that was the case

3  that I am aware of.

4      Q.  Right.  But those are ones that you have

5  found, not the ones that exist, correct, might or

6  might not be?

7      A.  Well, again, Mr. Brown, if you have an

8  initial count, you have a hand tally and you have a

9  recount, and they are very, very, very close

10 together, the chances of there being lots of --

11 here's the reality, if there was thousands and

12 thousands of double scans, we would have been

13 thousands of physical ballots short.  We were not.

14         There was -- if you take point

15 1053 percent of five million, you're talking about,

16 I guess, 5,000 ballots or so, somewhere in that

17 range.  So that would be inside that range, which

18 makes me see from the evidence before us that there

19 were not thousands of them, there might have been

20 hundreds.

21         And again, if there was a particular area

22 where this would have occurred, you would have seen

23 the number of ballots cast shooting past the number

24 of people who were within a particular precinct,

25 and we didn't see that exist anywhere that I'm

Page 374

1    aware of right now either.

2         So in the general view of the data,

3    there's not anything pointing to that happening on

4    a large scale.

5    Q.   And --

6    A.   And frankly, Mr. Brown, now that there's

7    so many people looking at this, I'm pretty sure

8    that all the ones that have occurred have likely

9    been surfaced.

10   Q.   The -- and what we've been talking about

11   in terms of the hand count and the machine recount,

12   that didn't dis -- touch any of the down ballot

13   races; correct?

14   A.   Correct.

15   Q.   And so the -- your statements about the

16   proof of the accuracy of the system would be

17   limited to what you can find in the POTUS hand

18   count and recount; correct?

19   A.   Again, I'm going to push back on the

20   underpinning of your question.  The presidential

21   race was done because that's the one we chose to

22   do.  It showed that the machines counted the

23   ballots accurately.  There's no claim anywhere that

24   there was some other untoward action in any other

25   elections.

1            And again, if you go back and look at the

2     outcomes in these elections, they all generally

3     reflected normal things.  So that's -- there's no

4     reason to believe that that occurred.

5         Q.   Just one second, please.

6              Let me direct your attention again to

7     Exhibit 33, the second page.  This is the article

8     by the -- by Conny McCormack.

9         A.   Okay.

10        Q.   She says at the top of the page:

11             "The biggest challenge was the

12         data entry of 41,881 batch reports

13          statewide into a spreadsheet."

14             Do you see that?

15        A.   Yes.

16        Q.   And we saw some of the difficulties of

17    that both in DeKalb County and in Fulton County

18    through Dr. Stark's declaration.

19             Are you with me?

20        A.   I got where you -- I got where you're at.

21        Q.   She then says:

22             "We poured over each county's

23          reconciliation report to identify

24          inadvertent double entry of some

25          ballot batches..."

1          What is she talking about there?  What is

2     she referring to?  And if --

3          A.   I don't know.

4          Q.   If she did that, why did we find so many

5     problems reconciling the tally sheets to the

6     totals?

7          A.   I don't know.  You'd have to ask her.

8          MR. BROWN:  Okay.  That is all I

9          have.  To the extent, and I think it's

10         agreed, that Mr. Sterling was not

11         knowledgeable about some of the topics,

12         we'll reserve our right to continue such

13         as it is.

14         MR. RUSSO:  Okay.  Which topics are

15         those?

16         MR. BROWN:  I don't have them in

17         front of -- front of me.  And we can -- we

18         can address it later.

