IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


DONNA CURLING, et al.

        Plaintiffs

                          CIVIL ACTION FILE
     vs.                  NO. 1:17-CV-2989-AT

BRAD RAFFENSPERGER, et al.

        Defendants




VIDEOTAPED ZOOM DEPOSITION OF
SARA TINDALL GHAZAL

November 5, 2021
10:13 A.M.


Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

```
 1                APPEARANCES OF COUNSEL

 2                (All appearances via Zoom)

 3

 4    On behalf of the Plaintiffs:

 5         HANNAH ELSON, ESQ.
           VERONICA ASCARRUNZ, ESQ.
 6         REEMA S. SHOCAIR ALI, ESQ.
           MORRISON & FOERSTER LLP
 7         2100 L Street, NW
           Suite 900
 8         Washington, DC 20037
           202.887.1500
 9

10    - and -

11         ROMMY FLORES, ESQ.
           MORRISON & FOERSTER LLP
12         707 Wilshire Boulevard
           60th Floor
13         Los Angeles CA 90017-3543
           rommyconklin@mofo.com
14         213.892.5422

15

16    On behalf of Sara Ghazal and the State Defendants:

17         VINCENT R. RUSSO, ESQ.
           CAREY MILLER, ESQ.
18         ROSS ALLOY BELINFANTE LITTLEFIELD
           500 14th Street NW
19         Atlanta Georgia 30318
           678.701.9381
20         vrusso@robbinsfirm.com
           carey.miller@robbinsfirm.com
21

22

23

24

25
```

1                    APPEARANCES OF COUNSEL

2


3    On behalf of Defendants Fulton County Voter
     Registration and Elections and Richard Barron:
4
          NANCY ROWAN, ESQ.
5         OFFICE OF THE FULTON COUNTY ATTORNEY
          141 Pryor Street, SW
6         Suite 4038
          Atlanta, Georgia 30303
7

8

9    ALSO PRESENT:

10        Bryan Robinson, Videographer
          Marilyn Marks, Coalition for Good Governance
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   WITNESS:  SARA TINDALL GHAZAL

3   EXAMINATION                              PAGE
    By Ms. Elson                               7
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    INDEX TO EXHIBITS

2        Plaintiffs'
           Exhibit          Description          Page
3

4        Exhibit 1    Tweet by Sara Ghazal, Dated    38
                      2/28/2020
5
         Exhibit 2    Email Chain                     60
6
         Exhibit 3    Attachment from Email, Bates    63
7                     Nos.
                      STATE-DEFENDANTS-00201663
8                     through -1664

9        Exhibit 4    Tweet by Sara Ghazal, Dated    72
                      2/28/2020
10
         Exhibit 5    Tweet by Sara Ghazal           81
11

12    (Exhibits attached to transcript.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            Deposition of SARA TINDALL GHAZAL
                    November 5, 2021
 2

 3            (Reporter disclosure made pursuant to

 4       Article 8.B of the Rules and Regulations of the

 5       Board of Court Reporting of the Judicial

 6       Council of Georgia.)

 7            VIDEOGRAPHER:  We are on the record.  The

 8       time is 10:13 a.m. on November 5, 2021, and

 9       this is the beginning of the video deposition

10       for Sara Ghazal.

11            Would counsel present please identify

12       themselves and who they represent for the

13       record.

14            MS. ELSON:  Good morning.  This is Hannah

15       Elson.  I'm here representing Curling

16       plaintiffs, from Morrison & Foerster.  I also

17       have Veronica Ascarrunz and Reema Shocair with

18       me from Morrison & Foerster as well.

19            MR. RUSSO:  Good morning.  This is Vincent

20       Russo with the law firm Robbins Alloy

21       Belinfante Littlefield.  I have with me Carey

22       Miller from our firm.  We represent Ms. Ghazal

23       and the State defendants in this case.

