IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


DONNA CURLING, et al.

        Plaintiffs

                          CIVIL ACTION FILE
    vs.                 NO. 1:17-CV-2989-AT

BRAD RAFFENSPERGER, et al.

        Defendants




VIDEOTAPED ZOOM DEPOSITION OF
REBECCA NASH SULLIVAN, ESQ.

November 5, 2021
2:03 P.M.


Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

```
 1              APPEARANCES OF COUNSEL

 2            (All appearances via Zoom)

 3

 4    On behalf of the Plaintiffs:

 5         HANNAH ELSON, ESQ.
           VERONICA ASCARRUNZ, ESQ.
 6         REEMA S. SHOCAIR ALI, ESQ.
           MORRISON & FOERSTER LLP
 7         2100 L Street, NW
           Suite 900
 8         Washington, DC 20037
           202.887.1500
 9

10    - and -

11         ROMMY FLORES, ESQ.
           MORRISON & FOERSTER LLP
12         707 Wilshire Boulevard
           60th Floor
13         Los Angeles CA 90017-3543
           rommyconklin@mofo.com
14         213.892.5422

15

16    On behalf of Rebecca Sullivan and the State
      Defendants:
17
           CAREY MILLER, ESQ.
18         ROSS ALLOY BELINFANTE LITTLEFIELD
           500 14th Street NW
19         Atlanta Georgia 30318
           678.701.9381
20         vrusso@robbinsfirm.com
           carey.miller@robbinsfirm.com
21

22

23

24

25
```

```
 1              APPEARANCES OF COUNSEL

 2


 3   On behalf of Defendants Fulton County Voter
     Registration and Elections and Richard Barron:
 4
         NANCY ROWAN, ESQ.
 5       OFFICE OF THE FULTON COUNTY ATTORNEY
         141 Pryor Street, SW
 6       Suite 4038
         Atlanta, Georgia 30303
 7

 8

 9   ALSO PRESENT:

10       Bryan Robinson, Videographer
         Marilyn Marks, Coalition for Good Governance
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX OF EXAMINATION

2   WITNESS:  REBECCA SULLIVAN, ESQ.

3   EXAMINATION                              PAGE
    By Ms. Elson                               7
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      INDEX TO EXHIBITS

2     Plaintiffs'
        Exhibit             Description              Page
3

4     Exhibit 1    2/28/2020 Meeting Minutes of    63
                   the State Election Board, No
5                  Bates Numbers

6     Exhibit 2    Transcript from the State       77
                   Election Board Hearing on
7                  January 22, 2020, Bates Nos.
                   STATE-DEFENDANTS-00156152
8                  through -6241

9

10             (Exhibits attached to transcript.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      Deposition of REBECCA NASH SULLIVAN, ESQ.
                     November 5, 2021
 2

 3            (Reporter disclosure made pursuant to

 4      Article 8.B of the Rules and Regulations of the

 5      Board of Court Reporting of the Judicial

 6      Council of Georgia.)

 7            VIDEOGRAPHER:  We are on the record.  The

 8      time is 2:03 p.m. on -- on November 5, 2021,

 9      and this is the beginning of the video

10      deposition for Rebecca Sullivan.

11            Would counsel present please identify

12      themselves for the record.

13            MS. ELSON:  This is Hannah Elson.  I'm

14      here representing Curling plaintiffs, from

15      Morrison & Foerster.  I'm joined by my

16      colleague Veronica Ascarrunz also from

17      Morrison & Foerster.

18            MR. MILLER:  This is Carey Miller here on

19      behalf of the State defendants.  We'll be

20      defending this deposition on behalf of my

21      client State Election Board member Rebecca

22      Sullivan.  I don't believe we have any others

23      in the room at the moment from our side.

24            MS. ROWAN:  This is Nancy Rowan from the

25      Office of the County Attorney here on behalf of
```

1          Fulton County board of -- of registration and

2          election and Richard Barron.

3               MS. MARKS:  This is Marilyn Marks, client

4          rep- -- excuse me, plaintiff representative

5          Collation for Good Governance.

6               VIDEOGRAPHER:  Thank you.  Will the court

7          reporter please swear in the witness.

8          REBECCA SULLIVAN, ESQ., having been first duly

9     sworn, was examined and testified as follows:

10    EXAMINATION

11    BY-MS. ELSON:

12        Q.  Well, thanks for being here today,

13    Ms. Sullivan.

14             Would you mind stating your full name and

15    address for the record?

16        A.  Rebecca Nash Sullivan, 2560 Blake Lane

17    Snellville, Georgia, 30078.  That is my home

18    address.

19             VIDEOGRAPHER:  I'm sorry.  Her audio is

20          pretty low.

21             COURT REPORTER:  It is, yes.

22             MR. MILLER:  Okay.  Give me just one

23          second.  I think I'll try and adjust the mic.

24             VIDEOGRAPHER:  Hannah, do you want to go

25          off record?

1          MS. ELSON:  Sure.  That's fine with me.

2          VIDEOGRAPHER:  Let's do that.  Off record

3      at 2:05.

4          (Off the record.)

5          VIDEOGRAPHER:  We're back on the record at

6      2:07.

7  BY MS. ELSON:

8      Q.  All right.  So today -- do you --

9          MS. ELSON:  Does anyone hear an echo?

10     Okay.

11  BY MS. ELSON::

12     Q.  Today I will be asking you a series of

13  questions about this litigation.

14          Before we do that, do you understand that

15  you're under oath today?

16     A.  I do.

17     Q.  And that oath means that you understand

18  your answers today will be the truth?

19     A.  Yes.

20     Q.  If you answer a question, I'm going to

21  assume you understood the question.

22          Is that okay with you?

23     A.  Yes.

24     Q.  Is there any reason why you would be

25  unable to give full and complete testimony today?

1        A.    No.

2        Q.    And I just want to note that we should try

3   and not talk over each other because if we're both

4   talking at the same time, the court reporter can't

5   take down a clean record.

6              Does that make sense?

7        A.    Understood.

8        Q.    All right.  And because we're in this

9   remote environment, do you have any windows open on

10  your computer besides this Zoom window and the

11  Exhibit Share?

12       A.    No.

13       Q.    And can I confirm that during the course

14  of the deposition today, you will not open any

15  additional windows besides those?

16       A.    Yes, you can confirm that.  I will not.

17       Q.    Okay.  If you need a break at any point,

18  just let me or Carey know.  I just ask that you

19  answer any questions pending before taking the

20  break.

21       A.    Sure.

22       Q.    All right.  Where did you go to college?

23       A.    The University of Georgia.

24       Q.    And what did you get a degree in?

25       A.    Political science.

Page 10

```
 1        Q.    And you went to law school; correct?
 2        A.    I did.
 3        Q.    And you received a JD?
 4        A.    Yes.
 5        Q.    What is your current employment?
 6        A.    I am general counsel and assistant
 7   commissioner of the Georgia Department of
 8   Administrative Services.
 9        Q.    Okay.  How long have you been in that
10   position for?
11        A.    A little over seven years.
12        Q.    Do you deal with elections in that
13   capacity?
14        A.    No, I do not.
15        Q.    And where were you working before the
16   assistant -- the Georgia Department of
17   Administrative Services?
18        A.    The Political Law Group was the name of
19   the firm at the time.
20        Q.    Have you ever been involved, besides the
21   State Election Board, in any other organizations
22   that deal with elections?
23        A.    Not that I'm aware of.  Is there any
24   specific organization you're talk- -- asking me
25   about?
```

1      Q.   No --

2      A.   Okay.

3      Q.   -- not that I know of.

4           Have you previously been deposed?

5      A.   Yes.

6      Q.   In what cases?

7      A.   Fair Fight versus Raffensperger.

8      Q.   Any other cases?

9      A.   No.

10     Q.   What did you do to prepare for the

11  deposition today?

12     A.   I met with counsel and reviewed some of

13  our State Election Board rules.

14     Q.   Did you review documents besides those

15  State Election Board rules?

16     A.   Just materials provided by counsel.

17     Q.   Did you collect documents to produce in

18  this case?

19     A.   I did.

20     Q.   And where did you look for those

21  documents?

22     A.   On the email address that I use for the

23  State Election Board.

24     Q.   And what did you look for?

25     A.   I looked for -- reviewed my email.  I

1    looked for any emails that might be respon- --

2    relevant to issues in this case.

3         Q.   Okay.  Have you seen the most recent

4    complaint in this case?  And that's titled the

5    "Third Amend-" -- "The Third Amended Complaint."

6         A.   I don't recall seeing that.

7         Q.   What to your understanding is this

8    litigation about?

9         A.   It's about the use of ballot marking

10   devices for Georgia elections.

11        Q.   Has this case been discussed by the

12   State Election Board?

13        A.   It has likely been discussed in executive

14   session --

15        Q.   Do you recall what --

16        A.   -- for -- for litigation updates by our

17   counsel.

18        Q.   Okay.  And that would be Ryan Germany?

19        A.   Ryan Germany would be included as well as

20   the counsel -- outside counsel that represent us.

21        Q.   I understand.

22             Have you personally discussed this case

23   with anyone?

24        A.   I don't believe so, outside our counsel.

25        Q.   I didn't ask you this when you mentioned

1   the Fair Fight deposition before.

2           Were you deposed in that case in your

3   capacity as a State Election Board member?

4       A.   Yes.

5       Q.   Okay.  You are currently a member of the

6   State Election Board; right?

7       A.   Correct.

8       Q.   When did you join the

9   State Election Board?

10      A.   I believe I was appointed in July of --

11  July-ish 2013.

12      Q.   And how were you appointed?

13      A.   I was appointed by the Speaker of the

14  Georgia House of Representatives.

15      Q.   And why did you join?

16      A.   I think it would be a good opportunity for

17  public service.

18      Q.   What was your familiar- -- what was your

19  familiarity with Georgia elections prior to serving

20  as a State Election Board member?

