IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, ET AL.,<br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, ET AL.,<br>Defendants. | Civil Action No. 1:17-CV-2989-AT |

## COALITION PLAINTIFFS' RESPONSE TO
## STATE DEFENDANTS' NOTICE OF FILING [DOC. 1388]

On June 1, 2022, State Defendants filed a combined notice and case status update in this Court presenting two "recent developments," (Doc. 1388, at 1), each of which requires a response. First, State Defendants notified this Court of a decision by the Fulton County Superior Court on May 31, 2022, rejecting claims that the use of a QR code to record votes violated a Georgia state law requiring that ballot must be marked in a format readable by the voter. Second, State Defendants selectively quote excerpts from the transcript of the recent Eleventh Circuit oral argument in the consolidated interlocutory appeals of the pollbook and scanner orders issued by this Court. Third, State Defendants ignore the Eleventh Circuit panel's clear indication at oral argument that Coalition Plaintiffs have standing to bring these claims. Coalition Plaintiffs respond as follows.

1

I.  **The Ruling of Fulton County Superior Court on QR Codes Neither Binds This Court Nor Detracts from Plaintiffs' Claims**

The decision on QR codes recently issued by the Fulton County Superior Court, (Doc. 1388-1, at 6), should not be considered by this Court. A state trial court decision provides no binding authority for this Court, even on matters of state law, and the decision, in any event, does not detract from the merit of Plaintiffs' federal constitutional claims.

One factual ground for Plaintiffs' challenges to the constitutionality of the Dominion BMD System is that Georgia's BMDs record an in-person voter's official votes in a humanly unreadable, encrypted QR code that voters cannot verify to be correct before casting their ballots into tabulation scanners. Plaintiffs have claimed that the state-mandated use of a humanly unreadable QR code for voting both is unconstitutional *and* violates a Georgia statute requiring that, "electronic ballot markers shall produce paper ballots which are marked with the elector's choices in a format readable by the elector." O.C.G.A. § 21–2–300(a)(2).

This Court previously found (correctly) that the use of humanly unreadable QR codes had been proved and was contrary to Georgia law: "[T]he evidence shows that the Dominion BMD system does not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the

voter because the votes are tabulated solely from the unreadable QR code." (Doc. 964, at 82.)

State Defendants now claim that a Judge of the Fulton County Superior Court disagrees. They point to Judge Kimberly Adams's holding of May 31, 2022, stating:

> The fact that the paper ballots include a QR code which the system uses to tabulate votes does not violate either statute's requirements that paper ballots be produced and that the interpretations of the electors' intent be produced in a readable fashion. These requirements are satisfied by the printed paper ballot.

(Doc. 1388-1, at 6.)

This holding of the Fulton County Superior Court should be disregarded for two reasons. First, the finding of a state trial court on a matter of state law does not bind this Court. "In matters of state law, federal courts are bound by the rulings of the state's highest court. . . . If the state's highest court has not ruled on the issue, a federal court must look to the intermediate state appellate courts." *Veale v. Citibank, F.S.B.*, 85 F.3d 577, 580 (11th Cir. 1996) (internal citations omitted); *see also Coral Springs St. Sys. v. City of Sunrise*, 371 F.3d 1320, 1333 (11th Cir. 2004) ("In ascertaining Florida law, we look to both the state's Supreme Court and, where necessary, its District Courts of Appeal.") Where a federal question turns on a matter of state law, federal courts are not bound by the state-law determinations

3

of a state trial court. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 457 (1967) (tax context) ("[W]hen the application of a federal statute is involved, the decision of a state trial court as to an underlying issue of state law should a fortiori not be controlling.").

Since the Fulton County Superior Court's holding is not authority for this Court, the Court can and should stand on its own previous findings—"that the Dominion BMD system does not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code," (Doc. 964, at 82)—which are plainly correct.

