# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CURLING PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' BRIEF REGARDING LAW ENFORCEMENT INVESTIGATIVE PRIVILEGE

# TABLE OF CONTENTS

I.      Background ..................................................................................2

II.     Argument...................................................................................11

    A.   State Defendants fail to establish an ongoing investigation—all
         evidence refutes their unsubstantiated claim ...............................11

    B.   State Defendants have not met their high burden to establish the
         additional requirements to invoke the investigative privilege...................14

    C.   Plaintiffs' (and the public's) strong interest in the discovery
         sought far outweighs any alleged harm to State Defendants......................18

III.    Conclusion.................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Black Voters Matter Fund v. Raffensperger*,
   478 F. Supp. 3d 1278 (N.D. Ga. 2020), *aff'd sub nom. Black Voters
   Matter Fund v. Sec'y of State for Ga.*, 11 F.4th 1227 (11th Cir. 2021) ........ 13, 15

*In re City of N.Y.*,
   607 F.3d 923 (2d Cir. 2010) ................................................................................16

*In re Polypropylene Carpet Antitrust Litig.*,
   181 F.R.D. 680 (N.D. Ga. 1998) ............................................. 11, 14, 19

*JTR Enters., LLC v. An Unknown Quantity of Colombian Emeralds*,
   297 F.R.D. 522 (S.D. Fla. 2013) ................................................. 11, 14

*Navarro v. Applebee's Int'l, Inc.*,
   2010 WL 3745905 (M.D. Ga. Sept. 20, 2010) ............................................. 14, 17

*White v. City of Fort Lauderdale*,
   2009 WL 1298353 (S.D. Fla. May 8, 2009) ........................................................18

**Rules**

Fed. R. Civ. P. 26(b)(5)............................................................................................17

Ga. Comp. R. & Regs. r. 183-1-12-.05(3) .................................................................6

Ga. Comp. R. & Regs. r. 183-1-12-.05(5) ........................................................ 6, 15

State Defendants assert a sweeping law enforcement investigative privilege to withhold *all* information about a reported breach of Coffee County's EMS server and possibly other voting equipment in January 2021. This is improper. They fall far short of their high burden to *prove* up the privilege. The Court should order the discovery sought, to be completed promptly by a specific deadline.

*First*, the privilege turns entirely on State Defendants' *unsubstantiated* claim of an "ongoing investigation" into that breach. But they've provided no evidence of any law enforcement investigation having occurred at all, *much less ongoing*. State Defendants simply ignore Gabriel Sterling's unambiguous statement from April 2022 that whatever investigation was conducted reached its conclusion months ago. And newly-obtained evidence from Coffee County—which State Defendants did not disclose—confirms there has been no investigation. *Second*, they provide *no evidence* required to invoke the investigative privilege, including sworn testimony from the appropriate department head. *Third*, their privilege log is vague and conclusory. *Fourth*, the privilege does not protect the *facts* of what occurred, including the lack of a real investigation. *Fifth*, Plaintiffs' need for the discovery (and the public interest) greatly outweighs the privilege asserted.

All indications are that—much like State Defendants' false claims of a "unique" and "confidential" GEMS database—their "ongoing investigation" claim

1

is a ruse to avoid revealing that this extraordinary breach occurred and that a real investigation has not.[1]  They identified no such investigation in discovery, and reportedly nobody involved has heard from any Georgia investigator.  Further, that State Defendants could identify, per their privilege log, only a *dozen* documents *in total* about the purported investigation confirms it isn't real.  Where are the investigators' emails, interview notes, and other typical law enforcement investigative files? Who are these nameless law enforcement investigators, when exactly did they start their investigation, and why is their investigation purportedly still ongoing (after Mr. Sterling declared it over months ago, no less)?

State Defendants undoubtedly want to avoid admitting they have not taken the reported breach seriously.  But that's no basis to withhold highly relevant information or to force *Plaintiffs* to incur the huge cost and burden of conducting that investigation, as State Defendants argue.  They're required to provide any information they have, including the lack of a meaningful investigation.

## I.    BACKGROUND

Until at least April 2021, the doors to the Coffee County elections office were routinely left unlocked.  (Ex. A at 130-31.)  This included the doors to the building, the Election Supervisor's office, and the EMS server and ICC room.

---

[1] *Compare* Order, Dkt. 463 at 2-3, *with* Order, Dkt. 668 at 1-2.

(*Id.*)  And the password to the EMS server was posted for all to see on the computer monitor in that office.  (*Id.* at 82, 107-08, 151-52; Ex. B at -102 to -103.)

Shortly after the 2020 Presidential election, the former Coffee County Elections Supervisor, Misty Hampton, made a video that went viral on YouTube claiming to show that Dominion's voting equipment could be manipulated.  (Ex. A at 53; Ex. B.)  Visible in the video was the 16-digit EMS server password stuck to the computer monitor.  (Ex. A at 82, 151-52; Ex. B.)  *Four months later*, Ms. Hampton's replacement, James Barnes, arrived on his first day of work to find that same post-it note still stuck to that same monitor.  (Ex. A at 82, 107-08, 151-52.)  Neither State Defendants nor Coffee County had it removed in all that time.  Mr. Barnes was told that the EMS server still used that same password.  (*Id.* at 107-08.)

