# EXHIBIT E

2:22-cv-00677-JJT, July 21, 2022

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| **Kari Lake, et al.,** | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) 2:22-cv-00677-JJT |
| | ) |
| **Katie Hobbs, named as Kathleen Hobbs, as Secretary of State, et al.,** | ) |
| | ) |
| | ) Phoenix, Arizona |
| Defendants. | ) July 21, 2022 |
| _____ | ) 9:06 a.m. |

**BEFORE:   THE HONORABLE JOHN J. TUCHI, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

Official Court Reporter:
**Elaine Cropper, RDR, CRR, CCP**
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

United States District Court

BENJAMIN R. COTTON - Direct

1    in fact, even when they are protected and watched.                    09:49:45

2              So with all of that, we would like to call our first

3    witness, Mr. Ben Cotton.

4              THE COURT:  Mr. Cotton, if you would please step up

5    to my courtroom deputy, she will swear you in.                        09:50:04

6              COURTROOM DEPUTY:  Please state your name and spell

7    your last name for the record.

8              THE WITNESS:  Benjamin Richard Cotton.  C-O-T-T-O-N.

9              (BENJAMIN R. COTTON, a witness herein, was duly sworn

10   or affirmed.)                                                         09:50:17

11             THE COURT:  And Mr. Cotton, you may take your mask

12   off or leave it on as you see fit.

13             And also the same for you, Mr. Parker.

14                         **DIRECT EXAMINATION**

15   BY MR. PARKER:                                                        09:50:48

16   Q.   Mr. Cotton, state your full name for the record, please.

17   A.   My name is Benjamin Richard Cotton.  C-O-T-T-O-N.

18   Q.   And describe, please, for the Court your relevant

19   experience in the area of cybersecurity?

20   A.   I have over 25 years of experience performing computer          09:51:08

21   forensics, e-discovery, and instant response within both the

22   public and the private sectors.  I have also served 13 years as

23   an instructor for guidance softwares EnCase and EnCase

24   Enterprise platform.

25   Q.   Describe some of the work that you have done as it relates       09:51:34

BENJAMIN R. COTTON - Direct

| | | |
|---|---|---|
| 1 | to cybersecurity in terms of your experience. | 09:51:36 |
| 2 | A.   I am currently Vice President for Incident Response for | |
| 3 | eSentire.  And I routinely perform incident responses, computer | |
| 4 | forensics engagements, cybersecurity assessments for both | |
| 5 | public and private sector entities. | 09:51:52 |
| 6 |       My most notable experience was, I was the one, with | |
| 7 | my software that I developed, that discovered the Office of | |
| 8 | Personnel Management Breach by the nation state actor, China. | |
| 9 | Q.   And how did that occur? | |
| 10 | A.   We were actually there on a demo of the software.  We were | 09:52:13 |
| 11 | permitted to install inside of the servers and push some agents | |
| 12 | out and it just so happened they pushed that agent out to a SQL | |
| 13 | server that was infected with the agent and we discovered it in | |
| 14 | about an hour. | |
| 15 | Q.   And what occurred after you discovered it? | 09:52:33 |
| 16 | A.   Well, you know, it's kind of one of those things, did they | |
| 17 | put this here to test me?  Okay.  So I looked at it.  I did a | |
| 18 | little bit deeper analysis on it, confirmed that it was | |
| 19 | malware, and I interacted with the IT staff there to ask them a | |
| 20 | couple of questions.  The first one was:  Do you use McAfee | 09:52:56 |
| 21 | software?  Because the malware was disguised as McAfee | |
| 22 | executables. | |
| 23 |       They said they did not, that they used Symantec. | |
| 24 |       And I told them they had a problem, imaged the | |
| 25 | memory, turned that over to them and went into the incident | 09:53:15 |

United States District Court

BENJAMIN R. COTTON - Direct

1   response mode.                                                          09:53:17

2   Q.   Have you testified as an expert before?

3   A.   I have.

4   Q.   And can you describe how many times and --

5   A.   Approximately seven times.  They are fully detailed in my          09:53:29

6   CV.  That includes very large-scale testimony such as I was on

7   the Lockheed Martin side of the *Lockheed Martin v.*

8   *L-3 Communications* for the ATRRS contract.  I was on the Banco

9   Progreso side of the *Banco Progreso v. Pedro Castillo* which at

10  this time was the largest individual bank fraud in the history         09:53:56

11  of the IMF.

12  Q.   In those cases, were you doing computer forensic work?

13  A.   Computer forensic work primarily with cybersecurity as an

14  underlying tenet on all cases.

15  Q.   Have you worked for the United States Government in the            09:54:12

16  area of cybersecurity?

17  A.   I have.  I am a contractor for the DHS Hunting and

18  Incident Response Team as well as I did deep dive forensics on

19  high-value terrorist targets for the Intel at a three-letter

20  Intel agency, and I've also performed forensics analysis work          09:54:35

21  for the Drug Enforcement Agency with their national laboratory

22  in Norton, Virginia.

23  Q.   Do you have a security clearance?

24  A.   I do.

25  Q.   What is that?                                                      09:54:52

BENJAMIN R. COTTON - Direct

1    A.   It's a top secret with special compartmented information          09:54:52

2    in a full lifestyle poly.

3    Q.   Are you familiar with the electronic voting machine

4    computerized systems that Maricopa County uses?

5    A.   Yes.                                                              09:55:10

6    Q.   And how did you become familiar with that?

7    A.   I was engaged to do the forensics analysis and the

8    forensics preservation of the systems provided by Maricopa

9    County in response to the Arizona State Senate audit.

10   Q.   And do you understand they are going to be using that            09:55:27

11   system again in 2022?

12   A.   That is my understanding from the statements, yes.

13   Q.   You have submitted a declaration in this case; correct?

14   A.   I have.

15   Q.   And do you stand by the accuracy of all of the statements        09:55:42

16   made in that declaration?

17   A.   I do.

18   Q.   Describe in general the components that you would look at

19   or you did look at as it related to the 2020 election in

20   Maricopa County?                                                      09:56:02

21   A.   So we looked at what was provided in response to the

22   subpoena and that included the EMS server, the election

23   management server.  That included the EMS clients which are

24   computers that remotely access the server.  It also included

25   the ICC systems that controlled the scanners for the Canon           09:56:24

BENJAMIN R. COTTON - Direct

1   devices.  We looked at the HiPro scanners, there were four of          09:56:31
2   those.  We looked also at the adjudication systems and we were
3   provided with the ICPs, the ballot tabulators.  However, we
4   were not provided with the proper authentication keys to get
5   into the technician or the administrative functions of the          09:56:54
6   ballot tabulators so we were not able to analyze its
7   configuration or perform forensics image of those systems.

8           We also had access to all of the SD cards that went
9   into each tabulator.  Now, for every device that you produced
10  to us, we followed the Federal Rules of Evidence handling          09:57:19
11  procedures.  We created forensics images of those with the
12  EnCase and the Forensics Toolkit software.

13          So we did preserve a forensics image of all of those
14  systems that we have and those were used as the basis for the
15  analysis.                                                            09:57:35
16  Q.    In terms of the components that you were not provided
17  authentication in order to get in and analyze, did you ask to
18  be provided with that information?  Did you indicate that it
19  was important to your review?
20  A.    We did and we did that on multiple occasions.  What          09:57:53
21  ultimately came back both, in public and private statements by
22  the County, was that the county did not actually control those
23  authentications, those eye button tokens, that would permit to
24  us get access to the technician or the administrative functions
25  of the system.  The only people who had access and control of          09:58:12

United States District Court

BENJAMIN R. COTTON - Direct

1    those were the Dominion employees who were on site at the          09:58:19

2    County.

3              Furthermore, the County indicated that they could not

4    compel the Dominion employees to produce those eye buttons or

5    tokens.  So, therefore, we were not allowed or we did not get     09:58:32

6    access to confirm the configurations of the wireless modems,

7    the LANs and those such devices as they were configured on the

8    tabulators.

