IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, *et al.* *Plaintiffs,* v. BRAD RAFFENSPERGER, *et al.,* *Defendants.* | CIVIL ACTION FILE NO. 1:17-CV-2989 |

**STATE DEFENDANTS' REPLY BRIEF
REGARDING INVESTIGATIVE PRIVILEGE**

State Defendants offer this reply to Plaintiffs' responses regarding investigative privilege. [Doc. 1438, 1439]. For the reasons stated in State Defendants' initial "short brief" and as more fully explained below, Plaintiffs have failed to demonstrate any need to obtain access to evaluative and investigative methods regarding an ongoing law-enforcement investigation.

**I.    Items subject to a claim of investigative privilege.**

At this juncture, it is important to delineate what State Defendants are currently withholding under such a claim following the review of investigative reports ordered by the Court. [Doc. 1424 at Tr. 16–19]. State Defendants have withheld twelve investigative reports on the basis of investigative privilege. Eleven of these reports have nothing to do with Coffee

County. The twelfth consists of the investigative report developed and written in relation to the pre-existing Coffee County allegations in SEB Case No. 2020-250. For all twelve of these reports, Plaintiffs currently possess the related investigative summaries which were presented to the SEB and reveal the underlying *factual* information pertinent to the investigation.

The thirteenth item referenced on State Defendants' privilege log concerns State's ongoing investigation into allegations concerning unauthorized access to Coffee County election equipment—allegations revealed to State Defendants **nearly a year after Plaintiffs became aware of them**. This thirteenth item is subject to a claim of both investigative privilege and work product. While Plaintiffs speculate that this dual claim indicates there is no law enforcement purpose of the investigation, [Doc. 1438 at 15–16], their speculation is just that.[1] Rather, because Plaintiffs have injected this allegation (which for nearly a year they apparently believed lacked merit) into the course of this litigation, State

---

[1] Likewise, Plaintiffs' speculation that State Defendants are engaged in some grand conspiracy to "shield communications between the State Defendants and subpoenaed witnesses from discovery" is also without merit. [Doc. 1438 at 16 n.17]. Never mind that State Defendants have done no such thing and have not in any way interfered with Plaintiffs' subpoenaed witnesses.

2

Defendants have no choice but to assert both claims regarding their evaluation of the Coffee County equipment.[2]

These thirteen items referenced in State Defendants privilege log are the *only* documents for which State Defendants are currently asserting a claim of investigative privilege.[3] And neither State Defendants nor "their lawyers" have *ever* posited that "*all documents and other information any way related to* the reported Coffee County breach are privileged—including *all facts.*" [Doc. 1438 at 16 (emphasis in original)]. Plaintiffs' counsel know this because counsel for State Defendants made that clear to them in a conference call two weeks ago. Specifically, in response to a series of interrogatories propounded on the call, State Defendants responded that questions about the existence and timing of investigations (as opposed to the sources and methods being used in an ongoing investigation) are *not* subject to a claim of investigative privilege and could be answered in the forthcoming 30(b)(6) deposition.

---

[2] State Defendants maintain that this quest into Coffee County is untimely, a matter Plaintiffs were unable to explain at the July 15 Conference, [Doc. 1424 at Tr. 22:23–23:08], which this Court has not yet addressed, and for which State Defendants reserve the right to move for discovery sanctions.
[3] If further discovery is ordered, State Defendants may assert the investigative privilege regarding other documents.

3

Regardless though, the only documents which State Defendants have reviewed for purposes of their production and privilege log are the investigative reports ordered by the Court, as previously discussed during the July 15 teleconference. [Doc. 1424 at 16–19]. Any further discovery of the State regarding Coffee County remains subject to an order of the Court on Plaintiffs' request in Paragraph 4 of their earlier filing. [Doc. 1421].

## II. The Secretary's Investigations Division and the Coffee County investigation.

The Investigations Division of the Secretary of State employs two dozen sworn, POST-certified, law enforcement officers.[4] Dec. of Ryan Germany, attached as Ex. A ("Germany Dec.") at ¶ 2. Those investigators handle matters including charities and securities fraud, professional licensing violations, and elections investigations. *Id.* Matters subject to their investigations may be referred to the Office of the Secretary of State by local prosecutors, federal law enforcement agencies, law enforcement or regulatory bodies of other states, and other governmental entities. *Id.* at ¶ 3. Their investigations may result in administrative action, civil enforcement

---

[4] The Peace Officer Standards and Training Council ("POST") establishes training requirements and administers certification of law enforcement officers in Georgia. *See* O.C.G.A. § 35-8-1, *et seq.*

4

proceedings, or referral for criminal prosecution by the appropriate authorities. *Id.* at ¶ 4.

