## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

Civil Action No. 1:17-CV-2989-AT

REDACTED

## PLAINTIFFS' OPPOSITION TO MOTION TO QUASH SUBPOENAS AND FOR ATTORNEY'S FEES AND COSTS BY CATHLEEN A. LATHAM

Contrary to Cathleen A. Latham's unsubstantiated claim that she is merely an innocent bystander here, she was in fact a key figure responsible for the extraordinary breach of Georgia's voting system in Coffee County in January 2021.  According to Sullivan Strickler, the forensics firm that was engaged to copy election software and data from Coffee County equipment and devices:

> Cathy Latham was a primary point of contact in coordinating and facilitating SullivanStrickler's work in Coffee County, Georgia on January 7, 2021, pursuant to its engagement with Sidney Powell. Ms. Latham was on site in the Coffee County elections office that day while the work was performed.  (Ex. 9.)

Jil Riddlehoover, Coffee County's former Assistant to the Elections Supervisor who was in the Elections Office on January 7, 2021, also testified that Latham was there the day the breach of the Coffee County election system occurred.  Latham's lack of candor and compliance with the subpoenas she received require the discovery sought, which is highly relevant.

On June 15, 2022, Latham was served with a subpoena for a deposition and a subpoena for documents concerning unauthorized access to Georgia's voting system via Coffee County's election equipment and data.  On August 8, 2022, she appeared for a deposition, during which it became clear that she failed to produce relevant documents from her electronic devices.  She admitted failing to search for key emails and texts, confirmed the existence of documents that she never

produced (and still has not produced), exhibited ignorance about the data on her phone, made statements under oath that contradict the evidence, and selectively pled the Fifth Amendment.  As a result of Latham's non-compliance, immediately following her August 8 deposition, Plaintiffs served Latham with another document subpoena needed to search for and collect relevant data on her personal electronic devices.  Plaintiffs did not take that step lightly.  It was necessary based on a compelling record that Latham had not been forthcoming and had not complied with the original document subpoena.

Latham's Motion—which is only as to the August 8 subpoena—should be denied because (1) Latham's deposition testimony is contradicted by other credible evidence; (2) she admitted she did not produce—*and still has not produced*—all responsive documents; (3) the subpoena seeks narrowly tailored information about the Coffee County breach and Latham's role in it, which can be segregated from any personal data on her devices *just as Plaintiffs offered to do*; and (4) Latham waived the Fifth Amendment privilege by selectively answering questions on the same topics at issue.  Lastly, Latham's request for fees is absurd and wholly inappropriate under the circumstances.  The Court should deny the Motion entirely.

## **FACTUAL BACKGROUND**

Latham's Motion attempts to paint Cathy Latham as "an innocent person who is in danger of being ensnared by ambiguous circumstances."  (Motion at 2.)  But eyewitnesses and contemporaneous documents identify Latham as a primary liaison between the forensics team that copied the Georgia voting system software, Coffee County elections equipment software and data on January 7, 2021, and the Coffee County elections officials that facilitated the copying.  Indeed, counsel for the team that performed the Coffee County data collection and copying confirmed this:

> On behalf of my client, SullivanStrickler, I can confirm that Cathy Latham was a primary point of contact in coordinating and facilitating SullivanStrickler's work in Coffee County, Georgia on January 7, 2021, pursuant to its engagement with Sidney Powell.  Ms. Latham was on site in the Coffee County elections office that day while the work was performed.  (Ex. 9.)

Appendix A and the referenced exhibits clearly place Latham at the epicenter of the Coffee County breach.  (*See* Appx. A, Timeline.)[1]

---

[1] The Motion also claims Latham was "one of the presidential elector nominees in the 2020 election."  (*Id.*)  This is at best incomplete.  Latham was the Chair of the Coffee County Republican Party and one of a group of Republicans who falsely claimed to be Georgia electors and who is currently under investigation into whether Donald Trump and others illegally attempted to overturn the 2020 election.  *See* Megan Butler, *Fake Georgia GOP electors challenge subpoenas in election probe*, Courthouse News Service (July 19, 2022),

