# EXHIBIT 1

## Redacted for PII

Page 1

1                    UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF GEORGIA

2                          ATLANTA DIVISION

3             Civil Action No. 1:17-cv-02989-AT

4

5    DONNA CURLING, et al.,

6              Plaintiffs,

7    vs.

8    BRAD RAFFENSPERGER, et al.

9              Defendants.

10

11

12                 VIDEOTAPED DEPOSITION OF

13                    CATHLEEN LATHAM

14

15                     August 8, 2022

16                       10:15 a.m.

17

18                 Warner Robins, Georgia

19

20

21          Laura M. MacKay, RPR, CCR-B-1736

22                 (Appearing remotely)

23

24

25

Page 2

1                          INDEX TO EXHIBITS

2

3    EXHIBIT          DESCRIPTION                          PAGE

4    For the Plaintiffs:

5      Exhibit 1    Subpoena to Produce Documents        49

6      Exhibit 2    Subpoena to Produce Documents        51

7                   served by Coalition plaintiffs

8      Exhibit 3    Screen shot from Hampton video        53

9      Exhibit 4    Letter dated 12/23/20 re Notice of    58

10                  Obligation to Preserve Documents

11                  Related to Dominion

12     Exhibit 5    Draft executive order dated          62

13                  December 16, 2020, from President

14                  Trump

15     Exhibit 6    iPhone text message string screen    74

16                  shots

17

18

19

20

21

22

23

24

25

Page 3

1                        INDEX TO EXAMINATION

2

3    BY MR. CROSS                                        10

4    BY MR. ABNEY                                        198

5    BY MR. PICO-PRATS                                   207

6    BY MR. CROSS                                        212

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 4

1   APPEARANCES OF COUNSEL:

2   On behalf of the Plaintiffs:

3            DAVID D. CROSS, Esq.

4            Morrison & Foerster LLP

5            2100 L Street, NW

6            Suite 900

7            Washington, D.C. 20037

8            (202) 887-1500

9            dcross@mofo.com

10  -and-

11           ADAM M. SPARKS, Esq.

12           Krevolin & Horst, LLC

13           One Atlantic Center

14           1201 West Peachtree Street, NW

15           Suite 3250

16           Atlanta, GA  30309

17           (404) 888-9700

18           sparks@khlawfirm.com

19

20

21

22

23

24

25

```
                                              Page 5
 1   APPEARANCES OF COUNSEL: (Con't)
 2   On behalf of the Coffee County Board of Elections:
 3            STEPHEN DELK, Esq. (Via Zoom)
 4            Hall Booth Smith, P.C.
 5            1564 King Road
 6            Tifton, GA  31793
 7            229.382.0515
 8            sdelk@hallboothsmith.com
 9   On behalf of the Coalition for Good Governance:
10            RUSSELL T. ABNEY, Esq. (Via Zoom)
11            Watts Guerra, LLP
12            Dominion Drive
13            Building 3, Suite 100
14            San Antonio, Texas 78257
15            866.457.3403
16            rabney@wattsguerra.com
17   On behalf of the State Defendants:
18            JAVIER PICO-PRATS, Esq. (Via Zoom)
19            CAREY MILLER, Esq. (Via Zoom)
20            22 Robbins Firm
21            500 14th Street, NW
22            Atlanta, Georgia 30318
23            678.701.9381
24            javier.picoprats@robbinsfirm.com
25            cmiller@robbinsfirm.com
```

Page 6

```
 1   APPEARANCES OF COUNSEL: (Con't)
 2   On behalf of the Witness:
 3           ROBERT D. CHEELEY, Esq.
 4           Cheeley Law Group
 5           2500 Old Milton Pkwy
 6           Suite 200
 7           Alpharetta, GA  30009
 8           bob@cheeleylawgroup.com
 9           (770) 814-7001
10   Also Present:  (Via Zoom)
11           Caroline Middleton
12           Duncan Buell
13           Ernestine Thomas-Clark
14           Jenna Conaway
15           Kevin Skoglund
16           Marilyn Marks
17           Mary Kaiser
18           Susan Greenhalgh
19           Wail Jihadi
20           Oluwasegun Joseph
21           Philip Stark
22           Sonya Swanbeck
23           Veronica Ascarrunz
24   Videographer:
25           LEO MILEMAN
```

Page 7

1            (Pursuant to Article 10(B) of the Rules and

2     Regulations of the Georgia Board of Court Reporting,

3     a written disclosure statement was submitted by the

4     court reporter to all counsel present at the

5     proceeding.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE VIDEOGRAPHER:  Good morning.  We are

2       on the video record at 10:15 a.m. on Monday,

3       August the 8th, 2022.  Please note that the

4       microphones are sensitive and may pick up

5       whispering and private conversations.  Please

6       mute your phones at this time.  Audio and

7       video recording will continue to take place

8       unless all parties agree to go off the

9       record.

10          This is Media Unit 1 of the video

11      recorded deposition of Cathleen Latham taken

12      by counsel for plaintiff in the matter of

13      Donna Curling versus Raffensperger, et al,

14      filed in the Northern District of Georgia,

15      Atlanta Division.

16          Location of this deposition is Portland

17      Hotel in Warner Robins, Georgia.

18          My name is Leo Mileman representing

19      Veritext, I'm the videographer.  The court

20      reporter is Laura MacKay from the firm

21      Veritext.  I'm not related to any party in

22      the action nor am I financially interested in

23      the outcome.

24          If there are any to proceeding, please

25      state them at the time of your appearance.

1    Counsel and all present, including remotely,

2    will now state their appearances and

3    affiliations for the record beginning with

4    the noticing attorney after which the court

5    reporter will swear in the witness.

6         MR. CROSS:  David Cross, Morrison &

7    Foerster representing the Curling plaintiffs.

8    And with me is my colleague Adam Sparks of

9    Krevolin & Horst.

10        MR. CHEELEY:  Bob Cheeley representing

11   Ms. Latham.

12        MR. ABNEY:  Russ Abney representing the

13   Coalition plaintiffs.

14        MR. PICO-PRATS:  This is Javier

15   Pico-Prats representing the State

16   defendants.

17        THE WITNESS:  I can't understand them at

18   all.

19        MR. DELK:  Stephen Delk on behalf of

20   Coffee Board of Elections.

21        (Off-the-record discussion.)

22        (Recess 10:18-10:34 a.m.)

23        THE VIDEOGRAPHER:  Back on the video

24   record at 10:34 a.m.  Everyone please

25   continue with their names after which the

1        court reporter will swear in the witness.

2            MR. CHEELEY:  This is Bob Cheeley,

3        counsel for Cathy Latham.  And I would object

4        to Fulton County being on this call.  They're

5        not a party to the case.

6            MR. CROSS:  They are.  They're a

7        defendant.

8            MR. CHEELEY:  Okay.  I didn't realize

9        that.

10           MR. CROSS:  And like I said, Bob, I

11       don't -- this is David Cross by the way.  I

12       don't know if you can see me.  I don't see

13       their counsel on here anyways, but they are a

14       party.

15           Laura, you want to swear the witness.

16           THE COURT REPORTER:  Sure.

17                     CATHLEEN LATHAM,

18   having been duly sworn, was examined and testified

19   as follows:

20                     EXAMINATION

21   BY MR. CROSS:

22       Q.  Good morning, Mrs. Latham.

23       A.  Good morning.

24       Q.  Have you been deposed before?

25       A.  No, sir.

1      Q.  So this is your first time.  Let me just --

2   quick overview, I'm sure Mr. Cheeley walked you

3   through it a little bit.  But I'm going to ask you

4   questions today on behalf of the Curling plaintiffs.

5   My name is David Cross.  My colleague, Mr. Sparks is

6   here with me.

7           There may be other lawyers that are going

8   to ask you questions as well.  There are two groups

9   of plaintiffs here.  Russ Abney, who is also on,

10   represents the other group of plaintiffs which

11   includes an organization called the Coalition for

12   Good Governance.  And the director of that

13   organization is Marilyn Marks, who I believe you

14   know.

15           And there are -- there's counsel for the

16   secretary of state's office on.  They may have

17   questions as well.  And if Fulton County joins, they

18   may have questions, too.

19           It will be important during the course of

20   the day that we both speak loud for the court

21   reporter otherwise we're both going to be repeating

22   ourselves.  I'll ask the questions, you will give

23   your answers.  Whatever question I ask, you have to

24   give an answer unless Mr. Cheeley instructs you not

25   to answer for privilege.

Page 12

```
 1          Do you have any questions about the
 2   process?
 3        A.  No.
 4        Q.  Okay.  And you understand you are under
 5   oath today?
 6        A.  Yes.
 7        Q.  And do you understand that's the same oath
 8   you would take if you were testifying live in a
 9   courtroom?
10        A.  Yes.
11        Q.  Can you state your full name for the
12   record.
13        A.  Cathleen Latham.
14        Q.  And do you have a middle name or a first
15   name?
16        A.  Just my maiden name.
17        Q.  And what is that?
18        A.  Alston.
19        Q.  Where do you currently reside?
20        A.  Texas.
21        Q.  What's your address there?
22        A.  I'm not giving it.  It's brand new and
23   Marilyn Marks has sent people to my house to
24   intimidate me and interview me and stuff, and I
25   prefer not to be harassed.  I will give my Georgia
```

Page 13

```
 1   address which is still here, but not my new address.
 2         Q.   So did you travel in from Texas for the
 3   deposition?
 4         A.   I was here.  I came in a week ago.
 5         Q.   And so you still own a residence in
 6   Georgia?
 7         A.   Yes.
 8         Q.   And what is that address?
 9         A.   ████████████████████████████████████.
10              Who else came into the meeting?
11         Q.   That was Mr. Sparks joining.
12              We'll deal with the Texas address other
13   ways.  Is there any other property that you own in
14   the state of Georgia?
15         A.   No.
16         Q.   When did you relocate to Texas?
17         A.   July 1st.
18         Q.   All right.  Did you go to college?
19         A.   Yes.
20         Q.   Where?
21         A.   Baylor.
22         Q.   When did you graduate?
23         A.   That's giving my age.
24         Q.   Sorry.
25         A.   1988.
```

Page 14

1      Q.   And did you graduate with a degree I

2   assume?

3      A.   Yes.

4      Q.   What was that in?

5      A.   Education.

6      Q.   And do you have any other formal

7   educational degrees apart from college?

8      A.   Yes.

9      Q.   What is that?

10     A.   I have a master's from Troy University.

11     Q.   Where is Troy University?

12     A.   Alabama.

13     Q.   The master's is also in education?

14     A.   Yes.

15     Q.   Any other formal education?

16     A.   No.

17     Q.   You were a school teacher for years; is

18   that right?

19     A.   Yes.

20     Q.   How long did you teach?

21     A.   In Georgia, 28 years.

22     Q.   Did you teach anywhere else?

23     A.   Yes.

24     Q.   Where?

25     A.   Texas, Pennsylvania.

Page 15

```
 1      Q.  So when you graduated Baylor in '88, did
 2  you go directly to Troy?
 3      A.  No.
 4      Q.  How long did you take off between
 5  undergraduate and Troy?
 6      A.  2005 to 2006 is when I was at Troy.  And
 7  they had a cohort that came to Douglas, so I didn't
 8  travel to Alabama.
 9      Q.  So from '88 to 2005 you were teaching?
10      A.  Yes.
11      Q.  And where did you teach first?
12      A.  I was a substitute teacher in Texas, so I
13  taught many places.
14      Q.  And how long did you teach in Texas?
15      A.  A semester.
16      Q.  And then you -- did you go from there to
17  Pennsylvania?
18      A.  Yes.
19      Q.  How long were you there roughly?
20      A.  Five years.
21      Q.  And then from there to Georgia?
22      A.  Yes.
23      Q.  And where did you first teach in Georgia?
24      A.  I've only taught at Coffee High School in
25  Douglas, Georgia.
```

Page 16

```
 1        Q.  So the address you gave me earlier in
 2   Douglas, is that the only address you've ever lived
 3   at in Georgia?
 4        A.  Except for a temporary rental house and I
 5   do not remember that address.
 6        Q.  When did you retire teaching?
 7        A.  May 2021.
 8        Q.  So you taught in Georgia.  When you went to
 9   Troy, did you take time off from teaching for that
10   or did you do them both at the same time?
11        A.  I did them both at the same time.
12        Q.  Do I understand you taught economics?
13        A.  Yes.
14        Q.  Are you currently employed?
15        A.  I just teach adjunct.  Right now I'm not
16   working.
17        Q.  Where do you teach adjunct?
18        A.  Georgia Virtual.
19        Q.  And sorry, what is Georgia Virtual?
20        A.  Virtual school for Georgia.
21        Q.  Virtual school for Georgia high schools?
22        A.  Uh-huh.
23        Q.  Sorry.  Is that a "yes"?
24        A.  Yes, I'm sorry.
25        Q.  That's okay.
```

Page 17

```
 1          And these are public schools, private or
 2   both?
 3        A.   It's for the Department of Education of
 4   Georgia.
 5        Q.   And you do that virtually from Texas?
 6        A.   I can do it virtually from anywhere.
 7        Q.   And is that economics?
 8        A.   Yes.
 9        Q.   Have you been employed by anyone in Georgia
10   other than teaching at Coffee County department of
11   education?
12        A.   No.
13        Q.   Have you had any other jobs since
14   graduating college beyond the teaching jobs you
15   described?
16        A.   I was a nanny, I was a stay-at-home mom.
17   These are all while I was in Pennsylvania.  I just
18   did odd jobs trying to be a stay-at-home mom, and I
19   also did substitute teaching.
20        Q.   No other jobs in Georgia?
21        A.   No.  Not -- no.
22        Q.   You were at some point the Coffee County
23   Republican Party chair; is that right?
24        A.   Yes.
25        Q.   How long did you serve as the chair?
```

Page 18

```
1            MR. CHEELEY:  You know what to --
2        A.  On the advice of lawyers, I respectfully
3   decline to answer on the basis of my rights and
4   privileges under Article 1, Section 1, Paragraph 16
5   of the Georgia Constitution, the Fifth Amendment of
6   the United States Constitution and Georgia law.
7            As the United States Supreme Court has
8   stated, the privilege against testifying protects
9   everyone, including innocent people from answering
10  questions if the truth might be used to help create
11  a misleading impression that they were somehow
12  involved in improper conduct.
13           I was previously labelled as a witness of
14  another investigation and agreed to cooperate, but
15  the District Attorney's Office has now labelled me a
16  target, and so I very reluctantly follow the advice
17  of my counsel and I decline to testify or answer
18  questions in this deposition.
19  BY MR. CROSS:
20       Q.  Ms. Latham, are you worried that indicating
21  the dates that you served as the chair of the Coffee
22  County Republican Party may incriminate you?
23       A.  On the advice of counsel, I decline to
24  testify for the reasons I've previously stated.
25  Thank you.
```

1      Q.  Ms. Latham, do you understand that when you
2  assert a Fifth Amendment in a civil litigation the
3  court can infer that you are -- that you did in fact
4  commit whatever offense you are concerned about?
5      A.  On the advice of counsel, I decline to
6  testify for the reasons I previously stated.
7      Q.  How did you obtain your position as Coffee
8  County Republican Party chair?
9      A.  On the advice of counsel, I decline to
10  testify for the reasons I previously stated.
11         MR. CROSS:  Just to make this go faster,
12      Mr. Cheeley, if she's going to assert a
13      response to all of the questions, if she just
14      says "Fifth Amendment invocation," that will
15      encompass her prior statement.  Is that okay?
16         MR. CHEELEY:  Very well.
17  BY MR. CROSS:
18      Q.  Ms. Latham, did you previously serve as the
19  Georgia GOP under 80,000 caucus chair?
20      A.  Fifth Amendment.
21      Q.  And when did you serve as that chair?
22      A.  Fifth Amendment.
23      Q.  What is the role of the caucus -- of that
24  caucus in the state -- in the Republican Party of
25  Georgia?

Page 20

1    A.  Fifth Amendment.

2    Q.  How did you obtain that position?

3    A.  Fifth Amendment.

4    Q.  What is the role of the caucus chair?

5    A.  Fifth Amendment.

6    Q.  In your time serving as the caucus chair,

7  did you ever hear about problems with the Dominion

8  voting system in Georgia?

9    A.  Fifth Amendment.

10   Q.  Did you at any point report or convey any

11 problems to any election officials in the state of

12 Georgia?

13   A.  Fifth Amendment.

14   Q.  Did you at any point serve on a state

15 Republican executive committee?

16   A.  Fifth Amendment.

17   Q.  What was your role on that committee?

18   A.  Fifth Amendment.

19   Q.  When did you leave that position?

20   A.  Fifth Amendment.

21   Q.  How long did you serve in that position?

22   A.  Fifth Amendment.

23   Q.  Do you know someone named Burt Jones?

24   A.  Fifth Amendment.

25   Q.  Do you have any relationship with

1    Mr. Jones?

2        A.   Fifth Amendment.

3        Q.   Do you know someone named Bill Ligon,

4    L-I-G-O-N?

5        A.   Fifth Amendment.

6        Q.   Do you have any relationship with

7    Mr. Ligon?

8        A.   Fifth Amendment.

9        Q.   What was the purpose of the state

10   Republican executive committee?

11       A.   Fifth Amendment.

12       Q.   To your knowledge, did the committee ever

13   make any recommendations to the state on election

14   security?

15       A.   Fifth Amendment.

16       Q.   Did the committee ever take any position on

17   using hand marked paper ballots in lieu of the

18   Dominion system?

19       A.   Fifth Amendment.

20       Q.   Are you aware that the current Republican

21   platform in Georgia calls for replacing the Dominion

22   system with hand marked paper ballots?

23       A.   Fifth Amendment.

24       Q.   Have you ever been a party in a lawsuit?

25       A.   Fifth Amendment.

Page 22

1      Q.   Is Mr. Cheeley representing you today?

2      A.   Yes, sir.

3      Q.   When did you first retain Mr. Cheeley?

4      A.   I don't know, but I'll say Fifth Amendment.

5      Q.   Are you paying for Mr. Cheeley's fees or is

6   somebody else paying?

7      A.   Fifth Amendment.

8      Q.   Did you put in any effort to prepare for

9   today's deposition?

10      A.   Fifth Amendment.

11      Q.   Did you speak with anyone about your

12   deposition before arriving today?

13      A.   Fifth Amendment.

14      Q.   Did you review any documents in advance of

15   the deposition?

16      A.   Fifth Amendment.

17      Q.   You received subpoenas from plaintiffs in

18   this case to produce documents; is that right?

19      A.   Yes.

20      Q.   And did you collect and produce documents

21   in response to those subpoenas?

22      A.   Yes.

23      Q.   What efforts did you undertake to search

24   for responsive documents?

25      A.   Fifth Amendment.

1      Q.   Is there anything at all you can tell me

2   today about what you did to search for documents in

3   response to the document subpoena we issued?

4      A.   Fifth Amendment.

5      Q.   Did you search your personal devices?

6      A.   Fifth Amendment.

7      Q.   Did you search any computers?

8      A.   Fifth Amendment.

9      Q.   Search any hard copy files?

10      A.   Fifth Amendment.

11      Q.   Did you speak with anyone other than your

12   lawyer about the subpoenas that you received from

13   us?

14      A.   Fifth Amendment.

15      Q.   What's the relationship between the Coffee

16   County Republican Party chair and the Coffee County

17   election supervisor?

18      A.   Fifth Amendment.

19      Q.   When you served as the Coffee County

20   Republican chair, did you from time to time meet

21   with the Coffee County elections supervisor?

22      A.   Fifth Amendment.

23      Q.   Do you know someone named Missy Hampton?

24      A.   Fifth Amendment.

25      Q.   Are you aware that Missy Hampton is

Page 24

1    sometimes referred to as Misty Hayes?

2         A.   Fifth Amendment.

3         Q.   Have you ever spoken with Misty Hampton?

4         A.   Fifth Amendment.

5         Q.   Are you aware that Missy Hampton previously

6    served as the Coffee County election supervisor?

7         A.   Fifth Amendment.

8         Q.   There's literally nothing you can tell me

9    about any communication you ever had with

10   Ms. Hampton that you don't believe would incriminate

11   you; is that right?

12        A.   Fifth Amendment.

13        Q.   Did you ever visit the election office in

14   Coffee County?

15        A.   Fifth Amendment.

16        Q.   Were you ever physically inside the

17   election office at Coffee County?

18        A.   Fifth Amendment.

19        Q.   Were you ever inside the election office at

20   Coffee County when Misty Hampton was the election

21   supervisor?

22        A.   Fifth Amendment.

23        Q.   Are you familiar with the election

24   management system server that each county in Georgia

25   has to manage the Dominion voting system?

Page 25

1        A.   Fifth Amendment.

2        Q.   Are you aware that in Coffee County there

3    is a room in the election's office where their EMS

4    server is located?

5        A.   Fifth Amendment.

6        Q.   Are you aware in that room there's also a

7    central scanner and a computer called the ICC?

8        A.   Fifth Amendment.

9        Q.   Were you ever at any point in the Coffee

10   County room where the EMS server and ICC are housed?

11       A.   Fifth Amendment.

12       Q.   Did you yourself ever access the EMS server

13   in Coffee County?

14       A.   Fifth Amendment.

15       Q.   Did you ever touch the server?

16       A.   Fifth Amendment.

17       Q.   Did you ever see the server?

18       A.   Fifth Amendment.

19       Q.   Did you ever access the ICC in Coffee

20   County?

21       A.   Fifth Amendment.

22       Q.   Did you ever touch it?

23       A.   Fifth Amendment.

24       Q.   Did you ever see it?

25       A.   Fifth Amendment.

1      Q.  Did you at any point ever see anyone in the
2   Coffee County EMS server room other than Coffee
3   County election officials at the time Misty Hampton
4   and her assistant Jil Riddlehouser [sic]?
5      A.  Fifth Amendment.
6      Q.  During your time as Coffee County
7   Republican Party chair, did you ever meet with the
8   Coffee County election board?
9      A.  Fifth Amendment.
10     Q.  When you served as the Coffee County
11  Republican Party chair, was there anyone you
12  reported to?
13     A.  Fifth Amendment.
14     Q.  Did you ever meet with any state or county
15  election officials while you served in that role?
16     A.  Fifth Amendment.
17     Q.  When you served as the Coffee County
18  Republican Party chair -- strike that.
19         When you served as the chair of the under
20  80,000 caucus, did you ever meet with any Georgia
21  election officials?
22     A.  Fifth Amendment.
23     Q.  As the Coffee County Republican Party
24  chair, what involvement, if any, did you have in the
25  administration of the 2020 November elections?

Page 27

1        A.   Fifth Amendment.

2        Q.   As the Coffee County Republican Party

3    chair, what involvement, if any, did you have with

4    the January 2021 Senate runoff elections?

5        A.   Hold on one second.  I'm catching up.

6    Fifth Amendment.

7        Q.   Were you aware that Ms. Hampton, Misty

8    Hampton made a video that became available online on

9    YouTube of her interacting with the Dominion system

10   in the Coffee County election office?

11       A.   Fifth Amendment.

12       Q.   Have you ever seen that video?

13       A.   Fifth Amendment.

14       Q.   Were you there when the video was made?

15       A.   Fifth Amendment.

16       Q.   Is there anything at all you can tell me

17   about that video?

18       A.   Fifth Amendment.

19       Q.   Were you aware that in the video you can

20   see on her monitor screen a Post-it note with what's

21   supposed to be a confidential password for the MS

22   server in Coffee County?

23       A.   Fifth Amendment.

24       Q.   When you were in the Coffee County

25   elections office, did you ever see that Post-it note

Page 28

```
 1   on her screen yourself?
 2        A.  Fifth Amendment.
 3        Q.  Are you aware of any efforts by Coffee
 4   County or the State of Georgia to address the fact
 5   that that Post-it note was probably disclosed
 6   online?
 7        A.  Could you repeat that, please.
 8        Q.  Sure.  Are you aware of any efforts by
 9   Coffee County or the State of Georgia to address the
10   fact that Ms. Hampton had publicly disclosed the EMS
11   server password online?
12        A.  Fifth Amendment.
13        Q.  Did you ever discuss that video with
14   anyone?
15        A.  Fifth Amendment.
16        Q.  Do you know Anthony Rowell or Tony Rowell?
17        A.  Fifth Amendment.
18        Q.  Have you ever had any interactions with
19   Mr. Rowell?
20        A.  Fifth Amendment.
21        Q.  Have you ever discussed with Mr. Rowell the
22   disclosure of the EMS password online?
23        A.  Fifth Amendment.
24            MR. CHEELEY:  How do you spell his name?
25            MR. CROSS:  R-O-W-E-L-L.
```

1          MR. CHEELEY:  Thank you.

2     BY MR. CROSS:

3          Q.  Are you familiar with Paul Maggio?

4          A.  Fifth Amendment.

5          Q.  Have you ever spoken with him?

6          A.  Fifth Amendment.

7          Q.  Have you ever communicated with him at all?

8          A.  Fifth Amendment.

9          Q.  Are you aware of a team that included Paul

10    Maggio traveling to Coffee County on or around

11    January 7th of 2021 to access Coffee County's

12    election equipment?

13         A.  Fifth Amendment.

14         Q.  Are you aware of that team accessing the

15    EMS server in Coffee County at that time?

16         A.  Fifth Amendment.

17         Q.  Have you ever discussed those circumstances

18    with Anthony Rowell?

19         A.  Fifth Amendment.

20         Q.  Have you ever discussed those circumstances

21    with Eric Chaney?

22         A.  Fifth Amendment.

23         Q.  Do you know Eric Chaney?

24         A.  Fifth Amendment.

25         Q.  Have you ever had any communications with

Page 30

1   Eric Chaney?

2        A.   Fifth Amendment.

3        Q.   Do you know any members of the Coffee

4   County election?

5        A.   Fifth Amendment.

6        Q.   Have you ever communicated with any of the

7   members of the Coffee County election board about

8   Mr. Maggio and others accessing voting equipment in

9   Coffee County in January of 2021?

10        A.   Fifth Amendment.

11        Q.   Do you know Wesley Vickers?

12        A.   Fifth Amendment.

13        Q.   Have you ever communicated with Wesley

14   Vickers?

15        A.   Fifth Amendment.

16        Q.   Do you know James Barnes?

17        A.   Fifth Amendment.

18        Q.   Have you ever communicated with James

19   Barnes?

20        A.   Fifth Amendment.

21        Q.   Have you ever communicated with anyone at

22   all about Mr. Maggio and others accessing voting

23   equipment in Coffee County in January of 2021?

