# EXHIBIT 11

**Redacted for PII**

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION
 3       DONNA CURLING, ET AL.,        )
                                       )
 4            Plaintiffs,              )
                                       )
 5       vs.                           )    CIVIL ACTION NO.
                                       )
 6       BRAD RAFFENSPERGER, ET        )    1:17-CV-2989-AT
         AL,                           )
 7                                     )
              Defendants.              )
 8
 9
10
11
12
13       VIDEOTAPED 30(b)(6) DEPOSITION OF ERIC B. CHANEY
14                   (Taken by Plaintiffs)
15                    August 15, 2022
16                      10:20 a.m.
17
18
19
20
21
22
23
24
25       Reported by:   Debra M. Druzisky, CCR-B-1848
```

1                   APPEARANCES OF COUNSEL
2     On behalf of the Curling Plaintiffs:
3         DAVID D. CROSS, Esq.
          MARY G. KAISER, Esq.
4         SONJA N. SWANBECK, Esq.
          VERONICA ASCARRUNZ, Esq.
5         JENNA CONAWAY
          CAROLINE MIDDLETON
6         WAIL JIHADI
          OLUWASEGUN JOSEPH
7         Morrison & Foerster
          2100 L Street NW, Suite 900
8         Washington, D.C.  20037
          (202) 887-8795
9         dcross@mofo.com
10        -and-
11        HALSEY G. KNAPP, JR., Esq.
          Krevolin & Horst
12        1201 West Peachtree Street, Suite 3250
          Atlanta, Georgia  30309
13        (404) 888-9700
          hknapp@khlawfirm.com
14        asparks@khlawfirm.com
15
      On behalf of the Coalition Plaintiffs:
16
          BRUCE P. BROWN, Esq.
17        Bruce P. Brown Law
          1123 Zonolite Road, Suite 6
18        Atlanta, Georgia  30306
          (404) 881-0700
19        bbrown@brucepbrownlaw.com
20
      On behalf of the Deponent:
21
          STEPHEN DELK, Esq.
22        Hall Booth Smith
          1564 King Road
23        Tifton, Georgia  31793
          (229) 382-0515
24        sdelk@hallboothsmith.com
25

Page 3

1        APPEARANCES OF COUNSEL (Continued.)
2   On behalf of the Defendants Georgia Secretary of
    State and State Election Board:
3
        JAVIER PICO-PRATS, Esq.
4       DANIELLE HERNANDEZ, Esq.
        Robbins Ross Alloy Belinfante Littlefield
5       500 14th Street
        Atlanta, Georgia  30318
6       (678) 701-9381
        javier.picoprats@robbinsfirm.com
7
        -and-
8
        BRYAN TYSON, Esq.
9       Taylor English Duma
        1600 Parkwood Circle, Suite 200
10      Atlanta, Georgia 30339
        (770) 434-6868
11      btyson@taylorenglish.com
12
    Also Present:
13
        Scott Bridwell, videographer
14      Donna Curling
        Susan Greenhalgh
15      Marilyn R. Marks
        Kevin Scoglund
16      Duncan Buell
        Philip Stark
17      Ernestine Thomas-Clark (Coffee B.O.E.)
18                  --oOo--
19
20
21
22
23
24
25

Page 4

```
 1                    INDEX TO EXAMINATION
 2      Witness Name:                              Page
 3      ERIC B. CHANEY
 4          By Mr. Cross                              8
 5          By Mr. Brown                            179
 6          By Mr. Pico-Prats                       185
 7
 8
 9
10              INDEX TO PLAINTIFF'S EXHIBITS
11         No.              Description           Page
12      Exhibit 1      6-30-22, Subpoena to Produce    21
                       Documents, Information or
13                     Objects or to Permit Inspection
                       of Premises in a Civil Action to
14                     Eric B. Chaney re: The
                       above-captioned action.
15
        Exhibit 2      8-5-22, Subpoena to Produce      23
16                     Documents, Information or
                       Objects or to Permit Inspection
17                     of Premises in a Civil Action to
                       Eric B. Chaney re: The
18                     above-captioned action.
19      Exhibit 3      8-14-22, Chaney Response to CGG  24
                       Subpoena for Production of
20                     Documents re: Curling v. Kemp.
21      Exhibit 4      State Defendants 202100 thru     34
                       103, 9-28-21, State of Georgia
22                     Secretary of State,
                       Investigations Division Summary
23                     re: Coffee County.
24      Exhibit 5      Color photograph of             38
                       computer/keyboard with Post-It
25                     note.
```

Page 5

INDEX TO PLAINTIFF'S EXHIBITS (Continued.)

| No. | Description | Page |
|---|---|---|
| Exhibit 6 | Latham 24 thru 53, Compilation exhibit re: Coffee County Board of Elections documents. | 40 |
| Exhibit 7 | 10-6-20 thru 5-3-22, Coffee County Board of Elections and Registration Regular Monthly Meeting Minutes. | 44 |
| Exhibit 8 | 4-12-22, E-mail string from Jennifer Dorminey Herzog to Ryan Germany re: Response to 4-12-22 Emma Brown Washington Post inquiry. | 88 |
| Exhibit 9 | 3-15-18 thru 3-1-21, text message string between Eric Chaney and Misty Hampton. | 101 |
| Exhibit 10 | 8122022-34 thru -53, 1-8-21, E-mail string from Paul Maggio to Sidney Powell re: Jim Penrose-Coffee County GA forensics engagement agreement. | 137 |
| Exhibit 11 | 6-3-22, ICS Advisory re: Vulnerabilities affecting Dominion Voting Systems ImageCast X. | 160 |
| Exhibit 12 | LinkedIn Web page print-out re: Robert A. Sinners. | 171 |
| Exhibit 13 | 12-12-20, Verified Petition for Emergency Injunctive and Declaratory Relief re: Still v. Raffensperger. | 182 |

- - -

1          THE VIDEOGRAPHER:  Good morning.

2     We're going on the record at 10:20 a.m.,

3     Monday, August 15th, 2022.  Please note

4     the microphones are sensitive and may pick

5     up whispering, private conversations and

6     cellular interference.

7          Please turn off all cell phones or

8     place them away from the microphones as

9     they can interfere with deposition audio.

10    Audio and video recording will continue to

11    take place unless all parties agree to go

12    off the record.

13         This is media unit one of the video

14    recorded deposition of Eric Chaney taken

15    by counsel for defendant in the matter of

16    Donna Curling, et al. versus Brad

17    Raffensperger, et al., filed in the United

18    States District Court of the Northern

19    Georgia -- District of Georgia, Case

20    Number 1:17-CV-02989-AT.

21         This deposition is being held at the

22    Fairfield Inn, located at 1815 Peterson

23    Avenue South, Douglas, Georgia.

24         My name is Scott Bridwell.  I'm from

25    the firm of Veritext Legal Solutions.  I

Page 7

1       am the videographer.  The court reporter

2       is Debra Druzisky from the firm Veritext

3       Legal Solutions.

4            I am not authorized to administer an

5       oath.  I am not related to any party in

6       this action, nor am I financially

7       interested in the outcome.

8            Counsel and all present in the room

9       and everyone attending remotely will now

10      state their appearance and affiliations

11      for the record.

12           MR. CROSS:  David Cross of Morrison &

13      Foerster on behalf of the Curling

14      plaintiffs.  And with me is my colleague

15      Jenna Conaway.

16           THE WITNESS:  Eric Chaney, witness.

17           MR. DELK:  Stephen Delk on behalf of

18      Mr. Chaney.

19           MR. PICO-PRATS:  Javier Pico-Prats on

20      behalf of the state defendants.

21           (Whereupon, a technical discussion

22       ensued off the record.)

23           THE VIDEOGRAPHER:  Will the court

24      reporter please swear in the witness?

25   ///

Page 8

```
 1                    ERIC B. CHANEY,
 2    having been first duly sworn, was examined and
 3    testified as follows:
 4             THE VIDEOGRAPHER:  Thank you.  We may
 5        proceed.
 6                    EXAMINATION
 7    BY MR. CROSS:
 8        Q.   Good morning, Mr. Chaney.
 9        A.   Good morning.
10        Q.   Appreciate you being here.  You are here
11    pursuant to a subpoena; right?
12        A.   Yes.
13        Q.   And can you just give me your full name
14    again for the record?
15        A.   Eric Brandon Chaney.
16        Q.   And where do you currently live?
17        A.   ██████████████████████████████
18    █████████
19        Q.   Okay.  And how long have you been at that
20    address?
21        A.   A couple months.
22        Q.   And where were you before that?
23        A.   ██████████████████████████████.
24        Q.   And how long were you there?
25        A.   Two years.
```

1      Q.    And then how about before that?

2      A.    I've lived in Douglas my entire life.

3      Q.    Okay.  So always in Douglas, Georgia?

4      A.    Yes.

5      Q.    Okay.  And sorry.  I get confused with

6    counties in Georgia.  You guys have a lot of

7    counties, 159; right?

8      A.    We do.

9      Q.    I grew up in South Carolina.  I don't

10   think we have that many.  What county do you

11   currently live in?

12     A.    Coffee.

13     Q.    And how long have you been in Coffee

14   County?

15     A.    My entire life.

16     Q.    Your whole life.  Okay.

17           Have you -- so you've always voted in

18   Coffee?

19     A.    That's correct.

20     Q.    Okay.  All right.  Have you been deposed

21   before?

22     A.    I have.

23     Q.    How many times?

24     A.    Once.

25     Q.    And just generally, what kind of case was

1    that?

2           A.    A civil case.

3           Q.    Okay.  Were you a witness or a party?

4           A.    A party.

5           Q.    Okay.  Defendant?

6           A.    Yes.

7           Q.    Okay.  So this will probably be similar.

8    I'll ask you questions during the course of the

9    day.  You have to -- you have to answer the

10   question I ask unless Mr. Delk instructs you not

11   to.

12          If at any point you have a question about

13   the question, something's not clear, just tell me.

14   If you want to take a break at any point, that's

15   fine.  The only rule is you have to answer a

16   pending question --

17          A.    Sure.

18          Q.    -- unless the break is to ask a question

19   to your counsel about privilege.  Otherwise, you

20   need to answer.

21          Answers need to be audible and need to be

22   "yes" or "no," not "huh-uh" or "uh-huh."

23          A.    Right.

24          Q.    Otherwise, it makes it hard for Debra.

25          Is there any reason that you feel you

Page 11

1    cannot testify truthfully and completely today?

2        A.   No.

3        Q.   Okay.  You're not on any kind of

4    medications or anything that might affect your

5    testimony?

6        A.   No.

7        Q.   Where did you go to school?

8        A.   I went to school in Coffee County since

9    kindergarten and attended South Georgia College at

10   the time.  It's now South Georgia State College.

11       Q.   And that's here in Coffee County?

12       A.   That's correct.

13       Q.   When did you graduate college?

14       A.   I did not graduate from college.

15       Q.   All right.  Did you attend '98 to 2001?

16       A.   In college?  I did.

17       Q.   Okay.  So you didn't do, what, a senior

18   year?

19       A.   Yes.  I attended college and high school

20   my senior year.

21       Q.   Okay.  And then so you didn't get a

22   degree?

23       A.   I did not.

24       Q.   Got it.

25            Do you have any other formal education

1    besides a high school degree and attending college?

2          A.    I do not.

3          Q.    Okay.  And you run a car dealership?

4          A.    Yes, sir.

5          Q.    How long have you done that?

6          A.    Since 2001.

7          Q.    Okay.  So you left college and started

8    running the car dealership?

9          A.    That's correct.

10         Q.    Do you own the dealership?

11         A.    I do not.

12         Q.    So you -- are you a manager?

13         A.    I am actually the C.E.O.

14         Q.    C.E.O.?  Okay.

15         A.    Yes, sir.

16         Q.    So you started at that same -- so you

17   started at that same dealership in 2001 and you've

18   been there for 21 years?

19         A.    Yes.

20         Q.    What did you start as?

21         A.    I guess in sales.

22         Q.    Okay.

23         A.    Yeah.

24         Q.    When did you become the C.E.O.?

25         A.    I don't recall.

1      Q.    Would you say it's more than five years?

2      A.    Yes.

3      Q.    More than ten years?

4      A.    No.

5      Q.    Okay.  Who owns the dealership?

6      A.    Donnie Chaney, my father.

7      Q.    Okay.  And new cars or used?

8      A.    Used.

9      Q.    And that's here in Coffee County?

10     A.    Yes.

11     Q.    Is that in Douglas?

12     A.    Yes.

13     Q.    Okay.

14           (Whereupon, a technical discussion

15       ensued off the record.)

16   BY MR. CROSS:

17     Q.    Have you had any other jobs since you left

18   college besides the dealership?

19     A.    No, sir.

20     Q.    Okay.  And at some point you served on the

21   Coffee County Board of Elections; right?

22     A.    That's correct.

23     Q.    How long did you do that?

24     A.    I'm not really sure an exact date that I

25   went on the board.

Page 14

1      Q.    Would you say you served on the board more
2   or less than five years?
3      A.    More.
4      Q.    Okay.  More than ten?
5      A.    No.
6      Q.    More than seven?
7      A.    No.
8      Q.    So somewhere maybe in the five to six,
9   seven-year range?
10      A.    That's correct.
11      Q.    Okay.  And do I understand you resigned
12   from the board last Friday?
13      A.    I did.
14      Q.    Okay.  And what was the reason for that?
15      A.    Because I moved down to Mallard Point from
16   Bay Meadows.
17      Q.    And where is Mallard Point?
18      A.    It's on the east side of the county.  Bay
19   Meadows is on the southwest side of the county.
20   District 3 is Bay Meadows encompassment, and
21   Mallard Point is District 5, if I recall correctly.
22      Q.    Okay.  So but you still live in the
23   county?
24      A.    Yes.
25      Q.    So why would you need to resign from the

Page 15

1    board if you're still in the county?

2         A.   I was under the impression that the board

3    member has to reside within the district of the

4    commissioner who appoints him.

5         Q.   I see.

6              How many districts are there in the

7    county?

8         A.   I think five.

9         Q.   Okay.  There's six voting precincts;

10   right?

11        A.   I'm not sure.

12        Q.   Okay.  Does each district have its own

13   voting precinct?

14        A.   There again, I'm not sure --

15        Q.   Okay.

16        A.   -- specifically.

17        Q.   Okay.  Just make sure you keep your voice

18   up.

19        A.   Sure.

20        Q.   Okay.  So how many members of the board

21   are there?

22        A.   Five.

23        Q.   And each member of the board is appointed

24   by a commissioner of a particular district?

25        A.   Yes.

Page 16

1    Q.    And what district were you appointed for?

2    A.    Three.

3    Q.    Okay.  And when were you appointed?  That

4    was sometime in the last five to seven years?

5    A.    Correct.

6    Q.    Okay.  And who appointed you?

7    A.    Commissioner A.J. Dovers.

8    Q.    When did you move out of District 3?

9    A.    Specifically, I'm not exactly sure of the

10   exact date, but a couple months ago.

11   Q.    Okay.  And so what brought that to a head

12   on Friday?

13   A.    I have -- or had talked to my commissioner

14   about, you know, if did I need to resign, did I

15   need to, you know, turn the resignation letter in.

16   They was not sure.

17        And they finally got some legal grounds

18   that you can't serve unless you're living or

19   residing within the district that you're appointed

20   to.  So.

21   Q.    Okay.  So this was an issue that just came

22   up on Friday?

23   A.    It's an issue we addressed on Friday.

24   Q.    Okay.  When did -- when did the issue

25   first arise?

Page 17

```
 1        A.    I notified the commissioner when I moved.
 2        Q.    And that was a couple months ago?
 3        A.    Yes.
 4        Q.    Okay.  And then when did you first hear
 5   from the commissioner that you needed to live in
 6   the district?
 7        A.    Friday.
 8        Q.    Okay.  So you heard the same day and
 9   resigned that day?
10        A.    That's correct.
11        Q.    Who else is current -- well, strike that.
12              Who is currently on the board right now
13   for Coffee County?
14        A.    Our chairperson is Ms. Ernestine
15   Thomas-Clark.  Co-chair I believe is either Wendell
16   Stone or Matthew McCullough.  I'm not 100 percent
17   sure of that at this time.
18              Matthew McCullough is a board member,
19   Wendell Stone is a board member, and Andy Thomas is
20   a board member currently.
21        Q.    Did you ever serve as chair?
22        A.    No.
23        Q.    Co-chair?
24        A.    No.
25        Q.    Did you ever have any position on the
```

Page 18

1    board other than just a board member?

2        A.    No.

3        Q.    What were your responsibilities generally

4    as a member of the Coffee County election board?

5        A.    Just a board member.

6        Q.    Right.  But what does the Coffee County

7    board do with respect to elections in the county?

8        A.    The board basically is in charge of hiring

9    the supervisor of elections and the assistant

10   supervisor of elections and making sure they

11   fulfill their duties and conduct elections and make

12   sure that people are able to register to vote in

13   Coffee County.

14       Q.    Okay.  And do I understand right that the

15   elections supervisor and the assistant elections

16   supervisor in Coffee County, they report to the

17   board?

18       A.    They do.

19       Q.    Have you served on any other election

20   boards?

21       A.    No.

22       Q.    Have you had any other official positions

23   with respect to Georgia elections?

24       A.    No.

25       Q.    What did you do, if anything, to prepare

Page 19

```
1     for the deposition today?
2              MR. DELK:  And I'll instruct the
3          witness, don't divulge anything that you
4          and I discussed in our meetings.
5              THE REPORTER:  I'm sorry.  I don't
6          know who was speaking.
7              MR. DELK:  That was Stephen Delk.
8              THE REPORTER:  Okay.  Can you restate
9          that, please?
10             MR. DELK:  Sure.  I was just
11         instructing the witness to not divulge
12         anything from my communications with him,
13         because that would be privileged
14         information.
15             But subject to that, you can respond.
16    BY MR. CROSS:
17        Q.   So apart from talking with your counsel,
18    what, if anything, did you do to prepare for today?
19        A.   On the advice of counsel, I respectfully
20    decline to answer on the basis of my rights and
21    privilege under Article I, Section 1, Paragraph 16
22    of the Georgia Constitution, the Fifth Amendment of
23    the United States and Georgia law.
24             As the United States Supreme Court has
25    stated, privilege against testifying protects
```

Page 20

1   everyone, including innocent people, from answering

2   questions if the truth might be used to help create

3   a misleading impression that they were somehow

4   involved in improper conduct.

5           So I hereby follow the advice of my

6   counsel and respectfully decline to answer.

7       Q.   You're taking the Fifth Amendment in

8   response to a question of what you did to get ready

9   for today?

10      A.   Yes.

11      Q.   Okay.

12           MR. CROSS:  And Mr. Delk, just for

13      ease, if he's going to take the Fifth in

14      response to any other questions, if he

15      just says Fifth Amendment.

16           MR. DELK:  That's fine, as long as we

17      stipulate that in -- by stating so, it

18      encompasses the entirety of the statement.

19           MR. CROSS:  Yes.

20           MR. DELK:  That's agreeable.

21           MR. CROSS:  Yeah.  Okay.  You tell

22      me.

23           MR. DELK:  Moving forward all you

24      need to do is say "Fifth Amendment," and

25      it saves you from having to read the whole

Page 21

1      statement.

2            THE WITNESS:  Yes.

3            MR. CROSS:  Yeah.

4            (Whereupon, a discussion ensued

5         off the record.)

6    BY MR. CROSS:

7      Q.   All right.  Let me hand you what's been

8    mark -- what's going to be marked as Exhibit 1.

9            MR. CROSS:  Mr. Delk, if you want to

10        take a look at it, it's a copy of the

11        document subpoena that we -- that my

12        client served.

13                        (Whereupon, Plaintiff's

14                         Exhibit 1 was marked for

15                         identification.)

16    BY MR. CROSS:

17      Q.   And sorry, disregard that red X.  I wasn't

18    going to use that particular copy, but it's the

19    only one we have.  Otherwise, it's exactly the

20    same.

21      A.   Sure.

22      Q.   But just tell me, do you recognize Exhibit

23    1?

24      A.   Yes.

25      Q.   Okay.  And so you recognize this as a

Page 22

1    subpoena that you received in this case to produce

2    documents?

3         A.    Yes.

4         Q.    All right.  So take -- turn to Page 10, if

5    you would, where at the top it says Document

6    Requests.  And then you'll see that there's ten

7    document -- or sorry, 12 document requests that go

8    to Page 12.

9              Do you see that?

10        A.    Yes.

11        Q.    Walk me through what you did, if anything,

12   to collect and produce documents for this subpoena.

13        A.    Fifth Amendment.

14        Q.    There's nothing at all you're willing to

15   tell me on that topic; is that right?

16        A.    Fifth Amendment.

17        Q.    Okay.  Do you recall receiving a subpoena,

18   a separate document subpoena from the other

19   plaintiffs, the Coalition plaintiffs?

20        A.    Fifth Amendment.

21        Q.    Can you -- what, if anything, did you do

22   to collect documents in response to a subpoena that

23   you received for documents from the other

24   plaintiffs in this case?

25        A.    Fifth Amendment.

Page 23

1              (Whereupon, a discussion ensued
2        off the record.)
3   BY MR. CROSS:
4        Q.    I'm going to mark that as Exhibit 2.
5   That's the Coalition subpoena.
6                         (Whereupon, Plaintiff's
7                          Exhibit 2 was marked for
8                          identification.)
9   BY MR. CROSS:
10       Q.    Mr. Chaney, do you recognize Exhibit 2 as
11  a second subpoena you received for documents in
12  this case?
13             (Whereupon, the document was
14        reviewed by the witness.)
15             THE WITNESS:  Yes.
16  BY MR. CROSS:
17       Q.    And what, if anything, did you do to
18  collect documents for that subpoena?
19       A.    Fifth Amendment.
20             (Whereupon, a discussion ensued
21        off the record.)
22             MR. CROSS:  Let's go off the record
23        for a second.
24             THE VIDEOGRAPHER:  We're going off
25        the record at 10:39.

Page 24

