The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3

 4   DONNA CURLING, ET AL.,          :
                                     :
 5          PLAINTIFFS,              :
     vs.                             :   DOCKET NUMBER
 6                                   :   1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,     :
 7                                   :
            DEFENDANTS.              :
 8

 9

10        TRANSCRIPT OF DISCOVERY CONFERENCE PROCEEDINGS

11           BEFORE THE HONORABLE AMY TOTENBERG

12          UNITED STATES DISTRICT SENIOR JUDGE

13                   SEPTEMBER 9, 2022

14                      1:09 P.M.

15

16

17

18

19

20

21    MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22               TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
1              A P P E A R A N C E S   O F   C O U N S E L

2

3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:
4

5         DAVID D. CROSS
          MORRISON & FOERSTER, LLP
6
          ADAM SPARKS
7         KREVOLIN & HORST

8

9    FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
     WILLIAM DIGGES, III, AND RICARDO DAVIS:
10

11        BRUCE P. BROWN
          BRUCE P. BROWN LAW
12
          ROBERT ALEXANDER McGUIRE, III
13        ROBERT McGUIRE LAW FIRM

14

15   FOR THE STATE OF GEORGIA DEFENDANTS:

16
          VINCENT ROBERT RUSSO, JR.
17        CAREY A. MILLER
          JOSHUA B. BELINFANTE
18        JAVIER PICO PRATS
          ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
19

20   FOR FULTON COUNTY, GEORGIA:

21
          CHERYL RINGER
22        OFFICE OF FULTON COUNTY ATTORNEY

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **(Atlanta, Fulton County, Georgia; September 9, 2022.)** |
| 3 | THE COURT:  Good afternoon, everybody.  We are here |
| 4 | for a conference in Curling, et al. v. Raffensperger, et al., |
| 5 | Case Number 1:17-CV-2989. |
| 6 | It looks like we have -- I'm looking around -- Mr. |
| 7 | Cross and Mr. Sparks for Curling.  Is that -- |
| 8 | MR. CROSS:  Yes, Your Honor. |
| 9 | THE COURT:  And Mr. Brown here for the Coalition. |
| 10 | And do we have Mr. McGuire from afar or not? |
| 11 | MR. McGUIRE:  Yes, Your Honor.  I'm on too. |
| 12 | THE COURT:  Okay.  And for the State of Georgia, we |
| 13 | have got Mr. Belinfante, Mr. Miller, and Mr. Russo. |
| 14 | MR. RUSSO:  And, Your Honor, we also have Mr. Pico |
| 15 | Prats with our firm.  And Mr. Tyson said he would try to join |
| 16 | if his deposition ended. |
| 17 | THE COURT:  Okay.  And how do you spell Mr. Prats' |
| 18 | last name? |
| 19 | MR. PICO PRATS:  It is P-I-C-O and then a space and |
| 20 | P-R-A-T-S. |
| 21 | THE COURT:  Great. |
| 22 | All right.  The Court has convened this conference in |
| 23 | light of the request from the plaintiff.  And the first |
| 24 | question obviously I put forth there and also had emailed you. |
| 25 | And I don't know how the plaintiffs want to divide this. |

1          But it would be helpful, I think, as an initial

2   matter for each side to address how the Coffee County data

3   system breach issue fits into your respective and original

4   claims and your theory of the case and the defenses presented

5   in the lawsuit.

6          MR. CROSS:  Good afternoon, Your Honor.

7          THE COURT:  Good afternoon.

8          MR. CROSS:  I'll go first, and Mr. Brown may have

9   some additional thoughts.

10         Let me start with -- in answering that question, let

11  me start with the positions that the State has taken and

12  explain why the Coffee County piece is so critical for our

13  case.

14         In Mr. Tyson's opening statement in September of 2020

15  at the PI hearing, he said, the plaintiffs offer a series of

16  theories.  They are still not backed up by any evidence of any

17  compromise of a component of any part of the system.  The

18  plaintiffs are unable to connect any of these dots they are

19  putting on the page, and everything they offer is speculative.

20         In the sur-reply that they filed, they stated,

21  Curling plaintiffs cite no evidence that the Dominion system

22  has ever been compromised.

23         More recently in a brief on standing that Your Honor

24  asked for specifically, they said, of course, there is also

25  zero evidence that any BMD used in any election has ever been

 1    actually compromised.  All of plaintiffs' injuries are

 2    therefore hypothetical and generalized whether looked at on a

 3    pleading standard or based on the current evidence in the

 4    record.

 5          And so, Your Honor, the State has consistently taken

 6    the position that the vulnerabilities that we have established

 7    in the system through Dr. Halderman, validated by CISA earlier

 8    this year -- that they don't matter because the system is

 9    locked down, that it is secure, and that all of these

10    vulnerabilities are theoretical.

11          In fact, to use Secretary Raffensperger's own words,

12    he did a live interview with Mark Niesse in February of this

13    year, and this is what he had to say.  Halderman was actually

14    given security codes, so he had full access of the equipment,

15    and he had it for 12 weeks and he comes back with his report

16    and says, quote, well, if you have that kind of access, then

17    you could change things.  Secretary Raffensperger goes on to

18    say, well, duh, yeah.

19          That is our case, Your Honor.  Secretary

20    Raffensperger acknowledged that if someone were to get the kind

21    of access that Dr. Halderman got, which is a tiny, tiny

22    fraction of the access that we now know occurred in Coffee

23    County, they could change things.  They could engage in all

24    kinds of mischief.

25          Merritt Beaver, the CIO, testified that the reason it

 1   is so critically important to lock down this system, to make

 2   sure that no one gets access is because once you get access,

 3   once you get the Dominion software, in his words, that is the

 4   roadmap, the roadmap for the system.

 5          And so, you know, there's always been a disagreement

 6   in this case about whether our concerns rise to the level that

 7   they warrant a constitutional violation.  The State takes the

 8   position they don't.  They are certainly entitled to take that

 9   position.

10          But their principal defense -- and I would submit

11   this, Your Honor -- really their only defense that is left

12   before we learned about the breach was that yes, it has these

13   software vulnerabilities.  Dr. Halderman's report is not

14   refuted.  Dr. Gilbert, their expert, did not disagree with any

15   of his technical findings.  But it is okay because no one could

16   ever exploit them.

17          And what we now know is in Coffee County a number of

18   different actors, whose motives I think can best be

19   characterized most generously as questionable, had extensive

20   access.

21          All Dr. Halderman got was a single BMD and a single

22   precinct scanner and an off-the-shelf printer that is used with

23   that system.  And he was able to hack it in three days with

24   just that.

25          We now know that a team from Sullivan Strickler, in

1   their words, copied everything that had data on it.  That is

2   their testimony in the 30(b)(6).  And they were there at the

3   direction of Cathy Latham, the head of the GOP at the time;

4   Misty Hampton, the election supervisor at the time; Eric

5   Chaney, a member of the Board of Elections at the time; Ed

6   Voyles, former chair of the board who was there.  And the

7   direction they got was copy everything.

8          There was a man named Scott Hall who has been

9   identified in some of the discovery we got as Trump's man on

10  the ground.  His direction to them time and again was copy

11  everything.  And they say they did.  We have half a terabyte of

12  data.

13         And let me be clear about what that is.  It is not

14  just voting data.  It is the software.  It is what Mr. Beaver

15  said is the roadmap for the system.

16         And that wasn't the only visit.  Scott Hall came in

17  in that visit with someone that Sullivan Strickler identified

18  as programmer -- a programmer sitting in that office.  Then

19  Doug Logan with Cyber Ninjas, notorious for their work in

20  Arizona, came back with Jeffrey Lenberg, another computer

21  science person.  And they spent two days in the office,

22  January 18 and 19.  We don't know what they did inside.

23         Jeffrey Lenberg then came back and spent five

24  straight days, hours each day in that office.  We do not have

25  insight into what he did.  But these are people who are

1    self-professed computer science experts.  Lenberg himself

2    identifies himself as someone who part of his expertise is

3    hacking systems.  That is what he does.  And he sat in that

4    office with access to everything.  Not just a couple of pieces,

5    like Dr. Halderman, disconnected from the system.  He had

6    access to every computer, including, Your Honor, the computer

7    that connects in to the State system.

8          Because, remember, the way the system work is the

9    tabulation results have to come off the EMS server.  First,

10   they came off the scanners.  They go to the EMS server.  They

11   then have to get to the State.  That is done through the ENR,

12   the election night reporting system.  And that is a computer

13   that is connected to the internet that sits in every county

14   office that then runs back to the state.

15         So people, who I think you could fairly say their

16   integrity is in doubt, had unfettered access to this, what

17   amounts to about 8, 9, or 10 days to do whatever testing they

18   wanted, to copy whatever they wanted, and to figure out if you

19   wanted to exploit an election -- to exploit any of the

20   vulnerabilities that are unrefuted from Dr. Halderman, this is

21   how you would do it.

22         And worse, Your Honor, Sullivan Strickler took all

23   that data, the Dominion software, the roadmap for the system,

24   and put it on the internet.  And we have the download files for

25   at least some period of time where we can see a lot of

1    different people from Doug Logan to many other names folks have

2    seen in the press where they routinely downloaded the Dominion

3    software for the central scanner, for the EMS server, for the

4    precinct scanners, for all of the different flashcards and

5    memory cards and thumb drives that are part of this system.

6    Downloaded it time and time again.

7            And what is also disturbing, Your Honor, is they

8    uploaded files.  And one of the questions we have is:  What did

9    they change?  Why did they download those files, do something

10   with them, and then put them back up?  And whatever gets

11   uploaded is then accessible to whoever has access to that

12   ShareFile.

13           There is an individual named Ben Cotton -- one of the

14   ways that we first started to think, well, maybe this breach

15   actually occurred was when we saw testimony from Ben Cotton

16   earlier this year saying that he had actually analyzed the

17   Fulton County Dominion software.  And Mr. Cotton testified that

18   the user log-ins that were provided by Sullivan Strickler were

19   also shared.

20           So what that means is when we look at the download

21   and upload log, we can see the user log-in but we don't know

22   who is behind that.  It could be someone other than the

23   individual that was assigned to.  And then, of course, we

24   have --

25           THE COURT:  All right.  Just slow down for me for a

1    second.

2         MR. CROSS:  Sorry.

3         THE COURT:  Maybe you can explain to me the Ben

4    Cotton business you just were speaking of because I hadn't

5    heard his name other than seeing it referenced here before --

6         MR. CROSS:  So --

7         THE COURT:  -- what you are saying his role was

8    according to you.

9         MR. CROSS:  Yes, Your Honor.  And kind of taking a

10   step back, the way this sort of unfolded for us was, you know,

11   there is this call from Scott Hall, a bail bondsman, sometime

12   last year -- reached out to Ms. Marks.  And we have heard a lot

13   about that call.

14        I will tell you candidly I don't recall when I first

15   heard of that.  I think it was sometime this year.  I thought

16   that was insane, the idea that this man was saying, we went in

17   and we copied everything.  That seemed unthinkable.

18        And so certainly we did not aggressively pursue it.

19   That is an issue that the State has raised.  But it seemed

20   unthinkable that what happened in Coffee County could ever

21   happen.  We obviously have been concerned about a breach but

22   not of this size and magnitude.

23        Then what happens is we learn that this man, Ben

24   Cotton, who identifies as a computer science expert, provided a

25   declaration in a case in Arizona where he testified that he had

```
1    been retained by a lawyer I believe named Stefanie Lambert to
2    analyze the Dominion software from Coffee County and from
3    Fulton County.  And he then testified live in a PI hearing over
4    the summer where he provided a little more insight into that.
5            So once the Ben Cotton piece came out, that is when
6    it started to kind of dawn on us maybe something actually
7    happened here.  So that is when we started to try to pursue
8    this in discovery.  And that is when we ended up in front of
9    Your Honor, I think, in May or June when we got the permission
10   to serve subpoenas.
11           So Ben Cotton is another piece of this where he has
12   testified he has analyzed this software extensively.  We don't
13   have any insight into his analysis.  We frankly haven't asked
14   for that.  We don't need it.  And I'm not -- we're not
15   interested in his views on that.
16           But it shows the scope and the reach of this.  That
17   what you have at the highest level is an interstate effort that
18   is organized and overseen by Sidney Powell.  She signs the
19   engagement letter for Sullivan Strickler to do the copying in
20   Coffee County.  Jesse Binnall, one of Donald Trump's personal
21   lawyers, also signed an engagement specifically for copying
22   voting data in Georgia.  Those letters are signed, Sidney
23   Powell on December 6 of 2020; Jesse Binnall on November 30,
24   2020.
25           And those letters also include efforts to get access
```

1    to voting equipment in Michigan and in Nevada.  And then the

2    data that comes out of Coffee County ultimately makes its way

3    to Ben Cotton in a case in Arizona.

