# EXHIBIT 2

Page 1

1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF GEORGIA

3                 ATLANTA DIVISION

4

5          Civil Action No. 1:17-cv-02989-AT

6    _____

7    DONNA CURLING, et al.,

8         Plaintiffs,

9    vs.

10   BRAD RAFFENSPERGER, et al.,

11        Defendants.

12   _____

13

14      VIDEOTAPED DEPOSITION OF DEAN M. FELICETTI

15   DATE:          September 2, 2022

16   TIME:          9:12 a.m. to 4:28 p.m.

17   LOCATION:     Witness location

18

     REPORTED BY:  Felicia A. Newland, CSR

19

20              Veritext Legal Solutions

             1250 Eye Street, N.W., Suite 350

21              Washington, D.C. 20005

22

```
 1                 A P P E A R A N C E S
 2      On behalf of the Witness:
 3           ERIC B. COLEMAN, ESQUIRE
 4           Winter Capriola Zenner, LLC
 5           3490 Piedmont Road, Northeast, Ste 800
 6           Atlanta, Georgia 30305
 7           ecoleman@wczlaw.com
 8           -- and --
 9           AMANDA CLARK-PALMER, ESQUIRE
10           Garland Samuel and Loeb
11           3151 Maple Drive, Northeast
12           Atlanta, Georgia 30305
13           aclark@gsllaw.com
14      On behalf of the Curling Plaintiffs:
15           MARY KAISER, ESQUIRE (Via Zoom)
16           DAVID D. CROSS, ESQUIRE
17           JENNA CONAWAY (Via Zoom)
18           WAIL JIHADI (Via Zoom)
19           Morrison & Foerster LLP
20           2100 L Street, Northwest
21           Suite 900
22           Washington, D.C. 20037
```

```
                                                     Page 3
 1             A P P E A R A N C E S (Cont'd)

 2          mkaiser@mofo.com

 3          dcross@mofo.com

 4      On behalf of the Curling Plaintiffs:

 5          ADAM SPARKS, ESQUIRE

 6          Krevolin & Horst, LLC

 7          1201 West Peachtree, Northwest, Suite 3250

 8          Atlanta, Georgia 30309

 9          sparks@khlawfirm.com

10      On behalf of the Coalition for Good Governance

11      Plaintiffs:

12          BRUCE P. BROWN, ESQUIRE

13          Bruce P. Brown Law

14          1123 Zonolite Road, Northeast

15          Suite 6

16          Atlanta, Georgia 30306

17          bbrown@brucepbrownlaw.com

18          -- and --

19          MARILYN MARKS, ESQUIRE (Via Zoom)

20          7035 Marching Duck Drive, E504

21          Charlotte, North Carolina 28210

22          Marilyn@uscgg.org
```

```
                                            Page 4

 1               A P P E A R A N C E S (Cont'd)

 2       On behalf of the State Defendants:

 3             CAREY MILLER, ESQUIRE (Via Zoom)

 4             VINCENT R. RUSSO, ESQUIRE

 5             Robbins Firm

 6             500 14th Street, Northwest

 7             Atlanta, Georgia 30318

 8             carey.miller@robbinsfirm.com

 9             vincent.russo@robbinsfirm.com

10       Also Present:  (Via Zoom)

11             Donna Curling

12             Ernestine Thomas-Clark

13             Kevin Skoglund

14             Oluwasegun Joseph

15             Diane LaRoss

16             J. Alex Halderman

17             Donna Price

18             Susan Greenhalgh

19             Richard A. DeMillo

20             Veronica Ascarrunz

21             Duncan Buell

22             Philip B. Stark
```

Page 5

1                  C O N T E N T S

2      EXAMINATION BY:                            PAGE

3           Counsel for Curling Plaintiffs          9

4           Counsel for Coalition Plaintiffs       310

5           Counsel for State Defendants           321

6           Counsel for Curling Plaintiffs         331

7              FELICETTI DEPOSITION EXHIBITS

8      NO.  DESCRIPTION                           PAGE

9      1    SUBPOENA TO TESTIFY AT A DEPOSITION IN A    15

10          CIVIL ACTION

11     2    Picture of Jim Nelson, Senior System     25

12          Engineer at SullivanStrickler LLC

13     3    Picture of Jennifer Jackson, Senior      26

14          System Engineer at SullivanStrickler LLC

15     4    Picture of Karuna Naik, Senior System     29

16          Engineer at SullivanStrickler LLC

17     5    Picture of Paul Maggio, Senior System     30

18          Engineer at SullivanStrickler LLC

19     6    Engagement Agreement, November 30, 2020    49

20     7    Engagement Agreement, MI AZ, December 6,   78

21          2020

22     8    January 8, 2021 Maggio e-mail chain       81

Page 6

1           invoice

2      9    Phone text message, 8/12/2022              113

3     10    Coffee County Board of Elections and       121

4           Registration Elections Office Security

5           Video, January 7, 2021

6     11    January 8, 2021 From 5pm to 6pm missing    138

7           video

8     12    Bates Numbers 08122022 000236 to 265       142

9     13    Password Memos, 08122022-000123 through    183

10          125

11    14    Maggio hard drive contents (screenshots)   197

12    15    8/17/2022 Maggio Production (Triage        203

13          reports) Folder Structure

14    16    Bates Numbers 08122022-000126 through      236

15          136

16    17    Bates Numbers 08122022-000137 through      241

17          161

18    18    Bates Numbers 08122022-000175 through      246

19          176

20    19    Bates Numbers 08122022-000098 through      251

21          105

22    20    Bates Numbers 08122022-000204 through      254

Page 7

1            205

2       21   Excel Attachment, 08122022-000205.XLSX      254

3       22   Bates Numbers 08122022-000022 through 33     257

4       23   Maggio-000057 58 Excel                       260

5       24   May 7, 2021 Barnes e-mail chain re:          266

6            Cyber Ninjas

7       25   Subpoena                                     273

8       26   STATE-DEFENDANTS-001 01937                   276

9       27   ICS Advisory (ICSA-22-154-01)                280

10           Vulnerabilities Affecting Dominion

11           Voting Systems ImageCast X

12      28   Copy of Check to Defending the Republic      296

13

14       *(Exhibits attached to transcript.)

15

16

17

18

19

20

21

22

```
 1                   P R O C E E D I N G S

 2                    *  *  *  *  *  *  *

 3                  VIDEOGRAPHER:  Today's date is

 4      September 2, 2022, and we are on the record at

 5      9:12 a.m.  This will be the videotaped 30(b)(6)

 6      deposition of SullivanStrickler, LLC, given by Dean

 7      Michael Felicetti.

 8                       Would counsel present please

 9      identify themselves for the record.

10                  MR. CROSS:  David Cross,

11      Morrison & Foerster for the Curling Plaintiffs.

12      And with me is my colleague, Adam Sparks.

13                  MR. BROWN:  Bruce Brown for the

14      Coalition Plaintiffs.

15                  MR. COLEMAN:  Eric Coleman on behalf

16      of SullivanStrickler.

17                  MS. CLARK-PALMER:  Amanda

18      Clark-Palmer on behalf of SullivanStrickler.

19                  MR. RUSSO:  Vincent Russo, Robbins

20      Firm, on behalf of the State Defendants.

21                  MS. LAROSS:  Diane LaRoss from Taylor

22      English, also on behalf of the State Defendants.
```

```
 1                    VIDEOGRAPHER:  Thank you.

 2                    Will the court reporter please

 3      swear in our witness?

 4                         * * * * * * *

 5       Whereupon,

 6                    DEAN MICHAEL FELICETTI

 7      was called as a witness and, having been first duly

 8      sworn, was examined and testified as follows:

 9         EXAMINATION BY COUNSEL FOR CURLING PLAINTIFFS

10      BY MR. CROSS:

11              Q     Good morning.

12              A     Good morning.

13              Q     Can you state your -- oh, grab your

14      mic.

15              A     Oh, my bad.

16              Q     That's all right.  I did the same

17      thing.

18                    MS. CLARK-PALMER:  Do you want it on

19      your lapel or the tie?

20                    MR. CROSS:  The tie is probably best.

21                    Are you getting him okay?

22                    THE WITNESS:  Am I good?
```

```
 1        BY MR. CROSS:

 2              Q       Good morning.

 3              A       Hi.

 4              Q       Can you just state your full name and

 5        address?

 6              A       Sure.  Dean Michael Felicetti,

 7        ████████████████████████████████████████████████████

 8              Q       So you are not local?

 9              A       No.

10              Q       Okay.

11              A       No.

12              Q       And you're employed by the

13        SullivanStrickler firm?

14              A       Yes.

15              Q       Have you been there since 2017?

16              A       No.

17              Q       How long have you been there?

18              A       Two years August.

19              Q       Okay.  Where were you before that?

20              A       I was a partner in a company called

21        the Oliver Group.

22              Q       And what are your responsibilities at
```

```
                                                        Page 11

 1       SullivanStrickler?

 2             A     I work closely with several clients

 3       from a client relationship standpoint, as well as

 4       information governance and data risk assessments,

 5       and sales component as well.

 6             Q     Has that been your role since you

 7       joined about two years ago?

 8             A     Yes.

 9             Q     Is there an office in Rhode Island or

10       do you work remotely?

11             A     I work remotely.

12             Q     So you're the only -- the only

13       employee in Rhode Island?

14             A     Yes.

15             Q     Is the firm based in Atlanta?

16             A     Yes.

17             Q     Are there any other offices?

18             A     Yes.

19             Q     Where?

20             A     Austin, Texas and London, England.

21             Q     Okay.  What is your educational

22       background?
```

                                                    Page 12

 1                A     I -- from a university standpoint, I

 2        have an applied, an AAS, associates in computer

 3        science.  And professional, I hold a certification

 4        in Information Governance Officer.  So it's a CO,

 5        it's called.

 6                Q     Where is your undergraduate degree

 7        from?

 8                A     AA -- it's SUNY Adirondack.

 9                Q     Got it.

10                A     Yeah.

11                Q     Is that a BA or a BS or what is it?

12                A     Associates.

13                Q     Associates degree?

14                A     Yes.

15                Q     Got it.  Okay.

16                      In computer science?

17                A     Yes.

18                Q     Okay.  You said the job before

19        SullivanStrickler, that was the Oliver Group?

20                A     Yes.  Which we were acquired by a

21        company called RVM, but I still facilitated the

22        role as a partner in the Oliver Group, but also as

```
 1          the director of information governance for RVM.

 2                 Q     Did you have a -- did you work

 3          somewhere before the Oliver Group?

 4                 A     I did.  I was the chief technology

 5          officer for an e-Discovery company called Ibis

 6          Consulting.

 7                 Q     What was your role there?

 8                 A     Technology, software development,

 9          management, client relations, growth of technology,

10          and technology vision.

11                 Q     Okay.  Did you have a job before

12          that?

13                 A     I did.  '92, this was out of college,

14          I was a computer operator at Foxwoods Casino in

15          Connecticut, in the IT department.

16                 Q     That must have been fun.

17                 A     Yeah, it was a lot of work, a lot of

18          hours, and it was enjoyable.  It was paid

19          education.  It was right out of college, so I was

20          lucky.

21                 Q     At some point off the record you can

22          tell us all --
```

Page 14

```
 1              A     Oh --

 2              Q     -- the secrets of the casino.

 3              A     Of course.  Of course.

 4              Q     Was that your first job out of

 5      college?

 6              A     First career job, yes.

 7              Q     Okay.  And did you graduate -- you

 8      got your associates degree, you said, in '92?

 9              A     It was.

10              Q     And you also coach basketball?

11              A     I do.  I'm a high school basketball

12      coach, going on 13, 14 years now, I think.

13              Q     Nice.

14              A     I love it.

15              Q     Okay.  So do you understand that

16      you're testifying today on behalf of

17      SullivanStrickler as a corporate representative?

18              A     Yes, sir.

19              Q     And just yes or no; has -- has -- I

20      assume someone has explained to you what that

21      means?

22              A     Yes.
```

1            Q      All right.  Let me show you the first

2      exhibit.

3            A      Sure.

4               (Felicetti Deposition Exhibit Number 1

5               marked for identification.)

6               MR. CROSS:  Sorry, we only have

7      limited copies.

8               MR. RUSSO:  That's okay.

9               MR. CROSS:  The Exhibit Share, for

10     everyone, if you're logged in, it's all going to go

11     up there.

12     BY MR. CROSS:

13           Q      Have you seen Exhibit 1 before?

14           A      Yes.

15           Q      Okay.  And this is a copy of the

16     subpoena that we served on SullivanStrickler for

17     today's deposition.  Do you understand that?

18           A      Yes.

19           Q      And you're saying you're appearing

20     pursuant to the subpoena?

21           A      Yes.

22           Q      Okay.  If you flip to page 5 of the

1          attachment, you'll see a heading "Topics."

2                    A      Yeah.

3                    Q      And then the topics go through

4          page 8, 17 topics.  Do you see that?

5                    A      Yes.

6                    Q      And are you prepared to testify on

7          those topics for SullivanStrickler today?

8                    A      Yes.

9                    Q      Okay.  And I should have asked you at

10         the start.  Is there any reason today that you

11         cannot give full and truthful testimony?

12                   A      No.  I --

13                   Q      Okay.  You're not on any medication?

14         You're not intoxicated?

15                   A      No.

16                   Q      Okay.

17                   A      Oh, no.  No.

18                   Q      All right.  Thank you.

19                   A      You're welcome.

20                   Q      All right.  Just walk me through what

21         you did to prepare for today's deposition.

22                          And to be clear, I don't -- I don't

Page 17

```
 1          want to get into any substance of communications
 2          with counsel.
 3                 A      Sure.
 4                 Q      So just walk me through what you did
 5          to prepare yourself on the -- on the topics.
 6                 A      Reviewed documentation, reviewed the
 7          subpoena.  I spoke with the team members that were
 8          part of the services provided to get a sense of
 9          timeline, technologies utilized, areas around the
10          topics identified in the subpoena.
11                 Q      Okay.  What documents did you review
12          for today?
13                 A      I -- I reviewed the production
14          documents that were produced to, I guess, all
15          parties.
16                 Q      The documents that were produced in
17          response to a subpoena we served on Paul Maggio?
18                 A      Yes.
19                 Q      Okay.  Did you review all of those
20          documents or just a subset?
21                 A      I reviewed all of the documents.
22                 Q      Does that include photos, for
```

```
 1      example?

 2              A     Yes.

 3              Q     And there was a hard drive that was

 4      also produced by Mr. Maggio.  Were you aware of

 5      that?

 6              A     Produced how?

 7              Q     It was a literal hard drive that had

 8      files and data on it.

 9              A     Produced?

10              Q     To us.

11              A     Oh, no.

12              Q     Okay.  Were you aware before now that

13      there was a hard drive that was produced by

14      Mr. Maggio?

15              A     I know there was a hard drive.  I'm

16      not sure where it was produced to.

17                    Does that make sense?

18              Q     Yes.

19                    So, just for context, when you talk

20      about the team members that -- and the services

21      provided, you're talking about the services that

22      were provided by a team that included Paul Maggio
```

1      with respect to copying and preserving data from

2      election equipment in Coffee County.  Is that

3      right?

4              A     Yes.

5              Q     Okay.  And are you aware that

6      Mr. Maggio produced to us a hard drive that had

7      data that that team had copied from Fulton County?

8              A     Yes.

9              Q     Okay.  I'm sorry, I --

10             A     No, no.  I should have asked.

11             Q     Let me clean up the question because

12     I misspoke.

13             A     Yeah.

14             Q     Produced to us a hard drive that had

15     the data that that team copied from Coffee County?

16             A     Yes.

17             Q     Okay.  And did you look at -- at

18     those files in whatever form the firm has them?

19             A     No.  I looked at the reports, not the

20     actual files.

21             Q     Okay.  And when you say "reports,"

22     what do you mean?

```
                                                    Page 20
 1              A      Chain-of-custody information, which

 2       outlines were provided.

 3              Q      Okay.  Did you -- in preparing for

 4       today, did you review any documents that, to your

 5       knowledge, have not been produced to the parties in

 6       discovery?

 7              A      No, sir.

 8              Q      Okay.  Are you aware of any photos or

 9       video that the firm has with respect to the

10       services provided for Coffee County that have not

11       been produced in this case in discovery?

12              A      No.

13              Q      Okay.  And did you undertake any

14       efforts to determine whether any such photos or

15       video exists?

16              A      No.

17              Q      If you wanted to do that, who would

18       you ask?

19              A      Jennifer Jackson.

20              Q      Who is she?

21              A      She handled the chain of custody at

22       intake on-site.
```

```
                                                     Page 21

 1              Q     When you say "on-site," you mean

 2       on-site where?

 3              A     At Coffee County.

 4              Q     Okay.  And just so we're clear, we're

 5       talking about Coffee County, Georgia?

 6              A     Yes.

 7              Q     Do you know whether any of the photos

 8       that were produced to us were changed in any way

 9       for production?

10                    Like, was a photo cropped, for

11       example, like we got a part of a photo and not the

12       whole photo?

13              A     I don't know.  The information on the

14       photos contain all the chain-of-custody

15       information.  So by cropping, maybe to narrow down

16       exactly what was collected, I guess, but I would

17       say no.

18              Q     Okay.  And to be clear,

19       Mr. Felicetti -- am I saying that right?

20              A     Yeah.

21              Q     I'm not looking for you to guess or

22       speculate or assume anything today --
```

Page 22

```
 1              A      Okay.

 2              Q      -- so only tell me what you know.

 3              A      I appreciate that.

 4              Q      You know, in natural conversation, we

 5       assume things all the time, but I'm not looking for

 6       that today.

 7              A      Excellent.

 8              Q      Okay.  You said in addition to -- oh,

 9       so we're talking about the documents.

10                     Are there any other documents --

11       well, sorry, let me take a step back.

12                     Is there anything else you can tell

13       me about the documents that you reviewed in

14       preparation for today?

15                     We talked about the photos.  We

16       talked about reports.  What else?

17              A      No.

18              Q      Okay.  Is there anything that you're

19       aware of that was produced to us by Mr. Maggio that

20       you did not review in preparation for today?

21              A      No.

22              Q      You said you also spoke with team
```

1          members.  Who did you speak with for today's

2          deposition?

3                  A     I spoke with the team members that

4          were on-site at Coffee County, Georgia.

5                  Q     And who were those people?

6                  A     Jim Nelson, Paul Maggio, Jennifer

7          Jackson, and Karuna Naik.

8                  Q     And Naik, is that N-A-I-K?

9                  A     Yeah.

10                 Q     And Karuna is K-A-R-U-N-A?

11                 A     Yeah.

12                 Q     Okay.

13                 A     Good job.

14                 Q     You obviously coach kids, you just

15         gave me a gold star.

16                 A     Yes, that's it.

17                 Q     All right.  So if we can walk through

18         each of those.  Who is Jim Nelson?

19                 A     Jim Nelson is a IT/technical expert

20         that works for SullivanStrickler.

21                 Q     What is his role?

22                 A     His role in the company?

1          Q     Yes, sir.

2          A       He handles data migration, data

3     collection, converting legacy data, back-up tape

4     data, historical data, taking data that may be

5     inaccessible for review.  I guess that's the wrong

6     term, but to took at it natively or to be able to

7     look at these files, he'll take some historic data

8     that may be a challenge to convert and put it into

9     a format that is reviewable, whether that's IT,

10    information.gov, forensics, et cetera.

11         Q     Do you know just generally how long

12    he's been at the firm?

13         A     No.

14         Q     All right.  Do you know generally

15    what his education and experience are?

16         A       Experience, I knew he worked at a

17    company called eMag, which was not unlike the

18    company SullivanStrickler.  So it was a very

19    similar company dealing with data and IT services.

20    Other than that, I don't -- I don't know what

21    his . . .

22         Q     All right.  Let me hand you what's

```
1        been marked as Exhibit 2.

2               A     Sure.

3                     (Felicetti Deposition Exhibit Number 2

4                     marked for identification.)

5        BY MR. CROSS:

6               Q     Who is this?

7               A     That is Jim Nelson.

8               Q     Okay.  Is this the Jim Nelson we were

9        just talking about who's at SullivanStrickler,

10       right?

11              A     Yes, sir.

12              Q     Okay.  Thank you.

13                    What was -- well, actually I'll come

14       back to that.  Never mind.

15                    You also mentioned Jennifer Jackson.

16       Who is she?

17              A     She is the CRO at SullivanStrickler,

18       chief relationship officer.

19              Q     And what is her role?

20              A     Relations with our clients with

21       regards to communication, updates, marketing, as

22       well as project management.  That's it that I can
```

```
 1        think of.
 2              Q     Does she have any computer science
 3        background?
 4              A     She's technical.  She has an
 5        e-Discovery background, so I guess by virtue of
 6        that, yes.
 7              Q     Do you know about how long she's been
 8        at the firm?
 9              A     No.
10                  (Felicetti Deposition Exhibit Number 3
11                    marked for identification.)
12        BY MR. CROSS:
13              Q     All right.  Let me hand you
14        Exhibit 3.  Who is that?
15              A     Jennifer Jackson.
16              Q     Is this the Jennifer Jackson that
17        we've been talking about at your firm?
18              A     Yes, sir.
19              Q     All right.  You mentioned Karuna
20        Naik.
21              A     Yes.
22              Q     Who is she?
```

1          Is it Nake or Nik [pronounced

2     phonetically]?

3          A    I'm sorry.  Now I put you on the

4     spot.  Some people call her Nik.  I call her Naik

5     [pronounced phonetically], so can we call her Naik

6     for this?

7          Q    Sure.

8          A    It's just easier for me.

9          Q    Okay.

10         A    She is a forensic expert, recently

11    promoted to our director of forensics.

12         Q    When you say "forensic expert," what

13    does that mean?

14         A    She provides the level of forensic

15    collection expertise that allows her the ability to

16    provide defensible forensic collection of data.

17         Q    When you say --

18         A    Does that help?

19         Q    Yes.

20              And when you say "defensible forensic

21    collection," what does that mean?

22         A    There are ways to collect data in

Page 28

1    which you keep metadata intact or data intact

2    without leaving a footprint.  And obviously that's

3    what we do, and that's -- she is an expert at that,

4    as well as she is now managing the team, or as her

5    promotion, handling other experts.

6             Q      When you say "collecting data without

7    leaving a footprint," what does that mean?

8             A      When you are asked to image the data

9    by a law firm, the goal is to obviously not leave a

10   footprint, like modifying timestamps, date stamps,

11   that you touched the data, that you altered the

12   data, et cetera.  So you collect it in a way in

13   which the metadata, the data around the data, both

14   external and internal, remains intact.

15               So does that answer your question?

16            Q      Yes.

17               And is sort of part of the idea that

18   you're collecting the data in a way that one does

19   not alter the data; and, two, sort of doesn't leave

20   traces behind on the original equipment that the

21   data had been touched or copied or accessed?

22            A      Yes.  A pristine copy, or a

1         preservation copy it's also referred to as.

2              Q     Okay.  And that's among the services

3         that SullivanStrickler provides?

4              A     Yeah.  Yes.

5              Q     And was that among the services that

6         were engaged for Coffee County?

7              A     Yes.

8              Q     Is there a difference between

9         Ms. Naik's training expertise and Mr. Nelson's?

10             A     Yes.

11             Q     In what way?

12             A     Different technologies warrant

13        different skill sets with regards to collections of

14        data.

15             Q     And let me show you Exhibit 4.

16                  (Felicetti Deposition Exhibit Number 4

17                   marked for identification.)

18        BY MR. CROSS:

19             Q     Who is this?

20             A     This is Karuna Naik of

21        SullivanStrickler.

22             Q     Okay.

Page 30

1          A     She's the best.  No, she's the best

2     to work with.

3          Q     And then last, you mentioned Paul

4     Maggio.  What is his role at the firm?

5          A     He is the chief operating officer of

6     the firm.

7          Q     And what does he do as the chief

8     operating officer?

9          A     Provides technical services from

10    forensic collections to e-Discovery services, as

11    well as the overall day-to-day operations of the

12    organization.

13         Q     Does he have forensic expertise in

14    the way that you described for Ms. Naik?

15         A     He has forensic expertise of

16    different technologies.

17         Q     All right.  Let me hand you

18    Exhibit 5.

19         A     Sure.

20            (Felicetti Deposition Exhibit Number 5

21            marked for identification.)

22

```
 1        BY MR. CROSS:

 2              Q      Who is this?

 3              A      Paul Maggio, the COO of

 4        SullivanStrickler.

 5              Q      Okay.  Thank you.

 6              A      You're welcome.

 7              Q      Were there -- was there anyone else

 8        at SullivanStrickler that was part of or supported

 9        the team that did the work for Coffee County?

10              A      No.

11              Q      Is there someone at SullivanStrickler

12        named Greg Freemyer?

13              A      Yes.

14              Q      And what is his role at the firm?

15              A      He provides forensic services.  He

16        was previously the director of forensic services,

17        but now Karuna is.  He is in charge of R&D.

18              Q      And did he have any involvement with

19        the team that did the work in Coffee County?

20              A      I don't know.

21              Q      Do you know each of these people,

22        Mr. Nelson, Mr. Maggio, Ms. Jackson, and Ms. Naik,
```

Page 32

1         personally?

2                A      Personally, how?  Personally versus

3         virtually?

4                Q      Fair enough.

5                       Have you met them personally?

6                A      Yes.

7                Q      Have you worked with them on

8         projects?

9                A      Yes.

10               Q      With respect to the services that

11        were provided for Coffee County, now I'd like to

12        drill down a little more and just understand what

13        the role was for each of them on that specific

14        team.

15               A      Of course.

16               Q      So if we can go back and we'll start

17        with Paul Maggio.  What was his role with respect

18        to those services?

19               A      Paul Maggio was team lead and was in

20        charge of the forensic collection of the polling

21        pads.  And he was our main point of contact

22        on-site/project manager, the lead.

1          Q      And when you say he was responsible

2      for the forensic collection of poll pads, what does

3      that mean?

4          A      Each on-site expert, because of skill

5      set, focuses on certain areas, buckets of data.  So

6      that was his, for lack of a better term, buckets of

7      data to forensically collect.

8          Q      Meaning Mr. Maggio was personally

9      responsible for collecting the data off of the

10     electronic poll pads in the Coffee County office?

11         A      Yes.

12         Q      Was there anything else that he was

13     responsible for the forensic collection of in that

14     office?

15         A      No.

16         Q      And you said he was the lead.  Did he

17     otherwise have responsibility for generally

18     overseeing the work of the team?

19         A      Yes.

20         Q      What was Mr. Nelson's role on that

21     team?

22             A      He collected the -- collected -- he

1      imaged the EMS server.

2             Q    When you say "imaged the EMS server,"

3      what does that mean?

4             A    Forensically imaged, created a

5      forensic image of the drives in the server.

6             Q    Is this what we talked about before

7      capturing what you said is a pristine image?

8             A    Yes.

9             Q    Was there anything else he was

10     responsible for collecting in Coffee County?

11            A    No.

12            Q    Did he have any other

13     responsibilities on this --

14            A    Can I go back to that question?

15            Q    Sure.

16            A    Is that okay?

17                There may have been a hard drive.

18            Q    In the --

19            A    Do you mind if I look at my notes?

20            Q    Sure.

21            A    Okay.

22                Oh, yeah.  He also collected thumb

1              drives and hard drives.  Sorry about that.

2                   Q     That's okay.

3                         The notes you're looking at, are

4              those notes you took when you spoke to these

5              individuals to help prepare for today?

6                   A     Yes.

7                   Q     Okay.  The thumb drives that

8              Mr. Nelson talked about, what can you tell me about

9              those?

10                  A     I don't know.

11                  Q     Those were thumb drives that were

12             found in the Coffee County election office, and --

13             and he was responsible for collecting data off of

14             those?

15                  A     Those specific thumb drives, yes.

16                  Q     Were there other thumb drives that

17             someone else was responsible for?

18                  A     Yes.

19                  Q     Okay.  Got it.  We'll come back to

20             that.

21                  A     Sure.

22                  Q     Do you have an understanding of what

Page 36

```
 1          was collected off the thumb drives that Mr. Nelson
 2          collected from?
 3                 A      I do not.
 4                 Q      Was there anything -- what can you
 5          tell me about those thumb drives?
 6                 A      They were -- as I understand it, they
 7          were -- there was a large repository of thumb
 8          drives that was -- the imaging was facilitated by
 9          somebody else.  And these particular thumb drives
10          were tied into the EMS server, the election
11          management server.  And I don't -- unfortunately, I
12          don't have any other details other than that.
13                 Q      The ones that Mr. Nelson imaged were,
14          to your understanding, thumb drives that were used
15          with the EMS server?
16                        Just when you say "tied into," what
17          do you mean?
18                 A      I don't know.  I don't know, no.
19                 Q      And then you said Mr. Nelson also was
20          responsible for imaging hard drives.  What can you
21          tell me about that?
22                 A      As I understand it, there was one
```

1          hard drive that failed during imaging.  The hard

2          drive didn't fail, the image creation failed, let

3          me rephrase that.  And so it was given to Jim to

4          take a look at.  So it was an image.

5                    Q      Just one?

6                    A      Yeah.  As I understand, it was one.

7                    Q      Okay.  What can you tell me about

8          that hard drive in terms of what was on it, what it

9          was used for?

10                   A      I don't know.

11                   Q      Okay.  Do you know whether he was

12         able to get the data off of it?

13                   A      I do.  He was able to image it.

14                   Q      Are we talking about just a

15         standalone hard drive or a hard drive inside of

16         another device?

17                   A      It -- I don't know.

18                   Q      Do you have any information about

19         what that hard drive was used for in the office?

20                   A      I do not know.

21                   Q      Any information on the type of data

22         that was on it?

1           A     I do not know.

2           Q     Okay.  You said there was another set

3     of thumb drives that were imaged by someone else.

4     Who was that?

5           A     Karuna.

6           Q     Okay.  What were those thumb drives

7     used for?

8           A     Those thumb drives were a collection

9     of -- let me think.  Can I look at my notes again?

10          Q     Uh-huh.

11          A     Sorry.  This is a lot.

12                Thumb drives.  (Witness reading from

13    document.)  I do not know.

14          Q     These thumb drives, or thumb drives,

15    were in the elections office?

16          A     Yes.  Yes, sir.

17          Q     And to your understanding, they were

18    used with the election equipment?

19          A     Yes, sir.

20          Q     So to take a step back, what was

21    Ms. Naik's role on the team?

22          A     Forensic imaging.

Page 39

1           Q     What all did she have responsibility
2      for forensic imaging in addition to the thumb
3      drives?
4           A     SD cards, CompactFlash cards.
5           Q     Is there a difference between an SD
6      card and a CompactFlash card?
7           A     CompactFlash cards.
8           Q     Okay.  Basically the same thing?
9           A     Yeah.
10          Q     What was on the CompactFlash cards
11     that she imaged?
12          A     I believe it was the -- hold on one
13     sec.  I should know this.  Can we come back to
14     that?
15          Q     Sure.
16          A     So maybe it'll --
17                THE WITNESS:  Is that all right with
18     you guys?
19                MR. COLEMAN:  That's up to you.
20                THE WITNESS:  It should --
21     BY MR. CROSS:
22          Q     It's okay.

```
                                                    Page 40

 1              A      -- but right now I don't know.

 2              Q      Okay.  So she imaged CompactFlash

 3      drives and thumb drives.  Anything else in the

 4      office?

 5              A      No.  That was it.

 6              Q      Did she have any other

 7      responsibilities on that team?

 8              A      Those were her primary

 9      responsibilities.  I guess -- no, that would be it.

10              Q      That takes us to Jennifer Jackson.

11      What was her role?

12              A      Documentation, chain of custody.

13              Q      What do you mean by "chain of

14      custody"?

15              A      So for each piece of -- each target

16      piece of media that was imaged, we tagged with a

17      code, an identifier, take a picture, and log for

18      chain of custody.  So we have a -- a means of which

19      to track everything that was going to be collected.

20              Q      Why is chain of custody important

21      with data and devices like this?

22              A      The chain of custody is required,
```

Page 41

```
 1          one, for the ability obviously to track when data

 2          is handed to a third party for imaging, to identify

 3          the fact that we are in ownership of that

 4          particular piece of media for a certain length of

 5          time.  And it's used for tracking, logging

 6          historical information, et cetera.  So we can track

 7          back where a particular drive was imaged from, who

 8          the -- what's your -- what it was labeled as, any

 9          other identifiers.

10                    It's also used as a means to

11          physically check media for any damage, any --

12          anything that looks out of place.  So you're in a

13          position to look at something and say, "Well, you

14          know, before we move forward with this, please note

15          that, I don't know, it looks like it failed," or

16          something like that.  But it's another means in

17          which to -- to track information, not only the

18          physical state of it, but just the documentation to

19          track it all the way back.

20               Q    Is maintaining chain of custody with

21          respect to computer equipment and data, is that

22          generally considered a best practice?
```

Page 42

```
 1            A       Absolutely.

 2            Q       Why?

 3            A       Chain of custody is for forensic

 4       companies, back-up tape companies, couriers, et

 5       cetera, is a means in which to take ownership of

 6       evidence for the sake of whatever their service may

 7       be.  So for us, we're brought in by attorneys to

 8       image stuff and then deliver what we imaged to the

 9       attorneys.

10                    Without that tracking mechanism,

11       there's no way to tie back, not only what we

12       collected, but what we collected maybe back to a

13       custodian, et cetera.  So it's vitally important.

14            Q       Is it important to maintain chain of

15       custody with computer equipment so that you have

16       a -- a record of who has had access to it?

17            A       Not necessarily, no.

18            Q       Why not?

19            A       If you receive a box of drives that

20       you're imaging, the chain of custody would only

21       provide what you have physically in your hand.

22       When you begin a discovery process or a forensic
```

Page 43

```
 1        analysis, at that point you're now digging deeper

 2        into the things that you would be talking about,

 3        last access, modified, et cetera, et cetera, but

 4        chain of custody wouldn't get you that.

 5               Q     I see.  In that situation, okay.

 6                     When your firm is engaged to access

 7        computer equipment, is it important to -- to

 8        maintain the chain of custody in terms of from

 9        start to finish who had access to that equipment,

10        what was done with it, all the way through the end

11        of the point at which the project ends?

12               A     Yes.

13               Q     Okay.  Why is that important?

14               A     Taking ownership of -- of devices

15        becomes the responsibility of the forensic company

16        that's handling the work.  At which point, the

17        ability to hand it back and have a means to track

18        that is tracking that chain of custody, and it's

19        vital.

20               Q     Did SullivanStrickler carefully track

21        the chain of custody with respect to the Coffee

22        County project?
```

```
                                              Page 44

 1              A     Yes, sir.

 2              Q     And to your understanding, did it

 3       comply with firm policy and best practices?

 4              A     Yes, sir.

 5              Q     It sounds like Ms. Jackson was one of

 6       the people responsible for that.  Is that right?

 7              A     Yes, sir.

 8              Q     Was anyone else -- did anyone else

 9       have responsibility with respect to the chain of

10       custody?

11              A     No.  No.

12              Q     You said she was responsible for

13       documentation.  What do you mean?

14              A     Logging.  As part of the chain of

15       custody, logging a code that we identify a piece of

16       media as, as well as any physical labels that may

17       be on a device or a hard drive, and our internal

18       code that we use for tracking.

19                    Does that help?

20              Q     Yes.

21              A     Okay.

22              Q     But just -- I understand what you
```

Page 45

1          mean, but for the record, explain what you mean

2          when you say "internal code for tracking."

