# EXHIBIT B

**Sent:** Saturday, December 26, 2020 11:50 PM EST
**To:** cathy latham <cathyalatham@gmail.com>
**CC:** Ed Voyles <bevoyles@gmail.com>
**Subject:** FW: Judge Totenberg opinion re: BMD ballots and GA law
**Attachment(s):** "2020-10-11 Opinion [dckt 964_0].pdf","CGG-Securing GA Election 11.27.20 .pdf"

Cathy,
Below is an email to Senator Parent on the Senate Judiciary Committee who reached out to me to ask about this. The body of the email to her has the portion of the ruling I was referencing to you that the current system does not meet state law. Of course this is just information from Judge Totenberg , not really granting any relief. She is addressing state laws, and our case in front of her is for federal constitutional violations. The Judge's full opinion is attached as well. Parent is an attorney and wanted the entire ruling.

I have also attached another document made at the request of a large GOP donor for the January runoff who lives outside GA. He wanted a summary of what should be done to protect the runoff as well as a summary of key quotes in the Totenberg ruling. So you will see some of the highlights there. You might want to see that before reading the entire 147 page ruling.

As you will see, the Judge comes very close to declaring the machines unconstitutional , but decides that it is too close to the election. Obviously we will continue the fight expecting that we will be successful in riding the state of the Dominion touchscreens and associated problem components.

Yet the fact that she has ruled them to violate state law should be saying something to the lawmakers.
Marilyn

---

**From:** Marilyn Marks <Marilyn@USCGG.org>
**Date:** Thursday, December 3, 2020 at 8:13 AM
**To:** Elena Parent <elena@elenaparent.com>
**Subject:** Judge Totenberg opinion re: BMD ballots and GA law

Senator Parent,

We mentioned the excerpt from Judge Totenberg's ruling commenting on the BMDs' failure to meet the HB316 statutory requirements. I have attached her full ruling, which is sobering reading about the problems with the BMD system, and have excerpted the portion about the state law below. Of course the questions before her were federal constitutional questions, not the state law issues, so the ruling has no direct impact on the state's use of the equipment.

I believe that many members of the General Assembly on both sides of the aisle will be concerned that the Secretary chose a system in direct conflict with the statutory controls the lawmakers enacted.

From page 81
"Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and **privately mark a paper ballot** at the direction of an elector, interpret ballot selections, communicate such interpretation for elector verification, and **print an elector verifiable paper ballot**;" and (2) "produce paper ballots which are **marked with the elector's choices in a format readable by the elector**" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2).

Plaintiffs and other voters who wish to vote in-person are required to ==**vote on a system that does none of those things**==. Rather, the evidence shows that the Dominion BMD system **does not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter** because the votes are tabulated solely from the unreadable QR code. Thus, under Georgia's mandatory voting system for "voting at the polls"73 voters must cast a BMD-generated ballot tabulated using a computer generated barcode that has the potential to contain information regarding their voter choices that does not match what they enter on the BMD (as reflected in the written text summary), or could cause a precinct scanner to improperly tabulate their votes. "

This may be of interest to some of your colleagues on the committee.

Please let me know if you have questions.


Marilyn Marks
Executive Director
Coalition for Good Governance
Cell: ███████
Marilyn@USCGG.org
Follow me @MarilynRMarks1

CGG20220000681

**Sent:** Monday, December 28, 2020 2:20 PM EST
**To:** Ed Voyles <bevoyles@gmail.com>; cathy latham <cathyalatham@gmail.com>
**Subject:** Re: Secret ballot ---FW: Election officials travel to Coffee County, Georgia to begin investigation | KDNL

See report below that you've likely already seen, re: the complaint about violation of secret ballot.
The law makes this the responsibility of the COUNTY board not the SOS—
**§ 21-2-70. Powers and duties**

Each superintendent within his or her county or municipality shall exercise all the powers granted to him or her by this chapter and shall perform all the duties imposed upon him or her by this chapter, which shall include the following:
13) To conduct all elections in such manner as to ==guarantee the secrecy of the ballot== and to perform such other duties as may be prescribed by law;

Also here is an order by SOS back in March in response to our HAVA complaint:

While Complainants have not presented evidence of a HAVA violation, they have shown that polling places layouts developed by local election officials must be done in a manner that ensures voter privacy, including ==obscuring the sightlines of observers, poll watchers, and the public such that they cannot view a BMD screen.==

See the voter complaint in Coffee below

https://abcstlouis.com/news/nation-world/election-officials-travel-to-coffee-county-georgia-to-begin-investigation

# Election officials travel to Coffee County, Georgia to begin investigation

COFFEE COUNTY, Ga. (WFXL) — Two officials from the Secretary of State's office arrived in Coffee County Friday morning to begin their investigation into the Board of Elections.

```
<a href="https://abcstlouis.com/news/nation-world/election-officials-travel-to-coffee-county-georgia-to-begin-investigation?video=34e6b17f074447d4b6bbaafe2ef73a6c&jwsource=cl" class="">https://abcstlouis.com/news/nation-world/election-officials-travel-to-coffee-county-georgia-to-begin-investigation?video=34e6b17f074447d4b6bbaafe2ef73a6c&jwsource=cl</a>
<iframe src="<a href="http://sinclairstoryline.com/resources/embeds/jw8-embed.html?client=googima&file=https://content.uplynk.com/34e6b17f074447d4b6bbaafe2ef73a6c.m3u8&autostart=false" class="">http://sinclairstoryline.com/resources/embeds/jw8-embed.html?client=googima&file=https://content.uplynk.com/34e6b17f074447d4b6bbaafe2ef73a6c.m3u8&autostart=false</a>" width="640" height="360" frameborder="0" scrolling="auto" loading="lazy"></iframe>
```
Copied
*Video: WGXA*

Last Wednesday, the SOS office announced that they would be opening an investigation regarding their handling of the November 2020 presidential election recount.

> *All counties were to be completed by Wednesday night, December 2, at midnight, as instructed by the Secretary of State. By Thursday, there were 6 counties finalizing their recount upload. On Thursday, Coffee County officials were working with the Secretary of State's office and Dominion Voting Systems to resolve a discrepancy of 50 votes.-Secretary of State's Office*

According to the Elections Director Misty Martin, Coffee County's tally was off by 51 votes.
Martin could not say for certain that she had scanned the same batch of 50 ballots twice, but that it could be a possibility. She was also unable to specify what machine problems were encountered.
Voters in Coffee County became aware that the election's office was being investigated.
One of those voters, Melonie Flynn, says she wasn't shocked when she heard the news.
Although Flynn said, she's never personally experienced problems while voting, she has had privacy concerns.
"I wouldn't be surprised, that's all I could tell you. I would not be surprised. There's a lot of discrepancy in this county probably back since the '20s," Flynn said. "==The only thing I thought was strange is when I came in, even though it was supposed to be private, it really wasn't. Because anybody walking behind me could have seen what I was voting.=="
Flynn wasn't the only voter who expressed concerns about the voting process in Douglas.