19         MR. RUSSO:  Okay.

20         MR. BROWN:  Thank you, Mr. Sterling.

21         Appreciate your time.

22         THE WITNESS:  Thank you, Mr. Brown.

23         MR. BROWN:  Thank you, Vince.

24         MR. RUSSO:  Thank you.

25         Thanks, Debra.  Thanks Chris.

Page 377

```
 1            THE VIDEOGRAPHER:  We are going off

 2        the record at 5:11.

 3             (Whereupon, a discussion ensued

 4          off the record.)

 5             (Whereupon, the reading and

 6        signing of the deposition by the

 7        witness was reserved.)

 8                      - - -

 9             (Witness excused.)

10                      - - -

11             (Whereupon, the deposition

12        concluded at 5:15 p.m.)

13                    --oOo--

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 378

1                    VERITEXT LEGAL SOLUTIONS

2                FIRM CERTIFICATE AND DISCLOSURE

3

4              Veritext represents that the foregoing
    transcript as produced by our Production
5   Coordinators, Georgia Certified Notaries, is a
    true, correct and complete transcript of the
6   colloquies, questions and answers as submitted by
    the certified court reporter in this case.

7

8              Veritext further represents that the
    attached exhibits, if any, are a true, correct and
    complete copy as submitted by the certified
9   reporter, attorneys or witness in this case;

10             And that the exhibits were handled and
    produced exclusively through our Production
11  Coordinators, Georgia Certified Notaries.  Copies
    of notarized production certificates related to
12  this proceeding are available upon request to
    litsup-ga@veritext.com.

13

14             Veritext is not taking this deposition
    under any relationship that is prohibited by OCGA
15  15-14-37(a) and (b).  Case-specific discounts are
    automatically applied to all parties at such time
16  as any party receives a discount.  Ancillary
    services such as calendar and financial reports are
    available to all parties upon request.

17

18

19

20

21

22

23

24

25

Page 379

1           R E P O R T E R   C E R T I F I C A T E

2       STATE OF GEORGIA )
        COBB COUNTY      )

3

4               I, Debra M. Druzisky, a Certified Court
        Reporter in and for the State of Georgia, do hereby
5       certify:
                  That prior to being examined, the witness
6       named in the foregoing deposition was by me duly
        sworn to testify to the truth, the whole truth, and
7       nothing but the truth;
                  That said deposition was taken before me
8       at the time and place set forth and was taken down
        by me in shorthand and thereafter reduced to
9       computerized transcription under my direction and
        supervision.  And I hereby certify the foregoing
10      deposition is a full, true and correct transcript
        of my shorthand notes so taken.
11                Review of the transcript was requested.
        If requested, any changes made by the deponent and
12      provided to the reporter during the period allowed
        are appended hereto.
13                I further certify that I am not of kin or
        counsel to the parties in the case, and I am not in
14      the regular employ of counsel for any of the said
        parties, nor am I in any way financially interested
15      in the result of said case.
                  IN WITNESS WHEREOF, I have hereunto
16      subscribed my name this 3rd day of March, 2022.

17

18

19

20                    <%13053,Signature%>
                        Debra M. Druzisky
21                      Georgia CCR-B-1848

22

23

24

25

Page 380

1    To:  Mr. Russo

2    Re:  GABRIEL STERLING

3    Date Errata due back at our offices:  _____

4

5    Greetings:

6

7       This deposition has been requested for read and
     sign by the deponent.  It is the deponent's
8    responsibility to review the transcript, noting any
     changes or corrections on the attached PDF Errata.
9    The deponent may fill out the Errata electronically
     or print and fill out manually.
10
        Once the Errata is signed by the deponent and
11   notarized, please mail it to the offices of
     Veritext (below).
12
        When the Errata is returned to us, we will seal
13   and forward to the taking attorney to file with the
     original transcript.  We will also send copies of
14   the Errata to all ordering parties.

15      If the signed Errata is not returned by the
     above date, the original transcript may be filed
16   with the court without the signature of the
     deponent.
17

18   Please send completed Errata to:

19   Veritext Production Facility

20   20 Mansell Court, Suite 300

21   Roswell, Georgia  30076

22   (770) 343-9696

23

24

25

Page 381

1    ERRATA FOR ASSIGNMENT # 5106522

2        I, the undersigned, do hereby certify that I
     have read the transcript of my testimony, and that
3

4    _____ there are no changes noted; or

5    _____ the following changes are noted:

6

7        Pursuant to Rule 30(7)(e) of the Federal Rules
     of Civil Procedure and/or OCGA 9-11-30(e), any
     changes in form or substance which you desire to
8    make to your testimony shall be entered upon the
     deposition with a statement of the reasons given
9    for making them.

10       To assist you in making any such corrections,
     please use the form below.  If additional pages are
11   necessary, please furnish same and attach hereto.

12   Page_____Line_____Change:_  _____

13   Reason for change:_____

14   Page_____Line_____Change:_  _____

15   Reason for change:_____

16   Page_____Line_____Change:__  _____

17   Reason for change:_____

18   Page_____Line_____Change:__  _____

19   Reason for change:_____

20   Page_____Line_____Change:__  _____

21   Reason for change:_____

22   Page_____Line_____Change:___  _____

23   Reason for change:_____

24   Page_____Line_____Change:___  _____

25   Reason for change:_____

Page 382

1    Page_____Line_____Change:____    _____

2    Reason for change:_____

3    Page_____Line_____Change:_____    _____

4    Reason for change:_____

5    Page_____Line_____Change:_____    _____

6    Reason for change:_____

7    Page_____Line_____Change:_____    _____

8    Reason for change:_____

9    Page_____Line_____Change:____    _____

10   Reason for change:_____

11   Page_____Line_____Change:_____    _____

12   Reason for change:_____

13   Page_____Line_____Change:_____    _____

14   Reason for change:_____

15   Page_____Line_____Change:_____    _____

16   Reason for change:_____

17   Page_____Line_____Change:_____    _____

18   Reason for change:_____

19                   _____
                     DEPONENT'S SIGNATURE
20

21   Sworn to and subscribed before me this _____ day of

22   _____, 2022.

23   _____
     NOTARY PUBLIC
24   My Commission Expires: _____.

25   _____  Notary Public

Page 383

1        R E P O R T E R   D I S C L O S U R E

2   DISTRICT COURT    )    DEPOSITION OF
    NORTHERN DISTRICT)    GABRIEL STERLING
3   ATLANTA DIVISION )

4

            Pursuant to Article 10.B of the Rules and
5   Regulations of the Board of Court Reporting of the
    Judicial Council of Georgia, I make the following
6   disclosure:
            I am a Georgia Certified Court Reporter.
7   I am here as a representative of Veritext Legal
    Solutions.
8           Veritext Legal Solutions was contacted by
    the offices of Morrison & Foerster to provide court
9   reporting services for this deposition.  Veritext
    Legal Solutions will not be taking this deposition
10  under any contract that is prohibited by O.C.G.A.
    9-11-28 (c).
11          Veritext Legal Solutions has no contract
    or agreement to provide court reporting services
12  with any party to the case, or any reporter or
    reporting agency from whom a referral might have
13  been made to cover the deposition.
            Veritext Legal Solutions will charge its
14  usual and customary rates to all parties in the
    case, and a financial discount will not be given to
15  any party in this litigation.

16

17                    <%13053,Signature%>
                      Debra M. Druzisky
18                    Georgia CCR-B-1848

19

20

21

22

23

24

25