24            MS. ROWAN:  Nancy Rowan from the Fulton

25       County office of the attorneys office.  I
```

```
 1          represent Fulton County Voter Registration and
 2          Election and Richard Barron.
 3              MS. MARKS:  Marilyn Marks, plaintiffs'
 4          representative, Coalition for Good Governance.
 5              VIDEOGRAPHER:  Anyone else?  Okay.  Then,
 6          thank you, Counsel.
 7              Will the court reporter please swear in
 8          the witness.
 9          SARA TINDALL GHAZAL, having been first duly
10     sworn, was examined and testified as follows:
11     EXAMINATION
12     BY-MS. ELSON:
13     Q.    Thanks for being here today, Ms. Ghazal.
14          Am I pronouncing your name correctly?
15     A.    Good enough.
16     Q.    Okay.  If you could just state your full
17     name and your address for the record.
18     A.    Sara Tindall Ghazal.  1344 Waterford Green
19     Close, Marietta, Georgia, 30068.
20     Q.    Thank you.  I'm going to be asking you a
21     series of questions regarding this litigation.
22     Before we do that, I just want to confirm that you
23     understand that you're under oath today.
24     A.    I do.
25     Q.    And if you answer a question, I'm going to
```

1          assume that you understood the question.

2                    Is that okay with you?

3          A.   Of course.

4          Q.   Is there any reason why you would be

5     unable to give full and complete testimony today?

6          A.   Not to the best of my knowledge.

7          Q.   And I know we're all familiar with Zoom,

8     but we should try and not talk over each other

9     because if we're both talking at the same time, the

10    court reporter can't take a clean record.

11         A.   I understand.

12         Q.   Do you have any -- thank you.  Sorry.

13              Do you understand?

14         A.   Yes.

15         Q.   Do you have any chat function open on your

16    computer screen or any windows open other than the

17    Zoom?

18         A.   I do not.

19         Q.   Okay.  And can you confirm that during the

20    course of the deposition, you will not open any

21    other windows besides the Zoom and the Exhibit

22    Share?

23         A.   Yes.

24         Q.   Okay.  And if you need a break at any

25    point, just let me or your attorney know.  I just

1     ask that you answer any questions that are pending

2     before we take a break.

3                   Does that sound okay?

4          A.    That's fine.

5          Q.    Okay.  Did you go to college?

6          A.    Yes, I did.

7          Q.    And where did you go?

8          A.    I went to the University of the South.

9          Q.    And what degree did you get?

10         A.    Political science.

11         Q.    Did you do any graduate work?

12         A.    I have a law degree.

13         Q.    And what is your current employment?

14         A.    I am not currently employed.

15         Q.    Were -- when was the last time you were

16    employed?

17         A.    For remuneration?  When I was working for

18    the Democratic Party of Georgia.

19         Q.    And when were the approximate dates of

20    that?

21         A.    2018 through 2019.

22         Q.    What was your position titled for the

23    Democratic Party of Georgia?

24         A.    Voter protection director.

25         Q.    What did you do in that job?

Page 10

1          A.   I worked to make sure that voters had

2     access to their ballot and could -- could cast a

3     ballot.

4          Q.   Did you have any other duties in that

5     position?

6          A.   I supported the -- the democratic caucus

7     when it came to legislation that -- that related to

8     elections.  Yeah.

9          Q.   Does the Democratic Party have a hotline

10    that it staffs for voters during elections?

11         A.   Yes.  That is one of the primary sources

12    of support, the direct support for voters.

13         Q.   And have you ever worked that hotline?

14         A.   Yes.

15         Q.   And when was that?

16         A.   In -- through -- throughout 2018 and 2019.

17         Q.   So fair to say you dealt with elections in

18    that -- in that position?

19         A.   I did.

20         Q.   Have you ever been involved in any other

21    organizations that deal with elections?

22         A.   I spent more than ten years working for

23    The Carter Center, and in that role, I observed

24    elections overseas.

25         Q.   And when did you work for

Page 11

1       The Carter Center?

2             A.   Well, I started out in 1992 as an intern.

3       I spent five years.  Then I returned to work in 1998

4       to 2000.  And then I again -- no, I -- excuse me.

5       1998 to 2003.  And then I returned again in 2015,

6       and I worked there until I left and went to work for

7       the Democratic Party in 2017 -- 2018.  Sorry.

8       Losing track of time.

9             Q.   Okay.  Have you previously been deposed?

10            A.   I have not.

11            Q.   What did you do to prepare for the

12      deposition today?

13            A.   I read parts of the decisions from -- the

14      Court decisions.  I didn't -- I admit I did not get

15      through the entire -- the entirety of it, and I also

16      reviewed several -- several of the regulations.

17            Q.   And what regulations are you referring to?

18            A.   Regulations that had been passed by the

19      State Election Board both prior to my time on the

20      board and since -- since we -- since I've joined the

21      board a few months ago related to the conduct of

22      elections.  I also -- I -- I met with Mr. Russo.

23            Q.   And did you review any other documents

24      besides the complaint that you mentioned and the

25      regulations that you mentioned?

Page 12

1          A.   I reviewed an email that I had overlooked

2     initially regarding just some potential proposed

3     changes to a regulation.

4          Q.   Okay.  And was that the email, do you

5     know, that your counsel referenced sending to us

6     this morning?

7          A.   I believe so.  I believe so.

8          Q.   Okay.

9          MS. ELSON:  And, Mr. Russo, are you

10         planning on sending that?

11         MR. RUSSO:  You -- you should have it.  So

12         we sent -- Carey Miller just sent it.  It -- we

13         would have it -- we need to produce it with a

14         Bates stamp.  We just were unable to -- to do

15         that with our -- our relativity vendors.  We

16         were having some issues being able to --

17         technical difficulties with how the -- the

18         proposed rule was being PDF'ed, but we will

19         provide that to you.  We're also going to mark

20         it confidential.  So if it is used today, we

21         need to make sure that it is -- it is

22         appropriately designated for purposes of -- of

23         the deposition.

24         MS. ELSON:  Thank you.  And I apologize.

25         I hadn't checked my inbox.  So I have received

1           that, and we will ask some questions about it

2           later after we've had a chance to review it.

3                MR. RUSSO:  Okay.

4      BY MS. ELSON:

5           Q.   Did you, Ms. Ghazal, review any deposition

6      transcripts in advance of today?

7           A.   I did not.

8           Q.   And you mentioned that you had seen a

9      complaint in this case.

10               Do you know whether that's the most recent

11     complaint, titled the "Third Amended Complaint"?

12          A.   I -- I did not review the complaints.  I

13     reviewed the -- the Court's documents.  I would have

14     to go back and look.  I don't recall precisely which

15     documents I reviewed.

16          Q.   Do you mean the Court opinions when you

17     say the "Court documents"?

18          A.   Yes.  The Court-issued opinions.

19          Q.   Okay.  What, to your understanding, is

20     this litigation about?

21          A.   The -- as it currently stands?

22          Q.   Yes.

23          A.   My understanding is the -- the current

24     litigation is with regard to the legality of the

25     current voting system that is in use in the State of

Page 14

 1    Georgia.

 2         Q.   Have you discussed this case with anyone?

 3         A.   This case has been ongoing for several

 4    years.  Yes, of course.

 5         Q.   Who, to your recollection, have you

 6    discussed that with?

 7         A.   How long do you have?  This is a -- this

 8    is a -- a thoroughly covered case for anybody who

 9    has been involved in elections in Georgia.  I've

10    discussed the case with my predecessor on the State

11    Election Board.  I've discussed this case with

12    Ms. Marks extensively when I was at the -- at the

13    state party.  I have discussed this case with the

14    counsel for -- for the Democratic Party of Georgia.

15    I've discussed this case with people I've worked

16    with on -- on various campaigns.  I've discussed

17    this case with election advocates, but all, you

18    know, at -- at a fairly high level because I've not

19    been a party to the case at all.

20         Q.   You mentioned discussing this with your

21    predecessor on the State Election Board.

22              What was your discussion with your

23    predecessor?

24         A.   Generally it was whenever something else

25    would -- would come out.  Because while I was not

1    employed formally from 2019 to 2020, I was -- I was

2    a candidate for office.  So it was important to

3    understand the impact of any opinions coming out of

4    the -- the Court with regard to how elections would

5    and could proceed in Georgia.  So I needed to

6    understand the practical impact on voters.

7         Q.   Have you discussed this case with other

8    State Election Board members?

9         A.   I have not.

10        Q.   And just to confirm, that includes -- so

11   you have not discussed this case at any SEB

12   meetings, State Election Board meetings?

13        A.   If I recall correctly, Ryan Germany has

14   given some brief updates that I don't recall the

15   precise details that he gave.  I do recall that

16   there was nothing substantive discussed.

17             (Phone ringing.)

18             Apologies.  My daughter.

19             MR. RUSSO:  And I would simply,

20        Ms. Ghazal, remind you not to disclose any

21        attorney-client privileged communications.

22   BY MS. ELSON:

23        Q.   You are currently serving as a member on

24   the State Election Board; right?

25        A.   That is correct.

Page 16

1          Q.   And when did you join?

2          A.   June 1, 2021.  That was technically the --

3     the 1st of June.  However, I don't recall the date I

4     was sworn in by the governor.  It was somewhat after

5     that.

6          Q.   Understood.

7               How were you appointed to that position?

8          A.   After the resignation of David Worley, I

9     was appointed by the Democratic Party of Georgia,

10    the executive committee.

11         Q.   And is David Worley the individual you

12    mentioned having spoken about this litigation with?

13         A.   That's correct.

14         Q.   Why did you join the State Election Board?

15         A.   Because I believe strongly in elections

16    that are accessible to voters, and I thought this

17    was an opportunity for me to contribute to that.

18         Q.   Can you say any more about what you mean

19    by elections being accessible?

20         A.   So I was a strong -- strongly outspoken

21    person -- member of the public when it came to some

22    of the -- the restrictions in SB202 which is also

23    subject to significant litigation right now, so.

24    And I -- the role of the State Election Board is to

25    write regulations within the confines of the law,

1    and those regulations need to be very clear so that

2    counties can administer elections effectively.  And

3    so that's -- that's where I see that accessible

4    elections can be -- can be affected.

5         Q.   You mentioned that it's the SEB's

6    responsibility to write rules within the confines of

7    the law.

8              What purpose do those rules have besides

9    accessibility?

10        A.   Providing clarity for the counties on how

11   to administer elections in a way that -- that are

12   adherent to the law.  Laws are never written in a

13   way that are easily administerable, especially for

14   non-lawyers.  So we have to translate the law into

15   something that's easier to understand.

16        Q.   Has the State Election Board promulgated

17   any rules or regulations since you've joined?

18        A.   Yes.

19        Q.   For what purpose?

20        A.   For implementing the changes under SB202.

21   They -- I don't recall all of them in great detail,

22   but they're -- they're all published on the

23   State Election Board website.

24        Q.   And what are you working on now?

25        A.   I have not seen any additional drafts

Page 18

1   beyond what has passed.

2        Q.   Okay.  Do you yourself have any particular

3   responsibilities in the State Election Board?

4        A.   I'm a member.  I also work with an

5   informal rules working group.

6        Q.   What does that working group do?

7        A.   That working group reviews draft rules,

8   draft regulations before they are put before the

9   board formally and gives input on them.

10       Q.   Does that working group receive any

11  information when they're considering a rule in order

12  to help inform their decision on the proposed rule?

13       A.   I'm not sure what you mean.

14       Q.   I'll try and rephrase.

15            When the rules working group is reviewing

16  a draft rule, do they receive any briefings or other

17  information to assist them in their review of the

18  rule?

19       A.   In the two meetings where I have been,

20  that I've attended, we are sent the drafts --

21  generally -- well, the first one we were sent the

22  drafts before the meeting.  The second meeting we

23  received the drafts when we were in the room, and we

24  discussed it and proposed revisions in the room.  So

25  I would not consider any of that a formal briefing.

Page 19

1          Q.   Are you familiar with the ballot marking

2     devices that Georgia currently uses in its

3     elections?

4          A.   Yes.

5          Q.   Is it okay with you if I refer to those as

6     BMDs during today's deposition?

7          A.   Yes.

8          Q.   Do you understand why Georgia switched

9     from the previous DRE machines to BMDs?

10         A.   I believe I do, yes.

11         Q.   And what is your understanding of why they

12    made that switch?

13         A.   My understanding is they were in a

14    position to need to change the -- the voting system

15    because the -- the previously used voting system was

16    quite old.  It was out of date.  It was out of

17    warranty.  So they made a policy decision to move

18    from the DRE, the direct reporting electronic

19    system, to a ballot marking device after having

20    conducted statewide meetings with the

21    SAFE Commission and significant debate within the

22    state legislature.

23         Q.   Did the State Election Board play a role

24    in choosing Georgia's current election system?

25         A.   To the best of my knowledge, no, but I was

Page 20

1          not a member at the time.

2                Q.   And to the best of your knowledge, has the

3          State Election Board ever interacted with the

4          SAFE Commission?

5                A.   Not to my knowledge.

6                Q.   Do you have any concerns with Georgia's

7          current election system?

8                A.   That's a fairly broad question.  I'm not

9          quite sure what -- what concerns you would mean.

10               Q.   It is a broad question.

11                    Do you have any concerns with the ballot

12         marking devices that Georgia currently uses?

13               A.   I'm concerned at their cost.  I'm

14         concerned about their complexity.

15                    I apologize.  I have a cat trying to get

16         in.

17               Q.   That's fine.  My door is closed to my cat

18         as well, and I am waiting for the meowing to begin.

19                    Do you know whether any other states rely

20         on BMDs for elections?

21               A.   There are dozens of states that deploy

22         BMDs within their elections.  I believe South

23         Carolina is the only other state that uses it as its

24         primary form of in-person voting.

25               Q.   You mentioned that one of your concerns

Page 21

1    with BMDs is complexity.

2              Can you explain those concerns?

3         A.   The more moving parts there are, the --

4    the more work it places on County election

5    administrators and poll workers.

6         Q.   What moving parts does a BMD entail?

7         A.   It's a machine that has to go in some sort

8    of a holder.  It has to be charged up, plugged in.

9    I mean, this is -- it's a -- it's another piece of

10   equipment that has to be used.

11        Q.   Are BMDs the only piece of election

12   equipment that is used currently?

13        A.   No.

14        Q.   What other pieces of election equipments

15   are used?

16        A.   Poll pads are used for voter check-in for

17   election day.  Very frequently during early voting,

18   laptops are used instead.  Some folks -- some

19   counties use an EZ-VOTE overlay which I believe also

20   has a -- additional equipment.  There is the --

21   the -- the ballot marking device -- ballot marking

22   device which is connected to a printer and then

23   there is a scanner.  But that's all for in-person

24   voting.

25        Q.   Apart from the concern you mentioned

Page 22

1     regarding the sheer amount of equipment that's

2     needed, do you have any concerns about the

3     functioning of the BMDs?

4          A.   None in particular.

5          Q.   Okay.  Is this election equipment

6     something that you've discussed with the

7     State Election Board?

8          A.   No, I don't believe so, not as a system.

9          Q.   And to circle back quickly, you mentioned

10    that some counties use laptops instead of poll pads.

11              Do -- does Georgia have regulations in

12    place surrounding the use of laptops in elections?

13         A.   Well, first, to clarify, that is only

14    during early vote.  That is not for election day

15    precinct-based voting.  That's very different.

16              And I'd have to admit, I am not as

17    familiar with the regulations related to early

18    voting.  I'm very -- very fresh on the -- on the

19    board, and I have not reviewed all of those.

20         Q.   Understood.

21              Does the State Election Board discuss best

22    practices in terms of elections in general?

23         A.   In terms of specific rules, within the

24    rules working group we have had these discussions,

25    but that is -- those are not board meetings because

```
 1    there is -- we don't have a quorum in there and

 2    those are not official meetings.

 3        Q.   Okay.  Who else is on the rules working

 4    group besides you?

 5        A.   My cohort Matt Mashburn is on there.

 6    There will always be at least one county election

 7    supervisor, not superintendent, a -- a county

 8    supervisor, and staff from the Secretary of State's

 9    office.

10        Q.   Do you know the name of the election

11    supervisor who's currently on the rules working

12    group?

13        A.   Nancy Boren.

14        Q.   Can you spell her last name, by any

15    chance?

16        A.   B-o-r-e-n.

17        Q.   Thank you.  And do you know who at the

18    Secretary of State's office is on the working group

19    currently?