21      A.   As a citizen, I'm generally familiar with

22  elections.  I had some experience when I was in the

23  governor's office regarding legislation that was

24  passed regarding voting rights, regarding voter IDs

25  and, you know, just general knowledge of elections

1    through research.

2         Q.   And was that position in the governor's

3    office before your work with the Political Law

4    Group?

5         A.   Yes.

6         Q.   What position did you hold there?

7         A.   I held three different positions:  Policy

8    advisor, deputy executive counsel, and then

9    executive counsel.

10        Q.   What are the responsibilities of the

11   State Election Board?

12        A.   They're set forth in statute.  There's a

13   list of responsibilities, but generally to pass

14   rules and regulations regarding the conduct of

15   elections to ensure that they are fair and uniform,

16   as well as to hear alleged violations of the

17   election law or election rules and to determine

18   whether or not there's probable cause that a

19   violation has occurred.

20        Q.   What types of potential violations does

21   SEB hear about?

22        A.   Any violation of the election law or

23   election rules that we've passed.

24        Q.   Do you -- let me start over.

25             Do you yourself have any particular

1    responsibilities in your position on the

2    State Election Board?

3         A.   I am the vice chair of the

4    State Election Board, so I do preside over meetings

5    when there is not a chair.

6         Q.   Are you a member of any working groups or

7    commissions on the SEB?

8         A.   I am not.

9         Q.   Are you familiar with Georgia's current

10   ballot marking devices?

11        A.   I am.

12        Q.   Are you okay if I call those BMDs during

13   today's deposition?

14        A.   I am.

15        Q.   Are you familiar with Georgia's previous

16   election system?

17        A.   Excuse me.  Yes.

18        Q.   Do you understand why Georgia switched

19   from that previous election system to BMDs?

20        A.   Well, the general assembly passed a law

21   requiring the switch.

22        Q.   Do you understand why that law was passed?

23        A.   It's my understanding that to replace

24   aging technology at the time.

25        Q.   Did the State Election Board have a role

Page 16

1    in choosing the election system that Georgia

2    currently uses?

3         A.   It did not.

4         Q.   Do you have any concerns with the election

5    system that Georgia currently uses?

6         A.   I do not.

7         Q.   Do you know whether any other states rely

8    on BMDs for their elections?

9         A.   I believe that other states do.

10        Q.   Within the State Election Board, do you

11   discuss best practices as they concern to election

12   systems?

13             MR. MILLER:  Object to form.

14             You can answer.

15             THE WITNESS:  Best practices regarding

16        various election systems?  Is that your

17        question?

18   BY MS. ELSON:

19        Q.   (Nodded head.)

20        A.   No, we do not discuss that.  It is not the

21   State Election Board's role to select the election

22   system.

23        Q.   And whose role is it to select the

24   election system in Georgia?

25        A.   In this case, the general assembly passed

1    a law that required -- that required the type of

2    election system to be used.

3         Q.   Does the State Election Board ever hear

4    testimony regarding the choice of Georgia's election

5    system?

6         A.   I don't recall ever hearing testimony

7    regarding that.

8         Q.   All right.  As a member of the

9    State Election Board, do you care about the security

10   of elections in Georgia?

11             MR. MILLER:  Object to form.

12             THE WITNESS:  Of course.

13   BY MS. ELSON:

14        Q.   Is it important to you to know that the

15   election system being used is not hackable by

16   outside actors?

17             MR. MILLER:  Object to form.

18             THE WITNESS:  It is important for me to

19        know that the election system that is used is

20        safe and secure.

21   BY MS. ELSON:

22        Q.   And what do you mean by "safe and secure"?

23        A.   That it is protected as -- from -- kept

24   secure and not accessed by others and that there are

25   protocols in place to make sure that it is a secure

1   and safe system.

2        Q.   Have you heard any complaints about

3   Georgia's current election system being hackable?

4        A.   General complaints, yes.

5        Q.   And what have those complaints been?

6        A.   I think that there are complaints in this

7   case regarding that, speculize -- spec --

8   speculative concerns that the system could be

9   hacked.

10        Q.   Have you heard complaints from other

11   individuals besides the plaintiffs in this

12   litigation?

13        A.   Yes.  We have received complaints through

14   public comment at the State Election Board, through

15   emails that were sent to me by members of the

16   public.  And I've certainly been aware of news media

17   reports.

18        Q.   When does the State Election Board solicit

19   public comment?

20        A.   We generally have public comment -- we

21   solicit public comment through -- for every meeting.

22   There is an email address that is supplied on our

23   agenda to give public comment.  Over the years, we

24   have had portions of public comment in our public

25   meetings where members of the public are allowed to

1    come and speak.

2         Q.   Did you collect and produce those emails

3    that you've received --

4         A.   I did.

5         Q.   -- in public comments?

6              And just to confirm, you have not heard

7    any live testimony from voters to the SEB about

8    concerns with the BMD system?

9         A.   I would say that there have been concerns

10   expressed through public comment.

11        Q.   Okay.  But not through live testimony?

12        A.   I don't know what you mean by "live

13   testimony."

14        Q.   Do voters in Georgia ever appear at SEB

15   hearings and give testimony?

16        A.   Like, are they -- they will come and speak

17   in public comment.  The members of the public are

18   not sworn in during State Election Board meetings,

19   so I don't know exactly what you mean by "give

20   testimony."

21        Q.   I see.  I think I was considering that

22   public comment and the live speaking were two

23   different things, but it sounds like you're saying

24   that you consider those to be the same thing.

25        A.   When someone stands up and speaks to the

1    board in a public comment -- in the time in the

2    agenda that's allotted for public comment is what

3    I'm speaking about.  I'm sorry if that's not clear.

4        Q.   No, it's very clear.  I think I

5    misunderstood, so thanks for clarifying.

6             Would you support the use of an election

7    system that could be hacked in a few minutes by a

8    voter in the voting booth?

9             MR. MILLER:  Objection.  Calls for

10            speculation.  And form.

11            You can answer.

12            THE WITNESS:  I support secure election

13            systems.

14   BY MS. ELSON:

15       Q.   Would you support the use of an election

16   system that could be hacked in a few minutes by a

17   voter in the voter booth?

18            MR. MILLER:  Same objection.

19            THE WITNESS:  I believe that was the same

20            question.  I think that it is important to have

21            measures and control -- measures in place and

22            make sure that the security of these devices,

23            you know, can be monitored and any

24            opportunities for hacking be minimized.

25

Page 21

```
 1  BY MS. ELSON:

 2       Q.   If you were shown proof that an election

 3  system could be hacked by a voter in the voting

 4  booth, would you support the use of that system?

 5            MR. MILLER:  Same objection.

 6            THE WITNESS:  I think that it is important

 7       to have security controls in place regarding

 8       any election system.  I do not -- would not

 9       support a scenario where voting machines were

10       used in such a way that -- and security

11       controls were not in place.

12  BY MS. ELSON:

13       Q.   Do you -- let me strike that.

14            Are you familiar with how BMDs work?

15       A.   Yes.

16       Q.   And can you describe your understanding of

17  how they work?

18       A.   I understand -- I can describe my

19  understanding from a user's experience.  I do not

20  have technical expertise regarding BMDs.

21       Q.   That would be great.  Thanks.

22       A.   You -- I have voted on the BMD twice.  You

23  get a voter access card.  You insert it into the

24  machine.  You select -- make your voter selections

25  and the BMD machine prints out a paper ballot.  You
```

Page 22

1    review the paper ballot and scan the paper ballot,

2    and that is generally the process.

3         Q.   And where do you get the voter access card

4    from?

5         A.   From -- this is a live voting.  From when

6    you go through the steps when you arrive to vote.

7    From the poll workers.

8         Q.   What company manufactures the BMDs in use

9    in Georgia?

10        A.   It's my understanding they are -- Dominion

11   is the name of the company.

12        Q.   Has the State Election Board interacted at

13   all with Dominion?

14        A.   I believe that we may have had one meeting

15   where someone from Dominion came and spoke about the

16   machines, the security of the machines, but that

17   would be reflected in the minutes of the board

18   meetings.

19        Q.   Have you ever, aside from the two times

20   you voted on one, inspected a BMD before?

21        A.   I have observed one, yes.  But inspected,

22   no.

23        Q.   When did you observe the BMD?

24        A.   I believe that there were some available

25   in the Secretary of State's office prior -- after

Page 23

1    the -- the contract was awarded but prior to going

2    into use, for County election officials and others

3    to observe.

4         Q.   And you mentioned earlier that Dominion

5    came and spoke about the security of the machines at

6    a State Election Board meeting.

7              Why did they come and speak about

8    security?

9         A.   Because there were concerns raised by

10   members of the public.  Speculative concerns.  I

11   believe, I -- I'm not positive about this, but I

12   believe that a representative came after one of the

13   elections to speak generally on the topic in the

14   public meeting.

15        Q.   Do you recall --

16        A.   So anything he said would be reflected in

17   the minutes or the transcription of those meetings.

18        Q.   Okay.  Do you know how BMDs are updated?

19        A.   I do not have any technical expertise

20   regarding how BMDs are updated.

21        Q.   Have you discussed with the

22   State Election Board how BMDs are updated?

23        A.   I do not recall any specific discussions

24   about that.

25        Q.   So the State Election Board has not

Page 24

1   promulgated any rules about how the machines should

2   be updated?

3        A.   I didn't say that, but I don't recall a

4   specific rule regarding updating of BMDs.  I'm sure

5   that that topic may be addressed within one of the

6   rules, but I'm not aware of a rule on that specific

7   topic.

8        Q.   Okay.  Do you know who is responsible for

9   updating the BMD machines?

10       A.   I do not.

11       Q.   Are you aware that removable media such as

12  memory cards or USB sticks can be inserted into BMD

13  machines?

14       A.   I don't have any tech- -- technical

15  expertise regarding BMD machines.

16       Q.   Is removable media in BMD machines

17  something that the State Election Board has ever

18  discussed?

19       A.   We do not discuss the technical aspects of

20  the BMD machines.