Second, even if the State mandating the use by in-person voters of a humanly unreadable QR code to record their votes *were* compliant with Georgia law (which it is not), that fact still fails to diminish in any way Plaintiffs' *federal* claims that such a practice unjustifiably burdens and violates federal constitutional rights to vote and to equal protection. The state trial court's finding, even if it were correct, should be disregarded as having no negative bearing on Plaintiffs' claims.

## II. State Defendants' Selective Quotations from the Eleventh Circuit's Oral Argument Transcript Are Unhelpful, Taken Out of Context

Next, State Defendants point to excerpts from the recent oral argument in the State's consolidated interlocutory appeals of this Court's pollbook and scanner

orders, claiming the excerpts are "relevant to this case moving forward." (Doc. 1388, at 4.) Two of these items require a response from Coalition Plaintiffs.

### A. The "Agnostic" Quote

First, State Defendants reference a statement by counsel that Coalition Plaintiffs "are agnostic as to the method of voting if the method of voting allows people to vote." (Doc. 1388-2, at 29:19–31:14.)[1] State Defendants want the Court to misread this statement, standing alone, as a broad concession that any voting method is unobjectionable to Coalition Plaintiffs, so long as it does not completely deny voters the ability to cast votes. But the full context of the colloquy leading up to this statement shows that counsel for Coalition Plaintiffs made no such concession. Instead, he was only addressing the much narrower question of whether the required use of an electronic method to check in voters (i.e., the electronic pollbooks), by itself and without evidence of repeated pervasive unmitigated failures or serious vulnerabilities, was a severe burden—the answer to which was "no."

---

[1] Pinpoint citations to docketed materials throughout this paper refer to the blue PACER pagination, not to the cited document's internal pagination.

The focus of the panel—and thus the focus of counsel—at this point in the argument was limited to identifying the exact burden on voters that should be used to decide the merits of the pollbook relief granted by this Court under the *Anderson-Burdick* framework. (Doc. 1388-2, at 26:6–:21; id. at 27:15–28:7.) This focus on the merits of the pollbook relief meant that the phrase, "method of voting," referred to the use of electronic pollbooks—*i.e.*, to the "method" that had been adopted to check voters in. The panel was asking whether the use of an *electronic* check-in method was a severe burden on voters, and counsel was attempting to answer "no" because the burden that justified the pollbook relief lay not in the State's choice to use electronic pollbooks, but instead in the State's failure to provide an updated paper backup to mitigate the electronic pollbooks' predictable failures given their documented history of chronic dysfunction.

It was in this context that Coalition Plaintiffs' counsel told the panel, "I don't think there's any burden at all on the State requiring you to vote by a method that works. The burden arises when the method doesn't work." (Doc. 1388-2, at 24:11–26:21.) Counsel later elaborated, "[T]he thing that is causing the burden is not the method of voting. . . . [W]e're agnostic as to the method of voting if the method of voting allows people to vote. It's the fact that the State is doing something which is – which is failing to provide an updated pollbook to take

6

account of predictable failures." (Id. at 29:20–30:2.) Counsel's point in stating Coalition Plaintiffs' agnosticism over the use of electronic pollbooks, versus some other "method of voting"—*i.e.*, some other method of checking voters in—was to highlight that the source of the burden justifying this Court's pollbook relief was the State's failure to mitigate the defective pollbooks, *not* the State's choice to use electronic pollbooks in the first place.

This context shows that counsel's statement that Coalition Plaintiffs were "agnostic as to the method of voting" related only to the State's decision to use electronic pollbooks as the method for checking voters in. It is incorrect for State Defendants to suggest that this Court can or should apply counsel's statement more broadly to other issues in this case "going forward."[2] (Doc. 1388, at 4.)

---

[2] Coalition Plaintiffs have never conceded—and do not concede—that *any* component of a voting system must *completely* disenfranchise voters to be constitutionally objectionable or to be part of the claims in this case. Under *Anderson-Burdick*, even non-severe burdens that fall well short of total disenfranchisement are unconstitutional if caused by unreasonable or discriminatory restrictions, such as the unreasonable failure to provide an *up-to-date* paper backup for historically defective electronic pollbooks used at voter check-in on Election Day.