On or about January 7, 2021, Ms. Hampton reportedly allowed Scott Hall and others associated with the "Stop the Steal" movement[2] and Georgia's "fake electors"[3] into the Coffee County election office.  Ms. Hampton apparently hoped

[2] Emma Brown & Amy Gardner, *Georgia county under scrutiny after claim of post-election breach*, Wash. Post (May 13, 2022), https://www.washingtonpost.com/investigations/2022/05/13/coffee-county-misty-hampton-election/.

[3] Megan Butler, *Fake Georgia GOP electors challenge subpoenas in election probe*, Courthouse News Serv. (July 19, 2022), https://www.courthousenews.com/fake-georgia-gop-electors-challenge-subpoenas-in-election-probe/.

they could show that the 2020 Presidential election "was not done true and correct."[4]  Mr. Hall flew to Coffee County with a five-person team led by Paul Maggio, an executive at the computer forensics company Sullivan Strickler, to scan ballots and image voting equipment.[5]  Mr. Maggio's team spent several hours at the Coffee County elections office.[6]  They reportedly "imaged every hard drive of every piece of equipment" and scanned ballots.[7]  Coffee County and State Defendants claim *no documentation* exists of this alleged breach of the voting equipment.  Mr. Barnes testified that the recordings from the surveillance cameras in the office had been erased when he arrived in April 2021.  (Ex. A at 167, 171.)

In February 2021, Ms. Hampton and her assistant Jil Ridlehoover resigned, allegedly for falsifying timesheets.  (*Id*. at 79-80.)  Mr. Barnes was told that none of Ms. Hampton's emails were preserved.[8]  (*Id*. at 41-42.)  They supposedly were wiped from every device she had access to.  (*Id*. at 46.)  Discovery in this case

---

[4] Brown & Gardner, *supra* note 2.

[5] Jose Pagliery, *Texts Reveal GOP Mission to Breach Voting Machine in Georgia*, Daily Beast (June 5, 2022), https://www.thedailybeast.com/how-a-coffee-county-gop-chair-coordinated-a-voting-machine-breach.

[6] *Id*.

[7] Brown & Gardner, *supra* note 2.

[8] Wesley Vickers, Coffee County manager, was surprised that Charles Dial, a third-party contractor who provided IT services to Coffee County, deactivated Ms. Hampton's account and deleted her emails.  (Ex. A at 48-49.)

revealed that to be incorrect.  Coffee County just this week admitted that, per Plaintiffs' subpoenas, it "has recently been able to recover the items on Misty Hampton's Coffee County issued phone" and aims to produce those to the parties. No investigation (if any) had recovered those items before Plaintiffs' subpoenas.

Upon taking over as Coffee County Elections Supervisor on April 1, 2021, Mr. Barnes discovered a business card from Doug Logan of Cyber Ninjas at the base of Ms. Hampton's former computer.  (*Id*. at 157, 160; Ex. C.)

In late April 2021, Mr. Barnes discovered that the EMS server password did not work.  (Ex. A at 106.)  He thought this might be a security concern so he called Priteck Patel in the Secretary of State's Center for Elections ("CES"), who told Mr. Barnes that he would come look at the EMS server the following week.  (*Id*. at 106-09.)  About a week later, Mr. Patel and someone named Chris arrived from CES (Mr. Barnes could not recall Chris's last name).  (*Id*. at 109-10, 112.)  They tried the EMS server password written on the post-it, but it no longer worked.  (*Id*. at 109-10, 145.)  Mr. Patel and Chris were surprised the password did not work because only the *state* can change EMS server passwords.  (*Id*. at 65, 110.)  County employees cannot.  (*Id*.)  That same day CES replaced the EMS server with one Mr. Patel had brought with him.  (*Id*. at 110-13.)  Even though the ICC worked fine, CES also replaced it.  (*Id*. at 111-13.)  The equipment was replaced out of a

5

concern they might have been "compromised." (*Id*. at 147-48.)  Mr. Barnes never

heard from CES or anyone at the state again about this issue.  (*Id*. at 115, 122-23.)

Reportedly, *no documentation* exists for any of these critical, highly unusual

events, including Mr. Barnes' report to CES that the EMS server no longer

worked, the CES visit to Coffee County, its seizure of that EMS server and the

ICC, or the concern that both may have been "compromised" through improper

access.  (*Id*. at 118-21, 131-32, 134-36.)  Mr. Barnes did not notify the Secretary of

State in advance of replacing the EMS server and ICC in writing of the reason for

the relocation of that equipment and installation of the new equipment, as Ga.