9    Q.   But you made it clear that you wanted access?

10   A.   Yes.                                                         09:58:52

11   Q.   Now, the vendor is Dominion Voting Systems in Maricopa?

12   A.   Correct.

13   Q.   And you say they had control of providing the access?

14   A.   Yes.  And the concern on that, obviously, is that

15   inherently the validation of the certification of the systems    09:59:07

16   and the validation of those tabulators should be an

17   intergovernmental function by Maricopa County personnel.  And

18   if they don't have access to do that that, then that means that

19   they are relying on the goodness and kindness and accurate

20   reporting of the Dominion employees.                             09:59:31

21   Q.   In terms of what you were able to get and look at in

22   the -- under the hood, if you will, of the electronic voting

23   system used in Maricopa, what did you find when you looked in

24   terms of any security vulnerability?

25             MR. GAONA:  Objection, Your Honor.  I just want to      09:59:58

BENJAMIN R. COTTON - Direct

```
 1    note for the record, given the pending motion, that we do have          10:00:00
 2    an objection to Mr. Cotton providing expert testimony on this
 3    issue under Rule 702, a *Daubert* decision, as well as
 4    maintaining our relevance and 403 objections.  I just want to
 5    note a standing objection for the record on that issue with          10:00:15
 6    respect to his opinions.
 7              THE COURT:  You may.
 8              MR. GAONA:  Thank you.
 9              THE COURT:  All right.  You may proceed.
10              MR. PARKER:  No need for me to respond to that at          10:00:23
11    this point, Your Honor.
12              THE COURT:  No.  You are going to respond in writing
13    and I know you're in the middle of your examination now, so we
14    will establish a timeline for the response before we leave here
15    today.                                                             10:00:38
16              Go ahead, sir.
17              MR. PARKER:  Thank you.
18              THE WITNESS:  Quite frankly, I was shocked at the
19    lack of cybersecurity elements within the voting system and
20    I'll give you a couple of examples of that.                       10:00:50
21              So if I was to summarize this, I would say that the
22    average home computer is better protected than the EMS and the
23    client systems that were in the Maricopa County environment.
24    BY MR. PARKER:
25    Q.   And why do you say that?                                      10:01:10
```

BENJAMIN R. COTTON - Direct

1  A.   Well, let me back that up.  So when you -- when you look                    10:01:11

2  at a computer, you have a layered line of defenses because

3  cybersecurity is an ongoing continual effort and there's no one

4  security mechanism that is going to be completely bulletproof.

5  In the case of Maricopa County, they primarily relied on an air    10:01:31

6  gap system and that air-gap system, given the configuration of

7  those other components of the enterprise, could be bypassed in

8  about 30 seconds.

9          We'll probably go into that a little bit further.  So

10 once you get past that air gap, then you have to rely on          10:01:54

11 on-prem type of devices like antivirus.  Now, the EAC does

12 require the antivirus on the system.  But in the case of

13 Maricopa County, the definitions of that antivirus had not been

14 updated since August 6 of 2019.  I examined the systems in

15 April and May of 2021.                                             10:02:21

16         So the business importance on that is that from my

17 experience as a cybersecurity expert, there are over one

18 million pieces of malware that are either generated, modified

19 or newly equipped with signatures changed every day.  And so

20 when you look at this, there were, you know, just off the top    10:02:45

21 of my head, roughly 700 million pieces of malware out there

22 that the Maricopa County systems would not detect by their

23 antivirus.

24         Furthermore --

25 Q.   What about patches, updates?                                  10:03:01

United States District Court

23

BENJAMIN R. COTTON - Direct

1    A.    System patches are an essential element of cybersecurity.          10:03:04

2           As we know, Microsoft is one of the largest producers

3    of system software in the world.  In its systems, with the

4    exception of the tabulators, for all of the computer devices

5    that were turned over to me they were running, they went by          10:03:23

6    version of Windows software.  They had the Dominion software as

7    an application on that device but underlying this was Windows.

8           Every week Microsoft will release a vulnerability

9    patch update.  That's because even Microsoft doesn't know all

10   of the vulnerabilities that exist in their own operating          10:03:45

11   system, and people find these vulnerabilities that can allow

12   them to get remote access and exploit the systems.  And

13   Microsoft will patch those and they do that on a weekly basis.

14   Depending on where you are, that's typically Wednesday or

15   Thursday.          10:04:02

16          They also provide an off-line service for these

17   patches so that you don't have to connect to the Internet to

18   download them and put them on your systems.

19   Q.    When was the last time those patches were updated or added

20   at all?          10:04:16

21   A.    The same date that they installed the software, which was

22   August 6, 2019.

23   Q.    No patches since then and you looked at it in 2021?

24   A.    Correct.  There were well over a thousand known

25   vulnerabilities that could have been exploited by a kiddie          10:04:32

United States District Court

BENJAMIN R. COTTON - Direct

```
 1  scriptor with a program called Metasploit or some other exploit    10:04:34
 2  tool.  It wouldn't have taken any skill.
 3  Q.   What about passwords, were those protected?
 4  A.   So they did have a password.  And the reason I use "a
 5  password" was they used the same password for every single         10:04:51
 6  account on the domain on the system.
 7  Q.   And you saw this yourself?
 8  A.   I did.
 9  Q.   With respect to the antivirus, the patches, and the
10  passwords, you saw all of that yourself?                           10:05:04
11  A.   Yes, I did.  And I used -- I examined the forensics
12  images.  I used forensically court-approved tools to perform
13  that analysis, and those images are available for other experts
14  to look at if they should request.
15  Q.   So if the passwords are the same for all people getting       10:05:23
16  access, is that a proper protection mechanism?
17  A.   No.  And furthermore, it wasn't just it was the same
18  password, it's that the password was established at the time of
19  the installation of the software and it had not been changed
20  since it was installed.                                            10:05:45
21       So that same password had been used for all accounts
22  from August 2019 until the time that I examined the system.
23  Q.   So if you had that password, could you get into the EMS
24  system?
25  A.   You could, either locally or, if you had remote access,       10:06:01
```

BENJAMIN R. COTTON - Direct

1   you could log in remotely to the system.                      10:06:05

2   Q.   What about log management activity in the system?  Did you

3   assess that?

4   A.   I did and, quite frankly, they had left the default sizes

5   for all of the logs.                                           10:06:26

6           So the way that works is that I'm going to use the

7   Windows security log, for example.  On the server version of

8   Microsoft, that is set at 20 megabytes and when a new log entry

9   comes in, the oldest log entry is deleted and thrown away.

10          When I examined -- from that forensics image I took    10:06:48

11  of the EMS server, the latest -- or the furthest back that that

12  log went was 5 February 2021.

13  Q.   Post election?

14  A.   Post election the County had turned over some logs but

15  missing was the Windows security log.  There were approximately 10:07:16

16  79 different entries or different log types on the Windows

17  operating system side and they turned over three

18  Windows-specific logs to the Senate.  But they did not turn

19  over the application log or the security log.