As State Defendants have repeatedly stated, the Secretary initiated an investigation into Coffee County shortly after the 2020 elections concerning three allegations: (1) the Coffee County elections board's refusal to certify its November 2020 results; (2) a YouTube video of its former elections director utilizing the "adjudication" function and claiming to show it can alter cast votes (and in the process, revealing for the world the password for the Coffee EMS); and (3) a voter who did not timely receive the absentee ballot she requested. *Id.* at ¶ 7. Those three items of the investigation were heard by the State Election Board at its December 2021 meeting at which point the Board bound over those allegations to the Attorney General for civil enforcement proceedings. [Doc. 1397-1]. At that point, the investigation would have been considered concluded from the Secretary's perspective, because it was now with the Attorney General.[5]

After Mr. Sterling gave essentially that report during his deposition on February 24, 2022, Plaintiffs revealed the existence of the new allegations for

---

[5] The intervening replacement of the Coffee County EMS was not unusual. The Secretary's office regularly replaces non-functioning equipment in county offices and the testimony of Mr. James Barnes confirms that he was unable to log into the server. [Doc. 1440-1 at 106:13–111:24].

5

the first time, when a short clip of the telephone recording was played during Mr. Sterling's deposition. Plaintiffs provided the full recording on March 2, 2022, and Mr. Germany directed an investigator to re-open its investigation to evaluate the claims made by Mr. Hall. *Id.* at ¶ 20. Given the spurious claims previously made by Mr. Hall and individuals affiliated with him, *id.* at ¶¶ 10–17, the general unreliability and uncooperative nature of the former Coffee County Elections Supervisor, and the length of time between the date on which the alleged event occurred (January 7, 2021) and the time when the allegation was revealed to the State Defendants (February 24, 2022), the Secretary's staff and investigators determined to first proceed with evaluating forensic evidence available on the Coffee County server.[6] *Id.* at ¶ 22. In doing so, the Investigations Division has utilized the resources of its vendor, Dominion Voting Systems, as well as State Defendants' consulting expert in this litigation. *Id.* at ¶¶ 22, 24. For obvious reasons—including Plaintiffs' involvement in keeping records containing the allegations of Mr. Hall a secret—State Defendants have not disclosed details of the

---

[6] It is ironic to see Plaintiffs complain at length about available evidence going stale or possibly being no longer available. If Plaintiffs had informed State Defendants of the allegations when Ms. Marks recorded her call with Mr. Hall instead of waiting for an extended period of time, perhaps that would not be the case. Unfortunately, we will never know.

6

investigation beyond the factual timeline. That lack of disclosure does not mean no investigation is occurring, as Mr. Germany's declaration details. *Id.* at ¶¶ 21–29.

At present, given the nature of the allegations—potentially criminal,[7] beyond just Title 21—and circumstances revealed by State Defendants' investigation, the Secretary of State has also requested the assistance of the Georgia Bureau of Investigation in this matter. *Id.* at ¶ 29.

### III. Plaintiffs cannot show a need to obtain access to investigative files.

As State Defendants noted, Plaintiffs' lack of action in the year since they became aware of the allegations fails to show any need to obtain access to confidential files of the State's investigation. Coalition Plaintiffs did not even address this fact. For their part, Curling Plaintiffs addressed it in one rambling footnote. [Doc. 1438 at 25 n.23]. This is dispositive. *F.E.C. v. Rivera*, 335 F.R.D. 541, 549 (S.D. Fl. 2020) (denying motion to compel regarding work product and investigative privilege in FEC civil enforcement matter) (quoting *United States v. Gutierrez*, 931 F.2d 1482, 1491 (11th Cir. 1991)). And the

---

[7] Indeed, Mr. Maggio's assertion of his Fifth Amendment rights, [Doc. 1411], also supports this scope of the investigation.

factors noted in State Defendants' initial brief weigh in favor of denying disclosure too.