On January 6, 2021, as the Capitol building in Washington was under attack, Latham was on the phone with Scott Hall, an Atlanta bail bondsman, "about wanting to come scan our ballots from the general election like [was] talked about the other day." (Ex. 2 at 1.) Following that phone conversation, Latham texts Hall's email address to Misty Hampton, the Coffee County Elections Supervisor. (*Id.* at 5.) The next morning, on January 7, 2021, Paul Maggio emails Sidney Powell, Doug Logan (Cyber Ninjas' CEO), and others that "███████████ ███████████████████████████████████ ███████ and attaches an invoice from his computer data firm for that work. (Ex. 4 at -035.) Meanwhile, via multiple text messages and emails, including ones Latham admits exist but never produced (as discussed further below), Latham coordinates the January 7 arrival and whereabouts of the "Team . . . led by Paul Maggio" and Scott Hall. (*See* Appx. A, Timeline; Ex. 2 at 3, 6 (Latham texting Hampton multiple times of Hall and Maggio leaving, flying, landing, and arrival); Ex. 3 at -078 (Latham texting with Maggio about his whereabouts and to arrange picking up Hall).)

---

https://www.courthousenews.com/fake-georgia-gop-electors-challenge-subpoenas-in-election-probe/

Latham admits being in the Elections Office on January 7 and meeting Scott Hall there but she claims to have only been there a few minutes after 3:48 PM. However, the (then) Assistant to the Election Supervisor, Jil Riddlehoover, testified that Latham was present before 2:30 PM.  (Ex. 5 at 99-101.) Riddlehoover also admits being told by Ms. Hampton to "sit over there [and] don't say anything. You don't know what's going on."  (*Id*. at 165:12-18.)

The afternoon of January 7, 2021, Maggio updates Sidney Powell by email that " █████████████████████████████."  (Ex. 4 at -034.)  Hall stated that the team "went in there and imaged every hard drive of every piece of equipment."  (Doc. 1364-1 at 1.)[2]  "We basically had the entire Elections Committee there…[a]nd they said, 'We give you permission, go for it.'"  (*Id.*) Documents produced by Paul Maggio confirm that █████████████ ███████████████████████████████████████████ █████████████████████ (Ex. 6).

A photograph Maggio produced places Coffee County Board member Eric Chaney in the office during the copying.  (Ex. 7 at -247.)  That night, Chaney sent Hampton the phone number of Robert Sinners, a former campaign staffer for Donald Trump, who had arranged for a cadre of false electors, *Latham among*

---

[2] Voice recording available at https://bit.ly/CGGhall.

*them*, to cast electoral college votes for Trump in Georgia in "complete secrecy."[3]
Immediately after, Chaney, Hampton, and Latham collude over text to "switch to
Signal," a mobile application that can be used to encrypt, hide, and delete text
messages, shielding them from investigators.  (Ex. 2 at 2, 7-8.)  The following
morning, on January 8, 2021, Maggio emails Sidney Powell that ███████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████  (Ex. 4 at -034.)

On January 10, 2021—days after the Coffee County breach—Latham texted
Hampton to ask about the status of a scanner.  As part of the January 7, 2021
breach, cast ballots from both the January 5, 2021 Senate run-off and the
November 2021 General Election were scanned and the images were taken to be
shared with others.  Latham claimed during her deposition that she asked about the
scanner just to be "nosey"—a claim that doesn't pass the laugh test.  (Ex. 1 at
176:22-24 ("I was just being nosey.").) In fact, Plaintiffs have information that
Latham herself borrowed the scanner used to scan the ballots, from her church,

---

[3] *See* Amy Gardner, et al., *Fake Trump electors in Ga. Told to shroud plans in
'secrecy,' email shows*, Wash. Post (June 6, 2022),
https://www.washingtonpost.com/politics/2022/06/06/fake-trump-electors-ga-told-shroud-plans-secrecy-email-shows/.

where she is the Secretary and where Coffee County Board of Elections member,

Matthew McCullough, is the CFO.  (*See id.* at 169-171.)  What is clear from the

evidence is that Latham was a key player in organizing and facilitating the breach

of Georgia's voting system in Coffee County—and she not only has highly

relevant documents she still has not produced, she also has shown a lack of

trustworthiness to ensure their production.[4]

## **ARGUMENT**

### I.   **Cathy Latham's Testimony Under Oath Contradicts Credible Evidence regarding Her Critical Role with the Coffee County Breach**

Plaintiffs' subpoena is necessary because Latham was not credible in her

deposition, and it is *undisputed* that responsive documents from her electronic

devices were not produced.  During her deposition, Latham repeatedly made

statements under oath that contradict credible evidence.  Indeed, she could not tell