24        A.   Fifth Amendment.

25        Q.   Are you aware that Misty Hampton left her

Page 31

1   position as elections supervisor in February of

2   2022?

3       A.   Fifth Amendment.

4       Q.   Do you know why she left that position?

5       A.   Fifth Amendment.

6       Q.   Have you ever discussed that with her?

7       A.   Fifth Amendment.

8       Q.   Do you know whether she was terminated?

9       A.   Fifth Amendment.

10      Q.   Were you yourself present in the Coffee

11  County elections office when Mr. Maggio and others

12  came in to access the equipment in January of 2020?

13      A.   Fifth Amendment.

14      Q.   Who all was present when that occurred?

15      A.   Fifth Amendment.

16      Q.   Was Scott Paul present?

17      A.   Fifth Amendment.

18      Q.   Was Doug Logan present?

19      A.   Fifth Amendment.

20      Q.   Who all traveled to Coffee County on or

21  around January 6 or 7, 2021 for the purpose of

22  accessing Coffee County's election equipment?

23      A.   Fifth Amendment.

24      Q.   Is there anything at all you are willing to

25  tell me about the individuals accessing Coffee

Page 32

1    County's election equipment in January of 2020?

2         A.  Fifth Amendment.

3         Q.  Do you believe disclosing any information

4    at all about those circumstances may incriminate

5    you?

6         A.  Fifth Amendment.

7         Q.  Do you believe you have committed any

8    crime?

9         A.  Fifth Amendment.

10        Q.  Did Misty Hampton authorize Paul Maggio or

11   anyone else to access Coffee County's election

12   equipment on or around January 7th of 2020?

13        A.  Fifth Amendment.

14        Q.  Did Eric Chaney authorize that?

15        A.  Fifth Amendment.

16        Q.  Did anyone on the Coffee County board --

17   election board authorize that?

18        A.  Fifth Amendment.

19        Q.  Do you know if anyone on the Coffee County

20   election board was aware that that was happening?

21        A.  Fifth Amendment.

22        Q.  Are you aware that Eric Chaney did in fact

23   know that it was happening?

24        A.  Fifth Amendment.

25        Q.  Do you know what, if anything, the

1    individuals who accessed the Coffee County election

2    equipment on or around January 7, 2021, what, if

3    anything, they took with them from that office?

4         A.   Fifth Amendment.

5         Q.   Do you know whether they copied software

6    from any of the election equipment in that office?

7         A.   Fifth Amendment.

8         Q.   Do you know what devices they physically

9    connected to Coffee County's EMS server at that

10   time?

11        A.   Fifth Amendment.

12        Q.   Do you know what equipment they physically

13   connected to the ICC in Coffee County January 7 of

14   2020?

15        A.   Fifth Amendment.

16        Q.   Do you know whether they took a forensic

17   image of any of the voting equipment in Coffee

18   County?

19        A.   Fifth Amendment.

20        Q.   Did they access any of the BMDs at that

21   time in Georgia in Coffee County?

22        A.   Fifth Amendment.

23        Q.   Did they access any of the poll packs in

24   Coffee County at that time?

25        A.   Fifth Amendment.

Page 34

1       Q.   Did they access any of the flash drives
2    that are used with the voting equipment at that time
3    in Coffee County?
4       A.   Fifth Amendment.
5       Q.   Did they access any computers or other
6    electronic devices in the office at that time?
7       A.   Fifth Amendment.
8       Q.   Did they copy any data from any of the
9    voting equipment or other devices in the Coffee
10   County elections office on or around January 7 of
11   2021?
12      A.   Fifth Amendment.
13      Q.   Mrs. Latham?
14      A.   Yes, sir.
15      Q.   What are you looking at on your phone?
16      A.   My friend just sent me a text, I was just
17   answering her.  I didn't answer her.  She was
18   telling me she ate her kolache.
19      Q.   Is it about this deposition?
20      A.   No, sir.  Would you like to see?
21      Q.   Sure.
22      A.   "I just ate my sausage kolache and they
23   were good."
24      Q.   All right.  Great.
25           Just to keep things simple, let's not

Page 35

```
 1  access any devices while we're --
 2        A.   You did.   That's why I took a break.
 3        Q.   Right.   But I'm not the witness?
 4        A.   Okay.
 5             MR. CHEELEY:   You can do it during a
 6        break.
 7             THE WITNESS:   Okay.   I thought he was
 8        taking a break.
 9             MR. CROSS:   Thank you.
10  BY MR. CROSS:
11        Q.   Yeah.   I'll let you know if we go off.
12        A.   All right.
13        Q.   Have you ever communicated with anyone in
14  the secretary of state's office about Mr. Maggio or
15  others accessing Coffee County's voting equipment on
16  or around January 7, 2020?
17        A.   Fifth Amendment.
18        Q.   Have you ever communicated with Secretary
19  Raffensperger?
20        A.   Fifth Amendment.
21        Q.   Have you ever communicated with Gabriel
22  Sterling?
23        A.   Fifth Amendment.
24        Q.   Have you ever communicated with Jordan
25  Fuchs?
```

Page 36

1      A.   Fifth Amendment.

2      Q.   Do you know whether anyone in the secretary

3  of state's office was aware that that occurred at

4  some point after January 7 of 2021?

5      A.   Fifth Amendment.

6      Q.   Has anyone from the secretary of state's

7  office ever contacted you about potential improper

8  access to Coffee County's voting system?

9      A.   Fifth Amendment.

10      Q.   Has anyone, any employee, representative or

11  agent of the State of Georgia at any point ever

12  contacted you about potential improper access to

13  Coffee County's voting equipment?

14      A.   Fifth Amendment.

15      Q.   Do you know Rudy Guiliani?

16      A.   Fifth Amendment.

17      Q.   Have you ever had any communications with

18  Rudy Guiliani?

19      A.   Fifth Amendment.

20      Q.   Have you ever communicated with him about

21  gaining access to Dominion voting equipment in

22  Georgia or elsewhere?

23      A.   Fifth Amendment.

24      Q.   Do you know Sidney Powell?

25      A.   Fifth Amendment.

1      Q.   Have you ever had any communications with

2  Sidney Powell?

3      A.   Fifth Amendment.

4      Q.   Have you ever had any communications with

5  Sidney Powell about gaining access to Dominion

6  voting equipment in Georgia or elsewhere?

7      A.   Fifth Amendment.

8      Q.   Do you know Stefanie Lambert?

9      A.   Fifth Amendment.

10      Q.   Have you ever had any communications with

11  her?

12      A.   Fifth Amendment.

13      Q.   Have you ever had any communications with

14  Stefanie Lambert about gaining access to Dominion

15  voting equipment in Georgia or elsewhere?

16      A.   Fifth Amendment.   Sorry.

17           Will you spell her last name?

18      Q.   Stefanie Lambert?

19      A.   Uh-huh.

20      Q.   L-A-M-B-E-R-T.

21      A.   Thank you.

22      Q.   Do you know Lin Wood?

23      A.   Fifth Amendment.

24      Q.   Have you ever had any communications with

25  Lin Wood?

Page 38

1          A.   Fifth Amendment.

2          Q.   Have you ever communicated with Lin Wood

3     about gaining access to Dominion voting equipment in

4     Georgia or elsewhere?

5          A.   Fifth Amendment.

6          Q.   Do you know Patrick Buirn, B-Y-R-N-E?

7          A.   Fifth Amendment.

8          Q.   Have you ever will any communications with

9     Patrick Byrne?

10          A.   Fifth Amendment.

11          Q.   Have you ever communicated with Mr. Byrne

12     about gaining access to Dominion voting equipment in

13     Georgia or elsewhere?

14          A.   Fifth Amendment.

15          Q.   Do you know Benjamin Cotton?

16          A.   Fifth Amendment.

17          Q.   Have you ever communicated with Mr. Cotton?

18          A.   Fifth Amendment.

19          Q.   Have you ever communicated with Mr. Cotton

20     about gaining access to Dominion voting equipment in

21     Georgia or elsewhere?

22          A.   Fifth Amendment.

23          Q.   Do you know whether Mr. Cotton has ever

24     obtained copies of proprietary Dominion voting

25     software?

Page 39

```
 1        A.   Fifth Amendment.
 2        Q.   Are you aware that he's testified under
 3   oath that he gained -- attained that software from
 4   Coffee County, Georgia?
 5        A.   Fifth Amendment.
 6        Q.   Are you aware that he's testified under
 7   oath that he has software, Dominion proprietary
 8   voting software from Fulton County in Georgia as
 9   well?
10        A.   Fifth Amendment.
11        Q.   Do you know how he obtained the software
12   from either of those counties?
13        A.   Fifth Amendment.
14        Q.   Have you ever discussed that with anyone?
15        A.   Fifth Amendment.
16        Q.   Did you assist with that?
17        A.   Fifth Amendment.
18        Q.   Did you help orchestrate that?
19        A.   Fifth Amendment.
20        Q.   Were you aware that it was happening?
21        A.   Fifth Amendment.
22        Q.   Do you know anyone who was involved in
23   obtaining that software for Mr. Cotton?
24        A.   Fifth Amendment.
25        Q.   Do you know Russell Ramsland,
```

Page 40

```
 1   R-A-M-S-L-A-N-D?
 2        A.   Spell that again.
 3        Q.   R-A-M-S-L-A-N-D.
 4        A.   Fifth Amendment.
 5        Q.   Do you know whether Russell -- strike that.
 6             Have you ever communicated with Russell
 7   Ramsland about obtaining access to Dominion voting
 8   equipment in Georgia or elsewhere?
 9        A.   Fifth Amendment.
10        Q.   Do you know Steve Bannon?
11        A.   Fifth Amendment.
12        Q.   Have you ever communicated with Mr. Bannon
13   about obtaining access to voting equipment in
14   Georgia or elsewhere?
15        A.   Fifth Amendment.
16        Q.   Do you know if anyone else has ever
17   communicated with Mr. Bannon about obtaining access
18   to Dominion voting equipment in Georgia or
19   elsewhere?
20        A.   Fifth Amendment.
21        Q.   Do you know Doug Franks?
22        A.   Spell that.
23        Q.   F-R-A-N-K-S?
24        A.   Fifth Amendment.
25        Q.   Have you ever communicated with Mr. Franks
```

Page 41

1   about obtaining access to Dominion voting equipment
2   in Georgia or elsewhere?
3         A.  Fifth Amendment.
4         Q.  Are you familiar with a firm called
5   Sullivan Strickler?
6         A.  Fifth Amendment.
7         Q.  Are you familiar with Paul Maggio of
8   Sullivan Strickler?
9         A.  Fifth Amendment.
10        Q.  Have you ever communicated with anyone at
11  Sullivan Strickler about obtaining access to
12  Dominion voting equipment in Georgia or elsewhere?
13        A.  Fifth Amendment.
14        Q.  Do you know Greg Freemyer from Sullivan
15  Strickland?
16        A.  Fifth Amendment.
17        Q.  Have you ever communicated with him about
18  obtaining access to Dominion voting equipment in
19  Georgia or elsewhere?
20        A.  Fifth Amendment.
21        Q.  Do you know Jenna Ellis?
22        A.  Fifth Amendment.
23        Q.  Have you ever communicated with Jenna Ellis
24  about obtaining access to Dominion voting equipment
25  in Georgia or elsewhere?

Page 42

1      A.   Fifth Amendment.

2      Q.   Do you know Jennifer Jackson at Sullivan

3  Strickler?

4      A.   Fifth Amendment.

5      Q.   Have you ever communicated with her about

6  obtaining access to Georgia voting equipment in

7  Georgia or elsewhere?

8      A.   Fifth Amendment.

9      Q.   What can you tell me about the access

10  Mr. Maggio or anyone else at Sullivan Strickler had

11  to Coffee County's voting equipment in January of

12  2020?

13      A.   Fifth Amendment.

14      Q.   Have you ever communicated with Scott Hall

15  about obtaining access to Dominion voting equipment

16  in Georgia or else somewhere?

17      A.   Fifth Amendment.

18      Q.   Are you aware that Scott Hall himself

19  traveled to Coffee County on or around January 7 of

20  2021 to help organize access to Coffee County's

21  confidential voting equipment?

22      A.   Fifth Amendment.

23      Q.   Did you help organize that?

24      A.   Fifth Amendment.

25      Q.   Did you communicate with him about that?

Page 43

1        A.   Fifth Amendment.

2        Q.   Were you there?

3        A.   Fifth Amendment.

4        Q.   Do you know Alex -- I think it's Cruce,

5   C-R-U-C-E?

6        A.   Spell that last name.

7        Q.   C-R-U-C-E.

8        A.   Fifth Amendment.

9        Q.   Have you ever communicated with that

10   individual about obtaining access to Dominion voting

11   equipment in Georgia or elsewhere?

12        A.   Fifth Amendment.

13        Q.   Do you know Robert Preston, Jr.?

14        A.   Fifth Amendment.

15        Q.   Have you ever communicated with that

16   individual about obtaining access to Dominion voting

17   equipment or elsewhere?

18        A.   Fifth Amendment.

19        Q.   Do you know Preston Haliburton?

20        A.   Fifth Amendment.

21        Q.   Is Mr. Haliburton an attorney who has

22   represented you, including in a senate -- a Georgia

23   Senate hearing?

24        A.   Fifth Amendment.

25        Q.   Have you ever claimed whistleblower status

Page 44

1  with respect to Georgia election issues?

2          MR. CHEELEY:  You can answer that.

3      A.  Yes.

4  BY MR. CROSS:

5      Q.  In fact, you claimed that publicly in a

6  Senate hearing in Georgia; is that right?

7      A.  Yes.

8      Q.  And in what way were you a whistleblower?

9      A.  Fifth Amendment.

10     Q.  What were you blowing the whistle on?

11     A.  Fifth Amendment.

12     Q.  Do you know Doug Logan of Cyber Ninjas?

13     A.  Fifth Amendment.

14     Q.  Have you ever communicated with Mr. Logan

15 about obtaining access to Dominion voting equipment

16 in Georgia or elsewhere?

17     A.  Fifth Amendment.

18     Q.  Do you know whether Doug Logan was present

19 on or around January 7, 2021, when a team accessed

20 Coffee County's EMS server?

21     A.  Fifth Amendment.

22     Q.  Did you ever communicate with him about

23 that?

24     A.  Fifth Amendment.

25     Q.  Do you know Bernard Kerik, K-E-R-I-K?

1      A.  What's his first name?

2      Q.  Bernard?

3      A.  Fifth Amendment.

4      Q.  Have you ever communicated with Bernard

5  Kerik about obtaining access to Dominion voting

6  equipment in Georgia or elsewhere?

7      A.  Fifth Amendment.

8      Q.  Do you know Kurt Hilbert, H-I-L-B-U-R-T

9  [sic]?

10      A.  Fifth Amendment.

11      Q.  Have you ever communicated with Kurt

12  Hilbert about obtaining access to Dominion's voting

13  equipment in Georgia or elsewhere?

14      A.  Fifth Amendment.

15      Q.  Individuals associated with the Donald

16  Trump campaign after the November 2020 election were

17  actively seeking access to Dominion voting equipment

18  in the country; is that right?

19      A.  Fifth Amendment.

20      Q.  What, if anything, can you tell me about

21  that?

22      A.  Fifth Amendment.

23      Q.  What steps did you take to help organize

24  that?

25      A.  Fifth Amendment.

1      Q.   What steps did you take to help organize

2   that in Georgia?

3      A.   Fifth Amendment.

4      Q.   Do you know Dominic -- I'm going to spell

5   the last name -- L-A-R-I-C-C-I-A?

6      A.   LaRiccia?

7      Q.   Yes.   Thank you.

8      A.   Fifth Amendment.

9      Q.   Do you know Dominic LaRiccia?

10      A.   LaRiccia.   Fifth Amendment.

11      Q.   Have you ever communicated with Dominic

12   LaRiccia about obtaining access to Dominion voting

13   equipment in Georgia or elsewhere?

14      A.   Fifth Amendment.

15      Q.   To your knowledge, how many individuals

16   have made forensic copies of software from voting

17   equipment in Coffee County?

18      A.   Fifth Amendment.

19      Q.   How many individuals have made forensic

20   copies of Coffee County's prior EMS server?

21      A.   Fifth Amendment.

22      Q.   Same question regarding Coffee County BMDs?

23      A.   Fifth Amendment.

24      Q.   Same question regarding Coffee County

25   E-poll books?

Page 47

1        A.   Fifth Amendment.

2        Q.   Same question regarding any electronic

3   equipment in the Coffee County elections office?

4        A.   Fifth Amendment.

5        Q.   During the time that a team was in the

6   Coffee County election office on or around

7   January 7, 2021, accessing the election equipment

8   there, what, if anything, did they upload to that

9   equipment?

10        A.   Fifth Amendment.

11        Q.   Did they load any software onto it at all?

12        A.   Fifth Amendment.

13        Q.   Did they alter any of the software or

14   firmware on any of that equipment?

15        A.   Fifth Amendment.

16        Q.   Did they update any malware?

17        A.   Fifth Amendment.

18        Q.   Did they upload anything to any -- to the

19   EMS server that could have any impact on the

20   elections in the state of Georgia?

21        A.   Fifth Amendment.

22        Q.   Did they connect any devices to any

23   election equipment in the Coffee County election

24   office that could have an impact on elections in the

25   state of Georgia?

1        A.   Fifth Amendment.

2        Q.   Was it their intent to do that?

3        A.   Fifth Amendment.

4        Q.   What involvement did you have in helping to

5    obtain a copy of Dominion voting software from

6    Fulton County?

7        A.   Fifth Amendment.

8        Q.   What involvement did you have with

9    obtaining copies of Dominion voting software from

10   any county in Georgia?

11       A.   Fifth Amendment.

12       Q.   What counties in addition to Coffee and

13   Fulton did you help try to identify as potential

14   points of access with Dominion voting equipment for

15   those looking to obtain access?

16       A.   Fifth Amendment.

17       Q.   What was done with any of the data or other

18   information that was extracted from Coffee County

19   voting equipment on or around January 7, 2021?

20            MR. CHEELEY:   Object to the form.

21            You may answer.

22       A.   Just Fifth Amendment.

23   BY MR. CROSS:

24       Q.   Who has that data?

25            MR. CHEELEY:   Object to form.

Page 49

1       A.  Fifth Amendment.

2   BY MR. CROSS:

3       Q.  What efforts have been made to use the

4   information that was gleaned from accessing the

5   Coffee County voting equipment on or around

6   January 7, 2021?  What efforts had been made to use

7   that to manipulate elections in the United States?

8           MR. PICO-PRATS:  Object to the form.

9       A.  Fifth Amendment.

10  BY MR. CROSS:

11      Q.  What efforts have been made to analyze that

12  data?

13          MR. CHEELEY:  Object to the form.

14      A.  Fifth Amendment.

15  BY MR. CROSS:

16      Q.  Ms. Latham, let me hand you what's been

17  marked as Exhibit 1.  If you will take a look at

18  that, please.

19          (Exhibit 1 marked.)

20  BY MR. CROSS:

21      Q.  Ms. Latham, Exhibit 1 is --

22      A.  (Inaudible).

23      Q.  Oh, yeah.  I was just going to describe it

24  for you.  I'll wait until you take a look at it.

25  It's a copy of the subpoena for documents that my

Page 50

1    group served on you.
2         A.   Wait a minute, Exhibit 1.
3         Q.   Yeah.  And just take a moment to look
4    through it if you need to.
5         A.   I don't -- do you mean Attachment 1A?
6         Q.   Yeah.  Do you see there's a subpoena on the
7    first page?
8         A.   Yeah.
9         Q.   And then behind that if you get to -- do
10   you see where it says Attachment A?
11        A.   Yes.
12        Q.   And have you seen Attachment A before?
13        A.   Yes.
14        Q.   And so do you recognize Attachment A?  And
15   if you turn to page 10 of it, you will see the
16   document request.  Do you recognize this as the
17   document request we served on you?
18        A.   It appears to be the same one.
19        Q.   What steps specifically did you take to
20   search for documents responsive to each of the
21   requests here?
22        A.   Fifth Amendment.
23        Q.   Is there anything at all you can tell me
24   about what you did to search for documents
25   responsive to the request to the exhibit?

1      A.   Fifth Amendment.

2      Q.   Are there any documents responsive to

3  Exhibit 1 that you have not produced?

4      A.   Fifth Amendment.

5      Q.   Are there any documents responsive to

6  Exhibit 1 that you have withheld on some sort of

7  privilege ground or other ground?

8      A.   Fifth Amendment.

9           (Exhibit 2 marked.)

10  BY MR. CROSS:

11      Q.   Let me hand you what's Exhibit 2,

12  Mrs. Latham.   Just tell me if you recognize

13  Exhibit 2.

14      A.   Yes, I recognize it.

15      Q.   Do you recognize Exhibit 2 as a document

16  subpoena that was served on you by the Coalition

17  plaintiffs?

18      A.   Yes.

19      Q.   If you turn to page 10 you will see where

20  the document requests themselves are listed.

21      A.   Uh-huh.

22      Q.   Is that a "yes"?

23      A.   Yes.

24      Q.   And what steps, if any, did you take to

25  search for documents responsive to this subpoena?

1          MR. CHEELEY:  Let me state on the

2      record, she -- I'm authorized to state on the

3      record that Cathy Latham did a due and

4      diligent search, complete search and produced

5      all documents responsive to the subpoenas.

6          MR. CROSS:  Well, I appreciate that

7      Mr. Cheeley, but you're not the witness so

8      that's not helpful.

9  BY MR. CROSS:

10     Q.  Ms. Latham, is there anything at all you

11  can tell me about what you've done to search for and

12  produce documents responsive to Exhibit 2?

13     A.  Fifth Amendment.

14     Q.  What's the basis for what your attorney

15  just said?

16     A.  Fifth Amendment.

17     Q.  Are there any documents that you have

18  identified as responsive that you are aware of that

19  you withheld from your production in response to

20  Exhibit 2?

21     A.  Are you finished?

22     Q.  Yes, ma'am.

23     A.  Oh, that cut on.  I couldn't hear you.

24          Fifth Amendment.

25          THE WITNESS:  Do you want these back?

Page 53

1            MR. CHEELEY:  You can keep them.

2            THE WITNESS:  Oh, good.  I'll add it to

3        my collection.

4   BY MR. CROSS:

5        Q.  The representation that Mr. Cheeley just

6   made, Ms. Latham, did you authorize him to make that

7   representation?

8            MR. CHEELEY:  Attorney-client privilege.

9   BY MR. CROSS:

10        Q.  Let me hand you what's going to be marked

11   as Exhibit 3.

12            The table is big.  Thanks, Ms. Latham.

13            (Exhibit 3 marked.)

14   BY MR. CROSS:

15        Q.  Let me ask you, Mrs. Latham -- Ms. Latham,

16   have you ever seen Exhibit 3 before?

17        A.  Fifth Amendment.

18        Q.  Do you recognize this as a screen shot from

19   the video that Misty Hampton put up online where she

20   was in the elections office of Coffee County?

21        A.  Fifth Amendment.

22        Q.  Do you recognize the Post-it note there on

23   her computer screen in Exhibit 3 as containing

24   the -- what was supposed to be a confidential

25   password to the Coffee County EMS server in or

Page 54

1    around December of 2021 sorry -- 2020?

2         A.   Fifth Amendment.

3         Q.   Is there anything at all you can tell me

4    about Exhibit 3?

5         A.   Fifth Amendment.

6         Q.   Do you know whether the password on the

7    Coffee County EMS server was changed at some point

8    after this video came out in 2020?

9         A.   Fifth Amendment.

10        Q.   Do you know why the EMS password in Coffee

11   County stopped working in 2021?

12        A.   Fifth Amendment.

13        Q.   Do you know that when James Barnes came in

14   to replace Misty Hampton as the elections supervisor

15   in Coffee County, he could not get the password to

16   work for the EMS server?

17        A.   Fifth Amendment.

18        Q.   Did you ever discuss that with Mr. Barnes?

19        A.   Fifth Amendment.

20        Q.   Did you ever discuss that with any member

21   of the Coffee County election board?

22        A.   Fifth Amendment.

23        Q.   Did you ever discuss that with anyone at

24   all?

25        A.   Fifth Amendment.

Page 55

1          Q.  In what way did the access that
2     Mr. Maggio's team and others have to the EMS server
3     on January 7, 2021, in what way did that cause the
4     EMS password to stop working?
5               MR. CHEELEY:  Object to the form.
6          A.  Fifth Amendment.
7     BY MR. CROSS:
8          Q.  Did individuals who had access to the
9     Coffee County EMS server on or around January 7,
10    2021, did they make any effort to change the
11    password?
12         A.  Fifth Amendment.
13         Q.  Did they inadvertently change the password?
14         A.  Fifth Amendment.
15         Q.  Did they do something to cause the password
16    to stop working?
17         A.  Fifth Amendment.
18         Q.  Do you know why the secretary of state's
19    office came in and seized the EMS server that had
20    been in place in Coffee County on or around
21    January 7, 2021?
22         A.  Fifth Amendment.
23         Q.  Are you aware the secretary of state's
24    office claims to have replaced it on or around
25    June 8, 2021?

Page 56

1          A.   Fifth Amendment.

2          Q.   Do you know why they replaced it?

3          A.   Fifth Amendment.

4          Q.   Did you ever discuss that issue with

5     anyone?

6          A.   Fifth Amendment.

7          Q.   Did you ever discuss that issue with

8     Secretary Raffensperger?

9          A.   Fifth Amendment.

10         Q.   Did you ever discuss that issue with

11    Gabriel Sterling?

12         A.   Fifth Amendment.

13         Q.   Did you ever discuss that issue with Eric

14    Chaney?

15         A.   Fifth Amendment.

16         Q.   Do you know why the secretary of state's

17    office also seized the ICC in the summer of 2021

18    from Coffee County?

19         A.   Fifth Amendment.

20         Q.   Were you aware that the ICC was still fully

21    operational at the time?

22         A.   Fifth Amendment.

23         Q.   Were you aware that James Barnes as the new

24    Coffee County elections supervisor was concerned

25    that both had been compromised?