```
 1              (Whereupon, a discussion ensued
 2         off the record.)
 3              THE VIDEOGRAPHER:  We are on the
 4         record at 10:43 a.m.
 5                          (Whereupon, Plaintiff's
 6                          Exhibit 3 was marked for
 7                          identification.)
 8    BY MR. CROSS:
 9         Q.   All right.  Mr. Chaney, I'm going to hand
10    you Exhibit 3.  We'll let Mr. Delk look at it
11    first.
12              Tell me if you recognize Exhibit 3.
13              (Whereupon, the document was
14         reviewed by the witness.)
15              THE WITNESS:  I do.
16    BY MR. CROSS:
17         Q.   Okay.  And what is Exhibit 3?
18         A.   My response for production of documents.
19         Q.   In response to the subpoena served by the
20    Coalition plaintiffs; right?  See where it says
21    C.G.G.?
22         A.   Yes.
23         Q.   Okay.  And if -- do I understand
24    correctly, you have not produced any document at
25    all in response to either of the document subpoenas
```

Page 25

1    you received; right?

2              MR. DELK:  Object to the form.

3              You can answer if you understand.

4              THE WITNESS:  I produced what I have.

5    BY MR. CROSS:

6         Q.   Which is nothing?

7         A.   I produced what I have.

8         Q.   Okay.  Walk me through the documents that

9    you produced in response to the subpoenas.

10   Describe them for me.

11             MR. DELK:  I'll object to the extent

12        there's a qualifier in one of the

13        responses about documents by agreement of

14        counsel regarding any documents that have

15        been previously produced in the

16        litigation.

17             But subject to that, he can certainly

18        respond.

19   BY MR. CROSS:

20        Q.   What did you personally produce in

21   response to the subpoenas, if anything?

22        A.   Everything that's here.

23        Q.   What does that mean?

24        A.   It's pretty cut and dry.  It's in black

25   and white.  Everything that's here --

Page 26

1      Q.   Right.  And --

2      A.   -- is what I produced.

3      Q.   Okay.  And if we look, in response to one,

4   you say "none."  Right?

5      A.   That's correct.

6      Q.   Two says "none."  Right?

7      A.   That's right.

8      Q.   In fact, if we go from three to eight,

9   they all say "none."  Right?

10     A.   Okay.

11     Q.   Meaning you represented you had no

12  documents to produce in response to any of those

13  requests; correct?

14     A.   That's correct.

15     Q.   Then we get to number nine; right?

16     A.   Okay.

17     Q.   And nine has an objection about

18  attorney-client privilege and work product.  Do you

19  see that?

20     A.   I do.

21     Q.   And then it says:

22          "Chaney has no additional

23      documents of which he is aware to

24      provide in response to this request

25      outside of what has been previously

Page 27

1        provided to Marilyn Marks."
2            Do you see that?
3        A.    That's correct.
4        Q.    Okay.  And you're talking about there
5    documents that Ms. Marks received from Coffee
6    County in response to open records requests; right?
7        A.    That's correct.
8        Q.    Okay.  What involvement did you have in
9    collecting documents for the open records requests
10   that Ms. Marks served that are referenced there?
11       A.    Fifth Amendment.
12       Q.    And number ten has the same response;
13   right?
14       A.    That's correct.
15       Q.    Number 11 has the same response; right?
16       A.    That's correct.
17       Q.    So for nine, ten and 11, did you have any
18   involvement in collecting documents for the open
19   records requests that are referenced in those
20   responses?
21       A.    Fifth Amendment.
22       Q.    Because you have not produced any
23   documents yourself in response to nine, ten and 11
24   apart from what might have been included in the
25   open records productions; right?

Page 28

1      A.    Fifth Amendment.

2      Q.    And then when we get to the rest of the

3   requests, 12 through 27, they all say "none."

4   Right?

5      A.    That's correct.

6      Q.    So you represented you had no documents at

7   all to produce in response to those requests;

8   correct?

9      A.    Yes.

10     Q.    And you're not going to tell me anything

11  about what you did to look for documents in

12  response to any of these requests; is that right?

13     A.    Fifth Amendment.

14     Q.    When you received either of the subpoenas

15  for documents, did you destroy documents that were

16  responsive to that request?

17     A.    Fifth Amendment.

18     Q.    Had you previously destroyed documents

19  responsive to those requests?

20     A.    Fifth Amendment.

21     Q.    Are you aware that, as a member of the

22  Coffee County election board of -- election board,

23  that you have certain legal obligations under

24  Georgia law to preserve the documents with respect

25  to county election business?

Page 29

1        A.    Fifth Amendment.

2        Q.    Have you complied with that obligation?

3        A.    Fifth Amendment.

4        Q.    Take a look at request two in Exhibit 3,

5    if you would, please, on the first page.  This one

6    asks for:

7              "All communications, including

8          text messages with Misty Hampton

9          related to, referencing or regarding

10         Coffee County election matters,

11         including election records, election

12         activities or election system

13         components."

14             Do you see that?

15       A.    I do.

16       Q.    And Misty Hampton is the -- is a former

17   elections supervisor in Coffee County; right?

18       A.    Correct.

19       Q.    And she left in February of 2021; right?

20       A.    I don't know the exact date.

21       Q.    Does that sound about right?

22       A.    I don't know.

23       Q.    Well, do you recall that she left in the

24   spring of 2021?

25       A.    I do.

Page 30

1      Q.   Okay.  And she served in that position,
2  was it about nine years?
3      A.   I don't know.
4      Q.   She was in that position the whole time
5  you were on the board; right?
6      A.   Yes.
7      Q.   Okay.  And so do I understand right that,
8  in response to the request number two here, you had
9  absolutely no documents to provide us that in any
10  way relate to, or any communications with the
11  former elections supervisor that in any way relate
12  to Coffee County election matters?
13      A.   That's correct.
14      Q.   Even though you're required to preserve
15  those by law?
16      A.   I don't have any documents.
17      Q.   When did you destroy those?
18           MR. DELK:  Object to the form.
19  BY MR. CROSS:
20      Q.   When did you destroy those documents?
21      A.   Fifth Amendment.
22      Q.   Why did you destroy those documents?
23      A.   Fifth Amendment.
24      Q.   You destroyed every communication you ever
25  had with Misty Hampton, even those regarding Coffee

Page 31

1    County election matters; is that right?
2         A.    Fifth Amendment.
3              MR. DELK:  Object to the form.
4    BY MR. CROSS:
5         Q.    Are you aware that the proceeding we're
6    test -- you're testifying in today is a civil
7    proceeding, not a criminal proceeding?
8         A.    It's my understanding.
9         Q.    Okay.  And are you aware that, when a
10   witness asserts the Fifth Amendment in a civil
11   proceeding, the Court can infer that the individual
12   has done what they're being asked about?
13        A.    Fifth Amendment.
14        Q.    Does that inference concern you?
15        A.    Fifth Amendment.
16             MR. DELK:  Object to the form.
17   BY MR. CROSS:
18        Q.    Do you believe you've committed a crime?
19        A.    Fifth Amendment.
20        Q.    Mr. Chaney, are you or have you been under
21   investigation by any federal or state authorities
22   at any time?
23        A.    No.
24        Q.    Are you being or have you been called to
25   testify in any federal or state grand jury

Page 32

1   proceeding?

2       A.   No.

3       Q.   Are you or have you received any formal or

4   informal assurance of immunity from any federal or

5   state authority?

6       A.   Not that I'm aware of.

7       Q.   Have you sought immunity?

8       A.   No.

9       Q.   Have you been charged with a crime

10  regarding any matter in which you are claiming

11  Fifth Amendment privilege today?

12      A.   No.

13      Q.   Has any law enforcement authority

14  contacted you about any matter on which you're

15  claiming the Fifth Amendment privilege today?

16          MR. DELK:  Object to the form.

17          THE WITNESS:  Fifth Amendment.

18  BY MR. CROSS:

19      Q.   At all times that you were engaged in any

20  matter related to the Coffee County election

21  process or involving Coffee County election

22  equipment, were you acting in your official

23  capacity as a member of the Coffee County Board of

24  Elections?

25      A.   I don't understand the form of your

Page 33

1    question.  Can you --

2        Q.    Sure.

3        A.    -- rephrase that?

4        Q.    You have been inside the Coffee County

5    election office; right?

6        A.    Yes.

7        Q.    And was there ever a point where you were

8    inside the Coffee County elections office in any

9    capacity other than as a member of the board?

10       A.    No.

11       Q.    Just so I understand, when you're invoking

12   the Fifth Amendment today, are you doing that on

13   your personal behalf or on behalf of the Coffee

14   County Board of Elections?

15            MR. DELK:  Object to the form.  You

16       know that's not legally proper to do it on

17       behalf of the board.  And this deposition

18       is noticed for individual, not a 30(b)(6),

19       so I object to the entire format of that

20       question being improper.

21            MR. CROSS:  I mean, it seems like

22       we're agreeing, but I just want to make

23       sure that he's asserting the Fifth

24       personally, not on behalf of the board.

25            MR. DELK:  He's only providing

Page 34

1          testimony personally.

2                MR. CROSS:   Okay.

3     BY MR. CROSS:

4          Q.   Do you disagree with your counsel?

5          A.   I do not.

6          Q.   Okay.

7                          (Whereupon, Plaintiff's

8                          Exhibit 4 was marked for

9                          identification.)

10    BY MR. CROSS:

11         Q.   So Mr. Chaney, I've handed you what's been

12    marked as Exhibit 4.  Just take a moment to read

13    through it, and tell me if you recognize it.

14              (Whereupon, a discussion ensued

15         off the record.)

16              (Whereupon, the document was

17         reviewed by the witness.)

18              THE WITNESS:  Yes, sir, I do.

19    BY MR. CROSS:

20         Q.   And what do you recognize Exhibit 4 as?

21         A.   It's just an investigation summary where

22    there was a complaint -- or complaints filed I

23    guess through the Secretary of State's office.  And

24    I see the findings and the potential violation on

25    the back of the page.

Page 35

1      Q.   Okay.  So Exhibit 4 is an official summary
2  from the Secretary of State's office about an
3  investigation involving Coffee County; is that
4  fair?
5      A.   Yes.
6      Q.   And what involvement, if any, did you have
7  with this investigation?
8      A.   None that I recall.
9      Q.   So did anybody from the State interview
10  you as a member of the board?
11      A.   Not that I recall.
12      Q.   Did anyone from the State provide a report
13  to any -- to you as a member of the board other
14  than what's written here?
15      A.   Not that I recall.
16      Q.   Okay.  So if we look at Exhibit 4, look at
17  complaint two on Page 1.  Do you see that?
18      A.   I do.
19      Q.   And it reads:
20           "A video surfaced on YouTube where
21       it showed Coffee County election
22       supervisor Misty Martin discussing the
23       ways in which the election software
24       could be manipulated."
25           Do you see that?

Page 36

1      A.    I do.

2      Q.    And Misty Martin is the same person as

3    Misty Hampton?

4      A.    Yes.

5      Q.    Okay.  So we're talking about the, at this

6    time, the Coffee County election supervisor; right?

7      A.    Yes.

8      Q.    Okay.  And are you familiar with that

9    YouTube video?

10     A.    Yes.

11     Q.    You filmed that video; right?

12     A.    Fifth Amendment.

13     Q.    The video that's referenced there, that

14   was filmed during an official meeting of the Coffee

15   County election board in the Coffee County

16   office -- election office; right?

17     A.    Fifth Amendment.

18     Q.    All right.  Turn to the third page, if you

19   would.  Do you see where it has Findings at the

20   top?

21     A.    Yes, sir.

22     Q.    And then Complaint Two referencing that

23   same complaint.  Do you see that?

24     A.    Yes.

25     Q.    And under the findings here, the State

Page 37

```
 1   reports:
 2            "Ms. Martin, along with Coffee
 3        County Board of Election member Eric
 4        Chaney, made two videos claiming the
 5        Dominion system election software
 6        could be manipulated."
 7            Do you see that?
 8        A.   I do.
 9        Q.   Do you disa -- dispute that finding?
10        A.   Fifth Amendment.
11        Q.   It then goes on, if you come to the third
12   sentence, four lines down in the middle, do you see
13   where it reads, "Ms. Martin never"?
14        A.   I do.
15        Q.   And it -- and the finding here is:
16            "Ms. Martin never once during the
17         videos explained the intended use of
18         the adjudication process.
19            "The video was very misleading and
20         seemed its purpose was simply to
21         create doubt and public mistrust in
22         the Dominion Voting System."
23            Do you see that?
24        A.   Yes.
25        Q.   Was it your purpose in creating this video
```

Page 38

```
1    to create doubt and public mistrust in the Dominion
2    Voting System?
3               MR. DELK:  Object to the form.
4               THE WITNESS:  Fifth Amendment.
5    BY MR. CROSS:
6         Q.   What was the purpose of the video?
7         A.   Fifth Amendment.
8         Q.   As you sit here, do you have any reason to
9    believe creating the video was criminal?
10        A.   Fifth Amendment.
11        Q.   Do you believe that video being released
12   to the public was criminal?
13        A.   Fifth Amendment.
14        Q.   If you come down to the second paragraph,
15   do you see where there's discussion of a password
16   that was taped to the bottom of the computer screen
17   Ms. Martin was using?
18        A.   Yes.
19             (Whereupon, a discussion ensued
20         off the record.)
21                       (Whereupon, Plaintiff's
22                        Exhibit 5 was marked for
23                        identification.)
24   BY MR. CROSS:
25        Q.   I'll hand you Exhibit 5.  And just tell me
```

Page 39

1    if you recognize Exhibit 5, please.

2         A.    Not specifically, I don't.

3         Q.    So Exhibit 5 is a screenshot that we took

4    from the video that's referenced in this complaint

5    of a Post-It note there and the password.

6              Does that help you recognize what that is?

7         A.    I don't -- I mean, I see something there,

8    but I don't know if it's a password or what it is.

9         Q.    Okay.  But do you re -- looking at Exhibit

10   5, do you recall that portion of the video where

11   there was a screen -- the computer screen in the

12   elections office that had a Post-It note with some

13   digits written on it?  Do you recall that?

14        A.    Fifth Amendment.

15        Q.    Okay.  In the findings here, the Secretary

16   of State reports in the last sentence:

17              "It was later discovered the

18         password was used to access the

19         Dominion Voting System."

20              Do you see that?

21        A.    I do.

22        Q.    Do you disagree with that finding?

23        A.    Fifth Amendment.

24        Q.    Do you know whether that password was used

25   to access the E.M.S. server computer or if it was

Page 40

1    instead used to access a particular election

2    database for the November 2020 election that the

3    County received on a hard drive from the State?

4         A.    Fifth Amendment.

5         Q.    Did you, yourself, ever log in to the

6    E.M.S. server desktop in the Coffee County election

7    office?

8         A.    No.

9         Q.    Do you know what the password was?

10        A.    No.

11        Q.    Do you know if anyone ever changed that

12   password?

13        A.    I do not.

14             (Whereupon, a discussion ensued

15          off the record.)

16                       (Whereupon, Plaintiff's

17                        Exhibit 6 was marked for

18                        identification.)

19   BY MR. CROSS:

20        Q.    All right.  Let me hand you what's been

21   marked as Exhibit 6.

22             (Whereupon, the document was

23          reviewed by the witness.)

24             THE WITNESS:  Okay.

25   BY MR. CROSS:

Page 41

1       Q.    Do you recognize Exhibit 6?

2       A.    Yes.

3       Q.    And what is it?

4       A.    There's quite a bit of information here,

5    several different things.

6       Q.    So let's start with the letter.  The cover

7    letter in Exhibit 6 is a letter that you sent on

8    behalf of the Coffee County Board of Elections;

9    right?

10      A.    Yes.

11      Q.    And you sent that to the House

12   Governmental Affairs Committee; right?

13      A.    Yes.

14      Q.    And that was for the state of Georgia

15   House Governmental Affairs Committee; right?

16      A.    Yes.

17      Q.    And what was the purpose of you sending

18   this letter on behalf of the board?

19      A.    I feel it's pretty self-explanatory with

20   the language inside the letter.  It gives our

21   complaints.

22      Q.    Well, was the idea to convey to the House

23   Governmental Affairs Committee concerns that the

24   Coffee County board had about the reliability of

25   the Dominion Voting System?

Page 42

1          MR. DELK:  Object to the form.

2          You can answer.

3          THE WITNESS:  We had issues in, that

4     we've noted in this letter that we would

5     have liked some clarity on and some

6     guidance from the Secretary of State's

7     office.

8  BY MR. CROSS:

9     Q.   So then why did you send the letter to the

10 House Governmental Affairs Committee instead of

11 directly to the Secretary of State's office?

12    A.   I think it addresses it here inside the

13 letter, that we was having some issues and that we

14 had contacted the Secretary of State's office and

15 we had had -- you know, we'd not gotten anywhere

16 with the Secretary of State's office by submitting,

17 you know, any complaints or calls or so on and so

18 forth.

19    Q.   So the board over some period of weeks or

20 months had in -- had raised certain concerns with

21 the Dominion system with the Secretary of State's

22 office and had not gotten a response; is that

23 right?

24    A.   As I recall.

25    Q.   Okay.  And so then the board decided to

Page 43

```
 1   turn to the House Governmental Affairs Committee
 2   for help; is that right?
 3               MR. DELK:  Object to the form.
 4               You can respond unless I --
 5               THE WITNESS:  Okay.
 6               MR. DELK:  -- unless I instruct
 7        otherwise.
 8               THE WITNESS:  That's correct.
 9   BY MR. CROSS:
10       Q.   Okay.  And what was the reason that you
11   decided to include each of the exhibits to the
12   letter?
13       A.   It's just data.  It shows some of our --
14   some of our issues we was having.
15       Q.   Well, how did you think that data would be
16   helpful to the committee?
17       A.   I'm not sure.
18       Q.   Do you still have a copy of this letter
19   yourself?
20       A.   I don't.
21       Q.   Why not?
22       A.   I don't know.
23                       (Whereupon, Plaintiff's
24                        Exhibit 7 was marked for
25                        identification.)
```

Page 44

1    BY MR. CROSS:

2        Q.   All right.  Mr. Chaney, handing you what's

3    been marked as Exhibit 6.

4            MR. DELK:  I think we're on seven.

5            MR. CROSS:  Are we?

6            (Whereupon, there was unreportable

7         cross-talk.)

8            MR. CROSS:  Yeah.  Thank you.

9        Exhibit 7.

10   BY MR. CROSS:

11       Q.   And just tell me if you recognize Exhibit

12   7 as a collection of meeting minutes from the

13   Coffee County Board of Elections.

14            (Whereupon, the document was

15         reviewed by the witness.)

16            THE WITNESS:  Yes.

17   BY MR. CROSS:

18       Q.   And if you would, look on the cover page,

19   the earliest date on these meeting minutes is

20   October 6th, 2020; right?

21       A.   Yes.

22       Q.   And if you go to the second-to-last page,

23   do you see that the most recent is May 3rd of this

24   year?

25       A.   Yes.

1     Q.   Okay.  And how often when you were on the
2  board did the board meet?
3     A.   Once a month.
4     Q.   Were there ever special meetings?
5     A.   I think so, but I don't recall
6  specifically.
7     Q.   Okay.  So it met at least once a month?
8     A.   That's correct.
9     Q.   And what was the purpose of those
10  meetings?
11     A.   We would just discuss board of elections
12  business and, you know, things that boards discuss
13  during a meeting.
14     Q.   Was there an expectation that the board
15  meeting minutes would capture all of the topics
16  that were addressed at those meetings?
17     A.   It's my understanding that it would.
18     Q.   All right.  Turn to the third page.  This
19  is the November 10, 2020 meeting.  Do you see that?
20     A.   I do.
21     Q.   If you look down at number six, do you see
22  where it says, "Mrs. Martin discussed the general
23  election results"?
24     A.   Yes.
25     Q.   And then this captures some of the

Page 46

1   dialogue in this.  And if you come down kind of

2   towards the middle of the paragraph, you'll see

3   where it says, "Mr. Chaney expressed his feelings."

4        Do you see that?

5   A.   I do.

6   Q.   And it says:

7        "Mr. Chaney expressed his feelings

8        of how the Dominion system 'sickens

9        him,'" which is in all caps, "of the

10       possibility of fraud and the deception

11       that can be manipulated by the

12       adjudication process.

13       "Mr. Chaney also stated that he

14       told his state representative that he

15       was not trying to shoot the messenger,

16       but the Dominion system he felt was a

17       piece of junk."

18       Do you see that?

19   A.   I do.

20   Q.   Do you recall this discussion at the board

21   meeting?

22   A.   Not verbatim, I don't.

23   Q.   Okay.  But does this generally capture

24   accurately your feelings at the time?

25            MR. DELK:  Object to the form.

Page 47

1          You've not given him a complete statement

2          of this document.

3                But subject to that, you can respond.

4                THE WITNESS:  Fifth Amendment.

5     BY MR. CROSS:

6          Q.   Do you have a view on the reliability of

7     Georgia's Dominion Voting System?

8          A.   Fifth Amendment.

9          Q.   What was it about the possibility of fraud

10    with the Dominion Voting System that sickened you?

11         A.   Fifth Amendment.

12         Q.   Are you aware of any fraud involving the

13    Georgia voting system?

14         A.   Fifth Amendment.

15         Q.   All right.  Turn to the one, January 12th,

16    2021 meeting minutes.  And you see under number one

17    of the attendees, it says, "absent, Eric Chaney."

18                Do you see that?

19         A.   I do.

20         Q.   Do you recall why you were absent on

21    January 12th?

22         A.   I do not.

23         Q.   Did you make an effort to attend board

24    meetings?

25         A.   I did.

Page 48

1      Q.   Okay.  And then you get to the next one
2   here is April 13, 2021.  Do you see that?
3      A.   I do.
4      Q.   Did the board meet in February and March
5   of that year?
6      A.   I don't recall.
7      Q.   Is there a reason they would not have met
8   for two months out of the year?
9      A.   I don't recall.
10      Q.   Do you know why there are no meeting
11   minutes for any board meeting in February and March
12   of 2021?
13      A.   I do not.  But I would -- I think COVID
14   could have possibly had a hand in that.  I don't --
15   I'm -- there again, I'm not 100 percent sure.  But
16   those dates strike me as possible dates that may
17   have been affected by that.  But there again, I'm
18   not 100 percent sure of that.
19      Q.   Yeah, and I'm not asking you to speculate.
20   You don't know why there are no meeting minutes for
21   those months?
22      A.   I don't.
23      Q.   Okay.  Do you recall that Ms. Hamp --
24   Misty Hampton and Jil Ridlehoover's employment with
25   the County ended on February 25th of 2021?

Page 49

1      A.    There again, I don't recall the exact

2   date, but I do agree their term did end.

3      Q.    Okay.  And when they signed their letters

4   of resignation, they did that in separate meetings

5   with the board; right?

6      A.    Correct.

7      Q.    And did you attend those two meetings?

8      A.    I did.

9      Q.    In the meeting with Ms. Hampton, was she

10  told that the reason she was being asked to resign

11  was because her timesheets were inaccurate?

12     A.    That is correct.

13     Q.    And did she admit in that meeting that her

14  timesheets were inaccurate?

15     A.    I don't recall specifically if she

16  admitted it or not.

17     Q.    Did she say in that meeting that she had

18  been directed by members of the board to capture

19  comp time in the way she submitted her timesheets?

20     A.    I don't recall specifically.

21     Q.    Do you recall personally acknowledging in

22  that meeting that she had been told to do that?

23     A.    I do not.

24     Q.    You just don't know one way or the other

25  whether you said that?

Page 50

1          A.    I don't.

2          Q.    Well, as you sit here, do you -- are you

3     aware that she was told by one or more members of

4     the board to capture comp time in the way she

5     prepared her timesheets?

6               MR. DELK:  Object to the form.

7               THE WITNESS:  I'm not.

8     BY MR. CROSS:

9          Q.    You're saying you're not aware of that?

10         A.    I'm not aware if that was specifically

11    stated that way.

12         Q.    Well, what are you aware of about what was

13    conveyed to Ms. Hampton about how to capture her

14    time, her comp time?

15         A.    I'm not aware -- I'm not sure exactly.

16         Q.    Well, what are you sure of?

17         A.    I'm not sure of the way -- the form of

18    that question, if I can answer correctly, because

19    I'm not exactly sure of the verbiage that was used,

20    you know, as telling her how to calculate her time.

21         Q.    Okay.  So tell me whatever you can about

22    what Ms. Hampton was told to capture comp time with

23    respect to her timesheets.

24         A.    I'm --

25               MR. DELK:  Object to the form.

Page 51

1          THE WITNESS:  I'm not sure.  There

2      again, I don't know how she was told to do

3      her comp time.

4  BY MR. CROSS:

5      Q.   Well, you're not offering a view that she

6  submitted fraudulent timesheets, are you?

7      A.   Yes.

8      Q.   You are offering that view?

9      A.   I am.

10      Q.   Based on what?

11      A.   Video evidence that she was not in the

12  office during office hours that she had written

13  down that she was present in the office doing

14  office --

15      Q.   But if the additional --

16      A.   -- duties.

17      Q.   Sorry.  Go ahead.

18      A.   No, I'm done.

19      Q.   But if the additional time on those

20  timesheets was capturing comp time that she was

21  owed in accordance with the instructions of the

22  board, how would that be fraud?

23          MR. DELK:  Object to the form.

24          THE WITNESS:  There again, I told you

25      I don't know the specifics of her comp