4           And so all of this to get back to your question, Your

5    Honor, is there is -- it is undisputed that the facts in this

6    case are that if anyone ever got access to the Dominion

7    software that's used on these various pieces of equipment or --

8    and if they got access to the equipment itself, which is still

9    used -- and the Coffee County voting equipment, apart from the

10   EMS server and the ICC, have never been replaced.  They are

11   still used, all the thumb drives, all the flash drives that

12   were copied, all of the ICPs, the precinct scanners, the

13   laptops.  Everything that was copied, other than the ICC and

14   the server according to the State which they took in June of

15   2021, as we understand it, has continued to be used and is

16   still there today for use.  We just deposed the Coffee County

17   Board of Elections on that, I think, last week.

18          And so what it comes back to for us is we are way

19   beyond the defense that the State has always asserted that we

20   are in a world of theory and speculation.  We are not in a

21   world of conjecture.  We're in a world candidly, Your Honor, I

22   never, ever predicted.

23          I recall we asked Your Honor -- in August, September

24   of 2020, we asked to get access -- I think maybe after the

25   hearing as well -- access to a county EMS server because we

1    wanted to be able to do the analysis beyond just the BMD.  And

2    Your Honor's response in your order was, well, we haven't shown

3    that there has ever been a compromise to the equipment.  And

4    Your Honor sort of accepted, understandably, their position

5    that before you give us access to that level of sensitive

6    equipment and sensitive software we should have more than just

7    a theoretical concern that the equipment could be breached.

8            And I literally remember saying to my team, well,

9    we're never going to meet that standard.  How could we ever

10   find out that there was a breach of equipment?

11           And we are in a world that is way beyond that where

12   literally dozens of individuals from what we can see went into

13   the office, spent time in the office day after day after day,

14   and then sent that out into the ether.  And we don't even know

15   who all has it and what they have done with it for a year and a

16   half.

17           And so our view is, Your Honor, we're at a point

18   where if anyone is moving for summary judgment it probably

19   should be us, because I don't see how they can continue to

20   defend a system that has been breached this badly, that has

21   these vulnerabilities that, again, are not disputed.  The

22   software vulnerabilities -- there is no expert that has

23   testified in this case that disputes those findings and those

24   vulnerabilities.

25           And now their one defense to that is to say but no

1   one could ever get access to the system.  Secretary

2   Raffensperger has been in the press repeatedly saying that

3   before the Coffee County breach no one could ever get access to

4   the system.  So this is all theory.  It is pie in the sky.  It

5   is not.

6          And the last thing I want to be clear about, Your

7   Honor, is it is often thrown at us, including in the filing

8   last night, saying that we're just like the plaintiffs in this

9   Pearson case.  I want to be very clear about this.  Each time

10  the State says to us that we are Sidney Powell, we are Rudy

11  Giuliani, we are Lin Wood, it is deeply, deeply offensive to my

12  clients.  And it is just wrong.

13         And, in fact, there is a tragic irony here that even

14  though this happened a year and a half ago, even though the

15  Secretary's office was on notice in May of 2021, which I'll

16  come back to, that this access may have happened, we are the

17  ones that brought this to light.  We are the ones who have

18  spent an enormous amount of time and money from flying to areas

19  of Georgia I never thought I would see to depose people and to

20  get documents and to get data and chasing down things like the

21  video footage from Coffee County that we were repeatedly told

22  for many months did not exist.

23         We spent a lot of time and money chasing that down

24  until they were finally forced to admit that they had it and

25  turned it over at the last minute that shows the people coming

1   and going, that show that people like Ms. Lathem were not

2   truthful in their deposition.

3          So I just -- I do want to be clear for all of the

4   plaintiffs that our view has never been -- we have never

5   alleged a hack of the system in the past.  We are not part of

6   the Stop the Steal campaign.  We believe that that is

7   completely bogus.  It is inappropriate.  They have misused work

8   in this case from us, from Your Honor, from others.

9          Our case is quite simply that there is a system that

10  is used in the environment in Georgia that because of the way

11  it operates and because of the way it has been maintained and

12  now the access it has had to it that voters cannot have

13  reasonable confidence that their vote will count when it is

14  cast.

15         And the State gets upset when we say that because

16  they say, well, you are undermining voter confidence.  And to

17  that I say no.  What undermines voter confidence is what

18  happened in Coffee County.  What undermines voter confidence is

19  the fact that the State has not shown any effort to investigate

20  what happened in Coffee County until just the last few weeks

21  when the GBI we now know was brought in, which is great.  We're

22  happy to see that.

23         But to the other point that I alluded to a moment

24  ago, in May of 2021, James Barnes, who replaced the election

25  supervisor, Misty Hampton -- she was the one who let the team

16

1   into the office in January of 2021.  Coffee County replaced her

2   with James Barnes.  James Barnes emailed -- and I have the

3   email that I can hand the Court if you need to see it.  It may

4   already be in the record.

5         James Barnes finds attached to her computer a

6   business card from Doug Logan of Cyber Ninjas.  Right?  At this

7   point, that organization was already in the press for the bogus

8   audit that they did in Arizona.

9         Dominion I think the day before sent a note out to

10  their jurisdictions, to county supervisors, and says -- warns

11  them that individuals like Doug Logan, Cyber Ninjas, are trying

12  to get access to voting equipment under the auspices of an

13  audit.  And Dominion made clear to everyone this is not legit,

14  you cannot give access to anyone to the equipment.

15        Mr. Barnes understandably gets concerned because he

16  sees this card for that organization sitting in the office that

17  he now handles.  He emails that business card to Chris Harvey,

18  the State election director, and says, I'm worried about this.

19  I'm alarmed is his word.

20        Chris Harvey, to his credit, within a few days -- I

21  think it may have been the next business day.  There may have

22  been a weekend in between -- quickly sends that on -- responds

23  to Mr. Barnes.  And he adds two very important people, Frances

24  Watson, the head of the investigative unit at the time in the

25  Secretary's office, and Michael Barnes, the long-time head of

1    CES.

2         And Mr. Harvey writes back sharing the alarm that

3    Mr. Barnes had conveyed and calls for an investigation by

4    Ms. Watson specifically into the question of whether there may

5    have been improper access with the Coffee County election

6    equipment.  Ms. Watson forwards that on to someone named Pamela

7    Jones.  My best guess is she's an investigator in Ms. Watson's

8    office because Ms. Watson says to Ms. Jones, follow up with

9    Mr. Barnes and let's find out what happened here.

10        So they get this alert.  And everybody does the right

11   thing.  Immediately they jump on this and say we're going to

12   investigate and figure out was there access.  And then it just

13   dies.  There is not a single document from the State indicating

14   that anything was done.

15        And we have now spoken with every single person

16   involved with this that we can get access to.  James Barnes

17   testified under oath he never heard another word from the

18   State.  Nobody came to him and said what Ms. Watson had

19   directed and Mr. Harvey had directed.  Did anybody get improper

20   access?  No one in Coffee County on the Board of Elections had

21   ever heard of this issue.  Didn't know there was even a concern

22   about Cyber Ninjas.  No one from the State came to look at the

23   equipment other than replacing the EMS server and the ICC in

24   June.

25        But, again, remember, their explanation for that

```
 1    isn't that they were worried about a compromise of the system,

 2    which is what Mr. Harvey had raised, but because the password

 3    just stopped working on the EMS server.  And to this day, we

 4    don't know why that was.  We can probably guess.  But we don't

 5    know.

 6            Then fast forward -- so there is no evidence of any

 7    investigation by the State when they get this incredibly

 8    alarming warning from the election supervisor.  Fast forward to

 9    April of this year.  And Gabe Sterling at a public conference

10    says there are these allegations about a breach in Coffee

11    County, we have investigated it, and it didn't happen.

12            So somewhere along the way, the State reached a

13    conclusion that the breach we now know occurred did not.  And

14    we have asked time and time again for some evidence of an

15    investigation.  And we have seen none.

16            And so that, Your Honor, is what I would respectfully

17    submit undermines voter confidence.  And that is all part of

18    the importance of our case.  Because the other piece of this

19    is:  The only way to secure a system is people have to know

20    that if they breach that system they are going to be held

21    accountable.  And these people almost got away with it.

22            The video that we now have from Coffee County that

23    shows the people who were there -- it is an incredible irony as

24    to how we got that.  The only reason we have that video, which

25    again the county claimed for -- their lawyers claimed for many
```

1  months did not exist -- is because in February of 2021 they let

2  the two election -- two election office employees go

3  purportedly for time sheet fraud.

4      The way they did that was they pulled surveillance

5  video from the office and they looked when those employees came

6  and went and compared that to their time sheets.  Otherwise,

7  that surveillance video all gets overwritten every 90 days

8  apparently.

9      So it turns out someone -- we don't know who because

10  they won't tell us -- held on to that video.  And so just

11  coming out of the fact that they decided to look into the time

12  sheets for these two individuals and pull the video and it

13  captured that window and they still have it, we have it.

14  Otherwise, we wouldn't have that.

15      And so, Your Honor, I guess just to net it out --

16  Your Honor, the one other thing I wanted to say is the other

17  thing we often hear from the State -- and Secretary

18  Raffensperger himself has been quite emphatic on this -- is

19  that what Dr. Halderman did is not real world.  They say, well,

20  he got access to the equipment, and that is not real world.

21  Because by getting access to the equipment, you know, that

22  would never happen in the real world.  Well, it did.  We know

23  that.

24      But here is the other piece.  And I do want to make

25  this clear.  What Dr. Halderman did -- his step-by-step

```
 1    analysis of the equipment, Mr. Beaver, the CIO, testified, that
 2    is exactly how a cybersecurity assessment is supposed to go.
 3    And they do it in the ordinary course.  They don't do it with
 4    the election system, which is odd.  But they do it with other
 5    pieces of the IT components.
 6             And this is what Mr. Beaver said.  It is referred to
 7    as a red hat assessment.  The red hat are the bad guys.  So
 8    they bring in someone like Fortalice.  They are the red hat.
 9    And they try to breach the system.  And what he testified is
10    when they do the red hat he says we gave them the user name and
11    password to a computer that was on our network.  Well, why did
12    you give them that access?  And he goes on to explain, it is a
13    typical exercise for a red hat.  That is how it is done.
14             And so it is frustrating and I would submit, Your
15    Honor, misleading when the State says that what Dr. Halderman
16    did is something out of the norm, it is not how it is done.  It
17    is how the Secretary's office itself does it.  We wish they
18    would do it on the election system.
19             But where does that leave us, Your Honor?  It leaves
20    us --
21             THE COURT:  Let me go back for one moment.
22             MR. CROSS:  I'm sorry.  Go ahead.
23             THE COURT:  As to the issue of posting the Dominion
24    software on the internet, is there a record of that?
25             MR. CROSS:  Yes, Your Honor.  We can actually -- I
```

1    can hand that up.

2            THE COURT:  How did you become aware of it?

3            MR. CROSS:  Sure.  So we served a subpoena on a man

4    named Paul Maggio.  You may recall the litigation.  Maggio was

5    the team lead for Sullivan Strickler that did the copying.  And

6    once Your Honor denied the motion to quash, they then seemingly

7    have fully cooperated.  They produced a lot of evidence,

8    documents.  We went back, and they produced more.

9            In two of the things they produced that I will hand

10   up if I may -- sorry.  I gave you all the copies.  Sorry about

11   that.  Two of the things that Sullivan Strickler produced

12   are -- the first one you'll see has like a bunch of black boxes

13   on the front of it.  Both have some redactions.  But one is --

14   the shorter one is a list of everyone who had access to the

15   Coffee County data and additional data that is blacked out we

16   think -- we understand from Michigan at least it is a list of

17   user names.

18           So you can see who those people are, what their email

19   addresses are, what their names are, and you can see their

20   permissions.  Like, for example, did they have the permission

21   to download, upload?  Can they delete things?

22           The next piece, the longer document, is an

23   upload/download log that I was talking about earlier.  And that

24   shows the user name.  And it shows -- if you look at it, that

25   first column that has like a long name that is like a file

1    name, that is the actual file that the individual either

2    downloaded or uploaded to that ShareFile site.  And then you

3    can see the date and when they did it.