3               A    So SullivanStrickler utilizes a

4          project code, an internal code, that we reference

5          not only in chain of custody, but in the

6          communications back and forth as a means for

7          tracking and consistency.

8               Q    Does every project get assigned an

9          internal code?

10              A    Yes, sir.

11              Q    And one was assigned here, right?

12              A    Yes, sir.

13              Q    Do you recall was the code here

14         SSA1722?

15              A    I can't tell you right now, but I'm

16         going to check.

17                   Yes, sir.

18              Q    Okay.  What other responsibilities

19         did Ms. Jackson have, if any, on this team?

20              A    I -- I don't know aside from chain of

21         custody.

22              Q    Who took the photos that were

Page 46

1        produced?

2                A     Jennifer Jackson.

3                Q     Is that part of her responsibility in

4        terms of documenting the work?

5                A     Yes, sir.

6                Q     So taking those photos, is that a --

7        is that a part of your standard procedures for this

8        type of project?

9                A     It is a normal procedure.

10               Q     Do you know whether anyone involved

11       with the work, including people in Coffee County's

12       office, did anyone object to the photos?

13               A     I don't know.

14               Q     Sorry, I may have asked you before.

15       Is there anyone else who had any responsibility

16       either on or supporting the Coffee County team

17       beyond these four individuals?

18               A     No.

19               Q     How did the firm select the team

20       members for the Coffee County project?

21               A     Based on experience, capabilities.

22               Q     Who generally makes the decision on

Page 47

```
 1          who is assigned to a project like this?

 2                    A     Paul Maggio.

 3                    Q     So in the general course, Paul Maggio

 4          would have selected the people for this team?

 5                    A     Yes.

 6                    Q     Do you know whether employees at the

 7          firm have the option to opt out of a project if

 8          they are asked to work on it?

 9                    A     They do.

10                    Q     Do you know whether anyone was asked

11          to work on the Coffee County project and declined?

12                    A     I do not know.

13                    Q     Okay.  Who would you ask if you

14          wanted to know?

15                    A     Paul Maggio.

16                    Q     Do you know whether anyone, whether

17          on the team or otherwise, at SullivanStrickler

18          expressed any concerns about taking on this work?

19                    A     I don't know.

20                    Q     Do you know whether anyone expressed

21          any concerns at all about working on the team?

22                    A     I don't know.
```

Page 48

```
 1              Q     Who engaged SullivanStrickler to do
 2        the work in Coffee County?
 3              A     Jim --
 4              Q     Penrose?
 5              A     Yes, Jim Penrose and Doug Logan.
 6              Q     When did they first reach out to
 7        SullivanStrickler for the work, approximately?
 8              A     Early January for Coffee County.
 9              Q     What's the basis for that testimony?
10              A     Can you repeat the question?
11              Q     Sure.
12                    What's -- what's the basis for your
13        understanding that Mr. Penrose and Mr. Logan
14        reached out to the firm, specifically for Coffee
15        County, in early January?
16              A     By virtue of requests for other
17        services outside of Coffee County.  The request
18        came in that pointed to Coffee County, I believe,
19        in early January.
20              Q     Okay.  And just so I understand, for
21        that testimony, are you relying on documents you
22        looked at or people you spoke with or both?
```

Page 49

```
 1            A      People I spoke with.

 2            Q      Okay.  Who specifically?

 3            A      Paul Maggio.

 4            Q      When you say "early January," you

 5     mean January 2021?

 6            A      Yes, sir.

 7            Q      Have you looked at any of the

 8     engagement agreements that were signed with the

 9     firm with respect to copying and preserving

10     election data?

11            A      Yes, sir.

12            Q      All right.  Let's look at a couple of

13     those.

14            A      Sure.

15                   (Felicetti Deposition Exhibit Number 6

16                    marked for identification.)

17     BY MR. CROSS:

18            Q      Let me hand you --

19            A      Perfect.

20            Q      -- Exhibit 6.

21                   Actually before you look at that --

22            A      Yeah.
```

Page 50

1          Q     -- you've got a stack of documents

2     with you.

3          A     Yes.

4          Q     What do you have with you?

5          A     I have the production stack.

6          Q     On any of the documents that you have

7     with you, do you have notes on any of those

8     documents?

9          A     I do not.

10         Q     Okay.  I didn't know if it would be

11    helpful for you to look at them.

12         A     No.

13         Q     All right.  So do you recognize

14    Exhibit 6?

15         A     I do.

16         Q     Is this an engagement agreement for

17    forensic analysis of the SullivanStrickler firm?

18         A     Yes, sir.  Excuse me.

19         Q     Do you need some water?

20         A     I'm good.

21         Q     Okay.

22         A     Thanks.

Page 51

1              Q     And this engagement agreement is with

2        Jesse Binnall of the Harvey & Binnall firm.  Is

3        that right?

4              A     Yes, sir.

5              Q     And it's dated November 30, 2020?

6              A     Yes, sir.

7              Q     Is this engagement agreement, does it

8        reflect the standard agreement and the standard

9        terms that SullivanStrickler uses?

10             A     Yes, sir.

11             Q     Does SullivanStrickler have different

12       types of standard agreements depending on the type

13       of project it's doing or does it have a standard

14       agreement sort of across the board?

15             A     The agreement is standard aside from

16       if there was different services being provided.  So

17       aside from forensic work, there may be back-up tape

18       recovery work, something like that.  Mostly the

19       format on all the agreements or the template that

20       we use are as here.

21             Q     Okay.  So the SullivanStrickler firm

22       has a standard agreement it uses for all its

Page 52

1       projects, but what might change are the specific

2       services that are going to be --

3               A    Yes, sir.

4               Q    Okay.

5               A    Requirements, pricing, et cetera.

6               Q    And are you familiar with Jesse

7       Binnall?

8               A    Familiar how?

9               Q    Have you heard of him?

10              A    I have.

11              Q    And -- and what do you know about

12      him?

13              A    I only know based on my discussions

14      with the team on who he is.

15              Q    And what is your understanding of who

16      he is?

17              A    An attorney that executed the

18      documentation for us to kick off forensic

19      collections.

20              Q    And you understand that Jesse Binnall

21      is a personal lawyer for Donald Trump?

22              A    No.

Page 53

1            Q      You had not heard that before now?

2            A      Huh-uh.

3            Q      No?

4            A      No, I have not.

5            Q      If you look at the second page of

6       this agreement, Exhibit 6 --

7            A      Uh-huh.

8            Q      -- those are signatures by Paul

9       Maggio and Jesse Binnall.  Is that right?

10           A      Yes, sir.

11           Q      Okay.  And it looks like the -- the

12      signature page for Mr. Binnall is dated

13      December 2nd of 2020, right?

14           A      Yes, sir.

15           Q      If you look at the third page of the

16      agreement where it says "Exhibit 1 Overview," is

17      this overview page, is that generally something

18      that's standard, the substance will vary, but the

19      inclusion of it, is that standard in your

20      engagements?

21           A      Yes, sir.

22           Q      What is the purpose of that?

Page 54

```
 1              A     Outline requirements as requested of

 2        a client to outline what we're collecting, general

 3        overview of requirements, and what is being asked

 4        for us -- from us.

 5              Q     And here in this one, we have

 6        "Requirements."  And it says, "The following were

 7        defined during a phone call, face-to-face meetings,

 8        and/or e-mail interactions between customer and" --

 9        "SS" is SullivanStrickler, right?

10              A     Yes, sir.

11              Q     And "customer," that would be

12        Mr. Binnall?

13              A     Yes, sir.

14              Q     So, "Between customer and

15        SullivanStrickler representatives has requirements

16        to be satisfied through the performance of services

17        by SullivanStrickler."

18                    And then this next paragraph is sort

19        of a general overview of those services.  Is that

20        fair?

21              A     Yes.

22              Q     And here, what was agreed was
```

Page 55

1       customers requesting that SullivanStrickler provide

2       services such as computer forensic elections and

3       analytics on the Dominion Voting Systems equipment,

4       from the poll pads, and in parenthesis iPads, to

5       the Windows machines that run the scanners, to the

6       Linux machines that tabulate the votes in the state

7       of Nevada and subsequent work in the state of

8       Georgia.

9                    Do you see that?

10      A       Yes, sir.

11      Q       What -- what work was anticipated

12      with respect to the state of Georgia in this

13      agreement with Mr. Binnall?

14      A       I don't know.

15      Q       If you look at page 5 --

16      A       Yep.

17      Q       -- here there's a heading of

18      "Pricing."

19      A       Yes, sir.

20      Q       And is it generally part of the

21      contracting practices to have a section like this

22      on pricing in your agreements?

Page 56

1                A      Yes, sir.

2                Q      And the first is State of Nevada.  Do

3       you see that?

4                A      Yes, sir.

5                Q      Flat rates and then there's a

6       breakdown of those rates, right?

7                A      Yes, sir.

8                Q      And then below that, do you see

9       "State of Georgia work"?

10               A      Yes, sir.

11               Q      And there's a lot more detail on the

12      state of Georgia work here, right?

13               A      Yes.

14               Q      And here it includes forensic

15      collections/computer hard drives, Windows or Linux,

16      and then there's a rate, right?

17               A      Yes.

18               Q      And that 895, that's a charge per

19      hard drive that would be collected?

20               A      Yes, sir.

21               Q      And then the next is encrypted

22      versions of Windows devices/servers at 1,500 per

Page 57

1        system, right?

2                A       Yes, sir.

3                Q       Then the next one is forensic

4        collection/mobile devices or tablets/iPads, and

5        that's a rate $950 per device?

6                A       Yes, sir.

7                Q       The next is senior forensic expert

8        technical time, and that's charged at $325 an hour?

9                A       Yes, sir.

10               Q       And that hourly, that would be work,

11       for example, what Mr. Maggio did on the forensic

12       collection of the poll pads, that you charged by

13       the hour?

14               A       No, not necessarily.

15               Q       That might be charged by device?

16               A       Right.  So a device fee, and then if

17       there is forensic analytical work that's required,

18       then there's an hourly rate associated with that.

19               Q       I see.

20               A       And it's contingent at the project

21       level, so whatever the demand of the project may

22       be.

1              Q     So the collection is typically

2       charged on a per-device rate, and if there's some

3       forensic analysis of the data subsequent, that

4       might be an hourly rate?

5              A     Yes, sir.

6              Q     Okay.  And then there's forensic

7       expert technical time for the state of Georgia work

8       at $275 an hour, right?

9              A     Yes, sir.

10             Q     And there's an expert witness time at

11      $4.50 an hour?

12             A     450.

13             Q     Oh, sorry.

14             A     That's --

15             Q     That would be a terrible --

16             A     That's the rate --

17             Q     Let's try that again.

18                   So the expert -- the expert witness

19      time is $450 an hour, right?

20             A     Yes, sir.

21             Q     And it says, "Includes reports and

22      affidavits," right?

Page 59

```
 1              A      Correct.

 2              Q      Was there an anticipation for the

 3      Binnall Agreement, that anyone at SullivanStrickler

 4      might be an expert witness on -- with respect to

 5      the Georgia work?

 6              A      Expectation?  I don't know.  And the

 7      reason why I say that is because there's a level of

 8      expectation of affidavit work for every forensic

 9      project we work on.  Whether it happens or not, we

10      have to be prepared in letting our clients know

11      that there's a subsequent cost to that.

12              Q      Okay.  Do you know -- do you know why

13      under the state of Georgia you have an expert

14      witness time with respect to reports and

15      affidavits, but that same bullet is not anticipated

16      for state of Nevada work?

17              A      I do not know.

18              Q      Okay.  And then also under Georgia,

19      we've got travel time, if required, at 50 percent

20      of normal rate, right?

21              A      Yes, sir.

22              Q      And then under Georgia, destination
```

Page 60

1          media at $248 per encrypted hard drive, right?

2                    A    Yes, sir.

3                    Q    The data that's collected -- sorry,

4          strike that.

5                         The data that was collected for

6          Coffee County, was that encrypted when it was

7          collected?

8                    A    Was that encrypted --

9                    Q    Let me ask a better question.

10                   A    Yeah.

11                   Q    Did Paul -- sorry, strike that.

12                        Did SullivanStrickler take any

13         efforts on its own to -- to add encryption to data

14         that it copied from Coffee County?

15                   A    Yes.

16                   Q    Okay.  What did it do to encrypt the

17         data that it copied?

18                   A    We used password-protected files.  I

19         don't know the -- the technology.  And we also, I

20         believe, used BitLocker on some data as well, some

21         drives.

22                   Q    What is BitLocker?

Page 61

```
 1            A    It's an industry-standard encryption

 2      technology that's utilized for destination, either

 3      preservation media, anything.

 4            Q    The encryption that was used for the

 5      data from Coffee County, that does not alter the

 6      substance of the data --

 7            A    No, sir.

 8            Q    -- the files?

 9                 Okay.  And sorry, let me -- just make

10      sure I get my question finished before --

11            A    Sure.

12            Q    -- you --

13            A    Yeah, I'm sorry.

14            Q    No, that's okay.  It happens all the

15      time.

16            A    Yes.

17            Q    It's just for the court reporter.

18                 All right.  And then we have under

19      Georgia work, "Relativity services."  What is that?

20            A    Relativity is a case management

21      review platform.

22            Q    And that's something that
```

Page 62

```
 1        SullivanStrickler has a license to?

 2             A     Yes, sir.

 3             Q     Was Relativity ultimately used with

 4        respect to the Coffee County work?

 5             A     I don't know.  I would say no based

 6        on we didn't host anything in Relativity, so the

 7        short answer is no.

 8             Q     Okay.  To the best of your knowledge,

 9        nothing was -- none of the data copied from Coffee

10        County was loaded into a Relativity platform?

11             A     Correct.

12             Q     And then the next bullet, "Storage.

13        Devices may be stored at the Vault for the

14        following fees:"

15                   Do you see that?

16             A     Oh, yes, sir.

17             Q     What's "the vault"?

18             A     We -- our building is a vault.  It's

19        an old accounting facility that was owned by a

20        bank.  So we securely manage and vault physical

21        media and data.

22             Q     So literally like an old bank vault?
```

Page 63

1              A     Yes, it is.

2              Q     Like a big steel door?

3              A     It's very cool.

4              Q     Okay.

5              A     It's very cool.  You're welcome to a

6        tour when this is all done.

7              Q     Was any of the Coffee County data --

8              A     Strike that you're welcome to a tour

9        thing.  My bad.  Oops.  I'm trying my best here,

10       give me some slack.

11             Q     Yeah, you're doing fine.

12             A     Okay, thanks.

13             Q     You're doing fine.

14                   Was the Coffee County data ultimately

15       stored in the vault for any period?

16             A     Yes, sir.

17             Q     Is there data from Coffee County

18       still stored in the vault?

19             A     Yes, sir.

20             Q     Was that data ever stored outside of

21       the vault?

22             A     No, sir.

Page 64

1            Q     And that data was ultimately uploaded

2      to a file share site on the internet?

3            A     Yes, sir.

4            Q     Okay.  Do you know why with the

5      Binnall Agreement, there's a lot more detail and

6      what looks to be a lot broader scope of work

7      anticipated for Georgia than there was for Nevada?

8            A     I do not.

9            Q     If you wanted to know the answer to

10     that, who would you ask?

11           A     Paul Maggio.

12           Q     You said earlier that your

13     understanding from talking to Mr. Maggio was that

14     the firm was first engaged to do work in Georgia in

15     early January 2021, but we have an agreement with

16     Mr. Binnall from November 30 that anticipates a

17     pretty broad scope of Georgia work.

18                 Do you know -- can you explain that

19     to me?

20           A     Sure.  As I understand it, the -- and

21     I don't know anything really other than Coffee

22     County, so I don't know what was done in Nevada,

1      but I know that there was the potential, I believe,

2      at that time to do work in Georgia, but it never

3      came to fruition, as I understand it.  So the -- so

4      not that it went stale, but it kind of went away.

5                   And then an e-mail went out regarding

6      doing some work in Georgia, which I believe is

7      covered in another engagement letter.  So this one,

8      as I understand it, became irrelevant to what was

9      being done in Georgia.  So I -- honestly, I don't

10     know.

11            Q      Okay.  So do I understand correctly

12     that the scope of work laid out in the Binnall

13     Agreement in November of 2020, with respect to

14     Georgia, that work was anticipated as a possibility

15     as of that time, but the firm did not get an actual

16     green light to do Coffee County work until early

17     January of 2021?

18            A      Yes, sir.

19            Q      And then on the overview page --

20            A      Which?

21            Q      Sorry.  Back one page.

22            A      Yeah.

Page 66

```
 1              Q     -- we read this language before, that

 2         these requirements were defined during phone calls,

 3         face-to-face meetings, and/or e-mail interactions.

 4                    Were there face-to-face meetings

 5         between anyone at SullivanStrickler and Mr. Binnall

 6         or anyone at his firm?

 7              A     I don't know.  That is standard

 8         language as well in our statements of work.

 9              Q     If you wanted to know, would you ask

10         Paul Maggio?

11              A     Yes, sir.

12              Q     All right.  Flip to where it says

13         Exhibit 2, still in the Binnall Agreement.  And

14         does this reflect what we were talking about

15         earlier, your standard terms of service, but the

16         specific work to be done might change a bit from

17         agreement to agreement, or are these all just your

18         standard terms?

19              A     Standard terms.

20              Q     Okay.  If you look at this -- go

21         ahead, if you need to flip through it.

22              A     No, I'm sorry.  That's fine.
```

Page 67

```
 1              Q      If you look at the second page of the
 2       "Terms of Service," do you see the Number 4
 3       heading --
 4              A      Sorry about that.
 5              Q      And by the way, I should have told
 6       you at the start, if you need to take a break at
 7       any point, just let me know.
 8              A      Okay.  I appreciate that.
 9              Q      Otherwise, I will tend to just keep
10       going.
11              A      Okay.
12              Q      I'm happy to -- I'm happy to break.
13              A      I might need water soon, but right
14       now, I'm good.  Thank you.
15              Q      I was just thinking the same.  Why
16       don't we finish this and then we take a break.
17              A      That would be great.
18              Q      Okay.  So Number 4, "Customer's
19       Representations and Warranties."  So that's a
20       standard term in your agreements?
21              A      Yes, sir.
22              Q      And so here it reads, "The Customer
```

Page 68

```
 1          hereby represents and warrants the Company and
 2          agrees that during the term, Customer will ensure
 3          that, A, customer is the owner or valid licensee of
 4          all the information, documents, graphic items, and
 5          other data of every kind and description.  The
 6          Customer may process through its receipt of the
 7          services or use in the services."  And then it goes
 8          on from there.
 9                     Actually, then it goes on, "And
10          Customer has secured all necessary licenses,
11          consents, permissions, waivers, and releases for
12          the use of the customer content and each element
13          thereof, including without limitation, all
14          trademarks, logos, names, and likenesses contained
15          therein, without any obligation by Company to pay
16          any fees, residuals, guild payments, or other
17          compensation of any kind to any individual,
18          partnership, joint venture, corporation, limited
19          liability company, trust, unincorporated
20          association or organization, or government or any
21          agency or political subdivision thereof."
22                     Do you see that?
```

Page 69

1          A      Yes, sir.

2          Q      And this is a standard term for you?

3          A      I think.  And the reason why I say

4     that is the terms.  If there are changes that have

5     been made with track changes and accepted or

6     something that I just don't know, I wouldn't know

7     that.  I don't know it well enough to know the

8     specific language for each tenets unfortunately.

9          Q      Fair enough.

10              But the general concept that's

11     captured here in the representations of what we

12     just read, it would be general practice to have

13     language along those lines?

14         A      Yes, sir.

15         Q      What was the -- what is the purpose

16     of this language in your engagement agreements?

17              Let me ask you a better question and

18     see if I can help you.

19         A      Yes, please.

20         Q      Is the purpose of this language

21     intended to help SullivanStrickler ensure that the

22     work that it is doing, that it has all the sort of

Page 70

1       legal permissions and rights to do?

2               A       Yes, sir.

3               Q       And was it SullivanStrickler's

4       understanding, with respect to the Binnall

5       engagement, that any work done pursuant to this

6       agreement, the firm, through the customer, here

7       Mr. Binnall, would have all the legal permissions

8       and rights to do whatever work it would do?

9               A       Yes, sir.

10              Q       Does the firm have any standard

11      policies or practices with respect to these types

12      of engagements to sort of confirm or validate for

13      itself that the customer does, in fact, have all of

14      the necessary legal rights and permissions for the

15      work to be performed?

16              A       So maybe I'm understanding the

17      question wrong.  So are you asking if the attorneys

18      that are hiring us to do the work --

19              Q       No.  I'm sorry.

20                      Let me ask -- so you've got standard

21      language that says we want to make sure that the

22      customer engaging us has all the legal rights and

Page 71

1              permissions to do what it's asking us to do.

2                        A       Right.

3                        Q       Okay.  In addition to having that

4              sort of protection in the agreement, does

5              SullivanStrickler, as some standard practice, do

6              any sort of its own due diligence to say, "Let's

7              just make sure the customer does, in fact, have all

8              those rights and permissions"?

9                        A       No.

10                       Q       So the general practice of the firm

11             would be to trust that your customer is being

12             straight with you, that that customer has the right

13             to do what they're asking you to do?

14                       A       Yes.

15                       Q       Does the firm generally work for

16             lawyers?

17                       A       Yes, sir.

18                       Q       Is the idea of the firm that because

19             lawyers are officers of the court, the firm should

20             be able to rely on them for ensuring compliance

21             with these terms?

22                       A       Yes, sir.

Page 72

```
 1              Q      With respect to Coffee County in

 2        particular, did the firm get what it believed were

 3        assurances from Coffee County election officials

 4        that it was allowed to do the work that it was

 5        doing?

 6              A      Assurance in that they pointed out

 7        what needed to be imaged and identified what we

 8        were to be collecting, yes.

 9              Q      And by "they," you're talking about

10        Coffee County election officials who were

11        on-site --

12              A      People that were on-site, correct.

13        Yes, sir.

14              Q      On-site in the elections office

15        during the copying?

16              A      Yes, sir.

17              Q      And it was the understanding of

18        SullivanStrickler that at least some of those

19        individuals giving that direction were election

20        officials for Coffee County?

21              A      Yes, sir.

22              Q      Is it your understanding now, with
```

Page 73

1          what you've learned since, that the individuals who

2          engaged SullivanStrickler for the Coffee County

3          work, in fact, did not have the legal authority or

4          permissions to do what they asked you to do?

5                    A     No.

6                    Q     What is your understanding about

7          that?

8                    A     That the direction provided by us was

9          under a legal umbrella of a directing attorney.

10                   Q     Okay.  And sorry, let me -- let me

11         try to break that down a little bit.

12                   A     Sure.

13                   Q     Is the view today of

14         SullivanStrickler that the work that it did did not

15         violate any laws?  Is that fair?

16                   A     Yes, sir.

17                   Q     And that view is based, in part, on

18         the assurances received from the customer who

19         engaged the firm for that work and the direction

20         that the firm received on-site from election

21         officials in Coffee County.  Is that fair?

22                   A     Yes, sir.

Page 74

```
 1            Q     Do you have any understanding
 2      today -- let's -- let's put aside for a moment the
 3      election officials.
 4            A     Sure.
 5            Q     Do you have any understanding today
 6      that the customer that engaged SullivanStrickler to
 7      do the work in Coffee County, that that customer
 8      actually did not have the legal rights or
 9      permissions to ask SullivanStrickler to do the work
10      it did in Coffee County?
11            A     No, sir.
12            Q     That's not something you've heard
13      before today?
14            A     No.
15            Q     Okay.  And do I understand correctly
16      that even though the Binnall Agreement specifically
17      discusses the Georgia work, the work that was done
18      in Coffee County was done pursuant to a separate
19      agreement?
20                  If you don't know, that's fine.
21            A     I believe so, yes, sir.
22            Q     Okay.  And that's based on
```

Page 75

1          discussions with Mr. Maggio and others?

2                    A     Yes.

3                    Q     The work that was done in Coffee

4          County, was that done -- was the customer for that

5          work Sidney Powell?

6                    A     Sidney Powell paid the bills.

7                    Q     What's your understanding of who the

8          customer was for the purpose of the engagement

9          agreement for the Coffee County work?

10                   A     Sidney Powell.  Very good.

11                   Q     So is it SullivanStrickler's

12         understanding still today that Sidney Powell had

13         all of the necessary legal rights and permissions

14         for the work that she engaged SullivanStrickler to

15         do in Coffee County?

16                   A     Yes, sir.

17                   Q     What is the basis for that

18         understanding?

19                   A     Borrowed license at the time -- no,

20         see, I don't -- I don't know.

21                   Q     That's okay.

22                   A     Yeah, sorry.

Page 76

```
 1              Q      No, that's okay.

 2                     If you -- sticking to the

 3       agreement --

 4              A      Yeah.

 5              Q      -- turn to the page that has -- it's

 6       two pages later.

 7              A      Sure.

 8              Q      -- heading 12, "Indemnification of

 9       Company."

10              A      Yep.

11              Q      Is this another standard provision in

12       your agreements generally?

13              A      Yes, sir.

14              Q      And the idea here is that if

15       SullivanStrickler incurs any kind of cost with

16       respect to liability claims, for example, arising

17       out of the work, the customer will indemnify and

18       hold SullivanStrickler harmless for that?

19              A      Yes, sir.

20              Q      Has SullivanStrickler raised any

21       indemnification claim with respect to the Coffee

22       County work with the customer that retained the
```

Page 77

```
 1        firm for that?

 2              A     I don't know.

 3              Q     Again, your understanding is the

 4        customer for that work was Sidney Powell?

 5              A     Yes, sir.

 6              Q     I promised you a break.

 7              A     I appreciate that.

 8              VIDEOGRAPHER:  The time is 10:22 a.m.

 9        We are off video record.

10              (Recess from 10:22 a.m. to 10:34 a.m.)

11              VIDEOGRAPHER:  The time is 10:34 a.m.

12        We are back on video record.

13        BY MR. CROSS:

14              Q     You asked earlier that we come back

15        to the question about CompactFlash drives that

16        Ms. Naik copied.  Have you recalled what was on

17        those?  If not, we can come back to it later.

18              A     We are going to have to come back to

19        it later.

20              Q     That's fine.

21              A     Yeah.

22              Q     That's fine.
```

Page 78

1                    Okay.  So let's look at 7.  I'm going

2       to hand you Exhibit 7.

3                    (Felicetti Deposition Exhibit Number 7

4                    marked for identification.)

5       BY MR. CROSS:

6                Q     And do you recognize this as an

7       engagement agreement for forensic analysis where

8       Sidney Powell retained the firm?

9                A     Yes, sir.

10               Q     And this is dated December 6, 2020.

11      Is that right?

12               A     Yes, sir.

13               Q     So this is about a week after the

14      engagement with Mr. Binnall that was November 30,

15      2020, right?

16               A     Yes, sir.

17               Q     And if you look on the first page of

18      the agreement, there's a -- it looks like an

19      eSignature by Sidney Powell.  Do you see that?

20               A     Yes, sir.

21               Q     There doesn't look to be a signature

22      by Mr. Maggio, but is it -- was this engagement

1      operational?

2              A      Yes, sir.

3              Q      Okay.  Why did the firm enter into

4      this agreement with Ms. Powell about a week after

5      the Binnall Agreement?

6              A      I don't know.

7              Q      If you look at, again, this overview

8      section, where it says Exhibit 1 under

9      requirements, we have the same first paragraph.  Do

10     you see that?

11             A      Yes, sir.

12             Q      And then below, it gives the overview

13     for this agreement, which reads, "Customer," and,

14     again, here that's Sidney Powell, right?

15             A      Yes, sir.  Sorry.

16             Q      That's okay.

17                    So here Sidney Powell is requesting

18     that SullivanStrickler provide services such as

19     computer forensic collections and analytics on the

20     Dominion Voting System's equipment and the poll

21     pads, in parenthesis iPads, to the Windows machines

22     that run the scanners to Linux machines that

Page 80

1          tabulate the votes in the state of Michigan.

2                    Do you see that?

3          A     Yes, sir.

4          Q     So do I understand correctly that

5     this agreement with Ms. Powell was signed with

6     respect to forensic collection and analytics work

7     that was anticipated in Michigan?

8          A     Yes, sir.

9          Q     All right.  How did it come to be

10     that the work done in Coffee County was done for

11     Ms. Powell instead of Mr. Binnall?

12          A     As I understand it, the focus

13     shifted, I don't want to say from Michigan, but

14     maybe after Michigan, to Coffee County.  And I

15     don't know why there are two different engagements,

16     one specifically for Jesse Binnall, versus this

17     one.

18          Q     Okay.  SullivanStrickler performed

19     forensic collection of data pursuant to the Binnall

20     agreement, right, in some jurisdiction?

21          A     I don't know.  I don't know what

22     happened in Nevada.

Page 81

1           Q     Okay.  Is it your understanding that

2     the Binnall Agreement ended up being for work only

3     that would have occurred in Nevada?

4           A     Yes, sir.

5           Q     And so any work that was done in

6     Michigan and Georgia was done pursuant to the

7     Powell Agreement?

8           A     Yes, sir.

9           Q     All right.  You can put that aside

10     for the moment.

11           A     Okay.

12           Q     I'll have some more questions in a

13     minute.

14                 To kind of help with the context

15     here, let me hand you Exhibit 8.

16           A     Sorry.

17              (Felicetti Deposition Exhibit Number 8

18              marked for identification.)

19     BY MR. CROSS:

20           Q     All right.  So Exhibit 8, this is an

21     e-mail thread between individuals at

22     SullivanStrickler, Ms. Powell, and a variety of

Page 82

1       other folks that relate to, at least in part, the

2       work that was done in Coffee County.

3                   Do you see that?

4             A     Yes, sir.

5             Q     Is this a document that you've seen

6       before today?

7             A     I've seen this before.

8             Q     So is this one of the things that

9       you -- you reviewed in preparing for the

10      deposition?

11            A     Yes, sir.

12            Q     All right.  If you look at the last

13      page of the e-mail, there's an attachment, a

14      SullivanStrickler invoice.  You can flip all the

15      way to the back.

16            A     Yep.

17            Q     Is this in the form of a standard

18      invoice for forensic work?

19            A     Yes, sir.

20            Q     And if you look here, it's sent to

21      Sidney Powell, Defending the Republic.  Do you see

22      that?

Page 83

```
 1              A      Yes, sir.

 2              Q      And if you look under the activity,

 3      there's a date of January 7, 2021, "On-site Coffee

 4      County, Georgia."  Do you see that?

 5              A      Yes, sir.

 6              Q      And then there's another entry for

 7      travel, right?

 8              A      Yes, sir.

 9              Q      So do I understand correctly the

10      invoice here was an invoice sent to Sidney Powell

11      for the collection that was done in Coffee County

12      on January 7, 2021?

13              A      Yes, sir.

14              Q      And the total was 26,000 for the

15      forensic work and $220.64 for travel?

16              A      Yes, sir.

17              Q      Was this paid?

18              A      I believe so.  I don't know.

19              Q      Would that be a question -- who would

20      that be a question for?

21              A      Paul would know, Paul Maggio.

22              Q      Okay.  But as you sit here, you don't
```

Page 84

1       have any reason to believe that the firm was never

2       paid for the work?

3              A      Yeah, I would believe that it -- this

4       has been paid.

5              Q      All right.  So start in the back of

6       the thread.  And we can go through it in

7       chronological order.

8              A      Sure.

9              Q      If you look at the bottom of these

10      little production numbers, the one ending in 49 --

11      or actually the bottom of 48 is where the first

12      e-mail starts.

13             A      Yep.

14             Q      So you see at the bottom of the page

15      ending in 48, there's an e-mail at November 30,

16      2020 from Jim Penrose.  Do you see that?

17             A      Yes, sir.

18             Q      And his e-mail is Jim@fightbacklaw --

19      fightback.law.  Do you see that?