Douglas native Revis Stone said he also cast a ballot in person for the recent November 3 election.

Stone said if it were up to him, someone would be out of a job.

"We voted in person to make sure it counted. There again, I'm not sure it did count because these machines evidently can be manipulated," Stone said. "We didn't get any help from our governor. We didn't get any help from our secretary of state. We didn't get any help from the person in charge of the elections. If I had my ability, I would change their job position and get them out of their current positions. They would not be working tomorrow."

An official from the SOS office said they would not be commenting on the matter since the investigation is ongoing.

They did, however, provide the following information regarding the case:

> *Our investigators make their presentations/findings to the State Election Board. The board generally only meets a few times a year to consider cases like this, and so it may be many months until this case is presented to the board. The board has the option to dismiss it or to right a letter of reprimand to the county, post fine, or for some reason if it looks like it was criminal in nature they can go so far as to make a recommendation to a district attorney or the state attorney general. An investigation is not a conclusion. In other words we're looking into this to find out if we have gotten enough information, if we think we need to look further. But until we've done that we're not making any decision on what we think we'll find.*

FOX 31 News also reached out to someone from the Coffee County Board of Elections for comment. They declined to comment on the matter but said they would be following up with a response soon.

CGG20220001275

**Sent:** Wednesday, December 30, 2020 5:24 PM EST
**To:** Misty.hampton@coffeecounty-ga.gov <Misty.hampton@coffeecounty-ga.gov>; Ed Voyles <bevoyles@gmail.com>;
cathy latham <cathyalatham@gmail.com>
**Subject:** You will find this interesting from our case
**Attachment(s):** "809-3 Harri declaration .pdf"

Relates to games on server and other security issues.


Marilyn Marks
Executive Director
Coalition for Good Governance
Cell: ███████
Marilyn@USCGG.org
Follow me @MarilynRMarks1

CGG20220001360

**Sent:** Saturday, December 26, 2020 9:58 PM EST
**To:** Marilyn Marks <Marilyn@uscgg.org>
**Subject:** Re: Lamar County GOP Chair

Yes. She may. Tell her my title.  That will help.

On Sat, Dec 26, 2020 at 9:52 PM Marilyn Marks <Marilyn@uscgg.org> wrote:

> Thanks so very much.
>
> May I use your name? Will she know you?
>
>
>
>
> ---
>
> **From:** cathy latham <cathyalatham@gmail.com>
> **Date:** Saturday, December 26, 2020 at 9:24 PM
> **To:** <Marilyn@uscgg.org>
> **Subject:** Re: Lamar County GOP Chair
>
>
>  Ashley Gilles
>
> @gmail.com
>
>
> On Sat, Dec 26, 2020 at 9:13 PM Marilyn Marks <Marilyn@uscgg.org> wrote:
>
>> I would love to talk with her about Spalding too.
>>
>> Could you get me in touch with her, Cathy?
>>
>> I went to Spalding on Election Day after their pollpads melted down.
>>
>>
>>
>> ---
>>
>> **From:** cathy latham <cathyalatham@gmail.com>
>> **Date:** Saturday, December 26, 2020 at 8:57 PM
>> **To:** <marilyn@uscgg.org>
>>
>>
>> https://www.youtube.com/watch?v=7n5DRKIN4XY

**Sent:** Saturday, December 26, 2020 7:24 PM EST
**To:** Marilyn@uscgg.org <Marilyn@uscgg.org>
**Subject:** Re: My counties

Sounds good.

On Sat, Dec 26, 2020 at 7:23 PM Marilyn Marks <Marilyn@uscgg.org> wrote:

> Wow!
>
> Got enough to keep you busy?
>
> Do you know how many have Republican appointed members on their election boards (when they have boards)?
>
> I will get with out volunteers and interns to see where we have some funky reports that might be helpful for us to look at together.
>
>
> Thanks.
>
> MM

**From:** cathy latham <cathyalatham@gmail.com>
**Date:** Saturday, December 26, 2020 at 7:20 PM
**To:** <Marilyn@uscgg.org>
**Subject:** My counties


These are the counties under my caucus.  They all have populations under 80,000.


Cathy


Appling
Atkinson
Bacon
Baker
Baldwin
Banks
Barrow
Ben Hill
Berrien
Bleckley
Brooks
Bryan
Bulloch
Burke
Butts
Calhoun
Camden
Candler
Catoosa
Charlton
Chattahoochee
Chattooga
Clay
Clinch
Coffee
Colquitt
Cook

Crawford
Crisp
Dade
Dawson
Decatur
Dodge
Dooly
Early
Echols
Effingham
Elbert
Emanuel
Evans
Fannin
Franklin
Gilmer
Glascock
Glynn
Gordon
Grady
Greene
Habersham
Hancock
Haralson
Harris
Hart
Heard
Irwin
Jackson
Jasper
Jeff Davis
Jefferson
Jenkins
Johnson
Jones
Lamar
Lanier
Laurens
Lee
Liberty
Lincoln
Long
Lumpkin
Macon
Madison
Marion
McDuffie
McIntosh
Meriwether
Miller
Mitchell
Monroe
Montgomery
Morgan
Murray
Oconee
Oglethorpe
Peach
Pickens
Pierce
Pike
Polk
Pulaski
Putnam
Quitman
Rabun
Randolph
Schley

Screven
Seminole
Spalding
Stephens
Stewart
Sumter
Talbot
Taliaferro
Tattnall
Taylor
Telfair
Terrell
Thomas
Tift
Toombs
Towns
Treutlen
Troup
Turner
Twiggs
Union
Upson
Walker
Ware
Warren
Washington
Wayne
Webster
Wheeler
White
Wilcox
Wilkes
Wilkinson
Worth

**Sent:** Monday, December 28, 2020 9:43 AM EST
**To:** cathy latham <cathyalatham@gmail.com>; Ed Voyles <bevoyles@gmail.com>
**Subject:** FW: Authority of county boards to use hand marked paper ballots
**Attachment(s):** "20200718 CGG Law and Q&A .pdf","B Brown letter re Fulton .pdf","CGG-Securing GA Election 11.27.20 .pdf"

Cathy,
You may not have the attached.
See Judge Totenberg's ruling below that the BMD system does not meet GA law. (Our case is about federal constitutional law, so her ruling on state law doesn't really impact the result of our case, but nonetheless is important.).