20        A.   I think it's a fairly informal group.  In

21    the last meeting, both the general counsel,

22    Ryan Germany, and Sara.  And I'm terribly

23    embarrassed, I don't recall Sara's last name right

24    now, but she's the deputy general counsel.  They

25    were present along with Blake Evans, the -- the
```

Page 24

```
1      election director.
2           Q.   Thank you.  All right.  We talked a bit
3      about your concerns with the BMD system.
4                As the member of the State Election Board,
5      do you care about the security of elections in
6      Georgia?
7           A.   Of course.
8           Q.   Do you find it important as a member of
9      the State Election Board to know that the election
10     system in use is not hackable by outside actors?
11          A.   I find that a slightly ridiculous question
12     because any system, there -- there is a speculative
13     possibility.  It -- it's not a binary issue.
14          Q.   Can you say more about what you mean?
15          A.   Certainly.  I could be victim to a
16     meteorite crashing through my -- my roof right now
17     because I know that that's possible, but it doesn't
18     worry me, it doesn't concern me because I think it's
19     highly unlikely to happen.
20          Q.   If there were proof found that an election
21     system could be hacked, would you support the use of
22     that election system?
23          A.   I would challenge -- sorry.
24               MR. RUSSO:  I'm just going to object to
25          the form.
```

1            THE WITNESS:  I would challenge anyone to

2        find any system that is completely unhackable.

3        Again, it's not binary.  It is -- the question

4        is is how likely.  What is the likelihood?

5        What is the possibility -- not the possibility.

6        Let me rephrase that.

7            The question is is not whether it could

8        happen or -- but rather how likely it is to

9        happen given the -- the -- everything else

10       that's in place.

11   BY MS. ELSON:

12       Q.   So to rephrase my question, I'm not asking

13   right now about whether you believe that all

14   election systems are able to be hacked.

15           I'm just asking would you support the use

16   of election equipment that could be hacked by a

17   voter in the voting booth?

18           MR. RUSSO:  Objection to form.

19           THE WITNESS:  Again, I -- I -- I don't

20       find that a reasonable or rational question.

21   BY MS. ELSON:

22       Q.   Would you support the use of a system

23   about which it was proven that there was a high

24   probability of hacking?

25           MR. RUSSO:  Objection to form.

Page 26

```
 1              THE WITNESS:  A high probability of
 2         hacking?  I've certainly -- that's not
 3         something I have ever seen.
 4    BY MS. ELSON:
 5         Q.   If you were to see that, would that be a
 6    system that you support?
 7              MR. RUSSO:  Same objection.
 8              THE WITNESS:  I -- I -- I just don't even
 9         find that a -- a rational question.  I don't --
10         I don't believe that a system that has a high
11         probability of hacking would make it through
12         the EAC certification system.
13    BY MS. ELSON:
14         Q.   Can you describe the EAC certification
15    system you mentioned?
16         A.   My understanding of it is that there are
17    several -- several organizations that actually
18    specialize in computer security, election security,
19    and they are mandated to review every single system
20    that is proffered for use.  They -- they do software
21    testing and hardware testing to determine whether or
22    not the -- the system is adequately secure.  And
23    they will certify that system if they believe --
24    if -- if these laboratories believe that they are
25    adequately secure.
```

Page  27

1          Q.   Do you know the names of any of those

2     organizations?

3          A.   One of them is Pro V & V, I believe.  I do

4     not recall the name of the -- I know there's at

5     least one other organization that does this.

6          Q.   Does the State Election Board ever receive

7     information about the EAC certification of Georgia's

8     election machines?

9          A.   I was not on the State Election Board the

10    last time the system underwent that process.

11         Q.   Do you know how the ballot marking devices

12    work?

13         A.   I know from the perspective of a user how

14    they work.

15         Q.   Can you describe that perspective to me?

16              MR. RUSSO:  Objection.  Also, I mean,

17         she's testifying as a State Election Board

18         member, not in her personal capacity.

19              THE WITNESS:  As a voter, you receive a --

20         an encoded card that has your ballot style

21         imprinted on it.  You place it into the ballot

22         marking device.  It pulls up the -- the ballot

23         style that has been assigned to each voter, and

24         you use the touchscreen to choose your -- your

25         selection.  And then from there, it goes to a

1    printer and your -- your ballot selections are

2    printed.

3  BY MS. ELSON:

4       Q.   Do you know how the information gets put

5  on the voter card that you mentioned?

6            MR. RUSSO:  Objection to the form.

7            And in terms -- what do you mean by how it

8            gets on -- onto the card?

9  BY MS. ELSON:

10      Q.   The question is trying to find out how the

11  ballot style selection for that particular voter is

12  communicated to the -- the -- encoded -- how it's

13  encoded to the card.

14      A.   Well, again, I am -- I'm not a computer

15  scientist, but in general, it should be encoded by

16  the poll pad if -- if they're properly functioning.

17  Every -- every voter file on -- accessible on the

18  poll pad has the voter's precinct combination

19  programmed in there and that will do that.  If --

20  when the poll pads are not working, there is a way

21  to hard code a -- one of -- one of the -- the voter

22  access cards.

23      Q.   Do you know how the voter access codes are

24  encoded when the poll pads aren't working?

25            MR. RUSSO:  Objection.  She -- she's not a

Page 29

1          testifying expert.  She said that already.  And

2          I'd ask, if you know, you can answer.  But

3          she's not here as an expert.

4               THE WITNESS:  And I -- I don't know

5          exactly.

6     BY MS. ELSON:

7          Q.   Okay.

8          A.   I'm not trained as a poll worker.

9          Q.   Do you know what company manufactures the

10    BMDs?

11         A.   Dominion.

12         Q.   Has the State Election Board ever

13    interacted with Dominion, to your understanding?

14         A.   Prior to my joining the

15    State Election Board -- and this is -- this is

16    available in the transcripts of -- of a previous

17    meeting.  And my understanding is that a

18    representative of Dominion election systems did come

19    to -- and -- and -- and provide a presentation to

20    the State Election Board.  But, again, that was

21    prior to my membership.

22         Q.   Understood.

23              Have you, besides during your use as a

24    voter, ever inspected a BMD?

25         A.   I have not.

Page 30

1       Q.    Do you know how the BMDs are programmed?

2       A.    Not specifically, no.

3       Q.    Does the State Election Board ever discuss

4    how the BMDs are programmed?

5       A.    Beyond whatever is contained in the rules,

6    no.

7       Q.    And what is contained in the rules?

8       A.    The rules discuss how -- when ballot

9    definitions are created, when they -- they -- the

10   content of the ballots need to be proofread, and

11   when the programming has to be done in terms of

12   the -- the timeline before -- for an election.

13      Q.    And in terms of ballots needing to be

14   proofread, do you mean before they are issued to the

15   voter or after?

16          MR. RUSSO:  And -- and object to form.

17          Are you referring to what is in the -- the

18       rules or something else?  Because if there's a

19       rule, then you can just show her the rule and

20       she can talk about the rule.

21   BY MS. ELSON:

22      Q.    You can answer.

23      A.    I was referring to the -- the ballots as

24   they were being -- as they are built and programmed

25   prior to them being.  And so that would be before

Page 31

```
 1        they are -- before they are programmed in.
 2            Q.    Do you know who's responsible for updating
 3        the BMD machines?
 4            A.    I do not.
 5            Q.    And to your knowledge, has the
 6        State Election Board promulgated any rules about how
 7        the machines should be updated?
 8                  MR. RUSSO:  Objection to form.
 9                  It's unclear which -- what you mean by
10             updating a BMD machine.
11                  MS. ELSON:  I'm referring to software
12             updates.
13                  MR. RUSSO:  Okay.
14                  THE WITNESS:  I am not aware.
15        BY MS. ELSON:
16            Q.    Okay.  You mentioned voter-encoded cards
17        being inserted into the BMD machines.
18                  Are you aware that other removable media
19        can be inserted into those machines?
20                  MR. RUSSO:  Objection.  Form.
21                  THE WITNESS:  I am not aware.
22        BY MS. ELSON:
23            Q.    So removable media isn't something you've
24        discussed with the State Election Board?
25            A.    That's a very broad discussion.  Removable
```

Page 32

1    media is used in various aspects.  I -- I --

2    specifically with the BMDs?  I literally, I -- I

3    don't know which parts have removable media and

4    which ones do not.

5         Q.   Okay.  You mentioned earlier that when

6    voters vote on a BMD, they're provided with a paper

7    printout; right?

8         A.   Yes.

9         Q.   And that printout shows both a QR code and

10   text that can be read by humans; correct?

11        A.   Correct.

12        Q.   When votes are tabulated, are they

13   tabulated using the QR code or the human readable

14   text?

15        A.   My understanding is the -- the scanners

16   currently read the QR code.

17        Q.   Is it your understanding that they in the

18   past ever read something different -- let me

19   rephrase.

20             Since the adoption of BMDs, is it your

21   understanding that the scanners have always

22   tabulated the QR codes?

23        A.   That is my understanding, yes.

24        Q.   Has the State Election Board ever

25   discussed rules concerning which part of the vote --

Page 33

1      let me stop there.

2              Has the State Election Board ever

3      discussed rules that have to do which part of the

4      voter's printout is tabulated?

5              MR. RUSSO:  Objection.  Form.

6              THE WITNESS:  Not since I have been on the

7          State Election Board.  There was a

8          State Election Board meeting in 2019 that had

9          some discussion, but I do not recall the -- the

10         contours of that discussion or the rule that

11         was being passed at the time.

12     BY MS. ELSON:

13         Q.   Okay.  Have you heard any complaints from

14     voters that they're unable to verify their votes

15     using the current election system in Georgia?

16         A.   I have heard voters say that they can't

17     read a QR code.  I have never heard a voter complain

18     that they're unable to read the text.

19         Q.   And just to confirm, the part of that

20     paper that's tabulated is the QR code?

21         A.   Correct.

22         Q.   Did the complaints you heard about QR

23     codes concern you given that the QR codes are what

24     are tabulated?

25         A.   No.

Page 34

1          Q.   Why not?

2          A.   Because I know that the text is available

3     in readable form, and I understand the way audits

4     work.

5          Q.   Can you say more about why audits are

6     relevant here?

7          A.   An audit is -- is used to confirm that the

8     correct winner of an election contest was identified

9     by the tabulation process.

10         Q.   And when are audits required under Georgia

11    elections?

12         A.   Audits are required for at least one

13    randomly chosen contest per -- for every general

14    election, I believe.

15         Q.   Can you describe how audits work?

16         A.   A statistically significant number of

17    ran- -- ballots are randomly chosen.  The number of

18    ballots are based on the -- the contest itself and

19    the margin win in that contest.  And they are then

20    hand counted to determine whether or not the outcome

21    was correct -- was correctly determined.

22         Q.   And by hand counted, which portion of the

23    voter's printout is counted?

24         A.   The human readable text.

25         Q.   Does an audit ever confirm that on a

Page 35