21       Q.   And why is that?

22       A.   Because we are not responsible for the

23  technical aspects of the BMD machines.

24       Q.   And who is responsible for the technical

25  aspects of the BMD machines?

1          MR. MILLER:  Objection.  Calls for a legal

2      conclusion.

3          THE WITNESS:  I believe that the election

4      superintendents work with the Secretary of

5      State for -- regarding the use of the ballot

6      marketing devices.

7  BY MS. ELSON:

8      Q.   Would you agree that the choice of

9  machines used might have an affect on whether

10 elections in Georgia are fair and secure?

11         MR. MILLER:  Object to form.

12         THE WITNESS:  I don't have any reason to

13     believe that the -- that could be true.

14 BY MS. ELSON:

15     Q.   So when voters voted -- let me strike

16 that.

17         When voters vote on the BMDs, they're

18 provided with a paper printout; correct?

19     A.   That is correct.

20     Q.   And that printout shows both human text --

21 human readable text and a QR code?

22     A.   Yes, that is correct.

23     Q.   When votes are tabulated that were cast on

24 BMDs, are they tabulated using the QR codes or the

25 human readable text?

Page 26

1        A.    It's my understanding they're calculated

2   based on QR code.

3        Q.    Has the State Election Board ever

4   discussed rules concerning which part of the vote

5   will be tabulated?

6        A.    We do have a rule regarding the definition

7   of a vote.

8        Q.    Were you a member of the

9   State Election Board when that rule was proposed and

10  voted on?

11       A.    I was.

12       Q.    Did the State Election Board receive any

13  briefing or information to assist them in making an

14  informed decision about that rule?

15       A.    We would be provided advice and guidance,

16  recommendations by the Secretary of State's office

17  and their staff.

18       Q.    Have you heard any public comment from

19  voters that they are unable to verify their votes

20  using Georgia's current election system?

21            MR. MILLER:  Object to form.

22            THE WITNESS:  I have heard voter -- I have

23        heard members of the public express concern

24        that the QR code -- about the QR code, yes.

25

Page 27

1   BY MS. ELSON:

2        Q.   And can you describe those concerns?

3        A.   That generally they're afraid that the QR

4   code does not reflect the printed text.

5        Q.   Were you concerned when you heard comments

6   about that topic?

7        A.   I have not been presented any evidence

8   that a QR code does not reflect the printed text.

9        Q.   Have you been presented with any evidence

10  that the QR code does reflect the text?

11       A.   Yes.  I would say based on recounts of

12  votes, I think that -- of the risk-limiting audit

13  says that the votes are accurate.

14            COURT REPORTER:  I'm sorry.  I didn't hear

15       you.  You said he risk something audit are

16       accurate.

17            THE WITNESS:  Risk-limiting audit.

18            COURT REPORTER:  Risk remitting.  Thank

19       you.

20            THE WITNESS:  Limiting.  Limiting, not

21       remitting.

22            COURT REPORTER:  Limiting.  Thank you.

23  BY MS. ELSON:

24       Q.   I definitely will have some follow-up

25  questions about audits in a moment.

1            To your knowledge, does the Secretary of

2    State's office commission studies regarding election

3    systems?

4         A.   I don't know if the State -- the

5    State Election Board or Secretary of State's office?

6         Q.   My question was about the Secretary of

7    State's office.

8         A.   I don't have knowledge about studies that

9    are commissioned by the Secretary of State's office.

10        Q.   Okay.  Are you aware that one study

11   commissioned by the Secretary of State's office

12   found that over half of voters reviewed their ballot

13   less than a second or not at all?

14            MR. MILLER:  Object to form.

15            THE WITNESS:  I'm not aware of that

16        specific study, no.

17   BY MS. ELSON:

18        Q.   Are you --

19        A.   I do not know -- I -- I will add that we

20   have put in place rules that poll workers must

21   remind voters to review their paper ballots now.

22        Q.   And when you voted on a BMD, did you find

23   in practice that poll workers remind voters to

24   review their ballot?

25        A.   Yes.

Page 29

1    Q.   Does it concern you to know that a study

2   found that over half of their voters review their

3   ballot very cursorily?

4        MR. MILLER:  Object to form.

5        THE WITNESS:  I hope the voters, when

6        presented with a paper ballot and are told to

7        review their ballot, will review their ballot.

8        They have responsibility for reviewing their

9        ballot.

10  BY MS. ELSON:

11   Q.   We talked a bit about this before, but are

12  voters in Georgia able to verify that their

13  individual ballot reflects their preferred

14  selections when voting using a BMD?

15       MR. MILLER:  Object to form.  Calls for

16       speculation.

17       THE WITNESS:  They're able to review

18       their -- the printed text of their ballot.

19  BY MS. ELSON:

20   Q.   Just to confirm, is the printed text

21  what's tabulated when votes are counted?

22       MR. MILLER:  Objection.  Asked and

23       answered.

24       THE WITNESS:  The QR code is what is

25       counted in the ballot scanner, is my

Page 30

1        understanding.

2    BY MS. ELSON:

3        Q.   And can humans read QR codes?

4        A.   They cannot, at least to the best of my

5    knowledge.

6        Q.   Have you ever discussed voter verification

7    regarding BMDs with members on the

8    State Election Board?

9             MR. MILLER:  Object to form.

10            THE WITNESS:  I don't recall any specific

11        conversations.

12   BY MS. ELSON:

13       Q.   So you mentioned earlier that you believe

14   the audits are able to prove that the QR code

15   accurately reflects what is on the human readable

16   portion of a ballot.

17            Are audits important to verifying election

18   results?

19       A.   I think -- I think that they are a

20   safeguard, yes.

21       Q.   And what makes them important or a

22   safeguard?

23            MR. MILLER:  Object to form.

24            THE WITNESS:  Because the risk-limiting

25        audit is able to -- to give some security that

Page 31

1          the vote outcome is what was -- that the

2          hand-marked paper ballots are the same as the

3          vote that was tabulated on the ballot scanner.

4     BY MS. ELSON:

5          Q.   And what is a risk-limiting audit?

6          A.   They -- the law provides for a specific

7     audit framework to be done regarding ballot scanning

8     devices on a periodic basis, and there are also

9     provisions in the State Election Board regarding

10    that -- State Election Board rules regarding a

11    risk-limiting audit.  My understanding is it's an

12    audit based on a statistical number of ballots to --

13    of a hand recount.

14         Q.   You mentioned those audits are required

15    periodically.

16              Do you know how often those audits are

17    conducted?

18         A.   I can't recall specifically, but I believe

19    it is addressed in the law.

20         Q.   When do you believe that audits should be

21    required?

22              MR. MILLER:  Objection.  Lack of

23          foundation.

24              THE WITNESS:  I don't have a personal

25          opinion on how often they should be required.

Page 32

1    BY MS. ELSON:

2        Q.    Does Georgia use any other type of audit

3    besides the RLA audit you just mentioned?

4        A.    Not that I can specifically think of.

5        Q.    Does the State Election Board play a role

6    in deciding when an audit should take place in

7    Georgia?

8        A.    I do not believe we have a role in that

9    process.

10        Q.    Does the State Election Board have a role

11    in deciding what types of audits should occur?

12        A.    I do not believe so.

13        Q.    Are audit results ever shared with the

14    State Election Board?

15        A.    Specifically with the

16    State Election Board, I have not had that

17    experience.

18        Q.    Have audits ever come up at

19    State Election Board meetings?

20        A.    We have passed a rule regarding audits.

21        Q.    Do you discuss audits with the Secretary

22    of State's office?

23        A.    I don't recall any specific discussions

24    with the Secretary of State's office regarding that

25    topic.

Page 33

1      Q.   You mentioned an RLA audit.

2           Can you explain step by step how that

3   works?

4           MR. MILLER:  Objection.  Lack of

5       foundation.  Ms. Sullivan is not testifying as

6       an expert.

7           THE WITNESS:  No, I cannot.

8   BY MS. ELSON:

9      Q.   What do you understand the difference to

10  be between an audit and a recount under Georgia law?

11          MR. MILLER:  Objection.  Calls for a legal

12      conclusion.

13          THE WITNESS:  My understanding is that a

14      recount is something that a candidate is

15      entitled to request if there is a certain

16      percentage difference between the votes, and

17      that recount is conducted under rule by

18      scanning versus a risk-limiting audit which is

19      a manual hand recount and is something that is

20      set forth in the law to be required on a

21      periodic basis.

22  BY MS. ELSON:

23     Q.   So a risk-limiting audit is conducted by

24  hand?

25     A.   That is my understanding.

1    Q.   And what exactly is tabulated by hand

2   during a risk-limiting audit?

3    A.   The votes.

4    Q.   Given that in this case there are two

5   pieces of the printed paper, can you be more

6   specific when you say "the vote"?

7    A.   I'm sorry.  I didn't understand your

8   question about two pieces of paper.

9    Q.   Yeah.  That was -- I misspoke.

10        Given in this case that there are two

11   pieces of information on each ballot, a portion of

12   text and a QR code, can you detail what you mean by

13   "the vote"?

14    A.   In a risk-limiting audit, they're counting

15   the printed text is my understanding.

16    Q.   Okay.  Does the risk-limiting audit ever

17   compare the printed text on a ballot to the QR code

18   on that same ballot?

19    A.   I am not an expert on risk-limiting

20   audits.

21    Q.   So as a State Election Board member, you

22   don't know whether during a risk-limiting audit, the

23   printed text on the ballot is compared to the QR

24   code on that ballot?