### B.    Judge Luck's Comment on *Jacobson*

State Defendants also isolate and point to Judge Luck's observation that *Jacobson* requires more than the simple fact that the Secretary be the "chief election officer" to be liable for conduct of the counties. (Doc. 1388-2, at 31:21–32:10.) State Defendants mean to imply that at least Judge Luck looked unfavorably on State Defendants being held responsible for pollbook-related conduct on the part of county officials. But State Defendants neglect to include Judge Luck's later, and far more pertinent, statements about *Jacobson* on this exact point:

> HON. ROBERT LUCK: So I have to say I'm very familiar with Jacobson, and I'm familiar with Florida's system. So I did a lot of digging, and I don't know how you get around -- and please tell me how you do -- the Georgia statute, and I'm talking about 21-2-300 in all of its glory. "The equipment used for casting and counting votes, for counting votes in county, state, and federal elections shall be the same in each county of the state and shall be provided by the State as determined by the secretary of state." The secretary of state determines the method of voting.
>
> [STATE DEFENDANTS' COUNSEL]: Absolutely.
>
> HON. ROBERT LUCK: That's different than in Florida.

(Id. at 45:11–:46:2.)

With this second example, State Defendants have again selectively excerpted the appellate oral argument transcript in a way that misrepresents a single isolated excerpt, devoid of context, as "relevant to this case moving forward." (Doc. 1388, at 4.) Until the panel issues its opinion, little can be gleaned from the transcript excerpts that the State Defendants have chosen to emphasize.

### III. State Defendants Bury the Lede—Appellate Oral Argument Strongly Suggested Plaintiffs' Standing Is Established, as State Defendants Themselves Conceded

Predicting any outcome based on an oral argument is of course an uncertain endeavor. But if anything appeared clear from the Eleventh Circuit's questioning of all counsel, it was that the panel took Plaintiffs' standing as established, at least based on Coalition for Good Governance's organizational standing. (Doc. 1388-2, at 5:21–9:17.) Apart from the initial colloquy focusing on organizational standing, the panel devoted its questioning almost exclusively to the merits of the pollbook and scanner orders. Judge Luck told Coalition Plaintiffs' counsel directly, "I think there's standing." (Doc. 1388-2, at 21:2–:3.) Judge Grant appeared equally disinclined to spend any time on standing, saying, "We're not talking about standing. Standing is over." (Id. at 28:3–:4.)  When pressed on rebuttal, counsel for State Defendants conceded that Plaintiffs would have standing with respect to at least one claim against one defendant. (Id. at 49:14–:19.)  Given the implication of

9

the panel's statements and questions about standing and given that both the parties and this Court anticipated that the appellate oral argument might provide "tea leaves" based on which further case progress might hinge, (Doc. 1347, at 4), State Defendants have plainly buried the lede by omitting to tell this Court that Plaintiffs' standing appears solid.

      Respectfully submitted this 5th day of June 2022.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III
Admitted Pro Hac Vice
 (ECF No. 125)
ROBERT MCGUIRE LAW FIRM
113 Cherry St. #86685
Seattle, Washington 98104-2205
(253) 267-8530

*/s/ Russell T. Abney*
Russell T. Abney
Georgia Bar No. 000875
WATTS GUERRA, LLP
Suite 100
4 Dominion Drive, Building 3
San Antonio, TX 78257
(404) 670-0355

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC

3340 Peachtree Road NE
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges, Ricardo Davis & Megan Missett*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, ET AL.,<br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, ET AL.,<br>Defendants. | Civil Action No. 1:17-CV-2989-AT |

CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that on June 5, 2022, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record. In addition, pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

                                                */s/ Robert A. McGuire, III*
                                                Robert A. McGuire, III