Comp. R. & Regs. r. 183-1-12-.05(3) requires.  No log exists of CES entering the

EMS server room to replace the EMS server and ICC, as Rule 183-1-12-.05(5)

requires.  The Secretary did not provide written authorization for the relocation, as

Rule 183-1-12-.05(3) requires.  And somehow *no* emails, text messages, other

written communications, or phone logs exist regarding these unusual events.[9]

In May 2021, around the same time the EMS server and ICC were replaced,

Mr. Barnes received an email from Dominion warning about third-party actors

---

[9] Mr. Barnes' recollection that CES replaced the EMS server and ICC in late April
or perhaps early May 2021 conflicts with State Defendants' claim that it occurred
on June 8, 2021—for which they provide no evidence except a standard hash test
report for some EMS server.  (Dkt. 1377-4 at 3-4.)

trying to get access to EMS servers, and it mentioned Cyber Ninjas.  (Ex. A at 158.)  Mr. Barnes remembered the Cyber Ninjas' business card and, concerned that the Coffee County voting equipment might have been "compromised" (*id*. at 160-62), he emailed a copy of the card to Chris Harvey, Georgia's former statewide Elections Director (*id*. at 159).  Mr. Harvey told Mr. Barnes to check whether Cyber Ninjas contacted anyone in the Coffee County elections office and whether Cyber Ninjas accessed any Coffee County elections equipment.  (*Id*. at 163-64.) Mr. Harvey indicated he would follow-up with Mr. Barnes.  (*Id*. at 164.)  Mr. Harvey also contacted Frances Watson, the then-head of the Secretary's investigations unit, who directed one of her investigators to contact Coffee County officials about the situation involving Cyber Ninjas.[10]  (Ex. C.)

But Mr. Barnes never heard again from anyone at the state about Cyber Ninjas.  (Ex. A at 164-69.)  No one from the state contacted Mr. Barnes's assistant or the Coffee County Board of Elections (*id*. at 166), and no one came to Coffee County to look at the voting equipment or elections office to assess improper access or otherwise (*id*. at 165-66).  Mr. Barnes reportedly—and inexplicably— never followed up with Mr. Harvey or anyone else at the state about his concerns.

---

[10] Brown & Gardner, *supra* note 2.

Despite Mr. Harvey's and Mr. Barnes's concerns of improper access to voting equipment in Coffee County, the county continued to use the reportedly-breached server and ICC until CES seized them. (*Id*. at 168.)  And Coffee County has continued to use all the other voting equipment that also may have been breached, including BMDs, printers, scanners, computers, and removable media. Mr. Barnes reported that the flash drives he used with the EMS server are from a box he found in the Coffee County elections office containing some 30-40 flash drives. (*Id*. at 194-95.)  He *assumed* the state provided those because they looked to be blank and they looked like the ones provided by the state—but he did not confirm this; and nobody has tested them for any sort of compromise. (*Id*. at 195.)

On April 7, 2022, State Defendants' counsel represented that the "Secretary of State opened an investigation" into the Coffee County breach (Dkt. 1374 at 21) promptly after the February 24, 2022 deposition of Gabriel Sterling, the Secretary of State's Chief Operating Officer (Dkt. 1370-5 at 21:9-22).  This was a stunning claim given State Defendants also claim that that specific investigation is part of a broader investigation[11] into improper activities involving Ms. Hampton and the

---

[11] The SEB referred that investigation to the Attorney General—not the Secretary of State—in December 2021.  (Dkt. 1397-1 at 171-72.)  The Secretary now claims that case was somehow referred to his office in 2022 (Dkt. 1397 at 3), but he offers no evidence of this, which would require SEB approval and *some documentation*.

Coffee County elections office that was opened in *December 2020*: State Election Board ("SEB") Case No. 2020-250.  (Dkt. 1427 at 5; Dkt. 1397 at 2.)  Thus, State Defendants remarkably claim that that broader investigation somehow did not turn up—after more than a year—*any indication* that anyone possibly improperly accessed Coffee County's elections office and voting equipment.

State Defendants' counsel's claims of an "ongoing investigation" into the Coffee County breach not only lack *any supporting evidence* of any kind, they directly contradict Mr. Sterling's statements in his deposition (Dkt. 1370-5 at 21:9-22) and publicly in April of 2022 that the Coffee County investigation had reached its conclusion, which was—unequivocally—that the breach "didn't happen."[12]

In May 2022, Ms. Hampton reported that no investigators had contacted her about Mr. Hall's claims regarding breaching Coffee County's voting equipment.[13] Her counsel just recently reiterated this.

In June of 2022, Mr. Benjamin Cotton of CyFIR testified that he had forensically examined Coffee County's and Fulton County's elections systems (Ex. D ¶¶ 9, 17(b).)  Mr. Cotton reiterated this on July 22, 2022.  (Ex. E at 37.)

---

[12] The Carter Center, *Restoring Confidence in American Elections*, YouTube (Apr. 29, 2022, uploaded May 9, 2022), https://youtu.be/PbB_c_PX8D8%20at%20approximately%2035:30, at 35:30

[13] Brown & Gardner, *supra* note 2.