20          The issue with that is that that is the log that       10:07:39

21  actually records the remote accesses to the system, the IP

22  addresses from which that remote access occurs and the user

23  that performs that remote access.

24  Q.   And so were logs overwritten post election or did you have

25  the election time period logs?                                 10:08:03

United States District Court

BENJAMIN R. COTTON - Direct

1   A.   Well, the logs were -- the term that I would use were                10:08:06

2   rolling the logs, so the logs were rolled in the case of the

3   Windows security log.

4           On three separate occasions, the first occasion being

5   on the -- I believe it was the fifth of February.  There were           10:08:21

6   about 462 instances of a script being ran that ran to check for

7   a blank password.  Now, there are only about 15 accounts on the

8   system.  So they ran that 462 times.

9           The next occasion was on the third of March and they

10  ran that same script over 34,000 times.  And then on the 12th           10:08:54

11  of April, which was right before they were turning the devices

12  over to the Senate, they ran that approximately three hundred

13  and some times.  The net result of that activity was that the

14  Windows security log only went back to the fifth of February.

15  Q.   And were you ever provided with some sort of a secure data          10:09:22

16  set from when the election occurred that might have been saved

17  or backed up or mirror imaged?

18  A.   I was not.  That was actually an issue between the Senate

19  and the County as to the full compliance on the subpoena.

20  Q.   Any other maladies or issues you found in terms of the             10:09:48

21  security in the system when you looked at the Maricopa County

22  electronic voting machine system?

23  A.   Yes.  So there is a -- I have personally viewed a line in

24  the Arizona code that remote access to those systems shall not

25  be enabled.  There shall be no program on those systems that            10:10:13

United States District Court

BENJAMIN R. COTTON - Direct

1   would allow remote access.                                              10:10:16

2           On all of the systems that I examined, the Microsoft

3   Remote Desktop application was still on the systems and that

4   was used to remotely log in to the server on multiple times.

5   Q.  So you saw actual evidence of remote intervention?              10:10:36

6   A.  I saw actual evidence of remote log-ins into the EMS

7   server.

8   Q.  And do you know whether those were permissible or security

9   breach or . . .

10  A.  The attributable log-ins -- because I did see some           10:10:54

11  anonymous log-ins that I could not trace back to an event.  The

12  ones that I saw came from the local EMS subnet, if you will,

13  the IP address that -- for the voting system.

14  Q.  Since we're talking about intrusion into the system

15  through remote access, air gap is a term that you used a little   10:11:19

16  bit earlier.  Is that a process to prevent or limit remote

17  access?

18  A.  It is an attempt to limit a remote access.  I would say

19  that it's a good step but it's not bulletproof.  It's easily

20  bypassed.                                                         10:11:43

21          Everyone in here probably owns a cell phone and

22  whether it's IOS or whether it's Android based that cell phone

23  would have a function called personal hotspot where you can use

24  your cell phone as a wifi connector to the outside.

25          The issue with that becomes, is that each of the Dell     10:12:05

United States District Court

BENJAMIN R. COTTON - Direct

| | | |
|---|---|---|
| 1 | computers that were within that system did have wifi cards and | 10:12:10 |
| 2 | that those wifi cards had been registered as a network on the | |
| 3 | computing devices. | |
| 4 | So what that means is that at the time they installed | |
| 5 | the software, those wifi cards were not disabled in BIOS. | 10:12:25 |
| 6 | Otherwise, they would not have been recognized by the operating | |
| 7 | system. | |
| 8 | But the other interesting fact is, if you set up a | |
| 9 | wifi without a password, then it is -- the default | |
| 10 | configuration for Windows to automatically connect to an | 10:12:45 |
| 11 | unprotected wifi system. | |
| 12 | Q.   Is that a description of a hotspot?  If somebody gained | |
| 13 | access, they could utilize the hotspot to gain access? | |
| 14 | A.   Sure, yeah.  That would give access to the Internet.  You | |
| 15 | know, there are multiple examples of breaches through air-gap | 10:13:09 |
| 16 | systems.  If you remember the Snowden breach of the NSA, that | |
| 17 | was an air-gap system. | |
| 18 | Q.   That the NSA had set up? | |
| 19 | A.   That the NSA had set up. | |
| 20 | Q.   And Snowden breached it? | 10:13:28 |
| 21 | A.   Correct. | |
| 22 | Q.   You would assume it was a hardened system? | |
| 23 | A.   Yes. | |
| 24 | Q.   It was breached, nonetheless? | |
| 25 | A.   Yes. | 10:13:35 |

United States District Court

BENJAMIN R. COTTON - Direct

1    Q.    Other examples?                                              10:13:38

2    A.    Stux -- S-T-U-X -- net is an example and that was a piece

3    of malware that was designed to be delivered via USB.  It would

4    iterate a network, promulgate itself until it reached a

5    centrifuge, and then control the speed of the centrifuge in       10:14:04

6    order to destroy the centrifuge.

7    Q.    Have you heard the phrase or statement made by

8    cybersecurity experts that given enough time and access, any

9    computer system can be hacked?

10   A.    Yes.                                                         10:14:24

11   Q.    Do you agree with it?

12   A.    I certainly do, especially if you have physical access to

13   those systems.

14   Q.    Did you find that the Maricopa County system that you

15   reviewed and is going to be used in 2022 had security to          10:14:43

16   prevent access?

17   A.    No.  The only prevention they had from an access

18   perspective would be their passwords and those passwords were

19   shared.  The user accounts were not attributable to an

20   individual.  The -- it was the same password for every single    10:15:03

21   account.

22   Q.    Do you remember what the password was?

23   A.    I do.

24   Q.    What was the password?

25             MR. LARUE:  Objection, Your Honor.  We're in open       10:15:18

BENJAMIN R. COTTON - Direct

1    court and letting that password out to the public is not in an          10:15:20

2    anyone's interest and it serves no probative purpose to their

3    argument.

4              THE COURT:  Mr. Parker?

5              MR. PARKER:  Your Honor, the testimony is -- and I          10:15:31

6    don't think it will be disputed -- that that password is shared

7    by people who don't work for Maricopa any more.  They have had

8    the password.  It hasn't changed.  It's already out.

9              MR. LARUE:  Your Honor, we do dispute that --

10             THE REPORTER:  Can you pull the microphone a little          10:15:45

11   closer to you, please.

12             THE COURT:  The objection is sustained.  There is no

13   value to going further on this point.

14             You can make your argument, Mr. Parker.

15             MR. PARKER:  Thank you, Your Honor.          10:15:58

16   BY MR. PARKER:

17   Q.  What about protective measures that the defendants point

18   to to say even if we didn't have this or that security measure

19   in place and with the most hardened system in the country, you

20   know, we've got the EAC having certified our machines and we          10:16:20

21   have logic and accuracy testing before and after and of course

22   we have the two percent audit of paper balance.  Will those

23   things protect the vote?

24             MR. GAONA:  Objection, Your Honor.  Foundation.

25             THE COURT:  Do you wish to be heard, Mr. Parker?          10:16:40

BENJAMIN R. COTTON - Direct

1        MR. PARKER:  I think he has identified his background          10:16:43

2   and credentials as it relates to cybersecurity and he's in a

3   unique position to be able to testify about this because he has

4   been in looking at the Maricopa County system.

5        THE COURT:  The argument here is that you want to ask        10:17:00

6   this witness about essentially, among other things, the

7   statistical relevancy of a two percent sampling and that is

8   beyond any expertise which you put him up for.  The objection

9   is sustained.