First, disclosure of this information will almost certainly thwart the government's investigation. As it stands, Plaintiffs are proceeding with depositions and subpoenas in which, as they note, recipients are either evading service or invoking their Fifth Amendment Privilege. Moreover, the Plaintiffs have—throughout this litigation—actively broadcast all possible information they obtained publicly. *See, e.g.*, [Doc. 1302-1]; *see also, e.g.*, Twitter, @MarilynRMarks1, https://twitter.com/MarilynRMarks1/status/1553556713416048640?s=20&t=_V9HePTU-89LmBk4mVMnEw (one of several Twitter threads discussing Coffee County).

Second, as State Defendants noted in their initial brief, factual information regarding Coffee County remains available to Plaintiffs. In fact, **it was Plaintiffs themselves who had knowledge of the Coffee County allegations for a year already** and took no steps to conduct third-party discovery until now. Indeed, Plaintiffs devote more than half of their brief detailing information they have already obtained. Even still, to the extent their thirst has not yet been quenched, they are presently proceeding with depositions and document subpoenas to numerous individuals.

Third, at least some of Plaintiffs themselves are sources for the allegations in the first instance. At minimum, they are already sitting through depositions of various fact witnesses and, consequently, potentially interfering with the fidelity of witnesses' independent statements—for example, Ms. Marks sat in on the deposition of Mr. Barnes, who replaced Ms. Martin as elections supervisor in Coffee County, as she has done for all depositions taken in this case.

Fourth, regardless of Plaintiffs' speculation and theories on novel questions of Georgia law, an active investigation remains ongoing. In circumstances like this, Courts have rightly "concluded that 'there ought to be a pretty strong presumption against lifting that privilege.'" *FEC*, 335 F.R.D. at 549 (quoting *F.T.C. v. Timeshare Mega Media & Mktg. Grp., Inc.*, No. 10-62000-CIV, 2011 WL 6102676, at *5 (S.D. Fla. Dec. 7, 2011) (quoting *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir. 1997)).

Finally, Plaintiffs' latest endeavor in the course of never-ending discovery in this case is only minimally relevant to their case (if at all). Plaintiffs take great umbrage that State Defendants are equating them to "luddites," [Doc. 1438 at 27–28], However, State Defendants do not dispute that Plaintiffs wish to continue using the Dominion EMS and Scanners should they succeed on their claims. Nonetheless, Ms. Marks put it best in

9

her "Facts from Marilyn" Twitter account: "I'm not bothering with Dominion to seek BMD changes. The BMDs are so inherently bad they cannot be fixed. What's the point in trying to convince Dominion? GA needs to quit BMDs." Twitter, @FactsFromMRM, https://twitter.com/FactsFromMRM/status/1553942803381633025?s=20&t=M7kPu1_dYsXzEioneKNPqg. In other words, regardless of what occurred (or did not) in Coffee County and whether the State's investigations of these allegations is sufficient in their view, Plaintiffs will remain unsatisfied so long as BMDs are utilized in Georgia.

Moreover, the allegation about which Plaintiffs seek this discovery has nothing to do with those BMDs, instead dealing with unauthorized access to the EMS and Scanners they would prefer be used, but with hand-marked paper ballots instead. In any event, no matter the type of election system that is used, county election officials must have access to that system in order to conduct elections. The best way to deal with the potential of those with required access to election equipment who misuse that access is to ensure such individuals face the consequences of their decisions.[8]

---

[8] In the instance currently under investigation in Coffee County, the insider who allegedly misused her access has already faced severe consequences (being fired from her job) and potentially faces even more severe consequences.

## CONCLUSION

This Court should allow the State's investigation to proceed without further interference from Plaintiffs. They remain free to ask questions in depositions and conduct discovery to the extent permitted by the Court. But lifting the investigative privilege at this point could have serious consequences to the fidelity of the potentially criminal investigation being conducted by the Secretary of State's investigators and the GBI.

Respectfully submitted, this 2nd day of August 2022.

/s/*Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Jonathan D. Crumly
Georgia Bar No. 199466
jcrumly@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

*Counsel for State Defendants*

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Filing has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this Response has been prepared using 13-pt Century Schoolbook font.

*/s/Bryan P. Tyson*
Bryan P. Tyson