---

[4] Plaintiffs note that the State Defendants have taken no interest in Latham or any other material witness involving Coffee County, notwithstanding their repeated representations to the press and to the Court that their investigation – since April, 2022 – is ongoing.  To Plaintiffs knowledge, no representative of the State (including the Secretary, the State Election Board, or the GBI) to date has made any contact with Cathy Latham, Eric Chaney, Misty Hampton, Ben Cotton, anyone on the Coffee County Board, Paul Maggio, or any of their lawyers.  No investigation could be ongoing without making contact with these people.  Indeed, the only person that the State Defendants have subpoenaed—today, four days before discovery is to close—for depositions or documents, is CGG's Executive Director Marilyn Marks.

a coherent or consistent story. She first claimed Fifth Amendment privilege over whether she knew Paul Maggio. (Ex. 1 at 29:3-16, 30:21-24, 41:7-9, 41:14-16, 42:2-13.) When presented with text messages she sent passing along Maggio's phone number and movements, she then claimed she had his phone number only from an email she received from Scott Hall (that she did not produce) and passed it along without knowing why. (Ex. 1 at 122:7-11, 126:15-127:22.) "All [she] kn[e]w is that there was a guy named Paul Maggio and Scott was flying in" and she didn't know why or to see whom. (*Id.* at 129:3-7.) She testified that she "never talked to Paul Maggio." (*Id.* at 148:1-4.) But text messages produced by Maggio himself *after* Latham's deposition show she actually did communicate with Maggio, on January 7, 2021 no less, at least by text message *specifically to coordinate arrival of the SullivanStrickler forensics team and the pick-up of Scott Hall*. (Ex. 3 at -078.) Latham did not produce these messages. And again, SullivanStrickler "confirm[ed] that Cathy Latham was a primary point of contact in coordinating and facilitating SullivanStrickler's work in Coffee County, Georgia on January 7, 2021, pursuant to its engagement with Sidney Powell." (Ex. 9.)

Latham similarly claimed Fifth Amendment privilege over whether she was in the Elections Office on January 7, 2021. (Ex. 1 at 31:10-32:9.) She then testified she was there for "[j]ust a few minutes. It wasn't long at all" and it was

sometime between 3:48 and 4:45 p.m.  (*Id.* at 136:21-22, 146:4-25.)  But Jil
Riddlehoover, the Assistant to the Elections Director, testified that Latham was in
the Elections Office before 2:30 p.m.  (Ex. 5 at 99-101.)  And SullivanStrickler
confirmed "Ms. Latham was on site in the Coffee County elections office that day
*while the work was performed*."  (Ex. 9 (emphasis added).)

When presented with the texts from January 7 showing Chaney and
Hampton wanted to move their conversation to Signal, a mobile application that
permits encrypted text messaging, Latham testified that she did not install Signal
and though she "eventually got Signal on [her] phone, …[she] didn't know what it
was at this point."  (Ex. 1 at 147:5-25.)  But texts from Latham—again, that she
failed to produce herself though she produced immediately adjoining texts—show
that *on January 7* she confirmed "I'm on signal."  (Ex. 2 at 8.)

Latham also pled the Fifth about whether she knew Scott Hall, but when
presented with evidence that she spoke with him, she eventually admitted that she
had been in contact with Hall multiple times, put him in contact with Misty
Hampton, and advised Hampton of the arrival and approach of the team including
Hall and Maggio.  (*Compare* Ex. 1 at 42-43 *with id.* at 112-115, 117, 123-31, 153-
54.)  Latham testified that she did not know why Hall was in Coffee County, but
then when confronted with her own texts—that she did not produce—about a

borrowed scanner, she then remembered "because [she] had forgotten why – what I had talked to Scott about, and he was there to scan ballots." (*Compare* Ex. 1 at 115, 123-31, 153-54 *with id*. at 169:11-17.)  Two days after the Coffee County breach, Latham followed up with Hampton "Did you all finish with the scanner?" to which Hampton responds "Not yet. I am hoping by Tuesday. Do they need the scanner back??" and Latham responds "No one has said anything."  (Ex. 2 at 8.) These texts were never produced by Latham.  She testified a "scanner had been borrowed" and she was merely curious and "nosey" about it, but then pled the Fifth on where it was borrowed from.  (Ex. 1 at 171-79.)  Plaintiffs have information that Latham herself borrowed the scanner from her church—where she is the Secretary and where Elections Board Member McCullough is the CFO—for Scott Hall's team's scanning of the Coffee County ballots.  Latham's testimony flipped back and forth between not knowing anything about the scanner to knowing a fair amount to selectively pleading the Fifth as to its provenance.  (*See* Ex. 1 at 169-179, 187-190.)  The Court can and should rightly infer from her selective Fifth Amendment invocation that she did in fact provide the scanner and knew what it was for as a key organizer of the Coffee County breach.  *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009).