Page 57

1        A.   Fifth Amendment.

2        Q.   Did you ever discuss that with Mr. Barnes?

3        A.   Fifth Amendment.

4        Q.   Are you aware of any investigation by

5   anyone in the state of Georgia into the reasons why

6   the EMS password stopped working in Coffee County's

7   EMS server in 2020?

8        A.   Fifth Amendment.

9        Q.   Are you aware of any investigation by

10   anyone in the state of Georgia into potential

11   improper access to any voting equipment in Coffee

12   County?

13        A.   Fifth Amendment.

14        Q.   Same question regarding Fulton County?

15        A.   Fifth Amendment.

16        Q.   Same question regarding any county in

17   Georgia?

18        A.   Fifth Amendment.

19             (Exhibit 4 marked.)

20   BY MR. CROSS:

21        Q.   Let me hand you what's been marked as

22   Exhibit 4.  Mrs. Latham, do you recognize Exhibit 4?

23        A.   Give me time to read that.

24        Q.   Sure.

25        A.   Yes.

Page 58

1      Q.  And do you recognize Exhibit 4 as a letter

2  you received from the Clare Locke firm regarding a

3  lawsuit involving Dominion voting systems?

4      A.  Yes.

5      Q.  And do you recall that in this letter you

6  were instructed to preserve any and all information,

7  including documents that might be relevant to that

8  litigation?

9      A.  Yes.

10     Q.  And what steps, if any, did you take to

11 comply with that request?

12     A.  Fifth Amendment.

13     Q.  Have you, in fact, complied with this

14 request?

15     A.  Fifth Amendment.

16     Q.  Have you deleted or destroyed or lost

17 anything that might be potentially relevant to the

18 Dominion lawsuit?

19     A.  Fifth Amendment.

20     Q.  After receiving the subpoena plaintiffs

21 served on you in this case, did you delete, destroy

22 or otherwise dispose any documents that might have

23 been responsive to those subpoenas?

24     A.  Fifth Amendment.

25         MR. CHEELEY:  You can answer that

Page 59

1      question.

2          A.  Okay.  Then can you repeat it?

3    BY MR. CROSS:

4          Q.  Sure.  After you received the subpoenas the

5    plaintiff served on you in this case, did you

6    delete, destroy or dispose any documents or

7    information that might have been responsive to those

8    subpoenas?

9          A.  No, sir.

10         Q.  When you received the subpoenas for

11   documents from plaintiffs in this case, were there

12   any documents that came to mind as responsive that

13   you had already lost or deleted such as text

14   messages?

15             MR. CHEELEY:  You may answer.

16         A.  Say that again so I make sure I --

17   BY MR. CROSS:

18         Q.  Sure.  When you received the document

19   subpoenas from the plaintiffs in this case, were

20   there any documents such as text messages that came

21   to mind that were responsive to the subpoenas that

22   you had already lost or deleted?

23         A.  No, not that I'm aware to the best of my

24   knowledge.

25         Q.  So you exchanged text messages with Misty

Page 60

1    Hampton in the past, right?

2           MR. CHEELEY:  You can assert your

3       privilege.

4       A.  Oh.  Fifth -- Fifth Amendment.

5    BY MR. CROSS:

6       Q.  You exchanged text messages with Eric

7    Chaney in the past, right?

8       A.  Fifth Amendment.

9       Q.  When you received our subpoenas for

10   documents in this case, did it occur to you that

11   some of the text messages you had with Ms. Hampton

12   or Mr. Chaney or others were responsive to those?

13      A.  Fifth Amendment.

14      Q.  Are you representing that still to this day

15   you have every text message that you ever exchanged

16   with Ms. Hampton that would be responsive to our

17   request?

18      A.  Fifth Amendment.

19      Q.  Are you representing that still to this day

20   you have every text message you ever sent or

21   received that would be responsive to our document

22   request?

23          MR. CHEELEY:  Object to the form.

24      A.  Fifth Amendment.

25   BY MR. CROSS:

Page 61

1      Q.   Do you delete text messages in the ordinary
2   course?
3      A.   What do you mean?
4      Q.   In the ordinary course with your phone, do
5   you delete text messages from your phone?
6           MR. CHEELEY:   If you are able, you can
7      answer.
8      A.   No.
9   BY MR. CROSS:
10      Q.   So your phone could still have today every
11   text message you've ever sent or received with that
12   phone?
13      A.   No.
14      Q.   Why not?
15      A.   Fifth Amendment.
16      Q.   Do you use an iPhone?
17      A.   Do I answer that?   Fifth Amendment.
18      Q.   Have you used an iPhone since the fall of
19   2020?
20      A.   Fifth Amendment.
21      Q.   In responding to our document subpoenas did
22   you make any effort to recover any information that
23   might sit in an iCloud account, for example?
24      A.   Fifth Amendment.
25      Q.   Do you have an iCloud account?

Page 62

1        A.   Fifth Amendment.

2             (Exhibit 5 marked.)

3   BY MR. CROSS:

4        Q.   Mrs. Latham, I've handed you what's been

5   marked as Exhibit 5.  Tell me if you recognize that,

6   please.

7        A.   It's the same thing that's in this.

8        Q.   Maybe.  What are you saying is "this"?

9   What have you got?  Oh, on the subpoena?

10       A.   Yeah.

11       Q.   It might be.  Yeah.  Yeah, I think it is.

12       A.   Yeah, I mean it's the first time I saw it.

13  I didn't see it.

14       Q.   Well, let me ask you.  So Exhibit 5, do you

15  recognize this as a draft executive order dated

16  December 16, 2020, from President Trump?

17            MR. CHEELEY:  If you know.

18       A.   Yes, that's what it says.

19  BY MR. CROSS:

20       Q.   And do I understand correctly you are

21  saying the first time you ever saw Exhibit 5 was

22  when it was attached to one of the subpoenas that --

23       A.   Yes, sir.

24       Q.   You said yes?

25       A.   Yes.

Page 63

1      Q.  What involvement, if any, did you have with

2   individuals who helped prepare Exhibit 5?

3          MR. CHEELEY:  Would you repeat the

4      question?

5   BY MR. CROSS:

6      Q.  What involvement, if any, did you have with

7   any of the individuals who helped prepare Exhibit 5?

8          MR. CHEELEY:  You may answer.

9      A.  This?

10  BY MR. CROSS:

11     Q.  Yes, this document?

12         MR. CHEELEY:  Yes.

13  BY MR. CROSS:

14     Q.  Yep, the draft executive order.

15         MR. CHEELEY:  You can answer.

16     A.  Well, first of all, there's no names on

17  here who drafted it, but I have never seen there

18  before until you put it in this.

19  BY MR. CROSS:

20     Q.  You have never even seen any press articles

21  on Exhibit 5 before the subpoena?

22     A.  No.  I mean, no.

23     Q.  So you didn't have any involvement with

24  anyone who helped prepare Exhibit 5, I just want to

25  be clear.  Is that right?

Page 64

1       A.  I have no idea.  Fifth Amendment because I

2   don't know what you're talking about.

3       Q.  Well, why do you think you might have had

4   involvement with some individuals about preparing

5   Exhibit 5?

6           MR. CHEELEY:  Object to form.

7       Mischaracterizes the testimony.

8   BY MR. CROSS:

9       Q.  I don't want to mischaracterize your

10  testimony.  You said you don't know.  Why is it you

11  don't know whether you had involvement with anyone

12  who was preparing Exhibit 5?

13          MR. CHEELEY:  That's not her testimony.

14      She said she had never seen it.  It was

15      attached to the subpoena.

16          MR. CROSS:  Don't testify, Mr. Cheeley.

17          MR. CHEELEY:  Well, you're trying to

18      trick the witness.

19          MR. CROSS:  It's not a trick.  She just

20      said I don't know.  We can read it back if

21      you want.  Let me just ask the question.

22      Okay?

23  BY MR. CROSS:

24      Q.  I asked you if you had any involvement with

25  anyone who to help prepare Exhibit 5, and you said,

Page 65

1   "I don't know."  What did you mean by that?

2        A.   I've never seen this until it was in the

3   subpoena.  So therefore, I don't know who prepared

4   it.  I've never seen it.  I don't even know what

5   it's talking about until I read it the very first

6   time, period.

7   BY MR. CROSS:

8        Q.   Okay.  Mrs. Latham, grab Exhibit 2 again if

9   you would.  It's the document subpoena from the

10  Coalition.

11       A.   The thick one?

12       Q.   Yes, ma'am.

13       A.   Yes, sir.

14       Q.   If you turn to the back, you will see

15  Exhibit 1 is the December 16, 2020, draft executive

16  order we just looked at.  Do you see that?

17       A.   Uh-huh.

18       Q.   And then if you turn a few pages in to that

19  you will see where there's a date at the top

20  December 17, 2020?

21       A.   Yeah.

22       Q.   And so you'll see here there's a second

23  document entitled, "Presidential Findings to Seize,

24  Collect, Preserve and Analyze National Security

25  Information Regarding the 2020 General Election."

1        A.   Where -- where are you reading?

2        Q.   The title just under December 17 [sic],

3    2020?

4        A.   Oh, sorry, okay.

5        Q.   That's okay.  Do you see that?

6        A.   I was looking for that paragraph.

7        Q.   Do you see where I'm at?

8        A.   Yes, I do.

9        Q.   Had you seen this document before you

10   received the subpoena?

11       A.   No, sir.

12       Q.   Do you have any -- is there any information

13   you can tell me about how this document was

14   prepared?

15       A.   No, sir.

16       Q.   Did you have any involvement with anyone

17   who might have been involved in preparing this

18   document?

19       A.   No, sir.

20            MR. CROSS:  All right.  Why don't we

21       take a quick break.  We'll go off the record.

22            THE VIDEOGRAPHER:  Off the video record

23       at 11:41 a.m.

24            (Recess 11:42 a.m.-12:09 p.m. )

25            THE VIDEOGRAPHER:  Back on the video

Page 67

1          record at 12:09 p.m.

2      BY MR. CROSS:

3          Q.  Mrs. Latham, do you understand you're still

4      under oath?

5          A.  Yes, sir.

6          Q.  You were in Washington DC on or around

7      December 17 of 2020, correct?

8          A.  I don't remember what days I went.

9          Q.  Do you recall being in DC in December of

10     2020, right?

11         A.  Yes.

12         Q.  And you spent some time at the Willard

13     Hotel while you were there?

14         A.  That's where I slept, yes.

15         Q.  And your attorney Preston Haliburton was

16     there with you, correct?

17         A.  No.  Not at the Willard.

18         Q.  Mr. Haliburton was never at the Willard in

19     December of 2020 with you?

20         A.  No, sir.  Not that I can recall, no.

21         Q.  But you're aware that there was a war room

22     set up at the Willard Hotel in December of 2020 by

23     individuals associated with the Trump campaign to

24     look for evidence of election fraud; is that right?

25              MR. CHEELEY:  Counsel, I have an e-mail

Page 68

1      from -- here from last week where it said

2      that the questions today would only be

3      relating to the January 2021 runoff election

4      and nothing to do with November 2020.  So are

5      you not going to honor that?

6          MR. CROSS:  Well, you're reading it much

7      more narrow.  That's not what we said.

8          MR. CHEELEY:  It is what you said.

9          MR. CROSS:  It's not, and this relates

10     to potentially the Coffee County intrusion

11     which is what I'm trying to understand.  But

12     I also say that that deal was offered in

13     exchange for substantive testimony.

14         We showed up here today incurring

15     thousands of dollars in expense for you to

16     tell me that she's now going to assert the

17     Fifth.

18         MR. CHEELEY:  No, I always told you that

19     she would assert the Fifth.

20         MR. CROSS:  Absolutely did not.  I'm not

21     going to argue with you now.  If she was

22     going to assert the Fifth, we didn't need to

23     negotiate scope at all.  And so she may end

24     up paying our fees and costs today, but we'll

25     deal with that later.

Page 69

1          MR. CHEELEY:  No, she won't.

2          MR. CROSS:  We'll deal with that later.

3    BY MR. CROSS:

4       Q.  Ms. Latham, my question to you is, you were

5    aware that there was a war room set up by

6    individuals associated with the Trump campaign at

7    the Willard Hotel purportedly looking for election

8    fraud, right?

9       A.  Fifth Amendment.

10      Q.  Were you ever in that war room?

11      A.  Fifth Amendment.

12      Q.  What IT individuals did you meet with while

13   you were in DC in December of 2020?

14      A.  Fifth Amendment.

15      Q.  Do you remember telling Marilyn Marks on

16   December 17, 2020, that you were in DC meeting with

17   IT?

18      A.  Fifth Amendment.

19      Q.  Who were those individuals you were meeting

20   with at that time?

21      A.  Fifth Amendment.

22      Q.  So you were in DC staying at the Willard

23   Hotel on or around December 17, 2020, the same day

24   that one of the two executive order -- draft

25   executive orders was drafted and you're saying today

Page 70

1    that you can't tell us anything about your

2    involvement with that; is that right?

3         A.   Fifth Amendment.

4         Q.   Who else was with you in DC in December of

5    2020?

6         A.   Fifth Amendment.

7         Q.   Bill Ligon was there, right?

8         A.   Who?

9         Q.   L-I-G-O-N.  Is it Ligon, Ligon

10   [pronouncing], Bill Ligon?

11        A.   Fifth Amendment.

12        Q.   Ms. Latham -- Mrs. Latham, are you or have

13   you been under investigation by any federal or state

14   authorities?

15        A.   Fifth Amendment.

16        Q.   Are you being or have you been called to

17   testify in any federal or state grand jury

18   proceeding?

19        A.   Yes, that's why I'm claiming my Fifth

20   Amendment.

21        Q.   What is that proceeding?

22        A.   Fifth Amendment.

23        Q.   How does that proceeding relate to this

24   case?

25        A.   Fifth Amendment.

Page 71

1        Q.   Do you know whether that proceeding relates

2   to this case?

3        A.   Fifth Amendment.

4        Q.   When were you called to testify before a

5   federal or state grand jury proceeding?

6        A.   Fifth Amendment.

7        Q.   Is it a federal or state proceeding?

8        A.   Fifth Amendment.

9        Q.   When did you first learn of that

10   proceeding?

11        A.   Fifth Amendment.

12        Q.   Have you provided testimony already?

13        A.   Fifth Amendment.

14        Q.   Has anyone offered you any sort of immunity

15   in exchange for cooperation with any investigation?

16        A.   Fifth Amendment.

17        Q.   Have you sought immunity?

18        A.   Fifth Amendment.

19        Q.   Are you cooperating with any federal or

20   state investigation?

21        A.   Fifth Amendment.

22        Q.   Have you been charged with any crime

23   regarding any matter in which you claim Fifth

24   Amendment privilege today?

25        A.   Fifth Amendment on my Fifth Amendment.

Page 72

1        Q.  Has anyone suggested to you you might be

2   charged with a crime with respect to any topic we've

3   covered that you have asserted the Fifth Amendment

4   to today?

5        A.  Fifth Amendment.

6        Q.  Why were you in DC in December of 2020?

7        A.  Fifth Amendment.

8        Q.  Can't tell me anything at all about why you

9   were there?

10        A.  Fifth Amendment.

11        Q.  Were you there to commit a crime?

12        A.  Fifth Amendment.

13        Q.  Did you commit a crime while you were in DC

14   in December of 2020?

15        A.  Fifth Amendment.

16        Q.  Are you aware of anyone who committed a

17   crime in December of 2020 in DC?

18        A.  Fifth Amendment.

19        Q.  How did you assist individuals associated

20   with the Trump campaign to find aborted evidence of

21   election fraud involving the November of 2020

22   election?

23        A.  Fifth Amendment.

24        Q.  Why did you assist with that?

25        A.  Fifth Amendment.

Page 73

1      Q.   Do you believe there was election fraud in
2   the November 2020 presidential election?
3      A.   Fifth Amendment.
4      Q.   Do you believe that election was rightly
5   decided?
6      A.   Fifth Amendment.
7      Q.   Do you believe it was rightly decided in
8   Georgia?
9      A.   Fifth Amendment.
10     Q.   Do you believe any voter in Georgia in
11   November 2020 had their vote counted in some way
12   other than they intended?
13     A.   Fifth Amendment.
14     Q.   Same question regarding the January 2021
15   runoff?
16     A.   Fifth Amendment.
17          (Exhibit 6 marked.)
18   BY MR. CROSS:
19     Q.   Let me hand you Exhibit 6, Mrs. Latham.
20     A.   Thank you.
21     Q.   All right.  Flip to -- you'll see there's
22   little page numbers at the bottom.  Do you see that?
23     A.   Yes.
24     Q.   Okay.  Flip to page No. 5 if you would,
25   please.

Page 74

1       A.   Okay.  Yep.

2       Q.   And do you see at the top there's a CL

3  below Cathy?

4       A.   Yes.

5       Q.   And do you recognize this as a screenshot

6  from an iPhone text message?

7       A.   Yes.

8       Q.   Have you seen -- do you recognize the text

9  here that you sent on January 5th and January 6th of

10  2021?

11       A.   Okay.  Now, this is sent to me, correct?

12       Q.   Right, this is sent from another phone to

13  you?

14       A.   Okay, got you.

15       Q.   And so do you recognize that?

16       A.   I recognize some of it, yeah.

17       Q.   And so the -- the text in the blue boxes

18  are the texts that you received and the texts in the

19  black boxes are the ones that you sent.  Do you

20  understand that?

21       A.   Okay.  So the blue is from whoever sent

22  this to me?

23       Q.   Right.

24       A.   Okay.

25       Q.   And so do you recognize these texts that

Page 75

1   you exchanged with Misty Hampton in January of 2020?

2           MR. CHEELEY:  Who just joined?

3       A.  Okay.

4           MR. CHEELEY:  Hold on a second.

5           THE WITNESS:  Who just joined?

6           MR. BUELL:  This is -- this is Duncan

7       Buell.  I just -- I had to drop off and I

8       just rejoined.

9           MR. CHEELEY:  Who is that?

10          MR. SPARKS:  Dr. Buell, B-U-E-L-L.

11          MR. CHEELEY:  Who does he represent?

12          MR. CROSS:  He's an expert.

13          MR. BUELL:  I'm an expert for the

14      Coalition.

15          MR. CHEELEY:  All right.

16  BY MR. CROSS:

17      Q.  So, Mrs. Latham, do you recall these texts

18  in Exhibit 6 that you exchanged with Misty Hampton?

19      A.  I think so, yeah.  It's from the election,

20  yeah.

21      Q.  Right.  And so the first one is a text that

22  Ms. Hampton sent to you at 8:42 p.m. on January 5th

23  of 2021 asking if you're okay.  Do you see that?

24      A.  Uh-huh.

25      Q.  "Yes"?

Page 76

1        A.   Yes.   I'm sorry.

2        Q.   That's okay.

3             And then she writes:   "If you need me

4    Friday, get me the same thing you got, and the board

5    can't stop me."  Do you see that?

6        A.   Yes.

7        Q.   What was that about?

8        A.   Can I answer this?  It has -- okay.  I had

9    pictures of what was going on in the parking lot

10   during the election.

11       Q.   And what are you talking about?

12       A.   There was stuff going on with the

13   Democratic voters.  They were giving out hot dogs

14   for people who were voting, and -- and I got the

15   video and the photos for them asked for by Misty and

16   the -- and somebody else with the -- with them.

17   They asked me to go out there and take the photos.

18   That's what I took.

19       Q.   Where are those photos now?

20       A.   I don't -- I may have them.  I don't know.

21       Q.   Is there anything else you can tell me

22   about that particular text?

23       A.   The January 5th?

24       Q.   Yes.

25       A.   Yes.  I mean, that's all I know.  And it

Page 77

1   was they she was needing those photos from what was

2   going on in the parking lot.

3        Q.   Why did she need those?

4        A.   Because she couldn't leave her post.  She

5   knew I was out there.  She was inside the building.

6        Q.   But why did she need the pictures?  What

7   was the purpose of Misty Hampton getting those

8   photos?

9             MR. CHEELEY:  Object to the form.

10            If you know.

11       A.   I don't know why, she just asked me to get

12   them for her.  I don't remember, I mean, exactly

13   why.  But that's what I'm thinking that was.  That's

14   all I know.

15   BY MR. CROSS:

16       Q.   So just so I understand, Ms. Hampton sent

17   you a text on January 5th, 2021, at night asking you

18   for photos?

19       A.   Or did I get the photos or something.  I

20   remember that was part of the thing.  That's all I

21   can remember.

22       Q.   And you took them with your iPhone?

23       A.   I'm sure I did.  Is any of this previous to

24   that?  No.

25       Q.   No.

Page 78

1        A.   Okay.  All right.  But it was "get me the

2   same thing you got."  I had videos or photos or

3   whatever was going on because I took several of

4   them.

5        Q.   And what -- sorry.  Go ahead.

6        A.   That's all I know.  That's all I can think

7   that that's about.

8        Q.   What date did you take the photos or

9   videos?

10        A.   The election day, January 5th.  I mean, if

11   I have those, I'll -- if I don't have them, I know

12   where they may be.

13        Q.   So this is photos or videos you took in the

14   parking lot of the Coffee County election office on

15   January --

16        A.   No.  Not the office.

17        Q.   Where?

18        A.   It's where the election was occurring at

19   Central Square Gym.

20        Q.   The polling site?

21        A.   Yes.

22        Q.   And why did you take those pictures?

23        A.   Because there was violations to what had

24   gone out by the secretary of state.

25        Q.   And why were you there?

Page 79

1      A.  I had been there all day.  I was the Coffee

2   County -- I was out there manning the tent.  You

3   know, people were waving signs.  You know, you're

4   just out there -- but I couldn't walk in the

5   building.  I didn't go in the building.

6      Q.  Were you there in your role as Coffee

7   County Republican chair?

8      A.  Yes.

9      Q.  And so you were in the parking lot, you saw

10  something you thought was an infraction and you took

11  some photos and video?

12     A.  I was asked to take the photos and the

13  videos, yes.

14     Q.  Asked by who?

15     A.  Misty and somebody else within the -- I

16  don't know who asked her to ask me.  She was

17  relaying.  That's all I know.

18     Q.  So you took those.  And then how did you

19  send those to her?

20     A.  I don't know.  I promise you, I can't

21  recall.

22     Q.  The text message we're looking at here, is

23  this still on your phone?

24     A.  Probably, yeah.  I mean, yeah, I would

25  assume.  I haven't --

Page 80

1        Q.   Why would it not be?

2        A.   Can I ask him real quick?

3        Q.   You can ask him whether you're going to

4    assert a privilege, that's the only thing.

5             MR. CHEELEY:   If you --

6        A.   I got a new phone.  Not everything

7    uploaded.  That's why I've had to say I didn't know

8    if everything went.  I got a new phone because I had

9    an old, old phone.  I was being honest.

10   BY MR. CROSS:

11       Q.   When did you get a new phone?

12       A.   Right before I retired.  So it had to be

13   May of 2021.  I can't -- I mean, I was just trying

14   to be honest because I couldn't tell you if

15   everything uploaded or not.  I know I lost contacts.

16       Q.   Why can you get a new phone in May of 2021?

17       A.   Because I had an iPhone 5 or something like

18   that.  The screen stopped working.

19       Q.   Where did you get the new phone?

20       A.   AT&T.

21       Q.   In person or how?

22       A.   Yes, in person.  I'm pretty sure I did in

23   person, yeah.  Because right after that they shut

24   down the main office there in Douglas.

25       Q.   In person at an AT&T store?

Page 81

1       A.  Yeah.  Douglas has an AT&T store, but they

2   shut down right after that.

3       Q.  What did you do with the old phone?

4       A.  They took it.

5       Q.  And did you work with people in the store

6   to transfer data from the old phone to the new

7   phone?

8       A.  I have no idea.

9       Q.  Well, what steps did you take to upload

10  data from the old phone to the new phone?

11      A.  I signed into Google, I guess.  I mean,

12  that's the only thing I've never known to do.

13      Q.  And what do you mean when you "signed in to

14  Google"?

15      A.  You open Google and sign in.

16      Q.  Well, do you have an Apple account?

17      A.  I don't think so.

18      Q.  When you got a new phone, it's an iPhone,

19  right?

20      A.  Yeah, but I've done everything through

21  Google.

22      Q.  So you went from an old iPhone to a new

23  iPhone?

24      A.  Yeah.

25      Q.  Is that the phone you have now?

Page 82

1      A.   Yeah.

2      Q.   Can you pull it out?  Do you know how to go

3  to settings?

4      A.   Yeah.

5      Q.   So if you go to settings, can you see if

6  you're actually logged in to an Apple iCloud

7  account?

8           THE WITNESS:  Yes or no?

9           MR. CHEELEY:  We're not getting into

10      that.

11      A.   Okay.  Fifth Amendment.

12  BY MR. CROSS:

13      Q.   So you're unwilling to tell me whether you

14  have an iCloud Apple account?

15           MR. CHEELEY:  She's already answered

16      that.

17  BY MR. CROSS:

18      Q.   Well, I asked her a different question.  Do

19  you even have an Apple iCloud account?

20      A.   The guy may have helped me.  I don't know.

21      Q.   But you're --

22      A.   I use Google.

23      Q.   I understand, but I'm asking you a

24  different question.  Are you willing to look at your

25  phone and see if that phone is logged in to an

Page 83

1    iCloud account?

2              MR. CHEELEY:  Let me take it up with her

3         outside the presence.  I need to speak with

4         her about it.

5         A.  I mean, I'm not trying to hide anything.  I

6    just don't know, and I don't know what you are

7    trying to do.

8    BY MR. CROSS:

9         Q.  The only thing I'm trying to figure out

10   is --

11        A.  I mean, if you -- would you like me to

12   pull -- okay.

13        Q.  I mean, Mrs. Latham, I promise you it's not

14   a trick.  The only thing I want is to get the facts.

15   I'm not trying to do anything else today.

16             As I understand it, I think every iPhone

17   you have to log into an Apple account, and then

18   that's -- that information gets loaded into an

19   iCloud and that way that can all transfer from one

20   phone to the next.  All I'm trying to figure out is

21   maybe there's some set of data that we have not

22   gotten because you didn't know it existed, and if

23   it's there, we would want to try to capture what's

24   in it.

25        A.  If I sent photos and videos, I would have

Page 84

1    done it through Google or whatever.  And they

2    wouldn't be -- I mean, they might be on my phone

3    from the e-mail, but I don't think they are.  I

4    don't remember them from the text message.

5         Q.  Okay.  Well, we're trying to get documents

6    that we think are important for our case, and if

7    they're on your phone or they're accessible through

8    your phone, that's what we need to understand and

9    that's all I'm trying to get at.  Because even if

10   you send stuff through Google, my understanding is

11   if it's sitting on an iPhone, it's still likely

12   sitting in an iCloud account.