```
 1          time agreement or what she was to put.
 2                But I know that, if you're in the
 3          office from -- if you're putting on your
 4          timesheet that you're in the office from
 5          8:00 to 3:00, that you're in the office is
 6          my opinion.  And if you're not there on
 7          video, then you're not in the office.
 8     BY MR. CROSS:
 9          Q.   She was salaried; right?
10          A.   Yes.
11          Q.   What was her salary?
12          A.   I don't know.
13          Q.   And she got paid the same salary over the
14     course of the year; right?
15          A.   Yes.
16          Q.   So regardless of what she put on her
17     timesheet, she got paid the same; right?
18          A.   Yes, I assume that's right.
19          Q.   There was no suggestion to her in that
20     meeting or at any other time that her timesheets
21     caused the County to pay her more than she was
22     owed; right?
23          A.   Can you rephrase that again so I can maybe
24     get a better -- clearer understanding?
25          Q.   All right.  As a salaried employer, what
```

Page 53

1    she put on her timesheets did not affect how much

2    she got paid; right?

3        A.   If she says that she's in the office

4    performing the duties of her job, then if she's not

5    there, I think that's -- there's -- in lies the

6    problem.

7        Q.   Right.  But regardless of what she puts on

8    her timesheets, the paychecks she get -- that she

9    got was always the same; right?

10       A.   I'm not sure.

11            MR. DELK:  Object to the form.

12   BY MR. CROSS:

13       Q.   You just don't know?

14       A.   I don't know.

15       Q.   Okay.  So before you asked her to resign,

16   it wasn't important to you to figure out whether

17   she had been authorized to report her timesheets in

18   the way she did and whether it even affected her

19   compensation?

20            MR. DELK:  Object to the form.

21            THE WITNESS:  Her not being at work

22       when she said she was at work was a big

23       factor for me.

24   BY MR. CROSS:

25       Q.   What was the video evidence that you

Page 54

1   relied on?

2        A.    Surveillance video from the elections

3   office.

4        Q.    How many cameras are there in that office?

5        A.    I'm not sure.

6        Q.    How many cameras were in that office at

7   the time that you looked at the surveillance video?

8        A.    I'm not sure.

9        Q.    Did you actually review the surveillance

10  video?

11       A.    I did.

12       Q.    How much video was there, for what time

13  period?

14       A.    I can't recall.

15       Q.    Was it a week?  Was it a month?  Was it

16  multiple months?

17       A.    I'm not exactly sure.

18       Q.    Well, can you say it was more or less than

19  a month?

20       A.    There again, I'm not sure.

21       Q.    Well, did it take you a few minutes to

22  review it or did it take you hours or did it take

23  you days?

24       A.    I was shown in just excerpts.

25       Q.    Who showed you excerpts?

Page 55

1          A.    I don't recall.

2          Q.    Was it another member of the board?

3          A.    There again, I don't recall.

4          Q.    Was it counsel for the board, like, Tony

5    Rowell?

6          A.    I do not recall.

7          Q.    Where is that video surveillance today?

8          A.    I do not know.

9          Q.    Would it surprise you to learn that Coffee

10   County claims it doesn't exist?

11         A.    There again, I don't know.

12         Q.    Did that video surveillance cover the

13   month of January 2021?

14         A.    I don't know.

15         Q.    You don't recall whether you viewed any

16   video surveillance from the elections county office

17   from January of 2021?

18         A.    I do not.

19         Q.    As a former member of the board, do you

20   have any inside information into why that video

21   surveillance would have been destroyed?

22         A.    Fifth Amendment.

23         Q.    Do you recall that, in that meeting on --

24   in February of 2021, that Ms. Hampton showed up

25   with a letter of resignation in an envelope?

```
 1        A.    I do not remember specifically.
 2        Q.    Do you have a general memory of that, that
 3   she offered a letter of resignation?
 4        A.    Yes.
 5        Q.    And do you recall that Mr. Rowell -- I'm
 6   sorry, do you recall that Tony Rowell rejected that
 7   and insisted that she sign a letter of resignation
 8   that the board had drafted for her?
 9        A.    I don't recall specifically.
10        Q.    Do you have a general memory that that's
11   how it went?
12        A.    I do not.
13        Q.    Why don't you tell me everything you
14   remember about that meeting.  Walk me through it.
15        A.    Fifth Amendment.
16        Q.    In that meeting Mr. Rowell told
17   Ms. Hampton that, if she didn't sign the
18   resignation letter that the board had prepared,
19   that they would fire her and she would lose her
20   retirement; right?
21        A.    Fifth Amendment.
22        Q.    The board threatened her; correct?
23              MR. DELK:  Object to the form.
24              THE WITNESS:  Fifth Amendment.
25   BY MR. CROSS:
```

Page 57

1      Q.   In that meeting do you recall that she
2   signed the letter of resignation handed to her by
3   Mr. Rowell?
4      A.   Fifth Amendment.
5      Q.   After the board met with her, they met
6   with Jil Ridlehoover; right?
7      A.   That's correct.
8      Q.   And you were in that meeting as well;
9   correct?
10      A.   Yes.
11      Q.   And did she sign the same letter of
12   resignation as Ms. Hampton?
13      A.   Fifth Amendment.
14      Q.   And do I understand correctly that you
15   said it was a big concern for you that Ms. Hampton
16   and Ms. Ridlehoover were reporting time in the
17   office when they were not actually there?
18          MR. DELK:  Object to the form.
19          THE WITNESS:  I had an issue more
20      with Misty handling the timecards and
21      timesheets.  Because she was the one, if I
22      recall correctly, that said she had filled
23      out the timesheets for she and Jil, and
24      she had Jil sign the timesheets.  And that
25      was my problem with both employees.

Page 58

1    BY MR. CROSS:

2        Q.    And that was discussed in this meeting?

3        A.    If I recall.

4        Q.    So you do remember some things from the

5    meeting?

6        A.    Bits and pieces.

7        Q.    So even though Ms. Ridlehoover had signed

8    timesheets that you say were fraudulent, you

9    shortly thereafter hired her to work for you;

10   right?

11       A.    Fifth Amendment.

12       Q.    Well, she does work for you; right?

13       A.    Fifth Amendment.

14       Q.    Okay.   It's public knowledge that

15   Ms. Ridlehoover works for you; right, sir?

16            MR. DELK:   You can answer that

17       question.

18            THE WITNESS:   She does.

19   BY MR. CROSS:

20       Q.    So you didn't -- you didn't have enough

21   concern with her committing fraud to think she was

22   an unreliable employee; is that fair?

23       A.    As I stated before my reasons, Misty had

24   filled out both timesheets, and my problem was I

25   had more of an issue with the way Misty had

Page 59

1    conducted and done what she done that I felt like

2    Jil was a victim of circumstance.

3        Q.   By signing timesheets that you thought

4    were fraudulent?

5        A.   Fifth Amendment.

6        Q.   James Barnes replaced Ms. Hampton as the

7    elections supervisor in Coffee County; right?

8        A.   Yes.

9        Q.   Do you recall that he began around April

10   1st of 2021?

11       A.   I'm not sure of the exact date, but in

12   that time frame, yes.

13       Q.   Do you know if anyone had access to the

14   Coffee County election office between the time

15   Ms. Hampton was let go and the time Mr. Barnes

16   started?

17       A.   I don't.  I know I did not.

18       Q.   Have you ever heard of Mike Lindell?

19       A.   I have.

20       Q.   And who is he?

21       A.   A guy that does a lot of commercials,

22   infomercials on TV is all I know.

23       Q.   He owns My Pillow; right?

24       A.   That's -- I think so.

25       Q.   And have you seen any news about

Page 60

```
 1    Mr. Lindell as associated with former President
 2    Trump?
 3         A.    Bits and pieces, I have.
 4         Q.    When was Mr. Lindell in the Coffee County
 5    election office?
 6         A.    To my knowledge, he's never been in the
 7    elections office.
 8         Q.    You're not aware of Mr. Lindell being in
 9    Coffee County in around February, late February or
10    early March 2021?
11         A.    No, sir.
12         Q.    What about Doug Logan?
13         A.    No recollection of the name.
14         Q.    You're not aware of Doug Logan being in
15    the Coffee County election office?
16         A.    No.
17         Q.    What about Paul Maggio?
18         A.    I don't recognize the name.
19         Q.    Not aware of him in that office?
20         A.    Not that I'm aware of.
21         Q.    What about Chris -- sorry.  What about
22    Scott Hall?
23         A.    I don't know the name.
24         Q.    Not aware of him in that office?
25         A.    No, sir.
```

Page 61

1       Q.    Do you know Robert Sinners?

2       A.    I know the name.

3       Q.    Who is that?

4       A.    Just an attorney in the -- I know the name

5    of Robert Sinners, but I don't know Robert Sinners.

6       Q.    He works for the Secretary of State's

7    office; right?

8       A.    No idea.

9       Q.    You don't know Robert Sinners who started

10   working for the Secretary of State's office in

11   20 -- February of 2021?

12      A.    I do not.

13      Q.    Is there a reason why you have his phone

14   number?

15      A.    As I said, I don't know Robert Sinners.  I

16   knew he's an attorney, but I don't -- past that, I

17   don't know Robert Sinners.

18      Q.    Okay.  All right.  Look at the meeting

19   minutes from June 8th, 2021.

20      A.    Okay.

21      Q.    I'm sorry.  Before we turn to that, the

22   video surveillance that you reviewed when

23   Ms. Hampton was asked to resign, did you see in any

24   of that video anyone in the Coffee County elections

25   office that wasn't supposed to be there?

Page 62

1          A.     Fifth Amendment.

2          Q.     Was that something that was discussed with

3     other members of the board or counsel?

4          A.     Fifth Amendment.

5          Q.     All right.  Take a look at the June 8,

6     2021 minutes.  Do you recall this board meeting?

7          A.     Not specifically, I do not.  No, sir.

8          Q.     Do you recall Mr. Barnes reporting to you

9     or anyone else on the board at any meeting that the

10    Secretary of State's office had come in and taken

11    the E.M.S. server and the I.C.C. that had been in

12    Coffee County?

13         A.     I vaguely remember some discussion of

14    that, but I don't remember any specific

15    information.

16         Q.     Tell me what you remember about that.

17         A.     First of all, the terms "I.C.C. scanner"

18    and -- I mean, all the -- that really doesn't --

19    that doesn't ring a -- you know, I don't even know

20    what that is, per se.

21               He just made mention that something was --

22    some of the equipment wasn't working, he contacted

23    the Secretary of State's office, as I recall, and

24    they had come -- I think, if I remember correctly,

25    they come down, they couldn't get it to work or

Page 63

1    couldn't figure it out, so they took some

2    equipment, I'm not sure of what, back with them.

3         Q.    And this was a -- this was something that

4    John -- Mr. Barnes conveyed to the board?

5         A.    That's right.

6         Q.    And was that at a board meeting?

7         A.    I think so.

8         Q.    Okay.  Do you know why that doesn't appear

9    in any of the board meeting minutes?

10        A.    I do not.

11        Q.    Does that surprise you?

12        A.    There again, I said I think so.  I'm not

13   100 percent sure that it was conveyed to us in a

14   board meeting.  I don't recall.

15        Q.    Well, something as serious as the

16   Secretary of State's office seizing two major

17   components of your voting equipment, you'd expect

18   that to be discussed in a board meeting, wouldn't

19   you?

20        A.    I --

21             MR. DELK:  Objection.

22             THE WITNESS:  I was never under the

23        impression that it was seized.  I was

24        under the impression that they replaced

25        our equipment.  That's my understanding.

Page 64

1    BY MR. CROSS:

2        Q.   Replacing, getting new election equipment,

3    the E.M.S. and the I.C.C., wouldn't you expect that

4    to be discussed at a board meeting?

5            MR. DELK:  Object to the form.  Asked

6        and answered.

7            THE WITNESS:  I'm not sure.

8    BY MR. CROSS:

9        Q.   Where were the board meetings typically

10   held?

11       A.   Typically, they were held at the Board of

12   Elections office.

13       Q.   So where Misty Hampton's office was?

14       A.   That's correct.

15       Q.   Okay.  And that's the same office where

16   the E.M.S. server, the I.C.C. and the B.M.D.s were

17   all stored; right?

18       A.   That's correct.

19       Q.   So the June 8 --

20           MR. DELK:  When we talk about the

21       board, just for clarification so there's

22       no confusion about Misty's office, can

23       we -- the Board of Elections building

24       perhaps?

25           MR. CROSS:  Sure.  Yeah.  That's

Page 65

1        fair.  I'm not suggesting they're all in

2        Misty Hampton's office.

3    BY MR. CROSS:

4        Q.   But just so we're clear, the board

5    meetings were typically held in the county

6    elections office, and there are separate spaces in

7    that office where some of the equipment is stored;

8    is that fair?

9        A.   That's fair.

10       Q.   Okay.  And the June 8, 2021 meeting, do

11   you have any reason to think that that was not held

12   in the county elections office?

13       A.   I don't.  I don't recall, but I would

14   assume that it was held there.

15            MR. DELK:  And I'll instruct you,

16       don't assume.  You're under oath.  If you

17       know, answer.

18            MR. CROSS:  Yeah.

19            MR. DELK:  If you don't, then you

20       don't know.

21            THE WITNESS:  I'm not 100 percent

22       sure, yes.

23   BY MR. CROSS:

24       Q.   Okay.  But do you recall having board

25   meetings at some location other than the county

Page 66

```
 1   elections office, official board meetings like
 2   this?
 3        A.   We did hold Zoom board meetings at some
 4   point during the pandemic, but I'm not sure if this
 5   was one of them.  I don't know.
 6        Q.   Right.  But June of 2021, a year and a
 7   half into the pandemic, you guys were back in the
 8   office at that point; right?
 9        A.   I -- it's fair to think so, yes.
10        Q.   Okay.  Do you recall being in the county
11   elections office on June 8th for a meeting and
12   seeing individuals come in from the State to
13   replace the E.M.S. server?
14        A.   I don't.
15        Q.   Has anyone ever told you the State claims
16   to have replaced your server on June 8th?
17        A.   Yes.
18        Q.   When did you hear that?
19             MR. DELK:  I'll object and say don't
20        divulge any communication with counsel.
21        But subject to that warning, you may
22        respond.
23             THE WITNESS:  Taking the Fifth.
24   BY MR. CROSS:
25        Q.   Okay.  Do you know whether the Secretary
```

Page 67

1   of State's office actually replaced the E.M.S.

2   server in Coffee County?

3        A.   I don't know specifically.

4        Q.   So you don't know for sure whether that

5   server was actually replaced?

6        A.   I'm not say -- I didn't see them do it

7   physically.  So.

8        Q.   Okay.  What's your understanding of why

9   the server was replaced?

10       A.   Fifth Amendment.

11       Q.   What's your understanding of why the

12  I.C.C. was replaced by the State?

13       A.   Fifth Amendment.

14       Q.   Did Mr. Barnes ever convey to you or

15  others on the board any concern that that equipment

16  had been compromised?

17       A.   Fifth Amendment.

18       Q.   Are you aware that he testified under oath

19  that he -- that that was his understanding of why

20  it was being replaced?

21       A.   No, I'm not.

22       Q.   Are you aware of anyone ever having

23  compromised the E.M.S. server in Coffee County?

24       A.   Fifth Amendment.

25       Q.   Did Mr. Barnes ever say anything to you

1    about the password not working on -- for the E.M.S.

2    server?

3         A.    Not that I recall.

4         Q.    So what was your understanding as to why

5    the server was replaced by the State?

6         A.    Fifth Amendment.

7         Q.    Did you ever hear from anyone that the

8    server, the E.M.S. server was no longer accessible

9    by the password?

10        A.    Fifth Amendment.

11        Q.    Let me ask a better question.  Before the

12   server was replaced by the State, had you heard at

13   that time that the password was no longer working?

14        A.    Fifth Amendment.

15        Q.    Do you know why the password may have

16   stopped working, assuming that happened?

17        A.    Fifth Amendment.

18        Q.    Do you know whether anyone at the county

19   level has the ability to change the password for

20   the E.M.S. server?

21        A.    Fifth Amendment.

22        Q.    Do you know if anyone ever changed it?

23        A.    Fifth Amendment.

24        Q.    All right.  Turn to the September 7, 2021

25   meeting minutes, please.  So if you come down to

Page 69

1    number seven, do you see where it says:

2            "James Barnes said Beau Roberts

3         from Dominion Voting Systems is

4         looking into the missing mobile ballot

5         printer"?

6            Do you see that?

7    A.   Yes.

8    Q.   What was that about?

9    A.   I don't recall.

10   Q.   Was there a mobile ballot printer that

11   Coffee County had that had gone missing?

12   A.   I do not recall.

13   Q.   So nothing you remember about this?

14   A.   No, sir.

15   Q.   Why was Beau Roberts of Dominion looking

16   into a missing printer instead of someone on behalf

17   of the county or the state?

18           MR. DELK:  Object to the form.

19           THE WITNESS:  I don't know.

20   BY MR. CROSS:

21   Q.   Do you know if it was ever found?

22   A.   I don't know.

23   Q.   All right.  Go to the next month, November

24   9, 2021.  Do you see that?

25   A.   Yes, sir.

Page 70

```
1        Q.    Number nine reads:
2              "Agent Paul Allen is looking into
3        election fraud that has nothing to do
4         with the board or elections staff."
5              Do you see that?
6        A.    I do.
7        Q.    Agent Paul Allen, who is that?
8        A.    I don't recall that name.
9        Q.    Do you recall whether he was with the
10   State of Georgia or federal?
11       A.    As I said, I don't recall the name.
12       Q.    You don't recall anything about who he was
13   with?
14       A.    I do not.
15       Q.    What was he looking into with respect to
16   election fraud?
17       A.    I have no idea.
18       Q.    There's nothing you can tell me about this
19   topic?
20       A.    I don't recall any of that.  I don't
21   recall who Paul Allen is.
22       Q.    If you look at number ten, it reads:
23              "Eric Chaney notified the board
24         that he had recently moved out of his
25          commissioner's district.
```

Page 71

1           "Upon further research, he
2       discovered there is no stipulation
3       that Board of Elections and
4       registration members must live in the
5       same district as the person who
6       appointed them.
7           "He has decided to remain on the
8       board at least two more years."
9           Do you see that?
10  A.    Yes.
11  Q.    And what was the research that you did at
12  that time?
13          MR. DELK:  I'll object to the extent
14      it involves any privileged communication
15      with counsel.
16          But subject to that, you can respond.
17          THE WITNESS:  I had made Commissioner
18      Dovers aware that I had moved, as I
19      previously stated.  And he said he would
20      be in charge of finding out if I needed to
21      resign or not.
22          And he got back with me and said that
23      he had gotten with someone in the county,
24      I'm not sure of who, and they had said
25      that I could fulfill the rest of my term

Page 72