4         And we have deposed -- we took a 30(b)(6) of Sullivan

5    Strickler.  They were very cooperative.  They came in and

6    provided a lot of information about what they did.  And one of

7    the things they said was at the direction of Doug Logan and Jim

8    Penrose, who is another individual associated with this, under

9    the engagement with Sidney Powell -- they put this all on the

10   internet.  And then they would share it with whoever Doug Logan

11   or Jim Penrose told them to share it with that.  And that sat

12   on the internet at least through sometime, it sounds like, in

13   the mid to late summer of --

14         THE COURT:  You are saying you learned this through

15   the deposition or --

16         MR. CROSS:  Both.

17         THE COURT:  -- you were reading -- as opposed to

18   somebody such as Dr. Halderman looking at the internet and

19   finding it?

20         MR. CROSS:  Correct.  That's right.  We did not find

21   it on the internet.  It is a ShareFile site that is -- to be

22   clear, ShareFile is a cloud service provider.  And so that is

23   part of our other concern here is this isn't something that was

24   like a local server in Sullivan Strickler's office that you

25   would get access to.  They uploaded it to a third-party company

1    that sits in the cloud.  And so anyone with access to their

2    cloud services potentially would have access to that data.

3              And, again, that data sat with -- you can tell by the

4    redactions based on what they have told us with voting data

5    that came from Michigan -- we don't know if there is data from

6    other places.  They looked at Nevada at least under the

7    engagement.

8              THE COURT:  Because I was trying to figure out -- I

9    mean, the more -- I mean, I'm not saying that that is not on

10   the internet.  I'm just saying -- trying to figure out whether

11   anyone was posting about it so others might be -- other members

12   of the public might be accessing it.

13             MR. CROSS:  Right.  Great question, Your Honor.  We

14   haven't seen that.  We do know that -- my understanding is Jeff

15   Lenberg who was the one who came on the second trip with Doug

16   Logan and the one who was there for five days -- he put up some

17   sort of YouTube video talking about something that he did in

18   Coffee County.

19             And the other thing also to keep in mind, Your Honor,

20   is every time someone downloaded that data, we don't know where

21   it went from there.  We don't know how they maintained it,

22   whether it was secure at all.

23             We do know that the data was also sitting out on a

24   hard drive on two occasions.  One of those occasions we know

25   went to a Stefanie Lambert, this lawyer involved with Ben

```
 1    Cotton, because we have a document on that from Paul Maggio's
 2    office.  That indicates that there was a previous shipment, and
 3    we don't know for sure what that was.  So the data went out
 4    both through the internet and on hard drives to a lot of
 5    different folks.
 6                THE COURT:  Okay.
 7                MR. CROSS:  So, Your Honor, where that leaves us --
 8    right? -- is in a world where --
 9                THE COURT:  I want you to wrap up because I'm not
10    going to be able --
11                MR. CROSS:  Absolutely, Your Honor.
12                Let me just say it this way:  This is how I think
13    about it.  If we're going on a skydiving trip and we saw a
14    bunch of bad actors unpack our parachutes, take them all apart,
15    and then repack them and put them back and we learned that when
16    we were on an airplane and if the pilot said to you, it is
17    probably fine, your parachute is probably fine, just go ahead
18    and jump and we'll find out when you're in the air, no one
19    would jump out of that plane.
20                That is where we are.  It is not an exaggeration.
21    Right?  We have lots of people who are widely considered bad
22    actors because of the lies that they spread about the 2020
23    election who had unmitigated access to the election system --
24    not pieces, not disconnected pieces -- the actual system in
25    practice for the better part of two weeks.
```

```
 1              And we don't know what all they did.  But we do know
 2   what they could have done.  And it is not satisfactory to tell
 3   voters, let's just hope the system works.  And we have begun an
 4   investigation in the last couple of weeks.  Let's hope that
 5   that doesn't find that the system doesn't work.
 6              That, Your Honor, we don't think is an appropriate
 7   way to proceed.  And that is why this is so critically
 8   important for our claims.
 9              Thank you, Your Honor.
10              MR. BROWN:  Go ahead, Vince.
11              THE COURT:  Thank you.  Is there anything else from
12   the plaintiffs' side, or did you speak on behalf of everybody?
13              MR. BROWN:  I don't have anything further, Your
14   Honor.
15              THE COURT:  Thank you very much.
16              MR. RUSSO:  Good afternoon, Your Honor.
17              THE COURT:  Good afternoon.
18              MR. RUSSO:  I want to first start and just say, you
19   know, that the scope of what has happened in Coffee County is
20   important to all of us.  It is important to the State and all
21   of us standing up here.
22              The -- you know, as we know, every system is
23   vulnerable to an insider attack.  What Mr. Cross has just
24   described, if true, is a crime, and it warrants prosecution.
25   But, you know, the access that these people had to the system
```

1    was they wanted access to show something and not necessarily

2    alter something from what we know.  But that doesn't change the

3    fact that they had unauthorized access and that an

4    investigation is going on.

5            Your Honor asked about the claims in this case and

6    how Coffee County and the incident in Coffee County affects the

7    claims in this case.  And, you know, Your Honor, the claims

8    originally in this case, as you may recall, involved the BMD QR

9    code and that, you know, humans couldn't read the QR code.

10           To date, we have yet -- there is yet to be any

11   evidence in this case of any voter who printed out their BMD

12   ballot and the names of the candidates printed on the ballot

13   were different than the candidates they punched in on the

14   screen.

15           We hear now -- and this, of course, has been shifting

16   to some degree over the years -- but regardless, you know,

17   individuals being able to trust and have confidence in the

18   system.

19           And, Your Honor, I think that we still maintain all

20   of our defenses regarding standing.  I think that highlights

21   one of the problems with standing in this case for the

22   plaintiffs and that this is a generalized grievance.

23           Of course, none of the individual plaintiffs reside

24   in Coffee County.  So to the extent this access to the

25   equipment in Coffee County is relied on for standing purposes,

1    it doesn't affect those individuals -- the individual

2    plaintiffs because they don't reside in Coffee County.

3         And, you know, the issues with regard to being able

4    to trust whether the machines are going to count the vote

5    accurately is an issue that would occur with hand-marked paper

6    ballots also.

7         As Mr. Cross correctly pointed out, the EMS and the

8    ICC in Coffee County was replaced.  The scanners -- the access

9    to the scanners -- those would be the same scanners that would

10   be used for a hand-marked paper ballot.

11        The discovery that has been conducted around Coffee

12   County included videos of the former supervisor in Coffee

13   County showing various problems that she believed exists with

14   the hand-marked paper ballots, not BMDs.  So there's that

15   issue.

16        THE COURT:  I thought what -- that she was -- I don't

17   know which video you are talking about.  But the one -- but I

18   thought at least the chairwoman's testimony before the

19   legislature dealt with, my understanding, still the functioning

20   of the scanning software as to -- in decoding the votes on the

21   absentee ballots.

22        MR. RUSSO:  The video that I'm referring to is one

23   that was produced by Robert Sinners in his production.  It

24   shows Ms. Hampton, who is the former election supervisor in

25   Coffee County, taking various hand-marked paper ballots and

```
1    scanning them through the system.  That is the one --
2            THE COURT:  That is the one you are talking about?
3            MR. RUSSO:  Yes, ma'am.  And at a broader level
4    though, the fact that the scanners were a part of the system
5    that they are pointing to as having been accessed, those are
6    the same scanners that would be used with what they -- the
7    relief they are seeking.
8            So, you know, at the end of the day, Your Honor, the
9    issues with the discovery around Coffee County need to be able
10   to demonstrate that there is a burden on the right to vote and
11   a severe burden on the right to vote.
12           The system -- it is a decentralized system.  We know
13   that.  We know -- it remains unclear how whatever access
14   occurred in Coffee County would be able to be spread across the
15   entire state.
16           The reference to Dr. Halderman and the amount of time
17   that he had I think is -- it is not that he was in a lab just
18   necessarily having free access to the equipment.  It is the
19   ability to put that into action in an actual election and how
20   that would have to work given the system is so decentralized.
21           So at the end of the day, the claims in this case
22   are, you know, First and Fourteenth Amendment claims under
23   Anderson-Burdick.  And a burden still has to be shown.  And I
24   don't think that -- we don't think that what has -- the access
25   from Coffee County -- in Coffee County gets to the point of
```

1   showing any votes have been changed.  There is, of course, a

2   criminal investigation going on.  Access to -- changing out

3   equipment, that is still something I will tell you is in

4   discussion for the State and how they go about doing that and

5   working with Coffee County to do that.  So that is still

6   ongoing.  But the EMS has been changed out.

7          Now, Mr. Cross mentioned references to Sidney Powell

8   and Lin Wood are deeply offensive to them.  And I understand

9   that.  And, frankly, Your Honor, discovery around Coffee County

10  has shown that Ms. Marks had communications with Harry

11  MacDougald, who was the attorney -- one of the attorneys in the

12  Pearson case.  Which, of course, as we know, the attorneys in

13  the Pearson case were also Lin Wood and Sidney Powell and an

14  attorney for an organization called Defending the Republic.

15  Those individuals were all involved in this Coffee County

16  incident.  And so that is -- there is a connection there.  It

17  is not just some made-up connection.

18         I'm going through my notes here.  Your Honor, I'll

19  just -- I think I'll just end with this, unless you have

20  additional questions.

21         THE COURT:  Let me just ask you just something to

22  clarify a few points.

23         So are you -- when you say this matter is under

24  criminal investigation, is that the GBI or is that what is

25  happening with the grand jury in Fulton County?

1          MR. RUSSO:  I'm referring to GBI's investigation is

2     my understanding.  So we're -- we represent the State in this

3     case.  We obviously don't represent the State in regards to

4     their investigation.  I'm not privy to all of those details.

5          I do know that Judge Duffey has indicated he would be

6     happy to speak with you if would you like to speak with him

7     about their investigation in an in camera conversation.  And I

8     think as far as I know that offer still stands.

9          THE COURT:  Okay.  All right.  Thank you very much.

10         MR. RUSSO:  I was seeing if my colleagues had

11    anything else.

12         THE COURT:  You are seeing if they had anything else

13    to pop in about.

14         MR. BELINFANTE:  Your Honor, if I may say

15    something -- and it is -- Mr. Cross and I talked last night,

16    and I told him I would do this.

17         And I know we're not talking about the brief we filed

18    last night.  But I want to say something on the record given

19    that it was on the record.  There is one point in the brief --

20    and I think Mr. Russo has now explained it a little better --

21    where it refers to plaintiffs having communications with some

22    of the litigants in the Pearson case.

23         That is not both plaintiffs.  That is not the Curling

24    plaintiffs.  And that could have been worded a bit more

25    strictly.  He and I talked about that.  So -- and I told him I

1    would make that representation today before you.

2            THE COURT:  Thank you.

3            MR. BROWN:  Just first on this last point -- go

4    ahead.

5            MR. CROSS:  Just to bring up on the last point, Your

6    Honor -- Mr. Brown may want to say something too.  Let me hand

7    you the email they are talking about.

8            Could I hand this to you, Mr. Martin?

9            THE COURT:  Thank you.

10           MR. CROSS:  I do appreciate the State's clarification

11   on that.  But we should be clear about what is happening here.

12   This is the email that they are referencing.

13           And if you look at the cover of it, it is the email

14   from Harry MacDougald to Robert Sinners, who is an employee in

15   the Secretary's office, where it just indicates that he has had

16   a call with Ms. Marks.  And you can see what she is doing here

17   is basically trying to explain to him why what they are trying

18   to do doesn't work.

19           But the heading here is data file needed for vote

20   swapping/switching.  And what the State said in their filing

21   last night -- they characterized Ms. Marks as consulting with

22   the people who breached the Coffee County elections office.

23           There is a call here.  But here is what is not

24   mentioned and what we find particularly troubling, Your Honor.