20             A      Yes, sir.

21             Q      And this is an e-mail that is

22      addressed to Paul and Greg, right?

```
                                            Page 85

 1                A     Yes, sir.

 2                Q     So Paul Maggio and Greg Freemyer?

 3                A     Yeah.

 4                Q     And it starts out referring to an

 5       opportunity in Nevada.  Do you see that?

 6                A     Yes, sir.

 7                Q     And then it goes on to indicate that

 8       the -- the lead attorney for the Nevada project

 9       would be Jesse Binnall.  Do you see that?

10                A     Yes, sir.

11                Q     And then there's a reference to Brian

12       Kennedy.  Who is that?

13                A     I don't know.

14                Q     Okay.  And then if you go to the top

15       of the next page, this is --

16                A     Which Bates?

17                Q     Oh, it ends in 49.

18                A     Oh, on 49?

19                Q     Yeah, if you go back.

20                A     I'm sorry.

21                Q     So we're still on the same e-mail

22       from Mr. Penrose.  And it reads, "From our side,
```

Page 86

1      Doug Logan" -- there's a cell number -- "will be

2      joining you and flying out there with you."

3                    Do you see that?

4           A     Yes, sir.

5           Q     So do I understand correctly that

6      when the work was first contemplated for

7      SullivanStrickler to access voting equipment, that

8      first came at the direction of Jim Penrose and Doug

9      Logan?

10          A     Yes, sir.

11          Q     And did -- did they remain key points

12     of contact throughout the work that was done by the

13     firm with respect to copying election equipment?

14          A     Yes, sir.

15          Q     Including Coffee County?

16          A     Yes, sir.

17          Q     Okay.  And then it goes on.  "Your

18     POC on the ground Nevada is Todd from our team."

19                    Do you know who Todd is?

20          A     I do not.

21          Q     And then below, do you see where it

22     says, "Todd, the SullivanStrickler POC for the

Page 87

```
1          flight is Paul Maggio, the SullivanStrickler team

2          lead is Greg Freemyer"?

3                    Do you see that?

4          A     Yes, sir.

5          Q     Was Greg Freemyer the team lead for

6          what was anticipated for Nevada?

7          A     I don't know Nevada.  I have no idea.

8          Q     Okay.  But your understanding is

9          Mr. Freemyer did not have involvement with the

10         Coffee County collection?

11         A     Correct.

12         Q     Okay.  If you then come to -- come

13         back a page, so we're on the page ending in 48.

14         A     Uh-huh.

15         Q     So Mr. Binnall writes on the same

16         thread immediately after Mr. Penrose's e-mail,

17         "Send me an agreement and call my cell with any

18         questions."

19                   Do you have that?  Do you see that?

20         A     Where?  On 48?

21         Q     Yeah, right there.

22         A     Oh, yeah.  Yes.  I'm sorry.
```

Page 88

1          Q      No, it's okay.

2                 So Mr. Binnall asked for an

3      agreement, right?

4          A      Yes.

5          Q      And then if you continue up through

6      the thread, December 1st, 2020, Paul Maggio sends

7      an engagement agreement for Nevada work, as well as

8      the possible Georgia work.  Do you see that?

9          A      Yes, sir.

10         Q      And do I understand correctly, that

11     engagement agreement is the one that we looked at

12     earlier with Mr. Binnall?

13         A      Yes, sir.

14         Q      Okay.  Then if you come to the bottom

15     of the page 46 -- ending in 46 --

16         A      Yep.

17         Q      -- there's an e-mail from Jesse

18     Binnall to Paul Maggio, still in the same thread.

19     And if you flip back the page, you'll see the

20     actual e-mail.

21         A      Yeah.

22         Q      And Mr. Binnall writes to Mr. Maggio,

1           "Paul, it looks like this one is going to Wood."

2       Do you see that?

3               A       Yes, sir.

4               Q       Do you understand that's a reference

5       to Lin Wood?

6               A       I don't know.

7               Q       Okay.  Are you familiar with Lin

8       Wood?

9               A       I am familiar with the name Lin Wood.

10              Q       Do you have an understanding that Lin

11      Wood was involved with SullivanStrickler's

12      retention by Mr. Binnall or Ms. Powell with respect

13      to copying election equipment?

14              A       I don't know.

15              Q       Okay.  And who do you understand Lin

16      Wood to be?

17              A       Do you mind if I hit my notes?

18              Q       Sure.

19              A       Thank you.

20                      Yeah, no, I do not.

21              Q       Okay.  All right.  So let's keep

22      going.

```
                                                        Page 90

 1                A      Sure.

 2                Q      Come to the -- let's see, come to the

 3       page ending in 45.  And do you see there's an

 4       e-mail from Jesse Binnall to Paul Maggio,

 5       December 1st, 2020, middle of the page?

 6                       Do you see that?

 7                A      Yes, sir.

 8                Q      And here Mr. Binnall indicates to

 9       Mr. Maggio that he has signed the engagement

10       agreement.  Do you see that?

11                A      Yes, sir.

12                Q      Okay.  And then if you come to the

13       page ending in 44, Mr. Maggio indicates here,

14       e-mailing Mr. Binnall and a couple of other folks,

15       that he's sending the initial invoice for the

16       matter.

17                       Do you see that?

18                A      Yes, sir.

19                Q      What work was that invoice for?

20                A      I can make an assumption that --

21                Q      I don't want you to assume.  If you

22       don't know, that's okay.
```

Page 91

```
 1                A      Yeah, I -- I don't know.

 2                Q      Okay.  Had SullivanStrickler

 3        performed any work in Georgia or with respect to

 4        Georgia at this time?

 5                A      No, sir.

 6                Q      Okay.  Then if you come up to the

 7        bottom of the page ending in 43, at the bottom of

 8        the page there's an e-mail from Paul Maggio, again

 9        to Jesse Binnall and others.  And he indicates,

10        "Attached are both invoices for the two days we

11        spent in Las Vegas, Nevada in support of this

12        matter."

13                       Do you see that?

14                A      Yes, sir.

15                       Can I back up to your previous

16        question?

17                Q      Sure.

18                A      Yes.  So the invoice would have been

19        related to the Nevada collection.

20                Q      Okay.  And your understanding is it

21        would not have related to Georgia?

22                A      Correct.
```

Page 92

1          Q      Okay.  And there are a couple of

2     folks on the e-mails here.  One is

3     britrav@█████████████  Do you know who that is?

4          A      I do not.

5          Q      And then the AR@SullivanStrickler, is

6     that an account that you use for payments?

7          A      Yes, sir.

8          Q      All right.  Come to the bottom page

9     ending in 41.  There's an e-mail here from Paul

10    Maggio on December 5th, 2020.  Do you see that?

11         A      Yes, sir.

12         Q      And here, Mr. Maggio writes to Jesse

13    Binnall, "The SullivanStrickler team has arrived in

14    Antrim County, Michigan and will be on-site at

15    9:00 a.m. tomorrow.  It is our assumption that we

16    will be working under our existing agreement and

17    maintain the same daily rates/conditions of the

18    signed document for Nevada."

19                Do you see that?

20         A      Yes, sir.

21         Q      Then he goes on, "If you need a new

22    agreement, please let me know."  Do you see that?

Page 93

1              A     Yes, sir.

2              Q     And then Mr. Binnall responds that

3        same day, "I don't have any authority regarding

4        Michigan.  Who is your campaign contact there?"

5                    Do you see that?

6              A     Yes.

7              Q     The reference to campaign, that's the

8        Trump campaign?

9              A     I don't know.

10             Q     Who would you ask if you wanted to

11       know?

12             A     Paul Maggio.

13             Q     As we saw earlier, the retention

14       agreement with Sidney Powell was -- was dated

15       December 6, the next day after this e-mail.

16                   Do you recall that?

17             A     Yes, sir.

18             Q     All right.  So we come up to the page

19       ending in 40.  Here, Mr. Maggio sends an e-mail to

20       Jim -- Jim Penrose, and others, saying, "Since

21       we've already begun work in Antrim County,

22       Michigan, it would be best for all parties if we

Page 94

1       have a signed agreement in place.  Attached is an

2       engagement agreement with you as the signee."

3                Do you see that?

4          A    Yes, sir.

5          Q    So do I understand correctly that

6       SullivanStrickler sent a new engagement agreement

7       specific for Michigan to Mr. Binnall on December 6,

8       2020?

9          A    Yes, sir.

10         Q    Okay.  And then --

11         A    Uh, wouldn't it have --

12         Q    Or was it Jim Penrose?

13         A    No, yeah, I think it would have went

14      to Jim Penrose.

15         Q    Thank you.

16         A    You're welcome.

17         Q    You're right.  Sorry, that's my

18      mistake.

19                The e-mail is to Jim Penrose, and it

20      indicates you as the signee.  So there was an

21      agreement for Jim Penrose?

22         A    Yes, sir.

Page 95

1          Q      Okay.  Thank you.

2                 And then Mr. Penrose responds on

3    December 6th, "Here is the signed engagement letter

4    from Sidney Powell, Defending the Republic.  Please

5    send the invoice to Sidney and I'll get them paid."

6                 Do you see that?

7          A      Yes, sir.

8          Q      Do you know what happened between the

9    proposed engagement agreement for Jim Penrose for

10   Michigan and getting an engagement letter signed by

11   Sidney Powell for Michigan?  How that change was

12   made?

13         A      I don't know.

14         Q      Is the engagement letter that's

15   referenced here -- is it your understanding with

16   Ms. Powell -- that that's the one that we looked at

17   earlier?

18         A      Can you rephrase that --

19         Q      Yes.

20         A      -- starting with the engagement

21   letter?

22         Q      Yes, sorry.  Let me ask a better

1      question.

2                    A      Yeah.

3                    Q      So here where Mr. Penrose indicates

4      that he's sending back a signed engagement letter

5      from Sidney Powell, is that, to your understanding,

6      the Sidney Powell Agreement that we looked at

7      earlier from December 6, 2020?

8                    A      Yes, sir.

9                    Q      Okay.  And then Mr. Penrose goes on

10     in his e-mail, "Please do not communicate about any

11     additional forensics work in Arizona to the other

12     legal teams.  Keep that in confidential channels

13     with me, Sidney, and Doug."

14                    Do you see that?

15                    A      Yes, sir.

16                    Q      Do you understand "Doug" there refers

17     to Doug Logan?

18                    A      I do.

19                    Q      And Doug Logan is copied on the

20     e-mail here.  Do you see that?

21                    A      I do, yes, sir.

22                    Q      Do you have any understanding as to

Page 97

1        why SullivanStrickler was directed by the client

2        here not to communicate about additional forensics

3        work in Arizona to the other legal teams?

4                A      I don't know.

5                Q      Do you know who the other legal teams

6        were?

7                A      No.

8                Q      All right.  So then Mr. Maggio

9        responds on December 6, 2020, acknowledged and

10       confirmed with respect to the signed engagement by

11       Ms. Powell, right?

12               A      Yes, sir.

13               Q      Okay.  I'm sorry, I know this is

14       probably a bit tedious, but --

15               A      No, it's not.  I -- I completely

16       understand.

17               Q      We'll work our way through on how we

18       end up in Coffee.

19               A      No, that's fine.

20               Q      All right.  So then on December 8,

21       2020, Mr. Maggio sends an e-mail in the same

22       thread.  "We will upload the system files from the

1    election management server collected from Antrim

2    County, Michigan to a secured FileShare site."  The

3    second bullet also refers to Antrim County,

4    Michigan.  The third bullet refers to payment for

5    the Clark County, Nevada collection.

6              Do you see that?

7         A    Yes, sir.

8         Q    Was there a collection done in

9    Nevada?

10        A    No.

11        Q    Okay.  Then Ms. Powell responds,

12   "Nevada must be paid by the campaign."  Do you see

13   that?

14        A    Yes, sir.

15        Q    Is that a reference to the Trump

16   campaign?

17        A    I don't know.

18        Q    Do you have any reason to believe it

19   would be another campaign?

20        A    I do not.

21        Q    And then she goes on, "I have seen

22   none of that information.  I am authorizing payment

Page 99

```
 1        today from Michigan."

 2                     Do you see that?

 3              A     Yes, sir.

 4              Q     So Sidney Powell -- it was the Sidney

 5        Powell Engagement that covered the Michigan work,

 6        right?

 7              A     Yes, sir.

 8              Q     Okay.  Then we get to December 21 --

 9        sorry, back up.

10              A     Yeah.

11              Q     At the bottom, we're on December 10,

12        2020 from Brendan Sullivan at your firm.  Do you

13        see that?

14              A     Right here?

15              Q     Right here.

16              A     Yes, I got it.

17              Q     Who is he?

18              A     Brendan Sullivan is the CEO of

19        SullivanStrickler.

20              Q     What was his role with respect to the

21        Sidney Powell or Jesse Binnall engagement?

22              A     I don't know.
```

```
                                          Page 100

 1              Q      Okay.  What was his role, if any,

 2      with respect to Coffee County?

 3              A      I don't know.

 4              Q      Okay.  So Mr. Sullivan responds on

 5      December 10, "We received the Michigan on-site work

 6      check this morning.  Thanks for executing, Sidney."

 7                     Do you see that?

 8              A      Yes.

 9              Q      Then we jump ahead 11 days to

10      December 21, and Mr. Maggio sends an invoice as the

11      retainer for the Wayne County, Michigan work.

12                     Do you see that?

13              A      Yes, sir.

14              Q      "Expectation is this will be paid

15      prior to work commencing."  Do you see that?

16              A      Yes, sir.

17              Q      In that same day Sidney Powell

18      responds, "Copying Tricia with instructions to

19      transfer money promptly with understanding that I

20      and Phil Waldron and Todd and Conan will receive a

21      copy of all data immediately and have access to all

22      information needed immediately to complete their
```

Page 101

1          assessment.  And a complete copy of all analysis

2          you do is to be given to us as well."

3                    Do you see that?

4          A     Yes, sir.

5          Q     Conan is Conan Hayes.  Is that right?

6          A     I believe so.

7          Q     And what's your understanding as to

8          who he is?

9          A     I don't know.

10         Q     Okay.  If you wanted to know, would

11         Mr. Maggio be the right person?

12         A     Yes, sir.

13         Q     Who is Todd?

14         A     I don't know.

15         Q     Who is Phil Waldron?

16         A     I don't know.

17         Q     And then the reference with

18         Ms. Powell, "A complete copy of all analysis that

19         you do," did SullivanStrickler, beyond just copying

20         data in Michigan, did it also do an analysis of

21         that data?

22         A     No analysis was performed.

Page 102

1          Q      What about with respect to Coffee

2     County?

3          A      No analysis was performed.

4          Q      Okay.  All right.  If you look at the

5     bottom in this thread ending in -- the page ending

6     in 35, do you see there's an e-mail from Sidney

7     Powell on December 21, 2020?

8          A      Yes, sir.

9          Q      And she writes, "Thank you ALL!!"

10                "All" is in all caps with two

11    exclamation points.  Do you see that?

12         A      Yes, sir.

13         Q      And then we come up now to January 7,

14    2021 at 10:31 a.m.  Do you see that?

15         A      Yes, sir.

16         Q      This is an e-mail from Paul Maggio to

17    Sidney Powell, Tricia@█████████████  Jim

18    Penrose, Brendan Sullivan, and Doug Logan, right?

19         A      Yes, sir.

20         Q      And Tricia has the same e-mail,

21    @█████████████.com, as Sidney Powell, right?

22         A      Yes, sir.

Page 103

```
 1              Q     So do you understand that Tricia is
 2       someone who works with Ms. Powell?
 3              A     Yes, sir.
 4              Q     Okay.  Do you know who she is?
 5              A     I do not.
 6              Q     All right.  And here now on
 7       January 7th in the morning, the subject line of
 8       the -- even though we're still on the same e-mail
 9       thread, the subject line now refers to "Coffee
10       County, Georgia Forensics Engagement Agreement."
11                    Do you see that?
12              A     Yes, sir.
13              Q     So the project number SSA1722 is
14       still the same project number that we have down in
15       the thread referring to Wayne County, Michigan
16       forensics.
17                    Do you see that?
18              A     Yes, sir.
19              Q     So do I understand correctly that
20       SullivanStrickler -- the Coffee County work was
21       part of the same project as Michigan?
22              A     Yes, sir.
```

Page 104

1          Q     Okay.  Then here, Mr. Maggio writes

2     on the morning of January 7, "Per Jim Penrose's

3     request, we are on our way to Coffee County,

4     Georgia to collect what we can from the

5     election/voting machines and systems.  As per our

6     existing agreement, I am attaching the invoice for

7     our initial retainer.  Please let me know if there

8     are any questions or concerns."

9                Do you see that?

10         A     Yes, sir.

11         Q     The invoice that's attached there,

12    that's the one we looked at at the back here for

13    the Coffee County work.  Is that right?

14         A     I believe so.

15         Q     Okay.  So we -- we can see here that

16    sort of the evolution of the engagement went from

17    having an engagement with Mr. Binnall, with respect

18    to focusing on Nevada in the e-mail thread, to then

19    an engagement with Ms. Powell for Michigan, to

20    January 7, 2021, the Coffee County -- the team

21    traveling to Coffee County for collection.

22                Is that right?

1          A     Yes, sir.

2          Q     Okay.  Does this thread or any of the

3    discussions or any of the prep that you did enable

4    you to offer any explanation for sort of how the

5    evolution happened that Georgia work went from a

6    Binnall retention to happening as part of a Sidney

7    Powell retention?

8          A     I do not.  I don't know.

9          Q     Okay.  Would that be a question for

10   Paul Maggio?

11         A     Yes, sir.

12         Q     Okay.  When Mr. Maggio writes here,

13   "We are on our way to Coffee County, Georgia," the

14   "we" there are the four individuals from

15   SullivanStrickler we talked about before?

16         A     Yes, sir.

17         Q     Okay.  So that's Ms. Naik,

18   Ms. Jackson, Mr. Nelson, and Mr. Maggio?

19         A     Yes, sir.

20         Q     Anyone else?

21         A     No.

22         Q     Okay.  And then in the same thread,

Page 106

1      we have an e-mail from Mr. Maggio at 4:10 p.m. on

2      January 7, 2021 providing an update that reads,

3      "Everything is going well here in Coffee County,

4      Georgia."

5                      Do you see that?

6              A      Yes, sir.

7              Q      And then he writes, "Can we get some

8      sort of confirmation that the payment is being sent

9      this afternoon?"

10                     Do you see that?

11             A      Yes, sir.

12             Q      So Ms. Powell had not yet paid, I

13     gather?

14             A      Yes.  And there is reference to a

15     retainer, so whether that was the retainer or the

16     project in its entirety, I don't know.

17             Q      So it's -- it's possible that

18     Ms. Powell had paid the retainer and the balance

19     was due.  Is that the idea?

20             A      It's possible.

21             Q      Okay.  But you don't know to what

22     extent she had paid anything at all yet for Coffee

Page 107

1      County?

2               A     Yes.  Yes, sir.

3               Q     Okay.  Then the afternoon, January 8,

4      2021, Mr. Maggio sends another update.  "Everything

5      went smoothly yesterday with the Coffee County

6      Election.  Everyone involved was extremely

7      helpful."

8               Do you see that?

9               A     Yes, sir.

10              Q     And this e-mail was -- he's

11     addressing Sidney, right?

12              A     Yes, sir.

13              Q     When he wrote, "Everyone involved was

14     extremely helpful," is it your understanding that

15     included individuals in the Coffee County office

16     who identified themselves as election officials?

17              A     Yes, sir.

18              Q     Okay.

19              A     Well, the people that were there that

20     identified themselves as officials, yes, but there

21     were also people there that we wouldn't know -- I

22     hate to assume, but they presented themselves as

Page 108

1       officials, even having an office there and things

2       like that.

3               Q       Understood.  And we'll walk through

4       the photos to identify those folks.

5                       He further provides in his report on

6       the afternoon of January 8, "We are consolidating

7       all of the data collected and will be unloading it

8       to our secured site for access by your team.

9       Hopefully we can take care of payment today."

10                      Do you see that?

11              A       Yes, sir.

12              Q       He's working hard to get paid.

13              A       I noticed that.  I guess when you

14      read it, it's --

15              Q       No, I respect it.

16              A       Thank you.

17              Q       We all have clients.

18                      And when he indicates, "We're

19      consolidating all the data collected," what is --

20      is that a general practice in those type of

21      engagements?

22              A       It is.  When there are multiple data

Page 109

```
1        sources to be imaged, the destination of where you

2        put the images may be in different formats.  So for

3        a server, it might be a big drive or, you know,

4        other devices, it may be smaller and staggered.  So

5        the idea is to consolidate to create one localized

6        environment for our clients to have ease of access

7        to be able to pull the data down.

8                Q     Mr. Maggio informs Ms. Powell that,

9        "The data will -- after consolidation will be

10       uploaded to our secured site for access by your

11       team."

12                      Do you see that?

13                A     Yes, sir.

14                Q     And is that the online ShareFile

15       site?

16                A     It is.

17                Q     Okay.  Is that a site that you guys

18       host or is that a cloud site?

19                A     It is a cloud service.

20                Q     Is -- is the company literally called

21       ShareFile?

22                A     It is.
```

Page 110

1          Q     So that -- that sits in the cloud on

2     servers with ShareFile.  It's not a local server

3     that your firm owns?

4          A     We do not own that server.

5          Q     Okay.  And on the e-mail here, the

6     report that Mr. Maggio gives, again, it's addressed

7     to Sidney Powell, and it's copied to Tricia at her

8     firm.  Do you see that?

9          A     Yes, sir.

10         Q     It's copied to Jim Penrose?

11         A     Yes, sir.

12         Q     It's copied to Brendan Sullivan at

13    your firm?

14         A     Yes, sir.

15         Q     It's copied to Doug Logan?

16         A     Yes.

17         Q     And then there's a new e-mail address

18    here, Magnolia64@ ███████████ .  Do you see that?

19         A     Yes, sir.

20         Q     Do you understand that's an e-mail

21    from a man named Scott Hall?

22         A     I do not.

Page 111

```
 1              Q     Okay.  Are you familiar with Scott

 2       Hall?

 3              A     I am.

 4              Q     How do you know Scott Hall?

 5              A     Based on discussions with the team

 6       and his involvement in the collections.

 7              Q     What is your understanding of his

 8       involvement with the collections?

 9              A     That he was on-site.

10              Q     In Coffee County on January 7th --

11              A     Yes, sir.

12              Q     I'm sorry, let me just make sure I

13       get the question done.

14              A     Yeah.  Yeah.  I'm sorry.

15              Q     No, you're good.  It's common.

16                    All right.  And did you discuss with

17       Mr. Maggio Mr. Hall's involvement in the Coffee

18       County project?

19              A     Yes, sir.

20              Q     What did Mr. Maggio have to say about

21       Mr. Hall's involvement?

22              A     He was a senior --
```

Page 112

1                    MR. CROSS:  Exhibit 9.

2                    THE WITNESS:  He had a senior role in

3        oversight, to some extent.

4        BY MR. CROSS:

5              Q    So you had said earlier, and we see

6        in the e-mails, that Jim Penrose and Doug Logan

7        were principal points of contact for Coffee County,

8        right?

9              A    Yes, sir.

10             Q    When did Mr. Hall, Scott Hall, become

11       involved with the Coffee County project?

12             A    I believe -- I don't know.  I know he

13       was there on-site that day.

14             Q    Okay.

15             A    Anything prior to that, I'm not fully

16       aware.

17             Q    Do you know why he was involved?

18             A    I don't.

19             Q    All right.  Let me hand you what's

20       been marked as Exhibit 9.  And we're looking at

21       Tab 16.

22

Page 113

```
 1                 (Felicetti Deposition Exhibit Number 9

 2                  marked for identification.)

 3       BY MR. CROSS:

 4                 Q     Is Exhibit 9 one of the documents you

 5       looked at in preparation for today?

 6                 A     Yes, sir.

 7                 Q     This is an e-mail -- sorry, strike

 8       that.

 9                       This is a text thread between Paul

10       Maggio and Cathy Latham, right?

11                 A     Yes, sir.

12                 Q     And this comes from Paul Maggio's

13       phone, right?

14                 A     Yes, sir.

15                 Q     So the green is from -- are texts

16       that Mr. Maggio is sending and the black, those are

17       texts that Ms. Latham is sending, right?

18                 A     Can you repeat that?  I'm sorry.

19                 Q     Yeah, sorry.

20                       Since this came from Paul Maggio's

21       phone, the green texts are the ones that Mr. Maggio

22       sends, the black texts are ones that Ms. Latham
```

1      sends, right?

2              A      Yes, sir.

3              Q      Okay.  So what we see here is on

4      January 7, 2021 at 11:09 a.m., Ms. Latham sends a

5      text to Mr. Maggio with an address in Douglas,

6      Georgia.

7                     Do you see that?

8              A      Yes, sir.

9              Q      Are you aware that that's the address

10     for the Douglas local airport?

11             A      I am not.

12             Q      Okay.  And then Mr. Maggio responds a

13     minute later, "Received.  We will pick up Scott."

14     Do you see that?

15             A      Yes, sir.

16             Q      Did you understand that Scott Hall

17     flew into the Douglas, Georgia airport on the

18     morning of January 7 --

19             A      Yes, sir.

20             Q      -- of 2021?

21                    Okay.  And so what we see here is

22     Ms. Latham coordinating with Mr. Maggio on somebody

Page 115

1        is picking up Scott Hall from the airport, right?

2                A     Yes.

3                Q     And then another minute later

4        Mr. Maggio writes back, "Better yet, have Eddie

5        pick up Scott.  Our vehicle is full.  We will meet

6        him there."

7                      Do you see that?

8                A     Yes, sir.

9                Q     Who actually drove the team to

10       Maggio?  Like literally drove the vehicle?

11               A     Jim Nelson.

12               Q     Do you know what kind of vehicle they

13       were in?

14               A     I know he has a truck.

15               Q     Okay.  Like a pickup truck?

16               A     Yeah.  But I don't know if that's

17       what he drove.  And as far as in that truck, there

18       were three people; so it was Jim, Paul, and

19       Jennifer.

20               Q     And how did Ms. Naik get there?

21               A     She had to drive and pick up a

22       Cellebrite, one of our forensic tools.  So she had

Page 116

1          to go and get it from, I believe, the office and

2          then meet everyone there.

3                 Q       So Ms. Naik separately drove to

4          Douglas?

5                 A       To -- not to Douglas.  Is that where

6          Coffee County is?

7                 Q       Yes.

8                 A       Oh, then yes.  Yes.  Sorry.

9                 Q       That's okay.

10                        And she drove there alone?

11                A       Yes.

12                Q       Did she drive back alone?

13                A       Yes, sir.

14                Q       And the other three rode back in

15         Mr. Nelson's vehicle?

16                A       Yes, sir.  Well, I believe his

17         vehicle.  He drove.

18                Q       Understood.

19                        Okay.  Then Ms. Latham writes back to

20         Mr. Maggio at 11:30 a.m., "How far out" -- sorry.

21         She writes back, "How -- how far out are you?"

22                        Do you see that?

Page 117

1           A      Yes, sir.

2           Q      And Mr. Maggio responds, "We are in

3    town waiting for Scott to let us know when to pull

4    in."  Do you see that?

5           A      Yes, sir.

6           Q      Where did the team wait for the green

7    light from Scott Hall?

8           A      I believe the parking lot.

9           Q      Of the Coffee County elections

10   office?

11          A      Yes, sir.

12          Q      A pen with a light on it?

13          A      Oh, it's very cool.  I got it

14   yesterday.  I'm sorry.  I don't even use it.  It

15   kind of tweaks me out a little, so I want to

16   apologize.

17          Q      Oh, no, that's fine.

18          A      I'm sorry.

19          Q      Do I understand correctly, the team

20   was waiting for Mr. Scott Hall to give them

21   direction that it was time to go into the elections

22   office?

Page 118

1          A     Yes, sir.

2          Q     Do you have any understanding of what

3     they were waiting for?

4          A     Other than Scott being a senior --

5     sorry, a senior leader on this effort in Coffee

6     County, no.

7          Q     When did the firm first start taking

8     direction from Scott Hall for Coffee County as

9     opposed to taking direction directly from Jim

10    Penrose, Doug Logan or Sidney Powell?

11         A     It wasn't as much direction as

12    general, if you have an issue, you collect

13    everything type of deal.

14         Q     Okay.

15         A     Nothing is specific.  And that was

16    provided by the other folks.

17         Q     Since the Coffee County was done

18    pursuant to the engagement with Sidney Powell, was

19    it the understanding of SullivanStrickler that

20    Scott Hall was part of that Sidney Powell team, and

21    that's --

22         A     Yes.

1          Q     Okay.  And what was the basis for

2     that understanding?

3          A     I don't know.

4          Q     Okay.  And so, again, looking back at

5     the text between Mr. Maggio and Ms. Latham

6     coordinating the team's arrival and getting Scott

7     Hall there, do I understand correctly that

8     Ms. Latham was also a key point of contact for the

9     SullivanStrickler team with respect to the Coffee

10    County work?

11         A     Yes, sir.

12         Q     So she was one of the primary points

13    of contact for organizing and facilitating the work

14    in Coffee County?

15         A     Yes, sir.

16         Q     Oh, do you know who Eddie is?

17         A     I do not.

18         Q     Do you know how Scott Hall got from

19    the airport in Douglas to the Coffee County

20    elections office?

21         A     I do not.

22         Q     Do you know if someone traveled with

```
                                          Page 120

 1       Scott Hall?

 2              A     I do not.

 3              Q     In your prep for this, did you learn

 4       that Mr. Hall arrived at the elections office with

 5       another person?

 6              A     I did not.

 7              Q     Okay.

 8              A     Yeah.

 9              Q     If we look at the next page,

10       January 7 at 11:42 a.m., this is a text from Cathy

11       Latham to Paul Maggio, sending a picture of Scott

12       Hall, right?

13              A     I --

14              Q     I'm sorry.  No, no, I got that wrong.

15       I got that wrong.  This is a separate text.

16              A     Yeah.

17              Q     This is a text from Scott Hall to

18       Paul Maggio sending a picture of himself?

19              A     Yes, sir.

20              Q     Got it.  Okay.

21                    And that's at 11:42 a.m. on

22       January 7th?
```

Page 121

```
 1            A     Yes, sir.

 2            Q     Okay.

 3                  All right.  Let me hand you

 4       Exhibit 10.

 5            A     Yes, sir.

 6                (Felicetti Deposition Exhibit Number 10

 7                marked for identification.)

 8       BY MR. CROSS:

 9            Q     Actually before you look at that, a

10       couple of questions that I forgot to ask you.

11            A     Yes, sir.

12            Q     So your standard practice is to --

13       you typically are engaged by lawyers or law firms

14       for your work.  Is that fair?

15            A     Yes.

16            Q     And so the lawyers or law firms, they

17       will have a client that they are working on behalf

18       of for the work that they hire you for?

19            A     Yes.

20            Q     Who is Mr. Binnall's client for that

21       engagement?

22            A     For?
```

Page 122

```
 1              Q     For the engagement agreement that we
 2        saw signed.
 3              A     I don't know.
 4              Q     Okay.  And if you wanted to know, who
 5        would you ask?
 6              A     Paul Maggio.
 7              Q     Okay.  And who was Ms. Powell's
 8        client for the engagement that we saw with respect
 9        to Coffee County?
10              A     I don't know.
11              Q     Okay.  Who would you ask?
12              A     Paul Maggio.
13              MR. CROSS:  Could we ask before the
14        deposition ends if he could ask Mr. Maggio who the
15        clients were?
16              MR. COLEMAN:  Yeah, that's fine.
17              MR. CROSS:  Okay.  Thank you.
18        BY MR. CROSS:
19              Q     And then you mentioned Ms. Naik
20        picked up a -- is it a Cellebrite kit?
21              A     Yeah, Cellebrite.  Yeah, a dongle
22        kit.
```

1          Q      What is that used for?

2          A      It's used for forensically capturing

3     certain devices.

4          Q      What types of devices?

5          A      Mobile typically, iPads.

6          Q      Was that needed for the poll pads in

7     Coffee County?

8          A      It was.

9          Q      Where did Ms. Naik get that kit?

10         A      I believe at our office.

11         Q      In Atlanta?

12         A      Yes, sir.

13         Q      So that's -- that's a standard device

14    that you guys have?

15         A      Yes.

16         Q      Okay.

17                All right.  Take a look at

18    Exhibit 10, if you would.  You, yourself, have not

19    been on-site in the Coffee County elections office?

20         A      I have not been on-site.

21         Q      Okay.  So what we have here, we had a

22    deposition with the Coffee County Board of

Page 124

1          Elections yesterday on this.  These -- these are

2          screenshots from surveillance video that was

3          produced by Coffee County to us.

4                    A     Okay.

5                    Q     So what it is, there is a camera

6          sitting outside the front door of the elections

7          office and it shows people going in and out of the

8          elections office.

9                         Do you understand that?

10                   A     Yes, sir.

11                   Q     Okay.  So let me just see -- there

12         are some people I want to ask you about.

13                        MR. COLEMAN:  I was going to say I

14         don't think it's uploading to the FileShare.

15                        MR. CROSS:  The photos?

16                        MR. COLEMAN:  Yeah.

17                        MR. CROSS:  Yeah, it's a little bit

18         slow, I think, because it's a very large document.

19                        Do we happen to have an extra one?

20                        MR. SPARKS:  We don't.

21                        MR. CROSS:  Okay.

22                        MR. SPARKS:  I'm getting ready to --

Page 125

1                    MR. CROSS:  Yeah, it's a very, very

2        large -- yeah.

3                    We can go off the record for a

4        moment.

5                    VIDEOGRAPHER:  The time is 11:16 a.m.

6        We are off video record.

7                (Recess from 11:16 a.m. to 11:17 a.m.)