Attached is a layman's level review of the law that permits counties to go to HMPB.  Also for info is the letter we wrote Fulton about the many violations as they continue to use BMDs.  And a big donor to GOP  asked me to lay out a plan a month ago and summarize some of Judge Totenberg's important findings.  That is on the 3rd pdf. You might find those sobering.

Sorry if some of this is repetitive
MM

---

**From:** Marilyn Marks <Marilyn@USCGG.org>
**Date:** Wednesday, December 16, 2020 at 2:11 PM
**To:** Ed Voyles <bevoyles@gmail.com>
**Subject:** Authority of county boards to use hand marked paper ballots

Per our conversation.
My view is that it is the county boards have the obligation to choose hand marked paper ballots, given that the system cannot meet Georgia law.
Also, per my email last night (attached again), Judge Totenberg noted that the system does not even meet Georgia statutes in her last ruling:

*"Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, communicate such interpretation for elector verification, and print an elector verifiable paper ballot;" and (2) "produce paper ballots which are marked with the elector's choices in a format readable by the elector" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2).*
*Plaintiffs and other **voters who wish to vote in-person are required to vote on a system that does none of those things**. Rather, the evidence shows that the Dominion BMD system does not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code. Thus, under Georgia's mandatory voting system for "voting at the polls" voters must cast a BMD- generated ballot tabulated using a computer generated barcode that has the potential to contain information regarding their voter choices that does not match what they enter on the BMD (as reflected in the written text summary), or could cause a precinct scanner to improperly tabulate their votes.*
**(page 13 of the attached)**

Happy to discuss with you or Mr. Rowell.

Marilyn Marks
Executive Director
Coalition for Good Governance
Cell: █████████
Marilyn@USCGG.org
Follow me @MarilynRMarks1

CGG20220000266

## I. When using BMDs "Wholly Or In Part is Not Practicable"

### A. Governing Georgia Laws

   *1.    O.C.G.A. § 21-2-281 states:*

In any primary or election in which the use of voting equipment is impossible or impracticable, for the reasons set out in Code Section 21-2-334, the primary or election may be conducted by paper ballot in the manner provided in Code Section 21-2-334.

   *2.    O.C.G.A. § 21-2-334 states:*

 If a method of nomination or election for any candidate or office, or of voting on any question is prescribed by law, in which the use of voting machines is not possible or practicable, or in case, at any primary or election, the number of candidates seeking nomination or nominated for any office renders the use of voting machines for such office at such primary or election impracticable, or if, ***for any other reason, at any primary or election the use of voting machines wholly or in part is not practicable***, the superintendent may arrange to have the voting for such candidates or offices or for such questions conducted by paper ballots.

(Emphasis added).

   *3.    Election Rule 1-183-1-12(c) and (d)*

If an emergency situation makes utilizing the electronic ballot markers impossible or impracticable, as determined by the election superintendent, the poll officer shall issue the voter an emergency paper ballot that is to be filled out with a pen after verifying the identity of the voter and that the person is a registered voter of the precinct.

1

CGG20220000267

## B.    Common Misconceptions Corrected

*1.    Doesn't the State law requiring a uniform system of voting require counties to use BMDs no matter what?*

No. It is true that BMDs are currently the default system and, absent conditions that making the use of BMDs "wholly or in part impracticable," counties are not free to use hand marked paper ballots just because they prefer that method of voting.  However, if using BMDs is impracticable, then counties may use hand marked paper ballots.

*2.    Doesn't the State Board or the Secretary of State alone have the power to determine if using BMDs are "wholly or in part impracticable"?*

No.  Both Georgia statutes and the Board Rule quoted above give the authority to the *election superintendent* (that is, the BRE) to make the determination as whether to using BMDs is impossible or impracticable, in whole or in part. This makes sense as malfunctioning machines or emergency situation require local assessment and prompt decision making.

*3.    Isn't the authority to switch to hand marked paper ballots limited to the rare situation in which using BMDs is truly impossible?*

No.  Georgia law also allows hand marked paper ballots to be used if using BMDs is "not practicable."  "Not practicable" means "not feasible," which means not "capable of being used or dealt with successfully."  So if a county determines that the BMDs cannot be used successfully, then the county may use hand marked paper ballots.  In addition, Georgia law provides that hand marked paper ballots may be used if using BMDs is even "*in part*" not feasible.

Thus, if the election superintendent determined that, for example, it was not feasible to use BMDs because of labor shortages necessary to test the BMDs effectively, or not feasible to use BMDs in a manner

2

CGG20220000267

that was compliant with Georgia's ballot secrecy laws, discussed in Part II, then the election superintendent would be authorized to use hand marked paper ballots.

>    *4.     Isn't it the Secretary of State's fault, and not the counties' fault, that the counties are put in the position of trying to use these faulty BMDs?*

The Secretary can be blamed for purchasing the BMDs and for failing to give the counties adequate support, but Georgia laws give the duty for proper deployment of equipment to the county boards, which are also responsible for testing the accuracy of the systems and guaranteeing ballot secrecy.

## II.     Ballot Secrecy Laws

### A.     Governing Georgia Laws

>    *1.     Article II, Section 1, Paragraph 1 of the Geoergia Constitution:*

Elections by the people shall be by secret ballot.

>    *2.     O.C.G.A. § 21-2-379.22 Requirements for adoption and use of electronic ballot markers:*

No electronic ballot marker shall be adopted or used in primaries or elections in this state unless it shall, at the time, satisfy the following requirements:

…(5) Permit voting in ***absolute secrecy*** so that no person can see or know any other elector's votes, except when he or she has assisted the elector in voting, as prescribed by law;

3

CGG20220000267

3.    *O.C.G.A. § 21-2-70(13):*

Election superintendents (i.e., the BRE) has the duty to "conduct all elections in such manner as to guarantee the secrecy of the ballot."

4.    *State Election Board Rule 183-1-12-11(4):*

The polling place shall be arranged in such a manner as to provide for the privacy of the elector while voting and to allow monitoring of each voting system component by the poll officers while the polls are open. The electronic ballot markers and ballot scanners used in the polling place shall be set up in a manner to assure the privacy of the elector while casting his or her ballot while maintaining the security of such units against tampering, damage, or other improper conduct.