```
 1        particular voter's printout, the human readable text
 2        is reflected in the QR code?
 3                MR. RUSSO:  Objection to form.
 4                THE WITNESS:  An audit should be able to
 5            determine whether or not the QR code was
 6            correctly counted the -- the voter's choice.
 7            If there is a discrepancy in the outcome of an
 8            audit versus the outcome of the tabulation,
 9            that would suggest that there was a -- a
10            difference.
11        BY MS. ELSON:
12            Q.  To your understanding of audits, the --
13        within a single vote -- let me rephrase.
14                So you stated that audits select a
15        statistically significant sample of ballots to
16        review.
17                Do those audits ever compare within a
18        single ballot that the human readable text matches
19        what is reflected in the QR code?
20                MR. RUSSO:  Objection to form.
21                THE WITNESS:  Not to the best of my
22            knowledge.
23        BY MS. ELSON:
24            Q.  So do audits in Georgia verify whether any
25        one individual's vote was counted accurately?
```

Page 36

1          MR. RUSSO:  Objection to form.

2          THE WITNESS:  Audits verify whether the

3      right person won.

4  BY MS. ELSON:

5      Q.   So the answer to the question of whether

6  they verify that any specific vote was counted

7  correctly would be no?  Am I misunderstanding?

8      A.   No.  That's -- that -- that is my

9  understanding as well.

10      Q.   Okay.  If a QR code was changed from what

11  the voter selected, would an audit be able to pick

12  up on that change?

13      A.   A single QR code and a single vote, that

14  is unlikely.

15      Q.   Are you familiar with any studies that

16  Georgia has commissioned regarding voter

17  verification?

18      A.   Yes, I am.

19      Q.   And what studies are you familiar with?

20      A.    In this past election, there was a

21  study -- I do not recall who undertook the study,

22  but there -- to review how many voters verified --

23  appeared to have verified their ballot.

24      Q.   And by verifying their ballot, what do you

25  understand that to mean?

1          A.   To ensure that the human readable words

2     reflected their selections.

3          Q.   There was a study titled "2021 Georgia

4     Voter Verification Study."

5               Are you aware that that study found

6     over -- that over half of voters reviewed their

7     ballot less than a second or not at all?

8               MR. RUSSO:  Objection.  Form.

9               THE WITNESS:  I do not know the exact

10              findings of that, but I do know that it was --

11              that -- that many voters had a -- a brief

12              glance.

13    BY MS. ELSON:

14         Q.   What did you think of that finding?

15         A.   The finding didn't -- frankly, did not

16    concern me.

17         Q.   And why is that?

18         A.   Because it doesn't take long to make sure

19    that your choices were reflected, and the reason it

20    doesn't take long is because it doesn't contain only

21    the -- the name of the -- the candidate, it also

22    contains a political party which acts as a proxy for

23    the vast majority of voters.  It takes very little

24    time to glance down and see what's on that ballot.

25         Q.   And to your understanding, is every race

1    that the voter made a selection in available for

2    review in that human readable portion?

3         A.   Yes.

4         Q.   All right.  I'm going to introduce a

5    document and --

6         A.   I have a second screen set up for that,

7    so.

8         Q.   Okay.

9         A.   I don't want you to think I'm looking at a

10   chat.

11        Q.   Thanks for letting me know.

12             While I'm setting this up, can you tell me

13   how you came to be familiar with the verification

14   study?

15        A.   I honestly don't recall exactly.

16             (Plaintiffs' Exhibit 1 was marked for

17             identification.)

18   BY MS. ELSON::

19        Q.   Okay.  All right.  Will you refresh your

20   exhibit screen and let me know if there's an exhibit

21   available to you there?

22        A.   Yes.

23        Q.   Okay.  Do you recognize this tweet?

24        A.   I do.

25        Q.   Did you tweet this?

1        A.   Yes, I did.

2        Q.   And can you read that tweet for us?

3        A.   "I am not comfortable with anything less

4    than a full hand audit of any race that goes to

5    recount (meaning the margin is less than on -- half

6    of one percent) but I'm not the expert here."

7        Q.   Can you describe the difference between an

8    audit and a recount in Georgia?

9        A.   A recount is going to be -- is a

10    retabulation of the votes, whereas an audit is an

11    activity that we have been discussing which will

12    confirm that the -- the tabulation accurately

13    identified the -- the winner.

14        Q.   You described a recount as being a

15    retabulation.

16             What exactly does the tabulating in a

17    recount?

18        A.   That -- those -- the scanner conducts a

19    tabulation.

20        Q.   When are recounts conducted in Georgia?

21        A.   As it states in the tweet, when the margin

22    is less than -- less than 1/2 percent or at the

23    discretion of the Secretary of State.

24        Q.   Why do you -- let me rephrase.

25             Why did you tweet that you aren't

Page 40

```
 1      comfortable with anything less than a full hand
 2      recount -- excuse me, anything less than a full hand
 3      audit of any race that goes to recount?
 4              MR. RUSSO:  Objection.  This is prior to
 5           her time on the State Election Board.
 6              THE WITNESS:  If anything, you know, I
 7           feel just as strongly about this now because
 8           this is about public confidence and the outcome
 9           of a tabulation.  And the point of an audit is
10           to enhance confidence and that the outcome was
11           correctly identified and that's what audits do.
12      BY MS. ELSON:
13           Q.   And just so I understand.
14              By a full hand audit, you mean humans
15      counting the human readable portion of the printed
16      paper?
17           A.   Correct.
18              MR. RUSSO:  Objection to form.
19      BY MS. ELSON:
20           Q.   And who are the experts you refer to in
21      this tweet?
22           A.   There are experts in election
23      administration who -- who have more experience in
24      this than I do, and obviously I was not a member of
25      the State Election Board either at the time.
```

Page 41

1          Q.   To your understanding, has the

2     State Election Board ever considered a rule that

3     would require audits prerecount?

4          A.   To the best of my understanding, they have

5     not considered that.

6          Q.   Would you prefer that such a rule be

7     adopted?

8          A.   In my personal opinion, yes.

9          Q.   Are there any other reasons that you

10    prefer that besides the increase in confidence it

11    offers?

12               MR. RUSSO:  Objection to form.

13               Are you asking as an SEB member?  Or I

14          think she testified in her personal capacity

15          she said she had a preference.  I just want to

16          make sure it's clear what -- what the scope of

17          the question is here.

18    BY MS. ELSON:

19         Q.   As a State Election Board -- let me check

20    the real transcript.

21               MS. ELSON:  Could you read the question

22          back?  I apologize.

23               COURT REPORTER:  One moment, please.

24               (Whereupon, the record was read by the

25          reporter as follows:

Page 42

1                    Question, "Are there any other

2          reasons that you prefer that besides the

3          increase in confidence it offers?")

4          MS. ELSON:  Thank you.  I'll rephrase.

5    BY MS. ELSON:

6          Q.   As a State Election Board member, are

7    there any other reasons you prefer a rule requiring

8    prerecount audits besides the reason you gave

9    previously?

10          MR. RUSSO:  Objection to form.

11          She didn't -- she didn't give a reason

12          previously why she had that opinion in her

13          capacity as a State Election Board member.  She

14          said, "In my personal opinion, yes."

15    BY MS. ELSON:

16          Q.   Does your preference on this issue differ

17    depending on whether you are a State Election Board

18    member or not?

19          A.   No, it does not.

20          Q.   Do you have any other reasons besides the

21    reason you gave for improving confidence of the

22    public in preferring a rule that requires prerecount

23    audits?

24          A.   Audits confirm the outcome.  Anything that

25    can confirm an outcome I think is a positive step.

Page 43

1          Q.   Do you believe that audits as they're
2     conducted currently in Georgia confirm an outcome?
3          A.   Yes, I do.
4          Q.   What would the difference be between a
5     full hand audit as you prefer versus the way audits
6     are currently done in Georgia?
7          A.   There is no difference.  As I was writing
8     this, it was probably in the middle of a
9     State Election Board meeting, would be my guess, and
10    I intended to refer to the risk-limiting audits
11    which are hand-conducted audits.
12         Q.   And just to confirm, those risk-limiting
13    audits count only a portion of the total votes cast?
14         A.   That is correct.
15         Q.   What would happen if the results of an
16    audit indicated a different outcome than the outcome
17    the machines tabulated?
18              MR. RUSSO:  Objection to form.  Calls for
19         a legal conclusion.
20              THE WITNESS:  My understanding is when
21         the -- when the risk limit has been met, the
22         sufficient number of ballots are pulled and it
23         identifies a different outcome, then you pull
24         more ballots, you count more ballots.
25

Page 44