25        MR. MILLER:  Object to form.

```
 1              THE WITNESS:  I mean, I believe that there
 2         is -- I don't know specifically what you're
 3         asking me.
 4   BY MS. ELSON:
 5         Q.   During a risk-limiting audit -- strike
 6   that.
 7              If a QR code was changed from what the
 8   voter selected, would a risk-limiting audit be able
 9   to pick up on that change?
10              MR. MILLER:  Objection.  Calls for
11         speculation.
12              THE WITNESS:  I'm sorry.  Could you
13         rephrase your question?
14   BY MS. ELSON:
15         Q.   If somehow a QR code reflected something
16   differently than the human readable portion of a
17   voter's ballot, would a risk-limiting audit be able
18   to detect that discrepancy?
19              MR. MILLER:  Same objection.
20              THE WITNESS:  I think you're -- you're
21         getting into technical issues which I don't
22         have any real knowledge of.  I am not an expert
23         regarding QR codes.
24   BY MS. ELSON:
25         Q.   Do you think it's important that each
```

1  voter's vote is counted when they cast a ballot in

2  the Georgia election?

3           MR. MILLER:  Object to form.

4           THE WITNESS:  Yes.

5  BY MS. ELSON:

6      Q.   And is there any mechanism available in

7  Georgia for a voter to be sure that their vote is

8  counted as they cast it?

9      A.   They can review the printed text on their

10 ballot and be -- I think that can be safe that their

11 vote is counted.

12     Q.   And can you say more about what you mean

13 when you say "they can be sure" -- or "they can be

14 safe" -- "it's safe that their vote was counted"?

15     A.   We don't have any reason to believe in

16 Georgia that the vote that is -- the printed ballot

17 is not what is count -- the -- the vote as reflected

18 in the printed text does not reflect the vote that

19 was calculated via QR code.

20     Q.   And a risk-limiting audit as you've

21 described them to me today does not assess the

22 content of the QR codes; correct?

23           MR. MILLER:  Objection.  Asked and

24      answered.

25           THE WITNESS:  The risk-limiting audit,

Page 37

```
 1        it's my understanding, reflects the -- is a

 2        hand count of the printed text.

 3   BY MS. ELSON:

 4        Q.   What would happen if the results of an

 5   audit indicate a different outcome than the one the

 6   machines tabulated?

 7             MR. MILLER:  Objection.  Calls for a legal

 8        conclusion.  Calls for speculation.

 9             THE WITNESS:  I don't know specifically

10        what would happen in that scenario.

11   BY MS. ELSON:

12        Q.   You don't know whether there's any way for

13   that election outcome to be declared invalid or to

14   rerun the election?

15             MR. MILLER:  Same objection.

16             THE WITNESS:  I believe that it is

17        addressed in the law, but I don't know

18        specifically how -- what happens at that point

19        in the process.  I have not seen that occur.

20   BY MS. ELSON:

21        Q.   And what do you mean when you say -- well,

22   strike that.

23             We've talked a bit about RLA audits.

24             What is a recount as you understand the

25   term to mean in the context of Georgia elections?
```

1            MR. MILLER:  Objection.  Calls for a legal

2       conclusion.

3            THE WITNESS:  I think I explained earlier

4       that my understanding of a recount is something

5       that a candidate is entitled to under law if

6       requested if the election contest is a certain

7       percentage difference.

8  BY MS. ELSON:

9       Q.   And during those recounts, is it your

10  understanding that the machines do the retabulating?

11      A.   That is my understanding, yes.

12      Q.   And those machines are tabulating the QR

13  code portion of the voter's ballots?

14      A.   Yes.

15      Q.   Would you be concerned if you weren't

16  allowed to vote in an election for some reason?

17            MR. MILLER:  Object to form.

18            THE WITNESS:  If someone were to prevent

19       me from voting?  Is that your question?  Would

20       I be concerned if someone were to stop me from

21       voting?

22  BY MS. ELSON:

23      Q.   If someone or something were to stop you

24  from voting.

25      A.   I can't imagine a scenario where I would

1   be stopped from voting if I was lawfully able to

2   vote.

3        Q.   If you were not allowed to vote, however,

4   would that concern you?

5             MR. MILLER:  Same objection.

6             THE WITNESS:  I don't have any, you

7        know, -- I cannot imagine a scenario in which I

8        was not allowed to vote if I was lawfully able

9        to vote.

10  BY MS. ELSON:

11       Q.   I'll try and rephrase.

12            If someone were to present to you or if

13  you were to hear about a scenario where someone was

14  prevented from voting in an election to which they

15  were legally otherwise entitled to vote, would that

16  concern you?

17       A.   I believe that everyone can -- who is

18  legally entitled to vote should be able to cast a

19  vote.

20       Q.   Would you be concerned if you were forced

21  to vote by a mail-in ballot in an election in

22  Georgia?

23            MR. MILLER:  Object to form.

24            THE WITNESS:  If I were -- I -- I have a

25       hard time spec- -- I mean, you're asking me a

Page 40

1          very speculative thing.  I cannot imagine a

2          situation where I was forced to vote by

3          absentee ballot.

4     BY MS. ELSON:

5          Q.   If you found out after an election that

6     your particular vote had not been counted, would you

7     find that concerning?

8          MR. MILLER:  Objection.  Calls for a legal

9          conclusion.  Excuse me.  Calls for speculation.

10          THE WITNESS:  Would I find it concerning

11          if my vote was not counted?

12     BY MS. ELSON:

13          Q.   Yes.

14          A.   Yes, I would be concerned if my vote was

15     not counted if it was legally and appropriately

16     voted.

17          Q.   All right.  And a couple of questions

18     about hand-marked paper ballots.

19          Would you use ballot marking devices that

20     tabulate the human readable portion of the ballot

21     rather than the -- strike that question.  I made the

22     same mistake this morning.

23          Would you use scanners that tabulate the

24     human readable portion of the ballot rather than the

25     QR code portion?

Page 41

```
 1            MR. MILLER:  Objection.  Calls for
 2       speculation and relevance.
 3            THE WITNESS:  Would I object to using a
 4       scanner that tabulated the written text versus
 5       a QR code?  No, I would not object to that.
 6  BY MS. ELSON:
 7       Q.   Do you think that Georgia's previous
 8  election system which utilized DREs was as reliable
 9  as the BMD system?
10            MR. MILLER:  Objection.  Lack of
11       foundation and relevance.
12            THE WITNESS:  I don't have any expertise
13       in that matter -- I mean, in that regard.
14  BY MS. ELSON:
15       Q.   And would you use hand-marked paper
16  ballots if that was the election system in Georgia?
17       A.   I would use the hand-marked paper ballots
18  if that was the election system, yes.  If that was
19  the way that votes were required to be cast, I would
20  certainly use a paper-marked ballot.
21       Q.   Can hand-marked paper ballots be altered
22  by malware?
23            MR. MILLER:  Object to form.  Speculation.
24            THE WITNESS:  I would think potentially
25       there could be that concern if a -- if a
```

1          scanner was -- anytime a scanner was involved,

2          but I'm not aware of a situation where

3          hand-marked paper ballots are completely a

4          paper process.

5     BY MS. ELSON:

6          Q.   Would you agree that there are a higher

7     number of technical machines in use with the BMD

8     system than there were with the DRE system?

9          A.   I have no knowledge of that.

10         Q.   Are hand-marked paper ballots more secure

11    than the BMD system?

12              MR. MILLER:  Objection.  Lack of

13         foundation.  Relevance.

14              THE WITNESS:  I don't have any expertise

15         regarding that.

16    BY MS. ELSON:

17         Q.   Are you aware that a hand-marked paper

18    ballot system costs tens of millions of dollars less

19    to maintain and administer than a BMD system?

20         A.   I don't have any expertise regarding the

21    cost of any election management system.

22         Q.   Would it concern you to hear that

23    hand-marked paper ballot systems cost much less

24    money than BMD systems?

25              MR. MILLER:  Objection.  Relevance.

1              THE WITNESS:  No, that does not concern

2        me.

3   BY MS. ELSON:

4        Q.   And why not?

5        A.   I -- I don't have any concern regarding --

6   it is not my concern regarding the cost of an

7   election system.

8        Q.   Are you aware of any unauthorized access

9   to any component of Georgia's election system,

10  either the current system or previous systems?

11             MR. MILLER:  Object to form.

12             THE WITNESS:  I believe that there was

13        some concern regarding unauthorized access

14        involving KSU, but I don't have any specific

15        personal knowledge.

16  BY MS. ELSON:

17       Q.   Do you recall -- strike that.

18             Are you aware of Logan Lamb?

19       A.   The name sounds familiar, yes.

20       Q.   Did the reports you recall hearing about

21  the KSU server concern you when you heard them?

22             MR. MILLER:  Objection.  Relevance.

23        Misstates testimony.

24             THE WITNESS:  Can you ask your question

25        again?

Page 44

1    BY MS. ELSON:

2        Q.   Sure.  And I apologize if I misstated

3    something.

4             Did you state earlier that you heard of

5    some unauthorized access to the KSU --

6        A.   Or allegations of unauthor- --

7    unauthorized access, yes.

8        Q.   Did those allegations concern you?

9        A.   I think -- I mean, there's always some

10   concern, yes, if there are allegations of --

11   specific allegations of unauthorized access to the

12   election system.

13       Q.   Why would that be concerning to you?

14            MR. MILLER:  Objection.  Relevance.

15            THE WITNESS:  It is important to maintain

16       the security of the election system.

17   BY MS. ELSON:

18       Q.   Did the State Election Board do anything

19   in response to those allegations?

20       A.   I don't recall that the

21   State Election Board did anything.

22       Q.   Did the office of the Secretary of State

23   do anything about those allegations?

24       A.   I believe that they did.  I believe that

25   there was some movement out of KSU for those

Page 45

1   functions, but I'm not -- that -- that is just my

2   understanding.  I don't have any personal knowledge

3   about this issue.

4       Q.   Okay.  When the DREs were in place, how

5   often was election security with the DREs discussed

6   at State Election Board meetings?

7           MR. MILLER:  Objection.  Relevance.

8           THE WITNESS:  I don't remember any

9       specific conversations, but just like with the

10      ballot marking devices, there are rules in

11      place regarding the security of the -- those

12      devices.

13  BY MS. ELSON:

14      Q.   And are those rules promulgated by the

15  State Election Board?

16      A.   There were some rules promulgated by the

17  State Election Board regarding security of the

18  devices, yes.