Despite receiving many requests over a period of years for the discovery at issue, (Ex. F), State Defendants have not produced a single document about the Coffee County breach or their alleged, yearlong investigation into the incident.

Despite claiming for months that State Defendants have an *ongoing* investigation into the reported Coffee County breach since at least February of this year, a July 20, 2022 email from the Secretary of State's in-house lawyer, Ryan Germany, indicates otherwise.[14]  (Ex. G at 2-3.)  *Just two days* before defending their investigative privilege claim, Mr. Germany emailed Anthony Rowell, a lawyer at a firm representing Coffee County, stating:  "We would like to come down there and **conduct some interviews** to see if we can **get a handle on what happened** if anything.  I would like to [*sic*] people other than Misty Hampton **at the outset**…." (*Id*.)  Thus, just last week the Secretary's in-house lawyer—*not an investigator with the investigative unit*—suddenly sought to speak with witnesses about "what happened" with the reported *January 2021* Coffee County breach and confirmed the inquiry is "at the outset," not a months-long, ongoing investigation.

Just days later, on July 25, 2022, State Defendants' litigation counsel again represented in a meet-and-confer that the investigation into improper access to

---

[14] Plaintiffs obtained the email just this week through an Open Records Request to Coffee County—State Defendants have not produced it in discovery.

Coffee County voting equipment began in the summer of 2021 with the
replacement of the EMS server and ICC and expanded to include Mr. Hall's
allegations in February 2022.  Mr. Germany's email indicates otherwise.

## II.   ARGUMENT

The "***law enforcement*** investigative privilege is a judicially created
privilege," *In re Polypropylene Carpet Antitrust Litig.*, 181 F.R.D. 680, 687 (N.D.
Ga. 1998) (emphasis added), that protects certain *investigatory* files from *public*
disclosure.  *Id*. at 686-87.  It is "based primarily on the harm to law enforcement
efforts which might arise from public disclosure of … investigatory files"; and it's
qualified, not absolute.  *Id*. at 688.  Importantly, the investigative privilege applies
only to ***ongoing*** investigations.  *JTR Enters., LLC v. An Unknown Quantity of
Colombian Emeralds*, 297 F.R.D. 522, 529 (S.D. Fla. 2013) (rejecting application
of privilege where claimant had "not provided an affidavit or any supporting
documentation to confirm that there is, in fact, an ongoing criminal investigation").

### A.   State Defendants fail to establish an ongoing investigation—all evidence refutes their unsubstantiated claim

State Defendants' privilege claim fails at the start:  there is *no evidence* of
any *ongoing law enforcement investigation*.  Literally, none.  And the only state
official to comment on the reported Coffee County breach stated in April 2022 that

whatever investigation occurred reached its conclusion *months ago*.[15]  That came

from the Secretary's Chief Operating Officer and eviscerates the privilege claim.[16]

Mr. Germany's July 20, 2022 email further belies the claims of an "ongoing

investigation."  (Ex. G.)  He wrote to Coffee County's counsel:  "We would like to

come down there and conduct some interviews to see if we can get a handle on

what happened if anything.  I would like to [*sic*] people other than Misty Hampton

at the outset…."  (*Id*.)  This too disposes of their privilege claim.

*First*, it shows there's been no real investigation (if any at all).  Otherwise,

Mr. German could simply speak with the state investigators about what they have

learned in the purported yearlong investigation.  Further, the Secretary's *lawyer*—

not investigators responsible for investigating an election security breach—sent the

email.  And he sent it *not* to Coffee County elections officials but to a lawyer for

the County.  Thus, this is intended at best for the purposes of this litigation—not a

law enforcement investigation—to gain a preview of subpoenaed witnesses'

deposition testimony.  In fact, State Defendants claim work product protection on

their privilege log with reference to *this litigation*.  Alternatively, the email is an

---

[15] The Carter Center, *supra* note 12.

[16] State Defendants do not even address Mr. Sterling's statement, much less try to explain the contradiction with their representations to this Court—nor could they.

effort to gin up an "ongoing investigation" to support the ruse needed for the investigative privilege claim.[17]  Regardless of what Mr. Germany intended, his email does not evidence an *ongoing **law enforcement** investigation* by the SEB or the Secretary's investigative unit—indeed, it confirms the opposite.

*Third*, the email is not a follow-up in the midst of an *ongoing* investigation. Rather, the email explicitly is "at the outset" of the Secretary's inquiry.

*Fourth*, it directly contradicts Mr. Sterling's April 2022 public claim that the investigation into "what happened" in Coffee County was finished and found that the breach "didn't happen."  Mr. Germany states that the Secretary's Office wants to "get a handle on what happened if anything."  Thus, the Secretary's Office in fact has reached *no* finding (consistent with there being *no* investigation).