10       I would also point out that this leads into another          10:17:17

11  sort of common theme which is that information in the form of a

12  declaration has already been submitted to the Court so I've

13  looked at it.  I'm going to rule on whether or not it is

14  appropriate to consider in the end or needs to be stricken.

15  But, again, we don't need to repeat things that the Court has    10:17:32

16  already -- has in its ambit and, as I said to you, has

17  internalized.

18       Mr. Gaona?  You're still standing.

19       MR. GAONA:  I'm sorry, Your Honor.  I'm just waiting

20  for you to finish talking, Your Honor.                            10:17:47

21       THE COURT:  Please go ahead, Mr. Parker.

22       MR. PARKER:  Thank you, Your Honor.

23  BY MR. PARKER:

24  Q.   Do you have any background -- do you know what the U.S.

25  EAC is?                                                           10:17:52

United States District Court

32

BENJAMIN R. COTTON - Direct

| | | |
|---|---|---|
| 1 | A.    I do. | 10:17:54 |
| 2 | Q.    And do you have any background with working with | |
| 3 | certifications related to the EAC? | |
| 4 | A.    I have reviewed the certifications they have produced and | |
| 5 | I've reviewed the policies and ultimately I've reviewed the | 10:18:04 |
| 6 | product that was delivered in the field as a result of those | |
| 7 | certifications. | |
| 8 | Q.    One of the exhibits that you produced was regarding | |
| 9 | Williamson County; correct. | |
| 10 | A.    Correct. | 10:18:17 |
| 11 | Q.    And that was an EAC-certified system? | |
| 12 | A.    It was. | |
| 13 | Q.    And it had a number of errors identified? | |
| 14 | A.    That is correct. | |
| 15 | MR. PARKER:  Nothing further, Your Honor. | 10:18:28 |
| 16 | THE COURT:  All right.  Thank you, Mr. Parker. | |
| 17 | Mr. Gaona, will you be conducting the questioning of | |
| 18 | the witness? | |
| 19 | MR. GAONA:  Yes, Your Honor. | |
| 20 | THE COURT:  All right.  Whenever you're ready.  And | 10:18:37 |
| 21 | I'm fine if you want to go from -- and this is true for all | |
| 22 | counsel, from your counsel table position our from the lectern. | |
| 23 | MR. LARUE:  Your Honor, before Mr. Gaona begins, just | |
| 24 | to alert the Court, Mr. Liddy will have just a few questions | |
| 25 | after Mr. Gaona is done. | 10:18:54 |

United States District Court

BENJAMIN R. COTTON - Cross

| | | |
|---|---|---|
| 1 | THE COURT:  I understand. | 10:18:57 |
| 2 | **CROSS - EXAMINATION** | |
| 3 | BY MR. GAONA: | |
| 4 | Q.   Good morning, Mr. Cotton.  Thank you for being here this | |
| 5 | morning.  Appreciate it.  I just have a couple of questions for | 10:19:03 |
| 6 | you. | |
| 7 | Are you being paid for your work on this case? | |
| 8 | A.   Yes, I am. | |
| 9 | Q.   Who is paying you? | |
| 10 | A.   The law firm of Parker Daniels. | 10:19:13 |
| 11 | Q.   How much have you been paid to date? | |
| 12 | A.   I haven't been paid anything yet to date but we have | |
| 13 | billed. | |
| 14 | Q.   How much have you billed so far? | |
| 15 | A.   I don't have that information with me.  That is generally | 10:19:26 |
| 16 | handled out of the Accounting Department. | |
| 17 | Q.   Are you billing Mr. Parker's firm on an hourly basis? | |
| 18 | A.   I am. | |
| 19 | Q.   What's your hourly rate? | |
| 20 | A.   My hourly rate for nondeposition testimony is $350 an | 10:19:36 |
| 21 | hour.  For deposition and testimony, it's $450 an hour. | |
| 22 | Q.   Do you have an estimate as to how many hours you've | |
| 23 | devoted so far to this particular case? | |
| 24 | A.   We have probably performed at least 40 hours of work. | |
| 25 | Q.   Okay.  You are not an expert on elections, are you, | 10:19:52 |

United States District Court

BENJAMIN R. COTTON - Cross

1    Mr. Cotton?                                                    10:19:58

2    A.    Not elections, no.

3    Q.    You're not an expert on voting systems, are you,

4    Mr. Cotton?

5    A.    I am an expert on the underlying operating system that   10:20:05

6    controls and provides access to those systems, yes.

7    Q.    But you would not call yourself an expert on voting

8    systems themselves; correct?

9    A.    I would -- no.

10   Q.    You also wouldn't call yourself an expert on voting      10:20:19

11   systems security; correct?

12   A.    I would call myself an expert on voting systems security

13   as it applies to the underlying computers that provide the

14   computing power, the access for those systems.

15   Q.    But, again, not as to voting system security specifically; 10:20:37

16   correct?

17   A.    Well, are you trying to draw a line of distinction that

18   says that the operating system is irrelevant?  Because the

19   operating system provides full access to all aspects of the

20   Dominion system.                                              10:20:55

21   Q.    Prior to the 2020 general recollection, Mr. Cotton, isn't

22   it true that you had not performed a forensic examination into

23   a single voting system?

24   A.    That's incorrect.

25   Q.    Which voting systems had you analyzed prior to that?     10:21:09

United States District Court

BENJAMIN R. COTTON - Cross

| | | |
|---|---|---|
| 1 | A.   Antrim County, Michigan, a Dominion 5.5-B system. | 10:21:13 |
| 2 | Q.   Okay.  And was your retention there part of an election | |
| 3 | fraud lawsuit? | |
| 4 | A.   It was part of the *Bailey v. Antrim County* lawsuit, yes. | |
| 5 | Q.   What year did you perform that forensic examination? | 10:21:27 |
| 6 | A.   That would have been in 2021, immediately prior to the | |
| 7 | examination of the systems down here. | |
| 8 | Q.   And perhaps you misunderstood my question because my | |
| 9 | question was, prior to the 2020 general election, had you | |
| 10 | performed an examination?  And you just told me that | 10:21:46 |
| 11 | examination was performed in 2021? | |
| 12 | A.   Correct.  So I performed the examination of those systems | |
| 13 | prior to performing the examination on the Maricopa County | |
| 14 | systems. | |
| 15 | Q.   Okay.  I think we're two trains passing in the night here. | 10:21:57 |
| 16 | Before the 2020 general election occurred in November of 2020, | |
| 17 | you had never performed a forensic examination of a voting | |
| 18 | system? | |
| 19 | A.   That would be correct. | |
| 20 | Q.   That's correct.  Okay.  Thank you. | 10:22:11 |
| 21 |       And were you -- in the *Antrim County* case that you | |
| 22 | mentioned, were you retained by parties who were disputing the | |
| 23 | accuracy of the results? | |
| 24 | A.   I was retained by the parties to investigate why there was | |
| 25 | a vote-flipping situation that had occurred in Antrim County. | 10:22:25 |

United States District Court

BENJAMIN R. COTTON - Cross

1    Q.   But who actually hired you, which party?                10:22:30

2    A.   It was the plaintiff on that case.  So it was the

3    attorneys representing Bailey.

4    Q.   The plaintiff who alleged that there was a vote-flipping

5    problem as you called it; correct?                          10:22:41

6    A.   Well, the County clerks admitted that there was

7    discrepancy in the vote.  The question was, how did it happen?