Latham also pled the Fifth on what efforts she undertook to search for responsive documents, whether she searched her personal devices, whether she has withheld responsive documents, and what the basis was for her counsel's representation that Latham had performed a due and diligent search and produced all responsive documents.  (Ex. 1 at 22:23-23:10, 50:19-51:8, 52:1-24.)  Though Latham refused to respond to these questions, the Motion states that she has provided all responsive documents.  (Motion at 6-7.)  Latham cannot have it both ways—claiming compliance but refusing to answer numerous questions about the efforts, if any, taken to comply with the subpoenas.  The Court can and should infer from her invocation of the Fifth Amendment on that topic that the answers would reveal a lack of compliance.

Further, Latham's claim of compliance is demonstrably incorrect far beyond a simple "inadvertent" failure to search for one email address.[5]  She admitted that she received multiple phone calls and email messages from Scott Hall, but she did not produce a single such email.  (Ex. 1 at 131:5-132:12; *see also* Ex. 1 at 156-164

---

[5] Notably, Latham should have been on heightened alert to be cautious with her electronic data because on December 23, 2020, Latham received a letter from Dominion's counsel instructing her to ensure that she maintain emails, text messages, recordings, voice mails, drafts, notes, communications, documents, data, and electronically store information relating in any way to the use of the Dominion election system in the November 2020 election.  (Ex. 10.)  So all her documents related to the Coffee County breach should have been preserved.

(discussing nearly a dozen emails she sent and received from Hall including about RLA county data, contact information for others, and Dominion contracts that have still not been produced); *id.* at 164-65 (admitting that she communicated with Hall on Signal); *id.* at 167 (being shown text message with Misty Hampton regarding use of Signal, which Latham didn't produce); *id.* at 168 (discussing text messages Latham found on her phone with Ms. Hampton that she did not produce, which discussed a scanner).)  Notably, though agreeing to produce files found on her phone during her deposition that were not previously produced, *Latham has yet to produce a single such file*.  (*See* Ex. 1 at 213.)

Text messages produced by Latham and others point to the intentional use of Signal in order to shield those communications from scrutiny and discovery and intentional deletion of emails and texts.  A forensic collection and extraction of these email, text messages, iMessages, and encrypted communications, focused on the relevant individuals, dates, and events, and with necessary safeguards to protect Latham's privacy (discussed below), is necessary to help discern the full scope of the Coffee County breach and Latham's pivotal role in it.

Even in the most innocent light, Latham exhibited a complete lack of diligence and knowledge of what content is maintained on her phone and how to access it, at one point asking if she could ask her attorney for the answer to what is

12

on her phone. (*See* Ex. 1 at 79:22-80:9; *see also id.* at 80:11-15 ("I couldn't tell you if everything uploaded or not"); *id.* at 81 (having "no idea" whether and how she transferred data from her old phone and thinking she does not have an Apple account on an iPhone, which is always required); *id.* at 61 (pleading Fifth Amendment when asked if she uses an iPhone); *id.* at 82 (initially being instructed by her attorney to claim Fifth Amendment privilege over whether she has an iCloud Apple account); *id.* at 155:21-156:1 (later testifying she has an iCloud account but doesn't know how to access it to pull data stored).)  Whether through lack of technological knowledge and a selective memory, or intentional obfuscation, Latham's testimony and other documents demonstrate that she did not search for or produce critical documents and communications, which she testified have not been deleted, with the individuals involved in the breach of the Georgia voting system.  Thus, a reasonable forensic extraction is necessary.

The above facts neatly rebut the representation in Latham's Motion that "Ms. Latham has *no* undisclosed information relevant to Plaintiff's case."  (Motion at 6 (emphasis in original).)  By Latham's own admission, emails exchanged with Scott Hall have yet to be produced.  (Motion at 3.)  The sole remaining way to obtain those and other highly relevant documents is through the subpoena of her devices.  *See Barton & Assocs., Inc. v. Liska*, 2020 WL 8299750, at *1 (S.D. Fla.