13        There are a lot of people don't know that

14   which is why you might remember a few years ago

15   there were some celebrities that had some very

16   embarrassing hacks.

17        A.  Well, I don't embarrassing photos.

18        Q.  No, and I'm not suggesting that.  I'm just

19   telling you that there are people who are -- that

20   just don't know that everything sits on an iPhone

21   sits in an iCloud account.

22        A.  Okay.  Well, I'm telling you this had to do

23   with the photos from the election --

24        Q.  Totally get it.

25        A.  -- in the parking lot.

Page 85

1      Q.  Totally get it.

2      A.  And those are probably on my Google photo

3  thing.

4      Q.  All right.  Well, what I'm going to ask is,

5  we'll take a break again at some point, if you would

6  look at your phone with Mr. Cheeley and come back

7  and let us know whether you have an iCloud account,

8  whether it's logged into that phone and whether any

9  efforts have been made to search that for responsive

10  materials.

11          MR. CHEELEY:  All right.

12  BY MR. CROSS:

13      Q.  All right.  Looking back at Exhibit 5, the

14  text message between you and Ms. Hampton on January

15  5th of 2021, what's your understanding -- you said

16  she was asking you for these photos and videos.

17  What's your understanding of why she said "the board

18  can't stop me"?

19      A.  I have no idea.

20      Q.  Well, you said you understood she was

21  asking you for photos and videos from that day,

22  right?

23      A.  Yeah.  And there was no response from me

24  saying, what do you mean.

25          I don't know.

Page 86

1      Q.   Right.   And that was what I was going to
2  ask you.   You didn't write back, hey, I don't know
3  what you're talking about or I'm confused.
4      A.   I didn't do a thumbs-up or anything.   I...
5      Q.   As you sit here, you have no idea what she
6  meant when she said "the board can't stop me"?
7      A.   I cannot testify as to what she meant.
8      Q.   What your understanding was; is that right?
9      A.   Correct.
10     Q.   So then she writes to you the next day at
11  10:07 in the morning.   Do you see that?
12     A.   Yep.
13     Q.   And she writes:   "I hope and pray you are
14  not catching any heat from your work today."   Do you
15  see that?
16     A.   Uh-huh.
17     Q.   "Yes"?
18     A.   I see that, yes.   Sorry.
19     Q.   That's okay.
20     A.   I forget.
21     Q.   It's habit.
22          What's your understanding of why she
23  thought you might catch heat from your work on
24  January 6th?
25     A.   Because all day -- all evening during the

Page 87

1   scanning of the ballots in the room where there was

2   a window, there was a bunch of people videotaping

3   me, making fun of me, threatening me, calling me

4   names, and they were going after my job.

5           And therefore, she knew that the next day

6   when I went to work there was going to be all kinds

7   of problems because they all were showing me what

8   was going on on videos on Facebook Live.  And I was

9   being threatened.

10      Q.  By "job" you mean?

11      A.  My job as a teacher.

12      Q.  Okay.

13      A.  I'm sorry.

14      Q.  And when you say Facebook videos online,

15  what are you talking about?

16      A.  People were doing Facebook Lives behind me.

17  There was a room -- a room with glass and --

18          THE WITNESS:  May I say who was in the

19      room?

20          MR. CHEELEY:  Yeah.

21      A.  It was Misty at the desk, Ms. Ernestine and

22  me.  Ms. Ernestine was representing the Democrats, I

23  was representing the Republicans, and we were

24  sitting there watching everything.

25          And the people behind me were mad that

Page 88

1   Ms. Ernestine was in there, that they couldn't put

2   who they wanted in there, and they were mad that I

3   was in there and they started doing videos.  And the

4   videos were horrendous.  They were on Live, and they

5   were threatening me.  They were making fun of me,

6   et cetera.

7   BY MR. CROSS:

8        Q.  When you say "there," where are you

9   talking?

10       A.  What do you mean?

11       Q.  You said Ms. Ernestine, you and others were

12   there.  Where was "there"?

13       A.  Ms. Ernestine and I were in that room.

14   It's a little bitty room.  It was the room where the

15   scanner, and Misty was scanning and it was going on

16   to the whatever she does on her machine.  And I was

17   being threatened.

18       Q.  So this is -- this is at the election

19   county office?

20       A.  On the night of January 5th of the runoff,

21   yes.

22       Q.  Got it.  So this is -- this is where Misty

23   Hampton's office is or was at the time?

24       A.  It's the election board office, but it's

25   the room where they do the scanning.  It's a little

Page 89

```
 1   bitty room, and there was barely room for three of
 2   us.  And Ms. Ernestine got the chair, and I was
 3   standing beside her.
 4        Q.  And so this was the night of January 5th?
 5        A.  Yes.
 6        Q.  2021?
 7        A.  Yes.
 8        Q.  Who all was in that room?
 9        A.  Misty, Ms. Ernestine and myself.  It's a
10   little bitty room.
11        Q.  Was Eric Chaney there?
12        A.  Not in that room, no.  They -- the board
13   usually was outside processing absentee ballots.  I
14   was not watching that.  There was somebody else
15   watching that, I don't know who.
16        Q.  Is this the room that used to be called the
17   GEMS room when you had the little GEM system?
18        A.  I have no idea.
19        Q.  But this is the room where they do
20   adjudications?
21        A.  No.
22        Q.  Was it a different room?
23        A.  This is where she was scanning.
24        Q.  There is the room where the ICC is, the
25   central scanner?
```

Page 90

1      A.  Yes.  The one that stands alone, not the
2   one on the trash can.
3      Q.  And to get to this room, do you go through
4   the election supervisor's office?  Is it a door from
5   that office?
6      A.  It's just a big room, yeah.  There is a
7   little bitty room.
8      Q.  Right.
9      A.  Yes.
10      Q.  That's attached to Misty Hampton's office?
11      A.  She didn't have an office.  It was just a
12   big room.
13      Q.  Okay.  But there was a room where Misty
14   Hampton had a desk, right?
15      A.  Yes.  That was the big room.
16      Q.  That was the big room.  And then the room
17   where you were with Ms. Ernestine and Misty Hampton
18   and she was scanning ballots, that was the small
19   room off of that?
20      A.  Yes.  And it has a glass window behind it
21   where you can stand outside and people can watch.
22      Q.  Okay.  And so why were y'all in that room
23   on the night of January 5th, 2021?
24      A.  They were scanning ballots.
25      Q.  "They" being Misty Hampton?

Page 91

1        A.   Misty was scanning ballots.

2        Q.   Was Jil there as well?

3        A.   I have no idea.

4        Q.   You don't recall whether she was there?

5        A.   I can't remember.

6        Q.   So the only people you can recall in that

7    little room were yourself, Ms. Ernestine --

8        A.   There's only room -- there's barely room

9    for two people that we had to make room for three.

10   It's a teeny-tiny room.

11       Q.   Understood.

12            But the only people you recall inside that

13   room were you, Ms. Ernestine and Ms. Hampton?

14       A.   Yes.

15       Q.   And then who was in the bigger room?

16       A.   I can't tell you.  People were coming in

17   and out as they were bringing in from the other

18   precincts their stuff.

19       Q.   Is that --

20       A.   All of the stuff that they bring in from

21   the precincts.

22       Q.   Is that ballots?

23       A.   Whatever they're bringing in.  They're

24   bringing in suitcases, machines, whatever they're

25   bringing in.  They check them in whatever they do.

1    I was busy watching the scanning.

2         Q.  Why was Ms. Hampton scanning those ballots

3    that night in that room?

4         A.  Absentee ballots have to be scanned that

5    night, and also they had had the scanner that sits

6    on the trash can had failed at some point during

7    early elections, and they had to seal that.  And so

8    all of those had to be rescanned.  Those would have

9    been ballots with QR codes.

10             And so all of those had to be rescanned

11   from early voting.  And from their numbers, they

12   said there was 5,000 of them to scan.  So they all

13   had to be rescanned plus absentee ballots.  So it

14   went on for hours.

15        Q.  Why were you personally in the room when

16   Ms. Hampton was scanning those ballots?

17        A.  Because a Republican and a Democrat is

18   always present.  If a county works well together,

19   there's always equal representation.

20        Q.  Who was the Democrat?

21        A.  Ms. Ernestine.

22        Q.  And Ms. Ernestine was also the chair of

23   Coffee County election board, right?

24        A.  At that time, I think maybe.  But the

25   democrats, would -- each party has to send in a

Page 93

1    letter who represents them, and they had sent their

2    letter in for her.  That's what I was told.  I can't

3    testify to that exactly.

4         Q.  So the three of you are in the room,

5    Ms. Hampton is scanning ballots?

6         A.  And that's all I know.

7         Q.  And then while that's happening, there are

8    people coming and going in the large room?

9         A.  I guess, yes.

10        Q.  Well, I don't want you to guess.  Did you

11   see people come and going?

12        A.  I could see people, but I wasn't paying any

13   attention.

14        Q.  And what did you see people bring in to

15   that larger room specifically?

16        A.  Stuff.  That's all -- I mean, just stuff.

17        Q.  You said like suitcases, for example?

18        A.  Yes.

19        Q.  What was in the suitcases?

20        A.  I don't know.

21        Q.  Did you see people bring in machines like a

22   BMD?

23        A.  I have no idea.

24        Q.  You don't know what was in the suitcases?

25        A.  I didn't look.  That's not any job.

Page 94

1        Q.   Did you see people bring in ballots that
2   were then tabulated by Ms. Hampton?
3        A.   I don't know.
4        Q.   Well, where did she get the ballots from?
5        A.   I would assume, but I wasn't paying
6   attention to that.  I'm just doing -- watching that.
7        Q.   Well, she's got a stack of ballots she's
8   running through a scanner, right?
9        A.   Uh-huh.
10       Q.   "Yes"?
11       A.   Yes, sorry.
12       Q.   And where does she get those ballots from?
13       A.   They were in a box from what I remember.
14  They brought -- came in in a box, paper box.
15       Q.   Was the box inside that room with you?
16       A.   I don't remember.  I can't recall.
17       Q.   Describe the box as specifically as you
18  can.
19       A.   A Xerox box that a case of paper would come
20  in.
21       Q.   So somebody carried that box into the
22  room --
23       A.   I'm assuming --
24       Q.   -- and then they had to be scanned?
25       A.   I'm assuming.

Page 95

1      Q.  Well, I don't want you to assume, so let's
2  just be clear.
3      A.  I don't know who brought it in.  I don't
4  know if it was already in there or not.  I actually
5  was worried about Ms. Ernestine getting a seat and
6  making sure she was taken care of.
7      Q.  So when -- you don't recall how the ballots
8  in that xerox box got into the room where they were
9  being scanned?
10      A.  No.
11      Q.  Did you see ballots from the Dominion
12  system that night anywhere else beyond the ones in
13  that xerox box?
14      A.  The box kept being refilled, but, you know,
15  I don't know.
16      Q.  So there were people bringing ballots in
17  that were going into that box and Ms. Hampton then
18  would scan?
19      A.  Yes, but I wasn't paying attention to who
20  was coming in and out.
21      Q.  Is there anything you can tell me at all
22  about how ballots got in to the Coffee County
23  election office that night?
24      A.  Carried in by the people who worked those
25  precincts.  That's all I know.

Page 96

1      Q.   So, for example, did you see people carry

2   ballots in in some kind of secured bag that they had

3   to unseal?

4      A.   I have no idea.  That would have been

5   somebody else's -- I'm not -- I didn't pay attention

6   to that.

7      Q.   Okay.  So all you remember -- again, you

8   tell me if I have this wrong at all, Mrs. Latham.

9   What you remember is a xerox box on the floor in --

10   sorry -- was it on the floor?

11      A.   Yes.

12      Q.   Okay.  So what you recall is a xerox box on

13   the floor in the small room where the scanner is,

14   you and Ms. Ernestine are there, Ms. Hampton is

15   there.  She -- Ms. Hampton is scanning those ballots

16   for tabulation purposes, and that box is getting

17   more ballots in it from people who are bringing

18   ballots into the election office, but you didn't see

19   specifically who was bringing those ballots in or

20   how --

21      A.   No, sir.

22      Q.   -- what form they brought them?

23      A.   No, sir.

24      Q.   Okay.  How long were the three of you in

25   that office, in that small room?

Page 97

1          A.   Hours.   I don't know.   It was -- it was a
2     long night.
3          Q.   At any point while the three of you were
4     either in that room or in the bigger room, did you
5     ever see anybody else in that small room where the
6     scanner is?
7          A.   Not that I can testify to.
8          Q.   Are you aware of anyone else who went in to
9     the small scanner room that night?
10         A.   Not that I can testify to.
11         Q.   What does that mean?
12         A.   When I would take a break like to go get a
13    piece of pizza or something, I mean, I don't -- I
14    wasn't watching.
15         Q.   So there were points in time on the night
16    of January 5th, 2021, where you were outside of the
17    small room where the ICC is and you didn't have eyes
18    on that room?
19         A.   Correct.
20         Q.   So what you're saying is, you can't -- you
21    can't say whether someone may have been in the room
22    when you didn't see it; is that fair?
23         A.   Yes, sir.
24         Q.   Okay.   But as you sit here, did you hear at
25    any point, learn of anyone else who may have gone

Page 98

1    into that room on the night of January 5th besides

2    the three people you have named?

3         A.   Not that I know of.

4         Q.   Is there any reason you have -- you suspect

5    anyone was in the room that night?

6         A.   Not that I know of.

7         Q.   Do you have any reason to believe that

8    anyone went into that room beyond the three of you

9    that night?

10         A.   I am going to retract that.  Whatever the

11   Dominion tech -- because when it started jamming on

12   us, he would stand behind Misty and direct her what

13   to do.

14         So the Dominion guy, his name is Samuel

15   something with a C.  That's all I can remember.

16         Q.   So Samuel the Dominion tech was also in the

17   small room --

18         A.   He would come in when it would jam.

19         Q.   And what did he do when he was in there?

20         A.   He would tell Misty what to do.

21         Q.   To -- to fix the jam?

22         A.   Yes.

23         Q.   Was she the only one who touched the

24   equipment in that room?

25         A.   Yes.

Page 99

1      Q.  Did the Dominion tech ever touch the

2  equipment?

3      A.  No.

4      Q.  He just walked her through the steps and

5  she would clear the jam?

6      A.  Yes.

7      Q.  And are you talking a jam on the scanner?

8      A.  Yes.

9      Q.  Did anyone print anything in that room that

10 night?

11     A.  No.

12     Q.  Did you see anyone print anything in the

13 elections office at all on the night of January 5th?

14     A.  No.  And there's plenty of Facebook Live

15 videos.  If you go get those videos from people, I'm

16 sure you can see the whole thing.

17     Q.  You said there's two scanners:  There's the

18 one in the room where you guys were, the central

19 scanner and then there's a scanner on a trash can?

20     A.  Every precinct has the ICP which is a

21 scanner that -- you know, when they go vote on the

22 BMD, they go and stick it in there.

23     Q.  So you're in the room with the ICC, the

24 central scanner, but there's also a smaller ICP in

25 the bigger election office there?

```
 1        A.  Are you asking me if there was one that
 2   night set up?
 3        Q.  Yes.
 4        A.  Not that I know of.  I wasn't looking for
 5   one.
 6        Q.  At what point did you ever see an ICP that
 7   was sitting on a trash can in the election office in
 8   Coffee County?
 9        A.  When it was during early elections, during
10   when you would go in and vote.  And it was in the
11   other room.
12        Q.  The big room?
13        A.  There's another big room.
14        Q.  Ah, yes.  Okay.  Got it.
15        A.  And that's where people show up to early
16   vote.
17        Q.  Just so we're clear, the layout is, there
18   are three rooms, right?  There's the big room where
19   Misty Hampton and Jil Riddlehouse [sic]had their
20   desks.  There's a small room connected to that where
21   the ICC and the EMS server are.  And then there's
22   another big room where voters would come in and do
23   early voting?
24        A.  Yes.
25        Q.  And the ICP, the smaller scanner sat on a
```

Page 101

1    trash can in that room where voters voted during the

2    early voting in the fall of 2020; is that right?

3         A.   We're talking about January 5th.

4         Q.   I'm sorry you are right.   So the ICP that

5    you said sat on a trash can for early voting, that

6    was early voting leading up to the January 5th,

7    2021, runoff?

8         A.   Uh-huh.

9         Q.   "Yes"?

10        A.   Yes, sorry.

11        Q.   Okay.

12        A.   I apologize to the transcriber for nodding.

13        Q.   Do you know why that scanner sat on a trash

14   can?

15        A.   I did not design the system.

16        Q.   Is it -- is it designed to sit on a trash

17   can?

18        A.   That's what it's set up to look like.   I

19   call it a trash can.   I don't know if it's a trash

20   can.   It just looks like a trash can.

21        Q.   Oh, okay.

22        A.   It looks like the big Rubbermaid trash

23   scans it sits on.

24        Q.   That's why I was asking.   I want to make

25   sure we're talking about the same thing.   When you

Page 102

1    say the ICP is sitting on a trash can, do you mean

2    the bin that collects the ballots?

3         A.  Yes.

4         Q.  Okay.

5         A.  It looks like a huge, big, old, black trash

6    can.

7         Q.  Right.

8         A.  So we all call it a trash can.

9         Q.  Okay.  Okay.  But you're just talking about

10   the bin that's designed to collect the ballot once

11   it goes through and scanned?

12        A.  Yes.

13        Q.  And you're not suggesting that -- that

14   those ballots are just trashed?

15        A.  No.

16        Q.  Okay.  I thought that was the case, but

17   that's why I wanted to clear up the record and make

18   sure we're clear.

19             Are there any more details you can tell me

20   about who came in to the election office the night

21   of January 5th, 2021?

22        A.  No, sir.

23        Q.  Are there any more details you can tell me

24   on what anybody brought into the office that night?

25        A.  Besides the election stuff that they would

Page 103

1    bring from the precinct, pizza, somebody brought in

2    pizza.

3          Q.   Anything else?

4          A.   No, sir.

5          Q.   Is there anyone by name that you can tell

6    me who was in the election office that night besides

7    you, Ms. Hampton, Ms. Ernestine and the Dominion

8    tech?

9          A.   Just the board of election people there.

10         Q.   Coffee County board of elections?

11         A.   Yes.

12         Q.   So Eric Chaney was there that night?

13         A.   Yes.

14         Q.   Were other election board members there

15   that night?

16         A.   Yes.

17         Q.   Who?

18         A.   Wendell Stone, and two others I cannot

19   recall their name.  Sorry.

20              Matthew McCollough, that was one, but I

21   can't remember the other guy's name, sorry.

22         Q.   When you were in the scanner room, the ICC

23   room that night, were there any ballots that had to

24   be scanned more than once?

25         A.   Yes.

1      Q.   How many approximately?

2      A.   They were the jammed ballots.  Just a fair

3  estimation, around 70.

4      Q.   And so these were ballots that would go

5  into the scanner, the scanner would jam and you'd

6  have to -- Ms. Hampton would rerun it?

7      A.   No.  She put them to the side.

8      Q.   And then what were done with them?

9      A.   At the end they were ran.

10      Q.   Do you recall any other ballots being

11  rescanned?

12      A.   No.

13      Q.   Do you recall any ballots being scanned --

14  that they went through the scanner so it didn't jam,

15  but there was a problem with the way that they were

16  tabulated?

17      A.   No.  I don't even know what you were

18  asking, so I have no idea.

19      Q.   Yeah.  So let me -- I guess let me ask a

20  better question.

21           Were there any ballots that were scanned

22  that night that went through the scanner, the

23  scanner didn't jam, but some issue was flagged by

24  the system with the ballot being tabulated?

25      A.   I have no idea.

Page 105

1        Q.  You don't recall one way or the other
2   whether that happened?
3        A.  Correct.  I can't remember.
4        Q.  Was there any effort made by anyone that
5   night to confirm that the QR code on any ballot that
6   was being tabulated reflected the same selections as
7   what was listed the human readable portion of the
8   ballot?
9        A.  I don't know what you're asking.
10       Q.  It's your understanding of the current
11  Dominion system when a ballot is printed from the
12  BMD --
13       A.  I understand that part.
14       Q.  -- there's a QR code at the top and there's
15  human-readable text at the bottom, right?
16       A.  Yes.
17       Q.  And I believe you yourself have said
18  before, including at a Senate hearing, that it's
19  possible the QR code --
20       A.  I did not testify to that.
21       Q.  We can pull --
22       A.  I didn't say it was possible.  I said I
23  can't read a QR code.
24       Q.  Right.  You like to give the example of
25  autographed, right?

Page 106

1        A.   So whatever.

2        Q.   Well, not whatever.  Hold on.

3        A.   Explain -- explain what you're asking me

4    just now, though, please.

5        Q.   I'm trying to.

6             So you have said before that you have a

7    concern that the BMDs can work like auto correct

8    where you type something and the software changes it

9    into something other than what you intended and then

10   it sends it out like a text message, right?

11       A.   Possibly.

12       Q.   You don't remember saying that in a Senate

13   hearing and on a podcast?

14       A.   It said it probably could, yes.

15       Q.   Okay.  So --

16       A.   But what were you asking me about

17   January 5th?

18       Q.   Right, I'm getting there.

19            Are you aware of any effort made my anyone

20   in the Coffee County election office on the night of

21   January 5th, 2021, to confirm that what was being

22   tabulated from the QR code on a ballot was the came

23   as the selections indicated on the human-readable

24   portion of that ballot?

25       A.   No.

Page 107

1          Q.  Other than the scanner jamming the ICC, was

2     there any other problem or issue arose on the night

3     of January 5th, 2021, with tabulating the ballots?

4          A.  I'm thinking.  Mainly it was just the

5     scanners jamming and giving the error message on the

6     screen.  That was it.

7          Q.  The error message was from the jam?

8          A.  Yes.

9          Q.  The ballots that were being scanned while

10    you were in the room, did those ballots have QR

11    codes or were they mail-in ballots?

12         A.  They were QR codes.

13         Q.  Why was Misty Hampton running the QR code

14    ballots through the ICC on the night of January 5th,

15    2021?

16         A.  I already testified that they had an ICB go

17    down during early voting and those were having to be

18    rescanned because -- I don't know what happened.  I

19    just know we had to rescan them.  I don't know if

20    they tried to do something with whatever they had be

21    rescanned.  They got sealed and rescanned.

22         Q.  The actual in-person vote election day for

23    the Senate runoff, was that January 5th?

24         A.  5th.

25         Q.  What day did early voting end, do you

Page 108

1  remember?

2       A.  I would assume without me looking back at

3  the calendar, the Friday before.

4       Q.  So why was Ms. Hampton scanning

5  BMD-generated ballots the night before the

6  in-person -- I'm sorry -- the night of the in-person

7  election if the ICP had failed a day or more before?

8       A.  From what I can remember, they sealed it

9  when it failed and she did not want it opened until

10  the board was there.  And then having to call in a

11  voter review panel, et cetera, it just made it easy

12  to do it on one night from what I can recall.

13      Q.  So an -- the ICP failed during early voting

14  in -- leading up to the January 5th election, and

15  Ms. Hampton had the bin that holds those ballots

16  sealed until she tabulated them the night of the

17  5th?

18      A.  Yes, from what I understood, the cards or

19  something in the machine failed.

20      Q.  Did she scan any ballots the night of the

21  5th that did not have a QR code that you saw?

22      A.  Absentee.

23      Q.  Yes.

24      A.  Absentee.

25      Q.  She did?

Page 109

1    A.  Yes.

2    Q.  Okay.  So the night of the 5th, she was

3  scanning both QR-coded ballots and absentee ballots?

4    A.  Yes.  And the military.  I forgot about the

5  military.

6    Q.  All right.  So let's come back to

7  Exhibit 6.

8       So January 5th, 2021, 8:42 p.m. Ms. Hampton

9  asked you for some photos and videos from the

10  parking lot outside of the voting location in Coffee

11  County, and then at some point later that night

12  you're with her and Ms. Ernestine in the -- the ICC

13  room in Coffee County while she's tabulating

14  ballots.  Do I have that right?

15    A.  Yeah.  Can you repeat that?  I'm sorry.

16    Q.  Sure.  Yeah.

17       So we can see January 5th, 2021, 8:42 p.m.

18  Ms. Hampton asked you you said for photos and videos

19  from the parking lot of the voting location, polling

20  site in Coffee County the night of January 5th,

21  2021, and at some point that night -- that same

22  night you were with Ms. Hampton and Ms. Ernestine in

23  the ICC room in Coffee County, right?

24    A.  Yes.

25    Q.  Were you with her when you got this text?

Page 110

1     A.  I have no idea.  I really don't know.  The

2  whole time I was in the ICC room, I did not have any

3  phone.  I followed procedure of turning off my own,

4  et cetera.  So I don't know.

5     Q.  Did anybody bring a phone into the room

6  that night?

7     A.  No.

8     Q.  That you know of?

9     A.  That I know of.

10    Q.  Did you see anyone bring any equipment, any

11 devices of any kind into the ICC room the night of

12 January 5th?

13    A.  No.

14    Q.  Including the Dominion tech, he didn't

15 bring anything with him?

16    A.  Oh, he had his phone.

17    Q.  He did?

18    A.  Yes.

19    Q.  What did he do with his phone?

20    A.  He was making phone calls, texting and

21 stuff.

22    Q.  While he was in the room helping -- walking

23 Ms. Hampton through the jam?

24    A.  At times possibly, yeah.  It jammed many

25 times, so...

                                                    Page 111

1        Q.   Did the Dominion tech take any photos or

2   videos that you saw?

3        A.   Not that I know of.

4        Q.   All right.  So looking back at this text

5   thread, so now we get to the morning of January 6th,

6   10:07 a.m.  We looked at this a moment ago.  The

7   next sentence reads:  "I am here if you need

8   anything from me.  Thanks for all of your support,

9   my friend."  Do you see that?

10       A.   Yep.

11       Q.   You write back:  "You are welcome.  So far

12   so good."  Do you see that?

13       A.   Yes.

14       Q.   What did you mean by "so far so good" on

15   the morning of January 6th?

16       A.   Nobody was saying anything to me about the

17   videos and what people were saying about me.

18       Q.   And then later that afternoon, 5:06 p.m.

19   you send a text:   ██████████████████

20            Do you see that?

21       A.   I do see that.

22       Q.   What is that?

23       A.   I have no idea.  I'm assuming I got a phone

24   call and so I sent somebody's e-mail.