```
 1        on the board.
 2     BY MR. CROSS:
 3        Q.    And that was in November of 2021?
 4        A.    That's correct.
 5        Q.    Do you know who Commissioner Dovers
 6     with -- who he spoke with to confirm that you could
 7     remain on the board?
 8        A.    I do not.
 9              And to clarify this, I told them I was
10     moving out of the district, not moved.
11        Q.    Well, it says here:
12              "Eric Chaney notified the board
13         that he had recently moved..."
14        A.    Yes.
15        Q.    Right?
16        A.    I said I was going to move, that I was --
17     that is -- I had not formally moved yet.
18        Q.    So you're saying that the meeting minutes
19     are wrong where it says you had already moved?
20        A.    Well, I had not moved as of this date.  I
21     was planning on moving earlier, but some did --
22     I -- well, you couldn't find furniture and so on
23     and so forth, so it delayed my moving.
24        Q.    Until when?
25        A.    I don't recall the specific date, but it
```

Page 73

1    was after the first of the year.

2         Q.    Sometime early in 2021?

3         A.    I --

4               MR. DELK:  2022.

5    BY MR. CROSS:

6         Q.    Sorry.  2022.

7               Sometime in early 2022?

8         A.    Yes.

9         Q.    That's when you moved out of the district?

10        A.    That's correct.

11        Q.    Okay.  But in the meeting on December 7,

12   2021 when you guys approved the meeting minutes,

13   which you seconded, you didn't tell anyone that

14   that was inaccurate; right?

15        A.    I did not.

16        Q.    So in November of last year, you informed

17   the board that you are moving out of the district.

18   Commissioner Dovers says no problem, you can finish

19   out your term for at least two more years.

20               Right?

21        A.    That was my understanding.

22        Q.    Okay.  And then all of a sudden, out of

23   the blue this past Friday, somebody comes to you

24   and says, well, that's wrong and you now have to

25   resign?

Page 74

1          A.    I was called --

2                MR. DELK:  Objection.  Asked and

3          answered.

4                THE WITNESS:  I was called and he

5          said that, because of something they -- a

6          law they had found, that I needed to

7          resign.

8     BY MR. CROSS:

9          Q.    Called by whom?

10         A.    Commissioner Dovers.

11         Q.    And what was the law that he had found?

12               MR. DELK:  Object to the form.

13               THE WITNESS:  I don't know.

14    BY MR. CROSS:

15         Q.    You resigned your position without

16    bothering to ask what the law was that they relied

17    on telling you you had to leave?

18         A.    I did.

19         Q.    There's nothing you can tell me about the

20    legal basis for why you left?

21         A.    As I said --

22               MR. DELK:  Object to the form.  Calls

23         for a legal conclusion.  He's a lay

24         witness.

25               You can respond.

Page 75

1           THE WITNESS:  I don't have any

2      response.

3    BY MR. CROSS:

4      Q.   Tell me everything about -- well, let's

5    back up.

6           You got a call from Commissioner Dovers on

7    Friday?

8      A.   That's correct.

9      Q.   Were you expecting a call from him?

10     A.   I was not.

11     Q.   Where were you when he called you?

12     A.   On a lawnmower mowing the grass.

13     Q.   So he called you on your cell?

14     A.   He did.

15     Q.   And what did he say when he called you?

16     A.   As I stated before, that it had been

17   brought to his attention that, in fact, if you

18   moved out of the district into another district,

19   that you could not serve on a board that you were

20   appointed to by the elected commissioner for their

21   district.

22     Q.   And he said that there was some law that

23   they had dug up that said that that's -- that's the

24   rule?

25     A.   That's correct.

Page 76

1      Q.   Did you ask him why they didn't find it
2  when they did the research in November of 2021?
3      A.   I mean, I was hot, tired, on a lawnmower,
4  and I wasn't -- I didn't have a lot of appetite for
5  getting into any legal jargon with Commissioner
6  Dovers.  I felt like he knew what he was talking
7  about.  So.
8      Q.   Well, you felt like he knew what he was
9  talking about in November when he gave you the
10  opposite opinion; right?
11          MR. DELK:  Object to the form.
12  BY MR. CROSS:
13      Q.   Yes?
14      A.   I don't know.
15      Q.   The commissioner called you up out of the
16  blue and said that they were taking the complete
17  opposite position of what he told you they had
18  researched and confirmed almost a year ago, and you
19  had no questions for him about it at all?
20          MR. DELK:  Object to the form.
21  BY MR. CROSS:
22      Q.   Is that your testimony, sir?
23          MR. DELK:  Asked and answered.
24      Argumentative.
25          THE WITNESS:  I've already answered

Page 77

 1      that.
 2    BY MR. CROSS:
 3        Q.   You had no questions for him?
 4        A.   No questions.
 5        Q.   Okay.  And what did you say when he told
 6    you that?
 7        A.   Okay.
 8        Q.   And you hung up?
 9        A.   That's pretty much the basis for our
10    conversation.
11        Q.   That was the whole conversation?
12        A.   I didn't say it's the whole conversation.
13    I said that was the basis of our conversation.
14        Q.   What was the rest of the conversation?
15        A.   I don't recall specifically.
16        Q.   Well, tell me what you recall from the
17    conversation you just had on Friday that was
18    important enough that you resigned your position on
19    the board.
20        A.   I already told you.
21        Q.   Tell me the rest of it.
22        A.   I told you.
23        Q.   So the whole conversation was he tells you
24    I was wrong almost a year ago, you have to quit,
25    and you said okay and that was it?

Page 78

```
 1        A.   Pretty much.
 2        Q.   Okay.  You say "pretty much."  What am I
 3   missing?
 4             MR. DELK:  Object to the form.  Asked
 5        and answered multiple times.
 6             You can tell him the same thing if
 7        you need to.
 8             THE WITNESS:  I've stated what
 9        happened.
10   BY MR. CROSS:
11        Q.   What else was said in that call beyond
12   what you've now disclosed?
13        A.   I've disclosed what was said in the call.
14        Q.   So he said one thing, you said one thing,
15   and that was the entirety of the conversation?
16        A.   (Whereupon, there was no audible response
17   by the deponent.)
18             MR. DELK:  Object to the form.
19   BY MR. CROSS:
20        Q.   "Yes"?
21        A.   Pretty much.
22        Q.   Well, see, you keep hedging.
23             MR. DELK:  He answered your question.
24   BY MR. CROSS:
25        Q.   You understand you're on video; right?
```

Page 79

1          A.    I do.

2          Q.    You understand that there's a judge that's

3     going to watch that video at some point and assess

4     your credibility; right?

5          A.    I do.

6          Q.    You understand that video may become

7     public?

8          A.    Sure.

9          Q.    Okay.  So I'm going to ask you again, tell

10    me the entirety of the conversation, entirety of

11    what you and Mr. -- Commissioner Dovers talked

12    about on Friday, start to finish.

13               MR. DELK:  Object to the form.

14               THE WITNESS:  I've already --

15               MR. DELK:  Asked and answered.

16               THE WITNESS:  -- stated that.

17    BY MR. CROSS:

18         Q.    So the entirety of the conversation, not

19    pretty much, not part of it, not some of it, the

20    entirety of the conversation was he called you up,

21    said I was wrong almost a year ago, you now have to

22    leave the board, and you said okay, and that's the

23    whole conversation?

24         A.    That pretty well sums it up.

25         Q.    You seem like you want to keep hedging.

Page 80

```
 1       A.    I'm not hedging anything.
 2             MR. DELK:  Object to the form.
 3             You don't have to respond to his
 4       argumentative comments.  Wait for a
 5       question.
 6  BY MR. CROSS:
 7       Q.    All right.  And you want us to believe
 8  that you leaving the board out of the blue on
 9  Friday has nothing to do with this deposition in
10  this case.
11             MR. DELK:  Object to the form.
12  BY MR. CROSS:
13       Q.    Is that right?
14       A.    No.
15       Q.    You don't want us to believe that?
16       A.    It's inaccurate.  It's not correct.
17       Q.    Okay.  And you leaving the board on Friday
18  had nothing to do with the fact that you let people
19  come in to the elections office on January 7 of
20  2021 and access the voting equipment; is that -- is
21  that your testimony?
22             MR. DELK:  Object to the form.
23             THE WITNESS:  I've not let anyone
24       into the elections office.  I've never had
25       a key to the elections office.
```

Page 81

1    BY MR. CROSS:

2        Q.   Are you testifying that you did not

3    facilitate access to the elections office on

4    January 7, 2021 for individuals to access the

5    voting equipment?

6        A.   Fifth Amendment.

7        Q.   And are you saying that that had nothing

8    to do with the fact that you suddenly left the

9    board on Friday?

10       A.   Fifth Amendment.

11       Q.   There we go.

12           MR. PICO-PRATS:  Can we go off the

13       record real quick so I can jump to the

14       restroom?

15           MR. CROSS:  Sure.  Yeah.  Why don't

16       we take a break.  It's a good time.

17           THE VIDEOGRAPHER:  Okay.  We're going

18       off the record at 11:44.

19           (Whereupon, a discussion ensued

20        off the record.)

21           (Whereupon, there was a brief

22        recess.)

23           THE VIDEOGRAPHER:  We're back on the

24       record at 12:02.

25    BY MR. CROSS:

Page 82

```
 1        Q.   Mr. Chaney, the -- sorry, just to go back,
 2    just to make sure I understand something, the
 3    Coffee County elections supervisor, I think we
 4    covered this before, but that person and their
 5    assistant reports to the Coffee County board;
 6    right?
 7        A.   Correct.
 8        Q.   So they take -- they take their direction
 9    from the board members; is that fair?
10            MR. DELK:  Object to the form.
11            You can answer.
12            THE WITNESS:  Not from the board
13        members, the board.
14    BY MR. CROSS:
15        Q.   From the board?
16        A.   Yes.
17        Q.   Okay.  Do you know Lin Wood?
18        A.   Not personally.
19        Q.   But you -- you've heard of him?
20        A.   Heard the name, yes.
21        Q.   Have you ever met him?
22        A.   I have not.
23        Q.   Has he ever been in the Coffee County
24    election office to your knowledge?
25        A.   Not to my knowledge.
```

Page 83

1      Q.   Do you know Stephanie Lambert?

2      A.   I do not.

3      Q.   Do you know if she's ever been in the

4  Coffee County election office?

5      A.   I do not.

6      Q.   Do you know Sidney Powell?

7      A.   I've heard the name.

8      Q.   Have you met her?

9      A.   I have not.

10      Q.   Do you understand that she represented the

11  Trump campaign in some election litigation?

12      A.   Correct.

13      Q.   Did you ever have any communications with

14  her?

15      A.   I did not.

16      Q.   Has she ever been in the Coffee County

17  election office?

18      A.   Not to my knowledge.

19      Q.   Do you know Patrick Byrne?

20      A.   I do not.

21      Q.   Ever communicated with him?

22      A.   No, sir.

23      Q.   Has he ever been in the Coffee County

24  election office?

25      A.   Not to my knowledge.

Page 84

1       Q.   Do you know Ben Cotton?

2       A.   I do not.

3       Q.   Ever communicated with him?

4       A.   Not to my knowledge.

5       Q.   Do you know if he's ever been in the

6   Coffee County election office?

7       A.   Not that I know of.

8       Q.   Do you have any reason to believe that he

9   has been?

10      A.   As I said, I don't know.  I don't know

11  that he has or has not been.

12      Q.   Okay.  Do you know Russell Ramsland?

13      A.   I do not.

14      Q.   Have you ever communicated with him?

15      A.   Not that I'm aware of.

16      Q.   Do you know whether he's ever been in the

17  Coffee County election office?

18      A.   There again, not that I know of.

19      Q.   Do you know Steve Bannon?

20      A.   I've heard the name.

21      Q.   You understand he worked on the Trump

22  campaign; right?

23      A.   I just know the name.  I don't know to

24  what degree.

25      Q.   You don't know whether Steve Bannon worked

Page 85

1    on the Trump campaign?

2        A.    I'm not sure.  I think he was something to

3    do with Trump, but I don't know about campaign or

4    whatnot.

5        Q.    Do you know whether he was ever in the

6    Coffee County election office?

7        A.    I do not.

8        Q.    Do you know Doug Franks?

9        A.    I don't.

10       Q.    Do you know whether he was in the Coffee

11   County election office?

12       A.    I don't.

13       Q.    Do you know Cathy Latham?

14       A.    I do.

15       Q.    And she's the former chair of the G.O.P.

16   in Coffee County; right?

17       A.    Yes.

18       Q.    Okay.  Fair to say she's been in the

19   Coffee County election office multiple times;

20   right?

21       A.    I'm not sure how many times, but I'm sure

22   she's been in there.

23       Q.    Well, you've been in that office with her;

24   right?

25       A.    I have seen Cathy in the office, yes.

Page 86

1        Q.    Do you know Greg Freemyer?

2        A.    I do not.

3        Q.    Do you know whether he's ever been in the

4    Coffee County election office?

5        A.    I do not.

6        Q.    Do you know the firm Sullivan Strickler?

7        A.    I do not.

8        Q.    Never heard of them?

9        A.    Not that I recall.

10       Q.    I may have asked you this one before.

11   Sorry if I did.  Do you know the name Paul Maggio?

12       A.    I do not.  You've asked that, but I'm

13   not -- I don't -- that name doesn't ring a bell.

14       Q.    So you don't recall ever meeting him at

15   any point?

16       A.    No, sir.

17       Q.    Are you saying you have not met him or you

18   just don't remember one way or the other?

19       A.    I don't recall whether I've met him or

20   not.

21       Q.    Do you know whether Paul Maggio has ever

22   been in the Coffee County election office?

23       A.    I do not.

24       Q.    Do you have any reason to believe he has

25   not been?

Page 87

1          MR. DELK:  Object to the form.

2          THE WITNESS:  As I said, I'm not sure

3     if he has or has not been.

4  BY MR. CROSS:

5     Q.   Do you know Jenna Ellis?

6     A.   I do not.

7     Q.   Ever communicated with her?

8     A.   No.

9     Q.   Do you know whether she's ever been in the

10  Coffee County election office?

11    A.   I do not.

12    Q.   Do you know Jennifer Jackson?

13    A.   I do not.

14    Q.   Do you know whether she's ever been in the

15  Coffee County election office?

16    A.   I don't.

17    Q.   You said earlier you don't know Scott

18  Hall?

19    A.   I don't.  I -- the name rings a bell from

20  open records requests and so on and so forth, but I

21  don't know him.

22    Q.   So you're only -- but your only

23  familiarity with the name is open records requests

24  that came in to the county while you were on the

25  board?

Page 88

1      A.    That's right.

2      Q.    I think you said earlier you're not

3   familiar with Doug Logan?

4      A.    I'm not.

5      Q.    And you don't know whether he's ever been

6   in the Coffee County election office?

7      A.    No, sir.

8      Q.    And you don't know whether Scott Hall's

9   ever been in that office?

10      A.    I'm not sure, no, sir.

11            (Whereupon, a discussion ensued

12         off the record.)

13                        (Whereupon, Plaintiff's

14                         Exhibit 8 was marked for

15                         identification.)

16   BY MR. CROSS:

17      Q.    Mr. Chaney, I've handed you what's been

18   marked as Exhibit 8.  Just take your time and

19   you're welcome to flip through it, read through it

20   if you need.

21            (Whereupon, the document was

22         reviewed by the witness.)

23   BY MR. CROSS:

24      Q.    Okay.  So the exhibit -- the E-mails in

25   Exhibit 8 are E-mails that were provided to us by

Page 89

```
 1    counsel for Coffee County in response to an open

 2    records request.

 3             Do you -- are you aware of that?

 4       A.   Yes.

 5       Q.   Okay.  And the E-mail at the top of the

 6    first page is from Jennifer Herzog on April 12th of

 7    2022.  Do you see that?

 8       A.   Yes.

 9       Q.   And Ms. Herzog is at the firm where

10    Mr. Delk works; right?

11       A.   Correct.

12       Q.   So Ms. Herzog, is it your understanding

13    that she represent -- she's counsel for Coffee

14    County?

15       A.   Yes.

16       Q.   Does she also represent you personally or

17    no?

18       A.   Not that I'm aware of.

19       Q.   Okay.  And so there's an E-mail thread

20    here we're going to talk through here in a little

21    bit.  She forwards that on to Ryan Germany at the

22    Secretary of State's office on April 12th of this

23    year; right?

24       A.   Yes.

25       Q.   And do you know Ryan Germany?
```

Page 90

```
 1        A.   I do not.
 2        Q.   Are you aware that he is the general
 3    counsel in the Secretary of State's office?
 4        A.   I'm not.
 5        Q.   Never heard of Ryan German?
 6        A.   No, sir.
 7        Q.   So you've never spoken with him, never
 8    communicated with him; right?
 9        A.   No, sir.
10        Q.   And then she copies Anthony Rowell, which
11    is another attorney for Coffee County; right?
12        A.   That's right.
13        Q.   And that's the Tony Rowell we talked about
14    earlier that was in the meeting with Ms. Hampton
15    when she was let go?
16        A.   Right.
17        Q.   Okay.  Now, if we -- if you come to the
18    bottom of the second page of the E-mail thread, or
19    really look in the middle, do you see there's an
20    E-mail from Emma Brown at the Washington Post?
21        A.   I do.
22        Q.   And she sends that E-mail at 5:00 in the
23    morning on April 12th of 2022; right?
24        A.   Yes.
25        Q.   And she sends it to Wesley Vickers at
```

Page 91

1    Coffee County?

2        A.    Yes.

3        Q.    Who's Wesley Vickers?

4        A.    He is the county manager or comptroller, I

5    would -- I would say.  I'm not sure of his exact

6    title, but.

7        Q.    What is his relationship, if any, with the

8    Coffee County Board of Elections?

9        A.    I'm not sure.

10       Q.    And then Ms. Brown also contacted

11   Mr. Rowell and Ms. Herzog.  Do you see that?

12       A.    I do.

13       Q.    And the subject is Time Sensitive

14   Washington Post Inquiry.  Do you see that?

15       A.    Yes.

16       Q.    And then you see in the first paragraph

17   she writes:

18           "As you know from my previous

19        inquiries to each of you, I have been

20        reporting on the claim that

21        businessman Scott Hall arranged after

22        the 2020 election to ferry a team of

23        people to Coffee County where he says

24        in a recorded phone call that they

25        made copies of Dominion election

1        equipment with permission from local

2        elections officials."

3             Do you see that?

4     A.   I do.

5     Q.   And you were one of the local elections

6  officials that gave permission for that; right?

7             MR. DELK:  Object to the form.

8             THE WITNESS:  Fifth Amendment.

9  BY MR. CROSS:

10    Q.   Ms. Brown then goes on:

11             [As read]  "The County's former

12        election supervisor Misty Hampton

13        (previously Martin) told me that Scott

14        Hall did visit her office with other

15        people after she reached to someone on

16        the 'federal level' seeking help"

17        investigating -- "seeking help

18        investigate the election."

19             Do you see that?

20    A.   I do.

21    Q.   She then goes on:

22             "She said she did not remember how

23        many people or who they were or when

24        they visited or what they did.  She

25        said Eric Chaney was present with her

Page 93

1           and she did nothing without his

2           knowledge."

3                Do you see that?

4      A.   I do.

5      Q.   And that's a true statement, right, that

6  you were present when this happened and you knew

7  what was going on?

8      A.   Fifth Amendment.

9      Q.   Ms. Brown then writes:

10               "Hampton said the group passed

11          through the locked door between the

12          building foyer and the election

13          department, which she described as an

14          area off limits to the general public

15          but a place where non-county employees

16          such as candidates, anyone seeking to

17          meet with her, even her mother, could

18          go and did go."

19               Do you see that?

20      A.   I do.

21      Q.   She then goes on:

22               "She also said that, while she was

23          sure that Hall and the team he brought

24          did not enter a locked room housing

25          the touch screen voting machines, she

1      did not know whether they entered the

2      room housing the E.M.S. server as that

3      room was often unlocked during the day

4      and she wasn't watching their every

5      move."

6          Do you see that?

7      A.   I do.

8      Q.   But you are aware that that team did, in

9   fact, enter the room with the E.M.S. server;

10  correct?

11     A.   Fifth Amendment.

12     Q.   You're aware that they connected hard

13  drives to that equipment and copied it; right?

14     A.   Fifth Amendment.

15     Q.   You're aware that they brought in a

16  borrowed scanner and copied cast ballots; right?

17     A.   Fifth Amendment.

18     Q.   You're aware that Cathy Latham provided

19  that scanner; right?

20     A.   Fifth Amendment.

21     Q.   She borrowed that scanner from her church,

22  did she not?

23     A.   Fifth Amendment.

24     Q.   When did she return it to the church?

25     A.   Fifth Amendment.

Page 95

1      Q.   So then if we come up, Ms. Herzog sends

2    Ms. Brown's E-mail to you the same day and writes:

3          "Eric, we received the below

4          correspondence at 5:05 a.m.  Please

5          give Tony Rowell and myself a call as

6          soon as possible to discuss."

7          Do you see that?

8      A.   I do.

9      Q.   And then later that afternoon, you write

10   back to Ms. Herzog in an E-mail.  Do you see that?

11     A.   I do.

12     Q.   And you write:

13          "I do not know Scott Hall..."

14          Right?

15     A.   That's correct.

16     Q.   That was a lie; right?

17          MR. DELK:  Object to the form.

18          THE WITNESS:  No.

19   BY MR. CROSS:

20     Q.   That was not a lie?

21     A.   That was not a lie.

22     Q.   Okay.  And you write:

23          "I do not know Scott Hall, and to

24          my knowledge I am not aware of nor was

25          I present at the Coffee County Board

```
 1        of Elections and registration's office

 2        when anyone illegally accessed the

 3        server or the room in which it is

 4        contained."

 5             Do you see that?

 6     A.    I do.

 7     Q.    Everything you wrote in that sentence was

 8  a lie; right?

 9             MR. DELK:  Object to the form.

10             THE WITNESS:  Fifth Amendment.

11  BY MR. CROSS:

12     Q.    Is it your position that, when Scott Hall

13  and others came in and accessed the voting

14  equipment in Coffee County in January of 2021, that

15  that was legal?