25   If you turn to the second page of this email, you will see that

```
1     there is an email from Frank Strickland at Taylor English.  He
2     appears throughout this entire thread sending multiple emails.
3     But in this one in particular, he writes to Robert Sinners, who
4     at the time was not an employee of the Secretary's office.  I
5     should be clear about that.  He came to the office in February
6     of 2021.  And he says -- he endorses Harry MacDougald.  I have
7     been friends and colleagues for 30 years.
8                 THE COURT:  I'm sorry.  I'm not --
9                 MR. CROSS:  Sorry.  If you look at the bottom of the
10    second page -- do you see the email from Frank Strickland
11    November 10 of 2020?
12                THE COURT:  Note to Robert Sinners?
13                MR. CROSS:  Yes.
14                THE COURT:  Uh-huh (affirmative).  Okay.
15                MR. CROSS:  Yes.  He goes on to write Mr. Sinners, I
16    hope you will take Harry's concept seriously.  My opinion is
17    that it should be pursued to a logical conclusion.  Harry needs
18    the granular data to accomplish that result.
19                And throughout this, this lawyer from the Taylor
20    English firm is trying to help these individuals find evidence
21    that they believe existed on swapping or switching votes.
22                So I don't think it is fair or accurate at all for
23    the State to say that Ms. Marks consulted with these
24    individuals in their effort to find data.  That is not -- or
25    their effort to overturn the election or do anything improper.
```

1    That is not what Mr. MacDougald's email indicates.

2            But what it does indicate, quite troubling, is that

3    the same law firm that was before this Court in September of

4    2020 defending this system, the same law firm that has defended

5    this system now for two years since, was actively working with

6    individuals who were trying to overturn the election to claim

7    that it was stolen for Joe Biden because votes were swapped or

8    switched in Georgia with that system.

9            And let me be clear.  We have shown -- see no

10    connection to the Robbins Firm on this.  I want to be very

11    clear about that.  It is only Taylor English.

12            But the State cannot have it both ways.  The State

13    cannot come in a filing with this Court and say because Harry

14    MacDougal had a call with Ms. Marks where she tried to convey

15    to him that what they were doing was nonsense and call that

16    consultation and yet when the very same law firm that has been

17    tasked with defending the system is actively undermining it

18    that is consultation.  And that is deeply troubling, Your

19    Honor.

20            The other just points I wanted to touch briefly on of

21    what was said, Your Honor, Mr. Russo said there is no evidence

22    that anything was altered in Coffee County.  That may be true.

23    I don't know.  We don't know everything they know because of

24    the investigative privilege.  But there is also no evidence

25    moving in the other direction because no one has looked.  And

1    that is troubling.  There should be confidence that nothing was

2    altered.

3           The notion that no plaintiff resides in Coffee

4    County -- they try to say this isn't relevant to our case.

5    Again, I have already walked you through the way the Coffee

6    County breach can infect the broader system.  I don't think I

7    need to say more on that.  But it is not isolated to Coffee

8    County at all.

9           Briefly on the hand-marked paper ballots point, Your

10   Honor, Mr. Russo is absolutely right.  Hand-marked paper

11   ballots, like any other voting system, have risks.  But here is

12   the key point that they always overlook.  To alter votes and

13   particularly to alter election outcomes with hand-marked paper

14   ballots is very difficult because you literally have to go

15   ballot by ballot.  Right?  You have to have an individual that

16   is going to mark a ballot to void that ballot, put a spare mark

17   on it or throw it out or replace ballots.

18          At most over a period of many, many hours and days,

19   one might be able to do that with a few hundred ballots.  With

20   people like Doug Logan and Jeff Lenberg and whoever this

21   programmer was, Scott Hall, sitting in an election office for

22   two weeks, they can en masse alter votes statewide.  Because it

23   just takes the injection of a piece of software to do that that

24   becomes almost impossible to detect, particularly in a very

25   close election like we saw in the Presidential election where

```
 1    you don't need to change a lot of votes to switch the outcome.
 2    And if you spread that out over a bunch of -- a lot of votes
 3    across -- or a lot of voters across 159 counties, it becomes
 4    almost impossible to detect, particularly when you don't have
 5    an RLA.
 6              And the last point I'll make, Your Honor, is this
 7    notion that it is a decentralized system.  Again, that is not
 8    how it works.  It is a very centralized system that moves up to
 9    the state level, information moves back and forth, including
10    over the internet.
11              And I'll leave Your Honor with that.
12              THE COURT:  Okay.
13              MR. RUSSO:  Your Honor, if I could just briefly -- I
14    want to just start:  Taylor English doesn't have a
15    representative here.  I don't necessarily know that it is fair
16    to Taylor English to be attacking Frank Strickland in this --
17    for him to be attacked in this email without them having anyone
18    here.
19              But, you know, you look at the email.  It is talking
20    about accessing server logs and server access.  We don't know
21    what all communications Ms. Marks might have had with the
22    Pearson plaintiffs.  We know Ms. Cathy Latham was one of the
23    plaintiffs in the Pearson case.  But we don't know that.
24              What we know next is that she had a recorded phone
25    call with Scott Hall.  That call appears to have -- the
```

1   recording started shortly after the call started.  We don't

2   know what they said to each other when the call started, if

3   they had had prior communications or not.

4          I mean, that goes to one of the discovery issues

5   here.  But Mr. -- at a larger level, Mr. Cross' statement that

6   they don't know if anything was altered is in and of itself a

7   concession that they do not know that there was any burden on

8   any voters.

9          THE COURT:  Right.  Well, the thing is though that is

10  why they are -- I'm going to just terminate one part of this.

11  I mean, I don't think it is going to be -- it is a very

12  fruitful thing to -- at this juncture for Ms. Marks to be

13  attacked or to -- or for Mr. Strickland to be attacked.

14         I mean, I think both of them are long-time voting

15  activists in their different ways and have a profound interest.

16  But I have no -- I'm just -- I just think we would waste less

17  time if we kind of could just strip ourselves of that.

18         It is not -- it is not helpful to me.  I know that

19  you -- the State subpoenaed Ms. Marks.  I don't know what has

20  happened with that and whether -- but that is my general view.

21         But then as to the -- not to say that there couldn't

22  be something critical that you go and pursue.  But I think the

23  State had a lot of still potential information available to it

24  that apparently wasn't -- might not have been pursued.  I don't

25  need to go further about that at this juncture.

1          But as to the question of, well, the plaintiffs

2    acknowledge that they don't know for sure whether anything was

3    modified or changed, I take it that is why they are saying that

4    they need to look at the -- have asked to look at these

5    servers.  Because also the State hasn't said we have done a

6    thorough examination and we tested it and we tried to attack it

7    and see what -- either.

8          So, you know, it is a -- I understand what you are

9    saying that Coffee County has its own -- also has its own

10   database.  But they are all integrated databases.  So that is

11   the concern.

12         And this has obviously been a moving target all

13   summer also.  The concerns about the -- how wide it is or how

14   profound it might be or not at all are just ones that everyone

15   has been -- it seems to me as far as I can tell, it has been a

16   moving target all summer.

17         MR. RUSSO:  And, Your Honor, I would simply just

18   point out that we do know when the servers were accessed, we do

19   know when they were taken out of use by the State.  There were

20   no elections held at that time in the intervening period.  So

21   we do know that they were not -- servers were not used in an

22   election.

23         So from that standpoint, that is something we know at

24   this point.  Regardless of whether some of these are more

25   discovery-related issues, I understand that.

```
 1              THE COURT:  Okay.  I mean, obviously most of the
 2    requests from the discovery still are from the plaintiffs.
 3              Mr. Sterling's deposition has been postponed by
 4    agreement; is that right?
 5              MR. CROSS:  Yes.
 6              THE COURT:  So are you -- have the parties agreed on
 7    completion of the depositions that are in Paragraph 1 under
 8    Roman Numeral II?
 9              MR. BROWN:  Your Honor, we have had some fruitful
10    discussions with the defendants' counsel on not only the
11    remaining discovery, which has already been launched, but also
12    we have told them the witnesses that we still have to subpoena.
13    And they haven't agreed that those are appropriate, but we have
14    disclosed why we want to take them and the limited nature of
15    that.
16              In terms of the mop-up, I think we're in agreement on
17    Gabe.  We're getting a date for that.  We haven't been able
18    to -- we have served but haven't been able to secure deposition
19    dates for Logan and Hampton and believe we'll be able to do
20    that in the next couple of weeks or so.  I'm not sure.  We have
21    a motion that we're filing -- have to file in Florida on Logan
22    because he hasn't produced documents.
23              And so in terms of the what I would call mop-up and
24    the way we presented it in the email to the Court was that we
25    wanted to inform the Court of what we needed to do but do not
```

1   necessarily believe that we need Your Honor to do anything with

2   respect to that.

3           In terms of the new discovery --

4           THE COURT:  Well, on the mop-up ones, let me just ask

5   you this:  I mean, just jumping to the defendants' request to

6   take the -- serve -- they had served a subpoena on Ms. Marks.

7   And I understand that the plaintiffs subsequently objected to

8   the subpoena and said that the defendants weren't authorized to

9   conduct discovery related to Coffee County.  I mean, that

10  doesn't make sense to me.

11          MR. BROWN:  That is not --

12          THE COURT:  That is not your position?

13          MR. BROWN:  That is not our position, Your Honor.

14  Our position -- and I think we've worked things out with

15  respect to Ms. Marks' subpoena.

16          Our objection was that they did a subpoena rather

17  than a Rule 34 request, which was improper right at the end of

18  discovery.  So we had only five days to respond to what really

19  is a document request to the party.  So we said that is not the

20  way to do it.  That is wrong, and there are reams of cases.

21          THE COURT:  Yes.  I understand that.

22          MR. BROWN:  You understand that.  And so the response

23  from Mr. Tyson, as you would expect, very professional and

24  reasonable, said, okay, can we -- can we deem Ms. Marks within

25  the control of CGG and would CGG give these documents or some

1     portion of these documents as a supplementation of their prior

2     discovery responses.  And I said sure.

3            And so -- and the key pieces here -- and some of this

4     is important information.  We're not saying that it is not

5     relevant.  One of the things that we have done throughout the

6     case is to share -- both sides have shared discovery that we

7     get from third parties with the other party, just as a matter

8     of course.  And we have done that through all of this.

9            We also launch a lot of Open Records Act requests.

10    And one of the State's concerns was to make sure that the

11    responses to Open Records Act requests that our organization

12    got or our volunteers got was also shared with the State.  And

13    we said sure, and we are going to produce that.

14           So I don't think -- we may have to work out some of

15    the details of the scope of the subpoena to Ms. Marks.  And we

16    will sort of drill down on that.  But we will make every effort

17    to resolve the State's concerns and give them a reasonable

18    response to that -- on that.

19           THE COURT:  All right.

20           MR. BROWN:  I don't know if you want me to address

21    this now.  But in terms of new people that we want to subpoena,

22    we listed in the email two people.  One was Jeffrey Lenberg,

23    and the other is Alex Cruce.  And both of them are seen in the

24    video in Coffee County.  And we did not see that video until

25    about a week ago.

1          And both of them are self-described computer

2    programmers.  And we believe that they obviously have

3    discoverable information.  So we would like to subpoena them.

4          In addition, we would like to subpoena a man by the

5    name of Ed Voyles.

6          THE COURT:  Is he here?  I don't remember seeing his

7    name.

8          MR. BROWN:  He is in Coffee County.  He was the

9    former chair of the Coffee County Board of Education -- I'm

10   sorry -- Board of Electors.  He too was in the Coffee County

11   offices during the caper and we believe has discoverable

12   evidence.

13          And then finally we may need to subpoena the

14   testimony of a man named Robert Sinners.  Mr. Sinners now works

15   for the Secretary of State but -- and has been there since

16   February of 2021.  But before that, he worked for the Trump

17   campaign.  And his phone number appears in some key -- in a key

18   text message during the actual theft of the Coffee County

19   equipment.

20          The two -- the text was sent from two people who have

21   pled the Fifth about why his phone number appears.  So we would

22   like to talk to him directly.  The State has -- the State

23   defendant has cooperated -- thank you -- and given us his

24   documents because he is now with the Secretary with the State.

25          So what the State I think, quite appropriately, did

1    is say we're going to represent Sinners from the moment he

2    joined the Secretary of State but before that he is on his own.

3         So we have actually got two document requests from

4    them.  But it leads to other questions that we have that we

5    think a deposition would be appropriate.

6         THE COURT:  And how long of a deposition?

7         MR. BROWN:  Our depositions have been pretty tight.

8    I think each of the -- well, not sure about Lenberg and Cruce.

9    Sinners, I think, would be several hours.

10         THE COURT:  So is your understanding that he was

11   working still for the Trump campaign or was he working for the

12   Secretary of State's office at the time the EMS server was

13   accessed?

14         MR. BROWN:  He was working for the Trump campaign,

15   and he also was the coordinator of the fake or what are called

16   the fake elector group.  And we know from his documents that he

17   was down in Coffee County.