8                    VIDEOGRAPHER:  The time is 11:17 a.m.

9        We are back on video record.

10       BY MR. CROSS:

11               Q    Before we look at the picture, we

12       talked earlier that Ms. Latham was one of the

13       principal points of contact organizing the Coffee

14       project.  Do you recall that?

15               A    Yes, sir.

16               Q    Ms. Latham was literally the person

17       who welcomed Mr. Maggio and his team at the

18       elections office the morning of January 7th, 2021.

19       Is that right?

20               A    Yes, sir.

21               Q    And when they arrived, she presented

22       herself as a Coffee County elections official.  Is

1          that right?

2                    A     Yes, sir.

3                    Q     If we look at page 33 in Exhibit 10

4          in the -- the screenshots of the video provided by

5          Coffee County, you'll see here Mr. Maggio is in the

6          grey sweater, right?

7                    A     Uh-huh.  Yes, sir.

8                    Q     And Jim Nelson is next to him in the

9          khaki pants?

10                   A     Yes.

11                   Q     Jennifer Jackson is in front in the

12         pink jacket?

13                   A     Yes.

14                   Q     And do you understand that's Cathy

15         Latham escorting them into the building?

16                   A     I don't know.

17                   Q     Okay.  That's fine.

18                         Then if we come to the next page, we

19         see the same woman with grey hair holding the door

20         open and Mr. Maggio and Mr. Nelson are walking in,

21         right?

22                   A     Yes, sir.

Page 127

```
1              Q    And this is at 11:43 a.m. on
2       January 7, 2021, right?  If you look at the top,
3       the timestamp.
4              A    Oh, okay.  Yes, sir.
5              Q    All right.  Flip to, it looks like,
6       page 38.  So here you have -- do you see the
7       timestamp just above the photo, January 7, 2021 at
8       11:50 a.m.?
9              A    Yes, sir.
10             Q    We have the same woman with grey
11      hair.  Do you see her?
12             A    Yes, sir.
13             Q    She's escorting two individuals into
14      the building, right?
15             A    Yes, sir.
16             Q    Do you recognize the one behind her
17      as Scott Hall, the person that we saw in the
18      picture before?
19             A    I do.
20             Q    Okay.  And then do you know who the
21      second individual is coming in with Mr. Hall and
22      Ms. Latham?
```

1           A      I do not.

2           Q      If you wanted to know who that

3      individual was, who would you ask?

4           A      One of the team members from

5      SullivanStrickler that were there.

6                  MR. CROSS:  Amanda, if we could get

7      that answer before the end of the deposition?

8                  MS. CLARK-PALMER:  Yes.

9                  MR. CROSS:  Thank you.

10     BY MR. CROSS:

11          Q      All right.  Now come to page 42.

12                 MR. SPARKS:  One second.  I need this

13     in an e-mail, I think, maybe in order to do that.

14                 MR. CROSS:  Yeah, we will do that.

15     E-mail Jenna.  I think we may have to do it as a

16     FileShare, an FTP, because it's big, but --

17                 MR. SPARKS:  I will.

18                 MR. CROSS:  Thanks.

19                 MR. RUSSO:  Can you put on the record

20     the page number for that?

21                 MR. CROSS:  In the exhibit?

22                 MR. RUSSO:  Yeah.  The page -- the

Page 129

1        page that you're looking at there.  You may have

2        sent it, but I --

3                    MR. CROSS:  Page 38, yeah.  I'm

4        sorry.

5        BY MR. CROSS:

6               Q    All right.  Flip to page 42.  So here

7        we have Mr. Nelson and Mr. Maggio walking out of

8        the building at 12:15 p.m. on January 7, right?

9               A    Yes.

10              Q    And then again at 12:17 p.m.,

11       January 7, we have Mr. Maggio and Mr. Nelson coming

12       back in, right?

13              A    Yes, sir.

14              Q    Mr. Maggio is carrying a black bag?

15              A    Yes.

16              Q    What was in that bag?

17              A    Forensic collection materials,

18       devices.

19              Q    Standard devices you would --

20              A    Standard -- industry-standard

21       forensic tools.

22              Q    And do you see that Mr. Nelson is

1      wheeling some kind of case in?

2              A     Yes, sir.

3              Q     What was in that case?

4              A     Forensic collection tools.

5              Q     So this is something Mr. Nelson

6      brought in with him?

7              A     Yes, sir.

8              Q     All right.  Did the SullivanStrickler

9      team take any equipment or devices from the Coffee

10     County office when they left?

11                  Sorry, let me ask a better question.

12     Obviously it's a really broad one.  Let me ask a

13     better question.

14                  Did the SullivanStrickler team take

15     any of the -- did they take any equipment or

16     devices from Coffee County when they left the

17     Coffee County office that they did not themselves

18     bring in?

19             A     They did not.

20             Q     So, for example, did they take a BMD

21     with them, the vote -- the touchscreen voting

22     devices?

Page 131

```
 1              A      No, sir.

 2              Q      So the only thing they took out were

 3      any devices they brought in, plus the data that

 4      they copied from inside the office?

 5              A      Yes.

 6              Q      All right.  Flip to page 51.  So

 7      we're at 12:56 p.m. on January 7, 2021.  Do you see

 8      that?

 9              A      Yes.

10              Q      So Mr. Nelson is holding a Coffee

11      County elections office door open.  Mr. Maggio is

12      standing with him, right?

13              A      Yes, sir.

14              Q      Who's the woman they're talking to?

15              A      That is Karuna Naik.

16              Q      And she has a bag also, right?

17              A      Yes, sir.

18              Q      Did she also -- she brought in a

19      Cellebrite kit, right?

20              A      Yes, sir.

21              Q      Did she bring any other devices?

22              A      She may have.
```

1          Q     Okay.  But she also did not take

2     anything out of the office that she, herself, or

3     the team did not bring in?

4          A     Correct.

5          Q     Other than the data?

6          A     Yes, sir.

7          Q     Okay.

8                All right.  Flip to page 55.  So now

9     we're at January 7, 2021 at 1:19 p.m.  Cathy Latham

10    is standing at the door talking to a man in a black

11    hat.

12                Do you see that?

13         A     Yes, sir.

14         Q     Do you know who that is?

15         A     I do not.

16         Q     And then if you come back to page 57,

17    the same man, it looks like he's bringing in

18    takeout containers at 1:23 p.m.

19                Do you see that?

20         A     Yes, sir.

21         Q     Someone brought lunch in for the team

22    so they could continue working in the office,

                                                      Page 133

1       right?

2                 A      Yes, sir.

3                 Q      Did Scott Hall pay for the lunch?

4                 A      I don't know.

5                 Q      Do you know who took care of lunch in

6       terms of going to get it, organizing it?

7                 A      I don't.

8                 Q      Will you look at page 60?

9                        There's a man coming in, grey hair,

10      grey beard, January 7, 2021 at 1:39 p.m.  Do you

11      recognize him as Ed Voyles?

12                A      No.

13                Q      Do you know the name Ed Voyles?

14                A      I do not.

15                Q      Do you know the name Eric Chaney?

16                A      I know the name Eric Chaney.

17                Q      And do you understand that Eric

18      Chaney was a member of the Coffee County Elections

19      Board at the time of the Coffee County collection?

20                A      I did not.

21                Q      During the time that the

22      SullivanStrickler team was in the Coffee County

Page 134

1        election office on January 7, you're aware that

2        there was at least one member of the Coffee County

3        Elections Board who was there for that work, right?

4                A      Yes, sir.

5                Q      And to the best of your

6        understanding, was Eric Chaney that person or do

7        you not know?

8                A      I don't know.

9                Q      All right.  Go to page 62, January 7,

10       2021 at 2:21 p.m.  There's a young man coming in in

11       a red hat.  Do you know who that is?

12               A      I do not.

13               Q      All right.  Go to page 72.  So if you

14       look at 72 and 73 together, January 7, 2021,

15       between 4:46 and 4:49 p.m., here we see Scott Hall

16       and the individual who came in with him.  We see

17       them leaving the elections office, right?

18               A      Yes.

19               Q      The individual that came in with him

20       has a blue backpack, right?

21               A      Yes.

22               Q      Do you know what was in that

Page 135

```
 1      backpack?
 2              A     I do not.
 3              Q     Mr. Hall leaves with a black backpack
 4      and a brown bag of some sort.  Do you see that?
 5              A     Yes, sir.
 6              Q     Do you know what was in those bags?
 7              A     No.
 8              Q     Do you know whether Mr. Hall or his
 9      colleague took anything out of the Coffee County
10      elections office that they did not bring in?
11              A     No.
12              Q     You just don't know?
13              A     I don't know.
14              Q     Would that be -- who would you ask if
15      you wanted to know?
16              A     One of the team members.
17              Q     Okay.
18                    MR. CROSS:  If we can get an answer
19      to that, too.
20                    MS. CLARK-PALMER:  Who were the
21      people you said?  I missed that.  Who are the
22      people you want to know whether or not they took
```

1        anything back?

2                    MR. CROSS:  Well, the question would

3        be whether any -- whether SullivanStrickler knows

4        if anyone took anything out of the elections office

5        that they did not bring in.

6                    MS. CLARK-PALMER:  Okay.

7                    MR. CROSS:  And, in particular,

8        whether anyone took any of the voting equipment out

9        of the office.  Thank you.

10       BY MR. CROSS:

11                Q      All right.  Flip to pages 76 and 77.

12       So here we have someone coming into the elections

13       office, January 7, 2021 at 5:24 p.m.  Do you know

14       who that is?

15                A      I do not.

16                Q      But on January 7, 2021, the only

17       people that SullivanStrickler had in the office

18       were the four we've talked about?

19                A      Yes, sir.

20                Q      Okay.  Flip to page 80.  The two

21       individuals in baseball caps coming into the office

22       at 6:53 p.m. on January 7, 2021, do you know who

Page 137

1       those folks are?

2               A     I do not.

3               Q     Flip to pages 84 and 85.  So here we

4       are January 7, 2021 at 7:42 and 7:43 p.m., and this

5       is when we see the SullivanStrickler team leave,

6       right?

7               A     Yes, sir.

8               Q     And on page 72, it's Paul Maggio

9       and -- and Jim Nelson leaving, right?

10              A     Correct.

11              Q     It looks like they're leaving with

12      the same bags they brought in, right?

13              A     Yes, sir.

14              Q     And then in page 85, we see Ms. Naik

15      and Ms. Jackson leaving, right?

16              A     Yes, sir.

17              Q     Are they leaving with the same bags

18      they brought in?

19              A     Yes.

20              Q     All right.  Flip to the last page,

21      87.  So now we're at January 7, 2021 at 7:49 p.m.

22      There's a white car out front.  Do you see that?

Page 138

1          A     Yes, sir.

2          Q     Do you know whose vehicle that is?

3          A     I do not.

4          Q     Not one of the vehicles that anyone

5    from SullivanStrickler drove, or you don't know?

6          A     It's not their vehicles that I know

7    that they own.

8          Q     Okay.

9          A     Do you know what I mean?

10          Q     Yes.

11          A     Okay.

12          Q     Yes.  That's good.

13                Did anyone from SullivanStrickler

14    ever go back to Coffee County after January 7 to do

15    any additional work?

16          A     No.

17          Q     So just the one day?

18          A     One day.

19          Q     Let me show you Exhibit 11.

20             (Felicetti Deposition Exhibit Number 11

21              marked for identification.)

22                THE WITNESS:  Do you mind if I take a

1        bio break?  Is that okay?

2                        MR. CROSS:  No.  Any time you want.

3                        VIDEOGRAPHER:  The time is 11:31 a.m.

4        We are off video record.

5                  (Recess from 11:31 a.m. to 11:39 a.m.)

6                        VIDEOGRAPHER:  The time is 11:39 a.m.

7        We are back on video record.

8                        MR. CROSS:  Okay.  Do you -- does he

9        have 12?  Oh, he does.  Okay.

10                       THE WITNESS:  Yeah.  Yeah.

11       BY MR. CROSS:

12              Q    Grab Exhibit 20, if you would.

13                       MR. SPARKS:  Exhibit 11.

14       BY MR. CROSS:

15              Q    I'm sorry, Exhibit 11.  It's the tab

16       numbers.  Flip to -- wait a minute, are there not

17       page numbers on this one?  There's not.  Okay.

18                  So flip like two full pages and

19       you'll see a picture of a young man, it looks like,

20       in blue pants, blue sweater, January 8, 2021 at

21       8:53 a.m.

22                  Do you see that?

Page 140

1           A     Yes, sir.

2           Q     He's walking out holding some type of

3     equipment.  Do you see that?

4           A     Yes.

5           Q     And then at 8:53 a.m., he's heading

6     back into the office in a black mask.  Do you see

7     that?

8           A     Yes, sir.

9           Q     Okay.  And he's leaving again, it

10    says 8:55 a.m., with some equipment on sort of a

11    rolling cart.  Do you see that?

12          A     Yes, sir.

13          Q     Do you know this individual?

14          A     No.

15          Q     Do you have any reason to believe one

16    way or the other whether this person is affiliated

17    with SullivanStrickler?

18          A     That there would be -- well,

19    there's -- I don't know how to answer that.  Can

20    you rephrase the question?

21          Q     Yeah.  Sorry, that's not good.

22    That's a -- that's a lawyer question.

1           A      Yeah.

2           Q      Is this person affiliated with

3    SullivanStrickler?

4           A      No.

5           Q      Do you know what equipment he's

6    rolling out?

7           A      It looks like a printer maybe, but I

8    can't -- no.

9           Q      You don't know?

10          A      No.

11          Q      That's fine.

12                 MR. CROSS:  All right.  And we were

13    looking at, it looks like, pages 4, 5, and 6 of

14    Exhibit 11, just for the record.

15    BY MR. CROSS:

16          Q      Okay.  The photos that I've shown you

17    today from the security footage outside of the

18    office, have you seen those before today?

19          A      I have not.

20          Q      Did anyone on the SullivanStrickler

21    team try to evade any of the surveillance cameras

22    at the elections office when they were doing their

Page 142

1       work?

2                A     No.

3                Q     And would they have had any reason to

4       do that?

5                A     No, sir.

6                Q     Because the firm's understanding at

7       the time, and still today, is that it had all the

8       legal rights to do what it was doing?

9                A     Yes, sir.

10               Q     All right.  Let me hand you

11      Exhibit 12.

12                     (Felicetti Deposition Exhibit Number 12

13                     marked for identification.)

14      BY MR. CROSS:

15               Q     All right.  So take a moment, if you

16      need, and flip through Exhibit 12.

17                     Do you recognize these as photos that

18      were produced by Mr. Maggio and that were taken by

19      the team on January 7, 2021 in the elections

20      office?

21               A     Yes, sir.

22               Q     Okay.  And we talked before earlier

1          that Ms. Jackson, part of her responsibility was to

2          document the work, including taking photos.

3                          Do you recall that?

4                  A     Yes, sir.

5                  Q     Did she take these photos?

6                  A     Yes.

7                  Q     Is your understanding that she took

8          all of the photos?

9                  A     Yes.

10                 Q     Did anyone else with

11         SullivanStrickler take any photos or video?

12                 A     No.

13                 Q     Okay.  Did anyone else in the room --

14         sorry, strike that.

15                        Did anyone else who was on-site in

16         Coffee County on January 7, 2021 take any photos or

17         video?

18                 A     Not that I know of.  I don't know.

19                 Q     Did you discuss that specifically

20         with any of the team members?

21                 A     I did.

22                 Q     And no one on the team was aware of

Page 144

1      anyone else taking photos or video?

2                  A     I was directed to Jennifer Jackson

3      whenever it came to that.

4                  Q     All right.  Is it fair to say the

5      team's understanding or recollection from the

6      events was that she was the only one who took

7      photos and video?

8                  A     Yes, sir.

9                  Q     Okay.  All right.  Let's start with

10     the first page.

11                 A     Sure.

12                 Q     And it's got this little production

13     number ending in 236.  These are pictures of

14     CompactFlash drives, right?

15                 A     Yes, sir.

16                 Q     And each CompactFlash drive has a

17     little note next to it with the project number

18     SSA1722, right?

19                 A     Yes, sir.

20                 Q     And then below the project number

21     there's other information.  What is the information

22     that's recorded on each of those notes?

Page 145

1              A      The CF number is a tracking code.

2      And the -- the word next to it or -- yeah, the word

3      to the right of the CF number is the label of the

4      machine, the device that was -- that the cards were

5      removed from.

6              Q      Okay.  So each of the CompactFlash

7      drives, when the team arrived, was installed in a

8      device.  The team pulled the CompactFlash out of

9      the device, copied it.  Is that right?

10             A      No.

11             Q      Oh, sorry.  I'll tell you what, let

12     me just ask.  Walk me through the steps the team

13     took to copy the -- the CompactFlash drives that we

14     see in this picture.

15             A      As I understand it, the CompactFlash

16     disks were given to Karuna to image.  And I can

17     walk you through that process if you want to hear

18     it.

19             Q      We will in a moment.

20             A      Okay.

21             Q      Who gave her the CompactFlash?

22             A      It would have been -- there were a

Page 146

1      number of people.  It would have been either Misty

2      Hampton -- I would say Misty Hampton, because she

3      directed, "Grab this, get this, get that, get

4      this."

5           Q      Misty Hampton was the elections

6      supervisor in Coffee County at the time?

7           A      As I understand it, yes.

8           Q      Okay.  And you anticipated where I

9      was going to go.

10                 Did anyone beyond Ms. Hampton direct

11     the SullivanStrickler team what to copy?

12          A      Yes, I believe so.

13          Q      What's your understanding about

14     others who gave direction?

15          A      Misty directed the larger percent,

16     but as I understand it, Cathy Latham also provided

17     direction on what was required for collection.  And

18     Scott Hall had said, "Get -- are you sure you're

19     getting everything?  Are you getting everything?"

20     So that was interpreted as, "Make sure you get

21     everything that you can."

22          Q      Okay.  And what was the idea for the

Page 147

1          SullivanStrickler team?  Essentially if there was a

2          device in the office that had data on it, the

3          team's task was to extract that data to the extent

4          they could?

5               A     Yes, sir.

6               Q     So looking back at the first picture

7          in Exhibit 12, so let's just take the fourth one

8          down on the left.  So you've got the project number

9          and then "CF04."  And then there's that Braxton-2."

10         Or what is that word?

11              A     It looks -- it does look like Braxton

12         or Broxton, but that information also would be

13         tracked in the chain-of-custody log that was

14         produced.

15              Q     And do you see next to that it looks

16         like there's one that refers to Ambrose?

17              A     Yes, sir.

18              Q     Do you understand that -- that the

19         references here on these notes correlate to voting

20         precincts in Coffee County, or do you know?

21              A     I do not.  We reference them as just

22         labeled.

Page 148

1              Q      And if we look at the Ambrose one, if

2       you look at the CompactFlash drive, it says

3       "Ambrose ICP" on it, right?

4              A      Yes, sir.

5              Q      And so you're just capturing that

6       information on the note?

7              A      That's exactly right.

8              Q      And "ICP," do you understand that

9       that refers to a Dominion printer or -- well,

10      strike that.

11             Do you understand that "ICP" refers

12      to a printer that is used in a voting precinct with

13      the vote -- with the ballot-marking device?

14             A      I do not.

15             Q      So you mentioned earlier that

16      Ms. Naik did the imaging.  Walk me through the

17      steps that she took to image the CompactFlash

18      drives.

19             A      Sure.

20             We bring a laptop with us, a

21      SullivanStrickler laptop.  And on that laptop is a

22      bootable thumb drive that contains an operating

Page 149

1          system that boots the laptop in the means at which

2          to begin the collection of targeted data without

3          leaving a footprint.

4                    So, essentially, the process is S2

5          laptop with a bootable thumb drive that contains

6          not only an operating system that allows us the

7          collection, but also software called -- we use DFIR

8          scripts, which is used to help create the forensic

9          images.

10                   And DFIR scripts is an

11         industry-standard tool that's utilized.  It's

12         D-F-I-R, if you're interested.  We should have it

13         in here, let's see -- so DFIR scripts, we

14         utilize -- and what it does is when the machine,

15         the S2 laptop boots up, it'll boot off this thumb

16         drive that we have and then recognize that there is

17         something connected to it, like a thumb drive.

18                   And we use DFIR scripts, and it

19         points to the thumb drive to be -- or the drive or

20         CompactFlash to be imaged, forensically imaged.  So

21         you point to a target to be imaged and then

22         subsequently attached to that laptop is a

Page 150

1          destination drive.

2                        So if you're visualizing the process,

3          laptop, bootable into Linux using DFIR scripts,

4          target, which is one of these, or a thumb drive,

5          and then over here is a one-terabyte hard drive.

6          So they're all labeled and foldered based on the

7          images that are created.

8                        During that process, the images that

9          are created, the forensic images of those devices

10         are verified.  So basically what it'll do, it will

11         go in and say, "All right.  We've collected --

12         we've imaged a pristine copy of the target device."

13         In this case, a flashcard, and there's a hash value

14         that's created.  And then it verifies that the --

15         that what we have done is pristine.  It's an exact

16         representation of what is being collected gets put

17         to a one-terabyte disk.

18                        Does that make sense?

19              Q      Yeah.

20                        Is that essentially the same process

21         that was taken for all of the forensic collection

22         in Coffee County?

Page 151

1          A    No.

2          Q    Okay.  What equipment or devices was

3    that process used for?

4          A    For what I just spoke about?

5               Everything, all the thumb drives,

6    everything but the EMS server and the -- the

7    tablets.  Those are different devices or

8    different -- I'm sorry, different technologies

9    utilized to capture that information or to image

10   those.

11         Q    So the EMS server was different and

12   the tablets were different?

13         A    Yes, sir.

14         Q    Okay.  What about laptops?

15         A    The same -- the same tool was

16   utilized.

17         Q    As the CompactFlash?

18         A    Yeah.

19         Q    Okay.  Walk me through the process

20   that was used for the EMS server.

21         A    Okay.  The EMS server -- I take it

22   back.  Hold on.  I take it back.  Can we go back?

1          Q      Sure.

2          A      I apologize.

3                 I think we actually utilized the same

4      exact methodology for the EMS server, but the

5      difference was -- the one difference was, it was

6      running -- yeah, it was the same exact process.  I

7      apologize.  But it was using what's called RAID.

8      So they had multiple hard drives within the server.

9                 So we had to collect those

10     individually as mirrored drives.  So the process

11     was identical, but the -- the technologies were

12     identical, but the process was a little bit

13     different.

14         Q      For the EMS server?

15         A      Yes, sir.

16         Q      Okay.

17         A      And then the iPads --

18         Q      And before we get to that --

19         A      Yeah.

20         Q      -- the end result of those processes,

21     though, is the same, which is to get this, what

22     you've referred to as, a pristine copy that doesn't

Page 153

1       alter the data or leave traces on the original

2       equipment?

3               A     Yes, sir.

4               Q     Okay.  And what was the process for

5       the tablets, the poll pads?

6               A     That's where we would utilize

7       Cellebrite, which again is an industry standard.

8       That was the dongle, the tool, that was picked up

9       by Karuna when she was in her own car.

10                    And so we would attach a dongle to

11      our laptop, connect it to the tablet, and then --

12      systematically, it's the same approach.  Different

13      technology but collects the same information.  And

14      creates that pristine image without a footprint.

15              Q     Okay.  Are you familiar with a device

16      in the Dominion System in the Coffee County

17      election office that's referred to as the ICC, a

18      central scanner?

19              A     I am.  I'm aware of a scanner, yes.

20              Q     Was an effort made to copy data from

21      the scanner -- or the computer attached to the

22      scanner that sat in the same room as the EMS

1        server?

2                A       Yes.

3                Q       And was data captured from those --

4                A       I believe it was, yes.

5                Q       Using one of these two processes?

6                A       Yes, sir.

7                Q       The EMS server has a computer

8        attached to it.  Do you recall that?

9                A       Yes, sir.

10               Q       Was the collection for the EMS

11       server, was it done through the computer attached

12       to the server or did they connect it directly to

13       the server itself or both?

14               A       So can you -- I'm sorry, can you

15       repeat the question?

16               Q       Sure.

17                       So there's two devices associated

18       with the EMS server.  There's the server itself and

19       then there's a computer that connects to the

20       server, right?

21               A       Yes.

22               Q       Okay.  Did they image the computer

Page 155

1      connected to the server?

2              A    No.  They booted the server up using

3      a bootable thumb drive that doesn't leave a

4      footprint and then pushed it off using DFIR

5      scripts.

6              Q    And did they plug the thumb drive

7      directly into the server?

8              A    I believe they did, but I don't know

9      100 percent.

10             Q    Okay.

11             A    And that's --

12             Q    All right.  I referred to an ICP

13     earlier.  I misspoke on what that is.

14                  Are you aware that in the

15     Dominion's -- well, let's back up for a moment.

16                  You don't go to Georgia obviously?

17             A    I do not.

18             Q    You live in Rhode Island?

19             A    Yes, sir.

20             Q    How do you -- what's the mechanism of

21     voting in Rhode Island at the polls?

22                  Do you write something by hand?  Do

1           you use a computer?

2                   A     By hand.

3                   Q     And so in Rhode Island, if you go to

4           vote, you get a paper ballot, you mark that paper

5           ballot by hand, and then what do you do with it?

6                   A     We put it into a machine, a scanner.

7                   Q     Okay.  Have you seen what are called

8           ballot-marking devices that are used in Georgia?

9                   A     No.

10                  Q     Okay.  Are you aware that the voting

11          system in Georgia, unlike the hand-marked paper

12          ballot that you use in Rhode Island, voters vote on

13          a touchscreen that's connected to a printer, that

14          printer prints a ballot, and that ballot is then

15          scanned?

16                  A     Yes, sir.

17                  Q     And that ballot is scanned if they're

18          voting on election day on a scanner in the

19          precinct?

20                  A     Yes, sir.

21                  Q     And that is referred to as an ICP.

22          Have you heard that?

Page 157

1                A    Yes, sir.

2                Q    Okay.  And -- and the -- the

3       SullivanStrickler team on January 7th copied data

4       from scanners, too, right?

5                A    Yes, sir.

6                Q    And that's both the central scanner

7       that sits in the office and individual scanners

8       that are used at precincts?

9                A    Yes, sir.

10               Q    And these ballot-marking devices, the

11      touchscreens, the team also collected data from

12      those as well, right?

13               A    I believe so.  They were the big

14      touchscreens?

15               Q    Yes.

16               A    I believe so.  And I -- and I -- I

17      believe so.  I think they were running Android or

18      something, OS on them, but I don't know

19      specifically how they were collected.

20               Q    Okay.

21               MR. CROSS:  If we could confirm that

22      before the deposition is over.

1      BY MR. CROSS:

2           Q     Have you heard the ballot-marking

3      devices, the touchscreens, referred to as a

4      Dominion ICX?

5           A     I have not.

6           Q     Okay.  But, again, the -- the

7      directive leading into the Coffee County project

8      and on-site was collect data from any device in

9      this office that has data?

10          A     That we were directed to collect

11     from.

12          Q     Okay.  All right.

13                All right.  So flip to -- going back

14     to Exhibit 12 --

15          A     Sure.

16          Q     -- the next photo.  This is a picture

17     of a thumb drive.  It's black, DataStick Pro, TD

18     01.  Do you see that?

19          A     Yes, sir.

20          Q     And this is one of the thumb drives

21     that the team was directed to copy, right?

22          A     Yes, sir.

```
                                            Page 159

 1            Q     And then if we go to the next page
 2     ending in 238, are these more CompactFlash drives?
 3            A     They are.
 4            Q     Okay.  And these were copied --
 5            A     Yes, sir.
 6            Q     -- from the Coffee County office?
 7            A     Yes, sir.
 8            Q     Okay.  Page ending in 239, these are
 9     more CompactFlash drives copied from the office?
10            A     Yes, sir.
11            Q     If we go to 240, we have a picture of
12     Jim Nelson on the left, right?
13            A     Yes.
14            Q     Karuna Naik on the right?
15            A     Yes, sir.
16            Q     And do you understand they're sitting
17     in the small room that had the EMS server and the
18     central scanner in it?
19            A     Yes, sir.
20            Q     The computer that Mr. Nelson is
21     looking at, do you know if that's the computer
22     that's attached to the EMS server or is that one
```

Page 160

```
 1        that they brought with them?

 2              A     I don't know.

 3              Q     Do you know what's running on the

 4        screen there?

 5              A     I can't really tell.  It looks like

 6        command lines, so it may be a collection device.

 7              Q     Okay.

 8              A     It may be one of ours.

 9              Q     If you look at the picture, do you

10        see there is a -- it looks like a desktop computer

11        that's standing up just over Mr. Nelson's right

12        shoulder?

13              A     Yes, sir.

14              Q     And you see that there's a tag, it

15        looks like, attached to maybe a thumb drive that's

16        plugged into that computer?

17              A     Yes.

18              Q     Do you understand that to be a device

19        that you guys brought with you to collect data?

20              A     I do not.

21              Q     Okay.  So you don't know what that is

22        then?
```

Page 161

1           A     I don't.

2           Q     Okay.  And then do you know what

3    Ms. Naik is holding in her hand?

4           A     It -- I can guess, but I don't know.

5    It looks like a collection laptop.

6           Q     Okay.

7                 All right.  Go to the page ending in

8    241.  These are thumb drives that SullivanStrickler

9    collected on-site in Coffee County?

10          A     Yes, sir.

11          Q     Go to 242.  This is a Dell laptop

12   that SullivanStrickler collected from on-site?

13          A     Yes, sir.

14          Q     Do you know what this laptop was used

15   for?

16          A     I do not.

17          Q     Would that be a question for the

18   team?

19          A     It would be, yeah.  I mean, often

20   when we're brought in to image devices, it's --

21   you -- we're pointed, "Okay.  Here, collect these.

22   Image these, image this, image that, image these."

Page 162

1          So, you know, there's -- that's why when we see

2      something like this, we just forensically image it,

3      code it, and, you know, verify it, so . . .

4               Q     The point being the team may not

5      always know what the device is used for.  They're

6      just pulling data?

7               A     Exactly.  Well, not pulling it,

8      imaging it.

9               Q     Well, I've oversimplified your --

10     your proceedings.

11              A     Thank you.  You're good.

12              Q     All right.  Go to 243.  Do you

13     understand that to be a picture of the bottom of

14     the laptop that's in 242?

15              A     Yes, sir.

16              Q     Okay.  All right.  Now go to 244.  So

17     this is another picture of the EMS server room that

18     we saw just a moment ago that Mr. Nelson and

19     Ms. Naik were sitting in.

20                    Do you see that?

21              A     Yes, sir.

22              Q     And if you look in the screen of this

Page 163

1          computer on the right --

2                    A     Yes.

3                    Q     -- that looks to be a reflection of

4          Ms. Jackson taking the photo, right?

5                    A     Yes, sir.

6                    Q     And then if you look now, you've got

7          a clearer image --

8                    A     Yeah.

9                    Q     -- of -- of this desktop standing up

10         with the device of the yellow tag.  The device with

11         the tag on it, is that consistent with your

12         practice, to use a device like that that would have

13         a tag on it indicating what it is?

14                   A     It is.

15                   Q     Okay.  So is it your best-educated

16         guess that that device is something you guys

17         brought with you to collect data?

18                   A     Yes.  My educated guess here seems

19         that that is a bootable thumb that we're using to

20         forensically grab the data from these machines --

21         to image the data from these machines on these USB

22         drives or one of the USB drives that are attached.

1          Q      And, again, what that bootable thumb

2     does is allows the team to boot up the computer,

3     here the EMS server, using the thumb drive to boot

4     it up rather than using the -- the software

5     operating system on the server itself?

6          A      Yes, sir.

7          Q      Okay.  And if we look, there's a

8     black external hard drive here that looks like it's

9     attached via USB cord.

10               Do you see that?

11         A      Yes, sir.

12         Q      And is that a device that you guys

13    would have brought with you?

14         A      It could very well be a destination

15    drive.  We use those, yes.

16         Q      So that's the type of device you

17    would use for data collection like we see here?

18         A      Yes, sir.

19         Q      And so the idea is the thumb drive

20    would be used to boot up the device and then the

21    data would transfer to an external hard drive like

22    we see here?

Page 165

1           A       Yes, sir.

2           Q       And then do you see this device to

3      the left of the computer, it's white on the front

4      and black on the side?

5           A       Oh, yes, sir.

6           Q       Do you know what that is?

7           A       I can guess.  It looks like a

8      hardware capture device, but I can't really tell.

9           Q       So you don't know whether that's a

10     device that you guys brought or not?

11          A       It could be --

12          Q       Okay.

13          A       -- but I don't know with a hundred

14     percent certainly.

15          Q       And you've got a little bit clearer

16     image of the screen of the computer here.  Do you

17     know whether what's running there is part of the

18     collection?

19          A       It does look that way, yes.

20          Q       All right.  Go to 245.  Wait, did I

21     go backwards?  No, that's right.  Go to 245.  Did I

22     go backwards?  Sorry.  All right.  These are --

Page 166

1          A     That's okay.  I don't know why these
2     are upside down.
3          Q     245, these are more CompactFlash
4     drives that the team copied on-site in Coffee
5     County?
6          A     Yes, sir.
7          Q     And then 246 is another picture of
8     Mr. Nelson and Ms. Naik in the EMS server room
9     doing the collection?
10         A     Yes, sir.
11         Q     247, I think we may have looked at
12    this earlier.  Well, let me -- 247, this is a
13    picture in the Coffee County election office,
14    right?
15         A     Yes, sir.
16         Q     Do you know -- the computer that's
17    seen here, do you know if that's a computer that
18    you guys brought or something that you're
19    collecting from?
20         A     It looks like ours.
21         Q     All right.  Just based on the
22    information that you can see here?

```
 1              A    Yeah, based on the spreadsheet,

 2       what's in document recovery, based on the task bar,

 3       but I'm not 100 percent certain.

 4              Q    Okay.  And you --

 5              A    I could -- it very much -- it looks

 6       like ours now that I'm looking at it.  It looks

 7       like a Surface with a keyboard.

 8              Q    Okay.  If you look at 248 --

 9              A    Yeah.

10              Q    -- do you know what this is?

11              A    Yes, sir.  It looks like a USB drive.

12       I can't really tell.  Yes, it looks like a drive.

13              Q    Like an external hard drive?

14              A    Yeah.

15              Q    Okay.  And do you see where it's got

16       the project number and then "EMS 01"?

17              A    Yes, sir.

18              Q    The Dell basic warranty, the external

19       hard drive, does this look like a drive that you

20       guys brought with you?

21              A    It does.

22              Q    And is -- it's my understanding that
```

Page 168

1      the EMS 01, that what this indicates is this is the

2      hard drive that likely contained the data taken

3      from the EMS -- sorry, copied from the EMS server?