**B.    Common Misconceptions Corrected**

1.    *Who has the legal duty under the Georgia election laws to ensure that voting is in absolute secrecy?*

The Election Superintendent (i.e., the BRE).

2.    *If it is not possible to configure the BMDs such that absolute voter secrecy is preserved, what is the Election Superintendent legally obligated to do?*

Not use BMDs. A BMD cannot be used "unless it shall, at the time" permit "voting in absolute secrecy." And, if BMDs cannot be used, the Election Superintendent must use hand marked paper ballots.

4

CGG20220000267

      *3.      Is "absolute secrecy" violated if the only other person who can see the vote is a pollworker?*

Yes.  Under Georgia law, "absolute secrecy" means that "no person can see or know any other elector's votes."

      *4.      Can the result of an election be challenged based on the violation of ballot secrecy?*

Yes.  The violation of ballot secrecy would be one basis for challenging the result of an election.  *See Laite v. Stewart,* 112 Ga. App. 853, 855 (1965).

                                          **Bruce P. Brown**
                                          **Bruce P. Brown Law LLC**
                                        **1123 Zonolite Road, NE**
                                        **Atlanta, Georgia 30306**
                                        **(404) 881-0700**

                                        **July 18, 2020**

CGG20220000267



**Bruce P.**
**Brown**
**Law**

October 3, 2020

**By Email**

Cheryl Ringer
Office of the County Attorney
141 Pryor St., SW
Suite 4038
Atlanta, Georgia 30303

Re: Fulton County Board of Elections' Ongoing Violations of State Law

Dear Cheryl:

The Fulton County Board of Elections has made many recent and welcome efforts to make voting more convenient and accessible. We enthusiastically commend such efforts. Given the Secretary of State's numerous reckless decisions regarding the upcoming election, however, Fulton is being lured into serious violations of Georgia's Election Code, as detailed below.

This week the Secretary of State disclosed that all of the existing software (and data, including evidence, from prior elections required to be preserved) must be wiped from the BMDs and replaced with new, uncertified, untested software that was written by Dominion just this past weekend. Fulton is complying with the State's ill-considered instructions, despite the fact that such actions are in plainly in violation of the Georgia Election Code.

You and the Board Members will recall that the Secretary unfairly blamed the Board for the "complete meltdown" that was the June Presidential Primary. The Secretary is either deliberately setting up the Board again to take the blame for another meltdown, or is recklessly unable to deploy its new systems in compliance with state law or federal constitutional requirements. Either way, the Board should not, and as a matter of Georgia law, cannot, allow it to continue.

We are confident that if the Board is made aware of these statutory violations that it will immediately bring Fulton County into compliance. The Board can do so by invoking the provisions for O.C.G.A. § 21-2-281, which allow the Board to switch to hand marked paper ballots in the event that using the BMDs is ***impossible*** or ***impracticable***. The conditions are expanded by State Election Board Rule 183-1-12-.11(2)(c) stating that if the BMDs are ***unusable***, impracticable or impossible for voting (c), and 183-1-12-.11(2)(d) adding that if ***insufficient*** BMDs are available, hand marked paper ballots should be used.

(404) 881-0700 | 1123 Zonolite Rd., Suite 6, Atlanta, Georgia 30306
www.brucepbrownlaw.com | bbrown@brucepbrownlaw.com

CGG20220000272

Ms. Cheryl Ringer
October 3, 2020
Page 2


What follows a partial list of the Georgia statutes and Rules that the Board is currently violating:

1. **Illegal software is being installed on Fulton's BMDs (**violation of O.C.G.A. §§ 21-2-368(d); 21-2-379.24; 21-2-300(a)(3))

Georgia law requires, at a bare minimum, that the following three steps be taken before voting system software may be used on election equipment:

First, O.C.G.A. §21-2-300(a)(3) requires that the system be certified by the federal EAC. At this very moment, Dominion technicians, at the direction of the Secretary, are installing new software on Fulton's BMDs, software that Dominion has confirmed to Judge Totenberg has *not* been certified by the EAC. This is *not* just a "patch" or revision: the prior election software is being wiped from the equipment and replaced in its entirely by new, uncertified, untested software. This software has never been run in any election in any jurisdiction—not even a mock election—and was written this past weekend.

Second, Voting System Rule 590-8-1.01(d)(6) requires that, after the system is EAC certified, it be sent to a state certification agent for further testing and a report. With no EAC certification, this of course has not occurred.

Third, Voting System Rule 590-8-1.01(d)(7) requires that, after the state certification agent issues its report, the Secretary of State must make a determination whether to certify the system. Certification of new voting systems is required by O.C.G.A § 21-2-379.24. The Secretary certified the prior BMD system, but not the system that Dominion technicians are installing on Fulton's BMDs this week.

Further, O.C.G.A. § 21-2-368(d) requires the Fulton Board: "At least ten days prior to any primary or election, including special primaries, special elections, and referendum elections, the election superintendent shall verify and certify in writing to the Secretary of State *that all voting will occur on equipment certified by the Secretary of State*."

Early voting begins in ten days and this Board has not, and cannot, make the necessary certification without misrepresenting the undisputed facts.

These are not hyper-technical or bureaucratic requirements, but mandatory provisions of Georgia law that were enacted to protect the security and reliability of the voting systems and voters' constitutional rights to cast an accountable ballot. Untested and uncertified software can create errors in the operation and tallies of the BMDs and can carry bugs and malware into the database that can affect absentee ballots, reporting capabilities, and possibly pollbooks.

CGG20220000272

Ms. Cheryl Ringer
October 3, 2020
Page 3

**2.** **Fulton is not conducting mandatory acceptance testing of the new software** (violation of Election Rule 183-1-12-03(1))

The Secretary of State's Voting Systems Rule 590-8-1-.01(d)(8) states, "[a]cceptance tests shall be performed in the user's environment to demonstrate that the voting system as delivered and installed is identical to the system that was certified by the State and satisfies the requirements specified in the procurement documents."

State Election Board Rule 183-1-12-03(1) states: "Upon the receipt of new, repaired, or upgraded components of the voting system, including electronic ballot markers . . . the election superintendent of the county is responsible to check that an acceptance test has been performed on the device in accordance with standards issued by the Secretary of State. No component of the voting system shall be placed into service until such time as the unit satisfactorily passes the prescribed acceptance tests."