```
 1      BY MS. ELSON:
 2           Q.   And if those additional ballots also
 3      indicate a different outcome?
 4           A.   If -- eventually, within the form of a
 5      risk-limiting audit, you will reach a full recount,
 6      a full hand recount.  And at that point, if there is
 7      a -- a different outcome that is identified, then I
 8      would expect to see that in a court.
 9           Q.   And so it's your understanding that in
10      such a case, the election outcome may be declared
11      invalid by a Court?
12           A.   That's what I would expect to see, yes.
13           Q.   Okay.  Would you be concerned if you
14      weren't allowed to vote in an election for some
15      reason?
16           A.   Yes.
17           Q.   And why is that?
18           A.   Because I am a duly registered voter.
19           Q.   Would you be concerned if you were forced
20      to vote by a mail-in ballot?
21           A.   I would be concerned if I were forced to
22      vote by any method that I did not choose.
23           Q.   And why is that?
24           A.   Because part of our system in Georgia is
25      that there are three different -- two primary
```

Page 45

1    methods but three medium through which you can --

2    you can cast a ballot, and I want as a voter to have

3    that choice myself.

4         Q.   If you found out after an election that

5    your vote had not been counted, would that concern

6    you?

7              MR. RUSSO:  Object to form.

8              THE WITNESS:  Are you asking me in my --

9         as a State Election Board member or just simply

10        as a voter in Georgia?

11   BY MS. ELSON:

12        Q.   I guess that depends on whether your

13   answers would be different.

14        A.   I -- I don't think they would be.  I think

15   any -- any -- I would be concerned for myself and --

16   and upset if I found out that my vote did not count.

17   I would be concerned about the system as a

18   State Election Board member why anybody's vote did

19   not count.

20        Q.   Okay.  Would you use BMDs that tabulate

21   the human readable portion instead of the QR codes?

22        A.   BMDs -- BMDs don't tabulate.

23        Q.   You're right.

24             Would you use scanners that tabulate the

25   human readable portion rather than QR codes?

Page 46

1          A.   Certainly.  But I also have used scan- --
2     I just used a scanner that tabulated my QR code on
3     Tuesday, so.
4          Q.   So you have voted on a BMD before?
5          A.   Yes, I have.
6          Q.   Okay.  Do you think that Georgia's
7     previous election system consisting of DREs were as
8     reliable as the BMDs?
9          A.   I have no reason to believe that an
10    incorrect candidate was declared winner under the
11    previous DRE system.  I do believe that having a
12    paper ballot that a voter will have in their hand
13    and verify is -- creates higher level of confidence
14    and a higher level of verifiability.
15         Q.   Would you prefer a system where a voter
16    was able to verify that the human readable text was
17    reflected in the QR code on their vote?
18              MR. RUSSO:  I'm going to object to the
19         form.
20              Thanks for holding off, Sara.
21              THE WITNESS:  Could you repeat the
22         question?
23    BY MS. ELSON:
24         Q.   Sure.  Would you prefer a -- that Georgia
25    use a system that allows a voter to confirm that the

Page 47

1    human readable text matches what is reflected in the

2    electronic QR code?

3         A.   I believe that the audit is designed to do

4    just that.

5         Q.   And you're referring to the audit where

6    the human readable portion of the ballots are

7    tabulated?

8         A.   That's correct.

9         Q.   Would you vote using a hand-marked paper

10   ballot?

11        A.   I have on many occasions.

12        Q.   And hand-marked paper ballots -- let me

13   rephrase.

14             Can hand-marked paper ballots be altered

15   by malware?

16        A.   The ballot itself cannot be.  The

17   electronic scan and the electronic tabulation of it

18   can be, certainly.

19        Q.   Do you believe that hand-marked paper

20   ballots are more secure than a BMD system?

21        A.   Again, security is not binary, so I'm not

22   quite sure what you mean by more secure.

23        Q.   Do you believe that human -- that

24   hand-marked paper ballots offer fewer opportunities

25   for insecurity than ballot marking devices do?

Page 48

1          A.   There is one less opportunity, perhaps,

2     for outside, but there's also greater opportunity

3     for voter error with them.  So in terms of whether

4     or not they will -- a -- a hand-marked paper ballot

5     will accurately reflect a voter's choice, I think

6     that's an open question.

7          Q.   Why is there greater opportunity for error

8     with hand-marked paper ballots?

9          A.   People make mistakes.  It -- there -- it

10    was evidenced quite broadly in 2020, in the

11    November 2020 election, when it -- when we had

12    multiple candidates for one office.  There were

13    significant numbers of -- of ballots -- of votes

14    that were thrown out because of human error, not

15    understanding how that worked.

16         Q.   Can voters make mistakes when voting on

17    BMDs?

18         A.   It's far rarer.  They're far less common.

19         Q.   And why is that?

20         A.   BMDs don't allow overvotes.

21         Q.   Can you describe what an overvote is?

22         A.   An overvote is when a -- when a voter

23    chooses multiple candidates for a single office and,

24    therefore, those votes get thrown out.

25         Q.   But voter error is possible with BMDs?

Page 49

1           A.   Voter error in -- with a BMD would entail
2      choosing the wrong candidate which can happen --
3      which can happen on a BMD or a hand-marked paper
4      ballot.
5           MS. ELSON:  Okay.  So we've been going for
6           about an hour.  Does anyone need a break?
7           THE WITNESS:  I don't mind plowing through
8           for now.
9           MR. RUSSO:  Okay.  I defer to Sara.
10     I'm -- I'm happy to keep going.
11          MS. ELSON:  Okay.
12     BY MS. ELSON:
13          Q.   Are you aware of any unauthorized access
14     to any component to Georgia's election system?
15          MR. RUSSO:  Objection -- objection form.
16          THE WITNESS:  Are you -- what -- what time
17          frame are you speaking of?  Within the past
18          year?  Within the past five years?
19     BY MS. ELSON:
20          Q.   Within the past five years?
21          A.   Within the past five years.  I am aware
22     that when Kennesaw State University maintained most
23     of the voter files, there was an unauthorized access
24     by an individual who reported that the systems were
25     accessible.

Page 50

1          Q.   Do you know whether the

2    State Election Board investigated that report?

3          A.   At the time I was working at the Carter

4    center, so I did not follow the State Election Board

5    proceedings closely.  So I simply don't know what

6    the State Election Board did at the time.

7          Q.   And is -- are you aware of Logan Lamb?

8          A.   Yes.

9          Q.   And who is he?

10         A.   He is an -- the individual who accessed

11   the systems when they were housed at Kennesaw State

12   University.

13         Q.   And what did he discover regarding that

14   system?

15         A.   That -- I don't know precisely aside from

16   the fact that it was accessible from -- by an

17   outside individual who did -- who should not have

18   had access to the system.

19         Q.   Did those discoveries concern you?

20         A.   Sure.  Yes.

21         Q.   What was concerning about them?

22         A.   The lack of security.  I -- I -- I don't

23   know the extent to the -- to whatever happened.

24         Q.   To your understanding, did the Office of

25   the Secretary of State take any actions in response

Page 51

1      to Mr. Lamb's discoveries?

2           A.   Well, Kennesaw State University is no

3      longer being used to maintain any of the election

4      systems.  They brought it all in-house.

5           Q.   When Georgia's past election machines, the

6      DREs, were in place, was election security ever

7      discussed at the State Election Board meetings, to

8      your understanding?

9                MR. RUSSO:  Object to form.  She wasn't a

10               member of the State Election Board.

11               THE WITNESS:  As -- as Mr. Russo stated, I

12               was not a member of the State Election Board,

13               so I don't know what all was discussed.

14     BY MS. ELSON:

15          Q.   After the BMDs were implemented, how often

16     did the State Election Board discuss election

17     security?

18               MR. RUSSO:  Objection to form.

19               THE WITNESS:  Again, before I was a member

20               of the State Election Board, I know that it was

21               discussed following the -- the 2020 elections,

22               and the false narratives that arose around it.

23               MS. ELSON:  All right.  If it's okay with

24               you, I would like to request a ten-minute break

25               to review that email that you sent.

Page 52

1          MR. RUSSO:  Yeah.

2          VIDEOGRAPHER:  Let's go off the record at

3     11:20.

4          (Off the record.)

5          VIDEOGRAPHER:  We're back on the record at

6     11:33.

7    BY MS. ELSON:

8          Q.  Okay.  Ms. Ghazal, in the process of

9    preparing -- or in the process of this litigation,

10   did you collect any documents?

11         A.  Personally?

12         Q.  To produce in the -- in this case.

13         A.  Sure.  I -- I reviewed my email inbox

14   because I have only been on the board for a few

15   months, so I can review line by line.

16         Q.  Okay.  Did you look anywhere else besides

17   your email?

18         A.  I did not.

19         Q.  All right.  Are you aware that an expert

20   in case named Alex Halderman has examined Georgia's

21   voting equipment and issued a report about it?

22         A.  Yes.

23         Q.  And what do you know about that report?

24         A.  I know the report has been sealed and

25   shared only with the attorneys.

Page 53

1          Q.   Have you read about Dr. Halderman's public

2     reply or his declarations?

3          A.   I have seen news reports related to it.

4          Q.   And what do those news reports discuss?

5          A.   That -- one in particular suggested that

6     he was -- that -- that Dr. Halderman was seeking to

7     share the results of his -- his studies with other

8     parties.

9          Q.   Are you aware that he found that Georgia's

10    election system can be hacked in numerous ways?

11              MR. RUSSO:  Objection to form.

12              THE WITNESS:  That is my understanding

13         based on the reporting, yes.

14    BY MS. ELSON:

15         Q.   And are you aware that at least one -- he

16    found that at least one of those hacks can be

17    implemented by a voter in the voting booth in just a

18    couple of minutes?

19              MR. RUSSO:  Objection to form.

20              THE WITNESS:  I haven't read the report,

21         so I am not aware of that level of detail.

22    BY MS. ELSON:

23         Q.   Does hearing that concern you?

24         A.   I would have to have much more context.

25         Q.   Has the State Election Board taken any

Page 54