19      Q.   And you're referring to both DREs and

20  BMDs?

21      A.   Yes.

22      Q.   What information does the

23  State Election Board receive to assist it in

24  assessing proposed rules about security?

25          MR. MILLER:  Object to form.

Page 46

1                   THE WITNESS:  That's a very general

2          question.  Can you ask me a more specific

3          question or rephrase it?

4    BY MS. ELSON:

5          Q.   Yeah.  When the State Election Board is

6    considering a rule that has to do with, say, the

7    security of BMD machines, does the

8    State Election Board receive any briefing or outside

9    presentations regarding those machines?

10                  MR. MILLER:  Object to form.

11                  THE WITNESS:  I don't recall any specific

12         briefings, but we -- recommendations are made

13         by the Secretary of State staff.

14   BY MS. ELSON:

15         Q.   Were you aware of any security

16   vulnerabilities associated with the previous DRE

17   machines?

18                  MR. MILLER:  Objection on form.

19         Relevance.

20                  THE WITNESS:  I'm not an expert regarding

21         the technical aspects of DREs.

22   BY MS. ELSON:

23         Q.   So you're not aware of any

24   vulnerabilities -- oh, sorry.  Strike that.

25                  Did the State Election Board ever discuss

Page 47

1    election security in the context of Georgia's change

2    from DREs to BMDs?

3         A.   I don't recall any discussions.

4         Q.   After the implementation of the BMDs, how

5    often did the State Election Board discuss election

6    security?

7              MR. MILLER:  Object to form.

8              THE WITNESS:  I don't recall any specific

9         discussions.

10   BY MS. ELSON:

11        Q.   And that is even though there have been

12   many concerns raised about the BMD election

13   security?

14        A.   I mean, it's certainly been discussed in

15   meetings in context to -- with rules, but how often,

16   I -- I don't know -- I don't know how often the

17   issue comes up.

18        Q.   And when was it discussed in -- as it

19   concerns rules?

20        A.   Regard- -- the security of the ballot

21   marking devices?  I think there's several rules that

22   touch on security regarding transport and storage of

23   those devices, how they may be programmed, I think

24   that issue would have come up each time we discussed

25   one of those rules.

1      Q.   And those rules are passed based on

2  recommendations from the Secretary of State's

3  office?

4           MR. MILLER:  Object to form.

5           THE WITNESS:  There are recommendations --

6       there are recommendations from the Secretary of

7       State's office but there is also a rules

8       working group that works on the rules prior to

9       being presented to the board.

10  BY MS. ELSON:

11      Q.   And that working group consists of

12  State Election Board members?

13      A.   Generally two State Election Board members

14  will be in that group as well as local election

15  officials and election officials from the Secretary

16  of State's office.

17      Q.   Does the rules working group receive any

18  briefing or information regarding the BMDs when they

19  are drafting rules about election security?

20      A.   During my time on the working group, I do

21  not remember any specific briefings outside of those

22  members of the State Election Board staff.

23      Q.   And so just to follow-up on that, are you

24  saying that other State Election Board members

25  presented about information?

1      A.   I'm saying that the Secretary of State's

2 staff have addressed that issue and made

3 recommendations.

4      Q.   Okay.  So to your understanding, they

5 don't use any -- they don't gather any information

6 when they are making the recommendations?

7           MR. MILLER:  Object to form.

8           THE WITNESS:  Who's they?  The Secretary

9      of State staff?

10 BY MS. ELSON:

11      Q.   Oh, the rules working group.

12      A.   The rules working group I think is

13 certainly gathering information from the Secretary

14 of State staff who study these issues and this

15 topic.

16      Q.   Okay.  Thank you.

17      A.   I can't say what State Election Board

18 members gather on their own.

19      Q.   Okay.  Understood.

20      A.   Can we take a break?  We're --

21      Q.   Oh, of course.

22      A.   -- right -- right on about an hour.

23      Q.   Sure.

24      A.   Okay.  Thanks.

25      Q.   Do you want to say ten minutes?  Is that

1    okay?

2         A.   How about five?

3         Q.   Five's fine.

4         A.   Okay.

5              (Cross-talk.)

6              VIDEOGRAPHER:  Sorry.  Off record at 2:55.

7              (Off the record.)

8              VIDEOGRAPHER:  Back on the record.  The

9         time is 3:02.

10   BY MS. ELSON:

11        Q.   All right.  Are you aware that an expert

12   in this case named Alex Halderman has examined

13   Georgia's voting equipment and issued a report about

14   it?

15        A.   I have heard that.

16        Q.   What do you know about that report or what

17   have you heard about it?

18        A.   I just know that it has been done.

19        Q.   Have you read about Dr. Halderman's public

20   reply or his declarations?

21        A.   I have not.

22        Q.   Have you heard news reports covering

23   Dr. Halderman's work?

24        A.   I don't have any knowledge of his work,

25   no.

Page 51

1      Q.   If you were to hear that Dr. Halderman

2   found that Georgia's current election system can be

3   hacked in numerous ways, would that concern you?

4           MR. MILLER:  Object to form.

5           THE WITNESS:  I don't have any specific

6       knowledge of his report and do not feel like

7       it's appropriate to comment on that.

8   BY MS. ELSON:

9      Q.   Would it concern you if a cybersecurity

10  expert were to tell you that they examined Georgia's

11  election system and found that it could be hacked?

12          MR. MILLER:  Objection.  Calls for

13      speculation.

14          THE WITNESS:  I would certainly want to

15      know the circumstances of that and I don't have

16      the circumstances of that.

17  BY MS. ELSON:

18     Q.   Has the State Election Board taken any

19  action to learn more information about

20  Dr. Halderman's report?

21          MR. MILLER:  Objection.  Relevance.

22          THE WITNESS:  I have not, no.

23  BY MS. ELSON:

24     Q.   Have other State Election Board members,

25  to your understanding?

1       A.    I don't know.

2       Q.    Would you like to know more information

3  about the vulnerabilities that Dr. Halderman found?

4            MR. MILLER:  Object to form.

5            THE WITNESS:  I'm sorry.  Would I like to

6       know more about it?

7  BY MS. ELSON:

8       Q.    Yes.

9       A.    It is -- it is good generally for the

10 board to be aware of things regarding the election

11 system that we can effect by changes through rules.

12 If there are rules that we can pass that make better

13 security, I think that is always a good thing.

14      Q.    Do you think that having information about

15 security vulnerabilities in the election system

16 would assist the State Election Board in

17 promulgating rules related to security?

18           MR. MILLER:  Object to form.

19           THE WITNESS:  We're speaking

20      speculatively.  I think that would depend on

21      what kind of concerns they're talking about.

22 BY MS. ELSON:

23      Q.    Are you aware that plaintiffs in this case

24 have asked the Secretary of State's office attorneys

25 to provide a proposal to allow both the Secretary of

1    State's office and the State Election Board to

2    access some of Dr. Halderman's report?

3              MR. MILLER:  Objection.  Form and

4         relevance.

5              THE WITNESS:  I am not familiar with that,

6         no.

7    BY MS. ELSON:

8         Q.   Do you plan on taking any action to learn

9    information about the vulnerabilities we've been

10   discussing?

11             MR. MILLER:  Same objection.

12             THE WITNESS:  I don't plan on taking any

13        action right now, no.

14   BY MS. ELSON:

15        Q.   And why is that?

16        A.   I don't have any specific plans at this

17   moment to take any actions.

18        Q.   Are you aware that the Secretary of

19   State's office has hired their own experts in this

20   litigation?

21        A.   I am aware of that, yes.

22        Q.   And are you aware that this election

23   security expert retained by the State testified

24   under oath that he doesn't dispute Dr. Halderman's

25   findings about the vulnerabilities that the

1   equipment can be hacked?

2          MR. MILLER:  Object to form and

3      characterization.

4          THE WITNESS:  I am not aware of the expert

5      witness' testimony in this case.

6   BY MS. ELSON:

7      Q.   Does it concern you to hear that the

8   State's election security expert testified under

9   oath that he does not dispute Dr. Halderman's

10  findings?

11     A.   I don't --

12         MR. MILLER:  Same objection.

13         THE WITNESS:  I don't have any specific

14     knowledge of the testimony and, therefore, I

15     can't, you know, express any opinion about

16     that.

17  BY MS. ELSON:

18     Q.   Are you aware that the State has admitted

19  that it has taken no measures to address the

20  failings that Dr. Halderman found with Georgia's

21  voting equipment?

22         MR. MILLER:  Same objection.

23         THE WITNESS:  I have -- I have no

24     knowledge of that.

25

Page 55

 1   BY MS. ELSON:

 2        Q.   Does hearing that affect your confidence

 3   in Georgia's voting system?

 4             MR. MILLER:  Same objection.

 5             THE WITNESS:  I don't have any knowledge

 6        of the expert report, so I can't form an

 7        opinion on that.

 8   BY MS. ELSON:

 9        Q.   As a State Election Board member, have you

10   ever reached out to a source for assistance or

11   guidance on an issue within that source's specific

12   expertise?

13             MR. MILLER:  Object to form.

14             THE WITNESS:  I'm not -- I'm -- I -- I

15        mean, that was a very broad question, but I

16        can't think of any specific scenario that is

17        responsive.

18   BY MS. ELSON:

19        Q.   So you've never reached out to -- strike

20   that.

21             Some examples would be a cybersecurity

22   expert or an election security expert.

23             Has the sec- -- have you as a -- have you

24   as an SEB member ever reached out to experts such as

25   those?

Page 56

1      A.    I have not.

2      Q.    Has the State Election Board ever had a

3  cybersecurity expert examine the BMD election

4  system?

5            MR. MILLER:  Objection.  Relevance.

6            THE WITNESS:  The State Election Board has

7       not.  I do not know whether or not the

8       Secretary of State's office has.

9  BY MS. ELSON:

10     Q.    Did I understand your earlier testimony to

11  be that you have no knowledge of how the RLA audit

12  works, the risk-limiting audit works?