In short, State Defendants fail to meet their high burden to prove an *ongoing law enforcement investigation* into the subject of the discovery sought.  The only evidence available directly refutes their claims.[18]  Thus, the Court should reject the

---

[17] The email also may be an effort to shield communications between State Defendants and subpoenaed witnesses from discovery, including in depositions, by claiming they are subject to the investigative privilege.  That would be improper.

[18] State Defendants should be barred from offering any new allegations or evidence for the first time on reply.  *Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1304 n.15 (N.D. Ga. 2020), *aff'd sub nom. Black Voters Matter Fund v. Sec'y of State for Ga.*, 11 F.4th 1227 (11th Cir. 2021) ("[T]he Court will not consider new arguments raised for the first time in a Reply brief").

privilege here and order disclosure of all relevant documents and information, including deposition testimony. *See JTR Enters., LLC*, 297 F.R.D. at 529.

**B.     State Defendants have not met their high burden to establish the additional requirements to invoke the investigative privilege**

For the law enforcement investigative privilege to apply, its proponent must meet three specific requirements: (i) the head of the department having control over the documents must raise a formal claim of privilege; (ii) the department head must assert the privilege based on his or her actual personal review and consideration of the documents; and (iii) and the claimant must make a detailed specification of the information for which the privilege is claimed, with an explanation why this particular information properly falls within the scope of the privilege. *Polypropylene Carpet*, 181 F.R.D. at 687; *see also Navarro v. Applebee's Int'l, Inc.*, 2010 WL 3745905, at *2 (M.D. Ga. Sept. 20, 2010) ("To maintain a claim of privilege, the head of the department that has control over the requested information must formally raise a claim of privilege. This request must be accompanied by a detailed specification of the information for which the privilege is claimed and an explanation why it properly falls within the scope of the privilege."). To determine if these requirements are met, courts look to testimony from the relevant department head. *Polypropylene Carpet*, 181 F.R.D. at 687-88 (analyzing three affidavits and declarations setting forth details

14

pertaining to criminal antitrust violations and explaining why the privilege

applies).  State Defendants have not even tried to meet these three requirements.[19]

The SEB has the authority to investigate—or authorize the Secretary of State

to do so—the reported Coffee County breach and related circumstances (*e.g.*, the

EMS server password change).  Ga. Comp. R. & Regs. r. 183-1-12-.05(5).[20]  The

SEB Chair must invoke the investigative privilege unless the SEB authorized the

Secretary of State to conduct this particular investigation.  There is no evidence

that the SEB authorized the Secretary of State to conduct the Coffee County server

breach investigation as part of SEB Case No. 2020-250 *or otherwise*.  Neither is

there any evidence that the SEB Chair invoked the investigative privilege asserted

here (or that he is even aware of the invocation) or that he authorized the Secretary

[19] State Defendants should be barred from offering this evidence for the first time
on reply.  *Black Voters Matter Fund*, 478 F. Supp. 3d at 1304 n.15.
[20] It shall be the duty of the State Election Board:

> (5) To investigate, or authorize the Secretary of State to investigate, when
> necessary or advisable the administration of primary and election laws and
> frauds and irregularities in primaries and elections and to report violations of
> the primary and election laws either to the Attorney General or the
> appropriate district attorney who shall be responsible for further
> investigation and prosecution. Nothing in this paragraph shall be so
> construed as to require any complaining party to request an investigation by
> the board before such party might proceed to seek any other remedy
> available to that party under this chapter or any other provision of law.

Ga. Comp. R. & Regs. r. 183-1-12-.05(5).

of State to do so.  And even if the Secretary of State had the requisite authorization from the SEB, there is no evidence that he *personally* has invoked the investigative privilege here either.  Only State Defendants' *litigation lawyers* have claimed the privilege.  And they did so well after Mr. Sterling stated whatever investigation occurred was done.

The second criterion requires the department head to assert the privilege based on their personal consideration of the documents.  There is no evidence that the SEB Chair or the Secretary of State has personally considered *any* (much less all) of the withheld documents and other information, or that *they personally* decided to withhold all that because *each* is of the type that the privilege is intended to protect.  *See In re City of N.Y.*, 607 F.3d 923, 944 (2d Cir. 2010).  There is *no testimony* from the SEB Chair or Secretary, or anyone else.

The third criterion requires that the claimant make a detailed specification of the information for which the privilege is claimed, with an explanation for why this information properly falls within the scope of the privilege.  State Defendants provide no such evidence from anyone, much less the SEB Chair or Secretary of State.  Their *lawyers* simply make a sweeping claim that *all documents and other information any way related to* the reported Coffee County breach are privileged— including *all facts*—without specifically describing the expansive scope of detailed

16

documents and information they're withholding.  And they never explain how all those documents and information specifically fall within the narrow privilege.