8    And so that was the investigation that I was hired to analyze.

9    Q.   And the plaintiff in that case -- rather the plaintiff in

10   that case was convinced that this vote-flipping issue had     10:22:59

11   actually caused there to be errors in how the -- how results

12   were reported; is that correct?

13   A.   Well, there were errors in how the -- how the vote results

14   were initially reported and they caught those and they

15   corrected that with a hand count of the ballot.  So then the   10:23:20

16   question was, how did that happen on a certified Dominion

17   voting system?

18           And so that's why I was retained, is to look at that

19   system.  The other side retained an individual by the name of

20   Halderman who also looked at that system.                    10:23:36

21   Q.   Okay.  Now, your declaration you note that you also

22   performed a forensic examination of a voting system in Mesa

23   County, Colorado; is that correct?

24   A.   I believe I said that I had looked at Antrim, the Coffee

25   County Voting System, and some auxiliary information on the    10:23:56

United States District Court

BENJAMIN R. COTTON - Cross

1  Colorado case, yes.                                                10:24:01

2  Q.   But you didn't actually perform a forensic examination of

3  the Mesa County, Colorado, voting system; correct?

4  A.   On the Mesa County Colorado system, I did some additional

5  analysis but not a full evaluation.                               10:24:13

6  Q.   Okay.  Let's talk about Coffee County, Georgia.  You

7  mentioned that.  Isn't it true that you were recently

8  subpoenaed in a case that is pending in federal court due to

9  your examination of that voting system?

10 A.   That's true.                                                 10:24:26

11 Q.   And the nature of that subpoena arises out of the fact

12 that the examination wasn't officially authorized by any County

13 authorities; is that correct?

14 A.   That is incorrect.  The subpoena asks for my information

15 on my knowledge of unauthorized access to the -- to those       10:24:40

16 voting systems which I have none.  My access was authorized by

17 the Coffee County election official in that case and I was

18 retained by her attorney to examine those systems.

19 Q.   And isn't it true that that particular official was under

20 investigation for having provided you access to the voting       10:25:01

21 system in Coffee County?

22 A.   I don't know the full extent of the charges?

23 Q.   But you're aware that there are charges.

24 A.   I am aware that there's an investigation.  I don't know

25 what the full nature of that investigation is.                    10:25:11

United States District Court

BENJAMIN R. COTTON - Cross

1   Q.   Okay.                                                          10:25:13

2        Now, you mentioned that you were involved in the

3   forensic examination of the voting system here in Maricopa

4   County; correct?

5   A.   Correct.                                                       10:25:19

6   Q.   And your company, Cyfir, was retained alongside Cyber

7   Ninjas, Inc., to perform what was labeled as an audit of the

8   2020 general election here in Maricopa County; correct?

9   A.   I was a subcontractor to Cyber Ninjas.

10  Q.   Correct.                                                       10:25:35

11       Did you understand when you were retained that the

12  audit was a product of the members of the Arizona legislature

13  who were questioning the results of the 2020 general election?

14  A.   What I understood was -- is they were attempting to

15  validate what happened, if anything happened, and to and look  10:25:57

16  at the integrity of the vote.  You know, I did not enter into

17  this as a partisan type effort.  I'm not a partisan individual.

18  You know, this is a -- it's not a Democrat issue.  It's not a

19  Republican issue.  This is an American issue.

20       And when you look at 2016, we had half of the voters    10:26:24

21  disenfranchised when President Trump won.  And when you look at

22  2020, we had half of the voters disenfranchised because they

23  thought something was going on when President Biden won.

24       So, you know, this was really an effort to kind of

25  re-enfranchise everyone and say, look, this is an open audit    10:26:53

United States District Court

BENJAMIN R. COTTON - Cross

1   and there's either something here or there's nothing here.  If      10:26:58

2   there's something here, then we address that and we correct it.

3   You know, it was not a partisan-type issue.

4          MR. GAONA:  Your Honor, I want to move to strike

5   everything the witness said about 50 percent of the voters in       10:27:10

6   2016 and 2020 being disenfranchised for lack of foundation.

7          THE COURT:  Mr. Parker?

8          MR. PARKER:  Your Honor, I think further inquiry as

9   to what he meant by that would be appropriate.

10          THE COURT:  The motion is denied for now.  The              10:27:34

11   parties can explore it.

12          MR. GAONA:  Thank you, Your Honor.

13   BY MR. GAONA:

14   Q.   Mr. Cotton, are you a registered voter?

15   A.   I am.                                                          10:27:47

16   Q.   Which state are you registered in?

17   A.   Montana.

18   Q.   Do you know whether Montana -- well, let me back up.

19          How long have you been voting?

20   A.   I have been voting since I was 18 years old.                  10:27:55

21   Q.   Do you know whether Montana uses an electronic voting

22   system to tabulate votes?

23   A.   They do.

24   Q.   Now, you mentioned as part of your testimony that -- I

25   think what you said was there were 700 million pieces of           10:28:09

40

BENJAMIN R. COTTON - Cross

| | | |
|---|---|---|
| 1 | malware that you claim Maricopa County's Dominion systems would | 10:28:14 |
| 2 | not have detected because there hadn't been updates performed. | |
| 3 | Is that an accurate summary of your testimony there? | |
| 4 | A.    There's more than that, but yes. | |
| 5 | Q.    Okay.  And to be clear, you found no evidence that any | 10:28:27 |
| 6 | malware had actually infected any of the voting systems in | |
| 7 | Maricopa County that you examined; correct? | |
| 8 | A.    I did not find malware present. | |
| 9 | Q.    You found no evidence that any viruses of any kind had | |
| 10 | infected the Maricopa County voting systems; correct? | 10:28:40 |
| 11 | A.    I did not find any viruses.  I will caveat this with the | |
| 12 | systems were delivered to me in a turned-off position so, | |
| 13 | therefore, any memory resident-only artifacts I didn't have | |
| 14 | access to. | |
| 15 | Q.    Okay.  But based on your detailed forensic examination | 10:29:00 |
| 16 | that you did perform, you found no evidence, either malware or | |
| 17 | viruses, that had infected those systems; correct? | |
| 18 | A.    Correct. | |
| 19 | Q.    As you sit here now, Mr. Cotton, you are not aware of any | |
| 20 | actual malicious third-party intrusion into any voting system | 10:29:17 |
| 21 | in Arizona, are you? | |
| 22 | A.    Incorrect. | |
| 23 | Q.    Incorrect? | |
| 24 | A.    Yes.  In the 2020 election there was a breach of the | |
| 25 | registration server. | 10:29:29 |

United States District Court

BENJAMIN R. COTTON - Cross

| | | |
|---|---|---|
| 1 | Q.   I'm going to stop you there, Mr. Cotton.  My question was | 10:29:31 |
| 2 | about the voting system, not a voter registration database. | |
| 3 | Those are two distinct things.  Talking about the voting, is | |
| 4 | there anything else over which you performed a forensics | |
| 5 | examination, those systems that tabulate and count voters' | 10:29:41 |
| 6 | ballots, you are not aware of any malicious third-party | |
| 7 | intrusion into those systems, are you? | |
| 8 | A.   Okay.  I'm going to caveat this with you said -- | |
| 9 | Q.   Mr. Cotton, it's a yes-or-no question. | |
| 10 | A.   Actually it's not. | 10:29:57 |
| 11 | Q.   It is, Mr. Cotton.  You examined the specific set of | |
| 12 | systems. | |
| 13 |             MR. PARKER:  Your Honor, argumentative. | |
| 14 |             THE COURT:  The objection is overruled. | |
| 15 |             Mr. Gaona is the master of his question.  He can | 10:30:10 |
| 16 | formulate or reformulate the question.  He has not gotten an | |
| 17 | answer yet. | |
| 18 |             Ask the question again. | |
| 19 |             Answer the question, yes, no, or it cannot be | |
| 20 | answered with yes and no. | 10:30:25 |
| 21 |             THE WITNESS:  Yes, Your Honor. | |
| 22 | BY MR. GAONA: | |
| 23 | Q.   Let's try this.  Let's back up, Mr. Cotton, so I can be as | |
| 24 | clear as possible.  You performed a forensic examination on the | |
| 25 | voting systems utilized by Maricopa County; is that correct? | 10:30:34 |