May 11, 2020) (finding that, because a witness had failed to produce copies of any text messages during the non-compete period and had failed to preserve his phone, a forensic examination was warranted); *Health Mgmt. Assocs., Inc. v. Salyer*, 2015 WL 12778793, at *1 (S.D. Fla. Aug. 19, 2015) (finding that the plaintiff had made a sufficient demonstration of need for forensic examination when the devices at issue were likely to contain information relevant to the litigation and the defendant had failed to cooperate in discovery); *Wynmoor Cmty. Council, Inc. v. QBE Ins. Corp.*, 280 F.R.D. 681, 687 (S.D. Fla. 2012) (finding a forensic examination to be warranted when the plaintiffs were either unwilling or unable to conduct a search of their computer systems for documents responsive to the defendant's discovery requests).

## II.   The Subpoena Properly Seeks Narrowly Tailored Information Relevant to the Breach of Coffee County and Is Proportional to Latham's Role

Latham's arguments that the subpoena improperly seeks irrelevant and private information and is disproportionate also fail.  Questioning Plaintiffs' "true motives," Latham's Motion falsely claims that Plaintiffs' subpoena is "an excuse to go on an unbounded fishing expedition" "so that they can rifle through her personal, confidential, and privileged information unfettered."  Not so.  Latham omits that Plaintiffs' explicit offer belying that claim:

14

> Regarding your concern about privilege, we would have the [independent e-discovery] vendor search for and identify any communications with you or her criminal counsel so that we would not have access to those. If there are other carve-outs you would like to discuss, we are happy to have that discussion. We're not looking to invade legitimate privilege or to access irrelevant, personal information. But it is now clear that we cannot rely on you and your client to provide all the documents that she was obligated to provide in response to our subpoenas.  (Ex. 8.)

Rather than respond to this offer from Plaintiff's counsel for appropriate provisions to safeguard Latham's privacy and privilege, Latham filed the Motion claiming disingenuously that Plaintiffs' sole intent was to "rifle through her personal . . . information unfettered."  (Motion at 6.)

Equally specious is Latham's claim that her role is irrelevant to the case, stating repeatedly that it is a years-old case, which is entirely beside the point.[6] Plaintiffs' complaints challenge the constitutionality of the current Dominion BMD voting system in Georgia.  This case concerns the reliability of that voting system and its implications for the individual right to vote and the outcomes of local, state, and national elections in Georgia.  The subpoena seeks information to understand the extent to which that voting system and election data might have been improperly accessed and compromised.  The Court has already repeatedly held that

---

[6] This argument, along with a clear misunderstanding of when it is appropriate to claim a Fifth Amendment privilege, also raises the concern that Latham improperly withheld documents and testimony based on the unilateral determination that it was irrelevant or incriminating.

the Coffee County breach is relevant to this case and the high stakes and public

interest in election integrity in Georgia.  (Doc. 1442 (denying Maggio motion to

quash); June 7 Tr. at 27, 29, 63.)  The record described above reflects that Latham

interacted with and coordinated a group of individuals, at the request of Sidney

Powell, to travel to Coffee County, by putting them in contact with the Coffee

County Elections Supervisor and arranging for transportation to the Coffee County

Elections Office, where she was also present during the breach.  She evidently also

supplied a scanner for the purpose of scanning Coffee County cast ballots.  Her

selective testimony about those extraordinary events raises serious questions of

what actually occurred, why, when, and by whom.  What is beyond dispute is that

Latham has been neither candid nor fully correct in the little she has provided.

The subpoena also meets any requirements of proportionality.  The subpoena

has a single narrowly-tailored request.  All that is required is for Latham to make

her devices available for a short period of time (much shorter than her deposition)

for a forensic collection, with her devices immediately returned to her.  The

independent discovery vendor could cull out legitimately privileged and irrelevant,

private material without accessing the substance through appropriate search

protocols.  Initial reliance on Latham to perform the search herself clearly resulted

in the production of incomplete data, as evidenced by her own testimony and her

16

correspondence produced by and testified by other witnesses.  This incompleteness is compounded by the fact that Latham pled the Fifth for large parts of her deposition, making documentary evidence particularly important.  The incompleteness is further compounded by Coffee County's similar gaps in data.[7] The subpoena is narrowly tailored to the singular request for Latham's electronic devices and potential unauthorized access to Georgia's voting system.