25       Q.   Explain that to me.

Page 112

1      A.  I don't know.  I'm sitting here looking at
2  it, and I even thought about it on my phone, and I'm
3  assuming that I got a phone call and I sent her that
4  text.
5      Q.  Why do you assume that had you got a phone
6  call and then sent an e-mail --
7      A.  Because I wasn't asked -- you know, there's
8  not a text before that, so...
9      Q.  Oh, I see.  So you're --
10      A.  I'm just assuming I got a phone call.
11      Q.  From Misty Hampton?
12      A.  Possibly.  I'm assuming, yes.
13      Q.  Well, whose e-mail was that?
14      A.  The only one I can think of is that it was
15  Scott Hall because that's how I got this text that I
16  forwarded.  The next text.
17      Q.  The next page in Exhibit 6?
18      A.  Yes, because I didn't get a text from him,
19  I just kind of copied it and just put it there.
20  That's all I can figure out.  But I can't testify if
21  that's his e-mail or not.
22      Q.  All right.  So as you sit here today
23  looking at your text, 5:06 p.m. on January 6th to
24  Misty Hampton, the ████████ e-mail address --
25      A.  Yeah.

Page 113

1     Q.  -- your best recollection is that's
2   probably Scott Hall?
3     A.  Possibly, yes.  But I can't verify it.
4     Q.  And how did you get Scott Hall's e-mail
5   address?
6     A.  He gave it to me.
7     Q.  When?
8     A.  Whenever he called me.
9     Q.  When did he call you?
10    A.  I don't remember.
11    Q.  Did he call you in January of 2021?
12    A.  I don't remember.
13    Q.  Was it December of 2021?
14    A.  Had to be January, but I don't remember.
15    Q.  So sometime shortly before your January 6th
16  e-mail is when you recall hearing from Scott Hall?
17    A.  Uh-huh.
18    Q.  Yes?
19    A.  Yes, sir, sorry.
20    Q.  Okay.  And had you ever spoken to him
21  before?
22    A.  Just like within that day or so.
23    Q.  So when Scott Hall called you in
24  January 2021, that was the first time you had ever
25  spoken to him; is that right?

Page 114

1      A.  Yes, sir.

2      Q.  And what's your understanding of why he

3  called you?

4      A.  I can't remember.

5      Q.  What did he say when he called you?

6      A.  I can't remember.  I -- so much stuff was

7  going on, I don't remember.

8      Q.  Did you know Scott Hall before he called

9  you?

10     A.  No.

11     Q.  Had you ever heard his name?

12     A.  No.

13     Q.  Scott Hall called you out of the blue in

14  January 2021 and you don't remember anything he had

15  to say?

16     A.  He -- I do know he asked me about my

17  testimony because, you know, by that time -- what

18  was the testimony? -- it was December 30th or

19  something like that.  I can't remember.

20     Q.  In front of the Senate --

21     A.  Yeah.

22     Q.  -- the Georgia Senate?

23     A.  I think so.  Was it December 30th?  I don't

24  remember.

25     Q.  Do you remember he asked you about your

Page 115

1   testimony regarding the BMD system?

2        A.   Uh-huh.

3        Q.   "Yes"?

4        A.   Yes, sorry.

5        Q.   Were there anything else you remember?

6        A.   No.   That's it.

7        Q.   Did he ask you about getting authorization

8   to get into the elections office in Coffee County?

9        A.   He never asked me that.

10        Q.   Mr. Hall did not ever raise with you --

11        A.   He asked me could I connect him to Misty.

12        Q.   And that's when you sent the e-mail

13   address?

14        A.   Yes, I had to have called her and then sent

15   the e-mail address.

16        Q.   And what did he say about why he wanted you

17   to connect him to Misty Hampton?

18        A.   He wanted to talk to her.

19        Q.   About what?

20        A.   I'm assuming what I testified to.   He

21   didn't tell me what he was going to talk to her

22   about.

23        Q.   So somebody called you out of the blue,

24   asked for -- to be connected to the Coffee County

25   elections supervisor, you connected them and you had

Page 116

1   no idea what they were going to talk about?

2       A.   No, sir.   I already talked to him once

3   about my testimony, and then he called me again.   So

4   there was two phone calls.

5       Q.   Were both of those calls in January of

6   2021?

7       A.   Yes, sir.

8       Q.   Because they were after your testimony?

9       A.   Yes, sir.

10      Q.   So the first time he called you, he asked

11  you about your testimony?

12      A.   Yes, sir.

13      Q.   Any other details about that call?

14      A.   No.   I mean, I just -- what I -- on the

15  testimony.

16      Q.   Did he mention Misty Hampton at that point?

17      A.   He asked me about the video and I didn't

18  know -- I mean, I just knew about the video, that's

19  it.

20      Q.   The video of her online where she had her

21  EMS password out, the YouTube video?

22      A.   I didn't know anything the EMS password

23  until you showed it to me.

24      Q.   Oh -- okay.   Well, just so we're clear,

25  when you say the video you mean the video that Misty

Page 117

1    Hampton put up online where she was, like, scanning
2    ballots in the election office?
3          A.   Yes.
4          Q.   What did he ask you about that video?
5          A.   I don't remember.  I'm trying to think.  He
6    asked me was I part of it and I wasn't part of it.
7    I knew about the video after the fact.  I cannot
8    tell you what.  I mean, I can't.  I talked to so
9    many people during all that stuff.  I don't -- I
10   don't remember.
11         Q.   When you testified before the Senate, was
12   Scott Hall present?
13         A.   I didn't -- I don't know.
14         Q.   You didn't see him there?
15         A.   I didn't know him.  I hadn't talked to him.
16   I don't know.
17         Q.   But did he tell you later when you spoke to
18   him that he had been there for your testimony?
19         A.   There's people who've told me that, I can't
20   tell you if he did or not.
21         Q.   So someone told you that, you don't
22   remember if it was him?
23         A.   I've been told that by people before, yeah.
24         Q.   All right.  So he called you the first
25   time, talked about your testimony in front of the

Page 118

```
1  Senate.  He mentioned Misty Hampton's online video.
2  Any other details about that call?
3       A.  No.
4       Q.  So then he calls you a second time.  How
5  long between the two calls roughly?
6       A.  I'm assuming he called me on the second
7  because I wouldn't imagine the 1st because that's a
8  holiday.  I mean, it wasn't even a week.  It was a
9  couple of days.
10      Q.  Well, your testimony -- sorry your
11 testimony in the Senate was on December 30th, right?
12      A.  Yes.
13      Q.  His first call then would have likely been
14 on January 2nd?
15      A.  Possibly, I don't know.
16      Q.  And then when he called you the second
17 time, was it the same day or another day?
18      A.  It was another day, I will say that.
19      Q.  So sometime between -- well, strike that.
20      A.  When he called me the second time, it had
21 to have been January 6th because I would have called
22 Misty and I said, well, let me give you his e-mail.
23 So it had to be -- and it was after school because I
24 wouldn't have taken a call during work, so it had to
25 be in between 4:00 and 5:06.  So that's all I can
```

Page 119

1   safely say it possibly could have been.

2       Q.  So when he called you on the afternoon of

3   January 6th, tell me everything you remember about

4   the call, please?

5       A.  Could I connect him to Misty.  But I -- and

6   I can't remember if he said her name or not.  So I

7   think he said the one in the video.

8       Q.  Anything else you remember about that call?

9       A.  No.

10      Q.  You didn't ask him why?

11      A.  No.  Because that had been a hectic day.  I

12  hadn't had any sleep, all the stuff had been

13  happening, I had been getting phone calls left and

14  right I was answering.  I was tired, I wanted to go

15  home.

16      Q.  But someone you had only spoken to once

17  before that you didn't know wanted to talk to the

18  election supervisor of a county where you are the

19  Republic chair, and you disconnected them without

20  asking why?

21      A.  I just -- if Misty wanted to talk to him,

22  she said she would, I -- I sent her the e-mail.

23      Q.  So he called you and then you called

24  Ms. Hampton?

25      A.  I'm assuming, yes, since there -- I sent

Page 120

```
 1   her his e-mail, yeah.
 2        Q.  Well, you just said she said she would talk
 3   to him, so you --
 4        A.  I sent her the e-mail.  That's all I
 5   remember doing.
 6        Q.  But did you at some point call her and say,
 7   hey, there's this guy Scott Hall that wants to speak
 8   to you, should I connect you?
 9        A.  I don't know.  I would not have given him
10   her phone number.  So I probably gave her the
11   e-mail, which is what I had, and that's what I did.
12        Q.  Well, you sent the e-mail on January 6th,
13   it's just an e-mail there's no context so you must
14   have given her the context over the phone so she
15   knew what that was?
16        A.  Yeah, but I can't recall.
17        Q.  As you sit here today do you have any
18   reason to believe you did not call her to tell her
19   what you were going to send her?
20        A.  I said I called her.
21        Q.  Okay.  I'm just --
22        A.  And that's the contact I had, so therefore
23   I gave it --
24        Q.  Okay.
25        A.  -- to her.
```

Page 121

1        Q.  So Mr. Hall calls you afternoon of

2  January 6th, you call Ms. Hampton and convey --

3        A.  And I gave her the e-mail address.  That's

4  all I gave her.

5        Q.  Did she ask why Mr. Hall wanted to talk to

6  her?

7        A.  I said I don't recall.

8        Q.  You don't remember anything about your

9  conversation?

10       A.  I hadn't slept.  I don't remember.  I had

11 been under extreme stress from being threatened.  I

12 was tired.  I don't remember.

13       Q.  Did it strike you as odd?

14       A.  No.  I mean, no, I don't know what my

15 feelings were.  I was tired.  I can remember being

16 tired.

17       Q.  All right.  So turn to the next page of

18 Exhibit 6.

19       A.  Yes, sir, I'm on page 6.

20       Q.  And so now we go from the afternoon of

21 January 6th to the morning of January 7, 2021.  Do

22 you see that?

23       A.  Yep.

24       Q.  And so you send Ms. Hampton here a text

25 that says:  "Team left Atlanta at 8:00."  And it

Page 122

1    goes on to say, "Five members led by Maggio."
2          Do you see that?
3          A.   Yep.
4          Q.   And there's a phone number here with a
5    Georgia area code.  Do you see that?
6          A.   Yes.
7          Q.   Is that Mr. Maggio's phone number?
8          A.   That is the message I had on e-mail when I
9    woke up that morning that I just copied it and sent
10   it to her.  That's all I -- and I don't know why he
11   sent it to me since he had her contact.
12         Q.   Okay.  So let's just take a step back.  The
13   first text that you sent to Ms. Hampton at 9:46 a.m.
14   on January 7, 2021, you're saying that's a copy and
15   paste from an e-mail you received from Scott Hall?
16         A.   Uh-huh.
17         Q.   "Yes"?
18         A.   From -- it had to have been from this
19   e-mail right here, this ████████ e-mail.
20         Q.   So did you search your e-mails for any
21   e-mails with Scott Hall?
22         A.   And that's all I have.
23         Q.   What's all you have?
24         A.   The e-mail with the contact and that, and I
25   had his e-mail.  He had given me his e-mail.  That's

Page 123

1   all I had for contact.

2        Q.   Okay.  But if I understand right, you are

3   saying that you woke up the morning of January 7,

4   2021, you had an e-mail from Scott Hall?

5        A.   And in fact, the e-mail was -- because on

6   my -- I sent y'all the text, and I think I sent the

7   text at 7 something.

8        Q.   Okay.  When you say "e-mail" --

9        A.   I had an e-mail.

10       Q.   Not a text message?

11       A.   I didn't have a text message.

12       Q.   So an e-mail from ███████

13       A.   Yes.

14       Q.   Okay.  And what e-mail account was that in?

15   Was that a G mail account?

16       A.   I'm -- yes.

17       Q.   Because you use Google?

18       A.   Yes.

19       Q.   Okay.  And what is your Gmail e-mail

20   address?

21       A.   Do I have to say it out loud so everybody

22   has to -- gets to e-mail me?

23       Q.   Let's --

24       A.   I mean, you have it.

25       Q.   We'll come back to that.

 1        A.   Okay.

 2        Q.   That's not a concern.  We'll come back to

 3   that.

 4             When you got our document subpoenas,

 5   though, did you look for e-mails with Scott Hall

 6   including the one that you got you say the morning

 7   of --

 8        A.   Yes.  And I did not have that one and it's

 9   possibly one I deleted, just a generic thing.  I

10   didn't -- I don't tend to delete e-mails, but every

11   once in a while I will.  Like, you go through

12   because I only received, like, 13,000 e-mails for

13   being an elector.  So I mean, some things may have

14   gotten deleted.

15        Q.   But as you sit here now, are you saying you

16   don't have any e-mails in your possession on your

17   phone, your computer, anywhere with Scott Hall?

18        A.   I looked.  I typed in Scott Hall.  I did

19   not remember that his name -- his number was

20   ███████████   I typed in Scott Hall.

21        Q.   So you did not search for ███████████?

22        A.   I can go back and search and will send it

23   to him if I have anything.  Can I make a note of

24   that?

25        Q.   Please do.

Page 125

```
 1        A.  Yes.
 2        Q.  And I would appreciate it if you could do
 3   it at a break because I don't want to have to make
 4   you come back for another deposition.
 5        A.  All right.  What is, it █████
 6        Q.  █████████████.
 7        A.  Okay.
 8        Q.  ███████████████?
 9        A.  I'm sorry, I only searched for Scott Hall,
10   and I apologize.
11        Q.  Okay.  And then when you search your
12   e-mails, did you search just your inbox?
13        A.  I did everything.
14        Q.  Including the trash?
15        A.  Yes.  But my trash deletes every 30 days.
16        Q.  In Gmail?
17        A.  Yes.
18        Q.  How long has that been set up?
19        A.  Forever.
20        Q.  All right.  So let's look back.  So you
21   wake up, you've got an e-mail from Scott Hall, "Team
22   left at 8."  Why did you send that on to Misty
23   Hampton?
24        A.  Because it came to me and I didn't know why
25   it didn't go to her.  So I just sent her the
```

Page 126

1   information.  I think it -- I think the original

2   message said:  Let Misty know.

3           And I just copied that part.  And I didn't

4   know -- and in my mind I do remember going, I don't

5   know why he let me know.  I went to work.

6           Q.  Did you respond to him?

7           A.  No.

8               What was that?  Your chair fell.

9           Q.  I got short.  Sorry.

10              So you didn't write him back and say, hey,

11  what's this about or why are you e-mailing me or...?

12          A.  No.

13          Q.  No response?

14          A.  No.

15          Q.  Okay.  What was your understanding when he

16  said, "Team left at 8," what was your understanding

17  of what that's about?

18          A.  Oh, I don't know.

19          Q.  Well, you understood that there was a team

20  of individuals led by Paul Maggio that were going to

21  Coffee County from Atlanta, don't you?

22          A.  I got to -- I don't know what I think.

23          Q.  Well, when you got this, did you ask

24  Ms. Hampton what it was about?

25          A.  No, not at this moment, no.

Page 127

1       Q.  And you also wrote, "Scott is flying in."

2       A.  I guess I cleared it up.  Scott is flying

3  in.

4       Q.  Right.

5       A.  Yeah.  So he may have said in the message,

6  you know, let Misty know I'm flying in whatever, but

7  I did cut and copy that and put that in there

8  because the phone number.

9       Q.  Right.  So you copied and pasted you said

10  from an e-mail from Scott Hall the first one and

11  then in the second part you let her know that Scott

12  Hall was flying there?

13      A.  Yeah.  That's probably part of the other

14  little message.  I'm bad about transposing numbers

15  that's why I did that.

16      Q.  All right.  But presumably Scott Hall

17  doesn't refer to himself in third person, so --

18      A.  No.  What I'm saying is he -- I'm just

19  saying from what I can tell from my texting is

20  possibly that he said, I'm also flying in whatever.

21          And so I wouldn't have copied that because

22  that wouldn't have made sense.

23      Q.  Right.

24      A.  Yeah.

25          MR. CHEELEY:  Did somebody just join?

Page 128

```
 1          THE VIDEOGRAPHER:  It's Mary Kaiser.
 2          MR. CROSS:  She's with us.  She's one of
 3      my colleagues.
 4          THE WITNESS:  Okay.
 5  BY MR. CROSS:
 6      Q.  All right.  So the morning of January 7,
 7  2021, you learned from Scott Hall that there was a
 8  team of five people heading from Atlanta to Coffee
 9  County?
10      A.  I just said, "Team left Atlanta" -- I'm
11  telling you what's there.  It was a very brief
12  message.
13      Q.  But you sent that on to Ms. Hampton because
14  you understood that team was going to meet with her?
15      A.  I'm assuming.  At this point I don't know.
16      Q.  And you understood that Scott Hall was
17  separately flying in to Coffee County, right?
18      A.  It just said, I am flying in or whatever,
19  whatever he would have said.  So I just said, Scott
20  is flying in.
21      Q.  Okay.
22      A.  I just assumed it was all one plane -- I
23  don't know -- that he was coming.
24      Q.  Well, tell me everything you know about the
25  individuals who traveled from Atlanta to Coffee
```

Page 129

1    County on the morning of January 7, 2021, with
2    respect to these text messages.
3          A.   All I know is that there was a guy named
4    Paul Maggio and Scott was flying in.
5          Q.   To see Misty Hampton?
6          A.   They were coming in to Coffee County, yeah.
7    That's all I know.
8          Q.   But to the elections office to see Misty
9    Hampton?
10         A.   I don't know.  I just let her know.
11         Q.   Well, you let me her know because you
12   thought they were going to see her, right?
13         A.   I was sent an e-mail that said, "Let Misty
14   know."
15         Q.   And then she responds "Yay" with four
16   exclamation points.  Do you see that?
17         A.   Yep, I see that.
18         Q.   And then she asks you, "What is Scott's
19   last name?"
20         A.   I said, "Hall."
21         Q.   Right.  You responded "Hall."  And then she
22   writes:  "Is someone coming at 10 to vote review
23   panel?"  Do you see that?
24         A.   Yes.
25         Q.   What was that about?

1      A.  Voter review panel.  There were some

2   ballots that still needed voter review panel for

3   some reason.  And I couldn't take off, and there was

4   another person named Lane, and I couldn't get a

5   commitment from him to go in, so I didn't know

6   whether anybody was going to be there or not.  But I

7   told her, I said, "I trust you all."

8           Because, you know, Ms. Ernestine is very

9   honest.  She trained me in voter review panel,

10  and -- but I trusted them to do the voter review

11  panel.  If there was any questions, they would have

12  called me.

13     Q.  The team that was heading in that morning

14  with Paul Maggio and Scott Hall, do you know they

15  were going to meet with Eric Chaney?

16     A.  I have no idea.

17     Q.  Do you know whether they did meet with Eric

18  Chaney?

19     A.  I have no idea.

20     Q.  Okay.  So then you respond:  "I could not

21  get Lane to commit.  I trust you all."  We just

22  talked about that.

23          Ms. Hampton responds:  "Okay."

24          And then you wrote back:  "How is it today?

25  Finished?"

Page 131

1          Do you see that?

2      A.  Uh-huh.

3      Q.  What was that about?

4      A.  Voter review panel I'm assuming.

5      Q.  All right.  Turn to page 3 in Exhibit 6.

6  Yeah, there you go.

7          So if you look at the top you'll see we

8  pick up with that other text left off --

9      A.  Uh-huh.

10      Q.  -- "How is it today?  Finished?"

11  Ms. Hampton writes --

12      A.  Thank you.  I was wondering where the rest

13  of that was.

14      Q.  Yeah, sorry.  It kind of got out of order.

15      A.  Yeah.

16      Q.  And Ms. Hampton writes:  "All were very

17  simple."  Do you see that?

18      A.  That was the voter review panel.

19      Q.  Right.

20      A.  Yes.

21      Q.  And then you write still the morning of

22  January 7:  "Good.  Scott has landed and the rest of

23  team is almost at Douglas."

24      A.  Yep.  Because I got another e-mail message,

25  so I just copied it and copied the concept of the

```
 1   message.
 2         Q.  Well, this one you didn't copy and paste.
 3   You put in your own words?
 4         A.  Right, I put in -- that's what I said.  I
 5   copied the gist of the message, yeah.
 6         Q.  And so why was Mr. Hall communicating with
 7   you about this instead of Ms. Hampton?
 8         A.  I don't know.
 9         Q.  You didn't ask him?
10         A.  It was just -- I got an e-mail, so I just
11   sent it on to her.  And I don't know what time that
12   was.
13         Q.  When you say --
14         A.  But it I will look.  It looks like it was
15   almost after school, so...  Or maybe.  I don't know.
16         Q.  And when you say "...the rest of the team
17   is almost in Douglas," who is the rest of the team?
18         A.  I told you what his e-mail said.
19         Q.  So Paul Maggio and four others?
20         A.  It said the -- I remember him saying, "I've
21   landed, rest of team is almost to Douglas."  I don't
22   know.
23         Q.  But so you understood that Scott Hall flew
24   in and the rest of the team was traveling from
25   Atlanta --
```

Page 133

1        A.  Yes.

2        Q.  -- by car?

3        A.  I don't know.

4        Q.  And then she writes back:  "Okay.  The

5   Democratic man is still here."  Do you see that?

6        A.  Yes.

7        Q.  Who was that?

8        A.  I have no idea.  I thought she meant

9   Dominion.  I don't know.

10       Q.  And then January 7, still the same day

11  3:40 p.m. she writes:  "Going great so far."  Do you

12  see that?

13       A.  Yes.

14       Q.  And that was about the work that Mr. Hall

15  and Mr. Maggio were doing; is that right?

16       A.  I am assuming.  I don't know.

17       Q.  But as you sit here, your best recollection

18  of what that was was her giving an update on what

19  Mr. Hall and Mr. Maggio were doing in the election

20  office?

21       A.  I don't know.

22       Q.  And you didn't ask her?

23       A.  No, but I went after 4:00 to go check on

24  the voter review panel because oftentimes they need

25  somebody to sign off and look at the things.  So I

Page 134

1    didn't respond because I was probably on my way

2    there.

3        Q.   To the elections office?

4        A.   Yeah.   I went up there, went and checked to

5    make sure they didn't need my signature, and then I

6    went across the street and had early dinner with my

7    husband.

8        Q.   So you were in the elections office on

9    January 7?

10       A.   I walked into the front part.   I didn't go

11   into the office.

12       Q.   Who did you see in the Coffee County

13   elections building on January 7, 2021?

14       A.   There were people in there, and I get

15   uncomfortable when there's others.   You know what I

16   mean?   So I just went in there, asked if they needed

17   me to do any voter review panel.

18       Q.   When you say "there were people in there,"

19   people where?

20       A.   In -- outside of the -- inside the glass

21   room because I was outside.

22       Q.   So January 7, 2021, sometime in the

23   afternoon or early evening, you arrive at the Coffee

24   County elections office, you see individuals in that

25   room where the ICC and the EMS server are?

Page 135

1          A.   Uh-huh.  No, no, no.  Only in the -- the --
2     the big room.
3          Q.   Oh.
4          A.   The blinds were drawn or any other thing,
5     so...
6          Q.   You could see them in the big room where
7     Misty Hampton's desk was?
8          A.   There was a couple people in there, yeah.
9          Q.   And you say the blinds were drawn.  The
10    blinds were drawn in what way?
11         A.   The window that you can see into the --
12    where you tabulate.
13         Q.   Where the ICC is?
14         A.   Yes.  I don't know if that's the server
15    room or not.  I don't -- because to me a server is a
16    big thing.
17         Q.   So the room where the ICC is, was that door
18    closed?
19         A.   No.  It's blinds.  It's a window.
20         Q.   Right.  Right.  But there's a room --
21         A.   I didn't go in, so I don't know.
22         Q.   I understand.
23         A.   The blinds were closed.
24         Q.   Right.  So the blinds were closed, you
25    couldn't see through the glass.  But was the door

Page 136

1   open?

2       A.  I couldn't see in because -- I mean, the

3   room -- the glass room that I'm in, that room is

4   here and then there's a door here and then the big

5   room is right here.  Does that make sense?

6       Q.  I see.

7       A.  So if they're around --

8       Q.  I see what you're saying.

9       A.  There's no visibility.

10      Q.  You have visibility of the glass window,

11  you don't have visibility of the door?

12      A.  Huh-uh.

13      Q.  Yeah, right?

14      A.  Yes.  Correct.

15      Q.  Okay.  But you could see the glass window

16  had the blinds closed, but you don't know whether

17  the door was open or closed?

18      A.  No, sir.

19      Q.  Okay.  Got it.  And how long were you in

20  the elections office that night?

21      A.  Just a few minutes.  It wasn't long at all.

22  I can't tell you how long.  But anyway, I asked

23  to -- in fact, I think I only talked to Jil if --

24  did I need to do anything with the voter review

25  panel.

Page 137

1        Q.   When you came in that night, the person
2   that Ms. Hampton refers to as "the Democratic man,"
3   she's talking about the Democratic rep for the voter
4   review panel; is that right?
5        A.   Excuse me?
6        Q.   When she refers to "Democratic man" on
7   January 7, she's referring to the Democratic rep for
8   the voter review panel?
9        A.   No, the voter review panel was
10  Ms. Ernestine.  I thought when she said "the
11  Democratic man is still here," I thought she meant
12  Dominion.  I don't know who the Democratic man is.
13       Q.   So you don't know who she's talking about?
14       A.   No, I thought she meant the Dominion man.
15       Q.   So when you went into the elections office
16  on January 7, 2021, who was every person you were
17  able to see in that -- in the premises there?
18       A.   I saw Jil.
19       Q.   Who else?
20       A.   I didn't look around.  I asked about the
21  voter review panel.  Did I need to sign off on
22  anything.  I didn't see Ms. Ernestine.  I didn't
23  see -- because she would have signed off on her part
24  of it I would assume.  I saw Jil.  I talked to Jil
25  about the voter review panel.  That's all I can

Page 138

1    remember.  And she said, no, everything was good,

2    and I can't even remember if I talked to Misty or

3    not when I went in like that.

4        Q.  Did you see Misty Hampton?

5        A.  I can't even recall.

6        Q.  But you didn't see Ms. Ernestine?

7        A.  No.

8        Q.  And are you aware that on January 7, the

9    Democrats had a different representative other than

10   Ms. Ernestine to handle the voter review panel?

11       A.  No.

12       Q.  Do you recall seeing any male figure in the

13   office that day?

14       A.  Possibly.  I wasn't paying attention.

15       Q.  Tell me what your best memory is.

16       A.  In the -- in the big room?  I can't

17   remember.  I'm trying to remember.