16     A.    Fifth Amendment.

17     Q.    Do you dispute that it was illegal?

18     A.    Fifth Amendment.

19     Q.    Did the board authorize that?

20     A.    Fifth Amendment.

21     Q.    Did you authorize that?

22     A.    Fifth Amendment.

23     Q.    Did Ms. Hampton authorize that?

24     A.    Fifth Amendment.

25     Q.    If you come down to the middle of your
```

Page 97

```
 1    E-mail, do you see the sentence that begins "I have
 2    no knowledge whether"?
 3         A.   I do.
 4         Q.   And you wrote to Ms. Herzog:
 5              "I have no knowledge whether or
 6         not Misty allowed anyone without
 7         authorization to access the server
 8         room (which remains locked).  And
 9         because of the layout of the elections
10         office, which is very small, you have
11         to walk through Misty's office to
12         access that room.
13              "Therefore, it is highly unlikely,
14         if not impossible, for her not to know
15         who did or did not enter the server
16         room."
17         Do you see that?
18         A.   Yes.
19         Q.   You then go on:
20              "I have no personal knowledge that
21         anyone without authorization accessed
22         the server room..."
23         Do you see that?
24         A.   Yes.
25         Q.   That was a lie; right?
```

Page 98

1           MR. DELK:  Object to the form.

2           THE WITNESS:  No.

3     BY MR. CROSS:

4       Q.   So that's a true statement, that you have

5     no personal knowledge that anyone without

6     authorization accessed the server room?

7       A.   Fifth Amendment.

8       Q.   Well, is it a lie or is it a true

9     statement?

10      A.   Fifth Amendment.

11      Q.   Well, you just said it's not a lie.

12      A.   Fifth Amendment.

13      Q.   Okay.  And you go on in that same sentence

14    to say that you also have no "knowledge of any

15    other statements or allegations in Ms. Brown's

16    letter."

17           Do you see that?

18      A.   That's correct.

19      Q.   That also was a lie; right?

20      A.   Fifth Amendment.

21           MR. DELK:  Object to the form.

22    BY MR. CROSS:

23      Q.   And you wrote this E-mail specifically for

24    the purpose of Ms. Herzog providing it as the

25    response to the Washington Post inquiry; right?

1      A.    Correct.

2      Q.    Did you convey the truth of what happened

3   to your counsel or did you lie to your counsel,

4   too?

5           MR. DELK:  Object to the form.

6      That's privileged.

7           THE WITNESS:  Fifth Amendment.

8   BY MR. CROSS:

9      Q.    Why did you write this dishonest E-mail in

10  response to the inquiry from the Washington Post?

11          MR. DELK:  Object to the form.  Asked

12      and answered.

13          THE WITNESS:  Fifth Amendment.

14  BY MR. CROSS:

15     Q.    In the days leading up to January 7 of

16  2021, you reached out to Misty Hampton and asked if

17  she'd be willing to work with folks to get access

18  to the voting equipment in her elections office;

19  right?

20          MR. DELK:  Object to the form.

21          THE WITNESS:  Fifth Amendment.

22  BY MR. CROSS:

23     Q.    You had multiple conversations with her

24  about that; right?

25     A.    Fifth Amendment.

Page 100

1      Q.   You told her specifically that one of

2   those individuals would be a man named Scott Hall;

3   right?

4      A.   Fifth Amendment.

5      Q.   Cathy Latham was one of the key

6   individuals who helped organized this with Scott

7   Hall; right?

8      A.   Fifth Amendment.

9      Q.   You and Ms. Latham worked together to

10   organize this; correct?

11      A.   Fifth Amendment.

12      Q.   On the morning of January 7, 2021, you

13   were aware that Scott Hall and others arrived in

14   the Coffee County election office specifically for

15   the purpose of copying ballots and copying data

16   from the voting equipment; right?

17      A.   Fifth Amendment.

18      Q.   Did you send any text messages about that?

19      A.   Fifth Amendment.

20      Q.   Do you use Signal?

21      A.   Fifth Amendment.

22      Q.   It's incriminating whether you use Signal

23   at all?

24      A.   Fifth Amendment.

25      Q.   I take it you use Signal only to commit

Page 101

1    crimes?

2         A.   Fifth Amendment.

3              MR. DELK:  Object to the form.

4    BY MR. CROSS:

5         Q.   You were in the Coffee County elections

6    office on January 7, 2021 yourself; right?

7         A.   Yes.

8         Q.   Ms. Latham was also there; right?

9         A.   Fifth Amendment.

10        Q.   You were there when Scott Hall walked into

11   the door; right?

12        A.   Fifth Amendment.

13                       (Whereupon, Plaintiff's

14                        Exhibit 9 was marked for

15                        identification.)

16   BY MR. CROSS:

17        Q.   All right.  Mr. Chaney, I've handed you

18   what's been marked as Exhibit 9.  Take a moment to

19   read through it.  But do you recognize that these

20   are text messages that you exchanged with Misty

21   Hampton?

22             (Whereupon, the document was

23          reviewed by the witness.)

24             THE WITNESS:  I recognize this as a

25        text thread, but I'm not -- I mean, I

Page 102

1           can't testify to them.

2      BY MR. CROSS:

3           Q.    Text thread with Misty Hampton?

4           A.    Fifth Amendment.

5           Q.    All right.  Do you see at the bottom

6      there's pagination 24 pages, if you look on the

7      bottom right corner?

8           A.    Yes, sir.

9           Q.    Go to Page 12 of 24 in the text thread

10     with Ms. Hampton.  You see the date November 12th,

11     2020 --

12          A.    Yes.

13          Q.    -- 10:08 p.m.?

14                And she wrote to you:

15                "Did you like that post?  Was that

16          okay?"

17                You said:  "I did.  Very good."

18                She writes:  "Thank you."

19                Do you see that?

20          A.    I do.

21          Q.    Do you recall what this was about, what

22     this post was about?

23          A.    Fifth Amendment.

24          Q.    Okay.  And then you write back:

25                "Thanks for your hard work."

Page 103

1           She says:  "Thank you for all your
2      help."
3           You say:  "It has not gone
4      unnoticed."
5           She says:  "Thank you."
6           Do you see that?
7      A.   I do.
8      Q.   And your view was that Ms. Hampton, at
9   least before the issue of the timesheets arose, she
10  did a good job managing the elections office;
11  right?
12      A.   Fifth Amendment.
13      Q.   Whether Ms. Hampton did a good job is
14  potentially incriminating to you?
15           MR. DELK:  Object to the form.
16           THE WITNESS:  Fifth Amendment.
17  BY MR. CROSS:
18      Q.   Then in -- just stay with me, because
19  we're going to flip through this.  Go to Page 13.
20  On November 13, 2020, she sent you a picture of a
21  ballot that had two Q.R. codes.
22           Do you remember that?
23      A.   Fifth Amendment.
24      Q.   Do you recall during your time as a member
25  of the Coffee County board that the Dominion system

Page 104

1    sometimes would generate ballots from the B.M.D.s
2    that had more than one Q.R. code?
3        A.   Fifth Amendment.
4        Q.   Was that an issue that you or anyone in
5    the County to your knowledge raised with the State?
6        A.   Fifth Amendment.
7        Q.   And if you look down at the bottom, she
8    also sent a picture of a ballot that she said was
9    missing some of the races that were supposed to be
10   on that ballot.
11            Do you see that?
12       A.   I do.
13       Q.   Do you recall that being a concern that
14   you or others had with the -- in Coffee County with
15   the voting system?
16       A.   Fifth Amendment.
17       Q.   Was that a concern that you or others on
18   the board raised with the State?
19       A.   Fifth Amendment.
20       Q.   All right.  Come to November 17.  This is
21   the top of Page 15.  Do you see that?
22       A.   Yes.
23       Q.   And so on November 17, 2020 at 1:55, she
24   sends you a postal -- a U.S. postal receipt.  Do
25   you see that?

1       A.   Yes.

2       Q.   What was that for?

3       A.   Fifth Amendment.

4       Q.   Then on November 19, 2020, do you see that

5    you exchanged some texts with her at 5:19 p.m.?

6    Are you with me there?

7       A.   Yes, I'm there.

8       Q.   And then you wrote to her:

9            "Do you have the election bulletin

10       from the Secretary of State office

11       about how the audit had proved the

12       machines reliable and that Notes

13       should certify the original numbers?"

14           Do you see that text?

15      A.   I do.

16      Q.   She writes back:

17           "I will go back on Firefly and

18       find them."

19           Do you see that?

20      A.   Yes.

21      Q.   And then you respond:

22           "E-mail them to me, please.

23       Trump's man wants them."

24           Do you see that?

25      A.   I do.

1       Q.   Who is Trump's man?

2       A.   Fifth Amendment.

3       Q.   Why did somebody associated with former

4    President Trump want something from Coffee County,

5    Georgia?

6            MR. DELK:  Object to the form.

7            THE WITNESS:  Fifth Amendment.

8    BY MR. CROSS:

9       Q.   Do you know the name Jesse Binnall,

10   B-I-N-N-A-L-L?

11      A.   I don't.

12      Q.   Have you ever communicated with him?

13      A.   Not to my knowledge.

14      Q.   Are you aware that he is one of Trump's

15   personal lawyers?

16      A.   I'm not.

17      Q.   So you indicate:

18           "Trump's man wants them."

19           She writes:  "Okay."

20           Then you write:

21           "They're after the S.O.S. and

22    GOV."

23           Do you see that?

24      A.   I do.

25      Q.   And you're referring to the Secretary of

1    State Raffensperger and Governor Kemp; right?

2        A.    Fifth Amendment.

3        Q.    Ms. Hampton responds:

4            "Good," with four exclamation

5         points.   "I'll help them any way I

6         can."

7            And then you respond:

8            "Me, too."

9            Do you see that?

10       A.    I do.

11       Q.    Why did you have to help Trump's man,

12   whoever that was, go after Secretary Raffensperger

13   and Governor Kemp?

14       A.    Fifth Amendment.

15       Q.    Why did you want to help Trump's man do

16   anything?

17       A.    Fifth Amendment.

18       Q.    Did you believe what you were doing to

19   help Trump's man was a crime?

20       A.    Fifth Amendment.

21       Q.    Do you believe that now?

22       A.    Fifth Amendment.

23       Q.    Is whatever you were doing in this text

24   the subject of any criminal investigation to your

25   knowledge?

Page 108

```
 1        A.    Fifth Amendment.
 2              MR. DELK:  Object to the form.
 3   BY MR. CROSS:
 4        Q.    And then you come down, you see December
 5   1st, 2020, 11:10 a.m.?
 6        A.    Yes.
 7        Q.    And you sent her a screenshot from Amazon.
 8   Do you see that?
 9        A.    That's correct.
10        Q.    And what you had just purchased on Amazon
11   is a digital voice recorder.  Do you see that?
12        A.    That's correct.
13        Q.    Why did you purchase a digital voice
14   recorder?
15        A.    We use a recorder in the board meetings to
16   record.  We did have a cassette recorder, but we
17   went to a digital recorder.
18        Q.    And so that was purchased to record the
19   board meetings?
20        A.    That's correct.
21        Q.    And are the board meetings typically
22   recorded in that way?
23        A.    That's correct.
24        Q.    Do you have any reason to believe that
25   those recordings no longer exist?
```

Page 109

1       A.   I'm not sure.

2            MR. CROSS:  Mr. Delk, since your firm

3       also represents Coffee County, we need

4       those produced, please.

5            MR. DELK:  We'll take that up

6       following the deposition.

7            MR. CROSS:  Okay.

8  BY MR. CROSS:

9       Q.   Then if you come to the top of the next

10  page, December 1st, 2020, do you -- sorry, just

11  flip the page.  Or did you already flip?  Oh, yeah,

12  you're there.  I'm sorry.

13           The top of that page, December 1st, you

14  sent Ms. Hampton contact information for someone

15  named Tyler Harper.  Do you see that?

16           MR. DELK:  Object to the form.

17           You can respond.

18           THE WITNESS:  Which page are you on

19      now?

20  BY MR. CROSS:

21      Q.   Top here.  Do you see Tyler Harper?

22      A.   I do.

23      Q.   Who is Tyler Harper?

24      A.   He's a senator for district eight in

25  Georgia.

1    Q.   Why did you send Tyler Harper's contact

2    information to Misty Hampton on December 1st of

3    2020?

4    A.   That's not a phone number.

5    Q.   Well, it's a V.C.F.   That's how you

6    forward contact information; right?

7    A.   I'm not sure.

8    Q.   Well, do you know why you would -- why you

9    sent contact information for Tyler Harper to

10   Ms. Hampton?

11   A.   Fifth Amendment.

12   Q.   And she responds:

13       "Tell me who a good lawyer would

14    be for that."

15       What was that about?

16   A.   Fifth Amendment.

17   Q.   And in this thread, you say to her:

18       "Did you get Tyler's contact

19    info?"

20       She writes:

21       "Yes, it left him off, but I just

22    did a new one with him in it."

23       What's she talking about there?

24   A.   Fifth Amendment.

25   Q.   She then writes:

Page 111

1              "Just hope I don't get fired for

2         it.  L.O.L."

3              You wrote:

4              "You won't," with an exclamation

5          point.

6              Do you see that?

7     A.    Fifth Amendment.

8     Q.    What was she doing that might get her

9     fired?

10    A.    Fifth Amendment.

11    Q.    Why were you confident she would not get

12    fired?

13    A.    Fifth Amendment.

14    Q.    Were you confident she would not get fired

15    by virtue of your position on the board?

16    A.    Fifth Amendment.

17    Q.    And then if you come down, still on

18    December 1st of 2020, do you see you sent her a

19    text that says:

20              "Do you still have those lawyers'

21         E-mails?"

22              Do you see that?

23    A.    I do.

24    Q.    What lawyers?

25    A.    Fifth Amendment.

Page 112

1     Q.   She writes:  "I do."

2          You write:  "E-mail them in the morning."

3          What was it you wanted her to E-mail them

4     about?

5     A.   Fifth Amendment.

6     Q.   Then on December 2nd of 2020 at 7:14 p.m.,

7     she writes to you:

8          "Trump is going to be in Valdosta

9       Sunday afternoon."

10         Do you see that?

11    A.   I do.

12    Q.   She writes below that:

13         "So who do we know that can get us

14      Calle of talking to him?"

15         Do you see that?

16    A.   I do.

17    Q.   And then you write:

18         "Dominic's buddy.  Russ Goodman."

19         Right?

20    A.   I do.

21    Q.   Who's Russ Goodman?

22    A.   Fifth Amendment.

23    Q.   Who's Dominic?

24    A.   Fifth Amendment.

25    Q.   Why did you think that Dominic or Russ

Page 113

1    Goodman could get any of you guys access to Trump

2    at this time?

3         A.   Fifth Amendment.

4         Q.   So December 4th of 2020, top of the next

5    page, 10:33 a.m., do you see that?

6         A.   Yes.

7         Q.   Ms. Hampton writes to you:

8              "I am sitting here with Tony

9         Rowell.  And after him looking at the

10        numbers from the recount, he suggests

11        that we do not certify.

12             "The certification is supposed to

13        be done by noon today.  We have

14        drafted a letter to be sent to the

15        State, so I was going to see if you

16        can sign a letter."

17             Do you see that?

18        A.   I do.

19        Q.   Then later that day she writes:

20             "You busy?"

21             Do you see that?

22        A.   Yes.

23        Q.   Then on December 8, 2020 at 2:36 p.m., she

24    writes:

25             "Why is he scared?"

Page 114

1           Do you see that?

2      A.   I do.

3      Q.   And you write back:

4           "Pussy."

5      A.   I do.

6      Q.   Who are you referring to?

7      A.   Fifth Amendment.

8      Q.   Are you referring to Tony Rowell?

9      A.   Fifth Amendment.

10     Q.   She then questions:

11          "You have a signed copy?"

12          And you say:  "Yes."

13          Do you see that?

14     A.   I do.

15     Q.   Signed copy of what?

16     A.   Fifth Amendment.

17     Q.   She then writes:  "Okay."

18          And you write:  "I want you there."

19          Right?  Are you with me?

20     A.   I see.

21     Q.   You wanted her where?

22     A.   Fifth Amendment.

23     Q.   What was it you wanted her to do?

24     A.   Fifth Amendment.

25     Q.   She then writes:

Page 115

1              "Good.  Are you going to be here

2         with Ed and Robert Preston?"

3              Do you see that?

4         A.   I do.

5         Q.   Who's Robert Preston?

6         A.   He is a local journalist that owns Douglas

7    Now -- represents Douglas Now.  I don't know if he

8    owns it.

9         Q.   Was Robert Preston involved with the

10   YouTube video that we talked about earlier where

11   Ms. Hampton showed how the adjudication system

12   worked, was he involved in that getting on the

13   Internet?

14        A.   Fifth Amendment.

15             MR. DELK:  Object to the form.

16   BY MR. CROSS:

17        Q.   And Ed, is that Ed Voyles?

18        A.   I don't know.

19        Q.   Well, she wrote she was going to be here

20   with Ed and Robert Preston, and you responded:

21             "Yes."

22             Right?

23             MR. DELK:  Object to the form.

24             THE WITNESS:  I can't speculate for

25        Misty.

1    BY MR. CROSS:

2        Q.   No.  I understand that.  But just so we're

3    clear we're reading the same thing, she writes:

4            "Are you going to be here with Ed

5         and Robert Preston?"

6            You respond:  "Yes."

7            Right?

8        A.   That's correct.

9        Q.   Okay.  You didn't ask her who Ed was?

10       A.   I did not.

11       Q.   Well, do you have any reason to think it's

12   someone other than Ed Voyles?

13       A.   There again, I can't speculate on Misty's

14   behalf.

15       Q.   Okay.  Ed Voyles is a former member of the

16   Coffee County elections board; right?

17       A.   He was.

18       Q.   Was he a chairman at one point?

19       A.   I'm not sure.

20       Q.   Ed Voyles was in the election office for

21   some portion of January 7th of 2021 right?

22       A.   Fifth Amendment.

23       Q.   So then on December 8, 2020, later that

24   same day we were just looking at, 9:44 p.m., you

25   wrote to Ms. Hampton:

Page 117