18         He is also involved in the lawsuit that was -- odd

19   lawsuit that was filed against Coffee County by another fake

20   elector named Shawn Still, which is an unusual lawsuit, Your

21   Honor, in that it was filed in December against Coffee

22   County --

23         THE COURT:  December of '21?

24         MR. BROWN:  Of '20.

25         THE COURT:  Of '20.

```
1              MR. BROWN:  It was filed in December of '20.  And it
2       was filed in Fulton County against Coffee County,
3       Raffensperger, et cetera.  It alleges that -- makes a lot of
4       allegations that show a lot of information about internal
5       Coffee County information, which is suspicious.  Sinners signed
6       the notary for that lawsuit.  Shawn Still, the plaintiff in
7       that lawsuit, alleged in the lawsuit in a verified complaint
8       that he was a member of the Electoral College, not that he was
9       a nominee, not that he was a fake elector, but that he was in
10      the Electoral College, which, of course, is false.  And he
11      swore that under oath.
12              Oddly -- we don't know why -- that lawsuit was
13      dismissed without prejudice unilaterally by the plaintiff the
14      same day that Sinners got the -- that Sinners' phone number
15      appears when Coffee County was -- so Coffee County gets raided
16      that same day they dropped their lawsuit.  We don't know why.
17              THE COURT:  Raided in December?
18              MR. BROWN:  On the 7th of January.
19              THE COURT:  On the 7th of January?
20              MR. BROWN:  Right.  Same day.  So we think -- we
21      think in terms of whether it is discoverable is so plainly
22      discoverable that it may indeed lead to admissible evidence.
23      So that is why we would take those four, three of the people
24      who were there.  The other was contacted by people who were
25      there.
```

```
1              And that would wrap up the depositions that we
2     haven't subpoenaed.  The ones we have subpoenaed, we haven't
3     been able to tag.
4              Oh, I should add, Your Honor, that Cruce is important
5     because he was with Hall -- Scott Hall.
6              THE COURT:  I can understand that one.  All right.
7              MR. BROWN:  Okay.  That is what I have.  If you have
8     any questions, I'm happy to answer them.
9              THE COURT:  I mean, Shawn Still seems like, frankly,
10    a little more remote.
11             MR. BROWN:  Yeah.  Still -- Still is not on our list.
12             THE COURT:  He is not on your list.  This was an FYI?
13             MR. BROWN:  Right.  Sinners is.  And because he --
14    the people who were there called him the day it happened right
15    as it was wrapping up.  And we don't know why.  And they won't
16    testify because they are taking the Fifth.
17             THE COURT:  So you have not been able to serve who
18    that you indicated that you had been --
19             MR. BROWN:  We haven't been able to serve Scott Hall.
20    He is a bail bondsman.
21             THE COURT:  Right.  I know who he is.
22             MR. BROWN:  And then also Stefanie Lambert.  Stefanie
23    Lambert is the lawyer for Misty Hampton or purportedly is the
24    lawyer for Misty Hampton.  She engaged Cotton to look at the
25    Coffee County -- to do a forensic analysis of the Coffee County
```

```
 1    software.
 2              She is connected with many of the individuals
 3    involved.  She is in Michigan.  We have been trying to serve
 4    her for a couple of weeks now, I think.  And she is stuck in
 5    service.  She won't come out of her house.  And then we have
 6    served Misty Hampton and Doug Logan, and we are still trying to
 7    take -- trying to get them to appear for a deposition.
 8              I think that is it for who we are still trying to
 9    get.
10              THE COURT:  So what is your thought if you can't -- I
11    mean, this could be -- end up -- it is another district, for
12    instance, obviously in Michigan or in another district.
13              I mean, how long are you thinking that you -- I'm
14    just trying to understand just practically speaking how long
15    you would be extending this process.
16              MR. BROWN:  We have tried to be tactical in the way
17    we have gone after these witnesses.  And we have used 30(b)(6)s
18    to great effect because it allows an organization to testify
19    without taking the Fifth.  So that has been helpful.
20              And so we've tried to get the information at the
21    easiest source given the resource drain.  With Lambert, I'm not
22    sure what we'll be able to do.  We've got some leads on where
23    she is.  Maybe we'll be able to tag her up there.  And if we
24    do, we'll do a Zoom deposition.  And if she doesn't comply,
25    we'll contact the court up there just like we're doing in
```

```
 1   Florida with Logan.
 2            THE COURT:  Right.  All I'm asking you is:  How long
 3   would you imagine this was going to be out there?  I mean, I
 4   don't know whether -- I mean, I'm not -- you're asking for an
 5   extension for these purposes.  And I guess I'm just trying to
 6   understand what would be the -- I mean, if I grant it, then
 7   there is still the question of how long.
 8            MR. BROWN:  Your Honor, this may come as a surprise
 9   to you.  But we want to get this done.  And we want to try this
10   case.  And we want to get these questions answered absolutely
11   soon as we can.
12            We think we can do this in three weeks, and we would
13   be comfortable with that limitation, recognizing that we have a
14   lot of mop-up to do.  I think we can take Gabe Sterling's
15   deposition within that time period, which should be very
16   helpful.
17            We do need the State's -- although the file may be
18   thin, we would like the State's investigative files before we
19   take Gabe's deposition.  But don't have to have it in advance
20   of that if that is a difficulty.
21            THE COURT:  Mr. Belinfante is shaking his head.  I
22   can give you some instant feedback since you don't have eyes in
23   the back of your head.
24            MR. BROWN:  I think what Mr. Belinfante was referring
25   to is that it is a real fat investigative file that he is not
```

1    giving us, and I'm saying it is a real thin investigative file

2    because we don't see any traces of a real investigation.

3              THE COURT:  All right.  I can't -- that is beyond my

4    detective capacity between the two of you.

5              All right.  So you are saying three weeks?

6              MR. BROWN:  Yes.

7              THE COURT:  All right.  I'll separate -- we'll

8    separately discuss the EMS and the request as to access to data

9    or data systems.

10             MR. BROWN:  Yes, Your Honor.  The issue there is that

11   we all have copies of what Sullivan Strickler copied in Coffee

12   County.  The State has the only copy of what they copied in

13   Coffee County.  And so we -- our experts would like to have

14   access to make a comparison to the two to see if there are any

15   changes made.

16             THE COURT:  I missed something.  You-all have access

17   to what they looked at, but you don't -- but the State has

18   something more?

19             MR. BROWN:  The State has the actual EMS server.

20             THE COURT:  The EMS server from Coffee County?

21             MR. BROWN:  From Coffee County that they picked up

22   several months after -- after Lenberg was in there fiddling

23   with it for five days or whatever.

24             I don't want to get into the substance again.  But

25   that is crucially important to determine what was done after

```
 1   the caper on January 7, to see what was done to it by Lenberg
 2   or others.
 3          It is not -- we think it could enhance our case if
 4   there was something done to it.  But analytically it is really
 5   unnecessary because we have shown that the software is now in
 6   the public domain -- virtually in the public domain.  And so
 7   whether or not the hackers actually did something to that
 8   server doesn't stop the whole analysis that Mr. Cross went
 9   through about Dr. Halderman's report and the Secretary's
10   response and the ability of who knows how people have, maybe
11   even working in concert, to develop new hacks to go into
12   Georgia's system.
13          And for the same reason, the fact that it came from
14   Coffee County is irrelevant.  It can be -- any county in
15   Georgia can be hacked with the information that now the whole
16   world has that came from Coffee County.
17          And so we think it is actually to the State's
18   interest and to our interest and to their investigation to
19   allow our experts and their experts to compare those two and to
20   report to the Court as to if the existing EMS server that was
21   physically taken from Coffee County has any changes from it
22   between the time that it was copied.
23          THE COURT:  All right.
24          MR. BROWN:  Thank you, Your Honor.
25          MR. RUSSO:  I'll try to be brief, Your Honor.
```

49

```
 1              First, the first point is we have objected in the
 2     past, of course, to this additional discovery around Coffee
 3     County.  And we want to maintain that objection.  And it is the
 4     fruit of Ms. Marks' recorded phone call, of course, that was
 5     withheld in discovery.
 6              I think that gets to a point regarding the subpoena
 7     to Ms. Marks.  And I don't know -- you know, we'll work with
 8     Mr. Brown, of course, on that.  Our concern has been, you know,
 9     is she -- are documents being withheld because they are
10     claiming that they are hers in her personal capacity or are
11     documents, you know, also documents those of the Coalition for
12     Good Governance and therefore they would have been responsive
13     to past discovery requests.
14              As you may recall, we had had discovery requests at
15     one time about communications with Sidney Powell and the
16     individuals involved in the Pearson lawsuit.  We know that
17     those individuals were, of course, tied to the Coffee County
18     issue.  And the objections that the plaintiffs had to those
19     requests were upheld.
20              So when we deposed Ms. Marks in the 30(b)(6), we
21     were -- you know, they lodged objections.  Mr. McGuire did.
22     And we were not able to ask those kinds of questions.  So we
23     were kind of stuck in a situation where we don't know what is
24     hers individually, or is something being withheld for some
25     reason that we don't know?  And therefore we felt like the
```

1    subpoena was the best way to cover our bases.

2         Regarding --

3         THE COURT:  Let me just ask about that.  Are you-all

4    going to -- I have to say I don't remember all of the details

5    of what was objected to or not.  And these were also phone

6    calls.  So it can slip through.

7         But is Ms. Marks or the Coalition objecting to

8    providing her communications with --

9         MR. BROWN:  No, Your Honor.  Your Honor, I may not --

10   there was a period of time where I couldn't work on the Coffee

11   County issue for totally unrelated issues.  And I don't know --

12   I don't remember either.  However, our current position is no,

13   we're not objecting.

14        THE COURT:  You're going to give it to the State?

15        MR. BROWN:  Yes, Your Honor.

16        MR. RUSSO:  Moving on to the other issues, Your

17   Honor, access to the servers.  I think everybody -- I think the

18   plaintiffs recognize and agree that the servers were swapped

19   out prior to any election.  So I'm not quite sure what the --

20   how giving them access to those servers at this juncture

21   would -- what is the relevance of that to establishing their

22   claims since they were not used in any election after they had

23   been accessed.

24        That aside, you know -- and this goes into some of

25   the other points raised by Mr. Brown.  You know, there, of

1    course, is a criminal investigation going on.  And, you know,

2    we don't want this discovery to impede that investigation.  We

3    have -- my understanding is that the servers have been turned

4    over to law enforcement.

5         So, you know, that is just one other consideration of

6    ours that we want to raise.  Again, we're not involved in the

7    criminal investigation.  But they are obviously relevant to it

8    since they are tied to unauthorized access to the State

9    equipment.  So there's that.

10        With regard to the other individuals that they would

11   like to depose, you know, I don't want to get in a tit for tat.

12   I mean, I think a lot of these individuals -- they knew about

13   them previously.  They were referenced in Tweets and other

14   communications that were produced in Coffee County discovery.

15        Your Honor, if you're inclined to extend discovery,

16   that is fine.  We would just simply want to know what discovery

17   we're able to conduct in that extension since, you know, we

18   have got strings of emails where we were told that we weren't

19   allowed to conduct discovery.  So that is --

20        THE COURT:  Well, if I allow any more discovery, you

21   will have discovery too.  It is not a one-way street.

22        MR. RUSSO:  So I think that is really the only other

23   point I had is we just wanted to make sure we understood what

24   we could do and can't do.

25        THE COURT:  Okay.

1          MR. CROSS:  Your Honor, could I add a couple of quick

2    things?

3          THE COURT:  Well, you can answer this question since

4    you work most directly with Mr. Halderman -- Dr. Halderman.

5          Without you -- are you seeking a copy of the server

6    and ICCs by the Secretary?  Is there such a thing?  Rather

7    than -- you're not looking for the original that has been

8    seized by the -- by the GBI, are you?

9          MR. CROSS:  Literally what I wrote down to say to

10   you.  We're looking for a forensic copy.  So something that

11   would capture exactly as it appears on the ICC and the server

12   that the State took possession of.  And then we would put that

13   in whatever secure way we need to keep it to let our expert do

14   their work.

15         THE COURT:  So what would you -- I mean, it seemed

16   that it wasn't the most important thing, that it might -- what

17   are you hoping -- what are you thinking that it would reveal

18   that we should bother to do this -- spend the time for you to

19   do that?