4              A     Yes, sir.

5              Q     Okay.  And then in 249, these are

6      more CompactFlash drives copied on-site by the

7      team?

8              A     Yes, sir.

9              Q     And 250, this is another -- well,

10     strike that.

11             250, do you see where it's got again

12     the project number and then "Tabulation 01"?  Do

13     you see that?

14             A     Yes, sir.

15             Q     And do I understand correctly that

16     in -- in the picture, in 250, that this is the

17     central scanner or what's often referred to as the

18     tabulator in the office?

19             A     Based on the label and the

20     documentation, yes.

21             Q     And, again, this is a device that the

22     team copied the data from?

Page 169

1          A     Yes, sir.

2          Q     Okay.  If you go to 251, do you know

3     what this is?

4          A     It looks like a router.  Yeah, it's a

5     router, I think.  I can't really tell.

6          Q     Do you know whether the team

7     attempted to copy data from a router?

8          A     I don't think they did.  No, they did

9     not try to collect data from a router.

10          Q     Would you expect there to be data on

11     a router?

12          A     No.

13          Q     All right.  252, more CompactFlash

14     drives that the team copied?

15          A     Yeah.

16          Q     All of the data that was copied from

17     Coffee County, that was all copied on-site in the

18     office?

19          A     Yes, sir.

20          Q     Okay.  So there was never a moment

21     when someone provided equipment or devices to the

22     SullivanStrickler team from Coffee County that was

Page 170

1          copied outside of the office?

2                   A     That's correct.

3                   Q     Okay.  Look at 253.  That's

4          Mr. Maggio standing on the left, right?

5                   A     Yep.  Yes, sir.

6                   Q     So this is another picture in the

7          elections office from January 7th, 2021, right?

8                   A     Yes.

9                   Q     And do you know what these two

10         computers here are?

11                  A     I do not.

12                  Q     Okay.

13                        All right.  Look at the page ending

14         in 254.  It says "SOS_Georgia & Votes!"  Do you

15         know what this is a picture of?

16                  A     I do not.

17                        Can we back up?

18                  Q     Sure.

19                  A     I think I -- now that I think about

20         it, these don't -- this doesn't look like an

21         external drive, if we go to 248.

22                  Q     Okay.

1           A     And I think I referenced it as that.

2      I don't know what this is.

3           Q     Oh, I see.  Okay.

4           A     Do you know what I mean?  I think my

5      original comment was, "I believe this is one of our

6      deliverables."  I don't think it is.

7           Q     So --

8           A     Sorry about that.

9           Q     No, no, no.  That's no problem at

10     all.

11               Flip to 244.  The desktop computer

12     that's standing up here on the desk, used with the

13     EMS server, that's a Dell computer.  Do you see

14     that?

15          A     Yes, sir.

16          Q     Okay.  Now, if you flip to 248,

17     there's a reference to "EMS 01," and it says, "Dell

18     Basic Warranty."  And if you look, you can see a

19     keyboard in the top right corner, you can see the

20     cables off to the left.

21               Does it look like this is -- what's

22     pictured here is that desktop computer?

Page 172

1           A     It does.

2           Q     Okay.

3           A     Sorry I had to go back.

4           Q     No, no.

5           A     Okay.

6           Q     I'm glad you did that.  That's very

7    helpful.

8                 So then we come to 254.  We have a

9    picture of the same Dell desktop.  You can actually

10   see it now sitting next to the router on the table

11   in the EMS server room.

12                Do you see that?

13          A     Yes.

14          Q     And there's a Post-it note on it.  Do

15   you know whether that Post-it note is a password

16   that is used for that computer?

17          A     I wouldn't know.  We don't need

18   passwords.

19          Q     Okay.

20          A     So we wouldn't --

21          Q     I was going to ask you that.

22          A     Okay.

1          Q      The forensic copying that you guys

2     did in Coffee County, you were able to take all of

3     the data that you took without needing passwords to

4     any devices?

5          A      That is correct.

6          Q      And how -- walk me through sort of

7     how that's possible.

8          A      When -- passwords that are typically

9     provided, unless they -- that are on local

10    machines, or on machines, if they are not

11    encrypting the actual OS at boot, when it boots,

12    you can forensically image -- we're only looking at

13    a source.

14               So we can look at -- here's an

15    example:  So if this laptop here had a password on

16    it, when we attach our device and we boot and we

17    point to that to collect, it's just looking at a

18    block of data or the data that's on the disk.  And

19    also pieces of the disk that may not contain data,

20    but fragments of data.  So imagine it just

21    collecting that, whatever's on the disk, then

22    creating an image of that, and then taking that off

Page 174

1    with it.

2                    Now, if I was looking to do something

3    targeted where you said to me, you know, "We really

4    only want these files," without doing a forensic

5    image, we would require a password to attach to the

6    machine and then to filter down using Windows tree

7    viewer or searching or whatever to grab the files.

8                    But there's no need -- for the

9    technologies that were here for us to need any

10   passwords to gain that -- to forensically image

11   them.

12        Q    And the forensic image captures, if

13   done correctly, all of the files, all of the data

14   sitting on the device?

15        A    Yes, sir.

16        Q    Once the data is pulled off in that

17   process, is a password needed to then access that

18   data on whatever device it's copied to?

19        A    Yes, sir.

20        Q    So the -- the data that is -- that

21   was taken -- I'll be more precise.  The data that

22   was copied in Coffee County, has anyone at

Page 175

1       SullivanStrickler accessed that data, like opened

2       files?

3               A     No, sir.

4               Q     So that data was simply copied to

5       devices, uploaded to a ShareFile, and that data was

6       then shared with whoever you were directed to share

7       it with?

8               A     Yes.  So the -- the flow is this:

9       The -- we go in, we're directed to collect -- say I

10      walked into this room and, "All right.  We need you

11      to forensically image all this stuff."  Okay.  We

12      bag and tag it.  We take the pictures.  We

13      forensically image all of -- all of these

14      particular items.

15              Some of them may -- may come across

16      as forensic-image files that would need to then be

17      extracted.  Others may be just JPEGs or images or

18      pictures.  At which point, we would then password

19      and encrypt and put on ShareFile and say -- well, I

20      skipped a step.

21              We would create a preservation copy

22      of the working copy so we have two copies.  We

Page 176

1          would upload the data to the ShareFile, and then

2          whomever asked for access or was given access based

3          on the attorneys, they would say, "All right.  We

4          need access for this, this, and this."  We would

5          create those accounts and then you would be able to

6          pull the data down.

7                     Does that paint a picture?

8          Q     Yeah.

9          A     Does that --

10         Q     Thank you.

11         A     You're welcome.

12         Q     So for anyone accessing that data and

13         wanting to actually look at the data itself, look

14         at the files, they might need a password to the

15         extent that any particular file is password

16         protected at the time you collected it?

17         A     And they would need a password from

18         us.  So everything that gets put on ShareFile is

19         password protected.  So they -- it would require a

20         password no matter what to gain access to that

21         data.

22         Q     Okay.  When the firm shared the data

Page 177

1          from Coffee County via the ShareFile, it provided

2          log-in credentials to the individuals who were

3          given access to that data, right?

4                    A    Yes, sir.

5                    Q    And so the log-in credentials would

6          be, what, a user name and a password?

7                    A    Yes.

8                    Q    And that -- once they logged in, they

9          then would have access to -- to whatever was

10         sitting on that ShareFile site for their user

11         account?

12                   A    For their account, yes.  So -- yes.

13         So permissions based on access to certain areas

14         within that ShareFile repository.  And permissions,

15         like "Ability to download, yes or no; ability to

16         upload, yes or no; you know, admin rights, no,"

17         this -- things like that.

18                   Q    If a user were to share their log-in

19         credentials for your ShareFile site with another

20         individual, you wouldn't have any way of knowing

21         that, right?

22                   A    I don't know.  I don't think we would

1    be able to know that.

2              Q    Okay.

3              A    The only thing we would have is a

4    log -- an activity log of the original credentials

5    and their activity.

6              Q    All right.  Take a look at -- still

7    in Exhibit 12, go to 255.  These are more

8    CompactFlash that were copied on-site in Coffee

9    County?

10             A    Yes, sir.

11             Q    The same with 256?

12             A    Yes, sir.

13             Q    257, here we have two thumb drives

14   that were copied on-site?

15             A    Yes.

16             Q    Do you know what was on these thumb

17   drives?

18             A    I believe these were the -- I --

19   there are thumb drives, and I'm not sure if these

20   are the labels that contain the scanned documents

21   that they had on-site, the scanned information that

22   was referenced.

1          Q     So if you look at these two, the top

2     one says -- it's got the project number and then TD

3     01.  Do you see that?

4          A     Yes, sir.

5          Q     Do you know what the "TD" refers to?

6          A     I do not.

7          Q     And then the one below, same project

8     number, "TD 02."  Do you see that?

9          A     Yes, sir.

10          Q     And then it says, "ICX," and I'm not

11     sure what that is.  "ISC" something.  Do you know

12     what that one says?

13          A     I do not.

14          Q     Okay.  And then the thumb drive

15     itself also refers to ICX.  Do you see that?

16          A     Yes, sir.

17          Q     And are you familiar with the

18     Dominion terminology that ICX refers to those big

19     touchscreen voting devices?

20          A     Yes.

21          Q     Okay.

22          A     I am now.

Page 180

```
 1              Q     Okay.  And I'm sorry, we may have
 2        covered this.  The team was directed on-site to
 3        collect data from those touchscreens as well,
 4        right?
 5              A     Correct.
 6              Q     Okay.  And then if we look at 258,
 7        two more CompactFlash drives.  And those were
 8        copied on-site?
 9              A     Yes, sir.
10              Q     All right.  Go back to 257 for a
11        second.
12              A     Okay.
13              Q     Does it look to you like what it says
14        here is, "ICX install"?  Maybe that's what is
15        intended?
16              A     I can make that assumption, but it
17        does say "istall," so I don't know -- I mean it
18        could be.
19              Q     Look on the thumb drive itself.  Do
20        you see where it says, "Install," I-N-S-T-A-L-L?
21              A     Yes.
22              Q     Okay.  Who would have copied these
```

1      thumb drives on your team?

2            A     Karuna Naik or Jim Nelson.

3            Q     Okay.

4                  All right.  And do you know what the

5      ICX install thumb drive would be used for in the

6      office?

7            A     I do not.

8            Q     Okay.  And if you look here at 258,

9      it refers to "ICP advance voting scanner card."  Do

10     you see that?

11           A     Yes.

12           Q     So do I understand correctly, these

13     CompactFlash drives, the data was copied -- they

14     are used with scanners in the Coffee County

15     election office that were used with advanced

16     voting?

17           A     I don't know.

18           Q     Okay.  259, there's a Post-it note.

19     It says, "Elect#" -- a little pound sign -- "2020."

20     Do you see that?

21           A     Yes, sir.

22           Q     And then there's a -- it looks like

Page 182

1      maybe a 16-digit alpha numeric below.  Do you see

2      that?

3              A     Yes.

4              Q     Are those passwords?

5              A     Maybe.

6              Q     Okay.  And it looks like -- if you

7      look at the person in the background, it looks like

8      Paul Maggio is holding that, right?

9              A     It does.

10             Q     If you wanted to know what those

11     passwords were used for, would that be a question

12     for Paul Maggio, or someone on the team?

13             A     Can I reference that memo that was

14     sent?  There was a memo that was sent, right, that

15     was part of the production and it listed a couple

16     of passwords?

17             Q     Oh.

18             A     If it matches up to that, then that's

19     what it would be.

20                   What's the 123?  Yeah, it does not.

21             Q     Yeah, I didn't think it did.

22                   MR. CROSS:  Okay.  Let's, just for

Page 183

1      the record, grab 11 just to be clear on what he's

2      looking at.

3                (Felicetti Deposition Exhibit Number 13

4                marked for identification.)

5      BY MR. CROSS:

6           Q      Let me hand you Exhibit 13.  And just

7      take a look and compare it to what you've got.  And

8      let's just make sure that we're looking at the same

9      thing.

10          A      Okay.  Thank you.

11          Q      Tab 11, Exhibit 13.

12                 So the memos that you were just

13     looking at that are -- they're the same as what

14     I've marked as Exhibit 13, right?

15          A      Yes.

16          Q      Okay.  And do you know what these

17     memos are?

18          A      They were, as I understand it, the

19     passwords required to gain access to the EMS

20     server.

21          Q      Okay.  So if we look at these memos,

22     there are a number of passwords that are included

Page 184

1      here.  And is it your understanding that at least

2      one of the passwords on here would provide access

3      to the EMS server?

4              A    Yes.

5              Q    And what's the basis of that

6      understanding?

7              A    Discussions with Jim Nelson.

8              Q    Okay.  But to do the work that you

9      guys did, you didn't need a password?

10             A    That is correct.  We did not need

11     passwords.

12             Q    Given that, do you know why

13     Mr. Maggio had Ms. Jackson take a picture of what

14     looked to be passwords on page 259 of Exhibit 12?

15             A    The only -- I -- I have no idea.

16     Unless it was stuck on a server somewhere, but I

17     don't know.

18             Q    Okay.  And then on page 260 --

19             A    Hold on one second, please.

20             Q    Sure.

21             A    Okay.  Sorry.

22             Q    -- these are more CompactFlash drives

Page 185

1       that were copied on-site, right?

2               A     Yes, sir.

3               Q     And if you look at them, these refer

4       to ICP.  Do you see that?

5               A     Yes.

6               Q     So the CompactFlash drives that were

7       copied, some of those were used with the poll pads.

8       Is that right?

9               A     Yes.

10              Q     And some of them were used with the

11      ICPs.  Is that right?

12              A     Yes.

13              Q     Were any of the CompactFlash drives

14      that were copied on-site used with any other

15      devices or equipment?

16              A     CompactFlashes?  No.

17              Q     Okay.

18              A     That I know of, no.

19              Q     Okay.  And then if we go to 261,

20      these are more thumb drives that were copied

21      on-site?

22              A     Yes.

1          Q     And we saw TD 01 and 02 earlier.

2     This goes from TD 03 to TD 07.  Any idea what the

3     "TD" refers to?

4          A     It would have been the tracking code

5     that we gave it.  I do not know.  Jennifer Jackson

6     would have done that.

7               MR. CROSS:  If we can get an answer

8     to that question, too, what the "TD" refers to in

9     the photos.  Thank you.

10    BY MR. CROSS:

11         Q     All right.  And then 262, it's a

12    picture of -- it says "Latitude 3400" at the top.

13    Do you know what this is?

14         A     I don't.  I do not.

15         Q     And then 263, a picture of a Dell

16    laptop.  Do you know what that is?

17         A     I do not.

18         Q     Okay.  If you look here on the left,

19    there's a device plugged in with this little note

20    on it, "DFIR."

21         A     Yes.

22         Q     That's a device that you guys brought

1       to boot it up?

2               A     Yes, to do a collection.

3               Q     Okay.

4               A     So this could be a targeted machine

5       for collection.

6               Q     And then 264, a Canon.  Do you know

7       what this is?

8               A     I do not.  It looks like a potential

9       print server or printer, from what I can see.

10              Q     And then, lastly, 265, two more thumb

11      drives.  Actually, this -- this may be another

12      picture of what we saw before, because this one has

13      TD 01 on the top.  Do you see that?

14              A     But it's missing the labels from the

15      other picture.

16              Q     Yeah, maybe it flipped over.  Oh,

17      yeah, go to -- go to 257.  The tags look to be the

18      same writing.  Do you think they're -- does it look

19      to you like they're the same drives, maybe just

20      flipped over?  Do you know?

21              A     Yeah, it looks like not only flipped

22      over, but the cover is on one.

Page 188

1          Q     Right, TD 01 has the cover on it?

2          A     Yes.

3          Q     Okay.  "TD," would that potentially

4     be shorthand for thumb drive?

5          A     Yes.  Actually, yes, it is, just like

6     "CF" is CompactFlash, yeah.  Sorry.

7          Q     I didn't get it either.  Adam handed

8     me a note.

9          A     It's a Da Vinci Code.

10         Q     I know, yeah.  Too lost in the weeds.

11         A     Yeah.

12         Q     What does "SSA" stand for?

13         A     I don't know.

14         Q     So that's not a standard project code

15    that you --

16         A     It is.  We use it for every single

17    project.

18         Q     And it all starts with SSA?

19         A     Every project starts with SSA.

20         Q     So maybe "SullivanStrickler" --

21         A     Account?

22         Q     Okay.

Page 189

```
 1              A     I don't know.

 2              Q     Okay.

 3                    All right.  And so what we've talked

 4        about on-site, January 7, 2021, the team copied

 5        data from the EMS server, a scanner that sat in

 6        that room, and a computer that works with that

 7        scanner.  ICPs, CompactFlash drives used with ICPs,

 8        and the poll pads, some laptops that we saw, and

 9        some number of ICXs, or what are referred to as the

10        BMDs, the big touchscreens.  Is that right?

11              A     Yes.

12              Q     Is there anything else that you're

13        aware of the team copied data from on-site that day

14        that we have not yet talked about?

15              A     There was the -- I believe, a hard

16        drive that I mentioned when we started today

17        that -- I'm sure it's referenced in the chain, but

18        I wasn't sure what that was for.

19              Q     It was an external hard drive that

20        was sitting in the office?

21              A     Yes, sir.

22              Q     And you don't know what -- what was
```

Page 190

1          on that?

2                    A      Huh-uh.

3                    Q      No?

4                    A      No.  No, sir.

5                    Q      Okay.  The data that was captured

6          from Coffee County forensically, does that include

7          components that would be needed to reverse-engineer

8          any of the software from those devices?

9                    A      I don't know.

10                   Q      Is that -- is that an expertise that

11         you have, reverse-engineering software?

12                   A      Not operating systems.

13                   Q      Other types of software?

14                   A      Legacy.  So maybe back-up tape

15         software.

16                   Q      Was SullivanStrickler retained to

17         copy election data or equipment for any Georgia

18         county beyond Coffee?

19                   A      No, sir.

20                   Q      Was there ever any discussion with

21         any client about potentially copying election data

22         or equipment in Georgia beyond Coffee County?

1          A     No, sir.

2          Q     How was the decision made to do the

3     collection in Coffee County specifically?

4                Who made -- who made -- who picked

5     Coffee County?  Was it the client?

6          A     The client.

7          Q     Did the client -- and are we

8     talking -- for the client, are we talking about

9     Jesse Binnall or Sidney Powell or someone else?

10         A     Sidney Powell through Jim Penrose and

11    Doug Logan.

12         Q     Okay.  Does the firm have any insight

13    into how they selected Coffee County?

14         A     No.

15         Q     Are you familiar with an -- an

16    individual named Ben Cotton?

17         A     I've read the name, but that's it.

18         Q     Are you aware that Ben Cotton

19    purports to be a computer science expert who has

20    testified under oath in a proceeding in Arizona

21    that he has analyzed the data that your team

22    collected from Coffee County?

1          A     I did not know that.

2          Q     Okay.  Do you know how he got that

3    data?

4          A     No.

5          Q     He has also testified that he has

6    analyzed similar data from Fulton County.  Were you

7    aware of that?

8          A     No.

9          Q     Did anyone at SullivanStrickler have

10   any involvement with collecting data from Fulton

11   County?

12         A     No.

13         Q     So look -- take a step back to the

14   start of the trip.  You said it's early January of

15   2021, you guys get the green light from Jim Penrose

16   and Doug Logan to go to Coffee County, right?

17         A     Yes, sir.

18         Q     How precise can you be -- was it --

19   how many days before the team left on January 7th,

20   do you know?

21         A     How many?

22         Q     I'm sorry.

                                                    Page 193

1                       When the green light came in from Jim

2           Penrose and Doug Logan, was it the day before?  Was

3           it a few days before?

4                   A    I believe it was a day or two before.

5                   Q    And your understanding is based on

6           discussions with the teams -- the team?

7                   A    With the teams, and I believe it's in

8           some of the e-mail threads.

9                   Q    Okay.  Yeah, I mean the e-mail thread

10          we looked at before -- I mean, we can go back to

11          it, but it jumps from December to the day of

12          January 7th when they were leaving that morning.

13                  A    I know it was early January based on

14          my discussions with the team.

15                  Q    And presumably for a project like

16          this, the team would have to have some advanced

17          notice so that it could get ready?

18                  A    Yes.

19                  Q    Okay.  And so we just saw, for

20          example, that they -- they brought in various

21          equipment and devices.  So they would need enough

22          notice to figure out what equipment they needed and

Page 194

1      who all would need to go down?

2            A      This is not unlike many projects.  It

3      is you have 24 to 48 hours to be on-site type of

4      deal.

5            Q      So oftentimes in your -- in the

6      firm's practice, you might only get a day or two

7      notice on a project like this?

8            A      Absolutely.

9            Q      Okay.  And the best sort of timing

10     you can give me is sometime within a day or two

11     before January 7th is when the team was told "Go to

12     Coffee County"?

13           A      Yes, sir.

14           Q      Okay.  And that came from Jim Penrose

15     and Doug Logan?

16           A      Yes, sir.

17           Q      And was it sometime in that window

18     where Jim Penrose and Doug Logan also told the

19     team, "Scott Hall is going to help coordinate"?

20           A      I don't know.

21           Q      Okay.  And do you know at what point

22     the team was connected with Cathy Latham to also

1      coordinate?

2             A     I believe the day of.

3             Q     Okay.  Did Mr. Maggio select the

4      members of the Coffee County team after the

5      greenlight from Jim Penrose and Doug Logan or had

6      he already had a team on stand by?

7             A     I would assume after -- I can't

8      assume.

9             Q     Don't guess.  It's okay.

10            A     After, based on if it was the same

11     team -- if it was the same team utilized or -- or

12     briefed on any other collection as a team, then we

13     would deploy the same team.  And also timing and

14     availability.  But there's always people ready to

15     go for a matter when it involves forensic

16     collections.  So I don't know if that helps.

17            Q     No, no, that helps.

18                  Greg Freemyer was one of the

19     individuals who was responsible for the data

20     collection in Michigan, right?

21            A     Yes.

22            Q     Do you know why Mr. Freemyer was

1          responsible -- or part of the team for Michigan,

2          but not part of the team for Coffee County?

3                    A      Another project?

4                    Q      You just don't know?

5                    A      Yeah, I don't know.

6                    Q      That's fine.

7                    A      Yeah.

8                    Q      Okay.  For the copy of the data that

9          we got on a hard drive, is there any information

10         our experts would need to access that data to look

11         at it themselves?

12                          Like, do they need log-in credentials

13         from SullivanStrickler?

14                    A      Well, they would need the password to

15         decrypt, but I don't know how the data was

16         delivered to you.  If they were delivered to you as

17         forensic images, then you would need somebody that

18         has the ability to open the forensic images.

19                    Q      Right.

20                          Assuming they have that expertise,

21         they wouldn't need any log-in credentials beyond

22         the credentials that SullivanStrickler would

1          provide to decrypt the data?

2                    A      Correct.

3                    Q      Okay.

4                           All right.  Let me hand you 13.

5                           MR. CROSS:  Is that where we are?

6                           MR. SPARKS:  14.

7          BY MR. CROSS:

8                    Q      Oh, 14.

9                           (Felicetti Deposition Exhibit Number 14

10                          marked for identification.)

11                          MR. BROWN:  This is sort of a

12         confusing question.  Can I ask a question?  Just

13         one question.  Just one important question.

14                          MR. CROSS:  I don't care.

15                          MR. BROWN:  Okay.  You just answered

16         that --

17                          MS. CLARK-PALMER:  Here.

18                          MR. CROSS:  You don't want to put

19         your mic on?

20                          MR. BROWN:  I'm confused with the

21         password for -- is the password that you just

22         referenced, is that created by SullivanStrickler in

1          the forensic process?  Is there another one with

2          the underlying data?

3                    THE WITNESS:  No.  They should have

4          access.

5                    MR. CROSS:  Yeah, let me -- let me

6          just ask it.

7                    MR. BROWN:  I'm sorry.

8                    MR. CROSS:  No, no.  That's good.

9          That's good.

10         BY MR. CROSS:

11                   Q    So the -- so the question is:  You

12         just described there was a password needed to get

13         access to the data that was collected.  That is a

14         password generated by SullivanStrickler for its own

15         encryption, right?

16                   A    Correct.

17                   Q    Okay.  And once that password is

18         entered, they should have access to all the

19         forensic data collected in the same way that

20         SullivanStrickler does?

21                   A    Yes.

22                   Q    Okay.

Page 199

```
1                    MR. BROWN:  If the underlying -- if
2        the underlying files are encrypted or have a
3        password protection, they would need to know that
4        as well?
5                    THE WITNESS:  That is correct.
6        BY MR. CROSS:
7            Q     So, again, if the underlying files
8        are encrypted or password protected, whoever would
9        access that would need either the password or some
10       way around the password, around the encryption?
11           A     Correct.
12                   MR. BROWN:  I'm sorry.
13                   MR. CROSS:  I already knew that but
14       apparently --
15                   THE WITNESS:  Oh.
16                   MR. CROSS:  Bruce, what's my next
17       question?
18                   MR. COLEMAN:  While we're kind of off
19       topic, do you want to talk about a lunch break at
20       some point or --
21                   MR. CROSS:  Yeah.  I was going to
22       suggest we can either do one more document, we can
```

Page 200

```
 1          break now.  You're in the hot seat, you -- you
 2          choose.
 3                       THE WITNESS:  I -- I really don't
 4          care.
 5                       MR. CROSS:  Why don't we do -- why
 6          don't we do one more that kind of relates to what
 7          we were looking at and then we'll --
 8                       MR. RUSSO:  Whatever is fine with me.
 9                       THE WITNESS:  Yeah, that's fine.  I
10          want to kind of get through as much as we can.
11                       MR. CROSS:  Yeah, typical witness
12          mentality.
13                       MR. COLEMAN:  It's his wife's
14          birthday.
15          BY MR. CROSS:
16                Q    All right.  Let's look at 14.  So I
17          think you said you did not look at a copy of the
18          hard drive that was provided to us.  Is that right?
19                A    Correct.
20                Q    Okay.  So this is the file structure
21          taken from our copy of the hard drive that was
22          provided to us.  So you've not seen this before?
```

Page 201

1              A     I have not.

2              Q     Okay.  If you just look at the -- the

3        top where it's got the project number, SSA1722.  Do

4        you see that?

5              A     Yes, sir.

6              Q     "Hard drive contents," do you see

7        that?

8              A     Yes.

9              Q     And then there are these sort of

10       primary-level folders, "CompactFlash,

11       Dominion-Supplied Laptop, EMS Server, Miscellaneous

12       Thumbs, Polling Pads, Reports, Tabulation System."

13                   Do you see that?

14             A     Yes.

15             Q     And would it be standard practice

16       when this data is collected to create a file

17       structure like this where you're storing data in

18       folders that indicate where it came from?

19             A     Yes.

20             Q     Okay.  And so here, it would be

21       standard practice that, for example, where it says

22       "CompactFlash" that would be data copied from

Page 202

```
 1        CompactFlash drives in Coffee County?
 2               A     Yes.
 3               Q     Same with "EMS Server," for example?
 4               A     Yes.
 5               Q     And then "PW.txt," would that --
 6        would it be standard practice that that would be a
 7        text file that includes any passwords?
 8               A     Yes.
 9               Q     Okay.
10               A     And then if you look, what we've done
11        is broken down the file structure beneath those
12        higher-level --
13                     Yeah.
14               Q     -- files.  And so the standard
15        practice here would be to create a folder that
16        corresponds to each device, right?
17               A     Yes.
18               Q     So under "CompactFlash," for example,
19        we saw in the pictures there would be a
20        CompactFlash that has a note that designates it
21        CF1.  The standard practice would be to create a
22        folder that captures the data in that folder from
```

Page 203

1        that particular flash drive?

2                A     Correct.

3                Q     Okay.  And that would be the practice

4        with everything that's captured here sort of

5        creating levels of subfolders that make clear what

6        specific device particular data came from?

7                A     Yes.

8                Q     Okay.  Let me show you just one more

9        quick one and then we'll break if that's okay.

10               A     Okay.

11                     (Felicetti Deposition Exhibit Number 15

12                     marked for identification.)

13       BY MR. CROSS:

14               Q     All right.  Let me show you

15       Exhibit 15.  Exhibit 15 is another document that

16       we -- we -- it's more sort of file structure

17       information from the hard drive.  And it's referred

18       to as triage reports.

19                     Are you familiar with triage reports?

20               A     Yes.

21               Q     What are those?

22               A     Reports created from forensic images

Page 204

1          that are created or that are -- that are created

2          that we can provide base -- data based on

3          particular file requirements; like format, type, et

4          cetera.

5                  Q       So a triage report is created by

6          SullivanStrickler as part of its work?

7                  A       Usually, yes.

8                  Q       Okay.

9                  A       Normally, yes.

10                 Q       Okay.  So the triage reports we would

11         see on the hard drive, those are likely created by

12         the team as part of its work, not something it

13         collected from Coffee County?

14                 A       Correct.

15                 Q       And again, maybe -- sorry, I may not

16         have fully understood.  What is the purpose of the

17         triage report?

18                 A       Just a general overview of the type

19         of data that's been collected.  Sometimes you'll

20         find -- you can, especially through remediation

21         effort, determine if a device that you imaged is

22         relevant at all based on an overview of what has

Page 205

1      been imaged and collected.

2            Q    Okay.  And if we look here, it looks

3      like there's a triage report that corresponds to

4      certain devices, such as the laptop, the tabulator,

5      USB, and EMS.

6                 Do you see that?

7            A    Yes.

8            Q    And what is "USB," it says,

9      "Detective reports", do you know what that refers

10     to?

11           A    I have an idea, but I don't -- I

12     can't say intelligently what it is.

13           Q    What would be your best-educated

14     guess on what that is?

15           A    It could be a USB history report that

16     shows if drives were hooked up and files were

17     loaded on and off a device, but I -- I don't know

18     if that's 100 percent.

19           Q    Okay.  You mentioned before the

20     Cellebrite kit.  Do you know whether that kit was

21     used or needed to collect from devices beyond the

22     poll pads?

Page 206

1           A    It's my understanding it was just the

2     poll pads.

3           Q    So do you know specifically whether

4     it was used to collect data from the ICX, the

5     touchscreen voting machines?

6           A    It may have been attempted to be

7     used, but I'm not sure what happened with those

8     because of the OS.  I know they were Android, and I

9     don't know exactly how they were collected in

10    detail.

11          Q    Who would that be a question for?

12          A    It would be Paul or Karuna.

13          Q    Okay.  Do you know how many of the

14    ICX, the touchscreen machines, were imaged?

15          A    I do not.

16               MR. CROSS:  Why don't we break for

17    lunch.  Thank you.

18               VIDEOGRAPHER:  The time is 12:47 p.m.

19    We are off video record.

20          (Recess from 12:47 p.m. to 1:03 p.m.)

21               VIDEOGRAPHER:  Okay.  The time is

22    1:04 p.m.  We are back on video record.

Page 207

```
 1      BY MR. CROSS:
 2              Q    All right.  Some follow-up questions
 3      for you on some of the stuff that we talked about.
 4                  So I understand SullivanStrickler
 5      only had one visit to Coffee County on January 7th?
 6              A    Yes.
 7              Q    Okay.  Are you aware that there
 8      were -- that Doug Logan, one of the principal
 9      points of contact for the firm, himself visited the
10      Coffee County elections office on January 18 and
11      19?
12              A    No.
13              Q    So SullivanStrickler doesn't have
14      any -- SullivanStrickler doesn't have any insight
15      into why Mr. Logan was there?
16              A    Correct.
17              Q    So you're not aware of any
18      communications between --
19                  MR. CROSS:  Thank you.  That's so
20      kind.
21      BY MR. CROSS:
22              Q    You're not aware of any
```

Page 208

1      communications between Mr. Logan and anyone at

2      SullivanStrickler with respect to Mr. Logan's own

3      visit to Coffee County?

4              A      Correct.

5              Q      Did SullivanStrickler have any

6      insight into what the individuals who accessed the

7      data that your team copied, what those individuals

8      did with that data once they got it?

9              A      No.

10             Q      So sort of the extent of the role and

11     responsibilities of SullivanStrickler was copy the

12     data, provide it to the client or whomever the

13     client tells you to provide it to, and then it's up

14     to the client as to what happens from there?

15             A      Correct.

16             MR. CROSS:  Can whoever's on Zoom

17     make sure you're on mute?  Thank you.

18     BY MR. CROSS:

19             Q      Was there ever any discussion or

20     concern at SullivanStrickler that -- that anyone

21     who might get access to the data from Coffee County

22     might misuse it or was that just a topic that

1      didn't come up?

2             A     Yeah, that's not -- that does not

3      come up.

4             Q     Okay.  And so is it fair to say the

5      firm sort of trusting or relying on the client,

6      here the lawyers, to take appropriate

7      responsibility for who get -- who gets access to

8      that data and what's done with it?