Crucially, this Election Rule gives the *Board* the responsibility of assuring that satisfactory acceptance testing has been conducted. But Fulton has not done *any* acceptance testing or generated any of the required documentation. The Board is about to "place into service" components that have *not* passed "the prescribed acceptance tests," in complete violation of this Rule.

**3.** **Fulton is failing to conduct complete Logic and Accuracy Testing** (violation of O.C.G.A. §§ 21-2-379.25 (a) and (c))

O.C.G.A. §§ 21-2-379.25 (a) and (c) require that the county "verify that **each** device is properly recording votes and producing proper ballots," and that "the superintendent shall have **each** electronic ballot marker tested to ascertain that it will correctly record the votes cast for **all offices and on all question**."

Testing being conducted by Fulton, based on the Secretary's guidance, does not comply with this statute because it fails to "have each electronic ballot marker tested … for all offices and on all questions." As laid out in detail in the *Curling v. Raffensperger* litigation and discussed extensively in recent conferences with the Court where this Board was represented, the Secretary's procedure for LAT falls far short of the minimum statutory requirements that this Board is obligated to obey. The Secretary of State's representative testified in a recent hearing that conducting the LAT on BMD units at the levels required by statute is **impractical** and too time consuming to accomplish. The Board, however, remains legally obligated to voters to ensure that the statutorily required LAT be conducted.

Ms. Cheryl Ringer
October 3, 2020
Page 4

**4.** ==**Fulton is failing to review accuracy of the election database**== (violation of Rules 183-1-12-.19 (5); 183-1-12-07(1))

Election Board Rule 183-1-12-07(1) states that "the election superintendent shall review the electronic databases used to generate ballots for correctness and accuracy."

Election Board Rule 183-1-12-(.19)(5) requires that "the county election superintendent shall provide to the Secretary of State or his or her designee a final copy of the election management system database for the county."

Again, in this Rule the State Election Board has transferred the responsibility for database review to this Board. We do not believe that Fulton is conducting the required database review for accuracy of its voluminous contents and configuration of the ballots and tabulation instructions, as required by the Election Code, or that it is sending a final corrected database to the Secretary prior to the election.

**5.** ==**Violation of absolute secrecy in voting** (O.C.G.A. §§ 21-2-379.22(5)== and 21-2-70)

O.C.G.A. § 21-2-70  directs this Board to guarantee the secrecy of the ballot:

Each superintendent within his or her county or municipality shall exercise all the powers granted to him or her by this chapter and shall perform all the duties imposed upon him or her by this chapter, which shall include the following: . . .

**(13)** To conduct all elections in such manner as to *guarantee the secrecy of the ballot.*

The large well-lit BMD displays, however, advertise Fulton voters' votes to others in the polling place.  O.C.G.A. § 21-2-379.22 further provides:

No electronic ballot marker shall be adopted or used in primaries or elections in this state unless it shall, at the time, satisfy the following requirements: . . .

**(5)** Permit voting in *absolute secrecy* so that no person can see or know any other elector's votes, except when he or she has assisted the elector in voting, as prescribed by law;

Fulton's failure to take necessary action to ensure ballot secrecy not only is violating voters' rights but also invites challenges to the outcome because the secrecy of the ballot is not being guaranteed.

CGG20220000272

Ms. Cheryl Ringer
October 3, 2020
Page 5

### Security failures

There are numerous gravely serious security failures at EPC that must be addressed. We have detailed some of them in our pleadings in the Curling case, and we continue to offer, without response from this Board, to have a meeting with the Board or management to share our concerns in more detail.

### Remedy Provided by the Election Code

The Georgia Election Code provides for adopting hand marked paper ballots instead of BMDs in cases like this one where it is impossible or impracticable to do so. Given that it is impossible to use the system and comply with many mandates of Georgia law, it is the duty of the Board to adopt hand marked paper ballots, which can be read with the optical scanner and thoroughly audited. Georgia statutes (O.C.G.A. §§ 21-2-281, 21-2-334) call for this solution, and recent SEB Election Rule 183-1-12-.11(2)(c)-(d) specifically supports its application when BMDs are impractical to use.

We would very much like the opportunity to discuss our concerns with you and the Board and urge the Board to not install or use this unreliable, untested and illegal system.

Please let me know if you have any questions.

Sincerely,

Bruce P. Brown

cc:    Kaye Burwell
       David Lowman
       Marilyn R. Marks
       Cary Ichter
       Robert A. McGuire

## Georgia's US Senate Runoff Races at Risk

### *A Modest Proposal for a Defensible Vote Count*

With the control of the US Senate at stake, it is imperative that a fair, complete, accurate and unassailable vote count be conducted. The election must be conducted in a manner that candidates, the press, American voters and the world's leaders will accept that the winners reflect the will of the Georgia voters. Unless Georgia simplifies and secures its voting technology immediately, January's true election outcomes can never be known, verified, or defended. If the election is conducted on the current Dominion touchscreen voting system, the election will result in predictable bitter controversy.  A long-term cloud will be cast over the election currently planned to be conducted without the ability to obtain a verifiable outcome. The nation need not tear itself further apart with the predictable rancor of yet another disputed election when a commonsense solution is at hand.

Proposed Solution—In a departure from using its controversial electronic touchscreen voting machines, Georgia should use simple hand marked paper ballots for both polling place and mail ballots (Exhibit 1), count them on optical scanners, and conduct robust post-election audits on all three races on the simple January ballot to verify the outcome. No new equipment is required. The simple solution will save millions in labor cost and create an accurate and uncontestable vote.  The solution is authorized by current law.

Problem—In 2020, Georgia implemented an expensive new Dominion touchscreen voting system that is highly vulnerable to undetectable erroneous programming and hacking. The barcode balloting system in which the voter's official vote is embedded in a QR code was controversial even before it was approved by the Georgia General Assembly in 2019 in a party line vote. Republicans adopted the recommendation of Secretary of State Raffensperger, rejecting the advice of cybersecurity experts and election auditing experts, who warned of its inability to produce an auditable result.

The barcode balloting system, Ballot Marking Devices, ("BMDs"), failed its first major tests in 2020, resulting in the headline grabbing "Complete Meltdown" [1] in the June primary, and the Republican challenges to the November presidential election and the controversy over voting system security.   The just completed hand count "audit" of the

---

[1]  https://www.nytimes.com/2020/07/25/us/politics/georgia-election-voting-problems.html;
https://www.cnn.com/2020/06/10/politics/georgia-primary-vote-brian-kemp/index.html

Coalition for Good Governance—Marilyn Marks (Marilyn@USCGG.org)          11/27/20

CGG20220000277

vote tallies[2] found thousands of uncounted votes because of memory card issues, and concerning apparent machine counting errors. (See item 8 below.)