```
 1        action to retrieve that context?
 2                   MR. RUSSO:  Objection to form.
 3                   THE WITNESS:  To the best of my knowledge,
 4              no.
 5        BY MS. ELSON:
 6              Q.   And why have -- why haven't they?
 7                   MR. RUSSO:  Objection to form.
 8                   It's unclear what we're talking about
 9              here.  Why haven't they done -- done what and
10              what is the context?
11        BY MS. ELSON:
12              Q.   Do you understand the question,
13        Ms. Ghazal, or do you want me to repeat or rephrase?
14              A.   Could you rephrase, please?
15              Q.   Sure.
16                   Why hasn't the State Election Board taken
17        any action to learn information about the
18        vulnerabilities that Dr. Halderman found in his
19        report?
20                   MR. RUSSO:  Object to form.
21                   THE WITNESS:  I can't speculate what other
22              members are thinking or doing.  We -- we are
23              four individuals with one unfilled position.
24              So I don't -- I don't know what they're
25              thinking.
```

Page 55

1      BY MS. ELSON:

2          Q.   Would you want to know more information

3      about what Dr. Halderman found?

4          A.   I am not a technical expert.  I don't know

5      how much I would understand, frankly, of what

6      Dr. Halderman found.  I believe a high-level

7      understanding would be helpful.

8          Q.   And are you aware that we've asked the

9      Secretary of State's offices attorneys to provide a

10     proposal to allow the Secretary of State and the

11     State Election Board access to some or all of the

12     sealed report?

13              MR. RUSSO:  Objection to form.

14              THE WITNESS:  I was aware that there was

15          some discussion.  I didn't -- I'm not aware of

16          the -- the extent of what is -- what has been

17          discussed.

18     BY MS. ELSON:

19         Q.   To follow-up on something you mentioned,

20     would you like to receive high-level information

21     about what Dr. Halderman found in terms of

22     vulnerabilities of the Georgia election system?

23         A.   Yes.

24         Q.   Are you aware that the Office of the

25     Secretary of State have hired their own experts in

Page 56

1     this litigation?

2           A.    That would be my assumption for any

3     litigation.

4           Q.    And are you aware that the Secretary of

5     State's election security expert testified under

6     oath that he doesn't dispute Dr. Halderman's

7     findings about the Georgia election equipment?

8                 MR. RUSSO:  Objection to form.  It lacks

9           foundation.

10                THE WITNESS:  I have no direct knowledge

11          of what the Secretary of State's expert has

12          testified to.

13    BY MS. ELSON:

14          Q.    What has the Secretary of State's

15    office -- let me start over.

16                What has the State Election Board done to

17    remedy the vulnerabilities discovered by

18    Dr. Halderman in Georgia's election system?

19                MR. RUSSO:  Object to the form.  She just

20          testified that she hasn't seen his report.

21                THE WITNESS:  I don't know what the

22          vulnerabilities may be, so yeah.

23    BY MS. ELSON:

24          Q.    Are you aware that the state has admitted

25    that it hasn't taken any measures to address the

1    failings that Dr. Halderman identified?

2              MR. RUSSO:  Objection to form.

3              THE WITNESS:  I don't know what the

4         failings are that Dr. Halderman has identified.

5    BY MS. ELSON:

6         Q.   Does the knowledge that a computer expert

7    has identified failings in Georgia's voting

8    equipment affect your confidence in Georgia's

9    current system?

10        A.   Again, going back to how we started, I'm

11   not aware of any computer-based system that does not

12   have vulnerabilities.

13        Q.   So your answer would be that the findings

14   of Dr. Halderman that the currently used equipment

15   can be hacked in a variety of ways doesn't affect

16   your confidence in that equipment?

17             MR. RUSSO:  Objection to form.

18             She doesn't know what the findings are or

19        the opinion, I should say.

20             THE WITNESS:  Without understanding the --

21        the -- the -- the findings, I -- it -- it can't

22        affect my confidence in the system.

23   BY MS. ELSON:

24        Q.   Has the State Election Board ever had a

25   cybersecurity expert examine the BMD election

Page 58

1     system?

2              MR. RUSSO:  Objection to form.

3              Are you asking about since she's been on

4          the State Election Board?

5              MS. ELSON:  Given that the meetings are

6          public, I think she can answer either way, to

7          her understanding.

8              THE WITNESS:  My understanding is that the

9          Secretary of State has had the system examined

10         on numerous occasions, but that's not the

11         State Election Board.  Those are different

12         entities.

13    BY MS. ELSON::

14         Q.   Has the State Election Board ever had a

15    cybersecurity expert examine the system?

16         A.   That is not the role of the

17    State Election Board.

18         Q.   Do you know whether any of the computer

19    equipment used in Georgia's election system is able

20    to be connected to the Internet?

21              MR. RUSSO:  Objection to form.  It's

22         ambiguous.

23              THE WITNESS:  The only equipment that I am

24         aware of -- I -- I -- I don't know.  I don't

25         know.  Aside from the check-in computers during

Page 59

1            early vote, by definition they have to be

2            connected to the Internet.

3    BY MS. ELSON:

4        Q.   And do those check-in computers to your

5    understanding encode the voter access cards or is

6    that a different system?

7        A.   I don't know.

8        Q.   Would it concern you if any of the

9    computer equipment besides the early vote check-in

10   system is able to be connected to the Internet?

11            MR. RUSSO:  Objection to form.

12            THE WITNESS:  I'm not a cybersecurity

13            specialist, so I can't make an assessment.

14   BY MS. ELSON:

15       Q.   Was any part of Georgia's previous DRE

16   system transferred to the BMD system?

17       A.   I have no knowledge of that.

18       Q.   Do you want to know?

19       A.   As a member of the State Election Board,

20   the only reason for me to know that is if it would

21   help inform the -- the writing of our regulations or

22   ascertain whether or not somebody else has -- has

23   violated it.  I don't -- I don't see it as being

24   necessarily relevant.

25       Q.   Would you see any issue in reusing memory

Page 60

1       cards or other components from the DRE system in the

2       current BMD system?

3               MR. RUSSO:  Objection to form.  If there's

4           any issue.

5               THE WITNESS:  I don't even -- I don't know

6           whether that is done or whether it's relevant.

7       BY MS. ELSON:

8       Q.   If you were to know that memory cards or

9       other components from the old system had been

10      recycled for reuse in the current system, would that

11      concern you?

12      A.   Other components, I don't know what that

13      would -- I don't know what that means.  I am aware

14      that memory cards can be reformatted for use.  And,

15      again, I'm not a cybersecurity specialist to

16      understand the implications of it.

17      Q.   Okay.  I'm going to introduce another --

18      I'm going to introduce two documents.  Bear with me

19      for one moment.  All right.  I appreciate your

20      patience.

21              Do you see two new exhibits available to

22      you on Exhibit Share?

23      A.   I see one.  Let me re- -- oh, there -- the

24      second one is there, yes.

25      Q.   Okay.

Page 61

1                    (Plaintiffs' Exhibit 2 was marked for

2              identification.)

3    BY MS. ELSON:

4         Q.   If you could please open Exhibit No. 2.

5         A.   Uh-huh.

6         Q.   So I'll represent to you that this was --

7    this is an email that was produced by your counsel

8    this morning after this deposition began.

9              And to confirm, is this the email that you

10   mentioned earlier you had found and reviewed?

11        A.   Yes.

12        Q.   How did this email come to your attention

13   to be produced for today's deposition?

14        A.   I was rereviewing to make sure I hadn't

15   missed anything, and I -- I found it in the -- I

16   came across it in my inbox.

17        Q.   Okay.  If you can -- actually, so this is

18   an email from you to █████████ dated

19   September 14, 2021.

20        A.   That is incorrect.  It is an email from

21   █████████ to me.

22        Q.   Thank you.  I apologize.

23              And this email contains an attachment?

24        A.   That is correct.

25        Q.   Who is █████████?

1      A.   ████████████████████████████

2   ████████████████████████████████████

3   ████████████████.

4      Q.   And what is the function of that

5   institute, to your understanding?

6      A.   ████████████████████████.

7   ████████████████████████████████████████

8   ████████████████████████████████████

9   ████████████████.

10      Q.   And what has been -- strike that.

11           What is your understanding of why

12   ████████ is emailing you?

13      A.   I asked his advice.

14      Q.   And what did you ask his advice on?

15      A.   I asked his advice on a rule that we

16   were -- we were reviewing at one point because --

17   because of the -- under SB202, digital artifacts of

18   ballots are now available as -- as open records,

19   as -- as public records.  But other parts of that

20   rule concerned use of memory devices and storage

21   and -- and how they -- how they were to be used.

22      Q.   And why did you ask his advice?

23      A.   Because I'm not a cybersecurity expert and

24   he knows a great deal more than I do.

25      Q.   Okay.  What is your understanding of what

Page 63

1          ████████ meant by "keep it discrete"?

2          A.   ████████████████████████

3     ███████████████████   ████████████████

4     ████████████████████████████████████████

5     ██████████████   █████████████████████████

6     ██████████████████████████████.

7          Q.   Okay.  And if you can turn now to

8     Exhibit No. 3.

9               (Plaintiffs' Exhibit 3 was marked for

10         identification.)

11    BY MS. ELSON:

12         Q.   And just let me know when you have that

13    pulled up.

14         A.   Yes, I have it pulled up.

15         Q.   Is this the attachment from the email you

16    and I just discussed?

17         A.   It is.

18         Q.   And what is this attachment?

19         A.   This is ████████' draft revisions to the

20    rule that currently exists.

21         Q.   And is this particular attachment, when it

22    was sent, was it a draft rule?

23         A.   This was not the portion of the rule that

24    was being changed.  I reached out to him because I

25    thought that the rule could use further clarity.

Page 64

```
 1        Q.   And, again, the portion of that rule you

 2   thought could use further clarity was about

 3   removable media or memory cards, you -- you said?

 4        A.   Yes.  I may also be using the word loosely

 5   because I am -- because this is -- this is beyond

 6   the scope of my expertise which is why I reached out

 7   to him.

 8        Q.   What is this rule about?

 9        A.   This rule is about what data needs to be

10   secured, what -- and -- and how the -- the memory

11   cards should be -- should be utilized.

12        Q.   And some of these redlines seem to be from

13   ███████

14             Why is that?

15        A.   Because I asked for his advice.  That's

16   precisely why I reached out to him.