13     A.    I am not an expert on risk-limiting

14  audits, no.

15     Q.    I guess I'm asking less about whether

16  you're an expert than I am whether you have

17  knowledge about how such an audit works.

18            Do you have any knowledge of how the RLA

19  works?

20     A.    There is a rule that we have passed

21  regarding an RLA that sets some bas- -- basic

22  frameworks, but I do not have that rule memorized.

23     Q.    And you testified earlier that you have no

24  knowledge of the technical aspects of the BMDs;

25  correct?

1        A.    Correct.

2        Q.    So I'm curious about how you promulgated

3    rules about the RLA as a State Election Board member

4    if you didn't have knowledge of how those worked.

5             Is the issue that you had knowledge when

6    you were addressing the rule that you no longer

7    have?

8             MR. MILLER:  Object to form.

9             THE WITNESS:  Do I need to know the

10           technical details of the ballot marking device

11           to understand that there is a risk -- I don't

12           think I need to know the technical

13           interworkings of a ballot marking device system

14           to know that there is such a thing as a

15           risk-limiting audit.

16    BY MS. ELSON:

17        Q.    And I didn't mean to connect those two

18    questions.

19        A.    Well, that's what you were doing.

20        Q.    I apologize.

21             The question that I meant to ask was how

22    did you promulgate rules about the audits as a

23    State Election Board member if you didn't have

24    knowledge about how those audits work?

25        A.    I don't have the specific knowledge

1  regarding the various types of risk-limiting audits.

2  This recommendation came to us through the rules

3  working group, and they formulated those

4  recommendations.

5        Q.   Okay.  Do you know which

6  State Election Board members are currently on the

7  working group, the rules working group?

8        A.   I believe that Sara Ghazal and Matt

9  Mashburn were most recently on the working group.

10        Q.   So the rules working group, including

11  those two members of the State Election Board, know

12  the details of the risk-limiting audits?

13            MR. MILLER:  Object to form.

14            THE WITNESS:  I don't know.

15  BY MS. ELSON:

16        Q.   Are you relying on them when -- strike

17  that.

18            When the State Election Board's rules

19  working committee makes a recommendation to you

20  regarding a proposed rule about audits, are you

21  relying on them to make an informed recommendation

22  based on knowledge that they have about audits?

23        A.   Yes.  I am relying on an informed

24  recommendation from the Secretary of State's staff,

25  as well as the members of the rules working group.

1     Q.   Okay.  And you mentioned having no

2  knowledge of the technical aspects of the BMDs.

3          Without knowledge of how the BMDs work,

4  how is the -- how is the State Election Board able

5  to promulgate rules about voting with those devices?

6     A.   I didn't say that I don't know how the

7  ballot marking devices work, but I don't -- if I did

8  say that, I didn't mean to say that.  But I don't

9  have technical expertise regarding all aspects of

10  the ballot marking device.

11     Q.   And so it's -- let me know if this

12  mischaracterizes what you said.

13          But it's your understanding that the

14  State Election Board does not promulgate rules

15  regarding the technical aspects of the voting

16  devices?

17          MR. MILLER:  Object to form.

18          THE WITNESS:  There may be some technical

19     aspects that are addressed regarding -- I'm

20     trying to think of an example.  I'm not going

21     to say that there's not anything that -- in the

22     State Election Board rules that would have some

23     bearing on a technical aspect of a ballot

24     marking device.

25

1   BY MS. ELSON:

2       Q.   And if that were the case, and you've

3   stated that you lack technical knowledge about the

4   BMDs, is your ability to pass rules including

5   technical aspects made possible in the same way that

6   your ability to pass rules about audits is?

7           MR. MILLER:  Object to form.  Relevance.

8           THE WITNESS:  That was a pretty complex

9       question, compound question.

10          The State Election Board hears from a

11      number of -- the rules working group, experts

12      in the Secretary of State's office, as well as

13      members of the public to make informed decision

14      when they're passing rules.

15  BY MS. ELSON:

16      Q.   Is it your understanding that someone on

17  the State Election Board understands technical

18  aspects of the BMDs?

19      A.   I cannot speak to the knowledge of other

20  State Election Board members.

21      Q.   Are BMDs connected to the Internet to

22  receive updates?

23      A.   It is my understanding that BMDs are

24  generally not connected to the Internet.

25      Q.   Would it concern you if BMDs were

Page 61

1   connected to the Internet?

2          MR. MILLER:  Objection.  Calls for

3       speculation.

4          THE WITNESS:  I think that everything

5       regarding BMDs should be conducted in the most

6       safe and secure manner whatsoever.

7   BY MS. ELSON:

8       Q.   Would you want BMDs to be connected to the

9   Internet?

10         MR. MILLER:  Same objection.

11         THE WITNESS:  I don't want BMDs to be

12      connected to the Internet unless it is

13      necessary for them to operate.

14  BY MS. ELSON:

15      Q.   Okay.  Does any of the computer equipment

16  used in Georgia's current election system utilize

17  removable media such as memory cards or USB sticks?

18         MR. MILLER:  Object to form.

19         THE WITNESS:  I believe it does, but I

20      don't have technical knowledge of the entire

21      election system.

22  BY MS. ELSON:

23      Q.   You receive -- you testified earlier that

24  you receive recommendations regarding rules from the

25  State Election Board rules working group?

Page 62

1      A.   Yes.

2      Q.   Is it your understanding that the rules

3   working group has technical knowledge about the BMD

4   system?

5           MR. MILLER:  Objection.  Asked and

6        answered.

7           THE WITNESS:  I don't know what the

8        knowledge is of other members.

9   BY MS. ELSON:

10      Q.   Have you discussed with the

11   State Election Board whether malware can be

12   introduced to BMDs through removable media?

13      A.   I don't recall any specific questions -- I

14   mean, any specific discussions.

15      Q.   Was any part of the DRE system transferred

16   to the BMD system?

17           MR. MILLER:  Object to form.

18           THE WITNESS:  Not that I'm aware of.

19   BY MS. ELSON:

20      Q.   Would you want to know that information?

21           MR. MILLER:  Objection.  Relevance.

22           THE WITNESS:  Only if it were necessary

23        for me to have that information.

24   BY MS. ELSON:

25      Q.   In what situation would it be necessary

1    for you to have that information?

2            MR. MILLER:  Same objection.

3            THE WITNESS:  I can't -- I can't

4        speculate.

5    BY MS. ELSON:

6        Q.   Okay.  Would you see any issue with

7    reusing memory cards or other components from the

8    DRE system in the current BMD system?

9        A.   I don't have any technical knowledge

10   regarding the reuse of any removable media.

11       Q.   So you wouldn't have any concerns if that

12   were the case?

13       A.   I don't have any knowledge as to whether

14   or not there should be concern.

15       Q.   Okay.  All right.  I'm going to publish a

16   document.  Let me stamp it and then I will introduce

17   it.  If you can refresh your Exhibit Share, let me

18   know if you are able to see Exhibit No. 1.

19            (Plaintiffs' Exhibit 1 was marked for

20        identification.)

21            THE WITNESS:  I can see it.

22   BY MS. ELSON:

23       Q.   You said you can see it?  Sorry.

24       A.   Yes.

25       Q.   Okay.  And if you can see the text at the

1    top of this document states that these are minutes

2    from a State Election Board on --

3         A.   Yes.

4         Q.   -- February 28?

5         A.   Yes.

6         Q.   And do you recall attending this specific

7    meeting?

8         A.   I don't remember the specific meeting, no.

9         Q.   But you don't have any indication that you

10   wouldn't be, given that your name's there?

11        A.   I can't -- I'm sorry.  I haven't scrolled

12   down to see what the meeting was about.

13        Q.   Oh, yeah.  You can take time to review the

14   document if you'd like.

15        A.   I don't remember this specific meeting,

16   but I have no reason to believe I was not there.

17        Q.   Okay.  If you scroll to page 2 --

18        A.   Yes.

19        Q.   -- if you look to Proposed Rule 5, do you

20   see where it says that preservation of memory cards

21   was discussed?

22        A.   Yes.

23        Q.   What function do memory cards serve in

24   Georgia's current election system?

25        A.   I would like to look at that proposed rule

Page 65

1    to be able to answer that question, but I believe

2    that there are memory cards -- I can't tell you what

3    the specific role of memory cards are at the moment.

4         Q.   Okay.  What is your understanding for the

5    policies that Georgia has in place to ensure a

6    secure chain of custody for memory cards?

7              MR. MILLER:  Object to form.

8              THE WITNESS:  I don't have personal

9         knowledge of that.

10   BY MS. ELSON:

11        Q.   Has the State Election Board discussed

12   memory cards at other times besides this meeting?

13        A.   I don't know.  I can't recall any specific

14   discussions.

15        Q.   All right.  If you can scroll to page 3,

16   we'll be looking at Roman numeral V.

17        A.   Okay.

18        Q.   And near the middle of this page, do you

19   see where it states "Logic and Accuracy Testing"?

20        A.   Are you talking about just the reference

21   to the rule?

22        Q.   Yes.

23        A.   Yes.

24        Q.   Do you know what "Logic and Accuracy"

25   testing refers to?

1      A.   Generally speaking, yes.  It's to make

2  sure that the system is working appropriately and

3  correctly.

4      Q.   And just for clarity, by "system," are you

5  referring to the various components of Georgia's

6  election system such as BMDs and scanners?

7      A.   Yes.

8      Q.   When there is a rule about logic and

9  accuracy testing in front of the

10  State Election Board, what type of information is

11  provided to you in order for you to make an informed

12  decision about whether or not this is a good rule?

13           MR. MILLER:  Object to form.

14           THE WITNESS:  There is discussion, just

15      like any other rule, recommendations made by

16      Secretary of State staff, county election

17      officials who actually do this, and members of

18      the public are invited to give input.

19  BY MS. ELSON:

20      Q.   Within that world that you described, are

21  you given any detailed information about how logic

22  and accuracy testing affects the voting machines?