State Defendants' so-called "privilege log" highlights the obvious impropriety of their privilege claim.  Tellingly, they did not even include the log with their filing, contrary to this Court's directive.  (Dkt. 1424 at 18-19.)  It offers no details about the documents and does not explain how each falls within the scope of the privilege.  The descriptions are vague, generic, and conclusory.  The log lacks the information required by Rule 26(b)(5) to assess the privilege claim, including the names and roles of authors, senders, and recipients as well as creation, sent, and received dates.  The privilege log does not reflect a single **investigator**, lawyer, or state official of any kind.  There is no indication whether anyone outside the scope of the asserted privilege received, authored, or sent the document.  State Defendants' counsel simply expects Plaintiffs and this Court to *blindly accept* that each of the documents is actually privileged.  But State Defendants have a specific history of inaccurate claims in this case that renders that approach especially unreliable and improper here.  (Dkt. 1367 at 33-34 n.19.)

The Court should reject the asserted privilege and order immediate disclosure of the requested discovery.  *See Navarro*, 2010 WL 3745905, at *2 ("[T]he State of Georgia has not complied with the requirements for raising this

17

privilege.  Therefore, the law enforcement investigatory privilege does not prevent the Plaintiffs from receiving the requested documents.").

### C.   Plaintiffs' (and the public's) strong interest in the discovery sought far outweighs any alleged harm to State Defendants

The Court need not consider the balancing test here because State Defendants fail to even get that far.  *See White v. City of Fort Lauderdale*, 2009 WL 1298353, at *4 (S.D. Fla. May 8, 2009) (holding that, where defendants had not satisfied their initial burden of showing the investigative privilege applied, the court need not "reach the balancing test typically applied" in "investigation privilege cases.").  But State Defendants fail that test too.

Only after the privilege's proponent establishes that the qualified investigative privilege applies does the court apply a 10-factor balancing test weighing a party's need for the information against the government's ***need*** to withhold the documents.[21]  Tellingly, State Defendants do not even attempt to

---

[21] The ten factors are:  "(1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8)

satisfy these factors—nor could they.  They should not be permitted to address these factors for the first time on reply.  They waived any right to do so.

*First*, there is no basis for this Court to conclude that the discovery sought will thwart governmental processes by discouraging citizens from giving the government information.  State Defendants provide no evidence of seeking any information from witnesses for well over a year.  And to the extent Mr. Germany's July 20, 2022 email could be construed as finally doing that, there is no evidence that anyone he has asked to interview is refusing to do so, *much less as a result of Plaintiffs seeking discovery from State Defendants*.  Nor would that make any sense given those same witnesses are going to produce documents and be deposed.

*Second*, there is no asserted impact upon persons who have given information of having their identities disclosed—nor could there be.  There's no evidence *anyone* has given State Defendants *any* information as part of *any law enforcement investigation*.  And State Defendants themselves emphasize that identities of witnesses are already known to Plaintiffs.  (Dkt. 1427 at 5 ("Plaintiffs have subpoenaed nearly a dozen individuals from whom they can obtain the

_____

whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff's case." *Polypropylene Carpet*, 181 F.R.D. at 688.

discovery they seek" in addition to open records requests to Coffee County).)

*Third*, State Defendants do not—and could not—claim any chilling effect on "governmental self-evaluation and consequent program improvement" from disclosure. This factor is wholly inapplicable here.

*Fourth*, the information Plaintiffs seek is *factual*. The investigative privilege is not a wholesale shield that protects *all facts* from disclosure as State Defendants contend. For example, documents and testimony about who improperly accessed the Coffee County EMS server and any other voting equipment or data, when and how they did so, who was present for it, who all has received any files or other data taken, what all was done with the equipment or data at the time of the access and afterward, and what the implications of those actions are for the security and reliability of that equipment and Georgia's interconnected voting system more broadly are *facts*, not investigatory techniques or processes that could possibly be protected from disclosure by the investigative privilege (if it applied here—*it doesn't*). And *some* facts regarding the Coffee County breach are already publicly known.[22] This includes what look to be Coffee County Cast Vote Records and JSON files available on the internet dated around the same time as the reported

_____

[22] Brown & Gardner, *supra* note 2; Butler, *supra* note 3; Pagliery, *supra* note 5.

January 7, 2021 breach.  (Ex. H.)  *Many* more facts remain uncovered.  ***This includes data on the Coffee County ICC that CES seized and that Mr. Barnes testified functioned fine, including the password***.  (Ex. A at 111-13.)  State Defendants have no basis for withholding the *ICC data*, including log files bearing on the reported breach (e.g., showing ballot scans on or about January 7, 2021.)

*Fifth*, no Plaintiff here "is an actual or potential defendant in any actual criminal proceeding either pending or reasonably likely to follow from the incident in question."  This factor is wholly inapplicable here.

*Sixth*, "whether the police investigation has been completed" was addressed above.  There is no evidence that any ***police investigation*** ever actually occurred, and to the extent it did, Mr. Sterling reported it ended months ago.  And Mr. Germany's July 20, 2022 email indicates it never occurred at all.

*Seventh*, there is no evidence or allegation that "any interdepartmental disciplinary proceedings have arisen or may arise from the investigation."  This factor is wholly inapplicable here.