United States District Court

BENJAMIN R. COTTON - Cross

1    A.    I cannot answer that yes or no.                       10:30:39

2    Q.    Why can you not answer that yes or no, Mr. Cotton?

3    A.    Because I examined a subcomponent of the voting system.

4    Q.    So what did you actually -- how would you describe what

5    you actually examined then?                                 10:30:49

6    A.    Exactly what I defined.  I look at the EMS server.  I

7    looked at the ICCs.  I looked at the adjudication systems.  And

8    I was not allowed to examine the ICPs.  I was not allowed to

9    examine because they didn't turn over the poll books, any

10   laptop associated with the system because they said that wasn't  10:31:14

11   covered in the scope.  But there were laptops that were

12   involved in that system.  I did not examine the switch or the

13   routing device that you used on that system.  I did not examine

14   multiple IP devices that had -- I found the IPs inside of the

15   EMS but those were not produced as part of the subpoena.     10:31:40

16   Q.    And Mr. Cotton, so just to be clear, you've already listed

17   off everything you did examine; correct?  Now you are listing

18   off things that you claim you were not provided; correct?

19   A.    But which are part of the system.

20   Q.    Okay.  So let me ask this again.  Of the voting system   10:31:52

21   components that you examined, you found no evidence of any

22   malicious third-party intrusion into those systems; is that

23   correct?

24   A.    That is incorrect.

25   Q.    Why is that incorrect?                                 10:32:11

United States District Court

BENJAMIN R. COTTON - Cross

1   A.   As I testified before the Senate, there is evidence of          10:32:12

2   atypical anonymous log-ins that due to the lack of information

3   provided, I was not able to resolve.  So, therefore, I cannot

4   determine that there was no breach, nor could I determine that

5   there was a breach.          10:32:29

6   Q.   But, again, as you sit here now, you have no evidence that

7   shows or proves that those anonymous log-ins that you are

8   mentioning were the product of a malicious third-party

9   intrusion into the voting system; correct?

10  A.   I have seen this very same type of activity --          10:32:47

11  Q.   Mr. Cotton, that's not what I asked.  The question is a

12  yes-or-no question now.  We've gone down this road --

13  A.   Please repeat the question.

14  Q.   I'm trying to elicit a response from you.

15       Based on the systems that you actually reviewed and          10:32:58

16  despite the fact that there maybe some log-ins that you can't

17  explain, you found no evidence of any actual third-party

18  malicious intrusion into Maricopa County's voting systems?

19  A.   I cannot say yes on that question.

20  Q.   Okay.          10:33:17

21       Your forensic examination of the voting systems used

22  in Arizona was specific only to the Dominion system that is

23  used by Maricopa County; correct?

24  A.   Within the scope of the Senate engagement, yes.

25  Q.   Right.  And are you aware that -- do you know whether any          10:33:35

United States District Court

BENJAMIN R. COTTON - Cross

| | | |
|---|---|---|
| 1 | other County other than Maricopa uses a similar system to | 10:33:38 |
| 2 | Maricopa? | |
| 3 | A.   I believe most of the other counties use ES&S systems. | |
| 4 | Q.   So you did not perform any forensic examination into any | |
| 5 | of the ES&S systems used by any other County in Arizona other | 10:33:51 |
| 6 | than Maricopa; correct? | |
| 7 | A.   Not in Arizona. | |
| 8 | Q.   As part of your report to the Senate, you originally | |
| 9 | concluded there was evidence that Maricopa County's voting | |
| 10 | system had been connected to the Internet; is that correct? | 10:34:05 |
| 11 | A.   That's correct. | |
| 12 | Q.   And are you aware that the Senate and the County | |
| 13 | collectively hired former Congressman Shadegg to gather a group | |
| 14 | of IT experts to examine that claim, among others? | |
| 15 | A.   I'm aware that he hired a panel of experts, yes. | 10:34:22 |
| 16 | Q.   And are you aware that those experts concluded that you | |
| 17 | were wrong about your conclusions about those systems having | |
| 18 | been connected to the Internet? | |
| 19 | A.   I am aware of that, yes. | |
| 20 | Q.   Okay.  Are you familiar with Congressman Shadegg's party | 10:34:32 |
| 21 | affiliation? | |
| 22 | A.   I am not. | |
| 23 | Q.   So you don't know that he was an elected Republican from | |
| 24 | Arizona, do you? | |
| 25 | A.   No. | 10:34:43 |

BENJAMIN R. COTTON - Cross

1   Q.    Now, you also originally claimed, in providing information      10:34:46
2   to the Arizona Senate, that there was evidence that Maricopa
3   County had deleted election files from its system; is that
4   correct?
5   A.    That's correct.                                                 10:34:54
6   Q.    Didn't you later recant that claim?
7   A.    I did not.
8   Q.    Did you have to clarify what your position on that claim?
9   A.    I provided additional testimony on that, yes.
10  Q.    But the original scope of your claim was incorrect, wasn't     10:35:04
11  it?
12  A.    No.
13  Q.    Why not?
14  A.    Because there were files deleted on the EMS server.   There
15  were files deleted off the HiPro systems.                           10:35:14
16  Q.    What was your clarification that you provided?
17  A.    I provided screen shots of those deleted files and those
18  were part of my testimony before the Arizona Senate.   And I
19  provided dates and times.   I also provided a clarification that
20  on the HiPro system, they had not turned on or enabled the          10:35:37
21  hashing function for the ballot images.
22  Q.    Are you familiar with a group called the Truth and Liberty
23  Coalition?
24  A.    I am not.
25          MR. GAONA:   I don't have any further questions, Your        10:35:59

BENJAMIN R. COTTON - Cross

| | | |
|---|---|---|
| 1 | Honor.  Thank you. | 10:36:00 |
| 2 | THE COURT:  All right.  Thank you, Mr. Gaona. | |
| 3 | Mr. Parker, any redirect? | |
| 4 | MR. GAONA:  I believe Mr. Liddy had a couple of | |
| 5 | questions. | 10:36:09 |
| 6 | THE COURT:  Oh, that's right.  I'm sorry. | |
| 7 | Mr. Liddy, please. | |
| 8 | MR. LIDDY:  Thank you, Your Honor. | |
| 9 | **CROSS - EXAMINATION** | |
| 10 | BY MR. LIDDY: | 10:36:16 |
| 11 | Q.   Mr. Cotton, Tom Liddy from Maricopa County Attorney's | |
| 12 | Office on behalf of Maricopa County. | |
| 13 | You have testified here that you had previously | |
| 14 | testified before the Arizona Senate? | |
| 15 | A.   That's correct. | 10:36:28 |
| 16 | Q.   Were you placed under oath when you made your presentation | |
| 17 | to the Arizona Senate? | |
| 18 | A.   I was not. | |
| 19 | Q.   So you didn't actually testify to the Senate, did you? | |
| 20 | A.   I presented. | 10:36:35 |
| 21 | Q.   You presented.  Now, did you present to the full body of | |
| 22 | the Senate? | |
| 23 | A.   I presented to a committee.  That was televised publicly. | |
| 24 | I don't know who all was watching. | |
| 25 | Q.   Do you know the name of the committee? | 10:36:47 |

United States District Court

BENJAMIN R. COTTON - Cross

| | | |
|---|---|---|
| 1 | A.   I do not. | 10:36:50 |

2  Q.   Do you know how many senators were -- participated in that

3  presentation?