Rule 26 allows for discovery that is "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  Proportionality is generally defined by looking at "the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation."  *Id.; see also Se. Mech. Servs., Inc. v. Brody*, 2009 WL 3095642 (N.D. Ga. June 22, 2009) (stating that "the scope of subpoenas for production of documents pursuant to Rule 45 is the same as the scope of discovery under Rule 26(b)" (internal citations omitted)).  Any objection to a discovery request "should be plain enough and specific enough so

---

[7] For example, Misty Hampton's mobile device contained data stopping as of January 1, 2021, according to Coffee County, even though the breach occurred after this time frame; no Coffee County Election Board members produced any correspondence (except for a single email from Eric Cheney falsely claiming no knowledge of the Coffee County breach that he helped organize and physically oversee (Ex. 12; Ex. 11 at 24:23-31:2; Ex. 7 at -247); and recordings of critical meetings of the Coffee County Board of Elections are inexplicably missing. Cheney repeatedly pled the Fifth in his deposition.  (Ex. 11 at 24:23-31:2.)

that the court can understand in what way the [requests] are alleged to be objectionable." *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1559 (11th Cir. 1985) (internal citations omitted).  "To establish that complying with a subpoena would result in an undue burden, a party or non-party may show 'the money, work-hours, or other cost' associated with complying." *Hudson v. Wal-Mart Stores East, LP*, 2020 WL 8882048 (M.D. Ga. Oct. 28, 2020) (citing *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018).  Vague and conclusory assertions are not sufficient.  *Id.*  Latham falls far short of her burden.  She provides no facts or any specific showing supporting her claim of burden, apart from a general fear of Plaintiffs' "true motives," which is amply addressed by the proposed safeguards to her personal information.

## III.   The Fifth Amendment Privilege Does Not Prohibit the Production of Documents that May Contain Incriminating Information.

Given the above revelations, Latham's claim that she "has provided Plaintiffs all of the non-privileged information that [Plaintiffs] have requested" is meritless.  (*See* Motion at 3-4 n.2.)  Latham's contention that because she is a target of criminal investigation, her phone and other electronic devices contain protected information is misplaced.  (*See* Motion at 8 n.5.)  Latham's devices and the data on them are not protected by the Fifth Amendment privilege, and any Fifth

Amendment Privilege as to the events of the Coffee County breach has been waived in any event.

First, the Court has already held in this case, in ruling on Maggio's motion to quash, that "the Fifth Amendment does not prohibit the production of documents when the creation of the documents was not compelled." (Doc. 1442 at 4.)  It is well settled "that a person may be required to produce specific documents even though they contain incriminating assertions," as long as "the creation of those documents was not 'compelled'." *United States v. Hubbell*, 530 U.S. 27, 35-36 (2000). Thus, papers that are "voluntarily prepared prior to the issuance of the summonses" are not considered to "contain compelled testimonial evidence." *Id.* at 36-37 (citing *Fisher v. United States*, 425 U.S. 391, 409-10 (1976)).  As a result, an individual cannot avoid compliance with a subpoena "merely because the demanded documents contained incriminating evidence." *Id.* at 36.  Because the subpoena does not seek the *creation* of any incriminating (or other) documents, the Fifth Amendment provides no support for Latham's Motion.

Second, Latham has waived the Fifth Amendment privilege.  Latham *initially* pled the Fifth as to nearly every question for hours.  But then she testified for hours as to her knowledge and involvement with Scott Hall, Paul Maggio, Eric Chaney, and Misty Hampton, the events involving the Coffee County breach, and

her activities on January 5-8, only selectively invoking the Fifth when she found it self-serving to do so—and often improperly.  (*See, e.g.,* Ex. 1 at 171:11-15 (after testifying as to the purpose, use, timing, type, and features of the borrowed scanner, pleading the Fifth selectively only on where the scanner came from because "I'm not going to pull anybody in to something.")  As discussed above, Latham pled the Fifth as to some, but not all, details of the events surrounding January 7 and her interactions with the Coffee County Board of Elections, the Elections Supervisor, the team copying the Coffee County elections software and data, and the Trump campaign.  She cannot then choose to selectively shield some facts of those associations and activities.  In so doing, she has done exactly what the courts have held a witness cannot do: create a distorted record that inaccurately serves the narrative she is trying to spin to avoid the culpability she clearly has as a key member of the group who organized the breach of Georgia's voting system.  If a deponent voluntarily discloses any facts regarding a criminal transaction or connection, she is not permitted to stop, but must go on, because disclosure of a fact waives the privilege as to details.  *Brown v. Walker*, 161 U.S. 591, 597 (1896); *Rogers v. United States*, 340 U.S. 367, 373 (1951). The rationale is that if a deponent were permitted to select the stopping point after disclosing facts, and then assert her Fifth Amendment privilege as to the details surrounding the facts, a great