18       Q.  Did you see Scott Hall?

19       A.  No, Scott came from outside.  And he and I

20   talked outside, and I was glad to have met him.  And

21   then I left.

22       Q.  I'm sorry, when you say he came from

23   outside, what does that mean?

24       A.  Outside the building.

25       Q.  So you saw Scott Hall outside of the

Page 139

1    elections office on January 7?

2         A.   Uh-huh.

3         Q.   "Yes"?

4         A.   Yes, sir, sorry.

5         Q.   Did you ever see him inside the building?

6         A.   He came in from outside and he and I talked

7    in the inner room, and then he and I went outside

8    and I just talked about how nice it was.  And then

9    my phone -- and my husband told me he was on his

10   way, and we went over and had dinner.  We had an

11   early dinner that night.

12        Q.   Okay.

13        A.   Because I was tired.

14        Q.   And I just want to make sure I understand

15   right, so tell me if I have it wrong.  Afternoon,

16   evening, January 7, 2021, you are in the Coffee

17   County elections office, the big room -- when you

18   say "big room" you mean the one that Jil

19   Riddlehouse --

20        A.   Okay.  I was outside.  There's a glass room

21   right here, there's their big room, okay.  I was

22   outside of that talking to Jil through the window.

23        Q.   You were in the big room?

24        A.   I was outside of the big room.  There's a

25   glass, like, reception area.

Page 140

1          Q.   So sort of a foyer?

2          A.   Yes.

3          Q.   So you're in there talking to Jil

4     Riddlehouse [sic] and then that's when Scott Hall

5     came in from outside?

6          A.   Uh-huh.

7          Q.   "Yes"?

8          A.   Yes, sorry.

9          Q.   And did he speak to Jil too?

10         A.   No.  Because she was behind the glass.

11         Q.   How did you talk to Jil Riddlehouse [sic]

12    if she was behind the glass?

13         A.   There's, you know, the little talking

14    thing.

15         Q.   Ah, okay.

16         A.   Yeah.

17         Q.   Okay.  So she's behind the glass, you're in

18    sort of the foyer area, Scott Hall comes in?

19         A.   Uh-huh.

20         Q.   Was there anyone else in there?

21         A.   In the foyer?

22         Q.   Yes.

23         A.   Not that I can recall.

24         Q.   Was there anyone else inside the building

25    at all that you saw or that you were aware of?

Page 141

1      A.  Not that I can recall.  I saw people, but I
2  wasn't paying attention.
3      Q.  And when Mr. Hall came in, did he approach
4  you immediately?  Did he talk to someone else?  What
5  did he do?
6      A.  He said, "Are you Cathy?"  And he said,
7  "I'm Scott Hall."  And I shook his hand, it was nice
8  to meet him.  And he knew me because I had been on
9  the TV.
10     Q.  How long did you guys talk?
11     A.  I mean, five minutes at the most.  I can't
12  tell you how long.
13     Q.  Did he tell you why he was there?
14     A.  We weren't -- it was just -- I was tired.
15  Talked about stuff, I don't even remember what we
16  talked about.  Like I said, I was exhausted.
17     Q.  Did you ask him why he was there?
18     A.  No, didn't talk about it.
19     Q.  Did he at any point walk over --
20     A.  And at this point I do know he was about to
21  leave, and so -- and I don't know why he was outside
22  and I didn't see him when I came in, but, he was
23  getting ready to leave.  So...
24     Q.  Did he ever -- did you see him talk to Jil
25  Riddlehouse [sic]?

Page 142

1      A.  No.

2      Q.  Did you see him talk to Misty Hampton?

3      A.  I didn't see Misty.

4      Q.  Did you see him talk to anyone other than

5  yourself?

6      A.  No.

7      Q.  Did you see anyone with him?

8      A.  No.  He came in by himself.

9      Q.  So he came in, you spoke for maybe five

10  minutes and then what did you do?

11      A.  I went out and I'm assuming -- I left him

12  in the foyer so I didn't look.

13      Q.  So when you left, he was still inside?

14      A.  Yes.

15      Q.  Did you ever see him leave the building?

16      A.  No.  I left.

17      Q.  So as you sit here, you don't know when he

18  left the elections office?

19      A.  No, sir.

20      Q.  And so you left, went to dinner with your

21  husband?

22      A.  Yes.

23      Q.  And did you eat locally?

24      A.  Yes, we're isolated.  There's no place to

25  go.

Page 143

1        Q.   Where did you eat?

2        A.   Danny's.

3        Q.   Denny's?

4        A.   Danny's.

5        Q.   Oh, Danny's.  Okay.  Sorry.

6             Is that -- how close is that to the

7    elections office?

8        A.   You can see it.

9        Q.   And so while you were at dinner, you didn't

10   see Mr. Hall leave, for example?

11       A.   No.  Because I would have had to drive

12   around.  It's the one-way street, so I would have

13   had to drive around and go to Danny's.

14       Q.   How long were you at Danny's?

15       A.   I don't know, hour maybe.  And then I went

16   home.

17       Q.   And then you went home?

18       A.   Uh-huh.

19       Q.   And your husband was with you?

20       A.   Yeah.  We were in separate vehicles, we

21   went home.

22       Q.   So you didn't have dinner with Mr. Hall?

23       A.   No.  No.

24       Q.   Are you aware that Mr. Hall bought pizza

25   from a pizza place near the elections office that

Page 144

1   day?

2        A.   If he did, he bought it from Danny's, but

3   we had dinner at Danny's.

4        Q.   But you never saw Mr. Hall come in and buy

5   pizza?

6        A.   No.

7        Q.   And you didn't eat with him?

8        A.   No.

9        Q.   Did he offer you pizza?

10       A.   Hm?

11       Q.   Did he offer you pizza?

12       A.   No.

13       Q.   Okay.  Did you see what vehicle he came in?

14       A.   No.

15       Q.   When he came inside, was he carrying

16   anything?

17       A.   No, not that I know of, maybe a cell phone,

18   but...

19       Q.   Did you see anything in his hands, like did

20   he have a bag, a computer?

21       A.   No.

22       Q.   Did you see a phone at any point?

23       A.   I said maybe a cell phone if he was

24   carrying anything.  But I didn't -- I can't testify

25   to that.

Page 145

1       Q.   Right.  And sorry, that's why I was just

2  trying to clarify.  I don't want you to guess.  Did

3  you see a cell phone?

4       A.   No.

5       Q.   Is there any other details, any other

6  information you can tell me about your conversation

7  you had with him in the elections office?

8       A.   I'm trying to think.  I didn't think he

9  would be a big man, and I think I made a comment

10  about that.  Because, you know, how you try to get

11  an impression or visual of people when you talk to

12  them?  He's a tall man.

13      Q.   You commented that he was taller than you

14  expected?

15      A.   Yes, but I'm short so everybody is tall.

16      Q.   Anything else you remember from the

17  conversation?

18      A.   No.  I can't recall.

19      Q.   Do you recall when you had dinner?

20      A.   It would have been before 5 because I know

21  my husband got off and we went and had an early

22  dinner because I was wondering if there would be

23  somebody to serve because it was before 5:00.  And

24  we would have eaten dinner and hurried up to get

25  home to feed the dogs.

Page 146

```
 1        Q.  All right.  So look back at Exhibit 6 if
 2   you would, please.  And we're still on this page 3?
 3        A.  Okay.
 4        Q.  So we left off where Ms. Hampton texts you
 5   at 3:48 p.m., "Going great so far."  And then you
 6   said you arrived shortly thereafter at the elections
 7   office, right?
 8        A.  Uh-huh.
 9        Q.  "Yes"?
10        A.  Oh, say that again, I'm sorry.  I'm just --
11   my mind is going in...
12        Q.  No, no, no, that's okay.
13            So you arrived at the elections office
14   shortly after you got her text at 3:48 p.m. on the
15   7th, right?
16        A.  Yeah, and I probably didn't see it or
17   anything, you know, because I just went in.  So
18   there's no telling.
19        Q.  So somewhere -- somewhere between 3:48 p.m.
20   and about 5:00 you were in the elections office, had
21   a conversation with Scott Hall and then went to
22   dinner with your husband?
23        A.  Yeah, somewhere in between this and I would
24   say 4:30 because I have -- my mind -- we went to go
25   eat somewhere in between 4:30 and 4:45.
```

1      Q.   And then she sends you a follow --

2   Ms. Hampton sends you a follow-up text at 8:02 p.m.

3   the same day, January 7, right?

4      A.   Yes.

5      Q.   And she invites you to install Signal?

6      A.   Uh-huh.

7      Q.   "Yes"?

8      A.   Yes.

9      Q.   Did you install it?

10     A.   No.

11     Q.   You've never communicated with Ms. Hampton

12   about -- with Signal?

13     A.   No.

14     Q.   You've never installed Signal on your

15   phone?

16     A.   I have Signal on my phone, but I never

17   communicated with Misty on Signal.

18     Q.   So you do have Signal on your phone?

19     A.   Yes, I eventually got Signal on my phone,

20   but I didn't know what it was at this point.  No.

21     Q.   Did you search Signal for responsive

22   communications?

23     A.   Yes.  And I don't have anything from Misty.

24     Q.   Anything with Scott Hall?

25     A.   No.

Page 148

1      Q.  Paul Maggio?

2      A.  No.  I don't -- I never talked to Paul

3  Maggio, so I don't -- the only way I have his phone

4  number is from that text.

5      Q.  But you understood that Ms. Hampton wanted

6  you on Signal because she didn't want to communicate

7  on text anymore, right?

8      A.  From what I remember, she said Eric was

9  going to use it, and that's -- but I didn't put it

10  on there.

11      Q.  And that's Eric Chaney?

12      A.  Yes, sir.

13      Q.  She told you that in person or on a phone

14  call?

15      A.  I can't remember.

16      Q.  What all do you recall about the

17  conversation where she told you Eric Chaney was

18  going to use Signal?

19      A.  I don't remember.

20      Q.  Do you remember anything at all beyond her

21  saying Eric Chaney is going to use Signal?

22      A.  I don't remember, that's all I remember.

23  And I only remembered it because of seeing the text.

24      Q.  And you never used Signal to communicate

25  with Eric Chaney?

Page 149

1      A.  I did after the fact.  I sent him some

2  articles.

3      Q.  When?

4      A.  I don't remember.  It was just articles,

5  yeah, about stuff I would find about Coffee County.

6  Like what Marilyn Marks was sending out, I would

7  send him those.

8      Q.  Did you communicate with anyone using

9  Signal on January 7, 2021?

10      A.  I don't know.  I wasn't asked to look for

11  that date.  I mean, I sent everything I had.

12      Q.  I would ask you to take a look at that at a

13  break as well whether you have any communications --

14      A.  Okay.

15      Q.  -- I would say within two weeks of

16  January 7, 2021.

17      A.  Is two weeks fair?  I can't tell you

18  everybody.  I mean --

19      Q.  No, no, fair enough.  I don't need everyone

20  but just anyone in association with Coffee County.

21      A.  You mean this, not just Coffee County?

22      Q.  Well, let's be -- let's be clear.  Anything

23  to do with Scott Hall --

24      A.  Okay.

25      Q.  -- or Paul Maggio, their trip in, or any

1    member of the Coffee County elections board or

2    former --

3          A.   Okay.

4          Q.   -- Coffee County elections employee.

5          A.   Got you.

6          Q.   Okay?

7               MR. CHEELEY:  We've been going quite a

8          while.

9               MR. CROSS:  Oh, yeah, sorry.

10              MR. CHEELEY:  It's 1:38.  Can we get

11         some lunch?

12              MR. CROSS:  Yes.  Let me -- just give me

13         one minute because I think I can finish up on

14         this.

15              MR. CHEELEY:  You predicted before we

16         started this last time it would be about an

17         hour.

18              MR. CROSS:  Yeah.

19              MR. CHEELEY:  It's been an hour.

20              MR. CROSS:  Right.  Let's close out this

21         point and then -- and then --

22   BY MR. CROSS:

23         Q.   Flip to page 7 real quick.

24              MR. CHEELEY:  I've got a 3:00 Zoom call

25         that I need to take.

Page 151

1        A.  Okay, go ahead.

2     BY MR. CROSS:

3        Q.  So you'll see here -- well, actually,

4     there's nothing of any more substance on that so

5     don't not worry about that.

6            MR. CROSS:  Okay.  Yeah, let's go off

7        the record.

8            THE VIDEOGRAPHER:  Off the video record

9        at 1:39 p.m.

10           (Recess 1:39-2:37 p.m.)

11           THE VIDEOGRAPHER:  Back on the video

12       record at 2:37 p.m.

13    BY MR. CROSS:

14       Q.  All right.  Do you still have Exhibit 6 in

15    front of you?

16       A.  I sure do.

17       Q.  Okay.  If you go to page 3 -- I'm sorry, I

18    couldn't remember if I asked you this before.  When

19    Ms. Hampton texted you at 3:48 p.m. on January 7,

20    "Going great so far, was that about the work that

21    Mr. Hall and Mr. Maggio were doing?

22       A.  I don't know.  It could have been about the

23    voter review panel.  I don't know.  I said it...

24       Q.  You just don't know one way or the other

25    whether --

Page 152

1        A.   No.   Because I didn't text her and there's
2   no response from me, so I have no idea.
3        Q.   Do you know Jeff Lenberg?
4        A.   No.
5        Q.   Have you ever heard that name?
6        A.   You said it today and then I read back over
7   here and they were talking about it.  But I've never
8   heard that name before or that I recall.
9        Q.   Do you know whether Jeff Lenberg was in the
10  Coffee County elections office on January 7, 2021?
11       A.   Not that I recall.
12       Q.   All right.  Take a look at the first page
13  of Exhibit 6.
14       A.   Yes.
15       Q.   Do you see here this is a text thread
16  between Misty Hampton and Eric Chaney?
17       A.   Uh-huh.
18       Q.   I'm sorry, yes?
19       A.   Yes, I'm sorry.
20       Q.   Everybody does it.  Everybody does it.
21            And you see here on January 6th, there's a
22  text message that reads:  "Scott Hall is on the
23  phone with Cathy about wanting to come scan our
24  ballots from the general election like we talked
25  about the other day.  I'm going to call you in a

Page 153

1  few."  Do you see that?

2       A.  I do see that.

3       Q.  That's a text that Ms. Hampton sent Eric

4  Chaney?

5       A.  No.  Did she send it to -- or did he -- oh,

6  okay, I see it now.  Okay, all right.

7       Q.  Are you with me?

8       A.  Yep.

9       Q.  And she sends that at 4:26 p.m. on

10  January 6, right?

11       A.  Yep.

12       Q.  So does that refresh your recollection that

13  you were on the phone with Mr. Hall around 4:30 p.m.

14  on January 6?

15       A.  Which would have been after school, so

16  yeah.

17       Q.  Yeah.

18       A.  Yes.  And then so when I did see this, but

19  I mean, I still do not recall what we talked about,

20  but this right here says what we talked about was

21  scanning ballots.

22       Q.  Right.  And does that refresh your

23  recollection that you discussed with Mr. Hall that

24  he wanted to come down and scan ballots in the

25  election office?

Page 154

```
 1        A.  It doesn't jog my memory, but I will attest
 2   that's what this says here.  Like I said, I cannot
 3   remember exactly what I talked to him about.
 4        Q.  You don't have any reason to believe
 5   Ms. Hampton got it wrong, right?
 6        A.  No, she would have probably said exactly
 7   what I said.
 8        Q.  Okay.
 9        A.  And I mean scanning ballots.  I mean...
10        Q.  Right.
11        A.  So...
12        Q.  And if you look back at page 5 of
13   Exhibit 6, just so we have the timing right, you can
14   see you sent this ▮▮▮▮▮▮▮ e-mail address to
15   Ms. Hampton at 5:06 p.m., so about half an hour
16   after --
17        A.  Right.
18        Q.  -- Ms. Hampton's text to Eric Chaney?
19        A.  So then probably within that phone call,
20   that's where she wanted it.  Took me a while maybe
21   to find me, I don't know.  But yeah, so maybe that
22   was the one phone call.
23        Q.  Okay.
24        A.  There you go.
25        Q.  Okay.  In the ▮▮▮▮▮▮▮▮▮▮▮▮▮,
```

Page 155

1  that's not your e-mail address?

2       A.   No.

3       Q.   Okay.  Do you have a proton e-mail address

4  or have you ever?

5       A.   I did, but it was a campaign and I don't

6  even use it anymore.  I don't have access to it.

7       Q.   Okay.  When was the last time you used

8  that?

9       A.   It was during a campaign.

10      Q.   Was it before January of 2021?

11      A.   No, it was after.

12      Q.   It was after?

13      A.   Yeah, it was this year.  It was this

14  campaign.  Yeah, so...

15      Q.   Did you have a proton e-mail address in or

16  around January 2021?

17      A.   Not that I -- no, huh-uh.

18      Q.   Okay.  Did you get a chance to look for the

19  documents we talked about?

20      A.   Yes.

21      Q.   What did you find?

22      A.   I found just -- I do have a iCloud, I

23  didn't know I did, but I'm assuming it got set up

24  while I was doing the phone, but I don't use it.  I

25  don't even know what the password is, so I have to

```
 1   wait and get on there to look for anything.
 2        Q.   Okay.  What about the -- did you search the
 3   ███████████  e-mail address?
 4        A.   Uh-huh, yep.  And I sent basically forms
 5   that were on the secretary of state's website.  I
 6   sent the RLA count from counties, and -- and I
 7   shared articles from everything that I have from him
 8   is, like, late January and February of 2021.  That's
 9   all I have.
10        Q.   Can we see those e-mails?
11        A.   I don't want people's others' names going
12   in there.  But I will show them to you.
13             THE WITNESS:  What do you say?  Yes or
14        no?
15             MR. CHEELEY:  For the e-mails?
16             THE WITNESS:  Uh-huh.
17             MR. CHEELEY:  As long as we have an
18        understanding that you'll redact for
19        publication the names of other people copied
20        or on the e-mails.
21             THE WITNESS:  Yeah.
22             MR. CHEELEY:  Because she doesn't want
23        to subject them to harassment.
24             THE WITNESS:  Yep.  I sent him --
25   BY MR. CROSS:
```

Page 157

1      Q.  Can I see?

2      A.  NO, I'm not going to let you touch my

3  phone, but I'll sit next to you.

4      Q.  Okay.

5      A.  Okay.  I'm going to put my glasses on.

6  Hold on.

7          MR. CHEELEY:  Yeah, just move it.

8      A.  I'm sorry.

9          This one is he wanted county data from the

10 risk-limiting, and I got that from the secretary of

11 state's website.

12 BY MR. CROSS:

13     Q.  That's February 24, '21?

14     A.  Uh-huh.  No, 20- -- yeah, 24.  And then

15 there was another --

16     Q.  Can you pull up the e-mail not just the

17 attachment?

18     A.  Yep, see.

19     Q.  Okay.

20     A.  All I did was send him that.

21     Q.  Okay.

22     A.  Okay.  The next one is he wanted somebody's

23 phone number, and I don't want that going -- I don't

24 want to pull people in.  He just wanted somebody's

25 contact information.  Can I just show it to you?

Page 158

1      Q.   Yeah, let me see.

2      A.   And I just said --

3      Q.   This is an e-mail you sent?

4      A.   Yeah.

5      Q.   Where is his e-mail?

6      A.   Right there.

7      Q.   No, no.  Are you showing me just your sent

8   folder?

9      A.   Yeah, because -- no, I'm showing you when I

10  did the search, this is what came up.

11     Q.   Oh.

12     A.   Yeah.

13     Q.   So that's what you sent?

14     A.   Uh-huh.

15     Q.   And let me see that again.  What is that

16  person's role?

17     A.   Right there.

18     Q.   Okay.  All right.  We're going to ask for

19  production of these e-mails, but just go ahead.

20     A.   And then this was another county.

21     Q.   And just to go back, why did he want that

22  individual -- I won't say the full name.

23     A.   To talk.  They only wanted to talk.  I

24  don't know why he wanted them.  I was just giving it

25  to him.

Page 159

```
 1        Q.  But did he --
 2        A.  And then --
 3        Q.  Sorry.  Did he tell you what he wanted to
 4   talk with the Stevens person about?
 5        A.  No, he just wanted to know who had trouble.
 6        Q.  Trouble with what?
 7        A.  With whatever went on with the recount, the
 8   RLA.  So that was it.
 9        Q.  That was about the audit?
10        A.  Uh-huh.
11        Q.  "Yes"?
12        A.  Yes.
13        Q.  So you connected him with that individual?
14        A.  Uh-huh.
15        Q.  "Yes"?
16        A.  Yes.
17        Q.  Okay.
18        A.  And then that's another county person.  I
19   did this county.
20        Q.  Just open the e-mail if you would.
21        A.  Gosh.  It's just he sent it to me and
22   then I --
23        Q.  Here?
24        A.  He sent it, and he was from --
25        Q.  Who is Arthur Moore?
```

Page 160

1        A.   Don't say his name out loud.

2        Q.   Oh, sorry.

3        A.   That county.

4        Q.   But how does this relate?

5        A.   He was in that county.  He sent me the

6    information.

7        Q.   So hold on.  Let's just take a step back.

8             Are we looking at the ████████ e-mails?

9        A.   Yeah, and I forwarded it to him.

10        Q.   Oh, I see.  I'm sorry.

11        A.   Yeah.

12        Q.   So this -- this comes in from this

13    individual?

14        A.   Yeah.  So I --

15        Q.   And you forward that on to Scott Hall?

16        A.   I was sharing -- I was sharing all the

17    stuff of what people had problems --

18        Q.   So let me just see these two e-mails.

19        A.   This is just where I forwarded it and he

20    sent me the reports, and then there's those reports.

21    And you can just see the reports what they said.

22    This is what they had problems with.

23        Q.   Okay.

24        A.   And these things are public record.

25        Q.   Okay.  What's next?

Page 161

1        A.   This is the one that I got from this
2    person.  And I just -- I don't -- I just sent it to
3    him.
4        Q.   Okay.
5        A.   And I don't know why I copied it.
6        Q.   That's February 24, 2021?
7        A.   Yeah.  There was -- yeah, you can see that
8    this --
9        Q.   Who all is on that?
10       A.   There was nobody on that.  I just sent
11   him --
12       Q.   So you just sent it to him?
13       A.   I sent him the copy of that.
14       Q.   Okay.
15       A.   Because I think I sent -- right here,
16   here's the other thing.  I sent him that which was
17   public record.
18       Q.   The R level report?
19       A.   Uh-huh.  Which is public record.
20       Q.   And what's your e-mail of that?
21       A.   The same one I just showed you.
22       Q.   But let me see this, the e-mail itself.
23   Okay.  And then --
24       A.   So on this day, I sent him all of this
25   information.

1        Q.   Wait, so go back.  What is this?  Oh,
2    that's the one you showed me.  Sorry, I don't want
3    to touch you phone.
4        A.   That's all right.
5        Q.   What's this one?
6        A.   She sent me what came from that, the board
7    of elections.
8        Q.   Okay.  And then what's the next one?
9        A.   I'm sorry, I had onions.  I don't want to
10   be breathing on you.
11       Q.   That's okay.
12       A.   It is so wonderful here.  Oh, that's just a
13   repeat.  I don't know why I sent it to him twice.
14       Q.   Keep going down.
15       A.   Okay.  Then there's that one.  There's the
16   Effingham [sic] him.  And then he was this.  I
17   don't know what this is.
18       Q.   Scroll all the way to the top.
19       A.   It looked like phishing.  So --
20       Q.   Wait come up.
21       A.   Yeah.  There's my.
22       Q.   This is February 10?
23       A.   Yeah.
24       Q.   He says:  "Please confirm receipt."  What
25   is he sending you?

Page 163

1        A.  He attached the link of the Dominion

2   contracts.  He was wanting this thing, whatever that

3   is.

4        Q.  First --

5        A.  And what it was is a link to contacts.

6        Q.  Contacts or contracts?

7        A.  Contacts.

8        Q.  Oh.

9        A.  It's not going to let me go.  I have to

10  have wireless.  This one?

11       Q.  Yeah.

12       A.  Yeah.  Oh, it is contracts.  I don't know

13  what that is.  It's the Dominion contract.  That's

14  what it is.

15       Q.  Scott Hall sent you the Dominion contracts

16  for the state of Georgia?

17       A.  Yeah, because it was public record.  It's

18  the one that's public record.

19       Q.  And you don't have any other e-mails that

20  come up for him?

21       A.  Huh-uh, that's it.

22       Q.  Why do you only have your sent mails?

23  Where are the e-mails he sent you?

24       A.  That wasn't the -- those were -- I did the

25  whole search when I did the search.

Page 164

1          Q.  So you don't have any e-mails he sent you,
2     you only have e-mails that you sent him?
3          A.  I just -- I did it right here.  I searched
4     for him, and that's what came up, all of that came
5     up.
6          Q.  Right.  But none of these are e-mails from
7     that account, they're only e-mails to that account.
8          A.  Okay.  Let me see.  I don't have anything
9     there.  It's just what I sent.
10         Q.  Okay.
11         A.  So --
12         Q.  So what happened to the e-mails from Scott
13    Hall?
14         A.  He would call me.  You can see it's from
15    the phone call.  It's the -- because they were all
16    sent on one day.  He called me and said, can you
17    send me these.
18         Q.  In February of 2021?
19         A.  Yes.
20         Q.  Yeah.  But you testified earlier that he
21    e-mailed you the morning of January 7 and you did a
22    copy and paste?
23         A.  I said a text or an e-mail.  I said I
24    didn't know which one.  The only thing I can figure
25    out on Signal is that he had his Signal set to

Page 165

1    disappear because anything I have for him is gone,

2    and I did not erase it.

3        Q.  Let me see Signal.

4        A.  Hold on a minute.  Let me get on to it.

5    Okay.  I don't want you to see who is texting me.

6    Let me see where the search is, okay.  This one is

7    hard to work.  Hold on.

8            There it is.  And I don't have anything for

9    him.  So he set his messages to disappear, which you

10   can do on that.

11       Q.  So you don't have any from Scott Hall?

12       A.  Huh-uh.

13       Q.  What about Eric Chaney or Misty Hampton?

14       A.  Not on here.  I don't have anything from

15   Misty.

16       Q.  You don't -- you don't have anything from

17   Misty?

18       A.  Not on Signal.  I don't think so.  I'll

19   check again.