```
 1            "Think we can get James to give a
 2        statement?"
 3            Do you see that?
 4    A.    I do.
 5    Q.    Who is James?
 6    A.    Fifth Amendment.
 7    Q.    And then she responds:
 8            "No, he does not want to be
 9        involved."
10            You respond:
11            "That's going to hold us up."
12            She writes:
13            "I don't think so.  I really do
14        not know if he is a legal citizen."
15            Do you see that?
16    A.    I do.
17    Q.    And when you said, "that's going to hold
18    us up," hold what up?
19            MR. DELK:  Object to the form.
20            THE WITNESS:  Fifth Amendment.
21    BY MR. CROSS:
22    Q.    Is James, whoever he is, is that a -- is
23    he a legal citizen?
24    A.    Fifth Amendment.
25    Q.    You then write back:
```

1               "All we need is a written

2         statement."

3               Do you see that?

4         A.   I do.

5         Q.   A written statement for what?

6         A.   Fifth Amendment.

7         Q.   A written statement about what?

8         A.   Fifth Amendment.

9         Q.   A written statement by whom?

10        A.   Fifth Amendment.

11        Q.   What can you tell me about the written

12   statement that you said you needed?

13        A.   Fifth Amendment.

14        Q.   Who was the written statement for?

15        A.   Fifth Amendment.

16        Q.   Then the next day, December 9, 2020, 9:27

17   a.m., you write -- I'm still at the bottom of the

18   page.  I'm sorry.  She -- Ms. Hampton writes:

19               "Does Wendell think he is going to

20         change the vote to not go tomorrow?"

21               You write back:

22               "I'm about to puss this joker

23         off."

24               Do you see that?

25        A.   I do.

Page 119

1     Q.   What was the vote that was being discussed
2  there?
3     A.   Fifth Amendment.
4     Q.   Then on December 10th, 20:20, 4:09 p.m.,
5  she writes to you:
6          "Dominic is pissed and he is
7       trying to call you."
8          Do you see that?
9     A.   I do.
10     Q.   The next day at 12:12 p.m., you write:
11          "Send me T.J.'s number."
12          Do you see that?
13     A.   I do.
14     Q.   Who is T.J.?
15     A.   I'm not sure.  Fifth Amendment.
16     Q.   And you see she sends you:
17          "T.J. V.C.F."
18          Do you see that?
19     A.   Yes.
20     Q.   So as you sit here, you don't know who
21  T.J. was?
22     A.   Fifth Amendment.
23     Q.   All right.  Then come down to the top of
24  the next page.  You see it's dated December 30,
25  2020 at 4:00 p.m.?

1      A.   Yes, sir.

2      Q.   And there are three screenshots of poll

3   pads, three photos of poll pads that Ms. Hampton

4   sent you.  Do you see that?

5      A.   Yes.

6      Q.   And on the first one she shows that the

7   poll pad is accessing Netflix; right?

8      A.   Yes.

9      Q.   And on the second one, she shows that the

10   poll pad is accessing, what is she -- what is that?

11   Do you know what that is?  Some sort of games?

12           MR. DELK:  Object to the form.

13           THE WITNESS:  I'm not sure.

14   BY MR. CROSS:

15      Q.   One of the things that Ms. Hampton had

16   raised as a concern with you and others was that

17   the poll pads used in Georgia are connected to the

18   Internet; right?

19      A.   That's correct.

20      Q.   And you're aware that -- well, back up.

21           Ms. Hampton's daughter also worked for the

22   County; right?

23      A.   She did.

24      Q.   She helped with elections?

25      A.   She was employed part-time with the

Page 121

1    County.

2        Q.   And you're aware that, during at least one

3    election, Ms. Hampton's daughter was able to use a

4    poll pad to watch Netflix during the election;

5    right?  Ms. Hampton conveyed that to you?

6        A.   Fifth Amendment.

7        Q.   Then if you come down to the bottom,

8    there's still -- just so you can see, we're still

9    on December 30 of 2020.  That spills over to the

10   top of Page 20, and there's an additional photo.

11            So this is still December 30.  Do you see

12   that?

13       A.   Yes.

14       Q.   And there's a card game that's depicted on

15   a computer screen in that one; right?

16       A.   Yes.

17       Q.   And here Ms. Hampton wrote to you:

18            "This is the computer that the

19         I.C.C. scanner is connected to."

20            Right?

21            MR. DELK:  Object to the form.

22            THE WITNESS:  Fifth Amendment.

23   BY MR. CROSS:

24       Q.   And then she sends you another photo.  Do

25   you see that below?

Page 122

1          A.    Yes.

2          Q.    And there she writes:

3                "This is the E.M.S. server

4           computer."

5                Do you see that?

6          A.    Fifth Amendment.

7          Q.    Then on December 31 of 2020 at 7:46 p.m.,

8     you wrote to her:

9                "Did you get the letter sent?"

10               Do you see that?

11         A.    Yes.

12         Q.    What letter?

13         A.    Fifth Amendment.

14         Q.    Sent to whom?

15         A.    Fifth Amendment.

16         Q.    About what?

17         A.    Fifth Amendment.

18         Q.    For what purpose?

19         A.    Fifth Amendment.

20         Q.    Who wrote it?

21         A.    Fifth Amendment.

22         Q.    What was your involvement?

23         A.    Fifth Amendment.

24         Q.    Who else was involved?

25         A.    Fifth Amendment.

1      Q.   She responds to you:

2           "No.  I am going to finish it

3       tomorrow."

4           Do you see that?

5      A.   I do.

6      Q.   And then you responded with an E-mail

7   address for Preston Haliburton.  Do you see that?

8      A.   I do.

9      Q.   Why did you give her Preston Haliburton's

10  E-mail address?

11     A.   Fifth Amendment.

12     Q.   Okay.  Are you aware that Mr. Haliburton

13  represents Cathy Latham?

14     A.   Fifth Amendment.

15     Q.   All right.  Come to Page 22 of 24.  If you

16  come down in the middle, do you see there's a text

17  January 6th of 2021 at 4:26 p.m.?

18     A.   I do.

19     Q.   And on that day, Ms. Hampton wrote to you:

20           "Scott Hall is on the phone with

21       Cathy about wanting to come scan our

22       ballots from the general election like

23       we talked about the other day.  I am

24       going to call you in a few."

25           Do you see that?

Page 124

1       A.    I do.

2       Q.    "Cathy" refers to Cathy Latham; right?

3       A.    Fifth Amendment.

4       Q.    So you were aware, at least as of January

5    6th of 2021, that Scott Hall was coming in to the

6    Coffee County election office at least to access a

7    copy, to scan ballots; right?

8       A.    Fifth Amendment.

9       Q.    So when you testified earlier that your

10   only familiarity with Scott Hall was through an

11   open records request, that was a lie; right, sir?

12           MR. DELK:  Object to the form.

13           THE WITNESS:  Fifth Amendment.

14   BY MR. CROSS:

15      Q.    Are you aware that lying under oath is a

16   felony?

17      A.    Fifth Amendment.

18      Q.    Do you know who Javier represents?

19      A.    I do.

20      Q.    The Secretary of State's office; right?

21      A.    I do.

22      Q.    Do you understand the Secretary of State's

23   office has a lawyer sitting in this room in which

24   you just lied?

25           MR. DELK:  Object to the form.

Page 125

1    BY MR. CROSS:

2        Q.    Right?

3        A.    Fifth Amendment.

4        Q.    She then writes back later that same day,

5    8:54 p.m.:

6              "I found out tonight that there is

7         another way to change the ballots in

8         R.T.R."

9              Do you see that?

10       A.    I do.

11       Q.    What's R.T.R.?

12       A.    I don't know.

13       Q.    And you write back:  "What?"

14             She writes:  "Yelp."

15             You say:  "How?"

16             She says:  "I found a manual on Dominion."

17             And then you say:  "Wow."

18             Do you see that?

19             MR. DELK:  Object to the form.

20             THE WITNESS:  I do.

21   BY MR. CROSS:

22       Q.    What was this other way to change ballots?

23       A.    I'm not sure.

24       Q.    Then on January 7, 2021, 10:18 a.m., she

25   writes to you:

Page 126

1              "Hey, are you coming to the
2         office?  I need a board member to be
3          here when we transfer ballots."
4              Do you see that?
5       A.    I do.
6       Q.    Why did a board member need to be there to
7    transfer ballots?
8       A.    Fifth Amendment.
9       Q.    And by "transfer ballots," she's talking
10   about copying the ballots for Scott Hall and
11   others; right?
12              MR. DELK:  Object to the form.
13              THE WITNESS:  Fifth Amendment.
14   BY MR. CROSS:
15      Q.    And you wrote:
16              "I'll be there at 11:00."
17              Right?
18      A.    I did.
19      Q.    And you don't dispute that you were in the
20   Coffee County election office on January 7, 2021;
21   right?
22      A.    Fifth Amendment.
23      Q.    And when you were in the office that day,
24   you saw Scott Hall come in with others right?
25      A.    Fifth Amendment.

Page 127

1      Q.   And you don't dispute that Ms. Latham was

2   in the office that day; right?

3      A.   Fifth Amendment.

4           (Whereupon, Ms. Curling joined the

5        deposition.)

6   BY MR. CROSS:

7      Q.   You don't dispute that Jil Ridlehoover was

8   in the office that day; right?

9      A.   Fifth Amendment.

10     Q.   If you come to the top of the next page,

11  January 7 of 2021 at 7:24 p.m., you send a phone

12  number to Ms. Hampton.

13          Do you see that?

14     A.   I do.

15     Q.   Whose phone number is that?

16     A.   I don't know.

17     Q.   Why did you send her that number?

18     A.   I don't know.

19     Q.   Nothing you can tell me about that phone

20  number?

21     A.   Fifth Amendment.

22     Q.   That phone number is for Robert Sinners,

23  S-I-N-N-E-R-S; right?

24     A.   I'm not sure.

25     Q.   You sent a phone number to Ms. Hampton on

Page 128

1   January 7, 2021 and you have no idea whose number

2   it is?

3        A.   Fifth Amendment.

4        Q.   I'm going to ask you again, Mr. Chaney.

5   You are aware that that phone number is registered

6   to Robert Sinners; right?

7        A.   Fifth Amendment.

8             MR. DELK:  Object to the form.

9   BY MR. CROSS:

10       Q.   What was Mr. Sinners' involvement in a

11  team coming into the Coffee County elections office

12  on January 7, 2021 to copy ballots and copy

13  proprietary data off of the Dominion voting

14  equipment?

15            MR. DELK:  Object to the form.

16            THE WITNESS:  Fifth Amendment.

17  BY MR. CROSS:

18       Q.   Did you personally communicate with

19  Mr. Sinners?

20       A.   Fifth Amendment.

21       Q.   Were you asking Ms. Hampton to communicate

22  with Mr. Sinners about those events?

23       A.   Fifth Amendment.

24       Q.   Who in the Secretary of State's office to

25  your knowledge was aware of what happened on

Page 129

```
 1    January 7th, 2021 involving Mr. Hall and Mr. Maggio
 2    and others?
 3         A.   Fifth Amendment.
 4              MR. DELK:  Object to the form.
 5    BY MR. CROSS:
 6         Q.   When did they become aware?
 7         A.   Fifth Amendment.
 8         Q.   Immediately after you send her this phone
 9    number, you write to her:
10              "Let's switch to Signal."
11              Right?
12         A.   Fifth Amendment.
13         Q.   Well, it's written here in front of us.  I
14    mean, we can get that much right.  You wrote to
15    her:
16              "Let's switch to Signal."
17              Right?
18              MR. DELK:  Object to the form.  Asked
19         and answered.
20              THE WITNESS:  Fifth Amendment.
21    BY MR. CROSS:
22         Q.   You wanted to switch to Signal because you
23    wanted to make sure you could delete the messages
24    you guys were exchanging; right?
25         A.   Fifth Amendment.
```

Page 130

1      Q.   Maybe if you'd thought of that sooner, we
2   wouldn't have all these texts, would we?
3      A.   Fifth Amendment.
4           MR. DELK:  Object to the form.
5   BY MR. CROSS:
6      Q.   Thought of it a little bit too late.
7           MR. DELK:  Argumentative.
8           Don't -- you don't have to respond.
9      That's not even a question.
10  BY MR. CROSS:
11     Q.   I gathered from going through the document
12  requests earlier where you wrote "denied" that you
13  have no responsive Signal messages to produce to
14  us; is that right?
15     A.   Fifth Amendment.
16     Q.   In fact, you've recently told people
17  associated with the Coffee County board that you
18  deleted those messages; right?
19          MR. DELK:  Object to the form.
20          THE WITNESS:  Fifth Amendment.
21  BY MR. CROSS:
22     Q.   On January 8th of 2021 at 11:52 a.m., she
23  writes to you:
24          "Did you check Signal?"
25          Right?

Page 131

1          A.    That's right.

2          Q.    And then she says:

3                "Call you in just a minute."

4                Do you recall, do you remember talking to

5    her that morning?

6          A.    Fifth Amendment.

7          Q.    The team of individuals who came in to

8    copy ballots and the voting equipment, they were

9    still in the office doing that on January 8th

10   right?

11         A.    Fifth Amendment.

12         Q.    On January 12th of 2021 at 2:56 p.m., she

13   sends you a handwritten note with the name Bob and

14   then Chris Linscheid, L-I-N-S-C-H-E-I-D.

15               Do you see that?

16         A.    I do.

17         Q.    Who is Chris Linscheid?

18         A.    I don't know.

19         Q.    And she includes a phone number.  Do you

20   see that?

21         A.    I do.

22         Q.    Why did she send you those?

23         A.    I don't know.

24               MR. DELK:  Object to the form.

25   BY MR. CROSS:

Page 132

1        Q.    Nothing you can tell me about that?

2        A.    Fifth Amendment.

3        Q.    Did you ever communicate with Chris

4    Linscheid?

5        A.    Fifth Amendment.

6        Q.    Did you ever call that number?

7        A.    Fifth Amendment.

8        Q.    Do you know if those individuals are

9    involved in copying ballots and voting equipment in

10    Coffee County?

11            MR. DELK:  Object to the form.

12            THE WITNESS:  Fifth Amendment.

13    BY MR. CROSS:

14        Q.    On January 15, 2021 at 5:08 p.m., she

15    wrote to you:

16            "Do you have Snapchat?  Signal is

17         down," with an exclamation point.

18            Do you see that?

19        A.    I do.

20        Q.    Did you use Snapchat?

21        A.    Fifth Amendment.

22        Q.    Did you communicate with her or others on

23    Snapchat about individuals copying ballots and

24    voting equipment?

25        A.    Fifth Amendment.

Page 133

1          Q.    She then writes to you on January 19, 2021
2     at 10:35 a.m.:
3               [As read]  "If you happen to be in
4            town, the guys measuring my desk are
5            still" there -- "are still here."
6               Do you see that?
7          A.    I do.
8          Q.    That was a code that you and Ms. Hampton
9     worked out regarding individuals being in the
10    office copying voting equipment; right?
11              MR. DELK:  Object to the form.
12              THE WITNESS:  Fifth Amendment.
13    BY MR. CROSS:
14         Q.    There was no one there actually measuring
15    her desk; isn't that right?
16         A.    Fifth Amendment.
17         Q.    Because not only did individuals copy
18    voting equipment on January 7, but they came back,
19    some of the same people and some different people
20    came back on the 19th to do some additional
21    copying; right?
22              MR. DELK:  Object to the form.
23              THE WITNESS:  Fifth Amendment.
24    BY MR. CROSS:
25         Q.    Doug Logan was there on January 19, wasn't

Page 134

1    he?

2         A.    Fifth Amendment.

3         Q.    Did you guys agree to use code "measuring

4    my desk" to hope that it would conceal that what

5    you were doing was criminal?

6              MR. DELK:  Object to the form.

7              THE WITNESS:  Fifth Amendment.

8    BY MR. CROSS:

9         Q.    Then the next day on January 20, 2021,

10   6:47 p.m., she writes:

11              "Do you have a high capacity

12        scanner in your office?"

13              Do you see that?

14        A.    What's the date again?

15        Q.    January 20, 2021, 6:47 p.m.

16        A.    I do.

17        Q.    And she was asking you for the scanner

18   because she was still scanning ballots from the

19   November 2020 election for this team of

20   individuals; right?

21              MR. DELK:  Object to the form.

22              THE WITNESS:  Fifth Amendment.

23   BY MR. CROSS:

24        Q.    You're aware that Misty Hampton helped

25   scan ballots from the November 2020 election from

Page 135

1   January 7 of 2021 until January 27th of 2021?

2           MR. DELK:  Object to the form.

3           THE WITNESS:  Fifth Amendment.

4   BY MR. CROSS:

5      Q.   Some of those ballots were scanned on this

6   scanner that Ms. Latham provided from her church;

7   right?

8      A.   Fifth Amendment.

9      Q.   Did you provide her a high pass -- high

10  capacity scanner for that purpose?

11     A.   Fifth Amendment.

12     Q.   If you come down, you'll see on January

13  7th -- January 27, 2021 at 9:23 a.m., she writes to

14  you:

15           "I took care of the people

16       measuring my desk."

17           Do you see that?

18     A.   I do.

19     Q.   That was her way of letting you know that

20  she had sent the ballots on a flash drive; right?

21           MR. DELK:  Object to the form.

22           THE WITNESS:  Fifth Amendment.

23  BY MR. CROSS:

24     Q.   Where did she send those ballots?

25     A.   Fifth Amendment.

Page 136

1    Q.    Were you the one who told her where to

2    send those ballots?

3        A.    Fifth Amendment.

4        Q.    Who wanted the ballots?

5        A.    Fifth Amendment.

6        Q.    Why did they want them?

7        A.    Fifth Amendment.

8        Q.    Were any of the ballots or other

9    information that was taken from the voting

10   equipment in Coffee County provided to Robert

11   Sinners?

12       A.    Fifth Amendment.

13       Q.    Turn to the last page.  Do you see on

14   February 27, 2021, 9:00 a.m., you wrote to her:

15               "You're welcome.  I wish you the

16           best.  Use your knowledge to get

17           ahead"?

18               Do you see that?

19       A.    I do.

20       Q.    And she writes:

21               "T.J. is coming Wednesday to have

22           lunch and meet some people if you

23           would like to join."

24               You respond:

25               "Okay.  If I'm in town, I'll try

1        to come."

2            Do you see that?

3    A.    I do.

4    Q.    Who is T.J.?

5    A.    I do not recall.

6    Q.    When you referred earlier to "Trump's

7    man," were you referring to Robert Sinners?

8    A.    Fifth Amendment.

9                    (Whereupon, Plaintiff's

10                   Exhibit 10 was marked for

11                   identification.)

12   BY MR. CROSS:

13   Q.    All right.  Let me hand you what's been

14   marked as Exhibit 10.  Take your time to read

15   through it for a moment if you need to.

16        MR. BROWN:  This is Bruce Brown.  I

17        did not catch the answer to the last

18        question as to whether Sinners was Trump's

19        man referenced in the prior text.  I just

20        did not hear the -- if he answered it or

21        not.

22        MR. CROSS:  I think it was "Fifth

23        Amendment," but Debra can confirm.

24        Yeah.  Yeah.

25        MR. BROWN:  Thank you very much.

Page 138

1       Sorry for the interruption.

2              (Whereupon, the document was

3        reviewed by the witness.)

4              THE WITNESS:  Okay.

5    BY MR. CROSS:

6       Q.   So have you had a chance to flip through

7    Exhibit 10?

8       A.   Yes.

9       Q.   Have you seen this before?

10      A.   I have not.

11      Q.   Okay.  All right.  So let's talk a little

12   bit about this.  Come to -- the E-mails work from

13   the back to the front in chronological order like

14   most do.  Come to three pages from the end.  You'll

15   see a November 30, 2020 E-mail at 7:10 p.m. from

16   Jim Penrose, bottom of the right-hand page.

17             MR. DELK:  When you say the page, are

18        you talking about whole pages?  Because

19        they're front and back copied.

20             MR. CROSS:  Yeah.  Yeah.

21             MR. DELK:  What was the date and time

22        again?

23             MR. CROSS:  November 30, 2020.

24             MR. DELK:  Okay.

25   BY MR. CROSS:

1     Q.    So Jim Penrose at ████████ sends an

2    E-mail addressed to Paul and Greg.  Do you see

3    that?

4     A.    Yes.

5     Q.    And do you know Jim Penrose?

6     A.    I do not.

7     Q.    Never communicated with him?

8     A.    No, sir.

9     Q.    He writes to Paul and Greg:

10             "Thanks so much for jumping onto

11          this opportunity in Nevada.  I am

12          connecting you with the lead attorney

13          in Nevada, Jesse Binnall, along with

14          Brian Kennedy," there's a phone

15          number, "to ensure we get the

16          engagement letter in place for

17          tomorrow's forensic activities."

18             Do you see that?

19     A.    Yes.

20     Q.    It goes on on the top of the next page:

21             "From our side, Doug Logan will be

22          joining you and flying out there with

23          you.  Your P.O.C. on the ground Nevada

24          is Todd from our team."

25             Do you see that?

Page 140

1        A.    I do.

2        Q.    And then if you come down, it says:

3              "Todd, the Sullivan Strickler

4         P.O.C. for the flight is Paul Maggio.

5         The Sullivan Strickler team lead is

6         Greg Freemyer."

7              Do you see that?

8        A.    Yes.

9        Q.    Do you know what this is about?

10       A.    I do not.

11       Q.    Okay.  If you come up, Jesse Binnall from

12  Harvey Binnall responds to that E-mail on November

13  30, 2020.  Do you see that?  Middle of the previous

14  page.

15       A.    This next page?

16       Q.    Go back, here.

17       A.    Okay.

18       Q.    And if you look at this E-mail,

19  Mr. Binnall writes to Jim Penrose.  Do you see

20  that?

21       A.    Yes.

22       Q.    And then included and copied, do you see

23  Abigail Frye from the same firm as Mr. Binnall?

24       A.    I do.

25       Q.    Then there's B-R-I-T-R-A-V at

```
 1        ██████████.  Do you see that?

 2        A.    I do.

 3        Q.    Do you know who that is?

 4        A.    I don't.

 5        Q.    Then you see there's an E-mail for Doug

 6   Logan?

 7        A.    Yes.

 8        Q.    An E-mail for Greg Freemyer at Sullivan

 9   Strickler?

10        A.    Uh-huh.

11        Q.    "Yes"?

12        A.    I do.

13        Q.    And then we see Lin Wood; right?

14        A.    That's right.

15        Q.    Then we see Paul Maggio; right?

16        A.    Yes.

17        Q.    Phil Waldron at ██████████, do you see

18   that?

19        A.    Yes.

20        Q.    Then Sidney Powell at ██████████,

21   do you see that?