20         MR. CROSS:  Right.  Again, let me just pick up for a

21   moment on what Mr. Brown said, which is in part the answer to

22   your question, which is I don't think we need this for our

23   claims.  I think we need it only to respond to their defense.

24         Because we heard the defense again today that we

25   haven't shown that anything was altered.  I don't think we have

53

1    to show that to prevail on our claims.  That said, I do want
2    to -- I have an obligation to explore every reasonable avenue
3    to respond to that argument.
4           And so given we know the access individuals had and
5    the prospect that something was altered or something was added,
6    I think we need to look.  And it may come back and everything
7    on that server may look exactly like it is supposed to except
8    for the indications of the breach that we know now are on that
9    server.  Maybe that is all we find.  I don't know.
10          But I think we have an obligation and a right given
11   their defense to be able to look at that and see when the
12   people went in did they alter any of the files.  Did they add
13   anything to the files?  Is there evidence, for example, of a
14   back door?  You know, someone could have added a remote access.
15   Those are the types of things we would want to look for to be
16   able to respond to the argument that has been made.
17          Again, Your Honor, I don't think the State can have
18   it both ways to say we don't have evidence that something was
19   altered but not give us the ability to look at the equipment
20   that was taken to see what it looked like after those people
21   left.
22          That is the challenge with what Sullivan Strickler
23   gave us.  It is very impactful to see everything Sullivan
24   Strickler was able to get and who they shared it with.  But
25   what we would like to see is what did the equipment look like

1    after these people left.  And that is what the State has in

2    their exclusive control and the county.  The county does as

3    well.

4              Let me just hand this up too if I may, Your Honor.

5              Mr. Martin, if I may.

6              So these are the photos that were produced by

7    Sullivan Strickler.  To Sullivan Strickler's credit, Your

8    Honor, they seem to have genuinely believed that they had all

9    the requisite permissions for what they did, which is somewhat

10   understandable.  When they showed up, Misty Hampton -- the

11   elections office employees were there, a member of the current

12   board was there.  Cathy Latham introduced herself as an

13   elections official, escorted them into the building.

14             So -- and they were acting under the direction of

15   attorneys who we all like to think are officers of the court.

16   So it does seem in fairness to Sullivan Strickler that they

17   generally believed they had the permissions to do what they

18   did.

19             Obviously they didn't because they couldn't get that

20   through the people who were involved.  But they followed their

21   normal chain, chain of custody.  They did everything as you

22   would expect to be done, including taking a lot of photos.

23             And what you have in these photos, Your Honor, are

24   all or at least most -- it may not be all.  That is not

25   entirely clear -- but where they go through the many

1  differences of devices and equipment, compact flash, thumb

2  drives, individual computers, laptops.

3         And they tag each one, they indicate what is on it.

4  It has a number associated with it.  And they documented

5  everything that they did.  So you can really see the

6  extraordinary scope of what all they copied.  It wasn't just

7  the EMS server or the ICC.

8         And everything you see there except for the EMS

9  server and the ICC continues to be used in whatever elections

10 are happening in Coffee County since January of 2021.

11        And to that point, Your Honor, again taking the EMS

12 server and the ICC doesn't really solve the problem.  If you

13 walk into a roomful of people and one person in that room has a

14 virus, taking patient zero out of the room hours or days after

15 he has been there doesn't mean no one else got infected in the

16 same time frame.  And that is our concern on what is left.

17        What I did want to touch on though just very briefly,

18 Your Honor, is the discovery issues -- the EMS server piece.  I

19 think I answered your question.

20        On the 30(b)(6) and on Sinners, one point we raised

21 with the State this morning -- they have not had an opportunity

22 to react to this.  But just to let Your Honor know how we are

23 trying get at this in an efficient way, because Mr. Sinners is

24 an employee in the Secretary's office and has been since

25 February of last year, to the extent he has any knowledge about

1    the events of Coffee County -- and, again, Eric Chaney who is

2    on the board text Mr. Sinners' number to Misty Hampton the

3    night when they are finishing up.  I don't know why that is

4    because Mr. Chaney pled the Fifth and Ms. Hampton has not

5    appeared yet for a deposition.

6          But there is that and other connections as to why we

7    want to get his information.  One way is to depose him.  The

8    other is because he is an employee of the State in a relatively

9    senior position -- he is now communications director -- our

10   position would be that the State has an obligation to educate

11   their witness on what Mr. Sinners knows about those events, if

12   anything, because he is an employee.  So he is within the

13   institutional knowledge of the State.

14         Again, just raised this this morning.  I'm not asking

15   them to take any position on that.  They obviously need to

16   think about that.

17         But our hope is that we will come to an agreement on

18   that.  And that may obviate the need to sit down with

19   Mr. Sinners in particular.

20         The other part of that is, as Mr. Brown mentioned,

21   because there is no Fifth Amendment invocation with a 30(b)(6),

22   that would let us get to whatever knowledge Mr. Sinners might

23   have without putting him in the position of having to assert

24   the Fifth, assuming he would need to.  He may not.  I don't

25   know because I don't know what he has to say.

1          The last thing I just wanted to hand up, Your Honor,

2     because I referenced it and so Your Honor has it --

3          May I approach, Mr. Martin?

4          This is the email exchange that I mentioned from May

5     of 2021 where Mr. Barnes alerts the State.  The only reason I

6     come back to this, Your Honor, is because I get where the State

7     is coming from when they say that the call between Ms. Marks

8     and Mr. Hall did not come out earlier.  Fair enough.

9          But what they extrapolate from that is to say that

10    they were surprised.  And I don't think that that is a fair

11    claim when they got this in May of 2021.

12         Here is the point I will leave you with before I sit

13    down, Your Honor.  In May of 2021, three of the most senior

14    officials responsible for elections in the State, the elections

15    director, the head of the investigative department, and the

16    head of CES, are all on notice that Cyber Ninjas may have

17    breached Coffee County.  They may have gotten access to

18    equipment.

19         And to their credit, they call for an investigation.

20    There is no evidence it ever went anywhere.  And it would have

21    to be a very senior person in the Secretary of State's office

22    for that not to go anywhere, I would have to think.

23         And so it is not well taken when they suggest that we

24    surprised them because Ms. Marks didn't produce a call earlier

25    when they had this and we have long wanted to know what

58

1    happened with it.  We don't have an answer.

2            Thank you, Your Honor.

3            THE COURT:  Let me just move on for a moment.  There

4    were some other items that we haven't talked about.

5            What is the story?  Have you been able to resolve the

6    question of the designation of Mr. Maggio's documents?

7            MR. CROSS:  We have not, Your Honor.

8            MR. RUSSO:  I'm happy to take that.

9            We have not resolved that issue.  I mean, the

10   documents are marked confidential under the protective order.

11   The protective order allows the parties to mark third-party

12   productions as confidential.

13           I think, you know -- and disclosing the Coffee County

14   server also may be somewhat related to this.  You know, the

15   production at issue that was marked confidential was provided

16   to the media prior to being provided to us.  We didn't have the

17   opportunity to mark it confidential prior to that being

18   disclosed or at least a portion of it.  And I don't think --

19   I'm not saying it was all disclosed, but I think like some

20   pages.

21           And, you know, to the extent that the Coffee County

22   server is -- we're still not -- we still don't think it is

23   relevant given that it was never used in an election after

24   being accessed, we would suggest that it should be attorneys'

25   eyes only if it was to be produced.

```
 1              THE COURT:  The server?  Is that what you are saying
 2     or the --
 3              MR. RUSSO:  That -- yeah.  I'm simply saying the
 4     server that they have now asked for.
 5              THE COURT:  All right.
 6              MR. RUSSO:  We don't think it should be produced.
 7     But if Your Honor is going to order that, we just want to make
 8     sure there are some protections around it, given that it is the
 9     subject of a law enforcement investigation also.
10              THE COURT:  All right.
11              MR. RUSSO:  You know, regarding the confidentiality
12     of the documents, I don't know that they are not able to use
13     those documents under the protective order with respect to
14     witnesses in depositions, quite honestly.  But I will let Mr.
15     Cross explain their position.
16              MR. CROSS:  Your Honor, on the EMS server and the
17     ICC, certainly we would agree to whatever reasonable
18     accommodations need to be made.  We absolutely agree that there
19     is sensitive software, if nothing else, on there.
20              We also suspect, Your Honor, because of our
21     understanding the way the Poll Pads work that there may be PII
22     for all 7 million voters.  Because one of the things that they
23     also copied was all of the Poll Pads.  And the State may have
24     more -- better information.  But my understanding is that each
25     of the Poll Pads has on it a copy of the full pollbook, which
```

1    includes voter registration information and certain PII.

2              We have not -- we have been very careful with that

3    hard drive because we don't want to stumble into that.  But we

4    think that what was also loaded to that ShareFile site and

5    downloaded and distributed may include PII for the full set of

6    voters across the State.

7              And so we are not challenging the confidentiality

8    designation if applied to certain things like that.  Right?

9    The Dominion software, fair.  If there is PII, fair.

10             But what they have designated because they did it in

11   an en masse designation is things like the emails that I have

12   handed up, third-party emails.

13             So one of the emails that we can hand you is where

14   you actually see Sullivan Strickler and Doug Logan and Scott

15   Hall and Sidney Powell and the others -- Stefanie Lambert --

16   sort of working their way up to the breach on January 7.

17             There is no basis to designate that confidential from

18   the State.  Those are entirely third parties.  The individuals

19   involved in that designated confidential.  They have designated

20   the CISA -- let me hand that up, Your Honor.

21             If you flip through that, Your Honor, I certainly can

22   see how that is embarrassing to anyone who is tasked with

23   securing the system.  But the protective order has a very

24   particular standard.  And it has to be, you know, like a

25   commercial sensitivity or some sort of sensitivity that goes

1    beyond just we don't really like what it says and the light
2    that it casts us in.

3              None of the individuals, including Sullivan
4    Strickler, who are involved in that email designated as
5    confidential.  And I don't think the State has any basis for
6    standing to do so.  And that is true for everything else in the
7    production.  The photos, for example, we handed up.  I don't
8    see any reason why the State can designate those confidential.
9    And some of the press already have a lot of that.

10             They have designated the CISA advisory confidential
11   in their own production.  They have designated correspondence
12   from concerned voters and candidates with the SEB that is
13   publicly available confidential.

14             In the Sinners production, they have designated -- or
15   Mr. Sinners or through the State has designated text messages
16   and other things that don't have any confidentiality about
17   them.  And it hamstrings our ability to use that because we can
18   only show confidential information to certain people.

19             And I will say, Your Honor, that we --

20             THE COURT:  I thought I heard Mr. Russo say they
21   don't object to your showing them to witnesses.

22             MR. CROSS:  To witnesses, right.  We can show it in a
23   deposition.  But if someone decides to cooperate with us --
24   right?  Let's imagine that we could get someone like Doug Logan
25   or Misty Hampton or someone to sit down with us.  As I read the

1    protective order, we have no ability to show them any of that

2    because we're not in a deposition.  But we should be able to do

3    that.

4         The other point, Your Honor, I will say is we very

5    much believe that there is an incredibly important public

6    interest in this case.  And part of what is important --

7    particularly because if the State is not going to make any kind

8    of switch to the system that we think is needed, it becomes all

9    the more important for voters to be educated so that they, for

10   example, can exercise their right to vote by hand-marked paper

11   ballot.  It doesn't resolve the issue.  But it may be a little

12   better than voting at the precinct on the BMDs.

13        So we don't think it is appropriate for a designation

14   to come in which seems intended to keep us out of the press

15   because it doesn't really serve any other purpose.  If our

16   experts, our clients, third-party witnesses can look at it, the

17   only ones who can't are the public and the press.  And that is

18   not at all what the protective order is intended to do.

19        If we can share it with all these other individuals,

20   then we should be able to share it with anyone who has

21   legitimate interest.  And we think that is true for the press

22   and for the public, Your Honor.

23        MR. RUSSO:  Your Honor, I'm going to let Mr. Miller

24   address some of this since he was involved in it.  But, you

25   know, he will address the confidential provision and the

1    protective order, which I think -- and outside of letting

2    anybody just have access to it does address whether they wanted

3    to show it to somebody who is copied on the email recipient.

4         MR. MILLER:  Thank you, Your Honor.  I'll be very

5    brief here.  But I do just want to make sure the Court is

6    cognizant of the course of proceedings that led to the

7    designation of this production as confidential.