9             A     Yes.

10            Q     Are you familiar with the name Jeff

11     Linberg?

12            A     I am not.

13            Q     So you -- you've not heard that Jeff

14     Linberg joined Doug Logan on his visit to Coffee

15     County on January 18 and 19 of 2021?

16            A     I don't know.  I don't know.

17            Q     Okay.  So to your knowledge, Jeff

18     Linberg isn't someone that SullivanStrickler

19     communicated with about the Coffee County work?

20            A     Correct.

21            Q     Was there any written engagement with

22     Doug Logan or Jim Penrose?

1          A    I don't believe so.

2          Q    So your coordination with Doug Logan

3     and Jim Penrose was done pursuant to either the

4     Binnall Agreement or the Powell Agreement,

5     depending on what -- what work was being done?

6          A    Yes.

7          Q    So is it fair to say the direction to

8     coordinate with the two of them, that came from

9     Jesse Binnall and Sidney Powell?

10         A    Yes.

11         Q    Were there any written communications

12    between members of the SullivanStrickler team and

13    Doug Logan and Jim Penrose beyond the ones that

14    we've seen or that were produced?

15         A    No.

16         Q    And how do you know that?

17         A    We've produced everything that we've

18    been asked to produce, so I don't --

19         Q    And let me -- let me be a little

20    clear.

21         A    Yeah.

22         Q    So the document subpoena we served on

1     Paul Maggio, is it -- is it the case that in

2     complying with that subpoena, Mr. Maggio produced

3     all e-mails, correspondence, any documents that --

4     that SullivanStrickler, as a firm, has with respect

5     to the Coffee County work?

6              A     Yes.

7              Q     And what's your basis for that

8     understanding?

9              A     Based in discussions yesterday.

10             Q     With members of the team?

11             A     Yes.

12             Q     We saw one text message between Paul

13    Maggio and Cathy Latham, another between Paul

14    Maggio and Scott Hall.

15                   Is it fair to say that at least some

16    members of the SullivanStrickler team used text

17    messages to communicate with some individuals

18    regarding the Coffee County work?

19             A     Outside of what you just identified,

20    between each other or -- I don't --

21             Q     In any way.

22                   Like, to what extent did the team use

1    text messaging to communicate with anyone regarding

2    the Coffee County work?

3         A     Internally, I'm not sure.  But they

4    may have texted one another as far as the internal

5    team.

6         Q     So is it your understanding that

7    SullivanStrickler has produced all text messages

8    with respect to the Coffee County work that

9    Jennifer Jackson, Jim Nelson, and Karuna Naik also

10   have or might -- would have?

11        A     I don't know.

12        Q     Do you know whether Scott Hall made

13   any other trips to Coffee County with respect to

14   election issues?

15        A     I do not.

16        Q     Does the firm know of -- of anyone

17   else beyond the folks we've talked about today who

18   visited any Georgia county to copy voting software

19   or data?

20        A     I'm only aware of Coffee County

21   period and what we did.  So I don't know anything

22   outside of that.

1          Q     Is there anyone beyond the folks

2     we've talked about today or seen in the photos that

3     the firm is aware of that -- that visited Coffee

4     County at any point to copy voting equipment or

5     data?

6          A     Can you repeat the question?

7          Q     Sure.

8          A     Sorry.  Sorry.

9          Q     So we talked about a number of

10    people, like your team, Scott Hall, others.  We've

11    looked at some photos.

12               My question is just specific to

13    Coffee County.  Is there anyone known to

14    SullivanStrickler that visited Coffee County to

15    copy voting equipment or data beyond the names

16    we've already talked about or seen in photos?

17         A     No.

18         Q     Okay.  Do you know whether the EMS

19    server in Coffee County has internet capability,

20    like remote access?

21         A     I do not know.

22         Q     So in some of the pictures we looked

Page 214

1      at, it looked like there was a router sitting on

2      that table.

3              A       Right.

4              Q       Do you have any insight into why

5      there would be a router sitting in that elections

6      office where the EMS server sits?

7              A       I do not.

8              Q       Did SullivanStrickler ever access any

9      of the voting equipment or data in Coffee County

10     remotely over the internet?

11             A       No.  Everything was air gapped.

12             Q       And when you say "air gapped," you

13     mean your collection of it was air gapped?

14             A       Yes.

15             Q       None of the devices you brought with

16     you were connected to the internet?

17             A       That is correct.

18             Q       Okay.  What was the process -- and

19     you may have touched on this before, but just to

20     make sure I understand.

21                     What was the process for getting the

22     data onto your ShareFile site?

Page 215

1              I know we talked before, you

2       consolidate the data, then you upload it to the

3       ShareFile site.  That's done physically in the

4       SullivanStrickler office?

5              A      Right.  So a copy is made,

6       consolidated, that we discussed, of all of the

7       targeted data that was collected.  That -- those

8       drives that were utilized to collect the data are

9       then preserved with a preservation copy.  So you

10      have a working copy, a preservation copy.  The

11      preservation copy is then -- that data is then

12      uploaded to the ShareFile.

13             Does that answer your question?

14             Q      Yes.

15             A      Okay.

16             Q      Did SullivanStrickler require anyone

17      who had -- was given access to the ShareFile for

18      the Coffee County data to sign any kind of

19      non-disclosure or any confidentiality agreement?

20             A      No.  We were working under the

21      original agreement information.

22             Q      So the way it would work is your

Page 216

1     points of contact, like a Doug Logan or a Jim

2     Penrose or Sidney Powell, would -- would reach out

3     to SullivanStrickler and say, "Hey, I want you to

4     share the Coffee County data with -- with this

5     individual as well."  And then you guys would give

6     log-in credentials for the ShareFile to that

7     individual?

8              A     That's exactly right.

9              Q     Does each individual have their own

10    log-in credentials for ShareFile?

11             A     Yes.  And permissions.

12             Q     Right.

13                   You talked about this before.  Each

14    individual user may have some different

15    permissions, meaning one user can upload and

16    download, but another can only download?

17             A     Or only have access to certain areas

18    within ShareFile.

19             Q     Are you aware that one or more of the

20    individuals that you guys gave log-in credentials

21    to shared their log-in credentials with -- with

22    other individuals?

1          A     I am not aware of that.

2          Q     You have not heard that Ben Cotton

3     testified that that was done?

4          A     Not that specifically.

5          Q     Okay.  Are you familiar with the name

6     Dave Bossie, B-O-S-S-I-E?

7          A     I am not.

8          Q     Not someone that you're familiar

9     with, with respect to the Coffee County project, or

10    at all it sounds like?

11         A     At all.

12         Q     Okay.

13         A     That name bears nothing.

14         Q     We talked about collecting data from

15    the poll pads.

16               What specific data was captured from

17    the poll pads?

18         A     I don't know.  And the reason why I

19    say that is because we don't know what fields or

20    information is collected from the devices because

21    they are created as images.  Like I wouldn't -- I

22    don't know.

Page 218

1          Q     Do you understand the -- the poll

2     pads are used to check voters in for voting at the

3     precincts?

4          A     Yes.

5          Q     And are you aware that the poll pads,

6     as I understand it, have on them specific voter

7     information?

8          A     I would -- yes.

9          Q     Okay.  And do you understand that by

10    forensically capturing all the data on the poll

11    pads, that data includes personal identifying

12    information, PII, for Georgia voters?

13         A     I don't know.  And the only reason

14    why I say that is because I don't know what that

15    data looks like or the information.  I can say that

16    they were imaged.

17         Q     With respect to the engagement in

18    Coffee County, was there ever any concern raised

19    about the possibility of forensically capturing PII

20    for some seven million voters in Georgia?

21         A     No.

22         Q     All right.  Did -- is it fair to say

Page 219

1       the client never warned SullivanStrickler that by

2       capturing data on the poll pads, that they would be

3       capturing PII for Georgia voters?

4               A    Correct.

5               Q    Okay.  The data that was loaded to

6       the ShareFile at the direction of the client, did

7       that include all of the data collected from Fulton

8       County -- I'm sorry, from Coffee County?

9               A    Yes.

10              Q    So in addition to Coffee County,

11      there was a SullivanStrickler team, that included

12      at least Paul Maggio, that did some copying of

13      voting data or software in Antrim County, Michigan,

14      right?

15              A    I don't know.

16              Q    I'm setting up for a broader question

17      which is --

18              A    Yeah.

19              Q    -- what experience does

20      SullivanStrickler have, prior to Coffee County, in

21      specifically collecting and preserving data from

22      voting equipment, if any?

1          A     Well, voting equipment being a

2    tablet, laptop, hard drives, servers, an extensive

3    amount, if we look at it purely from a technology

4    standpoint.

5          Q     It's fair to say there was nothing

6    unusual about the technology that was copied in

7    Coffee County, that it went beyond the firm's prior

8    experience and training in terms of doing this type

9    of forensic collection?

10         A     That's correct.

11         Q     So we talked about there's a device,

12   I think you may have referred to it as the UEFI

13   device.  Do you know what that is?

14         A     It is the -- it is a collection tool,

15   yes.

16         Q     The software that's used on that

17   collection tool, is that something -- where does

18   that software come from?  Where did it come from?

19               Like, for example, is that standard

20   software off the shelf?

21         A     It's the standard, yeah.  And I don't

22   know where it originated from.

Page 221

1           Q      So it's not software that

2      SullivanStrickler wrote?

3           A      No.  No.

4           Q      So that's standard off-the-shelf

5      software that the firm obtains from some source

6      that it then uses for this type of collection?

7           A      Correct.

8           Q      And you -- you don't know the source

9      of that software that you guys use?

10          A      I do not.

11          Q      Do you know what it's called?  Is

12     there a brand?

13          A      I don't know.

14          Q      Okay.  And can you sort of to the

15     best of your ability, walk me sort of mechanically

16     how that device works?

17                 The UEFI device, like, how does it

18     work?

19          A      Well, there's -- it's similar to what

20     we were doing for the -- it's similar to the DFIR

21     list, where it's bootable, not leaving a footprint

22     in grabbing data.  To the extent of the details

Page 222

1       around it, I wouldn't know.

2               Q     Okay.  Why does -- why does some

3       devices need the UEFI software and others use

4       the -- like you said, the DFIR, the D-F-I-R,

5       software?

6               A     Source technologies, how data is laid

7       down on disk, physical disk.  Operating system

8       information, whether a disk -- it's a physical

9       disk, whether it's logical, whether it's -- there

10      is a number of things.

11                    However, the list of tools that are

12      utilized by companies like SullivanStrickler are

13      pretty standard amongst all of us, but it would be

14      the technology.  So Cellebrite for iPads, X-Rays

15      for mobile phones.  Just for -- as an example,

16      there are multiple softwares that are used

17      specifically in our industry for certain

18      technologies.

19              Q     Is it fair to say that the

20      Cellebrite, the DFIR, the UEFI, those all serve

21      essentially the same purpose, but they're designed

22      to be used with different technology?

```
 1              A    Yes.

 2              Q    Okay.  Did the team run into any

 3     capability issues with any of the software they

 4     brought with them for collection, in terms of

 5     getting it to work with the local software and data

 6     they were copying?

 7              A    Yes.

 8              Q    And walk me through that.

 9              A    I want to say three CompactFlash

10     drives, I believe, didn't collect properly, so we

11     utilized another software called PALADIN.  I could

12     be wrong on the number.  PALADIN is similar to --

13     it's another platform that is used to image

14     devices.

15              So sometimes if a -- you know, if a

16     collection fails, we have in the toolkit another

17     software that will work.  And I -- I don't know if

18     it's three.  I don't know what the number was, but

19     it -- it was used on a couple of devices that

20     failed.

21              Q    Okay.

22              A    And data collections.
```

Page 224

1          Q      And did PALADIN then successfully

2     work?

3          A      Yes.

4          Q      Okay.  Are you familiar with a device

5     called a hardware write blocker?

6          A      Yes.

7          Q      What does that do?

8          A      It's a physical device that does not

9     allow any footprint on disks via hardware.  So you

10    can't alter, you can't edit, you can't add a file,

11    delete a file.  It keeps the disk in pristine

12    condition so you can boot off it.

13         Q      And is using a hardware write

14    blocker, is that generally considered a best

15    practice for the type of forensic work you guys do?

16         A      Yes, depending on, yeah, what's being

17    collected.

18         Q      And why is that?

19         A      It's another mechanism in which not

20    to leave your -- a trace or altered metadata.

21         Q      Did the team for Coffee County use

22    some sort of hardware write blocker for their work?

Page 225

1          A     I don't know if they needed write

2     blockers for what we did.  Maybe on the EMS server,

3     but I would have to -- I -- I don't know.

4          Q     So the idea is, it may be that they

5     were able to do this sort of pristine copy that

6     doesn't leave traces on the original equipment in

7     Coffee County without needing the hardware write

8     blocker?

9          A     That's correct.  So every --

10     everything that was collected, forensically imaged,

11     was unaltered.  So how they got there, whether it

12     was a write blocker or not, which I don't think it

13     was a write blocker, the means at which they got

14     there was the same result as a write blocker, if

15     that makes sense.

16          Q     Yes.

17               Were any of the devices that

18     SullivanStrickler brought in and used in Coffee

19     County on-site, were any of them a Samsung device?

20          A     That we used --

21          Q     Yeah.

22          A     -- to collect?

Page 226

1          Q      Yeah.

2          A      I do not believe so.

3          Q      And were -- I may have asked you

4     this, but just to be clear, were any of the

5     devices, anything at all that SullivanStrickler

6     brought in and they connected to any equipment in

7     the Coffee County office, were any of those devices

8     connected to the internet at any point during the

9     collection?

10         A      They were not.

11         Q      And all of the devices that you guys

12    used to collect data, none of those devices has

13    ever been directly connected to the internet?

14         A      I don't even know if that's accurate.

15         Q      Okay.  You just don't know?

16         A      Yeah, I don't -- I don't know.

17         Q      At some point, the data was

18    consolidated and uploaded to ShareFile?

19         A      Correct.

20         Q      And so at some point, there was a --

21    a SullivanStrickler device that had the data that

22    was connected to the internet to load it to the

Page 227

1      ShareFile site?

2              A      Yes.

3              Q      Okay.

4              A      Which is encrypted in transmission as

5      well.

6                      MS. CLARK-PALMER:  When you get to a

7      good breaking point, the food is here.

8                      MR. CROSS:  Okay.  Cool.  We're

9      almost there.

10     BY MR. CROSS:

11             Q      To the best of the firm's knowledge,

12     the work that was done in Coffee County was done

13     according to standard policies and practices, and

14     you would not expect to have left any trace of that

15     work on the local equipment and devices?

16             A      Correct.  Yes, sir.

17             Q      Okay.  And as you sit here, based on

18     any information available, do you know -- have you

19     learned anything that would lead you to believe

20     that the team somehow inadvertently or

21     intentionally did leave traces behind?

22             A      No.

Page 228

1           Q      Okay.  As you sit here, you have no

2       basis to believe that that was the case?

3           A      That's correct.

4           Q      Okay.  What's the basis for the

5       team's belief that the UEFI USB drive or the

6       software on it would not affect any of the target

7       devices it was used on?

8           A      I don't know.

9           Q      Okay.

10          A      I mean, we can -- because it's a

11      standard software, that's, I believe, defensible.

12      I don't -- an approach, but I can't answer for --

13      for that.

14          Q      Did the team take any measures to

15      determine whether any of the devices that it

16      brought with it to connect to the Coffee County

17      equipment to determine whether any of those devices

18      might have been compromised with malware or

19      something similar?

20          A      The -- so the bootable -- can you

21      repeat the question?

22          Q      Yeah.  And let me kind of take a step

Page 229

1      back.

2              A      Sure.

3              Q      In the ordinary course of work for

4      SullivanStrickler, you have your own devices you

5      bring in to do a forensic collection?

6              A      Correct.

7              Q      And that includes a variety of

8      different types of devices, like hard drives, thumb

9      drives, right?

10             A      Yes.

11             Q      Okay.  It also includes things like

12     laptops?

13             A      Correct.

14             Q      Is there any standard or practice at

15     SullivanStrickler to routinely test all of that

16     equipment to determine whether that equipment has

17     been compromised in some way, like, for example, by

18     malware?

19             A      Yes, but not every device, because

20     not every device needs it.  So I guess the ones

21     that technically would require it, would fall under

22     that guide, but . . .

1          Q      How often is that sort of testing

2      done on any device that you would use in the course

3      of your work?

4          A      I don't know.

5          Q      And you said some device doesn't --

6      some devices don't need that.  Why would some

7      devices not need that?

8          A      Well, I'm thinking about hardware

9      devices used for forensic imaging where it's a

10     device that you put between source and target that

11     just moves and copies data.

12         Q      And it's your understanding that type

13     of device, for example, it just couldn't store

14     malware on it?

15         A      Correct.

16         Q      I see.

17                And what type -- give me an example

18     of that kind of device.  Is there some sort of --

19         A      It's been a while.  I -- FTK, one of

20     the -- no, not FTK.  The -- I don't know.  I'll

21     have to get back to you, but it'll come to me.

22         Q      Okay.  We're almost --

Page 231

1          A     Oh, ImageMaster, I believe it's

2     called.  ImageMaster devices are purely that,

3     source destination, let them go.

4          Q     Has the team examined any of the

5     devices or data that are brought back from Fulton

6     County to check whether any of those devices

7     contain malware or some sort of compromising

8     software?

9          A     No.

10          Q     Does -- the normal services

11     SullivanStrickler provide, does that include

12     helping clients with cyber breaches or things like

13     malware?

14          A     No.

15          Q     Has the firm ever had itself a cyber

16     breach or a malware attack?

17          A     No.

18                MR. CROSS:  All right.  Let's break.

19     Thank you.

20                THE WITNESS:  Okay.  You're welcome.

21                VIDEOGRAPHER:  The time is 1:30 p.m.

22     We are off video record.

```
                                                    Page 232

 1                   (Recess from 1:30 p.m. to 2:16 p.m.)

 2                   VIDEOGRAPHER:  The time is 2:16 p.m.

 3         We are back on video record.

 4         BY MR. CROSS:

 5              Q    All right.  Let me show you --

 6         actually, so there were some outstanding questions.

 7         Were you able to get knowledgeable on some of

 8         those?

 9              A    Yes.

10              Q    Okay.  Do you need me to ask them

11         again or do you just want to walk me through what

12         you were able to learn over the break?

13              A    If you want to ask them again, that

14         would be helpful.

15              Q    Okay.  Do you know who Jesse

16         Binnall's client was for the SullivanStrickler

17         engagement?

18              A    No.

19              Q    Okay.  And does that mean the firm

20         itself does not know?

21                   Like, did you talk to members of the

22         team and they don't know?
```

Page 233

1           A     Yes.

2           Q     Okay.  Same question for Sidney

3     Powell; do you know who her client was?

4           A     No.  Oh, I do.  Hold on.  We had a

5     chat.  Sorry.  I apologize.

6           Q     That's okay.

7           A     Defending the Republic.  I apologize.

8           Q     So is this -- all right.  So what

9     you've got here is a copy of the check that was

10    paid to you guys?

11          A     Yes.

12          Q     All right.  So --

13          A     So when I referenced before I wasn't

14    sure if it was --

15          Q     Yeah.

16          A     That's it right there.

17                MR. CROSS:  So we'll mark this -- we

18    don't -- we don't have an Exhibit Share, but that's

19    fine.  Are we on Exhibit 16?

20                MR. SPARKS:  I think it's 16.

21                MR. CROSS:  Actually, you know what

22    I'm going to do?  I'm going to mark this at the end

Page 234

1      because otherwise it's going to throw -- it gets

2      complicated on Exhibit Share.  So just remind me at

3      the end to mark this as an exhibit.  We won't do it

4      for now.

5      BY MR. CROSS:

6              Q     Okay.  So the check came for the

7      Sidney Powell Engagement from Defending the

8      Republic, Inc.  And that's for the Coffee County

9      work?

10             A     Yes.

11             Q     And do you know anything about that

12     organization?

13             A     I do not.

14             Q     Okay.  Let's see.  Oh, was anybody

15     able to identify the person who came in who was

16     with Scott Hall on-site?

17             A     No.

18             Q     Did that person do anything on-site?

19             A     Not as far as collections, no.

20             Q     What did he do?

21             A     As we understand it, he was with

22     Scott Hall as a programmer.

Page 235

```
 1              Q     And when you say "programmer," what
 2       do you mean?
 3              A     That's all I know.
 4              Q     Somebody who would program software
 5       or computers?
 6              A     Yes.
 7              Q     Okay.  Did he have a computer or
 8       devices with him?
 9              A     I don't know.
10              Q     Okay.  Did he offer any direction or
11       guidance to the SullivanStrickler team on what to
12       do?
13              A     He did not.
14              Q     Okay.  He was just there with Scott
15       Hall --
16              A     That's correct.
17              Q     -- as a programmer?
18              A     Correct.
19              Q     Okay.  Did anyone who was there that
20       day on-site, to the knowledge of the firm or the
21       team, take anything with them that they did not
22       bring in themselves apart from data that was
```

Page 236

1       copied?

2               A     They did not.

3               Q     Okay.  And to be clear, the team that

4       was there from SullivanStrickler, they didn't see

5       anyone take anything with them.  Is that fair?

6               A     That is fair.

7               Q     Okay.  But presumably they didn't

8       have eyes on everyone at all points in time?

9               A     Presumably, yes.

10              Q     Okay.  And -- and just to be sure,

11      the check from Defending the Republic, it cleared?

12              A     I would assume so, yes.

13              Q     As far as you know, it --

14              A     As far as I know --

15              Q     -- cleared?

16              A     -- it cleared.

17              Q     Okay.

18              A     Yes.

19              Q     All right.  Let me hand you what's

20      been marked as Exhibit 16.

21                    (Felicetti Deposition Exhibit Number 16

22                    marked for identification.)

Page 237

1      BY MR. CROSS:

2              Q      Hold on, I'm sorry.  Yeah, this is

3      Tab 9.

4                     And do you recognize Exhibit 16 as a

5      redacted document that your firm produced?

6              A      Yes.

7              Q      Okay.  And what is this?

8              A      The page stamped 126 identifies user

9      access credentials for certain areas of the

10     ShareFile.  So the path of access, the folder,

11     first name, last name, company, e-mail, et cetera.

12     Whether they have the ability to download, upload,

13     delete, manage permissions, et cetera.

14             Q      Okay.  So if I flip through this,

15     essentially what I see is information for

16     individuals who were given access to the data from

17     Coffee County that was uploaded to the ShareFile?

18             A      Yes.

19             Q      And if I come across, I can look and

20     see under the headings of "Download, Upload,

21     Delete, Manage Permissions, Notify/Upload,

22     Notify/Download, and View."  The true/false there

1       indicates whether they have permissions to do those

2       things?

3               A       Yes.

4               Q       True means they do; false means they

5       don't?

6               A       Yes.

7               Q       Okay.  So just taking, for example,

8       if we look at Doug Logan, which is right in the

9       middle --

10              A       Yes.

11              Q       Do you see him?

12              A       Yes, sir.

13              Q       -- and you come across, it looks like

14      he had permission to download for true, upload for

15      true, false for -- for everything else except view,

16      he also had the -- he had permission?

17              A       Correct.

18              Q       So he could download stuff from the

19      site, right?

20              A       Yes.

21              Q       He could upload stuff to the site,

22      right?

```
 1              A     Yes.

 2              Q     And he could view stuff on the site?

 3              A     Correct.

 4              Q     But he couldn't delete anything?

 5              A     That is correct.

 6              Q     And what is manage permissions?

 7                    Does that mean giving other people

 8       permissions?

 9              A     I believe so, yes.  Or manage your

10       own permissions as well.

11              Q     Ah, okay.

12              A     I believe.

13              Q     Okay.  And then "Notify/Upload,

14       Notify/Download," what is that?  Like getting an

15       alert?

16              A     Where -- where are we?

17              Q     At the very top, these --

18              A     Oh, yeah, "Upload, Download."

19              Q     The note --

20              A     Oh, yes.

21              Q     So the "Notify/Upload,

22       Notify/Download," would that be if someone uploaded
```

Page 240

1    or downloaded something, anyone who had "true" for

2    that, they would get an alert?

3         A    I believe so.  I'm not 100 percent

4    certain.

5         Q    Okay.  Got it.  Got it.  Got it.

6              And every name we see in Exhibit 16

7    that received some sort of access to the Coffee

8    County data, that would be an individual that

9    SullivanStrickler was directed to either by Sidney

10   Powell or Doug Logan or Jim Penrose to give them

11   access?

12        A    By Doug Logan and Jim Penrose, yes.

13   I'm not sure about Sidney Powell directly.

14        Q    Okay.  Are you familiar with Stefanie

15   Lambert?

16        A    I am not.

17        Q    Okay.  All right.  Well, we'll come

18   back to a document on that.

19        A    Sure.

20        Q    Let me hand you Exhibit 17, which is

21   my Tab 10.

22

1            (Felicetti Deposition Exhibit Number 17

2            marked for identification.)

3    BY MR. CROSS:

4         Q    And Exhibit 17 is another document

5    that was produced to us in response to the Maggio

6    subpoena.

7              Have you seen this before?

8         A    Yes, I have.

9         Q    What is this?

10        A    This is a representation of the

11   FileShare activity.

12        Q    So --

13        A    ShareFile, sorry, to be clear.

14        Q    I often make the same mistake.

15             So if we look at Exhibit 17, and just

16   take the first page, "Item Name," is that a

17   particular file that's sitting on the ShareFile?

18        A    It is.

19        Q    Okay.  And then there's a date and a

20   time, right?

21        A    Yes.

22        Q    And then next to that is, "Activity."

Page 242

1          If we look at the first line, that's "Download,"

2     right?

3               A     Correct.

4               Q     So do I understand that what this

5     shows is that the user indicated here downloaded

6     whatever item is listed there at that date and

7     time?

8               A     Yes.

9               Q     And the user on that first line is,

10    "Conan H," Conan Hayes?

11              A     Yes.

12              Q     And then it's got his e-mail address,

13    his company, ASOG, A-S-O-G.  Then the IP address,

14    that would be the user's IP address?

15              A     Yes.

16              Q     And are you familiar with the company

17    ASOG?

18              A     I am not.

19              Q     And if you come to the page ending in

20    141, you'll see -- if you come down, do you see how

21    the -- under the location, there's Florida,

22    Virginia, Florida, and then we get to Milan

Page 243

1    Lombardia.  Do you see that?

2            A    Yes.

3            Q    And that corresponds to downloads by

4    Conan Hayes on January 13 of 2021.  Do you see

5    that?

6            A    Yes.

7            Q    And then go to the page ending in

8    50 -- 150.

9            A    Excuse me, real quick.  You said

10    2020 -- oh, I'm sorry.  Okay.  Never mind.

11            Q    Yeah.

12            A    And you want me to go to where?

13            Q    150.

14            A    Okay.

15            Q    And here we have -- you'll see Doug

16    Logan has some downloads, indicates in Florida,

17    then there's New Jersey.  And then we get to

18    Florence, Toscana for Scott T on January 9, 2021.

19                Do you see that?

20            A    Yes, sir.

21            Q    And that -- that, again, indicates

22    the location that was captured in the system for

Page 244

1           where the person was when they did the download?

2                   A      Not necessarily.

3                   Q      And -- and the question I was going

4           to ask is:  If someone were downloading information

5           through a VPN, for example, it may not capture

6           their actual physical location?

7                   A      Correct.

8                   Q      And so if, for example, someone

9           wanted to mask the physical location of where they

10          were and their IP address, there are ways for them

11          to do that such as the VPN?

12                  A      Yes.

13                  Q      So when -- when we look at this,

14          Exhibit 17, the IP address and the physical

15          location may or may not be the actual IP address

16          and actual physical location of the individual when

17          they did whatever they did?

18                  A      Yes.

19                  Q      And under "User," that indicates the

20          user log-in credentials for that activity, right?

21                  A      The user name created, yes.

22                  Q      Right.

Page 245

1              But the firm doesn't have any way of

2        knowing whether the log-in credentials that are

3        used for any action, whether that was actually by

4        the person who was assigned those credentials,

5        right?

6              A     Correct.

7              Q     And do I understand the redactions in

8        here are for data that was not from Coffee County?

9              A     I would assume so, yes.

10             Q     Okay.

11             A     But I don't know specifically.

12             Q     Okay.  Oh, data collection.

13                   So it looks like, in going through

14       this, the latest date for any action is February 26

15       of 2021.  Do you know why the log only goes through

16       February 26 of 2021?

17             A     I do not know.

18                   MR. CROSS:  Okay.  If there are

19       additional logs, we would ask for production of

20       those, because our understanding is that the data

21       sat on that ShareFile longer.  In fact, I think

22       Benjamin Cotton testified that he didn't access

Page 246

1     until -- until months later.  I think maybe June of

2     2021.

3     BY MR. CROSS:

4          Q     Do you know whether the data is still

5     on the ShareFile today?

6          A     I don't.

7          Q     Who would know that?

8          A     Paul Maggio.

9          Q     Okay.

10              MR. CROSS:  If we could get an answer

11    to that, that would be great.

12              THE WITNESS:  Sure.

13    BY MR. CROSS:

14         Q     All right.  Let me hand you -- sorry,

15    let me hand you Exhibit 18.

16              (Felicetti Deposition Exhibit Number 18

17               marked for identification.)

18    BY MR. CROSS:

19         Q     So at the top, this is an e-mail from

20    Greg Freemyer, of SullivanStrickler, to Paul Maggio

21    and Karuna Naik on April 22nd, 2021 at 5:55 p.m.

22              Do you see that?

Page 247

1              A      Yes.

2              Q      Is this one of the documents that you

3       looked at as well for today?

4              A      I believe it is, yes.

5              Q      Okay.

6              A      Yes.

7              Q      So if you look at the earliest e-mail

8       in the thread, it starts on the bottom of page 1.

9       There's an e-mail from JPComms2020@████████████.

10                    Do you see that?

11             A      Yes.

12             Q      And do you understand that is an

13      e-mail address for Jim Penrose?

14             A      I do not.

15             Q      Okay.  And so that e-mail comes in

16      April 22nd, 2021 to Paul Maggio, with a copy to

17      federalattorney@████████████  and Greg Freemyer of

18      your firm.

19                    Do you see that?

20             A      Yes.

21             Q      And the subject line, if you go to

22      the top of the next page, "Coffee County Forensics

Page 248

1      FedEx Request."

2                      Do you see that?

3           A      Yes.

4           Q      And do you see the signature block in

5      this e-mail from the JP Comms is Jim Penrose?

6           A      Yes.

7           Q      Okay.  And so here we can see

8      Mr. Penrose writes to Paul Maggio, on April 22nd,

9      2021, "Can you please FedEx all the forensics

10     material from the Coffee County acquisition to the

11     same address as before?"

12                     Do you see that?

13          A      Yes.

14          Q      Do you know what address that is?

15          A      No, but I believe we have the labels

16     that were produced to you.

17          Q      Okay.  And we'll come to that.

18          A      Okay.  But I don't -- but I don't

19     know.

20          Q      Okay.  So what we talked about so far

21     is the data was collected on January 7.  It was

22     then uploaded to a ShareFile at some point, but

1       here in April, we see that there were some

2       shipments, something was shipped.  The data was

3       shipped to an address sometime between January 7

4       and April 22nd, because it's saying the same

5       address as before.

6                    Are you aware of that data being

7       shipped between January 7th and April 22nd?

8            A     I am not.

9            Q     Okay.  And then it says here,

10      "Invoice Stefanie Lambert for the work like last

11      time."  Do you see that?

12           A     Yes.

13           Q     And so do you understand that

14      Stefanie Lambert was one of the people that

15      SullivanStrickler communicated with and shared the

16      Coffee County data with?

17           A     I do not know.

18           Q     Okay.  That's not a name that came up

19      in your prep for today?

20           A     Yeah, I didn't -- I didn't hear that

21      name.

22           Q     Okay.  So I gather you don't -- you

Page 250

1       don't have any insight as to why the firm was

2       sharing the Coffee County data with Ms. Lambert?

3            A     No.

4            Q     Other than Mr. Penrose asked?

5            A     Yeah, I don't.

6            Q     And then Mr. Maggio writes back, "Jim

7       and Stefanie, this is received.  We will begin the

8       process of copying everything to a drive."

9                  Do you see that?

10           A     Yes.

11           Q     And then Mr. Maggio e-mails

12      internally asking if all of the data is on a drive

13      somewhere, would it just be best to just download

14      from ShareFile.  And then Mr. Freemyer responds,

15      "That's a Karuna question.  I had no involvement

16      with the Coffee County data."

17                 Do you see that?

18           A     Yes.

19           Q     Okay.  And then --

20                 MR. CROSS:  17.  Thanks.  I think

21      this is going to be 18, right?

22                 MR. SPARKS:  19.

```
                                              Page 251

 1                    MR. CROSS:  I think we're trying to

 2        get Exhibit 18 in.

 3                    MR. COLEMAN:  Do you want to go off

 4        the record?

 5                    MR. CROSS:  Yeah, I want to go off

 6        the record for just a moment.

 7                    VIDEOGRAPHER:  The time is 2:36 p.m.

 8        We are off video record.

 9             (Recess from 2:36 p.m. to 2:39 p.m.)

10                    VIDEOGRAPHER:  The time is 2:39 p.m.

11        We are back on video record.

12                    (Felicetti Deposition Exhibit Number 19

13                    marked for identification.)

14        BY MR. CROSS:

15             Q    All right.  So I've handed you what's

16        been marked as Exhibit 19.  And you can keep

17        Exhibit 18 handy because I think they relate.

18                    If you look at Exhibit 19, there's a

19        FedEx label on the front.  Do you see that?

20             A    Yes, sir.

21             Q    And then if you flip to the e-mail

22        thread sitting behind it, you'll see that it
```

Page 252

1          includes part of the e-mail thread that we were

2          looking at just a moment ago.  So it starts with

3          that e-mail from Jim Penrose on April 22nd, 2021

4          asking for the data to be shipped to Stefanie

5          Lambert.

6                    A     Yes.

7                    Q     And then you've got Mr. Maggio's

8          response that we saw before saying, "Received and

9          we'll begin the process."