Background

In August 2019, just after Secretary Raffensperger's decision to purchase the Dominion BMD voting system, non-partisan 501(c)(3) organization Coalition for Good Governance ("CGG") expanded its election security lawsuit in front of the Honorable Amy Totenberg in the Northern District of Georgia. Judge Totenberg had just ruled in CGG's favor that Georgia's paperless touchscreen voting machines were unconstitutional and forced the state to abandon them. Rather than heeding the Court's warnings about the replacement purchase of another touchscreen voting system, the state allocated $150 million for the purchase of a more complex and equally vulnerable (and unconstitutional) system ---the BMDs.

The Court denied preliminary injunctive relief just prior to the start of the November election, because of the closeness to the election, but in its 147 page order, expressed grave concerns about the viability of the system and adopted CGG's experts' views as the credible evidence in the case. Much of the undisputed evidence and facts are best summarized by reference to the Court's order.

Key facts:

1.  No new equipment required. Georgia has all the voting equipment needed to use hand marked paper ballots for the January election. The equipment change merely substitutes traditional paper ballots marked with pen (Exhibit 1) for the complex touchscreen units and printers that create and mark a barcoded ballot for a voter. (Exhibit 2) The touchscreen units and printers should be mothballed for January's election.

2.  Touchscreen complexity. Dominion's complex BMDs were originally designed for accessibility units for voters with disabilities. Georgia adopted them as a uniform system for all voters who vote in polling places. (75% of voters).  Its unnecessary complexity is the root cause of its flawed security design. (See picture of set up at Exhibit 3.)

3.  Only hand marked ballots are secure. A voting system should never put a computer between the voter and his ballot. Computers invite mischief and errors. The hand marked

---

[2] It is important to understand that gross tallies of discrepancies have not been reported, but only net changes. https://www.ajc.com/politics/recount-finds-thousands-of-georgia-votes-missing-from-initial-counts/ERDRNXPH3REQTM4SOINPSEP72M/

Coalition for Good Governance—Marilyn Marks (Marilyn@USCGG.org)          11/27/20

paper ballot, marked in secret by the voter, is the only current voting method that both protects secrecy and assures that the ballot reflects the choice made by the voter. Approximately 75% of Americans vote using hand marked paper ballots counted by optical scanner.

4. <u>Voters cannot read their BMD vote.</u> Voters cannot read their official vote before they cast it in the scanner--embedded in the QR code. The human readable text printed below the barcode is not read by the system. Mis-programming or hacking can cause the text to be accurate but the QR code to embed a vote for the wrong candidate.

5. <u>BMD results cannot be audited.</u> Post-election audits of the human readable text on the ballot compared to the vote count cannot validate the election outcome because the vast majority of the voters do not review their ballot cards before casting, despite being reminded to do so. This results in an untrustworthy ballot as a source document for auditing.

6. <u>Election outcomes cannot be proven</u>. Three of the nation's top experts have co-authored a paper explaining what becomes obvious, "*Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters*." [3]  Their abstract states "We identify two properties of voting systems, contestability and defensibility, necessary for audits to confirm election outcomes. No available EAC-certified BMD is contestable or defensible."  There is almost universal agreement among independent voting systems and cybersecurity experts that BMD voting systems are not secure enough to conduct elections for public office.

7. <u>Essential post-election audit of election outcome.</u> Given the vulnerable nature of the entire Dominion system, it is essential that a robust post-election audit be conducted that can unquestionably verify the ***outcomes*** of the races. Even using hand marked paper ballots scanned by optical scanners, results must be audited to assure that scanners have not been corrupted or mis-programmed. Statistically valid sample hand counts of the ballots can obtain that uncontestable assurance. Merely "auditing" the arithmetic of the BMD ballot cannot confirm the ***outcome*** because the ballot printout with its QR code, **is not a trustworthy record of voter choices.**

8. <u>Machine Vote Count Errors Detected –Not Corrected.</u> Secretary Raffensperger just conducted a controversial full hand counted "audit" of the November 3 presidential race. The audit could not be designed to confirm the BMD election outcome, but could only

---

[3] https://www.dropbox.com/s/18osk48o0u8jhz9/bmd-insecure-accepted.pdf?dl=0

Coalition for Good Governance—Marilyn Marks (Marilyn@USCGG.org)                    11/27/20

CGG20220000277

test the arithmetic of the vote tallying—not which candidate was selected by the most voters. The source of machine and hand count vote count differences remains unresolved, which only adds to the controversy about the Dominion system. The Secretary has minimized the troubling vote count discrepancies, speaking only in "net changes" rather than investigating the source of the machine and hand count differences which have offsetting impact in some cases.

Given that **significant and widespread discrepancies have not been investigated** nor detailed information released, **the January election must be safeguarded** by adopting a hand marked balloting system that can identify and correct any machine errors prior to finalizing the results.

9. <u>Secret Ballot Litigation Risk</u>. --A high risk factor is rarely discussed that could potentially void any election conducted on Georgia's BMD system. It is undisputed that the touchscreen displays are so large, bright and visible from across the room that no one can vote in private by secret ballot on the machines. (Exhibit 4) After a year of seeking solutions in response to widespread voter complaints, no one has been able to solve this systemic problem. (The touchscreen units were originally designed for blind voters, and a "privacy mask" blacks out the screen while the blind voter uses the audio controls to mark his ballot. Obviously, a privacy mask is unworkable for the vast majority of the voters voting while reading the touchscreen display. The units are simply not suitable for generalized use.)

Georgia law is quite strict and strong to protect the "absolute secrecy" of the ballot. In fact, Georgia case law holds that an election must be voided if conducted by non-secret ballot. No one disputes the fact that BMDs use non-secret ballots. No plaintiff has yet attempted to challenge an election with the BMDs on these grounds, but it remains an exceptionally devastating risk. The US Senate races should not tolerate this unnecessary risk.

10. <u>Switch to hand marked ballots is lawful.</u> Georgia law includes the logical and essential provision that if it is impractical or impossible to use the BMDs, that hand marked paper ballots must be used. Given the many ongoing issues, including the impossibility of complying with secret ballot laws (and many others), and the inaccurate ballot counting disclosed in the audits, it is clear that BMDs are impractical to use in this election.