17        Q.   And some appear to be from ███████████.

18             Who is ██████████?

19        A.   ███████████████████████████████████████████

20   ██████████  ██████████████████████████████████████

21   █████████████████████████████████████████████████

22   ███████████████████████████████████████████████████

23   ████████████████████████████████████████  █

24   █████████████████

25             ██████████████████████████████████████████
```

Page 65

1  ████████████████████████████████████████

2  ████    ███████████████████████████████

3  ████████████████████████████████████████

4  █████████████████

5       Q.   What did you understand to be the reasons

6  for the redlines that he made here?

7       A.   ███████████████████████████████

8  ████████████████████████████████████████

9  ██████████████████████

10      Q.   You mentioned a bit about this, but I want

11 to make sure I understand.

12           Does this draft we're looking at currently

13 exist as a rule that's in effect with these edits

14 that ████████   suggested?

15      A.   No, it does not, and I had -- I had not

16 shared this further after I received it from

17 █████████.

18      Q.   And was that because the rule had been

19 tabled by that point?

20      A.   That's -- that's correct.  The part of the

21 rule that dealt with making accessible the -- the

22 electronic images was -- was forwarded, but my

23 understanding was that the Secretary of State's

24 office was going to do further research on best

25 practices before moving forward with making further

Page 66

 1        changes to the rule.

 2             Q.   Okay.  Have you heard updates from the

 3        Secretary of State's office regarding that research?

 4             A.   I have not.

 5             Q.   Have you reached out to -- let me ask

 6        something before that.

 7                  You mentioned that ███████████ expertise

 8        is cybersecurity; correct?

 9             A.   That is my understanding.  Cybersecurity

10        specifically in the arena of election systems.

11             Q.   Okay.  Have you reached out to other

12        individuals for input on issues within their

13        expertise, as a State Election Board member?

14             A.   I informally reached out to Kevin Rayburn

15        just to -- Kevin Rayburn is the former deputy

16        general counsel on the State Election Board and is

17        currently employed by the EAC.

18             Q.   And what did you reach out to him

19        regarding?

20                  MR. RUSSO:  And I'm going to -- and I

21             don't know the time frame yet.  But I'm going

22             to object to the extent it's asking for

23             privileged information from -- from Mr. Rayburn

24             while he was with the Secretary of State's

25             office.

1           I -- I missed if you said if you reached

2      out to him after he'd left or not.

3           THE WITNESS:  It was after he left, and I

4      simply asked what the VVSG guidelines were with

5      regard to removable media memory storage.

6    BY MS. ELSON:

7      Q.   And what does VVSG stand for?

8      A.   Voluntary voter -- voting -- voting system

9    guidelines.

10     Q.   Have you reached out to other individuals

11   regarding cybersecurity, as an SEB member?

12     A.   I have not.

13     Q.   And have you reached out to ████████ at

14   other times?

15     A.   Not within the context of my SEB

16   membership.

17     Q.   Do you anticipate that the Secretary of

18   State's office will be providing the SEB an update

19   about this topic?

20     A.   The topic of removable memory cards?

21     Q.   Yes.

22     A.   Yes.  I anticipate that there will be

23   further rulemaking on this after they have finished

24   consulting whoever they're consulting, I don't know

25   who it is, regarding best practices.

Page 68

1          Q.   And what do you mean when you say "best

2     practices"?

3          A.   I mean industry standards within both

4     cybersecurity and elections technology.

5          Q.   Okay.  Are you familiar with a company

6     called Fortalice?

7          A.   I have heard of Fortalice, yes.

8          Q.   Do you know what that company does?

9          A.   I believe they conduct -- they work -- not

10    specifically.

11         Q.   That's okay.

12         A.   I don't want to -- I don't want to

13    misspeak, so.

14         Q.   Are you aware that the Secretary of

15    State's office hired Fortalice to conduct

16    assessments of its IT systems and its security

17    vulnerabilities?

18         A.   Yes, I am aware that that has happened.

19         Q.   Have you read the resulting reports for

20    those assessments?

21         A.   I have not.

22         Q.   Are you aware that those reports found

23    serious security flaws with the Secretary of State's

24    IT systems?

25                    MR. RUSSO:  Objection to form.  She hasn't

Page 69

1              read the report.
2                   COURT REPORTER:  I'm sorry.  Repeat the
3              last part of your objection.
4                   MR. RUSSO:  I said she just testified that
5              she had not read the reports.
6                   MS. ELSON:  And I think you can just keep
7              them to objection to form.
8                   THE WITNESS:  I -- I don't know what the
9              findings were.
10    BY MS. ELSON:
11         Q.   Are you aware of anything that the
12    Secretary of State's office has done to remedy
13    defects found in its IT systems?
14                  MR. RUSSO:  Objection to form.
15                  THE WITNESS:  I am not aware.
16    BY MS. ELSON:
17         Q.   Okay.  Has the State Election Board done
18    anything to remedy the defects found in the
19    Secretary of State's IT systems?
20                  MR. RUSSO:  Objection to form.
21                  THE WITNESS:  I am not aware of anything.
22    BY MS. ELSON:
23         Q.   Okay.  As a State Election Board member,
24    is ballot secrecy important to you?
25         A.   Ballot secrecy is guaranteed under the

Page 70

1    Georgia Constitution.

2         Q.   And would it be safe to say that it is

3    important to you that that constitution is upheld

4    and abided by?

5         A.   Certainly.

6         Q.   Do you publicly announce who you vote for

7    after an election?

8         A.   It depends.  Sometimes, yes, I do.

9         Q.   During your time working for the

10   Democratic Party of Georgia, did you speak with

11   voters about concerns regarding ballot secrecy?

12        A.   Yes.

13        Q.   Did any of those voters have concerns

14   being in a small minority in Republican Counties

15   regarding their ballot secrecy?

16        A.   Those concerns were related to -- more to

17   primary ballots and having to request specifically a

18   Democratic versus a Republican primary ballot.

19        Q.   Would it concern you if someone could see

20   who you were voting for while you were voting?

21        A.   Yes.

22        Q.   Have you heard any complaints from voters

23   about the BMD screens being too large?

24        A.   I have.

25        Q.   And what were those complaints?

Page 71

1           A.   That the screens are large enough that

2    people could -- could see their selections depending

3    on the way the voter is standing and the way the --

4    the voting location was set up.

5           Q.   Do those complaints concern you?

6           A.   Anytime a voter doesn't feel confident in

7    the system, it concerns me.  So, yes.

8           Q.   Sorry.  I didn't mean to cut you off.

9           A.   It's all right.

10          Q.   Have you discussed ballot secrecy with any

11   State Election Board members?

12          A.   No, not since I've been on the -- on the

13   board.

14          Q.   Have you heard complaints from counties

15   that they are unable to guarantee ballot secrecy

16   using the BMDs?

17          A.   I am not aware of specific complaints from

18   counties since I have been on the board.

19          Q.   And how about since -- when -- before you

20   joined the board?

21               MR. RUSSO:  Objection to form.

22               THE WITNESS:  I don't recall.  What I -- I

23          will clarify that to a certain extent.  Part of

24          it was simply -- there were complaints about

25          the physical space required to ensure that the

Page 72

1          machines were separated adequately.

2     BY MS. ELSON:

3          Q.   And when were those complaints you're

4     referring to brought up?  At State Election Board

5     meetings?

6          A.   I don't recall specifically when they were

7     brought up.

8          Q.   Okay.  I'm going to introduce a document

9     now, and let me just stamp it and then I will

10    publish it.

11               (Plaintiffs' Exhibit 4 was marked for

12               identification.)

13    BY MS. ELSON:

14         Q.   All right.  That should be published.  So

15    just let me know when you're able to access it.

16         A.   I see it.

17         Q.   Okay.  And is this another tweet by you?

18         A.   It is.

19         Q.   Okay.  And this tweet mentions a petition

20    with a proposed rule that would allow hand-marked

21    ballots in the event that precinct conditions

22    prevent ballot secrecy?

23         A.   Yes.

24         Q.   Do you remember this petition and proposed

25    rule?

1          A.   If I remembered it, I would have mentioned

2     it.

3          Q.   I stated my question incorrectly.

4               Does this refresh your memory about the

5     petition and proposed rule?

6          A.   Yes.

7          Q.   And do you recall hearing about the

8     situation in Sumter County regarding ballot secrecy?

9          A.    In general, yes.  I was at that

10    State Election Board meeting.

11         Q.   And can you describe -- you started to

12    describe a bit the county's concern with the space

13    required from BMDs.

14              Can you describe what counties have done

15    to handle that concern?

16              MR. RUSSO:  Objection to form.

17              THE WITNESS:  Counties have certainly

18              changed the layout within -- within precincts

19              to ensure that -- or to -- to try to ameliorate

20              the problem of voters overseeing somebody

21              else's screen.

22              Some counties have also expended funds to

23              purchase privacy screens so -- to make it more

24              difficult.

25

Page 74

1    BY MS. ELSON:

2         Q.   And to your understanding, are those

3    privacy screens acceptable for use according to

4    Georgia's other election rules?

5              MR. RUSSO:  Objection to form.

6              THE WITNESS:  I have no knowledge of how

7         those screens may interact with any other

8         rules.

9    BY MS. ELSON:

10        Q.   Okay.  Is it your understanding that all

11   counties have been successful in providing adequate

12   ballot secrecy in the precincts that use BMDs?

13        A.   Georgia has 159 counties and some of them

14   are exceedingly small.  I am not aware.  I simply

15   don't know.

16        Q.   Would it concern you if certain counties

17   simply didn't have enough space to use the BMDs in a

18   way that ensures ballot secrecy for every voter?

19        A.    It would concern me that there is

20   additional stress and pressure put on counties.  I

21   would be very surprised if there were -- if it were

22   simply not possible, though.

23        Q.   So to your understanding, counties are

24   able to find space for their BMD machines such that

25   all voters have ballot secrecy?

1          A.   I don't have information either way.

2          Q.   All right.  I just have a few more topics

3     to cover.

4               Do you know how poll workers are trained

5     in Georgia?

6          A.   We have 159 counties.  I suspect that

7     there are 159 ways of training poll workers.  There

8     is a -- certainly a video training that is provided

9     by the Secretary of State's office.  Many counties

10    provide additional training on top of that.

11         Q.   Is the State Election Board involved in

12    deciding how poll workers are trained?

13         A.   I am not aware that the

14    State Election Board is involved in poll worker

15    training.

16         Q.   Do you believe that poll workers should be

17    trained rigorously?

18         A.   Yes.

19         Q.   Are poll workers trained to operate BMDs?

20              MR. RUSSO:  Objection to form.

21              THE WITNESS:  I have not undergone poll

22         worker training.

23    BY MS. ELSON:

24         Q.   So you don't know whether poll workers are

25    trained to operate BMDs?

1          A.   I do not.

2          Q.   Okay.  Have you ever received complaints

3      from voters that their poll worker was unable to

4      help them because the poll worker didn't know what

5      to do with the machines?

6               MR. RUSSO:  Objection to form.

7               Poll worker training is not an issue in

8          the case.

9               THE WITNESS:  You have to understand that

10         when the BMDs were implemented, I was a

11         candidate.  So I am not aware of what voter

12         complaints may have been after the

13         implementation of the BMDs.

14     BY MS. ELSON:

15         Q.   Did you speak to voters during your

16     candidacy?

17         A.   I did.

18         Q.   Did you receive any complaints about

19     machine problems from those voters?

20              MR. RUSSO:  Objection to form.

21              Complaints she received as a candidate,

22         again, that -- that's not relevant to the case.

23              MS. ELSON:  Again, you can just state the

24         objection.

25              THE WITNESS:  So there -- the complaints I

Page 77

1          received were more about the -- the machines

2          not being set up, machines not being

3          accessible.  So machines not working, I don't

4          recall specifically anything with that.

5     BY MS. ELSON:

6          Q.   Okay.  When you mentioned complaints about

7     machines being unaccessible, what do you mean by

8     that?

9          A.   Well --

10              MR. RUSSO:  Objection to form again.

11              THE WITNESS:  -- they weren't delivered in

12          time, for instance, in Gwinnett County.  So

13          they literally weren't physically present when

14          polls opened in June of 2020.

15    BY MS. ELSON:

16         Q.   Did you hear about that situation

17    happening in other counties?

18         A.   Cobb County had late deliveries.  I think

19    there were other counties.  I just don't recall the

20    specifics of it.

21         Q.   Do you know who was responsible for

22    delivering BMDs to the counties?

23         A.   The State is responsible for delivering

24    BMDs to the counties, but the -- the problem was

25    that it was the -- the counties that did not get

Page 78

1      them to the precinct in time.

2           Q.   I see.  And you also mentioned you had

3      heard complaints about machines not being set up.

4                Can you describe those?

5           A.   It's -- it's basically the same thing,

6      that they weren't -- they -- they didn't arrive in

7      time or they weren't -- they weren't plugged in and

8      ready to go when polls opened.  But I think that was

9      very broadly covered in the media.  The -- the

10     June 2020 primary was deeply problematic.

11          Q.   And in your experience, what happens to

12     machines that don't appear to be working?

13          A.   They should be taken off-line.

14          Q.   And by off-line do you mean unplugged?

15          A.   Whether they're plugged or unplugged

16     doesn't matter so much as they should not be -- they

17     shouldn't be made available to voters to attempt to

18     use.

19          Q.   Is it important to you as a

20     State Election Board member that every county in

21     Georgia has sufficient election equipment for all

22     voters who want to to cast a ballot?

23          A.   Yes, that is very important.

24          Q.   And aside from the complaint about

25     counties not receiving equipment in time, have you

Page 79

```
 1        heard voters complain about counties not having
 2        enough equipment?
 3                MR. RUSSO:  Objection to form.
 4                THE WITNESS:  I have not heard any
 5            complaints about counties not having enough
 6            BMDs or scanners.
 7        BY MS. ELSON:
 8            Q.   Have you heard voters complain about
 9        counties not having enough of other equipment?
10            A.   Check-in can sometimes be a problem.
11            Q.   And what equipment is used during
12        check-in?
13            A.   It depends on if it's election day or
14        early voting.  Election day equipment, that's --
15        those are poll pads.
16                MR. RUSSO:  And I'm going to just object
17            to continuing to go down this path.  I've --
18            I've let you go down it now, but none of this
19            is related to the complaints in the case or the
20            issues here.  And most of these questions
21            are -- are related to her time prior to being
22            on the State Election Board.
23                MS. ELSON:  It's my understanding that
24            she's here as a 30(b)(1) witness.
25                Is that incorrect?
```

Page 80