23           MR. MILLER:  Object to form.

24           THE WITNESS:  I don't know what you're

25      referring to.

Page 67

1    BY MS. ELSON:

2         Q.    Okay.  We can strike that question.

3         A.    Can I -- can I look back at you or am I --

4    are we going to need to look at this document?

5         Q.    Oh, whatever your preference is.

6         A.    Well, I mean, if you're going to keep

7    referring to it, I'll keep it up.

8         Q.    I do have a couple more questions about

9    this document.

10        A.    Okay.  It's just strange to talk to this

11   document.  Go ahead.  I like to see you.

12        Q.    I understand.

13              So on the same page at the end of the list

14   where "Logic and Accuracy" testing is listed, do you

15   see where it states "Use of emergency paper ballots

16   when voting machines are inaccessible"?

17        A.    Yes.

18        Q.    Under what circumstances would voting

19   machines be inaccessible?

20              MR. MILLER:  Objection.  Calls for a legal

21        conclusion.

22              THE WITNESS:  Like, for example, if the

23        power was completely out at a voting location.

24   BY MS. ELSON:

25        Q.    Are there any other circumstances you can

Page 68

1   think of?

2        A.   I'm sure there are other circumstances,

3   but that's the example immediately comes to mind.

4        Q.   Have you ever received public comment from

5   counties about not having enough emergency paper

6   ballots?

7             MR. MILLER:  Objection.  Relevance.

8             THE WITNESS:  I don't know.  Not -- not

9        specific -- specifically to my recollection.

10  BY MS. ELSON:

11       Q.   Have you ever received complaints from

12  voters about their polling places not having enough

13  emergency ballots?

14            MR. MILLER:  Same objection.

15            THE WITNESS:  I don't specifically recall

16       any.

17  BY MS. ELSON:

18       Q.   Okay.  And we can exit out of this

19  exhibit.

20            Does the State Election Board have any

21  part in deciding how recounts are conducted in

22  Georgia?

23       A.   Hold on a second.  I need to figure out

24  how to exit.  I don't know.

25            MR. MILLER:  If you click on the Zoom at

1        the bottom of your screen there.

2             THE WITNESS:  Oh, got it.

3             MR. MILLER:  Yeah.

4             THE WITNESS:  I'm sorry.  Go ahead.

5    BY MS. ELSON:

6        Q.   Hello again.

7        A.   Hi.

8        Q.   Does the State Election Board have any

9    part in deciding how recounts are done?

10       A.   I can't recall that they do, but there is

11   a State Election Board rule on recounts.

12       Q.   Does that rule, to your understanding,

13   specify how the recount should be conducted?

14       A.   I can't recall that off the top of my

15   head.

16       Q.   Does the State Election Board have any

17   role in deciding whether in a particular

18   circumstance a recount should occur?

19       A.   I believe that when a recount should occur

20   is controlled by law, but it may also be addressed

21   in the rules.

22       Q.   Do audits happen before every recount in

23   Georgia?

24             MR. MILLER:  Object to form.

25             THE WITNESS:  Do audits happen before

1      every recount?  Audits of what?

2  BY MS. ELSON:

3      Q.   The RLA audits you testified about

4  earlier.

5      A.   Do they happen before every recount?

6      Q.   Yes.

7      A.   I don't know.

8      Q.   You don't know.

9           Do you think they should happen before

10  every recount?

11      A.   I don't --

12           MR. MILLER:  Objection.  Form.

13           THE WITNESS:  I don't have an opinion.

14  BY MS. ELSON:

15      Q.   We mentioned a bit about how certain

16  portions of the State Election Board don't have

17  technical expertise about the components of

18  Georgia's election system.

19           Would you want to receive more information

20  about the technical components of the current

21  system?

22           MR. MILLER:  Object to form.  Relevance.

23           THE WITNESS:  It is certainly within the

24      power of the State Election Board to request

25      more technical knowledge.

Page 71

1   BY MS. ELSON:

2        Q.   As a State Election Board member, would

3   you like to receive more detailed information than

4   you have so far?

5             MR. MILLER:  Objection.  Asked and

6        answered.

7             THE WITNESS:  It is always good to be

8        informed.  I'm not going to say that I do not

9        want any more information regarding any area of

10       voting.

11  BY MS. ELSON:

12       Q.   And a similar question.

13            Would you also be interested in -- or

14  would you also appreciate being more informed about

15  the security aspects of the current election system?

16            MR. MILLER:  Object to form.

17            THE WITNESS:  I think it is always good to

18       be informed.

19  BY MS. ELSON:

20       Q.   Are you familiar with the company

21  Fortalice?

22       A.   I have heard that name, but no.

23       Q.   So you weren't aware that the Secretary of

24  State's office hired Fortalice to assess its IT

25  systems and security vulnerabilities?

```
 1             MR. MILLER:  Object to form.  Lack of
 2        foundation.
 3             THE WITNESS:  I am not familiar with that,
 4        no.  I do recall the name, but I have no
 5        familiarity with that.
 6   BY MS. ELSON:
 7        Q.   Okay.  Is ballot secrecy important to you
 8   as a State Election Board member?
 9        A.   Of course.
10             MR. MILLER:  Object to form.
11             THE WITNESS:  Of course.
12   BY MS. ELSON:
13        Q.   Would it concern you if someone could see
14   who you were voting for while you were voting?
15             MR. MILLER:  Same objection.
16             THE WITNESS:  Yes.
17   BY MS. ELSON:
18        Q.   Have you ever heard voters complain that
19   the BMD screens are too large?
20        A.   I have.
21        Q.   Did those complaints concern you?
22        A.   I think that there are a lot of opinions
23   about the BMD system, but there are -- I know the
24   Secretary of State's office put out specific
25   instructions on how to display those BMDs so that
```

Page 73

1    the secrecy of the ballot was preserved.

2         Q.    Have you ever received complaints or

3    public comment from counties regarding their

4    inability to follow the Secretary of State's

5    guidance?

6              MR. MILLER:  Object to form.

7              THE WITNESS:  I don't recall any specific

8         examples of that.

9    BY MS. ELSON:

10        Q.    And are -- is the guidance you're

11   referring to referring to the space and direction in

12   which the -- each machine is set up in a polling

13   place?

14        A.    I believe that it addresses proper setup

15   so that a secrecy of the ballot can be maintained.

16        Q.    Is it your understanding that the counties

17   in Georgia are able to comply with that guidance?

18        A.    I have no reason to believe they are not

19   able to comply.

20        Q.    Would it concern you if you heard that

21   some counties were not able to arrange the BMDs in

22   their polling places such as that ballot secrecy was

23   preserved for every voter?

24        A.    I think that they need to come up with a

25   way to use their systems in a way that preserves the

Page 74

1    secrecy of the ballot.  Whether or not they use the

2    specific guidance presented by the Secretary of

3    State's office or find an alternative -- alternative

4    arrangement.

5         Q.   And what would some alternative

6    arrangements be?

7              MR. MILLER:  Objection.  Calls for

8         speculation.

9              THE WITNESS:  I can't think of any

10        specific examples off the top of my head.  I

11        have not been involved in the arrangement of

12        voting machines before.

13   BY MS. ELSON:

14        Q.   Have you discussed ballot secrecy with

15   other State Election Board members?

16        A.   I am sure that this issue has come up in

17   the context of State Election Board meetings.

18        Q.   Can you recall what you discussed?

19        A.   The need to maintain the secrecy of the

20   ballot and that has been discussed.

21        Q.   Do you know how poll workers are trained

22   in Georgia?

23              MR. MILLER:  Objection.  Relevance.

24              THE WITNESS:  I know that poll worker

25        training is required, but I don't have specific

1        knowledge regarding that training.  It's done

2        at the local level, is my understanding.

3   BY MS. ELSON:

4        Q.   So the -- just to confirm, the

5   State Election Board isn't involved at all in

6   deciding how poll workers should be trained?

7             MR. MILLER:  Same objection.

8             THE WITNESS:  I don't remember an example

9        where the State Election Board was involved in

10        poll worker training.

11   BY MS. ELSON:

12        Q.   Okay.

13        A.   There may very well be

14   State Election Board rules that address training.

15        Q.   Are poll workers in Georgia trained to

16   operate BMDs?

17             MR. MILLER:  Objection.  Lack of

18        foundation.  Relevance.

19             THE WITNESS:  I have never participated in

20        poll worker training, so I don't know what the

21        specifics of their training is.

22   BY MS. ELSON:

23        Q.   Have you heard any complaints from voters

24   that their poll worker was unable to help them

25   because the poll worker didn't know how to deal with

1    the machine?

2         A.    I don't remember any specific complaint

3    regarding that.

4         Q.    Have you heard any complaints from voters

5    about the BMD machines not working?

6         A.    I -- I don't recall any specific exam- --

7    I mean, a specific complaint regarding a specific

8    instant about a marking device not working, no.

9         Q.    Have voters complained to you in general

10   about the ballot marking devices?

11        A.    We know that voters have complained about

12   the use of ballot marking devices.  I think that

13   we've already discussed this.

14        Q.    In your experience, what happens to

15   machines at polling places that don't appear to be

16   working?

17             MR. MILLER:  Object to form.

18             THE WITNESS:  I don't know what you mean

19        by "don't appear to be working," but if they go

20        through logic and accuracy testing, if there is

21        a problem, it's my understanding that they are

22        taken out of commission and not used for voting

23        until they are working properly.

24   BY MS. ELSON:

25        Q.    Is it important to you as a

1   State Election Board that every county in Georgia

2   has sufficient election equipment for all voters who

3   want to to cast a ballot?

4           MR. MILLER:  Objection.  Relevance.

5           THE WITNESS:  I think that what is

6       sufficient is a subjective question, but, yes,

7       it is important that they all have a number of

8       voting machines so that every voter can vote

9       without waiting in extraordinarily long lines.

10  BY MS. ELSON:

11      Q.   Have voters or counties made public

12  comm- -- comment about not having had enough

13  equipment in past elections?