*Eighth*, this Court already has found that this "suit is non-frivolous and brought in good faith."  (Dkt. 309 at 38-39; 375 at 1-2; 579 at 7, 130-31; 964 at 84.)  The Eleventh Circuit did too.  (Dkt. 338 at 8-10.)

*Ninth*, the information sought is *not* available through other discovery or

from other sources, as State Defendants wrongly claim.  One witness already

refused to produce any documents or to be deposed, instead asserting the Fifth

Amendment protection.  (Dkt. 1411 at 7-9.)  At least one other key witness has

indicated they may assert the Fifth Amendment at their deposition *because of State*

*Defendants' baseless claim of an ongoing investigation*.  Only one witness has

produced any documents, and it was a very small production of documents largely

if not entirely already available.  Another key witness has asked to be paid an

expert fee of hundreds of dollars an hour to produce documents and be deposed on

the *facts* of what occurred.  Mr. Hall has successfully evaded subpoena service for

months at considerable expense to Plaintiffs.[23]  In short, if State Defendants really

---

[23] State Defendants' argument that Plaintiffs cannot show a need for the discovery
sought because *just one of the Plaintiffs* had the recording of the call with Mr. Hall
since March 2021 fails.  First, that has no bearing on whether State Defendants met
their burden to prove up the investigative privilege.  Second, there should be no
prejudice to State Defendants since they supposedly had been investigating
improper access to Coffee County's voting system for nearly a year when they
learned of that call—so the events described in the call should have come as no
surprise to them.  Third, even *if* there were an undue delay in disclosing the call,
that should not prejudice the rights of the *other Plaintiffs* here to pursue this critical
discovery.  Lastly, State Defendants' hands are far from clean here.  They
deliberately avoided disclosing the claimed investigation and related allegations in
response to every discovery request that called for that information, including
targeted interrogatories and deposition questions.  In essence, their complaint is
that Plaintiffs stumbled upon this damning information by the sheer luck of Mr.
Hall's call while State Defendants sought to keep that information from Plaintiffs.

have conducted the thorough yearlong investigation they claim and have gathered

facts about what happened, disclosing those facts may substantially narrow the

scope of third-party discovery needed—which gets to the last point:  the

investigation State Defendants conducted, if any, and whatever else they've done

in response to concerns about a serious breach of the voting system in Coffee

County *is information only State Defendants can provide*.  If they did little or

nothing, as all indications are, that would be highly relevant information for the

merits of Plaintiffs' claims and Defendants' defenses.  They do not get to hide that.

 *Tenth*, the importance of the information to Plaintiffs' case is indisputable.

State Defendants' only response to the numerous, *undisputed*, critical deficiencies

with Georgia's voting system, per Dr. Halderman's July 1, 2021 report and CISA's

June 3, 2022 advisory, is that nobody could obtain access to that system to exploit

those vulnerabilities.  This claim is wholly unsubstantiated—and it's refuted by the

Coffee County breach, including replacing the EMS server and ICC, if the breach

happened.  This undoubtedly is why State Defendants withheld any mention of it

throughout discovery in this case, why they stuck their heads in the sand about it

for over a year, and why they now refuse to provide any information at all about it.

 Further—and very importantly—*replacing the EMS server and ICC cannot

possibly remediate the reported breach*.  There might be other voting equipment

still in use in Coffee County that also was breached.  Also, any compromise might have affected additional components of Georgia's broader voting system across the state.  But even if that hasn't happened, the fact that individuals and organizations have had the Dominion software for *over a year and a half to discern the sort of serious deficiencies Dr. Halderman and CISA identified with it* means they—and possibly others—*now may have the means to exploit one or more of those vulnerabilities in **future elections** in Georgia and elsewhere*.  This includes a voter with a USB stick uploading vote-stealing malware to a BMD or associated printer in a matter of minutes in a voting booth, just as Dr. Halderman developed and successfully tested.  The discovery sought is genuinely critical here.

Further, even if some of the discovery sought were truly extremely sensitive, the Court's Protective Order would provide sufficient protections for that very limited information.  (Dkt. 477.)  But no such sensitivity has been shown.

Finally, State Defendants' claim that Plaintiffs object to all *electronic* voting systems is absurd and a distraction.  (Dkt. 1427 at 4-5.)  Plaintiffs and their experts have identified an *electronic* voting system as the gold standard:  using *electronic* scanners to tabulate hand-marked paper ballots and using *electronic* BMDs for those who need them, managed and controlled by reliable and secure EMS servers, computers, online voter registration databases, and electronic PollPads with paper

24

backups.  As Plaintiffs have made clear, the only thing they seek to *eliminate* from *Georgia's* current voting system are the *BMDs* (and the associated printers that then would be unnecessary) except for the very few voters who need them— *because they can't be reasonably secured in Georgia* (and especially not "perfectly secured" as State Defendants theorize).  (*Id.*)  The reported Coffee County breach—plus State Defendants' abject failure to address it—highlights why BMDs in **Georgia's** *woefully-unsecured voting system* violate the constitution.  State Defendants' attempt to paint Plaintiffs as some sort of radical Luddites fails.  It ignores that their own election cybersecurity experts *both* advised against Georgia's current voting system, with Dr. Wenke Lee objecting to BMDs entirely just as Plaintiffs do and Dr. Michael Shamos objecting to the use of barcodes. (Dkt. 313-1; Dkt. 615-3 at 2; Dkt. 554 at 57:13-21.)