4  A.   On the dais there were two senators.

5  Q.   Were any of them from the minority of the Arizona State     10:37:00

6  Senate?

7  A.   I do not know.

8  Q.   Did any of the senators question you?

9  A.   Yes.

10 Q.   And did any of the members of the minority question you?    10:37:07

11 A.   I don't recall.

12 Q.   You previously testified today that you had the

13 opportunity, as a subcontractor with Cyber Ninjas, to look at

14 the EMS system that Maricopa County used in the general

15 election of 2020; is that correct?                             10:37:24

16 A.   That's correct.

17 Q.   Did you make a duplicate of that EMS -- of the data in

18 that EMS system?

19 A.   I made a forensics image.

20 Q.   A forensic image.  And on what system did you place that   10:37:32

21 forensic image?

22 A.   I placed the forensics image on a storage device.  That

23 storage device was retained by the U.S. Senate -- or not

24 Senate, the Arizona State Senate as part of the retention

25 program.                                                       10:37:51

United States District Court

BENJAMIN R. COTTON - Cross

| | | |
|---|---|---|
| 1 | Q.   Are there any other copies made of the data that you put | 10:37:55 |
| 2 | on that storage device? | |
| 3 | A.   Yes. | |
| 4 | Q.   How many? | |
| 5 | A.   Under contract I was allowed to produce one copy of that | 10:38:02 |
| 6 | data and I have retained that in a U.S. Government approved | |
| 7 | GSA safe. | |
| 8 | Q.   And you -- who gave you permission to retain that copy? | |
| 9 | A.   The Senate. | |
| 10 | Q.   The Arizona Senate? | 10:38:19 |
| 11 | A.   Yes. | |
| 12 | Q.   The full body of the Senate?  Did the Senate vote on it? | |
| 13 | A.   I know that the President of the Senate, under the | |
| 14 | contract that was initiated, authorized us to make that copy. | |
| 15 | Q.   When you say "us," did you make the copy or did you direct | 10:38:35 |
| 16 | someone else to make the copy? | |
| 17 | A.   I made the copy. | |
| 18 | Q.   You made the copy.  And where is that copy today? | |
| 19 | A.   That copy is stored in my security facility in Montana. | |
| 20 | Q.   Do you own property in Montana? | 10:38:46 |
| 21 | A.   I do. | |
| 22 | Q.   There are improvements upon that property? | |
| 23 | A.   There are. | |
| 24 | Q.   Is one of the structures on that property something you | |
| 25 | from time to time refer to as a lab? | 10:38:53 |

United States District Court

BENJAMIN R. COTTON - Cross

1   A.   Yes.                                                                                    10:38:55

2   Q.   Is that the structure you are referring to when you say

3   it's in there secure?

4   A.   Yes.

5   Q.   And how did you get it from Arizona, outside our borders,    10:39:00

6   up to Montana?

7   A.   I received permission from the U.S. Senate -- or the State

8   Senate to transport that and I personally transported that in

9   my vehicle.

10  Q.   Is your vehicle a pickup truck?                              10:39:14

11  A.   It is.

12  Q.   Is it black?

13  A.   No.

14        MR. PARKER:  Objection, Your Honor.  Relevance on

15  this line of questioning.                                         10:39:20

16        THE COURT:  Mr. Liddy, what is the relevance of the

17  details of the transport?

18        MR. LIDDY:  Your Honor, this witness has testified in

19  this proceeding ad nauseam as to his expertise in security

20  protocols.  I would like to examine him about the security       10:39:33

21  protocols that he used moving our election data after he

22  duplicated it out of our state into a log cabin in Montana.

23        THE COURT:  The objection is overruled.

24        You may proceed.

25  \\\

United States District Court

BENJAMIN R. COTTON - Cross

| | | |
|---|---|---|
| 1 | BY MR. LIDDY: | 10:39:49 |
| 2 | Q.   So did you drive that pickup truck yourself? | |
| 3 | A.   I did. | |
| 4 | Q.   Was there anybody else in there with you? | |
| 5 | A.   My wife. | 10:39:55 |
| 6 | Q.   Did you make any stops along the way? | |
| 7 | A.   I did. | |
| 8 | Q.   Did you leave the vehicle during those stops? | |
| 9 | A.   I did but the vehicle -- if the data was still in the | |
| 10 | vehicle, there was one person at all times with the vehicle. | 10:40:02 |
| 11 | Q.   At all times? | |
| 12 | A.   Yes. | |
| 13 | Q.   Now, you mentioned that you've done some contract work for | |
| 14 | a three-letter agency that shall not be named; is that correct? | |
| 15 | A.   That's correct. | 10:40:12 |
| 16 | Q.   And is that somewhere south of the Legion Memorial Bridge | |
| 17 | and north of the Chain Bridge in Northern Virginia off the | |
| 18 | coast of the Potomac regularly referred to as Great Falls? | |
| 19 | A.   It would be in the Northern Virginia area. | |
| 20 | Q.   And would the experts with whom you've done deep dives | 10:40:29 |
| 21 | approve of the security protocol that you used in moving that | |
| 22 | data from your pickup truck from our state up to Montana? | |
| 23 | A.   Yes. | |
| 24 | Q.   What are the names of those experts in security up there | |
| 25 | in Langley that would approve of you moving that with your wife | 10:40:43 |

United States District Court

BENJAMIN R. COTTON - Cross

| | | |
|---|---|---|
| 1 | in the pickup truck? | 10:40:48 |
| 2 | A.   Langley had no involvement with this, period, and I'm not | |
| 3 | going to bring in something that is irrelevant to this because | |
| 4 | they had no authorities, no approvals on this.  What I can say | |
| 5 | is that if you want to look at the handling of classified | 10:41:04 |
| 6 | information that is available on the Internet and it's known as | |
| 7 | a hand-carry.  And, yes, they would have approved, with my | |
| 8 | security procedures, had this been classified information. | |
| 9 | Q.   You've answered my question.  You said they would have | |
| 10 | approved.  Can you give me the names of those federal | 10:41:21 |
| 11 | government experts who would have approved? | |
| 12 | A.   I am currently not working, so I have no point of contact | |
| 13 | to give you for that. | |
| 14 | Q.   So when you say they would have approved, you have no one | |
| 15 | in particular in mind; is that correct? | 10:41:35 |
| 16 | A.   What I am saying is, it would have been in accordance with | |
| 17 | the published procedures? | |
| 18 | Q.   Has anybody else had access to the data that you copied | |
| 19 | that is up there in Montana? | |
| 20 | A.   Only with the approval of the Senate. | 10:41:44 |
| 21 | Q.   May I have the names of the people that have access to it? | |
| 22 | A.   I would have to produce that.  I don't have that with me. | |
| 23 | Q.   Will you do that for us for all parties? | |
| 24 | A.   Yes. | |
| 25 | Q.   Thank you. | 10:41:56 |

United States District Court

BENJAMIN R. COTTON - Redirect

1    MR. LIDDY:  Your Honor, I have no further questions.    10:41:58

2    THE COURT:  All right.  Thank you, Mr. Liddy.

3    Now, Mr. Parker, did you have any redirect?

4                    **REDIRECT EXAMINATION**

5    BY MR. PARKER:                                           10:42:12

6    Q.   Mr. Cotton, you were asked about Congressman Shadegg's

7    review of the work that you did in his panel.  Do you recall

8    that?