20

distortion of the facts would result.  *Brown*, 161 U.S. at 597; *Rogers*, 340 U.S. at 373; *nBank, Nat'l Ass'n v. Radian Servs., LLC*, 2005 WL 8156166, at *2 (N.D. Ga. Aug. 5, 2005) ("Moreover, once a witness discloses incriminating facts or associations, she cannot refuse to disclose the details; she cannot say that she was involved and then refuse to answer questions that would fully disclose the scope and details of her involvement." (citing *Rogers*, 340 U.S. at 373)).

Even if the Court were not to find waiver, it can and should draw adverse inferences from Latham's invocation of the Fifth Amendment, particularly because Latham has selectively invoked the Fifth and independent evidence shows she was dishonest.  *See Eagle Hosp. Physicians*, 561 F.3d at 1304 ("[I]n a civil suit such as this one, the court may draw adverse inferences against a party that invokes the Fifth Amendment.").  ***The adverse inference supports the subpoena because Latham asserted the Fifth even as to the efforts she took to comply with the subpoena and whether she has in fact produced all documents.***  Again, the Court can and should infer that the answers to those questions would be unfavorable to her, particularly given the independent evidence supporting the inference and Latham's own testimony showing her search and production for documents was not diligent at best and obfuscatory at worst.

## IV.    Latham Is Not Entitled to Attorney's Fees

21

Because the subpoena is proper for the reasons above, Latham's request for fees should be denied (if anyone is awarded fees and costs, it should be Plaintiffs for having to respond to this meritless Motion after Latham failed to comply with the subpoenas and provided incoherent and inaccurate testimony in her deposition). Latham claims that she is entitled to attorney's fees for the expenses incurred filing her motion to quash under Rules 26 and 45.  (Motion at 9.)  Contrary to Latham's claim that Plaintiffs "have not even attempted compliance with their mandatory Rule 45 duty to 'take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena,'" Plaintiffs' subpoena at issue contains a single request and Plaintiffs offered to pay themselves for an independent e-discovery vendor to collect the data sought in a manner that would not invade legitimate privilege or collect personal, irrelevant data.[8]  All Latham must do is produce her electronic devices to the vendor for a short period.

## CONCLUSION

Latham's Motion to Quash Subpoenas lacks merit.  Her failure to produce electronic documents that clearly exist raise sufficient question of her ability or willingness to search for and produce responsive data critically important to discerning the breach of the Coffee County election system.  Sufficient safeguards

---

[8] *See supra*, page 9.

will be used to protect her private and privileged data, while permitting a forensic

extraction of critical information.  This data is highly relevant, proportional to the

needs of the case, and not entitled to immunity or privilege under the Fifth

Amendment.  The Court should thus deny the Motion.  Additionally, the Court

should deny Latham's request that the Court assess fees and costs.

Respectfully submitted this 29th day of August, 2022.

| | |
|---|---|
| _/s/ David D. Cross_ | _/s/ Halsey G. Knapp, Jr._ |
| David D. Cross (*pro hac vice*) | Halsey G. Knapp, Jr. |
| Mary G. Kaiser (*pro hac vice*) | GA Bar No. 425320 |
| Veronica Ascarrunz (*pro hac vice*) | Adam M. Sparks |
| Hannah R. Elson (*pro hac vice*) | GA Bar No. 341578 |
| MORRISON & FOERSTER LLP | KREVOLIN & HORST, LLC |
| 2100 L Street, NW, Suite 900 | 1201 West Peachtree Street, NW |
| Washington, DC 20037 | Suite 3250 |
| (202) 887-1500 | Atlanta, GA 30309 |
| | (404) 888-9700 |

*Counsel for Plaintiffs Donna Curling, Donna Price & Jeffrey Schoenberg*

| | |
|---|---|
| _/s/ Russell T. Abney_ | _/s/ Bruce P. Brown_ |
| Russell T. Abney | Bruce P. Brown |
| Georgia Bar No. 000875 | Georgia Bar No. 064460 |
| WATTS GUERRA, LLP | BRUCE P. BROWN LAW LLC |
| 4 Dominion Drive, Building 3 | 1123 Zonolite Rd. NE |
| Suite 100 | Suite 6 |
| San Antonio, TX 78257 | Atlanta, Georgia 30306 |
| (404) 670-0355 | (404) 881-0700 |

*Counsel for Plaintiff Coalition for Good Governance*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been

prepared in accordance with the font type and margin requirements of LR 5.1, using

font type of Times New Roman and a point size of 14.