20           No, I don't have anything there.

21       Q.  Let me see.

22       A.  And I'm going to show you Eric here.

23       Q.  Let me see when you search for Misty.

24       A.  It didn't come up.

25       Q.  What do you mean?

Page 166

1      A.  No results.

2      Q.  What did you search for?

3      A.  No results, Eric Chaney.

4      Q.  So just search for Eric or Chaney.

5      A.  I would have put him in as Eric Chaney.

6      Q.  Maybe.  People put all kinds of stuff in

7  those.

8      A.  Do you know how Signal works?  It connects

9  to your contacts, and I have him in my phone as Eric

10  Chaney.

11      Q.  Okay.

12      A.  So...

13      Q.  What about Misty?

14      A.  Misty Martin, that's all the texts that we

15  have, just like you have.

16      Q.  Well, I don't have if we have all of those.

17  Let me see those.

18      A.  Some of them have nothing to do with that.

19  Some of them were happy birthday, and she wanted my

20  son's wedding pictures.  I'm not sending you wedding

21  pictures.  And then she sent me that picture of the

22  hand sanitizer, which is what I wanted.

23      Q.  Okay.  But can you scroll through at least

24  in the January 2021?

25      A.  Yes, I will.

1       Q.   And let me see if we have all that.

2       A.   Hold on.

3       Q.   And this isn't Signal?

4       A.   No, this is -- I don't have anything from

5    her from Signal.  I promise you, I don't.  This

6    is -- wait, this is June.  Okay.  Yep, here he goes,

7    "What's his last name?"  January 7.

8       Q.   So go up to, like, January 1st so I can

9    see.

10      A.   Oh, here are all of the pictures.  I sent

11   them to her on here.  This is from the election.  I

12   mean, that stuff has nothing to do with that.

13   There's all the pictures I sent her.  And then here

14   is, "Are you okay?"  Here is Friday.

15           I'm surprised she didn't share the pictures

16   with you.  There's that.  There's that.  There's

17   that.  And then "Happy birthday."  There we go.

18      Q.   Wait.  So go up.  So you wrote -- so we

19   didn't have this.  So when she sent you the Signal

20   link you responded --

21      A.   I have Signal, but I never communicated

22   with her on Signal.

23      Q.   And so the next one was January 10th.  Did

24   you-all finish with --

25      A.   And you've got that right over there:  "Did

Page 168

```
 1  you-all finish with the scanner?"
 2          "Not yet.  I'm hoping by Tuesday."
 3      Q.  What were you asking her about finishing
 4  with the scanner?
 5      A.  Did she finish with the scanner is what I
 6  asked her.
 7      Q.  All right.  We'll come back.  Scroll down a
 8  little bit.
 9      A.  This is February, this is about my
10  birthday.
11      Q.  Well, let me just see -- okay.  I mean,
12  you're going to have to produce it eventually, but
13  I'm trying to keep you from having to come back.
14  All right.  Let's go back to Exhibit 6.
15          And jump to if you would, please, page 8.
16      A.  Yep.
17      Q.  All right.  So there is the one that we
18  were just looking at?
19      A.  Correct.
20      Q.  And so now -- and sorry, I have more
21  context for it.  So that -- at the top where it says
22  "I'm on Signal" --
23      A.  Uh-huh.
24      Q.  -- that's actually sent on January 7 in
25  response to her January 7 text on the page
```

Page 169

1   immediately before.

2        A.   Yeah.

3        Q.   Do you see that?  Is that right?

4        A.   Yeah.

5        Q.   Okay.  And so then it jumps from January 7

6   to January 10th, and you write, "Hey, did you-all

7   finish with the scanner?"  Do you see that?

8        A.   Uh-huh.

9        Q.   "Yes"?

10       A.   Yes, sorry.

11       Q.   Finish doing what with the scanner?

12       A.   They were scanning those ballots.

13       Q.   What ballots?

14       A.   January 5th, which is what I assumed

15   from -- because I had forgotten why -- what I had

16   talked to Scott about, and he was there to scan

17   ballots.

18       Q.   I see.  I understand.

19       A.   Yeah.

20       Q.   So the -- when you were asking her on

21   January 10th if they were finished with the scanner,

22   you were asking if they were done scanning the

23   ballots that Scott Hall had come to --

24       A.   No.  I was asking was she finished with the

25   scanner.

Page 170

1        Q.   Finished using the scanner?

2        A.   Yeah.

3        Q.   To scan the ballots?

4        A.   Uh-huh.

5        Q.   Which is what you had -- you had talked to

6    Scott Hall about?

7        A.   Over here.  But I hadn't talked to Scott

8    Hall.  I was just asking her if she was finished

9    with the scanner.

10        Q.   Right.  But this is three days later --

11    four days later after you had spoken to Scott Hall

12    about scanning ballots?

13        A.   Uh-huh.

14        Q.   "Yes"?

15        A.   Yes.

16        Q.   Okay.  And why were you wondering four days

17    later if they were done with the scanner?

18        A.   Because the scanner had been borrowed.  I

19    was just wondering if they were finished with the

20    scanner.

21        Q.   Okay.  And when you say the scanner was

22    borrowed, what do you mean?

23        A.   She had borrowed a scanner.  I was just

24    being nosey, did you finish with the scanner.

25        Q.   I'm sorry, who is "she"?

Page 171

1      A.   Misty.  This is who we're talking with.

2      Q.   Okay.  Where had she borrowed a scanner

3  from?

4      A.   I'm going to plead the Fifth on that.

5      Q.   Okay.  Did she -- so she -- sorry.  Strike

6  that.

7           Misty Hampton had borrowed a scanner so

8  that Scott Hall and others could scan ballots; is

9  that what I understand?

10     A.   That's what I understand, yes.

11     Q.   Okay.  And you're uncomfortable telling me

12 where she got the scanner from?

13     A.   Yeah, because just -- I don't know where

14 everything went, and I'm not going to pull anybody

15 in to something, so...

16     Q.   Well, hold on.  I just want to be -- I

17 want --

18     A.   I mean, I just know a scanner had to be

19 borrowed and I was curious was they finished with

20 the scanner.  I was just asking.

21     Q.   I understand, but there's -- and your

22 attorney can advise you on this, but there are two

23 different things between invoking the Fifth because

24 you are worried about self-incrimination versus not

25 wanting to share information.

Page 172

1          And so what I'm asking you is, are you
2    saying that you're invoking the Fifth on the
3    question of whether -- of where the borrowed scanner
4    came from because you're concerned with
5    self-incrimination or you just don't want to share
6    information?
7          A.  I really don't know where the scanner came
8    from.  I know they borrowed a scanner.
9          Q.  Okay.
10         A.  Okay.
11         Q.  That's fine.
12              How do you know they borrowed -- "they"
13   being Misty Hampton and Scott Hall and the others,
14   how do you know they borrowed a scanner?
15         A.  Because something was said about borrowing
16   a scanner.
17         Q.  Said by whom?
18         A.  Misty.
19         Q.  On a phone call or where?
20         A.  I don't know.  I really don't know.
21         Q.  Was that before or after --
22         A.  Oh, excuse me.
23         Q.  Was that before or after --
24         A.  I'm sorry, whoever listened to that.
25         Q.  This conversation where you heard they had

Page 173

1   borrowed a scanner, was that before or after you met

2   Mr. Hall on January 7?

3        A.  Had to be before.

4        Q.  Okay.

5        A.  Had to be before.

6        Q.  And why is that?

7        A.  Because he and I didn't talk about that, I

8   don't think.  I don't even -- wait a minute.  Let me

9   see how I knew about the scanner.

10            MR. CHEELEY:  I've got my 3:00 call.  I

11        need to step out and jump on it for a few

12        minutes.

13            MR. CROSS:  Okay.  Let's take a break.

14        How long -- we'll go off the record.

15            THE VIDEOGRAPHER:  Off the video record

16        at 2:59 p.m.

17            (Recess 2:59-3:03 p.m.)

18   BY MR. CROSS:

19        Q.  All right.  So just picking up where we

20   left off, Mrs. Latham, you just know there was a

21   borrowed scanner for the ballots that were

22   scanning --

23        A.  Yes.

24        Q.  -- with Mr. Hall, you don't know where it

25   came from?

1    A.  No.

2    Q.  Okay.  Did it come -- do you know whether

3  it came from another county in Georgia?

4    A.  No, no.

5    Q.  So did it come from the state?

6    A.  It's just a scanner, document scanner.  It

7  was a document scanner, scan-ner [pronouncing].

8    Q.  Oh, I see.  So this wasn't -- this wasn't

9  like a Dominion ICC or a Dominion scanner?

10    A.  No, somebody -- I --

11    Q.  This was a generic scanner?

12    A.  Yes.

13    Q.  I see.  Okay.  Thank you.  That helps.

14    A.  Yes.

15    Q.  So this was a generic scanner that they

16  were using to scan the ballots?

17    A.  And that's what I -- when I was talking

18  about here when they wanted to scan ballots, that's

19  what I thought scanning ballots because I know there

20  had be a discussion about DPI.  Is that a right

21  term?

22    Q.  Oh, oh, the dots per inch I think it is?

23    A.  Yeah.

24    Q.  On the scanners?

25    A.  Yeah.

Page 175

1          Q.  And so your understanding there was a
2     discussion on what sort of the settings of the
3     scanner and how reliable they were on scanning
4     ballots?
5          A.  Yes.
6          Q.  I see.  And who was that discussion with?
7          A.  No, no, I just knew that from what I had
8     heard in, like, the media and stuff.
9          Q.  I see.
10         A.  That was nobody's discussion here.
11         Q.  I see.
12         A.  That was just -- so...
13         Q.  So your understanding is somebody borrowed
14    a generic scanner and they used that to scan Coffee
15    County ballots that were voted in the January 2021
16    runoff?
17         A.  Uh-huh.
18         Q.  "Yes"?
19         A.  Yes, yes, sorry, sorry.
20         Q.  And when they scanned those ballots, what
21    did they do with the images they created on the
22    scanner, do you know?
23         A.  I have no idea.
24         Q.  Okay.  Do you know why they scanned them?
25         A.  They -- somebody wanted a -- I don't know

Page 176

1     why.  I just --
2               MR. CHEELEY:  Don't speculate.
3     BY MR. CROSS:
4          Q.  Yeah.  I'm not asking you to speculate.  If
5     you don't know, you don't know?
6          A.  I don't know.  I don't know.
7          Q.  So in your discussions with Mr. Hall and
8     Ms. Hampton you never asked why they were scanning
9     the ballots?
10         A.  The only -- I mean, no.  I don't know.
11         Q.  All right.  So if you come back to
12    Exhibit 7 [sic] and the text thread between you and
13    Ms. Hampton on January 10.  You got that in front of
14    you?
15         A.  Yes.
16         Q.  Okay.  So you said:  "Did you-all finish
17    with the scanner?"
18              She says:  "Not yet, I'm hoping by Tuesday.
19    Do they need the scanner back?"
20              Do you see that?
21         A.  Yeah.
22         Q.  And then you said, "No one has said
23    anything.  Just curious."
24         A.  I was just being nosey.
25         Q.  Yeah, but she's asking you if they need the

Page 177

1    scanner back because you supplied the scanner,
2    right?
3         A.   I did not supply a scanner.
4         Q.   Well, why is she asking you if they need
5    the scanner back?
6         A.   I guess she's -- I don't -- I don't know
7    why.
8         Q.   Well, who is "they" in her text?
9         A.   I don't know.  I don't know if she thought
10   I was in communication with however it got there,
11   whatever.  I don't know.
12        Q.   Well, when you said, "no one has said
13   anything," who were you talking about?
14        A.   No one contacted me about a scanner.
15        Q.   Well, I just want -- I may be confused and
16   I apologize for the (overspeaking) --
17        A.   That's okay.
18        Q.   So she -- you asked her about the scanner.
19   She says:  "Do they need the scanner back?"
20             And your response is:  "No one has said
21   anything."  And you're saying you don't know
22   anything about where the scanner came from?
23        A.   I was -- I know one was obtained.  So I was
24   just curious about, you know, was it, you know --
25   was it done.  I mean, where is the scanner, did it

1  go back or whatever.  I was just being curious.  It

2  was three days later, hadn't heard anything.  She

3  had been fairly insistent with what was going on.  I

4  was just curious.  Sorry, I was --

5       Q.  So when you say she had been fairly

6  consistent [sic] with what's going on, she had been

7  giving you updates -- (overspeaking)

8       A.  Well, you can see where she was, you know,

9  doing the other days, so I was, like, I hadn't heard

10  anything so I just asked, did you finish with the

11  scanner.  I knew one had been borrowed.

12       Q.  And as you sit here, you don't have any

13  idea why she asked you if whoever provided the

14  scanner needed it back?

15       A.  Maybe she thought I had heard.

16       Q.  I'm not asking you to guess, you don't

17  know?

18       A.  No.  I don't know.

19       Q.  But you didn't respond, why are you asking

20  me.  You said, "No one has said anything" as if you

21  were expecting to hear.

22       A.  I hate texting.  Have you noticed mine are

23  brief?  I just...

24       Q.  Okay.  But again, you didn't write back to

25  her, why are you asking me, right?  You said, "No

Page 179

1   one has said anything" as if you were expecting to
2   hear from someone about the scanner.
3        A.  I was not expecting to hear back.  I was
4   just being --
5        Q.  Okay.
6        A.  -- nosey, et cetera.
7        Q.  Okay.  All right.  Flip to the next page,
8   please.  So now we jump a month ahead to February 10
9   of 2021.  Do you see that?
10       A.  Yep.
11       Q.  And this is still a text thread between you
12   and Ms. Hampton?
13       A.  Yep.
14       Q.  And you write to her on February 10, 2021,
15   in the morning at 8:10:  "Are you going to be on the
16   Georgia secretary of state webinar today?"
17            And she responds:  "I'm going to watch it."
18            Do you see that?
19       A.  Yes.
20       Q.  What was this about?
21       A.  The Georgia secretary of state webinar.
22       Q.  Right, but a webinar on what?
23       A.  I don't remember.
24       Q.  You don't have any recollection of this
25   webinar?

Page 180

1      A.   No.   I mean, there were several webinars.
2  I know Marilyn Marks had been trying to get us to go
3  on some of these webinars, so I don't -- I mean, I
4  don't know.  I don't remember what it was about.
5      Q.   Okay.  And then she writes back to you:
6  "Do I need to be looking for something?"
7           And you answered:  "No.  I was asked and
8  looked at the itinerary and didn't see anything
9  suspicious.  So I was curious."  Do you see that?
10      A.   Yes.
11      Q.   Who asked you to look at the itinerary for
12  that webinar?
13      A.   Say that again.
14      Q.   Who asked you to look at the itinerary for
15  that Georgia secretary of state webinar?
16      A.   I believe Marilyn Marks if I'm going back
17  on memory.  And it says here:  I was asked and then
18  I looked at the itinerary.
19           It's not like I was asked to look at the
20  itinerary.  I just looked at the itinerary.
21      Q.   But when you said you didn't see anything
22  suspicious, what did you mean?
23      A.   Anything that stood out.
24      Q.   Well, you said "suspicious."  What were you
25  looking for that might be suspicious?

Page 181

1        A.   I don't know.  I really don't know.

2        Q.   And then she -- Ms. Hampton responds:

3   "Yeah I don't see anything either."

4             And then you write back:  "I do know that

5   they are going to toe the line that there is nothing

6   wrong with Dominion."  Do you see that?

7        A.   Yeah.

8        Q.   And by "they" are you referring to the

9   Georgia secretary of state putting on the webinar?

10        A.   Yeah.

11        Q.   And why did you expect that they would toe

12   the line, that there was nothing with Dominion?

13        A.   Just tow the line, there's nothing wrong

14   with Dominion.

15        Q.   You don't agree with that there's nothing

16   wrong with the Dominion equipment, right?

17        A.   Fifth Amendment.  I've testified what I

18   thought was wrong.

19        Q.   Right.  I mean, you've been public about

20   your views, for example, in the state Senate hearing

21   we've talked about before, right?

22        A.   I've always had problems with the scanner.

23   The scanners are faulty.  That's the only problem

24   I've ever had with them.

25        Q.   Well, you've expressed a concern about the

Page 182

1   QR code that's printed by the DV system, right?

2       A.   Because the scanner can't read it.  The

3   scanner can't read it at times.  That's all I did

4   with January 5th --

5       Q.   The voters can't --

6       A.   -- but after that, that's it.

7       Q.   And the biggest concern you've expressed is

8   that voters cannot read the QR code, right?

9       A.   Yeah.

10      Q.   "Yes"?

11      A.   I said:  "Yeah."

12      Q.   All right.  Turn to page 4 of Exhibit 6,

13  please.  All right.  So here we jump ahead to

14  July 15 in a text thread with you and Ms. Hampton.

15  Do you see that?

16      A.   Yep.

17      Q.   And you wrote to her:  "What was the name

18  of the Colorado dude that was in Coffee in January?

19  I can't remember his name."  Do you see that?

20      A.   Yes.

21      Q.   And she wrote back:  "Scott Hall was there

22  and Jeff Lenberg."  Do you see that?

23      A.   Yes.

24      Q.   Does that refresh your memory that Jeff

25  Lenberg was in the Coffee County elections office in

Page 183

1   January --
2       A.  No.
3       Q.  Hold on.  Let me just finish the question.
4           -- in January 2021 with Scott Hall?
5       A.  No.
6       Q.  You just don't remember one way or the
7   other?
8       A.  Because that's not what I was asking her.
9   My next question directed her to what I was asking.
10      Q.  All right.  You then write, "This was the
11  election night for the runoff.  The Dominion guy
12  that was from Colorado.  The one who was extra."  Do
13  you see that?
14      A.  Uh-huh.
15      Q.  When you say "the one who was extra," what
16  do you mean?
17      A.  There were two Dominion guys.  The Colorado
18  guy was extra.  He was sent extra.
19      Q.  I see.  Okay.  And then she says:  "Oh,
20  yeah, let me look."  You say okay, and then there's
21  a -- what looks like supposed to be a name here --
22      A.  Yeah.
23      Q.  -- Samuel C-H-A-L-L maybe an A.  Is that
24  the Dominion tech you said earlier --
25      A.  Yes.

Page 184

1      Q.   -- Samuel with a C?

2      A.   Yes.

3      Q.   Okay.   And then do you remember who the

4  other person was?

5      A.   No.

6      Q.   Do you have this text message on your phone

7  where we can see what those names are?

8      A.   This name?

9      Q.   Yes, ma'am.

10      A.   I'm sure I do.   And it's also in my

11  affidavit I gave you.

12      Q.   Affidavit?

13      A.   It was in one of my papers.

14      Q.   I don't think we got an affidavit from you,

15  so I'm not sure what that is.

16      A.   Okay.   This is his name.

17      Q.   Samuel Challand, C-H-A-L-L-A-N-D -- is that

18  E-S at the end?

19      A.   I don't know.

20      Q.   I don't know what that is.

21      A.   Hold on.   I'll turn it this way.   How is

22  that?

23      Q.   Oh, yeah, E-S.   And you can't see the name

24  underneath it?

25      A.   No.   She -- it's like she screen-shot it.

Page 185

1        Q.   Screen-shot it, okay.

2        A.   And it doesn't look like there's a name.

3   It looks like it's something "into the" -- it was

4   like it was -- I don't know what it was.

5        Q.   Okay.  You just mentioned affidavit.  Did

6   you write and sign some sort of document for this

7   case?

8        A.   No.  Not this case, no.

9        Q.   So what affidavit did (overspeaking)--

10       A.   I put it in my paperwork.  I don't know

11  where it is.  I put it in my paperwork to be turned

12  in to y'all.

13       Q.   A signed affidavit?

14       A.   Uh-huh.

15       Q.   Okay.

16       A.   I documented what happened January 5th.

17       Q.   You wrote an affidavit that documented what

18  happened on January 5th of 2021 in Coffee County?

19       A.   Uh-huh.

20       Q.   "Yes"?

21       A.   Yes.

22       Q.   And you're saying that was produced to us?

23       A.   Yes.  I gave it to -- I turned it in on a

24  Dropbox.

25            MR. CHEELEY:  Do you have it?

1          MR. CROSS:  I don't think we've ever --

2          MR. CHEELEY:  Whatever I've received

3      from her I'm pretty sure my paralegal

4      produced it.  I can check.

5          MR. CROSS:  I looked at everything that

6      came in and I didn't see that.

7   BY MR. CROSS:

8      Q.  For what purpose did you originally write

9   that affidavit?  Did you write it for this case or

10  you wrote it for some other purpose?

11     A.  It's in the affidavit.

12     Q.  The affidavit explains why you wrote it?

13     A.  I think so.

14     Q.  Well, since I don't have it in front of me

15  and I don't know that we've ever gotten it, what --

16     A.  I really don't want to go into that because

17  it's going to rehash everything we've already talked

18  about.

19     Q.  Well, no, the only think I'm asking now is

20  why did you write an affidavit?

21     A.  Because a bunch of stuff happened on

22  January 5th with the scanner and this dude, this

23  Samuel dude.

24     Q.  Okay.  So the affidavit concerns what we

25  talked about earlier where Ms. Hampton was scanning

1    ballots in the election office on the night of

2    January 5th and the scanner kept jamming?

3         A.  Yes.

4         Q.  And it concerns this Dominion tech?

5         A.  Yes.

6         Q.  All right.  And was there a proceeding,

7    some sort of legal proceeding you wrote that for?

8         A.  I wrote it because I needed to document

9    everything that went on.

10        Q.  When did you write it?

11        A.  It's dated.  I don't remember.  Probably in

12   June/July of 2021.

13        Q.  Okay.  So you didn't write it for this

14   case?

15        A.  No, sir.

16        Q.  Got it.

17            Okay.  Sorry a few more questions.  The

18   scanner, do you know what brand it was, the one that

19   was borrowed for Scott Hall and the others?

20        A.  No, sir.

21        Q.  Do you know if it came from, like, a store?

22        A.  Like, Walmart?

23        Q.  Yeah.  I gather they didn't buy it.  They

24   borrowed it from someone who already had it?

25        A.  Yeah, just a letter scanner where you put

Page 188

1    stuff in, from what I understand, yes.
2         Q.  Do you know why they didn't just go buy
3    one?
4         A.  No.
5         Q.  And you're sure it wasn't a Dominion
6    scanner?
7         A.  Yes.
8         Q.  How are you sure it was not a Dominion
9    scanner?
10        A.  Because who would have had a Dominion
11   scanner at their -- wherever they got it?  It was a
12   document scanner.
13        Q.  Misty Hampton had -- at least she had two
14   scanners in her office.  So how do you know they
15   weren't using those scanners?
16        A.  I don't know.
17        Q.  So just to be clear, you don't -- when
18   you -- you don't know whether when they say borrowed
19   a scanner whether they actually meant some generic
20   scanner versus a Dominion scanner, you're guessing?
21        A.  No.  It was not a Dominion scanner.
22        Q.  So how do you know that?
23        A.  Because they borrowed someone's scanner.
24        Q.  But how do you know that they did not
25   borrow a Dominion scanner, for example, from the

Page 189

1    Coffee County election office?

2         A.   Okay.  I don't know.

3         Q.   You just don't know one way or the other?

4         A.   There you go.

5         Q.   Okay.

6         A.   I assumed it was a regular scanner.

7         Q.   So they -- they scanned ballots over a

8    period of several days, as we saw in the text

9    message, because on January 10th they weren't done

10   yet, right?

11        A.   According to the text.

12        Q.   Is it your understanding they scanned all

13   of the ballots that were voted in the January runoff

14   in Coffee County?

15        A.   I have no idea.

16        Q.   Do you know whether they scanned ballots

17   more than once?

18        A.   I have no idea.

19        Q.   Do you know whether the scanner was a high

20   capacity like a high volume scanner?

21        A.   I have no idea.

22        Q.   Do you know where they scanned the ballots,

23   was it in the elections office?

24        A.   I have no idea.

25        Q.   Would you have reason to believe they would

1  have taken the ballots out of the election office or

2  you just don't know?

3       A.  I would say they didn't, but I don't know.

4       Q.  So you never asked Misty Hampton or Scott

5  Hall or anyone else where they did the scanning?

6       A.  No.

7       Q.  Why were you curious on January 10th

8  whether it was done?

9       A.  Because I was being nosey.

10       Q.  Did you have any concerns at any point that

11  having outside individuals come into the elections

12  office and handle ballots and using nonstate-issued

13  equipment was improper?

14       A.  It was not my call.

15       Q.  Whose call was it?

16       A.  I don't know.

17       Q.  Do you know whether anyone on the Coffee

18  County election board approved that?

19       A.  I have no idea.

20       Q.  Do you know whether they knew?

21       A.  I have no idea.

22       Q.  Well, we knew that Eric Chaney knew, right?

23       A.  I mean, just from that, yes.

24       Q.  Right.  So as of -- Eric Chaney at least

25  knew as of January 6th that Scott Hall was working

Page 191

1   with Misty Hampton to scan ballots, right?

2        A.   Just from that text, yes.

3        Q.   And coming back to that text, this refers

4   to the general election, but your understanding he's

5   talking about the general election for the runoff or

6   is he talking about the general election from

7   November 2020?

8        A.   What just happened, the January 5th.

9        Q.   Well, that was a special runoff election?

10       A.   Yes.

11       Q.   Okay.

12       A.   So they hadn't -- I mean, in procedure they

13  hadn't been sealed or anything, so...

14       Q.   So it's your understanding he -- well, let

15  me just ask you.  Do you know whether Scott Hall and

16  the others who came in in January of 2021 to Coffee

17  County, did they scan ballots from the November 2020

18  election?

19       A.   I don't know.

20       Q.   You don't know, okay.

21            I'm sorry, I can't remember if I asked you

22  this:  We talked earlier you were in DC in December

23  of 2020.  I can't remember if I asked you, why were

24  you there?

25            THE WITNESS:  Bob?

Page 192

1          MR. CHEELEY:  Repeat the question,
2     please.
3          THE WITNESS:  He wants to know why I was
4     in DC on --
5          MR. CHEELEY:  Yeah, you can tell him.
6     A.  I was invited to a tour.
7  BY MR. CROSS:
8     Q.  Tour of what?
9     A.  DC.
10    Q.  By whom?
11         THE WITNESS:  Do I have to say all the
12    names?
13         MR. CHEELEY:  Yeah.
14    A.  Juliana Thompson.
15 BY MR. CROSS:
16    Q.  Who was that?
17    A.  Juliana Thompson.
18    Q.  Who is that?  Who is Juliana Thompson?
19    A.  Her name is Juliana Thompson.  She's -- she
20 does tours of DC.
21    Q.  Why did she invite you to do a tour of DC?
22    A.  Because I couldn't go the previous year
23 because we get to see the Christmas trees, and I got
24 to go to the Bible museum.  I mean, it was only a
25 two-day thing --

1     Q.  Okay.

2     A.  -- because of COVID.  The previous year

3  they went several days and I couldn't go because it

4  was too expensive.