22        A.    Yes.

23        Q.    And you see the subject line of the E-mail

24   here is Urgent in all caps, Nevada Forensics

25   Engagement?
```

1      A.   I do.

2      Q.   All right.  So come up now, the next

3   E-mail at the bottom of the previous page is from

4   Greg Freemyer at Sullivan Strickler, on November

5   30, 2022 -- sorry, 2020 at 11:57 p.m.

6           Do you see that?

7      A.   I do.

8      Q.   And then come up, the next E-mail we see

9   is on December 1st of 2020 at 4:09 a.m. from Paul

10   Maggio.  Are you with me?

11      A.   I do.

12      Q.   And he writes:

13           "Attached is the engagement

14       agreement for the Nevada work as well

15       as the possible Georgia work."

16           Do you see that?

17      A.   I do.

18      Q.   Do you know what that's about?

19      A.   I don't.

20      Q.   All right.  Come to -- I'm sorry.  They're

21   not numbered.  It would be a lot easier.  But flip

22   four pages, like, whole pages in to the document

23   from the front and you'll see an E-mail from Jesse

24   Binnall on December 5th of 2020.

25           Yeah.  Yeah.  So here on December 5th of

Page 143

1    2020, Jesse Binnall writes to Paul Maggio and some

2    other individuals.  Are you with me?

3        A.   Yes.

4        Q.   And he writes:

5             "I don't have any authority

6         regarding Michigan.  Who is your

7          campaign contact there?"

8             Do you see that?

9        A.   I do.

10       Q.   Do you know whether "campaign" refers to

11   the Trump campaign?

12       A.   I don't.

13            MR. DELK:  Object to the form.

14   BY MR. CROSS:

15       Q.   And Mr. Binnall is responding to an E-mail

16   on December 5th, 2020 at 6:32 p.m. from Paul

17   Maggio.  Do you see that immediately below?

18       A.   Yes.

19       Q.   And Mr. Maggio wrote to Jesse Binnall:

20            "Good evening.  The Sullivan

21         Strickler team has arrived in Antrim

22         County, Michigan and will be on-site

23          at 9:00 a.m. tomorrow."

24            Do you see that?

25       A.   I do.

Page 144

1        Q.   And you're aware that there is evidence

2   that individuals went in and copied, had access to

3   voting equipment in Antrim County, Michigan on or

4   around this time?

5        A.   I'm not.

6        Q.   And below that it also says:

7             "It is our assumption that we will

8        be working under our existing

9        agreement and maintain the same daily

10       rate/conditions of the signed document

11       for Nevada."

12            Do you see that?

13       A.   I do.

14       Q.   So what we have here are E-mails produced

15   by Mr. Maggio indicating that his firm, Sullivan

16   Strickler, was engaged to do forensic work on

17   voting equipment in Antrim County, Michigan;

18   Nevada; and possibly Georgia.

19            Are you with me?

20       A.   Okay.

21       Q.   And do you still maintain that you don't

22   know who Paul Maggio is?

23       A.   That's correct.

24       Q.   Okay.  Are you familiar with the R.I.C.O.

25   statute?

Page 145

1           A.    I'm not.

2           Q.    Do you know what a R.I.C.O. crime is?

3           A.    Fifth Amendment.

4           Q.    So then if you come forward in the next

5      page, do you see the December 6th, 2020 E-mail from

6      Paul Maggio?

7           A.    I do.

8           Q.    Right here.  This side.

9           A.    Okay.

10          Q.    And here he writes:

11                "Since we have already begun work

12           in Antrim County, Michigan, it would

13           be best for all parties if we have a

14           signed agreement in place.  Attached

15           is an engagement agreement."

16                Do you see that?

17          A.    Yes.

18          Q.    Then Jim Penrose responds to that, look at

19     the bottom of the next page, December 6th, 2020 at

20     1:49 p.m. -- sorry, going in that direction.

21                Do you see that bottom over here?

22          A.    Okay.

23          Q.    Mr. Penrose responds to Paul Maggio,

24     including Sidney Powell and Doug Logan.  Do you see

25     that at the bottom?

Page 146

1          A.   I do.
2          Q.   And Mr. Penrose writes:
3               "Here is the signed E.L. from
4            Sidney Powell, Defending the
5            Republic."
6               Do you see that?
7          A.   I do.
8          Q.   Next paragraph:
9               "Please do not communicate about
10           any additional forensics work in
11           Arizona to the other legal teams.
12           Keep that in confidential channels
13           with me, Sidney and Doug only."
14              Do you see that?
15         A.   I do.
16         Q.   And do I understand correctly, you
17    maintain you've never communicated with Sidney
18    Powell?
19         A.   That's correct.
20         Q.   Never communicated with Doug Logan?
21         A.   That's correct.
22         Q.   Were you aware that they were involved in
23    an effort to access voting equipment in states
24    around the country?
25         A.   Fifth Amendment.

Page 147

1      Q.   Were you aware that they were involved in
2   efforts to access voting equipment in Coffee County
3   in or around January of 2021?
4      A.   Fifth Amendment.
5      Q.   All right.  Flip another page ahead.  Do
6   you see in the middle of the page an E-mail from
7   Paul Maggio on December 8th of 2020?
8           MR. DELK:  What time?
9           MR. CROSS:  3:52 p.m., here.
10           MR. DELK:  Okay.
11           THE WITNESS:  I do.
12   BY MR. CROSS:
13      Q.   And here Mr. Maggio writes:
14           "Jim, per our discussion, we will
15        upload the system files from the
16        election management server collected
17        from Antrim County, Michigan to a
18        secure Sharefile site."
19           Do you see that?
20      A.   I do.
21      Q.   Were you aware that Mr. Maggio's firm had
22   taken files from an election management server in
23   Antrim County?
24      A.   I was not.
25      Q.   Were you aware that they put them on the

Page 148

1    Internet?

2         A.    No.

3         Q.    Were you aware that they took the data

4    from Coffee County that they copied on January 7

5    and January 8, maybe January 19, put that on the

6    Internet as well?

7         A.    Fifth Amendment.

8         Q.    Sidney Powell responds, if you come up, on

9    December 8 -- up here.  It should be up there.

10   Yep.

11            Hold on.  Are we on the same page?

12            MR. DELK:  What's the time and date?

13   BY MR. CROSS:

14        Q.    Yeah, here.  Sidney Powell responds to the

15   December 8 E-mail from Paul Maggio we just looked

16   at, she responds the same day at 4:01 p.m.

17            Do you see that?

18        A.    I do.

19        Q.    And she writes:

20            "Nevada must be paid by the

21        campaign."

22            Do you see that?

23        A.    I do.

24        Q.    Do you know whether that refers to the

25   Trump campaign?

Page 149

1          A.    I do not.

2          Q.    She also indicates:

3                "I have seen none of that

4          information.   I am authorizing payment

5          today for Michigan."

6                Do you see that?

7          A.    I do.

8          Q.    Do you know whether the Trump campaign

9     paid for the individuals who went in to Coffee

10    County on or around January 7, 2021 to copy ballots

11    and copy the voting equipment there?

12                MR. DELK:  Object to the form.

13                THE WITNESS:  Fifth Amendment.

14    BY MR. CROSS:

15          Q.    Then if you come to -- keep going forward,

16    you see an E-mail at the bottom here from Sidney

17    Powell on December 21 of 2020?

18          A.    I do.

19          Q.    And she writes to Paul Maggio and others.

20    Do you see that?

21          A.    Yes.

22          Q.    You see Doug Logan's on that as well?

23          A.    Yes.

24          Q.    And someone Tricia at ████████████.

25    Do you see that?

1      A.    I do.

2      Q.    And here she writes:

3            "Copying Tricia with instructions

4       to transfer money promptly with

5       understanding that I and Phil Waldron

6       and Todd and Conan will receive a copy

7       of all data immediately and have

8       access to all information needed

9       immediately to complete their

10      assessment.  And a complete copy of

11      all analysis you do is to be given to

12      us as well."

13            Do you see that?

14     A.    I do.

15     Q.    Do you know Phil Waldron?

16     A.    I do not.

17     Q.    Ever communicated with him?

18     A.    Not to my knowledge.

19     Q.    Do you know who Todd is here?

20     A.    I do not.

21     Q.    Do you know who Conan is here?

22     A.    I do not.

23     Q.    Were you aware that, when you helped give

24   access to Scott Hall, Paul Maggio and others on

25   January 7th, 2021 into Coffee County, that that was

Page 151

1    part of a broader initiative to breach voting

2    equipment across the country?

3         A.    Fifth --

4              MR. DELK:  Object to the form.

5              THE WITNESS:  Fifth Amendment.

6    BY MR. CROSS:

7         Q.    All right.  Now come to the top of this

8    page.  You're there.  Do you see the E-mail still

9    in the same thread, Paul Maggio writes on January

10   7, 2021 to Sidney Powell.

11             Do you see that?

12        A.    I do.

13        Q.    10:31 a.m.; right?

14        A.    Yes.

15        Q.    Doug Logan's included on that; right?

16        A.    Yes.

17        Q.    Jim Penrose is on that; right?

18        A.    That's right.

19        Q.    And the subject line now says Coffee

20   County, Georgia Forensics Engagement Agreement.

21   Are you with me?

22        A.    Yes.

23        Q.    And Mr. Maggio writes to Sidney Powell:

24             "Per Jim Penrose's request, we are

25          on our way to Coffee County, Georgia

Page 152

1          to collect what we can from the

2          election/voting machines and systems."

3              Do you see that?

4      A.   I do.

5      Q.   And you see in the next sentence he

6   indicates that they are doing this "per our

7   existing agreement."  Do you see that?

8      A.   I do.

9      Q.   And do you still maintain that you don't

10  know Paul Maggio and he wasn't in the office that

11  day when you were there January 7 of 2021?

12     A.   Fifth Amendment.

13     Q.   Now come to the first page.  Later that

14  same day, January 7, 2021, Paul Maggio E-mails

15  Sidney Powell and others at 4:10 p.m.  Do you see

16  that?

17     A.   Yes.

18     Q.   And he writes:

19          "Everything is going well here in

20       Coffee County, Georgia."

21          Do you see that?

22     A.   I do.

23     Q.   And everything went well in Coffee County,

24  Georgia because you and Ms. Hampton were there to

25  help; right?

Page 153

1           MR. DELK:  Object to the form.

2           THE WITNESS:  Fifth Amendment.

3    BY MR. CROSS:

4       Q.   You organized their trip with Ms. Hampton;

5    right?

6           MR. DELK:  Object to the form.

7           THE WITNESS:  Fifth Amendment.

8    BY MR. CROSS:

9       Q.   You organized their trip to Coffee County

10   with Ms. Latham; right?

11      A.   Fifth Amendment.

12      Q.   Who else did you organize it with?

13      A.   Fifth Amendment.

14      Q.   Then on January 8, 2021, the most recent

15   E-mail is from Paul Maggio to Sidney Powell and

16   others at 3:48 p.m.  Do you see that?

17      A.   I do.

18      Q.   So we're on January 8, 2021, and

19   Mr. Maggio writes:

20           "Sidney, everything went smoothly

21        yesterday with the Coffee County

22        collection.  Everyone involved was

23        extremely helpful."

24           Do you see that?

25      A.   I do.

Page 154

1      Q.   That included you; right?
2           MR. DELK:  Object to the form.
3           THE WITNESS:  Fifth Amendment.
4  BY MR. CROSS:
5      Q.   He then writes:
6           "We are consolidating all of the
7       data collected and will be uploading
8       it to our secure site for access by
9       your team."
10          Do you see that?
11     A.   I do.
12     Q.   Were you aware at the time that you let
13  these people come in to collect data that they were
14  going to put it on the Internet?
15     A.   Fifth Amendment.
16     Q.   Do you think that's a secure way to manage
17  a voting system?
18     A.   Fifth Amendment.
19     Q.   Do you have any concerns about what that
20  means for the reliability of the voting system
21  going forward?
22     A.   Fifth Amendment.
23     Q.   Did you think what you were doing was
24  legal?
25     A.   Fifth Amendment.

1    Q.   Did you think you were helping the
2  republic?
3    A.   Fifth Amendment.
4    Q.   Do you think you were serving your duty
5  under the Constitution?
6    A.   Fifth Amendment.
7    Q.   Or were you doing it for the money?
8    A.   Fifth Amendment.
9    Q.   Did you get paid?
10   A.   Fifth Amendment.
11   Q.   Did you receive anything of value in
12  exchange for letting folks in to the Coffee County
13  office to do this?
14   A.   Fifth Amendment.
15        MR. DELK:  Object to the form.
16  BY MR. CROSS:
17   Q.   Turn to the very last page of this
18  document, please.  Do you see there's an invoice
19  here from Sullivan Strickler?
20   A.   I do.
21   Q.   And you see it's billed to Sidney Powell.
22  Do you see that?
23   A.   I do.
24   Q.   And you see it's dated January 7 of 2021;
25  right?

Page 156

1        A.    I do.

2        Q.    And under Client/Matter, do you see it

3    says Voting Machines Analysis?

4        A.    I do.

5        Q.    And then below Activity, there's a date of

6    January 7, 2021 for the first entry.  Do you see

7    that?

8        A.    I do.

9        Q.    And the activity is described as

10   forensics, colon, forensic expert daily rate;

11   right?

12       A.    That's right.

13       Q.    And then for the date of January 7, 2021,

14   it says:

15             "On-site Coffee County, Georgia.

16        Four people times one day."

17             Right?

18       A.    Correct.

19       Q.    Who were the four people that came in to

20   the Coffee County elections office for collection

21   when you were there that day?

22             MR. DELK:  Object to the form.

23             THE WITNESS:  Fifth Amendment.

24   BY MR. CROSS:

25       Q.    And then there's a second entry that says

Page 157

1    Forensics Travel.  Do you see that?

2        A.   I do.

3        Q.   Mileage, 394 miles round trip Atlanta,

4    Georgia to Douglas, Georgia.  Do you see that?

5        A.   I do.

6        Q.   And there's a charge of 220 dollars and 64

7    cents just for the travel; right?

8        A.   I see that.

9        Q.   The forensics work, the bill is

10   26,000 dollars; right?

11       A.   Right.

12       Q.   And so do you still maintain that you

13   don't know anything about what happened on January

14   7th of 2021 even though we've got a bill for over

15   26,000 dollars for Sullivan Strickler coming in to

16   do forensics copying of the voting equipment in

17   Georgia?

18            MR. DELK:  Object to the form.

19            THE WITNESS:  Fifth Amendment.

20   BY MR. CROSS:

21       Q.   The truth is, Mr. Chaney, that the E-mail

22   that you sent Ms. Herzog in response to the

23   Washington Post inquiry was a lie, and you knew all

24   about what happened on January 7th, 2021; right?

25            MR. DELK:  Object to the form.

1            THE WITNESS:   Fifth Amendment.

2    BY MR. CROSS:

3        Q.    You know all about what they did on

4    January 8th; right?

5        A.    Fifth Amendment.

6        Q.    You know what they did on January 19;

7    right?

8        A.    Fifth Amendment.

9        Q.    How many times did individuals come in to

10   the Coffee County elections office in 2021 to copy

11   ballots or copy voting equipment to your knowledge?

12       A.    Fifth Amendment.

13       Q.    How many times did they do it in 2020?

14       A.    Fifth Amendment.

15       Q.    Why'd you do it?

16       A.    Fifth Amendment.

17       Q.    You don't want to explain, you don't want

18   to defend what you did?

19       A.    Fifth Amendment.

20            MR. DELK:   Object to the form.

21   BY MR. CROSS:

22       Q.    So you're just going to let everyone infer

23   that you committed a crime?

24       A.    Fifth Amendment.

25       Q.    Well, you're a true believer in the cause.

Page 159

1          MR. DELK:  Object to the form.

2      Argumentative.  That's not even a

3      question.

4          You don't have to respond.

5  BY MR. CROSS:

6      Q.   So you left the board on Friday, and

7  you're still working at your daddy's car

8  dealership; right?

9      A.   I haven't been in to work today, but I

10  assume I have a job when I get there.

11      Q.   Do you know whether anyone involved with

12  the events of copying voting equipment in January 7

13  of 2021, or January 8 or January 19, whether anyone

14  associated with the County received any payment or

15  anything of value?

16          MR. DELK:  Object to the form.

17          THE WITNESS:  Fifth Amendment.

18          MR. DELK:  While you're -- I don't

19      want to interrupt your flow.

20          MR. CROSS:  I'm almost done.

21          MR. DELK:  If you're getting close to

22      transitioning, we can --

23          MR. CROSS:  Yeah, I'm almost done.

24          MR. DELK:  -- push through, but I'm

25      about at the point I need a break --

Page 160

1           MR. CROSS:  Sure.

2           MR. DELK:  -- for a few minutes at

3       least.

4           MR. CROSS:  Sure.  Yeah, I think I

5       can finish up, and then we'll take a

6       break.

7           MR. DELK:  Okay.

8                   (Whereupon, Plaintiff's

9                    Exhibit 11 was marked for

10                   identification.)

11   BY MR. CROSS:

12      Q.   All right.  Let me hand you what's been

13   marked as Exhibit 11.  And just tell me if this is

14   something you've seen before.

15           (Whereupon, the document was

16        reviewed by the witness.)

17           THE WITNESS:  I don't recall seeing

18       this.

19   BY MR. CROSS:

20      Q.   So Exhibit 11 -- well, let me ask you

21   this.  When you served on the board -- let's make

22   it even simpler.

23           Are you familiar with a federal agency

24   called C.I.S.A., C-I-S-A?

25      A.   No, sir.

Page 161

1        Q.    Cybersecurity and information -- I forget

2   the acronym.   Cybersecurity and information --

3   that's embarrassing, because I don't remember.   I'm

4   going to have to look it up.   I always just call it

5   C.I.S.A.   Get it right.

6            Okay.   Cybersecurity and Infrastructure

7   Security Agency as part of D.H.S.   Are you familiar

8   with them?

9        A.    I'm not.

10        Q.    When you served on the board of Coffee

11   County, what role does the board have with respect

12   to election security, if any?

13            MR. DELK:   Object to the extent any

14        response he gives is him individually, not

15        speaking on behalf of the board.

16            If I could just have a standing

17        objection, I'll try not to interrupt.

18            MR. CROSS:   Sure.

19            THE WITNESS:   Can you restate that?

20   I'm sorry.

21   BY MR. CROSS:

22        Q.    Yeah.   Based on your experience as a

23   member of the Coffee County election board, what's

24   your understanding of the board's role with respect

25   to election security?

Page 162

1      A.    Just to carry out elections in a secure
2  manner.
3      Q.    How so?
4      A.    The way we store equipment, you know, that
5  the voting machines are properly stored, locked,
6  the scanners, the -- all that stuff, all the
7  equipment is kept locked away.
8      Q.    And do you have an understanding that was
9  it important to keep the voting equipment, things
10  like B.M.D.s, poll pads, the E.M.S. server, locked?
11          MR. DELK:  Object to the form.
12          THE WITNESS:  We have done that.
13      That's how things typically transpire.
14  BY MR. CROSS:
15      Q.    And that was important for election
16  security?
17      A.    Yes.
18      Q.    Okay.  Did you at any point while you were
19  on the board learn -- well, strike that.
20          Are you familiar with a -- with an
21  election security expert named Alex Halderman?
22      A.    No, I'm not.
23      Q.    Did you ever hear at any point while you
24  were on the board that an election security expert
25  had been given access by a federal judge to voting

Page 163

1   equipment from Fulton County, and he had analyzed

2   that equipment?

3        A.   I have not.

4        Q.   So you never heard that from the Secretary

5   of State's office?

6        A.   No, sir.

7        Q.   Never heard that, in July of last year,

8   Dr. Halderman prepared a hundred-page report

9   detailing numerous very serious vulnerabilities

10  with that equipment?

11       A.   I have not.

12       Q.   No one ever told --

13       A.   And --

14       Q.   Oh, go ahead.  I'm sorry.

15       A.   When you say "equipment," you're saying --

16       Q.   The Fulton County Dominion voting

17  equipment.

18       A.   Okay.  Specifically for Fulton County

19  or --

20       Q.   Yes.

21       A.   Okay.  I have not.

22       Q.   And specifically a B.M.D. that was

23  provided, a Dominion B.M.D.

24       A.   Yeah, I'm just trying to get a basis on

25  what you're --

Page 164

1      Q.    Sure.

2      A.    -- meaning to say.

3            No, I have not.

4      Q.    And so I gather you also were not aware

5      that the judge allowed Dr. Halderman's report to go

6      to C.I.S.A. so that C.I.S.A. could do its own

7      assessment of the reliability of the Dominion

8      voting equipment?

9      A.    No, sir.

10     Q.    What you have in front of you as Exhibit

11     11 is an advisory that C.I.S.A. released in June of

12     this year after working with Dr. Halderman, his

13     co-author on the report, Dominion and potentially

14     others, analyzing the vulnerabilities he had found.

15     That's what you've got.

16           And you're -- you've never seen this

17     before?

18     A.    I haven't.

19     Q.    And this, this wasn't something that the

20     Secretary's office provided the Coffee County

21     election board to your knowledge?

22           MR. DELK:  Object to the form.

23           THE WITNESS:  I'm not sure if they

24        provided it to other members or possibly

25        the supervisor, but I haven't personally

Page 165

1          seen it.

2      BY MR. CROSS:

3          Q.   As a member of the Coffee County election

4      board, would you expect the Secretary's office to

5      advise a -- the county election boards that a

6      federal agency had identified serious

7      vulnerabilities with the Dominion equipment you

8      were tasked with using?

9              MR. DELK:  Object to the form.

10     BY MR. CROSS:

11         Q.   You'd expect them to let you know that;

12     right?

13         A.   I would.

14         Q.   If you look at the heading here, do you

15     see number one, Summary?

16         A.   I do.

17         Q.   It says:

18             "This advisory identifies

19          vulnerabilities affecting versions of

20          the Dominion Voting Systems Democracy

21          Suite ImageCast X..."

22             Do you see that?

23         A.   I do.

24         Q.   And the ImageCast X, that's the B.M.D.;

25     right?  You're aware of that?

1       A.   I'm not.

2       Q.   Okay.  That's -- it goes on:

3            "The ImageCast X can be configured

4        to allow a voter to produce a paper

5        record or to record votes

6        electronically."

7            So we're talking about the B.M.D. here.

8   Are you with me?

9       A.   Okay.

10      Q.   And then if you come to the end of this

11  document, turn to the second-to-last page, do you

12  see there's a heading in bold, number three,

13  Mitigations at the bottom?

14      A.   Yes.

15      Q.   And here it reads:

16           "C.I.S.A. recommends election

17       officials continue to take and further

18       enhance defensive measures to reduce

19       the risk of exploitation of these

20       vulnerabilities."

21           Do you see that?

22      A.   I do.

23      Q.   "Specifically, for each election,

24       election officials should."

25           And then you see there's about a dozen

Page 167

1   bullets that continue on to the top of the next
2   page?
3       A.   I do.
4       Q.   Are you aware of any communication by the
5   Secretary's office to the Coffee County election
6   board or anyone with responsibility for Coffee
7   County elections to ensure that any of these
8   mitigation measures were taken?
9       A.   I'm not personally aware.
10      Q.   Are you aware of any effort by Coffee
11  County to implement these mitigation measures?
12          MR. DELK:  Object to the form.
13          THE WITNESS:  I'm not aware.
14  BY MR. CROSS:
15      Q.   And you're not aware that anybody ever
16  told anyone at Coffee County they needed to
17  implement these measures; right?
18      A.   I'm not personally aware, no, sir.
19      Q.   And as a member of the Coffee County
20  election board, if mitigation measures as serious
21  as those here were being implemented in the county,
22  you would expect to have received a report on that
23  as a member of the board; right?
24          MR. DELK:  Object to the form.
25          THE WITNESS:  Can you state that

1        again?  I'm sorry.  I didn't follow you.
2    BY MR. CROSS:
3        Q.   Sure.
4            One of the things we established earlier
5    is that the board met at least monthly?
6        A.   Right.
7        Q.   And in those board meetings, things that
8    were germane to the responsibility of the Coffee
9    County election board were discussed?
10       A.   Correct.
11       Q.   And so we've got here a federal advisory
12   that came out in June of this year encouraging
13   certain mitigation measures to be taken with
14   respect to the Dominion system used in the state of
15   Georgia.
16           Are you with me?
17       A.   I am.
18       Q.   Okay.  So if there were efforts made to
19   implement these mitigation measures in Coffee
20   County, would you expect that to have been
21   communicated to you at a board meeting or in some
22   other fashion as a member of the board?
23           MR. DELK:  Object to the form.
24           THE WITNESS:  Well, it may have been
25       at some point, but I don't recall.

Page 169

1   BY MR. CROSS:

2       Q.   Okay.  Do you know the name Dominic, is it

3   LaRiccia, L-A-R-I-C-C-I-A?

4       A.   I do.

5       Q.   Who is that?

6       A.   He is I think still our current state

7   representative in this district.  But I know -- I

8   don't think he's going to be the representative

9   next term.

10      Q.   All right.  Are you familiar with an

11  organization called Cyber Ninjas?

12      A.   I'm not.

13      Q.   Never heard of them?

14      A.   No, sir.

15      Q.   Not aware that they're associated with

16  Doug Logan?

17      A.   No, sir.

18      Q.   Are you familiar with someone named Shawn

19  Stills [sic]?

20      A.   No, sir.

21      Q.   Never heard that name?

22      A.   No.

23           MR. CROSS:  All right.  Let's go off

24      the record.  Give me just one minute.  I

25      think I'm done.

Page 170

1              MR. DELK:  Okay.

2              THE VIDEOGRAPHER:  We're going off

3        the record at 1:26.

4              (Whereupon, a discussion ensued

5          off the record.)

6              (Whereupon, there was a brief

7          recess.)

8              THE VIDEOGRAPHER:  We're going back

9        on the record at 1:46.

10  BY MR. CROSS:

11       Q.    All right.  Mr. Chaney, I'm almost done.

12  Just a few more questions for you.

13       A.    Okay.

14       Q.    Will you get Exhibit 10 again real quick?

15  It was the E-mail thread from Paul Maggio.

16       A.    Right.

17       Q.    One more question, if you look at the most

18  recent E-mail, January 28 of 2021, and you come

19  down to the last E-mail address in the C.C. line,

20  do you see it says ███████████████████████?

21       A.    I do.

22       Q.    Do you recognize that address?

23       A.    I do not.

24       Q.    Are you aware that that's an E-mail

25  address for Scott Hall?

Page 171

1          A.    I don't know.

2          Q.    You've never communicated with anyone at

3     that address?

4          A.    I have not.

5          Q.    Okay.  All right.  Let me hand you what's

6     being marked as Exhibit 12.

7                          (Whereupon, Plaintiff's

8                           Exhibit 12 was marked for

9                           identification.)

10    BY MR. CROSS:

11         Q.    I'll give it to Mr. Delk first.

12               (Whereupon, the document was

13          reviewed by the witness.)

14    BY MR. CROSS:

15         Q.    So this is a LinkedIn profile for Robert

16    A. Sinners, communications director in the

17    Secretary of State's office.  Have you ever seen

18    this before?

19         A.    Not to my knowledge, no, sir.

20         Q.    Okay.  So if you look at the first page,

21    do you see that at the bottom it indicates, Georgia

22    Republican Party, D.J.T., state director, Election

23    Day operations, from May of 2020 to February 2021?

24               Do you see that?

25         A.    I do.

Page 172