8         On Monday morning probably about three or four weeks

9    ago, we received calls from our clients regarding press

10   inquiries they were getting specific to specific items that are

11   alleged to have been imaged and looked through and so forth.

12        Frankly, we had no idea what the impetus of it was

13   until about five minutes later which landed in our in-box was

14   the production of subpoenaed documents from Mr. Maggio.  At

15   that point, we simply were trying to both get our hands around

16   what exactly was produced while at the same time trying to

17   protect against what we have been referring to throughout here

18   of the ongoing criminal investigation and disclosures that will

19   be made to witnesses that, you know, not only just related to

20   the criminal investigation but that are going to come up and,

21   frankly, interfere or dilute the testimony of witnesses that

22   are going to come up in this case.

23        Nonetheless, that is the process that led to the

24   designation of these documents.  At the same time, what we

25   explicitly stated in the designation of the documents is that

1      we are marking them confidential so as not to preclude their

2      ability to use them or for their clients to access them.  We

3      were explicitly providing that you can use these in a

4      deposition as you would like going forward.  And we

5      subsequently -- my colleague followed up and said what can we

6      do to make sure this doesn't happen moving forward.

7               And the point was not that there can be no public

8      discussion of this litigation.  There has been plenty of public

9      discussion of this litigation.  But such that we receive the

10     documents before a call is made to try and get some reporter to

11     write a news story about it.  It is a newsworthy story.

12              But, Your Honor, that is the process that led to

13     this.  And at this juncture, there is nothing impeding the

14     ability to use these documents going forward, which says you

15     can use them for a deposition.  In fact, the example as to

16     Mr. Logan, we received an email from counsel asking can we show

17     Mr. Logan one of these documents that has been marked

18     confidential because we think we might be able to talk him into

19     cooperating for a deposition.  We said, sure, go ahead.

20              I presume they did so.  We asked them to copy us to

21     the email.  That didn't happen.  But I presume it -- we

22     received it after -- you forwarded it to us, afterward.  Yeah.

23     You wouldn't copy us.

24              MR. BROWN:  You received it.

25              MR. MILLER:  You forwarded it to us.  So that is what

1   this whole process has been.  You know, I'm not going to go
2   into the whole back-and-forth over the State would be
3   embarrassed over this Sidney Powell stuff.
4           You know, Your Honor, two points that I just have to
5   make real quickly is:  In November and December of 2020, I
6   spent my Thanksgiving and Christmas defending against Sidney
7   Powell and Lin Wood.
8           Likewise, with respect to every single document we
9   have ever received in this case from the Curling plaintiffs,
10  all of them have been designated attorneys' eyes only.  We
11  haven't caused a fuss.  At the end of the day, discovery is for
12  litigation.  It is for advancing the ball forward.  And if we
13  get to the point to use it in court, we will address those
14  items as well.
15          I'm not here to go tit for tat on that.  But that is
16  the context in which this is all occurring.
17          THE COURT:  Thank you.
18          MR. MILLER:  Thank you.
19          THE COURT:  I just want to go back for a moment to
20  understand what is up on the cloud and that somebody else could
21  access at this juncture or that whether -- I mean, whatever
22  happened in Coffee County appears remarkable.  But I mean, it
23  is still the question of its impact on your claims.  And voters
24  here are not from Coffee County.
25          I understand this is not an isolated system though.

```
 1    So I'm trying to understand what exactly again is up on the

 2    cloud that somebody else could grab that it would be -- that

 3    is -- or otherwise that is sort of -- that you believe is

 4    transformative of your position as to the challenge of your

 5    standing.

 6             MR. CROSS:  Yes, Your Honor.  The cloud as we

 7    understand from the 30(b)(6) that we got from Sullivan

 8    Strickler has been taken down.  They shut the ShareFile site

 9    down they thought sometime last year maybe in the late summer.

10    So --

11             THE COURT:  Of '21?

12             MR. CROSS:  Of '21, yes, Your Honor.  So the Dominion

13    software and whatever data -- additional voting data they got

14    sat up on that cloud from January until sometime in the late

15    summer.

16             THE COURT:  So that had the Dominion software on it?

17             MR. CROSS:  Yes.

18             THE COURT:  I just wanted to confirm that.  Okay.

19             MR. CROSS:  Exactly.  Dominion software from the

20    server, Dominion software from the tabulators, the scanners.

21    We understand it also had the Dominion software from the BMD at

22    least from a thumb drive.  Because one of the pictures you have

23    there is labeled ICX install.  The ICX is the term Dominion

24    uses for the BMD.  The install, as we understand it, would be

25    the operating software -- the Dominion software for the BMD.
```

```
 1              It is -- they may have had some trouble imaging the

 2      BMDs themselves.  But the software would sit on that thumb

 3      drive from what we understand.

 4              To your question, Your Honor, about standing, you

 5      know, even before we heard about Coffee County -- and we have

 6      talked about this before.  I mean, we can only read so much

 7      into an oral argument.  We don't have a decision from the

 8      Eleventh Circuit.

 9              But it certainly sounded like there was no real

10      concern of standing in this case for the plaintiffs with the

11      Eleventh Circuit panel.

12              THE COURT:  Right.  I mean, I have heard that before.

13      I'm asking you about how this evidence -- what this whole

14      development affects you.

15              MR. CROSS:  I see.  Again, Your Honor, because

16      what -- it shows two things.  One is it shows that there has

17      already been an intrusion into the system that may very well

18      cause the system not to work as it should going forward in

19      future elections.  And that would not be limited to Coffee

20      County for the reasons I have already given.

21              But it also shows, Your Honor, that the security

22      system, which again we submit is really the only defense that

23      the State has at this point in this case to the vulnerabilities

24      Dr. Halderman and CISA have identified -- it just doesn't work.

25      Right?  Because -- and that is, I think, really the most
```

```
 1    important takeaway from this.
 2            Let's put aside -- let's just assume for the sake of
 3    argument that all these people did was copy a bunch of stuff
 4    and they didn't do anything that would have caused the system
 5    to work wrong going forward.  Let's assume best case scenario.
 6    That doesn't affect our claims.  Because what the State is
 7    saying is yes, we have a voting software system that has lots
 8    of very serious vulnerabilities.  Those vulnerabilities could
 9    be exploited in a number of different ways.
10            But our defense of the State is no one could ever
11    exploit them because you have to have physical access to the
12    equipment.  And what we now know is that is not hard to get.
13    Not only is it not hard to get, it is not hard to get in spades
14    at a level no one I think ever would have predicted.
15            THE COURT:  So going back to the State's former
16    expert witness in an earlier proceeding from Pennsylvania whose
17    name is --
18            MR. CROSS:  Michael Shamos.
19            MR. RUSSO:  Shamos.
20            THE COURT:  Thank you.  I mean, he would say that is
21    as old as an election system, that you could pick up the boxes.
22            MR. CROSS:  Right.  And here is why that is
23    important.  This is where I think there has always been a
24    little bit of sort of ships passing in the night between us and
25    the State.
```

69

1          Today Mr. Russo says hand-marked paper ballots have a

2    problem.  Dr. Shamos said that.  Although Dr. Shamos did say

3    don't use QR codes.  So he was in agreement with us on that.

4          The point is this -- and it is the point I made

5    before -- one of the reasons hand-marked paper ballots are

6    secure --

7          THE COURT:  All right.  I'm not interested in why --

8          MR. CROSS:  Well, that is how this connects to our

9    standing.  I don't want to just repeat myself.  But the way

10   this connects to the standing is:  If you can't secure the

11   system against access, then what you need to do is mitigate the

12   mischief someone can make.  Right?  The mischief one can make

13   with hand-marked paper ballots happens on a fractional scale of

14   what you can on a BMD system for the reasons I talked about

15   before because you can't manipulate the ballot en masse.

16          THE COURT:  Okay.  Well, I get that.  And so you are

17   saying you can't manipulate the ballot.  You can't manipulate

18   the QR code because there is no QR code, et cetera.  And I do

19   understand that.

20          But that is -- one would say -- that is a -- may be a

21   policy issue, a larger systems issue.

22          Does it in some way in terms of your individual

23   clients --

24          MR. CROSS:  Yes.

25          THE COURT:  -- have an impact?  That is what I'm

1      asking.

2              MR. CROSS:  Yes.

3              THE COURT:  How does this in any way maybe build your

4      case about that in your mind?

5              MR. CROSS:  Because the supreme court has made clear

6      that the right -- the constitutional right to vote is not just

7      to cast your vote.  It is to have your vote counted the way it

8      is intended.

9              Necessarily implicit in that is that voters have to

10     have confidence -- reasonable confidence -- right? -- that that

11     will happen the moment they walk away.  We are all agreed on

12     that.  Their own witnesses have testified that voter confidence

13     is really, really critically important.

14             But you can't have that in this environment with this

15     system.  And that is where the injury comes on an

16     individualized level.  Right?  Every voter who votes on this

17     system knowing what we now know about it --

18             THE COURT:  But isn't that every voter --

19             MR. CROSS:  No.  Because --

20             THE COURT:  -- then and therefore is a generalized

21     harm?

22             MR. CROSS:  No.  Because the harm is individualized

23     to each voter.  Right?  This is *Spokeo*.  Right?  The supreme

24     court in *Spokeo* makes clear in a footnote that just because

25     many different people may suffer the same harm -- think of mass

1    torts.  Right?  Mass torts, everybody suffers a lot of the same

2    harm.

3              My work, antitrust cases, everybody gets overcharged.

4    They all suffer the same harm.  But they all still have

5    standing individually to sue.  Because even though they are all

6    suffering the same or similar harm, the way it impacts them is

7    individualized.  And that is what the standard is.

8              It is not what the State says, well, if everyone

9    suffers the same or similar harm coming out of the same set of

10   events, you have no standing.  If that were the standard, you

11   would vitiate a whole lot of types of actions, especially civil

12   rights actions.  They would be gone.

13             And the supreme court time and again has said that is

14   not what we're talking about.  Again, you can look at *Clapper*

15   like we have talked about before.  *Clapper* is very clear.  It

16   is our case.  Because what it says is in *Clapper* that if those

17   people could show that they had sort of -- the CIA had actually

18   been listening to their calls individually.  Well, they would

19   have standing.  But it was all speculative about whether they

20   might be.  Right?  That was what *Clapper* turned on.

21             *Clapper* didn't say, well, even if they were listening

22   to their calls, they would all have to suffer the same harm.

23   The Court actually says, if you can show that, then you have

24   standing.

25             So it is not what they are saying.  And it is hard to

1   imagine any more individualized harm at a democracy level than

2   taking away the right to vote or rendering it illusory where

3   voters walk away and they don't know.

4           THE COURT:  All right.  I think --

5           MR. RUSSO:  Your Honor, would you like for us to

6   respond to that?

7           THE COURT:  If you want to, you are welcome to.

8           MR. RUSSO:  Sure.  I'll be quick.

9           In regards to the cloud, my understanding from the

10  30(b)(6) deposition was that the cloud was password protected.

11  Now, I'm sure Mr. Cross will say somebody could have downloaded

12  it from the cloud and then done something with it.  Of course,

13  we would know if somebody downloaded it from the cloud based on

14  the logs.

15          But putting that aside, the plaintiffs' own expert or

16  consultant, Susan Greenhalgh -- she stated publicly that

17  Colorado's Dominion system, which is the same Dominion system,

18  was made publicly available in 2021.  So the fact that

19  something -- that a system is necessarily out there, I don't

20  know that that wins the day for the plaintiffs.

21          I mean, the burden of proof to show that the burden

22  on the right to vote is severe and outweighed by the State's

23  interest, of course, is on the plaintiffs.