10                   Do you see that?

11                   A     Yes, sir.

12                   Q     And then now we have an e-mail back

13         from Stefanie Lambert on April 22nd where she says

14         to Paul Maggio, "Thank you."  Top of the second

15         page.

16                   A     Yeah.

17                   Q     And then Mr. Maggio writes to her,

18         April 27th, 2021, "Stefanie, this is going out

19         tonight."  Writes the FedEx tracking number.  And

20         then sends another e-mail with a BitLocker password

21         for the data, right?

22                   A     Yes.

1          Q     And so -- and then on the cover, this

2     is a copy of the shipping label to Stefanie Lambert

3     and the address that SullivanStrickler shipped the

4     Coffee County data to for her attention?

5          A     Yes.

6          Q     Okay.  And, again, since we see in

7     here that it says, "Ship it to the same address as

8     before," do you have any insight into anything that

9     SullivanStrickler shipped to Ms. Lambert at this

10    address prior to this shipment?

11         A     I do not.

12         Q     We talked a little bit about Ben

13    Cotton.  Are you aware that Ben Cotton is an

14    expert -- who holds himself out to be an expert who

15    was retained by Stefanie Lambert?

16         A     No.

17         Q     So do you have any insight -- well,

18    let me ask it this way:  Are you aware that the way

19    that Ben Cotton got the Coffee County data that the

20    SullivanStrickler team collected was through

21    Stefanie Lambert or you just don't know?

22         A     I don't know.

Page 254

1          Q    Do you know whether SullivanStrickler

2     provided log-in credentials to Benjamin Cotton?

3          A    I don't know.  The only way I could

4     look is if the ShareFile log was in here.

5               (Felicetti Deposition Exhibit Number 20

6               marked for identification.)

7     BY MR. CROSS:

8          Q    All right.  Let me hand you

9     Exhibit 20.

10              (Felicetti Deposition Exhibit Number 21

11              marked for identification.)

12    BY MR. CROSS:

13         Q    I'm going to go ahead and hand you

14    Exhibit 21, which, as I understand it, is an

15    attachment to Exhibit 20.

16              So if you look at Exhibit 20, this is

17    a message from Jennifer Jackson to Paul Maggio,

18    Greg Freemyer, and Karuna Naik on January 8, 2021.

19              Do you see that?

20         A    Yes, sir.

21         Q    And there's an attachment, "SSA1722,

22    Coffee County."  And then it indicates it's an

Page 255

1        Excel file, right?

2              A     Yes.

3              Q     If you turn to 21, my understanding

4        is this -- the way the documents were produced,

5        Exhibit 21 is the attachment to that message?

6              A     Yes.

7              Q     Do you recognize Exhibit 21?  Do you

8        know what that is?

9              A     I do.

10             Q     And what is that?

11             A     This is a chain-of-custody log, a

12       tracking log.

13             Q     Explain to me -- we talked before why

14       it's important.  Can you just sort of walk me

15       through the fields and what they show?  You can

16       just pick one of the rows.

17             A     Sure.  So the photos that we looked

18       at previously, this is a spreadsheet representation

19       of what was tagged and labeled, et cetera.  So if

20       I'm looking at 20 -- 205, this guy --

21             Q     Uh-huh.

22             A     -- the first column representing the

Page 256

1      identified was CS, CompactFlash, the flash drives,

2      b represented the label, and C represented whether

3      it was primary or secondary based on the labels in

4      the photos.

5              Q     What is primary versus secondary?

6              A     I don't know.  I don't know if

7      they're duplicative.  I don't know, but that's how

8      they were handed to us and labeled.

9              Q     So the primary and secondary

10     designation, that comes from Coffee County, that's

11     not your terminology?

12             A     Correct.

13             Q     I see.

14             A     Correct.

15             Q     Okay.  So grab Exhibit 12, if you

16     would, it's the photos --

17             A     Sure.

18             Q     -- that Jennifer Jackson took.  And

19     if you look at -- look at these together.

20             A     Sure.

21             Q     The photo that ends in 236.

22             A     Yes.

Page 257

1          Q      The first one is CF01, and then it
2    says "BTown-1."  Do you see that?
3          A      Yes, sir.
4          Q      And so that would correspond to the
5    first row in Exhibit 21, right?
6          A      Yes.
7          Q      And then the next one in the picture
8    at 236, is CF02 BTown-2, and that corresponds to
9    the second row in 21?
10         A      Yes.
11         Q      Okay.  So if for some reason someone
12   thought it would be really fun to do, and I will
13   leave it to someone on my team, someone could go
14   through the photos using these notes and match
15   those up to the chain-of-custody log, right?
16         A      Yes.
17         Q      Okay.
18              (Felicetti Deposition Exhibit Number 22
19                marked for identification.)
20   BY MR. CROSS:
21         Q      All right.  Exhibit 22.  So
22   Exhibit 22 at the top is an e-mail from Jim Penrose

Page 258

1          to Paul Maggio, January 7, 2021 at 5:13 p.m.

2                         Do you see that?

3               A     Yes.

4               Q     And is this a document that you

5          looked at in your prep?

6               A     Yes.

7               Q     If you turn to the second page, look

8          down towards the bottom of the second page, you'll

9          see an e-mail from Sidney Powell, December 21,

10         2020.  And here, she's talking about copying Tricia

11         with instructions to transfer money.  It references

12         Phil Waldron and Todd and Conan.

13                        Do you recall we looked at that same

14         e-mail earlier?

15              A     Yes.

16              Q     Okay.  So this is the same e-mail

17         thread, but the more recent e-mails are a bit

18         different.  And if you need to compare them, you

19         can grab that other exhibit.

20                        So come up from the one we just

21         looked at, December 21, 2020.  Paul Maggio says,

22         "Sending the invoice to Tricia."

1          Do you see that?

2     A     Yes, sir.

3     Q     And then we have the "thank you all"

4     by Sidney, which we saw before from Sidney Powell.

5          Do you see that?

6     A     Yes.

7     Q     And then in the middle of the page,

8     we get to the e-mail we saw before, January 7, in

9     the morning, that the team is on their way to

10    Coffee County, Georgia.

11         Do you see that?

12    A     Yes.

13    Q     And then this e-mail from Jim Penrose

14    at 5:13 p.m. on January 7, he writes to Paul

15    Maggio, "I've pulsed Mary and Tricia to respond."

16         Do you see that?

17    A     Yes.

18    Q     What is "pulsed"?

19    A     Reached out to?  I don't --

20    Q     Okay.

21    A     Yeah, I would assume.  I don't know.

22    Q     I didn't know if maybe -- for

```
                                              Page 260

 1      example, it's not another -- like a Signal-type

 2      communication platform or something, or you don't

 3      know?

 4              A     No, I don't -- I never heard of

 5      "pulsed" before.

 6              Q     Okay.  And Tricia works with Stefanie

 7      Lambert -- sorry.  Strike that.

 8                    Tricia works with Sidney Powell?

 9              A     Yes.

10              Q     Do you know who the "Mary" is?

11              A     I do not.

12              Q     Okay.  And who would you ask if you

13      wanted to know who Mary was?

14              A     Paul.

15              Q     All right.  Let me hand you what's

16      been marked as Exhibit 23.

17                    (Felicetti Deposition Exhibit Number 23

18                     marked for identification.)

19      BY MR. CROSS:

20              Q     And this is an e-mail from Karuna

21      Naik to Paul Maggio on January 10, 2021 at

22      5:08 a.m.  Is that right?
```

Page 261

1           A     Yes.

2           Q     And here we see a reference to the

3    same Coffee County Excel file that we saw before,

4    right?

5           A     Yes.

6           Q     And if you flip to the second page,

7    that looks to be the same chain-of-custody log that

8    we looked at earlier, right?

9           A     Yes.

10          Q     And here -- here she writes --

11   Ms. Naik writes, "Attached is the Excel that is

12   saved to Project-Clients with an additional

13   worksheet called Zip Files.  This contains the

14   names of all of the zip files we are uploading to

15   ShareFile."

16              Do you see that?

17          A     Yes.

18          Q     So the spreadsheet that's attached --

19   and sorry, I should have been clear.  It looks like

20   there are a couple of documents that are attached

21   to her e-mail.

22          A     Yeah.

Page 262

1               Q      One is the chain-of-custody log, and

2        then behind that is the -- this more detailed

3        spreadsheet.

4               A      Yes.

5               Q      And that's beginning at page 8.  Do

6        you see that?

7               A      Yes.

8               Q      And it says "Zip Files" at the

9        bottom?

10              A      Yes.

11              Q      So this spreadsheet, do I understand

12       that that is a list of files that were uploaded to

13       the ShareFile?

14              A      Yes.

15              Q      Do you see -- if you look at page 10

16       of 10 in the spreadsheet --

17              A      Yes.

18              Q      -- do you see right here it says,

19       "Tabulation system," and then it refers to ICP?

20              A      Yes.

21              Q      We talked before that there's sort of

22       two tabulators that the Dominion System uses.

Page 263

1      There's the central tabulator that sits in the EMS

2      room and then there are the local tabulators that

3      are used in the precincts.

4                    Do you remember that?

5           A     Yes.

6           Q     Local are ICPs, central is ICC.

7      Okay?

8                    The reference to ICP, is that a

9      mistake in that some of the tabulation files are

10     actually referenced -- are actually from the

11     central scanner?  Do you know?

12          A     I don't know.

13          Q     Okay.  Who would you ask that

14     question to?

15          A     Paul.

16          Q     Okay.  Can you go back to, I'm

17     sorry --

18          A     Sure.

19          Q     -- Exhibit 17, the upload/download

20     log?  And turn to the page ending in 140.

21          A     Okay.

22          Q     If you look in the middle of the

1      page, below this black redacted line, do you see

2      there's an indication of uploads and the user name

3      is Doug Logan?

4              A     Yes.

5              Q     And then the files that indicate to

6      the left, do you see how they all reference EMS?

7              A     Yes.

8              Q     Do you know why Doug Logan was

9      uploading these EMS files to the SullivanStrickler

10     ShareFile?

11             A     I do not.

12             Q     Do you know where those files came

13     from?

14             A     I do not.

15             Q     Do you know what they are?

16             A     I do not.

17             Q     Okay.  Then come to the next page

18     ending in 141.  You'll see Doug Logan's name

19     continues.  And then you get to Conan H. again,

20     Conan Hayes.  Do you see that?

21             A     Yes.

22             Q     And the first file indicates -- Conan

Page 265

1      Hayes downloaded, it refers to EMS.  Do you see

2      that?

3              A     No.

4              Q     Sorry.

5              A     The first -- yeah.

6              Q     Wait, no, he creates -- sorry.  Back

7      up.

8                    He downloads, do you see there --

9      there are five entries for Conan Hayes that say

10     "ICC/Coffee, ICC"?

11             A     Yes.

12             Q     Do you know where -- those files that

13     are labeled ICC that Conan Hayes downloaded, where

14     those came from?

15             A     I don't.

16             Q     And that's why I'm wondering if --

17             A     The ICPs are --

18             Q     Right, if somewhere someone along the

19     way realized they had mislabeled files taken from

20     the ICC as ICP and correct that, and that's how the

21     ICC Coffee County files ended up on the ShareFile,

22     or do you know?

Page 266

1          A    I don't.  I -- the only thing I know

2     is what was able to be collected without failure

3     was collected.

4          Q    Right.

5          A    So I -- you know, if it's a labeling

6     issue, I don't know.

7          Q    Okay.  If it's possible to get an

8     answer to that question today --

9          A    Sure.

10          Q    -- whether somebody went back and

11     realized that they had mislabeled ICP as ICC --

12          A    Yeah.

13          Q    -- that would help.  Thank you.

14               (Felicetti Deposition Exhibit Number 24

15                marked for identification.)

16     BY MR. CROSS:

17          Q    All right.  Exhibit 24, Tab 23.  Have

18     you seen this document before?

19          A    I have not.

20          Q    Okay.  So are you familiar with

21     Frances Watson, the former head of the

22     investigative unit at the Secretary of State's

Page 267

1      office in Georgia?

2             A      I'm not.

3             Q      Okay.  So when the -- the

4      SullivanStrickler team went into Coffee County on

5      January 7 of 2021, the election supervisor at that

6      time was Misty Hampton, right?

7             A      Yes.

8             Q      And are you aware that she left the

9      office in February and was replaced in April of

10     2021 by a man named James Barnes?

11            A      No.

12            Q      Okay.  So if you look here, Friday,

13     May 7th, 2021, James Barnes, who had become the

14     elections supervisor in Coffee County, sends an

15     e-mail to Chris Harvey, who at the time was the

16     state election director, with a subject line,

17     "Coffee County."

18                   Do you see that?

19            A      Yes.

20            Q      And then he -- Mr. Barnes writes to

21     Mr. Harvey, "The Dominion e-mail today pertaining

22     to Cyber Ninjas was alarming to me.  When I took

Page 268

1          over at the Coffee County office, the attached
2          business card was at the base of Misty Hampton's
3          computer monitor."
4                    Do you see that?
5          A     Yes.
6          Q     If you flip to the next page, we have
7          the whole e-mail that got produced to us in kind of
8          a weird way.
9                    It then goes on.  "I thought nothing
10         of it until I heard about the situation in Arizona
11         with the DoJ.  If she did not use them, she was, at
12         the very least, in contact."
13                   Do you see that?
14         A     Yes.
15         Q     And so do you understand that in May
16         of 2021, there was an alert that came out from
17         Dominion to election jurisdictions using Dominion
18         equipment warning folks that Cyber Ninjas, Doug
19         Logan's company, was trying to get access to voting
20         equipment?
21                   Had you heard that before today?
22         A     I had not.

1          Q     Okay.  And if you come back to the

2      front page, Chris Harvey writes back to James

3      Barnes, adds Frances Watson, again, who was the

4      head of the investigative unit, Michael Barnes, the

5      head of CES, which is responsible for state

6      elections in Georgia at the state level.

7                And he writes, "Thanks for sending

8      this.  I think it might be prudent to see if there

9      has been any contact between the person on the card

10     and anyone in your office and/or if they have had

11     any access to any of your equipment."

12               Do you see that?

13         A     Yes.

14         Q     He goes on, "I have let our

15     investigations division and CES know and they might

16     follow up with you."

17               Do you see that?

18         A     Yes.

19         Q     And then Frances Watson forwards this

20     on to someone in her office, Pamela Jones, "Can you

21     contact the County and verify what if any contact

22     Cyber Ninjas had with any election equipment?"

Page 270

1          Do you see that?

2     A    Yes.

3     Q    Did anyone ever raise with

4  SullivanStrickler any concern about Doug Logan

5  having had access to voting equipment in Coffee

6  County through the SullivanStrickler engagement?

7     A    No.

8     Q    Was the engagement -- sorry, were the

9  engagements with Jesse Binnall and Sidney Powell,

10  were you instructed by the client that those were

11  confidential engagements; meaning you couldn't

12  share with the public that you had been retained to

13  do that work?

14     A    Based on the engagement

15  documentation, I believe so, but I don't know.

16     Q    Was there ever any directive from the

17  clients with respect to the Coffee County

18  engagement not to share the fact of the engagement

19  with anyone beyond anyone they authorized you to

20  share that with?

21     A    I don't know.  It's not -- it

22  wouldn't be common practice in what we do for work

1    to share any information regardless, so I don't

2    know if -- like maybe rephrase the question, but

3    that's . . .

4            Q    So the general type of work that you

5    guys do, your ordinary -- sort of the ordinary

6    approach would be that that's a confidential

7    engagement between you and the client?

8            A    Correct.

9            Q    Okay.  And that was the approach you

10   took here?

11           A    Yes.

12           Q    Has anyone ever contacted

13   SullivanStrickler on behalf of the State of Georgia

14   with any questions or concerns about the work the

15   firm did in Coffee County?

16           A    I would not know.

17           Q    Who would you need to ask?

18           A    Paul, or Brendan maybe.

19           Q    For example, is -- has any State or

20   County investigator ever asked to conduct an

21   interview of anyone at SullivanStrickler who was

22   involved in that work?

```
 1              A     Yes.

 2              Q     What can you tell me about that?

 3              A     I think -- now, I don't know if I'm

 4       saying this right.  I'm sorry, I'm trying to be

 5       helpful.  We received a subpoena.

 6              Q     From -- from us or from someone else?

 7              A     From someone else.

 8                    MS. CLARK-PALMER:  Do you have a copy

 9       with you?

10                    THE WITNESS:  I do.

11                    I'm sorry, I'm really --

12       BY MR. CROSS:

13              Q     No, that's okay.

14              A     I'm sorry about that.

15              Q     Sure.

16              A     Sorry.  The language gets me.

17              Q     No, that's okay.

18                    Just the one copy?

19              A     Yeah, sorry.

20              Q     That's okay.  That's okay.

21                    MR. COLEMAN:  Do you want to mark it

22       and put it in --
```

Page 273

1                    MR. CROSS:  Yeah.

2                    MR. COLEMAN:  -- and we can make

3          copies.

4                    MR. CROSS:  Can I mark this one or do

5          you want to make one?

6                    MR. COLEMAN:  That's -- yeah, you can

7          mark it and then we can run copies.

8                    MR. CROSS:  Okay.

9                    MS. CLARK-PALMER:  I'll go and grab

10         some more.

11                   MR. CROSS:  What are we up to, 25?

12              (Felicetti Deposition Exhibit Number 25

13                marked for identification.)

14         BY MR. CROSS:

15              Q    All right.  So -- all right.  So

16         Exhibit 25 is entitled "Subpoena for the production

17         of documentary evidence."  And this is issued by

18         the State of Georgia, Fulton County.  Is that

19         right?

20              A    Yes.

21              Q    And it's issued to the firm?

22              A    Correct.

Page 274

1           Q     And so do I understand right, this is

2      a subpoena that was issued to the firm by the

3      Fulton County DA, Deputy District Attorney, Will

4      Wooten?

5           A     Yes.

6           Q     Okay.  And it's -- where's the date?

7      And it's dated August 29, 2022?

8           A     Yes.

9           Q     All right.  And the subpoena seeks,

10     "All documents, including, but not limited to,

11     letters, contracts, e-mails, text messages,

12     voicemails, audio recordings, video recordings,

13     payment agreements, retainer agreements, data

14     received from third parties, internal or external

15     analyses, internal or external reports, phone call

16     records, billing records, and payment records

17     concerning any and all agreements between the

18     witness" -- which would be SullivanStrickler --

19     "and Sidney Powell, Lin Wood, including individuals

20     known by the witness to be associated with Sidney

21     Powell or Lin Wood in any way, to obtain, preserve,

22     analyze or otherwise transmit election data

Page 275

1       obtained in Coffee County, Georgia, Antrim County,

2       Michigan, and any other jurisdiction where such

3       data was obtained, preserved, analyzed or otherwise

4       transmitted by the witness."

5               Is that right?

6       A       Yes.

7       Q       Okay.  And I gather this is a

8       subpoena that was just recently received by

9       SullivanStrickler?

10      A       Correct.

11      Q       So the firm has not yet produced any

12      documents to your knowledge?

13      A       I believe we have not produced any.

14      Q       Are you aware of any other outreach

15      by any state or county officials in Georgia

16      regarding the work done in Coffee County?

17      A       I am not.

18      Q       Are you aware of any outreach by any

19      federal authorities regarding the work done in

20      Coffee County?

21      A       I am not.

22      Q       Just hang on to that for a minute --

Page 276

```
 1              A     Yep.

 2              Q     -- because we will look at these

 3       together.

 4                    (Felicetti Deposition Exhibit Number 26

 5                    marked for identification.)

 6       BY MR. CROSS:

 7              Q     So let me hand you what's been marked

 8       as Exhibit 26.  And just hang on to that.  Keep it

 9       safe.

10              A     Okay.

11              Q     Have you seen Exhibit 26 before?

12              A     I've not.

13              Q     Okay.  If you look back at Exhibit

14       24, we read -- when you look at this, the second

15       page after the slip sheet --

16              A     Yes.

17              Q     -- you saw this reference here from

18       the Coffee County elections supervisor in the

19       e-mail to the state election director referring to

20       a Dominion e-mail pertaining to Cyber Ninjas and

21       him being alarmed by that.

22                    Do you see that?
```

Page 277

1              A      Yes.

2              Q      So this is dated the day before,

3        May 6th, 2021, from Dominion Voting, "Customer

4        notification, maintaining secure chain of custody

5        for your Dominion Voting System."

6                     Do you see that?

7              A      Yes.

8              Q      And here it reads, "Dominion has been

9        alerted that customers are being approached with

10       offers or requests to conduct, quote, a forensic

11       audit of their voting equipment."

12                    Do you see that?

13             A      Yes.

14             Q      Had you learned or had the firm

15       learned at any point before today that Dominion

16       Voting Systems was concerned that individuals were

17       trying to gain forensic access to their voting

18       equipment?

19             A      No.

20             Q      To your knowledge, has there been any

21       outreach by Dominion Voting Systems to

22       SullivanStrickler regarding the work done in Coffee

Page 278

1      County?

2              A     I don't know.

3              Q     Who would you need to ask?

4              A     Paul Maggio.

5              Q     Okay.  Do you know the name Robert

6      Sinners, S-I-N-N-E-R-S?

7              A     No.

8              Q     Do you know whether the team that did

9      the Coffee County work had any communications with

10     Robert Sinners regarding that work?

11             A     I would say no, but let me just

12     double-check.

13             Q     Okay.

14             A     No.

15             Q     That's not a name that came up in

16     your discussions with the team members?

17             A     It is.  It was taken directly from

18     the -- when asked, because it was taken directly

19     from the subpoena.

20             Q     Oh, oh.  Oh, okay.

21             A     Yeah.  Oh, no, it didn't come up in

22     the course of doing what -- no, no.

1              So when asked, did you have any -- a

2      conversation, or whatever, with Robert Sinners, the

3      answer was no.

4              Q    Got it.

5              So in preparing for today, you asked

6      each of the 14 members, "Did you have any

7      communications with Robert Sinners regarding the

8      Coffee County work" and they said "No"?

9              A    I asked Paul.

10             Q    Okay.  And he said no?

11             A    Correct.

12             Q    What about the name Russ Ramsland?

13             A    No.

14             Q    Did you raise that or he said --

15             A    I did, because it came up a couple

16     times in the subpoena --

17             Q    Okay.

18             A    -- and it was identified as no.

19             Q    Okay.  And I may have asked you

20     before, did you ask members of the team whether

21     they had any communications with someone named Jeff

22     Linberg?

Page 280

1          A      I think I looked that up and I didn't

2     see it.  The answer is no, no communications.

3          Q      With Jeff Linberg?

4          A      That is correct.

5          Q      Did you ask the team whether they had

6     any communications with Mike Lindell, known as the

7     "My Pillow guy"?

8          A      I did ask, and the answer was no.

9          Q      So SullivanStrickler, the firm, does

10    not have any insight as to why Mike Lindell flew to

11    Douglas, Georgia in the middle of the night on

12    February 25th, 2021?

13         A      No.

14              (Felicetti Deposition Exhibit Number 27

15               marked for identification.)

16    BY MR. CROSS:

17         Q      Let me hand you Exhibit 27, please.

18    And let me ask you, are you familiar with a federal

19    agency called the Cybersecurity and Infrastructure

20    Agency, or CISA?

21         A      I am not.

22         Q      You're familiar with DHS, Department

Page 281

1      of Homeland --

2              A    Yes.

3              Q    Okay.  Are you aware that there's a

4      federal agency that sits within DHS that has the --

5      some responsibility for election security at the

6      federal level?

7              A    I'm not aware of that.

8              Q    If you look at Exhibit 27, this is an

9      advisory that CISA, that agency, sent out to

10     jurisdictions that use certain of the Dominion

11     Voting Systems' equipment and software in June of

12     2022.  So this is not something that you've seen

13     before?

14             A    Correct, I have not seen this.

15             Q    Okay.  If you look at the first page

16     under "Summary" it states, "This advisory

17     identities vulnerabilities affecting versions of

18     the Dominion Voting Systems' Democracy Suite

19     ImageCast X, which is an in-person voting system

20     used to allow voters to mark their ballots."

21                  Do you see that?

22             A    Yes.

Page 282

1          Q     And the ImageCast X here, that's what
2     we referred to as the ICX, the touchscreen?
3          A     Yes.
4          Q     And had the firm learned at any point
5     during the course of its engagement for Coffee
6     County or with respect to that engagement, that
7     this federal agency had identified a number of
8     serious vulnerabilities with that voting system?
9          A     I don't know.
10         Q     And sorry, we may have covered this,
11    but let me be precise.
12         A     Uh-huh.
13         Q     Was there ever a point in which
14    anyone asked anyone at SullivanStrickler to analyze
15    any of the data that was collected for any purpose
16    such as identifying vulnerabilities?
17         A     There was no request for any
18    analyzation at all.  It was purely, "Image these
19    devices."
20         Q     Okay.  Is the firm aware that
21    Stefanie Lambert, one of the people they had sent
22    the data to, is now under criminal investigation in

Page 283

```
 1        Michigan with respect to accessing voting
 2        equipment?
 3              A     No.  I shouldn't say that.  I don't
 4        know.
 5              Q     You don't know?
 6              A     By "firm," you mean us --
 7              Q     Yes.
 8              A     -- or the law firm that hired us?
 9              Q     SullivanStrickler.
10              A     Oh.  Repeat the question.
11              Q     Do you know whether folks at
12        SullivanStrickler are aware that Stefanie Lambert
13        is under criminal investigation in Michigan with
14        respect to accessing voting equipment?
15              A     I don't know.
16              Q     Is there a concern today at
17        SullivanStrickler that the firm may have
18        inadvertently provided sensitive voting data and
19        software to individuals that you now might believe
20        did not have the best of intentions?
21              A     No.
22              Q     Is that something that's been
```

Page 284

1      considered or discussed?

2              A     I don't know.

3              Q     The --

4              A     No.  We delivered data based on

5      direction of the law firm.

6              Q     But fair to say SullivanStrickler

7      does not know what the intentions were of those

8      individuals with that data?

9              A     Correct.

10             Q     Okay.  SullivanStrickler doesn't know

11     what those individuals had done with that data once

12     they downloaded it?

13             A     That is correct.

14             Q     For example, SullivanStrickler has no

15     way of knowing whether anyone who has gotten access

16     to that data has, for example, used it to develop

17     malware that then could be used to affect elections

18     going forward into the future?

19             A     That is correct.

20             Q     You just -- you just can't know?

21             A     Can't know.

22             Q     Certainly that was not

Page 285

1      SullivanStrickler's intention?

2              A     Correct.

3                    MR. CROSS:  Sorry, let me just see

4      if -- people are a lot smarter than I am.  If I

5      have any additional -- Bruce, you know, just pipe

6      up any time.

7                    MR. BROWN:  I'm looking to the

8      smarter people first.

9                    MR. CROSS:  You're behind a long

10     list, my friend.

11                   VIDEOGRAPHER:  Do you want to go off

12     the record, sir?

13                   MR. CROSS:  No, because I think we're

14     about done, or at least I am.

15     BY MR. CROSS:

16             Q     Do you know whether Scott Hall ever

17     received log-in credentials?

18                   And you don't need to look.  If he

19     did, would it be on that list?

20             A     Yes, it would be --

21             Q     Okay.

22             A     -- on that list.

Page 286

1          Q       So if he's not on that list, your

2     best guess would be that he did not receive

3     credentials?

4          A       Correct.

5          Q       Oh, when the SullivanStrickler team

6     went into Coffee County, was there any action to

7     change any password that preexisted on any of their

8     equipment?

9          A       No.

10         Q       Is there anything that the

11    SullivanStrickler team did in Coffee County that

12    might possibly have caused a password to change?

13         A       No.

14         Q       Are you aware that James Barnes, the

15    individual who became the elections supervisor in

16    Coffee County in April of 2021, according to him,

17    at some point he could not get the EMS server

18    password to work?

19         A       I'm not aware of that.

20         Q       Are you aware that according to the

21    Secretary of State's office, and Mr. Barnes, the

22    Secretary came in and replaced the EMS server when

1      the password no longer would access that server?

2              A      I'm aware of that based on the

3      subpoena.

4              Q      Okay.  But you had not learned that

5      before the subpoena?

6              A      Correct.

7              Q      And so does the firm have any insight

8      or any ideas as to how that password might have

9      changed, assuming it did change?

10             A      No idea.

11             Q      While the SullivanStrickler team was

12     in Coffee County on January 7, there were also

13     folks who were scanning paper ballots, right?

14             A      Correct.

15             Q      And did any of the SullivanStrickler

16     team participate in scanning ballots?

17             A      No.

18             Q      Was it mostly Misty Hampton who was

19     doing that?

20             A      Yes.

21             Q      Was there anyone else the team

22     witnessed scanning ballots beyond Ms. Hampton?

Page 288

1          A     Not based on my discussion with the
2     team.  It was purely Misty.
3          Q     And one of the -- Ms. Hampton, when
4     she was scanning ballots, was she using like a
5     generic scanner?
6                She wasn't using a Dominion scanner,
7     right?
8          A     Correct, a generic office-type
9     scanner.
10         Q     Does the team have any insight of
11    where that scanner came from?
12         A     I believe it was there, but I don't
13    know for sure.
14         Q     That's fine.  Don't guess.
15         A     Okay.
16         Q     So, for example, did the team see
17    someone like Cathy Latham walk in with it?
18         A     I don't know.
19         Q     Okay.  Did the -- did
20    SullivanStrickler ever receive any of the scanned
21    ballot data?
22         A     On thumb drives as part of the

Page 289

1   imaging.

2          Q    I see.  Okay.

3          A    Yeah.

4          Q    So Ms. Hampton scanned the ballots --

5    those ballots, that data was then loaded to a thumb

6    drive, and those thumb drives were shared with

7    SullivanStrickler?

8          A    Imaged, yes, correct.

9          Q    And so the data that went up on the

10   ShareFile site included both the data that

11   SullivanStrickler copied from equipment, plus the

12   cast ballot data that was scanned?

13         A    If it was on a thumb drive and given

14   to us to image and that was the data, then yes.

15         Q    I see.

16         A    So if -- if somebody scanned the

17   images -- or the ballots and they created PDFs or

18   JPEGs and gave us a thumb drive and said, "Here,

19   image that," then yes.

20         Q    Okay.  I see.

21              Let's make sure we're talking about

22   the same thing.

1          A     Sure.

2          Q     The SullivanStrickler team went in

3     and scanned -- or sorry, copied thumb drives and it

4     copied whatever data was on those thumb drives at

5     the moment the team came in to copy them?

6          A     Correct.

7          Q     At the same time in parallel, Misty

8     Hampton is scanning cast ballots with a scanner?

9          A     Yes.

10          Q     Do you know whether -- the scans that

11     Misty Hampton created, whether those scans were

12     also at some point provided to SullivanStrickler?

13          A     Yes, they were put on a thumb drive

14     for us to scan -- to forensically image.

15          Q     Okay.  Got it.  Got it.

16                And was that done on the 7th or

17     later?

18          A     No, the same day.  So the 7th.

19          Q     Do you know what elections she was

20     scanning ballots from?

21          A     I don't know.

22          Q     Okay.  Did the team see anyone other

1       than Ms. Hampton scan ballots?

2             A     Based on my discussion with the team,

3       it was Misty.  That's it.

4             Q     So we've talked about a number of

5       folks, and we looked at pictures outside the

6       building.  Let me just make sure I get a complete

7       picture of the inside.

8                   So in the office during the day while

9       SullivanStrickler was doing its work, it was

10      obviously the four members of the SullivanStrickler

11      team?

12            A     Yes.

13            Q     Cathy Latham was there for most of

14      the day.  Is that right?

15            A     Yes.

16            Q     And I think you said earlier she was

17      helping provide some direction on what to copy?

18            A     Yes.

19            Q     Misty Hampton was there for most of

20      the day, also providing some direction?

21            A     Yes.

22            Q     Scott Hall was there for most of the

1       day, at least ensuring, in his words, that

2       everything was copied?

3               A       Yes.

4               Q       And Scott Hall's colleague, you guys

5       don't know his name, he was there as some kind of

6       programmer for most of the day?

7               A       Yes.

8               Q       Eric Chaney, board member at the

9       time, was there for most of the day during the work

10      that was happening?

11              A       We don't know at what --

12              Q       Well, let me ask a better question.

13              A       Yeah.

14              Q       There was a then-current member of

15      the Coffee County Board of Elections who was in the

16      office during most of the time that

17      SullivanStrickler was doing its work?

18              A       Yes.

19              Q       And it was a man?

20              A       Yes.

21              Q       Do you know the name Jil Ridlehoover?

22              A       Yes.  From the subpoena.

Page 293

```
 1              Q     And do you understand she was the
 2       assistant to Misty Hampton?
 3              A     I did not know that.
 4              Q     And are you aware that -- can you say
 5       that she was there most of the day during the work
 6       as well or do you know?
 7              A     I didn't think she was, but let me
 8       just double-check.
 9              Q     If you don't know, that's fine.
10              A     I think I hear a baby.
11              Q     Me, too.
12              A     I don't know why -- I do not know.
13       Sorry.
14              Q     That's fine.
15                    Do you know the name Matt McCullough?
16              A     No.
17              Q     Was that someone that you talked to
18       the team about, whether that person was there?
19              A     I did not.
20              Q     Okay.  Do you know the name Alex
21       Kaufman?
22              A     No.
```

Page 294

1          Q     Was that a name that you talked to

2     the team about?