Hand marked ballots are far easier for the voter, faster than touchscreen voting, with no difference in time required for scanning and tallying. The only argument that the state has

Coalition for Good Governance—Marilyn Marks (Marilyn@USCGG.org)          11/27/20

CGG20220000277

successfully used to retain the BMDs is that the primary and general election ballots are long and complex and differ by precinct. During early voting at vote centers, maintaining ballot inventory levels and issuing correct ballot styles is administratively tedious. However, in the January election, every ballot style in the state is identical, as the content is only 3 statewide races. The only argument the State had for the use of BMDs is not applicable for the January election. Hand marked paper ballots is the simple logical choice.

11. <u>Dominion BMD system permits voting multiple times.</u> It is undisputed that the BMDs have a security flaw that permits the voter to fool the machine into reacting to a purposeful harmless paper jam, causing it to print up to three more ballots although only 1 ballot is logged. The voter can cast all 4 ballots and all will be tabulated. Additionally, the electronic pollbooks permit a pollworker to issue as many smartcard (BMD activation cards) as they wish, although only 1 card is logged into the system for the voter. As these security flaws become better known, it is inevitable that the weaknesses will be exploited. The proposed hand marked paper ballots can be issued under traditional tight controls.

<u>Supporting documentation</u>

The attached summary (Exhibit 5) is a compilation of references from Judge Totenberg's October 11, 2020 ruling denying the Motion for Preliminary Injunction to declare the BMD system unconstitutional. Although the Court denied most relief, the Order makes clear that the Court is highly skeptical of the system and its constitutionality and reliability to produce an accountable election.

<u>Summary</u>

There is a compelling need for an accountable defensible election scheme for the January Senate Runoffs. There is likely bi-partisan agreement that adopting a simple commonsense solution is strongly preferable to accepting the high risk of the unaccountable BMD system, with unresolved discrepancies from November, and with the potential of being declared unconstitutional.

Coalition for Good Governance
Marilyn Marks, Executive Director
970 404 2225
Marilyn@USCGG.org

CGG20220000277

Exhibit 1

# PUTNAM COUNTY
SAMPLE

## OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION RUNOFF BALLOT
### OF THE STATE OF GEORGIA
### JANUARY 5, 2021

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do NOT use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do NOT circle, underline or mark through choices |
| 3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do NOT use check marks or X to mark ballot |
| | Do NOT mark more choices per race than allowed |
| | Do NOT sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

**A.** Do not attempt to mark through the selection or attempt to erase.  Write "Spoiled" across **the ballot and across the return envelope**
**B.** Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:**  Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned.  You will then be permitted to vote a regular ballot

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

**For United States Senate**
(Vote for One)

○ David A. Perdue
(Incumbent) Republican

○ Jon Ossoff
Democrat

**SPECIAL ELECTION RUNOFF**

**For United States Senate**
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ Kelly Loeffler
(Incumbent) Republican

○ Raphael Warnock
Democrat

**For Public Service Commissioner**
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ Lauren Bubba McDonald, Jr.
(Incumbent) Republican

○ Daniel Blackman
Democrat

CGG20220000277

# FAYETTE COUNTY

## OFFICIAL BALLOT

### REPUBLICAN PARTY PRIMARY AND NONPARTISAN GENERAL ELECTION OF THE STATE OF GEORGIA
### MAY 19, 2020

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e) and 21-2-383(a)]*

351-Blackrock



For President of the United States  (Vote for One) (REP)
   Vote for Donald J. Trump (I)

For United States Senate  (Vote for One) (REP)
   Vote for David A. Perdue (I)

For Public Service Commissioner  (Vote for One) (REP)
   Vote for Jason Shaw (I)

For Public Service Commissioner  (Vote for One) (REP)
   Vote for Lauren Bubba McDonald, Jr. (I)

For U.S. Representative in 117th Congress From the 3rd Congressional District of Georgia (Vote for One) (REP)
   Vote for Drew Ferguson (I)

For Judge of the Probate Court  (Vote for One) (REP)
   Vote for Ann S. Jackson (I)

For Clerk of Superior Court  (Vote for One) (REP)
   Vote for Sheila Studdard (I)

For Sheriff  (Vote for One) (REP)
   Vote for Barry H. Babb (I)

For Tax Commissioner  (Vote for One) (REP)
   Vote for Kristie King (I)

For Coroner  (Vote for One) (REP)
   Vote for W. Bee Huddleston (I)

For Solicitor General  (Vote for One) (REP)
   Vote for James K. Inagawa (I)

For County Commissioner District 5  (Vote for One) (REP)
   Vote for Ann Wittenberg

For County Board of Education District 5  (Vote for One) (REP)
   Vote for Brian Anderson (I)

Republican Party Question 1 (REP)
   Vote for YES

Republican Party Question 2 (REP)
   Vote for NO

Republican Party Question 3 (REP)
   Vote for NO

For Justice, Supreme Court of Georgia (Vote for One) (NP)
   Vote for Elizabeth "Beth"  Beskin

For Justice, Supreme Court of Georgia (Vote for One) (NP)
   Vote for Sarah Hawkins Warren (I)

For Judge, Court of Appeals of Georgia (Vote for One) (NP)
   Vote for Trenton "Trent"  Brown, III (I)

For Judge, Court of Appeals of Georgia (Vote for One) (NP)
   Vote for Christian Coomer (I)

For Judge, Court of Appeals of Georgia (Vote for One) (NP)
   Vote for Sara Doyle (I)

For Judge, Court of Appeals of Georgia (Vote for One) (NP)
   Vote for Elizabeth Dallas Gobeil (I)

For Judge, Court of Appeals of Georgia (Vote for One) (NP)
   Vote for David Todd Markle (I)

1/2

For Judge, Court of Appeals of Georgia
(Vote for One) (NP)
    Vote for Carla McMillian (I)

For Judge, Superior Court of the Griffin
Judicial Circuit  (Vote for One) (NP)
    Vote for Scott L. Ballard (I)

For Judge, Superior Court of the Griffin
Judicial Circuit  (Vote for One) (NP)
    Vote for W. Fletcher Sams (I)

For Judge of Magistrate Court Post 1
(Vote for One) (NP)
    Vote for Christy Dunkelberger (I)

For Judge of Magistrate Court Post 2
(Vote for One) (NP)
    Vote for Kathy Brown Valencia (I)

For Judge of Magistrate Court Post 3
(Vote for One) (NP)
    Vote for Robert "Bob" Ruppenthal
       (I)

For Judge of Magistrate Court Post 4
(Vote for One) (NP)
    Vote for Natalie Ashman

CGG20220000277



CGG20220000277



**Exhibit 5**

**Excerpts from 10/11/20 Ruling --Judge Amy Totenberg**
(full Order here https://bit.ly/CGGOrderOct )


Page 89

The substantial risks and long-run threats posed by Georgia's BMD system, at least as currently configured and implemented, are evident.