```
 1              MR. RUSSO:  She' -- she's here as a member
 2         of the State Election Board.  That's who she's
 3         named in the case as.  She's named in her
 4         capacity as a State Election Board member.
 5              MS. ELSON:  Okay.  Well, we can certainly
 6         take it up with the judge whether certain
 7         topics are relevant.
 8              Do you want to instruct her not to
 9         answer --
10              MR. RUSSO:  Sure.
11              MS. ELSON:  -- those questions today?
12              MR. RUSSO:  You can go on, but just --
13         just know that we object to the relevance of
14         this and we'll take it up with the judge as
15         needed.
16              MS. ELSON:  Okay.  Understood.
17              MR. RUSSO:  Let's keep moving.
18    BY MS. ELSON:
19         Q.  Besides the issues that we've already
20    discussed today, have you heard voters complain
21    about other aspects of the BMD and QR system?
22         A.  I mean, that's incredibly broad.  So I've
23    of course heard voters object to lots of things.
24    I'm not sure quite what you're asking.
25         Q.  I'm asking specifically about aspects of
```

1    the BMD machines or the QR system that's used to

2    tabulate votes.

3         A.   There are lots of objections from voters

4    who don't understand the system and don't understand

5    the -- the -- what -- what's a genuine risk and what

6    is -- I'm just -- I'm not quite sure where you're --

7    what you would -- are asking in this.  I mean,

8    voters have complained a lot because there's a lot

9    of disinformation out there and they don't

10   understand.

11        Q.   To your understanding, is the Secretary of

12   State's office or State Election Board undertaking

13   any efforts to increase voter's understanding about

14   how the BMD system works?

15        A.   I don't --

16             MR. RUSSO:  Objection to the extent --

17        objection to the extent that's going to call

18        for something that is either protected by

19        attorney-client or work product.  There are

20        obviously multiple lawsuits going on that are

21        separate from this one that may be relevant.

22             Otherwise, Sara, feel free to go ahead.

23             THE WITNESS:  I'm not aware of anything at

24        the moment, no.

25

Page 82

1               (Plaintiffs' Exhibit 5 was marked for

2          identification.)

3     BY MS. ELSON:

4          Q.   Okay.  All right.  I am just introducing

5     one last exhibit.  So let me know if you refresh

6     that whether or not you can access that exhibit.

7          A.   Yes.

8          Q.   Okay.  And is this a tweet that you wrote?

9          A.   It is.

10         Q.   Can you read that tweet, the first one?

11         A.   "Many of the students came prepared to

12    protest the use of BMD and QR codes."

13         Q.   Does this -- now that you've read this

14    tweet, do you recall this protest?

15         A.   I do.

16         Q.   Do you recall what the students were

17    protesting, more specifically than the use of BMDs

18    and QR codes?

19         A.   The -- it's -- I don't think it's anything

20    more than the use of QR codes that they were

21    protesting.

22         Q.   And what about the QR codes were they

23    protesting?

24         A.   Their inability to read the QR codes.

25         Q.   Did it concern you to hear these students

Page 83

1      protest?

2           A.   It highlighted to me the need for better

3      voter education.

4           Q.   And can you read the second tweet on this

5      page?

6           A.   "Apparently we will have new rules on

7      defining the official ballot."

8           Q.   And to your understanding, did the

9      State Election Board promulgate those rules?

10          A.   I believe so.

11          Q.   Would it be your preference that the human

12     readable portion of the ballot is defined as the

13     official ballot rather than the QR code?

14          A.   Yes.

15          Q.   And why is that?

16          A.   That the human readable portion is the

17     portion that voters verify and can be clearly

18     defined as reflecting the voter's choice by the

19     voter.

20          Q.   And why do you think that's important?

21          A.   It's important that voters have confidence

22     in -- in the system and that their vote is being

23     counted.

24          Q.   And it's your belief that if -- if the

25     human readable portion of that ballot were defined

Page 84

1       as the official vote, that would give con- -- voters

2       more confidence that their vote was being counted?

3               A.   Yes.

4               Q.   All right.  I just have a couple of

5       follow-up questions and then I think I'm all set.

6                    We discussed the SAFE Commission earlier

7       today.

8                    Have you ever testified before the

9       SAFE Commission?

10                   MR. RUSSO:  Objection to form.

11                   THE WITNESS:  Yes.  Prior to my time as a

12              member of the State Election Board, I did

13              testify before that.

14      BY MS. ELSON:

15              Q.   Okay.  And what did you testify about?

16              A.   I testified to the importance of voter

17      confidence in the system.

18              Q.   Did any of your testimony involve the BMD

19      machines?

20              A.   I honestly don't recall because that was

21      several years ago.

22              Q.   Understood.

23                   Has the Secretary of State's office or the

24      State Election Board initiated any rulemaking to

25      address the complaints regarding the insufficiency

1    of equipment that counties experienced during

2    previous elections?

3              MR. RUSSO:  Objection to form and also to

4         the extent it's calling to -- seeking to

5         produce any attorney-client communications,

6         working product.  I object to that, too.

7              THE WITNESS:  I am not aware of any.

8    BY MS. ELSON:

9         Q.   Do you plan to initiate any proposals with

10   the State Election Board for the general assembly to

11   address the equipment issues that counties faced?

12        A.   I need a better understanding of what

13   actual issues the counties faced before I can make

14   any proposals.

15        Q.   And why haven't you sought that

16   information?

17        A.   I have not heard specific reports that

18   there are -- there were equipment lacks.  I would

19   need a specific report from a county before

20   understanding those -- that is a serious problem

21   that would need to be addressed.

22        Q.   And so the complaints you heard from

23   voters weren't connected with or followed up by any

24   reports from counties?

25        A.   Complaints from voters generally are

Page 86

1    dealing -- were -- in -- in 2020 the problems were

2    during early vote, and that's a very different thing

3    from election day and it is dealt with differently

4    in the law.

5         So my understanding is the counties have a

6    tremendous amount of leeway to conduct early vote

7    the way they want because that's the -- those are

8    the policy choices that our laws have allowed.  And

9    that's where the problems have been.

10        Q.   Has the State Election Board initiated any

11   proposals for the general assembly -- excuse me, for

12   the general assembly to improve ballot secrecy?

13        A.   I am not aware of any.

14        Q.   Do you plan on initiating any proposals

15   with the State Election Board for the general

16   assembly to improve ballot secrecy?

17             MR. RUSSO:  Objection to form.

18             THE WITNESS:  At this time I do not have

19        any concrete plans.

20             MS. ELSON:  Okay.  Well, I think those are

21        all the questions I have for you.

22             Does your counsel have any questions for

23        you?

24             MR. RUSSO:  Let's go on a quick

25        five-minute break, if possible, and if we

Page 87

```
 1            have -- if I have any, I will -- I expect it
 2            will be quick, but let me just go over my notes
 3            real quick.
 4                 MS. ELSON:  Sure.  That's fine.
 5                 VIDEOGRAPHER:  Off the record at 12:25.
 6                 (Off the record.)
 7                 VIDEOGRAPHER:  Back on the record.  The
 8            time is 12:31.
 9                 MR. RUSSO:  Thank you.  We -- we don't
10            have any additional questions for Ms. Ghazal.
11            We do, of course, reserve the right to -- for
12            her to review and sign.  So I don't think we
13            addressed that at the beginning.
14                 VIDEOGRAPHER:  All right.  If nothing
15            further, then we will conclude the deposition.
16            The time is 12:32 and we are off the record.
17                 (Deposition concluded at 12:32 p.m.)
18                 (Pursuant to Rule 30(e) of the Federal
19            Rules of Civil Procedure and/or O.C.G.A.
20            9-11-30(e), signature of the witness has been
21            reserved.)
22
23
24
25
```

1                    C E R T I F I C A T E

2

3

          STATE OF GEORGIA:

4

          COUNTY OF FULTON:

5

6

          I hereby certify that the foregoing transcript was

7    taken down, as stated in the caption, and the

     questions and answers thereto were reduced to

8    typewriting under my direction; that the foregoing

     pages represent a true, complete, and correct

9    transcript of the evidence given upon said hearing,

     and I further certify that I am not of kin or

10   counsel to the parties in the case; am not in the

     regular employ of counsel for any of said parties;

11   nor am I in anywise interested in the result of said

     case.

12

13

14              Lee Ann Barnes

15

16

          LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER DISCLOSURE

 2

 3        Pursuant to Article 10.B. of the Rules and
          Regulations of the Board of Court Reporting of the
 4        Judicial Council of Georgia which states: "Each
          court reporter shall tender a disclosure form at the
 5        time of the taking of the deposition stating the
          arrangements made for the reporting services of the
 6        certified court reporter, by the certified court
          reporter, the court reporter's employer, or the
 7        referral source for the deposition, with any party
          to the litigation, counsel to the parties or other
 8        entity. Such form shall be attached to the
          deposition transcript," I make the following
 9        disclosure:

10

11        I am a Georgia Certified Court Reporter. I am here
          as a representative of Veritext Legal Solutions.
12        Veritext Legal Solutions was contacted to provide
          court reporting services for the deposition.
13        Veritext Legal Solutions will not be taking this
          deposition under any contract that is prohibited by
14        O.C.G.A. 9-11-28 (c).

15

16        Veritext Legal Solutions has no contract/agreement
          to provide reporting services with any party to the
17        case, any counsel in the case, or any reporter or
          reporting agency from whom a referral might have
18        been made to cover this deposition. Veritext Legal
          Solutions will charge its usual and customary rates
19        to all parties in the case, and a financial discount
          will not be given to any party to this litigation.
20

21

22        <%12034,Signature%>

23        LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC

24

25
```

```
 1    Vincent R. Russo, Esquire

 2    vrusso@robbinsfirm.com

 3                         November 19, 2021

 4    RE: Curling, Donna  v. Raffensperger, Brad

 5        11/5/2021, Sarah Tindall Ghazal (#4880381)

 6        The above-referenced transcript is available for

 7    review.

 8        Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    erratas-cs@veritext.com

16

17     Return completed errata within 30 days from

18    receipt of transcript.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25
```

1    Curling, Donna  v. Raffensperger, Brad

2    Sarah Tindall Ghazal (#4880381)

3              E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   Sarah Tindall Ghazal Date

25

1     Curling, Donna  v. Raffensperger, Brad

2     Sarah Tindall Ghazal (#4880381)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Sarah Tindall Ghazal, do hereby declare that I

5     have read the foregoing transcript, I have made any

6     corrections, additions, or changes I deemed necessary as

7     noted above to be appended hereto, and that the same is

8     a true, correct and complete transcript of the testimony

9     given by me.

10

11    _____ _____

12    Sarah Tindall Ghazal Date

13    *If notary is required

14                         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                         _____ DAY OF _____, 20___.

16

17

18                         _____

19                         NOTARY PUBLIC

20

21

22

23

24

25