14          MR. MILLER:  Objection.  Relevance.

15          THE WITNESS:  I don't recall any specific

16      examples.

17  BY MS. ELSON:

18      Q.   I'm going to introduce one more document.

19  Bear with me for one moment.

20          (Plaintiffs' Exhibit 2 was marked for

21      identification.)

22  BY MS. ELSON:

23      Q.   All right.  If you wouldn't mind

24  refreshing your screen and confirming with me once

25  you're able to see Exhibit No. 2, I believe.  Yes.

Page 78

1       A.    I see it.

2       Q.    Okay.  And the first page of this document

3    states that this is a transcript from the

4    State Election Board hearing on January 22, 2020;

5    correct?

6       A.    Yes.

7       Q.    And if you scroll to page 2, you can see

8    that your name, Rebecca Sullivan, is listed as being

9    present; correct?

10      A.    Correct.

11      Q.    Do you recall being present at this

12   meeting?

13      A.    I have to look at the document.  I don't

14   recall what this meeting is.  Yeah, I don't recall

15   this specific meeting, but I have no reason to

16   believe I was not there.

17      Q.    Okay.  I'm going to apologize in advance

18   for the clicking required, but if you could scroll

19   to page 7, please, and just let me know when you're

20   there.

21      A.    Sorry.  I'm not familiar with this

22   computer and how it all works.  Okay.  I'm on

23   page 7.

24      Q.    Okay.  No apology necessary.

25            At the bottom of page 7, do you see where

Page 79

1    Mr. Woodall's public comment begins?

2         A.   Yes.

3         Q.   And he states that he's the president of

4    the Georgia NAACP --

5         A.   Yes.

6         Q.   -- and a resident of Atlanta?

7              If you could scroll to the next page,

8    page 8, in the middle of the middle paragraph on

9    page 8, do you see where Mr. Woodall comments that

10   "███████████████████████████████████████████████

11   ██████████████████████████████████   ████████

12   ████████████████████████████████████████████████

13   ███████████████████████████████████████████

14   ███████████████████████████████████████████████"?

15        A.   Yes, I do see that.

16        Q.   Do you have any reason to believe that

17   Mr. Woodall was not telling the truth here?

18             MR. MILLER:  Objection.  Relevance.

19             THE WITNESS:  I don't -- I don't know -- I

20        mean, I don't have any reason to believe that

21        he was lying.  I don't know -- have any reason

22        to believe he has personal information

23        regarding specific county receipt of voting

24        machines.

25

Page 80

```
 1  BY MS. ELSON:

 2      Q.   Were you concerned when you heard this

 3  comment?

 4           MR. MILLER:  Objection.  Relevance.

 5           THE WITNESS:  I don't remember this

 6           comment being made.

 7  BY MS. ELSON:

 8      Q.   Did the State Election Board take any

 9  action in response to this comment that "███████

10  ████████████████████████████████████████████████

11  ██████████████████████████████████████████"?

12           MR. MILLER:  Objection to form and

13           relevance.

14           THE WITNESS:  I do not recall any specific

15           action.  I do know that there was a intensive

16           effort by the Secretary of State's office to

17           make sure that all counties got the machines

18           that they needed in time and had the training

19           necessary.  And this is -- would be a part of

20           the initial rollout of the BMDs, I think.

21  BY MS. ELSON:

22      Q.   Okay.  Has the Secretary of State's office

23  conducted -- taken any action since the BMDs were

24  initially rolled out to ensure adequate information

25  and training necessary?
```

Page 81

```
 1              MR. MILLER:  Objection.  Relevance.  Lack
 2         of foundation.
 3              THE WITNESS:  I don't know what the
 4         Secretary of State's office has done
 5         specifically with regard to equipment since the
 6         initial rollout.
 7    BY MS. ELSON:
 8         Q.   Okay.  All right.  We can put that exhibit
 9    aside.
10              We talked a bit about ballot secrecy
11    earlier.
12              Is the State Election Board initiating any
13    proposals for the general assembly to improve ballot
14    secrecy?
15              MR. MILLER:  Objection to form.
16              THE WITNESS:  Not that I'm aware of.
17    BY MS. ELSON:
18         Q.   Do you plan to initiate any proposals for
19    the general assembly to improve ballot secrecy in
20    the future?
21              MR. MILLER:  Same objection.
22              THE WITNESS:  I don't have any immediate
23         plans to make a proposal to the Georgia General
24         Assembly regarding the elections.
25
```

Page 82

1   BY MS. ELSON:

2       Q.   Is the State Election Board initiating any

3   proposals for the general assembly to improve

4   election security of Georgia's current election

5   system?

6           MR. MILLER:  Objection to form and

7           relevance.

8           THE WITNESS:  I think I just answered the

9           question that we -- I am not proposing --

10          preparing to propose any recommendations to the

11          general assembly for the next legislative

12          session regarding any aspect of elections.  I

13          cannot speak on behalf of the other members of

14          the State Election Board or the Secretary of

15          State's office.

16  BY MS. ELSON:

17      Q.   As a member of the State Election Board,

18  do you consider it your responsibility to ensure

19  that the election system is run in a way that

20  ensures elections are legal and secure?

21          MR. MILLER:  Object to form and relevance.

22          THE WITNESS:  Elections are actually run

23          at the local level by election superintendents,

24          and I think there's a shared responsibility by

25          everyone involved in elections to make sure

1          that elections are as safe as they can be in

2          the state of Georgia.

3     BY MS. ELSON:

4          Q.   So it's your testimony that both local

5     precincts and the State Election Board had the

6     responsibility to ensure --

7          A.   I would say --

8               MR. MILLER:  Objection.  Misstates.

9               THE WITNESS:  I would say that each party

10          that had -- that plays a role in elections has

11          their own responsibilities, specific -- has

12          that responsibility -- I'm having a hard time

13          articulating what I'm trying to say here.

14               But within their own role, they have a job

15          to make sure that elections are safe and secure

16          to the extent it pertains to their role.

17               MS. ELSON:  Do you want to take a

18          five-minute break?  I think those are all the

19          questions I have for you but --

20               THE WITNESS:  Sure.

21               MS. ELSON:  -- we can break for -- maybe

22     until 3:46 and then come back.

23               THE WITNESS:  Okay.

24               VIDEOGRAPHER:  Okay.  Off record at 3:42.

25               (Off the record.)

Page 84

```
 1              VIDEOGRAPHER:  We're back on the record at
 2        3:48.
 3              MS. ELSON:  So those are all the questions
 4        I have for you, Ms. Sullivan, and I understand
 5        your counsel doesn't have any more questions
 6        for you either.
 7              MR. MILLER:  We do not.  We will just go
 8        ahead and reserve Ms. Sullivan's right to
 9        review and sign the transcript, but other than
10        that, we're -- we're all set.
11              VIDEOGRAPHER:  Okay.  If nothing further,
12        then we'll conclude the deposition.  The time
13        is 3:48 and we're off the record.
14              (Deposition concluded at 3:48 p.m.)
15              (Pursuant to Rule 30(e) of the Federal
16        Rules of Civil Procedure and/or O.C.G.A.
17        9-11-30(e), signature of the witness has been
18        reserved.)
19
20
21
22
23
24
25
```

Page 85

1                        C E R T I F I C A T E

2

3

        STATE OF GEORGIA:

4

        COUNTY OF FULTON:

5

6

        I hereby certify that the foregoing transcript was

7    taken down, as stated in the caption, and the

     questions and answers thereto were reduced to

8    typewriting under my direction; that the foregoing

     pages represent a true, complete, and correct

9    transcript of the evidence given upon said hearing,

     and I further certify that I am not of kin or

10   counsel to the parties in the case; am not in the

     regular employ of counsel for any of said parties;

11   nor am I in anywise interested in the result of said

     case.

12

13

14              *Lee Ann Barnes*

15

16

        LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER DISCLOSURE
2
3        Pursuant to Article 10.B. of the Rules and
         Regulations of the Board of Court Reporting of the
4        Judicial Council of Georgia which states: "Each
         court reporter shall tender a disclosure form at the
5        time of the taking of the deposition stating the
         arrangements made for the reporting services of the
6        certified court reporter, by the certified court
         reporter, the court reporter's employer, or the
7        referral source for the deposition, with any party
         to the litigation, counsel to the parties or other
8        entity. Such form shall be attached to the
         deposition transcript," I make the following
9        disclosure:
10
11       I am a Georgia Certified Court Reporter. I am here
         as a representative of Veritext Legal Solutions.
12       Veritext Legal Solutions was contacted to provide
         court reporting services for the deposition.
13       Veritext Legal Solutions will not be taking this
         deposition under any contract that is prohibited by
14       O.C.G.A. 9-11-28 (c).
15
16       Veritext Legal Solutions has no contract/agreement
         to provide reporting services with any party to the
17       case, any counsel in the case, or any reporter or
         reporting agency from whom a referral might have
18       been made to cover this deposition. Veritext Legal
         Solutions will charge its usual and customary rates
19       to all parties in the case, and a financial discount
         will not be given to any party to this litigation.
20
21       *Lee Ann Barnes*
22
23       LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC
24
25

1    Carey Miller, Esqurie

2    carey.miller@robbinsfirm.com

3                       November 19, 2021

4    RE: Curling, Donna  v. Raffensperger, Brad

5        11/5/2021, Rebecca Sullivan (#4880381)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of transcript.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

```
 1    Curling, Donna  v. Raffensperger, Brad

 2    Rebecca Sullivan (#4880381)

 3                  E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____   _____

24    Rebecca Sullivan Date

25
```

1    Curling, Donna  v. Raffensperger, Brad

2    Rebecca Sullivan (#4880381)

3              ACKNOWLEDGEMENT OF DEPONENT

4      I, Rebecca Sullivan, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____  _____

12   Rebecca Sullivan Date

13   *If notary is required

14                     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                     _____ DAY OF _____, 20___.

16

17

18                     _____

19                     NOTARY PUBLIC

20

21

22

23

24

25