## III.   CONCLUSION

State Defendants respond here just as with Logan Lamb's findings, Fortalice's failed penetration testing, and the public availability of their GEMS database:  obstruction and misrepresentations.  They've not responded with *any evidence* required to prove up their law enforcement privilege claim, which is belied by Mr. Sterling's April 2022 statements and Mr. Germany's July 20, 2022 email.  The Court should reject the privilege claim and order the discovery.

Respectfully submitted this 28th day of July, 2022.

| | |
|---|---|
| _/s/ David D. Cross_ | _/s/ Halsey G. Knapp, Jr._ |
| David D. Cross (*pro hac vice*) | Halsey G. Knapp, Jr. |
| Mary G. Kaiser (*pro hac vice*) | GA Bar No. 425320 |
| Veronica Ascarrunz (*pro hac vice*) | Adam M. Sparks |
| MORRISON & FOERSTER LLP | GA Bar No. 341578 |
| 2100 L Street, NW, Suite 900 | KREVOLIN & HORST, LLC |
| Washington, DC 20037 | 1201 West Peachtree Street, NW |
| (202) 887-1500 | Suite 3250 |
| | Atlanta, GA 30309 |
| | (404) 888-9700 |

*Counsel for Plaintiffs Donna Curling, Donna Price & Jeffrey Schoenberg*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

 */s/ David D. Cross*
David D. Cross

27

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 28, 2022, a copy of the foregoing **CURLING PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' BRIEF REGARDING LAW ENFORCEMENT INVESTIGATIVE PRIVILEGE** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

 */s/ David D. Cross*
David D. Cross

28

## APPENDIX A

| 2020 | |
|---|---|
| December 2020 | Former Coffee County Elections Supervisor, Misty Hampton, posted a video on YouTube claiming to show that Dominion's voting equipment could be manipulated. Coffee County's EMS server password was visible in the video. |
| **2021** | |
| On or about January 7, 2021 | Misty Hampton reportedly allowed people into the Coffee County election office to scan ballots and image voting equipment. |
| February 25, 2021 | Misty Hampton and her assistant Jil Riddlehoover resigned. |
| At least until April 2021 | Coffee County elections office doors, including the door into the election supervisor's office and the door into the EMS server room, were routinely left unlocked. |
| April 1, 2021 | James Barnes, Misty Hampton's replacement, began work. The EMS server password was still visibly posted. |
| | James Barnes discovered a business card for Cyber Ninjas. |
| | James Barnes was told that none of Misty Hampton's emails were preserved. |
| Late April of 2021 | James Barnes discovered that the EMS server password did not work and called the Secretary of State's Center for Elections (CES). |

|  | About a week later, CES visited Coffee County. They tried the EMS server password; it didn't work. That same day CES replaced the EMS server and ICC. |
|---|---|
| May 2021 | James Barnes received an email from Dominion warning about third-party actors trying to get access to EMS servers, and it mentioned Cyber Ninjas. |
| May 7, 2021 | James Barnes emailed a copy of the Cyber Ninjas's card to Chris Harvey, Georgia's former statewide Elections Director. |
| May 11, 2021 | Chris Harvey told James Barnes to check whether Cyber Ninjas contacted anyone in the Coffee County elections office or accessed any elections equipment. |
| May 11, 2021 | Chris Harvey told Frances Watson, the head of the Secretary's investigations division, to contact Coffee County officials about the situation involving Cyber Ninjas. |
|  | James Barnes never heard anything further about the EMS/ICC replacement or the investigation Chris Harvey requested regarding Cyber Ninjas. |
| **2022** | |
| February 24, 2022 | Recording of Scott Hall telephone call played at the deposition of Gabriel Sterling, Chief Operating Officer for the Secretary of State's office. |
| April 1, 2022 | State Defendants' counsel represented that the Secretary of State began investigating the Coffee County breach in February of 2022. |
| April 29, 2022 | Gabriel Sterling stated publicly that the Coffee County investigation had concluded and that the breach "didn't happen." |

| | |
|---|---|
| June 8, 2022 | Benjamin Cotton of CyFIR declared that he had forensically examined Coffee County's and Fulton County's election systems. |
| July 20, 2022 | The Secretary of State's in-house lawyer stated that the Secretary of State's office wanted to conduct interviews to "*get a handle on what happened* if anything [in Coffee County].  I would like to [*sic*] people other than Misty Hampton *at the outset*…." |
| July 25, 2022 | State Defendants' litigation counsel represented in a meet-and-confer that the investigation into improper access to Coffee County voting equipment began in the summer of 2021. |