9    A.    I do.

10   Q.   Did Congressman Shadegg find that there was anything you   10:42:27

11   did that was wrong or inappropriate?

12   A.    No.   Their findings were incorrect; but other than that,

13   he found no objection to the procedures or my examination

14   techniques.

15   Q.   How were there findings incorrect?                  10:42:47

16   A.   Well, first and foremost, I don't know what they examined

17   from an EMS perspective to determine that there was no Internet

18   access.  I know that under the contract that was signed by

19   Maricopa County, there were actually two EMS servers.  I don't

20   know which server they looked at.  That's not itemized in the   10:43:07

21   report.  I don't know what the basis for his findings were.

22        What I do know is that when the report came out, I

23   reran my findings and I'm confident in my findings of the

24   instances where there was Internet access.

25   Q.   So you are here to testify and swear to the fact that your  10:43:26

BENJAMIN R. COTTON - Redirect

1  findings are not changing and that you have rechecked and that                     10:43:30
2  they are accurate as it relates to connectivity?
3  A.    That is correct, and also there was a previous mention of
4  that they couldn't find the log-rolling activity and rechecked
5  all of that as well.                                                              10:43:48
6          And on the images that I preserved and are still
7  forensically preserved, that data is still there.
8          THE COURT:  I'm sorry, Mr. Parker.  You're going to
9  have to clarify that for me, the phrase log-rolling activity.
10 I'm not familiar with that.                                                       10:44:01
11         THE WITNESS:  So rolling the logs, Your Honor, is the
12 act of an individual, whether authorized or unauthorized, of
13 performing an action that essentially clears the logs out.  And
14 that is called rolling the logs in hacker vernacular.
15         THE COURT:  Thank you.                                                    10:44:17
16 BY MR. PARKER:
17 Q.    So logs remain in the system for a period of time and they
18 could be overwritten if activity overwrites -- reaches a
19 certain point that overwrites previous logs?
20 A.    Correct.                                                                    10:44:28
21 Q.    All right.
22         Turning your attention now to the questioning that
23 you just shared from the defense regarding trying to
24 differentiate between your expertise on computer systems and
25 your expertise on electronic voting computer systems.  Is there 10:44:47

United States District Court

BENJAMIN R. COTTON - Redirect

1   something unique about electronic voting computer systems that      10:44:52

2   makes your expertise about cybersecurity and computer systems

3   inapplicable?

4   A.   No.   Quite the opposite.   In the case of the Dominion

5   Voting System, for any authentication into the SQL server,          10:45:06

6   which was used to store all the voting data, all of the

7   results, all of those things, they were using what is known as

8   a user mode access.   So they were using the Windows user

9   account to grant access into the very heart of the voting

10  system.                                                             10:45:31

11           So if you have one of those shared passwords and one

12  of those user names, you could get literally right into where

13  the votes were recorded, tabulated and you could edit those

14  votes.

15  Q.   It appears the defense is taking the position that because     10:45:49

16  the Arizona voting system has not been entirely hacked and

17  decimated, to your knowledge, that it must not have happened.

18  Can hacks or malware occur undetected in computer voting

19  computer systems?

20  A.   They can, especially if you don't have a good monitoring       10:46:09

21  function in that network.   And Maricopa County had a zero

22  monitoring function on the network and on the end points.

23  Q.   They had a zero monitoring function.   What does that mean?

24  A.   It means they had none.   So any -- you know, it's

25  recommended by CISA that you have end-point monitoring and          10:46:27

United States District Court

BENJAMIN R. COTTON - Redirect

1    baseline monitoring so you can alert if any program is executed    10:46:32

2    that is not part of your approved baseline.  They also

3    recommend that you have a network-monitoring protocol so that

4    you can determine whether additional devices are added to that

5    network.  Even an air-gap network can be easily bypassed.    10:46:48

6            In this particular case there was no monitoring.

7    There was zero collection of network traffic.  There was just

8    no way they would have ever detected that if it had been a

9    memory-resident piece of malware.

10   Q.   In terms of undetectability of malicious intrusion, are    10:47:08

11   you familiar that CISA itself had an undetected malicious

12   intrusion that they didn't know about for ten months just in

13   the last short while?

14   A.   I'm not aware of that and I'm not surprised.

15           MR. GAONA:  Objection, Your Honor, as to foundation    10:47:29

16   and relevance.

17           MR. PARKER:  Your Honor, the undetectability issue is

18   of central importance to this case.  This is just an example at

19   the highest levels of the U.S. Government where undetectable

20   malware has been discovered and existed for ten months before    10:47:46

21   it was discovered.

22           THE COURT:  In a system having nothing to do with

23   Arizona's EMS.  The objection is sustained.  That's a point for

24   argument, Mr. Parker.

25   \\\

United States District Court

BENJAMIN R. COTTON - Redirect

| | |
|---|---|
| 1  BY MR. PARKER: | 10:48:03 |
| 2  Q.   Can computers be invaded by malicious attack without the | |
| 3  users' owners knowing about it? | |
| 4  A.   I would redefine "invaded."  I would say infected, but | |
| 5  yes. | 10:48:30 |
| 6  Q.   Now, you made the reference to 50 percent being | |
| 7  disenfranchised in one election and 50 percent being | |
| 8  disenfranchised in the other election.  Are you telling us that | |
| 9  50 percent of Americans were disenfranchised during either of | |
| 10 these elections or are you referring to how they may feel? | 10:48:53 |
| 11 A.   I'm referring to how they may feel. | |
| 12 Q.   So you're not asserting that they were disenfranchised? | |
| 13 A.   No. | |
| 14           MR. PARKER:  Nothing further, Your Honor. | |
| 15           THE COURT:  All right.  Mr. Parker, thank you. | 10:49:04 |
| 16       May the witness be excused? | |
| 17       Mr. Parker, may the witness be used? | |
| 18           MR. PARKER:  Yes, Your Honor. | |
| 19           THE COURT:  Mr. Gaona? | |
| 20           MR. GAONA:  Yes, Your Honor. | 10:49:21 |
| 21           THE COURT:  And Mr. Liddy, may the witness be | |
| 22 excused? | |
| 23           MR. LIDDY:  Yes, sir. | |
| 24           THE COURT:  All right. | |
| 25       You may step down, sir. | 10:49:26 |

United States District Court

C E R T I F I C A T E                         05:29:03

         I, ELAINE M. CROPPER, do hereby certify that I am

duly appointed and qualified to act as Official Court Reporter

for the United States District Court for the District of       05:29:03

Arizona.


         I FURTHER CERTIFY that the foregoing pages constitute

a full, true, and accurate transcript of all of that portion of

the proceedings contained herein, had in the above-entitled     05:29:03

cause on the date specified therein, and that said transcript

was prepared under my direction and control, and to the best of

my ability.


         DATED at Phoenix, Arizona, this 26th day of July,      05:29:03

2022.




                         s/Elaine M. Cropper             05:29:03

                         _____
                         Elaine M. Cropper, RDR, CRR, CCP




                                                          05:29:03

                    United States District Court