*/s/ David D. Cross*
David D. Cross

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2022, a copy of the foregoing

**PLAINTIFFS' OPPOSITION TO MOTION TO QUASH SUBPOENAS AND**

**<u>FOR ATTORNEY'S FEES AND COSTS BY CATHLEEN A. LATHAM</u>** was

electronically filed with the Clerk of Court using the CM/ECF system, which will

automatically send notification of such filing to all attorneys of record.

*/s/ David D. Cross*
David D. Cross

**Appendix A: Timeline**

| Date | Event | Source |
|------|-------|--------|
| Jan. 6, 2021, 4:26 PM | Misty Hampton (Elections Supervisor) texts Eric Chaney (Coffee County Elections Board member) that **Latham** is on the phone with Scott Hall "about wanting to come scan our ballots from the general election like we talked about the other day." | Ex. 2 (Latham Ex. 6) at 1. |
| Jan. 6, 202, 5:06 PM | **Latham** texts Scott Hall's email address to Misty Hampton: " ███████████████ " | Ex. 2 (Latham Ex. 6) at 5. |
| Jan. 7, 2021, 9:46 AM | **Latham** texts Misty Hampton that Hall/Maggio "Team left Atlanta at 8. 5 members led by Paul Maggio ██████ . Scott is flying in" and advising Misty of Scott Hall's last name. | Ex. 2 (Latham Ex. 6) at 6. |
| Jan. 7, 2021, 10:31 AM | Paul Maggio emails Sidney Powell, Doug Logan, and others that ████ ████████████████ ████████████████ and attaching the invoice for Sullivan Strickler's retainer. | Ex. 4 (Chaney Ex. 10, Maggio emails) at -035. |
| Jan. 7, 2021, 11:09 AM | **Latham** texts the municipal airport address to Paul Maggio and he instructs her to have " ████ " pick up Scott. | Ex. 3 (Maggio texts) at -078. |

| Date | Event | Source |
|------|-------|--------|
| Jan. 7, 2021, 11:33 AM | **Latham** asks Paul Maggio how far out he is and he responds that they are in town and ███████████████ ████████████████████ " | Ex. 3 (Maggio texts) at -078. |
| Jan 7, 2021, before 2:30 PM | **Latham** was in the Elections Office on January 7 before 2:30PM | Ex. 5 (Jill Riddlehoover Tr.) at 99-101. |
| Jan. 7, 2021, before 3:48 PM | **Latham** texts Misty Hampton "Scott has landed and the rest of team is almost to Douglas" | Ex. 2 (Latham Ex. 6) at 3. |
| Jan 7, 2021, between 4-5 PM | **Latham** was in Elections Office and met Scott Hall | Ex. 1 (Latham Tr.) at 139-140. |
| Jan. 7, 2021, 4:10 PM | Maggio emails Sidney Powell that ████████████████████ ███████████████ " and asking for confirmation of payment. | Ex. 4 (Chaney Ex. 10, Maggio emails) at -034. |
| Jan. 7, 2021, 7:24 PM | Eric Chaney texts Misty Hampton "Let's switch to Signal" | Ex. 2 (Latham Ex. 6) at 2. |
| Jan. 7, 2021, 8:02 PM | Misty Hampton texts **Latham** to switch to Signal and **Latham** responds that she is on signal. | Ex. 2 (Latham Ex. 6) at 7-8. |
| Jan. 8, 2021, 3:48 PM | Paul Maggio emails Sidney Powell that ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ██████████ " | Ex. 4 (Chaney Ex. 10, Maggio emails) at -034. |

| Date | Event | Source |
|---|---|---|
| Jan. 10, 2021, 4:07 PM | **Latham** asks Misty Hampton "Did you all finish with the scanner?"<br><br>Misty Hampton responds "Not yet. I am hoping by Tuesday. Do they need the scanner back??"<br><br>Latham responds "No one has said anything." | Ex. 2 (Latham Ex. 6) at 8.<br><br>(These texts were never produced by Latham)<br><br>Latham initially testified she did not know what Scott Hall was doing in Coffee County but when confronted with these texts remembered it was to scan ballots and then pled the Fifth as to the provenance of the scanner.  Ex. 1 (Latham Tr.) at 169-173. |