5     Q.  So you went to DC in December 2020 to do a

6  tour?

7     A.  Yes.

8     Q.  And did you see anyone while you were in DC

9  other than Juliana Thompson?

10     A.  The people on the tour.

11     Q.  Who was on the tour?

12     A.  A lot of people.  There were some people I

13  didn't know.  There were some people I met.

14     Q.  Did you see anyone who was not on the tour

15  with you?

16     A.  I don't know what you mean.

17     Q.  Did you meet with anyone in DC other than

18  the people who were on the tour with you?

19     A.  I'm going to plead the Fifth on that.

20     Q.  Okay.  Did you speak with Steve Bannon

21  while you were in DC in December of 2020?

22     A.  I'm going to plead the Fifth.

23     Q.  Okay.  All right.  I think I'm almost done,

24  Mrs. Latham.  Give me just a moment.

25          You said earlier you didn't want to provide

Page 194

1    your address in Texas.  Do you live in Harker

2    Heights?  What town are you in?

3          A.  I'll give the county.  How is that?

4          Q.  What county?

5          A.  McLennan.

6          Q.  McLennan County, okay.  So here is the

7    deal --

8          A.  Listen --

9          Q.  We have to do one --

10         A.  -- Marilyn Marks has sent people to my

11   house.  She leaks everything that goes on in these

12   depositions and then raises money for it.  I don't

13   want to be threatened again where people come to my

14   house.  She has sent people to my house.

15         Q.  Who?

16         A.  Marilyn Marks.

17         Q.  Who is around to your house?

18         A.  Press.  She sends press people and then

19   admits to other people that she did it.

20         Q.  You're talking people like Jose Paglia of

21   the Daily Beast?

22         A.  Yeah.

23         Q.  Emma -- I forget Emma's last name at

24   Washington Post, did you talk to her?  Emma Wood I

25   think it is?

Page 195

1          A.   I stopped answering doors and phones.

2          Q.   Okay.  And it's your belief that the press

3     is coming to you because Marilyn Marks controls it

4     not because they're conducting their own

5     investigation?

6          A.   She sent them, and she admitted it to Sally

7     Grubbs.

8          Q.   Who is Sally Grubbs?

9          A.   She's chair of Cobb County.

10         Q.   Cobb County what?

11         A.   GOP.

12         Q.   Oh, okay.

13         A.   Marilyn Marks admitted to Sally that she

14    sent them to my house.

15         Q.   And you think the press coming to your

16    house to gather information about an important

17    issue --

18         A.   It's threatening, yes.

19         Q.   Okay.  Okay.  All right.  Well, the issue

20    is we need to do one of two things.  We either need

21    to get your physical address in Texas --

22              MR. CHEELEY:  Why?

23              MR. CROSS:  Well, I'm going to explain

24         that.

25    BY MR. CROSS:

Page 196

```
 1      Q.  -- or we need to get you to agree that
 2  Mr. Cheeley will accept service of a subpoena in the
 3  future if we need you to testify again.
 4      A.  I'll agree.
 5      Q.  If we get that as an agreement, then I
 6  won't ask for your physical address.  But what I
 7  don't want to be is in a world where we need to get
 8  additional testimony and we're trying to hunt you
 9  down.
10          MR. CHEELEY:  That's fine.
11      A.  Yeah.
12  BY MR. CROSS:
13      Q.  Okay.  All right.  Then I won't ask for
14  your address.
15      A.  I appreciate that.  Thank you.
16      Q.  And then you have been taking notes.  What
17  are your notes?
18      A.  I'm just making a list of names.  I want to
19  figure out who some of these people are.  You've
20  mentioned a bunch of people I don't know.
21      Q.  Okay.  All right.  We'll ask for --
22      A.  And I've drawn flowers.
23      Q.  We'll ask for a copy of the notes because
24  there are people who are on the Zoom who aren't in
25  the room.  So we'll ask for a copy of that.
```

Page 197

1          And then let me just make sure --

2     A.   And plus, I made notes of what you wanted

3  and stuff like that.  I drew pictures.

4     Q.   Let me look real quick, Ms. Latham, but I

5  think I'm done.  So just hang on.

6          MR. CROSS:  Okay.  I don't have any

7      further questions for you, Mrs. Latham.  Like

8      I said, others on the Zoom may.  I know

9      Mr. Cheeley has to take a break so why don't

10     we go off the record.

11         THE VIDEOGRAPHER:  Off the video record

12     at 3:28 p.m.

13         (Recess 3:28-4:53 p.m.)

14         THE VIDEOGRAPHER:  Back on the video

15     record at 4:53 p.m.

16         MR. SPARKS:  This is Adam Sparks for

17     Curling plaintiffs.  I believe at this point

18     we'll pass the torch to Coalition plaintiffs

19     for any questions they may have of the

20     witness.

21         MR. ABNEY:  Thanks.

22         Court reporter, can you hear me okay?

23         THE COURT REPORTER:  Yes, I can hear you

24     perfect.

25                      EXAMINATION

Page 198

1    BY MR. ABNEY:

2        Q.   Okay.  Ms. Latham, my name is Russ Abney, I

3    represent the Coalition plaintiffs and I just have a

4    few follow-up questions for you.  Some things I just

5    want clarification on, some things I don't think

6    were covered yet today I wanted to ask you about.

7    But if you don't understand my questions, will you

8    please let me know and I'll rephrase it or try to

9    ask it a different way?

10       A.   Okay.

11       Q.   Early in your -- well, both early and just

12   a few minutes ago, you talked about people coming to

13   your house and harassing you.  Do you recall that?

14       A.   Yes.

15       Q.   Who exactly came to your house and when?

16       A.   I don't remember the date, but it was a --

17   some reporter came from -- I know the Joe guy came

18   from Daily Beast, and then somebody else showed up

19   at my house and I just sent them away.  It was from

20   Washington Post or something like that.  But don't

21   quote me on that.

22       Q.   Okay.  So when -- when did Joe from The

23   Daily Beast come to your house?

24       A.   I don't know the date.  I really don't.  I

25   would have to look it up.

Page 199

1      Q.   Do you know the time frame?

2      A.   Summer.

3      Q.   Did you read the article that Joe from The

4  Daily Beast wrote that mentioned you?

5      A.   Okay.  So then it would have been at the

6  end of May.  Maybe middle of May.  I don't -- it was

7  sometime in May.

8      Q.   Okay.  My question was, have you read the

9  article that Joe from The Daily Beast wrote as a

10 result of talking to you that day?

11     A.   I skimmed it, yes.

12     Q.   Okay.  He indicates that he sat on your

13 front -- in the article he indicates that he sat on

14 the front porch and talked to you for an hour or

15 longer; is that true?

16     A.   I didn't look at the time, but he sat out

17 there for a long time, yes.

18     Q.   Did you sit out there with him?

19     A.   Yes.

20     Q.   Okay.  Did Joe say anything to you to

21 intimidate you?

22     A.   It felt intimidating to have him there,

23 especially after I found out who sent him.  That's

24 what made it seem more ominous.

25     Q.   Okay.  Did Joe tell you who sent him?

Page 200

1      A.   No.

2      Q.   Did Joe tell you he was doing a story about

3   Coffee County and the election?

4      A.   Nope.

5      Q.   What did he tell you?

6      A.   He told me he was trying to figure out

7   about Brad Raffensperger and -- and something with

8   election security or something.

9      Q.   Okay.  He was working on a story --

10      A.   On Brad Raffensperger.

11      Q.   -- about -- sorry.

12          Did he tell you he was working on a story

13   about election security in the state of Georgia and

14   whether or not Brad Raffensperger was doing a good

15   job protecting election security?

16      A.   He may have not have used those words, but

17   he talked about Raffensperger and election security,

18   yes.

19      Q.   And this other reporter you said came to

20   your house, did you talk to the other reporter?

21      A.   No.

22      Q.   How do you know it was a reporter?

23      A.   They identified themselves as a reporter.

24      Q.   Okay.  Did they knock on your door or ring

25   your doorbell?

1      A.   Rang my doorbell.

2      Q.   Did you answer the door?

3      A.   I did.  And then I shut the door.

4      Q.   Okay.  Did the reporter say anything to you

5  other than introducing themselves?

6      A.   As soon as they finished introducing

7  themselves, I shut the door.

8      Q.   So do you feel intimidated by anybody

9  ringing your doorbell or is it only if a reporter

10  rings your doorbell?

11      A.   I'm intimidated when anybody rings my

12  doorbell.

13      Q.   Okay.  Do you know Kevin Moncla?

14      A.   Do I know him?  I've talked on the phone

15  with him.

16      Q.   Who is he, to your knowledge?

17      A.   He's somebody who writes articles and I've

18  talked to him a couple of times on the phone, and

19  that's about it.

20      Q.   What did you talk to him about on the

21  phone?

22      A.   He asked me a couple of questions about --

23  I don't even remember.  And I didn't even have any

24  information for him and so I didn't talk to him.

25      Q.   Okay.  I thought you just told me you

1   talked to him a couple of times on the phone?

2       A.  He's called a couple of times, that's

3   all -- that's what I meant.

4       Q.  And what kind of information was he looking

5   for that you didn't have?

6       A.  I can't remember -- (overspeaking)

7       Q.  Do you know Shawn's -- I'm sorry, go ahead.

8       A.  Nothing.

9       Q.  Do you know Shawn Still?

10      A.  Shawn Still?

11      Q.  Yes.

12      A.  I know who he is, yes.

13      Q.  Do you know him?

14      A.  To say hi, yes, that's about it, yes.

15      Q.  Are you familiar with a lawsuit he filed

16  against Coffee County?

17      A.  Excuse me?

18      Q.  Are you familiar with a lawsuit he filed

19  against Coffee County?

20      A.  No, sir, didn't know about it.  First time

21  I'm hearing it.

22      Q.  You're unaware that he filed an election

23  lawsuit involving Coffee County?

24      A.  Yes, sir, that's what I just said.  I'm

25  unaware of it.

1      Q.   You -- strike that.

2           Are you aware of any investigations by the

3      secretary of state into any election issues in

4      Coffee County?

5      A.   No, sir.

6      Q.   Is it fair to say then that you have never

7      been contacted by anybody working on behalf of the

8      secretary of state involving any investigations

9      about anything to do with elections in Coffee

10     County?

11     A.   Can you give me a date, date frame?

12     Q.   Calendar year 2020 or later.

13     A.   I spoke with two members before the

14     November election.

15     Q.   November of what year?

16     A.   2020.

17     Q.   What was that -- what were those

18     conversations about?

19     A.   About obtaining a new scanner for Coffee

20     County.  I talked to Raffensperger and Sterling.

21     Q.   You testified a lot about events that

22     happened on January 7th of 2021.  Do you recall

23     that?

24     A.   Can you say that again?

25     Q.   Do you recall testifying earlier about

1    events that occurred on January 7th, 2021?

2         A.   Yes.

3         Q.   You went through some text messages and

4    talked about meeting Scott Hall at the election

5    office that day.  Do you recall that?

6         A.   Yes, sir.

7         Q.   My understanding is, is that you went to

8    the election office sometime in the early afternoon

9    on that day, were there for a very short period of

10   time and then left around 4:30 or 4:45 I think you

11   said to go have dinner; is that right?

12        A.   Yes, sir.

13        Q.   Did you go to the county election office at

14   any other time on that day?

15        A.   I can't recall.

16        Q.   Were you working on that day?

17        A.   Yes, sir.

18        Q.   And what hours did you work on that day?

19        A.   From 8:00 until 3:45.  Or 7:45 to 3:45.

20        Q.   And from the timeline you gave earlier in

21   your testimony, it would seem that if you would have

22   been at the election office at any other time on

23   that day, it would have been before 7:30 in the

24   morning; is that right?

25        A.   Can you repeat that?

Page 205

1      Q.   Sure.   I think you said you went earlier,
2   you testified you went to the election office after
3   work; is that right?
4      A.   Correct.
5      Q.   And you were there a short period of time
6   and left around 4:30 or 4:45 in the afternoon,
7   right?
8      A.   Correct.
9      Q.   So if you would have been at the election
10  office at any other time, it would have either been
11  before you started working or after you had dinner.
12  Is that fair to say?
13     A.   Yes.
14     Q.   I mean, would it have been possible for you
15  to go to the election office during work hours?
16     A.   I mean, I taught a full schedule, I didn't
17  have a planning period, so I can't remember.
18     Q.   Is there any chance you had lunch at the
19  election office or with people from the election
20  office that day?
21     A.   No, sir, I only have a 25-minute lunch, or
22  did.
23     Q.   Okay.
24     A.   And I mean, the high school is in the
25  middle of the county.   I mean, it's in the middle of

Page 206

1    nowhere.

2         Q.  So you would have remembered if you were at

3    the county election office before 7:30 in the

4    morning, right?

5         A.  Yes, sir.

6         Q.  And you would remember if you had dinner

7    with your husband and then went back to the county

8    election office after dinner, right?

9         A.  Yes, sir, I think.

10        Q.  So it would be --

11        A.  I'm hoping I would.  I was very tired.  I

12   had not had sleep in -- I just know I was extremely

13   tired.

14        Q.  Do you have any knowledge about the

15   election server being taken by the secretary of

16   state and replaced?

17        A.  Only when I saw it in a newspaper.  That's

18   the only knowledge I have when it was mentioned by

19   one of the articles.  Don't ask me what article, I

20   don't know.

21        Q.  Okay.

22            MR. ABNEY:  That's all the questions I

23        have.  Thank you very much, Ms. Latham.

24            THE WITNESS:  Thank you.

25            MR. CHEELEY:  Anyone else?

1          MR. PICO-PRATS:  I have some questions

2      as well on behalf of the State defendants if

3      no one else has any other questions than me.

4          THE WITNESS:  Who is that?

5          MR. PICO-PRATS:  My name is Javier

6      Pico-Prats on behalf of the State defendants.

7          THE WITNESS:  Who is he with?

8          MR. CHEELEY:  Secretary of state's

9      election board.

10         THE WITNESS:  Okay.

11                        EXAMINATION

12  BY MR. PICO-PRATS:

13      Q.  Good afternoon, ma'am.

14      A.  Hey.

15      Q.  I'll be very brief.  I only have a few

16  questions.

17          Do you know any of the plaintiffs on this

18  case personally?

19      A.  Who are they?  I mean, I know the case is

20  called Curling, and I've talked with Marilyn Marks.

21  That's the --

22      Q.  Do you know Donna Curling?

23      A.  No, sir.

24      Q.  Donna Price?

25      A.  No, sir.

1        Q.   Jeffrey Schoenberg?

2        A.   Who?

3        Q.   Jeffrey Schoenberg.   I may be

4    mispronouncing it.

5        A.   No, sir.   No, sir.

6        Q.   Do you know who the Coalition For Good

7    Governance is?

8        A.   Yes, sir.

9        Q.   Who do you know as part of the coalition?

10       A.   Marilyn Marks.

11       Q.   What is your relationship with Ms. Marks?

12       A.   I have no relationship with her.

13       Q.   How do you know her?

14       A.   She was on several Zoom calls, you know,

15   talking about election integrity.   She reached out

16   to me.   She was able to, you know, give information

17   and stuff, like, you know, she would talk and then

18   she would ask me questions and I would try to answer

19   them to the best of my ability.   I mean...

20       Q.   Did you only communicate on Zoom calls?

21            THE WITNESS:   What did he say?

22   BY MR. PICO-PRATS:

23       Q.   Did you only communicate on those Zoom

24   calls?

25       A.   Did I something on the Zoom calls?

Page 209

1      Q.   Communicate.

2      A.   On one of the Zoom calls I was just a

3  participant.  I just was listening because I didn't

4  know what her thing was.  And then, you know, she

5  and I would talk on the phone every once in a while,

6  I mean.  And then she would ask me questions and I

7  would, like -- I would have no idea.  You know, just

8  stuff like that.

9      Q.   What would the contents of the

10 communications revolve around?

11     A.   A lot of times she would call me and she

12 would say stuff like -- I mean, I can't get specific

13 because I don't remember.  But she would be, like,

14 Why are the Republicans doing this?

15          And I'm, like, I don't know.  I'm not privy

16 to the politicians.

17          It was like she thought I had some kind of

18 inside track.  And I'm, like, I don't know what

19 they're thinking.  And then she would want me to get

20 on these, like, secretary of state things, and I

21 only went on one time just so I could hear Misty and

22 whatever she was going to say.  But I mean, it was

23 that.

24          I mean, she would often send me stuff to

25 look at, and I would -- most of the time I got tired

1  of it and I would just ignore it.

2      Q.  You had mentioned discussions with

3  Ms. Marks in December of 2020.  Do you remember

4  that?

5      A.  That I had remarks with her?

6      Q.  Discussions.

7      A.  I wouldn't know when they were.  I mean --

8  I mean, I could --

9      Q.  Okay.

10     A.  I mean, if you have a specific question I

11 can try to answer it.

12     Q.  You had discussed it over -- with Mr. Cross

13 earlier that you had a phone conversation in

14 December of 2020 with Ms. Marks.

15     A.  I could have, yes.  I mean, I could have.

16 I mean, I don't remember exactly.

17     Q.  Did you --

18     A.  It's possible.

19     Q.  Sorry, I didn't mean to interrupt you.

20         Did Ms. Marks speak to you about forensic

21 examination of the Dominion equipment?

22     A.  She always said it was impossible.  She

23 said a forensic examination -- she would go into

24 this long spiel about how long it would be and all

25 this kind of stuff and it was impossible.

Page 211

1       Q.   She would say it was impossible?

2       A.   Yeah, that's the gist I got from her is,

3   yeah, that it was impossible to do a forensic.  In

4   other -- and she would clarify it as in the way most

5   people think it would be, like that, you know.

6            I think she thought she had a defin- --

7   it's my opinion, so I can't testify to that.  I'm

8   sorry.  I had an opinion about it, but no.  I can't

9   testify to that.

10           She would remark that it was impossible to

11  do a forensic audit based on what most people were

12  thinking was a forensic audit.

13      Q.   Okay.  Thank you.

14           Is it your understanding that a forensic

15  examination occurred in Coffee County?

16      A.   No, sir.

17      Q.   One second.  I'm just reviewing my notes.

18      A.   Okay.

19      Q.   Do you have any personal knowledge of any

20  access to Coffee County equipment by nonelection

21  workers?

22      A.   No, sir.

23      Q.   You don't have any knowledge of anyone ever

24  attempting to access the Coffee County equipment by

25  any means?

1        THE WITNESS:  Did he say DeKalb County?

2   BY MR. PICO-PRATS:

3        Q.  Coffee?

4        A.  Oh, no, sir.

5        Q.  With the text messages that Mr. Cross was

6   showing you earlier, were your communications with

7   Misty Hampton in regards to any access of the

8   election equipment?

9        A.  No, sir.

10        MR. PICO-PRATS:  That's all the

11        questions I have of you.  Thank you very

12        much, ma'am.

13        THE WITNESS:  Thank you.

14        MR. CHEELEY:  Is that it?

15        MR. CROSS:  Just briefly.  This is David

16        Cross.

17                FURTHER EXAMINATION

18   BY MR. CROSS:

19        Q.  Mrs. Latham, have you withdrawn your -- are

20   you withdrawing your Fifth Amendment invocation in

21   response to any of the questions we asked you today

22   where you invoked the Fifth?

23        THE WITNESS:  What does that mean, Bob?

24        MR. CHEELEY:  You're not.

25        THE WITNESS:  I'm not.

Page 213

1          MR. CROSS:  Then I have no further

2     questions.

3          Mr. Cheeley, we do have a subpoena we

4     wanted to ask if you would accept service for

5     pursuant to the agreement we had earlier.  We

6     can talk about the substance of it later.  If

7     you can just confirm acceptance of service.

8     I understood earlier you weren't going to

9     make us serve her personally.  And then we

10    can talk about substance.

11         THE WITNESS:  Is that so I can give you

12    the e-mails that I --

13         MR. CROSS:  Yes.

14         THE WITNESS:  I'll get -- what I do is

15    dump everything into a PDF file, and I dumped

16    into a drive for them and then they were

17    supposed to give you everything.

18         MR. CROSS:  Okay.

19         THE WITNESS:  And that's what I'll do,

20    I'll go home, create them as a PDF.

21         MR. CROSS:  Well, let us talk to Bob

22    because I think we may want -- what we want

23    is direct access to the phone so we can

24    search it ourselves.

25         MR. CHEELEY:  I'll accept the subpoena,

Page 214

1          but I need to talk to my client about it.

2                  MR. CROSS:  Sure, I understand that.

3                  Thank you, Mrs. Latham.  Sorry the day

4          ran long.

5                  We're off the record.

6                  THE VIDEOGRAPHER:  This is the end of

7          the deposition.  Off the record at 5:15.

8                  (Deposition concluded at 5:15 p.m.)

9                  (Signature reserved.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        The following reporter and firm disclosures
   were presented at this proceeding for review by
2    counsel:
3                    REPORTER DISCLOSURES
4               The following representations and
   disclosures are made in compliance with Georgia Law,
5    more specifically:
   Article 10(B) of the Rules and Regulations of the
6      Board Of Court Reporting (disclosure forms)
   OCGA 9-11-28(c) (disqualification of reporter
7      for financial interest)
   OCGA 15-14-37(a) and (b) (prohibitions against
8      contracts except on a case-by-case basis).
   - I am a certified reporter in the State of Georgia.
9   - I am a subcontractor for Veritext.
   - I have been assigned to make a complete and
10     accurate record of these proceedings.
   - I have no relationship of interest in the matter
11     on which I am about to report which would
      disqualify me from making a verbatim record or
12     maintaining my obligation of impartiality in
      compliance with the Code of Professional Ethics.
13  - I have no direct contract with any party in this
      action and my compensation is determined solely
14     by the terms of my subcontractor agreement.
15
16                    FIRM DISCLOSURES
17  - Veritext was contacted to
      provide reporting services by the noticing or
18     taking attorney in this matter.
   - There is no agreement in place that is
19     prohibited by OCGA 15-14-37(a) and (b). Any
      case-specific discounts are automatically
20     applied to all parties, at such time as any
      party receives a discount.
21  - Transcripts:  The transcript of this proceeding
      as produced will be a true, correct, and
22     complete record of the colloquies, questions,
      and answers as submitted by the certified court
23     reporter.
   - Exhibits:  No changes will be made to the
24     exhibits as submitted by the reporter,
      attorneys, or witnesses.
25

Page 216

1    - Password-Protected Access:  Transcripts and
        exhibits relating to this proceeding will be
2       uploaded to a password-protected repository, to
        which all ordering parties will have access.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 217

1                        CERTIFICATE
STATE OF GEORGIA:
2 COUNTY OF FULTON:
                    I hereby certify that the foregoing
3 transcript was taken down, as stated in the caption,
and the colloquies, questions and answers were
4 reduced to typewriting under my direction; that the
transcript is a true and correct record of the
5 evidence given upon said proceeding.
                    I further certify that I am not a
6 relative or employee or attorney of any party, nor
am I financially interested in the outcome of this
7 action.
                    I have no relationship of interest in
8 this matter which would disqualify me from
maintaining my obligation of impartiality in
9 compliance with the Code of Professional Ethics.
                    I have no direct contract with any
10 party in this action and my compensation is based
solely on the terms of my subcontractor agreement.
11                   Nothing in the arrangements made for
this proceeding impacts my absolute commitment to
12 serve all parties as an impartial officer of the
court.
13                   This the 11th day of August 2022.
14
15
16       _____
         LAURA M. MACKAY, CCR-B-1736
17
18
19
20
21
22
23
24
25

Page 218

1    To: ROBERT D. CHEELEY, Esq.
     Re: Signature of Deponent CATHLEEN LATHAM

2
                    August 11, 2022
3    Greetings:
     This deposition has been requested for read and sign
4    by the deponent.  It is the deponent's
     responsibility to review the transcript, noting any
5    changes or corrections on the attached PDF Errata.
     The deponent may fill out the Errata electronically
6    or print and fill out manually.

7
     Once the Errata is signed by the deponent
8    please email it to the offices of Veritext (below), also email
     parties of the case.

9

10

11

12
     If the signed Errata is not returned within the time
13   above, the original transcript may be filed with the
     court without the signature of the deponent.

14

15
     Please send completed Errata to:
16
     Veritext Legal Solutions
17
     cs-midatlantic@veritext.com

18

19

20

21

22

23

24

25

Page 219

1   ERRATA for ASSIGNMENT #5359093

2   I, the undersigned, do hereby certify that I have read the
    transcript of my testimony, and that

3

4   ___ There are no changes noted.

5   ___ The following changes are noted:

6

7   Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
    Procedure and/or OCGA 9-11-30(e), any changes in form or
    substance which you desire to make to your testimony shall

8   be entered upon the deposition with a statement of the
    reasons given for making them.  To assist you in making any

9   such corrections, please use the form below.  If additional
    pages are necessary, please furnish same and attach.

10

11  Page _____ Line _____ Change

12  _____

13  Reason for change_____

14  Page _____ Line _____ Change_____

15  _____

16  Reason for change_____

17  Page _____ Line _____ Change_____

18  _____

19  Reason for change_____

20  Page _____ Line _____ Change _____

21  _____

22  Reason for change_____

23  Page _____ Line _____ Change _____

24  _____

25  Reason for change _____

Page 220

1  Page _____ Line _____ Change _____

2  _____

3  Reason for change _____

4  Page _____ Line _____ Change _____

5  _____

6  Reason for change _____

7  Page _____ Line _____ Change _____

8  _____

9  Reason for change _____

10 Page _____ Line _____ Change _____

11 _____

12 Reason for change _____

13 Page _____ Line _____ Change _____

14 _____

15 Reason for change _____

16 Page _____ Line _____ Change _____

17 _____

18 Reason for change_____

19

20                    _____

                          DEPONENT'S SIGNATURE

21

   Sworn to and subscribed before me this ___ day of

22 _____, _____.

23

   ___  _____

24 NOTARY PUBLIC

25 My Commission Expires:_____

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.