```
 1        Q.   And you understand that D.J.T., that's
 2   Donald Trump?
 3             MR. DELK:  Object to the form.
 4             THE WITNESS:  I'm not sure.
 5   BY MR. CROSS:
 6        Q.   Okay.  And so we can see here that,
 7   according to Mr. Sinners' LinkedIn page, he worked
 8   with the Georgia Republican Party here from May of
 9   2020 to February 2021.
10             Are you with me?
11        A.   Yes, sir.
12        Q.   And then we come up towards the top of
13   that, and it indicates in February of 2021, he
14   became an employee in the Secretary of State's
15   office as the director of constituent services.
16             Do you see that?
17        A.   Where are we now?
18        Q.   Top of the first page.
19        A.   I don't --
20        Q.   It's up here.
21        A.   Okay.
22        Q.   Do you see it?
23        A.   Yes.
24        Q.   Were you aware before today that he was
25   the director of constituent services in the
```

1   Secretary's office?

2          A.   No.

3          Q.   Do you know why it was in February of

4   2021, just shortly after Scott Hall and others

5   breached the election equipment in Coffee County,

6   why it was that Mr. Sinners was then hired in the

7   Secretary's office?

8               MR. DELK:  Object to the form.

9               THE WITNESS:  Fifth Amendment.

10  BY MR. CROSS:

11         Q.   And you see here he was promoted to

12  communications director in June of this year?

13         A.   I do.

14         Q.   And you never had any involvement with

15  Mr. Sinners as part of your work on the Coffee

16  County election board?

17         A.   Fifth Amendment.

18         Q.   Do you sometimes leave bottles of natural

19  light beer on Ms. Hampton's car, on her windshield?

20              MR. DELK:  Object to the form.

21  BY MR. CROSS:

22         Q.   From time to time; right?

23         A.   Fifth Amendment.

24         Q.   Fifth Amendment of whether you left beer

25  on the car?

1      A.    Fifth Amendment.

2      Q.    You mentioned before, we talked about this

3   briefly, I just want to make sure I understood,

4   that you looked at video evidence from surveillance

5   cameras in the election county office at Coffee

6   County before Ms. Hampton and Ms. Ridlehoover were

7   let go; right?

8      A.    That's correct.

9      Q.    Tell me everything that you know about the

10   surveillance system in that office.

11      A.    I'm not privy to the surveillance system

12   in that office.  I don't know.

13      Q.    Well, you've been in the office many

14   times?

15      A.    I have.

16      Q.    Where are the cameras?  Where have you

17   seen cameras?

18      A.    I don't know.  I never looked for cameras.

19      Q.    Well, when you looked at the video, what

20   was shown?  What portion of the office was visible

21   in the cameras?

22      A.    It was just one area that was focused on

23   that I seen the door, the coming and going of the

24   door.

25      Q.    What area?

Page 175

1        A.    The front of the -- towards the front
2    office.
3        Q.    The sort of that open foyer space where
4    there's a window and Ms. Ridlehoover would sit
5    behind that window?
6        A.    The door that comes in and out of, not the
7    lobby door, but the door that goes in and out of
8    the -- that separates the public from the private
9    area.
10        Q.    So when you come into the Coffee County
11    election office, you walk in and there's a room
12    with a glass window in front of you,
13    Ms. Ridlehoover would sit behind that window;
14    right?
15        A.    That's correct.
16        Q.    And then off to the left there's a door,
17    and that door goes in to where Ms. Ridlehoover and
18    Ms. Hampton would sit?
19        A.    Misty had a private office.  Her office
20    was through the -- to the left even of that door.
21        Q.    Right.  So -- and that's fair.
22             So to be more precise, the door to the
23    left of that window where Ms. Ridlehoover sat, when
24    you went through that door, you'd be into a room
25    where Ms. Ridlehoover's desk was to your right?

Page 176

1      A.    That's right.

2      Q.    Is that the door that you saw in the

3  video?

4      A.    Yes.

5      Q.    Did the video surveillance capture any

6  other portion of the office?

7      A.    Not that I recall.

8      Q.    And Ms. Hampton's office was to the left

9  when you came inside that door?

10      A.    That's correct.

11      Q.    And she had a -- she could lock her door?

12      A.    Yes.

13      Q.    And there were glass windows into her

14  door?

15      A.    That's right.

16      Q.    And before you went through the door into

17  Ms. Ridlehoover's space, to the left of that public

18  room, there was also a glass window that looked

19  into the gyms room; right?

20      A.    Correct.

21      Q.    And that -- that's -- the gyms room is

22  where the E.M.S. server and I.C.C. were kept?

23      A.    Yes.   Correct.

24      Q.    Including after the switch to the Dominion

25  system, Dominion and E.M.S. server sat in that same

Page 177

1    room?

2         A.    Correct.

3         Q.    So that was visible, that room was visible

4    to the public as long as the blinds were open?

5         A.    That's right.

6         Q.    And so the only camera that you're aware

7    of is the one that caught that door that went from

8    the public foyer into the space where

9    Ms. Ridlehoover sat?

10        A.    That I recall.

11        Q.    Okay.  No other cameras you can think of?

12        A.    No.

13        Q.    Was there any other door that provided

14   access to Ms. Hampton's office besides that one

15   door?

16        A.    No.

17        Q.    So if you wanted to get in to

18   Ms. Hampton's office, you'd have to come through

19   the front door of the building and then that door

20   that sat next to the window where Ms. Ridlehoover

21   sat?

22             MR. DELK:  Object to the form.

23   BY MR. CROSS:

24        Q.    That was the only way to get to her

25   office?

Page 178

1        A.    That I'm aware of.

2        Q.    When you come in through the door to the

3    public space, there's also -- well, strike that.

4             There's a -- there's a room to the right

5    of that building where the pub -- where the early

6    voting was done; right?

7        A.    That's correct.

8        Q.    And that room has its own door into the

9    parking lot?

10       A.    That's right.

11       Q.    And that room also has a door that goes

12   into the space where Ms. Ridlehoover sat; right?

13       A.    That's correct.

14       Q.    So if you wanted to get into Ms. Hampton's

15   office, you wouldn't have to go through the door

16   where the camera is, you could come through the

17   early voting space; right?

18       A.    There again, I'm not sure if you can or

19   not.  I'm not sure if that door that partitions off

20   those offices are kept locked or not.  I'm not sure

21   of that.

22       Q.    Well, before you reached the conclusion

23   that the video camera captured all the time

24   Ms. Hampton was in the office, it was important to

25   figure out with whether there was another access

Page 179

1     point that was not on camera; right?

2          A.    I'm not sure.

3               MR. CROSS:  All right.  I don't have

4          any further questions, Mr. Chaney.  I

5          appreciate your time.

6               THE WITNESS:  Thank you.

7               MR. CROSS:  I think Mr. Brown may

8          have some questions.

9               THE WITNESS:  Sure.

10              MR. CROSS:  Bruce, you're up.

11                    EXAMINATION

12    BY MR. BROWN:

13         Q.    Mr. Chaney, my name is Bruce Brown.  I

14    represent the Coalition plaintiffs in this case.  I

15    just have a couple of questions.

16              MR. BROWN:  If you could hand the

17         witness Exhibit 8.

18              MR. DELK:  Do you mind if I close out

19         this "got it" on the screen so I can see

20         you?

21              MR. CROSS:  Go ahead.  Yeah.  Go

22         ahead.  Yeah.

23              What's Exhibit 8, Bruce?

24              MR. BROWN:  Exhibit 8 is the Jennifer

25         Herzog exchange.

Page 180

1           MR. CROSS:  He's got it.

2      BY MR. BROWN:

3           Q.   Let me refer you to Exhibit 8, and

4      specifically your E-mail to Jennifer Herzog at the

5      bottom of the first page of Exhibit 8.

6                Are you with me?

7           A.   I am.

8           Q.   You'll see that you say I don't know Scott

9      Hall.  Is that still your testimony today?

10          A.   Fifth Amendment.

11          Q.   And then you say in the next line:

12               [As read]  "...nor was I present

13                at the Coffee County Board of

14                Elections and registration office when

15                anyone illegally accessed the server."

16          A.   Fifth Amendment.

17          Q.   If I change that to say when anyone

18     accessed the server, would that still be your

19     position, that you were not there when anyone

20     accessed the silver -- server, whether it was

21     illegal or not?

22               MR. DELK:  Object to the form.

23               THE WITNESS:  Fifth Amendment.

24     BY MR. BROWN:

25          Q.   Let me drop down to the bottom sentence in

Page 181

1    that paragraph.  You say:

2            "I have no personal knowledge..."

3            Do you see that?

4        A.   Yes.

5        Q.   Contrary to the lawyer's statement, do you

6    have any knowledge that anyone accessed the server

7    room?

8        A.   Fifth Amendment.

9            MR. DELK:  Object to the form.

10   BY MR. BROWN:

11       Q.   I'm going to direct your attention back to

12   the lawsuit that was filed by Shawn Still.  And I'm

13   going to see if I can do a screen share.

14           MR. BROWN:  Debra, am I authorized to

15       do the screen share?

16           MR. DELK:  What's he talking about

17       directing back?  I don't recall any

18       lawsuit that he just stated.

19           MR. BROWN:  Do you see the --

20           MR. DELK:  I want to make sure we're

21       on the same page.

22           MR. BROWN:  I don't know if I'm

23       sharing the screen or not.  Am I?

24           MR. DELK:  No.

25           THE WITNESS:  It doesn't appear so.

Page 182

1              (Whereupon, a technical discussion

2          ensued off the record.)

3              MR. BROWN:  Let me -- I'm going to

4          mark this as the next exhibit number,

5          which would be what?

6              MR. DELK:  13.

7              MR. CROSS:  13, yeah.

8                        (Whereupon, Plaintiff's

9                        Exhibit 13 was marked for

10                        identification.)

11   BY MR. BROWN:

12       Q.   Exhibit 13 is a copy of the lawsuit filed

13   by Shawn Still against you and other members of the

14   board and Brad Raffensperger.

15              Are you still not familiar with that

16   lawsuit?

17       A.   Sorry.  It doesn't ring a bell.

18       Q.   Did you have any communications with Shawn

19   Still before he filed this lawsuit that you recall?

20       A.   I don't even know who Shawn Still is.

21       Q.   Shawn Still is affiliated with Mr. Sinners

22   and Ms. Latham, and they're all so-called

23   alternative electors.

24              Does that refresh your recollection?

25       A.   Fifth Amendment.

Page 183

1      Q.   Do you know if the facts relating to a

2   lawsuit that was to be filed against Coffee County

3   were shared with anybody relating to Coffee County

4   before they were -- before the lawsuit was filed?

5      A.   Fifth Amendment.

6         MR. DELK:  Object to the form.

7  BY MR. BROWN:

8      Q.   Do you know anything about a friendly

9   lawsuit that was filed by Shawn Still against

10  Coffee County for the purpose of getting access to

11  Coffee County's election equipment in discovery?

12        MR. DELK:  Object to the form.

13        THE WITNESS:  Fifth Amendment.

14  BY MR. BROWN:

15     Q.   Do you recall any friendly lawsuit being

16  filed against Coffee County so that, as was the

17  case in Nevada, election equipment could be

18  obtained in discovery?

19     A.   Fifth Amendment.

20     Q.   Do you know why this lawsuit was dropped

21  the same day, January 7, that Brad [sic] Hall and

22  others made copies of the Coffee County election

23  equipment, making the lawsuit unnecessary?

24       MR. DELK:  Object to the form.

25       THE WITNESS:  Fifth Amendment.

Page 184

1    BY MR. BROWN:

2         Q.   Did you speak with Tony Rowell about this

3    lawsuit either before or after it was filed?

4              MR. DELK:  Object to the form.

5         That's attorney-client privileged.

6    BY MR. BROWN:

7         Q.   To your recollection, did you speak to

8    anybody about a lawsuit in December and January

9    that was filed against you and the other members of

10   the board and Brad Raffensperger?

11             MR. DELK:  Object to the form.  Vague

12        to the extent any such communications are

13        privileged.

14             THE WITNESS:  Fifth Amendment.

15   BY MR. BROWN:

16        Q.   Do you know how Mr. Still got access to

17   the information that he put in the complaint if it

18   was not through some sort of back-door

19   communications with people at Coffee County?

20             MR. DELK:  Object to the form.

21             THE WITNESS:  Fifth Amendment.

22   BY MR. BROWN:

23        Q.   Did you talk with Cathy Latham about the

24   Shawn Still lawsuit?

25        A.   Fifth Amendment.

1        Q.    Do you know who John Eastman is?

2        A.    I do not.

3        Q.    Did you talk to him about the copying of

4    the election equipment in Coffee County?

5        A.    Fifth Amendment.

6             MR. BROWN:  I don't have any further

7        questions.

8             (Whereupon, a technical discussion

9         ensued off the record.)

10                         EXAMINATION

11    BY MR. PICO-PRATS:

12        Q.    Mr. Chaney, I just have a few more

13    questions, and then we'll be done for the day.

14        A.    Okay.

15        Q.    Do you know who the plaintiffs are in this

16    lawsuit that you're being deposed for?

17        A.    I do not.  Are you asking about know them

18    personally or --

19        Q.    If you just know them --

20        A.    I do not.

21        Q.    Okay.  Do you know who Donna Curling is?

22        A.    I've seen the name, but I don't know who

23    she is.

24        Q.    Do you know Donna Price?

25        A.    I don't.

Page 186

1      Q.   Do you know Jeffrey Stromberg?

2      A.   I do not.

3      Q.   Do you know the Coalition for Greater

4  Governance?

5      A.   I've seen that name.

6      Q.   What do you know about the Coalition?

7      A.   I think Marilyn Marks heads that up, if

8  I'm not mistaken.  And she is -- she did reach out

9  to me sometime way back, but I don't specifically

10  remember our dialogue.

11      Q.   When was the first time that Marilyn Marks

12  reached out to you?

13      A.   I think it was sometime in 2020.

14      Q.   Was it the front half of 2020?

15      A.   The -- probably around or before the

16  election in 2020.

17      Q.   The November --

18      A.   Yes.

19      Q.   -- election?

20           Do you know generally what Marilyn Marks

21  was reaching out about?

22      A.   To be honest with you, I didn't appreciate

23  her -- she was annoying, and she wouldn't -- she'd

24  just call, call, call, call, E-mail, E-mail,

25  E-mail.  I didn't want to have any dialogue with

1    her.

2         Q.    What was she calling about?

3         A.    I'm not exactly sure.

4         Q.    Did you ever actually speak with her or

5    was it only phone calls that were left unanswered?

6         A.    I think I did speak to her on the phone,

7    you know, answer a call that I wasn't sure who it

8    was.  And after speaking to her briefly and -- I

9    just didn't return calls or didn't reply to her

10   E-mails.

11        Q.    When was the last time that she reached

12   out to you?

13        A.    I'm not exactly sure.

14        Q.    Was it in this year?

15        A.    I'm not sure.

16        Q.    Did you ever speak to her about the

17   Dominion voting equipment?

18        A.    Not that I recall.

19        Q.    Did you ever speak to her about the

20   forensic examination?

21        A.    Not that I recall.

22             MR. PICO-PRATS:  That's all the

23        questions I have for you.

24             THE WITNESS:  Thank you.

25             (Whereupon, a discussion ensued

Page 188

1                off the record.)

2                     THE VIDEOGRAPHER:  So we are going

3           off the record at 2:05 p.m.

4                     (Whereupon, a discussion ensued

5           off the record.)

6                     (Whereupon, the reading and

7           signing of the deposition by the

8           witness was reserved.)

9                                - - -

10                    (Witness excused.)

11                               - - -

12                    (Whereupon, the deposition

13          concluded at 2:10 p.m.)

14                          --oOo--

15

16

17

18

19

20

21

22

23

24

25

Page 189

1                VERITEXT LEGAL SOLUTIONS
2             FIRM CERTIFICATE AND DISCLOSURE
3
4         Veritext represents that the foregoing
   transcript as produced by our Production
5  Coordinators, Georgia Certified Notaries, is a
   true, correct and complete transcript of the
6  colloquies, questions and answers as submitted by
   the certified court reporter in this case.
7
8         Veritext further represents that the
   attached exhibits, if any, are a true, correct and
   complete copy as submitted by the certified
9  reporter, attorneys or witness in this case;
10        And that the exhibits were handled and
   produced exclusively through our Production
11 Coordinators, Georgia Certified Notaries.  Copies
   of notarized production certificates related to
12 this proceeding are available upon request to
   litsup-ga@veritext.com.
13
14        Veritext is not taking this deposition
   under any relationship that is prohibited by OCGA
   15-14-37(a) and (b).  Case-specific discounts are
15 automatically applied to all parties at such time
   as any party receives a discount.  Ancillary
16 services such as calendar and financial reports are
   available to all parties upon request.
17
18
19
20
21
22
23
24
25

Page 190

```
 1       R E P O R T E R   C E R T I F I C A T E
 2    STATE OF GEORGIA )
      COBB COUNTY      )
 3
 4            I, Debra M. Druzisky, a Certified Court
      Reporter in and for the State of Georgia, do hereby
 5    certify:
              That prior to being examined, the witness
 6    named in the foregoing deposition was by me duly
      sworn to testify to the truth, the whole truth, and
 7    nothing but the truth;
              That said deposition was taken before me
 8    at the time and place set forth and was taken down
      by me in shorthand and thereafter reduced to
 9    computerized transcription under my direction and
      supervision.  And I hereby certify the foregoing
10    deposition is a full, true and correct transcript
      of my shorthand notes so taken.
11            Review of the transcript was requested.
      If requested, any changes made by the deponent and
12    provided to the reporter during the period allowed
      are appended hereto.
13            I further certify that I am not of kin or
      counsel to the parties in the case, and I am not in
14    the regular employ of counsel for any of the said
      parties, nor am I in any way financially interested
15    in the result of said case.
              IN WITNESS WHEREOF, I have hereunto
16    subscribed my name this 18th day of August, 2022.
17
18
19
20            _____
              Debra M. Druzisky
21            Georgia CCR-B-1848
22
23
24
25
```

Page 191

1    To:  Mr. Delk
2    Re:  ERIC B. CHANEY
3    Date Errata due back at our offices:  _____
4
5    Greetings:
6
7       This deposition has been requested for read and
     sign by the deponent.  It is the deponent's
8    responsibility to review the transcript, noting any
     changes or corrections on the attached PDF Errata.
9    The deponent may fill out the Errata electronically
     or print and fill out manually.
10
        Once the Errata is signed by the deponent and
11   notarized, please mail it to the offices of
     Veritext (below).
12
        When the Errata is returned to us, we will seal
13   and forward to the taking attorney to file with the
     original transcript.  We will also send copies of
14   the Errata to all ordering parties.
15      If the signed Errata is not returned by the
     above date, the original transcript may be filed
16   with the court without the signature of the
     deponent.
17
18   Please send completed Errata to:
19   Veritext Production Facility
20   20 Mansell Court, Suite 300
21   Roswell, Georgia  30076
22   (770) 343-9696
23
24
25

Page 192

ERRATA FOR ASSIGNMENT # 5317960

1    I, the undersigned, do hereby certify that I
2    have read the transcript of my testimony, and that

3

4    _____ there are no changes noted; or
5    _____ the following changes are noted:

6

    Pursuant to Rule 30(7)(e) of the Federal Rules
7    of Civil Procedure and/or OCGA 9-11-30(e), any
    changes in form or substance which you desire to
8    make to your testimony shall be entered upon the
    deposition with a statement of the reasons given
9    for making them.
10   To assist you in making any such corrections,
    please use the form below.  If additional pages are
11   necessary, please furnish same and attach hereto.
12   Page_____Line_____Change:_   _____
13   Reason for change:_____
14   Page_____Line_____Change:_   _____
15   Reason for change:_____
16   Page_____Line_____Change:__   _____
17   Reason for change:_____
18   Page_____Line_____Change:__   _____
19   Reason for change:_____
20   Page_____Line_____Change:__   _____
21   Reason for change:_____
22   Page_____Line_____Change:___   _____
23   Reason for change:_____
24   Page_____Line_____Change:___   _____
25   Reason for change:_____

Page 193

1    Page_____Line_____Change:____   _____

2    Reason for change:_____

3    Page_____Line_____Change:_____   _____

4    Reason for change:_____

5    Page_____Line_____Change:_____   _____

6    Reason for change:_____

7    Page_____Line_____Change:_____   _____

8    Reason for change:_____

9    Page_____Line_____Change:____   _____

10   Reason for change:_____

11   Page_____Line_____Change:_____   _____

12   Reason for change:_____

13   Page_____Line_____Change:_____   _____

14   Reason for change:_____

15   Page_____Line_____Change:_____   _____

16   Reason for change:_____

17   Page_____Line_____Change:_____   _____

18   Reason for change:_____

19                   _____

                          DEPONENT'S SIGNATURE

20

21   Sworn to and subscribed before me this _____ day of

22   _____, 2022.

23   _____

     NOTARY PUBLIC

24   My Commission Expires: _____.

25    _____ Notary Public

Page 194

1          R E P O R T E R   D I S C L O S U R E
2    DISTRICT COURT   )   DEPOSITION OF
     NORTHERN DISTRICT)   ERIC B. CHANEY
3    ATLANTA DIVISION )
4
               Pursuant to Article 10.B of the Rules and
5    Regulations of the Board of Court Reporting of the
     Judicial Council of Georgia, I make the following
6    disclosure:
               I am a Georgia Certified Court Reporter.
7    I am here as a representative of Veritext Legal
     Solutions.
8              Veritext Legal Solutions was contacted by
     the offices of Morrison & Foerster to provide court
9    reporting services for this deposition.  Veritext
     Legal Solutions will not be taking this deposition
10   under any contract that is prohibited by O.C.G.A.
     9-11-28 (c).
11             Veritext Legal Solutions has no contract
     or agreement to provide court reporting services
12   with any party to the case, or any reporter or
     reporting agency from whom a referral might have
13   been made to cover the deposition.
               Veritext Legal Solutions will charge its
14   usual and customary rates to all parties in the
     case, and a financial discount will not be given to
15   any party in this litigation.
16
17
                         Debra M. Druzisky
18                       Georgia CCR-B-1848
19
20
21
22
23
24
25

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30


(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.