24          Mr. Cross has referred to this mass torts scenario

25  which the individuals who are injured in a mass tort have all

```
 1   actually experienced an injury.  That is the difference.  Here,
 2   the harm that Mr. Cross has stated is having reasonable
 3   confidence.  And I don't even know what exactly that means.
 4   But he said some reasonable confidence that their vote is
 5   counted.  And that applies to everybody.
 6             So the issue of the generalized grievances is not
 7   solved by pointing to other areas of law where multiple people
 8   are injured and standing does exist.
 9             So I'll leave it at that, unless you have questions
10   for me.
11             THE COURT:  No.
12             I just would -- Mr. Cross, was the -- when Mr. Russo
13   indicates that your colleague had testified or referenced that
14   the Dominion system was made publicly available in 2021, what
15   did that mean?  Do you know?
16             MR. CROSS:  That is for Bruce.
17             MR. BROWN:  Yeah.  Your Honor, it is very
18   significant.  Colorado uses hand-marked paper ballots.  They
19   have BMDs only for accessibility.
20             THE COURT:  Right.
21             MR. BROWN:  So the implications of that is why we are
22   seeking the relief in this case.
23             THE COURT:  All right.  I just was asking about the
24   cloud.
25             MR. BROWN:  Right.  And the significance of the
```

1  cloud -- of the -- it is very fair to say that in any realistic
2  way the Dominion software that Georgia uses in every county is
3  in the public domain.  It is -- it has been copied by a number
4  of people with no restrictions on how they can copy it.
5          So although it was only on the cloud in a ShareFile
6  site for six months, it is unreasonable to assume anything
7  other than anybody who wanted to get their hands on it could
8  get their hands on it.
9          THE COURT:  Right.  I understand that that is what
10  you believe the evidence will show.  I'm just asking about --
11  Mr. Russo indicated that a colleague of -- whose name I
12  recognize -- but Susan --
13          MR. BROWN:  Greenhalgh.
14          THE COURT:  Greenhalgh -- that she indicated that the
15  Dominion system from Colorado had been officially posted on the
16  -- is that so?  And what did that mean?
17          MR. BROWN:  I understand that it was downloaded from
18  Mike Lindell's forum.
19          THE COURT:  Oh, I see.  It was not officially posted
20  through the Secretary of State's office?
21          MR. BROWN:  That's correct.
22          THE COURT:  I've got it.
23          MR. RUSSO:  I didn't mean the Secretary of State's
24  office had made it public.  I'm happy to provide the public
25  article that she wrote that links to this, if Your Honor would

1    like it.

2              THE COURT:  All right.  Thank you.  That would be

3    great.  You can provide it to us at the conclusion.

4              All right.  Well, it sounds like you have some plans

5    for moving forward.  I would like to think a little bit about

6    this.  But you can obviously proceed with anything -- any

7    depositions that have been noticed.  And you have a plan for

8    going forward as to the documents of -- Ms. Marks' document --

9    the subpoena for her documents.

10             And I will issue something by the end of the day

11   basically giving you -- as to the rest of the matters before

12   me.  I don't want to have you hanging out while I'm trying to

13   parse out what you have all said.

14             MR. CROSS:  Your Honor, I think the one thing that we

15   need help from you with in the short term is resolving the

16   investigative privilege issue.  Because as I understand it from

17   the State, as things stand, when we go in to Mr. Sterling's

18   30(b)(6) deposition, they have let us know that there will

19   likely be a lot of instructions not to answer.

20             We obviously have a disagreement in scope.  And the

21   situation has evolved.  When we were briefing this before, we

22   did not have evidence in our view of an investigation.  There

23   now is.  There is no dispute about it.  The GBI has begun an

24   investigation.

25             So there is some scope that likely is appropriate.

1    We still submit -- and I'm not -- I would rather Your Honor

2    just rule on the papers than us take the time to file a reply.

3            What I will just say briefly in response to their

4    opposition is it still doesn't meet the standard.  We walked

5    the Court through very specific factors that the courts have

6    said must be satisfied if you are going to invoke the

7    investigative privilege.  They do not address those factors.

8    One of which is it has to come from the Secretary himself or

9    from Judge Duffey.  And all they have is a declaration from

10   Ryan Germany.  And then we go through the other factors.  I

11   won't repeat it.  But those arguments have not been refuted.

12           To net it out practically, I think Your Honor is in

13   the unenviable position of trying to figure out where the line

14   is.  I think they are drawing the line far too broad because

15   they are sweeping in all facts.

16           We are not interested in their investigative

17   procedures, the sort of things like people undercover or how

18   they are analyzing certain things.  If they had a consultant to

19   come in and look at the EMS server and engage in certain

20   methods, we're not interested in any of that.

21           What we do want are the facts.  What have they found?

22   What have they pursued?  And the facts of the investigation

23   because we do think an important issue here is what did they

24   investigate when.  For example, what sat behind Mr. Sterling's

25   report in April that the State had concluded the breach did not

1    happen?

2            So we do need at Your Honor's earliest opportunity

3    before that deposition guidance.

4            THE COURT:  When is the deposition?  You haven't

5    scheduled the deposition?

6            MR. CROSS:  They are going to offer us dates for the

7    week after next.  So we are -- sorry.  It is a tight timeline.

8    But sometime in the next couple of weeks.

9            We could probably put that off a little bit if Your

10   Honor needs a little more time.  There is not urgency to it.

11   We would like to get it done sooner than later.  But more

12   important is giving Your Honor time to resolve that.

13           THE COURT:  So Mr. Russo or your colleagues, what

14   is -- why would information concerning why Mr. Sterling had no

15   knowledge of the investigation or said he had no knowledge or

16   what he knew back -- when the last deposition was taken -- why

17   would that be privileged?

18           MR. BELINFANTE:  I think there are certain ones --

19   and we said in our brief -- and I'll read it from Docket 1444.

20   It looks like Page 3.  Questions about the existence of timing

21   of investigations as opposed to sources and methods are not

22   subject to a claim of investigative privilege.

23           So some of those questions we won't do or we would

24   not object to.  What we have said is -- and I think

25   unfortunately this is why it is tough to make a blanket rule or

1    a blanket ruling at this point.  Because each question is going

2    to necessarily call in different factors.

3            So, for example, when Mr. Cross talks about it comes

4    from the Secretary of State or the SEB, right now -- and they

5    have been separate entities.  But right now, they are even more

6    separate entities.  The Secretary is no longer chair of the SEB

7    and all of those kind of things.  So there are different pieces

8    there.

9            Also in some ways -- and I think Mr. Russo spoke to

10   this -- we're also in a little bit of a bind because we don't

11   know what all the GBI is doing as civil counsel in this case.

12   We don't know a lot of what is there.

13           And so to the extent that the 30(b)(6) witness is

14   supposed to be charged with knowing what law enforcement is

15   doing, they may not.  And to the extent that they do know what

16   law enforcement is doing, well, that would certainly we think

17   fall within the investigative privilege.

18           And so -- but I think that the real challenge here is

19   trying to determine here and now which questions will violate

20   and which will not.  I mean, I think we have sat out some of

21   that information in our brief.  But really it seems to be a

22   case by case basis or question by question, I should say.

23           THE COURT:  Okay.

24           MR. CROSS:  Your Honor, if the State's position is

25   that sources and methods are off-limits, speaking for myself --

1    Mr. Brown can say if he disagrees -- I think that is fine.  I

2    don't think we're asking -- source is a little bit harder maybe

3    because that gets into facts.

4         You know, we certainly want the names of people who

5    are involved in things.  But we don't need to get to the level

6    of this investigator spoke to this source and that is how they

7    learned this.  Or this investigator undertook this method.

8    Whether it is following someone or looking at a phone, we don't

9    need that.

10        So maybe we're not as far apart as it seemed on the

11   brief.  It is just the facts.  Right?  We want to be able to

12   say tell us essentially what do you know about the breach in

13   Coffee County.  Just walk us through the facts of what

14   occurred.

15            THE COURT:  The sequence of time.

16            MR. CROSS:  Right.  Tell us what you did.  Not the

17   methods of investigation.  But when did you initiate an

18   investigation?  How did that investigation proceed?  Who was

19   involved?  Who knew what?  If you reached a conclusion, as it

20   sounds like, how did you reach that conclusion and why?

21        Just factual level.  And maybe there is not as much

22   of a gap if their real concern is sort of the investigative

23   sources and methods.  We acknowledge depending on the scope of

24   that that generally would be investigative privilege.

25            MR. BELINFANTE:  And I think this is just proving the

1     point that it is a question by question analysis, Number 1.

2     But I would have to say -- and I realize relevance is not much

3     of an objection in a deposition.

4            But, you know, let's say that the investigation

5     started April 1.  Let's say it started September, you know, 5.

6     What relevance is that to where we are in terms of the claims

7     that are there and the harm to the right to vote?

8            So I'm really not sure where all of this is going in

9     the first place.  And so -- and given what Mr. Miller talked

10    about in terms of, you know, us getting press inquiries before

11    we see documents, it heightens our concern about the

12    investigation.

13           I mean, we have been told for months, you are not

14    investigating.  We're not in a position to comment on much of

15    any of it.  And so we're concerned of the nature of the

16    questions.

17           And so that is why we took a very strong position on

18    the investigative privilege.  But I do think to Mr. Cross'

19    point we're not objecting to a lot of the questions that are

20    there, other than relevance, which I realize is not going to be

21    something that we'll instruct the witness not to answer on.

22           THE COURT:  Well, would it be worthwhile for you to

23    spend a little more time talking with each other about how

24    you -- given the fact there is some overlap in your -- and some

25    possibility of narrowing what the problems are, you might be

```
1   able to do that.  And then if we pick a date for the deposition
2   when I know I'm available, then at the -- you know, you can
3   take a break at some point and we could then go over in the
4   deposition those matters.
5           MR. BELINFANTE:  I think that is a great idea.
6           MR. CROSS:  Yes.
7           THE COURT:  It sounds like you could narrow a lot
8   yourselves.  And then what you are worried about is, you know,
9   what do you do -- you don't really want to litigate the whole
10  thing again and go on and on.
11          So I will tell you I'm kind of absolutely creamed
12  through the end of September.  So if the trial that I'm worried
13  about in the first of October doesn't materialize, it will be
14  easier.
15          But if you do it, we can try to -- if time is not of
16  the essence in terms of doing this in the next two weeks, then
17  I could make myself available.
18          MR. BELINFANTE:  Your Honor, it sounds like -- and I
19  may suggest this, just thinking out loud:  While they have got
20  other depositions to do, we were trying to offer Mr. Sterling
21  because it was being made up because of a death he had in the
22  family.
23          THE COURT:  Right.
24          MR. BELINFANTE:  If they want to do the other
25  depositions and then we can do Mr. Sterling to accommodate the
```

```
 1   Court's schedule, we could all certainly be in touch.  We can

 2   certainly talk about that.  But that may be --

 3              THE COURT:  Why don't you-all just, you know, talk

 4   some more between yourselves about this.  If you need -- I

 5   mean, I obviously have sort of held back on dealing with this

 6   because it is -- it is messy and I don't know all the evidence.

 7              But if you can come to some general contours and you

 8   tell me what those are, then I can be of more help during the

 9   course of the deposition.

10              MR. CROSS:  Okay.  Thank you, Your Honor.

11              MR. BELINFANTE:  Thank you.

12              THE COURT:  So I'm going to hold off on ruling on

13   that until you have made any progress or -- and I'll give you

14   a -- I think that --

15              Harry, when do you think we're going to hear from

16   Brendle?

17              COURTROOM DEPUTY CLERK:  I don't know.  I was hoping

18   today, but she didn't give me any indication.

19              THE COURT:  We'll get back to you by the beginning of

20   next week.  I think we'll know then at least.

21              MR. BELINFANTE:  All right.  Thank you, Your Honor.

22              THE COURT:  All right.  Well, we'll get back to you

23   by the end of the day.  And thank you.

24              And I do acknowledge that it is nicer to see

25   people -- their real faces.  And I think, you know, for me I
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
1    can understand who is talking because I have talked with
2    you-all for so many years.  For my law clerks, that is a whole
3    other matter.  You know, they are saying, who is that?
4             Even though, you know, we have the true protectress
5    here.  Ms. Welch always asks you who is speaking.  But I think
6    it is harder for them when they hear you.
7             MR. BROWN:  Thank you, Your Honor.  Mr. Belinfante
8    does look much better in person.
9             MR. BELINFANTE:  I'm not sure how to respond to that,
10   Your Honor.  It doesn't happen often.
11            THE COURT:  I don't know.  I think we have a very
12   handsome crew here all together in my view, very smart and very
13   handsome.  So -- and obviously the law firm decided to stick
14   with that rule when they picked the next associate.
15            All right.  Thank you very much.  I appreciate the
16   tenor of the discussion and its thoughtfulness.  And I have got
17   these exhibits now.  So we'll look at them a little bit more.
18            And thank you.
19            MR. CROSS:  Thank you, Your Honor.
20            MR. BROWN:  Thank you.
21            COURTROOM SECURITY OFFICER:  All rise.
22                    (The proceedings were thereby concluded at 3:06
23                    PM.)
24
25
```

84

```
 1                    C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   83 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   9th day of September, 2022.

14

15

16

17                        _____
                          SHANNON R. WELCH, RMR, CRR
18                        OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```