3          A     I did not.

4          Q     Did you talk to the team about

5     whether they communicated with someone named John

6     Eastman?

7          A     I did not.

8          Q     Okay.

9          A     We can go back to Jil Ridlehoover.

10         Q     Uh-huh.

11         A     I brought that name up to Paul -- or,

12    I'm sorry, to the team, and the answer was no, not

13    there.

14         Q     The answer was --

15         A     Or the answer to your question

16    regarding communication with that person.

17         Q     No, no, the -- did Mr. Maggio say --

18    did he know whether Ms. Ridlehoover was there

19    during the day or he just didn't --

20         A     He didn't know.

21         Q     Okay.  Do you know the name Alex

22    Cruce, C-R-U-C-E?

Page 295

1           A     I do.

2           Q     And was that a name that you raised

3     with them?

4           A     It is.

5           Q     And what did they say?

6           A     There was no interaction.

7           Q     That's not a name that they

8     recognized?

9           A     That is not a name they recognized.

10          MR. CROSS:  All right.  Let's go off

11    the record and take a short break, if we can.

12          VIDEOGRAPHER:  The time is 3:27 p.m.

13    We are off video record.

14          (Recess from 3:27 p.m. to 3:49 p.m.)

15          VIDEOGRAPHER:  The time is 3:49 p.m.

16    We are back on video record.

17          MR. CROSS:  All right.  I'm just

18    about done.  Just for the record, we've marked as

19    Exhibit 28 the check from Sidney Powell's

20    organization, Defending the Republic, for the

21    Coffee County work.

22

Page 296

```
 1                (Felicetti Deposition Exhibit Number 28

 2                marked for identification.)

 3      BY MR. CROSS:

 4           Q     I do have a few follow-up questions

 5      for you.

 6                Were you able to confirm whether the

 7      data that was copied from Coffee County is still on

 8      your ShareFile site today?

 9           A     It is not.

10           Q     It is not?

11           A     No.

12           Q     When did that come down?

13           A     Summer.

14           Q     This past summer?

15           A     Yes.

16                No, last summer.  I apologize.

17           Q     Summer of 2021?

18           A     Yes.

19           Q     Oh, okay.

20                And who made the decision to take it

21      down?

22           A     I believe Paul Maggio.
```

1          Q      And what was the impetus for taking

2     it down?

3          A      The cost, the fees associated with

4     keeping the data up as one reason.

5          Q      Okay.  Was there a directive from any

6     of the clients to take the data down?

7          A      Not that I'm aware of.

8          Q      Was there any complaint from any

9     client that the data was taken down?

10         A      Not that I'm aware of.

11         Q      Okay.  Oh, were you able to figure

12    out whether they had mislabeled some files as ICP

13    instead of ICC?

14         A      Yes.

15         Q      And had they done that?

16         A      They had.

17         Q      Okay.  So some files initially

18    labeled ICP were from the ICC and then they were

19    corrected to be called ICC?

20         A      Yes.

21         Q      Okay.  And were you able to get any

22    more insight into the work that they did to copy

Page 298

1    data from the ICX, the touchscreen machines?

2              A    The ones we're calling BMD, right?

3              Q    BMDs.

4              A    They were attempted to be collected,

5    but we believe they were not collected, because not

6    only were they not on -- they were not on the chain

7    of custody, when they were running Android OS, they

8    were not collected.

9              Q    Okay.  So there was an effort made to

10   collect data from the BMDs, but the -- the -- your

11   belief at this point is that that effort failed?

12             A    That is correct.

13             Q    Was there -- apart from the effort to

14   copy the BMDs -- well, actually, let me just ask it

15   this way:  Was there any device or equipment in the

16   office that the team was told at some point, "Do

17   not copy that"?

18             A    No.

19             Q    Was there any device or equipment in

20   the office that the team on its own decided not to

21   copy?

22             A    No.

1          Q     Was there any device or equipment

2     that might possess data in the office that the team

3     is aware was there and they made no effort to copy?

4          A     I don't know.  I don't think so.

5          Q     Okay.  Did you ask anyone on the team

6     whether they had any communications with someone

7     named Garland Favorito?

8          A     I did.

9          Q     And what was the answer?

10         A     I believe the answer was no, but

11    there were conversations had with Garland Favorito.

12         Q     And who had those communications?

13         A     Paul Maggio.

14         Q     And what can you tell me about those?

15         A     Just that they spoke about potential

16    work.

17         Q     When was that?

18         A     I don't know.

19         Q     Before or after the Coffee County

20    work?

21         A     I believe before.

22         Q     Okay.  Were there any communications

Page 300

1      with Mr. Favorito regarding Coffee County

2      specifically or was it more general about accessing

3      equipment in Georgia?

4            A     I don't know.

5            Q     Okay.  Was any of the Coffee County

6      data shared with Garland Favorito?

7            A     I would have to look on the

8      ShareFile.

9            Q     So if it was, it should be reflected

10     on the ShareFile?

11           A     Yes, sir.

12           Q     Okay.  The one -- the one issue with

13     the ShareFile though, is the ShareFile log only

14     shows people who got access to the data through the

15     ShareFile, right?

16           A     Yes.

17           Q     Okay.  But we also know that on at

18     least one occasion a hard drive of that data was

19     shipped directly to Stefanie Lambert, right, we saw

20     the e-mails?

21           A     Yes.

22           Q     So the ShareFile site doesn't capture

Page 301

```
 1          everyone who received the data from Coffee County

 2          from SullivanStrickler, right?

 3                      There's at least one exception?

 4          A      One exception, yes.

 5          Q      Okay.  Are you aware of anyone else

 6          who received data -- Coffee County data from

 7          SullivanStrickler through means other than the

 8          ShareFile site?

 9          A      I am not.

10          Q      Was that something that you looked

11          into?

12          A      We did, yes.  I looked into that.

13          Q      Okay.  And --

14          A      Sorry.

15          Q      No, please go ahead.

16                      What can you tell me about the steps

17          that were taken to try to collect data from the

18          BMDs?  What was the method?

19          A      The only method that would have been

20          feasible -- and this is -- I wasn't there -- would

21          be to utilize Cellebrite, because of the Android OS

22          that it has on the back-end --
```

1          Q     Okay.

2          A     -- as far as the operating system.

3     So I would think Cellebrite would have been

4     utilized.

5          Q     Okay.  And do you have any -- any

6     information about why the team was unable to copy

7     data from the BMDs, assuming that's the case?

8          A     I do not, just that it -- they

9     failed.  That's all.

10         Q     Okay.

11         A     The collection failed and I don't

12    know why.

13         Q     Okay.  I do not have any further

14    questions.  Just a few quick things similar to what

15    we talked about earlier.  We do want to get the

16    complete ShareFile logs.

17         A     Oh, as far as the ShareFile logs,

18    what you have is what there is.  There's a timeline

19    limitation on ShareFiles' ability to produce logs

20    after a certain time frame.

21         Q     Okay.  Let me make sure I understand

22    that, because the logs that we have, it looks like

1          it cuts off toward the end of February 2021 --

2                    A       Correct.

3                    Q       -- but the ShareFile was up through

4          the summer of 2021, which would be more recent in

5          time.  So shouldn't we have logs at least from that

6          time period?

7                    A       I don't know.

8                    Q       Okay.

9                    A       I don't know the -- the -- based on

10         the limitations of that, I don't think so, because

11         there's a year limitation of holding data on

12         ShareFile, the way it can run reports.

13                   Q       Why would you have older ShareFile

14         logs as opposed to more recent ones?

15                           Because what we're looking for is

16         more recent logs.  So since -- right, I get --

17                   A       But the data was taken down over --

18         if the data was taken down, it would have been a

19         year ago.

20                   Q       Uh-huh.

21                   A       So to go back and try to run reports

22         against data that's over a year old, I think -- I

Page 304

1      believe, from the way I understand it, that

2      SharePoint has a limitation -- SharePoint --

3      ShareFile has a limitation on being able to provide

4      those reports.

5              Q    So how did you get the reports from

6      an earlier period?

7              A    Because the data was up, the request

8      was made earlier.  So I think the report was

9      generated from -- in December maybe.

10                 MR. COLEMAN:  September.

11                 THE WITNESS:  September to March,

12     right?  I was just trying to figure this out.  So

13     yeah, the report that was created and given to you

14     was created during the time frame of -- within a

15     year of the data still being up.

16                 MR. BROWN:  Who asked for it?

17                 MR. CROSS:  Well, yeah, hold on.

18     Hold on.

19                 MR. BROWN:  I'm sorry.

20     BY MR. CROSS:

21             Q    So we served a subpoena on

22     Mr. Maggio -- I think in maybe June is when the

```
                                              Page 305

 1      subpoena went in.  So are you saying that when the

 2      subpoena came in, it was with -- okay.

 3                    MR. COLEMAN:  So you're having the

 4      same --

 5                    THE WITNESS:  Yeah, I don't -- I

 6      don't know --

 7                    MR. COLEMAN:  The document that

 8      you're referencing was created at that time -- back

 9      in March of '21.

10                    MR. CROSS:  Okay.

11                    MR. COLEMAN:  That's the --

12                    MR. CROSS:  Yeah.

13                    MR. COLEMAN:  If the time frame that

14      was requested, right, was September through --

15      through March, when it was created, right?  And so

16      the document -- that document was generated back

17      then and then it was stored somewhere.

18                    MR. CROSS:  I see.

19                    MR. COLEMAN:  In response to the

20      subpoena, that document that had been previously

21      created is what got produced.

22                    MR. CROSS:  I see.
```

Page 306

1              MR. COLEMAN:  It's not possible now

2         to now go back and regenerate a new fresh file.

3              MR. CROSS:  Got it.  And I thought

4         that's where we were going.

5    BY MR. CROSS:

6         Q    So to Bruce's question:  What was the

7    purpose of creating -- the ShareFile log that we

8    have today, what was the purpose of creating that

9    in March of last year?

10        A    September.

11        Q    Oh, sorry, September.

12        A    September of last year.

13             It is also common practice for us to

14   look at activity in logs for ShareFile.  So that

15   may have been one reason why.

16        Q    But do you know why it was created?

17        A    I do not.

18        Q    Do you know who made the request to

19   create a snapshot of downloads for that particular

20   window of time?

21        A    I would assume --

22        Q    I don't want you to guess.  If you

1        don't know, just say you don't know.

2               A     I don't know.

3               Q     Okay.  But somebody made a decision

4        in September of last year to create a ShareFile log

5        for the specific window of time that's captured in

6        the log that was produced?

7               A     Correct.

8               Q     Okay.  And you don't -- you don't

9        have any insight why someone didn't capture the

10       full time period of the ShareFile site?

11              A     Correct.

12              Q     And it's not possible to do that now?

13              A     It is not.

14              Q     Okay.  And if you wanted to find out

15       why that particular window was created for a log,

16       who would you ask?

17              A     Paul Maggio.

18                    MR. CROSS:  Okay.  The other thing

19       that I was just going to raise is we didn't -- the

20       download -- sorry.

21                    The ShareFile log showed that there

22       was some data uploaded by Doug Logan, for

Page 308

1        example.  And so to the extent that there's data

2        on the ShareFile site that has not been produced

3        to us, we would ask for production of that, to

4        the extent that you still have it or it's

5        accessible.

6        BY MR. CROSS:

7              Q     Oh, and then one other question.

8                    So we've seen a couple of new

9        documents today, the check from Sidney Powell's

10       organization, the subpoena from Fulton County.

11                   Are there any other documents you

12       have with you or that you looked at for your

13       deposition that you have not yet shared with us?

14             A     No.  Everything that I've looked at

15       has been -- was produced.  And aside from the

16       Fulton County subpoena that I shared with you

17       today.

18             Q     And the check?

19             A     And the check.

20             Q     Okay.

21             A     Okay.

22             Q     Okay.  So everything else in this

1         stack, to the best of your understanding, is

2         materials that were produced to us?

3               A     It definitely is, yes.

4               Q     Okay.  And the notes you've looked

5         at, those are notes that you took during your

6         communications to prepare for today?

7               A     Yes.

8               Q     Okay.

9               MR. CROSS:  Would you guys have an

10        objection to us getting his notes?

11              No?  Okay.  All right.

12              MR. COLEMAN:  I'll make a copy also.

13              MR. CROSS:  Okay.  If it's possible

14        to get those scanned today --

15              MS. CLARK-PALMER:  Yeah.

16              MR. CROSS:  -- we can just mark them

17        before the deposition ends just so we can get that.

18              MS. CLARK-PALMER:  Yes.

19              MR. CROSS:  That would be great.

20        Thanks, Amanda.

21              I don't have anything else.

22              Bruce, it is now your turn to ask

Page 310

1        questions.

2          EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

3        BY MR. BROWN:

4              Q    I have a lot of questions.  Just

5        kidding.  Okay.  All right.  Thank you for your

6        time today.  We really appreciate it.  I'm going to

7        go over some questions.  They are going to be

8        overlapping or duplicative, but they'll be quick, I

9        hope.

10                   MR. BROWN:  If we can go back to the

11       ShareFile list, David.

12                   MR. CROSS:  Yeah.

13       BY MR. BROWN:

14             Q    If you go to Exhibit 17, if you go to

15       page 140, which is the page that has the Doug Logan

16       uploads on that.

17             A    Am I on the wrong --

18                   MR. CROSS:  No, no, this one.

19                   THE WITNESS:  Oh.  All right.  Let's

20       see.

21                   MR. CROSS:  There's another copy of

22       that.  I'm sorry.

Page 311

```
 1                THE WITNESS:  I'll find it here.
 2      Sorry about that.
 3      BY MR. BROWN:
 4           Q     No, no, it's all good.
 5                If you look at page 140, you'll see a
 6      number of uploads that are just the week after the
 7      main upload that was done by SullivanStrickler --
 8      by Doug Logan.  Do you see that on the 16th?
 9           A     Yes, sir.
10           Q     And you may have been asked this, but
11      is there any way that we could find out now what he
12      uploaded?
13           A     I don't know.  I mean, if we -- if I
14      make a call to the office, maybe.
15           Q     Well, it's just the -- the -- I know
16      that the ShareFile site is no longer active --
17           A     Yeah.
18           Q     -- correct?
19                But is what was up there in your --
20           A     Oh, I see.
21           Q     -- in your possession?
22                Do you follow me?
```

```
 1              A      Yeah.   Everything was downloaded to
 2       disk, so a preservation copy was made of anything
 3       that would be there.   So this information would be
 4       on the preservation disk.
 5              Q      Including things that were uploaded
 6       by others?
 7              A      Yes.
 8              Q      Okay.
 9              A      Yep.
10              Q      Looking -- without looking at your
11       preservation disk, but just looking at -- at this
12       report, can you tell what or why things were being
13       uploaded by Doug Logan during that time frame?
14              A      I can't.
15              Q      You were asked a question about
16       Garland Favorito.
17              A      Yes, sir.
18              Q      Are you aware of -- other than
19       Garland Favorito, are you aware of any other
20       requests of your company to do any work in Georgia
21       prior to the work that you did for Sidney Powell?
22              A      Let me look through this.
```

1              Yeah, there was no other request for

2       other work in Georgia that I know of.

3              Q     Okay.  Is the firm aware of any other

4       forensic work like yours being done in Georgia

5       around the same time frame?

6              A     I don't know.

7              Q     Okay.

8              A     Are you asking -- I'm sorry.  At the

9       same locations or --

10             Q     Anywhere in Georgia.

11             A     Just forensic companies doing work,

12      forensic work?

13             Q     Doing work for -- fair enough.

14                   Doing work with respect to elections

15      information and data.

16             A     I don't know.

17             Q     Okay.

18             A     I don't know.

19             Q     You may have covered this, but there

20      is a Todd S. that's mentioned in that file.  Do we

21      know who that is?

22             A     We do not.

```
 1          Q     Okay.  You have been asked about
 2   contacts from the -- anybody from the State, from
 3   the Secretary of State, et cetera, and your
 4   response was limited to the subpoena that you
 5   received recently.
 6                You with me?
 7          A     Yes.
 8          Q     Did your firm informally come into
 9   any knowledge about the Secretary of State doing
10   any kind of investigation into Coffee County?
11          A     I don't know.
12          Q     Okay.  Do you know who Tony Rowell
13   is, R-O-W-E-L-L?
14          A     Anthony Rowell?  No, per my
15   discussion with the team.
16          Q     Okay.  You mentioned that there was
17   an external hard drive that wasn't within one of
18   the components, but just an external hard drive
19   that was imaged --
20          A     Yes.
21          Q     -- by your firm.
22                What was on that drive, do you know?
```

Page 315

1          A      I don't know.

2          Q      Okay.  Do you know how many drives

3     your firm took down there to use to do the -- to do

4     the imaging?

5          A      They used -- oh, let's see, I know

6     for the thumb drives they used the one-terabyte

7     drive and broke it down.  So that was one drive.

8     For the server, I believe, two.  But I don't know

9     the answer.  Maybe three or four drives, but that's

10    purely guessing.

11         Q      And those would be just drives that

12    you have in stock that you use?

13         A      Yes, sir.

14         Q      Okay.  We were going over the -- the

15    copy of the log files that was actually made

16    before, produced to us recently, the log files here

17    in the time range that was accessible to the

18    ShareFile.

19         A      Oh, yeah.  Yes.

20         Q      Okay.  At the time that those were

21    made, you would have had more recent information if

22    it was printed out, right?

1          A     I don't know.

2          Q     Okay.

3          A     If it was -- the last date on the

4     report was the 26th --

5          Q     Of February?

6          A     -- of February.

7          Q     Right.

8          A     And if -- the report was run from

9     September to March 1st, I believe, so maybe not,

10    but I don't know specifically.

11         Q     Did -- did your firm ever hear

12    anything about Misty Hampton being fired?

13         A     I don't know.

14         Q     You don't know anything about that?

15         A     No.

16               MR. BROWN:  I have a long list of

17    things I need to check through to make sure that

18    we've covered everything, so hang on.

19               VIDEOGRAPHER:  Do you want to go off?

20               MR. BROWN:  No.

21               MR. RUSSO:  While you're looking, do

22    you want me to ask some questions, Bruce?

Page 317

1                    MR. BROWN:  Yeah, go ahead.

2                    THE WITNESS:  I can talk about

3        basketball.  That's more fun.

4                    MR. RUSSO:  Sure, let's go.

5        BY MR. BROWN:

6            Q     Just a couple more.

7            A     Yes, sir.

8            Q     I want to make sure I understand

9        how -- what we know about how the team copied the

10       data from the poll pads.

11           A     Sure.

12           Q     And could you just review again sort

13       of the process of copying from the poll pads?

14           A     Okay.  We utilized Cellebrite, which

15       is an industry standard forensic tool for

16       collecting and tabulating tablets.  And so we

17       booted off the machine using Cellebrite, connected

18       to the poll pads, and created forensic images of

19       those devices without leaving a -- a footprint on

20       the devices.  So we'd point to it, grab the image,

21       put it on a destination drive, and then upload them

22       to ShareFile.

Page 318

```
 1              Q    As far as you know, did the team
 2     collect everything that was on the poll pads or
 3     some subset of what was on the poll pads?
 4              A    As far as I know, they collected
 5     everything.  They were full forensic images.
 6              Q    The EMS has within it two hard
 7     drives, right?
 8              A    Two or more, yes.
 9              Q    Okay.
10              A    But two --
11              Q    But all of them were copied?
12     Whatever was in there was copied?
13              A    Yes, correct.
14              Q    Okay.
15              A    There were two drives -- I shouldn't
16     say that.  There were multiple drives.  I don't
17     know specifically, but they were mirrored for
18     back-up.  They were being protected.  So protected
19     but for redundancy, so in case one of the drives
20     failed, the other one could pick up.  So we imaged
21     both.
22              Q    Okay.  And in the ShareFile folders,
```

Page 319

1      I think it -- does it -- let me back up a little

2      bit.

3                A     Sure.

4                Q     The upload -- and you can look at the

5      old document or just -- just from your memory, but

6      when someone uploads something to the ShareFile,

7      there's a description of the file.  That

8      description would be automatically generated by

9      whatever file is being uploaded, correct?

10               A     As I understand it, yes.

11               Q     Okay.  And so whatever -- whatever --

12     the name is going -- the name is going to follow it

13     up there --

14               A     Correct.

15               Q     -- right?

16                     And then the far column on the right

17     is an event number.  And could you just describe

18     what that is?

19               A     I can't.

20               Q     Okay.

21               A     I believe it's a hash value that's

22     created of the file, but I'm not 100 percent

1    certain.  It looks like a -- it looks like a hash

2    value to me, but I'm not sure.

3         Q    Okay.  And it would be a hash value

4    that's generated by a ShareFile, correct?

5         A    Correct.

6         Q    Okay.

7         A    And this is purely -- I'm just

8    guessing here, but if -- it can be utilized as a

9    hash value to match it to the original so we can

10   show a true preservation if you upload or download

11   it.  I could be wrong, but . . .

12        Q    And the -- I believe very few of the

13   users had the authority to change the data on the

14   ShareFile, correct?

15        A    That is correct.

16        Q    But they could download it, change

17   it, and then upload it, correct?

18        A    They could.

19        Q    So as far as you know, your company

20   hasn't heard from Dominion at all about this?

21        A    As far as I know, they have not.

22        Q    Do you know if Scott Hall ever

Page 321

1    obtained log-in credentials?

2              A    For the --

3              Q    The ShareFile.

4              A    -- ShareFile?

5                   I don't know.  It would be on the

6    ShareFile log if he --

7              Q    But if it's not on that, you have no

8    knowledge of it?

9              A    Right.

10                  MR. BROWN:  Okay.  That's all I've

11   got.  Thank you.

12        EXAMINATION BY COUNSEL FOR STATE DEFENDANTS

13   BY MR. RUSSO:

14             Q    All right.  Good afternoon,

15   Mr. Felicetti.  I'll try to be quick because I know

16   you want to get home to your wife for her birthday.

17             A    She doesn't want me to get home, so

18   take your time.

19             Q    That's no problem.  That sounds like

20   something I would hear in my house.  I just have a

21   few -- a few questions for you.

22                  You mentioned earlier that

Page 322

1        SullivanStrickler attempted to image the BMDs, the

2        ballot-marking devices, but that failed --

3              A       Yes, sir.

4              Q       -- correct?

5                      Do you know how many devices,

6        ballot-marking devices, they -- SullivanStrickler

7        attempted to image?

8              A       I don't know.  I would think they

9        would try to image all of them, but I don't know.

10             Q       And do you know what -- what the

11       process SullivanStrickler used to attempt to image

12       those devices?

13             A       I believe it was utilizing Cellebrite

14       because --

15             Q       Okay.

16             A       -- it is the technology that runs the

17       BMDs.

18             Q       Okay.  So that's a similar technology

19       to what was used for the poll pads?

20             A       Correct.

21             Q       Okay.  And do you know how many poll

22       pads SullivanStrickler imaged or attempted to

Page 323

1      image?

2             A    I don't know, but it would be

3      identified in the produced chain-of-custody log, in

4      that tab, in that spreadsheet.  I don't know off

5      the top of my head.

6             Q    I want to, I guess, turn to

7      Exhibit 12.  Do you --

8             A    I guess I don't have -- I have them

9      here.

10            Q    Exhibit 12 is the list of pictures,

11     yeah.  That's right, I think her name was Jackson.

12     You testified that Ms. Jackson took those pictures?

13            A    Yes.  Yes, sir.

14            Q    Okay.  And if you could turn to the

15     page that's Bates labeled -- it's -- the last three

16     numbers are 263.

17            A    Yes, sir.

18            Q    And it appears to be a Dell laptop?

19            A    Yes.

20            Q    And are you familiar with what --

21     what this laptop was used for?

22            A    I am not.  I know a laptop was

Page 324

1       forensically captured.

2               Q     And I noticed there's a tag on it,

3       and I think Mr. Cross asked you earlier, the tags

4       on these flash drives, that they were done by

5       SullivanStrickler, right?

6               A     Yes.  That looks like one of our

7       bootable DFR collection devices.

8               Q     Okay.  And it looks like it says

9       "DFIR" --

10              A     Yes, that's it.

11              Q     -- on it.

12              A     Yeah.

13              Q     Okay.  And do you know what type of

14      flash drive -- the manufacturer of that flash drive

15      is?  Can you tell?

16              A     I don't know.  I'm sorry.

17              Q     And I know earlier you were asked a

18      question about Samsung flash drives.  Is that --

19      does that look like -- if you're familiar with

20      flash drives that you use at SullivanStrickler,

21      would that be a Samsung?

22              A     It does look like a Samsung.

1          Q     Okay.  And you mentioned that Sidney

2     Powell is the attorney for the Georgia work.  She

3     had the contract with SullivanStrickler?

4          A     Yes, sir.

5          Q     And Defending the Republic is the

6     client, correct?

7          A     Yes, sir.

8          Q     When did Ms. Powell first contact

9     SullivanStrickler about this project?

10               MS. CLARK-PALMER:  About the Coffee

11    County project?

12               MR. RUSSO:  Yes.

13               THE WITNESS:  Coffee County was early

14    in January, I think.  I'll have to look in the

15    e-mails that was produced.  I don't know off the

16    top of my head.  I'm sorry.

17    BY MR. RUSSO:

18          Q     Okay.  And the contract that she

19    signed was dated December 6th.

20          A     Oh, yes.  So it would have --

21    originally, it was Jim Penrose and Doug Logan that

22    made the initial reach-out.  So on behalf of Sidney

Page 326

1      Powell, I believe.

2            Q     Okay.  And that's -- that's actually

3      what I was going to ask you; is how is that

4      relationship -- if you all had a prior relationship

5      with Ms. Powell or --

6            A     No.

7            Q     Okay.  And you mentioned Mr. Penrose

8      and Doug Logan.  The -- their e-mail accounts that

9      we looked at earlier, the e-mails would indicate

10     they're from fightbacklaw.law.  Are you familiar

11     with -- with Fight Back Law?

12           A     I am not.

13           Q     All right.  And did -- did

14     SullivanStrickler have any communications with --

15     with Lin Wood?

16           A     About Coffee County?

17           Q     About Coffee County.

18           A     There is no communication with Lin

19     Wood.

20           Q     Okay.  And was there any -- or do you

21     know the name Julia Haller, who was with Defending

22     the Republic?

1          Does that sound familiar?  It's

2     H-A-L-L-E-R.

3          A     No.  No.  I'm sorry.

4          Q     You testified earlier that Cathy

5     Latham and Scott Hall gave direction about what to

6     copy --

7          A     Well --

8          Q     -- in Coffee County?

9          A     Cathy Latham and Misty Hampton gave

10    direction.  And Scott Hall also was generally

11    saying, "Make sure you get everything."  But

12    that -- you know, as far as, "Grab that thumb

13    drive, grab that," that wasn't necessarily what his

14    role was.

15         Q     And now, do you know if there was

16    anyone who -- and they were all on-site, right?

17         A     Yes, sir.

18         Q     Now, do you know if there was anyone

19    who was not on-site who was also directing what

20    to --

21         A     I don't know.

22         Q     -- to get?

Page 328

1            Okay.  Do you know if the Coffee

2    County project for Ms. Powell, for Sidney Powell,

3    was for litigation purposes?

4            A    I do not know.

5            Q    Do you know that Cathy Latham was a

6    plaintiff in a lawsuit that was filed by

7    Ms. Powell --

8            A    No.

9            Q    -- in Georgia?

10           A    No, I didn't know that.

11           Q    Did SullivanStrickler have any

12   communications with an attorney named Harry

13   MacDougald?

14           A    It doesn't --

15                MR. CROSS:  Can you spell that,

16   Vincent?

17                MR. RUSSO:  M-A-C-D-O-U-G-A-L-D.

18                THE WITNESS:  I don't know.

19   BY MR. RUSSO:

20           Q    Was that -- is that something that

21   you guys inquired about?

22           A    I did not.  If his name wasn't in the

Page 329

1          subpoena as somebody, I -- I just --

2                  Q     So anyone whose name is on the

3          subpoena, you did not ask about?

4                  A     Correct.  We would --

5                        MR. COLEMAN:  No, no.  Hold on.  Can

6          you repeat that question?

7          BY MR. RUSSO:

8                  Q     Anyone whose name was not in the

9          subpoena, you did not ask about?

10                 A     Correct.

11                 Q     Okay.  That might be all of my

12         questions.  Let me consult here.

13                       So you mentioned your best

14         practices -- or SullivanStrickler's best practices

15         earlier at the -- at the start.  And you -- you

16         indicated that the forensic imaging that

17         SullivanStrickler does, the practices only take --

18         take data off.  They do not put data on any of the

19         equipment, correct?

20                 A     Yeah, well, we don't take --

21                 Q     I'm sorry.

22                 A     -- data off.  It images the data.

1       Yes, images the data.

2                Q    Do you know if SullivanStrickler, in

3       that process, anything would have been done --

4       strike that.

5                     Do you know if in SullivanStrickler's

6       process for imaging -- conducting forensic image,

7       any data would go onto the equipment?  So putting

8       data on the equipment rather than simply imaging

9       what was on there?

10               A    It depends on what the forensic

11      collection requirements are and what the devices

12      are.  For this particular engagement, speaking for

13      Coffee County, no.  It was no footprints.  So pull

14      the data off, don't install.

15               Q    Do you know the -- I'm sorry.  Go

16      ahead.

17               A    No, no, you go ahead.

18               Q    I was going to ask, do you know if

19      the DFIR -- and I'm going to get this wrong -- but

20      the device, it could do that, leave a footprint?

21               A    Well, I mean, you could if you

22      manually on purpose used a Linux command to write

Page 331

```
1        data to something, but that -- I mean, you could do
2        that, you could walk up to a machine and type on
3        it, too, so I don't --
4                Q     Okay.
5                      MR. RUSSO:  I have no further
6        questions.  I appreciate it.  Thank you.
7                      THE WITNESS:  You're welcome.
8                      MR. CROSS:  Could I ask you just one
9        additional question?
10         EXAMINATION BY COUNSEL FOR CURLING PLAINTIFFS
11       BY MR. CROSS:
12               Q     We looked at a USB stick that
13       referenced ICX install.  Do you know what was on
14       that?
15                     For example, did it have the ICX
16       application on it?
17               A     I don't know.
18               Q     And who would you ask?
19               A     It was a thumb -- a thumb drive,
20       correct?
21               Q     Right.
22               A     Probably Karuna.
```

Page 332

1          Q     Okay.

2                MR. CROSS:  Okay.  No further

3     questions.

4                MR. COLEMAN:  Anybody else have

5     questions?

6                MR. RUSSO:  Thank you.

7                THE WITNESS:  Thank you.

8                MR. CROSS:  Thank you.

9                VIDEOGRAPHER:  The time is 4:28 p.m.

10    This concludes the videotaped deposition.  We are

11    off video record.

12                (Whereupon, at 4:28 p.m., the

13                video-recorded deposition of DEAN M.

14                FELICETTI was concluded; signature

15                reserved.)

16

17

18

19

20

21

22

Page 333

CERTIFICATE OF NOTARY PUBLIC

1

2      I, FELICIA A. NEWLAND, CSR, the officer before whom

3      the foregoing videotaped deposition was taken, do

4      hereby certify that the witness whose testimony

5      appears in the foregoing deposition was duly sworn

6      by me; that the testimony of said witness was taken

7      by me in stenotype and thereafter reduced to

8      typewriting under my direction; that said deposition

9      is a true record of the testimony given by said

10     witness; that I am neither counsel for, related to,

11     nor employed by any of the parties to the action in

12     which this deposition was taken; and, further, that

13     I am not a relative or employee of any counsel or

14     attorney employed by the parties hereto, nor

15     financially or otherwise interested in the outcome

16     of this action.

17

18

19

20                    FELICIA A. NEWLAND, CSR

                      Notary Public

21

       My commission expires:

22     September 15, 2024

Page 334

1              A C K N O W L E D G E M E N T   O F

2                      D E P O N E N T

3

4        I, DEAN M. FELICETTI, do hereby acknowledge I have

5        read and examined the foregoing pages of testimony,

6        and the same is a true, correct and complete

7        transcription of the testimony given by me, and any

8        changes or corrections, if any, appear in the

9        attached errata sheet signed by me.

10

11

12

13

14      _____          _____

         Date                      DEAN M. FELICETTI

15

16

17

18

19

20

21

22    5384640

Page 335

1        Donna Curling, et al. vs. Brad Raffensperger, et al.

2                    DEAN M. FELICETTI

3    INSTRUCTIONS TO THE WITNESS:

4        Please read your videotaped deposition over

5    carefully and make any necessary corrections.  You

6    should state the reason in the appropriate space on

7    the errata sheet for any corrections that are made.

8        After doing so, please sign the errata sheet

9    and date it.

10        You are signing same subject to the changes you

11    have noted on the errata sheet, which will be

12    attached to your deposition.

13        It is imperative that you return the original

14    errata sheet to the deposing attorney within thirty

15    (30) days of receipt of the deposition transcript by

16    you.  If you fail to do so, the deposition

17    transcript may be deemed to be accurate and may be

18    used in court.

19

20

21

22

Page 336

1       Veritext Legal Solutions
        1250 Eye Street, N.W., Suite 350
2       Washington, DC 20005
        (202) 857-DEPO

3

4                   E R R A T A   S H E E T
5       Case Name:   Donna Curling, et al. vs. Brad
        Raffensperger, et al.

6

        Witness Name:  DEAN M. FELICETTI
7

        Deposition Date:  September 2, 2022
8

        Page No.   Line No.    Change/Reason for Change
9
10
11
12
13
14
15
16
17
18
19
20
21     _____              _____
        Signature                            Date
22     5384640

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.