===============================================================

Page 79

Plaintiffs have shown **demonstrable evidence** that the manner in which Defendants' alleged mode of implementation of the BMD voting system, logic and accuracy testing procedures, and audit protocols deprives them or puts them at imminent risk of **deprivation** of their fundamental right to cast an effective vote **(i.e., a vote that is accurately counted)**.

Page 68

     Between November 2018 and March 2019, Dr. Appel conducted a research collaboration with Dr. DeMillo of Georgia Tech and Dr. Stark, leading to the publication of a joint paper, Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters. After analyzing the consequences of a study of whether voters review ballot cards produced by BMDs, their research concluded:

> Risk-limiting audits of a trustworthy paper trail can check whether errors in tabulating the votes as recorded altered election outcomes, but there is no way to check whether errors in how BMDs record expressed votes altered election outcomes. The outcomes of elections conducted on current BMDs therefore cannot be confirmed by audits.

Page 30

The issues and alleged practices identified by Plaintiffs as a basis for enjoining the system include:

- the BMD QR code's lack of encryption, that opens voting data up to breach, alteration, and other security weaknesses;

Coalition for Good Governance—Marilyn Marks (Marilyn@USCGG.org)          11/27/20

- cybersecurity risk management and practices that allegedly render the voting system vulnerable to compromise and breach, and **alteration or loss of votes;**

- alleged major shortcuts taken in state protocols now used for conducting Logic and Accuracy testing ("L & A") of voting machines required under Georgia law preceding each election, even though L & A testing constitutes a fundamental threshold standard to verify the correct functioning and accurate output of the BMD system and its component parts;

- the alleged **impossibility** or inadequacy of using Risk-Limiting Audit methodology **meaningfully to audit BMD ballots** and votes tallied based on a scanned QR code, where evidence indicates that **only a fraction of voters review their printed ballo**t; ...

- the alleged failure to protect the confidentiality of the voting process by **...** the large BMD screens that expose the voter's selection choices to other individuals in the precinct and burdening their free exercise of the franchise.

============================================================

Page 145

The Court's Order has delved deep into the true risks posed by the new BMD voting system as well as its manner of implementation**. These risks are neither hypothetical nor remote under the current circumstances.** The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system **does not benefit the public** or citizens' confident exercise of the franchise. The stealth vote alteration or operational interference risks posed by malware that can be **effectively invisible to detection**, whether intentionally seeded or not, are high once implanted, if equipment and software systems are not properly protected, implemented, and audited.  The modality of the BMD systems' capacity to deprive voters of their cast votes without burden, long wait times, and insecurity regarding how their votes are actually cast and recorded in the unverified QR code makes the potential constitutional deprivation less transparently visible as well, at least until any portions of the system implode  because of system breach, breakdown, or crashes. Any operational shortcuts now in setting up or running election equipment or software creates other risks that can adversely impact the voting process.

      **The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of "might this actually ever happen?" – but "when it will happen," especially if further protective measures are not taken**. Given the masking nature of malware

CGG20220000277

and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," **the future does not bode well.**

Still, this is year one for Georgia in implementation of this new BMD system as the first state in the nation to embrace statewide implementation of this QR barcode-based BMD system for its entire population. Electoral dysfunction – cyber or otherwise – should not be desired as a mode of proof. **It may well land unfortunately on the State's doorstep.** The Court certainly hopes not.

Page 81

Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, communicate such interpretation for elector verification, and print an elector verifiable paper ballot;" and (2) "produce paper ballots which are marked with the    elector's choices in a format readable by the elector" O.C.G.A. § 21-2-2(7.1);
O.C.G.A. § 21-2-300(a)(2).

**Plaintiffs and other voters who wish to vote in-person are required to vote on a system that does none of those things.** Rather, the evidence shows that the Dominion BMD system does not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code. Thus, under Georgia's mandatory  voting  system  for  "voting at the polls" voters must cast a BMD- generated ballot tabulated using a **computer generated barcode that has the potential to contain information regarding their voter choices that does not match what they enter on the BMD (as reflected in the written text summary), or could cause a precinct scanner to improperly tabulate their votes.**

======

Page 78

Absent such an injunction, there is **no audit remedy that can confirm the reliability and accuracy of the BMD system,** as Dr. Stark has stressed. Plaintiffs do not request, and have not offered, any other proposed audit procedures to accomplish the goal of the RLA. Nor is the Court in a position to reach a judgment regarding whether the Secretary of State's plan to conduct a single RLA assessment in one statewide race under these circumstances provides any meaningful protection or guidance regarding the accuracy of tabulation of the overall voting results (or system).

CGG20220000277

**The Court has some major doubts, given the entirety of the evidence discussed here**.

===============

p. 41

Based on his cybersecurity expertise and in-depth knowledge hacker strategies, Hursti identified concerns regarding the security of these systems. He found that in the two county election offices he visited, election servers **enabled unsafe remote access to the system through a variety of means**, extending from frequent use of flash drives and accessing of the internet to the use of outside unauthorized applications (such as game programs) residing on election management and tabulation servers and other practices. **Mr. Hursti testified that these practices drive a hole through the essential cybersecurity foundation requirement of maintaining a "hardened" server** (and associated computers) as well as air gapped secure protection of the system. Without these basic protections, malware can far more easily penetrate the server and the operative BMD system software in turn.

=========

p. 68

Dr. Wenke Lee, the only cybersecurity expert appointed to the Georgia Secretary of State's "Secure, Accessible & Fair Elections Commission," echoed Dr. Stark's opinions in advising the Commission on basic security requirements for voting systems:

> In order to support risk-limited—auditing, paper ballots must be easily and clearly readable and manually countable. In particular, a paper ballot must show each and every vote exactly as cast by the voter. It cannot be just a summary of the votes (e.g., only a tally, or only the presidential ballot and not the down ballots). A manual count absolutely cannot rely upon a barcode, QR code, or any other kind of encoding scheme that is readable only by a machine because the cyber system that reads those codes also can be compromised and lie to the voter or auditor. In short, during a manual review, a human must be able to clearly see evidence of the voter's original act.

Coalition for Good Governance—Marilyn Marks (Marilyn@USCGG.org)          11/27/20